CLEARY GOTTLIEB STEEN & HAMILTON LLP

NEW YORK
PARIS
BRUSSELS
LONDON
FRANKFURT
COLOGNE
MOSCOW

2112 Pennsylvania Avenue, NW
Washington, DC 20037-3229
T: +1 202 974 1500
F: +1 202 974 1999

clearygottlieb.com

D: +1 202.974.1680
msolomon@cgsh.com

ROME
MILAN
HONG KONG
BEIJING
BUENOS AIRES
SÃO PAULO
ABU DHABI
SEOUL

VIA ECF

March 3, 2021

The Honorable Analisa Torres
United States District Judge
Daniel Patrick Moynihan Courthouse
500 Pearl Street
New York, NY 10007

Re: *SEC v. Ripple Labs Inc. et al.*, No. 20-cv-10832-AT

Dear Judge Torres:

On behalf of Defendant Brad Garlinghouse, we write pursuant to Section III of Your Honor's Individual Practices, setting forth the arguments that Mr. Garlinghouse anticipates raising on a motion to dismiss the SEC's first amended complaint (ECF No. 46) ("AC") pursuant to Fed. R. Civ. P. 12(b)(6).

This case represents regulatory overreach, plain and simple. On December 22, 2020, the SEC brought this suit, alleging that Mr. Garlinghouse engaged in a scheme with Ripple Labs Inc. ("Ripple") that allegedly had been taking place right under the SEC's nose since "at least 2013" to continuously and unlawfully sell XRP – which transactions the SEC alleges should have been registered as securities all along under Sections 5(a) and (c) of the Securities Act. AC ¶ 1. The linchpin of the SEC's case is its recent revelation that Defendants' transactions in XRP – a digital asset used to make faster, cheaper, and more efficient payments and money transfers – are and always have been a type of security called an "investment contract" despite the contrary understanding of the XRP market for more than eight years. The SEC's allegations fail for a number of reasons.

First, the SEC fails to recognize the economic realities of Defendants' transactions in XRP, the XRP market, and Ripple's business, each of which exhibit none of the traditional characteristics of an investment contract under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). *Howey* requires the SEC to show, among other things, that Defendants agreed with XRP purchasers to form a "common enterprise" that was dependent upon Ripple's "managerial efforts" for profit. But Mr. Garlinghouse's XRP sales involved no contract of any kind with the buyers, as his sales were done anonymously over an exchange. Nor were the proceeds of Mr. Garlinghouse's sales pooled with other buyers in a common enterprise. And XRP's value historically has not been correlated with Ripple's actions, results, or public announcements, but instead with changes in the value of other digital assets, such as bitcoin and ether, that the SEC has publicly declared are not

securities.[1] Moreover, in 2015 and again in 2020, the Department of Justice and the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") found XRP to be a "virtual currency," requiring Ripple to implement anti-money laundering controls generally not applicable to securities transactions, which it did and continues to do. *See* AC ¶ 379.

Second, not satisfied simply to try to fit the square peg of XRP into the round hole of the securities laws, the SEC has also chosen to target Mr. Garlinghouse with *personally* violating the securities laws – both by selling his own XRP and by allegedly aiding and abetting Ripple's sales. Straining to impose personal liability on an executive like Mr. Garlinghouse for simply doing his job where he reasonably understood that his actions complied with the law represents an abuse of prosecutorial discretion that has sent a dangerous signal to entrepreneurs and will chill innovation.

Effectively conceding the deficiencies in its original complaint, the SEC elected to amend on February 18, 2021 after Mr. Garlinghouse pointed out various defects in the pleadings. These were the exact same defects (among others) Mr. Garlinghouse had already pointed out during the investigative process. The SEC's amended complaint fares no better. The SEC has not adequately alleged that Mr. Garlinghouse *knew or recklessly disregarded* that Defendants' transactions in XRP were investment contracts or that Ripple was somehow acting improperly in selling XRP such that he can be liable for aiding and abetting Ripple's sales. Nor – under Supreme Court and Second Circuit precedent – can the SEC establish that Mr. Garlinghouse's sales and offers of XRP fall within the territorial scope of the Securities Act.

## I. The Amended Complaint Fails to Adequately Allege Scienter, a Necessary Element of the Aiding and Abetting Claim.

The amended complaint purports to allege that Mr. Garlinghouse aided and abetted Ripple's unregistered sales of XRP. While violations of Section 5 do not require a showing of scienter, aiding and abetting does. 15 U.S.C. § 77o(b); *see SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012). The SEC has the burden to demonstrate that Mr. Garlinghouse either knew or recklessly disregarded that he was associating himself with something "improper" and nonetheless "substantially assisted" Ripple in committing that violation. *See SEC v. Espuelas*, 905 F. Supp. 2d 507, 518 & n.5 (S.D.N.Y. 2012) (requiring the SEC to show that defendant knew or recklessly disregarded that the underlying activity was "improper" to prove aiding and abetting a non-scienter violation).

After a 30-month investigation, and after the production of more than 200,000 pages from Defendants and third parties, the best that the SEC can do is allege that Mr. Garlinghouse was generally aware of the risk that some digital assets could possibly be deemed to be securities, but that he worked hard to ensure that XRP did not even appear to have those features. For example, the SEC alleges that Mr. Garlinghouse participated in discussions about "messaging" around XRP to "make sure the verbiage . . . doesn't put us at risk of XRP sounding like a security," AC ¶¶ 407-08, that Mr. Garlinghouse "demonstrate[ed] a keen interest in the regulatory status of digital

[1] Director William Hinman, Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit: Crypto, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418. On a motion to dismiss, the Court may take judicial notice of documents retrieved from governmental websites. *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015).

assets," *id.* ¶ 409, and that Mr. Garlinghouse liaised with various exchanges who sought comfort that XRP was *not* a security as a condition of listing, *see id.* ¶¶ 414-18.

These allegations – which only show the efforts of a prudent executive trying to get it right – do not cut it. The SEC fails even to adequately allege negligence, let alone the far more onerous knowledge or recklessness standard. Alleging that Mr. Garlinghouse was aware of the mere *risk* that a transaction in XRP might be "classified as a security," AC ¶ 420, is a far cry from plausibly alleging that Mr. Garlinghouse *knew or recklessly disregarded* that Defendants' transactions in XRP *were* securities. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (defining recklessness as action entailing "an unjustifiably high risk of harm that is either known or so obvious that it should be known"); *In re Tremont Sec. Law, State Law, & Ins. Litig.*, No. 08 CIV. 11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (defendant's recognition of generalized risks does not constitute recklessness). The SEC has suggested that it would be sufficient to show merely that Mr. Garlinghouse knew that Ripple's offers and sales of XRP were not registered with the SEC. But this theory fails to distinguish between substantially assisting *legal* conduct as opposed to improper conduct, and would essentially transform aiding and abetting into a strict liability offense. *See, e.g.*, *Espuelas*, 905 F. Supp. 2d at 518 & n.5 (even where the underlying violation does not require scienter, in order to establish aiding and abetting, the SEC must show that defendant knew or recklessly disregarded that the underlying activity was "improper").

But it is worse than simply a pleading failure. The SEC's own allegations *demonstrate* that, like the market more broadly, Mr. Garlinghouse was inundated with evidence that Defendants' transactions in XRP were not investment contracts, undermining any suggestion that he understood that he was associating himself with something improper. Right when Mr. Garlinghouse joined Ripple as COO in 2015, the company finalized a public enforcement settlement with the Department of Justice and FinCEN on the basis that XRP was a "virtual currency," in which the Company agreed to undertake remedial steps applicable to currency transactions and inapplicable to securities transactions. AC ¶ 379. Likewise, the SEC alleges that XRP was listed on digital asset trading platforms, some of which have their principal place of business in the United States, and none of which are registered with the SEC. *Id.* ¶ 161. The AC does not allege that these third parties believed that Defendants' transactions in XRP were securities – and consequently that they were violating the law – and there is no reason to believe they did or they were. Now, however, the SEC has determined that in the face of government action and market consensus, Mr. Garlinghouse should have unilaterally reached a different conclusion – that Defendants' transactions in XRP always were investment contracts – and that it was at least reckless for him not to do so. But, under these circumstances – where Mr. Garlinghouse's understanding that Defendants' transactions in XRP were not investment contracts was reasonable based on all available facts and where the applicability of the securities laws to XRP clearly "allow[s] for more than one reasonable interpretation" – "it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).

To sum up: what is fatal to the SEC's aiding and abetting claim is the lack of any plausible allegations that Mr. Garlinghouse's state of mind ever crossed over from general awareness of the risk *inherent in the digital currency space* that a digital asset *could* be classified as a security if certain criteria were met, to knowledge or recklessness that Defendants' transactions in XRP

specifically *were* or *are* investment contracts or that Ripple was somehow doing something wrong. Without this, the SEC's aiding and abetting claim must be dismissed.

**II. The Amended Complaint Fails to Allege that Mr. Garlinghouse's Sales and Offers of XRP Fall within the Territorial Scope of the Securities Act.**

Even if Defendants' transactions in XRP were investment contracts (which they are not), the SEC's allegations regarding Mr. Garlinghouse's personal offers and sales of XRP likewise *still* fail to plead relevant transactions by Mr. Garlinghouse in the United States. This is a critical failure. The registration requirements of Section 5 of the Securities Act apply only to offers and sales of securities *in the United States*, and do not reach offers and sales made on foreign exchanges. *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267-69 (2010) (Congress lacks the power "to regulate foreign securities exchanges"); *see also SEC v. Bio Def. Corp.*, No. 12-11669, 2019 WL 7578525, at *11-13 (D. Mass. Sept. 6, 2019) (applying *Morrison* to Section 5 claim).

Tellingly, the SEC knows the details of Mr. Garlinghouse's XRP transactions perfectly well, and yet nowhere in its 79-page amended complaint did it allege the particulars of even a *single* offer or sale of XRP by Mr. Garlinghouse in the United States. Instead, the SEC alleges merely that Mr. Garlinghouse has "sold over 357 million of his XRP, for approximately $159 million," AC ¶ 183, and that these transactions occurred on "various digital asset trading platforms," including two platforms that were incorporated in the United States, and one with its principal place of business in New York. *Id.* ¶ 186. These vague allegations seek to obscure what the SEC knows but merely hints at with a passing reference to Mr. Garlinghouse's "worldwide" sales. *Id.* ¶ 183. The truth is that the vast majority of Mr. Garlinghouse's XRP sales were made on foreign exchanges, and those transactions do not and cannot violate the federal securities laws. Because the SEC has not identified the offers or sales – if any – that it contends were conducted in the United States and that therefore violated Section 5(a) or (c), it fails to state a claim. *See Sullivan v. Barclays PLC,* No. 13-cv-2811*,* 2017 WL 685570, at *29 (S.D.N.Y. Feb. 21, 2017) (dismissing CEA claim under *Morrison* where complaint made "no allegations concerning the location of the transactions themselves or the structure of LIFFE transactions").

The SEC cannot save its pleadings by arguing that Mr. Garlinghouse's offers or sales are domestic simply because either he or XRP purchasers (the location and identity of which Mr. Garlinghouse was unaware) may have been physically present in the United States at the time of the transactions. *See* AC ¶¶ 185, 187. Second Circuit precedent is clear that a person does not violate the securities laws by engaging in a transaction on a foreign securities exchange merely by being present in the United States at the time. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (finding it insufficient to allege that a U.S. entity "placed a buy order [of a foreign security] in the United States that was then executed on a foreign exchange"). The *Morrison* analysis turns on where securities offerings and sales take place – determined by where they become "irrevocable" – not where the principals of those transactions reside. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012) ("a purchaser's . . . residency does not affect where a transaction occurs . . . ."). For the foregoing reasons, the SEC has failed to allege that Mr. Garlinghouse's sales and offers of XRP fall within the territorial scope of the federal securities laws.

Respectfully submitted,

Matthew C. Solomon

Cc: All counsel (via ECF)