

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

March 10, 2021

**VIA ECF and EMAIL**
Hon. Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   *SEC v. Ripple Labs, Inc.* et al., No. 20-cv-10832 (AT) (S.D.N.Y.)

Dear Judge Torres:

Pursuant to Rules III(A) and III(B)(ii) of this Court's Individual Practices, Plaintiff Securities and Exchange Commission ("SEC") respectfully responds to Defendant Christian A. Larsen's ("Larsen") letter (D.E. 50) ("Letter") setting forth grounds on which he intends to move to dismiss the SEC's First Amended Complaint (D.E. 46) ("Complaint"). Larsen's Letter makes clear that he intends to ask the Court to draw inferences in his favor, ignore the Complaint's allegations, and improperly weigh evidence on a motion to dismiss. *See also* SEC Letter dated Mar. 10, 2021 (D.E. 55) ("SEC Garlinghouse Letter") at 1-2. For these and other reasons, the SEC intends to oppose Larsen's anticipated motion to dismiss.

**I.      The Complaint Adequately Pleads that Larsen's Aiding and Abetting.**

       **A.      The Complaint Adequately Alleges Larsen's Scienter.**

In 2012, two legal memos warned Larsen that XRP could be considered a security if it was offered and sold under certain circumstances and advised him to contact the SEC to seek additional clarity as to whether XRP was a security. ¶¶ 51-53, 55-56.[1]  Larsen did not heed this advice. Instead, he later offered and sold XRP in some of the precise ways the memos had advised him not to do (lest XRP would be a security), and never contacted the SEC staff about his public fundraising activities with respect to or the legal status of XRP. ¶¶ 4, 57-60, 395-98.

The memos also advised Larsen that XRP was likely not a currency for purposes of the federal securities laws because it was not backed by a central government and was not legal tender. ¶ 54. Larsen received similar advice with respect to tax laws from Ripple's accountant in 2013, and again in 2015 from an attorney for an entity working with Ripple to create an XRP denominated-fund, who explained that even "currency" could be sold as a security, ¶¶ 400-01. Moreover, as Larsen has candidly admitted, he willingly undertook the risk that he could be considered the issuer of securities when he was selling XRP, in exchange for XRP that he would later sell for hundreds of millions of dollars. ¶ 53.  Thus, although the SEC need not allege that

---
[1] "¶¶ __" refers to paragraphs of the Complaint (D.E. 46).

Larsen knew or recklessly disregarded *the legal conclusion* that XRP *is* a security as Larsen suggests, *see SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980), *see also* SEC Garlinghouse Letter at 2, n.2, these factual allegations plead precisely that.

Given these facts, Larsen's three arguments as to why the Complaint fails to allege that he acted with scienter are meritless. First, Larsen contends that Department of Justice and Financial Crimes Enforcement Network ("FinCEN") 2015 settlement with Ripple meant XRP was a virtual currency and therefore, presumably in Larsen's view, could not also be a security. Second, Larsen contends he could not have known or recklessly disregarded XRP was a security because the SEC did not "publicly state[ ]" that XRP was a security until the SEC filed this action—but did make statements about other digital assets (namely bitcoin and ether) that allegedly confused Larsen into thinking those statements applied equally to XRP.[2] Finally, Larsen contends that the two legal memoranda he received concluded that "it was very likely" that XRP were not securities.

These arguments implicitly require the Court to rely on one-sided factual assertions as to Larsen's knowledge and belief that are not alleged in the Complaint and then make credibility assessments as to which version of these facts is true. Worse for Larsen, these extraneous facts (which are subject to dispute) could even plausibly support a reasonable jury's conclusion that Larsen did in fact act with the requisite scienter.

For example, the argument that the FinCEN settlement confused Larsen into believing that if XRP is a "currency" it cannot be a "security" (despite direct warnings to the contrary—*e.g.*, ¶¶ 400-401, and despite the fact that the settlement on which Larsen relies itself disclaims that XRP was a traditional "currency") raises several issues of disputed fact and requires credibility assessment that are not proper on a motion to dismiss. It suggests that Larsen had enough understanding of law such that when FinCEN regulated XRP as a "convertible virtual currency" *under Department of the Treasury regulations*, he mistook that as bestowing an exemption from regulation *under the securities laws*. The argument that when certain SEC officials analyzed the applicability of the securities laws to digital assets other than XRP (bitcoin and ether), suggests the same thing—that Larsen's understanding of the securities laws was such that he felt able to apply the official's analysis of the securities laws as to bitcoin and ether to XRP. Importantly, these contentions also raise other questions, such as what the source of this understanding was (such as lawyers or other advisors) and whether Larsen discussed with others—including advisors—these supposed beliefs, or if he was ever pointed in a contrary direction.

---

[2] Larsen's (and Garlinghouse's) citation to *Safeco Ins. Co. Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007) is inapposite. *Safeco* is a case involving the Fair Credit Reporting Act, not the federal securities laws, and it does not support Larsen's argument that the Securities Act's definition of "security" is unclear, Letter at 2. In *Burr*, the Supreme Court noted that it was *not* confronted with "a case in which the business subject to the Act had the benefit of guidance from the courts of appeals or the [regulatory agency] that might have warned it away from the view it took." *Burr*, 551 U.S. at 70. Here, by contrast, there is an "abundance of caselaw interpreting and applying [*SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946),] at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power." *United States v. Zaslavski*y, No. 17 CR 647 (RID), 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018).

These assertions also ignore other applicable legal principles. Larsen's contention that XRP could not be a security ignores that nothing prevents a "virtual currency" from being offered and sold as an investment contract and therefore considered a security under the federal securities laws, as Larsen was informed. ¶¶ 400-01; *see also generally Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets*, 86 FR 3897-01, 2021 WL 136609, at n.4 (Jan. 15, 2021) (nothing in FinCEN proposal intended as a "determination" that a convertible virtual currency "is currency for purposes of the federal securities laws"); *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013) (discussing 31 C.F.R. § 1010.100(m)) (drawing contrast between "virtual currency" and "real currency"). And his contention that he relied on the SEC's actions ignores that the lack of a public statement or act by the Commission does not signify approval of a transaction. *See* 15 U.S.C. § 78z (providing that "[n]o action or failure to act by the Commission . . . shall be construed to mean that [the Commission] has in any way passed upon the merits of, or given approval to, any security or any transaction"). Larsen's argument would read into the Securities Act a pre-enforcement obligation that is not there—that the SEC issue a specific statement as to each violator it investigates before it brings suit.

**B. The Complaint Adequately Alleges Larsen's Substantial Assistance.**

Larsen orchestrated Ripple's initial offers and sales of XRP, then continued to direct and act as one of a handful of key decision makers for Ripple's ongoing offers and sales of XRP. ¶¶ 73, 75, 76. Larsen also directly participated in the offer and sale of XRP by selling his own holdings in the same market and in the same manner as Ripple and by personally promoting XRP to investors. ¶¶ 85, 403. Larsen also negotiated and/or approved various aspects of Ripple's offers and sales of XRP. ¶¶ 100, 101, 110-118, 140, 152, 153, 160, 168, 169, 171-179, 199, 224.

Far from "merely restat[ing] that Mr. Larsen fulfilled his role as CEO," Letter at 3, these facts sufficiently plead that Larsen substantially assisted Ripple's unregistered offers and sales of XRP and thus aided and abetted Ripple's violations because they permit a reasonable jury to conclude that Larsen "participated" in the violation and "wished to bring [it] about." *SEC v. Rio Tinto plc*, No. 17 Civ. 7994, 2019 WL 1244933, at *128 (S.D.N.Y. Mar. 18, 2019). Larsen's attempt to atomize the Complaint into time periods at the pleading stage is improper—though he will be free at the relief stage to argue that his violations were discrete and not continuous.

**II.    Larsen Engaged in "Domestic Transactions" In XRP.**

Like Garlinghouse, Larsen invites the Court to adopt a distorted version of *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), to his own offers and sales of XRP. The Court should reject that invitation for the same reasons it should reject Garlinghouse's.

The Complaint alleges that Larsen, from within the United States, offered and sold XRP through digital asset trading platforms to investors within and outside the U.S., while he engaged in directed selling efforts (including marketing campaigns) in the U.S. and on digital asset platforms located in the U.S. ¶¶ 174-77. Additionally, Larsen (and Ripple) offered XRP for sale on Ripple's website; offered and sold XRP to U.S. purchasers; advertised XRP to potential purchasers both in the U.S. and abroad; answered questions from at least one actual investor

regarding his purchases of XRP; and touted his own XRP sales as recently as September 2020. *E.g.*, ¶¶ 88-89, 179, 207, 218, 246, 265, 300, 346.

When properly applied, *Morrison* and Regulation S issued under the Securities Act of 1933 show that Larsen's domestic offers and sales of XRP are well within the reach of Section 5 of the Act. Larsen's claim that the SEC "fails to allege even *one* [offer or sale] that was completed in the United States," Letter at 4 (emphasis in original), is plainly at odds with the Complaint's allegations (*e.g.*, ¶ 177) and exposes the true thrust of Larsen's motion to dismiss—that the Court usurp the jury's role by weighing evidence at the pleading stage. Allegations that Larsen offered and sold XRP to U.S. purchasers and on U.S. trading platforms more than suffice to satisfy *Morrison* at the pleading stage for the same reasons they do with respect to Garlinghouse. *See Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 66 (2d Cir. 2018) (explaining that a "plausible allegation" of a domestic transaction was "a sufficient basis to resolve the extraterritoriality question at pleadings stage); *see also* SEC Garlinghouse Letter at 3-4.[3]

### III. Monetary Relief for Larsen's Sales from September 1, 2015 Is Proper.

Larsen committed a discrete violation of Section 5 each time he offered or sold XRP without registering the offers or sales with the SEC or qualifying for an exemption from registration. *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1988) ("Each sale of a security, then, must either be made pursuant to a registration statement or fall under a registration exemption."). Larsen's assertion that the statute of limitations for his Section 5 violations begins to accrue on the date of his first offer or sale of XRP is incorrect. For statute of limitations purposes, when a defendant engages in "a series of repeated violations of an identical nature," each instance is "actionable for five years after its occurrence." *SEC v. Kokesh*, 884 F.3d 979, 985 (10th Cir. 2018) (internal quotation marks and citation omitted); *see also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286, 288 n.7 (2d Cir. 2013) (finding it appropriate to "count[ ] each late trade as a separate violation" where defendants perpetrated a late trading "scheme"). The SEC could not have had "'a complete and present cause of action,'" *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (citation omitted), as to Larson's unregistered XRP offers and sales until he made them.[4]

Respectfully submitted,

/s/ Jorge G. Tenreiro

Jorge G. Tenreiro

cc: All counsel (via email)

---

[3] Larsen's citation to *Cavello Bay Reins. Ltd. v. Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (Letter at 4), misses the mark because, among other things, that case involved a private transaction between a Bermuda purchaser and a Bermuda seller of private, restricted securities. There, the Second Circuit concluded that the transactions at issue were not domestic, not based on irrevocable liability as Larsen purports to argue, but on the Court's conclusion that the transactions were predominantly foreign because of the unique facts of that case, not present here.

[4] Here, the SEC only seeks monetary relief for Larsen's offers and sales of XRP starting on September 1, 2015 (five years before the filing of the Complaint plus the time provided for in the SEC's tolling agreement with Larsen).