**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

   v.

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN

                         Defendants,

JORDAN DEATON, JAMES LAMONTE,
TYLER LAMONTE, MYA LAMONTE,
MITCHELL MCKENNA, KRISTIANA WARNER and
ALL SIMILARLY SITUATED XRP HOLDERS,

                      Proposed
                      Intervenors.

---

**MEMORANDUM OF
LAW IN SUPPORT OF
MOTION TO
INTERVENE
PURSUANT TO
FEDERAL RULES OF
CIVIL PROCEDURE 24**

**20-cv-10832 (AT)**

# TABLE OF CONTENTS

**Section**                                                                              **Page**

TABLE OF AUTHORITIES…………………………………………………………………....i

INTRODUCTION…………………..……………………………………………………….1

BACKGROUND……………………………………...……………………………………10

    Examples of Today's XRP Being Utilized With No Connection,
    Reliance or Knowledge of Ripple…………………………………………………15

ARGUMENT…………………………………………………………………….....20

    Grounds for Intervention………………………………………………………21

    Intervention as of Right…………………………………………………………21

        (1) Timeliness of Motion…………………………………………...22

        (2) Protectable Interest…………………………………………...22

        (3) Interest May be Impaired…………………………………….....23

        (4) Interests Not Adequately Represented by the Parties………………………26

    Permissive Intervention…………………………………………………………27

CONCLUSION……………………………………………………………………29

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Brennan v. NYC Bd. Of Educ.*,
    260 F.33d 123 (2d Cir. 2001) ………………………………………...…………21, 22

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
    250 F.3d 171 (2d Cir. 2001)………………………………………………………26

*Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co.*,
    No. 06 CIV. 2875 LAK HBP, 2207 WL 2593000 (S.D.N.Y., Sept. 7, 2007)...…………...21

*Int'l Design Concepts, LLC v. Saks, Inc.*,
    486 F.Supp.2d 229 (S.D.N.Y. 2007)…………………………………………………..22

*MasterCard Int'l Inc. v. Visa Int'l Serv. Assoc., Inc.*,
    471 F.3d 377 (2d Cir. 2006)………………………………………………………..21, 23

*Peterson v. Islamic Republic of Iran*,
    290 F.R.D. 54 (S.D.N.Y. 2013)………………………..………………...…………..21

*R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.*,
    467 F.3d 238 (2d Cir. 2006)…………………………………………………………..21

**Statutes**

15 U.S.C. § 77e(a)……………………………………………………………………..27

15 U.S.C. § 77e(c)……………………………………………………………………..27

**Rules**

FRCP Rule 24(a)……………………………………………………………...1, 21, 29

FRCP Rule 24(a)(2)………………………………………………..………….20

FRCP Rule 24(b)……………………………………………………………1, 29

## INTRODUCTION

Proposed Intervenors ("XRP Holders"), pursuant to Fed. R. Civ. P. 24(a) and (b), seek to intervene in this Securities and Exchange Commission ("SEC") enforcement action. The SEC's stated mission and goals are to protect investors, promote fairness and *share information* about companies…to help investors make informed decisions and invest with confidence.  Instead of protecting investors and sharing information to help investors make informed decisions the SEC knowingly and intentionally caused multi-billion-dollar losses to innocent holders who have purchased, exchanged, received and/or acquired the Digital Asset XRP, including the named Proposed Intervenors, and all others similarly situated.

On December 22, 2020, former SEC Chairman Jay Clayton ("Clayton"), on essentially his last day as Chairman, directed the filing of the most significant SEC enforcement action in modern history, then left the SEC forever. Despite the magnitude and significance of this enforcement action, the SEC's Director of Enforcement, Marc Berger, a few weeks later, also left the SEC forever.  On December 22, 2020, the SEC filed an enforcement action against named defendants Ripple Labs ("Ripple"), along with two of its executives, co-founder Christian Larsen ("Larsen") and CEO Bradley Garlinghouse ("Garlinghouse"). But there is a third unnamed defendant that the SEC essentially sued de facto: all individuals holding the Digital Asset XRP (XRP Holders).  The SEC, in its Complaint against Ripple, made an extraordinary allegation that it lacks good faith to make. Without question or doubt, the SEC could never prove the allegation made against all XRP Holders. That allegation is that today's XRP represents investment contracts under current U.S. Securities laws. Any person attempting to argue that XRP acquired from an exchange is acquiring an investment contract, is a person who lacks fundamental knowledge of both block-chain technology and U.S. Securities law. XRP Holders

are thousands of individuals who have purchased and/or acquired the Digital Asset XRP, not from Ripple or its executives, but from the multiple exchanges that have sold and/or transferred XRP during the last eight years (these exchanges also sell and/or transfer other Digital Assets such as Bitcoin ("BTC") and Ethereum ("ETH") as well as many others).

Strikingly, in its Complaint, the SEC did not limit the claims (as they have in other digital token cases) to specific distributions of XRP directly sold from the defendants during a specific time period (usually, this includes the initial offering of the asset). Instead, the SEC implied that all XRP, including the XRP owned by the Proposed Intervenors, and all others similarly situated, are investment contracts, and thus, unregistered securities. In the SEC's First Amended Complaint, the SEC alleges that "from 2013 **to the present"** Ripple has and continues to sell unregistered securities with the Digital Asset XRP.  By claiming that the XRP sold and/or distributed by Ripple - **in the present day -** are unregistered securities, the SEC is essentially claiming and/or implying that all XRP, including the XRP in thousands of accounts of XRP Holders, many of whom have never heard of the company Ripple, may also constitute unregistered securities.

Prior to filing the action against XRP, Clayton and the SEC was warned by a former chief of the SEC, Joseph Grundfest ("Grundfest") that the mere filing of an enforcement action alleging XRP to be securities would result in unprecedented multi-billions in losses to individual holders of XRP with absolutely no connection to Ripple or its two executives. *Theblockcrypto.com*  Grundfest informed and warned Clayton that the mere filing of the enforcement action almost eight years after XRP had been openly traded on over two-hundred exchanges worldwide would cause the exchanges and market intermediaries to delist and/or halt the trading of XRP. *Id*. Within 48 hours of the SEC's Complaint against Ripple and XRP,

everything Grundfest predicted and warned Clayton about, came true. *Blockchain.news*
Claiming to protect investors, the SEC is seeking $1.3 billion in alleged ill-gotten gains from the
named defendants, but by alleging that today's XRP may constitute unregistered securities, the
SEC caused over $15 billion in losses for XRP Holders. *Hence, the relevant question is who,
exactly, is the SEC protecting by going after XRP?* Why would the SEC make a claim that it
simply cannot prove? Whether the SEC can prove specific distributions by Ripple or its
executives of XRP during a specific time between 2013-2017 constituted sales of investment
contracts, may be an open question, but it would be absurd for the SEC to even attempt to argue
that XRP purchased, **yesterday,** by the Proposed Intervenors from a third-party exchange with
no connection to Ripple, constitute investment contracts, aka unregistered securities.

On January 1, 2021, nine days after the SEC filed its de facto Complaint against XRP
Holders, the Proposed Intervenors filed a Petition for Writ of Mandamus in Rhode Island Federal
District Court, asking the Court to order the Acting Chairman of the SEC to amend the
Complaint to exclude the XRP owned by XRP Holders, and only allege claims the SEC can, in
good faith, attempt to prove. In the pleadings supporting the Writ of Mandamus, XRP Holders
seriously questioned whether any lawyer representing the SEC would appear in open court and
attempt to argue that today's XRP represents an investment contract under the *Howey Test.* In
fact, the Proposed Intervenors openly questioned whether the claim that today's XRP may
constitute unregistered securities was simply a gross error in drafting the Complaint. XRP
Holders believed the SEC, when faced with the Writ of Mandamus, might voluntarily amend the
Complaint excluding today's XRP, and only plead, like it has in the past, specific distributions of
XRP during specific years constituted investment contracts.  Instead of amending the Complaint
to exclude allegations that caused massive losses to XRP Holders, the SEC moved to dismiss the

Writ and continued to allege claims it lacks good faith to pursue by filing its First Amended Complaint - alleging the same present-day language.

On March 5, 2021, the SEC filed a motion to dismiss the XRP Holders' Writ of Mandamus for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  In essence, the SEC filed its motion to dismiss the Writ based on claims of jurisdiction, sovereign immunity, standing, and that the relief sought by XRP Holders involves duties of the SEC that are discretionary in nature.  XRP Holders' response to the motion to dismiss would normally be due on March 19, 2021.  After reviewing the SEC's motion to dismiss and considering the arguments and statements made therein, the XRP Holders have filed, instead, this Motion to Intervene, and have provided notice to the Rhode Island Federal District Court of the withdrawal of the Petition for Writ of Mandamus.

The SEC, in its motion to dismiss the Writ, has made clear that this Honorable Court provides the **exclusive forum** to hear **all matters** related to its enforcement action against Ripple and XRP. The SEC argues "Here, an avenue for judicial review of the Commission's complaint against Ripple clearly exists. The Southern District of New York **will decide** whether the complaint warrants any relief. Thus, the Commission's enforcement proceeding in the Southern District of New York, brought under the Securities Act, supplies the **exclusive** method for testing the validity of the Commission's complaint against Ripple." *See Respondents' Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim Upon Which Relief Can Be Granted, Deaton v. U.S. Securities and Exchange Commission et al., Case 1:21-cv-00001-WES-PAS, Document 11, District of Rhode Island, at page 12. (emphasis added).* Remarkably, the SEC, in its motion to dismiss, not only took zero responsibility for the damages caused by its actions but blamed the exchanges for causing the damages suffered by XRP Holders. *Id.* at 14.

Although Clayton and the SEC were specifically warned by Grundfest that the mere filing of the enforcement action alleging XRP as a security would cause the market intermediaries and exchanges to delist and/or suspend the trading of XRP, thereby causing the price to collapse, resulting in multi-billions in losses, the SEC blamed the exchanges for causing the catastrophic economic harm suffered by XRP Holders. *Id.*

This Honorable Court might be inclined to believe that when XRP Holders claim that it is absurd to allege that today's XRP constitutes investment contracts under applicable U.S. Securities laws and that the SEC lacks the requisite good faith to make such claims, the XRP Holders are engaging in hyperbole. Once the Court understands the current utility, development and technology behind XRP and the XRP Ledger ("XRPL") and becomes aware of the development related to XRP that's completely independent of Ripple and its executives the Court will realize that these statements are not hyperbole. In fact, many of the current uses of XRP that is utilized by XRP Holders are done so without Ripple or its executives' knowledge or awareness.

The XRPL is an open permissionless distributed ledger technology. XRP is the native digital token of the XRPL. Any person, business or entity can access the XRPL from anywhere in the world without Ripple's knowledge or consent. The Digital Asset XRP is often acquired by individuals or businesses who have never heard of Ripple. As discussed later, XRP Holders can establish that the XRP acquired by XRP Holders from sources independent of Ripple, do not rely solely or even partially on the efforts of Ripple and its executives to generate profits or maintain utility. It is well known by the SEC and all parties that if Ripple were to no longer exist, the Digital Asset XRP would continue to be developed and used by hundreds of third-party developers and businesses.

The U.S. Government has already evaluated the Digital Asset XRP and classified it accordingly. The Department of Justice ("DOJ") and Financial Crime Enforcement Network ("FinCEN") classified XRP as a virtual **currency** in both 2015 and 2020, requiring Ripple to register and comply with U.S. Banking laws - not U.S. Securities laws. Moreover, also in 2015, Ripple and the U.S. Government entered into a non-prosecution agreement over XRP. In that agreement, the United States made clear that *"[a]ny sale or transmission of XRP by Ripple Labs or any of its subsidiaries* **shall** *be conducted* **only** *through an entity* **registered with FinCEN**." (emphasis added). The doctrine of equitable estoppel should prevent the SEC from attempting to classify it as a security – years later. The DOJ & FinCEN's classification of XRP as virtual **currency** is consistent with XRP's classification in countries outside the United States. Japan, the U.K., Switzerland, the UAE and other countries have declared XRP **not a security** and is best described as a hybrid digital asset acting as both an exchange token and utility token. *Dailyhodl.com* The U.K.'s Financial Conduct Authority ("FCA") stated clearly that XRP **is not** a security token. *Id.* The World Economic Forum ("WEF") and International Monetary Fund ("IMF") have classified XRP as a **Bridge Asset or Currency** between Central Bank Digital Currencies ("CBDC") or as a bridge currency between sovereign currencies. *Crypto-news-flash.com* **Even more incredible, the incoming SEC Chairman, himself, Gary Gensler, while teaching block-chain technology at MIT and at conferences on economics, has described XRP as a "bridge currency."** *Video Clip of Gary Gensler at the Peterson Institute for International Economics, 2018*

Prior to the SEC's enforcement action, according to Ripple, XRP was traded globally on over 200 exchanges and only 10-20 percent of trading transpired within the United States. For almost eight years the SEC has allowed XRP to be traded alongside other virtual currencies like

BTC and ETH. Although the SEC and Clayton did not publicly declare XRP a non-security like they did for ETH and BTC, its actions, inactions and acquiescence implied that XRP was in fact not a security. As stated, in 2015, FinCEN classified XRP as virtual currency, and the U.S. government entered into a binding agreement with Ripple that Ripple "shall" only register the sales of XRP with FinCEN.  The SEC **now,** however, claims that XRP was not a currency as the U.S. Government declared but an unregistered security in 2015 and continues to be one today. The government should be held to its own contracts and not hide behind intra-government agency ambiguity.

During the time period the SEC claims XRP was an unregistered security, the SEC granted Ripple permission to take a minority stake in the publicly-traded company MoneyGram International ("MGI"). Ripple invested $50 million purchasing approximately 9% of MGI. The SEC approved this purchase of MGI with the full knowledge that Ripple would encourage MGI to use the Digital Asset XRP as a cross-border utility token related to remittances. Hence, the SEC allowed the use of this **so-called illegal security** to be utilized not just by Ripple, but by MGI, as well. The SEC admits to this knowledge when it states that Ripple paid "Money Transmitter significant financial compensation – **often paid in XRP**." *See SEC First Amended Complaint, p. 64 para. 366 (emphasis added).*

The SEC knew that MGI would sell XRP in the Secondary Markets to holders such as the XRP Holders. It appears the SEC, believing XRP to be an unregistered security, provided consent for XRP to be acquired and/or utilized by MGI and then sold in secondary markets to innocent holders with no connection to Ripple or even MGI (purchasers of XRP on exchanges do not know the identity of the seller*). If the SEC truly believed XRP to be an illegal security, why would it allow this transaction to take place?* Even more shocking is that the SEC discussed with

MGI how XRP should be recorded in its financial statements. According to the February 2020 MGI earnings report, after consultation with the SEC, MGI stated it would no longer classify fees from Ripple as revenue but record them as a contra expense. The SEC deep dived into the minutia of a company's quarterly financial statement about how this Digital Asset XRP should be recorded, *but, at no time during this detailed discussion related to XRP and MGI, did the SEC* inform MGI or Ripple that the XRP paid to MGI from Ripple was in violation of U.S. Securities laws.

Possibly even more disturbing than the MGI interaction with the SEC regarding XRP, is the interaction that the SEC had with market-makers and Digital Asset Exchanges regarding XRP as late as 2019.  These exchanges, acting with due diligence and attempting to be good corporate citizens, approached the SEC and inquired as to whether the SEC might consider XRP a security BEFORE these exchanges listed XRP for trading.  With full knowledge that the exchanges were going to list XRP, the SEC refused to provide guidance on the digital asset. The SEC is now blaming those exchanges for the catastrophic losses incurred by XRP holders, including the Proposed Intervenors.. *See Respondents' Motion to Dismiss fat page 14.*

The facts and law are so clear that XRP Holders strongly believe they will be successful at the Summary Judgement stage because no material issue of fact can be disputed regarding the status of **today's XRP**. There is simply no colorable claim that today's XRP represents an investment contract under applicable securities laws. Ripple's Answer to the First Amended Complaint **partially** addresses the issue of today's XRP. Ripple states:

> The Complaint's overreaching allegations have caused harm not only to Ripple, but also to **hundreds of non-parties** that integrate XRP into products or offerings or otherwise support XRP and to **millions of XRP holders**. It is especially important that the Court **rapidly determine** the most consequential and overarching issue: whether Ripple's **current distributions** of XRP are investment contracts under existing U.S. securities

laws.  The answer is a resounding no, and reaching that determination quickly is **urgently** needed to provide clarity to the market.

*Ripple's Answer to First Amended Complaint, p. 8, para. 16. (emphasis added).* Although Ripple may be focused on its own current distributions of XRP and the need for it to have clarity, XRP Holders' interests are not adequately represented as Ripple makes that abundantly clear when it states that "holders of XRP cannot objectively rely on Ripple's efforts." *See Answer of Ripple Labs, Inc. To Plaintiffs First Amended Complaint,* p. 5, para. 10.

It should not be lost on this Honorable Court that the co-founder of Ripple (identified in the SEC's Complaint only as co-founder 2), Jed McCaleb (JM), sells millions of XRP every week. *Coingeek.com* JM has sold billions of XRP continuously for the last several years. *Id*. JM briefly paused his daily or weekly sales of XRP for a couple of weeks immediately following the SEC's filing of the Ripple enforcement action. *Coinnounce.com*  XRP Holders assumed that the SEC must have issued a cease-and-desist letter to JM to stop selling these allegedly unregistered securities. However, that is not the case, as JM has resumed his selling of XRP to any exchange that has not halted XRP. *Beincrypto.com*  ***These exchanges turn around and sell JM's XRP to the same individual investors that the SEC is allegedly attempting to protect from Ripple's sale of XRP***.  The SEC's selective enforcement regarding XRP is wholly inconsistent with U.S. Securities law. Either today's XRP is inherently a security, or it's not. If the SEC is claiming that XRP is only a security when Ripple sells or transfers it directly to a customer, partner and/or exchange (assuming that *Howey* allows the SEC to pigeon hole an asset into a security when it leaves one entity's hand, but then, immediately, is no longer a security, thereafter), then the SEC needs to amend its Complaint and/or provide regulatory clarity and guidance to the market, because, as predicted by Grundfest, the SEC's actions have resulted in possibly the largest economic loss in a non-fraud case in U.S. history.  The SEC's overbroad allegation that Ripple

has engaged in a single eight-year securities offering is such a reckless disregard for the impact that such absurd claims would have on the very investors the SEC is mandated to protect is not only grossly negligent, but shameful.

There is no other remedy available to XRP Holders. As stated, the SEC has declared that this Honorable Court serves as the exclusive remedy "for testing the validity of the Commission's complaint against Ripple." *Respondents Motion to Dismiss at 12*. A vast majority of U.S. exchanges have either delisted or suspended all XRP trading, including, but not limited to, Coinbase, Bitstamp, Binance, Kraken, Bitwise, Simplex, B2C2, Crypto.com, etc. *XRP Holders maintaining accounts with these exchanges, cannot purchase, sell or trade their XRP - unlike the unnamed co-founder (JM) of the very company being sued by the SEC.* In essence, the XRP owned by the Proposed Intervenors, and all others similarly situated, on these exchanges, have become untradeable.

## **BACKGROUND**

Prior to the SEC's enforcement action against Ripple and XRP Holders, XRP was the third-largest Cryptocurrency in the World. It had been traded openly on over two hundred exchanges globally since 2013. *Coindesk.com*

XRP traded on exchanges in line with the two largest cryptocurrencies, BTC and ETH and officials from the SEC, including Clayton, had previously publicly deemed BTC and ETH as non-securities. *Coindesk.com; CNBC.com*

XRP, according to Ripple, is used as a currency by as many as 150 third-party consumers and commercial applications.

Prior to the SEC's enforcement action against Ripple and XRP Holders, the following information and facts were widely known by the Digital Asset industry, the U.S. Government, generally, and the SEC, specifically:

The Head of Asset Management of Signum, a Swiss bank in Singapore, called out to the public to *increase exposure to "the tokens of the future"* and listed those tokens to be "*BTC, ETH, and XRP.*" Signum classified BTC as the future asset for store of value and wealth. It classified ETH as an infrastructure play of the future. It classified XRP as not a security, but as technology of the future regarding *payments*. *Realizing the Future of the Blockchain Economy With Signum Capital*, Asia Blockchain Review, July 21, 2019.

BTC, Cryptocurrencies, Decentralized Finance ("DeFi") and Central Bank Digital Currencies ("CBDCs") was one of the most discussed issues in global finance and money during the three years preceding the enforcement action. *Bloombergquint.com*

The Bank of England had stated that Digital Currencies may replace the banks' role in payments altogether. *LedgerInsights.com*

At the November 2020 G20 Summit, China's President Xi urged world leaders to support CBDCs. *Coingeek.com*

Japan had accelerated a rollout of the Digital Yen and CBDC. *www3.nhk.or.jp*

Canada had announced it would launch a CBDC. *Cointelegraph.com*

The European Central Bank had stated that Europe was losing in the CBDC race and would face significant consequences. *Cryptonews.com*

PayPal CEO Dan Shulman had stated that there was no doubt people flocking to digital currencies and CBDCs will definitely be the future and he had no doubt that CBDCs would be issued directly by the Central Banks to people. *Forbes.com*

The head of one of the largest Japanese Banks had stated that digital currency development was the top priority for trade and finance in Japan. *Coindesk.com*

A top Russian banker publicly declared global payments giant SWIFT would be replaced by digital currencies. *Finance.yahoo.com*

In the last few years, Ripple emerged as the main challenger to SWIFT by offering instant cross-border payments, utilizing XRP. Then Acting Director of the Office of the Comptroller of the Currency (OCC) Brian Brooks publicly stated that the government should utilize existing private companies like Ripple and its technology to replace the SWIFT system. Additionally, Brian Brooks stated publicly that the industry needed clarity and the SEC needed to finally announce whether XRP would publicly receive a non-security declaration similar to the ones provided for BTC and ETH. *Bankingdive.com*

Ripple announced that it intended to leverage its payments platform and the XRPL for delivery of CBDCs.  Garlinghouse publicly stated that Central Banks were looking to issue CBDCs on the XRPL. In fact, Ripple presented a plan to host CBDCs and public and private entities would be able to modify CBDCs according to their needs.

The WEF named XRP as the most relevant cryptocurrency for CBDCs by banks. *Dailyhodl.com*

Ripple's CTO, David Swartz, stated that the XRPL would act as a bridge currency between CBDCs.  But Ripple's CTO is not the only relevant person in this action to describe XRP as a **bridge currency** between CBDCs.  *In an ironic twist of fate, Clayton's appointed replacement as Chairman of the SEC, Gary Gensler, in 2018 (over two years before Clayton directed the filing of this action), at a presentation for the Peterson Institute for International*

*Economics, himself, described XRP as a "**bridge currency**" between two CBDCs*. (emphasis added). *Video Clip of Gary Gensler at Peterson Institute for International Economics, 2018.*

Former CFTC Chairman, Chris Giancarlo, who heads up the Digital Dollar Project for the U.S. Government, publicly stated, in writing, that XRP is not a security. *Cointelegraph.com*

XRP was also declared not a security according to Japan's FSA. *Coindesk.com*

The UK's FCA, unlike the SEC, provided clear guidance to investors and businesses regarding crypto-assets and digital currencies. The FCA stated that crypto fits into several brackets: a) a security token; b) a utility token; and c) an exchange token. A security token is like a stock certificate or debt instrument. It provides title rights to a company. A utility token is designed for a specific purpose. An exchange token is traded on platforms for value in something. The FCA declared XRP to be a "hybrid token" constituting both a utility and exchange token. It **was not** determined to be a security token. *Tokenist.com*

Japan, Singapore, the U.K., Switzerland, and the UAE all declared XRP to be a non-security. *Crypto-news-flash.com*

Ripple partner Xago announced they were utilizing XRP to move money across Africa. *Cryptogazette.com*

London-Based Think Tanks declared that XRP can minimize intermediaries and boost the speed of international payments. *Dailyhhodl.com*

The Office of Monetary & Financial Institutions Forum (OMFIF) produced a report on blockchain technology and the advantages of XRP as an alternative in payments. *Reddit.com*

Bitex, an exchange in the UAE that offers XRP, expanded to India with a wallet trading platform utilizing BTC, ETH**, and XRP**. *Aithority.com*

13

Deel, partnered with Coinbase (which traded XRP), launched a crypto-payroll service that allows international workers to be paid in BTC, ETH, and XRP, allowing near instantaneous withdrawals. In other words, international workers withdraw their paychecks in XRP – *XRP is being used as a substitute for fiat currency. Theblockcrypto.com*

Japanese financial giant SBI sponsored an Esports team and announced it was paying its players not in the Japanese Yen, but in XRP. Like Deel, XRP is being used *as a substitute to fiat currency*. Many U.S. residents watch these tournaments, with 1-6 million viewers watching every tournament video. Another example of U.S. XRP holders witnessing the use of XRP **as** a *payment currency*, not a security. *Cryptopotato.com*

The CEO of Japanese financial giant, SBI Holdings, informed the public that he wanted the next World's Fair in Japan to only accept XRP *as a currency payment*. SBI had also announced plans to test XRP in the $6.6 trillion foreign exchange (Fx) market. The total Fx market, worldwide, is between $1 to $7 quadrillion. *Dailyhhodl.com*

Flare Finance announced that it was opening the DeFi Market to XRP. *Coinspeaker.com*

Ripple had invested in MoneyTap, a subsidiary of SBI, and MoneyTap incorporated XRP. It had been announced that SBI Asia will also use XRP. *Coindesk.com*

Ripple claimed that 20% of transactions on its global network of financial institutions now use XRP and that ODL facilitates cross-border payments using XRP as a *Bridge Currency,* just as Mr. Gensler described it in 2018.

IMF Publications listed two competing digital tokens that can be used as a *Bridge Currency* in international settlements and remittances. Those two tokens are XRP and the JPM Coin. *Medium.com*

DBS, Singapore's largest bank and the sixth-largest bank in the world, declared that XRP is better and faster than SWIFT. *Finews.asia*

DBS launched a digital exchange between four fiat currencies (SGD, HKP, JPY & USD) and the four most established cryptocurrencies (BTC, ETH, XRP and BCH). *Forkast.news*

BitPay launched a massive crypto payment for businesses and 225 countries can now pay in XRP, ETH and BTC. *Ledgerinsights.com*

Belarus' largest bank launched a crypto exchange service to include XRP.

*Cointelegraph.com*

Goldman Sachs' former executive resigned and went to work for Ripple related to Fx markets. As stated, SBI was testing XRP in the Fx Markets and the Global Fx markets equal $1-7 Quadrillion. *Dailyhodl.com*

### Examples of Today's XRP Being Utilized With No Connection, Reliance or Knowledge of Ripple

In addition to this overwhelming evidence demonstrating that XRP is a form of currency and not a security, the following examples constitute a small sample of how the XRP Holders represented in this motion utilize the Digital Asset XRP independent of Ripple and without Ripple's knowledge or permission:  XRP is being used as a form of currency payment at over 500 shopping markets;  for payment related to over 300 internet service providers; for payment at over 60 offline services; for payment at 30 businesses related to tourism, traveling and renting; for payment at over 500 crypto services; or payment at over 150 businesses all accepting XRP as a form of payment according to cryptwerk.com; XRP Holders use an Uphold XRP debit card accepted anywhere a major credit card is accepted and is used to buy everyday items for XRP Holders at Walmart, Amazon, and Target; cars can be purchased using XRP at cryptoemporium.eu; XRP is used as collateral to get a loan at Nexo; XRP is routinely sent to

friends and family in the Philippians, free of charge, without a bank account and is the fastest method at Coins.ph; XRP Holders use a XRP debit card with a 5% cashback in XRP; seven charities recently received XRP all over the world and more than 283,000 XRP were donated by the XRP community (goodxrp.org); St. Jude used XRP Tipbot to donate to their Research Hospital; Developers are Digitizing the entire stock world on top of the XRPL utilizing XRP from RealSologenic (Sologenic to release its XRP Ledger-based DEX before the end of March. (usanewslab.com)); using XRP to Borrow and mint $USDX stable coins in Kava Labs; $Kava CDP and lending in Hard Protocol using a wrapped version of $XRP on Binance Chain $BEP2 XRPB; Minting $FXRP on Flare Networks; On The Chain' YouTube channels are Coil enabled, and receive micropayments of XRP every time a video streams; XRP is used to transfer one's current money from one exchange to another in about three seconds verses going through a bank which takes 3 to 5 days for the money to arrive at the bank, and another 3 to 5 days for funds to settle at the final destination; purchasing a mountain bike on Craigslist and accepting a P2P payment in $XRP over the XRPL; use XRP on TransferGo to send money abroad; in Brazil, XRP is cashed for fiat in ATM's with a debit card; XRP used to bridge currency to move money around to different exchanges like it was designed to do without Ripple's software; used to buy/exchange for metals, stocks, and different assets on Uphold; XRP is used to send money instantly to Thailand to fund a big housing development; XRP is accepted on adult websites as payment along with BTC and ETH; XRP is used for popular NFTs; used when needed to move Value from Exchanges; gaming sector is building games on top of XRPL; XRP is used to pay creators through Coil for a subscription; companies building on and using XRPL include Coil, XRP Labs, and Cinnamon; XRP is stored on Nexo Finance wallet and it gives 4% paid daily just for sitting there, with option able to opt in to include being paid daily in Nexo tokens instead if

preferred; Flare Network accepts XRP in their tip bots; Flare is using XRP for their smart contract platform; XRP Holders purchase anything and everything, from breakfast to a car with P2P transactions; Celsius Network allows XRP to gain interest for being stored on their network; XRP is used between other crypto currencies to exchange and make money rather than lose money through fees; XRP ledger is built for a specific use case-payments, and it has the capability to host a private permissioned ledger (needed for CBDCs); to date, XRP ledger hosts more than 5,000 different ledgers and all can transfer value between them with help of XRP; XRP Holders purchase gold and silver direct (stussiegold.eu/en/ripple); Forte is planning to use the XRPL for in game purchases of swords/armor; XRP Holders pay for VPN (Nord VPN), electronic services with XRP; XRP Holders use XRP as a store of value like BTC; XRP Holders send money back and forth from Mexico; XRP is used to buy IOUs in the XRPL DEX; XRP is used to pay reserve fees in the XRPL; used to make donations; used to activate XRPL addresses; used to claim spark tokens; Developers, writers, engineers, bloggers, and youtubers receive XRP for web monetization payments; Used to mint f-assets (fxrp) on the flare network for use of smart contracts; used to be utilized in lending and borrowing on markets such as Venus Finance platform; being used for NFTs with Gala; XRP holders have a Wirex Card and use XRP to buy food and services wherever Mastercard is accepted; used as collateral on Venus (DEFI) and earn interest at c. 6% in XVS or VAI; one can offer XRP on a ledger nano s; Revolut App uses XRP to pay for groceries in-store; Wieste and XRPL Labs is a prime example of independent developers being able to be built on an open-source public blockchain; before the delisting, XRP would be staked on Crypto.com to earn XRP, with a 4% APY; Flare Finance is launching soon and certain XRP Holders serve as liquidity providers; some collateralize XRP on Kava Labs to mint stable coin USDX and earn rewards for that; some use XRP as collateral on KAVA for the

collateralized debt position (XRPB bridged asset); XRPL has an in-built DEX (Decentralized Exchange) where you can exchange issued tokens; XRP Tipbot is used for giving tips on Twitter; a development on a crowdfunding platform in Luxembourg that uses mainly F-XRP; Digital marketing company accepts XRP as payment for all sorts of digital services, from hosting and web design, to marketing and PR; some staff and freelancers are paid in XRP because there are no international fees; XRP Ledger's built-in decentralized exchange, 24/7 trading of BTC, ETH, XRP, USD, EUR; Goods sold on craigslist and offer-up accept XRP as a form of payment; Xumm Wallet is used to store multiple cryptocurrencies including XRP; FLR Finance beta program uses XRP; XRP is lent on Celsius Network; Mobile.betonline.ag used and accepted XRP as a form of payment in online bets for the Superbowl and even paid betters in XRP when they won; there are literally hundreds of developers and businesses utilizing the XRPL and XRP and the majority of these companies and developers have never had any contact whatsoever with Ripple or its executives; and Linqto, Inc. announced 30 plus people have used XRP to buy Ripple SPVs. *Twitter feed @JohnEDeaton1*

The last example above is maybe the clearest example of the vast difference between XRP and a true security. Linqto is a private company that offers pre-IPO shares of companies for accredited investors. Ripple shares can be purchased by accredited investors through Linqto. Over 30 people have purchased actual shares (i.e. securities) of Ripple and paid for those shares using XRP. **XRP is the currency used to purchase the Ripple securities**. *Linqto.com*

As stated earlier, Ripple and XRP were well known to the government. The SEC could have made the claim against XRP in 2017 when the SEC brought Initial Coin Offering ("ICO") cases against several companies, alleging that the digital token that was being offered constituted an unregistered security. Two of these cases involved the EOS and KIN Tokens. These

companies raised capital by offering ICOs. These tokens were promised by the promoter who received money for that promise. This ICO scenario fits squarely in the four factor *Howey test* of what constitutes a security.  Because these ICOs constituted securities, the SEC shut it down. Ripple and XRP, however, were left alone by the SEC during these high-profile ICO prosecutions. *Why wouldn't Clayton and the SEC file the enforcement action during this period? Why wait until you are walking out the door of the SEC forever?*

The SEC's actions, inactions and acquiescence implied that XRP was in fact not a security. In addition to the SEC's approval of Ripple buying a stake in MGI knowing XRP would be transferred, the OCC, in April 2020, issued a notice to banks in the U.S. that they could custody crypto assets. *Clayton issued a letter that states the SEC agrees with the OCC that U.S. banks can now custody cryptocurrency*. XRP was the third-largest crypto asset when this letter was written. Clayton did not state that he agreed with the OCC with the exception that banks CAN'T custody XRP because they are unregistered securities**.** He never provided a statement that XRP or other Crypto could later be determined a security. Instead, it appeared that the SEC was in full agreement that Banks could custody Crypto. *Clayton never said please be aware that eight months from the date of this letter, on my way out the door, I intend to allege the third-largest crypto asset in the world to be an unregistered security*. No mention of XRP whatsoever.

The SEC's Complaint, as written and alleged, implies that the XRP held in thousands of individual accounts and or digital wallets belonging to innocent holders who have absolutely no connection to Ripple, or its executives, are unregistered securities. In fact, many of these innocent holders, including named Intervenors, and others similarly situated, have never heard of Ripple. The SEC may try and argue that what the Proposed Intervenors are claiming is not a fair reading of the allegations. If true, why did Grundfest warn that the exchanges would delist and/or

suspend the trading of XRP? If it is not a fair reading of the SEC's allegations, then why did the

exchanges delist and/or suspend XRP trading?  Grundfest informed Clayton that he was "aware

of no instance in which the simple announcement of a commission's enforcement procedure has,

absent allegations of fraud or misrepresentation, caused multi-billion-dollar losses of innocent

third parties."  *Theblockcrypto.com*  In the SEC's Complaint, there are no allegations of fraud or

misrepresentation. No exigent circumstance existed. A new administration was less than 30 days

from taking over. *So why did Clayton, Berger and the SEC file this action the way they did and

when they did?* It reeks of politics and appears to be motivated for improper reasons. XRP

Holders explored the improper motives of Clayton in their Writ of Mandamus.  Despite XRP

Holders alleging criminal-like behavior against its former Chairman, the SEC, in its Motion to

Dismiss, doesn't refute the allegations, but simply states that Clayton is not a party to the

litigation. *Respondents' Motion to Dismiss at 4, fn 3.* Since the filing of the Writ, troubling

conflicts of interests have been uncovered regarding the leadership at the SEC that may very well

explain the motivation behind the enforcement action against Ripple and XRP.

Improper motive is not a conspiracy theory espoused only by the Proposed Intervenors or

disgruntled XRP Holders. This appearance of improper motive was not lost on Grundfest. He

informed Clayton that XRP should not receive different treatment from the SEC than ETH was

receiving. Grundfest informed Clayton that "XRP and ETH should be subject to the same

treatment given that the SEC hasn't illustrated a 'material distinction' between the operations of

ETH and XRP that is relevant to the application of federal security laws." *Theblockcrypto.com*

Grundfest, himself, openly questioned Clayton's motives. He stated that the SEC "imposing

security law obligations on XRP while leaving ETH untouched raises fundamental fairness

questions **about the exercise of commission discretion.**" *Theblockcrypto.com* (emphasis added).

## ARGUMENT

Federal Rule of Civil Procedure 24(a)(2) provides in pertinent part:

(a) Intervention of Right.  On timely motion, the court must permit anyone to intervene who:

*******

(2) claims an interest relating to the property or transaction that is the subject of the action and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

**Grounds for Intervention**

Thus, to intervene pursuant to Fed. R. Civ. P. 24(a): "an applicant must (1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties of the action." *R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.,* 467 F.3d 238, 240 (2d Cir. 2006) (quoting *In Re Bank of New York Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003)) (internal quotation marks omitted); *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Assoc., Inc.,* 471 F.3d 377, 389 (2d Cir. 2006). "Failure to satisfy any one of these requirements is a sufficient ground to deny the application." *Id.*  However, denial of intervention is not mandatory if one element is not met. *See Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co*., No. 06 CIV. 2875 LAK HBP, 2007 WL 2593000, at *2 (S.D.N.Y., Sept. 7, 2007) (noting that the test is flexible and courts generally look at all four factors rather than focusing narrowly on anyone).

Whether a party may intervene is left to the Court's sound discretion. *Brennan v. New York City Bd. Of Educ.,* 260 F.3d 123, 128 (2d Cir. 2001). "Courts typically consider the same four factors whether a motion for intervention is 'of right' under Fed.R.Civ.P 24(a), or 'permissive' under Fed. R. Civ. P. 24(b)." *Peterson v. Islamic Republic of Iran,* 290 F.R.D. 54, 57 (S.D.N.Y. 2013).

Proposed Intervenors, as XRP Holders, and all others similarly situated, satisfy all four of the criteria for Intervention as of Right.

### *Intervention as of Right*

**(1) Timeliness of Motion**

The court should grant the motion to intervene because the motion for intervention was timely made.  The motion was made as soon as possible after discovering the existence of the Complaint filed by the SEC and after receiving the SEC's motion to dismiss Proposed Intervenors' Writ of Mandamus. In fact, Proposed Intervenors have withdrawn their Petition for a Writ and seek intervention for the sake of judicial economy.  The proposed intervention is timely as it even meets the current deadline set by the Court to amend in new parties.  The scheduling order in the present action provides that additional parties may be added within thirty days of February 15. Hence, the deadline to add additional parties is March 17, 2021.

By meeting the current deadline of the Court's scheduling order, this motion to intervene is on its face, timely. *See e.g., Int'l Design Concepts, LLC v. Saks, Inc.,* 486 F.Supp.2d 229,234 (S.D.N.Y. 2007) (motion to intervene filed more than one year after the second amended complaint was timely where delay caused no prejudice to parties). The first pretrial hearing on this case was February 22, 2021, less than 30 days from the timing of Proposed Intervenors' intervention motion. There is no delay and no prejudice to the parties.

**(2) Protectable Interest**

As cited above, to intervene, a party must also show a cognizable interest in the action. "For an interest to be cognizable under Rule 24(a)(2), it must be direct, substantial, and legally protectable." *Brennan,* 260 F.3d at 129. XRP Holders are entitled to intervene in this action as a matter of right because they have a legally protectable interest in the subject matter of this action. Proposed Intervenors, as holders of XRP, and all others similarly situated, have a direct, protectable interest in this action because they own the very property and asset in question. In fact, the SEC claims that XRP is a security. A security, by definition, entitles the holders to certain legal rights (ownership, IOUs, options, profits, voting rights, etc).  XRP Holders are entitled to intervene in this action as a matter of right because they have a legally protectable interest in the subject matter at hand – the Digital Asset XRP, which was negatively impacted when the SEC knowingly, intentionally and/or recklessly caused multi-billion-dollar losses to innocent XRP Holders who have purchased, exchanged, received and/or acquired the Digital Asset XRP, including Proposed Intervenors, and all others similarly situated, when the SEC's enforcement action essentially qualified all present-day XRP as unregistered securities. Accordingly, Proposed Intervenors "assert an interest relating to the property or transaction that is the subject of the action." *MasterCard Int'l Inc*., 471 F.3d at 389.

**(3) Interest May be Impaired**

XRP Holders' interests in the action will be substantially impaired or impeded if they are not allowed to intervene. Ripple's lawyers, as well as the lawyers representing Garlinghouse and Larsen owe no ethical, legal or representative duty to XRP Holders. In fact, this lack of obligation, lack of duty, and lack of representation of the interests to XRP Holders and Proposed Intervenors is an essential and integral element of their defense. Ripple and its executives owe no duty or obligation to XRP Holders, including Proposed Intervenors. A review of Ripple's

pleadings, thus far, demonstrate and magnify this point.  Ripple's Answer makes it very clear

that "Ripple has no explicit or implicit obligation to any counterparty to expend efforts on their

behalf; proceeds of XRP sales are not pooled in a common enterprise; **and holders of XRP**

**cannot objectively rely on Ripple's efforts**." *Answer of Defendant Ripple Labs, Inc. To*

*Plaintiffs First Amended Complaint,* page 5, para. 10 (emphasis added).  This language, by

Ripple, could not be any clearer. XRP Holders are not Ripple shareholders. As stated, a

significant percentage of XRP Holders have never even heard of the company Ripple Labs.

When XRP Holders acquired XRP, they did not rely on any efforts made by Ripple, and during

this lawsuit, cannot rely on the efforts of Ripple or its counsel. As a result, while Ripple, Larsen

and Garlinghouse are represented in this action, XRP Holders have no legal representation of

their own. Ripple's lack of duty to XRP Holders is replete, both explicitly and implicitly,

throughout Ripple's Answer to the Complaint but also inextricably intertwined and integrated in

its defenses. Ripple makes clear that XRP "categorically differs from the various instruments and

business arrangements that Congress authorized the SEC to regulate – all of which, **unlike**

**Ripple's relationship to XRP holders**, involve 'schemes devised by those who seek the use of

the money of others on the promise of profits.'" *Answer of Defendant Ripple Labs, Inc. To*

*Plaintiffs First Amended Complaint,* page 7, para. 14 (emphasis added).  Ripple makes clear that

it "never held an ICO, never offered future tokens to raise money, and has no contracts with the

vast majority of XRP holders." *Id.* Not only are there no contracts between Ripple and the XRP

Holders, including Proposed Intervenors, and all others similarly situated, there is absolutely no

privity between XRP Holders seeking intervention and Ripple, Garlinghouse or Larsen. Many

XRP Holders, including Proposed Intervenors, and all others similarly situated, have no clue who

these defendants are because they acquired their XRP from independent market intermediaries

such as the exchanges previously identified. This is an important distinction because Ripple must defend its own distribution of XRP and states that "it never offered or sold investment contracts in its distributions of XRP." *Id.* at 10, para. 10. Ripple's lawyers cannot be expected to focus their attention on distributions of XRP made by entities not associated with their clients. Ripple's lawyers will be focused on Ripple sales of XRP, not sales of XRP offered by Coinbase, Uphold, Kraken, Binance or any other non-related third-party. Ripple's defense will be focused on its own direct transactions. For example, Ripple "specifically denies that its sales of XRP were intended to, or did, incentivize buyers to realize a 'guaranteed profit,' and further denies that its sales of XRP could have provided a 'guaranteed profit,' given that Ripple could not control movements in the market price of XRP following its sales." *Id.* at 30, para. 109.  Hence, Ripple and its lawyers must focus on its direct sales of XRP. XRP Holders, including Proposed Intervenors, and all other similarly situated, did not purchase or acquire XRP from Ripple, Garlinghouse or Larsen.

The SEC seeks to recover $1.3 billion in alleged damages through disgorgement and other available remedies.  Of course, according to Ripple, the SEC's own conduct has caused approximately $15 billion in losses to XRP Holders. Part of the Relief that was sought in XRP Holders' Writ of Mandamus was an Order requiring any and all funds collected by the SEC from a settlement with the defendants or from a judgment against the defendants, be placed into a constructive trust for the benefit of XRP Holders who have been economically damaged.  Instead of agreeing that the actual XRP Holders, who the SEC allegedly filed the case on behalf, would receive the funds, if any, the SEC not only moved to dismiss the Writ, but implied that XRP Holders should seek any redress from the exchanges that delisted or suspended XRP. *See Respondents Motion to Dismiss*, *at 14*. Grundfest warned Clayton and the SEC that the

exchanges would likely suspend trading of XRP out of fear of running afoul of securities laws and be faced with their own SEC enforcement action. *Somagnews.com* Clearly, the SEC is not interested in protecting the interests of XRP Holders, and, thus, the disposition of this action may harm or impeded their interests.

### (4)  Interests Not Adequately Represented by the Parties

Finally, intervention as of right is appropriate because Proposed Intervenors' interests are not adequately represented by the existing parties in this action. "[T]he burden to demonstrate inadequacy of representation is generally speaking minimal." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001) (internal quotations omitted). XRP Holders easily satisfies this minimal standard.

The existing parties in this action do not adequately represent XRP Holders' interest in the action because legal counsel for Ripple, Larsen and Garlinghouse have no ethical responsibility to XRP holders. *Consider the fact that although the shared interests of Ripple and these two executives are clearly intertwined, they have separate legal counsel to represent their independent interests.* The lack of ethical responsibility to XRP holders stems from a conflict-of-interest that is present if Ripple's counsel even attempted to represent the interests of both holders of XRP and Ripple. It would be antithetical for Ripple's counsel or counsel for Garlinghouse or Larsen to attempt to represent the interests of XRP Holders. *In fact, it is an essential integral part of the defense to demonstrate that these defendants owe no duty and have no obligation to XRP Holders, including Proposed Intervenors, and all others similarly situated.* Clearly, the SEC's interests and the interests of XRP Holders are at odds with each other. It is the conduct of the SEC, not Ripple or its two executives, that caused $15 billion in losses to XRP Holders. The SEC seeks to have defendants disgorge all alleged ill-gotten gains obtained from

their continuous sales of XRP, pay prejudgment interest thereon, impose civil monetary penalties on the defendants, and permanently enjoin them from future violations of securities laws (i.e. possibly prevent the future sales of the 55 billion XRP Ripple holds in escrow). First, the $1.3 billion in damages sought by the SEC does not come close to making XRP Holders whole. Second, if the SEC did recover any funds from these defendants, at this point, it's clear that the SEC will not act in the interests of XRP Holders. XRP Holders need independent representation.

### *Permissive Intervention*

In the alternative, if XRP Holders' motion for intervention as of right is denied, Proposed Intervenors should be allowed permissive intervention in this action. The claims that XRP Holders desire to assert in this action, if permitted to intervene, share both common questions of law and fact. Specifically, this action concerns, in part, whether XRP is an unregistered security in its present state. If XRP qualifies as a security, it would be subject to Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act" [15 U.S.C.  §§77e(a) and 77e(c)].  Since the SEC alleged XRP is a security and was subsequently delisted and suspended by various exchanges, the XRP in the accounts of XRP Holders has significantly depreciated in value and continues to be suppressed by the very existence of this enforcement action. The questions posed by the claims brought by XRP Holders are sufficiently common to justify intervention because XRP was distributed by Ripple and other exchanges. In fact, Ripple sold XRP to various exchanges who in turn sold XRP to the Proposed Intervenors and all others similarly situated. In fact, according to the SEC's Complaint, Ripple paid market development fees to MoneyGram in the form of XRP; and, MoneyGram, in turn, sold that XRP to the exchanges; who, in turn, sold that XRP to XRP Holders, including to the Proposed Intervenors, and all others similarly situated. Because various exchanges were also distributing XRP, many holders had no prior relationship

or knowledge of Ripple. When a purchaser buys XRP on an exchange they do not know who or where that XRP is from.  Regardless, whether XRP is a security or a currency will significantly impact the value of XRP held by individuals with no ties to Ripple or its two executives. Currently, the interests of XRP Holders are not represented in this action.

Judicial economy will be served by allowing intervention because the legal arguments, witnesses and theories are the same. In contrast, adding XRP Holders and their claims to the current suit would not substantially delay the trial or prejudice any party. In fact, granting the XRP Holders' Motion to Intervene will cause no delay. The Court has only held the first February 22, 2021 pretrial conference thus far. The factual issues are identical, and only the legal rights that flow from the facts are disputed. If granted leave to intervene, counsel for the Proposed Intervenors will significantly contribute to the full development of the underlying factual issues in the case to the just and equitable adjudication of the legal questions presented.

## CONCLUSION

The SEC could have addressed the issues raised by the Proposed Intervenors in their Writ of Mandamus regarding the classification of present day XRP held by the thousands or millions of XRP Holders with no connection to Ripple or its two executives. Instead, the SEC deferred those issues and the classification of present day XRP for this Honorable Court to decide. The SEC has already invoked the jurisdiction of this Court as the **exclusive** Court governing all remedies available to XRP Holders. *See Respondents Motion to Dismiss at 12.* "The [SDNY] will decide whether the complaint warrants any relief. Thus, the Commissions enforcement proceeding in the [SDNY]…supplies the exclusive method for **testing the validity** of the Commission's complaint against Ripple." *Id.*

Essentially, it appears that, at best, the SEC has essentially filed a declaratory judgment asking the Court to decide whether XRP is equivalent to an investment contract. When you consider the significance and magnitude of this enforcement action and how and when it was filed along with the Grundfest letter and the knowledge of the catastrophic economic destruction that would ensue, it is difficult to not believe that malfeasance isn't at hand.  But, regardless of motives, it is urgent that not only the current distributions of XRP from Ripple be rapidly addressed by this Court, but it is imperative that the entire current status of today's XRP be addressed and determined by this Honorable Court.

For the foregoing reasons, XRP Holders respectfully ask that they be allowed to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a), or, in the alternative, should be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(b).

Dated: March 14, 2021                                    Respectfully Submitted,

John E. Deaton, Esq.
THE DEATON LAW FIRM
450 North Broadway
East Providence, R.I. 02914
Tel: (401) 351-6400
Fax: (401) 351-6401
Email: all-deaton@deatonlawfirm.com
Attorney for Proposed Intervenors