

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

March 17, 2021

**VIA ECF**
Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 219
New York, N.Y. 10007

Re:   *SEC v. Ripple Labs, Inc.* et al., No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Plaintiff Securities and Exchange Commission ("SEC") respectfully requests that the Court deny the letter motion by Defendants Christian A. Larsen ("Larsen") and Bradley Garlinghouse ("Garlinghouse") (together, "Individual Defendants") to quash subpoenas relating to their financial condition (D.E. 59) ("Letter"). The financial records (which the SEC has previously offered to limit as described below) directly relate to several elements the SEC must prove to prevail in this action.

I.      **Introduction**

The SEC's Complaint alleges that, in an unregistered offering of securities, Individual Defendants obtained at least $600 million of investor funds from selling a digital asset security called XRP, while orchestrating defendant Ripple Labs, Inc.'s ("Ripple") sales of another $1.4 billion of XRP. The SEC asserts two claims against Individual Defendants: violations of Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e, as to their unregistered offers and sales of XRP, and aiding and abetting Ripple's violations, which requires proof of knowing or reckless conduct (scienter). At the heart of these claims is the SEC's contention that XRP are "investment contracts" and therefore securities, which requires an investment of money into a common enterprise with a reasonable expectation of profits from the efforts of others, under *SEC v. W.J. Howey & Co.*, 328 U.S. 293 (1946).

The SEC seeks financial records for at least three relevant reasons. First, because XRP transactions appear as pseudonymous transactions on a blockchain, Individual Defendants' bank records are the only reliable way to de-anonymize their movements of XRP and determine exactly how much they raised from their XRP sales to the public. Second, the SEC anticipates that financial records will show whether Individual Defendants personally funded efforts to increase the value of XRP, which is relevant to the "efforts of others" prong of the *Howey* test. Finally, financial records will show how much Defendants—who insist they had no idea their conduct was wrongful—enriched themselves relative to other income, which bears on the powerful, personal financial motivation they had to look the other way when confronted with the legal consequences of their conduct.

The SEC is not seeking records of how much money is "spen[t] at the grocery store every week," Letter at 2, and is willing to have Individual Defendants redact transactions of less than $1,000. Nor is this a "fishing expedition." *Id.* at 3. The financial records the SEC seeks are relevant, Individual

Defendants do not claim the requests are burdensome, and, to the extent Individual Defendants have a privacy interest in the records, the Protective Order in this action (D.E. 53) will protect that interest. That Individual Defendants enriched themselves with hundreds of millions from the public and now seek to shield their financial records from the SEC and the Court (casting requests for them as "trolling" and a "fishing expedition") is troubling. Their motion to quash should be denied.

## II.    Relevant Factual Background

XRP is the digital token native to Ripple's blockchain (the "XRP Ledger") and can be freely transferred among blockchain users (without the need for a central counterparty) in transactions that appear pseudonymously on the XRP Ledger. The XRP Ledger contains public information showing the amount of XRP moved between digital addresses, but, unlike bank accounts, digital wallets can be created without providing any identifying information.

In 2012, the XRP Ledger's creators generated a fixed supply of 100 billion XRP. Later, Ripple's founders, including Larsen, agreed that 80% of all XRP would be contributed to Ripple, while the founders would divide the remainder among themselves. Larsen's individual XRP holdings at the time of Ripple's inception totaled 9 billion XRP, which he viewed as "comp[ensation] for founders personally assuming th[e] risk" that they could be considered the issuers of XRP. *See* Ex. A.

Starting in 2013, Larsen, as Ripple's CEO, began orchestrating Ripple's sales of XRP to public investors and, soon thereafter, began selling some of the nine billion XRP that Ripple had awarded him. Since 2013, Larsen has directly transferred at least 7.1 billion XRP by moving the XRP from 28 blockchain addresses on the XRP Ledger in 535 transactions to 101 blockchain addresses on the XRP Ledger (that the SEC has so far been able to identify) and since 2015, Larsen has sold at least 1.7 billion XRP, ¶ 91,[1] netting him at least $450 million in investor proceeds. ¶ 175. But these transactions are pseudonymous, and Larsen can hide their full extent from the SEC. Indeed, the SEC has obtained evidence showing that Larsen appears to continue moving his XRP using pseudonymous, cross-border blockchain transactions since the filing of this case.

Starting in 2015, Garlinghouse, as Ripple's chief operating officer and later CEO, also directed Ripple's sales of XRP and, starting in 2017, personally pocketed over $159 million for his own sales of XRP. Since 2017, Garlinghouse has directly transferred at least 636 million XRP from 17 blockchain addresses in 115 transactions to 25 blockchain addresses on the XRP Ledger (that the SEC has so far been able to identify) and has sold at least 357 million XRP. ¶ 183.

Though Individual Defendants have not produced a single document to the SEC in this litigation— about XRP sales or otherwise—both identified in the SEC investigation transactions using unhosted wallets (that is, blockchain addresses that only they control), and the SEC has discovered that at least Larsen has used other intermediary and custodial wallets at offshore digital asset platforms.

Individual Defendants sold XRP while touting their efforts to achieve widespread adoption of XRP to increase its price and value. *E.g.*, ¶¶ 243-89. As part of these efforts, Larsen personally funded the creation of an organization that he and Ripple used to further distribute and sell over 693 million XRP to investors. *See* Ex. B; ¶¶ 136-46, 170. Garlinghouse, meanwhile, stated he was "very long" XRP as he was pseudonymously selling millions into the market. *See* ¶¶ 7, 321, 380-81.

---

[1] "¶ __" are references to paragraphs in the SEC's First Amended Complaint (D.E. 46).

## III.    The Document Requests and Subpoenas

The SEC served document requests on Individual Defendants, Letter Exs. A-B, and subpoenas on the banks it has so far been able to identify, *id.* Exs. C-H, seeking certain financial information about Individual Defendants (the "Requests"). The SEC agreed to narrow the Requests to documents sufficient to show Individual Defendants' financial condition at the time of their receipt and sales of XRP—which does not appear in Individual Defendants' Letter. *See* Ex. C at 3. The SEC further explained that it is not interested in details of Individual Defendants' financial affairs beyond establishing the net proceeds of their XRP sales, the relative importance of the sales to their income, and their use of XRP investor funds. *Id.* Individual Defendants have refused to provide any records other than unspecified, self-selected "trading records relating to the sales of XRP." Letter at 2.[2]

## IV.    Argument

Absent proportionality concerns not at issue here, discovery is proper as to any "nonprivileged matter that is relevant to any party's claim or defense," regardless of admissibility at trial. Fed. R. Civ. P. 26(b)(1). This standard "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citation omitted). The party resisting discovery must show why the requests are not proper and cannot do so with "[g]eneral and conclusory objections as to relevance, overbreadth, or burden." *Harris v. Bronx Parent Hous. Network, Inc.*, No. 18 Civ. 11681 (SN), 2020 WL 763740, at *2 (S.D.N.Y. Feb. 14, 2020) (citation omitted).

### A.    Defendants' Financial Condition Is Critical to the Claims and Defenses Here.

*Full Extent of XRP Sales.* Under Section 5, "[e]ach sale of a security . . . must either be made pursuant to a registration statement or fall under a registration exemption." *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). Accordingly, the SEC needs Individual Defendants' bank records to establish their illegal sales of XRP. Bank records are the simplest and most reliable way to de-anonymize Individual Defendants' XRP transactions: they must eventually convert XRP into fiat currency that appears on their bank records, because XRP is not legal tender and is not universally accepted for goods and services. Without the bank records, the SEC would have to take Individual Defendants at their word, particularly as the SEC has already had to "manually" trace the Individual Defendants' transactions since they last provided data, with no guarantee that the SEC has been able to identify the complete universe of their sales and blockchain movements of XRP. *See Zietzke v. United States*, 426 F. Supp. 3d 758, 766 (W.D. Wash. 2019) (refusing to quash subpoenas to digital asset trading platforms and concluding the IRS "is not required to rely on [p]etitioner's claim that he has provided the agency with everything it needs to know"); *Kinseth v. SEC*, No. 09 Mc. 87, 2009 WL 4110209, at *3 (N.D. Iowa Nov. 24, 2009) (refusing to quash subpoenas to banks for records and noting "the SEC is not required to take [defendant's] word" that he had produced all the records).

---

[2] Among other things, the SEC seeks disgorgement and civil penalties against Individual Defendants, for which their financial condition and the net profits of their sales are relevant. *See, e.g., Liu v. SEC*, 140 S. Ct. 1936, 1946 (2020) (disgorgement requires calculating "net profits"); *SEC v. Rajaratnam*, 918 F.3d 36, 45 (2d Cir. 2019) ("We thus have no hesitation in concluding that, in calculating the size of a penalty necessary to deter misconduct, the extent of a defendant's wealth is a relevant consideration."). In the punitive damages context, where financial condition is also relevant, *e.g., Queenie, Ltd. v. Nygard Intern.*, 321 F.3d 282, 290 (2d Cir. 2003), discovery proceeds as to these facts without a *prima facie* showing of liability. *See Baykeeper v. Kramer Metals, Inc.*, No. 07 Civ. 3849, 2009 WL 10671577, at *4 (C.D. Cal. Feb. 27, 2009) (collecting cases). The SEC is entitled to discovery as to Individual Defendants' financial condition on this basis alone.

*Whether XRP Are "Investment Contracts."*  The *Howey* test asks whether a promoter offered an investment of money into a common enterprise while fueling a reasonable expectation of profit based mostly on the promoters' efforts.  328 U.S. at 301; *see also* Individual Defendants' Pre-Motion to Dismiss Letters dated Mar. 3, 2021 (D.E. 49, 50) ("Pre-Motion Letters") at 1 (disputing whether XRP meets *Howey* test).  The SEC anticipates that Individual Defendants' financial records will show the extent to which they personally funded these efforts.  The Complaint alleges and evidence shows that at least Larsen engaged in such efforts using his XRP.  ¶¶ 136-46, 170; Ex. B.  Individual Defendants' contention that the "SEC is seeking information to support a theory not alleged in its Complaint," Letter at 3, is therefore incorrect.[3]

Accordingly, in *SEC v. Telegram Grp., Inc.*—a non-fraud case in the digital asset context also involving a claim under Section 5, but not aiding and abetting claims that require proof of scienter—Judge Castel compelled defendants to produce their bank records.  No. 19 Civ. 9439 (D.E. 67) (S.D.N.Y. Jan. 13, 2020); *see also id.* (D.E. 52) at 4-5 (explaining relevance of bank records to *Howey* test). Individual Defendants attempt to distinguish *Telegram* by noting, without citing any authority, that "[p]ersonal financial records are obviously of a different character." Letter at 4.  This is a "[g]eneral and conclusory objection" of the type this Court has rejected.  *Harris*, 2020 WL 763740, at *2.

*Individual Defendants' Scienter.*  The SEC has developed evidence that Individual Defendants were repeatedly warned—but purposefully ignored—that XRP could be securities, whose offering required registration with the SEC.  *See* ¶¶ 51-60, 395-427.  Meanwhile, Individual Defendants insist that the SEC cannot prove scienter and that they acted in good faith.  *E.g.*, Pre-Motion Letters at 3.

Understanding what proportion of Individual Defendants' income was comprised of proceeds from XRP sales could help a fact-finder decide which version of events to credit.  The existence of a concrete personal financial benefit is highly relevant circumstantial evidence of a reason to act wrongfully.  As Judge Wood explained in permitting the SEC to introduce evidence at trial to show the total *proportion* of income derived from the charged transactions, a defendant "may well have been inclined to protect one of its major revenue streams and thus ignore or conceal potential wrongdoing related to its sale of . . . securities." *SEC v. Am. Growth Funding II, LLC*, No. 16 Civ. 828, 2019 WL 1748186, at *4 (S.D.N.Y. Apr. 19, 2019); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (noting that "personal financial gain may weigh heavily in favor of a *scienter* inference"); *SEC v. eSmart Techs.*, No. 11 Civ. 895, 2013 WL 12333681, at *2 (D.D.C. Oct. 24, 2013) (granting SEC motion to compel bank records as relevant to scienter).  Individual Defendants offer not to argue that their sales of XRP were insignificant sources of income, but the SEC is entitled to explain *just how significant* those sales were to their bottom lines.[4]

---

[3] Rule 26(b)(2)'s "focus does not mean that a fact must be alleged in a pleading for a party to be entitled to discovery of information concerning that fact.  All it means is that the fact must be germane to a claim or defense alleged."  6 Moore's Federal Practice § 26.42 (citation omitted).  Nevertheless, most of Individual Defendants' arguments in seeking to quash are based on this erroneous premise—that to be discoverable, the information sought must be charged in the Complaint (which, in any event, it is here).  *See, e.g.*, Letter at 1, 2 (proposing to limit discoverable information to "the challenged transactions"); *id.* at 2 (noting supposed lack of "allegations that the . . . Defendants' personal finances were intermingled with those of [Ripple]"); *id.* at 4 (noting "an allegation that is not . . . made here" as to Individual Defendants' movement of assets).

[4] *Shemian v. Rsch. In Motion Ltd.*, 570 F. App'x 32, 35 (2d Cir. 2014), Letter at 3, concerns the Private Securities Litigation Reform Act's pleading standards and explains that an executive's desire to achieve *corporate* welfare is insufficient to allege motive—it says nothing about the probative value of *personal* financial gain to motive.

Moreover, evidence of *how* Individual Defendants handled the hundreds of millions of dollars they obtained from public investors may help a fact-finder determine whether they in fact acted with the innocent belief that their actions were above reproach. *See, e.g.*, *SEC v. Lipkin*, No. 99 Civ. 7357, 2006 WL 435035, at *1 (E.D.N.Y. Jan. 9, 2006) ("[S]ubstantial efforts the defendants took to hide the proceeds they received from the scheme through offshore bank accounts" showed "a high degree of scienter."); *United States v. Lindsey*, No. 91-5727, 1992 WL 224496, at *1, 4 (6th Cir. Sept. 14, 1992) (evidence that defendant attempted to "ma[k]e himself judgment-proof by placing his assets in the names of others and by moving his assets overseas" was relevant to showing intent). The full extent of Garlinghouse's sales of XRP while claiming he was "long" the asset is particularly relevant to his claim that he acted innocently while engaging in XRP sales.

Finally, Individual Defendants incorrectly contend that the SEC seeks "indiscriminate discovery," Letter at 3, and cite inapposite cases to do so. *Morelli v. Alters*, Letter at 3, involved a dispute over a "single loan" between the parties and a request for financial records covering seven years after the loan was made. No. 19 Civ. 10707, 2020 WL 6508858, at *6 (S.D.N.Y. Nov. 5, 2020). Meanwhile, this case involves possibly hundreds of transactions by each Individual Defendant over only the years covered by the Requests. *Solow v. Conseco, Inc.*, Letter at 3, is even further afield, as it involved a subpoena for financial information *about a third party*—the plaintiff's direct competitor, not the defendant. No. 06 Civ. 5988, 2008 WL 190340, at *5 (S.D.N.Y. Jan. 18, 2008). Finally, in *Arias-Zeballos v. Tan*, Letter at 4, 5, the court had stricken the plaintiff's claim relating to the purchase of certain real estate and therefore quashed subpoenas for financial documents evidencing the stricken transaction. No. 06 Civ. 1268, 2007 WL 210112, at *1 (S.D.N.Y. Jan. 25, 2007).

### B.   Defendants Cannot Show the Requests Are Improper.

To be sure, financial records—like many other documents turned over in discovery—are sensitive, and litigants would prefer to keep them private. But "the fact that sensitive information is involved in litigation gives a party neither an absolute nor automatic right to have the discovery process hindered." *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 72-73 (S.D.N.Y. 2010) (citation omitted). Rather, courts enter protective orders—such as the one Judge Torres entered here (D.E. 53)—to address privacy concerns. *See id.* (collecting cases); *see also Ladson v. Ulltra East Parking Corp.*, 164 F.R.D. 376, 377 n.2 (S.D.N.Y.1996) (noting that legitimate privacy concerns about documents are appropriately addressed through a protective order).

And though Individual Defendants refer to California's right of privacy, they "cite[ ] no decisions suggesting that California state privacy interests are a valid basis to quash a federal subpoena, and for good reason: that is not the law in federal court." *In re Rule 45 Subpoena Issued to JP Morgan Chase Bank, N.A.*, 319 F.R.D. 132, 134 (S.D.N.Y. 2016) (citing *Conopco, Inc. v. Wein*, No. 05 Civ. 9899, 2007 WL 2119507, at *2 (S.D.N.Y. July 23, 2007) ("[E]ven the confidentiality of personal financial matters must yield to the Federal Rules of Civil Procedure, which govern the discovery of information relevant to the claims and defenses in a federal court action."))[5]

---

[5] As Defendants acknowledge, "nothing in [the Right to Financial Privacy Act of 1978] shall apply when financial records are sought by a Government authority under the Federal Rules of Civil or Criminal Procedure." 12 U.S.C. § 3413(e). Accordingly, *Miller's* holding that there is no right of privacy as to bank records remains applicable to subpoenas issued in civil actions. *See In re C and M Invests. of High Point, Inc.*, No. 13-10661, 2015 WL 661177, at *2 (Bank. M.D.N.C. Feb. 11, 2015) (collecting cases).

Hon. Sarah Netburn
March 17, 2021
Page 6

Respectfully submitted,

Jorge G. Tenreiro

cc:     All counsel (via ECF)