

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

March 22, 2021

**VIA ECF**

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 219
New York, N.Y. 10007

Re:  *SEC v. Ripple Labs, Inc.* et al., No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Plaintiff Securities and Exchange Commission ("SEC") respectfully opposes Defendants' March 15, 2021 letter motion (D.E. 67 ("Letter")) seeking a pre-motion conference on their motion to compel. Defendants request discovery far beyond anything that could be considered relevant or proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b)(1). Defendants seek discovery about two unrelated digital assets (Bitcoin and Ether) and discovery of internal SEC documents—neither of which is relevant to any cognizable defense—to try to shift the blame for Defendants' own actions and inactions to the SEC. Such discovery is inappropriate and should be denied, as at least one district court in this District has already held in indistinguishable circumstances in a digital asset case. *See SEC v. Kik Interactive Inc.,* No. 19 Civ. 5244 (AKH) (S.D.N.Y. Nov. 12, 2019) (D.E. 36) (rejecting discovery from the SEC as to Bitcoin and Ether and as to SEC internal documents) ("*Kik*").

**I.    Relevant Factual and Legal Background**

The SEC's Complaint alleges that, in an unregistered offering of securities, Defendants sold a digital asset security called XRP in return for proceeds of at least $1.38 billion. Compl. ¶ 1. The SEC therefore alleges that all Defendants violated Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, as to their unregistered offers and sales of XRP, and that Defendants Christian A. Larsen ("Larsen") and Bradley Garlinghouse ("Garlinghouse") (together, "Individual Defendants") aided and abetted Defendant Ripple Labs, Inc.'s ("Ripple") violations. While unregistered sales of securities do not require any proof of intent, aiding and abetting liability requires knowing or reckless conduct. At the core of these claims is the SEC's contention that XRP are "investment contracts" and thus securities, which requires an investment of money into a common enterprise with a reasonable expectation of profits from the efforts of others, under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). *See SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 358, 365 (S.D.N.Y. 2020) (application of the *Howey* test turned "on the economic realities underlying a transaction, and not on the name appended thereto.").

As relevant here, the Complaint alleges that, in 2012, in legal memos that Ripple obtained before it started selling XRP, Ripple and Larsen received unequivocal advice from their lawyers that XRP could

be considered a security under the federal securities laws under certain circumstances and that Ripple should consider contacting the SEC to obtain clarity as to whether XRP was a security. Compl. ¶¶ 53-55. Among other things, the ███████ ████████████████████████████ and noted:



Ex. A (Oct. 19, 2012 Memo at 17) (emphasis supplied). ███████████████████████

███████████████████████████████[1]█████████████.

In 2015, Ripple ███████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████ Ex. B at 2. ███████████
███████████████████████ Ex. C.

Moreover, Larsen received XRP as compensation upon Ripple's founding for "personally assuming th[e] risk" of being deemed the *issuer* of XRP. Compl. ¶ 57; *see also* Ex. A to J. Tenreiro Letter dated Mar. 18, 2021 (D.E. 72). And, in 2017, Ripple's then-chief compliance officer explained to Garlinghouse that "XRP certainly has some 'securities-type' characteristics," and Garlinghouse was aware that "merely calling a token a 'utility token . . . does not prevent the token'" from being a security. Compl. ¶¶ 407, 411. In 2018, Garlinghouse further admitted that, while he was optimistic that it would not occur, he could not "guarantee" that XRP would not get classified as a security. Compl. ¶ 420.

Rather than contact the SEC, ███████████████████, Ripple knowingly assumed this regulatory risk and for years offered and sold $1.38 billion worth of XRP into the market in unregistered transactions. Compl. ¶ 59. During that time, other participants in the digital asset space repeatedly asked Defendants about the legal status of XRP under the securities laws, and at least one expressed concern to Ripple that XRP was a security. Compl. ¶¶ 415-19. Yet Defendants did not contact the SEC about its XRP offering until the SEC staff contacted Defendants about its investigation.

Meanwhile, many other participants in the digital asset space did seek specific guidance from the SEC as to the legality of their conduct. Some obtained relief from the SEC staff to go forward with their offering of digital assets, and others received no such assurances.[2]

---

[1] Even if XRP were "currency" (it is not), Ripple's *sales* of XRP while promoting efforts to increase its value would still constitute sales of investment contracts because Ripple never restricted offers and sales to those who had a need for alternatives to fiat currencies. Compl. ¶¶ 381-87. *See Telegram*, 448 F. Supp. 3d at 374 (sales of digital asset not restricted to individuals with need or desire for a currency precluded finding that asset had a "consumptive use" as currency).

[2] For example, in July 2019, SEC staff qualified two token offerings under Regulation A+, a streamlined approach to conducting a public offering. Blockstack Inc., Offering Statement (Form 1-A/A) (July 8, 2019), https://www.sec.gov/Archives/edgar/data/1693656/000110465919039476/a18-15736_1ex1a2acharterd1.htm; YouNow, Inc.,

With that background, the key questions to be resolved in this litigation are: whether Ripple's digital asset, XRP, was offered and sold by Ripple as an "investment contract" under *Howey* and thus was offered and sold in violation of Section 5; and whether the Individual Defendants aided and abetted Ripple's violations. Defendants principally contend (as relevant to their motion) that XRP is akin to Bitcoin and Ether, and thus that the SEC's views as to whether those assets are securities under the securities laws is relevant to this case. But as detailed below, courts have rejected arguments that comparisons to Bitcoin and Ether—let alone the SEC's internal views as to these subjects—have any relevance to the analysis of whether a digital asset is a security and instead focus on the objective *Howey* factors. And one court has refused to compel the SEC to provide this sort of discovery.

## II. The Parties' Meet-and-Confer Process

In connection with its Initial Disclosures and in response to Defendants' First Request for Production of Documents (the "Requests"), the SEC produced over 81 GB of data, which consist of approximately 97,865 documents and 3,911 external e-mails. That production encompassed all non-privileged or otherwise protected documents from the investigation that led to this case and included documents received from third parties, transcripts, subpoenas, and external emails and other communications.

Counsel for the SEC met and conferred with Defendants about that production and their Requests on multiple occasions. Among other things, Defendants emphasized their view that the SEC's production lacked documents regarding what they characterize as a central question in this litigation: whether the market viewed XRP as a security. Counsel for the SEC pointed out that this argument fundamentally miscast the proper inquiry in this case and that this discovery was thus wholly irrelevant to any defense available in this case. Nevertheless, in an attempt to reach a discovery compromise and provide Defendants with the information they seek, the SEC agreed to search for and produce a variety of non-privileged documents to satisfy Defendants' Requests, including:

- E-mail communications, which include the terms "XRP" or "Ripple," between third parties and nine senior personnel from the SEC, including from the Divisions of Corporation Finance, Trading and Markets, and Investment Management, who we identified as most likely to have responsive documents after performing significant diligence to make that determination; and

- Documents received from third parties during investigations from four different SEC cases involving digital assets, insofar as the documents include the terms "XRP" or "Ripple."

These XRP and Ripple-related documents—e-mail communications between the relevant senior personnel at the SEC and third parties, as well as third-party productions in other digital asset cases—are not relevant to any claim or defense, but the SEC agreed to provide them to reach compromise.

Yet the SEC's agreement to search for and produce these documents did not satisfy Defendants. Instead, they continued to seek two additional categories of documents: 1) documents regarding Bitcoin and Ether, and 2) internal SEC communications about XRP, Bitcoin, and Ether (the "Disputed

---

Offering Statement (Form 1-A/A) (July 10, 2019), https://www.sec.gov/Archives/edgar/data/1725129/000162827919000254/younow1-aa2a htm. Also in 2019, the staff issued two no-action letters, in which the staff agreed not to recommend enforcement action by the Commission in connection with two token offerings. Pocketful of Quarters, Inc., SEC No-Action Letter (July 25, 2019), https://www.sec.gov/corpfin/pocketful-quarters-inc-072519-2a1; TurnKey Jets, Inc., SEC No-Action Letter, 2019 WL 1471132 (Apr. 3, 2019).

Documents"). Counsel for the SEC explained that the SEC's internal views and communications—about any digital asset—are irrelevant to how the market viewed XRP or to any issue relevant to this case and that most of the internal documents are likely privileged or otherwise protected from disclosure. When the parties reached an impasse, Defendants filed their Letter.

### III. The Requested Bitcoin and Ether Documents Are Not Relevant.

Defendants' opening argument (Letter at 2) that XRP is "like" Bitcoin and Ether and therefore not an "investment contract" under *Howey* has previously been made by other defendants in SEC or Department of Justice securities laws cases involving digital assets. Every court confronted with the argument has rejected it and instead applied the fact-specific *Howey* test. In this case, Defendants' own statements to the market confirm that XRP is not like Bitcoin or Ether for purposes of the securities laws. In short, as the cases make clear, simply invoking comparisons to Bitcoin and Ether (or labeling a digital asset a currency) is not a cognizable defense. Discovery pertaining to Bitcoin and Ether can therefore have no bearing on the issues in this case or at least is not proportional to the needs of the case, as Judge Hellerstein recently held in an SEC digital asset case.

Whether XRP are securities is a fact-specific inquiry. *See Howey*, 328 U.S. at 299 (test is "flexible" and "capable of adaptation"); *see also SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) (the inquiry "necessarily turn[s] on the totality of the circumstances"); *United States v. Leonard*, 529 F.3d 83, 87–91 (2d Cir. 2008) (same); *SEC v. Shields*, 744 F.3d 633, 645 (10th Cir. 2014) (noting that under *Howey* "each case must be analyzed on its own facts" (internal quotations omitted)).

Facts about two digital assets that are not at issue in this case are irrelevant to the question here: did Defendants offer and sell XRP as a security? The focus is on XRP and Ripple, not on other digital assets (or the SEC). "Consistent with Howey's focus on substance over form, [courts] look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest." *Shields*, 744 F.3d at 646 (citing *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 756-57 (11th Cir. 2007)). The analysis turns on the economic inducements the promoter offered. *Merchant Cap.*, 483 F.3d at 760. The inquiry is objective, focusing on the promises and offers made; it is not a search for the precise motivation of individual participants. *See Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'").

Applying that law, courts have uniformly rejected arguments that a digital asset is not a security because it resembles Bitcoin or Ether or labeled a currency. First, in *United States v. Zaslavskiy*, No. 17 Cr. 647 (E.D.N.Y.), the defendant argued that his digital token, RECoin, was a "currency" and not a security, because "[c]ase law . . . recognizes that digital currencies function as a medium of exchange." Mem. of L. In Supp. of Mot. to Dismiss at § II.A., 2018 WL 2016192 (E.D.N.Y. Mar. 26, 2018). He further cited the SEC's statements about the status of Bitcoin as a medium of exchange and argued that, because RECoin's purpose was to function as a currency, it was akin to Bitcoin, for which "the only value. . . lies in its ability to pay for things." *Id.*[3]

---

[3] *Zaslavskiy* was a criminal prosecution arising out of the same set of facts as a parallel SEC civil action. *See SEC v. RECoin Grp., Inc.*, No. 17 Civ. 5725 (E.D.N.Y. Sept. 29, 2017).

Judge Dearie rejected Zaslavskiy's argument that RECoin was "currency" simply because it may function as a medium of exchange and made no comparison to Bitcoin in doing so. Instead, hewing to decades-old Supreme Court precedent, Judge Dearie dismissed these arguments and noted that "[t]he label [defendant] chooses to attach to the alleged scheme does not control the analysis." *Zaslavskiy*, 2018 WL 4346339, at *3 (E.D.N.Y. Sept. 11, 2018) (citing *SEC v. Edwards*, 540 U.S. 389, 393 (2004)).

Next, the defendants in *Telegram* advanced similar arguments and repeatedly pointed to SEC staff statements about Bitcoin and Ether to argue that Telegram's digital asset, Grams, were not securities because they were intended to function as currency. *E.g.*, Defs.' Mem. of L. in Opp. to Plf. Mot. for Prelim. Injunction, *SEC v. Telegram Grp., Inc.*, No. 19 Civ. 9439 (D.E. 71) ("Telegram Br.") at 1, 3, 10, 26, 27 (S.D.N.Y. Jan. 15, 2020);[4] *see also* Defs.' Mem. of L. in Opp. to Mot. to Strike, *SEC v. Telegram Grp., Inc.*, No. 19 Civ. 9439 (D.E. 96) at 22-23 (S.D.N.Y. Jan. 21, 2020).[5]

Like Judge Dearie, Judge Castel rejected these arguments. Concluding that the SEC was likely to show that Grams were securities, he acknowledged that the SEC staff had made statements to the effect that Bitcoin are not securities, but noted that "form should be disregarded over substance" and that the application of the *Howey* test turned "on the economic realities underlying a transaction, and not on the name appended thereto." *Telegram*, 448 F. Supp. 3d at 365 (citing *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *United Hous. Found. v. Forman*, 421 U.S. 837, 849 (1975); and *Glen-Arden Commodities v. Constantino*, 493 F.2d 1027, 1034 (2d Cir. 1974)); *see also* Ex. D at 4-5 (Tr. of Proceedings in *SEC v. Telegram Grp., Inc.* dated Feb. 19, 2020) (noting case was not about other digital assets and that "labels do not get anybody out of this one way or another").

Finally, the defendant in *Kik* also made this argument. As particularly relevant here, Kik specifically sought discovery into the SEC's views on Bitcoin, Ether, or other digital currencies—including communications between the SEC and market participants as to these assets. *See* Joint Discovery Letter in *Kik*, No. 19 Civ. 5244 (D.E. 27) at 4, 6 (S.D.N.Y. Oct. 28, 2019) (noting SEC's supposed "failure to provide any guidance . . . [as to] its application of federal securities laws to cryptocurrency projects"); *see also* Br. In Supp. Of Mot. For Recons. in *Kik*, No. 19 Civ. 5244 (D.E. 34) at 8. Much like Ripple, Kik argued that trading volume of its digital token, Kin, was so high that "Kin has more activity as a digital currency than Bitcoin or Ether, which the SEC has deemed not to be securities." Mem. of L. in Supp. of its Mot. for Summ. J., *Kik*, 2020 WL 1671643 (S.D.N.Y. Mar. 20, 2020).

Like Judges Dearie and Castel, Judge Hellerstein rejected the defendants' substantive arguments comparing Kin to Bitcoin and Ether in granting the SEC's motion for summary judgment and rejecting Kik's. *Kik*, __ F. Supp. 3d ___, 2020 WL 5819770, at *6 (S.D.N.Y. Sept. 25, 2020) (noting *Howey* turns on economic reality and citing *Tcherepin*, 389 U.S. at 336)). And Judge Hellerstein rejected

---

[4] These arguments included noting that Grams were an "improvement" on "digital currencies like Bitcoin and Ether – neither of which has been deemed 'securities' by the SEC"; that the "SEC failed to provide meaningful guidance" to Telegram during the investigation of its conduct; that "Grams are intended to function as a store of value and medium of exchange on the TON Blockchain, similar to the functionality of Bitcoin"; that Grams are like Bitcoin, "which the SEC has concluded is not a security"; and that Grams are "more appropriately viewed as currency" because of their supposed ability to pay for things, again comparing Grams to Bitcoin.

[5] The *Telegram* defendants argued that "Grams will function in the same manner as Bitcoin or Ether, digital assets that the SEC considers non-securities" and complained that the SEC had brought suit despite "the undeniably strong parallels between Grams, Bitcoin and Ether."

5

defendants' efforts to obtain discovery from the SEC as to Bitcoin and Ether and noted that if the defendants were confused about the requirements of *Howey*, they could make that argument objectively. *Kik,* No. 19 Civ. 5244 (AKH) (S.D.N.Y. Nov. 12, 2019) (D.E. 36).

Nor is Ripple's argument that XRP is not a security because the Financial Crimes Enforcement Network bureau of the United States Department of the Treasury ("FinCEN") designated XRP as a "virtual currency" a cognizable defense. (Letter at 2.) That argument was made by Telegram, *see, e.g.*, Telegram Br. at 28 n.16, and did not prevent Judge Castel from granting the SEC's request to preliminarily enjoin Telegram's unregistered offering. Indeed, FinCEN's designation of XRP as a *virtual* currency under *Treasury* regulations (*see* Letter at 2) is irrelevant to XRP's status as a security or a *traditional* currency under *the securities laws*, as FinCEN itself has repeatedly stated. For example, when it proposes requirements for Money Services Businesses relating to "virtual currency," FinCen notes that "nothing" it says about whether virtual currencies are subject to its Money Services Business requirements is intended to constitute a determination that "any" virtual currency "is currency for purposes of the federal securities laws." *Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets*, 86 FR 3897-01, 2021 WL 136609, at n.4 (Jan. 15, 2021).[6]

Courts have also recognized this principle in explicitly holding that various agencies with overlapping powers may regulate the same conduct. *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217, 228 (E.D.N.Y. 2018) (permitting regulation of digital asset under Treasury regulations and Commodities Exchange Act because "[f]ederal agencies may have concurrent or overlapping jurisdiction over a particular issue or area" and "often cooperate to enforce their overlapping powers."). As the Second Circuit most recently explained in upholding the SEC's authority to enforce provisions of a statute focused on banking conduct, "when confronted with two Acts of Congress allegedly touching on the same topic, this [c]ourt is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 79-80 (2d Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)); *see also FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001) ("[W]e live in an age of overlapping and concurring regulatory jurisdiction," and courts accordingly "must proceed with the utmost caution before concluding that one agency may not regulate merely because another may."); *SEC v. Wyly*, No. 10 Civ. 5760, 2013 WL 2951960, at *3 & n.33 (S.D.N.Y. June 13, 2013) ("[T]wo government agencies are generally assumed capable of 'administering their overlapping obligations and yet avoiding inconsistency.'") (citation omitted).

Here, these principles apply with even more force because Defendants repeatedly recognized—and ▮ ▮—that XRP was not like Bitcoin and was not a currency. *See* § I.

---

[6] In concluding that the Bank Secrecy Act applies to virtual currency transactions as well as currency transactions, FinCEN distinguishes between "virtual" currency and "real" currency. As FinCEN explained before its settlement with Ripple: "In contrast to real currency, 'virtual' currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction." *Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013) (discussing 31 C.F.R. § 1010.100(m)). FinCen continues to adhere to this guidance.

Yet even if XRP were a real "currency" (which it is not), XRP could still be a security if offered and sold as part of an investment contract under *Howey*. *See Kik*, 2020 WL 5819770, at *7; *Telegram*, 448 F. Supp. 3d at 371-74; *Zaslavskiy*, 2018 WL 4346339, at *7. Offers and sales of investment contracts and therefore securities can, depending on the facts and circumstances, exist even where the underlying asset is an asset with real word "uses" such as real property, whiskey, or animals. *See, e.g., Howey*, 328 U.S. at 297-300 (land); *Constantino*, 493 F.2d at 1033-35 (whiskey); *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (animals).

For all these reasons, whether other digital assets are or are not securities (proving which would require extensive evidentiary hearings into the ways those assets were offered and sold and their respective economic realities) does not inform the *Howey* test here or any other issue in this litigation. Discovery on that issue is therefore improper and not proportional to the needs of the case.

**IV.     The Requested Documents Concerning the SEC's Own Views about XRP (and Ether and Bitcoin) Are Not Relevant.**

**A.     The SEC's Internal Views and Communications Are Irrelevant.**

As detailed above, the key questions in this litigation are: whether XRP is an "investment contract" under *Howey*; whether Defendants offered and sold unregistered securities, not exempt from registration, in violation of Section 5; and whether Garlinghouse and Larsen aided and abetted Ripple's violations and committed additional violations through their own sale of XRP. Defendants ignore these legal principles and try to shift blame to the SEC by claiming they lacked fair notice that XRP could be securities, including by claiming they received "no formal guidance that [Ripple's] sales [of XRP] may be illegal," Letter at 2. But "the law does not require the Government to reach out and warn all potential violators on an individual or industry level" before bringing suit, *Kik*, 2020 WL 5819770, at *10 (citing *Dickerson v. Napolitano*, 604 F.3d 732, 745-46 (2d Cir. 2010)). As noted above, the SEC has provided guidance, including guidance that Ripple and Garlinghouse were aware of. Compl. ¶ 37.

Instead, under the Securities Act, the SEC may, "in its discretion, bring an action in any district court of the United States . . . [t]o enjoin" any violations of the securities laws. 15 U.S.C. § 77t(b). The Act separately gives the SEC discretion to issue regulations with respect to a variety of provisions including, as relevant here, to issue certain regulations to determine which transactions are exempted from the registration requirements of Section 5. *See* 15 U.S.C. § 77d(a). Defendants' argument that the SEC must "give formal guidance" to each potential violator before exercising its statutory discretion to enforce the securities laws through a civil action such as this one is a requirement that does not exist.

Moreover, the views, if any, of the SEC Commissioners and staff as to whether XRP or other digital assets are "investment contracts"—particularly while in the process of gathering information to make a recommendation regarding enforcement of the securities laws as to XRP—are entirely irrelevant now that the staff has completed its investigation and the SEC itself has authorized the enforcement action. Statements of agency staff cannot bind the SEC or otherwise alter its decision. *See Sidell v. Comm'r of Internal Revenue*, 225 F.3d 103, 111 (1st Cir. 2000) ("[S]tatements by individual IRS employees cannot bind the Secretary [of Treasury]."); *WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004) (citing *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("[I]nformal staff opinions lack force of law.")). Nor are the SEC's views as to the treatment under *Howey* of other digital assets relevant to whether XRP is a security. It is for the federal courts, which have "for over 70 years . . . [produced an] abundance of caselaw interpreting and analyzing *Howey*," *Zaslavksiy*, 2018 WL 4346339, at *9, to decide whether XRP is an investment contract. As Judge Hellerstein held in rejecting a digital asset issuer's request to conduct the same discovery Defendants now seek, including internal and external SEC communications about Bitcoin, Ether, and other digital assets, "the deliberations within an agency shed[ ] no light on the application of the statute or regulation in issue. If the law is vague, or confusing, or arbitrary, as defendant argues, that can be argued objectively. Proper discovery should be focused on what defendant

did, and not why the agency decided to bring the case." *Kik*, No. 19 Civ. 5244 (AKH) (S.D.N.Y. Nov. 12, 2019) (D.E. 36).

Defendants correctly recognize that whether an instrument "constitutes an investment contract within the Securities Act depends on 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'" *Constantino*, 493 F.2d at 1034 (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-353)). But Defendants wrongly assert that "the SEC itself helped shape the character of XRP . . . in commerce." Letter at 3. To the contrary, the SEC does not give "character" to instruments "in commerce" by issuing "terms of [an] offer," setting forth a "plan of distribution," or holding out "economic inducements" to prospects. Rather, the legal focus should be squarely on what Ripple—the issuer, promoter, and "responsible steward" of XRP, Compl. ¶ 213— and Garlinghouse and Larsen did to offer and sell XRP. Indeed, Defendants point to no case that accepts their theory that, to apply *Howey*, a court must probe into the communications of the agency charged with enforcing it, and the SEC is aware of no such case.

Nor can internal SEC views of the status of XRP, Bitcoin, or Ether be relevant to the Individual Defendants' scienter. To the extent the Individual Defendants may argue that the SEC staff's pronouncements about the application of *Howey* to Bitcoin or Ether led Individual Defendants to believe that XRP was not a security, these facts can be "argued objectively." In other words, if the Individual Defendants want to argue that they read or heard SEC guidance on the topic of digital assets and *Howey* and that this led to their good faith belief that they were in compliance with the law, they have all the information they need to make this argument. The SEC statements on which Individual Defendants claim to have relied are by definition public—they cannot argue that they relied on internal agency views not known to them; they know any advice their counsel may have given them in the face of these various public statements by SEC staff; and they can testify as to their own beliefs and understandings following their knowledge of these statements. Nothing the SEC said or did internally or said or did with respect to non-parties is probative of this defense. Defendants are not entitled to internal SEC documents with no relevance to any legitimate issue in this case just to try to put the SEC on trial.

### B. Defendants' Cited Case Law Does Not Support Their Requests.

Defendants argue that the SEC should be ordered to produce internal documents on the grounds that they bear on Defendants' asserted defense of lack of fair notice and their purported good faith to defeat the aiding and abetting claim. Letter at 6-7. But the cases on which they rely are inapposite because they involve whether a party lacked fair notice of an agency rule and how the agency has interpreted or applied its own rule. This case involves the application of *Howey* and its progeny, a judicially-crafted test that has for over 70 years provided clear guidance on how to interpret a statutory term, "security." *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015) (when applying a statute, "[t]the relevant question is not whether [the defendant] had fair notice of the [agency's] interpretation of the statute, but whether [the defendant] had fair notice of what the statute itself requires").

For instance, *SEC v. Kovzan*, No. 11–2017–JWL, 2012 WL 4819011 (D. Kan. Oct. 10, 2012), was an omissions case. The issue was whether the defendant was required to disclose in an SEC filing certain perquisites received by the company's CEO. *Id.* at *2. The obligation to disclose this information resulted from Item 402 of Regulation S-K, an SEC-drafted disclosure regulation concerning executive compensation, which the defendant argued he did not understand. *Id.* The court held that evidence of

industry practice is relevant to an assessment of recklessness, and therefore the SEC was required to search for and produce non-public guidance, or notes of non-public guidance, that it had provided to other companies concerning Item 402. *Id.* at *3-5 (citing cases including *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (involving interpretation of SEC Rule 15c3–3(e))). Here, the interpretation of an SEC rule or regulation—or the SEC's interpretation of its own rules and regulations—is not at issue. Rather, the issue is how to apply the statutory term, using the objective *Howey* test, to Defendants' conduct.

Indeed, Defendants' fair notice arguments as to digital assets have been rejected by other courts:

> [T]he test expounded in *Howey* has—for over 70 years—provided clear guidance to courts and litigants as to the definition of 'investment contract' under the securities laws. Moreover, the abundance of case law interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required.

*Zaslavskiy*, 2018 WL 4346339, at *9. Simply put, any internal SEC staff view is not germane to the relevant inquiry in this case, since nothing said inside the agency will affect whether Defendants had fair notice of what the law requires. *See also Kik,* 2020 WL 5819770, at *10 (distinguishing *Upton* and finding that "every cryptocurrency, along with the issuance thereof, is different and requires a fact-specific analysis"); *SEC v. NAC Found., LLC*, __ F. Supp. 3d ___, No. 20 Civ. 04188, 2021 WL 76736, at *4 (N.D. Cal. Jan. 8, 2021) (noting that motion to dismiss Section 5 claim as to digital asset sales "distills down to a straightforward application of the *Howey* test" and characterizing as not "serious," as "strategically misguided," and as "legally mistaken" arguments based on supposed misconduct by SEC).

Therefore, the SEC's aiding and abetting claims and Defendants' fair notice defense provide no basis for ordering the production of the documents Defendants seek.

### V. Defendants' Requests Are Disproportionate, Overbroad, and Unduly Burdensome.

As explained above, Defendants' Requests at issue are irrelevant and thus improper on that basis alone. Additionally, the Requests are highly disproportionate, overbroad, and unduly burdensome because not only do they demand irrelevant discovery, they also demand highly burdensome discovery, including for internal documents that would require a significant privilege review.

First, Defendants' Requests would require an enormous search and review of an overwhelming number of documents. As the Rule 26 Advisory Committee notes make clear, the 2015 "amendments were intended to 'encourage judges to be more aggressive in identifying and discouraging discovery overuse.'" *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14 Civ. 7126 (JMF), 2016 WL 6779901, at *2 (S.D.N.Y. Nov. 16, 2016) (quoting Fed. R. Civ. P. 26(b)(1), advisory committee notes to 2015 amendments); *see also id*. at *3 ("At bottom, then, Plaintiffs' entire relevancy argument hinges on a general contention that every communication and work product related to the regulatory investigations is 'likely' to contain additional relevant information. But that sort of conclusory claim is insufficient to support such an expansive discovery request."); *Badr v. Liberty Mutual Grp., Inc.*, No. 06 Civ. 1208, 2007 WL 2904210 (AHN), at *3 (D. Conn. Sept. 28, 2007) ("any and all" documents "overly broad").

Defendants' request that the SEC search 19 custodians for both internal and external documents, and for documents related to Bitcoin and Ether, would impose a disproportionate burden on the SEC to review a massive number of irrelevant documents. Specifically, a search to determine the number of responsive

documents held by 16 of Defendants' 19 proposed custodians (excluding the three SEC Commissioners), found the following number of search hits for external communications: 29,754 for Bitcoin or "BTC"; 10,900 for Ether or "ETH"; and 6,364 for XRP or Ripple. Ex. E (Declaration of Martha Mitchell). The SEC should not be forced to review and produce tens of thousands of irrelevant documents. Such a result would be entirely inconsistent with Rule 26's relevance and proportionality requirements. Instead, the SEC should be allowed to proceed with its agreement to search the nine custodians most likely to possess responsive documents related to XRP and Ripple.

Second, much of the discovery sought by the Requests is protected by one or more privileges or protections, and reviewing the vast number of documents covered by the Requests to determine which are privileged or protected would be extremely burdensome.

Several of the Requests seek information covered by the deliberative process privilege and the attorney-client privilege. But the "decision making processes of [a] government agency" are protected from discovery by the deliberative process privilege. As the Supreme Court explained earlier this month:

> To protect agencies from being 'forced to operate in a fishbowl,'…the deliberative process privilege shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'… The privilege is rooted in 'the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news.'… To encourage candor, which improves agency decision, the privilege blunts the chilling effect that accompanies the prospect of disclosure.

*United States Fish & Wildlife Serv. v. Sierra Club*, No. 19-547, __ S. Ct. __, 2021 WL 816352, at *4 (Mar. 4, 2021) (internal citations omitted); *see also United States v. Klein*, No. 16-cr-442, 2017 WL 782326, at *2–4 (E.D.N.Y. Feb. 28, 2017) (SEC action memo protected by deliberative process privilege). The Requests also seek documents protected by the attorney-client privilege, including documents reflecting SEC staff attorneys' recommendations to their client, the SEC itself. *See id*. at *2–4 (SEC action memo was protected by the attorney-client privilege).

The Requests also seek attorney work product that "would inevitably tend to disclose the investigating attorneys' preliminary positions and legal theories concerning the suspected conduct of defendant [], and those factual areas which were of particular interest to the SEC investigators at the time." *SEC v. Rosenfeld*, No. 97 Civ. 1467, 1997 WL 576021, at *4 (S.D.N.Y. Sept. 16, 1997). The SEC's communications with other law enforcement agencies are also protected by the law enforcement privilege. *See id.* (finding law enforcement privilege would be implicated by discovery topics relating to communications between SEC and foreign regulator).

Thus, requiring the SEC to identify and then review internal documents for privilege, particularly when the documents are not relevant for the reasons described above, would impose significant burden on the SEC and would not be proportional to the needs of this case.[7]

---

[7] In addition to the Disputed Documents discussed above, the SEC should not be ordered to review and produce documents regarding XRP or other digital assets from its Office of Investor Education. The requested documents are unsolicited e-mails from the public and generic responses from that Office. As such, they are not relevant to any determination in this action.

Respectfully submitted,

Dugan Bliss

cc: All counsel (via ECF)