L3JsSECc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES and EXCHANGE COMMISSION,

                    Plaintiff,

             v.                        20 Civ. 10832 (AT)(SN)

RIPPLE LABS, INC., et al.,

                    Defendants.

------------------------------x
                                       New York, N.Y.
                                       March 19, 2021
                                       10:30 a.m.

Before:

                        HON. SARAH NETBURN,

                                       U.S. Magistrate Judge


                            APPEARANCES


SECURITIES and EXCHANGE COMMISSION
     Attorneys for Plaintiff SEC
BY:  JORGE G. TENREIRO
     DUGAN BLISS
     DAPHNA A. WAXMAN
     JON A. DANIELS


DEBEVOISE & PLIMPTON, LLP
     Attorneys for Defendant Ripple Labs, Inc.
BY:  ANDREW J. CERESNEY
     MARY JO WHITE
     LISA ZORNBERG
     JOY GUO

L3JsSECc

1                              APPEARANCES
                              (CONTINUED)
2


3    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
          Attorneys for Defendant Bradley Garlinghouse
4    BY:  MATTHEW SOLOMON
          NOWELL BAMBERGER
5         ALEXANDER JANGHORBHANI
          SAM LEVANDER
6         LUCAS HAKKENBERG


7


8    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Christian A. Larsen
9    BY:  MARTIN FLUMENBAUM
          MICHAEL GERTZMAN
10        MEREDITH DEARBORN
          KRISTINA BUNTING
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JsSECc

1              (The Court and all parties appearing telephonically)

2              THE COURT:  Good morning, everybody.  This Judge

3   Netburn.

4              I think we are all set.  This case is SEC v. Ripple

5   Labs, Incorporated.  The docket number is 20 CV 10832.

6              We have a number of lawyers on the line.  I'm going to

7   ask that only those lawyers who anticipate speaking state their

8   names for the record at this time.

9              On behalf of the SEC?

10             MR. TENREIRO:  Good morning, Judge Netburn.

11             This is George Tenreiro on behalf of the SEC.

12             THE COURT:  On behalf of Defendant Garlinghouse?

13             MR. SOLOMON:  Good morning, your Honor.

14             My name is Matthew Solomon on behalf of

15   Mr. Garlinghouse.

16             THE COURT:  Thank you.

17             On behalf of Defendant Larsen?

18             MR. FLUMENBAUM:  Good morning, your Honor.

19             This is Marty Flumenbaum from Paul, Weiss, Rifkind,

20   Wharton & Garrison LLP on behalf of Mr. Larsen.

21             THE COURT:  On behalf of Ripple Labs?

22             MR. CERESNEY:  Good morning, your Honor.

23             This is Andrew Ceresney on behalf of Ripple from

24   Debevoise & Plimpton.

25             THE COURT:  Thank you.

L3JsSECc

1              I hope everybody on the call is healthy and safe.

2      In light of the pandemic, we are conducting this proceeding

3      remotely by telephone.  We have a court reporter on the line,

4      so if I can ask that the attorneys state their name each and

5      every time so that we can have a clean record.

6              I've asked only those lawyers who anticipate speaking

7      to state their appearance.  Certainly, if any other lawyer

8      wishes to speak, I'll just ask that you state your full

9      appearance at that time.

10             We are here right now on discovery letters that were

11     filed on March 11, and the SEC responded on March 17.  These

12     concern requests from the SEC to obtain information from the

13     defendants seeking their personal financial records, as well as

14     subpoenas that were served upon the defendants' financial

15     institutions.

16             Why don't I begin.  I don't know who intends to take

17     the lead here, whether or not that will be you, Mr. Solomon, or

18     somebody else on behalf of the defendants.

19             MR. SOLOMON:  It is going to be me, your Honor.  I'm

20     happy to begin.

21             THE COURT:  Great.

22             MR. SOLOMON:  Great.  Good morning, again.

23             Again, it is Matthew Solomon from Cleary Gottlieb

24     Steen & Hamilton.  I'm going to be arguing on behalf of

25     Mr. Garlinghouse and also Mr. Larsen.

L3JsSECc

1          I may take a little bit more time, your Honor, than I

2     normally would.  I anticipate Mr. Larsen's counsel will want to

3     speak when I'm done, but he will not repeat the same arguments

4     that I'm making.  I think his comments will be brief.

5          With me from Cleary are Nowell Bamberger, Alexander

6     Janghorbhani, Sam Levander and Lucas Hakkenberg.

7          Your Honor, we filed our letter motion on March 11, on

8     behalf of Mr. Garlinghouse and Mr. Larsen, because the SEC has

9     made multiple discovery requests in the form of requests for

10    production of records and third-party subpoenas for

11    Mr. Garlinghouse and Mr. Larsen's detailed personal financial

12    information and those of their families.  These requests seek

13    irrelevant information that is disproportionate to the nature

14    of the case and inappropriately burdens their privacy

15    interests.

16         Your Honor, I want to be perfectly clear off the bat.

17    This is not a case where defendants are unwilling to produce

18    financial records.  We have produced, many months ago,

19    including details of all of their XRP transactions while at

20    Ripple.  This is not unspecified, self-selected trading

21    records, as the SEC says in their letter.  They have the XRP

22    transactions already.  That is why they have alleged all of

23    these sales of those transactions.

24         But the SEC now has made a sweeping request for all of

25    their other personal financial records.  And, your Honor, they

L3JsSECc

are entitled to nothing more than they already have or will

shortly receive.  Despite shifting theories, and I know your

Honor comes prepared and has read the letters, and the theories

have shifted, but they still have not and cannot provide

support for their theory of relevance.  They do not have a high

burden granted, but they have to make a prima facie showing of

relevance, and they can't.

They don't get the records to pressure test whether

there may be something out there they don't know about.  They

don't get the records to try to establish motive.  The sales of

XRP, they already have and detailed in their complaint and in

their letter to you, give them all three to need or to make

whatever argument they want about motive.  They don't get the

records to fish for ways the individuals may have somehow

privately promoted Ripple.  They have no allegations about

that.

And they certainly don't get the records merely

because they are seeking a penalty.  This is a really strange

proposition, and if it were accepted, it would open up every

litigant to discovery of all of their personal financial

records merely upon filing of a lawsuit seeking a penalty.

That is not the law.

So, your Honor, the bottom line, Mr. Garlinghouse and

Mr. Larsen have already produced and will continue to produce

all potentially relevant financial information, namely, their

L3JsSECc

1    trading records in relation to XRP.  We have tried to work with

2    the SEC on this.  They responded by issuing more third-party

3    subpoenas to banks seeking the same information they seek from

4    us.

5             When we demanded they withdraw those subpoenas, you

6    can imagine, your Honor, when we called the banks, they are

7    anxious to get this resolved.  They don't want to get crossways

8    with the SEC.  So we asked the SEC to withdraw the subpoenas

9    they sought, they refused and said they were going to court.

10   That is why we filed.

11            Because the law doesn't support them, as your Honor

12   probably already knows from your review of the cases.  What

13   they are reduced to is making up new arguments and denigrating

14   the obvious privacy individuals have in their personal,

15   financial records, especially where, as here -- and this is

16   critical -- the charge conduct does not sound in fraud, it does

17   not sound in misrepresentation, it doesn't sound in market

18   manipulation, or anything of the sort.  By their own admission,

19   it is a strict liability case.  That is how they categorize it.

20            So we are asking you to squash the third-party

21   subpoenas and to grant our protective order as to the

22   individual defendants' personal financial records.

23            Let me take a step back, your Honor, because this is

24   the first time we are appearing in front of you, and I'm not

25   going to belabor this, but I think it would be useful to

L3JsSECc

1    provide a little bit of context generally for the request and

2    why it is so inappropriate.

3            XRP is a digital asset.  It is just like Bitcoin or

4    Ether.  It has traded for years, years without incident.

5    Millions of XRP holders, dozens of exchanges and market makers

6    all operated under the well-founded belief that XRP was not an

7    investment contract and, therefore, not a security.  This is

8    not some rinky-dink ICO, initial coin offering.  This was,

9    until the SEC sued, the third largest digital asset after

10   Bitcoin and Ether, with major customers, major bank customers,

11   several global financial institutions.

12           In 2018, right after Mr. Garlinghouse became CEO, the

13   SEC officials stated publicly, neither Bitcoin nor Ether were

14   securities.  In fact, other government agencies regulating XRP

15   regulate it as a currency, not as a security.  In fact, they

16   brought an enforcement action in 2013, right after

17   Mr. Garlinghouse started, on the basis that XRP was a currency.

18           So following a lengthy investigation, your Honor, the

19   SEC brought this case alleging for the first time publicly in

20   December 2020 that XRP, in their view, is an investment

21   contract and, therefore, a security.

22           This is the first time -- this was the first time the

23   SEC brought a litigated case against individuals in this space

24   that did not sound in fraud.  So when you hear discussions of

25   Telegram and Kik, please keep that in mind.  These are Section

L3JsSECc

1    5 cases against companies.  They have now sued the company and

2    individuals based on conduct they say stretches back to 2013.

3           What did Mr. Garlinghouse and Mr. Larsen allegedly do?

4    Well, the SEC says they participated in one long, unregistered

5    securities offering over many years.  An offering that took

6    place in plain sight, that the SEC now dramatically says in its

7    letter was illegal.  And this started, your Honor, this scheme

8    allegedly started well before my client had ever heard of

9    Ripple or XRP and four years before he sold a single XRP unit.

10   This long offering, according to the SEC in their 79-page

11   amended complaint, allegedly violated Section 5 of the

12   Securities Act.  And the SEC has also brought additional claims

13   against Mr. Larsen and Mr. Garlinghouse relating to their

14   personal XRP sales and for allegedly aiding and abetting Ripple

15   sales.

16          And just to be clear, the aiding and abetting claim

17   means that the SEC believes Mr. Garlinghouse and Mr. Larsen

18   intentionally or recklessly helped Ripple break the law.  That

19   is what they have to prove.  They will never be able to prove

20   that.  We are moving to dismiss this charge.  That is what they

21   have to prove.

22          That brings us to the instant motion, and that is just

23   some background, your Honor.  We met and conferred --

24          THE COURT:  Can I interrupt for one moment?

25          I know that this is the very issue that is being

L3JsSECc

1   briefed right now in the motion to compel the SEC that has been

2   filed by Ripple, I believe.

3          But can you talk to me from your perspective on this

4   distinction -- again, I'm trying to wrap my brain around the

5   various terms and assets here -- how you view XRP as

6   distinguishable from Bitcoin and Ether?

7          MR. SOLOMON:  Yes.  Your Honor, it is a great

8   question.

9          We don't view it as distinguishable.  Bitcoin and

10  Ether are also digital assets.  They also originated with an

11  initial offering.  They also have developed use cases for

12  Bitcoin and Ether, just like XRP has.  They also are

13  decentralized, just like Ripple is.  Just like Ripple, Bitcoin

14  and Ether, you know, again, have been trading for many, many

15  years.  And the SEC apparently decided that they were not

16  securities, not investment contracts, and these are the sister

17  assets of XRP.

18         And the SEC made this proclamation in 2018.  So

19  naturally, the SEC, having made that decision, SEC officials

20  having declared that Bitcoin and Ether are not securities, they

21  are not investment contracts and, of course, those companies

22  have not been sued, their executives have not been sued.  Your

23  Honor can check the price of Bitcoin.  It's been quite a run.

24  XRP has been treated differently, and for no good reason.

25         THE COURT:  Again, this may not be relevant to the

L3JsSECc

1    issues that are before us today, but it is just helpful for me

2    to understand.

3          MR. SOLOMON:  Yes.

4          THE COURT:  My understanding of XRP is that not only

5    does it have a sort of currency value, but it also has a

6    utility, and that utility distinguishes it, I think, from

7    Bitcoin and Ether.

8          Is that correct?

9          MR. SOLOMON:  So Bitcoin and Ether, I think, also have

10   utilities.  They also have use.  You can't use Bitcoin, for

11   example, necessarily everywhere to buy a cup of coffee or to

12   buy groceries, but Bitcoin does have use cases that it has

13   developed.  So does Ether.  They have smart contracts, for

14   example, that can be done over the Ethereum block chain.

15         XRP also has developed a number of use cases, and

16   these started very early in the process, which is why it is so

17   baffling that the SEC has charged this long-running scheme from

18   2013 to the present.  Because XRP, for example, has a product

19   called ODL, on demand liquidity, which is used to assist

20   financial institutions in having seamless and less costly

21   transactions in key corridors.  For example, the U.S. to

22   Mexico.  And XRP as a digital asset is helpful because it means

23   the banks don't have to have their own accounts on either end

24   and can deploy that money more effectively elsewhere and XRP

25   can be used as a bridge currency.

L3JsSECc

1          Mr. Garlinghouse was brought to Ripple to help develop

2     these additional use cases, and they have developed them.  They

3     have major customers.  So it really is strange, your Honor,

4     that we have a situation where the SEC has charged this

5     long-running scheme.  To present day, they are alleging even

6     today XRP is a security.  It is absurd, and they are not going

7     to be able to prove it.

8          What is frustrating is, because they've lumped in

9     individuals, they basically have tried to charge this as just

10    one long, overarching scheme.  Again, it is hard to follow the

11    complaint, but think that is their theory.  There was an

12    issuance of XRP very early, and then the company,

13    Mr. Garlinghouse and Mr. Larsen, even though they came at

14    different times and had different roles, in selling their XRP,

15    both for Ripple, and also selling their XRP themselves, were

16    scheming to violate the SEC's registration requirements.

17    Again, all of this happened openly, notoriously, right under

18    their nose for years.

19         Market makers thought it was not a security.

20    Exchanges thought it was not a security.  Millions of retail

21    holders thought it was not a security.  And the SEC did nothing

22    until December 2020.  So that is -- sorry to be frustrated

23    about it, but it really is one of these situations where you

24    hate to be trite.  It is pure regulatory overreach, especially

25    dragging individuals into this.

L3JsSECc

1          My client wasn't even there at the founding of this

2   company.  He didn't even sell a single unit of XRP until mid

3   2017, when they clearly had multiple use cases.  Your Honor,

4   XRP is very similar to Ether.  It is also similar to Bitcoin.

5   And a key aspect of this case is going to be able to get behind

6   the SEC's thinking of why in the world they are not investing

7   contracts.  They are not securities.  But we are.  So that is a

8   key issue in this case.

9          And if your Honor would like, I'm happy to move on to

10  the instant motion, just to put in context what the SEC is now

11  trying to do to build a case that it really doesn't have.  It

12  launched this case.  It doesn't have a case.  We are going to

13  prove that.  But they have now got a blizzard of discovery out

14  there to try to build a case they don't yet have.  I just don't

15  want Mr. Garlinghouse and Mr. Larsen to be unfairly victimized

16  by that.

17          THE COURT:  All right.  Let's move forward then to the

18  discovery.

19          MR. SOLOMON:  Sure.

20          So we had meet and confer.  I think this is ripe for

21  your Honor.  They already have, again, the documents they need

22  to make any conceivable argument that these individuals were

23  motivated somehow to look the other way and violate the law.

24  They have detailed the money they made selling XRP, just like

25  a lot of other people, by the way, who sold XRP associated with

L3JsSECc

1    this company.

2                THE COURT:  And just so I'm clear -- I'm sorry.

3                MR. SOLOMON:  Sure.

4                THE COURT:  Just so I'm clear, they say they have

5    received this.  Can you just describe to me in, maybe, lay

6    terms what it is that you have produced?

7                They have seen that Larsen sold 100,000 -- what

8    exactly have they seen?

9                MR. SOLOMON:  It's a great question, because the SEC

10   fudges this.

11               Here is what they have seen from Mr. Garlinghouse, and

12   then Mr. Flumenbaum can clarify for Mr. Larsen.  I just want to

13   make sure I'm being very precise on the fact.  We have already

14   produced to them during the investigation all of the trading

15   records showing the XRP that Mr. Garlinghouse got as employee

16   compensation.  By the way, he was paid XRP as employee

17   compensation, which naturally, when that vested, he monetized.

18   Because while XRP has a number of uses, your Honor, and did

19   back in '15, '16 and '17, you can't buy a cup of coffee

20   necessarily with XRP or Bitcoin or Ether.

21               So he got grants of XRP at various stages.  They have

22   all the documentation about those grants.  When that XRP

23   vested, they have all the documentation about Mr. Garlinghouse

24   selling his XRP.  He did himself and he did through a market

25   maker.  They have it all.  They have all the totals.  That is

L3JsSECc

1   how they were able to put together their complaint.

2           And you're going to hear over and over again, these

3   guys made this much money because that is the one fact they

4   had; they made money.  Of course, it doesn't get you anywhere

5   in a litigation.  They are going to trumpet that, which they've

6   done in their letter.  They have trading records, they have the

7   grant agreement from Mr. Garlinghouse, and we're getting them

8   trading records actually for 2020.  They've asked for those.  I

9   think we are producing those imminently.

10          We have also given them W-2s for Mr. Garlinghouse.  So

11  they are going to have, for Mr. Garlinghouse, all the money,

12  all the XRP that he got from Ripple during the entire time he

13  was there.  They are coming to you saying, Judge, we can't make

14  a motive argument.  We need to understand everything.  They've

15  got what they need.

16          In fact, I could have fought them on the W-2s, but I

17  didn't.  They've got a complete financial picture in terms of

18  the money and the XRP Mr. Garlinghouse got at Ripple as COO in

19  2015 and early 2016, and then as CEO in 2016 going forward.

20  And I defy Mr. Tenreiro to stand up and say otherwise.  They

21  have those records.

22          So I don't even know what they are talking about in

23  this new argument about we can't trace this or that on the

24  block chain.  It sounds like maybe they think it is too hard to

25  do their jobs, but from Mr. Garlinghouse, they have got what

L3JsSECc

1    they need.

2         I hope I answered your question.

3         THE COURT:  It does.

4         One of the arguments I understand the SEC to make --

5    and certainly, Mr. Tenreiro, you'll have an opportunity to be

6    heard, I appreciate you holding patiently.

7         One of the arguments I understand that the SEC is

8    making is we don't really know how much -- how many XRP each of

9    these individuals ever obtained or how they -- when they sold

10   them or how much they sold.  And I guess what you're saying is

11   that is not true, that they have received evidence of all of

12   the grants of XRP that they were given as part of compensation,

13   as well as W-2s, and they have also received all of the trades

14   that each of the individuals has made, all of the sales of the

15   XRP that they have received.

16        Is that correct?

17        MR. SOLOMON:  That's exactly right, your Honor.  That

18   is exactly right.

19        And maybe it makes sense for me just to address that

20   first argument they make because, frankly, it is the first time

21   they've ever made the argument to me that they need bank

22   records for Mr. Garlinghouse to somehow validate what we have

23   provided to them.

24        That argument, again, which isn't in any of their

25   other letters, because it is not something they thought of

L3JsSECc

1    because I think it is not a good argument, they are an ordinary

2    litigant now.  The SEC has got to play by the same rules that

3    we do.  And what they are basically saying, Judge, is we are

4    entitled to production of all the irrelevant information for

5    Mr. Garlinghouse's financial records just so we can confirm

6    that he and Mr. Larsen fulfilled their discovery obligations,

7    and that is just not how civil discovery works.

8         It may be how the SEC can comport itself in

9    administrative contexts, but they cannot do that in federal

10   court.  The rules simply do not provide for that.  That would

11   be like granting the plaintiff access to all of a defendant's

12   e-mail to allow the plaintiff to confirm that the defendant has

13   produced the e-mails that are responsive to the plaintiff's

14   requests.

15        They can propound discovery requests if they want to

16   know, for example, did Mr. Garlinghouse personally make efforts

17   to somehow fund Ripple-related projects.  They haven't done

18   that.  They are just asking for everything so they can fish.

19        So that first argument they make in their letter, it

20   just fails.  And frankly, the cases they cite, this Zietzke v.

21   U.S., that is a tax evasion case.  It involved a validity of an

22   IRS administrative subpoena, different standard as an IRS tax

23   evasion case, and the IRS said it didn't already have this

24   data.  And the Court said, well, the IRS is not required to

25   just accept the individual's claim that he provided it with

L3JsSECc

1    everything it needs to know.  Criminal tax evasion.  Different

2    standard administrative subpoena.

3            In this KingSett case, which by the way is

4    unpublished, these are the two lead cases they cite for their

5    lead argument on entitlement to these records.  That is an

6    unpublished decision, an SEC administrative subpoena from a pro

7    se party for bank records.  And all the SEC has to show, as

8    they know in an administrative subpoena context, it that its

9    discovery request was relevant to a legitimate law enforcement

10   inquiry.

11           And all the court said there was that the pro se

12   party's claim he had already produced some of the records

13   didn't make the SEC's inquiry illegitimate.  That is their lead

14   argument.  Those are their cases, and the cases don't get them

15   anywhere where they need to be.  They don't get to validate.

16   They don't get to say we don't trust these people, so give us

17   everything.  They have got to use the discovery tools just the

18   way we do.  And we'll be arguing in future conferences, I'm

19   sure, Judge, about trying to, in a more surgical way, discover

20   relevant evidence.  They don't get everything.  But that is

21   their first argument.

22           If I could just briefly touch on the other arguments,

23   just to make sure that we're clear on these.

24           Their second argument in their letter is that they

25   need these detailed financial records to show that XRP are

L3JsSECc

investment contracts under the <u>Howey</u> test.  There is this test

that the Supreme Court developed like 70 years ago that you

apply --

THE COURT:  Yes.

MR. SOLOMON:  -- to various arrangements.  I mean, it

is an old test and hard to apply to things like digital assets.

But the SEC is trying to do that here.  It is just trying to do

it in an unprincipled way and just stretching the test to

beyond recognition.  That is for another day.

They're saying --

THE COURT:  I'm still focusing on factors three and

four here, and I guess I would like to hear -- and obviously

I'll give the SEC an opportunity to respond in a moment -- how

these bank records would further that inquiry.

MR. SOLOMON:  That's exactly the right question.

They say in their letter, they anticipate -- well,

they say two things.  First they say they anticipate these

records will show whether individual defendants personally

funded efforts.  Then they say the extent to which the

individual defendants personally funded efforts.  If it is the

extent to which, I don't think they alleged it.  They certainly

didn't as to Mr. Garlinghouse.

So it seems, your Honor, they want to see how the

defendants might have used their personal resources in some

way, shape, or form to further the efforts of Ripple.  Now, it

L3JsSECc

 1    is a bizarre thing in the first instance because under Howey, I

 2    think the inquiry is, you know, they are saying Ripple is the

 3    issuer.  They've got all of Ripple's records.  They know what

 4    Ripple did and didn't do.  So they've got -- they are able to

 5    make those arguments.

 6          Now they want them from the individual defendants, who

 7    I think under their theory are underwriters, but it is not

 8    completely clear to us, your Honor.  We are waiting for the SEC

 9    to maybe spell that out with a little more clarity.  There is

10    no logical connection to Mr. Garlinghouse and Mr. Larsen, given

11    what the charges are and how they might speculatively be doing

12    things in their personal lives in relation to Ripple.  It just

13    doesn't compute.

14          Because the SEC's theory is, Mr. Garlinghouse, for

15    example, as he sold XRP, he entered an investment contract with

16    somebody and he promised to, you know, promote XRP and use his

17    own efforts.  I mean, that is absurd.  He didn't even know who

18    he was selling his XRP to.  He didn't even know he was a party,

19    so it is hard to imagine he had a contract with a party he

20    didn't even know.

21          I think their theory is Ripple entered into these

22    contracts with individuals, and that Mr. Garlinghouse and

23    Mr. Larsen, you know, were sort of part of an overarching

24    scheme.  I guess that's what they are saying.  Whatever they

25    are saying, they haven't spelled out the link between any

L3JsSECc

1    personal efforts they might have made as individuals and the

2    _Howey_ test.  It just doesn't make sense.

3           And, again, if the SEC wants to propound

4    interrogatories, they want to ask Mr. Garlinghouse in his

5    deposition, Hey, did you spend your personal funds in a way

6    that benefited the enterprise?  We may object as irrelevant,

7    given what they have charged, but they can ask him that.  What

8    they can't do is get inside all of his and his children's

9    personal financial affairs.  They are just not entitled to

10   that.

11          And you're going to hear Mr. Tenreiro stand up and

12   talk about _SEC v. Telegram_.  That is because he litigated that

13   case.  That case is from the Southern District, where no

14   individuals were charged, and the SEC got bank records from

15   Telegram that, according to the court, were relevant to the

16   question of how the company spent funds from investors to

17   ascertain whether purchasers of the supposed security

18   reasonably expected to profit based on the company's efforts

19   under _Howey_.

20          Again, here, these individuals, the SEC does not

21   allege that the individual defendants received funds from

22   investors in their personal bank accounts, and the burden of

23   producing personal financial records plainly exceeds that of

24   corporate bank records in any event.  So they are sort of

25   taking the _Telegram_ argument and trying to put it on top of

L3JsSECc

this case, and it doesn't work, principally because they are

individuals.  But also because Brad and Chris are not alleged

to have -- they are not the company.  They are individuals,

executives.

So I don't think the claim works.  I'm interested to

see how Mr. Tenreiro explains it, because this is very

different from <u>Telegram</u>, but that is their second argument.

The <u>Howey</u> argument.

And, your Honor, I'll just be honest, I don't fully

understand -- because they haven't thoroughly articulated it.

However they articulate it, there are other means, much less

burdensome means, to get at the question to how, if at all,

Mr. Larsen or Mr. Garlinghouse did things in their personal

capacity to help Ripple, if that is even relevant, which I

doubt it is.

Now, there are two more arguments they make that I

just want to touch on briefly, and I'm mindful of the time and

thank you for your indulgence, your Honor.

The third argument is that they say detailed knowledge

of Mr. Garlinghouse's personal financial condition is relevant

to scienter.  They want to understand what proportion of his

income was comprised of proceeds from XRP sales.  Apparently,

based on their theory -- and this is their aiding and abetting

theory -- that Mr. Garlinghouse was motivated to ignore

Ripple's alleged wrongdoing to protect one of his major revenue

L3JsSECc

1    streams.  They are picking up that language from the Southern

2    District case, but they are citing the case for the wrong

3    proposition.

4            He is producing financial records concerning the

5    revenue streams that could be relevant here.  As I just told

6    your Honor -- and, again, Mr. Flumenbaum can confirm on behalf

7    of Mr. Larsen -- they've got that.  They have alleged it.  They

8    put it in, I think, the first paragraph of the letter to you.

9    That is their case, that they made money.  So they have that

10   information about revenue streams.

11           But what they are not entitled is to discover just how

12   significant those sales were to his bottom line.  And this is

13   just another way of saying, you know, Mr. Garlinghouse

14   incentivized to make money.  That can be said about any

15   defendant in any case.  It can't be a basis for relevance in

16   this case.

17           And by the way, your Honor, that is why they walked

18   away from the <u>Goldstone</u> case.  If you look at their early

19   letters, they site <u>SEC v. Goldstone</u> for the proposition that

20   they are entitled to the records.  We pointed out, yeah,

21   <u>Goldstone</u> stands for the opposite proposition.  The court there

22   allowed only evidence of income that the individual defendants

23   got from the company to make the motive argument.  That was a

24   fraud case, by the way, that one of the attorneys on this call

25   litigated.  They just dropped it.  They just walked away from

L3JsSECc

that case altogether because they realized it doesn't support

them.

I think that is just emblematic that they are grasping

for some theory, any theory, to get bank records.  Because, of

course, they want them.  Of course they want them.  You know,

what are you going to find in someone's bank records?  Are you

going to find that, you know, Matt Sullivan, two years ago, got

a facial?  OK.  Nobody is entitled to know that.  That is not

their business.  It is not germane.  It is not tied to anything

in this case.

Again, I would just cite your Honor to the Eastmark

case.  They cite that case.  That is Judge Boasberg in DC.

He's is a terrific judge.  I was at the SEC for this.  That's a

case about intent to defraud.  It is not a Section 5 case,

where the defendant was accused of diverting funds raised from

investors to her personal accounts.  Diverting funds, that is

what they are citing as authority.  It is apples and oranges.

And then this America Growth Funding case, it is

closer to the mark, it is a better case, but, again, you're

talking about the percentage of revenues the corporation earned

from security sales relevant to its overall revenue for trial.

That evidence was relevant to the intent to defraud for

scienter.  These people were accused of stealing, tricking

people.

This is a Section 5 case.  They already have plenty of

L3JsSECc

1   financial information to make whatever motive or scienter

2   argument they want.  That is their case.  That really is their

3   case against the individuals.  They made money.

4       So they also cite, you know, <u>Lipkin</u>, your Honor, <u>SEC</u>

5   <u>v. Lipkin</u> and <u>U.S. v. Lindsey</u>.  I mean, again, <u>Lipkin</u> is a case

6   where the defendants hid the proceeds of their fraud in

7   offshore bank accounts.  That is not this case.  That is not

8   this case.  No one is saying Mr. Garlinghouse hid any proceeds.

9   They are not bringing assets claims.

10       THE COURT:  I understand this point.

11       MR. SOLOMON:  Yes.  Last point.  Last point and then

12   I'm going to wind down.

13       They finally throw out this argument in a footnote, it

14   is in their opposition at page three, note three, they say

15   that --

16       THE COURT:  This is the discord argument?

17       MR. SOLOMON:  Exactly.

18       And the penalty argument and punitive damages

19   argument, it is ridiculous.  If you read the <u>Rajaratnam</u> case,

20   as I did last night, Second Circuit case, insider trading,

21   parallel criminal action.  all the court said there was the

22   wealth of Mr. Rajaratnam could be used to determine the amount

23   of penalty in that case.  It doesn't say that you're entitled

24   at the discovery stage of a civil case to have intrusive

25   discovery into a defendant's entire financial portrait.  That

L3JsSECc

1    is the one case they cite.

2          They actually say, Judge that this is an independent

3    basis, that on this fact alone, they get discovery.  That would

4    mean anytime the SEC brings a case and asks for a penalty,

5    *a fortiori*, they get to troll through individuals' personal

6    bank accounts.  That is no way that is the law.  They know it

7    is not the law.  I don't know why they are making the argument

8    that it is.

9          Last couple of points, Judge.  We have cases,

10   obviously, to point you to where courts have turned away this

11   kind of discovery.  The Morelli case, the <u>Reserved Solutions</u>

12   case, the <u>Solow</u> case.  These cases show that, of course, there

13   is a privacy interest.  I mean, the government -- it is

14   shocking the government says there is no privacy interest.  Of

15   course there is a privacy interest.  We are not saying it can

16   yield.  Of course it can yield.  Those cases stand for the

17   proposition there is a privacy interest.

18         By the way, Judge, the last major point I want to

19   make, we are also arguing, contrary to what the SEC says in

20   this letter, that even if these documents could be relevant,

21   which we don't believe they are, they haven't pointed to a

22   single case establishing they are.  What they are asking is

23   wildly disproportionate and extremely burdensome.  It is not a

24   tailored request.

25         It doesn't help that the SEC comes in and says, OK,

L3JsSECc

1    give us all the checks over 10,000 to your Honor.  They should

2    have said that three weeks ago.  We could have had a dialogue

3    about it.  But they didn't.  What they said was, You give it to

4    us or we're going to get it from the banks.  And no, we are

5    going to withdraw our subpoena for the banks until you guys

6    stipulate.  that is not the way the government should act.  It

7    is not the way any civil litigant should act, and that is why

8    we're here.

9           Your Honor, if the order doesn't help, the cases they

10   cite for that are 26(c) cases.  They don't get the documents.

11   Not a protective order.  They don't get these documents.  They

12   are not entitled to them.  They have plenty of documents

13   between us and Ripple.

14          Final point, and I would cite the Collins & Aikman

15   case, your Honor, a Southern District case from 2009.  The SEC

16   is not a super-litigant.  They are not investigating now.  They

17   are in a litigation, just like any other litigant.  They've got

18   to abide by the federal rules.  We don't think they are doing

19   that.

20          In fact, your Honor, they misstate the standard.  They

21   misstate the standard and say it is our burden.  Your own case

22   from a few days ago, the 9/11 case that you penned, it is the

23   correct version.  They have the burden to make a prima facie

24   case.  Then the burden sits to us.  And they misstate the

25   standard because they know they can't meet it.

L3JsSECc

1          Your Honor, we would ask that you quash all of the

2     subpoenas for financial records that they've made for the

3     individuals, and enter a protective order for the request that

4     they've made to Mr. Garlinghouse and Mr. Larsen.

5          This is harassing.  It is not appropriate.  It is

6     completely untethered to the law.  And I appreciate the extra

7     time and indulgence that you've given me.  I'm sorry if I've

8     abused it.  Obviously, we feel very strongly about this.

9          Thank you, your Honor.

10         THE COURT:  Thank you, Mr. Solomon.

11         Mr. Flumenbaum, do you want to add anything on behalf

12    of your individual client?

13         I assume the issues are largely the same.

14         MR. FLUMENBAUM:  Yes, your Honor.

15         Mr. Larsen was one of the founders of Ripple in late

16    2012.  He served as Ripple's CEO until the end of 2016, when

17    Mr. Garlinghouse took over.  Mr. Larsen has served as Ripple's

18    executive chairman since 2017.

19         What I wanted to just stress is to pull you back into

20    the actual requests that are attached here and talk about how

21    broad they are.  For Mr. Larsen, they are talking about eight

22    years of detailed financial information, checks, money orders,

23    deposit slips, withdrawals, with no linkage whatsoever that was

24    required.  Their definition of assets, again, includes anything

25    of value; cars, boats.  There is no tethering of these

L3JsSECc

1    requests.

2              When we tried to negotiate with the SEC, as

3    Mr. Solomon said, what happens?  They issue third-party

4    subpoenas to banks for the same information and wouldn't

5    withdraw it.  That is why we were forced to come to you as

6    quickly as we did.

7              So we have tried very hard to negotiate.  There is no

8    need for this information at this time.  This case is just

9    beginning.  If, for some reason, we have motions to dismiss

10   that are scheduled to be heard, which will be fully briefed by

11   early June.  There is no dispute as to the amount of XRP that

12   were sold by either Ripple or Mr. Larsen or Mr. Garlinghouse.

13   They have all the records from all of these entities.  They

14   know exactly --

15             I should point out to your Honor that these make up a

16   fraction of a percent of the total volume of XRP that has been

17   traded.  There has literally been a trillion dollars in XRP

18   trading since 2013.  And as Mr. Solomon said, XRP has traded

19   over 200 exchanges.  They have subpoenaed our account records

20   at the exchanges, which we utilized, and they will get that.

21   That is more than enough information to verify the financial

22   information that we have already provided.

23             Mr. Larsen has given them actually tax information

24   that lists all of the sales he has made while he was with

25   Ripple.  So they have all that stuff.  They can verify it

L3JsSECc

1    through the subpoenas that they have issued to GSR, which we

2    have not opposed.

3            And what you'll find, your Honor, is that virtually

4    all of these sales that they are complaining about took place

5    on foreign exchanges.  The SEC doesn't even have jurisdiction

6    over these sales, and they know that.  So that is going to be

7    one of the key issues that is in our motion to dismiss before

8    Judge Torres.

9            So this is not the time, on a practical basis, for the

10   SEC to be given the intrusive powers to look at all of our

11   clients' individual financial records.

12           I think that's all I want to add.  There is some

13   reference in his letter that I feel I need to deal with.  Point

14   two about certain evidence that suggests that Mr. Larsen has

15   been -- has sold XRP since the filing of the case.  I have no

16   idea what evidence they have, but it is my understanding that

17   there are no sales by Mr. Larsen of his XRP since the filing of

18   the complaint.

19           And I want to also stress that even if there were,

20   that would not be inappropriate.  The SEC did not seek any

21   preliminary relief restricting Ripple or Mr. Garlinghouse or

22   Mr. Larsen from selling XRP.  And, indeed, every day, tens of

23   thousands of other users of XRP sell these digital assets on

24   foreign exchanges and on domestic exchanges throughout the

25   world.

L3JsSECc

1          But I just wanted to address that the implication by

2     the SEC is really false, and in any case, it is irrelevant.  I

3     think the fact that they didn't bring a preliminary injunction

4     is something that your Honor should consider, because if the

5     SEC was confident in its case, they would have done that, and

6     they didn't do that.

7          THE COURT:  Thank you.

8          MR. FLUMENBAUM:  Thank you.

9          THE COURT:  I appreciate, again, that the SEC has

10    waited patiently.  I'm sure they've been biting their

11    collective tongues.

12         I'll invite the SEC to respond.

13         MR. TENREIRO:  Thank you, your Honor.

14         Good morning, again.  This is Jorge Tenreiro on behalf

15    of the SEC.

16         Your Honor, this is a case where an entity, and at

17    least two individuals, devised a scheme to use the money of

18    others on the expectation or on the promise of profits.  I just

19    quoted directly from the Supreme Court's language in Howey,

20    328 u.S. at 299.

21         What they did here falls squarely within the reach of

22    Howey, which was, again, quoting from the Supreme Court,

23    "drafted as a flexible principle capable of adaptation to

24    various and different schemes that people might devise to raise

25    money from other people."

1          Courts in this district and in the country have had no

2     problem applying <u>Howey</u> to digital assets.  Mr. Solomon's

3     comparison of XRP to other assets by saying, well, they are

4     digital assets, fails on its face, as the Supreme Court in

5     <u>Howey</u> and other cases explained, that labels are not

6     sufficient.

7          Because these individuals sold millions of XRP and

8     raised at least $600 million from investor funds and have been

9     charged by the SEC with violating Section 5 of the Securities

10    Act for these sales, but also for aiding and abetting Ripple's

11    sales of XRP, the bank records and financial records that we

12    seek go to core issues at dispute in this case.

13         Fundamentally, the SEC needs to be able to establish

14    all of the sales that occurred, and is not required to take

15    their words for it that they have produced all of the records.

16    Mr. Solomon tries to distinguish the cases that we cite in our

17    letters, and our letter pointed to the fact that some of those

18    involves an IRS case or administrative subpoena.

19         However, in <u>SEC v. Garber</u>, a case also in the Southern

20    District, the SEC sought tax records which require an even

21    higher burden and even higher threshold.  That case is

22    990 F.Supp.2d 462.

23         In that case, Magistrate Judge Francis explained that

24    the SEC was not entitled to rely on the first page of tax

25    returns and had the opportunity to test the liability of the

L3JsSECc

1    claims the defendants were making by looking at the complete

2    tax returns.  We are not seeking tax returns here.  As the

3    court is aware, the threshold for that is even higher.  We are

4    simply seeking --

5            THE COURT:  Let me stop you for a second, and I will

6    certainly look at the case that you just cited.  I have a lot

7    of respect for Judge Francis.

8            But distinguishing between the first page of your tax

9    filings and the underlying supporting documents is one thing.

10   What I understand is happening here is you're getting a full

11   picture from Ripple, from the individual defendants, of all of

12   the XRP that they were granted through various grants, all

13   transactional information regarding any time that they sold

14   those assets.  So it is not as if you're being given half the

15   information.  You're being given all of the information.

16           Your argue, as I understand it is, well, we just don't

17   know that they are telling the truth, that they are actually

18   giving us everything.  And in my experience, that is an

19   argument that parties make often.  Usually what I require is

20   some proof that your suspicion that there is information that's

21   being withheld, that there is some evidence to support that

22   suspicion beyond we just don't need to take your word for it.

23   Because we are in litigation.  Lawyers are officers of the

24   court, and there is some expectation, certainly that I have,

25   that lawyers are complying with their obligations.

L3JsSECc

1          So I guess my question to you is:  Do you have a basis

2     for believing that what you have received already is not

3     complete, or that there is some withholding that you're not

4     being informed of?

5          MR. TENREIRO:  Thank you, your Honor.  The answer is

6     yes.

7          So Mr. Solomon pointed to how we drafted the complaint

8     based on the record that they provided.  That is not quite

9     accurate.  We had records, incomplete records from them when we

10    filed the complaint and had to ourselves try to trace on

11    pseudonymous block chain transactions, other sales that

12    appeared to belong to Mr. Garlinghouse.

13         I appreciate the court's point that, you know, we are

14    in civil litigation, and that we don't get the documents simply

15    to confirm.  But this is a little bit different in the sense

16    that transactions on block chain are, by definition, difficult

17    to trace and difficult to understand.  We have also developed

18    evidence that during the time of the conduct at issue, Ripple,

19    Garlinghouse, Larsen, and another entity that they used to sell

20    XRP, intermingled their XRP sales through one of the market

21    makers and one of the exchanges that the market makers

22    utilized, and sold all of the XRP together.

23         So it is not clear to us that we're going to be able

24    to actually obtain full and clear individualized records of

25    these sales.  And we're not only talking about sales here, but

L3JsSECc

1    we're also talking about transactions and movements of the XRP,

2    because offers are also at issue.

3              So because of the --

4              THE COURT:  How would the latter be revealed in what

5    you're seeking?

6              MR. TENREIRO:  Right.  What we're seeking is bank

7    records, but also a full picture of the trading records, which

8    we don't think we received either, your Honor.

9              As I mentioned, we had to reconstruct some of the

10   trading records.  We also have not received, for example,

11   account opening documents for some of the trading accounts,

12   which are relevant, understanding their argument that these

13   accounts are foreign arguments that Mr. Flumenbaum made at the

14   end.

15             So I believe that we have developed evidence, and we

16   have also developed evidence, that during the time of the

17   conduct at issue here, the transaction, some of the XRP moved

18   into what is called unhosted wallets, so wallets that are not

19   created or managed by digital asset trading platforms.  And so

20   it might just be that they don't even necessarily know where

21   all of the wallets are because, you know, an individual might

22   easily go to, you know, say I have these four addresses, these

23   four accounts with these four digital asset trading platforms,

24   but the XRP can move outside of those platforms without even

25   them knowing about it or being able to sort of give us a full

L3JsSECc

 1   picture of that.

 2             The bank records --

 3             THE COURT:  Let me stop you for a second.

 4             My understanding, that the scope of today's dispute is

 5   that you want the defendants' personal financial records either

 6   from them or from their banks.

 7             So just to, like, be really simple-minded here, you

 8   want their UBS account, right?

 9             MR. TENREIRO:  That's right.

10             THE COURT:  One of the things you just said you are

11   seeking and you think you haven't received in full are the

12   trading records.

13             You may be right that you haven't received all of the

14   trading records.  I don't understand that to be part of today's

15   dispute.  I understand what you're asking for their UBS

16   account.

17             And so, one, I'm not sure that if what you want is

18   their trading records, I don't think that is going to be in

19   their hypothetical UBS account.  And number two, you just

20   started talking about how -- I'm not going to be able to say it

21   exactly the way you did -- wallets are in different systems and

22   they may not even know where their money is running, etc.

23             That is also not going to be in their UBS account.

24             MR. TENREIRO:  Your Honor, that's right.

25             THE COURT:  So what do you think you're going to see

L3JsSECc

1   in this hypothetical bank account that you're not getting

2   access to elsewhere?

3           MR. TENREIRO:  So, your Honor --

4           THE COURT:  Can you describe for me what you think

5   you're going to see?

6           MR. TENREIRO:  The bank accounts are the simple and

7   most reliable evidence of the net proceeds from their sales.

8   They have to convert -- you know, eventually they have to

9   convert the XRP into foreign currency, because as they

10   recognize, XRP is not universally accepted as a currency.  So

11   the net sales, the net proceeds that they received, personally

12   received, will be reflected in their bank accounts.

13          And so, again, because -- I was mentioning the trading

14   records simply to illustrate or respond to the court's question

15   about why the trading records were not sufficient and to

16   explain why we believe we don't have a full picture of the

17   trading records.

18          The simplest way to shortcut all of this is to look at

19   what monies reached their bank accounts.  And in my experience,

20   typically you will see a transfer of funds, and it will say

21   this came from, you know, X exchange, or X digital asset

22   trading platform.  You have a date and you have an amount, and

23   that will give the most reliable and comprehensive exposition

24   of the full extent of their sales and the proceeds that they

25   personally received from the sales of XRP.

L3JsSECc

1                I can't imagine --

2                THE COURT:  Because you believe that their

3       hypothetical bank account will show a $1 million wire transfer

4       from, I don't know who, to Ripple?  From the Coin Bank?

5                MR. TENREIRO:  Right.

6                THE COURT:  I'm sorry, what was that?

7                MR. TENREIRO:  So let's just use an example Coinbase,

8       which is a digital asset trading platform that sells --

9                THE COURT:  All of a sudden you'll see a million

10      dollars from Coinbase into Mr. Larsen's account?

11               MR. TENREIRO:  I haven't seen his trading records,

12      your Honor, but I would be shocked not to find that

13      information.  That is how this works in this space.

14               So the individual creates either, again, an unhosted

15      wallet or a wallet with a digital access trading platform, such

16      as Coinbase, but to monetize these digital assets after they

17      are sold for U.S. dollars.  So to monetize the digital assets

18      as the platform sells the assets for U.S. dollars, for example,

19      and then, you know, those funds have to be deposited at a

20      U.S. -- in a bank account, in a bank account that handles that

21      currency so they can use it.

22               For example, I don't mean to pick on Coinbase.  You

23      know, you could say Kraken or Bitstamp or whatever.  They have

24      used several different platforms here.  If, as Mr. Flumenbaum

25      emphasized towards the end of his presentation, many of these

L3JsSECc

1    platforms are incorporated or have offices abroad.  But

2    eventually the money has to come back to their U.S. bank

3    accounts for them to essentially receive it.

4           So when they sell the XRP, eventually the money comes

5    back.  I have worked on a large number of these cases, and just

6    let's say, I've never seen a case where the bank accounts don't

7    show exactly what I just mentioned, as the court illustrated

8    it.  Coinbase, X date, X amount, etc.  I expect to see --

9           THE COURT:  And that transaction will then also be

10   available on a business record from the other side of the

11   ledger, which is to say you would not see that either from

12   Ripple or from another entity.  Again, defendant one --

13           (Reporter interruption)

14   I'm sure what I was saying was eloquent, and I'm sure

15   I can't get back to where I was.  Let me see if I can recall

16   where I was.

17           My question to Mr. Tenreiro is, wouldn't this

18   information about the liquidation of the XRP also be available

19   from the business records or the trading records that the

20   defendants have already committed to providing?

21           MR. TENREIRO:  Your Honor, so Ripple, I don't believe,

22   would have these trading records.  The individuals have market

23   makers that conduct the trading on their behalf.  So it

24   wouldn't be in any of Ripple's records.

25           But to answer the court's question, some of the

L3JsSECc

1    transactions would be in the trading records that they are

2    providing.  But as I mentioned earlier, we have identified

3    other transactions or situations in which the assets are

4    commingled, such that it is not clear to us which trades belong

5    to who.

6         So, again, the most reliable and complete way to get

7    all this information is to see what amounts were transferred to

8    their accounts.  And, again, because of the very specific

9    factual situation which we're in, where we're dealing with

10   transactions that are, by definition, pseudonymous on a block

11   chain, the bank records are simply the most reliable and most

12   complete picture of the full extent of the proceeds,

13   particularly given not just when we're dealing with a block

14   chain, which, again, by definition, the transactions are

15   pseudonymous.

16        And, therefore, to the extent that there are movements

17   of assets of XRP, as we have already been able to identify,

18   that are not hosted by a company that has business records, we

19   won't be able to get those records.  So, in other words, let's

20   say we have -- so if Mr. Larsen, for example, has his XRP, he

21   gets his XRP from Ripple.  Certainly we can understand how much

22   XRP he gets from Ripple from some sort of business records from

23   Ripple.  So that is step one.

24        Then Mr. Larsen would have available to him a number

25   of options which he has availed himself, as we have explained,

L3JsSECc

1    which he did avail himself during the period in question.  One

2    is he can go to a digital asset trading platform, such as

3    Coinbase -- again, I don't mean to pick on them -- or he could

4    go to a digital asset platform that is headquartered in, let's

5    say, Hong Kong, as he has in this case.  And he can do this --

6    excuse me -- to an intermediary and say, I'd like to open an

7    account.  Open an address on the block chain for me.  I'm

8    transferring the XRP that Ripple gave me, and now sell some of

9    these for me.

10         Mr. Larsen could also himself simply transfer the XRP

11   from the block chain addressing which he received to other

12   block chain addresses that are not hosted by Coinbase, that are

13   not hosted by the hypothetical Hong Kong trading platform or

14   Kraken or whatever.

15         Once he starts moving the XRP into those new addresses

16   that are pseudonymous and anonymous and not -- that are

17   unhosted because they don't belong or were not created by

18   Coinbase or Kraken or whatever exchange we're discussing in the

19   hypothetical.  There is no business record that can give us

20   that transaction because there is no business we can go to and

21   say, hey, who does this address belong to?  Who are you trading

22   on behalf of?

23         He could sell the XRP through that address, but

24   essentially the proceeds, the way that it comes back out of a

25   block chain for Mr. Larsen, is he eventually converts it into

L3JsSECc

1    U.S. dollars, say -- I mean, I suppose he could have converted

2    it into other currencies, but our understanding is he did it

3    into U.S. dollars.  Therefore, he has to send it back to an

4    account, a bank account, probably in the United States.

5              So the bank account in the United States is the only

6    way to get a complete, reliable picture of all of these sales,

7    because eventually the money has to hit back his personal

8    account.  What happened in between is simply, by definition,

9    anonymous and just lends itself to incomplete and unreliable

10   transactions.  That is simply the nature of the platforms on

11   which these instruments trade.

12             So it is not -- I think it is very different than not

13   saying we're entitled to verify every single, little thing that

14   they give us or every e-mail, as Mr. Solomon said.  This is a

15   very specific -- this is a very sort of different type of

16   asset, where the most reliable information comes from the bank

17   records.

18             Now that goes to --

19             THE COURT:  So, let me ask you the million-dollar

20   question then, which is, why does all this matter?  Right?

21             This is a Section 5 case.  So why do you need to have

22   the most precise answer of how much money one of the defendants

23   made by selling the XRP?

24             You know that they received however many millions of

25   XRPs.  You know generally what sort of value that is.  It is a

L3JsSECc

lot of money, you know that.  You're going to get a fair number

of transactions.  Maybe you think there is other transactions

you're not getting, but you're certainly going to get a pretty

good picture of the profitability for these individual

defendants of their transactions, even if you think it is not

complete.

          Why do you need precision here if this is not a fraud

case?  This is a Section 5 case, so why is this so important?

          MR. TENREIRO:  Right, your Honor.

          So in a Section 5 case, the reason we need all of the

sales, because as the Second Circuit explained in the Cavanagh

case, which we put in our letter, each sale is a violation if

it is made not made pursuant to a registration statement or

qualifies for an exemption.

          So this is not just -- you know, I will get to the

other reasons why we need these reasons in a moment, if I am

permitted to do so, but this is at the core of the case.  These

are the violations.

          What are the violations we are charging?  We need to

be able to establish exactly what times and which times and how

many times the statute was violated by these sales.  It simply

goes to the core of the case, to the core claim of the

Section 5 claim.

          THE COURT:  That the individual defendants violated

Section 5 every time they sold it.

L3JsSECc

1          So forget everybody else who is selling XRP, these

2     individual defendants violated Section 5 each and every time

3     that they sold it?

4          MR. TENREIRO:  Well, your Honor, so -- I'm sorry.

5     What was the question about other individuals that were

6     selling?

7          THE COURT:  Presumably under this theory then, every

8     individual in the world who is selling XRP would be committing

9     a Section 5 violation based on what you just said.

10         MR. TENREIRO:  That's not quite correct, your Honor.

11    So the statute, the Securities Act of 1933 has sort of a

12    registration provision under Section 5, and then an exemption

13    provision under Section 4.  And broadly speaking, the Section 4

14    exemptions, I'm speaking very generally here, if these are

15    transactions by people in the market, they are exempted by

16    statute.

17         Section 5, though, focuses on and is relevant to this

18    case, the issuer and the affiliates of the issuer.  So it is

19    only Mr. Larsen and Mr. Garlinghouse, the CEOs, or someone on

20    the board.  The affiliates of the issue are captured by the

21    statute.  Section 4 specifically exempts these transactions

22    that the court put in the hypothetical of all these other

23    people buying and selling XRP in the market.  I don't think

24    that would be the case, your Honor.

25         THE COURT:  And you have specific claims -- I

L3JsSECc

apologize for asking a question maybe I should know the answer

to -- but you have claims against these two defendants that

they have engaged in these violations.

I thought the claims were aiding and abetting of

Ripple.  But there is also claims that they individually

engaged in violations?

MR. TENREIRO:  Yes.  We allege that they -- we allege

that the individuals violated Section 5 with their own sales

because they were affiliates of Ripple when they were making

the sale.  So their sales, every time they sold and failed to

register the transaction, unless they point to an exemption,

they violated Section 5 individually, irrespective of Ripple's

violation.

So that is correct, we have Section 5 claims against

them, and we have aiding and abetting claims also against them

for Ripple's violation.

THE COURT:  That clarification is helpful.

MR. TENREIRO:  Thank you, your Honor.

Now, if I might move on to the other reasons why the

financial information is relevant, and that does get to the

Section 5 claim.

Mr. Solomon, at some point during his presentation,

said that, you know, all sorts of individuals, including his

clients, were operating under -- I think it was a good faith

belief, or perhaps I'm paraphrasing, something along the lines

L3JsSECc

1   of they had something in their mind that made them believe that

2   their actions.  As they also mentioned, they are moving to

3   dismiss, and they very strongly dispute the allegations that

4   they knew that their conduct, that their conduct was wrongful.

5        Now, I would like to make a couple of factual and

6   legal points on this very important question, your Honor.  The

7   first is that, as we allege in our complaint, Mr. Larsen and

8   Ripple received an opinion from a lawyer in 2012, before they

9   began a single sale of XRP, where the lawyer said -- again,

10  this is in our complaint -- the lawyer said, Look, there are

11  certain circumstances under which if you sell these

12  instruments, you could be selling securities.  You probably

13  should talk to the SEC before you do any of it.

14        And as, again, alleged in our complaint -- and I don't

15  think they will dispute -- neither Ripple, nor Larsen, nor

16  later Garlinghouse approached the SEC before they engaged in

17  these types of sales.  And so our point of contention here --

18  now, what they have tried to do, and I would like a moment also

19  to address the Howey point in a second.

20        What they have tried to do here is recap themselves as

21  innocent victims of some power of the SEC, and when the facts

22  that we pointed to actually suggest quite the opposite.  This

23  brings me back to the bank records, your Honor.  Now, they are

24  trying to sort of distinguish cases that involve fraud, but I'm

25  sort of failing to understand why that is significant for this

L3JsSECc

1   reason.  For aiding and abetting, we have to prove scienter.

2   Although they try to raise the standard for what scienter

3   means, our position is and always has been, and it is

4   consistent in our letter to them, that scienter simply means

5   knowing or reckless conduct.  And that is what scienter means.

6        I'm not aware of a definition of scienter that shifts

7   simply because we're talking about aiding and abetting scienter

8   or scienter for purposes of fraud.  The way that I understand

9   the statute, scienter is scienter.  It might mean something

10  different in the context of what you have to know that you're

11  doing.  That is a separate point.  But it is always knowing and

12  reckless conduct that we have to prove, and there is a whole

13  host of cases, many of them are in our letter, where the courts

14  say one of the ways that you prove scienter, the cases

15  typically say you can't get into an individual's mind, so

16  scienter is typically proved by circumstantial evidence.  The

17  cases that we cite stand for that principle.

18        Trying to distinguish the AGF case or the Telegram

19  case because they involve corporations doesn't really work.  By

20  the way, both of those cases involved wholly owned

21  corporations, that individuals wholly owned, and in the AGF

22  case, the individuals were also on trial.

23        So the judge I think recognizes what I think is a

24  pretty logical principle that comes from the Goldstone case

25  that Mr. Solomon mentioned from which we are not walking away.

L3JsSECc

1    If an individual's livelihood depends very, very heavily on

2    this conduct, he has an incentive to turn the other way.  We

3    are not talking about a general incentive that all corporate

4    insiders have to sort of raise the stock of the price of a

5    corporation.  We are talking about a very specific individual

6    incentive.

7            Mr. Larsen netted at least $450 million from the sales

8    while he had in his hand an opinion from a reputable law firm

9    that said, This could get you in trouble with the SEC.  You

10   should contact him before you do this.

11           The question is, why did he make these sales while he

12   had that opinion?  I think it is pretty fair argument to make

13   to a jury that it was simply worth too much money to him to

14   take on this risk and, therefore, he recklessly disregarded

15   that his conduct could violate the securities -- that the

16   conduct he was aiding and abetting could violate the statute.

17           So they are saying, well, you know, we are innocent.

18   We really thought this was OK.  I think we are entitled to

19   argue to a jury, you know, if this is the only source of income

20   for this individual for eight years, he has nothing else to do.

21   He has no other income to make, and the same goes for

22   Mr. Garlinghouse.  If that is the case, we are entitled to make

23   that argument.

24           Now, the Eastmark case, I think, is interesting and

25   very on point on this point.  Mr. Solomon talked up the

L3JsSECc

1   Eastmark case.  In the Eastmark case, the SEC had said, look,

2   we can't trace all of these funds.  We don't know where they

3   are.  They may be in the bank account.  We didn't even say that

4   those records, that they were actually in the bank account.

5   The judge in that case said, Well, if they're in the bank

6   account, then that might prove scienter because she converted

7   funds.  If they're not on the bank account, that might help her

8   prove that she acted innocently.

9           So it is the same exact situation here where the bank

10  records, I don't know what is in the bank records, right.  It

11  sounds like I'm trying to find something I don't know is there.

12  The bank records are relevant because scienter is so important

13  in this case.

14          Their attempt to sort of distinguish the scienter and

15  fraud cases and the standard for scienter and aiding and

16  abetting, I think, fails because scienter is scienter.  The

17  Telegram case, you know, in Telegram, Judge Castel compelled

18  the production of bank records and it was only a Section 5

19  case.  And there, it was simply -- we didn't even need the

20  scienter point there.  It was simply we need to know what

21  happened to these funds, where did all these sales go, and what

22  happened to the funds.

23          Then in the Telegram case, we also made a point about

24  Howey, which is the point I would like to address next your

25  Honor.

L3JsSECc

1           Now, Mr. Solomon, I believe, stated a confused test

2     for the Howey test.  I urge the court to look at Howey.  If the

3     court has not done so already, I cited the relevant passages.

4     The first thing that I would like to mention is that the

5     Supreme Court in Howey itself said that a contract -- it is via

6     contract, a transaction, or a scheme.  So this idea that a

7     contract is needed is simply not correct.

8           The leading Second Circuit cases about Howey are the

9     two cases called Aqua-Sonic and Glen-Arden Commodities, and I'm

10    happy to give the court the cites, if the court would find them

11    helpful, to put into context what this dispute is really about.

12          Just briefly, Glen-Arden is 493 F.2d 1027, and

13    Aqua-Sonic is 687 F.2d 577.  Your Honor, I am going to bring

14    this back to the bank records in a moment.  I think it is

15    important to give context for what Howey and these cases say

16    is the test for establishing whether something is an investment

17    contract.

18          Mr. Solomon tried to say, you know, we are no

19    different than Bitcoin and Ether because we are a digital

20    asset.  These cases are uniformly clear, you can't just say

21    we're like something else.  We're a digital asset and end it on

22    the label.  We have to look at the promises and the statements

23    that a promoter made and the economic reality of the

24    transaction.

25          As Ripple's own lawyers told them, you are not like

L3JsSECc

Bitcoin because you are a centralized entity.  You are one

entity that has created these assets and is selling them.  That

is fundamentally different than the Bitcoin situation.  This

theme was repeated throughout Ripple's existence.

Mr. Garlinghouse, we have allegations in our complaint

where the defendants and Ripple discussing, for example, XRP

with a fund in 2015.  They say, you know, The Ripple ecosystems

rely on the efforts of Ripple Labs, the single largest holder

of XRP, breeds greater risk that XRP might be deemed a security

as compared to other virtual currency.

Again, the key distinction between Bitcoin and Ether

is there is a group of people that -- the people that are

selling the assets into the market and telling people, We are

going to create value.

Now, the court referenced a utility for XRP.  We

dispute whether that utility actually exists, your Honor.  But

the point is, even if it did exist, Ripple and the defendants'

efforts and their stated promised efforts to develop a use for

XRP is what makes XRP a security.  That is at the core of what

makes something a security under the Howey test and the cases

that I have cited.

Ripple, and today the defendants, made a point about

how they indiscriminately sold XRP.  That is quite true.  I

believe when the court goes to the Second Circuit cases that I

mentioned, the court will find that in those cases, the Second

L3JsSECc

```
 1   Circuit said, Wait a second.  If you're telling me that you're
 2   selling this instrument to people who might use it for utility
 3   but, in fact, you don't restrict your sales to those people,
 4   then I'm not going to buy your utility argument.
 5            So in the Glen-Arden case, the promoter was selling
 6   whiskey caskets to people who have no interest in drinking
 7   whiskey.  And in the Aqua-Sonic case, dental licenses to people
 8   who are not dentists or who could use these licenses.
 9            Here, XRP, Ripple and the defendants claim that XRP
10   had or was going to have some utility for affecting bank
11   transfers.  What they did was, they sold it into the market to
12   individuals just like you and I, indiscriminately to everybody.
13            Now, why did they do that?  Because the first and most
14   important, the fundamental goal that Ripple and the defendants
15   had was to get as much XRP trading into the market as possible.
16   They believed that liquidity would get twice increases and
17   might even make it more appealable as to have utility for some
18   banks in the future.
19            Now, I would like to point out that although
20   Mr. Solomon said that Ripple had utility since 2015, when his
21   client joined the company, and at paragraph 336 of our
22   complaint, we allege that in 2018, Mr. Garlinghouse explained
23   in a public speech, nobody was using XRP to effect profit or
24   payments as of that date, and instead said that he expected
25   that maybe this year, we could finally have our utility use
```

L3JsSECc

1    case.

2           Setting that point aside, your Honor, and going back

3    to what I was saying a moment ago, Ripple's first and foremost

4    was to get as much XRP trading into the market.  And these

5    efforts were multifaceted.  They took on many different efforts

6    and projects that Ripple undertook.  One of the ways in which

7    they did so, and we allege this in our complaint -- was the

8    establishing -- the establishment of a foundation called Ripple

9    Works that Mr. Larsen himself funded with his XRP.

10          So this is not a situation where we're just fishing or

11   inventing some sort of theory.  These individuals have very

12   concrete personal reasons to try to develop this,

13   quote-unquote, utility for Ripple.  They understand, I believe

14   they understand very well, that if an act is sold solely for

15   the purpose of this utility, it might fall outside of the

16   rubric of the <u>Howey</u> test.  So they made a lot of efforts to

17   develop that utility.  And these efforts included their own

18   personal efforts as CEOs of Ripple, but also utilizing, at

19   least for Mr. Larsen, their own personal finances.  That is

20   alleged in our complaint.

21          So the statement that we have not alleged that they

22   actually engaged in what I will call <u>Howey</u> efforts is

23   incorrect.  Mr. Larsen, indeed, engaged in <u>Howey</u> efforts, as

24   Ripple Works then turned around and sold, I believe, hundreds

25   of millions of units of XRP, which is tied directly into

L3JsSECc

1    Ripple's goals and the type of efforts that Ripple, Mr. Larsen,

2    and Mr. Garlinghouse were making.

3           So the fact that they used sort of an intermediary

4    entity is irrelevant for the <u>Howey</u> analysis.  They were using

5    different methods of making <u>Howey</u> efforts so that the token

6    might become more adopted.  So that is one of the reasons why

7    we need also the records, because the records will show the

8    extent of the <u>Howey</u> efforts, and that is the argument that was

9    accepted by Judge Castel, or presumably accepted by Judge

10   Castel, in <u>Telegram</u> because they are strongly refuting that

11   this asset is a security in the first place.

12          If they made sort of <u>Howey</u> efforts, it is very

13   different than a situation from Bitcoin and Ethereum.  There is

14   no centralized actor that we can point to that sort of meets

15   three different characteristics; owns the majority of the

16   assets that they created, is selling this asset, and then

17   telling people I'm going to make efforts to create utility for

18   your assets, so that, you know, this might be beneficial to

19   you, and then ultimately actually engage in these efforts.

20          Our allegations in the complaint are not just that

21   Ripple made these statements, but that Larsen and Garlinghouse

22   made these statements, that Larsen and Garlinghouse made these

23   sales, and that Larsen and Garlinghouse made these efforts,

24   including with their own personal finances.

25          So that is how we reason why we need the records, your

L3JsSECc

1   Honor.  And I have touched upon scienter.  I don't want to

2   belabor the scienter point again, but I would like to mention

3   that to the extent that they are pounding the table on this

4   idea that they acted, you know, innocently, the way that they

5   handled their finances, when they are holding an opinion from a

6   lawyer that is telling them this might get you in trouble, and

7   then turn around and do it anyway, the way they handled their

8   finances, your Honor, I believe is very relevant to scienter,

9   because it might prove or disprove whether they actually

10  believed they were acting innocently.

11          I would like to make one last <u>Howey</u> point.  They are

12  talking about the records about the XRP they received as

13  vesting, it is called vesting grants.  They are treating it as

14  a stock.  The company is treating it as stock.  And then they

15  turn around and tell the court and tell us they were acting

16  innocently, and that this was somehow all the SEC's false.

17          I believe, your Honor, that we are entitled to test

18  that theory and to respond to that theory by pointing to the

19  reasons that they had to ignore what the clear warnings were

20  that they had received.

21          Now, I focused on the opinion that they received from

22  the lawyers.  But in our letter, we refer the court to the

23  other many warnings that they received, including starting at

24  paragraphs 395 in the amended complaint, where Mr. Larsen and

25  Mr. Garlinghouse individually were warned that their conduct

L3JsSECc

1    could run afoul of the securities laws.  Now they're saying we

2    acted innocently, and we believe the records would go to that

3    point as well.

4             If I might just respond to a couple more points, your

5    Honor.

6             Mr. Flumenbaum referenced something in a letter about

7    sales that he says were misstating the records.  Just to be

8    clear, our letter references movement of assets by Mr. Larsen.

9    We haven't identified any sales.  I don't know if there are or

10   not.  That sort of illustrates the problem here.  Again, the

11   most reliable source of this information is the bank records.

12            You know, the fact that he highlights that virtually

13   all of this occurred on foreign exchanges, I think, sort of

14   reflects why, you know, we're going to the bank records in the

15   United States.

16            Now, Mr. Flumenbaum also mentioned, you know, your

17   Honor, this case is just beginning.  There is a motion to

18   dismiss pending.  I believe, your Honor, that Judge Torres'

19   scheduling order is quite clear that the fact that there is a

20   motion to dismiss pending is not a reason that should be used

21   to delay discovery.  The individual defendants are trying to

22   back-door a stay of discovery while they've also told us in

23   meet and confers we're only to get one shot at deposing their

24   client.  We have entered into a rather aggressive discovery

25   schedule, and so far have received little to nothing -- or we

L3JsSECc

1   received little documents from all three defendants.  I think

2   that delaying this question is not going to be helpful to the

3   resolution of this case.

4        The other point I'll make is, for example, we have

5   received -- the self-selecting point.  We received just this

6   morning some trading records from Mr. Larsen that, you know,

7   reflect trading in a certain account at a digital trading

8   platform.  In that account, he shows us his trading, not just

9   of XRP, but of the two other assets that they are going to come

10  and say, see, we are just like those two assets.

11       So I'm not dismissing the privacy concern.  My concern

12  here is that the defendants want to show us what they want to

13  show us, so that they can make their arguments, and withhold

14  the full picture that allows us to make our argument.

15       So when I see a statement from a digital asset trading

16  platform with trades by Mr. Larsen with XRP and Bitcoin and

17  Ethereum, I can already hear the defense counsel saying, See,

18  you know, we are just like Bitcoin and Ethereum.  I have gone

19  through the reasons why that is not the case, your Honor.  But

20  we should be able to have the full picture, which includes the

21  bank records, the most reliable and entire picture of what

22  actually they did, so we can respond to these theories.

23       I would be happy to answer any other questions the

24  court may have.

25       THE COURT:  I don't have any specific questions for

L3JsSECc

1     you now.  This was very helpful.

2               MR. FLUMENBAUM:  Your Honor, may I just make a few

3     points in rebuttal here?

4               MR. SOLOMON:  Marty, I have a few also.  Maybe let me

5     make a few, just to keep this in order.  Sorry.  Only because

6     I'm just conscious of the courts time and I know that we are

7     really probably testing your Honor's patience.

8               I'm sorry.

9               THE COURT:  I'm sorry.  Mr. Solomon, two things.

10              One, I want to confirm this is Mr. Solomon speaking,

11    so we have a clear record.

12              MR. SOLOMON:  It is, your Honor.  I apologize.

13              THE COURT:  Secondly, if I can ask you to respond

14    first to the argument that was made by Mr. Tenreiro that each

15    sale by your client is a Section 5 violation, and so aside from

16    these issues about the motive, that I think were at least in my

17    opinion, sort of the thrust of the SEC's response in writing.

18    I would like you to focus on this Section 5 argument, if you

19    could.

20              MR. SOLOMON:  Absolutely.

21              So, in theory, Judge, each domestic sale could be a

22    violation and that would include, contrary to what Mr. Tenreiro

23    said, not just Ripple, not just Ripple's affiliates, but any

24    retail holder or any party, if there is any intent to

25    distribute the security further.

L3JsSECc

1          So it is not correct to say that there is no potential

2    liability throughout the XRP ecosystem.  They have chosen to

3    focus on Ripple.  They have chosen to focus on Mr. Larsen and

4    Mr. Garlinghouse, very strategically.  But there is others at

5    the company who hold an enormous exam of XRP, who, for whatever

6    reason, maybe it is a matter of prosecutorial discretion, have

7    not elected to charge.  But in theory, any unregistered sale

8    not subject to an exemption -- and, by the way, talking about

9    exemptions is a little bit specious for these trades.

10          But here is the irony of that point, Judge.  They had

11   to amend their initial complaint because they failed even to

12   allege a single domestic transaction on the part of either

13   defendant.  They don't amend their complaint.  So they are

14   talking about they need to have all this information about

15   detailed financial data, but before suing these individuals in

16   federal court, they didn't establish that any transactions, any

17   sales, any offers, were domestic.  Now they have amended their

18   complaint, and the complaint still fails to do that.

19          We have moved to dismiss.  I would commend you, your

20   Honor, just to look at the public letter that Mr. Garlinghouse

21   filed.  It explains this, I think, very clearly and I hope

22   compellingly.  So yes, it is true that each sale of an

23   unregistered security, absent an exemption, as a matter of

24   strict liability could, could be prosecuted by the SEC.  Not

25   just Ripple, not just individuals, but anybody.  That is why it

L3JsSECc

1    is so wild that when Mr. Tenreiro says this is just a simple

2    application of Howey, nothing to see here folks, clearly there

3    is a contract, there is promises.

4           Why in the world did it take him eight years to figure

5    that out?  The reason is because there is no viable claim under

6    Howey that XRP is or ever was a security.  That is why it took

7    so long, and is why this case got brought when people were

8    walking out the door in late 2020.

9           But let me get back to the facts.  I think what is

10   going on here, and why Mr. Tenreiro was struggling for the

11   first few minutes to talk about why they need to backfill these

12   trading records, which are complete -- they are complete.  He

13   has never raised with me they are incomplete.  Never said that

14   once.  Never.  So that is news to me.  And if they are

15   incomplete, which they are not, we are happy to fix that.  They

16   can have whatever they want about Mr. Garlinghouse's sales of

17   XRP.  Just ask.  They never have.  This is a brand new issue

18   that they have raised.

19          But what happens at the SEC, your Honor, is

20   different people investigate the case than litigate the case.

21   Mr. Tenreiro was busy litigating Telegram during the

22   investigation here.  I guess they didn't get the documents they

23   need.  they certainly didn't get personal financial information

24   that they are now claiming is critical -- that is word they

25   used, critical to their case.  They sued without it.

1          They didn't get information about the domesticity of

2     Mr. Garlinghouse's sales.  95 percent were overseas.  They

3     don't tell you that.  They don't tell Judge Netburn that.  That

4     is a fact.  And they didn't bother to even allege any domestic

5     transaction, and they still haven't.

6          So it is a little ironic to hear Mr. Tenreiro come

7     in here and say, We need the minutia of every aspect of your

8     financial life, when they didn't even plead what they need to

9     have a viable claim under Section 5 for Mr. Garlinghouse or

10     Mr. Larsen.  So I want to be very clear about that.

11          Frankly, <u>Howey</u> is, you know, we can go on and on about

12     <u>Howey</u>, and I get Mr. Tenreiro's position.  He is dealing with

13     the cards he was dealt by a 30-month investigation.  That is

14     what the SEC does, they hand off cases from investigators to

15     litigators, and litigators deal with it and make the best

16     arguments they can.  He is a worthy adversary.  He has got

17     arguments.  Ours are better.  But you sort of heard it.  You

18     have sort of heard the case distilled.  But on the financial

19     records, I think by his own admission, I think by

20     Mr. Tenreiro's own admission, he doesn't have any information

21     that would tie the need, any legal need in this case, to

22     getting personal financial information.

23          I think it is just a simple way for them to get

24     everything they want, and that is just not the way, again, your

25     Honor, discovery works.  That is why they have a blizzard of

L3JsSECc

1     third-party subpoenas, and they hit us with a bunch of

2     subpoenas.  And we are not complaining it is hard to put

3     together the information we have.  we are doing what we can,

4     and they just need to play by the same rules.  This is not a

5     matter of convenience for them.  They are not regulators right

6     now, they are just an ordinary litigant.

7           Also, in terms of account opening documents, there was

8     an illusion they don't even have account opening documents for

9     Mr. Garlinghouse.  They are getting those, and they know it.  I

10    just wish the SEC wouldn't say things like we haven't produced

11    a single document, when they know that they have gotten

12    documents from the individuals, and they got a production

13    today.

14          So we are going to just try to just say the facts to

15    your Honor.  I would really like to maintain credibility, and I

16    really hope the SEC can do the same.  We are fighting hard, but

17    this isn't a game.  And I don't want to sit here and have to

18    correct things in front of your Honor every time I stand up.

19          But speaking of corrections, the Bitstamp records from

20    Mr. Garlinghouse, they have a withdrawal column.  I don't even

21    follow what Mr. Tenreiro is saying.  They have withdrawal

22    columns.  He knows the money that went out after the XRP was

23    sold.  He has those records.  Maybe he hasn't looked at them

24    because he didn't do the investigation, but now that he is

25    litigating, he has got to familiarize himself with the evidence

L3JsSECc

1   before running into court.

2            Also, your Honor, they are raising cases they have

3   never --

4            THE COURT:  Mr. Solomon, can I interrupt you for one

5   second?

6            Mr. Solomon, can I interrupt one for one second?

7            MR. SOLOMON:  Absolutely.

8            THE COURT:  I appreciate your remarks, but let's focus

9   on the facts and not on what Mr. Tenreiro has or has not done

10  in his role as taking over this case.  I don't think that is

11  productive.

12           MR. SOLOMON:  Fair enough, your Honor.  Fair enough.

13           I guess the point is, after a very long investigation,

14  there is some very basic information that they never asked for.

15  And now coming into court and saying we haven't provided it, we

16  are withholding documents, and making spurious accusations

17  about not being able to trust me, as counsel, or

18  Mr. Garlinghouse, with nothing to back that up, I just think

19  that is inappropriate.

20           But moving forward, your Honor, I'm glad Mr. Tenreiro

21  acknowledges that Apuzzo is the governing standard for

22  scienter.  There's been some confusion about that in his

23  papers, although he still misstates and says that it is knowing

24  or reckless conduct.  It is knowing or reckless conduct to help

25  an illegal enterprise, to help something unlawful that Ripple

L3JsSECc

1    is doing.

2            My client didn't see legal advice.  The legal advice

3    he talked about, your Honor, you can see the complaint

4    concluded it was unlikely that XRP would be determined to be a

5    security.  So this case, the aiding and abetting is all about

6    whether it was knowing or reckless to sell XRP, or to assist

7    Ripple in selling XRP, given everything out there in the

8    marketplace.  I think I sort of led with the argument by

9    talking about all the factors that pointed in the direction

10   that the SEC would not determine this as a security, at the

11   least of which is Bitcoin, Ether, and some of the other facts.

12           So we're not using the language of crime, saying

13   innocence.  That is not helpful.  What we have to show is that

14   it wasn't reckless or knowing for Mr. Garlinghouse or

15   Mr. Larsen to be a part of Ripple's sales, and demonstrably, it

16   wasn't.  Again, eight years, no action by the SEC, and various

17   other facts.  We just wanted to sort of clear the record on

18   this.

19           In terms of the economic reality, I just want to be

20   clear.  I never said that it is about labels.  In fact, I

21   started to tick through some of the similarities between Ether,

22   Bitcoin, and XRP.  I'm glad that we have joined issue on this,

23   because we are going to be seeking discovery from the SEC about

24   the manner in which it is determined that Bitcoin and Ether --

25   or the manner in which it found and articulated through its

L3JsSECc

1    senior officials, that Bitcoin and Ether are not securities.

2    That is obviously a critical part of this case.

3            And if the SEC is confident in its view that those are

4    materially different digital assets, it should have no problem

5    sharing them with the court, sharing them with the public.

6    These are critical judgments.  And Mr. Tenreiro is exactly

7    right, it is not about the labels.  It is a functional test.

8    We need to be able to test that proposition, because the SEC is

9    a team market actor.

10           We'll being back in front of you on that, your Honor,

11   once it is ripe.

12           THE COURT:  Right.  That's the next motion.

13           MR. SOLOMON:  Absolutely.  Yes, exactly.  That's the

14   next motion.

15           So, look, the SEC is doing its job.  They are fighting

16   hard.  But I would just say, again, they are not a super-

17   litigant.  They can't point to a single case that has ever

18   allowed this kind of searching discovery, particularly as it

19   relates to individuals.  It is not a fraud case.  And the

20   distinction there is, not just fraud, but individuals.

21           In a fraud case, it is easier to understand when

22   you're talking about cash -- about hiding assets or tax

23   evasion, why there may be a compelling need to get the

24   documents.  It is just not the case here.

25           So I hope before your Honor would be inclined to allow

L3JsSECc

1    any additional discovery, because we don't think anything is

2    required here, we can see what the SEC says about XRP.  I don't

3    know what they are talking about.  They have never raised that

4    with me.  I don't believe they have raised it with

5    Mr. Flumenbaum.

6          And maybe this entire episode was a waste of your

7    time, and I apologize for that, because we are willing and able

8    to provide any XRP information for the time that Mr. Larsen and

9    Mr. Garlinghouse were at Ripple so that they can make whatever

10    arguments they want to a fact-finder about motivations.  And we

11    believe we've already done that.

12          Apparently Mr. Tenreiro thinks differently.  We hope

13    we can join issue on that.  In terms of any non-XRP financial

14    information, I think they have made no showing today at all

15    that they are entitled to it, and it has been made very clear

16    that this is really something they want to have, not something

17    they are entitled to.

18          Thank you, your Honor.

19          THE COURT:  Thank you.

20          MR. FLUMENBAUM:  Your Honor, this is Mr. Flumenbaum.

21    I'm going to be very brief, because Mr. Solomon, as always,

22    said some of the things that I wanted to say.

23          There was nothing in Mr. Tenreiro's argument that

24    justifies the specific XRPs before your Honor, and the specific

25    third parties to banks like Citibank and Silicon Valley Bank,

L3JsSECc

1    where the defendants have some of their personal accounts.

2    They are not going to learn anything about XRP from those

3    accounts, and they know that.  They just want to be intrusive,

4    and they are harassing these two individuals.

5         Mr. Tenreiro misspoke when he quoted to you from the

6    2012 -- and I stress the date -- legal opinion.  This was

7    before Ripple was actually created and before it began its

8    operations, that it was unlikely that it would be determined to

9    be a security.  That is what -- and that legal opinion will be

10   in evidence, because it was utilized and it has been produced

11   to the SEC.  So the SEC has had this document for a long time.

12   That's one.

13        Two, what Mr. Tenreiro ignores is that in 2015, after

14   Ripple began its operations, they entered into an agreement

15   with the Department of Justice and the Department of Treasury,

16   in which Ripple was determined to be a money transfer

17   organization subject to the currency rules and money laundering

18   rules.  And that is the way it has been regulated since 2015.

19        Also, the Department of Financial Services in New York

20   regulates Ripple in that same manner.  So there is a major

21   distinction.  And in terms of XRP, XRP is -- this may be

22   important for your Honor to know -- XRP actually existed, the

23   entire quantity of XRP existed before Ripple was created.

24        So this is not a situation where Ripple created a, you

25   know, a token and then sold it out.  XRP existed beforehand,

L3JsSECc

1   and then it was utilized for appropriate uses as, starting back

2   in 2015.  As Mr. Solomon said, there were gateways, you know,

3   for uses, and it's now one of the predominant methods for money

4   transfers throughout the world.

5            There has been at least -- there are 140 million

6   payment transactions since 2013.  Approximately 1.3 trillion

7   units of XRP have moved across its decentralized ledger.  And

8   we will be able to show, in connection with Bitcoin and Ether,

9   that the prices of XRP, at least until the SEC brought it,

10  moves with the other virtual currencies, not in accordance with

11  Ripple's statements or conduct.

12           Ripple has its own shareholders who have funded the

13  company and they have sold stock that's separate from the

14  digital assets of XRP.  You know, XRP, we will prove, is

15  similar to Bitcoin and Ether.

16           That's all I want to respond to Mr. Tenreiro's

17  remarks.  Again, nothing that he said relates to the broad,

18  intrusive discovery that they are seeking.  If he has a problem

19  identifying, you know, a transaction or he thinks there is an

20  intermediary here, we can deal with that.  He has never raised

21  that with us before, and that is really the point.

22           His attempt to get these documents from the

23  third-party banks was just totally inappropriate, when we were

24  discussing this.  And if there is an issue with respect to a

25  transaction that he doesn't understand, we'll be glad to

L3JsSECc

1    explain it.  We have told him, we're prepared to give him

2    everything relating to the XRP trades.  He'll know exactly how

3    many of them.  Why he needs to know -- if he has 1,000 trades

4    now, so maybe he'll find 1001?  I'm not quite sure of the

5    relevance of that.

6            But in any event, we'll be glad to try to deal with

7    Mr. Tenreiro's knowledge of the market.

8            MR. TENREIRO:  Your Honor, may I respond briefly?

9    This is Jorge Tenreiro.

10           THE COURT:  Mr. Tenreiro, sure.

11           MR. TENREIRO:  Yes.  May I respond, your Honor?

12           THE COURT:  Go ahead.

13           MR. TENREIRO:  Your Honor, the court asked a question

14   to focus on whether each sale is a violation of the statute.

15   The defendants did not respond or address this question and

16   sort of went on the similar path that they typically do, and

17   that I would urge the court to resist, which is to sort of put

18   the SEC on trial, and now apparently put my own litigation

19   schedule on trial.

20           We have made a prima facie case for why we need these

21   documents, your Honor.  The defendants are arguing that some of

22   these sales are beyond the reach of the SEC because it matters

23   where the sales were placed.  Again, the only way that we can

24   understand the full extent of the sales and of where the sales

25   came from and the proceeds of the sales came from are the bank

L3JsSECc

1    records.

2            THE COURT:  I'm sorry.  Mr. Tenreiro, Mr. Solomon said

3    that 95 percent of Mr. Garlinghouse's sales happened overseas.

4    So that may not -- those sales may not qualify as a Section 5

5    violation.

6            I don't quite see what -- we all can have a fight

7    whether that is true or not.  But if we accept, meaning whether

8    95 percent of its sales were overseas, if we accept the

9    proposition that certain sales that are overseas would not be

10   subject to your claims, it's still not obvious to me why seeing

11   money that flows into a hypothetical bank account because of a

12   transaction would necessarily be probative of your claims.

13           MR. TENREIRO:  Right, your Honor.

14           Mr. Solomon urged the court to look at the letters on

15   this point.  I would urge the court to do the same and look at

16   our letters.

17           The premise is incorrect.  We can accept the fact that

18   some of the sales occurred on platforms that occurred abroad,

19   but as the defendants have pointed out, this is a Section 5

20   case, and their claim under Morrison is incorrect.  Morrison

21   dealt with fraud, and so they are sort of now, now that the

22   table is turned and they say, look at Morrison, which is a

23   fraud case.

24           We point out in our letter, it's regulation S, which

25   is issued under Section 5 and deals with what transactions are

L3JsSECc

1    considered domestic.  And under regulation S, which the SEC

2    promulgated, you know, a sale can't be exempted from the Act

3    simply by going essentially through a foreign conduit and then

4    finding its way back into the United States.  Otherwise, it

5    would be the easiest way to avoid the registration requirement

6    of the Securities Act, simply dumping all the securities to

7    people --

8              THE COURT:  We just lost Mr. Tenreiro.  I think he was

9    winding up.  I don't think it is appropriate for him to end the

10   conference without him joining back in.  I guess I'm going to

11   continue with my generosity.  I'm going to hold off for a

12   moment.  We'll get Mr. Tenreiro hopefully back on the line, and

13   then we'll wrap things up.

14             (Pause)

15             MR. TENREIRO:  Your Honor, this is Jorge Tenreiro.  I

16   apologize.  I believe my call dropped.

17             THE COURT:  Yes.  We heard it when it happened.

18             I'll give you an opportunity to finish your thought,

19   and then we're going to conclude today's proceeding.

20             MR. TENREIRO:  Thank you, your Honor.

21             So under Morrison -- so Morrison is inapplicable in

22   the way the defendants claim.  Regulation S controls whether a

23   sale or offer is domestic.  So under regulation S, as we

24   explain in our letter, if there is no restrictions on the

25   securities coming back to the United States, they are not

L3JsSECc

1    exempted.  As the court might imagine, it would be the easiest

2    way to avoid the registration requirement of Section 5 to

3    simply sell the shares, quote-unquote, abroad and have the

4    shares resold back in the United States.  So there is a very

5    fundamental dispute here as to what constitutes a domestic

6    sale, and it is another reason why the individual transactions

7    are relevant.

8          I would also urge the court to resist the entreaties,

9    it seems like the individual defendants, you know, have no

10   answer to the point that every sale is a potential violation of

11   the Act, now want to retreat and say, Well, let's go back and

12   meet and confer.

13         I urge the court to look at the record and the

14   letters.  We sent them a letter on February 26.  They didn't

15   respond to it.  we had to follow up with an e-mail on March 3.

16   Then we had a meet and confer.  Then they told us, you know, if

17   you don't withdraw the subpoenas, we're not going to meet and

18   confer with you again.  We have tried to meet and confer with

19   them.

20         Mr. Flumenbaum, who referenced the XRPs before your

21   Honor, the XRPs have been narrowed.  We have narrowed them, as

22   we have stated in our letters to them and in our letters to the

23   court.  We believe we have met our prima facie case to

24   demonstrate why these records are important and critical to

25   both the SEC's claims and the defenses, and I have not heard --

L3JsSECc

| | |
|---|---|
| 1 | Mr. Solomon is correct.  We have the burden to set forth that |
| 2 | case.  But having done so, they have to explain to the court |
| 3 | why there is a burden to them, or the requests are otherwise |
| 4 | improper.  And we respectfully submit to the court that they |
| 5 | have not done so. |
| 6 | Thank you. |
| 7 | THE COURT:  All right.  Thank you, everybody. |
| 8 | I'm going to take all of your recommendations to |
| 9 | reread some of the cases and look over some of these letters |
| 10 | again before making my rulings. |
| 11 | I'm going to reserve on a ruling at this time.  I do |
| 12 | need to adjourn the conference, in part, because I have another |
| 13 | conference.  I just wanted to check with you, Mr. Tenreiro, |
| 14 | just in the upcoming motions.  I don't know that we have a date |
| 15 | by which you are going to be responding to the motion to |
| 16 | compel? |
| 17 | MR. TENREIRO:  Monday, your Honor. |
| 18 | THE COURT:  You're going to file it on Monday? |
| 19 | MR. TENREIRO:  That's correct. |
| 20 | THE COURT:  OK.  All right.  So we will take a look at |
| 21 | those motions once they are fully submitted by Monday and |
| 22 | determine whether or not we think oral argument is appropriate |
| 23 | on those motions, and if so, we'll issue an order. |
| 24 | Again, I want to thank -- |
| 25 | MR. TENREIRO:  If I may? |

L3JsSECc

1     THE COURT:  Is this Mr. Tenreiro?

2     MR. TENREIRO:  I want to add, since the court

3   neglected to mention the SEC v. Kik case.  To the extent that

4   the court is looking at the Howey issue, the Telegram case has

5   the bank records, but also a substantive decision on the merits

6   in both SEC v. Kik and SEC v. Telegram, which are Southern

7   District cases, apply the Howey test to digital assets, and I

8   believe those would be the helpful to the court, if I may.

9     THE COURT:  Thank you.

10    I think both of those cases are in your letter.

11    MR. TENREIRO:  I believe only Telegram is, and

12  Telegram only cites the bank records decision.  But the docket

13  number for the Kik case is 19 CV, I believe it is 5433.  It is

14  not actually my case, but it is a case before Judge

15  Hellerstein.  And his opinion is, I believe, on West Law as

16  well.

17    THE COURT:  Great.

18    MR. SOLOMON:  We have no new authority, Judge.  We'll

19  rest on the authority that we have already set in our letters.

20    Thank you, again, for your time today.

21    MR. FLUMENBAUM:  Thank you, your Honor.

22    THE COURT:  Thank you, everybody.  Stay safe.

23    We're adjourned.

24    (Adjourned)

25