UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

SECURITIES AND EXCHANGE COMMISSION,

                                     Plaintiff,

           -against-

RIPPLE LABS, INC., et al.,

                                   Defendants.

----------------------------------------------------------------X

20-CV-10832 (AT)(SN)

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge:**

      The Securities and Exchange Commission has sued Ripple Labs, Inc., Bradley Garlinghouse and Christian A. Larsen for violations of Sections 5(a) and 5(c) of the Securities Act of 1933 by engaging in the unlawful offer and sale of unregistered securities. The amended complaint further alleges that Garlinghouse and Larsen aided and abetted Ripple in its violations. See ECF No. 46 at ¶¶ 9, 10; 15 U.S.C. §§ 77e(a), 77e(c).

      As part of civil discovery, the SEC seeks eight years of personal financial information of Garlinghouse and Larsen from them directly and through subpoenas served upon financial institutions with which they or their family members hold accounts. Garlinghouse and Larsen move for a protective order to avoid their discovery obligation and to quash the subpoenas served upon SVB Financial Group, First Republic Bank, the Federal Reserve Bank of New York, Silver Lake Bank, Silvergate Bank, and Citibank, N.A. The motion is GRANTED.

**BACKGROUND**

XRP is a digital asset (or "cryptocurrency") that can be issued or transferred using a distributed ledger—a peer-to-peer database spread across a network of computers that records all transactions publicly.[1] There are many such ledgers, some of which have "native" digital assets, perhaps with the best-known example being the Bitcoin, the native digital asset to the Bitcoin Ledger.[2] XRP is the native asset to the XRP Ledger. See ECF No. 46 at ¶¶ 32–37.

The SEC alleges that in approximately late 2011 or early 2012, Larsen and another co-founder began to work on the idea and code for what would become the XRP Ledger. In September 2012, Larsen (with others) founded Ripple Labs, Inc. Id. at ¶ 44. Upon completion of the XRP Ledger in December 2012, and as its software was deployed on the first computer servers on which it runs, its development team created a fixed supply of 100 billion XRP. Id. at ¶ 45. The development team then transferred 80 billion XRP to Ripple and 9 billion to Larsen as compensation.[3] Id. at ¶ 46. Garlinghouse joined Ripple in 2015, and subsequently received at least 357 million XRP from Ripple as compensation. See id. at ¶¶ 74, 87. The SEC claims that from 2013 to the present, the Individual Defendants offered or sold a portion of their individual holdings of XRP to the public in exchange for hundreds of millions of dollars (1.7 billion XRP netting $450 million for Larsen and his wife; 375 million XRP netting $159 million for Garlinghouse). See id. at ¶¶ 86–88.

---

[1] A number of technical details, distinctions, and operational nuances are absent from these descriptions of XRP and the XRP Ledger that may prove critical in the ultimate determination of whether the Defendants are liable for offering and selling unregistered securities. Without expressing a view on that issue for now, I seek to provide only the necessary facts to place the present dispute in context.
[2] See Satoshi Nakamoto, Bitcoin: A Peer-to-Peer Electronic Cash System, Bitcoin.org, https://bitcoin.org/bitcoin.pdf.
[3] The remaining 11 billion XRP was transferred to another co-founder and development team member who are not parties to the case. See ECF No. 46 at ¶ 46.

I.      **The SEC's Burden in this Case**

Sections 5(a) and 5(c) of the Securities Act require that whenever an issuer of securities, its control persons, or affiliates offers or sells securities to the public, those securities must first be registered with the SEC, absent certain exemptions. See 15 U.S.C. §§ 77e(a), 77e(c). The SEC claims that XRP is an investment contract, and therefore a security. Accordingly, the SEC claims that the Individual Defendants violated Section 5 by offering and selling their XRP into the public market without first registering those offers and sales, and that they aided and abetted Ripple's violations as well. See ECF No. 9.

To prevail, the SEC will need to show that XRP is an investment contract under the Howey test. See S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298–99 (1946) (holding that an "investment contract . . . means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party. . ."); S.E.C. v. Aqua-Sonic Products Corp., 687 F.2d 577, 582 (2d Cir. 1982) (finding that the Supreme Court had moved away from a literal interpretation of "solely" in the Howey test, and toward an economic realities and totality of the circumstances view of the alleged scheme); Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1034 (2d Cir. 1974) ("The question therefore becomes whether . . . in light of the economic reality and the totality of circumstances . . . the customers were making an investment . . . ."). Furthermore, in order to prove its allegations that the Individual Defendants aided and abetted Ripple in offering or selling unregistered securities, the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's offerings and sales of XRP required registration as securities and that those transactions were improper. See 15 U.S.C. § 77o(b); S.E.C. v. Apuzzo, 689 F.3d 204, 206 (2d Cir. 2011); S.E.C. v. Espuelas, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012).

**DISCUSSION**

The SEC has served the Individual Defendants with Requests for Production seeking their personal financial records over an eight-year period. See ECF. No. 59, Exs. A, B. It also issued third-party subpoenas to several financial institutions at which the Individual Defendants maintain accounts, seeking similar records. See id. at Exs. C–H. The Individual Defendants have moved to prevent the SEC's attempts to obtain these records. See id.

**I.       The Parties' Burdens Under the Federal Rules**

Rule 26(b) limits discovery to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). "The party seeking discovery bears the initial burden of proving the discovery is relevant." Citizens Union of City of N.Y. v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017). In considering whether a discovery request poses an undue burden, the court should consider if it is "unreasonably cumulative or duplicative"; if it "can be obtained from some other source that is more convenient, less burdensome, or less expensive"; if "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; and if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(1)-(2).

Furthermore, subpoenas "issued under Rule 45 of the Federal Rules of Civil Procedure are subject to Rule 26(b)(1)'s overriding relevance requirement." During v. City Univ. of N.Y., No. 05-cv-06992 (RCC), 2006 WL 2192843, at *2 (S.D.N.Y. Aug. 1, 2006). If the party issuing the subpoena establishes the relevance of the materials sought, the party moving to quash must demonstrate that it poses an undue burden. See Griffith v. United States, No. M8-85 (JFK), 2007 WL 1222586, at *2 (S.D.N.Y. Apr. 25, 2007). "Whether a subpoena imposes an undue burden depends upon such factors as relevance, the need of the party for the documents, the breadth of

the documents, the time period covered by it, the particularity with which the documents are described and the burden imposed." Night Hawk Ltd. v. Briarpatch Ltd., No. 03-cv-01382 (RWS), 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003). Trial courts have broad discretion to determine if a subpoena imposes an undue burden. See Jones v. Hirschfeld, 219 F.R.D. 71, 74 (S.D.N.Y. 2003).

**II.     Application**

The SEC argues that the Individual Defendants' personal financial records are relevant to its claims because, under Section 5 of the Securities Act, "each sale of a security must either be made pursuant to a registration statement or fall under a registration exemption"—making *each* of the Individual Defendants' sales of XRP a possible Section 5 violation. See ECF No. 72 at 3 (quoting SEC v. Cavanagh, 155 F.3d 129, 133 (2d Cir. 1998)) (cleaned up). The SEC claims that the Individual Defendants' personal financial statements would show deposits from cryptocurrency exchanges,[4] representing the "simplest and most reliable way to deanonymize [the] Individual Defendants' XRP transactions." ECF No. 72 at 3. The Individual Defendants counter that they have already agreed to produce (and have begun to produce) all of the trading records relating to the sales and transfer of their XRP holdings, as well as any financial records concerning compensation they received from Ripple—as XRP or otherwise.

To the extent that the Individual Defendants' personal financial records contain relevant information showing that the Individual Defendants transferred or sold XRP, the Defendants have already agreed to provide such records to the SEC. The SEC's Requests for Production and

---

[4] Cryptocurrency exchanges are businesses that allow customers to trade cryptocurrencies for other assets, such as fiat money or other digital assets. See, e.g., What is a Crypto Wallet?, Coinbase.com, https://www.coinbase.com/learn/tips-and-tutorials/how-to-send-crypto. Exchanges often host users' "crypto wallets," containing a public and a private key that, through a complex mathematical process, allows only that user to transfer cryptocurrency from the wallet. See What is a Private Key?, Coinbase.com, https://www.coinbase.com/learn/crypto-basics/what-is-a-private-key.

third-party subpoenas make broader requests, however, that would result in the disclosure of an immense trove of private financial information with no relevance to whether the Individual Defendants offered or sold XRP into the public market or promoted its sale to potential investors. And although the SEC argues that it has no interest in the individual Defendants' private transactions unrelated to XRP (e.g., grocery receipts), and that it is willing to further limit its requests, the proposed limited requests are not before the Court.

Insofar as the SEC seeks the personal financial records to verify that the records the Individual Defendants agreed to provide are complete, the Court finds no evidence to suggest that such a verification is necessary or appropriate. The SEC does not allege that the Individual Defendants have misrepresented their records, and it has not shown that the records that have been promised are lacking the information necessary to support its claims in any meaningful way. Indeed, this case is in its beginning stages, and the SEC's rush to serve requests and subpoenas seeking duplicative information of records already promised is premature at best.

The most compelling reason the SEC provides for why these banking records are necessary to prove Section 5 violations is that the Individual Defendants may have moved the XRP from the identifiable digital addresses (or "crypto wallets") linked to their banking or cryptocurrency exchange accounts, into other pseudonymous or anonymous crypto wallets. It argues that the Individual Defendants could use such pseudonymous accounts to make offers or sales of XRP to the public undetected. See Mar. 19, 2021 Hearing Transcript ("Tr.") 41:10–42:11. The SEC reasons that, because the records the Individual Defendants have agreed to share would not show sales from pseudonymous or anonymous accounts necessarily, the only way to verify such sales is by tracing their proceeds back to the Individual Defendants. The SEC argues that, because such proceeds must be converted into fiat currency to be of use to the Individual

Defendants, they would need to transfer them from cryptocurrency exchanges into their bank accounts, which would show a deposit date, amount, and the name of the depositing exchange. See Tr. 37:18–39:08. The SEC argues that such deposits are the most reliable record of individual offers or sales of XRP.

The SEC's argument presents several problems. First, the Individual Defendant's bank records might reflect a given deposit from a cryptocurrency exchange (e.g., Coinbase) on a certain date—but, by the SEC's own admission, that is all it would show.[5] It would not detail whether that deposit was the result of XRP sales, Bitcoin sales, sales of some other type of cryptocurrency, or even a withdrawal of U.S. dollars previously deposited into that Coinbase account. Furthermore, unless the Individual Defendant's bank deposits from Coinbase listed a particular XRP wallet address, it would be impossible from the bank records alone to determine whether the Coinbase transfer came from the Individual Defendant's known XRP wallet or from the presumed pseudonymous wallet. Perhaps most importantly, without more information from Coinbase, the SEC could not determine if the deposit was the result of one or more XRP transactions. Accordingly, the Court is not convinced that the personal banking records would show (or even could show) what the SEC claims they would—individual violations of Section 5.

Second, the SEC's "stress-test" argument assumes facts that have not yet been established. The SEC has not presented any evidence the Individual Defendants have hidden transactions or that the documents produced support an inference of hidden transactions. Furthermore, Defendant Larsen's counsel stated at oral argument that if the SEC "has a problem identifying . . . a transaction" on the XRP Ledger, that he would be "glad to explain it." See Tr.

---

[5] The SEC named Coinbase, a popular cryptocurrency exchange, at oral argument, though it alleges that the Individual Defendants used several different crypto exchanges for their transactions. For clarity, Coinbase is used as the hypothetical exchange, without any factual significance attached. See Tr. at 38:07–38:24.

at 68:24–69:07. The SEC's belief that the Individual Defendants' banking records might show evidence of a speculative transaction that could have occurred (and that the Individual Defendants are not providing in their XRP transaction records) is not a foundation on which to order expansive discovery into personal financial accounts.

Additionally, the SEC argues that the personal financial records at issue are relevant to showing the extent to which the Individual Defendants personally funded efforts to promote a "reasonable expectation of profit" for XRP's investors, necessary to prove the alleged Section 5 violations. See Howey, 328 U.S. at 298–99. Citing an unpublished order in which Judge Castel did not present his reasoning, the SEC proposes that the Individual Defendants should be compelled to provide their personal bank records as evidence of such promotion efforts. See S.E.C. v. Telegram Grp., Inc., No. 19-cv-09439, ECF No. 67 (S.D.N.Y. Jan. 13, 2020). The Court finds that Telegram is distinguishable, however, especially in light of the Individual Defendants' willingness to provide the SEC with records of their XRP transactions and sales in this case, whereas the Telegram defendant claimed that foreign privacy laws shielded its records from disclosure. See id. at ECF No. 61. Furthermore, the Court agrees with the Individual Defendants that the disclosure of corporate bank records at issue in Telegram was of a different character than the personal financial records at issue here.

Finally, the SEC contends that it is entitled to obtain the Individual Defendants' personal financial records to prove that they had a personal financial motive to aid and abet Ripple in offering or selling unregistered securities. Relying on S.E.C. v. Am. Growth Funding II, LLC, it argues that these personal financial records showing "what proportion of the Individual Defendant's income was comprised of proceeds from XRP sales" could help a factfinder assess whether the Individual Defendants sold their XRP holdings in good faith, or whether they had a

motive to purposefully ignore evidence that XRP may be considered a security. See No. 16-cv-00828 (KMW), 2019 WL 1748186, at *4 (S.D.N.Y. Apr. 19, 2019); ECF No. 72 at *4.

The Court is not persuaded that the SEC should be entitled to obtain the entirety of the Individual Defendants' personal financial records over an eight-year period for the purpose of bolstering its "proportional" financial motive argument. The SEC has alleged that the Individual Defendants gained more than half a billion dollars from their sales of XRP. See, e.g., ECF No. 46 at ¶ 6. Such an extraordinary sum surely is great enough to make the same "motive" argument, regardless of whether it represented 95% or 5% of the Individual Defendants' wealth.

Additionally, the Court finds that the Individual Defendants distinguished the authorities upon which the SEC relies from the case at hand, noting that they involved individuals and businesses who were accused of intent to defraud, unlike here. See, e.g., S.E.C. v. eSmart Tech, No. 11-cv-00895, 2013 WL 1233681, at *2 (D.D.C. Oct. 24, 2013) (granting SEC motion to compel bank records as relevant to scienter where the defendant was accused of diverting funds raised from investors to her personal bank account). The SEC argues that it cited these authorities only for the principle that bank records have been used as circumstantial evidence to support an inference of scienter. See Tr. 47:01–17. But it can be true that personal financial records provide evidence of scienter *in a fraud case* (the fact that investor funds were improperly transferred to a personal bank account) but would provide little insight into whether or not the Individual Defendants acted in good faith that XRP was not a security or did so knowingly or recklessly.

## CONCLUSION

Accordingly, the Court finds that the SEC's requests for the Individual Defendants' personal financial records, apart from those records of XRP transactions that are already

promised, are not relevant or proportional to the needs of the case. Accordingly, the Individual Defendants' motion is GRANTED. The SEC shall withdraw its Requests for Production seeking the Individual Defendants' personal financial records and withdraw its third-party subpoenas seeking the same. If, as discovery progresses, the SEC uncovers evidence that the Individual Defendants have not been forthcoming with records of their XRP transactions, it may provide such evidence to the Court and renew its application.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:    April 9, 2021
          New York, New York