**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                         Plaintiff,

            v.

RIPPLE LABS INC.,
BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN

                         Defendants.

Civil Action No. 1:20-CV-10832

ECF Case

ORAL ARGUMENT REQUESTED


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT CHRISTIAN A. LARSEN'S MOTION**
<u>**TO DISMISS THE FIRST AMENDED COMPLAINT**</u>


PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000

*Attorneys for Defendant Christian A. Larsen*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 4

    I.     The Creation of XRP and the Founding of Ripple ................................................. 4

    II.    Mr. Larsen Receives Legal Advice that XRP is Very Likely Not a Security......... 5

    III.   Mr. Larsen's Role as Chief Executive of Ripple from 2012 to 2016 .................... 6

    IV.   Mr. Larsen Transitions from CEO to Executive Chairman of Ripple's Board of Directors in late 2016................................................................................ 9

    V.    Mr. Larsen's Sales of XRP ................................................................................. 10

LEGAL STANDARD............................................................................................................. 11

ARGUMENT ......................................................................................................................... 11

    I.     The Second Claim for Relief Should Be Dismissed Because the Amended Complaint Fails to State a Section 15(b) Claim Against Mr. Larsen. ................. 11

         A.    The Amended Complaint Fails to Plausibly Allege Knowledge or Recklessness ..................................................................................... 12

         B.    The SEC Fails to Plausibly Allege Substantial Assistance by Mr. Larsen................................................................................................. 19

    II.    The First Claim for Relief Should Be Dismissed as to Mr. Larsen for Failure to Plead a Domestic Transaction. ........................................................... 22

         A.    The SEC Fails to Plead Any Sales Were Domestic Pursuant to *Morrison* .............................................................................................. 23

         B.    The SEC Fails to Plead Any Offers Were Domestic Pursuant to *Morrison* .............................................................................................. 26

         C.    Mr. Larsen's Sales and Offers Were "Predominantly Foreign" .............. 27

    III.   The SEC's Claims for Monetary Relief Are Time-Barred ................................. 28

CONCLUSION...................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
  677 F.3d 60 (2d Cir. 2012)....................................................................................23, 24, 25, 27

*SEC* v. *Ahmed*,
  308 F.Supp.3d 628 (D. Conn. 2018) ...........................................................................23

*SEC* v. *Apuzzo*,
  689 F.3d 204 (2d Cir. 2012).....................................................................................19, 21

*Arco Cap. Corps. Ltd.* v. *Deutsche Bank AG*,
  949 F. Supp. 2d 532 (S.D.N.Y. 2013).......................................................................24

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009)......................................................................................................11

*Banco Safra S.A. Cayman Islands Branch* v. *Samarco Mineracao S.A.*,
  19-3976-cv, 2021 WL 825743 (2d Cir. Mar. 4, 2021) ......................................24, 26

*In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011).......................................................................10

*SEC* v. *Bio Def. Corp.*,
  No. 12-11669-DPW, 2019 WL 7578525 (D. Mass. Sept. 6, 2019)........................22

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................................13

*Cavello Bay Reinsurance Ltd.* v. *Shubin Stein*,
  986 F.3d 161 (2d Cir. 2021).......................................................................................28

*Cent. Bank of Denver* v. *First Interstate Bank of Denver*,
  511 U.S. 164 (1994).....................................................................................................13

*Chambers* v. *Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002)........................................................................................4

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014)..................................................................................14, 25

*Clarke* v. *Pac. Gas & Elec. Co.*,
  No. 20-CV-04629-WHO, 2020 WL 6822912 (N.D. Cal. Nov. 20, 2020) .............30

ii

*SEC* v. *CMKM Diamonds, Inc.*,
    729 F.3d 1248 (9th Cir. 2013) ....................................................................20

*Ellul* v. *Congregation of Christian Brothers*,
    774 F.3d 791 (2d Cir. 2014)...............................................................11, 29

*SEC* v. *Espuelas*,
    905 F. Supp. 2d 507 (S.D.N.Y. 2012)........................................................12

*Farmer* v. *Brennan*,
    511 U.S. 825 (1994)..............................................................................13, 18

*Food & Drug Admin.* v. *Board & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000).....................................................................................27

*Gabelli* v. *SEC*,
    568 U.S. 442 (2013).....................................................................................29

*Harris* v. *Mills*,
    572 F.3d 66 (2d Cir. 2009)..........................................................................11

*Holsworth* v. *BProtocol Found.*,
    No. 20 CIV. 2810 (AKH), 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021)................24

*SEC* v. *Jones*,
    300 F. Supp. 3d 312 (D. Mass. 2018) ........................................................29

*Loginovskaya* v. *Batratchenko*,
    764 F.3d 266 (2d Cir. 2014).........................................................................25

*SEC* v. *Mattessich*,
    407 F. Supp. 3d 264 (S.D.N.Y. Sept. 9, 2019) .......................................12

*Matusovsky* v. *Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002)........................................................11

*Mori* v. *Saito*,
    No. 10 CIV. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ............23

*Morrison* v. *National Australia Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................ *passim*

*SEC* v. *Mudd*,
    885 F. Supp. 2d 654 (S.D.N.Y. 2014).......................................................20

*Myun-Uk Choi* v. *Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018)..........................................................................24

*Noa* v. *Key Futures, Inc.*,
638 F.2d 77 (9th Cir. 1980) ...............................................................................17

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)..............................................................................13

*Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*,
763 F.3d 198 (2d Cir. 2014)...............................................................................28

*SEC* v. *Paulsen*,
No. 18 CIV. 6718 (PGG), 2020 WL 6263180 (S.D.N.Y. Oct. 23, 2020).........12, 16

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)...............................................................................23

*Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*,
753 F. Supp. 2d 166 (S.D.N.Y 2010).................................................................25

*SEC* v. *Riel*,
282 F. Supp. 3d 499 (N.D.N.Y. 2017) ...............................................................21

*SEC* v. *River N. Equity LLC*,
415 F. Supp. 3d 853 (N.D. Ill. 2019) .................................................................12

*Safeco Ins. Co. of Am.* v. *Burr*,
551 U.S. 47 (2007)..............................................................................................14

*Schentag* v. *Nebgen*,
No. 1:17-CV-8734-GHW, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) ............22

*Sierra Club* v. *Oklahoma Gas & Electric Co.*,
816 F.3d 666 (10th Cir. 2016) ...........................................................................29

*State Univs. Ret. Sys. of Illinois* v. *Astrazeneca PLC*,
334 F. App'x 404 (2d Cir. 2009) ........................................................................11

*Sullivan* v. *Barclays PLC*,
No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ...............7, 26

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................................24

*SEC* v. *W.J. Howey Co.*,
328 U.S. 293 (1946).............................................................................................1

*Ward* v. *Succession of Freeman*,
854 F.2d 780 (5th Cir. 1988) ..............................................................................18

iv

*Wells Fargo Bank, N.A.* v. *Wright Mill Holdings, LLC*,
    127 F. Supp. 3d 156 (S.D.N.Y. 2015)........................................................................8

*SEC* v. *Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)......................................................................21

**Statutes, Regulations, and Rules**

15 U.S.C. § 77o(b) .............................................................................................................12

15 U.S.C. § 78c(a)(10)..................................................................................................2, 15

28 U.S.C. § 2462..........................................................................................................28, 29

Federal Rules of Civil Procedure Rules 12(b)(6) ...................................................1, 10

National Defense Authorization Act of 2020 ........................................................28

31 C.F.R. § 1010.100(ff)(8)(ii) (2014) ..........................................................................15

**Other Authorities**

Hester Peirce, Comm'nr, Sec. & Exch. Comm'n, *Running on Empty: A Proposal
    to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020),
    https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06......................10, 16

FinCEN, *Fact Sheet on MSB Registration Rule*, available at
    https://www.fincen.gov/fact-sheet-msb-registration-rule ........................................8

Dep't of the Treasury, *Application of FinCEN's Regulations to Certain Business
    Models Involving Convertible Virtual Currencies*, FIN-2019-G001 at 7 (May
    9, 2019), available at https://www.fincen.gov/sites/default/files/2019-
    05/FinCEN%20Guidance%20CVC%20FINAL%20508 ........................................8

Cheddar, *Interview with CFTC Chairman Heath Tarbert* (Jan. 13, 2020),
    https://twitter.com/cheddar/status/1216739497121107970 ..............................10, 16

William Hinman, Dir., Div. of Corp. Fin., Sec. & Exch. Comm'n, *Digital Assets
    Transactions: When* Howey *Met* Gary *(Plastic)*, (June 14, 2018), available at
    https://www.sec.gov/news/speech/speech-hinman-061418..............................10, 16

Sec. & Exch. Comm'n. *SEC Issues Investigative Report Concluding DAO Tokens,
    a Digital Asset, Were Securities: U.S. Securities Laws May Apply to Offers,
    Sales, and Trading of Interests in Virtual Organizations*, No. 2017-131 (July
    25, 2017) ..........................................................................................................9, 16

Dep't of Treasury, *Application of FinCEN's Regulations to Certain Business
    Models Involving Convertible Virtual Currencies*, FIN-2019-G001 (May 9,
    2019) ....................................................................................................................8

U.S. Dep't of Justice, *Cryptocurrency Enforcement Framework*, *Report of the Attorney General's Cyber Digital Task Force* (Oct. 8, 2020), available at https://www.justice.gov/ag/page/file/1326061/download .........................................................8

Defendant Christian A. Larsen respectfully submits this memorandum of law in support of his motion to dismiss the First Amended Complaint (ECF No. 46) (the "Amended Complaint") filed by the Securities & Exchange Commission (the "SEC") in its entirety as to him, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

In this case, the SEC seeks to regulate a novel and innovative financial asset by bringing an ill-conceived enforcement action in an undeveloped and highly uncertain area of the law. In its Amended Complaint, the SEC takes the extraordinary position that Ripple engaged in a multi-year unregistered offering of XRP—a digital asset that has been trading in a massive global market in plain view for eight years, where there are significant use cases for XRP apparent on the face of the Amended Complaint, and hundreds of billions of dollars of XRP transactions have been entered into across hundreds of digital asset exchanges. The SEC ultimately will be unable to demonstrate that transactions in XRP constitute securities because, among other reasons, transactions in XRP are not "investment contracts" under *SEC* v. *W.J. Howey Co.*, 328 U.S. 293 (1946). But this Court will not have to reach that question as to Mr. Larsen, the Executive Chairman of Ripple, because the SEC's allegations that Mr. Larsen violated Section 5 and 15(b) of the Securities Act of 1933 are deficient as a matter of law.

*First*, despite multiple attempts, the SEC has failed to adequately plead its Section 15(b) aiding and abetting claim, which requires that the SEC plausibly allege that Mr. Larsen knew or was reckless as to whether XRP was a security. At a minimum, to plead recklessness, the SEC must allege that it was "so obvious" to Mr. Larsen that he "must have been aware" both that XRP was an "investment contract" and that Ripple's conduct was improper. But there are multiple allegations in the Amended Complaint that render the SEC's claim that Mr. Larsen knew or was reckless as to whether XRP was a security implausible and defective as a matter of

law.  Even though the existence of XRP and Ripple's activities were publicly known throughout the entire eight years addressed in the Amended Complaint, the SEC never once publicly stated or even suggested that XRP transactions were securities.  In the meantime, against the backdrop of the statutory exclusion of "currency" from the definition of "security" under the federal securities laws (*see* 15 U.S.C. § 78c(a)(10)), the Department of Justice ("DOJ") and Financial Crimes Enforcement Network ("FinCEN") took the position that XRP was a virtual currency and subsequently regulated XRP as a virtual currency—a fact the SEC acknowledges in the Amended Complaint.  The SEC also declared that bitcoin and ether—the two digital assets most similar to XRP—are not securities, further undermining any claim that Mr. Larsen possessed the requisite knowledge or recklessness that XRP was in fact a security.

Far from plausibly supporting the SEC's theory, these allegations and facts subject to judicial notice fundamentally contradict the SEC's claim that Mr. Larsen acted knowingly or recklessly.  What's left of the Amended Complaint as to Mr. Larsen are conclusory assertions and misstatements and misrepresentations of a handful of cherry-picked documents that in no way support an inference that he acted knowingly or recklessly.  Reduced to their essence, the SEC alleges that Mr. Larsen, at most, was aware that there was "some risk" that XRP could be deemed to be a security—allegations that fall well short of pleading knowledge or recklessness under well-settled law.  Ultimately, all the SEC has alleged is that Mr. Larsen took a position on a novel and unsettled legal issue different from the one the SEC ultimately adopted in December 2020 when it filed this case.  Such allegations are insufficient to state a claim that Mr. Larsen acted knowingly or recklessly.

The SEC's aiding and abetting claim against Mr. Larsen also fails because it does not adequately plead that he "substantially assisted" Ripple's alleged Section 5 violations—another

essential element of an aiding and abetting claim under Section 15(b).  Critically, the SEC does not allege that Mr. Larsen made even a single statement promoting XRP as an investment opportunity.  Threadbare allegations that Mr. Larsen attended a handful of meetings and was copied on certain communications are insufficient to plead substantial assistance with respect to specific sales by Ripple.

*Second*, the SEC alleges that Mr. Larsen personally engaged in over $450 million in XRP sales in violation of Section 5.  But again, as a matter of law, the SEC's claim should be dismissed because it fails to adequately allege facts showing that even one offer or sale of XRP was domestic as required by the Supreme Court's decision in *Morrison* v. *National Australia Bank Ltd.*, 561 U.S. 247, 268–70, 273 (2010).  In four paragraphs of its 440-paragraph Amended Complaint, the SEC asserts in a conclusory fashion that Mr. Larsen's "directed his offers and sales of XRP from within the United States" and "made offers and sales of XRP to persons in the United States."  It is well established that such allegations are insufficient in the Second Circuit to plead a domestic offer or sale.  The SEC has resorted to such vague allegations because, after a two-and-a-half-year investigation, it is fully aware that its claim is doomed to fail since virtually all of the XRP transactions at issue in the Amended Complaint were completed on foreign exchanges.  And even if the SEC has adequately alleged some domestic elements of the transactions, they are nevertheless outside the reach of Section 5 because the offers or sales are "predominantly foreign" even on the face of the Amended Complaint.

*Third*, the SEC's claims for disgorgement and monetary relief are time-barred as a result of the SEC's own pleading choices.  The SEC chose to plead one ongoing multi-year offering (likely to avoid the dictates of *Morrison*).  In these circumstances, the statute of limitations on

Mr. Larsen's XRP sales began to run in 2013—rather than 2015 as the SEC wrongfully insists—and expired in 2018.

For all these reasons, the claims against Mr. Larsen should be dismissed with prejudice.

<b><u>STATEMENT OF FACTS</u></b>

**I.      The Creation of XRP and the Founding of Ripple**

In 2011, Co-Founder[1] began to spearhead the creation of a state-of-the-art blockchain that ultimately became known as the XRP Ledger. (Compl. ¶ 38.) The XRP Ledger is software code that operates as a peer-to-peer database spread across a network of computers that records transaction data. (*Id*. ¶ 39.) It was designed to be a superior alternative to bitcoin because it was more secure and did not involve inefficient mining of any tokens needed to transact. Co-Founder recruited Cryptographer-1 and Ripple Agent-1 to work with him to write the XRP Ledger's initial code. (*Id*. ¶ 38.) In 2012, when the XRP Ledger was deployed to the servers that would run it, a fixed supply of 100 billion of the token native to the XRP Ledger—what became known as "XRP"—was automatically created. (*Id*. ¶ 45.)

In February 2012—before Mr. Larsen had joined the XRP project team, before the XRP Ledger had been completed, and before Ripple was incorporated—Co-Founder and others requested legal advice from a reputable law firm on ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████ (Flumenbaum Decl. Ex. A.)[2] It included ███████████████████████████

---

[1]   The terms "Co-Founder" and "Ripple Agent-1" are used in the Amended Complaint and defined at paragraphs 20 and 22 of the Amended Complaint.

[2]   Because the SEC "relies heavily upon [the] terms and effect" of the February and October 2012 legal memoranda in its Amended Complaint and they are incorporated by reference, the entire documents may be considered on a motion to dismiss. *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

████████████████████████████ ████████████ and in light of this early advice, the proposed business plan was modified.

In mid-2012, Mr. Larsen decided to join the project.  (Compl. ¶ 42.)  In September 2012, NewCoin, Inc., later known as Ripple Labs Inc., was incorporated.  (*Id*. ¶¶ 16, 44.)  Ripple was formed to create products, certain of which would operate using the XRP Ledger.  (*Id*. ¶ 42.)  Ripple was granted 80 billion of the XRP that had been created.  (*Id*. ¶ 46.)  Co-Founder and Mr. Larsen each ultimately received nine billion XRP, while Ripple Agent-1 received two billion XRP.  (*Id*. ¶¶ 18, 20, 22, 46.)  Mr. Larsen was named the CEO of the company.  (*Id*. ¶¶ 18, 42–43.)

## II.  Mr. Larsen Receives Legal Advice that XRP is Very Likely Not a Security

In October 2012, the law firm updated its initial advice.  (Flumenbaum Decl. Ex. B.)  In its second memorandum, █████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████ ████████ ██████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ ██████

████████████████████  Importantly, the memorandum never concluded that Ripple Credits were "investment contracts" or "securities."

The Amended Complaint presents a misleading and distorted picture of the memorandum. As one example, the memorandum did not, as the SEC alleges (Compl. ¶ 53), suggest that the mere fact that parties engaged in "speculative investment trading" with respect to XRP would determine whether XRP was a security; rather, it stated that ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████ ██████ ████████ █████ ██ ██ ████ There was, for example, no recommendation that the Founders or the Company should inquire as to the purpose of those receiving XRP so as to ensure those recipients were not receiving the XRP for speculative purposes.

And while the SEC alleges that the October 2012 memorandum "advise[d] Ripple and Larsen to contact the SEC to obtain clarity as to whether XRP was a security under the federal securities laws," (Compl. ¶ 55), that is likewise false. Rather, the memorandum stated ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

### III. Mr. Larsen's Role as Chief Executive of Ripple from 2012 to 2016

As CEO of Ripple, Mr. Larsen was focused on doing what the SEC concedes Ripple was formed to do—create products, some of which would operate in conjunction with the XRP Ledger and XRP. (Compl. ¶ 42.)

Between 2012 and 2016, Ripple was focused on using its proprietary products, some of which worked with the XRP Ledger, to create a payments network—or the world's first

"distributed currency exchange."  As shown by the documents referenced in the SEC's own Amended Complaint, Ripple wished to promote adoption of XRP as a currency with no counterparty risk that could be used in Ripple's payment network.  Ripple described XRP as "the equivalent to paper cash in the physical world," a "Unit of Account," "Medium of Exchange," and "Store of Wealth."  Mr. Larsen also stated publicly on numerous occasions that he considered XRP to be a currency.  For example, in a February 19, 2014 interview, Mr. Larsen stated that XRP "is a math-based currency like [b]itcoin" because it is "a currency without a counterparty."  Similarly, in an April 14, 2014 interview, Mr. Larsen stated "[t]here is a currency built into [the XRP Ledger], called XRP."[3]

During Mr. Larsen's tenure as CEO, multiple government agencies agreed with Mr. Larsen's view that XRP was a currency, not a security—all while the SEC remained silent. As the Amended Complaint acknowledges, in May 2015, Ripple reached a settlement with both FinCEN and the DOJ relating to prior XRP sales by Ripple's wholly-owned subsidiary, XRP II, LLC ("XRP II"), and specifically to XRP II's registration as money services businesses and implementation of an anti-money-laundering program.  (Flumenbaum Decl. Exs. C & D.)[4]  In a jointly issued Statement of Facts, both agencies publicly concluded that XRP was a "virtual currency," that Ripple "provided virtual currency exchange transaction services," and that its subsidiary, XRP II, "engaged in sales of virtual currency to third parties."  (*Id.*, Attach. A at 1, 5.)  "Virtual currency" is described by FinCEN as "a medium of exchange that can operate like

---

[3]   Because the SEC references the documents described in this paragraph at paragraphs 63, 246, and 265 of the Amended Complaint, the Court may properly consider their terms on this motion to dismiss.  *See supra* n.2.

[4]   Because the SEC describes the terms of the DOJ and FinCEN settlement in the Amended Complaint (*see* ¶¶ 379–80) and they are subject to judicial notice, Mr. Larsen may rely on Exs. C and D in his motion to dismiss.  *See supra* n.2.  *See also Sullivan* v. *Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of DOJ settlement).

currency but does not have all the attributes of 'real' currency . . . including legal tender status."[5]

The Statement of Facts repeated that XRP was a "currency," or "money" more than a dozen

times. The settlement also established that XRP II was and continues to be a money services

business under the Bank Secrecy Act. (*See id.* ¶ 379 ("In May 2015, Ripple and XRP II

agreed . . . to settle charges brought by the [DOJ] and FinCEN for failing to register as a "Money

Services Business" under the Bank Secrecy Act and . . . to comply with other regulatory

requirements with respect to Ripple's XRP sales, which the settlement called 'virtual

currency'"); *id.* ¶ 19 (XRP II "is the entity through which Ripple offered and sold most of its

XRP in the Offering. XRP II is registered as a money service business with [FinCEN]").)[6] The

DOJ has continued to confirm its belief that XRP is a currency to this day. In August and

October of last year, the DOJ reiterated its view that XRP is a currency, calling it "one of the

major virtual currencies" in use alongside ether and bitcoin.[7]

---

[5] Dep't of the Treasury, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001 at 7 (May 9, 2019), available https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf. Courts routinely take judicial notice of governmental records or reports published on government websites. *See Wells Fargo Bank, N.A.* v. *Wright Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("Courts routinely take judicial notice of such governmental records [retrieved from official government websites].")

[6] "Money Services Businesses" are exclusively regulated by FinCEN for anti-money laundering (as reflected in the DOJ/FinCEN settlement), whereas anti-money laundering oversight for broker-dealers in securities is under the joint jurisdiction of FinCEN, FINRA and the SEC. *See* Declaration of Matthew C. Solomon in Support of Garlinghouse Motion to Dismiss ("Solomon Decl."), Ex. B (FinCEN, *Fact Sheet on MSB Registration Rule*, available at https://www.fincen.gov/fact-sheet-msb-registration-rule.) The Court may take judicial notice of this document. *See supra* n.5.

[7] U.S. Dep't of Justice, *Cryptocurrency Enforcement Framework*, *Report of the Attorney General's Cyber Digital Task Force*, at 25 (Oct. 8, 2020), available at https://www.justice.gov/ag/page/file/1326061/download. This Court may take judicial notice of this report. *See supra* n.5.

Other regulatory bodies' actions also caused Mr. Larsen to be confident that XRP was a currency not a security.  In 2016, XRP II obtained from the New York State Department of Financial Services ("NYDFS") a "BitLicense" or "virtual currency license" to enable it to sell XRP for, among others, financial institutions.  (*See* Compl. ¶ 19 ("XRP II is registered . . . as a virtual currency business with the [NYDFS]").)  From 2012 to mid-2017, while other agencies were investigating and bringing enforcement actions regarding virtual currencies generally and XRP in particular, the SEC did not release any guidance on, nor did it show any concern with, XRP or Ripple's activities, or even digital assets more broadly.

## IV.  Mr. Larsen Transitions from CEO to Executive Chairman of Ripple's Board of Directors in late 2016

On November 1, 2016—more than four years before this action was brought—Ripple announced that Mr. Larsen had decided to transition from his operational role as CEO of Ripple to executive chairman of Ripple's board of directors.  (Compl. ¶ 18.)  Brad Garlinghouse was named as the new CEO effective on January 1, 2017.  (*Id.* ¶ 17.)  Larsen's transition to Executive Chairman occurred approximately eight months before the SEC released its investigative report into The DAO matter.  In that report, the SEC stated *for the first time* that the U.S. securities laws may apply to some offering, selling, and trading of interests in digital assets.[8]  (Compl. ¶ 37.)  The report examined a completely factually distinct case from Ripple:  it concerned digital assets promoted as virtual shares in a virtual issuer, The DAO, which was expressly described as an alternative to typical corporate investments.

---

[8]     *See* Sec. & Exch. Comm'n, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities: U.S. Securities Laws May Apply to Offers, Sales, and Trading of Interests in Virtual Organizations*, No. 2017-131 (July 25, 2017) ("*The DAO Report*").  The Court may consider this document because the SEC relies on it in the Amended Complaint.  *See supra* n.2.

After the DAO Report, the SEC itself stated publicly in 2018 that the two digital assets most similar to XRP—bitcoin and ether—were not securities.[9] In addition, as late as early 2020, one of the SEC Commissioners, Hester Peirce, indicated that in her view a cryptocurrency may start out as a security, but over time as its uses become more developed and accepted, it becomes a currency and not a security.[10] In early 2020, the then-Chairman of the CFTC, Heath Tarbert, also said, in response to a question about whether XRP was a security, "[i]t's unclear . . . . We're working closely with the SEC to figure out what falls into what box."[11]

## V.    Mr. Larsen's Sales of XRP

From 2013 to 2020, Mr. Larsen sold his personal XRP predominantly through a foreign market maker.[12] As the Amended Complaint acknowledges, this foreign market maker sold Mr. Larsen's XRP on "digital asset trading platforms with worldwide operations and customers," "through certain digital asset trading platforms whose parent corporations are located outside the United States," and "to investors all over the world." (Compl. ¶¶ 174, 177.)

---

[9]    Solomon Decl. Ex. J, William Hinman, Dir., Div. of Corp. Fin., Sec. & Exch. Comm'n, *Digital Assets Transactions: When* Howey *Met* Gary *(Plastic)*, (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418. This Court may take judicial notice of the fact that Mr. Hinman said in this speech that bitcoin and ether were not securities. *See In re Bear Stearns Cos., Inc. Sec., Deriv., and ERISA Litig.*, 763 F. Supp. 2d 423, 582 (S.D.N.Y. 2011) (taking judicial notice of the fact that certain Congressional speeches contained certain information.)

[10]   Hester Peirce, Comm'nr, Sec. & Exch. Comm'n, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020), https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06. This Court may take judicial notice of the fact and contents of this speech. *See supra* n.9.

[11]   Cheddar, *Interview with CFTC Chairman Heath Tarbert* (Jan. 13, 2020), https://twitter.com/cheddar/status/1216739497121107970. The Court may take judicial notice of the fact and contents of this speech. *See supra* n.9.

[12]   The term "Market Maker" is defined in the Amended Complaint as "a global digital asset trading firm with an office in the United States." (Compl. ¶ 96.)

**LEGAL STANDARD**

To survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss, the SEC's Amended Complaint must plead sufficient factual allegations that, "accepted as true, [] 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted), and allegations "contradicted" by documents referenced in the complaint "are insufficient to defeat a motion to dismiss," *Matusovsky* v. *Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (citation omitted). Dismissal pursuant to Rule 12(b)(6) is also appropriate where a statute of limitations defense "appears on the face of the complaint." *Ellul* v. *Congregation of Christian Brothers*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).

In assessing Mr. Larsen's motion to dismiss, this Court is not required to consider the SEC's Amended Complaint in a vacuum: It is permitted to consider all the allegations in the SEC's Amended Complaint, matters of which a court can take judicial notice, and any documents that the SEC relies upon in the Amended Complaint. *See State Univs. Ret. Sys. of Illinois* v. *Astrazeneca PLC*, 334 F. App'x 404, 405 (2d Cir. 2009) (on motion to dismiss, courts "consider the complaint in its entirety, as well . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

**ARGUMENT**

I.   **The Second Claim for Relief Should Be Dismissed Because the Amended Complaint Fails to State a Section 15(b) Claim Against Mr. Larsen.**

In order to state a claim against Mr. Larsen for aiding and abetting a violation of Section 5 pursuant to Section 15(b) of the Securities Act of 1933, the SEC must allege that Mr. Larsen

"knowingly or recklessly provide[d] substantial assistance to another person in violation of [Section 5]." 15 U.S.C. § 77o(b). The facts set forth in the Amended Complaint do not support a plausible inference that Mr. Larsen (1) acted knowingly or recklessly with respect to the propriety of Ripple's XRP sales, or (2) substantially assisted any alleged unregistered sale or offer by Ripple. In particular, the SEC's failure to plead specific Ripple transactions that Mr. Larsen knew were improper or that he substantially assisted is fatal to the Section 15(b) claim. Therefore, on either of these grounds, the Section 15(b) claim against Mr. Larsen must be dismissed.

### A. The Amended Complaint Fails to Plausibly Allege Knowledge or Recklessness

To adequately plead that Mr. Larsen aided and abetted Ripple in its alleged violation of Section 5, the SEC must allege that Mr. Larsen had a culpable state of mind—that he both knew or was reckless as to the facts allegedly making XRP transactions investment contracts *and* knew or was reckless to the fact that Ripple's activities were "improper." *SEC* v. *Paulsen*, No. 18 CIV. 6718 (PGG), 2020 WL 6263180, at *14–15 (S.D.N.Y. Oct. 23, 2020) (finding defendant liable for aiding and abetting where he "knew that [the primary violator's] conduct was improper and illegal; and was concerned that his own involvement in that conduct presented a risk to him"); *SEC* v. *Mattessich*, 407 F. Supp. 3d 264, 272 (S.D.N.Y. Sept. 9, 2019) (assessing whether defendants "knew their conduct to be wrongful"); *SEC* v. *Espuelas*, 905 F. Supp. 2d 507, 518 & n.5 (S.D.N.Y. 2012) (explaining that the SEC must show that the defendant knew or recklessly disregarded that the underlying activity that constitutes the primary violation was "improper"); *SEC* v. *River N. Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019) (requiring that the SEC plead "the alleged aider and abettor's general awareness that his actions were part of an overall illegal course of conduct").

To plead recklessness, the SEC must plausibly allege facts showing that Mr. Larsen acted "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer* v. *Brennan*, 511 U.S. 825, 836 (1994). Recklessness is "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)). Even allegations of gross negligence do not suffice. *See* Brief for the Securities and Exchange Commission as Amicus Curiae Supporting Respondents at 26, *Cent. Bank of Denver* v. *First Interstate Bank of Denver*, 511 U.S. 164 (1994) ("[Recklessness] requires a state of mind closer to conscious intent than to gross negligence").

Thus, at a minimum, the SEC must plausibly allege facts showing that—despite significant regulatory uncertainty—it was "so obvious" that Ripple's offers or sales of XRP were improper that Mr. Larsen "must have been aware of it." *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 441 (S.D.N.Y. 2005) (quoting *Novak*, 216 F.3d at 308). This standard has an objective component that creates a supremely high burden, one that the SEC cannot and does not meet in its Amended Complaint.

> **(1)  The Amended Complaint Demonstrates That Mr. Larsen Did Not Have Knowledge or Act with Recklessness**

The SEC's own allegations, the documents it relies on in its Amended Complaint, and documents susceptible to judicial notice—all of which this Court may rely on in evaluating a motion to dismiss—show that Mr. Larsen, as a matter of law, did not possess knowledge or recklessness sufficient to support a Section 15(b) aiding and abetting claim. At most, the facts show there was a high degree of regulatory uncertainty in a novel and nascent industry regarding

whether XRP was a currency or a security. As the Supreme Court itself has acknowledged, when "statutory text and relevant court and agency guidance allow for more than one reasonable interpretation . . . a defendant who merely adopts one such interpretation" does not act with knowledge or recklessness because "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts." *Safeco Ins. Co. of Am.* v. *Burr*, 551 U.S. 47, 70 n.20 (2007); *see also City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 187–88 (2d Cir. 2014) (holding that appreciation of "uncertainty and disagreement . . . in the market at large" does not constitute recklessness). The SEC's allegation of recklessness rests on the naïve and inaccurate assumption that— throughout the entire eight years of Mr. Larsen's alleged violative conduct—whether XRP was a security was a black-and-white issue, such that anyone, including Mr. Larsen, must have known that it was in fact a security. In reality, as the SEC's own Amended Complaint makes clear and as statements from other regulators indicate, XRP's classification was a subject on which reasonable minds could and did differ at the time of Mr. Larsen's alleged conduct. As a matter of law, one cannot be reckless if there is legal uncertainty.

As the Amended Complaint acknowledges, in 2015, while Mr. Larsen was CEO of Ripple, multiple federal agencies—namely the DOJ and FinCEN—took the position that XRP was a currency, leading Ripple to agree to penalties pursuant to federal anti-money laundering and other regulations. As part of a 2015 settlement with Ripple, both agencies publicly concluded that XRP was a "virtual currency." (Flumenbaum Decl. Exs. C & D, Attach. A at 1, 4.) Moreover, the SEC itself described Ripple as a "digital currency company" during this time period. *Matter of Mellon*, Exchange Act Release No. 78924, 2016 WL 5340192 (Sept. 23, 2016). "Currency" is expressly excluded from the definition of a "security" under federal law.

15 U.S.C. § 78c(a)(10) (stating that the definition of security under the Securities Exchange Act "shall not include currency"). Similarly, FinCEN and the DOJ concluded during this time period that Ripple "provided virtual currency exchange transaction services" and XRP II "engaged in sales of virtual currency to third parties." (Flumenbaum Decl. Exs. C & D, Attach. A, at 1, 5.) Both the DOJ and FinCEN subsequently regulated XRP II as a "money services business." (Compl. ¶ 19; *see also id.* ¶ 379 (explaining that the DOJ and FinCEN settled charges relating to Ripple and XRP II's failure to register as a money services business).) FinCEN's regulations define money services businesses to *exclude* "person[s] registered with, and functionally regulated or examined by, the SEC or the CFTC[.]" 31 C.F.R. § 1010.100(ff)(8)(ii) (2014). The DOJ/FinCEN settlement also expressly permitted future sales and distributions of XRP, including in secondary markets, provided that Ripple complied with federal laws and regulations applicable to money services businesses (some of which are not applicable to sellers of securities), which it did. (Flumenbaum Decl. Exs. C & D, Attach. B, at 1.) Thus, it was objectively reasonable for a person in Mr. Larsen's circumstances to conclude that XRP was a currency within the jurisdiction of FinCEN and not a security within the jurisdiction of the SEC.

Furthermore, even though the existence of XRP and Ripple's activities was publicly known throughout the entire eight years addressed in the Amended Complaint, the SEC never once publicly stated or even suggested that XRP transactions were securities. In fact, the SEC waited until July 2017—after Mr. Larsen was no longer Chief Executive Officer of Ripple—to issue any guidance on when any digital assets might be considered a security. (*See* Compl. ¶ 37.) And in that guidance, the SEC stressed that whether the offering, selling, and trading of interests

in digital assets involves securities "depend[s] on the particular facts and circumstances" and described a case completely factually distinct from Ripple.[13]

Finally, in 2018 and 2019, the SEC itself declared that bitcoin and ether—the two digital assets most similar to XRP—were not securities.[14]  It is difficult to conceptualize how a person in Mr. Larsen's position would consider it "so obvious" that XRP was a security that Mr. Larsen "must have been aware" of it in circumstances where the SEC said that two other substantially similar digital assets were not securities.  In addition, even in early 2020, SEC Commissioner Hester Peirce and the then-Chairman of the CFTC both made pronouncements illustrating the regulatory uncertainty around the status of digital assets such as XRP.[15]  These pronouncements make it impossible for the SEC to allege plausibly that Mr. Larsen possessed the necessary knowledge or acted recklessly as to whether XRP was in fact a security.

### (2)     The Amended Complaint's Allegations in Support of Knowledge or Recklessness Are Deficient

In the face of these undisputed allegations set forth in the Amended Complaint and facts subject to judicial notice, which affirmatively establish the absence of knowledge or recklessness, the SEC pleads no facts showing that Mr. Larsen knew, or that it was so obvious he must have been aware, that Ripple's conduct was in any way improper—an element it must plead.  *See, e.g., Paulsen*, 2020 WL 6263180 at *14–15.  There are no allegations, for example, that Mr. Larsen attempted to conceal anything about his involvement in Ripple's conduct, or that he communicated to anyone else that he considered Ripple's conduct to be improper.  Nor is it alleged that he had access to facts that made it "so obvious" that XRP transactions constituted

---

[13]    *See The DAO Report*, supra n.8, at 10.

[14]    *See* Hinman, Solomon Decl. Ex. J, *supra* n.9.

[15]    *See* Peirce and Tarbert, *supra* nn.10 & 11.

"investment contracts." Indeed, it took the SEC eight years to bring a lawsuit alleging that Ripple's conduct violated the securities laws. The SEC's failure to plead any facts suggesting that Mr. Larsen knew or was reckless as to whether Ripple's conduct was improper alone is fatal to the SEC's claim.

Moreover, the SEC nowhere alleges in its Amended Complaint that Mr. Larsen actually knew, or that it was so obvious that he must have been aware, that XRP possessed the attributes of an "investment contract." The SEC cannot plausibly allege as much, because its assertion in this case that XRP is an "investment contract" constitutes a novel and unprecedented legal theory that was never articulated in any law, regulation, or official SEC pronouncement before the filing of this action. Instead, the SEC alleges that Mr. Larsen was aware of certain historical facts that the SEC is now using to build its case that XRP is a security. For example, the Amended Complaint alleges that Mr. Larsen knew or recklessly disregarded that XRP purchasers "were using money to purchase XRP and that Ripple was pooling that capital to fund its efforts to create profits for Ripple and XRP purchasers" (Compl. ¶ 90; *see also id.* ¶ 293), and that "XRP purchasers had a reasonable expectation of deriving profits by buying and selling XRP on these digital asset trading platforms" (*id.* ¶ 169; *see also id.* ¶ 242). As an initial matter, these allegations are wholly conclusory. But even more importantly, they cannot lead to the conclusion that Mr. Larsen knew or was reckless as to XRP being a security. For example, the same allegations could be true of commodities like gold and foreign currency, which are routinely bought and sold by investors in the expectation of profits. *See Noa* v. *Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (finding that purchases of silver bars were not securities because profits did not depend on managerial efforts of defendant).

Reduced to their essence, the SEC's allegations of knowledge or recklessness boil down to a generalized claim that Mr. Larsen was aware there was "some risk that XRP could be considered an 'investment contract' . . . depending on various factors" (Compl. ¶¶ 53, 395); that he "assume[d] a risk he knew existed—that the sale of [XRP] could constitute an offering of securities" (*id*. ¶ 58; *see also id*. ¶ 4); and that he "knew that XRP *may be* a security" (*id*. ¶ 395) (emphasis added). The SEC alleges no facts to support the culpable knowledge or recklessness required to plead an aiding and abetting claim.[16] *See Farmer*, 511 U.S at 836 (defining recklessness as acting "in the face of an *unjustifiably high risk of harm* that is either known or so obvious that it should be known." (emphasis added)).

The SEC's allegations are founded on a blatant mischaracterization of the two legal memoranda Ripple and Mr. Larsen received in 2012[17] and other documents referenced in the Amended Complaint. The SEC's scienter theory rests on its argument that Mr. Larsen "received legal advice as early as 2012 that under certain circumstances XRP could be considered an 'investment contract' and therefore a security under the federal securities laws" and that Mr. Larsen "ignored this advice." (Compl. ¶¶ 3, 4.) But, as the Court will see when it reviews the memoranda, the October 2012 memorandum discussed ███████████████████████████

██████████████████████████████████████████████████████

---

[16] The SEC relies on one out-of-context email from Mr. Larsen from seven years ago—before the DOJ/FinCEN settlement—suggesting that he was aware of the risk that he could possibly be deemed an issuer of securities. (*See* Compl. ¶¶ 57–58.) The acknowledgement of "some risk" is insufficient as a matter of law to support a finding of recklessness. *See Farmer*, 511 U.S. at 836.

[17] It is well-established that, in merely defending against the SEC's allegations regarding the non-privileged legal memoranda, Mr. Larsen does not effect any broader waiver of the privilege. *See Ward* v. *Succession of Freeman*, 854 F.2d 780, 789 (5th Cir. 1988) (holding that when opposing party puts previously privileged materials at issue in the case, a defensive use of the materials does not effect a waiver). Mr. Larsen maintains that the mere disclosure of the legal memoranda has not effected a broader subject matter waiver.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████ █████████████████    As to the

allegation that Mr. Larsen "ignored" the advice, the memoranda advised ███████████

███████████████████████████████████████████████

████████████████████████████    And that is exactly what Mr. Larsen and Ripple did.

The SEC fails to allege even *one instance* in the relevant eight-year period where Mr. Larsen

promoted XRP as an investment opportunity or as a speculative trading vehicle.  The SEC also

ignores the impact of its own inaction, the DOJ/FinCEN settlement, and its own statements

relating to bitcoin and ether in connection with this 2012 legal memorandum.  And again, while

the SEC seems fixated on the idea that Mr. Larsen appreciated that investors were purchasing

XRP for speculation, that is not sufficient to render XRP a security.  Otherwise, every

commodity and currency would be a security.

###### B.     The SEC Fails to Plausibly Allege Substantial Assistance by Mr. Larsen

In addition to failing to plausibly allege knowledge or recklessness under Section 15(b),

the SEC's allegations regarding Mr. Larsen's conduct are plainly inadequate to plead

"substantial assistance," as they fail to describe how Mr. Larsen "[sought] by his action to make

[Ripple's sales] succeed."  *SEC* v. *Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).  Instead, the

Amended Complaint relies on Mr. Larsen's various titles at Ripple to reframe ordinary

management and oversight activity as somehow essential to Ripple's XRP sales.  These

allegations fail to establish substantial assistance with respect to specific sales, providing another

reason for dismissal of the Section 15(b) claim.

The SEC alleges that Mr. Larsen, during his tenure as CEO from 2012 to 2016, "had final

decision-making authority over" decisions related to XRP sales, and approved or was consulted

on various aspects of the sales.  (Compl. ¶ 98; *id.* ¶¶ 73, 92, 100, 101, 110, 116, 152.)  Pleaded at this level of generality, such allegations merely restate that Mr. Larsen acted as Ripple's CEO, which is plainly inadequate to establish substantial assistance.  *See SEC* v. *Rio Tinto plc*, No. 17 CIV. 7994 (AT), 2019 WL 1244933, at *18 (S.D.N.Y. Mar. 18, 2019) (Torres, J.) (requiring that defendant "participate[] in [the violation] as in something that he wished to bring about, and that he sought by his action to make it succeed"); *see also SEC* v. *CMKM Diamonds, Inc.*, 729 F.3d 1248, 1258 (9th Cir. 2013) ("A participant's title, standing alone, cannot determine liability under Section 5, because the mere fact that a defendant is labeled as an issuer, a broker, a transfer agent, a CEO, a purchaser, or an attorney, does not adequately explain what role the defendant actually played in the scheme at issue.").  Although the SEC asserts that Mr. Larsen "ma[de] promotional statements" (Compl. ¶ 403), it fails to allege any specific statements, let alone tie any such statements to any specific sales of XRP.  The failure to plead sales with specificity and to link those sales to specific acts of Mr. Larsen renders the aiding and abetting claim deficient as a matter of law.  *See SEC* v. *Mudd*, 885 F. Supp. 2d 654, 670–71 (S.D.N.Y. 2014) (noting that, to aid and abet, a defendant must substantially assist "the commission of the *specific crime* in some way") (emphasis added).

The Amended Complaint also fails to plausibly allege that Mr. Larsen provided "substantial assistance" to Ripple with respect to the sales that occurred when Mr. Larsen was no longer CEO and only Executive Chairman of Ripple's Board.  The absence of concrete factual allegations for the period from 2017 through 2020—when Mr. Larsen was only Executive Chairman and had limited involvement in Ripple's day-to-day management—is particularly glaring on the face of the Amended Complaint.  Only 13 of the 440 paragraphs in the Amended Complaint address Mr. Larsen's role at Ripple after 2016.  The SEC merely alleges that "as

chairman of the Board, Larsen was consulted on such offers and sales," that he remained a "key decision maker[] and participant[] in, and continued to direct, Ripple's ongoing offering," and that he "continue[d] to communicate with potential and actual XRP investors and Ripple equity shareholders and to participate in certain projects Ripple is pursuing with respect to XRP." (Compl. ¶¶ 75, 76; *see also id.* ¶¶ 113, 138, 140, 160, 168, 199, 218, 224 (discussing involvement in meetings and presentations, "supervising" and "coordinating" RippleWorks sales,[18] obtaining updates on XRP listings, and participating in escrow formation).)  Such threadbare, conclusory allegations, entirely devoid of facts and disconnected from the details of any specific sales by Ripple, cannot establish substantial assistance, as they do not even attempt to provide the Court with a plausible theory of how Mr. Larsen attempted to help the sales succeed.  And the SEC again fails to specify any particular promotional statements made by Mr. Larsen after January 1, 2017 and to link such statements to any specific Ripple sale.

At bottom, the SEC's allegations do not rise to the level of "substantial assistance" found in other cases.  *See Apuzzo*, 689 F.3d at 214 (finding "substantial assistance" plausibly alleged where defendant agreed to participate in violative transactions, negotiated the details of the transactions, extracted agreements to ensure a counterparty's involvement, and approved and signed agreements with other counterparties which he knew were designed to conceal the fraud); *SEC* v. *Wey*, 246 F. Supp. 3d 894, 930 (S.D.N.Y. 2017) (finding "substantial assistance" plausibly alleged where defendant distributed shares, filed misleading information with the SEC, and sent misleading letters to NASDAQ); *SEC* v. *Riel*, 282 F. Supp. 3d 499, 525 (N.D.N.Y. 2017) (finding that defendant substantially assisted company's violations where he personally made misrepresentations on company's website, in oral statements, and in emails).

---

[18]  RippleWorks is a charitable organization co-founded by Mr. Larsen and independent of Ripple.

**II.    The First Claim for Relief Should Be Dismissed as to Mr. Larsen for Failure to Plead a Domestic Transaction.**

The SEC also fails to allege that Mr. Larsen's offers or sales of XRP on "various [trading] platforms" occurred within the United States and are therefore subject to Section 5(a) or (c) of the Securities Act. This deficiency is fatal to the Section 5 claim against Mr. Larsen.

To plead a Section 5 violation, the SEC must adequately allege that *each offer or sale* occurred within the territorial reach of Section 5. The Supreme Court held in *Morrison* v. *National Australia Bank Ltd.*, in the context of a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), that Congress did not intend the federal securities laws to reach extraterritorial conduct, establishing a "clear test" meant to "avoid" "interference with foreign securities regulation." 561 U.S. 247, 269 (2010). Under this test, the statute applies only to (1) transactions in securities listed on domestic exchanges and (2) purchases or sales "made in the United States." *Id.* at 269–70.

The Supreme Court made clear that *Morrison*'s holding extends beyond Section 10(b) and the Exchange Act to the securities laws more generally, reasoning that "[t]he same focus on domestic transactions is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading." *Id.* at 268 (citation omitted). Accordingly, lower courts have applied *Morrison*'s two-pronged test to claims under the Securities Act, including Section 5 claims. *See SEC* v. *Bio Def. Corp.*, No. 12-11669-DPW, 2019 WL 7578525, at *11–13 (D. Mass. Sept. 6, 2019) (applying *Morrison* to Section 5 claim); *see also Schentag* v. *Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at *10–13 (S.D.N.Y. June 21, 2018) (dismissing Section 5 claim, along with other Securities Act and Securities Exchange Act claims, under *Morrison*).

Under the *Morrison* test, the SEC has the burden of pleading and proving the domesticity of *each contested transaction*. *See SEC* v. *Ahmed*, 308 F. Supp. 3d 628, 660 (D. Conn. 2018) (noting that the "SEC must prove" domesticity "as to each transaction at issue"); *see also In re Petrobras Sec.*, 862 F.3d 250, 271–74 (2d Cir. 2017) (holding that the *Morrison* inquiry is "individualized"); *Mori* v. *Saito*, No. 10 CIV. 6465 (KBF), 2013 WL 1736527 at *5–7, (S.D.N.Y. Apr. 19, 2013) (designating certain transactions as adequately pleaded, but not others, for purposes of domesticity). This is particularly important when the SEC is alleging that the "core" of its case is that "each sale is a violation if it is not made pursuant to a registration statement or qualifies for an exemption." Hr'g Tr. 43:10–23 (Mar. 19, 2021). And yet, despite a two-and-a-half year investigation into Mr. Larsen's offers and sales of XRP and its allegation that Mr. Larsen sold over $450 million in XRP, the SEC fails to identify **even one** offer or sale of XRP by Mr. Larsen in the United States. And the SEC implicitly admits in its Amended Complaint that it cannot do so for virtually all of the transactions, acknowledging that Mr. Larsen "at times paid [a global digital asset trading firm] to make offers and sales of his XRP on digital asset trading platforms *with worldwide operations and customers*" (Compl. ¶¶ 96, 174) (emphasis added) and that he "offered and sold to investors all over the world" (*id.*). The SEC's failure to allege specific offers and sales of XRP is fatal to its claim.

A.      **The SEC Fails to Plead Any Sales Were Domestic Pursuant to *Morrison***

The SEC does not plead that any of Mr. Larsen's XRP sales occurred on a domestic exchange. Thus, under *Morrison*, the question is whether they were otherwise "made in the United States." *See* 561 U.S. at 270. A transaction is "made in the United States" when "irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012). Critically, "the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the

existence of domestic transactions." *Id.* at 70. Instead, courts require "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Banco Safra S.A. Cayman Islands Branch* v. *Samarco Mineracao S.A.*, 19-3976-cv, 2021 WL 825743, at *2 (2d Cir. Mar. 4, 2021). The inquiry focuses on "the time when the parties to the transaction are committed to one another . . . [where] there was a meeting of the minds of the parties." *Arco Cap. Corps. Ltd.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 542 (S.D.N.Y. 2013) (quoting *Absolute Activist*, 677 F.3d at 67–68).

Sales completed on foreign exchanges are not captured by Section 5(a). *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 532–33 (S.D.N.Y. 2011) (dismissing claims of American shareholders who purchased shares on a foreign exchange, reasoning that *Morrison* "clearly sought to bar claims based on purchases and sales of foreign securities on foreign exchanges . . ."); *see also Holsworth* v. *BProtocol Found.*, No. 20 CIV. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing Section 5 claim under *Morrison* where plaintiff in Wisconsin purchased digital coins on digital exchange in Singapore). In determining whether "irrevocable liability" was incurred on foreign exchanges, courts often examine where the matching of orders took place. *See Myun-Uk Choi* v. *Tower Rsch. Cap. LLC*, 890 F.3d 60, 67–68 (2d Cir. 2018) (analyzing Amended Complaint's allegations regarding where the matching of buy and sell orders took place).

The Amended Complaint is devoid of facts showing that "irrevocable liability was incurred" in the United States. Again, no specific transactions are pleaded. The SEC even acknowledges that Mr. Larsen sold his XRP through a foreign market maker "on digital asset trading platforms with worldwide operations and customers," "through certain digital asset trading platforms whose parent corporations are located outside the United States," and "to

investors all over the world."  (Compl. ¶¶ 174, 177.)  The SEC attempts to allege domesticity simply by claiming that Mr. Larsen (i) "directed his . . . sales of XRP from within the United States" (*id.* ¶ 176); (ii) made . . . sales of XRP to persons in the United States" (*id.* ¶ 178); (iii) "sold his XRP to investors . . . in the United States" (*id.* ¶ 174); (iv) "opened his account with at least one . . . United States-based wholly owned subsidiary" of a foreign exchange (*id.* ¶ 177); (v) made sales that "occurred on" certain platforms either incorporated or with their principal places of business in the United States (*id.*).  The SEC also claims that "resources located in the United States" were used to execute Mr. Larsen's trades, (*id.*), and vaguely alludes to a risk of XRP being sold back into the United States market.  (*See id.* ¶ 174.)  These conclusory allegations, however, devoid of any specific transactions, are insufficient to allege a domestic transaction.

*First*, the SEC cannot adequately plead domesticity by alleging that Mr. Larsen directed orders from the United States or by alleging that purchasers were located in the United States because that is irrelevant to where "irrevocable liability" is incurred.  *Plumbers' Union Local No. 12 Pension Fund* v. *Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y 2010) ("Accordingly, as a general matter, a purchase order in the United States for a security that is sold on a foreign exchange is insufficient."); *see also City of Pontiac*, 752 F.3d at 181 (likewise finding it insufficient to allege that a U.S. entity "placed a buy order [of a foreign security] in the United States that was then executed on a foreign exchange."); *Loginovskaya* v. *Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) ("The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction" because the wire transfers "were actions needed to carry out the transactions, and not the transactions themselves."); *Absolute Activist*, 677 F.3d at 69 ("[A] purchaser's citizenship or residency does not affect where a transaction

occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States.").

*Second*, the mere assertion that offers or sales occurred on platforms either incorporated or with their principal places of business in the United States (*see* Compl. ¶ 177) is similarly deficient because Second Circuit courts have made clear that it is not "enough to allege that a United States entity was involved in a transaction." *See Banco Safra*, 2021 WL 825743 at *2 (noting that the "physical location of a broker-dealer involved in the relevant transaction does not necessarily demonstrate where a contract was executed"). For similar reasons, the allegations regarding the opening of accounts says nothing about where Mr. Larsen's sales took place.

*Finally*, while the SEC alludes to a risk that Mr. Larsen's XRP will be sold back into the United States (*see* Compl. ¶ 174), that risk does not transform a foreign transaction into a domestic transaction. The SEC fails to assert that this has *in fact* occurred with respect to the XRP sold by Mr. Larsen, or that *any* XRP purchased on overseas exchanges has been resold in the United States. Accordingly, the Section 5(a) claim against Mr. Larsen should be dismissed. *See Sullivan*, 2017 WL 685570 at *29 (S.D.N.Y. Feb. 21, 2017) (dismissing CEA claim under Morrison where complaint made "no allegations concerning the location of the transactions themselves or the structure of [the] transactions").

### B. The SEC Fails to Plead Any Offers Were Domestic Pursuant to *Morrison*

Having failed to plead domestic sales of XRP, the SEC resorts to claiming that Mr. Larsen is nevertheless liable under Section 5(c) of the Securities Act of 1933 because, even if his sales were foreign, his *offers* of XRP were domestic. But this claim is equally deficient.

The SEC's central allegation in this regard is that Mr. Larsen's offers "occurred on various digital asset trading platforms," that he "offered . . . his XRP to investors all over the world" on trading platforms, and that he "at times paid [a] Market Maker to make offers . . . of

his XRP on digital asset trading platforms with worldwide operations and customers." (Compl. ¶¶ 174, 177.) Tellingly, the SEC does not allege that the offers on those platforms were made within the United States, and thus the only plausible inference is that those offers took place on foreign exchanges. But the Supreme Court made clear in *Morrison* that the federal securities laws were not intended by Congress to regulate foreign securities exchanges. *Morrison*, 561 U.S. at 267–68 (explaining that "no one . . . thought that the [Exchange] Act was intended to 'regulat[e]' *foreign* securities exchanges" and "[t]he same focus on domestic transactions is evident in the Securities Act of 1933"). The Amended Complaint's other allegations—that Mr. Larsen "directed his offers . . . of XRP from within the United States" and "made offers . . . to persons in the United States" (Compl. ¶¶ 176, 178)—are wholly conclusory and should be disregarded. *See Absolute Activist*, 677 F.3d at 70 (rejecting conclusory allegations).

In an attempt to distract from the deficiency of its allegations and the mandate of *Morrison*, the SEC relies on Regulation S—a regulation promulgated by the SEC prior to *Morrison* to exempt certain foreign securities offerings from registration. *See* Letter from Jorge G. Tenreiro, ECF No. 56, at 4 (Mar. 10, 2020). The SEC cannot use its regulations to extend the federal securities laws' reach in a manner inconsistent with Congress's intent. *Food & Drug Admin.* v. *Board & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (agency cannot regulate inconsistent with intent of Congress). *Morrison* demonstrates that Congress did not intend federal securities laws to be enforced extraterritorially. Thus, the SEC's allegations do not survive under *Morrison*, and Regulation S cannot revive them.

### C.     Mr. Larsen's Sales and Offers Were "Predominantly Foreign"

Even if the SEC adequately pleaded that Mr. Larsen's sales and offers were domestic pursuant to the Supreme Court's decision in *Morrison*, which it has not, the Section 5 claim should nevertheless be dismissed because—as evident on the face of the Amended Complaint—

Mr. Larsen's sales and offers were "predominantly foreign" under the Second Circuit's decisions in *Parkcentral Glob. Hub Ltd.* v. *Porsche Auto. Holdings SE*, 763 F.3d 198 (2d Cir. 2014) and *Cavello Bay Reinsurance Ltd.* v. *Shubin Stein*, 986 F.3d 161 (2d Cir. 2021).

These cases make clear that domesticity pursuant to *Morrison* is "necessary but not necessarily sufficient" to subject transactions to federal securities laws, and such transactions may still fall outside the reach of the federal securities laws if they are "so predominantly foreign so as to be impermissibly extraterritorial." *Parkcentral*, 763 F.3d at 216; *Cavello Bay*, 986 F.3d at 166–67. Here, it is evident on the face of the Amended Complaint that Mr. Larsen's offers and sales were "predominantly foreign." The Amended Complaint concedes that Mr. Larsen "offered and sold his XRP to investors all over the world" and "paid the Market Maker to make offers and sales of his XRP on digital asset trading platforms with worldwide operations and customers." (Compl. ¶ 174.) And, by contrast, the Amended Complaint asserts only vague references to domesticity. The SEC's failure to plead specific domestic offers and sales is fatal to its claims.

## III. The SEC's Claims for Monetary Relief Are Time-Barred

Because the SEC has chosen to frame its case as a single continuing violation of Section 5 of the Securities Act, its claims against Mr. Larsen for over $450 million in disgorgement and civil monetary penalties accrued more than five years prior to September 1, 2020[19] and are therefore barred by the statute of limitations set forth in 28 U.S.C. § 2462.[20]

---

[19] Mr. Larsen and the SEC entered into a tolling agreement suspending the running of the statute of limitations between September 1, 2020 and the time the initial Complaint was filed. While Mr. Larsen reserves his rights to challenge the tolling agreement, that issue is not relevant to Mr. Larsen's motion to dismiss.

[20] The SEC informed Defendants by email dated January 21, 2020, that "[t]he SEC will not assert, in this case, that the statute of limitations of the National Defense Authorization Act of 2020 ('NDAA') applies to any of the claims asserted by the SEC in this case."

Pursuant to 28 U.S.C. § 2462, an action "shall not be entertained unless commenced within five years from the date when the claim first accrued."  A claim first accrues when "the plaintiff has a complete and present cause of action."  *Gabelli* v. *SEC*, 568 U.S. 442, 448 (2013). Where a claim alleges a violation involving the offering or sale of unregistered securities, it accrues at the beginning of the alleged offering or sale.  *See SEC* v. *Jones*, 300 F. Supp. 3d 312, 315–18 & n.4 (D. Mass. 2018) (dismissing claims as time-barred because the SEC failed to allege that the defendant offered or sold securities within the five-year limitation period).  Where a plaintiff alleges in its complaint that the conduct at issue is "a single violation [that] continue[d] over an extended period of time," rather than "conduct that is a discrete unlawful act," the claim accrues on the start date of the violation.  *See Sierra Club* v. *Oklahoma Gas & Electric Co.*, 816 F.3d 666, 671–75 (10th Cir. 2016).  A statute of limitations defense may be decided on a motion to dismiss "if the defense appears on the face of the complaint."  *Ellul*, 774 F.3d at 798 n.12.

Despite investigating Ripple and Mr. Larsen for over two and a half years before filing its initial Complaint, obtaining Mr. Larsen's XRP trading records, and having every opportunity to identify each offer and sale for which it seeks monetary relief, the SEC fails to allege *any* discrete XRP offers or sales.  Rather, the SEC—perhaps in an effort to evade its obligation to allege the domesticity of each individual offer or sale (see *supra* Section II) or to prevent Defendants from making arguments about the applicability of specific exemptions—alleges that Defendants engaged in a "years-long unregistered offering of securities," lasting "[f]rom at least 2013 through the present," and seeks over half a billion dollars in disgorgement.  (Compl. ¶¶ 1, 5.)  The SEC defines this "years-long unregistered offering of securities" as "the Offering," (*id.* ¶ 5), and uses this defined term throughout the entirety of its Amended Complaint.  (*See id.* ¶¶

19, 73–75, 82, 85, 97, 190, 193, 196, 231, 239-241, 245, 250, 273, 287, 290, 293, 317, 342, 375–377, 383, 392, 395, 403, 423, 432.)

The natural result of the SEC's own pleading is that its claims for disgorgement and civil monetary penalties accrued in 2013, rather than 2015 as the SEC alleges, and thus its claims are now time barred. This result makes sense. Despite the fact that the underlying conduct at issue in "the Offering"—unregistered sales of XRP—occurred throughout this period, the SEC waited nearly eight years to bring this action. For those eight years, the SEC permitted a thriving XRP open market to grow to trade billions of dollars daily and allowed millions of market participants without any relation to Ripple to purchase XRP. It should not now be permitted to claim relief.

To the extent the SEC asks this Court in its opposition brief to rewrite the Amended Complaint to allege discrete violations, this Court should decline to do so. A theory of "'discrete,' 'repeated,' or 'multiple'" violations must be plainly alleged in the complaint. *See Clarke* v. *Pac. Gas & Elec. Co.*, No. 20-CV-04629-WHO, 2020 WL 6822912 at \*9 (N.D. Cal. Nov. 20, 2020) (finding claim time barred, noting that "[c]ounsel for [Plaintiff] spent much time at the hearing explaining how [Plaintiff's] claims involve[d] multiple discrete violations . . . but the fact of the matter is that the Complaint, on its face, does not make those allegations"). The SEC has already amended its Complaint once, and like any other plaintiff, the SEC controls how it chooses to plead its claims and must live with the consequences. The SEC's claims for civil monetary fines and disgorgement against Mr. Larsen should therefore be dismissed with prejudice as time-barred.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice as to Mr. Larsen.

Dated:  New York, New York
       April 12, 2021

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:   /s/ Martin Flumenbaum

     Martin Flumenbaum
     Michael E. Gertzman
     Meredith Dearborn
     Justin D. Ward
     Kristina A. Bunting

     1285 Avenue of the Americas
     New York, NY  10019-6064
     (212) 373-3000
     mflumenbaum@paulweiss.com

*Attorneys for Defendant Christian A. Larsen*