# Exhibit D

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**FINANCIAL CRIMES ENFORCEMENT NETWORK**

| | | |
|---|---|---|
| **IN THE MATTER OF:** | ) | |
| | ) | |
| | ) | |
| | ) | **Number 2015-05** |
| **Ripple Labs Inc.** | ) | |
| **San Francisco, California** | ) | |
| | ) | |
| **XRP II, LLC** | ) | |
| **Columbia, South Carolina** | ) | |

**ASSESSMENT OF CIVIL MONEY PENALTY**

**I.     INTRODUCTION**

The Financial Crimes Enforcement Network ("FinCEN") has determined that grounds exist

to assess a civil money penalty against Ripple Labs Inc. ("Ripple Labs") and XRP II, LLC[1]

(collectively, "Respondents"), pursuant to the Bank Secrecy Act ("BSA") and regulations issued

pursuant to that Act.[2]

Respondents admit to the facts set forth in Attachment A and that their conduct violated the

BSA.  Respondents consent to the assessment of a civil money penalty and enter into the

CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") with

FinCEN.

---

[1] XRP Fund II, LLC, a wholly-owned subsidiary of Ripple Labs, was incorporated in South Carolina
on July 1, 2013.  On July 2, 2014, XRP Fund II, LLC changed its name to XRP II, LLC. During
a portion of the relevant timeframe, the entity was named XRP Fund II, LLC, but it will be referred to
as XRP II throughout this ASSESSMENT.

[2] The Bank Secrecy Act is codified at 12 U.S.C. §§ 1829b, 1951-1959 and 31 U.S.C. §§ 5311-5314,
5316-5332.  Regulations implementing the Bank Secrecy Act appear at 31 C.F.R. Chapter X.

The CONSENT is incorporated into this ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by reference.

FinCEN has authority to investigate money services businesses for compliance with and violation of the BSA pursuant to 31 C.F.R. § 1010.810, which grants FinCEN "[o]verall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter[.]"

During the time periods identified in this ASSESSMENT, Ripple Labs and XRP II were "financial institutions" and "money services businesses" within the meaning of the BSA and its implementing regulations.  31 U.S.C. § 5312(a)(2); 31 C.F.R. §§ 1010.100(t), 1010.100(ff).

## II.     RESOLUTION WITH THE UNITED STATES ATTORNEY'S OFFICE FOR THE NORTHERN DISTRICT OF CALIFORNIA

On the same date as the CONSENT, Respondents have entered into a Settlement Agreement with the U.S. Attorney's Office for the Northern District of California, which has agreed not to criminally prosecute Respondents for the conduct described in the Statement of Facts attached as Attachment A.  Under that Agreement, Respondents have agreed to pay a forfeiture amount of $450,000 and engage in the remedial steps also outlined in the Remedial Framework set forth in Attachment B to the CONSENT and this ASSESSMENT.

## III.    DETERMINATIONS

Respondents willfully violated the BSA's registration, program, and reporting requirements.[3] First, until April 29, 2013, Ripple Labs acted as a money services business and engaged in sales of

---

[3] In civil enforcement of the Bank Secrecy Act under 31 U.S.C. § 5321(a)(1), to establish that a financial institution or individual acted willfully, the government need only show that the financial institution or individual acted with either reckless disregard or willful blindness.  The government need not show that the entity or individual had knowledge that the conduct violated the Bank Secrecy Act, or that the entity or individual otherwise acted with an improper motive or bad

its virtual currency, known as XRP, without registering with FinCEN as a money services business; in addition, while doing so, Ripple Labs failed to implement and maintain an anti-money laundering program that was reasonably designed to prevent it from being used to facilitate money laundering and the financing of terrorist activities.  Second, from July 1, 2013 through the conclusion of FinCEN's investigation into Ripple Labs and XRP II on October 1, 2014, XRP II, which later assumed Ripple Labs's functions of selling virtual currency, failed to implement and maintain an effective anti-money laundering program.  And third, XRP II failed to report suspicious activity related to several financial transactions.[4]

These violations, and the governing facts and law surrounding the violations, are described more fully in Attachment A to this ASSESSMENT, which is incorporated by reference.

## IV.    CIVIL MONEY PENALTY

FinCEN has determined that Respondents willfully violated the registration, program, and reporting requirements of the Bank Secrecy Act and its implementing regulations, as described in this ASSESSMENT and in Attachment A, and that grounds exist to assess a civil money penalty for these violations.  *See* 31 U.S.C. § 5321 and 31 C.F.R. § 1010.820.

FinCEN has determined that the penalty in this matter will be $700,000.  This penalty will be deemed partially satisfied upon full payment of the forfeiture of $450,000 to the U.S. Attorney's Office for the Northern District of California, as described in Part II above; the remainder shall be paid to the U.S. Department of the Treasury.

---

purpose.  Respondents admit to "willfulness" only as the term is used in civil enforcement of the Bank Secrecy Act under 31 U.S.C. § 5321(a)(1).

[4] *See* 31 U.S.C. § 5330, 31 C.F.R. § 1022.380 (registration); 31 U.S.C. § 5318(a)(2), (h), 31 C.F.R. § 1022.210 (AML program); and 31 U.S.C. § 5318(g), 31 C.F.R. § 1022.320 (SAR reporting).

## V.      UNDERTAKING

By executing the CONSENT, Respondents agree to the undertakings set forth in the

Remedial Framework in Attachment B of this ASSESSMENT and the CONSENT.  Failure to

comply with any provision of this Remedial Framework will constitute a violation of the

CONSENT.  If FinCEN determines that a failure to comply with the UNDERTAKING has

occurred, FinCEN may take any enforcement action against the Respondents it deems appropriate,

notwithstanding the Release in Part VII below.  Additional actions taken by FinCEN may include,

but are not limited to, the imposition of additional civil money penalties, injunctive orders, or

ordering other remedial actions within the authorities of FinCEN.

## VI.     CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Respondents consent to the assessment of a

civil money penalty in the sum of $700,000 set forth in Part IV above, and to the undertakings set

forth in the Remedial Framework in Attachment B.  Respondents admit to the Statement of Facts set

forth in Attachment A and admit that they willfully violated the BSA's registration, program, and

reporting requirements, as set forth in Attachment A.

Respondents recognize and state that they enter into the CONSENT freely and voluntarily

and that no offers, promises, or inducements of any nature whatsoever have been made by FinCEN

or any employee, agent, or representative of FinCEN to induce Respondents to enter into the

CONSENT, except for those specified in the CONSENT.

Respondents understand and agree that the CONSENT embodies the entire agreement

between them and FinCEN relating to this enforcement matter only, as described in Section II above

and in Attachment A.  Respondents further understand and agree that there are no express or implied

promises, representations, or agreements between them and FinCEN other than those expressly set

forth or referred to in this document and that nothing in the CONSENT or in this ASSESSMENT is binding on any other agency of government, whether Federal, State or local.

## VII.   RELEASE

Execution of the CONSENT, and compliance with the terms of this ASSESSMENT and the CONSENT, including the UNDERTAKING set forth above, settles all claims that FinCEN may have against Respondents for the conduct described in Section III of this ASSESSMENT and in Attachment A.  Execution of the CONSENT, and compliance with the terms of this ASSESSMENT and the CONSENT, does not release any claim that FinCEN may have for conduct by Respondents other than the conduct described in Section III of this ASSESSMENT and in Attachment A to this ASSESSMENT, or any claim that FinCEN may have against any director, officer, owner, employee, or agent of Respondents, or any party other than Ripple Labs and XRP II.  Upon request, Respondents shall truthfully disclose to FinCEN all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to the conduct of their current or former directors, officers, employees, agents, or others.


By:


_____/S/_____   May 5, 2015
Jennifer Shasky Calvery                                           Date
Director, Financial Crimes Enforcement Network
U.S. Department of the Treasury

## *ATTACHMENT A:  STATEMENT OF FACTS AND VIOLATIONS*

### I.    INTRODUCTION AND BACKGROUND

1.    Ripple Labs Inc. ("Ripple Labs") is a corporation registered in Delaware and headquartered in San Francisco, California.  NewCoin, Inc. and OpenCoin, Inc. ("OpenCoin") are the predecessors of Ripple Labs.

2.    Ripple Labs facilitated transfers of virtual currency and provided virtual currency exchange transaction services.

3.    The currency of the Ripple network, known as "XRP," was pre-mined.  In other words, unlike some other virtual currencies, XRP was fully generated prior to its distribution.  As of 2015, XRP is the second-largest cryptocurrency by market capitalization, after Bitcoin.

4.    XRP Fund II, LLC, a wholly-owned subsidiary of Ripple Labs, was incorporated in South Carolina on July 1, 2013.  On July 2, 2014, XRP Fund II changed its name to XRP II, LLC.  During a portion of the relevant timeframe, the entity was named XRP Fund II, LLC, but it will be referred to as XRP II throughout this document.

### II.    LEGAL FRAMEWORK

5.    The U.S. Attorney's Office for the Northern District of California ("U.S. Attorney's Office") is a component of the Justice Department.   The Financial Crimes Enforcement Network ("FinCEN") is a bureau within the Department of Treasury.  The Bank Secrecy Act and its implementing regulations require Money Services Businesses ("MSBs") to register with FinCEN by filing a Registration of Money Services Business ("RMSB"), and renewing the registration every two years.  *See* 31 U.S.C. § 5330; 31 C.F.R. § 1022.380.  Operation of an MSB without the appropriate registration also violates federal criminal law.  *See* 18 U.S.C. § 1960(b)(1)(B).  This is a requirement separate and apart from state licensing requirements, if any, that may be required by law.

6.    On March 18, 2013, FinCEN released guidance clarifying the applicability of regulations implementing the Bank Secrecy Act, and the requirement for certain participants in the virtual currency arena to register as MSBs under federal law.  *See* FIN-2013-G0001, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013) (the "Guidance").  Among other things, the Guidance defines two categories of participants in the virtual

currency ecosystem: "exchangers" and "administrators."  The Guidance states that exchangers and administrators of virtual currencies are money transmitters (a type of MSB) under FinCEN's regulations, and therefore are required to register with FinCEN as money service businesses.

7.     Specifically, the Guidance defines an exchanger as a person or entity "engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency."  The Guidance also defines an administrator of virtual currency as a person or entity "engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency."

8.     Both exchangers and administrators are MSBs that must register with FinCEN unless they fall within an exemption.  And regardless of whether they have registered as required, MSBs are subject to certain additional requirements under the Bank Secrecy Act and its implementing regulations.

9.     The Bank Secrecy Act and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering ("AML") program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities.  *See* 31 U.S.C. §§ 5318(a)(2) and 5318(h); 31 C.F.R. § 1022.210.

10.    Under the Bank Secrecy Act, an MSB is required to implement an AML program that, at a minimum: (a) incorporates policies, procedures and internal controls reasonably designed to assure ongoing compliance; (b) designates an individual responsible for assuring day to day compliance with the program and Bank Secrecy Act requirements; (c) provides training for appropriate personnel including training in the detection of suspicious transactions; and (d) provides for independent review to monitor and maintain an adequate program. 31 C.F.R. §§ 1022.210(d).

11.    Further, an MSB must report transactions that the MSB "knows, suspects, or has reason to suspect" are suspicious, if the transaction is conducted or attempted by, at, or through the MSB, and the transaction involves or aggregates to at least $2,000.00 in funds or other assets. 31 C.F.R. § 1022.320(a)(2).  A transaction is "suspicious" if the transaction: (a) involves funds derived from illegal activity; (b) is intended or conducted in order to hide or disguise funds or assets derived from illegal activity, or to disguise the ownership, nature, source, location, or control of funds or assets derived from illegal activity; (c) is designed, whether through structuring or other means, to evade any requirement in the Bank Secrecy Act or its implementing regulations; (d) serves no business or apparent lawful purpose, and the MSB knows of

2

no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (e) involves use of the MSB to facilitate criminal activity.  *Id.*

12.     As part of their risk assessment and risk mitigation plans, MSBs are required to implement Know-Your-Customer/Know-Your-Counterparty procedures.  Such procedures allow the MSB to assess the risk involved in providing account-based or transactional services to customers based on their identity and profile, and to comply with their AML Program requirements regarding foreign agents or foreign counterparties.  *See* FinCEN Interpretive Release 2004-1, Anti-Money Laundering Program Requirements for Money Service Businesses With Respect to Foreign Agents or Foreign Counterparties, 69 Fed. Reg. 74,439 (Dec. 14, 2004).

13.     Financial institutions, including MSBs, are also subject to the Funds Transfer Rule, 31 C.F.R. § 1010.410(e), which provides that (subject to certain exceptions) for individual transactions of $3,000.00 or above, the transmitting financial institution must obtain, verify, and keep key information (set forth in the regulation) from the transmitting party (the transmittor).  If acting as an intermediary financial institution, it must obtain and keep key information (the transmittal order received) from the transmittor's financial institution.  And, if acting as the financial institution for the recipient of the funds, the financial institution must obtain, verify, and keep key information (also set forth in the regulation) from the recipient.  The same financial institution may be acting as both transmittor's and recipient's financial institution.

14.     Similarly, financial institutions, including MSBs, are subject to the Funds Travel Rule, 31 C.F.R. § 1010.410(f), which provides that (subject to certain exceptions) for individual transactions of $3,000.00 or more, the transmittor's financial institution must pass on key information from the transmittor and the transaction to any intermediary financial institution; if acting as the intermediary financial institution, it must pass on this information to the recipient's financial institution.  And, if acting as the recipient's financial institution, it must receive, evaluate, and store this information received from the intermediary or the transmittor's financial institution.

15.     The FinCEN registration requirement and other requirements of the Bank Secrecy Act are independent obligations.  An MSB's failure to register with FinCEN does not relieve an MSB of its obligations under the Bank Secrecy Act and implementing regulations.  Nor does an MSB's registration with FinCEN mean that the MSB has fulfilled all of its requirements under the Bank Secrecy Act and regulations.  In other words, an MSB might have complied with the Bank Secrecy Act and implementing regulations, but failed to register as an MSB with FinCEN.  Likewise, an entity might

have registered as an MSB with FinCEN, but not have complied with the Bank Secrecy Act and implementing regulations.

## III.   VIOLATIONS

### A.   Ripple Labs's Operation as a Money Services Business in March-April 2013

16.   Ripple Labs has previously described itself in federal court filings and in a sworn affidavit as "a currency *exchange service* providing on-line, real-time currency trading and cash management . . . . Ripple facilitates the transfers of electronic cash equivalents and provides virtual currency exchange transaction services for transferrable electronic cash equivalent units having a specified cash value." *See Ripple Labs, Inc. v. Lacore Enterprises, LLC*, Motion for Preliminary Injunction, 13-cv-5974-RS/KAW (N.D. Cal. 2013) (emphasis added).

17.   From at least March 6, 2013, through April 29, 2013, Ripple Labs sold convertible virtual currency known as "XRP."

18.   Ripple Labs was not registered with FinCEN as an MSB while engaging in these sales.

19.   As described in Paragraphs 6 and 7 above, on March 18, 2013, FinCEN released guidance that clarified the applicability of existing regulations to virtual currency exchangers and administrators.  Among other things, this Guidance expressly noted that such exchangers and administrators constituted "money transmitters" under the regulations, and therefore must register as MSBs.

20.   Notwithstanding the Guidance, and after that Guidance was issued, Ripple Labs continued to engage in transactions whereby it sold Ripple currency (XRP) for fiat currency (*i.e.*, currency declared by a government to be legal tender) even though it was not registered with FinCEN as an MSB.  Throughout the month of April 2013, Ripple Labs effectuated multiple sales of XRP currency totaling over approximately $1.3 million U.S. dollars.

21.   During the time frame that it was engaged in these sales and operated as a money transmitter, Ripple Labs failed to establish and maintain an appropriate anti-money laundering program.  Ripple failed to have adequate policies, procedures, and internal controls to ensure compliance with the Bank Secrecy Act and its implementing regulations.  Moreover, Ripple Labs failed to designate a compliance officer to assure compliance with the Bank Secrecy Act, had no anti-money laundering training in place, and failed to have any independent review of its practices and procedures.

4

**B.      XRP II's Program and Reporting Violations**

22.     On July 1, 2013, Ripple Labs incorporated a subsidiary, XRP Fund II, LLC ("XRP Fund II"), now known as XRP II, LLC, in South Carolina.  XRP II was created to engage in the sale and transfer of the convertible virtual currency, XRP, to various third parties on a wholesale basis.  XRP II sold XRP currency in exchange for fiat currency in much the same way that Ripple Labs had previously done from March through April 2013.  In other words, XRP II replaced Ripple Labs as a seller of XRP.

23.     By on or about August 4, 2013, XRP II was engaged in the sale of XRP currency to third-party entities.

24.     On September 4, 2013, XRP II registered with FinCEN as an MSB.

25.     As of the date XRP II engaged in sales of virtual currency to third parties in exchange for value, XRP II became subject to certain requirements under the Bank Secrecy Act and its implementing regulations, as described in Paragraphs 5 through 15 above. XRP II was required to have an effective written AML program, to implement that program, and to have an anti-money laundering compliance officer.

26.     Notwithstanding these requirements, despite engaging in numerous sales of virtual currency to third parties, XRP II failed to have an effective, written AML program. For example:

   a)  It was not until September 26, 2013, that XRP II developed a written AML program.  Prior to that time, XRP II had no written AML program;

   b)  It was not until late January 2014 that XRP II hired an AML compliance officer, some six months after it began to engage in sales of virtual currency to third parties;

   c)  XRP II had inadequate internal controls reasonably designed to ensure compliance with the Bank Secrecy Act;

   d)  XRP II failed to conduct an AML risk assessment until March 2014;

   e)  XRP II did not conduct training on its AML program until nearly a year after beginning to engage in sales of virtual currency, by which time Ripple Labs was aware of a federal criminal investigation; and

f)  XRP II did not conduct an independent review of its AML program until nearly a year after it began to engage in sales of virtual currency, by which time Ripple Labs was aware of a federal criminal investigation.

27.   Further, from the date XRP II began engaging in sales of virtual currency to third parties, XRP II was required to report transactions that it knew, suspected, or had reason to suspect were suspicious and where the transactions or attempted transactions involved or aggregated to at least $2,000.00 in funds or other assets.  *See* 31 C.F.R. § 1022.320(a)(2).

28.   In addition to XRP II's lack of an effective AML program, XRP II also engaged in a series of transactions for which it either failed to file, or untimely filed, suspicious activity reports.  For example:

a)  On September 30, 2013, XRP II negotiated an approximately $250,000.00 transaction by email for a sale of XRP virtual currency with a third-party individual.  XRP II provided that individual with a "know your customer" ("KYC") form and asked that it be returned along with appropriate identification in order to move forward with the transaction.  The individual replied that another source would provide the XRP virtual currency and did not "require anywhere near as much paperwork" and essentially threatened to go elsewhere.  Within hours, XRP II agreed by email to dispense with its KYC requirement and move forward with the transaction.  Open source information indicates that this individual, an investor in Ripple Labs, has a prior three-count federal felony conviction for dealing in, mailing, and storing explosive devices and had been sentenced to prison, *see United States v. Roger Ver,* CR 1-20127-JF (N.D. Cal. 2002);

b)  In November 2013, XRP II rejected an approximately $32,000.00 transaction because it doubted the legitimacy of the overseas customer's source of funds. XRP II failed to file a suspicious activity report for this transaction; and

c)  In January 2014, a Malaysian-based customer sought to purchase XRP from XRP II, indicating that he wanted to use a personal bank account for a business purpose.  Because of these concerns, XRP II declined the transaction but again failed to file a suspicious activity report for the transaction.

# *ATTACHMENT B:  REMEDIAL FRAMEWORK*

1.    <u>Monetary Penalties:</u>

Ripple Labs Inc. and XRP II, LLC (formerly known as XRP Fund II, LLC) agree to forfeit $450,000.00 to the Office of the United States Attorney for the Northern District of California ("U.S. Attorney's Office").  Ripple Labs and XRP II further agree to pay a civil money penalty to FinCEN in the amount of $700,000.00, within 30 days of the date of this agreement.  Payment of the forfeiture to the U.S. Attorney's Office shall be deemed creditable toward FinCEN's civil money penalty.

2.    <u>Migration of Ripple Trade/Ripple Wallet to Registered MSB:</u>

Within 30 days of the date of this agreement, Ripple Labs and XRP II will move its service known as Ripple Trade (formerly known as Ripple Wallet, which allows end users to interact with the Ripple protocol to view and manage their XRP and fiat currency balances), and any such functional equivalent, to a money services business that is registered with FinCEN (the "Ripple Trade MSB").

    a)  Any sale or transmission of XRP by Ripple Labs or any of its subsidiaries shall be conducted only through an entity registered with FinCEN;

    b)  Users of Ripple Trade (which will include all users registering after the date of this agreement and any existing users who register at the request of Ripple Labs) will be required to submit customer identification information, as required under the rules governing money services businesses, to the Ripple Trade MSB;

    c)  Ripple Labs, via the Ripple Trade MSB, will offer incentives, including but not limited to XRP giveaways, for existing Ripple Trade users to transfer a wallet with customer identification information or account (that is, a wallet or account with customer identification information); and

    d)  After 180 days of the date of this agreement, Ripple Labs will (1) prevent any existing Ripple Trade user who has not transferred to a wallet or account with customer identification information from accessing the Ripple protocol through the Ripple Trade client, and (2) not otherwise provide any support of any kind to such a user in accessing the Ripple protocol.

3.   <u>Maintenance of Registration:</u>
     Ripple Labs and XRP II will maintain, or continue to maintain, XRP II's and the Ripple Trade MSB's registrations with FinCEN, including such re-registrations required by 31 U.S.C. § 5330.

4.   <u>Effective AML Program:</u>
     XRP II and the Ripple Trade MSB will implement and maintain, or will continue to maintain, an effective anti-money laundering ("AML") program, risk assessment, and other compliance measures as required by applicable law, including the Bank Secrecy Act and its implementing regulations.

5.   <u>AML Compliance Officer:</u>
     XRP II and the Ripple Trade MSB will maintain, or will continue to maintain, an anti-money laundering compliance officer to ensure day-to-day compliance with their obligations under the Bank Secrecy Act and its implementing regulations.

6.   <u>Training Program:</u>

     a)   Within 45 days after the date of this agreement, XRP II and the Ripple Trade MSB will create an AML training program for Bank Secrecy Act/AML compliance and will provide a copy of the training program to the U.S. Attorney's Office and FinCEN;

     b)   Within 45 days of the date of this agreement, XRP Fund II and the Ripple Trade MSB will provide training to each of their employees and provide to the U.S. Attorney's Office and FinCEN written evidence of such training, including a certification of such training, the name of each employee who attended such training, and the dates of such training.

7.   <u>External audit:</u>
     Within 60 days, XRP II and the Ripple Trade MSB will secure and retain an independent, external, and qualified party or entity (the "Third-Party Reviewer"), not subject to any conflict of interest, and subject to FinCEN's and the U.S. Attorney's Office's determination of non-objection, to examine their Bank Secrecy Act compliance programs and evaluate whether the programs are reasonably designed to ensure and monitor compliance with the requirements of the Bank Secrecy Act and the FinCEN rules applicable to money services businesses. Three reviews will occur: the first will commence within one year of this agreement; the second will occur in 2018; and the third will occur in 2020. Each review will cover the previous two

years, with no less than six months' worth of transactional analysis of those transactions in which XRP II and the Ripple Trade MSB was a party or served as an exchanger.   The Third-Party Reviewer will prepare a written report for each company's audit committee and the board of directors, setting forth its findings, and will transmit the report and all draft reports to the U.S. Attorney's Office and FinCEN simultaneously with any transmission to XRP II, the Ripple Trade MSB, or their agents.   To the extent that the report identifies any material deficiencies in XRP II's or the Ripple Trade MSB's programs and procedures, XRP II and the Ripple Trade MSB shall address and rectify the deficiencies as soon as is reasonably practicable.

8.   Enhancements to Ripple Protocol:

Within 60 days, Ripple Labs, XRP II, and the Ripple Trade MSB will improve, and upon request provide any information requested by FinCEN or the U.S. Attorney's Office as to the use and improvement of, existing analytical tools applicable to the Ripple protocol, including: (1) reporting regarding any counterparty using the Ripple protocol; (2) reporting as to the flow of funds within the Ripple protocol; and (3) reporting regarding the degree of separation.

9.   Look-Back for Suspicious Activity:

Within 180 days of the date of this agreement, Ripple Labs and XRP II will conduct a review of all prior transactions and attempted transactions to which Ripple Labs and/or XRP II was a party or served as an exchanger, within the last three years involving or aggregating to at least $2,000.00 in funds or other assets.  For any such transaction for which it is known, suspected, or there is a reason to suspect that the transaction (a) involves funds involved in illegal activity; (b) is intended or conducted in order to hide or disguise funds or assets derived from illegal activity, or to disguise the ownership, nature, source, location, or control of funds or assets derived from illegal activity; (c) is designed, whether through structuring or other means, to evade any requirement in the Bank Secrecy Act or its implementing regulations; (d) serves no business or apparent lawful purpose, where the MSB knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction; or (e) involves use of the MSB to facilitate criminal activity, Ripple Labs and/or XRP II will file a Suspicious Activity Report within 30 days of such determination.

10.   Transaction Monitoring:

Ripple Labs will institute AML programmatic transaction monitoring across the entire Ripple protocol, and will report the results of such monitoring to the U.S. Attorney's Office, FinCEN, and any other law enforcement or regulatory agency

upon request.   The monitoring and reporting must include, at a minimum: (a) risk rating of accounts based on the particular gateway used; (b) dynamic risk tools to facilitate investigation of suspicious activity, including counterparty reporting, flow of funds reporting, account flagging of suspicious accounts, and degrees of separation reporting; and (c) other reports of protocol-wide activity regarding any unlawful activity.

11.   <u>Funds Travel Rule and Funds Transfer Rule:</u>
XRP II and the Ripple Trade MSB will ensure, or continue to ensure, that all transactions made using XRP II, Ripple Trade, or Ripple Wallet will be, or will continue to be, in compliance with the Funds Transfer Rule and the Funds Travel Rule.