UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

     -against-

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN

                    Defendants.

---

20 Civ. 10832 (AT) (SN)

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRADLEY
GARLINGHOUSE'S MOTION TO DISMISS THE AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ............................................................................ iii

PRELIMINARY STATEMENT ...................................................................... 1

BACKGROUND ............................................................................................. 5

    A.   Ripple And Its Business.......................................................... 5

    B.   DOJ And FINCEN Settle Enforcement Action Against Ripple
        On The Basis That XRP Is A "Virtual Currency."........................... 6

    C.   As CEO, Mr. Garlinghouse Continued To Pursue Ripple's
        Payments Business Plan. ......................................................... 7

    D.   As CEO, Mr. Garlinghouse Spoke Openly And Regularly
        About The Value Ripple Brings To The Payments Market And
        Why XRP Is Not A Security............................................................. 8

    E.   Mr. Garlinghouse Received XRP As Executive Compensation
        And Sold XRP On Foreign Exchanges.......................................... 10

ARGUMENT ................................................................................................. 11

I.    THE SECOND CLAIM FAILS BECAUSE THE AC DOES NOT
    PLAUSIBLY ALLEGE THAT MR. GARLINGHOUSE KNEW OR
    WAS RECKLESS IN NOT KNOWING THAT RIPPLE WAS
    VIOLATING SECTION 5 OR ACTING IMPROPERLY. ........................ 11

    A.   The AC Fails To Plausibly Allege That Mr. Garlinghouse
        Acted "Recklessly."..................................................................... 13

    B.   The SEC's Efforts To Avoid Its Obligation To Plead
        Knowledge Or Recklessness Of The "Violation" Fail. .................... 18

II.   THE FIRST CLAIM FAILS BECAUSE THE AC DOES NOT
    ALLEGE THAT MR. GARLINGHOUSE'S PERSONAL OFFERS
    OR SALES OF XRP OCCURRED IN THE UNITED STATES. ............... 20

    A.   The AC Does Not Allege That Mr. Garlinghouse's Sales Were
        Domestic, As Required By Section 5(a) and (c).............................. 21

    B.   The AC Also Fails To Plead Any Domestic Offers Under
        Section 5(c)................................................................................. 26

    C.   Even If Mr. Garlinghouse's Conduct In The U.S. Were
          Relevant, The Transactions In Question Are Predominantly
          Foreign And Accordingly Outside The Scope Of Section 5. ..........................   29

CONCLUSION...............................................................................................................   30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
   677 F.3d 60 (2d Cir. 2012).........................................................................21, 23, 28

*Acito v. IMCERA Group, Inc.*,
   47 F.3d 47 (2d Cir. 1995) ......................................................................................16

*Banco Safra S.A. v. Samarco Mineracao S.A.*,
   No. 19-3976-CV, 2021 WL 825743 (2d Cir. Mar. 4, 2021).................................23

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003)....................................................................................8

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..............................................................................................11

*Cavello Bay Reinsurance Ltd. v. Shubin Stein*,
   986 F.3d 161 (2d Cir. 2021)..................................................................................30

*Central Bank of Denver v. First Interstate Bank of Denver*,
   511 U.S. 164 (1994)..............................................................................................13

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
   467 U.S. 837 (1984)..............................................................................................28

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014).............................................................................17, 24

*Cornwall v. Credit Suisse Grp.*,
   729 F. Supp. 2d 620 (S.D.N.Y. 2010)..................................................................25

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)..................................................................................16

*Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
   147 F.3d 118 (2d Cir. 1998), *abrogated on other grounds by Morrison v. Nat'l
   Australia Bank Ltd.*, 561 U.S. 247 (2010) ...........................................................29

*Farmer v. Brennan*,
   511 U.S. 825 (1994)..............................................................................................13

*Holsworth v. BProtocol Found.*,
    No. 20 CIV. 2810 (AKH), 2021 WL 706549 (S.D.N.Y. Feb. 22, 2021)................................22

*In re Amundsen*,
    AP File No. 3-18994 (Dec. 5, 2019) .........................................................................................19

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) .................................................................................................15

*In re Horning*,
    AP File No. 3-12156 (Sept. 19, 2006) .....................................................................................19

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
    915 F. Supp. 2d 450 (S.D.N.Y. 2013)......................................................................................23

*In re Tremont Sec. Law, State Law, & Ins. Litig.*,
    No. 08 Civ. 11117, 2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013) ........................................14

*In re Vivendi Universal, S.A. Sec. Litig.*,
    765 F. Supp. 2d 512 (S.D.N.Y. 2011)......................................................................................22

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).....................................................................................................16

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014).....................................................................................................25

*Mori v. Saito*,
    No. 10 Civ. 6465 (KBF), 2013 WL 1736527 (S.D.N.Y. Apr. 19, 2013) ................................22

*Morrison v. Nat'l Austl. Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................................................ passim

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018)................................................................................................25-26

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...............................................................................................13, 16

*Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*,
    763 F.3d 198 (2d Cir. 2014).....................................................................................................30

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010)................................................................................24, 27

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007)....................................................................................................17

*Schentag v. Nebgen,*
    No. 1:17-CV-8734-GHW, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) ............................20

*SEC v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012)......................................................................................12

*SEC v. Bio Def. Corp.,*
    No. 12-11669-DPW, 2019 WL 7578525 (D. Mass. Sept. 6, 2019)........................................20

*SEC v. Espuelas,*
    905 F. Supp. 2d 507 (S.D.N.Y. 2012)..............................................................12, 19

*SEC v. Honig,*
    No. 18 Civ. 8175 (ER), 2021 WL 276155 (S.D.N.Y. Jan. 27, 2021) ......................................11

*SEC v. Lowy,*
    396 F. Supp. 2d 225 (E.D.N.Y. 2003) ......................................................... 13-14, 18

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.,*
    296 F.R.D. 241 (S.D.N.Y. 2013) ..............................................................................11

*SEC v. Paulsen,*
    No. 18 Civ. 6718 (PGG), 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020) ........................12, 19

*SEC v. WJ Howey Co.,*
    328 U.S. 293 (1946)....................................................................................................2

*SEC v. Yorkville Advisors, LLC,*
    305 F. Supp. 3d 486 (S.D.N.Y. 2018)...................................................................12

*Slayton v. Am. Express Co.,*
    604 F.3d 758 (2d Cir. 2010)..............................................................................14, 18

*Staehr v. Hartford Fin. Servs. Grp., Inc.,*
    547 F.3d 406 (2d Cir. 2008)........................................................................................6

*Sullivan v. Barclays PLC,*
    No. 13-cv-2811 (PKC), 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ......................................6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)....................................................................................................5

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*,
  127 F. Supp. 3d 156 (S.D.N.Y. 2015) ...........................................................................6

**Statutes**

15 U.S.C. § 77a *et seq.* ........................................................................................ passim

15 U.S.C. § 77e(a) ................................................................................................. passim

15 U.S.C. § 77e(c) ........................................................................................ 20, 26, 28-29

15 U.S.C. § 77o(b) ...............................................................................................12, 17, 20

15 U.S.C. § 78a *et seq.* ................................................................................................21

15 U.S.C. § 78j(b) .......................................................................................................24

**Rules**

Fed. R. Evid. 201(b)-(d) ...............................................................................................6

Fed. R. Civ. P. 12(b)(6) ................................................................................................1

**Other Authorities**

Regulation S, Offshore Offers and Sales, Securities Act No. 33-6863, 17 C.F.R. §§
  230.901-04 (1990) ..................................................................................................28

17 CFR § 230.901 .......................................................................................................29

17 CFR § 230.903 .......................................................................................................29

85 Fed. Reg. 34870, 34880 (June 5, 2020),
  https://www.govinfo.gov/content/pkg/FR-2020-06-05/pdf/2020-10278.pdf ...........................8

Defendant Bradley Garlinghouse respectfully submits this memorandum of law in support of his motion to dismiss with prejudice the SEC's amended complaint (ECF No. 46) (the "<u>AC</u>") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

The SEC is straining to invoke a World War II-era precedent about orange groves to the nascent technology around digital assets and blockchain. It does not work in this case, and this effort to destroy Ripple Labs Inc. ("<u>Ripple</u>"), a vibrant U.S. company that has spent years working to develop technology to make cross-border payments faster, cheaper, and more reliable, will be dealt with on summary judgment. The SEC's extraordinary decision to sue *individuals* in the face of years of regulatory uncertainty about how it would try to regulate this new technology can be addressed now.

The SEC makes two claims against Mr. Garlinghouse. First, it alleges that Mr. Garlinghouse's personal sales of XRP, which began in mid-2017, violated the law because those sales somehow formed "investment contracts" between him and the purchasers (the "<u>First Claim</u>"). Second, it alleges that beginning the moment Mr. Garlinghouse joined Ripple in 2015, he began aiding and abetting Ripple's own alleged securities law violations by substantially assisting his employer's unlawful sales of XRP (the "<u>Second Claim</u>"). The SEC has already amended its original complaint after Mr. Garlinghouse pointed out legal defects in its theories. These were the same legal defects Mr. Garlinghouse had already raised with the SEC orally and in writing before the SEC filed its original complaint. The SEC still has not fixed them because it cannot fix them.

Mr. Garlinghouse takes on these claims in reverse order. The SEC's Second Claim should be dismissed because the SEC *still* fails to adequately allege aiding and abetting – that Mr. Garlinghouse *knew or recklessly disregarded* that XRP was an investment contract and that Ripple

was somehow acting improperly in selling XRP.  The SEC's First Claim should be dismissed because, under Supreme Court and Second Circuit precedent, the SEC *still* fails to allege that any of Mr. Garlinghouse's own sales and offers of XRP fall within the territorial scope of the Securities Act.  Dismissal of both claims is therefore required, and this would end the case as to Mr. Garlinghouse.

The SEC does not plead that Mr. Garlinghouse's background is in finance or digital assets, nor could it.  A native Kansan and graduate of Kansas University and Harvard Business School, he was recruited to Ripple in 2015 in his mid-forties, three years after Ripple was formed, following a successful career operationalizing consumer products at leading technology firms including Yahoo! and AOL.  By the time he joined, Ripple was already executing a business plan to develop payment solutions.  Part of that business relied on an open-source, decentralized blockchain technology – the XRP Ledger ("XRPL") – that was developed before Ripple came into existence.  XRP is the native digital asset of the XRPL.  After being named the company's CEO in 2017, Mr. Garlinghouse helped Ripple promote the development of products intended to improve cross-border transactions by removing the need to settle foreign exchange transactions using fiat currency exchanged through centralized institutions (such as banks), allowing payments to flow more quickly and seamlessly at a fraction of the cost and time that the legacy financial infrastructure can provide.

Now, for the first time, after XRP has been trading openly for more than eight years, the SEC apparently has come to the view that Ripple's sales of XRP constitute one long and unlawful (and yet highly-public) unregistered securities offering.  According to the AC, filed by the SEC *in 2021*, XRP sales should have been registered as securities offerings back *in 2013* based on an unfounded extension of the Supreme Court's Truman-era precedent, *SEC v. WJ Howey Co.*, 328

U.S. 293 (1946), to blockchain technology that could not have been contemplated by Congress or the Court.   But the SEC's theory of the case – even on its own terms – fails.   The SEC's interpretation of *Howey* is incorrect, as Ripple will establish at summary judgment.   Yet, even taking all the AC's allegations as true and drawing all reasonable inferences in the plaintiff's favor, as this Court must, the SEC's claims against Mr. Garlinghouse are based on two fundamental legal infirmities that the SEC cannot cure and require dismissal.

*First*, following a 30-month investigation and hundreds of thousands of pages of pre-complaint discovery (including hours of sworn testimony by Mr. Garlinghouse), the best the SEC can allege in support of its Second Claim is that Mr. Garlinghouse was aware of "regulatory uncertainty" surrounding the treatment of *some* digital assets, but that he and Ripple took steps to ensure that XRP did not even appear to have those features.   AC ¶¶ 407-09, 414-19.   Those allegations are a concession by the SEC that it cannot plausibly allege that Mr. Garlinghouse knew Ripple's XRP sales were illegal or improper or that his participation in ordinary business activities was somehow "an extreme departure from the standards of ordinary care."   In other words, the SEC pleads the opposite of scienter.   It alleges that Mr. Garlinghouse participated in discussions about "messaging" around XRP to "make sure the verbiage . . . doesn't put us at risk of XRP sounding like a security," AC ¶¶ 407-08, that Mr. Garlinghouse "demonstrat[ed] a keen interest in the regulatory status of digital assets," *id.* ¶ 409, and that Mr. Garlinghouse liaised with certain exchanges who sought comfort that XRP was not a security before listing XRP, *see id.* ¶¶ 414-18.   These allegations show only the actions of a responsible CEO trying to follow the law, not to help Ripple break it.

The bottom line is this:   There are no plausible allegations (considered alone or collectively) that Mr. Garlinghouse's state of mind *ever* crossed over from (1) general awareness

of the risk *inherent in the digital currency space* that a digital asset *could* be classified as a security if certain criteria were met, to (2) knowledge or recklessness that XRP specifically *was* or *is* an investment contract *and* that Ripple was violating the law or otherwise acting improperly.  The SEC must plausibly allege the latter and it cannot.  Unlike an ordinary civil litigant, the SEC had the time and the compulsory tools – and it used them – to locate *any* evidence of wrongdoing before publicly leveling this serious charge that requires knowledge or reckless conduct.  But, like an ordinary civil litigant that simply does not have the evidence to make plausible allegations, the SEC's repeated pleading failures now require dismissal of the Second Claim with prejudice.

*Second*, the SEC alleges that Mr. Garlinghouse's personal sales of XRP – XRP that he earned as compensation for his ordinary course duties at Ripple – likewise should have been registered as securities offerings.  But even if XRP were a security, which it is not, the Supreme Court and the Second Circuit clarified years ago that sales conducted abroad – such as Mr. Garlinghouse's sales on foreign exchanges here – are not subject to the U.S. securities laws. Because the SEC has not alleged the offers or sales – if any – that it contends were conducted in the United States and that therefore allegedly violated Securities Act Section 5(a) or (c), its First Claim must be dismissed based on binding precedent.  This is no technical matter; the SEC has failed to plausibly allege *an element* of the SEC's Section 5 claim.  While the SEC seeks to inflate the size of its claim by relying on sales of XRP by Mr. Garlinghouse that it *knows* occurred on *foreign* exchanges outside the regulatory ambit of the Securities Act, it continues to elide its obligation to actually plead the elements of the cause of action asserted in this case.  The registration requirements of Section 5 apply *only* to offers and sales of securities *in the United States*, and do not reach offers and sales made on foreign exchanges.  *Morrison v. Nat'l Austl.*

*Bank Ltd.*, 561 U.S. 247, 267-69 (2010) (Congress lacks the power "to regulate foreign securities exchanges"). Accordingly, the SEC's First Claim must also be dismissed with prejudice.

## **BACKGROUND**

### A.    **Ripple And Its Business.**

Ripple and XRP are not synonymous. Ripple was founded in September 2012, after the XRP Ledger had already been developed and was fully functional, and after all of the XRP that will ever exist had already been created. AC ¶¶ 16, 38, 44-45. For more than two years, Ripple developed and began executing on its business plans, but during this "initial stage" Mr. Garlinghouse had no affiliation with the company whatsoever. AC ¶ 73; *see id.* ¶¶ 38-73. The SEC does not and cannot allege that Mr. Garlinghouse saw or knew about the two legal memos provided by a leading international law firm in February and October 2012. AC ¶¶ 51-52.

In April 2015, Mr. Garlinghouse joined Ripple as Chief Operating Officer. AC ¶ 74. At that time, Ripple was engaged in an effort to develop a payment network "for banks and other financial institutions to effect money transfers." AC ¶ 67. One aspect of that strategy relied on using XRP as a "universal [digital] asset." *Id.* Ripple's business strategy was to build a global payment network that would avoid the costly and cumbersome existing centralized bank settlement process, and instead allow payments to flow in real time across borders and currencies using XRP as a bridge asset. *See* Solomon Decl., Ex. A, Digital Ventures Interview at 2 (Mar. 12, 2018) (quoted at AC ¶ 413) ("[A]t its core, Ripple is selling solutions to banks, to financial institutions, to payment providers globally that enables them to transact with much lower cost, much faster . . . .").[1] The SEC alleges that Ripple's business plans required "an active, liquid XRP

---

[1]    On a motion to dismiss, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court

secondary trading market," AC ¶ 68, and that to facilitate that market Ripple "continued its efforts to develop a use for XRP." *Id.*

> **B.    DOJ And FINCEN Settle Enforcement Action Against Ripple On The Basis That XRP Is A "Virtual Currency."**

Shortly after Mr. Garlinghouse joined Ripple in April 2015, Ripple and XRP II, LLC ("XRP II"), a subsidiary of the company, entered into a settlement with the Department of Justice and FinCEN, a bureau of the U.S. Department of Treasury, for failing to register as a "Money Services Business" (the "DOJ/FinCEN Settlement"). AC ¶ 379. The DOJ/FinCEN settlement characterized XRP as a "virtual currency," not as a security, and required Ripple to implement anti-money laundering controls generally not applicable to securities.[2] AC ¶ 379; Solomon Decl., Ex. C, Settlement Agreement between Ripple and DOJ at 10 (May 5, 2015) ("[D]espite engaging in numerous sales of virtual currency to third parties, XRP II failed to have an effective, written

---

can therefore consider Exhibits A, C, D, G, H, and I because they are relied on and incorporated into the amended complaint by reference. *See* AC ¶ 413 (quoting Ex. A), ¶ 379 (quoting Exs. C, D), ¶ 362 (quoting Ex. G), ¶ 266 (quoting Ex. H), ¶ 409 (quoting Ex. I).

The Court may take judicial notice of Exhibits B, C, D, E, F, and J under Federal Rule of Evidence 201, which requires courts to take judicial notice, at "any stage of the proceeding," of any fact "that is not subject to reasonable dispute because" it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)-(d); *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 423-26 (2d Cir. 2008). Courts routinely take judicial notice of settlements with government agencies and other governmental records or reports published on government websites. *See, e.g.*, *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of DOJ settlement); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) ("Courts routinely take judicial notice of such governmental records [retrieved from official government websites].").

[2]    The DOJ/FinCEN Settlement required XRP II to maintain its registration with FinCEN as a "Money Service Business," which is exclusively regulated by FinCEN for anti-money laundering purposes. By contrast, anti-money laundering oversight for broker dealers in securities is shared by FinCEN, FINRA, and the SEC. *See* Solomon Decl., Ex. B, FinCEN, Fact Sheet on MSB Registration Rule at 1, FinCEN.gov, https://www.fincen.gov/fact-sheet-msb-registration-rule ("The term 'money service business' does not include a bank or a person registered with and regulated or examined by the Securities and Exchange Commission . . . .").

AML program."); Solomon Decl., Ex. D, Settlement Agreement between Ripple and FinCEN at 10 (May 5, 2015) (same).  While the SEC has issued no regulations concerning whether digital assets are securities, its most recent pronouncement concerning the other two largest digital assets most akin to XRP established that sales of bitcoin and ether were not securities offerings.[3]  In the midst of this continuing regulatory uncertainty, in October 2020, the DOJ once again characterized XRP as a "virtual currency."  Solomon Decl., Ex. E, U.S. Department of Justice, Cryptocurrency Enforcement Framework, Report of the Attorney General's Cyber Digital Task Force at 37 (Oct. 8, 2020).

### C.    As CEO, Mr. Garlinghouse Continued To Pursue Ripple's Payments Business Plan.

In January 2017, Mr. Garlinghouse became CEO.  AC ¶ 17.  During his leadership of Ripple, the company has continued to focus on developing payment and liquidity applications with certain of its offerings leveraging XRP and the XRPL.  Among its offerings is On Demand Liquidity ("ODL"), a software application that allows "money transmitting businesses to buy XRP in one jurisdiction, transfer it to a separate destination, and sell XRP for the local fiat currency, to effect cross-border payments."  AC ¶ 131.  The Consumer Financial Protection Bureau has highlighted the potential of XRP, combined with Ripple's "innovative technology," to provide

---

[3]      Solomon Decl., Ex. J, Director William Hinman, Division of Corporation Finance, Remarks at the Yahoo Finance All Markets Summit:  Crypto, *Digital Asset Transactions: When Howey Met Gary (Plastic)* at 3 (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ("[B]ased on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions.  And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value.").

consumers with accurate information about the costs of international remittance transfers before the consumer decides to make the transfer.[4]

While Mr. Garlinghouse's role as CEO of Ripple was to manage and run Ripple's business – as distinct from XRP or the XRPL – during his tenure, Mr. Garlinghouse took steps to create more transparency in the XRP market and encourage appropriate regulation in the digital asset space. Some of these efforts are referenced in the AC. For example, in January 2017, Mr. Garlinghouse's first month as CEO, Ripple began to publish XRP Market Reports. AC ¶ 213. These reports provide a variety of information, including global XRP trading volume and information about Ripple's sales of XRP, which were only a tiny fraction of global volumes. The Reports also discussed other developments in the digital asset space more broadly. *See, e.g.*, AC ¶ 324. Under Mr. Garlinghouse's leadership, Ripple also worked to correct any misperception that Ripple maintained an undue influence on the XRP market, for example, by "announc[ing] that it would place 55 billion XRP (most of its current holdings) into a cryptographically-secured escrow that would restrict Ripple to accessing only one billion XRP every month." AC ¶ 223.

### D.     As CEO, Mr. Garlinghouse Spoke Openly And Regularly About The Value Ripple Brings To The Payments Market And Why XRP Is Not A Security.

The SEC acknowledges that Mr. Garlinghouse was conscientious about the regulatory environment in which Ripple operated. He "demonstrate[d] a keen interest in the regulatory status of digital assets," AC ¶ 409, and participated in discussions internally and with market participants

---

[4]     *See* Solomon Decl., Ex. F at 11, Remittance Transfers under the Electronic Fund Transfer Act (Regulation E), 85 Fed. Reg. 34870, 34880 (June 5, 2020), https://www.govinfo.gov/content/pkg/FR-2020-06-05/pdf/2020-10278.pdf (highlighting Ripple and XRP as an example of "innovative technologies by providers of cross-border money transfers" and noting that "Ripple's suite of products could . . . allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent."). The Court may take judicial notice of this document as a final rule published in the Federal Register. *See Baur v. Veneman*, 352 F.3d 625, 638 n.12 (2d Cir. 2003).

in an effort to ensure that XRP did not appear to the market to have features that could risk it being deemed a security, AC ¶¶ 407-08, 414-19.

Notably, out of Mr. Garlinghouse's thousands of public statements, the AC fails to cite a single one in which he promoted purchasing XRP as a way to invest in Ripple or Ripple's business. As the SEC acknowledges, Mr. Garlinghouse often explained that Ripple is "a payments company" that utilizes XRP to lower costs and improve speed for "cross-border transactions."  Ex. A at 2. Ripple was a "private company" with investors who "bought shares of Ripple the company." Solomon Decl., Ex. G, CB Insights Future of Fintech, Bradley Garlinghouse Speech at 6 (June 21, 2018) (quoted at AC ¶ 362).   In contrast, Mr. Garlinghouse explained that XRP exists "independently" of Ripple, *id.*, as "the only digital asset with a clear use case – it's the best digital asset for payments," Solomon Decl., Ex. H, Brad Garlinghouse, "Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply," Ripple Insights at 2 (May 16, 2017) (quoted at AC ¶ 266).

While the AC quotes extensively from Mr. Garlinghouse's public statements, it often takes them out of context.  For example, the SEC relies on a June 2018 speech by Mr. Garlinghouse, but omits his explanation in that same speech of why XRP sales are not securities offerings based on three factors:

> "One is if Ripple the company shut down tomorrow, the XRP Ledger would continue to operate.  It's open source, [de]centralized technology that exists independent of Ripple.  The second is . . . the people buying XRP, they don't think they're buying shares of Ripple . . .  Buying XRP doesn't give you ownership of Ripple, it doesn't give you access to dividends or profits that may come from Ripple. . . .  [T]he third one . . . XRP is solving a problem. . . .  [T]here's no utility in a security."

Ex. G at 6.  Mr. Garlinghouse's other statements cited in the AC concerned the *differences* between XRP and initial coin offerings ("ICOs"), in which the token sold is understood to represent an

interest in the future profitability of the issuer.  For example, the SEC refers to Mr. Garlinghouse's 2017 statement that ICOs that are "based on little more than a white paper and look much more like (not especially attractive) stock offerings" should be regulated as securities.  Ex. I, Brad Garlinghouse, "ICO=IPO: Why the SEC Is Right to Regulate Initial Coin Offerings," Ripple Insights at 1 (July 28, 2017) (quoted at AC ¶ 409 ("I say, if it looks like a duck and quacks like a duck then let's regulate it like a duck.")).  Likewise, the AC selectively quotes from a 2018 interview in which Mr. Garlinghouse contrasted "90 plus percent of these ICOs," for which he did not "understand what the real use case is of the token," whereas Ripple was "a whole different animal" that was "focused on being a payments company."  Ex. A at 14-15 (quoted at AC ¶ 413). The AC and the documents cited in it demonstrate a clear and consistent message from Mr. Garlinghouse regarding the nature of Ripple's business, and distinctly of XRP as a digital asset that was used both by Ripple and by a decentralized array of third parties.

### E.    Mr. Garlinghouse Received XRP As Executive Compensation And Sold XRP On Foreign Exchanges.

As part of his compensation, Mr. Garlinghouse received XRP from Ripple.  AC ¶¶ 128-29. Mr. Garlinghouse did not begin selling XRP until April 2017.  AC ¶ 87.  Although the SEC alleges that Mr. Garlinghouse sold "over 357 million XRP . . . for approximately $159 million," AC ¶ 183, the SEC does not identify even a single offer or sale of XRP by Mr. Garlinghouse that took place in the U.S.  To the contrary, the SEC acknowledges both that:  (1) Mr. Garlinghouse's personal offers and sales "occurred on various digital asset trading platforms" including platforms "located outside the United States," AC ¶ 186, and (2) Mr. Garlinghouse utilized a foreign Market Maker who sold Mr. Garlinghouse's XRP through the use of "trading bots on multiple, *worldwide* digital asset trading platforms," AC ¶ 183 (emphasis added).  At best, the SEC can make only conclusory and legally irrelevant allegations that Mr. Garlinghouse "*directed* his offers and sales of XRP from

within the United States," AC ¶ 185 (emphasis added), that these offers and sales were made to "investors all over the world," including to individuals located in the U.S., AC ¶ 184, and that certain offers and sales were made on exchanges incorporated, or that had a subsidiary incorporated, in the U.S., AC ¶ 186.

## ARGUMENT

As in any civil case, the SEC has the burden to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *SEC v. Honig*, No. 18 Civ. 8175 (ER), 2021 WL 276155, at *4 (S.D.N.Y. Jan. 27, 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To do so, "[t]he plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* To be legally sufficient, a defendant should not be left to guess at the plaintiff's theory of the case; a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor are "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" sufficient. *Id.* Rather, on a motion to dismiss, "[a]fter separating legal conclusions from well-pleaded factual allegations, the court must determine whether those facts make it plausible – not merely possible – that the defendants acted unlawfully." *SEC v. One or More Unknown Traders in Sec. of Onyx Pharm., Inc.*, 296 F.R.D. 241, 247 (S.D.N.Y. 2013).

## I. THE SECOND CLAIM FAILS BECAUSE THE AC DOES NOT PLAUSIBLY ALLEGE THAT MR. GARLINGHOUSE KNEW OR WAS RECKLESS IN NOT KNOWING THAT RIPPLE WAS VIOLATING SECTION 5 OR ACTING IMPROPERLY.

To state a claim for aiding and abetting liability against Mr. Garlinghouse, the SEC must plead three elements: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary

-11-

violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).  As Magistrate Judge Netburn recently recognized in this case:  "[I]n order to prove its allegations that the Individual Defendants aided and abetted Ripple in offering or selling unregistered securities, the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's offerings and sales of XRP required registration as securities and that those transactions were improper."  Op. & Order, ECF No. 103, at 3 (Apr. 9, 2021) (citing 15 U.S.C. § 77o(b); *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2011); *SEC v. Espuelas*, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012)).

Aiding and abetting is an offense that cannot be committed accidentally, negligently, or even with gross negligence.  The Securities Act establishes that aiding and abetting liability exists *only* when a person "knowingly or recklessly provides substantial assistance to another person *in violation of a provision* of this subchapter." 15 U.S.C. § 77o(b) (emphasis added).  That means that not only must the underlying activity break the law, but the defendant must know or recklessly disregard that the underlying activity he substantially assisted was illegal or, at least, somehow improper.  *See, e.g.*, *SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020) (requiring the SEC to show that defendant knew or recklessly disregarded that the underlying activity was an "illegal scheme"); *Espuelas*, 905 F. Supp. 2d at 518 & n.5 (requiring the SEC to show that defendant knew that the underlying activity was "improper").

Even where, as here, the underlying or "primary" Section 5 violation itself requires no scienter, the SEC must plausibly allege that Mr. Garlinghouse not only provided substantial assistance to Ripple in violating Section 5's registration requirement, but that he did so "knowingly or recklessly."  15 U.S.C. § 77o(b); *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018) ("[T]he plaintiff must at least demonstrate recklessness to satisfy the knowledge requirement. . . .  Mere negligence does not suffice."); *see also* Br. for Securities and Exchange

-12-

Commission as Amicus Curiae Supporting Resp'ts, *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) (describing recklessness as "closer to conscious intent than gross negligence").

**A.   The AC Fails To Plausibly Allege That Mr. Garlinghouse Acted "Recklessly."**

The SEC's primary theory appears to be that Mr. Garlinghouse acted "at least recklessly." AC ¶ 427.  But recklessness is a very high bar.  To adequately plead recklessness, the SEC must plausibly allege that Mr. Garlinghouse acted "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  Recklessness is "highly unreasonable" conduct that represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F.2d 38, 47 (2d Cir. 1978)); *see also SEC v. Lowy*, 396 F. Supp. 2d 225, 242-43 (E.D.N.Y. 2003) (same).

Here, the best the SEC can do is to allege that Mr. Garlinghouse was conscious of taking steps to *avoid* XRP being "classified as a security," so as to comply with the law, AC ¶ 420; *see id.* ¶¶ 405, 409, 411, 413, 421, and that he was focused on ensuring that XRP did not even appear to have the features of a security, *id*. ¶¶ 407-08, 412, 419.  That is the opposite of recklessness.  In fact, the AC expressly acknowledges that Mr. Garlinghouse was aware of "regulatory uncertainty," AC ¶¶ 418-19, at the time of his allegedly reckless conduct.  This allegation fatally undermines any plausible allegation that the law was "obvious."

The thrust of the SEC's allegations seem to be that Mr. Garlinghouse was aware that some digital assets – not XRP – could be considered securities, but that he took steps to ensure that XRP could not be perceived as a security.  *See id.* ¶ 405 (noting that "the digital asset space entails risks

relating to the application of the federal securities laws"); *id.* ¶ 409 (Mr. Garlinghouse "demonstrat[ed] a keen interest in the regulatory status of digital assets"); *id.* (Mr. Garlinghouse describing *other* digital assets (not XRP) as securities); *id* ¶ 411 (Ripple's public relations firm describing "a concern to have XRP considered a security"); *id.* ¶ 419 (Mr. Garlinghouse describing his "goal of dispelling . . . concerns about [XRP] being a security"). But recognizing and seeking to avoid a risk is not reckless – it is prudent. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (finding no scienter where "defendants engag[ed] in a good-faith process to inform themselves and the public of the risks"); *In re Tremont Sec. Law, State Law, & Ins. Litig.*, No. 08 Civ. 11117, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (defendant's recognition of generalized risks does not constitute recklessness).

Mr. Garlinghouse was the COO and then CEO of a company that participated in a well-developed market for and made discrete sales of the digital currency XRP. The allegation that Mr. Garlinghouse was generally aware of regulatory uncertainty could be made against any executive in any nascent industry, particularly one involving new technology where no clear regulatory guidance has been issued. What is missing and fatal to the SEC's aiding and abetting claim is the absence of any allegations that Mr. Garlinghouse was reckless in believing that Ripple's XRP sales were unregistered securities offerings (as opposed to a generalized desire to ensure they were *not*). Thus, the SEC's allegations of fact, accepted as true, actually point squarely in the opposite direction. For example:

- The SEC alleges that Platform A was "hesitant to list XRP" based on "regulatory uncertainty," AC ¶¶ 414-19, but Platform A was one of dozens of exchanges (more than 200) that *did* list XRP for trading, *see id.* ¶¶ 326, 328, 415, demonstrating that Platform A itself ultimately considered and rejected the risk that XRP was a security.

- The SEC alleges that in May 2015 – shortly after Mr. Garlinghouse joined Ripple – Ripple agreed to "settle charges brought by the United States Department of Justice and FinCEN for failing to register as a 'Money Services Business'" and that "with

-14-

respect to Ripple's XRP sales" the "settlement called [them] 'virtual currency.'" AC ¶ 379.

- The SEC alleges that after reading the 2017 *DAO Report*, finding DAO Tokens to be securities, Mr. Garlinghouse wrote "I say, if it looks like a duck and quacks like a duck then let's regulate it like a duck."  AC ¶ 409  But that same article, in a passage not quoted by the SEC, makes clear Mr. Garlinghouse's belief that "[t]his culling of the herd should not affect utilitarian assets like XRP" which neither "looks like" nor "quacks like" a security.  Ex. I at 2.

- The SEC misleadingly cites an excerpt from a February 2018 interview by Mr. Garlinghouse in which he said that "if there is not a real use case then it's really a securities offering," AC ¶ 413, but omits that Mr. Garlinghouse was contrasting Ripple's "focus on solving a real problem for real customers" with ICOs where "there's not real utility."  Ex. A at 4.

To be perfectly clear, the Court need not resolve any contested question of fact to grant this motion to dismiss.  The allegations in the AC – accepted as true, with all inferences resolved in the SEC's favor – not only fail to plausibly allege the state of mind required for the violation, but establish that Mr. Garlinghouse did *not* act recklessly.  They paint a picture of Mr. Garlinghouse recognizing the risks inherent in the digital asset space, AC ¶¶ 405, 409, 411, 413, 420, 421, in light of the SEC's own guidance regarding bitcoin and ether, two of the three largest digital assets (with XRP being the third) – and taking steps to ensure that XRP would *not* be perceived as a security and that sales of XRP would not be securities offerings, AC ¶¶ 407-08, 412, 419. Permitting allegations like these – that on their face defeat a reasonable inference of scienter – to advance past the pleadings stage would upset settled law.  It would also serve only to chill efforts by executives to educate themselves as to relevant risks and take efforts to mitigate them.

Against this backdrop, the SEC's allegations that Mr. Garlinghouse routinely spoke publicly about the regulatory environment and the reasons that sales of XRP were not securities offerings, *see supra* at 8-10, are entirely consistent with the conclusion that he believed XRP was not a security – and therefore fail to plead an inference of scienter.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("When faced with two possible explanations,

-15-

only one of which can be true and only one of which results in liability, plaintiffs cannot offer allegations that are 'merely consistent with' their favored explanation but are also consistent with the alternative explanation.") (quoting *Iqbal*, 556 U.S. at 678). Importantly, the SEC does not accuse Mr. Garlinghouse of fraud and points to no evidence that he was seeking to mislead the market by, for example, saying one thing publicly and something different in private. If anything, the SEC's allegations that Mr. Garlinghouse spoke often in public, and in detail, about the reasons that XRP sales should not be treated like ICOs or regulated as securities offerings *undermines* any suggestion that he knew or was reckless as to whether they were.

As for the SEC's allegations that Mr. Garlinghouse had a financial incentive either for Ripple to be successful or for his personal interests in XRP (including the compensation in XRP he received from Ripple in XRP) to retain their value, *see* AC ¶ 422, controlling precedent is clear that the SEC cannot predicate allegations of scienter against an executive on such generic assertions of financial motive, *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (holding that incentive compensation "can hardly be the basis" on which scienter could be pleaded); *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) (same); *Novak*, 216 F.3d at 307-08 (same); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (same).

The SEC is left only with its assertion that Mr. Garlinghouse got it wrong – that his analysis, weighing factors such as whether XRP purchasers obtained an interest in Ripple (they do not), whether XRP exists independently of Ripple (it does), and whether XRP is used to facilitate cross-border payments (it is), simply reached the wrong legal conclusion. *See, e.g.*, Ex. A, Ex. I. But aiding and abetting liability requires far more than the mere failure to reach the right legal conclusion or to predict what conclusion a court may reach many years in the future, particularly

where the SEC itself took eight years to arrive at this apparent view.  Allegations of "uncertainty and disagreement . . . in the market at large" are not the same as recklessness.  *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 187-88 (2d Cir. 2014).  As the Supreme Court has explained, where a regulatory scheme:

> allow[s] for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator.  Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts, whatever their subjective intent may have been.

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007).

The SEC virtually goes out of its way to explain that this is exactly what happened here.  In the face of "'regulatory uncertainty' about the status of XRP," Mr. Garlinghouse concluded that it was not a security.   AC ¶¶ 418-19; *see id.* ¶ 420 (describing that Mr. Garlinghouse was "optimistic that" XRP was not a security but could "not guarantee that").  This was the exact situation when Mr. Garlinghouse joined Ripple, has been throughout his tenure at the company, and remains the case today.  The SEC has issued no regulations concerning whether digital assets are securities, and the most timely and recent guidance that it issued concerning the other two largest digital assets most akin to XRP established that sales of bitcoin and ether were *not* securities offerings.  Ex. J; *see supra* n.3.  Even if Mr. Garlinghouse was wrong in predicting that a court would ultimately determine that XRP was not a security, the SEC does not and cannot plead that his was not a "reasonable interpretation."  *Safeco*, 551 U.S. at 70 n.20 (2007).

That all of this makes it difficult for the SEC to plead a case against Mr. Garlinghouse for knowingly or recklessly helping another break the law is precisely the point.  Whereas Congress has prescribed strict liability for primary offenders, as it has in Section 5, it has deliberately imposed *secondary* liability only on those who act with knowledge or recklessness that their conduct is wrong.  15 U.S.C. § 77o(b).  The SEC has not established that level of foreknowledge

-17-

here; again, it pleads the opposite.  Stripped of labels and conclusions, the AC is merely an effort to dress up the facts of Mr. Garlinghouse's diligence and conscientiousness while leading a company operating in an uncertain legal and business environment as evidence of wrongdoing. But diligence is "a prudent course of action that weakens rather than strengthens an inference of scienter."  *Slayton*, 604 F.3d at 777; *see Lowy*, 396 F. Supp. 2d at 243 (holding that the SEC failed to prove scienter where the defendant "responded reasonably to and investigated" red flags).

> **B.** **The SEC's Efforts To Avoid Its Obligation To Plead Knowledge Or Recklessness Of The "Violation" Fail.**

Unable to plausibly allege that Mr. Garlinghouse knew or recklessly disregarded that Ripple's sales of XRP were an unregistered, illegal securities offering, the SEC recognizes that its only route to avoid dismissal is to try to persuade this Court to move the goalposts by arguing that it need only plead "awareness of the underlying facts, not the labels that the law places on those facts."  Letter from Jorge G. Tenreiro, ECF No. 55, at 2 n.2 (Mar. 10, 2021).  To the extent the SEC means to suggest that Mr. Garlinghouse can be liable for aiding and abetting a Section 5 claim merely on the basis of knowledge that Ripple was selling XRP without a registration statement, rather than pleading that Mr. Garlinghouse knew or recklessly disregarded that Ripple's actions were *improper* because those sales constituted illegal unregistered securities offerings, the SEC is wrong.

As courts in this district, and the SEC itself, have concluded, aiding and abetting liability attaches to one who recognizes (or is reckless in not recognizing) that his course of action substantially assists wrongdoing, and who nonetheless persists in it.   For example, in *Espuelas*, the court held that the SEC had the burden to show both that the defendant was "aware of the facts that made [the underlying activity] improper" and that the defendant had sufficient technical knowledge "to appreciate that [the underlying activity] under the circumstances was improper."

905 F. Supp. 2d at 518.  Similarly, in *Paulsen*, the court observed that the defendant would be liable for aiding and abetting if he covered up what he knew or recklessly disregarded would be a primary violation of the securities laws, but would not if he "acted merely to protect [co-defendants] from discipline by their respective employers, and without any knowledge or reason to suspect that they had entered into a quid pro quo arrangement that violates the securities laws." 2020 WL 1911208, at *7.

The SEC itself acknowledges that it must meet this "improper" requirement in order to prove scienter in aiding and abetting actions in both federal court actions and in its own administrative proceedings.  *See, e.g.*, SEC's Post-Trial Memorandum at 2, *SEC v. Paulsen*, No. 18 Civ. 6718 (S.D.N.Y. Aug. 14, 2020), ECF No. 148 ("To meet the second element of aiding and abetting, the SEC must prove that Paulsen knew, consciously avoided knowing, or was reckless in not knowing that his role was part of an overall activity that was improper."); *In re Amundsen*, AP File No. 3-18994, at 8 (Dec. 5, 2019) (requiring "awareness or knowledge by the aider and abettor that his or her role was part of an overall activity that was improper"); *In re Horning*, AP File No. 3-12156, at 20 (Sept. 19, 2006) (same).

Indeed, Judge Netburn properly adopted this standard in granting Defendants' motion to quash in this case, finding that "in order to prove its allegations that the Individual Defendants aided and abetted Ripple in offering or selling unregistered securities, the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's offerings and sales of XRP required registration as securities and that those transactions were improper."  Op. & Order, ECF No. 103, at 3 (Apr. 9, 2021) (citing 15 U.S.C. § 77o(b); *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2011); *SEC v. Espuelas*, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012)).

-19-

Judge Netburn's articulation of the law is consistent with the text of 15 U.S.C. § 77o(b), the settled law in this district, and the SEC's own practice.  It also reflects the common sense conclusion that, for the scienter requirement to mean anything, the plaintiff must show that the defendant acted wrongfully.  In the context of a *malum prohibitum* violation – where, as here, there is nothing inherently wrongful in Ripple selling XRP without a registration statement – that means the defendant must be alleged to know he is acting unlawfully or is reckless to such illegality. Otherwise, proving the underlying violation itself would always lead inexorably (and strictly) to liability for secondary actors.  Without knowledge or recklessness as to the impropriety of Ripple's conduct because it was acting illegally, Mr. Garlinghouse could not have and, based on the SEC's own allegations, did not have the requisite scienter.

## II.   THE FIRST CLAIM FAILS BECAUSE THE AC DOES NOT ALLEGE THAT MR. GARLINGHOUSE'S PERSONAL OFFERS OR SALES OF XRP OCCURRED IN THE UNITED STATES.

The SEC's remaining theory of liability is that Mr. Garlinghouse's personal sales of XRP are primary violations of Section 5.  The SEC's allegations concerning Mr. Garlinghouse's personal sales fail as a matter of law because it has not adequately alleged that any of those sales occurred in the U.S.  The registration requirements of the Securities Act apply only to *domestic* sales (under Sections 5(a) and (c)) and offers (under Section 5(c)) of securities.  *Morrison v. Nat'l Austl. Bank Ltd*., 561 U.S. 247, 268-69 (2010) ("The same focus on domestic transactions is evident in the Securities Act of 1933 . . . .  That legislation makes it unlawful to sell a security . . . unless a registration statement is in effect.  15 U.S.C. § 77e(a)(1)."); *SEC v. Bio Def. Corp.*, No. 12-11669-DPW, 2019 WL 7578525, at *11-13 (D. Mass. Sept. 6, 2019) (applying *Morrison* to Section 5 claim, along with other Securities Act and Securities Exchange Act claims); *see also Schentag v. Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at *5, 10-13 (S.D.N.Y. June

21, 2018) (dismissing Section 5 claim, along with other Securities Act and Securities Exchange Act claims, under *Morrison*).  Here, to state a claim, it is the SEC's burden to plead that the challenged transactions are within the geographic scope of the Securities Act, and it must do so with non-conclusory allegations.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) ("The mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions.").  Here, it has not done so, even after having tried and failed once before.

   **A.**   **The AC Does Not Allege That Mr. Garlinghouse's <u>Sales</u> Were Domestic, As Required By Section 5(a) and (c).**

   Liability under Section 5(a) attaches only to domestic "sales" of securities.  In turn, sales are domestic only if:  (1) they occurred on "domestic exchanges," or (2) irrevocable liability was incurred or passage of title transferred in the U.S.  *Id.* at 66-69 (defining when a "sale" or "purchase" is domestic).

   The SEC alleges that Mr. Garlinghouse violated the U.S. securities laws by selling "over 357 million of his XRP, for approximately $159 million."  AC ¶ 183.  Yet, and in the absence of allegations describing even a single U.S. sale, the SEC acknowledges that Mr. Garlinghouse's "offers and sales occurred" on "multiple, worldwide digital asset trading platforms" where he sold to purchasers "all over the world."  AC ¶¶ 183-86.  The AC fails to indicate which (if any) of Mr. Garlinghouse's sales occurred on a U.S. exchange or otherwise became irrevocable in the U.S. The reason for this failure is simple:  The vast majority of Mr. Garlinghouse's sales were made either directly on foreign exchanges or placed through a market maker based outside of the U.S., which in turn sold XRP on global exchanges.  *See, e.g.*, AC ¶ 183 ("The Market Maker deployed trading bots on multiple, worldwide digital asset trading platforms . . . .").

Because the U.S. securities laws do not apply extraterritorially, the registration requirement under Section 5(a) does not apply to sales executed on foreign exchanges, *Morrison*, 561 U.S. at 267-68 ("We know of no one who thought that the Act was intended to 'regulat[e]' *foreign securities exchanges*.") (emphasis in original), and for that reason claims premised on sales on such exchanges must be dismissed, *see In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 532-33 (S.D.N.Y. 2011) (dismissing claims of American shareholders who purchased shares on a foreign exchange, reasoning that *Morrison* "clearly sought to bar claims based on purchases and sales of foreign securities on foreign exchanges"); *see also Holsworth v. BProtocol Found.*, No. 20 CIV. 2810 (AKH), 2021 WL 706549, at *3 (S.D.N.Y. Feb. 22, 2021) (dismissing registration claim under *Morrison* where plaintiff purchased digital coins on digital exchange in Singapore).

The SEC fails to allege that Mr. Garlinghouse's sales of XRP occurred in the U.S. Instead, it unsuccessfully tries to point to irrelevant facts in an attempt to side-step the domesticity requirement.

*First*, the SEC alleges that some *purchasers* of XRP were *located* in the U.S. AC ¶ 184 (alleging that Mr. Garlinghouse "offered and sold XRP to investors all over the world, including in the United States"); *id.* ¶ 187 ("Garlinghouse made offers and sales of XRP to persons in the United States."). The AC does not identify any such purchasers or any such transactions, which is a threshold pleading failure. And, despite recently telling Judge Netburn that each sale of XRP is a separate violation of the Securities Act, *see* Hr'g Tr. 45:10-12 (Mar. 19, 2021), the SEC has not pleaded the details of a *single* domestic sale of XRP by Mr. Garlinghouse, *see Mori v. Saito*, No. 10 Civ. 6465 (KBF), 2013 WL 1736527, at *7 (S.D.N.Y. Apr. 19, 2013) (finding certain plaintiffs failed to "plead domestic transactions . . . under *Morrison*" where the complaint

contained "insufficient context" as to the locations of those transactions); *In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 476 (S.D.N.Y. 2013) ("Conclusory arguments not supported by any factual allegations in a complaint are insufficient to establish that the option exercise transactions were domestic.").

More fundamentally, the Second Circuit has held that the location of the *purchaser* does not control whether a securities sale is foreign or domestic. *Absolute Activist*, 677 F.3d at 69 ("[A] purchaser's citizenship or residency does not affect where a transaction occurs; a foreign resident can make a purchase within the United States, and a United States resident can make a purchase outside the United States."). Rather, with respect to sales on foreign exchanges – like the overwhelming majority of Mr. Garlinghouse's sales – the transaction becomes irrevocable on the exchange, and it is therefore the location of the exchange that is relevant. *See Banco Safra S.A. v. Samarco Mineracao S.A.*, No. 19-3976-CV, 2021 WL 825743, at *2 n.2 (2d Cir. Mar. 4, 2021) (explaining that when orders are "matched" with a counterparty over an "electronic exchange system," irrevocable liability attaches where the exchange is located); *see also Morrison*, 561 U.S. at 285 (Stevens, J., dissenting) (noting that the holding in *Morrison* would "bar[]" "an American investor who buys shares in a company listed only on an overseas exchange" from filing a securities claim, even if "it was in New York City that the executives masterminded and implemented a massive deception").

*Second*, the SEC appears to suggest that Mr. Garlinghouse's physical location is relevant, and that any sales executed while he was located in the U.S. are accordingly domestic. AC ¶¶ 185-86. Setting aside that the SEC again pleads no specific sales of XRP at all, much less any specific trades that occurred while Mr. Garlinghouse was in the U.S., its allegations concerning Mr. Garlinghouse's location as the basis for domesticity are insufficient under controlling law. The

-23-

Second Circuit has held that transactions executed on foreign exchanges are extraterritorial and thus outside the scope of the U.S. securities laws irrespective of the location of the buyer and seller. *See City of Pontiac*, 752 F.3d at 181 (finding it insufficient to allege that a U.S. entity "placed a buy order [of a foreign security] in the United States that was then executed on a foreign exchange"); *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010) ("[A] purchase order in the United States for a security that is sold on a foreign exchange is insufficient to subject the purchase to the coverage of Section 10(b) of the Exchange Act."). This is all the more so given the SEC's acknowledgement that Mr. Garlinghouse used a foreign market maker to conduct trading on his behalf. *See* AC ¶ 183.

*Third*, the SEC's allegations that Mr. Garlinghouse engaged in *conduct* within the U.S. preparatory to those foreign sales fails for the same reason – the SEC does not allege that the sales themselves occurred in the U.S.[5] Indeed, in *Morrison*, the Supreme Court specifically rejected the argument that conduct in the U.S. leading up to the violation – such as, in that case, "deceptive conduct" and "misleading public statements" made in Florida – were sufficient to render a securities sale domestic. *Morrison*, 561 U.S. at 266. As the Court reasoned, "the presumption against extraterritorial application [of the federal securities laws] would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." *Morrison*, 561 U.S. at 266 (emphasis in original). Applying *Morrison*, courts in this Circuit have repeatedly recognized that *conduct* in the U.S. does not transform a *sale* occurring outside of the U.S. (such as on a foreign exchange) into a domestic one, absent a transaction on a U.S. exchange

---

[5]     For example, the AC alleges:  (i) that Mr. Garlinghouse opened an account with the U.S. subsidiary of a digital asset exchange *located abroad* (AC ¶ 186); (ii) that one of the foreign platforms utilized by Mr. Garlinghouse "used resources," which go unnamed and unexplained, that were "located in the United States to execute Garlinghouse's trades in XRP" (AC ¶ 186); and (iii) that Mr. Garlinghouse "directed" sales of XRP from the U.S. (AC ¶ 185).

or the incurrence of irrevocable liability in the U.S.  *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) ("[D]irection to wire transfer money to the United States is insufficient to demonstrate a domestic transaction" because the wire transfers "were actions needed to carry out the transactions, and not the transactions themselves."); *Cornwall v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) (rejecting an attempt "to carve out" of the rule in *Morrison* "a purchase or sale of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test" repudiated by *Morrison*).

*Finally*, the SEC alleges that Mr. Garlinghouse made unspecified sales on five unnamed "digital asset trading platforms" either "incorporated" in the U.S. or "incorporated abroad" but having a "principal place of business in New York."  AC ¶ 186.  Again, however, the Second Circuit has held that place of incorporation – without sufficient further allegations as to where the sales actually became irrevocable – do not satisfy *Morrison*.  *See, e.g.*, *Loginovskaya*, 764 F.3d at 274-75 (finding transactions were not domestic and party to transaction did not incur irrevocable liability in the U.S. despite being incorporated in New York).  Importantly, the SEC nowhere alleges:  (1) which (if any) of the 357 million XRP sold by Mr. Garlinghouse became irrevocable in the U.S. and on which (U.S.-based) platforms; (2) what facts would support the conclusion that any of these sales become irrevocable in the U.S., for example by alleging facts indicating that Mr. Garlinghouse's transactions "matched" or that irrevocable liability was otherwise incurred in the U.S., *see Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018); or (3) why the SEC should be able to maintain claims with respect to what it itself acknowledges are "worldwide" transactions made on foreign exchanges.  The reason for this is simple – transactions made on foreign exchanges are beyond the reach of Section 5 of the Securities Act.  *Morrison*, 561 U.S. at

267-68 ("We know of no one who thought that the Act was intended to 'regulat[e]' *foreign* securities exchanges.") (emphasis in original).

The SEC thus fails to meet its burden to plead the facts that would support the existence of domestic transactions in XRP by Mr. Garlinghouse.  This is not a mere technical pleading error. The SEC has known since before it filed its original complaint that the vast majority of Mr. Garlinghouse's sales were made on foreign exchanges.  Yet, despite conducting a 30-month investigation and having amended its complaint, the SEC still does not plead where Mr. Garlinghouse's sales of XRP occurred.  Instead, the SEC spends paragraph after paragraph of the AC addressing sales by Mr. Garlinghouse that it knows cannot support liability under Section 5. *See, e.g.*, AC ¶¶ 183, 184, 186.  Such allegations are not well pleaded, and the First Claim should be dismissed.

### B.   The AC Also Fails To Plead Any Domestic Offers Under Section 5(c).

The SEC's Section 5(a) claims, premised on "sales" in the U.S., must be dismissed under binding precedent.  The SEC's claims under Section 5(c) fare no better merely because that provision reaches "offers" of securities in addition to "sales," 15 U.S.C. § 77e(c), as the SEC also has not pleaded any offer that occurred in the U.S.  Rather, as the SEC concedes, Mr. Garlinghouse's offers also occurred on the exchanges themselves.  AC ¶ 186 ("Garlinghouse's *offers* and sales occurred *on* various digital asset trading platforms.") (emphasis added).  Here, the SEC's allegations that Mr. Garlinghouse's "offers" of XRP occurred <u>on</u> the foreign exchanges in question (AC ¶ 186 (emphasis added)) dooms its attempt to allege a violation of Section 5(c) of the Securities Act.  Foreign exchanges post offers to sell XRP that would only be visible to potential buyers on the exchange.  The exchange then blindly matches the sell order with a buy order (if there was one available).  *See Myun-Uk Choi*, 890 F.3d at 63 (transactions are "matched"

and irrevocable liability occurred on electronic platform when platform anonymously matches buy and sells orders).  Just as on-exchange "sales" occur on the exchange itself, so too do the offers; which is why claims concerning securities transacted on foreign exchanges are dismissed.  *See supra* at 23-24.

Seemingly the SEC's only answer to this obvious deficiency has been again to point to *conduct* by Mr. Garlinghouse in the U.S.  For example, the SEC alleges that Mr. Garlinghouse made statements about Ripple establishing an escrow for XRP, AC ¶ 255, that in an interview he tied the uses of XRP to a potential increase in price, AC ¶ 261, and noted that fostering a healthy XRP eco-system was important for Ripple, AC ¶ 307.  But, in *Morrison*, the Supreme Court expressly rejected a "conduct and effects" test, which would have looked to the existence of conduct in the U.S., in favor of a more strictly territorial conception.  561 U.S. at 255-61.  In other words, to the extent that the SEC is seeking to rely on Mr. Garlinghouse's "conduct" in the United States to support a claim related to "offers" and "sales" that occurred abroad, it is proceeding under a test that the Supreme Court expressly rejected.  Much as it might wish to, the SEC cannot turn back the clock and proceed under pre-*Morrison* case law merely because that might make it easier to state a claim.

What's more, to find that Mr. Garlinghouse's offers occurred in the U.S. could extend the SEC's regulatory authority to every participant in every foreign securities market as long as someone located in the U.S. participated in some way somewhere in the chain of transactions.  It is understandable why the SEC may wish to have this authority, but Congress and the Supreme Court have foreclosed it.  *Morrison*, 561 U.S. at 255-65; *Plumbers' Union*, 753 F. Supp. 2d at 178 (rejecting statutory interpretation for analyzing domesticity that "would . . . produce the regulatory multiplicity that the Supreme Court has directed courts to avoid").  The SEC must comply with

*Morrison* and adequately allege that – under Securities Act Section 5(c) – Mr. Garlinghouse's "offers" of XRP were located in the U.S., just as it must with respect to "sales" under Section 5(a).

In a last-ditch effort to circumvent this well-settled law, the SEC appears to be taking the startling position that whether a transaction is domestic or foreign is governed *not* by the tests the Supreme Court and Second Circuit have developed for evaluating extraterritoriality under the securities laws, *see Morrison*, 561 U.S. 247; *Absolute Activist*, 677 F.3d 60, but *instead* by its own Regulation S, Offshore Offers and Sales, Securities Act Release No. 33-6863, 17 C.F.R. §§ 230.901-04 (1990) – a regulation promulgated 20 years before *Morrison* was decided.  *See* Letter from Jorge G. Tenreiro at 4, ECF No. 55; Hr'g Tr. 71:21-72:7 (Mar. 19, 2021) ("*Morrison* is inapplicable in the way defendants claim.  Regulation S controls whether a sale or offer is domestic.").  The SEC implies, therefore, that unless a foreign securities offering complies with the SEC's own non-exclusive Regulation S safe harbors, the transaction must be domestic, even if it does not satisfy the tests laid out in *Morrison* and *Absolute Activist*.

This argument is not a serious one.  It betrays Congress' clear intent to limit the extraterritorial application of the Securities Act, as interpreted by the Supreme Court and Second Circuit.  To begin with, the extraterritorial scope of Section 5 is a matter of statutory interpretation.  As the Supreme Court held in *Morrison*, the U.S. securities laws are territorial.  *Morrison*, 561 U.S. at 263 ("Nothing suggests that [the U.S.] *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets.") (emphasis in original); *id.* at 268 (the "same focus on domestic transactions is evident in" the Securities Act as in the Exchange Act.).  The SEC could not – even if it wanted to – expand the extraterritorial reach of the Securities Act beyond what Congress itself prescribed.  *See, e.g.*, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984) (holding that an agency "must give effect to the unambiguously expressed

-28-

intent of Congress" where "Congress has directly spoken to the precise question at issue"); *see also Morrison*, 561 U.S. at 267 ("We know of no one who . . . even believed that under established principles of international law Congress had the power" to regulate foreign securities exchanges.). Put differently, because Section 5 does not apply extraterritorially, the SEC has no statutory authority to regulate securities offers and sales that occur abroad.  Whether it purported to do so 30 years ago when it promulgated Regulation S is beside the point.

But in any event, Regulation S does not even purport to regulate foreign transactions. Rather, it expressly provides that the terms "offer" and "sale" "shall be deemed not to include offers and sales that occur outside the United States."  17 CFR § 230.901.  While the Regulation provides a safe harbor for two specific categories of foreign transactions, 17 CFR § 230.903, those categories are *safe harbors* designed to provide certainty; they do not define the metes and bounds of what is a foreign transaction.  *See Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998), *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010) (finding that transactions that did not meet either of the Regulation S safe harbors were foreign transactions).  Put simply, the applicable test in this Circuit is whether an offer or sale was made on a U.S. securities exchange or otherwise became irrevocable in the U.S., no matter what safe harbor the SEC may have promulgated decades ago.

Because the SEC has not pleaded any "offers" by Mr. Garlinghouse in the U.S., in addition to the reasons described above, it fails to state a claim against him under Section 5(c).

C.    **Even If Mr. Garlinghouse's Conduct In The U.S. Were Relevant, The Transactions In Question Are Predominantly Foreign And Accordingly Outside The Scope Of Section 5.**

While the SEC has failed to allege domestic offers or sales, the Second Circuit has provided an additional safeguard to prevent the U.S. securities laws from improperly reaching conduct that

-29-

is "predominantly foreign" and risks conflict with foreign law.  *Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 216 (2d Cir. 2014).  Under the predominantly foreign analysis, even if a complaint alleges a domestic transaction – which the AC does not – "the features and incidents of the transaction may nevertheless be so foreign that it is not regulated by" the U.S. securities laws.  *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 166 (2d Cir. 2021) ("*Morrison*'s 'domestic transaction' rule operates as a threshold requirement, and as such may be underinclusive.").  Here, the AC acknowledges that Mr. Garlinghouse executed his sales through a foreign Market Maker and on foreign exchanges, and his unknown counterparties did the same, indicating that neither party sought the protection of the U.S. securities laws.  *Id.* at 167 (observing that if the parties to a transaction "had wanted the regulatory hand of U.S. law, they could have bargained for it and structured a U.S. transaction").  The SEC's suggested approach – which would open foreign exchanges to U.S. regulation and moot foreign regulators' authorities over their own markets – is directly contrary to *Morrison*'s admonition that the U.S. securities laws were not "intended to 'regulat[e]' foreign securities exchanges."  *Morrison*, 561 U.S. at 267 (emphasis in original).  This Court should reject the SEC's effort to end-run *Morrison*.

## CONCLUSION

For the foregoing reasons, the amended complaint should be dismissed with prejudice.

Dated:  April 12, 2021

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Matthew C. Solomon*

Matthew C. Solomon
Nowell D. Bamberger
2112 Pennsylvania Avenue, NW
Washington, DC 20037
202-974-1500

Alexander Janghorbani
Lucas Hakkenberg
Samuel Levander
One Liberty Plaza
New York, NY 10006
212-225-2000

*Attorneys for Defendant Bradley Garlinghouse*

-31-