**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

    v.

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN

                          Defendants,

JORDAN DEATON, JAMES LAMONTE,
TYLER LAMONTE, MYA LAMONTE,
MITCHELL MCKENNA, KRISTIANA WARNER and
ALL SIMILARLY SITUATED XRP HOLDERS,

                      Proposed
                      Intervenors.

**MEMORANDUM OF
LAW IN SUPPORT OF
MOTION TO
INTERVENE
PURSUANT TO
FEDERAL RULES OF
CIVIL PROCEDURE 24**


**20-cv-10832 (AT)**

**TABLE OF CONTENTS**

**Section**                                                                                           **Page**

TABLE OF AUTHORITIES…………………………………………………………………..iii

PRELIMINARY STATEMENT……...………...…………………………………………1

STATEMENT OF FACTS ……………………………………...…………………………..2

    I.      Government Agencies Recognize XRP as a Currency…………………..……………2

    II.     The Securities and Exchange Commission…….………………………………...…….3

    III.    XRP Holders Contribute to the XRP Ecosystem……………...…………………5

    IV.    The SEC Complaint Charges Ripple but Attacks XRP and XRP Holders……………7

    V.     XRP Holders Take Action………………………………………………………9

LEGAL STANDARD……………………………………………………...……………10

ARGUMENT……………………………………………………………………….....11

    I.      Intervention in SEC Enforcement Action is Permitted…………………...……..11

    II.     XRP Holders Should be Granted Intervention as of Right………………...……....13

        A. The Motion is Timely…………………………...………………………...13

              i.   XRP Holders Took Immediate Action to Protect Their Interests……13

              ii.  There is No Prejudice to Existing Parties Resulting From Delay……14

              iii.  XRP Holders Would Be Prejudiced By a Denial of the Motion ……15

              iv.  Circumstances Favoring Intervention……………………………..15

        B. XRP Holders Have a Protectable Interest in the Property Subject to This Action…..15

        C. Without Intervention, XRP Holders' Interest May Be Impeded by the Disposition of

           This Case……………………………………………………………...…22

        D. XRP Holders' Interests Are Not Adequately Represented…………………………24

i.   The SEC Does Not Adequately Represent The Interest of XRP Holders………………………………………………………………24

ii.  Defendants Do Not Adequately represent The Interests of XRP Holders………………………………………………………………26

III.   Alternatively, XRP Holders Should be Granted Permissive Intervention……...……26

A. Common Questions of Law and Fact Favor Intervention……………………………27

B. Intervention Does Not Prejudice Existing Parties…………………………………...28

IV.   Due Process and Fundamental Fairness Favor Intervention………………………....29

CONCLUSION……………………………………………………………………………30

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page**

*Brennan v. NYC Bd. Of Educ.,*
   260 F.33d 123 (2d Cir. 2001) …………………………………………...…………11, 15

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
   250 F.3d 171 (2d Cir. 2001)……………………………………………………………24

*Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co.,*
   No. 06 CIV. 2875 LAK HBP, 2207 WL 2593000 (S.D.N.Y., Sept. 7, 2007)...…………...10

*In re Holocaust Victim Assets Litig.,*
   ("*HVAL*") 225 F.3d 191, 197 (2d Cir. 2000)…………………………………………...13, 14

*In re Reyes,*
   No. 19 CIV. 7219, 2019 WL 6170901 (S.D.N.Y. Nov. 20, 2019) (Torres, A.)...........10, 27

*Int'l Design Concepts, LLC v. Saks, Inc.*,
   486 F.Supp.2d 229 (S.D.N.Y. 2007)……………………………………………………..14

*MasterCard Int'l Inc. v. Visa Int'l Serv. Assoc., Inc.*,
   471 F.3d 377 (2d Cir. 2006)……………………………………………………………..10, 13

*Peterson v. Islamic Republic of Iran*,
   290 F.R.D. 54 (S.D.N.Y. 2013)………………………...…………………...…………...27

*R Best Produce, Inc. v. Shulman-Rabin Marketing Corp.*,
   467 F.3d 238 (2d Cir. 2006)……………………………………………………………10

*Yang v. Kellner*,
   No. 20 CIV. 3325, 2020 WL 2115412 (S.D.N.Y. May 3, 2020) (Torres, A.)………..…...9

*SEC v. Caledonian Bank*, Ltd.,
   317 F.R.D. 358 (S.D.N.Y. 2016)………………………………………………………11

*S.E.C. v. Credit Bancorp, Ltd.,*
   194 F.R.D. 457 (S.D.N.Y. 2000)………………………………………………………12

*SEC v. Shavers*,
   4:13-cv-00416, 2013 WL 4028182, at *2 (E.D. Tex., Aug. 6, 2013)………………..…...20

*SEC v Telegram Grp, Inc.,*
2020 US Dist WL 1547383 [SDNY Apr. 1, 2020, No. 19-cv-9439 (PKC)……………………15

*SEC v. Telegram Grp. Inc.,*
448 F. Supp. 3d 352 (S.D.N.Y. 2020)……………………………………………………17

*SEC v W.J. Howey,*
328 U.S. 293, 298-99 (1946)…………………………………………………….…15

*Upton v. SEC,*
75 F. 3d 92, 97-98 (2nd Circuit 1996)……………………………………………..30

*U.S. v. Harmon,*
No. 1:19-cr-00395-BAH, Doc. 59 (District of Columbia Jul. 24, 2020)…………....…19, 20

*U.S. v. Faiella,*
39 F. Supp. 3d 544, 547 (S.D.N.Y. 2014)………………………………………………20

*United States v. Murgio,*
209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016)……………………………………………21

*United States v. Ologeam,*
No. 5:18-cr-81, 2020 WL 1676802 (E.D. Ky. Apr. 4, 2020)………………………...21

*United States v. Ulbricht,*
31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014)……………………………………………21

**Rules**

*FRCP Rule 24(a)*………………………………………………………............10, 13, 30

*FRCP Rule 24(a)(2)*………………………………………………………………...15

*FRCP Rule 24(b)*…………………………………………………………… 10, 27, 30

*Rule III(A), Individual Practices in Civil Cases,*
*Analisa Torres, U.S. Dist. J. S.D.N.Y. (rev. Jan. 21, 2020*)………………………13

**Other Authorities**

*Realizing the Future of the Blockchain Economy With Signum Capital*,
Asia Blockchain Review, July 21, 2019……………………………………………2

Bitcoin: A Peer-to-Peer Electronic Cash System,
Satoshi Nakamoto (2008). ………………………………………………………21

Proposed Intervenor-Defendants, Jordan Deaton, James Lamonte, Tyler Lamonte, Mya Lamonte, Mitchell Mckenna, Kristiana Warner and all other similarly situated XRP Holders, ("XRP Holders") respectfully submit this memorandum of law in support of their Motion to Intervene pursuant to Federal Rule of Civil Procedure 24.

## PRELIMINARY STATEMENT

XRP Holders are a putative class of users, investors, holders, developers, content providers and small businesses that utilize the digital asset XRP and the XRP Ledger ("XRPL"). Many XRP Holders have never heard of Ripple.[1] XRP Holders have a significant interest in the property at issue in this enforcement action. When the Securities and Exchange Commission ("SEC") brought this lawsuit against Ripple and its two executives, it not only alleged that the named Defendants conducted an unprecedented eight-year continuous and ongoing offering, it also specifically alleged XRP itself to be a security. This novel and dangerous assertion suggests *all* XRP constitute unregistered securities, including the XRP owned and utilized by XRP Holders.

The SEC allegations are riddled with material misrepresentations about XRP Holders; their reliance on Ripple, their use of XRP and their independent development of the XRP ecosystem. By failing to distinguish specific prior sales and distributions by Ripple from present-day XRP, the SEC has put the property of XRP Holders at the heart of this case and positions its interest at the complete opposite end of the spectrum from that of XRP Holders. The Defendants have also made it clear that they do not represent the interests of XRP Holders. Simply put, XRP Holders cannot rely on the Defendants' efforts in this case. Without intervention, the SEC can

---

[1] Proposed Intervenors and their counsel have been contacted by over 12,600 XRP holders, users, investors, developers, and small businesses utilizing XRP requesting to join in the motion to intervene.

continue to manipulate the role of XRP Holders to fit its narrative against Ripple and its two executives and potentially destroy the property interests of XRP Holders. XRP Holders, therefore, seek to intervene in this enforcement action pursuant to Fed. R. Civ. P. 24.

## STATEMENT OF RELEVANT FACTS

**I.      Government Agencies Recognize XRP as a Currency**

Prior to the SEC's enforcement action against Ripple and XRP Holders, XRP was the third-largest Cryptocurrency in the world. *See* Hr'g Tr. 8:8-10 (Mar. 19, 2021). Beginning in 2013, XRP was openly traded on over two hundred exchanges. Def.'s Answer to First Am. Compl. at 42, ECF No. 51.

XRP traded on exchanges with the two larger similar cryptocurrencies, Bitcoin and Ether. Senior officials from the SEC publicly deemed Bitcoin and Ether as non-securities. Def.'s Answer to First Am. Compl. at 3, ECF No. 51. Bitcoin, Ether and XRP have repeatedly been referred to as a new nascent asset class.[2]

In 2015 and 2020, the Department of Justice ("DOJ") and the Financial Crimes Enforcement Network ("FinCEN") entered into an agreement with Ripple stating XRP would be considered virtual currency and its use would be registered exclusively with FinCEN, not the SEC. Def.'s Answer to First Am. Compl. at 2, ECF No. 51.

---

[2] The Head of Asset Management of Signum, a Swiss bank in Singapore, called out to the public to *increase exposure to "the tokens of the future"* and listed those tokens to be "*Bitcoin, Ether, and XRP.*" Signum classified Bitcoin as the future asset for store of value and wealth. It classified Ether as an infrastructure play of the future. It classified XRP as not a security, but as technology of the future regarding *payments*. *Realizing the Future of the Blockchain Economy With Signum Capital*, Asia Blockchain Review, July 21, 2019.

In 2018, the newly appointed chairman of the SEC, Gary Gensler, described XRP as a

"***bridge currency***" between two Central Bank Digital Currencies ("CBDC"). *See* Deaton Decl.

Ex. B, Gensler Financial Roundtable, (September 26, 2018).

In June 2020, former chairman of the U.S. Commodity Futures Trading Commission

("CFTC") Chris Giancarlo ("Giancarlo") stated XRP is more like an alternative currency than a

security and should have the same legal status as Bitcoin or Ether.[4]

The United States isn't the only government to classify XRP as a non-security or

alternative currency. Japan, Singapore, and the U.K. have all declared XRP to be a non-security.

Def.'s Answer to First Am. Compl. at 42, ECF No. 51.

## II.    The Securities and Exchange Commission's Action, Inaction, and Acquiescence Communicate That XRP, Similar to Bitcoin and Ether, is Not a Security

In 2018, the SEC permitted and authorized Ripple to purchase a nine-percent minority

stake in MoneyGram International ("MGI") knowing that Ripple would distribute XRP to MGI

which in turn, would sell the XRP in the secondary market to purchasers including XRP Holders.

Pl's First Am. Compl. at 64, ECF No 46.

In June 2018, then-director of corporation and finance, William Hinman gave a speech in

which he publicly deemed Bitcoin and Ether as non-securities and provided general commentary

that at some point, a digital asset becomes sufficiently decentralized and can no longer be

---

[4] Writing an op-ed for the International Financial Law Review, along with Conrad Bahlke of the international law firm Willkie Farr & Gallagher, Giancarlo and Bahlke wrote that XRP doesn't hit any of the prongs of the *Howey Test* and should not be regulated as a security but instead considered a currency or a medium of exchange. According to Giancarlo and Bahlke, XRP was never marketed as a security, nor were investors promised any returns; the token has a very specific use case for liquidity and settlements; Ripple has never offered holders any rights of ownership or share of profits; and, therefore, there is no investment contract or formal relationship that exits between Ripple Labs and XRP Holders. *See* Deaton Decl. Ex. D Giancarlo cryptocurrencies and us securities laws beyond bitcoin and ether (June 17, 2020).

considered an investment contract. *See* Deaton Decl. Ex. C, William Hinman Speech (June 14, 2018).

In 2019, Platform A, prior to listing XRP, met with the SEC to determine the legal status of XRP and sought guidance as to whether the SEC considered XRP to be a security. Following that meeting, Platform A listed XRP. Other market participants also sought guidance from the SEC prior to the commencement of this action. At no time prior to the filing of this case did the SEC dissuade market players from listing or trading XRP. Def.'s Answer to First Am. Compl. at 98-99, ECF No. 51.

In March 2019, then-chairman of the SEC, Jay Clayton ("Clayton"), stated:

> [T]he analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument. A digital asset may be offered and sold initially as a security because it meets the definition of an investment contract, but that designation may change over time if the digital asset later is offered and sold in such a way that it will no longer meet that definition. I agree with Director Hinman's explanation of how a digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts. Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework.

*See* Deaton Decl. Ex. E, Jay Clayton Letter (March 7, 2019).

In January 2020, Bailard, a wealth and investment management firm, submitted its Code of Ethics for the SEC's approval. The section that deals with the cryptocurrency asset class reads as follow:

> In light of the extremely complex nature of the legal analysis regarding cryptocurrencies to determine which ones are securities and which ones are not, Bailard has decided to allow investments in three cryptocurrencies – Bitcoin, Ethereum, and XRP – that are generally accepted to be currencies and not currently subject to regulation by the SEC.

*See* Deaton Decl. Ex. F, Bailard Code of Ethics Excerpt at 2-3 (January 1, 2020).

As late as October 2020, approximately 60 days before Clayton directed and authorized the suit against Defendants and XRP, the SEC continued to inform XRP Holders – who were inquiring as to the status of XRP in relation to Bitcoin and Ether – that the SEC had made no determination as to whether XRP is a security and did not know when or if it would ever make such a determination. Def's Resp. Fn. 3 at 5, Mar. 24, 2021, ECF No. 81.

In December 2020, Clayton and the SEC was warned by a former chief of the SEC, Joseph Grundfest ("Grundfest") that the mere filing of an enforcement action alleging XRP to be securities would result in unprecedented multi-billions in losses to individual holders and users of XRP with absolutely no connection to Ripple or its two executives. Grundfest argued that the SEC had not established a material distinction between Ether and XRP that justified filing an enforcement action against XRP and doing so would call into question the Commission's exercise of discretion. *See* Deaton Decl. Ex. G, Grundfest Letter Discussion (December 17, 2020).

In March 2021, SEC Commissioner Hester Peirce appeared for an interview on the Thinking Crypto YouTube channel. During this interview, Commissioner Peirce admitted that the SEC tends to think of the token as the security, rather than the totality of the offering. She commented that it would be a better approach to look at the offering as a whole, rather than treat the token as securities. *See* Deaton Decl. Ex. H, Hester Peirce Thinking Crypto Interview (Mar. 9, 2021).

### III.    XRP Holders Contribute to the XRP Ecosystem

From 2013 to present, XRP Holders have been utilizing XRP and the XRPL for multiple purposes, creating value and utility for XRP. Undoubtedly, some XRP Holders purchased XRP for the purposes of speculative investment just as they have purchased Bitcoin and Ether. Some

XRP Holders are simply users of XRP and the XRPL, utilizing XRP exclusively in their capacity as consumers. *See* Deaton Decl. Ex. I, emails from XRP Holders. As consumers, XRP Holders utilize XRP as a substitute for fiat currency for everyday purchases at Walmart, Amazon, Target and millions of other businesses. *Id at 1*. XRP is utilized for direct payments in XRP for over 500 shopping markets, 300 internet service providers, 500 crypto-services, 30 tourism businesses and the list grows weekly. *See* Deaton Decl. Ex. K, Cryptwerk's XRP Directory. Some XRP Holders utilize their XRP as collateral in order to secure loans in fiat currency. *See* Deaton Decl. Ex. L, Nexo's Instant Crypto Credit Lines. Some XRP Holders use their XRP on XRP TipBot to donate to charities and other organizations. *See* Deaton Decl. Ex. M, Several known companies and applications using XRP.

Some XRP Holders are developers who use XRP operationally within their business model. *Id*. Some XRP developers utilize the XRPL's decentralized exchange ("DEX") for the digitalization of different assets, such as stocks, bonds and commodities. *Id.* Some XRP developers have created consumer products such as the Xumm Wallet which utilizes the XRPL to store multiple cryptocurrencies, including Bitcoin, Ether and XRP. *See* Deaton Decl. Ex. J, twitter responses from XRP Holders. Some XRP Holders acquired XRP, not as an investment but as a payment for goods and/or services rendered. *Id.* Some XRP Holders receive XRP as micropayments for providing content on YouTube, Coil and other media outlets. *Id.*

Some XRP Holders utilize XRP and XRPL to tokenize nonfungible tokens. *Id.* Some XRP Holders utilize XRP as a bridge currency to transfer one asset from one exchange to another. *See* Deaton Decl. Ex. N, excerpt of XRPL's overview of XRP. Some XRP Holders utilize XRP's superior speed and lower cost to purchase and move other assets such as Bitcoin and Ether. *See* Deaton Decl. Ex. O. The same is true for foreign fiat concurrencies (i.e. Pesos, Euros, Yen). *See*

Deaton Decl. Ex. M. Some XRP Holders utilize XRP to send money to friends and family around the world. *Id.*, Deaton Decl. Ex. I. Some XRP Holders utilize XRP for cross-border payments between the United States and Mexico, Europe, the Philippines, Thailand, and other foreign countries. *Id.*, Deaton Decl. Ex. I. Some XRP Holders have utilized businesses such as Linqto, Inc. to purchase stock before companies go public in an initial public offering.[5]

## IV.    The SEC Complaint Charges Ripple but Attacks XRP and XRP Holders

On December 22, 2020, the SEC filed an enforcement action against named defendants Ripple Labs ("Ripple"), along with two of its executives, co-founder and chairman Christian Larsen ("Larsen") and CEO Bradley Garlinghouse ("Garlinghouse"). Pl.'s Compl., ECF No. 4. In both the original and Amended Complaint ("AC"), in the very first paragraph, the SEC labels XRP itself as a "digital asset security" *Id.* at 1; AC at 1, ECF No. 46. By alleging "[f]rom 2013 through the present, Defendants sold over 14.6 billion units of a digital asset security called XRP," the SEC's theory is that the named Defendants have conducted a public eight year continuous and ongoing offering of unregistered securities. *Id.* Thus, the offering includes all present-day sales and distributions of XRP. The Complaint is not limited to only direct sales by the Defendant but includes all sales of XRP no matter the seller, including XRP Holders. *Id.* at 2. In fact, an entire section of the Complaint is dedicated to Ripple's alleged promises to create a market, not only for Ripple's sales, but for XRP Holders' sales, as well. The SEC incorrectly alleges that:  "*Defendants Promised to Undertake Significant Efforts to Develop and Maintain a Public Market for XRP Investors to Resell XRP*." *Id* at 46. The SEC's Complaint is riddled with allegations directly attacking XRP Holders. The SEC dedicates another section of its AC alleging

---

[5] Some XRP holders used their XRP to purchase shares of the company Ripple Labs through the Linqto service. This is a clear example of the difference between an alternative form of currency (XRP) and a true security (Ripple stock). Deaton Decl. Ex I.

XRP Holders have entered into a common enterprise with Ripple. AC at 51-55, ECF No. 46. The SEC claims (wrongly) that: "*Economic Reality Dictates that XRP Purchasers have No Choice But to Rely on Ripple's Efforts for the Success or Failure of Their Investment*." *Id.* at 50. The SEC incorrectly asserts that XRP Holders have no independent options related to the utility of XRP, without Ripple. Not true. The SEC also claims (wrongly) that XRP Holders lack the ability to develop or grow the XRP ecosystem independent of Ripple's efforts. *See* AC ¶¶ 285-289. In other words, throughout the Complaint, the SEC alleges that all XRP, including the XRP purchased, acquired, and/or utilized by XRP Holders are unregistered securities. The Complaint has an entire section dedicated to the assertion that all "**Purchasers of XRP Invested into a Common Enterprise**." *Id.* at 50.

The SEC is alleging that any sale or transfer of XRP by any entity, business or individual is a violation of Section 5 of the Securities Act.[6] In attempting to meet *Howey's* common enterprise prong, the SEC absurdly claims that because "XRP investors stand to profit equally if XRP's popularity and price increase,"[7] all XRP Holders entered into a common enterprise with Ripple. This claim is ridiculous because the same statement equally applies to Bitcoin, Ether, XRP, or even gold or silver investors. The language utilized by the SEC in the Complaint is both reckless and dangerous as it could be applied not only to every cryptocurrency but every commodity. The SEC's claim that XRP itself is a security *per se* is not an implied or suggested claim. The SEC

---

[6] AC ¶ 290 ("Investors who purchased XRP in the offering invested into a common enterprise with **other XRP purchasers**, as well as with Ripple") (emphasis added). Apparently, according to the SEC, XRP Holders entered into a common enterprise with not only a company that many never heard of but also with every other unknown XRP Purchaser in the world. See also AC ¶ 291 ("Because XRP is fungible, the fortunes of XRP purchasers were and are tied to one another, and each depend on the success of Ripple's XRP strategy.").

[7] AC ¶ 292; see also AC ¶ 282 ("… which would serve Ripple's economic interest and that of **all** XRP owners equally…the price of XRP rises and falls for XRP investors together and equally for all investors.") (emphasis added).

actually asserts that the very "nature of XRP itself" makes it a security. AC ¶¶ 293, 353.[8]  Judge

Netburn quickly recognized this outlandish claim and questioned the SEC regarding this novel

(and dangerous) theory when she proclaimed: "Presumably under this theory then, every

individual in the world who is selling XRP would be committing a Section 5 violation based on

what you just said." Hr'g Tr. 44:7-9 (Mar. 19, 2021).

If the SEC is successful in its claims against XRP, the SEC would have the authority to

regulate a vast number of non-parties, including digital asset exchanges, developers, vendors,

ordinary users, and retail holders of XRP. This would dramatically affect the entire secondary

retail market for XRP and possibly, all of cryptocurrency.

## V.    XRP Holders Take Action

Concerned with the impact the SEC's claims would have, including the suspension or

delisting of XRP on major U.S. exchanges, XRP Holders took immediate action to protect their

interests and filed a petition for a Writ of Mandamus against the Acting Chairman of the SEC

asking the Court to order the SEC to amend the Complaint to exclude the XRP owned and

utilized by XRP Holders. *Deaton v. SEC*, No. 1:21-cv-00001-WES (D. R.I. Jan. 1, 2021), ECF

No. 1.

In its Motion to Dismiss the Writ, the SEC made clear that this Honorable Court provides

the **exclusive forum** to hear **all matters** related to its enforcement action against Ripple and

XRP. The SEC argued:

> Here, an avenue for judicial review of the Commission's complaint against Ripple
> clearly exists. The Southern District of New York **will decide** whether the complaint
> warrants any relief. Thus, the Commission's enforcement proceeding in the Southern

---

[8] AC ¶ 293 ("The **nature of XRP itself** made it the common thread among Ripple, its management and **all XRP holders**.") (emphasis added); AC ¶ 353 ("The very **nature of XRP** in the market – as constructed and promoted by Ripple – compels reasonable XRP purchasers to view XRP as an investment.") (emphasis added); AC ¶ 291 ("Because XRP is fungible…").

District of New York, brought under the Securities Act, supplies the **exclusive** method for testing the validity of the Commission's complaint against Ripple.

Resp'ts Mot. to Dismiss at 12, Deaton v. SEC, No. 1:21-cv-00001-WES (D. R.I. Mar. 5, 2021), ECF No. 11.

After reviewing the SEC's motion to dismiss and considering the arguments and statements contained therein, XRP Holders withdrew their petition and now move to intervene in the current proceeding.

## LEGAL STANDARD

"Rule 24 of the Federal Rules of Civil Procedure provides the criteria a putative intervenor must meet to intervene either as of right or permissively." *Yang v. Kellner*, No. 20 CIV. 3325, 2020 WL 2115412 at *1 (S.D.N.Y. May 3, 2020) (Torres, A.). Intervention as a matter of right is governed by Rule 24(a) and permissive intervention is governed by Rule 24(b). When considering permissive intervention, the Court "considers the same factors that it considers for intervention as of right." *In re Reyes,* No. 19 CIV. 7219, 2019 WL 6170901 at *1 (S.D.N.Y. Nov. 20, 2019) (Torres, A.) (quoting *MASTR Adjustable Rate Mortgs. Trust 2006-OA3 v. UBS Real Estate Secs.,* 2013 WL 139636, at *2 (S.D.N.Y. 2013).

Intervention as a right will be granted only if: (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties. *In re Reyes, at* *1 (citing *MasterCard Int'l Inc. v. Visa Int'l Serv. Assoc., Inc.,* 471 F.3d 377, 389 (2d Cir. 2006); *see also In re Holocaust Victim Assets Litig.,* ("*HVAL*") 225 F.3d 191, 197 (2d Cir. 2000). "Failure to satisfy any one of these requirements is a sufficient ground to deny the application." *R Best Produce,*

*Inc. v. Shulman-Rabin Mktg. Corp.,* 467 F.3d 238, 240 (2d Cir. 2006). However, denial of intervention is not mandatory if one element is not met. *See Cole Mech. Corp. v. Nat'l Grange Mut. Ins. Co.*, No. 06 CIV. 2875 LAK HBP, 2007 WL 2593000, at *2 (S.D.N.Y., Sept. 7, 2007) (noting that the test is flexible, and courts generally look at all four factors rather than focusing narrowly on anyone). "The Court has broad discretion to, on timely motion, **permit anyone to intervene** who has a claim or defense that shares with the main action a common question of law or fact, so long as the intervention does not unduly delay or prejudice the adjudication of the original parties' rights." Whether a party may intervene is left to the Court's sound discretion. *Brennan v. New York City Bd. Of Educ.,* 260 F.3d 123, 128 (2d Cir. 2001) (emphasis added).

## ARGUMENT

### I.      Intervention in SEC Enforcement Actions is Permitted

The SEC claims that intervention is precluded in a case involving the SEC unless it consents. Pl.'s Resp. to Mot. To Intervene, at 3 (Mar. 26, 2021), ECF No. 85 (citing Securities Exchange Act of 1934, 15 U.S.C. § 78u(g) (2018)).  To support its claim, the SEC mistakenly relies on *SEC v. Caledonian Bank*, Ltd., 317 F.R.D. 358 (S.D.N.Y. 2016). Actually, *Caledonian* supports XRP Holders' intervention. The case stated explicitly that, "[w]hile Section 21(g) bars counterclaims against the SEC in enforcement actions, it **does not preclude all forms of intervention**." *Caledonian* at *368. (emphasis added). XRP Holders are not asserting any claims or counterclaims against the SEC. XRP Holders seek intervention as a third-party defendant, not as a third-party plaintiff asserting claims against the SEC. XRP Holders are de facto unnamed defendants in this action (although XRP Holders are referenced throughout the Complaint). Pursuant to Fed. R. Civ. P. 24(c), XRP Holders have provided the Court with Intervenor-Defendant's Proposed Answer to the First Amended Complaint. Deaton Decl. Ex. A.

11

The SEC makes passing reference to *S.E.C. v. Credit Bancorp, Ltd.,* 194 F.R.D. 457 (S.D.N.Y. 2000) acknowledging that "[s]ome courts have held that Section 21(g) does not bar intervention in SEC enforcement actions in a particular situation not presented here." Pl.'s Resp. at n. 4, ECF no. 85. After reading *Credit Bancorp,* XRP Holders understand why the SEC only made slight reference to the case. *Credit Bancorp* discusses the disagreement among the courts regarding whether § 21(g) precludes all applications to intervene. The conclusion of *Credit Bancorp*, however, asserts that because § 21(g) makes no direct mention of intervention, it cannot be reasonably interpreted to prohibit it *per se. Credit Bancorp, Ltd.,* at 466. In sum, this Honorable Court is not precluded from granting intervention to XRP Holders.

As stated, the SEC made clear that this Honorable Court "supplies the exclusive method for testing the validity of the Commission's complaint" against XRP. Resp'ts Mot. to Dismiss at 12, *Deaton v. SEC*, No. 1:21-cv-00001-WES (D. R.I. Mar. 5, 2021), ECF No. 11. The SEC has abrogated its responsibility and deferred to this Court's authority. The SEC has attempted to minimize its own conflicting views of XRP during the litigation of this case. In its response to Defendants' motion to compel discovery related to Bitcoin, Ether and XRP, the SEC basically stated that its own views on whether an asset is a security are irrelevant. Pl's Resp. at 7, Mar. 22, 2021, ECF No. 79. The SEC took the remarkable position that statements made by senior officials of the SEC, including its chairman, add little value when deciding if an asset or instrument constitutes a security. The SEC declared:

> Statements of agency staff cannot bind the SEC or otherwise alter its decision. Nor are the SEC's views as to the treatment under *Howey* of other digital assets relevant to whether XRP is a security. It is for the federal courts, which have for over 70 years… [produced an] abundance of caselaw interpreting and analyzing *Howey*," to decide whether XRP is an investment contract.

*Id.* (citations omitted).  Its grossly irresponsible for the SEC to suggest its own representations are irrelevant so soon after it suddenly decided that a digital asset owned by millions of individuals now constitutes a security *per se.* Moreover, the SEC deferred to the authority of this Court yet objects to the holders and users of that asset seeking intervention. Not only is intervention allowable but its required considering XRP Holders satisfy the requirements of Fed. R. Civ. P. 24(a).

## II.      XRP Holders Should be Granted Intervention as of Right

Pursuant to Federal Rule of Civil Procedure 24(a), XRP Holders are entitled to intervene as a right.

### A.  The Motion is Timely

Timeliness has no precise definition. In determining timeliness, "the Court may consider . . . factors [including]: (1) how long the applicant had notice of its interest in the action; (2) prejudice to the existing parties resulting from this delay; (3) prejudice to the applicant resulting from a denial of the motion; and (4) any unusual circumstance militating in favor of or against intervention. *HVAL* at 198; *MasterCard Int'l Inc.* at 389.

#### i.   XRP Holders Took Immediate Action to Protect Their Interests

XRP Holders' motion to intervene has been timely made. XRP Holders took immediate action to protect their interests when they filed a petition for Writ of Mandamus in the Federal District Court of Rhode Island on January 1, 2021, only nine days after the SEC filed its case against Defendants. The petition sought an order compelling the acting chairman of the SEC to amend its Complaint to make clear that the SEC was not alleging that the XRP held by XRP Holders constituted securities. In short, intervenors were asking for a declaration or clarification that the XRP token, itself, was not a security *per se*. On March 5, 2021, the SEC filed a motion

to dismiss intervenors petition invoking this Honorable Court's exclusive jurisdiction. Nine days later, on March 14, 2021, intervenors filed a motion to intervene.[10] According to the scheduling order entered in this case, the deadline to add additional parties (which does not apply to intervenors) expired on March 17, 2021. The mere fact that XRP Holders' initial filing was within the relevant deadline applicable to the existing parties in this case makes the motion timely on its face. *See e.g., Int'l Design Concepts, LLC v. Saks, Inc.,* 486 F.Supp.2d 229, 234 (S.D.N.Y. 2007) (motion to intervene filed more than one year after the second amended complaint was timely where delay caused no prejudice to parties). The first pretrial hearing on this case was February 22, 2021, less than 30 days from the timing of XRP Holders initial intervention motion.

### ii.    There is No Prejudice to Existing Parties Resulting From Delay

An essential factor for the Court to consider is prejudice to the existing parties caused by any delay attributed to intervenors. *HVAL* at 198.  XRP Holders have acted without delay and there is no prejudice to the parties that can be attributed to XRP Holders' motion. Moreover, XRP Holders do not seek additional discovery or any change to the current scheduling order entered by the Court. Therefore, granting XRP Holders' motion causes no delay prejudicing the existing parties.

---

[10] On March 15, 2021, XRP Holders' motion to intervene was "[d]enied without prejudice to renewal in a motion that complies with Rule III(A) of the Court's Individual Practices in Civil Cases." Doc. 68 at *3. XRP Holders' erroneously relied on an exception contained within Rule III(A) believing that "a delay in filing might result in the loss of a right." Rule III(A), Individual Practices in Civil Cases, Analisa Torres, U.S. Dist. J. S.D.N.Y. (rev. Jan. 21, 2020). The mere fact that this Honorable Court disagreed with intervenors' belief that a delay could result in a loss of right, is proof, alone, that this motion is timely.

### iii.     XRP Holders Would Be Prejudiced By a Denial of the Motion

Denial of the motion, however, would prejudice XRP Holders. As users, investors, holders, developers, content providers and small businesses that utilize the digital asset XRP and the XRPL, they possess the very property the SEC claims are unregistered securities. If left unrepresented, XRP Holders will be entirely unable to defend their interests.

### iv.     Circumstances Favoring Intervention

The SEC has taken the extraordinary position that XRP is an unregistered security that has no utility without the efforts of the Defendants. AC ¶¶ 282-289; ¶¶ 358-376. By focusing on the underlying asset, XRP, as a security *per se,* the SEC is abandoning the principle holding of *Howey,* which defines an investment contract as "a contract, transaction or scheme." *SEC v W.J. Howey*, 328 U.S. 293, 298-99 (1946). As is discussed below, focusing on the underlying asset is not only a departure from 75 years of precedent since *Howey,* it directly contradicts recent case law involving digital assets within the Southern District of New York. *See generally SEC v. Telegram Group Inc., et al.* 448 F. Supp.3d 352 (2020). This gross departure from precedent coupled with an approach that the token itself is a security, demands intervention.[12]

### B.  XRP Holders Have a Protectable Interest in the Property Subject to This Action

To intervene, a party must show a cognizable interest in the action. "For an interest to be cognizable under Rule 24(a)(2), it must be direct, substantial, and legally protectable." *Brennan,*

---

[12]Apparently, the SEC, as an institution, has struggled in applying *Howey* to digital assets. SEC Commissioner Hester Peirce said "one of the things I've been rethinking is we tend at the SEC to talk about the token itself as a security and that's really a shorthand. It's not that the thing itself-it's not that the orange groves, or orange trees or oranges were the security. We're saying the way you sold those pieces of land - it was a security offering. Instead, **what we've done now** is said that orange groves are kind of like the security. I think it's better if we really look at the offering as a whole and we don't try to treat the token as securities." *See* Deaton Decl. Ex. H, Hester Peirce Interview, Thinking Crypto, Mar. 9, 2021, (emphasis added).

260 F.3d at 129. XRP Holders are entitled to intervene in this action as a matter of right because they have a legally protectable interest in the subject matter of the action. XRP Holders have a direct protectable interest in this action because they own and utilize the very property and asset in question.

Throughout the AC, the SEC alleges that XRP Holders, many of whom had never heard of the Defendants prior to purchasing, acquiring or utilizing XRP, entered into a common enterprise with Ripple and other XRP holders. AC ¶¶ 290-314. Nothing could be further from the truth. XRP Holders include hundreds of developers, small businesses, artists, and content providers who are paid in XRP. XRP is utilized by many XRP Holders as not just a store of value but as a substitute for fiat currency, making daily purchases for ordinary items such as groceries, clothing and fuel. As stated above, XRP Holders have created value and utility to the XRP ecosystem irrespective of the efforts of Ripple.

The SEC is alleging that XRP itself is a security because it lacks the very utility XRP Holders have created. AC ¶¶ 282-289; ¶¶ 358-376. During a recent hearing before Judge Netburn, the Court recognized "not only does [XRP] have a sort of currency value, but it also has a utility, and that utility distinguishes it, I think, from Bitcoin and Ether." Hr'g Tr. 11:4-7 (Mar. 19, 2021). As stated, the SEC denies XRP's utility. "We dispute whether that utility actually exists, your Honor. But the point is, even if it did exist, Ripple and the Defendants' efforts and their stated promised efforts to develop a use for XRP is what makes XRP a security." Hr'g Tr. 51:15-21 (Mar. 19, 2021). The SEC's position is just plain wrong. Every passing month the XRP ecosystem continues to grow with more use cases being developed, irrespective of the efforts, strategies and/or statements of the Defendants. *See* Deaton Decl. Ex. R, XRP Use Cases To Explode With Defi Crypto Integration (April 13, 2021).

16

During this case, the SEC has often relied on *SEC v. Telegram Grp. Inc.,* 448 F. Supp. 3d 352 (S.D.N.Y. 2020). However, *Telegram* actually supports XRP Holders' intervention. Judge Castel made clear that "the security in this case is ***not simply the Gram***, which is little more than alphanumeric cryptographic sequence." 448 F. Supp. at 379 (emphasis added). The same exact statement can be made about XRP, Bitcoin, or Ether. Claiming that the token itself is the security would be akin to calling the "oranges" produced by the orange groves in *Howey* the securities.[13]

Judge Castel made clear that the central issue in *Howey* was not the underlying product, agreement, or the underlying asset. "*Howey* refers to an 'investment contract,' i.e. a security, as 'a contract, transaction or scheme,' using the term 'scheme' in a descriptive, not pejorative, sense." *Id.* (Citing *Howey*, 328 U.S. at 298-99). Judge Castel confirmed that the underlying asset (whether oranges or digital assets) are not *per se* investment contracts, but it is the "scheme" involving the full set of contracts, expectations, and understandings centered on the sales and distribution of the underlying asset that must be evaluated under *Howey. Id.* "*Howey* requires an examination of the entirety of the parties' understandings and expectations." *Id.* Any doubt or confusion on whether Judge Castel considered the token itself a security was laid to rest when he delivered his second Opinion and Order in *Telegram*. Judge Castel clarified that a central point of the Court's Opinion and Order was:

> [T]he 'security' was neither the Gram Purchase Agreement ***nor the Gram*** but the entire scheme that comprised the Gram Purchase Agreements and the accompanying understandings and undertakings made by Telegram, including the expectation and intention that the Initial Purchasers would distribute Grams into a secondary public market.

---

[13] Prior to filing this case, it seemed that Clayton and the SEC understood this point. *See* Deaton Decl. Ex. E, Jay Clayton Letter (March 7, 2019) ("a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument"); *but compare with* Hester Peirce interview, *supra*, Fn. 12.

*Telegram* Slip Copy 2020 WL 1547383 at *1(emphasis added).  In *Telegram,* the Court

recognized the inherent utility of a cryptocurrency such as Bitcoin, Ether or XRP.

> Cryptocurrencies (sometimes called tokens or digital assets) are a lawful means of storing
> or transferring value and may fluctuate in value as any **commodity** would. In the abstract,
> an investment of money in a cryptocurrency utilized by members of a decentralized
> community connected via blockchain technology, which itself is administered by this
> community of **users** rather than by common enterprise, is not likely to be deemed a
> security under the familiar test laid out in S.E.C. v. W.J. Howey Co., 328 U.S. 293, 298-
> 99 (1946).

*Telegram*, 448 F. Supp. 3d 352, 358 (emphasis added). The critical factor that distinguishes XRP

Holders from the investors in *Telegram* is the motive for consumptive use. The SEC attempts to

classify all XRP Holders as "speculative investors." Undeniably, some XRP Holders include

investors who speculate in this relatively new asset class.[14] Many XRP Holders also own Bitcoin

and Ether. But XRP Holders include developers, small businesses, artists, and content providers

who are paid in XRP. XRP is utilized by many XRP Holders as not just a store of value but as a

substitute for fiat currency. In sum, the consumptive use of XRP is an interest that the SEC lacks

standing to regulate.

   The *Telegram* decision is of great significance to the issue of intervention as well as the most

important issue presented in this case: whether present day XRP constitutes investment contracts.

The SEC was successful in proving that *Telegram*'s plan to distribute Grams was an offering of

securities under the *Howey* test to which no exemption applied. The difference here is that

---

[14] The SEC seems to conflate the *Howey* test with speculative investing. The SEC writes that
"[m]ovants may buy and sell XRP as a **speculative investment** . . . proof that Defendants
offered and sold XRP as a **speculative investment.**" Doc. 85 at *1 (emphasis added). Whether
some people acquired XRP as a speculative investment has no bearing on whether it's a security
or not. The same can be said for Bitcoin, Ether, Gold, Silver or any other commodity. More
importantly, according to *Howey*, speculation is irrelevant. *See Howey*, 328 U.S. at 301 ("If that
test be satisfied it is immaterial whether the enterprise is speculative or nonspeculative, or
whether there is a sale of property with or without intrinsic value.").

today's XRP has "functional consumptive uses." It can be used for transferring value and for many other uses. Because of the functionality of the asset, XRP is a product – a commodity or alternative currency– and therefore, not subject to the securities laws.

One major example of consumptive use is that XRP is routinely used as money or currency. XRP is used as a currency to purchase goods and services. In opposing the intervention, the SEC focused much of its attention on the statutory definition of  "currency"[15] and claimed that the Defendants will make the appropriate argument that XRP is a currency.[16] However, XRP Holders use the term currency and money interchangeably and any statutory distinction between the two words make no difference in determining whether XRP itself is an investment contract. XRP doesn't have to be deemed a currency to prevent it from being classified as a security. Many XRP Holders' interest in XRP is unrelated to investment. Instead, the interest is in XRP's operational utility and its utility as currency or money.

Regardless of the legal or sovereign definition of currency, there is no dispute that XRP acts as "money." And "[m]oney, in common parlance, is a medium of exchange – that is, a token that can be traded for goods or services." *U.S. v. Harmon,* No. 1:19-cr-00395-BAH, Doc. 59 *at* \*14-15 (District of Columbia Jul. 24, 2020) (internal citations omitted).

---

[15] In fn. 3 of Doc. 85 the SEC states that the Treasury Regulations define "currency" in the context of FinCEN Regulations as "[t]he coin and paper money of the United States or any other country that is designated as legal tender." Citing 31 C.F.R. sec. 1010.100(m).

[16] The SEC attempts to defeat intervention by claiming the Defendants will make the currency argument, but the SEC has made clear its intention to offer into evidence the fact that Garlinghouse has repeatedly said that he did not view XRP as a currency. SEC Resp. Mar. 10, 2021, Doc. 55 Fn. 3 (citing AC ¶ 386-87). The fact that the CEO of Ripple did not consider XRP as currency militates in favor of intervention because it demonstrates (1) XRP Holders use XRP in a way not intended by Ripple, thus, there could be no common enterprise and (2) the Defendants are not adequate protectors of XRP Holders' interests.

It is well settled that cryptocurrencies are considered money. "Bitcoin is just that – a medium of exchange, method of payment, and store of value. *Id.* at \*15.[17] "Bitcoin can be used to pay for goods or services." *Id.* The same applies to XRP. XRP was the world's second cryptocurrency and is used daily in payments.[18] "Bitcoin can also be exchanged for conventional currency." *Id.* at \*16 (citing IRS *Virtual Currency Guidance* ("Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies")). The same exact statements equally apply to XRP – with a caveat – XRP is one-thousand times faster, one-thousand times cheaper, and can handle 100 times more transactions per second and is better for the environment. *See* Deaton Decl. Ex. P, Major Reasons Why XRP is Better than Bitcoin (September 17, 2020). Federal Courts have concluded that Bitcoin qualifies as money under these ordinary definitions. *See U.S. v. Faiella*, 39 F. Supp. 3d 544, 545 (holding that Bitcoin is "money" because it can be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."). In fact, the SEC itself has relied on the fact that Bitcoin is a form of currency in prosecuting enforcement actions. In *SEC v. Shavers*, 4:13-cv-00416, 2013 WL 4028182, at \*2 (E.D. Tex., Aug. 6, 2013) the Court stated:

> It is clear that Bitcoin can be used as money. It can be used to purchase goods or services, and as *Shavers* stated, used to pay for individual living expenses. The only limitation on Bitcoin is that it is limited to those places that accept it as currency. [I]t can also be exchanged for conventional currencies, such as the U.S. Dollar, Euro, Yen, and Yuan. Therefore, Bitcoin is a currency or form of money.

[17] Citing Robert C. Hockett & Saule T. Omarova, *The Finance Franchise,* 102 Cornell L. Rev. 1143, 1208 (2017) (defining "Bitcoins, electronic tokens or bits of data, as a means of payment and exchange similar to regular currencies"); Internal Revenue Service, *IRS Virtual Currency Guidance Notice* 2014-21, 2014-16 I.R.B. 938 (2014) ("Virtual Currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value.").
[18] *See* Deaton Decl. Ex. S,  Brainard speech, (May 15, 2018),("[A] typical cryptocurrency may be used in payments.").

Every word of these statements can be equally stated about XRP. In fact, many XRP Holders use XRP to purchase and transfer Bitcoin and fiat currency on the XRPL utilizing XRP because of its speed and cost effectiveness. *See* Deaton Decl. Ex. Q, XRP is the Fastest Way to Send Bitcoin (August 4, 2019) and Deaton Decl.Ex. O.

The Southern District of New York has likewise found that Bitcoin and **similar cryptocurrencies** meet the definition of money. In *United States v. Ulbricht*, 31 F. Supp. 3d 540, 570 (S.D.N.Y. 2014) the Court defined "money" as an "object used to buy things" and concluded that "the only value for Bitcoin lies in its ability to pay for things" because "[b]itcoins can be either used directly to pay for certain things or can act as a medium of exchange and be converted into a currency which can pay for things."[19] XRP has the same value and can be used in the same way.

The SEC claims that "Defendants repeatedly recognized that XRP was not like Bitcoin and was not a currency." Pl's Resp. at 6, Mar. 22, 2021, No. 79. Ripple's intended use case is immaterial to XRP Holders. XRP Holders utilize XRP as a form of currency or money regardless of its original design or purpose. Assets and technology change and evolve over time. Bitcoin was designed to be a peer-to-peer electronic cash payment system,[20] yet today, Bitcoin is generally known as being too slow of a network for payments but is touted as a great store of value and accepted as digital gold. *See* Deaton Decl. Ex. T, BTC as Digital Gold (July 29,2019).

---

[19] *See also United States v. Murgio,* 209 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (stating "Bitcoins clearly qualify as money or funds …because they can be easily purchased in exchange for ordinary currency, act as a denominator of value, and [are] used to conduct financial transactions"); *and United States v. Ologeam,* No. 5:18-cr-81, 2020 WL 1676802, at *11 (E.D. Ky. Apr. 4, 2020 ([T]he federal district courts have unanimously and univocally concluded that Bitcoin constitutes money.").

[20] *See generally* Bitcoin: A Peer-to-Peer Electronic Cash System, Satoshi Nakamoto (2008).

Ripple may have specific use cases in mind for XRP but that doesn't prevent XRP Holders from utilizing the asset as they see fit. Thus, XRP's multiple utility has been driven by XRP Holders and not only from Ripple's efforts. As a result, the XRP of 2021 is much different than that of 2013. For these reasons, it is clear that XRP Holders have a significant interest in their XRP and a right to intervene in order to adequately protect it.

### C.  Without Intervention, XRP Holders' Interests May Be Impeded by the Disposition of This Case

This new security *per se* theory directly threatens the interests of XRP Holders, whose ability to utilize, trade or transact in XRP could be impaired even though there is nothing about their conduct that could plausibly make XRP an investment contract.[21] For more than eight years, the SEC has allowed XRP, the XRPL, and their associated technologies evolve from a promising digital asset with superior functionality into the third-largest digital currency in the world (after Bitcoin and Ether).

"XRP is estimated to be held today by millions of holders worldwide, with approximately $700 billion to $1 trillion in total trading volume since 2013." Def. Resp. Mar. 26, 2021 Doc. 86, at *2. Those XRP Holders, investors, developers, and businesses have sought intervention because the entire theory being pursued by the SEC threatens their interests. If XRP Holders are

---

[21] The SEC makes the extraordinary claim that because some holders of XRP may be utilizing XRP as a speculative investment that's traded in secondary markets "on digital asset trading platforms" is actual "proof that Defendants offered and sold XRP as a speculative investment [contract]." SEC Resp. Mar. 22, 2021, ECF No. 85 at *1. This meritless claim by the SEC would make every digital asset and/or cryptocurrency, including Bitcoin and Ether, unregistered securities because all of these digital assets are held, by some, as pure speculative investments that are traded in secondary markets on the same "digital asset trading platforms" that XRP is traded on.

not allowed to intervene, their interests could be more than impaired – those interests could be destroyed.

Considering that the SEC disputes the independent utility of XRP, intervention is necessary for XRP Holders to help develop the Court's understanding related to the **current** utility and development and technology behind XRP and the XRPL completely independent of Ripple and its executives. In fact, many of the current uses of XRP by XRP Holders are performed without Ripple or its executives' knowledge or awareness. This information is critical to the Court's application of the *Howey* test and ultimate determination as to whether XRP itself is a security.

Judge Castel made note that "[t]he SEC, for example, does not contend that Bitcoins transferred on the Bitcoin blockchain are securities." *Telegram*, 448 F. Supp. 3d 352, 358. In this case, however, the SEC is asking the Court to conclude that *all* XRP, including those owned by XRP Holders are securities. AC ¶¶ 239-244; ¶¶282-289; ¶¶ 290-293; ¶¶ 353-356;¶371-377; ¶¶ 381-389;¶ 391. Judge Netburn posited the SEC's theory when she stated "[p]resumably under this theory then, every individual in the world who is selling XRP would be committing a Section 5 violation based on what you just said." Hr'g Tr. 44:7-9 (Mar. 19, 2021).  The SEC's response to Judge Netburn's factually correct statement was ambiguous and nonsensical, to be polite. The SEC did not reject the premise of Judge Netburn's statement but attempted to minimize the interests of XRP Holders by stating:

> That's not quite correct, your Honor. So the statute, the Securities Act of 1933 has sort of  a registration provision under Section 5, and then an exemption provision under Section 4. And broadly speaking, the Section 4 exemptions, I'm speaking very generally here, if these are transactions by people in the market, they are exempt by statute.

Hr'g Tr. 44:10-16 (Mar. 19, 2021). However, Section 4 exemptions only apply to a security subject to registration under Section 5. Securities Exchange Act, 15 U.S.C. § 4

(2018). Hence, the SEC confirmed its belief and/or claim that the XRP held by XRP

Holders are in fact securities. Furthermore, the burden of proof to claim these exemptions

would fall to XRP Holders. *Telegram*, 448 F. Supp. 3d 352, 366 (citing *SEC v.*

*Cavanaugh*, 155 F.3d 129, 133 (2d Cir. 1998).

### D.  XRP Holders' Interests Are Not Adequately Represented

"[T]he burden to demonstrate inadequacy of representation is generally speaking minimal."

*Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 179 (2d Cir. 2001) (internal quotations

omitted). XRP Holders easily satisfy this minimal standard.

### i.   The SEC Does Not Adequately Represent The Interest of XRP Holders

The law is well settled that if there is no investment intent a transaction does not fall within

the scope of the securities laws. "[W]hen a reasonable purchaser is motivated to purchase by a

consumptive intent" and not for purposes of making a profit, the SEC has no interest to protect

under securities laws. *Telegram,* 448 F. Supp. 3d 352, 371. Clearly, the SEC is either unaware of

XRP Holders' use of XRP or they are choosing to ignore such use for litigation reasons. The

SEC repeatedly categorizes XRP Holders as speculative investors incapable of developing

independent utility and contributing to the overall growth and development of the XRP

ecosystem. AC ¶ 282-289. The SEC claims that XRP Holders' "ultimate goal in seeking to

intervene is for XRP to become available again for trading on digital asset platforms so that

Movants may buy and sell XRP as a speculative investment**."** Pl.'s Resp. to Mot. To Intervene,

at 1 (Mar. 26, 2021), ECF No. 85**.**

This statement alone proves that the SEC fails to truly understand or appreciate the threat to

XRP Holders' interests that the overly broad and vague allegations contained in its complaint

against Ripple and XRP Holders have caused. There are literally hundreds of businesses and

developers – independent of Ripple and its executives – utilizing the underlying technologies of XRP and the XRPL. *See* Deaton Decl. Ex. I-T. Many of those developers and individuals and small businesses have been slowed or halted due to the allegation that today's XRP itself is an investment contract and thus a security. But even if the SEC were correct (they are not) and XRP Holders' "primary motivation" is to "reinstate speculative trading of XRP on digital asset platforms" so that XRP Holders can sell XRP to "other investors at a profit",[23] this would demonstrate that XRP Holders are not relying on the Defendants at all. Putting aside the fact that XRP Holders did not purchase their XRP from Ripple, it confirms that XRP Holders wish to manage their own XRP holdings on their own terms. Ripple has no say in XRP Holders' decision to trade XRP (or hold, hedge, borrow, lend, etc.). Whether XRP Holders decide to sell their XRP, and whether they do so at a profit, is certainly not dependent on the efforts of Ripple, but is solely dependent on the personal trading decision of each holder and user and the fluctuations of the broader cryptocurrency market. It is well established that XRP's price is not correlated with the efforts of Ripple, but instead, the price of bitcoin.

In order to be successful in the application of the *Howey* test, the SEC must persuade this Court to believe allegations that are in direct contradiction to the interests of XRP Holders. The SEC claims that XRP Holders entered into a common enterprise with Ripple; XRP Holders claim they did not. The SEC claims that XRP Holders have solely relied on Ripple's efforts; XRP Holders claim they have not. The SEC claims XRP lacks utility; XRP Holders claim intend to

---

[23] In the SEC's pre-motion letter opposing XRP Holders' intervention, SEC Attorney Teneiro, at best, misinterpreted Deaton's quote, and, at worst, intentionally misled this Court, by claiming that Deaton stated the purpose of re-listing XRP was so that XRP's "price could double." Doc 85 at 1. No fair reading of Deaton's quote could be interpreted as such as Deaton was commenting "that if the SEC chooses to inform exchanges that they can resume trading XRP, its price could double, which means Ripple could have twice the money to defend the case."). Deaton Decl. Ex. U, Deaton FXStreet Interview (Mar. 22, 2021)

prove that XRP has the greatest utility of all cryptocurrencies. The SEC claims it represents the interests of XRP Holders; XRP Holders claim it does not.

Clearly, the SEC's interests and the interests of XRP Holders are at odds with each other.

### ii.   Defendants Do Not Adequately Represent The Interests of XRP Holders

Legal counsel for Ripple, Larsen and Garlinghouse have no ethical responsibility to XRP Holders. Consider the fact that although the shared interests of Ripple and these two executives are clearly intertwined, they have separate legal counsel to represent their independent interests. The lack of ethical responsibility to XRP holders stems from a conflict-of-interest that is present if Ripple's counsel even attempted to represent the interests of both holders of XRP and Ripple. It would be antithetical for Ripple's counsel or counsel for Garlinghouse or Larsen to attempt to represent the interests of XRP Holders. It is an integral part of the defense to demonstrate that these defendants owe no duty and have no obligation to XRP Holders.

Ripple makes clear that it "never held an ICO, never offered future tokens to raise money, and has no contracts with the vast majority of XRP holders." Def.'s Answer at 5, (Jan. 29, 2021), ECF No. 43. There are no contracts or sales between Defendants and XRP Holders. This is an important distinction because Ripple must defend its own distribution of XRP and states that "it never offered or sold investment contracts in its distributions of XRP." *Id.* at 10, ¶ 10. Ripple's lawyers cannot be expected to focus their attention on distributions of XRP made by entities not associated with their clients. Ripple's lawyers will be focused on Ripple sales of XRP, not sales of XRP offered by Coinbase, Uphold, Kraken, or any other third-party exchange.

Furthermore, the defense has made it very clear that "Defendants do not represent the interests of Intervenors as holders of XRP." Def. Resp. at 1, Mar. 2, 2021, ECF No. 86.

### III.   Alternatively, XRP Holders Should be Granted Permissive Intervention

In the alternative, if XRP Holders' motion for intervention as of right is denied, XRP Holders should be allowed permissive intervention in this action. "The Court has broad discretion to, on timely motion, **permit anyone to intervene** who has a claim or defense that shares with the main action a common question of law or fact, so long as the intervention does not unduly delay or prejudice the adjudication of the original parties' rights." *In re Reyes,* at *1 (emphasis added) (citing Fed. R. Civ. P. 24(b); and *Peterson v. Islamic Republic of Iran,* 290 F.R.D. 54, 57 (S.D.N.Y. 2013)) (emphasis added).

## A.  Common Questions of Law and Fact Favor Intervention

The defenses that XRP Holders desire to assert in this action, if permitted to intervene, share both common questions of law and fact. Although XRP Holders are not named defendant in this action, they are identified throughout the complaint. As stated above, entire sections of the SEC's AC are dedicated to claims and allegations against XRP Holders. The SEC alleges that "*Economic Reality Dictates that XRP Purchasers Have no Choice But to Rely on Ripple's Efforts for the Success or Failure of Their Investment*", (AC at 50), even though XRP Holders have developed entire businesses utilizing the XRPL without Ripple's knowledge. *See* Deaton Decl. Ex. M. For example, XRP is utilized to purchase and transport Bitcoin due to the XRPL's superior technology over the Bitcoin network. S*ee* Deaton Decl. Ex. O. The SEC claims "[m]ost, if not all, XRP investors simply lack the technical expertise and resources," to grow the XRP ecosystem. AC ¶ 285. Yet, XRP Holders have been essential to the development of the ecosystem over the last eight years. Contrary to the AC ¶ 286, XRP Holders have demonstrated great entrepreneurial effort without Ripple's support. The SEC has alleged that all "[p]urchasers of XRP invested into a common enterprise." AC ¶ 290. In essence, the SEC has claimed that

every XRP purchaser in the world has entered into a common enterprise, not only with Ripple, but with "all other XRP holders." AC ¶ 293.

The SEC claims "that XRP has no significant use beyond investment." AC ¶ 371. This is simply not true and XRP Holders should be present to defend against such blatantly false allegations.

**B.  Intervention Does Not Prejudice Existing Parties**

XRP Holders do not seek additional discovery or any change to the current scheduling order entered by the Court. Therefore, granting XRP Holders' motion will cause no delay that could prejudice the existing parties.

In an attempt to dissuade the Court from granting intervention, the SEC claims that if the Court permitted XRP Holders to intervene, all other XRP holders, including a **large** class of XRP investors that have sued Ripple, would also likely intervene creating an "avalanche" of claims and "near-certainty of undue delay, complexity and confusion," Pl. Resp. at 1 (March 26, 2021) (citing to *In Zakinov v. Ripple Labs, Inc.,* No. 4:18-6753 (D.E. 87) at para 1 (N.D. Cal. Mar. 25, 2020)). This claim is fear mongering and a complete red herring offered by the SEC. One, the same argument could be argued in every single case where intervention is sought. Essentially, the SEC claims that if the Court grants intervention it will encourage "all other XRP holders" to seek intervention. Counsel for XRP Holders, however, has been contacted by over 12,600 XRP holders asking to join. The proposed intervenors – XRP Holders - represent and share the interests of the nearly all XRP holders and investors. Second, the SEC misleads the Court by claiming that a "large class of XRP investors" have sued Ripple and might seek intervention. Moreover, the interests of this "large class" (a total of six plaintiffs) are already represented by the SEC. The SEC admits that those "purchasers argue, **as the SEC does**, that

Ripple unlawfully sold XRP in an unregistered securities offering." (emphasis added). *Id.* The

SEC's cited case law clearly demonstrates that this alleged "avalanche" of potential intervenors

would not be permitted by the Court. The SEC admits that these other XRP investors are making

the same exact argument against the Defendants that the SEC is making. Yet, the SEC cites to

*MASTR Adjustable Rate Mortgages Trust v. UBS Real Estate Serv., Inc.*, No. 12 Civ. 7322, 2013

WL 139636, at *2 (S.D.N.Y. Jan. 11, 2013) which clearly states "[w]hen a potential intervenor

shares 'the same ultimate objective" as an existing party in the case . . . adequate representation

is presumed." The XRP investors suing Ripple make identical allegations being pursued by the

SEC. Those XRP investors' interests are being protected by the SEC, thus there is no need for

intervention. Any other XRP holders' interests are being pursued by the Proposed Intervenors

and the 12,600 XRP Holders asking to join.

If granted leave to intervene, counsel for XRP Holders will significantly contribute to the

full development of the underlying factual issues in the case to the just and equitable

adjudication of the legal questions presented.

## IV.     Due Process and Fundamental Fairness Favor Intervention

For the last eight years, the SEC was well aware that XRP was widely sold, distributed

and traded in the secondary markets. The government was very familiar with Ripple and XRP

from the 2015 FinCEN settlement. The SEC permitted and authorized Ripple to purchase a nine-

percent minority stake in MGI knowing that Ripple would distribute XRP to MGI; which in turn,

would sell the XRP in the secondary market to purchasers, including XRP Holders. AC at 64,

ECF No 46.

Market participants including Ripple, XRP Holders, market-makers and intermediaries

sought regulatory guidance for eight years prior to this action. Def.'s Answer to First Am.

Compl. at 98-99, ECF No. 51. The SEC's action, inaction, and acquiescence communicated that XRP, similar to Bitcoin and Ether, was not a security.

In sum, the SEC's enforcement action against XRP converts "commonplace acts in the industry into violations." *Upton v. SEC*, 75 F. 3d 92, 97-98 (2nd Circuit 1996). In *Upton*, the Second Circuit overturned an SEC enforcement action. The SEC had been aware for years that market participants were engaging in the practice at issue. The SEC knew from its third-party communications that market participants lacked clarity of the SEC's position. The SEC nevertheless took "no steps to advise the public" of the SEC's new and opposite interpretation. The Court held that the SEC violated the Defendant's due process rights. *Id.* at 98.

Despite eight years of acceptance and acquiescence, Clayton directed the SEC to file this action on his last day at the SEC, then left forever. Although the SEC claims the motive or reasons behind why the SEC brought this action are irrelevant, Grundfest clearly stated that the filing of this action raised concerns over the "exercise of the Commission's discretion." *See* Deaton Decl. Ex. G, Grundfest Letter Discussion (December 17, 2020). XRP Holders respectfully submit to this Honorable Court's discretion.

## <u>CONCLUSION</u>

For the foregoing reasons, XRP Holders respectfully ask that they be allowed to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a), or, in the alternative, should be permitted to intervene pursuant to Federal Rule of Civil Procedure 24(b).

Dated: April 19,, 2021                          Respectfully Submitted,


John E. Deaton, Esq.
THE DEATON LAW FIRM
450 North Broadway
East Providence, R.I. 02914
Tel: (401) 351-6400
Fax: (401) 351-6401
Email: all-deaton@deatonlawfirm.com
Attorney for Proposed Intervenors