# Exhibit E

EFiled:  Feb 19 2021 04:35PM EST
Transaction ID 66356312
Case No. 2021-0007-MTZ

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

TETRAGON FINANCIAL GROUP LIMITED,  )
)
Plaintiff,  )
)
v.  )   C.A. No. 2021-0007-MTZ
)
RIPPLE LABS INC.,  )   PUBLIC VERSION FILED
)   FEBRUARY 19, 2021
Defendant.  )

## DEFENDANT'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

OF COUNSEL:

David M. Grable
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3000

Marlo A. Pecora
Matthew B. Fox
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Dated:  February 13, 2021

Michael A. Barlow (#3928)
Adam K. Schulman (#5700)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000

*Attorneys for Defendant
Ripple Labs Inc.*

## **TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ........................................................................1

FACTUAL BACKGROUND .........................................................................7

A.    Tetragon Has Experienced "Extraordinary" Returns On Its
      Ripple Investments, And Has Not Written Them Down At All ..................7

B.    Tetragon Proposed A Default Provision That Did Not Identify
      Wells Notices Or Enforcement Actions As Triggers, But Did
      Include Concepts Of Finality, And Then Narrowed Its Scope
      Even Further ....................................................................................8

C.    Tetragon Claims A Securities Default...........................................11

ARGUMENT .........................................................................................13

I.    TETRAGON HAS NOT PROVEN A SECURITIES
      DEFAULT ...................................................................................14

      A.    The Commission Has Not "Determined On An Official
            Basis" That XRP Is A Security Now And Going Forward................14

            1.    Allegations In An SEC Complaint Are Not
                  Determinations On An Official Basis ......................................14

            2.    Federal Law Shows Which SEC Actions Could
                  Constitute Determinations On An Official Basis ....................20

            3.    The Sole "Settlement" Example Confirms That
                  Allegations In A Complaint Do Not Trigger A
                  Securities Default........................................................24

            4.    The Structure Of The Securities Default Provision
                  Confirms That There Has Been No Default ..........................26

      B.    Nothing Has Been Determined By The Commission
            Through A Wells Notice ..................................................28

C.    Tetragon's Arguments About The "Context" Of The Stockholders' Agreement Lack Merit ...................................................32

D.    Tetragon's Attacks On Ripple's Experts Are Not Well Taken ......................................................................................36

E.    Both Extrinsic Evidence And The Forthright Negotiator Principle Confirm That No Securities Default Has Occurred .....................................................................................39

    1.    Extrinsic Evidence Confirms That The Only Objectively Reasonable Meaning Of The Securities Default Provision Does Not Include The Filing Of An SEC Lawsuit Or Issuance Of A Wells Notice ...................................................................40

    2.    Tetragon's Self-Serving Testimony Is Contradicted By The Contemporaneous Documents And Is Internally Contradictory .........................................................44

    3.    The Parties' Negotiation History Supports Ripple ...................47

    4.    The Forthright Negotiator Principle Also Supports Ripple .....................................................................................49

    5.    Neither The SEC's Complaint Nor The Wells Notice State That XRP Is A Security On A Current And Going Forward Basis ......................................................51

II.    TETRAGON HAS NOT SHOWN IRREPARABLE HARM .......................52

III.    THE BALANCE OF THE EQUITIES WEIGHS AGAINST THE INJUNCTIVE RELIEF TETRAGON SEEKS ...................................55

CONCLUSION ........................................................................................56

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*AM Gen. Hldgs. LLC v. The Renco Grp., Inc.*,
    2016 WL 787929 (Del. Ch. Feb. 19, 2016)......................................................54

*ATR-Kim Eng Fin. Corp. v. Araneta*,
    2006 WL 3783520 (Del. Ch. Dec. 21, 2006), *aff'd sub nom.*,
    930 A.2d 928 (Del. 2007) .........................................................................44

*Basic Research, LLC v. F.T.C.*,
    807 F. Supp. 2d 1078 (D. Utah 2011)...................................................17

*Bonham v. HBW Hldgs., Inc.*,
    2005 WL 3589419 (Del. Ch. Dec. 23, 2005) .......................................43

*Chesapeake Corp. v. Shore*,
    771 A.2d 293 (Del. Ch. 2000) ..............................................................44

*Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*,
    166 A.3d 912 (Del. 2017) ......................................................................26

*City of Miami Gen. Emps' and Sanitation Emps.' Ret. Tr.*,
    107 A.3d 1049 (Del. 2014) .............................................................14, 55, 56

*City of Oakland v. Lynch*,
    798 F.3d 1159 (9th Cir. 2015) ..............................................................17

*In re CNX Gas Corp. S'holders Litig.*,
    4 A.3d 397 (Del. Ch. 2010) ...................................................................55

*Comrie v. Enterasys Networks, Inc.*,
    837 A.2d 1 (Del. Ch. 2003) ..................................................................49

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*,
    702 A.2d 1228 (Del. 1997)....................................................................39

*Equitable Tr. Co. v. Marshall*,
    25 Del. Ch. 238, 17 A.2d 13 (1940) ....................................................26

*Equity–Linked Invs., L.P. v. Adams*,
    705 A.2d 1040 (Del. Ch. 1997) ............................................................12

iii

*In re Estate of Jacobsen*,
   27 Misc. 3d 1220(A), 910 N.Y.S.2d 762 (Supr. 2010) ......................................17

*Frederick Hsu Living Tr. v. ODN Hldg. Corp.*,
   2017 WL 1437308 (Del. Ch. Apr. 14, 2017)....................................................12

*Hartley v. Consol. Glass Hldgs., Inc.*,
   2015 WL 5774751 (Del. Ch. Sept. 30, 2015),
   *aff'd*, 137 A.3d 122 (Del. 2016) .........................................................................50

*KFC Nat'l Council & Advert. Co-op., Inc. v. KFC Corp.*,
   2011 WL 350415 (Del. Ch. Jan. 31, 2011)........................................................43

*Kona Tech. Corp. v. S. Pac. Transp. Co.*,
   225 F.3d 595 (5th Cir. 2000) ............................................................................30

*Koss v. Sec. & Exch. Comm'n of U. S.*,
   364 F. Supp. 1321 (S.D.N.Y. 1973) ..................................................................31

*Kotler v. Shipman Assocs., LLC*,
   2019 WL 4025634 (Del. Ch. Aug. 21, 2019)....................................................49

*L & W Ins., Inc. v. Harrington*,
   2007 WL 2753006 (Del. Ch. Mar. 12, 2007) ....................................................14

*In re Lions Gate Entm't Corp. Secs. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ...........................................................29, 31

*Lorillard Tobacco Co. v. Am. Legacy Found.*,
   903 A.2d 728 (Del. 2006) .................................................................................16

*Lucia v. S.E.C.*,
   138 S. Ct. 2044 (2018)...............................................................................29, 31

*Nerium Int'l, LLC v. F.T.C.*,
   2020 WL 5217152 (N.D. Ill. Aug. 31, 2020)...............................................14, 17

*Osborn ex rel. Osborn v. Kemp*,
   991 A.2d 1153 (Del. 2010) ...............................................................................24

*Richman v. Goldman Sachs Gp., Inc.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) ...............................................................29

iv

*SEC v. Ripple Labs Inc. et al.*,
   No. 20-cv-10832 (S.D.N.Y. Dec. 22, 2020) ....................................................1, 2

*SI-Lake, Inc. v. Conroy*,
   1994 WL 728824 (Del. Ch. Dec. 16, 1994) ................................................14, 55

*Soo Line R.R. Co. v. Fruehauf Corp.*,
   547 F.2d 1365 (8th Cir. 1977) ............................................................................30

*SV Inv. P'rs, LLC v. Thoughtworks, Inc.*,
   7 A.3d 973 (Del. Ch. 2010) ................................................................................56

*Trascent Mgmt. Consulting, LLC v. Bouri*,
   2018 WL 4293359 (Del. Ch. Sept. 10, 2018)......................................................44

*U.S. W., Inc. v. Time Warner Inc.*,
   1996 WL 307445 (Del. Ch. June 6, 1996)....................................................39, 50

*United Rentals, Inc. v. RAM Hldgs., Inc.*,
   937 A.2d 810 (Del. Ch. 2007) ......................................................................39, 49

*United States v. Gluk*,
   831 F.3d 608 (5th Cir. 2016) ..............................................................................18

*United States v. Klein*,
   2017 WL 1316999 (E.D.N.Y. Feb. 10, 2017) ..............................................18, 19

*Wood v. Coastal States Gas Corp.*,
   401 A.2d 932 (Del. 1979) ...................................................................................35

*Zayo Gp., LLC v. Latisys Hldgs., LLC*,
   2018 WL 6177174 (Del. Ch. Nov. 26, 2018).........................................16, 43, 49

**Statutes**

5 U.S.C. §551 *et seq.*...........................................................................................23

15 U.S.C. .........................................................................................21, 22, 28

Administrative Procedure Act..............................................................................23

Securities Act of 1933 Sections 5(a) and (c) .......................................................51

Securities Exchange Act of 1934 Section 21(a) ...................................................22

**Other Authorities**

17 C.F.R. ...............................................................................................*passim*

15 Fed. Reg. 3175 (March 13, 1950)......................................................32

BLACK'S LAW DICTIONARY (11th ed. 2019) ..........................................15

MERRIAM-WEBSTER.COM DICTIONARY (2021) ..................................15, 16

OXFORD ENGLISH DICTIONARY (2d ed. 1989)....................................15, 16

Fed. R. Civ. P. 11(b)(2)........................................................................20

Federal Rule of Evidence 803(8)(A)(iii) ..............................................18

https://www.sec.gov/news/public-statement/peirce-roisman-statement-
    contingent-settlement-offers-021221#_edn1 .....................................25

Jean Eaglesham, *SEC Drops 20% of Probes After 'Wells Notice,'* THE
    WALL STREET JOURNAL, October 9, 2013 ............................................31

Restatement (Second) of Contracts § 206 (1981)....................................43

Ct. Ch. R. 11........................................................................................20

Ct. Ch. R. 30(b)(6) ..............................................................................46

Ct. Ch. R. 803(8)..................................................................................18

11 WILLISTON ON CONTRACTS § 32:12 (4th ed. 2010) ..................................43

# PRELIMINARY STATEMENT

███████████████████████████████ █████████

███████████████████████████████████████

— Transcript of the Deposition of Plaintiff Tetragon's Lead Negotiator Reade Griffith at 106:8-15.

\*      \*      \*      \*

Tetragon did not bargain for the rights that it now claims it has in this case. Pursuant to the Securities Default provision in the Stockholders' Agreement with Ripple (the "Stockholders' Agreement" or "Agreement"), Tetragon has redemption rights only if the U.S. Securities and Exchange Commission ("SEC" or "Commission"), "another governmental authority," or "a governmental agency of similar stature and standing" "***determined on an official basis***" that XRP is a security on a current and going forward basis (emphasis added).   No such determination has been made and no default trigger has occurred.

Tetragon alleged in its Complaint that two triggering Securities Default events occurred.  It first claims that a Wells notice received by Ripple triggered a Securities Default.  It did not.  Remarkably, Tetragon's own expert does not endorse this theory, and Tetragon has all but abandoned the argument at this point.  This is unsurprising as a Wells notice does not contain Commission determinations of

anything—let alone determinations "on an official basis."  Commissioners do not see, and never vote upon, such notices.  The SEC's Staff can, and do, abandon investigations after issuing such a notice.

Tetragon then claims that the filing of the SEC's Complaint (*SEC v. Ripple Labs Inc. et al.*, No. 20-cv-10832 (S.D.N.Y. Dec. 22, 2020), Dkt. 1) against Ripple in federal court alleging that its distributions of XRP were an "investment contract," and thus a security, triggered the default provision.  Again, Tetragon is incorrect.  The filing of the SEC's Complaint does not trigger this provision.  A complaint *alleges* things, it does not *determine* them, "on an official basis" or otherwise.  A complaint's allegations set up a matter and issues for a court to determine.  No matter how this Court rules in this case (*i.e.,* no matter how this Court determines the outcome of this case) it is undisputed that the status of XRP is still to be determined in the pending enforcement matter with the SEC.

The basic meaning of the terms at issue, as commonly and traditionally defined, confirm that *allegations* are not the same as a *determination*.  Tetragon's lead negotiator, Mr. Griffith, a Harvard trained lawyer, agrees with this fact, as demonstrated by the opening quote of this brief.  As does Tetragon's own expert, who testified as follows:

2

████████████████████████████████

Jackson Tr. at 117:5-9 (Ex. 1).

By filing an enforcement action in federal court, the SEC has not "determined" anything "on an official basis." Federal law identifies several ways the Commission may do so. Filing a complaint, and leaving the matter to the Court to decide, is not one of them. Federal regulations explicitly describe how the Commission, sitting in an adjudicative role, "determines" the outcome of cases brought through the **SEC administrative process**, as a finder of fact and arbiter of the law. The Commission can also issue a **Section 21A release**, such as the "DAO Report" that Tetragon highlights, which expressly stated that the Commission "determined" that the cryptocurrency at issue in that matter was a security (the DAO Report did not *allege* anything). **Rulemaking** by the SEC could also give rise to an official determination. And the Commission enters into **settlement agreements** that contain detailed "findings of fact" and application of law to fact, consistent with the sole example in the Securities Default provision; "settlement." Tetragon, advised by three different law firms, was well aware of these avenues for the SEC to

determine matters on an official basis when Tetragon drafted and negotiated the Securities Default provision.[1]

The structure of the Securities Default provision further confirms that there has been no default. The only illustrative example the parties included in the provision was a "settlement," something that *ends* a dispute between parties, and defines their rights and obligations going forward. In stark contrast, the filing of a lawsuit *begins* a dispute, and puts to a court the task of defining the law, rights, and obligations of the parties. Further, every settlement with the SEC requires the Commission to initiate an enforcement action, either before or contemporaneously with the settlement. In other words, there can never be a settlement with the SEC in any case without the filing of a complaint. Thus, to now argue that the filing of a complaint alone triggers the provision is contrary to the terms of the provision and its lone Securities Default example of a "settlement."

Tetragon's "business context" argument is an attempt to distract from and re-write the plain language of the Agreement, and does not change the analysis. Ripple simply did not agree to a provision that would require it to redeem a stockholder at

---

[1] Tetragon and its lawyers also knew that when the Commission votes to authorize a complaint, it is doing just that—authorizing the assertion of allegations to be decided by a court, not determining matters on an official basis in a way that defines the rights and obligations of the parties. *See infra* Section I.A.3.

the outset of an SEC case; Ripple agreed that certain rights could be triggered at the end of the dispute.  Once again, we have the sole "settlement" example, which requires findings as to XRP that would have the same effect on XRP's status as a court judgment making the same findings.  Tetragon undisputedly agreed to having its rights triggered at the ***endpoint*** of Ripple's dispute with the SEC (a settlement), not the beginning.  This itself is a valuable right, one that allows Tetragon to step in front of Ripple's Series A and B stockholders.  Under Delaware law and under Ripple's Restated Certificate of Incorporation, Ripple owes fiduciary duties to its Series A and B stockholders.  ██████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

As to extrinsic evidence, Ripple agrees with Tetragon's Mr. Griffith that this is an unambiguous provision that requires no reference to extrinsic evidence.  The plain language shows no Securities Default has occurred.  And extrinsic evidence further supports Ripple's interpretation.  During negotiations, Tetragon had in hand the draft term sheet another potential investor—whose offer Tetragon was competing with.  The draft term sheet from the other potential investor proposed a redemption provision specifically describing and referencing the receipt of both a Wells notice and the filing of an enforcement action as redemption triggers.  Tetragon could have proposed a similarly specific provision (as Tetragon's CEO,



Mr. Prince, admitted).  But Tetragon understood—as Mr. Griffith admitted—that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Griffith Tr. at 106:8-15 (Ex. 2).

So Tetragon deliberately chose not to expressly identify either a Wells notice or the filing of an enforcement action in this provision, despite Messrs. Griffith and Prince claiming in deposition, for the first time, that ██████████████████████ ████████████████.[2]  Instead, they drafted a provision only triggered when it is "determined" by a governmental body "on an official basis" that XRP is a security now and going forward.  If Tetragon truly thought the provision could capture events to which it knew Ripple would not agree ████████████████, this was not a forthright negotiation technique.  Certainly it does not reflect an agreement between the parties.  And as discussed below, contemporaneous documents do not support what Mr. Griffith now claims Tetragon expressed during negotiations.

At least the parties agree on one point.  No matter the outcome of this lawsuit, it is still to be determined by the federal court in New York overseeing the SEC case

---

[2] Curiously, Tetragon's 30(b)(6) witness, Tetragon's General Counsel, Sean Côté, did not testify ███████████████████████████████████████████████ ███████████████████████████████████████████████

whether Ripple's distributions of XRP constitute an investment contract and thus, a security on a current and going forward basis.  This Court is not ruling on that issue, and Ripple respectfully requests that the Court's opinion (its determination) in this matter, which may be reviewed by many in the marketplace, not address that ultimate issue to be decided in the SEC litigation.

## **FACTUAL BACKGROUND**[3]

**A.     Tetragon Has Experienced "Extraordinary" Returns On Its Ripple Investments, And Has Not Written Them Down At All**

Tetragon's "net investment" in Ripple's Series C was ▮▮▮▮▮▮ Ex. 3  at −140.  These are the same shares Tetragon now values at ▮▮▮▮▮▮  and that Tetragon valued at ▮▮▮▮▮▮▮▮ before the SEC filed its Complaint.  Prince Tr. at 7:14-16 (Ex. 4).  As Tetragon's CEO, Steve Prince, characterized it, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Prince Tr. at 16:4-17:6 (Ex. 4). Despite Tetragon's claims regarding supposed harm, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and even though Tetragon claims ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Côté Tr.

---

[3] Citations in the form "Ex. __" or "_____Tr." refer to exhibits to the transmittal declaration of Adam K. Schulman filed with this brief.

at 21:13-23:14 (Ex. 5); Plaintiff's Opening Brief In Support Of Its Motion For Preliminary Injunction ("Opening Brief") at 35 (Dkt. 94).

**B.    Tetragon Proposed A Default Provision That Did Not Identify Wells Notices Or Enforcement Actions As Triggers, But Did Include Concepts Of Finality, And Then Narrowed Its Scope Even Further**

Ripple General Counsel Stuart Alderoty ███████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Alderoty Tr. at 119:12-120:10 (Ex. 6).  Brad

Garlinghouse, Ripple's CEO, and Ron Will, Ripple's former CFO, ███████████

██████████████████████████████████████████████ Griffith Tr. at

43:5-17; Will Tr. at 10:3-19 (Ex. 7).  As explained by Mr. Alderoty, ████████████

██████████████████████████████████████████████ Alderoty

Tr. at 11:10-20.

On October 8, 2019, Tetragon sent Ripple a term sheet that defined Securities Default to include: "any settlements, fines or other proceedings with any governmental authority or agency that result in the Company being liable, either individually or in the aggregate, for more than $25 million."  Ex. 8 at −502).

When Tetragon drafted this language, it █████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████ Prince Tr. at 54:10-13, 66:11-67:-16.  Aware of

8

this proposal (a proposal Tetragon was competing with), Tetragon chose ***not*** to explicitly propose either a Wells notice or an enforcement action as triggers for its Securities Default provision.  Tetragon also knew, when negotiating the Securities Default provision, that █████████████████████████████████████████████ ████████████████████████  Griffith Tr. at 106:8-15.  Notably, however, Tetragon proposed language that would be triggered at the end of an action with a finding of liability, not the commencement of an action: "any settlements, fines or other proceedings with any governmental authority or agency that result in the Company being liable . . . ." Ex. 8 at −502.  That concept of final liability was a constant throughout negotiations.

On October 14 Tetragon sent Ripple another version of the provision, which Tetragon claimed was "significantly dumbed down."  Ex. 9 at −606.  The new language read: "A 'Securities Default' means if XRP is determined (including without limitation by settlement) by the U.S. Securities and Exchange Commission (or similar governmental authority or agency) to constitute a security on a current and going forward basis (and not, for the avoidance of doubt, a determination that XRP was a security in the past." Ex. 9 at −609.  It is undisputed that these edits only narrowed, and were not intended to expand, the scope of the provision.  Côté Tr. at 94:7-95:8 ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

9

███████████████████████████████████████████████

███████████████████████████████████████████████

Griffith Tr. at 44:12-47:5.

On the next and last turn of the default language, Ripple requested that "on an official basis" be added to the provision,[4] precisely (as Mr. Alderoty *and* Tetragon's lead negotiator, Mr. Griffith, testified) ████████████████████████████████ ████████████████████████████ Griffith Tr. at 106:8-15; Alderoty Tr. at 117:10-118:8.  The final version of the Stockholders' Agreement reads:

> A 'Securities Default' means if XRP is determined on an official basis (including without limitation by settlement) by the U.S. Securities and Exchange Commission (or (1) another governmental authority or (2) a governmental agency of similar stature and standing) to constitute a security on a current and going forward basis (and not, for the avoidance of doubt, a determination that XRP was a security in the past).

Compl. Ex. A (Stockholders' Agreement) § 5.4.

In the midst of the parties' negotiations, Ripple also participated in ongoing discussions with the SEC—█████████████████████████ Griffith at Tr. at 40:6-41:16; Alderoty Tr. at 24:2-27:4.  ████████████████████████████

---

[4] Ex. 10 at –5136).

[5] Griffith Tr. at 106:8-15; Alderoty Tr. at 117:10-118:8.

████████████████████████████████████████████████

████████████████████████████████████████████████

Alderoty Tr. at 33:17-35:3; Griffith Tr. at 50:15-51:8.  Because the possibility of an

enforcement action existed, Ripple wanted to ensure that ████████████████████

████████████████████████████████████ Alderoty Tr. at

117:10-118:4 ████████████████████████████████

████████████████████████████████████████████████

██████████████████████

## C.    Tetragon Claims A Securities Default

On September 25, 2020, Ripple received a Wells notice from the Staff of the

SEC.  Ex. 11.  ████████████████████████████ Côté Tr. at 67:13-

69:6.  Tetragon then sent Ripple a letter on October 19, 2020 claiming that the SEC

Staff's issuance of a Wells notice constituted a Securities Default under the

Stockholders' Agreement, and demanded redemption of its shares.  Ex. 12 at –

312.  On October 21, 2020 Ripple responded, informing Tetragon that Ripple

"disagree[d] that any Securities Default has occurred," in part because "it is well

settled law that a Wells Notice is not an official determination by the SEC that any

violation has occurred, much less one that could constitute a Securities Default."  *See*

Ex. 13 at –317-8).

On December 22, 2020, the SEC filed its suit against Ripple.  Ex. 14 (SEC Complaint, 12/22/2020).  The SEC did not seek a temporary restraining order or preliminary injunction preventing Ripple from continuing to distribute XRP.  *Id.* Two days after the SEC's Complaint was filed, Tetragon sent Ripple a letter asserting the existence of a Securities Default and demanding that its shares be redeemed in full six days later.  Ex. 15 at −543).  On December 30, 2020, Ripple informed Tetragon that "the SEC's complaint contains only SEC allegations, not SEC determinations," and, far from being a determination of anything "on an official basis," these SEC allegations are "not even final agency action."  *Id.* at 1.  Ex. 16 at −572 n. 1.

Ripple has separate obligations to its Series A and B stockholders ████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 17 § 6(a)(iv).  *See Equity–Linked Invs., L.P. v. Adams*, 705 A.2d 1040, 1042 (Del. Ch. 1997) ("[G]enerally it will be the duty of the board, where discretionary judgment is to be exercised, to prefer the interests of common stock—as the good faith judgment of the board sees them to be—to the interests created by the special rights, preferences, *etc.*, of preferred stock where there is a conflict."); *see also Frederick*

*Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at \*22 (Del. Ch. Apr. 14, 2017). Even though Ripple would prefer to end its relationship with Tetragon, who has sought to capitalize on an unfortunate situation by overstating its purported contract rights to the detriment of other stockholders, Ripple cannot ignore its obligations to those other stockholders by ignoring its good faith interpretation of the default provision at issue here. If it did, those other stockholders would have the right ████████████████████████

## ARGUMENT

Tetragon bears the burden of satisfying the heightened standard for a mandatory injunction because the relief it requests requires Ripple and its board of directors (the "Board") to take affirmative action. As this Court already found, "an order prohibiting Ripple from spending 'legally available funds' on anything other than redeeming the Series C shares until it has either redeemed them or placed funds into escrow" is a "mandatory injunction" because "it would be requiring Ripple to quantify legally available funds for a redemption."[6] Jan. 15, 2021 TRO Tr. at 57:13-24.

---

[6] The task of determining legally available funds is left to the Board and the requested order of this court would be a mandatory injunction to the Board to conduct an impairment analysis.

13

The issuance of a mandatory injunction is only proper in "a clear case, free from doubt" after a trial or based on solely undisputed facts. *SI-Lake, Inc. v. Conroy*, 1994 WL 728824, at *4 (Del. Ch. Dec. 16, 1994); *see C&J Energy Servs., Inc. v. City of Miami Gen. Emps' and Sanitation Emps.' Ret. Tr.*, 107 A.3d 1049, 1071 (Del. 2014) (concluding that the Court of Chancery erred by entering a mandatory injunction on a record that surfaced a number of important factual disputes).

In addition, Tetragon must show that the failure to issue a preliminary injunction will result in immediate and irreparable harm; and that, after balancing the equities, the harm to the plaintiff if relief is denied will outweigh the harm to the defendant if relief is granted. *L & W Ins., Inc. v. Harrington*, 2007 WL 2753006, at *7 (Del. Ch. Mar. 12, 2007).  Tetragon cannot meet its burdens.

## I.   TETRAGON HAS NOT PROVEN A SECURITIES DEFAULT

### A.   The Commission Has Not "Determined On An Official Basis" That XRP Is A Security Now And Going Forward

#### 1.   Allegations In An SEC Complaint Are Not Determinations On An Official Basis

The unambiguous meaning of the operative language does not include the Commission's authorization to file a complaint.  Complaints contain allegations not determinations.  The SEC's filing of a lawsuit in court did not determine XRP's status—a complaint does not determine anything. *See Nerium Int'l, LLC v. F.T.C.*, 2020 WL 5217152, at *4 (N.D. Ill. Aug. 31, 2020) (An agency's filing of a lawsuit

14

"does not determine the rights or obligations of the involved parties.  Instead, *a court makes those determinations as litigation proceeds.*") (citations omitted; emphasis added).  Complaints merely initiate a proceeding wherein an adjudicator determines whether the allegations have merit, as acknowledged by Tetragon's expert, Professor Jackson:



Jackson Tr. at 117:5-9.

Leading dictionaries define the word "determine" and "determination" to require finality and resolution of a dispute or issue—the polar opposite of mere allegations that *initiate* a lawsuit.  *See, e.g., Determination*, MERRIAM-WEBSTER.COM DICTIONARY (2021) (at law: "a judicial decision settling and ending a controversy"); *Determination,* OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "determination" as "[a] bringing to an end; a coming to an end; ending; termination" or "[t]he ending of a controversy or suit by the decision of a judge or arbitrator; judicial or authoritative decision or settlement (*of* a matter at issue)"); *Determination*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("[t]he act of deciding something officially; esp., a final decision by a court or administrative agency <the court's determination of the issue>."); *Determine,* BALLENTINE'S LAW DICTIONARY

(3d ed. 1969) ("To terminate; to cease; to end. To put an end to controversy by deciding the issue or issues, by making a settlement, or by adjustment . . ."). Moreover, the root of the word determination is *termination*. *See Determination*, MERRIAM-WEBSTER.COM DICTIONARY (2021); *Determination,* OXFORD ENGLISH DICTIONARY (2d ed. 1989).

"Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Lorillard Tobacco Co. v. Am. Legacy Found*., 903 A.2d 728, 738 (Del. 2006). "This is because dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." *Id.*; *see also Zayo Gp., LLC v. Latisys Hldgs., LLC,* 2018 WL 6177174, at \*11 (Del. Ch. Nov. 26, 2018). Under no reasonable interpretation could the Commission have "determined" XRP's status merely by permitting its Staff to *initiate* a litigation of that issue, thereby putting the determination to a court.[7]

---

[7] The plain meaning of the Securities Default provision is corroborated by the testimony of Ripple's lead negotiator, Mr. Alderoty, who explained that ███████████████████████████████████████████████████████████ Alderoty Tr. at 117:10-118:4

Case law further supports Ripple's interpretation.    It is "fundamental that the function *of the courts* is to determine controversies between litigants."  *In re Estate of Jacobsen*, 27 Misc. 3d 1220(A), 910 N.Y.S.2d 762 (Supr. 2010) (emphasis added) (internal quotation marks omitted).  Those controversies are not "determined" by a plaintiff's initial pleading.

Courts have repeatedly recognized that an agency's decision to file a civil lawsuit is not a "final agency action" for purposes of judicial review because it does not finally resolve the rights and obligations of the parties, but instead merely submits the dispute for resolution by a court.  *See City of Oakland v. Lynch*, 798 F.3d 1159, 1166-67 (9th Cir. 2015) (the initiation of suit was "not an action by which rights or obligations have been determined," but "simply ma[de] evident the Government's intention to challenge the status quo; any rights, obligations, and legal consequences are to be determined later by a judge."); *Nerium,* 2020 WL 5217152, at *4 ("[T]he FTC's initiation of a civil enforcement action does not constitute final agency action.").[8]

------------------------------------------------------------

[8] Settlements, on the other hand, can constitute final agency action. *See, e.g.*, *Basic Research, LLC v. F.T.C.*, 807 F. Supp. 2d 1078, 1091 (D. Utah 2011) (holding that an order pursuant to a settlement agreement was a final agency action because it "sets forth a final determination of the FTC").

The court in *United States v. Klein* rejected the notion that an SEC complaint contains "factual findings from a legally authorized investigation" for purposes of Federal Rule of Evidence 803(8)(A)(iii). *United States v. Klein*, 2017 WL 1316999, at *2 (E.D.N.Y. Feb. 10, 2017). The *Klein* court recognized that there are "*very real distinctions between factual findings and allegations*." *Id.* at *3 (emphasis added).[9] This Court should similarly recognize such "real distinctions."

This conclusion is doubly confirmed by considering what actually happens when the SEC approves a lawsuit. The Commission's decision is a limited one: "[t]he SEC [ ] decide[s] solely to authorize its [s]taff to ask a federal court to decide whether there is a violation of law." Expert Report of Former SEC Chairman Harvey Pitt ("Pitt Report") at ¶ 31 (Ex. 18). In the context of this case, former SEC Chairman Michael Piwowar explains that "[t]he filing of the SEC Complaint does not constitute a determination on an official basis by the U.S. Securities and Exchange Commission that XRP constitutes a security for any time period." Expert Report of Former SEC Acting Chairman Michael Piwowar ("Piwowar Report") at ¶

---

[9] The court in *United States v. Gluk*, 831 F.3d 608, 614 (5th Cir. 2016) concluded otherwise as to Rule 803(8), but as the court in *Klein* explained, "the *Gluk* court appears to have glossed over the very real distinctions between factual findings and allegations and engaged in no real inquiry into whether the statements at issue constituted factual findings." *Klein*, 2017 WL 1316999, at *3.

18

16 (Ex. 19).  Instead, "[t]he filing indicates only that a majority of the Commission, then voting, determined that the question is *litigable*."  *Id.* (emphasis added).

As former SEC Commissioners Pitt and Piwowar confirm, the Commission does not determine or find the truth of any allegation in an SEC complaint.  SEC complaints, like every single civil complaint, only contain allegations and begin (as in the case against Ripple) with the statement the Securities and Exchange Commission "alleges" certain facts and claims.  *See, e.g.*, Ex. 14 (SEC Complaint). Notably, the SEC Complaint against Ripple does not state, ███████████████ that the SEC has determined anything.  Pitt Tr. at 196:4-13 (Ex. 20).  This is because the allegations in these complaints are "not determinations or findings of the Commission."  Piwowar Report at ¶ 16; Pitt Report at ¶ 32.  This conclusion follows from the fact that "[t]he process by which the SEC authorizes the filing of litigation is not a fact-finding exercise."  Pitt Report at ¶ 34.  "[The] Commissioners do not assess or evaluate the veracity of the allegations of civil actions filed for the SEC." *Id.*  Indeed, as former Commissioner Pitt notes: "SEC Commissioners *rarely even see copies of complaints filed on the SEC's behalf*."  Pitt Report at ¶ 33 (emphasis added).  Commissioner Piwowar similarly confirmed that ██████████████ ███████████████████████████████  Piwowar Tr. at 109:22-110:1 (Ex. 21).  The Commission does not determine on an "official basis" the truth of allegations in complaints that they do not even see.

19

Tetragon's resort to Rule 11 is misplaced.  Tetragon cites no instance when the Rule has been applied to the Commission.  Moreover, Rule 11 merely requires that a complaint not be filed for an improper purpose, not make frivolous arguments, and not allege facts with no evidentiary support whatsoever.  Fed. R. Civ. P. 11.  Rule 11 itself permits parties to file complaints even if they are not "warranted by existing law," so long as a "nonfrivolous argument" can be made for "extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).  And despite Rule 11, courts regularly permit parties to make allegations on information and belief, and to plead alternative theories.  Indeed, the Advisory Committee Notes explain that "[t]he certification [required by Rule 11] is that there is (or likely will be) 'evidentiary support' for the allegation, *not that the party will prevail with respect to its contention regarding the fact*."  Fed. R. Civ. P. 11 Advisory Committee's Note (emphasis added).  This is a far cry from an official governmental determination that the allegations are true.

The plain meaning of "determined on an official basis" does not include the initiation of the SEC enforcement action.

### 2.    Federal Law Shows Which SEC Actions Could Constitute Determinations On An Official Basis

While the filing of an enforcement action is not a determination on an official basis by the Commission for the reasons described above, federal law identifies

multiple ways in which the Commission *could* reach a determination on an official basis, all of which could have triggered the Securities Default provision here had they occurred (but they did not). One avenue is through an administrative enforcement proceeding. As Tetragon's ███████ acknowledged,[10] there are two ways the SEC can bring enforcement proceedings: (1) a civil claim in federal district court; or (2) an internal administrative proceeding. *See* 15 U.S.C. §§ 77h-1(a), 77t(b); 17 C.F.R. § 202.5(b). As discussed above, if the SEC chooses to file a lawsuit in a federal court, the Commission votes to permit its Staff to litigate the issue and seek a determination from a judge. *See* Pitt Report at ¶ 23.

On the other hand, if the SEC opts to proceed administratively, federal law explicitly states that it is the Commission that "determines" the case when it reviews the decision of an administrative law judge and the underlying record in the administrative proceeding.[11]  17 C.F.R. § 201.460 ("***The Commission shall determine*** each matter on the basis of the record.") (emphasis added); *see also* Pitt Report at ¶ 24; Piwowar Report at ¶16. This is a formal adjudicatory process in

---

[10] ████████████████████████████████████████

[11] Indeed, guidelines issued by the SEC Enforcement Division on when to recommend civil litigation or administrative enforcement actions specifically state that if a "Commission decision on . . . issues" is desired in light of the Commission's expertise, Staff should consider recommending an administrative action, as opposed to civil litigation. *See* Ex. 22 (emphasis added).

21

which the Commission functions like a court and reaches determinations, findings of fact, and conclusions of law, after litigation before an Administrative Law Judge. Pitt Report at ¶ 27. Indeed, federal regulations define an administrative enforcement proceeding as "an action, initiated by an order instituting proceedings, ***held for the purpose of determining*** whether or not a person" has violated the federal securities laws. 17 C.F.R. § 201.101(a)(4) (emphasis added). By way of contrast, no law, regulation, or manual states that the Commission could determine that an instrument is a security through a Wells notice or by authorizing its Staff to litigate in federal court.

In addition, as Tetragon has acknowledged, the Commission may make determinations on an official basis in Reports of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934. Section 21(a) expressly states that such reports describe the findings of the Commission pursuant to investigations it "deems necessary ***to determine*** whether any person has violated, is violating, or is about to violate any provision of this chapter" or other rules. 15 U.S.C. § 78u(a)(1) (emphasis added). In 2017, the SEC issued a Section 21(a) report on "The DAO," an entity seeking to sell cryptocurrency "tokens" to alleged investors. *See* Ex. 23. Pursuant to its authority under Section 21(a), the Commission issued a report expressly stating that: "Based on the investigation, and under the facts presented, the

Commission has ***determined*** that DAO Tokens are securities . . ." *Id.* at 1.  The DAO report did not say "the Commission alleges . . . ."

The Commission also, of course, makes a determination on an official basis when it issues rules and regulations pursuant to the procedures set forth in the Administrative Procedure Act ("APA").  5 U.S.C. §551 *et seq.*  The Commission votes to authorize the issuance of rules, which are definitive statements of the Commission that carry the force of federal law.

The Commission may also make determinations on an official basis by voting to enter into settlements to resolve disputes.  By regulation, the Commission may only enter into settlements of administrative enforcement proceedings upon issuing an order containing its findings.  *See* 17 C.F.R. § 201.240(c)(7) ("Final acceptance of any offer of settlement will occur only upon the issuance of findings and an order by the Commission.").

These several examples confirm that the Commission has mechanisms to *determine* facts and conclusions of law that do not include the Commission's decision to authorize its Staff to *allege* facts and conclusions of law in a civil complaint.[12]

---

[12] Tetragon cites the notice provision of the Agreement to support its argument. Opening Brief at 35.  If anything, this argument cuts against Tetragon's position, as no notice was necessary to inform Tetragon of the SEC's Complaint, a highly

23

### 3. The Sole "Settlement" Example Confirms That Allegations In A Complaint Do Not Trigger A Securities Default

The Agreement's reference to a "settlement" as the only example of a Securities Default also supports Ripple's interpretation and is fatal to Tetragon's position. Every single SEC settlement first requires the authorization and filing of an enforcement proceeding—either a complaint in a civil lawsuit or an Order Instituting Proceedings (an "OIP," which is used to initiate administrative proceedings) in an administrative proceeding. Pitt Report at ¶ 47. To be clear—there can be no settlement with the SEC without the filing of an underlying action (either a civil lawsuit or an administrative proceeding). If the mere filing of a complaint or an OIP alone triggered a Securities Default, as Tetragon claims, there would never be a case where a settlement was necessary to trigger a default, rendering the sole example in the provision obsolete. The Court should reject an interpretation of the Stockholders' Agreement that turns its sole example into surplusage. *See Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)

---

publicized event. Wells notices are not public, but no notice was required of that event because it clearly did not constitute a Securities Default. And parties are of course free to contract for the right to "notice" of events that are public. In any event, Ripple told Tetragon about the Wells notice.

("We will read a contract as a whole and we will give each provision and term effect, so as not to render any part of the contract mere surplusage.").[13]

The inclusion of settlements as the only example in the operative provision is inconsistent with Tetragon's proposed interpretation in other ways as well. While complaints *initiate* disputes to be resolved later in time by an adjudicator, settlements—like other determinations—*resolve* disputed issues. Moreover, as noted above, federal law requires SEC administrative settlements to contain what SEC complaints never do: "findings" of the Commission. *See* 17 C.F.R. § 201.240(c)(7) ("Final acceptance of any offer of settlement will occur only upon the issuance of findings and an order by the Commission."). The inclusion of the sole settlement example thus confirms that the mere filing of a complaint is not a Securities Default.[14]

---

[13] ███████████████████████████████████████████████████
███████████████████████████████████████ Côté Tr. at 10:3-11:6.

[14] As recently as February 12, 2021, SEC Commissioners issued a public statement confirming that settlements with the SEC are used to "resolve both the claimed violations of federal securities laws and the [regulatory] collateral consequences that sometimes arise" therefrom.
https://www.sec.gov/news/public-statement/peirce-roisman-statement-contingent-settlement-offers-021221#_edn1

### 4.   The Structure Of The Securities Default Provision Confirms That There Has Been No Default

The structure of the Securities Default provision also runs against Tetragon's interpretation. The provision clearly provides for the possibility that the issue of XRP's status may be submitted to and determined by a court. It states that a default can be triggered *either* by an official determination "by the U.S. Securities and Exchange Commission (*or* (1) another governmental authority or (2) a governmental agency of similar stature and standing)." *See* Compl. Ex. A (Stockholders' Agreement) at § 5.4 (emphasis added). *See Chicago Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 916-17 (Del. 2017) (reversing where the trial court "failed to give adequate weight to the structure of the Purchase Agreement" in construing its terms).

Courts are, of course, governmental authorities—*see* Jackson Tr. at 267:10-12 ███████████████████████████████████████████████ ██—capable of determining whether an instrument is a security. Indeed, such determinations are regularly rendered by courts. *See, e.g.*, *Equitable Tr. Co. v. Marshall*, 25 Del. Ch. 238, 17 A.2d 13, 15 (1940) (stating that "whether [the

instruments at issue] are 'securities' . . . is the question to be determined" by the court).[15]

Mr. Griffith's testimony on this subject illustrates the problems with Tetragon's view of the provision.  When asked whether ████████████████████ ████████████████████████ Mr. Griffith testified ████████████████████ Griffith Tr. at 101:6.  At the same time, Mr. Griffith ████████████████████ ████████████████████████████████████████ First, he testified that ████████████████████████ *Id.* at 101:8.  When reminded   that   ████████████████████████████████ ████████████████████████████████, Mr.  Griffith ████████████████████████████████ *Id.* at 102:6- 21.    ████████████████████████████████████████

████████████████████████████

---

[15] Tetragon engages in a series of hypothetical questions in an attempt to ascertain what would constitute a "final court judgment" that would trigger the Securities Default provision.  Opening Brief at 26.  These questions are irrelevant, as the contract does not require a "final court judgment," and Ripple has never asserted that it does.  A judgment by the federal court overseeing the SEC enforcement action would constitute such a determination.

**B.      Nothing Has Been Determined By The Commission Through A Wells Notice**

After arguing heavily at the TRO stage that Ripple has been in constant breach of the Stockholders' Agreement based on the Wells notice constituting a Securities Default (TRO Opening Brief at 2), Tetragon has largely abandoned its argument that the Commission has determined anything on an official basis through the Wells notice.  Tetragon's own expert refuses to opine that this is a Securities Default.  *See generally* Jackson Report (Ex. 24) (not opining that the Wells notice triggered a Securities Default); *see also* Jackson Tr. at 29:8-14 ██████████████ ████████████████████████████████████████████[16]  Tetragon devotes less than two pages to the argument in its preliminary injunction brief, even inviting the court to "not reach the question."  Opening Brief at 28.

There is good reason for Professor Jackson's hesitance and Tetragon's retreat: it should be noncontroversial that a Wells notice is not a determination of *anything by the Commission*.  The Commission is "composed of five commissioners to be appointed by the President by and with the advice and consent of the Senate."  15 U.S.C. § 78d(a).  The Commission is distinct from SEC Staff, who are not appointed

---

[16]  Professor Jackson—who ████████████████████████████ ████████████████████  Jackson Tr. at 25:18-42:21.

28

or confirmed and serve as career employees.  *See Lucia v. S.E.C.*, 138 S. Ct. 2044, 2049 (2018) (distinguishing between the Commission and SEC Staff).  Wells notices merely indicate that SEC *Staff* is *preliminarily considering* making *recommendations* to the Commission; they do not evidence any determination by the Commission itself, "on an official basis" or otherwise.

Multiple courts have squarely held that Wells notices are not determinations by the SEC.  "A Wells notice only informs an individual or company that the SEC Enforcement Division Staff is considering recommending that the SEC file an action, **but the SEC itself has not yet determined whether or not to bring a case**." *In re Lions Gate Entm't Corp. Secs. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016) (emphasis added).  "A party's entitlement to make a Wells submission is 'obviously based on recognition that **staff advice is not authoritative**.'"  *Richman v. Goldman Sachs Gp., Inc.,* 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) (emphasis added).[17]

---

[17] Tetragon relies heavily on the SEC Enforcement Manual, but as the Manual states at its outset, it has no force of law.  SEC Div. of Enf't, Enforcement Manual, 1 (2017) (stating that Manual is "not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal").

Former SEC Commissioners Harvey Pitt and Michael Piwowar confirm these points.[18]  *See* Pitt Report at ¶¶ 50-59; Piwowar Report at ¶¶ 17-18.  The Commission is not even *consulted* about the issuance of Wells notices.  *See* Pitt Report at ¶ 52; Piwowar Tr. at 76:13-14, 78:9-12 ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

The Commission has ████████████████████████████████ Piwowar Tr. at 81:9-10 (emphasis added).

Tetragon attempts to blur the distinction between the Commission and Staff by arguing that the Wells notice was sent by "officials of the SEC," and thus must represent "official" determinations of the Commission.   Opening Brief at 28. Tetragon also emphasizes that Wells notices are "issued on SEC letterhead."  *Id.*

But the nature and legal status of a Wells notice is clearly not determined by its letterhead.   And Tetragon's semantic argument about "officials" of the SEC

---

[18] Commissioners Pitt and Piwowar offer expert testimony to assist the Court in understanding how the SEC in particular makes determinations on an official basis. *See Soo Line R.R. Co. v. Fruehauf Corp.*, 547 F.2d 1365, 1375 (8th Cir. 1977) (expert testimony on defendant's "noncompliance with the contract" properly admitted to interpret technical terms specific to industry); *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) ('a trial court's reliance on individuals experienced in a particular field for the purposes of obtaining explanation of the technical meaning of terms used in the industry is 'prudent.'").

reflects a fundamental misunderstanding of the agency, a distinction their own expert seemingly recognizes by refusing to support their position. The distinction between Staff and the Commission is a well-established and critical divide, carrying important legal implications ███████████████████████ *See* Former SEC Chairman Jay Clayton, *Statement Regarding Staff Views* (Sept. 13, 2018) (public statement from former SEC Chairman reminding of "the important distinction between the Commission's rules and regulations, on the one hand, and staff views on the other" and emphasizing that "it is the Commission and only the Commission" whose actions "have the force and effect of law"); Jackson Tr. at 99:4-13 ████████████████████████ Pitt Tr. at 37:2-5

████████████████████████████████████████████

████████████████████████████████████████████

*Lucia*, 138 S. Ct. at 2049 (distinguishing between the Commission and SEC Staff); *see also, e.g.*, *Koss v. Sec. & Exch. Comm'n of U. S.*, 364 F. Supp. 1321, 1326 (S.D.N.Y. 1973) ("staff comment letters do not represent the opinion of the Commission itself").

Perhaps most telling, the Staff may decide not to recommend an enforcement action after issuing a Wells notice. *In re Lions Gate*, 165 F. Supp. 3d at 19; Jean Eaglesham, *SEC Drops 20% of Probes After 'Wells Notice,'* The Wall Street Journal, October 9, 2013 ("In the two-year period that ended in September 2012,

31

159 of the 797 [20%] Wells notices issued went nowhere or stalled, according to the

SEC");[19] Jackson Tr. at 90:1-7 

Such Staff action simply cannot be a

Commission determination "on an official basis."[20]

### C.    Tetragon's Arguments About The "Context" Of The Stockholders' Agreement Lack Merit

Tetragon devotes significant effort to arguing about the supposed "business

context" in which the Agreement was negotiated.  These arguments do not override

the plain language of the Agreement.  Tetragon premises its argument on the notion

---

[19] *Available at* https://www.wsj.com/articles/SB10001424052702304500404579125633137423664.

[20] Tetragon argues that Wells notices are determinations on an official basis by the Commission because the Commission delegates authority to the Staff.  Opening Brief at 29-30.  But the authority to issue a Wells notice is not a power granted to the Commission that has in turn been delegated to Staff.  *See* 17 C.F.R. § 200.30-4. It is merely a technique, recorded in the SEC's "informal" procedures, developed by Staff, that Staff may or may not use at their sole discretion.  17 C.F.R. § 202.5; Piwowar Tr. at 80:1-6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Indeed, Staff do not take direction from the Commission; they work solely for its Chair.  *See* ▮▮▮▮▮ ; *see* Reorganization Plan No. 10 of 1950, 15 Fed. Reg. 3175 (March 13, 1950) (vesting the executive and administrative functions of the Commission in the Chairman, including "the appointment and supervision of personnel.").

32

that the parties knew the SEC was engaging in "regulation by enforcement," which Tetragon equates to the mere "filing of an enforcement action."  Opening Brief at 8, 31.  Whether or not "regulation by enforcement" is even relevant here—it is not— "regulation by enforcement" refers to the SEC filing and ***resolving*** multiple enforcement actions, leaving an industry to divine rules from the individual case ***resolutions***:



Alderoty Tr. at 93:7-21 (emphasis added); *see id.* at 96:1-4

It is against this backdrop that Ripple bargained for a provision requiring a determination on an official basis to be more than simply a set of allegations in a complaint.  *Id.* at 117:22-118:4

Tetragon argues that the parties "obviously" intended the SEC "filing [an] enforcement action" to be a trigger for the Securities Default provision. Opening Brief at 31. But if this were in fact so "obvious," the parties would have crafted a provision that expressly stated it was triggered upon the SEC "filing [an] enforcement action." Indeed, ███████████████████████████████████████

███████████████████████████████████████████████████

Griffith Tr. at 106:8-15. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ It makes "no commercial sense" for Tetragon to have behaved this way if it truly sought the trigger mechanism Tetragon now claims was so important. The reality is that

███████████████████████████████████████████████████

██████████████████████████████████████ Griffith Tr. at 106:8-15. The evidence simply does not support Tetragon's arguments about what the sophisticated parties to this Agreement "obviously" understood.

Tetragon's "business context" argument asks this Court to amend the plain meaning of the Agreement's text to ensure that Tetragon has an immediate right to exit in the face of any adverse financial consequence that may arise from the publication of a dispute with the SEC. But Tetragon did not bargain for that right and does not have that right. Tetragon's right to redemption is not immediate; rather,

34

per the Securities Default provision, any right to redemption does not arise for 60 days after Tetragon provides notice.[21]   The purported "market[] reaction[s]" discussed in Tetragon's brief, Opening Brief at 18, all occurred *within 60 days* of the filing of the complaint.[22]   Moreover, the Agreement expressly envisions multiple paths to a Securities Default that could take place well after an SEC investigation or complaint became public—settlements and determinations by "governmental authorities," including courts.

The plain language reading of the Securities Default provision gives Tetragon ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

Prince Tr. at 57:11-19.   But even as a preferred stockholder, Tetragon cannot leapfrog the rights of other stockholders without a contractual right having been triggered.  *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 937 (Del. 1979) ("the rights of the preferred shareholders as against the common shareholders are fixed by the contractual terms agreed upon when the class of preferred stock is created").  In

---

[21] Thus, even if the filing of the SEC's Complaint triggered a default—which it did not—Tetragon would not be entitled to redemption until February 22, 2020.

[22] Tetragon spends much time discussing the predicted consequences of a filed enforcement action on the XRP secondary market. While that is true and obvious, that is very different from the consequences to Ripple's business. *See infra* Section I.E.2.

the context of a company that undisputedly does not carry debt, Opening Brief at 6, that currently holds ███████████████████ on its balance sheet, and that forecasts ███████████████████, the notion that this right is "worthless" under its plain meaning (Opening Brief at 32) is unsupported, made-for-litigation rhetoric.

### D.   <u>Tetragon's Attacks On Ripple's Experts Are Not Well Taken</u>

Tetragon spends nearly seven pages of its brief attacking the credentials of Ripple's experts and attempting to poke holes in tertiary aspects of their analysis. Opening Brief at 43-49.  These attempts fail.

Tetragon *leads the merits section of its brief* with the assertion that Professor Jackson has "more recent Commission experience than either of Ripple's experts." Opening Brief at 21-22.  This is true, by a grand total of 18 months.  Tetragon fails to note that the combined experience of Mr. Pitt and Dr. Piwowar add up to triple the experience of Professor Jackson, and that both of Ripple's experts served as SEC Chairman at different times, while Professor Jackson was a Commissioner who served other chairmen.[23]

---

[23] Tetragon's counsel stated earlier in these proceedings that they "were confident" they could identify another Commissioner to serve as an expert that shared Professor Jackson's views.  *See* Jan. 15, 2021 TRO Tr. at 8.  They never did.

Tetragon's efforts to challenge the bases for Commissioners Pitt and Piwowar's opinions (Opening Brief at 45) are not well taken. Both served as Commissioners for years, voting on thousands of enforcement actions and other matters, and chaired the Commission at different periods. Their experience provide more than a sufficient basis to opine on how the Commission does and does not make determinations on an official basis. Indeed, Dr. Piwowar was one of the longest-serving recent Commissioners, spending nearly five years on the Commission between 2013 and 2018 (more than twice the length of Professor Jackson's tenure). Piwowar Report at ¶ 8. And Commissioners Pitt and Piwowar's opinions are confirmed by ample legal authority, including federal regulations, case law, and dictionary definitions.

Professor Jackson, on the other hand, offers unsupported opinions.[24] Professor Jackson claims that when the Commission votes to authorize its Staff to

---

[24] In a revealing portion of his testimony, Professor Jackson testified that ███████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████ Jackson Tr. at 84:22-88:6. The Wells notice in this case has none of these things, because no Wells notice ever would. █████████████████████████████ ██████████████████████████████. Pitt Tr. at 202:10-209:20. As Commissioner Pitt explained, ██████████████████

litigate an issue before a federal judge, "there can be no serious doubt" that it has "made the 'official' 'determination'" regarding the underlying allegations. Jackson Decl. at ¶ 25. Yet no federal law or regulation says that the Commission is determining the disputed issues when it votes to authorize a suit (unlike the regulations that expressly state as much in the context of administrative actions). No SEC internal guidance says as much, nor does any law, book, dictionary, or any other source.

Tetragon suggests that it would be impossible or illegal for the SEC to issue a rule determining that XRP in particular is a security. Opening Brief at 46. But the SEC has in fact engaged in rulemaking with particularized impact in the past. *See* Pitt Report at ¶ 21 n.9 (citing *PBW Stock Exchange, Inc.* v. *SEC*, 485 F.2d 718 (3rd Cir. 1973), *cert. denied*, 416 U.S. 969 (1974)). Indeed, even Professor Jackson does not agree with Tetragon's illegality position, and instead asserts that rulemaking "targeting a particular entity is exceedingly rare." Jackson Report at ¶ 45. And neither Commissioner Pitt nor Piwowar has ever contended that the only way, nor even the most probable way, that the Securities Default provision in this case could be triggered is by rulemaking. Both merely explain that rulemaking is one way

_____

█████████████████████████████████████████████. *Id.* at 209:9-20.

among several that the Commission can and does make determinations on an "official basis."

### E. Both Extrinsic Evidence And The Forthright Negotiator Principle Confirm That No Securities Default Has Occurred

As set forth above, the Securities Default language unambiguously shows that no default has occurred. Both parties argue that the Securities Default language is unambiguous. As such, no extrinsic evidence should be considered by this Court. *See Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.").

Extrinsic evidence comes into play if, and only if, the Court concludes that the contract's terms are ambiguous, a position neither party advances. *Id*. at 1232. Extrinsic evidence may include "the parties dealings during the negotiations and other relevant surrounding circumstances," "overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry." *U.S. W., Inc. v. Time Warner Inc*., 1996 WL 307445, at *16 (Del. Ch. June 6, 1996); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007).

If the Court does determine that extrinsic evidence is appropriate, the extrinsic evidence here leaves no doubt that Tetragon's redemption right is not triggered by the Wells notice or the SEC Lawsuit.

1.   **Extrinsic Evidence Confirms That The Only Objectively Reasonable Meaning Of The Securities Default Provision Does Not Include The Filing Of An SEC Lawsuit Or Issuance Of A Wells Notice**

Tetragon claims that it is "without contradiction" that the Securities Default provision has been triggered, and that Tetragon was "adamant" during negotiations that it need not await the outcome of "a lengthy judicial process or otherwise" in order to exercise its redemption rights.  Opening Brief at 10; Griffith Decl. ¶ 20.[25] But this claim *is* contradicted—not only by the plain language of the provision (*supra* at Section I.A.1), but by the parties' dealings during negotiations and surrounding circumstances.

Tetragon knew that Ripple would not agree to a Securities Default provision that would be triggered by allegations in an enforcement action complaint or a Wells

---

[25] Mr. Griffith's self-serving declaration is belied by the fact that, at his deposition, he could not even remember whether or not he made the statement he claims Tetragon was "adamant" about.  Mr. Griffith claims in his declaration submitted in support of Tetragon's motion that *he* "reiterated to Messrs. Garlinghouse and Will that [*he*] was adamant that Tetragon have the ability to redeem the investment immediately if Ripple was not able to resolve the SEC's investigation on favorable terms."  Griffith Decl. ¶ 22.  However, at his deposition three days earlier, ████████

notice.  Mr. Griffith claimed in his deposition that ███████████████

██████████████████████████████████ Griffith

Tr. at 104:8-105:13.  He was then asked, █████████████████

████████████████████████████████████████

██████████████████ Griffith answered that ██████

████████████████████████████████████████

██████████████████████████ Griffith Tr. at

105:6-106:3.

Tetragon's counsel, realizing the devastating impact of Mr. Griffith's

concession, asked leading follow-up questions of Mr. Griffith on this point at the

end of the deposition.[26]  But Tetragon could not then, and cannot now, un-ring the

bell that Mr. Griffith dinged when he conceded Ripple was correct.  When asked███

████████████████████████████████████████

██████████████████████████ Mr. Griffith unequivocally

_____

████████████████████████████████████████

██████████████████████ *Compare* Griffith Decl. ¶

22, *with* Griffith Tr. at 64:1-65:20.

[26] In an attempt to rewrite his client's testimony, Tetragon counsel inquired: ███

████████████████████████████████████████

██████████████ Griffith Tr. at 121:22-122:13.

responded: ███████████████████████████████████████████

████████████████████████████████████████ *Id.* at 106: 8-15

(emphasis added).

Armed with this understanding, at best, ████████████████████████

████████████████████████████████████ Prince Tr. at

66:11-67:16.[27]

Knowing that ████████████████████████████████████████

███████████████████████ (Griffith Tr. at 106:8-15), █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



████████████████████████ Prince Tr. at 68:13-70:4. *Tetragon* was the party that first drafted and circulated the Securities Default provision at the center of this dispute (Ex. 8); ████████████████ and Tetragon created revisions to the Agreement (Ex. 25); Ex. 9 at –606; Ex. 26. This record, and the principle that contract ambiguity is construed against the drafter, both support Ripple. *Bonham v. HBW Hldgs., Inc.*, 2005 WL 3589419, at *6 (Del. Ch. Dec. 23, 2005) ("If an ambiguity exists, the court must construe the contract language against the drafter."); *see also* Restatement (Second) of Contracts § 206 (1981); *KFC Nat'l Council & Advert. Co-op., Inc. v. KFC Corp.*, 2011 WL 350415, at *14 n.57 (Del. Ch. Jan. 31, 2011) ("It is also a well-established principle of contract law that ambiguities in contracts should be construed against the drafter. *See, e.g.*, 11 WILLISTON ON CONTRACTS § 32:12 (4th ed. 2010)").

Indeed, Delaware law recognizes that a court should not impose obligations that the parties specifically chose not to include in the Agreement. *Zayo Gp., LLC v. Latisys Hldgs., LLC*, 2018 WL 6177174, at *12-13 (Del. Ch. Nov. 26, 2018) (The seller "very deliberately declined to agree to this [at-issue] language because it would ***never agree*** to a representation that would require it to isolate and disclose potential non-renewals. . . . [the parties] chose not to include [the at-issue obligations] . . . ***There is no room for this Court to impose those obligations now***.") (emphasis added).

2.     **Tetragon's Self-Serving Testimony Is Contradicted By The Contemporaneous Documents And Is Internally Contradictory**

The notion that Tetragon's ████████████████████████████

████████████████████████ before it could be redeemed is nowhere to be found in the drafts or contemporaneous written communications, and indeed is contradicted by the original proposed Securities Default provision that Tetragon drafted and sent to Ripple—which included as a trigger "proceedings that result in the Company [Ripple] being liable." Ex. 8 at −502. *ATR-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 3783520, at *12-13, *18 (Del. Ch. Dec. 21, 2006), *aff'd sub nom.*, 930 A.2d 928 (Del. 2007) (declining to "credit [party]'s testimony" as made "to the contrary" of the "contemporaneous record," including contract drafting history, and finding such testimony "self-serving and untruthful").

Delaware courts also recognize that such testimony should be discounted when unsupported by contemporaneous documentary evidence. *Chesapeake Corp. v. Shore*, 771 A.2d 293, 307 (Del. Ch. 2000) (finding that the defendants' self-serving testimony lacked credibility because it was "quite curious, given the enormous importance the defendants place on this threat in the litigation" that "the minutes and contemporaneous notes of those board meetings are devoid of the mention of the latter threat"); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *11 (Del. Ch. Sept. 10, 2018) (holding that "contemporaneous

44

evidence" should be given more weight than made-for-litigation testimony "as it is free from the realities of litigation and closer in time to the events that transpired").

Here, Tetragon produced no contemporaneous evidence corroborating Messrs. Reade and Prince's testimony, not one contemporaneous email or communication referencing ███████████████████████████ which was raised for the first time in depositions. Indeed, the contemporaneous evidence says nothing about what Tetragon now claims was ███████████████████ ████████████████████████████████████████████████

Tetragon's January 2020 investment memo, the Tetragon business record that memorializes key facets of the deal and the factors relevant to Tetragon's decision to invest in the Series C Preferred Shares, is devoted *almost entirely* to discussing economic aspects of the deal. *Compare* Ex. 3 at −139), *with* Prince Tr. at 47:11-18, 71:11-21 (████████████████████████████████████████████ ████████████████████████████████████ The memo also discusses Tetragon's right to redeem, but says nothing about a purported desperation for a right of immediate redemption. It instead speaks only about a 3-5 year redemption horizon. Ex. 3 at -139 (referencing ability to redeem "in 3-5 years").

And the investment memo has a specific "risk" section that makes no mention of regulatory risks. *Id*. at −142. Nor has Tetragon produced a single other document from October through December 2019, when the parties were negotiating the

45

Securities Default provision, ███████████████████████████

████████████████

     Finally, Tetragon's made-for-litigation theory was contradicted by Tetragon's corporate representative, Sean Côté, Tetragon's General Counsel.  As Tetragon notes, a company's 30(b)(6) testimony "binds [it] under Rule 30(b)(6)," Opening Brief at 40-41.  Côté was involved in evaluating the investment, including the risks involved, and testified as Tetragon's corporate representative that ███████████

██████████████████████████████████████



     This testimony is important in multiple respects.  For one, Mr. Côté does not claim that Tetragon's ████████████████████████████

███████████████████████████████████████████

████████

---

28  *See also* Côté Tr. at 83:15-17 ███████████████████████████
███████████████████████████████████████████

In addition, Mr. Côté's 30(b)(6) testimony describes ███████████

██████████████████████████████████ *Id.* As

Tetragon well knows, ███████████████████████████

███████████████████████████████████████

███ Alderoty Tr. at 107:13-108:3.[29]  And as Tetragon has noted, Ripple ended

2020 with ████████████ in cash; it now has ██████ and is

forecasting to have ████████ in cash by the end of this year.  Opening

Brief at 6, 51; *see also* Ex. 27 at −*044 (board presentation dated January 28, 2021

projecting net income for 2021 of ██████  In short, Ripple is still executing on

its business plan as it was before.  This evidence all favors Ripple.

### 3.   The Parties' Negotiation History Supports Ripple

The parties' drafting history of the Securities Default provision further

supports Ripple's, not Tetragon's, interpretation of the provision.  The fact that

Tetragon drafted the term sheet (*supra* at Section b), included triggers and concepts

clearly geared toward finality (*supra* at Section I.A.1), and ████████████

███████████████████████████████████████

---

[29] Ripple ██████████████████████████ Côté Tr. at 59:11-
18.

██████ (Côté Tr. at 94:14-95:7; Griffith Tr. at 47:2-5; Ex. 9 at −606, −609; Ex. 10 at −136), all buttress Ripple's interpretation.

As Ripple's General Counsel, Stuart Alderoty, Ripple's ████████████████

█████████████████████████ (Alderoty Tr. at 119:12-120:10),

explained: ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

*Id.* at 117:22-118:4.  Ripple's intent was made clear to Tetragon through the drafting

history and the use of "determined" [30] and "on an official basis."[31]

─────────────────────

[30] ████████████████████████████████████

████████████████████ Alderoty Tr. at 122:9-14; *compare Determine,* BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("To terminate; to cease; to end.  To put an end to controversy by deciding the issue or issues, by making a settlement, or by adjustment . . . .").

[31] Tetragon's attempts to cast aspersions on Messrs. Garlinghouse and Will miss the mark.  Tetragon characterizes Messrs. Garlinghouse and Will as "Ripple's principal negotiators."  Opening Brief at 39-40.  But as the evidence shows: (1) ███████████ ████████████████████████████████████ (*supra*); (2) Tetragon's own witness, Mr. Griffith, testified that █████████████ ████ (Griffith Tr. at 43:5-17); (3) Mr. Garlinghouse, as Ripple's CEO, ████████████████████████████████████ and (4) Mr. Will—Ripple's former CFO, who left Ripple over five months ago and is the CFO of a new company—testified tha██████████████████████████████████

Delaware law well recognizes that communication of views through the exchange of drafts is a normal and appropriate way to negotiate.  *United Rentals, Inc.*, 937 A.2d at 819 (describing a negotiation conducted largely through the exchange of marked-up drafts); *Kotler v. Shipman Assocs., LLC*, 2019 WL 4025634, at *4-5 (Del. Ch. Aug. 21, 2019), *judgement entered*, (Del. Ch. Aug. 21, 2019) (same); *see also Zayo Grp.*, 2018 WL 6177174, at *12  ("[T]he drafting history of particular disputed provision(s) is often especially revealing of the process by which the parties reached a meeting of the minds and the ground on which that meeting occurred.").

### 4.   The Forthright Negotiator Principle Also Supports Ripple

"When making a determination regarding the 'shared intent' of the parties to an ambiguous contract, if a review of the extrinsic evidence does not lead the court to an 'obvious' conclusion, the court may apply . . . the 'forthright negotiator principle.'"  *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).  "[W]here ambiguity in contract language is not easily resolvable by extrinsic evidence, it may be necessary for the court, in considering alternative reasonable interpretations of contract language, to resort to evidence of what one side in fact

_____

(Will Tr. at 10:3-19), in other words, not the provisions governing the legal aspects of the Stockholders' Agreement.

49

believed the obligation to be, coupled with evidence showing that the other party knew or should have known of such belief.   This last principle of contract construction might be called the forthright negotiator principle." *U.S. W., Inc.*, 1996 WL 307445, at *11; *Hartley v. Consol. Glass Hldgs., Inc.*, 2015 WL 5774751, at *8 (Del. Ch. Sept. 30, 2015), *aff'd*, 137 A.3d 122 (Del. 2016) ("If extrinsic evidence renders no 'single, commonly held understanding of a contract's meaning,' that meaning might instead derive from operation of the forthright negotiator principle, which provides that one side's objectively reasonable interpretation becomes enforceable if the other party knew or had reason to know of the first's interpretation.").

If the Court determines that the extrinsic evidence discussed above does not lead it to an obvious conclusion, it may rely on the forthright negotiator principle to resolve the question, which further supports Ripple for multiple reasons.   First, Tetragon's witnesses testified that ███████████████████████████ ███████████████ (*supra* at p. 1, Section I.E.1), and ███████████████ ███████████████████ (*supra* at Section I.E.1).   Second, Tetragon knew and had reason to know—through the parties' negotiation history, the narrowing of the Securities Default provision over time, and the use of words like "settlement," "determined," and "on an official basis" (*supra* at Section I.E.2)—that the final provision would not be triggered at the beginning of an investigation or lawsuit, as

Tetragon now claims.  These facts show that Tetragon understood the true scope of the Securities Default provision—a scope that is very different from the one it now espouses to the Court.

> **5. Neither The SEC's Complaint Nor The Wells Notice State That XRP Is A Security On A Current And Going Forward Basis**

Neither the Wells notice nor the allegations in the SEC's Complaint triggers a "Securities Default" for an additional reason.  In order to trigger Tetragon's redemption rights, the official determination must be that XRP is a security on "a current and going forward basis."  Compl. Ex. A (Stockholders' Agreement) § 5.4.  This was not satisfied by either the Wells notice or the SEC Complaint.

The Wells notice provides no details whatsoever of the underlying facts at issue, but merely references potential violation of Sections 5(a) and (c) of the Securities Act of 1933.  Ex. 11 at –940).

As for the SEC Complaint, it does not seek a declaration of XRP's status as a security.  If the SEC were to prevail, it would obtain remedies for Ripple's past distributions of XRP and constrain Ripple's distributions of its XRP in the future.  That is what it asks for in its Prayer for Relief.

Tetragon also fails to note that the SEC did not seek either a temporary or preliminary injunction preventing Ripple's ability to continue to distribute

XRP. The SEC sought only a permanent injunction. Permanent injunctions are imposed only after final judgments by the court.

## II.    **TETRAGON HAS NOT SHOWN IRREPARABLE HARM**

Tetragon's brief focuses on purported harm to its asserted "protective" contractual rights. However, the Stockholders' Agreement does not actually provide such rights in the manner Tetragon alleges. In italics below is the portion of the sentence of a section of the Stockholders' Agreement that Tetragon cites as conferring it with protective rights:

> Upon receipt of a Redemption Request, the Company shall redeem the number of shares of Series C Preferred Stock specified in the Redemption Request at the Default Redemption Price, and *the Company shall apply all of its available cash and other liquid assets (including any available XRP the Company may lawfully use) to fund the payment of the redemption price in cash (and for no other purpose), except to the extent such redemption would violate Delaware law.*

Compl. Ex. A (Stockholders' Agreement) § 5.1 (emphasis added). Tetragon acknowledges that Ripple is not required to "redeem," as noted in the first part of the above provision, until 60 days after a valid notice of redemption (assuming no impairment).[32]

---

[32] Opening Brief at 34 ("That understanding is further confirmed by the short, 60-day clock (and immediate protective rights) that the parties agreed to on the occurrence of a Securities Default.").

Yet, Tetragon reads the second clause in the same sentence above ("the Company shall apply all of its available cash . . .") as imposing an *immediate* obligation.  Compl. Ex. A (Stockholders' Agreement) § 5.1.  Nothing in the plain language of this sentence supports such a reading, much less one that would somehow not apply to the first clause and only the second.  What this clause makes clear is that, *when* the time comes to redeem Series C, Ripple must use all of the cash and XRP it legally can to fund that redemption and for that purpose only.  And of course that question of "legally available funds" is one to be addressed by Ripple's Board after an actual "Securities Default."  *See* Jan. 15, 2021 TRO Tr. at 57:13-24.

Nor does the Agreement contemplate an escrow, as Tetragon has requested here.  Indeed, the parties clearly knew how to negotiate for such a term.  In an earlier provision of the same Agreement, the parties specifically set up an escrow obligation on Ripple with respect to potential redemption of Series A or B shares held by a Series C holder, *but not for redeeming the Series C shares themselves.*  Compl. Ex. A (Stockholders' Agreement) § 2.4 (detailing the provisions and obligation surrounding an escrow account).  This provision, which is inapplicable here, explicitly imposes an escrow obligation on Ripple, proscribes that Ripple "shall not be permitted to . . . otherwise use the Designated Funds," and gives Tetragon (and other Series C Stockholders) "leverage."  *Id.*  The language upon which Tetragon has been relying in this case does not, certainly not as Tetragon claims.

53

Discovery during this phase of the case has only strengthened the notion that Tetragon is not at risk of irreparable harm. ███████████ (as Tetragon raised as its fear in its TRO papers), the evidence shows that Ripple has ████

████████████████████.[33] ███████████████

████████████████ as Tetragon well knows.  Ex. 27. ████

█████████████████████ during the pendency of this litigation cannot be evidence of likelihood of irreparable harm. It instead shows that the water level in the proverbial bathtub is rising, not draining. Again, despite the picture that Tetragon has attempted to portray to this Court, Ripple ████████████████████████

Alderoty Tr. at 110:4-18, 107:13-108:3.

And as Ripple has noted previously, Delaware law recognizes that contractual provisions regarding irreparable harm are not dispositive on the issue.  *AM Gen. Hldgs. LLC v. The Renco Grp., Inc.*, 2016 WL 787929, at *2 (Del. Ch. Feb. 19, 2016) ("If the facts plainly do not warrant a finding of irreparable harm, this Court is not required to ignore those facts.").

---

[33] Opening Brief at 51 ("[A]lthough Ripple's cash position at year-end stood at ████ it now stands at ████████ (against a monthly run-rate of ████████ in costs).").

54

## III. THE BALANCE OF THE EQUITIES WEIGHS AGAINST THE INJUNCTIVE RELIEF TETRAGON SEEKS

The balance of equities in this case is clear.  Tetragon is seeking to leapfrog the Series A and B stockholders in Ripple and redeem its shares ███████████ ███ Prince Tr. at 16:4-17:6, based on a construction of the Stockholders' Agreement to which Tetragon's own lead negotiator ██████████████████ ██████████████ Griffith Tr. at 106:8-15.  The equities clearly do not favor such conduct.

Tetragon's ill motives are made clear by the fact that Tetragon began claiming default based solely on the issuance of a Wells notice *by SEC Staff*—an event that plainly does not constitute a determination on an official basis by the Commission.  Then, fixated on obtaining a windfall from an unfortunate turn for Ripple, Tetragon rushed into this Court making demonstrably false claims about Ripple's XRP sales in a verified complaint, Compl. ¶ 43, and asking this Court to issue extraordinary emergency relief based thereon.  The equities clearly do not favor such conduct.

This conduct is particularly troubling because Tetragon has never identified any concrete injury that it will suffer absent a preliminary injunction.  Indeed, it could not, as it is ultimately seeking money from a company it alleges is healthily ████████████████████████████ *See In re CNX Gas Corp. S'holders Litig.*, 4

55

A.3d 397, 420 (Del. Ch. 2010) ("Given the availability of monetary relief, the balance of the equities favors the denial of the motion for [injunctive relief].").

Moreover, Tetragon seeks what this Court has already determined to be a mandatory injunction, Jan. 15, 2021 TRO Tr. at 57:13-24, which are disfavored under Delaware law. *SI-Lake, Inc. v. Conroy*, 1994 WL 728824, at *4 (Del. Ch. Dec. 16, 1994); *see also C&J Energy Servs., Inc.*, 107 A.3d at 1071. Whether a redemption can be legally paid is, in the first instance, a question for Ripple's Board. *See, e.g., SV Inv. P'rs, LLC v. Thoughtworks, Inc.*, 7 A.3d 973, 984-990, n. 5 (Del. Ch. 2010).

The equities do not favor the extraordinary relief Tetragon seeks.

## **CONCLUSION**

For the foregoing reasons, Tetragon's motion for a preliminary injunction should be denied. Tetragon has not met its burden and is not entitled to any of the relief it seeks, even though Ripple would prefer to end its relationship with Tetragon, an investor that has sought to capitalize on an unfortunate situation by overstating its purported contract rights to the detriment of other stockholders.

However, if this Court concludes that a preliminary injunction is warranted, Ripple would agree to have its Board determine, as expeditiously as reasonably possible, what legally available funds Ripple has to fund a Tetragon redemption.

Alternatively, Ripple would agree to a continuation of the TRO until such time as these issues may be resolved at trial.

Ripple also respectfully notes for the Court that the issue of whether Ripple's distributions of XRP are subject to the federal securities laws is not a question pending before Your Honor, as that is a decision still to be determined by a federal court in New York presiding over the SEC's enforcement action.


OF COUNSEL:

David M. Grable
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3000

Marlo A. Pecora
Matthew B. Fox
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

Dated:  February 13, 2021

*/s/ Michael A. Barlow*
Michael A. Barlow (#3928)
Adam K. Schulman (#5700)
ABRAMS & BAYLISS LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware  19807
(302) 778-1000

*Attorneys for Defendant
Ripple Labs Inc.*


Words: 13,601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2021, my firm served true and correct copies of the *Public Version of Defendant's Answering Brief in Opposition to Plaintiff's Motion for Preliminary* upon the following counsel of record via File & Serve*Xpress*:

Garrett B. Moritz, Esq.
Elizabeth M. Taylor, Esq.
Ross Aronstam & Moritz LLP
100 S. West Street, Suite 400
Wilmington, Delaware 19801

  */s/ Adam K. Schulman*
Adam K. Schulman (#5700)