UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION, :
:
Plaintiff, :   20 Civ. 10832 (AT) (SN)
:
- against - :   ECF Case
:
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, :
and CHRISTIAN A. LARSEN, :
:
Defendants. :
:
------------------------------------------------------------------------x


## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO STRIKE DEFENDANT RIPPLE LABS, INC.'S FOURTH AFFIRMATIVE DEFENSE

Jorge G. Tenreiro
Dugan Bliss
Daphna A. Waxman
Jon A. Daniels
Ladan F. Stewart

*Counsel for the Plaintiff*
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)


April 22, 2021

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................. 3

    I.   Ripple Knew the Federal Securities Laws Could Apply Before It Sold Any XRP. ................ 3

        A.   The Prosper Order ........................................................................................... 3

        B.   Larsen and Ripple's Other Founders Received a Reputable Global Law Firm's Opinions in 2012 Outlining the Risks that the Federal Securities Laws Could Apply to the Offer and Sale of What Is Now Known as XRP. ......................... 4

    II.  Ripple Ignored the Legal Advice It Had Received in Order To Raise Hundreds of Millions of Dollars to Fund Its Operations. ................................................................. 7

    III.  The SEC Provided Guidance in the Digital Asset Space .............................................. 9

    IV.  The SEC's Investigation Into Ripple .......................................................................... 11

RIPPLE'S FOURTH AFFIRMATIVE DEFENSE .............................................................. 14

STANDARD OF REVIEW .................................................................................................... 15

ARGUMENT ......................................................................................................................... 16

    I.   Fair Notice to Ripple Does Not Turn on any SEC Interpretation or Failure to Act. ............ 16

    II.  Using the Appropriate Test for Fair Notice, the Securities Act's Definition of "Investment Contract" Is Not Unconstitutionally Vague. ............................................ 22

        A.   The Second Circuit and Other Federal Courts Have Uniformly Rejected Vagueness Challenges to the Statutory Term "Investment Contract." ...................... 23

        B.   The Securities Act Does Not Invite Arbitrary Enforcement. ................................... 26

        C.   Ripple Had Actual Notice that XRP Could Be Treated as Securities. ........................ 27

    III.  Ripple Cannot Assert Equitable Defenses Against the SEC As a Matter of Law. ............... 28

    IV.  The SEC Has Been and Will Continue to Be Prejudiced by the Affirmative Defense. ......... 29

CONCLUSION ....................................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................15

*Advance Pharm., Inc. v. United States,*
391 F.3d 377 (2d Cir. 2004) ...................................................................................28

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................15

*Boyce Motor Lines, Inc. v. United States,*
342 U.S. 337 (1952) ................................................................................................26

*Chasins v. Smith, Barney & Co.,*
438 F.2d 1167 (2d Cir.1970) ..................................................................................18

*Continental Mktg. Corp. v. SEC,*
387 F.2d 466 (10th Cir. 1967) ..........................................................................25 Fn.8

*Copeland v. Vance,*
893 F.3d 101 (2d Cir. 2018) .......................................................................22, 26, 27

*Dickerson v. Napolitano,*
604 F.3d 732 (2d Cir. 2010) ...........................................................................22, 23

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) ................................................................................................17

*FTC v. Ken Roberts Co.,*
276 F.3d 583 (D.C. Cir. 2001) ...............................................................................19

*FTC v. Wyndham Worldwide Corp.,*
799 F.3d 236 (3d Cir. 2015) ...................................................................................17

*General Media Comms v. Cohen,*
131 F.3d 273 (2d Cir. 1997) ...................................................................................22

*GEOMC Co., Ltd. v. Calmare Therapeutics, Inc.,*
918 F.3d 92 (2d Cir. 2019) ...............................................................................15, 29

*Glen-Arden Commodities, Inc. v. Costantino,*
493 F.2d 1027 (2d Cir. 1974) ......................................................................10 Fn.4, 24 Fn.7

*Graham v. SEC,*
  222 F.3d 994 (D.C. Cir. 2000) ..................................................................................... 19

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ..................................................................................................... 23

*Hill v. Colorado,*
  530 U.S. 703 (2000) ..................................................................................................... 22

*Iosello v. Leiblys, Inc.,*
  502 F. Supp. 2d 782 (N.D. Ill. 2007) ......................................................................... 23

*Irvine v. 233 Skydeck, LLC,*
  597 F. Supp. 2d 799 (N.D. Ill. 2009) ......................................................................... 23

*Klein v. SEC,*
  224 F.2d 861 (2d Cir. 1955) ....................................................................................... 19

*Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,*
  135 F.3d 266 (3d Cir. 1998) ....................................................................................... 18

*Reno v. American Civil Liberties Union,*
  521 U.S. 844 (1997) ..................................................................................................... 22

*Revak v. SEC Realty Corp.,*
  18 F.3d 81 (2d Cir. 1994) ........................................................................................ 5, 6

*Reves v. Ernst & Young,*
  494 U.S. 56 (1990) ................................................................................................... 5, 6

*SEC v. Alpine Sec. Corp.,*
  982 F.3d 68 (2d Cir. 2020) ......................................................................................... 20

*SEC v. Am. Growth Funding II, LLC,*
  No. 16-cv-828, 2016 WL 8314623 (S.D.N.Y. Dec. 30, 2016), *adopted in full,* 2017 WL 8314623
  (S.D.N.Y. Dec. 30, 2016) ..................................................................................... 16, 30

*SEC v. Brigadoon Scotch Distrib. Co.,*
  480 F.2d 1047 (2d Cir. 1973) ........................................................................ 23, 24 & Fn. 7

*SEC v. Cuban,*
  798 F. Supp. 2d 783 (N.D. Tex. 2011) ....................................................................... 30

*SEC v. Culpepper,*
  270 F.2d 241 (2d Cir. 1950) ................................................................................. 19, 29

*SEC v. Edwards,*
  540 U.S. 389 (2004) ..................................................................................................... 23

iv

*SEC v. Feng,*
  935 F.3d 721 (9th Cir. 2019) ..............................................................................25 Fn.8

*SEC v. Gulf & Western Indus., Inc.,*
  502 F. Supp. 343 (D.D.C. 1980) ....................................................................................29

*SEC v. Keating,*
  No. 91 Civ. 6785, 1992 WL 207918 (C.D. Cal. July 23, 1992) ....................................29

*SEC v. Kik Interactive, Inc.,*
  No. 19 Civ. 5244 (S.D.N.Y. June 4, 2019) ................................................................9-10

*SEC v. Kik Interactive, Inc.,*
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) .............................................................23, 25, 26, 27

*SEC v. KPMG LLP,*
  No. 03 Civ. 671, 2003 WL 21976733 (S.D.N.Y. Aug. 20, 2003) ............................15, 29-30

*SEC v. Laura,*
  No. 18 Civ. 5075, 2020 WL 8772252 (E.D.N.Y. Dec. 30, 2020) ............................... 15, 16

*SEC v. McCaskey,*
  56 F. Supp. 2d 323 (S.D.N.Y. 1999) ............................................................................29

*SEC v. Morgan, Lewis & Bockius,*
  209 F.2d 44 (3d Cir. 1953) ............................................................................................19

*SEC v. PlexCorps,*
  No. 17 Civ. 7007 (E.D.N.Y. Dec. 1, 2017) ..................................................................10

*SEC v. REcoin Group, Inc.,*
  No. 17 Civ. 5725 (E.D.N.Y. Sept. 29, 2017) ...............................................................10

*SEC v. Scoville,*
  913 F.3d 1204 (10th Cir. 2019) ..............................................................................25 Fn.8

*SEC v. SG Ltd.,*
  265 F.3d 42 (1st Cir. 2001) ......................................................................................25 Fn.8

*SEC v. Telegram Grp. Inc.,*
  No. 19 Civ. 9439 (S.D.N.Y. Oct. 11, 2019) ..................................................................9

*SEC v. Telegram Grp. Inc.,*
  448 F. Supp. 3d 352 (S.D.N.Y.) ...........................................................................10 Fn.4

*SEC v. Torr,*
  22 F. Supp. 602 (S.D.N.Y. 1938) .................................................................................19

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ............................................................................................................*passim*

*SEC v. Volkswagen AG*,
    __ F. Supp. 3d __, 2021 WL 451667 (N.D. Cal. Feb. 4, 2021) ................................. 16, 29

*Sullivan v. Barclays PLC*,
    No. 13 Civ. 2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ................................. 3 Fn.2

*United States v. Angell*,
    292 F.3d 333 (2d Cir. 2002) ........................................................................................ 29

*United States v. Bowdoin*,
    770 F. Supp. 2d 142 (D.D.C. 2011) ............................................................................ 25

*United States v. Farhane*,
    634 F.3d 127 (2d Cir. 2011) ........................................................................................ 26

*United States v. Farris*,
    614 F.2d 634 (9th Cir. 1979) ...................................................................................24 Fn.7

*United States v. Kay*,
    513 F.3d 432 (5th Cir. 2007) ................................................................................. 26, 27

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) .................................................................................... 23, 27

*United States v. Smith*,
    985 F. Supp. 2d 547 (S.D.N.Y. 2014) .................................................................. 22, 23

*United States v. Summerlin*,
    310 U.S. 414 (1940) ..................................................................................................... 29

*United States v. Zaslavskiy*,
    No. 17 Cr. 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ................................*passim*

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ...................................................................................... 17, 27

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
    455 U.S. 489 (1982).........................................................................................21, 22, 27, 28

*WHX Corp. v. SEC*,
    362 F.3d 854 (D.C. Cir. 2004) .................................................................................... 20

**Statutes**

15 U.S.C. § 77b...................................................................................................................19

15 U.S.C. § 77e ........................................................................................................*passim*

15 U.S.C. § 78u(a) .................................................................................................2, 9

15 U.S.C. § 78z .........................................................................................................19

31 U.S.C. § 5330 .........................................................................................................8

**Rules**

Fed. R. Civ. P. 12(f) .......................................................................................1, 15, 29, 30

31 C.F.R. § 1022.380 ..................................................................................................8

**Other Authorities**

Jay Clayton and J. Christopher Giancarlo, *Regulators are Looking at Cryptocurrency*, Wall St. J., Jan. 24, 2018, *available at* https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363 ..........................................................................................10

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, 2017 WL 7184670 (July 25, 2017) .................................................*passim*

Ripple CEO:  3 reasons XRP token is not a security, June 21, 2018, *available at* https://finance.yahoo.com/news/ripple-ceo-3-reasons-xrp-token-not-security-181455786.html

SEC Chairman Jay Clayton, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 .............10

*SEC Enforcement Manual* § 2.3.4, *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf ...................................................21

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its motion under Fed. R. Civ. P. 12(f) to strike Defendant Ripple Labs, Inc.'s ("Ripple") fourth affirmative defense of "lack of Due Process and fair notice." For the reasons set forth below, the Court should grant the SEC's motion and strike the defense.

## PRELIMINARY STATEMENT

This action requires the Court to determine whether Ripple's offers and sales of a digital asset called XRP were offers and sales of "investment contracts" and thus "securities" under the Securities Act of 1933 ("Securities Act"), and hence whether Ripple violated Section 5 of the Act when it offered and sold XRP to purchasers without registering such offers and sales. Ripple asserts that it lacked fair notice that its conduct violated the law and thus cannot be held responsible.

The thrust of Ripple's defense is that the SEC was obligated to but did not specifically warn Ripple that it was violating the law before the SEC filed suit. This defense—focused on what the SEC *did not do* before it filed this enforcement action—is legally insufficient and should be stricken.

Ripple's contention that the SEC must warn a market participant about its legal violation, or that the SEC must issue regulations or guidance before the SEC can exercise the authority Congress conferred on the SEC to enforce the securities statutes, finds no support in the Due Process Clause or any other principle of law. The Securities Act's registration provisions require market participants to comply with the law in the first instance, including requiring those who would offer or sell securities to provide important information before soliciting investors to purchase the securities. Congress also chose the SEC as the statutory guardian to enforce the law, with power to investigate when it has reason to believe a violation has occurred, and to sue to protect public investors. The implications of Ripple's defense—that to prosecute violations of the securities laws the SEC must provide specific notice of the illegality of certain conduct in advance of filing its action—turns the statutory regime on its head, and the Due Process Clause requires no such result.

The only question under the Due Process Clause is whether *the term* "investment contract" in the Securities Act (not in non-existent rules or regulations) fails to give "a person of ordinary intelligence a reasonable opportunity to know what is prohibited." But Ripple notably avoids expressly articulating this defense, because doing so would ask the Court to become the first in the nearly 88-year history of the Securities Act to declare the term unconstitutionally vague. In fact, the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"), has for decades provided an understandable definition of "investment contract," affording persons of ordinary intelligence with notice of the scope of the statute's application and foreclosing arbitrary enforcement. To the SEC's knowledge, no federal court has accepted a defendant's argument that the term fails to provide the constitutionally required notice; indeed, in the realm of offers or sales of digital assets, at least two district courts in this Circuit have rejected that argument.

Furthermore, the parties' pleadings, documents referenced therein, and facts of which the Court may take judicial notice show that Ripple, including through Individual Defendants Christian Larsen ("Larsen") and Bradley Garlinghouse ("Garlinghouse"), *actually had* notice that its offers and sales of XRP could run afoul of the federal securities laws. In 2005, Larsen co-founded, and through 2011 served as the CEO of, a company sued by the SEC in 2008 for violating the same registration provisions at issue in this case. Then, in 2012, before it sold a single XRP, Ripple's lawyers told Ripple that the sale of XRP could be deemed a sale of securities under the federal securities laws. Next, in July 2017, the SEC issued its "DAO Report"—a Report of Investigation, pursuant to Section 21(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(a)—which Garlinghouse read, and where the SEC stated that the use of novel technology to offer and sell instruments such as digital assets to raise capital is subject to the federal securities laws. Thereafter, the SEC instituted dozens of actions against both companies and individuals for violating Section 5's registration requirements in the context of offers and sales of digital assets.

Indeed, in 2018 Ripple's CEO noted publicly that in the digital asset space, "SEC's statements have been consistent and clear" and that "'[r]egulatory uncertainty' is just a euphemism for 'we wish we could ignore SEC regulations."  It was only after Ripple learned of the SEC's investigation in April 2018 that Ripple pivoted into the lawyer-driven 'regulatory uncertainty' euphemism that defines its fourth affirmative defense—but even that did not stop Ripple's unregistered offers and sales of XRP.  In short, Ripple understood but decided to assume the risk that this action could be filed.

Based on longstanding judicial precedent holding that the relevant securities law provides constitutional notice, and on Ripple's undisputed contemporaneous awareness that these laws could apply to its offers and sales of XRP, the Court should strike Ripple's fair notice defense.

## FACTUAL BACKGROUND[1]

## I.    Ripple Knew the Federal Securities Laws Could Apply Before It Sold Any XRP.

### A.    The Prosper Order

In 2008, the SEC sued a company called Prosper Marketplace, Inc. ("Prosper"), while Larsen was the CEO, for engaging in unregistered offers and sales of securities in violation of Securities Act Section 5.  ¶ 18; *see also* Ex. A (Order Instituting Proceedings, Rel. No. 33-8984 (Nov. 24, 2008)) at 2, 6.  Prosper (presumably through or with the approval of Larsen, its CEO) consented to the entry of an order (the "Prosper Order") finding that Prosper's creation of an online marketplace through which it offered and sold "lending" interests to the public constituted offers and sales of "investment contracts" as defined by the Securities Act and as informed by the Supreme Court's test in *Howey*.[2]  Prosper Order at 4.

---

[1] This section largely sets forth the relevant factual allegations in the Complaint and Answer, documents incorporated by reference in these pleadings, and facts of which the Court may take judicial reference.  "¶ _" refers to paragraphs in the SEC's Amended Complaint (D.E. 46); "Ex. [ ]" refers to Exhibits to the Declaration of Daphna A. Waxman in support of this motion ("Waxman Decl.").  Where additional facts are provided, they are provided only for context.

[2] The Court may take judicial notice of the terms of the settlement between Prosper and the SEC.  *See, e.g.*, *Sullivan v. Barclays PLC*, No. 13 Civ. 2811, 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017).

     **B.**     **Larsen and Ripple's Other Founders Received a Reputable Global Law Firm's Opinions in 2012 Outlining the Risks that the Federal Securities Laws Could Apply to the Offer and Sale of What Is Now Known as XRP.**

In 2012, before Defendants raised any money from investors, Ripple's founders-to-be, including Larsen, received two memos from a reputable global law firm, ¶¶ 52, 56, analyzing "the legal risk associated" with distributing "Coins" or "Ripple Credits," Ex. B at 1 (the "February 2012 Memo"), as XRP was then known.  *See also* Ex. C (the "October 2012 Memo," collectively the "Legal Memos").  The Legal Memos warned Ripple of precisely the risk Ripple now claims it had no notice of—that the federal securities laws could apply to offers and sales of XRP.

In its summary, the February 2012 Memo warned that, "[i]f sold to Investors who provide [Ripple's] Founders with the capital necessary to launch and operate [Ripple], [XRP] will likely be considered securities and subject to regulation under federal securities laws."  Ex. B at 2.  The summary also warned that XRP could be "subject to federal securities regulation" to the "extent that [XRP] are purchased with an expectation of profit because of the efforts of" any entity holding as little as 15% of all outstanding XRP.  *Id.*  The February 2012 Memo explained that "[s]ecurities include investment contracts, which are investments in a common enterprise with the expectation of profits solely from the efforts of others."  *Id.*  It also explained that, in *addition* to the risk of being subject to the federal securities laws, sales of XRP could *also* be subject to other statutory regimes, including the sales of a commodity, or as a part of a money transmitting business under federal and state law.  *Id.* at 3.  Accordingly, the February 2012 Memo's very first "Recommendation[ ]" was that Ripple refrain from *selling* XRP to "[i]nvestors," because doing so "increases the risk that [XRP] will be considered investment contracts and will therefore be regulated as securities."  *Id.* at 4.

In the February 2012 Memo's body, in a sub-heading titled "Securities," the memo correctly identified *Howey* as providing the definition of "investment contract" for purposes of the Securities

Act.  *Id.* at 9.  The memo then identified four factual circumstances that would present an increased

risk that XRP could be considered an investment contract under *Howey*—all applicable to XRP.

*First*, the February 2012 Memo explained that if Ripple sold XRP for consideration—that is,

in return for money—or even on "exchanges" in the secondary market, there was an increased risk

that XRP could be considered a security.  *Id.* at 9-10 & n.25.

*Second*, comparing XRP to Bitcoin, the memo explained that, under Second Circuit

precedent, XRP presents "a greater risk of being seen as a common enterprise" than Bitcoin and

thus a security "because there will be a specific entity . . . which is responsible for the promotion and

marketing of [XRP]," unlike with Bitcoin.  *Id.* at 10 & n.26 (citing *Revak v. SEC Realty Corp.*, 18 F.3d

81, 87 (2d Cir. 1994)).

*Third*, the memo made clear that, while the Exchange Act excludes "currency" from the

definition of "security," XRP, "unlike traditional currencies, do[es] not have . . . qualities of safety

and liquidity because [XRP] will neither be backed by the full faith and credit of a national

government nor widely accepted as a means of exchange."  *Id.* at 10.  The memo thus explained that

XRP "may be encompassed within what the Supreme Court explained as Congress's attempt to

define a security 'sufficiently broad to encompass virtually any instrument that might be sold as an

investment.'"  *Id.* at 10 & n.32 (citing *Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990)).

*Fourth*, the February 2012 Memo concluded that Ripple's founders and Ripple itself "should

not provide [XRP] to Investors in exchange for their investment and should not participate in the

sale of [XRP] in order to reduce the risk that [XRP] will be considered securities and regulated by

the Securities Act . . . and the . . . Exchange Act."  *Id.* at 11.

In October 2012, Larsen and Ripple's other founders received a second memo from the

same reputable law firm, the October 2012 Memo.  ¶¶ 52, 56.  This memo analyzed Ripple's

"revised business plan" and reiterated many of the February 2012 Memo's conclusions.  Based on

new information provided by Ripple's founders, the memo assumed that Ripple would "distribut[e]" XRP "to end users/consumers for no consideration"—that is, that Ripple would simply give XRP to XRP users without charging them money for the XRP.  Ex. C at 3.  However, even assuming that Ripple intended to give XRP to users rather than sell the XRP, the memo concluded that there was *still* a risk that sales of XRP could be considered sales of securities.  The memo explained that, if the XRP recipients sold XRP in the secondary market to those who purchased XRP with an expectation of profit caused by increased demand and limited supply, XRP may constitute investment contracts and therefore securities:

> If [XRP] are purchased and sold in the secondary market, individuals purchasing [XRP] may do so with the expectation of increased value caused by increased demand and limited supply. Although we understand this rationale to be incidental to the primary purpose, to the extent that [XRP] are purchased with an expectation of profit because of the efforts of [Ripple], Founders and/or others promoting [XRP], there is a risk that [XRP] will constitute investment contracts and be subject to federal securities regulation.

*Id.* at 4.

Like the February 2012 Memo, the October 2012 Memo correctly identified *Howey*, *Reves*, and *Revak* as controlling precedent with respect to the application of the securities laws to sales of XRP and then expanded on the first memo's analysis.  *See id.* at 15-18.  In relevant part, the October 2012 Memo noted that Ripple "has a greater risk of being seen as a common enterprise [than Bitcoin] because there will be a specific entity, [Ripple], which is responsible for the distribution of [XRP]."  *Id.* at 17.  The memo further noted that this risk would be lessened if "neither the Founders nor [Ripple] will be collecting or retaining funds from the distribution of [XRP]."  *Id.*  And, again like the February 2012 Memo, the October 2012 Memo concluded that (1) XRP was unlikely to be "currency" under the Exchange Act because it was not backed by the full faith and credit of a national government or widely used as a medium of exchange, *id.* at 17-18, and (2) XRP could be regulated under other legal regimes in addition to the securities laws.  *Id.* at 12-13, 18-19.

Finally, the October 2012 Memo included at least two recommendations (both of which Ripple eventually ignored) to lessen the risk that the sale of XRP could be subject to the federal securities laws.  First, the memo cautioned Ripple against "promoting the trading of [XRP] as an investment opportunity" because otherwise XRP's "potential to increase in value could result in regulatory scrutiny or accusations that [XRP] are investment contracts, and hence securities subject to the federal securities laws."  *Id.* at 7.  The memo therefore advised Ripple to "steer clear of promoting [XRP] as an investment opportunity."  *Id.* at 16.  Second, the memo twice advised Ripple's founders to "consider seeking a no-action letter from the SEC" as a way to "provide further comfort that [XRP] are not securities."  *Id.* at 4, 18.[3]

## II.   Ripple Ignored the Legal Advice It Had Received in Order To Raise Hundreds of Millions of Dollars to Fund Its Operations.

In 2013, despite the clear risks and warnings described in the Legal Memos, Ripple quickly pivoted from distributing XRP for free to lucratively profiting by offering and selling XRP for consideration.  This was contrary to advice contained in the February 2012 Memo that Ripple limit itself to gifting XRP to potential users without taking any money and contrary to what the October 2012 Memo assumed Ripple would do.  Indeed, from 2013 through 2020, Ripple sold XRP for nearly $1.4 billion and almost all of its revenues came from sales of XRP to public and private investors.  ¶¶ 1, 5, 61, 70-72, 81.  Ripple's business for the entire time period, in other words, was to sell XRP.  ¶¶ 77, 78, 296, 417.

---

[3]  As part of the its efforts to engage with the public and provide guidance on particular issues, the various divisions of the SEC, including the Division of Corporation Finance, routinely accept written requests for no-action, interpretive and exemptive letters relating to areas of the federal securities laws, rules, and regulations that the SEC administers and interprets (commonly referred to as the "No-Action process").  As part of the No-Action process, the person submitting a request must follow certain procedures and provide the SEC staff with all of the facts necessary to reach a conclusion in the matter.  The SEC staff, in turn, provides its views in a written response known as a "No-Action letter," which is published on the SEC's website along with the incoming request.  Upon request of three parties seeking such relief, the Division of Corporation Finance has issued three No-Action letters on whether the offers and sales of particular digital assets (not XRP) may be sold without registration under Securities Act Section 5.  Importantly, the process is initiated by those who communicate with the staff to navigate and comply with the federal securities laws.

In March 2013, Ripple founded XRP II, LLC, f/k/a XRP Fund, LLC ("XRP II"), the entity through which Ripple sold XRP (often at a discount to the market price) to at least twenty-six institutional investors looking to purchase XRP for speculation. ¶¶ 19, 81, 102-24. These investors included XRP Fund A, a private investment fund. ¶ 111. In mid-2015, Ripple, through XRP II, entered into a Memorandum of Understanding ("MOU") with XRP Fund A. *Id.* As part of that MOU, in December 2015, Ripple pre-reviewed XRP Fund A's offering documents, which specifically identified the "greater risk that XRP might be deemed a security" due to "[t]he Ripple ecosystem's reliance on the efforts of Ripple Labs – the single largest holder of XRP – to promote and expand the [XRP] ecosystem." ¶¶ 111, 234.

As noted, the Legal Memos described the legal risks associated with selling XRP under the federal securities laws and under other financial regulatory regimes as overlapping, not as mutually exclusive. *E.g.*, Ex. B at 3; Ex. C at 12-13, 18-19. Thus, while XRP might be analyzed in different ways under various statutory schemes, regulation under one does not preclude regulation under another—a fact Ripple knew when, in May 2015, it entered into a settlement with FinCEN and the Department of Justice, which noted that Ripple sold "convertible virtual currency" regulated by the Bank Secrecy Act and its implementing regulations. *See* 31 U.S.C. § 5330; 31 C.F.R § 1022.380. Moreover, before and after this settlement, Ripple received additional warnings that its sales of XRP could implicate more than one regulatory regime, including the securities laws, as FinCEN guidance also made clear. *See* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf; ¶¶ 399-402, 407, 411, 415, 418, 420. Ripple was so aware of this risk, that in 2015, 2016, and 2017, and as Ripple's business strategy developed, Ripple hired at least three more large, sophisticated law firms to advise the company on its compliance with legal and regulatory requirements of the United States' securities laws. In 2018,

2019, and 2020, following the DAO Report, Ripple solicited legal advice from at least five more large law firms on this question.  *See* Ex. D at 10-11.

Throughout the entire relevant time period, Ripple and its executives promoted XRP as an investment that would increase in value and price based on Ripple's efforts, which included taking steps to control the supply and price of XRP and creating an active and liquid trading market for XRP.  ¶¶ 230-42.  For example, in 2017 and 2018, Ripple doubled down on its efforts to sell XRP to retail and institutional investors by offering and paying XRP and cash incentives to certain digital asset trading platforms to make XRP available for trading.  ¶¶ 154-68.  However, some digital asset platforms resisted Ripple's attempts to pay cash or XRP incentives in exchange for an XRP "listing," and cited concerns that XRP could be a security.  ¶ 419.

## III.   The SEC Provided Guidance in the Digital Asset Space.

On July 25, 2017, the SEC publicly issued the DAO Report concerning so-called "DAO Tokens," a particular digital asset involving distributed ledger or blockchain technology.  *See* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Release No. 81207, 2017 WL 7184670 (July 25, 2017).  The SEC's DAO Report considered the offer and sale of the DAO Tokens and, based on long-standing legal principles including *Howey*, concluded that the offers and sales of the DAO Tokens were required to be registered under the federal securities laws or qualify for exemption from registration.  The SEC's message to digital token issuers was clear:  the use of distributed ledger or blockchain technology (which underlies XRP and many other digital assets) to raise capital must comply with the federal securities laws.

After the DAO Report, which Garlinghouse read, ¶ 409, and while Ripple continued to fund itself almost exclusively by selling XRP, the SEC sued many issuers for violations of Section 5 as to digital assets.  *See SEC v. Telegram Grp., Inc.*, No. 19 Civ. 9439 (S.D.N.Y. Oct. 11, 2019); *SEC v. Kik*

*Interactive, Inc.*, No. 19 Civ. 5244 (S.D.N.Y. June 4, 2019); *SEC v. REcoin Group, Inc.*, No. 17 Civ. 5725

(E.D.N.Y. Sept. 29, 2017); *SEC v. PlexCorps*, No. 17 Civ. 7007 (E.D.N.Y. Dec. 1, 2017).[4]

In addition, the then-SEC Chairman repeatedly gave market participants notice that the SEC

could view investments involving digital assets as offerings of securities.  *See* SEC Chairman Jay

Clayton, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017),

https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (explaining that when

purchasers are being sold on the potential for digital assets to increase in value – with the ability to

lock in those increases by reselling the tokens on a secondary market – or to otherwise profit from

the tokens based on the efforts of others—"[t]hese are key hallmarks of a security and a securities

offering."); Jay Clayton and J. Christopher Giancarlo, Regulators are Looking at Cryptocurrency,

Wall St. J. (Jan. 24, 2018) *available at* https://www.wsj.com/articles/regulators-are-looking-at-

cryptocurrency-1516836363 ("some products that are labeled virtual currencies have characteristics

that make them securities").  Shortly after the December 11, 2017 speech, Ripple's public relations

firm, knowing that "it had been a concern to have XRP considered a security," notified Ripple and

Garlinghouse, its CEO, of the then-SEC Chairman's statement that merely calling a token a "utility"

token or structuring it to provide utility did not prevent the token from being a security.  ¶ 411.

Following the DAO Report, Ripple received at least four requests from different market

participants, including Platform A and other digital asset trading platforms on which market

participants could buy and sell digital assets, for legal opinions regarding XRP's status under the

federal securities laws.  ¶¶ 414-15; *see also* Ex. D at 13 (listing seven such requests).  Ripple knew

---

[4] Defendants have at times suggested that cases involving allegations of fraud in addition to registration violations require a different analysis, but there is no basis to draw that distinction—*Howey* applies regardless of whether a defendant is *also* charged with violating anti-fraud provisions.  *E.g., Glen-Arden Commodities v. Costantino*, 493 F.2d 1027, 1035 (2d Cir. 1974) (applying *Howey* in case involving both violations of Section 5 and anti-fraud provisions); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (analyzing only Section 5 claims relying on *Glen-Arden's Howey* analysis).

about these specific requests for a legal opinion on XRP's status and knew that this issue was important to U.S.-based platforms.  ¶¶ 416, 418-19.  Indeed, without the ability for XRP to trade on digital asset platforms, Defendants could not unload their XRP holdings and profit.  ¶ 417.  Yet Ripple failed to provide a legal opinion as to the status of XRP, and some digital asset platforms decided not to make XRP available for trading due to concerns that XRP could be deemed a security.  ¶¶ 418-19.  These inquiries provided Ripple with additional warnings that the securities laws could apply to its conduct.

## IV.   The SEC's Investigation Into Ripple

On approximately April 13, 2018, staff in the SEC's newly-formed Cyber Unit began investigating whether Ripple's and others' conduct violated the federal securities laws, reached out to Ripple's counsel, and sent certain written requests to preserve documents.  Waxman Decl. ¶ 6.  The staff's then-non-public investigation to determine whether Ripple's conduct violated the securities laws included analyzing years of blockchain sales data, collecting and reviewing over 600,000 pages of documents, at least 343,890 of which were from third parties, and taking testimony from witnesses.  *Id.* ¶¶ 7-8.

In June 2018, weeks after Ripple had learned of the SEC's investigation, the SEC's then-Director of the Division of Corporation Finance, William Hinman, gave a speech about digital assets that did not mention XRP and that "expresse[d] [his] views and d[id] not necessarily reflect those of the [SEC]."  *See* https://www.sec.gov/news/speech/speech-hinman-061418.  In his speech, Mr. Hinman explained that "[t]he digital asset itself is simply code but the way it is sold as part of an investment to non-users by promoters to develop the enterprise can be, and in that context, most often is a security because it evidences an investment contract."  He contrasted that to Bitcoin: "When I look at Bitcoin today, I do not see a central third-party whose efforts are a key to determining the factor in the enterprise."

11

At the time of Mr. Hinman's speech, Ripple was doing exactly what Mr. Hinman had explained makes the offer and sale of a digital asset the offer and sale of a security—acting as a central party promoting XRP as an investment.  And there was no use for XRP at the time other than as an investment.[5]  In a damage-control effort following the speech continuing to today, Ripple and its public relations firm embarked on a campaign to broadcast its lawyer-driven claim that XRP "is not a security" and blame the SEC for what Ripple now claims is regulatory uncertainty.  *E.g.*, https://finance.yahoo.com/news/ripple-ceo-3-reasons-xrp-token-not-security-181455786.html.

In late 2018—after Ripple had hired counsel to represent it in the ongoing SEC investigation and after Mr. Hinman's speech had described sales of digital assets to non-users of the asset as indicative of the sale of securities (echoing the advice Ripple's law firm had provided in the Legal Memos)—Ripple announced for the first time the commercial adoption of a purported use for XRP.  Specifically, Ripple launched a product for cross-border money transmitting businesses using XRP in October 2018.  ¶ 363.  Ripple heavily subsidized this product, for which there was no organic market demand. ¶¶ 88, 283.  While the demand and use for this product was limited in size and scale, Ripple continued to make hundreds of millions of sales of XRP into public markets, with no expectation that any of these retail purchasers were acquiring XRP to utilize it on a platform designed for certain commercial enterprises.  ¶¶ 284-86, 383.

Indeed, around September 2019, a consortium of digital asset market participants led by Platform A introduced a rating system for evaluating the likelihood of whether certain digital assets could be deemed securities under *Howey*.  Based on information known at the time, they ranked XRP a 4 out of 5 and Bitcoin a 1, with 5 being the most likely to be deemed a security.  *See*

---

[5] Following the speech, Platform A told Ripple that they believed XRP could be deemed a security and thus declined to make XRP available for trading.  Other market participants told Ripple they would not move forward with plans to offer financial products involving XRP or with potential business partnerships involving XRP due to these same concerns.  Indeed, Ripple expressed concern to the SEC that Mr. Hinman's speech had implied that XRP was in fact a security.

Cryptocurrency Exchanges Including Coinbase Disclose Ratings of Digital Assets, Wall St. J. (Sept. 30, 2019) *available at* https://www.wsj.com/articles/cryptocurrency-exchanges-including-coinbase-to-rate-digital-assets-11569835801.

Meanwhile, during its investigation into Ripple, the SEC continued its efforts to enforce the federal securities laws against market participants involved with digital assets.  These included various settled and litigated SEC enforcement actions involving the same type of violations at issue in this case.  The agency also continued to provide the public and market participants with timely information and guidance to respond to massive growth and interest in digital assets.[6]

From the time the SEC alerted Ripple of its investigation in April 2018 until the SEC filed its Complaint in December 2020, Ripple continued to receive legal advice from many law firms in connection with this investigation and on regulatory issues.  *See* Ex. D at 10-11.  Through a busy speech circuit for Ripple's top employees, Ripple attempted to influence lawmakers and public opinion regarding XRP's legal status, including by criticizing the SEC for not providing regulatory clarity and by lobbying government officials and agencies regarding the regulation of digital assets, *e.g.*, Ripple Expands Global Regulatory Team in D.C. (Oct. 22, 2019) https://ripple.com/insights/ripple-expands-global-regulatory-team-in-d-c-and-joins-the-blockchain-association; Ripple CEO admits 'regulatory uncertainty' is halting adoption of cryptocurrencies (Jan. 31, 2019) https://coinrivet.com/ripple-ceo-admits-regulatory-uncertainty-is-halting-adoption-of-cryptocurrencies/.  Ripple took these steps unfazed by Garlinghouse's prior mantra that if someone "disagree[s] with the regulatory certainty" they "call it regulatory uncertainty," ¶ 413, and that the "SEC's statements have been consistent and clear.  'Regulatory uncertainty' is just a euphemism for

---

[6] *E.g.*, Framework for "Investment Contract" Analysis of Digital Assets *available at* https://www.sec.gov/files/dlt-framework.pdf;  No-Action Letters dated April 3, 2019 (*available at* https://www.sec.gov/divisions/corpfin/cf-noaction/2019/turnkey-jet-040219-2a1.htm) and July 25, 2019 (*available at* https://www.sec.gov/corpfin/pocketful-quarters-inc-072519-2a1).

'we wish we could ignore SEC regulations.'"  Garlinghouse, Mar. 8, 2018 Tweet

https://twitter.com/bgarlinghouse/status/971815090109337602.  Given the historical advice Ripple

had received since 2012, questions from market participants on the obvious question of whether

Ripple's offers and sales of XRP required registration under the securities laws, and the SEC's

formal investigation, Defendants were aware for many years that the securities laws could apply.  Yet

Defendants never sought a "no-action" letter from the SEC, as the Legal Memos had advised.  ¶ 59.

## RIPPLE'S FOURTH AFFIRMATIVE DEFENSE

The SEC sued Ripple on December 22, 2020, alleging that its offers and sales of XRP

violated the registration requirements of Sections 5(a) and (c) of the Securities Act, and thereafter

filed an Amended Complaint.  *See* ¶¶ 9-10, 430-35.

On March 4, 2021, Ripple answered.  *See* Ans. (D.E. 51).  Ripple's fourth affirmative defense

asserts a "Lack of Due Process and Fair Notice" (the "Defense").  *Id.* at 97-99.  Ripple claims that

the SEC's failure to specifically warn Ripple that its XRP offering and sales implicated the federal

securities laws until it instituted this lawsuit deprived Ripple of fair notice of what the law required.

*Id.* at 97 ("Ripple lacked fair notice that its conduct was prohibited" both "due to the lack of clarity

and fair notice regarding Defendants' obligations under law" and "regarding [the SEC's]

interpretation of the law," and due to the "countless market participants for years transact[ing] in

XRP believing it was not an investment contract" without any affirmative notice from the SEC "that

transactions in XRP violated the law"); *see also* Letter dated Mar. 16, 2021 (D.E. 70) ("Letter") at 3.

According to Ripple, its lack of fair notice was "exacerbated" by the SEC's lack of action or

notice to Ripple after three specific events, the second and third of which occurred after the SEC

had reached out to Ripple in connection with the SEC's investigation of Ripple, XRP, and others:

- The 2015 Settlement between DOJ/FinCEN and Ripple. When Ripple entered into a
  settlement with the U.S. Department of Justice and FinCEN "that described XRP as a
  'convertible virtual currency'" (the "FinCEN Settlement") and the SEC *did not notify* Ripple

that "prospective XRP sales as permitted by the [FinCEN Settlement] would nevertheless constitute a violation of another federal law." Ans. at 97 (emphasis added).

- <u>Mr. Hinman's June 2018 Speech</u>.  When the SEC's then-director of the Division of Corporation Finance stated in June of 2018 that he "did not consider the virtual currencies [B]itcoin or ether to be securities," and said *nothing about XRP at all*, which Ripple now claims that it and "other reasonable observers further reasonably understood . . . to indicate that [the SEC] would permit present-day sales of virtual currencies given the current market conditions for XRP," Ans. at 98, despite the SEC staff's continuation of its investigation into Ripple's conduct following this speech.

- <u>Platform A's 2019 decision to list XRP</u>. When Platform A decided to make XRP available for buying and selling on its platform after meeting with the SEC, given that the SEC "*did not state* that it considered XRP to be a security," Ans. at 98-99 (emphasis added), despite the fact that Ripple was paying Platform A to list XRP and that Platform A's consortium had rated XRP a 4 out of 5 likely to be a security.

## STANDARD OF REVIEW

A district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f). The *Twombly/Iqbal* plausibility pleading standard applies to an affirmative defense, which may be stricken if it does not plausibly allege enough facts to support it.  *See GEOMC Co., Ltd. v. Calmare Therapeutics, Inc.*, 918 F.3d 92, 97-98 (2d Cir. 2019); *see also SEC v. Laura*, No. 18 Civ. 5075, 2020 WL 8772252, at *2 (E.D.N.Y. Dec. 30, 2020) (plausibility standard applies in first step of Rule 12(f) analysis).  Moreover, "an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claim."  *GEOMC Co.,* 918 F.3d at 98.  "[P]rejudice may be considered and, in some cases, be determinative."  *Id.* at 98-99; *see also SEC v. KPMG LLP*, No. 03 Civ. 671, 2003 WL 21976733, at *2 (S.D.N.Y. Aug. 20, 2003) (if "the defense is insufficient as a matter of law, [it] should be stricken to eliminate . . . delay and unnecessary expense").

Courts routinely grant SEC motions to strike legally insufficient affirmative defenses at the pleadings stage because "courts have expressed reluctan[ce] to permit affirmative defenses to go forward against a government agency like the SEC, where the agency is seeking to enforce a

congressional mandate in the public interest." *SEC v. Am. Growth Funding II, LLC*, No. 16-cv-828, 2016 WL 8314623, at *3 (S.D.N.Y. Dec. 30, 2016) ("*AGF II*") (striking unclean hands defense) (citation omitted); *see also Laura*, 2020 WL 8772252, at *3 (striking unclean hands and laches defenses); *SEC v. Volkswagen AG*, __ F. Supp. 3d __, 2021 WL 451667, at *5 & n.3 (N.D. Cal. Feb. 4, 2021) (striking unclean hands defense based on allegations of unreasonable delay by SEC in bringing suit and rejecting assertion that the "SEC's motion to strike is 'premature'").

## ARGUMENT

The standard for "fair notice" of civil statutes that regulate economic activities is whether the law is sufficiently clear that its prohibitions would be understood by an ordinary person operating a profit-driven business.  Put another way, a "fair notice" defense to an action alleging that a defendant has violated such a civil statute is nothing more than a defense that a statute is void for vagueness under the Constitution's Due Process Clause as applied to a defendant's conduct. Whether Ripple calls its defense "fair notice" or "void for vagueness" makes no difference.  In the context of a civil statute that regulates economic activities—as opposed to agency regulations or criminal statutes, for example—those defenses are the same, and the Second Circuit has twice rejected void-for-vagueness challenges to the Securities Act's "investment contract" term, as have district courts in this Circuit specifically in the context of digital assets.  This Court should follow suit and strike Ripple's affirmative "fair notice" defense:  it is a legally insufficient defense on which Ripple cannot prevail as a matter of law.

## I.    Fair Notice to Ripple Does Not Turn on any SEC Interpretation or Failure to Act.

When an agency files an action in a district court alleging a violation of a statute pursuant to enforcement authority conferred by Congress, the only fair notice required to satisfy the Constitution's Due Process Clause is that the statute itself provide fair notice.  "The relevant question is *not* whether [the defendant] had fair notice of the [agency's] interpretation of the statute,

but whether [the defendant] had fair notice of what the statute *itself* requires." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015) (emphasis added). "As a necessary consequence, [the defendant] is only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute." *Id.* at 255. Courts respect the agency's view to the extent it is persuasive, but courts are the ultimate arbiter of the statute's meaning.

This is different from the higher fair notice standard applicable when an agency seeks to enforce its own rules or regulations—"ascertainable certainty." Specifically, in addressing an agency interpretation of its own rule, courts typically defer to the agency's reasonable interpretation, but regulated parties are entitled to know with "ascertainable certainty" an agency's interpretation of its regulation. *See id.* at 251-54 ("Courts appear to apply a more stringent standard of notice to civil regulations than civil statutes: parties are entitled to have 'ascertainable certainty' of what conduct is legally required by the regulation." (internal citation omitted)); *cf. FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254, 258 (2012) (setting aside FCC administrative orders because of "[t]he [FCC']s lack of notice . . . that its interpretation had changed so the fleeting moments of indecency . . . were a violation"). In other words, the Due Process Clause prevents deference to the application of an agency rule that fails to give fair warning of the conduct it prohibits or requires.

The Second Circuit's decision in *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996), supports these principles. *Upton* did not involve a fair notice challenge to a statute, but rather a fair notice challenge to the SEC's administrative ruling applying an SEC rule. *Id.* at 93, 98 ("[W]e cannot defer to the Commission's interpretation of *its rules* if doing so would penalize an individual who has not received fair notice of a regulatory violation." (emphasis added)).

Unlike *Upton* and the "ascertainable certainty" cases, the case now before this Court turns on a civil statute—not agency rules or agency interpretations of agency rules. It is for this Court to determine whether Ripple offered and sold what the Securities Act defines as a "security," and

17

Ripple is therefore "only entitled to notice of the meaning of the statute," *Wyndham Worldwide Corp.*, 799 F.3d at 255, the void-for-vagueness standard addressed in Section II, below.

Ripple's fair notice affirmative defense rests on the faulty premises that the proper inquiry involves what the SEC said or did and that the SEC was required to advise Ripple of the SEC's interpretation of the statute and application to Ripple's conduct, such that its failure to do so means Ripple cannot be sued for the statutory violation.  Ripple seems to contend that the SEC's failure to speak in the wake of Ripple's activity means Ripple did not have fair notice that its conduct was prohibited by the statute.  But the SEC was undeniably enforcing the securities laws in the digital asset space in which Ripple operated and using official agency channels like enforcement actions and the DAO Report (and SEC staff were also providing views in no-action letters, staff guidance, and speeches by senior agency officers).  Yet even if the SEC had done none of these things, Ripple's defense, if accepted, would mean that any time an agency seeks to apply a long-existing statute to a specific set of facts, the violator can argue that the agency's silence before the filing of the enforcement action precludes liability in that very action.  That is not and should not be the law.

Ripple's affirmative defense is also premised on the SEC's *not* issuing any applicable regulations and refraining from opining at all on XRP before it opened its investigation.  The implication is that the SEC should have stopped Ripple's violations or explained the law to Ripple before suing.  The fact that an agency files an enforcement action well within the applicable statute of limitations *without previously telling the defendant to stop what it is doing* does not deprive the court of its authority to enforce the law.  As explained in *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, a "district court is not deprived of . . . enforcement authority just because no court or regulator had previously chosen to exercise such authority with respect to the practice challenged here."  135 F.3d 266, 274 (3d Cir. 1998); *see also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171–72 (2d Cir. 1970)

(finding that defendant's failure to disclose its market maker status was material omission under Exchange Act, despite fact that SEC had never previously held that such disclosure was required).

Ripple's defense is also incompatible with the Exchange Act, which expressly precludes Ripple (and the market participants whose supposed confusion Ripple seeks to vindicate) from claiming reliance on the timing or sequencing of the SEC's decision to enforce the law. As Exchange Act Section 26 makes clear, "[n]o action or failure to act by the [SEC] . . . shall be construed to mean that the [SEC] has in any way passed upon the merits of, or given approval to, any security or any transaction." 15 U.S.C. § 78z. Based on this provision, the D.C. Circuit has held that "the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it finally accumulated sufficient evidence to do so." *Graham v. SEC*, 222 F.3d 994, 1007–08 (D.C. Cir. 2000). Furthermore, as the Second Circuit recognized long ago, "the Commission may not waive the requirements of an act of Congress nor may the doctrine of estoppel be invoked against the Commission." *SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1950) (citing *SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953); *SEC v. Torr*, 22 F. Supp. 602 (S.D.N.Y. 1938)). Here, as in *Culpepper*, the Court is "dealing with the propriety of an injunction to prevent future violations of an Act of Congress," and Ripple is not arguing that the SEC affirmatively acquiesced in Ripple's offers and sales or told Ripple they were exempt from the securities laws. *Culpepper*, 270 F.2d at 248 (distinguishing *Klein v. SEC*, 224 F.2d 861 (2d Cir. 1955)).

Finally, the three events that Ripple points to as "exacerbating" its lack of fair notice are legally inconsequential, even if proven. *First*, it is well understood that financial regulation in the United States is conducted by multiple agencies and departments, whose jurisdiction is at times overlapping. "[W]e live in an age of overlapping and concurring regulatory jurisdiction," and courts accordingly "must proceed with the utmost caution before concluding that one agency may not regulate merely because another may." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 593 (D.C. Cir. 2001); *see*

*also SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 78-80 (2d Cir. 2020) ("[W]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both.") (citation omitted).  Ripple itself understood this.  *E.g.*, Ex. B at 3; Ex. C at 12-13, 18-19.  Thus, that Ripple should have registered as a money services business subject to state or federal law was not a determination that other financial regulatory regimes do not apply to its business activities.  And a 2015 FinCEN settlement on the money services question did not impose on the SEC any duty to remind Ripple of its obligations to comply with the securities laws—laws that market participants specifically raised with Ripple long after that particular settlement.  Indeed, that settlement did not involve the federal securities laws, nor was the SEC a party.  *See* https://www.fincen.gov/news/news-releases/fincen-fines-ripple-labs-inc-first-civil-enforcement-action-against-virtual.

      *Second*, Mr. Hinman's June 2018 speech did not address XRP at all or suggest that Ripple's offers and sales of XRP were exempt from the Securities Act (indeed, many market participants interpreted it to mean the opposite).  Nor could Ripple draw any comfort from what was actually said as to whether its XRP offers and sales complied with the securities laws because, unlike the market, Ripple had known for approximately two months before that speech that the SEC was investigating that very question, and the SEC staff continued its investigation after the speech.

      Moreover, Mr. Hinman's speech—the speech of an SEC employee rather than the SEC itself (that is, a majority of the Commissioners), as a disclaimer in the speech made clear—was not a determination by the SEC and therefore could have had no bearing on whether the SEC provided fair notice.  *See WHX Corp. v. SEC*, 362 F.3d 854, 860 (D.C. Cir. 2004) (explaining that staff advice is not authoritative agency action)  Indeed, Ripple acknowledged this distinction just two months ago in its own filings in the Delaware Chancery Court, where it explained that actions by high-ranking SEC officials such as Mr. Hinman "are not determinations by the SEC."  Ex. D (Defs.' Answering

Br. in *Tetragon Fin. Grp. Ltd. v. Ripple Labs, Inc.*, 2021-0007-MTZ (D.E. 220) at 29 (Feb. 13, 2021)). Relying on case law and the testimony of three former SEC Commissioners, Ripple correctly argued in that action that there is an "important distinction between the [SEC's] rules and regulations, on the one hand, and staff views on the other" and that only the former "'have the force and effect of law.'" *Id.* at 31. Ripple got it right in the Chancery Court—speeches by high-level SEC employees do not bind the agency—and using a staff speech to argue lack of fair notice in this Court cannot be squared with Ripple's taking the opposite legal position in another lawsuit just two months ago.

*Third*, while Ripple points to the decision of Platform A to list XRP in 2019 after notifying the SEC of its intention to do so, the SEC does not disclose ongoing investigations to the public and thus would not have disclosed to Platform A an ongoing investigation into the legality of Ripple's offering of XRP. *See* SEC Enforcement Manual § 2.3.4 ("Formal investigative proceedings are nonpublic unless otherwise ordered by the Commission."), *available at* https://www.sec.gov/divisions/enforce/enforcementmanual.pdf. Yet Ripple, unlike Platform A and the public, knew of the SEC's then-existing investigation as to Ripple and XRP. What Platform A did or said, and the SEC's response or lack thereof, does not insulate Ripple from the consequences of its own decision not to seek a no-action letter from the SEC, particularly when Ripple knew the question was critical to its business even before the investigation began in 2018, and so important to market participants that they were asking Ripple for a legal opinion. This is especially true given that Ripple had paid incentives to Platform A to list XRP, and that Platform A was involved in a decision to rate XRP a 4 out of 5 likelihood to be a security. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) ("[T]he regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry").

In short, none of the allegations described as Ripple's basis for its Defense, even if proven, are legally sufficient, and the entire defense should therefore be stricken.

**II.    Using the Appropriate Test for Fair Notice, the Securities Act's Definition of "Investment Contract" Is Not Unconstitutionally Vague.**

 "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  "Importantly, it is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well."  *United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (collecting cases).  Whether by statute or judicial gloss, "a law need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth."  *Dickerson v. Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010) (internal quotation marks omitted).

Furthermore, "[t]he degree of linguistic precision…varies with the nature—and in particular, with the consequences of enforcement."  *General Media Comms. v. Cohen*, 131 F.3d 273, 286 (2d Cir. 1997).  As the Supreme Court has explained:

> [E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.

*Village of Hoffman Estates*, 455 U.S. at 498-99 (internal citations omitted); *see also General Media*, 131 F.3d at 286 (lower "standards of certainty" for statutes "depending primarily upon civil sanction for enforcement"); *compare Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–72 (1997) (noting the "special First Amendment concerns" raised by vagueness in the "content-based regulation of speech").  The standard for fair notice of civil statutes that regulate economic activities is whether the law is "sufficiently clear that its prohibitions would be understood by an ordinary person

operating a profit-driven business." *Irvine v. 233 Skydeck, LLC*, 597 F. Supp. 2d 799, 803 (N.D. Ill. 2009); *Iosello v. Leiblys, Inc.*, 502 F. Supp. 2d 782, 785 (N.D. Ill. 2007).

A.   **The Second Circuit and Other Federal Courts Have Uniformly Rejected Vagueness Challenges to the Statutory Term "Investment Contract."**

Whether Ripple offered and sold "investment contracts" requires applying the Supreme Court's *Howey* test to a specific set of facts. This analysis necessarily requires "a fact-specific analysis" that is "different" for every digital asset. *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020). The *Howey* test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those seeking to use others' money on the promise of profits." *SEC v. Edwards*, 540 U.S. 389, 393 (2004). By emphasizing elasticity in the regulation of securities, Congress and the Supreme Court predicted that issuers would devise new investment vehicles to raise funds from the public, and fair notice jurisprudence has long been marked by "flexibility and reasonable breadth" over "meticulous specificity." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972); *accord Dickerson*, 604 F.3d at 747.

No federal court has ever accepted the argument that the term "investment contract" as used in the Securities Act or as construed by the Supreme Court in *Howey* fails to provide persons of ordinary intelligence notice of what is prohibited in *any* context. *Howey* and its progeny provide clear, explicit standards that courts have applied for decades. *See SEC v. Brigadoon Scotch Distrib. Co.*, 480 F.2d 1047, 1052 n.6 (2d Cir. 1973); *see also United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *4 (E.D.N.Y. Sept. 11, 2018) ("Though 'investment contract' has not been defined by Congress, the test for whether a 'given financial instrument or transaction constitutes an 'investment contract' under the federal securities laws,' has long been settled" (citing *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008); *Howey*, 328 U.S. at 293)); *United States v. Smith*, 985 F. Supp. 2d 547, 588 (S.D.N.Y. 2014) (judicial decisions provide fair notice); *see generally General Media*, 131 F.3d at 287 (rejecting vagueness challenge in part because "[m]any of the terms employed in the [challenged

23

statute], read in light of the explanatory directive implementing it, have been found by the courts to be sufficiently clear for constitutional purposes").

The controlling Second Circuit authority on this very question is *Brigadoon Scotch*, where the court found "untenable" the claim that the term "investment contract" was void for vagueness "in light of the many Supreme Court decisions defining and applying the term." 480 F.2d at 1052 n.6. The Second Circuit reached that conclusion despite the defendant making three claims indistinguishable from Ripple's claims—that the defendant was merely selling interests in a usable physical commodity (whiskey caskets), *compare id.* at 1051 *with* Letter at 4 (noting supposed "inherent uses and utility" of XRP); that the SEC had "made no determination yet as to coverage under the federal securities laws), *compare Brigadoon Scotch*, 480 F.2d at 1051 *with* Letter at 3 (noting that the SEC "provided no contrary indication" to supposed market belief that XRP was not subject to the securities laws); and that the SEC had issued guidance indicating that the securities laws did not apply to such instruments but later issued guidance indicating that they did. *Brigadoon Scotch*, 480 F.2d at 1052 n.3 *with* Letter at 3 (noting supposedly contrary guidance as to ether).[7]

More recently, three district courts also rejected similar vagueness challenges, including two in the Second Circuit in cases involving digital assets. *Zaslavskiy*, relying partly on *Brigadoon Scotch*, rejected the argument that "the United States securities laws are unconstitutionally vague ('void for vagueness') as applied to cryptocurrencies." 2018 WL 4346339, at *8. The court explained: "[T]he abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related

---

[7] The Second Circuit reiterated that conclusion in *Glen-Arden*, 493 F.2d at 1029, 1033-35, affirming a preliminary injunction enjoining the sale of certain contractual instruments that the defendants contended were not investment contracts on the ground that they were contracts for the future delivery of a product. The Ninth Circuit reached the same conclusion more than forty years ago in a criminal proceeding. Relying on *Brigadoon Scotch*, in *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979), the Ninth Circuit rejected the vagueness challenge and explained that "[t]here are numerous authorities on the definition of a 'security', enough to give [the defendant] 'a reasonable opportunity to know' the bounds of the federal offense," and that it was "too late in the day more than 32 years after the Supreme Court's decision in [*Howey*] to say that the term 'security' is impermissibly vague." *Id.* (citation omitted).

24

guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the notice that is constitutionally required." *Id.* at *9.

Similarly, in *Kik*, Judge Hellerstein held that *Howey* easily passed the constitutional vagueness test because it "provides a clearly expressed test for determining what constitutes an investment contract, and an extensive body of case law provides guidance on how to apply that test to a variety of factual scenarios" which is "constitutionally sufficient." 492 F. Supp. 3d at 183.

The court in *United States v. Bowdoin* reached a similar conclusion, even though defendant's failure to abide by the law "'resulted from a bona fide mistake as to the law,'" 770 F. Supp. 2d 142, 147-48 (D.D.C. 2011). The court found no basis for the contention that it was "far from clear how to uniformly apply the *Howey* test to novel fact patterns." *Id.* (citing *Howey*, 328 U.S. at 300).

As *Howey* explained, Congress chose broad language to subject offers and sales of securities to federal regulation, and the dozens of decisions that follow *Howey* apply the analysis to what were likely "novel" and "innovative" situations in their time.[8] The enduring quality of the *Howey* decision is that the test is sufficiently flexible to meet and address novel investment schemes to ensure public investors obtain the required disclosures under the securities laws before they invest. In sum, *Howey* provides a clearly expressed test for determining what constitutes an investment contract, and an extensive body of case law provides guidance on how to apply that test to a variety of facts. Thus, Ripple cannot "demonstrate that a person of ordinary intelligence would not have sufficient notice that the charged conduct was proscribed." *Zaslavskiy*, 2018 WL 4346339, at *8; *Kik*, 492 F. Supp. 3d at 182.

---

[8] *See, e.g., SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) (investment packages to secure EB-5 visas); *SEC v. Scoville*, 913 F.3d 1204, 1219-22 (10th Cir. 2019) (online ad services); *SEC v. SG Ltd.*, 265 F.3d 42, 45-47, 51 (1st Cir. 2001) (electronic tokens to use with online games); *Continental Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) (program for purchase and future delivery of beavers).

### B.      The Securities Act Does Not Invite Arbitrary Enforcement.

Ripple's vagueness defense fares no better under the second prong of the analysis: whether statutory language "authorizes or even encourages arbitrary and discriminatory enforcement." *Copeland*, 893 F.3d at 114.  A vagueness challenge fails if "it provides sufficiently clear standards to eliminate such a risk" of arbitrary enforcement *or* "if the conduct at issue falls within the core of the statute's prohibition."  *United States v. Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011) (internal quotation marks omitted).

Ripple's vagueness defense fails both prongs.  First, as the *Zaslavskiy* court found, "*Howey* and its progeny set forth the standards needed to cabin [Section 5's] enforcement relative to investment contracts."  2018 WL 4346339, at *9 (quoting *Farrell*, 449 F.3d at 492-95).  The term "investment contracts" is therefore sufficiently clear to eliminate the risk of arbitrary enforcement. Second, Ripple's alleged conduct plainly "falls within the core of the statute's prohibition," *Copeland*, 893 F.3d at 119 (quoting *Farrell*, 449 F.3d at 494), because the Securities Act's core purpose is to ensure "full and fair disclosure" to investors through registration.  Short on cash, Ripple raised money from investors without disclosing information about its financial condition, and funded essentially all of its operations for nearly a decade by selling XRP to members of the public.  ¶¶ 5, 77-78, 296, 311, 405.  It is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  *United States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)). "Stripped of the 21st-century jargon," Ripple engaged in a straightforward fund-raise "replete with the common characteristics" of other such endeavors.  *Zaslavskiy*, 2018 WL 4346339, at *3.

Ripple also seems to contend that the Securities Act permits arbitrary enforcement by attempting to compare XRP to ether, a different digital asset, and complaining that the SEC has not brought enforcement actions with respect to that asset.  But, as the *Zaslavskiy* and *Kik* courts

explained, "[w]hether a transaction or instrument qualifies as an investment contract is a highly fact-specific inquiry." 2018 WL 4346339, at *4 (citing *Howey*, 328 U.S. at 293). "This is especially true in the context of 'relatively new, hybrid vehicle[s],' which require 'case-by-case analysis into the economic realities of the underlying transaction[s]." *Id.* (quoting *Leonard*, 529 F.3d at 88-89); *see also Kik*, 492 F. Supp. 3d at 183 (*Howey*'s fact-specific analysis precludes application of *Upton* reasoning). Simply incanting comparisons to ether does not show arbitrary enforcement, because discretion to enforce a business regulation is not the same as inviting arbitrary enforcement. *See Village of Hoffman Estates*, 455 U.S. at 503; *Farrell*, 449 F.3d at 493-94. As the Second Circuit explained in *Copeland* in rejecting a claim of unconstitutional vagueness, even a "pattern of discriminatory enforcement, without more, would not show that the statute is unconstitutionally vague. What [is needed] is that the statute, as drafted by the legislature and interpreted by the courts, *invites* arbitrary enforcement…by turn[ing] on the law enforcement officer's unguided and subjective judgment." 893 F.3d at 120 (emphasis added); *see also Kay*, 513 F.3d at 442 (rejecting vagueness claim based on alleged similar misconduct by competitor companies and noting that "multiple violations of a law do not…create vagueness in the law"); *Kik*, 492 F. Supp. 3d at 182-83 (concluding the Securities Act does not "authorize[ ] or even encourage[ ] arbitrary and discriminatory enforcement (citing *Copeland*, 893 F.3d at 114)).

## C.   Ripple Had Actual Notice that XRP Could Be Treated as Securities.

Even were the Court to set aside the decades-worth of cases described above, the pleadings and documents referenced therein show that Ripple *in fact had* fair notice that it could be offering and selling securities before it sold a single dollar's worth of XRP—its lawyers told Ripple's founders exactly that in 2012, and Ripple repeatedly acknowledged that risk internally and to outside parties over the course of the years that followed. ¶¶ 52-60, 413, 419, 421; Ex. B at 2-4, 9-11 & n.25; Ex. C at 3-4, 7, 12-19. Garlinghouse knew about the 2017 DAO Report, ¶ 409, which provided the

SEC's guidance that issuers engaged in offerings of digital assets needed to evaluate the application of the federal securities laws.  DAO Report, 2017 WL 7184670, at *9.  Ripple also continued to sell XRP to public investors after 2018, even after it was notified in April 2018 of the SEC staff's investigation into its conduct, and even after the Division confirmed its investigation was continuing after Mr. Hinman's June 2018 speech.  Ripple was on actual notice that the securities laws could apply and took no steps to obtain no-action relief to either clarify what it thought might be unclear, an avenue that was being pursued by other market participants at the time.  Ripple cannot now complain that this enforcement action was surprising or arbitrary.  *See Advance Pharm., Inc. v. United States*, 391 F.3d 377, 397 (2d Cir. 2004) ("[B]usinesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.  Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.") (quoting *Village of Hoffman Estates*, 455 U.S. at 498-99); *see also Zaslavskiy*, 2018 WL 4346339, at *9 (finding that the DAO Report was relevant guidance).

## III.   Ripple Cannot Assert Equitable Defenses Against the SEC As a Matter of Law.

Ripple alleges as part of its affirmative defense that the SEC "*for years* . . . neglected to provide the Defendants and the market with fair notice" and that the lack of fair notice was "exacerbated" by the FinCEN Settlement, the June 2018 Speech, and the Platform A Listing.  Ans. at 97, 99 (emphasis added).  Although Ripple disclaims raising any equitable defenses, *see* Letter at 4 n.1 ("courts have restricted certain equitable defenses, like estoppel and laches, when asserted against government plaintiffs"), Ripple's "fair notice" defense bears characteristics of equitable defenses like laches (for a suit brought after alleged unreasonable delay) and estoppel (for a suit brought after alleged prior acquiescence), which are unavailable in this SEC enforcement action.

To the extent Ripple's affirmative defense is based on the time it took the SEC to file this suit, it must be stricken, just as a laches defense would be.  "To succeed with a defense of laches, the

Court must find that the plaintiff delayed unreasonably and inexcusably in commencing the action and that the defendant suffered prejudice as a result." *SEC v. McCaskey*, 56 F. Supp. 2d 323, 327 (S.D.N.Y. 1999) (striking laches defense in an SEC enforcement action partly because the action was commenced within the statute of limitations).  "[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest." *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002); *see also United States v. Summerlin*, 310 U.S. 414, 416 (1940) ("[T]he United States is not…subject to the defense of laches in enforcing its rights."); *SEC v. Gulf & Western Indus., Inc.*, 502 F. Supp. 343, 348 (D.D.C. 1980) ("Here, the length of the investigation is a reflection of the complexity of the fact pattern and does not support a laches defense."); *see also Volkswagen*, 2021 WL 451667, at *5 (striking affirmative defense of unclean hands based on allegations that SEC unreasonably delayed in bringing suit).

To the extent Ripple's affirmative defense is based on the SEC's alleged acquiescence in Ripple's unregistered offers and sales of XRP, the affirmative defense should be stricken, just as an estoppel defense would be.  *See, e.g., Culpepper*, 270 F. at 248 ("[T]he Commission would not now be estopped even if it had acquiesced in the [relevant] transaction."); *SEC v. Keating*, No. 91 Civ. 6785, 1992 WL 207918, at *3 (C.D. Cal. July 23, 1992) ("In the context of a civil enforcement action by the SEC, courts have flatly rejected the estoppel defense.").

## IV.     **The SEC Has Been and Will Continue to Be Prejudiced by the Affirmative Defense.**

The Second Circuit has held that in evaluating the propriety of an affirmative defense, "prejudice may be considered and, in some cases, be determinative."  *GEOMC*, 918 F.3d at 98–99. As Judge Cote has explained, forcing the SEC to conduct extensive searches of internal agency files is the type of burden sufficient to satisfy the prejudice component of a Rule 12(f) motion to strike. *See KPMG*, 2003 WL 21976733, at *3 (holding SEC will be prejudiced if affirmative defense not

stricken because "defendants have already given notice that they will seek to discover the internal workings of the SEC investigations").

Here, Ripple has already relied on its Defense to seek intrusive discovery from the SEC, burdening the agency with searching through tens of thousands of e-mails to identify communications SEC staff and commissioners may have had about XRP, Bitcoin, and ether over an eight-year period, resulting in extensive litigation before Magistrate Judge Netburn. *See, e.g.*, D.E. 67, 78, 81, 126. Indeed, counsel for Ripple represented to Magistrate Judge Netburn that this discovery "has great relevance [ ] to our fair notice defense," Ex. F (Tr. of Apr. 6, 2021) at 22, and in granting Ripple's motion to compel this discovery, Judge Netburn reasoned that it could conceivably be relevant to Ripple's fair notice defense, *id.* at 51.

The SEC is currently in the process of identifying and reviewing tens of thousands of documents to respond to this burdensome discovery. If Ripple is able to continue to rely on its Defense, the SEC expects that additional, significant resources will have to be devoted to these improper allegations as the parties conduct fact and expert discovery. To the extent an affirmative defense "would unduly intrude into the SEC's investigative process, or would disproportionately implicate privileged communications or attorney work product," it requires discovery that "would force the SEC to give attention to matters collateral to its securities claims against Defendants" and is "sufficient to satisfy the Rule 12(f) requirement that the moving party show prejudice." *AGF II*, 2016 WL 8314623, at *7 (Report & Recommendation), *adopted in full*, 2017 WL 728701 (S.D.N.Y. Feb. 22, 2017); *KPMG*, 2003 WL 21976733, at *3 (striking affirmative defense against SEC on this basis); *SEC v. Cuban*, 798 F. Supp. 2d 783, 794-95 (N.D. Tex. 2011) (unclean hands affirmative defense "is a prime example" of "instruments [defendants employ] to challenge, and thereby to effectively derail, the enforcement action").

## CONCLUSION

For the foregoing reasons, the Court should strike Ripple's fourth affirmative defense.

Dated:  New York, New York
        April 22, 2021

Jorge G. Tenreiro
Dugan Bliss
Daphna A. Waxman
Jon A. Daniels
Ladan F. Stewart

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

31