

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

April 23, 2021

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square, Courtroom 219
New York, N.Y. 10007

Re:     *SEC v. Ripple Labs, Inc., et al.*, No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Plaintiff Securities and Exchange Commission ("SEC") respectfully requests that the Court deny Defendants' motion (D.E. 121, the "Letter") for an order requiring the SEC (1) to withdraw, and cease using, Requests for Assistance ("Requests") to foreign regulatory authorities and (2) to disclose the SEC's communications with those authorities. Defendants' Letter, devoid of any legal authority on point, makes arguments that two judges in this District have considered and rejected. Those courts have permitted the SEC to use Requests during civil litigation, because they are requests—not subpoenas enforceable by federal courts—and therefore not prohibited by the Federal Rules of Civil Procedure (the "Federal Rules").

The SEC has already agreed to provide Defendants with (1) any and all documents obtained from third parties and provided to the SEC based on the Requests and (2) a list of categories of documents the SEC has requested from each foreign authority. Fairness requires no more, and an opinion curtailing the use of Requests or requiring the disclosure of communications with foreign regulators could have broad adverse implications for the SEC across a wide array of governmental actions where the agency pursues cross-border cooperation to protect the United States' capital markets and its investors.

Under the applicable cooperation arrangements and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), the SEC is precluded from producing privileged communications with foreign regulators. For many of the United States' global regulatory partners, the confidentiality of their communications with the SEC is critical to continued cooperation, which is itself key to the SEC's mission of protecting the United States' capital markets.[1] Indeed, every year the SEC sends and receives hundreds of requests for assistance for use at all stages of the enforcement process—from investigations to post-judgment asset allocation, including matters in litigation. Thus, working with the other 124 signatories to the International Organization of Securities Commissions' ("IOSCO") Multilateral Memorandum of Understanding ("MMOU"), the SEC (and the CFTC) participates in an arrangement responsible for more than 4,000 information exchanges in each of the last three years. *See* IOSCO.org, https://www.iosco.org/about/?subsection=mmou; *see also* SEC, FY2021 Budget Justification at 52, *available at* https://www.sec.gov/files/secfy21congbudgjust.pdf (discussing SEC yearly use of Requests).

---

[1] *See, e.g.*, A. Ceresney, *Keynote Speech ACI's 33rd Int'l Conf. on the FCPA* (Nov. 30, 2016), *available at* https://www.sec.gov/news/speech/speech-ceresney-113016.html ("In this globalized marketplace, the SEC's ability to protect investors and maintain fair and efficient markets is often dependent on Enforcement's ability to investigate misconduct that takes place, at least in part, abroad. Coordination allows the SEC to maximize its ability to investigate wrongdoing while working within the parameters of many different legal systems.").

Defendants identify no cognizable harm from the SEC's use of Requests and protection of its communications with foreign regulators in this litigation—let alone any harm that would justify interfering with or jeopardizing international cooperation arrangements. Defendants have access to all of the documents obtained by the SEC and a full opportunity to challenge their admissibility in court. There is no reason to prevent the development of a full factual record. Defendants' request should be denied.

## I. The SEC's Use of Requests in Litigation Is Well Established.

### A. The SEC Cooperates With Foreign Regulators Through Voluntary Requests.

The SEC is a founding member of the IOSCO, founded in 1983 to, among other things, establish cross-border cooperation in enforcing the securities laws to protect the investing public and to maintain fair, efficient, and transparent markets. Following the events of September 11, 2001, the IOSCO developed the MMOU to facilitate further cooperation, setting out parameters for the exchange of information among IOSCO members. *See* Ex. A (MMOU (Rev. May 2012)). The SEC became one of the MMOU's first signatories in 2002, and has entered into other bilateral arrangements governing international assistance. *See* https://www.sec.gov/about/offices/oia/oia_cooparrangements.shtml.

Congress has recognized the SEC's ability to pursue information pursuant to the MMOU, providing in Section 21(a)(2) of the Securities Exchange Act of 1934 that the SEC may request "reciprocal assistance in securities matters" from a "foreign securities authority" that also requests assistance from the SEC. 15 U.S.C. § 78u(a)(2). The SEC's statutory authority to *request* "assistance" from foreign regulators stands in contrast to the SEC's statutory "empower[ment]" to "*subp[o]ena* witnesses, *compel* their attendance . . . and *require* the production of [documents]." *Id.* § 78u(b) (emphasis added). Only the SEC's subpoenas for testimony and documents may be enforced in federal court—a "request" for "assistance," by its own terms and by statute, may not. *Id.* § 78u(c).

The MMOU is a non-binding information-sharing arrangement, which explicitly provides that a regulatory authority may deny a Request for various reasons, including if a *criminal* proceeding has been initiated. MMOU ¶ 6(e)(ii). Federal courts cannot interfere with a requested authority's refusal to even respond to a Request, which occurs with some regularity—including twice in this case as described below. The Requests take the form of formal (privileged) communications between the SEC and the foreign regulator to comply with the MMOU's parameters, but that does not make them akin to compulsory process.

### B. The SEC's Authority to Request Assistance Does Not Cease in Litigation.

While the Federal Rules provide notice requirements for discovery methods that are enforceable by a federal court, the Second Circuit has long recognized that the Federal Rules do not prohibit litigants from obtaining documents and information through voluntary means not enforceable by a federal court. *See International Business Machines v. Edelstein*, 526 F.2d 37, 40–44 (1975) (granting a writ of mandamus, distinguishing between depositions and voluntary interviews, and holding that the parties could interview witnesses *ex parte*).

Nor do the federal securities laws restrict the SEC's ability to send Requests to foreign regulators once the SEC files a civil action against any particular party. The statute does not distinguish between Requests sent during a civil enforcement action for purposes of obtaining evidence in a continuing investigation and those transmitted for purposes of the litigation. 15 U.S.C. § 78u(b). The MMOU also contains no such restriction or distinction. To the contrary, the MMOU explicitly contemplates that information sought may be used in "conducting a civil or administrative enforcement proceeding." MMOU ¶ 10(a)(ii).

2

Defendants cite no provision of the Federal Rules or other authority that bars the SEC from *issuing* Requests during civil litigation. At most, Defendants' argument is that Requests are subject to the Federal Rules' *advance notice* requirements because they are effectively "subpoenas" under the rules. But Requests are not "subpoenas" under the Federal Rules either. A Federal Rule 45 "subpoena" (literally, "under penalty") "commands" a party to do something, Fed. R. Civ. P. 45(a), cannot be served on foreign nationals, Fed. R. Civ. P. 45(b), and can be enforced by a federal court. Fed. R. Civ. P. 37(a); *see also* Black's Law Dict. (11th Ed. 2019) (defining "subpoena" as "[a] writ or order commanding a person to appear before a court or other tribunal, subject to a penalty for failing to comply"). Requests have none of these characteristics, and are akin to appeals for voluntary cooperation in a world that depends heavily on international cooperation.

Thus, in *SEC v. Badian*, Magistrate Judge Pitman considered and rejected a defendant's request that, in an enforcement action, the Federal Rules require that the SEC be ordered to cease using Requests for use in litigation, or to provide a roadmap to its pursuit of such requests, reasoning in relevant part that a Request is "simply not a subpoena served pursuant to the Federal Rules of Civil Procedure." No. 06 Civ. 2621 (D.E. 112) at 1 (S.D.N.Y. Aug. 13, 2009) (attached as Ex. B) ("*Badian I*"). As Judge Pitman recognized:

> [T]here is nothing in the Federal Rules…that prohibits an attorney from calling up or visiting witnesses and asking them questions, … from asking witnesses for documents or from asking entities with which they have a professional or contractual relationship for documents or other information that may be within the entity's control. All of the foregoing investigatory practices may be pursued on an *ex parte* basis, although none are judicially enforceable. A witness who does not wish to respond to any of the investigative requests discussed above is free, literally, to slam her door in the lawyer's face… It is frequently the case…that documentary evidence is exclusively available to one side. There is no rule of law that limits an attorney's investigation in such cases to sources that are accessible to both sides.

Ex. B at 1–2. As noted, two foreign regulators have in fact refused to respond to the Requests. Thus, now-Chief Judge Swain later adopted in full Judge Pitman's "well-reasoned" opinion. *SEC v. Badian*, No. 06 Civ. 2621 (D.E. 144) (S.D.N.Y. May 11, 2010) (attached as Ex. C) ("*Badian II*"). She noted that there was no legal authority to disturb Judge Pitman's conclusion that requests are not "subpoenas" because they cannot be enforced by a federal court. *See also id.* at 3 ("The fact that the SEC enjoys recourse to a particular method of *ex parte* investigation that has legal force in a foreign tribunal under foreign law is immaterial.").

Defendants' attempts to distinguish *Badian* rely on the very premise that *Badian* rejected—that voluntary Requests are effectively subpoenas, *see* Letter at 4–5 (discussing *SEC v. Life Partners Holding, Inc.*, No. 12 Civ. 00033, 2012 WL 12850253, at *1 (W.D. Tex. Aug. 17, 2012); *SEC v. F.N. Wolf & Co.*, No. 93 Civ. 0379, 1993 WL 568717, at *2 (S.D.N.Y. Dec. 14, 1993); *SEC v. Honig*, No. 18 Civ. 8175 (S.D.N.Y. Sept. 4, 2019)). Notably, all of cases cited by the Defendants involved the SEC's issuance of legally-enforceable *investigative subpoenas* during litigation. Defendants offer no authority to support the argument that issuing voluntary Requests during litigation is somehow inappropriate or that Requests are subpoenas.

Nor, as Defendants contend, do the Federal Rules require parties to obtain foreign documents exclusively through the Hague Convention. Letter at 3. "It is beyond cavil that 'the Hague Convention is not the exclusive means for obtaining discovery from a foreign entity,' . . . [r]ather, the Hague 'Convention was intended as a permissive supplement, not a pre-emptive replacement, for other means of obtaining evidence located abroad.'" *Badian I* at 2 (citing *Société Nationale Industrielle Aerospatiale v. United States District Court for the Southern District of Iowa*, 482 U.S. 522, 536, 539-40 (1987)).

Defendants' insistence that, despite the Federal Rules, the SEC nevertheless be ordered to only use the more time-consuming and costly Hague Convention process to obtain documents located abroad reveals the true impetus for their Letter—to keep the SEC from collecting documents. But Defendants have already refused to produce documents to the SEC on the basis that they can be obtained from third-parties, *see, e.g.*, Ex. D (Letter of A. Ceresney dated Apr. 19, 2021 at 4-5 (refusing to produce documents between Ripple and public relations firm, noting that the SEC can obtain the documents from the firm)). And, as set forth below, Defendants have so far failed to produce documents to the SEC that it had to obtain from parties located abroad. Defendants' request to keep the SEC from obtaining documents on a voluntary basis from third parties merely seeks to prevent the "search for truth so essential to the effective operation of any system of justice." *Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000). Should Defendants prevail, contrary to the Federal Rules' mandate that the rules be applied "to secure the just, speedy, and inexpensive determination" of this action, Fed. R. Civ. P. 1, the SEC would need as much as eighteen additional months to complete discovery using the Hague Convention.

### C. The Federal Rules Do Not Require that the SEC Turn Over Privileged Materials.

Defendants' request that the SEC turn over its privileged communications with foreign authorities is equally improper, particularly given the SEC's agreement to turn over a list of the categories of documents the SEC has requested from each foreign authority. Congress sought to strengthen and encourage the SEC's use of Requests through the Dodd-Frank Act, enacted in the wake of the 2008 financial crisis. It provides that the SEC "shall not be deemed to have waived any privilege applicable to any information by transferring that information to . . . any foreign securities authority," and that the SEC "shall not be compelled to disclose privileged information obtained from any foreign securities authority." 15 U.S.C § 78x(f)(1), (2).

The Requests constitute the SEC's work product because they set forth, consistent with the procedures set out in the MMOU, the SEC's theory of the case, why documents requested would assist in furthering that theory, and the documents the SEC thinks may be relevant to the matter. MMOU ¶ 8(b). The sharing of this work product with a foreign regulator does not waive its protection. 15 U.S.C. § 78x(f)(1). At a meet and confer, counsel suggested that he would find it "interesting" to review the SEC's theory of the case in the Requests, but a lawyer's desire to get into his adversary's mind and to pierce international cooperation premised on confidentiality of communications is not a proper basis to order discovery.

A foreign regulator's response to the SEC's Requests is also protected by U.S. law to the extent it is protected from disclosure by the regulator's laws. 15 U.S.C. § 78x(f)(2). Additionally, under the MMOU, the SEC cannot disclose non-public documents and information under the arrangement, except under certain limited circumstances. MMOU ¶ 11(b) (noting that the requesting authority will "assert such appropriate legal exemptions or privileges with respect to such information as may be available"). In response to Defendants' original letter to the SEC on this issue, the SEC contacted the foreign regulators who had received Requests to ask whether the communications from that regulator to the SEC were subject to protection under the laws of their own jurisdictions. Though Defendants' Letter fails to note this, the SEC notified Defendants that the SEC had engaged in this endeavor and would disclose to Defendants any such communications as to which no foreign-law privilege or protection applies. To the extent a foreign regulator asserts privilege over its communications to the SEC, Defendants are not entitled to an order disturbing Congress's Dodd-Frank Act mandate or intruding into privileged communications between the SEC and foreign regulators in ways that would discourage regulators from cooperating with the United States in investigating and enforcing securities laws violations. *Zschernig v. Miller*, 389 U.S. 429, 432 (1968) ("the field of foreign affairs" is one that "the Constitution entrusts to the President and Congress"). To the

extent foreign authorities do not assert a privilege over their written communications to the SEC, the SEC will produce them, as the SEC has repeatedly told Defendants.[2]

## II. The Use of Requests Is Particularly Important in This Case.

Since the start of discovery, the SEC has issued 11 Requests to 9 foreign regulators, covering approximately 20 entities (all of which are listed in the SEC's Initial Disclosures) and their affiliates. The Requests seek assistance in obtaining documents from (1) 14 digital asset trading platforms, (2) five companies that Ripple claims "use" XRP in its so-called "On-Demand Liquidity" f/k/a xRapid and (3) one investor that purchased XRP directly from Ripple, and its affiliates. As to the status of the Requests and the ability to disclose the substance of its communications with a particular foreign regulator, two foreign regulators have refused to provide any assistance; three have prohibited the SEC from disclosing its communications with the SEC under the laws of their jurisdictions; one has stated that such disclosure is likely *not* prohibited; and the SEC later withdrew one of the Requests after the party at issue contacted the SEC and stated that it would accept a Rule 45 subpoena. The SEC is awaiting answers from the remaining regulators.

The Requests are particularly important in this case because they have provided and will provide the SEC with information that is not obtainable either from Ripple or another third party. For example, the SEC made Requests to digital asset trading platforms for two reasons. *First*, these platforms apparently have *sole* possession of intraday XRP trade data for Ripple's XRP sales for certain time periods—data that is critical to a central dispute between the parties (whether XRP's price moves were influenced by Ripple's announcements). But one market maker who sold XRP on Ripple's behalf told the SEC that it lacks intraday data for certain time periods, and a second market maker, now defunct, told the SEC that this information was not readily accessible to it and asked that we obtain it from the trading platforms. While the SEC also attempted to obtain this information directly from Ripple, Ripple recently told the SEC that Ripple does not have it either, leaving the only avenue for investigation offshore. *Second*, the Requests to trading platforms also concern hundreds of millions of XRP that, based on the SEC's forensic analysis of digital asset wallet addresses, the Individual Defendants apparently transferred (either directly or indirectly) to at least a dozen platforms (in addition to various United States platforms). Indeed, the Individual Defendants place significant weight on their trading on foreign platforms in their motions to dismiss. *See, e.g.*, D.E. 108 at 27-28; D.E. 111 at 10-11, 29. Yet, despite advancing these arguments and assuring the Court that they will produce all records respecting their trading in XRP, Ex. E (Tr. of Mar. 19, 2021) at 16, 66, the Individual Defendants have not turned over a single document concerning a non-U.S. domiciled digital asset account or otherwise explained the significance of these XRP transfers. On February 16 and March 1, 2021, the SEC notified Defendants that it would Federal Rule 45 subpoenas to two platforms, which received over 500 million XRP from digital wallet addresses related to Larsen. U.S. counsel for these entities later informed the SEC that some of the documents sought were located abroad, and that they would provide them if the relevant foreign regulatory permitted it, prompting two of the Requests.

---

[2] Defendants also incorrectly insist that the SEC violated the Federal Rules because it was required to produce its Requests and responses from foreign regulators pursuant to discovery requests served by Defendants. *See* Letter at 6-7 (citing RFP 2). As correspondence between the parties reflects, the parties agreed almost at the outset of discovery that the relevant period for their respective requests for production would conclude upon the filing of the case. *E.g.*, Ex. D at 4-5 (refusing SEC request to broaden relevant discovery period). It was not until April 12, 2021, the week it filed this Letter, that Defendants notified the SEC for the first time that, contrary to the parties' prior agreements, they now construed the Relevant Period for RFP 2 to encompass Requests transmitted *after* the filing of this case. Ex. F. At the April 14, 2021 meet-and-confer session, the SEC indicated that it would consider Defendants' request as it related to producing a privilege log as to the Requests, but Defendants filed their Letter before the SEC could inform Defendants that it will provide a categorical privilege log as to the Requests.

Finally, seeking this information from third parties through Requests is critical to timely completing discovery. Just this week, Ripple refused to produce relevant communications with a third party on the ground that the SEC could instead the documents from the third party. *See* Ex. D at 7 (referring to SEC RFP No. 33). Indeed, documents the SEC has collected through Requests include communications with Ripple that Defendants have not produced to the SEC despite being responsive to both investigative requests and Federal Rules subpoenas. *See, e.g.*, Ex. G (email attaching an xRapid Pilot executive summary for a purported "user" of XRP), Ex. H (concerning the public announcement of xRapid commercial availability). Ripple's position that the SEC must seek certain documents from third parties, coupled with Defendants' motion to preclude the use of Requests, would achieve nothing other than to impede the SEC's ability to obtain discovery from relevant parties under the existing scheduling order, because the Hague Convention process is much more time-consuming than Requests.

### III. Defendants Are Not Prejudiced by the Requests.

Defendants' arguments that they will be prejudiced by the Requests are meritless. First, despite contrary accusations, Letter at 1, the SEC informed Defendants of its intent to use RFAs at the start of discovery, when the Individual Defendants indicated they wanted an additional discovery period, *see* D.E. 48 ¶ 13(c), in part so they could conduct foreign discovery. Second, the SEC has produced and will continue to produce any and all relevant, non-privileged documents collected from third-parties by any means, and Defendants can of course object to any document they were not notified of, regardless of its provenance. Third, Defendants' incendiary contention that the SEC is using Requests as an "intimidation" tactic should not be credited. *See* Letter at 1. As explained, documents sought in the Requests are of the same nature as documents sought by the SEC's Rule 45 subpoenas. Defendants have not objected to any of the subpoenas to the extent they call for the same types of documents as the Requests. Baseless accusations of impropriety may make for good headlines, but do not establish prejudice.

Fourth, Defendants' inability to object to Requests does not prejudice them any more than the issuance of subpoenas (which the Requests are not) or voluntary requests to third parties, since they "lack[ ] standing to challenge" the Requests. *Badian II* at 3 (citation omitted). An adversary's inability to intrude on voluntary discovery efforts does not constitute prejudice—it is the nature of such requests. *See Badian I* at 1–2.

Defendants' final prejudice claim—that they themselves are unable to use Requests—is also an insufficient reason to preclude their use, especially where the resort to foreign discovery is in part because Defendants lack possession of the relevant evidence. As Magistrate Judge Dolinger concluded in *SEC v. Tourre*, if the SEC "has provided copies to defendant" of the materials it receives pursuant to Requests, as the SEC has done and will continue to do here, a defendant's complaint that it was "inequitable" that only the SEC could issue Requests to obtain documents for use exclusively in litigation is immaterial. No. 10 Civ. 3229 (BSJ) (MHD) (S.D.N.Y. Jan. 31, 2011) (attached as Ex. I) at 10-11; *see also Badian I* at 2 (rejecting this argument).

In fact, the SEC is not the only party to this case that has sought documents using means other than Rule 45 subpoenas. Defendants publicly announced that they filed Freedom of Information Act ("FOIA") requests for many of the same documents relating to Bitcoin, ether, and XRP that they sought in discovery, *see* Ex. J at 1; Ex. K at 4-5; *see also* D.E. 67-5 at 11-13 (making same requests as Ex. K), even before this Court had ruled on the merits of that dispute. Unlike the Requests, FOIA requests *require* the SEC to produce certain documents and may be pursued in court, even while, as here, the parties are litigating the very same issue before this Court. Thus, Defendants' contention that the SEC is gathering documents outside of this "Court's authority to oversee" discovery, Letter at 3, is disingenuous. The SEC is not a "super-litigant." *Id.* at 2. But this elides a critical distinction between ordinary civil litigants and the SEC as a civil litigant—that

the SEC is subject to additional obligations such as FOIA, which Defendants themselves have exploited. If anything, with this motion, their FOIA requests, and other demands to the SEC (for example that it turn over its investigative file before discovery), Defendants have fashioned themselves "super defendants."[3]

### IV.     Defendants' Cursory Approach to Meeting and Conferring Should Not Be Rewarded.

Defendants have already received information about Requests that they are not entitled to under the Federal Rules. Distilled to its essence, the only dispute remaining between the parties before Defendants filed their Letter was about the *sequence* of providing information about the Requests (which, to the extent covered by existing discovery requests, the Federal Rules only require be done in a "timely manner," Fed. R. Civ. P. 26(e)). Instead of attempting to resolve that remaining dispute Defendants chose to burden the Court with a request that it issue a broad ruling granting *everything* they had "demanded" from the SEC when the dispute began. This approach to litigation—aimed at bogging down the process with fruitless meet-and-confers that end up with "all or nothing" court demands—should not be rewarded.

The SEC first learned of Defendants' objection to the use of Requests during a March 17, 2021 meet and confer, *see* Letter at 2 n.2, to which the SEC indicated that the request to withdraw and cease the use of Requests was contrary to law. By letter dated March 22, 2021, Defendants "demand[ed] that the SEC waive any confidentiality right and, if necessary, obtain consent of the foreign regulators to do so" with respect to Requests, and stated that the SEC "must cease any future use of [Requests]." *See* Letter, Ex. A at 2. The next day, the SEC acknowledged the Defendants' "demand[s]" and indicated it would need some time to provide a fulsome answer to Defendants' demand as to communications *from* foreign regulators. *See* Ex. L at 1. Defendants ignored the SEC's answer and a few days later reiterated their demand, without citing authority, that the SEC withdraw the Requests. *See* Ex. M at 6. In later correspondence, the SEC reiterated that it needed time to answer and that there was no legal authority requiring the SEC to withdraw the Requests. *Id.* at 4-5. Throughout this process, Defendants identified no principle of law or document request that required the SEC to undertake these time-consuming endeavors—the SEC did so in a good-faith attempt to achieve middle ground and avoid burdening the Court.

In subsequent correspondence, Defendants raised new demands beyond those of their March 22 Letter, including that the SEC provide (1) notice and (2) status of the Requests, (3) the Requests themselves, and (4) SEC internal policies as to the use of Requests. *Id.* at 3. The SEC replied that it had then not received any documents and reiterated its commitment to provide them, and later said that it would provide Defendants with a description of the documents sought in the Requests but not the Requests themselves. *Id.* at 1, 3. Again, the SEC offered these concessions purely in an attempt to reach consensus.
Thus, as Defendants were aware when they filed their Letter, the SEC had already committed to giving them almost everything they had requested in the meet-and-confer process—including the names of entities subjected to Requests and the substance of the document requests in the Requests. Yet despite extensive and time-consuming negotiations with Defendants, Defendants filed their Letter to seek everything they originally demanded from the SEC, without any legal authority for their position. Defendants' approach to the meet-and-confer process discourages cooperation, threatens to require the Court's intervention on virtually every discovery dispute, and will impede a timely resolution of this matter based on the full merits.

---

[3] To the extent Defendants have contractual or other close relationships with third-parties that may be asked to produce documents based on SEC Requests (and the fact that certain entities also notified Defendants of the Requests suggests they do), Defendants are also free to request documents on a voluntary basis. Some parties may be less or more willing to cooperate with the SEC or with Defendants based on their relationships. This is simply the nature of discovery, as the *Badian I* court noted.

Respectfully submitted,

*/s/ Jorge G. Tenreiro*

Jorge G. Tenreiro

cc: All counsel (via ECF)