# Exhibit A

# UNITED STATES DISTRICT COURT
# DISTRICT OF RHODE ISLAND

In re: John Deaton, et. al.

| | | |
|---|---|---|
| JOHN DEATON, | : | |
| JORDAN DEATON, | : | |
| JAMES LAMONTE, | : | |
| TYLER LAMONTE, | : | |
| MYA LAMONTE, | : | |
| MITCHELL MCKENNA, | : | |
| KRISTIANA WARNER, | : | |
| and all others similarly situated, | : | |
| | : | |
| | : | |
| *Petitioners,* | : | |
| | : | |
| | : | **Case No.:** |
| v. | : | |
| | : | |
| ELAD ROISMAN AS ACTING SEC CHAIRMAIN, | : | |
| U.S. SECURITIES & EXCHANGE COMMISSION | : | **PETITION FOR WRIT OF** |
| | : | **MANDAMOUS** |
| *Respondents.* | : | |

## STATEMENT OF FACTS

1.      The U.S. Securities & Exchange Commission's (SEC) mission statement is to "protect investors, promote fairness and *share information* about companies…to help investors make informed decisions and invest with confidence."

2.      As chairman of the SEC, it was Jay Clayton's (Clayton) fiduciary duty to enforce the SEC mission statement. Instead of protecting investors and sharing information to help investors make informed decisions the Respondent knowingly and intentionally caused multi-billion-dollar losses to innocent investors who have purchased, exchanged, received and/or acquired the Digital Asset XRP, including the named Petitioners, and all others similarly situated.

3.     On December 22, 2020, SEVEN years after the Digital Asset XRP was introduced to the public for sale, establishing itself as the third largest cryptocurrency in the world, at the direction of Clayton, with improper motive and the specific intent to cause irreparable harm, the SEC filed an enforcement action against Ripple Labs (Ripple), its CEO Brad Garlinghouse (Garlinghouse), and Co-founder Chris Larsen (Larsen), alleging that "from 2013 **to the present**", Ripple has and continues to sell unregistered securities with the Digital Asset XRP. (emphasis added).

4.     XRP is the third largest virtual currency with billions of dollars trading every day. XRP trades on exchanges in line with the two largest cryptocurrencies, Bitcoin (BTC) and Ethereum (ETH).

5.     The SEC has previously deemed BTC and ETH as non-securities.

6.     XRP, according to Ripple, is used as a currency by as many as 150 third-party consumers and commercial applications.

7.     Prior to the enforcement action, XRP was the third largest Cryptocurrency in the World. It has been traded openly on over two hundred exchanges globally since 2013. It has been actively traded in the United States during that time on popular exchanges like Coinbase, Kraken, Binance, Voyager, Crypto.com, Uphold, and etc.

8.     The Head of Asset Management of Sygnum, a Swiss bank in Singapore, authored an article to the public recommending everyone *increase exposure to "the tokens of the future"* and lists those tokens to be *BTC, ETH, and XRP*. Sygnum classifies BTC as the future asset for store of value and wealth. It classified ETH as an infrastructure play of the future. It classified XRP as not a security, but as technology of the future regarding *payments*.

9.      Bitcoin, Cryptocurrencies, Decentralized Finance (DeFi) and Central Bank Digital Currencies (CBDCs) have been the most discussed issues in global finance and money during the last three years.

10.     For global governments, after addressing the need for financial relief caused by the Covid-19 Pandemic, Digital Currencies and CBDCs, have become the most significant financial topic in the world today.

11.     China's President Xi has urged world leaders to support CBDCs. At the recent G20 meeting in November 2020, he stressed the need for CBDCs.

12.     Japan accelerated a rollout of the digital Yen and CBDC.

13.     Canada announced it will soon launch a CBDC.

14.     The Bank of England stated digital currencies may replace banks role in payments altogether.

15.     The European Central Bank said that Europe is losing in the CBDC race and that there will be significant consequences.

16.     PayPal CEO Dan Shulman recently stated there is "no doubt people flocking to digital currencies and CBDCs *will be the future* and there is no doubt that CBDCs will be issued directly by Central Banks to people".

17.     A top Japanese Banker said digital currency development is the top priority and that Japan is behind China and South Korea.

18.     The Head of Russian Parliaments for financial markets stated that the Crypto Ruble will start in 2021.

19.     China has already created a CB-backed digital currency and has been using it for the last couple of months in select Chinese cities.

20.     A Top Russian banker declared global payments giant SWIFT to be replaced by digital currencies.

21.     In the last few years, Ripple emerged as the main challenger to SWIFT by offering instant cross border payments, utilizing XRP. Acting Director of the Office of the Comptroller of the Currency (OCC) Brian Brooks publicly stated that the Government should utilize existing private companies like Ripple and its technology to replace the SWIFT system.

22.     OCC Brian Brooks stated publicly that in the U.S. there are too many agencies in finance and banking. He openly asks the question "*Do we think it's best for the Government to build a CBDC or utilize the private sector, which is already built*?" Brian Brooks, without question was discussing XRP and the XRP Ledger (XRPL). There is no doubt it was XRP that he was referencing because he stated that the technology to build a CBDC was "already built", but that the only issue was with a *lack of regulatory clarity*. He could not have been referencing BTC or ETH because they have long enjoyed regulatory clarity by being declared non-securities by the SEC. Additionally, Brian Brooks has stated that the industry needs to know whether the SEC thinks XRP is a security.

23.     Ripple announced that it intends to leverage its payment platform and the XRPL for delivery of CBDCs.

24.     Garlinghouse publicly stated that Central Banks are looking to issue CBDCs on the XRPL.

25.     Ripple presented a plan to host CBDCs together with the XRP token. The XRPL will host CBDCs and public and private entities are able to modify CBDCs according to their needs.

26.     The World Economic Forum (WEF) named XRP as the most relevant crypto for CBDCs by banks.

27.     David Schwartz, Ripple's CTO, says that the XRPL will bridge between CBDCs. In short, XRP acts as a ***bridge currency*** (emphasis added).

28.     Former CFTC, Chris Giancarlo, who heads the Digital Dollar Project for the U.S. Government, has stated publicly, in writing, that XRP is not a security.

29.      Congressman Tim Emmer has publicly declared that XRP "is clearly not a security."

30.     Japan, Singapore, the U.K., Switzerland and the UAE have all declared XRP to be a non-security.

31.     XRP is declared a non-security according to Japan's Financial Services Agency.

32.     SBI, a Japanese corporation, has an E sports team and pays its players in the Digital Asset XRP. In this instance, XRP is utilized as payroll currency.

33.     The UK's Financial Conduct Authority (FCA), unlike the SEC, provides clear guidance to investors and businesses regarding crypto-assets and digital currencies. The FCA has stated that crypto fits into several brackets: a) a security token; b) a utility token; and c) an exchange token. A security token is like a stock certificate or debt instrument. It provides title rights to a company. A utility token is designed for a specific purpose. An exchange token is traded on platforms for value in something. The FCA declared XRP to be a "hybrid token", constituting both a utility and exchange token. It **was not** determined to be a security token.

34.     Ripple partner Xago announced they are utilizing XRP to move money across Africa.

35. The Office of Monetary & Financial Institutions Forum (OMFIF) produced a report on blockchain technology and discussed the advantages of XRP as an alternative in payments.

36. Bitex, an exchange in the UAE that offers XRP, is expanding to India with a wallet trading platform utilizing the Crypto Assets BTC, ETH, XRP, LTC and BCH.

37. Deel, partnered with Coinbase (which sells XRP), launches a crypto payroll tool that allows international workers to be paid in BTC, ETH and XRP, allowing near instantaneous withdrawals. In other words, International Workers withdraw their paychecks in XRP - *XRP is used as a substitute for fiat currency.*

38. Japanese financial giant SBI sponsors and/or owns an Esports team. SBI announced it is paying its players not in the Japanese Yen, but in XRP. Like with Deel, XRP is being used *as a substitute to fiat currency*.

39. SBI Ripple Asia CEO publicly stated that the CEO of Japanese Financial giant SBI Holdings is "XRP's biggest fan and wants the next World's Fair in Japan to only accept XRP *as a currency payment*."

40. SBI announced it plans to test XRP in the $6.6 trillion foreign exchange (Fx) market. The total Fx market, worldwide, is between $1 to $7 quadrillion. SBI also rolled out a BTC lending service and announced plans to add support for ETH *and XRP*.

41. Novatti partnered with Ripple to enable real-time remittances between Australia and Asia.

42. Goldman Sachs' former executive resigned and goes to work for Ripple related to Fx markets. As stated, SBI was testing XRP in the Fx Markets and the Global Fx markets equal $1-7 Quadrillion.

43.     The IMF in its publications lists two digital assets that can be used as a *bridge currency*: XRP and the JPM Coin.

44.     In 2015, the DOJ and FinCen categorized XRP as *virtual currency*.

45.      Hence, internationally and in the United States, XRP was being described as a *currency, virtual currency or commodity, or utility token*.

46.     The Digital Asset XRP and Ripple are well-known to the Respondent and officials in the U.S. Government. In 2015, the U.S. Government entered into a consent agreement over Ripple's sale of XRP to a well-known Bitcoin and Cryptocurrency Advocate and investor, Roger Ver. Ripple paid a fine for this XRP distribution and agreed not to establish a Ripple and/or XRP Wallet.

47.     Additionally, in 2015 the DOJ and FinCen settled a case with Ripple.  The DOJ and FinCen classified and/or determined that XRP was a "**virtual currency**" and that Ripple is a money transmitter of XRP (emphasis added). The settlement with the U.S. Government required Ripple's XRP transactions to comply with laws **that do not apply to** securities' transactions. However, more than 5 years later, despite one arm of the U.S. Government declaring XRP virtual currency, Clayton and the SEC, through its enforcement action, allege all XRP as securities. The enforcement action is not limited to the XRP sold to Roger Ver or others directly from Ripple, but ALL XRP, including XRP purchased by investors with absolutely no connection to Ripple or its executives.

48.     The issue of XRP and its classification as a virtual currency, and/or commodity, and/or security is an issue Clayton, himself, has been asked, repeatedly and publicly, on several occasions. Clayton, at least two years prior to the December 22, 2020 enforcement action declaring XRP a security, was specifically asked about XRP publicly. On one occasion, Clayton

was being interviewed on CNBC and was asked directly if the SEC was going to officially declare XRP a non-security similarly to the SEC declaring the two larger crypto assets, BTC and ETH, non-securities. Clayton only said, "**if it's a security, we will regulate it**." The CNBC anchor pushed back at this non-answer and stated to Clayton that there seems to be confusion regarding XRP because the SEC has not officially declared it as a non-security like it has BTC and ETH. Clayton smugly responded, "I hope I just cleared up any confusion by stating "**if it's a security we will regulate it."** It should be noted that Clayton was asked about XRP by CNBC during the very time period the SEC now claims Ripple and Garlinghouse were actively and continuously, selling illegal securities (in the form of XRP). Yet, Clayton waited for several more years before filing the enforcement action declaring all XRP as securities.

49. Clayton was asked directly about XRP approximately one year after CNBC's interview, while attending a Fintech 2019 Event. Ironically, both Garlinghouse and Clayton were guest speakers at the FinTech conference. The topic of discussion was digital currencies and Garlinghouse spoke immediately after Clayton. Again, Clayton was asked about when the SEC would declare XRP a non-security. Clayton responded that the SEC does not comment on specific products (although, the SEC had commented publicly on the specific products of BTC and ETH). Clayton stated that he very much appreciated the XRP issue, but he could not comment.

50. The SEC could have made the claim against XRP in 2017 when the SEC brought ICO (Initial Coin Offering) cases against several companies, alleging that the digital token that was being offered constituted an unregistered security. Two of these cases involved the EOS and KIN Tokens. These companies raised capital by offering ICOs. These tokens were promised by the promoter who received money for that promise. As discussed in the accompanying

*Memorandum of Support*, this ICO scenario fits squarely in the 4 factor *Howey test* of what constitutes a security.  Because these ICOs constituted securities, the SEC shut it down.  Ripple and XRP, however, were left alone by the SEC during these high profile ICO prosecutions. In fact, Garlinghouse spoke out against these Token assets.  In 2017, XRP had been openly traded for FOUR years.

51.     Although the SEC and/or Clayton did not affirmatively declare XRP a non-security similar to ETH and BTC, its actions implied that XRP was in fact not a security. During the time period the SEC **now** claims XRP was an unregistered security, the SEC granted Ripple permission to take a minority stake in the publicly traded company MoneyGram International (MGI). Ripple invested $50 million purchasing approximately 9% of MGI. *See SEC Complaint, p.58 fn.4.*  The SEC approved this purchase of MoneyGram with the full knowledge that Ripple would encourage MGI to use the Digital Asset XRP as a cross-border utility token related to remittances. Hence, The SEC allowed the use of this **so-called illegal security** to be utilized not just by Ripple, but by MoneyGram, as well. The SEC admits to this knowledge when its states that Ripple paid "Money Transmitter significant financial compensation – **often paid in XRP**." *See SEC Complaint, p. 58 (emphasis added).*

52.     The SEC knew that MGI would sell XRP in the Secondary Markets to investors such as the named Petitioners and all others similarly situated.  Hence, it appears, the SEC, believing XRP to be an unregistered security, provided consent for XRP to be purchased and/or utilized by MGI and then sold in secondary markets to innocent investors with no connection to Ripple or even MGI (purchasers of XRP on exchanges do not know the identity of the seller).

53.     The OCC, in April 2020, issued a notice to banks in the U.S. that they could custody crypto assets. *Clayton issues a letter that says the SEC agrees with the OCC that U.S.*

*banks can now custody cryptocurrency*. XRP is the third largest crypto asset. Clayton did not

state that he agreed with the OCC with the exception that banks CAN'T custody XRP because

they are securities**.** He never provided a statement that XRP or other Crypto could later be

determined a security. **Instead, it appeared that the SEC was in full agreement that Banks**

**could custody Crypto.** *He certainly didn't say but be aware that eight months later, on my way*

*out the door, I intend to declare the third largest crypto asset in the world to be an unregistered*

*security*. No mention of XRP whatsoever. It is one-hundred percent reasonable to assume that if

the SEC agrees that US banks can custody crypto assets, it would include the third largest

crypto-asset.

54.    Considering the magnitude of a SEC enforcement action involving the Digital

Asset XRP, Clayton was sent a letter, prior to the filing of the action, from former Chairman of

the SEC, Joseph Grundfest warning Clayton that the mere filing of the lawsuit generally

declaring XRP an unregistered security "would result in an unprecedented scenario of billions of

dollars in losses resulting from an exodus of intermediary market service providers." Chairman

Grundfest pleaded with Clayton stating that "no pressing reason compels immediate enforcement

action". Afterall, XRP has been publicly traded in the United States and globally for SEVEN

PLUS years with the SEC's full awareness and implicit permission. The Respondent was well

aware that XRP was being actively traded on over two-hundred exchanges globally, including

United States exchanges such as Coinbase, Kraken, Binance US, Voyager, Crypto.com, and

Uphold, amongst several others.

55.    Clayton was warned by Chairman Grundfest that if the SEC initiated an

enforcement action declaring the Digital Asset XRP an unregistered illegal security, in present

day, these Digital Asset exchanges would have no choice but to delist XRP and/or halt XRP

trading out of fear that an enforcement action will one day be commenced against them for selling illegal securities. Yet, Clayton was undeterred in his personal mission, contrary to the SEC's mission, and, filed the enforcement action, but not limited to specific distributions of XRP by Ripple's or its executives. Instead, Clayton took the extraordinary and absurd step of declaring all present day XRP, including the XRP owned by the named Petitioners and all others similarly situated, unregistered securities. According to the SEC's Complaint, the XRP held in thousands of individual accounts and or digital wallets belonging to innocent investors who have absolutely no connection to Ripple, or its executives, are securities. In fact, many of these innocent investors, including several of the named Petitioners, and others similarly situated, have never heard of Ripple.

56.     Former SEC Chairman Grundfest informed Clayton that he was "aware of no instance in which the simple announcement of a commission's enforcement procedure has, absent allegations of fraud or misrepresentation, caused multi-billion-dollar losses of innocent third parties."  In the SEC's Complaint against Ripple, Garlinghouse and Larsen, there are no allegations of fraud or misrepresentation.

57.     Clayton chose to file, quite possibly, *the most significant SEC enforcement action in 76 years* as he was walking out the door after allowing the Digital Asset XRP be sold for SEVEN years, leaving a new administration to deal with the aftermath. A different political party is assuming control and it is quite possible, if not likely, that they withdraw and/or amend and limit the Complaint's scope and allegations related to XRP. **Maybe the mere filing of the Complaint was the end game for Clayton.**

58.     Prior to the SEC enforcement action, declaring XRP an unregistered security, Clayton had tendered his resignation as chairman of the SEC. He informed the Trump

Administration that he was leaving well before his appointment term expired, and that his last day as chairman would be December 23, 2020. As discussed, BTC, Cryptocurrencies, DeFi, and CBDCs, have exploded and are the most significant developments in Finance and Money since President Richard Nixon removed the United States off the Gold Standard in 1971. The fact that Clayton would direct an enforcement action to be filed; alleging that the third largest cryptocurrency in the world (XRP), was, always has been, and continues to be an unregistered security in the United States; on the day before his last day as chairman of the SEC; with a new administration taking over in less than 30 days; knowing the economic chaos and destruction that would ensue; is puzzling as well as very troubling. It looks bad. It smells bad. And it is bad.

59.     Chairman Grundfest, in his letter to Clayton, raised this very issue. He stated, "creating precedent and imposing losses of this sort raises public policy concerns that would benefit from the views of the incoming administration." Clayton, however, ignored these public policy concerns, and, in spite of a new administration coming into office within less than thirty days; for political and/or personal motivation and, with the specific intent to inflict as much damage as possible against Ripple and the Digital Asset XRP; and, possibly, the entire cryptocurrency industry; on his second to last day in office, while in a position of authority to do so, Jay Clayton filed the **most significant SEC enforcement action in modern history.** These political and/or personal, improper motives are referenced herein and discussed in the accompanying *Memorandum of Support*. But on its face, it challenges reason and common sense to articulate a proper motive to file an action of this magnitude, against the third largest cryptocurrency, after SEVEN years of allowance, the day before you leave office, knowing a new administration would be taking over in less than four weeks.

60.     This appearance of improper motive was not lost on former SEC Chairman Grundfest. He informed Clayton that XRP, as the third largest crypto-asset, should not receive different treatment from the SEC than the 2nd largest crypto-asset, Ethereum (ETH), was receiving. Chairman Grundfest informed Clayton that "XRP and ETH should be subject to the same treatment given that the SEC hasn't illustrated a 'material distinction' between the operations of ETH and XRP that is relevant to the application of federal security laws." In fact, this former SEC Chairman, himself, openly questioned Clayton's motives. Chairman Grundfest stated that the SEC "imposing security law obligations on XRP while leaving ETH untouched raises fundamental fairness questions **about the exercise of commission discretion.**" (emphasis added).

61.     Despite the dire warnings by Chairman Grundfest and knowing very well that the filing of an enforcement action declaring XRP an unregistered security would cause innocent investors with absolutely no connection to Ripple or its executives to lose billions of dollars, the Respondent filed the enforcement action. Strikingly, they did not limit the claim (as they did in other token cases) to specific distributions of XRP directly from the Respondent. Instead, the SEC declared all XRP, including the XRP owned by the Petitioners and all others similarly situated as securities. As expected, there was immediate and irreparable damage inflicted upon innocent third parties, including the Petitioners and all others similarly situated. Within forty-eight hours of the SEC's declaration that all XRPs constitute illegal unregistered securities; the following happened:

        a.) XRP was immediately delisted from 54 exchanges, while other exchanges halted the product entirely;

b.) Bitstamp, on December 25, 2020, informed the public that XRP trading and deposits will be halted to all US customers on January 8th, 2021;

c.) Simplex stated it began blocking XRP transactions as a result of the SEC lawsuit;

d.) Bitwise, a Cryptocurrency Index Fund, liquidated all its XRP holdings in its publicly traded fund within hours of the SEC enforcement action;

e.) Bitrue no longer offers XRP purchases using credit cards for users in the U.S.;

f.) Posts were made on Twitter from XRP holders saying their life savings has lost 80% and they may suffer total economic losses;

g.) Financial source companies like ITrustCapital allow IRAs to switch from Fiat into Crypto including XRP, and innocent investors saw their retirement savings practically wiped out;

h.) There are discussions on Twitter of people questioning whether they should just commit suicide because of the financial damage inflicted by XRP's loss of value;

i.) Coinbase has decided to suspend all XRP trading effective January 19, 2021;

j.) B2C2 says it will stop XRP trading;

k.) Crypto.com has stated it will delist XRP effective January 19, 2021;

l.) There is no question that all exchanged doing business in the United States is going to follow suit and not run the risk of being charged with selling illegal securities; and,

m.) XRP's value has been cut by 75%, at the time of this Petition and is likely to fall further, costing billions of dollars in losses for innocent investors that have absolutely no connection to Ripple or its executives, including significant economic losses incurred by the named Petitioners and all others similarly situated.

62.    Exactly what Chairman Grundfest warned Clayton would happen from the mere filing of the enforcement action declaring XRP a security – did happen. Innocent investors, including the named Petitioners and all others similarly situated, lost multi-millions, if not, billions in USD.

63.    In previous enforcement actions like the 2017 ICO prosecutions, the SEC limited its enforcement allegations to the Company itself and its Executives and their distributions of the Digital Asset. Never before, has the SEC claimed that the Digital Asset in the wallets of individual investors, who did not purchase directly from the company or its executives, are securities. It appears to the Petitioners, that the Ripple/XRP enforcement action is not truly limited to one company and a couple of potential bad actors. The Respondent in this action could have, as they have done in the past, targeted specific distributions of XRP, especially in the early days of 2013 through 2015. Any colorable claim or argument that XRP constitutes an unregistered security could **only** be made in those very early days and distributions. The SEC could have targeted those early Ripple distributions and any individual sales by its executives without attempting absurdity by calling the XRP in the Petitioners' wallets unregistered securities. It is an attempt at futility to argue that **Today's XRP** is a security. It's not just legally wrong and intellectually dishonest, but it is absurd to call the XRP held by thousands of innocent investors, who have absolutely no connection to Ripple or its executives' securities.

Not SEVEN PLUS years after the Digital Asset XRP has been publicly traded on more than 200 exchanges worldwide. Many XRP holders, including some of the named Petitioners, have never even heard of Ripple, Garlinghouse, or Larsen.

64.   This enforcement action, directed by Clayton, against XRP, is much more to do about other things than whether XRP constitutes a security. In the accompanying *Memorandum of Support* the Plaintiffs provide the Court alternative theories exposing viable motives as to why Clayton would file the most significant SEC enforcement action in modern history.

65.   It is possible that the SEC filed the most aggressive Complaint possible in order to drive a settlement. It is possible that the SEC is unclear how digital currencies fit into the Howey framework and are engaging in regulation by enforcement. Interestingly, Respondent is the new SEC Chairman and has publicly been critical of this regulation by enforcement practice. Chairman Roisman has publicly cautioned against regulation by enforcement. He has stated that he "always analyzes on a case by case basis with **investor welfare** as his North Star." (emphasis added). He stated, "when considering market participants acting in good faith to comply with the rules, enforcement should be the last resort, not a first resort."

66.   Exchanges, however, faced with the SEC's claim that today's XRP is a security, must take action and delist, halt and/or suspend all activity related to XRP in the United States. As stated, BITWISE has liquidated all of its XRP. Grayscale Investments manages an XRP Trust for accredited investors. It may liquidate as well. Coinbase, arguably, the most significant exchange in the United States (if not the world) has indicated it will suspend all XRP activity on January 19, 2021. As stated earlier, many others have also delisted or suspended XRP trading. In short, the mere allegation by the SEC that XRP is a security, will likely render XRP

untradeable in the United States and its value would, in effect, for U.S. customers become zero, wiping out many innocent investors with absolutely no connection to Ripple or its executives.

67.    The Petitioners will demonstrate however, that the XRP being traded today in 2020 is in no way even close to be a security. Clayton knows that. Otherwise, he would have filed the enforcement action years ago.

68.    Clayton was well aware that the mere filing of the enforcement action, not limited to specific distributions of XRP directly from Ripple, but alleging that all XRP constitutes securities, could prove to be a kill shot against Ripple and XRP. Common sense, itself, informs one of that matter. But, here, Clayton received a letter from a former SEC Chairman pleading with him not to cause the harm he would cause to innocent investors with no connection to Ripple. Chairman Grundsfest even stated that filing an action causing multi-billion dollars in losses to investors when no exigency exists to do so, would cause one to question Clayton's discretion. XRP traded for SEVEN years, including several years while Jay Clayton was SEC chairman. Waiting for feedback from the new chairman and new administration would cause no harm. But, filing this action against XRP would cause "**unprecedented damage**."

69.    The SEC complaint against Ripple and XRP, declaring that XRP was, always has been, and continues to be, a security is likely the most far-reaching, outrageous and absurd claim the SEC has ever alleged.

70.    Here, the SEC, at Clayton's direction, is alleging that XRP today, SEVEN YEARS, including the XRP owned by the named Petitioners and all others similarly situated, constitute unregistered securities. The SEC is actually alleging that the XRP that sits in individual accounts on Coinbase, Kraken, Binance, Uphold, or in individual investor digital wallets, etc. are illegal securities - even if XRP holders have never heard of Ripple,

Garlinghouse, or Larsen. This broad, sweeping claim is why entities, such as Bitwise, liquidated all of its XRP. This overly broad, reckless, and absurd allegation by the SEC is why Chairman Grundfest wrote to Clayton warning him that there would be an "exodus of intermediary market service providers. Clayton and the SEC cannot claim that the extreme reaction by the marketplace was unforeseeable. *They knew these exact consequences would result wiping billions of dollars in innocent investor wealth*. The SEC and Clayton not only DID NOT protect the investors they swore an oath to protect, but they *intentionally caused catastrophic economic losses to those investors,* during a Global Pandemic, nonetheless.

71.   Chairman Grundfest stated in no uncertain terms that if the SEC imposes "security law obligations on XRP while leaving Ethereum untouched" then this "**raises fundamental fairness questions about the exercise of commission discretion**." (emphasis added). Chairman Grundfest recognized that this move by the SEC against XRP made no legal sense and called Clayton's motives into question.

72.   It is widely known both in the cryptocurrency community and the Government that Clayton is perceived to be anti-crypto. President Trump has stated that he does not favor Bitcoin or crypto assets. Secretary Steven Mnuchin has stated similar beliefs. Former National Security Advisor John Bolton has publicly stated that he was present when he heard President Trump instruct Treasury Secretary Steven Mnuchin "to go after Bitcoin." In the accompanying *Memorandum of Support* the Petitioners demonstrate how this SEC enforcement action may be targeting the cryptocurrency industry and even its potential impact on BTC.

73.   Ripple and its executives, especially Larsen, Garlinghouse, and General Counsel Stuart Alderoty have been very critical of the Trump Administration and of Clayton in his role as Chairman of the SEC.

74.    In fact, the tension between Ripple, Clayton and the Trump Administration became public in 2019-2020. Prior to that, Garlinghouse along with the CTO of Ripple met with Clayton and Trump's senior officials at the White House. Afterwards, Ripple's general counsel stated publicly that the U.S. is dangerously close to losing the global edge in crypto and Blockchain technology to China.

75.    Larsen repeatedly argued that the U.S. isn't winning the technological Cold War against China. Larsen repeatedly argued that China and Asian mining related to BTC and ETH constitutes for 80% of total mining, and the U.S. Government's inaction is losing the war and suppressing American innovation.

76.    Garlinghouse went on national television, including CNBC and Fox Business and openly threatens to relocate Ripple outside of the United States because of the Trump Administration's continued lack of regulatory clarity. Garlinghouse on Fox, nonetheless, states that the Trump Administration and Clayton are favoring China and suppressing American innovation by providing regulatory clarity to ETH and BTC, which are controlled and subsidized by the Chinese Communist Party.

77.    Ripple and its executives and/or lobbyist were effective in getting significant and powerful politicians to question Clayton's performance. Senator Mike Crapo wrote a letter to both the OCC and SEC seeking clarity regarding crypto payments. Senator Crapo stated that the different Government agencies need clear rules that do not stifle innovation.

78.    Weeks prior to the SEC enforcement action against Ripple a number of U.S. Congressman signed a letter to the SEC asking for regulatory clarity related to Digital Assets, including XRP.

79.    Ripple's efforts continued to place political pressure on Clayton. The Washington Examiner publicized an investigative piece on the issue of the Trump Administration and Clayton losing the Blockchain technology war to China because the SEC would not provide clarity. An article was published stating that cryptocurrency is at the forefront of not just finance but even national security. The article stated that the U.S. Intelligence Community is raising concerns about the Chinese Communist Party's (CCP) influence over digital currencies with the SEC. The Director of National Intelligence, John Ratcliffe, wrote a letter directed at Clayton in early November 2020 stating that "crypto, CBDCs and e-cash are all being drawn into a multi-front global competition against Beijing for leadership of the world's economy." He informed Clayton that experts and industry leaders (Ripple) are worried that China is leaving the U.S. behind in the digital-currency race.

80.    Director Ratcliffe pointed to concerns the U.S. has regarding China's sway over digital currencies as more than half of the world's crypto mining operations are located in China. He warned Clayton that the Chinese Government has created its own state-controlled digital currency that would make it tough for the U.S. based companies (Ripple) and innovators to compete. Ratcliffe offered to have the senior economic intelligence officers brief Clayton on the matter.

81.    Senator Tom Cotton's forwarded, at least two, letters to Clayton calling into question his leadership. His second letter in July 2020 to the Clayton also included Director Ratcliffe and White House National Security Advisor O'Brien lamenting how "so far, the SEC has concluded that only two Digital Assets can be considered non-securities—Chinese controlled Bitcoin and Ethereum." Cotton was making the same argument that Ripple and its executives have been making since 2017: *that the SEC has provided regulatory clarity for BTC*

*and ETH but not XRP, thereby favoring China over the United States' own innovation*. Ripple's claim that the SEC needs to provide regulatory clarity and that BTC and ETH favor Chinese companies over U.S. companies was being made by Congressmen, National Security Advisors, Senior Intelligence Officers and U.S. Senators. And they all were directing their criticisms to one agency and its Chairman: Clayton and the SEC. This Political pressure on the SEC and Clayton was intense and no doubt initiated by Ripple. As stated earlier, Clayton was not only questioned about Ripple and/or XRP by politicians and Government agents, but also interviewed by business television reporters on CNBC and Fox as well as by participants attending FinTech Conferences. In all settings, Clayton was always questioned directly about XRP. For almost three years, Clayton was continuously asked by multiple parties the same question: *Will the SEC make official statements and declarations that XRP, like BTC and ETH are not securities?* For three years, Clayton gave the same response which was that the "SEC will not comment on a specific product" - even though the SEC had previously provided comment of specific products in BTC and ETH. Clayton always replied by vaguely saying "If it's a security, we will regulate it."

82.     Senator Cotton argued that the "continued lack of regulatory clarity not only hurts U.S. developed Digital Assets, but it puts American national and economic security at risk." Clayton and the SEC refused to even address these concerns raised by prominent leaders of the United States Government as it related to the Digital Asset XRP. Despite these national and economic security risks, the Clayton and the SEC remained silent for another five months until they decided that they would provide that regulatory clarity via an enforcement action.

83.     Possibly the worst thing that Ripple executives could do after publicly alleging the Trump Administration and Clayton were favoring Chinese technology over American

innovation, was to also publicly congratulate President-Elect Joe Biden. Moreover, the Ripple executives stated that they believe the Biden Administration would be better for the digital currency industry than the Trump Administration. In fact, Garlinghouse publicly stated, that from his perspective, the Biden Administration had to be better than Trumps because Ripple couldn't imagine the regulatory environment being any worse than the current one. Unfortunately, Clayton proved Garlinghouse wrong and provided him with a real non-imagined worse environment.

84.  After SEVEN PLUS years of allowing XRP to be openly sold on multiple U.S. exchanges; after allowing XRP to be held in Crypto Index Funds and brokerage Trust Accounts; after approving Ripple's purchase of a minority stake in MGI, knowing that XRP would be promoted and utilized; after XRP was declared a virtual currency by the DOJ FinCen in 2015; after being informed by Ripple in May 2020 that Ripple would be selling more XRP to institutions and not stopping it; after years of being continuously questioned about whether XRP would get the same non-security status as BTC and ETH; and, after intense political pressure; knowing that the opposition party is assuming control of the SEC in less than 30 days; after being warned by a former SEC Chairman that he should not file an action; ***Clayton directed the most significant SEC enforcement action in modern history*** to be filed against Ripple, its executives, and XRP, the third largest Cryptocurrency, claiming all XRP as unregistered securities and causing billions in losses to innocent investors with no connection to Ripple. Then, the next day, Clayton left the SEC forever.

85.  The only logical explanation for why the SEC would allege that XRP continues today to be a security is to force a settlement. It is an often-common tactic for a prosecutor to overcharge a defendant in an effort to cause panic and/or fear and/or force a settlement/plea.

86.    If the SEC wanted to hold these two executives liable, it could have done so, separately, by alleging specific distributions made by them personally at specific periods of time, constituted securities. But, as demonstrated, XRP, itself, today, is not a security. According to the SEC complaint, the parties entered into statute of limitations tolling agreements. Therefore, the parties discussed a potential resolution or settlement. This statement is corroborated by Garlinghouse in his letter to Ripple employees when he states that he and Larsen could have settled separately but chose to fight the charges. Clearly, a pre-filing settlement was out of the question. Thus, the SEC possibly employed a kitchen sink approach to the charges and threw everything in (including the kitchen sink). Simply put, the SEC filed the most aggressive complaint they possibly could in order to inflict the greatest harm they could in order to bully or coerce a party to settle.

87.    It is so clear that the SEC lacks good faith to claim that present day XRP (the XRP held by Petitioners) are securities that it is likely that Summary Judgement will be granted on the issue.  Quite frankly, it is legally incorrect, intellectually dishonest and completely disingenuous for any SEC lawyer to stand up in open court and claim that all XRPs are securities. If the SEC attempted to make that argument, it would be laughable, if the economic damage that has been done wasn't so tragic.

88.    Another explanation for the SEC complaint against XRP is that the SEC is confused as to how digital currencies "fit" in the regulatory framework.  As stated, the new Chairman of the SEC, Elad Roisman, has publicly denounced this approach. At SEC Speaks 2020, Mr. Roisman stated "we should not use our enforcement powers to promulgate and **set new legal standards**." (emphasis added). Chairman Roisman expressed concern that regulation by enforcement can undermine the rule making process in the Administrative Procedure Act,

**which provides for public comment.**" (emphasis added). Former SEC Chairman Grundfest warned Clayton not to file the enforcement action and cause such damage when no exigency existed. Not only did Clayton, unlike Chairman Roisman, encourage public comment, Clayton wouldn't allow for comment by the incoming administration that was assuming control in less than 30 days.

89.   Respondents have a duty to amend its complaint against Ripple to exclude present day XRP, purchased by investors with no connection to Ripple or its executives. The claim that the XPR owned by Petitioners constitute securities has no good faith basis under the law and facts to make such a claim. Pursuant to the SEC's mandate, it has a fiduciary duty to protect innocent third-party investors. Failure to amend the SEC's complaint not only fails to protect investors but actually harms investors.

90.   Petitioners are incorporating herein by reference Petitioners Memorandum of Support, which provide clear proof well beyond a preponderance of evidence that today's XRP IS NOT a security.

## JURISDICTION AND VENUE

91.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. 1361, which provides district courts original jurisdiction of any action in the nature of mandamus to compel an officer or   employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

92.   Venue is proper pursuant to 28 U.S.C. 1391(e) as Respondents are officers or employees of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States.

## PARTIES

93.  The Petitioners and those similarly situated, are owners of XRP prior to the SEC's enforcement action alleging present-day XRP as securities and were economically harmed by Clayton's and the SEC's conduct.

94.  Petitioner John Deaton is an individual more than 18 years old, is a citizen of the United States and a resident of Rhode Island, residing at 211 Rumstick Road Barrington R.I. 02806.

95.  Petitioner Jordan Deaton is an individual more than 18 years old, is a citizen of the United States and a resident of Rhode Island residing at 211 Rumstick Road Barrington, R.I. 02806.

96.  Petitioner James LaMonte is an individual more than 18 years old, is a citizen of the United States and a resident of the Commonwealth of Massachusetts, residing at 188 Cross Street Seekonk, Ma 02771.

97.  Petitioner Tyler LaMonte is an individual more than 18 years old, is a citizen of the United States and a resident of the Commonwealth of Massachusetts, residing at 188 Cross Street Seekonk, Ma 02771.

98.  Petitioner Mya LaMonte is an individual more than 18 years old, is a citizen of the United States and a resident of the Commonwealth of Massachusetts, residing at 188 Cross Street Seekonk, Ma 02771.

99.  Petitioner Mitchell McKenna is an individual more than 18 years old, is a citizen of the United States and a resident of California, residing at 11007 Harstook Street North Hollywood, California 91601.

100.  Petitioner Kristiana Warner is an individual more than 18 years old, is a citizen of the United States and a resident of Rhode Island residing at 211 Rumstick Road Barrington, R.I. 02806.

101.  Respondent Securities and Exchange Commission is an agency of the United States Government, headquartered in Washington, D.C.

102.  Respondent Elad Roisman is the Acting Chairman of the Securities and Exchange Commission, headquartered in Washington, D.C.

**PRAYER FOR RELIEF**

Petitioners, on behalf of themselves and members of the class, seeks relief from this Court as follows:

a)      The Petitioners seek immediate relief requesting the Court order Respondents to amend its complaint against Ripple to exclude the claim that the XPR owned by Petitioners constitute securities.

b)      For an Order certifying that the action may be maintained as a class action, certifying Petitioners as representative of the Class, and designating the undersigned counsel as lead counsel for the Class;

c)      For an award of equitable relief as follows:

1)   Imposing a constructive trust for any funds awarded against Respondent on behalf of the class;

2)   If the SEC receives any funds from a settlement or verdict with Ripple Labs, Brad Garlinghouse and/or Chris Larsen, including but not limited to funds

from a penalty, civil fine, interests, disgorgement, or any other funds, those

funds will go into the constructive trust;

d)   For actual damages to be determined at trial;

e)   For reasonable attorney's fees;

f)   For an award of costs;

g)   For any other relief the Court might deem just, appropriate, or proper; and,

h)   For pre and post-judgement interest on any amounts awarded.

There is no other remedy available to the Petitioners. All major U.S. exchanges have indicated that they will either delist or suspend all XRP trading effective January 19, 2021. Once these exchanges delist and other suspend all XRP activity, the XPR owned by Petitioners will become untradeable and thus lose all value and become useless.

Respectfully Submitted,
By the Petitioners,
Through their attorney,

/s/ John E. Deaton

John Deaton, Esq. (RI Bar # 6537)
Deaton Law Firm
450 North Broadway
East Providence, RI 02914
(401) 351-6400
(401) 351-6401(fax)
All-Deaton@deatonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of January, 2021, I electronically filed the foregoing documents and that they are available for viewing and downloading from the Court's CM/ECF system. I further certify that a copy of the foregoing documents were mailed via U.S. Mail to the Respondents listed below:

Acting Chairman Elad L. Roisman
Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549
(202) 551-2700
CommissionerRoisman@sec.gov

/s/ John Deaton

John Deaton

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND


In re: John Deaton, et. al.


| | |
|---|---|
| JOHN DEATON, | : |
| JORDAN DEATON, | : |
| JAMES LAMONTE, | : |
| TYLER LAMONTE, | : |
| MYA LAMONTE, | : |
| MITCHELL MCKENNA, | : |
| KRISTIANA WARNER, | : |
| and all others similarly situated, | : |
| | : |
| | : |
| *Petitioners,* | : |
| | : |
| | :    **Case No.:** |
| v. | : |
| | : |
| ELAD ROISMAN AS ACTING SEC CHAIRMAIN, | : |
| U.S. SECURITIES & EXCHANGE COMMISSION | : |
| | : |
| *Respondents.* | : |


## MEMORANDUM IN SUPPORT OF WRIT OF MANDAMUS

1.       The U.S. Securities & Exchange Commission's (SEC) mission statement is to

"protect investors, promote fairness and *share information* about companies…to help investors

make informed decisions and invest with confidence."

2.       As chairman of the SEC, it was Jay Clayton's (Clayton) fiduciary duty to enforce

the SEC mission statement. He failed miserably. Instead of protecting investors and sharing

information to help investors make informed decisions, as required by the mission statement, the

Respondent knowingly and intentionally caused multi-billion-dollar losses to innocent investors

who have purchased, exchanged, received and/or acquired the Digital Asset XRP, including the named Petitioners, and all others similarly situated.

3.  On December 22, 2020, SEVEN years after the Digital Asset XRP was introduced to the public for sale, establishing itself as the third largest cryptocurrency in the world, at the direction of Clayton, with improper motive and the specific intent to cause irreparable harm, the SEC filed an enforcement action against Ripple Labs (Ripple), its CEO Brad Garlinghouse (Garlinghouse), and a Co-founder Chris Larsen (Larsen), alleging that "from 2013 to the present", Ripple has and continues to sell unregistered securities with the Digital Asset XRP.

4.  Considering the magnitude of a SEC enforcement action involving the Digital Asset XRP, Clayton was sent a letter, prior to the filing of the action, from former Chairman of the SEC, Joseph Grundfest warning Clayton that the mere filing of the lawsuit generally declaring XRP an unregistered security "would result in an unprecedented scenario of billions of dollars in losses resulting from an exodus of intermediary market service providers." Chairman Grundfest pleaded with Clayton stating that "no pressing reason compels immediate enforcement action". Afterall, XRP has been publicly traded in the United States and globally for 7-plus years with the SEC's full awareness and implicit permission. The Respondent was well aware that XRP was being actively traded on over two-hundred exchanges globally, including United States exchanges such as Coinbase, Kraken, Binance US, Voyager, Crypto.com, and Uphold, amongst several others. Clayton was warned by Chairman Grundfest that if the SEC initiated an enforcement action declaring the Digital Asset XRP an unregistered illegal security, in present day, these Digital Asset exchanges would have no choice but to delist XRP and/or halt XRP trading out of fear that an enforcement action will one day be commenced against them for

2

selling illegal securities. Yet, Clayton was undeterred in his personal mission, contrary to the SEC's mission, and, filed the enforcement action, but not limited to specific distributions of XRP by Ripple's or its executives, but, Clayton, took the extraordinary and absurd step of declaring all XRP, in present day, including the XRP owned by the named Petitioners and all others similarly situated, unregistered securities. According to the SEC's Complaint, the XRP held in thousands of individual accounts and or digital wallets belonging to innocent investors who have absolutely no connection to Ripple, or its executives, are securities. In fact, many of these innocent investors, including several of the named Petitioners, and others similarly situated, have never heard of Ripple.

5.      Former SEC Chairman Grundfest informed Clayton that he was "aware of no instance in which the simple announcement of a commission's enforcement procedure has, absent allegations of fraud or misrepresentation, caused multi-billion-dollar losses of innocent third parties."  In the SEC's Complaint against Ripple, Garlinghouse and Larsen, there are no allegations of fraud or misrepresentation by Ripple, Garlinghouse or Larsen.

6.      Prior to the SEC enforcement action, declaring XRP an unregistered security, Clayton had tendered his resignation as chairman of the SEC. He informed the Trump Administration that he was leaving well before his appointment term expired, and that his last day as chairman would be December 23, 2020. As discussed, infra, Bitcoin, Cryptocurrencies, Decentralized Finance (DeFi), and Central Bank Digital Currency (CBDCs), have exploded and are the most significant developments in Finance and Money since President Richard Nixon removed the United States off the Gold Standard in 1971.  The fact that Clayton would direct an enforcement action to be filed; alleging that the third largest cryptocurrency in the world (XRP),

3

was, always has been, and continues to be an unregistered security in the United States; on the

day before his last day as chairman of the SEC; with a new administration taking over in less

than 30 days; knowing the economic chaos and destruction that would ensue; is puzzling as well

as very troubling. It looks bad. It smells bad. And it is bad.

      7.    Clayton chose to file, quite possibly, the most significant SEC enforcement action

in 76 years as he was walking out the door after allowing the Digital Asset XRP be sold for

seven years, leaving a new administration to deal with the aftermath. A different political party is

assuming control and it is quite possible, if not likely, that they withdraw and/or amend and limit

the Complaint's scope and allegations related to XRP. As will be alleged later, **maybe the mere**

**filing of the Complaint was the end game for Clayton.**

      8.    Chairman Grundfest, in his letter to Clayton, raised this very issue. He stated,

"creating precedent and imposing losses of this sort raises public policy concerns that would

benefit from the views of the incoming administration." Clayton, however, ignored these public

policy concerns, and, in spite of a new administration coming into office within less than thirty

days; for political and/or personal motivation and, with the specific intent to inflict as much

damage as possible against Ripple and the Digital Asset XRP; and, possibly, the entire

cryptocurrency industry; on his second to last day in office, while in a position of authority to do

so, Jay Clayton filed the **most significant SEC enforcement action in modern history.** These

political and/or personal, improper motives are alleged later in this Petition. But on its face, it

challenges reason and common sense to articulate a proper motive to file an action of this

magnitude, against the third largest cryptocurrency, after seven years of allowance, the day

before you leave office, knowing a new administration would be taking over in less than four weeks.

9. Incredibly, as recent as May of this year Ripple made a significant distribution of XRP **AFTER** informing Clayton and the SEC that they were selling XRP to money market service providers. The SEC and Clayton said nothing - and did nothing. However, seven months later, the SEC claims that the very distribution of XRP Ripple informed them of constitutes the distribution of illegal securities!

10. This appearance of improper motive was not lost on former SEC Chairman Grundfest. He informed Clayton that XRP, as the third largest crypto-asset, should not receive different treatment from the SEC than the 2nd largest crypto-asset, Ethereum (ETH), was receiving. Chairman Grundfest informed Clayton that "XRP and ETH should be subject to the same treatment given that the SEC hasn't illustrated a 'material distinction' between the operations of ETH and XRP that is relevant to the application of federal security laws." In fact, this former SEC Chairman, himself, openly questioned Clayton's motives. Chairman Grundfest stated that the SEC "imposing security law obligations on XRP while leaving ETH untouched raises fundamental fairness questions **about the exercise of commission discretion.**" (emphasis added).

11. Despite the dire warnings by Chairman Grundfest and knowing very well that the filing of an enforcement action declaring XRP an unregistered security would cause innocent investors with absolutely no connection to Ripple or its executives to lose billions of dollars, the Respondent filed the enforcement action. Strikingly, they did not limit the claim (as they did in other token cases) to specific distributions of XRP directly from the Respondent. Instead, the

5

SEC declared all XRP, including the XRP owned by the Petitioners and all others similarly situated as securities. As expected, there was immediate and irreparable damage inflicted upon innocent third parties, including the Petitioners and all others similarly situated. Within forty-eight hours of the SEC's declaration that all XRPs constitute illegal unregistered securities; the following happened:

a.)  XRP was immediately delisted from 54 exchanges, while other exchanges halted the product entirely;

b.)  Bitstamp, on December 25, 2020, informed the public that XRP trading and deposits will be halted to all US customers on January 8th, 2021;

c.)  Simplex stated it began blocking XRP transactions as a result of the SEC lawsuit;

d.)  Bitwise, a Cryptocurrency Index Fund, liquidated all its XRP holdings in its publicly traded fund within hours of the SEC enforcement action;

e.)  Bitrue no longer offers XRP purchases using credit cards for users in the U.S.;

f.)  Posts were made on Twitter from XRP holders saying their life savings has lost 80% and they may suffer total economic losses;

g.)  Financial source companies like ITrustCapital allow IRAs to switch from Fiat into Crypto including XRP, and innocent investors saw their retirement savings practically wiped out;

h.)  There are discussions on Twitter of people questioning whether they should just commit suicide because of the financial damage inflicted by XRP's loss of value;

i.)  Coinbase has deciding to suspend all XRP trading effective January 19, 2021;

j.)  B2C2 says it will stop XRP trading;

k.)  Crypto.com has stated it will stop trading XRP effective January 19, 2021;

6

l.)     There is no question that all exchanged doing business in the United States is going to follow suit and not run the risk of being charged with selling illegal securities; and,

m.)     XRP's value has been cut by 75%, at the time of this Petition and is likely to fall further, costing billions of dollars in losses for innocent investors that have absolutely no connection to Ripple or its executives, including significant economic losses incurred by the named Petitioners and all others similarly situated.

12.     Exactly what Chairman Grundfest warned Clayton would happen from the mere filing of the enforcement action declaring XRP a security – did happen. Innocent investors, including the named Petitioners and all others similarly situated, lost multi-millions, if not, billions in USD.

13.     It is quite puzzling to understand why Clayton would rush an enforcement action of this magnitude as he is walking out the SEC's door. Its puzzling because Clayton and the SEC have known about the Company Ripple and its Executives for years. This is not a case where the SEC recently learned a company was selling illegal securities and taking advantage of investors and immediate action is necessary to protect those investors.  As stated, XRP is the third largest digital currency in the world, behind Bitcoin (BTC) and Ethereum (ETH), respectively. XRP, although the third largest, was, in fact, the second cryptocurrency asset created after BTC. In approximately late 2011 or early 2012, the founders of XRP began working on the XRP Ledger (XRPL). *See SEC Complaint p. 8.* The XRPL operates a peer-to-peer database, spread across a network of computers, that records data respecting transactions, among other things.

14.     According to the SEC, approximately 40% of the nodes validating transactions on the XRPL are operated by organizations or entities based in the United States, including Ripple

itself. _Id._ The Respondent are so familiar with Ripple and XRP that the SEC, itself, runs a node on the XRPL.

15.     Upon completion of the XRPL in December 2012, Ripple and its executives created a fixed supply of 100 Billion XRP. _See_ _SEC Complaint p. 9._ 80 Billion XRP was transferred to Ripple. 20 Billion XRP was divided amongst the founders and an agent of Ripple. Each cofounder received 9 Billion XRP and an agent of Ripple received 2 Billion XRP. The 20 Billion of XRP was for compensation.

16.     From 2013 through 2014, Ripple and Larsen distributed approximately 12.5 Billion XRP to programmers for compensation for reporting problems in the XRPL code, and to anonymous developers and others to establish a trading market for XRP. _See_ _SEC Complaint p. 11._ The SEC claims that during these 12.5 Billion distributions of XRP, Ripple began to make public statements with respect to XRP creating expectations of profit based on Ripple's efforts.

17.     Starting in 2015, Ripple decided that it would seek to make XRP a "universal Digital Asset" for banks and other financial institutions to effect money transfers. _See_ _SEC Complaint p. 12._

18.     According to the SEC Complaint, Ripple lacked funds to pay for the endeavors it was undertaking, and for its general corporate business expenses totaling in excess of $25 Million for 2013 and 2014, without selling XRP. _See_ _SEC Complaint p. 13._ In August 2013, Ripple, according to the SEC, made unregistered sales of XRP in exchange for fiat currencies or Digital Assets such as BTC.

19.     The SEC claims that between 2014 and 2019, Ripple sold at least 3.9 Billion XRP through market sales for $763 Million USD in order to fund its operations. *See SEC Complaint p. 14.*

20.     From 2013 through the end of the third quarter of 2020, Ripple sold 4.9 Billion XRP through internet sales for approximately $624 Million USD - also to fund Ripple's operations. In total, the SEC alleges that Ripple sold XRP for a total of 1.38 Billion USD in market and institutional sales alone.

21.     The SEC acknowledges that the market price for XRP has ranged from a low price of $0.002 per XRP in 2014, to a high price of $3.84 per XRP in early 2018, an increase of nearly 137,000%. During the month before the SEC's enforcement action against Ripple alleging that XRP, even today, is an unregistered security, XRP's price was generally between $0.58 cents and $0.65 cents, reaching a high of $0.91 cents. At the time of Petitioners' Petition against the SEC, XRP's price was $0.28. Shortly after the SEC's enforcement action against, in reality, XRP, XRP's price dropped from $0.58 cents to $0.17 cents.

22.     The SEC claims that since 2014, Ripple disbursed 4.05 Billion XRP valued at $500 Million through other distributions. *See SEC Ripple Complaint p. 15.*

23.     The SEC alleges that Larsen, from 2015 through March 2020, sold 1.7 Billion XRP to public investors in the market, netting Larsen $450 Million. Ripple's CEO, Garlinghouse, sold over 321 Million XRP that he received from Ripple to public investors in the market, generating approximately $150 Million.

9

24.     The SEC classified four types of XRP distributions made by Ripple and its executives: Market Sales, Institutional Sales, Other XRP Distributions, and Individual defendants' XRP Sales. *See SEC Complaint para. 88, 89, p. 15-16.*

25.     The SEC seems to take issue, as significant, that Ripple understood that XRP purchasers routinely resold XRP to other investors in the United States and other countries. *See SEC Complaint p. 15, para. 88.* This issue of secondary market resales of Digital Assets was also publicly mentioned by Clayton on business channels such as CNBC. As discussed later, if the fact that a Digital Asset is publicly traded in secondary markets somehow transforms that Digital Asset into a security, then the SEC's lawsuit against Ripple potentially **implicates all digital currencies and/or Digital Assets**. Quite frankly, it is an absurd position for the SEC to take.

26.     As Chairman Grundfest claimed, filing an enforcement action declaring all XRP a security, seven years after the fact, calls into question the SEC's exercise of its discretion and violates principles of fundamental fairness. **Is this an attack on all Cryptocurrencies, only disguised in an enforcement action against the third largest crypto?** Former Director of National Security John Bolton has publicly stated that he heard President Trump instruct Treasury Secretary Steven Mnuchin to "**go after Bitcoin**." In previous enforcement actions like the 2017 ICO prosecutions, the SEC limited its enforcement allegations to the Company itself and its Executives and their distributions of the Digital Asset. Never before, has the SEC claimed that the Digital Asset in the wallets of individual investors, who did not purchase directly from the company or its executives, are securities. It appears to the Petitioners, that the Ripple/XRP enforcement action is not truly limited to one company and a couple of potential bad actors. The Respondent in this action could have, as they have done in the past, targeted specific

distributions of XRP, especially in the early days of 2013 through 2015. Any colorable claim or

argument that XRP constitutes an unregistered security could **only** be made in those very early

days and distributions. The SEC could have targeted those early Ripple distributions and any

individual sales by its executives without attempting absurdity by calling the XRP in the

Petitioners' wallets unregistered securities. As discussed later, it is an attempt at futility to argue

that **Today's XRP** is a security. It's not just legally wrong and intellectually dishonest, but it is

absurd to call the XRP held by thousands of innocent investors, who have absolutely no

connection to Ripple or its executives' securities.  Not SEVEN PLUS years after the Digital

Asset XRP has been publicly traded on more than 200 exchanges worldwide. Many XRP

holders, including some of the named Petitioners, have never even heard of Ripple,

Garlinghouse, or Larsen.

27.     This enforcement action, directed by Clayton, against XRP, is much more to do

about other things than whether XRP constitutes a security. Later, the Petitioners allege the

potential real reasons behind Clayton's motives.

28.     As stated, the Digital Asset XRP and Ripple are well-known to the Respondent

and officials in the U.S. Government. In 2015, the U.S. Government entered into a consent

agreement over Ripple's sale of XRP to a well-known Bitcoin and Cryptocurrency Advocate and

investor, Roger Ver. Ripple paid a fine for this XRP distribution and agreed not to establish a

Ripple and/or XRP Wallet.

29.     Additionally, in 2015 the DOJ and FinCen settled a case with Ripple.  The DOJ

and FinCen classified and/or determined that XRP was a "**virtual currency**" and that Ripple is a

money transmitter of XRP (emphasis added). The settlement with the U.S. Government required

Ripple's XRP transactions to comply with laws **that do not apply to** securities' transactions. However, more than 5 years later, despite one arm of the U.S. Government declaring XRP virtual currency, Clayton and the SEC, through its enforcement action, allege all XRP as securities. Again, it is not limited to the XRP sold to Roger Ver or others directly from Ripple, but ALL XRP.

30.     The issue of XRP and its classification as a virtual currency, and/or commodity, and/or security is an issue Clayton, himself, has been asked, repeatedly and publicly, on several occasions. Clayton, at least two years prior to the December 22, 2020 enforcement action declaring XRP a security, was specifically asked about XRP publicly. On one occasion, Clayton was being interviewed on CNBC and was asked directly if the SEC was going to officially declare XRP a non-security similarly to the SEC declaring the two larger crypto assets, BTC and ETH, non-securities. Clayton only said, "**if it's a security, we will regulate it**." The CNBC anchor pushed back at this non-answer and sated to Clayton that there seems to be confusion regarding XRP because the SEC has not officially declared it as a non-security like it has BTC and ETH. Clayton smugly responded, "I hope I just cleared up any confusion by stating if it's a security we will regulate it." It should be noted that Clayton was asked about XRP by CNBC during the very time period the SEC now claims Ripple and Garlinghouse were actively and continuously, selling illegal securities (in the form of XRP). Yet, Clayton waited for several more years before filing the enforcement action declaring all XRP as securities.

31.     Clayton was asked directly about XRP approximately one year after CNBC's interview, while attending a Fintech 2019 Event. During the time of this event the SEC claim Ripple and Garlinghouse were actively and continuously, selling illegal securities in the form of

XRP.  Clayton and Garlinghouse both spoke at the *Institute for Financial Markets* where Clayton, yet again, was specifically asked about XRP. Amazingly, Garlinghouse also attended the same event and spoke immediately after Clayton. In fact, Clayton was asked by a person in the audience considering the fact that Garlinghouse would provide remarks right after Clayton, could Clayton inform the public if and when XRP would be classified by the SEC as non-securities like it has for BTC and ETH. Clayton's response was that although he "**really appreciated the XRP issue**" (emphasis added), he could not comment on XRP or any other product. **Clayton stated that the SEC could not comment on any specific products although the SEC had already commented on specific products in BTC and ETH**. Clayton's statement that the SEC can't comment on any specific product or company not only doesn't make sense considering that the SEC did comment on BTC and ETH, but it also **runs afoul of the SEC's Mission Statement**.  The SEC's mission statement states the SEC will share information about companies to help investors make informed decisions. XRP has been traded on over two hundred exchanges worldwide for the past seven years with a daily volume between $10-26 billion. Clayton knows there may be investor confusion yet remains quiet until the day before he leaves office, to all of a sudden, seven years later, declare XRP an unregistered security.

  32. If the SEC refuses to make comments on companies and/or specific products as Clayton suggests, then that leaves the industry and investors to wildly speculate as to what the SEC may or may not do. Today, or, SEVEN years from now!  Petitioners strongly believe that assuming XRP was a non-security, like BTC and ETH, after publicly trading by their side for seven years, was reasonable.  The SEC had a fiduciary duty to inform, otherwise. Absent the SEC sharing information, as the Mission Statement requires, the only way the public will know

with regulatory clarity is when the SEC files enforcement actions. Is that what the SEC is engaging in as it relates to Crypto Currency and the action against XRP?? This approach is called "regulation by enforcement." Maybe Clayton and the SEC is generally confused as to what a security is in the context of Blockchain technology and Digital Assets. Maybe the SEC doesn't know or understand how Digital Currencies fit in the regulatory scheme, and has been for years, himself, unsure about whether XRP constitutes a security. Maybe, Clayton and the SEC have used the XRP action as a way to engage in "regulation by enforcement."

33.     Interestingly, the new SEC Chairman Elad Roisman has publicly been critical of this regulation by enforcement practice. Chairman Roisman has publicly cautioned against regulation by enforcement. He has stated that he "always analyzes on a case by case basis with **investor welfare** as his North Star." (emphasis added). He stated, "when considering market participants acting in good faith to comply with the rules, enforcement should be the last resort, not a first resort."

34.     In the SEC complaint, it references Tolling Agreements between the SEC and Ripple and Ripple's executives. These agreements toll the statute of limitations from conduct and/or sales of XRP from as early as 2014. In other words, the SEC and Clayton have been aware of the "XRP lack of regulatory clarity issue" for many years, yet they allowed thousands of innocent investors, including the Petitioners, and all others similarly situated, with no absolutely no connection to Ripple or its two executives, continue to purchase and/or acquire XRP, in thousands of accounts throughout the United States.

35.     Clayton has on more than one occasion, spoken at the same meetings and conferences that Ripple's CEO, Garlington, has spoken. These conferences involved Digital

Assets. Garlinghouse would promote the utility of XRP at those very meetings attended by Clayton. As stated, Garlinghouse spoke immediately following Clayton. Almost every time Clayton attended and/or spoke at these Financial conferences, he was asked about XRP and regulatory clarity and when the SEC would provide a declaration of XRP being a non-security just like BTC and ETH. Despite his obligation to share valuable information to the public so investors can make informed decisions, he declined. Clayton's repeat response to the XRP question was always the same: "**If it is a security, we will regulate it."**

36.     Clayton's familiarity with Ripple, Garlinghouse and XRP was not limited to a few public gatherings. It included private meetings. In fact, one meeting between Garlinghouse and Clayton was at the white house with President Trump's senior officials. In short, Clayton's knowledge about the company Ripple, its executives, and the Digital Asset XRP is extensive. If he truly, honestly, and legally believed XRP was a security being exchanged 24/7 daily in the United States with thousands of innocent investors, including the Petitioners, and others similarly situated, he had a fiduciary duty to provide insight and information to the U.S. public. He had a duty to make a public statement that XRP **could** be deemed an unregistered security and for buyers to beware. He was asked repeatedly by professional financial journalists and others, and he refused to comment. Instead, he drops a bomb on the crypto community on his second to last day in office. He did so knowing a new opposing-party administration was only weeks away from assuming control. He was aware that this new administration may disagree with his enforcement action declaring that all XRP, past and present, are unregistered securities, costing billions in losses for innocent investors with no connection to Ripple or its executives. Clearly, Jay Clayton did not care about protecting investors.

15

37.     Although the SEC and/or Clayton did not affirmatively declare XRP a non-security similar to ETH and BTC, its actions implied that XRP was in fact not a security. During the time period the SEC **now** claims XRP was an unregistered security, the SEC granted Ripple permission to take a minority stake in the publicly traded company MoneyGram International (MGI). Ripple invested $50 million purchasing approximately 9% of MGI. *See SEC Complaint, p.58 fn.4.* The SEC approved this purchase of MoneyGram with the full knowledge that Ripple would encourage MGI to use the Digital Asset XRP as a cross-border utility token related to remittances. Hence, The SEC allowed the use of this **so-called illegal security** to be utilized not just by Ripple, but by MoneyGram, as well. The SEC admits to this knowledge when its states that Ripple paid "Money Transmitter significant financial compensation – **often paid in XRP**." *See SEC Complaint, p. 58 (emphasis added).*

38.     The SEC was fully aware that MGI would not HODL XRP. The SEC knew that MGI would sell XRP in the Secondary Markets to investors such as the named Petitioners and all others similarly situated.  Hence, it appears, the SEC, believing XRP to be an unregistered security, provided consent for XRP to be purchased and/or utilized by MGI and then sold in secondary markets to innocent investors with no connection to Ripple or even MGI (purchasers of XRP on exchanges do not know the identity of the seller).  **If the SEC truly believed XRP to be an illegal security, why would it allow this transaction to take place**? The answer is because the SEC knows very well that *Today's XRP* is not a security. The XRP in the accounts and/or digital wallets of the named Petitioners and others similarly situated, are, in no way, securities.

16

39. Exchanges, however, faced with the SEC's claim that today's XRP is a security, must take action and delist, halt and/or suspend all activity related to XRP in the United States. As stated, BITWISE has liquidated all of its XRP. Grayscale Investments manages an XRP Trust for accredited investors. It may liquidate as well. Coinbase, arguably, the most significant exchange in the United States (if not the world) has indicated it will suspend all XRP activity on January 19, 2021. As stated earlier, many others have also delisted or suspended XRP trading. In short, the mere allegation by the SEC that XRP is a security, will likely render XRP untradeable in the United States and its value would, in effect, for U.S. customers become zero, wiping out many innocent investors with absolutely no connection to Ripple or its executives.

40. The Petitioners will demonstrate however, that the XRP being traded today in 2020 is in no way even close to be a security. Clayton knows that. Otherwise, he would have filed the enforcement action years ago. He didn't. He knows XRP will not be classified a security and that's why he didn't pursue the case during his tenure. Instead, he files the case as he is leaving the SEC, with a new chairman and administration coming in less than four weeks.

41. It is clear, even to the blind, that Clayton's motive was to damage Ripple, its executives and XRP as Clayton was leaving and, in a position to do so. His intention to harm may not only be limited to XRP, but to the cryptocurrency industry itself. The complaint filed against Ripple and its executives, if successful, could be applied to every cryptocurrency, with possibly the exception of Bitcoin, despite, like XRP, having been openly traded for seven-plus years.

42. Clayton was well aware that the mere filing of the enforcement action, not limited to specific distributions of XRP directly from Ripple, but alleging that all XRP

constitutes securities, could prove to be a kill shot against Ripple and XRP. Common sense, itself, informs one of that matter. But, here, Clayton received a letter from a former SEC Chairman pleading with him not to cause the harm he would cause to innocent investors with no connection to Ripple. Chairman Grundsfest even stated that filing an action causing multi-billion dollars in losses to investors when no exigency exists to do so, would cause one to question Clayton's discretion. XRP traded for seven years, including several years while Jay Clayton was SEC chairman. Waiting for feedback from the new chairman and new administration would cause no harm. But, filing this action against XRP would cause "**unprecedented damage**."

*The defense cannot persuasively claim that the Petitioners engaged in purchasing and owning a risk-based asset and, therefore, took a knowing risk and simply made a bad investment. The issue isn't whether XRP is a good technology and/or investment. The issue is the SEC's action and/or inaction, and what investors, such as the named Petitioners, can rely on.*

43.     The Petitioners and all others similarly situated reasonably relied not only on the SEC's inaction against Ripple and XRP for seven years, but also relied on the actions taken by the SEC and other US agencies that constituted the approval of Ripple and the Digital Asset XRP.

*A)     Although the SEC never declared XRP a non-security like it did with ETH and BTC, other U.S. agencies, world Governments and others did declare XRP a non-security as XRP's utilization as Currency grows.*

44.     Currencies are excluded from statutory definition of a security.

45.      XRP has been trading in Secondary Markets since 2013. In 2015, the DOJ and FinCen settled a case with Ripple and determined XRP was virtual currency and that Ripple is a

18

money transmitter of XRP. The settlement required Ripple's XRP transaction to comply with laws that do not apply to security transactions. This is an agency of the federal Government classifying XRP as virtual currency. In 2015 the US Government entered into a consent agreement related to the sale of XRP to Roger Ver. These known Government interactions with Ripple involving XRP with no security law violations being publicly asserted by the SEC implies that if XRP were a security, the Government would have said so back then

46.      Currency is generally defined as a medium of exchange, unit of account and/or a store of value. In _U.S. v. Harmon_, C.J. Beryl A. Howell wrote that money or currency commonly means a medium of exchange, method of payment or a store of value. He found that BTC is these things. Clayton has publicly agreed that BTC is a store of value, and, thus, not a security. Later, the Petitioners will demonstrate that XRP is also being used as a store of value considering the significant depreciation in value of the USD. Furthermore, XRP holders can stake their XRP and generate far greater yield than maintaining their wealth in a currency being debased by the printing of trillions of USD and a Federal Reserve targeting north of 2% inflation. XRP holders can use their XRP as collateral for fiat and/or cryptocurrency loans. Clayton's analysis that BTC is not security because it acts as a store of value, equally applies to XRP, ETH, and other Cryptocurrencies. **This use case alone makes XRP a non-security.**

47.      XRP is the third largest virtual currency with billions of dollars trading every day. XRP trades on exchanges in line with the two largest cryptocurrencies, BTC and ETH.

48.      The SEC has deemed BTC and ETH as non-securities.

49.      XRP, according to Ripple, is used as a currency by as many as 150 third-party consumers and commercial applications. **This use case alone makes XRP a non-security.**

50.     Former CFTC, Chris Giancarlo (Crypto Dad), has stated publicly, in writing, that XRP is not a security.

51.     Congressman Tim Emmer has publicly declared that XRP "is clearly not a security."

52.     Brian Brooks, Acting Director of the Comptroller of Currency (OCC), was previously General Counsel of Coinbase, which has, for years, sold XRP.

53.     From 2015 to present, XRP has been traded in open markets on more than 200 exchanges worldwide, including several significant in the U.S. like Coinbase, Binance, Kraken, Voyager, Crypto.com, Uphold, etc.

54.     XRP is not a security according to Japan's Financial Services Agency.

55.     SBI, a Japanese corporation, has an E sports team and pays its players in the Digital Asset XRP. In this instance, XRP is utilized as payroll currency. **This use case alone makes XRP a non-security.**

56.     The UK's Financial Conduct Authority (FCA), unlike the SEC, provides clear guidance to investors and businesses regarding crypto-assets and digital currencies. The FCA has stated that crypto fits into several brackets: a) a security token; b) a utility token; and c) an exchange token. A security token is like a stock certificate or debt instrument. It provides title rights to a company. A utility token is designed for a specific purpose. An exchange token is traded on platforms for value in something. The FCA declared XRP to be a "hybrid token", constituting both a utility and exchange token. It **was not** determined to be a security token.

57.     The SEC, in 2017, brought ICO (Initial Coin Offering) cases against several companies, alleging that the digital token that was being offered constituted an unregistered

20

security. Two of these cases involved the EOS and KIN Tokens. These companies raised capital by offering ICOs. These tokens were promised by the promoter who received money for that promise. As will be discussed later, this ICO scenario fits squarely in the 4 factor *Howey test* of what constitutes a security. Because these ICOs constituted securities, the SEC shut it down. Ripple and XRP, however, were left alone by the SEC during these high profile ICO prosecutions. In fact, Garlinghouse spoke out against these Token assets. In 2017, XRP had been in openly traded for 4 years. The SEC leaving XRP alone during this period of aggressive prosecution of ICOs implicitly gave further confidence to investors that the third largest cryptocurrency was safe from being called a security, similar to BTC and ETH. XRP may prove to be a terrible investment when compared to BTC or even ETH. **But the Market gets to decide the winners and the losers in the digital currency revolution, NOT the Government.**

58.     Japan, Singapore, the U.K., Switzerland and the UAE have all declared XRP to be a non-security.

59.     Unlike XRP, actual stock in Ripple, the company, can be purchased by accredited investors through business entities like Linqto. When you purchase stock in Ripple, you do not receive XRP, but, traditional stock certificates in the company.

60.     The SEC runs a node on the XRPL, along with thousands of other individuals, companies and/or entities and even if Ripple ceased to operate as a company, the XRPL continues along with XRP.

61.     The SEC has made public statements that BTC and ETH are not securities. Much like BTC and ETH, XRP is a digital currency supported by a distribution ledger that uses cryptography to store and transfer assets.

62.     Former CTFC Chairman Chris Giancarlo authored an op-ed stating that XRP is not a security and is most similar to ETH, which is a commodity. Giancarlo is in charge of the Digital Dollar for the U.S. Government. Thus, his words, findings and conclusions carry significant weight with investors, such as the Petitioners and all others similarly situated.

63.     Since at least 2015, Ripple has focused XRP to be used by banks to replace SWIFT in the international payments and remittances arena. Many significant authorities, including the European Central Bank and the Russian Central Bank, amongst others, have stated that digital currencies will eventually replace SWIFT. XRP has been used to make international payments and transfers without intermediaries. **This use case alone makes XRP a non-security.**

64.     DBS, Singapore's largest bank and the sixth largest bank in the world, declares XRP is better and faster than SWIFT. **This use case alone makes XRP a non-security.**

65.     DBS launches a digital exchange between four flat currencies (SGD, HKP, JPY & USD) and the four most established cryptocurrencies (BTC, ETH, XRP and BCH). **This use case alone makes XRP a non-security**.

66.     BitPay launches a massive crypto payment for businesses and 225 countries can now pay in XRP, ETH and BTC. **This use case alone makes XRP a non-security.**

67.     Deel, partnered with Coinbase (which sells XRP), launches a crypto payroll tool that allows international workers to be paid in BTC, ETH and XRP, allowing near instantaneous withdrawals. In other words, International Workers withdraw their paychecks in XRP - *XRP is used as a substitute for fiat currency*. **This use case alone makes XRP a non-security.**

68.     Belarus' largest bank launches a crypto exchange service to include XRP.

69.     The OCC, in April 2020, issued a notice to banks in the U.S. that they could custody crypto assets. *Clayton issues a letter that says the SEC agrees with the OCC that U.S. banks can now custody cryptocurrency.* XRP is the third largest crypto asset. Clayton did not state that he agreed with the OCC with the exception that banks CAN'T custody XRP because they are unregistered securities**.** He never provided a statement that XRP or other Crypto could later be determined a security. **Instead it appeared that the SEC was in full agreement that Banks could custody Crypto.** *He certainly didn't say but be aware that eight months later, on my way out the door, I intend to declare the third largest crypto asset in the world to be an unregistered security.* No mention of XRP whatsoever. It is one-hundred percent reasonable to assume that if the SEC agrees that US banks can custody crypto assets, it would include the third largest crypto-asset.

70.     Clayton and the SEC, by this letter of agreement with the OCC, provided investors, including the named Petitioners, and all others similarly situated, confidence that XRP would not be classified a security or the SEC would have excluded certain assets *or simply limited the custody to BTC and ETH.*

71.     OCC Brian Brooks provided a path for Crypto Companies to become U.S. Banks and publicly stated that there was significant interest in Crypto firms seeking a Banking Trust Charter. Not only did the U.S. Government declare that U.S. banks could custody crypto; a crypto exchange, Kraken, was granted a bank charter by the State of Wyoming. Kraken is the first crypto exchange to be granted status as a U.S. bank. Kraken sells XRP and has for years. All of this was known to Clayton. Not only did Clayton and the SEC agree that U.S. banks could custody crypto, without excluding the third largest crypto, *but a crypto exchange that holds and*

23

*sells XRP was deemed a U.S. bank.* Based on the actions of the OCC and SEC, it was completely reasonable for the Petitioners and all others to gain more confidence that investing in the largest cryptocurrencies on the market was a viable way to speculate and possibly build and secure wealth.

72.     As stated, XRP was being exchanged publicly on over two-hundred exchanges worldwide. In the U.S., not only was the newly deemed bank, Kraken, holding XRP, but Coinbase, Grayscale, Bitwise, Binance, Crypto.com, Voyager and Uphold were as well, just to name a few.

73.     If the Respondent was actively investigating Ripple and XRP, then they had a duty to protect U.S. investors and share that information, consistent with its mission statement. Every investor, including the Petitioners and others similarly situated, assume risks when investing in *any investment*. The actions of Clayton can only be described as schizophrenic or politically and/or personally motivated to cause great harm to Ripple, XRP and/or to the cryptocurrency industry, with complete and utter disregard for the thousands of investors that Clayton swore to protect.

74.     CBOE Global Markets announced plans to launch Crypto Indexes, similar to Bitwise, in the Second Quarter of 2021. XRP, as the third largest crypto asset, would be part of the index just as it was a part of the Bitwise Crypto Index Fund.

75.     The Respondent was well aware that financial services companies, such as ITrustCapital, allowed U.S. residents to transfer their traditional Fiat IRA into crypto assets, including XRP. Some investors placed their entire life savings into XRP. Whether such an investment decision was wise or not *does not negate* the SEC and Clayton's complicity in

allowing the American public to rely on its guarantee not to intentionally cause great economic harm to innocent (even if naive) investors who have no connection to Ripple or its executives. The Respondent had a duty to disclose to the public their belief that XRP has always been and continues to be an unregistered security. The Petitioners will prove, however, that the SEC and Clayton actually do not believe that Today's XRP is a security *and that* is why an enforcement action was never filed until Clayton's second to last day.

76.     During the time period that Respondent claim XRP was an unregistered security, the Respondent was well aware that a third-party entity, Flare Networks, unrelated to Ripple, announced, promoted, and then executed a Digital Asset Token Airdrop for all XRP holders. Flare Networks informed the public, including the Respondent, that a Digital Asset called the 'Spark Token' would be Airdropped into all accounts that held XRP, assuming the exchange that each XRP holder used participated in the Airdrop. Flare Networks informed the public, including the Respondent, that, at a minimum, each investor holding XRP would receive, by Airdrop, a Spark Token for every XRP. Flare informed all parties that a snapshot would be taken of all XRP accounts/wallets on December 11, 2020 and December 12, 2020. All the major exchanges, including Coinbase, Kraken, Uphold, Binance, etc. participated in the Flare snapshot. Based on this promotion, new XRP accounts hit a one year high. At least 24,408 accounts/wallets held XRP at or around the snapshot. The SEC allowed this snapshot to take place and each XRP holder, including the Petitioners and all others similarly situated, are scheduled to receive Spark Tokens that equal the number of XRP tokens held on the snapshot day. *If XRP is an unregistered security, what classification does the Spark Token fall under?* If the SEC and Clayton actually believed XRP were illegal securities, why would they allow an Airdrop based on those illegal

securities? They would not have, if they honestly believed all XRPs are securities. The Flare Spark Token Airdrop was another example of the U.S. Government and the SEC implicitly agreeing that the XRP, in the Petitioners' accounts and in the accounts of all others similarly situated, including on all the U.S. exchanges, are not securities.

77.    The Flare Networks CEO stated "over the next Quarter, we will set out plans to trustlessly integrate XRP with Flare. This will enable smart contracts with XRP, on a next generation blockchain, with settlement on the XRPL." Flare's CEO explained that this integration with XRP and the XRPL, "is called a utility fork and it's the first of its kind." **This use case alone makes XRP a non-security**.

78.    Ripple partner Xago announces they are utilizing XRP to move money across Africa. **This use case alone makes XRP a non-security**.

79.    London-Based Think Tank says XRP can minimize intermediaries and boost the speed of international payments. **This use case alone makes XRP a non-security**.

80.    Defendant Clayton, himself, stated publicly that it's time to use technology to address the inefficiencies in payments systems.

81.    The Office of Monetary & Financial Institutions Forum (OMFIF) produced a report on blockchain technology and the advantaged of XRP as an alternative in payments. **This use case alone makes XRP a non-security**.

82.    Bitex, an exchange in the UAE that offers XRP, is expanding to India with a wallet trading platform utilizing BTC, ETH, XRP, LTC and BCH.

83.    Japanese financial giant SBI sponsors and/or owns an Esports team. SBI announces it is paying its players not in the Japanese Yen, but in XRP. Like Deel, mentioned

earlier, XRP is being used *as a substitute to fiat currency*. Many U.S. residents watch these tournaments, with 1-6 million viewers watching every tournament video. Another example of U.S. investors witnessing the use of XRP **as** a *payment currency*, not a security. **This use of XRP alone makes it a non-security**.

84. In fact, at a Linqto Global Investors Conference on December 8th-9[th], SBI/Ripple Asia's CEO, Adam Traidman, says that the CEO of SBI Holdings is "XRP's biggest fan and wants the next World's Fair in Japan to only accept XRP *as a currency payment*." **This use case alone makes XRP a non-security**.

85. Grayscale's XRP Trust doubled during November and December of 2020. The manager of Grayscale stated that one-third of its buyers own more than just BTC (GBTC). During the time period the Respondent claim that XRP is a security, investors were actively buying XRP with the SEC and Jay Clayton's full knowledge. If they truly believed XRP, in its current state, is a security, then they would have not allowed such significant retail and institutional purchasing of XRP. They allowed it to happen because they know XRP *is not* a security. Certainly, the XRP of today is not. If it was, Clayton would have filed the enforcement action long before his second to last day as chairman.

86. SBI announces it plans to test XRP in the $6.6 trillion foreign exchange (Fx) market. The total Fx market, worldwide, is between $1 to $7 quadrillion. XRP being utilized in any percentage of that market provides great opportunities, and reason, for U.S. investors, including the Petitioners and all others similarly situated, to invest in the Digital Asset XRP. **This use case alone makes XRP a non-security.**

87.    SBI also rolls out a BTC lending service and announces plans to add support for ETH *and XRP*. SBI also wires 200 million XRP from its lending service, suggesting the platform is up and running. This lending service provides liquidity to individuals or small and medium businesses. **This use case alone makes XRP a non-security.**

88.    Arrington XRP, a U.S. business, publicly announced it moved $50 million utilizing XRP into their company's treasury reserves, and it took three seconds to accomplish at a price of thirty cents. **This use case alone makes XRP a non-security.**

89.    Jack Ma, China's richest person and the founder of Alibaba, publicly states that cryptocurrency is the future and could help create a new financial world order. **This use case alone makes XRP and all of Crypto a non-security.**

90.    Decentralized Finance (DeFi) has probably been the hottest topic of finance in the last three years and Flare Finance announced that it was opening the DeFi Market to XRP. **This use case alone makes XRP a non-security**.

91.    In Asia, cryptocurrency and Digital Assets, including XRP, are already a part of the mainstream financial markets. **This use case alone makes XRP a non-security**.

92.    The World Economic Forum (WEF) names XRP as the most relevant cryptocurrency for CBDCs by banks. **This use case alone makes XRP a non-security.**

93.    Sophisticated and experienced, billionaire investor Tim Draper said publicly that he is a believer in XRP and that XRP's use case is expanding.

94.    Although XRP is the third largest crypto asset it often trades second only to BTC as far as trading volumes on the different exchanges. For example, at a given time-period on the Kraken exchange, Bitcoin traded at a $480 million volume; XRP traded at a $400 million

28

volume; and ETH traded at a $198 million volume. On Coinbase alone, XRP has traded in volume in excess of $1 billion within a twenty-four-hour time period.

95.     Ripple invested in MoneyTap, a subsidiary of SBI, and MoneyTap incorporates XRP. It is announced that SBI Asia will also use XRP. **This use case alone makes XRP a non-security.**

96.     Visa, partnering with Coinbase (which lists XRP) and Fold, launched a crypto-debit card in the U.S. for retail spending to Visa's 61 Million merchants. **This use case alone makes XRP a non-security.**

97.     Ripple claims that 20% of transactions on its global network of financial institutions now use XRP and that ODL facilitates cross-border payments using XRP as a *Bridge Currency*. **This use case alone makes XRP a non-security**.

98.     IMF Publications listed two competing digital tokens that can be used as a *Bridge Currency* in international settlements and remittances. Those two tokens are XRP and the JPM Coin.  **This use case alone makes XRP a non-security**.

99.     Fidelity Investments Reports that 45% of investor funds own crypto in the United States. XRP, being the third largest, is included in many of these accounts. In fact, many financial advisors tell investors to diversify their portfolio, to include crypto, but to also diversify their crypto holdings. This is consistent with market-cap traded Index Funds like Bitwise whose fund was 5.94% comprised of XRP at one point before the SEC's enforcement action declaring XRP a security forced them to liquidate all XRP holdings.

100.   Charles Schwab in December 2019 issued a report that stated that GBTC (the Grayscale BTC Trust) was one of the top five equities held by millennials. For several years it

has been foreseeable that the interest in crypto assets would grow, including the interest in the third largest crypto asset. Yet, The SEC and Clayton sat back and allowed the public to grow more and more confident that Crypto Assets, including XRP, would not be deemed securities.

101.   It is announced that in Zug, Switzerland, a person can make tax payments to the Government in BTC and ETH. It is expected that other crypto tax payments will also be allowed. **Paying your taxes in Cryptocurrency, alone, is a use case that makes those cryptocurrencies non-securities**.

102.   On November 30, 2020, twenty-three days before Clayton directs the filing of the enforcement action against XRP and the crypto industry, Grayscale states that the inflows into its different crypto trusts, including XRP, is more than six times the inflow last year and that many investors are not only buying BTC, but other cryptos as well. Grayscale states that the nature and amount of investments that are flowing into Grayscale indicates that investments into crypto assets has just begun. Twenty-five days later, Clayton initiates the action against XRP.

103.   In a televised interview with OCC Brian Brooks, he states that it is imperative that the U.S. Government does not let the U.K., Singapore or China leapfrog the United States in the digital finance world like what happened with 5G and China. Brian Brooks is critical of the Federal Reserve because it stated that it hoped to have developed a CBDC by 2024, while the U.K. was already using real-time payments. He described the situation as "absurd". Brian Brooks then stated that the technology for real-time payments and creation of a CBDCs exists today and described XRP and the XRPL. Brian Brooks emphasized the need for the U.S. Government to work with these private companies (Ripple) that can move billions of dollars per day faster and

cheaper. He emphasized the need to work with technology like XRP or the U.S. would be forced using antiquated and outdated systems like SWIFT.

104.    After OCC allowed banks to custody crypto-assets, Brian Brooks stated that almost immediately, twelve banks including PNC and USB have expressed interest in providing crypto-services.

105.    Novatti partners with Ripple Labs to enable real-time remittances between Australia and Asia. **This use case alone makes XRP a non-security**.

106.    The Head of Asset Management of Sygnum, a Swiss bank in Singapore, calls out to the public to *increase exposure to "the tokens of the future"* and lists those tokens to be "*BTC, ETH, and XRP*". Sygnum classifies BTC as the future asset for store of value and wealth. It classified ETH as an infrastructure play of the future. It classified XRP as not a security, but as technology of the future regarding *payments* (exactly what the OCC Brian Brooks had publicly discussed).

107.    American Express announces it has backed the Crypto Broker Falcon X. American Express announces interest into peer-to-peer payments with Venmo and PayPal. American Express is a Ripple partner.

108.    As stated, the SEC approved Ripple purchasing a minority stake in MGI ($50 Million), knowing Ripple would promote the use of XRP as a *Bridge Currency*. The MGI CEO was interviewed on CNBC about the Ripple connection. He stated that MGI has been "partnering with Ripple now for eighteen months and the idea behind that was for us to really push innovation and see how we can help in pioneering of the expansion of global utilization of blockchain technology." OCC Brian Brooks stated on CNBC, thereafter, that blockchain

31

technology is crypto assets. He stated that "there is no blockchain technology without crypto." The SEC, in its Complaint, allege that MGI only used XRP because Ripple subsidized the use. The Petitioners are also aware that MGI has further distanced itself from Ripple since the filing of the SEC's Complaint. First, the SEC permitted Ripple to purchase a minority stake in MGI knowing XRP would be promoted, used and sold to innocent investors, with no connection to Ripple. Second, despite what MGI states now, its CEO was publicly making statements positive towards Ripple and its blockchain technology, and, thus, XRP. *IF what the SEC alleges is accurate, then how does it allow companies like MGI to make these misleading statements to innocent investors?* Some of the named Petitioners, and others similarly situated, purchased XRP based on this perceived use case with MGI. Yet, it appears that the SEC takes no issue with such facts.

109. Ripple was selected by CNBC as one of the top fifty companies in the world when considering companies utilizing disruptive technologies.

110. Ripple is partnered with 300 financial institutions, including American Express, PNC, Bank of America, MGI and many others. It is widely known that Warren Buffet is the largest shareholder in Bank of America. Ripple's partnership with entities like Bank of America and American Express gave investors, including the Petitioners and all others similarly situated, confidence that Ripple would not later, in essence, be classified as a bad corporate citizen, by the SEC. Respondent had a duty to inform the public that it believed Ripple and its executives to be bad actors and/or involved in illegal securities. Ripple, in May of 2020, made XRP distributions only after providing the SEC notice. If the SEC knew it might, seven months later, call those

very distributions of XRP - illegal securities – it owed a duty to the public, including the Petitioners and all others similarly situated.

111. Ripple, in December 2019, is named the fourth most valuable VC backed Fintech Unicorn in the world valued at $10 Billion USD.

112. In 2020, Ripple claims 38% of the world's top 100 banks are linked to Ripple.

113. Ripple partners with European Exim Bank and on the Winter 2020 cover of Finance Magazine, the CEO of Exim Bank is pictured with the title "Ripple and the Trade Finance Revolution."

114. As stated, in the last few years, Ripple emerged as the main challenger to SWIFT by offering instant cross border payments. Brian Brooks publicly stated that the Government should allow existing private companies and technology to replace SWIFT.

115. Goldman Sachs' former executive resigns and goes to work for Ripple related to Fx markets. As stated, SBI was testing XRP in the Fx Markets and the Global Fx markets equal $1-7 Quadrillion. **This use case alone makes XRP a non-security**.

116. PayPal's CEO Dan Shulman publicly stated that digital currencies are the future of finance and money. In 2020, PayPal began allowing individual customers purchase Crypto Assets on PayPal's platform. Individuals, as of now, can purchase BTC, ETH, LTC and BTH on the PayPal platform. Interestingly, XRP, as the third largest Crypto Asset was not included. CEO Dan Shulman stated publicly, that prior to launching this Crypto Platform, PayPal was working closely with regulators. Hence, upon information and belief, Clayton shared information with PayPal regarding the SEC's potential filing of an enforcement action. XRP's market cap and liquidity is much more significant than BTH and LTC, therefore, the only explanation why

33

PayPal would exclude the third largest crypto asset is because it was provided information by Clayton that the American public was not.

117.    PayPal announced that in 2021 it will allow for crypto assets to provide the funding source for retail purchases to its 28 million merchants. Morgan Stanley issued a statement that the PayPal pledge to support Crypto as a funding source for 28 million merchants will likely lead to mass cryptocurrency adoption.

*B.) The CBDC Revolution and XRP's role in it.*

118.    After addressing the need for financial relief caused by the Global Covid-19 Pandemic CBDCs, have arguably become the most significant financial topic in the world today.

119.    China's President Xi has urged world leaders to support CBDCs. At the recent G20 meeting in November 2020, he stressed the need for CBDCs.

120.    Japan accelerated a rollout of the digital Yen and CBDC.

121.    Canada announced it will soon launch a CBDC.

122.    The Bank of England says digital currencies may replace banks role in payments altogether.

123.    The European Central Bank said that Europe is losing in the CBDC race and that there will be significant consequences.

124.    PayPal CEO Dan Shulman recently stated there is "no doubt people flocking to digital currencies and CBDCs *will be the future* and there is no doubt that CBDCs will be issued directly by Central Banks to people.

125.    A top Japanese Banker said digital currency development is the top priority and that Japan is behind China and South Korea.

126.    The Head of Russian Parliaments for financial markets stated that the Crypto Ruble will start in 2021.

127.    The Bank of America reports that the Federal Reserve will use digital dollars to unleash inflation, provide UBI and debt forgiveness.

128.    Federal Reserve chairman Jerome Powell is asked by legendary investor Paul Tudor Jones to declare Bitcoin as a monetary reserve, like gold.

129.    China has already created a CB-backed digital currency and has been using it for the last couple of months in select Chinese cities.

130.    Deutsch Bank released a report about China issuing the first CBDC and states that it is now a step closer to its goal of removing the U.S. dollar as the world's reserve currency.

131.    A Top Russian banker declared SWIFT to be replaced by digital currencies.

132.    OCC Brian Brooks stated publicly that in the U.S. there are too many agencies in finance and banking. He openly asks the question "*Do we think it's best for the Government to build a CBDC or utilize the private sector, which is already built*?" Brian Brooks, without question was discussing XRP and the XRPL. There is no doubt it was XRP that he was referencing because he stated that the technology to build a CBDC was "already built", but that the only issue was with a *lack of regulatory clarity*. He could not have been referencing BTC or ETH because they have long enjoyed regulatory clarity by being declared non-securities by the SEC. Additionally, Brian Brooks has stated that the industry needs to know whether the SEC thinks XRP is a security. **Utilizing XRP to help build CBDCs alone makes XRP a non-security.**

35

133.    In fact, Ripple announced that it intends to leverage its payment platform and the XRPL for delivery of CBDCs.

134.    Garlinghouse publicly stated that Central Banks are looking to issue CBDCs on the XRPL.

135.    Garlinghouse also stated publicly, "XRP could be a key crypto asset in the digital dollar revolution."

136.    Ripple presented a plan to host CBDCs together with the XRP token. The XRPL will host CBDCs and public and private entities are able to modify CBDCs according to their needs. **This use case alone makes XRP a non-security**.

137.    As stated, the WEF names XRP as the most relevant crypto for CBDCs by banks. **This use case alone makes XRP a non-security**.

138.    David Schwartz, Ripple's CTO, says that the XRPL will bridge between CBDCs. In short, XRP acts as a ***bridge currency*** (emphasis added). **This use case alone makes XRP a non-security**.

139.    After the WEF's comment regarding XRP, discussion emerged within the crypto community whether XRP would become the world's global CBDC or be a bridge asset between all CBDCs. While all of this positive news is being published in the Crypto investor community, the SEC is nowhere to be found. The SEC was aware of all of this utility being discussed related to XRP and not only said nothing, but when asked, repeatedly, refused to share information that would protect innocent investors.

140.    Not only did the WEF discuss the utility of the XRP token, but, long before the SEC's factually and intellectually dishonest claim that XRP is a security when it commenced its

36

enforcement action on December 22, 2020; the IMF had also listed XRP as a *bridge currency*. Hence, internationally and in the United States, XRP was being described as a *currency, or commodity, or utility token*. As stated, the DOJ's FinCen also classified it as "*virtual currency*."

141.    The SEC complaint against Ripple and XRP, declaring that XRP was, always has been, and continues to be, a security is likely the most far-reaching, outrageous and absurd claim the SEC has ever alleged. When you consider the economic destruction the SEC complaint caused, one immediately thinks that it was filed with reckless disregard for the collateral economic damage to thousands of innocent investors with absolutely no connection to Ripple and its executives. Once you consider all the forementioned facts coupled with the fact that Clayton was warned by a former SEC Chairman, whom pleaded with Clayton not to file the action due to "*unprecedented multi-billion-dollar losses to innocent investors,*" immediate thoughts of criminality come to mind. It is almost criminal what the Respondent have done to innocent investors with no connection to Ripple (including many that have never even heard of Ripple).

### *Today's XRP IS NOT the XRP of 2013 to 2015*

142.    The Petitioners in this action, as well as the undersigned counsel, are not bringing this action to defend Ripple, Garlinghouse or Larsen. It may very well be the case that at some point in the initial offerings of XRP, from Ripple to entities and/or individuals, some of those distributions, might, arguably, be considered a security under the *Howey Test*. But the SEC **did not** limit its allegations against Ripple, like it has in similarly situated cases, to early offerings of the asset in question. Here, the SEC, at Clayton's direction, is alleging that XRP today, SEVEN YEARS, including the XRP owned by the named Petitioners and all others similarly situated,

constitute unregistered securities. The SEC is actually alleging that the XRP that sits in individual accounts on Coinbase, Kraken, Binance, Uphold, or in individual investor digital wallets, etc. are illegal securities - even if XRP holders have never heard of Ripple, Garlinghouse, or Larsen. This broad, sweeping claim is why entities, such as Bitwise, liquidated all of its XRP. This overly broad, reckless, and absurd allegation by the SEC is why Chairman Grundfest wrote to Clayton warning him that there would be an "exodus of intermediary market service providers. Clayton and the SEC cannot claim that the extreme reaction by the marketplace was unforeseeable. *They knew these exact consequences would result wiping billions of dollars in innocent investor wealth*. The SEC and Clayton not only DID NOT protect the investors they swore an oath to protect, but they *intentionally caused catastrophic economic losses to those investors,* during a Global Pandemic, nonetheless.

143.   In essence, as alleged in its complaint, the SEC is claiming that all XRP holders knowingly relied solely on the efforts of Ripple to drive profits with their purchase of XRP. However, many Petitioners, including some of the named Petitioners as well as hundreds, if not thousands, of others similarly situated, have never heard of Ripple or its executives.

144.   The legal substance of the SEC Complaint claiming present day XRP a security is extremely weak and does not provide an analysis of how XRP today constitutes a security. Usually, the SEC will attempt to establish a prima facie case establishing the asset in question is, in fact, a security. The Complaint, in passing, references *SEC v. W.J. Howey Co., 328 U.S. 293 (1946),* but offers zero substantive analysis on the 4-factor test *Howey* – all of which must be met in order to call an asset a security. Instead, the SEC cites to *Howey* but simply concludes XRP is an unregistered security. There is barely any analysis made of the actual *Howey* factors

38

demonstrating XRP **ever** being a security. The little analysis that is offered by the SEC relate to specific, early distributions of XRP, made directly from Ripple and its executives. The SEC completely ignores all the facts and instances of XRP being utilized today, by parties other than Ripple. The SEC in its complaint cites to early distributions of XRP, but concludes XRP, even today, is an unregistered security.

145.   The Petitioners, in this action, have described the SEC enforcement action as an action against Ripple **and** XRP. These are two distinct and very different theories. The Petitioners are not here to defend Ripple. Ripple's talented legal team can do that. The Petitioners here, and all others similarly situated, however, as holders of XRP, must address the SEC claims that the XRP that they have acquired are illegal securities. The Petitioners and all others similarly situated have suffered great economic loss and bring this action seeking relief from the SEC, itself, for its own actions, but also to ensure that if the SEC ever collects funds from Ripple and/or its executives, that those funds will go to the innocent victims with no connection to Ripple or its executives.

### C) The XRP Existing Today is not a Security

146.  Former CFTC chairman Chris Giancarlo authored a written opinion on the Digital Asset XRP in June 2020 – 6 months before the filing of the SEC's enforcement action. Chairman Giancarlo is also head of the Digital Dollar Project for the U.S. Government. Hence, the Crypto Community has nicknamed him "Crypto Dad".  Applying a similar methodology, he used to help declare both BTC and ETH as non-securities, he reached the same conclusion regarding XRP. According to Chairman Giancarlo, XRP fails the *Howey Test*, and is not a security.

147. Chairman Giancarlo, along with former Federal Reserve member, Conrad Bahlke wrote an op-ed published in Internet Financial Law Review (IFLR) discussing Ripple and the application of U.S. Securities Laws to XRP, the world's third largest cryptocurrency. In this opinion piece, the authors highlight the case for XRP's classification as a *medium of exchange or a currency.*

148. Chairman Giancarlo points out that much like BTC and ETH, XRP is a digital currency supported by a distributed ledger that uses cryptography to store and transfer assets. He highlights that XRP and the underlying XRPL were specifically designed as a payment mechanism.

149. Chairman Giancarlo explains that Ripple, **today,** (emphasis added) offers XRP to address liquidity challenges faced by financial institutions, including high transaction fees, long processing times, the need for third party monitoring interposed by traditional clearing houses and settlement mechanisms.

150. According to Chairman Giancarlo, unlike BTC and ETH, however, XRP is not mined. This lack of mining does not fundamentally change how XRP is utilized or how securities laws apply.

151. Chairman Giancarlo explains that in the absence of mining, XRP cannot be generated by third parties. Instead of mining by third parties, a finite supply of 100 Billion XRPs were created at the time of inception. Ripple holds in escrow slightly more than fifty percent of the XRP and is sold periodically.

152. Chairman Giancarlo explains that the differences between XRP and BTC and ETH exist to better serve XRP's intended purpose as a liquidity tool and settlement mechanism.

40

These differences, however, do not fundamentally set XRP apart from BTC and ETH from a

legal perspective. Applying that same legal perspective to XRP, Chairman Giancarlo found that

using XRP to address liquidity issues and as an *asset to bridge different fiat currencies or even*

*bridge other Digital Assets* (CBDCs), XRP did not meet all 4 factors of the *Howey Test*.

### D) The Howey Test

153.    *Howey* is a 1946 Supreme Court case that has set the standard for over 74 years

in determining what constitutes a security. The underlying asset in *Howey* was orange groves.

These were plots of land that were sold to tourists. The investors purchased the lots of land, but

also paid the seller money to manage the orange groves. The seller would plant the seeds, water

the trees, harvest the oranges and then sell the oranges to people and places, and the investors

would share in the profits.

154.    The Supreme Court laid out a four-factor test that has become the *Howey Test* in

deciding whether an asset is an investment contract - also known as a security. The *Howey Test*

comprises of 4 factors and all four factors **must** be met in order to classify the asset as a security.

Those factors are: 1) a person must invest money; 2) in a common enterprise; 3) the person is led

to expect profits; and 4) from the sole efforts of others.

155.    The Supreme Court, in applying the four factors, concluded that the orange groves

were securities because the investors did nothing. They never visited the land; never procured the

trees; never took possession of the oranges; or did anything, except invest money and wait for

profits.

156.    After *Howey,* there have been a progeny of cases wherein the four-factor test was

applied. Some of the highlighted assets included oil drilling rigs, whiskey barrels, pay phones,

41

and even beavers. In all these cases, like in *Howey*, the investor gave money, sat back, and collected money in profits. In all of those situations, the assets (investment contracts) were deemed a security.

157. The single most important, consistent factor in *Howey and its Progeny* is that the investors purchased the asset (orange grove, beaver, etc.) from the sponsor/seller directly **but never took possession** of those assets. In other words, the investors never took possession of the beavers, or the oranges or the whiskey, or the pay phones, etc. The buyers never took possession of those assets. If, for example, the investor would have taken the oranges, himself, to sell, it would not have been a security.

158. The Petitioners, and all those similarly situated, have never purchased XRP from Ripple or its executives. The Petitioners, and all those similarly situated, have never visited Ripple offices or met its executives. Several of the named Petitioners and hundreds, if not thousands, of others similarly situated, have never heard of Ripple, Brad Garlinghouse, or Chris Larsen **UNTILL** the SEC's lawsuit.

159. Retail XRP holders, including the named Petitioners, and all others similarly situated, custody their XRP. Some Petitioners have money market service providers, such as Coinbase, custody their XRP. This is a significant distinction from *Howey and its Progeny*. In fact, inside the crypto community, there is a saying "Not your keys, not your crypto." In other words, unlike the oranges, the drillings rigs, the pay phones and the beavers, the holders of XRP keep possession of their own XRP and purchased and maintained their XRP with absolutely no connection to Ripple or its executives.

160.    If holders of XRP maintain their XRP on an exchange such as Coinbase (and almost all others) XRP holders, like the Petitioners, can **CONVERT** XRP into ETH, BTC, LTC, BTH or many other crypto assets. *This factor alone takes XRP out of the classification of a security, under Howey*. In *Howey and its progeny,* investors didn't have possession and control of the oranges or the beavers to sell. **And They certainly couldn't CONVERT the oranges to apples!** The SEC's overbroad claim that XRP is a security today would be laughable if it hadn't caused catastrophic economic loss to the innocent investors the SEC is supposed to protect.

161.    In sum, under *Howey,* a transaction represents an investment contract (aka security) if a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter, sponsor or third party. The mere fact that an individual has purchased and/or acquired XRP does not create any relationship rights or privileges with respect to Ripple. When the Petitioners and all others similarly situated acquired XRP, Ripple had not marketed XRP as an investment product, nor did it promise the Petitioners or other XRP holders any sort of profit, return, or investment. As stated, several of the named Petitioners and thousands of others similarly situated have never heard of Ripple or its executives prior to acquiring XRP. In fact, several of the named Petitioners, and many others similarly situated, only learned of the Company Ripple, Garlinghouse and Larsen **BECAUSE** of the SEC's enforcement action.  Some of the named Petitioners are only aware of Ripple emphasizing the functionality of XRP as a liquidity tool, settlement mechanism, and as a bridge asset between two fiat currencies and/or between different sovereign CBDCs. The Petitioners never believed that owning XRP provided title, privileges, and/or legal rights or entitlements into the Company Ripple.

162.    Not a single case in the 74 years since the *Howey Test* was established has the Court found a security absent a contract or privity between buyers and sellers.

163.    The Petitioners and all others similarly situated are unaware of efforts or statements by Ripple leading the Petitioners to expect profits for their purchase or acquisition of XRP. To the contrary, some named Petitioners are aware that Ripple executives and former executives have publicly stated that XRP was not designed for retail investors. These Ripple executives have stated that XRP was not designed to pay for a cup of coffee. Instead, it was designed for the banks and money service providers. In fact, XRP was labeled by the hard-core BTC community as the "Bankers Coin." XRP, as the Bankers Coin, was helping financial institutions, which run afoul of the original vision of BTC, which was to replace and/or bypass the banks. *See generally Bitcoin: A Peer-to-Peer Electronic Cash System, Satoshi Nakamoto, 2009.*

164.    The mere fact that some investors may acquire XRP with the hope that it will increase in value does not transform XRP into a security. The same is true of BTC and ETH speculators. The same is true with baseball card speculators, gold speculators, or even art speculators.

165.    If the SEC's claim that today's XRP constitutes a security under *Howey*, then all other "alternative coins" that comprise the cryptocurrency market are securities. This includes ETH, which the SEC has stated is a non-security. A ruling that the XRP that sits in people's accounts that have absolutely no connection to Ripple are illegal securities is a death blow not just to XRP, but to all non-Bitcoin designated crypto. Actually, if the courts stretch the *Howey Test* as far as Clayton has suggested in statements regarding securities, there are even scenarios

44

where the SEC could argue that specific Bitcoin distributions constitute a security. *Maybe that is the motive behind the ridiculous claim that the XRP in the Petitioners' accounts are securities.* The motive behind filing the enforcement action against XRP IS NOT the protection of investors or the fair application of federal securities laws. Clayton's motives, however, will be demonstrated later herein.

166.    Every Altcoin was built by someone for financial gain. That person, group or entity reports some kind of venture, special utility or business to boost its value. There are Bitcoin businesses that offer Bitcoin as payment. The receiver then certainly hopes and speculates that the Bitcoin will appreciate in value. *If the SEC is allowed to classify today's XRP, held by retail investors, as illegal securities, then an entire flourishing and innovative industry is in peril.* In fact, Prominent Bitcoin advocate, Max Keiser, has recently claimed that the SEC will now target all other altcoins.

167.    For example, if today's XRP is a security, so is Ethereum. ETH was created by Vitalik Buterin and twelve-million ETH was created for six founders and the development of the Ethereum Foundation. Sixty-million ETH were pre-mined for participants to buy. The Ethereum Foundation was founded in 2014. In 2017, when ETH was near all-time highs in value, Vitalik persuaded the foundation to sell 70,000 ETH, totaling, approximately, $100,000,000 for the foundation.

168.    The Ethereum Foundation has helped ETH grow. Without the Ethereum Foundation, ETH would be less successful. It was gifted ETH and it used it in order to fund ventures to help promote itself and ETH. Prominent crypto-investor, Mike Novogratz, purchased 500,000 ETH and Vitalik commented that the foundation may not have survived were it not for

45

that single purchase. Mike Novogratz speculated that ETH would increase in value. He has confirmed that, at times, he has sold some of his ETH for profit. On at least one occasion, Vitalik was able to get the major exchanges to stop trading ETH. The Ethereum Foundation's early sales of ETH, and Vitalik's actions in those early days, are not shining examples of decentralization. *But the ETH that exists today, like XRP, sitting in thousands of retail investors accounts and wallets cannot be compared to the distributions of ETH that were made many years ago at its inception and infant stage.* The point is not to take shots at ETH, but only to point out that, the SEC's claims against XRP would have to apply equally to ETH and every other Altcoin in the cryptocurrency market. Yet, the SEC has previously declared ETH to be a non-security. Chairman Giancarlo has declared ETH to be a commodity. Once again, likewise, Chairman Giancarlo has publicly stated that XRP is not a security.

169.    The Petitioners in this action, as well as the undersigned counsel, do not assert or believe that ETH is a security. Several of the named Petitioners, in addition to owning XRP, also own ETH and BTC. The Petitioners and undersigned counsel agree with previous SEC statements, that ETH is, in fact, **not a security**. The Petitioners, through counsel, are simply demonstrating what former SEC Chairman Grundfest stated to Clayton in his letter attempting to convince Clayton from filing the enforcement action declaring XRP an unregistered security and causing billions in losses to innocent investors. Chairman Grundfest informed Clayton that "XRP and Ethereum should be subject to the same treatment given that the SEC hasn't illustrated a "material distinction" between the operation of Ethereum and XRP that is relevant to the application of the federal securities laws."

170.    Chairman Grundfest stated in no uncertain terms that if the SEC imposes
"security law obligations on XRP while leaving Ethereum untouched" then this "**raises
fundamental fairness questions about the exercise of commission discretion**." (emphasis
added). Chairman Grundfest recognized that this move by the SEC against XRP made no legal
sense and called Clayton's motives into question.

> *Why would Clayton, after seven years of continuous and daily 24/7 trading of XRP
> in the United States, on his last full day in office, with a new opposing party
> administration assuming control of the SEC in less than 30 days, knowing that an
> enforcement action by the SEC, claiming that the third largest Cryptocurrency,
> XRP, even in its current status, constitutes unregistered securities, is going to
> cause unprecedented billions of dollars in losses to innocent investors with
> absolutely no connection to the company or its executives that the SEC is pursuing,
> after being cautioned and/or warned by a former SEC Chairman that there exists
> no exigency that could justify the catastrophic economic damage that will ensure -
> files suit anyway?*

**Alternative Motives**

***Political Revenge***

171.    It is widely known both in the cryptocurrency community and the Government
that Clayton is perceived to be anti-crypto. President Trump has stated that he does not favor
Bitcoin or crypto assets. Secretary Steven Mnuchin has stated similar beliefs. As stated, Former
National Security Advisor John Bolton has publicly stated that he was present when he heard
President Trump instruct Treasury Secretary Steven Mnuchin "to go after Bitcoin." More

significant, is that Ripple and its executives, especially Chris Larsen, Brian Garlinghouse, and General Counsel Stuart Alderoty have been very critical of the Trump Administration and of Clayton in his role as Chairman of the SEC.

172.    In fact, the tension between Ripple, Clayton and the Trump Administration became public in 2019-2020. Prior to that, Garlinghouse along with the CTO of Ripple met with Clayton and Trump's senior officials at the White House. Afterwards, Ripple's general counsel stated publicly that the U.S. is dangerously close to losing the global edge in crypto and Blockchain technology to China.

173.    Larsen publicly argued that China can reverse a Bitcoin transaction due to its control over the Chinese Bitcoin miners. Larsen repeatedly argued that the U.S. isn't winning the technological Cold War against China. Larsen repeatedly argued that China and Asian mining related to BTC and ETH constitutes for 80% of total mining, and the U.S. Government's inaction is losing the war and suppressing American innovation.

174.    Garlinghouse goes on national television, including CNBC and Fox Business and openly threatens to relocate Ripple outside of the United States because of the Trump Administration's continued lack of regulatory clarity. Garlinghouse on Fox, nonetheless, states that the Trump Administration and Clayton are favoring China and suppressing American innovation by providing regulatory clarity to ETH and BTC, which are controlled and subsidized by the Chinese Communist Party.

175.    Ripple and its executives and/or lobbyist were effective in getting significant and powerful politicians to question Clayton's performance. Senator Mike Crapo wrote a letter to

both the OCC and SEC seeking clarity regarding crypto payments. Senator Crapo stated that the different Government agencies need clear rules that do not stifle innovation.

176.     Weeks prior to the SEC enforcement action against Ripple a number of U.S. Congressman signed a letter to the SEC asking for regulatory clarity related to Digital Assets, including XRP.

177.     Ripple's efforts continued to place political pressure on Clayton. The Washington Examiner publicized an investigative piece on the issue of the Trump Administration and Clayton losing the Blockchain technology war to China because the SEC would not provide clarity. An article was published stating that cryptocurrency is at the forefront of not just finance but even national security. The article stated that the U.S. Intelligence Community is raising concerns about the Chinese Communist Party's (CCP) influence over digital currencies with the SEC. The Director of National Intelligence, John Ratcliffe, wrote a letter directed at Clayton in early November 2020 stating that "crypto, CBDCs and e-cash are all being drawn into a multi-front global competition against Beijing for leadership of the world's economy." He informed Clayton that experts and industry leaders (Ripple) are worried that China is leaving the U.S. behind in the digital-currency race.

178.     Director Ratcliffe pointed to concerns the U.S. has regarding China's sway over digital currencies as more than half of the world's crypto mining operations are located in China. He warned Clayton that the Chinese Government has created its own state-controlled digital currency that would make it tough for the U.S. based companies (Ripple) and innovators to compete. Ratcliffe offered to have the senior economic intelligence officers brief Clayton on the matter.

49

179.    Clayton did not appreciate the pressure being placed on him and his office, stemming from the direct efforts of Ripple and its executives.  Irritated by the Ratcliffe letter, he refused to personally respond although the letter was addressed to him. Instead, an SEC Spokesperson responded and claimed, "Chairman Clayton is committed to restoring innovation in the Digital Assets and digital payments space consistent with United States investor protection and anti-money laundering laws." A fairly mundane generic response to claims that the SEC was helping China win the blockchain crypto revolution.

180.    As the Washington Examiner observed correctly, this letter by President Trump's spy chief signaled a push to convince Clayton and the SEC to implement rules that make it easier for U.S. owned crypto companies (Ripple) to compete against those based in and controlled by China. The SEC's Spokesperson did fire back defensively, stating Clayton's "work has included engaging directly with domestic and international counterparts including Acting Comptroller Brian Brooks to ensure the U.S. can remain at the forefront of innovative financial and market technology."

181.    Ripple's General Counsel was interviewed regarding this scathing rebuke and criticism of Clayton and the SEC. Stuart Alderoty publicly warned about China's influence in the Digital Asset space. He said "the data doesn't lie; the vast majority of Bitcoin's network and infrastructure-chips, mining pools and software are all located in China or created by Chinese companies. This is not decentralization. The CCP wields absolute control in China."

182.    Ripple's General Counsel remarks to the Washington Examiner were critical of the Trump Administration and the SEC, including Clayton. Alderoty wrote in August 2020 that "the Chinese Government subsidizes the vast amounts of energy needed to fuel Bitcoin and

Ethereum miners and at least 65% of Bitcoin mining is concentrated in China." Ripple's General Counsel openly and publicly questioned whether the U.S. is really willing to allow China to win this new technological and economic Cold War and, with it, allow China to dictate important parts of a new global payments system.

183.     The Examiner explained how General Secretary of the CCP, Xi Jinping, has repeatedly shown interest in making the CCP the global leader, referring to blockchain as the new "Industrial Revolution" in 2018. In 2019, he said greater effort should be made to help China gain an edge in digital currencies.

184.     The Examiner also highlighted that the China Finance Magazine operated by the People's Bank of China said in September 2020 that the power of digital currencies would soon be a new "battlefield" and China should "seize the first track."

185.     The Washington Examiner's article concluded by taking a direct shot at Clayton. A Senior Intelligence officer told the Washington Examiner that "competing with China is a serious enough challenge without U.S. regulators getting in the way."

186.      Ripple's political pressure on Clayton and the SEC was significant, aggressive, and continuous up until the enforcement action was filed on December 22, 2020, Clayton's last full day at the SEC. Senator Tom Cotton also sent Clayton a letter in the Summer of this year, *after* he sent his first letter to Clayton in December 2018. In both letters, Cotton addresses the same issue with the SEC and did not mince words directed at Clayton when he asserted that "there is a need for the SEC to develop a clearer articulation of policy and ultimately formal commission guidance addressing digital currencies to ensure U.S. companies have a chance to lead."

187.    Senator Cotton's second letter in July 2020 to the SEC also included Director
Ratcliffe and White House National Security Advisor O'Brien lamenting how "so far, the SEC
has concluded that only two Digital Assets can be considered non-securities—Chinese controlled
Bitcoin and Ethereum." Cotton was making the same argument that Ripple and its executives
have been making since 2017: *that the SEC has provided regulatory clarity for BTC and ETH
but not XRP, thereby favoring China over the United States' own innovation*. Ripple's claim that
the SEC needs to provide regulatory clarity and that BTC and ETH favor Chinese companies
over U.S. companies was being made by Congressmen, National Security Advisors, Senior
Intelligence Officers and U.S. Senators. And they all were directing their criticisms to one
agency and its Chairman: Clayton and the SEC. This Political pressure on the SEC and Clayton
was intense and no doubt initiated by Ripple. As stated earlier, Clayton was not only questioned
about Ripple and/or XRP by politicians and Government agents, but also interviewed by
business television reporters on CNBC and Fox as well as by participants attending FinTech
Conferences. In all settings, Clayton was always questioned directly about XRP. For almost three
years, Clayton was continuously asked by multiple parties the same question: *Will the SEC make
official statements and declarations that XRP, like BTC and ETH are not securities?*  For three
years, Clayton gave the same response which was that the "SEC will not comment on a specific
product" -  even though the SEC had previously provided comment of specific products in BTC
and ETH. Clayton always replied by vaguely saying "If it's a security, we will regulate it."

188.    Senator Cotton argued that the "continued lack of regulatory clarity not only
hurts U.S. developed Digital Assets, but it puts American national and economic security at
risk." Clayton and the SEC refused to even address these concerns raised by prominent leaders of

the United States Government as it related to the Digital Asset XRP. Despite these national and economic security risks, the Clayton and the SEC remained silent for another five months until they decided that they would provide that regulatory clarity via an enforcement action.

*189.* Possibly the worst thing that Ripple executives could do after publicly alleging the Trump Administration and Clayton were favoring Chinese technology over American innovation, was to also publicly congratulate President-Elect Joe Biden. Moreover, the Ripple executives stated that they believe the Biden Administration would be better for the digital currency industry than the Trump Administration. In fact, Garlinghouse publicly stated, that from his perspective, the Biden Administration had to be better than Trumps because Ripple couldn't imagine the regulatory environment being any worse than the current one. *It appears that Jay Clayton proved Garlinghouse wrong and provided him with a worse environment than the status quo.*

190. After SEVEN PLUS years of allowing XRP to be openly sold on multiple U.S. exchanges; after allowing XRP to be held in Crypto Index Funds and brokerage Trust Accounts; after approving Ripple's purchase of a minority stake in MGI, knowing that XRP would be promoted and utilized; after XRP was declared a virtual currency by the DOJ FinCen in 2015; after being informed by Ripple in May 2020 that Ripple would be selling more XRP to institutions and not stopping it; after years of being continuously questioned about whether XRP would get the same non-security status as BTC and ETH; and, after intense political pressure; knowing that the opposition party is assuming control of the SEC in less than 30 days; after being warned by a former SEC Chairman that he should not file an action; **Clayton directed the most significant SEC enforcement action in modern history** to be filed against Ripple, its

executives, and XRP, the third largest Cryptocurrency, claiming all XRP as unregistered securities and causing billions in losses to innocent investors with no connection to Ripple. Then, the next day, Clayton left the SEC forever.

### B. Personal Gain

191.     Jay Clayton, prior to the SEC, was a partner at Sullivan & Cromwell LLP as its Head of Corporate Practice. Clayton advised the largest firms in investment banking and had a long history of advising and working with Goldman Sachs (GS). GS is deeply involved and familiar with the global banking infrastructure including cross-border commodity swaps and the SWIFT payment system. Jay Clayton's wife has worked for and closely with GS for two decades.

192.     As stated earlier, and admitted by the SEC in its complaint, since at least 2015, Ripple has targeted replacing SWIFT in the international payment arena with XRP. As stated, SBI Holdings is testing the use of XRP in the Fx markets. A former GS executive experienced in the Fx markets resigned to go to Ripple in order to explore that use case for XRP. As stated, the global Fx market is a $1-7 quadrillion market.

193.     In October 2020, GS officially makes a play into the cross-border payment market and officially becomes a competitor to Ripple. Remember, cross-border payments were the designed use case for XRP. Also, remember for the last five years, Ripple has been the only company offering a replacement to the SWIFT payment system. GS will now compete with Ripple in both the Fx markets and cross-border payments.  It will be interesting to see what connection, if any, Jay Clayton has with GS after leaving the SEC.

### C. Motive to Force Settlement

194.     The only logical explanation for why the SEC would allege that XRP continues today to be a security is to force a settlement. It is an often-common tactic for a prosecutor to overcharge a defendant in an effort to cause panic and/or fear and/or force a settlement/plea.

195.     If the SEC wanted to hold these two executives liable, it could have done so, separately, by alleging specific distributions made by them personally at specific periods of time, constituted securities. But, as demonstrated, XRP, itself, today, is not a security. According to the SEC complaint, the parties entered into statute of limitations tolling agreements. Therefore, the parties discussed a potential resolution or settlement. This statement is corroborated by Garlinghouse in his letter to Ripple employees when he states that he and Larsen could have settled separately but chose to fight the charges. Clearly, a pre-filing settlement was out of the question. Thus, the SEC possibly employed a kitchen sink approach to the charges and threw everything in (including the kitchen sink). Simply put, the SEC filed the most aggressive complaint they possibly could in order to inflict the greatest harm they could in order to bully or coerce a party to settle.

196.     The Petitioners offer the kitchen sink theory because there is no possible way that Clayton or the bright and talented lawyers of the SEC honestly believe that they can convince a judge or a jury that all the XRPs in existence, in thousands of accounts of investors that have absolutely no connection to Ripple, are all securities. The claim that today's XRP – the XRP sitting in the accounts and/or digital wallets of  the named Petitioners and all others similarly situated – constitute securities under the *Howey Test* is so weak that a Summary Judgement is likely to be granted in favor of the Petitioners in this action or in favor of Ripple in the SEC enforcement action regarding today's XRP.  Quite frankly, it is legally incorrect, intellectually

dishonest and completely disingenuous for any SEC lawyer to stand up in open court and claim that all XRPs are securities. If the SEC attempted to make that argument, it would be laughable, if the economic damage that has been done wasn't so tragic.

### D. The Enforcement by Regulation Approach to Cryptocurrency

197.     As stated, if the SEC is successful in classifying Today's XRP as a security, then, basically, all Crypto is in danger of being classified a security. Arguably, digital currencies, Defi, and CBDCs have been the most talked about area of finance during the last several years, exploding this year due to the Global Pandemic. Crypto and Bitcoin has generated more publicity and dialogue than any other financial topic and/or instrument in the world. In addition to the global expansion of crypto assets previously discussed, during the last 12-18 months the following news and or actions have been taken regarding the King of Crypto, BTC:

a)  As stated, legendary investor Paul Tudor Jones requested Federal Reserve Chairman Powell to classify BTC as a monetary reserve;

b)  Fidelity Investments, after establishing an entire division called Fidelity Digital Assets, predicts a $1 million BTC price in a 19-page report;

c)  Deutsche Bank calls for a $500,000 BTC in 2021;

d)  Citibank calls for a $318,000 BTC in 2021;

e)  Grayscale's BTC Trust has doubled in the last 6 months (along with all crypto assets, including ETH and XRP;

f)  MicroStrategy buys over $1 Billion in BTC and uses it as its treasury reserve, replacing fiat dollars;

g)  Square buys $50 million of BTC and places it on its corporate treasury reserve;

h) Individuals can buy BTC on Square's CashApp;

i) Individuals can buy BTC on Robinhood's App;

j) Individuals can purchase BTC, ETH, LTC and BTH on PayPal App and PayPal announces that in 2021, cryptocurrency can be used as a funding source for retail purchases for its 28 million merchants;

k) DBS publicly declares BTC a viable alternative to Gold;

l) Ruffer Asset Management purchases over $740 million in BTC;

m) One River declares it has approved the purchase of between $600 million up to $1 Billion in BTC;

n) CME, having started a BTC Futures Platform, announce they will have ETH Futures in 2021;

o) Guggenheim invests in BTC and says BTC is Digital Gold;

p) BTIG says BTC will go to a minimum of $50,000 within 12 months;

q) Niall Ferguson declares BTC the winner of the monetary systems;

r) Plan B's STF Model predicts $288K;

s) JPM predicts BTC at over $500,000;

t) Mass Mutual Insurance Company invests $100 million into BTC;

u) Legendary investors, Cathie Wood, Raoul Pal, Bill Miller, Stanley Drukenmiller, Alliance Bernstein, George Ball, Larry Fink, Chamath Palihapitiya, Blackrock, and many other legendary investors and money managers, declare BTC as the best store of value available to both institutional and individual investors;

57

     v)  BTC becomes the largest, by market cap, financial services entity in the World, surpassing American Express, Visa Mastercard, PayPal, JPM, Wells Fargo, Goldman Sachs, and Bank of America, and is growing larger by the day; and

     w)  BTC rises to the level as the 7th largest currency in the world.

    198.     Other than discussions related to providing economic relief to the world due to the global pandemic, without question, BTC, Cryptocurrency, and CBDCs have been the hottest topics in finance around the world. Yet, Cryptocurrency has also been attacked. John Bolton stated that President Trump directed the Treasury Secretary to "go after bitcoin." *Did Clayton and the SEC decide that they would engage in regulation by enforcement by going after the third largest Cryptocurrency? It's not likely the SEC can file suit against Satoshi Nakamato related to BTC!* Plus, the SEC previously declared BTC and ETH as non-securities. *Is the attack on XRP a way to revisit those declarations?* These are questions being asked because the SEC claim that Today's XRP is a security is, without argument, ABSURD! It is so absurd that it forces the Petitioners, the public, and this Honorable Court to question the SEC and Clayton's "*exercise of discretion"* just as Chairman Grundfest questioned it in his letter to Clayton.

    199.     Clayton has publicly stated that, in his belief, if a person purchases a token and someone goes out and does a venture and that effort increases the value of the token, it is a security. This characterization of a security is absolutely wrong. Clayton has also stated, publicly, that if a person gets a "return" in the secondary markets from the token, it is a security. These public statements make one believe that Clayton has never actually read *Howey.* Moreover, these statements are inconsistent with the SEC's prior declaration that BTC and ETH are non-securities.

200.     Earlier, Petitioners demonstrated that ETH also would have to be considered a security if Today's XRP is a security. *But what about BTC*? Certainly, no person would dare argue that BTC constitutes a security. But, has there ever been a BTC Foundation, similar to the ETH Foundation? Yes. Did the BTC Foundation promote the use and/or purchase of BTC? Yes. Have there been ventures related to the development of BTC? Yes. Have individuals or entities purchased BTC with the speculation that it would increase in value? Yes. Have those individuals or entities sold BTC for "a return" in the secondary markets? Yes.

201.     *Could the SEC, employing the regulation by enforcement strategy target BTC down the road, if successful with classifying XRP a security?* Miners and node validators for PoW create a Digital Asset. That asset, if it's on the Bitcoin monetary network, is BTC. These miners are creating BTC into existence for the sole purpose of selling that BTC in the secondary markets for profit (a return).  Under Clayton's absurd definitions of what constitutes a security, it would appear to be. *What about the BTC mining pools*? Are BTC mining pools common enterprises seeking to generate BTC to be sold for a profit?

202.     The Petitioners and the undersigned counsel are not suggesting that ETH or BTC are securities.  **They are absolutely, non-securities**.  But neither is XRP.  Best case scenario for the SEC in its action against Ripple, the *Howie test* could be stretched to include possibly the original distribution of tokens to founders, individuals or entities during the very early years when Ripple was the **only** promoter/sponsor/seller of XRP and sold directly to the buyers/investors.  *Howey* would have to be stretched to even include these early distributions, however. Remember, in *Howie and its progeny,* the investors never took possession of the oranges, whiskey, phone booths, or the beavers.

59

203. The issue before the Court and the public is that if the SEC actually attempts to incorporate Clayton's public definitions and argue that today's XRP is a security, it is a slippery slope that the SEC is going down. If the SEC does not amend its Complaint to only include alleging that specific XRP distributions, made by Ripple or its Executives, in the early days of Ripple and XRP, *then the entire Digital Asset Industry is on notice that the SEC could be coming for your Crypto next.* This regulation by enforcement approach applied to Crypto, almost a decade later, **must not** be allowed by the Courts.

204. As stated, the new Chairman of the SEC, Elad Roisman, has publicly denounced this approach. At SEC Speaks 2020, Mr. Roisman stated "we should not use our enforcement powers to promulgate and **set new legal standards**." (emphasis added). Chairman Roisman expressed concern that regulation by enforcement can undermine the rule making process in the Administrative Procedure Act, **which provides for public comment.**" (emphasis added). Former SEC Chairman Grundfest warned Clayton not to file the enforcement action and cause such damage when no exigency existed. Not only did Clayton, unlike Chairman Roisman, encourage public comment, Clayton wouldn't allow for comment by the incoming administration that was assuming control in less than 30 days.

## CLASS ACTION ALLEGATIONS

Petitioners re-alleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Petition.

Pursuant to Federal Rule of Civil Procedure 23, Petitioners bring this class action and seeks certification of the claims and certain issues in this action on behalf of a Class defined as:

*All United States persons who owned or continue to own the Digital Asset XRP*
*purchased before or on about December 22, 2020, excluding all persons, if any, who purchased*
*XRP directly from the Company Ripple and or from any of Ripple's Executives. The Class will*
*also exclude any owners of XRP who purchased all of their XRP holdings on or after December*
*23, 2020.*

Petitioners reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be expanded, narrowed or otherwise modified.

**Numerosity:** Members of the Proposed Class are so numerous that joinder of all members is impracticable. Petitioners do not know the exact size of the Proposed Class, but believes that there are, at least multiple hundreds, if not thousands of putative members of the Proposed Class geographically dispersed throughout the United States and elsewhere.

**Typicality:** The Petitioners Claims are typical of the claims of the members of the Proposed Class. The Petitioners and all members of the Proposed Class were damaged by the same improper conduct of the SEC and Former Chairman Jay Clayton. Specifically, the Respondent, lacking good faith, and with improper motive filed an enforcement action against Ripple Labs and its two executives, seeking, several remedies for relief including disgorgement, but failed to limit the enforcement action to only the type of XRP distributions that could legally be classified as a security under the *Howey Test*. Instead, Respondent maliciously and/or recklessly alleged that all present day XRP, including the XRP owned by the Proposed Class constitute unregistered securities. The Respondent made such broad-based allegations even though they lack good faith in believing the SEC can prove such absurd claims. The Respondent

was warned by a Former SEC Chairman that filing such a claim would cause multi-billion-dollar losses to innocent investors. For reasons previously stated, the Respondent filed an enforcement action it knows it cannot possibly prove. The Respondent may believe that they can prove specific early distributions of XRP, made directly from Ripple, "might' meet the factors in *Howey*, but no reasonable SEC attorney believes they can meet the *Howey Test* and convince a jury or judge that all present day XRP constitute securities. The SEC's improper and outrageous conduct has cost the Proposed Class economic losses that could exceed One Billion dollars.

**Adequacy of Representation**: The Petitioners will fairly and adequately protect and represent the interest of the Proposed Class. The interests of the Petitioners are coincident with, and not antagonistic to, those of the members of the Proposed Class. Accordingly, by proving their own claims, the Petitioners will prove other Proposed Class members' claims as well.

**Adequacy of Legal Representation:** Petitioners have retained counsel who has the necessary knowledge, competence and experience to effectively represent the Proposed Class. The Petitioners and Petitioners' Counsel have the necessary financial resources to adequately and vigorously litigate this class action. The Petitioners can and will fairly and adequately represent the interests of the Proposed Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Proposed Class.

**Predominance:** Questions of law and fact common to the members of the Proposed Class predominate over questions that may affect only individual members of the Proposed Class because the Respondent have acted on grounds generally applicable to the entire Proposed Class, thereby making a common methodology for determining class damages.

**Commonality:** Common questions of law and fact exists as to all members of the Proposed Class, including, but not limited to, the following:

      **a.**      Whether the Court will order the SEC to amend its Complaint and or declare that present day XRP, owned by the members of the class, are not securities;

      **b.**      Whether the SEC is the appropriate Government agency that governs digital currencies;

      **c.**      Whether the Digital Asset XRP purchased and owned by all members constitute a security under the Howey Test;

      **d.**      Whether if the SEC recovers any funds from Ripple and/or its Executives through disgorgement and/or in a settlement or judgement, those entire funds will be deposited in a constructive trust to reimburse members for their economic losses related to the SEC's and/or Ripple's conduct;

      **e.**      Whether the SEC itself will reimburse members for its actions and the conduct of its prior Chairman, Jay Clayton.

**Superiority:** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated, geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs

potential difficulties in management of this class action. The Proposed Class has a high degree of cohesion, and prosecution of the action through representation would be unobjectionable.

**Ascertainability:** The members of the Proposed Class are ascertainable by utilizing social media, Digital Exchanges such as Coinbase, Kraken, Binance, Voyager, Uphold, etc. Recently, a Digital Token Air Drop Snapshot was conducted by Flare Networks which took a virtual picture of all XRP accounts/wallets. The Petitioners are unaware of any special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

The claims asserted by the Petitioners in this action are identical of the claims of the Petitioners Class and any subclass, as the claims arise from the same course of conduct by the Respondent and the relief sought within the class and any subclass is common to the members of each.

Absent a class action, it would be highly unlikely that members of the class or subclass would be able to pursue their own interests because the costs of litigation through individual lawsuits might exceed expected recovery.

## CONCLUSION

The Petitioners take no position on whether some early distributions of XRP sold directly from Ripple or its executives constituted securities at the time of those specific early distributions. That argument is between the SEC lawyers and the lawyers representing Ripple. The Petitioners do note, however, a digital token, like XRP or ETH, can be created without it being a security. That doesn't mean that no laws apply – just not securities laws. There are consumer protection laws; banking laws; anti-fraud laws; anti-money laundering laws; unfair

64

trade practice laws; unfair competition laws, and etc., that can be triggered to protect investors and allow a fair playing field and disgorge ill-gotten gains from bad actors.

      The Petitioners, however, have demonstrated well beyond a preponderance of evidence, that **Today's Digital Asset XRP** - the XRP existing in the accounts/wallets of thousands of U.S. investors, including the accounts of the named Petitioners and all others similarly situated, are **NOT** securities. Many of these investors do not know anything about the Company Ripple. Some of these investors, including the Petitioners and others similarly situated, may very well have purchased XRP, speculating that its price would appreciate. Some investors buy exchange tokens or utility tokens and speculate that their price will appreciate. This does not cause it to subject to federal securities laws.

      When the SEC went after Companies and individuals during the ICO Craze in 2017, it is puzzling to understand why the SEC did not go after Ripple and its Executives at that time. In 2017, the SEC, was well aware of all the facts regarding Ripple and XRP it alleges in its Complaint against Ripple. Yet, Ripple and XRP were left alone for more than 3 years. During that time, the Digital Asset XRP not only traded publicly on money market exchanges, but the "use cases" for XRP grew exponentially, independent of Ripple. Use of the XRPL grew with parties and entities unrelated to Ripple. As stated, one independent entity, Flare Networks, developed blockchain technology's first Utility Fork, in efforts to bring Ethereum-based smart contracts to the XRPL. A snapshot of all XRP addresses took place with almost all XRP holders, including the XRP addresses of the named Petitioners. The Petitioners and all others similarly situated, are scheduled to receive an amount of Flare Spark Tokens equal to the amount of XRP owned at the time of the snapshot. The SEC and Clayton were fully aware that this Airdrop was

occurring related to XRP. If they honestly believed that today's XRP, sitting in the digital wallets of the Petitioners and thousands of other innocent investors, were, in fact, illegal securities, the SEC and Clayton would have prevented this Airdrop. *If today's XRP are securities, what are the Spark Tokens*? Arguably, if the SEC is correct, and XRP is a security and Spark Tokens are derived from those securities, Spark Tokens could be classified as securities, as well. In May 2020, Ripple informed the SEC that it intended to make a distribution of XRP pursuant to its ODL platform. The SEC did not prevent said distribution of XRP. Yet, seven months later, the SEC is now claiming that that same very distribution of XRP was a transaction involving unregistered securities. Without question or doubt, that May 2020 distribution of XRP found its way into the secondary trading markets and was purchased by investors who may have never heard of the Company Ripple. Investors who purchased that same XRP, have lost almost 80% in value of the token since the time of filing of the SEC enforcement action. Soon, in January of 2021, that same XRP allowed by the SEC, will be untradeable in the United States. If its untradeable in the United States, for American investors, it is useless and thus, a total loss. People's life savings have been wiped out because of improper, unethical motives of the Respondent.

There are many who will claim that XRP was a bad investment for the Petitioners and all others and they took that risk. For example, many BTC Maximalists have described XRP as a "Shit Coin". Any reasonable person, after reading the above-listed facts, can understand why an investor took certain risks when investing in XRP. *But whether an investment is a good one or not should be decided by the Market, NOT the Government.* The risks that investors, including the Petitioners, knowingly took, was whether the private and/or public markets would utilize

66

XRP's technology to the point of mass adoption or very limited use. The Petitioners and all others similarly situated, did not knowingly assume the risk that, after SEVEN YEARS of being openly traded right next to BTC and ETH, the SEC and Clayton, with improper motive and/or reckless disregard for innocent investors, would file an enforcement action against the third largest cryptocurrency, declaring ALL XRP, as unregistered securities, resulting in the destruction of billions of dollars in innocent investor wealth.

      Whether the defendant's assault on XRP was politically motivated, personally motivated, or an exercise in prosecutorial bullying tactics to drive settlement, the SEC and Clayton intentionally harmed innocent investors with no connection to Ripple. The fact that Clayton filed the most significant SEC enforcement action since the seminal 1946 *Howey* case despite it involving the digitalization of finance and money; so significant of an issue, that cryptocurrency and CBDCs were the biggest topics of the November 2020 G20 Summit; on the last day of Clayton's tenure as the SEC Chair; with the opposing party assuming control of the SEC in less than 30 days; after being warned by a former SEC Chairman about the unprecedented loss innocent investors would incur; in, and of itself, speaks volumes regarding Clayton and SEC's motives and actions.

      Maybe XRP is a bad technology or a bad investment. The markets, not the Government, should ultimately decide XRP's fate.  Maybe Ripple and it's the Executives should be held liable for their early distributions and suffer disgorgement. Even if XRP was a security and the CEO and Co-founder suffer disgorgement, the ecosystem likely runs, adherence and network traffic will continue, consensus nodes still run (including the SEC node running on the XRPL). In other words, the XRPL continues with or without Ripple. These facts demonstrate that the XRP the

Petitioners and all other similarly situated purchased, independent of Ripple, are not securities.

The U.K. FCA probably classified XRP correctly as a hybrid asset acting as both an exchange

token and a utility token. Of course, the IMF has classified it as a bridge currency. In Japan, XRP

is being used as payroll and/or payment currency. Regardless, of what XRP is or what XRP is

called, or how XRP is used – there one thing for certain – and that is WHAT IT IS NOT!

<div style="margin-left:50%">

Respectfully Submitted,
By the Petitioners,
Through their attorney,

/s/ John E. Deaton

John Deaton, Esq. (RI Bar # 6537)
Deaton Law Firm
450 North Broadway
East Providence, RI 02914
(401) 351-6400
(401) 351-6401(fax)
All-Deaton@deatonlawfirm.com

</div>

68

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of January, 2021, I electronically filed the foregoing documents and that they are available for viewing and downloading from the Court's CM/ECF system. I further certify that a copy of the foregoing documents were mailed via U.S. Mail to the Respondents listed below:

Acting Chairman Elad L. Roisman
Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549
(202) 551-2700
CommissionerRoisman@sec.gov

/s/ John Deaton

John Deaton

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| John Deaton, Jordan Deaton, James LaMonte, Tyler LaMonte, Mya LaMonte, Kristiana Warner | Elad Roisman as acting Chairman of SEC, Securities and Exchange Commission |

| **(b)**   County of Residence of First Listed Plaintiff | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |

| **(c)**   Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Deaton Law Firm 450 N. Broadway East Providence RI 02914 | |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1    U.S. Government
       Plaintiff

☐ 3    Federal Question
       *(U.S. Government Not a Party)*

☒ 2    U.S. Government
       Defendant

☐ 4    Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                       *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment<br>   & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted<br>   Student Loans<br>   (Excludes Veterans)<br>☐ 153 Recovery of Overpayment<br>   of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product<br>   Liability<br>☐ 320 Assault, Libel &<br>   Slander<br>☐ 330 Federal Employers'<br>   Liability<br>☐ 340 Marine<br>☐ 345 Marine Product<br>   Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle<br>   Product Liability<br>☐ 360 Other Personal<br>   Injury<br>☐ 362 Personal Injury -<br>   Medical Malpractice | **PERSONAL INJURY**<br>☐ 365 Personal Injury -<br>   Product Liability<br>☐ 367 Health Care/<br>   Pharmaceutical<br>   Personal Injury<br>   Product Liability<br>☐ 368 Asbestos Personal<br>   Injury Product<br>   Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal<br>   Property Damage<br>☐ 385 Property Damage<br>   Product Liability | ☐ 625 Drug Related Seizure<br>   of Property 21 USC 881<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal<br>   28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 835 Patent - Abbreviated<br>   New Drug Application<br>☐ 840 Trademark | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC<br>   3729(a))<br>☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and<br>   Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 485 Telephone Consumer<br>   Protection Act<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/<br>   Exchange |
| **REAL PROPERTY** | | | **LABOR**<br>☐ 710 Fair Labor Standards<br>   Act<br>☐ 720 Labor/Management<br>   Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical<br>   Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement<br>   Income Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information<br>   Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure<br>   Act/Review or Appeal of<br>   Agency Decision<br>☐ 950 Constitutionality of<br>   State Statutes |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/<br>   Accommodations<br>☐ 445 Amer. w/Disabilities -<br>   Employment<br>☐ 446 Amer. w/Disabilities -<br>   Other<br>☐ 448 Education | **PRISONER PETITIONS**<br>**Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate<br>   Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☒ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee -<br>   Conditions of<br>   Confinement | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff<br>   or Defendant)<br>☐ 871 IRS—Third Party<br>   26 USC 7609<br><br>**IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration<br>   Actions | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
      Proceeding

☐ 2   Removed from
      State Court

☐ 3   Remanded from
      Appellate Court

☐ 4   Reinstated or
      Reopened

☐ 5   Transferred from
      Another District
      *(specify)*

☐ 6   Multidistrict
      Litigation -
      Transfer

☐ 8   Multidistrict
      Litigation -
      Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1361
Brief description of cause:
Writ of Mandamus

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:        ☐ Yes    ☒ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*        JUDGE _____        DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 01/01/2021 | /s/John E. Deaton |

**FOR OFFICE USE ONLY**

RECEIPT #  _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____