# Exhibit C
# Filed Under Seal



*PRIVILEGED / CONFIDENTIAL*

October 19, 2012

TO:       Chris Larsen and Jed McCaleb
             OpenCoin Inc.

FROM:    Dax Hansen
             Keith Miller
             Carla Reyes

RE:       **Legal Analysis and Recommendations Regarding Ripple Network**

# I. INTRODUCTION

OpenCoin Inc., dba Ripple ("**Company**"), is developing a decentralized, open, global, peer-to-peer, crypto currency payment network ("**Ripple Network**") and a new crypto currency ("**Ripple Credits**").  You asked us to review the proposed features of the Ripple Network and Ripple Credits and to provide recommendations for mitigating relevant legal risks.  We provided you our initial analysis in a memorandum dated February 8, 2012.  Thereafter, you provided a revised business plan, detailed in the "Opencoin Features Overview," and asked us to provide additional analysis.  We look forward to discussing this analysis with you after you have had a chance to review this memorandum.

## II. DESCRIPTION OF THE RIPPLE NETWORK

Based on the "Opencoin Features Overview" and our conversations with Chris Larsen and Jed McCaleb ("**Founders**"), we understand the following:

- the Ripple Network will be an open source protocol and open source client software program developed and released to the public free of charge under a non-control software license, such as the MIT license, and downloaded and used by end users of the Ripple Network (the "**Ripple Client Software**");

- the Ripple Network will track ownership of Ripple Credits and transactions conducted using Ripple Credits and Third Party Ripple Currencies (described below) in a distributed public ledger (the "**Ripple Network Ledger**") accessible to end users through the Ripple Client Software;

- a finite number of Ripple Credits will be created and distributed.  In contrast to the similar existing decentralized crypto currency network, Bitcoin, Ripple Credits will not be "mined" by end users.  At introduction of the Ripple Network, all Ripple Credits available for distribution will exist and be assigned to several ledger addresses owned by

79435-0001/ADMIN31002299.6

*PRIVILEGED / CONFIDENTIAL*

Founders and Company, the for-profit corporation established by Founders.  Ripple Credits will be distributed and sold as described below;

- Ripple Credits must be used as "stamps" to pay the nominal transaction fees associated with using the Ripple Network.  Ripple Credits "stamps" will be destroyed after use;

- Ripple Credits may also be accepted by end users of the Ripple Network as payment for goods and services (e.g., accepted by merchants selling Internet or mobile games, or used for affiliate marketing, online gambling, tipping, and/or donations);

- the Ripple Network will also incorporate an improved version of the open source monetary system formerly known as Ripple ("**Original Ripple System**").  The Original Ripple System is a "financial system that recognizes existing trust relationships between human beings and works within that structure."[1]  Each Original Ripple System user identifies other users from whom they are willing to accept promises to repay and assigns a value, in one or more currencies, of the amount they expect the other users to be able to repay.  The Original Ripple System then allows any user to negotiate transactions with any other user based on chained promises to pay;

- incorporating the Original Ripple System into the Ripple Network will allow end users to use currencies other than Ripple Credits ("**Third Party Ripple Currencies**") on the Ripple Network, thereby allowing for more robust transactions;

- Transactions conducted on the Ripple Network using Third Party Ripple Currencies are reflected in the Ripple Network Ledger, but are not settled unless completed using Ripple Credits;

- Prior to the public launch of the Ripple Network, Founders will contribute the Ripple Client Software and a majority of Ripple Credits to Company and will retain a portion of Ripple Credits as individuals;

- Founders will not accept investment in Company in exchange for the issuance of Ripple Credits; instead, investors will receive stock in Company;

- Company will employ a team of individuals dedicated to promoting the Ripple Network, improving the Ripple Client Software and the Ripple Network, and conducting outreach efforts with law enforcement entities;

- because the Ripple Network will be an open source protocol, once released, Company will have no control over its operations or transactions initiated through the Ripple Network.  Anyone will be able to download the Ripple Client Software, participate in and use the Ripple Network, and build upon its open source protocol;

---

[1] "Why Ripple?", *available at*, http://ripplepay.com/essay/.

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099464

*PRIVILEGED / CONFIDENTIAL*

- Company will control the distribution of Ripple Credits, which it will distribute to end users/consumers for no consideration;

- although neither Company nor Founders will sell Ripple Credits to end users/consumers, they may occasionally sell Ripple Credits on a wholesale basis to exchanges and other business entities;

- the method for obtaining Ripple Credits will be made generally known to the public;

- Founders and Company will clearly disclose to the public how many Opencoins Founders retained individually and how many Ripple Credits Company retained for wholesale to exchanges and other business entities;

- Company will not benefit financially from the transactions that occur on the Ripple Network; and

- Company will not accept, hold or transmit money or monetary value on behalf of any user of the Ripple Network.

If this description is inaccurate in any way, please let us know, and we can update our analysis and recommendations.

### III.  SUMMARY OF CONCLUSIONS AND RECOMMENDATIONS

1. **Conclusions**

   a. **Ripple Credits that are purchased, even if only on a secondary market, might be prepaid access, but Company and Founders are unlikely to be considered providers or sellers of prepaid access if their activities are limited to those described in the assumptions above.**  There is a risk that Ripple Credits will be subject to regulation as "prepaid access" under the Bank Secrecy Act, which regulates providers and sellers of prepaid access.  Even though Company and Founders do not plan on selling Ripple Credits on a retail basis at the time of distribution, Ripple Credits may be resold in a secondary market and may therefore fall within the definition of prepaid access, which is "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle…" Because Ripple Credits represent a value, which a holder can retrieve or transfer at a later date to make purchases or trade, if Ripple Credits are paid for, they will likely be considered prepaid access.  However, if designated prepaid access, it is unlikely that Company or Founders will be considered the provider of the prepaid program because, under the current model, Company and Founders do not undertake activities considered to denote "principal oversight and control." Similarly, Founders and Company are unlikely to be considered sellers of prepaid access if they only sell Ripple Credits to exchanges and other business entities on a wholesale basis and never accept consideration from end users/consumers in

-3-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099465

*PRIVILEGED / CONFIDENTIAL*

exchange for Ripple Credits.  It is important to note that the "principal oversight and control" analysis has never been tested by FinCEN in practice, and therefore reliance thereon is not without risk.  To obtain more certainty, Company should not distribute Ripple Credits, or should transition to an automated distribution process as soon as possible, in order to more clearly qualify for the program manager exemption.

b.  **Although we believe that a compelling argument can be made that Ripple Credits do not constitute "securities" under the federal securities laws, given the lack of applicable case law, we believe that there is some risk, albeit small, that the Securities and Exchange Commission ("SEC") disagrees with our analysis.  The more that Founders and Company promote Ripple Credits as an investment opportunity, the more likely it is that the SEC will take action and argue that Ripple Credits are "investment contracts" and thus securities under the federal securities laws.**  If Ripple Credits are purchased and sold in the secondary market, individuals purchasing Ripple Credits may do so with the expectation of increased value caused by increased demand and limited supply.  Although we understand this rationale to be incidental to the primary purpose, to the extent that Ripple Credits are purchased with an expectation of profit because of the efforts of Company, Founders and/or others promoting the Ripple Credits, there is a risk that Ripple Credits will constitute investment contracts and be subject to federal securities regulation.  As discussed in more detail below, we believe this risk can be minimized through careful marketing efforts and/or by obtaining a no-action letter from the SEC.

c.  **Ripple Credits may become commodities.**  If people develop contracts for future delivery of Ripple Credits, they will likely be considered commodities under the Commodities Exchange Act.  Futures contracts for Ripple Credits, if developed, will be subject to regulation and enforcement by the Commodity Futures Trading Commission.

d.  **Exchanges will likely be designated money transmitters or currency exchangers, and Company faces some risk for being similarly categorized.**  Exchanges that facilitate Ripple Credits purchase and sale transactions between users likely will be deemed money transmitters under federal and state money transmitter laws to the extent they accept payment from user A to transfer to user B and accept Ripple Credits from user B to transfer to user A.  Exchanges also may be deemed currency exchangers.  While these exchanges will not exchange the currency of one country for the currency of another, they may be used to exchange the currency of country A for Ripple Credits and immediately exchange Ripple Credits for the currency of country B.  In substance, this transaction is no different than exchanging the currency of country A directly for the currency of country B, and may result in regulatory scrutiny.  Additionally, under state money transmitter laws, Ripple Credits may be considered payment instruments, resulting in any party that sells or issues Ripple Credits being treated as a money

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.     RPLI_SEC 0099466

*PRIVILEGED / CONFIDENTIAL*

transmitter. Under the current model, Company and Founders would not likely be considered the "issuer" of Ripple Credits, because they are not the maker or drawer of Ripple Credits and are not liable for payment on Ripple Credits. Nor will Company accept, hold or transmit money or monetary value on behalf of any user of the Ripple Network. However, the fact that Founders and Company will sell Ripple Credits on a wholesale basis to exchanges and other businesses triggers a risk of regulation as a money transmitter under state law because state statutes do not appear to offer an exception for sales on a wholesale basis. However, such regulation is limited to those entities "engaging in the business of" money transmission, and arguably neither Company nor Founders will sell Ripple Credits as their business. As a result, although Company and Founders are at low risk of regulation under federal money transmitter laws, they face some risk of regulation under state money transmitter laws.

e. **Ripple Credits are unlikely to be regulated under counterfeiting laws.** While commonly referred to as an alternative or crypto "currency," it is unlikely that Ripple Credits will be regulated under the federal laws regulating the issuance of coinage. Ripple Credits will not be metal coins or bars, and, we understand, will not be designed to be confused with currency of the United States or any other country. These characteristics will reduce the risk of Ripple Credits violating anti-counterfeiting and other currency laws.

f. **Founders and Foundation may be subject to illegal gambling regulations.** Promoting Ripple Credits for use in Internet gambling may lead Ripple Credits to be categorized as gambling devices under state gambling laws. A person is subject to criminal penalties for manufacturing gambling devices in violation of state laws. Additionally, if Ripple Credits are promoted for the purpose of illegal gambling and then used to facilitate illegal gambling, Company may be deemed to violate the federal Unlawful Internet Gambling Enforcement Act and/or treated as aiding and abetting illegal gambling.

g. **Accuracy in promotion of the Ripple Network will be necessary to avoid unfair and deceptive trade practices.** Unfair and deceptive trade practices are regulated on the federal and state levels. The language of the regulations is broadly written to flexibly address instances where consumers are misled or deceived. As such, it will be important that Founders clearly disclose the amount of Ripple Credits they retained when they contributed the Ripple Network to Company, and that Company clearly disclose the amount of Ripple Credits that it retained for wholesale to exchanges and other business entities instead of free distribution to end users. As long as that information is clearly disclosed, there does not appear to be anything inherently unfair or deceptive in the nature of the Ripple Network as proposed, but Founders and Company should carefully evaluate promotions and marketing of Ripple Credits to assure that users are aware of risks, as well as benefits, associated with the use of Ripple Credits.

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099467

*PRIVILEGED / CONFIDENTIAL*

    h. **Founders and Company may face risk related to aiding and abetting illegal activities perpetrated using Ripple Credits.** If Ripple Credits are promoted as a means of engaging in questionable or illegal online commerce, including but not limited to Internet gambling, copyright infringement, or purchasing pharmaceuticals illegally, Company could be accused of aiding and abetting illegality. Moreover, even if Company does not actively promote such uses, it could become caught in the crosshairs of regulators who do not understand that after the initial distribution of Ripple Credits, Company has no control over the Ripple Network, nor does it have any direct financial interest in third-party transactions in which Ripple Credits are used.

    i. **Users of Ripple Credits will have obligations to comply with state and federal tax laws relating to transactions involving Ripple Credits.** Transactions using Ripple Credits will be subject to state sales taxes like any other transaction for goods and services. Income that a person receives in the form of Ripple Credits will be reportable income for state and federal income tax purposes. Users of the Ripple Network should be aware that they will be subject to the same tax liabilities using Ripple Credits as they would be in other circumstances.

## 2. Recommendations

In light of the conclusions summarized above and analyzed below, we recommend that the Founders and Company take the steps below to further reduce the regulatory risks associated with the Ripple Network. Even if Founders are willing to take the steps below, regulatory risk cannot be completely eliminated because existing laws and regulations can be broadly applied or interpreted to apply to emerging payment systems such as Ripple Credits.

    a. **Do not sell Ripple Credits on a retail basis to end users and/or consumers, and limit sales of Ripple Credits on a wholesale basis to exchanges and other business entities**. Company and Founders will be unlikely to come within the definition of a seller of prepaid access because the current model contemplates that they will only sell Ripple Credits on a wholesale basis to exchanges or other business entities. Sales to end user and/or consumers, however, will end Company and Founders' eligibility for this exemption. Therefore, Company and Founders should not sell Ripple Credits on a retail basis to end users and/or consumers. Further, to mitigate risk that Founders and, more importantly, Company will be regulated as money transmitters, Founders and Company should limit their sales of Ripple Credits on a wholesale basis to exchanges and other business entities such that neither Founders nor Company can be characterized as engaging in the business of the selling payment instruments.

    b. **Company should not control distribution of Ripple Credits, or should transition to an automatic distribution method soon after launch of the Ripple Network.** Under the current model, some risk remains that Ripple Credits could be determined to be prepaid access and FinCEN might seek to regulate

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0099468

*PRIVILEGED / CONFIDENTIAL*

Company as the provider of that prepaid access. For the reasons summarized above and further elaborated below, if Company would like greater certainty that it will not be regulated as a provider of prepaid access, it should limit its activities to that of a program manager, which would prevent it from controlling distribution of Ripple Credits.

c. **Take steps to avoid misleading purchasers or recipients of Ripple Credits as to their value or the risks associated with them.** Whether Ripple Credits are ultimately determined to be a security, prepaid access, currency, or any other product, Company should be careful in its approach to promoting and marketing the Ripple Network and Ripple Credits. It will be important that Company and Founders do not mislead participants, particularly with regard to the liquidity and expectations concerning the value or safety of Ripple Credits.

d. **Avoid stating or implying that Ripple Credits are equivalent to or compete with USD or any other type of government issued currency**. United States government regulators of currency appear to be most concerned about fraud and confusion that results from the issuance of a currency that appears similar to or is represented in some way as United States dollars. There remains a risk that government regulators are also concerned with private currencies that become prominent and influence the value of USD, however, there has not been case law suggesting that this is their primary concern and the statutory language does not support enforcement action related to this broad competition concern.

e. **Do not advertise Ripple Credits for use in illegal Internet gambling**. Both state and federal laws regulate Internet gambling, and there are specific requirements for companies that offer Internet games. Neither Founders nor Company should promote Ripple Credits for use in illegal activities, and in particular should not promote the use of Ripple Credits as consideration in illegal Internet gambling.

f. **Do not promote Ripple Credits as being an investment opportunity.** Actively promoting the trading of Ripple Credits as an investment opportunity or its potential to increase in value could result in regulatory scrutiny or accusations that Ripple Credits are investment contracts, and hence securities subject to the federal securities laws. Founders and Company should make clear that its mission is to facilitate online commerce and not speculative investment trading.

g. **Do not promote the Ripple Credits for illegal or questionable uses, and educate the public and users that Company does not oversee or otherwise control the use of the Ripple Credits.** Actively promoting the use of Ripple Credits for illegal or questionable purposes, or even overemphasizing the anonymity of the transactions, could result in regulatory scrutiny or accusations of aiding and abetting, i.e., knowingly facilitating, illegal activity. Founders and Company should make clear that its mission is to facilitate legal, legitimate online

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099469

*PRIVILEGED / CONFIDENTIAL*

commerce.  Moreover, if Ripple Credits become a popular mechanism for consummating illegal transactions, government entities may focus their efforts on Company under a mistaken belief that it controls or oversees these transactions because individual wrongdoers are difficult and costly to locate and prosecute. For this reason, Founders and Company should make a concerted effort to publicize the fact that they do not control or oversee third party transactions using Ripple Credits, nor do they have any direct monetary interest in them.

    **h.  Do not use Ripple Credits in lieu of payment to employees**.  To the extent that Company employs individuals to design, engineer, develop, promote, market, or maintain any aspect of the Ripple Network, payment of these individuals must comply with state wage and hour laws.  Employees cannot be paid in Ripple Credits.

## V.  LEGAL ANALYSIS

### 1.  Federal Money Services Business Laws

#### a.  Prepaid Access

##### 1.  Whether Ripple Credits are "Prepaid Access"

The regulations promulgated by the Financial Crimes Enforcement Network ("**FinCEN**") under the Bank Secrecy Act ("**BSA**") require providers of prepaid access to (i) register with FinCEN as a money services business;[2] (ii) develop an anti-money laundering policy;[3] (iii) implement customer identification procedures;[4] (iv) implement transaction record keeping;[5] and (v) report suspicious activity.[6]  "Prepaid access" is defined as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number."[7]

If Ripple Credits are not "prepaid access," Company will not be subject to the prepaid access regulations under the BSA.  However, the phraseology that defines "prepaid access," namely, "funds or the value of funds," is not defined in the BSA regulations.  This leaves FinCEN a large measure of discretionary regulatory power in determining what constitutes prepaid access. Nevertheless, according to the Merriam-Webster Dictionary, "fund," refers to "a sum of money or other resources whose principal or interest is set apart for a specific objective."[8]  In other portions of the definitions of a money services business, the BSA regulations refer to funds in a

---

[2] 31 C.F.R. § 1022.380.
[3] 31 C.F.R. § 1022.210.
[4] *Id* at § 1022.210(d)(1)(iv).
[5] 31 C.F.R. § 1022.420.
[6] 31 C.F.R. § 1022.320.
[7] 31 C.F.R. § 1010.100(ww).
[8] *Merriam-Webster Dictionary* (2012), http://www.merriam-webster.com/dictionary/fund

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099470

*PRIVILEGED / CONFIDENTIAL*

list that includes currency and monetary instruments.[9] The definition, as well as references within the BSA regulations, suggests that "funds" refer to some amount of monetary value. The value of funds would therefore be access to a value equivalent to such monetary value. Ripple Credits will not be denominated in USD, meaning the relative value between the Ripple Credits and the USD paid to purchase the Ripple Credits could vary over time. However, FinCEN's position that prepaid devices redeemable for telephone minutes or songs,[10] which similarly may have value that varies against the USD, suggests that such variation against a specified monetary value may not be relevant to the analysis. As such, the risk will always exist that FinCEN may try to categorize Ripple Credits as prepaid access under this prong of the definition, namely that Ripple Credits provide access to the value of funds.

In addition to requiring that the prepaid device provide access to funds or the value of funds, the definition requires that the funds or value of funds be paid in advance. The "paid in advance," provision will limit the application of the regulation of prepaid access to the extent that Ripple Credits are not purchased. Company will give Ripple Credits away to end users and/or consumers for no consideration. However, Ripple Credits will still be distributed with the intent that later they will be purchased and resold through an exchange or through acceptance in commerce. Further, Founders and Company potentially will sell Ripple Credits to exchanges and other business entities on a wholesale basis. It therefore remains possible that FinCEN will take the position that although initially not paid in advance by consumers/end users because they are distributed without return consideration, later sales of Ripple Credits by and to exchanges or other secondary markets, which collect payment in advance, make Ripple Credits prepaid access.

There are also certain arrangements involving the provision and sale of prepaid access that do not constitute "prepaid programs," and therefore would not require compliance with the prepaid access regulations. These exceptions involve restricting the use and transfer of the prepaid access and limiting values of prepaid access held in a given account on a given day.[11] Ripple Credits will likely be considered open loop because the Founders intend Ripple Credits to be accepted by a wide range of domestic and international merchants and other parties. Closed loop prepaid access is "access to funds or the value of funds that can be used only for goods and services in transactions involving a defined merchant or location (or set of locations), such as a specific retailer or retail chain, a college campus, or a subway system,"[12] and prepaid access that does not fall within the definition of "closed loop" is open loop. To qualify for the open loop exemption from a prepaid program, each Ripple Network ledger address would have to be limited such that it could not have a maximum value in excess of $1,000 and no more than $1,000 could be "loaded, used or withdrawn" on any day, and the Ripple Credits could not be transmitted internationally, transferred between or among users, or have additional funds loaded

---

[9] 31 C.F.R. § 1010.100(ff)(1) (referring to a dealer in foreign exchange as "a person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in currency ...").

[10] Department of Treasury Financial Crimes Enforcement Network, *Frequently Asked Questions Final Rule – Definition and Other Regulations Relating to Prepaid Access* (Nov. 2, 2011), *available at* http://www.fincen.gov/news_room/nr/html/20111102.html.

[11] 31 C.F.R. § 1010.100(ff)(4)(iii).

[12] 31 C.F.R. § 1010.100(kkk).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0099471

*PRIVILEGED / CONFIDENTIAL*

from non-depository sources.[13]  Given the current model for the Ripple Network, as an international open payment system without centralized controls, it is unlikely that Company would be able to implement the restrictions necessary to make the Ripple Network fall within one of these exemptions.

### 2.    Whether Company or Founders are the "provider" of prepaid access

Where a product is categorized as prepaid access, the entity deemed to be the *provider* of that prepaid access is subject to the requirements of the BSA.  The provider of prepaid access is "the participant within a prepaid program that agrees to serve as the principal conduit for access to information from its fellow program participants."[14]  Acknowledging that some prepaid programs will not have a participant volunteer to act as the provider, FinCEN has indicated that in the absence of registration, the provider will be "the person with principal oversight and control over the prepaid program."[15]  The determination of the person who exercises "principal oversight and control over the prepaid program is a matter of facts and circumstances."[16]  The factors FinCEN will consider include which entity: (a) organized the program; (b) "set[s] the terms and conditions of the prepaid program and determin[es] that the terms have not been exceeded;" (c) "determin[es] the other businesses that will participate in the prepaid program, which may include the issuing bank, the payment processor, or the distributor;" (d) "control[s] or direct[s] the appropriate party to initiate, freeze or terminate prepaid access;" and (e) "engag[es] in activity that demonstrates oversight and control of the prepaid program."[17]

Given the current proposal, there is a low risk that Company or Founders will be considered the provider of prepaid access if Ripple Credits are determined to be prepaid access.  Under the current model, the Founders created the Ripple Network (including the Ripple Client Software) and contributed the Ripple Client Software, Ripple Network and Ripple Credits to Company.  Although Company will control the initial distribution of Ripple Credits, once the Ripple Network is open sourced, neither Founders nor Company will set the terms and conditions for use of the Ripple Network.  Further, the Third Party Ripple Currencies functionality and the open source nature of the software allows for creativity and innovation within the Ripple Network, which suggests that the users of the software themselves determine when the terms of the Network have been exceeded and how to treat a user who exceeds the terms (i.e., not trade with them through Third Party Ripple Currencies).  Similarly, only users can direct that Ripple Credits not be accepted by other users in the Ripple Network, and only users can determine whether to terminate access to IOUs through the Third Party Ripple Currencies.  Finally, there are no other businesses involved in the program, only the software and its users.

As a result, the primary basis on which Founders or Company could be designated the provider of prepaid access stems from the catch-all provision and whether FinCEN would view any of the functions the Founders or Company plan to undertake as "activity that demonstrates oversight

---

[13] 31 C.F.R. § 1010.100(ff)(4)(iii)(D).

[14] 31 C.F.R. § 1010.100(ff)(4)(i).

[15] 31 C.F.R. § 1010.100(ff)(4)(ii).

[16] 31 C.F.R. § 1010.100(ff)(4)(ii).

[17] 31 C.F.R. §1010.100(ff)(4)(ii)(A)-(E).

-10-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099472

*PRIVILEGED / CONFIDENTIAL*

and control of the program."  Specifically, Company will control distribution of Ripple Credits, both Company and Founders intend to later sell in secondary markets on a wholesale basis, and Company will employ a team of individuals dedicated to promoting the Ripple Network, improving the Ripple Client Software and other aspects of the Ripple Network, and conducting outreach efforts with law enforcement entities.  Despite these activities, Company and Founders do not have principal oversight and control over the fundamental aspects of the Ripple Network.  The Ripple Network is, at its core, a peer-to-peer open source software system that operates on a decentralized ledger.  No one, not even Company or Founders, can control the ledger or the software that runs it.  Users exchange Ripple Credits with each other based on their own determinations of trustworthiness, can exchange other currencies on the Ripple Network, and can innovate within the open source protocol.  The value of Ripple Credits will vary with the choices of the Ripple Network's users–Company and Founders will not have principal oversight and control over their value.  Further, once Founders have relinquished control of the Ripple Network to Company, they will be further protected by the formation of the corporate entity, so long as they do not engage in any activity that might cause a court to later pierce the corporate veil.

The "principal oversight and control" standard has not been tested.  In light of the resulting uncertainty regarding FinCEN's potential application of the test, Company could request an opinion in advance from FinCEN that Ripple Credits do not constitute prepaid access and/or that Company and Founders are not providers of prepaid access.  However, if Company did so, there is a significant risk that FinCEN will (a) try to place Ripple Credits and Company into a regulated category, notwithstanding the clear argument that the principal oversight and control test does not apply, (b) decline to render an opinion, given the complexity of the analysis, and tell Company to determine for itself how to categorize Ripple Credits and Company's activities, (c) ask Company to provide additional information to help FinCEN develop an opinion and leave Company and Founders in limbo for a significant amount of time, or (d) ask Company to develop a way to impose controls on Ripple Credits and/or the Ripple Network.  Ultimately, whether Company requests an opinion in advance or not, the risk of FinCEN asserting a way to regulate Ripple Credits is significant.  There also have been numerous articles suggesting the possibility that bitcoins will be classified as prepaid access.[18]

### 3.    Whether Company or Founders are "sellers" of prepaid access

In addition to regulating providers of prepaid access, the BSA also regulates *sellers* of prepaid access.  Sellers of prepaid access include "any person that receives funds or the value of funds in

---

[18] *See, e.g., Director Freis: FinCEN's New Rule adaptable to 'internet system,'* Bitcoin Money (Oct. 5, 2011) *available at* http://www.bitcoinmoney.com/post/11074108719/fincen-freis-prepaid-access-speech (describing the concern that bitcoin may be encompassed within prepaid access rule because it is designed to be technology neutral and be adaptable to a range of products, including an internet system (citing Remarks by James H. Freis, Jr. Director Financial Crimes Enforcement Network, Money Transmitter Regulators Association 2011 Annual Conference (Oct. 5, 2011))); Timothy B. Lee, *Major Bitcoin exchange shuts down, blaming regulation and loss of funds*, ars technical (Feb. 15, 2012), *available at* http://arstechnica.com/tech-policy/news/2012/02/major-bitcoin-exchange-shuts-down-blaming-regulation-and-loss-of-funds.ars; Jeremy Quittner, *For Banks, Digital Currency Poses Threat – and Opportunity*, Bank Technology News (Jan. 13, 2012) (quoting Steve Hudak, a spokesman for FinCEN).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0099473

*PRIVILEGED / CONFIDENTIAL*

exchange for an initial loading or subsequent loading of prepaid access if that person sells prepaid access offered under a prepaid program that can be used before verification of customer identification."[19] FinCEN has determined that the "[d]istribution of prepaid access products to other businesses for further distribution or sale to end users/consumers by those other businesses is not the type of activity intended to be covered by the Rule."[20] This exception exists because "[t]he definition of 'seller' is intended to address sales to the end user/consumer of the prepaid access product, not to apply to businesses in the distribution channels that move the prepaid access products to the market."[21]

Under the current model, Company will distribute Ripple Credits to end users without accepting funds in return. Further, Company will only sell Ripple Credits to exchanges and other business entities on a wholesale basis. Similarly, Founders will only sell the Ripple Credits of which they retained personal ownership to exchanges or other business entities on a wholesale basis. As a result, it is unlikely that either Company or Founders will be considered sellers of prepaid access because they will never distribute Ripple Credits in exchange for funds from an end user/consumer. The exchanges and other business entities engaging in the sale of Ripple Credits on a secondary market will, however, likely be considered sellers of prepaid access. Sellers of prepaid access have the same regulatory requirements as providers of prepaid access with the exception of registering as a money services business.

In any event, the definition of seller focuses on receiving "funds or the value of funds in exchange for an **initial loading** or **subsequent loading**." This language was a change from the definition in the proposed rule that categorized a seller of prepaid access as a person that receives funds or the value of funds "in exchange for providing prepaid access…directly to the person that provided the funds or value, or to a third party as directed by that person." Additionally, in the guidance for the proposed rule, FinCEN indicated in a footnote that "load" and "reload," as used in the prepaid access context, refer to the initial provision of value and all subsequent provisions of value to a prepaid access program. Company does not load or subsequently reload Ripple Credits with funds or the value of funds. As a result, the cumulative effect of selling Ripple Credits only on a wholesale basis to exchanges and business entities and the fact that Ripple Credits are never loaded with value, is to make it unlikely that Company or Founders will be considered sellers of prepaid access.

By calling for the distribution of Ripple Credits without exchange of consideration, the current model reduces the risk that Ripple Credits will be considered prepaid access under the Bank Secrecy Act regulations, although it remains possible. In any event, Founders and Company will likely not be considered providers or sellers of prepaid access.

### b.  Money Transmitter

---

[19] 31 C.F.R. § 1010.100(ff)(7).

[20] FinCEN, *Frequently Asked Questions - Final Rule - Definitions and Other Regulations Relating to Prepaid Access*, at 3, *available at* http://www.fincen.gov/news_room/nr/pdf/20111102.pdf.

[21] *Id.*

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0099474

*PRIVILEGED / CONFIDENTIAL*

In addition to regulating providers and sellers of prepaid access as money services businesses, the BSA regulations regulate money transmitters. A money transmitter is a person (a) that accepts "currency, funds, or other value that substitutes for currency from one person" **and transmits** "currency, funds, or other value that substitutes for currency to another location or person by any means" or (b) is "engaged in the transfer of funds."[22] The regulations expressly exclude from the definition of a money transmitter someone who only "provides the delivery, communication, or network access services used by a money transmitter to support money transmission services."[23] Founders and Company have a low risk of being considered money transmitters under the BSA regulations because they do not accept Ripple Credits from one party to "transmit" to another, but rather the Ripple Network will be a tool that allows users to "transmit" (transfer) the Ripple Credits themselves. The introduction of the Original Ripple System into the Ripple Network does not alter this analysis. The Original Ripple System is a "financial system that recognizes existing trust relationships between human beings and works within that structure."[24] Each Original Ripple System user identifies other users from whom they are willing to accept promises to repay and assigns a value, in one or more currencies, of the amount they expect the other users to be able to repay. With this network of trust in place, the Original Ripple System then allows any Ripple Network user to negotiate transactions with any other user based on chained promises to pay channeled through the social Ripple paths. In other words, the Original Ripple System increases the capability of the Ripple Network to allow for more complex transmissions, but, like the Ripple Network, is not itself the money transmitter. Exchanges that facilitate Ripple Credits purchase and sale transactions have a greater risk of falling within the category of a money transmitter and being subject to the BSA regulations for money services businesses.

### c. Currency Exchanger

Lastly, the BSA regulations include foreign currency exchangers as money services businesses subject to anti-money laundering regulation. A foreign currency exchanger is "a person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more countries in exchange for the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery."[25] Because this category of money services business expressly contemplates that it is the currency of a country exchanged for the currency of another country, exchanges that operate and exchange Ripple Credits for the currencies of different countries may be able to claim that they fall outside of the definition because the Ripple Credits will not be a currency of any particular country. However, exchanges may face risk that, while not directly exchanging the currency of one country for the currency of another, Ripple Credits are simply being used as an instrument to create the same result. If this is the case, regulators may categorize Ripple Credits exchanges as currency exchangers.

---

[22] 31 C.F.R. § 1010(ff)(5).

[23] 31 C.F.R. § 1010(ff)(5)(ii)(A).

[24] "Why Ripple?", *available at*, http://ripplepay.com/essay/.

[25] 31 C.F.R. § 1010(ff)(1).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0099475

*PRIVILEGED / CONFIDENTIAL*

### 2.  State Money Transmitter Laws

Most states regulate entities that transmit money and require that they are licensed and bonded. Most states include "selling or issuing payment instruments" within the definition of money transmission.[26]  Payment instruments are typically defined as "a check, draft, money order, traveler's check, or other instrument for the transmission or payment of money or **monetary value**…"[27]  Many states define "monetary value" as "any medium of exchange, **whether or not redeemable in money**."[28]  Ripple Credits may be considered an instrument for the transmission or payment of monetary value, which would result in any person who sells or issues Ripple Credits being a money transmitter.  If Ripple Credits are characterized as payment instruments, Company and Founders may be at risk of regulation under state money transmitter statutes because they will sell Ripple Credits, and Company will distribute Ripple Credits.

As to the sale of Ripple Credits, although Company and Founders will only sell Ripple Credits on a wholesale basis to exchanges and other business entities, and not to end users or consumers, it is unclear if this limitation will insulate Company and Founders from regulation.  States do not appear to offer an exemption for such sales in the same way that FinCEN accords such an exemption under the prepaid access rules.  Furthermore, although most states provide exemptions for payment instruments that can be redeemed only for the goods and services of the issuer, Ripple Credits will not qualify for this exemption because they are not redeemable solely for the goods and services of an issuer.[29]  As further elaborated below, there is no issuer of Ripple Credits within the meaning of state money transmitter laws.  However, any risk faced by Company and Founders under the money transmitter statutes is mitigated by the fact that those statutes generally regulate entities "engaging in the business of" money transmission (i.e., the business of selling payment instruments).[30]  Several state courts have interpreted "engaging in the business of" as requiring regular sales of something, rather than just a single sale.[31]  Clearly, the threshold for what rises to the level of engaging in the business of selling payment instruments will vary from state to state.  As a result, to reduce risk of regulation under state money transmitter statutes, Company should minimize its sales of Ripple Credits, even on a wholesale basis to exchanges and other business entities as much as possible, so that it cannot be characterized in engaging in the business of selling Ripple Credits.  In that light, the risk faced by Founders under state money transmitter statutes is less than that faced by Company, as any

---

[26] *See, e.g.*, Ariz. Rev. Stat. Ann. § 6-1202; Cal. Fin. Code § 2003(o).

[27] *See, e.g.*, Cal. Fin. Code § 2003(q) (emphasis added); Alaska Stat. § 6.55.990(19) (emphasis added).

[28] *See, e.g.*, S.D. Sess. Laws § 51A-17-1(12) (emphasis added); Cal. Fin. Code § 2003(m) (emphasis added); N.C. Gen. Stat § 53-208.2(12) (emphasis added).

[29] *See, e.g.*, Ga. Code Ann. § 7-1-680(a)(1); N.J. Stat. Ann. § 17:15C-2.

[30] *See, e.g.*, Cal. Fin. Code § 2030; Mass. Gen. Laws § 4; S.D. Sess. Laws § 51A-17-4; N.C. Gen. Stat § 53-208.3.

[31] *See, e.g., Morris v. Goodwill Indus., Inc.*, No. C2-95-19, 1995 WL 465348, *4 (Minn. App. Aug. 8, 1995) ("We conclude that a one-time sale of fixtures such as the clothing racks at issue here does not constitute 'engaging in the business' of selling that product. "); *Lanier v. City of Boston*, 95 F. Supp. 2d 17, 19 (D. Mass. 2000) (sale outside Fenway Park of single ticket at face value is not engaging in the business of reselling); *NPS LLC v. Stubhub*, No. 06-4874-BLS1, 2009 WL 995483, *9 (Mass. Super. Jan. 26, 2009) ("It appears that, to be engaged in the business of reselling, one must, at the very least, wish to sell more than one ticket for a profit, but it is not clear how many sales or prospective sales are needed to become so engaged.)

-14-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0099476

*PRIVILEGED / CONFIDENTIAL*

sales Founders make will be as private, individual owners of Ripple Credits, not as a business enterprise.

"Issue" is not usually defined in the state money transmitter statutes, but California has defined it with respect to a payment instrument as "the entity that is the maker or drawer of the instrument in accordance with the California Commercial Code and is liable for payment."[32] Because neither the Founders nor Company is liable for payment on Ripple Credits, there is a strong position that, at least in California, they are not money transmitters on the basis of issuance of Ripple Credits.

It is also common for states to include within the definition of a money transmitter someone who accepts money for the purpose of transmission or transmits money.[33] Similar to the analysis under the Federal money transmitter definition, Founders and Company have a low risk of being considered money transmitters because they do not accept Ripple Credits or money from one party to transmit to another nor, in any instance, do they transmit money. However, exchanges, which allow people to buy and sell Ripple Credits directly from one person to another, have a greater risk of falling within the category of a money transmitter because they will transmit both Ripple Credits and money between the buyers and sellers.

### 3. Securities

#### a. The Definition of a Security

Under the Securities Act of 1933, the term security means:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[34]

An instrument that does not fall within one of the traditional types of securities may nonetheless be regulated as a security if it constitutes an "investment contract." An investment contract has

---

[32] *See, e.g.,* Cal. Fin. Code § 2003(k).

[33] *See* Draft Uniform Money Services Business Act § 102(17)(B) (1999). The following states include the language "or transmitting," in their definition of money transmission: Arizona, Colorado, Connecticut, Georgia, Idaho, Illinois, Indiana, Maine, Minnesota, New Jersey, Oregon, and Tennessee.

[34] 15 U.S.C. § 77b(a)(1) ); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (noting Congress's goal of enacting "a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment.").

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099477

*PRIVILEGED / CONFIDENTIAL*

been defined by the Supreme Court to involve (a) an investment of money with the expectation of profits (b) in a common enterprise (c) derived solely from the efforts of others.[35]

### b. Application of the *Howey* Test – Investment of Money with the Expectations of Profits

In determining whether an investment of money was made with the expectations of profit, courts will look to "whether an investor 'chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.'"[36] The issue here will turn on the motivations of those obtaining Ripple Credits. If a person obtains Ripple Credits primarily to purchase goods or services, then they are less likely to be deemed securities. How secondary markets promote the use of Ripple Credits, and the type of consideration they receive may place Ripple Credits in a different position.

Generally, parties will debate whether or not investors expected to profit solely from the efforts of others. The Supreme Court recognized that an "expectation of profits" exists where there is (i) capital appreciation from the original investment, and (ii) participation in earnings resulting from the use of investors' funds."[37] In such a case, the investor is attracted solely by prospects of a return on his investment. By contrast, where a purchaser is motivated by a desire to use or consume the item purchased or to occupy the land or develop it, the "investment" will not be deemed to be a security. In applying this standard, courts will look at the representations used to induce use of the instrument.[38] Founders and NewCo, therefore, should steer clear of promoting Ripple Credits as an investment opportunity or as a speculative investment trading vehicle.[39] Although the language in *Howey* suggests that the expectations of profits must be *solely* from the efforts of others, appellate courts have uniformly declined to apply such a restrictive standard. Rather, the standard later outlined by the Supreme Court in *Forman* is more appropriate here.[40]

We understand that the primary reason for purchasing Ripple Credits is to facilitate online commerce, not to engage in speculative investment trading. As such, given the commercial nature here, Ripple Credits should not be considered securities.

---

[35] *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

[36] *S.E.C. v. SG Ltd.*, 265 F.3d 42, 48 (1st Cir. 2001) (*quoting International Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 559 (1979).

[37] *S.E.C. v. SG Ltd.*, 265 F.3d 42, 53 (1st Cir. 2001) (*citing United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975)).

[38] *Id.* ("In our view, these profit-related guarantees constitute a not-very-subtle form of economic inducement").

[39] *Reves*, 494 U.S. at 61.

[40] *Forman*, 421 U.S. at 852 ("the touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others"); see also *S.E.C. v. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973) (adopting a standard that examines "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099478

*PRIVILEGED / CONFIDENTIAL*

### c. Application of the *Howey* Test – Common Enterprise

Different circuits have examined the existence of a common enterprise differently.  Many courts have found that a common enterprise can arise from showing "'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro rata distribution of profits."[41]  In examining horizontal commonality, courts have looked at whether the instruments in question promise specific returns.[42]

Should the value of Ripple Credits increase, each person who purchased Ripple Credits will be proportionally better off, so all individual holders of Ripple Credits stand to receive gains through an increased value in their Ripple Credits if the Ripple Network succeeds.  Some commentators have pointed out that Bitcoin does not have a common enterprise[43] because there is no centralized money-making entity that will be raising money, but rather many individuals separately participating in a decentralized program.[44]

The Ripple Network has a greater risk of being seen as a common enterprise because there will be a specific entity, Company, which is responsible for the distribution of Ripple Credits and the promotion and marketing functions of the Ripple Network.  The common enterprise risk increases to the extent that there is an identifiable entity that is driving the promotion.  However, Ripple Credits themselves promise nothing and it appears that neither the Founders nor Company will be collecting or retaining funds from the distribution of Ripple Credits, meaning that the Ripple Credit's users' funds will not likely be pooled.  Neither Founders nor Company have promised any type of return or appreciation in the value of Ripple Credits and it appears that the business model of Company seeks to disperse, rather than pool, Ripple Credits' users' funds throughout the open-sourced Ripple Network.  Given that Company will be marketing the use of Ripple Credits, it may make sense to take precautions to ensure that in marketing the use of Ripple Credits, Company employees do not promise appreciation in the value of Ripple Credits or estimate appreciations in value should speculative investing occur.

### d. Ripple Networks as Notes or Currency

The 1934 Securities Act excludes from the definition of a security "currency or any note ... which has a maturity at the time of issuance of not exceeding nine months"[45]  Courts have read the exemption for short term notes to be applicable to commercial paper, not investment securities.[46]  While not all notes are securities, courts will apply a "family resemblance" test to determine whether an instrument denominated as a  note is in fact a security.  First, courts will

---

[41] *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).
[42] *S.E.C. v. SG Ltd.*, 265 F.3d 42, 48(1st Cir. 2001); see also *S.E.C. v. Infinity Group*, 212 F.3d at 184-185 (3d Cir. 2000) (finding that funds were pooled and that investors in turn received transfer agreements promising high rates of return).
[43] Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4:1 Hastings Sci. & Tech. L.J. 191, 199 (2011) [hereinafter *Grinberg*].
[44] *Grinberg*, 197.
[45] 15 U.S.C. § 78C(a)(10).
[46] *See Reves v. Ernst & Young*, 494 U.S. 56, 74 (1990) (Stevens, J., concurring).

-17-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099479

*PRIVILEGED / CONFIDENTIAL*

look at the reasonable motivations of a buyer and seller to purchase the note to determine whether the primary motivation is profit.[47]  Next, the court will examine the "plan of distribution" of the instrument to determine whether there is "common trading for speculation or investment."[48]  Finally, the court will look at both the reasonable expectations of the investing public and whether another regulatory scheme significantly reduces the risk of the instrument.[49]  Some commentators have explained that, like commercial paper, currency generally does not resemble a security because it is safe and liquid.[50]  Ripple Credits, however, unlike traditional currencies, do not have these qualities of safety and liquidity because they will be neither backed by the full faith and credit of a national government nor widely accepted as a means of exchange.  Ripple Credits, therefore, may be encompassed within what the Supreme Court explained as Congress's attempt to define a security "sufficiently broad to encompass virtually any instrument that might be sold as an investment."[51]  Again, the motivation of a purchaser of Ripple Credits and the promotion of Ripple Credits will be particularly relevant in determining whether the instruments can be considered notes, and if so, whether they will be considered securities under the federal securities laws.

### e.  Ways to Diminish the Risk that Ripple Credits are Deemed to be Securities

Although we believe that a compelling argument can be made that Ripple Credits do not constitute "securities" under the federal securities laws, given the lack of applicable case law, the Founders should consider seeking a no-action letter from the SEC.  Obviously there are pros and cons to seeking a no-action letter, including among others, the possibility that the SEC does not grant or delays a decision.  In any event, obtaining a no-action letter would provide further comfort that Ripple Credits are not securities under the federal securities laws.

### 4.  Commodities regulation

The Commodity Exchange Act ("**CEA**") regulates the sale of a commodity for future delivery.  Commodity means "wheat, cotton, rice, corn, oats…and all other goods and articles…and all services, rights, and interests…in which contracts for future delivery are presently or in the future dealt in."[52]  The CEA does not govern or apply in certain circumstances (other than section 5b or 12(e)(2)(B)) to transactions in delineated financial instruments (i.e., currencies) that are deemed to be "excluded commodities."  The CEA provides an exemption for a transaction in an excluded commodity if: (i) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and (ii) the agreement, contract, or transaction is not executed or traded on a trading facility.  Although an argument might be fashioned that Ripple Credits are an excluded commodity under the CEA (which is unlikely as they are not backed by the full faith and credit of a national government), their sale to the general public, even if only in

---

[47] *Id.* at 66.
[48] *Id.*
[49] *Id.* at 66-67.
[50] *See* Grinberg 203.
[51] *Reves*, 494 U.S. at 60-61.
[52] 7 U.S.C. § 1A(4).

-18-

79435-0001/ADMIN31002299.6

*PRIVILEGED / CONFIDENTIAL*

secondary markets, would preclude reliance on the exemption noted above, potentially subjecting certain transactions in Ripple Credits to federal regulation. While people will not immediately deal in futures or options contracts for Ripple Credits, to the extent that Ripple Credits mimic existing currencies, it is possible that futures or options contracts for Ripple Credits will be developed, and Ripple Credits may therefore fall subject to federal regulation under the CEA. The U.S. Commodity Futures Trading Commission (the "**CFTC**") regulates and enforces regulations relating to the sale of a commodity for future delivery. Statutorily, it is unlawful for a person to cheat, defraud, make false reports or statements or otherwise willfully deceive or attempt to deceive a person in connection with a contract or sale of any commodity for future delivery.[53] Additionally the CFTC requires registration from many parties engaged in the buying, selling, and promoting of commodities futures, including clearing organizations,[54] data repositories,[55] and intermediaries.[56] Given the uncertainty of whether Ripple Credits would be deemed commodities, and whether an active futures market for Ripple Credits will form, Founders and Company face a relatively low risk related to CFTC enforcement, and such risk can be addressed as it arises. If an active futures and options market in Ripple Credits does form, and exchanges begin to deal in these contracts, then exchanges, as well as parties that promote the sale of futures contracts for Ripple Credits, may be required to register with the CFTC and face enforcement action for any inaccurate or deceptive promotion of Ripple Credits.

### 5. Federal Currency Regulation

#### a. Counterfeiting

It is illegal in the United States to make, utter, or pass "any coins of gold or silver or other metal, or alloys of metals, intended for use as current money, whether in the resemblance of coins of the United States or foreign countries, or of the original design."[57] In 2011, after many years of investigation and prosecution, Bernard von NotHaus was convicted of counterfeiting coin and passing, publishing and selling such coins when they were known to be false.[58] At the time of the NotHaus conviction, the DOJ issued a press release explaining that

> Article I, section 8, clause 5 of the United States Constitution delegates to Congress the power to coin money and to regulate the value thereof. This power was delegated

---

[53] 7 U.S.C. § 6B(a)(2).

[54] 7 U.S.C. § 7a-1; 17 C.F.R. § 39.3.

[55] 7 U.S.C. §24a; 17 C.F.R. § 49.3.

[56] 7 U.S.C. § 6D; 7 U.S.C. § 6K; 7 U.S.C. § 6N (intermediaries required to register include (i) futures commission merchants who solicit or accept orders for futures contracts and accept money, securities or property to margin, guarantee, or secure any trades or contracts; (ii) introducing brokers who solicit and accept orders for futures contracts and does not accept any money, securities or property to margin, guarantee or secure any trades or contracts; (iii) commodity pool operator who engages in operations of a collective investment vehicle and solicits or accepts funds, securities or properties for the purchase of interests in the collective investment vehicle; and (iv) a commodity trading advisor who, for compensation, advises others or issues or promulgates analysis as to the value or advisability of trading in any futures or options contracts).

[57] 18 U.S.C. § 486.

[58] Superseding Bill of Indictment, *United States v. Bernard Von NotHaus,* Docket No. 5:09CR-27 (W.D.N.C. Nov. 17, 2010); Verdict Form, *United States v. Bernard Von NotHaus*, Docket No. 5:09CR27-V, (W.D.N.C. Mar. 18, 2011).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099481

*PRIVILEGED / CONFIDENTIAL*

> to Congress in order to establish and preserve a uniform standard of value and to
> insure a singular monetary system for all purchases and debts in the United States,
> public and private. Along with the power to coin money, Congress has the concurrent
> power to restrain the circulation of money which is not issued under its own authority
> in order to protect and preserve the constitutional currency for the benefit of all
> citizens of the nation. It is a violation of federal law for individuals…or
> organizations…to create private coin or currency systems to compete with the official
> coinage and currency of the United States.[59]

While the press release suggests that the conviction was predicated on the illegality of creating a competing currency, the legal basis for the conviction was counterfeiting. The Liberty Dollars included a $ sign, used the words "dollar," "USA," "Liberty," and "Trust in God."[60] It is likely that the counterfeiting and fraud aspect of the Liberty Dollars, rather than the competition with United States currency, led to the conviction.[61] Because the language of the counterfeiting statute exclusively addresses metal coinage or bars, it is likely inapplicable to the creation and distribution of Ripple Credits, which will be constructed of a string of code or ledger entry.

### b. Stamp Payments Act

The Stamp Payments Act of 1862 ("**Stamp Payments Act**") states that, "whoever makes, issues, circulates, or pays out any note, check, memorandum, token, or other obligation for a less sum than $1, intended to circulate as money or to be received or used in lieu of lawful money of the United States, shall be fined under this title or imprisoned not more than six months, or both."[62] Based on case law analyzing the Stamp Payments Act, one commentator has explained that it is unlikely to apply to anything that "(1) circulates in a limited area, (2) is redeemable only in goods, (3) does not resemble official U.S. currency and is otherwise unlikely to compete with small denominations of U.S. currency, or (4) is a commercial check."[63] Professor Ronald Mann, an expert in payment systems, has explained that the term "obligation" in the statute does not limit the list, and has made a statement regarding Bitcoin, which has a similar form factor to a coin, that it "is pretty clearly a 'token,' albeit an electronic one, I would argue it is covered [by the Stamp Payments Act]."[64] Ripple Credits will circulate widely, be redeemable for any products in which merchants will accept it, may compete with small denominations of U.S. currency, and is not a commercial check. Because there is no requirement that merchants accept Ripple Credits, it is unclear whether an "obligation" exists. There has not been a published court opinion

---

[59] Press Release, United States Attorney's Office, Western District of North Carolina, *Defendant Convicted of Minting His Own Currency* (March 18, 2011), *available at* http://www.fbi.gov/charlotte/press-releases/2011/defendant-convicted-of-minting-his-own-currency.

[60] *Id.*

[61] *Grinberg*, 191; Seth Lipsky, Op-Ed., *When Private Money Becomes a Felony Offense: The Popular Revolt Against a Declining Dollar Leads to a Curious Conviction,* Wall St. J. (Mar. 31, 2011) *available at* http://online.wsj.com/article/SB10001424052748704425804576220383673608952.html.

[62] 18 U.S.C. § 336.

[63] *See Grinberg,* 185 (citing United States v. Van Auken, 96 U.S. 366 (1878), United States v. Monongahela Bridge Co., 26 F. Cas. 1292 (W.D. Pa. 1863 (No. 15796); United States v. Roussopulous, 95 F.977 (D. Minn 1899), and Stetinius v. United States, 22 F. Cas. 1322 (C.C.D.D.C. 1839) (No. 13387)).

[64] *Grinberg,* 189 (quoting Mann).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0099482

*PRIVILEGED / CONFIDENTIAL*

interpreting the Stamp Payments Act since 1899.[65]  Given the lack of recent prosecutions, and the low risk that Ripple Credits create an obligation, Founders and Company face a relatively low risk of enforcement under the Stamp Payments Act.[66]

### 6.  Illegal Gambling

Many states have anti-gambling laws that make it a misdemeanor to sell, transport or manufacture a gambling device.[67]  Under these statutes, the term "gambling devices" is typically broadly defined.  For instance, in Colorado "gambling devices" include "any device, machine, paraphernalia, or equipment that is used or usable in the playing phases of any professional gambling activity,"[68] and in Washington "gambling devices" include "any device, mechanism, furniture, fixture, construction or installation designed primarily for use in connection with professional gambling."[69]  Founders and Company incur some risk related to illegal gambling if Ripple Credits are categorized as gambling devices.  While neither Founders nor Company can control use of the Ripple Credits, the risk of Ripple Credits being a gambling device increases if Founders and Company promote Ripple Credits for use in Internet gambling.  Founders and Company should not advertise the use of Ripple Credits for Internet gambling or any illegal purpose.  Additionally, under the Illegal Gambling Business Act "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined…or imprisoned…or both."[70]  While Founders and Company have not indicated intent to conduct an illegal gambling business, there is a risk that Ripple Credits that are used to finance illegal gambling will be seized and forfeited, which could cause instability to the Opencoin system.[71]

The Unlawful Internet Gambling Enforcement Act regulates designated payment systems, which are "system[s] utilized by a financial transaction provider that the Secretary or Board of Governors of the Federal Reserve System, in consultation with the Attorney General, jointly determine, by regulation or order, could be utilized in connection with, or to facilitate any restricted transaction."[72]  A restricted transaction is a transaction or transmittal involving any credit, funds, instruments, or proceeds in connection with a person's participation in unlawful Internet gambling.[73]  Participants in a designated payment system are required to "establish and implement written policies and procedures reasonably designed to identify and block or

---

[65] *Grinberg*, 190.

[66] Please note that the penalties for violation are limited to a fine and a maximum of six months imprisonment.  18 U.S.C. § 336.

[67] *See, e.g.*, Colo. Rev. Stat. § 18-10-105.

[68] Colo. Rev. Stat. § 18-10-102(3).

[69] RCW 9.46.0241.

[70] 18 U.S.C. § 1955.

[71] *Id.*

[72] 31 U.S.C. § 5362(3).

[73] 31 U.S.C. § 5362-5363.  Unlawful Internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."  31 U.S.C. § 5362(10).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099483

otherwise prevent or prohibit restricted transactions."[74]  The Department of Treasury and the Board of Governors of the Federal Reserve System have identified designated payment systems to include automated clearing house systems, card systems, check collection systems, money transmitting, and wire transfer systems.[75]  Unless the identification of designated payment systems is later modified, it is unlikely that the Ripple Network, Founders or Company would technically be subject to the blocking requirements of the Unlawful Internet Gambling Enforcement Act because Ripple Credits do not fall within one of the designated payments systems.

The Unlawful Internet Gambling Enforcement Act also regulates the ability for a person engaged in betting or wagering to knowingly accept from another person in connection with unlawful Internet gambling credit, an electronic fund transfer, a check, or proceeds from any other designated payment system.[76]  Unlawful Internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law..."[77]  The definition of a bet or wager excludes participation in a game or contest if the participants do not stake or risk anything other than personal efforts or points or credits given by the game's sponsor free of charge that can be redeemed only for participation in games offered by the game's sponsor.[78]  Because it is intended that Ripple Credits be redeemed in an open marketplace, if an Internet gaming company, which was otherwise not engaged in Internet gambling, gave away Ripple Credits and accepted them as payment to play games, the payment of the Ripple Credits would constitute a wager (not falling within the exemption discussed above), and may draw such company within the realm of unlawful Internet gambling.  Founders and Company should carefully evaluate any use of Ripple Credits in Internet gaming situations.

### 7.  Consumer Protection, Unfair or Deceptive Trade Practices

Section 5 of the Federal Trade Commission Act ("**FTC Act**") prohibits "unfair or deceptive acts in or affecting commerce."[79]  An act or practice is deceptive if (1) there is a representation, omission, or practice; (2) the representation, omission, or practice is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material.[80]  A representation is material if it is of a kind usually relied upon by a reasonably prudent person.[81]  Express claims, or deliberately made implied claims, used to induce the

---

[74] 12 C.F.R. § 233.5 (there is a safe harbor for compliance if a financial transaction provider participant "relies on the policies and procedures of the designated payment system that are reasonably designed to (i) Identify and block restricted transactions; or (ii) Otherwise prevent or prohibit the acceptance of the products or services of the designated payment system or participant in connection with restricted transactions; and (2) such policies and procedures of the designated payment system or participant comply with the requirements of [the regulation].")
[75] 12 C.F.R. § 233.3.
[76] 31 U.S.C. § 5363.
[77] 31 U.S.C. § 5362(10)(A).
[78] 31 U.S.C. § 5362(1)(E)(viii).
[79] 15 U.S.C. § 45(a)(1).
[80] *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir.2001).
[81] *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564 (7th Cir. 1989).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099484

*PRIVILEGED / CONFIDENTIAL*

purchase of a particular product or service are presumed to be material.[82] Thus, if Founders or Company make material representations, whether express or implied, that are likely to mislead reasonably prudent consumers, then the Founders or Company, as applicable, will likely face liability under the FTC Act and applicable state consumer protection laws.[83]

To minimize risk, Founders and Company should be careful about how and to whom they market Ripple Credits. For example, when Founders or Company sell Ripple Credits to exchanges, they should accurately describe the potential risk of purchasing the Ripple Credits.[84] Further, Founders should be certain that they clearly disclose that they retained Ripple Credits for personal use at the launch of the Ripple Network, and how many Ripple Credits they retained. Founders and Company should also note that if Founders and Company fail to comply with applicable laws relating to Ripple Credits, and the government takes action that results in the devaluation of Ripple Credits, consumers may claim that the promotion of Opencoin by Founders and Company, by failing to comply with applicable laws, was itself an unfair or deceptive trade practice.

### 8.   Aiding & abetting unlawful activity

As long as Company does not actively promote the use of the Ripple Credits for illegal or other questionable purposes, there is minimal risk that its conduct will subject it to aiding and abetting liability.  Nevertheless, there is a risk that Company could come under regulatory scrutiny if the Ripple Credits become a popular tool for illegal online commerce, as governmental entities have become increasingly aggressive in pursuing aiding and abetting charges/claims against companies involved in online commerce.

Aiding and abetting requires "first, that the principal committed the substantive offense charged, and second, that the [defendant] accomplice became associated with the principal's criminal endeavor and took part in it, *intending to assure its success.*"[85]  "[A] defendant must willfully and knowingly have associated himself in some way with the crime, and willfully and knowingly have sought by some act to help make the crime succeed."[86]  To prove an "association" with a crime, the government must provide both "proof of [defendant's] sufficient participation in the crime, as well as knowledge of it."[87]  To prove that Founders aided and abetted a crime, the government would have to prove that: (1) some principal committed the underlying crime; (2) Founders knew it; and (3) Founders participated in it with the intent that the crime occur.

---

[82] *Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984).

[83] *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fl. 2007); *see also* 15 U.S.C. § 53(b).

[84] *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267 (noting that defendants violated Section 5 of the FTC Act by making material misrepresentations regarding, *inter alia*, the potential earnings a consumer was likely to achieve by purchasing Defendants' Internet kiosks).

[85] *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010) (emphasis added); *see also United States v. Campa*, 679 F.2d 1006, 1013 (1st Cir. 1982) ("Proving beyond a reasonable doubt that a specific person is the principal is not an element of the crime of aiding and abetting...The prosecution need only prove that the substantive offense had been committed by someone.").

[86] *United States v. Bailey*, 405 F.3d 102, 110 (1st Cir. 2005) (approving language from jury instruction).

[87] *United States v. Guerrero*, 114 F.3d 332, 342 (1st Cir. 1997).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099485

*PRIVILEGED / CONFIDENTIAL*

To satisfy the knowledge requirement for aiding and abetting, the government must show the defendant had "more than merely a general suspicion that an unlawful act may occur."[88] Thus, the government would have to prove that Founders *knew* that Ripple Credits were being used to facilitate illegal activities. To reduce this risk, Founders and Company should be careful about how Ripple Credits are promoted and should not target illegal activities as markets of Ripple Credits.

Inferences of knowledge may also be drawn from evidence suggesting that the substantive crime or scheme was apparent or foreseeable to the defendant, or evidence that a defendant was willfully blind to illegal activities or consciously disregarded evidence of it.[89] For example, *United States v. Lovin* held that the evidence was sufficient to sustain a conviction against an operator of websites that advertised prescription drugs and linked purchasers to doctors and pharmacists who filled prescriptions without in-person examinations. The court rejected the defendant's argument that he did not know the doctors were filling prescriptions illegally, reasoning that the operator had previously been involved with illegal drug distribution networks, had talked to the conspiracy's ringleader about the need to avoid government scrutiny, and knew the rate at which doctors were approving orders.[90] In contrast, if a defendant is not aware of a crime or could not foresee it, he cannot be convicted.[91] To minimize risk of liability, Founders and Company will want to establish as much distance from any illegal industries as possible, and they should make clear in their mission statements, user guidelines, or other publications that they do not promote or condone use of the Ripple Credits for illegal activities, nor do they directly oversee, control, or financially benefit from transactions in which the Ripple Credits are used.

---

[88] *United States v. Rosario-Diaz*, 202 F.3d 54, 63 (1st Cir. 2000).

[89] *See, e.g., United States v. Llinas*, 373 F.3d 26, 31–33 (1st Cir. 2004) (evidence was sufficient to show defendant knew about conspiracy where she was present at conversation about drug purchase and later drove co-conspirator to purchase site); *United States v. Page*, 521 F.3d 101, 108–09 (1st Cir. 2008) (defendant found to have knowledge of conspiracy where co-conspirator used drug dealer slang familiar to defendant); *Otero-Mendez*, 273 F.3d at 52 (defendant properly convicted of aiding and abetting carjacking resulting in death where defendant knew principals were carrying guns); *United States v. Spinney*, 65 F.3d 231, 236–37 (1st Cir. 1995) (defendant accused of aiding and abetting armed bank robbery was "on notice of the likelihood" that weapon would be used in the robbery where defendant had major role in planning a daylight robbery); *United States v. Hernandez*, 218 F.3d 58, 66-68 (1st Cir. 2000) (rejecting defendant's argument that he did not know he was transporting drugs where defendant drove truck in a slow and evasive manner).

[90] 2009 U.S. Dist. LEXIS 101567, *9-12 (S.D. Cal. Oct. 30, 2009).

[91] *See, e.g., United States v. Lovern*, 2009 U.S. App. LEXIS 29307, *6–7 (10th Cir. Sept. 9, 2009). In this case, the operation involved a rogue pharmacy that issued prescriptions over the Internet without an in-person consultation. The evidence showed that the technician may have known that the pharmacy was filling prescriptions over the Internet or filling fake prescriptions, and that this conduct may have been illegal; however, the government specifically charged the defendant with aiding and abetting distribution by pharmacists outside the normal scope of their profession. *Id.* at *26-30. *See also United States v. Rosario-Diaz*, 202 F.3d 54, 63–64 (1st Cir. 2000) (vacating convictions for aiding and abetting and conspiracy to commit carjacking resulting in death where defendants who arranged a robbery could not foresee that the robbery would involve carjacking and murder); *United States v. Ogando*, 547 F.3d 102, 108 (2d Cir. 2008) (reversing cab driver's conviction for conspiracy to import drugs, noting that the fact that defendant had frequent contact with conspiracy members merely showed that he was "a livery cab driver regularly used by members of this conspiracy.").

-24-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0099486

*PRIVILEGED / CONFIDENTIAL*

Even if the government can prove knowledge, it is unlikely that merely creating a product that is then used in illegal activities would be sufficient to show participation. A defendant can aid and abet a crime by failing to take an action only if that failure was "with the specific intent to fail to do something the law requires to be done."[92] Moreover, for aiding and abetting liability to be based on failure to act, there must be "a legal duty and not simply a moral duty." Founders and Company, by staying removed from illegal activities, advising against the use of Ripple Credits for illegal activities, and educating the public about their lack of involvement in and control over third party transactions, will significantly reduce their risk of aiding and abetting illegal activity.

### 9. Tax Evasion

It is a felony to "willfully attempt in any manner to evade or defeat any tax" imposed by the Internal Revenue Service.[93] Furthermore, persons who conspire to "commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose," are subject to fines and imprisonment.[94] While Founders and Company may not have income tax exposure arising from the distribution of Ripple Credits, merchants, online retailers, and others who accept Ripple Credits in lieu of payments in USD or currencies of other countries will be responsible for reporting the income tax associated with such receipts. Bartering income is taxed at the fair market value of the goods and services exchanged, which would suggest that a merchant accepting Ripple Credits for a good is responsible to pay income taxes on the fair market value of the Ripple Credits, which is equal to the fair market value of the good exchanged for the Ripple Credits.[95] Founders and Company should make clear to Ripple Network participants that they will be responsible for tax liability associated with the acceptance of Ripple Credits.

In addition to federal income tax, people buying, selling and exchanging Ripple Credits will be responsible for state income tax and sales tax liability associated with such Ripple Credits. While state laws vary significantly, state income tax liability associated with the receipt of Ripple Credits in a given year will be calculated, in most states, similarly to the federal income tax calculation. For state sales tax purposes, the Streamlined Sales and Use Tax Agreement defines "Sales price" as "the total amount of consideration, including cash, credit, property, and services, for which personal property or services are sold, leased, or rented, valued in money, whether received in money or otherwise…"[96] This agreement has only been adopted by some states, and even in states where it has been adopted the definition of "sales price" may not be uniform.

Similarly, although Founders and Company may not have income or sales tax exposure arising from transactions involving Third Party Ripple Currencies, participants may be responsible for sales, income and gross receipts taxes. It seems likely that most state and local governments

---

[92] *Bailey*, 405 F.3d at 110 n. 4 (approving language from jury instruction).

[93] 26 U.S.C. § 7201.

[94] 18 U.S.C. § 371.

[95] Internal Revenue Service, *Bartering Income* (July 11, 2011), *available at* http://www.irs.gov/businesses/small/article/0,,id=187904,00.html.

[96] Streamlined Sales and Use Tax Agreement, 136 (May 19, 2011).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099487

*PRIVILEGED / CONFIDENTIAL*

would treat Original Ripple System promises to pay similarly to the way they would treat electronic currency, stored value, or conventional debts. The recognition and transfer of Third Party Ripple Currencies promises to pay should not themselves create a transfer tax liability; however, to the extent Third Party Ripple Currencies promises to pay are made in conjunction with a transfer of taxable goods or services, a transfer tax liability would arise. At least two caveats apply to this general conclusion. First, if the Third Party Ripple Currencies promise is denominated in a good or services that is subject to sales and use tax (e.g., one hour of carpentry service or an iPhone 5) the settling of Ripple promises could create additional taxable events. Second, there can be casual sale or other state exemptions which reduce the transfer tax burden for individuals who are not engaged in business. Ripple's Frequently Asked Questions section states that transactions "between private parties" are "normally NOT taxable" in contrast to a sale between a business and private person.[97] While this is true insofar as many states have casual or occasional sale exemptions that eliminate sales and use tax obligations on individuals making an occasional sale (e.g. a garage sale), most states will define an individual as a retailer and require collection if the individual makes a certain number of sales (generally, three per year) or holds herself out as making sales. Thus, even if a user is a private individual, he or she is likely subject to sales tax collection responsibilities if he or she denominates his or her Third Party Ripple Currencies promises in a taxable good or service or sell those goods or services in more than a few transactions each year.

In addition to sales tax issues, participants may run into issues with income and gross receipts taxes. In the extreme example, individuals could speculate or invest in Third Party Ripple Currencies promises. For example, buy a Third Party Ripple Currencies promise to pay an ounce of gold in exchange for a promise to pay USD $800 and resell that promise to pay an ounce of gold for a promise to pay USD $850 (a gain of USD $50, assuming the creditworthiness of the promises). Likewise, a promise to pay by a less creditworthy participant might sell for a discount compared to a promise to pay by someone with good credit. All such transactions in intangibles can give rise to income and gross receipts tax to those engaging in the exchanges and transactions.

In light of the foregoing, although Founders and Company are not subject to tax liability directly from the transactions occurring in the Ripple Network, Company should advise users of Ripple Credits to evaluate sales tax obligations related to accepting Ripple Credits and engaging in transactions involving Third Party Ripple Currencies just as such users would evaluate sales tax for transactions involving money.

### 10. Other Considerations

There are a number of other legal and non-legal issues that Founders and Company should consider when forming the Opencoin product and structure, including the following:

> **a. Foreign Regulation.** While this memorandum discusses United States regulation, Founders and Company should consider the risks of violating similar laws in all nations in which Ripple Credits are promoted, sold, and exchanged.

---

[97] "Is Ripple Taxable?," *available at* http://ripple-project.org/Main/FAQ#Is_Ripple_taxable.

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099488

*PRIVILEGED / CONFIDENTIAL*

For instance, Founders should consult with European counsel to determine whether Ripple Credits will be considered e-money and therefore regulated and requiring registration under the Electronic Money Institutions Directive ("**E-Money Directive**").  The E-Money Directive defines electronic money as "electronically, including magnetically, stored monetary value as represented by a claim on the issuer which is issued on receipt of funds for the purpose of making payment transactions…and which is accepted by a natural or legal person other than the electronic money issuer."[98]  The risk of regulation likely is low because the value of Ripple Credits will be based on the Opencoin economy but not backed by Founders or Company, and therefore there will be no claim on the issuer.  However, the risk should not be completely ignored because there are commentators who believe that crypto virtual currency, such as Opencoin, would be subject to the E-Money Directive.[99]

    **b. Hackers/security**.  Founders and Company should consider risks associated with security breaches or hackers breaking into the Ripple Network, like what occurred with Bitcoin and Mt. Gox.  While Founders and Company themselves may not have specific disclosure obligations arising from a breach resulting in a release of personal information, exchanges and other third party participants who aggregate and store Ripple Credits on behalf of individuals may face risk.

    **c. Promotional Ripple Credits and Expiration.**  To the extent that Ripple Credits are considered prepaid access, Founders can issue unpaid, promotional Ripple Credits, which could expire, provided that proper disclosure is made.  To the extent that Ripple Credits are considered prepaid access, they may also be regulated by the Federal CARD Act as a "general-use prepaid card," which is "a card, code or other device that is (i) issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in a specified amount, whether or not that amount may be increased or reloaded, in exchange for payment; and (ii) redeemable upon presentation at multiple, unaffiliated merchants for goods or services, or usable at automated teller machines."[100]  If Ripple Credits are general-use prepaid cards, then there will be limitations on expiring or imposing fees.  However, Ripple Credits that are issued in connection with loyalty, award or promotional programs may expire provided that the expiration date is stated on the front of the card and it is indicated on the front of the card that it is issued for a promotional, award or loyalty purpose.[101]  Because Ripple Credits will not be issued in the form of a card, disclosure would need to be in a comparable location on the user interface that the holders of Ripple Credits view.  Additionally, many state gift certificate statutes require issuers of

---

[98] Directive 2009/110/EC, *Second Electronic Money Directive*, Tit. I, Art. 2, § 3 (2009).
[99] *See, e.g.*, Edwin Jacobs, *Bitcoin: A Bit Too Far?*, Journal of Internet Banking and Commerce, vol. 16, no. 2 (August 2011).
[100] 12 C.F.R. § 205.20(a)(3).
[101] 12 C.F.R. § 205.20(a)(4).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC. RPLI_SEC 0099489

*PRIVILEGED / CONFIDENTIAL*

promotional gift certificates or cards to indicate the expiration date on the front of the gift certificate or card, in capital letters, and in at least 10 point font.[102]

**d.   Employee Payment/Wage & Hour.**  Founders and Company will need to compensate the dedicated team of developers and business people in compliance with wage and hour requirements.  Founders have indicated that Company will employ a dedicated team of developers and business people who support the Ripple Network.  Founders and Company will need to consider how this team will be compensated.  Having a volunteer team or compensating the team with Ripple Credits will both likely result in the violation of state wage and hour laws.  These laws generally require employers to pay non-exempt employees minimum amounts for hours worked, and these amounts can not generally be paid in anything other than legal tender of the United States or something readily convertible thereto.[103]

---

[102] *See, e.g.,* Cal. Civ. Code Civ. § 1749.5(d) (explaining that consumer protection laws do not apply to gift certificates distributed pursuant to an award, loyalty, or promotional program without any money or thing of value being exchanged if the expiration dates are printed on the face, in capital letters, in at least 10 point font).
[103] *See e.g.,* RCW 49.46.010(2).

79435-0001/ADMIN31002299.6

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0099490