UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
    :
                         Plaintiff,    :       20 Civ. 10832 (AT) (SN)
    :
               - against -      :       ECF Case
    :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,    :
    :
                   Defendants.    :
    :
-------------------------------------------------------------------------x

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS CHRISTIAN A. LARSEN'S AND BRADLEY GARLINGHOUSE'S MOTIONS TO DISMISS

Jorge G. Tenreiro
Dugan Bliss
Robert S. Moye
Benjamin Hanauer
Mark R. Sylvester
Daphna A. Waxman
Jon A. Daniels
Ladan F. Stewart

*Counsel for the Plaintiff*
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

May 14, 2021

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iv

PRELIMINARY STATEMENT .........................................................................................1

BACKGROUND: LEGAL FRAMEWORK AND DIGITAL ASSETS ...................................4

STATEMENT OF FACTS ..................................................................................................5

I.  BACKGROUND: RIPPLE, LARSEN, AND GARLINGHOUSE ........................................5

II.  RIPPLE OFFERED AND SOLD SECURITIES  WITHOUT A REGISTRATION
STATEMENT. ....................................................................................................................5

III.  DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THE UNLAWFUL
NATURE OF RIPPLE'S OFFERS AND SALES OF XRP. .......................................................6

    A.  Larsen Received and Ignored Specific Warnings that Offers and Sales of
    XRP Could Constitute Offers and Sales of Securities.........................................................6

        1.  Larsen Has Experience with SEC Claims of Section 5 Violations......................6

        2.  Larsen Received Two Legal Memos
         ..........................6

        3.  Larsen Knew or Recklessly Disregarded that XRP Was Being
        Offered and Sold
         ..................................................................................................10

        4.  Larsen Received Additional Warnings that XRP Was a Security. .......................11

    B.  Garlinghouse Knew or Recklessly Disregarded that Ripple's Offer and Sales
    of XRP Had the Characteristics of a Securities Offering...............................................11

        1.  Garlinghouse Knew or Recklessly Disregarded the Facts that Made
        Ripple's Offers and Sales of XRP the Offers and Sales of Securities...............11

        2.  Garlinghouse Knew or Recklessly Disregarded the Legal Risks. .......................12

IV.  DEFENDANTS SUBSTANTIALLY ASSISTED RIPPLE'S VIOLATIONS. ..................15

    A.  Defendants Actively Participated in Ripple's Unregistered Public
    Distribution of Securities with Their Own Offers and Sales of XRP from the
    United States.....................................................................................................................15

        1.  Defendants Shared Ripple's Goal of Selling as Much XRP as Possible
        into Markets They Created and Actively Participated in that
        Endeavor....................................................................................................................15

        2.  Defendants' Offers and Sales of XRP Were an Integral Part of
        Ripple's Public Distribution of XRP. .......................................................................16

    B.  Defendants Provided Additional Substantial Assistance to Ripple's
    Violations. .........................................................................................................................17

1.  Larsen ..................................................................................... 17

2.  Garlinghouse .......................................................................... 21

STANDARD OF REVIEW ............................................................................ 23

ARGUMENT ................................................................................................ 24

I.  THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS AIDED AND ABETTED RIPPLE'S VIOLATIONS OF SECURITIES ACT SECTION 5. ........ 24

A.  The Complaint Adequately Pleads That Defendants Knew or Recklessly Disregarded Ripple's Section 5 Violation. ................................................. 25

1.  The Complaint Pleads Sufficient Facts to Infer that Defendants Acted with a High Degree of Scienter. .................................................. 25

2.  Defendants' Contrary Arguments Misapply the Law. ............................ 28

B.  The Complaint Adequately Alleges That Larsen Substantially Assisted Ripple's Violations. ............................................................. 34

II.  THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS ENGAGED IN DOMESTIC OFFERS AND SALES OF SECURITIES. ......................... 36

A.  The Focus of the Securities Act's Registration Requirements Determines If a Permissible, Domestic Application of the Statute Is at Issue. ....................... 38

B.  Securities Act Section 5 Focuses Broadly on Every Aspect of a Public Offering, Not Just Particular Sales. ................................................ 39

1.  The Term "Offer" Goes Beyond its Common Law, Contractual Concept. ........................................................................................ 41

2.  Section 5 and Section 4 Together Make Clear that the Registration Requirement's Focus Is All Aspects of Public Offerings. ................... 43

C.  *Morrison* Explicitly Recognized that Regulation S Defines What Constitutes a "Domestic" Public Offering under Securities Act Section 5. .......................... 44

D.  Defendants Engaged in a Public Distribution of Securities That Failed to Comply with Regulation S. ........................................................ 45

E.  *Morrison* and the Securities Act Belie Defendants' Other Arguments. ......................... 48

F.  Even if *Morrison*'s Transactional Test Applied, the Complaint Pleads Transactions that Satisfy It. ....................................................... 52

1.  *Morrison*'s Transactional Test Must Apply to All Sales in Defendants' Public Distribution of XRP. ................................................... 52

2.  The *Morrison* Transactional Test is Satisfied Even with Respect to Each Individual Sale by the U.S. Defendants on non-U.S. Platforms. .............. 53

III.  THE CLAIMS FOR MONETARY RELIEF AGAINST LARSEN ARE TIMELY. ......... 59

CONCLUSION ................................................................................................ 60

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
  677 F.3d 60 (2d Cir. 2012) ............................................................................. 53, 55

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1982) ............................................................................. 35, 36

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................ 23

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
  493 F.3d 87 (2d Cir. 2007) ............................................................................ 24

*Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.,*
  ___ Fed. App'x ___, 2021 WL 825743, (2d Cir. Mar. 4, 2021) ..................... 54

*Barker v. Henderson, Franklin, Starnes & Holt,*
  797 F.2d 490 (7th Cir. 1986) ......................................................................... 26

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................ 24

*Blue Chip Stamps v. Manor Drug Stores,*
  421 U.S. 723 (1975) ........................................................................................ 39

*Cavello Bay Reinsurance Ltd. v. Shubin Stein,*
  986 F.3d 161 (2d Cir. 2011) .......................................................................... 51

*Chris-Craft Indus. v. Bangor Punta Corp.,*
  426 F.2d 569 (2d Cir. 1970) ....................................................................... 41, 42

*Diskin v. Lomasney & Co.,*
  452 F.2d 871 (2d Cir. 1971) .......................................................................... 41

*ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. J.P. Morgan Chase Co.,*
  553 F.3d 187 (2d Cir. 2009) .......................................................................... 27

*Gabelli v. SEC,*
  568 U.S. 442 (2013) ........................................................................ 59 Fn. 20, 60

*Geiger v. SEC,*
  363 F.3d 481 (D.C. Cir. 2004) ................................................................... 44, 53

*Gilligan, Will & Co. v. S.E.C.,*
  267 F.2d 461 (2nd Cir. 1959) ................................................................ 44 Fn. 14

*Giunta v. Dingman,*
    893 F.3d 73 (2d Cir. 2018) ..................................................................................56

*Glen-Arden Commodities, Inc. v. Costantino,*
    493 F.2d 1027 (2d Cir. 1974) ..............................................................................42

*Global-Tech Appliances, Inc. v. SEB S.A.,*
    563 U.S. 754 (2011) ............................................................................................31

*Gustafson v. Alloyd Co. Inc.,*
    513 U.S. 561 (1995) ............................................................................................39

*Herod's Stone Design v. Mediterranean Shipping Co. S.A.,*
    434 F. Supp. 3d 142 (S.D.N.Y. 2020).................................................................24

*In re Refco Inc. Secs. Litig.,*
    No. 08 Civ. 3065, 2012 WL 996910 (S.D.N.Y. Jan. 17, 2012) ..........................36

*In re Tezos Sec. Litig.,*
    No. 17 Civ. 6779, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018).........................58

*In re Vivendi Universal, S.A. Sec. Litig.,*
    765 F. Supp. 2d 512 (S.D.N.Y. 2011).................................................................57

*IIT v. Cornfeld,*
    619 F.2d 909 (2d Cir.1980) .......................................................................27 Fn. 8

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001) ...............................................................................27

*Kokesh v. SEC,*
    137 S. Ct. 1635 (2017) ............................................................................ 59 Fn. 20

*Loginovskaya v. Batratchenko,*
    764 F.3d 266 (2d Cir. 2014) ...................................................................... 53, 54

*Martin v. Pepsi Bottling Co.,*
    639 F. Supp. 931 (D. Md. 1986)...............................................................27 Fn. 8

*Monsen v. Consol. Dressed Beef Co., Inc.,*
    579 F.2d 793 (3d Cir. 1978) ...............................................................................24

*Morrison v. National Australia Bank Ltd.,*
    561 U.S. 247 (2010)......................................................................................*passim*

*Myun-Uk Choi v. Tower Rsch. Cap. LLC,*
    890 F.3d 60 (2d Cir. 2018) ...............................................................53 Fn. 17, 54, 57

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ...............................................................................27

*Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE,*
    763 F.3d 198 (2d Cir. 2014) ....................................................................................51

*Pinter v. Dahl,*
    486 U.S. 622 (1988) ......................................................................................... 41, 48

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.,*
    753 F. Supp. 2d 166 (S.D.N.Y. 2010) .....................................................................57

*R.A. Holman & Co., Inv. v. SEC,*
    366 F.2d 446 (2d Cir. 1966) ....................................................................................44

*Revak v. SEC Realty Corp.,*
    18 F.3d 81 (2d Cir. 1994) .......................................................................................8, 9

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) .................................................................................................8, 9

*RJR Nabisco, Inc. v. European Community,*
    136 S. Ct. 2090 (2016) ..............................................................................38, 39, 49

*Rubin v. United States,*
    449 U.S. 424 (1981) .........................................................................40, 41, 46, 47

*Safeco Ins. Co. Am. v. Burr,*
    551 U.S. 47 (2007) ...................................................................................................32

*Schentag v. Nebgen,*
    No. 17 Civ. 8734, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) .........................51

*SEC v. Aaron,*
    605 F.2d 612 (2d Cir. 1979) ....................................................................................40

*SEC v. Ahmed,*
    308 F. Supp. 3d 628 (D. Conn. 2018) ....................................................................55

*SEC v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012) .............................................................................24, 25

*SEC v. Arvida Corp.,*
    169 F. Supp. 211 (S.D.N.Y. 1958) .........................................................................42

*SEC v. Bio Defense Corporation,*
    No. 12 Civ. 11669, 2019 WL 7578525 (D. Mass. Sept. 6, 2019), *aff'd sub nom. SEC v. Morrone*, No.
    19-2006, __ F.3d __, 2021 WL 1850551 (1st Cir. May 10, 2021) ........................51

*SEC v. Blockvest, LLC,*
    No. 18 Civ. 2287, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ....................... 41-42

*SEC v. Cavanagh,*
    1 F. Supp. 2d 337 (S.D.N.Y. 1997), *aff'd* 155 F.3d 129 (2d Cir. 1998) . 36 Fn. 12, 40, 41, 50, 59, 60

*SEC v. Cavanagh,*
   445 F.3d 105(2d Cir. 2006) ............................................................................ 36, 52

*SEC v. Chinese Consolidated Benevolent Ass'n,*
   120 F.2d 738 (2d Cir. 1941) .............................................. 40, 41, 42, 43, 44, 46

*SEC v. C.M. Joiner Leasing Co.,*
   320 U.S. 344 (1943) ............................................................................................. 42

*SEC v. Continental Commodities Corp.,*
   497 F.2d 516 (5th Cir. 1974) ............................................................................. 50

*SEC v. DiBella,*
   587 F.3d 553 (2d Cir. 2009) ......................................................................... 24, 25

SEC v. Espuelas,
   905 F. Supp. 2d 507 (S.D.N.Y. 2012) ............................................................. 29

*SEC v. Espuelas,*
   908 F. Supp. 2d 402 (S.D.N.Y. 2012) ............................................................. 30

*SEC v. Falstaff Brewing Corp.,*
   629 F.2d 62 (D.C. Cir. 1980) ...................................................................... 28, 29

*SEC v. Goldman Sachs & Co.,*
   790 F. Supp. 2d 147 (S.D.N.Y. 2011) .................................................... 50 Fn. 15

*SEC v. Holschuh,*
   694 F.2d 130 (7th Cir. 1982) ............................................................................. 40

*SEC v. Hurgin,*
   484 F. Supp. 3d 98 (S.D.N.Y. 2020) ................................................... 25, 28, 31

*SEC v. Jones,*
   300 F. Supp. 312 (D. Mass. 2018) ................................................................... 60

*SEC v. Kern,*
   425 F.3d 143 (2d Cir. 2005) ....................................................................... 44, 52

*SEC v. Kik Interactive, Inc.,*
   492 F. Supp. 3d 169 (S.D.N.Y. 2020) ............................................................. 42

*SEC v. Kokesh,*
   884 F.3d 979 (10th Cir. 2018) .......................................................................... 60

*SEC v. Mattessich,*
   407 F. Supp. 3d 264 (S.D.N.Y. 2019) ....................................................... 25, 29

*SEC v. National Securities, Inc.,*
   393 U.S. 453 (1969) ..................................................................................... 29, 50

*SEC v. North American Research Development Corporation,*
424 F.2d 63 (2d Cir. 1970) ................................................................ 26, 43, 44, 47, 59

*SEC v. Paulsen,*
No. 18 Civ. 6718, 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020) ............................30 Fn. 9

*SEC v. Paulsen,*
No. 18 Civ. 6718, 2020 WL 6263180 (S.D.N.Y. Oct. 23, 2020) .......................................25

*SEC v. Pentagon Capital Mgmt. PLC,*
725 F.3d 279 (2d Cir. 2013) ................................................................................60

*SEC v. Ralston Purina Co.,*
346 U.S. 119 (1953), *vacated on other grounds,* 446 U.S. 680 (1980) .....................................40

*SEC v. Rio Tinto plc,*
No. 17 Civ. 7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019)...................................34

*SEC v. Sason,*
433 F. Supp. 3d 496 (S.D.N.Y. 2020).......................................................................36

*SEC v. Subaye, Inc.,*
No. 13 Civ. 3114, 2014 WL 448414 (S.D.N.Y. Feb. 4, 2014) .....................................27

*SEC v. Sugarman,*
No. 19 Civ. 5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) .....................................36

*SEC v. Telegram Grp., Inc.,*
No. 19 Civ. 9439, 2020 WL 1547838 (S.D.N.Y. Apr. 1, 2020).....................................52

*SEC v. Telegram Grp., Inc.,*
448 F. Supp. 3d 352 (S.D.N.Y. 2020).......................................................................36

*SEC v. Wey,*
246 F. Supp. 3d 894 (S.D.N.Y. 2017).................................................................. 24, 36

*SEC v. W.J. Howey Co.,*
328 U.S. 293 (1946).......................................................................4, 6, 7, 9, 10, 30, 32

*Slayton v. American Express Co.,*
604 F.3d 758 (2d Cir. 2010) ............................................................................ 33, 34

*Sullivan v. Barclays PLC,*
No. 13 Civ. 2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) .................................5 Fn. 2

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007)................................................................................................27

*United States v. Brown,*
578 F.2d 1280 (9th Cir. 1978) ...............................................................................29

*United States v. Georgiou,*
    777 F.3d 125 (3d Cir. 2015) ............................................................................ 53 Fn. 17

*United States v. Leonard,*
    529 F.3d 83 (2d Cir. 2008) ........................................................................................29

*United States v. Naftalin,*
    441 U.S. 768 (1979) ............................................................................... 41, 42, 56

*United States v. Svoboda,*
    347 F.3d 471 (2d Cir. 2003) ......................................................................................31

*United States v. Vilar,*
    729 F.3d 62 (2d Cir. 2013) .................................................................................. 55, 56

*United States v. Zaslavskiy,*
    No. 17 Cr. 647, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ........................ 32-33

*United States v. Wells Fargo Bank, N.A.,*
    132 F. Supp. 3d 558 (S.D.N.Y. 2015) .............................................................. 34 Fn. 11

*Walker v. Thompson,*
    404 F. Supp. 3d 819 (S.D.N.Y. 2019) ............................................................... 5 Fn. 2

*Watson v. N.Y. Doe 1,*
    439 F. Supp. 3d 152 (S.D.N.Y. 2020) ......................................................................25

*WesternGeco LLC v. ION Geophysical Corp.,*
    138 S. Ct. 2129 (2018) .................................................................................. 39, 47, 49

**Statutes**

15 U.S.C. § 77b ........................................................................................................... 40, 41

15 U.S.C. § 77d .............................................................................................. 39-40, 42, 52

15 U.S.C. § 77e ............................................................................................................*passim*

15 U.S.C. § 77o(b) ..............................................................................................................24

15 U.S.C. § 77q(a) ................................................................................................... 49 Fn. 15

15 U.S.C. § 77l(a) ...............................................................................................................50

15 U.S.C. § 78c(a)(10) .......................................................................................................31

15 U.S.C. § 77t(d) ..............................................................................................................59

15 U.S.C. § 78e ..................................................................................................... 53 Fn. 17

15 U.S.C. §78j(b) .........................................................................................................*passim*

15 U.S.C. § 78u(d)(7) ........................................................................................................59

15 U.S.C. § 7001 et. seq.................................................................................................55, 56, 57

28 U.S.C. § 2462............................................................................................................59 Fn. 20

California Civil Code § 1633.15(d) ..............................................................................................56

**Rules**

Fed. Civ. R. P. 12(b)(6)........................................................................................................23

17 C.F.R. § 230.405.......................................................................................................15 Fn. 5

17 C.F.R. § 230.901 .....................................................................................................37, 43, 44

17 C.F.R. § 230.902.............................................................................................................45

17 C.F.R. § 230.903.............................................................................................................44, 45

**Other Authorities**

*Guidelines for the Release of Information by Issuers Whose Securities are in Registration*, Rel. 33-5180, 1971 WL 120474, (S.E.C. Aug. 1971) .........................................................................................42

H.R. Rep. No. 85, 73d Cong., 1st Sess. 15 (1933).................................................................40

*Offshore Offers and Sales*, 55 F.R. 18306-01, 18306, Rel. No. 33-6863 (S.E.C. May 2, 1990) ...... 44, 45, 47

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, 117 S.E.C. Docket 745, 2017 WL 7184670 (July 25, 2017) .........................................................13

L. Loss & J. Seligman, 2 Securities Regulation 627 (3d ed. 1989) ...........................................40

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in opposition to Defendants Christian A. Larsen's ("Larsen") and Bradley Garlinghouse's ("Garlinghouse," together "Defendants") motions to dismiss (D.E. 105, 110) ("Motions") the SEC's First Amended Complaint (D.E. 46, the "Complaint"), in accordance with the Court's Order (D.E. 154).  For the reasons set forth below, the Court should deny the Motions.[1]

## PRELIMINARY STATEMENT

The Complaint alleges that Larsen, the co-founder and first chief executive officer ("CEO") of California-based co-defendant Ripple Labs, Inc. ("Ripple"), and Garlinghouse, Ripple's current CEO, offered and sold a digital asset issued by Ripple, known as "XRP," as a security.  Defendants did not register these offers and sales with the SEC, as Congress required in Section 5 of the Securities Act of 1933 ("Securities Act") to provide investors with important information to decide whether to invest in a security.  Defendants do not contend that the Complaint fails to adequately allege that they or Ripple offered and sold XRP as "a security."  Thus the Court should assume that Ripple and Defendants did so for purposes of the Motions.

Over several years, Larsen and Garlinghouse profited by at least $450 million and $159 million, respectively, from their own unlawful sales of XRP.  Defendants' sales were an integral part of Ripple's broader scheme to distribute as much XRP into global markets as possible, including to investors in the United States and including through U.S. digital asset trading platforms, *i.e.*, "exchanges" for electronically trading digital assets.  Ripple's sales, which Larsen and Garlinghouse directed, netted Ripple an additional $1.38 billion.

Larsen and Garlinghouse engaged in this conduct despite repeated warnings that Ripple's and their own offers and sales of XRP would likely violate the federal securities laws.  Before XRP even existed, a reputable law firm warned Larsen in two legal opinions that Ripple's and Larsen's

---

[1] References to "¶ __" are to the Complaint.  "Ex. []" refers to the Exhibits attached to the Declaration of Jorge G. Tenreiro, filed herewith.  "Larsen Br." refers to the brief in support of Larsen's Motion (D.E. 106) and "Garlinghouse Br." to the brief in support of Garlinghouse's Motion (D.E. 111).

offers and sales of XRP could require registration with the SEC under certain circumstances. Larsen then proceeded to direct Ripple's and his own offers and sales of XRP in a manner that the law firm had specifically warned against doing. As Larsen later acknowledged in an email, he did so because Ripple was paying him XRP potentially worth hundreds of millions of dollars to knowingly assume the legal risk that the SEC would hold him responsible for these unlawful sales. Similarly, multiple advisors and public SEC statements about the sales of digital assets had warned Garlinghouse of the risk that Ripple's offers and sales of XRP could be deemed to be offers and sales of securities.

Nevertheless, Defendants directed and furthered Ripple's years-long venture to create and manage an active, stable trading market for XRP to increase its value, in addition to engaging in their own sales of XRP. They approved the timing, amount, and manner of Ripple's XRP offers and sales to private and public investors. And they promoted XRP as a potentially lucrative investment from which investors could profit based on efforts they promised Ripple would undertake.

The Complaint alleges that Defendants and Ripple violated Section 5 of the Securities Act through their own respective offers and sales of XRP. The Complaint further alleges that Defendants aided and abetted Ripple's violations of Securities Act Section 5. In response to these allegations, Defendants move to dismiss on several grounds.

*First*, Defendants move to dismiss the aiding-and-abetting claim against them on the ground that the Complaint fails to adequately allege that they knowingly or recklessly aided Ripple's violations of Section 5. Ignoring the extensive factual allegations that Defendants understood (or, at a minimum, recklessly disregarded) the legal consequences of their conduct, Defendants invite the Court to set aside these allegations and reach evidentiary conclusions about their state of mind—an improper exercise on a motion to dismiss.

*Second,* Larsen alone moves to dismiss the aiding-and-abetting claim on the ground that the Complaint fails to allege that he substantially assisted Ripple's violations of Section 5. Again, Larsen

asks the Court to ignore the detailed allegations that he directed and assisted Ripple's scheme to distribute as much XRP into the domestic and global markets as possible, including through his own XRP offers and sales and through steps he took to direct Ripple's XRP marketing and sales.

*Third*, Defendants move to dismiss on the ground that the unlawful offers and sales of XRP—which took place from the U.S., were marketed to U.S. investors, were offered and sold in part through U.S. trading platforms, and were in fact sold to U.S. investors—were not "domestic" U.S. offers and sales covered by Securities Act Section 5. Defendants argue that the conduct alleged is instead "extraterritorial" and thus foreign conduct under *Morrison v. National Australia Bank*, 561 U.S. 247 (2010) ("*Morrison*"), and therefore not prohibited by Section 5. Defendants misread *Morrison*'s holding. To determine whether an alleged violation of a statute is domestic or extraterritorial, *Morrison* requires courts to analyze the statute to determine what conduct the statute seeks to regulate and what interests it seeks to protect. 561 U.S. at 267. Here, the Securities Act's proper focus is on the entire offering process by which securities flow from the hands of issuers (like Ripple) and their affiliates (like Defendants) to the hands of public investors in the market. Properly understood, nearly every single aspect of Defendants' violations occurred in the U.S. Indeed, as *Morrison* recognized, an SEC regulation, Regulation S, has long defined what constitutes a foreign offering that falls outside the domestic scope of Section 5. The Complaint alleges that Defendants and Ripple did not meet the requirements of that regulation, as Defendants do not dispute, and therefore their conduct was domestic, not extraterritorial.

*Finally*, Larsen moves to dismiss on the ground that the Complaint's requests for monetary relief against him—based on conduct that continued up until the filing of the Complaint—are time-barred. That argument, too, has no merit.

For these reasons, as discussed more fully below, Defendants' Motions should be denied.

3

**BACKGROUND: LEGAL FRAMEWORK AND DIGITAL ASSETS**

Congress enacted the Securities Act as a broad regime of full and fair disclosure, requiring an issuer (for example, a corporation that issues securities) and its control persons who offer and sell securities to the investing public to provide sufficient accurate information to allow investors to make informed investment decisions. ¶¶ 25-26. The Securities Act requires the registration of both offers and sales of an issuer's securities by the issuer and its affiliates (such as a corporation's control persons) into public markets, but exempts from registration ordinary trading transactions in the market by public investors. ¶¶ 27-29.

The definition of "securities" under the securities laws is broad and flexible. It includes "investment contracts," defined by *SEC v. W.J. Howey Co.* as an investment of money into a common enterprise with a reasonable expectation of profit from the efforts of others. 328 U.S. 293, 299, 301 (1946) ("*Howey*"). Courts have found that novel investment schemes are "investment contracts," including when they involve interests in land, animals, and online-only enterprises.

Many courts have found the existence of "investment contracts" with respect to schemes involving the offer and sale of "digital assets." "Digital assets" are assets represented by computer code and transferred on a "distributed ledger" and may be colloquially referred to as "virtual currencies," "cryptocurrencies," and digital "tokens" or "coins." ¶ 32. A "distributed ledger" or "blockchain" is a database spread across a network of computers. It records data and the changing states of the information in the ledger in theoretically unchangeable data packages (or "blocks") and typically relies on cryptography for security. ¶¶ 33-34. The "digital assets" that may be represented on such ledgers may also be "traded" on digital asset trading platforms, for other digital assets, or for fiat currency (legal tender). The digital assets may be allocated to the purchasers' accounts in the record of the platform (*i.e.*, "off-chain"), or they may also be transferred from one blockchain "address" to another, representing the change in ownership of the asset (*i.e.*, "on-chain"). ¶ 35.

4

**STATEMENT OF FACTS[2]**

## I.    BACKGROUND: RIPPLE, LARSEN, AND GARLINGHOUSE

Larsen co-founded Ripple in September 2012 as a Delaware corporation principally based in California.  ¶ 16.  Larsen served as Ripple's CEO from September 2012 through December 2016, and since then has served as executive chairman of Ripple's Board of Directors.  ¶ 18.  Garlinghouse served as Ripple's chief operating officer ("COO") from April 2015 through December 2016 and has served as Ripple's CEO from January 2017 to the present.  ¶ 17.  From 2015 through at least March 2020, Larsen and his wife sold more than 1.7 billion XRP to public investors for at least $450 million.  ¶ 86.  On December 13, 2016, Ripple granted Garlinghouse 500 million XRP in a negotiated compensation agreement and, on May 29, 2019, granted him an additional 250 million XRP.  ¶¶ 128, 129.  From April 2017 through at least October 2020, Garlinghouse profited by approximately $159 million from his own sales of XRP.  ¶¶ 87, 183.

## II.    RIPPLE OFFERED AND SOLD SECURITIES WITHOUT A REGISTRATION STATEMENT.

From 2013 to the filing of the Complaint, Ripple engaged in unregistered offers and sales of securities.  ¶ 9.  Ripple used the means and instrumentalities of interstate commerce to offer and sell XRP to investors in the U.S., without a registration statement being filed or in effect.  ¶¶ 392-94.  Ripple raised at least $1.38 billion by selling XRP without providing investors—including retail investors, in whose hands Ripple's securities ultimately came to rest—the type of financial and managerial information typically provided in such statements by hundreds of issuers every year.  *Id.*

Throughout the relevant time period, Ripple offered and sold XRP as part of "investment contracts" and thus "securities" under the Securities Act.  *E.g.*, ¶¶ 230-31, 241-42, 289-94, 315.

---

[2] This section sets forth only the facts relevant to the Motions, which are drawn from the factual allegations in the Complaint, documents incorporated by reference in the Complaint, and an SEC order the Court may take judicial notice of.  *See Walker v. Thompson*, 404 F. Supp. 3d 819, 823 (S.D.N.Y. 2019); *see also Sullivan v. Barclays PLC*, No. 13 Civ. 2811, 2017 WL 685570, at *21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of government settlement).

Among other things, Ripple and its executives promoted XRP as an investment into a common enterprise that would increase in value and price based on Ripple's efforts.  ¶¶ 104, 111, 232, 238-44, 290-357.  This included taking steps to control the supply and price of XRP and creating an active and liquid trading market for XRP—that is, a market in which investors could quickly and easily buy and sell XRP.  ¶¶ 230-357.  Ripple offered and sold XRP to raise the capital it needed to fund its operations.  ¶¶ 293-301.  Indeed, from 2013 through 2020, almost all of Ripple's revenues came from sales of XRP to investors.  ¶¶ 1, 5, 61, 70-72, 81.

## III.   DEFENDANTS KNEW OR RECKLESSLY DISREGARDED THE UNLAWFUL NATURE OF RIPPLE'S OFFERS AND SALES OF XRP.

### A.   Larsen Received and Ignored Specific Warnings that Offers and Sales of XRP Could Constitute Offers and Sales of Securities.

#### 1.   Larsen Has Experience with SEC Claims of Section 5 Violations.

This case is not the first time one of Larsen's businesses has faced SEC claims that the business made unregistered offers and sales of securities in violation of Securities Act Section 5.  In 2005, Larsen co-founded, and through 2011 served as the CEO of, Prosper Marketplace, Inc. ("Prosper"), against which the SEC instituted settled administrative proceedings in November 2008 for violating Section 5.  ¶ 18; *see also* Ex. A (Order Instituting Proceedings, Rel. No. 33-8984 (Nov. 24, 2008)) ("Prosper Order") at 1, 2, 6.  Prosper—presumably through Larsen, the company's then-CEO, or with his approval—consented to the entry of this order, without admitting or denying the order's non-jurisdictional findings.  Ex. A at 1, 2, 6.  The order found that Prosper's creation of an online marketplace, through which it offered and sold "notes," involved the offers and sales of "investment contracts" and thus "securities" under the Securities Act and the *Howey* test, Ex. A at 4.

#### 2.   Larsen Received Two Legal Memos ██████████████████████████ ██████████████████████.

In 2012—before Ripple or Defendants had sold any XRP to investors, ¶ 50—Larsen and other Ripple executives received two memos from a reputable law firm.  ¶¶ 52, 56.  The memos

analyzed ███████████████████ with distributing "Coins" or "Ripple Credits," as XRP was then known.  Ex. B (the "February 2012 Memo") at 1; Ex. C (the "October 2012 Memo" and, with the February 2012 Memo, the "Legal Memos").

The Legal Memos ████████████████████████████████████████████
██████████████.  In its summary, the February 2012 Memo ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
Ex. B at 2.  The summary ██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████.  *Id.* ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████.  *Id.*  Accordingly, the February 2012
Memo's ████████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████.  *Id.* at 4.[3]

In the February 2012 Memo's body, ████████████████████████████████████
████████████████████████████████████████████████████████.  *Id.* at
9. ████████████████████████████████████████████████████
████████████████████████████████████████████████████.

*First*, the February 2012 Memo ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████.  *Id.* at 9-10 & n.25.

---

[3] ████████████████████████████████████████████████████
*Id.* at 3.

*Second*, ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████ *Id.* at 10 & n.26 ██████████████████████).

*Third*, the memo made clear that, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ *Id.* at 10.

The memo explained ███████████████████████████████████

███████████████████████████████████████████████████

█████████████████████ *Id.* at 10 & n.32 ██████████████████

███).

*Fourth*, the February 2012 Memo concluded that ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████ *Id.* at 11.

In October 2012, Larsen received a second memo from the same law firm, the October

2012 Memo. ██████████████████████████████████ and reiterated many

of the February 2012 Memo's conclusions.  Based on new information, the memo assumed that

███████████████████████████████████████████████

██████████████████████████████████ Ex. C at 3.  However,

even assuming that ██████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████



*Id.* at 4.

Like the February 2012 Memo, the October 2012 Memo ████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████. *See id.* at 15-18. In relevant part, the October 2012 Memo
noted that Ripple ████████████████████████████████████████████████████
████████████████████████████████████████████████████████ *Id.* at 17.
The memo further noted that ████████████████████████████████████████████
████████████████████████████████████████████ " *Id.* And, again like the February
2012 Memo, the October 2012 Memo ██████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████ *id.* at 17-18, and (2) ████████████████████████████
████████████████████████ *Id.* at 12-13, 18-19.

Finally, the October 2012 Memo included at least two ████████████████████████
████████████████████████████████████████████████████████████
████████████. First, the memo ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████ " Ex. C at 7. The memo therefore advised ████████████████g

9

████████████████████████████ *Id.* at 16.  Second, the ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████  *Id.* at 4, 18; *see also* D.E. 131 at 7 n.3 (explaining "no-action letters").

By at least 2013, Larsen was aware of the contents of the Legal Memos.  ¶ 56.  In May 2014,

Larsen acknowledged in an email that he had received the advice in the Legal Memos.  ¶ 57.  In an

email, he explained that the lawyers who wrote the Legal Memos ████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.*; *see also* Ex. E.

### 3. Larsen Knew or Recklessly Disregarded that XRP Was Being Offered and Sold in the ████████████████████████████.

Larsen knew all the facts that made Ripple's offers and sales of XRP the offers and sales of

securities under *Howey*, and he knew or recklessly disregarded the legal consequences of these facts

████████████████████████████████████████.  *First*, Larsen knew that, ████████████████

██████████████████████, Ripple was in fact selling XRP for consideration to investors—both

because he orchestrated certain such sales and because he made his own.  ¶¶ 73, 89, 92, 98, 101-02,

112, 113, 171-79.  *Second*, given his involvement in the founding of Ripple when XRP was created,

and his own promotional statements touting the common interest between Ripple and all other XRP

holders, Larsen knew that there was a common enterprise between himself, Ripple, and all other

XRP holders, ████████████████████████████████████████████████████████

████████████████████  ¶¶ 38, 42, 44-46, 90, 293-94, 300, 313.  *Third*, Larsen knew or recklessly

disregarded that investors purchased XRP as an ████████████████████████████████████

████████████████████████████████████████████████  ¶¶ 232, 397.  For

example, on February 6, 2017, Larsen acknowledged to an "early investor in XRP" Larsen's own

view that most XRP trading was speculative:  "Most volume in the space is speculation in advance

10

of enterprise and eventually consumer flows." ¶ 389; Ex. F at 4, 5. *Fourth*, Larsen knew or recklessly disregarded that XRP investors had a reasonable expectation of profit from Ripple's efforts—indeed, he fueled such expectations with his own actions and statements. ¶¶ 242, 246, 289.

### 4. Larsen Received Additional Warnings that XRP Was a Security.

███████████████, Larsen received additional warnings that XRP could be subject to the federal securities laws, including because XRP was not a "currency" and because, even if it was, it could still be a security under the federal securities laws. ¶ 399. On November 11, 2013, Ripple's accountants sent Larsen a draft memo regarding certain U.S. tax considerations for Ripple and XRP. ¶ 400. The memo explained that XRP was likely not currency under federal income tax laws, principally because XRP "is not considered legal tender in the U.S." *Id.* The memo also explained that "'virtual' currency" like XRP was not traditional currency under guidance issued by the Financial Crimes Enforcement Network ("FinCEN") because XRP was not legal tender in any jurisdiction. *Id.*

On January 5, 2015, the head of an entity looking to establish a private investment fund for XRP forwarded to Larsen an email from the fund's attorney advising that even a virtual currency can be packaged into a security. ¶ 401. On March 9, 2016, while Larsen was CEO, Ripple's attorneys wrote to the New York Department of Financial Services stating that "Ripple consider[s] XRP a digital asset, not a currency," and that "XRP is not intended to be used as a currency." ¶ 402.

### B. Garlinghouse Knew or Recklessly Disregarded that Ripple's Offer and Sales of XRP Had the Characteristics of a Securities Offering.

#### 1. Garlinghouse Knew or Recklessly Disregarded the Facts that Made Ripple's Offers and Sales of XRP the Offers and Sales of Securities.

From the outset of his employment at Ripple in 2015 while he was COO, Garlinghouse began to oversee and direct Ripple's decisions about offers and sales of XRP and understood that sales of XRP drove Ripple's revenues. ¶¶ 405, 417. Moreover, at all relevant times, Garlinghouse

knew or recklessly disregarded all the facts that make Ripple's offers and sales of XRP the offers and sales of securities, because he actively and repeatedly promoted XRP as an investment of money into a common enterprise with a reasonable expectation of profits from Ripple's efforts. *First*, Garlinghouse knew that both he and Ripple sold XRP for money and other consideration because he specifically approved and directed many such sales. *E.g.*, ¶¶ 98, 101, 104, 110-11, 118, 120, 199, 205, 207, 212, 219. *Second*, Garlinghouse knew that Ripple and all other XRP investors shared a common interest, and he actively touted these common interests and actively encouraged investors to view their economic interests as aligned with Ripple's. *E.g.*, ¶¶ 253, 293, 306-11. *Third*, Garlinghouse knew that investors purchased XRP with an expectation of profit, in part because he himself encouraged such expectations, including by repeatedly touting how he was "very, very, very long XRP." ¶ 347; *see also* ¶¶ 329-30, 334, 336, 338, 342-46, 348-49. In fact, Garlinghouse acknowledged in an October 2019 speech that people are "speculating on digital assets" and that "99.9% of all crypto trading today is just speculation" by profit-seekers, a factor he knew could lead to a determination that XRP was a security. ¶ 421. *Finally*, Garlinghouse knew that investors' expectation of profits were tethered to Ripples' efforts, because he himself promised and touted such efforts, such as by touting Ripple's and its executives' "track record of being good stewards of XRP." ¶ 253; *see also* ¶¶ 242, 254-56, 260-62, 266, 278-79; Ex. G at 2.

### 2. Garlinghouse Knew or Recklessly Disregarded the Legal Risks.

Garlinghouse knew not only the *facts* of Ripple's underlying violations but also knew or recklessly disregarded the specific legal risks Ripple's conduct entailed. As reflected in his numerous public statements, Garlinghouse understood that the digital asset space entails risks relating to the application of the federal securities laws. ¶ 405. Also, in an email in June 2015, Garlinghouse conceded that Ripple could not distinguish between sales to speculators (investors) and consumers and wrote that it was "not clear to [him]…how one would reasonably discern…between a

12

speculator and a consumer." ¶ 406.  Next, on March 11, 2017, Ripple's chief compliance officer

("CCO") explained to Garlinghouse in an email that "XRP certainly has some 'securities-type'

characteristics and we do need to hone our playbook/messaging." ¶ 407.  On April 16, 2017, he

was similarly advised by e-mail that the CCO "want[ed] to make sure the verbiage [in employee offer

letters] doesn't put us at risk of XRP sounding like a security." ¶ 408.

In July 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities*

*Exchange Act of 1934: The DAO*, where the SEC "advise[d] those who would use…distributed ledger

or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with

the U.S. federal securities laws." 117 S.E.C. Docket 745, 2017 WL 7184670, at *1 (July 25, 2017)

("DAO Report").  Garlinghouse read the report, demonstrating his awareness that the securities

laws could apply to the offer and sale of digital assets, and commented on Ripple's website after it

was issued: "I say, if it looks like a duck and quacks like a duck then let's regulate it like a duck."

¶ 409.  Yet Garlinghouse continued to make XRP sound like a security.  ¶¶ 223, 410.  For example,

Garlinghouse boasted later in 2017 about being "very long" XRP—a term used for stock or other

securities holdings to mean that an investor's position will increase in value if the price of the

security rises.  ¶¶ 7, 347.  Garlinghouse made similar comments about being "very long" XRP when

Ripple announced in 2017 that it would place 55 billion XRP into an escrow (the "XRP Escrow"),

meant to stabilize XRP's price and assuage investor concerns.  ¶¶ 223, 410.

Garlinghouse continued to stay abreast of regulatory developments in the digital asset space

after the DAO Report because he understood that it was critical to Ripple's business that XRP *not*

be deemed a security.  On December 11, 2017, for example, Ripple's public relations firm emailed

him to notify him to "call…out" a recent statement by the then-SEC Chairman that "[m]erely calling

a token a 'utility' token or structuring it to provide some utility does not prevent the token" from

being a security, given that it "had been a concern to have XRP considered a security." ¶ 411.

13

Garlinghouse demonstrated his awareness of some of the facts that could result in offers and sales of XRP being securities and the potential legal ramifications of those facts at other moments. For example, in January 2018, Garlinghouse commented on an internal Ripple draft document that XRP should not be promoted as an investment, ¶ 412, even though he was doing that very thing on Twitter and in other public forums around the time. ¶¶ 306-11. In a Yahoo! Finance interview in February 2018, Garlinghouse acknowledged his understanding that "if there is not a real use case then it's really a securities offering," while knowing or recklessly disregarding that none of Ripple's sales of XRP up to that point were for XRP's "use," other than as an investment. ¶ 413. In the interview, Garlinghouse also characterized "people in the crypto space talking about 'regulatory uncertainty'" as really saying "more often than not that means 'I disagree with the regulatory certainty so I'm going to call it regulatory uncertainty.'" *Id.*

Finally, Garlinghouse was aware of the keen interest other market participants—especially the digital asset trading platforms that Ripple and Garlinghouse had repeatedly tried to get to "list" XRP for trading—had in the regulatory status of XRP under the federal securities laws. At least four digital asset trading platforms incorporated in the U.S. asked Ripple for a legal opinion as to the status of XRP under the federal securities laws. ¶ 415. Garlinghouse knew that a determination that XRP was a security could hurt Ripple's ability to continue raising capital by selling XRP. ¶¶ 416-17. On January 11, 2018, Garlinghouse signed Ripple's application with a digital asset trading platform whose principal place of business is in California ("Platform A") to make XRP available for trading. ¶ 414. The application represented that "[w]e understand that whether or not a digital asset may be considered a security is an important consideration for many in the digital asset ecosystem." *Id.* Shortly afterwards, as Defendants were told in a July 14, 2018 email, at least one other U.S. digital asset trading platform declined to make XRP available for trading on its platform because Ripple could not provide a legal opinion that XRP was not a security under federal law. ¶ 415.

Not surprisingly, given his knowledge as described above, when Garlinghouse (accompanied by Larsen) met with one of Ripple's equity investors in 2018, he told the investor that he could "[ ]not guarantee" that XRP would not be deemed a security by the SEC.  ¶ 420.

## IV.   DEFENDANTS SUBSTANTIALLY ASSISTED RIPPLE'S VIOLATIONS.

### A.   Defendants Actively Participated in Ripple's Unregistered Public Distribution of Securities with Their Own Offers and Sales of XRP from the United States.

Ripple's lack of funds and its stated business goal of finding a "use" for XRP compelled Ripple to sell as much XRP as possible to fund Ripple's operations, ¶¶ 50, 65-69, 79-91, and create an active, liquid trading market for the asset.  ¶¶ 68-71, 83, 89, 190.  To inspire investor confidence in this market, Ripple ensured that its sales would not decrease XRP's price.  *E.g.*, ¶¶ 193-229.[4] Beginning in 2015, Defendants, while Ripple's affiliates, actively participated in and assisted Ripple in achieving these goals—which Defendants shared with Ripple—by engaging in their own, concurrent offers and sales of XRP, while also ensuring that their sales would not decrease XRP's price.  ¶¶ 85-86, 173, 181-82, 188.[5]

#### 1.   Defendants Shared Ripple's Goal of Selling as Much XRP as Possible into Markets They Created and Actively Participated in that Endeavor.

Larsen (beginning in 2015) and Garlinghouse (beginning in 2017) directly participated in and assisted Ripple's XRP offering by offering and selling their own holdings of XRP into the open market, typically using the same distribution methods as Ripple.  ¶ 85.  Between the two of them, Larsen and Garlinghouse profited by more than $600 million from their own XRP sales.  ¶¶ 86-87. Defendants' offers and sales of XRP occurred in coordination with Ripple's efforts to develop and maintain a liquid market for XRP.  ¶¶ 173, 182.  Ripple's offers and sales of XRP took many

---

[4] Although Garlinghouse has not moved to dismiss the Complaint for failure to plead his substantial assistance (only Larsen has), this section summarizes the Complaint's allegations as to substantial assistance by each of them.  This section does so as to Garlinghouse to provide background necessary to explain allegations of his knowledge or recklessness and as to both Defendants to show that Defendants engaged in domestic offers and sales of securities.
[5] Under the Securities Act, an "affiliate" is a person who controls another person or entity.  *See* 17 C.F.R. § 230.405.

forms—for example, Ripple used four market makers with a presence in the U.S. to sell to the public, one of which Defendants also used to sell their own XRP to the public. ¶¶ 95-96, 183. Defendants' own offers and sales occurred on at least four U.S.-based digital asset trading platforms and other non-U.S.-based digital asset trading platforms. ¶¶ 177, 186.

Both Defendants tried to maximize their profits from their XRP sales while not depressing the price of XRP. ¶ 173. To do that, they monitored the timing and amount of their XRP sales and purchases, sometimes to coincide with strategic announcements about Ripple or XRP. ¶¶ 173, 182, 190-92. In fact, in an email to an investor, Larsen explicitly explained that his own personal sales of XRP were in line with Ripple's overall goal "to have widely held assets" in the market. ¶ 179.

Larsen directed significant efforts to monitor, manage, and impact the XRP trading markets, including the trading price and volume of XRP. *E.g.*, ¶¶ 193-194, 199, 205, 207, 218. Garlinghouse did the same. ¶¶ 193-194, 199, 205, 207, 211, 212, 218, 219, 220. For example, after consultation with Larsen, Garlinghouse gave the "go ahead" to "keep the buying [of XRP] light [the day after a Ripple news announcement] and then do the bigger slug starting Sunday" in 2016. ¶ 207. Garlinghouse also ensured that Ripple placed restrictions on sales of XRP by Larsen's co-founder to quell concerns that such sales would negatively impact XRP's market trading, ¶ 211, and instructed Ripple employees to "proactively" try to increase speculative trading with positive XRP news. ¶ 212.

### 2. Defendants' Offers and Sales of XRP Were an Integral Part of Ripple's Public Distribution of XRP.

Both Defendants made unregistered offers and sales of XRP to investors all over the world, including in the U.S., and did not restrict non-U.S. purchasers of their XRP from distributing it to investors in the U.S. ¶ 174 (Larsen); ¶ 184 (Garlinghouse). Both directed their offers and sales of XRP from within the U.S. and to U.S. persons. ¶¶ 176, 178 (Larsen); ¶¶ 184, 187 (Garlinghouse). Both engaged in significant publicity efforts, directed at U.S. markets, regarding the desirability of purchasing XRP as investments, including by posting articles on Ripple's website, Tweeting about

16

XRP, or giving interviews in Ripple's YouTube channel or U.S. financial news programs. *E.g.*, ¶¶ 113, 174, 177-78, 265, 300 (Larsen); 184, 186-87, 253-256, 261-62, 266, 278-79, 307-11, 326, 337, 345-349 (Garlinghouse); 60, 115-16, 119, 160, 190, 193 (both). Defendants' directed selling efforts into the U.S., in tandem with Ripple's, were marketed and aimed at investors, including U.S. investors. *E.g.*, ¶¶ 197-202, 217, 257-29, 264, 267-68, 271-72, 275, 301, 323-34, 331-36, 340 (efforts by other Ripple executives).

Both Defendants' XRP transactions occurred on a variety of digital asset trading platforms, including four incorporated in the U.S. and a fifth principally based in New York. ¶¶ 177, 186. Defendants also traded XRP on some digital asset trading platforms operated by non-U.S. companies, but, with respect to one such platform, both Defendants opened their accounts with the platform's U.S.-based wholly-owned subsidiary, and, with respect to another such platform, it appears to have used U.S.-based electronic resources to execute Defendants' trades. *Id.*

Even Defendants' other XRP transactions on non-U.S. digital asset platforms had a significant U.S.-based component. XRP are digital assets that exist on a distributed ledger (the XRP Ledger) Ripple created. Ripple or other U.S.-based entities run at least 40% of the "nodes" necessary to operate this blockchain and thus transfer ownership of XRP that changes hands (to the extent the transactions occur "on-chain," meaning transferred from one blockchain address to another). ¶¶ 32-35, 39-41. And, many of these platforms do not restrict access to U.S. persons.

B. **Defendants Provided Additional Substantial Assistance to Ripple's Violations.**

In addition to assisting Ripple's violations by making their own, parallel, coordinated sales of XRP, *see supra* Section I.A, Defendants substantially assisted Ripple's violations in other ways.

1. **Larsen**

In addition to his own sales, Larsen provided substantial assistance to Ripple's unregistered offers and sales by developing and implementing strategies to further XRP's distribution, negotiating

certain XRP sales, approving decisions to sell XRP into the market, and making promotional statements and speaking to investors about buying XRP. ¶ 403.

> ### a.   Larsen Co-Founded Ripple and, as its CEO, Was Responsible for its Strategy.

Ripple was founded with a fixed supply of 100 billion XRP. ¶¶ 44, 45. Shortly after founding Ripple in December 2012, Larsen, with his co-founder and another person, transferred 80 billion XRP to Ripple and the remaining 20 billion XRP to themselves, with Larsen receiving 9 billion XRP. ¶¶ 45, 46. After the transfer, Ripple and its founders controlled 100% of XRP. ¶ 46. Larsen and his co-founder created Ripple to, among other things, distribute XRP. ¶ 47.

As CEO, Larsen ran Ripple's day-to-day operations and was responsible for all aspects of manners and strategy and for the growth of and investment in the company. ¶ 43. Larsen solicited and participated in meetings with current and prospective Ripple equity and XRP investors and regularly updated Ripple's Board of Directors and shareholders. *Id.* As chairman of the Board, Larsen was consulted on the timing and amounts of unregistered offers and sales of XRP. ¶ 76.

> ### b.   Larsen Substantially Assisted Ripple in Creating a Market for XRP in the United States and Abroad and in Distributing XRP into those Markets.

From 2013 through 2014, Ripple and Larsen made efforts to create a market for XRP by having Ripple distribute approximately 12.5 billion XRP through "bounty programs" that paid programmers compensation for reporting problems in the XRP Ledger's code. ¶ 61. To do so, Ripple distributed small amounts of XRP (typically between 100 and 1,000 XRP per transaction) to anonymous developers and others to establish a trading market for XRP. *Id.* At the same time, Ripple began to make public statements about XRP that began to create in investors an expectation of profit based on Ripple's efforts. ¶¶ 62-63.

By at least late 2013, Ripple and Larsen viewed the "Goal of Distribution" for XRP as achieving "Network Growth" and "Rais[ing] funds for Ripple Labs operations," as reflected in at

least one internal Ripple document entitled the "XRP Distribution Framework." ¶ 65.  In August 2013, Ripple started making unregistered offers and sales of XRP in exchange for fiat currencies or digital assets such as Bitcoin.  ¶ 72.  Larsen orchestrated the initial stage of Ripple's unregistered offers and sales of XRP by approving the timing and amount of offers and sales to: (1) purchasers in the open market ("Market Sales"); (2) investment funds, wealthy individuals, or other sophisticated investors ("Institutional Sales"); and (3) others enlisted to assist Ripple's efforts to develop an XRP market (the "Other XRP Distributions").  ¶ 73.  From 2013 through 2019, to fund its operations, Ripple sold at least 3.9 billion XRP through Market Sales for approximately $763 million.  ¶ 80. From 2013 through the end of the third quarter of 2020, Ripple sold at least 4.9 billion XRP through Institutional Sales for approximately $624 million, also to fund Ripple's operations.  ¶ 81. Since 2013, Ripple has disbursed at least 4.05 billion XRP (valued at least $500 million) through Other XRP Distributions.  ¶ 84.

  *Market Sales.*  As CEO, Larsen initiated and approved Ripple's Market Sales of XRP.  ¶ 92. While he was CEO, Larsen had and exercised final decision-making authority over which trading venues (such as which digital asset platform) to use for Market Sales and how much XRP to sell on a particular venue, which Ripple typically set as an overall percentage of XRP's daily trading volume. ¶ 98.  As Ripple explained in June 2018 to a New York-based investment firm when the firm was considering the creation of an XRP-based fund, the "XRP Sales Committee consisting of Brad Garlinghouse (CEO), Chris Larsen (Co-founder and Executive Chairman)" and two other individuals at Ripple "make[] XRP distribution and sales decisions at the company."  ¶ 75.  Ripple conducted the Market Sales by paying at least four entities commissions, paid in XRP, for executing Ripple's XRP sales to the public on digital asset trading platforms, mostly through a global digital asset trading firm with a U.S. office (the "Market Maker").  ¶¶ 95, 96.[6]

---

[6] A "market maker" is a firm that stands ready to buy or sell a security at publicly quoted prices.

Ripple employees or the Market Marker sought Larsen's approval as to parameters for conducting Ripple's Market Sales. ¶ 100. For example, in mid-December 2015, Ripple's then-chief financial officer (the "CFO") informed Larsen and Garlinghouse that the Market Sales had been paused due to a drop in XRP price but suggested the following day that the sales be restarted. Larsen instead instructed the CFO to "keep paused for now" and "[w]ait until [the] market had recovered from this mistake," though he approved re-starting sales once he learned XRP's price had stabilized. *Id.* Similarly, in April 2016, the CFO emailed Larsen and Garlinghouse about continued "downward pressure on the price of XRP" and suggested having the Market Maker "adjust down a bit our net sell target for a few days to see if we can help stabilize and/or increase the XRP price." ¶ 101. Larsen responded, "Yes – let's adj[ust]."

*Institutional Sales.* Since at least 2013, Ripple and Larsen oversaw Institutional Sales to obtain essential funding for Ripple's operations and develop a speculative trading market in XRP. ¶ 102. Larsen played a significant role in negotiating and approving Ripple's Institutional Sales and other offers and sales of XRP to institutional investors. ¶ 110. For example, Larsen: (1) in April 2016, approved the sale of XRP to an institutional investor that describes itself as a "full-service digital currency prime broker.," who ultimately bought approximately 115 million XRP, ¶¶ 115-16; (2) in 2016, signed an agreement with a firm giving it an option to buy up to 5 billion XRP at a discounted price in exchange for efforts to help Ripple develop a "use" for XRP, ¶ 153; and (3) in 2017, Larsen met with "a $12B [$12 billion] alternative asset hedge fund" that bought approximately 14.8 million XRP, ¶¶ 113-14.[7]

### c.    Larsen Substantially Assisted Ripple by Promoting XRP.

Larsen was involved in efforts to promote XRP while and after he was CEO. ¶ 168. In a February 19, 2014 interview posted online, Larsen explained that one of Ripple's "key roles is

---

[7] Larsen also donated one billion of his own XRP to an entity whose sales of approximately 639 million XRP into the public he coordinated to further Ripple's goal of achieving widespread trading of XRP. ¶¶ 136-40.

making sure that we distribute [XRP] as broadly in a way that adds as much utility and liquidity as we possibly can." ¶ 265. He stated that he thought "our incentives are very well aligned…that for Ripple Labs to do well we have to do a very good job in protecting the value of XRP and the value of the network, and that really is the guiding principle here in our distribution of XRP." *Id.*

In its 2014 Promotional Document, Ripple explained its "plans to retain 25% of all XRP issued to fund operations (and hopefully turn a profit)." ¶ 299. Larsen similarly explained, in an online interview dated April 14, 2014, that Ripple was "keeping 25% of…XRP…to cover the bills." ¶ 300. Larsen also explained that Ripple was "keeping 25% of those XRP, and using the rest of it to incent market makers, gateways, consumers to come onto the protocol." ¶ 168.

Larsen was also instrumental to the formation of an escrow (the "XRP Escrow") that Ripple created for its large XRP holdings in order to assuage investor concern that Ripple's sales could cause XRP's price to crash. ¶¶ 221, 223. Larsen helped create the XRP Escrow by developing and approving the idea, which Ripple promoted as beneficial to XRP investors. ¶¶ 224, 228.

### 2. Garlinghouse

Starting at least by 2016, Garlinghouse began to oversee, direct, and lead Ripple's efforts to make XRP available for purchasers to buy and sell on digital asset trading platforms incorporated in the U.S. and abroad. ¶ 154. Ripple and Garlinghouse engaged in these efforts because they believed that making XRP available on digital asset trading platforms was critical to all XRP holders' ability to sell XRP into the market at higher prices. ¶¶ 155, 160. Garlinghouse negotiated deals with several platforms to list XRP so that XRP could be easily bought and sold. ¶¶ 156-58.

As a result, in 2017 and 2018, Ripple entered into agreements with at least ten digital asset trading platforms—none of which were registered with the SEC in any capacity, and at least two of which have principal places of business in the U.S.—providing for "listing" and trading incentives with respect to XRP. ¶ 161. Garlinghouse viewed these types of efforts as critical components of

21

Ripple's efforts as to XRP.  ¶ 166.  In an internal March 29, 2018 email, he described Ripple

providing incentives to platforms that trade XRP as an example of Ripple "do[ing] whatever we can

to invest in the success of the XRP ecosystem[.]"  *Id.*

      While he was CEO (and as Larsen had before him), Garlinghouse had final decision-making

authority over which trading venues to use for Market Sales and how much XRP to sell on a

particular venue, which Ripple communicated to traders as an overall percentage of XRP's daily

trading volume.  ¶ 98.  As CEO, Garlinghouse approved the timing and amounts of unregistered

offers and sales of XRP, just as Larsen had.  ¶¶ 75-76, 424-25.  Garlinghouse's decisions included

whether to adjust Ripple's XRP sales—sell more or less XRP—based on factors such as XRP's

trading volume in the market, the market price of XRP, or Ripple's need for capital.  ¶ 424.

      Garlinghouse also played a significant role in negotiating and approving Ripple's Institutional

Sales and other offers and sales of XRP to institutional investors, including while he was COO.

¶ 110.  For example, in mid-2015, Garlinghouse negotiated an institutional investor's purchase of

XRP in connection with the investor's potential formation of a "private investment fund" whose

sole purpose would have been to speculate on XRP as an investment ("XRP Fund A").  ¶ 111.  On

July 10, 2015, Garlinghouse emailed that potential investor a document—which Ripple had created

in 2014 and which Garlinghouse described to the potential investor as a "white paper"—entitled

*"The Ripple Protocol: A Deep Dive for Financial Professionals"* (the "2014 Promotional Document").  *Id.*

On August 3, 2015, Ripple, through XRP II, entered into a "Memorandum of Understanding" that

Larsen signed on XRP II's behalf.  *Id.*  That agreement committed Ripple to selling XRP to that

institutional investor for the purpose of having XRP Fund A own the purchased XRP.  *Id.*  Later

that year, around November 2015, Garlinghouse, Larsen, and others received drafts of the potential

offering documents for XRP Fund A and provided comments on these documents.  *Id.*  Similarly, in

April 2016, Garlinghouse approved the sale of 115 million XRP to a different institutional investor

that describes itself as a "full-service digital currency prime broker." ¶¶ 115-16.  Two years later, on September 24, 2018, Ripple entered into an agreement, signed by Garlinghouse, with a Japanese institutional investor, which ultimately purchased over one billion XRP from Ripple.  ¶¶ 120-23.

Finally, Garlinghouse engaged in extensive efforts to tout XRP with a consistent chorus of promotional statements on Twitter, on Ripple's website and YouTube channel, and in various press interviews.  For example, in a May 16, 2017 article on Ripple's website, Garlinghouse reminded investors that, "[t]o build XRP liquidity, we have been mindful over the years about how we distribute XRP.  Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity." ¶ 266.  He concluded that, to incentivize financial institutions, payment providers, and banks to "use" XRP (though none had up to that point), Ripple "remain[ed] committed to increasing XRP liquidity." *Id.*  Garlinghouse gave interviews and made public statements touting Ripple's efforts to develop and maintain a public market for XRP investors to resell XRP.  ¶¶ 277-279.  Garlinghouse publicly touted the formation of the XRP Escrow as proof that Ripple and XRP holders shared a common interest in the success of Ripple's efforts as to XRP and as one of Ripple's many efforts to manage the trading market for XRP.  ¶ 228.  Garlinghouse made numerous public statements describing his and Ripple's efforts to build value for XRP.  ¶¶ 253-56, 260-62.  He frequently and publicly encouraged investors to view their interests as aligned with Ripple's.  ¶¶ 306-11.  Similarly, Garlinghouse led investors to reasonably expect a profit from their investment in XRP from Defendants' efforts.  ¶¶ 320, 325-26, 329, 330, 334, 336-38, 342-49, 356-57.

**STANDARD OF REVIEW**

To withstand a Rule 12(b)(6) motion to dismiss, "a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, 'state a claim to relief that is plausible on its face.'" *Walker*, 404 F. Supp. 3d at 823 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "A plaintiff is not required to provide 'detailed factual allegations' in the complaint, but must assert 'more than

23

labels and conclusions[ ] and a formulaic recitation of the elements of a cause of action.'" *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant." *Id.* (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)); *see also Herod's Stone Design v. Mediterranean Shipping Co. S.A.*, 434 F. Supp. 3d 142, 155 (S.D.N.Y. 2020) (same).

## ARGUMENT

**I.  THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS AIDED AND ABETTED RIPPLE'S VIOLATIONS OF SECURITIES ACT SECTION 5.**

To properly plead its aiding-and-abetting claim, the SEC must allege (1) the existence of a securities law violation; (2) the aider and abettor's knowledge or reckless disregard of the primary violation; and (3) 'substantial assistance' by the aider and abettor "in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 211 & n.6 (2d Cir. 2012) (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)); *see also* 15 U.S.C. § 77o(b). "[T]he SEC's scienter [pleading] burden is lessened significantly [when] the complaint is replete with allegations describing [one defendant]'s participation in almost every stage of the scheme." *SEC v. Wey*, 246 F. Supp. 3d 894, 928-29 (S.D.N.Y. 2017). The scienter requirement in aiding and abetting cases exists to avoid holding someone liable for the mistakes of third parties or for engaging only in ministerial tasks. *See, e.g., Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978).

Defendants do not dispute that the Complaint alleges the existence of Ripple's violation of Securities Act Section 5 or that that violation involved unregistered offers and sales of "investment contracts." Garlinghouse also does not dispute that the SEC adequately pleads his substantial assistance, the third element of the aiding-and-abetting claim against him. Defendants contend that the Complaint does not adequately plead their knowing or reckless disregard of Ripple's violation, and Larsen contends that the Complaint does not adequately plead his substantial assistance of Ripple's violations. Both of these arguments are meritless.

24

A.   **The Complaint Adequately Pleads That Defendants Knew or Recklessly Disregarded Ripple's Section 5 Violation.**

"Satisfaction of the [knowledge] requirement" in an aiding and abetting claim "will…depend on the theory of primary liability." *DiBella*, 587 F.3d at 566 (citation omitted). The primary violation at issue here is Ripple's violation of Securities Act Section 5. In this context, knowledge of the circumstances that constitute the primary violation satisfies the knowledge element of the SEC's claim. *See SEC v. Mattessich*, 407 F. Supp. 3d 264, 272 (S.D.N.Y. 2019) (citing *Apuzzo*, 689 F.3d at 211); *see also SEC v. Paulsen*, No. 18 Civ. 6718, 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020) (the SEC may show a "'defendant's general awareness of [his] overall role in the primary violator's illegal scheme'" (citations omitted)). Typically, "scienter…arguments are not appropriate for resolution on a motion to dismiss." *SEC v. Hurgin*, 484 F. Supp. 3d 98, 112-13 (S.D.N.Y. 2020); *see also Watson v. N.Y. Doe 1*, 439 F. Supp. 3d 152, 156 (S.D.N.Y. 2020) ("The [c]ourt's function on a motion to dismiss is 'not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.'") (citation omitted).

1.   **The Complaint Pleads Sufficient Facts to Infer that Defendants Acted with a High Degree of Scienter.**

Neither Defendant contends that the Complaint fails to sufficiently plead their knowledge of the facts that constitute Ripple's violation or their general awareness of their role in that scheme.

a.   **Larsen**

As to Larsen, the Complaint pleads specific facts that Larsen approved and directed Ripple's unregistered offers and sales of XRP. These facts permit the inference that Larsen *knew* that Ripple was making offers and sales of XRP. *E.g.*, ¶¶ 75, 92, 95-96, 98, 100-102, 110, 113-116, 136, 140; *see supra* Statement of Facts § II.B.1(b). The Complaint also pleads that Larsen knew that Ripple's offers and sales of XRP were of "investment contracts," because he personally promoted XRP as an investment of money into a common enterprise with the reasonable expectation of profit from

25

Ripple's efforts. *E.g.*, ¶¶ 38, 42, 44-46, 73, 89, 90, 92, 98, 101-02, 112, 113, 171-179, 232, 242, 246, 265, 289, 293-94, 300, 397, 313; *see supra* Statement of Facts § III.A.3.  The Complaint further pleads that Larsen was aware that such offers and sales could be wrongful under certain circumstances, ▮

▮.  *E.g.*, ¶¶ 52, 56, 399-401; *see also* Ex. B & C; s*ee supra* Statement of Facts §§ III.A.2, III.A.4.  Finally, the Complaint pleads that Larsen was aware of his overall role in Ripple's illegal distribution, that his own financial interests were aligned with Ripple's interests, and that he took steps to further them.  *E.g.*, ¶¶ 18, 46, 173, 179.

### b.   Garlinghouse

As for Garlinghouse, the Complaint alleges that he treated XRP like an investment and was incentivized to increase XRP's trading price and volume, ¶ 422, like a CEO treats compensation received in the form of company stock.  That Garlinghouse treated and viewed XRP as an investment—and understood the nature of the asset—is also shown by his statements that he was "very long" the asset, ¶ 412, while making extensive sales to monetize his compensation.  ¶ 87.

Indeed, the mere fact that Garlinghouse's (and Larsen's) financial interests were aligned with Ripple's suffices to show, at the pleading stage, that Garlinghouse acted with the requisite scienter for aiding and abetting a Section 5 violation.  *SEC v. North Am. Research Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970) ("no financial stake or motivation is required to support a charge of Section 5 violation [including] with respect to those who assisted the principal wrongdoers out of friendship or other non-pecuniary motives").  As explained in *Barker v. Henderson, Franklin, Starnes & Holt*, a court looks to whether a defendant accused of aiding and abetting securities laws violations had a

26

financial interest in the scheme to determine whether the violation was "in the interest of the defendants." 797 F.2d 490, 497 (7th Cir. 1986) (Easterbrook, J.).[8]

The cases Garlinghouse cites are not to the contrary. *See* Garlinghouse Br. at 16. Those cases stand for the unremarkable proposition that, in the fraud context, a desire to increase "stock price or improve[ ] corporate performance" is insufficient to plead scienter. *ECA and Local 134 IBEW Joint Pension Tr. of Chi. v. J.P. Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009); *see also Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001). This case, by contrast, involves a "concrete and personal benefit" for Defendants, *Kalnit*, 264 F.3d at 139—the desire to create and maintain a market to make their *own personal sales* of XRP. *See also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325 (2007) (a "personal financial gain may weigh heavily in favor of a scienter inference"); *SEC v. Subaye, Inc.*, No. 13 Civ. 3114, 2014 WL 448414, at *8 (S.D.N.Y. Feb. 4, 2014) ("[P]leading 'motive' in the form of a concrete personal benefit derived from an alleged fraud is…one possible method of demonstrating scienter.") (citing *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).

Moreover, the Complaint makes specific allegations from which one can reasonably infer Garlinghouse knew (1) that Ripple was making unregistered offers and sales of XRP, because he approved many such specific transactions, *e.g.*, ¶¶ 75-76, 98, 110-11, 115-16, 120-23, 154-55, 156-58, 160-62, 166, 424-26; *see supra* Statement of Facts § II.B.2; (2) that Ripple's offers and sales constituted offers and sales of "investment contracts," because he himself promoted XRP as such, *e.g.*, ¶¶ 98, 101, 104, 110-11, 118, 120, 199, 205, 207, 212, 219, 242, 253-56, 260-62, 266, 278-79, 293, 306-11, 329-30, 334, 336, 338, 342-49, 421; *see supra* Statement of Facts § III.B.1; (3) that such offers and sales could be improper under certain circumstances, because he was so warned by advisors,

---

[8] The requirement of "'conscious and specific' motivation to aid and abet the fraud will hopefully serve to deter nuisance suits against defendants who merely performed clerical duties without knowledge that they were furthering allegedly fraudulent transactions. It will also preserve causes of action against members of the financial community who knowingly participate on the fringes of fraudulent schemes for personal gain." *Martin v. Pepsi-Cola Bottling Co.*, 639 F. Supp. 931, 935 (D. Md. 1986) (citing *IIT v. Cornfeld*, 619 F.2d 909, 927 (2d Cir.1980)).

acknowledged that fact publicly and privately, and knew that the status of XRP under the securities laws was of keen interest to the digital asset platforms he tried to persuade to list XRP, *e.g.*, ¶¶ 405-20; *supra* Statement of Facts § III.B.2; and (4) understood his role in Ripple's violations because he orchestrated them and they were aligned with his own interests, *e.g.*, ¶¶ 181-83, 190-92, 422 (Garlinghouse had incentive to obtain more favorable prices for his own sales of XRP).

### 2.   Defendants' Contrary Arguments Misapply the Law.

Defendant do not attempt to grapple with the obvious implications of the SEC's allegations that they knew (or at least recklessly disregarded) exactly what they were doing and the potential legal consequences of those actions.  Instead, Defendants make two interrelated but ultimately meritless arguments.  First, they seek to convince the Court that the SEC must establish that they *actually knew* the instruments at issue were *actually securities* under the law.  No such legal requirement exists.  Second, they try to persuade the Court to weigh evidence, make factual findings, and draw inferences of their supposed good faith in their favor.  This argument is highly improper on a motion to dismiss and should be rejected.  *Hurgin*, 484 F. Supp. 3d at 112-13.

### a.   There is No Legal Basis for Defendants' Heightened Scienter Requirement, but the Complaint Alleges Facts to Meet It.

The crux of Defendants' argument is their erroneous contention that the SEC must allege that Defendants knew that XRP was in fact a security *as a matter of law*.  *E.g.*, Garlinghouse Br. at 4, 16; Larsen Br. at 1, 16.

However, the SEC is not required to allege that Defendants knew *the legal consequences* of their actions. As the D.C. Circuit explained long ago:

> Knowledge means awareness of the underlying facts, not the labels that the law places on those facts.  Except in very rare instances, no area of the law not even the criminal law demands that a defendant have thought his actions were illegal.  A knowledge of what one is doing and the consequences of those actions suffices.

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980). The Second Circuit also has rejected the argument that, in a criminal prosecution, the defendants had to have known that the "units" they were selling possessed the characteristics that made them securities. *See United States v. Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008); *see also United States v. Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978) ("The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security.").

Many of the cases Defendants cite in support of their proffered pleading standard actually reject it. In *SEC v. Mattessich*, for example, defendants argued that the SEC had not sufficiently pled the scienter element of an aiding-and-abetting claim where the SEC had not pled that defendants had "knowledge of the specific SEC Rule" the primary violator violated. 407 F. Supp. 3d at 272 (cited in Larsen Br. at 12). Judge Failla rejected this argument, relying on *Falstaff Brewing* and on the fact that the rule at issue—like Securities Act Section 5—had no scienter requirement. *Id.* Instead, she held that to "state a claim for aiding and abetting, the SEC need not allege that Defendants knew the specific…rule that they helped violate." *Id.* Similarly, in *SEC v. Espuelas* (cited in Garlinghouse Br. at 12; Larsen Br. at 12), Judge Engelmayer noted that he "need not" resolve the issue of whether a defendant had sufficient knowledge to appreciate that his practices were improper, because there was no evidence that the defendants "knew of the facts" that underlay the primary violation. 905 F. Supp. 2d 507, 518 (S.D.N.Y.2012); *see also id.* at 525 (dismissing aiding and abetting claims due to lack of evidence that the defendant "knew of the features of the…transactions that made [them] improper"). Indeed, when other defendants in the same case later argued that they were entitled to summary judgment on the SEC's aiding-and-abetting claim because there was no evidence that they knew how to apply the specific accounting rule at issue in the case, Judge Engelmayer *rejected* that contention, noting that a "defendant's general awareness of

29

its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting

liability." *SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 (S.D.N.Y. 2012) (citation omitted).[9]

Here, of course, the SEC *does* allege facts that, if proven, would permit a fact-finder to

conclude that Defendants knew XRP was being offered and sold as part of investment contracts.

Larsen *explicitly acknowledged* he was running the risk that he would be considered the issuer of

securities by the SEC in exchange for significant financial compensation.  ¶¶ 56-57; Ex. E.

Moreover, as described above in more detail in Statement of Facts § III.A.3, the Complaint alleges

Larsen's (1) awareness of Securities Act Section 5 liability and the *Howey* test given his involvement

with the Prosper Order, ¶ 18, Ex. A; (2) ███████████████████████████████████████████

████████████████████████████████████████████████, ¶¶ 52, 56; ██████████

████████); ¶¶ 73, 89, 92, 98, 101-02, 112, 113, 171-179, 232, 242, 246, 289, 397 (Larsen's

████████████████████████████████████████████████████████████████████████

████); and (3) receipt of additional warnings that XRP was a security in the face of the FinCEN

settlement's acknowledgement that a "virtual" currency is not a "real" currency.  ¶¶ 399-404.

Similarly, the Complaint alleges that Garlinghouse repeatedly received warnings about risks

that XRP could be a security or had "securities like" characteristics, *e.g.*, ¶¶ 407, 408, 411; that he

knew that XRP's status under the securities laws was a critical question, *e.g.*, ¶¶ 414-16, 419; that he

openly acknowledged the specific factors that could make XRP a security under *Howey*, *e.g.*, ¶¶ 406,

409, 412, 413, 421, ultimately leading him to conclude that he could "not guarantee" that XRP was

not a security, ¶ 420.  Garlinghouse also was concerned with "verbiage" in communications that

---

[9] Defendants' citation to *SEC v. Paulsen* fares no better.  *See* Larsen Br. at 12, 16; Garlinghouse Br. at 12, 19.  There, Judge Gardephe cited the same standard the SEC sets forth here:  that "[t]o establish knowledge, the SEC must show a 'defendant's general awareness of [his] overall role in the primary violator's illegal scheme.'"  No. 18 Civ. 6718, 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020).  In denying summary judgment to the SEC, Judge Gardephe *did not*, as Defendants suggest, require the SEC to prove that the defendant knew the legal consequences of his acts.  He simply held—as this Court should hold—that issues that implicate "knowledge and intent, and the inferences that should be drawn from the evidence" are for fact-finders to resolve.  *Id.*

could make "XRP sound[ ] like a security," ¶ 408, while using that verbiage himself publicly, such as by stating he was "very long XRP," ¶ 411, or touting "significant improvements in…[the] price of XRP" which was up "over 5,000 percent from the beginning of 2017!." ¶ 343. Despite being asked by multiple U.S. trading platforms about the legal status of XRP under the federal securities laws, ¶ 415, Garlinghouse never sought any guidance on this question from the SEC, ¶ 59.

All of these allegations more than suffice to plead Larsen's and Garlinghouse's knowledge or recklessness and, if proven, will allow a fact-finder to conclude that Defendants knew or were reckless in not knowing that Ripple's XRP offers and sales could constitute offers and sales of securities. *See, e.g.*, *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[A]n egregious refusal to see the obvious or investigate the doubtful, may in some cases give rise to an inference of recklessness."); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (defendants in civil cases who consciously avoid knowledge are "just as culpable as those who have actual knowledge"); *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003).

        **b.**     **The Court Should Not Weigh Evidence or Make Factual Findings on a Motion to Dismiss.**

Defendants' remaining arguments boil down to a plea that the Court interpret the Complaint's well-pleaded factual allegations in their favor and that it draw "conclusion[s]" that defendants view as "entirely consistent" with these facts. *E.g.*, Garlinghouse Br. at 15. This is highly improper on a motion to dismiss. *E.g.*, *Hurgin*, 484 F. Supp. 3d at 112-13.

Both Garlinghouse (Garlinghouse Br. at 15) and Larsen (Larsen Br. at 14-15) ask the Court to decide that they must have reasonably believed XRP was not a "security," based on Ripple's 2015 settlement agreements with FinCEN and the Department of Justice, in which they labeled XRP a "virtual currency." Defendants' argument is perplexing given their insistence that they did not know the specific requirements of the federal securities laws. As Defendants point out, the definition of "security" under the Exchange Act of 1934 excludes "currency." 15 U.S.C. § 78c(a)(10). To accept

31

their arguments, the Court must conclude that Defendants knew enough about the securities laws to know that the definition of "investment contract" excludes "currency," but did not understand the legal factors that make something a security or that something may be sold as a security even if it is a "virtual currency." Defendants cite no support in the complaint or the documents it references for this absurd argument—that they had a partial understanding of what constitutes a security—and their briefs otherwise disclaim virtually any knowledge of the securities laws.

Moreover, to reach Defendants' proffered interpretation of the facts, the Court would have to ignore a fact of which it properly may take judicial notice: that the DOJ and FinCEN settlements with Ripple in 2015 specifically referenced certain guidance about "virtual currency" that FinCEN had issued in 2013. *See* D.E. 114-3 at 7-8; D.E. 114-4 at 7-8. In that guidance, FinCEN had noticed that "in contrast to real currency," "virtual currency" (as it called XRP in the settlements) "does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction." Ex. D (*Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (Mar. 18, 2013) ("FinCEN Guidance")); *see also* ¶ 382 (XRP is not legal tender in any jurisdiction). That guidance put Defendants on actual notice that, just because DOJ and FinCEN had labeled XRP a "virtual currency" in their settlements, did not mean that XRP was a "currency" excluded from the definition of a "security" under the Securities Act.

Defendants' citation to *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007), (Garlinghouse Br. at 17, Larsen Br. at 14) is meritless. There, the Supreme Court noted that it was *not* confronted with "a case in which the business subject to the Act had the benefit of guidance from the courts of appeals or the [regulatory agency] that might have warned it away from the view it took." *Burr*, 551 U.S. at 70. Here, by contrast, there is an "abundance of caselaw interpreting and applying *Howey* at all levels of the judiciary, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power," *United States v. Zaslavskiy*, No. 17 Cr. 647,

2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018), ███████████████████████████

████████████. For *Safeco* even to be relevant, the Court would first have to reach the untenable

legal conclusion that the Securities Act *did not* have "the benefit of guidance from the courts of

appeals" or the SEC. At a minimum, that is a question at the heart of the parties' dispute on the

merits and cannot be reached on a motion to dismiss that does not present the issue.[10]

  The remainder of Garlinghouse's arguments similarly seek to engage the Court in weighing

evidence and drawing inferences in his favor. For example, Garlinghouse asks the Court to draw

conclusions about his scienter based on the fact that Platform A listed XRP, which Garlinghouse

claims "demonstrat[es] that Platform A itself ultimately considered and rejected the risk that XRP

was a security." Garlinghouse Br. at 14. This is not a case against Platform A, nor is there a

"reliance on trading platforms" legal defense to scienter. Whatever conclusions Garlinghouse may

have fairly reached about the legality of his own conduct, given that he had been instrumental in

Platform A's decision to list XRP, ¶ 414, is to be resolved on the merits, not on a motion to dismiss.

Although Garlinghouse cites to cases like *Slayton v. American Express Co.* to argue that he acted in

"good-faith" to "inform" himself about the legality of his conduct, Garlinghouse does not contend

that he actually took steps to inform himself of these risks by consulting an attorney (and disclaims

---

[10] Another example also illustrates this problem. Larsen seeks to brush away the Complaint's allegation that he knew that investors were purchasing XRP for speculation. Larsen Br. at 19. In Larsen's mind, this is not sufficient evidence of his knowledge or reckless disregard for the legal consequences of his actions because, *on the merits*, the fact that someone was purchasing XRP "for speculation…is not sufficient to render XRP a security." *Id.* But that is not the SEC's argument. XRP was an investment contract not *simply* because it was purchased for speculation, but because it was offered and sold as an investment of money into a common enterprise with a reasonable expectation of profits from the efforts of others. That Larsen was specifically aware of *one* of the factors that render Ripple's conduct illegal shows that the SEC has properly pled his scienter at this stage. Larsen's argument invites the Court to make a ruling *on the merits* about whether that factor renders XRP a security. The Court should decline this invitation.

any knowledge of the Legal Memos), a fact which distinguishes his conduct from the defendant in

*Slayton*. 604 F.3d 758, 777 (2d Cir. 2010) (cited in Garlinghouse Br. at 14).[11]

Garlinghouse similarly asks the Court to make factual findings, arguing that his statements

acknowledging that, if an asset being sold had no real utility, it was likely a security should be

weighed against his statements that he believed XRP had utility.  *E.g.*, Garlinghouse Br. at 14-15.

These arguments again require reaching factual conclusions:  they ignore that Garlinghouse was

specifically aware that XRP had no "use" when he made public statements to the contrary.  ¶ 413.

And Garlinghouse's convenient after-the-fact reliance on his self-professed belief in "regulatory

uncertainty," Garlinghouse Br. at 1, 7, 14, must also be weighed—by a fact-finder, not on a motion

to dismiss—against his own more candid admission that "people in the crypto space talking about

'regulatory uncertainty'…more often than not means 'I disagree with the regulatory certainty so I'm

going to call it regulatory uncertainty.'"  ¶ 413.  Put another way, Garlinghouse made clear that

people often said there was "regulatory uncertainty" about whether a digital asset was being sold as a

security when really they knew it was being sold as a security but did not like that conclusion.[12]

### B. The Complaint Adequately Alleges That Larsen Substantially Assisted Ripple's Violations.

The SEC must only allege that Larsen participated in Ripple's violation "as in something that

he wished to bring about, and that he sought by his action to make it succeed."  *SEC v. Rio Tinto plc*,

No. 17 Civ. 7994, 2019 WL 1244933, at *18 (S.D.N.Y. Mar. 18, 2019) (citation omitted).

---

[11] Defendants received extensive legal advice about the potential legal consequences of their conduct, but Ripple has refused to disclose that advice on privilege grounds, despite its fair-notice affirmative defense that puts its understanding of the law in dispute.  *See generally* D.E. 165 (letter to Magistrate Judge Netburn seeking production of documents showing certain legal advice).  Should Defendants continue to insist that they acted in good faith while Ripple does not produce these documents, Defendants will not be able to advance this defense as a matter of law.  *See, e.g., United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 566-67 (S.D.N.Y. 2015) (granting protective order against individual defendant's assertion of good faith where corporation refused to waive privilege as to relevant documents).

[12] Both Defendants also point out that the SEC does not allege that they lied to people.  Larsen Br. at 16; Garlinghouse Br. at 16.  This is beside the point—there is no legal requirement that the SEC prove *deceptive* conduct to properly plead that a defendant aided and abetted a strict liability offense.  And the Complaint alleges that at least Garlinghouse misled the market by touting that he was "very long" XRP while he was actually selling large quantities of XRP.

Here, the SEC pleads numerous facts that show that Larsen actively participated in Ripple's unregistered public distribution of securities as something he wished to bring about and sought to make succeed.  The Complaint pleads that Larsen's and Ripple's financial incentives with respect to XRP were closely aligned, such that Larsen worked "in coordination with Ripple to develop and maintain a liquid market for XRP through which [Larsen and Ripple] could monetize their [XRP] holdings."  ¶ 173.  Larsen did so by using the same Market Maker as Ripple to make similar XRP sales on similar platforms, ¶¶ 174-77, and by making his own sales to the tune of over $450 million over the course of many years, ¶¶ 175-76; *see also* ¶¶ 85-86.  Larsen did so because, as he explained to an XRP investor in a June 30, 2019 email, he shared in Ripple's view that it is "better to have widely held assets," which his own XRP sales fostered.  ¶ 179.

Larsen has no response to these allegations other than to claim that the Complaint fails to "plead sales with specificity," Larsen Br. at 20, but he can identify no legal requirement that the SEC list each and every sale at the pleadings stage. *See, e.g., Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (allegation that broker was the principal broker during the ten-year period of violative trades sufficient to state an aiding-and-abetting claim at the pleadings stage).  Larsen also cites *Wey*, 246 F. Supp. 3d at 930, for the proposition that a complaint properly pleads substantial assistance where the "defendant distributed shares," Larsen Br. at 21, which is exactly what Larsen did here.

In any event, the Complaint pleads other affirmative acts by Larsen that furthered Ripple's unregistered offers and sales of XRP—none of which depends upon Larsen's particular title at the time, as Larsen contends, *see* Larsen Br. at 19-20. They include: (1) initially and subsequently approving and coordinating Ripple's Market Sales of XRP, ¶¶ 92, 98, 100, 199, 205, 207, as Ripple represented to others Larsen was responsible for, ¶ 72; (2) negotiating and entering into particular XRP Institutional Sales on behalf of Ripple, ¶¶ 113-16; (3) participating in Ripple's efforts to promote XRP on various digital asset trading platforms, ¶ 168; and (4) creating the XRP Escrow to

assuage XRP investors' concerns about the price of XRP.  ¶¶ 223-24.  Although Larsen erroneously contends that the SEC "fails to allege any specific statements" by himself promoting XRP, Larsen Br. at 20, the Complaint identifies a specific interview in which Larsen explained Ripple's "key roles" in distributing XRP as broadly as possible to add liquidity to the market and setting forth his view that Ripple will "do a very good job in protecting the value of XRP."  ¶ 265.

Any one of these affirmative acts—alone or in tandem with others—sufficiently alleges substantial assistance, regardless of Larsen's title.  "[A]t the motion to dismiss stage, the SEC must only allege" Larsen engaged in conduct that "contributed to the larger scheme."  *SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848, at *9 (S.D.N.Y. Sept. 30, 2020) (citing *SEC v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020)).  The SEC "is not required to allege that [Larsen] 'participated in each and every aspect'" of the violation at issue.  *Id.* (citing *Wey*, 246 F. Supp. 3d at 916); *see also In re Refco Inc. Secs. Litig.*, No. 08 Civ. 3065, 2012 WL 996910, at *7 (S.D.N.Y. Jan. 17, 2012) ("[S]ubstantial assistance with one part of the [violation] is sufficient to withstand a motion to dismiss [an] aiding and abetting claim."); *Armstrong*, 699 F.2d at 91-92 (allegations covering a ten-year period sufficient to survive a motion to dismiss, and a "decision as to [defendant's] liability for aiding and abetting the alleged [violations] must await further development of the facts").[13]

## II.   THE COMPLAINT ADEQUATELY ALLEGES THAT DEFENDANTS ENGAGED IN DOMESTIC OFFERS AND SALES OF SECURITIES.

Securities Act Section 5 was designed in part to empower the SEC to stop noncompliant securities offerings before transactions are complete.  *E.g.*, *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (preliminarily enjoining $1.7 billion offering by foreign issuer that included U.S. investors before issuer could distribute the digital token).  Relying on a Supreme Court case where Australian purchasers who bought securities on an Australian exchange sued an Australian bank

---

[13] Larsen's argument that the level of his substantial assistance changed from one year to the next is only relevant at the relief stage in this proceeding.  *E.g.*, *Cavanagh*, 155 F.3d at 135.

under a different statute, Defendants contend that U.S. citizens located in the U.S. and selling securities—at least in part—to U.S. investors do not have to comply with the registration provisions of the U.S. securities laws as long as they use a digital trading platform that clears transactions in a foreign country.  The Court should reject this argument out of hand based on the plain text of Section 5, which explicitly encompasses the process of offering securities.

To adequately plead a Section 5 claim against a defendant, the SEC must allege: (1) that no registration statement was filed or in effect as to the offer or sale of securities, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).  Here, without any registration statement filed or in effect—and acting on behalf of a U.S. issuer—Defendants engaged in extensive U.S.-based promotional efforts to create a worldwide market for XRP, and from the U.S. directed the sale of those securities into that global market, including into the U.S.  Every part of Defendants' public distribution of XRP violated Securities Act Section 5.

Against this background, the SEC and Defendants agree that Securities Act Section 5 covers "domestic" activities.  The parties differ as to what constitutes domestic "offer[s]" and/or "sale[s]" of securities under Section 5.  The proper criteria to make that determination are in Regulation S under the Securities Act, 17 C.F.R. § 230.901 *et seq.*, which the SEC promulgated to define precisely that—what constitutes domestic and what constitutes foreign offerings for purposes of Section 5. Defendants' offers and sales indisputably did not qualify as "foreign" under Regulation S. Defendants, however, insist that the Court import the Supreme Court's transactional test developed in *Morrison* to determine whether a "purchase or sale" for purposes of *Exchange Act Section 10(b)* is domestic.  *Morrison* addressed a statute that did not encompass "offer[s]" of securities in its text. Securities Act Section 5, by contrast, is the principal federal statute regulating an "offer to sell or

offer to buy" securities, 15 U.S.C. § 77e(a), (c), and Defendants' request that the same test apply to both provisions would erase the fundamental distinction between them.

Indeed, *Morrison* itself forecloses Defendants' argument.  Under *Morrison* and cases following it, the Court must determine the "focus" of the statutory provisions at issue to resolve whether the case involves a permissible domestic application of the law.  561 U.S. at 267.  Extensive case law establishes the breadth of the terms "offer" (a word not in Exchange Act Section 10(b)) and/or "sale" in Section 5.  And *Morrison* itself explicitly recognized that Regulation S properly cabins the territorial reach of Section 5 by defining what constitutes domestic and what constitutes foreign conduct for purposes of that law.  Moreover, looking at the provisions that work in tandem with Securities Act Section 5, as *Morrison* requires, shows that their focus is on the entire offering process.  These principles make clear that a litany of acts Defendants committed in the U.S. fall within the ambit of "offer" and/or "sale," requiring registration to provide essential disclosures to the U.S. investors to whom these U.S. Defendants pitched and sold their U.S. securities.

Defendants cannot genuinely quarrel with these principles.  They argue without support that the Court should skip past *Morrison*'s directive to determine the focus of the statute at issue—here Securities Act Section 5—and ignore the breadth of the "offers" and "sales" that are Section 5's focus.  They then try to cram the square peg of *Morrison's* transactional test for Exchange Act Section 10(b) into Section 5's round hole.  But, even if the Court were to apply a transactional Exchange Act Section 10(b) test to Securities Act Section 5 claims (which it should not), the Complaint adequately pleads that Defendants' conduct meets that test.  Defendants' motion to dismiss the Section 5 claims against them on extraterritoriality grounds should be denied.

### A.    The Focus of the Securities Act's Registration Requirements Determines If a Permissible, Domestic Application of the Statute Is at Issue.

*Morrison* establishes a "two-step framework for analyzing extraterritoriality issues."  *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2101 (2016).  First, a court should ask if the

relevant statute applies extraterritorially. *Id.* Second, the court should determine "whether the case involves a domestic application of the statute…by looking at the statute's *focus.*" *Id.* (emphasis added). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) (quoting *RJR Nabisco*, 136 S. Ct. at 2101).

"The focus of a statute is 'the objec[t] of [its] solicitude,' which can include the conduct it 'seeks to regulate,' as well as the parties and interests it 'seeks to protec[t]' or vindicate." *Id.* (citing *Morrison*, 561 U.S. at 267) (internal quotation marks omitted, alterations in original). Importantly, "[w]hen determining the focus of a statute, we do not analyze the provisions at issue in a vacuum." *Id.* (citing *Morrison*, 561 U.S. at 267). Instead, "[i]f the statutory provision at issue works in tandem with other provisions, it must be assessed in concert with those other provisions. Otherwise, it would be impossible to accurately determine whether the application of the statute in the case is a 'domestic application.'" *Id.* (quoting *RJR Nabisco*, 136 S. Ct. at 2101).

Here, as to the first step, the SEC does not contend that Section 5 applies extraterritorially. The question is the second step of the inquiry: whether, looking to the "focus" of Securities Act Section 5, by assessing the statute with the other provisions that work in tandem with it as *Morrison* requires, this case involves a domestic application. As set forth below, Section 5's focus extends beyond the discrete moment when title to a security passes, or even when parties commit themselves to a purchase or sale. Rather, Section 5 is focused on the entire process by which securities emanate from issuers and their affiliates to come to rest in the hands of the investing public.

## B.  Securities Act Section 5 Focuses Broadly on Every Aspect of a Public Offering, Not Just Particular Sales.

The Securities Act is "chiefly concerned [with]…initial distributions of newly issued stock from corporate issuers." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 752 (1975). That is the proper "focus" of Securities Act Section 5, whose "primary innovation…was the creation of federal

duties—for the most part, registration and disclosure obligations—in connection with public offerings." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995). Section 5 prohibits using interstate commerce to "sell [a] security," to "carry…[a] security for the purpose of sale or for delivery after sale," or "to offer to sell or offer to buy" a security, unless Section 5's registration requirements are met or an exemption applies. 15 U.S.C. § 77e(a)(1)-(2), (c). These provisions contemplate that the offer or sale of securities to the public must come with the "full and fair disclosure" afforded by registration with the SEC and delivery of a statutory prospectus containing detailed information about the issuer and the securities, necessary to enable purchasers to make an informed investment decision. *See SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1997), *aff'd*, 155 F.3d 129 (2d Cir. 1997). "The registration statement is designed to assure public access to material facts bearing on the value of publicly traded securities and is central to the Act's comprehensive scheme for protecting public investors." *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979) (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)), *vacated on other grounds*, 446 U.S. 680 (1980).

Section 5, by its terms, is broad: it prohibits any conduct involving the unregistered offers or sales. Through provisions that provide for exemptions from this requirement, like Securities Act Section 4(a)(1), however, Congress distinguished between (1) transactions that occur during the process by which securities are distributed to the public from the issuer of the securities, which require registration, and (2) subsequent trading in the market by investors, which generally does not. L. Loss & J. Seligman, 2 Securities Regulation 627 (3d ed. 1989) (the § 4(a)(1) exemption is meant to distinguish "between distribution of securities and trading in securities") (quoting H.R. Rep. No. 85, 73d Cong., 1st Sess. 15 (1933)); *see also SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 740 (2d Cir. 1941) (Section 4(a)(1) "does not in terms or by fair implication protect those who are engaged in steps necessary to the distribution of security issues"); *SEC v. Holschuh*, 694 F.2d 130, 137-38 (7th Cir. 1982) (the Securities Act "was created to exempt routine trading transactions with

respect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions"). Thus, transactions by issuers or others engaged in a distribution are not exempt from Section 5 registration requirements. *See* 15 U.S.C. § 77d(a)(1)-(2).

Meanwhile, Securities Act Section 2 defines "offer" broadly to include "every attempt or offer to dispose of, or solicitation of an offer to buy," a security; "sale" or "sell" to include "every… disposition of a security," *id.* § 77b(a)(3); "issuer" to include "every person who issues or proposes to issue any security," *id.* § 77b(a)(4); and "underwriter" to include "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security." *Id.* § 77b(a)(11). Accordingly, the "focus" of the Securities Act Section 5 requirement is a public offering, which is the *entire* process of distributing securities from an issuer to the public.

### 1. The Term "Offer" Goes Beyond its Common Law, Contractual Concept.

The Supreme Court has explained that "offer" and "sale" are "statutory terms[ ] which Congress expressly intended to define broadly…[and] are expansive enough to encompass the entire selling process." *United States v. Naftalin*, 441 U.S. 768, 773 (1979). Thus, "[i]t is not essential under the terms of the [Securities] Act that full title pass to a transferee for the transaction to be an 'offer' or a 'sale'." *Rubin v. United States*, 449 U.S. 424, 430 (1981). "[T]ransactions other than traditional sales of securities are within the scope of [Securities Act] § 2(3) and passage of title is not important." *Pinter v. Dahl*, 486 U.S. 622, 643 (1988) (quoting *Naftalin* and *Rubin*).

As a result, the definition of "offer" in Securities Act Section 2(a)(3) "extends beyond the common law contract concept of an offer." *Cavanagh*, 155 F.3d at 135; *see also Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971). An offer occurs "[w]hen it is announced that securities will be sold at some date in the future and, in addition, an attractive description of these securities and of the issuer is furnished." *Chris-Craft Indus. v. Bangor Punta Corp.*, 426 F.2d 569, 574 (2d Cir. 1970). "What is dispositive…is whether defendants' conduct conditioned the public mind." *SEC v.*

41

Case 1:20-cv-10832-AT-SN   Document 182   Filed 05/14/21   Page 52 of 71

*Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163, at *8 (S.D. Cal. Feb. 14, 2019) (enjoining future

conduct in connection with public distribution of digital asset securities) (citation omitted); *Guidelines*

*for the Release of Information by Issuers Whose Securities are in Registration*, Rel. 33-5180, 1971 WL 120474,

at *1 (S.E.C. Aug. 1971) ("[T]he publication of information and statements, and publicity

efforts…which have the effect of…arousing public interest in the issuer or in its securities

constitutes an offer in violation of the Act.").

A statutory "offer" or "sale" can occur under a variety of circumstances including: (a) the

contents of "website[s]" and "social media posts" concerning the asset, *Blockvest*, 2019 WL 625163,

at *9; (b) statements to the public and to the press, *e.g.*, *Chris-Craft*, 426 F.2d at 574; *SEC v. Arvida*

*Corp.*, 169 F. Supp. 211, 215 (S.D.N.Y. 1958); (c) written advertisements, *e.g.*, *Chinese Consolidated*, 120

F.2d at 740; and (d) transmittal of "an order to a broker to sell securities." *Naftalin*, 441 U.S. at 773;

*see also Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) ("[T]he test

whether a contract constitutes an investment contract within the Securities Act is 'what character the

instrument is given in commerce by the terms of the offer, the plan of distribution, and the

economic inducements held out to the prospect.'") (quoting *SEC v. C.M. Joiner Leasing Co.*, 320 U.S.

344, 352-353 (1943)); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020)

("courts regularly consider representations and behavior outside the contract," discussing *Joiner*).

Finally, in determining what acts constitute an "offer" covered by Securities Act Section 5,

courts often look to SEC regulations for guidance. *E.g.*, *Chris-Craft*, 426 F.2d at 574-75 (defendant's

failure to follow Securities Act Rule 135, which lists the type of statements that may be publicly

made without constituting an "offer," meant the defendant had violated Section 5 and that adding

an exemption not provided for in the rule "would…thwart other policies of the securities laws").

### 2.   Section 5 and Section 4 Together Make Clear that the Registration Requirement's Focus Is All Aspects of Public Offerings.

Consistent with the principles above, the Second Circuit has at least twice held that a distribution of securities from an issuer into the hands of U.S. investors violated Section 5 even when the actual title to the securities passed abroad.  First, in *Chinese Consolidated*, the court held that a defendant who had aided a foreign issuer in distributing securities to U.S. investors could be held liable for violating Section 5.  120 F.2d at 740-41.  As the court held, "where there was systematic continuous solicitation, followed by collection and remission of funds to purchase the securities, and ultimate distribution of the bonds in the United States through defendant's aid[,] [the] results should [not] be determined by the mere passage of title to the securities in China."  *Id.* at 741.

Likewise, in *SEC v. North American Research*, the Second Circuit affirmed a finding of Section 5 liability against individuals who had aided and abetted unregistered offers and sales of stock whose title first passed in Canada "with a view *to the distribution* [of the securities]…in the United States." 424 F.2d at 68 (emphasis added).  The court again explicitly held that, for purposes of Section 5, "[i]t matters not that none of the shares [the defendant] owned was sold in the United States," *id.*, and explained that "the Securities Act of 1933 established a series of specific enactments and definitions…as to protect the investing public from the detrimental effect of the dissemination and distribution of unregistered securities," and that it is therefore important to "view the statutes not individually but as interdependent components of an integrated regulatory plan."  *Id.* at 71, 82.

In each decision, the Second Circuit also reaffirmed the broad application of Section 5, explaining that the "primary purpose of the [Securities] Act" is "the protection of those who do not know market conditions from the overreachings of those who do," *North Am. Res. Dev. Corp.*, 424 F.2d at 81, and to "protect the public by requiring that it be furnished with adequate information upon which to make investments."  *Chinese Consolidated*, 120 F.2d at 741.

43

Accordingly, the registration provisions' focus is "'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (quoting *R.A. Holman & Co., Inv. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966)); *see also Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (holding that Section 5 covers "a public offering," defined as "the entire process…through which a block of securities is dispersed and ultimately comes to rest in the hand of the investing public" (quotation marks omitted)).[14]  And these provisions must be given a "broad and liberal interpretation." *North Am. Res. Dev. Corp.*, 424 F.2d at 71.

C.      ***Morrison* Explicitly Recognized that Regulation S Defines What Constitutes a "Domestic" Public Offering under Securities Act Section 5.**

In *SEC v. National Securities, Inc.*, the Supreme Court recognized the SEC's authority to define the terms used in the Securities Act.  393 U.S. 453, 465 (1969).  The SEC thus promulgated Regulation S "to clarify the extraterritorial application of the registration requirements of the Securities Act." *Offshore Offers and Sales*, 55 F.R. 18306-01, at 18306 (S.E.C. May 2, 1990).

*Morrison* explicitly recognized that "the [SEC] has interpreted" the territorial reach of Section 5 with Regulation S.  561 U.S. at 268-69 (quoting 17 C.F.R. § 230.901).  In support of its conclusion that Exchange Act Section 10(b) covered transactions in securities on national securities exchanges or "domestic transactions in other securities," the Court noted that the Securities Act is also focused on domestic conduct and pointed out that Regulation S properly defines the scope of what constitutes "domestic" and "foreign." *Id.*  Thus, while the Court in *Morrison* developed a test for domesticity under Exchange Act Section 10(b), the Court recognized that the SEC had already done that work for Securities Act Section 5—with Regulation S.

---

[14] The definition of "distribution" as used in Securities Act § 2(a)(11) is generally considered to be synonymous with a "public offering." *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959).

*Morrison* confirms the analysis of *Chinese Consolidated* and *North American Research*, and nothing in *Morrison* disturbs the "generally accepted [principle] that different considerations apply to the extraterritorial application of the antifraud provisions than to the registration provisions of the Securities Act." *Offshore Offers and Sales*, 55 F.R. at 18309 (citations omitted); *cf. Nat'l Secs.*, 393 U.S. at 466 ("[T]he meaning of the words 'purchase or sale' in the context of [Exchange Act] § 10(b)" must be considered in the context of that Act, and may have a different meaning than "these or similar words…in the numerous other contexts in which they appear in the securities laws," such as "sale" and "offer" for purposes of the Securities Act.). To the contrary, in citing favorably Regulation S's definition of what constitutes "domestic" and "foreign" for purposes of the Securities Act, the *Morrison* Court recognized and reaffirmed this distinction.

### D.   Defendants Engaged in a Public Distribution of Securities That Failed to Comply with Regulation S.

Regulation S provides that "the terms offer, offer to sell, sell, sale, and offer to buy shall be deemed to include offers and sales that occur within the United States and shall be deemed not to include offers and sales that occur outside the United States." 17 C.F.R. § 230.901. The Rule provides conditions under which "[a]n offer or sale of securities by the issuer, a distributor, [or] any of their respective affiliates…shall be deemed to occur outside the United States within the meaning of § 230.901." *Id.* § 230.903(a). As set forth below, Regulation S's proscriptions are consistent with the long-understood focus of Securities Act Section 5 on the entire process by which securities find their way from issuers to public investors, and prohibits the type of conduct that courts have for years held violates Section 5, if it occurs in the U.S.

To avail themselves of these provisions, issuers and their affiliates must take steps not to engage in a public distribution in which securities come to rest in the hands of U.S. investors. First, there must be no "directed selling efforts…in the United States by the issuer, a distributor, [or] any of their respective affiliates." *Id.* §§ 230.903(a)(1)-(3), (b)(2)(i), (b)(3)(i). "'Directed selling efforts'

means any activity undertaken for the purpose of, or that could reasonably be expected to have the effect of, conditioning the market in the United States for any of the securities being offered in reliance on this Regulation S." *Id.* § 230.902(c)(1). And the issuer and affiliate must engage in "offshore transactions" only and implement "[o]ffering restrictions." "Offshore transactions" requires that no offer be "made to a person in the United States." *Id.* § 230.902(h)(1)(i). "Offering restrictions" are aimed to prevent the resale of securities sold offshore to U.S. persons and require "statements to the effect that the securities…may not be offered or sold in the United States" in all offering materials and documents. *Id.* § 230.902(g)(2). Thus, a compliant foreign offering must prevent flow-back of securities to U.S. markets and investors.

Defendants' offers and sales of XRP undisputedly did not qualify as "foreign" under Regulation S. Ripple and Defendants were engaged in directed selling efforts to U.S. investors and took no steps to prevent XRP from landing in their hands. Among other things, (1) Defendants failed to take any steps to ensure that XRP would not be sold to U.S. investors, *e.g.*, ¶¶ 174, 177 (Larsen); 184, 186 (Garlinghouse); (2) Defendants in fact offered and sold XRP to U.S. investors, *e.g.*, ¶¶ 178 (Larsen); 187 (Garlinghouse); and (3) Defendants and Ripple all made extensive "offers" of XRP to U.S. investors—including through marketing statements on Ripple's website, Twitter account and YouTube channel, and interviews on U.S.-based finance programs, all discussing the risks and potential rewards of buying XRP—and in fact created a U.S. public market for XRP into which their XRP ultimately came to rest. *E.g.*, ¶¶ 113, 174, 177-78, 265, 300 (Larsen); 184, 186-87, 253-256, 261-62, 266, 278-79, 307-11, 326, 337, 345-349 (Garlinghouse); 60, 115-16, 119, 160, 190, 193 (both); 197-202, 217, 257-29, 264, 267-68, 271-72, 275, 301, 323-34, 331-336, 340 (Ripple).

Defendants failed to meet the conditions of Regulation S and engaged in numerous acts that violated Section 5 *in the U.S.* The fact that title to XRP may have passed abroad (an issue that is in dispute and best resolved on a full factual record as set forth below at Part II.E), is irrelevant. *E.g.*,

*Chinese Consolidated*, 120 F.2d at 738; *North Am. Res. Dev. Corp.*, 424 F.2d at 81; *see also Rubin*, 449 U.S. at 430 (passage of title not needed to constitute offer or sale). Stated differently, the conduct relevant to Section 5's focus—conditioning and selling into U.S. markets—occurred in the U.S. This case therefore involves a permissible domestic application of the statute even if some of Defendants' conduct occurred abroad. *WesternGeco*, 138 S. Ct. at 2137.

Defendants urge the Court to ignore Regulation S because the "SEC could not – even if it wanted to – expand the extraterritorial reach of the Securities Act beyond what Congress itself prescribed," Garlinghouse Br. at 28; *see also* Larsen Br. at 27. This argument is circular, as it is premised on the conclusion Defendants wish to advance—that their offers and sales were "foreign," and, therefore, that Regulation S does not or cannot apply. Moreover, as the SEC stated when it promulgated Regulation S, its purpose was to *limit* the scope of Section 5 to "domestic" offers and sales, which it accomplished by exercising its statutorily delegated authority to *interpret* Section 5. *See Offshore Offers and* Sales, 55 F.R. at 18307; *Morrison*, 561 U.S. at 268-69 ("[T]he [SEC] has interpreted" Section 5 in Regulation S). Defendants themselves recognize this insofar as they argue that "Regulation S does not even purport to regulate foreign transactions." Garlinghouse Br. at 29.

The same is true as to Defendants' contention that the SEC seeks to "open foreign exchanges to U.S. regulation." Garlinghouse Br. at 30; *see also* Larsen Br. at 27. This is not an enforcement action against non-U.S. digital asset trading platforms. The SEC seeks to enforce Section 5 as to Defendants' U.S. conduct—offering and selling the U.S. securities of a U.S. issuer into U.S. capital markets to U.S. investors. It is critical to the purposes of the Securities Act, *see supra* at § II.B, that U.S. investors have access to the full disclosure provided by registration in order to make an informed investment decision. That Defendants used both domestic and foreign conduits to violate the law does not and should not permit Defendants to so easily evade the application of the federal securities laws' registration requirements.

Finally, it is unclear how or why the fact that Regulation S pre-dates *Morrison*, as Defendants point out, has any relevance. To the contrary, the *Morrison* Court took guidance from Regulation S precisely because Regulation S already defined the territorial scope of Securities Act Section 5 by the time the Supreme Court did the same for Exchange Act Section 10(b). 561 U.S. at 268-69.

### E. *Morrison* and the Securities Act Belie Defendants' Other Arguments.

Defendants' arguments that the Section 5 claim pleads foreign "offers and sales" is premised on a single fact—that *some* (but, as even Defendants admit, not all) of their XRP was sold on digital asset platforms owned by companies located outside the U.S. According to Defendants, Section 5's scope is limited to the moment when unregistered XRP "sales were made…on foreign exchanges," Garlinghouse Br. at 21; Larsen Br. at 24 ("Sales completed on foreign exchanges are not captured by Section 5(a)"), which they view as occurring when "title was transferred." Larsen Br. at 23 (citation omitted); *see also* Garlinghouse Br. at 21.

This argument is mistaken for two reasons. *First*, it ignores *Morrison*'s admonition that a court must study the "focus" of a particular statute and its interrelated provisions to determine if a case involves a proper domestic application of the relevant statute. As the decades of case law and additional arguments below show, there is no reason to think that *Morrison's* transactional-based test—crafted for Exchange Act Section 10(b) and based upon that provision's "in connection with the purchase or sale of any security" language—applies to Securities Act Section 5's expansive focus, which does not even require passage of title for liability to attach. *See Rubin*, 449 U.S. at 430; *Pinter*, 486 U.S. at 643. *Second*, even assuming *Morrison*'s transactional test *was* a good fit for Section 5 (it is not), Defendants misapply even that test to this case for the reasons set forth in Section II.F below.

Defendants' attempt to import *Morrison*'s Exchange Act Section 10(b) transactional test into Securities Act Section 5 claims is contrary to *Morrison* itself. As noted, the Supreme Court has said that one must first identify the statue's "focus" to determine the proper test to apply. *Morrison*, 561

U.S. at 266-67; *RJR Nabisco*, 136 S. Ct. at 2101; *WesternGeco*, 138 S. Ct. at 2137.  Defendants do not even attempt this exercise, but their contention that the "offers" at issue are merely "post[ed]" on "[f]oreign exchanges," Garlinghouse Br. at 26, is simply untenable.  *See also* Larsen Br. at 26-27.  As noted, Section 5's focus is much broader than this unduly narrow reading of Section 5, which covers the full scope of a public offering, not just the moment title passes.  *See supra* Argument § II.B.

In *Morrison* itself, the Supreme Court decided whether Exchange Act Section 10(b)'s prohibition on deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered" covered fraudulent statements made in connection with purchases by Australian citizens of the securities of an Australian corporation on an Australian stock exchange.  561 U.S. at 251-53 & n.1.  At the first step of the analysis the Court held that, given Exchange Act Section 10(b)'s focus on "transactions" on a "national securities exchange," the statute does not apply extraterritorially.  *Id.* at 262-65.  At the second step, the Court developed a two-prong test to determine if the application of Exchange Act Section 10(b) to particular transactions constituted a permissible domestic application of the law.  If the transaction at issue occurred on U.S. national securities exchanges *or* constituted "domestic transactions in other securities" (a term the Court did not define), *id.* at 266-67, then the case involved a permissible domestic application of Exchange Act Section 10(b); otherwise, it did not.

Section 5's focus contrasts sharply with Exchange Act Section 10(b)'s, another reason to conclude that *Morrison*'s transactional test is ill-suited for determining whether a case involves a proper domestic application of Securities Act Section 5.  Whereas Securities Act Section 5 focuses broadly on all aspects of a public distribution of securities, Exchange Act Section 10(b) focuses only on deceptive conduct "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered."  15 U.S.C. § 78j(b).  The Supreme Court itself has recognized the distinction between the transactional language of Exchange Act

49

Section 10(b) and Securities Act Section 5's focus on the offering process.  In *SEC v. National Securities*, the Supreme Court explained that "Congress itself has cautioned that the same words may take on a different coloration in different sections of the securities laws; both the [Securities Act] and the [Exchange Act] preface their lists of general definitions with the phrase 'unless the context otherwise requires'."  393 U.S. at 466 (citations omitted).  Accordingly, the Court refused to use a rule enacted under Securities Act Section 5 to interpret the scope of Exchange Act Section 10(b), noting that the question before the Court was limited "to the meaning of the words 'purchase or sale' in the context of [Section] 10(b) [ ] [w]hatever these or similar words may mean in the numerous other contexts in which they appear in the securities laws."  *Id.*

The lower courts have noted the contrasting focuses of the two provisions as well.  As the Fifth Circuit explained:

> The purpose of the registration provisions of the [Securities] Act is to provide adequate disclosure to members of the investing public, and that of [Exchange Act Section 10(b)], to protect investors from the use of manipulative or deceptive devices in securities transactions [such that] the meaning of the terms 'sale' and 'purchase and sale' under different sections of the [Securities Act and Exchange Act] may vary.

*SEC v. Continental Commodities Corp.*, 497 F.2d 516, 527-28 (5th Cir. 1974) (citations omitted).  Again, Securities Act Section 5 liability may attach even if no sales occur, or even if the sale does not violate the statute.  *E.g.*, *Cavanagh*, 155 F.3d at 135 ("[A]n offer in violation of Section 5(c) constitutes an independent offense…regardless of whether a sale occurs or the conditions of that sale.").[15]

For these reasons, the cases cited by Defendants are all inapposite.  In each, only sales were presented, such that none of these courts had occasion to address the broader scope of acts covered by Section 5—the question squarely presented in this case.

---

[15] It is thus unremarkable that, as Defendants point out, courts have applied *Morrison*'s transactional test to Securities Act Section 17(a) which, similar to Exchange Act Section 10(b), focuses on fraud "in the offer or sale" of securities.  15 U.S.C. § 77q(a)(2).  Even in those cases, the courts draw a distinction between "offers" and "sales" subject to Securities Act Section 17(a).  *E.g.*, *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011) (dismissing "sales" claims not "offer" claims under Section 17(a) against defendant who marketed investment from New York).

For example, *SEC v. Bio Defense Corporation* involved securities offered overseas, from foreign call centers to foreign citizens, but the court nevertheless held that the SEC *could bring* suit under *Morrison* because the completion of the sales transaction occurred upon signing a document in the U.S.  No. 12 Civ. 11669, 2019 WL 7578525, at \*12 (D. Mass. Sept. 6, 2019), *aff'd sub nom. SEC v. Morrone*, No. 19-2006, ___ F.3d ___, 2021 WL 1850551 (1st Cir. May 10, 2021).  *Schentag v. Nebgen* is even further afield, as it involved a private right of action under Securities Act Section 12, which requires an actual purchase of securities to establish liability.  No. 17 Civ. 8734, 2018 WL 3104092, at \*5 (S.D.N.Y. June 21, 2018); *see also* 15 U.S.C. § 77*l*(a).  No such requirement exists in an SEC enforcement action under Securities Act Section 5.

Defendants' arguments fare even worse when they invoke the "predominantly foreign" language in *Parkcentral Global Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198 (2d Cir. 2014), and *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161 (2d Cir. 2021).  Both *Parkcentral* and *Cavello Bay* (neither of which involved Section 5) involved a non-U.S. defendant and the foreign securities of a non-U.S. issuer, where both sides to the transactions were institutional investors that chose the application of non-U.S. law in their agreements.  *E.g.*, *Cavello Bay*, 986 F.3d at 167; *see also Morrone*, ___ F.3d ___, 2021 WL 1850551, at \*6 (rejecting application of *Parkcentral* and *Cavello Bay* to promoters of the stock of a U.S.-based company who "conducted nearly all of their activities in furtherance of the fraud from the U.S.," and holding that such conduct was domestic under *Morrison*).  To the extent *Parkcentral* and *Cavello Bay* apply, they show the need to impose Section 5 liability on Defendants' unregistered distribution because it involved a public offering by a U.S. corporation and its U.S. affiliates of a U.S. security to retail U.S. investors, where liability requires no completed contract.[16]

---

[16] Defendants improperly insist that the Court weigh the evidence and make factual findings at the motion to dismiss stage, arguing that the Complaint shows that the trades were "executed…through a foreign Market Maker and on foreign exchanges."  Garlinghouse Br. at 30; Larsen Br. at 24.  These are incorrect recitations of the facts the Court must

**F.      Even if *Morrison*'s Transactional Test Applied, the Complaint Pleads Transactions that Satisfy It.**

**1.      *Morrison*'s Transactional Test Must Apply to All Sales in Defendants' Public Distribution of XRP.**

Even if *Morrison*'s transactional test were the proper method to determine the scope of Securities Act Section 5's registration requirement, the court must consider *all* the transactions at issue in Defendants' public distribution of XRP securities, including the resales of XRP to U.S. investors on U.S. markets (which indisputably satisfy *Morrison*) and not just Defendants' own sales during one stage of this multi-step distribution process.  In *SEC v. Telegram Group, Inc.*, the issuer—a foreign corporation—made unregistered offers and sales of digital asset securities to both U.S. and foreign investors, and argued—as Defendants do—that *Morrison* barred the application of Securities Act Section 5 to sales of the digital asset securities of the foreign issuer, by the foreign issuer to a foreign investor.  No. 19 Civ. 9439, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020).  Judge Castel rejected the argument and explained that the court had to consider "the entire scheme," which included "the intended resale of Grams by Telegram's conduits into the secondary market [which] is likely to involve U.S. purchasers," and that such secondary sales to U.S. purchasers "would likely satisfy *Morrison's* transactional test."  *Id.* at *1 (citing *Morrison*, 561 U.S. at 269-70).

*Telegram'*s analysis of *all* the transactions that constitute the public distribution of Ripple's securities by Defendants is consistent with the Second Circuit's holding that "if any person involved in a transaction is a statutory underwriter, then none of the persons involved may claim exemption under Section 4[(a)](1)."  *Kern*, 425 F.3d at 153.  In other words, in a "transaction with multiple stages," the "defendants' role in orchestrating the transaction while they were affiliates" subjects them to Section 5 liability even if they were no longer involved when "the unregistered sales

deem true for purposes of these Motions.  The Complaint alleges that Defendants' own offers and sales—which cannot be understood independent of Ripple's—occurred on at least four U.S.-based trading platforms as well as on other non-U.S. based trading platforms.  ¶¶ 177, 186.  Defendants' offers and sale were part of a worldwide distribution of securities.  It is the U.S. portion of this worldwide offering that the SEC seeks to regulate.

occurred," *SEC v. Cavanagh*, 445 F.3d at 115, because a defendant does "not have to be involved in the final step of the distribution to have participated in it." *Geiger*, 363 F.3d at 487.

### 2. The *Morrison* Transactional Test is Satisfied Even with Respect to Each Individual Sale by the U.S. Defendants on non-U.S. Platforms.

Even assuming *Morrison*'s transactional test for Exchange Act Section 10(b) applied to Securities Act Section 5 claims (which it does not), the Complaint pleads domestic offers and sales of XRP by Defendants under that test. As noted, transactions can meet *Morrison*'s transactional test in one of two ways: either because the transaction occurred on a "national securities exchange" in the U.S., or because it constituted a "domestic transaction in other securities." 561 U.S. at 266-67. The first method is a "bright-line test"—the transaction either occurred on a domestic exchange or did not. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68 (2d Cir. 2012) (citation omitted). The second method, can itself be met in one of two ways—by showing "irrevocable liability was incurred" or "title [to the shares] was transferred" in the U.S. *Id.*; *see also Loginovskaya v. Batratchenko*, 764 F.3d 266, 273-74 (2d Cir. 2014) ("there are two ways to allege a 'domestic transaction'" under Section 10(b) (citing *Absolute Activist*)). Irrevocable liability may be determined based many factors, including the location of the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 69-70.

To the extent any of the U.S. digital asset trading platforms used by Defendants are the types of "national securities exchanges" contemplated by *Morrison*, offers and sales on those platforms meet the first prong.[17] Moreover, all sales on all digital asset trading platforms meet the second prong because Defendants incurred irrevocable liability in the U.S.

---

[17] None of the digital asset platforms on which Defendants sold XRP are registered with the SEC as "exchanges." ¶ 94; *see also* 15 U.S.C. § 78e. Thus, it is far from clear that any sales on these platforms—either U.S. or non-U.S.—may be analyzed under *Morrison*'s bright-line prong. *E.g.*, *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (explaining that *Morrison*'s first prong was based on Exchange Act Section 10(b) language focus on "national securities exchange[s]"); *United States v. Georgiou*, 777 F.3d 125, 134-35 (3d Cir. 2015) (noting that the Exchange Act refers separately to "securities exchanges" and "over-the-counter markets," and that the SEC's webpage of registered exchanges does not include OTCBB or the Pink Sheets, and holding that those platforms are therefore not "national securities exchanges"). The Court need not resolve this question because *all* transactions meet *Morrison*'s second prong.

*First*, and contrary to Larsen's argument that the "SEC does not plead that any of Mr. Larsen's XRP sales occurred on a domestic exchange," Larsen Br. at 23, the Complaint alleges that at least some of Defendants' transactions of millions of XRP occurred on *at least five* digital asset trading platforms incorporated in the U.S.  ¶¶ 177, 186.  These transactions squarely satisfy *Morrison's* bright-line test under Defendants' own reading of the test, or, at a minimum, they satisfy *Absolute Activist*, because these allegations suffice to infer that irrevocable liability attached in the U.S.  *E.g.*, *Myun-Uk Choi*, 890 F.3d at 67 (allegation that a trade cleared on a U.S.-based platform sufficient to meet irrevocable liability test even if the security was listed on a non-U.S. based platform).

Defendants nevertheless insist that this allegation is insufficient to plead domestic transactions because one cannot infer from the fact that the transactions occurred on U.S.-based platforms that "irrevocable liability" for those sales occurred in the U.S.  However, this argument conflates the first way of meeting *Morrison*'s transactional test with the second.  Offers and sales on U.S. platforms are by definition "domestic" under *Morrison*'s first prong (bright-line test), and no *additional* allegations to prove the second prong (irrevocable liability test) are required.  Thus, all of the cases Defendants cite in support of the argument that the SEC does not allege domestic sales even as to U.S.-based platforms are cases interpreting the *second Morrison* prong, not the first, and none involved transactions on domestic trading platforms or suggest that allegations about irrevocable liability are necessary to meet the bright-line test.  *See, e.g.*, *Lognovskaya*, 764 F.3d at 274-75 (involving private transactions of sales); *Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.*, __ Fed. App'x __, 2021 WL 825743, at *2 (2d Cir. Mar. 4, 2021) (involving "secondary aftermarket transactions" and thus the second prong of the *Morrison* test).

Moreover, even if allegations relating to the second method of meeting *Morrison*'s test were required to meet the first, that certain transactions occurred on domestic platforms is enough to

plausibly infer that title passed in the U.S.  That inference is certainly more plausible than a contrary supposition—that U.S.-based platforms would "pass" the digital assets on foreign servers.[18]

*Second*, transactions that occurred on the digital asset platforms these particular Defendants used all doubly satisfy *Morrison*'s second prong, because Defendants and the U.S. purchasers of XRP incurred irrevocable liability for these transactions in the U.S.

In *Absolute Activist* itself, the Second Circuit explained that an off-exchange transaction is "domestic" under Morrison if *either* "the purchaser incurred irrevocable liability within the United States to take and pay for a security," *or* "the seller incurred irrevocable liability within the United States to deliver a security."  677 F.3d at 68.  The Court of Appeals later explained that the inquiry into where either side incurred irrevocable liability does not turn on contract-law principles or where "a contract is said to have been executed."  *United States v. Vilar*, 729 F.3d 62, 77-78 n.11 (2d Cir. 2013).  Rather, "territoriality under *Morrison* concerns *where, physically,* the purchaser or seller committed him or herself."  *Id.* (emphasis added).  In *Vilar*, the Second Circuit illustrated this idea with the example of a foreign seller who sent an offer to sell securities to a person in Puerto Rico.  That seller would incur irrevocable liability in the U.S. even though, under Puerto Rican law, any resulting contract would be governed by the foreign law where the offer originated.  *Id.*

*Morrison* and *Absolute Activist* allow that "the parties may be bound at two separate times and locations," such that where "the evidence demonstrates that at least one party…was acting from the United States,…the transactions are domestic under *Morrison*."  *SEC v. Ahmed*, 308 F. Supp. 3d 628, 669 (D. Conn. 2018).  And, once a party becomes irrevocably bound in one jurisdiction, the fact that another party still has to perform an act (perhaps in another country) to deliver the securities or otherwise complete the transaction does not place the transaction outside of the reach of the federal

---

[18] Moreover, Defendants seek to have it both ways.  They want the Court to infer that title to securities traded on U.S.-based platforms *does not* pass in those platforms' place of incorporation (the U.S.), but also want the Court to infer the opposite as to securities traded on non-U.S. platforms—that title *does* pass in the foreign locale.

securities laws if those circumstances are "entirely out of [the seller's] control and depended solely on subsequent actions taken by" third parties. *Giunta v. Dingma*n, 893 F.3d 73, 81 (2d Cir. 2018).

These principles are consistent with a consensus that has developed in the U.S. under the Uniform Electronic Transactions Act ("UETA") for determining the situs of a purchase or sale based on electronic communications.  15 U.S.C. § 7001 *et. seq.*  Under the UETA, which California (the jurisdiction of Defendants' principal place of business) has adopted, Defendants' electronic communications into the automated sales system of non-U.S. trading platforms—necessary to irrevocably commit them to sell XRP—are deemed sent from their place of business, California.  *See* ¶¶ 16-18, 176, 185; *see also* Cal. Civil Code § 1633.15(d) ("Unless otherwise expressly provided in the electronic record or agreed between the sender and the recipient, an electronic record is deemed to be sent from the sender's place of business."); UETA § 15(d).

Under these principles, even the second prong of *Morrison*'s transactional test is satisfied in at least one of two ways.  First, Defendants became irrevocably bound to sell their XRP when they transmitted their sell orders to the market makers from their offices or residences in California, so *Morrison* is satisfied because the seller incurred irrevocable liability in the U.S.  *See also Naftalin*, 441 U.S. at 773 (transmittal of order to sell may violate Securities Act Section 5).  Second, even if Defendants somehow became irrevocably bound on the non-U.S. exchanges, the *purchasers* of Defendants' XRP that were U.S. purchasers became irrevocably bound in the U.S., making Defendants indistinguishable from the would-be seller in *Vilar* (sitting abroad but transmitting an offer to sell into Puerto Rico), which the Second Circuit concluded satisfies *Morrison*.

Defendants ignore the foregoing principles and would reduce even the "irrevocable liability" test to the place a digital asset platform's parent company incorporates.  *E.g.*, Garlinghouse Br. at 23;

Larsen Br. at 24.[19]  This argument is the mirror image of the erroneous argument Defendants make to avoid liability as to transactions on U.S.-based platforms.  As to those transactions, Defendants would impose the requirements of *Morrison*'s second prong (irrevocable liability) on the first (the bright-line test).  Here, as to transactions on other platforms, Defendants would collapse the first *Morrison* prong into the second, rendering the "irrevocable liability" test superfluous.  Thus, while Defendants cite cases dealing with *Morrison*'s second prong to contend with trades that meet its first prong, here, they confusingly rely on cases dealing with *Morrison's* first prong to contend with its second.  *E.g.*, *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010) (transactions on a foreign, national securities exchange, the SWX Swiss Exchange, not addressing irrevocable liability) (cited in Garlinghouse Br. at 24; Larsen Br. at 25); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 532-33 (S.D.N.Y. 2011) (transactions on a foreign, national securities exchange, the Paris Bourse, not addressing irrevocable liability).

Defendants' argument is foreclosed by *Myun-Uk Choi*, where the Second Circuit applied the "irrevocable liability" test to transactions in securities listed on a non-U.S. trading platform.  As the Second Circuit explained, "*Morrison* clearly provided that the 'domestic transaction' prong is an independent and sufficient basis for application of the Securities Exchange Act to purportedly foreign conduct.  *Morrison* summarized the standard in the disjunctive:  '[W]hether the purchase or sale is made in the United States, *or* involves a security listed on a domestic exchange.'"  890 F.3d at 67 (citing *Morrison*, 561 U.S. at 269-70).  Thus, the court held that sufficiently plausible allegations that irrevocable liability occurred in the U.S. were enough to withstand a motion to dismiss under *Morrison*, notwithstanding that the securities were listed on a non-U.S. trading platform.

---

[19] As a preliminary matter, it is wholly nonsensical to speak, as Garlinghouse does, of a physical "location" for a digital asset exchange that operates by definition on a network of computers distributed around the planet.

Defendants' argument also relies on incomplete factual assumptions (not presently before the Court) about how XRP transactions actually occur.  The Complaint alleges that Defendants disposed of their XRP when they transmitted it from the U.S. to the Market Maker.  ¶¶ 174, 183.  To the extent that is the "sale" to which *Morrison*'s transactional test should apply, Defendants incurred irrevocable liability to dispose of (and did dispose of) their XRP when they transmitted instructions, signed by their associated "private keys," to the XRP Ledger to transfer their XRP to the Market Maker, which the Court may infer based on UETA occurred from Defendants' principal place of business—California.

To the extent the relevant sale is between the Market Maker and a purchaser on a non-U.S. based platform (which may be a U.S. investor, since many of these platforms have worldwide operations, *see id.*), the question of when "title passed" is more complicated than Defendants would allow, and further illustrates the pitfalls of trying to squeeze this case into *Morrison*'s transactional test.  To the extent a "sale" on a non-U.S. digital asset trading platform occurs "on-chain," ¶ 35— *i.e.*, actually on the XRP Ledger—the transfer is final when it is written to the XRP Ledger and validated by the blockchain's consensus mechanism.  This process is achieved, not on the servers of the digital asset platforms, but on the network of computers that "validate" new blocks for the XRP Ledger based on a system of consensus.  *See supra* at 4.  Today, at least 40% of these network computers are operated by Ripple or other U.S.-based entities, ¶¶ 39-41, and the number was above 80% at the time of some of Defendants' sales.  At the motion to dismiss stage, title to digital assets represented on blockchain may plausibly be understood to pass within the U.S. when, like the XRP Ledger, the digital ledger is operated primarily from the U.S.  *See In re Tezos Sec. Litig.*, No. 17 Civ. 6779, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (noting allegations that the Ethereum blockchain consisted of a "global network of 'nodes' clustered more densely in the United States than in any other country," which was sufficient to satisfy *Morrison*'s transactional test).

* * *

Defendants' arguments require ignoring *Morrison*'s admonition that the threshold step is to determine the "focus" of a statutory provision. They would effectively repeal the Securities Act's registration requirements *sub silentio* by permitting a U.S. issuer to condition U.S. capital markets and raise capital from U.S. investors but avoid providing the information that for nearly 80 years Congress has required when issuers seek to raise U.S. investor funds, by the trick—as simple as it gets in today's digital world—of trading the security on both U.S. and non-U.S. digital platforms. Section 5's broad provisions are designed to prevent such a result. *See North Am. Res. Dev. Corp.*, 424 F.2d at 71.

## III.   THE CLAIMS FOR MONETARY RELIEF AGAINST LARSEN ARE TIMELY.

The SEC seeks monetary relief—disgorgement and civil penalties—for Larsen's violations. *See* 15 U.S.C. §§ 77t(d), 78u(d)(7). Under the statute of limitations applicable to claims for monetary relief based on Larsen's Section 5 violations, the SEC may recover for violations that occurred five years before the September 1, 2020 date of its tolling agreement with Larsen, ¶ 429—that is, for conduct between September 1, 2015 and the filing of the Complaint. *See id.* § 78u(d)(8)(A)(i).[20]

Larsen argues, however, that the SEC cannot recover *any* of the $450 million in XRP sales proceeds he netted, ¶ 86, because he first violated the statute in 2013 and the statute of limitations expired in 2018, given that he and Ripple engaged in a years-long unregistered offering of securities.

But Larsen committed a discrete violation of Section 5 with *each* unregistered offer and *each* unregistered sale. *E.g.*, *Cavanagh*, 155 F.3d at 133. Accordingly, for statute of limitations purposes, "a series of repeated violations of an identical nature" renders each violation "actionable for five

---

[20] The five-year limitations period for the offenses at issue in this case was enacted by Section 6501(a) of the National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. 116-283, 134 Stat. 3388 (Jan. 1, 2021). It was previously set forth in 28 U.S.C. § 2462, as interpreted in *Gabelli v. SEC*, 568 U.S. 442 (2013), and *Kokesh v. SEC*, 137 S. Ct. 1635 (2017). Larsen is correct that the SEC does not argue that the NDAA's *ten-year* period applies to the request for *monetary relief*. *See* 15 U.S.C. § 78u(d)(8)(A)(ii). It *does* apply to the SEC's requests for injunctions, which Larsen does not allege are untimely, *id.* § 78u(d)(8)(B), as the SEC informed Larsen's counsel by letter dated February 3, 2021.

years after its occurrence." *SEC v. Kokesh*, 884 F.3d 979, 985 (10th Cir. 2018) (citation omitted); *see also SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 286, 288 n.7 (2d Cir. 2013) (finding it appropriate to "count[ ] each late trade as a separate violation" where defendants perpetrated a late trading "scheme"). The SEC could not have had "a complete and present cause of action," *Gabelli*, 568 U.S. at 448 (citation omitted), as to each XRP offer and sale until Larsen made each one.

Despite Larsen's argument (*see* Larsen Br. at 29-30), there is no inconsistency between the SEC's characterization of his conduct as repetitive and continuous in nature and the SEC's request for monetary relief for each unlawful offer and sale. After all, the Second Circuit held in *Cavanagh* that each offer and each sale requires registration, while also recognizing that Section 5's provisions are expansive and cover the entire offering process. 155 F.3d at 135. Nor is there any inconsistency in describing conduct as a single distribution involving multiple, discrete offers and sales.

*SEC v. Jones*, the only case involving Securities Act Section 5 that Larsen cites, provides no support for his proposition that the SEC may not obtain monetary relief for the illegal sales he made even a few weeks before the Complaint's filing. 300 F. Supp. 312 (D. Mass. 2018). That case involved a court finding, upon a full review of the factual record and not on a motion to dismiss, that the SEC had only offered evidence that the defendant was involved in sales that occurred in 2007 and not enough evidence that he was involved with sales that had occurred during the five years before the case was filed. *Id.* at 316-18. The court did *not* dismiss the claims as time-barred on the theory that Larsen advances—that the statute of limitations began to run on the date of the *first* sale—even though the case also involved claims of violative offers that spanned years. *Id.* at 314.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motions.

Dated:  New York, New York
        May 14, 2021

Jorge G. Tenreiro
Dugan Bliss
Robert S. Moye
Benjamin Hanauer
Mark R. Sylvester
Daphna A. Waxman
Jon A. Daniels
Ladan F. Stewart

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-9145 (Tenreiro)
tenreiroj@sec.gov