```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES and EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
          v.                          20CV10832(AT)(SN)
6                                     Remote Proceeding

7    RIPPLE LABS, INC., et al.,

8                    Defendants.

9    ------------------------------x
                                      New York, N.Y.
10                                    April 30, 2021
                                      10:00 a.m.
11
     Before:
12
                         HON. SARAH NETBURN,
13
                                      U.S. Magistrate Judge
14

15                         APPEARANCES

16
     U.S. SECURITIES and EXCHANGE COMMISSION
17        Attorneys for Plaintiff SEC
     BY:  JORGE G. TENREIRO
18        DUGAN W.E. BLISS
          DAPHNA A. WAXMAN
19        JON A. DANIELS
          LADAN F. STEWART
20
     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
21        Attorneys for Defendant Bradley Garlinghouse
     BY:  MATTHEW SOLOMON
22        NOWELL D. BAMBERGER
          ALEXANDER J. JANGHORBANI
23        SAMUEL LOEWENSON LEVANDER

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Appearances (Cont'd)

2

3    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
          Attorneys for Defendant Christian A. Larsen
4    BY:  MARTIN FLUMENBAUM
          MICHAEL E. GERTZMAN
5         KRISTINA A. BUNTING
          ROBIN LINSENMAYER

6

7    DEBEVOISE & PLIMPTON, LLP
          Attorneys for Defendant Ripple Labs, Inc
     BY:  JOY GUO
8         ANDREW J. CERESNEY
          LISA R. ZORNBERG
9         MARY JO WHITE

10   KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
          Attorneys for Defendant Ripple Labs, Inc.
11   BY:  MICHAEL KELLOGG

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (The Court and all parties appearing telephonically)

2          THE COURT:  Good morning, everybody.  This is Judge

3   Netburn.  I think we are all set to go.

4          Ms. Slusher, will the call the case, please.

5          THE DEPUTY CLERK:  Good morning, your Honor.

6          This is in the matter of *Securities and Exchange*

7   *Commission v. Ripple Labs, Inc., et al.*, 20 CV 10832.

8          Starting with the plaintiff, will you please state

9   statement your appearance for the record?

10          MR. TENEIRO:  Good morning, your Honor.  This Jorge

11   Teneiro on behalf of the Securities and Exchange Commission.

12   With me are my colleagues Dugan Bliss, Daphna Waxman, Jon

13   Daniels, and Lavan Stewart; and as in previous conferences,

14   other SEC staff members may also be listening in on the line.

15          THE COURT:  Thank you.  Good morning.

16          On behalf Ripple Labs.

17          MR. KELLOGG:  Good morning, Judge Netburn.

18          This is Michael Kellogg on behalf of Ripple Labs.

19   There are various colleagues also on the phone, but I will be

20   speaking for Ripple Labs.

21          THE COURT:  Thank you.

22          On behalf Mr. Garlinghouse.

23          MR. SOLOMON:  Good morning, your Honor.

24          This is Mat Solomon from Cleary Gottlieb with various

25   other Cleary attorneys.  If necessary today, I will be speaking

1    on behalf of Mr. Garlinghouse.

2              THE COURT:  Thank you.  Good morning.

3              On behalf of Mr. Larsen.

4              MR. FLUMENBAUM:  Good morning, your Honor.

5              This is Marty Flumenbaum from Paul, Weiss, Rifkind,

6    Wharton & Garrison.  With me on the phone is Michael Gertzman,

7    Robin Linsenmayer, and Christina Bunting.  Mr. Gertzman will

8    make the principal argument on behalf of all the defendants.

9              THE COURT:  So we are here on the motion filed by

10   Ripple Labs and all the defendants collectively.  That letter

11   was filed on April 16th.  I have the SEC's response from

12   April 23rd followed by an April 28th and April 29th letter from

13   the defendants and a late filed letter last night from the SEC.

14   I have read all of those letters.  I think that is everything

15   that is before the Court right now.

16             The issue that is presented today is a question about

17   the SEC's use of the Memoranda of Understanding that it has

18   with foreign regulators and its efforts to obtain discovery

19   through those channels.  I have read the letters as I

20   mentioned.  I will begin by giving each side an opportunity to

21   state their position any further.  Again, I feel like this

22   issue has been well briefed; but I am happy to hear from the

23   parties.

24             Since this is the defendants' motion, Mr. Kellogg, I

25   will let you begin.

1          MR. KELLOGG:  Actually, your Honor, Mr. Gertzman was

2     going to begin if that is okay, and then I will have a couple

3     Ripple Labs specific points to make at the end of his

4     presentation.

5          THE COURT:  That is fine, but I didn't hear who was

6     going to speak.

7          MR. GERTZMAN:  Good morning, your Honor.  This is

8     Michael Gertzman from Paul Weiss.  We represent Mr. Larsen.  As

9     Mr. Kellogg just said, I have been asked to speak on behalf of

10    all the defendants to get started here.

11         I apologize, your Honor, my call just dropped so I

12    missed the first sentences of what your Honor had to say.  So I

13    apologize for that and hope my line will be stable now.

14         Your Honor, the SEC in this case is improperly using

15    its memoranda of understanding for foreign securities

16    regulators to seek wide-ranging discovery from overseas parties

17    to gain unfair advantage over the defendants in a matter that

18    improperly evades the Federal Rules of Civil Procedure and the

19    powers of the Court.  We have no problems whatsoever with the

20    SEC's use of the MoU process in the pre-litigation

21    investigative stages of its work; but once the SEC completes

22    its investigation and proceeds to file a case in federal court,

23    as it has done in this case, the SEC is and it should be bound

24    by the very same rules of discovery as every other federal

25    court litigant.

1          The SEC is not a superlitigant.  It doesn't have the

2   right to take for itself questionable discovery powers that we,

3   the defendants, don't have; but it was done so here and in

4   doing so, it has undone the level playing field that the courts

5   and rules of procedure require all litigants to abide by, and

6   it has done so in a manner that has evaded the supervision of

7   this Court.  Since the very moment we first learned that the

8   SEC was engaging in these extrajudicial tactics, we repeatedly

9   asked them to stop, but they refused.

10          Now, 36 hours ago on the eve of this hearing -- and I

11   submit, your Honor, it is no coincidence that it was on the eve

12   of this hearing -- and only after weeks of meeting and

13   conferring and corresponding with SEC in which we asked them to

14   provide us with information about their overseas discovery

15   requests, the SEC has finally provided information that

16   revealed the enormity of the breadth and scope of their

17   previously undisclosed foreign discovery program.  It is really

18   quite enormous.  It is 50 separate requests to over 30

19   different individuals or entities in nine different countries

20   all around the world.  Far from alleviating the unfairness of

21   its use of the MoUs after this litigation was filed, the

22   disclosures that came in late Wednesday night only highlight

23   how one-sided and unfair the SEC's extrajudicial discovery

24   program is.

25          Most importantly the Wednesday night letter doesn't

1    change the fact at all that they have refused to stop using

2    these Moves to improperly secure the discovery from overseas in

3    this case.  So we're asking the Court to direct the SEC to stop

4    the use of MoUs in this litigation and for an order directing

5    the SEC to produce all the documents they have received or

6    reviewed in response to their use of the MoUs as well as the

7    requests themselves and their related correspondence with the

8    foreign regulators.

9          THE COURT:  I assume that this issue doesn't come up

10   all this often, which may explain the lack of case law here.

11   The only case law that the parties have cited that is

12   specifically on point is the *Badian* case, which upheld the

13   SEC's use of an MoU request.

14         Are you aware of any cases where the courts have

15   adopted the defendants' position here and directed the SEC to

16   cease using these requests?

17         MR. GERTZMAN:  No, your Honor.  There is no case that

18   specifically so holds; but the only case on this issue anywhere

19   that we're aware of is the *Badian* case.  I would submit to your

20   Honor that the *Badian* case is a very, very different case from

21   this one for a number of reasons.  I would also submit that

22   when you look at the record in that case, you can see that the

23   case was decided based on a faulty factual premise that

24   resulted from a statement by defense counsel in its papers that

25   turned out to be incorrect.

1          I would like to address *Badian*, but I should also say,

2     your Honor, that while there is no case that specifically goes

3     in our direction that I am aware of, there is plenty authority

4     in the very analogous contexts of the SEC's use of

5     administrative subpoenas; and SEC itself is quite clear and has

6     been clear in many contexts that it does not believe it should

7     be using administrative subpoenas and the context of litigation

8     once the investigation has concluded.  This is really no

9     different.  The administrative subpoenas are the domestic

10    equivalent of what the SEC is doing here with the MoUs.  So I

11    would submit, your Honor, that that authority is quite

12    analogous and quite potent on this issue.

13          Let me, if I could, speak more directly to *Badian*.  It

14    is a very different case from this one.  It involved only a

15    single targeted overseas discovery request.  It didn't involve

16    a multitude of requests across nine different countries

17    asserting entities as we have here.  Even if it were

18    controlling law, which of course it isn't and it has never been

19    followed, it does not stand for the proposition that the SEC

20    can make such broad, unrestrained use of the MoU processes as

21    it seems it is doing here.

22          Now, as I said the holding of *Badian* rests on a faulty

23    premise, and the record in that case shows that the decision

24    rests on a statement by defense counsel in that case that was

25    in fact incorrect; and when you unpack the record, you can see

1    that.  *Badian* said that the SEC could use its powers to obtain

2    foreign discovery in a civil case; but the mistaken belief on

3    which it relied was that the SEC's use of the MoU to obtain

4    that overseas discovery did not involve compulsory process.

5         The reason why the Court came to that view, your

6    Honor, was that defense counsel told the Court that the U.K.

7    financial regulator in that case that the request issued by the

8    U.K. financial regulator to the overseas entity from which

9    discovery was sought stated that the FSA, which was the

10   regulator, sought voluntary production of documents from the

11   overseas entity.  You can see that statement, an incorrect

12   statement, in one of the documents in Exhibit B to the SEC's

13   April 23rd letter.  Specifically, it is defense counsel's

14   August 12, 2009, letter to the Court, which states that the FSA

15   request was voluntary.

16        When you actually look at the FSA's request and you

17   look at the law, the MoU itself, and you look at the FSA's own

18   rules about how these things work -- and we can see the FSA's

19   actual request in Exhibit B to the SEC's April 23rd letter.

20   Specifically, it's the July 27th, 2009, letter that is part of

21   the Exhibit B.  When you look at that FSA request, it is

22   crystal clear that it was not voluntary at all.  The letter

23   says that if the entity does not provide the document

24   voluntarily, the FSA has the power to compel production of the

25   document.  The FSA request goes on to say that the entity

requires the FSA to compel the production, it should tell the

FSA that.  That does not sound like a voluntary request at all,

your Honor, and that was the erroneous premise on which the

opinion is based.

As Magistrate Judge Pittman went on to conclude -- he

analogized the FSA request to a voluntary request that any

party might make with third-party seeking discovery; but the

FSA request was not voluntary.  It basically said, *If you are*

*not going to produce voluntary, tell us and we'll make you*

*produce.*  That is not a voluntary request.  In fact, your

Honor, the MoU process is compulsory.  It's compulsory at the

level of a foreign regulator's request.  The MoU makes that

clear.  You can see that in Section 9(d) of the MoU.  It is at

page 6 of the multilateral Memoranda of Understanding.

As I mentioned, the enforcement guide for the U.K.

conduct authority, which is the same authority that was --

well, similar authority that was of issue in the *Badian* case,

it provides that the issuance -- for issuance of compulsory

process that in the event of noncompliance may be punished as

contempt.

THE COURT:  Can I just clarify, Mr. Gertzman?

MR. GERTZMAN:  Sure.

THE COURT:  Just to clarify that we all have the same

understanding, it is my understanding that the request from the

SEC to its foreign counterpart, that request is one that could

```
1    be rejected, that it is arguably a voluntary engagement; but

2    that once the foreign regulator agrees to move forward with the

3    request as to those entities that it regulates, that that

4    request may be more compulsory.

5            Is that your understanding as well?

6            MR. GERTZMAN:  Well, your Honor, it's our position

7    that it is compulsory at both levels -- both the level of the

8    SEC request to the foreign regulator and at the level of the

9    foreign regulator's request to the overseas party.  The reason

10   why it is compulsory at the level of the request from the SEC

11   to the foreign regulator is that the SEC, contrary to what they

12   suggest, there is no discretion.  There is no unilateral

13   pre-discretion on the part of the overseas regulator to decline

14   a request.  If you look at Section 6(e) of the MoU, it

15   delineates very, very narrow limited circumstances under which

16   the foreign regulator can decline.

17           And when the SEC makes a request under the MoU, it's

18   backed by the full force and power of the U.S. government.

19   It's a binding international agreement.  It's a treaty in

20   effect.  It's part of international law.  It isn't the SEC

21   calling up and saying, *Hey, would you mind giving us some*

22   *documents.*  It's the SEC writing pursuant to this international

23   treatise, this international obligation masking on behalf of

24   the U.S. government under a treaty to which our respective

25   countries are bound that you obtain and provide the documents.
```

1    That is not a mere request.  It's a call for a legal obligation

2    under an agreement backed by all the weight and power of the

3    U.S. government.

4          The real point, your Honor, is how much differential

5    and power there is here between the SEC's use of the MoUs and

6    our ability to get discovery form overseas parties.  Can you

7    imagine, your Honor, if we were to call up an overseas

8    regulator and say, *Hey, we're defendants in this case.  Would

9    you please get some discovery from us from one of the entities

10   in your country?*  Or if we were to call up the entity itself

11   and say, *Would you please sends up some documents*?  You can

12   imagine, your Honor, that that is a very different type of

13   requests from the SEC using its power under this MoU backed by

14   the U.S. government to enforce the powers of the MoU to obtain

15   this discovery.

16         That's the whole point, your Honor.  There should be a

17   level playing field.  The SEC has the full power to use the MoU

18   in the investigative process; but once the litigation began,

19   just like administrative subpoenas, it should play by the same

20   rules that we have to play by.  There are rules, your Honor.

21   There are clear procedures that all parties have equal access

22   to the -- the Hague Convention, letters rogatory.  There are

23   rules of civil procedure and statutes that apply to these

24   situations and we have to abide by them and so should the SEC.

25         THE COURT:  Let me ask you a question.  If we all

1   agree that you and the SEC can utilize the Hague Convention to

2   obtain discovery from a foreign entity, what is the difference

3   between use of a Hague Convention request and an MoU request

4   other than it's a little bit easier for the SEC?  Is that the

5   only difference?

6            MR. GERTZMAN:  No, your Honor.  There are very

7   important differences that go to the need and the entire scheme

8   of the Federal Rules of Civil Procedure to have the courts

9   supervise and keep track of what goes on in discovery.  What

10  the SEC is doing via the MoU process is entirely outside the

11  powers and supervision of this Court.  We only found out about

12  this, your Honor, because one of the foreign parties the SEC

13  was seeking discovery from told the company.  And we raised it

14  with the SEC and for weeks we didn't find out until Wednesday

15  night how sweeping and broad this discovery is.

16            If the SEC, like us, had to follow the Hague

17  Convention, they would have to make an application to the

18  Court.  The Court would have to approve that application.

19  Everyone would see and you would see what discovery is being

20  sought.  We would have an opportunity to object.  And if there

21  was something narrow or constricted about that request, we

22  could ask that it be expanded or changed in some way to make it

23  more fair.  What is going on here is the SEC is engaging in

24  discovery in secret on its own outside the supervision of the

25  Court.  And if it were a Rule 45 subpoena for domestic

1    discovery, we would see that because Rule 45 requires the

2    parties to tell the other parties about it.  If it was a Hague

3    Convention request, we would see it and your Honor would see

4    it.  But what is going to on here is outside the supervision of

5    the Court.

6           Your Honor, this is no small bit of discovery here.

7    When we got the letter on Wednesday night, it really became

8    clear how sweeping and broad this is.  There is an entire

9    massive overseas discovery program going on here that until we

10   press the SEC over weeks to get this information, we didn't

11   know about and we couldn't even bring it to your Honor's

12   attention.  That is not the way the Rules of Civil Procedure

13   are supposed to work.

14          Your Honor, let me make also a point about the SEC's

15   complaint that if they have play by the usual rules of the

16   Hague Convention that it will take too long.  Your Honor, I

17   submit that your Honor should not hear that complaint from the

18   SEC.  The investigation in this case went on for two and a half

19   years.  SEC had the full power of the MoU process to take and

20   get whatever international discovery it wanted.  There was

21   nothing surprising or secret about the fact that there would be

22   a need perhaps to get international documents in this case.

23          My client, through counsel, told the SEC that the

24   transactions here occurred overseas.  It was part of the Wells

25   process.  This was a significant argument in the pre-litigation

investigative phase of the case.  We produced documents that

show these transactions took place overseas.  But for some

reason the SEC decided to rush to bring the case at the end of

the year as the administration was turning over and having done

so, they have to play by the same rules.  They can develop the

record just the way we can develop the record, but they should

do it using the same rules that we are bound by.

           Lastly, your Honor, I just wanted to briefly address

the argument that the SEC should not have to turn over the

requests themselves or the correspondence with the foreign

regulators.  Your Honor, they are making a claim of privilege

here.  The privilege claim is vague.  Like any other litigant

if there are documents that are privileged, they should log

them.  If they are privileged in part, they should redact them

and produce a redaction log.  They don't just get to say,

*Sorry.  We're not giving you the stuff*, especially how sweeping

and broad this discovery is from essentially countries all over

the world.

           Your Honor, we submit to you that you should tell the

SEC to stop using the MoU process.  Now that this litigation is

underway they should play by the same rules of foreign

discovery that we have to play by and they should produce the

requests themselves as well as the correspondence of the

foreign regulators.

           Happy to answer any further questions you may have.

1              THE COURT:  Thank you.

2              Mr. Kellogg, is there something you wanted to add to

3      that.

4              MR. KELLOGG:  Yes, your Honor.  I will be quite brief.

5              I wanted to emphasize the practical consequences of

6      what the SEC is doing here for our litigation.  Once they file

7      a complaint, they have stepped into an Article III forum and

8      are subject to the rules of that forum.  They have tried to

9      evade that and those fundamental constraints by relying on an

10     investigative tool, the MoUs, to conducts extensive

11     international discovery.  That is not a no-harm-no-foul

12     situation as the SEC tries to suggest.  It has two real world

13     consequences that call into question the fairness of the

14     proceeding.

15             First, even though they eventually have to share with

16     us the documents they received through foreign regulators, they

17     can skew the evidence by what they ask for.  And they have done

18     exactly that in the MoUs, or at least what they have told us

19     about the MoUs.  As Mr. Gertzman noted in the domestic

20     discovery context if they want to serve a Rule 45 third-party

21     subpoena, we get to see it first.  If it is a one-sided request

22     for information, we can add our own subpoena.  In international

23     discovery, the same holds true for letters rogatory under the

24     Hague Convention.  We get to see them first and we can request

25     additional items to balance them out.  But that is not the case

1    with MoUs.  We don't get to see them before they go out.

2    Indeed, the SEC says we never get to see them and we don't get

3    to add to them.  That is critical here.

4          The SEC has asked 14 international digit-asset trading

5    platforms, and I am quoting from their April 23 letter at page

6    5 -- "Intraday XRP trading data for Ripple's XRP sales for

7    certain time periods."  It admits that such data "is critical

8    to a central dispute between the parties whether XRP's price

9    moves were influenced by Ripple's announcement."  The Court

10   knows how critical that is from the past argument we had.  In

11   other words, as we discussed at that argument, the information

12   is critical to whether the price of XRP moves in conjunction

13   with market forces rather than do solely or primarily to the

14   efforts of Ripple.

15         The problem is that the SEC couched its request to get

16   only the data that it thinks will support its argument.  They

17   are only looking for Ripple's sales at XRP even though those

18   are only a tiny fraction of a percent of overall sales, and

19   they reserve the right to cherrypick timeframes.  To make our

20   case, our experts need intraday trading data for all sales at

21   XRP and for the entire period in 2013 to December 2020.  That

22   information is incredibly hard to get.

23         As the SEC knows the Hague Convention process is

24   likely to be way too slow for the accelerated schedule in this

25   case, a schedule I would stress we need to keep because of the

1    tremendous harm the filing of this suit has done to XRP holders

2    throughout the world.  We have been working very hard to get

3    that data voluntarily from trade platforms and business

4    partners throughout the world, which brings me to the second

5    real-world consequence of the SEC's skirting the rules here.

6            When they filed this suit, it scared a lot of

7    third-parties who were suddenly faced with the prospect of

8    being sued for securities violation.  Many exchanges as a

9    result delisted XRP; some hedge funds dropped XRP from their

10   portfolios; and businesses using XRP, for example, in the forum

11   settlement process, stopped doing so.  The remaining ones,

12   particularly those in jurisdictions where regulators have

13   concluded that XRP is not a security, these businesses are now

14   being hit by massive document requests from their home

15   regulators and they are understandably freaked out.  We are

16   very concerned about further delisting and the dissolution of

17   existing business relationships.

18           Now, the SEC claims they are not deliberately

19   intimidating companies continuing to use XRP.  Whether

20   deliberate or not, that is the result.  Frankly, they are

21   trying to destroy our business before we have our day in court

22   and they are using what is an investigative tool in the

23   completely different context of discovery without notice to us.

24           Indeed, they tried to keep this a secret.  They kept

25   it a secret from us.  They kept it a secret from the foreign

1    regulators, who were enlisting to help, by using the file

2    number from its original investigation not acknowledging that

3    it was now in a court proceeding.  Most egregiously, they kept

4    it secret from the Court.

5         Now, as an Article I enforcement agency, they can be

6    as arbitrary and one-sided as the law allows in their Article I

7    world of investigations; but once they step into an Article III

8    court, they have to abide by the rules of that court and that

9    is all we're asking here.

10        THE COURT:  With respect to your first point about

11   your position that the SEC's MoU requests are only seeking part

12   of the information, which is not sufficient for you to defend

13   against the case, why isn't the response that you should be

14   issuing letters rogatory, or that you should at the appropriate

15   time move to exclude the evidence because it's prejudicial or

16   incomplete?

17        MR. KELLOGG:  Well, the SEC can hardly take that

18   position that letters rogatory are sufficient for us when they

19   have claimed in their letter that they would be extremely

20   prejudiced by having to use that standard school of discovery

21   because of the accelerated schedule and because how long it

22   traditionally takes to get information through letters

23   rogatory.

24        Now, as I noted we are trying our best to get this

25   information from our foreign partners and from foreign trading

platforms to the extent that they haven't been scared off by

the SEC from doing so and being seen to cooperate with us; but

it is very hard and it it is getting harder when they can then

issue MoUs.  We may have to resort to the Hague Convention

process, but it would be very slow.  If we have to do that, the

SEC should have to do it as well.

THE COURT:  Okay.  Thank you.

Mr. Teneiro, were you the one who will be responding?

MR. TENEIRO:  Yes, your Honor.  This is Jorge Teneiro.

If I may, I would like to make a few points on our position and

then respond to some of the arguments made by counsel.

Your Honor, at issue in this dispute is a multilateral

forum of protrude information that is specifically authorized

by the Securities Exchange Act.  In that statute, Congress

itself recognizes a critical distinction between subpoenas,

which are enforceable in court, and requests for assistance,

which the statute does not make enforceable in court.  Mr.

Gertzman said that administrative subpoenas have the domestic

equivalent of the request that are at issue here, but the

statute itself belies this distinction by actually making one

enforceable in court and the other one not enforceable in

court.  In fact, Section 21 and 2 of the Exchange Act says that

the SEC may provide assistance to foreign regulators.  So the

whole idea that the relationship between the SEC and the

foreign regulator is compulsory in any way is simply incorrect.

1          It is also worth noting that although the defendants

2   characterize these as treaties, they are not treaties.  They

3   are Memorandum of Understanding.  A treaty, just to get

4   technical about it, has to be ratified by two-thirds of the

5   Senate and approved by the Senate and ratified by the

6   President.  This is not that.  Section 6(a) of the MMoU

7   specifically says that it creates no rights and obligations.

8   As much as I wish that we always had answers from the

9   regulators, that simply is not the case.  In this very case, we

10  have received negative responses from some of them.

11         So, with the statute drawing no distinction between --

12  the statute itself draws no distinction between the SEC's

13  ability to use requests or in no way suggests that the

14  abilities to cease its active litigation once it commences.

15  The defendants don't provide any authority to the contrary --

16  at least not in the statute.

17         They also don't cite any provision in the rules that

18  indicate either that the request is akin to compulsory process

19  or that the ability to issue requests ceases when litigation

20  commences.  Accordingly in *Badian*, the only case that is on

21  point and is squarely on point at issue here, the Judge Pittman

22  correctly recognized that the requests are akin to voluntary

23  discovery.  Now, they say this was based on a misunderstanding

24  by Judge Pittman of the record.  I respectfully submit, your

25  Honor, that Judge Pittman did not misunderstand the record.

```
 1              If the Court goes to Docket 136-2 at page 8 in this

 2   docket, it is clear that although that Judge Pittman had a

 3   proper record before him that explained that the regulator was

 4   going to seek voluntary production of documents first and then

 5   might compel the production of documents later.  By the way,

 6   that point illustrates the other important piece here, which is

 7   that the requests are also not compulsory at the other end.  It

 8   simply depends on the regulator's discretion.

 9              In any case, your Honor, in her opinion that adopted

10   Judge Pittman's recommendation, Chief Judge Swain specifically

11   held that the fact that foreign authorities may choose to use

12   compulsory process--

13              OFFICIAL REPORTER:  Counsel, please slow down.

14              MR. TENEIRO:  I am sorry about that.

15              THE COURT:  Thank you, madam court reporter.  I was

16   going to say the same thing.  Yes, if you can speak more slowly

17   so I can hear you and the court reporter can hear you.  We're

18   both important.

19              MR. TENEIRO:  Thank you, your Honor.

20              So as I was saying in her opinion, adopting Judge

21   Pittman's opinion, Chief Judge Swain specifically held that the

22   fact that foreign authorities may choose to use compulsory

23   process does not change the nature of requests from voluntary

24   to compulsory.  The Court can see that in the opinion, which is

25   also at Docket 136-3 at page 4 in this docket.
```

1          On the other side of the balance, your Honor,

2     defendants suffer neither harm nor prejudice from the SEC's use

3     of these requests.  First, we notified them from the beginning

4     of the case that we were going to use the requests and they did

5     not object at this point.  We had a conversation about the need

6     to obtain evidence abroad and why that might make it a need for

7     the individual defendants to get additional discovery.  We

8     mentioned that we would be using these requests and they did

9     not object.

10          Second, as defendants cannot dispute, they have gotten

11    and will get all the documents that the SEC collects.

12          Third, as the Court recognized, they have all their

13    objections to admissibility of the evidence before the fact

14    finder if it is incomplete or unreliable or in some other way

15    improper.

16          Lastly, as the Court also noted, they're able to

17    obtain evidence located abroad by use of letters of requests or

18    by leveraging what are frankly impressive and vast business

19    relationships with foreign entities or simply by leveraging

20    their status as clients of some of the digital-asset trading

21    platforms.  If they want to do that, there is nothing that we

22    can do to stop there.  For them to say -- it seems like their

23    complaint boils down to, *Well, that takes too much time and we*

24    *just want to resolve this case quickly.  So let's resolve it*

25    *without all of the evidence that we need to actually resolve*

1    *the claims.*  That is not what the rules provide, your Honor.

2    The rules provide for the just and speedy resolution of

3    discovery, but we have to have all the evidence to our

4    arguments and to their defenses.

5          On the other side of this balance, your Honor, where

6    they have identified no harm, the SEC would be harmed

7    programmatically and in this particular case in any ruling in

8    favor of defendants.  Essentially what they are asking is for

9    the Court to exempt only the United States and the SEC from the

10   multilateral process that regulators across the globe use for

11   collecting information.

12         If I may just emphasize a little bit of what is in our

13   papers, your Honor, just because this is very important to the

14   SEC.  124 securities authorities are signatories to the MMoU

15   and it facilitates mutual assistance among international

16   regulators.  This cooperation is fundamental to the SEC's

17   mission and to other agencies around the globe to protect

18   public investors and the global economy.  As the Court knows,

19   the flow of securities and money does not stop at a country's

20   borders as this very case illustrates.  This flow is good for

21   the global economy, but it also presents jurisdictional

22   challenges from a global law enforcement prospective.

23         For these reasons foreign regulators have signed onto

24   the MMoU process specifically as a response to the trend

25   towards greater globalization, and Congress authorizes the SEC

1    to use these methods.  Sure, what we said in 2014, one of the

2    most important tools in our enforcement arsenal is strong

3    cooperation with our counterparts around the world, which is

4    absolutely critical.

5           THE COURT:  Mr. Teneiro, I reminder again to please

6    read or speak slowly.

7           MR. TENEIRO:  Thank you, your Honor.

8           So it is hard to imagine that merely seeking the

9    production of documents would be seen by foreign business

10   partners as reputational damaging of the defendants

11   particularly in light of the fact that this dispute is already

12   public.  Again, this harm which is nonexistence must be weighed

13   against the SEC's ability to continue with its international

14   cooperation probe in this global marketplace.

15          I don't want to get into the relevance of the

16   evidence, your Honor, unless the Court would like me to simply

17   because they do not claim that the evidence is not relevant to

18   this case.  Respectfully their complaint about how we're acting

19   outside the supervision of the Court are difficult to square

20   with the fact that defendants have availed themselves of the

21   Freedom of Information Act and issued at least three requests

22   to the SEC that are not also subject to the supervision of the

23   Court.

24          The SEC is definitely not a superlitigant, but for

25   them to pretend that the Federal Rules of Civil Procedure can

1    in fact erase the fact that the SEC is a governmental agency

2    that is subject to additional restrictions and also

3    responsibilities is simply not persuasive.  Again, they have

4    resources, including contractual relationships, that they can

5    avail themselves of and the Federal Rules of Civil Procedure

6    cannot and should not eliminate that.

7              Lastly, your Honor, as I believe the Court recognized,

8    there will be no meaningful difference if we went to the

9    letters rogatory procedure.  The supposed harm to the business

10   relationships would still occur.  The only difference would be

11   that the completion of discovery in this case will take much,

12   much longer.  I am pretty certain based on counsel's comments

13   that if we went back to them and said, *Well, why don't we agree*

14   *all to use letters rogatory but let's have another year of*

15   *discovery,* they would say no because they believe that this

16   lawsuit has caused tremendous harm to XRP people around the

17   world and they want to get it resolved quickly.  We do too.

18   This is why we're using the request process.

19             It is confounding to us that now they come in and say,

20   *Well, no, we don't want you to use that because it is too fast*

21   *and you are going to get all the evidence that you may might*

22   *need for this case*.  There is nothing in inequitable, your

23   Honor, about trying to obtain discovery quickly and efficiently

24   in order to meet the tight discovery schedule that defendants

25   want to meet as well.  There is nothing inequitable about

1   telling the defendants that the SEC will seek assistance

2   promptly turning over the documents and particularly given that

3   they retain all the rights to object to admissibility.

4          The only in equitable outcome would be a ruling

5   granting any part of defendant's motion because it wold upend

6   well established interconnected processes in which--

7          OFFICIAL REPORTER:  Counsel, you are reading too fast.

8          MR. TENEIRO:  The only inequitable outcome in this

9   case, your Honor, would be a ruling granting any part of

10  defendant's motion because that ruling would upend well

11  established processes in which global market regulators rely

12  every day and it would threaten the SEC's ability to protect

13  U.S. capital markets and investors and it would threaten the

14  ability of the fact-finder to have all the evidence before her

15  that is relevant to the resolution of this case.

16         Thank you.  I'd be happy to answer any questions.

17         THE COURT:  I have a question with respect to the

18  privilege issue.  Why would your requests to these foreign

19  regulators be privileged?  And if they are privileged, why

20  would you not be obligated to put that on a privilege log?

21         MR. TENEIRO:  Thank you, your Honor.

22         So we are going to put those on a privilege log.  The

23  parties have not exchanged privilege logs with respect to

24  documents that they have been producing in the litigation; but

25  we are going to put those on a privilege log.

1            With respect to the Court's first question, as

2    required by the MMoUs, the SEC has to sort of state its

3    understanding of the case as a part of the request.  So to the

4    extent that the request -- that the letter that we transmit to

5    the regulator states our impression and perhaps even our

6    theories of the case, that's our work product and it's

7    privileged.  To the extent the letters simply say, We seek

8    Documents A, B, C, and D, we provided them that information.

9    So, again, I am not sure what the harm to them is, but they are

10   not entitled to look into our work product as to why the

11   document might be relevant to a case.

12           THE COURT:  When you say you've provided that

13   information, I know in one of the letters you indicated or they

14   indicated that you have provided categories of information.

15   Have you actually provided them with a redacted version of the

16   request that at this time redacts your theory of the case

17   section but provides to the defendants the specific requests

18   that have been issued?

19           MR. TENEIRO:  We have not done that, your Honor.  We

20   have simply extracted from the request.  It's not just the

21   categories.  It is actually the actual substantive request

22   itself.  So when we say, Please, help us obtain all documents

23   relating to intraday trades, all documents relating to XRP's

24   legal status.  I guess it is fair to describe them as

25   categories only to the extent that subpoenas talk about

categories of documents and requests talk about the categories

of documents.  But we have provided them with that substantive

information.  It's what is in the request themselves.

        Redacting them and producing redacted versions is only

going -- I am not sure why if we're giving them that

information, they need a redacted version of the letter.  There

is, as I mentioned, sensitivities around disclosing and

communications with foreign regulators that we rather avoid.

We are providing them the substance of the requests.

        THE COURT:  Thank you.

        MR. GERTZMAN:  Your Honor, very briefly in reply?

        THE COURT:  Yes, go ahead.

        MR. GERTZMAN:  On the *Badian* case, Mr. Teneiro I think

is just incorrect when he says that these requests are really

voluntary and as I explained at both levels, they are not

voluntary.  I don't think I said, your Honor, that Magistrate

Judge Pittman misread the record.  I think what I said, at

least what I intended to say, is that he relied on a statement

by defense counsel that mischaracterized the voluntary nature

of the request to the overseas party.

        The distinction between treaties and the MMoU, the

point, your Honor, is I don't think I was saying that the MMoU

had been ratified by the Senate.  The point is it is an

agreement bit the United States government and is backed by the

United States government.  When the SEC uses that agreement to

1    get discovery, that is a power for greater than any power that

2    we have.  It is supposed to play by the same rules as we have

3    to play by and every other litigant has to play by under law

4    like the *Collins & Aikmen* case and many, many other cases as

5    well as the entire structure of the federal rules, which are

6    designed to level the playing field when it comes to discovery.

7         THE COURT:  Let me interrupt you for a couple of

8    points.

9         MR. GERTZMAN:  Sure.

10        THE COURT:  I will ask you questions that you are

11   raising right now.

12        First, explain to me why you think this voluntary

13   versus not voluntary point is the linchpin here.  Mr. Teneiro

14   cites to your use of the FOIA statute and those requests can be

15   deemed to be compulsory depending upon the scope of the

16   request.  So explain to me why you think whether the MoU

17   requests are compulsory or not is the linchpin?

18        MR. GERTZMAN:  Your Honor, it's important I think

19   mainly because it was the linchpin of the *Badian* decision.  As

20   your Honor knows that is the only case that squarely discusses

21   this issue at all.  When you tease apart that end, you can see

22   that these requests really are compulsory and therefore the

23   reasoning is flawed.  Not because Magistrate Judge Pittman made

24   a mistake but because defense counsel said something that

25   wasn't correct.  That is really the key.

1          The key for us, your Honor, is a tremendous

2    differential in power.  A government contract with you, if you

3    will, with overseas regulators that allows the SEC, and the SEC

4    alone, to get foreign discovery that we can't get.  That is the

5    linchpin for us.  The differential in power created by the

6    government itself created by in this case the Executive Branch.

7          It is completely outside the purview of this Court.

8    Once this case is brought, it belongs to your Honor and Judge

9    Torres to supervise discovery.  That is what the rules are all

10   about and the SEC should not be able to go do whatever it

11   wants, especially what it is doing here which is this massive

12   program of overseas discovery that is beyond entirely the

13   purview of this Court and the federal rules.

14         The FOIA point, your Honor, is really a red herring.

15   The FOIA requests that we submitted are from the SEC's own

16   documents.  So there is really no unlevel playing field here

17   when it comes to FOIA.  The FOIA requests as well and FOIA's

18   entire statutory framework and regime is also subject to court

19   oversight in the way the MoU tactics of the SEC have been

20   playing here is not.

21         Your Honor, I also wanted to respond to Mr. Teneiro's

22   point that they told us at the beginning that they were going

23   to be using the MoU process.  Your Honor, that is simply not

24   correct.  The only citation Mr. Teneiro gave for that in his

25   letter is Judge Torres' case management order, but that case

1    management order says nothing about the use of MoUs.  Mr.

2    Teneiro in the letter using the acronym RSA.  That acronym, as

3    far as I know, doesn't appear in any context that is relevant

4    here with respect to MoUs.  And RSAs in my experience usually

5    are further requests for admission, not requests for assistance

6    under MoUs.

7         I can assure your Honor that the minute we understood

8    that the SEC was engaging in this kind of tactics, we brought

9    it to the attention of the SEC with the subject of extensive

10   correspondence and meet and confers over the last six weeks

11   leading up to this hearing and we at no time assented to the

12   use of this process.  Yes, it was clear that there was

13   international discovery that may be needed here, but that has

14   been clear going back into the earliest days of the

15   investigative phase of this case.  Not the time for the SEC to

16   use its MoU powers, not now after it has brought the case when

17   we don't have the same rights.

18        I also, your Honor, wanted to address the SEC's point

19   that the order that we seek here would somehow debilitate the

20   SEC's ability to protect investors and regulator the securities

21   markets.  We are all for protecting investors and regulating

22   the securities markets appropriately, your Honor; but it is

23   just parade of horribles that is incorrect.  Our motion and the

24   order we seek has nothing to do with the SEC's use of the MoU

25   process in the investigative phase.  We have no issues with

1   that whatsoever and it can engage in that process to the

2   greatest extent that it wants to in this case, in any conflicts

3   on any issue.  But once the case is brought, they should play

4   by the same rules that we have to play by, your Honor.

5        I will stop there unless there are any additional

6   questions.

7        THE COURT:  No.  Thank you.

8        I am going to take all this under advisement.  I would

9   like to go back and look at a few other things before I issue

10  my ruling.  So I am afraid I am not going to rule on this

11  today, but we'll get a written opinion out shortly addressing

12  the issues.

13       There are some other issues that are before the Court.

14  I am not prepared to address those today either.  I don't know

15  that I am going to need further argument on those issues.  If I

16  will, I will schedule that conference.  Otherwise, I will issue

17  a ruling.

18       Before I let everybody go, is there anything further

19  from the SEC?

20       MR. TENEIRO:  No, your Honor.  Thank you very much.

21       THE COURT:  Anything further from the team of defense

22  counsel?

23       MR. GERTZMAN:  No, your Honor.

24       MR. KELLOGG:  No, your Honor.

25       THE COURT:  Let me remind everybody, as I have put in

```
 1   all of my orders, we continue to have problems with the public
 2   recording the proceedings.  I should have mentioned that at the
 3   beginning but I failed to do so.  If we find out that anybody
 4   has recorded today's conference and is posting it on the
 5   internet, we do find these and we'll have it taken down through
 6   our relations.  A reminder to everyone that is not only a
 7   violation of the rules but can render someone subject to
 8   criminal sanctions.  I appreciate that there is high interest
 9   in these matters but recording federal proceedings and
10   broadcasting them is impermissible.  A reminder to everyone of
11   that.
12           With that, I wish everybody a good weekend and to stay
13   safe.
14           We're adjourned.
15                            oOo
16
17
18
19
20
21
22
23
24
25
```