EXHIBIT D



# The SEC V. Ripple: Testing The Limits Of A Regulatory Vacuum



Apr. 15, 2021 2:39 PM ET | XRP-USD | 2 Likes

R. A. Moss's Blog
3 Followers | Bio

**Follow**

Please Note: Blog posts are not selected, edited or screened by Seeking Alpha editors.

## Summary

- Regulatory uncertainty is becoming increasingly problematic for the escalating number of start-ups that use cryptocurrencies and blockchain technology for products and services they want to sell.

- SEC lawsuit has decimated XRP's market value and scared enough cryptocurrency trading exchanges to either halt XRP trading or delist the token entirely.

- The enormous potential for innovation in this new financial sector – in winding the options for safeguarding value and creating and distributing wealth – will continue to be hindered.

- Despitethese headwinds, bullish on XRP and the broader crypto marketplace.

The birth and emergence of cryptocurrencies and other digital assets has been fascinating to observe for veteran commodities traders. From a regulatory point of view, different frameworks for trading physical assets like gold, oil, or soybeans, or trading financial instruments on their future value, evolved over time through a series of laws. This jurisprudence largely kept pace with the markets' needs to be fair and orderly, but most importantly to provide regulatory clarity. As the speed of innovation in cryptocurrency and digital assets has accelerated since the invention of Bitcoin (BTC) in 2008, one would expect regulators to rise to the occasion and do what is necessary to provide vital guidance and clarity. New crypto and digital asset law, however, has yet to even leave the gate.

Regulatory uncertainty is becoming increasingly problematic for the escalating number of start-ups that use cryptocurrencies and blockchain technology for products and services they want to sell. Suffice to say, we are far beyond the question of viability of Bitcoin. Blockchains and digital tokens are powering novient solutions for global payment systems like PayPal, supply chain management, publishing, and more all around the world. Yet, there are still no federal laws or rules which make clear how to regulate these assets.

This regulatory void has given the U.S. Securities and Exchange Commission (SEC) a sense of all-encompassing encouragement to test the limits of its authority. The Commission's recent enforcement action has not only boggled observers with its bravado, but also sent a chill throughout the industry.

Previous SEC leadership presided during a period of enormous growth and expansion of blockchain technology and the ballooning market capitalization of cryptocurrencies. Nevertheless, the agency steadfastly refused to propose any new rules to give clear guidance on how it should be treated and took increasingly hostile actions against developers. In December 2020, the SEC filed a lawsuit against Ripple (XRP), one of the largest players in cryptocurrency. The suit alleged that seven years' worth of sales of the XRP token that Ripple currently holds in escrow were one, continuous, unregistered securities offering. This hit the cryptocurrency and digital assets industry like a bomb, citing billion-dollar fines sought, to head-spinning details contained in the complaint.

Ripple is a company that sells software solutions for banks and payment companies so that customers can make cross-border money transfers between different currencies using the XRP ledger as the go-between. In essence, it makes the peer-to-peer feature of blockchain available to traditional banking. These transfers are faster, cheaper, and safer compared to slow and expensive bank wires that have diminishing value for today's consumers. The service has a robust customer base in Asia, where many different currencies exist in an increasingly integrated retail and consumer regional market. But the XRP ledger is not owned or controlled by Ripple, and billions of XRP tokens have been sold and distributed widely by users and holders who have never even heard of Ripple or its products.

The SEC lawsuit decimated the token's market value and scared enough cryptocurrency trading exchanges to either halt XRP trading or delist the token entirely. This meant millions of holders could do nothing but watch helplessly as their locked holdings dropped and later see-sawed in value. The investors the SEC were supposed to protect were now victims of their actions.

Cryptocurrency projects take time to build. Constructing a network and an ecosphere for a blockchain ledger to do something innovative and disruptive is a process. This usually entails distributing many tokens so that they can provide liquidity and move across that network. The process is similar to installing plumbing and electrical systems when building a new house. Unfortunately, the SEC has not been the helpful home inspector, checking on progress and dispensing clear advice. To cryptocurrency start-ups, the SEC has been more like an outside observer, arbitrarily deciding when to tear down the structure and start over. To those investors inside the house, they have no indication of what the SEC plans to do next. This is the opposite of fair and orderly.

The SEC was repeatedly asked if XRP was a security or not, and for years, it steadfastly refused to answer. The Commission stood and watched as billions of XRP tokens were sold on secondary markets by millions of retail holders who had no connection to Ripple. The regulator also witnessed a division of the Treasury Department classify XRP as a currency in 2015. The SEC still had nothing to say. Didn't this "action of no action" actually set precedence?

Additionally, the SEC took requests from cryptocurrency exchanges years before this lawsuit. These exchanges were persistently asking for clarity on XRP, as well as permission to list the token for trading. An astounding seven years went by as the XRP ledger became a full-fledged and decentralized network before the SEC suddenly announced that Ripple, its executives, and every retail holder of XRP worldwide should have known for the last seven years that the token was an unregistered security and they had all broken the law. This was devastating to those investors that purchased XRP.

As the filings from the SEC have shown from the beginning, the agency believes that the lack of any clarity on cryptocurrency regulation is why it will prevail in this case, no matter how illogical its reasoning becomes. Like with every enforcement action against this entirely new asset class, the SEC relies on tortured interpretations of the 1933 Securities Act – a law enacted when blockchain innovation could not even be imagined.

The enormous potential for innovation in this new financial sector – in widening the options for safeguarding value and creating and distributing wealth – will continue to be hindered due to the confusing, unnecessary regulatory void, unless Congress and the Biden administration take the opportunity to end this tragic cycle of regulatory uncertainty by implementing a clear set of rules for everyone. These contemporary rules, moreover, must acknowledge we have entered a new, technologically driven world. Antiquated analogies to orange groves or soybean fields from 80 years ago are moot. The hope is that wisdom will prevail.

**Disclosure:** I/we have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours.

2 Likes

Like     Share     Print     Comment

## Comments

Newest

Be the first to comment.

Publish

# The Right Regulatory Framework For Cryptocurrencies

Mar 18, 2021, 10:32 am

The cryptocurrency boom has proven to be more lucrative for its early investors than practically anything else since the of the late 90s. However, there is no guarantee that cryptocurrencies will remain in vogue, and actions by regulators will largely determine whether they continue gaining in value or end up being little more than a way for people to conduct illicit transactions. How–and who–regulates this relatively new and rapidly evolving form of currency to ensure robust consumer protections is vitally important.

## *Get The Full Warren Buffett Series in PDF*

Get the entire 10-part series on Warren Buffett in PDF. Save it to your desktop, read it on your tablet, or email to your colleagues

## A Cautionary Tale Of William Hinman

The case of William Hinman provides a cautionary tale. Hinman left one of the nation's top tech law firms in 2017 to take the helm at the Securities Exchange Commission's , where he won accolades for introducing policies intended to protect investors in an industry regarded as a kind of Wild West.

**Exclusive: Dan Loeb's Two New Stock Picks [Q1 Letter]**



Third Point's Dan Loeb discusses their new positions in a letter to investor reviewed by ValueWalk. Stay tuned for more coverage. Loeb notes some new purchases as follows: Third Point's investment in Grab is an excellent example of our ability to "lifecycle invest" by being a thought and financial partner from growth capital stages to

But from his perch, he also appears to have weighed in on issues involving the interests of his old firm – – whose clients include some of the biggest players in the cryptocurrency marketplace and some with ties to .

Hinman's appointment has raised conflict-of-interest questions with some people in the industry. For starters, he received an while at the SEC, vastly larger than his SEC salary.

What's more, after stepping down from his SEC post late last year Hinman to his previous employer, another example of a revolving door between government and private industry.

To be sure, there appears to be nothing illegal about taking his pension while at the SEC, but a former SEC ethics lawyer told ."

# The Global Race For Crypto Dominance

To appreciate why this matters it's critical to first understand the global race for crypto dominance. While Bitcoin's recently topped $1 trillion, a plethora of other digital currencies are competing in the marketplace as well. China recently a digital yuan – the eCNY––that is being used in retail transactions in major Chinese cities, and the Federal Reserve is now beginning to rolling out a digital currency of its own at some point.

China is clearly leading in mining, mining hardware production, and strategic priority. Roughly 2/3 of the Bitcoin are being executed in China, which means China has twice as much capacity to mine new Bitcoins as the rest of the world combined. This year, approximately 328,000 bitcoins will be mined, worth roughly $17 billion at today's prices. As there are over 60 cryptocurrencies worth in excess of $1 billion, there is competition for mining attention, and China is certainly making Bitcoin a strategic priority.

A global cryptocurrency market that results in China simultaneously being the *de facto* regulator and a main competitor would be a potential disaster for the U.S. To prevent this, the US must ensure that we have appropriate regulatory guardrails so that American can prosper and not be vulnerable to the machinations of the Chinese or any other big player with dubious motives.

In the absence of federal leadership, New York – as the

financial center of the world — is trying to find the right regulatory framework for cryptocurrencies. Two years ago, the Empire State created a [crypto taskforce](#) to determine how best to regulate, utilize, and define cryptocurrencies, with special attention to the cost of mining cryptocurrencies and [tax collection](#).

But reactions to New York's efforts [have been mixed](#): while some supporters welcome the transparent, rigorous framework, critics complain that its proposed regulations would be too severe and might make it impossible for U.S.-based cryptocurrencies to compete globally. And a sub-national regulatory regime for crypto-currency makes little sense: several New York--based crypto startups reacted to the new rules there by merely [decamping](#) to locales with more amenable regulations like neighboring New Jersey and Connecticut.

This sub-national patchwork of regulations is--unfortunately-- symptomatic of the current patchwork of policies that have failed to provide the nascent technology with the regulatory umbrella it needs. Which is why some experts believe the federal government should take a more active role in this industry.

Hinman played a significant role in establishing regulations for [digital currency](#) while at the SEC. For example, in 2018 he proposed that the SEC take into account the level of

decentralization of a digital currency before classifying it a security at a time when the agency was considering classifying most digital currencies as securities.

His time at the SEC also coincided with his former law firm's effort to lead a $100 million IPO of Chinese-based crypto-miner Canaan Inc, the world's second-largest maker of bitcoin-mining machines.

## XRP And Ethereum

Two other cryptocurrencies that have become valuable and somewhat useful are XRP--which is used for inter-central bank clearing--and Ethereum, a smart contract global computer blockchain. However, a recent SEC lawsuit against the XRP crypto caused it to lose roughly ⅔ of its value. The lawsuit came as Hinman left to return to Simpson Thatcher, which is a member of the Ethereum Alliance.

Investors and other adherents of cryptocurrencies may reflexively resist regulatory authority, but without some sort of robust federal governance of the market it will remain a niche offering used by a small cohort of investors.

What's more, the common use of cryptocurrencies to facilitate illicit transactions makes it problematic for governments across the globe: if it is impossible for them to rein in such actions, the Biden Administration may conclude

that it would be more prudent to try to end these altogether--a difficult or impossible task--or else encourage the Federal Reserve to issue a [competing digital currency](#). Introducing government competition to financial markets is a [*modus operandi*](#) for Obama-Biden technocrats.

Many investors in the cryptocurrency industry are already wary of federal regulatory authority, and the established players in financial markets have yet to fully embrace cryptocurrencies themselves. Anything done by regulators that enforces these prior notions--such as SEC regulations that could potentially be perceived as self-dealing--makes the task of bridging these divides even more difficult.

## About the Author

*Hassan Tyler is a former Legislative Assistant to Senator Joseph Lieberman and [an analyst for Capital Policy Analytics](#), a consulting firm in Washington, DC.*

# Continue reading your article with a WSJ membership.

By    Updated April 18, 2021 10:22 am ET

**Nasdaq stock exchange in Times Square in New York decorated for the debut of the Coinbase direct listing on Wednesday, April 14, 2021.**

Photo: Richard B. Levine/Zuma Press

The uncertainty is on display in the Securities and Exchange Commission case against Ripple Labs, a digital currency issuer. The SEC in December charged Ripple with issuing $1.3 billion in unregistered securities, based on the company's initial offering of its currency in 2013. The agency says Ripple's efforts to promote and profit from its product qualify the currency as a security, subject to the restrictions that govern sales of equities.

Yet court findings in the discovery phase of the suit have highlighted the inconsistency of the SEC's approach. In March Magistrate Judge Sarah Netburn told lawyers that Ripple "has a utility," casting doubt on the SEC's view that the tokens are principally a claim on future profits. And last week Judge Netburn granted Ripple access to the SEC's discussions of bitcoin and ether, the two largest cryptocurrencies, which the agency considers exempt from its rules.

The SEC believes bitcoin and ether aren't securities, in part because their developers don't profit from their sale. But those exemptions were announced through statements from former SEC Chairman Jay Clayton in 2019 and 2020, with no formal rule-making. The findings by Judge Netburn in the Ripple case suggest that the agency hasn't set clear rules for which currencies it regulates and which it doesn't.

**WSJ Newsletter**

## Notes on the News

The news of the week in context, with Tyler Blint-Welsh.

This confusion poses risks for investors. Coinbase delisted Ripple after the SEC filed suit in December, prompting a selloff that wiped out more than 60% of its value. The prices of Ripple and similar currencies have since tracked with the court's statement's on the SEC's case. U.S. participants in the $2 trillion cryptocurrency market are seeking clarity that the agency has declined to provide, preferring to announce its positions through individual enforcement actions.

Hope for a clear stance now rests on Gary Gensler, who on Wednesday was confirmed as SEC chairman. Mr. Gensler called cryptocurrency rules a priority in his confirmation hearing. Yet asked if new currencies should be subject to securities rules, he said it depends on "the extent that somebody is offering an investment contract or security

that's under the SEC's remit." This echoes the agency's current, unrefined standard on cryptocurrencies, which the court is now calling into question.

Commissioner Hester Peirce has set out the clearest position within the agency for rules on cryptocurrency issuance. On Tuesday she released an updated plan for a "safe harbor" that would exempt digital currencies from most securities regulations during a three-year development period. The plan would allow issuers to develop their networks and let buyers trade new currencies peer-to-peer, subject only to the antifraud provisions of the 1933 Securities Act.

Mr. Gensler may have signaled his openness to the proposal Wednesday by saying he'd "work with fellow commissioners and see how we can move forward." A next step for the SEC should be to recognize the harm of its current ad hoc approach. Investors and developers deserve to know whether their actions in the market are legal before they read news of the latest SEC lawsuit.

*Correction: An earlier version mistakenly attributed Judge Netburn's words that Ripple "has a utility" to another judge.*

**WSJ Opinion: Hits and Misses of the Week**

0:00 / 2:17

0:45



**WSJ Opinion: Hits and Misses of the Week**

Journal Editorial Report: The week's best and worst from Kim Strassel, Jason Riley, Jason Willick and Dan Henninger. Images: AP/Reuters/AFP/Getty Images Composite: Mark Kelly

# US SEC was Reportedly Warned that Investors May Lose Billions due to Enforcement Action Against Ripple, Legal Expert Claims

[Omar Faridi](#)   January 18, 2021 @ 3:33 pm

**John E. Deaton**, a lawyer focused on the blockchain and cryptocurrency sector ([and other societal/legal issues](#)), notes that the **US Securities and Exchange Commission (SEC)** was warned that investors [could potentially lose billions](#), considering "the magnitude of an SEC enforcement action" against **Ripple's XRP**, which is one of the largest digital assets in terms of market cap (at over $12.6 billion at the time of writing).

> THE SEC WAS WARNED INVESTORS WOULD LOSE BILLIONS. Considering the magnitude of an SEC enforcement action against the 3rd largest Digital Asset, XRP, the SEC, and it's Chairman, Jay Clayton, was sent a letter, prior to the filing of the action, from former Chief Joseph Grundfest.
>
> — John E Deaton (@JohnEDeaton1) [January 17, 2021](#)



Deaton claims that the SEC, and its Chairperson (at that time), **Jay Clayton**, had been sent a letter, well before the filing of the action, from former Chief Joseph Grundfest.

Deaton pointed out that Grundfest had reportedly warned Clayton and the SEC that "the mere filing of the lawsuit, declaring XRP an unregistered security, 'would result in an unprecedented scenario of billions of dollars in losses resulting from an exodus of intermediary market service providers.'"

Deaton confirmed that this is actually a direct quote from a former Chief who may have seen "all this coming." Deaton further noted that the mass "exodus of intermediary market service providers" has now taken place.

He also mentioned that crypto exchanges Coinbase, Kraken,

and nearly every other service provider has now halted XRP trading for US-based customers. Others, such as [Bitwise](#) and [Grayscale even liquidated their XRP holdings](#), Deaton confirmed.

He continued:

> *"Remember, XRP has been publicly traded in the U.S. and globally for seven plus years with the SEC's full awareness and implicit permission. The SEC was aware that XRP was being actively traded on over 200 exchanges globally, including in the U.S. Clayton was warned by Grundfest that if the SEC initiated an enforcement action declaring XRP an unregistered security, in present day, these exchanges would have no choice but to delist and/or halt XRP trading from fear of an SEC action against them."*

Deaton added:

> *"Grundfest informed Clayton that he was aware of no instance in which the simple announcement of a commission's enforcement procedure has, absent allegations of fraud or misrepresentation, caused multi-billion-dollar losses of innocent third parties."*

In the SEC's complaint filing against American Fintech firm **Ripple Labs**, company CEO **Brad Garlinghouse**, and

founder **Chris Larsen** there are reportedly no fraud
allegations or those related to any type of misrepresentation,
Deaton noted. He also mentioned that given that "no fraud
was being alleged and the fact that XRP was allowed to be
traded for over 7 years, Grundfest pleaded with Clayton
stating that 'no pressing reason compels immediate
enforcement action.'"

However, Clayton and the SEC ignored this grave warning,
Deaton claims. Even though billions of dollars in losses have
been experienced by "innocent" investors, the SEC filed "the
most significant SEC case in modern history," Deaton claims.
Given that no "exigency existed and there was no immediate
need to file the case, Grundfest, himself, questioned
Clayton's and the SEC's true motive," Deaton added.

Grundfest also said that applying traditional securities' laws
to XRP but not Ethereum (ETH) "calls into question the
'commission's discretion,'" Deaton noted. He added that "in
short, Grundfest was saying 'if today's XRP is a security, so
is ETH.'"

Deaton further noted:

> "[Grundfest] was basically going on the record and
> saying that not only did it NOT make any sense, but it
> would be fundamentally unfair for the SEC to file this
> action. He basically told Clayton and the SEC that if you

*file this case claiming XRP is a security, it's because of other reasons, unrelated to the law."*

Deaton added:

*"Clayton and others were well aware that the mere filing of the enforcement action, not limited to specific distributions of XRP directly from Ripple, but alleging that all XRP constitutes securities, could prove to be a 'Kill Shot' against Ripple and XRP. Considering the magnitude of this case one would think that Clayton and the Enforcement Chief would certainly want to see it through. But, instead, they both left the SEC forever."*

As [reported](#) recently, **Tetragon Financial Group Ltd.** (LSE: TFG), a UK based investment firm with $2.35 billion in assets under management, has sued Ripple in Delaware courts.

Tetragon apparently had an agreement incorporated in its equity investment with Ripple that if XRP was deemed to be an unregistered security, Tetragon could get its money back.

In December, Ripple was [sued](#) by the US Securities and Exchange Commission regarding allegations of XRP being sold as an unregistered security.

# SEC Chairman: Cryptocurrencies Like Bitcoin Are Not Securities, but Most ICOs Are

In an interview with CNBC, Jay Clayton said that while bitcoin remains a commodity, all initial coin offering (ICO) tokens classify as securities.

Nick Marinoff    Jun 7, 2018



U.S. Securities and Exchange Commission (SEC) chairman Jay Clayton states that the SEC will not be bending the rules

anytime soon when it comes to cryptocurrencies and that while bitcoin remains a [commodity](#), all initial coin offering (ICO) tokens — or coins offered through a fundraising process — classify as securities.

"We are not going to do any violence to the traditional definition of a security that has worked for a long time," [he explained to CNBC](#). "There's no need to change the definition. A token, a digital asset, where I give you my money and you go off and make a venture, and in return for giving you my money I say 'you can get a return'[;] that is a security and we can regulate that. We regulate the offering of that security and regulate the trading of that security."

The fight has been ongoing since April of this year, when the [Venture Capital Working Group](#) — an association of lawyers, traders and crypto enthusiasts alike — gathered to meet with the SEC and assist regulators in viewing virtual currencies as "utility tokens" rather than securities.

Utility tokens often garner more practical uses than securities and allow customers direct access to a company's products or services. While utilities are generally exempt from SEC rules, securities, on the other hand, often represent stakes in a company's offerings. Users can garner capital or profit by investing in securities, which makes them subject to strict regulatory scrutiny.

One of the biggest questions crypto-investors have had is whether ether — the world's second-largest cryptocurrency — would fall under this category. In its earliest days, ether was [originally offered](#) as a presale (now ICO) token, but it has since become highly decentralized, which could potentially bar it from "security status."

Clayton says that contrary to popular belief, the SEC is willing to assist ICOs to enter a plane of legitimacy, granted their organizers are willing to comply with the organization's rules.

"If you have an ICO or a stock, and you want to sell it in a private placement, follow the private placement rules," he explained. "If you want to do any IPO with a token, come see us."

Nigel Greene — CEO and founder of the investment firm deVere Group — says Clayton's stance on ICOs and cryptocurrencies is [a positive sign](#) that digital assets are becoming more mainstream.

"The SEC is right to insist that the digital coins, such as bitcoin, which are replacement for sovereign currencies, such as the dollar, sterling, yen and euro, are not securities," he said. "I believe the SEC is also right that tokens — which [Clayton] did not name — that act as digital assets are securities. This clarification by the SEC removes some of the

uncertainty that has been swirling around the crypto sector and serves to strengthen the overall proposition of many major cryptocurrencies. The SEC's invaluable and far-sighted work in this area once again highlights how many governments, central banks and regulators around the world are all now recognizing the scale and potential of bitcoin and other cryptocurrencies."

# Exchanges Want to list XRP, Yet Fear of SEC lawsuit Continue

[Delma Wilson](#)



## Jesse Powell Cautions Exchanges!

The ongoing SEC-Ripple lawsuit has been in the spotlight in the entire crypto space. Many believed some flaw as the lawsuit was filed amid the XRP bull run. As the SEC filed the lawsuit, the price slashed like never before shedding the maximum of the gains.

Many exchanges announced delisting of the asset fearing

any negative rounds around the exchange functioning. In the recent update, SEC's lawsuit appears to have faded a little with Ripple's stand becoming stronger and many expect the case may also be closed very soon.

As the [XRP price](#) is showcasing some signs of a bull run, now exchanges rethink to list

XRP, yet fearful with the SEC's proceedings. Jesse Powell, CEO, and CO-founder of [Kraken Exchange](#) cautioned the other exchanges before listing XRP.

## XRP Price Analysis

The XRP price since the start of the month has entered a strong consolidation phase, trending in a very narrow range. Yet failed to break the lower resistance levels below $0.4, however also failed to break the upper resistance levels at $0.49.



Interestingly, since the previous trading day, it is trending in the upper levels of the parallel channel, indicating a probable break out any moment from now.

At the time of writing, XRP price is $0.4674 with a jump of more than 1% in the past 24 hours. Currently, it is mandatory to break the upper resistance levels at $0.5 without declining the price below the support levels.

**Technical Specification**

- The resistance levels are formed at $0.502
- The support levels are formed at $0.451
- The indicators for XRP price are neutral

# Ethereum 2.0 – Ether's journey from a security to a security

Editorial 3 January 2021 Johnny Jaswal

**The quantum mechanical properties of Ether**

Superposition is a quantum property that effectively refers to the ability to simultaneously be in multiple states.

Ether ("ETH") appears to be in superposition as commentary suggests it is and isn't a security at the same time.

In 2018, William Hinman, then Director of the SEC's Division of Corporation Finance, implied that Ether was initially offered through a securities offering but was no longer a security at the time.

Typically, a product that begins as a security remains a security so I see issues with Hinman's analysis, which I will refer to as Hinman's puzzle. Issues with the Hinman puzzle have recently been highlighted by former SEC Commissioner Joseph Grundfest in the context of the SEC's complaint concerning XRP. Grundfest has stated that the SEC has not adequately delineated the difference between ETH and XRP in coming to the conclusion that XRP is a security and ETH is

not. For example, both issuances were centrally issued,

included premines and had continuing issuances.

As stated by Michael Novogratz, former partner at Goldman Sachs and founder of Galaxy Digital, "...$BTC and $ETH seem to have an SEC pass."

Hinman's reasoning seemingly hinged on his understanding of there no longer being any central enterprise being invested in, and thus purchasers no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts. In other words, Hinman's position is that assets can transition out of security state through sufficient decentralization. As stated by Hinman, "...when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede."

Hinman concluded:

> ...when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise.... Applying the disclosure regime of the federal securities laws to the offer and resale of Bitcoin would seem to add little value. And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure,

*current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value.*

*…And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.*

## Ethereum 2.0: Securities analysis

The last part of Hinman's statement produced above is powerful: in systems that rely on central actors whose efforts are a key to the success of the enterprise, securities laws apply.

I won't use this forum to delve into a debate regarding Hinman's previous conclusion that there are not central parties whose efforts are a key determining factor in the enterprise with respect to BTC and Ethereum, as one need look no further than [Blockstream](#) / core developers / "co-owners" responsible for final publication authority in the case of BTC and the Ethereum Foundation / core developers / Vitalik Buterin in the case of ETH. The economic and technical control, power and influence over development, information asymmetries, experimenting, changes to

protocols and conflicts of interest issues regarding these central parties should give the SEC and other regulators cause for concern and reasons to revisit the Hinman puzzle.

Notwithstanding the above, for the purposes of this article, with respect to [Ethereum 2.0](), I want to revisit the securities analysis based on Hinman's emphasis that the determination of whether something is a security is not static. Therefore, as implied by Hinman, while a token like BTC or ETH could transition away from classification as a security, it can revert back into security status. If we assume ETH transitioned away from classification as a security, which as stated above is debatable, there are compelling reasons to conclude that Ethereum 2.0 brings it back to its state as a security—thus, as the title of this article implies, ETH's journey from a security to a security.

## Issuer Liability: Application of digital asset securities laws to Ethereum 2.0

There are, at present, compelling reasons to conclude that the SEC and federal courts are likely to decide that the launch and buildout of the Ethereum 2.0 network constitutes an investment contract under Howey. At the highest level, the transaction between the Ethereum Foundation and the initial validator investors bears resemblance to Telegram's and Kik's initial private sales to investors, which qualified as securities transactions (the *SEC v. Kik Interactive, Inc.* and

framework to token sales). As in both cases, the Ethereum
Foundation promised to develop the Ethereum 2.0 network
and deliver the ETH2 tokens earned as interest to the initial
validators **upon the successful launch of this platform**.
Likewise, as in both Telegram and Kik, there is no
consumptive use for the tokens earned on the Ethereum 2.0
network in its present form. Notably, Telegram conceded
that this transaction constituted an investment contract.

Bearing in mind that the Howey test is always highly fact-
specific, an independent analysis likewise results in the
same conclusion.

As to the first element under Howey, a court would likely find
that the validators have made an investment of money in the
Ethereum 2.0 network because the validators are staking a
valuable currency equivalent in exchange for the pledged
interest payments. First, users that want to earn rewards for
helping to secure the network and process transactions
must deposit 32 ETH tokens into a smart contract on the
original Ethereum blockchain. An equal amount of ETH is
then created on the Ethereum 2.0 beacon chain, which is
represented as a new token on that chain, and which the
user can put up as collateral to become a validator. These
validators only received their 32 ETH on the Ethereum 2.0
network because the critical mass validator threshold was

reached, allowing the Ethereum 2.0 network to launch. Second, the ETH created on Ethereum 2.0 cannot be sent back to the original Ethereum blockchain. Third, validators will immediately begin earning interest—potentially as high as to 20%—on their initial 32 ETH investment.

As to the second element of Howey, a common enterprise, the $325 million of ETH staked to launch Ethereum 2.0 would likely be considered a pooling of funds that would give rise to horizontal commonality. As the court held in Kik Interactive, the "key feature" defining a common enterprise "is not that investors must reap their profits" in a specific form or at the same time, but rather is "that investors' profits at any given time are tied to the success of the enterprise". Specifically, "the nature of a common enterprise [is] to pool invested proceeds to increase the range of goods and services from which income and profits could be earned or, . . . to increase the range of goods and services that holders of [the digital asset] would find beneficial to buy and sell with [that digital asset]".

A court is likely to find that the ETH staked to the Ethereum 2.0 network satisfies this test. First, over 16,000 validators collectively staked $325 million, a threshold that was required for the launch of the Ethereum 2.0 network to occur. Second, the ETH created on the Ethereum 2.0 network cannot be sent back to the original Ethereum

blockchain, and it cannot be used for any consumptive purposes on the present version of the new Ethereum 2.0 network. Rather, the future value of the staked ETH, if any, turns entirely on the Ethereum Foundation completing the four promised phases of Serenity leading to the merging of the Ethereum mainnet and the Ethereum 2.0 network. Absent a merger of the two networks, the ETH held on the Ethereum 2.0 network would have no consumptive uses and no real value. Thus, these features lead naturally to the conclusion that the $325 million of staked ETH constitutes the pooling of funds to not just increase, but create, the goods and services that holders of the ETH on the Ethereum 2.0 network can use this asset for. In addition, as the Ethereum Foundation has explained, the launch of Ethereum 2.0 is necessary to allow for the scaling and sustainability of the Ethereum mainnet. Thus, if the four-phase plan succeeds, once Ethereum 2.0 has smart contract capability and is merged with the Ethereum mainnet, this could result in an enormous increase in the range of goods and services for which the ETH token may be used.

As to the third element, a reasonable expectation of profits, there are several factors that would support a finding that the validators have acquired additional ETH tokens on the Ethereum 2.0 network (via interest payments) with investment intent. A court would likely find that the following facts weigh in favor of finding a reasonable expectation of

profits. First, the ETH earned on the Ethereum 2.0 network is locked on this network until and unless there is a merger with the Ethereum mainnet, and cannot at any point prior to such merger be sent to the Ethereum mainnet. Second, no consumptive transactions or smart contracts can presently occur on the Ethereum 2.0 network. Third, the Ethereum 2.0 network does not have an existing marketplace where the earned ETH tokens are accepted for consumptive use.

Accordingly, the value of the ETH tokens earned as interest payments at present is entirely speculative, and the future value turns entirely on the Ethereum Foundation successfully executing on its four-phase plan leading to the merging of the Ethereum 2.0 network with the Ethereum mainnet. If the Ethereum Foundation does succeed in its plan, these token stand to have a greater value (potentially significantly greater value) than the current market value of ETH tokens, because the merged Ethereum network will have greater capabilities—most notably vastly increased scalability. That potential value is substantial. If the Ethereum Foundation fails, the tokens could ultimately be worthless. Investors understand this.

Further, the first investors to have staked an interest stood to earn higher interest on their investment at the outset than subsequent investors, because the percentage of interest each validator earns changes over time and decreases

inversely in proportion to the total number of validators. Thus, the first investors stand to have captured the most value during the initial period when their stake was relatively greater, and thus their interest payments were relatively higher for the same task. Based on these factors, a court would likely conclude that the interest tokens acquired by validators in exchange for staking 32 ETH were acquired with investment intent.

Finally, in evaluating the fourth element—whether the validators bear a reasonable expectation of profits based upon the entrepreneurial or managerial efforts of others—a court would likely consider the fact that the Ethereum Foundation and its employed developers have taken predominant responsibility for building out the Ethereum 2.0 network. Further, the Ethereum Foundation, in its promotional materials supporting the Ethereum 2.0 network, lays out the four-phase plan ultimately resulting in the promised merging of Ethereum 2.0 and the Ethereum mainnet, and promises that this plan "will make Ethereum more scalable, more secure, and more sustainable." The Foundation further represents that these upgrades are "necessary to unlock Ethereum's full potential". It is well understood that the value of ETH tokens turn heavily on whether the network can in fact scale, because the network's capabilities are significantly limited by its present scaling limitations—which cause slow transaction times and

high transaction fees. Furthermore, both the Ethereum Foundation and Vitalik Buterin have repeatedly publicly promoted the Ethereum Foundation's investment in building out the Ethereum 2.0 network as solutions to these problems. Thus, the promise of scalability is a promise of significant future value. That value turns predominantly on the work of the Ethereum Foundation itself and whether its developers are able to achieve the four-phase plan promised on the ethereum.org website.

Based on these facts, a court might reasonably find that the token's market value would depend heavily on the efforts of the Ethereum Foundation. As Ethereum's developers will presumably continue to build out, improve, and administer updates to the network and distribution of ETH post-launch, a court is likely to find that Ethereum 2.0 validators are heavily reliant on the efforts of the Ethereum Foundation for their ETH token holdings on the Ethereum 2.0 network to have any value, let alone to appreciate in value.

Accordingly, there are, at present, compelling reasons to conclude that the SEC and federal courts are likely to decide that the launch and buildout of the Ethereum 2.0 network constitutes an investment contract under Howey.

**Exchange Liability: Offer and sale of unregistered securities**

In addition to issuer liability discussed above, the ETH analysis should be of particular relevance to digital asset exchanges. As there are several aspects of the sale and distribution of tokens on the Ethereum 2.0 network that could likely cause the SEC or a court to conclude that the entire process constitutes an investment contract and thus qualifies as a security that must be registered, digital asset exchanges that list ETH, or tokenized versions of ETH held on Ethereum 2.0, may be exposed to claims of offering and selling unregistered securities without registering under applicable federal and state securities laws as exchanges and/or broker-dealers in violation of U.S. securities laws.

Recent lawsuits highlight this risk.

- On April 3, 2020, 11 class action lawsuits were filed in federal court against multiple defendants, including four exchanges (also naming executives), alleging they offered and sold billions of dollars in unregistered securities without registering under applicable federal and state securities laws.

As outlined in the claim against Binance, Changpeng Zhao, Yi He and Roger Wang:

> *Binance would profit handsomely as well by receiving a percentage of each trade and by receiving substantial payments from Issuers to have their tokens listed.*

*...exchanges like Binance, preying on the public's lack of familiarity with the technology underpinning these tokens, characterized these tokens as "utility tokens," even though they were in effect bets that a particular project would develop into a successful venture. In truth, these tokens were securities under federal and state securities laws.*

*...Binance made statements that reasonably led Plaintiffs and Class members to conclude that the Tokens were not securities.*

*Binance routinely touted and continues to tout its offerings of tokens as not requiring registration with the SEC because they did not constitute securities. In promoting the Telegram Open Network ICO, for example, Binance Research stated: "As the fundraising of TON was covered via an SEC exemption and Grams have similar use cases as Ether, Grams are thus likely to be classified as crypto assets."*

*And as part of the vetting that Binance claimed to do when soliciting sales of tokens, [Changpeng] Zhao has claimed that Binance requires projects to obtain legal opinions that their tokens do not qualify as securities.*

- On December 30, 2020, a [class action complaint](#) was filed against Coinbase, alleging that by engaging in the

unlicensed sale of securities to the public (XRP). Coinbase engaged in acts of unfair competition and gained an unwarranted competitive advantage over digital asset exchanges that only sold commodities.

With respect to this lawsuit against Coinbase, I am expecting to see additional lawsuits against exchanges stemming from the SEC's complaint against Ripple Labs, former CEO Christian Larsen, and current CEO Bradley Garlinghouse, for the continuous offering from 2013 through the present of over 14.6 billion units of XRP tokens in exchange for consideration worth over $1.38 billion. The SEC noted that Larsen and Garlinghouse personally profited by approximately $600 million from these sales. In addition, the defendants never contacted the SEC to obtain clarity on their obligations nor did they file a registration statement prior to offering or selling XRP. Importantly, the SEC alleges that Ripple engaged in this illegal securities offering even though Ripple received legal advice as early as 2012 that under certain circumstances XRP could be considered an investment contract and therefore a security under the federal securities laws.

My view is that the April 3rd, 2020 actions against the exchanges, the December 30th, 2020 action against Coinbase and those that will likely ensue following the XRP complaint will put a spotlight on digital asset exchanges and

procedures that were undertaken to ensure listed tokens were not securities. By virtue of an asset being listed on an unregistered exchange, it is arguable that investors explicitly or implicitly were led by exchanges to reasonably believe they were not investing in securities despite the fact, as highlighted above, exchanges were potentially aware of legal advice that certain assets could be considered investment contracts and therefore securities under the federal securities laws. As alleged in the Coinbase lawsuit, Coinbase knew that XRP was not a commodity, but rather a security under federal securities laws.

Coming back to ETH, in line with the lawsuits discussed above, as there are several aspects of the sale and distribution of tokens on the Ethereum 2.0 network that could likely cause the SEC or a court to conclude that the entire process constitutes an investment contract and thus qualifies as a security that must be registered, digital asset exchanges that offer / sell ETH, or tokenized versions of ETH held on Ethereum 2.0, may be exposed to claims of offering and selling unregistered securities without registering under applicable securities laws in violation of U.S. securities laws.

## Broken Window Theory: Once disorder begins, things get out of control

As stated on the SEC's website, its mission is to protect investors who rely on financial markets to secure their

financial futures, maintain fair, orderly, and efficient markets, and facilitate capital formation.

It is my view that the myth of decentralization and a lack of understanding regarding the state of digital assets and platforms have allowed assets such as BTC and ETH to secure the "SEC pass" referred to by Michael Novogratz above. The SEC has taken a positive step with respect to its XRP complaint and should similarly revisit other assets such as ETH, especially in the context of the Ethereum 2.0 analysis above.

The SEC's lack of movement risks sending a signal that the digital assets will not be policed—the broken window theory—once disorder begins, things get out of control.

When reviewing the SEC complaint re: Ripple, there are some very concerning allegations with respect to digital asset exchanges, specifically surrounding alleged payments that were made to digital asset trading platforms to support XRP's trading market. As stated in the SEC's complaint, "Ripple entered into agreements with at least ten digital asset trading platforms—none of which were registered with the SEC in any capacity...—providing for listing and trading incentives with respect to XRP. Ripple paid these platforms a fee, typically in XRP, to permit the buying and selling of XRP on their systems and sometimes incentives for achieving volume metrics."

Also, separate from issuer liability and exchange liability for offering and selling unregistered securities in violation of U.S. securities laws, exchanges have initiated the offering of ETH staking services; effectively, the sale of a contract with rights to staking profits, which in my preliminary view could also lead to the conclusion that the process constitutes an investment contract and thus qualifies as a security. I would argue that the ETH staking services can reasonably be construed an investment contract by virtue of being a contract, transaction or scheme whereby a person invests money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. Staying with ETH staking services, the deposit taking activities, with a right to returns, may in my view trigger banking laws. Lastly, as mentioned above, it appears that some digital asset exchanges may begin to list tokenized versions of ETH held on Ethereum 2.0 as a separate token, which will presumably have an entirely different market value than ETH tokens held on the mainnet, compounding the securities laws issue.

It's not a stretch to state that disorder has been tolerated and thus things are out of control.

In a quote I have used before, as stated by Former President Barack Obama, "the arc of the universe may bend towards justice, but it doesn't bend on its own." It's time for the SEC

and Regulators to do some bending

\*\*\*

Johnny Jaswal is the Managing Director and General Counsel of the Jaswal Institute, responsible for providing regulatory, legal, government relations, strategic and related investment banking advisory services. He has a wealth of experience advising on regulatory matters, mergers, acquisitions, divestitures and capital raising activities.

Johnny represents global blockchain and digital asset companies and is responsible for leading global advisory services. In addition to advising governments and regulatory authorities on digital asset legislation, Johnny has formed/executed the global M&A, capital raising, regulatory and tax strategies for multiple businesses.

Prior to founding his advisory firm, Johnny was a member of senior management on the corporate development and strategy team of TMX Group, which owns a portfolio of financial and technology assets including the Toronto Stock Exchange, an investment banker at TD Securities, which is among Canada's top-ranked investment banks, a business lawyer at Blake, Cassels & Graydon LLP and Goodmans LLP, two of Canada's top law firms, and an engineer in several sectors.

Johnny has a Master of Business Administration from the Schulich School of Business, a Juris Doctor from Osgoode Hall Law School, a Bachelor of Engineering: Electrical Engineering from Ryerson University and has been admitted to the Ontario Bar.

*This article is for informational purposes only and does not, and is not intended to, constitute legal advice. No person or entity may rely on this article for legal or other advice from Johnny Jaswal/the Jaswal Institute. The article speaks solely as of the date written. Future factual changes or developments, and future court cases or SEC guidance, could affect the analysis or conclusions presented in the article. Johnny Jaswal/the Jaswal Institute are not under any obligation to update the article to reflect future events or factual changes, or for any other reason.*

**New to Bitcoin? Check out CoinGeek's [Bitcoin for Beginners](#) section, the ultimate resource guide to learn more about Bitcoin—as originally envisioned by Satoshi Nakamoto—and blockchain.**

# Regulation By Enforcement Is Stifling Cryptocurrency

Apr 29 2021

| Topics: | Administrative Law & Regulation · Financial Services & E-Commerce |
|---|---|
| Sponsors: | Administrative Law & Regulation Practice Group |



News

One of the few things that can make an industry demand more regulation is the alternative of "regulation by enforcement," in which regulatory agencies substitute enforcement actions for rulemaking. This crude, often arbitrary method of making policy without the hard work of crafting and enacting written rules can make formal

regulation look attractive to the industry involved.

One such industry is cryptocurrency, where explosive innovation and growth have left the players appealing for the regulatory clarity and consistency that the feds have so far refused to provide.

This "uncertainty is on display in the Securities and Exchange Commission case against Ripple Labs" notes a recent [Wall Street Journal](#) editorial. The SEC's lawsuit, which has been called the cryptocurrency trial of the century, focuses on XRP, the popular cryptocurrency Ripple launched almost a decade ago. It alleges that Ripple's promotion and sale of, and continued involvement with, XRP make it a "security" that should have been registered with the SEC.

The SEC does not allege that any XRP investors were defrauded. Nonetheless, the agency seeks billions in penalties from Ripple and two of its executives, based on a very old legal framework of New Deal-era statutes and a 1946 Supreme Court test for determining what a security is. The SEC is attempting to stretch that framework to give it jurisdiction over a technological innovation that was never imagined by the lawmakers of that time.

It's a tortuous stretch because a security is an ownership share in a company or a right to share in its revenues. In contrast, XRP holders have no financial stake in Ripple and

some have never even heard of the company.

The SEC has declared that Bitcoin and Ether, the two largest cryptocurrencies, are not securities, based to a large extent on both cryptocurrencies' supporting structure—a decentralized, open-source ledger (the "blockchain") distributed across a disparate network of computers around the globe. Because XRP has the same structure, it should follow that XRP is also not a security.

In fact, because XRP is built for utility—faster and cheaper international transactions—rather than investment, it is less like a security than Bitcoin and Ether in at least one respect.

"For more than eight years, the SEC allowed XRP ... [to] evolve from a promising digital asset with superior functionality into the third-largest digital currency," notes [John Deaton](), who filed a motion to intervene in the SEC's case on behalf of over 10,000 XRP holders. But then the SEC "alleged XRP itself to be an unregistered security and all of us who have traded it since 2013 have been engaged in unlawful trades."

That's what happens when agencies eschew clear rules and instead make backdoor policy by prosecuting conduct that was previously acceptable.

Unfortunately, this is common at the SEC, which is viewed as

engaging in regulation by enforcement "with respect to some of the most important issues addressed by the SEC over the decades—insider trading, questionable foreign payments by public companies, and securities fraud," explain [Professor James Park](#) and Howard Park of the UCLA School of Law. Now the agency is using settlement agreements to establish when cryptocurrency is a security.

Two of the SEC's five commissioners, Hester Peirce and Elad Roisman, have spoken out about regulation by enforcement and recognize the many problems inherent in this practice. For one, it circumvents the Administrative Procedure Act and the notice and public participation the Act requires.

It also raises basic rule of law issues, allowing regulators to impose their personal policy preferences in a regulatory void and pick winners and losers with little consistency. Compare the SEC's treatment of Bitcoin and Ether to that of XRP. Rule of law concerns are particularly acute because enforcement actions are typically punitive.

"[T]he people we regulate should have the right to know what the rules are before being charged with breaking them," said [Mick Mulvaney](#) when he headed the Consumer Financial Protection Bureau. Fair notice is all the more important where, as with cryptocurrency, the unwritten rules concern which entities fall under the agency's jurisdiction in the first place.

Furthermore, "The use of enforcement actions to define prohibited conduct short-circuits debate over whether the conduct should be regulated at all," notes Paul Mahoney, a former law clerk to Supreme Court Justice Thurgood Marshall. Additionally, it can give the false appearance that vital issues—such as when cryptocurrency is a security—have been settled.

Finally, by selectively punishing newer players without enacting rules that would apply to all players, agencies confer an added and decidedly anticompetitive advantage on companies that were first to market. Again, think Bitcoin and Ether.

The uncertainty posed by the regulatory vacuum threatens the enormous, transformative potential of cryptocurrency and disadvantages this nation, to the benefit of China and our other rivals, in the competition for leadership of this global industry. At a minimum, the SEC should enact clear rules or just stay out of the way.

However, the best solution would be for Congress to enact a regulatory framework for cryptocurrency, which is too important to be left entirely to the less democratic process of agency rulemaking. Moreover, only legislation can provide a long-term solution that will survive changes in administrations and resolve the competition between the eight federal agencies claiming authority to regulate

cryptocurrency.

Such bills have recently been introduced in Congress. Perhaps most promising is the bipartisan Token Taxonomy Act, which would explicitly exclude cryptocurrency from the definition of a security and preempt the inconsistent patchwork of state regulation that is springing up to fill the federal void.

At very least, these bills have sparked a debate about the contours of a regulatory framework for cryptocurrency. It is a vital discussion at a time when the industry needs clear and consistent rules of the road more than ever.

# Cryptocurrencies Are Not a Fad, They're a Revolution. America Needs to Prepare.

In the mid-1970s, a cutting-edge group of hackers founded the Homebrew Computer Club in Silicon Valley. Their specialty was developing tools to break into the telephone systems of major corporations, and they went on to create innovative technologies that changed the world, generating millions of dollars in value along the way. One of those hackers was Steve Jobs.

It was in the days of an innovation economy that fostered risk and was free from crushing regulations that I found my start and built a career in technology, as did the founders of companies like Apple, Microsoft, Intel, and Cisco. The disruption of incumbents, however uncomfortable, placed Silicon Valley on the map and put the United States at the forefront of an economic revolution that forever changed the way we live.

As we near the end of the coronavirus pandemic and step into a new chapter of our nation's economy, one that's more digitally connected than ever before, we should create policies to foster this same sense of innovation within today's tech sector. Under the new leadership of the Biden

administration, America has an opportunity to take a fresh look at one such disruptive technology: blockchain and cryptocurrencies.

The federal government's approach to cryptocurrencies today reminds me of Washington's approach to the telecom sector in the late 1990s, when the United States faced a challenge. The nation's decision to favor a centralized telephone network — akin to the railroads — forced legacy networks to rely on expensive, unpopular long-distance calls to fuel their growth. This slowed U.S. innovation to a glacial pace, creating a vacuum filled by foreign companies like Nokia, Ericsson and DoCoMo.

Ultimately our government turned to Joseph Schumpeter's idea of "creative destruction," passing the 1996 Telecommunications Act. This deregulatory approach fueled two decades of technological innovation that put the United States squarely at the front of the pack.

Even in today's increasingly digital world, the U.S. financial system still relies on antiquated technology to transfer capital, using tech that's about as outdated as the fax machine — something for which there is an emoji but no person under 25 has likely ever set eyes on. Newer and more efficient technologies replaced faxes with digital emails and text messages. Blockchain is poised to replace slow and expensive wire transfers.

Today's global economy has been digitized in almost every way. Like Uber and Airbnb, blockchain and cryptocurrencies [represent packets of information sent across networks between two parties without friction](). That same process is already remaking our entire economy. Whether a digital token, an available ride, or a furnished apartment, the concept and the trend are the same. Businesses succeed when friction is eliminated and when consumers are offered faster, cheaper, and more secure alternatives, disruption becomes inevitable. Just as the yellow cabs in New York City were not immune from disruption, neither is its financial industry.

The future of our financial services infrastructure and America's role in it means our regulatory system can't get this wrong. Digital currencies already exist, conventional banks already use them, and the market cap of the cryptocurrency industry recently [exceeded $2 trillion](). We need a regulatory framework that builds on this growth, not one that squanders it.

Two regulatory actions in December indicate that Washington doesn't understand that: The Securities and Exchange Commission [sued]() Ripple Labs, the inventor of the XRP token, claiming that the cryptocurrency was an unregistered security when they sold it. [Many]() [say]() the lawsuit reflects [a failure to understand]() the nature of

cryptocurrencies and the networks on which they operate. The Treasury Department also [proposed](#) a set of rules for self-hosted wallets that U.S. cryptocurrency exchanges say could [put them out of business](#).

The backdrop of all of this is an [$84 trillion](#) global economy struggling against negative growth, carrying $270 trillion in [debt](#) that grew by roughly 10 percent in the past year. The only way to reverse this dangerous trend is to move more people back into the productive economy — and that will take embracing innovation. The Biden administration needs to understand that it must set clear rules rather than take wasteful rear-guard actions.

A failure to create a regulatory framework that supports cryptocurrency growth means that the United States will not only fall behind in global financial services, but it will also endanger the value of the U.S. dollar itself. If we don't innovate, the dollar could become the long-distance call in a WhatsApp world. America and its regulators need to support regulatory frameworks that encourage innovation both for and from our nation to maintain our lead.

*Bill Tai has been a venture capitalist since 1991 and has served on the board of eight publicly listed companies; he was among the earliest investors in Canva, Dapper Labs, Wish.com and Zoom Video.*

Morning Consult welcomes op-ed submissions on policy, politics and business strategy in our coverage areas. Updated submission guidelines can be found [here](here).

EDITORS' PICK | Mar 11, 2021, 01:23pm EST | 184,077 views

# SEC Stumbles In Ripple Case, Lost In A Maze Of Its Own Making



**Roslyn Layton** Senior Contributor ⓘ
Enterprise Tech
*International Tech Policy*



Pushback against the SEC's Ripple case reveal its arbitrary and illogical premise.    GETTY

When the U.S. Securities and Exchange Commission filed its multi-billion dollar lawsuit against the blockchain technology company Ripple and two executives in December, the timing was doubly peculiar. The complaint alleged that Ripple's sales of the cryptocurrency XRP from 2013 to the present were illegal, unregistered security offerings rather than the distribution of a digital token to build a payments network. The SEC waiting

seven years to make this allegation with billions of XRP tokens now coursing through the secondary crypto markets was strange enough. But the case was also filed in the final hours of outgoing SEC chairman Jay Clayton and then dumped on an evenly-split commission heading towards a new Administration.



By watching the volley of filings heat up the case docket, it has become clear that the SEC's decision to sue Ripple was misguided. And in recent days, a series of developments are starting to make it look like a disastrous mistake that the presumed incoming chairman, Gary Gensler, will have to sort out.

The SEC probably didn't expect the storm that Clayton's final act has kicked up, and it has exposed the inherent weakness in the decision to sue. It began on January 1, when a group of XRP holders led by Rhode Island attorney John E. Deaton struck back at the agency.

Deaton, a personal injury lawyer with class action experience, filed a petition in the U.S. District Court in his home state to force the SEC to exclude his XRP holdings from being defined as a security. He says he didn't buy XRP as an investment contract and never considered it a security, and the SEC's action against Ripple unfairly harmed him when it sent its value plunging and forced crypto exchanges to start delisting the token. After filing his action, Deaton says he was inundated with requests from thousands of fellow XRP retail holders wanting to join his case.

Last Friday, the SEC's response to Deaton landed in Rhode Island. For those watching the Ripple case in New York, it carried an astonishing argument: the SEC asked to dismiss Deaton's petition because no determination has yet been made on whether XRP is a security. Put two and two together, and the SEC is saying that Ripple and its two top executives had to have reasonable knowledge of something seven years ago that the agency itself wasn't sure about last Friday. One wonders which part of the 1933 Securities Act the SEC will eventually use to argue that Ripple is obliged to have psychic powers to operate lawfully in the United States.

MORE FOR YOU

**It's Time To Rethink Accounting For Cryptocurrency**

**Report: U.S. Officials Investigating Crypto Exchange Binance Amid Market's Massive Boom**

**What Will The Ripple Effect Be In The Crypto Space?**

Co-defendants Brad Garlinghouse and Chris Larsen, top Ripple executives, had sent letters to the New York judge on March 3, anticipating their own motions to dismiss the lawsuit with arguments around "fair notice and due process". Two days later, the SEC's response to Deaton only made their arguments even more obvious. Are the SEC staff attorneys failing to show for Zoom meetings to coordinate with each other? It's no wonder that Ripple filed Freedom of Information Act (FOIA) requests for internal SEC documents and communications that could show that while seven years worth of high-profile developments were going on related to XRP, the agency's actions were as unclear and confusing. Kind of like the contradictory filings they just made two days apart in New York and Rhode Island.

On March 8, the SEC seemed to panic. It fired off a letter to the New York judge demanding she strike the "fair notice" defense from the Ripple case altogether, calling it "improper" and "spurious" and seeking an immediate

hearing to decide on it. If the judge disagrees, one can only wonder what is lurking in the internal SEC communications that Ripple might find from that FOIA request and other discovery measures. What internal work went into the 2018 announcement by then-Director of Corporation Finance William Hinman that ether (ETH) is not a security, given its similarities to XRP?  Which crypto exchanges asked for clear guidance from the SEC on XRP's legal status before listing the token, and what were the agency's internal discussions and responses? How many opportunities was the SEC given since 2013 to give Ripple and XRP holders fair notice about XRP's status, and what went into every decision to let those opportunities pass?

I called this case the cryptocurrency trial of the century in December, and I'm being vindicated with each development. Not only is the future of the U.S. crypto industry at stake, but the arrogance of unrestrained regulators making policy through enforcement is on trial as well. The SEC has made clear it doesn't care how many investors it harms or how many companies it drives overseas as it seeks to stretch its authority beyond common sense. The makings of what appears to be a class action lawsuit against the SEC on this issue confirms the backlash against its overreach.

The most heartening development this week was the introduction of bipartisan legislation by Rep. Patrick McHenry (R-NC), senior Republican on the House Financial Services Committee, to establish a public-private working group led by the SEC and the Commodity Futures Trading Commission (CFTC) to begin hammering out a clear regulatory framework for digital assets. I participated in a Real Clear Policy panel discussion in January with McHenry on crypto regulation, and he spoke of his determination to put an end to the agency's overreach. It was on the same day President Biden nominated Gary Gensler to chair the SEC.

Gensler said in his Senate confirmation hearing in February that he thinks the SEC should only use its enforcement resources when it can address big problems in the markets.  So it would stand to reason that the new chairman

will address the biggest problem for crypto markets by investing SEC resources in McHenry's working group, rather than in Jay Clayton's misguided lawsuit that might blow up in the agency's face.



*Follow me on Twitter or LinkedIn.*

 **Roslyn Layton**                                    [ Follow ]

I analyze international technology policy through business economics. EVP, Strand Consult; Co-Founder, ChinaTechThreat; Visiting Researcher, Department of Electronic...

**Read More**

Reprints & Permissions

ADVERTISEMENT

# Cryptocurrency's Future in the U.S. Is Threatened By SEC Action Against Ripple

Securities and Exchange Commission Chairman Gary Gensler has an important opportunity to undo actions taken in the waning hours of the Trump administration that threaten cryptocurrency innovation.

Back in December, outgoing SEC Chair Jay Clayton brought an unprecedented enforcement action against the enterprise software company Ripple, creator of the digital currency XRP —which *was* the world's third most popular cryptocurrency, but not anymore.

The SEC's lawsuit seeks billions in penalties from Ripple Labs Inc. and its executives. But the agency does not allege that any of its investors were defrauded.

Instead, the agency complains about Ripple's alleged failure to register XRP as a "security," characterizing its sales of the cryptocurrency as "investment contracts" covered by federal securities laws. The unprecedented move stretches the SEC's reach too far and seriously threatens the developing cryptocurrency ecosystem—and America's vital leadership place within it.

# XRP Is Not a Security

Cryptocurrencies represent a dramatic leap forward in financial technology, because they solve the biggest challenge of electronic monetary transfers: When no physical transfer of paper money takes place, you need some way of recording transactions so that people cannot simply make transactions up, and create cash for themselves.

Normally, that central place is the Federal Reserve Bank—which records and processes every credit card transaction. Cryptocurrencies eliminate that regulatory intermediary by providing a decentralized, computerized "ledger," allowing for direct transfers between buyers and sellers with no regulatory intermediaries.

Cryptocurrencies like XRP are not securities. A security is a share of ownership in a company—giving the shareholder a stake in the business and an interest in its profits. But those who acquire or hold XRP are not granted any financial stake in Ripple.

The value of XRP is entirely independent from the value of Ripple, and Ripple possesses no unique proprietary information about XRP that it could use to harm potential holders of the cryptocurrency. Accordingly, it makes no sense to regulate cryptocurrencies like XRP as securities, as

the SEC itself has recognized for XRP's leading competitors Bitcoin (BTC) and Ethereum (ETH).

Yet the SEC claims otherwise for XRP, because of the very thing that makes XRP more appealing than its higher-market cap alternatives: XRP's superior method of issuance.

Just as the Treasury Department periodically issues new dollars, cryptocurrencies issue new electronic credits. BTC and ETH are issued through a Byzantine process tied to the maintenance of their electronic ledgers: Users who validate transactions are rewarded with newly created crypto units.

This has given rise to a cottage industry of crypto "miners" who profit by validating BTC and ETH transactions, and that arrangement has proven an environmental disaster, because the computational power needed for mining leaves an enormous carbon footprint, generating 48.5 billion pounds of $CO_2$ annually.

Treasury Secretary Janet Yellen recently described Bitcoin as "an extremely inefficient way of conducting transactions. And the amount of energy that's consumed in processing those transactions is staggering." Ripple, by contrast, created a finite number of XRP units and sells them in batches according to a predetermined schedule.

But to a hammer, everything is a nail. And the SEC sees

these batch releases as akin to issuances of securities, simply because Ripple can take the money earned during each issuance to fund other aspects of its business.

All the major cryptocurrency issuers, however, benefit from issuing their cryptocurrencies, whether at the front end for Ripple, or by offsetting the verification costs essential for decentralized currencies, like BTC.

## XRP Is Not an Investment Contract

Ripple's issuance of XRP therefore does not meet the legal definition of an "investment contract." A holder of XRP is engaged in no more of a "common enterprise" with Ripple than a holder of a dollar is with the U.S. Treasury.

Fluctuation in the value of an XRP does not foster the expectation of "profits solely from the efforts of the promoter" Ripple, because that rise and fall is not tied to Ripple, but rather the health of the *currency* and the macroeconomic factors that influence it.

Requiring Ripple to register XRP as a security would impair its utility, which depends upon XRP's near instantaneous and seamless settlement of low-cost transactions. Registration would subject thousands of exchanges, market makers, and others to lengthy, complex, and costly requirements.

Therefore, XRP holders are not clamoring for SEC oversight —they're asking for the case to be dismissed. In fact, on March 14, Rhode Island attorney John Deaton, an XRP holder, filed a [motion to intervene](#) in the SEC's case against Ripple on behalf of other XRP holders who've been harmed by the SEC's importune action. On March 29, the court [ordered](#) that it would consider the motion and proposed intervention, despite the SEC's attempt to [block it outright](#).

## Time for a Fresh Start

Though misguided, the SEC attack on Ripple presents a promising opportunity for the Biden administration. Under new leadership, the SEC could course-correct back to its mission to protect investors, while fostering fair and efficient markets, rather than interfering with currencies outside its jurisdiction.

Gensler has a solid understanding of blockchain technology, and he could usher in fresh start on cryptocurrency by dismissing the case against Ripple. Rather than fight the cryptocurrency industry, Gensler should collaborate with them, and work toward the shared goal to safeguard the future of crypto, and America's place within it.

*This column does not necessarily reflect the opinion of The Bureau of National Affairs, Inc. or its owners.*

# Author Information

*J. Carl Cecere* *is the owner of Cecere P.C., a law firm devoted to Supreme Court and Appellate practice. The author says he has no interest or stake in Ripple and doesn't own XRP.*

# Ripple Effect: SEC Lawsuit against Cryptocurrency Company May Provide Guidance For Crypto Industry



On December 21, 2020, the Securities and Exchange Commission (SEC) filed a high-profile enforcement action against a major cryptocurrency company. The SEC complaint alleges violations of federal securities laws by defendant Ripple Labs, Inc. ("Ripple"). Founded in San Francisco in 2012, Ripple is a well-established company, and its founders are regarded as pioneers in the crypto industry.

The SEC complaint alleges that Ripple sold its cryptocurrency, named XRP, as an unregistered security. The SEC argues that XRP is a security, and not a commodity or other type of asset, because it was generated, distributed, and sold by Ripple in a "centralized fashion."

**Is XRP an "investment contract" (and thus a security) under U.S. securities laws?**

The outcome of the Ripple case will largely depend on whether XRP is an "investment contract" under U.S. securities laws, thus making it subject to registration requirements under the Securities Act of 1933. The U.S. Supreme Court's decision in *SEC v. W.J. Howey Co.* provides that an investment contract exists when there is "an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

The SEC has already indicated that bitcoin and Ethereum are not securities due to their decentralized nature, which is a hallmark of blockchain applications. The bitcoin blockchain is a distributed ledger that maintains a permanent and immutable record of all transactions. There is no central entity that mints or distributes bitcoin. Instead, transactions are verified and bitcoin is mined by a series of "nodes," which is a widely distributed network consisting of hundreds of thousands of individuals across the world. Since there is no central entity whose efforts are a key factor in developing or distributing bitcoin, it is not considered to be a "common enterprise with profits derived from the efforts of others." Therefore, it is outside the scope of the *Howey* test and is not considered a security.

Ripple, on the other hand, is viewed differently by the SEC,

which has taken the position that the development and distribution of XRP was conducted by Ripple in a centralized way. One of the examples given by the SEC is that Ripple, by itself, minted the entire supply of XRP when it was first launched. For its part, Ripple is seeking to review the SEC's internal discussions about XRP and whether the SEC believed it was an investment contract. Some observers believe that if permitted, this development could hurt the SEC's case against Ripple and XRP.

**Criticisms of the Ripple lawsuit**

Many observers from the crypto and business communities have been critical of the SEC's lawsuit against Ripple. Some worry that it could cripple a nascent industry that seeks to make technology, finance, and money itself accessible to more people. Others point out that the lawsuit was hastily conceived, given that it was filed one day before Chairman Jay Clayton resigned from the SEC. In fact, only three of the five SEC commissioners approved filing the Ripple lawsuit, the minimum threshold for an SEC action to proceed. Still others point out that the case doesn't seem to involve any harm to investors, that the SEC has known about XRP since 2013, and that XRP is a legitimate technology with a market capitalization of approximately $25 billion. Some argue that it would make more sense for the SEC to wait and pursue a more clear-cut case under the *Howey* test in order to

develop more case law on this issue. Former SEC Chair and current Ripple defense attorney Mary Jo White said: "[There's no way to sugarcoat it. [The SEC is] dead wrong legally and factually](#)."

## Is There a Mutually Beneficial Outcome on the Horizon?

As a major crypto case brought by the SEC, the Ripple lawsuit may have a significant impact on the future regulation of not only cryptocurrencies, but also blockchain and financial technology (FinTech) applications, which operate using similar technologies. Moving forward, it may make sense for the SEC to implement reasonable, measured regulations for cryptocurrency, blockchain, and FinTech companies. Also, Congress could provide a framework for the regulation of cryptocurrencies and other digital assets, but this may be unlikely in today's political environment. For now, the SEC is likely to lead the way in balancing the interests between a regulatory framework that protects investors, yet is suitable for crypto companies seeking to develop legitimate new technologies. A balanced regulatory framework would ideally benefit the crypto industry by providing a roadmap for future compliance, and predictability about permitted activities.

While the outcome of the Ripple lawsuit is uncertain, the parties have engaged in settlement discussions. The newly appointed SEC Chair, Gary Gensler, is considered an

authority on cryptocurrency, which he taught about at MIT. Gensler may take an interest in the Ripple case and any resulting regulatory framework, potentially leading to a more balanced approach by the SEC moving forward.

While the SEC seeks to protect the public and ensure compliance with securities laws, it also seems to understand the potentially significant benefits associated with blockchain technology. In a recent "Risk Alert," the SEC advised investment advisers, broker-dealers, and national securities exchanges of the advances in distributed ledger technologies while recommending best [practices for maintaining compliance with securities laws](#). Moving forward, cryptocurrency proprietors must stay up-to-date on the rapidly developing laws and regulations in this space, and should consult experienced cryptocurrency or securities counsel with any questions.

# Former SEC Lawyer Claims Agency's Not Turning Back from Lawsuit Against Ripple

Cover image via stock.adobe.com

[Read U.TODAY on](#)

[Google News](#)

**Georgetown Law professor Linda Jeng, who was part of the U.S. Securities and Exchange Commission's trading and markets division from 2008 to 2009, [told Roll Call](#) that it was too late for the agency to back down from its legal fight with distributed ledger tech provider Ripple:**

> I think the SEC has already headed down this path and they're not turning back.

**Jeng, however, is "disappointed" by the fact that the agency took the company to court after many years since the introduction of the product, channeling the defense's argument. She believes that it's taking a toll on the regulator's credibility.**

**She further states that former SEC chairman Jay Clayton**
**bringing an enforcement action as his final act before**
**leaving the agency made the decision seem political.**

**Related**

**SEC Says XRP Holders Are Compelling It to Bring**
**Enforcement Action Against Them**

## Discovery battles

**While Ripple signaled that it would give its settlement**
**talks another try with the new administration, Gary**
**Gensler's SEC is evidently pushing ahead with the**
**lawsuit.**

**The two parties are currently engaged in nasty discovery**
**fights. Ripple is asking the court to prevent the SEC from**
**sending memorandum of understanding (MoU) requests**
**to foreign regulators while the agency is seeking to bar**
**the defendants from accessing its internal staff**
**communications.**

**Meanwhile, Magistrate Judge has granted the SEC's**
**motion to file a single opposition brief to CEO Brad**
**Garlinghouse's and co-founder Chris Larsen's twin**
**motions to dismiss the lawsuit.**

# SEC Explains Itself by Issuing a Risk Alert for Crypto Assets

27 February 2021, 15:01 GMT+0000

**The Securities and Exchange Commission (SEC) released a Risk Alert regarding digital crypto securities on Feb. 26.**

The SEC pointed out that Risk Alerts are not judgements or warnings or hints at acceptance regarding the subject matter. The alerts only represent the view of the Commission.

## SEC Viewpoint

In this case, the SEC's Division of Examinations observed certain points "during examinations of investment advisers, broker-dealers, and transfer agents" regarding crypto. The SEC then broke down their observations by these groups and pointed to issues that attracted the Commission's attention.

In general, though, the Commission's concern's center on AML, operational [security](#) and record keeping, and risk management. Exchanges in particular raise attention for registration issues. That can range from registering with users to the exchange registering with the SEC itself.

# Crypto Mom Asks, "How do You Feel?"

SEC Commissioner Hester Pierce, commonly known as Crypto Mom, took to Twitter to solicit opinions.

> SEC's exam division released a risk alert on digital assets. I welcome your feedback: [https://t.co/YzPWEefMfh](https://t.co/YzPWEefMfh)
>
> — Hester Peirce (@HesterPeirce) [February 26, 2021](#)

# Some Much Needed Clarity

The SEC and U.S. government in general [knows](#) that it has a problem when it comes to cryptocurrency regulation. For the most part, this regulation is patchwork, and interagency clarity is lacking.

The case of Ripple Labs is one example of where the SEC in particular comes under fire for its lack of clarity and cooperation. Ripple Labs settled securities issues with Financial Crimes Enforcement Network (FinCEN), a Treasury department organ, in 2015, and paid a fine. It has also licensed its XRP token with the State of New York as a digital currency.

However, on Dec. 22, 2020, the SEC filed charges against Ripple regarding an alleged $1.2 billion in unregistered securities sales of XRP. It also filed suit against Ripple's former CEO Chris Larsen and currency CEO Brad Garlinghouse for another $600 million in unregistered securities sales.

The case brought widespread comment because of the timing. Outgoing SEC Chair Jay Clayton left the Commission just a few days after the cases were filed. However, the lack of coordination between Treasury and the SEC in the matter raised questions as well. Garlinghouse noted that Ripple has operated on the market for seven years since the FinCEN ruling without official comment from the SEC.

# Gensler on the Way?

The final piece of the SEC puzzle may be put into place in early March. On Mar. 2, Gary Gensler appears before the Senate Banking, Housing, and Urban Affairs Committee. His

nomination will put a new spin on the Commission's actions. The committee will ask him about how he intends to proceed regarding crypto, and interested parties both inside Washington and out, including BeInCrypto, will be paying careful attention.

## Disclaimer

**All the information contained on our website is published in good faith and for general information purposes only. Any action the reader takes upon the information found on our website is strictly at their own risk.**

# SEC Should Drop Litigation Over Ripple's XRP Token

May 5, 2021, 4:24 PM EDT

Law360 (May 5, 2021, 4:24 PM EDT) --
In litigation settings, it often pays to heed the advice contained in Kenny Rogers' classic song "The Gambler": "You've got to know when to hold 'em / Know when to fold 'em."



J.W. Verret

This is useful advice for the U.S. Securities and Exchange Commission's ongoing litigation against the creators of the cryptocurrency XRP at Ripple Labs Inc. The SEC alleges that XRP is a security and its sellers were required to file formal initial public offering documents with the SEC and abide by the heavily regulated IPO process, and that failure to do so eight years ago and ongoing trading in the security violates the securities laws.

The SEC needs to fold 'em on the litigation against Ripple, and instead focus its energy on a formal rulemaking process to update the rules for securities registration to account for the unique dynamics of digital assets.

The SEC lost a number of pretrial motions in the last few months. A pretrial hearing before a magistrate judge demonstrated a pattern over eight years in which confusing guidance from regulators in speeches left XRP holders, Ripple and trading platforms completely in the dark with respect to the SEC's view of whether XRP is a security.

This wasn't just a game of gotcha, it was a game of gotcha after an eight-year waiting game in which XRP's investment base grew exponentially. Fortunately U.S. Magistrate Judge Sarah Netburn, who is overseeing the discovery in the U.S. District Court for the Southern District of New York litigation, refused to give the SEC blind deference in the face of this apparent lack of regulatory due process.

In a victory for Ripple, attorney John Deaton was granted a motion by the court to file a request to intervene. If ultimately successful, he will bring the perspective of investors who have been harmed — not by the defendant but by the SEC's actions — to the litigation.

In another victory for Ripple and Ripple executives, Judge Netburn appeared to indicate the XRP has a utility function, which undermines key aspects of the test for determining whether it is a security established by the U.S. Supreme Court's 1946 decision in SEC v. W. J. Howey Co.

The primary victory for Ripple was that the judge granted the plaintiff's request for discovery concerning the SEC's internal deliberations about whether XRP should be considered a security. The defendant will have an opportunity to see how the SEC determined that Ether was not a security, as former SEC Corporate Finance Director Bill Hinman determined in a widely covered speech, but XRP is a security.

While these discussions will be helpful to Ripple's defense and are a step toward due process in this specific case, I worry that airing these internal communications may affect the SEC's ability to engage in an honest internal dialogue over the regulation of digital assets in the future. These communications may also be used to challenge any future compromise at the agency over the regulation of digital assets.

This argues in favor of the SEC settling or withdrawing the action against Ripple and Ripple executives and preserve its range of options to draw up a new test in the future for the definition of a security in the digital asset space.

Indeed, if the SEC loses the case, those pushing for a more accommodative definition to facilitate offerings like Ripple will gain momentum that the current leadership at the SEC may come to regret.

While supporters of accommodative policy to digital assets can hope for a full victory in the case, that's one heck of a gamble that would impact the future of this next-generation mode of capital formation. Better that the SEC withdraw this action and that all five commissioners work together toward a compromise that builds a definition of "security" required to register with the SEC that accounts for the unique attributes of digital assets.

One key component of an updated test would recognize that digital assets evolve in a way that may meet the definition of a security early in its development, while still centralized, but not meet the test later in its evolution as the digital asset becomes more decentralized.

The public policy implications of the SEC's stance, which involves a suit against a cryptocurrency that has been openly held for eight years with no action by the SEC, and large asset owners' losses precipitated by the SEC's filing of an enforcement action itself, are also dubious.

Former SEC Commissioner Joseph Grundfest is rumored to have written to then-Chairman Jay Clayton with the admonition that no prior SEC enforcement action has caused as much damage to investors.[1]

This all suggests that it's time to for the SEC to heed Kenny Rogers' advice.

The SEC should fold 'em in the case against Ripple, and instead open up negotiations among the five commissioners to refine the definition of a security in the digital asset space. That would be a different card game all together, and one in which the incoming leadership at the SEC would hold a much better hand.

*[J.W. Verret](#) is an associate professor of law at the George Mason University's Antonin Scalia Law School.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the organization, its clients or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] https://www.crowdfundinsider.com/2021/01/171332-us-sec-was-reportedly-warned-that-investors-may-lose-billions-due-to-enforcement-action-against-ripple-legal-expert-claims/.

*For a reprint of this article, please contact*
*reprints@law360.com*.

# Deep State Crony Heinousness and China: Crypto-Currency Edition

[Seton Motley](#)   Apr 21, 2021 9:01 AM ET

Diary



*(AP Photo/Ahn Young-joon, File)*

Many of the Deep State bureaucrats with which We the People are afflicted?  Go in and out of government – via a metaphorical revolving door to and from many crony parts of the private sector.

People leave private crony sector gigs – for government gigs overseeing the sectors they just left.  And later revolve back to the sectors they were just overseeing.  Where they receive many accolades – and LOTS of money.  Lather, rinse, repeat....

And perhaps the largest of these many private crony sectors – is Wall Street.

Wall Street is famous for destroying millions of US businesses and hundreds of millions of US lives – by shamelessly outsourcing much of our economy to Communist China.

Behold a shameless cryptocurrency example thereof.

First: We should define a couple of monetary terms.

> [Currency](): "Circulation as a medium of exchange."
>
> [Security](): "An instrument of investment in the form of a document (such as a stock certificate or bond) providing evidence of its ownership."

Cryptocurrencies are...currencies – and quite obviously not securities.  They are money – not stocks.  Which means the Securities and Exchange Commission (SEC) – can not regulate them.

Even the SEC has acknowledged this.

> July 2018: [SEC Chairman Jay Clayton: Cryptocurrencies Like Bitcoin Are Not Securities](#)

But if you're a mite confused by the government and its crypto-pronouncements – it's only because you've been paying attention.

> June 2018: [SEC: Some Crypto Coins Are Securities](#):
>
> "The Securities and Exchange Commission's (SEC) leading authority on Bitcoin, cryptocurrency and initial coin offerings (ICOs) has ruled that some well-known cryptocurrencies like Bitcoin and Ethereum are not securities. However, the coins offered during initial coin offerings very likely are entirely — or mostly — securities...."

The SECs "leading authority on Bitcoin, cryptocurrency and initial coin offerings (ICOs)" who issued this muddled mess? Clayton henchman William Hinman – the SECs Director of Corporate Finance.

But as you will see, there was a method to Clayton and Hinman's muddled-ness.

These SEC crypto-classifications are *muy importante*.  A "currency" designation means less regulation – and more

freedom to do crypto-business.  A "security" designation means MUCH MORE regulation – which is awful for crypto-business.

So this was a really bad deal....

> [SEC Charges Ripple and Two Executives with Conducting $1.3 Billion Unregistered Securities Offering](#):
>
> "The complaint alleges that the defendants failed to register their offers and sales of XRP (their cryptocurrency) or satisfy any exemption from registration, in violation of the registration provisions of the federal securities laws."

There's a reason US-based Ripple didn't "register their offers and sales of XRP."  Because XRP is a currency – not a security.  So they under no obligation to register with the SEC.

In fact, for clarification's sake Ripple had for years been begging the Clayton-Hinman SEC to define XRP as either a currency or a security.  Crypto trading platforms had also [asked](#) for a ruling on XRP.

In January 2020, the Clayton-Hinman SEC was STILL futzing around.  Commodity Futures Trading Commission Chairman Heath Tarbert [said at that time](#) "It's unclear. Stay tuned. We're working closely with the SEC to figure out what falls

into what box."

Clayton and Hinman had already definitively stated Bitcoin and Ether were not securities.  But never provided any such clarity for or about XRP.

Until the Clayton-Hinman SECs ridiculous December 2020 case.  Which ridiculously, retroactively declared XRP a security – going all the way back to its 2013 creation.  And thereby declaring nearly all things XRP – retroactively illegal.

Which was, of course, egregiously damaging to Ripple and XRP – and its millions of retail investors.  The XRP price tanked.  Trading exchanges delisted or suspended trading – for fear of the SEC lawsuit asserting all XRP sales were and are illegal.  This locked up the holdings of everyone – including XRPs retail investors.  Who were trying to cut their government-imposed losses in the midst of a panic.

The Clayton-Hinman SECs case makes no legal sense.  But it makes quite obvious crony sense.

Clayton filed the suit on December 22 – HIS LAST DAY AT THE COMMISSION.  Guess where he landed his next gig?  If you guessed Wall Street – congratulations.  Oh – and guess on what he's working?

[Ex-SEC Chairman Clayton to Advise Brevan-Backed Firm on Crypto](#):

> "One River Asset Management, a $2.5 billion firm whose cryptocurrency funds are backed by hedge fund titan Alan Howard, brought on former Securities and Exchange Commission Chairman Jay Clayton as an adviser....
>
> "(In) the fourth quarter of 2020,... (One River founder and Chief Executive Officer Eric) Peters started a digital asset subsidiary and raised funds...to invest in Bitcoin and Ether....
>
> "Under Clayton, who left the SEC in December..., regulators determined Bitcoin and Ether weren't securities, removing an overhang that could have impeded trading and acceptance of those tokens."

Get that?  In October 2020, One River starts investing in Bitcoin and Ether.  In December 2020, Clayton slams Bitcoin-Ether competitor XRP with a ridiculous government suit.  In March 2021, One River hires Clayton.

And Hinman?  Hinman was paid $1.6 million per year by the Simpson Thatcher law firm – WHILE WORKING AT THE SEC.  Simpson Thatcher also holds huge interests in Chinese cryptocurrencies.  The firm is a member of the Ethereum Enterprise Alliance (i.e. Ether cryptocurrency).  And the firm handled the $100 million IPO of Chinese crypto mining equipment giant Canaan.

What follows is the rather obnoxious timeline of Clayton and Hinman's revolving door Chinese cronyism.  Their business interests – which bookend their 2017-2020 tenure at the SEC – demonstrate a CLEAR conflict of interest.

2014: Clayton and Hinman play pivotal roles in the Initial Public Offering (IPO) of Chinese tech giant Alibaba – which owns the payments platform Alipay (a competitor to Ripple). This transaction earned them millions in fees from China. Hinman pocketed $15 million on the deal via his law firm – while working at the SEC.

2016: Cryptocurrency mining farms controlled by China take control of the hashrate of Bitcoin.  It remains in control to this day.

(Hashrate: "The speed at which a computer is completing an operation in the Bitcoin code.")

2017: Clayton and Hinman are appointed to the SEC. Hinman "leaves" his law firm – but again,  continues getting paid $1.6 million per year by them.

2018: Clayton tells CNBC that Bitcoin is not a security. Which means less regulation of Bitcoin.  Its price soars.

2018: Hinman gives a widely covered speech which laid out how Ether is not a security.  Which means less regulation of Ether.  Great news for Ether.

Meanwhile...

> [China Creates Its Own Digital Currency, a First for Major Economy](#)

Excellent news.  Here's some more....

> [The SEC Swats Cryptocurrency Flies While The Chinese Government Takes The Farm](#):
>
> "The leading American innovators in blockchain solutions are on the verge of leaving the US in frustration. Why? Because Washington has failed to develop a clear regulatory framework that would keep them in the US and ensure American leadership."

Well "Washington has failed to develop a clear regulatory framework" isn't entirely accurate.

Clayton-Hinman's SEC was quite clear that Chinese-backed Bitcoin and Ether were nigh regulation-free.

The only cryptocurrency they slammed with massive regulation – was US-based Ripple's XRP.

Now that you know about all the Chinese money pouring all over – you understand why this is how it is.

# SEC V. Ripple: The Cryptocurrency Trial Of The Century

[Roslyn Layton](#)   12:00pm EST

Dec 29, 2020,|135,785 views

On Chairman Jay Clayton's last day, the SEC filed a lawsuit against Ripple, which many consider an ... [+]

CQ-Roll Call, Inc via Getty Images

Just hours before Security and Exchange Commission (SEC) Chairman Jay Clayton left the building on December 23 at the end of his tenure, the SEC filed a [lawsuit](#) against Ripple Labs Inc., alleging that it raised over $1.3 billion through the sale and distribution of the digital assets of XRP without registering. Ripple, founded in San Francisco in 2012, operates the RippleNet and the XRP payment protocol, considered superior to bitcoin with its improved ledger, faster settlement speed, and digital wallet for international transactions across 55 countries. Ripple is one of the titans of the new crypto industry in the U.S., developing real-economy products from revolutionary technology.

Ripple's blockchain-like exchange network is claimed to be an efficient, inclusive, and low-cost supplement (some say

alternative) to traditional payment networks like the Society for Worldwide Interbank Financial Telecommunication (SWIFT) and others. The SEC suit does not allege fraud but seeks unspecified damages and to ban Ripple's executives from participation in digital asset market trades. The case appears to impugn one of the few positive aspects of Clayton's 2017 [Statement on Cryptocurrencies and Initial Coin Offerings](#) noting that these "disruptive, transformative and efficiency enhancing" technologies could "facilitate capital formation and provide promising investment opportunities for institutional and Main Street investors alike." More largely the case reaffirms Clayton's statement in which he claimed supreme SEC authority to regulate every digital asset imaginable, regardless of its design, intention or use.

Following the suit, the price of XRP plummeted by 25 percent, and some trading has been halted. Ripple [launched](#) a vigorous response, calling the suit an attack on the emergent cryptocurrency industry at large. The case has interesting parallels to telecommunications in which regulators use obsolete laws to regulate new technologies, undermining U.S. competitiveness in innovation. Clayton's parting shot was his most audacious swipe against an innovative industry he spent four years trying to dominate with authority claimed from a 1934 statute. With potentially sweeping implications, the case is shaping up to be the

crypto trial of the century. Here are the some of the key issues.

## 1.    Currency or Security?

The central question is whether XRP is a currency or security. Currency is a medium of exchange and store of value, like dollars, gold, or frequent flier miles. A security, on the other hand, is a financial investment contract, typically tradeable, like a stock or bond.  This matters because different laws and regulations apply. In 2015 the US Departments of Justice and Treasury concluded, as part of a settlement with the Financial Crimes Enforcement Network (FinCEN), that XRP is a currency.  Indeed, Ripple has been complying with rules for digital currencies with these agencies for 5 years, in addition to the currency compliance it performs across countries. Ripple notes that the XRP ledger is decentralized and open-source, operating on consensus among a growing community of users and developers making new products with it, and XRP is not an investment contract in their company nor something they control.  If investors want to invest in Ripple, they would buy shares in the company itself, not XRP.

This determination has not stopped the SEC from claiming that Ripple's practices with XRP amount to investment contracts under the Howey test and hence require disclosures as "securities." The SEC has brought similar suits

against other cryptocurrencies, notably Grams from
Telegram and Kik Interactive tokens, causing tension in the
cryptocurrency world as America's eight financial regulators
jockey for pre-eminence as the top cop in fintech.

## 2.    Regulatory Boundaries

The case represents a significant regulatory overreach.
Reasonable minds can agree that however compelling
financial technology may be, Congress, not regulators,
decides what is regulated. Despite cryptocurrency industry
pleas for a rational framework, Congress unfortunately has
said little about cryptocurrency, leaving regulators to make
up their own rules. This development parallels the regulatory
experience of broadband internet, which has but a passing
reference in the Telecommunications Act of 1996. Having no
Congressional framework in place, the Obama Federal
Communications Commission (FCC) attempted to regulate
the internet with the laws designed for price regulation of the
telephone. Arguing that the internet was a mere extension of
the telephone network, FCC Democrats promoted a policy
designed to protect Silicon Valley giants in the name of
helping consumers. The gambit spawned more than a
decade of litigation and thwarted billions of dollars in
investment in new broadband networks, depriving
broadband network operators of the ability to recover costs
and creating a digital divide in rural areas. With the Ripple

case, the shoe is on the other foot; a Republican agency in
an expressly "deregulatory" administration purports to
protect consumers by going after currency innovators. Such
turf grabbing is a classic symptom of regulatory
obsolescence, and perversely keeps legions of lawyers in
business in federal courts.

## 3.    Do regulators protect China or US consumers?

While disclosure is recognized as an important element for a
functioning market and consumer protection, it's notable
that the SEC has allowed hundreds of Chinese firms with a
collective value of $2.2 trillion to list on US exchanges
without disclosures or audits for almost two decades,
gravely endangering US investors. Earlier this year the
bipartisan US-China Commission submitted this in a report
to Congress and described how China enjoys the fruits of
America's financial markets while it simultaneously upsets
global norms. However it seems that America's fledgling
cryptocurrency industry was the focus of Clayton's wrath,
not China.

In any event, consumers are increasingly drawn to Ripple
and cryptocurrencies precisely to avoid the cost and
complexity of traditional, highly-regulated financial services,
a trend which itself demonstrates that innovation frequently
delivers better outcomes than regulation. Moreover, the
flagrant deficit spending by the US government drives down

the value of the dollar and drives investors and consumers to more transparent, decentralized money like cryptocurrency.

## 4.    What is the US strategy for cryptocurrencies and blockchain?

The conflicting approaches amongst US regulatory agencies reflects the lack of larger regulatory framework. While permissionless innovation has helped spawn the innovation, regulators left unchecked will seek new things to regulate. In the past the bumbling approach may have mattered less, but today the US faces an existential economic and security crisis with China, which is determined to supersede America. Seeing that the US doesn't have its crypto act together, China has moved to [issue](#) its own digital currency, build a blockchain ledger from it, and [pilot](#) the technology's use in its domestic economy. Clayton's replacement could make a much-needed [reset.](#) While the SEC Chair may inherit a flawed lawsuit, this new leader need not repeat the flawed policy. More important, Congress should step up in 2021 and make the proper framework for cryptocurrency to ensure US leadership and clarify regulatory boundaries.

# SEC V. Ripple: Mining For Clarity In Regulatory Chaos

[Roslyn Layton](#)    09:16am EST

Feb 10, 2021, 62,877 views



Bitcoin (BTC), Ethereum (ETH), Ripple (XRP) and Litecoin (LTC) are cryptocurrencies, but the SEC ... [+]

Getty Images

Ripple, the U.S. crypto giant, recently [filed a formal response](#) to a Securities and Exchange Commission (SEC) [lawsuit](#) brought by former Chairman Jay Clayton in December. Ripple categorically denies the accusations

against the company and its senior executives. The complaint argues that the XRP digital currency was used as a medium of exchange for cross-border transactions in Ripple's software products and illicitly evaded SEC registration for seven years.

The response was robust and vehement, confirming the widespread expectation that the company would fight back hard. But there was an even more interesting development: Ripple also filed a [Freedom of Information (FOIA) request with SEC](#) requesting documents related to the agency's determination that Bitcoin (BTC) and Ethereum (ETH) are definitively not securities.

This move appears to be linked to the SEC's core arguments in its lawsuit that Ripple's currency XRP is a security and that the company and its executives should be punished for distributing it without going through the onerous registration process. Experts and analysts have long pointed out the similarities between XRP and ETH, and this begs the question: why did the SEC declare that ETH is not a security but file a lawsuit saying that XRP is?

Professor J.W. Verret of the Antonin Scalia Law School at George Mason University was blunt about the SEC's "haphazard and inconsistent" gyrations on this question in his [Feb. 3 *Law360* analysis](#):

- *XRP relies on Ripple to make a market in the asset, a role that is common to many other commodities that are not determined to be securities. And yet the SEC targeted Ripple for failure to register XRP as a security with the SEC. There are a number of similarities between Ethereum and Ripple. A [CoinGeek article](#) points to similarities between the two cryptocurrencies with respect to continued involvement of core developers in continued maintenance of the network code that underlies the two currencies.*

- *In a [widely covered speech in 2018](#), then-SEC Division of Corporation Finance Director William Hinman observed that the digital asset Ethereum should not be considered a security. He observed that if the "central enterprise" aspect of a cryptocurrency asset is not present, it may no longer be properly described as a security.*

- *The lines between XRP and Ethereum are much grayer than Hinman's groundbreaking speech would indicate. This is not to argue that the SEC should also sue Ethereum, as that would cause millions in losses to innocent asset owners. It does however demonstrate that the SEC's regulatory approach to cryptocurrency has been haphazard and inconsistent over the last four years.*

Here is the crux of the contradiction in the SEC's behavior.

ETH was first sold to investors in [an initial coin offering (ICO) in 2014](#), raising over $17 million. It was never registered as a security with the SEC. Four years later, the SEC's William Hinman announces definitively that ETH is not a security. Fast forward to 2020. The SEC sues Ripple and two high-ranking executives for not registering XRP as a security in 2013 when it held currency sales, not an ICO. The SEC's complaint alleged that Ripple and its senior executives pumped XRP as if it were shares whose value was dependent on Ripple's success as a company, which Ripple's response meticulously refutes. Comparing the SEC complaint against Ripple with Hinman's 2018 speech on ETH lends further credence to angry XRP holders who believe the lawsuit was more than hypocrisy on Clayton's part, but spite.

To add yet another level of absurdity, a few days after Ripple's response was filed, [Ethereum co-founder Joe Lubin](#) and [Pantera Capital](#), a blockchain and crypto investment fund, joined forces to pump ETH among potential investors. The [invitation](#) to the conference call was complete with a rocket ship emoji, the ham-fisted social media analogy for ETH's "all-time high" (ATH) yet still undervalued price.

**Pantera Capital** [@PanteraCapital](#) **on Feb 2, 2021:**

*"Despite [#ethereum](#) hitting a new ATH , we believe both it and [#DeFi](#) assets built on top are undervalued relative to their long-term potential. Join us February 16th for a*



Pantera Capital tweet ETH hitting an all time high on February 2, 2021. Twitter

*discussion on WHY with guest speaker:* [*@ethereumJoseph*](#)
*Register here:"*

The SEC says ETH is not a security. This seems to undermine its credibility in the Ripple case.

*Follow me on [Twitter](#) or [LinkedIn](#).*

I analyze international technology policy through business economics. EVP, Strand Consult; Co-Founder, ChinaTechThreat; Visiting Researcher, Department of Electronic

...

# It's Time For The SEC To Overhaul Cryptocurrency Regulation

February 3, 2021, 5:13 PM EST

Law360 (February 3, 2021, 5:13 PM EST) -- In the waning days of U.S. Securities and Exchange Commission Chairman Jay Clayton's tenure, the agency filed a suit against executives of Ripple Labs Inc., arguing that the cryptocurrency associated with the company, XRP, was an unregistered security.



J.W. Verret

The SEC alleges that Ripple executives raised $1.38 billion in funding from sales of XRP over an eight-year period. The SEC's decision to wait eight years, and over a billion dollars later, before filing this complaint was irresponsible.

More importantly, why is XRP considered a security by the SEC, but other cryptocurrencies like Ethereum and Bitcoin are not? And will those lines be drawn by clear rules, or will those contours instead be sketched by a meandering series of enforcement actions that leave founders and investors with massive losses in their wake and an expanse of

uncertainty on the horizon?

In SEC v. Howey, the [U.S. Supreme Court](#) in 1946 established the Howey test for determining whether an asset was an investment contract, or a security, and therefore required to be registered with the SEC.[1] The consequence of a failure to register may include the penalty that all investors can get their money back from the sale.

The four-part Howey test asks whether the asset is an (1) investment of money (2) in a common enterprise (3) with the expectation of profit (4) generated solely from the efforts of a promoter or third party. The Howey test was based on state blue sky laws that long predated the SEC.

One of the problems with applying a legal interpretation that is almost 80 years old to this technology is that it simply does not fit.

Cryptocurrency looks a lot like a security at the beginning of its business life cycle, as a central promoter must sell a sufficient critical mass of tokens such that the interactive network takes on a life of its own. Early in the life cycle of the asset, the central activity of the founders, in promoting the asset and in maintaining the code underlying the asset, is central to the success of the enterprise. The test for a security is easily met.

Then, as the asset takes off, it becomes controlled by a decentralized community of users who can then trade in the asset and maintain and evolve the asset's code. There is no longer a central actor who is key to the asset's value.

The SEC's regulations regarding which assets must register with the SEC, and face limits on method of distribution, disclosure requirements and compliance cost, and those that do not, are not well tailored to take into account this evolution of cryptocurrency along its transition from centralized to decentralized. The rules are binary, either your asset is a security and always will be regulated like one, or it is not.

In a widely covered speech in 2018, then-SEC Division of Corporation Finance Director William Hinman observed that the digital asset Ethereum should not be considered a security.[2] He observed that if the "central enterprise" aspect of a cryptocurrency asset is not present, it may no longer be properly described as a security.

Two key aspects for cryptocurrency purposes are whether the asset is part of a common enterprise and is expected to create profit solely from the efforts of a promoter or third party affiliated with the asset.

This is a straightforward test to administer in the old tangible world of joint enterprise. If someone sells you a partial interest in a hotel that will be run by managers, it would be an investment in a common enterprise with profit generated solely by the managers of the hotel.

Hinman argued that the value of Ethereum, much like the value of Bitcoin, is no longer primarily generated by the individuals who set up the digital ledger associated with it. The value of Ethereum is more tied to the value of the good or service that Ethereum tokens can purchase. In that regard, it has become more like a currency than a security.

Under the Howey test, Bitcoin is so decentralized that it is nowhere near the dividing line. It is clearly not a security. In some ways XRP is similar to Bitcoin, though it is not quite as widely traded or as fully decentralized. XRP relies on Ripple to make a market in the asset, a role that is common to many other commodities that are not determined to be securities.

And yet the SEC targeted Ripple for failure to register XRP as a security with the SEC. There are a number of similarities between Ethereum and Ripple. A CoinGeek article points to similarities between the two cryptocurrencies with respect to continued involvement of core developers in continued maintenance of the network code that underlies the two currencies.[3]

Arguing for Hinman's position that Ethereum is not a security, it is true that anyone can propose a change in the code. A majority of Ethereum users then vote on whether the code change passes. On the other hand, the cryptocurrency's founders are the most frequent parties actually making changes in the code.[4]

This is similar to the role of Ripple executives in development of the XRP code described in the SEC's complaint. Some have argued that changes underway in a new version of Ethereum may change it back into a security even if Hinman's analysis is accurate.[5]

Hinman noted that Ethereum may have previously been a security, but was not at the time of his speech. This observation belies the alternate reality of the regulatory approach to this issue, as Hinman suggests Ethereum is technically liable for failure to originally register a securities offering, but that it would be a waste of SEC resources to force registration now because Ethereum is no longer a security.

The lines between XRP and Ethereum are much grayer than Hinman's groundbreaking speech would indicate. This is not to argue that the SEC should also sue Ethereum, as that would cause millions in losses to innocent asset owners. It

does however demonstrate that the SEC's regulatory approach to cryptocurrency has been haphazard and inconsistent over the last four years. The changeover in administration at the SEC presents an opportunity for that to change.

Crowdfund Insider reports that former SEC Commissioner Joseph Grundfest sent the SEC chairman a letter in response to the Ripple complaint that observed that the billions of dollars lost by Ripple investors as a direct result of the SEC's action was unprecedented, and that the inconsistency between the SEC's approach to Ripple and to Ethereum called into question the SEC's use of its discretion. [6]

Under the leadership of Clayton, the SEC was neither consistent nor predictable in its approach to determining whether the offer and sale of cryptocurrencies constitutes offers or sales of securities regulated by the SEC that are required to register with the SEC.

If there is one thing markets crave from regulation, it is consistency. When two similar transactions or enterprises are presented to a regulator, they should be impacted similarly by the regulations. This makes the rules of the road predictable and fosters better compliance.

The current application of the Howey test represents a significant departure from the language in the original case. The U.S. Supreme Court said that the source of an investment's profit must come solely from the efforts of others. Solely. Not mostly, not partially. Solely. Some circuit opinions have subsequently watered down that limitation, but the SEC could tighten it back up for modern innovations like cryptocurrencies.

The SEC has sufficient authority under that original articulation of the test for an investment contract, as well as under its own exemptive authority, to provide the cryptocurrency ecosystem with a more precise test tailored to the evolutionary nature of decentralized digital assets. It could elaborate on the level and type of founder involvement that will deem a cryptocurrency a security.

The SEC could give recognition to those cryptocurrencies, like XRP, that were previously deemed a currency by the U.S. Department of the Treasury as a basis for application of a 21st century adaption of the Howey test. The SEC could also consider the three-year safe harbor for cryptocurrencies, put forward by SEC Commissioner Hester Peirce, that would give cryptocurrencies time to become decentralized.[7]

Until the SEC provides more clarity to when and how cryptocurrencies will be regulated, cryptocurrency founders

and investors will be left to hope for insights from reading the tea leaves of the complaints in enforcement actions and settlements and then trying to make educated guesses about why the SEC chose to charge one cryptocurrency founder but not another. Regulatory consistency and the rule of law deserve a better way.

*J.W. Verret is an associate professor at the Antonin Scalia Law School at George Mason University and a member of the SEC's Investor Advisory Committee.*

*The opinions expressed are those of the author(s) and do not necessarily reflect the views of the organization, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

[1] https://supreme.justia.com/cases/federal/us/328/293/.

[2] https://www.sec.gov/news/speech/speech-hinman-061418.

[3] https://coingeek.com/ethereum-2-0-ethers-journey-from-a-security-to-a-security/.

[4] https://hackernoon.com/ethereum-a-security-sec-a145d638f5aa.

[5] https://coingeek.com/ethereum-2-0-is-an-unexploded-regulatory-bomb/.

[6] https://www.crowdfundinsider.com/2021/01/171332-us-sec-was-reportedly-warned-that-investors-may-lose-billions-due-to-enforcement-action-against-ripple-legal-expert-claims/.

[7] https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06.

*For a reprint of this article, please contact reprints@law360.com.*

# Bidenworld On Crypto: Don't Fall Into The Regulation Trap

• The most polarizing matter is the SEC lawsuit filed against Ripple, the company that uses the XRP token on its cross-border payments service.

Bitcoin's market value recently topped $1 trillion. Tesla recently bought $1.5 billion in the digital asset to set up liquidity for accepting it as a form of payment for its cars. Microstrategy, which is publicly listed like Tesla, issued convertible bonds to help amass $4 billion in bitcoin on its balance sheets. China has rolled out a digital yuan – the eCNY-- now being used in retail transactions in major Chinese cities.

Digital money is here. America had better accept reality and embrace this new innovation. If we do, the U.S. has all it takes to dominate the new frontier of cryptocurrencies and blockchain technology and lead the fintech revolution. But if the Biden Administration's America-last policy chooses overregulation instead of innovation, the U.S. will hand the 21st Century economy to the Chinese Communist Party.

Treasury Secretary Janet Yellen has called bitcoin "inefficient" and "highly speculative." Sen. Elizabeth Warren, always hostile to digital currency, spun Yellen's comments as

a wholesale slam on cryptocurrency. It's no surprise Warren [doesn't get](#) this innovation, which should alarm her younger progressive admirers who do. Meanwhile, Federal Reserve Chairman Jerome Powell has been more of a straddler – [he said](#) a digital dollar is a "high priority project" but that the U.S. does not need to be first in issuing a digital currency.

The overall picture is not comforting so far.

On March 2, Joe Biden's nominee to chair the Securities and Exchange Commission, Gary Gensler, faced his [confirmation hearing](#) before the Senate Banking Committee, and fintech companies, digital asset holders and the wider world of blockchain innovation were watching closely. Hopes were raised because of Gensler's background in teaching blockchain at MIT. They came away worried, not comforted. Three GOP senators tried to press him on what he'd do to nurture blockchain fintechs, but he appeared to robotically read his own talking points, saying he'd "promote the technology" but also focus on "our core values of investor protection." He didn't specify what "promote" means or how "core values" would translate into regulatory clarity.

But crypto investors fear that the "our" doesn't include them.

In fact, there is not one clear rule in place for cryptocurrency project developers to follow when they raise capital, nor do cryptocurrency holders have any clear idea what

"protection" they are being given by Biden's new regulators. Unlike in Japan, Britain, and other major markets, there is no regulatory framework for cryptocurrencies here. That is largely the fault of the previous SEC chairman, Jay Clayton, who embraced policy by enforcement in place of clarity, leaning on statutes written a century ago that don't serve digital asset issuers or owners well.

This state of play makes the Biden Administration the ones who will decide our fate as a global player, and possibly the fate of the dollar itself as a global asset. The world can't afford to have them get crypto wrong.

Gensler in particular faces the biggest test. He will lead a commission that is split over which way to go on this issue. The most polarizing matter is the SEC lawsuit filed under Clayton against Ripple, the California-based payment systems company that uses the XRP token on its cross-border payments service. The agency alleged in the Southern District of New York that XRP was an unregistered security from Ripple rather than a currency sold and distributed since 2013 to fund and build a network for Ripple's project, and went after two senior executives as well.

The clash of two alternate realities in the Ripple case dramatizes how a lack of clear rules can be disastrous. On one side is an elderly SEC clinging to the 1933 Securities

Act, trying to make it fit over a decentralized ledger for a digital token on the market for nearly a decade. On the other are thousands of XRP holders who thought they were buying a currency on the secondary markets, not a security, and were given a dose of "investor protection" in a surprise SEC action that sent the value of their holdings plunging and forced exchanges to halt trading it. Instead of settling and writing new rules to clear up any future confusion, the SEC opted to make the courts decide at a time when an increasingly conservative judiciary is growing skeptical of executive actions.

Gensler should honor his own words in the confirmation hearing about when the SEC should decide to sue rather than make policy. He said the agency should only engage its limited resources for enforcement when it can address greater problems in the markets. If he was serious, he'd settle the Ripple case and crack the whip on writing specific rules for digital assets once and for all.

No previous SEC chair was as qualified as he is to do it, and crypto holders will see that "our core values of investor protection" really means what it should.

# Ripple case seen as precedent for cryptocurrency regulation

## SEC remained silent as the market for the digital coin developed



Garlinghouse, the Ripple CEO shown here speaking at TechCrunch Disrupt SF 2018, has been sued by the SEC for failing to register the digital coin offering as a security. (Steve Jennings/Getty Images for TechCrunch)

Cryptocurrency experts are closely watching a legal battle between Ripple Labs Inc. and the Securities and Exchange Commission, anticipating the case could establish precedent

and clarify the regulatory landscape for digital coin offerings.

The SEC last year sued the company, CEO Brad Garlinghouse and Executive Chairman Chris Larsen in the U.S. District Court for the Southern District of New York, alleging they should have registered XRP under securities law. Ripple and its executives have asked the court to dismiss the case.

Ripple scored wins in preliminary rulings in the federal court, including gaining access to internal SEC documents and shielding its executives' personal bank records from discovery. Holders of Ripple's XRP cryptocurrency at issue in the litigation were also granted permission in April to intervene in the case.

Those wins don't necessarily foreshadow a victory for Ripple, but the case is on track to establish legal precedent for the SEC's authority over digital coin offerings, according to Drew Hinkes, a lawyer at Carlton Fields PA in Miami who works on cryptocurrency matters.

"This is a significant case," Hinkes said in an interview with CQ Roll Call. "Ripple has tremendous financial resources, has assembled an incredible team of well-respected lawyers and has one of the most high-profile projects in the industry."

Most securities enforcement actions end up resolved with a settlement, but the deep resources and firm positions on each side could take this case to the 2nd U.S. Circuit Court of Appeals, or eventually the Supreme Court, and provide the industry more reliable guidance than the current mix of district court decisions, settlements and nonbinding statements from agency officials, Hinkes said.

"The 2nd Circuit is incredibly sophisticated in this area, and it will be very interesting to see how they rule on these keystone issues," said Hinkes, who teaches part time at New York University's law and business schools. The 2nd Circuit is based in New York.

## Suit over registration

San Francisco-based Ripple was founded in 2012 and offers a real-time payment settlement network based on blockchain technology. Since its formation, the fintech has raised $1.38 billion from the sale of more than 14 billion units of its digital coin called XRP, according to court documents.

XRP is the world's fourth-largest cryptocurrency today, with a $70 billion market value.

The SEC says XRP meets the definition of a security because it's an investment contract, the test articulated in 1946 by the Supreme Court in a case called SEC v.

Howey. "Section 5 of the Securities Act is all embracing," the agency wrote in the complaint.

The SEC wants to focus the dispute narrowly on whether XRP meets that long-standing definition, according to Thomas Gorman, a securities lawyer at Dorsey and Whitney LLP in Washington and former senior counsel in the agency's enforcement division.

If money is pooled, and the investors are expecting to share profits, it's probably a security subject to registration, Gorman told CQ Roll Call.

Ripple says XRP isn't an investment contract but a medium of exchange, like cash or other cryptocurrencies. It cited a settlement in 2015 with the Justice Department and the Treasury Department's Financial Crimes Enforcement Network that required the company to register as a money services business.

The cryptocurrencies bitcoin and ether were determined by the SEC to be commodities, not securities, in recent years, and the SEC doesn't have jurisdiction over them. Ripple wants to know more about that decision and was granted access in the court case to internal documents on how the agency concluded that XRP should be treated differently.

Ripple and the executives say the SEC failed to demonstrate

that the company should have known XRP was subject to registration and because the agency remained silent for years while "a massive global trading market" built up around XRP, according to court filings.

Unfair delay can be a persuasive argument, Linda Jeng, an adjunct professor at Georgetown Law and former SEC lawyer, said in an interview.

"As a former regulator, I am disappointed to see the SEC wait so many years after the introduction of a product to launch an enforcement action," said Jeng, who is also global head of policy at fintech startup Transparent.

Regulators should always apply their power thoughtfully and proportionally, and it should be predictable, Jeng said. When the agency waits this long to pursue an action, it makes them look arbitrary and chips away at their credibility, she said.

Hinkes also found Ripple's arguments to be "very sympathetic" and said the agency's delay and different classification of other coins undermines the government's position that Ripple executives should have known XRP had to be registered as a security and recklessly disregarded the obligation.

Still, he cautioned that doesn't mean the agency lacks

authority to bring the case. The SEC has broad enforcement discretion, and it appears to be filed within the statute of limitations, Hinkes said.

Gorman predicted the court will focus its decision on the investment contract analysis and downplay delays in bringing the action.

The SEC has been increasingly broad in recent years as to what constitutes intent to pool an investment, so greater clarity on that issue would be beneficial, Gorman said. As for Ripple's preliminary discovery wins, Gorman said the judge may be granting Ripple broad access because the case is likely to be scrutinized on appeal.

Experts don't anticipate any surprises when the SEC turns over internal memos, but industry insiders would be interested to take a peek behind the regulator's veil.

"To my knowledge, these documents have not been publicly disclosed before," Hinkes said. "Though it's unclear whether they'll be made public here, I imagine many in our industry would find those interesting."

## Leadership transition

The SEC filed suit against Ripple on Dec. 22, 2020, the day before former Chairman Jay Clayton's resignation, and some

"It made it seem more political," Jeng said, also noting that Ripple is the largest cryptocurrency issuer the agency has gone after in recent years. Regulators should never appear political and must consistently apply the law to maintain credibility, she said.

The SEC didn't respond to a request for comment.

Some think new SEC Chairman Gary Gensler, who has an interest in digital assets, is poised to launch a broader effort to clarify the regulatory landscape for cryptocurrencies. They don't necessarily expect the agency to abandon the Ripple case or rush to settle under Gensler.

"I think the SEC has already headed down this path and they're not turning back," Jeng said.

Ripple isn't backing down either, according to General Counsel Stuart Alderoty.

"The SEC is out of step with the rest of the world," Alderoty told CQ Roll Call. "This is much bigger than Ripple. It's about the future of digital assets in the U.S."

# Analysis: Biden's SEC chair nominee signals more regulation for cryptocurrencies

WASHINGTON (Reuters) - The U.S. Securities and Exchange Commission appears likely to work on its first guidelines for cryptocurrencies after President Joe Biden's nominee to lead the agency promised to provide "guidance and clarity" to the rapidly evolving market.

FILE PHOTO: A collection of bitcoin (virtual currency) tokens are displayed in this picture illustration taken Dec. 8, 2017. REUTERS/Benoit Tessier/Illustration

Speaking during his confirmation hearing before the Senate Banking Committee on Tuesday, Gary Gensler offered the first thoughts on handling cryptocurrencies if he is confirmed to lead the top U.S. markets regulator.

"Bitcoin and other cryptocurrencies brought new thinking to payments but raised new issues of investor protection we still need to attend to," Gensler told lawmakers, describing them as "catalysts for change."

As SEC chairman, he would promote the new technology while ensuring investor protections, he said. The SEC has

not adopted rules specifically tailored to cryptocurrencies and how they should be treated by people and companies, which some argue has created an unclear rulebook.

"It's important for the SEC to provide guidance and clarity," Gensler said. "Sometimes that's a clarity that will be a thumbs up, but even if it's thumbs down, it's important to provide that."

As a decentralized asset created by users, Bitcoin is likely exempt from securities laws. But there is a "strong case" that digital currencies created and issued by companies have likely violated securities law, Gensler said at a conference in 2018. These include the second and third most widely used virtual currencies, which were created by Ripple Labs and Ethereum.

The SEC has said Bitcoin is not a security and is suing Ripple alleging it broke laws with an unregistered digital-asset securities offering. The agency has previously said Ethereum's Ether is not a security, a view that diverges from Gensler's.

Bitcoin hit record highs last month after companies including car-maker Tesla and Mastercard said they were embracing the cryptocurrency.

Globally, the highly volatile cryptocurrency market was worth

roughly $1.45 trillion as of Tuesday afternoon, up from around $200 billion two years ago, according to data from CoinMarketCap.

The crypto industry as well as some SEC officials have for years been calling for clarity over how cryptocurrencies fit into securities laws. Previous SEC chief Jay Clayton took the view that most coin offerings, a cryptocurrency fundraising mechanism, appeared to run afoul of securities laws.

## DESIRE FOR REGULATORY CERTAINTY

Leading the CFTC in the aftermath of the 2009 financial crisis, Gensler implemented complex new derivatives rules, often butting heads with Wall Street groups. He later taught a class on cryptocurrencies at MIT.

"Gensler would bring to the job a high degree of knowledge about crypto, and I think that's helpful for someone trying to regulate in this space," Hester Peirce, a Republican SEC commissioner who has supported clearer rules for digital assets, told Reuters last month.

The growing embrace of digital assets by companies and investors adds to the urgency, Peirce added.

"Industry has been pretty clear they would like more regulatory certainty they were not able to get that under

Chair Clayton, I think Mr. Gensler understands that," said Matthew Kulkin, co-chair of Steptoe & Johnson LLP's Financial Services Group.

Reporting by Chris Prentice and Pete Schroeder; additional reporting by Anna Irrera; Editing by Cynthia Osterman



Seeking Alpha | My Portfolio | My Authors | Top Stocks | Latest News | Markets | Stock Ideas | DM... | Search by symbol | Sign in | Join

Trending | My Portfolio | My Authors | Top Stocks | Latest News | Markets | Stock Ideas | DM...

# Asking The Right Questions About The New Finance Ecosystem

Feb. 26, 2021 8:06 AM ET | COIN, DOGE-USD, DME... | 

Talal Debs, PhD's Blog
Follow

**Please Note:** Blog posts are not selected, edited or screened by Seeking Alpha editors.

## Summary

- The real strengths of DLT are significantly lower costs, higher security for participants, and complete traceability of "things" both digital and real.
- GME and DOGE-USD are eye-catching examples that traditional equity and next generation fintech markets are not keeping pace sufficiently with the way markets of the future are likely to work.
- XRP-USD lawsuit is troubling and should concern innovative investors planning to put more capital at risk.
- COINB sounding an alarm; also, CBDCs can be the foundation for mass adoption and profoundsavings in cost and capital.
- Bullish on cryptocurrency.

Movies like *Forgetting Sarah Marshall* sometimes manage to bury deep truths in apparently puerile humor. One scene has the protagonist, played by Jason Siegel, on a Maui beach getting a first-time surfing lesson from a beach bum instructor, played by Paul Rudd.

In seeking to explain that ineffable "edge" that a surfer must find, Rudd explains that one can't just learn by "method" since, as he puts it, "The less you do, the more you do..." Taking this apparently sage instruction to heart, when asked to demonstrate his technique, Siegel instead lies flat on his long board. Seeing this, the instructor states the less romantic but even more obvious conclusion, "Well ... you gotta do more than that!"



This modern parable expresses well the bind the financial technology ecosystem – the realm of financial technology ("fintech"), decentralized finance ("DeFi"), blockchain, and artificial intelligence ("AI") – finds itself in, between regulatory inaction on the one hand or micro-management on the other. Recent regulatory actions have illustrated these extremes in the context of blockchain's evolution. At the end of 2020, the Securities and Exchange Commission (SEC) filed a lawsuit against Ripple (XRP-USD), the San Francisco-based software company, claiming that XRP, the token they use on their cross-border payments network, is a security. While Forbes has dubbed this move the "crypto trial of the century", it has been labeled by securities law experts as deeply flawed. Others have assessed that the lawsuit is a byproduct of the lack of a clear set of rules. Though we may not have all the details of the Ripple case, this feels like the right diagnosis. If that's right, then this will feel to Ripple like having the rug pulled out by the SEC after billions of XRP coins were sold over seven years during a period of little clarity. While adding clarity is important, unexpected rule changes are never encouraging to industry and investors. As a result, one must imagine that more than one innovator has looked at the current rulebook for putting more capital at risk in these incredibly promising markets and said, "you gotta do better than that!"

Alternatively, the swing to sudden new regulations can also quash innovation. For example, the Treasury Department's Financial Crimes Enforcement Network (FinCEN) recently proposed some stark rules to impose a set of know your customer ("KYC") requirements on cryptocurrency exchanges. While there are surely important goals intended here, the specifics of this proposal and it's very short time-line for public comment (15 days is like the blink of an eye in Washington) has led leading U.S. exchanges like Coinbase (COINB) to sound the alarm, saying these rules would be so burdensome that they would threaten its existence.

So how shall we find that "edge" markets need to thrive? One of the lessons I learned as a risk officer at J.P. Morgan (NYSE:JPM) was that the essence of having authority to approve transactions is the responsibility to enable virtuous and well-structured risk taking as efficiently as possible. In other words, a good overseer wants to enable and encourage good risk-taking decisions at the grassroots of any enterprise or market under their scope. Perhaps we should seek to emulate in this respect that perennial of old: "I will set my law in their hearts." Far better to set things up to encourage market participants to do the right thing themselves than the heavy handed alternative. Moreover, when creativity can be unleashed in this way, increasing the size of the economic good for everyone, then the other crucial mandate of regulators (i.e., to prevent and control bad behaviors) becomes much easier.

To remind us what is at stake, as many industry observers have predicted for years, fintech has progressed rapidly. These advancements have been aimed at providing greater and more direct access to financial services for a broader set of people. From the non-finance savvy to young adults entering the market for the first time, this expansion is especially relevant when it comes to investing and payment and transaction services. The underlying and important story is one of innovations that can potentially revolutionize key components of economic activity for the better. Capital raises, payments, and transparency are just a few areas that stand to gain exponentially.

For example, blockchain could be developed and shaped to bring structural efficiencies to the economy. By leveraging decentralized ledger technology (DLT), a host of advantages become evident. The real strengths of DLT are significantly lower costs, higher security for participants, and complete traceability of "things" both digital and real. This transparency is paralleled by DLT's greatest asset. While it might sound Orwellian to some, if it is structured properly, it is does not have to be.

Additionally, cross-border payments and transfers, now slow and expensive, could become rapid and nearly cost-free. As investor Steven Fiorillo has pointed out on these pages, "XRP has real-world utility in the form of payments, allowing cross-border payments in as little as 3-5 seconds." Furthermore, if countries adopt digital currencies (e.g., Central Bank Digital Currencies, or CBDCs), they could lay the foundation for mass adoption and profound savings in cost and capital. This is one of the many applications that could be developed and brought to market. Fed Chairman Jerome Powell also seems to support that at this stage.

All this sounds great, but achieving it requires staying one more dragon worth mentioning: finding the way to govern the digital markets of the future can't rely on simply translating older methods into new forms. Very few readers of this article will have missed recent illustrations of this in the form of the GameStop (NYSE:GME) trading controversy. A few may have missed a similar set of events around Dogecoin (DOGE-USD). In any case, these two examples are eye-catching examples that both traditional equity and next generation fintech markets alike are not keeping pace sufficiently with the way markets of the future are likely to work. This new world has startled some into realizing they need to learn more; and it is apparent that government officials and regulators are now taking much more interest. A recent Congressional hearing on Robinhood, GME, and the meme trading frenzy attested to this fact.

To me, one of the most interesting things about the GME mania was that it was a triumph of "game theory" – the power positioning of trading interests over "reality." That is to say, the swings in value did not appear to be the ephiphenomena of a true debate on GME's prospects as an enterprise. Traditionally, one point of regulating markets is to allow the tension between buyers and sellers to externalize a debate about the correct value of the thing being traded, in this case GME stock. As a society, we should want market participants focused on what GME is worth. It appears from the outside that, sadly, few were really asking that question. Whatever view one takes on whether the "shorts" or the "short squeezers" were more justified, the problem appears to be that power, in this case the purchasing power of GME equities, is more fundamental than truth. It is the regulators job, the eponymous method made famous by Socrates, to keep the marketplace focused on asking the right questions. In these episodes, the question of fundamental value was hardly in the frame.

The future of fintech and innovation can be truly as exciting one as we all re-think the best ways for markets to function and capital to be deployed. The best maxim for regulators and legislators might well be some amalgam of surfer wisdom and Socratic thought. While we must build the right guardrails to protect from fraud, we must promote responsible manipulation, too often the "the less you do, the more you do." But more than that we must always, and this begins by asking the right questions focused on transparency, access to data, and workable uniform rules.

**Disclosure:** I am/we are long cryptocurrency, as my stocks mentioned, and no plans to initiate any positions within the next 72 hours.

Like | Share | Print | Comment

Comments    Newest ▾ | 1

Add your comment...

# Greater Innovation Is the Solution to Bitcoin's Carbon Footprint

The growth of blockchain technologies like cryptocurrencies seem to be [doubling each year](), and this fast growth has revealed the unintended environmental consequences just as quickly. Last month, Elon Musk [announced]() that Tesla is accepting Bitcoin as a form of payment for its fast-selling electric cars. Enthusiasts for cryptocurrencies celebrated it as a milestone for liberating a financial system riddled with friction and exclusion.

But some environmentalists saw it as a contradiction with Tesla's commitment to their cause. They echoed Treasury Secretary Janet Yellen recent [comments]() that Bitcoin is "an extremely inefficient way of conducting transactions" that consumes a "staggering" amount of energy.

Yellen was right on both points. While she was not arguing against the technology, her observations reveal that nurturing this technology toward the democratization of finance also requires tackling the carbon footprint of so-called "crypto mining." Innovation in the crypto space has already proven that we can do both.

Case 1:20-cv-10832-AT-SN   Document 834-4   Filed 06/13/23   Page 129 of 136

Bitcoin has both the blessing and the curse of being first. Its methodology was set up to prove an idea, not necessarily be the best version of that idea. The famous [Bitcoin white paper](#) of 2008 introduced the concept of using cryptography to establish secure peer-to-peer transactions online without going through financial institutions. It established a digital token, called Bitcoin, as a reward for those who used computers and servers to validate and copy the network's ledger of transactions. The more one verified and copied, the more Bitcoin one could obtain, and the "blockchain" of transactions would become stable and permanent. This process of generating Bitcoin was nicknamed "mining" and it relies on huge networks of energy-consuming hardware.

Since its inception, the Bitcoin ledger has been expanded for more than a decade by miners. This activity [now consumes around 121.36 terawatt-hours per year](#) according to researchers at the University of Cambridge's Centre for Alternative Finance. They calculate that [Bitcoin related electricity consumption](#) today is greater than that of Argentina (121 TWh), the Netherlands (108.8 TWh), or the United Arab Emirates (113.20 TWh).

Blockchain innovation has expanded on the original concept, and scores of new ledgers have been developed to improve on the initial blueprint. In 2013, developers created the

Ethereum ledger, which uses a token named Ether. This new network [cut the average mining time](#) to about 12 seconds, down from about 10 minutes for Bitcoin, and added more utility to the ledger beyond peer-to-peer transfers of coins.

Many crypto-enthusiasts will tell you that Ether has a wide range of projects running on it, like smart contracts and supply chain management solutions as well as moving money between digital wallets. In contrast to Bitcoin, [Ether consumes 23 TWh](#) annually on average, showing that greater efficiency from the blockchain with greater functionality is possible. But as Ether transactions increase, its energy consumption will likely increase as well.

Innovators are also visionaries, and they knew early on that if the cryptocurrency idea took off by using the mining method, there would eventually be serious environmental consequences. [An online discussion](#) started in 2011 among developers on how to solve this eventual problem. An idea emerged around a blockchain built on "pre-mined" cryptocurrencies.

Could a project be built in the laboratory quickly with a large volume of coins in a sort of "vault" and eliminate the wasteful process of mining? The creators could then distribute the coins through some issuance process just like a central bank. This inspired [the creation of the XRP ledger in 2012](#) by the founders of Ripple, a San Francisco-based software

company that uses the XRP token to process instant cross-border payments for global banks. XRP's ledger is now open source, and the coin is one of the biggest cryptocurrencies in the world. Other developers are either copying the concept, or developing new tokens to add functionality to the XRP ledger to rival Ether.

The comparative carbon efficiency of pre-mined cryptocurrencies was dramatic. According [to the XRP Ledger Project](#), XRP transactions consume 0.0008 percent of the energy needed for Bitcoin. This means applying a "pre-mining" innovation to blockchain can reduce the $CO_2$ emissions for 20 million cryptocurrency transactions from 9.32 million metric tons (Bitcoin) to only 90 metric tons (XRP).

The line from Bitcoin to Ether to XRP and steadily greener cryptocurrencies is a similar line from coal to cleaner energy sources. The inauguration of each new coin brought forth valuable co-innovations in energy efficiency. Innovation created cryptocurrencies, and innovation is solving negative environmental impacts. Policymakers can expand the benefits of cryptocurrencies by creating an enabling environment for coin systems that deliver additional innovations in energy efficiency.

*Dr. Michael K. Dorsey, who served on the National Advisory Committee of the U.S. Environmental Protection Agency*

*during the Obama administration and served for 11 years on the Board of Directors of the Sierra Club, is currently chief strategy officer for Solair, a technology company that provides unique and proprietary renewable energy products and solutions for the emerging markets.*

Morning Consult welcomes op-ed submissions on policy, politics and business strategy in our coverage areas. Updated submission guidelines can be found [here](#).

# Will Gary Gensler be the Hero who ends the War on Crypto?

[Crypto & Policy](#)

By Thomas Hodge

The crypto world was not sorry to see SEC Chairman Jay Clayton leave his post. Most in the industry considered him hostile to the sector and trigger-happy on enforcement; instead of attempting to nurture innovation. His tenure was seen as a "[crypto cold war](#)" led by a friend of Wall Street's biggest banks. For the more than 50 crypto project leaders who were hit with Clayton's enforcement hammer, it was a blitzkrieg. Industry powerhouse Ripple, which markets payments software using the XRP token, was Clayton's final target, [sued](#) for allegations — seven years after the fact — that XRP was sold as an unregistered security even though the agency [doesn't](#) [seek](#) to have the U.S. District Court establish that the token is actually a security. In short, Clayton left a mess for American developers, coin holders, policymakers, and the courts to sift through.

While SEC leadership under a Democratic presidency might typically raise significant concerns for innovators, news that President Joe Biden has nominated MIT professor Gary Gensler to replace Clayton has many in the space suddenly

hopeful. Once called the "Crypto Great-Grandfather" by

"Crypto Mom" SEC Commissioner Hester Peirce — the most pro-crypto member currently on the SEC — Gensler's leadership could be pivotal as the sector's pioneers cannot afford four more years of open hostility. Rival financial markets in Tokyo, London, Dubai and Singapore have set up friendly regulatory frameworks and rolled out the red carpet for American developers to take their innovations there. Most notably, China is stealing the geopolitical thunder with the rollout of the digital yuan. In the last week, one of the four-largest state-owned banks has been testing the digital yuan throughout its ATMs in the city of Shenzhen. Gensler may need to catch up, after Clayton's left U.S. interests well behind.

By just acknowledging that cryptocurrency technology goes far beyond the vagaries of the Securities Act of 1933, Gensler will raise hopes. Clayton stubbornly looked at any excuse to threaten crypto projects, dismissing any "catering" to the technology in one interview:

> *"We are not going to do any violence to the traditional definition of security that has worked for a long time... We've been doing this a long time, there's no need to change the definition."*

The basis on whether an asset is a security or not refers to the Howey Test, rooted in a 1946 U.S. Supreme Court ruling

that classified a security as an investment contract in a common enterprise with the seller in which an investor can expect to receive a profit. Many strongly argue that this shouldn't include open source ledgers where a digital currency operates to perform specific functions for each developer's project, and a consensus model allows for a variety of validators to influence decisions

At a recent webinar held by *Real Clear Policy* on U.S. crypto regulations in the Biden Administration, J.W. Verret, a law professor at the Antonin Scalia Law School of GMU, found the Howey test a bit outdated. "I could right now write an interpretation of the Howey test, consistent with the Supreme Court's view from its initial analysis in this Howey case — from I think at this point — 70 years ago, that I think would provide a lot more clarity, just by going back to that word 'solely' and making it more of a real restriction on the definition of security," Verret said. In summary, the Howey Test is certainly arcane and likely unworkable as a crypto regulation. We are long overdue for regulatory clarity that can keep up with our nation's evolving fintech. Gensler's perspective will hopefully be made clear in his confirmation hearings.

https://www.youtube.com/watch?v=vLU4B8L-ROc