

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

May 25, 2021

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square, Courtroom 219
New York, N.Y. 10007

Re:   *SEC v. Ripple Labs, Inc.*, et al., No. 20-cv-10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Plaintiff Securities and Exchange Commission ("SEC") respectfully requests an order: (1) permitting the SEC to notice six additional depositions, (2) compelling Defendant Ripple Labs, Inc. ("Ripple") to search the records of five additional custodians to identify documents responsive to the SEC's Requests for Production ("RFPs"), and (3) compelling Ripple to produce records relevant to post-Complaint XRP transactions and efforts, and to Ripple's lobbying efforts designed to create the "market confusion" Ripple now claims as a defense. The parties met and conferred during various video conferences and in written correspondence and are at an impasse as to these issues.

The SEC's request for additional discovery is proportional to the needs of the case and justifies expanding the number of depositions allowed. The conduct at issue spans eight years and involves nearly $2 billion in illegal sales of XRP. The responsibility for key components of Ripple's unlawful distribution of XRP was diffused through multiple employees whose obligations varied over the years. While Ripple has unfettered access to these agents, the SEC does not and needs the ability to compel testimony to obtain critical information about (1) the creation and promotion of a trading market for XRP, and (2) Ripple's communications with market participants about whether offers and sales of XRP constituted securities. This evidence is necessary to show that Ripple offered and sold "investment contracts" under *Howey* and to rebut Ripple's claim that there was "confusion in the minds of [market] participants" (including, presumably, Ripple as a market participant) about the application of *Howey* to Ripple's conduct. D.E. 70 (Letter to Hon. Analisa Torres) at 2 (citation omitted); *see also* D.E. 81 (Letter to Hon. Sarah Netburn) at 5 (identical quote).

The parties have engaged in intensive discovery. The SEC has issued numerous subpoenas and noticed the depositions of ten current or former Ripple employees. It has nevertheless become clear that, to ensure the Court considers this case on a full record, additional discovery is needed.[1]

**I.    The SEC Should Be Permitted to Conduct Additional Depositions.**

The ten individuals the SEC will depose played different roles at Ripple at various times and will provide non-duplicative testimony about various matters (and seven were listed as witnesses in Ripple's initial disclosures, as designated by an asterisk): (1) Defendant Christian Larsen*; (2)

---

[1] The SEC anticipates imminently seeking from Judge Torres a short extension of the current July 2 close of fact discovery deadline given, among other things, the amount of other discovery still outstanding.

Defendant Bradley Garlinghouse*; (3) David Schwartz, Ripple's Chief Technology Officer*; (4) Monica Long, Ripple's Head of Marketing*; (5) Miguel Vias, Ripple's Head of XRP Markets from 2016 to 2019*; (6) Breanne Madigan ("Madigan"), Ripple's Global Head of Institutional Markets from 2019 to the present; (7) Asheesh Birla, Ripple's Head of Product*; (8) Patrick Griffin, Ripple's former SVP of Business Development*; (9) Dinuka Samarasinghe, XRP Markets Team Member, from 2017 to 2020; and (10) Antoinette O'Gorman, Ripple's former Chief Compliance Officer.

However, the diffusion of responsibilities within Ripple over time, the sheer scale of the company's $2 billion unlawful offering of securities, and evidence developed in discovery demonstrate the need to depose additional witnesses and to notice a Rule 30(b)(6) deposition of Ripple. For example, at one deposition, the deponent was unable to answer questions about how much funds Ripple raised from the "On-Demand Liquidity" ("ODL") product that Ripple now claims proves that XRP is not a security, see D.E. 51 at ¶¶ 13, 378, or about whether the companies that Ripple funded through an initiative known as "xPring" sold XRP and, if so, how much XRP they sold. This deponent identified two of the below Ripple employees as having the relevant knowledge. Set forth below are the witnesses who have non-duplicative knowledge of critical issues that the SEC seeks to depose.

(1) Christian Gil, GSR Co-Founder: GSR is the "Market Maker" referred to nearly two-dozen times in the SEC's Complaint. D.E. 46 at ¶¶ 96, 99, 101, 139-41, 173-74, 185, 188, 197, 200, 204-07. GSR has refused to provide testimony to the SEC on a voluntary basis, though the company engaged in various market making activities on behalf of all three Defendants and possesses unique knowledge of their efforts to make a trading market for XRP.

(2) Ron Will, Ripple's former CFO: Will can provide testimony relevant to the SEC's claims, specifically about Ripple's finances and its dependence on XRP sales for revenue. In her deposition, Madigan explained that while she could not testify as to Ripple's finances, Will could do so (Ex. B at 49:11–50:8, 387:7–11), including discussing the revenues Ripple earned from its sales of XRP, as well as revenue (if any) from the ODL platform. Ex. B at 314:19– 25. Will also communicated with others regarding Ripple's views, formed based upon the advice of counsel, about the status of XRP under the securities laws. E.g., Ex. C; Ex. D (Will signing application for XRP listing to third party platform explaining Ripple's view based on the advice of counsel that ███████████████████████████████████████ Will is therefore an important witness regarding the supposed "confusion in the minds" of market participants as to XRP, and Ripple's role in forming those views.

(3) Ethan Beard, Ripple's former Head of xPring: Ripple used a program called "xPring" to support and fund companies that sold millions of XRP to third parties. These sales are charged as violating Section 5 of the Securities Act, D.E. 46 at ¶¶ 147-150, 170. The SEC sought information about xPring in Madigan's deposition but she was unable to testify about when and how xPring-funded companies sold XRP, and pointed to Beard as the one with the most knowledge on this point. Ex. B at Tr. 60:15-63:11; 71:25-72:7 & 72:19-73:4.

(4) Phil Rapoport: Rapoport was the Ripple employee with primary responsibility for recruiting investors to trade in XRP from 2013 through 2015. Rapoport was also Ripple's point person with GSR and another market maker. He communicated Ripple's goals with respect to its XRP sales to GSR. Ex. F, Ex. N at 2 (discussing ███████████████████████████████ ). In addition, Rapoport communicated with at least one XRP investor and shared a 2015 draft legal opinion about the legal status of XRP under the securities laws, which is the subject of a pending

motion. *See* Ex. E; *see also* D.E. 166-5; D.E. 191. This is relevant to Ripple's defense that there was "confusion in the minds" of market participants, as it shows that Ripple was communicating directly with market participants regarding this issue based on legal advice Ripple received.

(5) Ryan Zagone, former Head of Regulatory Affairs: Zagone communicated with regulators and policy makers regarding the regulatory framework for digital assets and XRP's status under the laws of various jurisdictions. Ex. G. He also expressed internally views that XRP was different from Ethereum, Ex. H, one of the two assets Ripple now claims dictate the relevant legal treatment of XRP. Zagone's responsibilities did not fully overlap with O'Gorman's (who was primarily responsible for serving as Ripple's BSA Compliance Officer). *See* Ex. Q (organizational chart). Moreover, Zagone interfaced with certain market participants, including at least one digital asset research and advocacy group, to express Ripple's views as to whether XRP's offers and sales would be securities. *See* Ex. I.

In addition, given the size of Ripple's enterprise and the number of people involved, the SEC requests permission to depose a Ripple representative pursuant to Rule 30(b)(6), to cover any gaps in knowledge that these witnesses may have. *See generally Winfield v. City of New York*, No. 15 Civ. 5236, 2018 WL 840085, at *4 (S.D.N.Y. Feb. 12, 2018) ("The primary purpose of a Rule 30(b)(6) deposition is to 'streamline the discovery process'" (internal citations omitted)).

These targeted, non-cumulative requests are necessary under the circumstances for the SEC to develop its claims and address Ripple's defenses. The SEC appreciates the additional time and resources the parties would have to expend in conducting additional depositions (and document discovery). But, as the Court has noted, this is "an incredibly high-stakes, high-value litigation." Ex. A at 52 ("19 [SEC] custodians for an incredibly high-stakes, high-value litigation is not unreasonable"). In the context of such a litigation, involving well-funded, sophisticated parties, where the conduct at issue spans many years and involves billions of dollars, allowing the SEC to notice a Rule 30(b)(6) deposition of Ripple and to depose five additional witnesses who undeniably have unique and relevant information is reasonable and appropriate. Indeed, this is precisely the type of circumstance where Rule 26(b) contemplates that additional discovery may be necessary and proportional to the needs of the case, taking into account "the amount in controversy, the parties' relevant access to relevant information, the parties' resources, [and] the importance of the discovery in resolving the issue...." Rule 26(b)(1); *see also Esso Exploration & Production Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, No. 14 Civ. 8445, 2018 WL 11217859, at *1 (S.D.N.Y. Oct. 12, 2018) (granting motion for deposition, taking into account the likelihood proposed deponent had relevant information, high stakes of case, and difficulty movant had in otherwise accessing that information).[2]

## II. Ripple Should Be Required to Produce the Documents of Additional Custodians.

Through multiple meet and confers, Ripple has refused to produce documents responsive to Requests for Production seeking highly relevant information. The documents at issue were

---

[2] In multiple meet and confers, Ripple opposed the requests for additional depositions on the basis that the SEC conducted an investigation, and has noticed the depositions of witnesses who testified in the SEC's investigation instead of noticing the depositions of the witnesses requested herein. But "there is no authority which suggests that it is appropriate to limit the SEC's right to take discovery based upon the extent of its previous investigation into the facts underlying the case." *SEC v. Espuelas*, 699 F. Supp. 2d 655, 659 (S.D.N.Y. 2010) (quoting *SEC v. Sargent*, 229 F.3d 68, 80 (1st Cir. 2000)). Indeed, "[n]ow that the SEC has sifted through its investigatory findings, filed suit, and had the benefit of the Court's rulings, it may wish to recalibrate its approach to discovery." *Espuelas*, 699 F. Supp. 2d at 659.

generated by five Ripple employees who are the custodians of certain highly relevant documents. Ripple's refusal is unwarranted and the Court should compel Ripple to promptly search for and produce responsive documents from the five custodians set forth below.

During the meet and confer process, Ripple informed the SEC that it will not include as custodians whose emails it would search Zagone, Ripple's former Head of Regulatory Affairs, or Cameron Kinloch, Ripple's Head of Finance. Both Zagone and Kinloch had important roles at Ripple and engaged in important communications at issue in this case. For example, the SEC has identified third-party documents where either Zagone or Kinloch is the *only Ripple custodian* included on an email: (1) Exhibit K shows Zagone discussing Ripple's public relations strategy, and (2) Exhibit L shows Kinloch corresponding with a market maker that Ripple used to buy and sell XRP to retail investors. *See* D.E. 46 at ¶¶ 202-09 (referring to XRP purchasing activities coordinated by Kinloch as VP of Finance). The only way for the SEC to obtain all relevant internal and external documents involving these witnesses is for Ripple to include them in the list of custodians whose documents are being searched for responsive material. But Ripple has refused to do so.

Ripple has similarly refused to search the records of certain of its General Counsels and Deputy General Counsel for responsive, non-privileged documents. The SEC has asked Ripple to search the records of Norman Reed (Ripple's General Counsel from 2015–2017), Brynly Llyr (Ripple's General Counsel from 2016-2018), and Sameer Dhond (Ripple's Deputy General Counsel 2018–present). All three proposed custodians sent or received *external, non-privileged* communications relating to Ripple's affirmative defense. When Ripple sought to convince digital asset platforms to list XRP, some of those platforms asked Ripple about the legal status of XRP offers and sales under the federal securities laws. Llyr and Dhond communicated with various platforms to discuss these issues. Ex. M. The SEC is entitled to rebut Ripple's "confusion in the minds of market participants" defense with evidence that its own lawyers caused that confusion. Reed was also involved in a purported joint venture between Ripple and a third party to create an XRP Fund that would provide investors with direct exposure to XRP, where they discussed, among other things, the need to get an opinion from the SEC as to the legal status of XRP. Ex. J.[3]

While the SEC is not "entitled under the rules of proportionality, to every single document" related to the litigation, it is entitled to "documents or information that the rejected custodians will hold that is not likely to be held by defendants' proposed (or agreed to) custodians." *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, No. 9 Civ. 2137, 2013 WL 4838796, at *2 (S.D.N.Y. Sep. 11, 2013) (Netburn, J.) (internal quotation omitted). Here, the five proposed custodians are the sole Ripple custodians on communications with third parties—all five sent or received documents that are responsive to the SEC's requests for production and highly relevant to key issues in the pending litigation. Thus, their inclusion "is reasonably calculated to lead to relevant evidence that might not be captured if they were excluded." *Fort-Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 106 (S.D.N.Y. 2013).

Ripple resisted including these custodians in its searches in part on the ground that it would be burdensome or duplicative to do so. The SEC does not have the information it needs to evaluate

---

[3] These five custodians are likely to have documents responsive to a large number of RFPs made by the SEC, including but not limited to: (1) Zagone: Ex. R at RFP 1.1, 1.2, 1.3, 1.19, 1.22, 1.23, 1.25; Ex. S at RFP 2.5, 2.6, 2.33; Ex. T at RFP 3.1; Ex. P at RFP 4.1; (2) Kinloch: Ex. R at RFP 1.3, 1.6, 1.32; Ex. S at RFP 2.1; (3) Reed, Sameer, and Dhond: Ex. R at RFP 1.1, 1.2, 1.20, 1.22, 1.23; Ex. S at RFP 2.2, 2.5, 2.6, 2.42, Ex. P at RFP 4.3, 4.4.

this assertion because Ripple refused to tell the SEC how many non-duplicative additional documents it would have to review if it included these custodians in its search terms. Given Ripple's refusal to even quantify the burden of adding these custodians, the Court should assume that the SEC's request for this discovery is proportional to the needs of the case.

### III. Ripple Should Be Required to Produce Certain Documents Post-Dating the Filing of the SEC's Complaint and Relating to Its Lobbying Efforts.

Ripple should produce documents relating to its offers and sales of, and efforts with respect to, XRP that post-date the filing of this action. Ripple has repeatedly argued that its efforts do not affect the price of XRP to defend its view that offers and sales of XRP do not satisfy the *Howey* test. *E.g.*, D.E. 51 at ¶ 13 ("XRP's price is not and has not been determined by Ripple's activities — instead, the market has for many years priced XRP in correlation with other virtual currencies"). But Ripple has also told the SEC that its experts *may* rely on publicly-available data about the price of XRP since the filing of the Complaint in advancing these arguments. Moreover, Ripple insists that the "current" status of XRP under the securities laws is the most important issue in this litigation.[4] Given these arguments and Ripple's refusal to limit its expert opinion to pre-Complaint XRP prices, Ripple should be ordered to produce documents relating to its activities as to XRP since the Complaint was filed, so that the SEC may rebut Ripple's arguments that there was no correlation between its own activities and the price of XRP (to the extent such correlation is even relevant to the claims at issue in this case), and other arguments that Ripple is advancing about the status of XRP "today."[5] Post-Complaint documents are likely to exist with respect to RFPs 1.3, 1.4, 1.8, 1.11, 1.17, 1.24, 1.32, 1.34 (Ex. R), 2.1, 2.34, 2.42 (Ex. S), and 3.3, 3.4 (Ex. T).

Ripple should also be compelled to produce documents concerning its lobbying efforts. Ex. P at RFP 6. Evidence of efforts by Ripple to affect public perception—or to sow confusion in the market—about XRP's regulatory status is relevant to rebutting Ripple's affirmative defense that it lacked "fair notice." Discovery has already shown that Ripple engaged in such efforts by, for example, putting on its "payroll" a former government official to make statements about the legal status of XRP. *See, e.g.*, Ex. O ███████████████████████████████████████████████████████████████ Ripple relies on statements that it paid that official to make, to support its litigation position. *E.g.*, D.E. 172 at 22 n.8 (referring to statement by former CFTC Chairman). These lobbying efforts—aimed at obtaining statements from public figures that fit Ripple's litigation narrative of XRP—are in addition to and separate from the efforts of Ripple's public relations firm to feed statements into the market about the regulatory status of XRP, which are also the subject of discovery. Since Ripple has put at issue its purported lack of "fair notice" based on the beliefs of market participants, the SEC is entitled to test whether the supposed "confusion" was bought and paid for by Ripple, as opposed to a reflection of genuine market sentiment.

---

[4] *See, e.g.*, D.E. 51 ¶ 16 ("It is especially important that the Court rapidly determine the most consequential and overarching issue: whether Ripple's current distributions of XRP are 'investment contracts'."); D.E. 152 at 2 ("Defendants' case will deal not only with the present status of XRP as a security, but also its past status.").

[5] Ripple has suggested that if its experts make arguments about post-filing XRP price movements, the SEC can seek discovery at that time. But Ripple's approach would require re-opening fact discovery and re-deposing witnesses, unnecessarily extending expert discovery well beyond its current six week schedule.

Sincerely,

Jorge G. Tenreiro

cc: All parties (via ECF).