L512SECc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES and EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                            20 Civ. 10832 (AT)(SN)

RIPPLE LABS, INC., *et al.*,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          May 21, 2021
                                          2:00 p.m.

Before:

                    HON. SARAH NETBURN,

                                          U.S. Magistrate Judge


                              APPEARANCES


SECURITIES and EXCHANGE COMMISSION
        Attorneys for Plaintiff SEC
BY:   JORGE G. TENREIRO
      DUGAN BLISS
      DAPHNA A. WAXMAN
      JON A. DANIELS
      ROBERT MOYE
      BENJAMIN HANAUER
      LADAN F. STEWART
      MARK R. SYLVESTER


DEBEVOISE & PLIMPTON, LLP
        Attorneys for Defendant Ripple Labs, Inc.
BY:   ANDREW J. CERESNEY
      MARY JO WHITE
      LISA ZORNBERG

L5l2SECc

```
 1                              APPEARANCES
                               (CONTINUED)
 2

 3   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            Attorneys for Defendant Christian A. Larsen
 4   BY:  MARTIN FLUMENBAUM
          ROBIN LINSENMAYER
 5        KRISTINA BUNTING

 6

 7   CLEARY GOTTLIEB STEEN & HAMILTON, LLP
            Attorneys for Defendant Bradley Garlinghouse
 8   BY:  MATTHEW SOLOMON
          NOWELL D. BAMBERGER
 9        SAMUEL L. LEVANDER
          NICOLE TATZ
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

L5l2SECc

```
1            (The Court and all parties appearing telephonically)

2            (Case called)

3            THE DEPUTY CLERK:  Starting with the Securities and

4    Exchange Commission, could you please state your appearances

5    for the record.

6            MR. TENREIRO:  Good afternoon, your Honor, this is

7    Jorge Tenreiro on behavior of the Securities and Exchange

8    Commission.  My colleagues are on the line.  I'm happy to go

9    through them, but I think the court reporter has their

10   appearances.

11           THE COURT:  Thank you.  Good afternoon, Mr. Tenreiro.

12           On behalf of Ripple Labs.

13           MR. RAPAWY:  Good afternoon, your Honor.  This is

14   Gregory Rapawy for Ripple Labs, and Mr. Kellogg is also on the

15   line with me.

16           THE COURT:  Good afternoon.

17           And on behalf of defendant Larsen?

18           MR. FLUMENBAUM:  On behalf of defendant Larsen, this

19   is Martin Flumenbaum, from Paul Weiss Rifkind Wharton &

20   Garrison.  With me are Robin Linsenmayer and Christina Bunting.

21           THE COURT:  Thank you.

22           On behalf of Mr. Garlinghouse?

23           MR. SOLOMON:  Hi, Judge Netburn.  It is Matt Solomon

24   on behalf of Mr. Garlinghouse.  Nowell Bamberger, Sam Levander,

25   and Nicole Tatz are on the phone with me, from Cleary Gottlieb.
```

L5l2SECc

1    Thank you.

2              THE COURT:  Great.  Good afternoon to everyone.

3              A few housekeeping matters.  First, I will remind

4    everybody that this is an open, public line, that members of

5    the public and the press are listening in.

6              We have a court reporter on the line.  The court

7    reporter is the only person who is permitted to make any

8    recording or rebroadcasting of today's proceeding.  It is a

9    violation of my court orders and the law for anybody to record

10   or rebroadcast this proceeding.

11             To the lawyers, I will ask that you always state your

12   name before you speak each and every time, so that the court

13   reporter can properly attribute your statements to you.  And I

14   will remind everybody to please speak slowly so that the court

15   reporter can get every word that you say.

16             We are here on an application filed by the Securities

17   and Exchange Commission.  The letter was filed on May 7.  I

18   have the defendant Ripple's May 14 letter in opposition and a

19   reply brief filed on May 19 by the Securities and Exchange

20   Commission.

21             The question presented in today's conference is

22   whether or not, by asserting the affirmative defense of fair

23   notice, whether the Ripple defendants have waived their

24   attorney-client privilege such that fairness requires that they

25   turn over communications with their counsel.

L5l2SECc

```
1          Mr. Tenreiro, why don't I begin with you since it is
2    your application.
3          MR. TENREIRO:  Yes.
4          THE COURT:  I want to start by just jumping into some
5    statements that you make in your letters.
6          You describe the defendants' defense as one that
7    subjectively lacked fair notice, and I want to ask if you have
8    any authority for the proposition that the fair notice defense
9    is a subjective defense and that the good faith of the
10   defendant in asserting that defense is relevant.
11         And relatedly, in discussing the fair notice defense,
12   you state -- I am looking at your opening letter.  You state
13   that "the SEC should be" required -- or "be permitted to test
14   and rebut this defense."  That's a quote.  And then in your
15   reply letter you cite to the Court's decision in Scott v.
16   Chipotle about the requirement to test the truth of a defense
17   that's raised.
18         And so my second question to you, after the subjective
19   question, is what sort of testing would one be doing?  These
20   are obviously related questions.  But what sort of testing are
21   you suggesting that fairness requires the SEC to engage in?
22         MR. TENREIRO:  Thank you, your Honor.  This is Jorge
23   Tenreiro on behalf of the SEC.
24         So to answer the Court's first question, I think, your
25   Honor, that the case that Ripple relies on the most for its
```

L5l2SECc

1    affirmative defense, which is the *Upton* case, shows that the

2    Court may look to whether there was actual notice.

3              Now, in that case, the Second Circuit said, look, just

4    because an examiner had warned you that you might be violating

5    the law, we are not going to say that's sufficient notice, but

6    the Second Circuit's analysis of that fact suggests that the

7    actual notice could be a bar to the defense.

8              And I want to get to the Court's second question, and

9    I will, but I think what's important from --

10             THE COURT:  Can I interrupt you?

11             MR. TENREIRO:  Yes, please.

12             THE COURT:  Sorry.  I just want to interrupt you for a

13   second.  In the *Upton* case, which I agree is the case that the

14   defendants rely on most firmly, in the *Upton* case, the question

15   was with respect to a particular rule, and as I read the case,

16   there was a question as to whether or not the rule was being

17   enforced, but there was no question that the rule said what it

18   said, though in that case I think it is slightly different

19   because there wasn't a question about the state of play.  The

20   state of play was clear.  The SEC had issued a particular rule

21   that, on its face, was clear.  And so I think there was a

22   legitimate question about actual notice of a very clear rule.

23             We don't have that here.  Here, as I read the

24   affirmative defense -- this is the fourth affirmative defense

25   that Ripple asserts -- it couches its defense in a lack of

L5l2SECc

clarity on the SEC's part, that the SEC was unclear, that

market participants did not know what the SEC was intending to

do, and that there were various events that supported that lack

of clarity.

So I think the actual notice question is a little bit

different when you are talking about a very clear rule that was

clear on its face versus an assessment of various factors over

time.

MR. TENREIRO:  Well, that's right, your Honor.  So

there are two points that are important there.

Our position has been, from the beginning of the case,

that *Howey* provides the clear guidance and standards that are

ascertainable, which is all that due process and fair notice

require.

So from our perspective, one can look -- you know, in

*Upton*, as the Court correctly said, there was a rule that was

clear.  Our position is Howey provides the clear standards here

and what the -- you know, the lack of action by the SEC,

because they don't actually point to any rule or statement that

we made.  They simply said the lack of action somehow made that

clear rule unclear.  And so they sort of made the *Upton* case

turn on subjective factors.

But what I think is more important, your Honor, is, I

think the Court in the *Chipotle* case recognized that it doesn't

necessarily matter if it is subjective or objective because,

L5l2SECc

 1   even in *Chipotle*, the defense under Section 259 was objective

 2   and the defense under 260 was subjective.  I think the

 3   principle that controls here is that if the defendant

 4   voluntarily injects their state of mind into the case, then

 5   the -- the then fairness results in waiver.

 6          And our position is, well, how do we know that their

 7   defense injects their state of mind into the case, whether it's

 8   from an objective or subjective point of view?  Well, we submit

 9   that they have all but admitted that their state of mind is

10   what this defense is about, and I can point the Court -- we

11   point to the Court -- we point the Court to some of these

12   statements in our reply letter, and I would like to point the

13   Court to a couple of more.

14          In the premotion conference letter that they submitted

15   to Judge Torres about their affirmative defense, they said, at

16   page 2, this is docket entry 70, they essentially say there

17   that if they can prove that there was confusion in the minds of

18   market participants, then they win on the affirmative defense.

19          When they sought to compel documents from the SEC,

20   they filed a letter to this Court.  That's docket 81 at 5, and

21   they repeated the same concept.  They said:  If there is

22   confusion in the minds of market participants, the SEC cannot

23   as a matter of law prevail.  And so they have essentially --

24   they have directly inserted their state of mind as a part of

25   their defense.

L5l2SECc

         Now, to be sure, they are very careful not to say good
faith, because I believe they know what the consequences of
that would be, but I think this Court and other Courts in this
circuit, including the Second Circuit in *Bilzerian* very clearly
said you can't -- you know, you can't split it in half.  Right?
Chipotle, in the *Chipotle* case, said:  My defense is based only
on what I perceived from the guidance that was out there.  And
this Court said, wait a second, okay, but we need to test that
with what you actually knew or believed about that guidance
that was out there.  So you can't cabin it or artificially cut
it up in half.  That's just simply not fair.

         The answer -- you know, Ripple's answer, when they
assert the affirmative defense, talks about how they transacted
for years in XRP, quoting, "believing XRP was not an investment
contract."  You know, they say that when Platform A listed XRP,
the SEC supposed inaction confused them into thinking their
actions were legal.

         So whether one couches a defense as objective or
subjective doesn't ultimately matter because they have injected
their state of mind into the case, and that's the principle
that controls.

         In other words, your Honor, Ripple is asserting an
advice of the SEC defense.  We have stated that defense does
not exist.  But insofar as they are asserting that advice, it
is essentially the mirror image of a defense of counsel

L512SECc

1    defense.  They just want to cabin it to be supposed advice of

2    the SEC.  So it doesn't matter that they don't also rely on the

3    advice of counsel.  As I said, they can't artificially cabin

4    that.  And we point the Court not just to the *Chipotle* case,

5    but also to the *United States v. Exxon* case in the D.C. -- in

6    the District of D.C., where the defendant tried sort of the

7    same trick that Ripple is trying here, you know:  We were

8    confused by what the Department of Energy was doing and saying.

9    And the Court there said, okay, that's fine, you can make that

10   defense, but you have received the advice of lawyers.

11        And here Ripple cannot and will not deny they

12   received -- you know, they were a sophisticated player in this

13   market, they hired up to 12 law firms, and at least four of

14   them specifically gave them advice as to the legal status of

15   XRP under the securities laws.

16        That brings me to answering the court's second

17   question, which is, well, how would we test -- what would we be

18   testing?  It might be helpful to walk through the events that

19   they point to that the Court alluded to a moment ago.

20        They say, for example, that they entered into a

21   settlement with FinCEN, where FinCEN said, you know, XRP is a

22   virtual currency.  Well, we would test that defense if there is

23   advice where a lawyer might tell them, oh, you know, you can be

24   a currency, but you could also be a security.  And in fact, we

25   know they got that advice.  They got that advice in 2012 from

L5l2SECc

1    what we call Law Firm A in our letter, and they got similar

2    advice from another law firm in a -- you know, it is either

3    Exhibit E or F in our submission, where a lawyer says to them,

4    you know, you can be a currency but also repackage it as a

5    security.

6          So that's how we would test, for example, that

7    particular point.  They (inaudible) of their affirmative

8    defense at the very top.

9          THE COURT:  We just lost you for one second,

10   Mr. Tenreiro.  You just cut out for a second.

11         MR. TENREIRO:  I apologize.

12         At the beginning of their answer, on page 97, they say

13   that fair notice required that a party -- a reasonably

14   intelligent party can ascertain the standards by which it

15   measures the legality of its conduct.  Well, one answer would

16   be did a lawyer actually ascertain them for you?  And our

17   contention is, you know, the Law Firm A memos correctly

18   identified the standards.  So as a factual matter, you cannot

19   come to court and say I just didn't know what standards

20   governed the legality of my conduct if a lawyer actually

21   identified those standards for you.  So Ripple's confusion, or

22   supposed confusion, has to be tested against what it was

23   actually being told.

24         Now, on the Platform A listing, right, how would we

25   test that?  They say well, Platform A listed XRP and nothing

L5l2SECc

1    happened.  They must have believed this was legal.  Well,

2    Ripple will not deny, as we have shown also in our opening

3    letter, that Ripple said to Platform A:  We have the advice of

4    a lawyer that says this is fine.  That's identical to what

5    happened in the *Exxon* case that I have referred to.  *Exxon* was

6    saying, well, you know, there were price issues here.  This

7    wasn't our fault.  The district court said:  Wait a second.

8    There is evidence that you were talking to these people that

9    were setting prices.  So for that point, we also need to know

10   what was in your mind, based on what your lawyers told you, to

11   see whether you influenced what these people were doing.

12          So what we submit, your Honor, is that under the

13   fairness principle -- well, to take a step back --

14          THE COURT:  Sorry.  Maybe I misheard what you said.

15   You are saying -- the last thing you just said, that you might

16   need to see what the lawyers said because it would be

17   influenced by Ripple?

18          MR. TENREIRO:  Well, no.  Ripple is influencing what

19   the platforms are doing.  So Ripple is saying, right, that the

20   SEC's supposed inaction is influencing what the market

21   participants are thinking, and our submission is, it just

22   cannot be the law, under the fairness principle, that they get

23   to advance that fair notice defense based on, for example,

24   internal SEC communications about digital assets generally that

25   they were not even privy to, and we do not get to test that or

L5l2SECc

rebut that, you know, or at least that we are not allowed to weigh that against the advice they actually received about the product they actually had.

So, you know, critical to that point is that we know they got advice. As I have said, I think the advice that we have already submitted shows the Court how it would be tested. Ripple also says, your Honor, that they are not relying on the advice of counsel. So, again, that's not relevant as I have mentioned, as this Court recognized in *Chipotle*. You don't have to actually rely on the advice of lawyer as long as you put your state of mind into the case. It is also not true. In their motion to strike, in their -- sorry, in their opposition to our motion to strike, they say, at pages 18 and 19, this is docket 172, they say that the legal memos from Law Firm A support their fair notice defense. I mean, they actually say that. So they are relying on that advice. Again, it's not needed, but they are doing that. So they are putting the question of what was in their mind at issue by asserting a defense that depends on all of these facts.

We have said, your Honor, from the beginning of the case, they certainly are allowed to argue unconstitutional vagueness. And Judge Hellerstein, in *Kik*, said that's objective. You don't get discovery as to what the SEC was doing. We wouldn't get discovery as to what their lawyers were telling them, but that's not sort of the battlefield that they

L5l2SECc

1    have been wanting to litigate this case in.  They want to

2    litigate it as these are the things that occurred and our

3    belief when these things occurred was that what we were doing

4    was okay, such that there is some sort of constitutional

5    barrier to liability because we were just too confused as to

6    what was happening.

7           I think that's at the core of the --

8           THE COURT:  So I get the differences -- I get the

9    difference between those two concepts, and I understand that if

10   a defendant says "I just didn't believe it to be true" or "I

11   was acting in good faith" that this would be an appropriate

12   area for discovery.

13          You know, this is really akin, as I understand it,

14   this defense, to a void for vagueness argument, where somebody

15   challenges a statute and says, you know, this law that

16   restricts speech is unconstitutional because it is so vague.

17   And comparing this defense to a claim like that, it would be of

18   no moment that the particular entity that was challenging the

19   statute had a lawyer who said, oh, actually, the law is really

20   clear, or the law is not clear at all.  The Court, in deciding

21   that question, would simply look at the statute, how it was

22   enforced, what was going on in the relevant market, etc., to

23   decide whether or not a particular statute was void for

24   vagueness.  And it seems to me that the fair notice defense

25   that's raised here is much more akin to that kind of a

L5l2SECc

1    challenge.

2            MR. TENREIRO:  Well, your Honor, so we agree that if

3    it were -- sorry, we agree that if it were a void for vagueness

4    challenge, we would completely agree, whatever the lawyers told

5    them, not relevant.

6            But I respectfully disagree that the defense as they

7    have couched it is more akin to a void for vagueness challenge.

8    In their motion to strike, they disavow a void for vagueness

9    challenge.  They say:  That is not the defense we are making.

10   You know, I could find the citation in a minute, but they are

11   saying, in their opposition to our motion to strike, this is

12   not a void for vagueness challenge.  This is not what this is

13   about.  And they said that to Judge Torres in their premotion

14   conference letter, which is docket 70.  They conclude that

15   letter by saying, "The bottom line is that the Court must rest

16   with the factual context in deciding what constitutes fair

17   notice in this particular case.  It is not based just on does

18   *Howey* provide the relevant standards by which the conduct can

19   be measured."

20           Again if that was a defense, we would not be here.

21   But they have said repeatedly to this Court, and to

22   Judge Torres, you know -- again, I'm quoting from docket 70 --

23   "this defense is not purely a legal question."  That's -- you

24   know, the Court, your Honor just described a purely legal

25   question.  Right?  Is it void for vagueness?  Is it too

L5l2SECc

confusing?  They said it's a factual inquiry.  We need a fully

developed factual record.  That's, again, from docket 70.

        And not only have they said that to sort of defend

their affirmative defense from our motion to strike, they have

also -- they have also couched -- or characterized that defense

in those terms when seeking discovery against us.  They said --

and I am repeating myself a little bit, but they said

that ---they basically said that if they can prove that there

was confusion in the minds of market participants, based on

these specific moments that they point to, then they win.  So

they are not saying, if we can prove there was confusion in the

minds of market participants because people read *Howey* and have

no idea what it means, they can't say that, your Honor, because

the Second Circuit has repeatedly turned back void for

vagueness challenges to *Howey*.  So they don't want to make that

defense, because they know they would lose.  And Judge

Hellerstein in *Kik* rejected that defense when it was purely

void for vagueness, Judge Dearie in *Zaslavskiy* rejected it, and

of course the Second Circuit has rejected it.  So they can't

make that argument because they know all of the cases are

against them.

        They have affirmatively decided to move away from a

purely legal question, and they specifically say that.  They

say this is not a pure legal question.  The Court must wrestle

with the factual context in citing this particular case, and as

L5l2SECc

```
 1    the Court alluded to, they -- you know, they have these moments
 2    in which they claim they were confused.
 3              Now, if I might add, your Honor, another reason why we
 4    know this defense injects Ripple's state of mind into the case,
 5    again, Ripple has said that.  Ripple has told us that.  In
 6    their motion -- in their opposition to our motion to strike
 7    they conclude by saying that the individual defendants'
 8    defenses will justify the same discovery as Ripple's fair
 9    notice defense.  That's a quote from page 26 or 27 of their
10    opposition to our motion to strike.  I don't think counsel will
11    be able to argue that the individual defendants are not making
12    a good-faith defense.  They are.  They are saying, We did not
13    know.  We acted in good faith.
14              So to the extent that Ripple says that the same -- the
15    defenses will justify the same discovery, it's because it is
16    the same defense.  Ripple is making exactly the same defense as
17    the individual defendants are making.  And so, you know, the
18    old adage, what's good for the goose has to be good for the
19    gander.  There can be no dispute that the -- that this advice
20    would be relevant to the individual defendants, setting aside,
21    of course, they cannot waive Ripple's privilege, that -- we are
22    not arguing that.  But if the individual defendants' defense
23    means that they get the same discovery from the SEC as Ripple
24    would under the affirmative defense, then that means we get the
25    same discovery from Ripple as we would against the individual
```

L5l2SECc

1    defendant.  The principle has to apply both ways.  Otherwise,

2    they are getting to say, on the one hand, you know, it's a

3    purely legal issue; on the other, it's very factual.

4           Just for the citation on the motion to strike their

5    opposition, it's at page 17, where they say, "The SEC

6    erroneously contends that Ripple's defense lacks merit because

7    it is impermissible as applied to void for vagueness."

8           So I appreciate the Court's point and, again, I agree,

9    if it's void for vagueness, we are done.  But they reject that.

10   They say that's not the defense.  And so given that, we are

11   here because they are asserting, they are putting in their

12   state of mind into play.

13          I am happy to answer other questions, your Honor.  I

14   would like to simply conclude at least my affirmative

15   presentation by responding a little bit to some of the policy

16   arguments in the same way that this Court did in *Chipotle*,

17   which is, you know, they may assert the defenses that they

18   want.  They retain control over that.  If they decide to assert

19   a defense that they couch in, you know, their state of mind,

20   then we get to see what was actually in their state of mind.  A

21   ruling in our favor will give all the parties access to the

22   documents, the documents needed to litigate the defense on a

23   fully developed record and, as the Court said in *Chipotle*,

24   "will encourage sophisticated parties," like Ripple, that

25   clearly had access to resources and to 12 law firms, "to

L5l2SECc

1    receive competent advice and to follow the advice."  If they

2    received advice and they did not follow it, we submit that, as

3    they have couched their affirmative defense, they would lose.

4    They would not be able to argue that they actually were

5    confused if they got advice and refused to follow it.

6           Again, I'm happy to answer any additional questions.

7           THE COURT:  My understanding -- and obviously Ripple

8    will be given an opportunity to speak on its behalf, but the

9    fact that it says that there is a factual record that needs to

10   be developed for its defense doesn't necessarily follow that

11   that development includes the state of mind of Ripple.  I have

12   read closely their affirmative defense and, as I interpret it,

13   they are arguing that the conduct of the SEC and of the market

14   created a lack of clarity on the question of how XRP should be

15   regulated.

16          It is not entirely clear to me still, despite your

17   excellent presentation, why Ripple's state of mind on that

18   question is relevant.  The way I have been thinking about it,

19   in part, is that a lawyer, either five years ago or as an

20   expert in this lawsuit, might look at various facts, might look

21   at various actions, and say, based on this landscape, I opine

22   that it's clear that XRP should have been regulated as a

23   security or it's not clear.  And in some way that's sort of

24   expert opinion about what the state of play was at the relevant

25   time, and Ripple's lawyers providing that assessment was just

L5l2SECc

1    one expert's opinion on what the assessment was.

2            But the defense, as I am interpreting it, at least at

3    this moment, seems to focus much more on the external factors

4    and not what an expert would do when she evaluates those

5    external factors.  And I haven't seen a case -- and I would

6    request if you know of one to provide it to me -- that looks at

7    a fair notice defense and asks about how somebody asserting

8    that defense subjectively believed -- what their subjective

9    belief was.

10           Certainly with respect to a good-faith defense, which

11   I believe a lot of the cases that we have talked about discuss,

12   certainly the *Bilzerian* case talked about a good-faith belief,

13   the *Chipotle* case talked about a good-faith belief, in those

14   instances I think the subjective belief does need to be probed.

15   But my reading of the cases with respect to a fair notice

16   defense is that an entity's subjective belief is not relevant.

17   It could have bad intent.  The question is what were the

18   external factors for the market?  So I am looking for a case

19   that says, well, no, what somebody actually believed is

20   relevant in a fair notice defense.

21           MR. TENREIRO:  Thank you, your Honor.  This is Jorge

22   Tenreiro again.

23           So on the first part of the question, I agree, I think

24   that's fair that if -- you know, simply because they might say

25   there are facts here doesn't necessarily push them over the

L5l2SECc

```
1    line into actually sort of waiving involuntarily.  But what I
2    would urge the Court to sort of focus on, and it comes from
3    Chipotle and from Bilzerian, is it doesn't have to be that they
4    say good faith, because otherwise it's too easy for them to
5    just avoid the words "good faith" in their pleadings.  I think
6    the Court in Chipotle relied on Judge Kimba Wood's opinion in
7    Arista Records, where Judge Wood said, if the parties' state of
8    mind is at issue -- now let me get to that point, right,
9    because the Court then said, why is there state of mind at
10   issue here and where is the case?  I would point the Court to
11   the United States v. Exxon case from the -- you know it is 94
12   F.R.D. 246, from the District of Columbia, where that's exactly
13   what happened.  The party tried to say:  My defense is just
14   based on what the Department of Energy told me.  It is not
15   based on anything else.  It is just based on these external
16   factors.  And the judge said:  Wait a second.  That's not fair.
17   You can't do that.  You can't cut it up like that.

18           And in fact, that's actually what this Court said in
19   Chipotle, where Chipotle said:  I'm asserting that I cannot be,
20   you know, subjected to this additional damages, or whatever,
21   under the Fair Labor Standards Act, based on guidance that was
22   out there.  I'm just looking at the guidance, is what Chipotle
23   said.  That's all I am looking at.  And this Court quite
24   correctly said:  Wait a second.  You can't do that.  You can't
25   split it up like that.  If you are going to go there, we have
```

L5l2SECc

1    to go there.

2              So the case that the Court is asking me for, I think,

3    is the *Exxon* case from D.C.  And I think that the other thing

4    that's important, your Honor, that, again, I keep citing

5    *Chipotle*, because I think it is very much -- not exactly on all

6    fours, but very similar to this case --

7              THE COURT:  It was also written by a very smart judge.

8              MR. TENREIRO:  That's right.  Exactly.

9              So in *Chipotle*, the Court did something -- did two

10   things, your Honor, that in fact we have seen in subsequent

11   cases, and many Southern District judges have sort of adopted

12   this approach, because it is such a smart approach, two things

13   that are important.  The Court said, first, it is a

14   case-by-case question.  We have to see how the privilege is

15   being asserted and what's going on here.  So we have gone

16   through that.  I don't want to belabor a lot of it.  But these

17   external factors that Ripple is pointing to are sort of

18   intertwined with the internal views that they have, to the

19   extent that they have legal advice that then they use to

20   influence external views, because they are telling the

21   platforms:  We have lawyers.  They disclose in 2012 and '13:

22   Here is what our lawyers told us.  In 2015, they disclose a

23   memo and they said:  Here is what our lawyers told us.

24             So even if it's true that one could artificially cabin

25   Ripple's defense, and we really can't, but even if that were

L5l2SECc

1    true and they want to just focus on external factors, in this

2    case they influence those factors with the opinions of the

3    lawyers.  And --

4                THE COURT:  But you have received those opinions.

5                MR. TENREIRO:  Well, that's right, your Honor.  But we

6    have to understand sort of what were the factual bases for the

7    opinions.

8                So if the Court looks, for example, at the October

9    2012 memo by the Law Firm A, you know, it indicates we

10   received, you know, a document from you that sort of updates

11   your business plan.  So we need to be able to -- and subsequent

12   disclosures by Mr. Larsen suggest that there were

13   clarifications or conversations with those lawyers.  So we need

14   sort of the full record, not just the ones that Ripple has

15   chosen to disclose to the market for its benefit or for its

16   purposes.

17               And as I said a moment ago, you know, Ripple shouldn't

18   be able to put on a defense that sort of looks at the state of

19   mind of the SEC and every market participant, because that is

20   what the external focus is, but does not look at their state of

21   mind.  That is sort of fundamentally unfair.  And they are

22   putting in their state of mind because they are a market

23   participant.  So they can't sort of externalize themselves in

24   that way.  They are a market participant.  The confusion in

25   their minds that they point to in multiple filings, the

L5l2SECc

1   confusion in the minds of every market participant, as they

2   have described it, well, okay, that's them.  They are a market

3   participant.  In fact, they are the most important one.  They

4   are the ones with the assets.

5          The other thing that the Court did in *Chipotle*, your

6   Honor, that I sort of point to is, you know, *Chipotle* was

7   trying to say this isn't a good-faith defense and the Court

8   said, well, let me look at the case law that applies to this

9   defense, and how can I tell from this case law that good faith

10  matters?  And perhaps that's why the Court is asking me for a

11  case where, sort of, the analysis happened along these lines.

12         This is why we pointed the Court to cases that say if

13  you have actual notice, it's an absolute bar.  In the Eighth

14  Circuit case that we cite, you know, it wasn't even notice by

15  the government.  It was, like, the Court said:  Based on your

16  own actions -- the defendant there his name was Washam, I

17  believe.  The Eighth Circuit said, based on your own actions --

18  the pin cite is -- it's 312 F.3d at 930.  The Eighth Circuit

19  said:  Based on your actions, we can tell that you knew what

20  the law required from you.  So you can't come here now and say

21  there is a constitutional bar to liability.  And the Eighth

22  Circuit there relied on a Tenth Circuit opinion along the same

23  line.  It's not just that the government can give you the

24  actual notice, but you could actually have notice based on what

25  you knew.  And so that -- those cases sort of stand for that

L5l2SECc

```
1    principle, that the state of mind becomes relevant when they

2    make it -- when they make that affirmative defense.

3             Your Honor, respectfully perhaps one of the reasons --

4             THE COURT:  I --

5             MR. TENREIRO:  Um-hmm?

6             THE COURT:  Sorry.  Continue.  I didn't mean to

7    interrupt you.

8             MR. TENREIRO:  Your Honor, I simply wanted to say that

9    one of the reasons why perhaps there is not a case that

10   directly addresses this issue is because, as we have said, this

11   fair notice defense, Upton is the only case that sort of

12   recognizes the fair notice defense as they sort of couch it.

13   But we understand the Court has seen it differently in the

14   context of seeking discovery against us.  We want to cabin this

15   defense as an objective defense, unconstitutional vagueness,

16   that's the end of the story.  We can argue based on what Howey

17   and the cases interpreted in it say.  But they resist that.

18   They don't want to do that.  They want discovery from us.  They

19   want to be able to say that what we believed and what the

20   market participants believed was relevant.  That simply means

21   that what they believed was relevant.

22            But the interesting thing about it, though, is that

23   Upton itself recognizes that if a person actually had notice,

24   they might be precluded even from raising the Upton type

25   defense because the Second Circuit at the end of the opinion
```

L5l2SECc

1    analyzes that question, rejects it, says this isn't enough, but

2    says, well, you know, here is something that the SEC pointed

3    to.  So I'm not sure why there should be a distinction between

4    notice that might have been provided for -- provided to Ripple

5    by an examiner at the New York Stock Exchange or by the SEC

6    itself or by their own lawyers, and I don't think the cases

7    would recognize that distinction to the extent that, you know,

8    the fair notice defense is based on this sort of, oh, I was

9    confused because of all of these sort of things that were

10   happening.  I don't see why we would cabin out what they were

11   told, what they knew.

12         I mean, let's just say that Mr. Garlinghouse was

13   reading the Bill Hinman speech that they point to and sent an

14   e-mail to his colleague and said, oh, wow, this speech makes it

15   really clear that we are a security.  I think we would all

16   agree that that goes against his defense and it goes against

17   Ripple's defense really.  So why would it be different if a

18   lawyer said that?  The whole point of the fairness principle is

19   that you can't make a defense that calls into question what you

20   you believed and then shield the advice of the lawyer.

21         So I think that -- and, again, to sort of remind the

22   Court, to the extent that Ripple says that their defense is the

23   same as the individual defendants' defense, it becomes

24   abundantly clear what is going on here.  They are trying to

25   make an argument based on what they believed.  If Ripple pleads

L5l2SECc

1   a different defense, it's a different argument.

2           THE COURT:  May I ask you a question?  You say,

3   persuasively, that Ripple itself is a market participant, and

4   so if the fair notice defense is just what did the market

5   think, then what Ripple thinks is also part of that assessment.

6   And I don't think anyone is arguing that, you know.  Certainly

7   we can look and see what Ripple did.  We know what its conduct

8   was obviously.

9           And, you know, to your point about if Mr. Garlinghouse

10  wrote an e-mail after the speech reflecting Ripple's or its

11  officers' thinking, that would be discoverable.  But obviously

12  attorney-client communications are of a different sort and,

13  generally speaking, the law protects those communications for

14  good policy reasons.

15          So if you already have some of these memos that were

16  provided from Ripple to third parties, you know what Ripple's

17  conduct was.  You know what actions it took.  You know what it

18  was saying to third parties, like the exchanges.  Why do you

19  need that additional interference with their attorney-client

20  communications?  Why is that deeper assessment critical to your

21  ability to defend against this defense?

22          MR. TENREIRO:  Well, your Honor, because of the

23  fairness principle.  They chose what, you know -- they chose

24  what advice to disclose to market participants, presumably

25  because they thought it helped them.  We have to be able to

L5l2SECc

1    test what the lawyers actually told them.

2           Let's just imagine a scenario where, you know, they

3    enter into a settlement with FinCEN, and FinCEN says you are

4    virtual -- a convertible virtual currency, and then -- we know

5    they have the advice of a lawyer helping them out with that,

6    and that's fine.  The lawyer says to them, by the way, you

7    still have the SEC.  You know, you better talk to them because

8    this doesn't clear you.  You know, there are still other

9    federal laws out there.  They are not going to disclose that to

10   a market participant, but that would rebut -- that would be the

11   end.  You know, as they said, that would be game over for their

12   affirmative defense, that they were confused when they entered

13   into the FinCEN settlement.  They just chose not to follow that

14   advice.  So I don't know what is out there, but what I do know

15   is that they chose which ones to disclose.

16           And just a minor point on the exchanges, we don't know

17   what they have given, the exchanges, because we haven't seen

18   that, but, you know -- and, your Honor, it's sort of -- that

19   argument, if accepted, would be sort of the reverse argument

20   that we made that was rejected by Ripple, where we said:  Look.

21   You have our external communications.  You have what we have

22   said publicly.  You have what the SEC has said.  You have the

23   Dow report.  You have the guidance.  You have statements.  You

24   have speeches.  But that's not enough.  They say, no, no, what

25   you were thinking was relevant because there is confusion, and

L5l2SECc

1    if you were confused, how could we not be confused?  Well,

2    okay, but the other side of that is, if you were not confused,

3    then why does it matter if we were confused?  It just simply

4    goes to that.

5          And having only the memos that Ripple chose to

6    disclose to its business partners to sort of convince them to

7    do business with them, I think, would really be an affront to

8    the fairness principle.  I certainly -- you know, I'm very

9    attuned to the Court's concern that, you know, attorney-client

10   is different, we protect it, but I think, again, *Chipotle*, even

11   there, the Court said, you know, we have to construe it

12   narrowly at times to protect sort of the public's right to

13   every man's evidence, I think is the quote.  And the Court

14   concluded by noting that the policy point that *Chipotle*

15   advanced and said, all I'm doing here is encouraging you to

16   follow your lawyer's advice.  If Ripple follows the lawyer's

17   advice, if the lawyer's advice comes in and the lawyer said,

18   hey, this is really confusing, I'm sorry I can't -- you know,

19   there might be this, or might be that, okay, you know, it's not

20   going to help us.  It would help them.  And if it doesn't say

21   that, if it says something else, they might lose --

22          THE COURT:  Mr. Tenreiro, we lost you for the last

23   four seconds.  You dropped again.

24          MR. TENREIRO:  Sorry.

25          THE COURT:  You were saying --

L5l2SECc

1          MR. TENREIRO:  I thought by doing this from my office

2     line it wouldn't happen.  I apologize, your Honor.

3          THE COURT:  It's out of use.

4          MR. TENREIRO:  Exactly.  Exactly.

5          So as I was saying, if Ripple received advice -- I was

6     sort of talking about the policy points that the Court raised

7     which, you know, is a very good point and obviously, you know,

8     Courts should be careful in this area.  We are not disputing

9     that.  But if Ripple got advice from lawyers that sort of said,

10    hey, this is really confusing, and I'm not sure what's going to

11    happen here, that's going to help them, and we won't be able to

12    rebut their affirmative defense.  But if that's not the advice

13    they got, if they got advice that sort of identifies the

14    standards that they need to follow, that identifies for them

15    that the speech doesn't really say anything about fair conduct

16    at all, it doesn't apply to them, if they got advice that the

17    FinCEN settlement doesn't clear them with the SEC, then, you

18    know, the fairness principle requires them to lose that

19    defense, but it will encourage sophisticated parties with

20    access to deep resources, like Ripple, to follow the lawyers'

21    advice, as the Court said in *Chipotle*.

22         So I would argue that sort of the policy concerns

23    weigh strongly in favor of disclosure here, your Honor, and

24    will permit all of the parties to litigate this issue that has

25    sort of become, in ways, again, that we don't agree with, in

L5l2SECc

1    many ways the heart of the case or a part of the case on a full

2    record and will permit the fact-finder to make a determination

3    based on all of the advice and not just the advice that Ripple

4    chose to disclose.

5              You know, I would add that in the motion we filed this

6    week, Ripple is now clawing back some of that advice that it

7    apparently doesn't think is helpful to them, so that's why the

8    fairness principle is there and says, once you put your state

9    of mind into play, we just need to look at all of it and assess

10   everything, and then Ripple will have -- Ripple will have what

11   they want.  The factual record will be developed and the

12   fact-finder will have to determine, you know, what was in your

13   mind.  Were you really confused or not?

14             THE COURT:  Thank you.

15             Before I switch to Ripple I just have two I think

16   quick questions for you, which are, do you think this question

17   before the Court today should wait for a decision on the motion

18   to strike the answer?

19             MR. TENREIRO:  Okay.

20             THE COURT:  And a related question, what about the

21   motion that's in the pipeline that I have not looked at but I

22   know has to do also with the attorney-client privilege issues?

23   Do you think that that motion should be resolved with this

24   motion.

25             MR. TENREIRO:  So, your Honor, thank you.  Jorge

L5l2SECc

1    Tenreiro again, for the benefit of the court reporter.

2             On the first question, the answer is no.  I don't

3    think it is premature, because I don't believe they are going

4    to withdraw the defense, and we are sort of barreling toward

5    the end of fact discovery.  And Ripple has said that they

6    intend to move for summary judgment.  We are looking at that

7    issue.  We might move on -- you know, as to summary judgment as

8    well.

9             So if they move on summary judgment and we say, you

10   know, these sales and offers meet the *Howey* test, they are

11   going to turn around and say, okay, but as a matter of law,

12   because of my defense, even if reliable, the Constitution sort

13   of stands in your way, SEC.  So we won't be able to rebut that

14   defense at summary judgment.  Discovery is about to close.  So

15   short of sort of -- sorry, short of them withdrawing the

16   defense or everybody waiting until Judge Torres decides the

17   motion to strike, we need the discovery now.  And Judge Torres

18   did say in her scheduling order that there shouldn't be any

19   sort of stay of discovery issues, you know, based on the

20   pending of dispositive motions under Rule 12.  Certainly if

21   the --

22             THE COURT:  Right.

23             MR. TENREIRO:  -- Court is inclined to wait, then we

24   would have to reevaluate whether we can complete discovery in

25   this case, and the parties will have to make decisions about

L5l2SECc

1    what that means.  You know, I certainly understand the Court's

2    question about, well, maybe the defense goes away, right, the

3    defense goes away, but if the Court orders its discovery and

4    the defense goes away, well, you know, the documents are no

5    longer relevant to Ripple.  There is a protective order, they

6    can claw them back, and that's the end of it.

7         If Ripple gets on the line following my presentation

8    and they are willing to say, no, that's okay, you know what?

9    We will wait to move for summary judgment until the motion to

10   strike is decided, maybe that's a different question, and

11   maybe, you know, we both agree, okay, let's all just wait.  But

12   I don't think that's going to be their position.

13        I think their position is we need to move for summary

14   judgment, you know, in August.  Discovery is going to end.

15   This case needs to be completed.  And so insofar as that

16   continues to be their position, then we need the discovery now.

17   Again, if they are going to change that sort of way in which

18   they wanted to manage the litigation schedule, then perhaps we

19   can revisit.

20        As to the Court's second question, there is some

21   overlap, your Honor, with the new motion.  At least insofar as

22   the facts of that motion demonstrate that there has been -- to

23   sort of answer the Court's last question to me, which is, why

24   do you need more than what they have chosen to disclose?  I

25   think the facts of that motion -- and I know the Court is going

L5l2SECc

1    to look at them very carefully in deciding that motion, but the

2    facts that we lay out there show Ripple trying to essentially

3    game the attorney-client privilege that they have and disclose

4    the information that's helpful to them, claw back the

5    information that's not helpful to them.  And this is why we

6    refer to sort of fairness principle more broadly in our

7    submissions in connection with this motion, and answers the

8    Court's previous question to me, why do we need more?  It's

9    because Ripple has chosen so far and they have remained in

10   control over what they disclose, and even when they disclose

11   it, and then when they have seen that it is something doesn't

12   help them, they claw it back.  They should be subject, your

13   Honor, to an order that says that all of this information is

14   discoverable and that it's been put in issue by their defense.

15             Thank you.

16             THE COURT:  All right.  Thank you.

17             (Court and staff confer)

18             THE COURT:  I will turn to Ripple.  Mr. Rapawy, are

19   you going to take the lead here?

20             MR. RAPAWY:  I am, your Honor.  For the court

21   reporter's benefit, Gregory Rapawy, for Ripple Labs.

22             THE COURT:  Thank you.

23             MR. RAPAWY:  Your Honor, Ripple -- I'm sorry?

24             THE COURT:  I just said thank you.

25             MR. RAPAWY:  Oh.  Excuse me.

L5l2SECc

1           THE COURT:  You can continue.

2           MR. RAPAWY:  Your Honor, Ripple has not -- very good.

3           Your Honor, Ripple has not waived its attorney-client

4    privilege.  That privilege, as the Court knows, is vital to

5    protect clients' candid disclosures to attorneys and attorneys'

6    candid advice to clients.

7           The rules that govern the waiver of that privilege,

8    because it is so important, should be clear, so that clients

9    can make knowing and intelligent decisions on whether to waive

10   or preserve the privilege.

11          Now, here, the SEC is tasking the Court to declare an

12   extraordinarily broad waiver.  Here it is a privileged

13   communication that is extending into the SEC's own

14   investigation.

15          They originally, I believe, made two arguments in

16   support of that.  One of them was the selective disclosure

17   doctrine from *von Bulow* and the other is at-issue waiver from

18   *Bilzerian*.  In their reply, they said that they were not

19   arguing selective disclosure at all.  In the argument today it

20   sort of sounded like that point had come back a little bit.

21   But I will take them at their word that they are not arguing

22   selective disclosure.  If they were, for the reasons stated in

23   our letter, it would be foreclosed by the Second Circuit's

24   *von Bulow* decision.  We are not dealing with any selective

25   disclosures in litigation here.  We are dealing with

L5l2SECc

1    pre-litigation disclosures, and *von Bulow* forecloses that

2    argument entirely.

3            The at-issue waiver argument deals only with the

4    situation where the client has put the legal advise it received

5    from its attorneys at issue in litigation, and Ripple has not

6    done that.  And to be clear, the focus is whether the party

7    claiming privilege has put the communications at issue.  It's

8    not enough that the adversary would like to use them or put

9    them at issue, and it is not enough that they are merely

10   relevant to a claim or defense.  And we take that from the

11   Supreme Court -- the general rule from the Supreme Court's

12   decision in *Salerno* that you don't forfeit the privilege merely

13   because it might contradict your position.  And I believe the

14   Second Circuit's decision in *County of Erie* essentially took

15   the same analysis and applied it to the attorney-client

16   privilege waiver context.  And that has to be the rule because

17   privileged communications are very frequently potentially

18   relevant.  Clients talk to attorneys all the time about facts

19   that then become the subjects of litigation.  That's part of

20   what we want to protect.  That doesn't in and of itself create

21   a waiver.

22           The two classic ways to put privileged communications

23   at issue are, of course, the advice-of-counsel defense, which

24   literally makes privileged advice defense and a good-faith

25   defense which, under *Bilzerian*, is considered to be an

L5l2SECc

affirmative contention about state of the defendant's mind and

therefore puts at issue what the client heard from their

attorney that might have informed their state of mind.

But there is no advice-of-counsel defense or

good-faith defense to a primary section 5 violation.  Section 5

is strict liability.

THE COURT:  Sorry, Mr. Rapawy.  Sorry.  Sorry.  Can I

just ask everybody who is not Mr. Rapawy to mute your phones so

we can get rid of some of the background noise.  Thank you.

All right.  Continue.

MR. RAPAWY:  Thank you, your Honor.

So section 5, strict liability, it doesn't matter that

we wholeheartedly believed and believe now that XRP is not an

investment contract.  If the finder of fact disagrees with us

on that, we will still be liable.  And it also doesn't matter

if our attorneys told us that it was an investment contract or

if they told us that it wasn't or if they told us that they

weren't sure.  None of those things will help us make out the

defense we are trying to make out.  Instead, our defense is

fair notice under *Upton*, and that focuses on whether a

reasonable person of ordinary intelligence could have learned

whether the conduct was prohibited not on the particular state

of mind that Ripple had.

There are some similarities, I think, to the void for

vagueness argument.  I think *Upton* certainly cites some void

L5l2SECc

1   for vagueness cases, but we do think it is sort of evolution or

2   distinct branch of the doctrine, not a void for vagueness

3   argument as such and that, of course, is the subject of the

4   motion to strike that is currently pending before Judge Torres.

5          The controlling authority here is *Upton*.  I think

6   that, properly read, *Upton* makes clear that a fair notice

7   defense does not turn on subjective beliefs or awareness, and I

8   think if you look at the part at the end that was discussed in

9   the SEC's argument, the informal warning that the firm received

10   from a Stock Exchange examiner that the disputed practice

11   "violated the spirit of the rule" and was "being looked at

12   closely by the regulatory bodies," and then the Second Circuit

13   goes on to say, well, that's not enough, that doesn't give

14   you -- that did not -- that doesn't give you fair notice, that

15   is a pretty clear statement that advice that's received is not

16   the subject of this defense.  Whatever -- in that case it

17   happened to be advice from the examiner, but I don't know why

18   advice from a lawyer would be any different.  It's not the kind

19   of fair notice we are concerned about in the *Upton* line of

20   cases.

21          And I think our position is also supported by the

22   *County of Erie* case, which we raised in our letter, and the SEC

23   did not address in reply, and that case involved qualified

24   immunity, so it is not squarely on point, but it did hold that

25   an argument that the law was not clear does not put legal

L5l2SECc

1    advice or the defendant's state of mind at issue, and we think

2    the same principle should apply here.

3              And your Honor asked whether we had anything that was

4    really squarely on point.  I do have one case for you.  I

5    apologize that it is not in our letter.  I learned of it after

6    the letter was filed.  It is from the Eastern District of Ohio,

7    *United States v. Ohio Edison Company,* 2002 WL 1585597.  And

8    because we didn't have that in our letters, I don't want to

9    argue it, but I will just put that cite there for the Court's

10   attention.  I think it is responsive to your question, and I

11   think it coheres with the points that we are making today.

12             Now, the SEC has cited a couple of decisions that I

13   would like to address for the first time in their reply letter,

14   and that they have cited for the proposition that a fair notice

15   defense does require good faith, and in particular they relied

16   on the *General Electric* case from the D.C. Circuit and the

17   *Exxon Mobil* case from the Northern District of Texas.  And to

18   be clear, there are two *Exxon Mobil* cases.  One of them is from

19   DC in the '80s and the other is more recent from Texas.

20             But the ones that they cite that use the phrase "good

21   faith" are talking, in my view, pretty clearly about the good

22   faith of a hypothetical regulated party.  So if you look at

23   page 1329 of line 53 F.3d, it's the *General Electric* case, you

24   will see that the -- that the full statement of the inquiry

25   from Judge Tatel is "whether, by reviewing the regulations and

other public statements issued by the agency, a regulated party

acting in good faith would have been able to identify the

prohibited conduct."  And the "would have," I think, is key,

because that makes clear that you are talking about a

hypothetical objective party, you are not talking about the

knowledge of an actual existing party.

(Continued on next page)

L5lsSEC2

1          MR. RAPAWY:  In any event, regardless of your reading

2     of <u>General Electric</u> or -- and the <u>Exxon Mobile</u> case from the

3     Northern District of Texas just followed <u>General Electric</u>.  It

4     is the same analysis.

5          But <u>Upton</u> is controlling here.  <u>Upton</u> was 25 years

6     ago.  Nobody has found one case that says that an <u>Upton</u> defense

7     puts state of mind at issue, and we would respectfully suggest

8     that this is not a good case to be the first, your Honor.

9          A couple of points that I would like to address that

10    the SEC raised during their argument.  One argument is that the

11    way that we have argued our defense puts our state of mind at

12    issue, regardless of whether <u>Upton</u> is objective or subjective.

13    I don't agree with that characterization of our arguments.

14          I will not go through point by point, but I think if

15    you look at their citations, you will find that were are

16    consistently referring to the notice that would be available to

17    a reasonable market participant or member of the public.  That

18    is the objective standard; it is not a subjective standard.

19          Now, to be clear, Ripple is a market participant.  And

20    so in that sense, you know, Ripple's communications, even their

21    internal communications, could be relevant because they would

22    be evidence of what a reasonable market participant would have

23    seen.  But that does not put at issue Ripple's particular state

24    of mind, and so it is not enough to create a waiver under

25    <u>Bilzerian</u>.  The ultimate question is objective, and an ultimate

L5lsSEC2

1   goal would be the same for Ripple or anyone else who is

2   participating in the market.

3          On the question of internal communications, there is a

4   theme that comes through in the letters and we heard it again

5   this morning, that we are being inconsistent for seeking

6   discovery of their internal communications but withholding

7   ours.  I don't think there is any inconsistency at all.

8          To be clear, we have not, at any time, resisted

9   discovery of our non-privileged internal documents as being

10  somehow irrelevant.  We have produced those where they are

11  responsive.  And, in fact, the discovery they have received

12  from us has been much broader than the discovery that we have

13  received from them, because discovery of them, as the court

14  knows, having been your Honor's ruling, excludes informal

15  internal e-mails, and to lessen the burden on the agency, we,

16  of course, do not have any similar protection and we haven't

17  asked for one.

18         So I would say both parties' internal communications

19  are potentially relevant to the fair notice defense.  Neither

20  parties' internal communications are at issue and, therefore,

21  there is no waiver.

22         On the subject of whether actual notice is a bar to a

23  fair notice defense.  I do not think the cases they rely on

24  support a rule that raising fair notice waives the privilege.

25  They have two.  These were, again, raised for the first time in

L5lsSEC2

1    their reply.  One of them was the <u>Backlund</u> case from the Ninth

2    Circuit.  And I think, as was almost sort of conceded before,

3    the agency specifically told one of the individuals there he

4    was violating the law.  And the other one had a communication

5    with the agency where he asked for and didn't get the required

6    permit.

7         So under those circumstances, I think that is a very

8    different kind of actual notice argument than the argument,

9    well, your lawyer might have told you that you were breaking

10   the law, which is an argument that could be made about any

11   defendant in any case.

12        The <u>Washam</u> case from the Eighth Circuit actually did

13   not technically decide the actual notice issue.  It said the

14   rule was clear and commented in dicta that the fact that the

15   defendant told customers how much to ingest of the chemical,

16   where the label said not to ingest it, indicates that he knew

17   perfectly well what he was doing.  I think that was a fair

18   observation.  I don't think that had anything to do with this

19   case.

20        In any event, we are again under <u>Upton</u> here in the

21   Second Circuit, and I do think <u>Upton</u>, properly read, rejected

22   an argument that advice was or could be relevant.

23        I don't want to spend a lot of time on your Honor's

24   opinion in <u>Chipotle</u>, because you know it better than I do.  But

25   very briefly, our reading of that case is that those were

L5lsSEC2

1    explicit statutory good faith defenses.  That is clearly under

2    <u>Bilzerian</u>.  Our defense is not a good faith defense, and it is

3    certainly not the defense where there is a statute that

4    explicitly says you have to -- explicitly, excuse me, says that

5    you have to show good faith, which is what you were dealing

6    with in this case.

7         THE COURT:  At this point, can you address -- I think

8    it is related to what you're talking about now -- the argument

9    that the SEC raised that your individual defendants -- who I

10   know are not your clients -- are raising a good faith defense,

11   and that in your applications and letter briefing to Judge

12   Torres, you have suggested that the evidence will be the same

13   for both of those defenses?

14        MR. RAPAWY:  So I think that the argument there, your

15   Honor, is that some of the same evidence is relevant, not that

16   the -- and I will clarify a little bit further.  I can't say

17   whether the defendants, if and when they answer, will raise an

18   affirmative good faith defense.  That's not my decision to

19   make, and it may never come to pass.

20        I can say that to the extent that the defendants are

21   saying that the SEC hasn't met its burden to show that they

22   acted recklessly or with knowledge that they were violating the

23   law or aided and abetted with that knowledge.  To the extent

24   they are making that argument, that is not a good faith

25   defense.  That is, instead, a claim that -- it is a mere denial

L5lsSEC2

1    of a culpable state of mind.  And if you go to the Bilzerian

2    case in particular, at page 1293, it says that the district

3    court's ruling did not prevent the defense from urging lack of

4    intent.

5             So, again, we don't know what they are going to plead.

6    We won't find that out until later.  But to the extent that

7    what they are going to argue is the SEC can't prove lack of

8    intent because in 2013, 2015, 2017, maybe right up until this

9    case was filed, nobody knew what the law required.  No one knew

10   what the law required.  That would overlap with our defense,

11   perhaps, it would negate recklessness, but it would not be a

12   good faith defense.

13            I hope that is responsive to your Honor's question.

14            THE COURT:  Yes.  Thank you.

15            MR. RAPAWY:  I wanted to touch briefly on the Exxon

16   case, the DC one that came up a couple of times.

17            I think, properly read, that is just another good

18   faith case.  To the extent that there is some reasoning in it

19   that maybe goes a little bit further, I would point out that it

20   relies extensively on the Hearn case from the Eastern District

21   of Washington, 1975.  And I think that the Second Circuit made

22   clear in the County of Erie case that while Bilzerian is

23   certainly still good law, Hearn is not a reliable guide for

24   waiver of privilege in this circuit.

25            So to the extent that your Honor were to read that

L5lsSEC2

1  1980 DC case against <u>Exxon</u> as supporting their position in

2  terms of its logic, I think you should look to <u>County of Erie</u>

3  and determine that that is not analyzing the law in the way

4  that it should be analyzed in this circuit today.

5        Very briefly, a few additional points.  The point of

6  the disclosure before the litigation came up several times.  I

7  do think that is foreclosed by <u>von Bulow</u> because it is

8  pre-litigation disclosure.  There has not been any showing that

9  we disclosed anything during investigation, that had not

10  previously been disclosed before the investigation began or

11  during the litigation.

12        I understand that there is another letter pending

13  about, you know, with an argument about an act that was made.

14  I would respectfully ask your Honor to put that one to the

15  side.  We have not had an opportunity to respond to that letter

16  yet.  We don't agree with their statement of the facts.  We

17  don't agree with their characterization of our position.  I

18  don't think it would be prudent of me to try to respond to that

19  entire letter orally in this hearing.  And so I would ask your

20  Honor just to deal with that one when it is fully briefed.

21        THE COURT:  Can I ask you to just go back a little bit

22  to the top here.

23        You know, one of the questions that I asked

24  Mr. Tenreiro was to explain to me why he believed he needed to

25  test your position that there was not fair notice, and that the

L5lsSEC2

1    only way to test that is to see whether or not your own lawyers

2    were telling you what the state of play was.

3            I would like you to respond to Mr. Tenreiro's

4    arguments in response to my question.

5            MR. RAPAWY:  Yes.

6            So I think that the arguments as to why -- I mean,

7    there are a couple of -- well, let me try to unpack.

8            What I think I heard him saying -- and I don't want to

9    mischaracterize.  what I think I heard him saying was that if,

10   you know, we influenced the market through putting

11   communications out there, then that necessarily would allow

12   them to go back to see what advice we were getting from our

13   lawyers contemporaneously to determine -- I mean, it is not

14   entirely clear to me what that would necessarily show.  Because

15   at the end of the day, the statements that were made to the

16   market are the statements that were made to the market.

17           Now, as we said with regard to the internal

18   communications, they can get our internal communications to

19   find out more evidence about the statements made to the market

20   that might have affected those market perception, as long as

21   they are non-privileged.

22           But what was --

23           THE COURT:  I think what they were saying, in part,

24   was that if you were saying to the exchanges, it's fine, we are

25   not a regulated security, you can trade us, etc., and therefore

L5lsSEC2

1   you were affecting the marketplace by putting that proposition

2   into the marketplace, but at the same time you're receiving

3   counsel saying, no, no, no, you're a security, you should not

4   be trading in this manner.  And so you might have been

5   manipulating that market.

6              (Indiscernible speaking)

7          I don't know who that is.  If you can mute your phone,

8   please.

9          Ms. Slusher, I don't know if you can tell who that is

10  from your end and mute, if that is possible.

11         Mr. Rapawy, I think the argument that the SEC was

12  making was that you may have been affecting the marketplace in

13  a biased way by revealing only some information and withholding

14  other information that might have moved the market differently.

15         MR. RAPAWY:  OK.  Two responses to that.

16         I mean, first, of course, obviously we're not

17  revealing the privileged communications here, so it is

18  difficult a little bit for me to address the speculation about

19  what advice we might have or might not have received.

20         But, in general, I think von Bulow is very clear that

21  alleged selective disclosure or alleged selective disclosure

22  before litigation, even if it is arguably unfair, does not

23  create a subject matter waiver.

24         My second response to that would be that I think it

25  goes to the point that the Supreme Court made in Salerno, which

L5lsSEC2

1    is the possibility that privileged communications might

2    contradict a party's position.  I think the hypothetical, which

3    we don't acknowledge to be true, that Mr. Tenreiro had sketched

4    is an argument that the privileged communications, if revealed,

5    might contradict our position.  That is not enough to forfeit

6    the privilege, because the privileged communications themselves

7    aren't directly at issue and because any party could say that

8    about the other side in any case.

9              And not necessarily, you know, in any case, where

10   you're trying to prove the other side say that mine is part of

11   your affirmative case, you could say, well, their lawyers might

12   have told them something that is helpful to me.  I want to see

13   it.  We don't know whether their lawyers told them something

14   helpful unless I can see it.

15             And that is just not enough.  It would be fair too

16   broad, and it would allow parties to effectively pierce the

17   other side's privilege without the -- decide that holds the

18   privilege ever affirmatively putting that material in issue.

19             THE COURT:  Thank you.

20             Anything further?

21             MR. RAPAWY:  Not unless your Honor has any further

22   questions.

23             THE COURT:  Thank you.

24             Mr. Tenreiro, anything you would like to say in

25   response?

L5lsSEC2

1          MR. TENREIRO:  Yes, your Honor, briefly.  This is

2     Jorge Tenreiro.  I appreciate the court's indulgence.  I do

3     have some points to respond to.

4          Counsel started by saying that they have not put the

5     legal advice that Ripple received at issue in this litigation,

6     and I would just like to highlight, while that is both not true

7     and also not relevant.

8          And one more time I would like to quote from Chipotle

9     where the court said, "Courts have recognized that a party need

10     not explicitly rely on advice of counsel.  Instead, advice of

11     counsel may be placed at issue where a party's state of mind,

12     such as his good faith belief in the lawfulness of his conduct,

13     is relied upon in support of the claim or defense."

14          That is from Chipotle, and as a matter of fact, now

15     I'm going to read from their opposition for our motion to

16     strike.  They say, "The October 2012 memo supports Ripple's

17     fair notice defense through its" -- and then they redact what

18     portion of it, and then we are obviously debating whether these

19     parts should be redacted or not.  I don't need to read it.  The

20     Court can read it.  It's at page 19 of their opposition.  They

21     explicitly say the memo supports Ripple's fair notice defense.

22     So the very first State of that they make is not true and it is

23     not relevant.

24          They also say, your Honor, that in this case, it

25     doesn't matter -- you know, I'm not purporting to quote now,

L5lsSEC2

1  and I don't want to mischaracterize what he said, but in sum

2  and substance he said, it doesn't matter if we believed that it

3  was an investment contract or that it was not an investment

4  contract.  If that is true, your Honor, then I would ask him to

5  withdraw the affirmative defense.  Because in the very second

6  paragraph they say, "Countless market participants for years

7  transacted in XRP believing it was not an investment contract."

8        So they can't come to the court now and say it doesn't

9  matter what we believed and tell the court this is the heart of

10  our affirmative defense.  That is how they are making the

11  defense, your Honor.  And they can't now, you know, sort of

12  contradict that.

13        I'm very familiar with the Ohio Edison case from, I

14  think, the District of Ohio.  Your Honor, the court is going to

15  look at that case, and if the court has questions about that

16  case, since it was not raised, you know, we would ask for an

17  opportunity to submit something in writing, but I can address

18  it now.

19        There, the court said that the defenses raised in that

20  case were routine defenses to a governmental enforcement

21  action.  I'm quoting from the decision.  The court said these

22  are, sort of, traditional unconstitutional vagueness, estoppel

23  defense.

24        When the court asked defense counsel if they were

25  asserting that defense, he said very artfully, he said, this is

L51sSEC2

1    not a individual for vagueness as such defense.  So <u>Ohio Edison</u>

2    is fine, but if they were making the void for vagueness

3    defense, we would have no argument.  But they won't say that

4    that is the defense they are making because it is not in.

5    Again, your Honor, I submit that the reason they are not making

6    the defense as a void for vagueness defense is because they

7    would lose.

8         Briefly, on <u>County of Erie</u> and <u>Hearn</u>.  I think this

9    court in <u>Chipotle</u> recognized that County of Erie didn't deal

10   with <u>Bilzerian</u>, but simply dealt with the specific type of

11   defense which was qualified immunity.

12        <u>County of Erie</u> and <u>Hearn</u>.  This court, Judge Netburn,

13   this court in <u>Chipotle</u> recognized that <u>County of Erie</u> didn't

14   sort of upset the <u>Bilzerian</u> fairness rule, and the sort of

15   fairness principle still applied.  <u>County of Erie</u> dealt with a

16   very specific qualified immunity type defense that is not at

17   issue here.

18        So they want to say, well, you know, <u>County of Erie</u>,

19   sort of calls into question <u>Hearn</u>, and to the extent that the

20   <u>Exxon</u> case in the DC -- in the District of Colombia relied on

21   that.  That is called into question.  But the fact is the

22   Second Circuit relied on that DC case in <u>Bilzerian</u> and cited it

23   approvingly in sort of its holding that when the party raises

24   their state of mind, there's been a waiver.

25        Now, defense counsel also concedes, your Honor, that

L51sSEC2

1   Ripple's internal communication about whether they believed XRP

2   was a security or not would be relevant.  They cannot answer.

3   If that is true, why wouldn't the communications from lawyers

4   be discoverable.  All they say is, well, that is because they

5   are privileged.  But that is circular, right.  We are here

6   because it is not proper for them to assert privilege, you

7   know, over those communications once they put their state of

8   mind at issue.  We're not arguing that we get to see them

9   because they are relevant.  We are arguing we get to see them

10  because they are relevant to their defense, as they have

11  couched that defense as, again, not a void for vagueness as

12  such defense.

13          Finally, your Honor, they say, well, Chipotle is based

14  on a statutory defense.  That is fine.  That is true.  This is

15  a constitutional defense.  They point to Upton, and there is no

16  reason why the court, as in Chipotle, can't look to case law

17  that interprets this constitutional defense.  And the General

18  Electric case and the Exxon -- the other Exxon case, the Nugent

19  case, both talk about how you have to be acting in good faith.

20  Otherwise, you can't just come in and say, I was confused, but

21  not have good faith.  So there is no statute for the court to

22  look at here, as in Chipotle for sort of what the elements of

23  the defense are, but there is judicial doctrine that sort of

24  establishes what the defense is.

25          Defense counsel said -- and I think this is one of my

L5lsSEC2

1  last points, your Honor -- they said nobody knew what the law

2  required.  That is not true.  Their lawyers knew.  2012, they

3  told them.  In 2012, they said, you could be a security.  Here

4  is <u>Howey</u>.  Here is <u>Reeves</u>.  Here is -- you know, their lawyers

5  knew from the very beginning.

6        And so for them to now come and say to the court,

7  Nobody knew, and leave us unable to rebut that by showing all

8  of the advice that they got, not just what they selectively

9  disclosed to third parties, is fundamentally unfair and

10 fundamentally against the fairness principle, as recognized in

11 this circuit.

12       Finally, your Honor, they cannot address the last

13 point which the court raised about, you know, if we look at

14 objective views in the market, that is fine.  But the question

15 is, did they unfairly influence the market?  They don't have a

16 response to that.

17       And if they are making the argument that the objective

18 views of market participants are relevant -- and, by the way,

19 not just to their defense.  They are saying it is relevant to

20 <u>Howey</u> itself.  Right?  If a market participant said or thought,

21 Oh, no, this isn't a security under <u>Howey</u>, they also say that

22 we should lose.

23       OK, well, if they thought that it was a security under

24 <u>Howey</u> because they were told that, that goes to that defense.

25 And, again, under the fairness principle, we should be

L5lsSEC2

1    permitted to see that advice and those communications.

2            Thank you.

3            THE COURT:  Thank you very much.

4            All right.  As always, excellent arguments from the

5    lawyers.  Thank you very much for that.

6            I'm going to take this all under advisement.  I

7    understand that the rulings affect discovery, which is quickly

8    approaching, so I will do my very best to get something out in

9    writing as soon as possible.

10           All right.  I think with that, we are adjourned.

11           MR. TENREIRO:  Your Honor, this is Jorge Tenreiro, if

12   I might interrupt the court.

13           I wanted to raise an administrative issue.  Ripple had

14   filed a motion to seal certain documents at docket 176, and we

15   would like to make an oral application for our response to be

16   due next Friday.

17           We have received their consent over e-mail, and rather

18   than burden the court with more letters, I thought I would just

19   take a shot and ask the court at the end of the conference.

20           THE COURT:  Application granted.

21           MR. TENREIRO:  Thank you.

22           THE COURT:  Anything further from either side?

23           (Pause)

24           Great.  All right.  With that, enjoy your weekend,

25   everybody.  Thank you.  We're adjourned.