**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

        v.

RIPPLE LABS INC.,
BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN

                        Defendants.

Civil Action No. 1:20-CV-10832

ECF Case

ORAL ARGUMENT REQUESTED

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANT CHRISTIAN A. LARSEN'S MOTION**
**<u>TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000

*Attorneys for Defendant Christian A. Larsen*

# **TABLE OF CONTENTS**

Page

Preliminary Statement ........................................................................................................ 1

Argument ........................................................................................................................... 2

    I.     The SEC's Aiding-and-Abetting Claim Against Mr. Larsen Fails. ....................... 2

         A.     The SEC's Allegations of Recklessness Are Legally Deficient. ............... 2

         B.     The SEC Fails to Plausibly Allege Substantial Assistance by
              Mr. Larsen. ................................................................................................... 7

    II.    The Section 5 Claim Against Mr. Larsen Should Be Dismissed
       Under *Morrison*. ................................................................................................... 8

         A.     *Morrison* Applies to Section 5 Claims ...................................................... 9

         B.     The Section 5 Claim Against Mr. Larsen Does Not
              Satisfy *Morrison*. ................................................................................... 11

    III.   The SEC's Claims for Monetary Relief Are Time-Barred. ................................. 14

Conclusion ....................................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Absolute Activist Value Master Fund Ltd.* v. *Ficeto*,
    677 F.3d 60 (2d Cir. 2012)........................................................................................13, 14

*Armstrong* v. *McAlpin*,
    699 F.2d 79 (2d Cir. 1983)......................................................................................................8

*Banco Safra S.A.* v. *Samarco Mineracao S.A.*,
    No. 16-cv-8800, 2019 WL 2514056 (S.D.N.Y. June 18, 2019) .............................................13

*SEC* v. *Bio Def. Corp.*,
    No. 12-11669-DPW, 2019 WL 7578525 (D. Mass. Sept. 6, 2019)........................................10

*United States* v. *Brown*,
    578 F.2d 1280 (9th Cir. 1978) ................................................................................................2

*SEC* v. *Cavanagh*,
    155 F.3d 129 (2d Cir. 1998)...........................................................................................8, 15

*SEC* v. *Espuelas*,
    908 F. Supp. 2d 402 (S.D.N.Y. 2012)....................................................................................3

*SEC* v. *Falstaff Brewing Corp.*,
    629 F.2d 62 (D.C. Cir. 1980) ................................................................................................2

*Gabelli* v. *SEC*,
    568 U.S. 442 (2013)............................................................................................................15

*Kaplan* v. *Shapiro*,
    655 F. Supp. 336 (S.D.N.Y. 1987)........................................................................................4

*SEC* v. *Kokesh*,
    884 F.3d 979 (10th Cir. 2018) .............................................................................................15

*United States* v. *Leonard*,
    529 F.3d 83 (2d Cir. 2008)....................................................................................................2

*Li* v. *Renaud*,
    654 F.3d 376 (2d Cir. 2011)................................................................................................11

*SEC* v. *Mattessich*,
    407 F. Supp. 3d 264 (S.D.N.Y. 2019)....................................................................................3

*Morrison* v. *Nat'l Australia Bank Ltd.*,
 561 U.S. 247 (2010)........................................................................8, 9, 10, 11

*SEC* v. *Morrone*,
 997 F.3d 52 (1st Cir. 2021)....................................................................10

*Myun-Uk Choi* v. *Tower Research Capital LLC*,
 890 F.3d 60 (2d Cir. 2018)....................................................................13

*Novak* v. *Kasaks*,
 216 F.3d 300 (2d Cir. 2000)....................................................................2, 3

*SEC* v. *Paulsen*,
 No. 18-cv-6718, 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020) ................................3

*SEC* v. *Pentagon Capital Mgmt. PLC*,
 725 F.3d 279 (2d Cir. 2013)....................................................................15

*In re Petrobras Sec. Litig.*,
 No. 14-CV-9662 (JSR), 2016 WL 11671141 (S.D.N.Y. Mar. 25, 2016)................................12

*In re Refco Inc. Sec. Litig.*,
 No. 08-cv-3065, 2012 WL 996910 (S.D.N.Y. Jan. 17, 2012) ................................8

*Safeco Ins. Co. of Am.* v. *Burr*,
 551 U.S. 47 (2007)....................................................................3

*Schentag* v. *Nebgen*,
 No. 1:17-CV-8734-GHW, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) ................................10

*Sierra Club* v. *Oklahoma Gas & Electric Co.*,
 816 F.3d 666 (10th Cir. 2016) ....................................................................14

*SEC* v. *Sugarman*,
 No. 19-cv-5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ................................8

*SEC* v. *Telegram Grp. Inc.*,
 448 F. Supp. 3d 352 (S.D.N.Y. 2020)....................................................................12

*SEC* v. *Telegram Grp. Inc.*,
 No. 19-CV-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020)................................12

*In re Tezos Sec. Litig.*,
 No. 17-CV-06779-RS, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018) ................................14

*SEC* v. *Wey*,
 246 F. Supp. 3d 894 (S.D.N.Y. 2017)....................................................................8

**STATUTES**

15 U.S.C. § 78j(b) .................................................................................................................9

28 U.S.C. § 2462 ............................................................................................................14, 15

**OTHER AUTHORITIES**

Al Barbarino, *SEC's Peirce on Crypto Ambitions, GameStop's Lessons* (May 3,
    2021), https://www.law360.com/articles/1379758/sec-s-peirce-on-crypto-
    ambitions-gamestop-s-lessons ........................................................................................5

William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*,
    SEC (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-
    061418 ...........................................................................................................................5

HM TREASURY, UK REGULATORY APPROACH TO CRYPTOASSETS AND
    STABLECOINS: CONSULTATION AND CALL FOR EVIDENCE (January 2021),
    https://assets.publishing.service.gov.uk/government/uploads/system
    /uploads/attachment_data/file/950206/HM_Treasury_Cryptoasset_and_Stable
    coin_consultation.pdf .....................................................................................................10

Hester Peirce, Comm'r, Sec. & Exch. Comm'n, *Running on Empty: A Proposal to
    Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020),
    https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06; .............................5

## PRELIMINARY STATEMENT

The SEC's opposition (ECF No. 183 ("Opp.")) misrepresents both the applicable law on aiding-and-abetting and the impact of the Supreme Court's *Morrison* decision.  The SEC also fails to cite a single specific domestic sale of XRP that Mr. Larsen allegedly transacted.  All of the SEC's claims against Mr. Larsen are legally deficient, unsupported by well-pleaded facts in the Amended Complaint, and should be dismissed.

*First*, the Court should dismiss the aiding-and-abetting claim.  Given the eight years of regulatory and legal uncertainty surrounding the treatment of digital assets under the securities laws, the Amended Complaint does not and cannot plausibly allege that it was "so obvious" that Ripple's conduct was "improper" that Mr. Larsen must have known as much.  It also attempts to create issues of fact by mischaracterizing two 2012 legal memoranda received as Ripple began its business.  But those memoranda, which the SEC relied on in its Amended Complaint and the Court may rely upon on this motion, belie the SEC's allegation that Mr. Larsen acted recklessly.  Indeed, they explicitly characterize the securities-law risk as minimal.  Finally, the SEC's allegations of substantial assistance are conclusory and insufficient.

*Second*, the Court should dismiss the Section 5 claim under *Morrison*.  The SEC argues that the *Morrison* test does not apply to the Securities Act of 1933 (the "1933 Act"), which the SEC claims has a different "focus" than the Securities and Exchange Act of 1934 (the "1934 Act").  But *Morrison* expressly foreclosed this issue, concluding that both statutes have the same focus.  The Amended Complaint does not identify any specific domestic securities transaction by Mr. Larsen; thus, the Section 5 claim against him should be dismissed.

*Finally*, the SEC's claims for monetary relief against Mr. Larsen are time-barred.  The Amended Complaint alleges a single offering beginning in 2013, more than five years before the SEC brought its case.

## ARGUMENT

**I.    The SEC's Aiding-and-Abetting Claim Against Mr. Larsen Fails.**

**A.    The SEC's Allegations of Recklessness Are Legally Deficient.**

The SEC misstates the law applicable to its adding-and-abetting claim, which requires it to plausibly allege that Mr. Larsen knew or was reckless as to whether XRP was a security.  At a minimum, the SEC must allege that it was "so obvious" to Mr. Larsen that he "must have been aware" that XRP was an "investment contract" and that Ripple's conduct in selling XRP was improper.  *Novak* v. *Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Given over eight years of regulatory uncertainty, legal memoranda, and other documents that the SEC itself relies on, the 2015 settlement with the Department of Treasury regulating Ripple's subsidiary as a money services business, the SEC's own pronouncements in the 2017 DAO Report, and statements by SEC officials as to the status of bitcoin, ether, and other cryptocurrencies—all of which is evident from the Amended Complaint or subject to judicial notice—the SEC cannot, as a matter of law, meet this demanding standard.

Rather than confront this reality, the SEC instead relies on securities fraud cases to suggest it need not show that Mr. Larsen knew the "legal consequences" of his acts.  (Opp. at 28–30).[1]  However, these cases stand for the unremarkable principle that, for purposes of a primary fraud violation, an intent to commit a knowing fraud is enough to satisfy scienter regardless of whether the defendant knew that the fraud involved a security.

---

[1]    *See United States* v. *Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978) (to sustain a criminal conviction under Section 17 of the 1933 Act, fraudulent intent was sufficient without actual knowledge that the fraud involved a "security"); *United States* v. *Leonard*, 529 F.3d 83, 91–92 (2d Cir. 2008) (for criminal mail-fraud and securities-fraud charges, the jury could find fraudulent intent even if the defendants believed their conduct would ultimately cause no harm to the victims); *SEC* v. *Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) (sustaining a civil charge under Rule 10b-5 where the defendant knew of the fraudulent misstatements and omissions, regardless of whether he knew his conduct was illegal).

This is not a fraud case.  To establish aiding-and-abetting, the SEC needs to allege actual culpable knowledge or recklessness, which is possible only if one was aware that Ripple's sale of XRP was improper.[2]  As Judge Netburn has explained in this case, "the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's offerings and sales of XRP required registration as securities and that those transactions were improper."  (ECF No. 103, at 3.)  The SEC cannot plausibly do so.

As a matter of law, mere awareness that conduct "could be" or "potentially is" illegal (Opp. at 28, 30) does not constitute recklessness.  Recklessness requires such "an extreme departure from the standards of ordinary care" that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Novak*, 216 F.3d at 308.  At most, the facts alleged here show that there was regulatory uncertainty regarding whether XRP was a currency or a security.  When "statutory text and relevant court and agency guidance allow for more than one reasonable interpretation . . . a defendant who merely adopts one such interpretation" does not act with knowledge or recklessness because "Congress could not have intended such a result for those who followed an interpretation that could reasonably have found support in the courts."  *Safeco Ins. Co. of Am.* v. *Burr*, 551 U.S. 47, 70 n.20 (2007).  Adopting an objectively reasonable (even if ultimately erroneous) view of the law is not reckless, regardless of one's subjective awareness of the legal risk.  *Id.*  Someone who takes a reasonable position on a novel legal issue is not "reckless" just because she knows that a regulator might disagree.

---

[2]   Notably, the SEC does not plead any fraud or other improper conduct by Ripple that could conceivably support a charge of recklessness—much less awareness by Mr. Larsen of such conduct.  *Cf., e.g.*, *SEC* v. *Paulsen*, No. 18-cv-6718, 2020 WL 1911208, at *6 (S.D.N.Y. Apr. 18, 2020) (defendant knew alleged kickbacks violated company policy and helped conceal them); *SEC* v. *Mattessich*, 407 F. Supp. 3d 264, 272 (S.D.N.Y. 2019) (defendants knew conduct violated employer's policies); *SEC* v. *Espuelas*, 908 F. Supp. 2d 402, 410–12 (S.D.N.Y. 2012) (citing evidence defendant actually believed accounting treatment was improper).

The SEC tries to distinguish *Safeco* on the ground that there is circuit precedent interpreting the *Howey* test.  (Opp. at 32–33.)  But there was no circuit precedent in 2012, and there still is none today, applying *Howey* to novel digital assets like XRP.  Insofar as the SEC suggests that this issue was clear under existing precedent, this is belied by the SEC's own articulated uncertainty about how to apply *Howey* to novel facts in general and cryptocurrency in particular.  By design, the *Howey* test is not a mechanical rule, but a "flexible" standard requiring detailed analysis in new contexts.[3]  And *Howey*'s age makes it harder, not easier, to apply to digital assets that could not have been imagined by the *Howey* Court.

To dismiss this claim, the Court need only hold that there were objectively reasonable legal arguments that, under the *Howey* test, XRP was not a security during the relevant time period.  This cannot be disputed.  The SEC took no salient regulatory action regarding cryptocurrency until 2017, when it concluded that one particular digital asset was a "security" in the factually distinct *DAO* case.  (Opp. at 13.)  Even then, the SEC emphasized that the *Howey* analysis "will depend on the facts and circumstances."  (DAO Report at 17.)  Meanwhile, other federal regulators held that XRP was a "currency," subjecting it to a regulatory regime inconsistent with the securities laws.  (ECF No. 106 ("MTD Br.") at 7–9, 14–15.)  The regulatory context, including the SEC's years of inaction, precludes a finding that Mr. Larsen acted recklessly with regard to whether XRP was a security.

Given the lack of clarity about how to apply *Howey* to digital assets and XRP, there was and is an objectively reasonable basis for Mr. Larsen to conclude—regardless of how this Court ultimately decides the issue—that XRP is not a security.  Indeed, over a decade after bitcoin was created, lawyers continue to debate *Howey*'s application to cryptocurrencies.  As the SEC's own

---

[3]   *E.g.*, *Kaplan* v. *Shapiro*, 655 F. Supp. 336, 339–41 (S.D.N.Y. 1987); (*see also* Opp. at 4 (*Howey* is "broad and flexible")).

Commissioner Peirce recently observed, after this case was filed: "Another area I've spent time thinking about is if we can provide clarity around when a token offering is a securities offering. There's been quite a bit of confusion here . . . ."[4]    She and others at the SEC have also acknowledged that a token, such as ether, may start as a security and evolve into a currency.[5] Thus, this Court can and should reject as a matter of law the SEC's incorrect assertion that this legal issue was susceptible to only one reasonable interpretation.  Since the SEC cannot plead that Mr. Larsen was reckless, its aiding-and-abetting claim should be dismissed.

The SEC also fails to plausibly allege that Mr. Larsen was **subjectively** aware of an unacceptably high risk that XRP was a security.  Documents incorporated by reference into the complaint—the two legal memoranda the SEC relies on—belie any such claim.  These memoranda concluded that XRP was likely **not** a security based on "compelling" arguments. (ECF No. 179-2 ("SEC Ex. C") at 4; *see also* ECF No. 179-1 ("SEC Ex. B") at 9–11 (finding "low risk" if XRP was not sold to Ripple's start-up investors).)  The SEC's arguments rest on mischaracterizations of the memoranda.

The SEC's most glaring distortion is its claim that the memoranda warned of a "high risk" if Ripple ever sold XRP instead of giving it away for free.  (Opp. at 7; *see also id.* at 8, 10.) That is simply false.  The February 2012 memorandum, from which the phrase "high risk" is lifted, said something very different:  "***[T]he current model***, which contemplates that at least

---

[4]    Al Barbarino, *SEC's Peirce on Crypto Ambitions, GameStop's Lessons*, LAW360 (May 3, 2021),                https://www.law360.com/articles/1379758/sec-s-peirce-on-crypto-ambitions-gamestop-s-lessons.

[5]    *See* Hester Peirce, Comm'r, Sec. & Exch. Comm'n, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization* (Feb. 6, 2020), https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06;  William  Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018) ("[T]his also points the way to when a digital asset transaction may no longer represent a security offering."), https://www.sec.gov/news/speech/speech-hinman-061418.

15% of Coins [*i.e.*, XRP] will be given out ***in exchange for investment*** creates a high risk that the Coins will be treated as investment contracts and regulated as securities."  (SEC Ex. B at 9 (emphasis added).)  In fact, as the SEC cannot dispute, Ripple followed this advice and did not distribute XRP to seed investors in exchange for investment in Ripple.  Instead, Ripple followed the memorandum's advice and sold Ripple stock (not XRP) to its initial investors.  (*See, e.g.*, Amended Complaint "AC" ¶¶ 64, 72.)

The SEC's brief is riddled with other distortions of these two memoranda.  Mr. Larsen urges the Court to read the memoranda in their entirety, as any fair reading shows that the SEC's claims rest on out-of-context statements and blatant mischaracterizations.  For example:

- The SEC claims the memoranda concluded XRP was "unlikely" a "currency." (Opp. at 9.)  The memoranda contain no such conclusion.  (SEC Ex. C at 17–18.)

- The SEC faults Ripple for not seeking an SEC no-action letter.  (Opp. at 10.)  But the legal memoranda were equivocal on this, noting "pros and cons."  (SEC Ex. C at 18.)

Ultimately, the Court should not allow the SEC's mischaracterizations to distract from the memoranda's bottom-line conclusion: XRP was likely ***not*** a security based on "compelling arguments".  That does not imply recklessness by Mr. Larsen; it shows the opposite.[6]

The SEC also misinterprets a 2014 email, arguing based on the email that Mr. Larsen "assumed the risk" of being characterized as an "issuer" under the securities laws.  (Opp. at 10 (citing SEC Ex. E).)  This is another mischaracterization.  On its face, the reference to "issuer" has nothing to do with the securities laws.  Rather, it refers to discussions, captured in the two

---

[6]   The SEC also cites a 2008 SEC settlement with Prosper, an online-lending company that Mr. Larsen served as CEO.  (Opp. at 6.)  That case, which Prosper settled without admitting or denying any of the SEC's claims and without paying a monetary penalty, was unrelated to cryptocurrency and did not involve Mr. Larsen as a party.  (*See* ECF No. 181-1.)  At most, the case shows Mr. Larsen's general awareness of the securities laws and the *Howey* test. The SEC's reference to this settlement seeks to tarnish Mr. Larsen unfairly.

memoranda, of whether Ripple's founders could be considered issuers of payment instruments under money-transfer laws.  (*See* SEC Ex. B, 8, 17–18; SEC Ex. C at 4–5, 14–15, 26–27.)  The memoranda never discussed a risk that Mr. Larsen could be an "issuer" under the securities laws.

Finally, the Court should reject the SEC's assertion that Mr. Larsen's arguments invite the Court to "weigh" facts.  (Opp. at 31–34.)  To dismiss the SEC's aiding-and-abetting claim, the Court need only conclude that: (i) Mr. Larsen cannot be liable for aiding-and-abetting unless he knew or recklessly disregarded that Ripple's conduct was wrongful because XRP was a security required to be registered with the SEC; and (ii) there were and are objectively reasonable legal arguments that, under the *Howey* test, XRP was and is not a security.  The Court can reach those conclusions based on its own understanding of the law, allegations in the Amended Complaint, and facts subject to judicial notice.  Thus, the SEC's allegations of recklessness fail and the aiding-and-abetting claim should be dismissed.

### B.      The SEC Fails to Plausibly Allege Substantial Assistance by Mr. Larsen.

The SEC's allegations of substantial assistance by Mr. Larsen are conclusory and insufficient.  (MTD Br. at 19–21.)  The SEC's opposition confirms as much.  The opposition claims that Mr. Larsen (i) "approv[ed] and coordinat[ed] Ripple's Market Sales," (ii) "negotiate[d] and enter[ed] into XRP Institutional Sales," (iii) "participat[ed] in Ripple's efforts to promote XRP on various digital asset trading platforms," and (iv) "creat[ed] the XRP Escrow."  (*Id.*)  The Amended Complaint, however, alleges no specific facts on these points. Instead, it alleges merely that Mr. Larsen, while Ripple's CEO, "approved" various actions (AC ¶¶ 92, 98, 100, 116, 224), was "consult[ed]" on others (*id.* ¶ 205), "met" with an investor (*id.* ¶ 113), was "instrumental" to "developing" an "idea" (*id.* ¶ 224), and made a supposedly "promotional" statement (*id.* ¶ 265). Of course Mr. Larsen attended meetings and approved

various actions—that was his job as CEO.  That falls far short of substantial assistance as defined in relevant case law.  (*See* MTD Br. at 21 (collecting cases).)[7]

The SEC's allegations are especially threadbare after December 31, 2016, when Mr. Larsen stepped down as Ripple's CEO.  The SEC's brief points to only two allegations from this time period:  that Mr. Larsen attended meetings where Ripple's XRP trading was discussed and that, on one occasion, he asked a question in an email.  (AC ¶¶ 168, 199.)  That does not constitute substantial assistance.  The SEC ignores this issue altogether, merely stating in a footnote that Mr. Larsen's reduced role "is only relevant at the relief stage."  (Opp. at 36 n.13.)  The SEC's argument is meritless:  The only case it cites, *SEC* v. *Cavanagh*, 155 F.3d 129 (2d Cir. 1998), does not even discuss substantial assistance.

## II.    The Section 5 Claim Against Mr. Larsen Should Be Dismissed Under *Morrison*.

In *Morrison*, the Supreme Court applied the presumption against extraterritoriality to the federal securities laws, concluding that they apply only to domestic securities transactions. *Morrison* v. *Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010).  The SEC's opposition argues that this holding does not apply to Section 5 of the 1933 Act, which supposedly has a different and

---

[7]    In discussing one of Mr. Larsen's cited cases, *SEC* v. *Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017), the SEC suggests that it was sufficient that "defendant distributed shares."  (Opp. at 35.)  In fact, the defendant in *Wey* "distributed shares, filed misleading information with the SEC, and sent misleading letters to NASDAQ."  (MTD Br. at 21.)

The SEC's cited cases add nothing to its argument.  Two of the cases do not even support its position.  *SEC* v. *Rio Tinto plc*, No. 17-cv-7994 (AT), 2019 WL 1244933, *18 (S.D.N.Y. Mar. 18, 2019) (finding no substantial assistance); *SEC* v. *Sugarman*, No. 19-cv-5998, 2020 WL 5819848, *11 (S.D.N.Y. Sept. 30, 2020) (defendant did not dispute the issue of substantial assistance).  The other two cases are distinguishable.  *In re Refco Inc. Sec. Litig.*, No. 08-cv-3065, 2012 WL 996910, *4–10 (S.D.N.Y. Jan. 17, 2012) (law firm allegedly drafted opinion letters and other documents knowing that they would be used to perpetrate a fraud); *Armstrong* v. *McAlpin*, 699 F.2d 79, 91–92 (2d Cir. 1983) (substantial assistance adequately alleged against one defendant who knowingly brokered ***all*** the fraudulent transactions at issue, but not against another defendant who (like Mr. Larsen) merely "'was aware of' and 'approved'" the alleged conduct).

broader "focus" than the specific statute considered in *Morrison* does.  The SEC's argument is contrary to the express language of *Morrison*, as well as numerous cases applying *Morrison* in the last decade.

### A.      *Morrison* Applies to Section 5 Claims.

The SEC attacks *Morrison*'s applicability to Section 5 specifically and the 1933 Act generally.  The SEC argues that *Morrison*'s analysis was limited to the text of Section 10(b) of the 1934 Act, which refers to the "purchase or sale" of securities.  15 U.S.C. § 78j(b).  By contrast, the SEC argues, the 1933 Act has a different and broader "focus" that looks at "every aspect of a public offering," not just "sales."  (Opp. at 38–44.)  On this basis, the SEC advances a shockingly broad geographic scope for Section 5.  In the SEC's view, it does not matter where the actual transactions occurred; an "offer" is domestic if, for example, the issuer posted on Twitter or communicated with foreign brokers from within the United States, or if U.S. investors ended up acquiring the securities (whether in a foreign transaction or in subsequent transactions on secondary markets).  (*See id.* at 39–48.)

*Morrison* forecloses this argument.  While the SEC's brief treats the "focus" of the 1933 Act as an open question, *Morrison* decided it:  "The same focus on domestic transactions is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading."  561 U.S. at 268 (citation omitted).  The central part of the *Morrison* Court's reasoning was that the territorial limits on Section 10(b) of the 1934 Act reflected the overall territorial limits of the securities laws.  *See id.* at 266–70.  The SEC's brief never even acknowledges this language.

The SEC's expansive interpretation of Section 5 is also inconsistent with the policy concerns animating *Morrison*.  The *Morrison* Court was worried that giving a broad geographic scope to the U.S. securities laws would subject issuers to conflicting regulatory schemes.  *See id.*

at 269.   Indeed, multiple foreign securities regulators had complained to the Court about "interference" with their own regulations.   *Id.*   *Morrison*'s transactional test was intended to provide guidance on the issue.   The SEC's position here does the opposite—requiring offerings on foreign exchanges to comply, in many instances, with both U.S. and foreign securities laws. The resulting confusion would be especially salient here, as multiple foreign securities regulators have concluded that XRP is ***not*** a security.[8]

The SEC's cases pre-date and are contravened by *Morrison*.[9]   These decades-old cases do not undertake the analysis required by *Morrison*, and *Morrison* expressly rejected the Second Circuit's jurisprudence in this area.   561 U.S. at 257.   By contrast, post-*Morrison* cases within this Circuit and elsewhere have applied *Morrison* to Section 5 claims.[10]   The SEC seeks to distinguish these cases (*see* Opp. at 51), but cannot deny that these courts applied the *Morrison* test to Section 5.   In recently affirming one of these cases, the First Circuit applied *Morrison* to determine the extraterritoriality of multiple securities laws claims, including one brought under Section 5.   *SEC* v. *Morrone*, 997 F.3d 52 (1st Cir. 2021).

To bolster its argument, the SEC falls back on one of its own regulations—Regulation S—to support its geographically unbounded reading of Section 5.   But Regulation S is irrelevant, because the SEC cannot use its own regulations to expand its jurisdiction beyond that permitted

---

[8]   *See, e.g.*, HM TREASURY, UK REGULATORY APPROACH TO CRYPTOASSETS AND STABLECOINS: CONSULTATION AND CALL FOR EVIDENCE § 1.12, at 5 (January 2021) (defining XRP as an "exchange token"), https://assets.publishing.service.gov.uk/government/uploads /system/uploads/attachment_data/file/950206/HM_Treasury_Cryptoasset_and_Stablecoin_co nsultation.pdf.

[9]   Opp. at 43 (citing *SEC* v. *N. Am. Res. & Dev. Corp.*, 424 F.2d 63, 68 (2d Cir. 1970); *SEC* v. *Chinese Consol. Benevolent Ass'n*, 120 F.2d 738, 740–41 (2d Cir. 1941)).

[10]   *See, e.g., SEC* v. *Bio Def. Corp.*, No. 12-11669-DPW, 2019 WL 7578525, at *11–13 (D. Mass. Sept. 6, 2019); *Schentag* v. *Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at *10–13 (S.D.N.Y. June 21, 2018).

by the presumption against extraterritoriality.[11]  While the SEC asserts that Regulation S meant to "clarify the extraterritorial application of the registration requirements" of the 1933 Act (Opp. at 44 (quoting pre-*Morrison* regulation)), it identifies no ambiguity to be "clarified" after applying *Morrison*.

The SEC also misses the mark when it asserts that *Morrison* "approved" Regulation S. (Opp. at 44–45.)  Here is what *Morrison* actually said:

> The same focus on domestic transactions is evident in the Securities Act of 1933, enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading.  That legislation makes it unlawful to sell a security, through a prospectus or otherwise, making use of "any means or instruments of transportation or communication in interstate commerce or of the mails," unless a registration statement is in effect.  The *Commission has interpreted that requirement* "*not to include ... sales that occur outside the United States.*"

561 U.S. at 268–69 (citations omitted) (emphasis added) (ellipsis in original).  The final quotation is from the SEC's Rule 901, the first section of Regulation S.  As the passage shows, the *Morrison* Court viewed Regulation S as supporting its view that the 1933 Act was **limited to domestic transactions**.  Thus, sales of XRP on foreign exchanges are not actionable under *Morrison*, which applies in full to the SEC's claims under Section 5.

### B.   The Section 5 Claim Against Mr. Larsen Does Not Satisfy *Morrison*.

After straining for 15 pages to overcome *Morrison*, the SEC makes an alternative argument that *Morrison*'s two-pronged test is satisfied.  (Opp. at 52–59.)  This argument fails.

First, despite the SEC's arguments, Judge Castel's decision in the *Telegram* case does not support the SEC's remarkable assertion that an allegation of just one domestic transaction would mean that **all** alleged transactions—domestic or foreign—are actionable under *Morrison*.  (Opp.

---

[11]   *See Morrison*, 561 U.S. at 255; *see also Li* v. *Renaud*, 654 F.3d 376, 382 (2d Cir. 2011) (regulations cannot alter an interpretation required by the "traditional tools of statutory construction") (quoting *Chevron U.S.A., Inc.* v. *NRDC*, 467 U.S. 837, 843 n.9 (1984)).

at 52–53.)  In *Telegram*, the "security" was not the digital asset itself (known as "Grams"), but a "scheme" consisting of "Gram Purchase Agreements and the future delivery and resale of Grams."  *SEC* v. *Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 367 (S.D.N.Y. 2020).  The court expressly found that this "scheme" involved "the expectation and intention that the Initial Purchasers would distribute Grams into a secondary public market."  *SEC* v. *Telegram Grp. Inc.*, No. 19-CV-9439 (PKC), 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020).  By contrast, the alleged security here is each individual unit of XRP (*i.e.*, the digital asset itself).[12]  Moreover, *Telegram*'s analysis of *Morrison* arose from a request to "clarify" a preliminary injunction that had already been entered; Judge Castel found that, because there was no practical way to prevent the scheme from going forward without domestic transactions, the entire scheme should be enjoined.  *See* 2020 WL 1547383, at *2.  By contrast, even if the SEC could allege that *some* of Mr. Larsen's transactions were domestic (and to be clear, it has not), its monetary remedies should be limited to those domestic transactions, and its claims related to foreign transactions should be dismissed.[13]

In any event, the SEC has not pleaded even one domestic transaction by Mr. Larsen under *Morrison*.  While the SEC feints at relying on *Morrison*'s first prong—for transactions on domestic securities exchanges—it all but concedes that this prong is satisfied only by transactions on *registered* U.S. securities exchanges, which are not alleged here.  (*See* Opp. at 53–54 & n.17 (citing *United States* v. *Georgiou*, 777 F.3d 125, 134–35 (3d Cir. 2015)).)  Thus, the SEC must rely solely on *Morrison*'s second prong—for "domestic transactions"—which is

---

[12]  3/19/21 Conf. Tr., ECF No. 87, at 45:7–13 ("So their sales, every time they sold and failed to register the transaction, unless they point to an exemption, they violated Section 5 individually, irrespective of Ripple's violation.").

[13]  *See, e.g.*, *In re Petrobras Sec. Litig.*, No. 14-CV-9662 (JSR), 2016 WL 11671141, at *3 (S.D.N.Y. Mar. 25, 2016) (dismissing plaintiff's claims in part insofar as they were based on foreign transactions).

governed by the "irrevocable liability" test set forth in *Absolute Activist Value Master Fund Ltd.* v. *Ficeto*, 677 F.3d 60 (2d Cir. 2012).  (Opp. at 53–58.)

The SEC relies on three allegations: (1) some of Mr. Larsen's purchases occurred on "digital asset trading platforms incorporated in the U.S." (Opp. at 54–55); (2) Mr. Larsen and alleged XRP purchasers were located in the U.S. (*id.* at 55–58); and (3) "at least 40%" of the computers that "validate" XRP transactions are operated by "Ripple or other U.S.-based entities" (*id.* at 58).  These allegations do not satisfy the SEC's burden under *Absolute Activist*.

First, it is inadequate to allege that a trading platform is "incorporated" or has its "principal place of business" in the United States, as such allegations say nothing about where the trading occurred.  Businesses incorporated or headquartered abroad often do business in the United States and *vice versa*.  As SEC itself alleges, some of these trading platforms have foreign parents and U.S. subsidiaries; others are incorporated abroad and have U.S. headquarters.  (AC ¶ 177.)  Missing in all this is ***where the trades occurred and irrevocable liability was incurred***.[14]

Second, it is settled that "the location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction."[15]  But that is all the Amended Complaint alleges.  While the SEC's brief asserts that "Defendants and the U.S. purchasers of XRP incurred irrevocable liability for these transactions in the U.S." and "Defendants disposed of their XRP when they transmitted it from the U.S. to the Market Maker" (Opp. at 55, 58), the cited paragraphs of the Amended Complaint merely allege that Mr. Larsen and XRP purchasers were

---

[14]   This distinguishes *Myun-Uk Choi* v. *Tower Research Capital LLC*, 890 F.3d 60 (2d Cir. 2018).  There, the plaintiffs alleged that trades on CME Globex—"located in Aurora, Illinois"—were "'matched' in the United States."  *Id.* at 63, 67.  There are no allegations here about where the trading platforms operate or transactions are "matched."

[15]   *Banco Safra S.A.* v. *Samarco Mineracao S.A.*, No. 16-cv-8800, 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019) (quoting *In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017)), *aff'd*, No. 19-3976, 2021 WL 825743 (2d Cir. Mar. 4, 2021).

located in the United States (AC ¶¶ 174, 183), and are silent about where irrevocable liability was incurred.  This is insufficient.  Even if the SEC had alleged that the transactions "took place in the United States," such a conclusory statement would also be insufficient.  *Absolute Activist*, 677 F.3d at 70.

Finally, the SEC relies on *In re Tezos Sec. Litig.*, No. 17-CV-06779-RS, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018), to claim that the Court should look to where companies operating the computers that "validate" XRP transactions are located.  (Opp. at 58.)  Not only is this irrelevant, but by focusing on validation, the SEC—like the California district court in *Tezos*—does not properly apply the Second Circuit's *Absolute Activist* test.  Under *Absolute Activist*, courts look to facts such as "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" to determine when a transaction becomes irrevocable.  677 F.3d at 70.  Nothing in Second Circuit law suggests that it is relevant where transactions are "validated."  And, in any event, the SEC pleads that the majority of XRP validators are located abroad.  (AC ¶ 41.)

The SEC has failed to plead a single specific domestic transaction under *Morrison* and its Section 5 claim should be dismissed.

## III.   The SEC's Claims for Monetary Relief Are Time-Barred.

The SEC concedes that the five-year statute of limitations of 28 U.S.C. § 2462 applies to its claims for monetary relief.  (Opp. at 59 n.20.)  That concession is fatal.  Under § 2462, where a plaintiff alleges "a single violation [that] continue[d] over an extended period of time," rather than "discrete unlawful act[s]," the claim accrues when the violation began.  *Sierra Club* v. *Oklahoma Gas & Electric Co.*, 816 F.3d 666, 671–75 (10th Cir. 2016).  Since the SEC alleges a single offering that began over five years ago, in 2013, its claim is time barred under § 2462.

The SEC's cited cases are not to the contrary.  It cites *SEC* v. *Kokesh*, 884 F.3d 979 (10th Cir. 2018), which held that *Sierra Club* was limited to cases involving "one continuing violation."  *See id.* at 984–85.  But the SEC alleges just such a continuing violation here.[16]  The SEC also misreads *Cavanagh*, which merely held that, if a registration statement has been filed, sales made after the registration statement expires are not part of the same "offering" that was registered.  *See* 155 F.3d at 133.  That likewise has no bearing here:  the SEC does not allege two offerings (one registered and one unregistered), but a single, continuous unregistered offering.[17]  The SEC's complaint does not allege discrete violations.  It has amended its complaint already and should not be given another chance.  Accordingly, the claims for monetary relief against Mr. Larsen should be dismissed as time-barred.

## <u>CONCLUSION</u>

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice as to Mr. Larsen.

---

[16]  *See, e.g.*, AC ¶ 3 ("Ripple engaged in this illegal securities offering from 2013 to the present . . . ."); *id.* ¶ 4 (defining the "Offering" as "a years-long unregistered offering of securities").

[17]  Equally unavailing is the SEC's reliance on *SEC* v. *Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013), and *Gabelli* v. *SEC*, 568 U.S. 442 (2013).  The quoted language from *Pentagon* concerns how to count violations for purposes of calculating civil penalties, not the statute of limitations.  725 F.3d at 288 n.7.  And the quoted language from *Gabelli* merely begs the question.  *Gabelli* noted that a claim accrues when the plaintiff has a "complete and present cause of action."  568 U.S. at 448.  Here, there is no dispute that the SEC had a "complete and present cause of action" with the first sale of XRP—the issue is whether there is one cause of action for the whole offering, or a separate cause of action for each sale.

Dated:  New York, New York
       June 4, 2021

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By:   /s/ Martin Flumenbaum

     Martin Flumenbaum
     Michael E. Gertzman
     Meredith Dearborn
     Robin A. Linsenmayer
     Justin D. Ward
     Kristina A. Bunting

     1285 Avenue of the Americas
     New York, NY  10019-6064
     (212) 373-3000
     mflumenbaum@paulweiss.com

     *Attorneys for Defendant Christian A. Larsen*