UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

        -against-

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                    Defendants.

---

20 Civ. 10832 (AT) (SN)

ORAL ARGUMENT REQUESTED

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BRADLEY GARLINGHOUSE'S MOTION TO DISMISS THE AMENDED COMPLAINT

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.   THE SEC HAS NOT PLEADED AND CANNOT PLEAD
SCIENTER ................................................................................................................. 3

     A.   The SEC Mischaracterizes Mr. Garlinghouse's Arguments
and Misstates the Legal Standard for Scienter ............................................... 3

     B.   The AC Does Not and Cannot Plausibly Allege That Mr.
Garlinghouse Recklessly Disregarded that Ripple's Sales and
Offers of XRP Were Improper ......................................................................... 5

II.   The SEC Does Not Allege that Mr. Garlinghouse's Personal Offers or
Sales of XRP Occurred in the United States ................................................................ 9

     A.   Morrison Applies to the SEC's Section 5 Claims ............................................ 9

     B.   Regulation S Does Not Supplant Morrison ..................................................... 10

     C.   Section 5 "Focuses" on Domestic Sales and Offers for the
Purpose of the Presumption Against Extraterritoriality................................... 11

     D.   The AC Fails To Plead Any Domestic Offers or Sales under
Section 5 ........................................................................................................... 13

CONCLUSION.................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012)....................................................................................... 12-15

*Allison v. Ticor Title Ins. Co.*,
907 F.2d 645 (7th Cir. 1990) ..................................................................................12

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015)......................................................................................9

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*,
467 U.S. 837 (1984)................................................................................................10

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)......................................................................................8

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)................................................................................................10

*Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
147 F.3d 118 (2d Cir. 1998)............................................................................... 11-12

*Farmer v. Brennan*,
511 U.S. 825 (1994)..................................................................................................7

*Hamlen v. Gateway Energy Servs. Corp.*,
No. 16 CV 3526 (VB), 2018 WL 1568761 (S.D.N.Y. Mar. 29, 2018) ....................4

*In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*,
18 Civ. 4993 (NRB), 2021 WL 1178216 (S.D.N.Y. Mar. 29, 2021) .......................5

*In re Smart Techs., Inc. S'holder Litig.*,
295 F.R.D. 50 (S.D.N.Y. 2013) ..............................................................................10

*In re Tezos Sec. Litig.*,
No. 17-cv-06779-RS, 2018 WL 4293341 (N.D. Cal. Aug. 7, 2018).......................15

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)......................................................................................8

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ................................................................................................ passim

*Myun-Uk Choi v. Tower Rsch. Cap. LCC*,
    890 F.3d 60 (2d Cir. 2018) ......................................................................................... 15

*Reilly v. U.S. Physical Therapy, Inc.*,
    17 Civ. 2347 (NRB), 2018 WL 3559089 (S.D.N.Y. July 23, 2018) ............................ 8

*Schentag v. Nebgen*,
    No. 1:17-CV-8734-GHW, 2018 WL 3104092 (S.D.N.Y. June 21, 2018) .................. 10

*SEC v. Bio Def. Corp.*,
    No. 12-11669-DPW, 2019 WL 7578525 (D. Mass. Sept. 6, 2019) .......................... 10

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ...................................................................................... 12

*SEC v. Espuelas*,
    905 F. Supp. 2d 507 (S.D.N.Y. 2012) ......................................................................... 5

*SEC v. Falstaff*,
    629 F.2d 62 (D.C. Cir. 1980) ...................................................................................... 5

*SEC v. Hurgin*,
    484 F. Supp. 3d 98 (S.D.N.Y. 2020) .......................................................................... 4

*SEC v. Mattessich*,
    18 Civ. 5884 (KPF), 2021 WL 797669 (S.D.N.Y. Mar. 1, 2021) ............................. 5

*SEC v. Morrone*,
    997 F.3d 52 (1st Cir. 2021) ......................................................................................... 5

*SEC v. Paulsen*,
    No. 18 Civ. 6718 (PGG), 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020) .................. 4

*SEC v. Revelation Cap. Mgm't*,
    246 F. Supp. 3d 947 (S.D.N.Y. 2017) ....................................................................... 10

*SEC v. Telegram Grp. Inc.*,
    No. 19-cv-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) ...................... 14

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) .................................................................................................... 7

*SEC v. Yorkville Advisors, LLC*,
    305 F. Supp. 3d 486 (S.D.N.Y. 2018) ........................................................................4

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    253 F. Supp. 359 (S.D.N.Y. 1966) ...........................................................................6

*United States v. Brown*,
    578 F.2d 1280 (9th Cir. 1978) ..................................................................................5

*United States v. Leonard*,
    529 F.3d 83 (2d Cir. 2008) ........................................................................................5

*United States v. Vilar*,
    729 F.3d 62 (2d Cir. 2013) ................................................................................. 14-15

*Whiteside v. Hover-Davis, Inc.*,
    995 F.3d 315 (2d Cir. 2021) ......................................................................................9

*Wyche v. Advanced Drainage Sys., Inc.*,
    710 F. App'x 471 (2d Cir. 2017) ...............................................................................8

**Statutes**

15 U.S.C. § 77a *et seq.* ....................................................................................... 3, 9-10, 12

15 U.S.C. § 77e ............................................................................................ <u>passim</u>

15 U.S.C. § 77o(b) ......................................................................................................4

15 U.S.C. § 78a *et seq.* ...........................................................................................10, 12

15 U.S.C. § 7001 *et seq.* ..............................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6) ...............................................................................................1

**Other Authorities**

17 C.F.R. § 230.901 .............................................................................................. 10-11

17 C.F.R. § 230.903 ..................................................................................................11

Defendant Bradley Garlinghouse respectfully submits this memorandum of law in further support of his motion to dismiss with prejudice (ECF No. 111) (the "Motion") the SEC's amended complaint (ECF No. 46) (the "AC") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

The SEC's Opposition (ECF No. 183) ("Opp.") is an elaborately-staged yet ultimately futile effort to obscure the pleading deficiencies identified in Mr. Garlinghouse's motion to dismiss. The SEC still fails – after two attempts – to plead core elements of its claims, and now seeks to move the goalposts by asking this Court to convert aiding and abetting into a strict liability offense (it is not), ignore binding Supreme Court and Second Circuit precedent, accept a mischaracterization of its own regulation and its application, and rely on misleading quotes from documents that facially defeat, rather than support, its theory of the case against Mr. Garlinghouse.

The SEC brought an exceedingly aggressive and unprecedented – and ultimately legally flawed – case against Ripple in December 2020 on the basis that XRP should have been registered as a security back in 2013 and remains a security today. This whole litigation is largely about that question, which is far from straightforward even now. The agency's decision to take a further leap by charging Ripple's current CEO, Mr. Garlinghouse, with a scienter-based offense that would require that he knew or recklessly disregarded that he was helping Ripple violate the law or otherwise act improperly from the moment he set foot at the company in 2015 as its Chief Operating Officer, defies plausibility. To prevail, the SEC would have to show, at a minimum, that it was *obvious* to Mr. Garlinghouse in 2015 and thereafter that Ripple's sales of XRP were improper. Yet the only even potential impropriety the SEC alleges is that Ripple's sales violated Section 5 of the Securities Act. Thus, to state a claim for aiding and abetting, the SEC must plead that Mr. Garlinghouse knew or that it was obvious to him years ago that Ripple was issuing

securities when it sold XRP.

The AC does not just fail to make these allegations, but it establishes that it was demonstrably *not* obvious to Mr. Garlinghouse, or for that matter to any of the market makers, exchanges or other regulators who for years concluded that XRP was not a security.  Nor was it obvious to the SEC, which surely would have acted before December 22, 2020 to stop an "obvious" unregistered securities offering.  So it is no surprise that, despite reviewing thousands of emails and other private internal communications and deposing Mr. Garlinghouse, the AC pleads *nothing* that would support an inference that Mr. Garlinghouse's subjective view was any different than the public statements he made consistently explaining not only that XRP was not a security but why it was not.  The SEC is left only with allegations that Mr. Garlinghouse recognized the general *risk* that sales of certain digital assets could be classified as securities, and that he sought to ensure that Ripple's communications about XRP sales did not convey a misimpression about what Ripple was selling when it sold XRP.  That is not aiding and abetting under the correct legal standard.

The SEC has no answer for its inability to plead that Mr. Garlinghouse knew or was reckless as to whether Ripple's XRP sales violated the securities laws or were otherwise improper. And so it seeks to persuade the Court that something less is required.  The Court should decline the invitation.  The SEC itself has acknowledged in other cases, and the case law is clear, that secondary actors are liable for aiding and abetting *only* where their conduct is knowing or reckless. That the SEC cannot plead knowledge or recklessness – in a case involving the sale of an entirely new species of asset (cryptocurrency) and where the lack of regulatory clarity is well documented – is no justification for lowering the standard for liability.  It is confirmation that the SEC's aiding and abetting claim never should have been brought and cannot proceed.

The SEC's Section 5 claim against Mr. Garlinghouse also fails because the AC identifies

no allegations of domestic offers or sales of XRP.  The SEC cannot avoid the characteristics of the transactions it is challenging by simply declining to allege any facts about them.  The law is well-established – only properly pleaded domestic offers and sales can support potential Section 5 liability.  To mask these pleading deficiencies, the SEC tries to turn the law on its head by arguing that this Court should be the first to accept that the territorial scope of the Securities Act is defined not by the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), but rather by the SEC's own Regulation S, which was adopted 20 years before *Morrison*. Worse, the SEC misreads Regulation S, which explicitly anticipated that non-domestic offers and sales were beyond the reach of Section 5.  Finally, the SEC's fallback argument – that every single offer and sale, even those executed by a foreign market maker on foreign exchanges, falls within the territorial reach of the Securities Act if any *conduct* occurred in the U.S. – is precisely what *Morrison* and its progeny in this Circuit foreclosed.

## **ARGUMENT**

## I.   **THE SEC HAS NOT PLEADED AND CANNOT PLEAD SCIENTER**

### A.   **The SEC Mischaracterizes Mr. Garlinghouse's Arguments and Misstates the Legal Standard for Scienter**

The Opposition mischaracterizes Mr. Garlinghouse's argument for dismissal of the aiding and abetting claim.  Mr. Garlinghouse does not argue "that the SEC must allege that Defendants knew that XRP was in fact a security *as a matter of law*."  Opp. at 28.  Rather, the SEC must plead that Mr. Garlinghouse knew or recklessly disregarded that Ripple's offers and sales of XRP were *improper*.  Mot. at 18-20.  The SEC has accepted this "improper" requirement in prior federal litigation, *see* Mot. at 19, in its own administrative proceedings, *id.*, and in this very case, *see* Op. & Order, ECF No. 103, at 3 (Apr. 9, 2021) (holding, on a discovery motion the SEC did not appeal, that "the SEC must show that the Individual Defendants knew or recklessly disregarded that

Ripple's offerings and sales of XRP required registration as securities *and that those transactions were improper*.") (emphasis added).[1]

The SEC recognizes that the AC does not plead that Mr. Garlinghouse knowingly or recklessly associated himself with anything improper, so instead the SEC now argues that it need only plead "knowledge of the circumstances that constitute the primary violation." Opp. at 25. That would transform aiding and abetting into a strict liability violation by allowing the SEC to premise an aiding and abetting claim solely on Mr. Garlinghouse's knowledge that Ripple was selling an unregistered digital asset (XRP), without also pleading that he knew or was reckless that there was anything wrong with doing so. That is not the law. *See* 15 U.S.C. § 77o(b) (requiring that a defendant act "knowingly or recklessly"); *see SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018) ("[T]he plaintiff must at least demonstrate recklessness to satisfy the knowledge requirement. . . . Mere negligence does not suffice.").[2]

The SEC has no answer to the cases holding that aiding and abetting liability can only arise where the defendant recognizes or is reckless as to the impropriety of the alleged conduct. Mot. at 18-19 (citing *SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020); *SEC v. Espuelas*, 905 F. Supp. 2d 507, 518 (S.D.N.Y. 2012)). Indeed, as the SEC itself acknowledged in litigating *Paulsen*, the legal standard requires that a defendant "knew, consciously avoided knowing, or was reckless in not knowing that his role was part of an overall activity that was improper." SEC's Post-Trial Memorandum at 2*, SEC v. Paulsen*, No. 18 Civ.

---

[1] *See Hamlen v. Gateway Energy Servs. Corp.*, No. 16 CV 3526 (VB), 2018 WL 1568761, at *2 (S.D.N.Y. Mar. 29, 2018) (prior determination of a legal issue by a magistrate judge was law of the case on later motion to dismiss before the district judge).

[2] The SEC's quotation of *SEC v. Hurgin*, 484 F. Supp. 3d 98, 112-13 (S.D.N.Y. 2020), for the proposition that "scienter . . . arguments are not appropriate for resolution on a motion to dismiss" is misleading. The full quote is "Hurgin argues that the Commission cannot establish that he acted with scienter, but his arguments are not appropriate for resolution on a motion to dismiss." *Id.*

6718 (PGG) (S.D.N.Y. Aug. 14, 2020), ECF No. 148; *see also Espuelas*, 905 F. Supp. 2d at 518 (requiring that defendant had sufficient knowledge "to appreciate that [his activity] under the circumstances was improper").

Instead, the SEC argues that out-of-circuit authority or criminal fraud cases somehow command a different result here.  They do not.  *SEC v. Falstaff*, 629 F.2d 62 (D.C. Cir. 1980), which the SEC relies on heavily, is entirely consistent with the "improper" requirement, as recognized by courts in this District.  *See SEC v. Mattessich*, 18 Civ. 5884 (KPF), 2021 WL 797669, at *9 (S.D.N.Y. Mar. 1, 2021) (citing *Falstaff* and holding that defendant must have "kn[o]w[n] that his particular arrangement ran afoul of [prohibitions on the payment of undisclosed commission compensation]" to incur aiding and abetting liability).  And criminal fraud cases establish only that a defendant charged with fraud is understood to have associated himself with impropriety by virtue of signing up *to a fraud*, whether or not he is aware that the object of the fraud is a security.  *United States v. Brown*, 578 F.2d 1280 (9th Cir. 1978); *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008).  By contrast, in this civil case, the only *mens rea* that the SEC alleges would distinguish between sales of XRP being proper and improper would be the knowledge that registration as a securities offering was required.

### B.   The AC Does Not and Cannot Plausibly Allege That Mr. Garlinghouse Recklessly Disregarded that Ripple's Sales and Offers of XRP Were Improper

None of the allegations about Mr. Garlinghouse in the AC meet the "improper" requirement.  Amid irrelevant allegations about others, the SEC's arguments relating to Mr. Garlinghouse consist only of short statements essentially regurgitating the allegations of the AC.  *See In re Aegean Marine Petrol. Network, Inc. Sec. Litig.*, 18 Civ. 4993 (NRB), 2021 WL 1178216, at *35 (S.D.N.Y. Mar. 29, 2021) ("Scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading.").  Stripped of the SEC's

argumentative gloss, these statements show nothing more than that Mr. Garlinghouse was generally following regulatory developments in the cryptocurrency space and taking efforts to ensure that Ripple's conduct was proper in a highly-uncertain regulatory environment.  *See* Mot. at 13-18.  Many of the SEC's allegations relate to events that occurred or information received prior to his even joining the company.  And, despite the extensive pre-complaint discovery afforded to the SEC, the AC does not allege any statement by Mr. Garlinghouse even suggesting he believed that XRP was a security.

None of the SEC's four categories of allegations about Mr. Garlinghouse, Opp. at 27-28; *see also id.* at 11-15, is "separately pled and individually supportable" to state a claim that Mr. Garlinghouse aided and abetted Ripple's alleged Section 5 violation.

*First*, allegations that Mr. Garlinghouse knew that Ripple did not register its offers and sales would be relevant only if Mr. Garlinghouse knew or was reckless that offers and sales of XRP *actually were* a securities offering or were otherwise improper.

*Second*, while the SEC cites 45 paragraphs of the AC for the proposition that Mr. Garlinghouse "promoted XRP as [investment contracts]," Opp. at 27, that is not what the AC actually alleges.  Rather, the AC alleges that Mr. Garlinghouse knew that Ripple was selling XRP, and that some were buying XRP because they thought the price would rise.  But, as the SEC itself concedes, allegations that an asset was purchased for speculative purposes does not establish that it is a security.  Opp. at 33 n.10 (disclaiming the argument that "XRP was an investment contract . . . *simply* because it was purchased for speculation"); *see also Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966) ("The mere presence of a speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts.").  People buy all sorts of things – from

-6-

diamonds to collectibles – in the expectation that their value will increase; not all (or even most) of those things are securities.  *Cf.* 15 U.S.C. § 77e; *see SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).  The SEC repeatedly confuses Mr. Garlinghouse's alleged knowledge that XRP was an asset with value and utility with supposed knowledge that it was a security.[3]

*Third*, the SEC alleges that Mr. Garlinghouse was aware of the risk that "such offers and sales *could be improper* under certain circumstances."  Opp. at 27 (emphasis added).  But it is not enough to allege that this conduct "could be improper"; to adequately plead recklessness, the SEC must plausibly allege that there was "an unjustifiably high risk of harm that is either known or so obvious that it should be known."  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  In any event, the SEC ignores that the very documents it relies on to establish those allegations show that, in words and deeds, Mr. Garlinghouse distinguished Ripple and XRP from those sales of other digital tokens that he understood could be securities offerings.  *See* Mot. at 13-14 (citing cases holding that a defendant's recognition of generalized risks does not constitute recklessness).  While the Opposition asserts that Mr. Garlinghouse "was . . . warned by advisors" that "offers and sales [of XRP] could be improper under certain circumstances," Opp. at 27, it misrepresents the documents the AC actually relies upon:

- The SEC asserts that Mr. Garlinghouse received "warnings" that XRP had "securities-type" characteristics, Opp. at 13, 30 (quoting AC ¶ 407), but the quoted document makes clear "Ripple's position that XRP is not a security," and that the focus of the email was to ensure that XRP would not be incorrectly perceived as a security, *see* Ex. K; AC ¶ 407 ("[W]e do need to hone our playbook/messaging.").

- The SEC relies on notes taken by a potential investor in Ripple equity to assert that Mr. Garlinghouse said he could "not guarantee" that XRP was not a security.  Opp. at 15, 30.

---

[3] The SEC insinuates that Mr. Garlinghouse's statement that he was "long XRP" was somehow misleading or deceptive (neither of which is pleaded); but Mr. Garlinghouse by any measure was and is "long XRP" – he received part of his employment compensation in XRP, and he held and holds significant amounts of XRP.  AC ¶¶ 87, 181.  The SEC cannot and does not point to any statement by Mr. Garlinghouse denying that he sold XRP.

The SEC omits the exculpatory portion of these notes, which state in full that Mr. Garlinghouse "feels optimistic that the SEC will rule" that XRP will not be classified as a security but "cannot guarantee that," and that "it should be [a] pretty straight forward decision" that XRP is not a security.  *See* Ex. L; AC ¶ 420.

- Similarly, the SEC misleadingly asserts that Mr. Garlinghouse "also was concerned with 'verbiage' in communications that could make 'XRP sound[] like a security,'" Opp. at 30-31 (quoting AC ¶ 408), but the quoted document is an email from the head of Ripple HR *to* Mr. Garlinghouse noting in the context of offer letters to new employees that their "verbiage doesn't put us at risk of XRP sounding like a security," *see* Ex. M.

And while the SEC contends that Mr. Garlinghouse "knew that the status of XRP under the securities laws was of keen interest to the digital asset platforms," Opp. at 28, it omits that over 200 digital asset platforms concluded XRP was not a security because they listed XRP on their platforms, *see* Mot. at 14; *see also* Op. & Order, ECF No. 210, at 5 (May 30, 2021).

*Fourth*, the SEC argues that the mere fact that Mr. Garlinghouse's "financial interests were aligned with Ripple's" is enough to plausibly allege scienter.  Opp. at 26-28.  But a long line of Second Circuit authority has rejected compensation-based motives as a basis for alleging a corporate officer defendant's scienter.  *See ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198, 201 (2d Cir. 2009) ("Motives that are common to most corporate officers, such as . . . the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of [the scienter] inquiry."); *Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) (citing cases holding the same).[4]

The SEC's demand that the Court not weigh its factual allegations, Opp. at 31-34, is misplaced and incorrect.  Mr. Garlinghouse is not asking the Court to resolve fact disputes – he is

---

[4] Characterizing Mr. Garlinghouse's compensation as a "concrete and personal benefit" in no way distinguishes his situation from any other corporate executive in America.  *See Wyche v. Advanced Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) ("Bonus compensation is not the type of 'concrete and personal' benefit upon which a finding of motive to commit securities fraud can be based") (quoting *Kalnit*, 264 F.3d at 139); *Reilly v. U.S. Physical Therapy, Inc.*, 17 Civ. 2347 (NRB), 2018 WL 3559089, at *12 (S.D.N.Y. July 23, 2018) ("[E]ven multi-million dollar bonuses that plaintiffs alleged were directly tied to misstatements were insufficient evidence of motive.").

asking the Court to look at the AC's allegations made after more than 30 months of investigation and to evaluate whether they plausibly allege that he knowingly or recklessly joined Ripple to help further an illegal scheme.  *See Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 323-25 (2d Cir. 2021) (granting 12(b)(6) motion where plaintiff's "allegations do not permit a plausible inference that Defendants *willfully* violated the statute – whether by actual knowledge or . . . by reckless disregard" where it "pleads facts that are merely consistent with Defendants' purported willfulness and . . . stops short of the line between possibility and plausibility."); *see also Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015) ("Rule 8's plausibility standard applies to pleading intent.").

## II.    THE SEC DOES NOT ALLEGE THAT MR. GARLINGHOUSE'S PERSONAL OFFERS OR SALES OF XRP OCCURRED IN THE UNITED STATES

Under Supreme Court precedent, the SEC has the burden to plausibly allege that Mr. Garlinghouse engaged in domestic offers or sales of XRP.  *Morrison*, 561 U.S. at 268-69.  The SEC alleges that there was "a discrete violation of Section 5 with each unregistered offer and each unregistered sale," Opp. at 59,[5] but it does not allege a single domestic offer or sale by Mr. Garlinghouse.

### A.    *Morrison* Applies to the SEC's Section 5 Claims

The SEC's primary argument is simply to reject controlling precedent it finds unhelpful, arguing that the transactional test in *Morrison* does not apply to Section 5 claims.  Opp. at 48.  The SEC cites no court in any jurisdiction that has reached this conclusion, and fails to identify a single case that held *Morrison* does not apply to *any* section of the Securities Act.  *See* 561 U.S. at 268 ("The same focus on domestic transactions is evident in the Securities Act of 1933, 48 Stat. 74,

---

[5] *See also* Hr'g Tr. 45:10-12 (Mar. 19, 2021) ("So their sales, every time [Mr. Garlinghouse and Mr. Larsen] sold and failed to register the transaction, unless they point to an exemption, they violated Section 5 individually, irrespective of Ripple's violation.").

enacted by the same Congress as the Exchange Act, and forming part of the same comprehensive regulation of securities trading.").  It also ignores cases in this District and elsewhere uniformly applying *Morrison* to Securities Act claims, including Section 5 claims.[6]

### B.      Regulation S Does Not Supplant *Morrison*

The SEC's secondary argument is that *Morrison* does not apply because its own administrative regulation – Regulation S – provides the "proper criteria" for determining "what constitutes domestic 'offer[s]' and/or 'sale[s]' of securities under Section 5."  Opp. at 37.  But the SEC cannot expand the territorial scope of a statute by regulation, so if Regulation S leads to a different conclusion than would result from applying *Morrison* to Section 5 of the Securities Act, the regulation would have to yield.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) ("Thus, despite the broad view of the Rule advanced by the Commission in this case, its scope cannot exceed the power granted the Commission by Congress under [Section] 10(b).").

In any event, the plain text of Regulation S defeats the SEC's argument.  The SEC relies on two different sections of Regulation S:

- Section 901 is a "general statement" that "the terms offer, offer to sell, sell, sale, and offer to buy shall be deemed to include offers and sales that occur within the United States and shall be deemed not to include offers and sales that occur outside the United States."  17 C.F.R. § 230.901.

---

[6] *See* Mot. at 20-21; *SEC v. Bio Def. Corp.*, No. 12-11669-DPW, 2019 WL 7578525, at *11-13 (D. Mass. Sept. 6, 2019) (applying *Morrison* to Section 5 claim), *affirmed sub nom. SEC v. Morrone*, 997 F.3d 52, 59 (1st Cir. 2021) ("Under [*Morrison*], the federal securities laws apply to only two types of transnational transactions: (1) "transactions in securities listed on domestic exchanges," and (2) "domestic transactions in other securities."); *Schentag v. Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at *5, 10-13 (S.D.N.Y. June 21, 2018) (applying *Morrison* to Section 5 claim); *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 55-56 (S.D.N.Y. 2013) ("Courts in this District uniformly concur that *Morrison*'s prohibition on extraterritoriality applies to Securities Act claims."); *see also SEC v. Revelation Cap. Mgm't*, 246 F. Supp. 3d 947, 952-53 (S.D.N.Y. 2017) (rejecting the SEC's argument that *Morrison* does not apply to Rule 105 of Regulation M).

- Section 903 provides a "non-exclusive" safe harbor that issuers and others can – but need not – rely on to engage in foreign securities offerings while eliminating the risk they might be found to be domestic.  17 C.F.R. § 230.903.

The SEC conflates the two sections by referring to them together as "Regulation S," but they have very different purposes.  While the SEC argues that *Morrison* somehow recognized that "Regulation S properly defines the scope of what constitutes 'domestic' and 'foreign,'" Opp. at 44, it ignores that *Morrison* cites *only* to Section 901 for the unremarkable proposition that the SEC had interpreted Section 5 "not to include . . . sales that occur outside the United States."  561 U.S. at 269.  *Morrison* does not cite to Section 903, and nothing in the decision suggests that *only* an offering that satisfies the Section 903 safe harbor is outside the scope of Section 5.  The SEC's argument also defies its own interpretative guidance, which makes clear that an offer or sale can occur outside the United States (as Section 901 recognizes) "*regardless* of whether the conditions of the safe harbor are met."  Offshore Offers & Sales, SEC Release No. 122, 1990 WL 311658, at *6 (Apr. 24, 1990) (emphasis added); *see Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 125 (2d Cir. 1998), abrogated on other grounds by *Morrison*, 561 U.S. 247 ("A transaction not within either of the safe harbors may still be outside of the United States within the meaning of 17 C.F.R. § 230.901.").  That has to be true, otherwise issuers, brokers, and underwriters offering foreign securities on foreign exchanges – and those purchasing them – would be subject to the U.S. securities laws, which is what *Morrison* expressly foreclosed. 561 U.S. at 263 ("Nothing suggests that this *national* public interest pertains to transactions conducted upon *foreign* exchanges and markets.").

### C.   Section 5 "Focuses" on Domestic Sales and Offers for the Purpose of the Presumption Against Extraterritoriality

The SEC concedes, as it must, that Section 5 does not apply extraterritorially.  Opp. at 39. The SEC must therefore show that this case involves a domestic application of Section 5.  *Morrison*

561 U.S. at 266-67; *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 66 (2d Cir. 2012).  Rather than plead domestic offers or sales, the SEC tries to argue that Section 5's scope covers not only offers and sales themselves, but rather "the *entire* process of distributing securities from an issuer to the public," Opp. at 41, even if the relevant offer or sale occurred abroad.  But if that were true, it would mean that the registration requirements of the securities laws have a *broader* territorial scope than the anti-fraud provisions, which apply only when a transaction occurs on a U.S. exchange or irrevocable liability is incurred within the United States.  *Morrison*, 561 U.S. at 267.  That is obviously wrong:  Even before *Morrison* repudiated the so-called "conduct and effects" test in favor of a transactional test, *id.* at 255-61, the Second Circuit "clearly state[d]" that the registration requirements of the Securities Act (including Section 5) have a more limited extraterritorial reach than the anti-fraud provisions.  *Eur. & Overseas Commodity Traders*, 147 F.3d at 123, 125 (collecting cases).

The SEC's interpretation seeks to roll the law backwards, and would mean that any "conduct" in the United States leading to a securities offer or sale implicates Section 5.  But the "conduct and effects" test is precisely what the Supreme Court rejected in *Morrison*.  561 U.S. at 255-61; *see also* Mot. at 24-27.  The law is clear that Section 5 is focused not on the entire "process of distributing securities," as the SEC argues, *see* Opp. at 41, but rather it is "transaction-specific." *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998); *see also Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990) ("Section 5 (the registration requirement) applies to transactions; each sale must be registered or exempt.  A violation does not stick to the instruments like tar.").[7] Tellingly, the only support the SEC identifies for its argument that the focus of Section 5 is the

---

[7] *Morrison* and its progeny have held that for such transaction-specific provisions of the Securities Act and Exchange Act, the "focus" is "not upon the place where the deception originated," but rather on "purchases and sales of securities in the United States."  561 U.S. at 266-68.

"entire offering process" are pre-*Morrison* cases that determined whether a defendant had sufficient involvement in a distribution of unregistered securities for liability to attach, and whether the Section 4(a)(1) exemption applied.  Opp. at 44 (citing *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005); *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004)).  These cases do not support the SEC's position that offers or sales that occurred abroad fall under Section 5 as long as some conduct occurred in the U.S.  *See Morrison*, 561 U.S. at 266 ("[T]he presumption against extraterritorial application [of the federal securities laws] would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case.").

### D.    The AC Fails To Plead Any Domestic Offers or Sales under Section 5

Having repeatedly tried to dodge the issue, the SEC's fallback position – which at least is the correct inquiry – is that the AC plausibly alleges domestic offers and sales of XRP under *Morrison*'s transactional test.  *See* Opp. at 52-58.  But the Opposition does not contest two critical points that foreclose this argument under binding authority:  (i) the SEC has the burden to plead domesticity, which is a substantive element of its Section 5 claim under *Morrison*, 561 U.S. at 253-54, and (ii) the AC contains no non-conclusory allegations that any of Mr. Garlinghouse's specific transactions are domestic, *Absolute Activist*, 677 F.3d at 70 ("Absent factual allegations suggesting that the [Defendants] became irrevocably bound within the United States or that title was transferred within the United States . . . the mere assertion that transactions 'took place in the United States' is insufficient to adequately plead the existence of domestic transactions.").

The SEC concedes that none of Mr. Garlinghouse's transactions in XRP occurred on a domestic exchange because "[n]one of the digital asset platforms on which [he] sold XRP are registered with the SEC as 'exchanges.'"  Opp. at 53 & n.17.  That leaves only *Morrison*'s second prong, which requires the SEC to "allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."  *Absolute Activist*, 677 F.3d at 62.  The SEC

argues that its allegation that "at least some of" Mr. Garlinghouse's transactions "occurred on *at least five* digital asset trading platforms incorporated in the U.S." is sufficient "to infer that irrevocable liability attached in the U.S." Opp. at 54. It is not. Under controlling precedent, the SEC must plead specific allegations regarding the transactions, such as "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Absolute Activist*, 677 F.3d at 70. Nor do the SEC's assertions that the term "offer" is afforded a broad interpretation, Opp. at 41, carry any weight. The SEC does not allege that Mr. Garlinghouse advertised, solicited, or otherwise let it be known that he was willing to sell XRP domestically; nor that offers of XRP made by a foreign market maker on Mr. Garlinghouse's behalf on foreign exchanges occurred in the United States. Mot. at 26-29.

The SEC's attempts to point to domestic *conduct* or ties do not pass muster under *Morrison*. The possibility of "resales of XRP to U.S. investors on U.S. markets," Opp. at 52, does not domesticate Mr. Garlinghouse's foreign offers or sales. *See Absolute Activist*, 677 F.3d at 67 (holding that the time for assessing territoriality is the moment "when the parties become bound to effectuate the transaction.").[8] California's enactment of the Uniform Electronic Transactions Act ("UETA") is irrelevant given the SEC's failure to allege "communications into the automated sales system" of foreign platforms by Mr. Garlinghouse. *See* Opp, at 56. Rather, the SEC alleges that Mr. Garlinghouse's foreign offers of XRP were made on his behalf by a foreign market maker. AC ¶ 183. Nor does state law control the territorial scope of Section 5. *See United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013). And, even if Mr. Garlinghouse's electronic communications

---

[8] Dicta in *SEC v. Telegram Grp. Inc.*, No. 19-cv-9439 (PKC), 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020), that the initial coin offering at issue in that case "would likely satisfy *Morrison*'s transactional test," does not stand for the broad proposition that a third-party purchaser's resale of XRP in the U.S. could somehow turn initial sales on foreign exchanges into domestic transactions.

were deemed to be sent from California, the "mere placement" of an order in the United States is not sufficient to establish that irrevocable liability was incurred domestically. *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d 173, 181 & n.33 (2d Cir. 2014).

The SEC's conjecture that some of the people who purchased XRP on foreign exchanges might have been Americans does not save its claim. Even if the SEC had pleaded that, the Second Circuit has held that a "purchaser's citizenship or residency does not affect where a transaction occurs." *Absolute Activist*, 677 F.3d at 69. In *Vilar*, which the SEC incorrectly avers is "indistinguishable," irrevocable liability was incurred in the United States because the fraudulent transactions were bilateral agreements between investment advisors and investors that were executed in the United States. 729 F.3d at 68-69, 76-78. No similar allegations were or could be made here. *Cf. Myun-Uk Choi v. Tower Rsch. Cap. LCC*, 890 F.3d 60, 67 (2d Cir. 2018) (finding domestic transactions where trades matched on an electronic exchange located in the U.S.).

Finally, the SEC tries to muddy the waters one last time by arguing that to the extent that Mr. Garlinghouse's sales occurred "on-chain," some portion of the network of computers involved in such transactions are operated by U.S. entities.[9] Opp. at 58. But again, the AC does not allege that Mr. Garlinghouse sold any XRP "on-chain." To the contrary, it alleges that his transactions were completed on "digital asset trading platforms or other intermediaries," which means that his offers and sales were made on the books and records of those exchanges. AC ¶ 183; *cf. In re Tezos Sec. Litig.*, No. 17-cv-06779-RS, 2018 WL 4293341, at *8 (N.D. Cal. Aug. 7, 2018) (addressing on-chain ICO tokens purchased through a website server in Arizona).

## **CONCLUSION**

For the foregoing reasons, the amended complaint should be dismissed with prejudice.

---

[9] While the AC alleges that approximately 40% of nodes are operated by entities based in the U.S., it contains no allegations as to where the validators themselves are located or whether "on-chain" transactions were validated in the U.S.

Dated:  June 4, 2021                    Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*/s/ Matthew C. Solomon*

Matthew C. Solomon
Nowell D. Bamberger
Nicole Tatz
2112 Pennsylvania Avenue, NW
Washington, DC 20037
202-974-1500

Alexander Janghorbani
Lucas Hakkenberg
Samuel Levander
One Liberty Plaza
New York, NY 10006
212-225-2000

*Attorneys for Defendant Bradley Garlinghouse*