

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

June 24, 2021

**VIA ECF**

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Courtroom 219
New York, N.Y. 10007

Re:  <u>SEC v. Ripple Labs, Inc., et al.</u>, No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Plaintiff Securities and Exchange Commission ("SEC") respectfully requests a conference with the Court to seek an order quashing the deposition subpoena directed to William H. Hinman (the "Subpoena," Ex. A)—the former director of the SEC's Division of Corporation Finance (the "Division")—issued by Defendant Ripple Labs, Inc. ("Ripple") and Defendants Christian A. Larsen and Bradley Garlinghouse (the "Individual Defendants"). In the alternative, the SEC seeks an order quashing the Subpoena without prejudice until after Judge Torres's ruling on the SEC's motion to strike Ripple's fair notice defense. The parties have met and conferred on this issue in writing and by video conference and are at an impasse.

Between 2017 and 2020, Director Hinman served as one of the SEC's highest-ranking officials. Other than the five Commissioners themselves, no SEC officers have more significant responsibilities or a higher rank than the directors of the SEC's six divisions. To depose a former high-ranking government official like Director Hinman, Defendants bear the burden of showing "exceptional circumstances" justifying the deposition. *See Lederman v. N.Y. City Dept. of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570, 2020 WL 8611024, at *12 (S.D.N.Y. Aug. 27, 2020) (Netburn, J.) ("Subjecting former officials' decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." (quotation marks omitted)). Defendants cannot meet this high burden.

Defendants claim they need to depose Director Hinman (1) to elicit testimony on the SEC's internal views as to certain legal issues and the process by which the SEC and its officials arrive at policymaking decisions—including to determine whether a public speech Director Hinman gave during his tenure at the SEC is admissible in evidence as representing the SEC's adopted position on a given matter, and to test the SEC's assertion of the deliberative process privilege over pre-decisional agency communications, and (2) to develop evidence as to market participants' views on whether XRP was offered or sold as a security. *See* Ex. I (June 7, 2021 Letter from L. Stewart).

Far from presenting "exceptional circumstances" sufficient to justify such a deposition, these proposed inquiries—the answers to which are at least partly protected by the deliberative process privilege and, to the extent not privileged, could be obtained through far less intrusive means— relate to the everyday tasks of most high-ranking government officials. Independent federal

agencies routinely enforce the laws entrusted to them, and many agency officials discuss issues with industry participants and give public speeches. Defendants' approach would subject high-level government officials to depositions regarding every law, regulation, or policy they consulted on or spoke about and that later underlay an enforcement action. It would leave little protected by the *Lederman* decision and disrupt the functioning of government agencies by discouraging qualified people from public service given the near certainty that their tenures would ensnare them in litigation.

I.      **Director Hinman Held a Position of Critical Importance to the SEC's Operations.**

Among the SEC's most important responsibilities in overseeing the United States' capital markets and protecting investors is the administration of certain statutory disclosure requirements under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"). Generally, the former requires a company offering or selling securities to file a registration statement with the SEC disclosing certain information, unless an exemption applies, *see generally* 15 U.S.C. § 77e, while the latter requires certain companies (including those that have an effective Securities Act registration statement or that have securities listed on a national securities exchange) to regularly report information about their business. *See generally id.* § 78*l*. The Securities Act gives the SEC authority to exempt certain offers and sales of securities from the Act's registration requirements. 15 U.S.C. § 77s.

The Division is one of the SEC's six divisions, consisting of nearly 400 staff members. Ex. B (Decl. of William Hinman) at ¶ 3. The director of the Division is "responsible to the Commission for the administration of all matters…relating to establishing and requiring adherence to standards of business and financial disclosure with respect to securities being offered for public sale pursuant to the registration requirements of the Securities Act…or the exemptions therefrom" and with respect to the periodic reporting requirements under the Exchange Act and other federal securities laws, as well as for overseeing the review of these disclosures. *See* 17 C.F.R. § 200.18. Director Hinman served in this position from May 2017 to December 2020. Ex. B at ¶ 2.

Under the director's supervision and management, the Division oversees disclosures by issuers in the United States' multi-trillion-dollar capital markets. The SEC estimates that, for fiscal year 2019, registered U.S. public offerings brought in $1.2 trillion in new capital, and exempt offerings accounted for $2.7 trillion of fundraising activities. *See Facilitating Capital Formation and Expanding Investment Opportunities by Improving*, Rel. No. 33-10884 (SEC Nov. 2, 2020) at 202–03 & Table 5, *available at* https://www.sec.gov/rules/final/2020/33-10884.pdf.

The Division also assists the SEC in carrying out other mission-critical activities, including advising the SEC on legal and accounting matters under the federal securities laws; recommending new rules or changes to existing rules; and providing informal guidance to companies, investors and their advisors. This guidance may take the form of so-called "no-action letters" stating the Division staff's views as to certain legal issues, including whether the offer and sale of an instrument constitutes the offer and sale of a security under the federal securities laws.

Pursuant to its statutory authority, 15 U.S.C. §§ 78d-1(a), 78d-2, the SEC has delegated substantial authority to the Division's director over a number of provisions relating to the registration provisions of the Securities Act and Exchange Act and the exemptions thereto. *See generally* 17 C.F.R. § 200.30-1.

## II. Director Hinman Has No First-Hand Knowledge of the Facts Underlying This Action.

Between 2018 and 2020, as part of the SEC staff's fact-gathering in connection with its investigation of Ripple's conduct, Director Hinman attended meetings with Ripple's counsel and certain Ripple employees to discuss the legal status of Ripple's offers and sales of XRP. Ex. B at ¶ 9. Director Hinman and his staff also consulted with the staff of the SEC's Division of Enforcement (the division responsible for investigating and litigating this matter) as to the legal status of Ripple's offers and sales of XRP under the federal securities laws, and reviewed written submissions by Defendants' counsel. *Id.* at ¶¶ 8, 10. Director Hinman has no personal, first-hand knowledge as to Defendants' offers and sales of XRP; whatever information he has about what Defendants did or did not do he derived from these meetings and submissions and from other conversations with SEC staff. *Id.* at ¶¶ 7–10. Nor did Director Hinman discuss with any market participant the participant's understanding of the legal status of XRP offers and sales under the federal securities laws or disclose to any market participant his own views on that topic. *Id.* at ¶¶ 14–15. Indeed, federal law prohibits him from doing the latter. *See* 17 C.F.R. § 203.2 (SEC investigations are non-public).

Although Director Hinman did not make any public statements about XRP during his tenure as Division Director, he did make a public speech on June 14, 2018, in which he expressed his own view that the offers and sales of the digital asset Ether at that time were "not securities transactions," based on his understanding of the specific facts and circumstances of Ether and the structure of the Ethereum blockchain at the time. *See* Ex. C (the "Speech"); *see also* Ex. B at ¶¶ 11–12. Director Hinman did not reference XRP or Ripple in the Speech. *Id.* at ¶ 12. Before he delivered the Speech, Director Hinman had discussions with other SEC employees about his plans for the Speech, as part of ongoing deliberations about whether offers and sales of Ether constituted securities transactions. *Id.* at ¶ 13. The Speech is publicly available and the SEC does not contest its authenticity.

## III. The Subpoena Should Be Quashed Because Defendants Cannot Meet Their Burden of Demonstrating "Exceptional Circumstances" Justifying It.

Eighty years ago, in *United States v. Morgan*, the Supreme Court strongly discouraged litigants from calling high-ranking government officials as witnesses in government enforcement actions, noting that such practices threatened "the integrity of the administrative process." 313 U.S. 409, 422 (1941). The Second Circuit has since imposed strict limitations on deposing senior government officials. *Lederman*, 731 F.3d at 203. "[T]o depose a high-ranking government official, a party must demonstrate exceptional circumstances justifying the deposition—for example, that the official has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." *Id.* (citing *Bogan v. City of Boston*, 489 F.3d 417, 423 (1st Cir. 2007); *In re United States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999)).

The purpose of the "exceptional circumstances" rule is to "protect the mental processes" of government officials "in order to promote open channels of communication within government" and encourage qualified individuals to hold public office. *Raymond v. City of N.Y.*, No. 15 Civ. 6885, 2020 WL 1067482, at *4 (S.D.N.Y. Mar. 5, 2020) (Cave, J.) (internal quotation marks omitted) (quashing subpoenas issued to former N.Y.P.D. Commissioners). The "party seeking the deposition must demonstrate that the official's testimony will likely lead to the discovery of admissible evidence essential to that party's case." *Id.* at *4 (internal quotation marks omitted).

Director Hinman was a high-ranking government official, and Defendants cannot meet their burden of showing "exceptional circumstances" justifying his deposition.

### A. Director Hinman Served as a High-Ranking Government Official.

A determination of whether an individual is "'a high-ranking government officer…is [made] on a case-by-case basis.'" *Terrorist Attacks,* 2020 WL 8611024, at *12 (quoting *McNamee v. Massachusetts*, No. 12 Civ. 40050, 2012 WL 1665873, at *2 (D. Mass. May 10, 2012)). The term is not "'limited to constitutional officers of the United States" but applies to those at the "apex" of a governmental organization, *Terrorist Attacks*, 2020 WL 8611024, at *12, which means someone with "a position of substantial importance to the operation of [a] governmental body." *McNamee*, 2012 WL 1665873, at *1–2.

Moreover, the doctrine "applies to both current and former high-ranking officials" because "[s]ubjecting former officials' decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service." *Terrorist Attacks*, 2020 WL 8611024, at *12 (citations omitted). A person's status as a former (rather than current) high-ranking official is one of the factors this Court has weighed in determining whether "extraordinary circumstances" exist. *Id.*

As the director of an SEC Division with substantial responsibilities, Director Hinman qualifies as a high-ranking government official under *Lederman*. Director Hinman's role was certainly of "substantial importance to the operation" of the SEC. *McNamee*, 2012 WL 1665873, at *1–2. In fact, his role was critical to the SEC's mission of overseeing the U.S. capital markets and protecting investors, as described in Section I.

Indeed, at least one district court has relied on *Morgan* to quash subpoenas issued to a then-director of a different SEC division, the Division of Enforcement, and to a then-former SEC Commissioner. *See* Ex. F (Tr. in *SEC v. Navellier & Assocs, Inc.*, No. 17 Civ. 11633 (D. Mass. May 31, 2019) ("*Navellier*") (D.E. 210)) at 8–9; *see also* Ex. G (Tr. in *Navellier* (D.E. 218) (July 22, 2019)) at 13 (denying motion for reconsideration of order quashing deposition subpoenas).

Moreover, Director Hinman's responsibilities were just as significant to the SEC as the duties of the government employees that courts in this District (and other courts) have considered "high-ranking government officials" and whose depositions have been quashed. These include: (1) a university president whose deposition subpoena was quashed by Judge Torres, *Branch v. State Univ. of N.Y. Downstate Med. Ctr.*, No. 18 Civ. 9516, 2021 WL 2157823, at *1–2 (S.D.N.Y. May 27, 2021) (affirming Magistrate Judge Freeman's order); (2) a former deputy mayor and the mayor's chief of staff, *Morales v. City of New York*, No. 18 Civ. 1573, 2020 WL 2571029, at *1 (S.D.N.Y. May 20, 2020); (3) former police commissioners, *Raymond*, 2020 WL 1067482, at *14; (4) foreign diplomats, *Terrorist Attacks*, 2020 WL 8611024, at *12 (but permitting depositions of certain former officials); (5) the former chief of staff to a congressperson, *McNamee*, 2012 WL 1665873, at *1–2; (6) Department of Labor employees, including the Secretary's chief of staff and certain regional administrators, *Simplex Time Recorder Co. v. Secretary of Labor*, 766 F.2d 575, 586 (D.C. Cir. 1985); (7) a deputy chief of staff of a federal agency, *Low v. Whitman*, 207 F.R.D. 9, 12 (D.D.C. 2002); and (8) the director of a state department of corrections, *Sarnowski v. Peters*, No. 16 Civ. 176, 2017 WL 4467542, at *3–4 (D. Or. Oct. 6, 2017).

Accordingly, Defendants should be required to show "exceptional circumstances" justifying the deposition of Director Hinman.

### B. Defendants Cannot Demonstrate "Exceptional Circumstances."

None of Defendants' proffered bases for Director Hinman's deposition rise to the level of "exceptional circumstances" required by *Lederman* because Defendants cannot demonstrate that Director Hinman "has unique first-hand knowledge related to the litigated claims or that the necessary information cannot be obtained through other, less burdensome or intrusive means." *Lederman*, 731 F.3d at 203.

Defendants seek to depose Director Hinman in order to elicit testimony that falls into two broad categories.

*First,* Defendants seek testimony on the SEC's internal views as to certain legal issues and the process by which the SEC and its officials arrive at policymaking decisions. Specifically, Defendants claim Director Hinman's testimony is relevant to "the SEC's regulations, policies, and guidance relating to the regulation of digital assets under the federal securities laws, the determination that bitcoin and ether were not securities, [and] the relevance of decentralization for the evolution of digital assets from being classified as securities." Ex. E (Defendants' Initial Disclosures) at 5. Defendants also seek to establish whether the Speech is admissible as an SEC admission and thus wish to question Director Hinman about whether "the SEC either approved, or adopted" the Speech and to "explore and test the contours of[ ] the SEC's assertion of the deliberative process privilege" over communications surrounding the preparation of the Speech and of certain SEC policy. Ex. D (June 11, 2021 Letter from R. Figel) at 4.

*Second*, Defendants seek testimony on "the understanding of market participants as to whether XRP was a security subject to the registration requirements of the Securities Act," based on Director Hinman's interactions with members of the public. *Id.* at 3.

Defendants' proposed bases for deposing Director Hinman would apply to many high-ranking government officials in federal executive agencies and are insufficient under *Morgan* and *Lederman*.

### 1. Defendants Cannot Properly Elicit Testimony on the SEC's Internal Processes and Can Explore the SEC's Assertions of Privilege through Less Intrusive Means.

To the extent Defendants seek to question Director Hinman about the SEC's policies regarding digital assets, the SEC's views on Bitcoin and Ether, the relevance of decentralization to prevent digital assets from being viewed as securities, or the preparation of Director Hinman's Speech, these are precisely the types of inquiries that are foreclosed by *Morgan* itself. There, the Supreme Court said the official "should never have been subjected to [an] examination" about "the process by which he reached the conclusions of his order, including the manner and extent of his study of the record and his consultation with subordinates." *Morgan,* 313 U.S. at 422; *see also SEC v. Comm. on Ways & Means of the United States House of Representatives*, 161 F. Supp. 3d 199, 252 (S.D.N.Y. 2015) (explaining that "*Morgan* and its progeny make clear that the 'exceptional circumstances' doctrine is premised on the notion that high-ranking officials should not be required to testify regarding their official decision-making processes").

Similarly, deposition questions about whether the "SEC either approved, or adopted" Director Hinman's Speech (Ex. D at 4)—seeking testimony on Director Hinman's communications with other SEC officials in connection with the Speech—would improperly intrude on the SEC's internal deliberations. Because Director Hinman stated that the Speech "expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff" (Ex. C at n.1) and because the SEC has never taken any action to adopt the Speech, questions

as to whether the SEC approved or adopted the Speech are necessarily questions about the process in which Director Hinman engaged before he made the Speech or about issues SEC officials were debating following the Speech. Any such decision-making processes would be subject to a number of privileges, including the attorney-client privilege and the deliberative process privilege, which "shields from disclosure…deliberations comprising part of a process by which governmental decisions and policies are formulated." *United States Fish & Wildlife Service v. Sierra Club, Inc.*, __ U.S. __, 141 S. Ct. 777, 785 (2021) (internal quotation marks omitted). The deliberative process privilege "is rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Dep't of the Interior & Bureau of Indian Affairs v. Klamath Water Users Protective Assoc.*, 532 U.S. 1, 8–9 (2001) (internal quotation marks omitted).

Further, questions about the SEC's assertion of privilege over internal agency deliberations cannot be the type of "exceptional circumstances" that justify deposing high-ranking government officials. Defendants have made no attempt to use other avenues of discovery, including requests for admission or interrogatories to the SEC, to obtain such information. The scope of the SEC's assertion of privilege can be obtained by other, far less intrusive and disruptive means.

Fundamentally, the matters on which Defendants seek Director Hinman's testimony—far from presenting "exceptional circumstances"—involve the day-to-day operations of executive agencies that enforce the law. Agencies routinely assert deliberative process privilege, *e.g.*, *Fish & Wildlife Serv.*, 141 S. Ct. at 785, and many enforcement matters present admissibility and other evidentiary issues. Permitting the deposition of Director Hinman based on such justifications would turn every government enforcement action—including criminal prosecutions—into a parade of requests for the testimony of high-ranking government officials, to the detriment of the government's ability to operate and to enforce the law. And, specifically, allowing Defendants to depose Director Hinman would likely result in Director Hinman being served with multiple deposition subpoenas by the many other persons alleged to have violated the registration provisions of the securities laws during his tenure at the SEC. Such a result would not only create significant burdens for Director Hinman, but would make other qualified individuals reluctant to serve in high-ranking roles at the SEC for fear of being embroiled in litigation for years following their terms of service.[1]

### 2. Director Hinman Has No Unique, First-Hand Knowledge of Market Participants' Understanding as to the Regulatory Status of XRP Offers and Sales.

Director Hinman has no first-hand knowledge of the facts underlying the SEC's claims against Defendants, and Defendants have not suggested otherwise. Whatever information Director Hinman obtained about Defendants' conduct during the SEC staff's investigation came second-hand from SEC staff—who, in turn, obtained the information from Defendants or third-parties—or during the meetings he attended with Defendants' counsel and representatives. *See* Ex. B at ¶¶ 7–10; *see also* Ex. F (*Navellier*) (quashing subpoena to SEC division director based on lack of first-hand knowledge).

---

[1] This is especially true where, as here, proponents of XRP have consistently used social media to disseminate negative and false statements about members of SEC leadership, including Director Hinman. A deposition of a former high-ranking SEC official like Director Hinman, when coupled with the type of negative media exposure already present in connection with this case, will increase the deterrent to public service for qualified individuals like Director Hinman.

Nor can Defendants establish that Director Hinman has any first-hand knowledge of the facts underlying Ripple's fair notice defense or that facts relevant to that defense are available solely through Director Hinman. As this Court has held, Ripple's fair notice defense is "an objective test of how a *reasonable* person would have interpreted the [SEC]'s conduct." D.E. 210 at 7 (emphasis added). Therefore, as this Court has explained, the facts underlying that defense include "the statute" itself, "how it was enforced," and "what was going on in the relevant market." Ex. H (Tr. of May 21, 2019 Hr'g) at 14:13–15:1 (noting Ripple's defense is "really akin…to a void for vagueness argument"). The first two facts—the "statute" and "how it was enforced"—are readily identifiable based on the text of the law and the SEC's enforcement actions, which are publicly known. With respect to the third fact, Director Hinman does not have unique first-hand knowledge of "what was going on in the relevant market," which can be established through less intrusive means. Indeed, even assuming market participants conveyed to Director Hinman their own subjective "interpret[ations] [of] the [SEC]'s conduct," such individual understandings are only marginally relevant to establishing an *objective* defense based on a hypothetical "reasonable" person. As Defendants themselves explained to the Court, their "fair notice defense does not turn on subjective beliefs or awareness." Ex. H at 38:5–7; *see also id.* at 39:20–40:6 (focus is on a "hypothetical objective party"); *id.* at 41:14–18 (the fair notice defense raises "an objective standard…not a subjective standard"). *Cf. SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) (objective *Howey* test "is not a search for the precise motivation of each individual [offering] participant").

Moreover, even if a market participant's subjective views were deemed relevant evidence of an objective defense, Defendants can easily elicit such evidence from the market participants themselves. Indeed, Director Hinman did not discuss with any market participant that participant's interpretations of the SEC's conduct with respect to XRP, *see* Ex. B at ¶¶ 14–15. As such, the best source of that information is not Director Hinman, but the participants themselves.

At bottom, a "fair notice" defense is too insubstantial to rise to the level of "exceptional circumstances" that justify deposing a former high-ranking government official, and Defendants can point to no case to the contrary. High-ranking government officers routinely interact with people outside the government. If a defendant could simply allege that third parties were confused by the agency's conduct and thus obtain the deposition of high-level officials, then agency officials would be routinely required to appear for depositions, and *Lederman* would be rendered meaningless.

In fact, Defendants' request is identical to the defendant's request in *SEC v. Kik Interactive* to depose Director Hinman, which Judge Hellerstein rejected. In doing so, Judge Hellerstein noted that the void for vagueness affirmative defense—effectively the same defense at issue here, Ex. H (Tr. of May 21, 2019 Hr'g) at 14:13–15:1—"raises an issue of law, not of fact." 19 Civ. 5244 (D.E. 30) (S.D.N.Y. Oct. 29, 2019).[2] On a motion for reconsideration, Judge Hellerstein explained that, "[i]f the law is vague, or confusing, or arbitrary, as defendant argues, that can be argued objectively," and admonished the parties not to spend discovery time on "wasteful forays into inadmissible facts." 19 Civ. 5244 (D.E. 36) (S.D.N.Y. Nov. 12, 2019). The circumstances in this case are identical. Ripple has asserted an objective defense, and the underlying facts (the SEC's conduct in the marketplace as to XRP) are objectively known to Ripple.

Defendants have also asserted that deposing Director Hinman is "critical…as to the specific state of mind and any other potential defenses of the Individual Defendants." Ex. D at 3. However, in opposing the SEC's motion for discovery against Ripple, Defendants told the Court that "we don't

---

[2] The request to depose Director Hinman in *Kik* is legally indistinguishable from the present case, as the central issue in dispute in *Kik* was whether the relevant digital asset was a security.

know what [the Individual Defendants] are going to plead" and that "[w]e won't find that out until later." Ex. H at 44:7—45:12. Defendants cannot have it both ways. If matters of discovery against the Individual Defendants cannot be determined "until later," then the relevance, if any, of Director Hinman's knowledge to the Individual Defendants' defenses should also be analyzed when those defenses are known, as that day "may never come to pass."[3] *Id.*

The fact that this case implicates the Individual Defendants' scienter—which is true for many of the dozens of enforcement actions the SEC has filed regarding digital assets—does not amount to "exceptional circumstances." Defendants' argument would justify the deposition of officials across the broad spectrum of government enforcement activity. A criminal defendant charged with violating the securities laws could argue that he or she did not know that the digital assets were securities and use that assertion to further claim that he should be allowed to question government officials about their understanding of the law because it would show, as Defendants have argued here, that if the official was confused, then so too was the criminal defendant. *Cf. United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *8–9 (E.D.N.Y. Sept. 11, 2018) (criminal defendant arguing *Howey* and the term "investment contract" are unconstitutionally vague as applied to his issuance of digital asset, the first ever such criminal prosecution by the Department of Justice).

Civil defendants who assert that they did not act with scienter should not be given greater latitude than criminal defendants (such as the defendant in *Zaslavskiy*) who are on trial for their liberty and cannot use ignorance of the law as a defense to prosecution. *E.g., United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir. 1972) ("Proof of specific intent to violate the law is not necessary to uphold a conviction" for violating Section 32(a) of the Securities Exchange Act of 1934, even though it requires "willful" conduct); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("strongly disagree[ing]" that the defendant's state of mind or "subjective belief as to the legality of his action" was relevant, because "[k]nowledge means awareness of the underlying facts, not the labels that the law places on those facts"). After all, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe," particularly those with a "scienter requirement [which] mitigates a law's vagueness," especially because "the regulated enterprise may have the ability to clarify the meaning of the regulation [at issue] by its own inquiry, or by resort to an administrative process." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–500 (1982). A ruling that the Individual Defendants may depose Director Hinman because the SEC has charged them with scienter-based violations of the law would open the door to depositions of high-ranking government officials in almost all enforcement actions.

\* \* \* \*

For these reasons, Defendants cannot meet their burden of establishing that "exceptional circumstances" justify Director Hinman's deposition. Accordingly, the Court should quash the Subpoena. In the alternative, the Court should quash the Subpoena without prejudice until after Judge Torres's ruling on the SEC's motion to strike Ripple's fair notice defense (D.E. 128). If the Court grants the SEC's motion, Ripple's principal basis for seeking to depose Director Hinman would no longer exist. If the Court does not, its interpretation of the defense may nevertheless determine whether Director Hinman has any first-hand knowledge of facts sufficient to meet the "exceptional circumstances" test.

---

[3] Judge Torres has ordered a 120-day discovery period for the Individual Defendants' case to start after the Court's ruling on the Individual Defendants' motions to dismiss. (D.E. 48 ¶ 13(c).)

Respectfully submitted,

/s Ladan F. Stewart

Ladan F. Stewart

cc: All counsel (via ECF)