

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

August 17, 2021

**VIA ECF**
Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York

Re:   <u>SEC v. Ripple Labs, Inc.</u> et al., No. 20 Civ. 10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

The SEC respectfully opposes Defendants' motion (Dkt. 289, "Motion") to compel production of internal and inter-agency documents protected by the deliberative process privilege ("DPP"). The DPP is a critical governmental privilege "designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005). The Court should not override that privilege and punish frank governmental deliberations, particularly where the internal predecisional, deliberative material Defendants seek, which they never saw or knew about, is not relevant to any claim or defense.

Defendants have already sought and obtained an extraordinary amount of discovery from the SEC. Yet, Defendants now claim that privileged, non-public SEC communications about the regulation of digital assets (not just XRP), are somehow so relevant that the SEC's important deliberative privilege should be overridden. Meanwhile, Defendants have moved to strike on the record the most probative, relevant evidence they have obtained from their SEC discovery: former SEC Division of Corporation Finance Director William Hinman's deposition testimony that he met with Ripple representatives and told them that *he considered Ripple's sales of XRP to be sales of securities and that Ripple should stop its unregistered sales*. The theory behind Defendants' Motion appears to be that non-public and privileged comments by SEC employees that Defendants never saw, including about digital assets other than XRP, are relevant, but what Director Hinman told Ripple's representatives about XRP is not. The Court should not allow the SEC's privilege to be overridden on this illogical basis and should instead deny the Motion.

**I.      Procedural and Factual Background**

   **A.      Relevant Claims and Defenses**

The SEC alleges that each Defendant violated Section 5 of the Securities Act of 1933. Defendants do not dispute that Section 5 is a strict liability offense such that the SEC "need not prove scienter or negligence." *SEC v. Genovese*, 2021 U.S. Dist. LEXIS 58323, at *7 (S.D.N.Y. Mar. 26, 2021). Turning strict liability on its head, Ripple asserts a "fair notice" defense that paints Ripple's actions as irrelevant while seeking to focus the case first on the SEC's outward conduct and, now, on its internal deliberations. Ripple's "fair notice" defense, which the SEC has moved to strike (Dkt. 131, 205, 237), rests exclusively on a single decision, *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996). In the 25 years since the *Upton* decision, *no* district court has *ever* applied it to absolve an SEC defendant of liability. To probe Ripple's defense, the SEC sought the legal advice Ripple received about XRP's status as a security. (Dkt. 165). Ripple fought this effort, arguing *Upton* "turns on what an objective 'person of ordinary intelligence' would have understood" from the SEC's public actions. (Dkt. 174). The Court agreed, finding that *Upton* 1) focuses on the SEC's supposed lack of public notice "as to whether XRP qualified as a security" and 2) "is an objective test of how a reasonable person would

have interpreted the agency's conduct," not an inquiry into subjective state of mind. (Dkt. 210 at 7-8). The SEC's motion to strike Ripple's *Upton* defense is currently pending before Judge Torres.

The SEC also alleges that Defendants Garlinghouse and Larsen (the "Individual Defendants") aided and abetted Ripple's Section 5 violations. The Individual Defendants have moved to dismiss these charges. (Dkt. 106 at 14-16; Dkt. 111 at 10-11, 16-17 (claiming they subjectively believed XRP was a currency, not a security)). By contrast, the SEC contends the Individual Defendants' views as to the legal status of XRP under the securities laws are irrelevant to the aiding-and-abetting claims. *E.g.*, Dkt. 183 at 28-29 (citing *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980)). The motions to dismiss are pending before Judge Torres.

### B. Relevant Prior Discovery and Defendants' Motion

On March 15, 2021, citing their *Upton* and scienter defenses, Defendants moved to compel the SEC to produce internal and external documents relating not just to XRP, but also to Bitcoin and Ether, the two assets Defendants argue are "closely analogous to XRP." (Dkt. No. 67 at 1). On April 6, 2021, the Court denied the motion to compel internal SEC communications, concluding that "informal communications" had limited relevance to "how the market is considering XRP and… how it affects the [Individual Defendants'] reasonable belief." Ex. A (Apr. 6, 2021 Hr'g Tr.) at 52:14-25. The Court also recognized the "extensive privilege issues" surrounding internal communications and the "potential to seriously chill government deliberations" by their disclosure. *Id.* After further motion practice, the Court held that while the SEC had to produce non-privileged *external* communications as to Bitcoin, Ether, and XRP, "informal intra-agency communications, such as emails…need not be searched or logged." (Dkt. 163 at 6). The Court also ordered the SEC to search for internal "memoranda or formal position papers discussing Bitcoin, Ethereum, and XRP," and to log responsive material withheld for privilege. *Id.*

The SEC has not only followed the Court's Orders but exceeded them. Although the Court ruled the SEC did not have to search or produce internal SEC emails, the SEC did so anyway, in order to properly identify any *formal* papers encompassed by the Court's Order. In that process, the SEC identified and produced over 400 non-privileged internal communications and numerous non-privileged SEC communications with other government agencies, all of which provided Defendants additional information about the SEC's meetings with third parties. The SEC likewise produced detailed privilege logs of its withheld internal communications, including, in an abundance of caution, logs of internal *informal* communications identified in its search for "memoranda or formal position papers." (Dkt. 289 at Ex. E).[1] The SEC also prepared two detailed logs providing information regarding who participated in drafting Director Hinman's speech. (*Id.* at Ex. B & D). The Court later permitted Hinman's deposition, despite his former role as a high-ranking official.

During the deposition, the SEC permitted Defendants to question Director Hinman for well over the seven hours allotted under the Federal Rules. Defense counsel squandered hours of their deposition time on irrelevant subjects, such as Hinman's and former SEC Chairman Clayton's private practice clients, emails Hinman had never received, public information such as the existence or lack thereof of SEC regulations, the procedural history of this litigation, and the state of mind of third parties. *E.g.*, Ex. B (Hinman Dep. Tr.) at 37:19-42:10, 50:10-51:3, 60:19-63:10, 101:5-104:15,

---

[1] Defendants complain the SEC is withholding the 36 categories of communications identified in the July 21, 2021 Privilege Log. (Mot. at 2, citing Dkt. 289 Ex. C). But the parties previously agreed 1) the SEC could categorically log internal informal communications among the SEC attorneys investigating and now litigating this case, and, in exchange, 2) Defendants did not have to log their own investigation-related documents at all.

2

118:11-119:7, 159:2-163:16, 170:17-175:2, 198:15-20, 218:16-220:6, 254:18-261:19, 301:19-306:9, 308:8-22, 323:1-331:8, 340:10-343:10, 404:9-406:3.

Director Hinman's most relevant deposition testimony was his detailed description of the only meetings he had with any third party where he expressed a view as to the legal status of XRP. Specifically, Hinman testified that in meetings with Ripple attorneys, after the SEC's Enforcement Division's investigation was underway, Hinman told Ripple he considered its sales of XRP to be sales of securities and that Ripple needed to stop selling XRP on an unregistered basis in order to become compliant with the securities laws. *Id.* at 95:9-96:5, 371:8-376:11, 377:5-381:8, 406:4-411:10, 413:14-416:18. Defendants moved to strike this testimony from the record. *Id.* at 95:9-98:7.

Despite the extraordinary discovery they have already obtained (and that which they would prefer to strike from the record), Defendants now seek documents withheld as privileged under the DPP (among other privileges). Defendants—without explicitly saying so—also seek to drastically expand the scope of discovery beyond XRP, Bitcoin, and Ether to obtain internal SEC communications about *all* digital assets. (Dkt. 289 at 1, 2, 6).[2] Defendants argue the DPP protects neither the documents the Court already ruled need not to be searched, logged, or produced, nor inter-agency communications as to the regulation of all digital assets. Defendants also argue that, even if the DPP applies, the Court should override it. Both arguments are meritless.

## II. The DPP Protects the SEC's Internal and Interagency Communications.

The DPP is "designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *La Raza*, 411 F.3d at 356. This is because "those who expect public dissemination of their remarks may well temper candor…to the detriment of the decisionmaking process." *U.S. v. Nixon*, 418 U.S. 683, 705 (1974). The DPP likewise "protect[s] against premature disclosure of proposed policies before they have been finally formulated or adopted." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). The DPP relatedly "protect[s] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992) (quoting *Coastal States*, 617 F.2d at 866). Further, "[t]he law is clear that both inter-agency and intra-agency communications are entitled to [DPP] protection." *Allstate Ins. Co. v. Serio*, No. 97 Civ. 0620, 1998 WL 477961, at *3 (S.D.N.Y. Aug. 13, 1998); *see also U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 786 (2021) (DPP applies to proposals among many agencies).

### A. The Withheld Documents Are Predecisional and Deliberative.

To be protected by DPP, documents must be predecisional and deliberative. *Sierra Club*, 141 S. Ct. at 786. Predecisional documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency," *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 80 (2d Cir. 2002), and "advisory reports by individuals without authority to issue final agency dispositions." *A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 147 (2d Cir. 1994) (citations omitted). "[T]he existence of the privilege [does not] turn[ ] on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *NLRB v. Sears, Roebuck, & Co.*, 421 U.S. 132, 151-52 n.18

---

[2] Consistent with their expansive Motion, Defendants recently served the SEC with a request for internal SEC documents reflecting its views as to the regulation of *all* digital assets. Defendants' current efforts to suddenly expand the scope of discovery run contrary to their prior arguments that XRP is most like Bitcoin and Ether and that this is unlike any other digital asset case the SEC has brought. *E.g.*, Dkt. 67 at 1.

3

(1975). Rather, agencies are expected to "engage[] in a continuing process of examining their policies;…the lower courts should be wary of interfering with this process." *Id.*

The SEC has withheld predecisional, deliberative documents. For example, the 63 documents in Defendants' Exhibits B and D are predecisional drafts of Hinman's speech. *SEC v. Nacchio*, 2009 WL 211511, at *9 (D. Colo. Jan. 29, 2009) (speech drafts fall "squarely within the [DPP]"). Similarly, the 13 internal documents in Defendants' Exhibit A and the 65 internal documents in Defendants' Exhibit F contain communications about pending decisions, such as the legal status of offers and sales of Bitcoin and XRP. *See* Ex. C, Decl. of Mark Tallarico ("Tallarico Decl.") at ¶¶ 4-5. These materials are thus predecisional and precisely the types of documents "that do not reflect agency policy or interpretations of the agency." *Pies v. I.R.S.*, 668 F.2d 1350, 1353 (D.C. Cir. 1981). *See* Ex. E, Decl. of Vanessa Countryman ("Countryman Decl.') at ¶ 3.[3]

Defendants argue the SEC has made *de facto* final decisions about the regulatory status of Bitcoin and Ether. But in *Sierra Club*, the Supreme Court rejected the contention that the decision to abandon a potential regulatory route amounted to a *de facto* final decision. 141 S. Ct. at 786. In addition, Defendants point to no case that indicates that, even if such a decision had been made, deliberations pre-dating the decision or following and examining that decision would not be privileged. Here, most of the documents at issue date to *before* the dates Defendants claim these final decisions were made, and "[a] draft is still a draft and thus still pre-decisional and deliberative." *Color of Change v. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 454 (S.D.N.Y. 2018) (quoting *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014)). "A privilege contingent on later events—such as whether the draft ultimately evolved into a final agency position—would be an uncertain privilege [and] little better than no privilege at all." *Id.* Moreover, any decision by SEC *staff* regarding whether Bitcoin and Ether appeared to be securities at a certain time (decisions the *SEC itself* has never made) in no way suggests SEC staff discontinued deliberations as to other issues relating to those and other digital assets, including whether their treatment by promoters at future times subjects such transactions to the securities laws. To list but one example, SEC staff were deliberating other digital asset guidance (eventually issued in 2019) before, during, and after the Hinman speech and were, of course, deliberating as to this enforcement action. *See generally* Dkt. 289 Ex. G at 3.[4]

### B.   There Is No Justification to Override the DPP.

The DPP may only be overcome by a sufficient showing that disclosure outweighs the interests in nondisclosure. *Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 109 (S.D.N.Y. 2005). Courts must consider: 1) the relevance of the evidence sought; 2) the availability of other evidence; 3) the seriousness of the litigation and the issues involved; 4) the government's role in the litigation; and 5) the possibility of future timidity by government employees. *Id.* These factors, particularly the first and fifth, weigh strongly in favor of nondisclosure.

---

[3] In the document review process in connection with this motion, the SEC determined to no longer assert DPP over parts or all of approximately 40 previously withheld documents. *See* Tallarico Decl. ¶ 3. Most of these documents are protected from disclosure by the attorney-client privilege and work product protection. The SEC will produce 11 of these documents to Defendants, ten with partial DPP redactions and one in its entirety, as well as amended logs reflecting these and other changes, including removing a number of duplicate entries from the privilege logs.

[4] Defendants complain this assertion of DPP is all encompassing, but it is not. If a final decision had been made about the status of a digital asset's sales at a particular time, the DPP would not protect later communications *about the status of that asset at that time*. The DPP continues to protect future conversations about future iterations of the asset.

### 1.     Internal and Inter-Agency SEC Communications Are Irrelevant to the "Fair Notice" Defense.

The "fair notice" defense pled by Ripple looks to the objective understanding of third-party market participants—not the SEC's internal or inter-agency deliberations.  Ripple's Answer claims the requisite objectivity is informed by the views of various exchanges, market makers, Ripple's customers, and "other *reasonable* observers." (Dkt. 51, at 97-98) (emphasis added).  However, despite receiving extensive legal advice warning that XRP sales could be securities transactions, Ripple conveniently claims its own beliefs are irrelevant.  To support its defense, Ripple cites specific instances of the SEC's *outward* conduct vis-à-vis third-party market participants.  (*Id.* at 97).  First, Ripple alleges that many market participants engaged in XRP transactions without being sued by the SEC. (*Id.*).  Next, Ripple references Director Hinman's June 2018 speech, in which he stated his belief that Bitcoin and Ether were not currently offered as securities *but in which he did not mention XRP*. (*Id.* at 98).  Finally, Ripple alleges that in meetings with certain market participants (but not Ripple), the SEC staff declined to opine whether the SEC considered XRP a security. (*Id.*).  None of Ripple's allegations supporting its defense involve internal or inter-agency SEC communications.

This Court recognized that *Upton* hinges on the SEC's external conduct, as opposed to its internal or inter-agency deliberations.  (Dkt. 210, at 7).  *Upton* reviewed an SEC administrative proceeding, where the SEC was both interpreting and enforcing one of its rules, the Customer Protection Rule. 75 F.3d at 93.  The court held that Upton could not be sanctioned because he had not received adequate notice that the SEC considered the conduct at issue to violate that rule.  *Id.* at 97-98.  The defense advanced in *Upton* made no reference to the SEC's internal deliberations, and the court did not address them in its decision.  Rather, *Upton* looked solely to external notice and guidance the SEC provided to Upton and other market participants.[5]  The court concluded that apart from issuing one consent order carrying "little, if any, precedential weight[,]…the [SEC] took no steps to *advise the public* that it believed the practice was questionable until August 23, 1989, after Upton had already stopped the practice.  The [SEC] may not sanction Upton pursuant to a *substantial change* in its enforcement policy that was not reasonably *communicated to the public*."  *Id.* at 98 (emphasis added).

Ripple also cannot cite a single case holding that *Upton* allows discovery into internal or inter-agency SEC communications.  On the other hand, Judge Hellerstein expressly prohibited such discovery in another Section 5 case involving a digital asset.  *SEC v. Kik Interactive, Inc.*, No. 19 Civ. 5244 (AKH) (S.D.N.Y. Nov. 12, 2019) (Dkt. 36) ("Proper discovery should be focused on what defendant did, and not why the [SEC] decided to bring the case").  Other courts have likewise refused to allow internal SEC discovery to support similar defenses that seek to put the conduct of the SEC at issue. *See, e.g.*, *SEC v. KPMG LLP*, 2003 U.S. Dist. LEXIS 14301, at *10 (S.D.N.Y. Aug. 20, 2003) (prohibiting discovery into "the internal workings of the SEC investigations"); *SEC v. Am. Growth Funding II, LLC*, 2016 U.S. Dist. LEXIS 180745, at *18-20 (S.D.N.Y. Dec. 30, 2016) (same).[6]

---

[5] Specifically, *Upton* referenced the SEC's external interactions including: (a) the SEC issuing a single non-precedential consent order involving similar conduct; (b) a SEC examiner advising Upton that his firm's conduct violated the spirit, but not the letter, of the rule; (c) the NYSE notifying the SEC that it would not sanction member firms until the SEC issued interpretive guidance; (d) a broker requesting the SEC to issue formal public guidance; and (e) the SEC issuing interpretative guidance only after Upton's firm had stopped the conduct at issue.  *Upton*, 75 F.3d at 96-97.

[6] The internal communications as to *all* digital assets (not just XRP or even Bitcoin and Ether) Defendants now demand are even less relevant under *Upton*.  *Upton* involved the application of a particular rule to Upton's particular conduct and not to that of other parties who were engaging in their own behavior in the same industry.

5

### 2. Internal and Inter-Agency Communications Are Irrelevant to the Aiding-and-Abetting Claims.

Unable to cite any decision, the Individual Defendants argue the SEC put *its own* state of mind at issue by bringing an action for aiding and abetting. They claim the SEC was confused, such that they could not understand XRP's legal status. Even accepting *arguendo* this proposed scienter standard, the SEC's internal and inter-agency communications while the staff was investigating, *of which the Individual Defendants were admittedly unaware*, could not affect their own knowledge or beliefs. Rather, the SEC's *outward-facing* actions are the relevant inquiry for charges where a defendant's state of mind is at issue. *U.S. v. Zaslavskiy*, 2018 U.S. Dist. LEXIS 156574, at *24-30 (E.D.N.Y. Sept. 11, 2018).[7] Indeed, the Individual Defendants' argument faces at least four insurmountable hurdles.

*First*, Defendants cannot point to the relevance of internal and non-public debate within an agency, particularly prior to the filing of an enforcement action, while the staff is gathering the facts, deliberating in an iterative fashion on an incomplete record, and engaging in constructive debate. Nor can Defendants explain how such nonpublic internal deliberations based on incomplete facts, of which outsiders are wholly unaware, could possibly confuse a defendant, particularly two defendants that, the record shows, engaged in well-funded lobbying and media campaigns seeking to influence the legal status of XRP under the securities laws. Defendants do not cite any case holding as much. The case they do cite, *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 n.20 (2007), focuses on objective interpretations of law, not an agency's internal deliberations. Conversely, courts hold that the SEC should not be punished for conducting a deliberative investigation as it contemplates charges. *See, e.g.*, *Graham v. SEC*, 222 F.3d 994, 1007-08 (D.C. Cir. 2000) (rejecting defense that SEC staff initially determined that "no conclusion could be reached as to whether any violative activities have occurred," because "the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it finally accumulated sufficient evidence to do so").

*Second*, the argument that the SEC put its own state of mind at issue by bringing an aiding-and-abetting claim implies that Congress weakened the SEC's enforcement capabilities when it expanded the SEC's authority to bring aiding-and-abetting claims in the Dodd-Frank Act of 2010 (the "Act"). In fact, the Act was intended to *strengthen* SEC enforcement authority. That Act lowered the scienter requirement for SEC aiding-and-abetting claims from knowledge to recklessness. *See generally SEC v. Wey*, 246 F. Supp. 3d 894, 926 (S.D.N.Y. 2017). Under the Individual Defendants' theory, Dodd-Frank's aiding-and-abetting provision means the SEC waives its DPP any time it brings an aiding-and-abetting claim, a surprising result that no court has read into the Act in the ten years since its passage. If this Court holds that the SEC puts its own state of mind at issue whenever it asserts aiding-and-abetting claims and thereby permits Defendants to pierce the SEC's DPP, the SEC may lose this privilege in countless pending and future cases with aiding-and-abetting claims.

*Third*, there is a threshold question as to whether the Individual Defendants are even permitted to raise a defense based on their subjective beliefs as to the legality of their conduct. This is because Ripple refuses to turn over privileged documents necessary to probe that defense (Dkt. No. 174 at 3

---

[7] Zaslavskiy was criminally charged for securities fraud for an investment scheme involving "cryptocurrencies." Similar to the Individual Defendants (and Ripple), Zaslavskiy claimed he could not be liable because he lacked reasonable notice the securities laws applied to digital assets. *Id.* at *24. The court rejected that argument. Consistent with *Upton*, the relevant inquiry is whether the government's *external* conduct—the securities laws cases filed, judicial decisions applying *Howey*, and the SEC's public guidance—provided sufficient notice. *Id.* at *27. Notably, *Zaslavskiy* was a criminal case, where the *mens rea* requirement and burden of proof were more stringent than for the civil charges here. *Zaslavskiy*'s holding, that the government's external-facing conduct is the proper inquiry when assessing alleged confusion over the securities' laws application to digital assets, should apply with even greater force to this civil case.

n.2), and the Individual Defendants argue it is premature to decide what evidence is needed to probe their states of mind. Ex. D (Tr. of May 21 Hr'g.) at 44. *See also, e.g.*, *United States v. Wells Fargo, Inc.*, 132 F. Supp. 3d 558, 566 (S.D.N.Y. 2015) (precluding employee from asserting good faith belief as to knowledge of law where employer would not waive privilege).

*Fourth*, the Individual Defendants' argument requires the Court to resolve the dispute, pending in the motions to dismiss, as to the proper scienter standard applicable to the aiding-and-abetting claims. Should the SEC prevail on that dispute, the Individual Defendants' understanding as to the legal status of XRP would be irrelevant and, by definition, the SEC's internal views and inter-agency communications would carry even less relevance. And, because the Individual Defendants will be entitled to an additional four months of discovery should Judge Torres deny their motions to dismiss, they will suffer no prejudice if this Court declines to compel the SEC to produce its internal communications at this time, a bell that could not be later un-rung. Should Judge Torres grant the motions to dismiss, the Individual Defendants' scienter would no longer be at issue.

### 3. The Remaining Factors Do Not Support Overriding the DPP.

**Future Timidity and Chilling Effect on Government Deliberations:** The risk of future timidity by government employees is often the most critical factor in the DPP analysis. *See Citizens Union of New York v. Attorney General of New York*, 269 F. Supp. 3d 124, 166-69 (S.D.N.Y. 2017). Here, allowing Defendants to access predecisional, deliberative materials would chill SEC and other government agencies. Tallarico Decl. ¶ 9, Countryman Decl. ¶ 4. This would be a devastating outcome that would result in government employees declining to offer dissent or contradictory viewpoints, since those expressions could later be used against the government by defendants in government enforcement actions. If conflicting internal SEC and interagency viewpoints could negate securities laws violations, defendants in every SEC action would seek predecisional discovery materials, with the hope of finding a dissenting commissioner or staff member, in order to advance claims of SEC "confusion" and to cast such "confusion" as "exculpatory," as Defendants attempt to do here. This result would eviscerate the purpose of the DPP: an effective government that deliberates candidly before undertaking important decisions. Indeed, "it would be impossible to have any frank discussion of legal or policy matters in writing if all such writings were to be subjected to public scrutiny." *Citizens Union*, 269 F. Supp. 3d at 170 (internal quotations omitted).

**Otherwise Available Evidence:** Because the SEC's internal and interagency communications are irrelevant to the proposed defenses, Defendants have no need to obtain such evidence. Further, Defendants have received information about SEC communications with other market participants and third parties. This includes Director Hinman's deposition testimony about his meetings with Ripple attorneys, in which he told Ripple he considered XRP to be a security and that Ripple needed to stop selling XRP on an unregistered basis. Ripple and its own lawyers have evidence showing how market participants (and, of course, Ripple) interpreted Hinman's speech, having engaged in a coordinated, well-funded media campaign in response, and having stated those views to the SEC. Moreover, having had hours to question Hinman and having wasted much of it on irrelevant facts, Defendants' complaints that they cannot obtain evidence of supposed objective market confusion elsewhere ring hollow. Therefore, this factor favors nondisclosure.[8]

**Seriousness of the Litigation:** The SEC acknowledges this is an important case. Yet this is precisely why the release of privileged agency deliberative communications would harm the public

---

[8] As to Defendants' request for the SEC's privileged notes of meetings with third parties, *see* Mot. App'x A at Row 1, information about those meetings is available to Defendants by subpoenaing the third parties, and Defendants have in fact subpoenaed such parties and continue to do so as fact discovery comes to a close.

interest rather than further it. "In all but exceptional cases it is considered *against* the public interest to compel [the] government to produce inter-agency advisory opinions." *MBTE Products Liability Litig.*, 898 F. Supp. 2d 603, 607 (S.D.N.Y. 2012) (emphasis added) (citation omitted). This is because the release of predecisional documents risks "confusing the issues and misleading the public by…suggesting reasons and rationales" that were not officially adopted by the agency. *Ingles v. City of New York*, No. 01 Civ. 8279, 2004 WL 2274653, at *1 (S.D.N.Y. Oct. 8, 2004) (citation omitted). Given the evolving nature of the digital asset market, the compelled release of draft opinions and recommendations would discourage meaningful deliberation in a field for which regulation, as the Court has noted, carries significant consequences for the markets. This factor likewise favors nondisclosure.

**Role of Government in the Litigation:** This factor favors disclosure when the government plays a "role in the allegedly unlawful conduct" at issue in the case. *Noel v. City of New York*, 357 F. Supp. 3d 298, 304 (S.D.N.Y. 2019). Because it is undisputed the SEC played no role in Defendants' offers and sales of XRP at issue here, this factor, too, favors nondisclosure.

### C. The SEC Has Appropriately Withheld Factual Material, Making *in Camera* Review Unnecessary.

Defendants argue the SEC has made no effort to segregate and disclose non-privileged factual material. But, when factual material is intertwined with deliberative policy discussions such that disclosure of factual portions would reveal the protected deliberations, the DPP applies to the entire document. *Color of Change*, 325 F. Supp. 3d at 455. Factual material may also be withheld where it would reveal the editorial judgment or impressions of the author. *See Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004) (notes taken by SEC officials in meetings, even though factual, were subject to the DPP because they "distill[ed] discussions reflecting the impressions of SEC officials"). To the extent the SEC has withheld factual material here, it has appropriately determined that the material is inextricably intertwined with protected deliberations. Tallarico Decl. at ¶ 6. Also, the Court denied Defendants' motion to compel production of internal SEC communications and ordered the SEC to search for and produce (subject to privilege) final memoranda and position papers and external communications. The SEC's logs demonstrate that the SEC has done so, rendering *in camera* review unnecessary.

### D. The SEC Appropriately Asserted the Attorney-Client Privilege and Work Product Doctrine.

While Defendants assert the withheld documents relate to "policy decisions" as opposed to legal advice, the logs reflect that SEC attorneys advised their client, the SEC, on legal concepts for the purpose of enforcing the securities laws. The communications were made in confidence to assist the SEC in fulfilling its law enforcement role. "[I]f anything, the traditional rationale for the privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law…be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest." *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005). And given the SEC's statutory mandate to investigate potential violations and bring enforcement actions, the documents protected by the work product doctrine were "prepared in anticipation of litigation." *See U.S. v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) ("[t]here is no rule that bars application of work-product protection to documents created prior to the event giving rise to litigation") (internal quotations omitted).

Respectfully submitted,

Jorge G. Tenreiro

cc: Counsel for All Defendants (*via* ECF)