

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Brookfield Place, 200 Vesey Street, Suite 400
New York, NY 10281-1022

NEW YORK
REGIONAL OFFICE

September 14, 2021

**VIA ECF**
Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York

Re:  *SEC v. Ripple Labs, Inc. et al.*, No. 20-cv-10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

The SEC respectfully submits that all documents referenced in Appendix A of Defendants'
motion to compel (Dkt. 289, "Motion") are predecisional and deliberative and therefore protected
by the deliberative process privilege ("DPP").  Many are also protected by the attorney-client
privilege and the work product doctrine.  The compelled release of the SEC's predecisional
deliberations relating to digital assets would discourage meaningful deliberation among SEC officials
and staff relating to investigations, potential cases, and other regulatory activities taken or under
consideration in a field where regulation carries significant consequences for the financial markets.

Additionally, the documents are irrelevant to Defendants' proposed defenses—even under
Defendants' relevance theory.  Defendants seek the documents to put on a (wholly improper)
defense that "the SEC staff…questioned whether XRP and other digital assets were securities" and
therefore that Defendants are not liable.  Motion at 4.  But none of the documents on Appendix A,
except for Entry 2, address whether transactions in XRP are securities.  The Court should not pierce
the SEC's DPP and other privileges, particularly when the documents are irrelevant to Defendants'
proffered defense.  As for Entry 2, it is an internal SEC staff email and memorandum, protected by
all three applicable privileges and drafted in connection with the SEC's then-pending investigation
into XRP, which culminated in the filing of this action.  Far from supporting Defendants' proffered
defense, it provides ████████████████████████████████████
████████████████████████████████████████.  Entry 2

at 6 ███████████████████████████████████████████████████████

████████████████████████████████████████. Piercing the government's privilege as a

litigant over materials prepared in advance of litigation would be extraordinary and inappropriate.

## I.  Procedural History and Factual Background

After extensive motion practice, on May 6, 2021 (clarifying its April 6, 2021 Order), this

Court ordered the SEC to produce non-privileged *external* communications about Bitcoin, Ether,

and XRP; however, the Court recognized that "informal intra-agency communications, such as

emails…need not be searched or logged." Dkt. 163 at 6.  The Court also ordered the SEC to search

for internal "memoranda or formal position papers discussing Bitcoin, Ethereum, and XRP," and to

log responsive material withheld for privilege.  *Id.*  The SEC complied by searching the required

materials and producing privilege logs.  Dkt. 289-1–289-5; Dkt. 299 at 2–3 & 299-2–299-4.

On August 10, 2021, Defendants filed a motion to compel production of documents

protected by the DPP.  Dkt. 289.  The Motion included an "Appendix A" purporting to be "a

subset of sample documents that appear most likely to include the most probative evidence in this

case."  *Id.* at 11.  On August 31, 2021, the Court ordered the SEC to produce, *in camera*, the

documents listed in Appendix A. Ex. A (Aug. 31, 2021 Hearing Tr.) at 35–36.  Appendix A contains

13 entries at issue.[1]  Nine entries are internal SEC documents (Entries 1, 2, 6, 8–9, 11–14), and four

entries are SEC communications with other law enforcement agencies (Entries 3–5, 10).

With respect to the internal SEC documents, the SEC included in its privilege logs

"memoranda or formal position papers discussing Bitcoin, Ethereum, and XRP," pursuant to the

Court's order.  *See, e.g.*, Dkt. 299-2 (reflecting memoranda to the Commission from its Division of

---

[1] SEC counsel has since produced one document on Appendix A, Entry 7, to Defendants and is therefore not submitting it for *in camera* review.  Entry 7 is an email from a foreign securities regulator to the SEC and had been withheld pursuant to 15 U.S.C. § 78x(d), which exempts the SEC from disclosing confidential information obtained from foreign securities regulators.  Dkt. 299-4 at 6.  The foreign regulator later consented to the disclosure of this document, and the SEC therefore produced it to Defendants.

Enforcement ("Enforcement"), whose staff conducts investigations into possible violations of the federal securities laws and prosecutes suits brought by the Commission). But the majority of the intra-agency documents logged by the SEC constitute internal SEC communications, notes, and drafts that are not responsive to this Court's orders: they are the very "intra-agency communications" that "need not be searched or logged" because they are not "intra-agency memoranda or formal position papers." Dkt. 163. The SEC logged these documents in a good-faith effort to avoid further litigation on certain categories of documents, such as SEC officials' notes of external meetings or drafts of Director Bill Hinman's June 2018 speech (the "Hinman Speech"), but, as the SEC has consistently argued, these are not responsive to the Court's orders. Indeed, *only one* of the intra-agency documents in Appendix A (Entry 2) is an internal memorandum or formal position paper that the SEC was required to produce or log pursuant to the Court's orders, and that document is clearly attorney work product, as well as protected by the attorney-client privilege and the DPP.

II.     **The DPP, the Attorney-Client Privilege, and the Work Product Doctrine Protect the Documents in Appendix A**

     A. **Appendix Entry 1 (Handwritten Notes of SEC Officials): Protected by DPP and Certain Notes Protected as Attorney Work Product**

Entry 1 of Appendix A refers to 17 sets of handwritten notes of meetings without specifically listing the documents as separate entries. The SEC is therefore providing these handwritten notes to the Court as Parts A through Q of Entry 1.[2] The handwritten notes were taken by three SEC officials:

- SEC official Valerie Szczepanik, an attorney, wrote the notes discussed in Parts A–G, K–N, and P of Entry 1. Until 2018, Ms. Szczepanik was an Assistant Director in the Division of Enforcement and the head of its Distributed Ledger Technology Working Group. She supervised, among other matters, investigations involving digital assets and, during the relevant time, worked in Enforcement's Cyber Unit until she left Enforcement in June 2018,

---

[2] We have included as **Attachment 1** to this brief a summary chart listing each of the entries in Appendix A as well as a summary of the privilege basis for each document.

at which time she became an Associate Director in the Division of Corporation Finance ("Corporation Finance") and the Senior Advisor for Digital Assets and Innovation.  Since June 2020, Ms. Szczepanik has led the Strategic Hub for Innovation and Financial Technology (FinHub) Office, reporting to the SEC Chair.

- SEC official Michael Seaman wrote the notes discussed in Parts H, I, and O.  Mr. Seaman is an attorney and Special Senior Counsel in Corporation Finance.  That division seeks to ensure that investors receive the material information necessary to make investment decisions, including with regard to offers and sales of securities, and provides assistance and advice to Enforcement in its recommendations to the Commissioners.

- SEC official Richard Gabbert wrote the notes discussed in Part Q.  Mr. Gabbert is an attorney and Counsel to SEC Commissioner Hester Peirce.

Each set of handwritten notes reflects the matters discussed in the meetings that the official authoring the notes believed were significant and could merit further consideration, as well as the official's predecisional considerations in analyzing the legal and policy issues raised at the meetings—not a verbatim transcript of the meetings.  Moreover, each set of notes is predecisional because each concerns matters for which the SEC had not issued any official policy or decision at the time the notes were taken.  *See Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76–77 (2d Cir. 2002).

In addition, most of those notes are protected by the attorney work product doctrine.  When she wrote her notes, Ms. Szczepanik, an attorney, either led Enforcement's Distributed Ledger Technology Working Group and was responsible for investigating potential securities violations involving digital assets for the purpose of deciding whether to recommend that the SEC initiate enforcement actions, or served as a senior officer in Corporation Finance.  Portions of her notes reflect information-gathering for open and potential enforcement investigations.  As the SEC conducts its investigations with an eye toward litigation, portions of the notes were generated in anticipation of litigation and are protected under the attorney work product doctrine.  Similarly, Mr. Seaman serves as an attorney with Corporation Finance, which routinely advises on Enforcement investigations.  We provide below a description of each set of handwritten notes, along with an explanation for why the document is protected by the DPP and/or the work product doctrine.

- **Part A** reflects Ms. Szczepanik's handwritten notes from a 2014 meeting with then-SEC Commissioner Gallagher, Professor Joseph Grundfest, and others to discuss Bitcoin.[3]

  o <u>DPP</u>: The notes are predecisional and deliberative. The notes record the information that Ms. Szczepanik deemed relevant to ongoing deliberations on whether and how to regulate activities involving Bitcoin, including whether offers and sales of Bitcoin would require registration with the SEC.

- **Part B** reflects Ms. Szczepanik's handwritten notes from a 2014 meeting with staff from the Financial Industry Regulatory Authority ("FINRA")—the largest self-regulatory organization in the U.S. securities industry and which is overseen by the SEC—about an open Enforcement investigation of a digital asset market participant for which the Commission had not taken final action,[4] and the regulatory status of various market participants.

  o <u>Work Product</u>: Portions of these notes are protected attorney work product, as they reflect Ms. Szczepanik's investigative work gathering information from FINRA for open Enforcement investigations.

  o <u>DPP</u>: The notes are also predecisional and deliberative because the discussions between the SEC staff and FINRA staff relate to actions the SEC staff was considering taking. In addition, the notes reflect the information Ms. Szczepanik deemed relevant to the SEC staff's ongoing deliberations about its regulatory oversight of transactions involving digital assets, including the regulatory status of various broker-dealers that dealt in digital assets.

  Moreover, with respect to these and other documents involving inter-agency communications, no waiver occurs when the SEC shares privileged material and work product with other agencies. *See* 15 U.S.C. § 78x(f) ("The Commission shall not be deemed to have waived any privilege applicable to any information by transferring that information to or permitting that information to be used by (A) any agency. . . [or] (C) any self-regulatory organization. . . ."). This statutory requirement is intended to encourage frank discussions among government agencies, and disclosure of such communications in this type of high-profile setting would undercut such coordination efforts.

- **Parts C and D**[5] reflect Ms. Szczepanik's handwritten notes from two meetings in June 2017 with representatives of a digital asset advocacy group. Information learned by the staff from these meetings was used in connection with open Enforcement investigations and to analyze whether to open new investigations relating to various digital assets.

  o <u>Work Product</u>: These notes are protected attorney work product, as they reflect Ms. Szczepanik's work in connection with Enforcement investigations.

  o <u>DPP</u>: The notes are predecisional and deliberative. The notes reflect the information Ms. Szczepanik deemed relevant to ███████████████████████████████████████ ███████████████████████████████████████████████████████████████

---

[3] Professor Grundfest is a retained consultant for Ripple and represented Ripple's interests in a number of meetings with SEC staff and Commissioners as late as 2020. Given Prof. Grundfest's relationship with Ripple, Ripple should be able to obtain information about what occurred at this meeting from him, obviating the need for any SEC attorney notes.

[4] Only the Commission, as opposed to Enforcement, can authorize an enforcement action.

[5] The SEC mistakenly did not include on its privilege log the work product doctrine as a basis to withhold Entries D and M but for the reasons detailed herein, the SEC believes both documents are protected attorney work product.

█████████████████████████████████████████████████████ as well as information deemed relevant to opening later Enforcement investigations. ███████████████████████

- **Part E** reflects: (a) Ms. Szczepanik's handwritten notes from a December 2017 meeting with Joe Lubin of Consensys (one of the co-founders of Ethereum) in which she gathered information to inform deliberations on whether ████████████████████████████ ███████████████; and (b) a March 2018 call with representatives of Consensys in which she gathered information on a separate digital asset.

  o <u>Work Product</u>: The notes of the December 2017 meeting are protected attorney work product, as they reflect Ms. Szczepanik's work gathering information about ███████████ ██████████████████████████████████████████████████████████

  o <u>DPP</u>: Both sets of notes are predecisional and deliberative. The notes reflect the information Ms. Szczepanik deemed relevant to determining whether ████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████

- **Parts F and H** reflect, respectively, Ms. Szczepanik's and Mr. Seaman's handwritten notes from an April 2018 call with then-MIT Professor Christian Catalini and other SEC staff in which SEC staff gathered information to inform its deliberations on whether ██████████████████ ████████████████████████

  o <u>Work Product</u>: Ms. Szczepanik's notes (Part F) are protected attorney work product, as they reflect Ms. Szczepanik's work gathering information about ████████████████ ██████████████████████████████████████████

  o <u>DPP</u>: Both sets of notes (Parts F and H) are predecisional and deliberative. The notes reflect the information SEC staff deemed relevant to its deliberations on whether █████████ █████████████████████████████████████████████████████████████

- **Part G** reflects Ms. Szczepanik's handwritten notes from an April 10, 2018 discussion with staff from another U.S. financial regulatory agency, the Commodities Futures Trading Commission ("CFTC"), as part of the SEC's efforts to gather information to inform its deliberations on whether ██████████████████████████████████████████████████ ████████████████ as well as the registration status of certain market participants and potential regulatory approaches which informed open Enforcement investigations.

  o <u>Work Product</u>: These notes are protected attorney work product, as they reflect Ms. Szczepanik's discussions with CFTC staff about open Enforcement investigations. The notes also reflect Ms. Szczepanik's work gathering information about ███████████████ ██████████████████████████████████████████████████

    o  <u>DPP</u>:  The notes are also predecisional and deliberative because SEC and CFTC staff were addressing whether ████████████████████████.  In addition, the notes reflect the information Ms. Szczepanik deemed relevant to further SEC staff's deliberations on whether and how ████████████████████████ ███████████████████████.

- **Parts I and J** reflect Mr. Seaman's handwritten notes from two meetings with representatives of Consensys and SEC staff on April 23, 2018 and June 8, 2018, in which SEC staff gathered information on whether ████████████████████████ ██████.

    o  <u>DPP</u>:  The notes are predecisional and deliberative.  The notes reflect the information Mr. Seaman believed was relevant to whether ████████████████████ ████████████████████████████████████ ███████████████.

- **Part K** reflects Ms. Szczepanik's handwritten notes from a 2016 meeting with Mr. Lubin to discuss Ethereum and certain digital assets.

    o  <u>Work Product</u>:  These notes are protected attorney work product, as they reflect Ms. Szczepanik's investigative work gathering information in connection with Enforcement's open investigation of ██████████.

    o  <u>DPP</u>:  The notes are also predecisional and deliberative, as they reflect information that Ms. Szczepanik deemed relevant to the Enforcement investigation that ████████████ ████████████████████████████████.

- **Parts L and M** reflect Ms. Szczepanik's handwritten notes from two meetings in July and August 2018 with CFTC staff.  Part L reflects discussions about a number of open Enforcement investigations, and Part M reflects discussions about ██████████████████████.

    o  <u>Work Product</u>:  These notes are protected attorney work product, as they reflect Ms. Szczepanik's investigative work gathering facts in connection with Enforcement's open investigations, including its then-open investigation of █████.  While at the time of these meetings, Ms. Szczepanik had transitioned from Enforcement to a new role in Corporation Finance, she continued to work closely with and advise Enforcement staff on various investigations, including ████████████████.

    o  <u>DPP</u>:  The notes are also predecisional and deliberative because SEC and CFTC staff were addressing issues related to open Enforcement investigations on which Ms. Szczepanik was advising Enforcement staff and on which no final action had been taken, ████████ ████████████████████████████████.  In addition, the notes reflect the information Ms. Szczepanik deemed relevant to further SEC staff's deliberations on open Enforcement investigations.

- **Part N** reflects Ms. Szczepanik's handwritten notes from an August 2018 meeting with a representatives of CME, a derivatives market, to discuss XRP.

o <u>Work Product</u>: These notes are protected attorney work product, as they reflect information Ms. Szczepanik gathered relating to Enforcement's open investigation of ███.

o <u>DPP</u>: The notes are also predecisional and deliberative. They reflect information that Ms. Szczepanik deemed relevant to Enforcement's investigation of ███, on which she was advising Enforcement staff and on which the Commission had not yet taken action.

- **Part O** reflects Mr. Seaman's handwritten notes from a September 2018 meeting with Ripple representatives—including Defendant Bradley Garlinghouse and Ripple's present counsel, Andrew Ceresney—regarding the SEC staff's investigation of Ripple.

  o <u>Work Product</u>: These notes are protected attorney work product. The purpose of the meeting was for SEC staff, including staff from Enforcement and Corporation Finance, to gather information for the ongoing Ripple investigation. Given Defendants' attendance at this meeting, Defendants can show no need for the SEC's protected notes.

  o <u>DPP</u>: The notes are also predecisional and deliberative. They reflect information that Mr. Seaman deemed relevant to the open investigation of Ripple, on which he was advising Enforcement staff and on which no final Commission action had been taken.

- **Part P** reflects Ms. Szczepanik's handwritten notes from a November 2018 meeting with staff for a U.S. Senator discussing the SEC's approach to regulating digital assets.[6]

  o <u>DPP</u>: The notes are predecisional and deliberative. They reflect discussions the SEC staff considered in deliberating regulatory approaches to digital assets.

- **Part Q** reflects Mr. Gabbert's handwritten notes during an August 2019 meeting between SEC Commissioner Peirce and SBI Holdings, Inc. ("SBI")—a Ripple shareholder—that included a discussion of the regulatory status of digital assets, including XRP.[7]

  o <u>DPP</u>: The notes are predecisional and deliberative. The notes reflect the information Mr. Gabbert deemed relevant to formulating a position as to whether ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.

These documents fall squarely within the DPP, which protects handwritten notes taken by government officials during meetings, including meetings with outside entities. For example, in *New York Public Interest Research Grp. v. EPA*, an EPA official's notes from an external meeting were protected by the DPP because they reflected the official's "priorities and interest in particular topics or statements" made during the meeting. 249 F. Supp. 2d 327, 338 (S.D.N.Y. 2003). Disclosure of such handwritten notes would "discourage candid discussion" and "thereby undermine[ ] the

---

[6] The SEC understands that the Individual Defendants have both made political contributions to that Senator. *See* https://www.opensecrets.org/donor-lookup/results?employ=ripple&order=desc&sort=A

[7] Given its close business relationship to SBI, Ripple is in a position to gather information from SBI about what occurred at this meeting, thus obviating the need to obtain the notes of Commissioner Peirce's counsel.

agency's ability to perform its functions.'" *Id.* (quotations omitted).  Similarly, in *Philips v. U.S. Immigration and Customs Enforcement*, the court recognized that "handwritten notes…are both pre-decisional and deliberative" where they predate an official agency decision and are prepared to assist the agency's decision makers.  385 F. Supp. 2d 296, 303 (S.D.N.Y. 2005).  The court further recognized that the factual material contained in notes is protected by the DPP where the facts are a "selective recording of information particularly pertinent to" the note taker.  *Id.*[8]  The handwritten notes at issue here were selective recordings taken by SEC attorneys for the purpose of analyzing pending legal and policy issues.  Therefore, Entry 1 in its entirety is protected by the DPP.

Eleven of the 17 sets of handwritten notes in Entry 1—Parts B–G and K–O—are also protected by the attorney work product doctrine, which "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975).  As the SEC conducts its investigations with an eye toward litigation, notes prepared by SEC attorneys as part of an Enforcement investigation are "prepared in anticipation of litigation" and are protected attorney work product.  *See United States v. Adlman*, 134 F.3d 1194, 1200 (2d Cir. 1998) ("There is no rule that bars application of work-product protection to documents created prior to the event giving rise to litigation.") (quotations omitted); *see also SEC v. Strauss*, No. 09 Civ. 4150, 2009 WL 3459204, at *4–5 (S.D.N.Y. Oct. 28, 2009).  Nor is there any reason to pierce this protection.  As discussed in Section III below, these internal SEC notes and communications are irrelevant, even accepting Defendants' affirmative defenses.  And, to

---

[8] As one district court has observed in protecting from disclosure SEC staff's notes of external meeting, "it would severely undermine the SEC's ability to address such issues if meeting participants did not feel at liberty to engage in an open discussion with the agency regarding self-regulatory responses and potential rules that might be adopted by the agency.  Moreover, it would surely undercut the agency's ability to engage in deliberations regarding potential regulatory responses if the thoughts and recommendations of top staff members in the policy-making process were exposed prior to a final decision."  *Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 169 (D.D.C. 2004); *see also Petroleum Information Corp. v. Dep't of the Interior*, 976 F.2d 1429, 1435 (D.C. Cir.1992) ("To the extent that predecisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected" under the DPP).

the extent these notes relate to other potential enforcement matters not involving XRP, they are even less relevant.  Further, information about those meetings that Defendants' own representatives and associates attended is available to Defendants through those representatives and associates, and information about what occurred at meetings between SEC staff and private outside parties can be requested from those third parties.

### B. Appendix Entry 2 (June 13, 2018 Email):  Protected as Attorney Work Product and by Attorney-Client Privilege and DPP

Entry 2 of Appendix A consists of a June 13, 2018 email from the Office of the Chief Counsel for Corporation Finance—an office that provides legal advice to the staff and the SEC—to other SEC staff members, including an Enforcement attorney then investigating Ripple's XRP transactions and currently litigating this action as a counsel of record, Daphna Waxman.  The email attaches a memo with a preliminary draft legal analysis of XRP.  ██████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ Entry 2 is protected by the work product doctrine, the attorney-client privilege, and the DPP.

First, the email and enclosed memorandum constitute attorney work product, as well as attorney-client communications, as they were drafted in anticipation of making a decision about whether to charge Ripple with violating the securities laws.  Enforcement staff worked closely with Corporation Finance staff in connection with the Ripple investigation.  This legal analysis was prepared to assist Enforcement staff in their analysis of Ripple's XRP transactions under *SEC v. W.J. Howey*, 328 U.S. 293 (1946), before Enforcement made a decision whether to recommend to the Commission that it authorize the present enforcement action.  *See Adlman*, 134 F.3d at 1200.

In addition, the documents are predecisional as they contained the preliminary views of SEC staff members in the early stages of Enforcement's investigation, did not reach a definitive

determination ████████████████████████, and did not present any

recommendation to the Commission.  *See Tigue*, 312 F.3d at 80 (a document is "predecisional" when

"it is prepared in order to assist an agency decisionmaker in arriving at his decision") (quotation

omitted).  The documents are also deliberative because discussions about what processes an agency

should implement or use to arrive at its policy decisions are themselves protected by the DPP.  *Id.* at

76.  Such legal analyses are thus protected by the DPP, the attorney-client privilege, and the work

product doctrine.  *See ACLU v. Nat'l Sec. Agency*, 925 F.3d 576 (2d Cir. 2019) (legal memorandum

protected by DPP and attorney-client privilege); *Rutigliano v. U.S. Dep't of Justice*, 847 Fed. App'x 86

(2d Cir. 2021) (prosecutor's memorandum containing legal evaluations and investigative opinions

protected by work product doctrine and DPP); *see also ACLU v. Dep't of Justice*, 90 F. Supp. 3d 201,

217 (S.D.N.Y. Mar. 3, 2015) ("[L]egal analysis of potential future actions that DOJ might—or might

not—take [are] both predecisional and deliberative.").

### C.  Appendix Entries 3, 4, and 5 (2017 Email Chains):  Protected by DPP

Entries 3, 4, and 5 reflect communications between Ms. Szczepanik and officials from the

U.S. Department of the Treasury's ("Treasury") Office of Terrorism Financing and Financial

Crimes.  These documents reflect deliberations among the SEC, Treasury, and the CFTC (though

the CFTC is not copied on the emails) about the characterization and analysis of various activities in

the digital asset space.  These discussions occurred in furtherance of overlapping regulatory activities

by the SEC, Treasury, and the CFTC in the digital asset space, and are unrelated to the application

of *Howey* to digital asset transactions.

These entries are predecisional and deliberative because they reflect inter-agency

collaboration in deliberations about how the U.S. regulatory framework applies to the digital asset

space and collaboration among government bodies regarding the enforcement of relevant laws

applicable to digital assets.  *See, e.g., U.S. Fish and Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777 (2021)

(DPP protects proposals sent between federal agencies when such documents reflect the agencies' preliminary thinking about an issue and not a final decision); *Allstate Ins. Co. v. Serio*, No. 97 Civ. 0620, 1998 WL 477961, at *3 (S.D.N.Y. Aug. 13, 1998) ("The law is clear that both inter-agency and intra-agency communications are entitled to [DPP] protection.").

### D. Entry 6 (October 17, 2017 Meeting Invite and Attachment): Protected by DPP

Entry 6 is an email invitation attaching a presentation about initial coin offerings ("ICOs") by Enforcement staff to the staff of the SEC's Division of Investment Management ("Investment Management"), which generally oversees the activities of investment funds and investment advisers. As explained below, activities in the digital asset space implicate regulatory issues such as the proper custody of digital assets by these entities and their fiduciary obligations to clients.

SEC counsel has produced Entry 6 to Defendants, subject to redactions based on the DPP.[9] The redacted portions of the email and presentation are predecisional and deliberative because they reflect predecisional thoughts and analyses on digital assets and ICOs from Enforcement staff, who were discussing the various issues applicable to Investment Management staff in the context of digital assets. *See Tigue*, 312 F.3d at 76–77; *Citizens for Responsibility & Ethics v. Nat'l Archives & Records Admin.*, 583 F. Supp. 2d 146, 162 (D.D.C. 2008) ("presentation [that] contains inter-agency recommendations and policy options" protected by DPP).

### E. Entry 8 (January 6, 2018 Email and Attachment): Protected by Attorney-Client Privilege and Partially Protected by DPP[10]

Entry 8 consists of a presentation to then-SEC Commissioner Michael Piwowar given by Ms. Szczepanik in her capacity as an attorney, Assistant Director of Enforcement's Cyber Unit, and head of the SEC's DLT Working Group. The presentation, titled "Bitcoin & Blockchain," provided

[9] Appendix A notes that the SEC did not include the basis for its privilege assertion in connection with this document. In a typographical error, the SEC's privilege log omitted a DPP assertion for this document.

[10] Appendix A contains a date of 6/1/2018 for this document based on a typographical error on the SEC's privilege log. The correct date for this document is actually 1/6/2018.

an overview of the digital asset market and included discussion of regulatory issues and investigative techniques.  The Cyber Unit is a key advisor to the SEC on legal issues implicated by digital assets. Therefore, a presentation by a Cyber Unit lead attorney to an SEC Commissioner, discussing regulatory and investigative issues, is protected by the attorney-client privilege.  *See In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005) ("It is crucial that government officials, who are expected to uphold and execute the law…be encouraged to seek out and receive fully informed legal advice."); *Freedom of the Press Foundation v. Dep't of Justice*, 241 F. Supp. 3d 986 (N.D. Cal. 2017) (presentation by agency counsel used to train government employees protected by attorney-client privilege).  These sorts of briefings are designed to assist Commissioners in evaluating legal issues that arise in both Enforcement recommendations and any proposed rulemaking.  In addition, portions of the presentation are protected by the DPP because they reflect predecisional thoughts and analyses on digital assets from Enforcement staff.

### F.  Entry 9 (June 5, 2018 Email and Attachment):  Protected by DPP

Entry 9 consists of an email enclosing a draft of the Hinman Speech for review and comment by SEC officials, including the directors of various SEC offices and divisions and the then-Chair of the SEC.  The draft speech and corresponding email are predecisional and deliberative, as Director Hinman was seeking feedback from other SEC personnel about the speech's contents prior to its delivery.  The email ██████████████████████████ ████████████████████████████████████████.  As such, the staff was deliberating on what the speech should say, and no final decision had been reached about its contents.  Such drafts and related emails are protected by the DPP.  *See Fox News Network, LLC, v. Dep't of Treasury*, 739 F. Supp. 2d 515 (S.D.N.Y. 2010) (draft press release protected by DPP); *Color of Change v. Dep't of Homeland Sec.*, 325 F. Supp. 3d 447, 454 (S.D.N.Y. 2018) ("[A] draft is still a draft

and thus still pre-decisional and deliberative.") (quotations omitted).[11]

### G. Entry 10 (June 7, 2018 Email and Attachments):  Protected by DPP

Entry 10 consists of communications among staff on the Financial Stability Oversight Council ("FSOC")'s Distributed Ledger Technology and Digital Asset Working Group (the "FSOC Working Group").  FSOC is a federal entity established by the Dodd-Frank Act.  12 U.S.C. § 5321. In December 2017, FSOC formed the FSOC Working Group, comprised of officials from a number of federal agencies, to consider issues related to digital assets, including facilitating regulatory coordination, information sharing, and data collection with member agencies, including the SEC.  These deliberations among staff members ███████████████████████████ ██████████████████████  Entry 10 is both predecisional and deliberative.  It consists of highly confidential agency assessments of ████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████.  Entry 10 is thus protected by the DPP.  *See U.S. Fish and Wildlife Serv.*, 141 S. Ct. at 785; *Fox News Network*, 739 F. Supp. 2d at 515.[12]

### H. Entries 11–14 (2018 Emails and Attachments):  Protected by DPP

Entry 11 consists of an October 25, 2018 email attaching draft talking points and questions and answers ("Q&A") for an October 26, 2018 keynote presentation by Director Hinman.  Entries 12 through 14 consist of November 2018 emails relaying draft talking points and Q&A for the then-SEC Chair's presentation at a November 27, 2018 conference.  These documents are predecisional

---

[11] Moreover, as noted above, this *draft*, and the dozens of other *drafts* of the Hinman Speech that the SEC logged in an effort to provide to Defendants the information they claimed to want through Director Hinman's deposition—*i.e.*, who reviewed the Hinman Speech and when—are intra-agency communications outside the scope of the Court's orders.

[12] Entry 10 also contains confidential information provided by ████████████████████████████████ ████████████████████████.  These documents do not have any responsive information.  In addition, the documents selected by the FSOC Working Group members as relevant to their deliberations reveal the nature of the confidential deliberations.

and deliberative because they reflect SEC staff recommendations about what to present at these events.  Such talking points prepared by staff for a senior official's review and consideration are internal deliberations protected by the DPP.  *See American Center for Law and Justice v. Dep't of Justice*, 325 F. Supp. 3d 162, 173 (D.D.C. 2018).  Even the "'final' version of talking points prepared by more junior staffers for a more senior official is rarely the final decision about what the senior official will say." *Id.* (internal citations omitted).  Rather, the senior official "may elect to use all, some, or none of the talking points prepared" for them.  *Id.*; *see also ACLU v. DHS*, 738 F. Supp. 2d 93, 111-12 (D.D.C. 2010) ("final" talking points submitted by staff to official fell within DPP, because final decision about what to say at an event is the remarks actually made at the event).  The DPP thus protects Entries 11 through 14.

## III. There Is No Justification to Override the DPP

The DPP may only be overcome by a sufficient showing that disclosure outweighs the interests in nondisclosure.  *Export-Import Bank v. Asia Pulp & Paper Co., Ltd.*, 232 F.R.D. 103, 109 (S.D.N.Y. 2005).  Courts must consider: 1) the relevance of the privileged evidence; 2) the availability of other evidence; 3) the seriousness of the litigation; 4) the government's role in the litigation; and 5) the possibility of future timidity by government employees.  *Id.*  This brief focuses on the first and fifth factors, which both heavily favor nondisclosure.

### A. The Documents Are Irrelevant to the *Howey* Analysis of XRP

Except for Entry 2—the legal memo about XRP that is protected by all three applicable privileges—none of the documents listed in Appendix A addresses the application of *Howey* to XRP.  And none (other than Entry 2) contains any information about whether it was reasonable to view XRP transactions as securities transactions.  Rather, the documents largely relate to other regulatory issues.  As in this case, transactions in digital assets may raise issues relating to the registration requirements of Section 5 of the Securities Act of 1933 and whether the transactions constitute

offers and sales of investment contracts under the *Howey* test.  But transactions in digital assets, as with any other financial instrument, raise many other issues under the federal securities laws.[13]  Here, the SEC's claims turn on whether Defendants' offers and sales of XRP should be deemed securities transactions under *Howey,* which itself turns on the "knowledge and the objective intentions and expectations of the parties" to the transaction.  *See SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365, 371 (S.D.N.Y. 2020) (citation omitted).  Other than Entry 2, the documents listed in Appendix A are irrelevant to this analysis—even under Defendants' theory of relevance—because they do not relate to the *Howey* analysis of XRP transactions.

### B.  Non-Public Communications Are Irrelevant to the Aiding-and-Abetting Claims

In its opposition to Defendants' Motion to Compel, the SEC explained in detail why SEC communications, *which were never public*, are irrelevant to the Individual Defendants' scienter defenses. Dkt. 299 at 6-7.  This Court has similarly observed that the SEC's "informal communications" have limited relevance to "how the market is considering XRP and… how it affects the [Individual Defendants'] reasonable belief."  Ex. B (Apr. 6, 2021 Hr.'s Tr.) at 52:14-25.  As demonstrated above, all of the internal SEC documents included in Appendix A are "informal communications."  Not a single one is a formal report or a position paper, and only one (Entry 2) is an internal memorandum (and is protected by all three applicable privileges).

In response, at the hearing on their Motion, Defendants argued that the SEC's internal documents "are relevant to showing whether it would have been obvious to anyone — anyone —

---

[13] To name but a few, digital assets may implicate the market manipulation prohibitions of Section 9 of the Securities Exchange Act of 1934 ("Exchange Act"), the broker-dealer registration requirements of the Exchange Act, and the securities laws' anti-fraud prohibitions.  Digital assets also may implicate the securities laws' requirements that (1) a digital trading platform register as a securities "exchange," (2) those managing others' assets register as "investment advisers," (3) investment companies and investment advisers have "custody" of client assets, (4) investment advisers provide "best execution" for client trades, and (5) digital assets held by the different participants in the financial system are properly valued.  Transactions in digital assets may also raise important concerns under other, overlapping regulatory regimes, including those relating to the protection of U.S. capital markets against cyberattacks, ensuring against the use of digital assets for illicit activities, and providing for the safety and soundness of the U.S. financial markets.

that XRP was a security, particularly the SEC." Ex. A at 8–9.  However, the correct recklessness

standard analyzes the propriety of a defendant's actions based on the facts and information *known or*

*reasonably available to the defendant*, and not the facts and information known to the SEC or other third

parties.  *See, e.g., SEC v. Johnson*, No. 03 Civ. 177, 2005 U.S. Dist. LEXIS 4732, at *9 (S.D.N.Y. Mar.

24, 2005).  In other words, the Individual Defendants' scienter turns on the information that *they*, as

opposed to a generic market participant, possessed.  Scienter has been defined as "intent to deceive,

manipulate, or defraud, or at least knowing misconduct."  S*EC v. First Jersey Sec., Inc.*, 101 F.3d 1450,

1467 (2d Cir. 1996).  Thus, the SEC routinely proves recklessness by showing a defendant ignored

unique red flags known or reasonably available to a defendant but not to third parties.[14]

Tellingly, Defendants cannot point to a single case in which the SEC staff's knowledge and

understanding were deemed relevant to liability.  However, there are numerous cases from this

District analyzing whether a defendant was reckless given the facts and circumstances known or

available to the defendant, as opposed to third parties.  *See, e.g., Schaeffer v. Nabriva Therapeutics PLC*,

No. 19 Civ. 4183, 2020 WL 7701463, at *12 (S.D.N.Y. April 28, 2020); *In re Global Crossing, Ltd. Sec.*

*Litig.*, 322 F. Supp. 2d 319, 346-47 (S.D.N.Y. 2004); *Egan*, 944 F. Supp. 2d at 566.

Moreover, courts have specifically refused to pierce the SEC's DPP even when an individual

defendant's state of mind is at issue.  In one case, defendants argued that the accounting standard

they had been sued for violating was complicated and that internal confusion at the SEC would

show that they could not have possibly acted with the intent to violate the law.  *SEC v. Nacchio*, No.

5 Civ. 480, 2009 U.S. Dist. LEXIS 8365, at *34-35 (D. Colo. Jan. 29, 2009).  In rejecting this

argument, the court found that, even if there were uncertainty among SEC personnel regarding the

---

[14] *See, e.g., SEC v. Egan*, 994 F. Supp. 2d. 558, 565-66 (S.D.N.Y. 2014); *SEC v. Spartan Sec. Grp. Ltd.*, No. 19 Civ. 448, 2020 U.S. Dist. LEXIS 242637, at *34-35 (M.D. Fla. Dec. 28, 2020); *SEC v. Rose*, No. 04 Civ. 2799, 2007 U.S. Dist. LEXIS 119107, at *47-48 (S.D. Tex. Sept. 5, 2007); *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1307 (S.D. Fla. 2007); *SEC v. Delphi Corp.*, 508 Fed. Appx. 527, 532-33 (6th Cir. 2012).

accounting treatment at issue, "personal opinions held by individual [SEC] staff members" would *not* be "relevant to the claims in this case, particularly if those opinions could not be attributed to the [SEC] itself or were never communicated to anyone outside the confines of the [SEC]." *Id.* at *40. Accordingly, the court rejected the notion that the SEC's internal deliberations were relevant to determining whether defendants acted with scienter.

By advocating for an "objective" standard that assesses the Individual Defendants' conduct using the information available to a generic market participant, the Individual Defendants are asking the Court to simply ignore the key evidence that shows why *they*, as opposed to others who sold XRP, aided and abetted Ripple's securities law violations.[15]  Again, even assuming the proper inquiry looked to conduct of a hypothetical market participant, the Individual Defendants still cannot explain how nonpublic internal SEC deliberations unknown to outsiders would somehow affect the reasonableness of that hypothetical person's conduct.  *See Allstate*, 1998 U.S. Dist. LEXIS 12583, at *15-16 (if analysis of a legal question turns on objective principles and "questions of [a government official's] motive, state of mind or scienter do not form part of the relevant legal standard . . . there is no reason to override the deliberative process privilege to permit discovery into the policy-making thought processes of regulators or of the executive").

Moreover, the Individual Defendants' argument requires the Court to prematurely resolve the dispute as to the proper scienter standard when this very issue is already pending before Judge Torres.  Because the Individual Defendants will be entitled to an additional four months of discovery should Judge Torres deny their motions to dismiss, they will suffer no prejudice if this

---

[15] In essence, the Individual Defendants argue that any specific information they received is irrelevant.  Under this misguided theory, if the Individual Defendants were told by 100 reputable attorneys that their XRP sales violated the securities laws, those warnings would have no bearing on their recklessness.  Rather, the Individual Defendants would want the Court to believe that their scienter must be evaluated by looking to a hypothetical XRP seller that never received the specific advice they received, or worse, by looking at the views of an SEC staff member who was not even aware of all of the facts and circumstances surrounding the Individual Defendants' XRP transactions.

Court declines to compel the SEC to produce its internal communications now.  Should Judge Torres grant the motions, scienter would no longer be at issue.  Given the sensitive nature of the withheld documents, even if the Court is inclined to grant Defendants' Motion, the most prudent measure would be to refrain from doing so until the motions to dismiss are resolved.

### C. Compelled Release of Internal and Inter-Agency Communications Will Have a Chilling Effect on the SEC's Future Deliberations

The Court has recognized the "extensive privilege issues" surrounding internal communications and the "potential to seriously chill government deliberations" by their disclosure.  Dkt. 299-1 at 52:14-25*; see also Citizens Union of City of New York v. Attorney General of New York*, 269 F. Supp. 3d 124, 170 (S.D.N.Y. 2017) ("[O]pen dialogue…would be chilled if…preliminary opinions and considerations are potentially subject to public disclosure.").  Defendants argue that this case is unique, thus warranting release of privileged material.  But the SEC routinely litigates cases involving complex issues and cases in which defendants seek discovery to try to obtain evidence that SEC staff internally debated the underlying legal issues.  Indeed, as the *Citizens* court noted, "every federal case is serious," 269 F. Supp. 3d at 168.  As the *Citizens* court noted, "every federal case is serious," 269 F. Supp. 3d at 168, but the court must still find a way to distinguish those cases where this "tip[s] in favor of disclosure or in favor of protecting [the SEC's] ability to function properly . . . without the distraction of civil litigation." *Id.*

To grant Defendants access to documents relating to a wide range of issues based on some alleged "confusion" among SEC staff would discourage internal deliberation in SEC investigations and adversely affect the SEC's ability to make difficult and complex decisions in a wide variety of matters.  Indeed, Defendants seek privileged deliberations about not only XRP, but also Bitcoin and Ethereum, the two largest digital assets in the world, over a period spanning eight years.  Given the broad swath of the request and the sensitive nature of the SEC's role in regulating the offers and sales of evolving assets to the public, the risk of impeding SEC deliberations is especially high.  *See*

*Carver v. Nassau County Interim Finance Auth.*, No. 11 Civ. 1614, 2012 WL 12266891, at *5 (E.D.N.Y. Aug. 9, 2012) (given government's "sensitive role in [a] continuing fiscal emergency…there is substantial risk that disclosure of…deliberative material could have an unwarranted and unfortunate chilling effect on…executives and other similarly situated officials").

Moreover, the risk of "impeding the…government's ability to promote the quality of agency decisions through the encouragement of candid discussion between officials" is especially acute where the information sought covers "deliberations and communications across wide areas of governmental functioning." *Noel v. City of New York*, No. 15 Civ. 5236, 2018 WL 6786238, at *5 (S.D.N.Y. Dec. 12, 2018) (quotations omitted).  The inter-agency communications reflected in many of the documents at issue involve deliberations between and among U.S. government department and agency staff as to the applicability of regulatory and oversight frameworks to the digital asset space.  Disclosure of these types of communications would interfere with and significantly chill cross-government efforts to interpret and enforce laws relating to the U.S. financial markets, including the federal securities laws.

<div align="center">*      *      *      *</div>

For the foregoing reasons, the SEC respectfully submits that the Court should conclude that all of the documents submitted for *in camera* review are protected by one or more privileges.  If the Court does determine that any of the documents should be produced to Defendants in whole or in part, the SEC submits that the Court should not order the production of "similar" documents, as the Court suggested it may be inclined to do during the August 31 hearing.  As the SEC expects the Court will find in the course of its *in camera* review, the nature of the documents at issue and the nuances of the DPP will require a close, document-by-document analysis, which the SEC has already done, and which the SEC believes the Court should likewise undertake before ordering the production of any material the agency deems privileged.

Respectfully submitted,

/s Ladan F. Stewart

Ladan F. Stewart

cc: Counsel for All Defendants (*via* ECF)

**ATTACHMENT 1**

**SUMMARY CHART OF DOCUMENTS SUBMITTED BY SEC FOR *IN CAMERA* REVIEW**

| Entry | Document Description | Attorney Work Product | Attorney-Client Comm. | Deliberative Process Privilege | Deliberations |
|---|---|---|---|---|---|
| 1(A) | February 14, 2014 handwritten notes from Valerie Szczepanik re: meeting between SEC Commissioner and external parties including Prof. Joseph Grundfest. | | | ☑ | Deliberations re: ███████████. |
| 1(B) | December 8, 2014 handwritten notes from Valerie Szczepanik re: meeting with FINRA. | ☑ | | ☑ | Deliberations re: open Enforcement investigations of digital assets and regulatory oversight of transactions involving digital assets. |
| 1(C) | June 20, 2017 handwritten notes from Valerie Szczepanik re: meeting with digital asset advocacy group. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of digital assets and ████ ████████████. |
| 1(D) | June 29, 2017 handwritten notes from Valerie Szczepanik re: meeting with digital asset advocacy group. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of digital asset and ██████████ ████████████. |
| 1(E) | December 13, 2017 handwritten notes from Valerie Szczepanik re: meeting with Consensys. | ☑ | | ☑ | Deliberations re: ██████████. |

| 1(F) | April 6, 2018 handwritten notes from Valerie Szczepanik re: meeting with Prof. Christian Catalini. | ☑ | | ☑ | Deliberations re: ███████████ ████████████████████. |
| 1(G) | April 10, 2018 handwritten notes from Valerie Szczepanik re: meeting with CFTC. | ☑ | | ☑ | Deliberations re: ███████████ ████████████████████. |
| 1(H) | April 6, 2018 handwritten notes from Michael Seaman re: meeting with Prof. Christian Catalini. | | | ☑ | Deliberations re: ███████████ ████████████████████. |
| 1(I) | April 23, 2018 handwritten notes from Michael Seaman re: meeting with Consensys. | | | ☑ | Deliberations re: ███████████ ████████████████████. |
| 1(J) | June 8, 2018 handwritten notes from Michael Seaman re: meeting with Consensys. | | | ☑ | Deliberations re: ███████████ ████████████████████. |
| 1(K) | June 24, 2016 handwritten notes from Michael Seaman re: meeting with Consensys. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of digital assets and ██████ █████████████████. |
| 1(L) | July 19, 2018 handwritten notes from Valerie Szczepanik re: meeting with CFTC. | ☑ | | ☑ | Deliberations re: open Enforcement investigations of digital assets. |
| 1(M) | August 22, 2018 handwritten notes from Valerie Szczepanik re: meeting with CFTC. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of ████████████ ███████. |

| 1(N) | August 28, 2018 handwritten notes from Valerie Szczepanik re: meeting with digital asset platform. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of ██████████ ████. |
| 1(O) | September 18, 2018 handwritten notes from Michael Seaman re: meeting with Ripple. | ☑ | | ☑ | Deliberations re: open Enforcement investigation of Ripple (filed in December 2020). |
| 1(P) | November 28, 2018 handwritten notes from Valerie Szczepanik re: meeting with staff for Senator Tom Cotton. | | | ☑ | Deliberations re: regulatory approaches to digital assets. |
| 1(Q) | August 2019 handwritten notes from Richard Gabbert re: meeting with SBI. | | | ☑ | Deliberations re: open Enforcement investigation of ██████████ ████. |
| 2 | June 13, 2018 email and attached memorandum from Office of Chief Counsel of the Division of Corporation Finance to staff of the Division of Enforcement re: legal analysis of XRP. | ☑ | ☑ | ☑ | Deliberations re: open Enforcement investigation of Ripple (filed in December 2020). |
| 3 | June 21, 2017 email chain between Valerie Szczepanik and staff from the U.S. Department of Treasury re: digital assets. | | | ☑ | Deliberations re: inter-agency regulatory framework for digital assets including ███. |
| 4 | June 22, 2017 email chain between Valerie Szczepanik and staff from the U.S. Department of Treasury re: digital assets. | | | ☑ | Deliberations re: inter-agency regulatory framework for digital assets including ███. |

| 5 | August 14, 2017 email chain between Valerie Szczepanik and staff from the U.S. Department of Treasury re: digital assets. | | | ☑ | Deliberations re: inter-agency regulatory framework for digital assets including ▉. |
|---|---|---|---|---|---|
| 6 | October 17, 2017 meeting invite and attached presentation from staff of the Division of Enforcement to the staff of the Division of Investment Management | | | ☑ | Deliberations re: regulatory issues relating to digital assets. |
| 7 | Document produced; not submitted for in *camera* review. | | | | |
| 8 | January 6, 2018 email from Valerie Szczepanik attaching presentation to SEC Commissioner re: digital assets. | | ☑ | ☑ | Deliberations re: regulatory issues relating to digital assets. |
| 9 | June 5, 2018 email to SEC personnel attaching draft of Hinman Speech. | | | ☑ | Deliberations re: ▉ and re: Hinman Speech (delivered on June 14, 2018). |
| 10 | June 7, 2018 email from Treasury staff member to FSOC Working Group. | | | ☑ | Deliberations re: ▉ |
| 11 | October 25, 2018 email attaching draft presentation material for Director Bill Hinman. | | | ☑ | Deliberations re: presentation material in advance of October 26, 2018 conference. |
| 12 | November 20, 2018 email attaching draft presentation material for SEC Chair. | | | ☑ | Deliberations re: presentation material in advance of November 27, 2018 conference. |

| 13 | November 24, 2018 email attaching draft presentation material for SEC Chair. | | | ☑ | Deliberations re: presentation material in advance of November 27, 2018 conference. |
|----|---|---|---|---|---|
| 14 | November 24, 2018 email attaching draft presentation material for SEC Chair. | | | ☑ | Deliberations re: presentation material in advance of November 27, 2018 conference. |