# CLEARY GOTTLIEB STEEN & HAMILTON LLP

<table>
<tr><td>NEW YORK</td><td rowspan="8">2112 Pennsylvania Avenue, NW<br>Washington, DC 20037-3229<br>T: +1 202 974 1500<br>F: +1 202 974 1999<br><br>clearygottlieb.com</td><td>ROME</td></tr>
<tr><td>PARIS</td><td>MILAN</td></tr>
<tr><td>BRUSSELS</td><td>HONG KONG</td></tr>
<tr><td>LONDON</td><td>BEIJING</td></tr>
<tr><td>FRANKFURT</td><td>BUENOS AIRES</td></tr>
<tr><td>COLOGNE</td><td>SÃO PAULO</td></tr>
<tr><td>MOSCOW</td><td>ABU DHABI</td></tr>
<tr><td></td><td>SEOUL</td></tr>
</table>

**VIA ECF**                                                September 28, 2021

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re: *SEC v. Ripple Labs, Inc. et al.,* No. 20-cv-10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

Defendants Bradley Garlinghouse and Christian Larsen (the "Individual Defendants") and Ripple Labs Inc. ("Ripple") respectfully submit this response to the SEC's September 14, 2021 Letter, (*see* ECF No. 351), regarding the documents over which the SEC has asserted deliberative process privilege ("DPP") and that the Court has directed be submitted for *in camera* review.

At the August 31 hearing, the Court directed the SEC to submit "*in camera* the documents logged on Appendix A" and that the parties then submit "targeted letter briefs on those documents." Aug. 31 Hr'g Tr. at 35:9-13. The Court did not invite the SEC to re-litigate the issues decided at the April 6 hearing and reaffirmed in the Court's May 6 order, (ECF No. 163), including the relevance of the documents withheld on DPP grounds. Nonetheless, the SEC devoted much of its response to arguing these points, contentions the Court has already rejected on several occasions. ECF No. 351 at 15-19; Apr. 6 Hr'g Tr. at 51:11-23; ECF No. 163 at 6.

The SEC also raises two new points on relevance that can be readily disposed of. *First*, the Court should not credit the SEC's *ex post* assertion that it chose to waste the Court's and the

Defendants' time by including almost exclusively *non-responsive documents* on its privilege logs. By their very nature, the privilege logs contained only documents that the SEC identified as responsive to the Court's orders compelling production. Now, the SEC claims "the majority of the intra-agency documents logged by the SEC," including all but *one* of the entries on Appendix A, are not only irrelevant but also non-responsive to the Court's orders.[1]  ECF No. 351 at 3.  Many of these documents appear to be not only highly relevant but potentially exculpatory in that they bear on what the SEC was hearing and discussing regarding the market's interpretation and understanding of the application of federal securities laws to Bitcoin, Ether and XRP.  *See* Appendix A, Entries 1A, 1C, 1D, 1E, 1G, 1K, 1N, 1O, 1P, 1Q, 8, 9.  The SEC cannot now erase its decision to log these documents as responsive simply because the agency fears they may undermine its case.

*Second*, the SEC continues to obfuscate the standard for the recklessness element of its aiding and abetting charges.  ECF No. 351 at 16-19.  Defendants recognize that recklessness is one of two potentially-sufficient mental states, alongside actual knowledge, 15 U.S.C. § 77o(b), but the SEC has pled its case as one of recklessness.  To establish recklessness, the SEC must show the status of XRP as a security throughout the entire charged period (2013-20) was "so obvious that [the Individual Defendants] must have been aware of it."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citation omitted).  The actions and reactions of others—particularly the world's foremost securities regulator—bear directly on how obvious the regulatory status of XRP was or could have been to anyone.  Apr. 6 Hr'g Tr. at 51:11-17; Op. & Order at 3 (Apr. 9, 2021), ECF No. 103 ("[I]n order to prove its allegations that the Individual Defendants aided and abetted

---

[1] The SEC tries to forge a distinction between "informal [internal SEC] communications" and "intra-agency memoranda or formal position papers."  ECF No. 351 at 2-3.  But most of the entries on its logs are described as emails *and attachments*.  ECF No 289-5.  As to the attachments, Defendants are in no position to distinguish between those the SEC considers memoranda as opposed to informal internal communications.  Moreover, the SEC already produced Appendix A, Entry 6 to Defendants (albeit with heavy redactions), an entry it claims falls into the latter category.

Ripple in offering or selling unregistered securities, the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's offerings and sales of XRP required registration as securities and that those transactions were improper.").  Put simply, if the SEC observed that others were acting as the Individual Defendants acted, that there was at least ambiguity in the market regarding the status of XRP under the securities laws, or if it was unable itself to determine whether XRP or other similar digital assets were securities, Defendants are entitled to discover that evidence and present it to the finder of fact.  *See, e.g.*, *Solis v. Beacon Assocs. Mgmt. Corp (In re Beacon Assocs. Litig.)*, 2011 U.S. Dist. LEXIS 89353, at *10 (S.D.N.Y. Aug. 11, 2011) (affirming order requiring disclosure of Labor Department investigative files to evaluate reasonableness of defendant ERISA fiduciary's conduct).  Consistent with the Court's prior findings, these materials are clearly relevant to scienter, in addition to Ripple's fair notice defense and the analysis under *Howey*.

When the SEC finally turns to the actual purpose of the briefing, it fails to articulate any specific policymaking process implicated by the documents it is withholding, nor does it demonstrate how requiring their production would chill any such process going forward.  Instead, the SEC relies on boilerplate assertions, offering little more than what it provided in its original privilege logs.  These assertions grow no more compelling by their repetition.  Documents are not privileged merely because they were created by SEC staff in the course of their jobs.  Rather, to sustain an assertion of DPP, the SEC must connect each and every document to an agency policy process and support its claim that they are deliberative in connection with that process.  The difficulty for the SEC here is that it has never undertaken any policymaking process with respect to digital assets, and its entire case rests on its view that the application of existing law to digital assets was so clear that no such process was needed.  The SEC's position is legally untenable, and accepting it here would be extraordinarily prejudicial to Defendants.

1.     **The SEC's Assertion of DPP over All Documents on Appendix A Is Fatally Undermined by Its Failure to Identify Any Specific Policy Process That the Withheld Documents Implicate.**

"[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974).  Any privilege, including the DPP, "must be construed narrowly, as sustaining any privilege prevents a party from obtaining access to otherwise relevant information." *SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403, 416-17 (S.D.N.Y. 2009).  As the Court has recognized, the DPP in particular cannot be used to prevent the disclosure of critical information because it "is a qualified privilege, it's not like the attorney-client privilege."  Aug. 31 Hr'g Tr. at 33:7-8.  And the DPP is not a privilege that automatically attaches; it "must be invoked 'by the head of the governmental agency which has control over the information to be protected.'"  *In re Terrorist Attacks on Sept. 11, 2001*, 2019 WL 3296959, at *6 (S.D.N.Y.  July 22, 2014) (Netburn, J.) (citation omitted).  Here, the SEC portrays its right to withhold "deliberative" documents in broad, sweeping terms, effectively claiming a privilege over any internal document or communication that touches on the regulation of securities or non-securities that the SEC might at some point seek to regulate.  *See, e.g.*, ECF No. 351 at 4 (arguing notes are "predecisional because each concerns matters for which the SEC had not issued any official policy or decision at the time the notes were taken").  This vague, conclusory description of these documents relies on a formulation of the DPP that overstates the scope of this qualified privilege.

To establish that the DPP applies, the SEC has the burden to show that each and every document over which it asserts the privilege was "(1) predecisional, *i.e.*, prepared in order to assist an agency decisionmaker in arriving at his decision, and (2) deliberative, *i.e.*, actually … related to the process by which policies are formulated."  *Nat'l Council of La Raza v. U.S. Dep't of Just.*, 411 F.3d 350, 356 (2d Cir. 2005) (internal quotation marks and citation omitted).  Establishing

these elements requires the SEC to connect each of these documents to some policy process, but, as the Court noted, the SEC's privilege logs do not make clear "what the decision is and when it was rendered." Aug. 31 Hr'g Tr. at 28:24-29:1. The SEC still has not tied the withheld documents to any policy process despite being given multiple opportunities to do so. Absent that connection, the SEC cannot argue that the animating purpose of the DPP is implicated by production of these documents because there is no deliberative process it can point to that would be chilled by their disclosure. The DPP is not a generalized privilege for agency documents and communications, and "does not protect a document which is merely peripheral to actual policy formation; the record must bear on the formulation or exercise of policy-oriented judgment." *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 80 (2d Cir. 2002) (internal quotation marks and citations omitted).

It is the SEC's obligation to establish that "the information sought is a part of the process leading to formulation of [the] *agency's* decision" and that the material sought "reflect[s] or . . . expose[s] the deliberative aspects of that process." *In re MTBE Prods. Liability Litig.*, 898 F. Supp. 2d 603, 606-07 (S.D.N.Y. 2012) (emphasis added) (internal quotation marks and citations omitted); *see also Collins & Aikman*, 256 F.R.D. at 416 (the SEC must show "whether the document . . . formed an essential link in a *specified consultative process*".) (emphasis added) (internal quotation marks and citation omitted); *see also Competitive Enter. Inst. v. U.S. Dep't of Treasury*, 308 F. Supp. 3d 109, 119 (D.D.C. 2018) ("Not every discussion by agency staff that touches on agency matters is protected…."); *Judicial Watch v. Reno*, 154 F. Supp. 2d 17, 18 (D.D.C. 2001) ("It is not enough to say that a memorandum 'expresses the author's views' on a matter. The role played by the document in the course of the deliberative process must also be established.") (citation omitted). The SEC's efforts on this score fall short. For example, the SEC asserts the redacted portions of Appendix A, Entry 6 are "predecisional and deliberative because they reflect predecisional thoughts and analyses on digital assets and ICOs" during a discussion of

"various issues applicable to Investment Management staff in the context of digital assets."  ECF No. 351 at 12.  This description appears to be that of routine agency business, not policymaking.

The SEC's argument that it need not "identify a specific decision in connection with which a memorandum is prepared" for the privilege to attach, (*see* ECF No. 300 at 3) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-52 n.18 (1975)), over-reads the law.  While a deliberative, predecisional document does not lose its privileged status merely because the policy process fails to "ripen into agency decisions," there still must *be* an identified policy process in the first place.  *Sears*, 421 U.S. at 151-52 n.18 (agency must show documents were "ingredients of the decisionmaking process"); *see also Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) ("To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*.") (citation omitted).  Here, the SEC has never asserted that it commenced a policy process addressing whether to regulate digital assets as securities.  Instead, the entire theory of this case turns on the SEC's contention that no policymaking or policy process was or is necessary because digital assets like XRP are plainly securities under 75-year old judicial precedent.  *See, e.g.*, ECF No. 54 at 2 (contending that "this case turns on a straightforward application of a well-settled legal test"); ECF No. 132 at 2 (arguing that *Howey* "has for decades provided an understandable definition of 'investment contract'").

Elsewhere, the SEC's position inverts the DPP so as to make it almost unrecognizable.  Whereas the law requires the agency asserting a privilege to establish that the withheld materials *were prepared as part of policy deliberations*, the SEC contends that the withheld documents are privileged because, in the case of internal notes, for example, "each concerns matters for which the SEC has not issued any official policy or decision."  ECF No. 351 at 4.  The DPP is not a blanket presumption of confidentiality for all documents that pre-date a decision the agency has not yet started to consider and may never consider.  It is the SEC's obligation to identify a specific

policy process and explain how the withheld documents relate to that process, an obligation the SEC did not come close to meeting here. *See United States v. Constr. Prods. Research., Inc.*, 73 F.3d 464, 473 (2d Cir. 1996) (the agency bears the burden of "establish[ing] the essential elements of the privilege.").  To take another example, the SEC argues Entries 3-5 in Appendix A are predecisional merely because they reflect discussions of "how the U.S. regulatory framework applies to the digital asset space," but draws no connection between those discussions and any actual policymaking process.  ECF No. 351 at 11.  The Court and Defendants cannot be expected to simply accept the SEC's assertion that any internal document relevant to this case must relate to a policy process. *See Collins & Aikman*, 256 F.R.D. at 416 ("The SEC asks the Court simply to take its word that these particular documents were predecisional [and] deliberative . . . . That cannot be sufficient.").  Because the SEC has failed to identify any specific policy process, it has not met its burden to establish a necessary element of DPP.  That failure alone is dispositive.

2.    **The Appendix A Documents Are Illustrative of Broader Problems with the SEC's Invocation of Privilege.**

Consideration of the specific documents the SEC is withholding, as reflected on Appendix A and in additional post-hearing documents subsequently withheld by the SEC—and which it refuses to submit for *in camera* review[2]—demonstrates the overbreadth of the SEC's privilege claim and Defendants' compelling need for the documents.

To assist the Court's review, Defendants have prepared a chart mirroring the SEC's table summarizing its privilege claims and our objections to those claims, and included that table as *Appendix A* to this letter.  Below we explain each of our objections in further detail:

- [3]

---

[2] Defendants filed a letter on September 24, 2021 requesting that the Court direct the SEC to provide 3 documents for *in camera* inspection that the SEC first included on a privilege log *after* the Court's August 31 hearing.  ECF No. 358. As expected, on September 27, the SEC opposed that request.  ECF No. 362.

[3] The SEC argues Defendants can obtain information about these meetings from the third parties who attended them. ECF No. 351 at 5 n.3, 8 nn.6-7.  That argument misses the point.  The SEC's perceptions of the meetings and its

- 

- ***DPP Applies to Agency Decisionmaking, Not Decisions of Individual Agency Staff Members* (*See* Entries 2, 8, 9, 11):**  The SEC repeatedly asserts that notes (or other withheld documents) are relevant to certain unspecified decisions that SEC staff was considering.  *See* ECF No. 351 at 3-8.  But the privilege does not extend to decisions of SEC staff implementing the agency's program; it is limited in scope to information that "is a part of the process leading to formulation of [the] *agency's* decision." *In re MTBE Prods. Liability Litig.*, 898 F. Supp. at 606-07 (emphasis added); *see also Bell v. Bd. of Educ.*, 2008 WL 4107445, at *3 (D.N.M. Apr. 22, 2008) (DPP "does not apply to individual decisions that a governmental agency makes, because the privilege primarily protects deliberation about what the broad policies should be, not individual decisions implementing existing policy.").  The SEC has made clear that the "agency" in this context is the Commission itself (as reflected in decisions by a majority of the five Commissioners), and it is not permissible for the agency to withhold documents as privileged unless they were intended to "assist an agency decisionmaker in arriving at [a] decision."  *Nat'l Council of La Raza*, 411 F.3d at 356 (citation omitted).  Even still, the SEC cloaks every writing of any agency "official" in the DPP.  For example, the SEC argues notes taken by Michael Seaman, then Special Counsel in the Division of Corporation Finance (effectively a line-level adviser), are predecisional, yet it gives no indication that these notes ever assisted an agency decisionmaker make a decision.

- ***Failure to Log Other Privileges Constitutes Waiver* (*See* Entries 1(B)-1(G), 1(K)-1(O), 2, 6):**  Despite serving both an original and supplemental version of its July 23,

---

conclusions as to the import of facts discussed are highly relevant, and that information can be obtained only from the SEC's own notes or memoranda memorializing these meetings.

2021 privilege log, having met and conferred with Defendants, having had the log reviewed and certified by senior staff in the Office of the General Counsel, and having briefed and argued the issue before the Court, the SEC *never before asserted* that *any* of the 17 notes were subject to the attorney-client privilege or work product doctrine. It relied exclusively on DPP.  *See* ECF No. 289-6.  The SEC now asserts that *nine* of these sets of notes are subject to another, previously-unasserted privilege.  By failing to do so in a timely manner, the SEC has waived its right to assert new privileges.  *See, e.g.*, *SEC v. Yorkville Advisors*, 300 F.R.D. 152, 167 (S.D.N.Y. 2014) ("[T]he SEC waived its privilege protections by failing to produce in a timely manner a privilege log that complied with the applicable rules."); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l., Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990) (finding failure to "specify work product as the particular privilege" constituted a waiver of the privilege).  Similarly, the SEC failed to assert a claim of attorney-client privilege over Appendix A, Entry 2 until it submitted its latest brief.  The Court should give no credence to that untimely assertion of privilege either.

- **Subsequent Use in Enforcement Proceedings Does Not Create Work Product Protection (*See* Entries 1(C), 1(D)):**  To the extent that the SEC is permitted to interpose the untimely privilege claims discussed above, its repeated assertions of work product protection on the basis that information gathered by the SEC was later *used* in investigations is improper.  *See* ECF No. 351 at 5 ("Information learned by the staff from these meetings was used in connection with open Enforcement investigations.").  Attorney work product protection attaches only to those documents created *because* of the existence or prospect of litigation, not those that are subsequently used in connection with litigation.  *See, e.g.*, *AU New Haven, LLC v. YKK Corp.*, 2016 WL

6820383, at *1 (S.D.N.Y. Nov. 18, 2016) (Netburn, J.) ("The doctrine protects only documents prepared 'because of the prospect of litigation' and does not protect documents that 'would have been prepared irrespective of the expected litigation.'") (quoting *United States v. Adlman*, 134 F.3d 1194, 1204 (2d Cir. 1998)). The SEC's letter asserts that certain documents are protected as attorney work product "to the extent" they "relate to other potential enforcement matters." ECF No. 351 at 10. That is insufficient to satisfy the SEC's burden: the SEC does not identify any actual or anticipated enforcement actions, nor does it assert that any particular document actually relates to them.

- ***Attorney-Client Privilege Attaches Only to Confidential Information Concerning the SEC (*See* Entries 2, 8):*** As with attorney work product protection, the SEC also makes an untimely, first-time assertion of attorney-client privilege over Appendix A, Entry 2. *See* ECF No. 351 at 10. Even if this belated assertion does not constitute waiver, the SEC has not substantiated its claim of attorney-client privilege over either Entry 2 or Entry 8. The attorney-client privilege "operates when 1) the communication from attorney to client is confidential, *and* 2) the communication is based on confidential information provided by the client." *Schlefer v. U.S.*, 702 F.2d 233, 245 (D.C. Cir. 1983). "[A] document 'does not come within the attorney-client privilege merely by being forwarded to or routed through the counsel's office.'" *Resol. Tr. Corp. v. Diamond*, 137 F.R.D. 634, 643 (S.D.N.Y. 1991) (quoting *Mobil Oil Corp. v. Dep't of Energy*, 102 F.R.D. 1, 9-10 (N.D.N.Y. 1983)). The SEC has failed to establish who the attorney is and who the client is as it relates to either of these documents or why they include any "confidential information *concerning the [a]gency.*" *Schlefer*, 702 F.2d at 245.

- ***The SEC Has an Affirmative Obligation to Segregate (*See Appendix A Generally*):***
  Assuming this Court finds that DPP is applicable to any portion of the documents at issue, which Defendants contend it is not based on numerous deficiencies, the SEC still must segregate privileged—that is, deliberative—material from the facts that it collects in the course of its activities.  Only the former can be withheld.  *See  Nat'l Day Laborer Org. Network v. U.S. Immigr. & Customs Enf't*, 486 F. Supp. 3d 669, 689 (S.D.N.Y. 2020) (DPP "does not protect documents in their entirety; if the government can segregate and disclose non-privileged factual information within a document, it must.") (quoting *Loving v. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008)); *see also* ECF No. 289 at 5-6.  The SEC has made essentially no effort to segregate deliberations about what law or policy *should be in the future* from facts and observations of the contemporaneous state of affairs.[4]  *See Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1230 (10th Cir. 2007) (requiring production of portions of letter that "merely state[] historical facts").  Indeed, the SEC does not acknowledge, for even a single document at issue, that there is a single line of factual information that is not privileged.

-

Defendants submit that application of these principles to the documents in Appendix A largely undermines the SEC's assertion of privilege over them.  That is not to say that the documents the SEC seeks to withhold are not internal or related to the agency's mission.  But that alone is not sufficient to make them privileged.  *See, e.g.*, *Nat'l Immigr. Project of Nat'l Laws Guild v. U.S. Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 729 n.10 (S.D.N.Y. 2012) (The SEC

---

[4] The SEC made *no* effort to segregate factual material prior to Defendants' filing their initial motion challenging its privilege logs, after which the SEC determined that factual material could be segregated from just 10 of the hundreds of entries on its logs.  The SEC produced these entries with heavy redactions.  For the remaining entries, the SEC continues to assert privilege on a blanket basis regardless of whether the information actually withheld is deliberative.

and other government agencies are not allowed to "treat[] their policies as private information")
(citation omitted).

Two other types of documents require specific mention:

### A.    The SEC's June 13, 2018 XRP Memo (Appendix A, Entry 2)

Perhaps the most explosive revelation of the SEC's privilege log is that the SEC's Division
of Corporation Finance—a Division that operates distinctly from the Division of Enforcement—
wrote a memorandum containing a "legal analysis of XRP."  That memorandum was then
circulated to certain individuals at the SEC on *the day before* former Director of Corporation
Finance Bill Hinman gave a speech publicly declaring Ether not to be a security.[5]  ECF No. 255-
3.  The SEC's privilege log asserts that this document is attorney work product and subject to the
DPP, and it asserts *for the first time in this letter* that it is also subject to attorney-client privilege.
The SEC is incorrect as to all three privilege claims.

This document is not work product.  *First*, if this document were part of the SEC's
investigative file, as the SEC now seems to assert, it presumably would have been covered by the
SEC's categorical privilege log, (*see* ECF No. 289-3), and no further logging would have been
necessary.  The very logging of this document suggests that it was not part of the investigative file
and raises questions about what it is and why it was prepared.  *Second*, the SEC does not tell us
who authored the document and when.  All we know is that it predates June 13, 2018, and that it
was *sent* by the Office of the Chief Counsel of the Division of Corporate Finance.  *Third*, the SEC
does not assert that the memorandum was drafted at the direction of Enforcement counsel in view
of litigation, only that it was sent to a single enforcement counsel—*along with nine other people
who are not in the Division of Enforcement*.  ECF No. 289-6 at 3.  There is every reason to believe

---

[5] *See Yahoo Finance Presents All Markets Summit:   Crypto*, Yahoo Finance (June 14, 2018)
https://finance.yahoo.com/news/yahoo-finance-presents-markets-summit-crypto-114756464.html.

that the Division of Corporation Finance was looking at XRP's status under the securities laws independently of considering whether the Division of Enforcement might recommend an action to the Commission.  Further, documents produced by the SEC show that yet another Division—the Division of Investment Management—was assessing facts in relation to Bitcoin, Ether and XRP around this same time.  *See* Appendix A, Entry 6.  *Fourth*, the Enforcement Division did not open a formal investigation into Ripple until March 2019, months after this Corporation Finance memorandum was circulated, and did not file this action until a year and a half after that.[6]  *Finally*, although the SEC asserts that "Enforcement staff worked closely with Corporation Finance staff in connection with the Ripple investigation," reliance by the Enforcement Division on expertise from Corporation Finance would not transform all of the latter's documents into pre-litigation attorney work product if they were not prepared for that purpose.

Indeed, the SEC's own internal notes reflect that little more than a month after this memorandum was circulated in June 2018, Ripple's CEO Brad Garlinghouse and others met with the Chairman of the SEC (Jay Clayton) and Director of Corporation Finance (Mr. Hinman), and that following those discussions the SEC's own note-taker recounted that Chairman Clayton "encourage[ed] the Ripple executives to continue its ongoing discussions *with the staff of the Division of Corporation Finance*"—with no mention of any ongoing enforcement matter.[7]  *See* ECF No. 289-8.  As for the SEC's assertion that Entry 2 does not "support[] Defendants' proffered defense," (ECF No. 351 at 1), the SEC's self-serving view on that question does not define the scope of discovery—relevance does.  This memorandum is plainly relevant.

---

[6] As noted above, the SEC's simultaneous suggestions that the legal status of XRP is a "straightforward" application of a settled, decades-old legal test, but also that it somehow took the SEC two and a half years of further investigation and deliberation after conducting the analysis in Entry 2 before it decided to bring this enforcement action, only underscore the highly relevant and potentially exculpatory nature of this memorandum.

[7] Illustrating the problem, the SEC produced and relied on a memorandum memorializing its view of this August 2018 meeting without claiming attorney work product protection.  ECF No. 289-8.

The SEC's assertions of DPP and attorney-client privilege over this document suffer from the same overarching flaws described above. As to attorney-client privilege—a claim that the SEC makes for the first time in its brief—the SEC fails to identify who the client is, who the attorney is and whether any information reflected in this memorandum was confidential and intended to be kept confidential with respect to the agency itself. Not every document prepared in the course of a lawyer's job responsibilities is protected by attorney-client privilege. With respect to the DPP, the SEC again fails to establish that this document was part of a policy process or was intended to assist the agency decisionmakers in arriving at a decision. In fact, that the SEC "did not present any recommendation to the Commission" suggesting the opposite is true. ECF No. 351 at 11. Thus, the SEC's attempts to claim all three privileges over this document fail.

### B.     Drafts of the Hinman Speech (Appendix A, Entry 9)

Entry 9 is a representative example of entries on the SEC's privilege logs for drafts of Mr. Hinman's June 14, 2018 speech. Opposing Defendants' prior efforts to obtain related discovery, the SEC submitted a sworn declaration from Mr. Hinman asserting that the speech reflected his "personal views," not agency guidance. ECF No. 255-2 ¶ 13. The SEC cannot now argue that drafts of the speech are predecisional on the grounds that the speech itself expressed guidance from the SEC submitted to the market after internal deliberation. Thus, the SEC is left to argue that the "decision" being deliberated was *the content of the speech itself*. ECF No. 351 at 13. In other words, the SEC argues that the speech itself did not announce an agency decision about its policy, but that the decision over what Mr. Hinman would say (which the SEC and Mr. Hinman both characterize *as his personal views*) was part of the SEC's policymaking function.

This circle cannot be squared. The SEC asks this Court to accept its absurd claim that the SEC was engaged in a deliberative process over what Mr. Hinman should say in a personal speech, even though it has argued in this litigation that Mr. Hinman's speech did not provide any

meaningful guidance to the marketplace.  Given its contention that Mr. Hinman's speech expressed his own views, the SEC cannot argue that communications about the speech were intended to facilitate *agency* decisionmaking: the process the SEC describes ended with Mr. Hinman giving a speech, and the SEC does not even assert that this process had anything to do with the Commission itself.  If such documents fell within the scope of the DPP, then practically every internal agency document would be protected by DPP in practically every case, because any agency could claim that it was "deliberating" over what one person should tell another, even if the speaker was acting in a personal capacity.  This is a quintessential example of an abusive sword and shield approach that should not be countenanced by the Court.  The SEC has the burden of demonstrating under the DPP that, at the time the Hinman Speech was delivered, it was part of a policymaking process by the SEC—an argument the SEC cannot now make based on its prior assertions in this litigation. *See Tigue*, 312 F.3d at 80 ("[The agency] must be able to demonstrate that, *ex ante*, the document for which executive privilege is claimed related to a specific decision facing the agency.") (citing *Sears*, 421 U.S. at 151 n.18).[8]  Accordingly, the DPP cannot apply to these pre-speech documents.

### 3.     The SEC Has Failed To Show A Significant Risk That Disclosure In This Case Would Chill Internal Debate.

As Defendants expect the Court's *in camera* review will confirm, the potential evidence Defendants seek here is relatively narrow in scope.  In that context, the SEC's broad assertions

---

[8] Each of the cases cited by the SEC on this point deals with the contents of speeches or press releases relating to *agency* decisions, not the personal views of agency employees (which is how the SEC has characterized Mr. Hinman's speech in this litigation).  In *Fox News v. U.S. Dep't of the Treasury*, the court considered "[w]hether an agency's discussions about how to package *its* views for presentation to the public should be covered by the deliberative process privilege."  739 F. Supp. 2d 515, 543 (S.D.N.Y. 2010) (emphasis added).  The court's analysis turned on whether the contents of the press release related to "'routine and ongoing' *agency* decisions" or "'policy-oriented' judgments" with only the latter being protected by the DPP.  *Id.* at 544 (emphasis added) (quoting *Tigue*, 312 F.3d at 80); *see ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp. 2d 130, 132, 136 (D.D.C. 2008) (finding email thread redacting agency employee opinions on "how to present Commerce's role" in certain policy changes were protected by the DPP as "deliberations regarding public relations policy"); *Sierra Club v. U.S. Dep't of Interior*, 384 F. Supp. 2d 1, 22 (D.D.C. 2004) (finding draft compilation of preliminary responses of the department to arguments "show[ed] the development of the Department's policy" and was thus protected by the DPP); *Thompson v. Dep't of the Navy*, 1997 WL 527344, at *5 (D.D.C. Aug. 18, 1997) (finding materials relating to "what information [the Navy] was going to disclose to the media vis-à-vis the explosion aboard the USS Iowa" were protected by the DPP).

that disclosure will "chill" internal debate are not credible.  As the Supreme Court has recognized, albeit in the criminal context, "we cannot conclude that advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution."  *Nixon*, 418 U.S. at 712.  The principle applies with equal force in a case the Court has already recognized is "exceptional" and "not a basis for future cases."  July 15 Hr'g Tr. at 40:8-9; 47:9-14.  The SEC's attempt to argue that disclosure in this case will open the floodgates to disclosure in others, (*see* ECF No. 351 at  19), is overwrought.  It is unusual for the SEC to bring an enforcement action seeking to re-classify an entire class of assets to bring them within its own jurisdiction, and at the same time to accuse individuals of acting "knowingly or recklessly" to substantially assist an improper activity that *in a light more favorable to the SEC* took the agency eight years to figure out.  It is particularly unusual to do so in a context where other federal agencies appear to have taken a different view, both currently and historically.[9]  These are not facts and agency judgments that are likely to frequently recur.  Indeed, the SEC trumpets that "Defendants cannot point to a single case in which the SEC staff's knowledge and understanding were deemed relevant to liability," (*see* ECF no. 351 at 17), but that only underscores the unusual facts and allegations here.

SEC staff operate under the understanding that internal agency documents are subject both to retention and potential disclosure under the Freedom of Information Act ("FOIA").  *See, e.g.*, *Nat'l Council of La Raza*, 411 F.3d at 355-56 ("FOIA strongly favors a policy of disclosure" and any exemptions to that policy, including the DPP, "are narrowly construed"); *see also U.S. Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) ("[C]onsistent with [FOIA's] goal of broad disclosure, these exemptions have been consistently given a narrow

---

[9] *See, e.g.,* Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, *In re Coinflip, Inc.*, CFTC Dkt. No. 15-29, Sept. 17, 2015, available at https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfcoinfliprorder09172015.pdf ("Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.").

compass").  Extending disclosure in the context of this unique litigation to include a narrow category of particularly relevant materials in an extraordinary case of wide-ranging consequence cannot credibly be argued to prevent SEC staff from deliberating on policy decisions in the future. *See also Clark v. United States*, 289 U.S. 1, 16 (1933) ("The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.").  If the SEC is concerned that resolving the scope of its jurisdiction over new classes of digital assets through litigation with private parties exposes the agency to increased scrutiny, the answer is not to deny relevant evidence to the defendants in those actions.  The decision on how to implement its policy objectives is one exclusively under the SEC's own control.

### 4.   The DPP Should Be Overcome On The Exceptional Facts Of This Case.

Should the Court conclude that any of the documents subject to *in camera* review are subject to the DPP, it should nonetheless analyze whether the qualified privilege should be overcome on the facts of this case.  *See* Aug. 31 Hr'g Tr. 33:6-7 ("[T]he deliberative process privilege is a qualified privilege"); *see also In re Grand Jury Subpoena dated Aug. 9, 2000*, 218 F. Supp. 2d 544, 553 (S.D.N.Y. 2002) (DPP is a "discretionary" or "qualified privilege" that "may be overcome by a showing of need.").  To make the point concrete:  Defendants submit that if the documents withheld by the SEC bear on the questions of (a) whether the market understood with clarity that XRP or similar cryptocurrencies were securities, (b) whether the SEC believed XRP or other similar cryptocurrencies were securities or had doubts about some or all, or (c) whether either of those issues was a close question, then the documents should be produced.  Defendants are prepared to agree to reasonable additional confidentiality protections to facilitate their production.

In assessing whether to override the DPP, courts consider a number of factors, including "[1] the relevance of the documents at issue in the litigation, [2] the availability of alternative

sources of evidence, [3] the seriousness of the litigation, [4] the role of the government in the litigation (the government's role as a plaintiff weighs toward disclosure), and [5] the possibility of future timidity by government employees." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 978 F. Supp. 2d 267, 279 (S.D.N.Y. 2013) (citation omitted).

These elements are addressed in detail in Defendants' substantive discussion, above. It is difficult to conceive of a case in which the balance of these factors would weigh more heavily in favor of disclosure. The SEC is attempting to pursue an extraordinary case—one that alleges explicitly that that the Individual Defendants were *reckless* in not recognizing that sales of XRP over nearly a decade were a prolonged, open and notorious unlawful securities offering, and implicitly that Ripple had fair notice that such sales of XRP were unlawful despite palpable confusion in the marketplace that discovery and the SEC Commissioners' own statements have already confirmed. Yet prior to bringing this case, the SEC had issued no guidance that would have suggested that Ripple's sales (as distinguished from—often fraudulent—ICOs, in which investors are promised returns and often conferred governance rights in exchange for investments in the development of as-of-yet-unbuilt digital ledgers).[10] And now that fact discovery has closed, the SEC remains evasive even about the basis of its allegations, (*see* ECF No. 326 at 2-5), all the while public statements of sitting and former Commissioners and leaders of other federal agencies make clear that the state of the law is *at best* unsettled. ECF No. 289 at 4.

This is not a close call. Having brought allegations that XRP's status as a security has been *since 2013* "so obvious that the defendant must have been aware of it," *Novak* 216 F.3d at 308, and seeking to disgorge approximately $1.4 billion from Defendants, the plaintiff in any other case would be required to produce evidence that its own view and the information known to it contemporaneously disprove or at least call into question that contention. The outcome should be

---

[10] *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: the DAO*, Exchange Act Release No. 81207 (July 25, 2017),  https://www.sec.gov/litigation/investreport/34-81207.pdf.

no different when the SEC voluntarily commences litigation. *See Collins & Aikman*, 256 F.R.D. at 414 (the SEC "is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action.").  The SEC's role as the plaintiff in this litigation—which distinguishes this case immediately from those in the FOIA context, in which the party seeking disclosure has no concrete interests at stake—at a minimum "weighs toward disclosure." *JPMorgan Chase & Co.*, 978 F. Supp. 2d at 279.

Defendants are not proposing an expansive invasion of the SEC's privilege.  We are only requesting—as we have throughout this case—that narrow categories of particularly relevant and potentially exculpatory evidence be disclosed.

Respectfully submitted,

/s/ Matthew C. Solomon
Matthew C. Solomon
(msolomon@cgsh.com)
CLEARY GOTTLIEB STEEN &
HAMILTON
2112 Pennsylvania Avenue NW
Washington, DC 20037
+1 (202) 974-1680

*Attorneys for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Attorneys for Defendant Christian A. Larsen*

KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK PLLC
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20036
+1 (202) 326-7900

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Attorneys for Defendant Ripple Labs Inc.*