L8UKSECCCORRECTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

             Plaintiff,

        v.                          20 CV 10832 (AT)(SN)
                               Remote Conference
RIPPLE LABS INC., et al.,

             Defendants.

------------------------------x

                            New York, N.Y.
                            August 31, 2021
                            12:16 p.m.

Before:

                  HON. SARAH NETBURN,

                                 Magistrate Judge

                    APPEARANCES

SECURITIES AND EXCHANGE COMMISSION
BY:  JORGE G. TENRERIRO

CLEARY GOTTLIEB STEEN & HAMILTON LLP
    Attorneys for Defendant Garlinghouse
BY:  MATTHEW C. SOLOMON

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
    Attorneys for Defendant Larsen
BY:  MARTIN FLUMENBAUM

DEBEVOISE & PLIMPTON LLP
    Attorneys for Defendant Ripple Labs, Inc.
BY:  MICHAEL K. KELLOGG

L8UKSECCCORRECTED

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          THE DEPUTY CLERK:  Starting with the Securities and

4    Exchange Commission, would you please state your appearances

5    for the record.

6          MR. TENREIRO:  Good afternoon, your Honor.  This is

7    Jorge Tenreiro, on behalf of the SEC.

8          THE COURT:  Good afternoon, Mr. Tenreiro.

9          THE DEPUTY CLERK:  And on behalf of --

10          THE COURT:  Thank you.

11          THE DEPUTY CLERK:  I apologize, your Honor.

12          On behalf of Defendant Garlinghouse?

13          MR. SOLOMON:  Good afternoon, your Honor.  It's

14    Matthew Solomon, on behalf of Mr. Garlinghouse.

15          THE DEPUTY CLERK:  And on behalf of Defendant Larsen?

16          MR. FLUMENBAUM:  Good afternoon, your Honor.  This is

17    Martin Flumenbaum, Paul Weiss Rifkind Wharton & Garrison.

18          THE DEPUTY CLERK:  And on behalf of Defendant Ripple

19    Labs.

20          MR. KELLOG:  Good afternoon, your Honor.  This is

21    Michael Kellogg, counsel for Ripple Labs, Inc.

22          THE COURT:  Thank you.

23          Good afternoon, everybody.  I hope everybody on the

24    call remains healthy and safe.  We're continuing to conduct

25    these proceedings remotely, by telephone, because of the

L8UKSECCCORRECTED

1   pandemic.  I hope very much that we will have a conference one

2   day in court all together, but, for now, we're continuing to

3   appear by telephone.

4           We have made available to the public an open line for

5   members of the public and the press to listen in.  I will

6   remind everyone that it is a violation of our court's rules, as

7   well as my own rules and orders, that any recording or

8   rebroadcasting of today's proceeding is strictly prohibited.

9   We are following up after these conferences, and when we learn

10  that postings are being made on various platforms, we are

11  requesting that they be taken down because it is a violation of

12  our orders and rules.  And so I will request that everybody

13  comply with those obligations.

14          Finally, I'll note that we have a court reporter on

15  the line and remind everybody both to mute your phone when

16  you're not speaking, and when you are speaking, if you'll

17  please state your name each and every time that you speak.  I

18  know that only the lawyers who intend to speak have stated

19  their appearance.  If any other lawyer who's on the line wishes

20  to be heard, I'll just ask that you state your appearance

21  clearly the first time you speak and then remind the court

22  reporter every time thereafter so we know to whom we should be

23  attributing our remarks.

24          We are here today in connection with a motion that was

25  brought by the defendant — it was filed on August 10th —

L8UKSECCCORRECTED

1    regarding the SEC's assertion primarily of the deliberative

2    process privilege, and I have reviewed the SEC's response

3    letter filed on August 17th and the reply letter by the

4    defendants filed on August 23rd.

5         I know that there is also a motion pending in

6    connection with the Slack messaging.  I don't intend to address

7    that today.  And I believe another motion was recently filed by

8    the defendants, which I don't believe is fully briefed, and so

9    we will certainly not be addressing that either.

10        Why don't I begin.  Mr. Solomon, will you be taking

11   the lead on behalf of your team?

12        MR. SOLOMON:  Yes, I will, your Honor.

13        THE COURT:  Let me ask you a pointed question, and

14   I'll ask the same question to Mr. Tenreiro as well:  In your

15   opinion — I want to focus first on the aiding and abetting

16   charge against the individual defendants — is the standard for

17   that charge an objective standard or a subjective standard?

18   Meaning is the question whether or not your client was

19   objectively reckless or is the question whether your client was

20   subjectively reckless?  And if you could point to the law that

21   you think supports your position, I would appreciate it.

22        MR. SOLOMON:  Of course, your Honor.

23        The standard is, for recklessness, one of objective,

24   not subjective.  And in our motion to dismiss, we cited a lot

25   of law on that.  I think *Apuzzo* is the formative Second Circuit

L8UKSECCCORRECTED

1      case on that, and there are numerous other cases in the

2      Southern District of New York that also apply that same

3      objective standard.  The Dodd-Frank Act, again, amended aiding

4      and abetting, which originally required knowledge, and now it

5      requires knowledge and recklessness.  Another case that I would

6      cite for that proposition that aiding and abetting -- reckless

7      aiding and abetting is an objective standard is *Novak v.*

8      *Kasaks*, and that's 216 F.3d 300 — that's a Second Circuit case

9      from 2000 — and that's the case, again, that stands for the

10     proposition that if the underlying law was unclear at the time

11     even to the SEC, then the alleged violation could not have been

12     "so obvious, that the defendant must have been aware of it."

13     It's that "so obvious" point, your Honor, that we've been

14     coming to the Court with, and we came to Judge Torres on the

15     motion to dismiss, that is really one of the key linchpins for

16     why we've been arguing since April, and your Honor has

17     accepted, that the SEC's internal documents and the way the SEC

18     was looking at the issue of XRP, Bitcoin and Ether, and

19     whether, to the SEC, there was certainty, there was clarity,

20     about whether or not those digital assets were securities

21     because of the objective recklessness standard.  That means it

22     is relevant, highly relevant, and ultimately highly probative,

23     that we get discovery into the SEC's thinking on that, because,

24     as a key market participant, the SEC's views go into the

25     objective analysis.  And, again, I would commend your Honor to

L8UKSECCCORRECTED

1    our motion to dismiss and our reply that catalogs the law on

2    these points.  I would just add, finally, the SEC really can't

3    argue otherwise, although it tries to argue it's a different

4    standard in its opposition, because it's taken the position in

5    its own jury instructions that recklessness is an objective,

6    not a subjective standard.  We think that is an accurate way to

7    look at the law.

8            The last thing I'll say, your Honor, is we've also

9    cited the *Safeco* case.  This is a Supreme Court case, 551 U.S.

10   47, it's from 2007, and, again, the Supreme Court is looking at

11   the recklessness standard generally, and it makes the point —

12   we've made this point in our papers — that uncertainty in the

13   applicable law is fatal to the SEC's claims if the governing

14   law "allows for more than one reasonable interpretation, a

15   defendant who merely adopts one such interpretation does not

16   possess knowledge or recklessness."  So I think the *Safeco* case

17   is a key case.

18           Finally, your Honor, the civil law generally calls a

19   person reckless who acts, or if the person has a duty to act,

20   fails to act in the face of an unjustifiably high risk of harm

21   that is either known or, again, "so obvious, that it should be

22   known."  And that's Prosser and Keaton, that's a restatement of

23   torts.  And then, again, *Farmer v. Brennan* is another Supreme

24   Court case, 511 U.S. 825.  So the overarching point is, if it

25   wasn't so obvious to the SEC during the 2013 to late 2020

L8UKSECCCORRECTED

1    alleged unregistered offering that XRP was a security, how

2    could it possibly have been so obvious to my client,

3    Mr. Garlinghouse, or Mr. Larsen under the reckless standard of

4    aiding and abetting.

5         THE COURT:  So, in the section of the SEC's opposition

6    letter, they mention the *Safeco* case -- that's S-a-f-e-c-o for

7    the court reporter -- but they do so also in connection with a

8    criminal case, it's *U.S. v. Zaslavskiy*, and in a footnote, they

9    talk about why, in that criminal case, the defendant sought

10   information about internal deliberations, according to this

11   letter, and was denied that discovery, and the court rejected

12   the argument that the SEC's views were relevant.

13        I know that this is a securities fraud case — this

14   being the *Zaslavskiy* case — it's a securities fraud case, and

15   so we're talking about different legal standards, it's not a

16   Section 5 case, but I'm wondering if you could just discuss for

17   me, to the extent you're aware, how that case, that criminal

18   case, does or does not affect my analysis.

19        MR. SOLOMON:  Absolutely, your Honor.  Very fair

20   question.

21        So I think what the SEC does is it is, candidly, to

22   mischaracterize Ripple's fair notice defense as well as the

23   individual's scienter argument in trying to sort of force this

24   case into the fact pattern of *Zaslavskiy*.  It doesn't fit, that

25   case doesn't apply to any of the arguments raised by the

L8UKSECCCORRECTED

defendants, and let me explain why.

First of all, Ripple's fair notice defense is not that
*Howey* is unconstitutionally vague as applied to
cryptocurrencies — that was the argument made in *Zaslavskiy*,
it's not being made here — and the individual defendants are
not raising that argument at all.

THE COURT:  That's also the argument made before Judge
Hellerstein in the *Kik* case, I believe; is that correct?

MR. SOLOMON:  That's exactly right, your Honor.
That's exactly right.  That decision concerned a different
issue.  The defendants in *Kik* wanted discovery into why the SEC
chose to bring that action.  That's not what we're looking for
here.  What we're looking for is whether the SEC acknowledged
that market participants did not understand that offers and
sales of XRP would be treated as securities either because the
SEC itself wasn't certain or because their communications with
market participants made that clear.  So, that's exactly right.
That is one distinguishing feature.

Now, in terms of the individual defendant's scienter
argument, the one that you just focused on, the SEC argues, or
tries to argue, that only its external conduct is relevant.
But as I just explained in the context of aiding and abetting,
and particularly the recklessness prong of aiding and abetting,
the internal memos we're seeking are relevant to showing
whether it would have been obvious to anyone — anyone — that

1    XRP was a security, particularly the SEC.  As your Honor has

2    already noted correctly, the documents we're seeking are highly

3    probative, we believe, of the scienter element of this

4    unprecedented aiding and abetting charge the SEC chose to bring

5    here.  By contrast, bringing it back to *Zaslavskiy*, he did not

6    raise a *mens rea* argument at all in his motion to dismiss the

7    indictment.

8           There's a few other distinguishing features, your

9    Honor, because this is a case the SEC cites to frequently, it

10   is a case that Mr. Tenreiro argued, and he argued it well, but,

11   again, it's a very different case.  That case also involved,

12   your Honor, an ICO and a fraud, neither of which are present

13   here.  Specifically, the defendant in *Zaslavskiy* had an ICO for

14   a virtual currency it hadn't even created yet that he claimed

15   was backed by reinvestments, and these are investments he never

16   secured.  He promised particular returns — 10 to 15 percent, I

17   believe it was.  That promise is what's so glaringly absent in

18   this case.  That's why this is not an ICO case, unlike

19   *Zaslavskiy*, and it's not a fraud case.

20          And then just thinking about the facts in light of the

21   three *Howey* prongs, your Honor, because your Honor has found

22   the internal memoranda and position papers we're seeking to be

23   relevant on the basis of fair notice, on the basis of *Howey*,

24   and also on the basis of scienter, I think it's fair to say

25   when you look at the *Zaslavskiy* case, that criminal case, it's

L8UKSECCCORRECTED

1    a clear application of *Howey*, and the court found as much and

2    said that a reasonable jury could find that the coins at issue

3    there were investment contracts.  So, again, radically

4    different facts.  That's all the court said there.

5          And, finally, your Honor, the SEC's briefing in that

6    case, which I went back and read last night — it's an

7    interesting read — it noted that the DAO report — this is the

8    report in 2017 that the SEC issued, it was a 21(a) report,

9    which is basically an expression of the Commission's views — in

10   other enforcement actions that the SEC had brought against

11   ICOs, those were flagged, but none of these cases, obviously,

12   gave Ripple any clarity on the regulatory status of XRP.  In

13   other words, your Honor, part of the argument we've been making

14   to your Honor on relevance is, if anything, these actions

15   suggest that XRP was less likely to be considered a security

16   given the absence of an ICO.  And especially, your Honor, when

17   you look at the briefing, again, in the *Zaslavskiy* case, in the

18   SEC's own brief, they say ICO's -- they say, "ICO's promised

19   profits through the issuance of digital assets."  There's no

20   promise here, none whatsoever.

21         So bottom line is recklessness was not even a

22   consideration in that case.  That was a criminal case.  It was

23   an intentional fraud case.  Recklessness is a construct that is

24   a creature of the civil law, and it's something that, again, is

25   part of the aiding and abetting charge that the SEC chose to

L8UKSECCCORRECTED

1  bring in this case.  And by bringing that case here, in the

2  civil case, that does open them up to exploration of what was

3  objective in the marketplace and was it so obvious that XRP was

4  a security.  And it is that charge, we believe -- in addition,

5  your Honor has found that *Howey* fair notice also rendered these

6  documents relevant for that purpose, but, really, it's that

7  aiding and abetting charge and the recklessness inquiry that

8  makes these internal documents so potentially highly probative

9  and so critical to the defendants' defense of this case, and,

10  really, that is the critical distinction from this criminal

11  case in *Zaslavskiy* along with all the other factual

12  distinctions as well.

13          And, again, these documents, we believe, will be

14  highly, highly exculpatory because it wasn't so obvious to the

15  SEC that XRP was a security.

16          THE COURT:  Let me switch gears now and ask you some

17  questions about the deliberative process privilege.  Again, I'm

18  going to ask Mr. Tenreiro these same questions.

19          In reading the SEC's opposition, they seem to make the

20  argument that the deliberative process privilege doesn't need —

21  I think this is the argument they make — doesn't need a

22  specific decision, that you can be predeliberative, but you

23  don't necessarily need to identify specifically what the

24  decision that was being deliberated is, and they cite to a FOIA

25  case, the NLRB case, for that proposition.

1        And so I wanted to get your read on whether or not you

2   believe that the deliberative process privilege requires that

3   the Court find the decision in order to determine what is

4   predeliberative -- or, excuse me, predecisional, or whether or

5   not there is case law that supports the proposition that an

6   entity can be sort of in perpetual deliberation.  Obviously,

7   I'll give Mr. Tenreiro an opportunity to be heard to the extent

8   that I am overstating the SEC's position, but, for now, if I

9   could ask you to just tell me what you believe the law is with

10  respect to the deliberative process privilege.

11       MR. SOLOMON:  Sure.

12       I think that an agency cannot be in a perpetual state

13  of deliberation.  I haven't seen a single case, your Honor,

14  where any court has accepted the kind of breathtakingly

15  expansive claim of deliberative process that's being made here.

16  And, basically, I think Mr. Tenreiro will tell you this

17  straight up, as he articulated to us several times, they're

18  taking the position that going back to 2013 and continuing

19  through today, the SEC has continuously deliberated on the

20  issue of whether -- not just Ethereum, but also Bitcoin, and, I

21  guess, concluding at least in December 2020 for some sales

22  purposes, XRP are securities.  That's their position.  They

23  were deliberating back in '13.  That continued in the ensuing

24  eight years, and it still continues today.

25       I think there is case law for the proposition — and I

1    think Mr. Tenreiro cited that in his opposition — that some

2    courts don't require there to be a specific identifiable policy

3    that was actually enacted, but what courts do require is that

4    for each document that is allegedly part of a deliberative

5    process, that that document needs to be tied to an actual

6    process, that has to be articulated, and the document has to be

7    prepared in order to assist the decision-maker in arriving at

8    an actual or potential decision.  And that's what's missing

9    here.  I think what the SEC is trying to say is, it's all one

10   big long deliberation, but we're only going to give you

11   platitudes, and this is the Tallarico declaration.  I don't

12   mean this in a pejorative way, but if you look at that

13   declaration, your Honor, it is very boilerplate, it is

14   extremely high level, it is basically we are looking at how and

15   whether the -- whether digital assets generally should be

16   regulated by the SEC.  And I don't think the case law goes so

17   far as to permit that kind of expansive definition of

18   deliberative process.

19          I would point your Honor to the *Yorkville* case, where

20   Judge Pitman makes this very point.  He basically says, look,

21   you can't just say everything is deliberative, you actually

22   have to tie those deliberations if not to a specific policy,

23   because policies may not actually end up being enacted or

24   policies may -- one policy may stop, and then there may be

25   another policy that picks up and begins.  So it isn't that

L8UKSECCCORRECTED

1    there has to be a specific policy you can point to for DPP to

2    apply, but each and every document, with specificity, has to be

3    tied to a policy-making process that is predecisional, and it

4    is deliberative.  And, frankly, we don't think the SEC has made

5    that showing based on their overbroad assertion, we believe,

6    based on the Tallarico deposition -- or the Tallarico

7    declaration, and then based on the case law, which basically

8    says, look, there's a bias in favor of transparency, not

9    secrecy.  The government has the burden of drawing the lines,

10   the government has the burden of delineating what is

11   predecisional, what is deliberative.  But, frankly, I think

12   that just hasn't been done here, which is part of the reason

13   why, your Honor, we don't think -- even though we're sitting

14   here on the last day of fact discovery, we don't think it's

15   premature that we're before your Honor on this question,

16   because this has been their position for weeks, we've asked

17   them are we going to get any documents, and they've made very

18   clear, we're going to assert a deliberative process privilege

19   over every single responsive document of the Court's two

20   orders.

21          Now, they've come off that after we filed our motion,

22   and 40 documents that were previously denominated as protected

23   by the DPP no longer are; however, 29 of those documents are

24   still being withheld from us on the basis of other privileges —

25   attorney-client privilege, work product privilege — and, your

L8UKSECCCORRECTED

1    Honor, of the 40 documents that they came off the DPP on, 11 of

2    those have been produced, but only in heavily redacted form.

3    And I would say to your Honor that this is really -- when you

4    look at the case law and you look at the standards that the SEC

5    ought to be held to in declaring this privilege, it is relevant

6    that they have now abdicated their initial position on 40

7    documents.  On 11, they appear to be maintaining it.  Even on

8    those 11, there's very heavy redactions, but on the unredacted

9    parts of the 11, your Honor, it's not a close call at all.

10   There's nothing deliberative about the information in those 11

11   documents.  And that's what gives us pause, and no one is

12   asserting any bad faith.  What's happening here is a difficult

13   process.  We've been through the ringer ourselves, Ripple and

14   the individuals, in carefully putting forth privilege logs,

15   we've been challenged on them, I've been challenged on them.

16   This is part of litigation, but, here, I think it is ripe for

17   your Honor because they are implacable in their broad-based

18   assertion.  It was only once we challenged, that they came off

19   any documents, and even the ones that they've come off, it's

20   very clear, we believe, that the deliberative process assertion

21   is still grossly overbroad given what the law provides.

22         So that's sort of the first step in the process, your

23   Honor.  We think it is way overbroad, the way it's asserted,

24   and on that basis alone, your Honor is empowered to order

25   disclosure of all of these documents, and other courts have.

L8UKSECCCORRECTED

1             THE COURT:  Thank you.

2             Mr. Tenreiro, as promised, I'm going to turn to you

3      now.  So why don't we take these issues in the order in which I

4      addressed them with Mr. Solomon and begin with my question

5      about the reckless standard and whether you agree that that's

6      an objective standard, and, if so, how you reconcile that with

7      the view that the potential uncertainty within the agency would

8      not be probative as to whether the individual defendants were

9      objectively reckless in their conduct.

10            MR. TENREIRO:  Thank you, your Honor.  This is Jorge

11     Tenreiro.

12            I think that the most interesting thing about

13     Mr. Solomon's answer in that regard is that he cites the *Novak*

14     case.  The *Novak* case is a fraud case, a 10b-5 case, and then

15     he spent the rest of his argument on this question

16     distinguishing fraud cases and *Zaslavskiy*, which was a

17     securities fraud case.  So I'm having a little bit of trouble

18     understanding when fraud cases are relevant to our analysis and

19     when they're not.

20            To answer the Court's question, even if the test is

21     objective, no objective outsider would have insight to internal

22     SEC deliberations, and I fundamentally disagree with

23     Mr. Solomon's statement that their knowledge of the law is

24     what's at issue here.  That's the standard that they want to

25     propose, and that's what's at issue before Judge Torres.  I

L8UKSECCCORRECTED

1    think Mr. Solomon correctly pointed the Court to our briefing

2    on this issue.  From our perspective, and this is cited in our

3    motion to dismiss brief, the *SEC v. Falstaff* case from the D.C.

4    Circuit says, "Knowledge means awareness of the underlying

5    facts, not the labels that the law places on those facts.

6    Except in very rare circumstances, no area of the law, not even

7    the criminal law, demands that a defendant have thought his

8    actions were illegal.  A knowledge of what one is doing and the

9    consequences of those actions suffices."

10          And that's consistent, from our perspective, with

11   criminal law cases in other circuits.  Again, these are cited

12   in our motion to dismiss brief, which is Document 183, pages 28

13   and 29.  And in a case involving specifically aiding and

14   abetting of a regulatory violation, of a books and records

15   violation, called *SEC v. Mattesich*, which we cite in that brief

16   and, I believe, also in our letter, a judge in this district

17   sort of adopts *Apuzzo* and says, "knowledge of the violation by

18   the aider and abettor."  There's no requirement that they

19   understand the consequences, the legal consequences of the law.

20   They're creating a standard that doesn't exist in criminal law,

21   your Honor.

22          So I think, from our perspective, it's a little bit

23   less about whether it's objective or subjective, but what do

24   they have to know is the question, from our perspective.  And

25   they can't actually cite to a single case that says that they

1    have to know the legal consequences of the conduct, certainly

2    not an aiding and abetting case and, ironically, not even in

3    the *Novak* case, which is a fraud case.

4           Now, they spent a lot of time saying don't look at the

5    fraud cases when we don't want you to look at them. *Zaslavskiy*

6    was fraud, it's different.  And there's another irony there,

7    your Honor.  The argument is self-defeating because they are

8    asking -- if the Court looks at the privilege logs at issue —

9    and I'm going to exclude Exhibit C to their motion for a moment

10   for a reason I'll explain — I looked at the logs again last

11   night, I think maybe there are three documents that relate to

12   XRP in these logs.  So what they're asking the Court is to say,

13   you know, they're saying, on the one hand, XRP is different,

14   you can't look at *Kik*, that was an ICO, you can't look at

15   *Zaslavskiy*, he committed fraud, XRP is unique, unique, unique,

16   that has been their sort of mantra throughout this litigation,

17   but now they're asking for the SEC to turn over all

18   conversations about all digital assets, parties that are not

19   before this Court.  It's hard to reconcile this sort of -- this

20   broad request for every conversation the SEC has had about

21   digital assets with their statement that XRP is so unique, that

22   this case is unique and that their knowledge can be proven

23   because their fact pattern was made.

24          I would like to clarify a point, your Honor, and I

25   apologize if the way that I wrote the letter was misleading.

L8UKSECCCORRECTED

In the *Zaslavskiy* case, the defendant did not seek internal SEC

deliberations.  In the *Zaslavskiy* case, the defendant said he

could not be liable because he lacked notice that the laws

applied to him.  That's a higher standard.  Criminal law

standard is higher than civil standard, and the judge rejected

the idea that the defendant could be excused by not knowing

that the laws applied to him.  So that just goes to that point

that I was making earlier.

Contrary to what Mr. Solomon said, the case that did

request internal SEC deliberations was the *Kik* case.

Mr. Solomon said correctly that in *Kik*, they wanted to know the

reasons for bringing that case — that is one of the things they

requested — but they also wanted to more generally sort of

discover what the SEC was thinking.  And, by the way, the

defense in *Kik* did rely on *Upton*.  It wasn't just this

unconstitutional vagueness argument, it relies specifically on

*Upton*, and even though *Upton* was before Judge Hellerstein, he

denied them discovery, both external and internal SEC

discovery, in that case.  He said if this is an objective

standard, then we can look at what the law is and what the

effects of the law are.

So, I hope I've answered the Court's questions about

the objective versus subjective.  I think where I'm getting

stuck is that, from your perspective, the dispute here is what

is it that they have to know.  They claim that they have to

L8UKSECCCORRECTED

1    know objectively that the law applies to their conduct, and

2    they can't cite to a single case that says that.  And I don't

3    think there is any case that says that.  They don't cite it in

4    this motion, and they don't cite it in their motion to dismiss

5    brief.

6                   There's --

7                   THE COURT:  Can I interrupt you for a second?

8                   MR. TENREIRO:  Sure.

9                   THE COURT:  Is it the SEC's position that in order to

10   determine whether or not Mr. Garlinghouse was objectively

11   reckless, you would look to see what he knew --

12                  MR. TENREIRO:  Yes.

13                  THE COURT:  -- and the state of the public sphere,

14   what was out in the public, to determine whether or not he was

15   objectively reckless, and even if internally, within the SEC,

16   there was a lack of clarity on the issue, that would not, in

17   your view, speak to the recklessnesses of Mr. Garlinghouse?  Is

18   that the SEC's view?

19                  MR. TENREIRO:  So, on the first part, your Honor, I

20   think the way that we would prove that Mr. Garlinghouse was

21   reckless is we would ask, and we would put forth evidence, did

22   you talk to anyone, did you ask a lawyer whether what you were

23   doing was right, did you ask an advisor, did you -- this is

24   your company's business selling this asset, how did you become

25   convinced that this applied.  So I'm not sure why anything that

L8UKSECCCORRECTED

1      some staffer at the SEC in a field office thought is relevant

2      to what he thought.

3              And this, by the way, feeds into a number of the

4      factors that courts analyzed with respect to need, right?

5      Courts say, well, if you can't get the evidence anywhere else,

6      maybe there's a need, but Mr. Garlinghouse doesn't need the

7      evidence.  He knows what he thought, he knows what he believed.

8      He can say -- he can stand in front of a jury and say, I

9      honestly thought that this was not a security, and these were

10     my reasons, and I was reasonable, I was not reckless.  We would

11     argue --

12             THE COURT:  That's a subjective test.  That's a

13     subjective test, and I think the defendants have said it's an

14     objective test.  So it has to be -- the measure has to be

15     against something objective, not what Mr. Garlinghouse said.

16     He could say whatever he wants he subjectively thought, but the

17     question is, was his belief objectively reasonable, and I think

18     what the defendants are saying is that in order to determine if

19     it was objectively reasonable, you have to look to see what the

20     world thought of it, and the question is whether or not if

21     internally at the SEC -- and I'm not suggesting that this is

22     what one would see, but if, internally, all of the

23     commissioners were sitting together having lunch saying, I have

24     no idea what to do about this, it's so confusing, I really just

25     don't know whether or not XRP should or should not be

L8UKSECCCORRECTED

considered a security, so they think it's unclear, the question

is whether or not the defendants should be entitled to know

that there was a lack of certainty among the experts, even if

he never heard that uncertainty, as a way of establishing that

objectively, it was reasonable for him to behave in the way he

did.

MR. TENREIRO:  Right.  So I think that there are two

problems, I think, with that sort of way of characterizing it.

To the extent that it's an objective test, it's an

objective test in his position -- it's an objective person in

his position, not in the position of an expert, but I don't

think that -- typically, when one proves knowledge or

recklessness, one has to focus on what the person actually

knew.  That is the case in the *Novak* case.  Even in the *Safeco*

case.  I think what the Supreme Court says in *Safeco* is if the

law is subject to determination by judges, then maybe that's a

problem, but I think there are two components, and there are

two sort of ways here, and that's why I just don't agree with

them that it's just an objective test.  I think there's a

number of ways in which the SEC can prove knowledge in a case

that involves scienter.

Otherwise, again, lack of understanding of the law

becomes a defense to every case, and there's no case that says

that.  That would apply in the criminal law.  And someone could

come in and say, as Mr. Zaslavskiy did, who was on trial for,

1    you know, his life, for his freedom, it wasn't clear to me that

2    these laws and *Howey* applied to digital assets, and it says

3    that that's just not the test, it's the law is what the law is.

4    So I'm not sure that I agree that it's objective in the way

5    that they characterized it, and so it's just not relevant.

6           To give another example, the *Nacchio* case, your Honor,

7    which we cited in connection with the Hinman issue, in the

8    *Nacchio* case, the SEC brought a lawsuit against individuals for

9    misapplying an accounting standard, and the accounting standard

10   they said -- it's very confusing, nobody knew how the

11   accounting standard applied, and they said we need the SEC's

12   internal deliberations because if someone at the SEC was saying

13   we have no idea, we're sitting around sort of to go with your

14   Honor's hypothetical, we're sitting around having lunch, and we

15   think we don't know how this standard applies, then that would

16   go to show that we were sort of justified in how we applied

17   these standards.  And this was a deliberative process privilege

18   case, and the court said, and I quote, that it failed to see

19   how personal opinions by staff would be relevant, particularly

20   if those opinions could not be attributed to the Commission

21   itself or were never communicated outside the Commission.

22          So I just don't think that they pointed to a single

23   case that says that deliberation inside the agency is relevant

24   to the defense they're making.

25          I think it's important here, your Honor, to draw a

L8UKSECCCORRECTED

1    distinction between Mr. Solomon is sort of -- the premise of

2    his entire argument is that there was confusion, and I don't

3    think there's any basis for that.  I think what there was is

4    deliberation, and the deliberative process privilege is meant

5    to protect that.  They don't cite a single case in which aiding

6    and abetting or fraud or -- without fraud, a court has ever

7    said, you know, you have to look at what the SEC was doing and

8    was saying to sort of measure whether the defendant can be

9    liable.

10           And I think it's particularly problematic for them, to

11   the extent that they're saying XRP is totally different anyway,

12   so what's the relevance of documents that have nothing to do

13   with XRP?  They've spent the entire litigation arguing that XRP

14   is totally different, and then we can look at *Kik*, can look at

15   *Zaslavskiy*, and can look at *Telegram*.  Now they are saying, no,

16   no, I have to know everything the SEC said about every digital

17   asset, because now when I want the documents, it's relevant to

18   my state of mind even though the digital assets has nothing to

19   do with my digital assets, at least according to them.

20           And, your Honor, I think the consequence of that --

21   sorry?

22           THE COURT:  Go ahead.

23           MR. TENREIRO:  Yeah, I think the sort of -- the

24   consequences of that are, I think, breathtaking and broad.  The

25   priv logs show that the government is deliberating — and this

L8UKSECCCORRECTED

might be a good transition into the second question about

perpetual deliberations — I think the priv logs show that the

SEC is deliberating various different issues, not -- again,

there's three documents maybe there that talk about the

application of -- or that even talk about XRP as per the log.

There's a number of issues in the digital asset space.  I think

the defendants are trying to collapse it all as digital assets

and law, but there's a lot of security statutes, and different

provisions can apply to different sorts of activities in the

digital asset space and, also, other provisions of the

U.S. Code that might apply in overlapping fashion or in other

ways different activities.

        So what they're saying is we're a very unique asset,

we're very different than everyone else, but we've been sued,

so this opens the door for us to look at everything that the

government is talking about if it touched the SEC because it

goes to our state of mind even if -- I mean, I'm looking at

some of the priv logs, and the priv logs themselves show that

some of these are conversations with the FBI about money

laundering and crypto, some of them are with individuals at

Treasury that work for the terrorism finance and financial

crimes unit.  Their argument is that because they are so

different than every other digital asset, they get to swing the

door open, and they swing the door open for all sorts of

defendants, to examine sort of the government's deliberations

L8UKSECCCORRECTED

1    across this very significant and expanding segment of our

2    economy.  I don't think there's any basis for that, your Honor,

3    and the breathtaking scope of a ruling would really be, I

4    think, significantly damaging to the quality of the

5    deliberations that the government is having contrary to the

6    NLRB case and other Supreme Court cases have recognized.  I

7    recognize those are FOIA cases, but those FOIA cases

8    incorporate -- the language of the statute incorporates the

9    civil discovery standard.

10           So, the fact that they're --

11           THE COURT:  So what you, I think, just said is that a

12   lot of the issues presented for which you are seeking

13   protection from the deliberative process privilege apply to a

14   whole host of deliberation.

15           MR. TENREIRO:  Yes.

16           THE COURT:  If you could answer the question that I

17   posed to Mr. Solomon about whether or not the Court needs to

18   know what the moment in time in which the deliberations have

19   ceased, whether that's because a decision has been made or

20   because the deliberations have ended and there will be no

21   decision.  Is it your view that the Court needs to be able to

22   say, this is the date by which the deliberations ended and be

23   able to identify either a decision or a decision not to decide,

24   or should the Court just assume that there can be, as I said

25   previously, perpetual deliberation on these complex issues?

L8UKSECCCORRECTED

1          MR. TENREIRO:  Your Honor, I don't think -- I suppose

2     that an agency or several agencies could deliberate an issue

3     for a long time.  I think that the Court should know, and the

4     priv logs -- and, I mean, if it's not clear, I'm happy to sort

5     of amend them, but the Court should know what the end date is

6     because the Court does need to be able to analyze, is it

7     predecisional or postdecisional, right?  So there does need to

8     be an end date, but the problem, I think, is that defendants

9     are collapsing all sorts of deliberation, and they're saying,

10    oh, there's this one big deliberation about digital assets.  I

11    think in our back-and-forth, I think it's Exhibit, I want to

12    say, H to their motion -- I'm just going to make sure -- it's

13    Exhibit G to their motion, so that's Document 289-7, we gave

14    them a list of different issues that are being deliberated.  So

15    the DAO report has been mentioned, right?  The DAO report was

16    deliberated, and then the final decision was issued.  The

17    decision whether to bring this case was deliberated, and then

18    that became final.

19          There are a number of issues in this space, your

20    Honor, so I think the answer to the Court's question, very

21    specifically, is that there's no perpetual deliberation.  The

22    Court's other hypothetical is what I think is correct — there

23    either is a date on which a decision is made, or perhaps at

24    some moment in time, some avenues of potential policymaking are

25    abandoned.  But we're not claiming this sort of blanket

L8UKSECCCORRECTED

1   deliberative over everything.  We have specifically stated the

2   different issues that are being deliberated.  I mean, just as

3   an example, I think the first privilege logs that they have, so

4   I think it's Exhibit A, and a couple of others mentioned what

5   we call action memos, right?  Those are the recommendations by

6   the Division of Enforcement to the Commission on potential

7   avenue of enforcement.  That's essentially assuming the

8   Commission makes a decision on those, that's the date on which

9   that deliberation ends.

10          But to take another example, there's Exhibit E —

11   again, I'm using the exhibit letters to their motion just for

12   simplicity — that would have a lot of SEC communications with

13   other agencies.  And it's publicly available, sort of the

14   different guidances or different statements that other

15   regulatory bodies have made.

16          So, for example, there's communications with FSOC, the

17   Financial Stability Oversight Council.  The FSOC issued

18   guidance in December 2020.  The communications in the priv log

19   predate that.  There's deliberations with the FSB, Financial

20   Stability Board.  They issued guidance, I believe, in June of

21   2019.  The documents predate those.  The documents in my log

22   predate those.

23          There's the --

24          THE COURT:  How am I supposed to know all of this?

25   I'm looking at Exhibit E right now.  How would I know, based on

L8UKSECCCORRECTED

1       this, what the decision is and when it was rendered?

2               MR. TENREIRO:  That's a fair question, your Honor.  I

3       think that the problem is defendants want everything, and

4       rather than sort of identifying here's the categories, they're

5       saying there's no privilege, or if there is, we get all of it

6       because we're very unique.  And if the answer here is to go

7       back and either narrow the scope of the dispute or to provide

8       information about the decisions, I think we do provide that

9       information in the priv log and in the declarations, but if

10      there's something that the Court -- for example, the Hinman

11      speech logs — that's Exhibit B and D — I think that's pretty

12      clear.  Exhibit C, which I had exempted earlier, is what we

13      call the investigative file over this case.  So those are all

14      the deliberations about whether and when or how to bring this

15      matter.  That deliberation ends when the case is brought.

16              But if there are particular documents, I'm happy to

17      give more information.  I think the defendants haven't actually

18      said they want this or that, and part of the reason for that

19      is, I'm not sure how they're going to come in and say I want

20      communications with the Financial Stability Board about digital

21      assets generally or about a conversation with the FBI about

22      money laundering when we're this unique asset that's about

23      *Howey*.  It doesn't make sense.  How could there be any

24      relevance?  Just that argument wouldn't fly, and I think that's

25      why they haven't made it.

L8UKSECCCORRECTED

1      But if they want to go back and say, okay, these are

2   the ones we want, and we want more information, I guess that's

3   something we could look at, but I just don't think it's proper

4   in this case.  They haven't made that request, and they haven't

5   made sort of the showing.

6      So --

7      THE COURT:  So the requests that they have made --

8   yes, you have, thank you.

9      The requests that they have made is that the Court

10  conduct an in camera review, which is something that I do often

11  in privilege issues.  And your response to that, I think, is

12  limited to what's Section C of your letter on page 8, which

13  asserts that -- just generally that the in camera review is

14  unnecessary because the factual material is intertwined with

15  the deliberative process discussions.

16      My inclination is to conduct an in camera review.  My

17  inclination is to do what I always do in these cases, which is

18  to request that the party seeking the documents identify a

19  small number of documents, which the defendants have now done,

20  and then to ask for limited briefing, recognizing that the SEC

21  has a privilege position because I'd like them to explain to

22  me, potentially with some of that information redacted to the

23  defendants, why they believe the privilege applies.  Obviously

24  to redact as little as possible, but I recognize that you can't

25  make an argument about privilege and, in so doing, waive that

L8UKSECCCORRECTED

1    privilege.

2            So that's my inclination.  Is there a reason, from

3    your view, why I shouldn't conduct an in camera review as

4    proposed by the defendants?

5            MR. TENREIRO:  Right, your Honor.  So, look, I guess

6    the answer is if the Court wants to do an in camera review, we

7    welcome in camera review, but there is a body of case law that

8    sort of talks about how if there's an issue with the priv logs,

9    it's better to correct them, and if there's -- at least a

10   couple of cases, at least in the D.C. Circuit, say that courts

11   have to exercise caution and consider the potential prejudice

12   to the privilege holder, and that, in fact, you might need to

13   have a prima facie showing of sort of bad faith, and

14   Mr. Solomon concedes to raising that here.  Some citations

15   include 9833 F.2d 248 out of the D.C. Circuit or 257 F.R.D. 302

16   out of the District of Columbia.  I think that the

17   defendants -- I guess my concern a little bit is the defendants

18   that we've accused of breaking the law and raising billions of

19   dollars are getting a little bit of special treatment.  Our

20   logs -- we sought their documents on the basis of the legal

21   basis that they waived their privilege, and the Court was able

22   to make a decision that applied and that applied generally.

23           I'm also sort of troubled by the request, I believe

24   the Court is referring to Appendix A, which sort of narrows the

25   number of documents.  The very first entry is notes, right,

L8UKSECCCORRECTED

1   notes with -- conversations with other parties.  I mean, these

2   other parties (unintelligible).

3          THE COURT:  Sorry, I think you cut out.  The very

4   first entry is notes with other parties.

5          MR. TENREIRO:  Yeah, I apologize, your Honor.  I think

6   someone accidentally unmuted their line.

7          The very first entry is notes with other parties about

8   conversations with other parties.  Now, in a case we cite in

9   our letter, which is *Bloomberg v. SEC*, the district court said

10  it would be very prejudicial for the SEC's ability to sort of

11  conduct its mission if notes that are taken by officials about

12  meetings with companies subject to SEC regulations are, you

13  know, disclosed, it would severely undermine, is the quote from

14  the case, the SEC's ability to gather information.  What's more

15  interesting about this is that they can call these third

16  parties, their names are here, Professor Grundfest is on the

17  payroll.  I don't understand what the need is.  These notes

18  tell you who to ask, and there's a senator there, and public

19  records show if they have a relationship or donations to the

20  senator.  I don't understand why our logs should be treated any

21  differently than theirs.

22         A lot of these others, again, sort of speak for

23  themselves.  Ms. Enwall works for --

24         THE COURT:  To be clear, I'm not suggesting that the

25  defendants review these documents.  I assume you know that I'm

L8UKSECCCORRECTED

suggesting that I review these documents and that we could have

a more specific conversation.  I mean, much of this letter

writing is in the abstract, but it may be that you are exactly

right, that when you actually look at the types of documents,

they really are too far afield or not appropriate for discovery

for any host of reasons.  But the deliberative process

privilege is a qualified privilege, it's not like the

attorney-client privilege, and so I think the argument is that

the defendants have, at least in my view, at least raised a

question as to whether or not the broad application of the

privilege is appropriate here, and have identified a series of

documents that they believe would establish that the privilege

was not invoked appropriately as to those documents.

        When I have privilege issues, I typically conduct

myself in this manner where I'll issue a ruling which will say,

as to Document 1, it is privileged, and it doesn't need to be

produced and any similar documents don't need to be produced;

as to Document 2, it's the privilege doesn't apply and similar

type of documents need to be produced, something of that

nature.

        So I guess I don't see why these defendants are

getting any privileged — excuse the pun — treatment here.  I

actually think it may assist the SEC so that I can see exactly

what these types of documents are and why you believe that they

would unfairly interfere with the SEC's important mission.  So

1    my instinct is to move forward in that regard.  I don't see

2    that as any special treatment for these defendants.  And you

3    didn't really address this in your letter, which is why I

4    wanted you to address it now.

5         MR. TENREIRO:  Right.  No, thank you, your Honor, I

6    understand, and I do understand the proposal.

7         As I said, if that's the Court's inclination, then

8    we'll obviously follow that directive.  I think what I was

9    taking a little bit of issue with is sort of the suggestion

10   that there is a broad assertion of privilege or that there's an

11   issue with our assertion of privilege, and that's taking me

12   back to the cases I cited where the courts say in camera review

13   in the context of deliberative process sort of requires the

14   prima facie finding or this idea that the agency has done

15   something wrong, and I take that the Court is not actually

16   saying that in this case, but that was sort of the response

17   that was given.  I think in camera review typically is reserved

18   for cases where there's been a problem that's been identified,

19   and I think this Appendix A sort of speaks for itself.  You

20   know, there's drafts, and the case law and deliberative process

21   could not be clearer that drafts -- you know, in the case we

22   cite where Judge Parker from this district — I think it's in

23   our letter, if I can just have one moment, I think it's

24   called — it's not Citizens United, it's *Citizens Union*, she

25   says drafts are just -- how could drafts ever be relevant.  So

1    if one looks at Appendix A, there's drafts, there's a

2    hodgepodge, there's some documents that suggest they can get

3    the evidence elsewhere, there's drafts, there's one that

4    talks -- I think two that talk about XRP maybe.  So that was

5    sort of my response, is that I just don't think it's needed in

6    this case, but if the Court wants us to do that, we will.

7                THE COURT:  Okay, good.  Thank you.  I do.

8                So let's talk about how to move forward.  What I would

9    like is to have the SEC send to me in camera the documents

10   logged on Appendix A, and then I'm going to give both parties

11   an opportunity to submit to me targeted letter briefs on those

12   documents, and with respect to the SEC, I'm going to allow it

13   to file certain portions of that letter redacted.  I will ask

14   the SEC to be as limiting as possible so that the defendants

15   have as much opportunity to respond, but I recognize, again,

16   that the privilege has not been waived, and I'm not going to

17   ask the SEC to do that in the context of defending its

18   position.  So what I'd like is the documents and a letter brief

19   from the SEC filed on the public record with redactions, as

20   limited as possible, and made available fully to me, and then

21   I'll give the defendants an opportunity to respond — I don't

22   think I need a reply brief here — and then I'll be able to

23   issue a ruling with respect to these privileged documents and

24   give the parties some guidance.  And if I conclude that certain

25   documents should be produced, it will give some guidance for

L8UKSECCCORRECTED

1    the SEC to review other assertions and see if there are other

2    documents that should be produced, and if I conclude that the

3    SEC has properly asserted the privilege, that means that

4    similar documents of that category also don't need to be

5    produced.

6           So let's set a schedule for that.  Today is the

7    Tuesday before Labor Day weekend.  Mr. Tenreiro, when would you

8    like to file your letter brief?  And I'd like it to be, let's

9    say, about 10 pages, I think, seems like a reasonable --

10   10 single-spaced or 20 double-spaced pages to address these

11   specific documents.

12          MR. TENREIRO:  Your Honor, may we have two weeks?

13          THE COURT:  Sure.

14          So that will get you to September 14th.

15          MR. TENREIRO:  Right.

16          THE COURT:  Mr. Solomon, I will have you speak on

17   behalf of your team.  When do you want to file any opposition

18   letter?

19          MR. SOLOMON:  Your Honor, if we could take two weeks

20   after that, and we'll try to get it to you as quickly as we

21   can, so it may be less than two weeks, but two weeks would be

22   good.

23          THE COURT:  Okay.  So that will get you to

24   September 28.

25          So, on the 14th, I'd like Mr. Tenreiro not only to

L8UKSECCCORRECTED

1  file his publicly available moderately or modestly or limited

2  redacted letter on the docket, and then send to the Court

3  ex parte the documents themselves and an unredacted version of

4  that letter.  If the documents are voluminous, as they may well

5  be, if I can ask you to also send me a binder with those

6  documents, I think that that would be helpful for me.

7          MR. TENREIRO:  Yes, your Honor.

8          THE COURT:  Thank you.  If you can just send that to

9  chambers.

10          MR. TENREIRO:  So a physical copy, obviously?

11          THE COURT:  A physical copy, yes, please.

12          MR. TENREIRO:  I'm happy to arrange for a physical

13  copy.  In addition to that, would the Court like a digital

14  transmission?  I'm happy to discuss with the deputy offline as

15  well.

16          THE COURT:  Why don't you just send me both.  Just

17  give me both.

18          MR. TENREIRO:  Absolutely.

19          THE COURT:  Thank you.

20          And then I'll get an opposition letter from the

21  defendants, recognizing that they will be a little bit with one

22  hand tied behind their back because there may be some limited

23  redactions in the SEC's letter, but that, unfortunately, is

24  just a product of this process, and then I will do my best to

25  turn around a decision as quickly as possible.

L8UKSECCCORRECTED

1          All right.  Anything further from you, Mr. Tenreiro?

2          MR. TENREIRO:  Your Honor, I would just like to

3     mention, the Court correctly mentioned the Slack motion and a

4     motion filed by the defendants last week.  We also filed a

5     motion.  I apologize that it was late last night.  It's

6     obviously not fully briefed, but I just wanted to bring it to

7     the Court's attention.

8          THE COURT:  Great.

9          And the parties, I think, have worked cooperatively on

10    scheduling their responses, so if anyone needs to ask for a

11    particular schedule outside of the norm, feel free to just

12    submit something on consent with respect to the briefing

13    schedule.

14         MR. TENREIRO:  I believe they have, your Honor.

15         MR. SOLOMON:  Yes, we have cooperated on the

16    scheduling issues so far.

17         THE COURT:  Terrific.  We'll take what we can get.

18         All right.  Mr. Solomon, anything further from you and

19    your colleagues?

20         MR. SOLOMON:  Your Honor, if I could just -- because

21    Mr. Tenreiro made a number of points for the record, if you'd

22    indulge me just for a very small amount of time, not to revisit

23    anything, but just to make sure the record is complete on a few

24    discreet points?  May I do that now quickly?

25         THE COURT:  Sure.

1          MR. SOLOMON:  First of all, the way your Honor is

2     approaching this, we think, is very sensible.  We'll do our

3     part to make the Court's burden as low as possible.  In camera

4     review makes all the sense in the world to us.

5          Just a few quick points to make sure, again, the

6     record is clear on this:  We don't agree with the recitation of

7     law on the part of Mr. Tenreiro.  Recklessness is an objective

8     standard.  Attempts to collapse knowledge with recklessness are

9     not helpful, and they're not going to be helpful to the Court's

10    review, because as you look through these documents, a key

11    inquiry for the probativeness relevant to these documents is

12    going to be were people discussing these issues at the SEC in a

13    way that would be potentially helpful or not helpful to the

14    defendants in terms of what the objective standard is, not just

15    for recklessness, but also for fair notice.  So we do want to

16    make sure to correct the record on that and make sure that our

17    position is clear — recklessness is objective, fair notice is

18    objective.  The Court has already so ruled in its prior

19    hearings, and the case law can all be found in our motion to

20    dismiss and our opposition.

21          The second quick point is that the *Kik* case on that

22    point is inapposite.  There were no individuals charged, there

23    was no reckless at play there.

24          The third point is simply, your Honor, as you're

25    thinking about notes, the SEC notes, this is a key area for us,

1    it's obviously a key area of sensitivity for the SEC, which is

2    why Mr. Tenreiro flagged it specifically.  Those, we don't

3    believe, ought to be covered by the deliberative process

4    privilege.  To the extent any could be, that privilege should

5    be overcome.  And let me just explain why.  The SEC has been

6    using a sword-and-shield approach to notes.  In the context of

7    Mr. Hinman's deposition, they used an internal note that the

8    SEC itself had generated from August 20th, 2018, offensively,

9    and it's a note that purported to capture a conversation

10   between my client and Mr. Clayton -- Bill Hinman and Jay

11   Clayton.  And this is the one note, internal note, that they've

12   produced, and they've tried to use it offensively at the Hinman

13   deposition.  It's actually an exculpatory note, it's very

14   helpful to my client, it's helpful to Ripple, but these kinds

15   of sword-and-shield tactics can't be countenanced, and so we do

16   feel very strongly, your Honor, and you will make the ultimate

17   determination, that internal SEC notes need to be turned over,

18   at a minimum parts, that we can get the facts from those notes.

19   We just want to be very clear about that.  We hope that this

20   exercise is one not just of separating facts from alleged DPP

21   protected materials, but really one that attempts to impose

22   some fairness and order on this process, to avert the sword and

23   shield phenomenon going forward.

24          Again, we believe these internal documents are going

25   to be highly exculpatory and critical to the fair defense of

L8UKSECCCORRECTED

1    this trial, and the public has a right to know what's in them,

2    we certainly have a right to know what's in them.

3            And I guess the last point I'd make is there's no

4    standard that your Honor needs to apply for in camera review.

5    Judges do it all the time.  Judges did it in most, if not all,

6    the cases that the SEC points to where deliberative process was

7    found to remain intact.  So we appreciate what the Court is

8    doing, it makes perfect sense, but I did want to be crystal

9    clear, we think the SEC has fallen down on its initial showing

10   that the DPP applies at all.  We think it's overbroad, we think

11   we basically just heard a concession of that from Mr. Tenreiro.

12   We appreciate the Court wants to be careful and incremental and

13   surgical, and that makes perfect sense, but our position is

14   they have not alleged DPP adequately at this point in time.

15   They haven't made a showing, and it's their burden.  Our

16   position is also, as your Honor noted, to the extent they are

17   able to establish deliberative process over any of the

18   documents in Appendix A or beyond, we suspect you may want to

19   look at more documents once you look at Appendix A, we believe

20   that that is easily overcome under the Franklin factors.  I'm

21   not going to belabor them, you haven't asked me to, but I just

22   wanted to make sure that our position was clear on the record.

23   We think you could make a ruling now that DPP was improperly

24   invoked, and to the extent DPP could exist over any of these

25   documents, they've had weeks, if not months, to review and log

L8UKSECCCORRECTED

1    and haven't done so adequately, in our view, you could find

2    that DPP is overcome.  We still think your Honor's approach is

3    the correct one — it's careful, it's incremental — but I just

4    wanted to make clear what our position was since I didn't have

5    a chance to make those points.

6             Thank you for your indulgence, your Honor, and we'll

7    do our part, again, to make your review as seamless as

8    possible.

9             THE COURT:  All right.  Well, thank you, everybody.

10   So I will look forward to the SEC's filing on the 14th and the

11   defendants' response on the 28th.  Between now and then, I hope

12   everybody has a happy Labor Day.  For those of you celebrating

13   the Jewish holidays, I hope you have a nice holiday.  And I

14   will look out for the rest of the motions that have been filed

15   in this case.

16            Thank you very much, everybody.  We're adjourned.

17            MR. SOLOMON:  Thank you, your Honor.

18            MR. TENREIRO:  Thank you, your Honor.

19                              *  *  *

20

21

22

23

24

25