# EXHIBIT A

2022 WL 196283
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,
v.
JUSTIN W. KEENER, d/b/a JMJ
Financial, Defendant.

Case No. 20-cv-21254-BLOOM/Louis
|
01/21/2022

BETH BLOOM, UNITED STATES DISTRICT JUDGE

**OMNIBUS ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**
*1 THIS CAUSE is before the Court upon Plaintiff Securities and Exchange Commission's ("Plaintiff" or "SEC") Motion for Summary Judgment, ECF No. [68] ("Plaintiff's Motion"), and Defendant Justin Keener's ("Defendant" or "Keener") Motion for Summary Judgment, ECF No. [71] ("Defendant's Motion") (collectively, "Motions"). The Court has carefully reviewed the Motions, all opposing and supporting submissions, the arguments presented at the hearing on the Motions, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiff's Motion is granted, and Defendant's Motion is denied.

**I. BACKGROUND**
Plaintiff initiated this action against Defendant on March 24, 2020, arising from Defendant's alleged violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78*o*(a)(1). According to the Complaint, ECF No. [1], between January 2015 and January 2018, Defendant bought and sold billions of newly issued shares of microcap securities (penny stocks) and generated millions of dollars of profits from those sales, but he failed to comply with dealer registration requirements under the Exchange Act. *Id.* ¶ 1. Specifically, Defendant's business model entailed buying convertible notes from penny stock issuers, holding the notes for at least six months, converting the notes into newly issued shares of stock at a deep discount to the prevailing market price (generally ranging between 35-50% less), and then selling those shares into the public market for a significant profit. *Id.* ¶¶ 2, 8, 13, 15. Defendant purportedly purchased or converted more than 100 notes from more than 100 different microcap issuers, and he sold over 17.5 billion newly issued shares into the public market generating approximately $21.5 million in profits during the alleged three-year period. *Id.* ¶¶ 2, 8, 16. In Plaintiff's view, Defendant operated as an unregistered securities dealer. *Id.* ¶¶ 3-4, 19, 22.

The Complaint further alleges that Defendant "held himself out to the public as being willing to buy convertible notes at a regular place of business[.]" *Id.* ¶ 10. In particular, he "operated a website that advertised his business to issuers;" "hired employees, who worked on commission, to solicit issuers who were willing to sell convertible notes to him;" he and his employees "attended, and sometimes sponsored, conferences at which they solicited penny stock issuers in person;" and he gave presentations at conferences "that included a notarized affidavit from his accountant stating that he had $20 million 'committed' to purchase convertible notes from issuers." *Id.* Plaintiff allegedly obtained "nearly all of the stock that he sold in his business directly from the issuers, through note conversion, and not from purchases in the secondary market." *Id.* ¶ 11.

Based on the foregoing, the Complaint asserts a single count for violation of Section 15(a)(1) of the Exchange Act. *Id.* ¶¶ 23-26. Plaintiff seeks four forms of relief: (i) a permanent injunction restraining Defendant and his agents from acting as an unregistered securities dealer; (ii) an injunction restraining Defendant from participating in the offering of any penny stock; (iii) ordering Defendant to pay a civil penalty; and (iv) ordering Defendant to disgorge, with prejudgment interest, all ill-gotten gains derived from the activities set forth in the Complaint. *Id.* at 11-12.

*2 On June 22, 2020, Defendant moved to dismiss the Complaint largely on the basis that he is a "trader" and not a "dealer" under the Exchange Act and therefore does not need to register with the SEC. *See generally* ECF No. [15] ("Motion to Dismiss"). Defendant made five overarching arguments: (1) there is extensive legal guidance on the definition of a dealer; (2) Plaintiff fails to allege any facts to show that Defendant was a dealer; (3) the Complaint's allegations show that Defendant was a trader; (4) Plaintiff fails to state a claim for injunctive

relief; and (5) the Complaint alternatively should be dismissed as a due process violation because of a lack of fair notice that his conduct could be unlawful. *Id.*

On August 13, 2020, the Court entered its order denying the Motion to Dismiss in its entirety. *See generally* ECF No. [29] ("Order on Motion to Dismiss"). Thereafter, on August 27, 2020, Defendant filed his Answer and Affirmative Defenses to Plaintiff's Complaint, ECF No. [30] ("Answer"), in which he asserts ten affirmative defenses: (1) incorporation of all defenses, including the Motion to Dismiss; (2) failure to state a claim; (3) due process; (4) estoppel; (5) statute of limitations; (6) advice of counsel; (7) injunctive relief; (8) disgorgement; (9) penny-stock bar; and (10) penalties. *Id.* at 7-8.

Regarding the instant Motions, Plaintiff filed its Motion, ECF No. [68], along with its corresponding Statement of Material Facts, ECF No. [67] ("Plaintiff's SMF"). Defendant filed his Opposition to Plaintiff's Motion, ECF No. [90] ("Defendant's MSJ Response"), and his Opposition to Plaintiff's SMF, ECF No. [91] ("Defendant's SMF Response"). Plaintiff also filed a Reply to Defendant's MSJ Response, ECF No. [102] ("Plaintiff's MSJ Reply"), and a Reply in Support of Plaintiff's SMF, ECF No. [101] ("Plaintiff's SMF Reply").

Defendant filed his Motion, ECF No. [71], along with his corresponding Statement of Material Facts in Support of Motion, ECF No. [72] ("Defendant's SMF"). Plaintiff filed its Opposition to Defendant's Motion, ECF No. [89] ("Plaintiff's MSJ Response"), together with its Opposition Statement of Material Facts, ECF No. [88] ("Plaintiff's SMF Response"). Finally, Defendant filed a Reply in Support of his Motion, ECF No. [99] ("Defendant's MSJ Reply"), and a Reply Statement of Material Facts, ECF No. [98] ("Defendant's SMF Reply").

On October 18, 2021, the Court held a hearing on the Motions, during which the parties argued their respective positions. ECF No. [114]; *see also* ECF No. [116]. The Motions are ripe for consideration.

## II. MATERIAL FACTS
Based on the parties' statements of material facts in support of and in opposition to the Motions, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.[1]

[1] In his SMF Response, Defendant urges the Court to reject Plaintiff's assertions of fact and deny Plaintiff's Motion because it "simply appended its exhibits to its motion, rather than to a declaration attesting to their authenticity as true and correct copies." ECF No. [91] at 1. While the Court recognizes that Federal Rule of Civil Procedure 56(e) previously required that documents be authenticated by and attached to an affidavit, that is no longer required under the current version of Rule 56. The current version now states: "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[U]nder current Rule 56, an objection cannot be based solely on evidence not being authenticated—the objection must be that evidence cannot be presented in admissible form, not that the evidence has not been presented in admissible form." *Abbott v. Elwood Staffing Servs., Inc.*, 44 F. Supp. 3d 1125, 1135 (N.D. Ala. 2014) (emphasis in original); *see also Cosmo v. Carnival Corp.*, 272 F. Supp. 3d 1336 (S.D. Fla. 2017) (finding that document relied upon in opposition to motion for summary judgment "need not be authenticated" because all that is required is that "evidence be presentable in admissible form at trial"). Defendant's objection is not that the evidence cannot be presented in an admissible form at trial, but rather than the documents have not been authenticated. Because authentication is no longer a requirement at the summary judgment stage and Defendant does not argue that documents are fabricated or cannot otherwise be authenticated at trial, Defendant's request that the Court reject Plaintiff's assertions is denied.

### A. Defendant and JMJ Financial
*3 Defendant was a resident of Miami, Florida from 2006 to 2018. ECF No. [67-1] at 25:18-20. Defendant does business under the fictitious name JMJ Financial ("JMJ"), which he registered in Florida in 2008. ECF No. [1] ¶ 5, ECF No. [30] ¶ 5; ECF No. [67-2] at 2. Some of Defendant's bank and brokerage accounts are held under the name Justin W. Keener d/b/a/ JMJ Financial, and some are held under the name Justin W. Keener. ECF No. [72-6] at 2. Both types of accounts are operated with Defendant's social security number. ECF No. [72-3] at 29:4-11; ECF No. [72-2] at 79:5-9.

During the relevant period of January 2015 to January 2018 ("the Relevant Period"), Defendant had offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico. ECF No. [67-1] at 30:21-31:6. JMJ's San Diego office had 7,400 square feet and accommodated

"15 to 20 individual offices" and cubicles. ECF No. [67-3] at 30:16-31:1. JMJ employed as many as 25 employees at one time during the Relevant Period. ECF No. [72-2] at 47:13-18; ECF No. [67-24] at 4, 6. According to Defendant's tax records, he had an employee payroll of $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017. ECF No. [67-6] at 15, 21, 31; *see also* ECF No. [67-1] at 88:23-90:9.

Defendant has never registered with the SEC as a securities dealer. ECF No. [1] ¶ 5; ECF No. [30] ¶ 5; *see also* ECF No. [91] ¶ 2. Defendant describes himself as an "investor" who has a "long term view" of his investments. ECF No. [72-3] at 36:3-16; ECF No. [72-2] at 92:2-3, 201:9-14. Defendant only invests his own money and does not handle anyone else's money. ECF No. [72-9] ¶¶ 21-22; *see also* ECF No. [72] ¶ 8; ECF No. [88] ¶ 8. Additionally, Defendant alone decides when and how to invest his money. ECF No. [72-3] at 33:16-21; ECF No. [72-10] at 53:11-54:1; *see also* ECF No. [72] ¶ 9; ECF No. [88] ¶ 9.

**B. JMJ's QuickLoan Program**
During the Relevant Period, Defendant purchased convertible notes from microcap companies (issuers) in need of cash. ECF No. [67-9] at 13; ECF No. [67-24] at 9; ECF No. [67-1] at 208:8-15; ECF No. [72-2] at 25:1-22. Defendant directly "negotiated the terms of the convertible notes and signed contracts to memorialize the investments he made into [the] issuers." ECF No. [30] ¶ 9; *see also* ECF No. [72-2] at 117:23-118:6.

The convertible notes were contracts in which the issuer of the note promised to pay JMJ a designated sum of principal and potentially interest within a designated time frame. *See, e.g.*, ECF No. [72-14] at 41-43; ECF No. [72-15] at 36-38; ECF No. [67-12] at 2-5. The convertible notes also gave JMJ the option to demand that sums owed under the notes be paid in the form of the issuer's stock at a discount to the market price. *Id.*; *see also* ECF No. [67-3] at 36:7-37:13; ECF No. [67-4] at 108:21-109:22. Defendant testified that the convertible notes held between 2014 and 2016 had a "10 percent discount to 40 or 50 percent discount[.]" ECF No. [67-1] at 61:13-62:2. Defendant also testified that the stock converted from the notes were not publicly traded until Defendant "introduces it to the market." ECF No. [67-1] at 120:15-121:8.

When evaluating issuers for JMJ's QuickLoan program, Defendant and/or his employees considered the liquidity of an issuer's existing stock, the volume at which it traded in the market, the amount of outstanding convertible debt, ECF No. [67-14] at 2; ECF No. [67-15] at 3, along with "the basic financial data" of the issuers, such as "assets, liabilities, revenue, profits, losses, [and] cash flow" and other information in public filings, ECF No. [72-3] at 51:9-18; *see also* ECF No. [72-11] (due diligence review for red flags); ECF No. [72-12] (same); ECF No. [72] ¶ 10; ECF No. [88] ¶ 10. Defendant also "developed proprietary technology," at a cost of more than $3 million, to find convertible notes for sale and to account for existing convertible notes. ECF No. [67-3] at 24:21-26:17, 27:20-28:23; ECF No. [67-17] at 58:5-59:19, 61:23-62:15; ECF No. [67-24] at 14; *see also* ECF No. [67] ¶¶ 23-24; ECF No. [91] ¶¶ 23-24.

**\*4** Defendant himself decided when to seek to convert some or all of an outstanding loan balance into stock. ECF No. [72-3] at 36:3-16, 36:25-37:5; *see also* ECF No. [72] ¶ 35; ECF No. [88] ¶ 35. When seeking to convert, Defendant would first place a request with an issuer's transfer agent. ECF No. [72-35] at 2; ECF No. [72-36] at 2; *see also* ECF No. [72] ¶ 36; ECF No. [88] ¶ 36. Once the transfer agent approved the conversion, Defendant would place a request with his brokerage firm to deposit the stock into his account. ECF No. [72-38] at 2; *see also* ECF No. [72] ¶ 39; ECF No. [88] ¶ 39. After the stock from a conversion was deposited into Defendant's brokerage account, he decided when and in what volume to sell, and would accordingly place a sale request with his brokerage firm. ECF No. [72-3] at 119:20-120:2; ECF No. [73-11] at 2; ECF No. [73-12] at 2; *see also* ECF No. [72] ¶ 51; ECF No. [88] ¶ 51. Defendant would hold the converted stock for at least six months before selling the shares into the market. ECF No. [72-3] at 36:3-16, 118:21-120:2; ECF No. [67-4] at 52:6-53:14.

Many of Defendant's convertible note transactions were risky. ECF No. [72] ¶ 30; ECF No. [88] ¶ 30. In some cases, the stock price of these companies declined while Defendant was holding the convertible note, companies went bankrupt or out of business during that period, or companies refused to honor the terms of the convertible notes because they were unsecured. ECF No. [72-3] at 36:25-37:5, 54:17-55:17, 56:18-57:10, 226:15-227:25; *see also* ECF No. [72] ¶¶ 30-31; ECF No. [88] ¶¶ 30-31. Defendant explains that because his investments were risky, his strategy was to hold a large number of similar convertible notes with the knowledge that some would fail, and with the hope that some would succeed. ECF No. [72-3] at 54:17-55:7, 70:21-71:9, 208:25-209:14; ECF No. [72-10] at 66:7-67:7; *see also* ECF No. [72] ¶ 32; ECF No. [88] ¶ 32.

The parties dispute the exact number of notes converted during the Relevant Period, as well as the net proceeds received from the sale of the converted stock. *Compare* ECF No. [67-11] ¶¶ 11-12 (Taveras Declaration, calculating net proceeds of approximately $34 million), *with* ECF No. [84-5] ¶ 36 (Flemmons Expert Report, calculating net proceeds of approximately $10 million). However, Defendant testified that between "100 to 200 issuers" sold JMJ convertible notes at part of its QuickLoan program, and that "50 to 100 percent would be a reasonable...estimate" of JMJ's profit margin on convertible notes. ECF No. [67-1] at 71:20-24, 246:7-20; *see also* ECF No. [67-24]. Defendant also admits that during the Relevant Period, he "converted more than 100 [convertible] notes from more than 100 different microcap issuers" and "liquidated billions of shares of common stock[.]" ECF No. [30] ¶¶ 1-2.

**C. Efforts to Acquire Convertible Notes**
During the Relevant Period, Defendant maintained a website that described the QuickLoan Program and JMJ's interest in purchasing convertible notes that "generally range between $50,000 and $250,000." ECF No. [67-9] at 8. The website set forth JMJ's interest in offering bridge loans and engaging in "convertible debentures" and "registered equity financing" with publicly traded companies. *Id.* The website also represented that "JMJ has placed over $60 million in the last five years, closing transactions with over 70 public companies in 2015 alone." *Id.*

Additionally, Defendant issued press releases that made statements such as: (1) "[JMJ] commits $20 Million in unsecured investment to emerging public companies in 2015[,]" ECF No. [67-23] at 10; (2) "Keener and JMJ Financial have committed $20,000,000 to unsecured investments in 2016[,]" *id.* at 4; (3) "JMJ Financial's primary investment vehicle, the QuickLoan, allows small publicly-traded companies the ability to access up to $500,000 utilizing a simple two-page promissory note[,]" *id.* at 6; and (4) "With a portfolio of over 200 companies and many years of operating experience, JMJ Financial is one of the most active, stable, and reliable investors focused on the smallcap segment[,]" *id.* at 8; *see also* ECF No. [67] ¶ 54; ECF No. [91] ¶ 54.

**\*5** Defendant maintained "lead generation software," known internally at JMJ as "the screener," that helped employees "screen public filings...to identify potential borrowers." ECF No. [67-3] at 24:21-25:16; *see also* ECF No. [67] ¶ 50; ECF No. [91] ¶ 50. The screener had the capacity to track every public company in the SEC's EDGAR database and then JMJ "could decide if it made sense to contact those companies to see if they had any capital needs." ECF No. [67-3] at 27:20-28:13. JMJ contacted hundreds of those companies. *Id.* at 28:14-23; *see also* ECF No. [67-1] at 46:5-8, 161:19-24; ECF No. [67] ¶¶ 50, 64; ECF No. [91] ¶¶ 50, 64.

Defendant sponsored and, with his employees, attended approximately 10 industry conferences in 2016 to "network[ ]" and meet "[c]ompanies who are seeking investors, other vendors, maybe attorneys and accountants" as well as for "education[al]" purposes. ECF No. [67-1] at 125:11-18; ECF No. [73-31]; *see also* ECF No. [67] ¶ 51; ECF No. [91] ¶ 51. Defendant hosted a dinner at Nobu Restaurant in Las Vegas for 24 "brokers and finders" on April 13, 2015. ECF No. [67-30]; *see also* ECF No. [67] ¶ 56; ECF No. [91] ¶ 56. Defendant also held a "Partner Seminar" at the Wynn Hotel in Las Vegas on August 14, 2015, ECF No. [67-16] at 2; *see also* ECF No. [67] ¶ 58; ECF No. [91] ¶ 58, and a "Broker and Finder Seminar" on April 8, 2016 at the Wynn Hotel, where JMJ covered all expenses for attendees, including the costs for accommodations and airfare, ECF No. [67-24] at 2; *see also* ECF No. [67] ¶ 59; ECF No. [91] ¶ 59.

At both Wynn Hotel events, Defendant made a presentation to the participants requesting that they send JMJ referrals of issuers that were looking to sell convertible notes. ECF No. [67-16] at 5, 41; ECF No. [67-24] at 5, 35; *see also* ECF No. [67] ¶ 60; ECF No. [91] ¶ 60. Defendant's presentations also included a notarized affidavit of his CFO Conrad Nagel stating that JMJ "has in excess of $20,000,000 in liquid cash and cash equivalents that is immediately available for investment into small cap emerging companies." ECF No. [67-16] at 24 (emphasis omitted); ECF No. [67-24] at 32 (same); *see also* ECF No. [67] ¶ 60; ECF No. [91] ¶ 60. According to Defendant's tax records, he took business deductions of $101,701 in 2015, and $67,407 in 2016 for the costs of sponsoring and sending his employees to industry conferences, as well as sponsoring JMJ-branded conferences. ECF No. [67-6] at 15, 21; *see also* ECF No. [67] ¶ 63; ECF No. [91] ¶ 63.

Plaintiff now moves for summary judgment on its claim that Defendant violated Section 15(a)(1) by operating as "dealer" without registering as such, as well as on Defendant's Third, Fourth, Fifth, and Sixth Affirmative Defenses. Defendant also moves for summary judgment on the bases that Plaintiff can neither establish Section 15(a)(1) liability nor entitlement to the remedies it seeks.

### III. LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

**\*6** A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.' " *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

Initially, the moving party bears the "responsibility of informing the...court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' " *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.' " *Id.* (quoting *Celotex Corp.*, 477 U.S. at 322). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *See Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) ("*One Piece of Real Prop.*"). Indeed, even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331). In particular, where "the parties respond[ ] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[ ] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.* Thus, where

the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

### IV. DISCUSSION

\*7 In Plaintiff's Motion, Plaintiff argues that summary judgment is warranted as to liability on its claim that Defendant violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78*o*(a)(1), because there is no genuine issue of material fact that Defendant operated as a securities "dealer" without registering with the SEC. *See generally* ECF No. [68]. Plaintiff further argues that Defendant's Third, Fourth, Fifth, and Sixth Affirmative Defenses fail as a matter of law, and that Defendant's Seventh, Eighth, Ninth, and Tenth Affirmative Defenses do not qualify as a defense to liability and cannot defeat Plaintiff's Motion. *Id.*

Defendant's Motion, on the other hand, argues that summary judgment should be granted in his favor because no reasonable jury could conclude that Defendant meets the definition of a "dealer" under the Exchange Act. *See generally* ECF No. [71]. Defendant alternatively argues that even if the Court were to find a material dispute of fact on liability, Defendant is nonetheless entitled to summary judgment on the basis that Plaintiff's claim is barred by due process. *Id.* Defendant further maintains that Plaintiff has failed to show that it is entitled to the disgorgement or injunctive relief it seeks. *Id.*

As both parties filed motions for summary judgment on the same legal issue—namely, whether Defendant qualifies as a "dealer" under the Exchange Act—the Court first sets forth the relevant framework for addressing this claim. The Court will then turn to the respective Motions, beginning with Plaintiff's Motion.

### A. "Dealer" Under the Exchange Act

Section 15(a)(1) of the Exchange Act makes it unlawful for anyone who is a dealer to use the mails or interstate commerce to engage in or attempt to induce the purchase or sale of securities unless the dealer is registered with the SEC. *See* 15 U.S.C. § 78*o*(a)(1).[2] Section 3(a)(5)(A) of the Exchange Act defines the term "dealer" as "any person engaged in the business of buying and selling securities...for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). Section 3(a)(5)(B) specifically excludes from the term "dealer" a person that buys or sells securities "for such person's own account, either individually or in a fiduciary capacity, but *not as a part of a regular business*." 15 U.S.C. § 78c(a)(5)(B) (emphasis added).

[2]  Section 15(a)(1) of the Exchange Act provides:
It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.
15 U.S.C. § 78*o*(a)(1)

The Eleventh Circuit Court of Appeals has explained that "the centerpiece to [the 'dealer'] definition is the word 'business,' which is defined as 'a commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*[.]' " *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015) (emphasis in original) (alteration adopted) (quoting Black's Law Dictionary 239 (10th ed. 2009)).[3] The Eleventh Circuit has further explained that "[c]entral to this definition is *profit* or *gain*." *Id.* (emphasis in original).

[3]  In *Big Apple*, the Eleventh Circuit interpreted the Securities Act of 1933 rather than the Exchange Act. However, the Eleventh Circuit panel noted that the definition of a "dealer" under both statutes is "very similar" and found the district court's analysis to be "sound" where the district court "analyzed the definition of dealer as it related to the SEC's [Exchange Act] claims and generally applied that analysis to the [Securities Act of 1933] exception." *Big Apple*, 783 F.3d at 809 n.11.

\*8 Additionally, "[c]ase law has established that the primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is

that the level of participation in purchasing and selling securities involves more than a few isolated transactions." *In the Matter of the Application of Gordon Wesley Sodorff, Jr.*, 50 S.E.C. 1249, 1992 WL 224082, at *4 (Sept. 2, 1992); *see also SEC v. Big Apple Consulting USA, Inc.*, No. 6:09-cv-1963-Orl-28, 2011 WL 3753581, at *9 (M.D. Fla. Aug. 25, 2011) ("This definition 'connotes a certain regularity of participation in securities transactions at key points in the chain of distribution.'" (alteration adopted) (quoting *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976))). "There is no requirement, however, that such activity be a person's principal business or the principal source of income." *Sodorff*, 1992 WL 224082, at *4.

Further, "the SEC has promulgated guidelines to help determine whether someone is acting as a dealer of not." *Big Apple*, 2011 WL 3753581, at *9; *see also Guide to Broker-Dealer Registration*, U.S. Securities and Exchange Commission, Division of Trading and Markets, Apr. 2008, https://www.sec.gov/reportspubs/investor-publications/divisionsmarketregbdguidehtm. html (last visited Jan. 11, 2022). The SEC Guide to Broker-Dealer Registration (the "SEC Guide") states that "each of the following individuals and businesses may need to register as a dealer" if:

• a person who holds himself out as being willing to buy and sell a particular security on a continuous basis;

• a person who runs a matched book of repurchase agreements; or

• a person who issues or originates securities that he also buys and sells. SEC Guide, § II.B.

The SEC Guide also sets forth "some of the questions [individuals and businesses] should ask to determine whether [they] are acting as a dealer:"

• Do you advertise or otherwise let others know that you are in the business of buying and selling securities?

• Do you do business with the public (either retail or institutional)?

• Do you make a market in, or quote prices for both purchases and sales of, one or more securities?

• Do you participate in a "selling group" or otherwise underwrite securities?

• Do you provide services to investors, such as handling money and securities, extending credit, or giving investment advice?

• Do you write derivatives contracts that are securities? *Id.* The SEC Guide makes clear that "[a] 'yes' answer to any of these questions indicates that you may need to register as a dealer." *Id.*

**B. Plaintiff's Motion for Summary Judgment**

**1. Liability under Section 15(a)(1)**
Plaintiff first argues that summary judgment is warranted as to liability on its Section 15(a)(1) claim because there is no genuine issue of material fact that Defendant operated as a securities "dealer" without registering with the SEC. *See generally* ECF No. [68]. According to Plaintiff, the undisputed material facts establish that Defendant meets the statutory "dealer" definition as a matter of law based upon: (1) Defendant's "business model and his day-to-day operations" which "focused almost entirely upon finding issuer clients that were offering securities (convertible notes) to buy, buying the notes, converting them to stock, and then selling the newly issued stock in the public market[;]" (2) "the 'sheer volume' of Defendant's convertible notes business, as well as the significant profits that it generated[;]" and (3) Defendant's practice of making a profit by "purchasing deeply discounted stock directly from his issuer clients and then promptly reselling in the marketplace." *Id.* at 24-26. Plaintiff further argues that even if the Court were to consider the activities listed in the SEC Guide, "Defendant held himself out to the public as being in the business of buying and selling securities." *Id.* at 29.

**\*9** In response,[4] Defendant contends that summary judgment in Plaintiff's favor is not warranted. *See generally* ECF No. [90]. First, Defendant argues that Plaintiff "misstates the law"— "[Plaintiff] ignores anything about the context, purpose, or actual language of the Exchange Act, and instead demands an interpretation that is nowhere in the 'plain language' of the statute." *Id.* at 13-14. According to Defendant, Plaintiff's Motion "conspicuously and studiously avoids any mention of even one specific dealer factor" and "[i]t is obvious [Plaintiff] remained silent because even a cursory look at the factors will demolish [Plaintiff's] position in this case." *Id.* at 16-18.

| | |
|---|---|
| 4 | Defendant admits that he has never registered with the SEC as a securities dealer. ECF No. [30] ¶ 5; ECF No. [91] ¶ 2. Additionally, Defendant does not challenge whether he or his employees used the mails or interstate commerce in conducting securities transactions. ECF No. [30] ¶ 13; ECF No. [91] ¶ 37. |

Defendant further urges the Court to "reject [Plaintiff's] invitation to apply brand new factors and impose retroactive liability on [Defendant] based on them." *Id.* at 19. Defendant explains that "[t]here is no basis in law" to support Plaintiff's claim that his business activities—namely, maintaining a large office, hiring employees and contractors, and creating a computer system to find, manage, and account for investments—qualify as "dealer" activity. *Id.* Additionally, Defendant maintains that "there is no law or guidance that even suggests that advertising directed at companies for the purpose of identifying investment opportunities could qualify" as "dealer" activity. *Id.* at 20-21. Further, according to Defendant, the volume of his trading activity is irrelevant because "[a]nyone who buys and sells microcap stocks even with small investments by definition will engage with hundreds of millions, if not billions of shares." *Id.* at 22. Lastly, Defendant avers that acquiring newly issued stock at a discount to the trading price does not make him a "dealer" because he held the stock long enough to demonstrate it was obtained for investment purposes. *Id.* at 23-25. At a minimum, Defendant argues that he is entitled to a jury trial on whether his activities qualify as being "in the business of buying and selling securities." *See generally id.*

**2. The factors set forth in the SEC Guide are not controlling**

The crux of the parties' dispute is whether the Court should apply the statutory language of the Exchange Act or the factors set forth in the SEC Guide in determining whether Defendant is a "dealer" subject to the Exchange Act's provisions. Plaintiff contends that "the plain language of the statute and the controlling precedent in the Eleventh Circuit that construes that language govern the determination of whether Defendant was acting as a dealer." ECF No. [68] at 28. In Plaintiff's view, "[t]he SEC Guide merely walks through the statutory dealer framework involving broker and dealer registration in an effort to aid those who may be required to register. But it does not supplant the plain language of the Exchange Act or the Eleventh Circuit's holding in *Big Apple*." *Id.* Stated differently, the SEC Guide sets forth non-binding factors that "are merely examples of activity or actions that might render one a dealer." *Id.* (citation omitted).

Defendant, conversely, argues that he is a "private investor" and not a "dealer" based upon various factors mentioned in the SEC Guide, ECF No. [90] at 10, 16-19, and urges the Court to reject Plaintiff's "remarkably overbroad" interpretation of the Exchange Act, *id.* at 36. According to Defendant, "[t]he very existence of the Guide demonstrates conclusively that the SEC concedes that the Exchange Act dealer definition is not transparent, and instead requires a complex facts-and-circumstances analysis." *Id.* at 16. In his view, "the SEC's 30-page motion for summary judgment on a dealer registration claim conspicuously and studiously avoids any mention of even one specific dealer factor[,]" leading to the only conclusion that Defendant, under a totality of the circumstances, cannot meet any of the dealer factors set forth in the SEC Guide. *Id.* at 16-17.

**\*10** As this Court previously stated in its Order on Motion to Dismiss, the Court is unconvinced that it should overlook the actual statutory language of the Exchange Act and instead look only to the factors set forth in the SEC Guide to determine whether Defendant was engaged in "dealer" activity. ECF No. [29] at 7-8; *see also SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272-73 (stating that "various factors and activities identified in previous SEC releases or SEC staff no-action letters" are "merely examples of activity or actions that might render one a dealer" and explaining that there is nothing that "implies that the listed factors are an exclusive or exhaustive checklist that creates a burden of proof for the SEC."); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853, 858 (N.D. Ill. 2019) (noting that "these factors (and any decisions construing them) are not controlling. They are neither exclusive, nor function as a checklist through which a court must march to resolve a dispositive motion. And whether and which are met is necessarily a fact-based inquiry best reserved for summary judgment or trial."). Indeed, the SEC Guide provides that a "yes" to any one of the referenced factors "indicates that you may need to register as a dealer." SEC Guide, § II.B. Under that same reasoning, a "no" answer to one or even all of the factors does not foreclose the possibility that someone is a "dealer."

The SEC Guide further warns readers "**CAUTION — MAKE SURE YOU FOLLOW ALL LAWS AND RULES**" and advises that "**it is not comprehensive**" and that readers "**may wish to consult with a private lawyer who is familiar with the federal securities laws, to assure that you comply with all laws and regulations.**" *Id.* § I (emphasis in original). While courts have

considered the factors set forth in the SEC Guide to determine whether a person is subject to the Exchange Act's registration requirements, the Court is unaware of any authority suggesting that these factors amount to binding legislation or supplant the plain language of the statute or judicial interpretation construing its language.[5]

 [5] The Court is not persuaded that the case authorities relied upon by Defendant stand for the proposition that the factors mentioned in the SEC Guide are controlling or exclusive in determining whether Defendant engaged in "dealer" activity. *See, e.g.*, *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (identifying factors that courts have relied upon, articulated in both scholarly literature and judicial precedent, to determine whether someone meets the statutory broker definition under the Exchange Act); *SEC v. Federated All. Grp., Inc.*, No. 93-cv-0895E(F), 1996 WL 484036, at *4, n.39 (W.D.N.Y. Aug. 21, 1996) (applying nine factors to determine whether defendant was a government securities dealer pursuant to Section 20(a) of the Securities Act and noting that "courts that have considered statutory language defining 'dealers' have required that a party be shown to have regularly participated in securities transactions at key points in the distribution chain in order to be characterized as a dealer." (citations omitted)); *see also Chapel Invs., Inc. v. Cherubim Ints., Inc.*, 177 F. Supp. 3d 981, 990 (N.D. Tex. 2016) (analyzing whether plaintiff may resell freely tradeable shares acquired from defendant in a court approved Section 3(a)(10) exchange).

Moreover, the Eleventh Circuit has examined the explicit statutory language defining a "dealer" without referencing factors when evaluating whether a party is subject to securities registration requirements. *See Big Apple*, 783 F.3d at 809-10; *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 361 (5th Cir. 1968) (determining that defendant was a dealer under the explicit terms of the Exchange Act because defendant purchased church bonds "for its own account as part of its regular business and sold some of them");[6] *see also SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 246061, at *8-9 (N.D. Tex. Jan. 26, 2012) (granting summary judgment in favor of the SEC, explaining that while "there is not an abundance of binding case law defining broker and dealer," *Eastside Church*, 391 F.2d at 361, is "illustrative," and determining that defendant was a dealer under the Exchange Act because he "bought and sold securities as part of his regular business").

 [6] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

### 3. Defendant operated as a "dealer" under the Exchange Act

**\*11** Upon review of the record and consideration of the parties' briefings, the Court agrees with Plaintiff that the undisputed material facts demonstrate that Defendant acted as a "dealer" within the plain language of the Exchange Act and controlling judicial precedent. As set forth above, the Eleventh Circuit has previously stated that "the centerpiece to this definition is the word 'business,' which is defined as 'a commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*[.]' " *Big Apple*, 783 F.3d at 809 (emphasis in original) (alteration adopted) (quoting Black's Law Dictionary 239 (10th ed. 2009)). In *Big Apple*, the Eleventh Circuit affirmed the district court's finding that the entities were dealers and did not qualify for a registration exemption. *Id.* at 809-10. The court found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer:

> While evidence of merely *some* profits from buying and selling securities may alone be inconclusive proof, the defendants' *entire* business model was predicated on the purchase and sale of securities. [The defendants] depended on acquiring client stock and selling that stock to support operations and earn a profit....As further evidence of their dealer status, [the defendants] purchased [an issuer's] stocks at deep discounts pursuant to its contractual agreement with [the issuer] and then sold those stocks for profit.

*Id.* (emphasis in original).

Here, the Court agrees with Plaintiff that the volume of Defendant's trading activity and his business operations support the finding that Defendant was "engaged in the business" of buying and selling securities within the meaning of the term "dealer" under the Exchange Act. Specifically, while the parties disagree on the precise number of convertible notes purchased and subsequently converted during the Relevant Period, Defendant "admits that he converted more than 100 [convertible] notes from more than 100 different microcap issuers" and "liquidated billions of shares of common stock during the Relevant Period." ECF No. [30] ¶¶ 1-2, 8. Additionally, Defendant does not genuinely dispute that he sought to make a profit

from selling the converted stock, and Defendant's own expert concluded that he generated approximately $10 million in net proceeds from these transactions during the Relevant Period. *See* ECF No. [84-5].[7]

[7] The Court recognizes that Defendant takes the position that his convertible notes business ultimately operated at a loss rather than at the significant profit that Plaintiff suggests. *See* ECF No. [84-5] (Flemmons Report, opining that Defendant incurred approximately $14 million in business expenses against his net income of $10 million. Defendant's challenge will be appropriately addressed at the remedies phase of the proceedings.

Moreover, while Defendant contends that he was merely an active investor, Defendant had offices in Miami, Florida, San Diego, California, and San Juan, Puerto Rico, ECF No. [67-1] at 30:21-31:6, and spent $2,695,185 in 2015, $2,428,808 in 2016, and $1,629,300 in 2017 on employee payroll, ECF No. [67-6] at 15, 21, 31; *see also* ECF No. [67-1] at 88:23-90:9. Notably, Defendant's employees also contacted hundreds of companies to inquire whether they could sell Defendant convertible notes, ECF No. [67-3] at 27:20-28:14-23, and developed proprietary software to find convertible notes for sale and to account for existing convertible notes, ECF No. [67-3] at 24:21-26:17, 27:20-28:23; ECF No. [67-17] at 58:5-59:19, 61:23-62:15; ECF No. [67-24] at 14. Defendant further advertised his interest in buying convertible notes via a website and press releases, which made statements such as: (1) "[JMJ] commits $20 Million in unsecured investment to emerging public companies in 2015[,]" ECF No. [67-23] at 10; (2) "Keener and JMJ Financial have committed $20,000,000 to unsecured investments in 2016[,]" *id.* at 4; (3) "JMJ Financial's primary investment vehicle, the QuickLoan, allows small publicly-traded companies the ability to access up to $500,000 utilizing a simple two-page promissory note[,]" *id.* at 6; and (4) "With a portfolio of over 200 companies and many years of operating experience, JMJ Financial is one of the most active, stable, and reliable investors focused on the smallcap segment[,]" *id.* at 8; *see also* ECF No. [67] ¶¶ 45, 54; ECF No. [91] ¶¶ 45, 54.

*12 Defendant maintains that the volume of his trading activity is "irrelevant" because "[a]nyone who buys and sells microcap stocks even with small investments by definition will engage with hundreds of millions, if not billions of shares." ECF No. [90] at 22. Alternatively, Defendant argues that he is "at minimum entitled to a jury trial on whether his volume of activity turned him into a dealer" particularly since "the SEC has admitted that no dollar or volume thresholds exist for identifying dealers[.]" *Id.* at 22-23. The Court is not persuaded. First, as the Court recognized in its Order on Motion to Dismiss, volume tends to establish that Defendant's "level of participation in purchasing and buying securities involves more than a few isolated transactions." ECF No. [29] at 8 (quoting *River North*, 415 F. Supp. 3d at 858); *see also Soforff*, 1992 WL 224082, at *4 ("[T]he primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few isolated transactions."). Additionally, in granting summary judgment in favor of the SEC on its Section 15(a)(1) claim, the court in *Almagarby* found that defendants, who operated a business of buying aged corporate debt of microcap companies and were engaged in even less securities trading, operated as unregistered dealers as a matter of law. *See Almagarby*, 479 F. Supp. 3d at 1272 (finding that "the sheer volume of the number of deals and the large sums of profit [d]efendants generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that [d]efendants were engaged in the 'business' of buying and selling securities."); *see also SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (defendant "was a dealer because his 'high level of activity...made him more than an active investor' ")).

As further evidence that Defendant meets the statutory "dealer" definition, Defendant acquired newly issued stock directly from microcap issuers at a discount, ranging between 10% to 50% depending on the terms of the convertible notes, and then resold the stock into the public market. ECF No. [67-1] at 61:13-62:2; ECF No. [67-24] at 15. *See Big Apple*, 783 F.3d at 810 ("As further evidence of their dealer status, [defendants] purchased [issuer's] stocks at deep discounts pursuant to its contractual agreement with [the issuer] and then sold those stocks for profit."); *Almagarby*, 479 F. Supp. 3d at 1272 ("It is undisputed that [d]efendants purchased securities from [i]ssuers at deep discounts and sold them back on the market for profit."); *see also Sodorff*, 1992 WL 224082, at *5 ("Unlike an investor or trader, [defendant's] profits did not result from appreciation in the value of the securities, but rather from his markup over the price he paid."); *River North*, 415 F. Supp. 3d at 859 (finding it "particularly significant" that, "like an underwriter," defendant "purchased stocks at a discounted price directly from numerous issuers" rather than "purchasing stocks already in the marketplace, like a trader").

Defendant argues that evidence that the stock was newly issued or that he obtained the stock at a discount to the

trading price is "irrelevant" to the "dealer" analysis. First, Defendant seems to suggest that because he "complied with Rule 144 [of the Securities Act] in connection with every sale" he held the stock for long enough to demonstrate that he obtained the stock for investment purposes. ECF No. [90] at 23-24. However, as Defendant recognizes, Rule 144 provides a "safe harbor" against underwriter status for the purpose of reselling unregistered securities into the market. 17 C.F.R. § 230.144(d)(1)(i). As such, the Court is not persuaded that Defendant's compliance with Rule 144's six-month holding period creates a genuine issue of material fact regarding whether Defendant operated as a "dealer" under the Exchange Act. Additionally, Defendant contends that a conversion discount "is a common feature in many convertible notes, especially where there is a long holding period before the investor can seek to convert the note and sell any stock." ECF No. [90] at 24. Yet, cases within the Eleventh Circuit, as well as the SEC, have relied on this precise feature in determining whether an individual's activity is characteristic of a "dealer." *See Big Apple*, 783 F.3d at 810; *Almagarby*, 479 F. Supp. 3d at 1272; *Sodorff*, 1992 WL 224082, at *5.[8]

[8] On December 29, 2021, Defendant filed a Notice of Supplemental Authority, ECF No. [117] ("Notice"), citing three cases in support of his position that "[w]hen a defendant has no customers and its 'only activities were buying securities from issuers at a discount, and then reselling them into the market for a profit,' defendant is not a dealer." *Id.* at 1 (quoting *In re ScripsAmerica, Inc.*, No. 16-11991 (JTD), 2021 WL 5745698, at *4-5 (Bankr. D. Del. Nov. 29, 2021) and citing *In re Immune Pharms. Inc.*, No. 19-13273 (VFP), 2021 WL 5989337, at *4-5 (Bankr. D.N.J. Dec. 8, 2021); *Discover Growth Fund, LLC v. Beyond Com., Inc.*, No. 3:21-cv-00328-MMD-CLB, 2021 WL 5404634, at *4-5 (D. Nev. Nov. 17, 2021))). However, the out of circuit authorities relied upon by Defendant do not provide a basis for the Court to stray from the Eleventh Circuit's unequivocal determination in *Big Apple* that evidence of a conversion discount is instructive of dealer activity. 783 F.3d at 810.

**\*13** Based on the foregoing, the Court concludes that Defendant operated as "dealer" within the meaning of the Exchange Act as a matter of law. Nonetheless, even if the Court were to apply the factors set forth in the SEC Guide, there is no genuine dispute of fact that Defendant "[held] himself out as being willing to buy and sell a particular security on a continuous basis[.]" *See* SEC Guide, § II.B. Specifically, during the Relevant Period, Defendant operated a website that described his business operations, ECF No. [67-9], hired employees to find issuers who were willing to sell convertible notes to him, ECF No. [67-1] at 166:6-169:19, ECF No. [67-3] at 22:3-23:15, sponsored and attended conferences in which he and his employees would find microcap issuers in person, ECF No. [67-1] at 123:11-18; ECF No. [67-3] at 93:12-94:24; ECF No. [69-29] at 2; and made PowerPoint presentations at conferences representing that he had $20 million "committed" to purchase convertible notes from issuers, ECF No. [67-16] at 24; ECF No. [67-24] at 32. *See* SEC Guide, § II.B (noting as a consideration, whether one "advertise[s] or otherwise let[s] others know that you are in the business of buying and selling securities").[9]

[9] Defendant avers that he did not hold himself out to the public that he was in the business of buying and selling securities because "neither his website nor any other marketing materials ever reference selling at all, let alone the sale of any of [Defendant's] converted stock[.]" ECF No. [90] at 11, 17. However, as Plaintiff correctly argues, Defendant promised issuers "[g]entle conversions and equity sales over time[,]" ECF No. [67-24] at 12, 29, 33; ECF No. [72-2] at 486, to reassure issuers that he would be "responsible" and not sell the converted stock all at once, ECF No. [72-2] at 133:23-135:11.

Accordingly, Plaintiff is entitled to summary judgment on its claim that Defendant violated Section 15(a)(1) by failing to register as a securities dealer.

**4. Defendant's Affirmative Defenses**
Next, Plaintiff seeks summary judgment on Defendant's Third, Fourth, Fifth, and Sixth Affirmative Defenses (due process, estoppel, statute of limitations, and advice of counsel). ECF No. [68] at 29-37. Plaintiff explains that Defendant's Seventh, Eighth, Ninth, and Tenth Affirmative Defenses (injunctive relief, disgorgement, penny-stock bar, and penalties) "relate solely to whether [Plaintiff] is entitled to various forms of relief" and do not qualify as a defense to liability. *Id.* at 37-38. In response, Defendant does not address Plaintiff's challenges regarding his estoppel or advice of counsel affirmative defenses and is therefore deemed to have abandoned those claims.[10] *See generally* ECF No. [90]. Additionally, Defendant does not challenge Plaintiff's contention that his remaining affirmative defenses should be addressed after a decision on liability has been issued by the Court. *Id.* As such, the Court only addresses Defendant's due process and statute of limitations affirmative defenses.

10  See *Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 n.4 (S.D. Fla. 2019) ("Generally, a litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (internal quotation marks omitted) (citation omitted)); *see also Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (internal citations omitted)).

**a. Third Affirmative Defense: due process**

Defendant's Third Affirmative Defense states that this action is "barred by due process, in whole or in part, where Defendant had no fair notice that his conduct could be unlawful." ECF No. [30] at 7. Plaintiff argues that Defendant's affirmative defense fails as a matter of law because "[t]he language of the Exchange Act Section 15(a)(1)—the dealer registration statute—and Section 3(a)(5)(A)—the definition of the term dealer—are clear and unambiguous, and Defendant can point to no case holding otherwise." ECF No. [68] at 31. Plaintiff further argues that "the Court should reject any argument that the SEC was required to or failed to provide guidance with respect to the dealer registration statute." *Id.* at 33.

**\*14** In response, Defendant makes three overarching arguments: (1) "the statutory language [of the Exchange Act] is not transparent, which is why the SEC has issued so many interpretations of it over the years[;]" (2) "[Plaintiff's] position in this litigation *directly contradicts* its prior guidance" which Defendant reasonably relied upon in determining that he is not a dealer; and (3) "whether [Defendant] had fair notice of the new way in which the Exchange Act definition of 'dealer' would be applied is a factual question that must be decided by the jury." ECF No. [71] at 28-32.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). This principle raises two due process concerns: (1) "that regulated parties should know what is required of them so they may act accordingly;" and (2) "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* at 254. The Eleventh Circuit has recognized that this doctrine has been applied in "very limited set of cases." *Glob. Green, Inc. v. SEC*, 631 F. App'x 868, 870 (11th Cir. 2015) (citation omitted). For example, the Eleventh Circuit explained that:

> the doctrine has been applied where the agency's interpretation was "so far from a reasonable person's understanding of the regulations" that regulated parties could not have been fairly informed of the agency's perspective, *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1330 (D.C.Cir.1995); where an agency changed course with respect to its interpretation of a governing statute, [*FCC*, 567 U.S. 239]; and where the Commission imposed civil penalties "pursuant to a substantial change in its enforcement policy," *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir.1996).

*Id.*

Upon review of the record and consideration of the parties' briefings, the Court agrees that Defendant's due process defense fails as a matter of law. As the Court observed in its Order on Motion to Dismiss, Defendant had notice that his conduct could be unlawful based upon "the express language of the Exchange Act, decisions from this circuit applying the definition of 'dealer,' and the SEC Guide itself[.]" ECF No. [29] at 10. The Court finds no basis in law or fact to compel a different conclusion at this juncture of the proceedings. *See supra* IV.B.3. Additionally, while Defendant contends that the statutory language of the Exchange Act is not transparent, Defendant's due process challenge is further underscored by controlling precedent applying the plain language of the Exchange Act's "dealer" definition. *See Big Apple*, 783 F.3d at 809 (applying the plain language of the statute and finding defendant was a dealer); *Eastside Church*, 391 F.2d at 362 (same); *Almagarby*, 479 F. Supp. 3d at 1268 (same).

Moreover, the Court is unconvinced that Plaintiff changed its interpretation of the Exchange Act's "dealer" definition to pursue this enforcement action. Indeed, the SEC Guide makes explicit that it only "highlights certain provisions of the Act[,]" that "it is not comprehensive[,]" and that the public "should not rely on [the] guide without referring to the actual statutes, rules, regulations, and interpretations." *See* SEC Guide, §§ I, IX (emphasis omitted). To the extent Defendant contends that Plaintiff was required to set forth guidance specifically on convertible notes or market-adjustable discounts, the Court is unaware of, and Defendant has failed to cite to, any authority requiring Plaintiff to issue precise guidance on the regulations it enforces. *See SEC v. Chenery Corp.*,

332 U.S. 194, 203 (1947) ("[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." (citation omitted)); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015) ("The relevant question is not whether [defendant] had fair notice of the [plaintiff's] *interpretation* of the statute, but whether [defendant] had fair notice of what the *statute itself* requires." (emphasis in original)). Accordingly, Plaintiff's Motion is granted as to the due process affirmative defense.

**b. Fifth Affirmative Defense: statute of limitations**

*15 Defendant's Fifth Affirmative Defense states that this action "is barred, in whole or in part, by the applicable statute of limitations." ECF No. [30] at 7. Plaintiff argues that the undisputed facts establish that its claim is timely under the limitation periods applicable to the various remedies sought. ECF No. [68] at 35. *See* 28 U.S.C. § 2462 (applying five-statute of limitations for penalties); 15 U.S.C. § 78u(d)(8)(A)(ii) (five-year statute of limitations for disgorgement in non-scienter claims); 15 U.S.C. § 78u(d)(8)(B) (ten-year statute of limitations for equitable remedies). Plaintiff explains that the parties entered into a one-year tolling agreement on March 27, 2019, which specifically states that "the running of any statute of limitations...is tolled and suspended for the period beginning on March 7, 2019 through March 6, 2020[.]" ECF No. [67-8]. Thus, according to Plaintiff, this means that it may "seek disgorgement and a penalty for any conduct that occurred on or after March 24, 2014 and may seek an injunction and a penny stock bar for any conduct that occurred on or after March 24, 2009." ECF No. [68] at 36.

In response, Defendant argues that Plaintiff's request for penalties and disgorgement are time-barred under 28 U.S.C. § 2462 because Plaintiff failed to commence this action within five years from when the claim first accrued. ECF No. [90] at 33. Defendant explains that Plaintiff's Complaint refers "to several transactions entered into by [Defendant] throughout 2014 and early 2015" and therefore had a " 'complete and present cause of action' against [Defendant] for operating as an unregistered securities dealer" more than five years before Plaintiff filed the Complaint on March 24, 2020. *Id.* at 34. Defendant further argues that the parties' tolling agreement cannot suspend the statute of limitations because Section 2462 is jurisdictional. *Id.* at 34-35. Lastly, Defendant maintains that even if the Court enforces the tolling agreement, "the evidence shows that [Defendant] began engaging in the transactions that [Plaintiff] says make him a dealer even before March 24, 2014. *Id.* at 36.

Upon review of the record and consideration of the parties' briefings, the Court agrees with Plaintiff that its requests for penalties and disgorgement are not time barred. Specifically, Plaintiff filed its Complaint on March 24, 2020 and, under Section 2462, Plaintiff is entitled to relief for conduct that occurred on or after March 24, 2015. ECF No. [1] ¶ 1 (defining the relevant period as January 2015 through January 2018); *see also* 28 U.S.C. § 2462.[11] Defendant contends that Plaintiff's claim first accrued well-before March 25, 2015, as evidenced by Plaintiff's reference "to several transactions entered into by [Defendant] throughout 2014 and early 2015[.]" ECF No. [90] at 34. However, as Plaintiff correctly points out, the court in *Almagarby* rejected this precise "first accrual" argument raised by Defendant and held that "[b]ecause some of [defendant's violative conduct] occurred within the limitations period, the statute of limitations [under Section 2462] does not bar the SEC's disgorgement claim." *Almagarby*, 479 F. Supp. 3d at 1271 (citing *United States v. Spectrum Brands, Inc.*, 924 F.3d 337, 350 (7th Cir. 2019); *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983))); *see also Robinson v. United States*, 327 F. App'x 816, 818 (11th Cir. 2007) ("The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." (citation omitted)). Here, Defendant admits that he engaged in his convertible notes business as late as January 2018—just over two years before Plaintiff initiated this action. ECF No. [30] ¶¶ 2, 8. As such, the Court concludes that Plaintiff's requests for penalties and disgorgement are timely.[12] Accordingly, Plaintiff's Motion is granted as to the statute of limitations affirmative defense.

[11] Section 2462 sets forth a general limitations period for civil suits seeking certain sanctions under the United States Code, and provides:
Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.
28 U.S.C. § 2462.

[12] Defendant relies on the Supreme Court's decision in

*Gabelli* to support his contention that Plaintiff is precluded from seeking penalties and disgorgement for conduct that occurred more than five years before the Complaint was filed. *Gabelli v. SEC*, 568 U.S. 442 (2013). However, *Gabelli* is inapplicable to the present action, as the Court specifically stated that the SEC's claims for "injunctive relief and disgorgement" were "not before [it,]" *id.* at 442 n.1, and only held that the *discovery rule* would not extend the five-year statute of limitations applicable to the SEC's claim for civil penalties under Section 2464, *id.* at 454.

**C. Defendant's Motion for Summary Judgment**

**\*16** Defendant's Motion argues that summary judgment should be granted in his favor on the bases that: (1) no reasonable jury could conclude that Defendant meets the definition of a "dealer" under the Exchange Act; (2) Plaintiff's Section 15(a)(1) claim is barred by due process; and (3) Plaintiff has failed to show that it is entitled to the disgorgement or injunctive relief it seeks. *See generally* ECF No. [71]. As set forth above in addressing Plaintiff's Motion, even viewing the evidence in the light most favorable to Defendant, the record establishes that Defendant operated as a "dealer" under the Exchange Act without registering as such, *see supra* IV.B.3, and Defendant's due process affirmative defense fails as a matter of law, *see supra* IV.B.4.a. Accordingly, Defendant's Motion is denied on these bases. Further, Defendant's remaining challenges regarding Plaintiff's ability to obtain disgorgement or injunctive relief are denied as premature and shall be addressed at the remedies phase of the proceedings.[13]

---

[13] At the hearing on the Motions, the parties agreed that it is premature for the Court to address issues regarding Plaintiff's requested relief until a decision as to liability has been issued. ECF No. [116] at 17:10- 17, 59:17-23.

**V. CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion for Summary Judgment, **ECF No. [68]**, is **GRANTED**.

2. Defendant's Motion for Summary Judgment, **ECF No. [71]**, is **DENIED**.

3. **On or before February 8, 2022**, the parties shall jointly file a proposed briefing schedule to address the appropriate remedies to be issued.

4. To the extent not otherwise disposed of, all pending motions are **DENIED AS MOOT**, any scheduled hearings are **CANCELED**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 21, 2022.

BETH BLOOM

UNITED STATES DISTRICT JUDGE

Copies to:

Counsel of Record

**All Citations**

Slip Copy, 2022 WL 196283

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.