# EXHIBIT E

Statement

# Statement on Digital Asset Securities Issuance and Trading

Division of Corporation Finance, Division of Investment Management, and Division of Trading and Markets

**Nov. 16, 2018**

In recent years, we have seen significant advances in technologies – including blockchain and other distributed ledger technologies – that impact our securities markets. This statement[1] highlights several recent Commission enforcement actions involving the intersection of long-standing applications of our federal securities laws and new technologies.

The Commission's Divisions of Corporation Finance, Investment Management, and Trading and Markets (the "Divisions") encourage technological innovations that benefit investors and our capital markets, and we have been consulting with market participants regarding issues presented by new technologies.[2]  We wish to emphasize, however, that market participants must still adhere to our well-established and well-functioning federal securities law framework when dealing with technological innovations, regardless of whether the securities are issued in certificated form or using new technologies, such as blockchain.

The Commission's recent enforcement actions involving AirFox, Paragon, Crypto Asset Management, TokenLot, and EtherDelta's founder,[3] discussed further below, illustrate the importance of complying with these requirements. Broadly speaking, the issues raised in these actions fall into three categories: (1) initial offers and sales of digital asset securities (including those issued in initial coin offerings ("ICOs")); (2) investment vehicles investing in digital asset securities and those who advise others about investing in these securities; and (3) secondary market trading of digital asset securities. Below, we provide the Divisions' views on these issues.

**Offers and Sales of Digital Asset Securities**

The Commission has brought a number of actions involving offerings of digital asset securities. To date, these actions have principally focused on two important questions.  First, when is a digital asset a "security" for purposes of the federal securities laws?[4] Second, if a digital asset is a security, what Commission registration requirements apply?[5] The importance of these and related issues is illustrated by several recent Commission enforcement actions involving digital asset securities. In particular, the remedial measures in two of these matters demonstrate a way to address ongoing violations by issuers that have conducted illegal unregistered offerings of digital asset securities.

Today, the Commission issued settled orders against AirFox and Paragon in connection with their unregistered offerings of tokens. Pursuant to these orders, AirFox and Paragon will pay penalties and also have undertaken to register the tokens as securities under Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act") and to file periodic reports with the Commission. They have also agreed to compensate investors who purchased tokens in the illegal offerings if an investor elects to make a claim. The registration undertakings are designed to ensure that investors receive the type of information they would have received had these issuers complied with the

registration provisions of the Securities Act of 1933 ("Securities Act") prior to the offer and sale of tokens in their respective ICOs. With the benefit of the ongoing disclosure provided by registration under the Exchange Act, investors who purchased the tokens from the issuers in the ICOs should be able to make a more informed decision as to whether to seek reimbursement or continue to hold their tokens.[6]

These two matters demonstrate that there is a path to compliance with the federal securities laws going forward, even where issuers have conducted an illegal unregistered offering of digital asset securities.

**Investment Vehicles Investing in Digital Asset Securities**

The Investment Company Act of 1940 ("Investment Company Act") establishes a registration and regulatory framework for pooled vehicles that invest in securities. This framework applies to a pooled investment vehicle, and its service providers, even when the securities in which it invests are digital asset securities.[7]

On Sept. 11, 2018, the Commission issued the Crypto Asset Management Order, finding that the manager of a hedge fund formed for the purpose of investing in digital assets had improperly failed to register the fund as an investment company. The order found that the manager engaged in an unlawful, unregistered, non-exempt, public offering of the fund. By investing more than 40 percent of the fund's assets in digital asset securities and engaging in a public offering of interests in the fund, the manager caused the fund to operate unlawfully as an unregistered investment company. The order also found that the fund's manager was an investment adviser, and that the manager had violated the antifraud provisions of the Investment Advisers Act of 1940 ("Advisers Act") by making misleading statements to investors in the fund.

Investment vehicles that hold digital asset securities and those who advise others about investing in digital asset securities, including managers of investment vehicles, must be mindful of registration, regulatory and fiduciary obligations under the Investment Company Act and the Advisers Act.[8]

**Trading of Digital Asset Securities**

Commission actions[9] and staff statements[10] involving secondary market trading of digital asset securities have generally focused on what activities require registration as a national securities exchange or registration as a broker or dealer, as those terms are defined under the federal securities laws.

Exchange Registration

Advancements in blockchain and distributed ledger technology have introduced innovative methods for facilitating electronic trading in digital asset securities. Platforms colloquially referred to as "decentralized" trading platforms, for example, combine traditional technology (such as web-based systems that accept and display orders and servers that store orders) with new technology (such as smart contracts run on a blockchain that contain coded protocols to execute the terms of the contract). These technologies provide the means for investors and market participants to find counterparties, discover prices, and trade a variety of digital asset securities.

A platform that offers trading in digital asset securities and operates as an "exchange" (as defined by the federal securities laws) must register with the Commission as a national securities exchange or be exempt from registration. The Commission's recent enforcement action against the founder of EtherDelta, a platform facilitating trading digital assets securities, underscores the Division of Trading and Markets' ongoing concerns about the failure of platforms that facilitate trading in digital asset securities to register with the Commission absent an exemption from registration.[11]

According to the Commission's order, EtherDelta—which was not registered with the Commission in any capacity—provided a marketplace for bringing together buyers and sellers for digital asset securities through the combined use of an order book, a website that displayed orders, and a smart contract run on the Ethereum blockchain.  EtherDelta's smart contract was coded to, among other things, validate order messages, confirm the terms and conditions of orders, execute paired orders, and direct the distributed ledger to be updated to reflect a trade.[12] The Commission found that EtherDelta's activities clearly fell within the definition of an exchange and

that EtherDelta's founder caused the platform's failure either to register as a national securities exchange or operate pursuant to an exemption from registration as an exchange.[13]

Any entity[14]that provides a marketplace for bringing together buyers and sellers of securities, regardless of the applied technology, must determine whether its activities meet the definition of an exchange under the federal securities laws. Exchange Act Rule 3b-16 provides a functional test to assess whether an entity meets the definition of an exchange under Section 3(a)(1) of the Exchange Act. An entity that meets the definition of an exchange must register with the Commission as a national securities exchange or be exempt from registration, such as by operating as an alternative trading system ("ATS") in compliance with Regulation ATS.

Notwithstanding how an entity may characterize itself or the particular activities or technology used to bring together buyers and sellers, a functional approach (taking into account the relevant facts and circumstances) will be applied when assessing whether a system constitutes an exchange.[15]  The activity that actually occurs between the buyers and sellers—and not the kind of technology or the terminology used by the entity operating or promoting the system—determines whether the system operates as a marketplace and meets the criteria of an exchange under Rule 3b-16(a).  For instance, the term "order" for purposes of Rule 3b-16 is intended to be broadly construed, and the actual activities among buyers and sellers on the system—not the labels assigned to indications of trading interest—will be considered for purposes of the exchange analysis.[16]

The exchange analysis includes an assessment of the totality of activities and technology used to bring together orders of multiple buyers and sellers for securities using "established non-discretionary methods"under which such orders interact.[17]  A system "brings together orders of buyer and sellers" if, for example, it displays, or otherwise represents, trading interest entered on a system to users or if the system receives users' orders centrally for future processing and execution.[18]

A system uses established non-discretionary methods if it provides a trading facility or sets rules.  For example, an entity that provides an algorithm, run on a computer program or on a smart contract using blockchain technology, as a means to bring together or execute orders could be providing a trading facility. As another example, an entity that sets execution priorities, standardizes material terms for digital asset securities traded on the system, or requires orders to conform with predetermined protocols of a smart contract, could be setting rules. Additionally, if one entity arranges for other entities, either directly or indirectly, to provide the various functions of a trading system that together meet the definition of an exchange, the entity arranging the collective efforts could be considered to have established an exchange.

Entities using blockchain or distributed ledger technology for trading digital assets should carefully review their activities on an ongoing basis to determine whether the digital assets they are trading are securities and whether their activities or services cause them to satisfy the definition of an exchange. An entity engaging in these types of activities should also consider other aspects of the federal securities laws (and other relevant legal and regulatory issues) beyond exchange registration requirements.

Broker-Dealer Registration

An entity that facilitates the issuance of digital asset securities in ICOs and secondary trading in digital asset securities may also be acting as a "broker" or "dealer" that is required to register with the Commission and become a member of a self-regulatory organization, typically FINRA.  Among other things, SEC-registered broker-dealers are subject to legal and regulatory requirements that govern their conduct in the marketplace and that provide important safeguards for investors.

Section 15(a) of the Exchange Act provides that, absent an exception or exemption, it is unlawful for any broker or dealer to induce or attempt to induce the purchase or sale, of any security unless such broker or dealer is registered in accordance with Section 15(b) of the Exchange Act. Section 3(a)(4) of the Exchange Act generally defines a "broker" to mean any person engaged in the business of effecting transactions in securities for the account of others. Section 3(a)(5) of the Exchange Act generally defines a "dealer" to mean any person engaged in the business of buying and selling securities for such person's own account through a broker or otherwise. As

with the "exchange" determination, a functional approach (taking into account the relevant facts and circumstances) is applied to assess whether an entity meets the definition of a broker or dealer, regardless of how an entity may characterize either itself or the particular activities or technology used to provide the services.[19]

The Commission's recent TokenLot Order illustrates the application of the broker-dealer registration requirements to entities trading or facilitating transactions in digital asset securities, even if they do not meet the definition of an exchange. According to the order, TokenLot was a self-described "ICO superstore" where investors could purchase digital assets, including digital asset securities, during or after an ICO, including in private sales and pre-sales. The parties' brokerage activities included marketing and facilitating the sale of digital assets, accepting investors' orders and funds for payment, and enabling the disbursement of proceeds to the issuers. They also received compensation based on a percentage of the proceeds raised in the ICOs, subject to a guaranteed minimum commission. TokenLot also acted as a dealer by regularly purchasing and then reselling digital tokens for accounts in TokenLot's name that were controlled by its operators.

**Conclusion**

The Divisions encourage and support innovation and the application of beneficial technologies in our securities markets. However, the Divisions recommend that those employing new technologies consult with legal counsel concerning the application of the federal securities laws and contact Commission staff, as necessary, for assistance. For further information, and to contact Commission staff for assistance, please visit the Commission's new FinHub page.

---

[1]     This statement represents the views of the Divisions of Corporation Finance, Investment Management, and Trading and Markets.  It is not a rule, regulation, or statement of the Securities and Exchange Commission ("Commission").  The Commission has neither approved nor disapproved its content.

[2]     The Chairman of the Commission and the Director of the Division of Corporation Finance have also provided public statements on this subject.  See, e.g., Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11; Digital Asset Transactions:  When Howey Met Gary (Plastic) (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418.

[3]     See CarrierEQ, Inc., Rel. No. 33-10575 (Nov. 16, 2018); Paragon Coin, Inc., Rel. No. 33-10574 (Nov. 16, 2018); Zachary Coburn, Rel. No. 34-84553 (Nov. 8, 2018) (settled order) ("Coburn Order"); Crypto Asset Management, LP and Timothy Enneking, Rel. No. 33-10544 (Sept. 11, 2018) (settled order) ("Crypto Asset Management Order"); and TokenLot LLC, Lenny Kugel, and Eli L. Lewitt, Rel. No. 33-10543 (Sept. 11, 2018) (settled order) ("TokenLot Order").

[4]     On July 27, 2017, the Commission issued a report, which concluded that particular digital assets were securities and explained that issuers of digital asset securities must register offers and sales of such securities unless a valid exemption applies. Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017) ("DAO Report"), available at https://www.sec.gov/litigation/investreport/34-81207.pdf. On Dec. 11, 2017, the Commission issued a settled order against an issuer named Munchee, Inc., making clear that a token may be a security even if it has some purported utility.  Munchee, Inc., Securities Act Rel. No. 10445 (Dec. 11, 2017) (settled order) ("Munchee Order").  Together, the DAO Report and the Munchee Order emphasize that digital assets offered and sold as investment contracts (regardless of the terminology or technology used in the transaction) are securities.

[5]     Of course, if a security is being offered or sold, the anti-fraud protections of the U.S. securities laws apply.  The Commission has filed a number of enforcement actions involving digital assets, including those alleging fraudulent ICOs.  See https://www.sec.gov/spotlight/cybersecurity-enforcement-actions (listing digital asset-related enforcement actions).

[6]     As discussed herein, activities relating to the offer and sale of digital asset securities can also raise other legal and regulatory issues and considerations under the federal securities laws, including, for example, broker and dealer registration considerations.

[7]     For a discussion of some questions that are relevant to registered investment companies that invest in certain digital assets, see Staff Letter to ICI and SIFMA AMG:  Engaging on Fund Innovation and Crypto-related Holdings, available at https://www.sec.gov/investment/fund-innovation-cryptocurrency-related-holdings.

[8]      In addition, pooled investment vehicles not only invest in securities but also are themselves issuers of securities. Although not addressed here, the requirements of the federal securities laws relating to an investment vehicle's offer and sale of securities apply to the same extent when those securities use new technologies, such as blockchain, as when they do not.

[9]     See, e.g. Coburn Order and TokenLot Order.

[10]    See Divisions of Enforcement and Trading and Markets, Statement on Potentially Unlawful Online Platforms for Trading Digital Assets (March 7, 2018), available at https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading.

[11]    See id.

[12]    Coburn Order at 6-7.

[13]    As stated in the Coburn Order, the Commission's findings were made pursuant to the respondent's offer of settlement and are not binding on any other person or entity.

[14]    The relevant legal and regulatory requirements discussed in this statement apply to natural persons or entities.  However, for ease of reference, this statement generally refers only to entities.

[15]    In its Regulation ATS adopting release, the Commission discussed what constitutes an exchange and provided examples illustrating various applications of Rule 3b-16.  See Regulation of Exchanges and Alternative Trading Systems, Exchange Act Rel. No. 40760 (Dec. 8, 1998), 63 FR 70844 (Dec. 22, 1998), available at https://www.gpo.gov/fdsys/pkg/FR-1998-12-22/pdf/98-33299.pdf.

[16]    See generally id. at 70844.

[17]    See id. at 70852.

[18]    See id. at 70852.

[19]    There are other potential legal and regulatory issues and considerations under the federal securities laws for entities engaging in digital asset securities activities, including clearing agency and transfer agent registration considerations, among other things.

Statement

# Joint Staff Statement on Broker-Dealer Custody of Digital Asset Securities

Division of Trading and Markets, U.S. Securities and Exchange Commission
Office of General Counsel, Financial Industry Regulatory Authority

**July 8, 2019**

Market participants have raised questions concerning the application of the federal securities laws and the rules of the Financial Industry Regulatory Authority ("FINRA") to the potential intermediation—including custody—of digital asset securities[1] and transactions.  In this statement, the staffs of the Division of Trading and Markets (the "Division") and FINRA (collectively, the "Staffs")—drawing upon key principles from their historic approach to broker-dealer regulation and investor protection—have articulated various considerations relevant to many of these questions, particularly under the SEC's Customer Protection Rule applicable to SEC-registered broker-dealers.[2]

As a threshold matter, it should be recognized by market participants that the application of the federal securities laws, FINRA rules and other bodies of laws to digital assets, digital asset securities and related innovative technologies raise novel and complex regulatory and compliance questions and challenges.  For example, and as discussed in more detail below, the ability of a broker-dealer to comply with aspects of the Customer Protection Rule is greatly facilitated by established laws and practices regarding the loss or theft of a security, that may not be available or effective in the case of certain digital assets.

The Staffs are aware of, and encourage and support, efforts to address these issues such that compliance with the Customer Protection Rule and other federal securities laws and FINRA rules is reasonably practicable.  In recent months, the Staffs have been engaged with industry participants regarding how industry participants believe a particular custody solution for digital asset securities would meet the possession or control standards prescribed in the SEC's Customer Protection Rule.  The Staffs have found these discussions to be very informative and appreciate market participants' ongoing engagement on these issues.  The Staffs encourage and support innovation and look forward to continuing our dialogue as market participants work toward developing methodologies for establishing possession or control over customers' digital asset securities.  Contact information for Commission and FINRA staffs is provided at the end of this statement.

**Importance of the Customer Protection Rule**

Entities seeking to participate in the marketplace for digital asset securities must comply with the relevant securities laws.[3]  An entity that buys, sells, or otherwise transacts or is involved in effecting transactions in digital asset securities for customers or its own account is subject to the federal securities laws, and may be required to register with the Commission as a broker-dealer and become a member of and comply with the rules of a self-regulatory organization ("SRO"), which in most cases is FINRA.  Importantly, if the entity is a broker-dealer, it must comply with broker-dealer financial responsibility rules,[4] including, as applicable, custodial requirements under Rule 15c3-3 under the Securities Exchange Act of 1934 (the "Exchange Act"), which is known as the Customer Protection Rule.

The purpose of the Customer Protection Rule is to safeguard customer securities and funds held by a broker-dealer, to prevent investor loss or harm in the event of a broker-dealer's failure, and to enhance the Commission's ability to monitor and prevent unsound business practices.  Put simply, the Customer Protection Rule requires broker-dealers to safeguard customer assets and to keep customer assets separate from the firm's assets, thus increasing the likelihood that customers' securities and cash can be returned to them in the event of the broker-dealer's failure.  The requirements of the Customer Protection Rule have produced a nearly fifty year track record[5] of recovery for investors when their broker-dealers have failed.  This record of protecting customer assets held in custody by broker-dealers stands in contrast to recent reports of cybertheft,[6] and underscores the need to ensure broker-dealers' robust protection of customer assets, including digital asset securities.

Various unregistered entities that intend to engage in broker-dealer activities involving digital asset securities are seeking to register with the Commission and have submitted New Membership Applications ("NMAs") to FINRA.  Additionally, various entities that are already registered broker-dealers and FINRA members are seeking to expand their businesses to include digital asset securities services and activities.  Under FINRA rules, a firm is prohibited from materially changing its business operations (e.g., engaging in material digital asset securities activities for the first time) without FINRA's prior approval of a Continuing Membership Application ("CMA").[7]

The NMAs and CMAs currently before FINRA are diverse:  Some of the NMAs and CMAs cover proposed business models that would not involve the broker-dealer engaging in custody of digital asset securities.  On the other hand, some NMAs and CMAs include the custodying of digital asset securities, and therefore implicate the Customer Protection Rule, among other requirements.

Some of these entities have met with the Staffs to discuss how they propose to custody digital asset securities in order to comply with the broker-dealer financial responsibility rules.  These discussions have been informative.  The specific circumstances where a broker-dealer could custody digital asset securities in a manner that the Staffs believe would comply with the Customer Protection Rule remain under discussion, and the Staffs stand ready to continue to engage with entities pursuing this line of business.

**Noncustodial Broker-Dealer Models for Digital Asset Securities**

As noted, some entities contemplate engaging in broker-dealer activities involving digital asset securities that would not involve the broker-dealer engaging in custody functions.  Generally speaking, noncustodial activities involving digital asset securities do not raise the same level of concern among the Staffs, provided that the relevant securities laws, SRO rules, and other legal and regulatory requirements are followed.[8]  The following are examples of some of the business activities of this type that have been presented or described to the Staffs.

- One example is where the broker-dealer sends the trade-matching details (e.g., identity of the parties, price, and quantity) to the buyer and issuer of a digital asset security—similar to a traditional private placement—and the issuer settles the transaction bilaterally between the buyer and issuer, away from the broker-dealer.  In this case, the broker-dealer instructs the customer to pay the issuer directly and instructs the issuer to issue the digital asset security to the customer directly (e.g., the customer's "digital wallet").

- A second example is where a broker-dealer facilitates "over-the counter" secondary market transactions in digital asset securities without taking custody of or exercising control over the digital asset securities.  In this example, the buyer and seller complete the transaction directly and, therefore, the securities do not pass through the broker-dealer facilitating the transaction.

- Another example is where a secondary market transaction involves a broker-dealer introducing a buyer to a seller of digital asset securities through a trading platform where the trade is settled directly between the buyer and seller.  For instance, a broker-dealer that operates an alternative trading system ("ATS") could match buyers and sellers of digital asset securities and the trades would either be settled directly between the buyer and seller, or the buyer and seller would give instructions to their respective custodians to settle

the transactions.[9]  In either case, the ATS would not guarantee or otherwise have responsibility for settling the trades and would not at any time exercise any level of control over the digital asset securities being sold or the cash being used to make the purchase (e.g., the ATS would not place a temporary hold on the seller's wallet or on the buyer's cash to ensure the transaction is completed).

**Considerations for Broker-Dealer Custody of Digital Asset Securities**

Whether a security is paper or digital, the same fundamental elements of the broker-dealer financial responsibility rules apply.  The Staffs acknowledge that market participants wishing to custody digital asset securities may find it challenging to comply with the broker-dealer financial responsibility rules without putting in place significant technological enhancements and solutions unique to digital asset securities.  As the market, infrastructure, and law applicable to digital asset securities continue to develop, the Staffs will continue their constructive engagement with market participants and to gather additional information so that they may better respond to developments in the market[10] while advancing the missions of our respective organizations: for the SEC, to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation; and for FINRA, to provide investor protection and promote market integrity.

**The Customer Protection Rule**

*Overview*

A broker-dealer seeking to custody digital asset securities must comply with the Customer Protection Rule.  As noted, the rule is designed principally to protect customers of a registered broker-dealer from losses and delays in accessing their securities and cash that can occur if the firm fails.  The rule requires the broker-dealer to safeguard customer securities and cash entrusted to the firm, as discussed below.  If the broker-dealer fails, customer securities and cash should be readily available to be returned to customers.[11]  In the event the broker-dealer were to be liquidated under SIPA, the SIPA trustee would be expected to step into the shoes of the broker-dealer and expected to be able to transfer, sell, or otherwise dispose of assets in accordance with SIPA.[12]

Among its core protections for customers, Rule 15c3-3 requires a broker-dealer to physically hold customers' fully paid and excess margin securities or maintain them free of lien at a good control location.[13]  Generally, a broker-dealer may custody customer securities with a third-party custodian (e.g., the Depository Trust Company or a clearing bank),[14] and uncertificated securities, such as mutual funds, may be held at the issuer or at the issuer's transfer agent.[15]  In either case, there is a third party that controls the transfer of the securities.  This traditional securities infrastructure (including, for example, related laws of property and security) also has processes to reverse or cancel mistaken or unauthorized transactions.

*Considerations for Digital Asset Securities*

There are many significant differences in the mechanics and risks associated with custodying traditional securities and digital asset securities.  For instance, the manner in which digital asset securities are issued, held, and transferred may create greater risk that a broker-dealer maintaining custody of them could be victimized by fraud or theft, could lose a "private key" necessary to transfer a client's digital asset securities, or could transfer a client's digital asset securities to an unknown or unintended address without meaningful recourse to invalidate fraudulent transactions, recover or replace lost property, or correct errors.  Consequently, a broker-dealer must consider how it can, in conformance with Rule 15c3-3, hold in possession or control digital asset securities.

In particular, a broker-dealer may face challenges in determining that it, or its third-party custodian, maintains custody of digital asset securities.[16]  If, for example, the broker-dealer holds a private key, it may be able to transfer such securities reflected on the blockchain or distributed ledger.  However, the fact that a broker-dealer (or its third party custodian) maintains the private key may not be sufficient evidence by itself that the broker-dealer has exclusive control of the digital asset security (e.g., it may not be able to demonstrate that no other party has a copy of the private key and could transfer the digital asset security without the broker-dealer's consent).[17]  In addition, the fact that the broker-dealer (or custodian) holds the private key may not be sufficient to allow it to

reverse or cancel mistaken or unauthorized transactions.  These risks could cause securities customers to suffer losses, with corresponding liabilities for the broker-dealer, imperiling the firm, its customers, and other creditors.

**The Books and Records and Financial Reporting Rules**

*Overview*

The broker-dealer recordkeeping and reporting rules[18] require a broker-dealer, among other things, to make and keep current ledgers reflecting all assets and liabilities,[19] as well as a securities record reflecting each security carried by the broker-dealer for its customers and all differences determined by the count of customer securities in the broker-dealer's possession or control compared to the result of the count with the broker-dealer's existing books and records.[20]  The financial responsibility rules also require that broker-dealers routinely prepare financial statements,[21] including various supporting schedules particular to broker-dealers, such as Computation of Net Capital under Rule 15c3-1 and Information Relating to the Possession or Control Requirements under Rule 15c3-3 under the Exchange Act.[22]

The books, records, and financial reporting requirements are designed to ensure that a broker-dealer makes and maintains certain business records to assist the firm in accounting for its activities.  These rules also assist securities regulators in examining for compliance with the federal securities laws and as such are an integral part of the financial responsibility program for broker-dealers.

*Considerations for Digital Asset Securities*

The nature of distributed ledger technology, as well as the characteristics associated with digital asset securities, may make it difficult for a broker-dealer to evidence the existence of digital asset securities for the purposes of the broker-dealer's regulatory books, records, and financial statements, including supporting schedules.  The broker-dealer's difficulties in evidencing the existence of these digital asset securities may in turn create challenges for the broker-dealer's independent auditor seeking to obtain sufficient appropriate audit evidence when testing management's assertions in the financial statements during the annual broker-dealer audit.[23]  We understand that some firms are considering the use of distributed ledger technology with features designed to enable firms to meet recordkeeping obligations and facilitate prompt verification of digital asset security positions (e.g., regulatory nodes or permissioned distributed ledger technologies).  Broker-dealers should consider how the nature of the technology may impact their ability to comply with the broker-dealer recordkeeping and reporting rules.

**Securities Investor Protection Act of 1970**

*Overview*

Generally, a broker-dealer that fails and is unable to return the customer property that it holds would be liquidated in accordance with SIPA.  Under SIPA, securities customers have a first priority claim to cash and securities held by the firm for securities customers.  Customers also are eligible for up to $500,000 in protection (of which up to $250,000 can be used for cash claims) if the broker-dealer is missing customer assets.  These SIPA protections apply to a "security" as defined in SIPA and cash deposited with the broker-dealer for the purpose of purchasing securities.[24]  They do not apply to other types of assets, including, importantly, assets that are securities under the federal securities laws but are excluded from the definition of "security" under SIPA.[25]

*Considerations for Digital Asset Securities*

In the case of a digital asset security that does not meet the definition of "security" under SIPA, and in the event of the failure of a carrying broker-dealer, SIPA protection likely would not apply and holders of those digital asset securities would have only unsecured general creditor claims against the broker-dealer's estate.[26]  Further, uncertainty regarding when and whether a broker-dealer holds a digital asset security in its possession or control creates greater risk for customers that their securities will not be able to be returned in the event of a broker-dealer failure.[27]  The Staffs believe that such potential outcomes are likely to be inconsistent with the expectations of persons who would use a broker-dealer to custody their digital asset securities.

**Control Location Applications**

As a related matter, the Staffs have received inquiries from broker-dealers, including ATSs, wishing to utilize an issuer or transfer agent as a proposed "control location" for purposes of the possession or control requirements under the Customer Protection Rule.  As described to the Staffs, this would involve uncertificated securities where the issuer or a transfer agent maintains a traditional single master security holder list, but also publishes as a courtesy the ownership record using distributed ledger technology.  While the issuer or transfer agent may publish the distributed ledger, in these examples, the broker-dealers have asserted that the distributed ledger is not the authoritative record of share ownership.  To the extent a broker-dealer contemplates an arrangement of this type, the Division will consider whether the issuer or the transfer agent can be considered a satisfactory control location pursuant to an application under paragraph (c)(7) of Rule 15c3-3.[28]

\*\*\*

As noted, the Staffs encourage and support innovation in the securities markets and look forward to continuing to engage with investors and industry participants as the marketplace for digital asset securities develops.  To contact Commission staff for assistance, please visit the Commission's FinHub webpage or contact Thomas K. McGowan, Associate Director, at (202) 551-5521 or Raymond Lombardo, Assistant Director, at (202) 551-5755.  To contact FINRA staff for assistance, please visit FINRA's FinTech webpage or contact Kosha Dalal, Associate General Counsel, at (202) 728-6903.

---

[1] For the purposes of this statement, the term "digital asset" refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "virtual currencies," "coins," and "tokens."  A digital asset may or may not meet the definition of a "security" under the federal securities laws.  For the purposes of this statement, a digital asset that is a security is referred to as a "digital asset security."

[2] This statement represents staff views of the Division of Trading and Markets and FINRA.  This statement is not a rule, regulation, guidance, or statement of the U.S. Securities and Exchange Commission ("SEC" or "Commission") or FINRA, and the Commission and FINRA's Board have neither approved nor disapproved its content.  This statement does not alter or amend applicable law and has no legal force or effect.

[3] For purposes of this statement, the Staffs use the term "entities" to refer to both firms and individuals.

[4] The financial responsibility rules include Rule 15c3-1 (the net capital rule), Rule 15c3-3 (the customer protection rule), Rule 17a-3 (the record making rule), Rule 17a-4 (the record retention rule), Rule 17a-5 (the financial reporting rule), and Rule 17a-13 (the quarterly securities count rule) under the Securities Exchange Act of 1934 ("Exchange Act").  This statement does not address all federal securities laws that may be implicated by a broker-dealer seeking to maintain custody of digital asset securities.  Further, this statement does not address other securities laws or rules that may apply to digital asset securities.

[5] Rule 15c3-3 was adopted by the Commission in 1972.  See Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 9856 (Nov. 10, 1972), 37 Fed. Reg. 25224 (Nov. 29, 1972).

[6] For example, one blockchain forensic analysis firm estimated that approximately $1.7 billion worth of bitcoin and other digital assets had been stolen in 2018, of which approximately $950 million resulted from cyberattacks on bitcoin trading platforms.  The estimate of total losses in 2018 is 3.6 times higher than the estimate of such losses in 2017.  See CipherTrace, Cryptocurrency Anti-Money Laundering Report, 2018 Q4, at 3 (Jan. 2019) (available at:  https://ciphertrace.com/crypto-aml-report-2018q4/).

[7] Firms can discuss with FINRA whether a contemplated change in business operations such as engaging in digital asset securities activities may require the filing of a CMA through the materiality consultation process.

[8] These business models and transactions must comply with other provisions of the securities laws or regulations. The Staffs offer no views about whether such business models would be in compliance with other securities laws or regulations.

[9] Entities that perform functions to facilitate the clearance and settlement of transactions in digital asset securities may be required to register as a clearing agency under Section 17A of the Exchange Act. See 15 U.S.C. 78q-1.

[10] See, e.g., Statement on Digital Asset Securities Issuance and Trading, Division of Corporation Finance, Division of Investment Management, and Division of Trading and Markets, Commission (Nov. 16, 2018) (available at: https://www.sec.gov/news/public-statement/digital-asset-securites-issuuance-and-trading); see also e.g., Engaging on Non-DVP Custodial Practices and Digital Assets, letter issued by staff, Division of Investment Management, Commission, dated Mar. 12, 2019 (available at: https://www.sec.gov/investment/engaging-non-dvp-custodial-practices-and-digital-assets).

[11] See Financial Responsibility Rules for Broker-Dealers, Exchange Act Release No. 70072 (July 30, 2013), 78 Fed. Reg. 51824, 51826 (Aug. 21, 2013). In addition, if the broker-dealer is liquidated in a formal proceeding under the Securities Investor Protection Act of 1970 ("SIPA"), the securities and cash held by the broker-dealer for its customers would be isolated and readily identifiable as "customer property" and, consequently, available to be distributed to customers ahead of other creditors. Id.

[12] See 15 U.S.C. 78fff-1 (setting forth the powers and duties of a SIPA trustee).

[13] See paragraphs (b) and (c) of Rule 15c3-3. An entity's designation as a good control location is based, in part, on its ability to maintain exclusive control over customer securities. See, e.g., paragraph (c)(5) of Rule 15c3-3 (deeming a "bank" as defined in Section 3(a)(6) of the Exchange Act to be a good control location so long as, among other things, the bank has acknowledged that customer securities "are not subject to any right, charge, security interest, lien or claim of any kind in favor of a bank or any person claiming through the bank" and the securities are in the custody or control of the bank).

[14] See paragraphs (c)(1) and (c)(5) of Rule 15c3-3.

[15] The Commission often receives applications under paragraph (c)(7) of Rule 15c3-3 to designate an issuer or the transfer agent of various types of uncertificated securities as a control location. The Division has delegated authority to "find and designate as control locations for purposes of Rule 15c3-3(c)(7) [under the Exchange Act] certain broker-dealer accounts which are adequate for the protection of customer securities." See 17 CFR 200.30-3(a)(10)(i). The Commission has stated that mutual funds in particular may be held at the issuer or the issuer's transfer agent. See, e.g., Broker-Dealer Reports, Exchange Act Release No. 70073 (July 30, 2013), 78 Fed. Reg. 51910, 51951 (Aug. 21, 2013) (stating that "[g]enerally, mutual funds issue securities only in book-entry form. This means that the ownership of securities is not reflected on a certificate that can be transferred but rather through a journal entry on the books of the issuer maintained by the issuer's transfer agent. A broker-dealer that holds mutual funds for customers generally holds them in the broker-dealer's name on the books of the mutual fund"). See also Form Custody for Broker-Dealers, 17 CFR 249.639 (providing broker-dealers with a field to indicate that they custody mutual fund securities with a transfer agent). The Division has also previously issued no-action letters regarding the maintenance of certain other uncertificated securities at the transfer agent. See, e.g., letter to Fantex Brokerage Services, LLC from Mark M. Attar, Senior Special Counsel, Division of Trading and Markets, Commission, dated Dec. 19, 2014 (providing that the staff would not recommend enforcement action if a broker-dealer treats a transfer agent for uncertificated securities as a good control location, under certain circumstances). These prior no-action letters do not address whether blockchain or distributed ledger technology, in connection with the maintenance of the single master security holder list, establishes control of uncertificated securities by the issuer (or transfer agent).

[16] See, e.g., paragraph (d) of Rule 15c3-3 (requiring that, not later than the next business day, a broker-dealer, as of the close of the preceding business day, shall determine the quantity of fully paid securities and excess margin securities in its possession or control and the quantity of such securities not in its possession or control).

[17] Cf. supra note 13.

[18] See generally Rules 17a-3, 17a-4, and 17a-5.

[19] See paragraph (a)(2) of Rule 17a-3.

[20] See paragraph (a)(5) of Rule 17a-3.

[21] See generally Rule 17a-5.

[22] See paragraph (d)(2)(ii) of Rule 17a-5.

[23] See generally PCAOB Auditing Standard 1105, Audit Evidence (describing sufficient appropriate audit evidence and stating that audit evidence consists of information that supports and corroborates management's assertions regarding the financial statements and information that contradicts such assertions).

[24] The SIPA definition of "security" is different than the federal securities laws definitions.  See 15 U.S.C. 78lll(14) (excluding from the SIPA definition of "security" an investment contract or interest that is not the subject of a registration statement with the Commission pursuant to the provisions of the Securities Act of 1933).  This means there may be digital assets that are: (1) securities under the federal securities laws and SIPA, and thus are protected by SIPA; (2) securities under the federal securities laws, but not under SIPA, and thus not protected by SIPA; or (3) not securities under the federal securities laws and therefore not protected by SIPA.

[25] If a broker-dealer holds securities that are not protected by SIPA, the broker-dealer must nevertheless comply with the physical possession or control requirements under Rule 15c3-3 with respect to those securities.

[26] Generally, in a SIPA liquidation, assets not included in customer property (other than customer name securities) are liquidated and paid out to general creditors on a pro rata basis.  See 15 U.S.C. 78fff-2(c); 15 U.S.C. 78fff(b).

[27] See supra note 16.

[28] See paragraph (c)(7) of Rule 15c3-3.

Statement

# Staff Statement on WY Division of Banking's "NAL on Custody of Digital Assets and Qualified Custodian Status"

Division of Investment Management Staff in Consultation with FinHub Staff

**Nov. 9, 2020**

The Staff of the Division of Investment Management (the "Staff"), in consultation with the FinHub Staff, issue this statement[1] following the publication of a recent letter by the Wyoming Division of Banking that included the Wyoming Division of Banking's views relating to the definition of "bank" and "qualified custodian" under the Investment Advisers Act of 1940 (the "Advisers Act") and rule 206(4)-2 thereunder (the "Custody Rule").[2]

The Wyoming Division of Banking letter seeks to address questions regarding custody of digital assets under federal law and state law by stating that a Wyoming-chartered public trust company is permitted to provide custodial services for digital and traditional assets under Wyoming law.[3] For example, the letter states that the entity may serve as a "qualified custodian" under the Custody Rule based on the definition of "bank" under the Advisers Act. The letter further states that the Wyoming Division of Banking would not recommend an investigation or enforcement action to the Securities and Exchange Commission (the "Commission"). In this regard, the letter seeks to provide interpretive guidance on a critical component of the Custody Rule, the definition of a "qualified custodian."

The Wyoming Division of Banking letter recognizes that it is addressing issues of both federal and state law and expressly states that the letter "should not be construed to represent the views of the SEC or any other regulatory agency." The Staff is issuing this statement to encourage interested parties to engage with the Staff directly on the application of the Custody Rule to digital assets, including with respect to the definition of "qualified custodian" under the rule.[4]

SEC-registered investment advisers have important regulatory obligations under the Custody Rule, and they are expected to exercise care with respect to client assets with which they are entrusted. Determining who qualifies as a qualified custodian is a complicated, and facts and circumstances based, analysis given the critical role qualified custodians play within this framework by safeguarding the client assets entrusted to investment advisers.[5] The Commission has limited the types of financial institutions that may act as qualified custodians to those institutions that possess key characteristics, including being subject to extensive regulation and oversight, that help to ensure that client assets are adequately safeguarded.[6]

The Staff has engaged extensively with investment advisers, custodians and other market participants who are interested in the application of the Custody Rule to digital assets.[7] Our engagement has also centered on soliciting feedback on issues related to the development of staff recommendations to amend the Custody Rule. If you would like to let the Staff know your views regarding these issues, we are providing an email box as a convenient method for you to communicate with us; we continue to communicate through the following address: IMOCC@sec.gov and insert "Custody Rule and Digital Assets" in the subject line.

In particular, we have been interested in the following on the topic of qualified custodians:

- Do state chartered trust companies possess characteristics similar to those of the types of financial institutions the Commission identified as qualified custodians? If yes, to what extent?
- In what ways are custodial services that are provided by state chartered trust companies equivalent to those provided by banks, broker-dealers, and futures commission merchants? In what ways do they differ? Would there be any gaps in – or enhancements to – protection of advisory client assets as a result of a state chartered trust company serving as qualified custodian of digital assets or other types of client assets?
- How do advisers assess whether an entity offering custodial services satisfies the definition of qualified custodian in the Custody Rule? What qualities does an adviser seek when entrusting a client's assets to a particular custodian? Do the qualities vary by asset class? That is, are there qualities that would be important for safeguarding digital assets that might not be important for safeguarding other types of assets? If so, what qualities and why? Should the rule prescribe different qualities based on asset class, or should the rule take a more principles-based approach and allow advisers to exercise care in selecting a custodian?
- Are there entities that currently satisfy the definition of qualified custodian under the Custody Rule that should not be included within that definition because they do not meet the policy goals of the rule? If so, which ones and why? Conversely, are there entities that currently do *not* satisfy the definition of qualified custodian but should? If so, which ones and why?

Submissions in response to this request will be made publicly available, and persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions. Please submit only information that you wish to make publicly available.

---

[1] This statement represents Staff views and is not a rule, regulation, or statement of the Commission. The SEC has neither approved nor disapproved its content. SEC Staff statements, like all SEC Staff guidance, have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person.

[2] Investment Advisers Act of 1940, Pub. L. No. 76-768, 54 Stat. 847 (codified as amended at 15 U.S.C. 80b-1 – 88b-21 (2012); 17 CFR 275.206(4)-2. As relevant here, "qualified custodian" is defined in the custody rule as "a bank as defined in section 202(a)(2) of the Advisers Act or a savings association as defined in section 3(b)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1813(b)(1)) that has deposits insured by the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act (12 U.S.C. 1811)," and "bank" is defined in section 202(a)(2) to include "…(C) any other banking institution, savings association, as defined in section 1462(4) of title 12, or trust company, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency, and which is supervised and examined by State or Federal authority having supervision over banks or savings associations, and which is not operated for the purpose of evading the provisions of this subchapter …".

[3] Wyoming Division of Banking, "No-Action Letter on Custody of Digital Assets and Qualified Custodian Status" (Oct. 23, 2020), available at http://wyomingbankingdivision.wyo.gov/home/pressreleases/twooceanno-actionletterdigitalassetcustodyqualifiedcustodianstatus.

[4] The Commission and the Staff, in considering the requirements of the Custody Rule and any enforcement actions thereunder, are not bound by statements or views expressed by state regulators. This includes statements or interpretations regarding custody of digital assets as well as more traditional securities and whether any entity is a "qualified custodian."

[5] With respect to one aspect of this analysis – whether any entity's business consists of exercising fiduciary powers similar to those permitted to national banks as required by the definition of "bank"– the Staff expects that it would consult with the staff of the Office of the Comptroller of the Currency.

[6] *See* Custody of Funds or Securities of Clients by Investment Advisers, Investment Advisers Act Release No. 2876 (May 20, 2009) [74 FR 25354 (May 27, 2009)], available at https://www.sec.gov/rules/proposed/2009/ia-2876.pdf, at note 4 (discussing the key characteristics of financial institutions that may act as qualified custodians).

[7] Written feedback we have received in response to the Staff's letter on Engaging on Non-DVP Custodial Practices and Digital Assets is available at https://www.sec.gov/investment/engaging-non-dvp-custodial-practices-and-digital-assets. The IM Staff Letter on Engaging on Non-DVP Custodial Practices and Digital Assets (Mar. 12, 2019) is available at https://www.sec.gov/investment/non-dvp-and-custody-digital-assets-031219-206. Comments are made publicly available to further a dialogue on these issues as the Staff prepares recommendations for amendments to the Custody Rule for Commission consideration. *See, also*, Securities and Exchange Commission Regulatory Flexibility Agenda, available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202004&RIN=3235-AM32.

## Related Materials

- Comments Received

Statement

# SEC FinHub Staff Statement on OCC Interpretation

## SEC FinHub Staff

**Sept. 21, 2020**

The Securities and Exchange Commission Strategic Hub for Innovation and Financial Technology Staff (FinHub Staff) issues this statement[1] on an interpretation published by the Office of the Comptroller of the Currency (OCC Interpretation)[2] addressing the authority of national banks and federal savings associations to hold stablecoin reserves. The OCC has limited its Interpretation to holding reserves of a stablecoin associated with hosted wallets that is backed by a single fiat currency and redeemable by the holder of the stablecoin on a 1:1 basis for the underlying fiat currency upon submission of a redemption request to the issuer.

Whether a particular digital asset, including one labeled a stablecoin, is a security under the federal securities laws is inherently a facts and circumstances determination. This determination requires a careful analysis of the nature of the instrument, including the rights it purports to convey, and how it is offered and sold.[3]

We believe that market participants may structure and sell a digital asset in such a way that it does not constitute a security and implicate the registration, reporting, and other requirements of the federal securities laws. However, the label or terminology used to describe a digital asset or a person engaging in or providing financial activities or services involving a digital asset, may not necessarily align with how that asset, activity, or service is defined under the laws and rules administered by the SEC. We encourage parties seeking to structure and sell a digital asset, or to engage in related activities, to contact the FinHub Staff through www.sec.gov/finhub with any questions they may have to help ensure that such digital assets are structured, marketed, and operated in compliance with the federal securities laws. The Staff stands ready to engage with market participants to assist them and to consider providing, if appropriate, a "no-action" position regarding whether activities with respect to a specific digital asset may invoke the application of the federal securities laws.

---

[1] This statement represents Staff views and is not a rule, regulation, or statement of the Commission. The SEC has neither approved nor disapproved its content. SEC Staff statements, like all SEC Staff guidance, have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person.

[2] See OCC Interpretation (Sept. 21, 2020).

[3] See SEC v. W.J. Howey Co., 328 U.S. 293 (1946); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce Fenner & Smith, 756 F.2d 230 (2d Cir. 1985).  Market participants are encouraged to review the materials relating to digital assets published on www.sec.gov/finhub.  For example, the FinHub Staff has published a framework to assist market participants in determining whether a particular digital asset is an investment contract and therefore a security.  See Framework for "Investment Contract" Analysis of Digital Assets (Apr. 3, 2019).