# CLEARY GOTTLIEB STEEN & HAMILTON LLP

| | | |
|---|---|---|
| NEW YORK | 2112 Pennsylvania Avenue, NW | ROME |
| PARIS | Washington, DC 20037-3229 | MILAN |
| BRUSSELS | T: +1 202 974 1500 | HONG KONG |
| | F: +1 202 974 1999 | BEIJING |
| LONDON | | BUENOS AIRES |
| FRANKFURT | clearygottlieb.com | SÃO PAULO |
| COLOGNE | | ABU DHABI |
| | D: +1 202.974.1680 | |
| MOSCOW | msolomon@cgsh.com | SEOUL |

**VIA ECF**                                                     February 25, 2022

Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York
40 Foley Square
New York, NY 10007

RE: *SEC v. Ripple Labs Inc. et al.,* No. 20-cv-10832 (AT)(SN) (S.D.N.Y.)

Dear Judge Netburn:

Defendants Ripple Labs Inc., Bradley Garlinghouse and Christian Larsen ("<u>Defendants</u>")
respectfully submit this opposition to the SEC's Motion for Partial Reconsideration and
Clarification of the Court's January 13, 2022 Order (ECF No. 429) ("<u>Motion</u>").

The SEC's Motion is an inappropriate attempt at a do-over simply because it is unhappy
with the Court's order on its prior briefing. The SEC makes no pretense that the demanding
standard for reconsideration is satisfied here. Instead, it seeks to yet again brief an issue that has
been extensively litigated for nearly a year, but this time based on a new theory, in a reversal-of-
course. Ignoring its prior briefing and a sworn declaration it procured from Former Director of
Corporation Finance William Hinman—in which the SEC maintained that Mr. Hinman's Speech
("<u>Speech</u>") simply expressed the "personal views" of the speaker (a position the SEC now knows
cannot support its privilege claim)—the SEC now argues for the first time that the Speech was the
culmination of and reflected a policy process within the Division of Corporation Finance ("<u>Corp
Fin</u>"). This reversal contradicts Mr. Hinman's sworn statement, Ex. A, at ¶ 13 ("<u>Hinman
Declaration</u>"). Likewise, with neither permission nor apology, the SEC submits a brand-new 5-
page declaration—in blatant violation of the local rules—from someone who has no first-hand
knowledge of the matters attested to. *Compare* ECF No. 429-7 *with* Local Civ. R. 6.3 ("No

Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

affidavits shall be filed by any party unless directed by the Court.").

And for all its tactics, the SEC ultimately fails to establish that this Court's January 13, 2022 Order was in error.  The SEC cannot show that the Court overlooked any factual matters before it:  the Court considered and credited both Mr. Hinman's sworn statements and the SEC's representations that the Speech expressed Mr. Hinman's "personal views."  ECF No. 413 at 14 ("Order").  Moreover, the Court already recognized that SEC staff were involved in discussions around the Speech and determined that those discussions were "merely peripheral" to actual policy-making. Order at 14–15 (quoting *Tigue v. U.S. Dep't of Just.*, 312 F.3d 70, 80 (2d Cir. 2002)).  Additional discussion (presumably contained within the SEC's self-selected documents) does not alter the analysis.  The DPP still would not attach because those communications were not an "essential link" in a "specific consultative process."  *Id.* (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)).  At most, given that the discussions apparently all concern what should be said in the Speech itself, they were "merely peripheral to actual policy formation."  *Id.*  Finally, the SEC's protean approach to litigating this issue only underscores why the Speech drafts and related communications are important and highly relevant for purposes of discovery to which Defendants are in any event entitled.

1.     **The Motion Should Be Denied Because The SEC Identifies No Controlling Law Or Facts That The Court Overlooked.**

"[T]o be entitled to reargument and reconsideration, the movant must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion."  *SEC v. Rio Tinto PLC*, 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021) (Torres, J.) (quoting *Dietrich v. Bauer*, 198 F.R.D. 397, 399 (S.D.N.Y. 2001)).  "[R]econsideration is generally denied unless 'the moving party can point to controlling decisions or data that the court overlooked.'"  *In re Terrorist Attacks on Sept. 11, 2001*, 2020 WL 5848990, at *2 (S.D.N.Y. Sept. 20, 2020) (Netburn, J.) (citation omitted).[1]

---

[1]     "[T]he purpose of the local rule confining reconsideration to matters 'overlooked' and barring the submission of affidavits unless authorized by the courts is to ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters."  *In re CRM Holdings, Ltd. Sec. Litig.*, 2013 WL 787970, at *3 (S.D.N.Y. Mar. 4, 2013) (internal citation omitted).

The SEC does not contend that the Court failed to consider any relevant legal authority, controlling or otherwise.  It cites no cases in its Motion that previously have not been considered by the Court.  *See* Order at 13 (citing, *e.g.*, *Nat. Res. Def. Council v. EPA*, 19 F.4th 177, 185 (2d Cir. 2021) ("*NRDC*")).

As for "factual matters," the SEC contends that the Court "did not consider two significant matters," namely that "Director Hinman made the Speech in order to communicate Corp Fin's approach on the regulation of digital asset offerings," and "the speech was the end product of significant collaboration by many staffers across the agency[.]"  Mot. at 3.  But the SEC offers no evidence that the Court did not consider the latter, and, as to the former, the Court could hardly have "considered" matters that the SEC never previously argued—and, indeed, as to which the only evidence it presented was *contrary* to the position it now takes.

In its briefing regarding Entry 9—the June 5, 2018 email attaching a draft of the Speech— the SEC previously argued, *in full*:

> Entry 9 consists of an email enclosing a draft of the Hinman Speech for review and comment by SEC officials, including the directors of various SEC offices and divisions and the then-Chair of the SEC.  The draft speech and corresponding email are predecisional and deliberative, as Director Hinman was seeking feedback from other SEC personnel about the speech's contents prior to its delivery.  The email [**REDACTED**].  As such, the staff was deliberating on what the speech should say, and no final decision had been reached about its contents.  Such drafts and related emails are protected by the DPP.

ECF No. 351 at 13.  The SEC never argued that the Speech "communicate[d] Corp Fin's" views.  To the contrary, the SEC argued that the Speech "expressed [Mr. Hinman's] *own* view."  ECF No. 255 at 3.  And that has been the SEC's consistent position—both in this case and in other litigation where the issue has recently come up.  *See* Ex. B, SEC Mot. to Quash, *SEC v. LBRY, Inc.*, No. 21 cv-00260 (D.N.H. Nov. 5, 2021), Dkt. No. 37 ("*LBRY* Mot. to Quash") (characterizing the Speech as "Director Hinman's personal views").

The Court did not overlook the SEC's argument:  it specifically credited the SEC's representation.  Order at 14 (describing Speech as reflecting Mr. Hinman's "personal views") (quoting Hinman Decl., Ex. A)).  Likewise, the SEC did not argue that the exchange of drafts was part of any broader policy process; it said the topic of any deliberations was "*what the speech should say.*"  ECF No. 351 at 13 (emphasis added).  The Court credited that representation too.

3

Order at 13–14.  The SEC cannot manufacture an "overlooked" fact by contradicting its own prior representations.  *See Wilder v. News Corp.*, 2016 WL 5231819, at \*5 (S.D.N.Y. Sept. 21, 2016) ("[A] reconsideration motion cannot be used as a vehicle to make new arguments that contradict or are inconsistent with a party's earlier submission.").

The SEC's argument that the Court erred when it "based its decision on a single document relating to the Speech—one that *Defendants* chose to highlight for the Court," Mot. at 1 (emphasis in original), is meritless.  It also ignores that Defendants could not have cherry-picked a document that was *withheld* from them.  The SEC did not submit other documents for the Court to consider. It did, however, describe documents other than Entry 9 relating to the Speech in its briefing.  ECF No. 351 at 14 n.11.  The SEC offers no reason to believe the Court did not consider the SEC's briefing.

Nor could the Court have "overlooked" the 10 documents that the SEC submits in support of its Motion, as those materials were never previously put before the Court.  "A motion for reconsideration is 'not intended as a vehicle for a party dissatisfied with the Court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion.'"  *Rio Tinto*, 2021 WL 818745, at \*2 (quoting *WestLB AG v. BAC Fla. Bank*, 912 F. Supp. 2d 86, 95 (S.D.N.Y. 2012)); *Polsby v. St. Martin's Press, Inc.*, 2000 WL 98057, at \*1 (S.D.N.Y. Jan. 18, 2000) ("[T]he court's initial decision [is not] the opening of a dialogue in which that party may then use such a [reconsideration] motion to advance new theories or adduce new evidence in response to the court's rulings.") (citation omitted).  As for the unauthorized Hardy declaration, it should be struck from the record.  *See, e.g.*, *Fid. Info. Servs., Inc. v. Debtdomain GLMS PTE Ltd.*, 2010 WL 3469910, at \*1 (S.D.N.Y. Aug. 24, 2010) (finding the appropriate remedy for submission of unauthorized affidavit on motion for reconsideration is to strike and disregard it).

### 2.      The SEC's Reversal of Position Does Not Justify Reconsideration.

Throughout its briefing and through Mr. Hinman's sworn testimony, the SEC has taken the position that the Speech reflected only Mr. Hinman's personal opinion, not an official policy position of the SEC or of any other members of the SEC staff.   Mr. Hinman's Declaration emphasized the disclaimer at the beginning of his speech that "[m]y remarks are mine alone," and

the written disclaimer that his Speech "expresses the author's views," and went on to say "[t]he speech was intended to express *my own personal views*." Ex. A, Hinman Decl. ¶¶ 11, 13 (emphasis added). When he was deposed in this case, Mr. Hinman testified that he believed his Speech "provided clarity as to how *I* was looking at these issues." Ex. C, Hinman Dep. Tr. 132:9–10 (emphasis supplied); *see also id.* at 233:14–15 ("The speech reflects my thoughts. I am comfortable that the speech reflects my thinking."); 233:19–20 (testifying that the statements in the speech "are intended to be a speech of my thoughts in the space."); 125:4–9 (confirming he did not give the speech as part of his duties as Director of Corp Fin). The SEC now seems to suggest that Mr. Hinman's sworn declaration and deposition testimony were at least misleading, arguing that the Speech all along reflected not only Mr. Hinman's personal opinion but also "represent[ed] the view of th[e] division," Mot. at 6 (quoting 17 C.F.R. § 202.1(d)). This reversal effectively repudiates the SEC's prior litigation position in this case. *See* Order at 14 (citing SEC submissions).

In support of its new position on the import of the Speech, the SEC seeks to dismiss the Speech's disclaimer as merely a "standard disclaimer," as if to suggest its substance should be ignored. Mot. at 5–6. This directly contradicts the SEC's prior reliance on that same disclaimer when it moved to strike Ripple's fair notice defense. *See* ECF No. 132 at 20 (arguing that the Speech "could have no bearing on whether the SEC provided fair notice" because it was "the speech of an SEC employee rather than the SEC itself (that is, a majority of the Commissioners), *as a disclaimer in the speech made clear*") (emphasis added). The SEC's argument also ignores that, according to his declaration, Mr. Hinman underscored the "standard disclaimer" when he delivered the speech, emphasizing that "My remarks are mine alone, not necessarily those of the Commission, the Commissioners, *or the staff.*" Ex. A, Hinman Decl. ¶ 11 (emphasis supplied). The standard disclaimer was included when the Speech was published, and it is required when employees of the Agency engage in "*Outside* employment and activities," like "teaching, lecturing, and writing activities." 17 C.F.R. § 200.735-4 (emphasis added). It is required precisely because, while the SEC's Office of General Counsel reviews speeches to ensure compliance with the SEC's ethical rules, that review does "not involve adoption of, or concurrence in, the views expressed"

by the agency itself. *Id.* The SEC's argument contradicts its recent representation in other litigation that the particular disclaimer in Mr. Hinman's Speech is "an important, and unambiguous, disclaimer," Ex. B, *LBRY* Mot. to Quash, at 4, not meaningless boilerplate.

As a matter of basic fairness, having taken and maintained the position that Mr. Hinman's speech reflected only his "personal views," the SEC cannot be permitted to backtrack to avoid the natural consequences of its own litigation strategy. *See, e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . .").

But even on the merits, the SEC's new position does not warrant reconsideration. The SEC cites to 17 C.F.R. § 202.1(d) for the proposition that "any statement by the director" of an SEC Division "can be relied upon as representing the views of that division," Mot. at 6. That SEC regulation refers to the SEC's rules governing "informal procedures" pursuant to which the Commission's staff provides "advice and assistance … to members of the public dealing with the Commission." This includes, for example, interpretive and no-action letters published by SEC divisions—including Corp Fin—on their respective websites. *See* Div. of Corp. Fin. No-Action, Interpretive and Exemptive Letters, SEC (Dec. 20, 2021), https://www.sec.gov/corpfin/corpfin-no-action-letters. It does not extend to speeches that reflect only an individual's "own personal views." Notably, unlike Mr. Hinman's Speech, guidance issued under the SEC's informal procedures does *not* contain disclaimers that it reflects only the personal views of the author. Nor does Rule 202.1(d) signify that every utterance of a Division Director is the view of the Division—particularly when the Director himself says in the very statement that it is not. Nothing in Rule 202.1(d) provides a basis for reconsideration here.

### 3.    Communications About Mr. Hinman's Speech Are Not "Essential Links" in a Policymaking Process.

That Mr. Hinman consulted with other staff at the SEC in coming to his "personal views" and deciding what to say in his Speech was neither overlooked by the Court, *see* Order at 14–15, nor does it transform such discussions into "pre-decisional" communications protected by the DPP. While Defendants lack access to the 10 new documents submitted by the SEC, the picture painted

by the SEC's own description of those documents is one that is entirely consistent with what the SEC previously told the Court and the Court credited:  that Mr. Hinman communicated with SEC staff about "what the speech should say."  ECF No. 351 at 13; *see also* Order at 13–14.  But no matter how extensive those communications were, they do not change the fundamental character of the *process* of which they were a part:  the SEC told the Court in prior briefing that the process in question concerned what to say in a speech communicating his "personal views," not whether the agency for which Mr. Hinman worked should adopt any particular rule or policy.

The SEC seems to argue the Speech should fall within an administrative twilight zone— somewhere between a "personal view" and "agency policy."  It argues for the first time that communications about the contents of the Speech were in fact an "essential link" in a process that led to issuance of Staff guidance by the Strategic Hub For Innovation and Financial Technology ("FINHub") nearly a year later, in April 2019 (the "Framework").  Mot. at 4–5.  The SEC has never before argued that the discussions about what Mr. Hinman should include in his 2018 Speech were part of a process that led to the Framework.  Even were it otherwise, the fact that SEC staff discussed with Mr. Hinman what he should say in a particular speech followed by the issuance of informal guidance by a distinct office within the SEC a year later, does not cloak the discussions about the Speech with a privilege.  It instead renders them—as the Court rightly held—"peripheral to actual policy formation."  Order at 14–15 (quoting *Tigue*, 312 F.3d at 80).

The SEC's arguments seem to equate the requirement that, to be privileged, a communication must "form[] an essential link in a specified consultative process," *Grand Cent. P'ship, Inc.*, 166 F.3d at 482, with a broader conception that any communications *relevant* to SEC policy are also privileged.  Not so.  To be *privileged*—and therefore stand as an exception to the rule that relevant evidence must be produced in discovery—the communications must be "prepared in order to assist an agency decisionmaker in arriving at his decision" as part of a "specified consultative process."  *Id.*; *see also Toney-Dick v. Doar*, 2013 WL 5549921, at *1 (S.D.N.Y. Oct. 3, 2013) ("The deliberative process privilege does not provide a blanket basis upon which to withhold documents that an agency has created during its decision-making process. Indeed, if that were the case, the deliberative process privilege would provide an exemption from

the discovery rules for decision-making agencies generally—and that, of course, is not the law."). The SEC identifies no such "process" or "decision-making" and nothing the SEC submits suggests that the discussions with Mr. Hinman were part of such a process.

Contrary to the SEC's argument, Mot. at 9–10, Mr. Hinman's Speech is nothing like the deliberative communications held privileged in *NRDC*, 19 F.4th at 189. Rather, the communications at issue in *NRDC* concerned deliberations during the course of a formal policy-making process about how to communicate the policy, once adopted, to the public. *See* 19 F.4th at 185–86; *see also* ECF No. 405 (Defendants' response to the SEC's notice of supplemental authority on *NRDC*). Here, the SEC has disclaimed both that there has been any formal policy-making by the SEC (or, for that matter, Corp Fin) and that Mr. Hinman's Speech was a communication of such policy. *See* Mot. at 10.

### 4.    Even If The DPP Applied, The Privilege Should Be Overcome On The Facts Of This Case And As A Consequence Of The SEC's Litigation Strategy.

Finally, even if it were a close call (and it is not), the Court should not permit the SEC to shield these documents from discovery in light of the SEC's shifting positions in this litigation— characterizing the speech as Mr. Hinman's "personal views" when it suits a particular litigation objective, then denying that the Speech is a reflection of SEC policy, *see* July 15, 2020 H'rg Tr. at 10:24–11:17, and finally pivoting to argue that, in fact, it actually reflects a *Division* policy process the SEC apparently identified only *after* the Court's ruling. "Neither the Federal Rules of Civil Procedure nor the Local Civil Rules permit any party to make its assertions of privilege a moving target." *SEC v. Yorkville Advisors, LLC*, 300 F.R.D. 152, 166 (S.D.N.Y. 2014) (finding waiver). Defendants have been seeking discovery on this issue for more than a year, and the SEC may not, at the thirteenth hour, suddenly start over on a fresh theory of privilege.

Likewise, while the Court has already held that, in general, the factors bearing on piercing the qualified DPP weighed against disclosure, those factors would favor disclosure even more strongly with respect to the documents at issue here if the Court were to find them privileged. In a case where the SEC alleges that it was at least reckless for Mr. Garlinghouse and Mr. Larsen to fail to recognize Ripple's sales of XRP as an unlawful securities offering, it is highly probative and potentially exculpatory that those within the SEC itself—the plaintiff in this case—struggled

8

with the very same question, so much so that it took them 52 drafts to "get it right" in Mr. Hinman's Speech. Mot. at 10; *see also* Order at 19 (recognizing the relevance of the materials to the SEC's scienter allegations); ECF No. 289 at 4 (citing July 14, 2021 Public Statement from Commissioners Hester M. Peirce, Elad L. Roisman regarding *In the Matter of Coinschedule*, criticizing the lack of clarity from the SEC even today).

Moreover, the Court's analysis declining to overcome the privilege as to other materials, which turned heavily on the policy-based justification underpinnings of the DPP and the importance that the SEC "'get it right' on the highly consequential decision of how (or whether) to regulate digital assets, [and] the need to promote candor to improve agency decisionmaking," Order at 22, should not control the outcome for materials related to the Speech. The SEC's decision to charge Mr. Garlinghouse and Mr. Larsen individually in this case was exceptional, and distinguishes this case from virtually every other digital asset case the SEC has brought. *Cf. SEC v. Telegram Grp., Inc.*, No. 1:19-cv-09439 (S.D.N.Y.); *SEC v. Kik Interactive Inc.*, No. 1:19-cv-05244 (S.D.N.Y.). So does the fact that XRP was circulating globally (in the billions of transactions) for nearly eight years before the SEC filed this case against Ripple. The Defendants have a strong interest in accessing the evidence at issue, as it is likely to be exculpatory insofar as it shows uncertainty within the SEC itself and the SEC's awareness of market confusion, thereby undercutting the SEC's allegations that the status of digital assets like XRP under the securities laws was obvious. On the other hand, the SEC's interest in concealing the discussions about what Mr. Hinman should say in such a speech, while maintaining allegations it chose to bring that Mr. Garlinghouse and Mr. Larsen were each at least reckless, is necessarily diminished. This is not a run-of-the-mill enforcement matter, and the Court has already noted that this is a unique case that is distinguishable from others that may come, Order at 20–21; *see also* July 15, 2021 Hr'g Tr., at 40:4–8; Apr. 6, 2021 Hr'g Tr. at 52:22–23, as other courts have recognized, *see* Ex. D, Feb. 23, 2022 Hr'g Tr. at 20:17–21:2, SEC v. LBRY, No. 1:21-cv-00260-PB (D.N.H.) (quashing subpoena to Mr. Hinman, distinguishing the SEC's allegations in this case).

Finally, to the extent that the SEC relies on policy-based justifications to avoid disclosure of relevant evidence, its interests in doing so are also diminished by the SEC's apparent efforts to

make the legal effect of the Speech ambiguous and to maintain a degree of plausible deniability over the agency's responsibility for the views expressed in the Speech. If the SEC's new position is to be credited, then rather than announcing policy in a formal statement on which the public could rely, Mr. Hinman and others at the SEC decided to make this pronouncement at a private event, in a speech he expressly labeled as reflecting views that were Mr. Hinman's "alone" and not those of the staff or anyone else at the SEC. And to this day, the SEC continues to speak equivocally about the nature and effect of the Speech. For example, although Mr. Hinman's Speech makes clear that Ether—a digital asset similar in many respects to XRP—was *not* a security in 2018, ECF No. 429-1 at 4 ("[B]ased on my understanding of the present state of Ether . . . current offers and sales of Ether are not securities transactions."), the current Chair of the SEC has repeatedly declined to say the same—as recently as last month. *See, e.g.*, *SEC Chair Gensler on Potential Crypto Regulation*, CNBC (Jan. 10, 2022), cnbc.com/video/2022/01/10/sec-chair-gary-gensler-on-potential-crypto-regulation-its-within-the-securities-laws.html ("We don't get involved in these types of public forums talking about any one project, one possible circumstance or give legal advice over the airwaves that way."). The stakes of this litigation are simply too high to permit the SEC to stand on the DPP to avoid producing probative evidence while maintaining optionality as to whether the process at issue, and its culmination, reflect agency policy at all.

*     *     *

For these reasons, respectfully, the SEC's Motion should be denied.

/s/ Matthew C. Solomon
Matthew C. Solomon
Nowell D. Bamberger
(msolomon@cgsh.com)
CLEARY GOTTLIEB STEEN & HAMILTON
2112 Pennsylvania Avenue NW
Washington, DC 20037
+1 (202) 974-1680

*Attorneys for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Attorneys for Defendant Christian A. Larsen*

KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK PLLC
Sumner Square
1615 M Street, NW, Suite 400
Washington, DC 20036
+1 (202) 326-7900

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Attorneys for Defendant Ripple Labs Inc.*