# Exhibit D

1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW HAMPSHIRE
2

3    * * * * * * * * * * * * * * * *
                                   *
4    SECURITIES AND EXCHANGE        *
     COMMISSION,                    *
5                                   * No. 1:21-cv-00260-PB
                         Plaintiff. * February 23, 2022
6                                   * 2:00 p.m.
     v.                             *
7                                   *
                                    *
8    LBRY, INC.,                    *

9                        Defendant.

10   * * * * * * * * * * * * * * * *

11
          TRANSCRIPT OF MOTION HEARING AND STATUS CONFERENCE
12                    HELD VIA VIDEOCONFERENCE
              BEFORE THE HONORABLE PAUL J. BARBADORO
13

14
     APPEARANCES:
15

16   For the Plaintiff:        Peter Moores, Esq.
                               Securities and Exchange Commission
17

18   For the Defendant:        Keith Miller, Esq.
                               Perkins Coie LLP
19
                               Timothy John McLaughlin, Esq.
20                             Shaheen & Gordon

21

22   Court Reporter:           Brenda K. Hancock, RMR, CRR
                               Official Court Reporter
23                             United States District Court
                               55 Pleasant Street
24                             Concord, NH 03301
                               (603) 225-1454
25

1                    P R O C E E D I N G S

2          THE CLERK:  This Court is in session and has for

3    consideration a motion hearing and status conference in civil

4    matter 21-cv-260-PB, U.S. Securities and Exchange Commission

5    versus LBRY, Inc.

6          THE COURT:  I've been informed that some members of

7    the public have requested access to this hearing.  We've

8    granted those requests.  People who are not admitted as parties

9    or counsel need to keep their cameras off and their microphones

10   muted throughout the hearing; and of, of course, it is

11   forbidden to make any recording of this proceeding.

12         Okay.  So, I have a Motion to Quash, I have a Motion

13   to Modify Scheduling Order, and I have a Motion for Protective

14   Order that's not ripe yet that I won't consider, unless the

15   parties jointly ask me to.

16         Let's start with the Motion to Quash.  I'll hear the

17   SEC on that motion.

18         MR. MOORES:  Thank you, your Honor.  Peter Moores from

19   the Securities and Exchange Commission.  We filed the Motion to

20   Quash the subpoena for the testimony of Director Bill Hinman.

21   We believe that the Morgan Doctrine is what controls here and

22   that Director Hinman is a high-ranking governmental official

23   afforded the protections of the Morgan Doctrine.  As such, the

24   sort of burden to take Mr. or Director Hinman's deposition

25   switches over to the defendant here who is seeking the

1   deposition to establish that extraordinary circumstances are

2   present to warrant the circumstance of taking his deposition.

3   The test under the Morgan Doctrine for whether or not there are

4   exceptional circumstances has been phrased in a couple of

5   different ways, but essentially that the information sought is

6   not obtainable elsewhere and it is personally and uniquely

7   possessed by Director Hinman in this case; and, two, the second

8   prong, is that the information sought is essential, not merely

9   relevant to in this case the LBRY's case.

10          Many courts actually have a third prong, and, in fact,

11   the Ninth Circuit In Re:  U.S. Department of Education, which

12   was cited on February 4th, 2022, has a third prong that there

13   has to be a showing of agency bad faith, and I don't believe

14   that that has been sort of argued here per se, but LBRY in its

15   papers has never suggested or offered that there is agency bad

16   faith and would fail under that third prong of the test.  But

17   at least on the papers both parties, I believe, have argued

18   sort of the first and second prong that I identified, and we'll

19   go through that today, your Honor.

20          As I said, it is LBRY's burden to show these

21   extraordinary circumstances.  LBRY has not shown that in its

22   papers.  And, first, what LBRY has conceded is that Director

23   Hinman does not possess any knowledge of the case here.  He

24   doesn't possess any knowledge about LBRY, doesn't possess any

25   knowledge about LBRY's offer and sales, nor LBC, which is LBRY

1    credits, token in question.

2         THE COURT:  Let's back up, though, because I do think

3    they challenge your contention that he's a high-ranking

4    government official with a position -- formerly held a position

5    that would qualify for the privilege that you're invoking.

6    I've collected the cases that I can find, and certainly there

7    are cases where a court says this person is a high-ranking

8    official, this person is not a high-ranking official, but what

9    is the principal basis on which I should make the distinction

10   between someone who is sufficiently high ranking to be covered

11   by the privilege?

12        MR. MOORES:  Your Honor, a lot of those cases that I

13   think we've all collected don't articulate a specific test.  I

14   think that the case that -- one of the cases that LBRY has

15   cited says it has to be the sort of apex of the agency, but the

16   proof of the cases throughout have shown that it doesn't have

17   to be sort of the highest member of an executive agency, and so

18   I think it ultimately falls back as to the sort of first

19   principles of why the executive privilege or why that

20   protection is afforded, which is essentially that a member of

21   the sort of Executive Branch is not to be hauled into court to

22   testify or to be deposed based upon their decision-making

23   processes.  Here we have Director Hinman who is, reports sort

24   of the second highest in terms of he's the head of the

25   division, is in charge of a lot of sort of internal decision

1   making at the Commission here and advising not only he's also

2   an attorney -- so advising as to policy as well as

3   attorney-client privilege up to the members of the Commission

4   itself.  So, I believe that he qualifies in other cases,

5   including the Navellier case that we cited, where it upheld

6   that a division director was a high-ranking governmental

7   official.

8           THE COURT:  Was that issue challenged by the plaintiff

9   in Navellier?  I know that the judge applied the privilege and

10  concluded that the official was a high-ranking official, but I

11  didn't see in their evidence that that was a litigated point, a

12  disputed point.  Can you help me out on that?

13          MR. MOORES:  So, with respect to whether or not the

14  Morgan Doctrine applied, it was challenged, the Morgan Doctrine

15  specifically applied.

16          THE COURT:  Did they make an argument to the judge

17  that the deponent was not a high-ranking government official

18  under Morgan?

19          MR. MOORES:  My recollection, your Honor, is it at

20  least wasn't sort of foremost in the judge's ruling.

21          THE COURT:  She didn't really explain.  I agree she

22  applied it to someone at the same rank as we have here.  I just

23  didn't see in her decision that she was evaluating competing

24  claims by the parties and coming down in a particular way on

25  it.  So, I think it clearly applies to people like

1    cabinet-level secretaries, it clearly applies to people like

2    mayors of a city, and it has been widely applied to people who

3    are not at the very top of the agency that they're heading, and

4    I've got examples, and I can draw analogies, but I don't find

5    in any of the case law a detailed discussion of the way in

6    which a judge would go about determining whether someone is or

7    is not a high-ranking official.

8           The weakness of these kind of categorical approaches

9    to problems are that you don't get to weigh competing

10   considerations and a totality of relevant circumstances

11   sometimes that you would like to be able to do.  For example,

12   here it appears that what LBRY wants to do is question the

13   former Director not about any facts about this particular case

14   that that person has knowledge of, because you've proffered

15   that he has no knowledge about this case, was not involved in

16   it, and has nothing to contribute based on personal knowledge

17   about it.  Instead, it appears that LBRY is trying to depose

18   this person to gain access to his thought process about how the

19   general issue of how the Howey test applies to digital

20   currencies works, and that seems to be matters of which you

21   would ordinarily not get a deposition for reasons completely

22   unrelated to the Morgan Doctrine.  It's the kind of thing that

23   either is simply not calculated to lead to any kind of relevant

24   information at all, or it's protected by the deliberative

25   process privilege.  So, I think that's part of the struggle

1    here.

2           It is just not apparent to me what this person has to

3    say that could be at all helpful to me in resolving the case,

4    but I did want your thoughts on how I would go about

5    distinguishing between whether someone is a high-ranking

6    official or not.  If you've got any other thoughts about it,

7    let me know.

8           MR. MOORES:  Yeah, your Honor.  I think that -- first

9    of all, I agree with a lot of what you just said about in terms

10   of the import of what Director Hinman's thoughts are and what

11   LBRY is seeking here, and I do think that there is a

12   relationship between the Morgan Doctrine and sort of

13   deliberative process privilege, which I think you were touching

14   a little bit upon, in terms of seeking the mental

15   decision-making processes of the deponent, and I think that

16   when you have someone who is cloaked with that decision-making

17   authority, which is, I believe, the sort of true import of why

18   LBRY is seeking Director Hinman, himself, they haven't noticed

19   somebody who is sort of lower on the staff or even a sort of,

20   you know, a low member of the staff.  They wanted the Director

21   himself, who is cloaked with that authority of decision making

22   on behalf of the Division of Corporation Finance, and so I

23   think sort of the reasons that LBRY is seeking Director

24   Hinman's point of fact that he would be protected under the

25   Morgan Doctrine itself.

1          THE COURT:  Although, the Morgan Doctrine appears to

2     be, rather than the deliberative process privilege, appears to

3     be focused primarily on the need to ensure that high-ranking

4     government officials aren't deluged with deposition requests,

5     because they supervise so many cases and deal with so many

6     issues that they should not be subjected to deposition as a

7     routine matter primarily because of the burden that it inflicts

8     on the person holding the position either as a current officer

9     or former official.  So, that seems to be the primary

10    motivation for the doctrine.  So, ine one sense, if you were to

11    try to construct a test you would say, well, let's interpret

12    what a high-ranking official is in light of why we have the

13    rule, and we seem to have the rule because someone who is

14    sufficiently high up in a governmental structure can find their

15    lives completely consumed with testifying in depositions of

16    routine cases.  I think your argument would be this person

17    oversees hundreds of matters that are potentially the subject

18    of litigation at any one time, and if you do not apply the

19    Morgan Doctrine to someone like this you will overburden the

20    holders of that office both while they currently hold the

21    office and after they complete their government service and

22    move on to other jobs.  So, that would seem to be one way of

23    trying to distinguish when someone who is sufficiently high

24    ranking to qualify.

25          MR. MOORES:  Your Honor, I agree.  In terms of the

1   Division of Corporation Finance, it oversees the registration

2   of security offerings that, you know, equate to trillions of

3   dollars and hundreds, if not thousands, of various issuers.

4   So, to the extent that there was ever a decision on the

5   registration that would involve Director Hinman, just with

6   respect to digital assets this is the third case in which

7   Director Hinman has been at least noticed, if not more, and I'm

8   just basing this upon when there have been motions to quash in

9   the Kik case, which we cited in our briefs, and the Ripple

10  matter, which I'm sure you're going to hear at least about from

11  LBRY.  So, this is the third time in which he's been hauled in

12  to testify as to his internal decision-making process with

13  respect to digital assets and --

14          THE COURT:  One of the concerns, potential concerns,

15  about extending the doctrine too far down into an organization

16  is that you're unnecessarily insulating people from having to

17  provide information about things that might be very important

18  to a particular litigant.  Say, for example, a person holding

19  the Director's position is a witness to allegations of sexual

20  harassment in the workplace.  That would be a case in which the

21  availability of that person for deposition would be highly

22  important notwithstanding his or her high position in

23  government, but the way the privilege works, the Morgan

24  Doctrine works under those circumstances it would be relatively

25  easy for someone in LBRY's position to demonstrate that the

1    Director, although holding a high-ranking position, should not

2    be immune from having to cooperate because they have direct

3    personal knowledge and they are uniquely positioned to

4    contribute in an important way to the case, not simply because

5    they're high up in a chain, where the actual work is being done

6    by people many levels below.  That's something that suggests to

7    me that we don't need to be, in determining what is high enough

8    for the Morgan Doctrine to apply, we don't need to be overly

9    concerned that will insulate people from being accountable for

10   their actions to the extent there's some reason to believe that

11   the person has engaged in conduct that might implicate them in

12   some kind of civil liability, or that they're a witness to

13   conduct.  Then, even if the Morgan Doctrine applied, it would

14   fit within the exception.

15        MR. MOORES:  Yes, your Honor.  I believe the

16   hypothetical you provided does not really touch upon a lot of

17   the main primary concerns of the Morgan Doctrine.  You know, if

18   it's an issue of sexual assault, that seems potentially a more

19   of a one-off situation that wouldn't overburden the

20   governmental official as well as something that's, you know,

21   within their knowledge as a potentially percipient witness and

22   does not go to their sort of decision-making in their official

23   duties.

24        THE COURT:  And if there is an allegation, say, that

25   someone at the director level harbored a particular bias and

1    participated in decisions in a way that potentially provided

2    the target of the decision with a defense, say there was a

3    selective enforcement claim that survived, I've said the

4    selective enforcement defense doesn't survive here, one could

5    say that there's a general Morgan Doctrine applicability; but

6    where the subjective mental state of the Director bears

7    directly on a viable defense, that would be a case where you

8    would find an exception to the Morgan Doctrine.

9         MR. MOORES:  Right, which I think is why you find, if

10   you read the Ninth Circuit's recent opinion and some of the

11   other court opinions that impose the bad-faith prong to the

12   sort of exceptional -- to whether or not the Morgan Doctrine

13   would apply or not, if there is a colorable argument of bad

14   faith, as you're suggesting, with the selective enforcement

15   claim, then that would fall outside of the Morgan Doctrine

16   potentially or at least it would be an exceptional --

17   extraordinary circumstance which would fall out of the

18   protection of the Morgan Doctrine.

19        THE COURT:  All right.  What else did you want to say

20   in support of your argument?

21        MR. MOORES:  Thank you, your Honor.  So, with respect

22   to the prong of whether or not the information is otherwise

23   available, this is not something that LBRY, who, again, has the

24   burden to establish is under the Morgan Doctrine, has really

25   put forth in their papers.  If we look at some of the topics

1     that they believe that Dr. Hinman, sorry, Director Hinman would

2     be testifying about, the perception in the marketplace, so if

3     this is what the marketplace was thinking, then that clearly

4     would be available from another source other than Director

5     Hinman.  And then the other sort of topics that they've

6     identified, which is the Commission's application of the <u>Howey</u>

7     test, or the Commission's approach in response to market

8     participants, or the status of the Commission's adoption, these

9     are not necessarily topics that are limited to Director Hinman,

10    and, again, if subject to discovery, then they could be

11    achieved in other ways than taking Director Hinman's testimony.

12    So, that would just, that prong alone LBRY fails in its effort

13    to take Director Hinman's testimony.

14          But more importantly I think, perhaps, is just whether

15    or not it is indeed relevant to this case, and as the standard

16    is, it's not just mere relevance.  It actually has to be

17    essential to the defense's argument here, LBRY's argument, and

18    primarily they're offering or they're proffering it that

19    Director Hinman's testimony would be somehow relevant to their

20    fair notice defense for --

21          THE COURT:  I think I've got your argument on that,

22    and my initial reaction is that argument is persuasive, that

23    fair notice defenses really turn on objective evaluations of

24    the available information and not the subjective understandings

25    of the people who are enforcing or promulgating the doctrine

1    that's being challenged.  So, I understand you make that

2    argument.  At least my preliminary assessment is that argument

3    is persuasive with me, so I don't need to hear you say more,

4    unless you feel you need to.

5         MR. MOORES:  No, your Honor.  The one thing I would

6    note sort of interestingly is LBRY is putting a lot of focus on

7    Director Hinman's speech and believes that it somehow supports

8    their position that the Howey test is too vague as applied to

9    at least LBRY's offer and sales.  But Director Hinman

10   throughout his speech in 2018 upholds the Howey test.  He's

11   simply applying the Howey test, and the references that he

12   makes to the Howey test are essentially just quoting the prongs

13   of it, where he might say if a promoter does not satisfy prong

14   two, then it's not an investment contract, or if it doesn't

15   satisfy prong three, then it's not an investment contract.  So,

16   in any sort of way it doesn't sort of make logical sense that

17   the speech in and of itself would be evidence that the Howey

18   test is too vague, because Director Hinman himself is saying

19   that the Howey test is what controls and, you know, the

20   application of it is the facts and circumstances of the

21   situation.

22        So, the last point I would make, your Honor, is really

23   just the notion that, even if it was relevant, what they're

24   ultimately seeking, what LBRY is ultimately seeking is stuff

25   that is protected by the deliberative process privilege or the

1   attorney-client privilege.  As I mentioned beforehand, Director

2   Hinman is an attorney, and in his role he would be providing

3   advice to the Commission or the Commissioners, and in terms of

4   developing policy, internal discussions about how that Howey

5   test would apply, the deliberative process privilege would also

6   apply.  So, in terms of how --

7           THE COURT:  I think you may be right on that, but if

8   that were all we were dealing with my inclination would be to

9   say you should have the deposition and you object and instruct

10  not to answer, and then the Court can evaluate on a

11  question-by-question basis claims of a deliberative process.

12          The basic problem for me is I haven't seen anything in

13  LBRY's requests that gives me any encouragement that he has

14  anything to say that would be relevant.  I understand your

15  point is that the test here, to the extent the doctrine

16  applies, is much more than mere relevance, but I'm just not

17  seeing what he has to say that's useful at all in this

18  litigation, and so that would be a basis on which to

19  potentially quash a deposition subpoena.  If it was just, well,

20  he's got things to say that are protected by the

21  attorney-client or deliberative process privilege, my view is,

22  well, let's see what he says in a deposition and you instruct

23  him not to answer on those questions where there's a potential

24  privilege, and then I evaluate those on a motion to compel.

25  Something like that's the way I would ordinarily do it.

1          MR. MOORES:  I would agree, your Honor.  I was just

2     suggesting that under this Morgan Doctrine specifically, and I

3     think you were talking a little bit perhaps outside the Morgan

4     Doctrine just on relevance, but within the construct of the

5     Morgan Doctrine, where LBRY has to establish extraordinary

6     circumstances, ultimately what they're seeking is not available

7     from Director Hinman due to the privileges, and that sort of

8     guts their argument that it is actually relevant or satisfies

9     the extraordinary circumstance.

10          THE COURT:  Your point is to the extent they want to

11     get from him, Tell us what you guys were talking about inside

12     the agency when you were formulating your policies about what

13     would qualify as an investment contract under Howey, your view

14     is that's deliberative process and/or attorney-client, and he

15     would never get it anyway, so he can't satisfy the

16     extraordinary circumstances exception based on that.  Okay.  I

17     understand your argument.

18          MR. MOORES:  Right.  And then, lastly, I know that

19     LBRY has suggested that Director Hinman's testimony would be

20     relevant to its sort of defense in chief, which is just that

21     the offer and sales do not satisfy the Howey test itself, but

22     it doesn't seem that Director Hinman --

23          THE COURT:  No offense to him, but that's my job here,

24     not his.  What he says when he speaks as a private citizen,

25     what he says when he gives speeches, my reaction is I could

1  care less.  I mean, that's not something that's entitled to

2  deference under any doctrine that I'm aware of, and in the end

3  of the day I'll make the decision whether the SEC has a viable

4  claim here or not.  So, I don't think what he has to say about

5  how he thinks the doctrine works matters at all.  Does it?  I

6  mean, how does it -- I don't defer to government employees

7  giving speeches on their own dime talking about the way they

8  think the law works.  I'm not giving any deference to that.  Am

9  I right about that?  Do you understand my concern?

10        MR. MOORES:  I do, and I think you are right, your

11  Honor, that the deference is to the precedent and the

12  controlling case law, not to director --

13        THE COURT:  And any regulations or actions that are

14  taken under doctrines like Chevron or similar doctrines in

15  which, when the agency speaks in ways that entitle it to

16  deference, then, of course, the Court would grant deference,

17  but the Court doesn't give deference to agency employees, even

18  high-ranking ones, when they try to say to people what they

19  think the law is.  That doesn't get any deference, and so it

20  wouldn't affect my decision making one way or the other.

21        MR. MOORES:  So, your Honor, subject to your questions

22  or rebuttal to what LBRY has to argue, I'll cede the floor.

23        THE COURT:  Okay.  Let me see what LBRY has to say.

24        Go ahead, Counsel.

25        MR. MILLER:  Good afternoon, your Honor.  My name is

1   Keith Miller.  I represent LBRY, Inc.  I'm a partner at Perkins

2   Coie.

3         Your Honor, I thought you made a good observation

4   regarding the rationale for the doctrine, and I'd like to

5   elaborate a little bit further on it.  First, as I understand,

6   the rationale for the rule is twofold.  One is to prevent a

7   chilling effect, if you will, on senior official government

8   officials so that they do not -- their discussions amongst

9   members of the agency are not chilled because of a threat of

10  being deposed.  The second rationale, as you stated, is the

11  need to ensure that an official, because of his title, he's not

12  engaged in litigation depositions because of his title.

13        So, with that rationale I would argue, your Honor, we

14  need to look at what we're trying to get from Mr. Hinman.

15  First of all, we're trying to obtain as a private citizen -- as

16  he said, These are my personal statements -- what he believed

17  was relevant in making determination under Howey whether a

18  digital asset is a security.  It's his speech that we're asking

19  to depose him about, not what did the other staff members talk

20  to you about about digital assets.  That's not what we're here

21  to ask Mr. Hinman about.  We're here -- he made a speech where

22  he drew conclusions as a personal individual.  We believe it is

23  very dispositive on the issue of fair notice.

24        If the Director of -- I'm sorry.  If the Director of

25  Corporate Finance has a theory about what the industry does

1   know and what the industry doesn't know, that's important

2   because it provides a standard.  If the entire industry, and we

3   will be presenting evidence at trial on this, if the entire

4   industry doesn't know if a digital asset under these types of

5   circumstances is an investment contract under Howey, okay, that

6   is relevant to evidence at trial to prove that they didn't have

7   fair notice.

8          THE COURT:  So, if he thought -- if a person in his

9   position gave a deposition in this case and took the position

10  that he subjectively thought that LBRY's offerings were

11  registrable securities offerings, that's a fact that I could

12  take into account in deciding whether your client is liable or

13  not?  That seems really weird to me.  We want to make decisions

14  about whether your client is liable based on the law, not based

15  on what random private citizens think about it.

16         MR. MILLER:  It goes to fair notice, your Honor, what

17  in our papers we've shown.  We have Mr. Hinman talking about

18  two digital assets, Bitcoin and Ether, and he concludes that

19  they are not securities, and he also concludes that at some

20  point in time, and his speech is clear on this, and it's also

21  cited by Chairman Clayton in his letter to Congress, that

22  securities that are initially securities can morph if the

23  efforts of others are no longer there.  So, we think, and

24  there's never been any communication by the SEC about what are

25  those factors, like when is something a security in the

1    beginning and then morphs into a non-security?  And so, we've

2    raised that as a defense here.  In our answer we said, even if

3    it was at some point in time and it is no longer a security

4    because the efforts of others are ministerial, and so, if

5    Hinman were to testify, I went through this process in writing

6    my article and in connection with that I met with industry

7    leaders, I met with lots of different attorneys, and that was

8    the impetus of writing this speech, I think that goes to show

9    or support our argument of fair notice, that there really

10   wasn't fair notice here.

11          THE COURT:  Let's assume that you're right, at least

12   insofar as it bears on your fair notice defense, what Hinman

13   actually publicly says, but that's not what you're seeking to

14   obtain in this deposition, because you already have what he

15   publicly says.

16          MR. MILLER:  Right.

17          THE COURT:  You're trying to get at things he hasn't

18   publicly said but that you think are useful in understanding

19   his thought process.  I don't see how that has any bearing on

20   your fair notice defense.

21          MR. MILLER:  Well, we would ask him, What was the

22   rationale for your speech?  Why did you put it out?  What were

23   your communications with third parties in connection with your

24   speech?  What was your application at the time -- how did you

25   apply Howey to Bitcoin and Ether?  You know, I think those are

1   the things that we would explore to try to figure out whether

2   our fair notice defense has further evidence that can be

3   demonstrated at the trial.

4        THE COURT:  Okay.  Well, look, I think that's helpful

5   to me, because it does -- you're being frank with me about the

6   kinds of things you want, which I appreciate.  It helps me

7   evaluate your request.  But I do understand you to be saying

8   that we really want to know what led into his speech, what his

9   thinking was, who he was talking to, what input he was getting

10  for it, because we think that bears on our fair notice defense.

11  That's primarily what you want to talk to him about.  Is that

12  fair to say?

13       MR. MILLER:  That's fair to say, and that's, frankly,

14  consistent in how the Court in the Ripple case has approached

15  this, and that is allow Hinman's deposition to occur and to

16  allow limited discovery regarding --

17       THE COURT:  In that Ripple case I'm remembering, if

18  I've got it wrong, you'll tell me, wasn't there an aiding and

19  abetting allegation in that case, and didn't the Court

20  specifically have to be concerned with the subjective mental

21  state of the deponent to evaluate a claim?  Much in the nature

22  of before I precluded it you asserted a selective enforcement

23  defense and a kind of bad-faith argument on the part of

24  decision makers, if I allowed that defense this case would look

25  more like Ripple, but it isn't really a Ripple case as it

1    currently is postured.  So, isn't that a way to distinguish

2    Ripple?  I think the government makes that point.

3         MR. MILLER:  They do, and in our response, your Honor,

4    we demonstrate why the Court's opinion wasn't solely focused on

5    the aiding and abetting.  Ripple and the individuals brought

6    the motion.  And so, yes, the Court did mention that the

7    individuals have to substantiate a knowledge prong for aiding

8    and abetting, but it was also for the benefit of Ripple.  It

9    wasn't just, Okay, individuals, you can take the deposition,

10   and I think we mention that in our brief at pages 12 and 13.

11        THE COURT:  So, you argue that, but what about Judge

12   Bowler's decision in Navellier?  She reached the conclusion

13   that the Morgan Doctrine did apply and protect someone at the

14   very same level.  You just say she got it wrong on this one and

15   I should --

16        MR. MILLER:  I think that case, if I remember it

17   correctly, your Honor, I believe that the depositions did take

18   place, but, again, the deliberative process privilege was

19   invoked at the deposition.  It wasn't a blanket, absolute

20   prohibition, unless I'm mixing that case --

21        THE COURT:  I may have misunderstood that.  Let me ask

22   the government.  Just tell me.  You're the one that cited

23   Navellier.  Is that right, the depositions already took place

24   and it's just a selective -- because that wouldn't make sense

25   to me.  That would be a deliberative process privilege, not a

1    Morgan Doctrine problem.

2          MR. MOORES:  Your Honor, I'll double check on this,

3    but it's my understanding that those depositions did not go

4    forward.  It was a former Commissioner and it was the Director

5    of Enforcement.  My understanding is that neither of those went

6    forward.

7          THE COURT:  Yeah, the Morgan Doctrine is designed to

8    prevent the deposition entirely, not to prevent selective -- to

9    protect certain answers once the deposition is underway.

10   That's really more deliberative-process privilege kind of

11   issues.  If you allow the deposition, the ordinary rules govern

12   how the deposition takes place.  That's the way I thought the

13   Morgan Doctrine worked.  Okay.  So, you'll both check on that

14   and let me know if you come up with anything, and I'll go back

15   over it, but I didn't recollect that the depositions, in fact,

16   occurred.  There were other depositions, but those depositions

17   I don't think did occur.

18          Okay.  So, Counsel, can you help me out on this?  What

19   do you think is the way to distinguish a high-ranking official

20   from a non-high-ranking official for purposes of the doctrine?

21          MR. MILLER:  I think you need to go back to the

22   rationale again, which is the need to ensure that an official

23   in his official capacity isn't being burdened.  Mr. Hinman is

24   no longer an official.  So, that argument I think is much more

25   supportive of our argument.

1          THE COURT:  I do think it's a relevant factor in

2     determining if they are a high-ranking official potentially

3     able to invoke the Morgan Doctrine whether there should be an

4     exception.  I think it's a factor but not determinative.

5     That's how I process it.  Do you agree or disagree?

6          MR. MILLER:  Yeah, I agree.  I do agree.  And we also

7     say in terms of looking at, as you said, there are cases on

8     both sides where a mayor is clearly, you know, a top-ranking

9     official and when there's other deputies, things like that,

10    depending on the agency.  So, we need to look at the SEC.  The

11    SEC is run by the Chairman and four Commissioners.  We're not

12    asking for their depositions.  Underneath are five Division

13    Directors and 25 other offices that report to the office of the

14    Chairman.  You've got Chief Accountant's office, you have Head

15    of Public Affairs, you have legislation and inter-government

16    affairs, you have the various divisions, Enforcement, things

17    like that.  Our position would be in this context Mr. Hinman is

18    not a high-ranking official because he's not at the apex of the

19    decision making.  And so, a lot of these cases talk about the

20    apex, and I've been trying to figure out what is apex, what

21    isn't, and I think it comes down to can they make the ultimate

22    decision.

23          THE COURT:  Well, if you believe in the unitary

24    executive theory, there's only one person at the apex of the

25    Federal Government, and that's the President of the United

1    States.  So, it clearly doesn't mean that, because it applies

2    to a secretary, it applies to cabinet secretaries, and it would

3    clearly apply to the SEC Commissioners and the Chair of the

4    Commission.  The question is does it ever apply below that

5    level in an organization like the SEC, and I don't think

6    there's been a well-reasoned decision that I've seen that helps

7    inform how a court should go about undertaking that analysis,

8    so what we're left with are a bunch of analogies where the

9    court applied it this way and the other court applied it that

10   way.

11        What I'm inclined to do is to say that we should

12   evaluate high ranking not in any kind of absolutist or

13   categorical way; we should really look at what the functions of

14   the office are, and if those functions are such that that

15   person is likely to be involved in highly voluminous, complex,

16   discretionary decision making, where the person exercises a

17   policy formulation role and isn't simply executing policies

18   established at lower levels, that you probably ought to think

19   of that person as high ranking because, given the exposure that

20   that person has to potential litigation, the burdens on the

21   office could be extraordinary, as opposed to, say, a line SEC

22   attorney, like the one that's currently arguing in front of me,

23   who's not a high-ranking official, but when you go sufficiently

24   up the policy chain that that person is effectively a manager

25   of a big portfolio where hundreds and thousands of decisions

1    are being made by subordinates and reviewed that that person is

2    sufficiently high ranking to potentially qualify.

3         And then, in my mind, we should police the

4    extraordinary circumstances exception reasonably to allow

5    exceptions like the one I proposed, where someone has direct

6    personal knowledge of a matter that isn't part of his

7    management portfolio where he's indirectly supervising a bunch

8    of stuff but he, in fact, or she, in fact, witnessed something

9    if it happened in the office that gives rise to potential

10   liability.  Then you would easily find the exception satisfied,

11   because that person has unique and very important information

12   as opposed to information that is largely derivative about

13   policymaking or execution of policy.

14        So, that's how I'm inclined to look at it, and

15   anything else you want to say on that subject go ahead, and

16   then make any other points you want to make on the particular

17   issue.

18        MR. MILLER:  Just a final point is, again, I think the

19   Court should view this as an individual, yes, he was at an

20   agency, but expressed an opinion, their personal opinion, and

21   for that reason I think the exceptions to Morgan, the Morgan

22   Doctrine, apply, and the rationale for the Morgan Doctrine

23   would not apply in this situation.

24        THE COURT:  All right.  Thank you.  I appreciate the

25   argument on it.

1          So, in preparation for the hearing today I carefully

2     reviewed the Supreme Court's decision in Morgan.  I read the

3     First Circuit's decision in Bogan against the City of Boston

4     reported at 489 F.3d 417, a 2017 First Circuit decision, which

5     is, of course, controlling precedent in my case.

6          I tried to look at how other courts dealt with the

7     issue of whether someone is a high-ranking official or not,

8     and, as I have suggested to you, I don't think there are an

9     abundance of well-reasoned decisions, certainly nothing that's

10    controlling on me.  Let me just identify a couple of examples

11    that I think are somewhat helpful, although the reasoning

12    provided is very limited.

13         I did look at the case of RI, Inc. against Gardner,

14    which is reported at 2011 Westlaw 4974834, an Eastern District

15    of New York decision from 2011 that held that the Solicitor

16    General of the United States Department of Labor was a

17    sufficiently high-ranking official to qualify under the Morgan

18    Doctrine.

19         I looked at a decision from the District of New

20    Jersey, U.S. against Sensient, S-e-n-s-i-e-n-t Colors, Inc.,

21    reported at 649 F.Supp. 2d 309, a 2009 District of New Jersey

22    decision, where the Court held that an EPA regional

23    administrator was a high-ranking government official.

24         And I looked at a decision from the District Court of

25    the District of Columbia, Low against Whitman, reported at 207

1   F.R.D. 9, where the Court concluded that the EPA's Deputy Chief

2   of Staff did qualify as a sufficiently high-ranking person.

3           Finally, I looked at, again, a District of -- Columbia

4   District Court decision, Sourgoutsis, S-o-u-r-g-o-u-t-s-i-s,

5   against United States Capitol Police, 323 F.R.D. 100, a 2017

6   District of Columbia District Court decision where the Court

7   held that the Inspector General of the United States Capitol

8   Police was a high-ranking official for the purpose of the

9   Morgan Doctrine.

10          As I said, my inclination, in the absence of more

11  specific guidance from the First Circuit or the Supreme Court,

12  is to suggest that in determining whether someone's a

13  high-ranking official you shouldn't look at a simple

14  categorical approach of are they the highest ranking official

15  in their agency.  Rather, I think you should look at it

16  functionally, and do they perform functions that involve

17  supervision of a large number of subordinate employees that are

18  responsible for carrying out the day-to-day operations of that

19  particular governmental agency, whether they are involved in

20  overseeing substantial amounts of government activity that

21  could potentially expose them to hundreds of thousands of

22  lawsuits if they were routinely subject to deposition, and

23  judged by that standard -- and I do believe, as I said, that

24  the Navellier case that I've previously cited supports this.

25          I do believe that potentially that the former Director

1    does qualify as a high official.  The fact that he's a former

2    official is a factor to consider but isn't dispositive,

3    because, again, we don't want people who take these positions

4    when they do leave office to spend the rest of their life

5    taking depositions, responding to efforts to establish whatever

6    it is that the litigant wants to establish.  So, I do think

7    that this former Director does have a position that potentially

8    qualifies him under the Morgan Doctrine for protection against

9    deposition.

10          What's really important to me here, though, is I just

11   do not understand how the former Director has anything to

12   contribute here.  And I respect Mr. Miller's argument, and I

13   appreciate his frankness.  I don't think that questions about

14   what drove him to make the speech, who he communicated with

15   when he made the speech, what his internal thought process was,

16   or who he may have been deliberating with while formulating his

17   views on this matter come anywhere close to satisfying an

18   extraordinary circumstance test.  To the extent he wants to use

19   the testimony to convince me that it was widely understood in

20   the marketplace that there was a particular view about how the

21   Howey test applies, that could be established from people other

22   than the former Director.  One could imagine an expert witness

23   that might testify about that, one could imagine people engaged

24   in the industry that might be able to testify about that, and I

25   don't believe that that information would be uniquely available

1    from the former Director.

2            More fundamentally, I just don't see how that

3    information has any potential relevance to the proceeding.  The

4    way I'm seeing it, the primary defenses here are this just

5    doesn't qualify under Howey, it's not an investment contract,

6    the SEC can't prove its case, and, in any event, we have a

7    viable fair notice defense.  Both of those issues turn on

8    objective facts, the Director has no personal knowledge of the

9    particulars of this case, and in my view the fair notice

10   defense really turns on objective criteria, not subjective

11   thought process of the individual involved, and I do agree that

12   it's likely that, to the extent one wants to get into that,

13   it's hard for me to see how it isn't protected by the

14   deliberative process privilege, and so it wouldn't be

15   available, in any event.  So, I don't believe that the

16   exceptional circumstances test comes anywhere close to being

17   satisfied here.

18           So, for those reasons and the additional reasons set

19   forth in the SEC's supporting memorandum I'm going to grant the

20   Motion for Protective Order and bar the deposition of the

21   former Director.

22           Does anybody need me to make any additional findings

23   or rulings with respect to that particular issue?

24           Is there anything else from the SEC that you feel I

25   need to take up that I haven't taken up?

1          MR. MOORES:  Not as to that motion, your Honor.

2          THE COURT:  All right.  Mr. Miller, anything else?

3     Your objections are all preserved, of course, for purposes of

4     appeal.  Is there anything else you need me to take up that I

5     haven't taken up on that particular --

6          MR. MILLER:  No, your Honor.

7          THE COURT:  All right.  So, let's turn to the next

8     matter, which is a proposal by the SEC to delay the scheduling

9     of this case.

10          Counsel, one thing that has really resonated with me

11     in this case is that LBRY feels extremely burdened by this

12     litigation.  Now, you make arguments that everything you've

13     done is appropriate and the discovery requests to date have not

14     been overly burdensome, but this is a company that is clearly

15     not in great financial circumstances.  This has a big bearing

16     on their efforts to survive.  This has been going on for years.

17     To the extent they oppose delays, I want to try to keep this

18     matter moving.  On the other hand, your point is you think that

19     they have -- if I'm understanding your position correctly, your

20     position is that LBRY, without making it clear to you

21     initially, has arbitrarily drawn a self-imposed line on what

22     discovery they're going to produce and that they're not -- they

23     haven't produced anything post filing of the complaint.  Am I

24     overstating your position, or is that your position?

25          MR. MOORES:  Your Honor, there's a lot that's true.