UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SECURITIES AND EXCHANGE
COMMISSION,

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/11/2022___

Plaintiff,

-against-

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

Defendants.

20 Civ. 10832 (AT) (SN)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against

Defendants Ripple Labs, Inc. ("Ripple"), and two of its senior leaders, Bradley Garlinghouse and

Christian A. Larsen, alleging that Defendants engaged in the unlawful offer and sale of securities

in violation of Section 5 of the Securities Act of 1933 ("Section 5" of the "Securities Act"), 15

U.S.C. §§ 77e(a) and (c). *See* Amend. Compl. ¶ 9, ECF No. 46. The SEC also alleges that

Garlinghouse and Larsen (together, the "Individual Defendants") aided and abetted Ripple's

Section 5 violations. *Id.* The Individual Defendants move separately under Federal Rule of

Civil Procedure 12(b)(6) to dismiss Plaintiff's complaint for failure to state a claim. Larsen

Mot., ECF No. 105; Garlinghouse Mot., ECF No. 110. For the reasons stated below, the

Individual Defendants' motions are DENIED.

**BACKGROUND**

The following facts are taken from the amended complaint and "are presumed to be true"

for the purpose of considering the Individual Defendants' motions to dismiss for failure to state a

claim. *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

The SEC alleges that, from 2013 to the filing of this action in 2020, Ripple violated

Section 5 by selling XRP—which the SEC claims is an "investment contract" for which

registration is required—without filing a registration statement.  *See* Amend. Compl. ¶¶ 4, 9, 60, 230–31, 241–42, 289–94, 392–93.  The SEC contends that Ripple and its executives promoted XRP as an investment into a common enterprise that would increase in value and price based on Ripple's efforts.  *See*, *e.g.*, *id*. ¶¶ 104, 111, 230–57, 294.  For the purposes of these motions, the Individual Defendants do not contest that the SEC's allegations plausibly show that Ripple's sale of XRP violated Section 5.  *See* Larsen Mem. at 1–2, ECF No. 106; Garlinghouse Mem. at 2, ECF No. 111.

Ripple was founded in 2012 by Larsen and a co-founder (the "Co-Founder").  *See* Amend. Compl. ¶¶ 16, 18, 38.  Around the time of Ripple's founding, the Co-Founder began creating the XRP Ledger, a software code that "operates as a peer-to-peer database, spread across a network of computers, that records data respecting transactions, among other things."  *Id.* ¶¶ 38–39.  After Ripple's founding, the Co-Founder and others associated with Ripple created a fixed supply of 100 billion XRP, *id.* ¶ 45, "a digital asset and the native token on the XRP Ledger," *id.* ¶ 48.

Larsen served as Ripple's Chief Executive Officer ("CEO") from September 2012 through December 2016.  *Id.* ¶ 18.  When Larsen was hired, Ripple was intended to "continue the XRP Ledger and XRP projects."  *Id.* ¶ 42.  In April 2015, Garlinghouse joined Ripple as its Chief Operating Officer ("COO").  *Id.* ¶ 17.  Then, in January 2017, Garlinghouse took over as CEO, and Larsen began serving as the executive chairman of Ripple's board of directors.  *Id.* ¶¶ 17–18, 74.

## I.    Larsen as CEO

In 2012, before Ripple began distributing XRP, Larsen and other Ripple executives received two legal memoranda from a law firm.  *Id.* ¶¶ 51–52, 56.  These memoranda analyzed

the risks associated with Ripple's distribution and monetization of XRP. *Id.* ¶¶ 51–53. The law firm warned that there was some risk XRP would be considered an investment contract by the SEC, and would, therefore, be subject to federal securities laws. *Id.* ¶ 53. Specifically, the memoranda stated that Ripple would face an increased risk of XRP being deemed a security if individuals purchased XRP as a speculative investment, or if Ripple employees promoted the idea that XRP could increase in price. *See id.*; *see also* ECF Nos. 108-1, 108-2.[1] The memoranda also explained that XRP would likely not be classified as currency, Amend. Compl. ¶ 54, an opinion reiterated in a memorandum Ripple's accountants sent to Larsen in 2013, *id.* ¶ 400.

By at least 2013, Larsen was aware of the contents of the memoranda and the possibility that the SEC would consider XRP a security. *See id.* ¶ 56. In in a May 2014 email, Larsen acknowledged that he received a large quantity of XRP because the legal memoranda advised that XRP may be deemed a security, and he was being compensated for "personally assum[ing] th[e] risk" of being classified as an issuer of securities. *Id.* ¶¶ 57–58; *see also* ECF No. 179-3.[2]

From 2013 to 2014, Ripple and Larsen made efforts to create a market for XRP by having Ripple distribute approximately 12.5 billion XRP to programmers through "bounty programs" that paid them for reporting problems in the XRP Ledger's code. Amend. Compl. ¶ 61. Ripple also distributed small amounts of XRP to anonymous developers and others to help establish a trading market for XRP. *Id.* During that time, Ripple began to make public

---

[1] The Court shall consider the legal memoranda and other such documents relied on in the complaint because they are "integral" to the amended complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also* Amend. Compl. ¶¶ 51–60. But, in doing so, the Court continues to draw all reasonable inferences in the SEC's favor. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

[2] *See supra* n.1.

statements with respect to XRP that gave investors reason to believe that Ripple's efforts would produce profits.  *Id*. ¶¶ 62–64.

In August 2013, Ripple started selling XRP in exchange for fiat currencies and other digital assets, such as bitcoin.  *Id*. ¶ 72.  Both Ripple and Larsen intended for their distribution of XRP to achieve "[n]etwork [g]rowth" and raise funds for Ripple's operations.  *Id*. ¶ 65.  As Larsen explained, Ripple was "keeping 25% of . . . XRP . . . to cover the bills, and using the rest of it to incent market makers, gateways, [and] consumers to come onto the protocol."  *Id*. ¶ 300. Larsen planned the initial stage of Ripple's XRP offering by approving the timing and amount of the offers and sales to:  (1) purchasers in the open market ("Market Sales"); (2) investment funds, wealthy individuals, or other sophisticated investors ("Institutional Sales"); and (3) others enlisted to assist Ripple's efforts to develop an XRP market (the "Other XRP Distributions").  *Id*. ¶ 73; *see also id*. ¶¶ 205, 207.  As CEO, Larsen initiated and approved Ripple's Market Sales of XRP.  *Id*. ¶ 92; *see also id*. ¶ 100.  He had final decision-making authority over which trading venues to use for Market Sales and how much XRP to sell in a particular venue.  *Id*. ¶ 98; *see also id*. ¶ 101.  And, Larsen strategized with other Ripple employees to adjust their selling plan to "stabilize and/or increase the XRP price."  *Id*. ¶ 101; *see also id*. ¶¶ 205–06.

The goal of Ripple's XRP sales was achieving as widespread a distribution of XRP as possible, which was necessary to promote an "aftermarket" of buyers and sellers of XRP.  *Id*. ¶ 89.  In a public interview, Larsen explained that one of Ripple's "key roles is making sure that [Ripple] distribute[s] [XRP] as broadly in a way that adds as much utility and liquidity as [it] possibly can."  *Id*. ¶ 265.  He stated that he thought the incentives of Ripple and XRP purchasers "are very well aligned" because, "for [Ripple] to do well [it] [has] to do a very good job in

protecting the value of XRP and the value of the network." *Id*.  Larsen described protecting the value of XRP as the "guiding principle" of Ripple's distribution.  *Id*.

When Garlinghouse joined Ripple as COO, he began assisting in Ripple's distribution of XRP.  He worked with Larsen to coordinate the distribution strategy to increase XRP's price. *See id*. ¶¶ 101, 205, 207, 211.  Garlinghouse also began to oversee, direct, and lead Ripple's efforts to make XRP available for purchasers to buy and sell on digital asset trading platforms incorporated in the United States and abroad.  *Id*. ¶¶ 154–59.  And, he participated in weekly XRP sales meetings where he exercised decision-making authority over the timing and amount of Ripple's XRP sales.  *Id*. ¶ 424.

Since at least 2013, Ripple and Larsen tried to make Institutional Sales "to obtain essential funding for Ripple's operations and develop a speculative trading market in XRP."  *Id*. ¶ 102; *see also id*. ¶¶ 104, 110–24.  Garlinghouse participated in these efforts when he was hired as COO.  *See id*. ¶ 110.  Larsen and Garlinghouse both played significant roles in negotiating and approving Ripple's Institutional Sales as well as other offers and sales of XRP to institutional investors.  *Id*.  In 2015, Garlinghouse negotiated an institutional investor's purchase of XRP in connection with the investor's formation of a private investment fund "whose sole purpose would have been to speculate on XRP as an investment."  *Id*. ¶ 111.  Both Garlinghouse and Larsen received drafts of the potential offering documents for that fund.  *Id*.  During those negotiations, Larsen received an email from the fund's attorney advising him of some concerns about XRP being regulated as a security even though it was considered a "virtual currency" in some contexts.  *See id*. ¶ 401.  In 2016, Larsen and Garlinghouse approved a sale to an institutional investor described as an "institutional reseller."  *Id*. ¶ 116.  This institutional

investor explained to Garlinghouse that he purchased XRP because Larsen had indicated to him that "XRP was central to Ripple's success." *Id*. ¶ 118.

As CEO, Larsen engaged in other efforts to further Ripple's distribution of XRP.  In 2015, Larsen co-founded RippleWorks, an entity that invests in XRP-related projects "to further Ripple's goals of achieving widespread trading of XRP in the market." *Id*. ¶¶ 137–38. Garlinghouse was also aware of RippleWorks' activities.  *See id*. ¶ 141.

In May 2015, Ripple agreed to settle charges brought by the United Stated Department of Justice and the United States Financial Crimes Enforcement Network for failing to register as a "Money Services Business" under the Bank Secrecy Act and for failing to comply with other regulatory requirements with respect to XRP sales. *Id*. ¶ 379.  The settlement agreement called XRP a "virtual currency." *Id*.

II.    Garlinghouse as CEO

In January 2017, Garlinghouse took over as Ripple's CEO. *Id*. ¶ 17.  Larson remained executive chairman of Ripple's board of directors. *Id*. ¶¶ 18, 74.  Garlinghouse, Larsen, and two other individuals made up the "XRP Sales Committee," a four-member committee that made XRP distribution decisions at Ripple. *Id*. ¶ 75.  Garlinghouse, as CEO, approved the timing and amounts of offers and sales of XRP, *id*. ¶ 76; *see also id*. ¶¶ 199, 205, and had final decision-making authority over which trading venues to use for Market Sales and how much XRP to sell in a particular venue, *id*. ¶ 98.  As chairman of the board, Larsen was consulted on offers and sales, *id*. ¶ 76, and participated in decisions regarding Ripple's sales strategy, *id*. ¶ 199.  In February 2017, Larsen expressed the view that "most volume in the [cryptocurrency] space is speculation in advance of enterprise and eventually consumer flows." *Id*. ¶ 398.  Garlinghouse also understood the importance of speculative investing, as he "instructed certain Ripple

employees to 'proactively' attempt to increase speculative trading value with positive XRP news." *Id.* ¶ 212.  In addition, Garlinghouse was informed by a Ripple employee that Ripple's goal was to "drive XRP speculative trading volume."  *Id.* ¶ 352.

In 2017 and 2018, Larsen and Garlinghouse worked together to convince digital asset platforms to list XRP.  *See id.* ¶¶ 160, 168.  As CEO, Garlinghouse was heavily involved in attempts to partner with such platforms.  *Id.* ¶¶ 165–66.  Garlinghouse expressed that Ripple viewed these efforts as an example of Ripple "doi[ng] whatever [it] can to invest in the success of the XRP ecosystem," which was "consistent with what [he had] also proactively said" publicly about Ripple's efforts.  *Id.* ¶ 166.  Garlinghouse also made statements suggesting that he was aware that some digital asset platforms may refuse to list XRP because they were concerned it was a security, and he helped prepare talking points intended to dispel the notion that XRP was a security or that a digital asset platform had refused to make XRP available to the public out of concerns that XRP was a security.  *Id.*  ¶ 167.

Larsen and Garlinghouse also worked together to further Ripple's sales to institutional investors.  In 2017, Larsen assisted with arranging a sale of 14.8 billion XRP to an institutional investor.  *Id.* ¶¶ 113–14.  In 2018, Garlinghouse signed an agreement with an institutional investor that described itself as "operat[ing] sales and exchange service[s] of crypto-assets to offer safe and secure transactions of crypto-assets for as many people as possible."  *Id.* ¶ 120 (alterations in original).

To assuage investor concerns, on May 16, 2017, Ripple announced that it would place 55 billion XRP, or most of its current holdings, into a "cryptographically-secured escrow" that would restrict Ripple to accessing only one billion XRP every month (the "XRP Escrow").  *Id.* ¶ 223.  Garlinghouse established the XRP Escrow, *id.* ¶ 426, and explained that it was meant to

address the concerns of XRP investors about Ripple's ability to sell its billions of XRP into the market "at any time," *id*. ¶ 221; *see also id.* ¶¶ 253, 336.  The escrow plan was intended, in part, to "secur[e] speculative liquidity" in XRP and "drive a material increase in XRP trading volume/liquidity."  *Id*. ¶ 225 (alteration in original).  Both Larsen and Garlinghouse were instrumental in the formation of the XRP Escrow by developing and approving the idea.  *Id*. ¶ 224.  Ripple and Garlinghouse publicly touted the formation of the XRP Escrow "as proof that Ripple and XRP holders shared a common interest in the success of Ripple's efforts as to XRP and as one of Ripple's many efforts to manage the trading market for XRP."  *Id*. ¶ 228; *see also id*. ¶ 253.

Garlinghouse was also involved in Ripple's efforts to promote XRP's use on a platform intended to allow money-transmitting businesses to buy XRP in one jurisdiction, and transfer and sell it in another location for the local fiat currency.  *See id*. ¶¶ 131, 362, 369, 370.  Although Ripple receives only *de minimis* fees from the cross-border payment platform, Garlinghouse views "the value creation of [that platform] as driving the liquidity in the XRP markets."  *Id*. ¶ 374.

As CEO, Garlinghouse made numerous statements regarding Ripple's relationship to XRP and its efforts to increase XRP's liquidity and price.  *Id*. ¶ 253.  In a June 2017 email, he said that Ripple had a "proven track record of being [a] good steward[] for XRP."  *Id*.  He explained that a decrease in the price of XRP "would certainly be bad for Ripple," *id*., and reminded Ripple's equity investors and advisors that Ripple remained "committed to making XRP the best digital asset for payments," *id*. ¶ 254.  In December 2017, Garlinghouse gave a public interview in which he explained that Ripple prioritized the volume of XRP sales and XRP liquidity, *id*. ¶ 256, and he posted on Twitter that "[a] healthy $XRP market and healthy $XRP

ecosystem is CRITICALLY important to [him]," *id*. ¶ 303.  And, in January 2018, Garlinghouse posted on Twitter that "fostering a healthy $XRP ecosystem is a top priority @Ripple." *Id*. ¶¶ 306–07.  Moreover, in a February 2020 interview at the New York Stock Exchange, Garlinghouse explained that Ripple's efforts to create a "use" for XRP should correlate with a potential increase in XRP price.  *Id*. ¶ 261.  In that same interview, Garlinghouse stated that markets would move "from that speculation that has driven the crypto market to utility." *Id*. ¶ 262.

Garlinghouse also expressed that Ripple was "focused on driving utility from" XRP, and that, if Ripple was successful, it would be "good for the liquidity of the whole ecosystem." *Id*. In a May 2017 article published on Ripple's website, Garlinghouse further explained that Ripple's "goal in distributing XRP is to incentivize actions that build trust, utility and liquidity." *Id*. ¶ 266; *see also* ECF No. 114-8.[3]  And, in a December 2017 interview, Garlinghouse claimed that XRP's price had recently risen because of Ripple's efforts to solve "a real problem . . . around cross-border payments," which made people "excited."  *Id*. ¶ 278.  Moreover, in another interview in March 2018, Garlinghouse reminded investors that "[t]here's no party more interested in the success of the XRP ecosystem than Ripple . . . because we own a lot of XRP." *Id*. ¶ 279.  He stated that Ripple had made investments and forged partnerships "in order to make sure that XRP is the most useful asset out there for solving a cross border payment problem."  *Id*.

During his time as CEO, Garlinghouse made many other public statements about Ripple's clear interest and investment in promoting the price of XRP and its distribution, *see id*. ¶¶ 308–11, 326, 338, 356, and the ways in which Ripple's efforts would drive up the price of XRP, *see id*. ¶¶ 318, 325, 343, 346, 348.  Garlinghouse also made statements that evinced a

---

[3] *See supra* n.1.

belief that XRP's purchasers viewed their holdings as a speculative investment.  *Id.* ¶¶ 330, 334, 337, 344, 347, 421.  For example, he said that digital assets, like XRP, "aren't currencies," because "[v]ery few people . . . have used . . . XRP to buy something."  *Id.* ¶ 386.  And, he once stated that Ripple's activities have "driven market interest in buying XRP as a speculative investment."  *Id.* ¶ 344.

During his tenure at Ripple, Garlinghouse received some warnings that XRP may be classified as a security.  In March 2017, Ripple's chief compliance officer advised Garlinghouse that "XRP certainly has some 'securities-type' characteristics."  *Id.* ¶ 407; *see also* ECF No. 226-1.[4]  The officer warned Garlinghouse that Ripple "need[s] to hone [its] playbook/messaging" to avoid such a classification.  Amend. Compl. ¶ 407; *see also* ECF No. 226-1.  That same officer later advised Garlinghouse that Ripple needed to ensure the language it used in employee offer letters "doesn't put [Ripple] at risk of XRP sounding like a security."  Amend. Compl. ¶ 408; *see also* ECF No. 226-3.[5]

Moreover, in July 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), which advised "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws."  Amend. Compl. ¶ 37.[6]  The DAO Report found that the particular digital assets at issue were investment contracts and, therefore, were properly considered securities.  *Id.*  After the DAO Report's publication, Garlinghouse made comments on Ripple's website indicating that he read the report.

---

[4] *See supra* n.1.
[5] *See supra* n.1.
[6] The Court shall consider the entirety of the DAO Report, SEC, No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (2017), https://www.sec.gov/litigation/investreport/34-81207.pdf, because it is a proper subject of judicial notice, *see United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020).

*Id.* ¶ 409.  In December 2017, Ripple's public relations firm notified Garlinghouse that the SEC

Chairman recently said that "[m]erely calling a token a 'utility' token or structuring it to provide

some utility does not prevent the token[] from being a security."  *Id.* ¶ 411.  The firm decided to

provide that notification to Garlinghouse because there "had been a concern to have XRP

considered a security."  *Id.*

In January 2018, when seeking to list XRP on a digital asset platform, Garlinghouse

submitted an application in which he acknowledged "that whether or not a digital asset may be

considered a security is an important consideration for many in the digital asset ecosystem" and

that Ripple had "received a legal memorandum from a reputable law firm" regarding the status

of XRP under the federal securities laws.  *Id.* ¶ 414.  Approximately four U.S.-based digital asset

platforms asked Ripple for a legal opinion as to the status of XRP under the federal securities

laws, and Garlinghouse was informed that, after Ripple failed to provide such an opinion, at least

one platform declined to list XRP because of concerns XRP would be deemed a security.  *Id.*

¶¶ 415, 418.  Garlinghouse also acknowledged that "Bloomberg put out there that [certain

platforms] are hesitant to list XRP because of concerns about it being a security."  *Id.* ¶ 419.

And, Garlinghouse, along with Larsen, met with a potential investor and "spoke for a while on

the outstanding issue of whether XRP gets classified as a security."  *Id.* ¶ 420.  In that

conversation, Garlinghouse noted that, although he was "optimistic" XRP would not be

considered a security, he could "[]not guarantee that."  *Id.* (alteration in original); *see also* ECF

No. 226-2.[7]

---

[7] *See supra* n.1.

III.    <u>Larsen's and Garlinghouse's Personal Sales of XRP</u>

In addition to facilitating Ripple's distribution of XRP, Larsen and Garlinghouse sold their personal XRP in a way that was intended to strike a balance between maximizing profits while not depressing the price of XRP.  Amend. Compl. ¶ 173; *see also id*. ¶¶ 85–87, 191. Larsen and his wife have sold over 1.7 billion XRP for at least $450 million.  *Id*. ¶ 86. Garlinghouse has sold over 357 million XRP for approximately $159 million.  *Id*. ¶ 87.  Larsen described his personal sale of XRP as "constructive" to the overall XRP market because of the "widely held view that over time, it['s] better to have widely held assets."  *Id*. ¶ 179. Garlinghouse, in discussing his personal XRP holdings, made representations that he considered XRP to be an investment vehicle, *id*. ¶¶ 42, 347, and, on multiple occasions, stated that he was "long XRP," *id*. ¶ 347.

From 2017 to at least 2020, Larsen and Garlinghouse offered and sold their XRP.  These transactions were consummated on various digital asset trading platforms, including four incorporated in the United States and one incorporated abroad, but with a principal place of business in New York.  *Id*. ¶¶ 177, 186.  At least two of the platforms incorporated in the United States were also U.S.-based.  *Id*. ¶¶ 162, 415–16.  Larsen and Garlinghouse also opened accounts with one platform's U.S.-based wholly owned subsidiary.  *Id*. ¶¶ 177, 186.  At times, transactions on these digital asset trading platforms occurred when XRP was "allocated to investors' accounts in the records of the platform."  *See id*. ¶ 35; *see also id*. ¶ 154.  Larsen and Garlinghouse also engaged the services of a global digital asset trading firm with an office in the United States to make offers and sales of their XRP.  *Id*. ¶¶ 96, 174, 183.  Both Larsen and Garlinghouse directed their XRP offers and sales from within the United States, *id*. ¶ 176; *see*

*also id*. ¶ 185, and made XRP offers and sales to persons in the United States, *id*. ¶ 178; *see also id*. ¶ 187.

## ANALYSIS

### I.   Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff is not required to provide "detailed factual allegations," but he must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555. Additionally, "where a particular state of mind is a necessary element of a claim, [a plaintiff's] pleading of that state of mind must be plausible and supported by factual allegations." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 278 (S.D.N.Y. 2013) (citing *Iqbal*, 556 U.S. at 686–87), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015). On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, and documents that the plaintiff knew about and relied upon when drafting the complaint. *See Chambers v. Time Warner*, *Inc*., 282 F.3d 147, 153 (2d Cir. 2002).

### II.   Application

#### A.  Aiding and Abetting Liability

To hold a defendant liable as an aider and abettor in a civil enforcement action, the SEC must plead and ultimately prove "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the

aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quotation marks omitted). After the Dodd-Frank Act took effect in 2010, the SEC may also satisfy the "knowledge" requirement by showing that the defendant was "reckless" in relation to the primary party's violation. *See SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018); *see also* Dodd-Frank Wall St. Reform & Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376, § 929O (2010) (codified at 15 U.S.C. § 78(t)(e)).  Courts cannot consider the three requirements in isolation from one another because "[s]atisfaction of the knowledge requirement will depend on the theory of primary liability, and there may be a nexus between the degree of knowledge and the requirement that the alleged aider and abettor render substantial assistance." *SEC v. Espuelas*, 905 F. Supp. 2d 507, 517 (S.D.N.Y. 2012) ("*Espuelas III*") (quoting *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009)).  Indeed, courts have found that "'[a] high degree of substantial assistance may lessen the SEC's burden in proving scienter' and vice versa." *SEC v. Wey*, 246 F. Supp. 3d 894, 928–29 (S.D.N.Y. 2017) (quoting *Apuzzo*, 689 F.3d at 215).

Here, the SEC alleges that the Individual Defendants aided and abetted Ripple's violation of Section 5 by assisting in Ripple's unregistered sale of XRP.  *See* Amend. Compl. ¶¶ 436–40. For the purposes of their motions, neither Larsen nor Garlinghouse argue that Ripple did not violate Section 5 by making unregistered sales of XRP.  *See* Larsen Mem. at 1–3; Garlinghouse Mem. at 1–4.  Therefore, the Court assumes that the SEC has adequately alleged the first requirement—the existence of a securities law violation by the primary party.  In order to prove the remaining requirements, the SEC must show that the Individual Defendants "joined the specific venture and shared in it, and that [their] efforts contributed to its success." *DiBella*, 587 F.3d at 566 (citation omitted).

### 1. Knowledge

The Individual Defendants argue that the SEC fails to sufficiently allege they had knowledge of Ripple's alleged violations of Section 5. *See* Larsen Mem. at 1–3; Garlinghouse Mem. at 1–4.[8] The Court disagrees.

Under 15 U.S.C. § 77o(b), liability can be imposed on a person who aids and abets a violation of Section 5 if that person "knowingly or recklessly provides substantial assistance to another person in violation of [Section 5]." In order to show that the Individual Defendants had knowledge of Ripple's alleged Section 5 violations, the SEC must show their general awareness of their overall role in Ripple's illegal scheme. *See SEC v. Paulsen*, No. 18 Civ. 6718, 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020) ("*Paulsen I*") (citation omitted). Notably, the SEC need not demonstrate that the Individual Defendants were aware that Ripple's scheme *was* illegal. *See SEC v. Mattessich*, 407 F. Supp. 3d 264, 272–73 (S.D.N.Y. 2019). Rather, the SEC must show that the Individual Defendants knew, or recklessly disregarded, the facts that made Ripple's scheme illegal. *See id.* As the D.C. Circuit explained:

> Knowledge means awareness of the underlying facts, not the labels that the law places on those facts. Except in very rare instances, no area of the law[,] not even the criminal law[,] demands that a defendant have thought his actions were illegal. A knowledge of what one is doing and the consequences of those actions suffices.

*SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980); *cf. Bryan v. United States*, 524 U.S. 184, 192 (1998) (explaining that "the knowledge requisite [for a] knowing violation of a statute is factual knowledge as distinguished from knowledge of the law" (citation omitted)).[9]

---

[8] A violation of Section 5 is a strict liability offense, which means that the SEC need not "prove scienter or negligence by [Ripple]" to establish its liability. *See SEC v. Genovese*, No. 17 Civ. 5821, 2021 WL 1164654, at *2 (S.D.N.Y. Mar. 26, 2021) (citing *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1046 (2d Cir. 1976)).

[9] Cases assessing the *mens rea* requirement for aiding and abetting strict liability offenses in the criminal context support such an interpretation. In criminal cases, courts generally find that the government must show "that the putative aider and abettor knew the facts that make the principal's conduct [unlawful]." *United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016). And, "if the conduct of an aider and abettor is sufficient to impose criminal liability, *a fortiori* it is sufficient to impose civil liability in a government enforcement action." *Apuzzo*, 689 F.3d at 212.

Next, the Individual Defendants argue that, even if the SEC need not show that they knew or recklessly disregarded that Ripple's actions violated Section 5, the SEC must show that they knew or recklessly disregarded that Ripple's actions were somehow otherwise "improper." *See* Larsen Mem. at 1, 12; Garlinghouse Mem. at 18–19.  Again, the Court disagrees.

The Court rejects the Individual Defendants' arguments primarily because a standard that requires showing knowledge of "improper" activity would result in the imposition of a "willfulness" requirement that is absent from 15 U.S.C. § 77o(b).[10]  In the securities law context, the Second Circuit has explained that the "willfulness" requirement for imposition of criminal liability requires a showing that the defendant had "knowledge that the conduct [was] unlawful," *see United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) (citation omitted), *cert. denied*, 141 S. Ct. 2755 (2021), or knew "that he was doing a wrongful act," *United States v. Tagliaferri*, 820 F.3d 568, 573 (2d Cir. 2016) (citation omitted); *see also United States v. Schlisser*, 168 F. App'x 483, 485 (2d Cir. 2006).  By contrast, the text of the statute at issue here, which imposes civil liability, does not include a "willfulness" requirement, and, therefore, does not support an interpretation that reads in such a requirement.  *Compare* 15 U.S.C. § 77o(b) (imposing liability on "any person that *knowingly* or *recklessly* provides substantial assistance to another person in violation of a provision of this subchapter" (emphasis added)), *with* 15 U.S.C. § 77x (imposing criminal liability on "[a]ny person who *willfully* violates any of the provisions of this subchapter" (emphasis added)).

---

[10] The Court also rejects Garlinghouse's argument that finding the Individual Defendants liable solely upon a showing that they knew the facts constituting Ripple's violations would be tantamount to imposing strict liability for aiding and abetting.  *See* Garlinghouse Mem. at 17–18; Garlinghouse Reply at 4.  This argument reflects a misunderstanding of strict liability because such liability may be imposed "even if [the violator] did not have knowledge of facts giving rise to the violation."  *Rock of Ages Corp. v. Sec'y of Lab.*, 170 F.3d 148, 156 (2d Cir. 1999).  Because strict liability generally does not depend on knowledge of these facts, a rule that imposes such a requirement is not imposing strict liability for aiding and abetting.

The Court also finds no basis for the conclusion that Congress intends for a willfulness requirement to be imposed absent any textual support.  Indeed, Congress' recent activity in this area, the passage of the Dodd-Frank Act, supports a reading of § 77o(b) that expands rather than contracts liability for aiding and abetting violations of the securities laws.  *Cf. Wey*, 246 F. Supp. 3d at 926–27 (explaining that the Dodd-Frank Act expanded aiding and abetting liability by allowing the SEC to hold a person liable for recklessly providing substantial assistance).

The Individual Defendants cite no binding authority imposing a willfulness requirement for aiding and abetting liability under § 77o.  Moreover, the Court rejects the Individual Defendants' interpretation of three cases from this district:  *SEC v. Paulsen*,[11] *SEC v. Mattessich*,[12] and *SEC v. Espuelas*.[13]  The Individual Defendants generally mischaracterize these

---

[11] The Individual Defendants cite two different orders in *SEC v. Paulsen* that they contend support requiring the SEC to show that they knew Ripple's conduct was improper.  *See Paulsen I*, 2020 WL 1911208; *SEC v. Paulsen*, No. 18 Civ. 6718, 2020 WL 6263180, at *14 (S.D.N.Y. Oct. 23, 2020) ("*Paulsen II*").  Garlinghouse cites a passage from *Paulsen I* where the district court stated that a defendant would not be liable if he "acted merely to protect [co-defendants] from discipline by their respective employers, and without any knowledge or reason to suspect that they had entered into a quid pro quo arrangement that violates the securities laws."  Garlinghouse Mem. at 19 (quoting *Paulsen I*, 2020 WL 1911208, at *7).  This passage does not show that the district court required the SEC to demonstrate that the defendant knew the quid pro quo arrangement violated the securities laws.  Rather, it merely shows that the court required the SEC to demonstrate that the defendant knew that the primary violator entered into a quid pro quo arrangement, and that the quid pro quo arrangement entered into by the primary violator violated the securities laws.  *See Paulsen I*, 2020 WL 1911208, at *5–8.  Larsen's citation to *Paulsen II* fares no better.  Larsen Mem. at 12.  In *Paulsen II*, the district court found that it was "not necessary for the SEC to demonstrate that [the defendant] knew all of the details of the crime" because the SEC had shown that the defendant's "conduct and actions demonstrate that he was general[ly] aware[] of the quid pro quo and its illegality."  *Paulsen II*, 2020 WL 6263180, at *14 (quotation marks and emphasis omitted).  This order merely stands for the proposition that, if the SEC can show knowledge of illegality, it need not show knowledge of all of the elements that make up the primary violation.  *See Ford*, 821 F.3d at 74–75.

[12] In *Mattessich* the district court did not find that the SEC needed to show that the defendants "knew their conduct to be wrongful."  *Mattessich*, 407 F. Supp. 3d at 272; *see also* Larsen Mem. at 12; Garlinghouse Reply Mem. at 5.  Rather, the district court, in responding to the defendant's argument that such a showing was necessary, found that the SEC had alleged that the defendants knew their conduct was wrong.  *Mattessich*, 407 F. Supp. 3d at 272.  The district court did not determine that those allegations were required.

[13] In parsing the knowledge requirement for aiding and abetting a violation of Section 13 of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), the district court in *SEC v. Espuelas* set out a three-step inquiry which appears to include a requirement that the SEC show that a defendant was aware that it was "improper" for the primary violator to recognize revenue from certain transactions.  *Espuelas III*, 905 F. Supp. 2d at 518.  But, in that same order, the district court also stated that "the SEC need only demonstrate that [a defendant] knew of facts that contradicted the substance of the reported accounting."  *Id*. at 524.  And, in two other orders in the same case, the district court reiterated that the SEC need show only that the defendant "knew that [the primary violator's] statements to the SEC overstated the amount of its revenue."  *See SEC v. Espuelas*, 908 F. Supp. 2d 402, 410 (S.D.N.Y. 2012) ("*Espuelas II*"); *SEC v. Espuelas*, 767 F. Supp. 2d 467, 475–76 (S.D.N.Y. 2011) ("*Espuelas I*").  In light of the apparent conflict

17

cases' holdings, and, to the extent these cases may provide some support for the imposition of a willfulness requirement, the Court does not find them persuasive.

### 2.  Substantial Assistance

Larsen also challenges the SEC's allegations regarding his provision of substantial assistance in furtherance of Ripple's alleged violations of Section 5.  *See* Larsen Mem. at 19–21.

To satisfy the substantial assistance component of aiding and abetting, the "SEC must show that the defendant in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed."  *Apuzzo*, 689 F.3d at 206 (quotation marks omitted) (alterations in original).  In other words, the defendant must "consciously assist[] the commission of the specific crime in some active way."  *SEC v. Mudd*, 885 F. Supp. 2d 654, 670–71 (S.D.N.Y. 2012) (citation omitted) (alteration in original).  When evaluating whether a defendant rendered substantial assistance, courts may consider the degree of knowledge the defendant has of the primary violation because when the SEC plausibly alleges a high degree of actual knowledge, this lessens the burden it must meet in alleging substantial assistance.  *Apuzzo*, 689 F.3d at 206.

### 3.  The SEC's Allegations

Turning to the SEC's allegations, the Court finds that the SEC has plausibly alleged that the Individual Defendants had knowledge of or recklessly disregarded the facts that allegedly made Ripple's sale of XRP amount to the unregistered sale of securities, and that Larsen provided substantial assistance.[14]

---

that would arise if the language from *Espuelas III* is given the meaning the Individual Defendants ascribe to it, *see, e.g.*, Larsen Mem. at 12 (citing *Espuelas III* for the proposition that "the SEC must show that the defendant knew or recklessly disregarded that the underlying activity that constitutes the primary violation was 'improper'"), the Court rejects the Individual Defendants' interpretation of *Espuelas III*.

[14] Because Garlinghouse does not challenge the SEC's allegations regarding his provision of substantial assistance, *see generally* Garlinghouse Mem., the Court shall address these allegations only to the extent they provide support for Garlinghouse's knowledge of Ripple's alleged violations.

As to Larsen, the SEC alleges that he played a large role in orchestrating Ripple's sale of XRP—allegations that support both his knowledge and his rendering of substantial assistance. *See Wey*, 246 F. Supp. 3d at 928–29; *Mudd*, 885 F. Supp. 2d at 670–71.  For example, Larsen oversaw Ripple's sale of XRP, *see, e.g.*, Amend. Compl. ¶¶ 73, 92, 98, 100, was directly involved in Ripple's strategy for supporting XRP's price, *see id*. ¶¶ 98, 100–01, served on the "XRP Sales Committee," *see id*. ¶ 75, and attempted to make sales to institutional investors to obtain essential funding for Ripple's operations, *see id*. ¶¶ 102, 104, 110, 112–13, 116. Furthermore, the SEC alleges that Larsen's personal sale of XRP was intended to assist with Ripple's distribution and the creation of a market for XRP investment.  *See id*. ¶ 173.  These allegations plausibly show that Larsen substantially assisted in and knew about Ripple's unregistered offer and sale of XRP.

The SEC also alleges facts that plausibly show that Larsen knew that purchasers of XRP may have viewed those purchases as an investment in a common enterprise with a reasonable expectation of profit based on Ripple's efforts.  *See, e.g.*, *id*. ¶¶ 244, 246, 265, 300.  For example, the SEC claims that Larsen knew that Ripple's activities were designed to protect the value of XRP, *id*. ¶ 265, that Larsen indicated to one institutional investor that XRP was "central to Ripple's success," *id*. ¶ 118, and that Larsen was aware that XRP sales were funding Ripple's operations, *see also id*. ¶¶ 90, 294, 300.  The SEC also asserts that Larsen understood that XRP was being sold to investors, *id*. ¶¶ 89, 397–98, including investors engaging in speculation, *id*. ¶¶ 102, 232, 398.  Moreover, the SEC alleges facts that plausibly suggest that Larsen was aware of the risk that Ripple's sale of XRP could be classified as an investment contract, and thus, as a security.  *See, e.g.*, ¶¶ 51–57, 399–401; *see also Ford*, 821 F.3d at 74–75.

19

The SEC's claims regarding Garlinghouse's knowledge of Ripple's activities are similarly sufficient.  These allegations plausibly show that as COO and CEO Garlinghouse also knew that Ripple was making unregistered offers and sales of XRP.  *See*, *e.g.*, *id*. ¶¶ 75–76, 98 104, 110, 116, 120, 154, 157–60, 199 424.  The facts alleged also plausibly demonstrate that Garlinghouse viewed XRP as an investment, *see*, *e.g.*, *id*. ¶¶ 342, 347, and promoted the idea that purchases of XRP were investments into a common enterprise with a reasonable expectation of profit based on Ripple's efforts, *see*, *e.g.*, *id*. ¶¶ 101, 118, 155, 166, 199, 210–12, 218–20, 253–56, 260–62, 266, 278–79, 293, 306–11, 330, 334–38, 342–49, 421, 426.  Additionally, the SEC further claims that Garlinghouse had reason to suspect that Ripple's actions were violating securities law.  *See*, *e.g.*, *id*. ¶¶ 405–21.

Accordingly, the Individual Defendants' motions to dismiss the SEC's cause of action for aiding and abetting Ripple's violations of Section 5 are DENIED.

### B.  Individual Sales

The Individual Defendants argue that the SEC's Section 5 claims based on their individual sale of XRP should be dismissed because the SEC fails to sufficiently allege that any of their XRP offers and sales were domestic, and, therefore, fails to allege that they violated Section 5.  *See* Larsen Mem. at 22–27; Garlinghouse Mem. at 21–29.  The Individual Defendants also contend that, even if the SEC has sufficiently alleged that their XRP offers and sales were domestic, the Court should still find that Section 5 does not apply because those offers and sales were predominately foreign.  *See* Larsen Mem. at 27–28; Garlinghouse Mem. at 29–30.

### 1.  Domesticity

It is a "longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (quotation marks

omitted).  All parties agree that Section 5 applies only to domestic offers and sales of securities.

*See* Larsen Mem. at 22; Garlinghouse Mem. at 20; SEC Mem. at 37, ECF No. 182.  But, they

disagree over what test this Court should apply to determine whether the Individual Defendants'

offers and sales were domestic, and whether the SEC's allegations satisfy any formulation of that

test.

     The Individual Defendants argue that the transactional domesticity test set out in

*Morrison* governs the Court's analysis of whether their offers and sales fall under Section 5.  *See*,

*e.g.*, Larsen Mem. at 3; Garlinghouse Mem. at 20.  In *Morrison*, the Supreme Court found that

Section 10(b) of the Securities Exchange Act of 1934 ("Section 10(b)" of the "Exchange Act"),

15 U.S.C. § 78j, does not apply extraterritorially.  *See Morrison*, 561 U.S. at 265.  The Supreme

Court reached this conclusion after rejecting the Second Circuit's "conduct and effects test" for

determining whether activity fell within the territorial scope of Section 10(b).  *See id*. at 256–

57.[15]

     After determining that Section 10(b) applies to only domestic conduct, the Supreme

Court turned to the question of when activity is considered "domestic" for the purposes of

Section 10(b)'s application.  *See Morrison*, 561 U.S. at 266–69.  Because Section 10(b) prohibits

a person from using a "manipulative or deceptive device" in connection "with the purchase or

sale of any security registered on a national securities exchange or any security not so

registered," 15 U.S.C. § 78j(b), the Supreme Court was faced with two ways of assessing

---

[15] The Supreme Court found that the conducts and effects test was difficult to administer and turned the "presumption against extraterritoriality" into a "craven watchdog" because the test allowed Section 10(b) to apply "whenever *some* domestic activity is involved in the case."  *Morrison*, 561 U.S. at 266 (emphasis in original).  The Supreme Court also expressed concern about treading on the jurisdiction of foreign countries who "regulate their domestic securities exchanges and securities transactions occurring within their territorial jurisdiction" in ways that "often differ[] from ours."  *Id*. at 269.

domesticity—it could decide the location of activity based on (1) the place where the deception originated, or (2) the place where the purchases and sales occurred, *see Morrison*, 561 U.S. at 266.

The Supreme Court approached this question by first determining the "focus" of the Exchange Act.  Analogizing to the Securities Act,[16] the Supreme Court concluded that the "focus" of the Exchange Act was "upon purchases and sales of securities in the United States." *Id*.  It discussed the portion of Section 5 that prohibits selling a security without a registration statement, 15 U.S.C. § 77e(a), and explained that the SEC has interpreted this requirement "not to include . . . sales that occur outside the United States."  *Morrison*, 561 U.S. at 268–69 (quoting Regulation S, 17 C.F.R. § 230.901).  Therefore, the Supreme Court determined that the Securities Act has "the same focus on domestic transactions" as the Exchange Act.  *Id.* at 268–69.  Because the Supreme Court concluded that the "focus" of the Exchange Act was on the sale of the securities, it adopted a transactional domesticity test that looked to whether the "purchase or sale [wa]s made in the United States, or involve[d] a security listed on a domestic exchange." *Id*. at 269–70.

Although *Morrison* itself did not clearly state when purchases or sales are "made" in the United States under the transactional domesticity test, the Second Circuit has since articulated a series of standards for determining where those purchases and sales occur.  *See generally Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012).  The Second Circuit determined the meaning of domestic purchases and sales by considering how "purchase" and "sale" are defined in the Exchange Act to include "any contract" to purchase or sell a

---

[16] The Exchange Act and the Securities Act were enacted by the same Congress and form two parts of the same "comprehensive regulation of securities trading."  *Morrison*, 561 U.S. at 268.

security, and it concluded that purchases and sales occur "when the parties become bound to effectuate the transactions."  *Id*. 67.

Therefore, the Second Circuit held that parties may show that a transaction occurred domestically by alleging specific facts that suggest that irrevocable liability attached or title was transferred in the United States.  *Id*. at 68–70 (rejecting allegations merely stating that "transaction took place in the United States" (quotation marks omitted)).  It explained that these facts may include those "concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money."  *Id*. at 70; *see also Banco Safra S.A.- Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 293 n.2 (2d Cir. 2021) (noting "that a transaction is . . . domestic when the two sides of the transaction are matched— thus forming a binding contract—on an electronic exchange system within the United States" (internal quotation marks omitted)).  The Second Circuit further rejected as insufficient allegations regarding a purchaser's citizenship or residency, as well as allegations that securities were heavily marketed in the United States or that U.S. investors were harmed by the defendant's actions.  *Absolute Activist*, 677 F.3d at 69–70.

Here, the SEC takes the position that *Morrison* does not determine the territorial scope of Section 5's registration requirement, arguing that an SEC regulation, Regulation S, determines what constitutes domestic offers and sales under Section 5.  *See* SEC Mem. at 37–38, 44–45 (discussing 17 C.F.R. § 230.903).  The Court disagrees.

The SEC correctly notes that *Morrison* quoted a provision of Regulation S, 17 C.F.R. § 230.901, when it explained how the SEC has understood Section 5 to apply only to sales that occurred in the United States.  *See Morrison*, 561 U.S. at 268–69.  But, the SEC contends that another provision of Regulation S, 17 C.F.R. § 230.903, which was not discussed or cited in

*Morrison*, governs this Court's assessment of Section 5's territorial scope.  *See* SEC Mem. at 37–

38, 44–45.  This provision of Regulation S sets out a series of conditions that, if satisfied, will

cause the SEC to view offers and sales as occurring outside the United States.  *See* 17 C.F.R.

§ 230.903.  Although the SEC argues that *Morrison*'s citation to § 230.901 signals the Supreme

Court's approval of using § 230.903 to determine when Section 5 may apply, SEC Mem. at 38,

*Morrison*'s reliance on § 230.901 for the general proposition that Section 5 does not apply

extraterritorially does not signal an intent to establish § 230.903 as the test for determining

whether offers and sales should be considered domestic.  Indeed, as the Second Circuit has

explained, § 230.903 merely provides "safe harbors," and "[a] transaction not within either of the

safe harbors may still be outside of the United States within the meaning of 17 C.F.R.

§ 230.901."  *Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d

118, 125 (2d Cir. 1998), *abrogated on other grounds by Morrison*, 561 U.S. 247.

Having determined that Regulation S does not govern the Court's analysis of whether the

Individual Defendants' offers and sales occurred domestically for the purposes of Section 5, the

Court must decide what test should be applied.  To the extent the Court is determining whether

*sales* occurred domestically, the Court finds that the transactional domesticity test set out in

*Morrison*, and clarified by *Absolute Activist*, governs this analysis.  *See Morrison*, 561 U.S. at

269–70; *Absolute Activist*, 677 F.3d at 69–70.  The Supreme Court clearly stated that the

provision of Section 5 that deals with unregistered sales of securities is focused on sales that

occur in the United States.  *See Morrison*, 561 U.S. at 268–69 (discussing 15 U.S.C. § 77e(a)(1)).

Moreover, the definition of "sales" provided in the Exchange Act and the Securities Act are

"virtually identical."  *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 164 & n.21 (S.D.N.Y.

2011) (discussing 15 U.S.C. § 77b(a)(3) and 15 U.S.C. § 78c(a)(14)).  The SEC has provided no

convincing reason why the transactional domesticity test for sales under Section 10(b) should not apply to sales under Section 5.

However, the Court is not persuaded that the transactional domesticity test should govern whether *offers* occurred in the United States. Indeed, when discussing Section 5, the Supreme Court quoted language from Section 5 and Regulation S that only dealt with "sales" of securities. *Morrison*, 561 U.S. at 268–69 (discussing 15 U.S.C. § 77e(a) and 17 C.F.R. § 230.901). As the Second Circuit explained, *Morrison* requires that courts assess "the particular statutory provision" at issue when determining if violations are domestic. *See Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (quoting *Loginovskaya v. Batratchenko*, 764 F.3d 266, 271 (2d Cir. 2014)); *see also RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 336 (2016). And, unlike Section 10(b), Section 5 applies to offers as well as sales. *See* 15 U.S.C. § 77e(c). Thus, the Court must decide what test should be applied to determine whether offers occurred in the United States. *Cf. SEC v. Blockvest, LLC*, No. 18 Civ. 2287, 2019 WL 625163, at *9 (S.D. Cal. Feb. 14, 2019) (recognizing that an offer does not require that performance be possible or that the issuer legally bind a purchaser).

The SEC argues, relying on *United States v. Naftalin*, that, because the definition of "offer" is construed broadly in other contexts, this Court should evaluate the "entire selling process" to determine if the SEC has properly alleged that offers occurred in the United States. *See* SEC Mem. at 41 (quoting *United States v. Naftalin*, 441 U.S. 768, 773 (1979)). But, "[n]owhere in *Naftalin* does the Supreme Court state that the location of a transaction can be determined by looking at 'the entire selling process.'" *Goldman Sachs*, 790 F. Supp. 2d at 158 (quoting *Naftalin*, 441 U.S. at 773). Indeed, this Court finds that a test that expansive would risk a reimposition of the conducts and effects test rejected in *Morrison*, *see id.*, because such a test

would result in similar "complexity, vagueness, inconsistency and unpredictability," *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010).  Moreover, the Court should not adopt a test for Section 5, a registration provision, that would have a much broader territorial reach than the test set out for Section 10(b), an anti-fraud provision.  As the Second Circuit has explained, "it is well-settled in this Circuit that the anti-fraud provisions of American securities laws have broader extraterritorial reach than American filing requirements."  *Eur. & Overseas Commodity Traders*, 147 F.3d at 125–26 (citation omitted).  The Court, therefore, concludes that the term "offer" should not be given its most expansive meaning.

When assessing a similar provision of the Securities Act that focuses on both offers and sales, a court in this district also found that the transactional test in *Morrison* governed the domesticity of sales but not the domesticity of offers.  *See Goldman Sachs*, 790 F. Supp. 2d at 164 (discussing the application of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)).  The court in *Goldman Sachs* looked at the definition of "offer" in the Securities Act, and determined that, for an "offer" to be domestic, "a person or entity must (1) 'attempt or offer[,]' in the United States, 'to dispose of' securities or security-based swaps or (2) 'solicit[,]' in the United States, 'an offer to buy' securities or security-based swaps."  *Id.* at 165 (quoting 15 U.S.C. §§ 77q(a), 77b(a)(3) (alterations in original)); *see also Absolute Activist*, 677 F.3d at 67 (explaining that courts must determine the meaning of a domestic purchase or sale by "consider[ing] how these terms are defined").  The Court agrees that this test should be used to determine whether offers are made in the United States for the purposes of Section 5.

Turning to the SEC's allegations, the Court finds that the SEC has sufficiently alleged that the Individual Defendants sold XRP in the United States.  In examining these sales, the Court applies the test set out in *Absolute Activist* to determine whether the SEC has alleged that

26

irrevocable liability attached or title was transferred in the United States.  The SEC claims that the Individual Defendants' sales occurred on multiple digital asset trading platforms, including Platforms A and B, which are incorporated in the United States.  *See* Amend. Compl. ¶¶ 177, 186.  Although the Individual Defendants are correct that the place of incorporation does not necessarily dictate where sales occur, *see*, *e.g.*, Garlinghouse Mem. at 25 (citing *Loginovskaya*, 764 F.3d at 274–75), the amended complaint alleges more than those platforms' place of incorporation.  The SEC also states that Platform A's principal place of business is in California, Amend. Compl. ¶ 157, and that Platforms A and B are based in the United States, *see id.* ¶¶ 162, 416.  And, the SEC alleges that digital assets, like XRP, are traded on digital asset trading platforms where they are, "at times[,] . . . allocated to investors' accounts in the records of the platform."  *Id.* ¶ 35; *see also id.* ¶ 154.  Taken together, these allegations plausibly allege that the Individual Defendants' sale of XRP on Platforms A and B occurred in the United States.

Moreover, the SEC also states that the Individual Defendants executed offers and sales on a digital asset trading platform through accounts based in the United States.  *See id.* ¶¶ 177, 186. Based on the allegations above, the Court may infer that their sales on that platform occurred in the United States because irrevocable liability may attach when digital assets enter and leave those accounts.  *See Myun-Uk Choi*, 890 F.3d at 67.

Furthermore, the SEC has also alleged that the Individual Defendants made offers from the United States.  When assessing offers, as opposed to sales, the focus "is on the person or entity [offering] securities."  *Goldman Sachs*, 790 F. Supp. 2d at 165 (quotation marks omitted). Therefore, it is the location of the offerors—here Larsen and Garlinghouse—that is relevant. The SEC alleges that the Individual Defendants resided in California during the time period in question, Amend. Compl. ¶¶ 17–18, and "directed [their] offers and sales of XRP from within

the United States," *id*. ¶¶ 176, 185, by making offers on digital asset trading platforms directly, *id*. ¶¶ 177, 183, 186, and by making offers through the "Market Maker," a global digital asset trading firm with an office in the United States, *id*. ¶ 96; *see also id*. ¶¶ 174, 183.  These allegations plausibly demonstrate that the Individual Defendants made their offers of XRP from the United States because they show either direct solicitation via placement of XRP onto the digital asset trading platforms, *see Goldman Sachs*, 790 F. Supp. 2d at 165, or an attempt to dispose of XRP via a broker, which is considered an offer under even a narrow interpretation of the term, *see Naftalin*, 441 U.S. at 773 ("At the very least, an order to a broker to sell securities is certainly an 'attempt to dispose' of them." (discussing 15 U.S.C. § 77b(3))).

Accordingly, the Court finds that the SEC has plausibly shown that the Individual Defendants made domestic offers and sales of XRP.

### 2.   Predominately Foreign

The Individual Defendants argue that this Court should find that their offers and sales are "predominately foreign" even if they are considered domestic.  *See* Larsen Mem. at 27–28; Garlinghouse Mem. at 29–30; *see also Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 215–16 (2d Cir. 2014); *Cavello Bay Reins. Ltd. v. Shubin Stein*, 986 F.3d 161, 166 (2d Cir. 2021).  The Court disagrees.

The Second Circuit has held that the presence of a "domestic" securities transaction is a necessary but not sufficient predicate for invocation of U.S. securities law.  *See Parkcentral*, 763 F.3d at 215.  And, when transactions involve "wholly foreign activity clearly subject to regulation by foreign authorities," the Second Circuit has found securities law violations to be predominately foreign, and, therefore, outside of the territorial scope of U.S. securities law.  *Id*. In the two cases where the Second Circuit determined that violations were predominately

foreign, the "conduct [ ] occurred in a foreign country, [and] concern[ed] securities in a foreign

company, [that were] traded entirely on foreign exchanges." *Id.* at 215–16; *see also Cavello*, 986

F.3d at 166–67 (explaining that "the security at issue [in *Parkcentral*] was wholly foreign" and

the case before it involved a "private agreement for a private offering between a Bermudan

investor . . . and a Bermudan issuer").  But, the Second Circuit was careful to point out that it did

"not suggest that the presence of some foreign element in a transaction necessarily means that

Congress did not intend to include it in the coverage of §10(b)."  *Parkcentral*, 763 F.3d at 216.

Rather, the key question is whether "[p]roviding a domestic forum [would] enhance confidence

in U.S. securities markets or protect U.S. investors."  *Cavello*, 986 F.3d at 167.

Here, the Court finds that the Individual Defendants' offers and sales were not

predominately foreign.  These offers and sales were made by U.S. residents, *see* Amend. Compl.

¶¶ 17–18, involved alleged securities issued by a U.S. company, *see id.* ¶ 16, concerned at least

some offers and sales made on U.S.-based platforms, *see id.* ¶¶ 177, 186, and included at least

some offers and sales made to U.S. purchasers, *see id.* ¶¶ 174, 178, 184.  Thus, the application of

Section 5 to these offers and sales would "enhance confidence in U.S. securities markets [and]

protect U.S. investors."  *Cavello*, 986 F.3d at 167.

Accordingly, the Individual Defendants' motions to dismiss the SEC's claims based on

their individual offers and sales are DENIED.

### C.  Timeliness

The SEC and Larsen entered into a tolling agreement on September 1, 2020.  *See* Amend.

Compl. ¶ 429.  Therefore, the SEC may seek monetary penalties for any causes of action that

accrued after September 1, 2015.  *See* 28 U.S.C. § 2462 (imposing five-year statute of

limitations).  In the amended complaint, the SEC alleges that Ripple engaged in the unlawful

offer and sale of unregistered securities from 2013 through the present, and that Larsen aided and abetted those offers and sales during that same time period. *See* Amend. Compl. ¶¶ 437–38. The SEC also alleges that Larsen made his own unregistered offers and sales of XRP from 2013 through, at least, 2020. *See id.* ¶ 433. Larsen argues that the SEC's claims for monetary civil penalties should be considered time-barred under 28 U.S.C. § 2462 because the amended complaint suggests that Larsen was involved in a "years-long unregistered offering of securities" that began in 2013, *see, e.g., id.* ¶ 5, and that the SEC's cause of action, therefore, accrued outside the five-year limitations period, *see* 28 U.S.C. § 2462. *See* Larsen Mem. at 28–30. The Court disagrees.

Larsen cites no cases in which a court has applied his interpretation of 28 U.S.C. § 2462 to claims under Section 5, or any other provision of securities law.[17] Indeed, numerous cases conflict with Larsen's interpretation of that provision. In *SEC v. Cavanagh*, the Second Circuit stated that Section 5's registration requirement is "transaction-specific." 155 F.3d 129, 133 (2d Cir. 1998).[18] Therefore, it follows that each unregistered transaction constitutes a separate violation of the statute that starts the running of the statute of limitations anew. *See Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1294 (2d Cir. 1992) ("The statute of limitations in federal securities law cases starts to run on the date that the parties have committed themselves to complete the purchase or sale transaction." (emphasis omitted)); *SEC v. Sason*, 433 F. Supp. 3d

---

[17] Larsen argues that *SEC v. Jones* supports his position but, in that case, the district court found that the statute of limitations barred the SEC's claims because there were no "allegation[s] that [the defendant] sold or offered to sell unregistered securities during the limitations period." 300 F. Supp. 3d 312, 314 (D. Mass. 2018); *see also* Larsen Mem. at 29. This does not support Larsen's argument because the amended complaint alleges that Ripple and Larsen made offers and sales throughout the limitations period. *See, e.g.*, Amend. Compl. ¶¶ 433, 437–38.

[18] To the extent Larsen relies on the SEC referring to Ripple's sales as "the Offering" in support of its position that all of Ripple's offers and sales were considered one violation of the Section 5, the Court is not persuaded. *See* Larsen Mem. at 29–30. The fact that the SEC labeled Ripple's transactions "the Offering" in describing the factual underpinning of its claims does not dictate how those transactions are viewed for the purpose of determining how the statute of limitations applies to those transactions.

496, 507–08 (S.D.N.Y. 2020).  Because the SEC's claims could not accrue for each offer and sale until Defendants actually offered or sold the XRP, *see Sason*, 433 F. Supp. 3d at 507, the Court does not find that they accrued when Defendants *began* to make unregistered offers and sales of XRP generally, *see SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 88 (D.D.C. 2014); *cf. Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action.").

Accordingly, Larsen's motion to dismiss the SEC's claims for monetary civil penalties is DENIED.

## CONCLUSION

For the foregoing reasons, the Individual Defendants' motions are DENIED.  The Clerk of Court is directed to terminate the motions at ECF Nos. 105 and 110.

SO ORDERED.

Dated: March 11, 2022
       New York, New York

_____
       ANALISA TORRES
       United States District Judge