

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

May 18, 2022

**VIA ECF**
Hon. Sarah Netburn
United States Magistrate Judge
Southern District of New York

Re:   *SEC v. Ripple Labs, Inc. et al.*, No. 20-cv-10832 (AT) (SN) (S.D.N.Y.)

Dear Judge Netburn:

In accordance with the Court's May 4, 2022 order, the SEC respectfully replies in support of its April 29, 2022 letter explaining why the attorney-client privilege protects internal SEC documents relating to former Director Hinman's June 14, 2018 speech ("Speech"). D.E. 473. Defendants' response focuses on their contention that Director Hinman developed and gave the Speech in his "personal capacity" such that none of the Speech communications are privileged. This Court, however, has never ruled that Director Hinman *developed and gave* the remarks in his personal capacity. It instead ruled that the Speech presented Director Hinman's "personal views." D.E. 413 at 14; D.E. 465 at 5. Even if it contains personal views, Director Hinman did not give the Speech in his personal capacity—the Speech would bear no relevance to Defendants' defenses if it had not been given by a senior SEC employee. Rather Director Hinman developed the Speech in his capacity as the Director of the Division of Corporation Finance ("Corp Fin"), in connection with issues he was facing in that position and through extensive consultation with SEC attorneys. Dozens of attorneys across the SEC's offices and divisions used their legal expertise and knowledge of confidential SEC matters to draft and edit the Speech—*something these attorneys could not do in response to a personal, non-work-related request*. Therefore, regardless of whether the final Speech contained "personal views," as opposed to official agency policy, the attorney-client privilege protects the legal advice Director Hinman obtained from SEC counsel during the development of the Speech.

> **I.   Director Hinman communicated with SEC staff to obtain their legal advice.**

Defendants argue that Director Hinman sought only non-legal advice, such as "policy," "packaging," or "political" advice. But that argument is factually incorrect and cannot be squared with Defendants' acknowledgment that his communications with SEC staff concerned "whether offers and sales of ether constituted securities transactions.'" D.E. 480 at 2. The question of "whether offers and sales of ether constitute securities transactions" is indisputably a legal question. Indeed, the Speech's "focus" is on "the application of the federal securities *laws* to digital asset transactions."[1] (emphasis added). Director Hinman's solicitation of feedback on the contents of a speech focusing on the application of securities laws to digital assets necessarily means that the input he received was primarily legal advice.[2] In drafting and commenting on the Speech, SEC lawyers used their specialized expertise to advise on the "application of the federal securities laws to digital

---

[1] https://www.sec.gov/news/speech/speech-hinman-061418
[2] As discussed in the SEC's April 29, 2022 letter, certain final drafts reflect both non-legal and limited legal edits. Pursuant to the attorney-client privilege, the SEC would redact only the limited legal advice from these final drafts, as opposed to messaging and stylistic edits.

asset transactions,"³ making the communications legal advice in its truest sense. *See In re Cty. of Erie*, 473 F.3d 413, 419-20 (2d Cir. 2007) ("legal advice" is "the interpretation and application of legal principles to guide future conduct or to assess past conduct"). Tellingly, Defendants have not cited to a single case in which communications such as these were deemed not to constitute legal advice.

Defendants also argue the attorney-client privilege fails because the speech communications "appear to include a large number of people at the SEC—lawyers and non-lawyers alike." D.E. 480 at 3. Yet, only one non-lawyer participated in the communications, the former Director of the SEC's Division of Trading and Markets. As the SEC explained in its April 29, 2022 letter, his or any other non-lawyer's involvement does not make the privilege inapplicable. He conveyed comments from his Division's attorneys, and the predominant purpose of the communications was obtaining and providing legal advice. The inclusion of non-lawyers does not defeat the attorney-client privilege. *See Mead Data Central, Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253 n.24 (D.C. Cir. 1977) ("'[T]he privilege extends to those communications between attorneys and all agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication.'").

While Defendants suggest that Director Hinman solicited "reactions" and "comments" as opposed to legal advice, they cite no authority requiring a client to explicitly include the term "legal advice" or any other specific language for communications to be protected. *See In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014) (privilege applied even where employees were not expressly informed that the purpose of an interview was to obtain "legal advice," and citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981), for the proposition that one need not "use magic words . . . to gain the benefit of the privilege.").

Finally, Defendants' contention that the attorney guidance Director Hinman received was not legal advice directly conflicts with their own assertion of the privilege on the same topic throughout this litigation—and shows that their current contention is incorrect. In various depositions, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ is privileged legal advice. *See, e.g.*, Ex. A (Christian A. Larsen Dep. Tr.) at 238 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, his attorney instructed Larsen not to answer based on the attorney-client privilege); Ex. B (Ryan Zagone Dep. Tr.) at 143-44 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Ripple's lawyer cautioned Mr. Zagone not to share information that he obtained through discussions with counsel); Ex. C (Antoinette O'Gorman Dep. Tr.) at 299-300 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓," Ripple's lawyer instructed Ripple's former Chief Compliance Officer not to answer to the extent the conversations involved counsel, and later instructed that unless she could "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" she should not answer at all).

---

³ *See* fn. 1.

## II. Director Hinman and SEC staff were necessarily acting in their official capacities when they drafted and commented on the speech.

Defendants claim Director Hinman delivered the Speech in his "personal capacity" and thus could not have an attorney-client relationship with SEC attorneys. While the Court has ruled the Speech reflected Director Hinman's "personal views," as opposed to official agency policy, it has never held that Director Hinman was acting only in his "personal capacity." Director Hinman developed the Speech in the course of his employment at the SEC, in consultation with SEC attorneys, and using information obtained through his position at the SEC. In the Speech he speaks as a government official saying, for example, "[w]e stand prepared to provide more formal interpretive or no-action guidance about the proper characterization of a digital asset in a proposed use."[4] He also notes that he is "pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities law."[5] Even Defendants acknowledge that the SEC has consistently argued that the Speech concerns "'Corp Fin's approach' to the regulation of digital assets." D.E. 480 at 4.

The fact that senior-level Corp Fin attorneys drafted the speech provides further proof that the Speech was developed as part of Director Hinman's official duties. The Speech drafters were not Director Hinman's personal assistants or private counsel—they were *government* attorneys whose primary duties involved providing legal advice and analysis. Similarly, Director Hinman requested feedback from high-ranking attorneys across the SEC, including the General Counsel and a senior advisor to the SEC Chair. SEC attorneys across many offices and divisions could not—and did not—use official time and resources to provide input on another employee's purely personal errand. While Defendants suggest that Corp Fin staff drafted the speech for "apparent administrative convenience," *see* D.E. 480 at 2 n.1, Director Hinman could not use agency employees to help him with personal tasks. Indeed, SEC employees cannot "encourage, direct, coerce, or request a subordinate to use official time to perform activities other than those required in the performance of official duties or authorized in accordance with law or regulation." 5 C.F.R. § 2635.705(b). SEC staff could use government time and resources to draft and review the Speech only because Director Hinman was acting as an SEC official when developing the Speech, even if the final Speech only reflected his views.[6] For purposes of the attorney-client privilege, there is no requirement that the communications relate to an official agency policy or decision; they need only be between client and counsel, confidential, and for the purpose of seeking legal advice. *Cty. of Erie*, 473 F.3d at 419.

None of the cases cited by Defendants support their argument that Director Hinman was acting outside of his official capacity while developing the Speech. D.E. 480 at 3. Their assertion that Director Hinman was acting only in his personal capacity is based on inapposite cases (e.g., *In re Lindsey*, 148 F.3d 1100 (D.C. Cir. 1998)) in which government officials subject to criminal investigations into their personal conduct discussed their alleged crimes with government counsel. And, unlike *Lindsey*, there is no suggestion that Director Hinman engaged in any conduct unrelated to his official role at the SEC, much less any criminal conduct.

---

[4] *See* fn. 1.
[5] *Id.*
[6] Notably, Defendants' attorneys, who include former high-ranking SEC officials familiar with these rules, do not claim that Director Hinman improperly used government resources when asking SEC staff members to assist with his Speech.

3

Defendants' assertion that Director Hinman gave the speech solely in his "personal capacity" also belies their previous arguments that the Speech "exacerbated" the "lack of fair notice to Ripple and the broader market." D.E. 51 at 98 (arguing that "Ripple and other reasonable observers further reasonably understood [the Speech] to indicate that [the SEC] would permit present-day sales of virtual currencies given the current market conditions for XRP"). Defendants can't have it both ways. Throughout this litigation, Defendants have argued that they reasonably relied on the Speech for guidance as to the *SEC's* views regarding the application of the securities laws in the digital asset space. D.E. 51 at 58; D.E. 462 at 98; D.E. 463 at 104. If they now argue that Director Hinman *developed and gave* the Speech solely in his personal capacity, separate from his duties as Director of Corp Fin, the Speech cannot be relevant.[7] If the Speech was developed as part of his official duties, however, the Speech communications fall squarely within the attorney-client privilege.

### III.  Disclosure would reveal SEC confidences.

Defendants argue that there could be no "confidential information *concerning the SEC*…in comments to a speech conveying Director Hinman's personal views." D.E. 480 at 5. Yet, the Speech was about the SEC and the application of the securities laws to ether. As he stated in his declaration, the Speech was "*part of the Commission's* ongoing deliberations about whether offers and sales of ether constituted securities transactions." D.E. 480-1 at ¶ 13 (emphasis added). In his official capacity and in nonpublic communications with SEC lawyers, Director Hinman confidentially provided and sought feedback about his views on whether offers and sales of digital assets, including ether, constituted securities transactions. The comments on the Speech reflect those confidential views and communications; thus, disclosure would reveal SEC confidential information. Defendants cite to *Schlefer v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983), for the proposition that an "agency Chief Counsel's opinions were not privileged because they contained no confidential information concerning the agency." D.E. 480 at 5. But *Schlefe*r merely held that factual information provided by an "outsider who seeks a ruling from the Agency" was not confidential information concerning the agency. 702 F.2d at 245. Its holding offers no guidance in this matter—Director Hinman was not a third-party outsider; he was the Director of Corp Fin. Nonpublic communications about his views and the views of other Corp Fin staff are not communications describing facts submitted by a third party.

### IV.  The SEC has standing to assert the attorney-client privilege.

Defendants' argument that the SEC has no standing to assert the privilege over its own internal legal communications is not supported by the case law on which Defendants rely. D.E. 480 at 5. In *United States v. Martoma*, the government sought to assert the attorney-client privilege on behalf of a non-party cooperating witness in a securities fraud case. 962 F. Supp. 2d 602 (S.D.N.Y. 2013). The cooperating witness sought to intervene to assert the privilege himself and argued that his interests were not adequately represented by the government. *Id.* at 604. Under those

---

[7] This is a position Defendants have expressly disavowed. *See* Ex. D (July 15, 2021 Hearing Tr.) at 17-18 (Ripple's counsel arguing that the Hinman Speech was intended "to provide guidance, not to present [Hinman's] personal views in some kind of abstract academic context, not to just have fun talking about an interesting issue. It is an interesting issue but that's not why he was giving a speech. He was giving a speech because the industry was asking for guidance and he was providing it with, admittedly, a disclaimer that the SEC wasn't going to be bound by that guidance.").

circumstances, the court found that the government lacked standing to assert the attorney-client privilege for the witness and allowed the witness to intervene. *Id.* at 604-06. In contrast, Director Hinman was a government employee seeking legal advice about a matter under consideration by the SEC.

Defendants also cite to *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 923 (8th Cir. 1997), for the proposition that White House counsel had no shared interest with then-First Lady Hillary Clinton. D.E. 480 at 5. Ms. Clinton was being investigated for potential criminal misconduct relating to the Whitewater affair, which involved actions that occurred before she became the First Lady. *In re Grand Jury*, 112 F.3d at 913. The court found that the investigation into Whitewater had no "legal, factual, or even strategic effect on the White House." *Id.* at 923. The court also found that Ms. Clinton's interests potentially significantly diverged from the interests of the White House, given the criminal nature of the investigation. *Id.* These facts bear no relationship to the facts at issue—Director Hinman's speech was legally and factually related to his duties at the SEC, and he and the SEC shared an interest in the speech being accurate and consistent with the advice of SEC attorneys.

### V. Conclusion

The attorney-client privilege protects the Speech drafts reflecting legal advice that Director Hinman sought and that attorneys in Corp Fin and other offices provided, as well as portions of final drafts and emails transmitting legal advice regarding the content of the Speech. The SEC stands ready to submit its proposed redactions for *in camera* review at the Court's direction.

Respectfully submitted,

*/s/ Pascale Guerrier*

Pascale Guerrier

cc: Counsel for All Defendants (*via* ECF)