# EXHIBIT 1

John E. Deaton ᐃ
Garrett L. Boatright°

# DEATONLAWFIRM, LLC

450 North Broadway, East Providence, Rhode Island 02914

---

ᐃ Admitted in RI, MA, CT & IA   ° Admitted in RI

**VIA EMAIL**                                                                April 27, 2022

Jorge G. Tenreiro                                  Martin Flumenbaum
Mark R. Sylvester                                  Michael E. Gertzman
Daphna A. Waxman                                   PAUL, WEISS, RIFKIND
Ladan Stewart                                      WHARTON & GARRISON LLP
SECURITIES AND EXCHANGE                            1285 Avenue of the Americas
COMMISSION                                         New York, NY 10019-6064
New York Regional Office
Brookfield Place                                   *Attorneys for Defendant Christian A. Larsen*
200 Vesey Street, Suite 400
New York, New York 10281-1022                      Matthew C. Solomon
                                                   CLEARY GOTTLIEB
*Attorneys for Plaintiff Securities*               STEEN & HAMILTON LLP
*and Exchange Commission*                          2112 Pennsylvania Avenue NW
                                                   Washington, DC 20037
Andrew J. Ceresney
Lisa R. Zornberg                                   *Attorney for Defendant Bradley*
DEBEVOISE & PLIMPTON LLP                           *Garlinghouse*
919 Third Avenue
New York, NY 10022

Michael K. Kellogg
Reid Mason Figel
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
Sumner Square
1615 M Street, N.W., Suite 400
Washington, DC 20036

*Attorneys for Defendant Ripple Labs Inc.*

Re: Amicus Curaie in *SEC v. Ripple Labs Inc, et al.*, No. 20-cv-10832 (AT) (SN) (S.D.N.Y.)

Dear Counsel,

    I am writing this letter on behalf of amicus curiae and seeking from the parties limited access to non-public documents which are relevant to amici, and which will assist my preparation of the Amicus Brief to the court.

    The parties recently filed a joint, proposed scheduling order (ECF No. 471) regarding motions for summary judgment and *Daubert* challenges. The proposed scheduling order seeks a waiver of Judge Torres's normal procedure. In short, the parties seek to waive the requirement of

April 26, 2022
Page 2 of 12

pre-motion letters and Rule 56.1 Statements ("pre-motion materials") outlined in Rule III(A) of Judge Torres's Individual Rules of Practice. Without pre-motion materials, amici are significantly disadvantaged. Most often, pre-motion materials and Rule 56.1 Statements provide important information for non-parties. Pre-motion materials reference deposition testimony, facts, exhibits, and supporting case law. This information provides important insight for amici to discern materials to ask permission to review, in order to submit a meaningful, non-duplicative Amicus Brief.

In the absence of pre-motion materials, coupled with being privy to only what is available in the public record, amici are disadvantaged in knowing the precise materials to seek permission to review. Amici need not be privy to the entire record and are not seeking to review the entire record. Before seeking permission from the Court, it is appropriate that amici first inquire what information each party agrees is relevant for amici to review. Although not entitled to review the entire non-public record, it is clear that in order to comply with Judge Torres' Order, amici are entitled to review certain materials not within the public domain and Judge Torres contemplated this conclusion. *See generally* ECF No. 372.

Judge Torres acknowledged the fact that amicus curiae "may view XRP differently from Defendants and thus may stress different arguments . . . ." *Id.* at 9. It is near impossible to "provide the Court with a meaningful perspective" without reviewing specific relevant information. *Id.* at 10. Most significant, Judge Torres ruled: "the Court will not permit Movants, as amici, to offer evidence or present witnesses." *Id.* (citation omitted). Judge Torres also ruled, however, that "[d]efendants [had] the opportunity and motive to acquire the evidence Movants would offer . . . ." *Id.*
From the clear language of her Order, Judge Torres indicated Amici would be privy to the evidence it could present, if allowed. It would be unreasonable, therefore, for any party to adopt a position that amici are not entitled to *any* evidence or information not included in the public record.

There is a Stipulation and Protective Order, see ECF 53, that governs the handling of confidential material and of course counsel for amici and amici individually would sign and abide by that Order.

Clearly, there exists non-public, relevant evidence necessary for amici to review. All parties are moving for summary judgment and will rely on facts, testimony, and exhibits almost all of which is not in the public record. Certainly, any evidence involving retail holders of XRP and secondary market sales of XRP is relevant and necessary for amici to review. Amici believe it prudent, and undoubtedly appreciated by the Court, if we Meet and Confer to discuss the information the SEC and the Defendants agree Amicus must be allowed to review.

In order to have a potentially substantive and meaningful Meet and Confer, amici have highlighted some specific non-public documents which are relevant to the Amicus Brief and which amici should have access.

April 26, 2022
Page 3 of 12

## I. *EXPERT TESTIMONY*

Amici believe that they should be allowed to review the following expert testimony and reports and be involved in relevant expert witness challenges as follows:

According to the joint-proposed Scheduling Order, there is a deadline for *Daubert* challenges. ECF No. 471 at 1. Challenges to expert testimony are a process in which amici should participate. For example, if there is an expert providing testimony regarding retail XRP holders (holders of XRP who did not acquire XRP from the Defendants), amici believes this to be an area amici can "provide the court with a meaningful perspective, and [it] will help ensure 'complete and plenary presentation of difficult issues so that the court may reach a proper decision.'" ECF No. 372 at 10 (citations omitted).

The *SEC v. Telegram* case provides an excellent example. In *Telegram*, the SEC offered expert testimony to "opine on the perspective of a reasonable purchaser of the digital tokens called Grams." *See* Expert Report of Patrick B. Doody, *SEC v. Telegram Group Inc.*, No. 1:19-cv-09439-PKC (S.D.N.Y. Dec. 20, 2019), ECF No. 81-10 at 4. If the SEC is relying on a similar expert to opine on the perspective of a reasonable purchaser of the digital token XRP, amici should certainly be allowed to review the expert reports, deposition testimony, and any exhibits attached thereto.

Likewise, if there is expert testimony regarding an alleged common enterprise between Ripple and retail XRP holders, amici should be allowed to review that expert's report, deposition testimony, and any exhibits attached thereto.

If there is expert testimony regarding what a reasonable XRP holder would rely on when acquiring XRP, amici should be privy to that that expert's testimony, report, and exhibits attached thereto.

Any expert testimony, reports or exhibits attached thereto, being offered related to the case or opining on the complexity for retail holders to access and utilize the XRP Ledger (XRPL), is information amici should have access to.

Another relevant area of potential expert information is that related to the non-investment uses of XRP. In some instances, today's XRP is being utilized in the United States and abroad as a substitute for fiat currency. Some XRP holders utilize XRP as a payroll currency. XRP also is being used to pay for goods and services. Retail holders utilize the XRPL to transfer value from one place to another, using XRP in the transaction. Retail holders utilize the decentralized exchange (DEX), built on the XRPL, to acquire other digital assets such as Bitcoin, CSC, LOX, or fiat currencies. Some vendors and businesses (e.g., Time Magazine) accept XRP as a form of payment. In other words, any expert, offered by the SEC, opining that retail XRP holders lack any consumptive intent when acquiring XRP, or any expert, offered by the Defendants, providing testimony related to non-investment reasons to acquire XRP, should be made available to amici.

Any expert offering testimony that XRP holders must rely on the efforts of Ripple to obtain profits or a financial benefit is testimony amici should review. It is well established that retail XRP

April 26, 2022
Page 4 of 12

holders can "stake" (loan) their XRP with digital asset trading platforms, independent of Ripple, thereby obtaining a financial benefit or profit from their XRP (usually earning 4-12% interest). Likewise, retail XRP holders can collateralize their XRP by securing a fiat loan. Hence, any expert testimony, offered by either side, related to the reliance or non-reliance of XRP holders on the efforts of Ripple, is relevant and must be made available to amici.

Obviously, any expert testimony regarding the utility of XRP is also relevant for amici. In fact, during the discovery phase of this case, the SEC served interrogatories on Defendant Ripple Labs, Inc., regarding the "current actual 'use[s]' or 'functions' of XRP" known to the defendant. ECF 165-4 at 5. Defendant Ripple Labs, Inc., responded, in part, by referencing a letter authored by counsel for amici. ECF 165-4 at 7.[1]

Any expert testimony opining that the very nature of XRP itself makes XRP an investment contract with Ripple is relevant and should be made available to amici.

Any expert testimony claiming XRP sold in the secondary market, independent of Ripple, constitutes an investment contract with Ripple, is relevant and should be made available to amici.

According to previous case filings, sixteen experts have been disclosed and deposed. There could be other areas of expert testimony relevant to a meaningful Amicus Brief. It is very difficult to surmise which experts are relevant without knowing the specific designations and areas of testimony, and that information must be made available to amici prior to briefing, as it will eventually be made public in any event

## II. *EVIDENCE RELATED TO THE XRP TOKEN ITSELF AND SECONDARY MARKET SALES*

### A. *Relevant Allegations Contained in the Complaint*

Amici should be allowed to review evidence the SEC intends to offer in support of the allegations contained in the following paragraphs within the Plaintiff's First Amended Complaint (ECF No. 46):

> 1. From at least 2013 through the present, Defendants sold over 14.6 billion units of a **digital asset security called "XRP,"** in return for cash or other consideration worth over $1.38 billion U.S. Dollars ("USD"), to fund Ripple's operations and enrich Larsen and

---

[1] Ripple Labs, Inc.'s Response, in part, reads: "See, e.g., Letter from John Deaton on behalf of XRP Holders to Judge Analisa Torres re: Intention to file Motion to Intervene (Mar. 19, 2021) (D.E. 75) at 4 (Noting "literally hundreds of developers using XRP and the XRPL[, where] the vast majority of these developers have never had any contact with Ripple or its executives" among a list of eight uses for XRP, a "few examples of how XRP Holders utilize XRP without Ripple's knowledge or input") (emphasis omitted)."

> Garlinghouse. Defendants undertook this distribution without registering their offers and sales of XRP with the SEC as required by the federal securities laws, and no exemption from this requirement applied. (emphasis added).

Any evidence suggesting the token itself is a security or investment contract is evidence amici should be privy to in order to prepare a meaningful brief to assist the Court.

> 238. Consistent with its privately-stated understanding, Ripple publicly offered and sold XRP as an investment into a common enterprise that included **Ripple's promises to undertake significant entrepreneurial and managerial efforts, including to create a liquid market for XRP**, which would in turn increase demand for XRP and therefore its price. (emphasis added).

Any evidence of Ripple making promises that allegedly induced retail holders in the secondary market, not in privity with Ripple, to acquire XRP is evidence amici should be allowed to review.

> 241. Based on these representations, Ripple's actions, and the economic reality, XRP investors in the Offering had a reasonable expectation of profiting from Ripple's efforts to deploy investor funds to create a use for XRP and bring demand and value to **their common enterprise.** (emphasis added).

Any evidence supporting a claim that retail XRP holders in the secondary market had a reasonable expectation of profit from Ripple's efforts, or entered into a common enterprise with Ripple, is evidence amici should be allowed to review.

> 244. Defendants also persistently stated publicly that—partly to achieve the goal of widespread XRP trading—they would take steps to create, promote, and protect the market for trading in XRP, such as managing the manner in which Ripple bought and sold XRP, and by persuading digital asset trading platforms to permit investors to buy and sell XRP. **These statements led reasonable investors to expect to profit from Ripple's efforts on behalf of XRP**. (emphasis added).

Any evidence supporting the claim retail XRP holders in the secondary market were led by Defendants to have a reasonable expectation of profit from Ripple's efforts is evidence amici should be allowed to review.

> 245. From the outset of the Offering, **Defendants publicly promised significant, meaningful entrepreneurial efforts with respect to XRP**. (emphasis added).

Any evidence supporting the claim that retail XRP holders in the secondary market were promised or led by Defendants to have a reasonable expectation of profit from Ripple's efforts is evidence amici should be allowed to review.

> 251. **On June 3, 2016**, Cryptographer-1 explained in the XRP Chat, in response to the question "**if Ripple Failed, XRP died?**", that he didn't "think it's likely XRP would

> succeed without us, though it's possible." But, he continued, while "there are significant technical obstacles to using XRP as a bridge or vehicle currency[,] . . . [o]ur XRP strategy is based on promoting it as a bridging currency . . . through various strategies including **paying traders an incentive.**" (emphasis added).

Any evidence supporting the claim that today, in 2022, if Ripple fails or ceases to exist, XRP would die or become worthless, or any evidence contradicting that statement from 2016, is evidence amici should be allowed to review.

> 263. **Starting in at least 2014**, Ripple also promised that it would undertake efforts to create, maintain, and **protect secondary resale markets for XRP**. (emphasis added).

Any evidence supporting or contradicting the claim today, in 2022, that retail XRP holders in the secondary market rely on the efforts of Ripple to protect secondary resale markets for XRP, is evidence amici should be allowed to review.

> 285. In contrast to Ripple, investors in XRP cannot take most or any of the steps that Ripple has taken to grow the XRP ecosystem and increase demand for XRP. **Most, if not all, XRP investors simply lack the technical expertise and the resources to do so.** (emphasis added).

Any evidence supporting or contradicting the emphasized sentence above or evidence regarding the ease or complexity for retail holders or non-Ripple Developers to access and utilize the XRPL is evidence amici should be allowed to review.

> 286. XRP investors are not in any position to, for example, undertake various, complex, expensive, and all-encompassing strategies about when or how to sell XRP into the markets to protect XRP's price, volume, and liquidity – as Ripple has done in a purported attempt to foster adoption of XRP. Nor are XRP investors in any position to increase significantly "demand" or "value" for XRP **by developing a "use" for the token through entrepreneurial efforts – at least not without Ripple's support.** In other words, not only are Ripple's touted efforts with respect to XRP significant, they are essential to the success or failure of the enterprise. (emphasis added).

Any evidence supporting or contradicting the emphasized sentence above or evidence regarding the ease or complexity for retail holders or non-Ripple Developers to access and utilize the XRPL is evidence amici should review. Any evidence demonstrating the level of developer activity, independent of Ripple, related to the XRP Ledger, is evidence amici should be allowed to review.

> 290. Investors who purchased XRP in the Offering **invested into a common enterprise with other XRP purchasers, as well as with Ripple.** (emphasis added).

Any evidence demonstrating the existence or non-existence of a common enterprise between retail XRP holders in the secondary market and Ripple is evidence amici should be allowed to review.

> 293. Moreover, Ripple pooled the funds it raised in the Offering and used them to fund its operations, including to finance building out potential "use" cases for XRP, paying others to assist it in developing a "use" case, constructing the digital platform it promoted, and compensating executives recruited for these purposes. Ripple did not segregate or separately manage proceeds from different XRP purchasers in the Offering, which Garlinghouse and Larsen knew or recklessly disregarded at all relevant times. **The nature of XRP itself made it the common thread among Ripple, its management, and all other XRP holders.** (emphasis added).

Any evidence supporting or contradicting the emphasized sentence above is evidence amici should be allowed to review.

> 353. **The very nature of XRP in the market**—as constructed and promoted by Ripple— compels reasonable XRP purchasers to view XRP as an investment. (emphasis added).

Any evidence supporting or contradicting the emphasized sentence above is evidence amici should be allowed to review.

> 367. Specifically, from 2019 through June 2020, Ripple paid the Money Transmitter 200 million XRP, **which the Money Transmitter immediately monetized by selling XRP into the public market, typically on the very days it received XRP from Ripple.** The Money Transmitter publicly disclosed earning over $52 million in fees and incentives from Ripple. (emphasis added).

Any evidence supporting or contradicting the claim that the XRP sold by the Money Transmitter into the secondary public market also constituted the transfer of unregistered securities, is evidence amici should be allowed to review.

> 373. From May through mid-August 2020, Ripple sold XRP to two other money transmitters for use in ODL for total proceeds of approximately $70 million dollars. In order to effectuate the ODL transaction, **the money transmitters then immediately resold those XRP into the public markets, to individuals and entities that had no "use" for XRP.** (emphasis added).

Any evidence supporting or contradicting the claim that the XRP sold by the money transmitters into the secondary public market also constituted the transfer of unregistered securities, is evidence amici should review. Additionally, any evidence the SEC is relying on that supports its claim that the individuals and entities acquiring XRP from the money transmitters had no use for XRP, as well as any evidence contradicting that claim, is evidence amici should be allowed to review.

> 384. Instead, Ripple and its executives repeatedly publicly disclaimed that XRP was "currency" **and tried to dissuade investors from thinking about XRP as "currency."** (emphasis added).

April 26, 2022
Page 8 of 12

Any evidence the SEC is relying upon demonstrating Ripple and its executives were successful in dissuading secondary market holders of XRP from using it as a form of currency, or any evidence that contradicts that assertion, is evidence amici should be allowed to review. Any evidence Ripple is relying on demonstrating XRP's use as a form of currency, is evidence amici should be allowed to review.

> 385.   **For example, in June 2016**, Cryptographer-1 explained in a public XRP Chat post: "We do not plan to encourage use of XRP as an alternative to Bitcoin or as a direct payment method at this time." (emphasis added).

Any evidence by either party showing the use of XRP today, in 2022, being used as a direct payment method, is evidence amici should be allowed to review.

> 386.   Two years later, in a press conference **on March 14, 2018**, Garlinghouse stated: I almost never use the expression cryptocurrency. And the reason is today, these aren't currencies. I can't go down to Starbucks and buy a coffee with Bitcoin. I can't buy . . . coffee with XRP.... Currencies, traditionally, are something you can use to transact efficiently and broadly. **Very few people, even in the crypto community have used the, you know, Bitcoin or XRP to buy something.** (emphasis added).

Any evidence by any party showing the use of Bitcoin or XRP today, in 2022, or at any time since that statement was made on March 14, 2018, to purchase items is evidence amici should be allowed to review.

> Page 63 of the Amended Complaint, subsection **A**, reads, in part: "**No Significant Non-Investment Use for XRP Exists.**"

Any evidence being offered to support or refute the claim that today, in 2022, no significant non-investment use for XRP exists, is evidence amici should be allowed to review.


> *B.   Howey Factors and "…The XRP traded, even in the secondary market, is the embodiment of those facts, circumstances, promises, and expectations, and today represents that investment contract."*[2]


> In order to "provide the Court with a meaningful perspective, and help ensure "complete and plenary presentation of difficult issues so that the Court may reach a proper decision"[3] in regard to the *Howey* test and the above statement related to current sales of XRP, amici should be granted access to the following:

---

[2] ECF No. 153 at 24.
[3] ECF No. 372 at 10.

April 26, 2022
Page 9 of 12

    Any evidence, documents, testimony, analysis, or opinions supporting, or contradicting or refuting, the claim "XRP traded, even in the secondary market, is the embodiment of those facts, circumstances, promises, and expectations, and today represents that investment contract." ECF No. 153 at 24.

    Any evidence, documents, testimony, analysis, or opinions regarding the perspectives of reasonable purchasers of XRP acquired in the secondary market.

    Any evidence, documents, testimony, analysis or opinions regarding the expectation of profits of reasonable purchasers derived from the efforts of Ripple.

    Any evidence, documents, testimony, analysis, or opinions regarding the expectations of profits by a reasonable purchaser from the sale of XRP in the secondary market.

    Any evidence, documents, testimony, analysis, or opinions regarding the existence of a common enterprise between Ripple and retail XRP holders who acquired XRP in the secondary market.

    Any identifiable uses of XRP at the time XRP was sold in secondary markets.

    Any identifiable abilities of XRP holders to facilitate transactions using XRP with commercial counterparties.

    Any evidence of agreements between Ripple and any other entity or XRP holder related to any alleged efforts to affect the price of XRP in the secondary market.

    Any evidence of price guarantees regarding the price of XRP causing reasonable purchasers of XRP to actually acquire XRP in the secondary market.

    Any evidence of agreements between Ripple and any other entity or XRP holder related to Ripple selling XRP at any kind of discount.

    Any agreement that Ripple would offer to buy back XRP from XRP holders.

    Any evidence of promises of XRP buybacks made by Ripple or its executives.

    Any evidence of marketing materials demonstrating that Ripple would undertake efforts on behalf of XRP holders to produce profits from the sale of XRP in the secondary market.

    Any evidence of XRP holders' abilities to use XRP for the purchase of goods and services.

    Any evidence or communications between XRP holders and the SEC or any other federal regulatory or state or foreign regulator requesting guidance regarding the SEC's or any other regulator's position on XRP's status and any answers provided, including but not limited to, the

April 26, 2022
Page 10 of 12

SEC OIEA and any evidence derived through foreign requests for assistance and Mutual Legal Assistance Treaties (MLATs) or even informal sharing agreements.

Any fundraising materials that were provided to potential XRP holders.

Any evidence that Ripple provided XRP holders with information regarding Ripple's management team and any information or communications indicating XRP holders considered Ripple's management team and that team's experience or expertise before acquiring XRP in the secondary market.

Any evidence regarding efforts by Ripple to promote XRP for purchase in secondary markets as opposed to just commercial use.

Any evidence of fundraising efforts directed at purchasers of XRP in secondary markets.

Any evidence of press efforts directed at XRP holders who purchased XRP or who Ripple wanted to entice to purchase XRP in secondary markets.

Any evidence that Ripple touted or communicated XRP price appreciation to purchasers of XRP in secondary markets.

Any evidence that XRP holders who purchased XRP in secondary markets would have any specific rights in Ripple profits, Ripple ownership or that XRP holders were described as being part of any particular or different classes of XRP holders.

Any evidence that a certain amount of XRP was being set aside specifically for purchase in secondary markets.

Any guarantees of a floor price of XRP or quantity of XRP set-aside for either commercial use or for purchase in secondary markets.

Any evidence that Ripple would undertake any efforts to protect retail XRP holders in any fashion.

Any evidence of price-supports made by Ripple or its executives offered to show Ripple's intent to send a signal to purchasers of XRP in secondary markets causing an expectation in price appreciation.

Any evidence that there were limitations or vesting requirements or exit terms on the sale of XRP in secondary markets.

Any evidence demonstrating whether XRP holders in the secondary market who did not purchase XRP from Ripple were aware or not aware of the existence of the company Ripple.

April 26, 2022
Page 11 of 12

      Any evidence relied upon by the SEC demonstrating a purchaser of XRP can enter into a common enterprise absent awareness of Ripple or its executives.

      Any evidence of statements, promises, or inducements made by Ripple that Ripple intended to be relied upon by XRP holders in the secondary market when acquiring XRP.

      Any evidence of any specific efforts made by Ripple that Ripple intended to be relied upon by secondary market XRP holders unaware of the company Ripple and its executives.

### III.   *UTILITY OF XRP*

      The amici believe that they should have access to non-public documents related to the following evidence as pertains to the "utility" of XRP:

      Any evidence being relied upon by the SEC to support its argument that no utility for XRP exists.[4]

      Any evidence being relied upon by the Defendants to refute a claim of a lack of utility.

      Any evidence demonstrating XRP holders do not need to rely on the efforts of Ripple or its management team to generate a profit or financial benefit, such as utilizing XRP as collateral when obtaining financing, or staking (loaning) XRP on digital trading platforms, independent of Ripple, such as, Nexo, Celcius, Bitrue or any centralized or decentralized platforms.

      Any evidence related to users of the XRP Ledger (XRPL), who acquired XRP in order to utilize the XRPL because of its transaction speed, low costs, or minimal energy consumption.

      Any evidence related to non-investment uses of XRP such as using it to transfer value from one location to another or use as a bridge asset between other digital tokens including but not limited ti Bitcoin and Ether.

      Any evidence related to users of the XRPL's DEX allowing the user to acquire or trade multiple assets.

      Any evidence related to acquiring XRP for non-investment reasons, such as a form of currency for payment for goods and services, or as a substitute for fiat currency, utilized as a store of value, and to purchase everyday items such as food, clothing, and other retail purchases.

---

[4] *See* Hr'g Tr. at 51, Mar. 19, 2021 (Attorney Jorge Tenreiro stating "Now, the [C]ourt referenced a utility for XRP. We dispute whether that utility actually exists, your Honor.").

April 26, 2022
Page 12 of 12

    Any evidence demonstrating XRP being used by non-Ripple affiliated entities for use in payment or debit cards, such as the Global ID debit card, or the UpHold debit card, or any other card.

    Any evidence demonstrating XRP being accepted as payment by vendors and merchants within and outside of the United States.

    Any evidence of Developers or companies, independent of Ripple, utilizing the XRPL, along with its native token, XRP.

    As stated at the beginning of this letter, amici believe it would be appropriate to discuss these matters prior to amici formally requesting permission from the Court. If any party believes amici isn't entitled to review any of the non-public materials, amici respectfully request a written reply indicating briefly the basis of that belief. If any party agrees that a conference is appropriate, please let me know what availability you have during the week of May 2, 2022. If I do not hear from either side by May 2, 2022, I will assume no party wishes to confer and that amici should file for redress from the Court.

    Thank you in advance and I look forward to working with you in this regard.

Sincerely,

John E. Deaton