UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,  :
                                     :
                          Plaintiff, :          20 Civ. 10832 (AT) (SN)
                                     :
              - against -            :          ECF Case
                                     :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,             :
                                     :
                         Defendants. :
                                     :
-------------------------------------------------------------------------x


**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
OBJECTIONS TO ORDERS COMPELLING THE SEC TO PRODUCE
<u>PRIVILEGED INTERNAL COMMUNICATIONS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................3

I.  Director Hinman's Speech ................................................................................................3

II.  Relevant Procedural History ...........................................................................................5

    A.  Defendants' Motion to Compel SEC Communications ..........................................5

    B.  Director Hinman's Deposition ...............................................................................5

    C.  Defendants' Motion, the Orders, and this Court's Relevant Decision ...................6

STANDARD OF REVIEW ..........................................................................................................9

ARGUMENT ...............................................................................................................................9

I.  The Orders Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Speech Drafts Are Not Relevant to any Claim or Defense in this Case. ............................9

II.  The Orders Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Deliberative Process Privilege Protects the Speech Drafts. ...................................................11

    A.  The Speech Drafts Are Predecisional and Deliberative. .......................................12

    B.  The Orders Erred as a Matter of Law in Finding that the DPP Could Not Apply to the Speech Because It Contained Personal Views. ................................................................12

    C.  The Orders Clearly Erred in Finding that the Speech Was Peripheral to Policy Formation. .................................................................................................................15

    D.  The SEC's DPP Should Not Be Pierced. .............................................................18

III.  The July Order Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Attorney-Client Privilege Protects the Speech Drafts. ......................................................19

CONCLUSION ............................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124 (S.D.N.Y. 2017) ...........................19

*Condit v. Dunne*, 225 F.R.D. 100 (S.D.N.Y. 2004) ...................................................................10

*Ethyl Corp. v. EPA*, 25 F.3d 1241 (4th Cir. 1994) ...................................................................14

*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) ...................................11, 12, 13

*In re Cnty. of Erie*, 473 F.3d 413 (2d Cir. 2007) ...............................................................19, 20

*In re Grand Jury Investigation*, 399 F.3d 527 (2d Cir. 2005)....................................................1, 19, 20

*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754 (D.C. Cir. 2014) .............................................20

*Nat. Res. Def. Council v. EPA*, 19 F.4th 177 (2d Cir 2021) ....................................................passim

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d Cir. 2005).................................................1

*NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132 (1975) ...............................................................11

*Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429 (D.C. Cir. 1992) .............................14

*Providence Journal Co. v. U.S. Dep't of the Army*, 981 F.2d 552 (1st Cir. 1992)......................11, 12

*Rodriguez v. Pataki*, 280 F. Supp. 2d 89 (S.D.N.Y. 2003) ......................................................18

*SEC v. Kik Interactive Inc.*, No. 19 Civ. 5244 (AKH) (S.D.N.Y. Nov. 12, 2019)......................10

*SEC v. Nacchio*, 704 F. Supp. 2d 1099 (D. Colo. 2010)....................................................10, 14

*Tigue v. DOJ*, 312 F.3d 70 (2d Cir. 2002)..........................................................................11, 12, 13, 14

*U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S. Ct. 777 (2021).........................................11, 12, 14, 19

*Weiss v. La Suisse*, 161 F. Supp. 2d 305 (S.D.N.Y. 2001) ......................................................9

**Statutes**

28 U.S.C. § 636...............................................................................................................9

**Page(s)**

**Rules**

Fed. R. Civ. P. 72 ................................................................................................................9

**Regulations**

17 C.F.R. § 200.735 ..........................................................................................................19

17 C.F.R. § 200.735-4 .........................................................................................................4

17 C.F.R. § 202.1(d) ..........................................................................................................16

Plaintiff Securities and Exchange Commission ("SEC") respectfully objects to Magistrate Judge Netburn's January 13, April 11, and July 12, 2022 Orders (D.E. 413, 465 & 531 ("Orders")) compelling the SEC to disclose 64 internal drafts of a speech by former SEC Division of Corporation Finance ("Corp Fin") Director Bill Hinman (Ex. 1, "Speech")[1] and the emails circulating Speech drafts (collectively, "Speech Drafts").

## PRELIMINARY STATEMENT

This Court has recognized that the SEC's non-public communications have no bearing on this case. As internal communications that no market participant, including Defendants, has seen, the Speech Drafts are not relevant to any of the claims or defenses at issue in this case. Yet the Orders compel the SEC to disclose them. Even if they were relevant, the Speech Drafts contain confidential deliberations and legal advice protected by the deliberative process privilege ("DPP") and the attorney-client privilege. These privileges serve important public interests. The DPP "promote[s] the quality of agency decisions by preserving and encouraging candid discussions between officials." *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d Cir. 2005). And the attorney-client privilege, which applies "with special force in the government context," ensures that government officials have access to informed legal advice. *In re Grand Jury Investigation*, 399 F.3d 527, 534 (2d Cir. 2005). If allowed to stand, the Orders will chill internal deliberations, not only at the SEC, but at other agencies as well.

Director Hinman's Speech, which he gave while he was the head of Corp Fin, provided guidance to market participants about how staff in that SEC division would analyze whether offers and sales of digital assets constitute securities under Supreme Court precedent. The Speech was not binding SEC policy—that is, a pronouncement of the Commission itself, the Commissioners

---

[1] "Ex. __" means exhibits attached to the Declaration of Ladan F. Stewart, dated July 26, 2022.

appointed by the President with the Senate's advice and consent.  Rather, Director Hinman, while

the head of an SEC division, developed the Speech in consultation with other SEC offices and

divisions as part of the SEC's larger discussions about the application of the securities laws to digital

assets.  Indeed, Director Hinman consulted over many weeks with dozens of SEC attorneys, several

of whom reviewed and revised multiple versions of the Speech.  During the Speech, Director

Hinman stated that it contained his personal views—a disclaimer required by SEC regulation to

ensure that market participants did not attribute his views to the Commission, and similar to

disclaimers that officials from other federal agencies provide when giving speeches.

The Orders' central holding is that, because of that disclaimer and statements based on the

disclaimer, the Speech and communications relating to its preparation were not agency deliberations

and, consequently, the Speech Drafts are not privileged.  This finding is contrary to law and based

on clearly erroneous characterizations of the factual record.  The Orders hold, in essence, that if

agency staff deliberations lead to a public statement that is not a formal action by the agency itself,

the DPP and attorney-client privilege do not apply to those deliberations, even though the same

deliberations would have been protected had they led to an internal memo substantively identical to

the speech.  This result is inconsistent with controlling authority recognizing the value of continually

examining agency policy regardless of what, if any, action an agency ultimately takes.  The Orders

also do not account for how the SEC and other agencies function and how they communicate and

interact with the public:  the Orders assume that, if a speech does not convey official agency policy

(because a majority of Commissioners has not voted to approve its content), it is therefore

"personal" and cannot be agency business.  But senior officials at the SEC and other agencies

routinely give speeches that provide meaningful information to the public about staff approaches to

legal and policy issues, even if those approaches do not formally bind the agency itself.

If permitted to stand, the Orders would chill the ability of government employees to deliberate about important policy issues and obtain candid legal advice from agency lawyers. The Orders should be set aside as clearly erroneous and contrary to law, and the SEC should be permitted to withhold the Speech Drafts because they are both irrelevant and privileged.

## BACKGROUND

### I.   Director Hinman's Speech

Director Hinman's June 14, 2018 public Speech was the culmination of weeks of non-public internal deliberations involving SEC attorneys across the agency. In May 2018, David Fredrickson, then-Corp Fin's Chief Counsel, began drafting the Speech. D.E. 429 at 7. Over the next month, Mr. Fredrickson, two other attorneys—Valerie Szczepanik (a digital asset specialist at the SEC) and Michael Seaman (Director Hinman's counsel)—and Director Hinman worked on the Speech, exchanging at least 23 drafts. *Id.*; *see also id.* at A-1–A-7 (summary chart of 64 Speech Drafts).

On June 4, 2018, Director Hinman circulated a draft of the Speech to officials outside Corp Fin, including counsel for the then-Chairman of the SEC. *Id.* at 7. Officials from three other SEC divisions or offices—the SEC's Office of the General Counsel, Division of Investment Management, and Division of Trading & Markets—provided substantive comments. *Id.* Director Hinman, Mr. Fredrickson, and Mr. Seaman revised the Speech in response. *Id.* On June 11, Director Hinman circulated a revised draft to many of the same officials who had received the earlier draft, and several of those officials provided a second set of substantive comments. *Id.* at 7–8. Director Hinman and Corp Fin attorneys further revised the Speech to address these comments and exchanged drafts until Director Hinman gave the Speech on June 14. *Id.* at 8.

The Speech communicates Corp Fin's approach to evaluating whether digital asset offerings may be considered securities offerings. Director Hinman began the Speech by noting that the conference "provide[d] a great opportunity to address a topic that is the subject of considerable

debate in the press and in the crypto-community – whether a digital asset offered as a security can, over time, become something other than a security." Ex. 1 at 1. Director Hinman provided "some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security," and stated that Corp Fin staff were "happy to help promoters and their counsel work through these issues." *Id.* at 4. He also provided a list of features relevant to determining when a digital asset functions as a security and specified that "[t]his list is meant to…start the dialogue with the [Corp Fin] staff." *Id.* at 5.

In his deposition, Director Hinman confirmed that the Speech was "intended to share more generally the framework that [Corp Fin] was using in thinking about these assets." Ex. 2 (Hinman Dep. Tr.) at 299:13–15; *see also id.* at 125:4–16, 127:7–14 (Director Hinman prepared the speech as part of his functions as Director of Corp Fin so that people "would be able to see how the division under my leadership was looking at these issues"); 131:20–22 (Speech was intended to "inform the marketplace of how…[Corp Fin] and I felt about these topics"); 301:9–14 (Corp Fin applied the Speech's framework when considering whether digital asset transactions involved "securities").

Director Hinman began the Speech by giving a disclaimer required to be included in any speech or publication by any SEC employee. *See* 17 C.F.R. § 200.735-4(d)(2)(ii).[2] Director Hinman noted: "My remarks are mine alone, not necessarily those of the Commission, the Commissioners, or the staff." D.E. 255-2 ¶ 11. The text of the Speech on the SEC's website contains a similar disclaimer. Ex. 1 at 5 n.1. As Director Hinman explained in his declaration:

> The Speech was intended to express my own personal views. During my preparation of the Speech, I discussed my thoughts with other Commission employees, as part of the Commission's ongoing deliberations about whether offers and sales of Ether constituted securities transactions. To the best of my knowledge, the Commission had not taken at that time, and still has not taken, any position or expressed a view as to whether offers and sales of Ether constituted offers and sales of securities.

---

[2] This standard disclaimer is similar to disclaimers staff and officials at other government agencies (including the Commodity Futures Trading Commission, the Federal Trade Commission, and the Federal Reserve) provide when giving speeches. Ex. 3; *see also* D.E. 429-6.

D.E. 255-2 ¶ 12.

Publicity following the Speech recognized that, while the Speech was not final *SEC policy*, Director Hinman was addressing how *Corp Fin staff* would advise the SEC.  For example, one of Defendants' counsel stated, "[w]hile Hinman's views are not binding on the Commission, his remarks strongly suggest the Commission's willingness to consider whether certain digital assets that may be initially offered as securities over time can later lose their status as securities."  Ex. 4.

## II.     Relevant Procedural History

### A.     Defendants' Motion to Compel SEC Communications

On March 15, 2021, Defendants moved to compel the SEC to produce external and internal SEC communications about XRP, bitcoin, and ether.  D.E. 67.  The SEC opposed the motion on the grounds that the SEC's internal communications are irrelevant and are in any event privileged. D.E. 79 at 7, 10.  On April 6, 2021, the Magistrate Judge granted Defendants' motion to compel production of *external* SEC communications, but stated that she was "not including SEC-to-SEC internal communications in that ruling" and denied "the request for discovery that is internal, and specifically internal, for instance e-mail communications between what I will call the SEC staff to SEC staff."  Ex. 5 (Apr. 6, 2021 Hr'g Tr.) at 51:23–24, 52:14–17.  The Magistrate Judge clarified in a May 6, 2021 order that the SEC must produce or log documents that are "final" and "formal" but need not produce or log "informal intra-agency communications, such as emails."  D.E. 163 at 6.

### B.     Director Hinman's Deposition

On June 24, 2021, the SEC moved to quash a deposition subpoena served on Director Hinman.  D.E. 255.  In its motion papers and in oral argument on the motion, the SEC made clear its position that the Speech *was not* official SEC policy but *was* part of SEC deliberations.  D.E. 259 at 3 (noting that SEC did not give Speech "its official imprimatur" but also Speech Drafts were "'deliberations comprising part of the process by which governmental decisions and policies are

formulated'" (citation omitted)); Ex. 6 (July 15, 2021 Hr'g Tr.) at 10–15.  On July 15, 2021, the

Magistrate Judge compelled Director Hinman's deposition.  Ex. 6 at 39–42.

Before the deposition, the SEC provided Defendants with privilege logs (D.E. 289-1, 289-2,

289-4) that included the Speech Drafts, but made clear: "We do not believe these or other drafts are

'intra-agency memoranda or formal position papers' (D.E. 163) that must be produced or logged

pursuant to the Court's April 6 or May 6 orders."  Ex. 7.   The SEC also reserved its right to argue

that the Speech Drafts "need not be produced or logged pursuant to the Court's orders."  *Id.*; *see also*

D.E. 351 at 2–3 & 14 n. 11 (noting Speech Drafts are "outside the scope of the Court's orders").

### C.      Defendants' Motion, the Orders, and this Court's Relevant Decision

On August 10, 2021, Defendants filed a motion to address the SEC's privilege assertions.

D.E. 289.  In response, as part of its argument that the DPP should not be pierced, the SEC argued

that its internal communications were irrelevant to any claim or defense in this case.  D.E. 299 at 1,

4–7.  After a hearing, the SEC provided 17 documents that Defendants had identified, one of which

was a Speech Draft, to the Magistrate Judge for *in camera* review.  D.E. 351 & 388.

On January 13, 2022, the Magistrate Judge ruled that, of the 17 documents the SEC

submitted for *in camera* review, the DPP did not protect three documents, including the Speech

Draft.  D.E. 413 ("January Order") at 5–18.  The January Order reasoned that the DPP does not

protect "the personal views of agency employees…unless they bear on 'the formulation or exercise

of policy-oriented judgment.'"  *Id.* at 14 (citations omitted).  The January Order found it "settled"

that the Speech reflected Director Hinman's *personal opinion and not the SEC's position*, relying on the

standard disclaimer that the Speech was "intended to express [his] own personal views," and the fact

that "the SEC has never taken 'any position or expressed a view as to whether offers and sales of

Ether constituted offers and sales of securities.'"  *Id.* (emphasis in original; citation omitted).

Without pointing to other facts, the January Order concluded the "speech was 'merely peripheral to

actual policy formation'" and not an "'essential link' in the SEC's deliberative process with respect to Ether." *Id.* at 14–15 (citations omitted).

At the same time, the January Order held the SEC need not produce drafts of other public statements made by SEC officials (including Director Hinman) on the issue of digital asset regulation because "draft talking points and questions and answers for SEC officials' use in communicating with the public[] are protected by the [DPP] because they concern SEC staff opinions about what to present to the public as agency policy." *Id.* at 15–16.

In the course of finding that Defendants could not pierce the privilege, the Magistrate Judge addressed the relevance of the documents to which she had found the privilege applied. She first found that Defendants had not established that the SEC's internal deliberations "implicate the fair notice defense," which is an objective defense. *Id.* at 18–19. She next concluded that "SEC internal deliberations…could potentially be relevant to demonstrating ambiguity or uncertainty as to XRP's status," which could bear on the scienter of Defendants Bradley Garlinghouse and Christian Larsen ("Individual Defendants") for purposes of the aiding-and-abetting claims. *Id.* at 19.

On February 17, 2022, the SEC moved for partial reconsideration and clarification of the January Order on the ground that "the Court based its decision on a single document relating to the Speech…and did not consider the [more than 60] other emails attaching drafts of the Speech that were before the Court on Defendants' motion." D.E. 429 at 1.

On March 11, 2022, this Court denied the Individual Defendants' motions to dismiss the aiding-and-abetting claims. D.E. 441. The Court held that "the SEC need not demonstrate that the Individual Defendants were aware that Ripple's scheme *was* illegal." *Id.* at 15. Rather, to prove scienter for aiding and abetting, "the SEC must show that the Individual Defendants knew, or recklessly disregarded, *the facts*" that constitute a Section 5 violation. *Id.* (emphasis added). The same day, this Court denied the SEC's motion to strike Ripple's "fair notice" defense, but agreed with the

Magistrate Judge that it was an "objective" defense that looked to the language of the statute in question and the SEC's outward-facing conduct.  D.E. 440 at 4, 6–8, 10 n.5.

On March 14, 2022, the SEC filed a supplemental letter in support of its motion for partial reconsideration of the DPP ruling, explaining that in light of this Court's March 11 order, "it is clear that the SEC's internal documents—reflecting its staff's thinking about XRP, bitcoin, ether, or any other digital asset—have no relevance to the Individual Defendants' scienter.  Nonpublic SEC documents cannot shed any light on whether Individual Defendants knew or consciously disregarded *the facts* that constitute Ripple's alleged violation."  D.E. 445 at 2.

On April 11, 2022, the Magistrate Judge denied the SEC's motion for partial reconsideration.  D.E. 465 ("April Order").  Relying on the January Order's conclusion that the Speech conveyed Director Hinman's personal views, the April Order found that "the emails and drafts here were in service of remarks that were explicitly *not* agency policy," and held that because "[t]he Speech was not an agency communication. . .the deliberations as to its content are not protected by the privilege."  *Id.* at 9.  In response to the SEC's argument that this Court's ruling on the applicable scienter standard rendered the Speech Drafts irrelevant, the Magistrate Judge "decline[d] to take such a narrow view of relevance in the context of discovery."  *Id.* at 2 n.1.

The April Order also invited the SEC to renew other privilege assertions "for any document where the [DPP] is found not to apply."  *Id.* at 10 n.4.  On April 29, the SEC renewed its assertion that the attorney-client privilege protects most Speech Drafts.  D.E. 473.  On July 12, the Magistrate Judge held that the attorney-client privilege did not protect the Speech Drafts, concluding that their "predominant purpose. . .was not to provide legal advice to aid the SEC in conducting the public's business."  D.E. 531 ("July Order") at 8.

## STANDARD OF REVIEW

When a magistrate judge issues an order on a non-dispositive pretrial matter, a district court "must…modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A). "An order is 'clearly erroneous' only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Weiss v. La Suisse*, 161 F. Supp. 2d 305, 321 (S.D.N.Y. 2001) (internal quotation marks and citation omitted). "An order is 'contrary to law' when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Id.*

## ARGUMENT

### I.     The Orders Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Speech Drafts Are Not Relevant to any Claim or Defense in this Case.

The only claims in this case are allegations that each Defendant violated Section 5 of the Securities Act and that the Individual Defendants aided and abetted Ripple's Section 5 violations. As this Court has recognized, "Section 5 is a strict liability offense, which means that the SEC need not 'prove scienter or negligence.'" D.E. 441 at 15 n.8 (internal quotations and citation omitted). Neither the Speech nor the SEC's internal Speech Drafts are therefore relevant to Section 5 liability.

Moreover, the January Order correctly held that the Speech Drafts are not relevant to Defendants' "fair notice" affirmative defenses: "Defendants have not established that the SEC's *internal* deliberations. . .implicate the fair notice defense: none of those deliberations was public, so market participants could not interpret or rely on them to guide their behavior." D.E. 413 at 18. This Court's later ruling addressing Ripple's fair notice defense confirmed that internal communications are irrelevant because "the evaluation of any fair notice defense is objective" and based on the language of Section 5 and the SEC's *external* conduct. D.E. 440 at 4, 6–8, 10 n.5.

While the January Order referred to the possibility that "the SEC's internal deliberations in the digital asset space could potentially be relevant to…the recklessness of the individual

Defendants' actions" and thus the scienter element of the aiding-and-abetting claims, D.E. 413 at

19, this Court's March 11, 2022 order forecloses the relevance of the Speech Drafts to the Individual

Defendants' scienter.[3]  This Court rejected the Individual Defendants' contention that the SEC had

to show they recklessly disregarded (or knew) that Ripple's actions were illegal and instead held that

"the SEC must show that the Individual Defendants knew, or recklessly disregarded, *the facts* that

made Ripple's scheme illegal."  D.E. 441 at 15 (emphasis added).  Internal, non-public SEC

documents that the Individual Defendants never saw can have no bearing on this analysis.

Courts in this and other Districts have reached a similar conclusion when defendants seek

discovery of documents they have never seen and argue it is relevant to their scienter.  *See, e.g., Condit*

*v. Dunne*, 225 F.R.D. 100, 111 (S.D.N.Y. 2004) (information is "not relevant to defendant['s]…state

of mind to the extent that [defendant] did not know that information at the relevant time," and

limiting discovery to only "what he was aware of at the time"); *SEC v. Kik Interactive Inc.*, No. 19 Civ.

5244 (AKH) (S.D.N.Y. Nov. 12, 2019) (D.E. 36) (rejecting discovery request for internal SEC

documents in digital asset case, finding "[p]roper discovery should be focused on what defendant

did"); *SEC v. Nacchio*, 704 F. Supp. 2d 1099, 1112 n.6 (D. Colo. 2010) ("[Defendant's] scienter is an

essential element of the claims against him, but the knowledge or beliefs of the SEC—or, more

accurately, individual employees of the SEC—is not probative of [defendant's] thought process.").

The Speech Drafts are internal SEC documents and communications that Defendants have

never seen.  They are irrelevant to whether Ripple violated Section 5.  They are irrelevant to

Defendants' "fair notice" defense.  And they are irrelevant to whether the Individual Defendants

---

[3] As noted, the SEC submitted a supplemental letter explaining that this Court's ruling rendered the
Speech Drafts irrelevant to the Individual Defendants' scienter.  D.E. 445 at 2.  Defendants argued
it was "improper to raise a new ground for reconsideration."  D.E. 450 at 2.  But the April Order
ruled on the arguments in the SEC's supplemental letter and did not conclude that they had been
improperly raised.  D.E. 465 at 2 n.1.  Thus, the ruling is now ripe for review.

knew "facts" that made Ripple's scheme illegal and thus irrelevant to their scienter.  The SEC should not be required to produce them.  For this reason alone, the Orders should be set aside.

## II. The Orders Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Deliberative Process Privilege Protects the Speech Drafts.

Even if the Speech Drafts were relevant, they are protected by the DPP.  The DPP protects documents that are (1) predecisional and (2) deliberative.  *U.S. Fish & Wildlife Serv. v. Sierra Club*, 141 S. Ct. 777, 786 (2021).  "To encourage candor, which improves agency decisionmaking, the [DPP] blunts the chilling effect that accompanies the prospect of disclosure."  *Id.* at 785.

The first prong seeks to distinguish between documents that "embody a final decision" and those that "leave[] agency decisionmakers 'free to change their minds.'"  *Id.* at 785–86 (citation omitted).  Thus, predecisional documents include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *Tigue v. DOJ*, 312 F.3d 70, 80 (2d Cir. 2002).  An agency need not "identify a specific decision in connection with which" a document was prepared to obtain DPP protection because "'[a]gencies are, and properly should be, engaged in a continuing process of examining their policies.'"  *Nat. Res. Def. Council v. EPA* ("*NRDC*"), 19 F.4th 177, 192 (2d Cir. 2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 n.18 (1975)).  A "record is predecisional if it relates to a specific decision *or a specific decisionmaking process*."  *Id.*

The second prong seeks to distinguish between documents that do not contain deliberations, for example because they merely recite facts, *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999), and those that were "'prepared to help the agency formulate its position,'" *NRDC*, 19 F.4th at 184 (quoting *Sierra Club*, 141 S. Ct. at 786).  A document will qualify as deliberative if it "'(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency.'"  *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Providence*

*Journal Co. v. U.S. Dep't of the Army*, 981 F.2d 552, 559 (1st Cir. 1992)).  The "key question" is "whether disclosure would tend to diminish candor within an agency."  *NRDC*, 19 F.4th at 185 (internal quotation marks and citation omitted).

### A.    The Speech Drafts Are Predecisional and Deliberative.

The Speech drafts are predecisional because they "reflect the personal opinions of the writer[s]"—staff from across the SEC—"rather than the policy of the agency."  *Tigue*, 312 F.3d at 80.  As the January Order recognizes, the Speech Drafts preceded any final decision by the agency on how the SEC would treat offers and sales of ether (D.E. 413 at 14) or how Corp Fin would respond to specific questions about regulating offers and sales of digital assets.  *See Sierra Club*, 141 S. Ct. at 785.  In addition, the Speech Drafts precede any decision about what to include in the Speech because "drafts are what they sound like: opinions that were subject to change."  *Id.* at 786.

The Speech Drafts are deliberative for the same reasons.  *See id.* (noting "considerable overlap" between the two prongs).  They "bear on the formulation and exercise of policy-oriented judgment," reflect the "personal opinions of the writer[s] rather than the policy of the agency," and "if released, would inaccurately and prematurely disclose the views of the agency."  *Grand Cent. P'ship*, 166 F.3d at 482 (internal quotation marks and citations omitted).

### B.    The Orders Erred as a Matter of Law in Finding that the DPP Could Not Apply to the Speech Because It Contained Personal Views.

The Orders erroneously found that the Speech Drafts are not protected by the DPP because the Speech reflected Director Hinman's personal views.  This was an error of law because the focus of the privilege analysis is whether the potentially privileged matters concern policy formation as opposed to primarily factual matters.  *See NRDC*, 19 F.4th at 184.  The SEC is not aware of any case indicating that the DPP does not apply where the policy matter being deliberated by agency officials may be categorized as a personal statement.  We are also aware of no legal authority for dividing all statements by agency officials into two binary categories:  either agency statements or personal

statements.  Requiring that all statements by agency officials fall into one category or another fails to

take into account how agencies like the SEC function and how agency officials communicate with

the public about agency matters.  The SEC urges the Court to recognize the more nuanced reality,

which is that statements like the Speech, while not an official position adopted by the Commission,

contain an agency official's (or his division's) views about policy issues pending before the agency.[4]

      The January Order relies upon *Tigue* and *Grand Central Partnership* for the proposition that

because the Speech represented Director Hinman's personal opinion (and not the official views of

the agency), the DPP could not apply to the Speech.  D.E. 413 at 14.  But *Tigue* and *Grand Central*

*Partnership* actually stand for the *opposite* proposition.  They hold that documents that reflect the

personal opinions of the writer rather than the policy of the agency are *more likely* to be protected by

the DPP:  "Protected by [the DPP] are 'recommendations, draft documents, proposals, suggestions,

and other subjective documents *which reflect the personal opinions of the writer rather than the policy of the*

*agency.*'"  *Tigue*, 312 F.3d at 80 (emphasis added; quoting *Grand Cent. P'ship*, 166 F.3d at 482).  In other

words, under controlling Second Circuit precedent, the fact that a document may reflect the opinion

of its writer rather than the final policy of the agency weighs *in favor* of finding that the DPP

applies—not against it, as the January Order incorrectly holds.

      Second, the January Order relies on *Tigue* for the proposition that documents relating to a

speech with personal views are unprotected because the documents were "'merely peripheral to

---

[4]  The July Order characterizes the SEC's position on the Speech as "hypocrisy."  D.E. 531 at 6.  It
suggests that the SEC has argued on the one hand that the Speech was not relevant because it was
not an official agency statement and on the other hand that it was privileged because Director
Hinman obtained legal advice from internal SEC lawyers in drafting the Speech.  *Id.*  The July Order
misunderstands the SEC's position on the Speech.  The SEC has consistently tried to explain that,
while the Speech was not an official, formal opinion *of the SEC as an agency*, it represented Director
Hinman's views (as the director of an SEC division) and was drafted as part of the SEC's
"predecisional" conversations about whether offers and sales of ether constituted securities
transactions.  *See supra* Background Section.  The SEC has never suggested that Director Hinman's
personal views did not reflect the policy of the SEC's Corp Fin division, and in fact Director
Hinman himself in his deposition indicated that the Speech reflected the division's thinking.

actual policy formation.'" D.E. 413 at 14 (quoting *Tigue*, 312 F.3d at 80).  The January Order interprets the phrase "peripheral to actual policy formation" to incorporate a requirement that the product of the deliberations relate to a statement of agency policy.  But the cases from which that language is taken show the distinction that matters is whether the potentially privileged documents are primarily factual or primarily about potential courses of action with respect to issues within the agency's purview.  *See Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994) (quoted by *Tigue* and finding documents may be peripheral to policy formation where they "are no more than summaries or graphical representations of purely statistical data"); *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1436 (D.C. Cir. 1992) (Ginsburg, J.) (quoted by *Ethyl* and explaining that the DPP does not protect matters such as "standard or routine computations or measurements").

Third, the January Order relies on the fact that the SEC itself has not reached a conclusion about how to regulate ether to hold that the Speech is not protected.  D.E. 413 at 14.  This is also contrary to law.  As the Supreme Court recently held, the fact that deliberations ultimately failed to lead to a decision does not erase the DPP's protection.  *Sierra Club*, 141 S. Ct. at 785–86.  The SEC is aware of no precedent suggesting that the DPP protection for drafts and personal opinions does not apply if the deliberations merely lead to a speech reflecting the agency employee's personal views.[5]  Finding that the DPP does not protect otherwise protectable deliberations if they lead to a personal statement by a public official is fundamentally at odds with the purpose of the DPP.  The DPP protects personal opinions and encourages the exchange of those views within agencies, even if they do not lead to the adoption of an agency decision.  Neither the Orders nor the cases they cite

---

[5] *See Nacchio*, 704 F. Supp. 2d at 111 (finding DPP protected communications about speech by SEC employee because "although [he] was nominally speaking as a private citizen and made clear that his remarks reflected only his personal opinions, his speech made several references to matters which would appear to implicate future SEC decision making").

provide a reason why personal opinions would lose protection just because they lead to a speech that contains an agency official's personal views.

### C.    The Orders Clearly Erred in Finding that the Speech Was Peripheral to Policy Formation.

The Orders' finding that the Speech was peripheral to policy formation is also contrary to the facts and the law.

#### 1.    The Speech Addressed Corp Fin's Policies and Practices Regarding the Regulation of Digital Assets.

The Orders clearly erred in finding the Speech did not represent Corp Fin policy (D.E. 465 at 5) because the Speech itself provides significant and substantive information about Corp Fin's approach to digital asset offerings.  Director Hinman's Speech expressly provided a "securities law analysis" to aid market participants working with the SEC, including a discussion of leading cases on what constitutes a security, a list of "some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security," and a list of seven questions to consider in evaluating whether an asset is being "offered as a security."  Ex. 1 at 1–5.

The April Order ignored these portions of the Speech and instead found that Director Hinman's statements that Corp Fin would "help promoters and their counsel work through these issues" did not show that Director Hinman intended to use the Speech to provide a "'framework' for [Corp Fin's] approach to evaluating digital asset offerings."  D.E. 465 at 6 (concluding that the fact that Director Hinman made "distinct offers of agency guidance in the Speech further reinforces that the Speech itself was not intended as guidance").  But the Speech text makes clear that the Speech addressed *Corp Fin's* policies and practices regarding the regulation of digital assets—as opposed to Director Hinman's own views divorced from Corp Fin policy.  Thus, the January and April Orders' finding was in error.

### 2. The Speech Is a Statement by an SEC Division Director that Represents His Own Views *and* the Views of His Division.

In support of their finding that Director Hinman was expressing his personal views and *not* the views of Corp Fin, the Orders relied on the fact that, as required by an SEC regulation, Director Hinman included a disclaimer in his Speech that the opinions he expressed were his own. *See* D.E. 413 at 14 ("the SEC has *publicly disclaimed responsibility* for the speech"); D.E. 465 at 7 ("The SEC seeks now to minimize the fact that it has publicly disclaimed responsibility for the Speech.").

The Orders' focus on this disclaimer is at odds with the January Order's finding that the DPP protected several draft talking points and Q&As used by SEC officials, including Director Hinman, that included the same disclaimer. D.E. 413 at 15; *see also* D.E. 429 at 6 & n.4.[6] In any event, this disclaimer simply said that Director Hinman was not providing a view that the SEC itself had adopted. The disclaimer does not address whether Director Hinman was providing the views of *the SEC division that he led*. A different SEC regulation addresses this question:

> The informal procedures of the Commission are largely concerned with the rendering of advice and assistance by the Commission's staff to the members of the public dealing with the Commission. While opinions expressed by members of the staff do not constitute an official expression of the Commission's views, they represent the views of persons who are continuously working with the provisions of the statute involved. And any statement by the director…of a division can be relied upon as representing the views of that division.

17 C.F.R. § 202.1(d). The April Order dismissed this regulation as "inapposite," finding its reference to "informal procedures" applies only to "interpretative and no-action letters." D.E. 465 at 7. But

---

[6] Indeed, the January Order recognizes that the DPP does protect internal communications among SEC staff preceding a (potential) public statement representing the staff's (and not the Commission's) views. Defendants challenged the SEC's assertion of privilege over Corp Fin staff's communications related to a request by a market participant for a "no-action letter." *See* D.E. 388 at 3–4. The January Order dismissed Defendants' objection that the deliberations at issue were Corp Fin's, and not the SEC's, and as such that there was "no agency decision or decisionmaking process to support the assertion of privilege" and instead found that Corp Fin's deliberations reflected "SEC employees' predecisional thoughts and analyses. . .including deliberations on whether the asset at issue is subject to the federal securities laws—a quintessential agency decision." D.E. 413 at 17; *see also* D.E. 429 at 10.

this ruling directly contradicts the plain text of the regulation.  Nothing in the regulation suggests that speeches are not "informal procedures" to which the regulation applies, and the reference to "any statement" plainly encompasses a speech.  Thus, the Speech could "be relied upon as representing the views of" Corp Fin, while also reflecting Director Hinman's personal views.

        **3.**      **The Speech Was the Product of Significant Collaboration by SEC Staff.**

The dozens of Speech Drafts exchanged show that attorneys across the SEC engaged in substantive deliberations about Corp Fin's policies and practices and how those would be conveyed through the Speech.  The 64 drafts and related commentary from attorneys in at least five different agency divisions and offices reflect the "give-and-take of the consultative process."  *NRDC*, 19 F.4th at 184 (internal quotation marks and citation omitted).

The Orders do not address this undisputed factual record and instead conclude, with no citation to the record, that "[t]he SEC's brief and documents demonstrate that, to the extent agency deliberations concerning the regulation of digital asset offerings were occurring at the time of the Speech's drafting, they were occurring separately and in parallel to the Speech."  D.E. 465 at 8. Nothing in the factual record supports the finding of "parallel deliberations"—one involving a personal speech by Director Hinman, and another involving the agency's deliberations.  To the contrary, "the sharing as well as the comments provided indicate that staff in [other SEC divisions and offices] recognized that the Speech was providing guidance that would indicate to the public how staff throughout the SEC would handle issues relating to digital assets."  D.E. 429-7 ¶ 8.

        **4.**      **The Orders Misapply Controlling Precedent in Holding that the Speech Drafts Did Not Bear on Policy-Oriented Judgment's Exercise.**

The April Order further clearly errs by incorrectly applying the Second Circuit's recent *NRDC* decision.  *NRDC* addressed two separate issues:  (1) whether the DPP protects drafts of documents used to communicate already-issued policies; and (2) whether a document "must relate to a discrete decision facing the agency in order to merit protection under the [DPP]."  19 F.4th at

181.  The April Order relies on *NRDC*'s first holding on post-decisional communications, but that holding does not apply here because the Speech is not a post-decisional communication.  The Speech Drafts were indisputably not connected to an already-issued agency policy.  More relevant to the dispute here is the Second Circuit's holding on the second issue.  There, *NRDC* held "that a record is predecisional if it relates to a specific decision or *a specific decisionmaking process* and was generated before the conclusion of that decision or process."  19 F.4th at 192.  *NRDC* rejected the suggestion that an agency must "identify a specific decision in connection with which" a document was prepared to obtain DPP protection.  *Id.* (internal quotation marks and citation omitted).  "To the contrary, [a]gencies are, and properly should be, engaged in a continuing process of examining their policies, and courts should be wary of interfering with this process."  *Id.* (internal quotation marks and citation omitted).  The Speech occurred in furtherance of such a decisionmaking process at the agency, and nothing in the record suggests otherwise.

        Nor did the Orders address the "key question" articulated by the Second Circuit in *NRDC* in determining whether the DPP applies to an agency's deliberations:  "whether disclosure would tend to diminish candor within an agency."  *Id.* at 185.  The Orders did not consider whether rejecting the DPP here would have a profound chilling effect on the ability of agency employees to deliberate about policy issues ahead of communications about policy.  Requiring the SEC to disclose the Speech Drafts—reflecting extensive internal predecisional deliberations on the part of agency employees on an issue of importance to the agency—would have a significant chilling impact on the SEC and other government agencies.

        D.      **The SEC's DPP Should Not Be Pierced.**

        A court must consider several factors to determine if the need for discovery outweighs the need for the DPP, including the relevance of the documents and the possibility of future timidity by government employees.  *See Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y. 2003) (citation

omitted).  As discussed in Section I above, the Speech Drafts are entirely irrelevant to this case.

Furthermore, their disclosure would discourage candor within the SEC and have profound chilling

effects on the ability of agency employees to deliberate policy issues.  As the January Order properly

recognized, "SEC staff are engaged in difficult and complex discussions about agency decisions

which affect millions of market participants in the digital asset space; they need to be able to

conduct those deliberations with the expectation of 'candor, which improves agency

decisionmaking.'"  D.E. 413 at 22 (quoting *Sierra Club*, 141 S. Ct. at 786).

### III.     The July Order Should Be Set Aside as Clearly Erroneous and Contrary to Law Because the Attorney-Client Privilege Protects the Speech Drafts.

Government officials' "access to candid legal advice directly and significantly serves the

public interest."  *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007).  For the government to assert

the attorney-client privilege, "it must establish: '(1) a communication between government counsel

and their clients that (2) was intended to be and was in fact kept confidential, and (3) was made for

the purpose of obtaining or providing legal advice.'"  *Citizens Union of N.Y.C. v. Att'y Gen. of N.Y.*,

269 F. Supp. 3d 124, 171 (S.D.N.Y. 2017) (quoting *Cnty. of Erie*, 473 F.3d at 419).

The July Order held that the advice sought and given in the Speech Drafts was

predominantly non-legal because the July Order incorrectly required that the advice be "intended to

*assist the agency in making decisions or acting lawfully*," as opposed to informing Director Hinman's

conduct.  D.E. 531 at 8 (emphasis in original).  As explained above, however, the process of

developing the Speech constituted agency business.  While Director Hinman's Speech was not *official*

*SEC policy*, the SEC and Director Hinman had a shared interest in ensuring the Speech reflected the

SEC staff's ongoing deliberations, and the SEC needed to ensure that its employee's speech did not

conflict with the agency's legal interests.  *See* 17 C.F.R. § 200.735.  Moreover, nothing in the law

requires that the privilege center on advice that impacts official agency decisions and policies.  *See*

*Grand Jury Investigation*, 399 F.3d at 534–36 (holding privilege attached to communications advising

public official on legality of official's actions in connection with bribery allegations).  Further, the July Order made no finding about whether an attorney-client relationship existed between Director Hinman and the SEC attorneys from whom he sought advice but acknowledged "[t]here is no debate that government employees can be clients."  D.E. 531 at 6.  That the Speech is not a binding agency position does not obviate Director Hinman's need to ensure that he accurately represented the law consistent with SEC positions.  *See Grand Jury Investigation*, 399 F.3d at 534.

The July Order also clearly erred by characterizing the communications between SEC attorneys and Director Hinman as "policy advice" or "communication advice," D.E. 531 at 7–8, and concluding that the advice was non-legal.  The July Order emphasized that Director Hinman sought "reactions" to his Speech and did not recall what specific comments he received.  *Id.* at 8.  But no magic words are required to invoke the privilege.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014).  Indeed, one of the examples cited in the July Order—whether "it is a good idea or a bad idea to make a particular public statement as a public figure," D.E. 531 at 8—can have a wide variety of legal ramifications, and expressing that such a statement is a "bad idea" does not render the advice non-legal.  The hallmark of legal advice is the "interpretation and application of legal principles to guide future conduct or to assess past conduct" that "requires a lawyer to rely on legal education and experience to inform judgment."  *Cnty. of Erie*, 473 F.3d at 419.  The Speech Drafts show SEC attorneys applying their legal experience in securities laws to guide Director Hinman in developing the Speech.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court sustain its objections to the January 13, 2022, April 11, 2022, and July 12, 2022 Orders, set the Orders aside, and find that the SEC has properly withheld the Speech Drafts.

Dated:  New York, New York
        July 26, 2022

<div style="margin-left:50%">

/s Ladan F. Stewart
Ladan F. Stewart
Pascale Guerrier
Mark R. Sylvester
Jorge G. Tenreiro
Daphna A. Waxman
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-0153 (Stewart)
stewartla@sec.gov

Benjamin J. Hanauer
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, IL 60604

</div>