**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,    :
    :
                     Plaintiff,    :       20 Civ. 10832 (AT) (SN)
    :
            - against -    :       ECF Case
    :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,    :
    :
                  Defendants.    :
    :
-------------------------------------------------------------------------x

## DECLARATION OF LADAN F. STEWART

I, Ladan F. Stewart, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am a member of the Bar of the State of New York.

2.       I am employed as Senior Trial Counsel in the New York Regional Office of Plaintiff

Securities and Exchange Commission (the "SEC").  I submit this declaration in support of the

SEC's Objections to Orders Compelling the SEC to Produce Privileged Internal Communications.

3.       Attached as **Exhibit 1** is a true and correct copy of a speech by William Hinman,

then-Director of the SEC's Division of Corporation Finance, entitled "Digital Asset Transactions:

When Howey Met Gary (Plastic)," delivered at the Yahoo Finance All Markets Summit: Crypto,

dated June 14, 2018, available at https://www.sec.gov/news/speech/speech-hinman-061418.

4.       Attached as **Exhibit 2** is a true and correct copy of excerpts of the deposition

transcript of William Hinman, dated July 27, 2021.

5.       Attached as **Exhibit 3** is a true and correct copy of: (1) a speech entitled "Remarks

of Commissioner Dawn D. Stump: We Can Do Hard Things (As Prepared for Delivery at the

Chamber of Digital Commerce)," dated January 13, 2022, available at

https://www.cftc.gov/PressRoom/SpeechesTestimony/opastump11 ("I want to provide the

standard disclaimer that the views I express today are my own and not necessarily those of the

Commission I am proud to serve upon."); (2) a speech entitled "NTIA Listening Session on Privacy,

Equity, and Civil Rights: Keynote Address of Commissioner Rebecca Kelly Slaughter As Prepared

for Delivery," dated December 14, 2021, available at

https://www.ftc.gov/system/files/documents/public_statements/1599831/slaughter-ntia-

keynote.pdf ("The views expressed in these remarks are my own and do not necessarily reflect the

views of the Federal Trade Commission or any other commissioner."); and (3) a speech entitled

"Empowering Community Banks (At the Conference for Community Bankers sponsored by The

American Bankers Association, Orlando, Florida)," by Governor Michelle W. Bowman, dated

February 10, 2020, available at

https://www.federalreserve.gov/newsevents/speech/bowman20200210a.htm ("Let me begin by

stating that the views I express today are my own, and not necessarily those of the Federal

Reserve.").

6.      Attached as **Exhibit 4** is a true and correct copy of a publication entitled "SEC

Director of Corporation Finance States That Secondary Market Sales of Ether Are Not Securities

Transactions Now, but 'Something Else,'" dated June 18, 2018, by Michael H. Krimminger and

Matthew C. Solomon, available at https://www.clearygottlieb.com/news-and-insights/publication-

listing/sec-director-of-corporation-finance-states-that-secondary-market-sales-of-ether.

7.      Attached as **Exhibit 5** is a true and correct copy of the transcript of an April 5, 2021

court conference before Magistrate Judge Netburn.

8.      Attached as **Exhibit 6** is a true and correct copy of the transcript of a July 15, 2021

court conference before Magistrate Judge Netburn.

9.      Attached as **Exhibit 7** is a true and correct copy of a letter from Ladan F. Stewart,

dated June 21, 2021, to counsel for Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 26, 2022
New York, New York

    /s Ladan F. Stewart

Ladan F. Stewart

# EXHIBIT 1

## Speech

# Digital Asset Transactions: When Howey Met Gary (Plastic)



**William Hinman**
*Director, Division of Corporation Finance*

**San Francisco, CA**

**June 14, 2018**

### Remarks at the Yahoo Finance All Markets Summit: Crypto

Thank you Andy. I am pleased to be here today.[1] This event provides a great opportunity to address a topic that is the subject of considerable debate in the press and in the crypto-community – whether a digital asset offered as a security can, over time, become something other than a security.[2]

To start, we should frame the question differently and focus not on the digital asset itself, but on the circumstances surrounding the digital asset and the manner in which it is sold. To that end, a better line of inquiry is: "Can a digital asset that was originally offered in a securities offering ever be later sold in a manner that does not constitute an offering of a security?" In cases where the digital asset represents a set of rights that gives the holder a financial interest in an enterprise, the answer is likely "no." In these cases, calling the transaction an initial coin offering, or "ICO," or a sale of a "token," will not take it out of the purview of the U.S. securities laws.

But what about cases where there is no longer any central enterprise being invested in or where the digital asset is sold only to be used to purchase a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes." I would like to share my thinking with you today about the circumstances under which that could occur.

Before I turn to the securities law analysis, let me share what I believe may be most exciting about distributed ledger technology – that is, the potential to share information, transfer value, and record transactions in a decentralized digital environment. Potential applications include supply chain management, intellectual property rights licensing, stock ownership transfers and countless others. There is real value in creating applications that can be accessed and executed electronically with a public, immutable record and without the need for a trusted third party to verify transactions. Some people believe that this technology will transform e-commerce as we know it. There is excitement and a great deal of speculative interest around this new technology. Unfortunately, there also are cases of fraud. In many regards, it is still "early days."

But I am not here to discuss the promise of technology – there are many in attendance and speaking here today that can do a much better job of that. I would like to focus on the application of the federal securities laws to digital asset transactions – that is how tokens and coins are being issued, distributed and sold. While perhaps a bit dryer

than the promise of the blockchain, this topic is critical to the broader acceptance and use of these novel instruments.

I will begin by describing what I often see. Promoters,[3] in order to raise money to develop networks on which digital assets will operate, often sell the tokens or coins rather than sell shares, issue notes or obtain bank financing. But, in many cases, the economic substance is the same as a conventional securities offering. Funds are raised with the expectation that the promoters will build their system and investors can earn a return on the instrument – usually by selling their tokens in the secondary market once the promoters create something of value with the proceeds and the value of the digital enterprise increases.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in *SEC v. Howey*.[4] That test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of *Howey*. A hotel operator sold interests in a citrus grove to its guests and claimed it was selling real estate, not securities. While the transaction was recorded as a real estate sale, it also included a service contract to cultivate and harvest the oranges. The purchasers could have arranged to service the grove themselves but, in fact, most were passive, relying on the efforts of Howey-in-the-Hills Service, Inc. for a return. In articulating the test for an investment contract, the Supreme Court stressed: "Form [is] disregarded for substance and the emphasis [is] placed upon economic reality."[5] So the purported real estate purchase was found to be an investment contract – an investment in orange groves was in these circumstances an investment in a security.

Just as in the *Howey* case, tokens and coins are often touted as assets that have a use in their own right, coupled with a promise that the assets will be cultivated in a way that will cause them to grow in value, to be sold later at a profit. And, as in *Howey* – where interests in the groves were sold to hotel guests, not farmers – tokens and coins typically are sold to a wide audience rather than to persons who are likely to use them on the network.

In the ICOs I have seen, overwhelmingly, promoters tout their ability to create an innovative application of blockchain technology. Like in *Howey*, the investors are passive. Marketing efforts are rarely narrowly targeted to token users. And typically at the outset, the business model and very viability of the application is still uncertain. The purchaser usually has no choice but to rely on the efforts of the promoter to build the network and make the enterprise a success. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network.

As an aside, you might ask, given that these token sales often look like securities offerings, why are the promoters choosing to package the investment as a coin or token offering? This is an especially good question if the network on which the token or coin will function is not yet operational. I think there can be a number of reasons. For a while, some believed such labeling might, by itself, remove the transaction from the securities laws. I think people now realize labeling an investment opportunity as a coin or token does not achieve that result. Second, this labeling might have been used to bring some marketing "sizzle" to the enterprise. That might still work to some extent, but the track record of ICOs is still being sorted out and some of that sizzle may now be more of a potential warning flare for investors.

Some may be attracted to a blockchain-mediated crowdfunding process. Digital assets can represent an efficient way to reach a global audience where initial purchasers have a stake in the success of the network and become part of a network where their participation adds value beyond their investment contributions. The digital assets are then exchanged – for some, to help find the market price for the new application; for others, to speculate on the venture. As I will discuss, whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis.

I believe some industry participants are beginning to realize that, in some circumstances, it might be easier to start a blockchain-based enterprise in a more conventional way. In other words, conduct the initial funding through a registered or exempt equity or debt offering and, once the network is up and running, distribute or offer blockchain-based tokens or coins to participants who need the functionality the network and the digital assets offer. This

allows the tokens or coins to be structured and offered in a way where it is evident that purchasers are not making an investment in the development of the enterprise.

Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not. Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers. When someone buys a housing unit to live in, it is probably not a security.[6] But under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others. For example, if the housing unit is offered with a management contract or other services, it can be a security.[7] Similarly, when a CD, exempt from being treated as a security under Section 3 of the Securities Act, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument can be part of an investment contract that is a security.[8]

The same reasoning applies to digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop the enterprise – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need to make an informed investment decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosures required under the federal securities laws nicely complement the *Howey* investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. So learning material information about the third party – its background, financing, plans, financial stake and so forth – is a prerequisite to making an informed investment decision. Without a regulatory framework that promotes disclosure of what the third party alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.

And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception. Applying the disclosure regime of the federal securities laws to the offer and resale of Bitcoin would seem to add little value.[9] And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value. Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.

I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument.[10] Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security. Similarly, investment

contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize an earlier point: simply labeling a digital asset a "utility token" does not turn the asset into something that is not a security.[11] I recognize that the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[12] But, the economic substance of the transaction always determines the legal analysis, not the labels.[13] The oranges in *Howey* had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[14] Promoters sold the receipts to U.S. investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments, and the purchasers were expecting a return from the promoters' efforts.

Promoters and other market participants need to understand whether transactions in a particular digital asset involve the sale of a security. We are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no-action guidance about the proper characterization of a digital asset in a proposed use.[15] In addition, we recognize that there are numerous implications under the federal securities laws of a particular asset being considered a security. For example, our Divisions of Trading and Markets and Investment Management are focused on such issues as broker-dealer, exchange and fund registration, as well as matters of market manipulation, custody and valuation. We understand that market participants are working to make their services compliant with the existing regulatory framework, and we are happy to continue our engagement in this process.

What are some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, consider whether a third party – be it a person, entity or coordinated group of actors – drives the expectation of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

3. Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?

4. Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?

5. Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?

6. Do persons or entities other than the promoter exercise governance rights or meaningful influence?

While these factors are important in analyzing the role of any third party, there are contractual or technical ways to structure digital assets so they function more like a consumer item and less like a security. Again, we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other,

possible features. This list is not intended to be exhaustive and by no means do I believe each and every one of these factors needs to be present to establish a case that a token is not being offered as a security. This list is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it is not meant to be a list of all necessary factors in a legal analysis.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2. Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?

3. Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?

4. Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?

5. Is the asset marketed and distributed to potential users or the general public?

6. Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?

7. Is the application fully functioning or in early stages of development?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate and comply with the federal securities laws.

---

[1] The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner. This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners or other members of the staff.

[2] Section 2(a)(1) of the Securities Act of 1933 (Securities Act) [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Securities Exchange Act of 1934 (Exchange Act) [15 U.S.C. § 78c(a)(10)] define "security." These definitions contain "slightly different formulations" of the term "security," but the U.S. Supreme Court has "treated [them] as essentially identical in meaning." *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[3] I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group (including "any unincorporated organization" see 5 U.S.C. § 77n(a)(4)) that is working actively to develop or guide the development of the infrastructure of the network. This person or group could be founders, sponsors, developers or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential efforts that affect the failure or success of the enterprise.

[4] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). Depending on the features of any given instrument and the surrounding facts, it may also need to be evaluated as a possible security under the general definition of security – see footnote 2 – and the case law interpreting it.

[5] *Id*. at 298.

[6] *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975).

[7] *Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development*, SEC Rel. No. 33-5347 (Jan. 4, 1973).

[8] *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985).

[9] Secondary trading in digital assets by regulated entities may otherwise implicate the federal securities laws, as well as the Commodity Exchange Act. In addition, as SEC Chairman Jay Clayton has stated, regulated financial entities that allow for payment in cryptocurrencies, allow customers to purchase cryptocurrencies on margin or otherwise use cryptocurrencies to facilitate securities transactions should exercise caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations. *Statement on Cryptocurrencies and Initial Coin Offerings* (Dec. 11, 2017). In addition, other laws and regulations, such as IRS regulations and state money servicing laws, may be implicated.

[10] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

[11] "[T]he name given to an instrument is not dispositive." *Forman*, 421 U.S. at 850.

[12] *Forman*, 421 U.S. at 853.

[13] *See* footnotes 10 and 11.

[14] SEC Rel. No. 33-5018 (Nov. 4, 1969); *Investment in Interests in Whisky*, SEC Rel. No. 33-5451 (Jan 7, 1974).

[15] For example, some have raised questions about the offering structure commonly referred to as a Simple Agreement for Future Tokens, or "SAFT." Because the legal analysis must follow the economic realities of the particular facts of an offering, it may not be fruitful to debate a hypothetical structure in the abstract and nothing in these remarks is meant to opine on the legality or appropriateness of a SAFT. From the discussion in this speech, however, it is clear I believe a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction. I expect that some, perhaps many, may not. I encourage anyone that has questions on a particular SAFT structure to consult with knowledgeable securities counsel or the staff.

# EXHIBIT 2

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------  )

SECURITIES AND EXCHANGE         )

COMMISSION,                     )

                Plaintiff,      ) Case No.

     vs.                        ) 20 CV 10832 (AT)

RIPPLE LABS, INC.; BRADLEY      )

GARLINGHOUSE, and CHRISTIAN A.  )

LARSEN,                         )

                Defendants.     )

------------------------------  )

DEPOSITION OF WILLIAM HAROLD HINMAN, JR.

WASHINGTON, D.C.

JULY 27, 2021

REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 124

1      A.   Yes.

2                      (Hinman Exhibit 10 was marked

3                       for identification.)

4   BY MR. FIGEL:

5      Q.   Let me show you what I'll ask the court

6   reporter to mark as Exhibit 10, which is EE in the

7   outline.  Would you mind handing that to the court

8   reporter?

9      A.   Hand it to the court reporter?

10     Q.   Yes.

11          Mr. Hinman, I'm confident that you're

12  familiar with this document.

13     A.   I am.

14     Q.   I'll represent to you this is a copy of

15  your June 14th, 2018 speech that was taken off of

16  the SEC Website.  You'll see at the top it's

17  entitled "Speech," and it says "Remarks at the

18  Yahoo Finance All Markets Summit:  Crypto."

19          You were the author of this speech?

20          MR. TENREIRO:  Object to form.

21     A.   Yes.

22     Q.   And you were responsible for the content

Page 125

1   of this speech?

2          MR. TENREIRO:  I object to form.

3      A.  Yes.

4      Q.  And you prepared this speech as part of

5   your duties as the director of the division of

6   corporate finance, correct?

7      A.  Again, I'm not sure I had a duty to

8   provide a speech, but I did do this speech while I

9   was the director, yes.

10     Q.  You prepared this speech as part of the

11  services you provided to the Securities and

12  Exchange Commission in your capacity as the

13  director of the division of corporate finance,

14  correct?

15     A.  I gave this speech while I was the

16  director of the division of corporation finance.

17     Q.  And you knew that this exhibit, we're now

18  talking about Exhibit 10, the document, was posted

19  on the SEC's Website, correct?

20     A.  Yes.

21     Q.  And you understood -- withdrawn.

22          And did you understand prior to the time

Page 126

1   you delivered this speech that it would be posted

2   on the SEC's Website?

3       A.  I think I did, yes.  Normally we would

4   think about that in advance.

5       Q.  Was it your decision to post the speech on

6   the SEC's Website?

7       A.  Yes.

8       Q.  And tell me what the process is by which

9   you made the judgment or the determination to post

10  the speech on the Website.

11          MR. TENREIRO:  I'm going to instruct him

12  not to discuss deliberation with staff or

13  commissioners or their counsel.  So you might want

14  to rephrase.  I mean, the process by which he made

15  the judgment?  I don't know, but go ahead.

16      A.  Do you want to rephrase?

17      Q.  Why don't you try to answer my question.

18      A.  Could you repeat the question?

19      Q.  Sure.  I'll rephrase it slightly.

20          Why did you decide to post Exhibit 10 on

21  the SEC's Website?

22          MR. TENREIRO:  And just, you know, the

Page 127

1  same instruction, but go ahead.

2      A.  Typically if I gave a speech while I was

3  the director I would have it posted just to

4  benefit, you know, the folks who wanted to see it

5  who couldn't go to the conference or hear the

6  remarks live.

7      Q.  And what benefit did you think folks who

8  didn't attend the conference would obtain from

9  having access to your speech?

10      MR. TENREIRO:  Same instruction,

11  Mr. Hinman.

12      A.  I think they would be able to see how the

13  division under my leadership was looking at these

14  issues.

15      Q.  And you didn't personally post the speech

16  on the Website, correct?

17      A.  That's right.

18      Q.  There was somebody in the IT department at

19  the SEC who would post it?

20      A.  That's right.

21      Q.  And did you review it before it was

22  posted, this version?

Page 128

1        A.   I don't know if I reviewed the actual

2    document that was handed over to IT, but I would

3    have looked at -- I've looked at this speech many

4    times before then and my counsel may have been the

5    folks that delivered this to IT.

6        Q.   And presumably you had the opportunity to

7    review your speech prior to your testimony today?

8        A.   Yes.

9        Q.   Are there any statements in Exhibit 10

10   that you do not believe to be accurate as you sit

11   here today?

12        MR. TENREIRO:  Without disclosing

13   deliberations with the staff that might have

14   occurred after the speech was published on the

15   Website.

16        A.   I don't believe so.

17        Q.   So in other words, if you were releasing

18   the speech today and you were still serving as the

19   director of the division of corporate finance,

20   would you edit this speech in any way before you

21   gave it?

22        MR. TENREIRO:  Object to form.

Page 130

1      A.   I don't think so.

2      Q.   Why did you give the speech, Mr. Hinman?

3           MR. TENREIRO:  Without disclosing -- you

4      know, so let's talk about the final decision only

5      and let's keep it high level, please, without

6      disclosing the reasons you might have discussed

7      with staff of the SEC or commissioners.

8      A.   Okay.  I was asked to attend the summit

9      and to speak at the summit, and we agreed -- or I

10     agreed to do that.  You know, why I think I gave

11     it?  Because this is an area where people were

12     interested in knowing how the division was looking

13     at these issues.

14     Q.   And did you have an understanding as to

15     why people were interested in how the division was

16     looking at these issues?

17          MR. TENREIRO:  Do not discuss -- or

18     disclose understandings you might have derived in

19     the deliberations or conversations with staff or

20     commissioners.

21     A.   Based on my own meetings up to the date of

22     this speech with outside parties it seemed like

Page 131

1    this was an area they, again, were interested in

2    knowing more about how the division itself felt

3    about this area.

4         Q.  And in your own mind did you think that

5    delivering this speech would answer any open issues

6    with respect to the application of the federal

7    securities laws to digital asset transactions?

8              MR. TENREIRO:  So, again, even in his own

9    mind, if it's in his mind because it came from

10   conversations and discussions with staff, please

11   don't answer.  Please try to uncouple what you

12   learned from, you know, your deliberations with the

13   staff to answer his question.

14        A.  Okay.  I'm sorry.  Would you mind asking

15   me the question again?

16        Q.  In your own mind did you think delivering

17   this speech would answer any open issues with

18   respect to the application of the federal

19   securities laws to digital asset transactions?

20        A.  I think it would inform the marketplace of

21   how corporation -- the division of corporation

22   finance and I felt about these topics, but there's

Page 132

1    a whole host of things covered here.

2         Q.  Did you think this -- withdrawn.

3              Did you believe this speech provided

4    clarity to the market with respect to the

5    application of the federal securities laws to

6    digitalize the transactions?

7              MR. TENREIRO:  So same instruction on

8    deliberative process and also object to form.

9         A.  I think it provided clarity as to how I

10   was looking at these issues.

11        Q.  And did you have an -- withdrawn.

12             Did you believe that was new information

13   to the marketplace?

14             MR. TENREIRO:  Same instruction.

15        A.  I think how I felt about things or the

16   framework I had in my mind was, you know, not --

17   wasn't something I had published in a speech

18   earlier.

19        Q.  And what about -- what are the things or

20   the framework that you had in your mind that you

21   communicated in the speech that you had not

22   published or stated earlier?

Page 133

1        A.  Well, as I've mentioned before, a lot of

2    things that are in the speech have been covered in

3    earlier topics, the application of the Howey case

4    in general, our concern about information

5    asymmetries of people who were doing unregistered

6    offerings of tokens.  What's more new here is a

7    framework that was meant to help people analyze,

8    okay, this is what I'm doing, am I offering a

9    security and do the securities laws apply, or at

10   least how is corp fin, the director looking at that

11   issue.

12       Q.  And did you view that as guidance that you

13   were offering to the marketplace that had not been

14   made available in the past?

15       A.  I think the framework was -- you know, in

16   terms of articulating specific factors was probably

17   the -- although we had referred to those things in

18   talking to market participants, I'm not sure we had

19   ever given a speech with the framework laid out the

20   way it is here.

21       Q.  All right.  Just a ministerial point.  So

22   we have the written speech.  We've entered into a

Page 298

1    attachment to the e-mail?

2         A.   No.

3         Q.   Are you familiar with the Blockchain

4    Association?

5         A.   Not very.

6         Q.   According to their Website they claim that

7    they're one of the "Leading advocacy groups in the

8    digital asset space whose goal is to improve the

9    public policy environment so that blockchain

10   networks will thrive in the United States."

11             Does that refresh your recollection at all

12   as to what the Blockchain Association is?

13        A.   It sounds like a trade association.

14        Q.   And they refer to themselves as the

15   unified voice of the blockchain in cryptocurrency

16   industry?

17        A.   Okay.

18        Q.   Does it refresh your recollection?

19        A.   Just -- just that someone active in the

20   space.  I don't really know them very well.

21        Q.   And if you see the attachment, they sent a

22   document that bears the caption the "Hinman token

Page 299

1   standard, a reasonable framework for determining

2   when tokens are and are not securities."  Do you

3   agree that your June 14th, 2018 speech announced a

4   Hinman token standard?

5        A.  I guess people have called it that.  I

6   didn't intend it for to be called the Hinman

7   standard.

8        Q.  Putting aside the label, did you

9   understand that people would view your speech as

10  having announced a framework by which the division

11  of corporate finance would determine when tokens

12  are and are not securities?

13       A.  The speech and other guidance was intended

14  to share more generally the framework that the

15  division was using in thinking about these assets.

16       Q.  Did you disagree with the substance of

17  what is reflected in the attachment, which is your

18  speech announced a new framework for determining

19  when tokens are and are not securities?

20           MR. TENREIRO:  Object to form.

21       A.  Do I disagree that it announced a new

22  framework?  I think I would quibble with that a

Page 300

1    little bit.  I think that's a framework many folks

2    were using at the time.

3        Q.  After your speech did third parties come

4    to the division of corporate finance and argue that

5    a digital transaction was not a security based on

6    the factors outlined in your speech?

7        A.  They would cite the factors and other

8    factors.

9        Q.  Did you accept that the factors set out in

10   your speech was the criteria by which the division

11   of corporate finance would evaluate whether a

12   digital asset transaction was a security?

13       A.  Generally.

14       Q.  And what do you mean by generally?

15       A.  There are other factors that may be

16   relevant that are not in the framework, things that

17   are more derived from the Gary Plastic case, for

18   instance.

19       Q.  Well, the factors that you outlined in

20   your speech that the Blockchain Association viewed

21   as the Hinman token standard was a new framework

22   that the division of corporate finance announced

Page 301

1    through you and your speech, correct?

2          MR. TENREIRO:  Objection to form.  He

3    already answered no to that question.

4          A.  I think, again, it was the first time that

5    particular framework was published.  So you could

6    call it a new publication, but I think the

7    framework itself, the principles underlying the

8    framework have been well known for a long time.

9          Q.  And following the speech the division of

10   corporate finance applied the framework that you

11   announced on June 14th in connection with their

12   evaluation of whether digital asset transactions

13   were securities, correct?

14         A.  Generally, but not always.

15                         (Hinman Exhibit 35 and

16                         Exhibit 36 were marked for

17                         identification.)

18   BY MR. FIGEL:

19         Q.  So I'm now showing you what is in the

20   outline as PPP and which I will ask the court

21   reporter to mark as Exhibit 35.  In light of the

22   concern about the time I'm going to also show you

# EXHIBIT 3

# Public Statements & Remarks

# Remarks of Commissioner Dawn D. Stump: We Can Do Hard Things

## As Prepared for Delivery at the Chamber of Digital Commerce

**January 13, 2022**

I want to thank the Chamber of Digital Commerce for inviting me to speak today.  Before beginning, I want to provide the standard disclaimer that the views I express today are my own and not necessarily those of the Commission I am proud to serve upon.

Do any of you have a theme song?  I have several that describe various milestones in my life, and as I reflect on my time at the CFTC, I'm leaning towards *I Can Do Hard Things* by Jennifer Nettles. [1]  As the song goes, "Sometimes I don't like it, but that don't mean I don't love it."  I do love my job —not in spite of, but because of, the challenging matters that we tackle (often in the face of difficult circumstances well beyond our comfort zones).

That's where I would like to start—getting out of our comfort zones and doing hard things.  This is front of mind for me in light of the incredible innovations we are seeing these days in terms of the structure, products, and services being offered in financial markets.  Many—but by no means all—of these innovations arise from developments in financial technology such as the growth of digital assets and decentralized finance (or DeFi).

As financial markets evolve and adapt to new demands, market regulators must not stifle beneficial innovations by clinging rigidly to regulatory approaches of the past that may no longer be fit for purpose.  But by the same token, infrastructure providers who offer the market access to new, innovative services must not dismiss the fact that they may be required to seek and comply with regulatory oversight in order to assure market integrity and customer protection.  It's time to thoughtfully consider the *hard things* we all must do to get comfortable with current realities.

So there, I have acknowledged the obvious, but why is this so hard?  Achieving the benefits of innovation in the context of market regulation is tougher than it sounds because we are not starting with a clean slate.  Take, for example, the U.S. derivatives markets regulated by the Commodity Futures Trading Commission.  These markets have, for some time, been characterized by futures and swaps contracts with varying degrees of execution and clearing occurring on centralized venues through intermediaries responsible for brokering and guaranteeing such transactions predominantly for institutional clients.  Recently, though, the pace of technological development and increasing retail interest in these markets is driving new business models that rely less on the traditional centralization of institutional participation via intermediaries, and rather propose to fulfil these functions in a more decentralized way.

These new market innovations are increasingly presenting novel issues that require comprehensive thinking by those of us at the CFTC who regulate the derivatives markets. I believe that our current approach of relying primarily on enforcement actions to impose penalties on those with novel products and markets for their failure to register with the agency is simply an insufficient response. I agree that many of the entities in question should be registered with the CFTC for oversight purposes, as we are tasked by Congress to regulate the infrastructure that permits access to swaps and futures—and many of these entities are, in fact, performing that function. However, we must acknowledge that the infrastructure we oversee is rapidly changing—and our current regulatory regime was not designed to fit the types of services that are evolving to meet the market's demands.

So, what's a regulator to do—continue to take enforcement actions against companies that develop products and business models that are outside-the-box, all the while knowing that our existing rules governing the registration and regulation of the traditional market infrastructure are ill-suited to the very thing that has driven their development (*i.e.* an expansion in the types of participants seeking access to these products and markets, and their preference for less intermediation)? Certainly, that is the easiest answer: "It's not our job to tell you how to meet our rules, just figure it out." Wait, what? How do we expect these companies to conform to a system that does not recognize their value add, the demands of their customers, or even perhaps the future of these markets? What is the goal—to shut down these services, or to encourage those who deliver these services to do so under proper oversight?

I certainly hope it's the latter. After all, it is innovation that provides solutions to meet new market demands. Congress has established a principles-based regime with flexibility to permit adaptation to innovation in the derivatives markets. And welcoming innovation in those markets historically has been at the heart of what we do at the CFTC.

I believe it is thus incumbent upon the CFTC to bridge the gap between its enforcement and oversight functions by setting more clearly defined regulatory expectations for new, innovative applications in the derivatives market infrastructure. That is a much taller task as compared to simply enforcing rules on the books beyond their original context. It's a tough job—but it is our job— and I am confident in our ability to do *hard things*. We cannot be mere bystanders to the fundamental market changes taking place before our eyes, nor should we abdicate the responsibility Congress has given us to "*promote* responsible innovation and fair competition."[2]

Adaptation by market regulators, however, should not be viewed by participants as a means to escape regulation. Quite the contrary, our adaptation to innovation is necessitated by the responsible oversight we owe the marketplace. As these matters continue to land on the CFTC's enforcement docket, it is urgent that we provide direction to those who seek to comply with the law. And then, armed with more clearly defined expectations, the CFTC can better identify those truly bad actors who seek evasion of the rules—and who deserve the full force of robust enforcement action.

In an attempt to start a helpful conversation, I have below identified a non-exhaustive list of areas in which our current rulebook governing infrastructure may require adapting to account for various new innovations taking shape in response to current market demands:

**Trading Platforms (Designated Contract Markets and Swap Execution Facilities)**:  In its recent enforcement action against Polymarket,[3] the CFTC found that an online trading platform offering event-based binary options failed to register as a designated contract market (DCM) or swap execution facility (SEF).  To operate its markets, Polymarket deploys smart contracts, which are hosted on a blockchain.  This was a matter of first impression for the CFTC with respect to a blockchain-based trading platform.  Yet, despite this fundamental difference from the traditional DCM/SEF infrastructure for which the CFTC's rules were written, the CFTC has not given any public consideration to how such a platform seeking to register as a DCM or SEF would be expected to operate under its existing rules.

The term "DeFi" is often used to describe some of the protocols relevant in this framework, and some argue DeFi can exist without regulatory oversight—a topic I will leave for another day.  But in a broader sense, I believe that DeFi is spurring innovative functionalities by market infrastructure providers that may improve efficiencies for those seeking the benefit of centralized liquidity (a feature of more traditional and regulated derivatives markets).  The really *hard thing* that requires our attention is this: How do we achieve our regulatory objectives in a manner that still enables infrastructure providers, and their customers, to benefit from these innovations?

**Clearinghouses (Derivatives Clearing Organizations)**:  Beyond trading, difficult questions persist relative to central clearing, which is a key tenet of addressing counterparty credit risks in derivatives markets.  Our clearing rules are designed around a structure where intermediaries stand between clients and clearinghouses as guarantors, and where clients (often institutional) use leverage to increase their exposure.  But we are lately seeing many new retail-focused derivatives clearing organizations (DCOs) that do not use an intermediary model.

To date, we have accommodated this model by imposing conditions such as requiring products to be fully collateralized.  But as we begin to see requests from DCOs to offer leveraged clearing to retail market participants, we would be well-served to clearly define regulatory expectations before enforcing the application of ill-suited rules.  And we must do so in a transparent way in order to fairly encourage competition.  We are well aware that there is a need for such engagement to maintain the safety and soundness of DCOs while at the same time encouraging retail access to the clearing infrastructure.  It's a difficult task, but *we can do hard things*.

**Brokers and Counterparties (Futures Commission Merchants)**:  In its recent enforcement action against Kraken,[4] the CFTC found that an online exchange enabling customers to engage in "retail commodity transactions" in digital assets such as Bitcoin operated as an unregistered futures commission merchant (FCM) with respect to those transactions.  This finding begs the question:  If Kraken had sought to register as an FCM, how would it have been expected to operate?  The CFTC has never comprehensively addressed how retail commodity transactions are to be regulated, and many of the CFTC's rules for traditional FCMs do not fit Kraken's role as an exchange.[5]  As a result, we are now obligated, in my view, to explain the regulatory parameters such transactions and such non-traditional FCMs are expected to meet—yet, another *hard thing* the CFTC must tackle.

In conclusion, the key takeaway is that we are at a crossroads that requires everyone to roll up their sleeves and *do hard things*.  Derivatives infrastructure providers must recognize that while their business models may be novel, they do not operate outside of the regulatory oversight required by U.S. law under the Commodity Exchange Act.  And for its part, the CFTC must urgently consider fine-tuning its rulebook (often a hard and tedious task), because responding to technological developments and ongoing market dynamics primarily through enforcement is neither good for the marketplace nor sustainable for the agency.  We all benefit from clearly defined regulatory expectations that promote compliance and strong enforcement focused on those who blatantly disregard such expectations to the detriment of your markets.

---

[1] Jennifer Nettles, "I Can Do Hard Things," I Can Do Hard Things EP (Big Machine Records, LLC 2019).

[2] Section 3(b) of the Commodity Exchange Act, 7 U.S.C. § 5(b) (emphasis added).

[3] *In re Blockratize, Inc. d/b/a Polymarket,* CFTC Docket No. 22-09 (January 3, 2022).

[4] *In re Payward Ventures, Inc. (d/b/a Kraken)*, CFTC Docket No. 21-20 (September 28, 2021).

[5] *See* Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken) (September 28, 2021), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b (https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b).  *See also* Concurring Statement by Commissioner Dawn D. Stump Regarding Tether and Bitfinex Settlement (October 15, 2021), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521 (https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521).

**-CFTC-**



UNITED STATES OF AMERICA
# Federal Trade Commission
WASHINGTON, D.C. 20580

Office of Commissioner
Rebecca Kelly Slaughter

## NTIA Listening Session on Privacy, Equity, and Civil Rights
*Keynote Address of Commissioner Rebecca Kelly Slaughter*[1]
*As Prepared for Delivery*

December 14, 2021

Good afternoon, everyone! I'm Commissioner Rebecca Kelly Slaughter from the Federal Trade Commission. It's my pleasure to be able to address you all at the start of the NTIA's listening sessions on privacy and civil rights. I'd like to thank Assistant Attorney General Kristin Clarke for her remarks; the country is so fortunate to have her leading on civil rights and economic justice issues at the Department of Justice.

Thanks as well to everyone at the NTIA that put this event together. Addressing the systemic harms of the data economy, especially those related to civil rights, is going to require coordination across agencies and sustained public participation. I'm excited to hear from the scholars and advocates speaking over the next few days. Your work is integral to advancing policymakers' understanding of these issues and your persistent advocacy helps ensure that we take bold action on advancing the cause of fairness, civil rights, and justice in every corner of our economy.

I am particularly excited that the organizers of this listening session have recognized from the outset that unfair or invasive data practices—like digital redlining, over-surveillance, and other harms to historically marginalized groups—extend beyond a limited understanding of "privacy" violations. These harms, which I think of as data abuses, often stem from the indiscriminate collection of personal data in order to fuel pervasive commercial surveillance in our economy. The framing of these listening sessions has it right. And I think is reflective of an evolution in how the government is approaching data and technology issues across agencies. I can't emphasize enough how glad I am to see us all talking about these issues this way.

The Department of Commerce and the White House have recently announced some artificial intelligence initiatives in an effort to guide the safe use of these tools in the economy. We're seeing the application of this technology in healthcare, criminal justice, employment, credit, and housing—all sectors where historically marginalized communities have been shut out of full and equal access to opportunities and services. Some of the application of these technologies holds promise; it can help distribute opportunities more broadly, resources more efficiently, and benefits more effectively. But technological tools are not necessarily free of the

---

[1] The views expressed in these remarks are my own and do not necessarily reflect the views of the Federal Trade Commission or any other commissioner.

1

weaknesses that plague their human designers, and they can be used to perpetuate and exacerbate discrimination and injustice.

Agencies across the government need to take action to address these issues within their spheres of competence. I'd like to unpack some of my thinking about the harms of algorithmic decision-making and artificial intelligence that exist at the intersection of privacy and civil rights, talk about the tools and legal authorities we have at the Federal Trade Commission to address these harms, and how FTC rulemaking play a role.[2]

I've been thinking about algorithmic harms in a few different ways. Poorly designed algorithms facilitate discriminatory harms through faulty inputs, faulty conclusions, and a failure to audit or test those algorithms for discriminatory outputs. But not all harms stem from design; algorithms can also facilitate proxy discrimination, enable surveillance capitalism, and inhibit competition in markets. Failure to closely scrutinize the impact of data-driven decision-making tools can drive discriminatory outcomes.

Figuring out how to map the FTC's authority onto these new technologies in order to effectively and proactively address these harms is a challenge. But, fortunately, we have at our disposal our general authority under the FTC Act; sector-specific rules and statutes, such as the Fair Credit Reporting Act and the Equal Credit Opportunity Act; and our section 18 rulemaking authority.

Most of the enforcement activity conducted by the FTC is brought under the general authority provided to the Commission by section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices. The Act is more than a century old, and since its passage, the agency has been able to apply the statute's general language to meet new enforcement challenges. That same approach urgently needs to be applied to the harms generated by the data-driven economy.

We have our section 5 deception authority which can be used in connection with algorithmic harms where the marketers of certain products or services represent that they can use marching learning technology in unsubstantiated ways. I believe the FTC has an opportunity here to call out algorithmic snake-oil, especially in areas like facial or affect recognition where it's likely these products just cannot deliver on their promises and create huge society-wide harm when their hype is taken at face value.

We can also use our unfairness authority to target algorithmic injustice. The unfairness prong of the FTC Act prohibits conduct that causes or is likely to cause substantial injury to consumers, where that injury is not reasonably avoidable by consumers and not outweighed by countervailing benefits to consumers or to competition. I believe discriminatory harms fall neatly within our unfairness authority. Surreptitious location tracking could give rise to this kind of claim. Or we could use unfairness where an algorithm is used to exclude a consumer from a benefit or an opportunity based on her actual or perceived status in a protected class. Our unfairness authority goes beyond traditional civil rights claims as well. It gives us the opportunity to examine practices like facial recognition and other kinds of increasingly unavoidable biometric data collection which may lead to discriminatory outcomes.

---

[2] *See* Rebecca Kelly Slaughter, Algorithms and Economic Justice, 23 YALE J. L. & TECH. 1, 11-14 (2021).

I also believe we should also look towards more creative enforcement of our FCRA and ECOA authority. For example, ECOA prohibits credit discrimination on the basis of race, color, religion, national origin, sex, marital status, age, or because you get public assistance. Everyone who participates in the decision to grant credit or in setting the terms of that credit, including real estate brokers who arrange financing, must comply with the ECOA. If lenders are using proxies to determine groups of consumers to target for high interest credit and such proxies overlap with protected classes, the FTC should investigate and, if appropriate, pursue ECOA violations.

A bolder approach that I would like to see the FTC take is to incentivize creditors to make use of the ECOA exception that permits the collection of demographic information to test their algorithmic outcomes. ECOA permits and the FTC should encourage non-mortgage creditors to collect demographic data on most borrowers and use it to reduce disparities and train AI and other algorithmic systems to reduce disparities. Vanishingly few creditors take advantage of this exception, thinking it's just much easier to never ask about race or gender. But this kind of self-testing has to be part of any effort at ensuring that algorithms do not create discriminatory outcomes.

Finally, I believe it is past time for the FTC to begin a section 18 rulemaking process on data abuses; among other benefits, this process can have a clarifying effect for the Congressional debate. Participating in the rulemaking process means businesses, advocates, consumers, workers, researchers, and other interested parties will all have the opportunity to make their opinions known, out in the open, and with specificity in the public record. An open record can provide substantiation of the types of consumer protection and competition harms people are experiencing in digital markets, and it can illuminate how we can act decisively to stamp out these abuses.

If and when the FTC opens that rulemaking record, I hope we'll see the kind of broad participation from the experts we're about to hear from at the NTIA about how we can best address these harms. The era of deploy and hope for the best, or "move fast and break things," has to be over. We're living with the consequences of an unregulated tech sector. I hope the next generation of technology is deployed with a critical eye toward its potential harmful effects so we can all reap the benefits of advanced algorithmic decision-making together.

Thank you all for you time.

# Speech

 PDF

---

February 10, 2020

## *Empowering Community Banks*

Governor Michelle W. Bowman

At the Conference for Community Bankers sponsored by The American Bankers Association, Orlando, Florida

**Share** 

---

Thank you to the American Bankers Association for inviting me to address this year's Conference for Community Bankers. I am delighted to be here with you again. Let me begin by stating that the views I express today are my own, and not necessarily those of the Federal Reserve.

As community bankers, you have worked hard to develop a deep understanding of your local economies, while also keeping perspective on the broader economic picture. There is little I could tell you about your local communities that you do not already know, but I thought I might say a few words on the national economic outlook before turning to my main topic for today.

My colleagues and I on the Federal Open Market Committee had our most recent meeting about two weeks ago, when we decided to keep our target range for the federal funds rate unchanged at 1-1/2 to 1-3/4 percent. This policy setting should help support the economic expansion, which is now in its 11th year. My outlook for the U.S. economy is for continued growth at a moderate pace, with the unemployment rate—which is the lowest it has been in 50 years—remaining low. I also see inflation gradually rising to the Committee's 2 percent objective. So on the whole, the national economic backdrop looks very favorable, which should be broadly supportive of your local economies. And of course, by ensuring that consumers and businesses in your communities have access to financial services, you are key contributors to the health of our national economy.

Let me now turn to my main topic for today, the interaction between innovation and regulation for community banks. As the Federal Reserve Board's first designated governor with experience in community banking, I am committed to maintaining a strong and thriving community bank sector. Small banks are the lifeblood of their communities—and they ensure that consumers and businesses have access to financial services. This capacity to address local needs is fundamental to a strong and stable financial system. To community bankers, customers are much more than their credit score or their annual income, and small businesses are far more than their most recent revenues. By extending credit and offering specialized products and services that meet the needs of their borrowers, these banks empower communities to thrive.

We live in an exciting time, when the face of banking is changing faster and perhaps more fundamentally than it ever has. The first digital banks appeared on the scene about 25 years ago. Since then, financial technology has evolved rapidly. Technology puts more information in the hands of both the customer and the bank. As financial institutions succeed in digitizing more of their offerings, customers are able to monitor cash flows, make direct payments, understand changes in their credit scores, track spending, and budget more easily. Technologies like predictive analytics, when supported with appropriate consumer protections, can

improve bank services and performance by enabling continuous tailoring of the customer experience. It also helps banks identify products that are best suited for their customers and their business model and strategy. For those account holders who are willing, an analysis of spending habits may indicate that they could benefit from services they hadn't yet considered.

But successful innovation is not just about adopting the latest technologies. Successful innovation has always required strategic vision and creativity. Community banks thrive when they find creative ways to serve their communities, using everything they know to build relationships, offer solutions, and make lending decisions. We need only look to the performance of community banks during the financial crisis to see how well they leverage this local knowledge and their relationships to make lending decisions.

After the onset of the crisis, community banks' superior loan quality resulted in lower aggregate delinquency and charge-off rates compared to the largest banks. This superior performance was widespread—community banks in the vast majority of states outperformed the largest banks in this way.[1]

Even today, community banks continue to perform with distinction. In the third quarter of 2019, community banks' pre-tax return on average assets was 1.5 percent, marking the highest pre-tax return on assets ratio reported by community banks since 2006. Asset quality also remains strong for community banks and is better than for larger banks. The community bank net charge-off rate for total loans and leases was less than 0.2 percent at the end of the third quarter 2019. Let me state that again—the net charge-off rate was less than 0.2 percent, less than half of the industry average. Community bank capital levels remain at continued high and increasing levels. Community banks reported a total risk-based capital ratio of nearly 16 percent, as compared to the industry average of less than 15 percent. This type of performance positions the community banking sector for continued success this year and well into the future, helping ensure the preservation of the community bank model for future generations of Americans.

Community banks understand their borrowers and their specific needs. While technology continues to evolve and change the way we live and bank for the better, it still cannot by itself fulfill that unique and vital role.

Today, there are more than 4,800 community banks in the United States.[2] Nearly 80 percent of these have assets totaling less than $500 million, with roughly 40 full- and part-time employees, on average. The vast majority of these community banks are financially strong, and are the backbone of the towns and cities they serve, providing loans to individuals and businesses in the local area. But as customers' needs and goals evolve, community banks will need to evolve to meet them.

The successful integration of financial technology into the community bank business model is proving to be enormously valuable to enable community banks to enhance the services they've already proven they can deliver effectively. Access to technology and services to meet customer needs is critical to ensuring community banks remain vibrant.

For the remainder of my remarks, I will focus on my vision for creating pathways to responsible community bank innovation. In particular, I will discuss the promise and the challenges that smaller banks face in identifying, integrating, and deploying transformative new technologies, and I will offer some ideas for how the Federal Reserve can help community banks find and manage their relationships with service providers.

**Clearing a Path for Innovation**

Community banks have always been innovators, but rapid technology adoption is challenging for banks of all sizes. In most cases, realizing the potential that technology offers requires community banks to obtain services from other companies or products from core service providers, which I will refer to collectively as third-party providers. As I noted earlier, banks with less than $500 million in assets employ roughly 40 people on average—nowhere near the number required to exhaustively develop, test, and manage every element of novel technologies. In my discussions with bankers, they note that the process of selecting, initially vetting,

and continuing to evaluate third-party service providers is onerous and presents obstacles to successful innovation.

I agree that the cost of complying with some of our regulations and expectations for third-party relationships can pose an outsized and undue burden on smaller banks. These compliance costs are in some instances disproportionate to bank size, complexity, risk, and capacity and can be the same for a bank with $10 million in assets and a bank with $10 billion in assets. Further, expectations of due diligence when applied to a potential fintech partner may require more financial history or information than that partner can provide.

Due diligence for new third-party relationships, even those that are not start-ups, can require a community bank to collect and analyze a significant amount of complex information. Also, the annual monitoring that is required adds an additional significant and ongoing burden. The process for managing the annual collection and review of the financials, audit results, and other operational compliance materials for multiple vendors can take weeks of time for several employees. Bank employees must review thousands of pages of documentation, and the workload per vendor can be the same for all banks, regardless of their asset size and number of employees. And as someone who has been involved in this compliance work, I know that it's not as if other responsibilities can wait—community bank employees often wear several hats. Community banks must weigh the benefit of any third-party relationship against the additional work required to evaluate the third party. And even when new product offerings emerge from service providers that already serve the bank, contract terms can be complicated to adjust, adding to the costs of obtaining technologies, which may ultimately be prohibitive. Flexible core systems are important for this reason. Collaboration between a bank and its core system provider is critical to ensure that technology solutions can be integrated quickly and cost effectively within the core system.

**Creating the Right Regulatory Environment**

Responsible innovation, especially for smaller institutions, requires two key aspects: a clear idea of how the technology serves a bank's strategic objectives and a regulatory environment that supports innovation. I will touch today on the important interplay between these factors, and in particular, the role that regulators can play in creating a regulatory environment that is conducive to innovation, preserves the safety and soundness of the financial system, and protects consumers. As regulators, we need to ensure that banks uphold sound risk-management practices. Yet we also have information that can help community banks meet those standards. We should closely examine opportunities to share that knowledge, subject to appropriate safeguards, in order to support innovation.

Responsible innovation begins with a bank's strategy. Banks need to identify their goals and then look to identify the kinds of products and services that can help them move forward to implement that strategy. In the past, I have spoken about the importance of considering the impact of new technologies and finding ways to leverage them, if a bank feels that it fits into its business model and strategy. For community banks, a decision to embrace a new technology or innovation is almost always synonymous with third-party engagement.

Regulators and supervisors can contribute to an environment where banks are empowered to achieve these strategic objectives, simplifying and clarifying the process of third-party selection, due diligence, and monitoring.

A bank may decide that its business model should evolve, and that offering a new product or partnering with a fintech company will help it position itself for future growth. This decision is an essential one, but what comes next? This is a new world for most community banks, and supervisors and regulators can lend their expertise to those banks seeking to navigate the unfamiliar landscape.

To that end, the Federal Reserve recently launched a web page on innovation and announced several upcoming Reserve Bank events. The innovation page on our website (www.federalreserve.gov/innovate) is

intended to be a one-stop shop for supervisory information, publications, research, and international work that is related to technology innovation. Most importantly, the web page also facilitates interaction with Federal Reserve System specialists, to enable bankers and tech industry participants to submit questions about all aspects of technology in the financial services industry, or to request an in-person meeting. Essentially, to open a dialogue.

We have also launched a series of Innovation Office Hours events hosted by Reserve Banks. These events incorporate panel discussions and face-to-face meetings for bankers with regulators and supervisors, which are intended to be a resource for both state member banks and fintech companies seeking partnerships with or offering services to banks. During these meetings, banks that attend the office hours will have an opportunity to share specific projects or proposed partnerships and learn about how regulators approach and consider risk management in those contexts. Regulators can also share their observations about effective implementation and risk-management practices across the sector. Equally important, the events provide regulators an opportunity to hear directly from banks and fintech companies about challenges to innovation. The office hours events will also include a panel discussion on innovation topics that will help to provide additional insights into new financial technologies. Our first office hours event will be held at the Federal Reserve Bank of Atlanta later this month. Additional events are planned later in the spring and throughout the rest of the year. These are an important opportunity for us to learn, and I look forward to hearing your feedback on these events.

I'd like to turn next to another step in this process—the selection of a third-party provider. This step can be challenging given a lack of information about potential partners when many firms, and their product offerings, are new. Notably, in the 2019 National Survey of Community Banks, community bankers voiced a desire for more transparency into third-party service providers, to inform decisions about whether to enter into contracts with these providers and the type of contract that may be appropriate.[3]

In this regard, I believe the Federal Reserve should consider several possible steps. First, we should explore the possibility of publishing the list of service providers subject to supervision by the agencies. This could provide a starting point for community banks by sharing information about the types of companies providing services to a large number of financial institutions.

Second, I believe we should increase transparency around our own practices. Through the banking agencies' service provider program, we regularly conduct examinations for and produce independent evaluations of certain providers of critical services. These exams are focused on risk management, audit, and internal controls. The Fed and other agencies have the statutory authority to oversee third-party providers that serve the banks they supervise. Providers that represent a significant level of risk to their clients are part of an interagency supervisory program. The agencies make the outcomes of those exams available to banks that are clients of a supervised service provider.

I believe we can take a step further with increasing transparency on our supervisory program by making information that may be useful about our supervision of key service providers available to banks. This could take a number of forms, such as being more transparent about who and what we evaluate. Of course, moving forward in these areas requires careful consideration and interagency collaboration, and I have asked our staff to work with other agencies to develop and propose workable options for giving banks the benefit of the knowledge that supervisors have about their potential providers in an appropriate manner.

Once banks seeking to innovate have navigated the selection process and identified a partner, they now face a complicated due-diligence process. I believe that regulators and supervisors have a role in easing the burden of that process for community banks in several respects.

First, we could help by implementing clear third-party guidance that is consistent across all regulatory agencies. The Federal Reserve is in the process of working with the other banking agencies to update our

third-party guidance. I believe that the banking agencies should all have consistent expectations for third-party relationships, and that the Federal Reserve should, as a starting point, move toward adopting the Office of the Comptroller of the Currency's (OCC) guidance. It is incredibly inefficient to have banks and their potential fintech partners and other vendors try to navigate unnecessary differences and inconsistencies in guidance across agencies.

Second, this guidance should allow banks to conduct shared due diligence on potential partners. If several banks use the same third-party service provider and are open to collaborating, they should be allowed to pool resources instead of duplicating one another's work.

Third, the guidance should explain what due diligence looks like for a potential fintech partner, because the standards applied to other third parties may not be universally applicable. For example, many fintech companies lack the kind of long financial history associated with more traditional bank vendors. Perhaps a fintech company has been around for only a few years. On its own, the fact that a bank cannot evaluate more than five years of the company's financials should not necessarily stop this company from being considered as a partner. Every bank has different objectives, and potential partnerships are not one-size-fits-all. Regulators should especially support partnerships that combine the strengths of community banks and fintech companies, which have a track record of success. The guidance should reflect some supervisory flexibility, and not impede prudent, strategic partnerships between community banks and potential partners.

Fourth, in order to give community banks a better picture of what success in due diligence looks like, and where it begins and ends, I also believe that we should release more information on its necessary elements. This change would provide clarity and assist community banks in completing their work. In particular, I believe that regulators can provide more clarity on the types of questions that should be asked of a prospective third-party provider and our view of a satisfactory answer. Such a handbook would not only have the benefit of increasing transparency for community banks but could also be beneficial for fintech companies that hope to become third-party providers.

Finally, I know from experience that once due diligence has concluded, the evaluation of third-party relationships is not over. As I noted earlier, monitoring can take weeks of work every year for community bank employees. To be sure, this work is an important part of risk management. But I believe regulators and supervisors have a role to play in ensuring that the burden is tailored to bank size, risk, complexity, and capacity. Knowing the burden that third-party monitoring can present to employees of the smallest banks, I have encouraged Federal Reserve staff to consider options for further tailoring our expectations for community banks with assets under $1 billion in this area. We should be mindful that when we apply the same expectations to banks with starkly different asset sizes, we are creating the same workload for a bank with about 30 employees as for a bank with roughly 180 employees, even though their resources and risk profiles are quite different.

## Closing Remarks

To conclude, I believe that we can create a regulatory environment in which community banks are empowered to innovate, in which supervisors leverage their own knowledge to help banks understand what to look for in a service provider. It's a regulatory environment in which guidance is clear and supervisors are appropriately flexible, and due diligence and third-party evaluations are appropriately scaled.

Every bank must decide for itself whether and how to adapt their business models to new technologies, but supervisors and regulators can facilitate innovation at a few key milestones on that path forward. First, supervisors and regulators can serve as a resource for banks navigating the financial technology landscape for the first time, and make subject-matter experts accessible. Second, we can make the process of selecting a partner appropriate for a bank's business strategy a more informed one, by being more transparent about our own supervisory program for certain service providers. Third, we can facilitate vetting of potential partners by allowing shared due diligence, providing in our guidance specific expectations for partnerships with fintech

companies, and publishing a handbook of sound practices in due diligence. Finally, we can reduce burden on banks as they continue to evaluate risk at third-party providers, by rightsizing our expectations and sharing more information about our supervisory program. Capacity, in addition to complexity and size, should be considered as we continue to tailor supervisory expectations.

As we work toward the environment I described, communication between regulators, supervisors, banks, and fintech partners must be frequent, and confusion about compliance requirements must not be an impediment to banks who wish to partner with third parties. I believe the steps I have laid out today are a promising beginning to making this regulatory environment a reality.

---

1. See Jeffrey W. Gunther and Kelly Klemme, *Financial Stability: Traditional Banks Pave the Way* (PDF) (Dallas: Federal Reserve Bank of Dallas, 2012). Return to text

2. See Federal Deposit Insurance Corporation, *FDIC Quarterly Banking Profile* (PDF) 13, no. 4 (Third Quarter 2019). Return to text

3. See https://www.communitybanking.org/~/media/files/publication/cb21publication_2019.pdf . Return to text

Last Update: February 10, 2020

# EXHIBIT 4

CLEARY GOTTLIEB

# SEC Director of Corporation Finance States That Secondary Market Sales of Ether Are Not Securities Transactions Now, but "Something Else"

*June 18, 2018*

On Thursday, June 14th, the SEC Director of Corporation Finance, William Hinman, stated his view that current secondary market trades of Ether are not now securities transactions as part of a speech on the treatment of digital assets under the securities laws.

While he expressly set aside the question of whether the capital-raising that initially accompanied the sale of Ether in 2014 was a securities offering, he confirmed previous suggestions that Ether is a prime example of a digital asset that may once have been offered as a security, but is now "something else" that is not regulated by the securities laws. While Hinman's views are not binding on the Commission, his remarks strongly suggest the Commission's willingness to consider whether certain digital assets that may be initially offered as securities over time can later lose their status as securities—a view that is shared by at least one CFTC commissioner.

This article was republished by the *Columbia Law School Blue Sky Blog*.

CLEARY LAWYERS INVOLVED

**Michael H. Krimminger**
*Washington, D.C.*
**Matthew C. Solomon**
*Washington, D.C.*

VIEW OTHER PUBLICATIONS

**Financial Technology**



Attorney Advertising.

© 2022 Cleary Gottlieb Steen & Hamilton LLP

# EXHIBIT 5

L465secC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES and EXCHANGE
COMMISSION,

                    Plaintiff,

            v.                          20 Civ. 10832 (AT)(SN)
                                        Remote Proceeding

RIPPLE LABS, INC., et al.,

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        April 6, 2021
                                        2:00 p.m.

Before:

                        HON. SARAH NETBURN,

                                        U.S. Magistrate Judge

                            APPEARANCES


SECURITIES and EXCHANGE COMMISSION
        Attorneys for Plaintiff SEC
BY:   JORGE G. TENREIRO
        DUGAN BLISS
        DAPHNA A. WAXMAN
        JON A. DANIELS
        LADAN STEWART

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
        Attorneys for Defendant Bradley Garlinghouse
BY:   MATTHEW SOLOMON

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
        Attorneys for Defendant Christian A. Larsen
BY:   MARTIN FLUMENBAUM
        MICHAEL GERTZMAN
        MEREDITH DEARBORN

L465secC

1        (The Court and all parties appearing telephonically)

2        THE COURT:  Good afternoon, everybody.  This is Judge

3   Netburn.  Let's begin by calling the case and then I want to

4   address a few housekeeping matters before we address the motion

5   that's before me today.

6        This case is SEC v. Ripple Labs Incorporated, the

7   docket no. is 20 Civil 13832.  Let me first confirm that our

8   court reporter is on the line.

9        OFFICIAL REPORTER:  Good afternoon, your Honor.

10  Pamela Utter with Southern District Reporters.

11       THE COURT:  Wonderful.  Thank you.

12       On behalf of the SEC?

13       MR. BLISS:  Good afternoon, your Honor.  This is Dugan

14  Bliss.  Joining me are my colleagues, Jorge Tenreiro, Daphna

15  Waxman, Jon Daniels, and Ladan Stewart.

16       THE COURT:  Thank you.  And will you be speaking

17  primarily on behalf of the SEC?

18       MR. BLISS:  I will, your Honor.

19       THE COURT:  Thank you.

20       And on behalf of defendant Ripple Labs?

21       MR. KELLOGG:  Good afternoon, your Honor.  This is

22  Michael Kellogg.  With me on the phone are several colleagues,

23  but I will be the one speaking on behalf of Ripple Labs.

24       THE COURT:  Thank you.

25       On behalf of defendant Bradley Garlinghouse?

L465secC

1          MR. SOLOMON:  Good afternoon, your Honor.  Matt

2    Solomon from Cleary Gottlieb and, like Mr. Kellogg, there is

3    other Cleary lawyers on the phone but I will be speaking on

4    behalf of Mr. Garlinghouse today.  Thank you.

5          THE COURT:  Thank you.

6          On behalf of defendant Christian Larsen?

7          MR. FLUMENBAUM:  Good afternoon, your Honor.  This is

8    Martin Flumenbaum from Paul Weiss.  With me are my colleagues,

9    Mike Gertzman and Meredith Dearborn, and Mr. Gertzman will be

10   the principal spokesperson for this hearing for Mr. Larsen.

11         MR. GERTZMAN:  Good afternoon, your Honor.  This is

12   Michael Gertzman.

13         THE COURT:  Thank you.  All right.  Good afternoon.

14         I hope everybody on the call is healthy and safe, as

15   well as our audience listening in.  Let me first address the

16   audience.  I understand that we have 500 people listening in.

17   I understand that we have maxed out our capacity to have people

18   listening to the conference.  We apologize for that.  We will

19   see if we can make arrangements to increase the limit from 500

20   but that is the full capacity for today's conference.  Related

21   to that, earlier this morning I was conducting other business

22   and approximately 175 individuals called in this morning --

23   into my conference line that I ordinarily use for court

24   conferences -- thinking that our 2:00 p.m. conference was

25   scheduled for this morning.  And that lasted for several hours

L465secC

1      constantly interrupting my other cases.  I then issued an

2      emergency order which I think stemmed that flow of people

3      calling in during my other court conferences.  We will make

4      every effort to keep these conferences open to the public.  We

5      have every intention of accommodating as many people as we can

6      and doing everything that we can to facilitate an open hearing

7      as though we were in the court house but I do need everybody

8      who wants to participate to pay attention to when conferences

9      are held.  This is not my only case and having 175 people

10     calling in, interrupting my court conferences, was incredibly

11     disruptive this morning, and so I will request and urge that

12     anyone who wants to listen in is welcome to listen in but

13     please make sure that you are calling in at the right time.  I

14     know a number of you were calling in from abroad and so maybe

15     there was some confusion as to how to calculate the time.

16     Please, use the Internet or some way to make sure you are

17     calling at the right time that the conference is scheduled for

18     so that that problem that happened this morning, which as I

19     said, was incredibly disruptive to my morning conferences, does

20     not repeat itself.

21            The second housekeeping matter I want to raise is with

22     respect to recording or rebroadcasting of today's proceeding.

23     That is strictly prohibited.  Let me say that again.  It is

24     prohibited for anyone to record or rebroadcast today's

25     proceeding.  That has been the law in the Southern District of

L465secC

1    New York for as long as the court has been around and it is the
2    oldest court house in the country.  We have a court reporter
3    here, she is excellent, and she is transcribing every single
4    utterance and that record will be made available to the public
5    through the court's filing system but it is impermissible to
6    record the conference and post it on YouTube or any other
7    platform for the public to see.  That is a violation of our
8    court rules and it is a violation of my order directing
9    everybody not to record or rebroadcast today's proceeding.

10          So, I want to make those points as clear as possible
11    so that we don't find out, as we did after our last conference
12    that the conference was recorded and then it was broadcast onto
13    YouTube.

14          Okay.  With those housekeeping matters completed let's
15    turn to the reason that we are all here today which is the
16    application filed by the defendants and a letter filed on March
17    15 regarding discovery requests that were served on the SEC.  I
18    have received the defendant's letter, again filed March 15th,
19    the SEC's response filed on March 22nd, and the defendant's
20    reply which was filed on March 24th and I have reviewed all of
21    those in preparation for today's proceeding.

22          Why don't I turn first to the SEC, even though this is
23    defendant's motion, but since the defendants filed a reply
24    brief I would like to turn first to the SEC so I guess I will
25    address my questions to Mr. Bliss.

L465secC

1          Mr. Bliss, let me ask you a few questions.  I

2     understand that a number of the arguments that you raise in

3     opposing the discovery that is sought is by citing other cases

4     that address two different factors, one is the question of

5     whether or not other cryptocurrencies, namely BitCoin and Ether

6     whether discovery related to those assets could be discoverable

7     in cases here and you cite to a couple of cases including the

8     *Kik* case where Courts have held that discovery related to other

9     assets was not appropriate.  So, I would like to ask you

10    whether or not in any of those cases you had individual

11    defendants that were sued where questions about recklessness or

12    knowledge was at issue, or whether all of those cases that you

13    cite were cases brought exclusively against the alleged issuer.

14         MR. BLISS:  Yes, your Honor.  So, those were cases

15    brought against issuers, not against individuals, although I do

16    believe that we explained in our letters why we think the

17    reasoning applies.

18         THE COURT:  Let's talk about that a little bit.  Go

19    ahead.

20         MR. BLISS:  So, I am happy to expand.  So, defendants

21    asked for these documents because essentially they're asking

22    that the Court look at how XRP was viewed and somehow it would

23    be relevant to look at how Bitcoin and Ether are viewed as

24    well.  Defendants summarily claim that Bitcoin and Ether are

25    like XRP but that is simply wrong and defendants know better

L465secC

| 1 | than anyone how XRP is different from those digital assets, and |

1    than anyone how XRP is different from those digital assets, and

2    I think, your Honor, if you look at that and just on the facts

3    as we have alleged them, it is clear why the arguments are

4    making -- don't make sense.  So, among other things, we alleged

5    in our complaint at paragraph 53 that back in 2012, Ripple and

6    Mr. Larsen received legal memos stating that XRP could be

7    considered a security including because Ripple was responsible

8    for promoting and marketing XRP and --

9              THE COURT:  Can I stop you for one moment?

10             MR. BLISS:  Yes.

11             THE COURT:  Sorry, Mr. Bliss.

12             I just want to remind you that we are on an open and

13   public line and to the extent there was any information that

14   was filed under seal, I don't know if what you are talking

15   about covers that, but I just want to remind everybody that

16   there were documents that were filed under seal here and that

17   should be honored.

18             MR. BLISS:  Absolutely, your Honor.  And to be clear,

19   I am only going to reference facts that we alleged in the

20   complaint, although there were additional facts filed under

21   seal that I will not be mentioning during this argument.

22             THE COURT:  Thank you.  All right.  Proceed.

23             MR. BLISS:  Certainly.

24             So, additionally, all 100 million XRP in existence

25   were created in 2012 and were controlled by Ripple and its

L465secC

 1    founders as we allege at Complaint paragraph 46.  Now, in

 2    contrast, Bitcoin and Ether are mined on an ongoing basis,

 3    meaning that totally unrelated people from around the world

 4    performed calculations with computers that unlock new coins

 5    which those people can then hold or sell themselves.  And

 6    unlike Bitcoin and Ether, Ripple and Mr. Larsen, and later

 7    Mr. Garlinghouse, themselves offered and sold XRP all from that

 8    100 million XRP that was originally created that was part of an

 9    ongoing offering that continued from at least 2013 to the

10    filing of the complaint and raised about $1.4 billion for

11    Ripple and enriched Mr. Larsen and Mr. Garlinghouse by about

12    $600 million as we allege in paragraph complaints paragraphs 1

13    through 8.

14           So, the point is there was never a central promoter

15    profiting from an ongoing offering of Bitcoin or Ether.  So,

16    XRP is nothing like those other digital assets.  And so,

17    however defendants try to explain the basis of the relevance of

18    the Bitcoin and Ether documents, we just believe there is no

19    supporting basis.  We did, obviously, highlight several cases

20    that did not analyze or, rather, did not analyze Bitcoin and

21    Ether, Zaslavskiy, Telegram, Kik as you noted.  I do agree that

22    those did not involve individual defendants but there is

23    nothing about the inclusion of individual defendants in our

24    case that somehow makes these coins that are not at issue in

25    our case relevant to the proceedings here.

L465secC

1           THE COURT:  Can I ask you a question, Mr. Bliss?  If

2     you are saying to me, Judge, they shouldn't get documents

3     related to Bitcoin and Ether because those are just totally

4     different assets, they have nothing to do with XRP; if I am to

5     make a discovery ruling on that conclusion, wouldn't I just be

6     deciding the case?  Because as I understand it the defendants

7     are saying, well, actually, there are many ways in which they

8     are similar and we are at discovery and we are entitled to

9     pursue our own defenses and one of the defenses that we are

10    going to make -- maybe we will be successful and maybe we

11    won't -- but one of the defenses is, hey, we are just like

12    those guys and so we want to build-up that defense.

13          So, it seems to me, if I understand your argument,

14    that if I were to agree with you and say you are right, these

15    are different assets and they shouldn't get discovery I would

16    basically be deciding the case.

17          MR. BLISS:  Your Honor, I understand where you are

18    coming from but in response, no.  For instance, defendants own

19    cited case law I think really establishes that.  Because the

20    case law that is out there, such as the *Marine Bank* Supreme

21    Court case, says that in doing the analysis that the Court will

22    ultimately have to do in this case that the Court has to look

23    at the character the instrument is given in commerce by the

24    terms of the offer, the plan of distribution, and the economic

25    inducements held out to the prospects.  That's the Supreme

L465secC

```
1     Court's Marine Bank decision.  In other words, the focus is on

2     the promoter.  In Section 5 cases, be they, you know, crypto,

3     digital asset cases, or otherwise, the question is how did the

4     promoter offer this instrument?  Was it offered as an

5     investment?  Was it something else?  There is absolutely no

6     case law supporting the idea that pulling in some unrelated

7     asset that somehow adds to the analysis matters and so, no,

8     there wouldn't be pre-judgment of the case because the case,

9     from the outset, needs to be focused on XRP, not on these other

10    assets that have nothing to do with whether XRP is a security.

11          THE COURT:  That brings me to another question that I

12    was going to ask you which is is it your view that the Howey

13    factors, when the Court is evaluating those, that the Court

14    should be looking exclusively at -- from the point of view of

15    the alleged issuer, meaning all that really matters, all that

16    should be concerned is how XRP or Ripple Labs introduced itself

17    to the world, how it made its offers -- I'm not using that word

18    in the legal term -- but how it promoted and presented itself

19    and that the Courts would not be looking at the marketplace,

20    the community, and how what was being offered for sale was

21    being interpreted by the rest of the community.

22          MR. BLISS:  Well, I think, your Honor, that several

23    cases have dealt with this including the Warfield case out of

24    the Ninth Circuit which found that it's possible that some

25    factors, in terms of market understanding of third-parties are
```

L465secC

1    relevant, but the *Warfield* case found, did "we must focus our

2    inquiry on what the purchases were offered, were promised."

3    And so, there are certainly are factors about market

4    understanding that are relevant but case after case -- *Marine*

5    *bank*, *Warfield*, and others that we discuss -- keep going back

6    to the offer and the promise made by the promoter.  So, the

7    case is focused from a legal perspective and should be focused

8    from a discovery perspective on that.  To broaden it and to

9    bring in these unrelated coins, it simply goes far beyond what

10   the law provides and how to decide these Section 5 cases.

11           THE COURT:  Thank you.

12           So, we were talking a moment ago about individual

13   liability and you were, I believe, expressing the view that the

14   claims against Garlinghouse and Larsen don't change the

15   analysis from any of these other cases that have been relying

16   on.

17           Can you discuss with me more a little bit why that is

18   your thinking?

19           MR. BLISS:  Sure.

20           So, I think that's one of the reasons why the

21   defendants assert that it somehow does change, it relates to

22   the claimed lack of due process or fair notice that they claim

23   to have not been given but, as we cited, and in particular the

24   *Kik* case focuses on that issue.  It makes clear that the law

25   does not require the government to reach out and warn all

L465secC

1    potential violators on individual or industry level and I

2    think, more importantly for today's purposes, the Court in *Kik*

3    ruled that the vagueness inquiry does not call for a factual

4    investigation, and to whether the statute has led to arbitrary

5    enforcement it asks objectively whether the statute authorizes

6    or even encourages arbitrary and discriminatory enforcement.

7    So, whether it is based on the individual's scienter,

8    affirmative defenses, or standard liability under Section 5, we

9    are talking about objective facts that matter.  The *Howey* test

10   raises objective questions based on the facts known to

11   defendants.  The due process and fair notice defenses raise

12   objective questions about the statute and so none of these

13   various issues that have been raised by the defendants or, in

14   particular, the individual defendants, provide any basis to

15   expand discovery into assets that are not at issue in the case

16   and, as we point out in our letter, we certainly don't believe

17   that they have identified a single case that has done that or

18   that would support doing that.

19          THE COURT:  Thank you.

20          Let's change focus now.  Can you talk about, more

21   generally, setting aside the Bitcoin and Ether documents but

22   even with respect to the XRP documents, the SEC's position with

23   respect to searching communications with third-parties, other

24   government agencies, and searching more broadly even within the

25   SEC.  I understand that that has been only to look at its

L465secC

1    investigative files and only half of the custodians that were

2    sought.  So, can you talk to me about the SEC's position with

3    respect to what I will call the XRP documents?

4         MR. BLISS:  Yes, I am happy to do that, your Honor.

5         Fist of all, we did agree, as part of this meet and

6    confer process leading up to the March 15 letter, that we would

7    review the e-mails of nine custodians who are high-ranking SEC

8    individuals for the terms "XRP" and "Ripple" that occurred in

9    external e-mails, meaning any communication that went outside

10   of the SEC itself so it could be to a complete third-party, to

11   another government agency, something like that, that we would

12   review those and produce responsive non-protected

13   non-privileged documents to defendants.  So, we are in the

14   process of doing that.  In terms of going beyond that -- so

15   obviously I have explained in some detail, both in the letter

16   and today, why we don't think that Bitcoin and Ether are

17   relevant and so why we didn't agree to search beyond that.

18   There are two additional parts to your question, one is the

19   searching for the internal XRP and Ripple documents and,

20   finally, I will get to the custodians themselves.

21        As for the internal XRP and Ripple documents, our

22   view, in coming up with this offer during the meet and confer

23   process, was that even though we don't believe that any of

24   these communications, you know, with third-parties between SEC

25   individuals and the outside world about XRP, are of any

L465secC

1    relevance.  Nonetheless, to try to accommodate defendants'

2    theory that somehow that would reflect the market view of XRP,

3    we did agree to produce those documents that are non-protected

4    because there would be third-party communications that would

5    presumptively not be protected.  But when it comes to --

6              THE COURT:  Can I interrupt you for definitional

7    clarification?

8              MR. BLISS:  Yes.

9              THE COURT:  You are talking about internal

10   communications, and when I think of internal communications I

11   think of SEC staffer to SEC staffer as an internal

12   communication but it sounds like you are referring to a

13   communication from an SEC staffer to somebody outside the SEC.

14   So, I just want to be clear what I am talking about.

15             MR. BLISS:  I apologize, your Honor.  I clearly was

16   confusing the way I said it.  I am referring to the internal

17   communication being e-mail communications between SEC staffers

18   or potentially commissioners, but essentially e-mail from one

19   SEC.gov address to another.  If there is an outside e-mail

20   address involved I would characterize that as an external

21   communication.

22             THE COURT:  So now we are just talking about internal

23   SEC to SEC.

24             MR. BLISS:  Yes.

25             And so, the internal communications really fall into

L465secC

1   two buckets; one is that the defendants have asked for internal

2   communications that reference external communications.  We

3   think that it would be unnecessarily burdensome and duplicative

4   to conduct that review because we are already going to be

5   producing the external communications themselves and so it

6   would be a lot of review to simply produce information related

7   to what we are already producing.  Now, the other set of

8   documents would be the internal discussions that if two folks

9   from one the SEC were, for whatever reason, discussing XRP or

10  Ripple.  Now, we believe that those are completely irrelevant

11  because there was no communication of those views to the

12  outside world to influence the market view as defendants are

13  looking for, and so there is simply nothing of relevance.  In

14  addition, as we pointed out in our letters, when you are

15  talking about internal agency communications you are getting to

16  the heart of deliberative process and other privileges and

17  while we have not reviewed all of those documents and while I

18  can't say for certain that any particular document would be

19  covered by the deliberative process privilege, law enforcement,

20  attorney-client, or work product, we also believe that a

21  substantial chunk of any review like that would be of protected

22  e-mails and so it would be asking us to search for irrelevant

23  and protected e-mails which we just feel that it is a

24  disproportionate burden in the case.

25          Finally, your Honor, if you would like, I am happy to

L465secC

1  go into a little bit more detail about how we selected the nine

2  custodians out of the 19 suggested by defendants.  If your

3  Honor wants to do that I would suggest that I will do that by

4  referring to initials rather than names given the nature of

5  these proceedings, if that's acceptable.

6       THE COURT:  That is certainly acceptable to me.  I am

7  happy to hear from you on your views generally.

8       MR. BLISS:  Yes, your Honor.

9       So, as to the custodians, we first of all identified a

10  number of custodians on our own before the custodians were

11  suggested by defendants.  They then provided a list and there

12  was a substantial overlap between the ones that we already

13  picked and the ones that they wanted.  And so, what we did is

14  that we had internal discussions to identify which individuals

15  in which division or other part of the Securities and Exchange

16  Commission would have potentially had communications with

17  third-parties -- with the outside world -- about Ripple or XRP.

18  And so, we identified two or three of the most relevant and

19  highest ranking people within the divisions of trading and

20  markets, divisions of investment management within the division

21  of corporate finance, as well as FinHub which is a subpart of

22  CorpFin dealing specifically with digital technology.  And so,

23  based on that we believed that we had identified the most

24  relevant custodians.  We cross-referenced that with the initial

25  disclosures put forward by defendants to make sure that if they

L465secC

1   had identified any individuals from the SEC they were included

2   on that list and we did that.  And so, that is how we arrived

3   at the nine individuals that we are currently searching for

4   e-mails in their boxes and those would be initials EB, DB, WH,

5   JI, JM, BR, VS, AS, and MV.

6           Now, there are 10 additional custodians that were

7   suggested by defendants who we don't believe -- we have not

8   agreed to search the e-mails and we do not believe we should be

9   ordered to search the e-mails and so there are a few reasons

10  particular to different individuals.  So, as to the individuals

11  with the initials FA, KL, and JB, these are people who are in

12  or were in high-ranking positions within the division of

13  enforcement who either were involved in the investigation

14  leading to, or who in the case of JB we have no reason to think

15  that there were third-party communications about XRP or Ripple.

16  So, for the other two, we think that's -- and the review would

17  show documents related to the investigation, not the type of

18  third-party communications that we understand defendants to be

19  seeking.

20          There are a few custodians who we believe are simply

21  duplicative of others and so those would be with the initials

22  SGB, RC, MR, and NS, who are largely are or were in the

23  division of corporate finance or the cyber unit.  And, from our

24  understanding of how communications are made within those

25  divisions involving those people, we believe that searching

L465secC

1   those e-mails would largely produce duplicative results.  In

2   other words, if those people were involved with communications

3   with the outside world, based on our own internal diligence, we

4   believe those communications would nevertheless show up in the

5   mail boxes of those custodians we are already searching.

6        And then, finally, there are three additional

7   custodians suggested by defendants with the initials JC, HP,

8   and ER, and those individuals are either current or former SEC

9   commissioners or chairs and our understanding is that those

10  individuals would have been unlikely or less likely to have

11  communicated with the outside world about XRP or Ripple by

12  e-mail but that has not been the standard practice.  And so, we

13  did not agree to search those mail boxes on that basis.  And I

14  apologize, that's a bit of a lengthy explanation, but that was

15  our analysis of each of the proposed custodians.

16        THE COURT:  No, that was helpful.  Thank you very

17  much.

18        Let me turn to Mr. Kellogg who I assume is going to

19  take the lead here.

20        MR. KELLOGG:  Thank you, your Honor.

21        I think Mr. Bliss' discussion really highlights why we

22  need and why we are entitled to the information about Bitcoin

23  and Ether.  At issue in this case is almost how to apply a

24  90-year-old statute and 75-year-old Supreme Court precedent to

25  something that only came into existence quite recently which is

L465secC

cryptocurrencies.  The SEC has not provided a lot of guidance

on that issue and they have been widely criticized for not

doing so but we do have some data points to look at.  On the

one hand there is the well publicized conclusion that two

digital currencies -- Bitcoin and Ether -- do not run afoul of

the how we test and are not securities.  On the other side of

the spectrum they have their initial coin offering cases, you

will see reference to DOW tokens, and you mentioned Kik and

Telegram, and they have said that those are securities because

an initial coin offering is just like a fundraising tool

created to start creating and deploy future crypto.  So, in

that context, digital coins or tokens are really shares in the

enterprise that will be created when funds are raised.  The

question here, at the great risk of oversimplifying an

important issue, is whether XRP is in relevant respects like

Bitcoin and Ether, or whether it is like the tokens in the

other digital asset cases the SEC relies on.  So,

understandably we are seeking documents exchanged between the

SEC and third-parties about Bitcoin and Ether and why they are

not securities so that we can apply that to our own XRP.

        Now, the SEC claims we are not entitled to those

documents because Bitcoin and Ether are "unrelated digital

assets" and therefore irrelevant to the *Howey* test.  Instead,

they claim that XRP is indistinguishable from the DOW tokens

and the initial coin offerings but that is a classic legal

L465secC

1   argument based on precedent.  Is the unique instrument we are

2   dealing with today, is it more like precedent A or is more like

3   precedent B?  And perhaps the most telling fact on that motion

4   is that the SEC, itself, is seeking comparative information

5   about XRP and other digital assets.  It made clear just last

6   week, as part of the meet and confer process -- and I want to

7   quote this because it is quite remarkable given the argument he

8   is making here -- they said to Ripple, "We request that you

9   also search for and produce documents relating to comparisons

10  to assets that have been the subject of SEC enforcement action

11  for being securities under *Howey*."  In other words, they want

12  to see comparative information of how XRP relates to other

13  digital assets but only if they think it helps their case.  If

14  it helps our case then they argue that the assets are unrelated

15  and information about them should be excluded.  Now, that's not

16  the way Rule 26 works.  The question is whether requested

17  discovery is relevant to any party's claim or defense.  And as

18  the Court explained in *Palm Bay International* and as you

19  yourself noted earlier, and I quote here from the case:  It

20  would be inappropriate for the Court, at this discovery stage

21  in this litigation, to make any substantive determination

22  regarding a disputed defense.  That determination is properly

23  made upon a motion for summary judgment or a trial before the

24  district judge.

25          So the SEC, in essence, wants summary judgment on this

L465secC

1    aspect of our defense but they don't get it in a Rule 26

2    dispute; all we need to show is the relevance of it to any

3    defense that we might offer.  Now, I am happy to walk through

4    the merits on why we think that Bitcoin and Ether are in fact

5    like XRP, they are the three major digital currencies in use

6    today and I can go down a check list of factors that they share

7    in common.  Indeed, I can also add factors that show that XRP

8    has certain advantages over Bitcoin and Ether that makes it

9    even less like a security in the SEC's telling and under the

10   *Howey* test.  Again, though, that isn't relevant, the merits

11   right now.  What is relevant is that we have got a legitimate

12   defense that we think we should be able to press.  The SEC has

13   published a 38-factor test for when a particular coin or

14   cryptocurrency is a security or at least factors that they say

15   you should take into account but they have made no effort to

16   weight those factors in any way or provide actual guidance for

17   the marketplace so we are left in the position of saying, okay,

18   these two -- Ether and Bitcoin -- you have said that they're

19   not securities.  These over here -- DOW, Telegram, Kik -- they

20   are securities.  We can gather evidence to support our view of

21   why XRP is like Bitcoin and XRP, part of which will show under

22   the *Howey* test that the Price of XRP moves in conjunction with

23   the digital currencies Bitcoin and Ether, not with anything

24   that Ripple is doing to promote those which is extremely

25   relevant under the *Howey* test.  The SEC is incorrect that *Howey*

L465secC

somehow silos XRP and treats it in isolation as if Bitcoin and
Ether did not exist.  That's not the way the *Howey* test works.
As the case law indicates and, actually, as the SEC itself
concedes, whether XRP is a security is a fact-specific inquiry
that necessarily turns on the totality of the circumstances.
So, we need to investigate the circumstances under which
Bitcoin and Ether are not securities, as well as the
circumstances under which that the SEC wants to indicate what
in DOW and Kik are.  The case Law says *Howey* turns on the
character of the instrument in commerce and what objective
participants were led to expect, and XRP's character in
commerce, what people were led to expect, is shaped by the
SEC's own messaging to the public about Bitcoin and Ether,
similarities between those currencies and XRP and its eight
years of non-action against XRP.  All of that led market
participants and Ripple itself to conclude that XRP was not a
security.  But, definitely relevant to the *Howey* test, as you
pointed out, it has great relevance both to our fair notice
defense because if we -- and the Second Circuit put it in
*Upton* -- if the SEC failed to give, "a person of ordinary
intelligence" a reasonable opportunity to know what is
prohibited and they are not put on fair notice that the SEC
would suddenly, after eight years decides that it would treat
XRP as a security and the same as Mr. Solomon and Mr. Gertzman
will elaborate, the same applies whether the individual

L465secC

1    defendants were reckless or had knowledge that XRP would be

2    found to be a security.

3              Now, we have already found documents from

4    third-parties going to various market participants like

5    cryptocurrency exchanges and hedge funds, met with the SEC

6    specifically seeking guidance on whether they could list and

7    transact in XRP along with Bitcoin and Ether or whether XRP had

8    to be treated as a security.  They presented their own analysis

9    to the SEC about why XRP was not a security.  And after the

10   meeting they proceeded to list XRP on their exchanges or invest

11   in XRP in their funds.  So, obviously they reached the

12   conclusion that XRP was not a security and was not told

13   otherwise by the SEC.  So, materials on those meetings between

14   the SEC and third-parties were shaping market expectations

15   about XRP and are highly relevant to our argument that we are

16   like Bitcoin and Ether and not like the initial coin offerings

17   at issue in Telegram.  And the SEC obviously cannot dispute

18   that its communications with these third-parties about how XRP

19   compares with Bitcoin and Ether and are not securities are

20   plainly relevant to our defenses and Rule 26 requires no more.

21             If I may move on I will turn to the SEC internal

22   documents and we are talking about documents concerning XRP

23   itself, as well as documents about how XRP compares to Bitcoin

24   and Ether and why the latter aren't securities.

25             THE COURT:  Mr. Kellogg, I just want to raise the same

L465secC

1    definitional points that I raised with Mr. Bliss which is if

2    you can be clear about whether you are speaking about documents

3    within the SEC, meaning SEC staffer to SEC staffer at whatever

4    hierarchy, versus documents between someone at the SEC and

5    someone outside of the SEC, whether that's another government

6    agency or a market participant or whomever.

7            MR. KELLOGG:  Yes, your Honor.  I am now talking about

8    the former, purely internal SEC documents, but one of the

9    reasons why such documents are relevant is that to the extent

10   that they're reflecting their communications in meetings with

11   third-party, they'll reveal market views on XRP and additional

12   contacts that external communications alone would not show.

13   The internal communications don't have themselves to be

14   admissible to be discoverable under 26(b)(1).  Now, as I noted,

15   the SEC is the focal point for requests for regulatory guidance

16   as to whether XRP was a security.  There are more than 200

17   currency exchanges (inaudible) creating an XRP before the suit

18   was brought and at least as many companies after using XRP in

19   their business plans.  We can't track down every one of those

20   companies to find out their interactions with the SEC but the

21   SEC's own internal correspondence, summaries of meetings,

22   communications, reports of communications the SEC may have had

23   with market participants, e-mails about meetings just

24   concluded, arguments made by participants in those meetings,

25   those will all provide us with a shortcut to clearly admissible

L465secC

1    evidence about third-party views.

2            The second point here is it is part of the SEC's

3    mission statement to study and understand market conditions.

4    There almost certainly are documents in their files that

5    reflect not SEC deliberations but market conditions and

6    investor expectations regarding digital currencies studied by

7    the SEC and that evidence goes squarely to the *Howey* inquiry.

8    As the Second Circuit held in the *Glen-Arden* case, to properly

9    apply *Howey* the Court must consider what investors

10   contemplated, their understanding of what defendants would do

11   to turn a profit, and market condition.  Those are market facts

12   and no one is in a better position to have studied those market

13   facts than the SEC.  And to stress we are not talking about

14   deliberations, we are not talking about what led to their final

15   enforcement decision, we are talking about their gathering

16   reports and otherwise on-market facts.

17           And the third reason why the internal communications

18   are important is they're likely to show that the SEC was

19   flailing when it came to the application of the Securities Act

20   of 1933 in digital currencies.  It is understandable that they

21   want to keep such documents hidden but they chose to bring this

22   case and such documents would support the individual

23   defendants' lack of knowledge or recklessness and Ripple's lack

24   of fair notice.  It will also reflect the SEC's own knowledge

25   about market uncertainty and how the SEC chose to respond or

L465secC

1    not to respond to that uncertainty.  Let me just give one

2    example:  We have a copy of a communication that the SEC has

3    made about XRP to the public saying that after a request was

4    received on whether XRP is like Bitcoin and Ether or not in

5    which the SEC -- this was just two months before they filed the

6    suit -- we haven't made any decision about XRP, we are not in a

7    position to say anything about XRP.  But their internal

8    communications on that issue are likely to reveal deficiently

9    substantial uncertainty that no market participant could have

10   been on fair notice as to how the SEC would come out in that

11   case.

12          Finally, if I may, I will address burden and

13   privilege.  Mr. Bliss did not press burden particularly much

14   and for good reason.  The burden of complying with our request

15   is far less than complying with the SEC's own request.  We have

16   the statistics laid out at page 5 in our reply.  What we are

17   requesting is also proportional to the needs of the case

18   considering the importance of the issues at stake, the amount

19   in controversy, and the parties' relative access to

20   information, all of which are factors are relevant under

21   26(b)(1).  And that's also true of custodians.  We sought

22   documents from 19 custodians compared to the 30 custodians the

23   SEC sought from us.  All 19 were centrally involved in meetings

24   with market participants and understanding the character of

25   digital currencies and commerce.  And, if they were following

L465secC

```
 1    government protocols, all of their communications would be over
 2    the SEC.gov handle and, hence, readily searchable.  The SEC
 3    unilaterally cut down our list to nine custodians and as we are
 4    holding information from the other 10 if we just ask, if not
 5    more likely, to have responsive documents.  They picked our 30
 6    custodians, we didn't get to pick and choose.  They don't get
 7    to pick and choose anymore who the custodians we want them to
 8    search are, as long as it is proportional to the importance of
 9    the case an the needs of the parties.  And I am happy to go
10    through all of the examples.  I think one of them is
11    particularly important, I am only talking about publicly
12    available information so there is no invasion of privacy here
13    but the Commission's former chairman is the one who authorized
14    the suit against XRP on his last day in office, thereby causing
15    a huge and immediate drop in XRP's market value, yet
16    Mr. Clayton has actively embraced Bitcoin and Ether.  Indeed,
17    he was the face of the agency meeting constantly with market
18    participants and receiving studies on the features and roles of
19    each of those digital currencies in commerce.  He was even
20    writing to Congress about them.  Based on these meetings and
21    studies, he obviously concluded that XRP is a security but
22    Bitcoin and Ether are not.  That has enormous market
23    consequences and we should have the right to seek documents and
24    meeting memos as set forth to the critical features and market
25    perceptions of each of the three digital currencies.
```

L465secC

1          Now, as to privilege, communications with

2     third-parties about Bitcoin and Ether are obviously not

3     privileged, just to go back to the first step in the

4     discussion.  None of those things are privileged.  Nor should

5     internal documents be to the extent that they're about market

6     conditions.  Case law draws a clear distinction between factual

7     material and deliberative process.  Moreover, the fact that

8     some documents may be privileged is not a basis to refuse to

9     conduct search.  Even some documents that are privileged,

10    whether it's deliberative process, litigation privilege,

11    they're subject only to a qualified privilege which means that

12    we may be entitled to argue as to specific documents if we have

13    a compelling need for them and no other source to fill that

14    need.  But, we can develop those arguments only if the SEC does

15    what Rule 26 requires which is review the documents and prepare

16    a privilege log.

17          Those are the points I wanted to make, your Honor, and

18    I am happy to answer any questions.

19          THE COURT:  Let me ask you a question with respect to

20    the documents related solely to Ether or Bitcoin.

21          My understanding is that in 2018 the SEC announced its

22    decision that those two assets were not securities.  Is there

23    any reason why you would need or be entitled to communications

24    in any form that relate solely to Bitcoin and Ether that

25    post-date that decision?

L465secC

1           MR. KELLOGG:  First of all, ones that post-date a

2      decision are not subject to the deliberative process

3      whatsoever, they're considered the development of the law by

4      the SEC and so there is no privilege for such document to the

5      extent that they reflect the SEC's understanding of just why --

6      an elaboration of just why Bitcoin and Ether are not

7      securities.  Now they announced this to the public -- or rather

8      the director of their corporate finance division announced this

9      to public in a speech in 2018 but it will read that speech in

10     vein for any details about just what it is that makes Bitcoin

11     and Ether not a security where it is something like a digital

12     currency like XRP is a security.  They talk about, for

13     example -- I mean we can go over the assets.  They say it has

14     a --

15           THE COURT:  I will stop you.  Sorry.  I will stop you.

16           MR. KELLOGG:  Okay.

17           THE COURT:  I don't need to go over the assets but my

18     question is if one of the reasons why you want to look at

19     Bitcoin and Ether communications or documents, I believe

20     exclusively to those assets, is because you want to see what

21     the SEC was thinking, what it was saying to other market

22     participants about how it was viewing these assets.  But, we

23     know that come 2018, when the speech is given, we know what

24     they think because now they're going public with it whether in

25     a sort of speech or otherwise, and presume that that decision

L465secC

1    was well thought out before the speech was given.  And so my

2    question to you is, after that public announcement in whatever

3    fashion and in whatever opaque way it was made, after that

4    announcement why would it matter what they were saying about

5    those assets since the market now had that information and

6    would act accordingly?

7              MR. KELLOGG:  Because the reasons for the decision are

8    certainly less than clear.  As I said, they later came up with

9    the framework for investment contract analysis, the list of 38

10   factors with no explication.  So, the reason why subsequent

11   communications, you could say everybody was coming to us and

12   saying, Okay, you now told us that Bitcoin and Ether are not

13   securities, you told us that DOW tokens are securities, what

14   about the vast middle in here?  What about XRP?  In what ways

15   is that like Bitcoin and Ether?  In what ways to you think that

16   is like DOW tokens?  And that information, what it is telling

17   the marketplace, is an admission about what the key factors are

18   that the SEC would apply to say something is or is not a

19   digital security as opposed to a cryptocurrency.  And we think

20   that to the extent they have articulated some factors

21   elaborating on the *Howey* test, we think we fall within what

22   they were telling people about when a particular currency is or

23   is not a digital asset.  That's been an ongoing dialogue since

24   the speech in June of 2018 that was given by Mr. Hinman.

25             THE COURT:  Thank you.

L465secC

1          I want to give an opportunity to the individual

2   defendants to speak but I want to reiterate my admonition to

3   the public again that the recording of today's conference is

4   prohibited and rebroadcasting it is prohibited and that anyone

5   who is found to have engaged in this conduct is subject to

6   criminal sanctions.  I know that this is being broadcast now on

7   the Internet and so we already have people looking into who is

8   engaging in that conduct.  Again, we will make this proceeding

9   as open as possible, to make it available for more people to

10  listen in than the 500 that are already listening if we are

11  able to do that.  Obviously, if we were in the court house we

12  would be limited by the physical limitations of the court

13  house.  The fact that we are engaging in this proceeding

14  remotely is not a basis to engage in criminal violations and so

15  we have our law enforcement officers looking into this issue

16  now.  And so, whoever is engaging in this conduct is on notice

17  that they are engaging in a violation of my specific order to

18  stop doing it, as well as the rules of our court and that

19  whoever is engaged in this conduct may be subject to criminal

20  sanctions.

21          So, why don't I turn -- I think we have spoken a lot

22  about some of the issues that relate to the individual

23  defendants but if Mr. Solomon or Mr. Gertzman wish to be heard,

24  I will certainly give them an opportunity to speak.

25          MR. SOLOMON:  Thank you, your Honor.  Matt Solomon for

L465secC

Mr. Garlinghouse and I am cutting as we are talking so I am
really going to trying not to repeat Mr. Kellogg's points which
were ably made with respect to *Howey* and, independently, with
respect to the individuals but let me amplify on the
individuals to make crystal clear our position.

As your Honor knows, in order to establish aiding and
abetting, and that's the second charge here brought against the
individuals, the SEC has to prove that Mr. Garlinghouse and
Mr. Larsen acted with scienter and that means that, to take my
client, Mr. Garlinghouse knew or recklessly disregarded that he
was associating himself with something improper, and that
something improper in the SEC's telling is Ripple's offers and
sales of XRP without a registration statement.  And that, your
Honor makes this a very different case from the typical SEC
case.  As you asked Mr. Bliss about up front, because aiding
and abetting charges are involving lying, insider trading,
accounting fraud, here the SEC case is really one of regulatory
interpretation and I think that's really what separates it from
so many others.  And the SEC isn't just saying that
Mr. Garlinghouse and Mr. Larsen got it wrong, they're saying
they got it beyond grossly negligent wrong, they were reckless
in not knowing that XRP was a security or they intentionally
avoided knowing that XRP was a security.  So, why is that
relevant for today's purposes?  We have already talked about
the kind of documents we are seeking, your Honor, documents

L465secC

perhaps showing that the SEC itself was struggling with the

question of whether XRP was a security and documents showing

the SEC's communications with other market participants who

were trying to get insight from the regulator as to whether XRP

was a security.  And where the SEC is advancing as its primary

theory that Mr. Garlinghouse and Mr. Larsen acted recklessly or

consciously avoided knowledge that they were acting improperly

because the SEC sales formed investment contracts and

substantially assisted that violation, again, what they have to

prove is in the face of an unjustifiably high risk of harm that

is either known or so obvious it should be known that they are

liable as aiders and abettors.  So, we are not talking about

negligence, we are not talking about gross negligence, this is

an order of magnitude above that, that's the scienter

component.  And the key to the scienter component in terms of

the discovery that's being sought in this case, your Honor, is

that recklessness has an objective component and that's the

Supreme Court that says that and the *Safebuilt* case that we

cited, and the Second Circuit affirms that in the *Sleighton*

case, 604 F.3d at 776, note 9, and it is that objective

component that is most relevant here.  The SEC's understanding

of and discussions around the nature of XRP throughout the

entire time, as well as Bitcoin and Ether which apparently are

not securities according to the SEC is relevant to the question

of whether the allegedly improper aspects of Ripple sales were

L465secC

1    so obvious that they should have been known by Mr. Garlinghouse

2    and Mr. Larsen.  And just to be very concrete about it, your

3    Honor, let's say we learn through this discovery that it wasn't

4    so obvious to Jay Clayton, or it wasn't so obvious to Bill

5    Hinman who ran CorpFin that XRP was or is a security, if we get

6    that and we are entitled to look for it before a fact finder,

7    that's game over for the SEC under the aiding and abetting

8    claim.  And, frankly, their entire case.  That's just one

9    illustration of why this discovery is so critical.

10           Conscious avoidance is another theory that the SEC has

11   put out in addition to recklessness.  That requires that the

12   SEC prove the executives deliberately shielded themselves from

13   sheer evidence of critical facts that are strongly suggested by

14   the circumstances.  This is the *Global Tech Appliance* case.

15   And again, we are going to show in our motion to dismiss which

16   will be filed next week, that the SEC has not adequately

17   alleged knowledge and recklessness and we believe that Judge

18   Torres will ultimately dismiss the aiding and abetting claims

19   but until she does, the individual defendants are entitled to

20   seek discovery to defend themselves and the SEC has to look.

21   They have to search for and produce the requested documents so

22   that we can at least have a full and fair opportunity to build

23   a defense for the SEC's recklessness and conscious avoidance

24   arguments.

25           We also have reason to believe, your Honor -- and I am

L465secC

1    not going to belabor it, Mr. Kellogg gave you some examples of

2    discovery that we have gotten, this is not some fishing

3    expedition, we have concrete examples of interactions between

4    sophisticated market players as late as May '19 where the SEC

5    has engaged in dialogue with those market players and the

6    actions they took after that dialogue establishes that they

7    believed, walking away from the meetings with the SEC, that XRP

8    was not a security.  That's exculpatory.  And we know the SEC

9    has provided private guidance to other market participants

10   leading them to understand that XRP was not a security and that

11   guidance is directly relevant to how the market viewed XRP.

12   That's the argument under *Howey* but it is also relevant to

13   whether it was reckless or intentional to our client to make a

14   determination themselves where the SEC itself may not have made

15   a determination or in fact may have believed, up until very

16   recently, that XRP was not a security, perhaps was more like

17   Ether, more like Bitcoin.  We are entitled to explore that and

18   we cited, your Honor, the *Kovzan* case.  It is a short case,

19   your has probably already read it.  It is really on all fours

20   with what is happening here and if you read the underlying

21   papers for the *Kovzan* case, the SEC filings, the same arguments

22   are being made by the SEC there.  This was the case, your

23   Honor, where the CFO of a public company was charged with

24   several scienter-based claims based on his involvement in a

25   perks scheme.  He was alleged to have omitted information on

L465secC

proxy statements of perks -- payments -- going to the CEO.  So

it was an omissions case and the Court there stated that the

recklessness component of scienter had an objective component

and that the individual defendant was therefore "entitled to

seek evidence from the SEC related to the industry standard in

relation to what the SEC itself considered to be unlawful

conduct in this area of executive compensation."  And the Court

was very clear that the SEC must produce relevant documents

including those reflecting communications between the SEC and

third-parties because they could reflect -- and again I'm

quoting from a case -- confusion regarding the regulations.

And again, the SEC made the same arguments in *Kovzan* that it

attempts to make here.  It said there, look, our internal

communications are irrelevant to scienter because the defendant

didn't know about them, but the Court said wait a minute, there

is an objective standard of recklessness so Kovzan is entitled

to this evidence whether or not -- and this is a quote -- "such

evidence was previously known to him or the public."

        Now, Mr. Bliss may say, look, *Kovzan* involved an SEC

regulation.  Here we are talking about the *Howey* test.  But,

the Court didn't make that qualification and frankly, your

Honor, it is irrelevant in the context of a scienter-based

aiding and abetting claim against the individuals.  In both

cases industry practice and SEC guidance are relevant to the

objective components of the individual defendants'

L465secC

1   recklessness.  In fact, here I think we have a stronger claim

2   than Mr. Kovzan did because what the SEC is effectively saying

3   is that Mr. Mr. Garlinghouse and Mr. Larsen didn't correctly

4   predict that the law would be, in the future, such that XRP

5   would be deemed, in 2020, to be a security by the SEC.

6          And we would say the *Sentinel* case also, your Honor,

7   as another case where the Court allowed exactly the kind of

8   discovery that we are seeking here.  So our entitlement, the

9   individual defendants' entitlement through this discovery isn't

10  just *Howey*, what Mr. Kellogg argued, that's an independent

11  basis when you ought to get discovery, but there is another

12  basis which is the decision to charge this with reckless

13  conduct and that's their theory of the case.  They chose to

14  charge individuals, they chose to do it with scienter-based

15  conduct despite an obvious lack of clarity.  They're telling

16  Judge Torres it is a simple case involving a rogue application

17  of *Howey* but, your Honor, I don't think anybody perhaps beyond

18  the SEC litigation team believes this is a separate case.  And,

19  again, we have seen evidence already of this in the discovery

20  that's been produced so far.

21         Again, the SEC has asked us to produce various

22  documents and they've attached to their letter two examples of

23  communications from Ripple or its investors that it cites as

24  evidence that XRP's status as a security should have been

25  obvious to the defendants.  Well, what we are seeking, your

L465secC

1    Honor, is the inverse of that and we are entitled to it because

2    we believe that the SEC's statements about XRP, Bitcoin, and

3    Ether, especially those made to market participants, is

4    evidence that shows it was much more questionable whether XRP

5    would ever be classified as a security than the SEC tells this

6    Court today.

7           Now, just a couple of final points and I think

8    Mr. Gertzman will want to make a couple of remarks on behalf of

9    Mr. Larsen.  I want to address the pandora's box argument,

10   Mr. Bliss alludes to it but I just want to take it on now

11   because really it goes to how unusual these circumstances are.

12   This is not the garden variety Section 5 case.  We are not

13   dealing with stocks or bonds or orange groves or whiskey drams

14   or the kind of cases that Courts and markets have considered

15   and evaluated for 75 years.  And XRP -- Ripple -- is not

16   like -- again, I'm not talking merits here I am just giving

17   context what the SEC has brought -- it is not like micro cap

18   initial coin offerings or ICOs that look just like IPOs.

19   That's Kik and Telegram.  And they brought enforcement actions

20   against those entities.  Fine.  But, Mr. Garlinghouse was out

21   there encouraging the SEC to pursue fraud actions in this space

22   because that kind of conduct threatens to taint the entire

23   industry and if this case proceeds there will be evidence of

24   that.  And Mr. Garlinghouse was talking to regulators, talking

25   to the public, and talking, indeed, to the SEC itself.  He

L465secC

1    never believed he was doing anything wrong and he wasn't.

2            So, we are not making a claim of selective enforcement

3    here.  You may hear that as well.  *The SEC chose not to sue*

4    *someone else for committing fraud so they can't sue us.*  All we

5    are saying is that the SEC is likely to have communications

6    that reflect on whether believing that XRP was not a

7    security -- as my client did, as Mr. Larsen did -- was

8    reasonable or at least not reckless.  And the SEC knows these

9    communications are relevant, it is seeking the same kind of

10   communications from us, it is offering up additional discovery,

11   your Honor, because I believe it realizes that we are entitled

12   to these documents but I have a lot of respect for Mr. Bliss

13   and I trust him but, frankly, I don't want him picking or

14   anybody in the SEC, picking our custodians.  I think that the

15   custodians we offered up is a reasonable number, the right

16   people, particularly the commissioners themselves, so we would

17   just ask again that that discovery be permitted and that the

18   SEC not be permitted to pick and choose what it provides to us.

19   We are not permitted to pick and choose what we provide to

20   them.

21           On Kik and Telegram finally, your Honor, I just want

22   to be very clear about this.  Again, put the merits aside, this

23   isn't about the merits but they've offered up discovery on Kik

24   and Telegram but not an Bitcoin and Ether.  I want to be

25   perfectly clear about this:  This case is nothing like those

L465secC

cases as you pointed out very early on, your Honor.  This is a
huge step beyond what the SEC took on there.  Kik and Telegram
involved initial coin offerings, ICOs.  This doesn't.  The SEC
sought preliminary injunctive relief in those cases to stop
what it believed was an ongoing unregistered offering scheme.
It didn't do it here.  Grams were new, according to Judge
Castel.  XRP isn't new at all.  There was no Telegram
blockchain at the time of the offering.  Not true here.  And
the companies in Kik and Telegram -- and this is critical --
were in privity of contract with the initial purchasers.
Ripple was not.  Digital assets in Kik and Telegram had no
utility.  XRP's technology has been used already to make faster
cheaper and more efficient payments.  But here is the kicker,
and Judge, this is back to where you started with your
questions:  The SEC didn't charge individuals in those cases,
nor in the case that they cited, this *Marine Bank* case.  No
individuals.  The issue in Kik was whether defendants could
seek discovery into internal SEC documents in support of its
defense that *Howey* was unconstitutionally vague and Judge
Castel said -- and the Court there said that is an issue of
law, not of fact.  Here, as Mr. Kellogg said with respect to
*Howey*, these documents speak directly to the fact-intensive
inquiry, specifically the character that XRP was given in
commerce.  You heard Mr. Bliss concede that there is an
objective inquiry to be made here under *Howey* and there is

L465secC

1    plainly an objective inquiry to be made if you are charging

2    individuals with recklessness.  And here, your Honor also, the

3    defendants have raised a fair notice defense, not vague to

4    avoid this defense.

5          So, I just want to be very clear that the ruling in

6    *Kik* on this issue has no bearing on the relevance of the

7    requested discovery to defend against the SEC's allegations

8    about the individual defendants' scienter.  And, again, these

9    are just some of the differences with *Kik* and *Telegram*.  There

10   are many others.

11         So just to conclude, your Honor, if the expert agency

12   couldn't resolve the question apparently for years on what XRP

13   was, was it a security?  Is it more like Bitcoin and Ether?  Or

14   is it more like one of these ICOs that they waited for years to

15   sort of figure that out, how could it possibly be reckless or

16   intentional for Mr. Garlinghouse or Mr. Larsen to determine XRP

17   was not a security?  It can't be.  And that's why this

18   discovery, independently of everything Mr. Kellogg said about

19   the *Howey* test -- those arguments apply to individuals too --

20   but on this independent basis we need this discovery to defend

21   ourselves.  If the SEC is prepared to say they're not pursuing

22   reckless they're not pursuing conscious avoidance maybe we

23   would be in a different place on this argument but I don't

24   think they're prepared to say that.

25         So, for all of those reasons, your Honor, we believe

L465secC

1   we are entitled to this discovery and we hope the Court orders

2   the discovery forthwith so we can make effective use of it to

3   defend ourselves in this litigation.

4           Thank you.

5           THE COURT:  Thank you.

6           Mr. Gertzman, there has been a lot of oxygen spent on

7   these arguments but if you feel like you have something

8   particular that is unique as to Mr. Larsen, there is something

9   that hasn't been raised that is important I will give you the

10   opportunity to be heard.

11          MR. GERTZMAN:  Thank you, your Honor, and I appreciate

12   that and I will be very brief and not repeat or try not to

13   repeat anything that Mr. Kellogg or Mr. Solomon said, although

14   I agree and support their points completely.

15          Just a couple of brief things.  First, Mr. Bliss said

16   in response to one of your questions early on that there is

17   nothing about the inclusion of the individual defendants in

18   this case that makes documents about Bitcoin and Ether

19   irrelevant in this case.  I don't agree with that, I think it

20   is incorrect, I think it is incorrect for the reason that your

21   Honor already pointed out which is it essentially asks this

22   Court, on an unsupported, naked assertion by the SEC on a

23   motion to compel, to throw out an entire issue of whether

24   Bitcoin and Ether are similar and how similar they are to XRP.

25   But the point I want to make is the point about recklessness in

L465secC

1    this context because the issue of how different or similar XRP

2    is to Bitcoin and Ether also goes to the issue of recklessness

3    in the minds of the individual defendants.  And no one is

4    saying, your Honor, that these three assets are exactly the

5    same.  How similar they are and how different they is a

6    critical factor when it comes to the way the defendants are

7    thinking about this and that's why this discovery is relevant

8    on the issue of recklessness.

9              I also want to just drill down a little bit on the

10   definition of recklessness because I think it helps explain and

11   show why the discovery we seek here is so critical and

12   relevant.  This is a term -- recklessness is a term that has

13   been defined, well-defined by the Courts at this point and the

14   cases that we cite in our papers including the definition but

15   the point is that there is an element of recklessness that is

16   objective.  There is an element that requires the SEC to prove

17   here that it was so obvious, it would have been so obvious to

18   Mr. Larsen and Mr. Garlinghouse that XRP was a security that

19   they were reckless; that they departed so far from ordinary

20   standards of care on that question that they were reckless.

21   And the way to think about how to prove or disprove an issue of

22   recklessness is to look at what's being said and thought about

23   and done in the marketplace on that issue.  And to use a term

24   Mr. Kellogg used, he described the SEC as a focal point.  I

25   think that's a fair characterization, that the SEC has a focal

L465secC

1    point on the issue of whether XRP was a security because it sat

2    at the center of lots of communications and discussions and

3    internal review and assessment of that issue.  And so, it is

4    the logical place to turn to for that evidence because if, in

5    the end, the evidence from the SEC shows that they were unsure

6    about whether XRP was a security or that they concluded at

7    times that it wasn't, then how in the world can Mr. Larsen and

8    Mr. Garlinghouse be accused of being reckless on that issue?

9             I also want to make a quick point, your Honor, about

10   specific allegations in the amended complaint, specifically

11   paragraphs 55 and 59 of the amended complaint in which the SEC

12   alleges that Mr. Larsen received legal advice in 2012 that he

13   should go to the SEC to seek clarity as to whether XRP was a

14   security.  I am mindful of your Honor's reminder that one of

15   the documents at issue here is under seal so I won't go into

16   the substance of the document but there will be a lot to be

17   said about that document as we go forward because I think the

18   SEC's allegations in the complaint about that advice really

19   distort and omit critical compliance and conclusions of that

20   advice.

21            The point I want to make on this motion to compel,

22   your Honor, is that it is really not appropriate and fair for

23   the SEC in the complaint to take Mr. Larsen to task for not

24   going to the SEC to ask about whether XRP was a security and

25   then to tell us, as they are in this motion, sorry, we are not

L465secC

going to tell you what we would have told Mr. Larsen about

whether XRP was a security.  We are not going to tell you what

we were thinking and doing and talking about with others on

that issue.  We are just going to criticize you for not going

to us in the first place.  That's not appropriate, your Honor.

They have put in issue the very question of what they were

saying and doing and thinking and talking about when it came to

whether XRP was a security.

The last point I want to make, your Honor, is that it

is really more of a general point that I think it's pretty

obvious that the issues in this case are really important;

they're obviously important to the parties, they are important

to my client and Mr. Garlinghouse who have been accused of

reckless and knowing conduct which is obviously a very serious

allegation.  I think it is fair to say that important segments

of the fintech and cryptocurrency community are watching this

case closely and, ultimately, it is going to be up to the

Court.  And by Court I mean this Court, your Honor, and Judge

Torres, and potentially the Court of Appeals and maybe even the

United States Supreme Court if it comes to that, it is going to

be up to the Court to decide whether XRP is or was a security

or not.  And I just think, given the importance of those issues

and how new an issue this is, how critical it is in the context

of trying to apply this 1933 definition of security and the

1946 Supreme Court *Howey* definition to the current situation it

L465secC

1    is important that this evidence within the SEC about its

2    communications with others and its discussions about those

3    communications, that that not be kept from the Court, it not be

4    kept out from the record.  The Court can always decide whether

5    that evidence should be admissible at trial and what weight it

6    should be given.  But, for that evidence to be ruled out of

7    discovery in the first place I think is really a distortion in

8    the face of Rule 26 so we would ask the Court to grant the

9    motion to compel.

10            I am happy to answer any questions you may have.

11            THE COURT:  Great.  Thank you.

12            Mr. Bliss, if you want to take five minutes to respond

13   to anything in particular I am happy to give that to you.

14            MR. BLISS:  Yes.  Thank you, your Honor.  I appreciate

15   that, because in listening to various different counsel's

16   statements it is really remarkable to hear that what really

17   underlies a lot of their request is this claim that action or

18   inaction by the SEC has somehow led the markets to believe

19   something about XRP as far as its status as a security.

20            Since 1946 there has never been a case saying that

21   some action or inaction by the SEC influences how the market

22   views an instrument.  They don't cite one.  It doesn't exist.

23   The actions of the promoter are what needs to be the focus

24   here.  And so, to try to put the SEC on trial is totally

25   inappropriate based on decades of law.  And it is clear, in

L465secC

1    listening to the various defense counsel assert that they think

2    that the discovery would somehow show that the SEC was flailing

3    or was confused is, again, remarkable.  The SEC acts pursuant

4    to its statutory authority.  It investigates.  It issues

5    enforcement actions.  It issues no action letters.  That's how

6    it operates.  And so, the idea that because it took X number of

7    years from the time XRP existed to get an enforcement action

8    somehow opens the kimono to total and complete discovery inside

9    the SEC is really a remarkable position for the Defense to be

10   advocating and it is not supported.  And specifically, on the

11   point that was suggested by Mr. Solomon that the SEC

12   individuals are somehow giving comfort to market participants

13   in SEC meetings that XRP is not a security, again, that is not

14   how the SEC operates.  In this case the SEC took time,

15   completed an investigation, filed an enforcement action.  And

16   so, allowing discovery into the SEC's internal and deliberative

17   communications would have a chilling effect on every federal

18   agency.  If agency employees' communications were subject to

19   discovery, every time an agency filed an enforcement action in

20   which the defendant challenged the clarity of the law or the

21   defendant's understanding of it or the timing of the action, it

22   would derail federal agency litigation from being focused on

23   the conduct of the defendants to being about the conduct of the

24   government and its officials.  It would also open the door to

25   discovery far beyond the issues in the filed regulatory

L465secC

1    actions.  Here it would involve the complicating factor of

2    opening the door to discovery from Ripple's own counsel who

3    were the chair of the SEC and the head of the Division of

4    Enforcement for several years of the relevant period in this

5    case when defense counsel now apparently claims that the SEC

6    gave the market some impression of XRP during the time that it

7    took to file the action.  And the improper breadth of the

8    discovery, it was further demonstrated today in terms of the

9    discussion of Mr. Clayton and a subpoena that was sent last

10   week to the former SEC's Chair's new place of employment for

11   documents and communications from while he was the Chair about

12   XRP and other digital assets.

13           So, there is just no basis to allow defendants to put

14   the SEC and its commissioners and its staff on trial for

15   operating in the way that it does.

16           And, specifically on the point of the *Kovzan* case,

17   Mr. Solomon correctly identified that that case and any of the

18   few cases they cited that grant some type of SEC internal

19   discovery are about situations in which the SEC has promulgated

20   rules and interpretation of those rules.  Every one of the

21   cases that they cite that's the case.  And this is not the case

22   here.  The *Howey* test is for federal court interpretation and

23   has been out there since 1946, it is not about an SEC rule that

24   has been implemented.

25           And, I also think it is important to go back to the

L465secC

1    speech by Mr. Hinman that has been referenced several times

2    now.  This was not an official position of the SEC commissioner

3    itself but it is important that in 2018 Mr. Hinman gave a

4    speech not about XRP but about digital assets generally.  He

5    said -- to quote that speech which is publicly available on the

6    SEC's website -- "The digital asset itself is simply code but

7    the way it is sold as part of an investment to non-users by

8    promoters to develop the enterprise can be, and in that

9    context, most often is a security because it evidences an

10   investment contract."  He contrasted that to Bitcoin:  "When I

11   look at Bitcoin today, I do not see a central third-party whose

12   efforts are a key to determining the factor in the enterprise."

13   But here Ripple is doing exactly what Mr. Hinman said makes a

14   digital asset a security:  Acting as a central party promoting

15   XRP as an investment.  And notably, as of June 2018 when

16   Mr. Hinman made that speech, there was no use for XRP other

17   than investment.  As we alleged in the complaint, paragraphs

18   362 to 364, it wasn't until October 2018 that Ripple

19   commercially launched any use for XRP.  And, even since then,

20   that use has been minimal accounting for no more than 1.6

21   percent of XRP's trading volume during any given quarter.  So,

22   at the time of Mr. Hinman's speech, Ripple had been conducting

23   an ongoing offering for five years during which time XRP was

24   offered and sold as an investment with no current use at all.

25   And, to the extent the defendants now wish to feign confusion

L465secC

1    about the time at which Mr. Hinman made those remarks in 2018,

2    Ripple was under investigation by the SEC at the time of that

3    speech.  That speech could not have provided any comfort or

4    confusion to the defendants about the status of XRP at that

5    time.

6          With that, I am happy to answer any questions.

7          THE COURT:  Just a quick clarifying question.  You

8    distinguish the speech, Mr. Hinman's speech suggesting it was

9    not a pronouncement but rather just a speech that referenced

10    Bitcoin and so is it -- does the SEC take a position that as of

11    a certain date its position was official as to Bitcoin and

12    Ether?

13          MR. BLISS:  So I want to make clear that this is my

14    understanding of the current situation and I don't want to be

15    overly technical but the SEC, itself, my understanding, it has

16    not taken an official position.  There is no action that it

17    took to say Bitcoin is not a security, Ether is not a security.

18    Now, there was a speech by a high-ranking person who said that

19    to him that's what it looked like but there has been no action

20    letter, no enforcement action, none of the official ways in

21    which the SEC takes a position on that matter that has

22    occurred.  What I understand defendants to be referencing is

23    the speech by Mr. Hinman which is not an official statement of

24    the Securities and Exchange Commission itself.

25          THE COURT:  Okay.  Thank you.  I appreciate that

L465secC

1   clarity.

2           Okay.  Thank you everybody for your arguments.  I

3   appreciate them.  As I have come to expect from this group of

4   lawyers, they were excellent and the papers that you submitted

5   as well were excellent.  And I recognize that this is

6   high-stakes litigation and that people are quite invested in

7   the outcome of the issues including the individual defendants

8   who face serious individual liability.

9           I have reviewed the letters and have listened

10  carefully to the argument.  I am going to grant, in large part,

11  the defendant's motion.  I think that the discovery related to

12  Bitcoin and Ether is relevant.  I think it is relevant to the

13  Court's eventual analysis with respect to the *Howey* factors,

14  but I also think it is relevant as to the objective review of

15  defendants' understanding in thinking about the aiding and

16  abetting charge or aiding and abetting count.  I also think it

17  is relevant to the fair notice defense that Ripple is raising.

18  So, for all of those reasons, I think discovery into Bitcoin

19  and Ether is appropriate and I am going to authorize it.  I am

20  going to authorize discovery both as to exclusively Bitcoin or

21  Ether communications as well as XRP communications between the

22  SEC and third-parties, and by that I am excluding all market

23  participants and the other government agencies.  I am not

24  including SEC-to-SEC internal communications in that ruling.

25  And so, the SEC is obligated to review the discovery request.

L465secC

1    I am just looking at the actual requests themselves.  I know we

2    have been talking about requests 4, 7, 8, 11, and 14.  Search

3    all of the relevant repositories for documents and discovery

4    related to communications to third-parties.  In addition, I am

5    ordering that discovery be conducted of all 19 custodians.  I

6    don't think that the SEC's arguments, as set forth within their

7    letters and again today, are a legitimate basis given the

8    relevancy standard to preclude discovery here.  19 custodians

9    for an incredibly high-stakes, high-value litigation is not

10   unreasonable, and given the three different categories of

11   grounds not to produce documents, I don't think that that is a

12   legitimate basis so I am going to direct that the SEC search

13   all 19 custodians for relevant and responsive documents.

14        I am going to deny in part the request for discovery

15   that is internal, and specifically internal, for instance

16   e-mail communications between what I will call the SEC staff to

17   SEC staff.  I think that that communication both is less

18   relevant as it goes to how the outside world -- how the market

19   is considering XRP and how the individual defendants, how it

20   affects their reasonable belief, and I also think that there

21   are likely to be extensive privilege issues there and I think

22   it has the potential to seriously chill government

23   deliberations and so I am not going to require communications

24   to be produced that are internal e-mail communications within

25   the agency.  If you want the parties to meet and confer -- and

L465secC

1    this will betray some of my ignorance as to how the SEC may

2    operate -- to the extent there are relevant minutes or more

3    official internal memos on these areas of discovery that I am

4    authorizing, both the Bitcoin and Ether discovery as well as

5    the XRP discovery, I want the parties to meet and confer on

6    whether those should be produced.  So, my limitation now is

7    just as to e-mail communications, the sort of everyday, more

8    informal communications that I think would not be appropriate

9    for discovery here.  But, to the extent internally there are

10   memos being sent up to higher-ranking officials expressing the

11   agency's interpretation or views on these matters, those types

12   of documents may be discoverable but I will direct that the

13   parties meet and confer with respect to that.  Obviously to the

14   extent in producing these documents there are documents that

15   are privileged, the SEC certainly has the right and obligation

16   to identify privileged documents and produce the privilege log

17   and the parties are ordered to meet and confer on that

18   privilege assertion and if you can't reach a resolution you can

19   obviously bring that dispute to me.

20          All right.  That is my ruling on the motion.  Anything

21   further from the SEC?

22          MR. BLISS:  No, your Honor.  Thank you.

23          THE COURT:  Anything further from the defendants?

24          MR. KELLOGG:  Nothing from Ripple left, your Honor.

25   Thank you.

L465secC

1        MR. SOLOMON:  Nothing from Mr. Garlinghouse.  Thank

2   you.

3        MR. GERTZMAN:  Nothing from Mr. Larsen right now.

4   Thank you, your Honor.

5        THE COURT:  All right everybody.  Stay safe.  Thank

6   you very much.

7        We are adjourned.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 6

L7F5secC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES and EXCHANGE
COMMISSION,

                    Plaintiff,

          v.                          20 Civ. 10832 (AT)(SN)
                                      Remote Proceeding

RIPPLE LABS, INC., et al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      July 15, 2021
                                      3:00 p.m.

Before:

                    HON. SARAH NETBURN,

                                      U.S. Magistrate Judge

L7F5secC

APPEARANCES


SECURITIES and EXCHANGE COMMISSION
     Attorneys for Plaintiff SEC
BY:  JORGE G. TENREIRO
     DAPHNA A. WAXMAN
     JON A. DANIELS
     LADAN F. STEWART
     MARK R. SYLVESTER
     BENJAMIN HANAUER

DEBEVOISE & PLIMPTON, LLP
     Attorneys for Defendant Ripple Labs Inc.
BY:  ANDREW J. CERESNEY
     MARY JO WHITE
     LISA R. ZORNBERG

KELLOGG, HANSEN P.L.L.C.
     Attorneys for Defendant Ripple Labs Inc.
BY:  GREGORY RAPAWY
     REID FIGEL

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
     Attorneys for Defendant Bradley Garlinghouse
BY:  MATTHEW SOLOMON
     NOWELL D. BAMBERGER
     ALEXANDER JANGHORBANI
     SAMUEL LEVANDER
     NICOLE TATZ

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Defendant Christian A. Larsen
BY:  MARTIN FLUMENBAUM
     MICHAEL GERTZMAN
     JUSTIN D. WARD
     KRISTINA A. BUNTING

L7F5secC

1     (Case called; The Court and all parties appearing

2   telephonically)

3     THE DEPUTY CLERK:  Starting with plaintiff Securities

4   and Exchange Commission, could you please state your

5   appearances for the record?

6     MS. STEWART:  Good afternoon, your Honor.  This is

7   Ladan Stewart for the SEC.  On the line today from the SEC are

8   Jorge Tenreiro, Mark Sylvester, Ben Hanauer, Daphna Waxman, and

9   John Daniels.

10     THE COURT:  Thank you.  Good afternoon.

11     Who do we have on behalf of Ripple Labs?

12     MR. RAPAWY:  This is Gregory Rapawy for defendant

13   Ripple Labs, your Honor.  With me on the line is Reid Figel,

14   and I believe some additional appearances have been provided to

15   the court reporter.

16     THE COURT:  Thank you.  Anybody else on behalf of

17   Ripple Labs want to state their appearance if they intend to be

18   speaking?  Mr. Ceresney, my notes suggest that you might be

19   speaking.  OK.

20     And on behalf of Mr. Larsen.

21     MR. FLUMENBAUM:  On behalf of Mr. Larsen this is Marty

22   Flumenbaum from Paul, Weiss, Rifkind, Wharton & Garrison.  With

23   me on the line are Mike Gertzman, Kristina Bunting and Justin

24   Ward.

25     THE COURT:  Thank you.  Good afternoon.

L7F5secC

1          And on behalf of Mr. Garlinghouse?

2          MR. SOLOMON:  Good afternoon, your Honor.  It is

3    Matthew Solomon on behalf of Mr. Garlinghouse, and with me on

4    the line are Nicole Tatz, Sam Levander, Alexander Janghorbani

5    and Nowell Bamberger.

6          THE COURT:  Thank you.

7          Good afternoon to everyone.  I hope everybody is

8    healthy and safe.  We are continuing to conduct these

9    proceedings remotely by telephone because of the pandemic.  I

10   want to remind everybody that for those people who are calling

11   in from the public, that it is a violation of the Court's

12   orders and rules and practices to record or rebroadcast any

13   portion of today's proceeding.  I know that that has been a

14   problem in the past and we continue to investigate that, but it

15   is in fact unlawful to record and rebroadcast the proceedings.

16   So, I will direct everyone that they are not permitted to do so

17   and that if we learn that today's proceeding has in fact been

18   recorded and rebroadcasted, that we will notify United States

19   Marshal's service who will conduct an investigation.

20          We have a court reporter on the line.  I mention that

21   for a number of reasons.  First, she will be in charge of

22   creating an official record which she will create and will

23   publish.  And, for the lawyers, just a reminder that each and

24   every time you speak, if you can state your name clearly so

25   that the court reporter can attribute your statements to you.

L7F5secC

1    And, please, make every effort both to speak slowly, especially

2    if you are going to be reading anything, please, speak slowly.

3    And, also, just be sensitive to other speakers so that we don't

4    have people speaking over one another.  Those are the

5    housekeeping matters for today.

6            So, we are here on an application from the SEC, it was

7    filed on June 24th, I have that letter seeking to quash the

8    subpoena served on the former director of the Division of

9    Corporation Finance, Mr. Hinman, and I have the opposition to

10   that letter application filed on July 1st by the defendants,

11   and the SEC's reply letter filed on July 8th, all of which I

12   have read.

13           So, this is the SEC's application so why don't I turn

14   first to Ms. Stewart.

15           MS. STEWART:  Yes.  Thank you, your Honor.

16           THE COURT:  Go ahead.

17           MS. STEWART:  The exceptional circumstances doctrine

18   articulated by *Lederman* goes back 80 years.  There are very

19   important tactical and policy reasons behind this doctrine and

20   why it has held up for 80 years.  With government resources

21   already scarce and the government already having to compete

22   with private industry for qualified individuals who are willing

23   to serve the public, it is important that public officials be

24   able to do the job the public needs them to do.  But, if public

25   officials are spending their time testifying in every

L7F5secC

government enforcement action in which they had any

involvement, and doing so years after they leave public office,

there will be two important chilling effects as the cases we

cite in our papers have noted.

First, these officials will be less likely to engage

in open deliberations within their agencies if they think they

will be likely to have to testify about every such

deliberation.  And, relatedly, and just as importantly, they

will be less likely to engage with the public, whether it is

through speeches, conferences, or informal meetings with market

participants.  These types of interactions are important to the

functioning of many government agencies including the SEC.

Again, if these officials have to fear being called to testify

about every such interaction, they'll be less likely to engage

in them.

The second chilling effect, which is also important,

would be the very retention of qualified individuals to serve

in these roles.  As your Honor noted in the 911 case that we

cite in our papers, subjecting former officials'

decision-making processes to judicial scrutiny and the

possibility of continued participation in lawsuits years after

leaving public office would serve as a significant deterrent to

qualified candidates for public service.  Again, this is an

equally important consideration.  The government needs

qualified people and depositions -- like the one defendants are

L7F5secC

1    after -- deters qualified candidates from serving the public.

2           Now, defendants dismiss these points as a parade of

3    horribles but this is not some abstract thing, it is a very

4    real issue.  This is not the first time a defendant in an SEC

5    enforcement action has tried to depose an SEC division

6    director.  The defendants in *SEC V. Kik* tried to depose

7    Director Mr. Hinman himself and Judge Hellerstein quashed their

8    efforts.  The defendants in *SEC v. Navellier* tried to depose

9    the then director enforcement at the SEC and the district court

10   in Massachusetts quashed that subpoena as well.

11          The SEC is not aware of any case where a current or

12   former SEC director was forced to testify and defendants have

13   not come forward with any such case.  So, if the Court allows

14   this deposition to go forward not only would it be making new

15   law but it would be opening the floodgates to many, many more

16   such subpoenas in this case and beyond.

17          First, there is little doubt that defendants would

18   seek to depose other current and former SEC officials including

19   Former Chairman Jay Clayton whose firm is already subpoenaed

20   for documents.  In fact, of the 11 witnesses in Ripple's

21   initial disclosures, four are current or former SEC officials

22   including Director Hinman.  And, the fact that the individual

23   defendants have another 90-day discovery window means they'll

24   have a second chance to try to depose additional SEC officials

25   even if they don't do it in the current discovery period.

L7F5secC

1          Second, a decision in this case allowing Director

2     Hinman's deposition would also expose him and many other

3     current and former SEC officials to serial depositions in

4     current and future enforcement matters.  I want to pause here

5     to note something that your Honor mentioned in the 911 case

6     that I mentioned a minute ago.  In that case, when your Honor

7     was applying *Lederman* to former officials of a foreign

8     government, one of the factors the Court noted in allowing

9     those depositions to go forward was that there was "no

10     likelihood of serial abusive litigation."  That's on page 14 of

11     your opinion.  Here, by contrast, there is every likelihood of

12     serial abuse of litigation against Director Hinman and against

13     other SEC division directors and high-level officials and even

14     SEC commissioners.

15          Third, the ripple effect of this serial abuse of

16     litigation would not be limited to the SEC, it would almost

17     certainly extend to other government agencies.  There is little

18     doubt that a decision by this Court to allow this deposition

19     will be cited by dozens if not hundreds of defendants in

20     enforcement actions for years to come.  This would expose

21     countless government officials, them and their agencies, with

22     dealing depositions instead of doling the people's work.  And,

23     it would chill agency deliberations both internally and with

24     the public.  And also importantly, as I mentioned, it would

25     deter qualified individuals from joining public service.

L7F5secC

1    Again, these aren't hypothetical or abstract issues, they're

2    very, very real and their impact on the functioning of

3    government would be very real.

4         So, this particular subpoena has to be viewed in light

5    of these broader concerns.  This is not just about Bill Hinman

6    in this one litigation, this is about Bill Hinman and countless

7    other SEC officials and countless other government officials in

8    countless other litigations.  This is serial and abusive, in

9    your Honor's words.

10        When viewed from this broad lens, it is not difficult

11   to understand the significant repercussions from the subpoena

12   on the functioning of the SEC and other agencies and this is

13   why the burden on defendants here is so high to show

14   exceptional circumstances and they have not done that.

15        I will pause now, your Honor.  I am happy, your Honor,

16   to go through more detail on why we believe the burden has not

17   been met on the specific topics that they seek to depose

18   Mr. Hinman on but I wanted to pause to see if your Honor had

19   any questions before I do that.

20        THE COURT:  Thank you.  I do.

21        I would like to focus on what I think is the biggest

22   issue here which is the 2018 speech.  I do think that that is a

23   unique fact that probably doesn't present itself in every

24   enforcement action that the SEC brings, though I do think your

25   concerns about the effects of requiring Mr. Hinman to be

L7F5secC

1   deposed are legitimate but I do want to focus on this speech.

2   In part, I want to move to the next prong of the analysis and

3   talk about how the government is defining the speech and what

4   you think are the reasons why it would be inappropriate to

5   require him to sit for the deposition and I will try and be a

6   little bit more precise.

7           As I understand it, when Mr. Hinman gave that speech

8   he stated clearly at the time that these were his own personal

9   views and not the views of the SEC.  So, I am wondering if you

10  can help me reconcile what I perceive as tension between a

11  speech that he gives as a senior person within the SEC but that

12  he gives on his own behalf and expressing only his own views,

13  and a view that his being asked to answer questions about that

14  speech might somehow interfere with the deliberative process

15  privilege.

16          MS. STEWART:  Sure.  I am happy to, your Honor.

17  Again, this is Ladan Stewart for the SEC.

18          So, speaking more generally about the speech, the

19  speech is publicly available on the SEC's website.  The SEC

20  doesn't contest its authenticity.  Director Hinman notes in his

21  declaration that he gave the speech so none of this is in

22  dispute and the SEC is willing to stipulate to all of that,

23  which is to say the speech is a speech.

24          Now, going to your Honor's specific question about

25  possibly there being tension between Mr. Hinman having given

L7F5secC

1   this speech in his personal capacity expressing his personal

2   opinions and any deliberative process protection.  So,

3   respectfully, your Honor, we don't think that any such tension

4   exists.  Director Hinman, and any SEC official who makes public

5   remarks, included in the process of crafting those remarks are

6   deliberations within the agency.  Here, as we have, we have

7   already produced to defendants a privilege log showing the back

8   and forth communications about drafts of Director Hinman's

9   speech showing that the speech was reviewed by others within

10  the Commission.  At the time the speech was given the

11  Commission had not expressed any position on whether Ether was

12  a security or I should say whether offer and sales of Ether

13  were securities.  So, by definition, any discussion that

14  Director Hinman was having with others at the Commission about

15  the issues in his speech were pre-decisional and therefore

16  deliberative process would apply and cover those

17  communications.  There is also --

18          THE COURT:  Can I interrupt for one second?  Sorry to

19  interrupt you.

20          Pre-decisional suggests that there was then a decision

21  made so what is the decision for which these communications

22  would be pre-decisional?

23          MS. STEWART:  So, I think the case law on deliberative

24  process is actually pretty clear that there doesn't need to

25  have been a decision made.  A lot of times -- and I think the

L7F5secC

*Fish & Wildlife* case that we cite talks about this.  A lot of times there are deliberations with agencies that end up going nowhere so a final decision is not made but that doesn't move the deliberative process protection from the pre-decisional communication even if no final decision has been made.

I would add, your Honor, that we have an additional case that we did not cite in our letters and we found this case after we filed our letters and we apologize for not having included it but we think it goes to your precise question of whether Mr. Hinman's own opinions are covered by the deliberative process privilege and this case says that they are and the case is *SEC v. Nacchio* and the cite is 2009 Westlaw 211511, and this is a District of Colorado decision from January 29th of 2009.

Another thing I want to note here is that it is very routine and commonplace in the government for officials to give speeches, to speak at conferences, to teach CLE courses and the like, and so in this sense the speech that Director Hinman gave is not something that is unique.  It happens all the time within the SEC and within other government agencies and, as Director Hinman did, officials at the SEC and other agencies routinely qualify their remarks by making sure that the audience understands that they reflect their own views and not the view of the Agency in order to ensure that the public is clear about who really is speaking because, as we told you in

L7F5secC

```
1   prior letters and prior arguments, the SEC speaks in certain
2   ways -- it speaks through enforcement actions, it speaks
3   through no action letters, it speaks through very formal and
4   particular ways and it cannot speak through the words of its
5   staff even and even its commissioners.
6           THE COURT:  Thank you.
7           Can you remind me what you are citing the Nacchio case
8   for?  For what proposition?
9           MS. STEWART:  For the proposition that the
10  deliberative process privilege would cover Director Hinman's
11  personal opinions that he delivered in his speech.  And,
12  generally, it is a helpful case on deliberative process more
13  generally and on speeches given by SEC officials but that goes
14  directly to the question that your Honor raised.
15          THE COURT:  Thank you.  Anything further?  Or I will
16  turn to it Mr. Rapawy.
17          MS. STEWART:  I am happy, your Honor, to talk about if
18  there are any other parts of our letter that you have certain
19  questions on but I would like to just really point out that
20  when it comes to the information that defendants want to get
21  from Mr. Hinman about sort of the deliberations around the
22  speech, there really are major issues with this kind of
23  exercise under Lederman and the case that we cite in our
24  papers, the SEC v. The Commission on Ways and Means case is
25  really on point there and it points out that Morgan and its
```

L7F5secC

1    progeny make clear that exceptional circumstances, that the

2    doctrine is premised on the notion that high-ranking officials

3    should not be required to testify regarding their official

4    decision making processes and that's exactly what defendants

5    are trying to get from Director Hinman here, they're trying to

6    get him to testify about the decision-making process of the SEC

7    about the speech or about anything else that has to do with

8    BitCoin, Ether, and that is just not exceptional circumstances

9    under *Lederman* and it is precisely what *Lederman* and *Morgan*

10   were trying to avoid.  And related to that is that questions

11   about this type of decision-making process are subject to the

12   deliberative process privilege, as I mentioned a moment ago.

13   At the time that Director Hinman gave his speech, the SEC had

14   not made a final determination about the regulatory status of

15   Ether so, as I mentioned, any such conversation would be

16   pre-decisional under the Supreme Court precedent *Fish &*

17   *Wildlife* and earlier cases.

18           So, you know, what really defendants are trying to do

19   here is to question Mr. Hinman about protected, privileged

20   information and defendants say, well, the SEC can object to

21   protective privilege and then we can get a record and we can

22   come back before the Court, but the point here is that deposing

23   a senior government official about the agency's deliberate

24   process is not an exceptional circumstance that justifies that

25   deposition.  We are not here asking the Court to rule on the

L7F5secC

1    privilege issues but, practically speaking, defendants wouldn't

2    get information from Director Hinman that they can't get and

3    have not already gotten from the SEC as I mentioned threw our

4    priv log logs that we have already provided to them and they're

5    not going to be able to get information beyond that in a

6    deposition, information beyond who Director Hinman spoke to and

7    the date of that conversation because the SEC will object to

8    any attempt to get into the substance of those discussions.

9         So, this is sort of a practical point but it also goes

10   to the larger question of it cannot be an exceptional

11   circumstance to depose a government official to test the

12   contour of the agency's privilege especially when there are

13   many other avenues open to defendants to do so.

14        So, with that I will stop, but I'm happy to answer

15   questions and any other points in our letters that your Honor

16   has.

17        THE COURT:  I do have a question.  Do you believe the

18   deliberative process privilege would be invoked or at play if

19   Mr. Hinman was deposed and asked questions like:  *Why do you*

20   *think Ether doesn't fall into the definition of investment*

21   *contract?  Why do you think this?*  Do you think that would

22   invoke the deliberative process privilege and, if so, why?

23        MS. STEWART:  This is Ladan Stewart again.

24        Yes.  Absolutely, your Honor.  We think that those

25   types of questions would invoke the SEC's deliberative process.

L7F5secC

1    It is difficult to imagine that Director Hinman would be able

2    to answer those types of questions without invoking information

3    that he learned from other SEC personnel in a kind of

4    pre-decisional and deliberative setting.  There were

5    conversations, all types of communications among the SEC staff,

6    SEC divisions about not just Ether but other digital assets.

7    And so, while his final opinion on that as he reflected in his

8    speech in 2018 may be public, again, the speech is what it is.

9    His opinion is what it is, it is already reflected in his

10   speech.  But, a defendant would not be able to get anything

11   beyond that from him on his opinion or his discussions with

12   other SEC officials about their opinions under the deliberative

13   process privilege.

14          THE COURT:  Thank you.  Let me turn to defendant.

15          MR. RAPAWY:  Thank you, your Honor.  Gregory Rapawy

16   for Ripple.

17          The SEC has failed to establish that it is entitled to

18   the extraordinary relief of quashing a deposition subpoena

19   directed to its former employee.  And we do not believe we have

20   any burden to show a special need for this deposition because

21   this witness, Mr. William Hinman, was never at the apex of any

22   governmental unit and, as of today, he has no governmental

23   responsibilities at all.  But if we did have to make that

24   showing he does have firsthand knowledge of industry

25   perceptions of digital assets and of their regulatory status

L7F5secC

because he knows firsthand about the communication that he had

with industry participants about whether digital assets were

securities, and he also knows firsthand about communications in

which we believe those industry participants expressed

confusion as of 2018 about how the federal securities laws

would or should apply to digital assets.  And he has that

personal knowledge because he spoke with people outside the

agency both before and after he gave the speech -- to which

your Honor referred, frequently referred to as the Hinman

speech -- in June 2018 about how the federal securities laws

apply to digital assets.  And we think that the circumstances,

the significance, and the impact of that speech are all

directly relevant to the SEC's claims and to our defenses.  We

need to depose Mr. Hinman to develop the facts about

perceptions in the marketplace that he was trying to respond to

with his attempt to revise guidance in that speech.  Whether he

was successful in clarifying matters or not, that was clearly

his intent.

          In general --

          THE COURT:  Why do you say that was clearly his

intent?

          MR. RAPAWY:  I think because that is a reasonable

inference from the speech itself and also from the fact that

the SEC later held it out to Congress -- the chairman said to

Congress and said that the Agency has been transparent on its

L7F5secC

1    application of the *Howey* criteria, the digital assets –– I am

2    paraphrasing but the exact quote is in our letter.  And I also

3    think that when the Agency's Office of Investor Education

4    points investors to the speech that is also a showing of the

5    intent that the speech was to provide guidance, not to present

6    his personal views in some kind of abstract academic context,

7    not to just have fun talking about an interesting issue.  It is

8    an interesting issue but that's not why he was giving a speech.

9    He was giving a speech because the industry was asking for

10   guidance and he was providing it with, admittedly, a disclaimer

11   that the SEC wasn't going to be bound by that guidance.  But

12   the existence of that ––

13            THE COURT:  If your view is that the speech reflects

14   Agency guidance –– I think is what you just said –– then why

15   wouldn't the discussions that led up to that speech be covered

16   under the deliberative process privilege?

17            MR. RAPAWY:  Well, I have two answers to that, your

18   Honor.  The first thing is we want to take this in steps in

19   part to determine whether this speech was adopted or approved

20   by the SEC.  Now, they have denied that.  It is a contested

21   issue, a contested factual issue in this case whether this

22   speech was ever adopted or approved by the SEC and we would

23   like to establish that one way or the other.  If it was, then

24   that really heightens the impact of that speech for Ripple's

25   fair notice event and for the individual's state of mind –– not

L7F5secC

1    defenses exactly but contesting the SEC's ability to prove

2    their state of mind at trial.  On the other hand, if it was

3    only his personal views, as the SEC contends then, as your

4    Honor suggested, we can still explore facts about this speech

5    that wouldn't be covered by deliberate process and we can use

6    it as evidence to what was thought about the status of the

7    digital assets in 2018.  Either way, whichever way that

8    ultimate question comes down, there are relevant non-privileged

9    questions that we can ask.  And to the extent that there are

10   any privilege issues to be raised in this case, I think that

11   they need to be decided on the record that would be created by

12   the deposition itself.

13            Now, *Nacchio*, as Ms. Stewart pointed out, was not

14   cited in the papers but I tried to pull it up really quickly

15   and I haven't had a chance to read through it fully, but it

16   does appear that the deposition did take in *Nacchio* and they

17   raised the deliberative process question on a

18   question-by-question basis and then the Court considered those

19   questions on the record that had been made at the deposition

20   which is exactly the process that we propose should be followed

21   here.

22            And I will also -- I am jumping ahead a little bit but

23   I also think that the SEC conceded in its reply that the

24   communications with third-parties, which are a big part of what

25   we are interested in in this case, would not themselves be

L7F5secC

privileged.  That's on page 4 of their letter.  Communications
with third-parties they described as a non-privileged area of
inquiry.  So, that at least we can ask him; we think it is
relevant, highly material, and something of which he has
personal knowledge.

I would like to touch on the legal questions relating
to whether he qualifies as high-ranking or official in the
first place.  I know your Honor is familiar with the law in
this area, but as we see the case, there is no dispute that
Mr. Hinman was never at the apex of the SEC.  He headed a
division within the SEC, one of six divisions in the SEC, and
he was less senior than the chairman, less senior than the four
other commissioners and a peer of, depending on how you count,
a dozen or two dozen other people.  And there are no that many
officials at the apex of a governmental unit.  And with respect
to Mr. Hinman specifically, the Division of Corporate Finance
undoubtedly does important work, he had about 400 people
reporting to him, the SEC as a whole had about 4,200 employees.
A person who supervises one tenth of the agency's work force is
not at the agency's apex and we submit that's the test.

We don't agree that the analysis should proceed at the
level of a subdepartment or a subdivision of an agency.  That
is not how the Court applied the test in the *Ways & Means* case
which is cited in the papers where the individual was the
director of a staff or subcommittee but not high-ranking

L7F5secC

1    official in the context of Congress which was the relevant

2    governmental unit.

3         It is also not how the Court applied the test in the

4    terrorist attack case where the Court asked whether the

5    individuals were high-ranking -- ambassadors count as

6    high-ranking and ministers count as high-ranking but the

7    cultural attache for Saudi Arabia to the United States who runs

8    a subdivision of the embassy of Saudi Arabia to the United

9    States -- the Saudi Arabian Cultural Mission -- was not high

10   ranking.

11        So, we think that those cases are the best reasoned

12   authority on this subject and they support our view that you

13   look at the status within the agency as a whole rather than the

14   status within a sub.

15        I also want to emphasize the point that Mr. Hinman is

16   also a former rather than a current SEC official and that is

17   not dispositive.  Former officials get some protection but it

18   is significant, and to the extent that the Court is doing any

19   kind of balancing or weighing of interest, we think it is very

20   important.  You will not be distracted from any current duties

21   he is performing on behalf of the public.  He has no current

22   duties on behalf of the public.  The only policy -- and, by the

23   way, he has not moved to quash his subpoena in his personal

24   capacity so undue burden on him as individual witness is also

25   not before the Court.  The only burden that is really

L7F5secC

cognizable in this context is the attenuated concern that if
this sort of thing became routine it would be a problem getting
qualified people to serve.  And that's certainly a factor that
Courts have considered but we do think this is an unusual and
exceptional case and we don't think it is run of the mill and
we don't think that a decision requiring him to testify would
cause anyone who was thinking about whether to take the job of
SEC division director would think, *Gosh, if I do this and I
give a really important speech, someone might want to ask me
questions about it years later*.  I don't think that's a
plausible scenario in which the government has legitimate
interests that are at stake.

          Going to the question of firsthand knowledge, because
although I think that, as your Honor sort of suggested that the
Hinman speech was the crux of the personal knowledge in this
case but it is not the only thing we want to ask about, it is
not the only thing that we have a basis to believe that
Mr. Hinman has personal, relevant, unique firsthand knowledge
of.  We think that there are a number of situations leading up
to but really for the entire year surrounding that June 2018
speech, I would put it from about March 2018 to March 2019, he
had a number of communications with individuals in the
marketplace where people are coming and we believe -- we don't
know what happened because we haven't asked the questions
yet -- we believe that they were either asking for guidance or

1    presenting their views to people in the marketplace as to

2    inform players in the industry as to the status of these

3    digital assets and those are relevant for multiple, several

4    reasons.  One is that if people are coming in and expressing

5    widespread view in the industry that when you buy digital

6    assets, a piece of code itself is not a contract or an

7    investment contract, that that's relevant to how Ripple's XRP

8    was held out in the marketplace which goes to the question of

9    whether it was an investment contract under *Howey* or under the

10   Securities Act generally.

11           Second, if those individuals were coming in and

12   expressing confusion about whether and when digital assets

13   could be regulated as securities, people said that and he

14   remembers it, or he can tell us who the people were who came in

15   and said to him that they were confused about these issues,

16   then would be relevant both Ripple's fair notice defense and

17   would also be relevant to the individual states of mind.  Now,

18   we have cited some examples of communications we wanted to ask

19   about in the letter and those are under seal because they

20   involve documents that the SEC designated as confidential.

21           I know I am talking a little fast here.  I want to

22   pause and ask if your Honor has any questions.

23           THE COURT:  No, I'm following you.

24           MR. RAPAWY:  OK.

25           So, but we did reach out to the SEC, we are going to

L7F5secC

1   try to narrow those redactions and get something with more

2   disclosure on the docket in the near future.  They said that

3   did they did not object to the disclosure of the individuals

4   and entities that communicated with Mr. Hinman or the general

5   subject matter of those conversations.  So, on that basis, I

6   want to point out the fact that leading up to that June 2018

7   speech he met personally with the founder of the Ethereum

8   Foundation, and also with representatives of ConsenSys, a

9   leading software development company for Ether.  And so those,

10  and we believe other conversations -- we don't know all of the

11  conversations because we have not been able, through discovery,

12  to get a complete list -- are among the matters that we think

13  we would like to ask him about and that he has personal

14  knowledge of.  He was a focal point for these conversations in

15  the industry in a way that no other individual was and I would

16  like to sort of, on that point, to address the question

17  couldn't we get it from the third-parties?  Because I know that

18  is a point that the SEC raised in its letter that is something

19  that might be on your Honor's mind.  And the answer is for some

20  of them we can and we are trying, but we don't know who all the

21  third-parties were.  We believe he had more conversations with

22  more people than we have been able to determine and he is the

23  one person who can tell us which of those conversations

24  happened, which of those conversations were substantive, and

25  even to the extent that his own recollections of those

L7F5secC

1   conversations were not relevant evidence -- and we believe they

2   are -- we can then go on to seek further discovery from those

3   third-parties and focus our efforts on the places where we can

4   actually find this evidence that we need for our case.

5        THE COURT:  On that, Mr. Rapawy, on that point, if you

6   were coming to me and saying we need to depose this person

7   because we need to know who he spoke to in these meetings, I

8   would say to you there are definitely easier and less intrusive

9   ways to get that information, presumably Mr. Hinman had a chief

10  of staff or a deputy who participated in those meetings.  I

11  suspect knowing nothing about Mr. Hinman's practices but

12  knowing something about how high-level government officials

13  act, that he wasn't meeting with these people on his own; or

14  you could get his calendar which, as a government official is

15  almost certainly preserved, know who he is meeting with.

16       So, on that cause I don't know why that would be a

17  basis in and of itself why that sort of information would

18  justify a deposition.

19       MR. RAPAWY:  Well, I don't know, your Honor, whether

20  there was any one particular person who was with him in all of

21  these conversations.  We have just very recently, in fact last

22  night, gotten a privilege log from the SEC that describes some

23  communications that may have been relevant to these discussions

24  that he had.  So, I am not sure that it would be as easy to do

25  as your Honor is suggesting but I take your point but there is

L7F5secC

some of that that we can do through other means.  I do think it
is, insofar as you are weighing the equities as to this
deposition as a whole, that the ability to ask him who he had
these conversations with, conversations that he invited people
to come in and have with him personally, he probably is the
single best source of information for that and so I think it's
at least a legitimate thing that we plan to get out of this
deposition in addition to discussing specifically the speech
with him.

          I also think he is uniquely situated to help us
develop the facts that will go to -- and I alluded to this
point earlier -- whether the speech is, itself, ever was
adopted or approved by the SEC which I think will significantly
affect its admissibility at trial or on summary judgment and
the probative weight that a fact finder would accord to it.  I
do think that we have accomplished some facts to support that
so far, the fact that the chairman said it to Congress, the
fact that the Office of Investor Education put it out there.
But, that said, I think that this is going to be hotly
contested and we need everything we can get and he is going to
be a significant, firsthand, unique source of knowledge about
the circumstances surrounding that speech and whether it was
intended to be taken as the views of the Agency and because of
his involvement in considerations after the speech whether it
was received that way.  Because I think it would be relevant to

L7F5secC

1    the fair notice defense and to the individual states of mind if

2    it was taken as guidance, if people told him they were

3    understanding it as guidance even if he maintained, as a formal

4    matter, that it was not the views of the agency.

5          Actually, I would like to make one further point on

6    the question of what happens if the speech itself was the

7    agency action or the agency decision, which is if the speech

8    itself were the agency decision, it would still, communications

9    after the speech would then be post-decisional and we can get

10   discovery of post-decisional discussions under the deliberative

11   process privilege doctrine as discussed I believe in the *Sears*

12   *Roebuck* case that is cited in the *Fish & Wildlife* case.  So,

13   even if you were to assume for assume that is for purposes of

14   analysis that it were a decision we could still have the

15   conversations afterwards where people told him how the industry

16   reacted to it.

17         I feel like I have covered most of the topics that I

18   planned to address.  I did want to say with regard to the *Fish*

19   *& Wildlife* decision, in particular, that I think that case can

20   be fairly read to say that the agency never has to reach a

21   final decision.  In that case there was a draft biological

22   opinion, it never got to be a final biological opinion.  I

23   guess the agency decided not to issue a final biological

24   opinion and the decisions leading up to the draft were still

25   privileged but I don't think it permits what counsel for the

L7F5secC

1   SEC, with respect, is trying to do here which is to say

2   decisions are pre-decisional, if there is any possibility that

3   the agency could someday make a decision, which they claim they

4   hadn't as of 2020, therefore everything gets cloaked going back

5   years because of the possibility that maybe someday they would

6   say something about Ether that they admit is actually agency

7   statement.

8           I do expect we will contest the applicability of the

9   deliberative process privilege.  I think that should be done on

10  a full record after the deposition, as it was done in *Nacchio*.

11  And, I also think that one thing one thing your Honor has not

12  seen in their letters is any communication that the assertion

13  of the deliberative process privilege has been authorized at

14  the appropriate agency level, it has to be done by someone

15  quite senior, and I would refer your Honor to the citations in

16  our April 20th letter which is ECF No. 142 at page 4 on that

17  point.

18          Finally, your Honor, I would like to spend a moment on

19  the sort of general policy concerns that Ms. Stewart started

20  with at the outset of her argument and the sort of uniqueness

21  of this case.

22          This is not an ordinary case.  This is a case where

23  the SEC is asserting, in litigation for the first time, that a

24  previously unregulated digital asset, that was in widespread

25  commercial use for the last eight years, is and always was a

L7F5secC

regulated security.  And on that theory you destroy the value

of promising technology imposed with retrospective penalties on

my clients, on the individual defendants, and to cause massive

losses to the XRP holders whose interests it is ostensibly

seeking to protect.  It is a very unusual set of facts and it

is one that puts market perception and industry confusion about

XRP and other digital assets for the SEC's claims and the core

of our defenses in a unique way.  And in unique cases, in

highly unusual cases you do get, sometimes have depositions of

the senior agency decision makers and people who inserted

themselves into the process through which these unusual agency

actions happened.  And I am referring indirectly to the case

involving the Secretary of Commerce and the decision by Judge

Furman that I know your Honor is familiar with.  And we have a

very legitimate basis to ask Mr. Hinman, specifically and

personally, about what he learned by acting as the focal point

of communications about industry perceptions and market

confusion as to whether digital assets were securities.  He was

responsible for speaking directly to the industry, to providing

public guidance whether it was phrased as his own views or

whether it was later adopted by the agency, and for attempting

to clarify the SEC's position on an extremely confusing issue

of law, issues of law and issues of facts.  We think that the

guidance that he gave in that speech that was either intended

or understood, or both, protects our case in a number of ways.

L7F5secC

1    Under those circumstances it is reasonable and proportionate

2    for us to seek his deposition and we respectfully submit that

3    it would prejudice our defense if we are completely denied the

4    opportunity to do so as the SEC is attempting to do.

5             On that basis, I would ask that the motion be denied.

6             THE COURT:  Thank you.

7             Do any of the counsel for the individual defendants

8    wish to be heard?

9             MR. FLUMENBAUM:  Your Honor, this is Mr. Flumenbaum

10   for Mr. Larsen.

11            I agree with what Mr. Rapawy has stated.  I want to

12   point out the obvious inconsistency, the SEC's argument before

13   you where they started out by saying that the speech reflects

14   his own personal views.  And the SEC's position is that it

15   still hasn't determined whether Either and BitCoin are

16   securities or currencies.  Under those circumstances,

17   deposition is a must.  We must be able to ask him about what he

18   stated, his other public remarks, and we will have to deal with

19   the SEC's improper use of deliberative process to try to shield

20   that but that should be done on a full record after his

21   deposition.  They are clearly taking an improper position with

22   respect to deliberative process.  They won't be able to make

23   out the basis for asserting that privilege.

24            THE COURT:  Thank you.

25            Ms. Stewart, can I ask one practical question?  My

L7F5secC

1   understanding is the deposition is noticed for Monday.  If I am

2   to authorize the deposition, is it still going forward on

3   Monday?

4                MR. FLUMENBAUM:  Yes.

5                MS. STEWART:  Your Honor, we would need time to

6   evaluate sort of our next steps in the event that your Honor

7   chooses to allow the deposition to go forward but, yes, the

8   parties had agreed on Monday as the sort of place holder date

9   for the deposition.

10               THE COURT:  OK.  Thank you.

11               MR. FLUMENBAUM:  The defendants are prepared to take

12  his deposition on Monday.  We have already adjourned it -- the

13  original date -- in June.

14               THE COURT:  Is that Mr. Flumenbaum speaking?

15               MR. FLUMENBAUM:  Yes.  I'm sorry.

16               And so, we had originally adjourned it after the SEC

17  indicated that it was going to make the motion before your

18  Honor but we do have a cutoff at the end of the month and it is

19  very important to get this deposition in as promptly as

20  possible.

21               MS. STEWART:  Your Honor, can I make a couple of

22  additional points?  This is Ladan Stewart.

23               THE COURT:  Yes.

24               MS. STEWART:  If that's OK?

25               THE COURT:  Please.

L7F5secC

1        MS. STEWART:  I just wanted to respond to a couple of

2   the responses that Mr. Rapawy makes.

3            First off, it has become clear both from his comments

4   and Mr. Flumenbaum's comments that what defendants are really

5   after here are to depose Mr. Hinman twice.  They want to depose

6   him, they want us to sit for hours and go through questioning

7   on the record and object to basically every question they ask

8   about the speech, about his personal opinions about Ether,

9   about his communications with agency officials and all of that.

10  Then they want to bring that record to your Honor and then, if

11  they succeed, they want to depose him again.  And I submit to

12  your Honor that that sort of litigation strategy is not an

13  exceptional circumstance under *Lederman* and that the more

14  appropriate avenue here would be to litigate these privilege

15  issues, as defendants have already told your Honor they intend

16  to do, which they can do on the basis of the privilege log that

17  we have already provided and are continuing to provide this

18  week and next week, and then we can litigate that issue before

19  your Honor and if your Honor decides that there are not

20  appropriate assertions of privilege, then Director Hinman could

21  sit for a deposition.  But to do that now, with this issue

22  outstanding, with the motion to strike outstanding which is

23  really the core of their wanting to depose Mr. Hinman is this

24  fair notice defense which your Honor has already ruled is

25  objective.  So, it is hard to understand what a market

L7F5secC

1    participants thought about Ether or BitCoin could be relevant

2    to Ripple's fair notice defense.  But, putting that relevance

3    issue aside, with all of these outstanding issues, it is just

4    difficult to understand why we need to expose Director Hinman

5    to this deposition right now.  The discovery window does not

6    end until the end of August, there is an additional 90-day

7    discovery window for the individual defendants' case.  There is

8    just simply no reason that this decision needs to be made right

9    now on this record.

10           The other point that I wanted to make was, just so we

11   are clear --

12           THE COURT:  Can I just interrupt you?  Sorry,

13   Ms. Stewart, just to interrupt for one moment?

14           You raised the *Nacchio* case, which is a 12-year-old

15   case, 11-year-old case, and we scrambled to find it.  It looks

16   like, based on Mr. Rapawy's quick read, based on my quick read,

17   based on my law clerk's quick read in the middle of a court

18   conference that in that case, which you thought was persuasive,

19   that deposition happened and then there was judicial ruling on

20   the privilege assertion.  So, are you suggesting that *Nacchio*

21   is not a kind of precedent that you want me to look to as

22   guidance for how to handle this dispute?

23           MS. STEWART:  No, your Honor.  *Nacchio* involved a more

24   junior SEC official so *Lederman* was not an issue as far as I

25   understand in that case.  It was not the kind of case where

L7F5secC

there was dispute about whether it was appropriate under *Morgan*

and *Lederman* to depose that individual so that case is really

about deliberative process privilege and not about the larger

issue of whether a high-level official of the SEC should be

deposed and that was the proposition for which we were using it

today.

THE COURT:  Continue.

MS. STEWART:  Thank you.  This is Ladan Stewart again.

I just wanted to make a couple of other quick points

about the third-party communications that Mr. Rapawy spent a

lot of time talking about.  You know, as your Honor pointed

out, there are other ways to get this information and, in fact,

defendants already have this information.  We have produced

documents, we have produced calendar entries, we will continue

to produce any relevant documents.  We have provided

interrogatory responses with this information.  There just is

no basis for defendant to say that we think there are

conversation that we don't know about because they have the

documents.  And, as I mentioned, it is also the case that these

communications that they're having that -- I'm sorry -- that

these types of third-party communications can't go to the

objective test that your Honor has already talked about for the

fair notice defense.

And one thing that I just wanted to point out that I

thought was interesting as I was going back through the

L7F5secC

1    transcript of our April 6 conference was your Honor asked a

2    question in that conference about if the SEC has made this

3    public announcement through this speech by Director Hinman

4    about Ether, then why is it that conversations that Director

5    Hinman or anyone at the SEC may be having with third-party

6    folks after that is even relevant.

7          Your Honor said:  *So, my question to you is after the*

8    *public announcement in whatever fashion and in whatever opaque*

9    *way was made, after that announcement, why would it matter what*

10   *they were saying about those assets if the market now had that*

11   *information and would act accordingly?*  This is on page 30 of

12   the transcript.  And Mr. Kellogg responded that the reason that

13   this was relevant was because there may have been conversations

14   about XRP and that's why this mattered even after the Ether

15   speech.  Now, here, Director Hinman has already said in his

16   declaration that he had no conversations with market

17   participants about XRP.  So, it sort of goes to show that there

18   really is nothing here.  There is nothing here that is relevant

19   and in light of that it just cannot be that under the

20   circumstances, in light of the chilling effects and all of the

21   issues that we have talked about, that this can possibly rise

22   to the exceptional circumstances that's required under *Morgan*

23   and *Lederman*.

24          I am happy to answer any more questions but there is

25   nothing else at this time.

L7F5secC

1        MR. FLUMENBAUM:  Your Honor, this Mr. Flumenbaum.

2        I would just like to make one comment.  We don't

3   intend on asking questions in which the deliberative process

4   privilege should properly be applied.  There are hours of

5   depositions from Mr. Hinman based on specific public statements

6   that he made and specific meetings that he made.  As Mr. Rapawy

7   said, he met with the principles of Ether one week before his

8   speech.  That is not deliberative process what was said during

9   those meetings.  And he should answer that question.  *What was*

10  *he told about Ether?  What was he told about centralization?*

11  Those are proper questions that could be asked of him and what

12  the SEC is trying do is prevent any discussion of any of the

13  background, any of his understanding at the time that he made

14  his statements and the meaning of those statements.  And that's

15  just inappropriate.  There is plenty to depose him on, I am

16  sure they'll invoke the deliberative process where they think

17  it is appropriate and I hope they do it only where it is

18  appropriate but, if they don't, we will come back and challenge

19  that but there is no basis to prevent his deposition on that

20  basis at all.

21       MS. STEWART:  Your Honor, this Ladan Stewart.  If I

22  may for just one moment?  I'm sorry.  One moment.  I apologize,

23  your Honor, this is Ladan Stewart again.

24       What Mr. Flumenbaum says goes directly to the point I

25  was trying to make earlier which is that the conversations that

L7F5secC

1    Director Hinman is having with third-parties, they already know

2    who the third-parties are and they can ask those third-parties.

3    There is no reason to depose Director Hinman to ask those

4    questions.  And, again, I want to emphasize, anything to do

5    with the speech in terms of the intent of the speech, the

6    reasons Director Hinman gave the speech, discussions he had

7    about the speech, those, we contend, are all covered by the

8    deliberative process privilege.  So, if this deposition does go

9    forward, we will instruct Director Hinman not to answer those

10   questions.  So, I don't think that Mr. Flumenbaum is going to

11   get the information that he now says he is going to get about

12   the speech.  Again, the speech is the speech.  Anything beyond

13   that is privileged.

14            Thank you, your Honor.

15            MR. RAPAWY:  Your Honor, this is Gregory Rapawy.  May

16   I very briefly?  I know there has been a lot of colloquy.  We

17   do object --

18            THE COURT:  Briefly.

19            MR. RAPAWY:  Briefly.

20            We do object to pushing the speech out in time.  There

21   is an August 31st deadline.

22            THE COURT:  You mean the deposition?

23            MR. RAPAWY:  Yes.  Excuse me.  I do mean the

24   deposition.  Too much talking about the speech.

25            We want to be able to do follow-up after the

L7F5secC

1   deposition and we really also feel that our client would be

2   prejudiced if discovery was extended again; it has already been

3   extended once over our deposition.  I do think it should be

4   possible to avoid two depositions here if the privilege

5   objections are limited to reasonable scope.  We certainly don't

6   intend to provoke two depositions.  We may get two if there are

7   blanket objections but we hope to avoid that.

8           That's all I have.

9           THE COURT:  OK.

10          MR. SOLOMON:  Your Honor, I'm sorry.  It is Matthew

11   Solomon for Mr. Garlinghouse.  I had one point that I would

12   like to make, if I may, and I will be very brief.

13          THE COURT:  Go ahead.

14          MR. SOLOMON:  I wasn't going to make this point the

15   first time Ms. Stewart said it but she has now said it twice to

16   you, that the individual defendants have an additional 120-day

17   discovery period.  After the motions to dismiss are decided we

18   don't think we will need it because we think they will be

19   granted but that is neither here nor there are in terms of

20   instant discovery period.  In fact, the SEC only agreed to that

21   additional discovery period if we could not rely on it to avoid

22   discovery on issues that are relevant now.  That's why my

23   client and Mr. Larsen will be sitting for depositions during

24   this discovery period.

25          So, the notion that we are somehow pulling a fast one

L7F5secC

1   and trying to push discovery now when we have the second bite

2   at the apple is based on a false premise.  The entire reason we

3   got that discovery was only because the SEC said we couldn't

4   delay anything, nor should they now be able to delay taking a

5   deposition that is clearly relevant -- I think we established

6   today -- of former Director Hinman to avoid discovery on these

7   issues.

8           Thank you, your Honor.

9           THE COURT:  Thank you.

10          Thank you, all, for your excellent argument, as

11  always.  I think the issues remain complicated.  I am going to

12  rule in part.  For the purposes of this dispute I am prepared

13  to find that Mr. Hinman was a high-ranking official.  He held

14  the head of one of the SEC's significant -- one of six

15  divisions and commanded significant authority and held

16  substantial responsibility within a very important federal

17  agency.  So, on the facts here I do believe that he is entitled

18  to the standard that is set forth in the *Lederman* case, 731

19  F.3d 199.  I recognize that he is a former official and under

20  the *Moriah* case that is certainly a factor that I considered in

21  thinking about how to rule here.

22          This is not a run-of-the-mill SEC enforcement case.

23  As Mr. Rapawy noted when he was speaking on this particular

24  issue, this case is I think separate and part from the standard

25  cases that the SEC brings and I do not believe that authorizing

L7F5secC

1   Mr. Hinman's deposition is going to open the floodgates and

2   serve as a basis for any defendant in an SEC enforcement action

3   to seek the depositions of heads of divisions.  And I expressly

4   find that this case is unique, that the nature of the case

5   involves significant policy decisions in our markets and that

6   the amount in controversy also is substantial and that the

7   public's interest in resolution of this case is also quite

8   significant.  So, I think that this case is not a basis for

9   future cases and future judges to find that a deposition is

10  appropriate in all instances but I do think in this case

11  Mr. Hinman, given the speech, must sit for a deposition.  So, I

12  am going to authorize his deposition.

13          There is a separate question about this issue of

14  privilege and I am very much not disposed to allowing or

15  requiring, I should say, Mr. Hinman to sit twice.  And given

16  the issues that have been raised today, I think there are a

17  couple of ways we can go forward.  Defendants are keen to take

18  this deposition on Monday -- which is why we are holding this

19  conference today -- and have suggested that they believe that

20  there is significant territory to cover where they do not

21  believing the privilege will be invoked.  Ms. Stewart seems to

22  think otherwise and has suggested, not impermissibly, but has

23  suggested she is going to direct Mr. Hinman not to answer wide

24  swaths of questioning and assert the deliberative process

25  privilege.  It seems to me there are a couple of ways we can

L7F5secC

1    proceed here:

2            First, we can go forward with the deposition on Monday

3    and a record can be created and the parties can come back to me

4    if they would like.  Everybody is on notice that I am very much

5    disinclined right now, given what we are talking about, to

6    require Mr. Hinman to sit twice.

7            The second way we can proceed is to have the parties

8    try and work out some sort of agreement between them about the

9    scope of the deposition and if they can't reach agreement, to

10   come back to me on specific questions -- I don't want specific

11   deposition questions but specific areas of questioning and get

12   a ruling from me on what areas would be protected and what

13   areas would not.  I am sensitive to the defendant's interest in

14   moving the case forward, I know that the SEC shared that

15   interest as well.  It seems to me that putting the deposition

16   off for a week and thinking a little bit more about how the

17   privilege might apply probably is a good idea and I guess I say

18   that with the hopes that the parties can have a conversation

19   maybe tomorrow and let me know how they would like to proceed.

20   But, I think that that makes the most sense.

21           Ms. Stewart, any questions about my ruling?

22           MS. STEWART:  This is Ladan Stewart from the SEC.

23           That makes good sense to us and we will certainly meet

24   and confer and get back to the Court.

25           THE COURT:  Mr. Rapawy?

L7F5secC

1      MR. RAPAWY:  Yes, your Honor.  Given the primaries

2   have you outlined, I agree.  I would like to consult with my

3   client certainly and it would be appropriate and convenient to

4   get back to the court.

5      THE COURT:  OK.  Terrific.  Here is what I am going to

6   do.  I am going to ask, given that this deposition may go

7   forward on Monday, that the parties meet and confer this

8   evening, tomorrow morning, and send me a letter by tomorrow

9   afternoon to let me know what the plan is.  You may choose to

10   go forward with the deposition on Monday or you may choose to

11   adjourn the deposition, I think for a brief period, and either

12   try to reach a resolution among the parties about what

13   questions would be permissible and what would be off limits, or

14   to bring that issue to me so that I can give some rulings with

15   parameters so that the parties know where I believe the

16   privilege would be appropriately invoked.

17      So, I will just wait to hear back from the parties

18   tomorrow.

19      MS. STEWART:  Thank you, your Honor.

20      THE COURT:  Thank you.  Anything further, Ms. Stewart?

21      MS. STEWART:  Not from me.  Thank you.

22      THE COURT:  Mr. Rapawy, is there anything further?

23      MR. RAPAWY:  No, your Honor.  Thank you, your Honor.

24      THE COURT:  Yes.  Who was that?

25      MS. ZORNBERG:  Your Honor, this is Lisa Zornberg from

L7F5secC

1    Debevoise & Plimpton.  I didn't expect to be a speaker.

2            If you would permit, given what was just discussed

3    about the meet and confer, I feel compelled, on behalf of

4    Ripple, to bring to the Court's attention that after two trips

5    to the Court already and two rulings by the Court to get

6    internal memoranda of the SEC, we have learned very recently --

7    and we have been meeting and conferring with the SEC on this

8    already and have reached a dead end on it -- the SEC informed

9    us last week -- the SEC has not produced a single internal

10   memoranda to defendants claiming that all of the responsive

11   documents that were ordered under the Court's orders are being

12   withheld for deliberative process privilege.  I flag that for

13   your Honor because we have been attempting, in the utmost good

14   faith, to pierce the overbreadth of the deliberative process

15   argument that the SEC has been advancing including counter  to

16   well-established law that even if you withhold opinions for

17   deliberative process you can't withhold fact.  The SEC

18   confirmed again, at noon today, they are withholding every part

19   of every responsive internal memoranda on deliberative process.

20   They have produced not one and they don't plan to.

21           I raise this to the Court because, as part of that

22   ongoing meet and confer, we think the SEC's position is

23   untenable, it's way overbroad.  We are preparing to take that

24   very issue on deliberative process to your Honor because it is

25   prejudicing Ripple and the individual defendants, this cloak of

L7F5secC

1    deliberative process.  And it is quite consistent with

2    Ms. Stewart's statement on this call, oh, if you depose

3    Mr. Hinman, we are going to say everything is covered by

4    deliberative process.

5            So, I just want your Honor to be aware that there has

6    been already multiple efforts by the defendants to bring the

7    SEC to reason on this.  We will meet and confer with them again

8    to seek reason on this but the issues are of apiece which is

9    that the SEC, in a very blanket way, is throwing deliberative

10   process over everything that they don't want to share without

11   drawing any finer lines that that.  Hopefully, based on today's

12   call, they'll come around to a different view but your Honor

13   should not be surprised, if when we come back to the Court if

14   the SEC remains as steadfast in this kind of blanket claim of

15   deliberative process, then we will come back to the Court and

16   will probably go beyond just the issue of Mr. Hinman's upcoming

17   deposition.

18           MS. STEWART:  Your Honor, this is Ladan Stewart.

19           THE COURT:  Thank you.

20           MS. STEWART:  If I may?

21           I disagree with much of what Ms. Zornberg just said

22   with the exception that I agree with her that the privilege

23   issues here are beyond Director Hinman's deposition.  The

24   parties are still in the process of exchanging privilege logs

25   and have agreed to finalize that process by the end of next

L7F5secC

1    week.  And Ripple and the other defendants have already told us

2    and they have now made very clear to your Honor that intend to

3    challenge those assertions.  So, it does make sense to do this

4    all together as part of briefing before this Court.  We will of

5    course try to meet and confer ahead of time but I agree with

6    Ms. Zornberg that this issue goes beyond Director Hinman, and

7    perhaps what does make sense is for us to meet and confer and,

8    if we can't, to propose a briefing schedule to your Honor for

9    these issues to get briefed expeditiously.

10           THE COURT:  I do think it makes sense to address all

11   of this at once, I think that's most efficient thing, and I

12   think it will also give me the most information.  And so, I

13   would urge the parties to try to address both the privilege log

14   issues that Ms. Zornberg just raised, as well as the privilege

15   issues that we have been discussing with respect to Mr. Hinman,

16   and it may make sense to brief that in an expedited basis in

17   order to get a ruling from me before the deposition of

18   Mr. Hinman goes forward.  Again, I'm going to leave that to the

19   parties for meet and confer this evening and tomorrow morning

20   and we will just look for a letter tomorrow afternoon,

21   hopefully with an agreed upon plan going forward.

22           MR. FLUMENBAUM:  Your Honor, this is Mr. Martin

23   Flumenbaum.

24           The problem that I see with the procedure going

25   forward is that, as I said, we can we can ask Mr. Hinman many

L7F5secC

questions at his deposition on Monday about his communications
with third-parties, both before his speech and after his
speech.  If the SEC is going to claim that third-party
conversations with Mr. Hinman are covered by deliberative
process, then we are never going to be able to go forth on
Monday.  So, maybe some guidance from your Honor -- I don't see
how the deliberative process privilege can apply to third-party
communications that Mr. Hinman had directly.  So, my view would
be if the SEC is going to maintain that that's covered by
deliberative process privilege, then your Honor should rule on
that right now because I don't see how it can possibly be
covered by the deliberate process privilege.

THE COURT:  For the sake of the court reporter, that
was Mr. Flumenbaum.

UNIDENTIFIED SPEAKER:  Um --

THE COURT:  Hold on.  Sorry.  We are going to wrap up
this conference.

I am going to request that the parties meet and confer
on this issue.  If Mr. Flumenbaum thinks that communications
with third-parties are absolutely going to be fair game and he
wants to go forward with the deposition because he thinks that
there is no good faith privilege issue, you can put that in
your letter to me tomorrow.  And if you intend to go forward
with the deposition on Monday, I will do my very best to get
you a ruling on that particular issue.

L7F5secC

1          It seems to me that the questions you are really

2     interested in have to do with this speech and those are the

3     ones where I think the deliberative process question is much

4     more complicated.  And so it may be easy for me to answer

5     whether or not the fact that Mr. Hinman spoke with

6     third-parties is or is not protected but this deposition is not

7     about that and, in fact, if this deposition were just about

8     those third-parties, I probably wouldn't authorize it because

9     it probably would not fall within the exceptional circumstances

10    category.  What in my mind is exceptional, and why I am

11    authorizing the deposition in the first place, is because of

12    the nature and effect of the 2018 speech.  That is what makes

13    this deposition exceptional and that is why I am authorizing

14    it.  And so, it seems to me to press forward, because you are

15    eager to hear who he spoke with, you may cut off your nose to

16    spite your face.

17          MR. FLUMENBAUM:  Well, I think third-party

18    conversations would be relevant to the speech itself.  For

19    example, his meetings with the head of Ether a week before his

20    speech I think would have great relevance to his speech.  So, I

21    look at it as part of this making the speech and reaching the

22    conclusions he did.

23          THE COURT:  Understood.

24          OK.  So I will hear from the parties tomorrow

25    afternoon.

L7F5secC

1              MS. STEWART:  Thank you, your Honor.

2              THE COURT:  Thank you, everybody.

3              MR. RAPAWY:  Thank you, your Honor.

4              MR. FLUMENBAUM:  Thank you.

5                              o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
BROOKFIELD PLACE, 200 VESEY STREET, SUITE 400
NEW YORK, NY 10281-1022

NEW YORK
REGIONAL OFFICE

June 21, 2021

**VIA E-MAIL**

Lisa Zornberg, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Matthew Solomon, Esq.
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037

Martin Flumenbaum, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

Re:     *SEC v. Ripple Labs, Inc., et al.*, 20-cv-10832 (AT) (S.D.N.Y.)

Dear Counsel:

On behalf of the Securities and Exchange Commission (the "SEC"), we are producing the following documents pursuant to the Court's April 6 and May 6, 2021 orders and our agreements:  (1) requests to the SEC's Office of Investment Education and Advocacy, Bates numbered NYRO_RIPPLE_IRIS_000001 – 000249 (designated as Confidential pursuant to the Protective Order); (2) responsive, non-privileged communications of SEC personnel, bearing Bates numbers SEC-LIT-EMAILS-000338717 – 000342554 (designated as Confidential pursuant to the Protective Order) and SEC-LIT-EMAILS-000342555 – 000343362 (designated as Highly Confidential pursuant to the Protective Order); and (3) a privilege log dated June 21, 2021 (designated as Confidential pursuant to the Protective Order); as discussed, we expect to produce additional privilege logs on a rolling basis.

We have included on the June 21, 2021 privilege log (and may include on future privilege logs) email communications attaching drafts of the 2018 speech by the then-director of the Division of Corporation Finance, Bill Hinman.  We do not believe these or other drafts are "intra-agency memoranda or formal position papers" (D.E. 163) that must be produced or logged pursuant to the Court's April 6 or May 6 orders.  However, in light of your stated desire to discover facts regarding internal review of Director Hinman's speech prior to its delivery (*e.g.*, June 11, 2021 Letter from R. Figel at 4), we are providing to you on this log non-privileged information about individuals at the SEC who received drafts of the speech based on communications we have reviewed to date in conducting our search for intra-agency memoranda or formal position papers.  We reserve our right

Lisa Zornberg, Esq.
Matthew Solomon, Esq.
Martin Flumenbaum, Esq.
June 21, 2021
Page 2

to argue that these and other drafts of intra-agency memoranda or formal position papers need not be produced or logged pursuant to the Court's orders.

Sincerely,

/s Ladan F. Stewart

Ladan F. Stewart