# EXHIBIT 3

# Public Statements & Remarks

# Remarks of Commissioner Dawn D. Stump: We Can Do Hard Things

## As Prepared for Delivery at the Chamber of Digital Commerce

**January 13, 2022**

I want to thank the Chamber of Digital Commerce for inviting me to speak today.  Before beginning, I want to provide the standard disclaimer that the views I express today are my own and not necessarily those of the Commission I am proud to serve upon.

Do any of you have a theme song?  I have several that describe various milestones in my life, and as I reflect on my time at the CFTC, I'm leaning towards *I Can Do Hard Things* by Jennifer Nettles.[1]  As the song goes, "Sometimes I don't like it, but that don't mean I don't love it."  I do love my job—not in spite of, but because of, the challenging matters that we tackle (often in the face of difficult circumstances well beyond our comfort zones).

That's where I would like to start—getting out of our comfort zones and doing hard things.  This is front of mind for me in light of the incredible innovations we are seeing these days in terms of the structure, products, and services being offered in financial markets.  Many—but by no means all—of these innovations arise from developments in financial technology such as the growth of digital assets and decentralized finance (or DeFi).

As financial markets evolve and adapt to new demands, market regulators must not stifle beneficial innovations by clinging rigidly to regulatory approaches of the past that may no longer be fit for purpose.  But by the same token, infrastructure providers who offer the market access to new, innovative services must not dismiss the fact that they may be required to seek and comply with regulatory oversight in order to assure market integrity and customer protection.  It's time to thoughtfully consider the *hard things* we all must do to get comfortable with current realities.

So there, I have acknowledged the obvious, but why is this so hard?  Achieving the benefits of innovation in the context of market regulation is tougher than it sounds because we are not starting with a clean slate.  Take, for example, the U.S. derivatives markets regulated by the Commodity Futures Trading Commission.  These markets have, for some time, been characterized by futures and swaps contracts with varying degrees of execution and clearing occurring on centralized venues through intermediaries responsible for brokering and guaranteeing such transactions predominantly for institutional clients.  Recently, though, the pace of technological development and increasing retail interest in these markets is driving new business models that rely less on the traditional centralization of institutional participation via intermediaries, and rather propose to fulfil these functions in a more decentralized way.

These new market innovations are increasingly presenting novel issues that require comprehensive thinking by those of us at the CFTC who regulate the derivatives markets.  I believe that our current approach of relying primarily on enforcement actions to impose penalties on those with novel products and markets for their failure to register with the agency is simply an insufficient response.  I agree that many of the entities in question should be registered with the CFTC for oversight purposes, as we are tasked by Congress to regulate the infrastructure that permits access to swaps and futures—and many of these entities are, in fact, performing that function.  However, we must acknowledge that the infrastructure we oversee is rapidly changing—and our current regulatory regime was not designed to fit the types of services that are evolving to meet the market's demands.

So, what's a regulator to do—continue to take enforcement actions against companies that develop products and business models that are outside-the-box, all the while knowing that our existing rules governing the registration and regulation of the traditional market infrastructure are ill-suited to the very thing that has driven their development (*i.e.* an expansion in the types of participants seeking access to these products and markets, and their preference for less intermediation)?  Certainly, that is the easiest answer: "It's not our job to tell you how to meet our rules, just figure it out."  Wait, what?  How do we expect these companies to conform to a system that does not recognize their value add, the demands of their customers, or even perhaps the future of these markets?  What is the goal—to shut down these services, or to encourage those who deliver these services to do so under proper oversight?

I certainly hope it's the latter.  After all, it is innovation that provides solutions to meet new market demands.  Congress has established a principles-based regime with flexibility to permit adaptation to innovation in the derivatives markets.  And welcoming innovation in those markets historically has been at the heart of what we do at the CFTC.

I believe it is thus incumbent upon the CFTC to bridge the gap between its enforcement and oversight functions by setting more clearly defined regulatory expectations for new, innovative applications in the derivatives market infrastructure.  That is a much taller task as compared to simply enforcing rules on the books beyond their original context.  It's a tough job—but it is our job—and I am confident in our ability to do *hard things*.  We cannot be mere bystanders to the fundamental market changes taking place before our eyes, nor should we abdicate the responsibility Congress has given us to "*promote* responsible innovation and fair competition."[2]

Adaptation by market regulators, however, should not be viewed by participants as a means to escape regulation.  Quite the contrary, our adaptation to innovation is necessitated by the responsible oversight we owe the marketplace.  As these matters continue to land on the CFTC's enforcement docket, it is urgent that we provide direction to those who seek to comply with the law.  And then, armed with more clearly defined expectations, the CFTC can better identify those truly bad actors who seek evasion of the rules—and who deserve the full force of robust enforcement action.

In an attempt to start a helpful conversation, I have below identified a non-exhaustive list of areas in which our current rulebook governing infrastructure may require adapting to account for various new innovations taking shape in response to current market demands:

**Trading Platforms (Designated Contract Markets and Swap Execution Facilities)**:  In its recent enforcement action against Polymarket,[3] the CFTC found that an online trading platform offering event-based binary options failed to register as a designated contract market (DCM) or swap execution facility (SEF).  To operate its markets, Polymarket deploys smart contracts, which are hosted on a blockchain.  This was a matter of first impression for the CFTC with respect to a blockchain-based trading platform.  Yet, despite this fundamental difference from the traditional DCM/SEF infrastructure for which the CFTC's rules were written, the CFTC has not given any public consideration to how such a platform seeking to register as a DCM or SEF would be expected to operate under its existing rules.

The term "DeFi" is often used to describe some of the protocols relevant in this framework, and some argue DeFi can exist without regulatory oversight—a topic I will leave for another day.  But in a broader sense, I believe that DeFi is spurring innovative functionalities by market infrastructure providers that may improve efficiencies for those seeking the benefit of centralized liquidity (a feature of more traditional and regulated derivatives markets). The really *hard thing* that requires our attention is this: How do we achieve our regulatory objectives in a manner that still enables infrastructure providers, and their customers, to benefit from these innovations?

**Clearinghouses (Derivatives Clearing Organizations)**:  Beyond trading, difficult questions persist relative to central clearing, which is a key tenet of addressing counterparty credit risks in derivatives markets.  Our clearing rules are designed around a structure where intermediaries stand between clients and clearinghouses as guarantors, and where clients (often institutional) use leverage to increase their exposure.  But we are lately seeing many new retail-focused derivatives clearing organizations (DCOs) that do not use an intermediary model.

To date, we have accommodated this model by imposing conditions such as requiring products to be fully collateralized.  But as we begin to see requests from DCOs to offer leveraged clearing to retail market participants, we would be well-served to clearly define regulatory expectations before enforcing the application of ill-suited rules.  And we must do so in a transparent way in order to fairly encourage competition.  We are well aware that there is a need for such engagement to maintain the safety and soundness of DCOs while at the same time encouraging retail access to the clearing infrastructure.  It's a difficult task, but *we can do hard things*.

**Brokers and Counterparties (Futures Commission Merchants)**:  In its recent enforcement action against Kraken,[4] the CFTC found that an online exchange enabling customers to engage in "retail commodity transactions" in digital assets such as Bitcoin operated as an unregistered futures commission merchant (FCM) with respect to those transactions.  This finding begs the question:  If Kraken had sought to register as an FCM, how would it have been expected to operate?  The CFTC has never comprehensively addressed how retail commodity transactions are to be regulated, and many of the CFTC's rules for traditional FCMs do not fit Kraken's role as an exchange.[5]  As a result, we are now obligated, in my view, to explain the regulatory parameters such transactions and such non-traditional FCMs are expected to meet—yet, another *hard thing* the CFTC must tackle.

In conclusion, the key takeaway is that we are at a crossroads that requires everyone to roll up their sleeves and *do hard things*. Derivatives infrastructure providers must recognize that while their business models may be novel, they do not operate outside of the regulatory oversight required by U.S. law under the Commodity Exchange Act. And for its part, the CFTC must urgently consider fine-tuning its rulebook (often a hard and tedious task), because responding to technological developments and ongoing market dynamics primarily through enforcement is neither good for the marketplace nor sustainable for the agency. We all benefit from clearly defined regulatory expectations that promote compliance and strong enforcement focused on those who blatantly disregard such expectations to the detriment of your markets.

---

[1] Jennifer Nettles, "I Can Do Hard Things," I Can Do Hard Things EP (Big Machine Records, LLC 2019).

[2] Section 3(b) of the Commodity Exchange Act, 7 U.S.C. § 5(b) (emphasis added).

[3] *In re Blockratize, Inc. d/b/a Polymarket,* CFTC Docket No. 22-09 (January 3, 2022).

[4] *In re Payward Ventures, Inc. (d/b/a Kraken)*, CFTC Docket No. 21-20 (September 28, 2021).

[5] *See* Concurring Statement of Commissioner Dawn D. Stump Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken) (September 28, 2021), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b (https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b). *See also* Concurring Statement by Commissioner Dawn D. Stump Regarding Tether and Bitfinex Settlement (October 15, 2021), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521 (https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement101521).

**-CFTC-**



Office of Commissioner
Rebecca Kelly Slaughter

UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

# NTIA Listening Session on Privacy, Equity, and Civil Rights
*Keynote Address of Commissioner Rebecca Kelly Slaughter*[1]
*As Prepared for Delivery*

December 14, 2021

Good afternoon, everyone! I'm Commissioner Rebecca Kelly Slaughter from the Federal Trade Commission. It's my pleasure to be able to address you all at the start of the NTIA's listening sessions on privacy and civil rights. I'd like to thank Assistant Attorney General Kristin Clarke for her remarks; the country is so fortunate to have her leading on civil rights and economic justice issues at the Department of Justice.

Thanks as well to everyone at the NTIA that put this event together. Addressing the systemic harms of the data economy, especially those related to civil rights, is going to require coordination across agencies and sustained public participation. I'm excited to hear from the scholars and advocates speaking over the next few days. Your work is integral to advancing policymakers' understanding of these issues and your persistent advocacy helps ensure that we take bold action on advancing the cause of fairness, civil rights, and justice in every corner of our economy.

I am particularly excited that the organizers of this listening session have recognized from the outset that unfair or invasive data practices—like digital redlining, over-surveillance, and other harms to historically marginalized groups—extend beyond a limited understanding of "privacy" violations. These harms, which I think of as data abuses, often stem from the indiscriminate collection of personal data in order to fuel pervasive commercial surveillance in our economy. The framing of these listening sessions has it right. And I think is reflective of an evolution in how the government is approaching data and technology issues across agencies. I can't emphasize enough how glad I am to see us all talking about these issues this way.

The Department of Commerce and the White House have recently announced some artificial intelligence initiatives in an effort to guide the safe use of these tools in the economy. We're seeing the application of this technology in healthcare, criminal justice, employment, credit, and housing—all sectors where historically marginalized communities have been shut out of full and equal access to opportunities and services. Some of the application of these technologies holds promise; it can help distribute opportunities more broadly, resources more efficiently, and benefits more effectively. But technological tools are not necessarily free of the

---

[1] The views expressed in these remarks are my own and do not necessarily reflect the views of the Federal Trade Commission or any other commissioner.

1

weaknesses that plague their human designers, and they can be used to perpetuate and exacerbate discrimination and injustice.

Agencies across the government need to take action to address these issues within their spheres of competence. I'd like to unpack some of my thinking about the harms of algorithmic decision-making and artificial intelligence that exist at the intersection of privacy and civil rights, talk about the tools and legal authorities we have at the Federal Trade Commission to address these harms, and how FTC rulemaking play a role.[2]

I've been thinking about algorithmic harms in a few different ways. Poorly designed algorithms facilitate discriminatory harms through faulty inputs, faulty conclusions, and a failure to audit or test those algorithms for discriminatory outputs. But not all harms stem from design; algorithms can also facilitate proxy discrimination, enable surveillance capitalism, and inhibit competition in markets. Failure to closely scrutinize the impact of data-driven decision-making tools can drive discriminatory outcomes.

Figuring out how to map the FTC's authority onto these new technologies in order to effectively and proactively address these harms is a challenge. But, fortunately, we have at our disposal our general authority under the FTC Act; sector-specific rules and statutes, such as the Fair Credit Reporting Act and the Equal Credit Opportunity Act; and our section 18 rulemaking authority.

Most of the enforcement activity conducted by the FTC is brought under the general authority provided to the Commission by section 5 of the FTC Act, which prohibits unfair or deceptive acts or practices. The Act is more than a century old, and since its passage, the agency has been able to apply the statute's general language to meet new enforcement challenges. That same approach urgently needs to be applied to the harms generated by the data-driven economy.

We have our section 5 deception authority which can be used in connection with algorithmic harms where the marketers of certain products or services represent that they can use marching learning technology in unsubstantiated ways. I believe the FTC has an opportunity here to call out algorithmic snake-oil, especially in areas like facial or affect recognition where it's likely these products just cannot deliver on their promises and create huge society-wide harm when their hype is taken at face value.

We can also use our unfairness authority to target algorithmic injustice. The unfairness prong of the FTC Act prohibits conduct that causes or is likely to cause substantial injury to consumers, where that injury is not reasonably avoidable by consumers and not outweighed by countervailing benefits to consumers or to competition. I believe discriminatory harms fall neatly within our unfairness authority. Surreptitious location tracking could give rise to this kind of claim. Or we could use unfairness where an algorithm is used to exclude a consumer from a benefit or an opportunity based on her actual or perceived status in a protected class. Our unfairness authority goes beyond traditional civil rights claims as well. It gives us the opportunity to examine practices like facial recognition and other kinds of increasingly unavoidable biometric data collection which may lead to discriminatory outcomes.

---

[2] *See* Rebecca Kelly Slaughter, Algorithms and Economic Justice, 23 YALE J. L. & TECH. 1, 11-14 (2021).

2

I also believe we should also look towards more creative enforcement of our FCRA and ECOA authority. For example, ECOA prohibits credit discrimination on the basis of race, color, religion, national origin, sex, marital status, age, or because you get public assistance. Everyone who participates in the decision to grant credit or in setting the terms of that credit, including real estate brokers who arrange financing, must comply with the ECOA. If lenders are using proxies to determine groups of consumers to target for high interest credit and such proxies overlap with protected classes, the FTC should investigate and, if appropriate, pursue ECOA violations.

A bolder approach that I would like to see the FTC take is to incentivize creditors to make use of the ECOA exception that permits the collection of demographic information to test their algorithmic outcomes. ECOA permits and the FTC should encourage non-mortgage creditors to collect demographic data on most borrowers and use it to reduce disparities and train AI and other algorithmic systems to reduce disparities. Vanishingly few creditors take advantage of this exception, thinking it's just much easier to never ask about race or gender. But this kind of self-testing has to be part of any effort at ensuring that algorithms do not create discriminatory outcomes.

Finally, I believe it is past time for the FTC to begin a section 18 rulemaking process on data abuses; among other benefits, this process can have a clarifying effect for the Congressional debate. Participating in the rulemaking process means businesses, advocates, consumers, workers, researchers, and other interested parties will all have the opportunity to make their opinions known, out in the open, and with specificity in the public record. An open record can provide substantiation of the types of consumer protection and competition harms people are experiencing in digital markets, and it can illuminate how we can act decisively to stamp out these abuses.

If and when the FTC opens that rulemaking record, I hope we'll see the kind of broad participation from the experts we're about to hear from at the NTIA about how we can best address these harms. The era of deploy and hope for the best, or "move fast and break things," has to be over. We're living with the consequences of an unregulated tech sector. I hope the next generation of technology is deployed with a critical eye toward its potential harmful effects so we can all reap the benefits of advanced algorithmic decision-making together.

Thank you all for you time.

# Speech

 PDF

February 10, 2020

## Empowering Community Banks

Governor Michelle W. Bowman

At the Conference for Community Bankers sponsored by The American Bankers Association, Orlando, Florida

Share 

Thank you to the American Bankers Association for inviting me to address this year's Conference for Community Bankers. I am delighted to be here with you again. Let me begin by stating that the views I express today are my own, and not necessarily those of the Federal Reserve.

As community bankers, you have worked hard to develop a deep understanding of your local economies, while also keeping perspective on the broader economic picture. There is little I could tell you about your local communities that you do not already know, but I thought I might say a few words on the national economic outlook before turning to my main topic for today.

My colleagues and I on the Federal Open Market Committee had our most recent meeting about two weeks ago, when we decided to keep our target range for the federal funds rate unchanged at 1-1/2 to 1-3/4 percent. This policy setting should help support the economic expansion, which is now in its 11th year. My outlook for the U.S. economy is for continued growth at a moderate pace, with the unemployment rate—which is the lowest it has been in 50 years—remaining low. I also see inflation gradually rising to the Committee's 2 percent objective. So on the whole, the national economic backdrop looks very favorable, which should be broadly supportive of your local economies. And of course, by ensuring that consumers and businesses in your communities have access to financial services, you are key contributors to the health of our national economy.

Let me now turn to my main topic for today, the interaction between innovation and regulation for community banks. As the Federal Reserve Board's first designated governor with experience in community banking, I am committed to maintaining a strong and thriving community bank sector. Small banks are the lifeblood of their communities—and they ensure that consumers and businesses have access to financial services. This capacity to address local needs is fundamental to a strong and stable financial system. To community bankers, customers are much more than their credit score or their annual income, and small businesses are far more than their most recent revenues. By extending credit and offering specialized products and services that meet the needs of their borrowers, these banks empower communities to thrive.

We live in an exciting time, when the face of banking is changing faster and perhaps more fundamentally than it ever has. The first digital banks appeared on the scene about 25 years ago. Since then, financial technology has evolved rapidly. Technology puts more information in the hands of both the customer and the bank. As financial institutions succeed in digitizing more of their offerings, customers are able to monitor cash flows, make direct payments, understand changes in their credit scores, track spending, and budget more easily. Technologies like predictive analytics, when supported with appropriate consumer protections, can

improve bank services and performance by enabling continuous tailoring of the customer experience. It also helps banks identify products that are best suited for their customers and their business model and strategy. For those account holders who are willing, an analysis of spending habits may indicate that they could benefit from services they hadn't yet considered.

But successful innovation is not just about adopting the latest technologies. Successful innovation has always required strategic vision and creativity. Community banks thrive when they find creative ways to serve their communities, using everything they know to build relationships, offer solutions, and make lending decisions. We need only look to the performance of community banks during the financial crisis to see how well they leverage this local knowledge and their relationships to make lending decisions.

After the onset of the crisis, community banks' superior loan quality resulted in lower aggregate delinquency and charge-off rates compared to the largest banks. This superior performance was widespread—community banks in the vast majority of states outperformed the largest banks in this way.[1]

Even today, community banks continue to perform with distinction. In the third quarter of 2019, community banks' pre-tax return on average assets was 1.5 percent, marking the highest pre-tax return on assets ratio reported by community banks since 2006. Asset quality also remains strong for community banks and is better than for larger banks. The community bank net charge-off rate for total loans and leases was less than 0.2 percent at the end of the third quarter 2019. Let me state that again—the net charge-off rate was less than 0.2 percent, less than half of the industry average. Community bank capital levels remain at continued high and increasing levels. Community banks reported a total risk-based capital ratio of nearly 16 percent, as compared to the industry average of less than 15 percent. This type of performance positions the community banking sector for continued success this year and well into the future, helping ensure the preservation of the community bank model for future generations of Americans.

Community banks understand their borrowers and their specific needs. While technology continues to evolve and change the way we live and bank for the better, it still cannot by itself fulfill that unique and vital role.

Today, there are more than 4,800 community banks in the United States.[2] Nearly 80 percent of these have assets totaling less than $500 million, with roughly 40 full- and part-time employees, on average. The vast majority of these community banks are financially strong, and are the backbone of the towns and cities they serve, providing loans to individuals and businesses in the local area. But as customers' needs and goals evolve, community banks will need to evolve to meet them.

The successful integration of financial technology into the community bank business model is proving to be enormously valuable to enable community banks to enhance the services they've already proven they can deliver effectively. Access to technology and services to meet customer needs is critical to ensuring community banks remain vibrant.

For the remainder of my remarks, I will focus on my vision for creating pathways to responsible community bank innovation. In particular, I will discuss the promise and the challenges that smaller banks face in identifying, integrating, and deploying transformative new technologies, and I will offer some ideas for how the Federal Reserve can help community banks find and manage their relationships with service providers.

**Clearing a Path for Innovation**
Community banks have always been innovators, but rapid technology adoption is challenging for banks of all sizes. In most cases, realizing the potential that technology offers requires community banks to obtain services from other companies or products from core service providers, which I will refer to collectively as third-party providers. As I noted earlier, banks with less than $500 million in assets employ roughly 40 people on average—nowhere near the number required to exhaustively develop, test, and manage every element of novel technologies. In my discussions with bankers, they note that the process of selecting, initially vetting,

and continuing to evaluate third-party service providers is onerous and presents obstacles to successful innovation.

I agree that the cost of complying with some of our regulations and expectations for third-party relationships can pose an outsized and undue burden on smaller banks. These compliance costs are in some instances disproportionate to bank size, complexity, risk, and capacity and can be the same for a bank with $10 million in assets and a bank with $10 billion in assets. Further, expectations of due diligence when applied to a potential fintech partner may require more financial history or information than that partner can provide.

Due diligence for new third-party relationships, even those that are not start-ups, can require a community bank to collect and analyze a significant amount of complex information. Also, the annual monitoring that is required adds an additional significant and ongoing burden. The process for managing the annual collection and review of the financials, audit results, and other operational compliance materials for multiple vendors can take weeks of time for several employees. Bank employees must review thousands of pages of documentation, and the workload per vendor can be the same for all banks, regardless of their asset size and number of employees. And as someone who has been involved in this compliance work, I know that it's not as if other responsibilities can wait—community bank employees often wear several hats. Community banks must weigh the benefit of any third-party relationship against the additional work required to evaluate the third party. And even when new product offerings emerge from service providers that already serve the bank, contract terms can be complicated to adjust, adding to the costs of obtaining technologies, which may ultimately be prohibitive. Flexible core systems are important for this reason. Collaboration between a bank and its core system provider is critical to ensure that technology solutions can be integrated quickly and cost effectively within the core system.

**Creating the Right Regulatory Environment**
Responsible innovation, especially for smaller institutions, requires two key aspects: a clear idea of how the technology serves a bank's strategic objectives and a regulatory environment that supports innovation. I will touch today on the important interplay between these factors, and in particular, the role that regulators can play in creating a regulatory environment that is conducive to innovation, preserves the safety and soundness of the financial system, and protects consumers. As regulators, we need to ensure that banks uphold sound risk-management practices. Yet we also have information that can help community banks meet those standards. We should closely examine opportunities to share that knowledge, subject to appropriate safeguards, in order to support innovation.

Responsible innovation begins with a bank's strategy. Banks need to identify their goals and then look to identify the kinds of products and services that can help them move forward to implement that strategy. In the past, I have spoken about the importance of considering the impact of new technologies and finding ways to leverage them, if a bank feels that it fits into its business model and strategy. For community banks, a decision to embrace a new technology or innovation is almost always synonymous with third-party engagement.

Regulators and supervisors can contribute to an environment where banks are empowered to achieve these strategic objectives, simplifying and clarifying the process of third-party selection, due diligence, and monitoring.

A bank may decide that its business model should evolve, and that offering a new product or partnering with a fintech company will help it position itself for future growth. This decision is an essential one, but what comes next? This is a new world for most community banks, and supervisors and regulators can lend their expertise to those banks seeking to navigate the unfamiliar landscape.

To that end, the Federal Reserve recently launched a web page on innovation and announced several upcoming Reserve Bank events. The innovation page on our website (www.federalreserve.gov/innovate) is

intended to be a one-stop shop for supervisory information, publications, research, and international work that is related to technology innovation. Most importantly, the web page also facilitates interaction with Federal Reserve System specialists, to enable bankers and tech industry participants to submit questions about all aspects of technology in the financial services industry, or to request an in-person meeting. Essentially, to open a dialogue.

We have also launched a series of Innovation Office Hours events hosted by Reserve Banks. These events incorporate panel discussions and face-to-face meetings for bankers with regulators and supervisors, which are intended to be a resource for both state member banks and fintech companies seeking partnerships with or offering services to banks. During these meetings, banks that attend the office hours will have an opportunity to share specific projects or proposed partnerships and learn about how regulators approach and consider risk management in those contexts. Regulators can also share their observations about effective implementation and risk-management practices across the sector. Equally important, the events provide regulators an opportunity to hear directly from banks and fintech companies about challenges to innovation. The office hours events will also include a panel discussion on innovation topics that will help to provide additional insights into new financial technologies. Our first office hours event will be held at the Federal Reserve Bank of Atlanta later this month. Additional events are planned later in the spring and throughout the rest of the year. These are an important opportunity for us to learn, and I look forward to hearing your feedback on these events.

I'd like to turn next to another step in this process—the selection of a third-party provider. This step can be challenging given a lack of information about potential partners when many firms, and their product offerings, are new. Notably, in the 2019 National Survey of Community Banks, community bankers voiced a desire for more transparency into third-party service providers, to inform decisions about whether to enter into contracts with these providers and the type of contract that may be appropriate.[3]

In this regard, I believe the Federal Reserve should consider several possible steps. First, we should explore the possibility of publishing the list of service providers subject to supervision by the agencies. This could provide a starting point for community banks by sharing information about the types of companies providing services to a large number of financial institutions.

Second, I believe we should increase transparency around our own practices. Through the banking agencies' service provider program, we regularly conduct examinations for and produce independent evaluations of certain providers of critical services. These exams are focused on risk management, audit, and internal controls. The Fed and other agencies have the statutory authority to oversee third-party providers that serve the banks they supervise. Providers that represent a significant level of risk to their clients are part of an interagency supervisory program. The agencies make the outcomes of those exams available to banks that are clients of a supervised service provider.

I believe we can take a step further with increasing transparency on our supervisory program by making information that may be useful about our supervision of key service providers available to banks. This could take a number of forms, such as being more transparent about who and what we evaluate. Of course, moving forward in these areas requires careful consideration and interagency collaboration, and I have asked our staff to work with other agencies to develop and propose workable options for giving banks the benefit of the knowledge that supervisors have about their potential providers in an appropriate manner.

Once banks seeking to innovate have navigated the selection process and identified a partner, they now face a complicated due-diligence process. I believe that regulators and supervisors have a role in easing the burden of that process for community banks in several respects.

First, we could help by implementing clear third-party guidance that is consistent across all regulatory agencies. The Federal Reserve is in the process of working with the other banking agencies to update our

third-party guidance. I believe that the banking agencies should all have consistent expectations for third-party relationships, and that the Federal Reserve should, as a starting point, move toward adopting the Office of the Comptroller of the Currency's (OCC) guidance. It is incredibly inefficient to have banks and their potential fintech partners and other vendors try to navigate unnecessary differences and inconsistencies in guidance across agencies.

Second, this guidance should allow banks to conduct shared due diligence on potential partners. If several banks use the same third-party service provider and are open to collaborating, they should be allowed to pool resources instead of duplicating one another's work.

Third, the guidance should explain what due diligence looks like for a potential fintech partner, because the standards applied to other third parties may not be universally applicable. For example, many fintech companies lack the kind of long financial history associated with more traditional bank vendors. Perhaps a fintech company has been around for only a few years. On its own, the fact that a bank cannot evaluate more than five years of the company's financials should not necessarily stop this company from being considered as a partner. Every bank has different objectives, and potential partnerships are not one-size-fits-all. Regulators should especially support partnerships that combine the strengths of community banks and fintech companies, which have a track record of success. The guidance should reflect some supervisory flexibility, and not impede prudent, strategic partnerships between community banks and potential partners.

Fourth, in order to give community banks a better picture of what success in due diligence looks like, and where it begins and ends, I also believe that we should release more information on its necessary elements. This change would provide clarity and assist community banks in completing their work. In particular, I believe that regulators can provide more clarity on the types of questions that should be asked of a prospective third-party provider and our view of a satisfactory answer. Such a handbook would not only have the benefit of increasing transparency for community banks but could also be beneficial for fintech companies that hope to become third-party providers.

Finally, I know from experience that once due diligence has concluded, the evaluation of third-party relationships is not over. As I noted earlier, monitoring can take weeks of work every year for community bank employees. To be sure, this work is an important part of risk management. But I believe regulators and supervisors have a role to play in ensuring that the burden is tailored to bank size, risk, complexity, and capacity. Knowing the burden that third-party monitoring can present to employees of the smallest banks, I have encouraged Federal Reserve staff to consider options for further tailoring our expectations for community banks with assets under $1 billion in this area. We should be mindful that when we apply the same expectations to banks with starkly different asset sizes, we are creating the same workload for a bank with about 30 employees as for a bank with roughly 180 employees, even though their resources and risk profiles are quite different.

**Closing Remarks**

To conclude, I believe that we can create a regulatory environment in which community banks are empowered to innovate, in which supervisors leverage their own knowledge to help banks understand what to look for in a service provider. It's a regulatory environment in which guidance is clear and supervisors are appropriately flexible, and due diligence and third-party evaluations are appropriately scaled.

Every bank must decide for itself whether and how to adapt their business models to new technologies, but supervisors and regulators can facilitate innovation at a few key milestones on that path forward. First, supervisors and regulators can serve as a resource for banks navigating the financial technology landscape for the first time, and make subject-matter experts accessible. Second, we can make the process of selecting a partner appropriate for a bank's business strategy a more informed one, by being more transparent about our own supervisory program for certain service providers. Third, we can facilitate vetting of potential partners by allowing shared due diligence, providing in our guidance specific expectations for partnerships with fintech

companies, and publishing a handbook of sound practices in due diligence. Finally, we can reduce burden on banks as they continue to evaluate risk at third-party providers, by rightsizing our expectations and sharing more information about our supervisory program. Capacity, in addition to complexity and size, should be considered as we continue to tailor supervisory expectations.

As we work toward the environment I described, communication between regulators, supervisors, banks, and fintech partners must be frequent, and confusion about compliance requirements must not be an impediment to banks who wish to partner with third parties. I believe the steps I have laid out today are a promising beginning to making this regulatory environment a reality.

---

1. See Jeffrey W. Gunther and Kelly Klemme, *Financial Stability: Traditional Banks Pave the Way* (PDF) (Dallas: Federal Reserve Bank of Dallas, 2012). Return to text

2. See Federal Deposit Insurance Corporation, *FDIC Quarterly Banking Profile* (PDF) 13, no. 4 (Third Quarter 2019). Return to text

3. See https://www.communitybanking.org/~/media/files/publication/cb21publication_2019.pdf . Return to text

Last Update: February 10, 2020