# EXHIBIT 5

L465secC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES and EXCHANGE
COMMISSION,

                    Plaintiff,

          v.                         20 Civ. 10832 (AT)(SN)
                                     Remote Proceeding

RIPPLE LABS, INC., et al.,

                    Defendants.

------------------------------x
                                     New York, N.Y.
                                     April 6, 2021
                                     2:00 p.m.

Before:

                    HON. SARAH NETBURN,

                                     U.S. Magistrate Judge


                         APPEARANCES


SECURITIES and EXCHANGE COMMISSION
     Attorneys for Plaintiff SEC
BY:  JORGE G. TENREIRO
     DUGAN BLISS
     DAPHNA A. WAXMAN
     JON A. DANIELS
     LADAN STEWART

CLEARY GOTTLIEB STEEN & HAMILTON, LLP
     Attorneys for Defendant Bradley Garlinghouse
BY:  MATTHEW SOLOMON

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Defendant Christian A. Larsen
BY:  MARTIN FLUMENBAUM
     MICHAEL GERTZMAN
     MEREDITH DEARBORN

L465secC

1              (The Court and all parties appearing telephonically)

2              THE COURT:  Good afternoon, everybody.  This is Judge

3     Netburn.  Let's begin by calling the case and then I want to

4     address a few housekeeping matters before we address the motion

5     that's before me today.

6              This case is SEC v. Ripple Labs Incorporated, the

7     docket no. is 20 Civil 13832.  Let me first confirm that our

8     court reporter is on the line.

9              OFFICIAL REPORTER:  Good afternoon, your Honor.

10    Pamela Utter with Southern District Reporters.

11             THE COURT:  Wonderful.  Thank you.

12             On behalf of the SEC?

13             MR. BLISS:  Good afternoon, your Honor.  This is Dugan

14    Bliss.  Joining me are my colleagues, Jorge Tenreiro, Daphna

15    Waxman, Jon Daniels, and Ladan Stewart.

16             THE COURT:  Thank you.  And will you be speaking

17    primarily on behalf of the SEC?

18             MR. BLISS:  I will, your Honor.

19             THE COURT:  Thank you.

20             And on behalf of defendant Ripple Labs?

21             MR. KELLOGG:  Good afternoon, your Honor.  This is

22    Michael Kellogg.  With me on the phone are several colleagues,

23    but I will be the one speaking on behalf of Ripple Labs.

24             THE COURT:  Thank you.

25             On behalf of defendant Bradley Garlinghouse?

L465secC

1              MR. SOLOMON:  Good afternoon, your Honor.  Matt

2       Solomon from Cleary Gottlieb and, like Mr. Kellogg, there is

3       other Cleary lawyers on the phone but I will be speaking on

4       behalf of Mr. Garlinghouse today.  Thank you.

5              THE COURT:  Thank you.

6              On behalf of defendant Christian Larsen?

7              MR. FLUMENBAUM:  Good afternoon, your Honor.  This is

8       Martin Flumenbaum from Paul Weiss.  With me are my colleagues,

9       Mike Gertzman and Meredith Dearborn, and Mr. Gertzman will be

10      the principal spokesperson for this hearing for Mr. Larsen.

11             MR. GERTZMAN:  Good afternoon, your Honor.  This is

12      Michael Gertzman.

13             THE COURT:  Thank you.  All right.  Good afternoon.

14             I hope everybody on the call is healthy and safe, as

15      well as our audience listening in.  Let me first address the

16      audience.  I understand that we have 500 people listening in.

17      I understand that we have maxed out our capacity to have people

18      listening to the conference.  We apologize for that.  We will

19      see if we can make arrangements to increase the limit from 500

20      but that is the full capacity for today's conference.  Related

21      to that, earlier this morning I was conducting other business

22      and approximately 175 individuals called in this morning --

23      into my conference line that I ordinarily use for court

24      conferences -- thinking that our 2:00 p.m. conference was

25      scheduled for this morning.  And that lasted for several hours

L465secC

1  constantly interrupting my other cases.  I then issued an

2  emergency order which I think stemmed that flow of people

3  calling in during my other court conferences.  We will make

4  every effort to keep these conferences open to the public.  We

5  have every intention of accommodating as many people as we can

6  and doing everything that we can to facilitate an open hearing

7  as though we were in the court house but I do need everybody

8  who wants to participate to pay attention to when conferences

9  are held.  This is not my only case and having 175 people

10  calling in, interrupting my court conferences, was incredibly

11  disruptive this morning, and so I will request and urge that

12  anyone who wants to listen in is welcome to listen in but

13  please make sure that you are calling in at the right time.  I

14  know a number of you were calling in from abroad and so maybe

15  there was some confusion as to how to calculate the time.

16  Please, use the Internet or some way to make sure you are

17  calling at the right time that the conference is scheduled for

18  so that that problem that happened this morning, which as I

19  said, was incredibly disruptive to my morning conferences, does

20  not repeat itself.

21        The second housekeeping matter I want to raise is with

22  respect to recording or rebroadcasting of today's proceeding.

23  That is strictly prohibited.  Let me say that again.  It is

24  prohibited for anyone to record or rebroadcast today's

25  proceeding.  That has been the law in the Southern District of

L465secC

| | |
|---|---|
| 1 | New York for as long as the court has been around and it is the |
| 2 | oldest court house in the country.  We have a court reporter |
| 3 | here, she is excellent, and she is transcribing every single |
| 4 | utterance and that record will be made available to the public |
| 5 | through the court's filing system but it is impermissible to |
| 6 | record the conference and post it on YouTube or any other |
| 7 | platform for the public to see.  That is a violation of our |
| 8 | court rules and it is a violation of my order directing |
| 9 | everybody not to record or rebroadcast today's proceeding. |
| 10 | So, I want to make those points as clear as possible |
| 11 | so that we don't find out, as we did after our last conference |
| 12 | that the conference was recorded and then it was broadcast onto |
| 13 | YouTube. |
| 14 | Okay.  With those housekeeping matters completed let's |
| 15 | turn to the reason that we are all here today which is the |
| 16 | application filed by the defendants and a letter filed on March |
| 17 | 15 regarding discovery requests that were served on the SEC.  I |
| 18 | have received the defendant's letter, again filed March 15th, |
| 19 | the SEC's response filed on March 22nd, and the defendant's |
| 20 | reply which was filed on March 24th and I have reviewed all of |
| 21 | those in preparation for today's proceeding. |
| 22 | Why don't I turn first to the SEC, even though this is |
| 23 | defendant's motion, but since the defendants filed a reply |
| 24 | brief I would like to turn first to the SEC so I guess I will |
| 25 | address my questions to Mr. Bliss. |

L465secC

1          Mr. Bliss, let me ask you a few questions.  I

2   understand that a number of the arguments that you raise in

3   opposing the discovery that is sought is by citing other cases

4   that address two different factors, one is the question of

5   whether or not other cryptocurrencies, namely BitCoin and Ether

6   whether discovery related to those assets could be discoverable

7   in cases here and you cite to a couple of cases including the

8   *Kik* case where Courts have held that discovery related to other

9   assets was not appropriate.  So, I would like to ask you

10  whether or not in any of those cases you had individual

11  defendants that were sued where questions about recklessness or

12  knowledge was at issue, or whether all of those cases that you

13  cite were cases brought exclusively against the alleged issuer.

14          MR. BLISS:  Yes, your Honor.  So, those were cases

15  brought against issuers, not against individuals, although I do

16  believe that we explained in our letters why we think the

17  reasoning applies.

18          THE COURT:  Let's talk about that a little bit.  Go

19  ahead.

20          MR. BLISS:  So, I am happy to expand.  So, defendants

21  asked for these documents because essentially they're asking

22  that the Court look at how XRP was viewed and somehow it would

23  be relevant to look at how Bitcoin and Ether are viewed as

24  well.  Defendants summarily claim that Bitcoin and Ether are

25  like XRP but that is simply wrong and defendants know better

L465secC

| | |
|---|---|
| 1 | than anyone how XRP is different from those digital assets, and |
| 2 | I think, your Honor, if you look at that and just on the facts |
| 3 | as we have alleged them, it is clear why the arguments are |
| 4 | making -- don't make sense.  So, among other things, we alleged |
| 5 | in our complaint at paragraph 53 that back in 2012, Ripple and |
| 6 | Mr. Larsen received legal memos stating that XRP could be |
| 7 | considered a security including because Ripple was responsible |
| 8 | for promoting and marketing XRP and -- |
| 9 | THE COURT:  Can I stop you for one moment? |
| 10 | MR. BLISS:  Yes. |
| 11 | THE COURT:  Sorry, Mr. Bliss. |
| 12 | I just want to remind you that we are on an open and |
| 13 | public line and to the extent there was any information that |
| 14 | was filed under seal, I don't know if what you are talking |
| 15 | about covers that, but I just want to remind everybody that |
| 16 | there were documents that were filed under seal here and that |
| 17 | should be honored. |
| 18 | MR. BLISS:  Absolutely, your Honor.  And to be clear, |
| 19 | I am only going to reference facts that we alleged in the |
| 20 | complaint, although there were additional facts filed under |
| 21 | seal that I will not be mentioning during this argument. |
| 22 | THE COURT:  Thank you.  All right.  Proceed. |
| 23 | MR. BLISS:  Certainly. |
| 24 | So, additionally, all 100 million XRP in existence |
| 25 | were created in 2012 and were controlled by Ripple and its |

L465secC

1    founders as we allege at Complaint paragraph 46.  Now, in

2    contrast, Bitcoin and Ether are mined on an ongoing basis,

3    meaning that totally unrelated people from around the world

4    performed calculations with computers that unlock new coins

5    which those people can then hold or sell themselves.  And

6    unlike Bitcoin and Ether, Ripple and Mr. Larsen, and later

7    Mr. Garlinghouse, themselves offered and sold XRP all from that

8    100 million XRP that was originally created that was part of an

9    ongoing offering that continued from at least 2013 to the

10   filing of the complaint and raised about $1.4 billion for

11   Ripple and enriched Mr. Larsen and Mr. Garlinghouse by about

12   $600 million as we allege in paragraph complaints paragraphs 1

13   through 8.

14          So, the point is there was never a central promoter

15   profiting from an ongoing offering of Bitcoin or Ether.  So,

16   XRP is nothing like those other digital assets.  And so,

17   however defendants try to explain the basis of the relevance of

18   the Bitcoin and Ether documents, we just believe there is no

19   supporting basis.  We did, obviously, highlight several cases

20   that did not analyze or, rather, did not analyze Bitcoin and

21   Ether, Zaslavskiy, Telegram, Kik as you noted.  I do agree that

22   those did not involve individual defendants but there is

23   nothing about the inclusion of individual defendants in our

24   case that somehow makes these coins that are not at issue in

25   our case relevant to the proceedings here.

L465secC

1          THE COURT:  Can I ask you a question, Mr. Bliss?  If

2     you are saying to me, Judge, they shouldn't get documents

3     related to Bitcoin and Ether because those are just totally

4     different assets, they have nothing to do with XRP; if I am to

5     make a discovery ruling on that conclusion, wouldn't I just be

6     deciding the case?  Because as I understand it the defendants

7     are saying, well, actually, there are many ways in which they

8     are similar and we are at discovery and we are entitled to

9     pursue our own defenses and one of the defenses that we are

10    going to make -- maybe we will be successful and maybe we

11    won't -- but one of the defenses is, hey, we are just like

12    those guys and so we want to build-up that defense.

13          So, it seems to me, if I understand your argument,

14    that if I were to agree with you and say you are right, these

15    are different assets and they shouldn't get discovery I would

16    basically be deciding the case.

17          MR. BLISS:  Your Honor, I understand where you are

18    coming from but in response, no.  For instance, defendants own

19    cited case law I think really establishes that.  Because the

20    case law that is out there, such as the *Marine Bank* Supreme

21    Court case, says that in doing the analysis that the Court will

22    ultimately have to do in this case that the Court has to look

23    at the character the instrument is given in commerce by the

24    terms of the offer, the plan of distribution, and the economic

25    inducements held out to the prospects.  That's the Supreme

1    Court's *Marine Bank* decision.  In other words, the focus is on

2    the promoter.  In Section 5 cases, be they, you know, crypto,

3    digital asset cases, or otherwise, the question is how did the

4    promoter offer this instrument?  Was it offered as an

5    investment?  Was it something else?  There is absolutely no

6    case law supporting the idea that pulling in some unrelated

7    asset that somehow adds to the analysis matters and so, no,

8    there wouldn't be pre-judgment of the case because the case,

9    from the outset, needs to be focused on XRP, not on these other

10   assets that have nothing to do with whether XRP is a security.

11        THE COURT:  That brings me to another question that I

12   was going to ask you which is is it your view that the *Howey*

13   factors, when the Court is evaluating those, that the Court

14   should be looking exclusively at -- from the point of view of

15   the alleged issuer, meaning all that really matters, all that

16   should be concerned is how XRP or Ripple Labs introduced itself

17   to the world, how it made its offers -- I'm not using that word

18   in the legal term -- but how it promoted and presented itself

19   and that the Courts would not be looking at the marketplace,

20   the community, and how what was being offered for sale was

21   being interpreted by the rest of the community.

22        MR. BLISS:  Well, I think, your Honor, that several

23   cases have dealt with this including the *Warfield* case out of

24   the Ninth Circuit which found that it's possible that some

25   factors, in terms of market understanding of third-parties are

L465secC

1    relevant, but the *Warfield* case found, did "we must focus our

2    inquiry on what the purchases were offered, were promised."

3    And so, there are certainly are factors about market

4    understanding that are relevant but case after case -- *Marine*

5    *bank*, *Warfield*, and others that we discuss -- keep going back

6    to the offer and the promise made by the promoter.  So, the

7    case is focused from a legal perspective and should be focused

8    from a discovery perspective on that.  To broaden it and to

9    bring in these unrelated coins, it simply goes far beyond what

10   the law provides and how to decide these Section 5 cases.

11          THE COURT:  Thank you.

12          So, we were talking a moment ago about individual

13   liability and you were, I believe, expressing the view that the

14   claims against Garlinghouse and Larsen don't change the

15   analysis from any of these other cases that have been relying

16   on.

17          Can you discuss with me more a little bit why that is

18   your thinking?

19          MR. BLISS:  Sure.

20          So, I think that's one of the reasons why the

21   defendants assert that it somehow does change, it relates to

22   the claimed lack of due process or fair notice that they claim

23   to have not been given but, as we cited, and in particular the

24   *Kik* case focuses on that issue.  It makes clear that the law

25   does not require the government to reach out and warn all

L465secC

1   potential violators on individual or industry level and I

2   think, more importantly for today's purposes, the Court in *Kik*

3   ruled that the vagueness inquiry does not call for a factual

4   investigation, and to whether the statute has led to arbitrary

5   enforcement it asks objectively whether the statute authorizes

6   or even encourages arbitrary and discriminatory enforcement.

7   So, whether it is based on the individual's scienter,

8   affirmative defenses, or standard liability under Section 5, we

9   are talking about objective facts that matter.  The *Howey* test

10  raises objective questions based on the facts known to

11  defendants.  The due process and fair notice defenses raise

12  objective questions about the statute and so none of these

13  various issues that have been raised by the defendants or, in

14  particular, the individual defendants, provide any basis to

15  expand discovery into assets that are not at issue in the case

16  and, as we point out in our letter, we certainly don't believe

17  that they have identified a single case that has done that or

18  that would support doing that.

19          THE COURT:  Thank you.

20          Let's change focus now.  Can you talk about, more

21  generally, setting aside the Bitcoin and Ether documents but

22  even with respect to the XRP documents, the SEC's position with

23  respect to searching communications with third-parties, other

24  government agencies, and searching more broadly even within the

25  SEC.  I understand that that has been only to look at its

L465secC

1    investigative files and only half of the custodians that were

2    sought.  So, can you talk to me about the SEC's position with

3    respect to what I will call the XRP documents?

4              MR. BLISS:  Yes, I am happy to do that, your Honor.

5              Fist of all, we did agree, as part of this meet and

6    confer process leading up to the March 15 letter, that we would

7    review the e-mails of nine custodians who are high-ranking SEC

8    individuals for the terms "XRP" and "Ripple" that occurred in

9    external e-mails, meaning any communication that went outside

10   of the SEC itself so it could be to a complete third-party, to

11   another government agency, something like that, that we would

12   review those and produce responsive non-protected

13   non-privileged documents to defendants.  So, we are in the

14   process of doing that.  In terms of going beyond that -- so

15   obviously I have explained in some detail, both in the letter

16   and today, why we don't think that Bitcoin and Ether are

17   relevant and so why we didn't agree to search beyond that.

18   There are two additional parts to your question, one is the

19   searching for the internal XRP and Ripple documents and,

20   finally, I will get to the custodians themselves.

21             As for the internal XRP and Ripple documents, our

22   view, in coming up with this offer during the meet and confer

23   process, was that even though we don't believe that any of

24   these communications, you know, with third-parties between SEC

25   individuals and the outside world about XRP, are of any

L465secC

1    relevance.  Nonetheless, to try to accommodate defendants'

2    theory that somehow that would reflect the market view of XRP,

3    we did agree to produce those documents that are non-protected

4    because there would be third-party communications that would

5    presumptively not be protected.  But when it comes to --

6              THE COURT:  Can I interrupt you for definitional

7    clarification?

8              MR. BLISS:  Yes.

9              THE COURT:  You are talking about internal

10   communications, and when I think of internal communications I

11   think of SEC staffer to SEC staffer as an internal

12   communication but it sounds like you are referring to a

13   communication from an SEC staffer to somebody outside the SEC.

14   So, I just want to be clear what I am talking about.

15             MR. BLISS:  I apologize, your Honor.  I clearly was

16   confusing the way I said it.  I am referring to the internal

17   communication being e-mail communications between SEC staffers

18   or potentially commissioners, but essentially e-mail from one

19   SEC.gov address to another.  If there is an outside e-mail

20   address involved I would characterize that as an external

21   communication.

22             THE COURT:  So now we are just talking about internal

23   SEC to SEC.

24             MR. BLISS:  Yes.

25             And so, the internal communications really fall into

L465secC

1    two buckets; one is that the defendants have asked for internal

2    communications that reference external communications.  We

3    think that it would be unnecessarily burdensome and duplicative

4    to conduct that review because we are already going to be

5    producing the external communications themselves and so it

6    would be a lot of review to simply produce information related

7    to what we are already producing.  Now, the other set of

8    documents would be the internal discussions that if two folks

9    from one the SEC were, for whatever reason, discussing XRP or

10   Ripple.  Now, we believe that those are completely irrelevant

11   because there was no communication of those views to the

12   outside world to influence the market view as defendants are

13   looking for, and so there is simply nothing of relevance.  In

14   addition, as we pointed out in our letters, when you are

15   talking about internal agency communications you are getting to

16   the heart of deliberative process and other privileges and

17   while we have not reviewed all of those documents and while I

18   can't say for certain that any particular document would be

19   covered by the deliberative process privilege, law enforcement,

20   attorney-client, or work product, we also believe that a

21   substantial chunk of any review like that would be of protected

22   e-mails and so it would be asking us to search for irrelevant

23   and protected e-mails which we just feel that it is a

24   disproportionate burden in the case.

25          Finally, your Honor, if you would like, I am happy to

L465secC

1    go into a little bit more detail about how we selected the nine

2    custodians out of the 19 suggested by defendants.  If your

3    Honor wants to do that I would suggest that I will do that by

4    referring to initials rather than names given the nature of

5    these proceedings, if that's acceptable.

6           THE COURT:  That is certainly acceptable to me.  I am

7    happy to hear from you on your views generally.

8           MR. BLISS:  Yes, your Honor.

9           So, as to the custodians, we first of all identified a

10   number of custodians on our own before the custodians were

11   suggested by defendants.  They then provided a list and there

12   was a substantial overlap between the ones that we already

13   picked and the ones that they wanted.  And so, what we did is

14   that we had internal discussions to identify which individuals

15   in which division or other part of the Securities and Exchange

16   Commission would have potentially had communications with

17   third-parties -- with the outside world -- about Ripple or XRP.

18   And so, we identified two or three of the most relevant and

19   highest ranking people within the divisions of trading and

20   markets, divisions of investment management within the division

21   of corporate finance, as well as FinHub which is a subpart of

22   CorpFin dealing specifically with digital technology.  And so,

23   based on that we believed that we had identified the most

24   relevant custodians.  We cross-referenced that with the initial

25   disclosures put forward by defendants to make sure that if they

L465secC

1    had identified any individuals from the SEC they were included

2    on that list and we did that.  And so, that is how we arrived

3    at the nine individuals that we are currently searching for

4    e-mails in their boxes and those would be initials EB, DB, WH,

5    JI, JM, BR, VS, AS, and MV.

6         Now, there are 10 additional custodians that were

7    suggested by defendants who we don't believe -- we have not

8    agreed to search the e-mails and we do not believe we should be

9    ordered to search the e-mails and so there are a few reasons

10   particular to different individuals.  So, as to the individuals

11   with the initials FA, KL, and JB, these are people who are in

12   or were in high-ranking positions within the division of

13   enforcement who either were involved in the investigation

14   leading to, or who in the case of JB we have no reason to think

15   that there were third-party communications about XRP or Ripple.

16   So, for the other two, we think that's -- and the review would

17   show documents related to the investigation, not the type of

18   third-party communications that we understand defendants to be

19   seeking.

20        There are a few custodians who we believe are simply

21   duplicative of others and so those would be with the initials

22   SGB, RC, MR, and NS, who are largely are or were in the

23   division of corporate finance or the cyber unit.  And, from our

24   understanding of how communications are made within those

25   divisions involving those people, we believe that searching

L465secC

1     those e-mails would largely produce duplicative results.  In

2     other words, if those people were involved with communications

3     with the outside world, based on our own internal diligence, we

4     believe those communications would nevertheless show up in the

5     mail boxes of those custodians we are already searching.

6              And then, finally, there are three additional

7     custodians suggested by defendants with the initials JC, HP,

8     and ER, and those individuals are either current or former SEC

9     commissioners or chairs and our understanding is that those

10    individuals would have been unlikely or less likely to have

11    communicated with the outside world about XRP or Ripple by

12    e-mail but that has not been the standard practice.  And so, we

13    did not agree to search those mail boxes on that basis.  And I

14    apologize, that's a bit of a lengthy explanation, but that was

15    our analysis of each of the proposed custodians.

16             THE COURT:  No, that was helpful.  Thank you very

17    much.

18             Let me turn to Mr. Kellogg who I assume is going to

19    take the lead here.

20             MR. KELLOGG:  Thank you, your Honor.

21             I think Mr. Bliss' discussion really highlights why we

22    need and why we are entitled to the information about Bitcoin

23    and Ether.  At issue in this case is almost how to apply a

24    90-year-old statute and 75-year-old Supreme Court precedent to

25    something that only came into existence quite recently which is

L465secC

cryptocurrencies.  The SEC has not provided a lot of guidance

on that issue and they have been widely criticized for not

doing so but we do have some data points to look at.  On the

one hand there is the well publicized conclusion that two

digital currencies -- Bitcoin and Ether -- do not run afoul of

the how we test and are not securities.  On the other side of

the spectrum they have their initial coin offering cases, you

will see reference to DOW tokens, and you mentioned Kik and

Telegram, and they have said that those are securities because

an initial coin offering is just like a fundraising tool

created to start creating and deploy future crypto.  So, in

that context, digital coins or tokens are really shares in the

enterprise that will be created when funds are raised.  The

question here, at the great risk of oversimplifying an

important issue, is whether XRP is in relevant respects like

Bitcoin and Ether, or whether it is like the tokens in the

other digital asset cases the SEC relies on.  So,

understandably we are seeking documents exchanged between the

SEC and third-parties about Bitcoin and Ether and why they are

not securities so that we can apply that to our own XRP.

Now, the SEC claims we are not entitled to those

documents because Bitcoin and Ether are "unrelated digital

assets" and therefore irrelevant to the *Howey* test.  Instead,

they claim that XRP is indistinguishable from the DOW tokens

and the initial coin offerings but that is a classic legal

L465secC

1    argument based on precedent.  Is the unique instrument we are

2    dealing with today, is it more like precedent A or is more like

3    precedent B?  And perhaps the most telling fact on that motion

4    is that the SEC, itself, is seeking comparative information

5    about XRP and other digital assets.  It made clear just last

6    week, as part of the meet and confer process -- and I want to

7    quote this because it is quite remarkable given the argument he

8    is making here -- they said to Ripple, "We request that you

9    also search for and produce documents relating to comparisons

10   to assets that have been the subject of SEC enforcement action

11   for being securities under *Howey*."  In other words, they want

12   to see comparative information of how XRP relates to other

13   digital assets but only if they think it helps their case.  If

14   it helps our case then they argue that the assets are unrelated

15   and information about them should be excluded.  Now, that's not

16   the way Rule 26 works.  The question is whether requested

17   discovery is relevant to any party's claim or defense.  And as

18   the Court explained in *Palm Bay International* and as you

19   yourself noted earlier, and I quote here from the case:  It

20   would be inappropriate for the Court, at this discovery stage

21   in this litigation, to make any substantive determination

22   regarding a disputed defense.  That determination is properly

23   made upon a motion for summary judgment or a trial before the

24   district judge.

25            So the SEC, in essence, wants summary judgment on this

L465secC

1    aspect of our defense but they don't get it in a Rule 26

2    dispute; all we need to show is the relevance of it to any

3    defense that we might offer.  Now, I am happy to walk through

4    the merits on why we think that Bitcoin and Ether are in fact

5    like XRP, they are the three major digital currencies in use

6    today and I can go down a check list of factors that they share

7    in common.  Indeed, I can also add factors that show that XRP

8    has certain advantages over Bitcoin and Ether that makes it

9    even less like a security in the SEC's telling and under the

10   *Howey* test.  Again, though, that isn't relevant, the merits

11   right now.  What is relevant is that we have got a legitimate

12   defense that we think we should be able to press.  The SEC has

13   published a 38-factor test for when a particular coin or

14   cryptocurrency is a security or at least factors that they say

15   you should take into account but they have made no effort to

16   weight those factors in any way or provide actual guidance for

17   the marketplace so we are left in the position of saying, okay,

18   these two -- Ether and Bitcoin -- you have said that they're

19   not securities.  These over here -- DOW, Telegram, Kik -- they

20   are securities.  We can gather evidence to support our view of

21   why XRP is like Bitcoin and XRP, part of which will show under

22   the *Howey* test that the Price of XRP moves in conjunction with

23   the digital currencies Bitcoin and Ether, not with anything

24   that Ripple is doing to promote those which is extremely

25   relevant under the *Howey* test.  The SEC is incorrect that *Howey*

L465secC

1    somehow silos XRP and treats it in isolation as if Bitcoin and

2    Ether did not exist.  That's not the way the *Howey* test works.

3    As the case law indicates and, actually, as the SEC itself

4    concedes, whether XRP is a security is a fact-specific inquiry

5    that necessarily turns on the totality of the circumstances.

6    So, we need to investigate the circumstances under which

7    Bitcoin and Ether are not securities, as well as the

8    circumstances under which that the SEC wants to indicate what

9    in DOW and Kik are.  The case Law says *Howey* turns on the

10   character of the instrument in commerce and what objective

11   participants were led to expect, and XRP's character in

12   commerce, what people were led to expect, is shaped by the

13   SEC's own messaging to the public about Bitcoin and Ether,

14   similarities between those currencies and XRP and its eight

15   years of non-action against XRP.  All of that led market

16   participants and Ripple itself to conclude that XRP was not a

17   security.  But, definitely relevant to the *Howey* test, as you

18   pointed out, it has great relevance both to our fair notice

19   defense because if we -- and the Second Circuit put it in

20   *Upton* -- if the SEC failed to give, "a person of ordinary

21   intelligence" a reasonable opportunity to know what is

22   prohibited and they are not put on fair notice that the SEC

23   would suddenly, after eight years decides that it would treat

24   XRP as a security and the same as Mr. Solomon and Mr. Gertzman

25   will elaborate, the same applies whether the individual

L465secC

1    defendants were reckless or had knowledge that XRP would be

2    found to be a security.

3           Now, we have already found documents from

4    third-parties going to various market participants like

5    cryptocurrency exchanges and hedge funds, met with the SEC

6    specifically seeking guidance on whether they could list and

7    transact in XRP along with Bitcoin and Ether or whether XRP had

8    to be treated as a security.  They presented their own analysis

9    to the SEC about why XRP was not a security.  And after the

10   meeting they proceeded to list XRP on their exchanges or invest

11   in XRP in their funds.  So, obviously they reached the

12   conclusion that XRP was not a security and was not told

13   otherwise by the SEC.  So, materials on those meetings between

14   the SEC and third-parties were shaping market expectations

15   about XRP and are highly relevant to our argument that we are

16   like Bitcoin and Ether and not like the initial coin offerings

17   at issue in Telegram.  And the SEC obviously cannot dispute

18   that its communications with these third-parties about how XRP

19   compares with Bitcoin and Ether and are not securities are

20   plainly relevant to our defenses and Rule 26 requires no more.

21          If I may move on I will turn to the SEC internal

22   documents and we are talking about documents concerning XRP

23   itself, as well as documents about how XRP compares to Bitcoin

24   and Ether and why the latter aren't securities.

25          THE COURT:  Mr. Kellogg, I just want to raise the same

1    definitional points that I raised with Mr. Bliss which is if

2    you can be clear about whether you are speaking about documents

3    within the SEC, meaning SEC staffer to SEC staffer at whatever

4    hierarchy, versus documents between someone at the SEC and

5    someone outside of the SEC, whether that's another government

6    agency or a market participant or whomever.

7              MR. KELLOGG:  Yes, your Honor.  I am now talking about

8    the former, purely internal SEC documents, but one of the

9    reasons why such documents are relevant is that to the extent

10   that they're reflecting their communications in meetings with

11   third-party, they'll reveal market views on XRP and additional

12   contacts that external communications alone would not show.

13   The internal communications don't have themselves to be

14   admissible to be discoverable under 26(b)(1).  Now, as I noted,

15   the SEC is the focal point for requests for regulatory guidance

16   as to whether XRP was a security.  There are more than 200

17   currency exchanges (inaudible) creating an XRP before the suit

18   was brought and at least as many companies after using XRP in

19   their business plans.  We can't track down every one of those

20   companies to find out their interactions with the SEC but the

21   SEC's own internal correspondence, summaries of meetings,

22   communications, reports of communications the SEC may have had

23   with market participants, e-mails about meetings just

24   concluded, arguments made by participants in those meetings,

25   those will all provide us with a shortcut to clearly admissible

L465secC

1   evidence about third-party views.

2          The second point here is it is part of the SEC's

3   mission statement to study and understand market conditions.

4   There almost certainly are documents in their files that

5   reflect not SEC deliberations but market conditions and

6   investor expectations regarding digital currencies studied by

7   the SEC and that evidence goes squarely to the *Howey* inquiry.

8   As the Second Circuit held in the *Glen-Arden* case, to properly

9   apply *Howey* the Court must consider what investors

10  contemplated, their understanding of what defendants would do

11  to turn a profit, and market condition.  Those are market facts

12  and no one is in a better position to have studied those market

13  facts than the SEC.  And to stress we are not talking about

14  deliberations, we are not talking about what led to their final

15  enforcement decision, we are talking about their gathering

16  reports and otherwise on-market facts.

17         And the third reason why the internal communications

18  are important is they're likely to show that the SEC was

19  flailing when it came to the application of the Securities Act

20  of 1933 in digital currencies.  It is understandable that they

21  want to keep such documents hidden but they chose to bring this

22  case and such documents would support the individual

23  defendants' lack of knowledge or recklessness and Ripple's lack

24  of fair notice.  It will also reflect the SEC's own knowledge

25  about market uncertainty and how the SEC chose to respond or

L465secC

1    not to respond to that uncertainty.  Let me just give one

2    example:  We have a copy of a communication that the SEC has

3    made about XRP to the public saying that after a request was

4    received on whether XRP is like Bitcoin and Ether or not in

5    which the SEC -- this was just two months before they filed the

6    suit -- we haven't made any decision about XRP, we are not in a

7    position to say anything about XRP.  But their internal

8    communications on that issue are likely to reveal deficiently

9    substantial uncertainty that no market participant could have

10   been on fair notice as to how the SEC would come out in that

11   case.

12           Finally, if I may, I will address burden and

13   privilege.  Mr. Bliss did not press burden particularly much

14   and for good reason.  The burden of complying with our request

15   is far less than complying with the SEC's own request.  We have

16   the statistics laid out at page 5 in our reply.  What we are

17   requesting is also proportional to the needs of the case

18   considering the importance of the issues at stake, the amount

19   in controversy, and the parties' relative access to

20   information, all of which are factors are relevant under

21   26(b)(1).  And that's also true of custodians.  We sought

22   documents from 19 custodians compared to the 30 custodians the

23   SEC sought from us.  All 19 were centrally involved in meetings

24   with market participants and understanding the character of

25   digital currencies and commerce.  And, if they were following

L465secC

1   government protocols, all of their communications would be over

2   the SEC.gov handle and, hence, readily searchable.  The SEC

3   unilaterally cut down our list to nine custodians and as we are

4   holding information from the other 10 if we just ask, if not

5   more likely, to have responsive documents.  They picked our 30

6   custodians, we didn't get to pick and choose.  They don't get

7   to pick and choose anymore who the custodians we want them to

8   search are, as long as it is proportional to the importance of

9   the case an the needs of the parties.  And I am happy to go

10  through all of the examples.  I think one of them is

11  particularly important, I am only talking about publicly

12  available information so there is no invasion of privacy here

13  but the Commission's former chairman is the one who authorized

14  the suit against XRP on his last day in office, thereby causing

15  a huge and immediate drop in XRP's market value, yet

16  Mr. Clayton has actively embraced Bitcoin and Ether.  Indeed,

17  he was the face of the agency meeting constantly with market

18  participants and receiving studies on the features and roles of

19  each of those digital currencies in commerce.  He was even

20  writing to Congress about them.  Based on these meetings and

21  studies, he obviously concluded that XRP is a security but

22  Bitcoin and Ether are not.  That has enormous market

23  consequences and we should have the right to seek documents and

24  meeting memos as set forth to the critical features and market

25  perceptions of each of the three digital currencies.

L465secC

1          Now, as to privilege, communications with

2     third-parties about Bitcoin and Ether are obviously not

3     privileged, just to go back to the first step in the

4     discussion.  None of those things are privileged.  Nor should

5     internal documents be to the extent that they're about market

6     conditions.  Case law draws a clear distinction between factual

7     material and deliberative process.  Moreover, the fact that

8     some documents may be privileged is not a basis to refuse to

9     conduct search.  Even some documents that are privileged,

10    whether it's deliberative process, litigation privilege,

11    they're subject only to a qualified privilege which means that

12    we may be entitled to argue as to specific documents if we have

13    a compelling need for them and no other source to fill that

14    need.  But, we can develop those arguments only if the SEC does

15    what Rule 26 requires which is review the documents and prepare

16    a privilege log.

17          Those are the points I wanted to make, your Honor, and

18    I am happy to answer any questions.

19          THE COURT:  Let me ask you a question with respect to

20    the documents related solely to Ether or Bitcoin.

21          My understanding is that in 2018 the SEC announced its

22    decision that those two assets were not securities.  Is there

23    any reason why you would need or be entitled to communications

24    in any form that relate solely to Bitcoin and Ether that

25    post-date that decision?

L465secC

1          MR. KELLOGG:  First of all, ones that post-date a

2     decision are not subject to the deliberative process

3     whatsoever, they're considered the development of the law by

4     the SEC and so there is no privilege for such document to the

5     extent that they reflect the SEC's understanding of just why --

6     an elaboration of just why Bitcoin and Ether are not

7     securities.  Now they announced this to the public -- or rather

8     the director of their corporate finance division announced this

9     to public in a speech in 2018 but it will read that speech in

10    vein for any details about just what it is that makes Bitcoin

11    and Ether not a security where it is something like a digital

12    currency like XRP is a security.  They talk about, for

13    example -- I mean we can go over the assets.  They say it has

14    a --

15          THE COURT:  I will stop you.  Sorry.  I will stop you.

16          MR. KELLOGG:  Okay.

17          THE COURT:  I don't need to go over the assets but my

18    question is if one of the reasons why you want to look at

19    Bitcoin and Ether communications or documents, I believe

20    exclusively to those assets, is because you want to see what

21    the SEC was thinking, what it was saying to other market

22    participants about how it was viewing these assets.  But, we

23    know that come 2018, when the speech is given, we know what

24    they think because now they're going public with it whether in

25    a sort of speech or otherwise, and presume that that decision

L465secC

1    was well thought out before the speech was given.  And so my

2    question to you is, after that public announcement in whatever

3    fashion and in whatever opaque way it was made, after that

4    announcement why would it matter what they were saying about

5    those assets since the market now had that information and

6    would act accordingly?

7              MR. KELLOGG:  Because the reasons for the decision are

8    certainly less than clear.  As I said, they later came up with

9    the framework for investment contract analysis, the list of 38

10   factors with no explication.  So, the reason why subsequent

11   communications, you could say everybody was coming to us and

12   saying, Okay, you now told us that Bitcoin and Ether are not

13   securities, you told us that DOW tokens are securities, what

14   about the vast middle in here?  What about XRP?  In what ways

15   is that like Bitcoin and Ether?  In what ways to you think that

16   is like DOW tokens?  And that information, what it is telling

17   the marketplace, is an admission about what the key factors are

18   that the SEC would apply to say something is or is not a

19   digital security as opposed to a cryptocurrency.  And we think

20   that to the extent they have articulated some factors

21   elaborating on the *Howey* test, we think we fall within what

22   they were telling people about when a particular currency is or

23   is not a digital asset.  That's been an ongoing dialogue since

24   the speech in June of 2018 that was given by Mr. Hinman.

25             THE COURT:  Thank you.

L465secC

1          I want to give an opportunity to the individual

2    defendants to speak but I want to reiterate my admonition to

3    the public again that the recording of today's conference is

4    prohibited and rebroadcasting it is prohibited and that anyone

5    who is found to have engaged in this conduct is subject to

6    criminal sanctions.  I know that this is being broadcast now on

7    the Internet and so we already have people looking into who is

8    engaging in that conduct.  Again, we will make this proceeding

9    as open as possible, to make it available for more people to

10   listen in than the 500 that are already listening if we are

11   able to do that.  Obviously, if we were in the court house we

12   would be limited by the physical limitations of the court

13   house.  The fact that we are engaging in this proceeding

14   remotely is not a basis to engage in criminal violations and so

15   we have our law enforcement officers looking into this issue

16   now.  And so, whoever is engaging in this conduct is on notice

17   that they are engaging in a violation of my specific order to

18   stop doing it, as well as the rules of our court and that

19   whoever is engaged in this conduct may be subject to criminal

20   sanctions.

21          So, why don't I turn -- I think we have spoken a lot

22   about some of the issues that relate to the individual

23   defendants but if Mr. Solomon or Mr. Gertzman wish to be heard,

24   I will certainly give them an opportunity to speak.

25          MR. SOLOMON:  Thank you, your Honor.  Matt Solomon for

L465secC

1    Mr. Garlinghouse and I am cutting as we are talking so I am

2    really going to trying not to repeat Mr. Kellogg's points which

3    were ably made with respect to *Howey* and, independently, with

4    respect to the individuals but let me amplify on the

5    individuals to make crystal clear our position.

6            As your Honor knows, in order to establish aiding and

7    abetting, and that's the second charge here brought against the

8    individuals, the SEC has to prove that Mr. Garlinghouse and

9    Mr. Larsen acted with scienter and that means that, to take my

10   client, Mr. Garlinghouse knew or recklessly disregarded that he

11   was associating himself with something improper, and that

12   something improper in the SEC's telling is Ripple's offers and

13   sales of XRP without a registration statement.  And that, your

14   Honor makes this a very different case from the typical SEC

15   case.  As you asked Mr. Bliss about up front, because aiding

16   and abetting charges are involving lying, insider trading,

17   accounting fraud, here the SEC case is really one of regulatory

18   interpretation and I think that's really what separates it from

19   so many others.  And the SEC isn't just saying that

20   Mr. Garlinghouse and Mr. Larsen got it wrong, they're saying

21   they got it beyond grossly negligent wrong, they were reckless

22   in not knowing that XRP was a security or they intentionally

23   avoided knowing that XRP was a security.  So, why is that

24   relevant for today's purposes?  We have already talked about

25   the kind of documents we are seeking, your Honor, documents

L465secC

1   perhaps showing that the SEC itself was struggling with the

2   question of whether XRP was a security and documents showing

3   the SEC's communications with other market participants who

4   were trying to get insight from the regulator as to whether XRP

5   was a security.  And where the SEC is advancing as its primary

6   theory that Mr. Garlinghouse and Mr. Larsen acted recklessly or

7   consciously avoided knowledge that they were acting improperly

8   because the SEC sales formed investment contracts and

9   substantially assisted that violation, again, what they have to

10  prove is in the face of an unjustifiably high risk of harm that

11  is either known or so obvious it should be known that they are

12  liable as aiders and abettors.  So, we are not talking about

13  negligence, we are not talking about gross negligence, this is

14  an order of magnitude above that, that's the scienter

15  component.  And the key to the scienter component in terms of

16  the discovery that's being sought in this case, your Honor, is

17  that recklessness has an objective component and that's the

18  Supreme Court that says that and the *Safebuilt* case that we

19  cited, and the Second Circuit affirms that in the *Sleighton*

20  case, 604 F.3d at 776, note 9, and it is that objective

21  component that is most relevant here.  The SEC's understanding

22  of and discussions around the nature of XRP throughout the

23  entire time, as well as Bitcoin and Ether which apparently are

24  not securities according to the SEC is relevant to the question

25  of whether the allegedly improper aspects of Ripple sales were

L465secC

1    so obvious that they should have been known by Mr. Garlinghouse

2    and Mr. Larsen.  And just to be very concrete about it, your

3    Honor, let's say we learn through this discovery that it wasn't

4    so obvious to Jay Clayton, or it wasn't so obvious to Bill

5    Hinman who ran CorpFin that XRP was or is a security, if we get

6    that and we are entitled to look for it before a fact finder,

7    that's game over for the SEC under the aiding and abetting

8    claim.  And, frankly, their entire case.  That's just one

9    illustration of why this discovery is so critical.

10          Conscious avoidance is another theory that the SEC has

11   put out in addition to recklessness.  That requires that the

12   SEC prove the executives deliberately shielded themselves from

13   sheer evidence of critical facts that are strongly suggested by

14   the circumstances.  This is the *Global Tech Appliance* case.

15   And again, we are going to show in our motion to dismiss which

16   will be filed next week, that the SEC has not adequately

17   alleged knowledge and recklessness and we believe that Judge

18   Torres will ultimately dismiss the aiding and abetting claims

19   but until she does, the individual defendants are entitled to

20   seek discovery to defend themselves and the SEC has to look.

21   They have to search for and produce the requested documents so

22   that we can at least have a full and fair opportunity to build

23   a defense for the SEC's recklessness and conscious avoidance

24   arguments.

25          We also have reason to believe, your Honor -- and I am

L465secC

1   not going to belabor it, Mr. Kellogg gave you some examples of

2   discovery that we have gotten, this is not some fishing

3   expedition, we have concrete examples of interactions between

4   sophisticated market players as late as May '19 where the SEC

5   has engaged in dialogue with those market players and the

6   actions they took after that dialogue establishes that they

7   believed, walking away from the meetings with the SEC, that XRP

8   was not a security.  That's exculpatory.  And we know the SEC

9   has provided private guidance to other market participants

10  leading them to understand that XRP was not a security and that

11  guidance is directly relevant to how the market viewed XRP.

12  That's the argument under *Howey* but it is also relevant to

13  whether it was reckless or intentional to our client to make a

14  determination themselves where the SEC itself may not have made

15  a determination or in fact may have believed, up until very

16  recently, that XRP was not a security, perhaps was more like

17  Ether, more like Bitcoin.  We are entitled to explore that and

18  we cited, your Honor, the *Kovzan* case.  It is a short case,

19  your has probably already read it.  It is really on all fours

20  with what is happening here and if you read the underlying

21  papers for the *Kovzan* case, the SEC filings, the same arguments

22  are being made by the SEC there.  This was the case, your

23  Honor, where the CFO of a public company was charged with

24  several scienter-based claims based on his involvement in a

25  perks scheme.  He was alleged to have omitted information on

L465secC

1  proxy statements of perks -- payments -- going to the CEO.  So

2  it was an omissions case and the Court there stated that the

3  recklessness component of scienter had an objective component

4  and that the individual defendant was therefore "entitled to

5  seek evidence from the SEC related to the industry standard in

6  relation to what the SEC itself considered to be unlawful

7  conduct in this area of executive compensation."  And the Court

8  was very clear that the SEC must produce relevant documents

9  including those reflecting communications between the SEC and

10 third-parties because they could reflect -- and again I'm

11 quoting from a case -- confusion regarding the regulations.

12 And again, the SEC made the same arguments in *Kovzan* that it

13 attempts to make here.  It said there, look, our internal

14 communications are irrelevant to scienter because the defendant

15 didn't know about them, but the Court said wait a minute, there

16 is an objective standard of recklessness so Kovzan is entitled

17 to this evidence whether or not -- and this is a quote -- "such

18 evidence was previously known to him or the public."

19        Now, Mr. Bliss may say, look*, Kovzan* involved an SEC

20 regulation.  Here we are talking about the *Howey* test.  But,

21 the Court didn't make that qualification and frankly, your

22 Honor, it is irrelevant in the context of a scienter-based

23 aiding and abetting claim against the individuals.  In both

24 cases industry practice and SEC guidance are relevant to the

25 objective components of the individual defendants'

L465secC

1    recklessness.  In fact, here I think we have a stronger claim

2    than Mr. Kovzan did because what the SEC is effectively saying

3    is that Mr. Mr. Garlinghouse and Mr. Larsen didn't correctly

4    predict that the law would be, in the future, such that XRP

5    would be deemed, in 2020, to be a security by the SEC.

6            And we would say the *Sentinel* case also, your Honor,

7    as another case where the Court allowed exactly the kind of

8    discovery that we are seeking here.  So our entitlement, the

9    individual defendants' entitlement through this discovery isn't

10   just *Howey*, what Mr. Kellogg argued, that's an independent

11   basis when you ought to get discovery, but there is another

12   basis which is the decision to charge this with reckless

13   conduct and that's their theory of the case.  They chose to

14   charge individuals, they chose to do it with scienter-based

15   conduct despite an obvious lack of clarity.  They're telling

16   Judge Torres it is a simple case involving a rogue application

17   of *Howey* but, your Honor, I don't think anybody perhaps beyond

18   the SEC litigation team believes this is a separate case.  And,

19   again, we have seen evidence already of this in the discovery

20   that's been produced so far.

21           Again, the SEC has asked us to produce various

22   documents and they've attached to their letter two examples of

23   communications from Ripple or its investors that it cites as

24   evidence that XRP's status as a security should have been

25   obvious to the defendants.  Well, what we are seeking, your

L465secC

1   Honor, is the inverse of that and we are entitled to it because

2   we believe that the SEC's statements about XRP, Bitcoin, and

3   Ether, especially those made to market participants, is

4   evidence that shows it was much more questionable whether XRP

5   would ever be classified as a security than the SEC tells this

6   Court today.

7           Now, just a couple of final points and I think

8   Mr. Gertzman will want to make a couple of remarks on behalf of

9   Mr. Larsen.  I want to address the pandora's box argument,

10  Mr. Bliss alludes to it but I just want to take it on now

11  because really it goes to how unusual these circumstances are.

12  This is not the garden variety Section 5 case.  We are not

13  dealing with stocks or bonds or orange groves or whiskey drams

14  or the kind of cases that Courts and markets have considered

15  and evaluated for 75 years.  And XRP -- Ripple -- is not

16  like -- again, I'm not talking merits here I am just giving

17  context what the SEC has brought -- it is not like micro cap

18  initial coin offerings or ICOs that look just like IPOs.

19  That's Kik and Telegram.  And they brought enforcement actions

20  against those entities.  Fine.  But, Mr. Garlinghouse was out

21  there encouraging the SEC to pursue fraud actions in this space

22  because that kind of conduct threatens to taint the entire

23  industry and if this case proceeds there will be evidence of

24  that.  And Mr. Garlinghouse was talking to regulators, talking

25  to the public, and talking, indeed, to the SEC itself.  He

L465secC

1    never believed he was doing anything wrong and he wasn't.

2              So, we are not making a claim of selective enforcement

3    here.  You may hear that as well.  *The SEC chose not to sue*

4    *someone else for committing fraud so they can't sue us.*  All we

5    are saying is that the SEC is likely to have communications

6    that reflect on whether believing that XRP was not a

7    security -- as my client did, as Mr. Larsen did -- was

8    reasonable or at least not reckless.  And the SEC knows these

9    communications are relevant, it is seeking the same kind of

10   communications from us, it is offering up additional discovery,

11   your Honor, because I believe it realizes that we are entitled

12   to these documents but I have a lot of respect for Mr. Bliss

13   and I trust him but, frankly, I don't want him picking or

14   anybody in the SEC, picking our custodians.  I think that the

15   custodians we offered up is a reasonable number, the right

16   people, particularly the commissioners themselves, so we would

17   just ask again that that discovery be permitted and that the

18   SEC not be permitted to pick and choose what it provides to us.

19   We are not permitted to pick and choose what we provide to

20   them.

21             On Kik and Telegram finally, your Honor, I just want

22   to be very clear about this.  Again, put the merits aside, this

23   isn't about the merits but they've offered up discovery on Kik

24   and Telegram but not an Bitcoin and Ether.  I want to be

25   perfectly clear about this:  This case is nothing like those

L465secC

cases as you pointed out very early on, your Honor.  This is a
huge step beyond what the SEC took on there.  Kik and Telegram
involved initial coin offerings, ICOs.  This doesn't.  The SEC
sought preliminary injunctive relief in those cases to stop
what it believed was an ongoing unregistered offering scheme.
It didn't do it here.  Grams were new, according to Judge
Castel.  XRP isn't new at all.  There was no Telegram
blockchain at the time of the offering.  Not true here.  And
the companies in Kik and Telegram -- and this is critical --
were in privity of contract with the initial purchasers.
Ripple was not.  Digital assets in Kik and Telegram had no
utility.  XRP's technology has been used already to make faster
cheaper and more efficient payments.  But here is the kicker,
and Judge, this is back to where you started with your
questions:  The SEC didn't charge individuals in those cases,
nor in the case that they cited, this *Marine Bank* case.  No
individuals.  The issue in Kik was whether defendants could
seek discovery into internal SEC documents in support of its
defense that *Howey* was unconstitutionally vague and Judge
Castel said -- and the Court there said that is an issue of
law, not of fact.  Here, as Mr. Kellogg said with respect to
*Howey*, these documents speak directly to the fact-intensive
inquiry, specifically the character that XRP was given in
commerce.  You heard Mr. Bliss concede that there is an
objective inquiry to be made here under *Howey* and there is

L465secC

plainly an objective inquiry to be made if you are charging

individuals with recklessness.  And here, your Honor also, the

defendants have raised a fair notice defense, not vague to

avoid this defense.

So, I just want to be very clear that the ruling in

*Kik* on this issue has no bearing on the relevance of the

requested discovery to defend against the SEC's allegations

about the individual defendants' scienter.  And, again, these

are just some of the differences with *Kik* and *Telegram*.  There

are many others.

So just to conclude, your Honor, if the expert agency

couldn't resolve the question apparently for years on what XRP

was, was it a security?  Is it more like Bitcoin and Ether?  Or

is it more like one of these ICOs that they waited for years to

sort of figure that out, how could it possibly be reckless or

intentional for Mr. Garlinghouse or Mr. Larsen to determine XRP

was not a security?  It can't be.  And that's why this

discovery, independently of everything Mr. Kellogg said about

the *Howey* test -- those arguments apply to individuals too --

but on this independent basis we need this discovery to defend

ourselves.  If the SEC is prepared to say they're not pursuing

reckless they're not pursuing conscious avoidance maybe we

would be in a different place on this argument but I don't

think they're prepared to say that.

So, for all of those reasons, your Honor, we believe

L465secC

1    we are entitled to this discovery and we hope the Court orders

2    the discovery forthwith so we can make effective use of it to

3    defend ourselves in this litigation.

4            Thank you.

5            THE COURT:  Thank you.

6            Mr. Gertzman, there has been a lot of oxygen spent on

7    these arguments but if you feel like you have something

8    particular that is unique as to Mr. Larsen, there is something

9    that hasn't been raised that is important I will give you the

10   opportunity to be heard.

11           MR. GERTZMAN:  Thank you, your Honor, and I appreciate

12   that and I will be very brief and not repeat or try not to

13   repeat anything that Mr. Kellogg or Mr. Solomon said, although

14   I agree and support their points completely.

15           Just a couple of brief things.  First, Mr. Bliss said

16   in response to one of your questions early on that there is

17   nothing about the inclusion of the individual defendants in

18   this case that makes documents about Bitcoin and Ether

19   irrelevant in this case.  I don't agree with that, I think it

20   is incorrect, I think it is incorrect for the reason that your

21   Honor already pointed out which is it essentially asks this

22   Court, on an unsupported, naked assertion by the SEC on a

23   motion to compel, to throw out an entire issue of whether

24   Bitcoin and Ether are similar and how similar they are to XRP.

25   But the point I want to make is the point about recklessness in

L465secC

this context because the issue of how different or similar XRP

is to Bitcoin and Ether also goes to the issue of recklessness

in the minds of the individual defendants.  And no one is

saying, your Honor, that these three assets are exactly the

same.  How similar they are and how different they is a

critical factor when it comes to the way the defendants are

thinking about this and that's why this discovery is relevant

on the issue of recklessness.

          I also want to just drill down a little bit on the

definition of recklessness because I think it helps explain and

show why the discovery we seek here is so critical and

relevant.  This is a term -- recklessness is a term that has

been defined, well-defined by the Courts at this point and the

cases that we cite in our papers including the definition but

the point is that there is an element of recklessness that is

objective.  There is an element that requires the SEC to prove

here that it was so obvious, it would have been so obvious to

Mr. Larsen and Mr. Garlinghouse that XRP was a security that

they were reckless; that they departed so far from ordinary

standards of care on that question that they were reckless.

And the way to think about how to prove or disprove an issue of

recklessness is to look at what's being said and thought about

and done in the marketplace on that issue.  And to use a term

Mr. Kellogg used, he described the SEC as a focal point.  I

think that's a fair characterization, that the SEC has a focal

L465secC

1   point on the issue of whether XRP was a security because it sat

2   at the center of lots of communications and discussions and

3   internal review and assessment of that issue.  And so, it is

4   the logical place to turn to for that evidence because if, in

5   the end, the evidence from the SEC shows that they were unsure

6   about whether XRP was a security or that they concluded at

7   times that it wasn't, then how in the world can Mr. Larsen and

8   Mr. Garlinghouse be accused of being reckless on that issue?

9           I also want to make a quick point, your Honor, about

10  specific allegations in the amended complaint, specifically

11  paragraphs 55 and 59 of the amended complaint in which the SEC

12  alleges that Mr. Larsen received legal advice in 2012 that he

13  should go to the SEC to seek clarity as to whether XRP was a

14  security.  I am mindful of your Honor's reminder that one of

15  the documents at issue here is under seal so I won't go into

16  the substance of the document but there will be a lot to be

17  said about that document as we go forward because I think the

18  SEC's allegations in the complaint about that advice really

19  distort and omit critical compliance and conclusions of that

20  advice.

21          The point I want to make on this motion to compel,

22  your Honor, is that it is really not appropriate and fair for

23  the SEC in the complaint to take Mr. Larsen to task for not

24  going to the SEC to ask about whether XRP was a security and

25  then to tell us, as they are in this motion, sorry, we are not

L465secC

1    going to tell you what we would have told Mr. Larsen about

2    whether XRP was a security.  We are not going to tell you what

3    we were thinking and doing and talking about with others on

4    that issue.  We are just going to criticize you for not going

5    to us in the first place.  That's not appropriate, your Honor.

6    They have put in issue the very question of what they were

7    saying and doing and thinking and talking about when it came to

8    whether XRP was a security.

9            The last point I want to make, your Honor, is that it

10   is really more of a general point that I think it's pretty

11   obvious that the issues in this case are really important;

12   they're obviously important to the parties, they are important

13   to my client and Mr. Garlinghouse who have been accused of

14   reckless and knowing conduct which is obviously a very serious

15   allegation.  I think it is fair to say that important segments

16   of the fintech and cryptocurrency community are watching this

17   case closely and, ultimately, it is going to be up to the

18   Court.  And by Court I mean this Court, your Honor, and Judge

19   Torres, and potentially the Court of Appeals and maybe even the

20   United States Supreme Court if it comes to that, it is going to

21   be up to the Court to decide whether XRP is or was a security

22   or not.  And I just think, given the importance of those issues

23   and how new an issue this is, how critical it is in the context

24   of trying to apply this 1933 definition of security and the

25   1946 Supreme Court *Howey* definition to the current situation it

L465secC

1    is important that this evidence within the SEC about its

2    communications with others and its discussions about those

3    communications, that that not be kept from the Court, it not be

4    kept out from the record.  The Court can always decide whether

5    that evidence should be admissible at trial and what weight it

6    should be given.  But, for that evidence to be ruled out of

7    discovery in the first place I think is really a distortion in

8    the face of Rule 26 so we would ask the Court to grant the

9    motion to compel.

10            I am happy to answer any questions you may have.

11            THE COURT:  Great.  Thank you.

12            Mr. Bliss, if you want to take five minutes to respond

13    to anything in particular I am happy to give that to you.

14            MR. BLISS:  Yes.  Thank you, your Honor.  I appreciate

15    that, because in listening to various different counsel's

16    statements it is really remarkable to hear that what really

17    underlies a lot of their request is this claim that action or

18    inaction by the SEC has somehow led the markets to believe

19    something about XRP as far as its status as a security.

20            Since 1946 there has never been a case saying that

21    some action or inaction by the SEC influences how the market

22    views an instrument.  They don't cite one.  It doesn't exist.

23    The actions of the promoter are what needs to be the focus

24    here.  And so, to try to put the SEC on trial is totally

25    inappropriate based on decades of law.  And it is clear, in

L465secC

1  listening to the various defense counsel assert that they think

2  that the discovery would somehow show that the SEC was flailing

3  or was confused is, again, remarkable.  The SEC acts pursuant

4  to its statutory authority.  It investigates.  It issues

5  enforcement actions.  It issues no action letters.  That's how

6  it operates.  And so, the idea that because it took X number of

7  years from the time XRP existed to get an enforcement action

8  somehow opens the kimono to total and complete discovery inside

9  the SEC is really a remarkable position for the Defense to be

10  advocating and it is not supported.  And specifically, on the

11  point that was suggested by Mr. Solomon that the SEC

12  individuals are somehow giving comfort to market participants

13  in SEC meetings that XRP is not a security, again, that is not

14  how the SEC operates.  In this case the SEC took time,

15  completed an investigation, filed an enforcement action.  And

16  so, allowing discovery into the SEC's internal and deliberative

17  communications would have a chilling effect on every federal

18  agency.  If agency employees' communications were subject to

19  discovery, every time an agency filed an enforcement action in

20  which the defendant challenged the clarity of the law or the

21  defendant's understanding of it or the timing of the action, it

22  would derail federal agency litigation from being focused on

23  the conduct of the defendants to being about the conduct of the

24  government and its officials.  It would also open the door to

25  discovery far beyond the issues in the filed regulatory

L465secC

1    actions.  Here it would involve the complicating factor of

2    opening the door to discovery from Ripple's own counsel who

3    were the chair of the SEC and the head of the Division of

4    Enforcement for several years of the relevant period in this

5    case when defense counsel now apparently claims that the SEC

6    gave the market some impression of XRP during the time that it

7    took to file the action.  And the improper breadth of the

8    discovery, it was further demonstrated today in terms of the

9    discussion of Mr. Clayton and a subpoena that was sent last

10   week to the former SEC's Chair's new place of employment for

11   documents and communications from while he was the Chair about

12   XRP and other digital assets.

13          So, there is just no basis to allow defendants to put

14   the SEC and its commissioners and its staff on trial for

15   operating in the way that it does.

16          And, specifically on the point of the *Kovzan* case,

17   Mr. Solomon correctly identified that that case and any of the

18   few cases they cited that grant some type of SEC internal

19   discovery are about situations in which the SEC has promulgated

20   rules and interpretation of those rules.  Every one of the

21   cases that they cite that's the case.  And this is not the case

22   here.  The *Howey* test is for federal court interpretation and

23   has been out there since 1946, it is not about an SEC rule that

24   has been implemented.

25          And, I also think it is important to go back to the

1    speech by Mr. Hinman that has been referenced several times

2    now.  This was not an official position of the SEC commissioner

3    itself but it is important that in 2018 Mr. Hinman gave a

4    speech not about XRP but about digital assets generally.  He

5    said -- to quote that speech which is publicly available on the

6    SEC's website -- "The digital asset itself is simply code but

7    the way it is sold as part of an investment to non-users by

8    promoters to develop the enterprise can be, and in that

9    context, most often is a security because it evidences an

10   investment contract."  He contrasted that to Bitcoin:  "When I

11   look at Bitcoin today, I do not see a central third-party whose

12   efforts are a key to determining the factor in the enterprise."

13   But here Ripple is doing exactly what Mr. Hinman said makes a

14   digital asset a security:  Acting as a central party promoting

15   XRP as an investment.  And notably, as of June 2018 when

16   Mr. Hinman made that speech, there was no use for XRP other

17   than investment.  As we alleged in the complaint, paragraphs

18   362 to 364, it wasn't until October 2018 that Ripple

19   commercially launched any use for XRP.  And, even since then,

20   that use has been minimal accounting for no more than 1.6

21   percent of XRP's trading volume during any given quarter.  So,

22   at the time of Mr. Hinman's speech, Ripple had been conducting

23   an ongoing offering for five years during which time XRP was

24   offered and sold as an investment with no current use at all.

25   And, to the extent the defendants now wish to feign confusion

L465secC

1    about the time at which Mr. Hinman made those remarks in 2018,

2    Ripple was under investigation by the SEC at the time of that

3    speech.  That speech could not have provided any comfort or

4    confusion to the defendants about the status of XRP at that

5    time.

6              With that, I am happy to answer any questions.

7              THE COURT:  Just a quick clarifying question.  You

8    distinguish the speech, Mr. Hinman's speech suggesting it was

9    not a pronouncement but rather just a speech that referenced

10   Bitcoin and so is it -- does the SEC take a position that as of

11   a certain date its position was official as to Bitcoin and

12   Ether?

13             MR. BLISS:  So I want to make clear that this is my

14   understanding of the current situation and I don't want to be

15   overly technical but the SEC, itself, my understanding, it has

16   not taken an official position.  There is no action that it

17   took to say Bitcoin is not a security, Ether is not a security.

18   Now, there was a speech by a high-ranking person who said that

19   to him that's what it looked like but there has been no action

20   letter, no enforcement action, none of the official ways in

21   which the SEC takes a position on that matter that has

22   occurred.  What I understand defendants to be referencing is

23   the speech by Mr. Hinman which is not an official statement of

24   the Securities and Exchange Commission itself.

25             THE COURT:  Okay.  Thank you.  I appreciate that

L465secC

1    clarity.

2           Okay.  Thank you everybody for your arguments.  I

3    appreciate them.  As I have come to expect from this group of

4    lawyers, they were excellent and the papers that you submitted

5    as well were excellent.  And I recognize that this is

6    high-stakes litigation and that people are quite invested in

7    the outcome of the issues including the individual defendants

8    who face serious individual liability.

9           I have reviewed the letters and have listened

10   carefully to the argument.  I am going to grant, in large part,

11   the defendant's motion.  I think that the discovery related to

12   Bitcoin and Ether is relevant.  I think it is relevant to the

13   Court's eventual analysis with respect to the *Howey* factors,

14   but I also think it is relevant as to the objective review of

15   defendants' understanding in thinking about the aiding and

16   abetting charge or aiding and abetting count.  I also think it

17   is relevant to the fair notice defense that Ripple is raising.

18   So, for all of those reasons, I think discovery into Bitcoin

19   and Ether is appropriate and I am going to authorize it.  I am

20   going to authorize discovery both as to exclusively Bitcoin or

21   Ether communications as well as XRP communications between the

22   SEC and third-parties, and by that I am excluding all market

23   participants and the other government agencies.  I am not

24   including SEC-to-SEC internal communications in that ruling.

25   And so, the SEC is obligated to review the discovery request.

L465secC

1    I am just looking at the actual requests themselves.  I know we

2    have been talking about requests 4, 7, 8, 11, and 14.  Search

3    all of the relevant repositories for documents and discovery

4    related to communications to third-parties.  In addition, I am

5    ordering that discovery be conducted of all 19 custodians.  I

6    don't think that the SEC's arguments, as set forth within their

7    letters and again today, are a legitimate basis given the

8    relevancy standard to preclude discovery here.  19 custodians

9    for an incredibly high-stakes, high-value litigation is not

10   unreasonable, and given the three different categories of

11   grounds not to produce documents, I don't think that that is a

12   legitimate basis so I am going to direct that the SEC search

13   all 19 custodians for relevant and responsive documents.

14          I am going to deny in part the request for discovery

15   that is internal, and specifically internal, for instance

16   e-mail communications between what I will call the SEC staff to

17   SEC staff.  I think that that communication both is less

18   relevant as it goes to how the outside world -- how the market

19   is considering XRP and how the individual defendants, how it

20   affects their reasonable belief, and I also think that there

21   are likely to be extensive privilege issues there and I think

22   it has the potential to seriously chill government

23   deliberations and so I am not going to require communications

24   to be produced that are internal e-mail communications within

25   the agency.  If you want the parties to meet and confer -- and

L465secC

1    this will betray some of my ignorance as to how the SEC may

2    operate -- to the extent there are relevant minutes or more

3    official internal memos on these areas of discovery that I am

4    authorizing, both the Bitcoin and Ether discovery as well as

5    the XRP discovery, I want the parties to meet and confer on

6    whether those should be produced.  So, my limitation now is

7    just as to e-mail communications, the sort of everyday, more

8    informal communications that I think would not be appropriate

9    for discovery here.  But, to the extent internally there are

10   memos being sent up to higher-ranking officials expressing the

11   agency's interpretation or views on these matters, those types

12   of documents may be discoverable but I will direct that the

13   parties meet and confer with respect to that.  Obviously to the

14   extent in producing these documents there are documents that

15   are privileged, the SEC certainly has the right and obligation

16   to identify privileged documents and produce the privilege log

17   and the parties are ordered to meet and confer on that

18   privilege assertion and if you can't reach a resolution you can

19   obviously bring that dispute to me.

20           All right.  That is my ruling on the motion.  Anything

21   further from the SEC?

22           MR. BLISS:  No, your Honor.  Thank you.

23           THE COURT:  Anything further from the defendants?

24           MR. KELLOGG:  Nothing from Ripple left, your Honor.

25   Thank you.

L465secC

1          MR. SOLOMON:  Nothing from Mr. Garlinghouse.  Thank

2     you.

3          MR. GERTZMAN:  Nothing from Mr. Larsen right now.

4     Thank you, your Honor.

5          THE COURT:  All right everybody.  Stay safe.  Thank

6     you very much.

7          We are adjourned.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25