# Exhibit H

L7F5secC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   SECURITIES and EXCHANGE
    COMMISSION,
4
                    Plaintiff,
5
            v.                          20 Civ. 10832 (AT)(SN)
6                                       Remote Proceeding

7   RIPPLE LABS, INC., et al.,

8                   Defendants.

9   ------------------------------x
                                        New York, N.Y.
10                                      July 15, 2021
                                        3:00 p.m.
11
    Before:
12
                        HON. SARAH NETBURN,
13
                                        U.S. Magistrate Judge
14

15

16

17

18

19

20

21

22

23

24

25

L7F5secC

```
1                              APPEARANCES

2

3   SECURITIES and EXCHANGE COMMISSION
         Attorneys for Plaintiff SEC
4   BY:   JORGE G. TENREIRO
          DAPHNA A. WAXMAN
5         JON A. DANIELS
          LADAN F. STEWART
6         MARK R. SYLVESTER
          BENJAMIN HANAUER
7
    DEBEVOISE & PLIMPTON, LLP
8        Attorneys for Defendant Ripple Labs Inc.
9   BY:   ANDREW J. CERESNEY
          MARY JO WHITE
10        LISA R. ZORNBERG

11  KELLOGG, HANSEN P.L.L.C.
         Attorneys for Defendant Ripple Labs Inc.
12  BY:   GREGORY RAPAWY
          REID FIGEL
13
    CLEARY GOTTLIEB STEEN & HAMILTON, LLP
14       Attorneys for Defendant Bradley Garlinghouse
    BY:   MATTHEW SOLOMON
15        NOWELL D. BAMBERGER
          ALEXANDER JANGHORBANI
16        SAMUEL LEVANDER
          NICOLE TATZ
17
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
18       Attorneys for Defendant Christian A. Larsen
    BY:   MARTIN FLUMENBAUM
19        MICHAEL GERTZMAN
          JUSTIN D. WARD
20        KRISTINA A. BUNTING

21

22

23

24

25
```

L7F5secC

1          (Case called; The Court and all parties appearing

2      telephonically)

3          THE DEPUTY CLERK:  Starting with plaintiff Securities

4      and Exchange Commission, could you please state your

5      appearances for the record?

6          MS. STEWART:  Good afternoon, your Honor.  This is

7      Ladan Stewart for the SEC.  On the line today from the SEC are

8      Jorge Tenreiro, Mark Sylvester, Ben Hanauer, Daphna Waxman, and

9      John Daniels.

10          THE COURT:  Thank you.  Good afternoon.

11          Who do we have on behalf of Ripple Labs?

12          MR. RAPAWY:  This is Gregory Rapawy for defendant

13      Ripple Labs, your Honor.  With me on the line is Reid Figel,

14      and I believe some additional appearances have been provided to

15      the court reporter.

16          THE COURT:  Thank you.  Anybody else on behalf of

17      Ripple Labs want to state their appearance if they intend to be

18      speaking?  Mr. Ceresney, my notes suggest that you might be

19      speaking.  OK.

20          And on behalf of Mr. Larsen.

21          MR. FLUMENBAUM:  On behalf of Mr. Larsen this is Marty

22      Flumenbaum from Paul, Weiss, Rifkind, Wharton & Garrison.  With

23      me on the line are Mike Gertzman, Kristina Bunting and Justin

24      Ward.

25          THE COURT:  Thank you.  Good afternoon.

L7F5secC

1                   And on behalf of Mr. Garlinghouse?

2                   MR. SOLOMON:  Good afternoon, your Honor.  It is

3       Matthew Solomon on behalf of Mr. Garlinghouse, and with me on

4       the line are Nicole Tatz, Sam Levander, Alexander Janghorbani

5       and Nowell Bamberger.

6                   THE COURT:  Thank you.

7                   Good afternoon to everyone.  I hope everybody is

8       healthy and safe.  We are continuing to conduct these

9       proceedings remotely by telephone because of the pandemic.  I

10      want to remind everybody that for those people who are calling

11      in from the public, that it is a violation of the Court's

12      orders and rules and practices to record or rebroadcast any

13      portion of today's proceeding.  I know that that has been a

14      problem in the past and we continue to investigate that, but it

15      is in fact unlawful to record and rebroadcast the proceedings.

16      So, I will direct everyone that they are not permitted to do so

17      and that if we learn that today's proceeding has in fact been

18      recorded and rebroadcasted, that we will notify United States

19      Marshal's service who will conduct an investigation.

20                  We have a court reporter on the line.  I mention that

21      for a number of reasons.  First, she will be in charge of

22      creating an official record which she will create and will

23      publish.  And, for the lawyers, just a reminder that each and

24      every time you speak, if you can state your name clearly so

25      that the court reporter can attribute your statements to you.

L7F5secC

1    And, please, make every effort both to speak slowly, especially

2    if you are going to be reading anything, please, speak slowly.

3    And, also, just be sensitive to other speakers so that we don't

4    have people speaking over one another.  Those are the

5    housekeeping matters for today.

6         So, we are here on an application from the SEC, it was

7    filed on June 24th, I have that letter seeking to quash the

8    subpoena served on the former director of the Division of

9    Corporation Finance, Mr. Hinman, and I have the opposition to

10   that letter application filed on July 1st by the defendants,

11   and the SEC's reply letter filed on July 8th, all of which I

12   have read.

13        So, this is the SEC's application so why don't I turn

14   first to Ms. Stewart.

15        MS. STEWART:  Yes.  Thank you, your Honor.

16        THE COURT:  Go ahead.

17        MS. STEWART:  The exceptional circumstances doctrine

18   articulated by *Lederman* goes back 80 years.  There are very

19   important tactical and policy reasons behind this doctrine and

20   why it has held up for 80 years.  With government resources

21   already scarce and the government already having to compete

22   with private industry for qualified individuals who are willing

23   to serve the public, it is important that public officials be

24   able to do the job the public needs them to do.  But, if public

25   officials are spending their time testifying in every

L7F5secC

government enforcement action in which they had any

involvement, and doing so years after they leave public office,

there will be two important chilling effects as the cases we

cite in our papers have noted.

First, these officials will be less likely to engage

in open deliberations within their agencies if they think they

will be likely to have to testify about every such

deliberation.  And, relatedly, and just as importantly, they

will be less likely to engage with the public, whether it is

through speeches, conferences, or informal meetings with market

participants.  These types of interactions are important to the

functioning of many government agencies including the SEC.

Again, if these officials have to fear being called to testify

about every such interaction, they'll be less likely to engage

in them.

The second chilling effect, which is also important,

would be the very retention of qualified individuals to serve

in these roles.  As your Honor noted in the 911 case that we

cite in our papers, subjecting former officials'

decision-making processes to judicial scrutiny and the

possibility of continued participation in lawsuits years after

leaving public office would serve as a significant deterrent to

qualified candidates for public service.  Again, this is an

equally important consideration.  The government needs

qualified people and depositions -- like the one defendants are

L7F5secC

1      after -- deters qualified candidates from serving the public.

2              Now, defendants dismiss these points as a parade of

3      horribles but this is not some abstract thing, it is a very

4      real issue.  This is not the first time a defendant in an SEC

5      enforcement action has tried to depose an SEC division

6      director.  The defendants in *SEC V. Kik* tried to depose

7      Director Mr. Hinman himself and Judge Hellerstein quashed their

8      efforts.  The defendants in *SEC v. Navellier* tried to depose

9      the then director enforcement at the SEC and the district court

10     in Massachusetts quashed that subpoena as well.

11             The SEC is not aware of any case where a current or

12     former SEC director was forced to testify and defendants have

13     not come forward with any such case.  So, if the Court allows

14     this deposition to go forward not only would it be making new

15     law but it would be opening the floodgates to many, many more

16     such subpoenas in this case and beyond.

17             First, there is little doubt that defendants would

18     seek to depose other current and former SEC officials including

19     Former Chairman Jay Clayton whose firm is already subpoenaed

20     for documents.  In fact, of the 11 witnesses in Ripple's

21     initial disclosures, four are current or former SEC officials

22     including Director Hinman.  And, the fact that the individual

23     defendants have another 90-day discovery window means they'll

24     have a second chance to try to depose additional SEC officials

25     even if they don't do it in the current discovery period.

L7F5secC

1              Second, a decision in this case allowing Director

2    Hinman's deposition would also expose him and many other

3    current and former SEC officials to serial depositions in

4    current and future enforcement matters.  I want to pause here

5    to note something that your Honor mentioned in the 911 case

6    that I mentioned a minute ago.  In that case, when your Honor

7    was applying *Lederman* to former officials of a foreign

8    government, one of the factors the Court noted in allowing

9    those depositions to go forward was that there was "no

10   likelihood of serial abusive litigation."  That's on page 14 of

11   your opinion.  Here, by contrast, there is every likelihood of

12   serial abuse of litigation against Director Hinman and against

13   other SEC division directors and high-level officials and even

14   SEC commissioners.

15             Third, the ripple effect of this serial abuse of

16   litigation would not be limited to the SEC, it would almost

17   certainly extend to other government agencies.  There is little

18   doubt that a decision by this Court to allow this deposition

19   will be cited by dozens if not hundreds of defendants in

20   enforcement actions for years to come.  This would expose

21   countless government officials, them and their agencies, with

22   dealing depositions instead of doling the people's work.  And,

23   it would chill agency deliberations both internally and with

24   the public.  And also importantly, as I mentioned, it would

25   deter qualified individuals from joining public service.

L7F5secC

1      Again, these aren't hypothetical or abstract issues, they're

2      very, very real and their impact on the functioning of

3      government would be very real.

4              So, this particular subpoena has to be viewed in light

5      of these broader concerns.  This is not just about Bill Hinman

6      in this one litigation, this is about Bill Hinman and countless

7      other SEC officials and countless other government officials in

8      countless other litigations.  This is serial and abusive, in

9      your Honor's words.

10             When viewed from this broad lens, it is not difficult

11     to understand the significant repercussions from the subpoena

12     on the functioning of the SEC and other agencies and this is

13     why the burden on defendants here is so high to show

14     exceptional circumstances and they have not done that.

15             I will pause now, your Honor.  I am happy, your Honor,

16     to go through more detail on why we believe the burden has not

17     been met on the specific topics that they seek to depose

18     Mr. Hinman on but I wanted to pause to see if your Honor had

19     any questions before I do that.

20             THE COURT:  Thank you.  I do.

21             I would like to focus on what I think is the biggest

22     issue here which is the 2018 speech.  I do think that that is a

23     unique fact that probably doesn't present itself in every

24     enforcement action that the SEC brings, though I do think your

25     concerns about the effects of requiring Mr. Hinman to be

L7F5secC

1    deposed are legitimate but I do want to focus on this speech.

2    In part, I want to move to the next prong of the analysis and

3    talk about how the government is defining the speech and what

4    you think are the reasons why it would be inappropriate to

5    require him to sit for the deposition and I will try and be a

6    little bit more precise.

7              As I understand it, when Mr. Hinman gave that speech

8    he stated clearly at the time that these were his own personal

9    views and not the views of the SEC.  So, I am wondering if you

10   can help me reconcile what I perceive as tension between a

11   speech that he gives as a senior person within the SEC but that

12   he gives on his own behalf and expressing only his own views,

13   and a view that his being asked to answer questions about that

14   speech might somehow interfere with the deliberative process

15   privilege.

16             MS. STEWART:  Sure.  I am happy to, your Honor.

17   Again, this is Ladan Stewart for the SEC.

18             So, speaking more generally about the speech, the

19   speech is publicly available on the SEC's website.  The SEC

20   doesn't contest its authenticity.  Director Hinman notes in his

21   declaration that he gave the speech so none of this is in

22   dispute and the SEC is willing to stipulate to all of that,

23   which is to say the speech is a speech.

24             Now, going to your Honor's specific question about

25   possibly there being tension between Mr. Hinman having given

1    this speech in his personal capacity expressing his personal

2    opinions and any deliberative process protection.  So,

3    respectfully, your Honor, we don't think that any such tension

4    exists.  Director Hinman, and any SEC official who makes public

5    remarks, included in the process of crafting those remarks are

6    deliberations within the agency.  Here, as we have, we have

7    already produced to defendants a privilege log showing the back

8    and forth communications about drafts of Director Hinman's

9    speech showing that the speech was reviewed by others within

10   the Commission.  At the time the speech was given the

11   Commission had not expressed any position on whether Ether was

12   a security or I should say whether offer and sales of Ether

13   were securities.  So, by definition, any discussion that

14   Director Hinman was having with others at the Commission about

15   the issues in his speech were pre-decisional and therefore

16   deliberative process would apply and cover those

17   communications.  There is also --

18          THE COURT:  Can I interrupt for one second?  Sorry to

19   interrupt you.

20          Pre-decisional suggests that there was then a decision

21   made so what is the decision for which these communications

22   would be pre-decisional?

23          MS. STEWART:  So, I think the case law on deliberative

24   process is actually pretty clear that there doesn't need to

25   have been a decision made.  A lot of times -- and I think the

L7F5secC

1    *Fish & Wildlife* case that we cite talks about this.  A lot of

2    times there are deliberations with agencies that end up going

3    nowhere so a final decision is not made but that doesn't move

4    the deliberative process protection from the pre-decisional

5    communication even if no final decision has been made.

6         I would add, your Honor, that we have an additional

7    case that we did not cite in our letters and we found this case

8    after we filed our letters and we apologize for not having

9    included it but we think it goes to your precise question of

10   whether Mr. Hinman's own opinions are covered by the

11   deliberative process privilege and this case says that they are

12   and the case is *SEC v. Nacchio* and the cite is 2009 Westlaw

13   211511, and this is a District of Colorado decision from

14   January 29th of 2009.

15        Another thing I want to note here is that it is very

16   routine and commonplace in the government for officials to give

17   speeches, to speak at conferences, to teach CLE courses and the

18   like, and so in this sense the speech that Director Hinman gave

19   is not something that is unique.  It happens all the time

20   within the SEC and within other government agencies and, as

21   Director Hinman did, officials at the SEC and other agencies

22   routinely qualify their remarks by making sure that the

23   audience understands that they reflect their own views and not

24   the view of the Agency in order to ensure that the public is

25   clear about who really is speaking because, as we told you in

L7F5secC

1   prior letters and prior arguments, the SEC speaks in certain

2   ways -- it speaks through enforcement actions, it speaks

3   through no action letters, it speaks through very formal and

4   particular ways and it cannot speak through the words of its

5   staff even and even its commissioners.

6          THE COURT:  Thank you.

7          Can you remind me what you are citing the *Nacchio* case

8   for?  For what proposition?

9          MS. STEWART:  For the proposition that the

10  deliberative process privilege would cover Director Hinman's

11  personal opinions that he delivered in his speech.  And,

12  generally, it is a helpful case on deliberative process more

13  generally and on speeches given by SEC officials but that goes

14  directly to the question that your Honor raised.

15         THE COURT:  Thank you.  Anything further?  Or I will

16  turn to it Mr. Rapawy.

17         MS. STEWART:  I am happy, your Honor, to talk about if

18  there are any other parts of our letter that you have certain

19  questions on but I would like to just really point out that

20  when it comes to the information that defendants want to get

21  from Mr. Hinman about sort of the deliberations around the

22  speech, there really are major issues with this kind of

23  exercise under *Lederman* and the case that we cite in our

24  papers, the *SEC v. The Commission on Ways and Means* case is

25  really on point there and it points out that *Morgan* and its

L7F5secC

1    progeny make clear that exceptional circumstances, that the

2    doctrine is premised on the notion that high-ranking officials

3    should not be required to testify regarding their official

4    decision making processes and that's exactly what defendants

5    are trying to get from Director Hinman here, they're trying to

6    get him to testify about the decision-making process of the SEC

7    about the speech or about anything else that has to do with

8    BitCoin, Ether, and that is just not exceptional circumstances

9    under *Lederman* and it is precisely what *Lederman* and *Morgan*

10   were trying to avoid.  And related to that is that questions

11   about this type of decision-making process are subject to the

12   deliberative process privilege, as I mentioned a moment ago.

13   At the time that Director Hinman gave his speech, the SEC had

14   not made a final determination about the regulatory status of

15   Ether so, as I mentioned, any such conversation would be

16   pre-decisional under the Supreme Court precedent *Fish &*

17   *Wildlife* and earlier cases.

18          So, you know, what really defendants are trying to do

19   here is to question Mr. Hinman about protected, privileged

20   information and defendants say, well, the SEC can object to

21   protective privilege and then we can get a record and we can

22   come back before the Court, but the point here is that deposing

23   a senior government official about the agency's deliberate

24   process is not an exceptional circumstance that justifies that

25   deposition.  We are not here asking the Court to rule on the

L7F5secC

1   privilege issues but, practically speaking, defendants wouldn't

2   get information from Director Hinman that they can't get and

3   have not already gotten from the SEC as I mentioned threw our

4   priv log logs that we have already provided to them and they're

5   not going to be able to get information beyond that in a

6   deposition, information beyond who Director Hinman spoke to and

7   the date of that conversation because the SEC will object to

8   any attempt to get into the substance of those discussions.

9           So, this is sort of a practical point but it also goes

10  to the larger question of it cannot be an exceptional

11  circumstance to depose a government official to test the

12  contour of the agency's privilege especially when there are

13  many other avenues open to defendants to do so.

14          So, with that I will stop, but I'm happy to answer

15  questions and any other points in our letters that your Honor

16  has.

17          THE COURT:  I do have a question.  Do you believe the

18  deliberative process privilege would be invoked or at play if

19  Mr. Hinman was deposed and asked questions like:  *Why do you*

20  *think Ether doesn't fall into the definition of investment*

21  *contract?  Why do you think this?*  Do you think that would

22  invoke the deliberative process privilege and, if so, why?

23          MS. STEWART:  This is Ladan Stewart again.

24          Yes.  Absolutely, your Honor.  We think that those

25  types of questions would invoke the SEC's deliberative process.

1   It is difficult to imagine that Director Hinman would be able

2   to answer those types of questions without invoking information

3   that he learned from other SEC personnel in a kind of

4   pre-decisional and deliberative setting.  There were

5   conversations, all types of communications among the SEC staff,

6   SEC divisions about not just Ether but other digital assets.

7   And so, while his final opinion on that as he reflected in his

8   speech in 2018 may be public, again, the speech is what it is.

9   His opinion is what it is, it is already reflected in his

10   speech.  But, a defendant would not be able to get anything

11   beyond that from him on his opinion or his discussions with

12   other SEC officials about their opinions under the deliberative

13   process privilege.

14           THE COURT:  Thank you.  Let me turn to defendant.

15           MR. RAPAWY:  Thank you, your Honor.  Gregory Rapawy

16   for Ripple.

17           The SEC has failed to establish that it is entitled to

18   the extraordinary relief of quashing a deposition subpoena

19   directed to its former employee.  And we do not believe we have

20   any burden to show a special need for this deposition because

21   this witness, Mr. William Hinman, was never at the apex of any

22   governmental unit and, as of today, he has no governmental

23   responsibilities at all.  But if we did have to make that

24   showing he does have firsthand knowledge of industry

25   perceptions of digital assets and of their regulatory status

L7F5secC

1    because he knows firsthand about the communication that he had

2    with industry participants about whether digital assets were

3    securities, and he also knows firsthand about communications in

4    which we believe those industry participants expressed

5    confusion as of 2018 about how the federal securities laws

6    would or should apply to digital assets.  And he has that

7    personal knowledge because he spoke with people outside the

8    agency both before and after he gave the speech -- to which

9    your Honor referred, frequently referred to as the Hinman

10   speech -- in June 2018 about how the federal securities laws

11   apply to digital assets.  And we think that the circumstances,

12   the significance, and the impact of that speech are all

13   directly relevant to the SEC's claims and to our defenses.  We

14   need to depose Mr. Hinman to develop the facts about

15   perceptions in the marketplace that he was trying to respond to

16   with his attempt to revise guidance in that speech.  Whether he

17   was successful in clarifying matters or not, that was clearly

18   his intent.

19           In general --

20           THE COURT:  Why do you say that was clearly his

21   intent?

22           MR. RAPAWY:  I think because that is a reasonable

23   inference from the speech itself and also from the fact that

24   the SEC later held it out to Congress -- the chairman said to

25   Congress and said that the Agency has been transparent on its

L7F5secC

1    application of the *Howey* criteria, the digital assets -- I am

2    paraphrasing but the exact quote is in our letter.  And I also

3    think that when the Agency's Office of Investor Education

4    points investors to the speech that is also a showing of the

5    intent that the speech was to provide guidance, not to present

6    his personal views in some kind of abstract academic context,

7    not to just have fun talking about an interesting issue.  It is

8    an interesting issue but that's not why he was giving a speech.

9    He was giving a speech because the industry was asking for

10   guidance and he was providing it with, admittedly, a disclaimer

11   that the SEC wasn't going to be bound by that guidance.  But

12   the existence of that --

13        THE COURT:  If your view is that the speech reflects

14   Agency guidance -- I think is what you just said -- then why

15   wouldn't the discussions that led up to that speech be covered

16   under the deliberative process privilege?

17        MR. RAPAWY:  Well, I have two answers to that, your

18   Honor.  The first thing is we want to take this in steps in

19   part to determine whether this speech was adopted or approved

20   by the SEC.  Now, they have denied that.  It is a contested

21   issue, a contested factual issue in this case whether this

22   speech was ever adopted or approved by the SEC and we would

23   like to establish that one way or the other.  If it was, then

24   that really heightens the impact of that speech for Ripple's

25   fair notice event and for the individual's state of mind -- not

L7F5secC

defenses exactly but contesting the SEC's ability to prove
their state of mind at trial.  On the other hand, if it was
only his personal views, as the SEC contends then, as your
Honor suggested, we can still explore facts about this speech
that wouldn't be covered by deliberate process and we can use
it as evidence to what was thought about the status of the
digital assets in 2018.  Either way, whichever way that
ultimate question comes down, there are relevant non-privileged
questions that we can ask.  And to the extent that there are
any privilege issues to be raised in this case, I think that
they need to be decided on the record that would be created by
the deposition itself.

          Now, *Nacchio*, as Ms. Stewart pointed out, was not
cited in the papers but I tried to pull it up really quickly
and I haven't had a chance to read through it fully, but it
does appear that the deposition did take in *Nacchio* and they
raised the deliberative process question on a
question-by-question basis and then the Court considered those
questions on the record that had been made at the deposition
which is exactly the process that we propose should be followed
here.

          And I will also -- I am jumping ahead a little bit but
I also think that the SEC conceded in its reply that the
communications with third-parties, which are a big part of what
we are interested in in this case, would not themselves be

L7F5secC

1    privileged.  That's on page 4 of their letter.  Communications

2    with third-parties they described as a non-privileged area of

3    inquiry.  So, that at least we can ask him; we think it is

4    relevant, highly material, and something of which he has

5    personal knowledge.

6            I would like to touch on the legal questions relating

7    to whether he qualifies as high-ranking or official in the

8    first place.  I know your Honor is familiar with the law in

9    this area, but as we see the case, there is no dispute that

10   Mr. Hinman was never at the apex of the SEC.  He headed a

11   division within the SEC, one of six divisions in the SEC, and

12   he was less senior than the chairman, less senior than the four

13   other commissioners and a peer of, depending on how you count,

14   a dozen or two dozen other people.  And there are no that many

15   officials at the apex of a governmental unit.  And with respect

16   to Mr. Hinman specifically, the Division of Corporate Finance

17   undoubtedly does important work, he had about 400 people

18   reporting to him, the SEC as a whole had about 4,200 employees.

19   A person who supervises one tenth of the agency's work force is

20   not at the agency's apex and we submit that's the test.

21           We don't agree that the analysis should proceed at the

22   level of a subdepartment or a subdivision of an agency.  That

23   is not how the Court applied the test in the *Ways & Means* case

24   which is cited in the papers where the individual was the

25   director of a staff or subcommittee but not high-ranking

L7F5secC

1   official in the context of Congress which was the relevant

2   governmental unit.

3         It is also not how the Court applied the test in the

4   terrorist attack case where the Court asked whether the

5   individuals were high-ranking -- ambassadors count as

6   high-ranking and ministers count as high-ranking but the

7   cultural attache for Saudi Arabia to the United States who runs

8   a subdivision of the embassy of Saudi Arabia to the United

9   States -- the Saudi Arabian Cultural Mission -- was not high

10  ranking.

11        So, we think that those cases are the best reasoned

12  authority on this subject and they support our view that you

13  look at the status within the agency as a whole rather than the

14  status within a sub.

15        I also want to emphasize the point that Mr. Hinman is

16  also a former rather than a current SEC official and that is

17  not dispositive.  Former officials get some protection but it

18  is significant, and to the extent that the Court is doing any

19  kind of balancing or weighing of interest, we think it is very

20  important.  You will not be distracted from any current duties

21  he is performing on behalf of the public.  He has no current

22  duties on behalf of the public.  The only policy -- and, by the

23  way, he has not moved to quash his subpoena in his personal

24  capacity so undue burden on him as individual witness is also

25  not before the Court.  The only burden that is really

L7F5secC

1      cognizable in this context is the attenuated concern that if

2      this sort of thing became routine it would be a problem getting

3      qualified people to serve.  And that's certainly a factor that

4      Courts have considered but we do think this is an unusual and

5      exceptional case and we don't think it is run of the mill and

6      we don't think that a decision requiring him to testify would

7      cause anyone who was thinking about whether to take the job of

8      SEC division director would think, *Gosh, if I do this and I*

9      *give a really important speech, someone might want to ask me*

10     *questions about it years later*.  I don't think that's a

11     plausible scenario in which the government has legitimate

12     interests that are at stake.

13             Going to the question of firsthand knowledge, because

14     although I think that, as your Honor sort of suggested that the

15     Hinman speech was the crux of the personal knowledge in this

16     case but it is not the only thing we want to ask about, it is

17     not the only thing that we have a basis to believe that

18     Mr. Hinman has personal, relevant, unique firsthand knowledge

19     of.  We think that there are a number of situations leading up

20     to but really for the entire year surrounding that June 2018

21     speech, I would put it from about March 2018 to March 2019, he

22     had a number of communications with individuals in the

23     marketplace where people are coming and we believe -- we don't

24     know what happened because we haven't asked the questions

25     yet -- we believe that they were either asking for guidance or

L7F5secC

1    presenting their views to people in the marketplace as to

2    inform players in the industry as to the status of these

3    digital assets and those are relevant for multiple, several

4    reasons.  One is that if people are coming in and expressing

5    widespread view in the industry that when you buy digital

6    assets, a piece of code itself is not a contract or an

7    investment contract, that that's relevant to how Ripple's XRP

8    was held out in the marketplace which goes to the question of

9    whether it was an investment contract under *Howey* or under the

10   Securities Act generally.

11          Second, if those individuals were coming in and

12   expressing confusion about whether and when digital assets

13   could be regulated as securities, people said that and he

14   remembers it, or he can tell us who the people were who came in

15   and said to him that they were confused about these issues,

16   then would be relevant both Ripple's fair notice defense and

17   would also be relevant to the individual states of mind.  Now,

18   we have cited some examples of communications we wanted to ask

19   about in the letter and those are under seal because they

20   involve documents that the SEC designated as confidential.

21          I know I am talking a little fast here.  I want to

22   pause and ask if your Honor has any questions.

23          THE COURT:  No, I'm following you.

24          MR. RAPAWY:  OK.

25          So, but we did reach out to the SEC, we are going to

L7F5secC

1    try to narrow those redactions and get something with more

2    disclosure on the docket in the near future.  They said that

3    did they did not object to the disclosure of the individuals

4    and entities that communicated with Mr. Hinman or the general

5    subject matter of those conversations.  So, on that basis, I

6    want to point out the fact that leading up to that June 2018

7    speech he met personally with the founder of the Ethereum

8    Foundation, and also with representatives of ConsenSys, a

9    leading software development company for Ether.  And so those,

10   and we believe other conversations -- we don't know all of the

11   conversations because we have not been able, through discovery,

12   to get a complete list -- are among the matters that we think

13   we would like to ask him about and that he has personal

14   knowledge of.  He was a focal point for these conversations in

15   the industry in a way that no other individual was and I would

16   like to sort of, on that point, to address the question

17   couldn't we get it from the third-parties?  Because I know that

18   is a point that the SEC raised in its letter that is something

19   that might be on your Honor's mind.  And the answer is for some

20   of them we can and we are trying, but we don't know who all the

21   third-parties were.  We believe he had more conversations with

22   more people than we have been able to determine and he is the

23   one person who can tell us which of those conversations

24   happened, which of those conversations were substantive, and

25   even to the extent that his own recollections of those

1    conversations were not relevant evidence -- and we believe they

2    are -- we can then go on to seek further discovery from those

3    third-parties and focus our efforts on the places where we can

4    actually find this evidence that we need for our case.

5             THE COURT:  On that, Mr. Rapawy, on that point, if you

6    were coming to me and saying we need to depose this person

7    because we need to know who he spoke to in these meetings, I

8    would say to you there are definitely easier and less intrusive

9    ways to get that information, presumably Mr. Hinman had a chief

10   of staff or a deputy who participated in those meetings.  I

11   suspect knowing nothing about Mr. Hinman's practices but

12   knowing something about how high-level government officials

13   act, that he wasn't meeting with these people on his own; or

14   you could get his calendar which, as a government official is

15   almost certainly preserved, know who he is meeting with.

16            So, on that cause I don't know why that would be a

17   basis in and of itself why that sort of information would

18   justify a deposition.

19            MR. RAPAWY:  Well, I don't know, your Honor, whether

20   there was any one particular person who was with him in all of

21   these conversations.  We have just very recently, in fact last

22   night, gotten a privilege log from the SEC that describes some

23   communications that may have been relevant to these discussions

24   that he had.  So, I am not sure that it would be as easy to do

25   as your Honor is suggesting but I take your point but there is

L7F5secC

some of that that we can do through other means.  I do think it

is, insofar as you are weighing the equities as to this

deposition as a whole, that the ability to ask him who he had

these conversations with, conversations that he invited people

to come in and have with him personally, he probably is the

single best source of information for that and so I think it's

at least a legitimate thing that we plan to get out of this

deposition in addition to discussing specifically the speech

with him.

          I also think he is uniquely situated to help us

develop the facts that will go to -- and I alluded to this

point earlier -- whether the speech is, itself, ever was

adopted or approved by the SEC which I think will significantly

affect its admissibility at trial or on summary judgment and

the probative weight that a fact finder would accord to it.  I

do think that we have accomplished some facts to support that

so far, the fact that the chairman said it to Congress, the

fact that the Office of Investor Education put it out there.

But, that said, I think that this is going to be hotly

contested and we need everything we can get and he is going to

be a significant, firsthand, unique source of knowledge about

the circumstances surrounding that speech and whether it was

intended to be taken as the views of the Agency and because of

his involvement in considerations after the speech whether it

was received that way.  Because I think it would be relevant to

1    the fair notice defense and to the individual states of mind if

2    it was taken as guidance, if people told him they were

3    understanding it as guidance even if he maintained, as a formal

4    matter, that it was not the views of the agency.

5           Actually, I would like to make one further point on

6    the question of what happens if the speech itself was the

7    agency action or the agency decision, which is if the speech

8    itself were the agency decision, it would still, communications

9    after the speech would then be post-decisional and we can get

10   discovery of post-decisional discussions under the deliberative

11   process privilege doctrine as discussed I believe in the *Sears*

12   *Roebuck* case that is cited in the *Fish & Wildlife* case.  So,

13   even if you were to assume for assume that is for purposes of

14   analysis that it were a decision we could still have the

15   conversations afterwards where people told him how the industry

16   reacted to it.

17          I feel like I have covered most of the topics that I

18   planned to address.  I did want to say with regard to the *Fish*

19   *& Wildlife* decision, in particular, that I think that case can

20   be fairly read to say that the agency never has to reach a

21   final decision.  In that case there was a draft biological

22   opinion, it never got to be a final biological opinion.  I

23   guess the agency decided not to issue a final biological

24   opinion and the decisions leading up to the draft were still

25   privileged but I don't think it permits what counsel for the

L7F5secC

1    SEC, with respect, is trying to do here which is to say

2    decisions are pre-decisional, if there is any possibility that

3    the agency could someday make a decision, which they claim they

4    hadn't as of 2020, therefore everything gets cloaked going back

5    years because of the possibility that maybe someday they would

6    say something about Ether that they admit is actually agency

7    statement.

8          I do expect we will contest the applicability of the

9    deliberative process privilege.  I think that should be done on

10   a full record after the deposition, as it was done in *Nacchio*.

11   And, I also think that one thing one thing your Honor has not

12   seen in their letters is any communication that the assertion

13   of the deliberative process privilege has been authorized at

14   the appropriate agency level, it has to be done by someone

15   quite senior, and I would refer your Honor to the citations in

16   our April 20th letter which is ECF No. 142 at page 4 on that

17   point.

18         Finally, your Honor, I would like to spend a moment on

19   the sort of general policy concerns that Ms. Stewart started

20   with at the outset of her argument and the sort of uniqueness

21   of this case.

22         This is not an ordinary case.  This is a case where

23   the SEC is asserting, in litigation for the first time, that a

24   previously unregulated digital asset, that was in widespread

25   commercial use for the last eight years, is and always was a

L7F5secC

1    regulated security.  And on that theory you destroy the value

2    of promising technology imposed with retrospective penalties on

3    my clients, on the individual defendants, and to cause massive

4    losses to the XRP holders whose interests it is ostensibly

5    seeking to protect.  It is a very unusual set of facts and it

6    is one that puts market perception and industry confusion about

7    XRP and other digital assets for the SEC's claims and the core

8    of our defenses in a unique way.  And in unique cases, in

9    highly unusual cases you do get, sometimes have depositions of

10   the senior agency decision makers and people who inserted

11   themselves into the process through which these unusual agency

12   actions happened.  And I am referring indirectly to the case

13   involving the Secretary of Commerce and the decision by Judge

14   Furman that I know your Honor is familiar with.  And we have a

15   very legitimate basis to ask Mr. Hinman, specifically and

16   personally, about what he learned by acting as the focal point

17   of communications about industry perceptions and market

18   confusion as to whether digital assets were securities.  He was

19   responsible for speaking directly to the industry, to providing

20   public guidance whether it was phrased as his own views or

21   whether it was later adopted by the agency, and for attempting

22   to clarify the SEC's position on an extremely confusing issue

23   of law, issues of law and issues of facts.  We think that the

24   guidance that he gave in that speech that was either intended

25   or understood, or both, protects our case in a number of ways.

L7F5secC

1    Under those circumstances it is reasonable and proportionate

2    for us to seek his deposition and we respectfully submit that

3    it would prejudice our defense if we are completely denied the

4    opportunity to do so as the SEC is attempting to do.

5             On that basis, I would ask that the motion be denied.

6             THE COURT:  Thank you.

7             Do any of the counsel for the individual defendants

8    wish to be heard?

9             MR. FLUMENBAUM:  Your Honor, this is Mr. Flumenbaum

10   for Mr. Larsen.

11            I agree with what Mr. Rapawy has stated.  I want to

12   point out the obvious inconsistency, the SEC's argument before

13   you where they started out by saying that the speech reflects

14   his own personal views.  And the SEC's position is that it

15   still hasn't determined whether Either and BitCoin are

16   securities or currencies.  Under those circumstances,

17   deposition is a must.  We must be able to ask him about what he

18   stated, his other public remarks, and we will have to deal with

19   the SEC's improper use of deliberative process to try to shield

20   that but that should be done on a full record after his

21   deposition.  They are clearly taking an improper position with

22   respect to deliberative process.  They won't be able to make

23   out the basis for asserting that privilege.

24            THE COURT:  Thank you.

25            Ms. Stewart, can I ask one practical question?  My

L7F5secC

1    understanding is the deposition is noticed for Monday.  If I am

2    to authorize the deposition, is it still going forward on

3    Monday?

4                 MR. FLUMENBAUM:  Yes.

5                 MS. STEWART:  Your Honor, we would need time to

6    evaluate sort of our next steps in the event that your Honor

7    chooses to allow the deposition to go forward but, yes, the

8    parties had agreed on Monday as the sort of place holder date

9    for the deposition.

10                THE COURT:  OK.  Thank you.

11                MR. FLUMENBAUM:  The defendants are prepared to take

12   his deposition on Monday.  We have already adjourned it -- the

13   original date -- in June.

14                THE COURT:  Is that Mr. Flumenbaum speaking?

15                MR. FLUMENBAUM:  Yes.  I'm sorry.

16                And so, we had originally adjourned it after the SEC

17   indicated that it was going to make the motion before your

18   Honor but we do have a cutoff at the end of the month and it is

19   very important to get this deposition in as promptly as

20   possible.

21                MS. STEWART:  Your Honor, can I make a couple of

22   additional points?  This is Ladan Stewart.

23                THE COURT:  Yes.

24                MS. STEWART:  If that's OK?

25                THE COURT:  Please.

L7F5secC

1          MS. STEWART:  I just wanted to respond to a couple of

2     the responses that Mr. Rapawy makes.

3          First off, it has become clear both from his comments

4     and Mr. Flumenbaum's comments that what defendants are really

5     after here are to depose Mr. Hinman twice.  They want to depose

6     him, they want us to sit for hours and go through questioning

7     on the record and object to basically every question they ask

8     about the speech, about his personal opinions about Ether,

9     about his communications with agency officials and all of that.

10    Then they want to bring that record to your Honor and then, if

11    they succeed, they want to depose him again.  And I submit to

12    your Honor that that sort of litigation strategy is not an

13    exceptional circumstance under *Lederman* and that the more

14    appropriate avenue here would be to litigate these privilege

15    issues, as defendants have already told your Honor they intend

16    to do, which they can do on the basis of the privilege log that

17    we have already provided and are continuing to provide this

18    week and next week, and then we can litigate that issue before

19    your Honor and if your Honor decides that there are not

20    appropriate assertions of privilege, then Director Hinman could

21    sit for a deposition.  But to do that now, with this issue

22    outstanding, with the motion to strike outstanding which is

23    really the core of their wanting to depose Mr. Hinman is this

24    fair notice defense which your Honor has already ruled is

25    objective.  So, it is hard to understand what a market

L7F5secC

1    participants thought about Ether or BitCoin could be relevant

2    to Ripple's fair notice defense.  But, putting that relevance

3    issue aside, with all of these outstanding issues, it is just

4    difficult to understand why we need to expose Director Hinman

5    to this deposition right now.  The discovery window does not

6    end until the end of August, there is an additional 90-day

7    discovery window for the individual defendants' case.  There is

8    just simply no reason that this decision needs to be made right

9    now on this record.

10          The other point that I wanted to make was, just so we

11   are clear --

12          THE COURT:  Can I just interrupt you?  Sorry,

13   Ms. Stewart, just to interrupt for one moment?

14          You raised the *Nacchio* case, which is a 12-year-old

15   case, 11-year-old case, and we scrambled to find it.  It looks

16   like, based on Mr. Rapawy's quick read, based on my quick read,

17   based on my law clerk's quick read in the middle of a court

18   conference that in that case, which you thought was persuasive,

19   that deposition happened and then there was judicial ruling on

20   the privilege assertion.  So, are you suggesting that *Nacchio*

21   is not a kind of precedent that you want me to look to as

22   guidance for how to handle this dispute?

23          MS. STEWART:  No, your Honor.  *Nacchio* involved a more

24   junior SEC official so *Lederman* was not an issue as far as I

25   understand in that case.  It was not the kind of case where

1    there was dispute about whether it was appropriate under *Morgan*

2    and *Lederman* to depose that individual so that case is really

3    about deliberative process privilege and not about the larger

4    issue of whether a high-level official of the SEC should be

5    deposed and that was the proposition for which we were using it

6    today.

7              THE COURT:  Continue.

8              MS. STEWART:  Thank you.  This is Ladan Stewart again.

9              I just wanted to make a couple of other quick points

10   about the third-party communications that Mr. Rapawy spent a

11   lot of time talking about.  You know, as your Honor pointed

12   out, there are other ways to get this information and, in fact,

13   defendants already have this information.  We have produced

14   documents, we have produced calendar entries, we will continue

15   to produce any relevant documents.  We have provided

16   interrogatory responses with this information.  There just is

17   no basis for defendant to say that we think there are

18   conversation that we don't know about because they have the

19   documents.  And, as I mentioned, it is also the case that these

20   communications that they're having that -- I'm sorry -- that

21   these types of third-party communications can't go to the

22   objective test that your Honor has already talked about for the

23   fair notice defense.

24             And one thing that I just wanted to point out that I

25   thought was interesting as I was going back through the

L7F5secC

1    transcript of our April 6 conference was your Honor asked a

2    question in that conference about if the SEC has made this

3    public announcement through this speech by Director Hinman

4    about Ether, then why is it that conversations that Director

5    Hinman or anyone at the SEC may be having with third-party

6    folks after that is even relevant.

7            Your Honor said:  *So, my question to you is after the*

8    *public announcement in whatever fashion and in whatever opaque*

9    *way was made, after that announcement, why would it matter what*

10   *they were saying about those assets if the market now had that*

11   *information and would act accordingly?*  This is on page 30 of

12   the transcript.  And Mr. Kellogg responded that the reason that

13   this was relevant was because there may have been conversations

14   about XRP and that's why this mattered even after the Ether

15   speech.  Now, here, Director Hinman has already said in his

16   declaration that he had no conversations with market

17   participants about XRP.  So, it sort of goes to show that there

18   really is nothing here.  There is nothing here that is relevant

19   and in light of that it just cannot be that under the

20   circumstances, in light of the chilling effects and all of the

21   issues that we have talked about, that this can possibly rise

22   to the exceptional circumstances that's required under *Morgan*

23   and *Lederman*.

24           I am happy to answer any more questions but there is

25   nothing else at this time.

L7F5secC

1          MR. FLUMENBAUM:  Your Honor, this Mr. Flumenbaum.

2          I would just like to make one comment.  We don't

3    intend on asking questions in which the deliberative process

4    privilege should properly be applied.  There are hours of

5    depositions from Mr. Hinman based on specific public statements

6    that he made and specific meetings that he made.  As Mr. Rapawy

7    said, he met with the principles of Ether one week before his

8    speech.  That is not deliberative process what was said during

9    those meetings.  And he should answer that question.  *What was*

10   *he told about Ether?  What was he told about centralization?*

11   Those are proper questions that could be asked of him and what

12   the SEC is trying do is prevent any discussion of any of the

13   background, any of his understanding at the time that he made

14   his statements and the meaning of those statements.  And that's

15   just inappropriate.  There is plenty to depose him on, I am

16   sure they'll invoke the deliberative process where they think

17   it is appropriate and I hope they do it only where it is

18   appropriate but, if they don't, we will come back and challenge

19   that but there is no basis to prevent his deposition on that

20   basis at all.

21         MS. STEWART:  Your Honor, this Ladan Stewart.  If I

22   may for just one moment?  I'm sorry.  One moment.  I apologize,

23   your Honor, this is Ladan Stewart again.

24         What Mr. Flumenbaum says goes directly to the point I

25   was trying to make earlier which is that the conversations that

L7F5secC

1    Director Hinman is having with third-parties, they already know

2    who the third-parties are and they can ask those third-parties.

3    There is no reason to depose Director Hinman to ask those

4    questions.  And, again, I want to emphasize, anything to do

5    with the speech in terms of the intent of the speech, the

6    reasons Director Hinman gave the speech, discussions he had

7    about the speech, those, we contend, are all covered by the

8    deliberative process privilege.  So, if this deposition does go

9    forward, we will instruct Director Hinman not to answer those

10   questions.  So, I don't think that Mr. Flumenbaum is going to

11   get the information that he now says he is going to get about

12   the speech.  Again, the speech is the speech.  Anything beyond

13   that is privileged.

14           Thank you, your Honor.

15           MR. RAPAWY:  Your Honor, this is Gregory Rapawy.  May

16   I very briefly?  I know there has been a lot of colloquy.  We

17   do object --

18           THE COURT:  Briefly.

19           MR. RAPAWY:  Briefly.

20           We do object to pushing the speech out in time.  There

21   is an August 31st deadline.

22           THE COURT:  You mean the deposition?

23           MR. RAPAWY:  Yes.  Excuse me.  I do mean the

24   deposition.  Too much talking about the speech.

25           We want to be able to do follow-up after the

L7F5secC

1    deposition and we really also feel that our client would be

2    prejudiced if discovery was extended again; it has already been

3    extended once over our deposition.  I do think it should be

4    possible to avoid two depositions here if the privilege

5    objections are limited to reasonable scope.  We certainly don't

6    intend to provoke two depositions.  We may get two if there are

7    blanket objections but we hope to avoid that.

8              That's all I have.

9              THE COURT:  OK.

10             MR. SOLOMON:  Your Honor, I'm sorry.  It is Matthew

11   Solomon for Mr. Garlinghouse.  I had one point that I would

12   like to make, if I may, and I will be very brief.

13             THE COURT:  Go ahead.

14             MR. SOLOMON:  I wasn't going to make this point the

15   first time Ms. Stewart said it but she has now said it twice to

16   you, that the individual defendants have an additional 120-day

17   discovery period.  After the motions to dismiss are decided we

18   don't think we will need it because we think they will be

19   granted but that is neither here nor there are in terms of

20   instant discovery period.  In fact, the SEC only agreed to that

21   additional discovery period if we could not rely on it to avoid

22   discovery on issues that are relevant now.  That's why my

23   client and Mr. Larsen will be sitting for depositions during

24   this discovery period.

25             So, the notion that we are somehow pulling a fast one

L7F5secC

1    and trying to push discovery now when we have the second bite

2    at the apple is based on a false premise.  The entire reason we

3    got that discovery was only because the SEC said we couldn't

4    delay anything, nor should they now be able to delay taking a

5    deposition that is clearly relevant -- I think we established

6    today -- of former Director Hinman to avoid discovery on these

7    issues.

8            Thank you, your Honor.

9            THE COURT:  Thank you.

10           Thank you, all, for your excellent argument, as

11   always.  I think the issues remain complicated.  I am going to

12   rule in part.  For the purposes of this dispute I am prepared

13   to find that Mr. Hinman was a high-ranking official.  He held

14   the head of one of the SEC's significant -- one of six

15   divisions and commanded significant authority and held

16   substantial responsibility within a very important federal

17   agency.  So, on the facts here I do believe that he is entitled

18   to the standard that is set forth in the *Lederman* case, 731

19   F.3d 199.  I recognize that he is a former official and under

20   the *Moriah* case that is certainly a factor that I considered in

21   thinking about how to rule here.

22           This is not a run-of-the-mill SEC enforcement case.

23   As Mr. Rapawy noted when he was speaking on this particular

24   issue, this case is I think separate and part from the standard

25   cases that the SEC brings and I do not believe that authorizing

L7F5secC

1    Mr. Hinman's deposition is going to open the floodgates and

2    serve as a basis for any defendant in an SEC enforcement action

3    to seek the depositions of heads of divisions.  And I expressly

4    find that this case is unique, that the nature of the case

5    involves significant policy decisions in our markets and that

6    the amount in controversy also is substantial and that the

7    public's interest in resolution of this case is also quite

8    significant.  So, I think that this case is not a basis for

9    future cases and future judges to find that a deposition is

10   appropriate in all instances but I do think in this case

11   Mr. Hinman, given the speech, must sit for a deposition.  So, I

12   am going to authorize his deposition.

13           There is a separate question about this issue of

14   privilege and I am very much not disposed to allowing or

15   requiring, I should say, Mr. Hinman to sit twice.  And given

16   the issues that have been raised today, I think there are a

17   couple of ways we can go forward.  Defendants are keen to take

18   this deposition on Monday -- which is why we are holding this

19   conference today -- and have suggested that they believe that

20   there is significant territory to cover where they do not

21   believing the privilege will be invoked.  Ms. Stewart seems to

22   think otherwise and has suggested, not impermissibly, but has

23   suggested she is going to direct Mr. Hinman not to answer wide

24   swaths of questioning and assert the deliberative process

25   privilege.  It seems to me there are a couple of ways we can

L7F5secC

1    proceed here:

2            First, we can go forward with the deposition on Monday

3    and a record can be created and the parties can come back to me

4    if they would like.  Everybody is on notice that I am very much

5    disinclined right now, given what we are talking about, to

6    require Mr. Hinman to sit twice.

7            The second way we can proceed is to have the parties

8    try and work out some sort of agreement between them about the

9    scope of the deposition and if they can't reach agreement, to

10   come back to me on specific questions -- I don't want specific

11   deposition questions but specific areas of questioning and get

12   a ruling from me on what areas would be protected and what

13   areas would not.  I am sensitive to the defendant's interest in

14   moving the case forward, I know that the SEC shared that

15   interest as well.  It seems to me that putting the deposition

16   off for a week and thinking a little bit more about how the

17   privilege might apply probably is a good idea and I guess I say

18   that with the hopes that the parties can have a conversation

19   maybe tomorrow and let me know how they would like to proceed.

20   But, I think that that makes the most sense.

21           Ms. Stewart, any questions about my ruling?

22           MS. STEWART:  This is Ladan Stewart from the SEC.

23           That makes good sense to us and we will certainly meet

24   and confer and get back to the Court.

25           THE COURT:  Mr. Rapawy?

L7F5secC

1          MR. RAPAWY:  Yes, your Honor.  Given the primaries

2     have you outlined, I agree.  I would like to consult with my

3     client certainly and it would be appropriate and convenient to

4     get back to the court.

5          THE COURT:  OK.  Terrific.  Here is what I am going to

6     do.  I am going to ask, given that this deposition may go

7     forward on Monday, that the parties meet and confer this

8     evening, tomorrow morning, and send me a letter by tomorrow

9     afternoon to let me know what the plan is.  You may choose to

10    go forward with the deposition on Monday or you may choose to

11    adjourn the deposition, I think for a brief period, and either

12    try to reach a resolution among the parties about what

13    questions would be permissible and what would be off limits, or

14    to bring that issue to me so that I can give some rulings with

15    parameters so that the parties know where I believe the

16    privilege would be appropriately invoked.

17         So, I will just wait to hear back from the parties

18    tomorrow.

19         MS. STEWART:  Thank you, your Honor.

20         THE COURT:  Thank you.  Anything further, Ms. Stewart?

21         MS. STEWART:  Not from me.  Thank you.

22         THE COURT:  Mr. Rapawy, is there anything further?

23         MR. RAPAWY:  No, your Honor.  Thank you, your Honor.

24         THE COURT:  Yes.  Who was that?

25         MS. ZORNBERG:  Your Honor, this is Lisa Zornberg from

L7F5secC

1    Debevoise & Plimpton.  I didn't expect to be a speaker.

2              If you would permit, given what was just discussed

3    about the meet and confer, I feel compelled, on behalf of

4    Ripple, to bring to the Court's attention that after two trips

5    to the Court already and two rulings by the Court to get

6    internal memoranda of the SEC, we have learned very recently --

7    and we have been meeting and conferring with the SEC on this

8    already and have reached a dead end on it -- the SEC informed

9    us last week -- the SEC has not produced a single internal

10   memoranda to defendants claiming that all of the responsive

11   documents that were ordered under the Court's orders are being

12   withheld for deliberative process privilege.  I flag that for

13   your Honor because we have been attempting, in the utmost good

14   faith, to pierce the overbreadth of the deliberative process

15   argument that the SEC has been advancing including counter  to

16   well-established law that even if you withhold opinions for

17   deliberative process you can't withhold fact.  The SEC

18   confirmed again, at noon today, they are withholding every part

19   of every responsive internal memoranda on deliberative process.

20   They have produced not one and they don't plan to.

21              I raise this to the Court because, as part of that

22   ongoing meet and confer, we think the SEC's position is

23   untenable, it's way overbroad.  We are preparing to take that

24   very issue on deliberative process to your Honor because it is

25   prejudicing Ripple and the individual defendants, this cloak of

L7F5secC

1   deliberative process.  And it is quite consistent with

2   Ms. Stewart's statement on this call, oh, if you depose

3   Mr. Hinman, we are going to say everything is covered by

4   deliberative process.

5          So, I just want your Honor to be aware that there has

6   been already multiple efforts by the defendants to bring the

7   SEC to reason on this.  We will meet and confer with them again

8   to seek reason on this but the issues are of apiece which is

9   that the SEC, in a very blanket way, is throwing deliberative

10  process over everything that they don't want to share without

11  drawing any finer lines that that.  Hopefully, based on today's

12  call, they'll come around to a different view but your Honor

13  should not be surprised, if when we come back to the Court if

14  the SEC remains as steadfast in this kind of blanket claim of

15  deliberative process, then we will come back to the Court and

16  will probably go beyond just the issue of Mr. Hinman's upcoming

17  deposition.

18          MS. STEWART:  Your Honor, this is Ladan Stewart.

19          THE COURT:  Thank you.

20          MS. STEWART:  If I may?

21          I disagree with much of what Ms. Zornberg just said

22  with the exception that I agree with her that the privilege

23  issues here are beyond Director Hinman's deposition.  The

24  parties are still in the process of exchanging privilege logs

25  and have agreed to finalize that process by the end of next

1   week.  And Ripple and the other defendants have already told us

2   and they have now made very clear to your Honor that intend to

3   challenge those assertions.  So, it does make sense to do this

4   all together as part of briefing before this Court.  We will of

5   course try to meet and confer ahead of time but I agree with

6   Ms. Zornberg that this issue goes beyond Director Hinman, and

7   perhaps what does make sense is for us to meet and confer and,

8   if we can't, to propose a briefing schedule to your Honor for

9   these issues to get briefed expeditiously.

10         THE COURT:  I do think it makes sense to address all

11   of this at once, I think that's most efficient thing, and I

12   think it will also give me the most information.  And so, I

13   would urge the parties to try to address both the privilege log

14   issues that Ms. Zornberg just raised, as well as the privilege

15   issues that we have been discussing with respect to Mr. Hinman,

16   and it may make sense to brief that in an expedited basis in

17   order to get a ruling from me before the deposition of

18   Mr. Hinman goes forward.  Again, I'm going to leave that to the

19   parties for meet and confer this evening and tomorrow morning

20   and we will just look for a letter tomorrow afternoon,

21   hopefully with an agreed upon plan going forward.

22         MR. FLUMENBAUM:  Your Honor, this is Mr. Martin

23   Flumenbaum.

24         The problem that I see with the procedure going

25   forward is that, as I said, we can we can ask Mr. Hinman many

L7F5secC

1    questions at his deposition on Monday about his communications

2    with third-parties, both before his speech and after his

3    speech.  If the SEC is going to claim that third-party

4    conversations with Mr. Hinman are covered by deliberative

5    process, then we are never going to be able to go forth on

6    Monday.  So, maybe some guidance from your Honor -- I don't see

7    how the deliberative process privilege can apply to third-party

8    communications that Mr. Hinman had directly.  So, my view would

9    be if the SEC is going to maintain that that's covered by

10   deliberative process privilege, then your Honor should rule on

11   that right now because I don't see how it can possibly be

12   covered by the deliberate process privilege.

13            THE COURT:  For the sake of the court reporter, that

14   was Mr. Flumenbaum.

15            UNIDENTIFIED SPEAKER:  Um --

16            THE COURT:  Hold on.  Sorry.  We are going to wrap up

17   this conference.

18            I am going to request that the parties meet and confer

19   on this issue.  If Mr. Flumenbaum thinks that communications

20   with third-parties are absolutely going to be fair game and he

21   wants to go forward with the deposition because he thinks that

22   there is no good faith privilege issue, you can put that in

23   your letter to me tomorrow.  And if you intend to go forward

24   with the deposition on Monday, I will do my very best to get

25   you a ruling on that particular issue.

L7F5secC

1          It seems to me that the questions you are really

2     interested in have to do with this speech and those are the

3     ones where I think the deliberative process question is much

4     more complicated.  And so it may be easy for me to answer

5     whether or not the fact that Mr. Hinman spoke with

6     third-parties is or is not protected but this deposition is not

7     about that and, in fact, if this deposition were just about

8     those third-parties, I probably wouldn't authorize it because

9     it probably would not fall within the exceptional circumstances

10    category.  What in my mind is exceptional, and why I am

11    authorizing the deposition in the first place, is because of

12    the nature and effect of the 2018 speech.  That is what makes

13    this deposition exceptional and that is why I am authorizing

14    it.  And so, it seems to me to press forward, because you are

15    eager to hear who he spoke with, you may cut off your nose to

16    spite your face.

17         MR. FLUMENBAUM:  Well, I think third-party

18    conversations would be relevant to the speech itself.  For

19    example, his meetings with the head of Ether a week before his

20    speech I think would have great relevance to his speech.  So, I

21    look at it as part of this making the speech and reaching the

22    conclusions he did.

23         THE COURT:  Understood.

24         OK.  So I will hear from the parties tomorrow

25    afternoon.

L7F5secC

1              MS. STEWART:  Thank you, your Honor.

2              THE COURT:  Thank you, everybody.

3              MR. RAPAWY:  Thank you, your Honor.

4              MR. FLUMENBAUM:  Thank you.

5                            o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25