# Exhibit K

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    SECURITIES AND EXCHANGE
     COMMISSION,
4
                    Plaintiff,
5
                 v.                        20 cv 10832 (AT) (SN)
6
     RIPPLE LABS INC. et al.,
7
                    Defendants.
8
     ------------------------------x
9                                          New York, N.Y.
                                           June 7, 2022
10                                         3:35 p.m.

11   Before:

12                    HON. SARAH NETBURN,

13                                         Magistrate Judge

14                         APPEARANCES

15   U.S. SECURITIES AND EXCHANGE COMMISSION
          Attorneys for Plaintiff
16   BY:  PASCALE GUERRIER
          LADAN F. STEWART
17        MARK R. SYLVESTER

18   DEBEVOISE & PLIMPTON, LLP
          Attorneys for Defendant Ripple
19   BY:  LISA R. ZORNBERG

20   CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Garlinghouse
21   BY:  MATTHEW SOLOMON
          NOWELL D. BAMBERGER
22
     PAUL WEISS RIFKIND WHARTON & GARRISON LLP
23        Attorneys for Defendant Larsen
     BY:  MARTIN FLUMENBAUM
24

25
```

```
 1                 (Case called)

 2                 THE DEPUTY CLERK:  Starting with the Securities and

 3       Exchange Commission, please State your names for the record.

 4                 MS. GUERRIER:  Good afternoon, your Honor.  I'm

 5       Pascale Guerrier on behalf of the SEC.

 6                 THE COURT:  Thank you.

 7                 MR. SYLVESTER:  Good afternoon, your Honor.  Mark

 8       Sylvester for the SEC.

 9                 THE COURT:  Thank you.

10                 MS. STEWART:  And Ladan Stewart for the SEC.  Good

11       afternoon.

12                 THE COURT:  Good afternoon.  Thank you.

13                 Why don't you just state your clients since I'm not

14       sure who is sitting in what order.

15                 MR. SOLOMON:  Good afternoon, your Honor.  Matthew

16       Solomon representing Brad Garlinghouse.

17                 MS. BAMBERGER:  Good afternoon, your Honor.  Nowell

18       Bamberger representing Brad Garlinghouse.

19                 MS. ZORNBERG:  Good afternoon, your Honor.  Lisa

20       Zornberg on behalf of Ripple Labs.

21                 MR. FLUMENBAUM:  Martin Flumenbaum on behalf of

22       Christian Larsen.

23                 THE COURT:  Thank you.

24                 First, I'm Judge Netburn.  It's nice to see you all.

25       We've had a lot of telephone conferences.  I'm happy to have
```

 1    you all here in court.  It's nice to see you all.

 2            Second, thank you for accommodating the last-minute

 3    switch.  Our version of supply-chain problems is with respect

 4    to court reporters.  So getting a court reporter here can be

 5    difficult.  So to accommodate the court reporters, we had to

 6    move it.  So I appreciate everybody's last-minute move on that

 7    front.

 8            Lastly, with respect to the court reporters, if

 9    everyone can make sure they always are speaking into the

10    microphone, it will facilitate her ability to transcribe the

11    conference correctly.

12            All right.  So we are here on the letter brief that

13    the SEC filed in connection with its application to withhold

14    certain documents in connection with the Bill Hinman speech on

15    the grounds that they are protected by the attorney-client

16    privilege.  I've read the SEC's April 29 and May 18 reply

17    letter and the defendants' joint letter filed on May 13.

18            Let me jump right in and begin with the SEC.  So I'd

19    like for you to help me understand what legal advice you are

20    arguing that Director Hinman received and for what business

21    purpose that advice was given.

22            MS. GUERRIER:  Thank you, your Honor.

23            Your Honor, Director Hinman sought the counsel of SEC

24    attorneys regarding the application of the securities laws to

25    digital assets.  The legal advice that Director Hinman received

1    concerned the federal securities laws.

2              THE COURT:  Can you make sure your microphone is even

3    closer.  Sorry.  With the mask, it's a little hard to hear, and

4    I want to hear everything that you're saying.

5              MS. GUERRIER:  Should I start again, your Honor?

6              THE COURT:  Please.

7              MS. GUERRIER:  Director Hinman sought legal counsel

8    from SEC attorneys, beginning with the attorneys in the

9    Division of Corporate Finance, about the application of the

10   securities laws to digital assets in connection with the speech

11   that he gave on June 14, 2018.

12             That speech was very legal, purely legal, and

13   addressed legal issues.

14             THE COURT:  The speech was legal you said?

15             MS. GUERRIER:  Yes, your Honor.  Basically the speech

16   addressed the securities laws application to digital assets.

17   So when Director Hinman sought the counsel of the SEC

18   attorneys, he wanted their legal advice regarding the

19   application of the securities laws to digital assets,

20   especially regarding when an offer of sale of a particular

21   digital asset becomes a security under the federal securities

22   laws.

23             In the first 23 drafts that we've asserted the

24   attorney-client privilege for, that communication from counsel,

25   SEC attorneys, to Director Hinman concerns purely legal issues

1   regarding the subject matter.

2          THE COURT:  What was the legal advice for?  I

3   understand what he was told you describe as legal advice

4   because it was about the legal standards concerning digital

5   assets.

6          But what was he seeking that advice for?

7          MS. GUERRIER:  Director Hinman wanted to make sure, in

8   terms of the legal issues, not inconsistent with the SEC's

9   position on the securities laws' application to digital assets.

10          So he needed to speak with attorneys who were versed

11   in the field of the securities laws in connection with digital

12   assets so that his speech was not inconsistent with the SEC's

13   position, legal position, on the securities laws as it applies

14   to digital assets.  So that was why the legal advice was

15   sought, and that was the purpose of obtaining that legal advice

16   from SEC attorneys.

17          THE COURT:  Because he didn't want to say, I think the

18   Howey factor is applied this way only to have the SEC take a

19   position that it applied a different way?

20          Is that the concept?

21          MS. GUERRIER:  I think the concept is what exactly is

22   the security -- what is the law on digital assets and is he

23   saying something that is inconsistent with that legal position

24   of the SEC, so whether or not he could say something that

25   contradicts the SEC's legal position on the securities laws'

1    application to digital assets.

2          THE COURT:  So he wasn't seeking legal advice to

3    educate himself on the legal standard?  He was just saying,

4    this is what I'm going to say.  Is this inconsistent with what

5    you said earlier?

6          MS. GUERRIER:  Your Honor, no.  He needed to educate

7    himself on the legal standards with regards to how the

8    securities laws applied to digital assets.  He needed that

9    advice from the SEC attorneys.

10          And in connection with his speech, the way that he

11    gave that speech, he spoke a lot about Howey factors.  He spoke

12    about the securities laws' applications to digital assets.  But

13    in the drafting of that speech, he wanted legal counsel as to

14    how the securities laws apply to digital assets.

15          THE COURT:  Okay.  We've been talking about Mr. Hinman

16    I think since August of 2021.  Then the issue of his deposition

17    came up.  There was a position that the SEC took that he was

18    not speaking on behalf of the SEC when he gave that speech and

19    that his statements cannot be imputed to the SEC; that they

20    were his own personal views.

21          Do you stand by that position today?

22          MS. GUERRIER:  If I may clarify.  If the speech is

23    determined to be his personal speech, as the Court has ruled,

24    that doesn't change the fact that he sought legal counsel about

25    the legal issues that were before him prior to providing that

1    final speech.

2           And he not only sought legal counsel within the

3    division of corp. fin., he also sought legal counsel from other

4    divisions that also were interested and had something to say

5    about the law with regards to the application of the securities

6    laws to digital assets.  And that's trading and markets and

7    investment management.

8           So even if the speech turned out to be, as the Court

9    stated, his personal views on the application of the securities

10   laws to digital assets, it does not change the fact that he

11   sought legal counsel about some of the legal issues that he

12   encountered in that speech.

13          And I also note to the Court that the first draft of

14   the speech was created by the chief counsel for the Division of

15   Corporate Finance.

16          THE COURT:  So here's where I get hung up:  I

17   understand that he is alleged to have sought legal advice from

18   lawyers about these issues.  Lawyers for the SEC are lawyers

19   for the SEC, which is to say that the SEC is the client.  And

20   so if he is receiving legal advice from the agency's lawyers,

21   it would be, I think, for the purpose of providing legal advice

22   to the agency who is the client.

23          And so here is where I'm having this tension because

24   the purpose of the attorney-client privilege, if we can pull

25   the lens back for a moment, is because we have an interest

1   in -- and I'll use "agencies" since that's what we're talking

2   about here -- in agencies making decisions in accordance with

3   the law and consulting with their lawyers to make sure they

4   understand the limits of the law so that they can conduct

5   public business appropriately.

6          The SEC has distanced itself from Mr. Hinman's speech

7   and said that that had nothing to do with the SEC, those were

8   his personal views, and he made that speech based on how he

9   believed the law should be applied or what he thinks about

10  digital assets.

11         So I'm having a hard time reconciling the purpose for

12  which we have the attorney-client privilege to allow agencies

13  to consult with lawyers so that they can make decisions based

14  on what the law requires and the SEC's position in this

15  litigation that Hinman was acting on his own and giving a

16  speech based on his own personal views.

17         And so when I asked you what was the purpose of the

18  legal advice, it's because I think for agency counsel to give

19  legal advice to its client, the SEC, there must be a purpose

20  for that; that the client is saying, we're going to do

21  something or not do something consistent with the law and we

22  need to consult with lawyers to make sure that we are acting as

23  the law requires.

24         But your position seems to be that he is getting legal

25  advice from agency counsel so that he, Mr. Hinman, can give his

1   own opinion on how the law should be applied.  And I think that

2   there's a real tension there.

3          And I'm having a hard time reconciling the purpose of

4   the attorney-client privilege, the nature of the privilege

5   within an agency representation and who the client is, with the

6   SEC's position in this litigation that Mr. Hinman's speech

7   cannot be imputed to the SEC and it can't be viewed as the

8   SEC's word.

9          In your reply letter, you talk about getting counsel

10  for the purposes of developing the speech.  I'm not exactly

11  sure what that is.  You used that phrase "developing the

12  speech," multiple times in your letter.

13         I'm not exactly sure what legal advice can be given

14  for the purpose of developing a speech or whether that would

15  even be available to you.  So I'm trying to really hone in on

16  what we're talking about here, what the purpose of this advice

17  was.

18         MS. GUERRIER:  If I may respond, your Honor.  So let

19  me just try to clarify the SEC's position.

20         We're not taking the position that the Commission

21  made -- the speech was the Commission's speech.  There was no

22  Commission speech.  This was a speech by Director Bill Hinman

23  in his capacity as director of corp. fin.

24         Now, the issue is who is the client in this situation.

25  And we're saying that --

1      THE COURT:  I hate to interrupt you, but you just said

2   something that seems different to me.  You said that the speech

3   was given by Director Hinman in his capacity as director of

4   corporate finance.  That seems different to me than what you

5   said a year ago.

6      Am I misremembering?  Because when we were discussing

7   whether he should be deposed, as I recall, there was argument

8   from the SEC that what he said really had no bearing on this

9   litigation because he wasn't speaking on behalf of that

10  division; that he was really just speaking at a private event.

11  And there was a lot of attention focused on the disclaimers.

12      But you just said just now that he was speaking as

13  director on behalf of that division.

14      MS. GUERRIER:  Yes.  What I'm saying is that he

15  presented the speech as the director of corp. fin. giving

16  basically advice to the market.  This is not unusual.  This is

17  something that the director of corp. fin. does.

18      In doing so, there was a disclaimer that the SEC does

19  not take any position on the speech and that the speech

20  reflected Director Hinman's personal views.  That does not

21  change the fact that Director Hinman was the client in this

22  situation because he sought legal advice from SEC attorneys.

23      And I submit that just because he's the director of

24  corp. fin. does not mean that he cannot be a client of the SEC

25  attorneys because he was acting in his position as the director

1    of corporate.

2              He could not have given a speech, a personal speech,

3    because the information about the legal issues before the SEC

4    would not have been available to him as Director Hinman, the

5    person.

6              So the only way that Director Hinman could have access

7    to the information, the communication that he sought the legal

8    advice about, would have to be in his capacity as the director

9    of corp. fin.

10             That information is confidential information within

11   the purview of the SEC.  That is not information that could be

12   shared outside of the confines of the SEC.  Director Hinman

13   could not have gone to his own personal counsel to discuss the

14   legal issues regarding the application of the securities laws

15   to digital assets.

16             Now, there are cases that basically say in a

17   government entity, government employees and other directors,

18   they can be the client of the actual government attorneys.  And

19   we cited some of the cases in our opening brief.

20             Director Hinman was the client in this case.  The

21   attorney-client relationship or the privilege requires that

22   there be an attorney-client relationship.  And in determining

23   who is the client, we're looking to see was Director Hinman

24   acting in his capacity as a director of corp. fin. and did he

25   seek the advice that he sought as the director of corp. fin.,

1    not as a private citizen, Director Hinman, concerning a speech

2    that has to do with legal issues before the SEC.

3            Director Hinman approached SEC attorneys and discussed

4    the legal issues related to the digital assets in the context

5    of his employment with the SEC.  That the speech reflected his

6    personal views really is not inconsistent with this position

7    because the director could give a speech that reflects his

8    personal view.

9            That's a separate event.  That does not change the

10   issue did he seek legal counsel from SEC attorneys, and that's

11   what he did.  And in that instance, when he sought legal

12   counsel, he was the client and SEC attorneys were providing

13   legal advice.

14           Again, your Honor, the speech, again, was given by

15   Director Hinman in his official capacity.  You could call it a

16   private event, but it was really in a public forum at the

17   Yahoo! forum for crypto.  Director Hinman addressed legal

18   matters at that speech.

19           He addressed purely legal issues concerning Howey,

20   concerning how the securities laws applied to digital assets.

21   But behind the scenes when the draft was being created, the

22   issue is was Director Hinman seeking legal counsel from SEC

23   attorneys.

24           And he's allowed to do that.  We've cited the cases in

25   our brief, for example, *National Broadcasting v. SBA* where the

1    attorney-client privilege protected an officer's/director's

2    request to a chief counsel for a legal opinion.  And there are

3    other cases in the brief.

4          THE COURT:  I'm familiar with the law here, and I

5    don't think the law is that controversial.  I think it's

6    actually pretty clear.  To me, the biggest issue is trying to

7    reconcile the position that the SEC has taken in this

8    litigation with the position you're taking here today.

9          And, again, a year ago when we were talking about this

10   deposition and even otherwise in this litigation, the SEC has

11   distanced itself from this speech, distanced itself from the

12   sort of advice or interpretation that Director Hinman expressed

13   there.

14         And this speech has played a central role I think from

15   the defendants' perspective -- and I'll hear from them in a

16   moment -- about how Ripple and its officers understood the

17   SEC's approach here.

18         And it seems to me that the SEC took a position

19   earlier in this litigation to distance itself from the speech

20   and now is taking a position to embrace the speech for purposes

21   of cloaking this material.

22         And, again, under the law, I don't think the law,

23   again, is that controversial or hard to apply as a general

24   proposition.  In fact, I feel like we are talking about this

25   speech in different lights, depending on how it suits the SEC.

 1              MS. GUERRIER:  So, your Honor, may I address the

 2   Court?

 3              THE COURT:  Please.

 4              MS. GUERRIER:  I don't think we're saying that

 5   Director Hinman is not acting in his official capacity.  The

 6   SEC distances itself from the actual speech if to the extent

 7   that it represents Director Hinman's personal views.  The SEC

 8   has a disclaimer for speeches that are given by people in

 9   Director Hinman's position.  The disclaimer is that the SEC

10   does not --

11              THE COURT:  If we want to pull up the transcript of

12   his speech, can you tell me which were his personal views and

13   which were the SEC's statements?

14              MS. GUERRIER:  Well, again, the disclaimer given in

15   that speech is that the SEC was not taking a view on

16   Director Hinman's speech.  Director Hinman was not speaking as

17   the Commission.  That's the distinction.  Director Hinman gave

18   a speech as the director of corp. fin.

19              And as the Court ruled and even if we accept that the

20   speech contents reflect Director Hinman's personal views, that

21   does not change the attorney-client analysis, whether or not

22   Director Hinman sought legal guidance, legal counsel, from

23   attorneys at the SEC in his capacity as the director of corp.

24   fin.

25              He did so.  He sought legal counsel.  The fact that

1   the speech at the end of the day included his personal views

2   does not change the analysis of what happened when the draft of

3   the speech was being created.

4          So I don't think we're taking an inconsistent

5   position.  I think we're saying that Director Hinman -- he

6   would not have given a speech as a private Director Hinman

7   because he would not have had access to this information.

8          He could not have sought legal counsel regarding these

9   legal matters from a private attorney.  These were

10  confidential, legal issues that were being contemplated and

11  reviewed by different divisions within the SEC.

12         Director Hinman gave the speech telling the market

13  this is how basically corp. fin. could deal with this.  These

14  are my views.  That does not change the fact that he sought

15  legal counsel.  The question is did he seek legal counsel, and

16  we assert that he did.

17         He did so primarily within corp. fin.  And then he

18  sought the legal counsel of other divisions.  If you look at

19  the drafts of the speech that we selected for which we're

20  asserting the attorney-client privilege, you could see that he

21  is receiving legal advice from the attorneys.

22         THE COURT:  Would the SEC take the position in this

23  litigation that as of I think it was June 2018 when the speech

24  was given that that speech reflects at least corp. fin.'s

25  position with respect to this issue?

1            MS. GUERRIER:  We could say that Director Hinman was

2    given corp. fin.'s position.

3            THE COURT:  You need to answer my question.

4            Did that speech reflect the position of corp. fin. in

5    2018?

6            MS. GUERRIER:  Yes.  This is a position that corp.

7    fin. -- based on Director Hinman's views, this is what corp.

8    fin. was telling the market.  So I would say, your Honor, that

9    the position is that this is corp. fin.'s position as stated

10   through Director Hinman's lenses.

11           THE COURT:  I don't understand the caveat because if

12   the speech was given from corp. fin., then it could be anybody

13   who gave it and it just happened to be Hinman.  Or it's Hinman

14   who's giving it, and it's just his views and corp. fin. is not

15   adopting them as their own.

16           And I think that is where I am struggling because

17   every time I ask you if that was corp. fin.'s position, you say

18   it was, as given through Hinman.  But he is just an officer at

19   that moment.

20           MS. GUERRIER:  What we're saying is that even if the

21   speech does reflect Director Hinman's personal views as the

22   director of corp. fin. and he's telling the market, this is how

23   I think we should deal with digital assets, that's a separate

24   inquiry from what happened when the speech was being drafted.

25           It doesn't really matter that at the end of the day,

1    the speech ended up reflecting his personal views.  What

2    matters is did he seek the legal advice and was it regarding

3    these legal issues that were before him and the SEC.

4            These are two separate inquiries, your Honor.  So

5    whether or not the speech reflected his personal views does not

6    change the analysis of when the attorney-client privilege

7    applies.  He was the client in this situation, and the SEC

8    attorneys were the attorneys providing legal guidance.

9            And if I may respectfully, your Honor, if the speech

10   does reflect his personal views, then it cannot be relevant to

11   any claim or defense in this case.  And even if the speech is

12   covered by the attorney-client privilege, which we assert that

13   it is covered because Director Hinman sought the -- the

14   predominant purpose of the counsel was for legal advice -- it's

15   still not relevant under Judge Torres' ruling for how to

16   evaluate fair notice.

17           THE COURT:  That I'm not going to get into.

18           MS. GUERRIER:  So, your Honor, I don't mean to

19   distract and move into another area but just to show that

20   that's a separate inquiry, whether or not corp. fin. washes its

21   hands from Director Hinman's personal speech or whether or not

22   Director Hinman gave the speech as the director of corp. fin.

23   But we assert that he gave the speech as Director Hinman, the

24   director of corp. fin.  At the time that he gave the speech,

25   that was his role.  He did so in his capacity as the director

1    of corp. fin.

2            When he sought the legal advice from the divisions --

3    trading and markets, investment management and corp. fin. -- he

4    did so as the director of corp. fin.  The information, the

5    communication, that he sought and he received advice about was

6    confidential communication about legal matters before the SEC.

7            That's the question, what did he seek the legal advice

8    about.  He sought the legal advice about the application of the

9    securities laws to the digital market.  He did so in his role.

10   He could not have done this as just personal Bill Hinman in his

11   individual capacity unrelated to his job duties.

12           THE COURT:  Okay.  Thank you.

13           Mr. Solomon, are you going to take the lead on this

14   from your table?

15           MR. SOLOMON:  Yes, I am, your Honor.

16           THE COURT:  Okay.  Just make sure you speak into the

17   microphone so the court reporter and I can hear you.

18           MR. SOLOMON:  If your Honor would prefer, I'm happy to

19   go over to the podium and take my mask off.  I don't know if

20   it's permissible in this courtroom.  Otherwise, I'm fine

21   staying here.  I just don't want to be muffled.

22           THE COURT:  I think it's up to you.

23           (Pause)

24           THE COURT:  I think if your colleagues -- you're far

25   enough from the SEC.  I think if your colleagues are

1    comfortable with you taking your mask off, I think it's

2    acceptable, I think, if everybody is comfortable.

3         If anyone is uncomfortable -- I don't want anyone to

4    feel uncomfortable.  But you seem to be far away from the

5    people behind you and far away from the people in front of you,

6    and we have the HEPA filter going.

7         MR. SOLOMON:  Thank you, your Honor.  And I see head

8    nods from my colleagues.  Just for the record, everybody seems

9    comfortable.  Thank you very much.

10         I think your Honor is struggling to get an answer for

11   something we've also been struggling to get an answer on for

12   the past year or so.  The SEC has characterized the Hinman

13   speech in different ways depending on the argument that it's

14   making.

15         If it's making a fair notice argument, it may

16   characterize it one way.  If it's making a deliberative process

17   privilege argument, it may characterize it a second way.  And

18   here we are at the attorney-client privilege stage, and we have

19   yet a third interpretation of what that speech was.

20         I think fundamentally, though as your Honor pointed

21   out, the law is not controversial on this.  The predominant

22   purpose for each and every communication that former

23   Director Hinman had preceding the speech must be legal advice.

24         And when we look at the evidence -- we haven't seen

25   the documents you have and the SEC has.  We haven't seen them.

1    But all of the evidence strongly suggests to us that Mr. Hinman

2    was conveying his personal views and that in connection with

3    seeking input, guidance, reactions from others who might have

4    views of their own, he gave a speech that expressed those

5    personal views.

6           The Court's already found that, and the Court has

7    properly found that because in the disclaimer of the speech

8    itself, it's very clear that Mr. Hinman says, these are my

9    views and not necessarily those -- not just of the Commission

10   but of the staff.

11          And if you go back to August of 2021 to the SEC's

12   response on our motion to compel, just to take your Honor back

13   through the history that you were referring to, the SEC then

14   said Director Hinman stated his belief that Bitcoin and Ether

15   were not currently offered as securities.

16          And this was in connection with the fair notice

17   defense.  So they had an interest in saying his belief there,

18   because if it was if it was something other than his belief,

19   they believe it might be more potent for the fair notice.  We

20   don't think that's the case, but that was their view.

21          Then in September of 2021, in their letter reply

22   regarding deliberative process privilege claims, they said:

23   "The draft speech and corresponding email are pre decisional

24   and deliberative as Director Hinman was seeking feedback from

25   other SEC personnel about the speech's contents prior to

1    delivery.  As such --" and I'm quoting -- "the staff was

2    deliberating on what the speech should say, and no final

3    decision had been reached.  Such drafts and related emails are

4    protected by the DPP."

5          Then we get to December 2021, and your Honor will

6    recall that the Second Circuit's NRDC decision came out, and

7    you asked for letter briefing on that.  They used the NRDC to

8    say that the speech was part of the messaging of an SEC policy,

9    yet another inconsistency.

10         And then we move forward to February of 2022, and this

11   was the SEC's motion for reconsideration and clarification of

12   your Honor's deliberative process privilege ruling.  The SEC

13   wasn't happy with one aspect of that ruling, the Hinman

14   documents.  Your Honor ruled for the SEC for the most part on

15   those deliberative process privilege claims but not on that

16   one.

17         In response to that, the SEC says, again:

18   "Director Hinman was seeking feedback from other SEC personnel

19   about the speech's contents prior to delivery in the same

20   document.  Drafts of the speech reflect opinions and thoughts

21   of staff, other than Director Hinman.  It was intended to

22   communicate the general approach used by corp. fin. in

23   evaluating whether digital asset offerings may be security

24   offerings."

25         What you're not hearing in here was representations

1    from the SEC that Director Hinman was receiving legal advice in

2    connection with that speech.  That wasn't a convenient argument

3    to make at the time.  They didn't make it.

4            And going back to the primary pieces of evidence in

5    this case, as your Honor did with the deliberative process

6    opinion, your Honor wrote, if you look at the Hinman

7    declaration, he doesn't say he was seeking legal advice.

8            If you look at the Hinman deposition, as your Honor

9    probably has -- and I can cite passages from it -- he

10   repeatedly talks about "my views."  "Whenever I was out

11   speaking, that was something I individually."  That's page 121.

12           In fact, when we put the question to former

13   Director Hinman whether he was giving the speech in his

14   capacity as corp. fin. director, he refused to answer the

15   question.  And perhaps he refused to answer it because he

16   wanted to toe a line about it being his personal views because

17   the SEC doesn't want to be bound by those views.

18           And that's fine.  That's why they had the disclaimer

19   in the speech.  And that's why the current chair of the SEC has

20   said quite clearly he would not agree, for example, that Ether

21   is not a security.

22           That is his right, and he's not bound by that prior

23   speech because that prior speech was given by Director Hinman

24   and they were his personal views, not necessarily those of the

25   Commission and not necessarily those of the staff.

1        And so he even went on to say in his deposition at

2   page 70:  "We, corp. fin., do not provide legal advice to the

3   public."  And he said he never did.

4        So I think pulling the lens back is absolutely the

5   right thing to do here.  It's very hard to parse through the

6   various twists and turns of the papers over the last year.

7   We've tried to do it too.  It's not easy.  It's not a clean

8   line.

9        So I think what we tried to do, your Honor, in our

10  briefing, what I'd like to do just in a couple more minutes

11  today, if you'll indulge me, is when you pull the lens back and

12  you look at this holistically, what's really going on here.

13        It is Director Hinman giving views, policy views

14  principally, on how the regulatory regime may or may not apply

15  to digital assets.  And if you look at the speech itself, as

16  your Honor has, it's laced with the words "I" and "we" and "my"

17  I think 20 times by my count, including the footnotes.

18        You see "we" three times.  And you see "we" as in come

19  talk to the SEC.  We would talk to you about your views, the

20  public.  And then you can do a legal analysis of those views.

21  But he wasn't doing a legal analysis.  Sure he used the word

22  "Howey" in his speech.  And pretty much everything the SEC does

23  could be said to have something to do with the law.

24        But as your Honor knows from the *Erie* case -- Judge

25  Jacobs was very, very clear -- is the predominant purpose legal

1    advice.  And there just isn't any record evidence to speak of

2    that it was, and all the available evidence is that it wasn't.

3              And the SEC can make arguments, and that's fine.  But

4    looking at the record, looking at what he said under oath in

5    his deposition, looking at the speech itself for hallmarks of

6    was this a legal document -- I think counsel for the SEC said

7    it was purely legal.  I just objectively don't think that's

8    correct.

9              That speech doesn't read like a legal document.  It

10   reads like policy musings of somebody, by the way, who is very

11   steeped in the securities laws.  Former Director Hinman was a

12   partner at major law firms for many years, a capital markets

13   expert.  He didn't need to go to the SEC and have them explain

14   what Howey was.  He knew that.

15             I haven't seen the communications, but it just doesn't

16   strike us that it's possible or likely that the predominant

17   purpose of that dialogue was to provide legal advice.

18             And even when you look at the arguments the SEC has

19   made on the basis of those documents, we noticed, when we were

20   going back through that, some of the comments are the comments

21   of trading and markets.  So it seems like there may have been

22   different comments and different perspectives coming in from

23   different quarters.  And that's fine.  There's nothing wrong

24   with that.

25             But it's not deliberative process, as your Honor has

1    already ruled.  And I don't think the attorney-client privilege

2    helps anymore.  That's probably why that wasn't argument one to

3    your Honor all along because of course attorney-client

4    privilege cannot be overcome with a showing of need.  DPP can.

5         So I think, again, going back through the history,

6    looking at the speech, looking at what he said and what he

7    didn't say, it's hard to square the circle.  And it does seem

8    to us as well that the way to analyze it is exactly what your

9    Honor said, what was the purpose of this legal advice.

10        And it's hard to see that purpose when you look at the

11   record evidence and all of it screams policy, talking to the

12   market, inviting people to talk to the SEC, not being

13   prescriptive.

14        And in fact, the last point I'll make, your Honor --

15   and I'm happy to answer any questions you have -- is if you

16   look at the speech itself, it specifically says that this is

17   not a full legal analysis.  These are some factors that I,

18   Director Hinman, are putting out for consideration.

19        I think that's what it was.  And I think under all

20   those circumstances and if you look at the case law, he was not

21   the client.  He was acting, sure, as director of corp. fin.  He

22   didn't resign as director of corp. fin., give the speech, and

23   then become the director of corp. fin. again.  We're not saying

24   that.  That's ridiculous.

25        What we're saying is that he expressly gave that

1   speech stating his personal views, not stating the Commission's

2   views.  We agree.  I guess you've heard today that it was corp.

3   fin.'s view also, but I'm not sure that I even got a sense of

4   whether the SEC is embracing that, again, probably because

5   looking at the evidence in its totality, it really does amount

6   to his views.  And if it's his views, it's hard to see an

7   attorney-client relationship existing.

8         Even if one did or could be said to exist, it's really

9   hard to see -- again, you have the documents.  We don't -- how

10  the purpose of those communications preceding that speech, in

11  light of all of the litigation so far in the record evidence,

12  were principally legal.

13        THE COURT:  It seems like there are two different

14  things you're talking about right now I think.  The first is

15  whether or not the advice that was given was legal in nature or

16  more policy or messaging or the like, which would not be

17  covered.

18        But I think there's also something that you focus on,

19  which is what I was looking at, which is the purpose of the

20  advice because the purpose of getting the advice is to conduct

21  public business in the context of an SEC staff person getting

22  advice from SEC lawyers.

23        But both sides cite the same cases.  Again, the law is

24  not really controversial here.  When you look at the

25  attorney-client privilege, you need to make sure that it's a

1    communication with a client and it's for the purpose of

2    obtaining legal advice.  And when you're talking about it in

3    the context of an agency, it's because they're conducting

4    public business.

5         And so I think there are two different questions I

6    have.  One is the actual advice that was given, was that legal.

7    Or was it policy or deliberations or something else.  And

8    secondly, what was the purpose of the advice.  And if the

9    purpose of the advice was not to conduct agency business, then

10   I think that there is a break in the chain.

11        But it sounds to me that your primary argument, if I'm

12   hearing you, is more about the nature of the advice than the

13   purpose for which it was given.

14        Is that fair?

15        MR. SOLOMON:  I think that's fair.  But we think the

16   purpose is relevant also.  In assessing whether there is

17   in fact attorney-client advice, I think it is relevant to

18   consider what the purpose is or the nature of the

19   communication.

20        Let me say this:  All indications are, your Honor,

21   that the communications are predominantly policy, not

22   predominantly legal.  And that's not to say that you haven't

23   seen documents or you will see documents where the word "Howey"

24   is used or the word "legal" is used.  That's not the test, as

25   your Honor knows from *Erie*.

1          Judge Jacobs was very clear about the need to go

2    through and do an assessment of what the predominant purpose

3    was.  And, again, we think all the record evidence screams the

4    predominant purpose was policy.

5          And in terms of the purpose of the comments, again, it

6    doesn't strike us, based on the record evidence that

7    Director Hinman -- and in fact, you can look at his sworn

8    testimony and look at his declaration.

9          He wasn't going and soliciting advice -- he hasn't

10   said that.  The SEC says that now, but he didn't say that --

11   for the purpose of assisting him on legal issues relating to

12   this speech.

13         To the extent there is legal information that was

14   exchanged between Director Hinman and others in the different

15   divisions, that may be incidental to the policy advice that he

16   was getting, the messaging advice he was getting, the way the

17   speech was packaged.

18         I'm sure there are communications -- and, again,

19   you've seen them back and forth between him and the many people

20   in the different divisions.  But in the context of giving a

21   speech with his personal views, not expressly announcing agency

22   policy -- the SEC has conceded that.  I'm not sure again what

23   their position is exactly on whether it was corp. fin.'s views.

24         But any way you slice it, if it's not predominantly

25   legal, it's not protected.  It's not privileged.  And if the

1    purpose of seeking that advice isn't to provide legal advice to

2    him but instead some other purpose -- again, around packaging,

3    messaging, sensitizing the public -- those are things that are

4    policy related.  They're not legal related.  And it just seems

5    to us that's exactly what was going on here.

6              THE COURT:  Thank you.

7              MS. GUERRIER:  Your Honor, may I respond?

8              THE COURT:  Yes.

9              MS. GUERRIER:  The predominant purpose of the

10   counseling that Director Hinman received was legal advice,

11   legal business of the government.

12             The purpose was to provide guidance to the market on

13   legal issues before the SEC.  And basically Director Hinman was

14   giving the market the views of how the SEC would treat digital

15   assets under the securities laws.

16             So the predominant purpose of the legal advice -- and

17   if we can look at the entries that reflect the communication

18   between the SEC attorneys and Director Hinman, it shows that it

19   was purely legal advice.

20             For example, if you look at entries 1 through 23,

21   these entries, these are the drafts that went back and forth

22   within corp. fin.  They analyze, your Honor, the application of

23   securities laws to digital assets.

24             When you look at when Director Hinman sought comments,

25   legal comments, from investment management and trading and

1    markets, there were also the requests for comments regarding

2    legal issues.  And those are drafts 24 to 58.

3           So the predominant purpose of the advice was legal,

4    and the purpose was to conduct government business.  It is the

5    director of corp. fin.'s business to advise the public about

6    what corp. fin.'s position is on a particular matter that's of

7    interest to the public.

8           So that the speech may have reflected his personal

9    views does not change the fact that he is conducting government

10   business, the government business of providing that kind of

11   guidance to the market.  And he states so in his speech.

12          THE COURT:  And you don't think that your statement

13   that the speech, the purpose of the speech, was to provide

14   guidance to the market -- that's what you said.

15          You don't think that that is an inconsistent position

16   to the position that you've taken in this litigation

17   previously?

18          MS. GUERRIER:  Your Honor, no, because previously we

19   were discussing the deliberative privilege process.

20          THE COURT:  Sorry.

21          MS. GUERRIER:  I'm sorry.  I'll get closer to the

22   mike.

23          In the context of the deliberative privilege, we were

24   discussing the entries and what Director Hinman's speech meant.

25   Here we're talking about the attorney-client privilege, whether

1     or not Director Hinman was a client, and whether the

2     predominant purpose of the counsel that he sought from the SEC

3     attorneys was for legal advice.

4           THE COURT:  Sorry to interrupt you.  But set aside the

5     deliberative process issue.  In August of 2021, the SEC's

6     position was that what Hinman said was not to provide guidance

7     to the market.  And in fact, the SEC opposed his deposition on

8     the grounds that what he said was not a message from the SEC.

9     It was just his personal view.

10          So today you said that it was in fact to provide

11    guidance to the market.  I'll obviously go back and look over

12    the filings.  But my recollection is that that is an

13    inconsistent position from the position you took 11 months ago.

14          MS. GUERRIER:  Let me just try to clarify, your Honor.

15    We're not saying that the Commission took a position one way or

16    another on the contents of Director Hinman's speech.

17          We're saying that this was Director Hinman, as the

18    director of corp. fin., giving this speech.  And he's allowed

19    to do that.  That's corp. fin.  At his position, he can speak

20    on behalf of corp. fin., and that's what he did.

21          Now, whether or not the SEC disclaims the speech and

22    says it doesn't take a position one way or another does not

23    change the fact that the speech was given by Director Hinman in

24    his official capacity.  The Commission did meet.  There was no

25    Commission agreement about the contents of the speech.

1          So when we're saying that it's not an inconsistent

2    position to state that the SEC did not take a position on

3    Director Hinman's speech, that does not change --

4          THE COURT:  The standard for relevance is pretty low.

5    It was the SEC's position last summer that his speech was not

6    relevant.

7          MS. GUERRIER:  Right.

8          THE COURT:  That it had nothing to do with anything

9    and that it was not relevant and I shouldn't require him to sit

10   for a deposition.  Now it seems like it's pretty relevant, even

11   if it's not a statement that the Commission made.

12         MS. GUERRIER:  Your Honor, respectfully, we still

13   believe that the speech is not relevant because what happens

14   behind the scenes does not fall under the objective standard

15   for fair notice or scienter.

16         So it's still irrelevant to the claims and defenses in

17   this case.  It has nothing to do with whether or not -- because

18   we have an objective standard for determining these issues.  So

19   putting that aside, going back to the predominant purpose --

20   and I just want to clarify one thing.  At his deposition, he

21   was asked whether he was requesting legal advice, and he did

22   respond that he thought that it was so.

23         If you look at page 273 and 274 of his deposition

24   transcript, that question was posed at his deposition.  And he

25   did say that.

1           THE COURT:  He said what?

2           MS. GUERRIER:  He believed that he was -- he stated

3   that he believed that this may have been legal advice because

4   the question posed was whether in his June 4 email, whether it

5   related to the legal status of offers and sales of certain

6   digital assets.

7           So these were not issues of policy, and his speech

8   does not talk about policy.  His speech goes into the

9   application of the securities laws to digital assets.  It

10  specifically talks about Howey and different aspects of the

11  law.

12          It's not about regulation.  It's not about policy.

13  It's about how the securities laws apply to certain digital

14  assets, and that's throughout the speech.  It's not just one

15  word or another.

16          But in terms of what qualifies the communication for

17  attorney-client protection, in this case, Director Hinman, by

18  the entries that we've selected, the predominant purpose of the

19  consultation was to seek the legal advice.

20          Again, the purpose of this consultation is to conduct

21  government business.  Director Hinman, in his position as the

22  director -- he's speaking to the market in his position as the

23  director of corporate finance.  He's not doing anything that's

24  outside of his profession, of his job basically.  So I think

25  that's satisfied.

1          Now, whether he's the client, the issue is was he

2   seeking legal advice.  In an entity, even in a government

3   entity, the agency -- the individuals who represent the agency

4   can be the client.  In this case, Director Hinman was acting as

5   a client when he posed these questions to the SEC attorneys.

6          And if you look at the -- your Honor, these drafts

7   have to be examined so that you can see whether or not they

8   fall within -- they meet the criteria.  And if you look at the

9   advice that was given and the communications that went back and

10  forth, they clearly show, in our opinion, that this is legal

11  advice being sought by Director Hinman of counsel who exercised

12  their knowledge, their legal skills, to answer legal questions.

13         Now, that the speech ended up being viewed as his

14  personal views does not change the equation.  The question is

15  was he seeking legal advice.  We say the predominant purpose of

16  the consultation was to seek legal advice about how do the

17  securities laws apply to the digital assets.  In that capacity,

18  when he did so, he did so as a client of the SEC attorneys.

19         We also assert that we did assert the attorney-client

20  privilege previously.  So we're not just asking -- we're

21  reasserting the privilege.  It's not like we didn't claim this

22  at the outset.  We did.

23         And the entries for which we're claiming the

24  attorney-client privilege, if your Honor had an opportunity to

25  review them, they speak of legal issues, not policy, not

1    business, not anything other than legal issues before the

2    Commission.

3         So in the context of attorney-client privilege, the

4    criteria we believe is met.  We have an attorney-client

5    relationship, Director Hinman being the client, the SEC

6    attorneys being the attorneys.

7         The predominant purpose of the communication was legal

8    advice, nothing else.  It wasn't business.  It wasn't about

9    policy.  It wasn't about regulations or anything outside of the

10   purview of the attorney-client relationship.

11        We just submit that I don't think that it's in dispute

12   that the communication was confidential and it remains

13   confidential throughout.  But primarily, the predominant

14   purpose was to seek legal advice.

15        THE COURT:  That the SEC knew how to act.

16        MS. GUERRIER:  Yes.  And also to make sure that

17   Director Hinman was not taking any position that was

18   inconsistent with the law, maybe not saying the law in the way

19   that the SEC believes it should be stated, so seeking legal

20   advice to make sure that he got it right and addressing these

21   very legal issues that he addressed at his speech on June 14 in

22   San Francisco.

23        THE COURT:  I do think there would be a difference

24   between seeking advice to make sure he's not taking a position

25   that is inconsistent with the position of the agency -- that

1    seems not like legal advice for the purpose of taking action --

2    versus seeking legal advice so that the agency can follow the

3    law.

4          MS. GUERRIER:  Well, again, your Honor, I don't think

5    that if you look at the entries that we've selected within the

6    communication, because we're looking at the communication to

7    see whether or not it's protected, you can see that that's

8    exactly what was going on.

9          So if I go back to the first 23 entries, we're

10   analyzing the securities laws.  And the exchange of those

11   drafts among corp. fin. allowed them to provide consulting on

12   legal issues related to the securities laws without going into

13   privileged communication because you do have to look at the

14   communication to see what exactly he was looking for and what

15   does the communication say.  And we assert that clearly it

16   does -- the predominant purpose of it is legal advice.

17         So I don't think at the end of the day, the final

18   version -- we're not claiming any coverage obviously against

19   the final version of the speech.  But that the speech ended up

20   being his personal views does not change the equation, the

21   analysis, the criteria that had to be met for the communication

22   to be protected by the attorney-client privilege.

23         And I submit, your Honor, that if you look at the

24   entries that we selected, you can see that each entry does

25   meet -- the predominant purpose of each entry is for legal

1    advice.  In that capacity when he was seeking legal advice,

2    Director Hinman, as the director of corp. fin., was the client

3    of the SEC attorneys.

4           THE COURT:  Okay.  I understand your position.

5           Anything further?

6           MR. SOLOMON:  Just very, very briefly, your Honor,

7    just a couple of points.

8           On page 132 of Director Hinman's deposition, he was

9    asked:  "Do you believe this speech provided clarity to the

10   market with respect to the application of the federal

11   securities laws to digitize the transactions?"

12          And his answer was:  "I think it provided clarity as

13   to how I was looking at those issues."  That's lines 9 and 10,

14   page 132.

15          He was asked again:  "Do you believe this was new

16   information to the marketplace?"

17          "I think how I felt about things or the framework I

18   had in my mind was, you know, wasn't something I published in a

19   speech earlier."

20          And later in the deposition, by the way, I think

21   counsel for the SEC indicated that Director Hinman had

22   testified that he did in fact receive legal advice.

23          But the question that was posed to him was:  "The

24   question is:  Did the information you requested from the

25   various recipients of the June 4, 2018, email relate to the

1   legal status of offers and sales of certain digital assets

2   under the United States securities laws?"

3          That was the question posed, page 273.  And then he

4   was told by his counsel:  "At a general level, yes or no."

5          And his response was:  "At this point, I believe it

6   may have.  That's the best of my recollection."  So even when

7   they try to point you to something to fortify this view that

8   there was legal advice, even Director Hinman didn't testify to

9   that.  He didn't recollect one way or the other.

10         So, again, we don't have the documents.  But it's very

11  hard to understand how they could possibly be predominantly

12  legal under these circumstances.  And your Honor talked about

13  the purpose of the information he was getting from the other

14  divisions, from various people.

15         If the purpose was for the purposes of his views on

16  the speech, we simply don't think that's attorney-client

17  privilege protected information.  And, again, it seems to us

18  that's what was likely going on here.

19         The SEC does seem to want to have it both ways here.

20  On the one hand, they've said Hinman's speech wasn't SEC agency

21  business, again, for purposes of fair notice earlier in this

22  litigation.

23         I think we now hear that, well, actually, it was

24  agency business for purposes of the attorney-client privilege

25  at least.  It is a conflict.  I think they are trying to have

1    it both ways.

2          We don't relish pointing these things out.  But we've

3    got individuals who have been sued here and their livelihoods

4    and their reputations are at stake.  So we would like a

5    consistent position.  We know your Honor is entitled to that.

6    We would like it.  And that's why we've been pressing this

7    issue for over a year, and that's why these documents are so

8    important to us.

9          We would just also just a couple of other points.  SEC

10   counsel keeps saying the speech "ended up," "ended up as

11   Director Hinman's personal views."  I think she's used that

12   formulation five or six times.

13         They were his personal views expressly.  He said so

14   under oath.  He said so in his deposition.  that's what the

15   disclaimer says.  So that cannot be erased, and your Honor has

16   ruled that way.  So I don't understand the equivocation around

17   that.  But I just want to make the point that they didn't "end

18   up" being his personal views.  They were his personal views.

19         By the way, even if the legal information that was

20   given to him was not for him to discharge his official function

21   but in relation to personal views he was giving in a speech, we

22   don't think that's protected for the reasons we've said in our

23   brief.

24         If the comments he received were specific to the

25   speech and he is not going about government business in giving

 1    the speech, as he expressly said he wasn't in the disclaimer,

 2    that's not protected.

 3            Again, Director Hinman himself candidly said in his

 4    deposition, when asked, did you give this speech as director of

 5    corp. fin. to announce corp. fin. policy, he didn't answer the

 6    question.

 7            And, again, I don't fault Director Hinman for

 8    anything.  He's retired.  He was doing his best in that

 9    deposition.  This isn't about him or his reputation.  It's

10    about trying to find pieces of evidence to support the view

11    that the SEC is advancing, and we're just not finding any of

12    it.

13            And the last thing I would say, just to come full

14    circle on the law, we agree the law is fairly standardized

15    here.  Your Honor has got a better handle on it I'm sure than

16    any of us do.

17            But when you look at *Erie*, one thing that's

18    interesting is that Judge Jacobs points out that you can't find

19    the predominant purpose of a communication "by quantification

20    or classification of one passage or another."  Instead, you

21    need to look at it "dynamically and in light of the advice

22    being sought or rendered."  And then he gives some examples of

23    that kind of advice.

24            And *Erie* was exactly the kind of case this isn't, an

25    agency lawyer, agency personnel about how to execute the law in

1    a constitutional manner.  That's just not what was happening

2    here.  We're so far from that here by all available evidence,

3    by his own sworn testimony, and candidly by the SEC's own

4    statements earlier in this litigation.

5         So we would ask that your Honor, having reviewed these

6    documents, make a determination that they are not protected by

7    the attorney-client privilege, and they have all the facts and

8    circumstances and record evidence.

9         Again, I'm happy to answer any other questions.  We do

10   appreciate the Court digging into this issue so much.  It is

11   very, very important to the defendants.  Thank you.

12        THE COURT:  Thank you.

13        MS. GUERRIER:  May I quickly respond, your Honor?

14        THE COURT:  Sure.

15        MS. GUERRIER:  So to bring back the issue before the

16   Court, the issue before the Court is whether or not the

17   documents, the drafts, are protected by the attorney-client

18   privilege.

19        Your Honor, we submit that they are because the

20   predominant purpose of the consultation was to obtain legal

21   advice about a legal issue that was before the SEC and

22   specifically as shown in the drafts that we've selected for

23   which we are asserting the privilege.

24        It's very clear, in our opinion, that you can see that

25   these are legal issues being analyzed.  And the advice that's

1    being given by SEC counsel to Director Hinman, they're legal

2    advice, not advice about policy, not advice about business or

3    anything else.  And one of the questions for predominant

4    purpose is is it legal advice or something else.  It wasn't

5    something else.  It was purely legal advice.

6            Now, going back to Director Hinman's deposition,

7    Director Hinman didn't say, I don't know.  He said that he

8    believes that he may have requested legal advice.  When he uses

9    these terms, it's clear that he's referring to legal advice

10   from SEC attorneys.  He wasn't referring to anything else.  He

11   did not say, I sought personal advice about the speech.  Those

12   words were never uttered at the deposition or in his

13   declaration.

14           In the context of the attorney-client privilege, in

15   the case that we talked about, *Erie*, the court did find an

16   attorney-client relationship in this situation where the issue

17   was policy advice rendered by a government lawyer.

18           So here, it's not even policy advice.  This is

19   strictly whether or not the securities laws apply to digital

20   assets.  So in the context of this case, this issue before the

21   Court, whether or not the attorney-client privilege applies, we

22   believe that the criteria for meeting the attorney-client

23   privilege is met in this case, your Honor.

24           And if you look at the entries and you analyze them,

25   which is what is required of the Court, you will see that at

```
 1    each stage, the drafts were exchanged.  It is legal advice

 2    that's being provided, not something else.  It's only legal

 3    advice.  Thank you, your Honor.

 4              THE COURT:  Okay.  Thank you very much, everybody.  I

 5    appreciate your time.  I appreciate you coming to court.  I

 6    hope on a personal level it was nice for you to come back into

 7    the courthouse.

 8              Obviously I'm taking this issue seriously.  Obviously

 9    I'm looking at all of the documents that have been submitted to

10    me, and I will get to my ruling as soon as I am able.

11              MS. GUERRIER:  Thank you, your Honor.

12              THE COURT:  All right, everybody.  Stay safe, and

13    we're adjourned.  Thank you.

14              (Adjourned)

15

16

17

18

19

20

21

22

23

24

25
```