# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN,

Defendants.

Case No. 1:20-cv-10832

## BRIEF OF AMICUS CURIAE THE CHAMBER OF DIGITAL COMMERCE

Lilya Tessler
Sidley Austin LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
Email: ltessler@sidley.com

*Attorney for Amicus Curiae*
*The Chamber of Digital Commerce*

September 14, 2022

## <u>TABLE OF CONTENTS</u>

**Page**

INTERESTS OF THE *AMICUS CURIAE* ..................................................................................1

ARGUMENTS ..........................................................................................................................4

    **I.**    LEGAL PRECEDENT PROVIDES THAT THE *HOWEY* TEST SHOULD BE APPLIED TO DETERMINE IF THE INITIAL OFFERING OF A DIGITAL ASSET IS AN INVESTMENT CONTRACT. ..............................................................................4

    **II.**    IT IS WELL SETTLED THAT THE SUBJECT OF AN INVESTMENT CONTRACT IS NOT ITSELF A SECURITY. ...............................................................................5

    **III.**    THE LAW IS UNSETTLED AS TO SECONDARY TRANSACTIONS OF DIGITAL ASSETS. ........................................................................................................7

CONCLUSION ........................................................................................................................13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cont'l Mktg. Corp. v. SEC*,
 387 F.2d 466 (10th Cir. 1967) ...............................................................................5

*Glen-Arden Commodities, Inc. v. Costantino*
 493 F.2d 1027 (2d Cir. 1974) .................................................................................5

*Hocking v. Dubois*,
 885 F.2d 1449 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990).........................5

*Reves v. Ernst & Young*,
 494 U.S. 56 (1990)..................................................................................................4

*SEC v. Edwards*,
 540 U.S. 389 (2004)............................................................................................4, 5

*SEC v. Glen-Arden Commodities, Inc.*,
 368 F. Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities,*
 *Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) ...................................................5

*SEC v. W.J. Howey Co.*,
 328 U.S. 293 (1946).................................................................................... *passim*

*SEC v. Telegram Grp. Inc.*,
 448 F. Supp. 3d 352 (S.D.N.Y. 2020)............................................................ *passim*

*SEC v. Wahi*,
 No. 2:22-cv-01009 (W.D. Wash. Jul. 21, 2022) ....................................................8

*Tcherepnin v. Knight*,
 389 U.S. 332 (1967)............................................................................................4, 6

*Warfield v. Alaniz*,
 569 F.3d 1015 (9th Cir. 2009) ................................................................................5

**Statutes**

Responsible Financial Innovation Act of 2022.....................................................12, 13

Securities Act of 1933...............................................................................................4, 5

Securities Exchange Act of 1934....................................................................................8

**Other Authorities**

Blockchain Alliance, https://blockchainalliance.org/ (last visited Aug. 30, 2022) ........................1

SEC Division of Examinations, Risk Alert: The Division of Examinations'
    Continued Focus on Digital Asset Securities (Feb. 26, 2021)..................................11

Gary Gensler, SEC Chair, SEC, "Remarks Before the Aspen Security Forum"
    (Aug. 3, 2021) ..................................................................................................9, 11

Letter from SEC Strategic Hub for Innovation and Financial Technology to
    NYDFS (Jan. 27, 2020) ....................................................................................11

Letters from SEC to FINRA (Sept. 25, 2020) ...............................................................11

SEC Strategic Hub for Innovation and Financial Technology, "Framework for
    'Investment Contract' Analysis of Digital Assets" (Apr. 3, 2019)....................................6, 8, 9

SEC Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the
    Securities Exchange Act of 1934: The DAO (July 25, 2017)....................................8

SEC Release No. 34-90788, Custody of Digital Asset Securities by Special
    Purpose Broker-Dealers (Apr. 27, 2021) ..............................................................11

Token Alliance, Chamber of Digital Commerce,
    https://digitalchamber.org/initiatives//token-alliance/ (last visited Aug. 30,
    2022) ....................................................................................................................1

William Hinman, SEC Dir., Div. of Corp. Fin., SEC, Digital Asset Transactions:
    When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets
    Summit: Crypto (June 14, 2018)..........................................................5, 6, 8, 9, 10

## INTERESTS OF THE *AMICUS CURIAE*

The Chamber of Digital Commerce (the "Chamber") is the world's largest digital asset and blockchain trade association. It represents diverse members of the blockchain industry globally, including more than 200 of the world's leading startups, software companies, financial institutions, and investment firms, as well as other market participants.[1] An important function of the Chamber is to represent the interests of its members in the courts and beyond, with an emphasis on fostering regulatory certainty and compliance. In doing so, the Chamber regularly files briefs as *amicus curiae* in cases involving issues of interest to the digital asset and blockchain community, particularly those presenting novel questions of law.

Founded in 2014 with the guiding principle of industry compliance, the Chamber continues to forge compliance-focused initiatives, in addition to advocating for clear and concise regulatory action and rulemaking. Blockchain Alliance, one of its first initiatives, features technical assistance and information sharing resources in crime prevention; founded in 2015, it now serves over 100 international government and commercial entities, including the Securities and Exchange Commission ("SEC").[2] The Chamber also conducts resource-intensive efforts to promote industry compliance under federal securities law, in addition to providing educational and technical assistance to policy makers.[3]

---

[1] This *amicus* brief reflects the view of the Chamber and does not reflect the views of any individual member of the Chamber. Ripple Labs, Inc. is a member of the Chamber, but did not contribute to or participate in the preparation of this brief.

[2] The Blockchain Alliance's mission is to combat criminal use of blockchain technology. *See* Blockchain Alliance, https://blockchainalliance.org/ (last visited Aug. 30, 2022).

[3] One example of the Chamber's focus in this space is the Token Alliance, an industry-led initiative of the Chamber developed to be a key resource for tokenized networks and applications. Comprised of 400+ industry thought leaders, technologists, and innovators, the Token Alliance has developed a series of tools and resources for industry and policymakers to make informed decisions when engaging in the token economy. *See Token Alliance,* Chamber of Digital Commerce, https://digitalchamber.org/initiatives//token-alliance/ (last visited Aug. 30, 2022), for resources devoted to appropriately growing the token economy.

Given its position in the digital asset and blockchain industry, as well as its significant advocacy initiatives, the Chamber has a strong interest in this case, which raises complex issues with potentially far-reaching consequences. Namely, whether the well-settled law applicable to the offer and sale of an investment contract that is a securities transaction is properly distinguished from the law applicable to secondary transactions in digital assets that were previously the subject of an investment contract. The Chamber does not proffer any opinions on any litigant's arguments on the merits; instead, the Chamber has an interest in ensuring that the legal framework applied to digital assets creates a clear and consistent precedent for industry members to follow.

This Court is well aware that, as of yet, no federal law (or regulation) specifically governs the legal characterization of digital assets recorded on a blockchain. United States jurisprudence has demonstrated its flexibility in modern application, but some rigidity manifests when decades-old law faces some of the more unique aspects of blockchain technology, which is not circumscribed to the practical limitations of traditional assets. Although blockchain technology in the financial services sector is immediately relevant in this case, blockchain is actively being used and pursued for use in a variety of industries. In each of these use-cases, the digital asset is only data on a blockchain.

This case involves an analysis of the factors established by *SEC v. W.J. Howey Co.* for the initial offering of a digital asset. 328 U.S. 293 (1946) ("*Howey*"). This Court is considering whether that offering, as distinct from the underlying asset, is an investment contract that meets the four prong test under *Howey*. Legal precedent is limited to the application of *Howey* to initial offerings of digital assets and was reiterated by this Court in *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ("*Telegram*"). On the other hand, if this Court decides to consider

the status of the underlying asset in subsequent sales after the initial offering, we want to remind the Court that there is no legal precedent on this issue. This lack of clarity has had a significant, chilling effect on both U.S.-based digital asset network developers and potential market participants. Such uncertainty undermines not only the development of digital asset networks, but the efforts of the variety of intermediaries, including advisers, broker dealers, digital asset exchanges, and custodians (among others) that endeavor to provide the regulatory compliant infrastructure necessary to support digital asset markets.

To address this uncertainty, the legislature is currently considering proposed legislation regarding the application of securities and commodities laws to digital assets. As such, we urge the Court to look to the proposed legislation in setting any precedents on this issue or otherwise defer to the legislature to provide regulatory clarity. The application of the correct legal standard and regulatory clarity is crucial for market participants. Such clarity would provide market participants the ability to reasonably conclude that they are operating in compliance with federal securities and commodities laws, without the looming possibility of enforcement at each and every turn of the blockchain industry's rapid growth.

Therefore, regardless of the outcome of this case, the Chamber urges the Court to recognize that (i) there is a well-settled law that can be applied to determine if an initial offering of a digital asset constitutes an investment contract; (ii) to the extent this Court goes beyond that analysis, there is no precedent that analyzes whether an underlying asset of an investment contract is itself a security; and (iii) the law is uncertain as to secondary transactions of the same digital asset that were previously issued pursuant to an investment contract and this Court should look to current pending legislation or defer to the legislature on what the legal standard should be for subsequent transactions of such assets.

**ARGUMENTS**

I.     **LEGAL PRECEDENT PROVIDES THAT THE *HOWEY* TEST SHOULD BE APPLIED TO DETERMINE IF THE INITIAL OFFERING OF A DIGITAL ASSET IS AN INVESTMENT CONTRACT.**

The issue in this case is whether the transactions where Defendants offered and distributed a digital asset constitutes unregistered securities transactions. Legal precedent provides how to analyze whether offerings of digital assets are securities. Section 2 of the Securities Act of 1933 (the "Securities Act") defines "security" by providing an enumerated list of financial assets commonly traded for investment or speculation (i.e., stocks or bonds), as well as general descriptive examples such as "investment contract." The Securities Act was passed in order to regulate financial instruments in "whatever form they are made and by whatever name they are called." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). As noted by the Court in *Howey*, the term "investment contract" embodies a "flexible, rather than a static, principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299.

The U.S. Supreme Court established a test in *Howey* to determine if a particular transaction constitutes an investment contract. The Court held that an investment contract means "a contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id.* In *Howey*, "all the elements of a profit-seeking business [were] present … [t]he investors provide[d] the capital and share in the earnings and profits; the promoters manage[d], control[led] and operate[d] the enterprise." *Id.* at 300. In analyzing whether a transaction or scheme is an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality" and the "totality of circumstances." *Tcherepnin v. Knight*, 389 U.S. 332 at 336

4

(1967); *Glen-Arden Commodities, Inc. v. Constantino,* 493 F.2d 1027 at 1034 (2d Cir. 1974).

Overall, the *Howey* test is "an objective inquiry into the character of the instrument or transaction

offered based on what the purchasers were 'led to expect.'" *Warfield v. Alaniz*, 569 F.3d 1015,

1021 (9th Cir. 2009).

As this Court noted in *Telegram*, "the *Howey* test provides the mode of analysis for an

unconventional scheme or contract alleged to fall within the securities laws." *Telegram*, 448

F. Supp. 3d at 365. Because the initial sale of a digital asset does not fit into any of the

enumerated categories used to define a security under the Securities Act, it is an unconventional

scheme and therefore must be analyzed under *Howey* to determine if it is an investment contract.

Accordingly, in *Telegram*, this Court used the test set forth in *Howey* to analyze whether an

offering of discounted digital assets constituted a security transaction by analyzing the economic

reality of the conduct at issue. *Id.* at 368.

II.     **IT IS WELL SETTLED THAT THE <u>SUBJECT</u> OF AN INVESTMENT
        CONTRACT IS NOT ITSELF A SECURITY.**

As discussed above, *Howey* provides that an "investment contract for purposes of the

Securities Act means a *contract, transaction, or scheme*." *Howey*, 328 U.S. at 298–99 (emphasis

added). Accordingly, the subject of such a contract, transaction, or scheme is not necessarily, on

its own, a security. This is true whether the subject of an investment contract is a physical asset,

or an intangible one, such as a digital asset. *See SEC v. Glen-Arden Commodities, Inc.*, 368 F.

Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities*, 493 F.2d 1027 (whisky

casks); *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones); *Hocking v. Dubois*, 885 F.2d 1449,

1462 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078 (1990) (condominiums); *Cont'l Mktg. Corp. v.

SEC*, 387 F.2d 466 (10th Cir. 1967) (beavers); *see also* William Hinman, SEC Dir., Div. of Corp.

Fin., SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo

Finance All Markets Summit: Crypto (June 14, 2018) ("investment contracts can be made out of virtually any asset (including virtual assets),") (the "Hinman Speech"); and *Telegram*, 448 F. Supp. 3d at 365 ("Courts have found other schemes and contracts governing a range of intangible and tangible assets to be securities"). In each of these examples, the subject of an investment contract is a commodity with its own properties and inherent value separate from the investment contract; beavers can be used for their pelts, oranges can be eaten, and condominiums can be lived in. Similarly, a digital asset can have its own value as an asset to pay transaction fees and use applications on a digital asset's network.[4] Thus, just like the oranges in *Howey* would not themselves be securities if the oranges were grown and sold at a farmer's market, the subject of an investment contract should be evaluated separately from the investment contract itself.

Although the *Howey* test is intentionally a flexible standard, it is not all encompassing. Indeed, guidance from the SEC staff suggests that certain transactions in a given digital asset are simply technology transactions and therefore not securities transactions.[5] The federal securities laws favor substance over form and the U.S. Supreme Court has placed emphasis on the economic reality of a situation. *Tcherepnin* 389 U.S. at 336; *Howey*, 328 U.S. at 298. Digital assets are simply electronic records which contain data that can represent anything. For example, some digital assets clearly represent securities such as tokenized stocks and bonds, while others are ledger entries that can be traded back and forth through technology transactions on a network as commodities (i.e., bitcoins). The essential character of a stock as a security is not changed merely because it is represented by a paper certificate as opposed to an electronic record. As

---

[4] *See* the Hinman Speech.
[5] *See, e.g.*, the Hinman Speech, the "Framework for 'Investment Contract' Analysis of Digital Assets," issued by SEC's Strategic Hub for Innovation and Financial Technology on April 3, 2019 (the "FinHub Framework"), and no-action letters issued by the SEC staff related to the offer and sale of digital assets.

such, the use of a particular technology does not and should not change the economic substance of the underlying asset.

As this Court has noted, "[digital assets] … are a lawful means of storing or transferring value and may fluctuate in value as any commodity would. In the abstract, an investment of money in a cryptocurrency *utilized by members of a decentralized community* connected via blockchain technology, which itself is *administered by this community* of users rather than by a common enterprise, is not likely to be deemed a security under the familiar test laid out in *S.E.C. v. W.J. Howey Co*." *Telegram*, 448 F. Supp. 3d at 358 (internal citations omitted and emphasis added).

This Court declined the opportunity in *Telegram* to opine on whether the subject of an investment contract is distinct from the investment contract's status as a security. Instead, this Court focused its decision on the scheme in its entirety, as opposed to opining on the characterization of its underlying asset. *See Telegram*, 448 F. Supp. 3d. On this point, we urge the Court to make clear that the status of the subject of an investment contract is a separate inquiry from the status of the investment contract itself.

## III.   THE LAW IS UNSETTLED AS TO SECONDARY TRANSACTIONS OF DIGITAL ASSETS.

Because the investment contract analysis focuses on the investment *transactions*, and not the underlying asset, the regulatory characterization of different transactions in a particular digital asset may change as related facts and circumstances change. For instance, the original sale of the land and trees in *Howey* constituted an investment contract when placed in context with W.J. Howey's management services; however, if those same plots of land and orange trees were then resold later, separate from W.J. Howey's services, such sales may no longer constitute investment contracts.

Indeed, the dynamic nature of the *Howey* analysis makes it a particularly challenging framework to apply to secondary transactions involving fast-moving and ever changing technology businesses, especially those that incorporate the native digital asset essential to the operation of the blockchain network.

The lack of clarity regarding secondary transactions in digital assets also impacts the blockchain industry as a whole (and potentially, the broader U.S. economy). In this case, all parties have commented on, and the Court has taken notice of, the recent public statements of two SEC commissioners that "[t]here is a decided lack of clarity for market participants around the application of the securities laws to digital assets and their trading." (ECF No. 264-1 at 1) ("Coinschedule Statement"). Recognizing that the fact-intensive *Howey* test is at times difficult for even experienced lawyers to apply, let alone market participants without legal training, the SEC has commendably provided guidance on the application of the federal securities laws to digital assets.[6] This guidance is rooted in federal and administrative precedent in applying *Howey*, and would appear to clearly provide for digital asset transactions that are not subject to the securities laws. However, the SEC's enforcement approach, similarly based on *Howey*, paints a different picture.[7] Because of this contradiction and guidance confusion, a number of market participants have approached the SEC without success requesting interpretive relief or rule-based guidance on the legal standard to apply for secondary transactions in digital assets that were previously the subject of an investment contract.

In the instant case, the SEC has stated that it "does not typically decide whether any particular financial instrument, without additional context, qualifies as a security *per se*." (ECF

---

[6] *See*, SEC Release No. 81207, Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017). *See also*, the Hinman Speech, the FinHub Framework, and no-action letters issued by the staff related to the offer and sale of digital assets.
[7] *See, e.g.*, *SEC v. Wahi*, No. 2:22-cv-01009 (W.D. Wash. July 21, 2022).

No. 326-2 at 4, declining to answer Defendants' interrogatory whether the SEC considers Bitcoin and Ether to be "securities"). The SEC has argued that it does not claim that XRP is itself a security, but rather that XRP, "even in the secondary market, is the embodiment of those facts, circumstances, promises, and expectations [surrounding the digital asset and the manner in which it is offered and sold], and today represents that investment contract." ECF No. 153, at 30. This application of the investment contract analysis to digital assets, like digital assets themselves, remains novel. We are not aware of any judicial decisions that have correctly applied *Howey* at the time of an initial sale, and then re-applied *Howey* to later secondary transactions involving the same underlying asset. That, however, is the approach that the SEC suggests is correct.[8]

At the same time, the SEC has not provided guidance on a reasonable time period, following an initial investment contract offering, to re-apply *Howey* or any other legal standard to a secondary transaction in a digital asset that was previously the subject of an investment contract. To the extent the Court considers secondary market transactions in its decision, the critical question to consider is what legal standard should be applied to determine which facts, circumstances, promises, and expectations are relevant, and at what point in time such elements should be considered.

This subtle distinction has no precedent, nor has it been expressed in any guidance from the SEC or its staff. For example, in a recent public statement discussing the regulation of platforms that facilitate trading in digital assets, SEC Chairman Gary Gensler stated that he agreed with the prior SEC Chairman's belief that "every ICO I have seen is a security."[9] An ICO, or "initial coin offering," is by definition, a type of transaction that the investment contract

---

[8] *See, e.g.*, the FinHub Framework (discussing whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales); *see also* the Hinman Speech.

[9] Gary Gensler, SEC Chairman, SEC, "Remarks Before the Aspen Security Forum" (Aug. 3, 2021) ("Gensler Aspen Remarks").

analysis may be clearly applied to. As a general matter, an ICO is a primary offering rather than a secondary transaction, the type of transaction facilitated by secondary trading platforms. Instead, secondary trading platforms support trading of digital assets that may have originally been issued pursuant to an ICO (or investment contract). Chairman Gensler was notably silent on the application and outcome of the investment contract analysis to the same digital assets that may be bought and sold in commercial or technology transactions, as well as on comments made by other SEC Commissioners and staff addressing this point, such as the Hinman Speech, the FinHub Framework, and the Coinschedule Statement, all of which recognize the lack of a legal standard or precedent on this issue.

On one hand, as stated above, it seems clear that where a company raises funds in exchange for a promise to use those funds to develop and deliver a yet-to-be-created product, the transaction is an investment contract subject to the federal securities laws. As noted in our *amicus* brief to this Court filed in *Telegram*, care needs to be taken not to conflate a digital asset with the circumstances of its initial offering. It cannot be that an asset that is the subject of an investment contract will forever embody the investment contract itself, as the SEC now suggests without citing legal precedent for that conclusion. Otherwise, purchases of certain casks of whisky, families of beavers, and orange trees would be subject to the securities laws, which has never been the case under the existing precedent. On the other hand, it remains extremely difficult to discern when digital assets may be used and traded without each purchaser entering into an investment contract. Without express regulation, the market has had to rely on highly fact-specific district court decisions, settled administrative enforcement actions, and non-binding guidance and personal public statements made by SEC staff and commissioners, some of which expressed views that have changed with each new appointment to the commission. The lack of

legal precision inherent in many speeches, along with contradictory statements made by various federal regulators has created a significant and unprecedented degree of confusion for the U.S. blockchain industry.

Moreover, and quite remarkably, the SEC has also made clear that the burden of determining whether a particular digital asset should or should not be treated as a security is the obligation of market participants. For instance, the SEC (at both the staff and commission level) has provided potential relief for certain digital asset activities conducted by broker-dealers, subject to the broker-dealer "establish[ing], maintain[ing], and enforce[ing] reasonably designed written policies and procedures to conduct and document an analysis of whether a digital asset is a security."[10] In spite of these requirements (and the recognized lack of regulatory certainty), the SEC staff has also expressed concern that market participants' (and potentially, state regulators') use of certain frameworks for evaluating regulatory risks associated with trading or holding a particular digital asset that are not endorsed or approved by the SEC or SEC staff, without separate legal analysis and opinion of securities counsel (presumably for each particular digital asset), may lead to such participants violating the federal securities laws.[11] Chairman Gensler has expressed the belief that "[t]he test to determine whether a crypto asset is a security is clear."[12] The *Howey* test may be clear, however, whether it is applicable to secondary transactions in digital assets is anything but. As a result of these significant issues, the Court will need to view this as a case of first impression without a settled legal precedent as it relates to secondary transactions in digital assets.

---

[10] SEC Release No. 34-90788, *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, p. 8 (Apr. 27, 2021); *see also*, Letter from SEC to FINRA, p. 3 (Sept. 25, 2020). The SEC staff has also stated that examinations of Investment Advisers will focus on whether advisers have policies and procedures that address whether digital assets are classified as securities. SEC Division of Examinations, *Risk Alert: The Division of Examinations' Continued Focus on Digital Asset Securities*, p. 2 (Feb. 26, 2021).

[11] *See* Letter from SEC Strategic Hub for Innovation and Financial Technology to NYDFS (Jan. 27, 2020).

[12] Gensler Aspen Remarks.

Although there is no precedent that meaningfully addresses the independence of the underlying asset from the overall transaction, the Chamber believes that, as long as the underlying asset does not include financial interests, such as legal rights to debt or equity, digital assets are presumed to be commodities. This viewpoint is shared by the drafters of the bipartisan Lummis-Gillibrand Responsible Financial Innovation Act ("RFIA"). The RFIA seeks to offer clarity to investors by creating a statutory distinction between the initial offering or distribution transaction and the underlying digital assets that are the subject of such a transaction, referred to as "ancillary assets."[13] The proposed bill mandates disclosure requirements for such ancillary assets that are not fully decentralized, and whose value is determined by the entrepreneurial and managerial efforts of others. Under the RFIA, when an asset is fully decentralized and there are no longer entrepreneurial or managerial efforts, the disclosure requirements are terminated and such asset is treated as a commodity.

It is our view that the RFIA is the natural application of *Howey* to digital assets because it codifies the "economic reality" element that distinguishes between the assets purchased pursuant to an investment contract from the investment contract itself. *See Howey*, 328 U.S. at 298. Additionally, it provides a sound framework for allowing the secondary transactions and resales of digital assets to occur while requiring disclosures to protect digital asset investors and increase market protections.

The Chamber respectfully asks that this Court draw upon the principles set forth in RFIA for guidance if it decides to clarify the characterization of digital assets which are the subject of an investment contract or defer such a decision to the legislature as it continues to make progress in establishing clarifying guidelines for the proper legal classification of digital assets.

---

[13] RFIA of 2022, S. 4356, 117th Cong. (2022).

**CONCLUSION**

The Court has previously asserted, correctly, that a digital asset is not a security solely by virtue of being represented in digital form or recorded on a blockchain ledger. However, we are not aware of any court that has applied the *Howey* test to secondary transactions instead of the facts and circumstances surrounding an initial offer and sale. Further, despite the guidance issued by SEC staff, we are not aware of any court that has reevaluated whether transactions in a digital asset are securities transactions based on changes in the relevant factual circumstances. The Chamber believes that the subject of an investment contract, such as a digital asset, should be analyzed separately from the contract itself, and that secondary transactions in the subject of an investment contract may be considered a commercial or technology transaction according to the relevant facts and circumstances. Therefore, the Chamber respectfully asks the Court to reiterate that the law applicable to an investment contract is separate and distinct from the law applicable to the subject of such investment contract. To the extent the Court considers secondary transactions in digital assets in its opinion, we urge the Court to note that the law is unsettled and to consider an appropriate legal framework that acknowledges proposed laws, such as the RFIA, which are currently under consideration by the legislature.

Dated:  Dallas, Texas
        September 14, 2022

                                         Respectfully submitted,

                                         By:  */s/  Lilya Tessler*
                                         Lilya Tessler
                                         Sidley Austin LLP
                                         2021 McKinney Avenue, Suite 2000
                                         Dallas, TX 75201
                                         Telephone: (214) 981-3300
                                         Email: ltessler@sidley.com

                                         *Attorney for Amicus Curiae*
                                         *The Chamber of Digital Commerce*