**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,    :

    :

               Plaintiff,    :       20 Civ. 10832 (AT) (SN)

    :

      - against -    :       ECF Case

    :

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,

    :

           Defendants.    :

    :

------------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Pascale Guerrier
Benjamin Hanauer
Robert S. Moye
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... vi

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ....................................................................................................................... 4

   I.   The Registration Provisions of the Securities Laws and the *Howey* Test ...................... 4

   II.   The DAO Report and SEC Enforcement Actions Involving Crypto Assets ................ 6

STATEMENT OF UNDISPUTED FACTS ............................................................................. 7

   I.   BACKGROUND ........................................................................................................... 7

      A.   Ripple's Founders Created XRP and the XRP Ledger. ....................................... 7

      B.   Defendants Receive Warnings that XRP Offers and Sales Could Be Investment Contracts under *Howey*. ..................................................................... 8

      C.   Ripple Needed to Monetize Its Large XRP Stake to Fund its Ambitious Business Plans of Finding a "Use" for XRP. ...................................................... 9

      D.   Ripple and Larsen Create the XRP Trading Markets. ...................................... 11

          1.   From the Start, Ripple Offered XRP as an Investment in Ripple's Ambitious, Upcoming Efforts and Expertise. ....................................... 11

          2.   Ripple Seeds a Market for XRP and Begins Selling XRP. ..................... 13

   II.   DEFENDANTS MARKETED A PURCHASE OF XRP AS AN INVESTMENT INTO A COMMON ENTERPRISE. ............................................................................ 14

      A.   Defendants' and XRP Investors' Financial Interests Have Always Been Aligned. ... 14

      B.   Defendants Repeatedly Touted their Common Interest with XRP Purchasers. .............. 15

      C.   Defendants Publicized Their Efforts To Lock Up Certain XRP Holdings as Proof of Ripple's "Stewardship" of XRP and Common Interest with Investors. ............ 16

   III.   DEFENDANTS TOLD INVESTORS TO VIEW XRP AS AN INVESTMENT THAT COULD BE PROFITABLE BASED ON RIPPLE'S PROMISED MANAGERIAL EFFORTS. ............................................................................................ 18

      A.   Defendants Touted XRP as an Investment in Ripple's Efforts to Find an XRP "Use" and Touted XRP Price Increases as Proof that Ripple Was Succeeding. ............... 18

          1.   Defendants Promised They Would Remain Committed to Undertaking Efforts to Find a "Use" for XRP. ..................................................... 18

          2.   Defendants Invited Investors To Speculate that Ripple's Efforts Could Lead to an Increase in XRP's Price. ........................................... 20

          3.   Defendants Often Touted XRP Price Increases. ..................................... 21

          4.   Defendants Used XRP's Rising Price as Proof of the Success of Ripple's Efforts. ........................................................................................ 22

    B.   Targeting Speculators, Defendants Made and Touted Other Significant Efforts to Increase and Protect the Liquidity of the XRP Markets. ...................................23

        1.   Defendants Targeted U.S.-Based Crypto Platforms to List XRP. ..............23

        2.   Defendants Undertook Efforts to Influence the Public's Understanding About XRP and Ripple. ...............................................................24

        3.   Ripple Undertook and Touted Other Steps To Protect the XRP Markets from Excessive Sales. ...............................................................25

IV.  DEFENDANTS' MARKETING WAS SUCCESSFUL: REASONABLE MARKET PARTICIPANTS VIEWED XRP AS AN INVESTMENT. ...................................26

V.   RIPPLE SOLD AND DISTRIBUTED OVER $2.1 BILLION OF XRP, AND THE INDIVIDUAL DEFENDANTS SOLD $600 MILLION, INTO THE PUBLIC XRP MARKETS THEY HAD CREATED. .........................................................27

    A.   Ripple Sold Over $1.5 Billion of XRP to Speculative Investors. ...................28

        1.   Targeting Speculators, Ripple Made Over $750 Million in Programmatic Sales of XRP. ...............................................................28

        2.   Ripple's $750 Million of Institutional Sales Were Distributions of XRP into Public Markets Using Conduits. .........................................28

    B.   Ripple Distributed $609 Million in XRP through Other Conduits, Including by Using XRP as Executive Compensation. ...............................................31

    C.   Larsen and Garlinghouse Sold Over $600 Million of XRP into the Markets. ...................32

VI.  DEFENDANTS DID NOT REGISTER THEIR OFFERS AND SALES OF XRP OR PROVIDE INVESTORS WITH RELEVANT INFORMATION. ...................33

VII. DEFENDANTS WERE REPEATEDLY WARNED THAT THEIR OFFERS AND SALES OF XRP COULD BE DEEMED SECURITIES TRANSACTIONS. ...........34

    A.   Ripple Received Legal Guidance that XRP Could Be a Security. ...................34

    B.   Ripple's Compliance and Regulatory Personnel Understood the SEC Could Consider XRP To Be a Security. ...............................................35

    C.   The SEC's Investigation Confirmed to Defendants that their XRP Distributions Could Violate the Federal Securities Laws. .........................................37

    D.   Realizing the SEC Could Determine Ripple Violated the Securities Laws, Ripple Undertook a Lobbying Campaign to Influence the SEC's Decision. ...................38

VIII.  LARSEN AND GARLINGHOUSE SUBSTANTIALLY ASSISTED RIPPLE'S UNREGISTERED OFFERS AND SALES OF XRP AND KNEW THE KEY ASPECTS OF RIPPLE'S OFFERS AND SALES. .................................................38

    A.   Larsen Knew or At Least Recklessly Disregarded the Facts that Made Ripple's Offers and Sales of XRP Unregistered Securities Transactions and Substantially Assisted Ripple's Violations. ...............................................39

        1.   Larsen Knew or At Least Recklessly Disregarded that XRP Was Being Offered and Sold as Part of a Common Enterprise with Ripple. ...................39

2.  Larsen Knew or Recklessly Disregarded that XRP Was Being Offered and Sold as an Investment in Ripple's Efforts. ...........................................................39

3.  Larsen Understood that XRP Could be Considered a Security. ..................40

4.  Larsen Substantially Assisted Ripple's Violations. ...........................................40

B.  Garlinghouse Knew or At Least Recklessly Disregarded the Facts that Made Ripple's Offers and Sales of XRP Unregistered Securities Transactions and Substantially Assisted Ripple's Violations.......................................................................41

1.  Garlinghouse Knew or At Least Recklessly Disregarded that XRP Was Being Offered and Sold as part of a Common Enterprise with Ripple. ....................41

2.  Garlinghouse Knew or Recklessly Disregarded that XRP Was Being Offered and Sold as an Investment in Ripple's Efforts...................................................42

3.  Garlinghouse Understood that XRP Could Be Considered a Security. ......................43

4.  Garlinghouse Recklessly Disregarded his Legal Obligation to Preserve Documents. ..................................................................................................43

5.  Garlinghouse Substantially Assisted Ripple's Violations of Section 5. ......................44

STANDARD OF REVIEW ON SUMMARY JUDGMENT ...................................................45

I.  LIABILITY UNDER SECURITIES ACT SECTIONS 5(a) AND 5(c) ...................45

II.  *HOWEY:* THE DEFINITION OF "INVESTMENT CONTRACT" ...................46

ARGUMENT..............................................................................................................................49

I.  RIPPLE OFFERED AND SOLD INVESTMENT CONTRACTS. ...........................49

A.  XRP Purchasers Undisputedly Invested in a Common Enterprise. ...................50

1.  Horizontal Commonality Undisputedly Exists. ...............................................50

2.  The Undisputed Facts and Economic Reality Establish  Strict Vertical Commonality...............................................................................................51

B.  XRP Purchasers Reasonably Expected to Profit From their Purchase of XRP. ...............53

1.  Defendants Undisputedly Marketed XRP as an Investment. ...................54

2.  Defendants Undisputedly Marketed and Took Steps to Ensure Investors' Ability to Resell XRP in Secondary Public Markets....................................55

3.  Defendants Undisputedly Touted their Efforts to Provide and Protect the Liquidity of the XRP Markets. ..................................................................55

4.  Defendants Undisputedly Targeted Speculators. ...........................................56

5.  Defendants Undisputedly Sold XRP in Indiscriminate Quantities, Indicative of Investment Intent...................................................................................58

6.  Defendants Undisputedly Touted their Financial Motivation to Turn a Profit from XRP...........................................................................................58

C.  XRP Purchasers Expected Their Profits to Result from Ripple's Efforts........................59

II.  DEFENDANTS VIOLATED SECTION 5 WHEN THEY DIRECTLY OR INDIRECTLY OFFERED AND SOLD XRP IN A PUBLIC DISTRIBUTION. ...............63

      A.    Ripple is an Issuer of Securities Who Engaged in a Public Offering in Part through Underwriters. ....................................................................................................64

      B.    Larsen and Garlinghouse Violated Section 5 Because They Were Affiliates of Ripple and Offered and Sold Its Securities in Unregistered Transactions.........................65

III.   THE INDIVIDUAL DEFENDANTS ALSO AIDED AND ABETTED RIPPLE'S VIOLATIONS OF SECTION 5. ....................................................................................66

      A.    Larsen Undisputedly Knew or Recklessly Disregarded Ripple's Violations and Substantially Assisted Them. .........................................................................................67

      B.    Garlinghouse Undisputedly Knew or Recklessly Disregarded Ripple's Violations and Substantially Assisted Them.....................................................................................68

IV.   DEFENDANTS' DUE PROCESS DEFENSES LACK LEGAL MERIT. ...........................69

      A.    Standards for Defendants' Due Process Defenses.........................................................69

      B.    Courts Have Uniformly Rejected Similar Due Process Defenses.................................70

          1.    *Howey* and Its Progeny Provided Defendants with Fair Notice. ...................70

          2.    Courts Routinely Reject Due Process Challenges to the Application of *Howey*, Including Specifically to Offers and Sales of Digital Assets............................71

          3.    The SEC Provided Digital Asset-Specific Guidance by Its Enforcement Actions and Public Statements.........................................................................73

      C.    Defendants Had *Actual Notice* that Their XRP Offers and Sales Could be Subject to the Federal Securities Laws. ......................................................................................74

CONCLUSION.......................................................................................................................75

## TABLE OF AUTHORITIES <span style="float:right">**Page(s)**</span>

**Cases**

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) ...........................................53

*Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565 (S.D.N.Y. 2011) .......................................................45

*Audet v. Fraser*, 2022 WL 1912866 (D. Conn. June 3, 2022) ..............................................49, 51, 61

*Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019).............................................49, 55, 59

*Beranger v. Harris*, 2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) .....................................................49

*Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337 (1952)........................................................75

*Case v. City of New York*, 408 F. Supp. 3d 313 (S.D.N.Y. 2019) .....................................................45

*CFTC v. Hunter Wise Commodities*, 1 F. Supp. 3d 1311 (S.D. Fla. 2014)........................................73

*CFTC v. Monex Credit Co.*, 2021 WL 6102524 (C.D. Cal. Oct. 28, 2021) .......................................73

*Coffey v. Ripple Labs, Inc.*, No. CGC-18-566271
  (Cal. Sup. Ct., San Francisco Cty., May 3, 2018).........................................................................37

*Copeland v. Vance*, 893 F.3d 101 (2d Cir. 2018)...............................................................................70

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012).......................................................69, 70, 73

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ....................................................................................................passim

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ........................................................................... 48, 64

*Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) ................................................................64

*Howmet Corp. v. EPA*, 656 F. Supp. 2d 167 (D.D.C. 2009) ...........................................................74

*In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340 (S.D.N.Y. 2011) ........................................51

*Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989) ..................................................................61

*Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414 (8th Cir. 1974).................................................48

*R. A. Holman & Co. v. SEC*, 366 F.2d 446 (2d Cir. 1966) ................................................................64

*Revak v. SEC Realty, Corp.*, 18 F.3d 81 (2d Cir. 1994) ................................................ 46, 50, 51, 52

*Reves v. Ernst & Young*, 494 U.S. 56 (1990) .....................................................................................47

*SEC v. Aaron*, 605 F.2d 612 (2d Cir. 1979),
  *vacated on other grounds*, 446 U.S. 680 (1980) ...........................................................................5

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ....................................................................................66

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982)......................................... 48, 51, 57, 61

*SEC v. AT&T, Inc.*, 2022 WL 4110466 (S.D.N.Y. Sept. 8, 2022) .....................................................74

*SEC v. Blockvest*, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ........................................................49

*SEC v. Bluepoint Inv. Counsel LLC*, 2021 WL 5326740 (W.D. Wisc. Nov. 16,
  2021).................................................................................................................................................73

*SEC v. Brigadoon Scotch*, 480 F.2d 1047 (2d Cir 1973)......................................................71

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) .....................................47, 55, 70

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998),
   *aff'd*, 155 F.3d 129 (2d Cir. 1998) ........................................................................ 5, 64

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) ...........................................5, 46, 63, 65

*SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738 (2d Cir. 1941) ................................64

*SEC v. Edwards*, 540 U.S. 389 (2004)...................................................................... passim

*SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019) ............................................................... 48, 53

*SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).............................................72

*SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027 (2d Cir. 1974)......................... passim

*SEC v. Grenda Grp., LLC*, 2021 WL 1955330 (W.D.N.Y. May 17, 2021) ......................68

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ...................................................50

*SEC v. Keener*, 2022 WL 196283 (S.D. Fla. Jan. 21, 2022) ...........................................73

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) .....................................................................65

*SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) .......................... passim

*SEC v. Kovzan*, 2013 WL 5651401 (D. Kan. Oct. 15, 2013) ..........................................73

*SEC v. Longfin Corp.*, 316 F. Supp. 3d 743 (S.D.N.Y. 2018) .........................................65

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)...................................... 5

*SEC v. Merchant Cap., LLC*, 483 F.3d 747 (11th Cir. 2007) ..........................................48

*SEC v. Mudd*, 2016 WL 815223 (S.D.N.Y. Feb. 29, 2016)............................................68

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ......................................................... 48, 63

*SEC v. NAC Found.*, 512 F. Supp. 3d 988 (N.D. Cal. 2021) .......................... 49, 53, 55

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953) ............................................... 4, 46, 63

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ..................................................... 48, 55

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001)...........................................48, 50, 54

*SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014) ...................................................... 47, 57

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ........................ passim

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013) .......................................................49

*SEC v. Tyler*, 2002 WL 32538418 (N.D. Tex. Feb. 21, 2002) ......................................56

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)......................................................... passim

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ......................................................68

*SEC v. Yorkville Advisors*, 305 F. Supp. 3d 486 (S.D.N.Y. 2018) .................................66

*Solis v. Latium Network, Inc.*, 2018 WL 6445543 (D.N.J. Dec. 10, 2018)....................48, 49, 54

*Tcherepnin v. Knight*, 389 U.S. 332 (1967) .................................................................... 47, 61

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) ....................................... 5, 47

*United States v. Bowdoin*, 770 F. Supp. 2d 142 (D.D.C. 2011) ..................................71

*United States v. Cinergy Corp.*, 495 F. Supp. 2d 892 (S.D. Ind. 2007) ......................74

*United States v. Corr*, 543 F.2d 1042 (2d Cir. 1976) ..................................................65

*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) ................................................73

*United States v. Farris*, 614 F.2d. 634 (9th Cir. 1979) ..............................................71

*United States v. Kay*, 513 F.3d 432 (5th Cir. 2007) ....................................................75

*United States v. Lainer*, 520 U.S. 259 (1997) ..............................................................71

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) ....................................46, 48, 57

*United States v. NGL Crude Logistics, LLC*, 2018 WL 4762901 (N.D. Iowa July 3, 2018)......................74

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014), *aff'd sub nom.*
    *United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) ..................................71

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968) ..............................................64

*United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ............passim

*Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996) ......................................................70, 72, 73

*Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341 (11th Cir. 2022) ...............................48

**Statutes**

15 U.S.C. § 77aa ..............................................................................................................4

15 U.S.C. § 77b(a) .............................................................................................5, 63, 64

15 U.S.C. § 77d ........................................................................................................63, 64

15 U.S.C. § 77e ........................................................................................................passim

15 U.S.C. § 77g ................................................................................................................4

**Other Authorities**

Framework for "Investment Contract" Analysis of Digital Assets, dated Apr.
    3, 2019 *available at* https://www.sec.gov/corpfin/framework-investment-
    contract-analysis-digital-assets (Apr. 3, 2019) ......................................................6

*Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934:*
    *The DAO*, SEC Rel. No. 81207, *available at*
    https://www.sec.gov/litigation/investreport/34-81207.pdf ...............................6, 35, 73

Thomas Lee Hazen, THE LAW OF SECURITIES REGULATION (4th ed. 2002).......................63

**Rules**

Fed. R. Civ. P. 56(a).......................................................................................................45

**Regulations**

17 C.F.R. § 230.405.........................................................................................................65

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its motion for summary judgment on the SEC's claims that Defendants Ripple Labs, Inc. ("Ripple"), Christian A. Larsen ("Larsen"), and Bradley Garlinghouse ("Garlinghouse," together with Larsen the "Individual Defendants") violated Section 5 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e, and that the Individual Defendants aided and abetted Ripple's violations. The Court should grant the SEC's motion.

## PRELIMINARY STATEMENT

Congress enacted Securities Act Section 5—a strict liability statute—to ensure that companies issuing securities and their officers ("issuers"), among others, disclose certain information when offering or selling securities to the public. This ensures that investors can make informed decisions about whether to invest in particular securities—a bedrock disclosure principle underlying U.S. capital markets. Section 5 therefore requires that, before directly or indirectly offering or selling securities to the public, issuers and their officers file with the SEC a publicly-available registration statement that includes information about the issuer's financial condition and the securities' investment risks, unless a valid exemption from registration exists. The undisputed facts here—including Defendants' own statements to the investing public—show that Defendants violated Section 5 by offering and selling digital tokens to the public as securities.

At the outset, Ripple's founders created and allocated among themselves and Ripple 100 billion units of a digital token called "XRP" through computer programming. Defendants then offered and sold over $2 billion worth of XRP to the public and used those proceeds to fund Ripple's business. Defendants concede they filed no registration statement for these offers and sales. The main issue before this Court is thus whether Defendants offered and sold XRP as securities. Under the Securities Act, the term "security" includes "investment contracts." Over 75 years ago, in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court held that an "investment contract" is

an "investment in a common venture premised on a reasonable expectation of profits to be derived from the … efforts of others." *SEC v. Edwards*, 540 U.S. 389, 395 (2004) (quotation marks omitted). The *Howey* test asks whether the transaction involves "all the elements of a profit-seeking business venture." 328 U.S. at 300. To answer that question, *Howey* requires courts to look at the economic reality of a transaction—not the label issuers place on it. Courts routinely grant the SEC summary judgment in cases applying the *Howey* test where, as here, the undisputed evidence shows that Defendants' offers and sales of XRP were offers and sales of investment contracts under *Howey*. The Court should grant the SEC summary judgment on its Section 5 claims.

*First*, the undisputed facts show that, as a matter of economic reality, a purchase of XRP is an investment in a common enterprise with other XRP holders and with Ripple. All units of XRP are fungible with each other, and the price of all units of XRP rise or fall equally. Moreover, starting in 2013, Ripple and its first chief executive officer ("CEO"), Defendant Larsen, funded the business by pooling and using the $1.5 billion in cash proceeds from the unregistered sales of XRP—which constituted nearly 90% of Ripple's funding sources during the relevant period. And, as Defendants said when marketing XRP to purchasers, Defendants' interests were "aligned" with those of XRP investors. As Ripple's second CEO, Defendant Garlinghouse, stated, "Ripple owns a lot of XRP" and therefore "[a]nything we do that's good for that digital asset is good for us." Company talking points instructed Ripple employees to say, consistent with statements on Ripple's website: Ripple "makes money through XRP sales" and "use[s] it to grow [its] team and [its] business."

*Second*, Defendants led investors to expect a "profit" from buying XRP. Ripple directed "investment" inquiries to its "how to buy XRP" webpages, specifically targeted "speculators" when offering and selling XRP, and promoted XRP price "rallies" and investors' ability to buy and sell XRP on online marketplaces (known as "exchanges" or trading platforms). Garlinghouse touted XRP's 20,000% increase in value and noted that Ripple was "just getting started" in "investing in"

efforts for XRP. Defendants also repeatedly marketed and undertook efforts to create, support, and protect the "liquidity" of the XRP trading market, the existence of which was critical for Ripple and XRP investors to profit from their XRP holdings.

*Third*, Ripple publicly tied the potential for profit to its promised entrepreneurial and managerial efforts. As Ripple put it, it was going to try to find a "use" for XRP (given that none existed when it was created) and to create an "ecosystem" around Ripple's technology—essentially, an infrastructure of digital products and services dependent on XRP. Ripple did so in hopes that it would increase the "demand" and therefore the "value" of XRP. Ripple then mounted a marketing campaign that made explicit to the investing public the economic reality of being XRP's largest stakeholder—that Ripple had significant and unique financial and reputational incentives to pursue a "use" for and to be good "stewards" of XRP. Larsen explained Ripple would "monetize" its XRP and invest it back into the "ecosystem," which would be "good for everybody." Garlinghouse noted that "investors" were "connecting the dots" between Ripple's efforts and XRP's price and explained that the existence of a central figure (Ripple) making efforts to increase XRP's value distinguished XRP from other digital assets for which no such figure existed, and that when the price of XRP went "up ~200%, "XRP's market cap" increased dramatically, which "signal[ed] market expectations of" Ripple. Garlinghouse also publicized his view that "Ripple's price" (referring to XRP) was going up because of the "work we have done." David Schwartz, one of XRP's most prominent creators, publicly explained that Ripple had economic incentives to spend $100 million to make the price of XRP go up by $0.01, because Ripple would then "massively profit."

Defendants cannot dispute the content of their many public statements about Ripple and XRP, including the sampling described above. Nor can Defendants dispute either the vast record of the efforts they made consistent with those representations or the economic reality: Ripple funded its business by touting XRP's profit potential, selling and distributing XRP to public investors while

3

keeping a large amount of XRP for itself, and, consistent with Ripple's financial incentives, becoming the creator, architect, developer, builder, and caretaker of XRP's common enterprise.

The SEC is also entitled to summary judgment on its aiding-and-abetting claim against the Individual Defendants. Based on the undisputed facts, Ripple violated Section 5, as described above; Larsen and Garlinghouse had a "general awareness of their overall role in Ripple's illegal scheme," D.E. 441 at 15; and they substantially assisted Ripple's scheme through their own actions as Ripple's CEOs and with their own offers and sales, through which they profited by another $600 million.

Finally, the SEC is entitled to summary judgment in its favor on Defendants' affirmative defense that they lacked "fair notice" that their conduct could violate the law and on the Individual Defendants' related due process defense. *Howey* provides securities sellers with the notice that is constitutionally required, the SEC explicitly warned issuers of digital assets to comply with the securities laws, and Defendants had *actual* notice that their conduct risked violating the securities laws, as the undisputed facts here show. Indeed, the alleged "regulatory uncertainty" Defendants have claimed in this litigation is belied by Garlinghouse's contemporaneous observation: "'Regulatory uncertainty' is just a euphemism for 'we wish we could ignore SEC regulations.'" Defendants made a calculated decision to risk an SEC or private lawsuit in order to profit by over $2 billion and cannot now feign surprise that their day in court has come.

## BACKGROUND

### I.    The Registration Provisions of the Securities Laws and the *Howey* Test

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), require the offer or sale of "securities" to the public to be accompanied by the "full and fair disclosure" afforded by a registration statement filed with the SEC. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 n.10 (1953). Registration requires disclosure of information about the value of securities, the issuer's financial condition, and investment risks. *See* 15 U.S.C. §§ 77g, 77aa; *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d

1082, 1098 (2d Cir. 1972). Congress enacted this registration requirement to ensure that potential securities purchasers have the information they need to make informed investment decisions, *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 360 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998), and it is "central to the [Securities] Act's comprehensive scheme for protecting public investors." *SEC v. Aaron*, 605 F.2d 612, 618 (2d Cir. 1979), *vacated on other grounds*, 446 U.S. 680 (1980).

A "security" includes an "investment contract," 15 U.S.C. § 77b(a)(1), which means an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *Howey*, 328 U.S. at 301; *Edwards*, 540 U.S. at 393. This "*Howey* test" is designed to be "flexible" and "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299; *see also United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 847-48 (1975) (Congress "sought to define 'the term security in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security'") (citations omitted)).

*Howey* is an objective test. Courts evaluate the "entirety of the parties' understandings and expectations," *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) (citing *Howey*, 328 U.S. at 297-98), to determine "whether, in light of the economic reality and the totality of circumstances," an investment contract existed. *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027, 1034 (2d Cir. 1974). The facts routinely support a finding that the *Howey* test has been met, and accordingly, courts routinely grant summary judgment to the SEC on Section 5 claims, including in determining whether something is a "security." *See, e.g., SEC v. Cavanagh*, 445 F.3d 105, 107-116 (2d Cir. 2006); *SEC v. Kern*, 425 F.3d 143, 147-53 (2d Cir. 2005); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (summary judgment in a digital asset case).

## II.      The DAO Report and SEC Enforcement Actions Involving Crypto Assets

On July 25, 2017, the SEC issued a *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, regarding the issuer of a "decentralized" digital token that sold the token to public investors to fund its business operations. 56.1 ¶ 938; SEC Rel. No. 81207, *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf ("DAO Report") at 1, 4.[1] The report analyzed the offer and sale of "DAO tokens" and concluded they were offered and sold as investment contracts based on *Howey* and later cases. 56.1 ¶ 939. The report "advise[d] those who would use…distributed ledger or blockchain-enabled means for capital raising[ ] to take appropriate steps to ensure compliance with the U.S. federal securities laws." 56.1 ¶ 940. The SEC explained:

> Whether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction. Those who offer and sell securities in the United States must comply with the federal securities laws, including the requirement to register with the Commission…. These requirements apply to those who offer and sell securities in the United States, regardless whether the issuing entity is a traditional company or a decentralized autonomous organization.

56.1 ¶ 944; *see also id.* ¶¶ 941-43.

The DAO Report is part of the "guidance issued by the SEC as to the scope of its regulatory authority and enforcement power" in the crypto space. *United States v. Zaslavskiy*, 2018 WL 4346339, at *9 (E.D.N.Y. Sept. 11, 2018). Between September 2017 and December 2020, the SEC filed 35 actions alleging that unregistered offers and sales of digital assets violated Section 5, 56.1 ¶¶ 945-81, and in April 2019, SEC staff issued additional guidance as to the application of *Howey* to offers and sales of digital assets. https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (Apr. 3, 2019). The SEC's message has been clear: those who sell digital assets to publicly raise capital must ensure their actions comply with the federal securities laws.

---

[1] "56.1 ¶ _" are citations to the SEC's Local Rule 56.1 Statement of Undisputed Facts. "PX __" are Exhibits to the Declarations of Ladan F. Stewart, Mark R. Sylvester, Jorge G. Tenreiro, or Daphna A. Waxman, all dated September 13, 2022, as explained in the 56.1, and all submitted in support of the SEC's motion for summary judgment.

STATEMENT OF UNDISPUTED FACTS

## I.      BACKGROUND

Before co-founding Ripple, Larsen was the CEO of a company the SEC sued for violating Section 5. 56.1 ¶ 1; PX 1 ¶ 18; PX 2 at 34-39. As set forth more fully below, in 2012, Larsen formed Ripple with other individuals who created a finite supply of 100 billion units of a digital asset they initially called "Ripple Credits" or "Ripples," and subsequently called XRP. Ripple and Larsen were warned by a law firm that selling this asset could run afoul of the Securities Act. But Ripple would eventually need to spend over two billion dollars to fund its ambitious business projects. 56.1 ¶ 145; Ferrante Decl. Ex. 2. And Ripple's business projects also depended on the existence of a robust, liquid trading market for XRP. 56.1 ¶ 109, PX 8 No. 100. Thus, Ripple's publicly-stated business mission and its financial health compelled it to sell or otherwise distribute XRP to raise capital.

### A.      Ripple's Founders Created XRP and the XRP Ledger.

In 2012, Jed McCaleb, Arthur Britto, and David Schwartz programmed a cryptographically secured ledger, or "blockchain," they called the Ripple Network or Ripple Protocol (now the "XRP Ledger"), which records transactions and exists across a network of computers. 56.1 ¶¶ 10-12, 20; PX 80 ¶¶ 38, 39; PX 8 Nos. 1, 2; PX 9; PX 503.13 at 1. They also created a fixed supply of 100 billion units of a "native token," which they called Ripple Credits or "Ripples," and today are called XRP. 56.1 ¶ 14; PX 8 ¶¶ 1, 3; PX 80 ¶¶ 48, 49; PX 2 at 25-26. Each unit of XRP is divisible into one million "drops" (0.000001 XRP is one "drop"), and each unit and drop of XRP are indistinguishable from and fungible with any other unit or drop. 56.1 ¶¶ 17, 18; PX 6 at 25-26; PX 8 Nos. 24, 25. XRP serves a *de minimis*, technical function on the XRP Ledger: to transfer XRP on the ledger, one must "burn" (*i.e.*, delete) 10 or 20 one-millionths of XRP. 56.1 ¶ 19; PX 6 at 35-36, 323; PX 7.

In September 2012, McCaleb, Britto, and Larsen founded Ripple's corporate predecessor, "NewCoin" or "Open Coin," and Larsen became its CEO. 56.1 ¶ 41; PX 80 ¶¶ 16, 18, 20, 44; PX 94

No. 719, PX 2 at 49-50. The three founders retained 20 billion XRP (including 9 billion for Larsen), and Ripple received the remaining 80 billion. 56.1 ¶ 15; PX 80 ¶¶ 18, 20, 22, 46; PX 1 ¶¶ 18, 20. Schwartz became chief cryptographer. 56.1 ¶ 40; PX 7 at 8-9; PX 6 at 19-20; PX 80 ¶ 21.

### B.    Defendants Receive Warnings that XRP Offers and Sales Could Be Investment Contracts under *Howey*.

In 2012, before the network of computers on which XRP exists was launched publicly, 56.1 ¶ 32; PX 6 at 25, Ripple and Larsen received two memos from the law firm Perkins Coie ("Legal Memos") about "legal risks" surrounding XRP. 56.1 ¶¶ 986-87; PX 80 ¶¶ 44, 56; PX 8 Nos. 13, 14; PX 242, 243. The Legal Memos analyzed "Ripple Credits" under *Howey* to determine if their offers and sales could be securities transactions. 56.1 ¶ 988; PX 242, 243. The February Memo advised that, "[i]f sold to Investors, [Ripple Credits] are likely to be securities," tokens "not initially sold may still constitute securities if sold at a later date," and if "these [tokens] are purchased with an expectation of profit because of the efforts of [persons] promoting the [tokens], there is a risk that [the tokens] will constitute investment contracts." 56.1 ¶ 989; PX 242. Perkins Coie recommended: "Do not sell [the tokens]." 56.1 ¶ 990; PX 242; *see also* 56.1 ¶¶ 991-92.

The October 2012 Memo similarly noted:

> Although we believe that a compelling argument can be made that Ripple Credits do not constitute "securities"…we believe that there is some risk, albeit small, that the [SEC] disagrees with our analysis. The more that Founders and Company promote Ripple Credits as an investment opportunity, the more likely it is that the SEC will take action and argue that Ripple Credits are "investment contracts" and thus securities…. [T]o the extent that Ripple Credits are purchased with an expectation of profit because of the efforts of Company…, there is a risk that Ripple Credits will constitute investment contracts.

56.1 ¶ 993; PX 243. Perkins Coie advised: "[S]teer clear of promoting Ripple Credits as an investment opportunity or as a speculative investment trading vehicle." 56.1 ¶ 996; PX 243. Perkins Coie warned that the risk of XRP meeting the *Howey* test was higher "because there will be a specific entity, [Ripple], which is responsible for the distribution of Ripple Credits and the promotion and

marketing functions of the Ripple Network." 56.1 ¶ 995; PX 243. Under a bold heading, "**Ways to Diminish the Risk that Ripple Credits are Deemed to be Securities**," Perkins Coie advised: "[O]btaining a no-action letter [from the SEC] would provide further comfort that Ripple Credits are not securities." 56.1 ¶ 997; PX 243; *see also* 56.1 ¶ 994.

Larsen reviewed and discussed the Legal Memos with Perkins Coie. 56.1 ¶ 998; PX 2 at 237-44. In May 2014, Larsen wrote that "investors and employees could not receive XRP, [as it] could risk SEC designation [as] a security" and that Ripple's founders "assumed risk of [being] issuers" and received "comp" for "personally assuming this risk." 56.1 ¶ 999; PX 244; PX 2 at 237-44; PX 1 ¶ 56. Larsen was Ripple's CEO until the end of 2016. 56.1 ¶ 860; PX 1 ¶ 6; PX 2 at 49. Since 2013, he has also been the Chairman of Ripple's Board and has at all times had a controlling stake in the company. 56.1 ¶¶ 861-62; PX 1 ¶¶ 6, 172; PX 8 No. 225, PX 2 at 58-60.

Defendant Garlinghouse joined Ripple as its Chief Operating Officer in 2015 and became its second CEO on January 1, 2017, a position he holds to this day. 56.1 ¶¶ 42, 864; PX 201 ¶¶ 6, 426. As set forth below, from the outset of his tenure, Garlinghouse received multiple warnings that XRP had "securities-type characteristics," and that "how [he] talk[s] about XRP matters" in terms of determining whether it was a security under the *Howey* test. 56.1 ¶¶ 915, 1014, 1025-27; PX 252.

### C. Ripple Needed to Monetize Its Large XRP Stake to Fund its Ambitious Business Plans of Finding a "Use" for XRP.

Ripple described its business goals ambitiously. Patrick Griffin, an early Ripple employee who managed its XRP sales, explained the goal as directing "all sorts of digital payment types" to occur on the XRP Ledger. 56.1 ¶¶ 44-45, 57; PX 3 at 58-61; PX 80 ¶ 24; *see also* 56.1 ¶ 58; PX 84 Nos. 650-51. Ripple's "business model [was] predicated on a belief that demand for XRP will rise (resulting in price appreciation) if the Ripple protocol becomes …the backbone for global value transfer," which Ripple would achieve by leveraging its "talented individuals with experience in relevant technology…companies." 56.1 ¶ 61; PX 9; *see also* 56.1 ¶ 62; PX 2 at 163-65, 185-88.

A related Ripple goal was to develop "uses" for XRP, such as a "bridge asset" (one that effects a trade between two other assets) because making efforts to find "uses" for XRP could make it "gain value," which would be "accredited to the asset holdings of Ripple." 56.1 ¶¶ 61-83; PX 80 ¶¶ 67, 147; PX 2 at 187; PX 3 at 48-50; PX 6 at 349-50; PX 7 at 132; PX 9; PX 10 at 77, 144; PX 14 at 104-05, 138-39; PX 15 at 250-59; PX 19 at 67; PX 27; PX 30; PX 32; PX 33; PX 508.05; PX 509.01.

In Larsen's words, these ambitions were "extremely expensive." 56.1 ¶ 93; PX 2 at 186-90. And as Garlinghouse put it, Ripple's "vision for XRP [was] ambitious," as Ripple was trying to solve a "multi-trillion dollar problem." 56.1 ¶¶ 97-101; PX 34; PX 503.04; PX 503.08; PX 503.12; PX 81 at 439. Asheesh Birla, Ripple's head of product development, noted that "[d]eveloping products for financial institutions is…very resource-intensive." 56.1 ¶ 96; PX 15 at 140, 166-67, 236. Thus, Ripple would "need to spend a billion dollars…to succeed." 56.1 ¶¶ 102-03; PX 35.

Stripped down, XRP is just computer code. When it was created, XRP had no market, no price, and no use. 56.1 ¶¶ 104-08; PX 7 at 60; PX 10 at 50-51; PX 21 at 15-16; PX 36 at 186-87. Ripple could not monetize its XRP or find any "use" for it as a "bridge asset" without a trading market, which requires market participants, marketplaces, liquidity, and trading interest. Market participants buying and selling, or "speculating" in, XRP were thus a precondition to Ripple's goals of monetizing it, as were "crypto exchanges," described as a "pillar" of Ripple's XRP strategy. 56.1 ¶¶ 109-110, 113-35, 672-73; PX 3 at 51-53, 110-13; PX 6 at 216-17, 242-43; PX 8 No. 100; PX 14 at 110-13, 299; PX 25 at 217; PX 38; PX 39; PX 26 at 214-18; PX 507.04. Thus, Ripple's twin goals— monetizing XRP while finding "uses" for it—required it to create a speculative trading market by incentivizing speculators and trading platforms. *Id.*; *see also* 56.1 ¶¶ 136-38; 159-70; PX 80 ¶ 294.

In 2013, Griffin and Phil Rapoport, another early Ripple employee whose responsibilities included the XRP markets, created a presentation reflecting the various ways in which Ripple would distribute XRP with the goal of creating a market for XRP, such that a "use" could develop and

Ripple could monetize XRP. 56.1 ¶¶ 139-43; PX 3 at 122-23, 129; PX 10 at 26-38, 99-101, 147-49; PX 44; PX 82; *see also* 56.1 ¶¶ 136-38; PX 6 at 246, 248, 364-66.

### D.     Ripple and Larsen Create the XRP Trading Markets.

#### 1.     From the Start, Ripple Offered XRP as an Investment in Ripple's Ambitious, Upcoming Efforts and Expertise.

In 2013 and 2014, Ripple created three documents—a "Ripple for Gateways" sales brochure, a "Ripple Primer," and a "Deep Dive for Financial Professionals"—which it distributed publicly, including to prospective and existing XRP investors. 56.1 ¶¶ 59-60, 73, 171; PX 9; PX 28-31; PX 52-53. These documents explained Ripple's "increase in value" thesis: Ripple's efforts to find use for XRP could increase demand for XRP and therefore its value. 56.1 ¶¶ 73-76. For example, the "Gateways" brochure, which Ripple distributed to at least 100 people starting around May 2013, explained that "XRP is valued by its usefulness to Internet commerce" and that Ripple's business plan is "based on the success of" XRP, which Ripple "will sell wholesale…to fund itself." 56.1 ¶¶ 172-73; PX 14 at 49-50; PX 52. The sales brochure touted XRP's profit potential by graphically representing the increasing price of bitcoin and XRP and stating this proved there was "value" in crypto. 56.1 ¶¶ 175-76; PX 14 at 30-32, 56; PX 52 at 19; *see also* 56.1 ¶¶ 172, 174.

The Primer, which Rapoport created (and sent to Larsen in draft form), was aimed at generating interest from financial institutions and received "widespread distribution." 56.1 ¶¶ 177-80; PX 3 at 147; PX 10 at 62-64; PX 28, 29. It similarly explained that Ripple "hope[d] to make money from XRP if the world finds the Ripple network useful," and that Ripple would retain a "portion [of XRP] with the hope of creating a robust and liquid marketplace in order to monetize its only asset." 56.1 ¶¶ 73, 76, 180; PX 30; PX 53. Ripple provided the Primer to two early XRP investors, who later became "evangelists" for XRP. 56.1 ¶¶ 181-82; PX 30; PX 405.

To reach a wide audience, Ripple posted on its website and circulated the "Deep Dive for Financial Professionals," which Rapoport created to answer investor questions. 56.1 ¶¶ 76, 183-86;

PX 10 at 182-84, 194-201; PX 500.05. This brochure explained how Ripple would "monetize" XRP and that "if the Ripple protocol becomes widely adopted, demand for XRP may increase leading to an increase in price." 56.1 ¶¶ 75, 187; PX 9. This document and an OpenCoin "Whitepaper" also explained Ripple would retain 25% of XRP to fund itself and that its "business model is based on the success of XRP"; set forth the experience of Ripple's "team"; noted that, given its promised efforts, Ripple expected "demand for XRP to be considerable"; and concluded that an early increase in XRP's price "prove[s] the viability of this model." 56.1 ¶¶ 61, 187, 357.a; PX 158.

Ripple gave similar sales pitches directly to potential investors in XRP. Griffin, Schwartz, Rapoport and other Ripple employees told potential investors that Ripple was taking steps to provide liquidity for the XRP markets and to build the XRP "network," and that Ripple would want to itself capture "any significant increase in the price of XRP it was able to achieve" by these efforts. 56.1 ¶¶ 77, 188, 190-91; PX 3 at 63; PX 6 at 363; PX 7 at 23-25; PX 10 at 120-23; PX 62; PX 508.05; Griffin marketed XRP as a "value play" or an "asset appreciation" play (*i.e.*, an asset that trades at a price too low) and Rapoport told investors Ripple would distribute XRP to "increase… demand" and "strengthen" XRP's price. *E.g.*, 56.1 ¶¶ 161, 173, 188.d, 189, 457; PX 3 at 48-49, 66-67; PX 55; PX 59; PX 60; PX 500.4; *see also* 56.1 ¶¶ 83, 254; PX 7 at 119-21; PX 87; PX 509.01 (similar).

Ripple also began an aggressive marketing campaign. In April 2013, Ripple tweeted about the "Ripple price," quoted Larsen as saying Ripple would keep 50% of XRP "to build team to contribute code, build apps, [and] promote #Ripple," posted an interview of Larsen explaining Ripple's business plans, and touted that an increase in XRP's price meant that "Ripplemania has officially arrived!!!" 56.1 ¶¶ 192-96; PX 17 at 52-53; PX 506.02, 506.07, 506.009, 506.010. From inception, Schwartz, one of XRP's creators who posts under the pseudonym "Joel Katz," explained to crypto asset enthusiasts that Ripple was effectively the "central authority" as to XRP who was going to "develop client and server software for as long as necessary" because it "believe[d] that

broad adoption of Ripple as a payment platform would drive demand." 56.1 ¶¶ 14, 22, 23, 197-99, 201, 203, 456; PX 6 at 43-44, 100-01, 355; PX 507.01, 507.02, 507.05-507.07. Schwartz also said that Ripple was "legally obligated" to its shareholders to maximize the value and liquidity of XRP, that its financial interest was in seeing the value of XRP increase, that Ripple would do "what we can to drive adoption" of the XRP Ledger or network, and that its adoption would "drive demand" in XRP. 56.1 ¶¶ 200, 202, 205, 223; PX 6 at 246-50, 507.04-507.06.

In late 2016, Ripple began promoting XRP by publishing "XRP Markets Reports" on its website, as explained below. 56.1 ¶ 500; PX 80 ¶ 103; PX 8 No. 232; PX 85 No. 426; PX 501.01.

## 2. Ripple Seeds a Market for XRP and Begins Selling XRP.

Alongside these promotional efforts, Ripple began creating a market for XRP. The first step was to give away XRP to the recipients who could then sell it, thus establishing a trading market and a price. 56.1 ¶¶ 592-600; PX 2 at 172-73; PX 3 at 73; PX 7 at 70-71; PX 10 at 26, 54-55, 124-26; PX 14 at 20, 102-03; PX 138. The next step was to give XRP to market makers in order to have them trade XRP against other assets and create price quotes. 56.1 ¶¶ 601-03; PX 10 at 53-54, 59, 83-86; PX 49. Ripple considered these steps, including "loaning" XRP to market makers and forgiving the loans once they "los[t] XRP to the market," as establishing the "building blocks" of an XRP market. 56.1 ¶ 603; PX 10 at 137-46; PX 26 at 38-43 117-19; PX 344. Ripple would later describe these efforts as attempts to "prime the pump" or start the "flywheel" of the XRP markets. 56.1 ¶¶ 111, 130, 604-05; PX 16 at 168-72; PX 36 at 121-22; PX 37; PX 38; PX 66; PX 503.15; PX 503.36.

Next, and despite legal warnings not to do so, Ripple began to sell XRP. 56.1 ¶¶ 606, 986-1007; PX 10 at 54-56. Ripple began selling XRP "over-the-counter" in transactions with institutional investors, hedge funds, and market makers, through its wholly-owned subsidiary XRP II ("Institutional Sales"). 56.1 ¶¶ 614.a, 616-20; PX 8 Nos. 229, 239-40; PX 14 at 148; PX 10 at 163-66; PX 21 at 40-43; PX 19 at 68-70; PX 18at 346. Ripple also began selling XRP directly to the public,

13

through market makers on crypto trading platforms, and noting that XRP was available to trade on such platforms. 56.1 ¶¶ 621-29, 630-33; PX 8 & PX 85 Nos. 44, 46-47, 51, 56, 571-73; PX 22 at 45; PX 141; PX 142; PX 506.008. The market makers used trading algorithms to sell in amounts programmatically set not to exceed a percentage of XRP's daily trading volume ("Programmatic Sales"). 56.1 ¶¶ 626, 634-41; PX 22 at 45; PX 85 No. 578; PX 14 at 217-18, 229; PX 80 ¶¶ 99, 198.

## II.   DEFENDANTS MARKETED A PURCHASE OF XRP AS AN INVESTMENT INTO A COMMON ENTERPRISE.

### A.   Defendants' and XRP Investors' Financial Interests Have Always Been Aligned.

Ripple relies on XRP to fund itself, and its XRP holdings are its single-largest entry on its balance sheets. 56.1 ¶¶ 146-52, 156, 162-70, 1060, 1128; PX 3 at 48-49, 66-67; PX 6 at 237; PX 15 at 70-73; PX 16 at 118-20; PX 20 at 30-31, 41; PX 42, 47, 55, 83, 146-47; PX 45 at Ex. 2; PX 346 at 7. It is therefore in Ripple's interest for the price of XRP to rise. Ripple employees acknowledged this economic reality: It is "beneficial to Ripple…if the price [of XRP] is higher"; as a matter of math and logic, "[i]f the price of XRP increased…Ripple's holdings of XRP [were] more valuable"; "over the long term, an increase in price would benefit both XRP holders and Ripple"; and, "if Ripple had a choice, Ripple would prefer the long-term price to go up." 56.1 ¶¶ 208-216, 222-30; PX 6 at 234-35; PX 10 at 44, 52, 151-52; PX 20 at 351-53; PX 21 at 351-52; PX 36 at 95-96; PX 81 at 339-40; PX 44, 65; PX 506.123. An XRP price decline, on the other hand, could be "detrimental" or "damaging" for Ripple. 56.1 ¶¶ 231-32; PX 3 at 264-65; PX 21 at 385. Accordingly, when XRP's price did not increase as much as that of other crypto assets, Ripple noticed and considered corrective steps. 56.1 ¶¶ 233-34, 246-48; PX 68, 69, 76, 77, 78.

This economic reality aligned Ripple's interests with those of XRP investors, who would want to see the price of XRP increase. 56.1 ¶¶ 235-36, 238-39; PX 6 at 287-89; PX 22 at 75-76; PX 25 at 165-66; PX 40. And it aligned Ripple's and XRP investors' interests with those of Ripple's

employees who received millions of dollars' worth of in XRP as compensation, permitting them to share in "the risk of the price of XRP" going up or down, or so that they could participate in the XRP markets with Ripple. 56.1 ¶¶ 217-22; PX 14 at 240; PX 21 at 351-52; PX 29 at 77-78; PX 81 at 339-40. Ripple disbursed over 800 million units of XRP as executive compensation. 56.1 ¶¶ 217-18; PX 80 ¶¶ 127-28, 422; PX 85 Nos. 419-424; PX 86 Nos. 66, 67. Ripple employees monitored the XRP markets—including XRP's price, volume, liquidity, and public sentiment—on a daily basis. 56.1 ¶¶ 241-48; PX 80 ¶¶ 193, 198; PX 14 at 226, 242-43; PX 17 at 39-40; PX 21 at 40; PX 22 at 66-70; PX 25 at 37-40, 123, 131-32; PX 68, 69, 76, 77, 78. As Griffin, who made $▮▮▮▮▮▮▮ selling XRP, admitted, he was hoping that XRP's trading liquidity, "volume and…price would rise" so that he could "make money." 56.1 ¶¶ 228, 851; PX 3 at 184-192; PX 14 at 136-37, 208.

### B.   Defendants Repeatedly Touted their Common Interest with XRP Purchasers.

It is "common knowledge" that Ripple is XRP's largest holder as Ripple posts its XRP holding on its website. 56.1 ¶¶ 249-50; PX 21 at 385; PX 23 at 171-74. And Ripple persistently touted the alignment of its interests with XRP investors' interests. The Deep Dive brochure stated that Ripple's interests were aligned with those who hold XRP. 56.1 ¶ 251; PX 9 at 17; PX 10 at 194-95. Garlinghouse explained *why* interests were aligned: "We are a capitalist, we own a lot of XRP." 56.1 ¶ 252; PX 502.06. Other Ripple employees publicly and privately acknowledged Ripple's ambitious business plans and their dependence on XRP sales. 56.1 ¶¶ 253-62; PX 14 at 313-14; PX 506.118; PX 87, 88, 90, 91, 92. Company talking points, which Ripple employees followed, instructed employees to say that Ripple "make[s] money through XRP sales," owns "just over 60% of XRP and…use[s] it to grow [its] team and [its] business." 56.1 ¶¶ 255-56, 347, 1032-33; PX 17 at 271-76, PX 19 at 217-18; PX 88; PX 508.33. This was consistent with Ripple's 2015 website post stating Ripple "sells XRP to fund its operations," which "allows Ripple Labs to have a spectacularly skilled team" to pursue its business. 56.1 ¶ 1226; PX 500.06.

Similarly, in October 2019, Garlinghouse stated in a public interview that "Ripple owns a lot of XRP," was "very interested in the health and success of the ecosystem," and "[a]nything we do that's good for that digital asset is good for us." 56.1 ¶ 263; PX 503.18 at 8. The same month, Ripple noted on its website that its interests were "aligned" with those of XRP holders and that Ripple was a "responsible and transparent stakeholder of XRP." 56.1 ¶ 264; PX 501.12.; *see also* 56.1 ¶¶ 265-68, 270; PX 93, 501.12, 501.13, 501.14, 506.117. Later that month, Garlinghouse publicly stated that Ripple "own[s] a lot of XRP so we are certainly interested in [the] success of" XRP. 56.1 ¶ 269; PX 503.24. Garlinghouse also publicly stated that he is "very long XRP as a percentage of [his] personal balance sheet." 56.1 ¶¶ 271-72; PX 80 ¶ 7; PX 20 at 124; PX 508.35. Schwartz noted that "the ideal situation for Ripple would be an increasing [XRP] price over the long term with few downward spikes" to "maximize" Ripple's proceeds from XRP sales; that both Ripple and XRP holders want more use for the XRP Ledger and XRP, "more liquidity for XRP," and are "interest[ed] in price"; and that even a small increase in XRP's price would cause Ripple to "massively profit." 56.1 ¶¶ 273-74, 438, 457-58; PX 6 at 271-275; PX 14 at 35-36; PX 52; PX 265; PX 508.18.

**C.     Defendants Publicized Their Efforts To Lock Up Certain XRP Holdings as Proof of Ripple's "Stewardship" of XRP and Common Interest with Investors.**

Ripple publicly cast itself as a responsible "steward" of XRP. As Ripple's talking points instructed Ripple employees to publicly note: "We've been strong stewards of XRP and our interests are very much aligned." 56.1 ¶ 258; PX 89. In other words, "Ripple, as an XRP owner, has similar interests with other XRP holders." 56.1 ¶ 259; PX 14 at 313-14; *see also* 56.1 ¶¶ 260-70, 356, 381, 426; PX 90, 91, 439, 501.19, 507.13, 507.14, 509.25 (statements regarding "stewardship" of XRP).

Ripple took other specific steps to demonstrate its "stewardship" of XRP. From its inception, Ripple "heard" public "feedback" that large sales of XRP by Ripple or its founders (including McCaleb, who received 9 billion units, 56.1 ¶ 15) could depress XRP's price. 56.1 ¶¶ 283, 290, 878; PX 96, 97, 197, 501.02. Ripple described this as "overhang" that could cause XRP to lose

16

"speculator interest" given the prospect of someone "flood[ing]" the market, or "headwinds" that would drive the price of XRP down and hinder its adoption. 56.1 ¶¶ 136, 276-82, 305, 320, 322, 332, 536; PX 2 at 92-93; PX 3 at 126-27, 198-200; PX 6 at 326-29; PX 14 at 72-73; PX 19 at 88-91; PX 22 at 78-79; PX 44, 94, 95, 100, 101, 104, 508.26. In response, Ripple sought to assure investors that Ripple's and investors' interests were in fact aligned.

*First*, to "shield XRP holders…from a short-term price shock" that could result from McCaleb's sales, Larsen and Ripple announced a "founders' XRP lockup plan" to assure investors there would be no "dumping event" by the other founders. 56.1 ¶¶ 283-85; PX 96, 108, 109. And, in approximately July 2014, when McCaleb announced his plan to increase his XRP sales, Ripple negotiated—and by August 2014 was able to announce at Larsen's direction—an agreement requiring McCaleb to slow down his sales to minimize any negative impact on XRP's price. 56.1 ¶ 286; PX 110. The announcement was meant "to assure the market we're resolving the founders' XRP responsibly." 56.1 ¶¶ 287, 306; PX 107, 111. While pitching an XRP investment to an institutional investor, Ripple explained that the "settlement deal" with McCaleb meant XRP's "price could go [up] +50-80%." 56.1 ¶ 289; PX 58; *see also* 56.1 ¶¶ 290-91; PX 14 at 329-32; PX 97, 98

*Second*, Ripple reminded the public of its financial incentives not to be a "bad actor" as to XRP. 56.1 ¶¶ 294, 307; PX 6 at 321-25; PX 508.37. In May 2017, with Garlinghouse's and Larsen's approval, Ripple announced it would place 55 billion XRP into an escrow account that would release 1 billion XRP a month and to which Ripple would return any unsold XRP on a monthly basis. 56.1 ¶¶ 295-305, 308-12; PX 8 No. 78; PX 80 ¶¶ 223-24, 228, 277; PX 99, 102-107. The escrow account's purpose was to remind investors of the common enterprise XRP represented—as Larsen put it, to "driv[e] trust" with the "XRP community," and, in Garlinghouse's words, to remove concerns investors had about Ripple "dump[ing]" XRP. 56.1 ¶¶ 316-23; PX 2 at 376-80; PX 81 at 421-22; PX 114. Garlinghouse promoted the escrow account arrangement as consistent with Ripple's "proven

track record of being good stewards of XRP" and as proving that Ripple's "self-interest is aligned with building and maintaining a healthy XRP market." 56.1 ¶ 330; PX 116. When the escrow account became effective in late 2017, Ripple again marketed it to "create a second wave of excitement … amongst speculators." 56.1 ¶¶ 331-34; PX 118, 119. Larsen and others at Ripple enthusiastically noted that the announcement generated a price increase in XRP, with Larsen texting a Ripple employee: "They like our xrp lock up!" 56.1 ¶¶ 335-37; PX 2 at 380-83; PX 120-22.

## III. DEFENDANTS TOLD INVESTORS TO VIEW XRP AS AN INVESTMENT THAT COULD BE PROFITABLE BASED ON RIPPLE'S PROMISED MANAGERIAL EFFORTS.

From its inception, Ripple cast XRP as an investment. Ripple directed "investment" inquiries to its "how to buy XRP" or "guide to getting XRP" webpages, as part of efforts to "drum[] up buyer interest in XRP." 56.1 ¶¶ 608-09, 611, 613-14; PX 50; PX 85 No. 608. Ripple listed on its website crypto trading platforms that traded XRP. 56.1 ¶¶ 610, 612; PX 85 at Nos. 607-10; PX 501.04. In January 2018, Ripple admitted on its website that the top question about "Ripple and XRP" was "How do I buy XRP?," explained where XRP was available for purchase, and explained it was "top priority for Ripple to have XRP listed." 56.1 ¶ 482.a; PX 500.20. Defendants also marketed XRP as an investment in Ripple's efforts to find a "use" for XRP, as described below.

### A. Defendants Touted XRP as an Investment in Ripple's Efforts to Find an XRP "Use" and Touted XRP Price Increases as Proof that Ripple Was Succeeding.

#### 1. Defendants Promised They Would Remain Committed to Undertaking Efforts to Find a "Use" for XRP.

Ripple publicly touted the various steps it was taking and would take to find a "use" for XRP and to protect the integrity and liquidity of the XRP markets. 56.1 ¶ 362; PX 80 ¶ 243; *see also supra* at § I.C. For example, Ripple's 2017 external talking points said employees "should talk! … about all the use cases for XRP that Ripple is supporting – and how [Ripple] efforts are directed towards those use cases." 56.1 ¶¶ 363, 365; PX 125. A 2019 XRP Markets Report announced an initiative

called "xPring," which was launched to "develop use cases for XRP." 56.1 ¶ 364; PX 501.11. In April 2020, Ripple posted that it was looking to boost XRP liquidity "through new use cases for XRP outside of cross-border payments." 56.1 ¶¶ 366-67; PX 501.14. And, in August 2020, Ripple told the public it was continuing to pursue "liquid and robust markets" for XRP by promoting other financial instruments (such as derivatives) tied to XRP. 56.1 ¶ 478; PX 501.15; *see also* 56.1 ¶ 367.

Ripple also hyped the quality of the team of experts it had hired to achieve these goals. As Schwartz put it, what "really set XRP apart from any other digital asset," including bitcoin and ether, was the "talented" or "amazing team of dedicated professionals that Ripple has … to unmask the valid ecosystem around XRP." 56.1 ¶¶ 61, 194, 256, 345, 349, 357-60; PX 6 at 337-40; PX 365; PX 61; PX 88; PX 506.07; PX 509.88. Ripple even encouraged its employees to view XRP as an investment in Ripple and told them to "buy, sell, trade, or recommend XRP" if they had "general confidence in Ripple team members, and confidence in [Ripple] itself." 56.1 ¶¶ 361; PX 79; PX 83.

Importantly, Ripple conveyed to investors that it was committed to these efforts and that there was no reasonable prospect—given Ripple's financial and reputational incentives—that it would abandon them. In February 2014, Larsen publicly explained that "our incentives are very well-aligned that for Ripple Labs to do well we have to do a very good job in protecting the value of XRP and the value of the network," and urged investors to "[g]ive us time" to show that Ripple would "add[] the most value to the protocol." 56.1 ¶ 461; PX 503.01. Schwartz continued to cast efforts to increase XRP's price as Ripple's "legal obligation" and argued publicly that it would not be rational for Ripple to walk away from XRP given its financial incentives, while admitting that this is the XRP markets' expectations. 56.1 ¶¶ 205, 440, 462, 464, 466; PX 509.35, 509.41, 509.78; PX 6 at 296-98. Garlinghouse said in interviews, variously, that he believed in the "potential appreciation" of XRP, that Ripple would "continue to invest" in the XRP ecosystem, and that Ripple was "just getting started" in its efforts. 56.1 ¶¶ 467-70; PX 503.07, 503.10, 503.11, 503.18, 506.119.

### 2. Defendants Invited Investors To Speculate that Ripple's Efforts Could Lead to an Increase in XRP's Price.

Ripple also persistently stated that if it was successful in finding uses for XRP or the XRP Ledger, there would be more "demand" for XRP. *E.g.*, 56.1 ¶¶ 386, 389, 439; PX 509.09, 509.25, 509.60; *see also supra* § I.C, I.D.1. Ripple frequently explained XRP's value and/or price would be tied to Ripple's efforts to increase demand. For example, in May 2014, Larsen stated "if the protocol is successful that digital asset will almost definitionally [sic] be successful," and for XRP "long term primary use is something that enables … the largest source of demand." 56.1 ¶ 377; PX 503.02. Schwartz noted that, if more people wanted to use XRP, then its price would go up—depending on Ripple's good "stewardship"—perhaps as high as $20 or $120 or higher. 56.1 ¶¶ 381, 386, 389, 439; PX 6 at 355-56; PX 501.19, 509.01, 509.09, 509.25, 509.60. Schwartz also cast Ripple's sales of XRP as placing "upward pressure" on XRP's price because they would give Ripple a bigger "war chest" with which to make efforts for the asset. 56.1 ¶ 445; PX 508.26. In April 2015, in response to XRP price declines, Ripple encouraged readers of an online XRP forum to think of the long-term prospects for XRP's price and link its value to Ripple's efforts and success. 56.1 ¶¶ 378-79; PX 96.

In February 2017, Larsen and Miguel Vias, another head of XRP markets, encouraged an XRP investor to think of XRP's potential appreciation over the long-term, including based on Ripple's entrepreneurial efforts. 56.1 ¶ 427; PX 179. Vias noted on an investor forum that it was a "foregone conclusion" that if Ripple "continue[s] to focus on the work" as to XRP, XRP's price would go up. 56.1 ¶ 441; PX 20 at 129-32; PX 508.20. Garlinghouse similarly stated during a Bloomberg interview that "Ripple's digital asset" (referring to XRP) would become "more valuable" if Ripple found more "utility" for it. 56.1 ¶ 387; PX 503.03. In late 2020, Breanne Madigan, Ripple's head of XRP markets, said that XRP could "outperform" other investments by 15% if it achieved "3% exposure" to the trillions of dollars that XRP is "solving for." 56.1 ¶ 455; PX 502.07.

### 3.     Defendants Often Touted XRP Price Increases.

Ripple often made celebratory public statements about XRP's price increases. For example, in March 2017, Garlinghouse tweeted that XRP was "at [a] two year high!," and the next month that XRP was "up nearly 500% to date." 56.1 ¶ 401; PX 506.062. That same month, Ripple tweeted an article by *Coindesk* noting that "Ripple Prices Surge to 4-month high." 56.1 ¶ 402; PX 506.056. Monica Long, Ripple's chief marketer, informed Garlinghouse that the purpose of this tweet was to "take advantage of the continued XRP increase," and proposed reaching out to Ripple's "exchange partners" to speak publicly about the XRP "rally." 56.1 ¶ 420; PX 124. Garlinghouse responded that he "LOVE[D] the idea!," *id.*, and then re-tweeted Ripple's promotion of the "4-month high" in "Ripple prices." https://twitter.com/Ripple/status/845347809830195200/retweets; *see also* 56.1 ¶¶ 403-08, 406.a, 417-19; 434, 436; PX 501.06, 501.11, 501.12, 506.059, 506.062, 506.063, 506.069, 506.070, 506.084, 506.094 (other examples of Ripple touting the increase in XRP's price).

Ripple took other steps to amplify XRP price increases. In December 2017, Ripple's official company talking points, prepared in light of XRP's price increase and resulting media attention, instructed employees to say: "XRP is up _% today." 56.1 ¶ 409; PX; 125; PX 17 at 286-87. In December 2017, Garlinghouse tweeted an article noting that "Ripple soars at Year End," 56.1 ¶ 408.a; PX 506.118. That same month, Griffin emailed a potential XRP investor noting, and tweeted about, the dramatic price increases in XRP. 56.1 ¶¶ 411-12; PX 126, 127. Meanwhile, Monica Long instructed Ripple's public relations agency (the "P.R. Agency") to "make hay while the sun shines" and to draft: (1) a tweet by an institutional XRP investor noting the "rally," (2) a tweet for Garlinghouse to announce that XRP would be listed on another trading platform, (3) a press release noting the addition of a "BADASS!" Ripple employee to Ripple's Board, and (4) a "customer announcement." 56.1 ¶ 413; PX 17 at 258-60; PX 119; *see also* 56.1 ¶¶ 414-15, 420; PX 124, 128 (discussing other plans to amplify message of XRP price increases).

### 4. Defendants Used XRP's Rising Price as Proof of the Success of Ripple's Efforts.

In 2017, XRP's price increased from $0.0064 to $2.30. 56.1 ¶ 400; PX 45 at Ex. 1. Ripple took credit for this increase and tied it to the success of its managerial efforts.

By this time Garlinghouse had become the self-described "face" of Ripple and its "most important spokesperson," appearing on major news networks like CNBC and CNN. 56.1 ¶ 43; PX 36 at 39-47, 50-52. Garlinghouse believed, as reflected by his internal talk to Ripple employees, that "XRP's rise over the course of" 2017 "signals market expectations of" Ripple, and that this was due to "the team" Ripple had built. 56.1 ¶ 416; PX 134, 135. Garlinghouse spoke publicly consistent with this belief. In April 2017, for example Garlinghouse stated in an interview that the increase in "Ripple's price" occurred because the market was finally recognizing Ripple's activities. 56.1 ¶ 431; PX 502.08. And in March 2018, he reiterated Ripple's "goal to develop a healthy ecosystem," and noted that, "if we can continue to build the momentum of customer usage that continues to drive the velocity and demand for XRP," he felt "very comfortable about the opportunity to grow the value of the XRP ecosystem which is good for all participants in the XRP ecosystem." 56.1 ¶¶ 451-52; PX 503.11; PX 503.22; *see also* 56.1 ¶ 1267; PX 502.04 (CNBC Garlinghouse interview where he states his belief that Ripple's efforts and promotion of a use case had "increased the value of XRP").

In emails to XRP investors and market participants, too, Ripple pushed the concept that XRP's increasing price was proof of Ripple's success. Ripple made that point directly to XRP investors in emails, touting the price increase as proof of "adoption" of XRP and the XRP Ledger, pitching the "record-setting week" reached by XRP, and noting the "strong correlation between the usefulness/value of XRP and the adoption usage of Ripple's technology." 56.1 ¶¶ 383, 432, 433; PX 129-133. Such communications also tied XRP's price increase to Ripple's efforts and noted that "adoption of the technology in turn could drive the value around XRP" and contribute to a "rally" in its price. 56.1 ¶¶ 432-33; PX 102, 129, 131-33.

Ripple made the same point in various XRP Markets Reports, including by explicitly tying "stunning" XRP price increases and "impressive" trading volume increases to Ripple's own efforts to develop a use for XRP. 56.1 ¶¶ 421-22; PX 501.02, 501.03. XRP Markets Reports also reflected the view that investors were "connect[ing] the dots" between a "29,631%" year-over-year price increase and the XRP escrow and Ripple's partnerships. 56.1 ¶¶ 423-24; PX 501.04, 501.05. This report also touted the "team" of developers Ripple had and noted how the company had been a "steward" of XRP. 56.1 ¶ 265.a; PX 501.03. Vias publicly attributed the "rally" in XRP's price to Ripple, while Long and Garlinghouse approved a quote for an article wondering "What's Driving Ripple's Price to All-Time Highs?," which explained Garlinghouse's view that "Ripple's Price"— referencing XRP's price—was up because of "a lot of work we have done." 56.1 ¶ 431; PX 502.08; *see also* 56.1 ¶¶ 427-31, 436, 441; PX 136, 137, 179, 502.01, 502.08, 506.094, 508.20 (other examples of Ripple tying XRP's price increase to Ripple's efforts).

### B. Targeting Speculators, Defendants Made and Touted Other Significant Efforts to Increase and Protect the Liquidity of the XRP Markets.

As part of its efforts to find a "use" case and increase XRP's price, Ripple undertook significant efforts to protect liquid, speculative trading in the XRP markets. Ripple devoted an entire "XRP markets team," led by Vias from November 2016 through April 2020, to build XRP market liquidity for XRP's bridge asset "use" case. 56.1 ¶ 475; PX 80 ¶¶ 23, 198; PX 21 at 14-15; PX 20 at 21-22, 141; PX 14 at 251-53; PX 153.

### 1. Defendants Targeted U.S.-Based Crypto Platforms to List XRP.

Seeking to attract speculators and building liquidity for the XRP trading markets and to respond to specific investor requests to make XRP more readily available for trading, Ripple offered crypto trading platforms incentives to list XRP. 56.1 ¶¶ 479-85, 487-493, 495, 498; PX 16 at 199; PX 21 at 76-80, 102-03, 110-13; PX 41, 140, 144; PX 85 No. 584; PX 80 ¶¶ 161, 163. Vias led this 'exchange strategy," which Ripple explicitly stated believed could reach certain "speculative [trading]

volume target[s]." 56.1 ¶¶ 492, 495; PX 43, PX 20 at 93-96, 180. In 2017 alone, Ripple entered into six agreements with platforms and also offered two U.S.-based crypto trading platforms $1 million and $5 million, respectively, to list XRP. 56.1 ¶ 499; PX 21 at 43-44, 140, PX 81 at 298-299, 305-08, 237-38; PX 437, 460. Ripple targeted one particular U.S.-based trading platform—Coinbase—for years to increase speculative trading volume in XRP, engaged in an online campaign to petition that platform to list XRP. 56.1 ¶¶ 496-97; PX 486, 504.29. Ripple noted internally that "investors are interested" in exchange listings because "they want to see a price increase by getting XRP more exposed on major exchanges." 56.1 ¶ 497.a; PX 541. Thus, Ripple touted XRP's availability on crypto trading platforms and noted it publicly when a new platform listed XRP or an existing platform increased XRP's availability. 56.1 ¶ 511; PX 501.04, 501.09-509.15.

### 2. Defendants Undertook Efforts to Influence the Public's Understanding About XRP and Ripple.

Ripple touted the XRP Market Reports, which were aimed at reaching XRP speculators, as part of Ripple's efforts to promote a "robust successful market" for XRP and attract trading liquidity to XRP. 56.1 ¶ 501; PX 21 at 178-80; PX 3 at 245-48; PX 81 at 385-87. The first XRP Market Report promised to provide "regular updates on the state of the market, including … commentary on … price movement and announcements of … exchanges." 56.1 ¶ 507; PX 501.01. Certain Market Reports noted their purpose to increase "transparency to the XRP market ecosystem." 56.1 ¶ 507-510; PX 501.01-501.10.

Through media talking points, the P.R. Agency, and even other XRP investors (with whom Ripple's interests were "aligned"), Defendants took other steps to combat what Ripple considered to be "misinformation" about XRP or Ripple or, in crypto parlance, "FUD": "Fear, Uncertainty, and Doubt." 56.1 ¶¶ 520-24; PX 2 at 213-14, PX 3 259-60; PX 17 at 49-50, 58, 81-84; PX 20 at 117; PX 25 at 191, 258-62; PX 48, 467, 468. As Madigan put it, "sentiments move markets," and information about Ripple could "shift the narrative" in its favor. 56.1 ¶ 525; PX 469. Moreover, Ripple noted

that its employees must act "transparently as to XRP transactions to avoid perceptions that could impair the integrity or reputation of the XRP market," and prohibited its employees from trading XRP based on material nonpublic information, such as about XRP adoption or listing on crypto platforms—a prohibition long applied to securities. 56.1 ¶¶ 526-27; PX 470-72.

### 3. Ripple Undertook and Touted Other Steps To Protect the XRP Markets from Excessive Sales.

Concerned that large sales of XRP could cause XRP to lose liquidity or interest in XRP by speculators, or to decrease in price, from the outset of the XRP trading markets Ripple took concrete, public actions to minimize the market impact of its distributions of XRP (in addition to the founder lockups and escrow described above). 56.1 ¶¶ 528-36; PX 95, 100, 473, 483, 485.

For Institutional Sales, Ripple at times imposed "lockups" (resale restrictions based on XRP trading volume) to "throttle" (slow down) resales. 56.1 ¶¶ 562-79, 583; PX 10 at 151-52, 156-61, 242-48, 252-54; PX 14 at 180; PX 22 at 207-10, 213-14; PX 25 at 125-27, 137; PX 58, 77, 424, 441, 444, 459, 461, 462, 466, 475, 487, 491, 498. It also at times stopped selling XRP at discounted prices, because the discounts had encouraged buyers to resell the XRP quickly, at a profit. 56.1 ¶¶ 581-82; PX 441, 475; PX 15 at 182-84. Ripple publicized these efforts as designed to prevent large subsequent resales and market and price instability. 56.1 ¶¶ 577-78; PX 501.01-501.06; PX 441.

For Programmatic Sales, Ripple's strategy was to "sell what we could sell without impacting the market," which meant without "impact[ing] the price and…volatility of the market." 56.1 ¶¶ 537-52; PX 10 at 273-77; PX 14 at 153-54, 162-63, 217-18; PX 18 at 141-42; PX 21 at 32-35, 59-60; PX 25 at 66-68; PX 26 at 58-59; PX 476. Ripple's XRP markets team regularly communicated with Ripple's market makers and with the Individual Defendants regarding Programmatic Sales and their potential impact on the broader market, including proposals for adjusting Ripple's sales strategy and recommendations for upcoming XRP sales. 56.1 ¶¶ 539-52, 560; PX 14 at 142-43, 152-55, 162-63, 223-24; PX 463, 476, 492-94; PX 26 at 58-59; PX 10 at 273-77; PX 25 at 66-68; PX  85 Nos.

561-63; PX 36 at 94-95. Ripple even provided specific instructions to market makers to stop sales or take other steps to protect XRP prices, including buying XRP. 56.1 ¶¶ 553-54, 556-59, 640; PX 14 at 232-39; PX 26 at 75-77, 90-92, 95-96; PX 463, 477-78, 481-82, 497. Ripple publicized these efforts, described their goal as minimizing market impact, and noted them as additional proof of Ripple's "disciplined, responsible" ownership of XRP. 56.1 ¶ 561.a; PX 501.04, 501.13, 501.14.

## IV.  DEFENDANTS' MARKETING WAS SUCCESSFUL: REASONABLE MARKET PARTICIPANTS VIEWED XRP AS AN INVESTMENT.

Defendants' efforts were successful. Institutional and retail investors, and other sophisticated market participants, routinely voiced their views that buying XRP was an investment in the XRP whose value would be driven by Ripple's efforts. In August 2014, one sophisticated investor told Larsen it had bought XRP because "the TEAM is what we bet on" and "because we [the investor] believe in the TEAM." 56.1 ¶ 877; PX 360. Another investor called Ripple "a central bank of XRP," which Ripple employees conveyed to the Individual Defendants. 56.1 ¶ 878; PX 445. Ripple received multiple inquiries about investing in XRP, with many explicitly calling it an investment in Ripple. *See* 56.1 ¶¶ 879-902; PX 158, 197, 204-05, 207, 209-10, 213-14, 216-17, 219-20, 222-232.

In April 2018, one crypto reporter noted—just as Schwartz had before—that XRP was "unlike bitcoin or ether." 56.1 ¶ 903; PX 506.113. The reporter reasoned that for bitcoin and ether "the success isn't dependent upon any particular entity," whereas "with XRP, its success depends on Ripple getting banks … to use it." *Id.* In May 2018, a blogger called "xrphodor" posted an article explaining why he thought "speculators would soon prefer" XRP because of the dedicated "Ripple team," "Ripple's track record," and Ripple's announcements of "use" cases for XRP. 56.1 ¶¶ 904-05; PX 488. Garlinghouse forwarded the article and stated: "hodor is one of us!" 56.1 ¶ 906; PX 446.

In 2019, Ripple discussed a potential engagement with a reputable investment bank to consider selling Ripple's equity to the public. 56.1 ¶ 907; PX 447 (Decl. of ███████, dated Sept. 8, 2022 ("██ Decl.")) ¶ 3. Based on its expertise and the information Ripple provided, as well as

public information and information about transactions in the securities of comparable companies, the bank prepared a presentation for Ripple. 56.1 ¶ 908; ███ Decl. ¶ 5. The bank's analysis explicitly tied Ripple's value to XRP's value and explained that any investment in Ripple assumed that Ripple had the financial incentive to continue to engage in efforts to increase XRP's price. 56.1 ¶ 909 ███ Decl. Ex. A at 6-10. That analysis was consistent with how Ripple's Chief Financial Officer Ron Will and at least one other sophisticated valuation firm viewed Ripple and XRP. 56.1 ¶¶ 910-13; PX 233; PX 234; PX 235; PX 206; PX 23 at 254.

The market at times treated the terms "XRP" and "Ripple" as synonymous (as Ripple itself did at times). 56.1 ¶¶ 196, 412, 414, 468, 431 (examples of Ripple talking about XRP as "Ripple"); *id.* 914-18; PX 19 at 176-77; PX 17 at 206-07; PX 81 at 356-61; PX 125, 127; PX 502.08; PX 506.09; *see also* 56.1 ¶¶ 921-22; PX 542, 544 (XRP investors explaining Ripple-related reasons they invested in XRP). When in March 2018 Ripple tried to convince *Business Insider* to remove from an article a statement that XRP is "the only popular coin that is run by a company," the magazine rejected the request as it was "absurd to dispute that XRP is run by a company." 56.1 ¶ 920; PX 236; PX 237.

## V.    RIPPLE SOLD AND DISTRIBUTED OVER $2.1 BILLION OF XRP, AND THE INDIVIDUAL DEFENDANTS SOLD $600 MILLION, INTO THE PUBLIC XRP MARKETS THEY HAD CREATED.

Ripple succeeded in its goal of monetizing XRP to fund its business by selling, directly or indirectly, over $2 billion worth of XRP into the public XRP markets it had created. These sales became the "life-blood" of, and were "existential" for, the company. 56.1 ¶¶ 139, 645; PX 3 at 122-23; PX 10 at 99-101; PX 82; PX 145. "Ripple's main business model/source of income [was] XRP sales." 56.1 ¶¶ 168-69; PX 147. From 2013 through 2020, Ripple's operating costs exceeded $2.1 billion. 56.1 ¶ 146; PX 45 at Ex. 2. Ripple raised $299 million by selling its stock and promissory notes, and made just $21.9 million from selling software (none of which has anything to do with XRP). 56.1 ¶¶ 143-44; 146, 153-54; PX 45 at Ex. 2; PX 8 at Nos. 85, 238; PX 36 at 67-73; PX 16 at

76-84. Ripple made up the difference by selling $1.5 billion in XRP and by distributing $609 million in XRP to conduits (that then sold the XRP to the public) to fund Ripple's venture of finding a "use" for XRP.

### A.     Ripple Sold Over $1.5 Billion of XRP to Speculative Investors.

#### 1.     Targeting Speculators, Ripple Made Over $750 Million in Programmatic Sales of XRP.

Between November 2014 and September 2019, Ripple sold $757 million of XRP in Programmatic Sales using the same market maker the Individual Defendants used (GSR), and then pooled the proceeds of those sales. 56.1 ¶¶ 647, 649-51; PX 45 at Ex. 3; PX 26 at 141-43.

Ripple's Programmatic Sales were made through "blind" bid/ask transactions—Ripple did not know the identity of the XRP purchasers on the other side of these trades. 56.1 ¶¶ 652-55; PX 14 at 158-62; PX 80 ¶¶ 93-95; PX 8 at No. ¶ 111; PX 442; PX 25 at 52, 212-14. Thus, Ripple did not and could not place any restrictions on the amounts of XRP the purchasers bought, their geographic location, or their resale plans. 56.1 ¶¶ 656-660, 662-69; PX 8 Nos. 39, 48; PX 81 at 374-77; PX 15 at 127-28; PX 22 at 58-60; PX 14 at 219-22; PX 2 at 191-92; PX 6 at 38-39, 81-82; PX 10 at 142-43, 297-301. Nevertheless, Ripple understood that people were speculating on XRP as an investment— as noted, Ripple explicitly targeted speculators and made increased speculative volume a "target goal," and it was "widely understood" at Ripple that speculators were a key part of the XRP markets. 56.1 ¶¶ 648, 670-709; PX 46, 142, 147, 148, 149, 152, 154, 155, 156, 159, 161, 162, 164-67; PX 3 at 86-87, 217-19, 122-23; PX 14 at 270-76; PX 20 at 29, 42-43; PX 25 at 82, 212, 217; PX 101.

#### 2.     Ripple's $750 Million of Institutional Sales Were Distributions of XRP into Public Markets Using Conduits.

Between late 2013 and the end of 2020, Ripple sold another approximately $728.9 million of XRP in Institutional Sales. 56.1 ¶ 716; PX 45 at Ex. 3. These sales were made by XRP II (Ripple's wholly-owned subsidiary) pursuant to written contracts that reflected an understanding that the

purchasers were sophisticated individuals or entities hoping to profit from XRP price movements—many through immediate resales of XRP. 56.1 ¶¶ 5-6, 619-20; PX 4; PX 18 at 344-46; PX 80 ¶ 19.

In an application XRP II filed to register as a money services business with the State of New York, Ripple stated that XRP II's "customers" were "institutional and other accredited investors" who are "purchasing XRP for speculative purposes," such that XRP was "not intended to be used as a currency." 56.1 ¶¶ 717-18, 721, 723; PX 47; PX 168; PX 169; PX 80 ¶¶ 19, 105, 166, 235. Many contracts required the purchaser to indemnify Ripple for any claims arising out of the purchaser's sale or distribution of XRP, indicating the purchaser's resale intent, while others explicitly explained that the purpose of acquiring XRP was to resell it. 56.1 ¶¶ 792-94; PX 282-87.

Ripple also priced some of these Institutional Sales at discounts from the then-prevailing market price and thus created an economic incentive for purchasers to quickly resell the XRP, as Ripple and Larsen understood. 56.1 ¶¶ 531, 533-34, 572, 574, 790-91; PX 10 at 151-54, 252-54; PX 100; PX 279-81, 290-91, 487. For example, when pitching a large XRP sale to a buyer in July 2014, Larsen noted that Ripple was selling large "block purchase[s]" and "view[ed] XRP as pretty undervalued," and provided a report "on XRP and Ripple that might be helpful from an investment perspective." 56.1 ¶ 731; PX 58. Rapoport negotiated discount and lockup terms as part of an eventual Institutional Sale to a hedge fund. 56.1 ¶ 575; PX 10 at 241-248; PX 441, 490.

Ripple knew that many Institutional Sales buyers were acting as conduits and reselling XRP into public markets. 56.1 ¶¶ 790-95, 797, 799, 802-03, 813; PX 292, 297-99. Indeed, some Institutional Sales buyers were buying XRP as brokers, while others simply resold it as part of their trading strategies. 56.1 ¶¶ 734-38; 790-95; PX 22 at 46-47; PX 25 at 52-53, 119, 126-27; PX 92, 95; PX 171-72; PX 173 at ¶ 8; PX 174. For example, in 2015 Ripple sold over $700,000 of XRP to one entity, who was reselling XRP, and Ripple paid it $100,000 as a commission. 56.1 ¶ 798; PX 296. As another example, a U.S.-based purchaser acquired over $83 million of XRP from Ripple and

immediately transferred it to a pre-arranged purchaser for a 2% fee. 56.1 ¶¶ 804-13; PX 311-16, 320. Larsen and Garlinghouse reacted favorable to selling that much XRP to an investor (Garlinghouse stated: "wow. Nice," and Larsen: "That's good"), and Ripple later observed an uptick in XRP trading volume surrounding this purchase, inferring that XRP was being resold into the market. 56.1 ¶¶ 810, 812, 813; PX 318-23; *see also* 56.1 ¶¶ 736; 814-16 (other examples of Institutional Sales); PX 543 (Decl. of ███████, dated Sept. 13, 2022) ¶ 9 (explaining XRP purchasers were for trading).

Many of Ripple's Institutional Sales were governed by contracts with resale lockups that were disclaimed when the actual XRP was delivered. 56.1 ¶¶ 801-02; PX 302-07. The contracts with actual sales restrictions limited a purchaser to selling XRP in amounts related to the trading volume of XRP, which helped Ripple control the speed at which resales occurred. 56.1 ¶ 800; PX 300-01.

In late 2018, years after its first Institutional Sale in 2013, Ripple launched a cross-border money transmission software called "xRapid," later known as "On Demand Liquidity" ("ODL"). 56.1 ¶¶ 109, 739; PX 8 ¶¶ 89, 587. ODL aimed to facilitate converting U.S. dollars into a foreign fiat currency (such as Mexican pesos) by exchanging dollars for XRP and then using the XRP to purchase the foreign currency. 56.1 ¶ 740; PX 8 No. 100. Ripple's ODL clients were money services businesses, not individuals, and they did not have to buy XRP from Ripple; they simply bought XRP in the open markets. 56.1 ¶¶ 743-44; PX 8 No. ¶¶ 94-95, 105; PX 15 at 195-97; PX 81 at 335-36. Between May and December 2020, Ripple sold XRP to financial institutions in connection with ODL, in transactions it called "XRP-O" or "XRP Origination," at times fashioning these sales as "loans." 56.1 ¶¶ 749-51; PX 80 ¶¶ 373, 378; PX 81 at 335-36. Ripple treated these sales as other "over-the-counter" sales. 56.1 ¶¶ 752-53; PX 181; PX 501.14-501.16. This is because ODL customers were simply conduits for Ripple's distributions of XRP into public markets; they held XRP for mere seconds before selling it into public markets, an even shorter holding period than

typical Institutional Sales buyers. 56.1 ¶¶ 755-57, 760, 787-88; PX 15 at 219, 327-40, PX 11 ¶ 44; PX 182; PX 80 ¶¶ 360, 373; PX 192.

ODL customers' resales of XRP into the market was so swift that Ripple took steps—consistent with its commitment and strong financial incentive to support the XRP markets—to minimize its market impact, as it had done for prior Institutional and Programmatic Sales. In fact, before Ripple enacted "XRP-O," it worried that the resulting resales of XRP could negatively impact the XRP markets. 56.1 ¶¶ 760-64; PX 22 at 238-41, 270; PX 25 at 355-62; PX 26 at 177-82; PX 81 at 483-84; PX 182, 183, 443. Ripple thus decided to *buy back* a portion of the XRP it was selling in XRP-O. 56.1 ¶ 765; PX 22 at 268-73. Larsen and Garlinghouse shared the concern that selling XRP to ODL customers could negatively affect XRP markets, and Larsen gave "an almost directive" to Garlinghouse to start buying back the XRP. 56.1 ¶¶ 766-78; PX 185-86.

Ripple publicized these and other XRP repurchases as explicitly intended to sustain market prices. *See* 56.1 ¶¶ 779-81; PX 25 at 364; PX 501.15, 501.16 As Ripple's primary market maker explained, Ripple bought XRP to have "fair and orderly" XRP markets and publicly made itself the buyer or seller "of last resort" for XRP. 56.1 ¶¶ 586, 784; PX 26 at 90, 131-32, 167. Investors took note of Ripple's repurchases as something that could "increas[e] demand and therefore price." 56.1 ¶ 786; PX 191; *see also* 56.1 ¶ 826; PX 192, 341 ("manag[ing] the supply" of XRP with XRP-O).

### B. Ripple Distributed $609 Million in XRP through Other Conduits, Including by Using XRP as Executive Compensation.

In addition to selling XRP for dollars and then deploying them, Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP into public markets—once more furthering Ripple's twin goals of deploying XRP sales proceeds to fund its projects and distributing XRP into the public markets. 56.1 ¶¶ 827-29; PX 80 ¶¶ 125, 131; PX 8 No. 33.

Through the end of 2020, Ripple realized $609 million from these types of distributions. 56.1 ¶ 830; PX 45 at Ex. 2. These distributions included millions of units of XRP as executive

compensation. 56.1 ¶¶ 217-18; PX 80 ¶¶ 127-28, 422; PX 85 Nos. 419-424; PX 86 No. 66. They also included distributing 776 million units of XRP as part of the so-called "xPring" initiative launched in 2018 to fund third parties that would pursue other "uses" for XRP. 56.1 ¶¶ 831-34; PX 6 at 392; PX 24 at 76-77; PX 25 at 59-60; PX 80 ¶ 147; PX 90; PX 501.10. Ripple touted the amount of money (in U.S. Dollars, not XRP) that it had invested to boost XRP. 56.1 ¶ 835; PX 193, 194. Ripple understood that these "partner" companies would sell the XRP into public markets in order to monetize it "immediately." 56.1 ¶¶ 836-37; PX 195, 196. Ripple also took and publicized steps to manage the pace at which xPring partners sold XRP into the market in order to control the effects of these sales on XRP's price and liquidity. 56.1 ¶¶ 838-42; PX 501.11, PX 24 at 176-80; PX 25 at 61-63, 72, 89-93; PX 195, 198. An April 2020 internal presentation about "XRP Supply" showed Ripple treated all of these XRP distributions as functionally identical in that they all "impact[ed] circulating supply." 56.1 ¶ 843; PX 199.

### C.     Larsen and Garlinghouse Sold Over $600 Million of XRP into the Markets.

Larsen offered and sold XRP from at least 2013 through 2020. Having received 9 billion units of XRP upon Ripple's founding, Larsen began his own sales in 2013 and continued selling XRP into public markets through 2020, making approximately $450 million from his sales. 56.1 ¶ 868; PX 2 at 66-69, 71, 76-79; PX 202 ¶¶ 37-38, Fig. 7, Tbl.2; PX 514. Larsen sold XRP even after learning of the SEC's investigation. 56.1 ¶ 869; PX 2 at 18-21, 79.

Garlinghouse sold XRP for $150 million in proceeds. 56.1 ¶ 870; PX 202 ¶¶ 39-40, Fig. 8, Tbl. 3; PX 81 at 330-33; PX 203; PX 86 No. 193. He continued to sell XRP through the end of 2020—after he was named in a private lawsuit accusing him and Ripple of unregistered XRP sales and after SEC staff informed him the staff was likely to conclude that Ripple's offers and sales of XRP were securities transactions. 56.1 ¶ 872; PX 86 No. 221; PX 81 at 115-18, 330-33. His XRP sales have been his largest source of income. 56.1 ¶ 873; PX 81 at 333.

## VI.   DEFENDANTS DID NOT REGISTER THEIR OFFERS AND SALES OF XRP OR PROVIDE INVESTORS WITH RELEVANT INFORMATION.

Ripple has promoted itself as the most "transparent" company in the crypto space, partly because Ripple purports to provide some information about its XRP sales and efforts as to XRP. 56.1 ¶¶ 264-68, 508-10, 926-27; PX 501.02; PX 501.03; 501.06; 501.12; PX 501.13; PX 501.14; PX 506.117. Indeed, Ripple has argued that the existence of an identifiable actor—Ripple—to provide information about a digital asset—XRP—distinguishes XRP from assets such as bitcoin and ether. 56.1 ¶¶ 350-52; PX 22 at 305-06; PX 392; PX 6 at 295, 325; *see also* ¶ 56.1 255; PX 88.

But Defendants have never filed a registration statement as to their offers and sales of XRP. 56.1 ¶ 928; PX 80 ¶¶ 2, 4, 8, 60, 72, 222, 393; PX 1 ¶ 60; PX 201 ¶ 60. Nor has Ripple ever filed or made public the type of information otherwise required by the federal securities laws, such as audited financial statements as to Ripple or XRP. 56.1 ¶¶ 929-32; PX 8 ¶¶ 227-28, 230; PX 94 ¶¶ 732-36; PX 238 at 28-39; PX 239; PX 510. Defendants claim Ripple has no obligation to provide full and accurate information to XRP investors, because it is a "private company" that takes "significant measures to safeguard" the confidentiality of its financial condition. 56.1 ¶ 937; D.E. 562 at 2; PX 33 at 303.

As a result, Ripple has provided incomplete information about its distributions of XRP into the market and its heavy subsidies of its ODL customers. For example, the XRP Market Reports that Ripple provides to investors on its website do not disclose all of Ripple's XRP distributions and are thus "not a good representation of the XRP that was introduced into the market." 56.1 ¶¶ 934; PX 22 at 265-66. Indeed, Ripple has expressed concerns about the "deleterious effect" if the market understood Ripple's distributions of "almost 200 million units of XRP in a single week." 56.1 ¶¶ 935-36; PX 23 at 25-27; PX 240, 455.

## VII.    DEFENDANTS WERE REPEATEDLY WARNED THAT THEIR OFFERS AND SALES OF XRP COULD BE DEEMED SECURITIES TRANSACTIONS.

### A.    Ripple Received Legal Guidance that XRP Could Be a Security.

As described above, in February and October 2012, Ripple and its founders, including Larsen, received two Legal Memos from Perkins Coie analyzing XRP's "legal risks," including potential offers and sales under *Howey. See supra* at § I.B. In February 2015, Ripple received another memorandum, this one from the Paul Hastings law firm, analyzing "whether XRP falls under the definition of a 'security'" under *Howey* "and is therefore subject to regulation by federal and state securities agencies." 56.1 ¶¶ 1000-01; PX 245; PX 246. The Paul Hastings memo concluded that XRP "likely should not be treated as a security" if Ripple did *not* pursue the entrepreneurial and managerial activities it had taken (and would continue to take). But the Paul Hastings memo also "note[d] that XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP." 56.1 ¶ 1002; PX 245. The memo also advised that Ripple would face an "uphill argument" if it sought to establish that XRP is exempt from the securities laws on the grounds that it is a "currency." 56.1 ¶ 1003; PX 245. Paul Hastings further advised:

> The relationship between XRP and Ripple Labs distinguishes XRP from certain other virtual currencies. Bitcoin, for example, does not have a single identifiable promoter....
>
> In order to help mitigate the risk of XRP being deemed a security, Ripple Labs should be extremely careful in promoting and selling XRP. Regulators will look to Ripple Lab's public documents and documents provided to potential purchasers of XRP in applying the *Howey* test. As such, statements touting XRP as an investment opportunity and the potential profits that buyers may derive from XRP's appreciation in value would tend to support the argument that XRP functions as a security.

56.1 ¶¶ 1004-07; PX 245.

In March 2015, when Ripple was contemplating the launch of an XRP investment fund for "accredited investors," the investment fund's draft prospectus cited various risk factors relating to the possibility that XRP was a security. 56.1 ¶¶ 1008-09; PX 247; PX 248; PX 249; PX 10 at 254-57.

**B.    Ripple's Compliance and Regulatory Personnel Understood the SEC Could Consider XRP To Be a Security.**

In October 2016, Ripple's Chief Compliance Officer ("CCO"), Antoinette O'Gorman, advised Garlinghouse that, despite FinCEN's designation of XRP as a cryptocurrency for purposes of FinCEN regulations, "the SEC may well come out on the side that certain crypto-currencies are securities." 56.1 ¶¶ 1010-11; PX 250; PX 18 at 179-81. In March 2017, O'Gorman emailed Garlinghouse: "XRP certainly has some 'securities-type' characteristics." 56.1 ¶ 1014; PX 252.

In approximately April 2017, O'Gorman and Ripple's general counsel gave a presentation to various Ripple teams reviewing how XRP could be evaluated under *Howey*. 56.1 ¶ 1015; PX 253; PX 254; PX 22 at 264-66, 270-73, 332-38. And shortly after the SEC issued the DAO Report, O'Gorman discussed it with both Larsen and Garlinghouse. 56.1 ¶ 1016; PX 22 at 127-29; PX 19 at 289; PX 81 at 41-42. O'Gorman also discussed with Garlinghouse that there was a risk XRP could be deemed a security, including based on guidance from the SEC. 56.1 ¶ 1017; PX 22 at 137-39. Likewise, Ripple's Director of Regulatory Relations, Ryan Zagone, was aware the SEC could consider XRP to be a security and subject to its jurisdiction. 56.1 ¶ 1012; PX 19 at 129-30.

As Perkins Coie had advised in October 2012, Zagone understood that companies can request a "No Action" letter from the SEC—a letter in which SEC staff explain that they will not recommend an enforcement action against someone based on particular conduct. 56.1 ¶ 1018; PX 19 at 50. As the SEC's expert explained in unrebutted testimony, the "No-Action letter process is a routine and common practice for market participants to gain an understanding of whether their proposed activity complies with the federal securities laws, including whether offers and sales of an instrument involves an 'investment contract.'" 56.1 ¶¶ 1019-22; PX 238 at 26-27.

Ripple's legal department was responsible for its compliance with the U.S. securities laws. 56.1 ¶ 1023; PX 22 at 54; PX 17 at 273-74. Ripple has claimed the attorney-client privilege over what Ripple's attorneys advised about its securities law exposure. But a non-privileged document Ripple's general counsel sent to the P.R. Agency shows Ripple *knew* that XRP could be considered a security and that *Howey* would govern the analysis. In December 2017, Ripple's general counsel sent the P.R. Agency "our internal draft message re how to talk about XRP." 56.1 ¶ 1024; PX 125; PX 18 at 292. The document was titled: "How We Talk About XRP (From Your Legal Department)." 56.1 ¶ 1025; PX 125. It stated that, if XRP was a security, it "could lead to lots of headaches," that "our laws require Securities to be registered," and that "how we talk about a digital asset can make a difference!" in terms of determining whether it was a security or not. 56.1 ¶¶ 1026-27; PX 125. The document also contained a "handy cheat sheet" for publicly discussing XRP:

| Instead of this... | Say this... |
|---|---|
| Ripple's XRP | XRP, or a digital asset native to the XRP Ledger |
| We are working hard to increase the price of XRP! | We are working hard to create compelling uses for XRP, a unique digital asset |
| XRP is a strong, long term investment | XRP is a unique and valuable digital asset |
| Trading in Ripple | Trading in XRP |
| We're up xx% today | XRP is up _% today |

56.1 ¶ 1026; PX 125.

In March 2018, Garlinghouse delivered a speech acknowledging: "There isn't regulatory uncertainty. [R]egulatory uncertainty…means…that I disagree with the regulatory certainty so I'm going to call it regulatory uncertainty." 56.1 ¶ 1028; PX 503.11. In the same vein, on March 8, 2018, he tweeted: "In context of yesterday's SEC statement(s), I hear some in crypto talk about the current 'regulatory uncertainty.' What's uncertain?! SEC's statements have been consistent and clear. 'Regulatory uncertainty' is just a euphemism for 'we wish we could ignore SEC regulations.'" 56.1 ¶ 1029; PX 506.112.

By May 2018, Ripple had advised its employees that it was "up to the SEC to decide" whether XRP was a security. 56.1 ¶ 1031; PX 88. Similarly, a member of Ripple's communications team asked Ripple personnel to study a document called "Key Messages, FAQ and Fast Facts" to provide guidance on how to discuss the "securities classification" issue. 56.1 ¶ 1032; PX 19 at 173-74, 178-80, 183-84; PX 88. The "Key Messages, FAQ and Fast Facts" contained a section called "SEC/security conversation" in which Ripple noted: "Ultimately, this will be up to the SEC to decide." 56.1 ¶ 1033; PX 255; PX 19 at 209-11.

That month, certain U.S. investors who had purchased XRP sued Ripple and Garlinghouse (in a lawsuit that remains pending) and alleged that they had improperly failed to register their offers and sales of XRP in violation of Section 5. *Coffey v. Ripple Labs, Inc.*, No. CGC-18-566271 (Cal. Sup. Ct., San Francisco Cty., May 3, 2018); *see also* 56.1 ¶¶ 921-22; PX 542, 544.

### C.   The SEC's Investigation Confirmed to Defendants that their XRP Distributions Could Violate the Federal Securities Laws.

In April 2018, the SEC's Division of Enforcement ("Enforcement") sent Ripple's attorneys a letter referencing an inquiry into Ripple and requesting that Ripple preserve documents, including those relating to Ripple's offers and sales of XRP and any analysis by Ripple regarding the application of the U.S. securities laws to offers and sales of XRP. 56.1 ¶ 1034; PX 256. By May 2018, Ripple had retained as counsel Andrew Ceresney, who had served as the SEC's Director of Enforcement from 2014 to 2016. 56.1 ¶ 1035; PX 505. Ripple was aware Enforcement could ultimately recommend to the SEC—that is, the Commissioners—that it take enforcement action against Ripple. 56.1 ¶ 1036; PX 19 at 187-88; *see also* 56.1 ¶¶ 1037-38.

Ripple representatives—including Ceresney and Garlinghouse—participated in multiple meetings with Bill Hinman, the SEC's then-Director of Corporation Finance, and Enforcement staff in connection with the investigation. 56.1 ¶¶ 1040-41; PX 258 at 371-72, 375-76. During one meeting in September 2019, Hinman advised Ceresney that, to become compliant with the securities

laws, Ripple should stop offering XRP or register those offerings, as Garlinghouse admits. 56.1 ¶¶ 1042-45; PX 258 at 95-96, 374, 380, 415-16; PX 86 No. 221.

### D. Realizing the SEC Could Determine Ripple Violated the Securities Laws, Ripple Undertook a Lobbying Campaign to Influence the SEC's Decision.

In the months after it learned of Enforcement's investigation, the P.R. Agency advised Ripple that lawmakers were preparing to "crack down" on "cryptocurrencies." 56.1 ¶ 1038; PX 257; PX 19 at 200. Ripple began actively campaigning to convince government officials that XRP should not be considered a security and, by July 2018, had retained lobbying firms. 56.1 ¶ 1046; PX 2 at 332; PX 19 at 51-52, 284-89; PX 259. In late 2018 and early 2019, Garlinghouse made multiple visits to Washington, D.C., to try to influence members of Congress, the prior administration, and the SEC Commissioners. 56.1 ¶¶ 1047-52; PX 81 at 46-47, 52-53, 55; PX 19 at 244-46, 249, 254-55, 259-63, 267-68, 270; PX 261; PX 262; PX 263; PX 264. In these meetings no one from the SEC ever said the SEC did not view Ripple's or Garlinghouse's offers and sales of XRP as securities transactions. 56.1 ¶ 1053; PX 86 Nos. 196-198, 216-219; PX 81 at 43-45. And during this period, Defendants were aware that the SEC's investigation was continuing. As a result, Ripple understood that the SEC could still ultimately decide that it considered XRP offerings to be securities offerings. 56.1 ¶ 1054; PX 19 at 278.

### VIII. LARSEN AND GARLINGHOUSE SUBSTANTIALLY ASSISTED RIPPLE'S UNREGISTERED OFFERS AND SALES OF XRP AND KNEW THE KEY ASPECTS OF RIPPLE'S OFFERS AND SALES.

Larsen and Garlinghouse (after becoming CEO) each directed Ripple's offers and sales of XRP and orchestrated, carried out, and oversaw implementation of Ripple's plan to distribute XRP widely—including through their own offers and sales of XRP, as described below. Larsen, as executive chairman, had the ability to cause Ripple to file a registration statement for its offers and sales of XRP, and both he and Garlinghouse knew that Ripple never filed a registration statement. 56.1 ¶¶ 1107, 1114, 1188; PX 81 at 198-99; PX 448 Nos. 64, 65; PX 86 Nos. 7, 8; PX 201 ¶ 222.

A. **Larsen Knew or At Least Recklessly Disregarded the Facts that Made Ripple's Offers and Sales of XRP Unregistered Securities Transactions and Substantially Assisted Ripple's Violations.**

1. **Larsen Knew or At Least Recklessly Disregarded that XRP Was Being Offered and Sold as Part of a Common Enterprise with Ripple.**

Larsen knew that XRP sales proceeds were used to fund Ripple's operations and that the vast majority of Ripple's cash flow and funding came from XRP. 56.1 ¶¶ 1056-1060; PX 2 at 201; PX 20 at 164; PX 350, 346. Larsen also knew that XRP was being offered and sold as an investment in Ripple's efforts. 56.1 ¶¶ 1061-1076; *e.g.,* PX 2 at 226; PX 503.01 at 22; PX 108, 58. And as a large XRP holder himself, 56.1 ¶ 15; PX 1 ¶¶ 18, 20, Larsen's own incentives were aligned with Ripple's (and with other XRP investors). As Larsen noted in August 2020 with respect to an increase in the price of XRP, "Got to love those rallies!" 56.1 ¶ 1076; PX 352.

2. **Larsen Knew or Recklessly Disregarded that XRP Was Being Offered and Sold as an Investment in Ripple's Efforts.**

Larsen was aware that "investor[s]" were buying XRP, because he pitched XRP to them as an investment and because they told him so. 56.1 ¶¶ 1069, 1071, 1072, 1075; PX 58, 354, 359, 355. Larsen admits he "hope[d]" and "believe[d]" that early XRP buyers were purchasing XRP for "long-term speculation purposes." 56.1 ¶ 1064; PX 2 at 226. He told one investor that "[m]ost volume in the space is speculation." 56.1 ¶ 1072; PX 359, PX 2 at 227, 231. Indeed, Larsen knew that some investors viewed XRP as an investment *in Ripple* or, as a large XRP investor noted, because they "bet on" the "TEAM." 56.1 ¶ 1070; PX 360.

Larsen also specifically explained his own belief that Ripple's efforts could increase XRP's price. In a February 2014 interview, Larsen explained that one of Ripple's "key roles is making sure that we distribute [XRP] … in a way that adds as much utility and liquidity as we possibly can," that "our incentives are very well aligned," and "that for Ripple Labs to do well [it had] to do a very good job in protecting the value of XRP." 56.1 ¶ 1065; PX 503.01 at 22.

When he sold his XRP, Larsen (like Ripple) took no steps to identify who in particular was buying the XRP or what the purchaser intended to do with it. 56.1 ¶¶ 1077-1085; PX 2 at 88-89, 149-, 153. Larsen (like Ripple) never restricted his sales of XRP to purchasers who would have a "use" for XRP. 56.1 ¶¶ 1080-1082, 1084-1085; PX 2 at 149-50. And Larsen (like Ripple) never took any steps to restrict U.S.-based purchasers from buying the XRP he was selling, including on non-U.S. based crypto trading platforms. 56.1 ¶¶ 1086-1088, 1091-1094; PX 2 at 88-89, 94-95, 103-05.

### 3.   Larsen Understood that XRP Could be Considered a Security.

Larsen knew as early as 2012 that XRP could be classified as a security. 56.1 ¶¶ 986-998; PX 242; PX 243; PX 2 at 237, 241. He reviewed the Legal Memos and understood that the XRP he received was "comp[ensation] for…personally assuming th[e] risk" of XRP being deemed a security. 56.1 ¶¶ 998-999; PX 2 at 237-244; PX 244. Moreover, Larsen participated in Ripple's efforts to market XRP as an investment, 56.1 ¶¶ 1069, 1071, 1072, 1075; PX 58, 354, 359, 355, even though he knew that Ripple's promotion of XRP as an investment was relevant to the question of whether XRP was deemed a security, 56.1 ¶¶ 986-998; PX 242; PX 243; PX 2 at 237, 241.

### 4.   Larsen Substantially Assisted Ripple's Violations.

As CEO, Larsen was aware of, participated in, or approved Ripple's: (1) sales of XRP, 56.1 ¶¶ 1095-1099; PX 2 at 219-20, 358-59; PX 46, 367, 368; (2) efforts to create XRP markets, 56.1 ¶¶ 1065, 1101; PX 344, 503.01; (3) efforts to get XRP listed on crypto trading platforms, 56.1 ¶ 1102; PX 2 at 391, 394; PX 372-375, 448; (4) use of XRP as incentive compensation, 56.1 ¶ 1103; PX 3 at 185; PX 377, 215; (5) efforts to stop the price of XRP from decreasing, 56.1 ¶ 1104; PX 381-382; PX 26 at 195-201; and (6) efforts to protect XRP's liquidity and price by imposing resale restrictions, 56.1 ¶ 1105; PX 383 at 4 § 1.7. At least as executive chairman, Larsen could have caused Ripple to file a registration statement. 56.1 ¶ 1107; PX 81 at 198-99.

Moreover, Larsen's personal sales of XRP assisted with Ripple's distribution and the creation of a market for XRP. *See supra* § V.C. Larsen described his XRP sales as part of a plan to reduce the market's fears associated with Ripple's founders' large XRP holdings. 56.1 ¶ 1108; PX 2 at 92-93. Larsen thus timed his sales to minimize the impact on the XRP market. 56.1 ¶ 1109; PX 2 at 71-76. And Larsen encouraged at least one marketing firm to "feed" positive news stories about XRP to the market: "Apple's finance app…hasn't updated a XRP story in 25 weeks!…Seems like a big opening for [the marketing firm] to feed XRP news!" 56.1 ¶ 1110; PX 391; *see also supra* § I.D.1.

Larsen engaged in most of these acts from within the United States. 56.1 ¶¶ 1111; PX 393 at 7-8. He managed most of his sales through an account with U.S.-based Bitstamp U.S.A. ("Bitstamp"), received sale proceeds back in U.S. dollars from that account, and withdrew them to his U.S.-based accounts. 56.1 ¶¶ 1112-1113; PX 394 at 5, 7-9, 17-64.

### B. Garlinghouse Knew or At Least Recklessly Disregarded the Facts that Made Ripple's Offers and Sales of XRP Unregistered Securities Transactions and Substantially Assisted Ripple's Violations.

#### 1. Garlinghouse Knew or At Least Recklessly Disregarded that XRP Was Being Offered and Sold as part of a Common Enterprise with Ripple.

Shortly after joining Ripple in 2015, Garlinghouse learned that Ripple owned billions of units of XRP and that it was selling its XRP to fund its operations. 56.1 ¶¶ 1126-1127; PX 81 at 31, 33, 330, 336; PX 36 at 83-85; PX 86 No. 22; PX 201 ¶ 1. Garlinghouse knew that Ripple's XRP sales represented at least 80% to 90% of its revenues. 56.1 ¶ 1128; PX 36 at 86-87. Garlinghouse also understood that, because its XRP holdings were a significant asset for the company, Ripple's valuation was driven by XRP's price—such that XRP was Ripple's "north star" and increases in XRP's price meant an increase in Ripple's valuation. 56.1 ¶¶ 1129-1130; PX 81 at 34; PX 396. Finally, Garlinghouse approved using XRP as incentive compensation for himself and other Ripple employees. 56.1 ¶ 1132; PX 73; PX 74; PX 75; PX 81 at 339-340.

2. **Garlinghouse Knew or Recklessly Disregarded that XRP Was Being Offered and Sold as an Investment in Ripple's Efforts.**

Garlinghouse was aware of and directed Ripple's efforts to target speculators in XRP and knew that speculators were purchasing XRP, as described below. He knew that Ripple needed speculative trading in XRP to build the "flywheel" for Ripple's products. 56.1 ¶ 1140; PX 66. When asked to explain "what drives the staggering appreciation and/or volatility" in the "cryptocurrency markets," he replied: "For XRP specifically…as Ripple has done well in announcing customers—that has driven market interest in buying XRP as a speculative investment." 56.1 ¶ 1142; PX 114. In a 2019 speech, he acknowledged that people are "speculating on digital assets" and that "99.9% of all crypto trading today is just speculation," including for XRP. 56.1 ¶ 1152; PX 503.25 at 22.

Garlinghouse himself attempted to drive speculative interest in XRP. In response to an investor inquiry about making it easier to buy XRP, Garlinghouse explained that he had been "personally buying XRP" and that the investor was "not alone in [his] expectations." 56.1 ¶ 1138; PX 65. In 2017, Garlinghouse told another investor that "XRP had a good year in 2016 - with significant increases in price and volume - which in turn has increased investor interest." 56.1 ¶ 1137; PX 515. Garlinghouse also told the public that he did not look at XRP's price over the course of the next few days or weeks but, rather, three to five years, that he was "interested in the long-term success of the XRP markets," and that "[o]n a personal basis…I'm also long XRP." 56.1 ¶¶ 1134, 1144; PX 81 at 436-438; PX 503.06 at 13.

Garlinghouse also tied XRP's rise in price to Ripple's efforts: "[E]very time the price of XRP goes up, the expectations on everyone in this room go up…. The expectations that everyone has about what Ripple is trying to do goes up." 56.1 ¶ 1147; PX 406 at 3-4. In connection with XRP's increasing price and trading volume, Garlinghouse said at an internal Ripple meeting that "[t]he work we're doing is very sound" and that "the rally on XRP is awesome for us." 56.1 ¶ 1139; PX

408 at 37. Like Ripple and Larsen, Garlinghouse does not know who specifically bought the XRP he or Ripple sold. 56.1 ¶ 1155; PX 81 at 22-25, 485-86; PX 26 at 251-52; PX 503.24 at 5-6.

### 3. Garlinghouse Understood that XRP Could Be Considered a Security.

Garlinghouse was repeatedly warned that XRP could be a security. As described above, he was told by CCO O'Gorman in March 2017 that "XRP certainly has some 'securities-type' characteristics." 56.1 ¶ 1014; PX 252. In December 2017, Ripple's P.R. Agency notified Garlinghouse of a recent statement by the then-SEC Chairman that "[m]erely calling a token a 'utility' token or structuring it to provide some utility does not prevent the token" from being a security, given that it "had been a concern to have XRP considered a security." 56.1 ¶ 1166; PX 517. In July 2018, shortly after he had learned of the SEC investigation, Garlinghouse admitted that Ripple had been "guilty" of putting its "head in the sand on a regulatory basis" and was now playing catch up on that front. 56.1 ¶¶ 1171, 1168; PX 81 at 38-39, 119-20; PX 410. Garlinghouse also understood that XRP was not a currency. As Garlinghouse explained publicly in March 2018: "I almost never use the expression cryptocurrency…. [T]hese aren't currencies…. I can't buy coffee with XRP." 56.1 ¶ 1167; PX 503.13 at 24.

### 4. Garlinghouse Recklessly Disregarded his Legal Obligation to Preserve Documents.

In 2017, Garlinghouse had a messaging app called "Signal" installed on the phone he used at Ripple. 56.1 ¶ 1170; PX 81 at 127-30. Garlinghouse told Ripple employees to send him messages on Signal, and he used Signal to communicate with Ripple employees (including Larsen and Long) about XRP and to communicate with XRP holders and third parties about XRP. 56.1 ¶¶ 1175-1178; PX 81 at 132-42, 162-63, 166-73; PX 413. For example, Garlinghouse discussed "the logistics of administering movement of XRP" with a market maker using Signal. 56.1 ¶ 1179; PX 81 at 139-40, 164. In the spring of 2018, Garlinghouse received and read document preservation notices advising him of his obligations to preserve documents in connection with the SEC's investigation of Ripple.

43

56.1 ¶ 1171; PX 81 at 38-39, 119-20. Despite the notices, Garlinghouse scheduled his Signal messages to automatically delete after one week. 56.1 ¶¶ 1170, 1173; PX 81 at 127-30; PX 413. As a result, there is no way to know how many relevant Signal communications have been destroyed and that Garlinghouse has therefore failed to produce to the SEC. 56.1 ¶ 1180; PX 81 at 130, 132.

### 5. Garlinghouse Substantially Assisted Ripple's Violations of Section 5.

Garlinghouse substantially assisted Ripple's Section 5 violations by: (1) making his own sales of XRP, described above, *see supra* § V.C; (2) engaging in extensive promotional efforts touting Ripple's efforts as to XRP and increases in XRP's price, *see supra* § V.B; (3) directing and approving Ripple's offers and marketing of XRP; (4) directing and approving Ripple's unregistered sales of XRP as further set out below; and (5) engaging or directing Ripple to engage in efforts with respect to XRP and the XRP markets, including efforts to list XRP. *See generally supra* §§ II, III.

Garlinghouse directed Ripple employees to disclose information he thought would be "noteworthy to the XRP market." 56.1 ¶ 1181; PX 414. And he directed efforts to "combat more aggressively" media stories that Ripple viewed as detrimental, including appearing on CNN to respond to rumors that Ripple was "dumping" XRP and giving directives to "amplify" positive messages. 56.1 ¶ 1183; PX 418, 419; PX 25 at 297-98. He also reviewed and provided feedback on the XRP Markets Reports. 56.1 ¶ 1184; PX 21 at 186; PX 420.

With respect to Ripple's XRP sales, Garlinghouse was a member of Ripple's "XRP Sales Committee," which approved "XRP distribution and sales decisions." 56.1 ¶ 1185; PX 520 at 8. He approved XRP sales, including Ripple's offers and sales of XRP to institutional investors. 56.1 ¶¶ 1186, 1193, 1194; PX 86 Nos. 17, 35; PX 81 at 330; PX 367; PX 425. And Garlinghouse had weekly meetings with several other Ripple employees "to discuss XRP sales targets…and what's going on in the markets and whether or not" they "need[ed] to change up [their] execution strategy." 56.1 ¶ 1190; PX 422 at 7.

Finally, Garlinghouse led and participated in Ripple's efforts to make XRP available on trading platforms, 56.1 ¶¶ 1196-1200; PX 81 at 306; PX 434-437; PX 86 Nos. 159, 168; PX 522, and directed employees to "get to the heart of why XRP is underperforming" and "develop a strategy to address it from both the supply side and the demand side." 56.1 ¶ 1195; PX 426.

Garlinghouse engaged in most of these acts from within the U.S., and he was in the U.S. when he sold at least some of his XRP and at least some of the time when he directed GSR to sell his XRP. 56.1 ¶¶ 1159-1161; PX 454 at 6-9; PX 86 Nos. 188-89; PX 201 ¶ 185. All of his XRP were sold for U.S. Dollars through an account at U.S.-based Bitstamp, and all proceeds were pooled in his account at a U.S. bank. 56.1 ¶ 1162; PX 81 at 180; PX 438; PX 394 at 5-9, 11-42. Until at least 2020, Garlinghouse never instructed GSR not to sell his XRP to U.S. persons and took no steps to restrict resales of his XRP to U.S. purchasers. 56.1 ¶ 1164; PX 81 at 487.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

"Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Case v. City of New York*, 408 F. Supp. 3d 313, 319 (S.D.N.Y. 2019) (applying Fed. R. Civ. P. 56(a)). "If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of material fact." *Id.* at 320 (citations omitted). "Where the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case." *Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565, 568 (S.D.N.Y. 2011) (citation omitted).

## I.   LIABILITY UNDER SECURITIES ACT SECTIONS 5(a) AND 5(c)

Securities Act Sections 5(a) and (c) make it "unlawful for any person, directly or indirectly" to "sell," "offer to sell" or "offer to buy," a "security" unless a registration statement is in effect or has been filed as to such security. 15 U.S.C. §§ 77e(a), (c). To prove a violation, the SEC must show:

45

(1) that no registration statement was filed or in effect, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce. *Cavanagh*, 445 F.3d at 111 n.13; *Kik*, 492 F. Supp. 3d at 177 (collecting cases). Once the SEC establishes a *prima facie* case of a Section 5 violation, the burden shifts to the defendant to show that it was entitled to an exemption from the registration requirements. *Ralston Purina*, 346 U.S. at 126; *Cavanagh*, 445 F.3d at 111 n.13.

As this Court has recognized, "the SEC need not 'prove scienter or negligence by [Ripple]' to establish its liability" for a Section 5 violation. D.E. 441 at 15 n.8 (citations omitted); *see also Howey*, 328 U.S. at 300 (even "bona fide mistake as to the law … cannot be sanctioned under the Act"). As noted, there is no dispute that Defendants have never had a registration statement filed or in effect as to *any* offer or *any* sale of XRP. Nor is there any dispute that they made their offers and sales through interstate commerce. 56.1 ¶ 1600; PX 80 ¶¶ 14, 392; PX 86 Nos. 210, 370. Defendants also cannot carry their burden of showing a registration exemption because they admit they never took any steps to determine whether their offers and sales of XRP were exempt. 56.1 ¶ 1601; PX 86 Nos. 216-17; PX 94 Nos. 706, 708-09, 711-13, 715-17, 722-23. In any event, Ripple engaged in a public distribution, which necessarily requires registration, as set forth below. This case thus turns on whether Defendants offered or sold "securities." They did, as a matter of law.

## II.   *HOWEY:* THE DEFINITION OF "INVESTMENT CONTRACT"

In *Howey*, the Supreme Court explained that an "investment contract … means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99; *see also Edwards*, 540 U.S. at 393; *Revak v. SEC Realty, Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) (outlining "the *Howey* test"); *United States v. Leonard*, 529 F.3d 83, 88 (2d Cir. 2008) (the "efforts" of others do not have to be the "sole" efforts from which a person is led to expect profits). The *Howey* test aims to

answer whether the transaction involves "all the elements of a profit-seeking business venture." 328 U.S. at 300; *Forman*, 421 U.S. at 849 (focus is "on the capital market of the enterprise system").

"[T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts.'" *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943); *see also Reves v. Ernst & Young*, 494 U.S. 56, 60-61 (1990) (with the Securities Act "Congress painted with a broad brush," to capture all "'schemes devised by those who seek the use of the money of others.'" (quoting *Howey*, 328 U.S. at 299)).

In applying *Howey*, "'form should be disregarded for substance and the emphasis should be on economic reality.'" *Telegram*, 448 F. Supp. 3d at 365 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). Thus, the test turns "'on the economic realities underlying a transaction, and not on the name appended thereto.'" *Id.* (quoting *Forman*, 421 U.S. at 849); *see also Edwards*, 540 U.S. at 393 (purpose of Securities Act is to regulate "investments, in whatever form they are made and by whatever name they are called" (citation omitted)); *Zaslavskiy*, 2018 WL 4346339, at *3 ("[t]he label [a promoter] chooses to attach to the alleged scheme do[e]s not control [the] analysis").

To determine if a defendant offered or sold an investment contract, courts analyze "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Joiner*, 320 U.S. 352-53 (looking to "sales campaign" and "sales literature"). Thus, "*Howey* requires an examination of the entirety of the parties' understandings and expectations," *Telegram*, 448 F. Supp. 3d at 379 (citing *Howey*, 328 U.S. at 297-98), to determine "whether, in light of the economic reality and the totality of circumstances," an investment contract existed. *Glen-Arden*, 493 F.2d at 1034 (relying on "sales literature" and "canned sales pitch"); *see also SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) (Courts "look at all the representations made by the promoter in marketing

47

the interests, not just at the legal agreements underlying the sale of the interest.") (citing *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 756-57 (11th Cir. 2007)). Indeed, "in applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions," *Leonard*, 529 F.3d at 85, including to "advertising methods" and "public statements." *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018).

"[A] person offers a security 'every' time he makes" a "'solicitation of an offer to buy,'" and a "sales 'approach' [does] not need to be personal to amount to a solicitation." *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345-46 (11th Cir. 2022). Instead, "social media posts[,] ... online videos and web links" all may establish "offers" under the Securities Act. *Id.* The analysis turns on the economic inducements the promoter offered pre-purchase, but the parties' post-purchase actions "can serve as evidence" of their expectations. *Merchant Cap.*, 483 F.3d at 760. "Liability under Section 5 is not confined only to the person who passes title to the security," *SEC v. Murphy*, 626 F.2d 633, 649 (9th Cir. 1980); those who play a "crucial" role in distribution "cannot escape liability by avoiding direct involvement in" the sale. *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004).

Applying these principles, courts have found *Howey* satisfied with regard to a variety of novel or unconventional investment products or projects: orange groves in *Howey*; payphone leases, *Edwards*, 540 U.S. at 389; investment packages to secure EB-5 visas, *SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019); online ad services, *SEC v. Scoville*, 913 F.3d 1204, 1219-22 (10th Cir. 2019); films, *Leonard*, 529 F.3d at 87-91; bank certificates of deposit, *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985); licenses to sell dental products, *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982); whiskey casks, *Glen-Arden*, 493 F.2d at 1034; and chinchillas, *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 416-18 (8th Cir. 1974). Courts have also found the *Howey* test to be satisfied where a promotor offered "virtual shares in an enterprise existing only in cyberspace." *SEC v. SG Ltd.*, 265 F.3d 42, 44-59 (1st Cir. 2001).

When presented with specific allegations or evidence, like the evidence before the Court in this case, that offers and sales of digital assets or so-called cryptocurrencies are offerings of investment contracts, courts applying *Howey* have also uniformly recognized that such offerings constitute offers and sales of securities (or would so constitute if the allegations are proved). *Kik*, 492 F. Supp. 3d at 177 (granting SEC summary judgment); *Telegram*, 448 F. Supp. 3d at 365 (granting preliminary injunction); *SEC v. Blockvest*, 2019 WL 625163, at *9 (S.D. Cal. Feb. 14, 2019) (granting preliminary injunction); *SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996-97 (N.D. Cal. 2021) (denying motion to dismiss); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (same); *Beranger v. Harris*, 2019 WL 5485128, at *4 (N.D. Ga. Apr. 24, 2019) (same); *Solis*, 2018 WL 6445543, at *3 (same); *Zaslavskiy*, 2018 WL 4346339, at *8 (denying motion to dismiss indictment); *see also Audet v. Fraser*, 2022 WL 1912866, at *12-18 (D. Conn. June 3, 2022) ("wallets"—software used to store cryptocurrency—were not investment contracts, but cryptocurrency was).

Defendants do not dispute that they offered and sold XRP in exchange for "money" (56.1 ¶ 607; PX 80 ¶¶ 1, 72, 76, 77, 80, 81; PX 8 No. 29), which suffices to establish the "investment of money" aspect of the *Howey* test. *See Telegram*, 448 F. Supp. 3d at 368-69 ("providing dollars or euros in exchange for the future delivery of" a digital asset "establishe[s]" an "investment of money" under *Howey*). Defendants' statements and efforts as to XRP, which show the undisputable economic reality, establish the other aspects of the *Howey* test as a matter of law.

## ARGUMENT

## I.    RIPPLE OFFERED AND SOLD INVESTMENT CONTRACTS.

Whether Defendants offered and sold "investment contracts" is a legal question that this Court can and should resolve based on facts that cannot be reasonably disputed. *SEC v. Thompson*, 732 F.3d 1151, 1160-61 (10th Cir. 2013) (whether something is a "security" "is a question of law and not of fact" to be decided at summary judgment) (citation omitted) (collecting cases)). As a matter of

economic reality, a purchase of XRP was an investment of money into a common enterprise with other XRP investors and with Defendants, a reality Defendants repeatedly confirmed by advertising that their interests were "aligned" with XRP holders' interests and by fueling expectations that they would undertake managerial efforts to enable profits, in the form of capital appreciation, from XRP.

### A.      XRP Purchasers Undisputedly Invested in a Common Enterprise.

There can be no genuine dispute that XRP purchasers invested "in a common enterprise." In the Second Circuit, a common enterprise can be established *either* by showing "horizontal commonality," *Revak*, 18 F.3d at 88, *or* "strict vertical commonality," *Telegram*, 448 F. Supp. 3d at 369. The undisputed facts and the resulting indisputable economic reality of XRP establish both.

### 1.      Horizontal Commonality Undisputedly Exists.

"Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture." *Revak*, 18 F.3d at 88 (citation omitted). To establish horizontal commonality, it is sufficient to show that "each investor was entitled to receive returns directly proportionate to his or her investment stake" as an "increase in the value of the investment." *SG Ltd.*, 265 F.3d at 46-47, 51; *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 188 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was … directly proportional to the amount of that investment"); *Kik*, 492 F. Supp. 3d at 178 (summary judgment for SEC where "investors reaped their profits in the form of the increased value" of the asset).

An "ongoing contractual obligation" to the purchasers of the asset "is not a necessary requirement for a finding of a common enterprise." *Kik*, 492 F. Supp. 3d at 178 (collecting cases); nor is the pro rata distribution of profits from the enterprise. *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 369 n.8 ("a pro rata distribution is not required for horizontal commonality" (citation omitted)). And an investor's ability to exit the common enterprise at the time of her choosing while others remain invested does not defeat horizontal commonality. *E.g.*, *Gary Plastic*, 756 F.2d at 241 (summary

judgment granted where investors could sell out of position "at a moment's notice"); *Aqua-Sonic*, 687 F.2d at 584-85 (commonality met despite ability of purchaser to exit common enterprise at will).

XRP are digital assets that are all identical to one another. The market price increases or decreases for all units of XRP together and equally. 56.1 ¶¶ 206-07; PX 8 Nos. 24, 25; PX 81 at 337. The holder of one unit of XRP is not entitled to fewer or more "profits" than the holder of another unit of XRP. Instead, XRP purchasers "reap[ ] their profits in the form of the increase in value" of their XRP. *Kik*, 492 F. Supp. 3d at 178. Moreover, Ripple did not segregate the funds it received from different XRP sales, such that one group of XRP purchasers could expect different returns on their investment. Instead, Ripple pooled the funds it received from XRP sales and deployed them to further the enterprise. Here, as in *Kik*, "[t]he economic reality is that" Ripple "pooled proceeds from its sale" of XRP "in an effort to boost the value of the investment," such that "[t]he stronger the ecosystem that" Ripple "built, the greater the demand for" XRP "and thus the greater the value of each purchaser's investment." 492 F. Supp. 3d at 179. "This is the nature of a common enterprise." *Id.* "This is not a scenario where the funds of each investor were segregated and separately managed, allowing for profits to remain segregated." *Id.*; *see also Revak*, 18 F.3d at 87 (horizontal commonality exists where the fortunes of the investors are tied "to the success of the overall venture"); *Audet*, 2022 WL 1912866, at *15 (horizontal commonality established as a matter of law where the price of the coin "rose and fell across the board").

### 2.   The Undisputed Facts and Economic Reality Establish Strict Vertical Commonality.

Courts in this District have found that a common enterprise can also be established by showing "strict vertical commonality" rather than horizontal commonality. *E.g.*, *Telegram*, 448 F. Supp. 3d at 369 (commonality under *Howey* may be demonstrated through either horizontal commonality or vertical commonality"); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) (same) (collecting cases). "'Strict vertical commonality' requires that the fortunes of

investors be tied to the fortunes of the promoter." *Revak*, 18 F.3d at 88 (emphasis and citation omitted). Here, strict vertical commonality exists in addition to horizontal commonality.

Ripple has been, by an overwhelming margin, the largest holder of XRP since its creation. 56.1 ¶¶ 36, 249, 307, 440, 462; PX 21 at 385; PX 509.35; PX 509.41. And XRP has been Ripple's largest asset by far. 56.1 ¶¶ 464-65; PX 509.78; PX 6 at 297. To this day, Ripple depends on selling XRP to fund itself and on an actively trading, liquid market for XRP that it created and maintained. PX 52 56.1 ¶¶ 150-52, 156, 162-70, 173; PX 3 at 48-49, 66-67; PX 6 at 237; PX 14 at 49-50; PX 15 at 70-73; PX 16 at 118-20; PX 20 at 30-31, PX 42, 47, 55, 83, 146, 147; *see supra* Facts § II.A. Investors also need liquidity in the market to sell their XRP. 56.1 ¶¶ 228, 851, PX 3 at 184-92. And Ripple executives received XRP as executive compensation. 56.1 ¶¶ 217-18; PX 80 ¶¶ 127-28, 422; PX 85 Nos. 419-424; PX 86 No. 66.

Thus, as a matter of economic reality, the success of XRP affects the fortunes of Ripple, its executives, and XRP investors. An increase in the price of XRP would benefit all of them. 56.1 ¶¶ 208-230. By contrast, a price decline would be detrimental for all. 56.1 ¶¶ 231-34; PX 3 at 254, 264-65. Indeed, Ripple and its employees monitored the XRP markets and expressed disappointment over unfavorable XRP price movements and happiness over favorable ones. 56.1 ¶¶ 241-48; PX 14 at 226, 242-43; PX 21 at 40; PX 22 at 66-70; PX 25 at 37-42, 123, 131-2; PX 80 ¶¶ 193, 198; PX 68, 69, 76, 77, 78.

Furthermore, Ripple undertook considerable efforts to ensure that XRP market participants understood this alignment of interests. In 2014 Larsen explained that whatever efforts Ripple made to develop XRP were "actually good for everybody" and that "our incentives are very well-aligned" because for "Ripple Labs to do well" it had to "do a very good job protecting the value of XRP." 56.1 ¶¶ 371, 461; PX 503.01. Similarly, Garlinghouse reminded investors that Ripple's "opportunity to grow the value of the XRP ecosystem … is good for all participants" and that "[a]nything we do

52

… that's good for that digital asset is good for us." 56.1 ¶¶ 263, 442, 452; PX 503.11; PX 503.18; PX 503.23. *See supra* Facts § II.B (Defendants tout "align[ment]" of interest). Ripple also made sure that investors understood that it would be dependent on XRP because it would sell the token to fund itself and would "massively profit" if XRP's price went up. 56.1 ¶¶ 273-74, 438, 457-58; PX 6 at 271-275, 353-55; PX 14 at 35-36, 47-50; PX 52; PX 265; PX 508.18; *see supra* Facts § I.C.1.

Given these indisputable facts, the SEC has established strict vertical commonality. Here, as in *NAC*, Defendants "retained a healthy share of [XRP] for their personal and corporate coffers," the fortunes of XRP purchasers "were 'linked' to the 'fortunes' of defendants … *or* the general success of their enterprise (which would, as a matter of efficient market theory, drive the price of … [the] digital asset[ ])." 512 F. Supp. 3d at 996. And, here, as in *Telegram*, it is undisputed that Ripple's massive XRP reserves are its "most valuable asset" and the "primary [ ] source of funding" for its operations. 448 F. Supp. 3d at 370. Moreover, the fact that Ripple at times "affixed its good name," *id.* at 371, to XRP by calling it "Ripples," and that Ripple would suffer "reputational damage," *id.* at 370, if XRP was not successful, 56.1 ¶¶ 38, 387, 403, 408, 412, 431, 526, 910; PX 127; PX 502.08, also establish strict vertical commonality.

## B.     XRP Purchasers Reasonably Expected to Profit From their Purchase of XRP.

"Profits" under *Howey* include "capital appreciation … from the development of the initial investment," and profit distributions are not required. *Edwards*, 540 U.S. at 395; *see also Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) ("That the plaintiffs did not expect to realize any tangible gain until they sold their property does not preclude investment intent.").

The potential for profit need not be the sole reason a purchaser buys an investment, and not all purchasers need to buy with an expectation of profit. *E.g.*, *Feng*, 935 F.3d at 730-31 (profit motive may be secondary to another motive for buying into scheme); *Telegram*, 448 F. Supp. 3d at 371 (same); *Howey*, 328 U.S. at 300-01 (defendants offered an investment contract though 15% of

purchasers were not passive investors). Here, there can be no genuine dispute that XRP investors reasonably expected profits because Defendants' promotions of XRP fueled these expectations.

### 1.    Defendants Undisputedly Marketed XRP as an Investment.

Ripple promoted XRP as an investment from the outset. On numerous occasions, through a variety of channels, Ripple touted XRP's potential to increase in "value" and for "demand" in XRP to grow from Ripple's efforts, while reminding investors of the fixed, finite supply of XRP. 56.1 ¶¶ 20, 373-74; PX 9; PX 10 at 193-94; PX 501.13. For example, Ripple graphically represented increasing crypto prices, including for XRP, to show the "value" in crypto. 56.1 ¶¶ 175-76, 357.a; PX 54; PX 158. It explained that "demand for XRP may increase leading to an increase in price." 56.1 ¶¶ 187, 375; PX 9; PX 266. Schwartz invited investors to "dream" "big" about the potential rise in XRP's price to up to $20 based on the "problem" Ripple was solving. 56.1 ¶ 381; PX 509.19, 509.01, 509.25. And Garlinghouse and other Ripple employees repeatedly touted a "rally" of XRP's price or returns. 56.1 ¶¶ 403-08, 406.a, 413-15, 417-20; 434, 436; PX 501.06, 501.11, 501.12, 506.059, 506.062, 506.063, 506.069, 506.070, 506.071, 506.084, 506.094; *see generally supra* Facts § III.A.3.

These indisputable promotional statements about the potential for XRP to increase in value and about Ripple's efforts to protect XRP's trading market led objective, reasonable purchasers to buy XRP with investment intent. Here, as in *Kik*, "[i]n public statements and at public events promoting" XRP, Ripple "extolled" XRP's "profit-making potential" and Ripple's employees, including its "CEO[s] explained the role of supply and demand in driving the value" of XRP. 492 F. Supp. 3d at 179. And here, as in *Telegram*, "while the offering materials covered some *potential* consumptive uses … they also highlighted the opportunity for profit by capital appreciation and resale." 448 F. Supp. 3d at 373 (emphasis added); *see also Solis*, 2018 WL 6445543, at *3 ("statements [that] stressed the limited supply of tokens" fuel an expectation of profit); *SG Ltd.*, 265 F.3d at 54 (touting potential "returns … constitute[s] a not-very-subtle form of economic inducement, closely

analogous to the advertising representations in *Joiner*"); *Scoville*, 913 F.3d at 1221-22 (investors expected profits under *Howey*, even though "there was never a 'guarantee'" of profit).

> **2.    Defendants Undisputedly Marketed and Took Steps to Ensure Investors' Ability to Resell XRP in Secondary Public Markets.**

Ripple also emphasized that XRP would be (and was) tradable on secondary crypto trading platforms and undertook and emphasized its own efforts to do so. 56.1 ¶¶ 511, 515-19, 584-91; PX 267; PX 501.04, 501.09-501.15; PX 85 at Nos. 608, 609. "[R]esale in the secondary market" is "crucial to the investor" for "realizing profits from capital appreciation." *Gary Plastic*, 756 F.2d at 240; *see also ATBCOIN*, 380 F. Supp. 3d at 356 n.14 ("Purchasers' ability to resell [tokens] on other exchanges also supports the conclusion that the coins are securities."). These undisputed statements separately and independently establish that investors had a reasonable expectation of profits. *See, e.g.*, *NAC*, 512 F. Supp. 3d at 997 (purchasers were "'led to expect'" that the token "would be tradeable on stock market-like exchanges"); *Kik*, 492 F. Supp. 3d at 179-80 (promoter "explained how [the token] would be tradable on the secondary market through cryptocurrency exchanges"); *Telegram*, 487 F. Supp. 3d ("[W]ithout the ability to resell [the token] into the secondary market, the $1.7 billion [raised] … would not have been raised.").

> **3.    Defendants Undisputedly Touted their Efforts to Provide and Protect the Liquidity of the XRP Markets.**

Much as the crypto trading platforms were a pillar of Ripple's products, XRP liquidity was a precondition of Ripple's goals. 56.1 ¶¶ 472-95. Thus, Ripple also emphasized the existence of active, liquid trading markets for XRP, and the steps it would take to maximize liquidity, including "undertak[ing] purchases" of XRP, making itself a buyer "of last resort" for "fair and orderly" XRP markets, combating "misinformation" in the XRP markets, and eliminating "overhang" as to XRP or otherwise minimizing any disruption caused by XRP sales. 56.1 ¶¶ 264, 522, 585-86; PX 26 at 90,

131-32; PX 501.12; PX 501.15; *see supra* Facts § III.B. Ripple touted the "liquid and robust markets" for XRP as late as August 2020. 56.1 ¶ 478; PX 501.15.

"[P]romis[ing] assistance in the liquidation of [investors'] investments" is an indication that an instrument was sold with a reasonable expectation of profit, and a promoter's representation that they may "buy … back" the item can be "crucial to any [investor's] hope to liquidate his investment." *Glen-Arden*, 493 F.2d at 1032, 1035. Ripple's touting of investors' ability to resell XRP "in the secondary market created and maintained by" Ripple, and of the "high degree of liquidity" maintained by Ripple in the secondary market, created a reasonable expectation of profit. *Gary Plastic*, 756 F.2d at 240 (holding that a bank product was sold as an investment contract given the promoter's efforts to (and marketing of efforts to) maintain liquidity); *see also Telegram*, 448 F. Supp. 3d at 373-74 (promoter's touting its "ability to provide [assistance] in the case of market turmoil … fueled the expectation that … [purchasers] would be able to resell … for a profit"); *SEC v. Tyler*, 2002 WL 32538418, at *6 (N.D. Tex. Feb. 21, 2002) ("Even if the investors did not know or rely upon Defendants' post-purchase activities in creating a secondary market to provide liquidity to the investment, investors relied upon Defendants' promises that such liquidity was available.").

### 4. Defendants Undisputedly Targeted Speculators.

Ripple targeted its offers and sales of XRP to those speculating on XRP's potential for profit. For its Institutional Sales, Ripple targeted venture capital firms and other types of "accredited investors" who were "purchasing XRP for speculative purposes." 56.1 ¶¶ 619, 620, 713, 718; PX 80 ¶¶ 19, 105, 166, 235; PX 168. For its Programmatic Sales, Ripple also specifically targeted speculators, in part because it recognized that it needed the liquidity provided by speculators to support the XRP markets. 56.1 ¶¶ 648, 653-60, 662, 668-73; PX 25 at 217. Ripple specifically crafted strategies—such as the announcement of the XRP escrow—to appeal to crypto speculators. 56.1 ¶¶ 303, 304, 323-331; PX 105, 106; 115, 116, 118. Ripple did not target or limit its sales to the types

of entities (*i.e.*, money transmittal businesses) that it will claim "consumed" XRP. And Ripple specifically *did not target* those who might view XRP as a currency. 56.1 ¶¶ 91, 92; PX 47; 503.18, 509.32. As Garlinghouse explained in multiple public interviews: "[T]hese aren't currencies…. I can't buy coffee with XRP." 56.1 ¶¶ 85-86, 90-92; PX 503.18; PX 503.19; PX 509.39.

Ripple's solicitation of purchases of XRP from the public, its marketing of XRP to the public, and its specific targeting of speculators establish expectation of profits under *Howey* as a matter of law. *See, e.g., Howey*, 328 U.S. at 296, 299 (purchasers are "attracted by the expectation of substantial profits" where promoters targeted persons "who lack the knowledge, skill and equipment necessary" to carry out the enterprise themselves); *Glen-Arden*, 493 F.2d at 1034-35 (promises of potential to "double [your] money" shows an investment contract was sold); *Leonard*, 529 F.3d at 90-91 (same result where "investors may be so lacking in requisite expertise, so numerous, or so dispersed that they become utterly dependent on centralized management"); *see also Shields*, 744 F.3d at 647 (marketing interests to "thousands of investors across the country with little or no experience in the … relevant industry" suggests reliance on efforts of others).

Indeed, of the over $2 billion in XRP that Ripple distributed, only tens of millions went to money transmittal businesses through the "ODL" product. 56.1 ¶¶ 818, 821; PX 296. And those sales were specifically designed to move XRP from the money transmittal business to investors in the public markets. 56.1 ¶¶ 752-53, 823; PX 181; PX 501-14-501.16. As such, even those sales were made to purchasers who ultimately expected to profit from XRP. *See Aqua-Sonic*, 687 F.2d at 583-84 (expectation of profit established as a matter of law where "the offering was [not] directed in large part at prospective [purchasers] who could be expected to operate their own distribution system [but instead] was aimed primarily at investors who could not reasonably be believed to be desirous and capable of undertaking" the efforts required); *Telegram*, 448 F. Supp. 3d at 374 (promoter "did not focus on cryptocurrency enthusiasts, specialty digital assets firms, or even mass market individuals

57

who had a need for an alternative to fiat currency…. [but instead] selected sophisticated venture capital firms (and other similar entities) as well as high net worth individuals with an inherent preference (i.e. their business model) toward an investment intent rather than a consumptive use"); *see also infra* Argument § III.

### 5. Defendants Undisputedly Sold XRP in Indiscriminate Quantities, Indicative of Investment Intent.

Ripple undisputedly offered and sold XRP in unlimited quantities, without restricting what any one person could purchase, particularly in the open markets. *See supra* Facts § V.A.1. Such purchases can only be logically explained by an expectation of profits. Other firms bought XRP and agreed to lock-ups or resale restrictions based on XRP's trading volume. 56.1 ¶¶ 575, 800-01; PX 300, 301. But "a rational economic actor would not agree to freeze millions of dollars … if the purchaser's intent was to obtain a substitute for fiat currency." *Telegram*, 448 F. Supp. 3d at 373. One sophisticated investor—Larsen—said it well: these provisions "reward investors." 56.1 ¶ 1069.

### 6. Defendants Undisputedly Touted their Financial Motivation to Turn a Profit from XRP.

Finally, Defendants' persistent statements that Ripple had a significant supply of XRP and thus an interest in increasing XRP's value fed reasonable investors' expectations that they could profit from XRP. For example, Garlinghouse reminded the public: "We are a capitalist, we own a lot of XRP." 56.1 ¶¶ 252, 249; PX 502.26; PX 503.29. Schwartz explained that because Ripple held billions in XRP, it could "justify spending $100 million dollars" trying to get an increase in $0.01 in XRP's price, because Ripple would "massively profit" from even a small price increase. 56.1 ¶¶ 273-74, 438, 457-58; PX 6 at 271-275, 353-55; PX 14 at 35-36, 47-50; PX 52; PX 265; PX 508.18; PX 509.04; PX 509.35; PX 509.41**.**

### C.   XRP Purchasers Expected Their Profits to Result from Ripple's Efforts.

Finally, no genuine dispute exists that XRP investors reasonably expected that their profits would be "derived from the entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 395. Ripple's nearly decade-long marketing campaign repeatedly conveyed not only that "efforts of others" would be required to grow the value of XRP, but that the "others" who would undertake the most important of those efforts were Ripple, its expert team, and others Ripple enlisted.

*First*, Ripple repeatedly vowed to develop a "use" and increase the "utility" or "demand" for XRP and highlighted its past efforts to do so. Ripple touted these efforts from the beginning of its public marketing campaign (with the Gateways, Primer, and Deep Dive brochures in 2013-2014), and later through its use of the XRP Market Reports and media talking points in 2016-2020. 56.1 ¶¶ 61-83; PX 80 ¶¶ 67, 147; PX 2 at 187; PX 3 at 48-50; PX 6 at 349-50; PX 7 at 132; PX 10 at 77, 144; PX 14 at 104-05; PX 15 at 250-59; PX 19 at 67; PX 508.05; PX 509.01; *see also supra* Facts § III.A.1. Ripple's early promotional brochures explained that it expected demand "to be considerable" if it succeeded in its efforts to make its technology "useful." 56.1 ¶¶ 75-76; PX 9. Ripple's 2017 talking points instructed employees that they "should talk … about all the use cases for XRP that Ripple is supporting – and how [Ripple] efforts are directed towards those use cases." 56.1 ¶¶ 363, 365; PX 125. The 2018 and 2019 xPring initiative was specifically marketed as part of Ripple's efforts to try to "develop use cases for XRP." 56.1 ¶ 346; PX 501.11. And in April 2020, Ripple posted that it was looking to boost XRP liquidity "through new use cases for XRP outside of cross-border payments." 56.1 ¶ 366; PX 501.14.

By touting past efforts and promising to undertake future efforts, Ripple created a reasonable expectation of profits. "The efforts of promoters, undertaken either before or after gaining control over investor funds, are relevant considerations due to *Howey*'s focus on economic realities." *Telegram*, 448 F. Supp. 3d at 375 (citation omitted)); *see also ATBCOIN*, 380 F. Supp. 3d at

59

355 (*Howey* satisfied where promoter "conveyed to purchasers of ATB Coins that the anticipated return on their investment would be the result of [the promoter's] efforts to commercialize the ATB Blockchain and ATB Coins"). Ripple's "advertised promotion of" the XRP Ledger and XRP "created a reasonable expectation in the minds of" purchasers "that their anticipated profits were dependent on [Ripple's] essential … efforts." *Telegram*, 448 F. Supp. 3d at 376.

*Second*, Ripple repeatedly noted the complexity and magnitude of the problem it was seeking to solve through its efforts, and how resource-intensive those efforts would be. 56.1 ¶ 93, 96-101; PX 15 at 140, 166-67, 236; PX 2 at 186-90; PX 503.04; PX 503.08; PX 503.12; PX 81 at 439. Schwartz repeatedly stated that Ripple would use its war chest of XRP strategically, to incentivize and increase adoption. 56.1 ¶ 445; PX 508.26. No single XRP investor could be expected to have the means, experience, or expertise to develop the necessary technology or to stimulate demand sufficient to establish and build XRP's "value," or to otherwise carry out these ambitious projects. No single XRP investor could or ever will have the enormity of Ripple's XRP resources to deploy into driving adoption. No single XRP investor could "spend[ ] $100 million" in an attempt to make the price of XRP go up by $0.01. 56.1 ¶¶ 274, 425, 437, 438, 440, 458-59, 462; PX 6 at 272-75; PX 508.18; PX 509.04; PX 509.35; PX 509.41.

At an even more fundamental level, no single XRP investor could hope to create the XRP markets in the way Ripple—the holder of 80 billion units at inception—had the power and resources, through funds from its XRP sales, to do. Any investor, even a sophisticated one, simply lacked the expertise and resources that Ripple had and flaunted. Those tasks fell to Ripple and those Ripple enlisted, using the money it raised from XRP purchasers and its large stash of XRP. In fact, Ripple repeatedly noted to the public that, unlike other digital assets, XRP could count on an identifiable, well-funded actor (Ripple) to make efforts with respect to XRP, 56.1 ¶¶ 61, 194, 256, 345, 349, 350-52, 357-60; PX 6 at 295, 325, 337-40; PX 22 at 305-06; PX 81 at 364-68; PX 506.07;

PX 509.88. *See, e.g.*, *Aqua-Sonic*, 687 F.2d at 582-83 ("[F]ocus[] [is] not on whether it was somehow possible for an investor to profit without [relying on the efforts of others], … but rather on whether the typical investor who was being solicited would be expected under all the circumstances to … remain[] passive and deriv[e] profit from the efforts of others."); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 135-36 (5th Cir. 1989) (investment contracts sold where investors lacked the expertise and experience to expend efforts required to make enterprise successful).

*Third*, Ripple highlighted the expertise of its team and its considerable resources to show its commitment to making XRP a success. Ripple told the public what "really set XRP apart from any other digital asset" was the "amazing team of dedicated professionals that Ripple has managed to unmask the valid ecosystem around XRP." 56.1 ¶¶ 345, 349, 359-60; PX 6 at 337-42; PX 509.88. Ripple highlighted the existence of this "team" in its early promotions and continued to do so in the XRP Market Reports, touting them as an "amazing," "talented," or "dedicated." 56.1 ¶¶ 61, 194, 256, 345, 349, 357-61; PX 61; PX 88; PX 506.07; PX 509.88; PX 365. Essentially, Ripple emphasized that XRP "differed from other cryptocurrencies because it had 'the financial backing of a company with the capital and resources' that '[n]o cryptocurrency in history' had enjoyed." *Audet*, 2022 WL 1912866, at *15, 16, 18 (holding "efforts of others" satisfied); *see also Tcherepnin*, 389 U.S. at 338 (finding capital shares were investment contracts where investors' profits depended on company managers' skill and honesty).

*Finally*, Ripple assured investors that it was "hard to give any credibility to the possibility that Ripple would abandon its most valuable asset" given Ripple's significant reputational and financial incentives. 56.1 ¶¶ 440, 462, 466; PX 6 at 298; PX 509.35; PX 509.41. Once again, Ripple's statements—that it has a large financial stake in XRP, funds itself from selling XRP, 56.1 ¶¶ 150-52, 156, 162-70, is committed to the liquidity of the XRP markets because its products depend on XRP, 56.1 ¶¶ 109-110, 113-38, 159-70, 273-74, 672-73, has interests "aligned" with XRP holders, and had

61

been a responsible "steward," 56.1 ¶¶ 133, 236, 251, 252, 258-70, 356, 381, 426, 449; PX 502.06; PX 503.29—fed reasonable expectations that Ripple would continue to take actions that would increase XRP's value. And Ripple's specific touting of the XRP escrow account as aligning investors' interests with Ripple's, 56.1 ¶¶ 323-331, fueled reasonable expectations that Ripple's incentives as to XRP would continue because the escrow account meant Ripple would continue to hold large amounts of XRP for a long time and not depress XRP's price.

As a matter of economic reality, reasonable investors knew it was implausible that Ripple—whose capitalization, business model, and reputational goodwill depended upon XRP—would walk away from the asset or the markets needed to make it successful. *See, e.g.*, *Kik*, 492 F. Supp. 3d at 180 ("efforts of others" established because promoter publicly noted it "would … create incentives to attract developers who would establish new uses for" its digital assets, that it would "'foster an ecosystem' rooted" in that asset," and that because of its 30% stake in the asset, it had a "unique incentive to increase demand" for the token or, as its CEO explained: "this is something we have to do"). Because Ripple repeatedly explained that its own products depend on liquid XRP trading, it was clear to investors that Ripple "fully intends to maintain a secondary market for its customers which would enable [investors] to sell their" XRP, which is "crucial to the investor" and which is possible given Ripple's "significant economic power." *Gary Plastic*, 756 F.2d at 233, 240; *see also id.* at 240-41 (noting investor also cares about "implicit promise … to maintain its marketing efforts").

*Telegram* is once again illustrative. There, the promoter stated it would lock up 4% of the token so that the promoter's "team would continue to play an important role in the growth" of the blockchain on which that token existed, and that it would integrate the token into its signature product. 448 F. Supp. 3d at 378. Similarly, Ripple stated that it was developing technology that depended on active, liquid XRP markets and promoted the XRP escrow account as guaranteeing that Ripple would remain a significant XRP holder for a long time. "The cumulative effect[ ] of the

advertised integration of the [technology] with [the company's product] and the lockups placed on the developer's [token holdings] created a reasonable expectation among [investors] that [the promoter] would continue to provide essential support for the [technology]." *Id.*; *see also id.* at 358-59 (finding "implicit (though formally disclaimed) intention … of the promoter to remain committed to the success of [its blockchain] … as a matter of fact rather than legal obligation").

In sum, based on indisputable evidence of Ripple's public statements and conduct as well as economic reality, Ripple offered and sold XRP, for money, as a common enterprise from which reasonable purchasers could expect profits from Ripple's acumen in deploying their capital. The offers and sales were "part of a larger scheme manifested by [Ripple's] actions, conduct, statements, and understandings … [that are] the offering of securities." *Telegram*, 448 F. Supp. 3d at 379.

## II. DEFENDANTS VIOLATED SECTION 5 WHEN THEY DIRECTLY OR INDIRECTLY OFFERED AND SOLD XRP IN A PUBLIC DISTRIBUTION.

As described above, Section 5 prohibits *any* unregistered transaction in securities. 15 U.S.C. § 77e; *Cavanagh*, 445 F.3d at 111. Section 4 exempts from this requirement "transactions by any person other than an issuer, underwriter or dealer" and "transactions by an issuer not involving a public offering." 15 U.S.C. § 77d(a). An "issuer" is anyone who purports to "issue" a security, *id.* § 77b(a)(4), which is typically the company selling the securities and its affiliates. *SEC v. Murphy*, 626 F.2d 633, 642 (9th Cir. 1980) (citing *Ralston Purina*, 346 U.S. at 120). "Underwriter" means "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security," while issuer "shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." *Id.* § 77b(a)(11). Congress enacted a broad definition of underwriter in order to "include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public." Thomas Lee Hazen, THE LAW OF SECURITIES REGULATION 431 (4th ed. 2002).

A "public offering" is a "distribution" of securities, which must be registered. *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959). A "'[d]istribution' comprises 'the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public.'" *R. A. Holman & Co. v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (citation omitted); *see also Geiger*, 363 F.3d at 487. In claiming an exemption under Section 4, the defendant must "establish[ ] that [its] sales do not constitute a disguised public distribution." *Cavanagh*, 1 F. Supp. 2d at 368-69. Section 4[(a)](1) "was intended to exempt only trading transactions between individual investors with relation to securities already issued." *SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941); *see also United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir. 1968); *SEC v. Nutra Pharma Corp.*, 2022 WL 3912561, at *7-11 (E.D.N.Y. Aug. 31, 2022) (summary judgment for SEC on Section 5 claim, holding a public distribution occurred as a matter of law where the offeror did not know each offeree's identity or the number of offerees).

## A.     Ripple is an Issuer of Securities Who Engaged in a Public Offering in Part through Underwriters.

Ripple is an issuer of securities that engaged in a widespread, unregistered distribution of XRP through intermediaries that included institutional investors and third parties that received XRP from Ripple so that those third parties could fund their own attempts to develop uses for XRP.

Ripple's Institutional Sales exemplify this. In 2017 and 2018, Ripple sold $83.7 million of XRP to a U.S.-based financial adviser, at a 7% discount. The purchases of XRP had no resale restrictions and Ripple observed an uptick in XRP volume after the purchases, meaning that XRP was being dumped into the market. Indeed, as soon as the entity received the XRP, it transferred it to a purchaser for a 2% fee. 56.1 ¶¶ 804-13; PX 309-21. This entity thus bought XRP with a view to distribution and was therefore a statutory underwriter of Ripple's offering. *See* 15 U.S.C. § 77b(a)(11), 77d; *Telegram*, 448 F. Supp. 3d at 366, 380 (promoter "built economic incentives into [sales] including large discounts and differential lockups, to ensure that the [institutional purchasers]

resold" the token and that promoter "did not intend for [token] to come to rest with the [institutional purchasers] but to reach the public at large"); *see also* 56.1 ¶¶ 567-72; PX 424 (Ripple employees aware of immediate resales by Institutional Sales buyers).

As another example, starting in May 2020, Ripple structured loans of XRP from Ripple to money services providers that were Ripple's ODL customers. In order for the providers to effect cross border transactions, however, the loaned XRP had to be sold into the market for fiat currency—immediately, without the providers having any economic exposure to XRP. 56.1 ¶¶ 755-57, 760, 787-88; 823; PX 15 at 219, 327-40, PX 11 ¶ 44; PX 182; PX 80 ¶¶ 360, 373; PX 192. In effect, Ripple replaced its Programmatic Sales with XRP-O, receiving the proceeds of XRP sales into the market as repayment on its "loan." Again, the "loaned" XRP came to rest in the hands of the public, not the money service providers that immediately resold it.

In all of these transactions Ripple was selling and distributing XRP that would come to rest in the hands of public investors as part of its scheme to distribute XRP as broadly as possible, among other things, as part of its efforts to foster liquidity in the secondary market.

### B.   Larsen and Garlinghouse Violated Section 5 Because They Were Affiliates of Ripple and Offered and Sold Its Securities in Unregistered Transactions.

"[A]n 'affiliate' of the issuer—'such as an officer, director, or controlling shareholder'— 'ordinarily may not rely upon the Section 4(1) exemption.'" *Cavanagh*, 445 F.3d at 111 (citation omitted). "Affiliate" means, among other things, a "control" person, which in turn means "any person" with "the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *SEC v. Kern*, 425 F.3d 143, 149 (2d Cir. 2005) (citing 17 C.F.R. § 230.405)). The test for control is "whether that person has enough influence within the group to be able to obtain the issuer's signature on a registration statement." *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 759 (S.D.N.Y. 2018) (citations omitted); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976).

Based on the undisputed facts, Larsen and Garlinghouse were "affiliates" and control persons of Ripple. Larsen was a controlling shareholder of Ripple's equity at all relevant times, and Larsen and Garlinghouse, as CEOs, had the power to and did direct Ripple's management. 56.1 ¶¶ 860-67; PX 1 ¶¶ 6, 172; PX 2 at 48-50, 57-60; PX 8 No. 225; PX 36 at 36-37; PX 80 ¶¶ 6, 17; PX 81 at 26; PX 94 Nos. 720-21; PX 149; PX 201 ¶¶ 6, 424-26. In fact, Garlinghouse admitted that Larsen both had the power to have Ripple file a registration statement for offers and sales of XRP. 56.1 ¶ 876; PX 81 at 26-28.

Accordingly, because Garlinghouse and Larsen both admit that none of their offers or sales of XRP were covered by a registration statement (56.1 ¶¶ 874-75; PX 1 ¶ 60; PX 201 ¶ 60), and because no exemption from registration is available to either of them, their own unregistered offers and sales violated Section 5 as a matter of law.

## III.   THE INDIVIDUAL DEFENDANTS ALSO AIDED AND ABETTED RIPPLE'S VIOLATIONS OF SECTION 5.

To establish aiding-and-abetting liability, the SEC must show that Ripple violated the law and that the Individual Defendants knew of (or recklessly disregarded) Ripple's violation and substantially assisted it. *See SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012); *SEC v. Yorkville Advisors*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018). The undisputed facts establish Ripple's Section 5 violations. *See supra* §§ I, II.A. To show knowledge of Ripple's violations, the SEC must demonstrate the Individual Defendants' "general awareness of their overall role in Ripple's illegal scheme," or that they "knew, or recklessly disregarded, the facts that made Ripple's scheme illegal." D.E. 441 at 15. To show substantial assistance, "the SEC must show that the defendant in some sort associate[d] himself with the venture … participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Id.* (citing *Apuzzo*, 689 F.3d at 206). Courts evaluate knowledge and substantial assistance together because a high degree of knowledge lessens the SEC's burden in proving substantial assistance and vice versa. *Apuzzo*, 689 F.3d at 214-15.

**A.      Larsen Undisputedly Knew or Recklessly Disregarded Ripple's Violations and Substantially Assisted Them.**

As shown above in Facts Section VIII.A, undisputed facts demonstrate that Larsen "played a large role in orchestrating Ripple's sale of XRP"—facts that "support both his knowledge and his rendering of substantial assistance." D.E. 441 at 19. For example, Larsen "oversaw Ripple's sale of XRP" and "was directly involved in Ripple's strategy for supporting XRP's price," including "Ripple's activities … designed to protect the value of XRP" and the promotion of XRP as "central to Ripple's success." *Id.*; 56.1 ¶¶ 1065, 1095-1099, 1101-1105; PX 2 at 219-20, 358-59, 391, 394; PX 3 at 185; PX 26 at 195-201; PX 383 at 4 § 1.7; PX 46, 215, 367, 368, 372-375, 377, 381-382, 448. Larsen also "understood that XRP was being sold to investors, including investors engaging in speculation." D.E. 441 at 19; 56.1 ¶¶ 1064, 1069-1072, 1075; PX 2 at 226-27, 231; PX 58, 354, 355, 359, 360. He knew that "XRP sales were funding Ripple's operation." D.E. 441 at 19; 1056-1060; PX 2 at 201; PX 20 at 164; PX 350, 346. And he knew that there was a real risk the SEC could determine that XRP was a security and that Ripple was engaged in activities that increased the risk of such a determination; indeed, Larsen was so advised by counsel and acknowledged that he knowingly took on (and was compensated with $450 million for) that risk.. 56.1 ¶¶ 986-999, 1069, 1071, 1072, 1075; PX 2 at 237-244; PX 58, 242, 243, 354, 355, 359. These indisputable facts show that "Larsen knew that purchasers of XRP may have viewed those purchases as an investment in a common enterprise with a reasonable expectation of profit based on Ripple's efforts." D.E. 441 at 19. And they show that "Larsen was aware of the risk that Ripple's sale of XRP could be classified as an investment contract, and thus, as a security." *Id.*

Larsen's substantial assistance is evidenced by these same facts. In addition, he had the authority to cause Ripple to register its offers and sale of XRP, and he made personal sales of XRP, which were "intended to assist with Ripple's distribution and the creation of a market for XRP investment." D.E. 441 at 19; 56.1 ¶¶ 1107-1109; PX 2 at 71-76, 92-93; PX 81 at 198-99; *see also SEC*

*v. Wey*, 246 F. Supp. 3d 894, 930 (S.D.N.Y. 2017) (distributing own shares establishes substantial assistance); *SEC v. Grenda Grp., LLC*, 2021 WL 1955330, at *13 (W.D.N.Y. May 17, 2021) (CCO liable for aiding and abetting where, had he "chosen to do so," he had the legal authority to end the problematic conduct); *SEC v. Mudd*, 2016 WL 815223, at *7 (S.D.N.Y. Feb. 29, 2016) (making the public statements that establish the underlying violation shows awareness of the violation and substantial assistance).

### B.   Garlinghouse Undisputedly Knew or Recklessly Disregarded Ripple's Violations and Substantially Assisted Them.

The undisputed facts similarly show that Garlinghouse knew of or recklessly disregarded Ripple's violations and substantially assisted them. As outlined in Facts Section VIII.B above, "Garlinghouse viewed XRP as an investment" and "promoted the idea that purchases of XRP were investments into a common enterprise with a reasonable expectation of profit based on Ripple's efforts." D.E. 441 at 20. Like Larsen, Garlinghouse knew that XRP was being sold to investors and speculators, that Ripple took significant steps to support XRP's price and liquidity, and that Ripple (and Garlinghouse himself) promoted XRP as an investment in Ripple's efforts. 56.1 ¶¶ 1126-1154 (primary exhibits cited above in Section VIII.B). Garlinghouse also "had reason to suspect that Ripple's actions were violating" the securities laws. D.E. 441 at 20. Indeed, he was warned that XRP had some "securities-type" traits and that XRP could be a security. 56.1 ¶¶ 1014, 1166, 1168, 1171; PX 81 at 38-39, 119-20; PX 252, 410, 517. And even though he knew he had a legal obligation to preserve documents for the SEC's investigation of Ripple's XRP transactions, he nevertheless used and asked others at Ripple to use an ephemeral messaging app that would make it impossible to recover evidence showing his activities as to XRP. 56.1 ¶¶ 1170-1180 (primary exhibits cited above in Section VIII.B). Finally, like Larsen, Garlinghouse further substantially assisted Ripple's violations by engaging in his own extensive sales of XRP. *See supra* Facts § V.C.

IV.    **DEFENDANTS' DUE PROCESS DEFENSES LACK LEGAL MERIT.**

Defendants each assert similar affirmative defenses alleging due process violations.

*First*, they assert "fair notice" defenses claiming the SEC violated their due process rights. D.E. 51 at 97-99; D.E. 462 at 97-99; D.E.463 at 103-105. To support the defense, Defendants plead facts purportedly alleging that the SEC failed to offer guidance to market participants engaged in XRP transactions, including after Ripple's 2015 settlement with the Department of Justice and FinCEN (which involved neither the SEC nor the federal securities laws) or after Coinbase's decision to list XRP. *Id.* Defendants also claim the SEC purportedly made them believe their XRP transactions were permissible after then-Director of the SEC Division of Corporation Finance, Bill Hinman, gave a speech about the application of *Howey* and *Gary Plastic* to certain digital assets. *Id.*

*Second*, Garlinghouse and Larsen assert "as applied" defenses alleging that "a person of ordinary intelligence would not have had a reasonable opportunity to know that XRP is a 'security' or an 'investment contract' under the securities laws." D.E. 462 at 99-101; D.E. 463 at 105-107.

The due process defenses fail as a matter of law. Courts routinely grant summary judgment against "fair notice" or void-for-vagueness defenses in SEC enforcement actions, Defendants have adduced no fact that would support the defenses' application, the SEC provided repeated guidance to Defendants and the marketplace, and the undisputed facts show Defendants' *knew* that their XRP transactions risked violating securities laws.

A.    **Standards for Defendants' Due Process Defenses**

As Defendants recognize, due process "requires that laws give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." D.E. 51 at 97; D.E. 462 at 97, 99; D.E. 463 at 103, 105. The question is whether the challenged laws (a) fail the "ordinary intelligence" standard, or (b) "are so standardless that they authorize or encourage 'seriously discriminatory enforcement.'" D.E. 440 at 7 (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)).

This "assessment cannot be conducted in the abstract; rather … the party claiming a lack of notice [must] show[ ] 'that the statute in question provided insufficient notice that his or her behavior at issue … was prohibited.'" *Id.* at 8 (quoting *Copeland v. Vance*, 893 F.3d 101, 117 (2d Cir. 2018)).

### B. Courts Have Uniformly Rejected Similar Due Process Defenses.

To support their due process defenses, Defendants primarily invoke *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996), and *Fox Television*. Both cases involved challenges to an agency's interpretation of its own rules—not a statute Congress enacted, as is at issue here—and *Fox* involved the heightened standard applicable to freedom of speech issues, also not present here. *See* D.E. 440 at 7. No court has relied on either case to defeat an SEC motion for summary judgment or otherwise allowed a fair notice or vagueness defense to be decided by a jury. Moreover, neither case involved the application of *Howey* or the term "investment contract." Indeed, every federal court that has addressed the issue has rejected the argument that the term "investment contract" as used in the Securities Act, or as construed by *Howey* and its progeny, is vague.

### 1. *Howey* and Its Progeny Provided Defendants with Fair Notice.

Even before *Howey*, the Supreme Court held that "the reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if" they operate as investment contracts. *Joiner*, 320 U.S. at 351. Shortly thereafter, as discussed above, *Howey* confirmed that Congress defined "security" broadly to embody a "flexible rather than a static principle … capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299. Indeed, long before it began charging securities laws violations involving crypto assets, the SEC brought cases where interests in novel investment products were deemed "securities" and subject to federal securities laws, as cited above in Summary Judgment Standard § 2.

These decisions provided additional guidance as to what conduct and characteristics sufficed to meet the *Howey* test. "[I]t is not only the language of a statute that can provide the requisite fair notice; judicial decisions interpreting that statute can do so as well," even when "the facts at issue in those decisions were not 'fundamentally similar' or 'materially similar' to the facts of the defendant's case." *United States v. Smith*, 985 F. Supp. 2d 547, 588, 589 (S.D.N.Y. 2014), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) (citing *United States v. Lanier*, 520 U.S. 259, 269 (1997)).

**2.      Courts Routinely Reject Due Process Challenges to the Application of *Howey*, Including Specifically to Offers and Sales of Digital Assets.**

Almost 50 years ago, the Second Circuit held it was "untenable" to claim the term "investment contract" was void for vagueness. *SEC v. Brigadoon Scotch*, 480 F.2d 1047, 1052 n.6 (2d Cir 1973). The court reached that conclusion despite the defendant making three claims similar to Defendants' claims: that it was selling interests in a usable commodity, *id.* at 1051, that the SEC had "made no determination yet as to coverage under the federal securities laws," *id.*, and that the SEC had issued confusing guidance. *Id.* at 1052 n.3. As the Ninth Circuit has likewise explained, it is "too late in the day more than 32 years after the Supreme Court's decision in [*Howey*] to say that the term 'security' is impermissibly vague." *United States v. Farris*, 614 F.2d 634, 642 (9th Cir. 1979).

The Individual Defendants' as-applied vagueness challenge has also repeatedly failed in the courts. *See, e.g., Brigadoon Scotch*, 480 F.2d at 1052 n.6 (affirming summary judgment for SEC and rejecting argument that "security" was unconstitutionally vague); *United States v. Bowdoin*, 770 F. Supp. 2d 142, 148 (D.D.C. 2011) ("The lineage of the term [investment contract] is too long … for … claim of unconstitutional vagueness to stand."); *Zaslavskiy*, 2018 WL 4346339, at *8-9 (rejecting argument that the "securities laws are unconstitutionally vague … as applied to cryptocurrencies").

And these defenses have similarly been rejected in digital asset cases. The most noteworthy decision is *Kik*, where the defendant advanced arguments identical to those raised by Defendants here: that the application of *Howey* to a digital asset "fails to provide people of ordinary intelligence a

71

reasonable opportunity to understand what conduct [Section 5] prohibits," and that all this was made worse by the SEC's supposed "failure to issue guidance on securities enforcement related … to cryptocurrencies, SEC officials' inconsistent public statements on the issue, and the SEC's failure to bring enforcement actions against other issuers of digital tokens." 492 F. Supp. 3d at 182-83. Judge Hellerstein rejected all of these arguments. *Id.* at 183. First, he noted that *Howey* and its progeny "give[] a reasonable opportunity to understand what conduct and devices it covers." *Id.* (citations omitted). He likewise observed that the "the law does not require the Government to reach out and warn all potential violators on an individual or industry level." *Id.* (citations omitted). He concluded by explaining why *Upton* did not support a due process defense:

> In *Upton*, the SEC had been inconsistent in its enforcement of a rule as applied to the same practice occurring consistently across the industry for years. *Id.* By contrast, as Kik acknowledges, every cryptocurrency, along with the issuance thereof, is different and requires a fact-specific analysis…. The statute at issue here [Section 5] does not ['authorize[ ] or even encourage[ ] arbitrary and discriminatory enforcement.'].

492 F. Supp. 3d at 183 (citations omitted).

*Kik* involved the same violation (Section 5), the same type of investment contract (offers and sales of digital assets), the same type of defense allegations (including extensive reliance on Director Hinman's speech, to no avail, *Kik*, No. 19 Civ. 5244, D.E. 77 at 78), and the same procedural posture (on a summary judgment record indisputably establishing the offer and sale of investment contracts). *Kik* should end the inquiry. *Zaslavskiy*, 2018 WL 4346339, at \*9 ("[T]he abundance of caselaw interpreting and applying *Howey* …, as well as related guidance issued by the SEC as to the scope of its regulatory authority and enforcement power, provide all the [requisite] notice."); *SEC v. Fife*, 2021 WL 5998525, at \*7 (N.D. Ill. Dec. 20, 2021) ("The standard against which the SEC seeks to measure Defendants' conduct is the statute itself, the language of which Defendants and all others even arguably involved in securities transactions plainly have had notice. And it is for the courts—not the parties—to determine whether … conduct falls within the scope of the statute.").

Beyond *Kik*, courts routinely reject fair notice defenses on summary judgment. *See, e.g.*, *SEC v. Keener*, 2022 WL 196283, at *14 (S.D. Fla. Jan. 21, 2022) ("Defendant had notice that his conduct could be unlawful based upon 'the express language of the Exchange Act, decisions from this circuit applying the definition of "dealer," and the SEC Guide itself[.]'…. [T]he Court is unaware of, and Defendant has failed to cite to, any authority requiring [the SEC] to issue precise guidance on the regulations it enforces.") (citations omitted); *SEC v. Bluepoint Inv. Counsel LLC*, 2021 WL 5326740, at *4 (W.D. Wisc. Nov. 16, 2021) (same); *SEC v. Kovzan*, 2013 WL 5651401, at *9-11 (D. Kan. Oct. 15, 2013) (same); *CFTC v. Monex Credit Co.*, 2021 WL 6102524, at *20 (C.D. Cal. Oct. 28, 2021) (granting summary judgment on fair notice defense, noting "[a]gencies are not required to anticipate problems, promulgate general rules before performing their statutory duties, and announce why they may proceed in one enforcement action but not in another"); *CFTC v. Hunter Wise Commodities*, 1 F. Supp. 3d 1311, 1235-27 (S.D. Fla. 2014) (same result). This Court should do the same.

### 3.     The SEC Provided Digital Asset-Specific Guidance by Its Enforcement Actions and Public Statements.

In addition to the decades-long line of cases flexibly applying the securities laws to all types of investment products, it is undisputed that Defendants knew of the DAO Report and the SEC actions against issuers of crypto assets. 56.1 ¶¶ 1010-16. Defendants cannot claim that "a person of ordinary intelligence" would lack fair notice that the SEC would again charge those who engaged in unregistered offers and sales of digital assets. D.E. 440 at 7 (quoting *Fox Television*, 567 U.S. at 253).

These prior enforcement actions and SEC guidance readily distinguish *Upton. See United States v. Coscia*, 866 F.3d 782, 792-93 (7th Cir. 2017) (rejecting fair notice defense, even though government had never before brought charges under the statute at issue, because Congress had given notice by enacting statute). Indeed, the SEC had only brought a single action involving the rule there at issue before charging *Upton*'s. 75 F.3d at 97-98. Unlike in *Upton*, the SEC's 35 prior enforcement actions alleging Section 5 violations relating to crypto assets show there has not been any "substantial

73

change in [the SEC's] enforcement policy." *Id.* at 98; *see also SEC v. AT&T, Inc.*, 2022 WL 4110466, at *38-39 (S.D.N.Y. Sept. 8, 2022) (rejecting fair notice defense at summary judgment, where 17 prior SEC enforcement actions involving the statutory provision at issue in the case distinguished *Upton* and negated argument that SEC had taken "conflicting public positions" on the matter).

### C.    Defendants Had *Actual Notice* that Their XRP Offers and Sales Could be Subject to the Federal Securities Laws.

Resolving the fair notice defense "does not require inquiry" into whether Defendants received actual notice their conduct could violate the law. D.E. 440 at 10 n.5. But courts have rejected the defense where undisputed facts showed the defendant "had actual notice of the potential liability associated with its actions." *United States v. NGL Crude Logistics, LLC*, 2018 WL 4762901, at *17-20 (N.D. Iowa July 3, 2018); *see also United States v. Cinergy Corp.*, 495 F. Supp. 2d. 892, 900-05 (S.D. Ind. 2007). Here, Defendants had actual notice that their XRP distributions could be considered investment contracts, including being (a) repeatedly advised by lawyers of that possibility; (b) subject to an SEC enforcement investigation; and (c) told that SEC staff considered Defendants' XRP sales to violate Section 5. *See supra* Facts § VII. And the fact that Ripple, despite being advised by counsel to do so, never requested a No-Action letter from the SEC while continuing to sell hundreds of millions of dollars' worth of XRP after the DAO Report and SEC investigation, *see* 56.1 ¶¶ 868-72, 1055; PX 45 at Ex. 3 (over 90% of XRP sales starting in 2017), and while engaging in conduct that counsel had specifically advised would increase the risk that XRP would be deemed a security, 56.1 ¶¶ 986-1009; 1022, further cuts against this defense. *See Howmet Corp. v. EPA*, 656 F. Supp. 2d 167, 174 (D.D.C. 2009) ("failure of inquiry is relevant consideration in determination of fair notice to regulated party") (citation omitted)).

Courts routinely reject fair notice defenses based on the clear standards set forth by the law at issue, like *Howey* does here. But where the additional facts demonstrate that Defendants knew there was a risk that their conduct could be illegal and decided to proceed anyway, courts also hold

that it is not "unfair to require that one who deliberately goes perilously close to an area of

proscribed conduct shall take the risk that he may cross the line." *United States v. Kay*, 513 F.3d 432,

442 (5th Cir. 2007) (citing *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 340 (1952)).

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court grant its motion for

summary judgment on liability as to Defendants' violations of Securities Act Section 5 and the

Individual Defendants' aiding and abetting of Ripple's Section 5 violations, as well as Defendants'

due process defenses.

Dated:  New York, New York
        September 13, 2022

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Pascale Guerrier
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

Benjamin Hanauer
Robert S. Moye
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450.
Chicago, Illinois 60604