# Appendix A

# TRANSCRIPT OF RECORD

## SUPREME COURT OF THE UNITED STATES

### OCTOBER TERM, 19**720**

### No. 843

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER

vs.

## W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT

# INDEX

PAGE

Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Answer of Defendants to Complaint . . . . . . . . . . . . . . . 4

Stipulation of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Exhibit "A"—Form of Contract . . . . . . . . . . . . . . . 11
    Exhibit "B"—Form of Agreement . . . . . . . . . . . . 15
    Exhibit "B-1"—Typical Sales Talk . . . . . . . . . . . . 20
    Exhibit "C"—Photostat of Circular entitled "Play
        in Florida at Howey-in-the-Hills" . . . . . . 29
    Exhibit "D"—Schedule Reflecting Sales of Land
        by the Howey Company and Correspond-
        ing caretaking Contracts of the Service
        Company during Three Year Period ended
        May 31, 1943 . . . . . . . . . . . . . . . . . . . . . . . . . 31
    Exhibits "E" to "H" inclusive—Photostat of
        Pictures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Motion of Plaintiff for Summary Judgment . . . . . . . 39
Petition of Plaintiff and Order to withdraw motion
    for Summary Judgment . . . . . . . . . . . . . . . . . . . 39

TRANSCRIPT OF PROCEEDINGS . . . . . . . . . . . . . . . 41
    Colloquy between Court and Counsel . . . . . . . . 43

Evidence for Plaintiff:
    Testimony of William A. McClain . . . . . . . . . 43

Evidence for Defendants:
    Testimony of Dodge Taylor . . . . . . . . . . . . . . 58

Statement made by the Court . . . . . . . . . . . . . . . 75
Statement made by Mr. Bedell, Counsel for
    Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

ii

## INDEX—Continued.

PAGE

Transcript of Proceedings—(Continued):
  Statement made by Mr. McClain, Counsel for
      Plaintiff ............................... 78

  Colloquy between Court and Counsel ........ 79

Motion of Plaintiff to adopt the Proposed Findings
      of Fact ................................. 80
  Plaintiff's Proposed Findings of Fact ......... 81

Defendants Proposed Findings of Fact and Con-
      clusions of Law ....................... 90
Findings of Fact and Conclusions of Law by the
      Court, dated 4/18/45 ...................... 94
Memorandum Opinion, entered 4/17/45 .......... 103
Final Judgment, entered 4/18/45 ............... 108
Notice of Appeal ............................... 109
Appellant's Statement of Points on Appeal ........ 110
Appellant's Designation of Contents of Record on
      Appeal .................................... 111

Appellees' Additional Designation of Contents of
      Record on Appeal ....................... 113
  Exhibit Defendant #1—Excerpt from the U. S.
      Census of 1940 ...................... 114
  Exhibit Defendant #2—Large Map (Omitted
      from Printed Record) Original on File
  Exhibit Plaintiff's "J"—Form of Agreement .... 117

Order transmitting Original Exhibit—Map to C. C. A. 120
Order dated 6/25/45 directing filing of Plaintiff's and
      Defendants' Proposed Findings of Fact ...... 120
Clerk's Certificate ............................. 122

## PETITION FOR CERTIORARI FILED FEBRUARY 12, 1946
### CERTIORARI GRANTED MARCH 25, 1946

Proceedings in U. S. C. C. A., Fifth Circuit_____ 123
    Minute entry of argument and submission_____ 123
    Opinion, Hutcheson, J_____ 123
    Judgment _____ 128
    Clerk's certificate_____ 128
Order allowing certiorari_____ 129

Case No. 220 Orlando Civil.

S. E. C. Attorneys:
  Roger Foster, Solicitor,
     Philadelphia, 3, Pa.
  Wm. A. McClain, Attorney,
     415 Palmer Bldg.,
      Atlanta, 3, Ga.

Defts. Attorneys:
  C. E. Duncan,
     Tavares, Fla.
  George C. Bedell,
     Bisbee Bldg.,
      Jacksonville, 2, Fla.

———

3             COMPLAINT.

Filed May 16, 1944.

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA.

Civil Action, File No. 220 Orl. Civ.

SECURITIES AND EXCHANGE COMMISSION,
                         Plaintiff,

v.

W. J. HOWEY COMPANY, and HOWEY-IN-THE-HILLS
SERVICE, INC.,
                         Defendants.

**2**

1. It appears to the plaintiff that the defendants are engaged and are about to engage in acts and practices which constitute and will constitute violations of Section 5 (a) of the Securities Act of 1933, 15 U. S. C. 77 (e) (a); and plaintiff, pursuant to Section 20 (b) of the Act, 15 U. S. C. 77 t (b), brings this action to enjoin such acts and practices.

2. This action arises under Section 22 (a) of the Securities Act of 1933, 15 U. S. C. 77 v (a).

3. Since on and prior to January 1, 1936, the defendants have been and are now selling securities evidenced in part by warranty deeds and development contracts in connection with the sale of land planted to citrus trees in Lake County, Florida, and in the sale of such securities have been and are now directly and indirectly using the mails and means and instruments of transportation and communication in interstate commerce and have been and are now directly and indirectly carrying such securities and causing them to be carried through the mails and in interstate commerce, by means and instruments of transportation, for the purpose of sale and for delivery after sale.

4. No registration statement with respect to such securities has been or is now in effect with the Securities and Exchange Commission.

5. The defendants will, unless enjoined, continue to engage in the acts and practices set forth in this complaint.

Wherefore, the plaintiff demands a preliminary and final injunction enjoining the defendants, their officers, servants, agents, employees, successors and assigns, and each of them, from:

**3**

(a) Directly or indirectly

(1) Making use of any means or instrument of transportation or communication in interstate commerce, or of the mails, to offer or sell securities evidenced in part by warranty deeds and development contracts in connection with the sale of land planted to citrus trees in Lake County, Florida, or any other security related to the sale and cultivation of citrus groves, through the use or medium of any prospectus or otherwise;

(2) Carrying such securities or causing them to be carried through the mails or in interstate commerce, by any means or instrument of transportation, for the purpose of sale or for delivery after sale; unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities; provided that the foregoing shall not apply to any security or transaction which is exempt from the registration provisions of Section 5 of the Securities Act of 1933.

> EDWARD H. CASHION,
> (Edward H. Cashion)
> Counsel.
> WILLIAM GREEN,
> (William Green)
> Regional Administrator.
> WILLIAM A. McCLAIN,
> (William A. McClain)
> Attorney.
> SECURITIES AND EXCHANGE
> COMMISSION.

415 Palmer Building,
Atlanta, Georgia.

State of Florida,
County of Duval.

I, William A. McClain, one of the attorneys for the plaintiff, make oath that the facts alleged in this Complaint

4

are true to the best of my knowledge and belief.

WILLIAM A. McCLAIN.

(William A. McClain)

Sworn and subscribed to before me this 16th day of May, 1944.

EDWIN R. WILLIAMS,

(Seal)                Clerk, U. S. District Court,

Jacksonville, Florida.

By OCTAVIA MOORE,

Deputy Clerk.

———

THE ANSWER OF W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC., TO THE COMPLAINT OF SECURITIES AND EXCHANGE COMMISSION.

5                Filed May 20, 1944.

(Title Omitted.)

The defendants are without knowledge that the plaintiff has ever determined that defendants are engaged or about to engage in acts and practices which constitute or will constitute violations of any provision of the Securities Act of 1933, and on the contrary allege the fact to be that the plaintiff and defendants have agreed to submit for determination of this Court the question as to whether the business conducted by the defendants is subject to the said Act upon a Stipulation, which Stipulation has been entered into between plaintiff and defendants, and is ready to be filed with this Answer. And these defendants say that they are advised and believe and upon information and belief allege the fact to be that their business is not

subject to the said Act. And these defendants say it is
untrue that on or prior to January 1, 1936, or at any other
time, defendants have been selling securities as in Para-
graph "3" of the Complaint alleged, and it is untrue that
in the sale of securities defendants have been or are now
directly or indirectly using the mails or means or in-
struments of transportation or communication, or directly
or indirectly carrying or causing to be carried securities
for the purpose of sale or delivery after sale, as in said
paragraph "3" alleged. And it is untrue that these de-
fendants, or either of them, has any purpose so to do.

C. E. DUNCAN,

Per  GEORGE C. BEDELL,

Tavares, Florida.

GEORGE C. BEDELL,
(George C. Bedell)
Attorneys for defendants.

703 Bisbee Building,
　Jacksonville, Florida.

---

6　　　　　　　　STIPULATION.

Filed May 20, 1944,

(Title Omitted.)

1. It is Hereby stipulated and agreed by and between
the Securities and Exchange Commission, Plaintiff, by its
undersigned attorney, J. Cecil Penland, and W. J. Howey
Company and Howey in the Hills Service, Inc., defendants,
by their undersigned attorney, George C. Bedell, as fol-
lows:

2. The W. J. Howey Company, hereinafter referred to
as the Howey Company, is a corporation organized under

**6**

the laws of the State of Florida in 1922 with its principal place of business at Howey-in-the-Hills, Florida.

3. Howey-in-the-Hills Service Inc., hereinafter referred to as the Service Company, is a corporation organized under the laws of the State of Florida, in 1932, with its principal place of business at Howey-in-the-Hills, Florida.

4. The officers and directors of the Howey Company and the Service Company are the same, namely:

C. V. Griffin, President and Treasurer and Director.

Dodge Taylor, Vice President and Director.

R. W. Holsclaw, Secretary and Director.

5. The stockholders of the Howey Company and the Service Company are substantially the same, namely:

|  | Howey Company | Service Company |
|---|---|---|
| C. V. Griffin .............. | 510 shares | 510 shares |
| Dodge Taylor .............. | 228 shares | 229 shares |
| R. W. Holsclaw ............. | 1 shares | 0 shares |
| C. M. Pinkerton ............ | 1 shares | 1 shares |
| Howey-in-the-Hills Investment Corp. ....... | 260 shares | 260 shares |
|  | 1000 | 1000 |

6. The Howey Company and the Service Company share the same offices and utilize the same facilities and personnel.

7. The Howey Company and the Service Company are under direct common control.

8. The Howey Company is the owner of large tracts of land in Lake County, Florida, which it is now and for more than twenty years has been planting to citrus trees and selling to various purchasers for development into citrus groves as hereinafter described. Form of contract, Exhibit A, made a part hereof, has been the standard form of land sales contract used by the Howey Company since 1935. In occasional instances modifications are used to meet the requirements of the individual purchaser.

9. The prices charged for the land, which vary according to the number of years it has been planted to citrus trees before it is sold, are as follows:

One year old groves $675 per acre.

Two year old groves $750 per acre.

Upon full payment of the purchase price the land is conveyed to the purchaser by a warranty deed. If the purchaser fails to pay the required installments, the Howey Company may foreclose the contract in the same manner as it would foreclose a mortgage under Florida laws.

10. The Service Company is now and since its organization has been engaged in the business of cultivating and developing citrus groves on land in Lake County, Florida. A copy of Form 1-B, the form of agreement used in said cultivation and development of citrus groves, is attached hereto as Exhibit B and made a part hereof. This form of contract has been the standard form of service contract used by the Service Company since 1935. In occasional instances modifications are used to suit the requirement of the owner.

8

11. By such service contract the Service Company undertakes to properly maintain, fertilize, spray and cultivate and otherwise care for the citrus groves growing on the land for a specified period for the following service fees:

For the first five years $40 per acre, per year.

For bearing groves $30 per acre, per year.

In addition to the stipulated fees, the owner of the land agrees to pay taxes as and when they become due, the market price delivered at the described property of pruning, dusting material, spraying, spraying material, special treatment, seed for cover crop, sowing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of the Service Company, all as set forth in Exhibit B; and as set forth in said Exhibit B, the purchaser grants full and complete possession of the premises to the Service Company which agrees to pay the purchaser a nominal rental and marketing of the fruit by the Service Company is therein provided for.

12. The Howey Company maintains the Floridan Country Club, a resort hotel owned by the Howey Company. While tourists and vacationists who patronize the Club are being escorted around the golf course, through the bridle paths and over the lakes, their attention is directed to the citrus groves adjoining these attractions. They are informed that young groves are for sale and if they show an interest in purchasing a grove the respective operations of the Howey Company and the Service Company are explained. Attached hereto and made part hereof as

Exhibit B-1 is a typical sales talk employed by representatives acting for the two companies in effectuating sales. A circular describing the entertainment offered by the Club, entitled "Play in Florida at Howey-in-the-Hills" is attached as Exhibit C and made a part hereof.

13. The acreage sold by the Howey Company and groves cared for by the Service Company are within a radius of eight to ten miles of Howey-in-the-Hills, Florida. About 90% of all transactions are closed at the office of the two companies, at Howey-in-the-Hills, Florida. Generally, where the Howey Company is selling the acreage and the Service Company is entering into a contract for its care, the agreements on Forms 1 and 1-B, Exhibits A and B, are executed simultaneously.

14. The customers are for the most part residents of states other than Florida. They do not possess the knowledge, skill and equipment necessary for the care and cultivation of citrus groves. In numerous instances the purchasers have acquired homes in the vicinity, or spend a portion of each year in the vicinity, and rely on the Service Company or some other service concern to care for the grove and market the fruit, frequently inquiring and making suggestions both with respect to care of the grove and marketing of the fruit.

15. The Howey Company will sell acreage to persons who do not intend to use the Service Company as their caretaker. Moreover, the Service Company will develop groves on land not purchased from the Howey Company and solicits service contracts from others than purchasers from the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company

and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company.

16. Prospective customers have an opportunity to learn that six to eight competing service companies operate in the same vicinity of Howey-in-the-Hills, Florida. In the first place, said competitors post signs by the groves serviced by them which are visible from the highways, and in the second place, they send advertisements to grove owners. Moreover, the officers of the Howey Company and the Service Company acquaint prospective purchasers with the existence of competitors.

17. The agreement to purchase land planted to young citrus trees and the development agreement are customarily offered to prospective customers at the same time. The purchaser is encouraged to enter into a caretaking agreement with the Service Company. He is, of course, informed that the Service Company's competency and efficiency in caring for citrus groves exceed those of its competitors.

18. During the year ended May 31, 1941, the Howey Company sold 10 groves involving 14.51 acres; and the Service Company is caring for 8 of these groves involving 12.69 acres. During the year ended May 31, 1942, the Howey Company sold 21 groves, involving 117.78 acres; and the Service Company is caring for 16 of these groves involving 99.31 acres. During the year ended May 31, 1943, the Howey Company sold 20 groves involving 62.97 acres; and the Service Company is caring for 18 of these groves involving 54.54 acres. Thus, of the 195.26 acres sold by the Howey Company during the three year period, 166.54 acres are being cared for by the Service Company, or 85%. A schedule showing the sales made by the Howey Company during the three year period

ended May 31, 1943, together with a brief description of the service agreement entered into by the Service Company, where applicable, is attached as Exhibit D and made a part herof. Of a total of 2487.36 acres of groves under cultivation by the Service Company in March, 1944, more than 1400 acres are of groves more than ten years old.

19. The mails and instruments of transportation and communication in interstate commerce are now and for sometime have been used in the sale of said agreements, Forms 1 and 1-B, and they are and for sometime have been, carried through the mails and in interstate commerce by means and instruments of transportation for the purpose of sale and for the delivery after sale.

20. At no time has a registration statement been in effect with this Commission under the Securities Act of 1933 with respect to these agreements, Form 1 and Form 1-B.

21. Photographs, Exhibits E, F, G, and H, show respectively a grove 1 year from planting, a grove 3 years from planting, a grove 7 years from planting, and a grove 20 years from planting.

C. E. DUNCAN,
GEORGE C. BEDELL,
   Attorneys for Defendants.
WM. A. McCLAIN,
   Attorney Sec. & Exchange
   Comm., Plaintiff.

11            EXHIBIT "A".

Articles of Agreement.

. . . . . . . . . . . . . . 19 . . . .

12

Amount paid at time of purchase $. . . . . . . .

W. J. Howey Company,
    Howey-in-the-Hills, Florida.

Gentlemen: I hereby apply for the purchase of the following described property, to-wit: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Section . . . . Township . . . . South, Range . . . . East, in Lake County, Florida, containing . . . . acres, more or less, subject to Government survey and subject to twenty (20) feet for roadways on two sides of each forty acres, as well as to all roadways now vested in the County of Lake or in the State of Florida. The price of the land as now developed is $. . . . . . . . All payments other than cash or its equivalent to be evidenced by promissory notes of even date herewith, bearing interest from date thereon at six per cent. per annum, interest payable annually.

Summary of all payments follows:

| | | | | |
|---|---|---|---|---|
| 1. | Cash . . . . . . . . . . . . . . . . . . . . . . . . . | $. . . . . . | | |
| 2. | Note due .. months after date .. | $. . . . . . | | |
| 3. | Note due .. months after date .. | $. . . . . . | | |
| 4. | Note due .. months after date .. | $. . . . . . | | |
| 5. | Note due .. months after date .. | $. . . . . . | | |
| | Total . . . . . . . . . . . . . . . . . . . . | $. . . . . . | $. . . . . . |

Upon the full payment of the total consideration hereinabove set forth, said W. J. Howey Company agrees to deliver, or cause to be delivered, a warranty deed conveying merchantable title. W. J. Howey Company further agrees to pay all taxes due to the date of this contract, purchaser to pay all subsequent taxes; provided, however that the W. J. Howey Company shall have the right to pay all subsequent taxes on behalf of the purchaser, and in

such event the taxes so paid shall be charged to the purchaser, together with interest at six per cent. per annum thereon from date of payments, and the said warranty deed embracing the said land, as aforesaid, shall not be delivered until such taxes and interest are paid.

The purchaser his heirs or assigns, agrees to purchase said property upon the terms and conditions herein set forth, and make all payments promptly when and as the same severally fall due.

It is understood that, from the date of the acceptance of this application by W. J. Howey Company, the purchaser shall have the right to use and occupy the foregoing premises and shall have full title to all rents and profits therefrom, excepting the fruit crop for the citrus marketing season of 19.. to 19...

The purchaser, however, promises and hereby agrees that the W. J. Howey Company does have a lien for money due hereunder upon all rents and profits, including returns from the sale of any fruit, from said premises from the date of the acceptance of this application until all sums due hereunder have been paid to W. J. Howey Company, and it is further agreed that such sums accruing by reason of such rents and profits from said premises shall be paid to W. J. Howey company and applied first on interest and then on principal sums last falling due under the terms hereof. This contract, upon its acceptance, shall constitute a notice and direction to any third party, whether an individual or corporation, having in its possession any money accruing from such rents and profits from the premises to pay the same to W. J. Howey Company to be applied according to the terms hereof whenever accompanied by presentation to such third party of a statement of the monies due hereunder, sworn to by an officer of the W. J. Howey Company.

**14**

If any of the said sums of money referred to be not promptly and fully paid within thirty days next after the same severally becomes due and payable, or if each and every the stipulations, agreements, conditions and covenants to be performed by the purchaser as set forth in said primossory notes and this contract, or either, are not duly performed, complied with and abided by, the said aggregate sum mentioned in this contract, remaining unpaid, either evidenced by promissory notes herein or otherwise, shall become due and payable forthwith or thereafter at the option of the W. J. Howey Company, its successors or assigns, as fully and completely as if the total consideration was originally stipulated to be paid on such day, anything in said promissory notes or in this agreement to the contrary notwithstanding; in which event the W. J. Howey Company shall have the option to foreclose this contract upon the premises hereinabove described and upon any citrus crop growing or to be grown upon the said premises, or either of them, in the same manner as the foreclosure of a mortgage or lien under the laws of the State of Florida, and in case of foreclosure the purchaser covenants and agrees to pay all Court costs, including a reasonable attorney's fee, for the foreclosure thereof. Provided further that, in the event the purchaser shall fail to pay any of said sums of money in this contract referred to within thirty days next after the same become severally due and payable, or if each and every the stipulations, agreements, conditions and covenants to be performed by the purchaser as set forth in said promissory notes and this contract, or either, are not duly performed, complied with and abided by, all sums of money then paid shall at any time after such default, at the option of said W. J. Howey Company, be forfeited to it as rent and liquidated damages, and all rights and interest in and to said described lands and appurtenances thereunto belonging as acquired by the purchaser herein shall

**15**

be forfeited as rents and liquidated damages to the said W. J. Howey Company, and this purchase agreement canceled; and in the event this latter option is exercised by the W. J. Howey Company, it shall return to the purchaser all unpaid notes, duly canceled. Time being the essence of this contract. All remittances must be made payable to the order of W. J. Howey Company.

This application shall not become a contract of purchase until accepted by said W. J. Howey Company at its office at Howey-in-the-Hills, Florida.

Name and address of purchaser's bank . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Address.

. . . . . . . . . . . . . . . . . . . . .
Purchaser.

. . . . . . . . . . . . . . . . . . . . .
Purchaser.

. . . . . . . . . . . . . . . . . . . . .
Address.

Accepted at Howey-in-the-Hills, Florida . . . . . . . . . . . . . . .
19 . . . . .

W. J. HOWEY COMPANY,
By . . . . . . . . . . . . . . . . . . . .

14              EXHIBIT "B".

This Indenture, Made and Entered into this . . . . day of . . . . . . . . . . . ., A. D. 19 . . . Between . . . . . . . . . . . . . . . . . . hereinafter called party of the first part, and Howey-in-the-Hills Service, Inc., a corporation organized and existing under the laws of the State of Florida, hereinafter called party of the second part.

16

Whereas, First party now owns the land hereinafter more particularly described and second party is and has been for some time engaged in the business of cultivating and building citrus groves and is properly equipped for such purpose, Witnesseth,

That for and in consideration of the mutual and dependent covenants hereinafter made, the parties to this indenture have agreed and do agree as follows:

First: (a) First party does hereby grant full and complete possession to second party for a period of .... years (from the date hereof) (from the date of the planting to citrus) of the following described property, to-wit: ................................................ Section ...., Twp. .... South, Range .... East, in Lake County, Florida, containing .... acres, more or less.

(b) First party does hereby agree to pay to second party the following sums:

(1) The sum of $...... per acre per year, said yearly payment to the divided into twelve (12) equal monthly installments, the first of which shall be payable on the first day of the month succeeding the date on which this indenture begins to operate.

(2) The market price delivered at the above described property of pruning, dusting, dusting material, spraying, spraying material, special treatment, seed for cover crop, sowing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of second party, such sums to be payable upon demand.

(3) First party shall pay taxes when and as they become due and, in the event first party fails to pay the

taxes as aforesaid, second party shall have the right to pay same and charge the amount so paid to first party, which shall then be considered part of the sums due under this indenture, and shall be payable upon demand.

Second:   (a) Second party does this day pay unto the first party the sum of $...... as rental, the receipt of which is hereby acknowledged.

(b)   Second party does hereby covenant that it will properly maintain, fertilize, spray, cultivate and otherwise care for the above described property and the citrus grove located and growing thereon for the full term hereof, according to its best judgment.

(c)   Second party further covenants and agrees to pay over to said first party the net proceeds of the fruit produced upon the above described lands after deducting therefrom any cost or charge incurred by second party in the gathering, packing, marketing and selling of each crop of fruit during the life of this indenture, as well as any of the sums which may be accrued to second party under the terms of paragraph First:   (b) (1) through (b) (3) hereinabove set forth, regardless of whether or not the same may then be due.   Such processes of harvesting and sale shall be performed by second party at the time and in the manner which in its judgment seem best.   It is further mutually agreed upon and understood that second party may at its discretion market the fruit upon the property above described in pools with other fruit of like variety and grade controlled or owned by second party and, if marketed in a pool, the proceeds of any and all shipments shall be pooled with the proceeds of other fruit of like variety and grade so marketed by second party as aforesaid and then the net proceeds of each pool shall be proportioned equally and paid to each member of such

pool, in accordance with the number of standard boxes contributed by each member of such pool. The pooling provision of this section shall not apply to fruit sold on the tree.

(d) In the event it is mutually agreed upon in writing between the parties hereto and provided there are no moneys accrued under the terms of this indenture from first party to second party at the time any specific crop is harvested, the first party shall thereupon own said specific crop of fruit and shall have the right of entry in the above described premises to dispose of the same in any manner whatsoever he may desire.

Third:  It is fully understood and agreed by the parties hereto that the consideration for this lease and agreement herein entered into by second party to maintain the grove and to pay over to first party the net proceeds from the sale of fruit therefrom based upon the nominal terms hereinabove set forth, and first party therefore enters into this present agreement to pay the sums above specified in paragraphs First:  (b) (1), (2) and (3).

Fourth:  The first party hereby assumes the risk of natural conditions and governmental rules and regulations, as well as market conditions, which may operate to prevent the production of a crop or the realization of net proceeds therefrom.

Fifth:  In the event second party shall extend the time of payment of any of the sums due or to become due from first party under the terms of paragraphs First:  (b), (1), (2) and (3) above by the acceptance of a note or other evidence of indebtedness, such instrument shall not be construed as payment, but shall be merely the evidence of

Case 1:20-cv-10832-AT-SN  Document 674-1  Filed 10/21/22  Page 24 of 43

the indebtedness, and shall be secured by this contract as though originally incorporated herein.

Sixth:  (a) It is further agreed that first party, his heirs and assigns, does hereby grant to second party whatever title or interest first party, his heirs or assigns, now owns, or shall hereafter acquire, in the premises hereinabove described, and the crops grown or to be grown thereon, and either of them to hold the same as security for all payments due from first party to second party under the terms of this indenture, and that in the event first party, his heirs or assigns, shall be in default for a period of thirty days in the payment of any of the sums so falling due, then second party shall immediately have the option to foreclose the lien hereby granted upon the premises and crops above described for the amounts then due under this indenture.  In the event it shall become necessary to place said claim or lien in the hands of an attorney for collection, then first party hereby covenants to pay a reasonable attorney's fee for the collection thereof, together with all costs and in addition thereto covenants and agrees to pay second party, its successors or assigns, all sums falling due according to the terms of this indenture from the date of such default to the time that final decree may be entered for the amount due.

(b)  It is undertsood that all payments falling due under the terms of this indenture from first party to second party shall be based upon the fiscal year as described in paragraph First:  (b) (1) and that these payments shall not be allocated in any manner whatsoever so as to apply to any particular crop; it being the intention of this instrument that all of the covenants herein contained are mutual and dependent during the life of this indenture and are not to operate independently or severally.

(c)   The exercising of the option to foreclose shall not operate as a breach or rescission of this indenture, or any of the terms hereof, on the part of second party, but in the event that final decree is secured by said second party, then this indenture shall terminate in all respects.

Seventh:   This agreement is executed in duplicate and is binding upon the parties hereto, their heirs, successors and assigns, and it expressly agreed upon that the covenants and conditions of this indenture shall run with the land and with the reversion.

Executed at Howey-in-the-Hills, Lake County, Florida, on the day and year first above written.

    (Seal)               . . . . . . . . . . . . . . . . . . . .
                              Party of the First Part.

    (Seal)                . . . . . . . . . . . . . . . . . . . .
                              Party of the First Part.
                              HOWEY-IN-THE-HILLS SERV-
                              ICE, INC.,
          By   . . . . . . . . . . . . . . . . . . .
                              Vice-President, Party of the
                              Second Part.

Signed, sealed and delivered in the presence of:

                          . . . . . . . . . . . . . . . . . . . .
                          . . . . . . . . . . . . . . . . . . . .
                          . . . . . . . . . . . . . . . . . . . .
                          . . . . . . . . . . . . . . . . . . . .

18                        EXHIBIT B-1.

The development of what is known as "Howey-in-the-Hills" was started by Mr. W. J. Howey in 1915 when he purchased a large tract of land, approximately 100,000

acres in extent. Of this area, about 40,000 acres is water and waste land, and the balance is good citrus land. There has been developed about 10,000 acres of grove which is now in bearing and about 2,000 acres of young groves which will be bearing in another four or five years.

Mr. Howey died in 1938 and Mr. Griffin and I bought the stock in the operating companies in 1940. We have been trying to build up the property as a tourist resort, and have renovated the hotel building, and made various improvements in it, such as the bathing beach, the stables, and the golf course. We are also developing as rapidly as we can the remaining citrus acreage, and during the last three years we have planted about 500 acres of grove annually. We are both primarily in the citrus business and expect to continue to be all our lives. Each year we set aside half or more of the newly planted groves to keep, and these are not for sale. The balance of the newly planted groves we do offer for sale to help us finance additional development.

The Howey tract is one of the most favored citrus areas. It lies imemdiately south of several large lakes, such as Lake Harris, Lake Griffin, Lake Eustis, and Lake Yale. There are between two and three hundred smaller lakes interspersed through the property. These lakes, coupled with the rolling topography of the land, give the area remarkable resistance to frost, as the lakes tend to warm any cold air which may descend on us from the north. In addition, cold air tends to drain down the hillsides into the valleys. In the history of this property the principal damage to the trees from cold has come in the pockets from which there is no air drainage, and we have removed all the trees from such areas.

Case 1:20-cv-10832-AT-SN Document 674-1 Filed 10/21/22 Page 27 of 43

The entire area is also underlaid with a red clay sub-soil, such as you see on these roads. A citrus tree has a long tap root through which it absorbs its moisture. This tap root customarily grows until it reaches moisture, which in this country is this clay sub-soil. Because this clay holds moisture just like a blotter, we have here a remarkable resistance to drought. In case of dry weather, trees here will show no signs of distress long after trees on the low lands show wilt.

In choosing the varieties of fruit which we are going to grow, we are guided entirely by commercial consider-ations. For that reason we don't propagate nor grow any varieties except those with a ready market acceptance. It takes two or three years in the nursery and another five years in the grove to get a tree ready to bear, and so we want to know that we're going to have fruit we can sell before we begin to grow a tree.

In some of the earlier plantings, there are Duncan grape-fruit and Pineapple oranges. These are fine varieties of fruit, but they have the market disadvantage of being seeded fruit and of coming on the market in mid-season, when the great bulk of the citrus crop moves. Plantings in later years were almost exclusively Marsh seedless grape-fruit and Valencia oranges. These are both late vari-eties, coming on the market in March, April, and May, or, in some cases, as late as June. Because they move after the larger volume of citrus is off the market and because they are seedless, they have ready market acceptance, and almost always bring preferred prices. In fact, these two varieties have for some years been the money crops of Florida citrus. Yet they do have certain disadvantages. All grapefruit varieties are fast growing, heavy bearing trees, but there have been some seasons, particularly dur-ing the depression, when grapefruit was hard to sell

Valencias, while they almost always bring good prices, are a relatively slow growing tree and relatively light bearers. The fruit on both varieties, because they mature late in the season, must be carried on the tree through the winter, which means that there is some element of frost risk in them.

It is to overcome these disadvantages that we have largely confined our plantings in the last three years to the Hamlin orange. This tree and the fruit seemingly possess every essential advantage for citrus. It is a fast growing, prolific bearing tree. The fruit, properly grown, is of exceptionally fine quality. It has smooth texture, thin skin, and is practically seedless. It matures in October or early November and is the first Florida fruit on the market. Because it comes on the market by itself, it always brings a preferred price. The price may not be quite as high as Valencias bring later in the season, but because the production is greater the revenue from each tree is more than from a Valencia. The early maturity practically eliminates the frost risk, and also any loss from a fall drought which we quite often have. Because the fruit is off the trees early, the trees can be cultivated and fertilized in the fall and winter with no other idea than to produce the next crop of fruit, and without having to safeguard the quality of the crop on the trees, as we must do with Valencias. While we have groves planted to all the standard varieties, we think the Hamlin orange is the finest of all of them, and if anyone wanted a small grove of one variety, we think this is the one he should choose.

Our cultural practices on young groves are intensive cultivation and fertilization for nine months of the year. The tree rows are worked every ten days or two weeks during that period and the trees are fertilized every sixty days. In December, January and February we keep the

Case 1:20-cv-10832-AT-SN  Document 674-1  Filed 10/21/22  Page 29 of 43

trees as dormant as we can, because it is in those three months we will get cold weather if we're going to have any.  Pruning on young trees is mainly confined to cutting off lemon sprouts coming out below the bud.  There is practically no spraying on young trees, although this fall we did give all the one and two-year-old trees a nutritional spray to kill scale, which seemed to be generally present in minor quantities.

It costs about $50 per acre per year on an average to take care of a young grove in this manner.  It could be done cheaper, but our methods produce a heavy, lush growth and get a bearing tree quicker than the cheaper methods.  And that is what we're after—to get a bearing tree as quickly as we can.  We continue with these methods until the tree is about five years old, when we let it bear its first crop.  Then we radically change our cultural methods to produce fruit rather than tree growth.

In a bearing grove, we fertilize rather heavily twice a year, once in May and again in December or January.  A Grapefruit tree the size of most of our bearing trees gets 20 to 25 pounds in each application, and an orange tree, 15 to 20 pounds.  The trees are also sprayed several times a year.  Early in the spring we put on a strong lime sulphur solution, or what is called a "dormant spray" to protect the bloom from thrips.  Then about May we use a "Bordeaux" spray, which is a mixture of copper and lime to control melanose.  In the summer and fall we use an oil emulsion spray for scale, or a lime sulphur spray for rust mite as the groves may need them.  We try to produce good, clean fruit, free from blemishes, and to do this we have to fertilize and spray in the quantities and at the time we should.

We aren't particularly interested in what it costs to take care of an acre of grove, but we are very much interested in what it costs to produce a box of fruit. Last year, costs on bearing groves averaged about $75 per acre. We produced grapefruit for about 20 cents per box and oranges for about 40 cents per box. This year labor costs are considerably higher, and consequently production costs will be somewhat increased.

Bearing groves are only cultivated during the winter. In the summer we allow either leguminous cover crops or the natural grasses to grow in the middles. In the fall we disc or plow these middles, and break the grass into the soil. This adds a certain amount of humus or organic matter to the soil.

There is some necessity for pruning. After the crop is taken from the trees, some dead wood shows up, but we don't do nearly as much pruning as we used to. It is an expensive operation to remove all this fine dead wood, and we have found that it gradually falls off anyway. So now we confine most of our pruning to large dead limbs.

We never prune off any live wood nor attempt to direct the growth of a bearing tree through pruning. Our object in growing these trees is to get a large tree with plenty of bearing surface. The inside as well as the outside of the tree bears fruit, and we want all that good wood in there to get the largest possible crops. The larger crops we can produce, the greater the return and the lower the production costs, and consequently the more profitable the grove. We're trying to produce this fruit at a low enough cost, so there is a good profit in it, even when prices are lower than they are now.

In fertilizing a grove, the principal constituents of a fertilizer mixture are ammonia, phosphoric acid and potash. We want at least 25% of the mixture to be organic substances which are slow feeding. In addition, we must

Case 1:20-cv-10832-AT-SN Document 674-1 Filed 10/21/22 Page 31 of 43

give attention to the so-called minor elements, magnesium, manganese, copper, and zinc. The U. S. Department of Agriculture has conducted experiments over the years, which show that trees obtaining all of these minor elements produce larger and better quality of crops, are more resistant to disease and the natural hazards of frost and drought. We apply these minor elements both in fertilizer and in spray solutions.

All of these trees here are budded trees, as opposed to trees grown direct from the seed. We bud the variety of citrus fruit we want on a rough lemon seedling about two years old. There are two common root stocks in Florida the sour orange and the rough lemon. The sour orange is a slow growing stock and is somewhat more resistant to cold damage than the rough lemon. It is particularly suited to low lands with a heavy soil, where it is apt to be colder than in this section, and where there is a good deal of nutriment in the soil. In these sand hills, however, it would take nearly fifteen years to get a tree on sour orange stock, and, with out natural protection against cold, we don't need the hardier stock. Trees on a rough lemon root system are, therefore, the only practical ones for this locality. We are doing some work now with trees on Cleopatra Mandarin stock, which is a trifle slower growing and somewhat hardier than the rough lemon.

As in any other thing in which nature is a factor, the production of citrus trees varies somewhat from season to season. In general we expect the range of production on grapefruit trees, the age of these bearing trees we have here, to be from 8 to 10 boxes per tree and on orange trees around 4 or 5 boxes per tree. On the Hamlin orange we will be able to get larger production than on Valencias, and on Hamlin trees of comparable age the production should be 6 or 7 boxes per tree. The trees are planted on 30-foot centers, which makes 48 trees per acre.

Case 1:20-cv-10832-AT-SN Document 674-1 Filed 10/21/22 Page 32 of 43

Prices for fruit also vary from season to season. We usually sell our fruit on-the-tree to outside buyers, who do the picking and packing and pay us for each day's picking as it is completed. We like this method of sale, because it relieves us of all responsibility except checking the amount of fruit picked, and enables us to settle with our growers within about two weeks from the time the fruit is picked. We keep a checker with each picking crew, and a separate count is made of the fruit belonging to each individual grower.

This year we have already sold all our Hamlins for $2.00 per box on-the-tree. All of our Pineapples for $1.85 per box on-the-tree and some of our Duncan grapefruit for $1.00 per box on-the-tree. These prices now are pretty well established by the ceiling price, and are about as much as the grower can get under the ceiling. These prices aren't unusually high due to the war, because the ceiling price was based on the average price over the several years immediately preceding the war. I have seen several seasons in which prices were as high or higher than those we are now getting.

Last season most groves made profits after production costs of about $200 per acre, although many groves did better than that. This year, based on our estimated crops and the prices we are getting, the general level of profits will probably be a little higher. However, I wouldn't want anyone who bought a grove to expect to average over the next ten years, or over the first ten years of bearing if they bought a young grove, much more than $100 per acre profit. There are going to be bad years with the good, and the productivity of a grove should be judged over a period of years.

The citrus industry has been the basic industry of this section of Florida since its settlement right after the Civil War. There are trees in this immediate vicinity that were

Case 1:20-cv-10832-AT-SN   Document 674-1   Filed 10/21/22   Page 33 of 43

planted around 1865 which are still producing large crops
of fruit. I am told that there are trees in Spain and Italy
which are 200 and 300 years old.

During the twenty years I have been here, I have seen
the production of citrus fruit in Florida increase from
about 25,000,000 boxes to about 60,000,000 boxes last sea-
son. Demand and consumption for that greatly increased
volume has been built up and sustained and the fruit is
still being sold at good prices. There will, of course, be
further increases in production, but the area still remain-
ing in the State which is good citrus land is limited.
Meanwhile, improved methods of canning and the new
dehydration processes being worked out by the Govern-
ment to ship fruit juices to the armed forces abroad will
undoubtedly lead to still further increases in demand and
consumption. Such processes will, too, probably result in
economies in handling, so that fruit or fruit juices can be
sold very reasonably and still leave the grower about the
same price that he is now getting.

Don't buy a grove unless you are prepared to take good
care of it. Nothing responds so quickly to care or lack
of care as a citrus tree, and a grove will be of no value
to you unless you look after it. If you do buy a grove, you
buy a specific piece of land to which you hold title, and
it is yours to do with as you like.

The growing of citrus fruit is an old established busi-
ness in Florida in which a large number of people are en-
gaged, and we don't claim to be the only people who know
how to do it right. Naturally, if you buy a grove we
would like to look after it for you, and we think we could
satisfy you as we have hundreds of others. But, if you
don't want our care, you are at liberty to employ anyone
you wish, or to look after it yourself.

EXHIBIT C





25

# EXHIBIT D.

Schedule Reflecting Sales of Land by the Howey Company and Corresponding Caretaking Contracts of the Service Company during Three Year Period Ended May 31, 1943.

Purchasers have been assigned identifying numbers to avoid making public their names addresses.

## Fiscal year ended May 31, 1941.

| Date 1941 | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|-----------|------------------|-----------------|----------------|---------------------------------|
| 2/12 | 1 | 1. | $ 700.00 | Ten-year service contract. |
| 2/12 | 2 | .91 | 910.00 | No service contract in force. |
| 2/18 | 3 | .91 | 910.00 | No service contract in force. |
| 2/19 | 4 | 1.25 | 1,250.00 | Ten-year service contract. |
| 2/22 | 5 | 1.12 | 1,120.00 | Ten-year service contract. |
| 2/25 | 6 | 4. | 2,800.00 | Ten-year service contract. |
| 2/26 | 7 | .83 | 830.00 | Ten-year service contract. |
| 4/25 | 8 | 1.66 | 1,660.00 | Ten-year service contract. |
| 5/ 2 | 9 | .83 | 830.00 | Ten-year service contract. |
| 5/29 | 10 | 2. | 2,000.00 | Ten-year service contract. |
| | | 14.51 | 13,010.00 | |

31

## Fiscal year ended May 31, 1942.

| Date | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 1941 | | | | |
| 10/21 | 8 | 5. | $ 5,000.00 | Ten-year service contract. |
| 1942 | | | | |
| 1/23 | 8 | .83 | 830.00 | Ten-year service contract. |
| 2/10 | 11 | 2. | 2,000.00 | Ten-year service contract. |
| 2/24 | 12 | 2. | 2,000.00 | Ten-year service contract. |
| 2/27 | 13 | 1. | 1,000.00 | Ten-year service contract. |
| 2/28 | 14 | .91 | 910.00 | Ten-year service contract. |
| 3/ 7 | 15 | 1.35 | 1,350.00 | Ten-year service contract. |
| 3/18 | 16 | 68.6 | 52,805.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 3/20 | 17 | .73 | 730.00 | Ten-year service contract. |
| 3/27 | 18 | 5.81 | 5,810.00 | Ten-year service contract. |
| 3/27 | 18 | 1.39 | 1,390.00 | No service contract in force. |
| 4/ 7 | 19 | .73 | 730.00 | No service contract in force. |
| 4/ 7 | 20 | .73 | 730.00 | Ten-year service contract. |
| 4/17 | 21 | 2.64 | 2,640.00 | Ten-year service contract. |
| 4/20 | 22 | 1.39 | 1,390.00 | Ten-year service contract. |
| 4/22 | 23 | 1.35 | 1,350.00 | No service contract in force. |

| | | | | |
|---|---|---|---|---|
| 4/24 | 24 | 1.35 | 1,350.00 | Ten-year service contract. |
| 4/24 | 25 | 1.35 | 1,350.00 | Ten-year service contract. |
| 4/28 | 26 | 10. | 10,600.00 | No service contract in force. |
| 4/28 | 27 | 5. | 5,000.00 | No service contract in force. |
| 4/ 9 | 28 | 3.62 | 1,629.00 | Ten-year service contract. |
| | | 117.78 | 100,594.00 | |

## Fiscal year ended May 31, 1943.

| Date 1942 | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 6/ 9 | 29 | 2.66 | $ 2,660.00 | Ten-year service contract. |
| 6/12 | 26 | 7.68 | 3,072.00 | No service contract in force. |
| 6/16 | 30 | 1.8 | 1,800.00 | Ten-year service contract. |
| 7/ 1 | 8 | 2.5 | 2,500.00 | Ten-year service contract. |
| 10/20 | 22 | .73 | 730.00 | Ten-year service contract. |
| 1943 | | | | |
| 1/12 | 31 | 11.49 | 8,617.50 | Ten-year service contract. |
| 2/17 | 28 | 1.68 | 840.00 | Ten-year service contract. |
| 2/14 | 16 | 2.5 | 2,500.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 2/26 | 32 | .7 | 840.00 | Ten-year service contract. |

33

| Date | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 3/ 2 | 33 | 2.79 | 3,348.00 | Ten-year service contract. |
| 3/ 3 | 34 | 8.89 | 8,769.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 3/ 5 | 35 | 5.67 | 2,550.00 | Ten-year service contract. |
| 3/15 | 36 | .91 | 1,092.00 | Ten-year service contract. |
| 3/16 | 37 | 1.35 | 1,620.00 | Ten-year service contract. |
| 3/20 | 38 | .75 | 900.00 | No service contract in force. |
| 3/26 | 39 | 1. | 1,200.00 | Ten-year service contract. |
| 4/ 5 | 40 | .91 | 1,092.00 | Ten-year service contract. |
| 5/21 | 41 | .65 | 780.00 | Ten-year service contract. |
| 5/21 | 29 | 3.17 | 3,804.00 | Ten-year service contract. |
| 5/25 | 42 | 5.14 | 3,469.50 | Ten-year service contract. |
| | | 62.97 | $52,184.00 | |
| Totals | | 195.26 | $165,788.00 | |

34

35



EXHIBIT E



37



EXHIBIT G

