**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

Defendants.

Case No. 20-CV-10832 (AT) (SN)

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. v

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 6

    A.    XRP and the XRP Ledger ........................................................................... 6

    B.    The Founding and Commercial Activities of Ripple ............................... 7

    C.    Ripple's Sales, Giveaways, and Payments of XRP ................................. 8

    D.    Ripple's "Touting" of XRP ..................................................................... 10

LEGAL STANDARD ....................................................................................................... 12

ARGUMENT .................................................................................................................... 12

I.     THE SEC HAS FAILED TO PROVE THE ESSENTIAL INGREDIENTS OF INVESTMENT CONTRACTS ................................................................................. 12

II.    THE SEC CANNOT SATISFY THE *HOWEY* TEST ................................... 16

    A.    The SEC Has Failed To Prove an Investment of Money ...................... 17

    B.    The SEC Cannot Prove a Common Enterprise ..................................... 19

          1.    The SEC's Shifting Common-Enterprise Theories All Fail as a Matter of Law Because They Amount to Broad Vertical Commonality ................................................................................. 21

          2.    The SEC Cannot Show Horizontal Commonality ................... 22

               a.    The SEC Has Not Demonstrated the Requisite Sharing or Pooling of Funds ........................................................ 22

               b.    The SEC Also Has Failed To Demonstrate Other Necessary Requirements for Horizontal Commonality ................................. 25

          3.    The SEC Cannot Show Strict Vertical Commonality ............... 29

    C.    The SEC Cannot Establish That XRP Holders Reasonably Expected Profits from Defendants' Entrepreneurial and Managerial Efforts ................................. 32

          1.    A Mere Expectation of Profit, Standing Alone, Is Insufficient To Create an Investment Contract ..................................................... 32

2.     Defendants' Public Statements Are Insufficient as a Matter of Law To Create a Reasonable Expectation of Profits from Defendants' Efforts .... 34

3.     The SEC's Reliance on Cases Concerning ICOs Is Again Misplaced ..... 38

4.     At a Minimum, There Is a Genuine Dispute of Material Fact Regarding Whether XRP Purchasers Reasonably Expected Profits from Defendants' Efforts .......................................................................... 39

III.   DEFENDANTS' FAIR NOTICE DEFENSE PRESENTS GENUINE DISPUTED ISSUES OF MATERIAL FACT FOR TRIAL .................................................................. 43

A.     Whether the SEC Gave Market Participants Fair Notice That XRP Was a Security Is a Fact-Specific Inquiry ....................................................... 44

B.     Market Participants Reasonably Believed That XRP Was Not a Security in the Face of Widespread Uncertainty and Evolving Guidance .............................. 45

1.     Initial Lack of Clarity Regarding Regulation of Digital Assets ............... 45

2.     The SEC Enters the Regulatory Field and Injects Further Uncertainty.... 47

3.     The SEC Reverses Course ..................................................... 51

C.     Defendants Have Adduced More Than Sufficient Facts To Support Their Due Process Defense ................................................................... 52

D.     The SEC's Arguments Against Defendants' Fair Notice Defense Lack Merit .... 54

IV.    THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE AIDING-AND-ABETTING CLAIM AGAINST THE INDIVIDUAL DEFENDANTS .............. 58

A.     Denial of the SEC's Summary Judgment Motion on Ripple's Alleged Section 5 Violation Ends the Inquiry ................................................. 59

B.     Even if the Court Finds a Section 5 Violation, a Genuine Issue of Material Fact Still Exists as to the Individual Defendants' Scienter ................................. 59

1.     Larsen Did Not Know and Was Not Reckless as to Whether XRP Was a Security ......................................................................... 61

2.     Garlinghouse Did Not Know and Was Not Reckless as to Whether XRP Was a Security ................................................................. 65

C.     Even if Ripple's Sales Violated Section 5, There Is a Genuine Dispute as to Whether the Individual Defendants Substantially Assisted Such Violations ....... 71

V.     THE SEC HAS NOT SHOWN THAT ANY DEFENDANT'S OFFERS OR SALES WERE DOMESTIC ............................................................................. 72

VI.     THE INDIVIDUAL DEFENDANTS' OFFERS AND SALES WERE EXEMPT
        UNDER SECTION 4(A)(1)............................................................................................... 75

CONCLUSION........................................................................................................................... 75

# TABLE OF AUTHORITIES

Page

## CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
  677 F.3d 60 (2d Cir. 2012)..................................................................74

*Aldrich v. McCulloch Props., Inc.*,
  627 F.2d 1036 (10th Cir. 1980) ..........................................................35

*Am. Commc'ns Ass'n, C.I.O. v. Douds*,
  339 U.S. 382 (1950)...........................................................................44

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)...........................................................................12

*Audet v. Fraser*,
  2022 WL 1912866 (D. Conn. June 3, 2022).......................................39

*Balestra v. ATBCOIN LLC*,
  380 F. Supp. 3d 340 (S.D.N.Y. 2019)...........................................27, 38

*Bank of Am. AIG Discl. Sec. Litig., In re*,
  980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93
  (2d Cir. 2014)......................................................................................60

*Bender v. Cont'l Towers Ltd. P'ship*,
  632 F. Supp. 497 (S.D.N.Y. 1986)......................................................33

*Bobrowski v. Red Door Grp., Inc.*,
  2011 WL 3875424 (D. Ariz. Aug. 31, 2011).......................................31

*Boelter v. Hearst Commc'ns, Inc.*,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017).................................................22

*Brodt v. Bache & Co.*,
  595 F.2d 459 (9th Cir. 1978) ..............................................................30

*Chicago Mercantile Exch. v. SEC*,
  883 F.2d 537 (7th Cir. 1989) ..............................................................25

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996).................................................................60

*Christopher v. SmithKline Beecham Corp.*,
  567 U.S. 142 (2012)............................................................................57

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014).................................................................73

*Cnty. Vanlines, Inc. v. Experian Info. Sols., Inc.*,
    2005 WL 3117211 (2d Cir. Nov. 22, 2005)..................................................................61

*Cooper v. King*,
    1997 WL 243424 (6th Cir. May 9, 1997) ...................................................................24

*Copeland v. Vance*,
    893 F.3d 101 (2d Cir. 2018)........................................................................................55

*Cornwell v. Credit Suisse Grp.*,
    729 F. Supp. 2d 620 (S.D.N.Y. 2010).........................................................................73

*Crawford v. Franklin Credit Mgmt. Corp.*,
    758 F.3d 473 (2d Cir. 2014)........................................................................................13

*Creasy Corp. v. Enz Bros. Co.*,
    187 N.W. 666 (Wis. 1922).........................................................................................13

*Cunney v. Bd. of Trustees of Vill. of Grand View*,
    660 F.3d 612 (2d Cir. 2011)........................................................................................44

*Davis v. Rio Rancho Estates, Inc.*,
    401 F. Supp. 1045 (S.D.N.Y. 1975)...............................................................20, 26, 38

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) ....................................................................................36

*Deckebach v. La Vida Charters, Inc. of Fla.*,
    867 F.2d 278 (6th Cir. 1989) ......................................................................................24

*Dooner v. NMI Ltd.*,
    725 F. Supp. 153 (S.D.N.Y. 1989)..............................................................................30

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)..............................................................................................44, 55

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985)............................................... 16-17, 33, 37, 38, 43

*Gates & Fox Co. v. OSHRC*,
    790 F.2d 154 (D.C. Cir. 1986).....................................................................................58

*Giannullo v. City of New York*,
    322 F.3d 139 (2d Cir. 2003)...................................................................................12, 72

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974)...................................................1, 13, 34, 37, 38

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................5, 44

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
    396 F. Supp. 175 (N.D. Cal. 1975) ................................................36

*Hart v. Pulte Homes of Mich. Corp.*,
    735 F.2d 1001 (6th Cir. 1984) ................................................26, 28

*Heine v. Colton, Hartnick, Yamin & Sheresky*,
    786 F. Supp. 360 (S.D.N.Y. 1992)............................................. 29-30

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ..........................................17, 23, 27

*Horwitz v. AGS Columbia Assocs.*,
    700 F. Supp. 712 (S.D.N.Y. 1988).................................................34

*Hosp. of Univ. of Pa. v. Sebelius*,
    847 F. Supp. 2d 125 (D.D.C. 2012) ...............................................58

*Int'l Bhd. of Teamsters v. Daniel*,
    439 U.S. 551 (1979)......................................................................18

*Inturri v. City of Hartford*,
    365 F. Supp. 2d 240 (D. Conn. 2005), *aff'd*, 165 F. App'x 66
    (2d Cir. 2006)..............................................................................44

*J.P. Jeanneret Assocs., Inc., In re*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011)............................................29

*Jenson v. Cont'l Fin. Corp.*,
    404 F. Supp. 792 (D. Minn. 1975) ................................................41

*Johnson v. Nationwide Indus., Inc.*,
    450 F. Supp. 948 (N.D. Ill. 1978), *aff'd*, 715 F.2d 1233 (7th Cir. 1983).........................37

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).........................................................60

*Kaplan v. Shapiro*,
    655 F. Supp. 336 (S.D.N.Y. 1987).................................................29

*Lenczycki v. Shearson Lehman Hutton, Inc.*,
    1990 WL 151137 (S.D.N.Y. Sept. 29, 1990)..................................29

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014).........................................................74

*Long v. Shultz Cattle Co.*,
    881 F.2d 129 (5th Cir. 1989) .......................................................................36

*Malik v. Network 1 Fin. Sec., Inc.*,
    2022 WL 453439 (2d Cir. Feb. 15, 2022).......................................................60

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982).......................................................................................16

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ...........................................24, 29, 30, 31

*McCormick v. Shively*,
    267 Ill. App. 99 (1932) ..................................................................................13

*Mechigian v. Art Cap. Corp.*,
    612 F. Supp. 1421 (S.D.N.Y. 1985)...............................................................31

*Milnarik v. M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir. 1972) ....................................................................28, 29

*Morales v. Quintel Ent., Inc.*,
    249 F.3d 115 (2d Cir. 2001)...........................................................................12

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010).......................................................................72, 73, 75

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................................................59

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*,
    753 F. Supp. 2d 166 (S.D.N.Y. 2010).............................................................74

*Poindexter v. Merrill Lynch, Pierce, Fenner & Smith*,
    684 F. Supp. 478 (E.D. Mich. 1988)...............................................................30

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) .............................2, 19, 21, 22, 24, 28, 29, 30, 33, 65

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993)..............................................................................25

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009).............................................................................59

*Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    682 F.2d 459 (3d Cir. 1982) ...................................................................... 27-28

*Schwartz v. Bache & Co.*,
    340 F. Supp. 995 (S.D. Iowa 1972) ................................................................33

*SEC v. Ahmed*,
    308 F. Supp. 3d 628 (D. Conn. 2018) ............................................................72

*SEC v. Am. Growth Funding II, LLC*,
    2018 WL 1626148 (S.D.N.Y. Mar. 29, 2018) ................................................59

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012) .................................................................... 71-72

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ..........................................................................43

*SEC v. AT&T, Inc.*,
    2022 WL 4110466 (S.D.N.Y. Sept. 8, 2022) ............................................58, 60

*SEC v. Brigadoon Scotch Distrib. Co.*,
    480 F.2d 1047 (2d Cir. 1973) ........................................................................55

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ......................................................................................33

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ..........................................................................75

*SEC v. Energy Grp. of Am., Inc.*,
    459 F. Supp. 1234 (S.D.N.Y. 1978) ..........................................................24, 41

*SEC v. Friendly Power Co.*,
    49 F. Supp. 2d 1363 (S.D. Fla. 1999) ........................................................ 18-19

*SEC v. Grenda Grp., LLC*,
    2021 WL 1955330 (W.D.N.Y. May 17, 2021) ..............................................72

*SEC v. Hui Feng*,
    935 F.3d 721 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 1387 (2021) ................35

*SEC v. Infinity Grp. Co.*,
    212 F.3d 180 (3d Cir. 2000) ......................................................................24, 27

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..........................................25, 26, 27, 38, 55

*SEC v. Lauer*,
    52 F.3d 667 (7th Cir. 1995) ..........................................................................27

*SEC* v. *Mattessich*,
    523 F. Supp. 3d 624 (S.D.N.Y. 2021)................................................................61

*SEC v. Mudd*,
    2016 WL 815223 (S.D.N.Y. Feb. 29, 2016)....................................................72

*SEC v. NAC Found.*, *LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................... 31, 32, 38-39

*SEC v. Pac. W. Cap. Grp. Inc.*,
    2015 WL 9694808 (C.D. Cal. June 16, 2015) ..........................................39, 40

*SEC v. Scoville*,
    913 F.3d 1204 (10th Cir. 2019) .....................................................................35

*SEC v. SG Ltd.*,
    265 F.3d 42 (1st Cir. 2001)......................................................................24, 35

*SEC v. Shields*,
    744 F.3d 633 (10th Cir. 2014) .......................................................................35

*SEC v. Sloan*,
    436 U.S. 103 (1978)........................................................................................1

*SEC v. Tecumseh Holdings Corp.*,
    2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ................................................72

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020)....................................19, 27, 31, 32, 38

*SEC v. Tyler*,
    2002 WL 32538418 (N.D. Tex. Feb. 21, 2002)..............................................38

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)............................................................................. *passim*

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)............................................................72

*Shotto v. Laub*,
    635 F. Supp. 835 (D. Md. 1986) ...................................................................31

*Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    618 F. Supp. 436 (S.D.N.Y. 1985)................................................................28

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
    253 F. Supp. 359 (S.D.N.Y. 1966)................................................................33

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)..................................................................68

*Solis v. Latium Network, Inc.*,
    2018 WL 6445543 (D.N.J. Dec. 10, 2018) .........................................39

*State v. Evans*,
    191 N.W. 425 (Minn. 1922)...................................................................12

*Tomassi v. Nassau Cnty.*,
    2019 WL 1440898 (E.D.N.Y. Mar. 15, 2019), *report and recommendation
    adopted*, 2019 WL 1440154 (E.D.N.Y. Mar. 29, 2019)......................23

*Tremont Sec. Law, State Law, & Ins. Litig., In re*,
    2013 WL 5179064 (S.D.N.Y. Sept. 16, 2013), *aff'd, Elendow Fund, LLC
    v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014) ............................68

*Union Carbide Corp. v. Montell N.V.*,
    179 F.R.D. 425 (S.D.N.Y. 1998) ............................................................6

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975).........................................................................33, 43

*United States v. Bowdoin*,
    770 F. Supp. 2d 142 (D.D.C. 2011) ......................................................55

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ................................................................52

*United States v. Smith*,
    985 F. Supp. 2d 547 (S.D.N.Y. 2014), *aff'd sub nom. United States v.
    Halloran*, 664 F. App'x 23 (2d Cir. 2016)..........................................44

*United States v. Ward*,
    2001 WL 1160168 (E.D. Pa. Sept. 5, 2001) .........................................58

*United States v. Zaslavskiy*,
    2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) .....................................55

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) .........................................................44, 54, 58

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.*,
    373 F.3d 241 (2d Cir. 2004)...........................................................23, 59

*Wals v. Fox Hills Dev. Corp.*,
    24 F.3d 1016 (7th Cir. 1994) .......................................................23, 25, 28

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ...................................................................18, 41

*Wechsler* v. *Steinberg,*
    733 F.2d 1054 (2d Cir. 1984)...........................................................................58

*Woodward v. Terracor,*
    574 F.2d 1023 (10th Cir. 1978) .......................................................................37

## ADMINISTRATIVE DECISIONS

*American Diamond Co.,*
    1977 WL 10907 (SEC Aug. 15, 1977) .............................................................15

*Future Sys. Inc.,*
    1973 WL 9653 (SEC June 8, 1973) .................................................................15

*Munchee Inc., In re,*
    Release No. 10445, 2017 WL 10605969 (SEC Dec. 11, 2017).......................27

*The London Diamond Exch.,*
    1972 WL 8488 (SEC Oct. 3, 1972)..................................................................15

## CONSTITUTION, STATUTES, REGULATIONS, AND RULES

U.S. Const. art. III.............................................................................................27

Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq.* ......................................72

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* .............................................1, 4, 5, 43, 52, 59, 75

    § 2(a)(4), 15 U.S.C. § 77b(a)(4)...............................................................75

    § 2(a)(11), 15 U.S.C. § 77b(a)(11)............................................................75

    § 4(a)(1), 15 U.S.C. § 77d(a)(1)...............................................................75

    § 5, 15 U.S.C. § 77e...............................................................................59, 71

    § 15, 15 U.S.C. § 77*o*.................................................................................59

    § 15(b), 15 U.S.C. § 77*o*(b) ......................................................................59

Securities Exchange Act of 1934, 15 U.S.C. § 77a *et seq.* .........................................43

    15 U.S.C. § 78c(a)(10)..............................................................................43

    15 U.S.C. § 78e..........................................................................................47

31 C.F.R. § 1010.100(ff)(8)(ii)....................................................................................46

Fed. R. Civ. P. 37(e) ....................................................................................................66

S.D.N.Y. Loc. R. 56.1(a) ..............................................................................................6

**ADMINISTRATIVE MATERIAL**

Securities & Exch. Comm'n:

    *Framework for 'Investment Contract' Analysis of Digital Assets*
    (Apr. 3, 2019).......................................................................................................50

    *Investor Bulletin:  Initial Coin Offerings* (July 25, 2017), *available at*
    https://perma.cc/ELA6-XADE.............................................................................27

    *Rep. of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of*
    *1934:  The DAO*, Release No. 81207, 2017 WL 7184670 (SEC July 25,
    2017) ..............................................................................................................47, 48

    SEC Chairman Jay Clayton, Testimony on "Oversight of the U.S.
    Securities and Exchange Commission," U.S. House Comm. on Fin.
    Servs. (June 21, 2018), https://www.sec.gov/news/testimony/testimony-
    oversight-us-securities-and-exchange-commission .............................................49

U.S. Gov't Accountability Office, *Virtual Currencies Report* (May 2014),
    https://www.gao.gov/assets/gao-14-496.pdf.......................................................45

**OTHER MATERIALS**

*Black's Law Dictionary* (11th ed. 2019)...............................................................13, 23

*SEC Stays Silent On Bitcoin As Currency Attracts New Controversies*, GIGAOM
    (May 3, 2013), https://advance.lexis.com/api/permalink/52965985-fe91-
    4006-b5f0-ac15b9775b73/?context=1000516 ....................................................45

Tal Yellin, Dominic Aratari & Jose Pagliery, *What is bitcoin?*, CNN MONEY
    (Dec. 3, 2013), https://perma.cc/K3Z8-8KYW .................................................45

Todd Zerega & Tom Watterson, *Regulating Bitcoins:  CFTC vs. SEC?*,
    REED SMITH LLP (Dec. 31, 2013), https://perma.cc/M24T-FKCH..................45

## PRELIMINARY STATEMENT

"[A]n agency may not bootstrap itself into an area in which it has no jurisdiction." *SEC v. Sloan*, 436 U.S. 103, 119 (1978) (citation omitted).  In its Motion for Summary Judgment, the Securities and Exchange Commission ("SEC") is trying to do just that.  After nearly two years of pleadings, discovery, and motion practice, the SEC still has no viable legal theory to support its central claim that Ripple Labs Inc. ("Ripple"), Christian Larsen, and Bradley Garlinghouse ("Individual Defendants"; collectively "Defendants") had to register XRP as a security under the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77a *et seq.*[1]

As an initial matter, the SEC has yet to grapple with the fact that it is trying to prove that Defendants sold investment contracts without pointing to a single contract at issue.  *See, e.g.*, *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974) (explaining that the *Howey* test evaluates "whether a *contract* constitutes an investment contract within the Securities Act" (emphasis added)).  Nor does the SEC claim that the purchase of XRP creates any rights in the buyer or imposes any obligations on the seller of the sort that the Court in *Howey* called the "essential ingredients" of any investment contract.

The theories that the SEC does advance are insufficient to prove its case and are internally inconsistent from element to element of the *Howey* test.  For example, unable to contest that users of Ripple's On-Demand Liquidity ("ODL") product bought significant quantities of XRP with no investment purpose, the SEC argues (at 59-63) that the Court should

---

[1] This is true whether looking at XRP itself or at the specific manner in which Defendants offered and sold XRP.  The SEC has at varying times claimed both that XRP is, *per se*, an investment contract and that Defendants offered and sold it as *part of* an investment contract.  *Compare, e.g.*, ECF No. 46 ("Am. Compl.") ¶ 404 ("Ripple's offers and sales of XRP were *part of* the offer and sale of an investment contract" (emphasis added)) *with id.* ¶ 231 ("At all relevant times during the Offering, *XRP was an investment contract*" (emphasis added)).  After two years of litigation, the SEC's Motion still offers no clarity on its position.

ignore the expectations of ODL users and instead look at the expectations of the downstream purchasers who bought XRP from those ODL users.  Yet when it seeks to establish that XRP purchasers made an investment of money in a common enterprise, the SEC (at 50-53) ignores those downstream buyers, who indisputably did not pay anything to Defendants.  That and other inconsistencies in the SEC's case are not mere carelessness.  They show the SEC's inability to present an internally consistent theory on which it can prevail.

Even taking its arguments on their own terms, the SEC still fails to carry its burden to show that any element of the *Howey* test is met, let alone to show that no reasonable jury could disagree.  On the "investment of money" element, the SEC offers no argument, incorrectly claiming that there is no dispute.  But the evidence shows that many XRP recipients paid nothing for their XRP, and, where money was exchanged, the SEC makes no attempt to establish that the payment represented an "investment" rather than a simple purchase.

On the "common enterprise" element, the SEC offers no coherent explanation of what the supposed enterprise is.  It insists instead that XRP holders must be in a common enterprise because all XRP holders face the same market price.  In other words, the SEC asks this Court to rule that a "common interest" is enough to establish a "common enterprise."  But that is just another way of phrasing the broad vertical commonality test that the Second Circuit rejected in *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89 (2d Cir. 1994).  The holders of any commodity share a common interest in its price.  But merely buying diamonds does not put the buyer in a common enterprise with De Beers, and merely buying U.S. dollars does not put the buyer in a common enterprise with the U.S. Treasury Department.  Nor does the SEC's repeated claim that XRP purchasers viewed XRP as "an investment in Ripple's efforts" plug the gap: *Revak* also expressly rejected that theory.

On the "expectation of profits" element, the SEC bases its claim on what it admits (at 3) is a "sampling" of snippets (generally only a word or two:  "use," "ecosystem," "demand," "value," "stewards") taken out of context from tweets, press releases, and other materials over an eight-year period, misleadingly depicting one word from a 2014 tweet as part of the same statement as a word from a 2017 blog post.[2]  But even if Ripple "touted" its "stewards[hip]" of XRP, SEC Br. at 2-3, the SEC nowhere disputes that Ripple has no obligation, legal or otherwise, to use its efforts for the benefit of XRP purchasers.

The only basis the SEC has for suggesting otherwise is a statement from David Schwartz that Ripple is "legally obligated to maximize *shareholder* value."  SEC 56.1 ¶¶ 117, 200, 205 (emphasis added).[3]  But that is precisely the point.  Ripple's sole obligation was to maximize value for its equity shareholders; it had no obligation, legal or otherwise, to act for the benefit of XRP holders.  Schwartz said exactly that immediately before the statement the SEC trumpets in its brief.  56.1 Resp. ¶ 1625; Ex. 112 ("I think we've been pretty clear that we are not making any promises to manage XRP as a currency with any particular target value.  . . .  We absolutely make no promises or representations about the value of XRP to the world in general.").

---

[2] As one example:  over the span of two sentences (at 16-17), the SEC strings together six "quotations" of one to two words each, but omits that these quotations are completely unrelated, coming from documents in November 2013, two different dates in May 2014, September 2016, May 2017, and November 2017 (PX 44, PX 95, PX 96, PX 104, PX 508.26).

[3] Citations to "Defs.' 56.1" refer to Defendants' Local Rule 56.1 Statement filed in support of their Motion for Summary Judgment, ECF No. 623.  Citations to "SEC 56.1" refer to the SEC's Local Rule 56.1 Statement filed in support of its Motion for Summary Judgment, ECF No. 629.  Citations to "56.1 Resp." refer to Defendants' Response to the SEC's Local Rule 56.1 Statement submitted in connection with this brief.  Citations to "Defendants' Motion for Summary Judgment" or "Defs.' MSJ" refer to ECF No. 622.  Citations to the "SEC's Motion for Summary Judgment" or "SEC Br." refer to ECF No. 628.  Exhibits attached to Defendants' Local Rule 56.1 Statement (ECF No. 623) or to Defendants' Response to the SEC's Local Rule 56.1 Statement are identified as "Ex."  Exhibits previously filed by the SEC in connection with the SEC's Local Rule 56.1 Statement are identified as "PX."

To the extent the SEC's case turns – as it seems to assert – on what XRP holders believed they were purchasing when they acquired XRP, the SEC cannot be entitled to summary judgment. Even if sales of XRP could become securities offerings because purchasers viewed statements made by Ripple as commitments to make efforts (which they could not), then the SEC would still have to show that buyers (a) knew of those statements, (b) purchased after those statements were made, and (c) reasonably drew from those statements the inferences that the SEC asks this Court to draw. Those are all fact-bound questions that turn on credibility and context. Yet the SEC offers no substantial proof on those questions; its lengthy statement of facts says nothing about them, and its lengthier Rule 56.1 statement effectively ignores them.

The SEC clearly hopes, with its blizzard of factoids (many contested), to bury the absence of any "essential ingredients" of an investment contract recognized in the blue sky laws preceding the Securities Act and in *Howey* and its progeny since that time. A purchase of Exxon stock grants the holder certain rights and creates obligations on the part of Exxon. A purchase of oil from Exxon (even for investment purposes) does neither. The purchaser gains no right to share in Exxon's profits, and Exxon undertakes no obligation to try to increase the oil's value. Such a purchase bears none of the indicia of an "investment contract," even if it creates an "alignment of interests." SEC Br. at 15. The same is true of a purchase of XRP. It creates no rights in the purchaser and imposes no obligations on Ripple, even if the purchaser bought XRP to speculate. However much the SEC might wish Congress had vested it with a roving mandate to regulate "investments" whenever it considers "disclosure" desirable, Congress has not.

The SEC also seeks to apply its novel interpretation of the statute retroactively – to the year 2013 – in claiming that Defendants always had fair notice that they were required to register XRP as a security and that the Individual Defendants recklessly disregarded their legal duties by not requiring Ripple to register XRP. The SEC ignores the lack of any clear statutory or

precedential requirement to treat XRP as a security and the agency's own belated "guidance" on this issue, which injected such confusion as to deny persons of ordinary intelligence any "reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  There are genuine issues of material fact as to whether Defendants and ordinary observers could fairly have known what the SEC now claims was prohibited.  And for its claims against the Individual Defendants, the SEC cherry-picks facts to support allegations of knowledge or recklessness, a quintessential jury question.

The SEC's overreaching view of its regulatory authority disregards not only the substance of its mandate, but also the territorial restrictions on that mandate.  It is the SEC's clear burden to prove that Defendants' offers and sales of XRP constituted a *domestic* securities offering; foreign offerings fall outside the scope of the SEC's regulatory authority.  Yet despite asking for summary judgment on the full range of Defendants' offers and sales of XRP, the SEC says nothing about where those offers and sales occurred.  That omission is fatal.  An enormous number of Defendants' offers and sales – including the overwhelming majority of the Individual Defendants' offers and sales – occurred outside the United States.  Many occurred in countries that overtly recognize that sales of XRP and similar digital assets are *not* securities offerings.

Further highlighting the absence of any genuine claim by the SEC is its new assertion that the Individual Defendants are "issuers" because of their affiliation with Ripple.  As the SEC knows, that is not the law:  the Securities Act deems an "affiliate" to be an "issuer" only when it sells to an "underwriter," which the Individual Defendants did not.  The SEC's repeated disregard of the law – as to whether XRP was offered and sold as a "security," whether Defendants had fair notice of or recklessly disregarded their obligations, whether any transactions were domestic, and whether the Individual Defendants were "issuers" – confirms that the SEC cannot prevail under the correct legal standard.

5

## STATEMENT OF FACTS

The SEC's narrative of the launch of XRP and the XRP Ledger, and of Ripple's founding and subsequent development of innovative use cases for XRP and the XRP Ledger, is riddled with mistakes and omissions.  Defendants address them in full in our response to the SEC's 56.1 statement (though the SEC's 56.1 statement fails to comport with either the letter or the spirit of Local Rule 56.1, and the Court can and should disregard it on that basis).[4]  We focus here on the facts, both disputed and undisputed, that require denial of the SEC's Motion.

### A.     XRP and the XRP Ledger

1.     Defendants' Motion for Summary Judgment set forth the history of the XRP Ledger.  It was created by a collaboration principally among Arthur Britto, Jed McCaleb, and David Schwartz in late 2011 and 2012, with the aim to create a faster, more reliable, and cheaper alternative to the Bitcoin blockchain.  Defs.' 56.1 ¶¶ 11-12, 26; Ex. 1, D. Schwartz Tr. 23:16-24:7, 118:15-20.  The ledger launched in 2012, at which point its code automatically generated a fixed supply of 100 billion units of its native currency, XRP.  Defs.' 56.1 ¶¶ 13, 18; Ex. 2, D. Schwartz Decl. ¶ 6.

2.     The SEC incorrectly suggests (at 7) that the XRP Ledger did not work when it was launched and that XRP had only a "*de minimis*" use.  On the contrary, the ledger was fully operational at launch and before a single unit of XRP was given to Ripple.  Defs.' 56.1 ¶ 19; Ex. 2, D. Schwartz Decl. ¶ 4.  XRP plays a critical role in operating the ledger, which requires

---

[4] Far from a "short and concise statement" of "material" facts, Loc. R. 56.1(a), the SEC's 263-page statement contains more than 1,600 supposed facts based on nearly 1,000 exhibits, many of which the SEC's Motion does not even cite.  For the reasons explained in Defendants' Response to the SEC's Local Rule 56.1 Statement, the Court should disregard the portions of the SEC's statement that egregiously violate the applicable legal standards, if not its entirety. *See, e.g.*, *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 428 (S.D.N.Y. 1998) (striking 86-page 56.1 statement based on its "outrageous length").

the destruction of a small amount of XRP.  SEC 56.1 ¶ 19.  The amount destroyed is *de minimis*, but the "technical function" (SEC Br. at 7) – without which the ledger cannot work – is anything but.  Defs.' 56.1.  ¶¶ 14, 29; Ex. 1, D. Schwartz Tr. 35:16-36:19; Ex. 2, D. Schwartz Decl. ¶ 5.

## B.     The Founding and Commercial Activities of Ripple

**1.**      Defendants' Motion for Summary Judgment also surveyed (at 5-10 & n.5) the founding and business of Ripple.  Ripple was founded by Britto, McCaleb, and Larsen after the XRP Ledger and all units of XRP had been created.  The SEC incorrectly says Schwartz co-founded Ripple.  56.1 Resp. ¶ 8; Ex. 1, D. Schwartz Tr. 21:5-7.  Also, Ripple did not receive XRP immediately upon the ledger's launch.  All 100 billion units initially went to McCaleb, Britto, and Larsen; only later did they collectively give 80 billion of the extant 100 billion XRP to Ripple (retaining the balance among themselves).  Defs.' 56.1 ¶¶ 21-22; Ex. 2, D. Schwartz Decl. ¶¶ 6-7.  Ripple made no commitments in exchange for that XRP.  56.1 Resp. ¶ 1603; Ex. 1, D. Schwartz Tr. 275:17-21.

Ripple does not own the XRP Ledger.  The ledger is based on open-source software, and its code can be (and has been) changed over Ripple's objection.  Defs.' 56.1 ¶ 51; Ex. 2, D. Schwartz Decl. ¶ 9.  Ripple has, however, developed products that leverage the ledger's advantages over other blockchains.  In particular, Ripple long ago determined that the market for cross-border payments was ripe for disruptive innovation.  Defs.' 56.1 ¶ 35; Ex. 21, Beard Tr. 45:10-13.  Indeed, Larsen presented that vision to the SEC itself, along with other regulators, in 2013.  56.1 Resp. ¶¶ 1632-1633; Ex. 169, SJ Opp. Larsen Decl. ¶ 4.  Despite the market's extraordinary size (about $20 trillion), cross-border payments, burdened by outdated technology, have remained slow and expensive.  Defs.' 56.1 ¶¶ 36-40; Ex. 3, Osler Rep. ¶ 25.  Ripple endeavored to develop software that would address this difficulty using the speed and cost advantages of the XRP Ledger, and that work has paid off for both Ripple and its customers.

Ripple today offers a cross-border-payments product known as ODL, and more than $10 billion in ODL payments have been made to date.  Defs.' 56.1 ¶¶ 41-48; Ex. 20, Long Decl. ¶ 3.

    2.      Ripple raised capital to undertake these activities from private equity investors who received various classes of Ripple stock.  Defs.' 56.1 ¶ 34; Ex. 11, Ferrell Rep. ¶¶ 20-32 & Ex. 1.  In 2012, it issued millions of shares of common stock.  They entitle holders to dividends when and if declared by Ripple's Board.  56.1 Resp. ¶ 1608; Ex. 11, Ferrell Rep. ¶¶ 25-26.  Ripple has also issued convertible notes, preferred stock, and a warrant.  Each grants Ripple's counterparty certain rights against Ripple.  56.1 Resp. ¶ 1609; Ex. 11, Ferrell Rep. ¶¶ 27-32.

    XRP grants none of those rights.  56.1 Resp. ¶¶ 1610-1622; Ex. 23, SEC Answers to RFA Nos. 57-66, 69-75.  People who buy XRP have no recourse against Ripple merely by being XRP owners.  *Id*.  As the SEC admits (at 10), "XRP is just computer code"; it comes with no rights or obligations attached to it.  Unlike securities, XRP appears on Ripple's balance sheet as an intangible asset, not debt or equity.  56.1 Resp. ¶ 1623; Ex. 171, Easton Rep. ¶¶ 10, 88.

**C.    Ripple's Sales, Giveaways, and Payments of XRP**

    1.      This case is principally about the sales, giveaways, and other transfers of the 100 billion XRP created upon the ledger's launch.  As noted, 20 billion XRP never belonged to Ripple.  McCaleb, Britto, and Larsen kept those units of XRP and retained or disposed of them as and when they wished, and any proceeds of any XRP sales those individuals made were never held by Ripple or commingled in Ripple accounts with Ripple-owned assets.  Defs.' 56.1 ¶¶ 22-23; Ex. 2, D. Schwartz Decl. ¶ 7.

    Of Ripple's 80 billion XRP, Ripple has given away more than 500 million to early adopters and programmers, and it has donated more than 2 billion units to charity (and the Individual Defendants have donated billions more).  Defs.' 56.1 ¶¶ 92-94; Ex. 14, Larsen Decl. ¶ 5; Ex. 17, Garlinghouse Decl. ¶ 4.  Ripple has sold XRP to an untold number of counterparties

and under many different circumstances; it has also made purchases using XRP.  Defs.' 56.1

¶¶ 87, 105; Ex. 40, A. Schwartz Rep. ¶¶ 18-31.  Often, there was no contractual relationship at

all between Ripple (or the Individual Defendants) and the XRP recipients.  Defs.' 56.1 ¶¶ 92, 96;

Ex. 41, Yadav Rep. ¶ 77.  For those of Ripple's sales conducted pursuant to a contract, none of

those contracts obligated Ripple to undertake post-sale actions for the benefit of the XRP holder;

none of them granted a counterparty any post-sale right to make any demand of any kind on

Ripple; and none of them granted a counterparty any claim to any share of Ripple's revenues or

profits.  Defs.' 56.1 ¶¶ 117-118; Ex. 23, SEC Answers to RFA Nos. 57-72, 90.

There is no necessary economic relationship between Ripple's success and XRP's price.

Ripple can succeed or fail regardless of whether XRP purchasers' holdings are profitable or

unprofitable.  Defs.' 56.1 ¶¶ 119-123; Ex. 23, SEC Answers to RFA Nos. 31-34.  Indeed, the

SEC admits that the price of XRP can go up or down regardless of where Ripple directs its

business efforts.  Defs.' 56.1 ¶ 120; Ex. 23, SEC Answers to RFA Nos. 30-31.  And that is true

in practice:  Ripple's actions have had no discernible lasting effect on the price of XRP.  Defs.'

56.1 ¶ 123; Ex. 11, Ferrell Rep. ¶¶ 90-106.  Rather, its price changes can be explained entirely by

fluctuations in the digital currency market generally (that is, by changes in the price of other

digital currencies like bitcoin and ether).  Defs.' 56.1 ¶ 123; Ex. 11, Ferrell Rep. ¶¶ 90-106;

Ex. 23, SEC Answers to RFA Nos. 37-40 ("the price of digital assets, as an asset class, appears

to have affected the price of XRP").

Many XRP purchasers bought XRP not for investment use, but for other reasons,

including for use in ODL and for use as a form of payment for goods and services.  Defs.' 56.1

¶ 60; Ex. 3, Osler Rep. ¶ 13; 56.1 Resp. ¶¶ 1604-1605; Ex. 167, Purchaser Affs.  Many XRP

purchasers who bought XRP for investment purposes did not expect profits to come from Ripple,

but from market movements or other sources.  56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs.

**2.** As noted in Defendants' Motion for Summary Judgment, XRP often has been sold on exchanges, and thus anonymously: there is no relationship (contractual or otherwise) between the buyer and the seller. Defs.' 56.1 ¶ 96; Ex. 41, Yadav Rep. ¶ 77. These transactions are executed using exchange-specific custodial accounts (known as "wallets"): the exchange processes orders under its own rules, and the transaction settles instantly. Defs.' 56.1 ¶¶ 157-158; Ex. 41, Yadav Rep. ¶¶ 37, 64, 69.

Many of these exchanges' operations are based abroad. Defs.' 56.1 ¶¶ 171-267; Ex. 83, SEC Answers to RFA Nos. 1049-1334. Defendants have conducted sales through foreign exchanges via a foreign market-maker. Defs.' 56.1 ¶¶ 285, 289, 310; 56.1 Resp. ¶ 1624; Ex. 11, Ferrell Report ¶¶ 49-51; Ex. 41, Yadav Rep. ¶ 112. The SEC's Motion makes no effort to differentiate those sales from those conducted through domestic exchanges.

**D.    Ripple's "Touting" of XRP**

The SEC does not argue that Ripple's offers and sales of XRP created any rights in XRP holders to receive anything from Ripple or any obligations on Ripple to do anything for XRP holders. Instead, it cherry-picks excerpts from documents with many authors and from public statements of many speakers, made at many points across an eight-year period of time to many audiences. The resulting account of Ripple's putative "touting" of XRP as an "investment" – not Ripple's contracts – is the basis for the SEC's argument that Ripple sold XRP as an investment contract. The SEC's narrative is beset by errors and disputed throughout.

The SEC makes factual representations that are demonstrably wrong or incomplete. For one example, the SEC claims that David Schwartz made a "public statement" about demand for XRP, SEC 56.1 ¶ 70, but quotes language from Schwartz's non-public testimony during the SEC's investigation, 56.1 Resp. ¶ 70. For another, the SEC cites (at 13) a 2013 statement by Schwartz that Ripple was "legally obligated to maximize shareholder value" as support for the

claim that XRP purchasers expected to profit from Ripple's efforts, but ignores his clear statement in that same document that "[w]e absolutely make no promises or representations about the value of XRP to the world in general."  56.1 Resp. ¶ 117; Ex. 112.  Defendants' Response to the SEC's 56.1 statement points out many other errors and omissions.

Factual errors aside, the SEC cannot coherently connect, as it must, the specific statements it cites to specific XRP purchase-and-sale decisions made in reliance on those statements.  Again, the statements are uniform in neither content nor audience, ranging (*e.g.*, at 18-22) from internal talking points to blog posts about Ripple activities supporting XRP "use cases," to a public statement that Ripple was pursuing "liquid and robust markets" for XRP, to an interview by the company's then-CEO "that he believed in the 'potential appreciation' of XRP." *E.g.*, 56.1 Resp. ¶¶ 85, 448, 478.  The SEC makes no effort to identify any specific representations that any specific member of the public viewed reasonably (or even unreasonably) as proof that Ripple would undertake efforts from which the purchaser would profit, and that thus served as the basis for any specific purchase decision.  Indeed, it makes no effort to suggest that anyone who bought XRP even encountered any of these statements in the first place; and the evidence indicates that many XRP purchasers had never even heard of Ripple, much less encountered the statements the SEC describes.  56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs.

Most fundamentally, the SEC's scavenger hunt still did not turn up any promise Ripple ever made to undertake any activity to increase XRP's price for the benefit of XRP holders – which is why the SEC can point only to exaggerated examples of "touting" and not to actual commitments on which purchasers could reasonably rely.  On the contrary, as shown, Ripple unambiguously disclaimed that undertaking.  56.1 Resp. ¶ 1625; Ex. 172.  It is thus unsurprising that those who purchased XRP to trade it expected to profit from their own trading strategies – not Ripple's efforts.  56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs; Ex. 279, ▮▮▮ Decl.

## LEGAL STANDARD

On the SEC's Motion for Summary Judgment, "[i]t is the [SEC's] burden to show that no genuine factual dispute exists, and all reasonable inferences must be drawn in [Defendants'] favor." *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2d Cir. 2003) (citation omitted). "[S]ummary judgment must be denied" if the SEC has failed to muster evidence that supports every element of its claims, "for the non-movant is not required to rebut an insufficient showing." *Id*. If the SEC meets its initial burden of production, the Court must still deny the Motion once Defendants respond with evidence establishing a genuine factual dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).[5]

## ARGUMENT

## I.     THE SEC HAS FAILED TO PROVE THE ESSENTIAL INGREDIENTS OF INVESTMENT CONTRACTS

As Defendants set forth in their Motion for Summary Judgment (at 13-28), the Supreme Court explained more than 75 years ago in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), that the meaning of the statutory term "investment contract" was "crystallized" by a series of state cases interpreting state "blue sky" laws. *Id*. at 298. Every single blue sky case finding an investment contract had – and every such Supreme Court and Second Circuit case post-1933, including *Howey* itself, has also had – three "essential ingredients." *Id*. at 301.

*First*, the investment contract in every case involved a contract between a promoter and an investor that established the investor's rights as to an investment. *E.g.*, *State v. Evans*, 191 N.W. 425, 425-26 (Minn. 1922); Defs.' MSJ at 18-19 (collecting cases). *Second*, that contract

---

[5] Factual disputes about the SEC's theory of its case do not preclude a grant of summary judgment to Defendants, whose Motion relies on genuinely undisputed facts under a correct legal standard. *See Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (where parties cross-move for summary judgment, "each party's motion must be examined on its own merits").

imposed post-sale obligations on the promoter to take specific actions for the investor's benefit. *E.g.*, *McCormick v. Shively*, 267 Ill. App. 99, 101 (1932) (no investment contract without such obligations); Defs.' MSJ at 19-20 (collecting cases). *Third*, that contract granted the investor a right to share in profits from the promoter's efforts to generate a return on the use of investor funds. *E.g.*, *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (no investment contract when there were "no rights either in the capital or profits of the company"); Defs.' MSJ at 21 (collecting cases). The *Howey* test then determines whether those contracts establishing rights and obligations are *investment* contracts. *Glen-Arden*, 493 F.2d at 1034 (the *Howey* test evaluates "whether a *contract* constitutes an investment contract within the Securities Act" (emphasis added)). Without these three essential ingredients, *Howey*'s test for an "investment contract" cannot coherently be applied, because there are no contracts, rights, or obligations to analyze in the first place.[6]

The SEC is the movant and carries the burden of proof at trial. Accordingly, it bears the burden of demonstrating that there is no genuine dispute of fact on every required element. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). It has not even tried to do so, which is fatal to its Motion.

The SEC does not and cannot point to any facts, and certainly no undisputed facts, establishing even one of the "essential ingredients of an investment contract" that must be present for *Howey* to be applied coherently. *Howey*, 328 U.S. at 301. As a threshold matter, the SEC ignores that many of Defendants' sales, donations, giveaways, and purchases using XRP

---

[6] Even the SEC admits in its Amended Complaint that "[i]nvestment contracts are *instruments through which*" an investment is made. Am. Compl. ¶ 31 (emphasis added). As *Black's Law Dictionary* notes, an instrument is "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Black's Law Dictionary* 952 (11th ed. 2019). XRP is no such thing.

during the relevant period created no contractual relationship at all between Defendants and the XRP recipients.  Defs.' 56.1 ¶ 92; Ex. 20, Long Decl. ¶ 8.  Where contracts with Ripple did exist, those contracts imposed no post-transaction obligations on Ripple to take actions for XRP recipients' benefit and gave no rights to XRP recipients to demand and receive any future profits from Ripple or anyone else.  Defs.' 56.1 ¶¶ 99, 102, 117; Ex. 40, A. Schwartz Rep. ¶¶ 11, 33, 35 & Ex. D; Ex. 23, SEC Answers to RFA Nos. 57-65.  Perhaps for that reason, the SEC neither cites these contracts nor submits them for the Court's consideration.

This absence of contracts setting forth rights and obligations leaves a fatal gap in the SEC's case:  there is no set of contracts, rights, and obligations to which the Court can apply the *Howey* test to determine whether the rights and obligations transform those contracts into investment contracts.  To fill this gap, the SEC invents elements for the Court to consider that have no basis in *Howey*.  It alleges (at 2-3) that "Defendants' interests were 'aligned' with" those of XRP purchasers; that sales of XRP by Ripple and Larsen "funded the business"; and that Ripple announced its intention to "pursue a 'use'" for XRP that would increase demand for XRP.

As a simple hypothetical demonstrates, these alleged facts, even if true, do not add up to a security under *Howey*.  Suppose a company owns 55% of the world's supply of one of the rare earth metals.  Today, that metal has a few, modest applications in manufacturing processes, but the company believes that it could be used to create revolutionary new microchips.  Suppose further that the company sells blocks of that metal and uses the proceeds to support its efforts to develop those microchips.  Under the SEC's theory, the company's sales of the metal blocks – and, indeed, probably anyone else's sales of them – would be sales of a security.  Purchasers' interests are "aligned" with those of the company; sales of the metal blocks "funded the business"; and the company is committed to "pursue a 'use'" for the metal.

The SEC's theory is plainly wrong and not the law.  A simple sale of metal blocks with no "investment" in the company (*i.e.*, no rights in the purchasers or obligations on the part of the seller) could not possibly be a security.  The company makes no promises to the metal buyers; it would be free to get out of the microchip business immediately, and buyers would have no recourse.  Even if the company succeeds in its development efforts, the buyers have no claim against the company for any profits; all they have is the metal that they bought on a "fee simple" basis and the hope that they can sell it on the open market for a profit.  *Cf. Howey*, 328 U.S. at 299 (security requires "something more than fee simple interests"); *see also* 56.1 Resp. ¶ 1669; Ex. 152 (SEC's Office of General Counsel recognizing, during discussions about how to apply *Howey* to digital assets:  "███████████████████████████████████████ ████████████████████████████████████████").

The SEC's own past guidance expressly provided that assets sold without accompanying future promises – even when marketed as "investment[s]" – are not securities.  *See*, *e.g.*, *American Diamond Co.*, 1977 WL 10907, at *4-5 (SEC Aug. 15, 1977) (taking no action where seller intended to advertise "the value of diamonds as an investment," but was "not contractually bound to provide any further services to the Buyer" after the transaction); *The London Diamond Exch.*, 1972 WL 8488, at *2-3 (SEC Oct. 3, 1972); *Future Sys. Inc.*, 1973 WL 9653, at *3 (SEC June 8, 1973).  It makes no attempt to explain its reversal in position.

Congress has not delegated to the SEC roving authority to convert the sale of all types of assets (even speculative ones) into sales of securities.  The SEC has recognized that limitation in prior "no action" letters.  Defs.' MSJ at 27 & n.16.  It also has recognized it internally in discussions about how to regulate digital assets.  56.1 Resp. ¶ 155 ("████████████████████████ ██████████████████████████████████████████████████████████ ████████████").  Congress used specific words ("investment contract") with a specific, well-

established meaning, and which conveys that a simple sale of assets does not qualify as a security and that something more – an ongoing relationship between the issuer and holder – is needed. The absence of any such relationship here is dispositive. If Congress wishes to broaden the SEC's authority to reach simple sales of digital assets, it can do so; but the SEC cannot unilaterally seize that authority, and the Court should not endorse the agency's attempt to do so.

## II.   THE SEC CANNOT SATISFY THE *HOWEY* TEST

The *Howey* test was never intended to apply to assets, like XRP, lacking the essential ingredients *Howey* described. The SEC's efforts to apply the *Howey* elements to XRP confirm this. The agency cannot, and does not attempt to, satisfy each element of the *Howey* test with respect to any particular transaction or category of transactions. Instead, it mixes and matches different categories of Defendants' transactions – over the entire eight-year period at issue – with different *Howey* elements. For example, it points principally to the expectations of purchasers on the secondary market on the "expectation of profits" element, but it ignores that those purchasers made no payment of money to (much less an "investment" in) Defendants that could satisfy the "investment of money" element. In other places, the SEC invents new elements such as that "investors reasonably expected to profit" from their XRP purchases, and then argues that its own made-up factors are satisfied – even though a mere expectation of profit is not recognized by the Second Circuit as a *Howey* element and fails to distinguish a security from other types of investments. *See infra* pp. 32-34.

The SEC's mix-and-match approach leaves the agency with a failure of proof:  when applying the *Howey* test, "*[e]ach transaction* must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole." *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) (emphasis added); *accord Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 232

(2d Cir. 1985); *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (en banc) (panel opinion misstated the law in concluding that all condominium sales were investment contracts as long as some sales were; "[s]uch a per se rule would be ill-suited to the examination of the economic reality of each transaction required by *Howey*").  The SEC cannot satisfy some *Howey* elements with one type of transaction and other elements with another.  It must apply the *Howey* test to each transaction at issue.  If the SEC wants to look to secondary market purchasers to establish an "expectation of profits," it must look to those same purchasers to establish an "investment of money" and a "common enterprise"; but those purchasers invested no money with Defendants and did not engage in a common enterprise with Defendants.  Similarly, if the SEC wants to look to direct recipients of XRP from Defendants, it must consider those direct recipients who paid nothing for their XRP and thus made no "investment of money."  The SEC does not even attempt to carry its burden of showing even one transaction that meets all of the *Howey* elements.

In any event, its evidence still falls far short of establishing the absence of a genuine dispute of material fact as to any (much less all) of the *Howey* elements.

## A.      The SEC Has Failed To Prove an Investment of Money

The SEC attempts to dispose of the first *Howey* element in a single sentence, claiming (at 49) that "Defendants do not dispute that they offered and sold XRP in exchange for 'money.'" That is incorrect.  Defendants contend that the SEC has failed to carry its burden on *Howey*'s first element for three reasons.

*First*, it is undisputed that, in many instances, Defendants did *not* offer and sell XRP for money.[7]  As the SEC itself has admitted, Ripple gave away significant amounts of XRP for free

---

[7] It is undisputed that Defendants *sometimes* received money for XRP.  SEC Br. at 49. But the SEC argues (*e.g.*, at 2) that *every* offer or sale of XRP over an eight-year period was the offer or sale of an investment contract.  As explained above, it is the SEC's burden to prove that all *Howey* elements are met for each transaction for which it seeks to establish liability.

to early adopters and programmers.  Defs.' 56.1 ¶ 92; Ex. 23, SEC Answer to RFA No. 56.

Defendants have also collectively donated more than 4 billion XRP to charity.  Defs.' 56.1 ¶ 93;

Ex. 20, Long Decl. ¶ 9; Ex. 14, Larsen Decl. ¶ 5; Ex. 17, Garlinghouse Decl. ¶ 4.  Distributions

for no consideration do not involve an investor "giv[ing] up a *specific consideration* in return for

a *separable financial interest* with the characteristics of a security."  *Int'l Bhd. of Teamsters v.*

*Daniel*, 439 U.S. 551, 559-60 (1979) (emphases added).

     *Second*, the SEC attempts (*e.g.*, at 57) to build its case around the expectations of

"ultimate[ ]" XRP purchasers in the secondary market.  But most secondary market purchasers

made no investment of money in or with Ripple (or any other Defendant).  It is undisputed that

Ripple's sales of XRP represented less than 1% of the overall market since at least 2017.  Defs.'

56.1 ¶¶ 77, 82; Ex. 11, Ferrell Rep. ¶ 143.  For virtually all XRP purchasers on the secondary

market, any money they paid for XRP thus went to someone other than Defendants.  As a matter

of law, that does not satisfy *Howey*'s "investment of money" element, which "requires that the

investor commit his assets *to the enterprise*."  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir.

2009) (internal quotation marks omitted, emphasis added).  None of these XRP recipients

committed assets to an enterprise that Defendants allegedly operated and managed.  They were

strangers purchasing XRP from other strangers.  Many were unaware of Ripple's existence or

did not care whether XRP originated from Ripple.  56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs.

     *Third*, even for sales of XRP in which a buyer paid money (rather than receiving XRP for

free) and paid it to one of the Defendants (rather than to someone else on the secondary market),

the SEC still cannot satisfy the first *Howey* element.  That is because *Howey* requires an

"*investment* of money," 328 U.S. at 301 (emphasis added), not merely payment of money.  *See*,

*e.g.*, *Warfield*, 569 F.3d at 1021 ("'investment of money' prong . . . requires that the investor . . .

subject himself to [a risk of] financial loss") (internal quotation marks omitted); *SEC v. Friendly*

*Power Co.*, 49 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999) (same).  If mere payment were sufficient to satisfy the first *Howey* element, then that element would have no meaningful effect; it would be satisfied not just for people buying investment contracts in orange groves, but for people who bought oranges at the supermarket.

The evidence shows, at the very least, a fact dispute as to whether buyers made an "investment of money."  Much undisputed evidence suggests they did not.  The SEC concedes (at 30-31), for instance, that ODL users who bought XRP from Ripple did so with an intent to "swift[ly]" convert that XRP into a fiat currency – not to invest in any common enterprise, and certainly not to take on a risk of investment loss.  Other evidence confirms that many XRP purchasers, including ODL users, could and did buy XRP for consumptive use rather than as an investment.  Defs.' 56.1 ¶ 60; Ex. 3, Osler Rep. ¶ 13; 56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs. As a matter of law, that was not an investment of money under *Howey*.[8]  The SEC not only fails to offer *undisputed* evidence distinguishing between consumptive use, speculation generally in digital assets, and any alleged investment purposes; it offers no evidence whatsoever on this element of the *Howey* test.  That failure of proof alone precludes summary judgment.

### B.    The SEC Cannot Prove a Common Enterprise

The SEC also fails to show that XRP holders joined in a "common enterprise."  *See Revak*, 18 F.3d at 89 (plaintiffs' claims failed where there was "no common enterprise within

---

[8] The SEC relies exclusively (at 49) on *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020), to suggest that mere payment of money is sufficient under *Howey*.  But *Telegram* never reached that question because the defendant "d[id] not dispute that there was an investment of money."  *Id*. at 369.  And *Telegram*'s facts show why:  a group of "Initial Purchasers" invested money into a common enterprise to develop a blockchain to allow "*future* delivery" of tokens (rather than simply paying to receive an asset immediately); they did so pursuant to a private placement agreement that all parties conceded was a securities offering; and the purchasers risked investment losses because any receipt of Grams was contingent on whether Telegram could successfully build a blockchain.  *Id*. at 368-69 (emphasis added).

the meaning of *Howey*").  "In the absence of a 'common enterprise' between the parties, [a

purchaser's] expectation of a profit on resale is insufficient to transform what is essentially a

sale of . . . property into the sale of an investment contract."  *Davis v. Rio Rancho Estates, Inc.*,

401 F. Supp. 1045, 1050 (S.D.N.Y. 1975).

More than four years after the SEC began its investigation, and almost two years after

filing this lawsuit, the SEC still has not decided what the common enterprise is:  its definition of

the "common enterprise" has shifted throughout the litigation and changes even within its current

brief.  The SEC began with a theory that Ripple itself was the common enterprise in which XRP

holders acquired an interest.  *See, e.g.*, Am. Compl. ¶ 295 ("Ripple would sell XRP to raise funds

for one common enterprise:  to fund its operations").  That cannot work because it is undisputed

that XRP holders had no interest in Ripple and Ripple owed XRP holders nothing.  Ex. 23, SEC

Answers to RFA Nos. 57-72, 90.  Accordingly, in discovery, the SEC (and its putative expert)

pivoted, pointing instead to an amorphous "XRP 'ecosystem'" as the supposed common

enterprise.  Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 41; Ex. 104, ████ Rep.

¶ 8 n.3 (defining the "ecosystem" as "all the software, people, and organizations who are

involved with a blockchain project, such as retail investors, institutional investors, miners,

software developers, software products, companies, merchants, trading platforms and market

makers").  That also makes no sense; not only is that collection of people and objects not an

enterprise under any reasonable definition of the term, but it also is not something in which XRP

holders own any interest.  Defs.' MSJ at 41-44.

Now, in its Motion, the SEC says variously (at 2, 39, 41) that XRP purchasers entered

into a vague "common enterprise with other XRP holders and with Ripple" (leaving out the

Individual Defendants); (at 50) that the enterprise was actually with "other XRP investors and

with Defendants" (including the individuals this time, but without explaining how this could

possibly be the case during the years before Defendant Garlinghouse joined Ripple, and when he

owned no XRP at all); and (at 17, 63) that XRP itself was the common enterprise.  It also says

(at 3-4) that Ripple alone was "the creator, architect, developer, builder, and caretaker" of the

(still undefined) enterprise.  That assertion is demonstrably incorrect whether the "enterprise" is

XRP itself, because XRP was created before Ripple even existed, or the "enterprise" is a broader

"ecosystem" surrounding XRP, because the "ecosystem" includes independent actors that Ripple

does not and cannot control.  Defs.' 56.1 ¶ 32; Ex. 2, D. Schwartz Decl. ¶ 8.  The SEC also equates

(at 15, 52) an "alignment" of interests with a common enterprise.  And it argues throughout (at

11, 18-20, 26, 39, 42, 68), in direct contravention of *Revak*, that the enterprise is an "investment

in Ripple's efforts."  The SEC's contradictory claims about the supposed common enterprise

confirm that it has no cogent factual claim to bring to trial.[9]

### 1.   The SEC's Shifting Common-Enterprise Theories All Fail as a Matter of Law Because They Amount to Broad Vertical Commonality

Under any of its formulations, the SEC's common-enterprise theory is foreclosed by

*Revak*, which held that a common enterprise cannot be established by a "mere showing that the

fortunes of investors are tied to the efforts of the promoter" – that is, broad vertical commonality.

18 F.3d at 88; *see id*. ("We do not interpret the *Howey* test to be so easily satisfied.").  Yet that is

just what the SEC argues throughout its brief.  *See*, *e.g.*, SEC Br. at 11 ("Ripple offered XRP as

an investment in Ripple's . . . efforts and expertise"); *id*. at 18 ("Defendants . . . marketed XRP

as an investment in Ripple's efforts"); *id*. at 20 ("Defendants invited investors to speculate [in]

Ripple's efforts"); *id*. at 26 (arguing that market participants "voiced their views that buying

---

[9] Defendants' Motion already demonstrated (at 38-44) that the undisputed facts entitle Defendants to summary judgment due to the absence of a legally sufficient common enterprise that Defendants "manage, control and operate."  *Howey*, 328 U.S. at 300.  Defendants incorporate by reference those arguments, which are sufficient to defeat the SEC's Motion.  We further address in this brief the specific arguments the SEC raises in its Motion.

XRP was an investment in the XRP whose value would be driven by Ripple's efforts"); *id*. at 39 ("XRP was being offered and sold as an investment in Ripple's efforts"); *id*. at 42 (same); *id*. at 68 (Defendants "promoted XRP as an investment in Ripple's efforts"). *Revak* precludes any argument that an investment in efforts can satisfy the common-enterprise element of *Howey*. That alone forecloses the SEC's Motion.

### 2.     The SEC Cannot Show Horizontal Commonality

#### a.     The SEC Has Not Demonstrated the Requisite Sharing or Pooling of Funds

Leaving aside the SEC's disregard for *Revak*, the facts it presents are insufficient to show horizontal commonality – the only approach the Second Circuit has endorsed. The SEC (at 50-51) rests its argument for horizontal commonality exclusively on two allegedly undisputed facts: (1) XRP is fungible, thus "[t]he market price increases or decreases for all units of XRP together and equally"; and (2) "Ripple did not segregate the funds it received from different XRP sales," which the SEC contends means Ripple "pooled the funds it received from XRP sales and deployed them to further the enterprise" (whatever "the enterprise" might mean, *see supra* pp. 20-21). That argument is insufficient for multiple reasons.

*First*, and most significantly, the SEC has an abject failure of proof on its factual assertions (at 51) that "Ripple did not segregate the funds it received from different XRP sales," "pooled the funds it received from XRP sales[,] and deployed them to further the enterprise." Those assertions are accompanied by no citation to the SEC's Rule 56.1 statement. Nor does the SEC try to prove those facts anywhere in the more than 1,600 paragraphs of that statement. Even if the SEC's legal theory were viable (it is not), it has no evidence to prove that legal theory. That is fatal to its Motion. *See Boelter v. Hearst Commc'ns, Inc*., 269 F. Supp. 3d 172, 203 (S.D.N.Y. 2017) (Torres, J.) (declining to grant summary judgment where plaintiff

"consistently argue[d]" that an event took place in a particular time period, but the "date range [wa]s not supported by any of the evidence cited by Plaintiff").[10]

Nor could the SEC prove its assertions about Ripple's treatment of sale proceeds, even if it had tried.  Ripple did not pool its funds from XRP sales.  It sold XRP through distinct subsidiaries with distinct bank accounts and distinct business efforts.  56.1 Resp. ¶ 1626; Ex. 170, Campbell Decl. ¶ 4.  And Larsen and Garlinghouse never intermingled the proceeds from their individual XRP sales with Ripple's corporate accounts.  Defs.' 56.1 ¶¶ 291, 305; Ex. 17, Garlinghouse Decl. ¶ 3; Ex. 14, Larsen Decl. ¶ 4.

*Second*, even if the SEC could somehow substantiate its assertion that Ripple intermingled funds, that would not be enough.  For horizontal commonality to be present, the investor's "stake" must represent an "undivided" interest in a shared pool of assets,[11] from which the promoter conducts the operations of a common enterprise and distributes profits to investors. *See, e.g.*, *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994); *Howey*, 328 U.S. at 296-97 & n.3, 299-300 ("land sales contracts and warranty deeds" that "evidenced" investors' "shares in th[e] enterprise" were de facto sales of "undivided interest[s]" in a "large citrus fruit enterprise," and investors did not own any specific oranges); *Hocking*, 885 F.2d at 1459

---

[10] *See also Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied *even if no opposing evidentiary matter is presented*." (internal quotation marks omitted)); *Tomassi v. Nassau Cnty.*, 2019 WL 1440898, at *8 (E.D.N.Y. Mar. 15, 2019) ("summary judgment . . . is inappropriate" where, "[i]n conclusory fashion, Defendants asserts [facts]" in support of their motion, but "Defendants' Rule 56.1 Statement is devoid of any mention of the pertinent [facts]"), *report and recommendation adopted*, 2019 WL 1440154 (E.D.N.Y. Mar. 29, 2019).

[11] An "undivided interest" is "[a]n interest held under the same title by two or more persons."  *Black's Law Dictionary* 800, 969 (11th ed. 2019).

(horizontal commonality requires investors to "give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise").[12]

No such undivided interests were present here, Defs.' 56.1 ¶¶ 117-118; Ex. 23, SEC Answers to RFA Nos. 57-72, 90, and the SEC does not argue otherwise. It follows that there is no horizontal commonality. In *Revak*, for example, the Second Circuit found "simply no indicia of horizontal commonality" because investors retained no interests in a shared pool of assets – "[t]he rents and expenses attributable to each unit were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner." 18 F.3d at 88.[13] There are likewise no such indicia here.

---

[12] The SEC cites (at 50) two out-of-circuit cases, *SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001), and *SEC v. Infinity Group Co.*, 212 F.3d 180 (3d Cir. 2000), to suggest that undivided interests are not required. The SEC is wrong. In *SG Ltd.*, investors "share[d] income derived from [SG's] website operations on a pro rata basis." 265 F.3d at 53 n.6. This, coupled with the facts that "participants' funds were pooled; that participants were told of their entitlement to support from this monetary pool; and that they collectively stood to gain or lose (depending on whether they received the guaranteed return on their shares)[,] . . . boost[ed] the SEC across the legal threshold for horizontal commonality." *Id*. In *Infinity Group*, the promoter pooled "participant contributions to create highly-leveraged investment power that would yield high rates of return while protecting the investors' principal contributions" and "the return on investment was to be apportioned according to the amounts committed by the investor." 212 F.3d at 187-88.

[13] *See also Deckebach v. La Vida Charters, Inc. of Fla.*, 867 F.2d 278, 283 (6th Cir. 1989) (affirming summary judgment where "purchase/management arrangement was not demonstrated by plaintiffs to rise to the level of a contribution or pooling of venture capital by a number of investors for a common and joint enterprise"); *Cooper v. King*, 1997 WL 243424, at *2 (6th Cir. May 9, 1997) (per curiam) (judgment noted at 114 F.3d 1186) (no horizontal commonality where "Plaintiffs did not acquire or own the phones in common with other investors" or "have an interest in the profit generated from all of the installed phones"); *Marini v. Adamo*, 812 F. Supp. 2d 243, 258-59 (E.D.N.Y. 2011) (horizontal commonality absent because "[the promoter] was not offering [rare coin purchaser] the opportunity to contribute funds and *share* in the profits of a coin portfolio that would be managed by [the promoter]" and there was "no allegation here that plaintiffs were investing with others and sharing in profits"); *SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1240 (S.D.N.Y. 1978) (finding no common enterprise where purchasers "do not contribute capital to any enterprise with the intention of sharing in its profits and earnings[;] they merely pay a fee for which certain services are provided in return").

The SEC attempts (at 51) to save its case by arguing that all it must show is that Ripple pooled the funds from its sales of XRP in its own bank accounts.  The SEC has not even shown that as a factual matter, but that argument also misunderstands the law regarding the pooling requirement, which is intended to assess whether the putative "investment contract" represents an interest equivalent to a stock purchase in "a profit-seeking business venture."  *Howey*, 328 U.S. at 300; *see also Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11-12 (1st Cir. 1993) ("what was purchased in this case was not a share of a business enterprise"; "there is no preten[s]e of a 'common enterprise' managed by the promoter and hence 'no security'"); *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 543 (7th Cir. 1989) ("Unusual interests such as rights in orange groves still may be 'securities' if they represent a pro rata share of a variable pool of earnings").  That is why investors must retain participatory interests in a shared pool for horizontal commonality to be present – a security (like a share of stock) is "an undivided interest in an enterprise, entitling the owner to a pro rata share in the enterprise's profits."  *Wals*, 24 F.3d at 1018.  The SEC cannot point to any such interests here.

### b.   The SEC Also Has Failed To Demonstrate Other Necessary Requirements for Horizontal Commonality

**i.**   Horizontal commonality also requires an ongoing contractual obligation to purchasers.  Defs.' MSJ at 19-23 (identifying authorities).  It is undisputed that no such obligation exists here.  Defs.' 56.1 ¶¶ 99, 101-104, 107-109, 112-114, 117-118; Ex. 40, A. Schwartz Rep. ¶¶ 11, 29-30, 33, 35, 42.

The SEC argues (at 50) that "[a]n 'ongoing contractual obligation' to the purchasers" is not necessary to establish horizontal commonality, citing *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020), exclusively.  *Kik* does not support the SEC's contention that a common enterprise can exist when there is no ongoing obligation at all (contractual or

otherwise).  The SEC also fails to acknowledge *Kik*'s statement that "[t]he contractual language is important to . . . the common enterprise inquiry."  *Id*. at 178.  If contract terms are "important" to the common-enterprise inquiry, then there is at least a fact dispute on the common-enterprise element because this "important" evidence uniformly favors Defendants in demonstrating the absence of any common enterprise.

In any event, *Kik*'s assertion that "an ongoing contractual obligation is not a necessary requirement for a finding of a common enterprise," *id*., finds no support in the two cases it cites for that proposition:  *Davis v. Rio Rancho Estates, Inc*., 401 F. Supp. 1045 (S.D.N.Y. 1975), and *Hart v. Pulte Homes of Michigan Corp*., 735 F.2d 1001 (6th Cir. 1984).  To the contrary, those courts found there was *no* common enterprise and reached that conclusion, based in part, on the absence of ongoing contractual obligations.  *See Davis*, 401 F. Supp. at 1050 ("Defendants did not promise to run the development and distribute profits to the plaintiff, as did the operators of the orange groves in Howey.  There was no management contract between plaintiff and defendants, nor were defendants obligated by the Purchase Agreement to perform any such services."); *Hart*, 735 F.2d at 1004 (horizontal commonality absent because, "[e]ven assuming that individual purchasers were assured of development, nothing in the pleadings suggests that the fortunes of individual purchasers were 'inextricably intertwined' by contractual or financial arrangements").

The same result should follow here.  Not only can Defendants proffer facts showing that they owed no ongoing obligation (contractual or otherwise) to XRP holders, but those facts are undisputed.  *See supra* p. 25 (citing Ex. 40, A. Schwartz Rep. ¶¶ 11, 29-30, 33, 35, 42).  Moreover, unlike in *Kik* – where no blockchain existed yet and the promoter undertook to create one – the XRP Ledger was operational before a single unit of XRP was ever sold or given away.  Defs.' 56.1 ¶¶ 19-20; Ex. 2, D. Schwartz Decl. ¶¶ 4, 6.  And Ripple was under no obligation

(unlike the promoter in *Kik*) to expend funds it received from its sales of XRP for the benefit of XRP purchasers.  The facts of *Kik* make it inapposite here.

**ii.**     The SEC is likewise wrong in claiming (at 50) that "pro rata distribution of profits from the enterprise" is not necessary to prove horizontal commonality, citing only to a footnote in *Telegram*.  *See* 448 F. Supp. 3d at 369 & n.8.  *Telegram*, too, is inapposite, for the reasons described *supra* note 8.  But, in any event, *Telegram*'s sole basis for that statement was *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019), which in turn relied entirely on a non-binding SEC administrative proceeding, *In re Munchee Inc.*, Release No. 10445, 2017 WL 10605969 (SEC Dec. 11, 2017).  *See Balestra*, 380 F. Supp. 3d at 354 n.12 (noting that *Munchee* is "not binding precedent").  *Munchee* itself contains no meaningful analysis of the issue.  *See* 2017 WL 10605969, at *6-8.  So the SEC's position is in essence that, because other courts have accepted the agency's *ipse dixit* without analysis, this Court should do so as well.

Outside of that short line of court decisions (all addressing Initial Coin Offerings)[14] relying on a non-binding administrative order from the SEC, no court has found horizontal commonality present absent some distribution of profits (or other payment) from the promoter to the investor.  Many cases from Article III courts have expressly held that a distribution of profits *is* required.  *See*, *e.g.*, *Infinity Grp.*, 212 F.3d at 187 n.8 ("'Horizontal commonality' . . . requir[es] a pooling of investors' contributions *and* distribution of profits and losses on a pro-rata basis." (emphasis added)); *SEC v. Lauer*, 52 F.3d 667 (7th Cir. 1995)); *accord Hocking*, 885 F.2d at 1459; *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459, 460 (3d Cir.

---

[14] An Initial Coin Offering ("ICO") is a pre-sale of digital assets in which the seller "tell[s] purchasers that the capital raised from the sales will be used to fund development of a digital platform."  SEC, *Investor Bulletin:  Initial Coin Offerings* (July 25, 2017), *available at* https://perma.cc/ELA6-XADE.  In contrast, the XRP Ledger was fully functional at all relevant times, Defendants never pre-sold XRP, and Defendants never held any ICO.  *E.g.*, Defs.' 56.1 ¶ 20; Ex. 2, D. Schwartz Decl. ¶ 6.

1982).  It is undisputed that there was no pro rata distribution of profits here and no right to
receive any profits from Ripple or anyone else.  Defs.' 56.1 ¶¶ 117-118.  For that reason as well,
the SEC cannot prevail on summary judgment – or at all.

  **iii.**  Finally, the SEC emphasizes (at 51) that the price of XRP was the same for all
XRP holders, and it claims (at 50) that "an investor's ability to exit the common enterprise at the
time of her choosing while others remain invested does not defeat horizontal commonality."
Courts have been clear, however, that, to establish horizontal commonality, the "success or
failure" of each investor in the enterprise must have a "'direct impact'" on the success or failure
of each other investor.  *E.g.*, *Revak*, 18 F.3d at 87 (quoting *Milnarik v. M-S Commodities, Inc.*,
457 F.2d 274, 276 (7th Cir. 1972)); *Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
618 F. Supp. 436, 438-39 (S.D.N.Y. 1985) (noting "the success or failure of the other investments
have a direct impact on the profitability of the plaintiff investor's account"); *see also Wals*, 24
F.3d at 1018 (horizontal commonality requires "a wheel and not just a hub and a spoke"); *Hart*,
735 F.2d at 1005 ("[P]laintiffs here, in purchasing these model homes, were not investing in a
'common enterprise' because their investment of funds and the risk they undertook were not
linked each with the other.").

  The SEC does not and cannot argue that individual XRP purchasers' returns are tied to
and have a direct impact on the returns of other XRP purchasers.  Indeed, the undisputed evidence
is that Ripple can succeed or fail regardless of whether XRP purchasers' holdings are profitable
or unprofitable – even though Ripple itself holds more XRP than anyone else.  Defs.' 56.1
¶¶ 119-123; Ex. 23, SEC Answers to RFA Nos. 31-34.  This too is fatal to the SEC's Motion.
Under the SEC's theory, each XRP purchaser's alleged common interest in the price of XRP is
what links them with Ripple, not some financial or contractual arrangement.  Yet that is the
hallmark of broad vertical commonality, which *Revak* rejected.  18 F.3d at 88; *see also Milnarik*,

457 F.2d at 276-77 (horizontal commonality absent despite brokerage customers having similar investment structures, because disparate customers made no unified investment decisions).

### 3.    The SEC Cannot Show Strict Vertical Commonality

The SEC incorrectly claims (at 50) that a common enterprise may be established in the Second Circuit "*either* by showing 'horizontal commonalty' *or* 'strict vertical commonality'" (citations omitted).  To the contrary, horizontal commonality is the only common-enterprise test the Second Circuit has adopted.  *See Revak*, 18 F.3d at 88.  Most circuit courts that have considered strict vertical commonality have rejected it or expressed doubts because the theory is inconsistent with *Howey*; the Second Circuit in particular has never adopted strict vertical commonality; and this Court should not either.  Defs.' MSJ at 47-49.

Even if strict vertical commonality were sufficient, the SEC cannot establish it.  Strict vertical commonality requires a "'one-to-one relationship between the investor and investment manager' such that there is 'an *interdependence* of *both profits and losses* of the investment.'" *Marini*, 812 F. Supp. 2d at 256 (quoting *Kaplan v. Shapiro*, 655 F. Supp. 336, 341 (S.D.N.Y. 1987)) (first emphasis added; second emphasis in *Kaplan*).  That direct one-to-one, interdependent relationship is critical:  if the alleged issuer can profit even when the investor suffers a loss (or vice versa), there is no strict vertical commonality.  *See*, *e.g.*, *Lenczycki v. Shearson Lehman Hutton, Inc.*, 1990 WL 151137, at *5 (S.D.N.Y. Sept. 29, 1990) ("It is the interdependence between the broker and the customer that is necessary to establish sufficient commonality to warrant a finding of an investment contract"); *accord Kaplan*, 655 F. Supp. at 341; *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011); *Heine v.*

*Colton, Hartnick, Yamin & Sheresky*, 786 F. Supp. 360, 370 (S.D.N.Y. 1992); *Dooner v. NMI Ltd.*, 725 F. Supp. 153, 158 (S.D.N.Y. 1989).[15]

This rule of law is fatal to the SEC's claim of strict vertical commonality. As explained above, XRP holders can experience losses on their XRP holdings even when Ripple has positive income, and Ripple's equity can increase in value even as XRP decreases in price. Defs.' 56.1 ¶¶ 119, 122; Ex. 23, SEC Answers to RFA Nos. 32-33. The opposite is also true: Ripple can experience losses or decreases in its equity value while XRP increases in price and XRP holders experience profits. Defs.' 56.1 ¶¶ 120-121; Ex. 23, SEC Answers to RFA Nos. 31, 34.

The SEC attempts (at 52) to avoid that conclusion by arguing that "the success of XRP affects the fortunes of Ripple, its executives, and XRP investors," because "[a]n increase in the price of XRP would benefit all of them" and "price decline would be detrimental for all." That is merely an assertion that Defendants have an interest in an asset they own and that interest is aligned with other XRP holders.[16] But, as a matter of law, "a common enterprise is not created by virtue of the statement that all accounts do the same thing." *Poindexter v. Merrill Lynch, Pierce, Fenner & Smith*, 684 F. Supp. 478, 481 (E.D. Mich. 1988). A common interest is

---

[15] *Brodt v. Bache & Co.*, 595 F.2d 459 (9th Cir. 1978) (cited in *Revak*), is illustrative. There, the Ninth Circuit found strict vertical commonality lacking because the brokerage house, Bache, "could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out." *Id*. at 461. The court observed that "the investor's return, while specifically determined by the commodities market, is also clearly affected by the expertise of the person doing the trading," but affirmed summary judgment for Bache because "there [was] no direct correlation" between Bache's and its customers' successes or failures: "[S]trong efforts by Bache will not guarantee a return nor will Bache's success necessarily mean a corresponding success for Brodt. Weak efforts or failure by Bache will deprive Brodt of potential gains but will not necessarily mean that he will suffer serious losses." *Id*.

[16] The SEC also claims (at 53) that the fact that Ripple at times "affixed its good name" to XRP and that Ripple would suffer "reputational damage" if XRP was not successful establishes strict vertical commonality. There is no evidentiary basis for that assertion, but these alleged facts also say nothing about whether there was an "interdependence of both profits and losses" between Ripple and XRP holders. *Marini*, 812 F. Supp. 2d at 256 (emphasis removed).

insufficient to establish a common enterprise. *See supra* pp. 2, 29; *see also*, *e.g.*, *Marini*, 812 F. Supp. 2d at 257 ("As an initial matter, the Court disagrees with plaintiffs that [defendants'] ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis."); *Shotto v. Laub*, 635 F. Supp. 835, 839 (D. Md. 1986) (common enterprise requires "interdependency between defendants' earnings and plaintiffs' profit or loss"); *Mechigian v. Art Cap. Corp.*, 612 F. Supp. 1421, 1427 (S.D.N.Y. 1985) ("a commonality of interest" in the price of lithographic plates and prints did not create a common enterprise); *Bobrowski v. Red Door Grp., Inc*., 2011 WL 3875424, at *1 (D. Ariz. Aug. 31, 2011) (explaining that finding a common enterprise based on alignment of interests "would merely collapse the second prong of the *Howey* test into the third").

The SEC cites (at 53) just two cases to support its strict vertical commonality argument: *SEC v. NAC Foundation*, *LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021), and *Telegram*.  The facts that supported a strict vertical commonality finding in those cases are not present here.  As explained above, in *Telegram* (a preliminary-injunction decision), the promoter entered into contracts to sell nonexistent Gram tokens in the future after it finished developing a blockchain (which it contractually undertook to develop).  448 F. Supp. 3d at 367.  A "common enterprise" was found to exist between the promoter and a small set of "Initial Purchasers" who bought Grams pursuant to a contract that all parties conceded was a securities offering.  *Id*. at 370. Critical to the court's finding was that "[f]ailure to launch the TON Blockchain by the contractual deadline would require Telegram to return any unspent funds to the Initial Purchaser, depriving Telegram of its primary planned source of funding for Messenger's growing expenses."  *Id*.  *NAC* (a motion-to-dismiss decision) likewise concerned a blockchain that was "still under development," thus "ICO participants [were not] issued actual AML BitCoin tokens, but rather stand-in 'ABTC tokens'" that "could be exchanged on a one-for-one basis" for the

31

AML BitCoin once the blockchain was launched.  512 F. Supp. 3d at 992.  The court also noted

that, when "investors exchanged capital for ABTC tokens," the tokens could "be put to no use

aside from online trading" on the blockchain.  *Id.* at 996.

Here, by contrast, Ripple was founded in 2012 after the core code for the XRP Ledger

was completed, and no XRP was sold before the launch of the XRP Ledger.  Defs.' 56.1 ¶¶ 20,

32; Ex. 2, D. Schwartz Decl. ¶¶ 6, 8.  There was never any "pledge" by Ripple or the Individual

Defendants to purchasers of XRP that bound anyone to do anything specific with the XRP

Ripple held.  *See infra* pp. 34-35.  In addition, XRP had an important use case at the time it was

distributed:  XRP always has been used to pay transaction fees on the XRP Ledger, and thereby

also serves as a protective measure against transfers with no economic value spamming the

network.  Defs.' 56.1 ¶ 14; Ex. 1, D. Schwartz Tr. 35:16-36:19.  Finally, at least before the SEC

filed this lawsuit, various individuals and businesses independent of Ripple accepted XRP as a

form of payment for goods and services ranging from coffee to furniture to travel.  Defs.' 56.1

¶ 60; Ex. 3, Osler Rep. ¶ 13; ECF No. 661 (describing one such use).  In short, the

"interdependence of both profits and losses" necessary to demonstrate strict vertical

commonality was present in *Telegram* and *NAC*, but it is undisputedly absent here.  Thus, the

SEC cannot establish strict vertical commonality.

> **C.** **The SEC Cannot Establish That XRP Holders Reasonably Expected Profits from Defendants' Entrepreneurial and Managerial Efforts**
>
> > **1.** **A Mere Expectation of Profit, Standing Alone, Is Insufficient To Create an Investment Contract**

The SEC goes to great lengths to try to show that Defendants marketed XRP as an

"investment," even incorrectly recasting the *Howey* test to include a new element on this point.

SEC Br. at 49-50, 53, 59 (claiming the *Howey* test has four elements).  The SEC knows that is

not the law.[17]  The SEC must prove that purchasers had "a reasonable expectation of profits to be

derived from [Defendants'] entrepreneurial or managerial efforts."  *United Hous. Found., Inc. v.*

*Forman*, 421 U.S. 837, 852 (1975).  It has attempted to divide that requirement into two in order

to suggest that a speculative motive is enough to satisfy *Howey* (it is not) and to distract from the

showing it cannot make:  that XRP purchasers *reasonably* expected profits derived *solely* from

*Defendants' efforts*.

As a matter of law, the SEC's question (at 53-58) whether "[p]urchasers [r]easonably

[e]xpected to [p]rofit" is irrelevant.  An investment or speculative motive "on the part of the

purchaser or seller does not evidence the existence of an 'investment contract' within the

meaning of the securities acts."  *Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,

253 F. Supp. 359, 367 (S.D.N.Y. 1966).  That is because,

> [i]n a sense[,] anyone who buys or sells a horse or an automobile hopes to realize
> a profitable "investment."  But the expected return is not contingent upon the
> continuing efforts of another.  In the words of the Supreme Court [such a buyer]
> "(has) been left to (its) own devices for realizing upon (its) rights."

*Id*. (quoting *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 348 (1943)).[18]  Instead, the

purchaser must be buying, in addition to the asset, a commitment from the promoter to take

actions to return a profit to the purchaser.[19]  Without such a limitation, all manner of

---

[17] The Second Circuit has clearly described "[t]he three elements of the *Howey* test" that "must all be present for a [particular] contract to constitute a security:  (i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others."  *Revak*, 18 F.3d at 87.  And the SEC itself argued just a few weeks ago that the *Howey* test has (only) those three elements.  ECF No. 536 at 1.

[18] *See also Bender v. Cont'l Towers Ltd. P'ship*, 632 F. Supp. 497, 501 (S.D.N.Y. 1986) ("The mere allegation that investors purchased condominiums and tenants purchased options with the intention of reselling at a higher price does not bring these transactions within the ambit of the federal securities laws."); *Schwartz v. Bache & Co.*, 340 F. Supp. 995, 998 (S.D. Iowa 1972) (whether sales of assets "were really for investment" "does not in and of itself affect the nature of the transaction, even if known to defendant").

[19] *See, e.g.*, *Gary Plastic*, 756 F.2d at 241 ("[I]nvestors [we]re buying something more than an individual certificate of deposit.  They [we]re buying an opportunity to participate in the

commodities would constitute securities. No such commitment was present here. *See supra*

p. 25 (citing Ex. 40, A. Schwartz Rep. ¶¶ 11, 29-30, 33, 35, 42). Accordingly, the SEC's

misguided insistence (at 53-58) that XRP purchasers bought with the intent to profit is

insufficient. *Howey* asks whether they reasonably expected profits to be derived from

Defendants' efforts – not just whether they reasonably expected profits.

### 2. Defendants' Public Statements Are Insufficient as a Matter of Law To Create a Reasonable Expectation of Profits from Defendants' Efforts

The SEC's argument that XRP holders expected profits from Defendants' efforts relies

wholly on snippets – generally taken out of context – from isolated tweets, press releases, and

other non-contractual materials over an eight-year period. Some are from internal emails that no

outside "investor" would have ever seen in the first place. But in its Motion, as in discovery, the

SEC cannot point to *any* statement in which Ripple undertook *any* obligation, in its contracts or

otherwise, to take *any* post-sale action to increase the price of XRP or otherwise return a profit to

XRP holders. Indeed, the SEC does not even argue that Ripple promised profits to anyone; it

argues only (at 20) that "Defendants invited investors to *speculate* that Ripple's efforts *could*

lead to an increase in XRP's price" (emphases added, capitalization omitted).[20]

---

CD Program and its secondary market" (maintained by Merrill Lynch)); *Glen-Arden*, 493 F.2d at
1035 (no investment contract unless "the customer, unlike the commodity buyer, while
purchasing actual tangible property, was upon the representations of [the promoter] buying in
addition services absolutely necessary to the turning of the promised profit"); *Horwitz v. AGS
Columbia Assocs.*, 700 F. Supp. 712, 716-17 (S.D.N.Y. 1988) ("[t]he deeds purchased by the
investors in *Howey* . . . were 'investment contracts' because they were coupled with the seller's
promise to cultivate and market oranges for the investors' profit" and "[a]n interest in real estate,
therefore, is considered a 'security' where ordinary investors pay, not only for the land, but for
the promoter's promise that the real estate will be managed in a way that may yield profits that
can be distributed to the investors").

[20] Defendants' Motion demonstrated that no XRP purchaser could reasonably expect
profits from Ripple absent a contractual obligation requiring Defendants to expend efforts on
their behalf. Defs.' MSJ at 49-50. The SEC offers no contrary argument in its Motion.

That failure of proof is yet another fatal defect in the SEC's case.  In each case where the Second Circuit has found an investment contract, the alleged promoters promised profit-generating efforts either within or accompanying a contract.  Defs.' MSJ at 55-56.  None of the statements the SEC points to in any way resembles the contractual post-sale obligations undertaken in the blue sky cases, *id*. at 19-20, or the post-sale obligations undertaken in every Supreme Court and Second Circuit case post-1933, including *Howey* itself, *id*. at 21-23.

The SEC cites several out-of-circuit cases, but all of them support Defendants' argument.  In *Aldrich v. McCulloch Properties, Inc*., 627 F.2d 1036 (10th Cir. 1980), the court denied summary judgment, noting that "the facts may show that defendants were *under no obligation by contract or promise* to provide significant development services for the benefit of purchasers." *Id*. at 1040 (emphasis added).  *SG Ltd*. concerned "shares in a . . . virtual enterprise" that the promoter set the price of and promised "would unfailingly appreciate."  265 F.3d at 44.  The promoter also "guaranteed that investors could buy or sell any quantity of shares at posted prices" and "pledged to allocate an indeterminate portion of the profits derived from its website operations to a special reserve fund designed to maintain the price of the [virtual] shares."  *Id*. at 44-45.  In *SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), an Internet advertising company sold "Adpack[s]," which entitled a buyer to certain advertising services and a portion of the company's revenue.  *Id*. at 1210.  Similarly, *SEC v. Shields*, 744 F.3d 633 (10th Cir. 2014), concerned sales of interests in four purported oil and gas exploration and drilling joint ventures that "promis[ed] investors annual returns between 256% and 548%."  *Id*. at 637.  The promoter sent each investor "a packet of offering documents which," among other things, "outlined the expected annualized profits for each purported joint venture."  *Id*. at 638.  *SEC v. Hui Feng*, 935 F.3d 721 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 1387 (2021), concerned a business that facilitated investments under the federal EB-5 Immigrant Investor Program, and "[t]he EB-5

transactions [at issue] were structured as investments in limited partnerships, with the promise of a fixed annual return on the investment, ranging from .5 to 5 percent." *Id.* at 729.  Finally, *Long v. Shultz Cattle Co*., 881 F.2d 129 (5th Cir. 1989), concerned a cattle-feeding program under which "investors would sign a 'consulting agreement' whereby [the promoter] agreed to provide advice regarding the purchase, feeding, and sale of the investor's cattle" and that allowed investors certain tax benefits." *Id.* at 130-31.

The SEC has failed to identify any evidence demonstrating that Ripple was under an "obligation" to act for the benefit of XRP holders (as opposed to in its own self-interest), and it points to no similar obligations undertaken by Ripple, in its contracts or in its public statements. The SEC argues (at 54-58) that Ripple "promoted XRP as an investment," "targeted speculators," "sold XRP in unlimited quantities," and "[t]outed" its own interests in increasing XRP's value.  But "touting" and "promoting" XRP's potential is materially different from undertaking an obligation to use its efforts to increase XRP's price.  Even if those facts were undisputed (and they are disputed, *e.g.*, 56.1 Resp. ¶¶ 648, 567, 358, 478), none of these statements could establish a reasonable expectation of profits from Defendants' efforts.

"[P]romises of [a] general nature" that are not accompanied by "actual commitments to perform specific services" are mere marketing puffery; they do not establish a reasonable expectation of profits by investors.  *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 181 (N.D. Cal. 1975) (granting summary judgment where "literature and handouts" made "promises of [a] general nature" but "no actual commitments to perform specific services" after sale).[21]  For the same reason, "Ripple's solicitation of purchases of XRP from the public, its

---

[21] *See also De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co*., 608 F.2d 1297, 1301 (9th Cir. 1979) (land sales contracts were not investment contracts where there was "no reference in the contracts to an obligation on the part of [the promoter] to develop any land" or "promise to distribute profits"; the developer "represented in its promotional materials that it would develop

36

marketing of XRP to the public, and its specific targeting of speculators" do not "establish expectation of profits under *Howey* as a matter of law," as the SEC claims (at 57). These assertions are also disputed, but, even if true, the cases the SEC cites (at 57) do not support such an untenable rule that would transform the sale of all types of ordinary assets – diamonds, gold, soybeans, cars, and even works of art – into sales of securities.

The SEC also argues (at 55-56) that Ripple "emphasized" its efforts to make XRP available on trading platforms and the "steps it would take to maximize [XRP's] liquidity."[22] But, again, the statements the SEC cites – even if they were undisputed (many are not) – are not promises that Ripple would undertake these efforts in exchange for investor funds. *See infra* pp. 34-35. Absent the exchange of investor funds for a promoter's commitment to use those funds for the benefit of the investor, the economic substance of the transaction lacks the essential characteristics of an investment contract.

The SEC relies (at 55) on *Gary Plastic* and *Glen-Arden.* Both cases only underscore the shortcomings in the SEC's evidence here. In *Gary Plastic*, Merrill Lynch represented to "prospective customers that [it] ha[d] available negotiable, insured, and liquid $100,000 CDs, for which they [would] maintain a secondary market." 756 F.2d at 232. Merrill Lynch also

---

part of the retained land . . . but no timetable for the development was set," and, "at most, [the purchaser] expected to profit from [the seller's] development only in the appreciation of its parcels because of proximity to that development"); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (affirming summary judgment for land developer because extra-contractual representations about "shopping centers, health and cultural facilities, transportation facilities, and abundant recreational opportunity" did not establish an investment contract where developer had "no contractual obligation to the plaintiffs other than to deliver title"); *Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 953 (N.D. Ill. 1978) (granting motion to dismiss where extra-contractual statements that "dr[ew] in [purchasers] by an expectation of appreciation in value" did not include any contractual "arrangement" requiring the seller to effect that increase in value), *aff'd*, 715 F.2d 1233 (7th Cir. 1983).

[22] The SEC misleadingly fails to note that Ripple had a direct relationship with just six trading platforms, out of more than 200 that listed XRP. In other words, hundreds of exchanges (more than 97%) decided independently to list XRP. Defs.' 56.1 ¶¶ 65-66.

obligated itself to repurchase its "negotiable, insured, and liquid" CDs "at prevailing market rates." *Id*. at 232-33. Similarly, in *Glen-Arden*, in finding that sales of warehouse receipts for Scotch whiskey were sales of investment contracts rather than sales of a commodities future, and in distinguishing one from the other, the Second Circuit noted the importance to the customer of Glen-Arden's offer to purchase the Scotch should it prove impossible to find another buyer. 493 F.2d at 1035.[23] The analogous promise would be if Ripple had told XRP holders it would buy XRP back from them if they could not otherwise sell it. Ripple never made any such promise, and the SEC does not contend otherwise.

Likewise, the various statements to which the SEC points (at 59-62) regarding Ripple's intent to create a "use" and "demand" for XRP do not establish any promise or commitment to do so. Those statements show only that Ripple had its own interest in the value and liquidity of XRP, and that it had an incentive to increase XRP's value for its own benefit. "Any benefit to" XRP holders from such efforts "would be purely incidental." *Davis*, 401 F. Supp. at 1050.

### 3. The SEC's Reliance on Cases Concerning ICOs Is Again Misplaced

The SEC again relies heavily on cases dealing with ICOs. But those cases each involved contractual rights and obligations. In *Balestra*, *Telegram*, and *Kik*, for example, the money invested in each ATB Coin, Gram, or Kin went to the promoter; the promoter contractually undertook to use that money to build the blockchain and/or the functionality for the tokens; and the investor could receive value only after – and only if – the promoter built the blockchain and/or the functionality using those assets as promised. Defs.' MSJ at 34-35; *see also NAC*,

---

[23] *See also SEC v. Tyler*, 2002 WL 32538418, at \*1 (N.D. Tex. Feb. 21, 2002) (cited in SEC Br. at 56) (alleging that "Defendants fraudulently enticed more than 480 mostly elderly investors into purchasing investments . . . with *false guarantees* about the investment's liquidity, interest rates, and 'fixed' maturity dates," including by "provid[ing] investors with letters outlining the maturity date of their investments, an annual rate of return, and the total value at maturity") (emphasis added).

512 F. Supp. 3d at 993 (motion to dismiss) (promoter planned to develop a new digital currency called "AML BitCoin" and, to fund its development efforts, sold "ABTC tokens" that expressly entitled purchasers to a claim against it in the future:  the promoter would, at some later time, be obligated to redeem the ABTC token for an AML BitCoin); *Audet v. Fraser*, 2022 WL 1912866, at *15 (D. Conn. June 3, 2022) (jury verdict) (promoter used funds raised via the various ICO stages to create a "Coin Adoption Fund" that it would use to guarantee purchasers a $20 price floor); *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *1 (D.N.J. Dec. 10, 2018) (motion to dismiss) (promoter sold LATX tokens in ICO to develop a "blockchain-based tasking platform"). These facts are absent here.

### 4. At a Minimum, There Is a Genuine Dispute of Material Fact Regarding Whether XRP Purchasers Reasonably Expected Profits from Defendants' Efforts

Even if the Court does not find the absence of any affirmative obligation on Ripple's part reason to deny the SEC's Motion (and grant Defendants' Motion), the SEC's reliance on snippets of Defendants' public statements drawn from over an eight-year period is insufficient to establish *Howey*'s "efforts of others" element for two additional reasons.

*First*, to the extent XRP owners have obtained profits, undisputed evidence shows that those profits resulted primarily from market forces of supply and demand, which do not satisfy the "efforts of others" element of *Howey*.  Defs.' MSJ at 50-54.  In *SEC v. Pacific West Capital Group Inc.*, 2015 WL 9694808 (C.D. Cal. June 16, 2015), for example, the court denied the SEC's motion for a preliminary injunction to enjoin Pacific West's sale of interests in life settlements.  The SEC relied on a "touting" theory similar to the one it offers here, pointing to

> the fact that defendants touted their activities and expertise in promotional literature, leading investors to expect that the success or failure of the enterprise depended on defendants, especially with respect to increasing the secondary and tertiary reserves, which Pacific West managed through the Trust.

*Id*. at *6.  But the court rejected that theory.  "[A] defendant's touting of its expertise" is "not determinative of defendant's crucialness to the success or failure of the enterprise."  *Id*. at *7.  "While amassing a larger number of investors may be a factor in increasing the size of the secondary and tertiary reserves," the court found the SEC had not demonstrated "whether the success or failure of Pacific West's life settlement arrangements were predicated on [its] efforts, or rather, on the timing of the underlying insureds' deaths."  *Id*. at *6.

Similarly here, the SEC has not demonstrated that XRP holders' returns were predicated on Ripple's efforts, rather than on general trends in the crypto market, nor can it make this showing:  its own expert has conceded that, since at least mid-2018, broader cryptocurrency trends explain more than 50% of XRP returns and that, in the final two full calendar quarters before the SEC filed this action (Q2 and Q3 2020), returns for bitcoin and ether "can explain as much as almost 90% of XRP returns."  Defs.' 56.1 ¶ 123; Ex. 74, ███ Rep. ¶ 121 & Fig. 40.

*Second*, the SEC's argument (1) rests entirely on a selective "sampling" of Defendants' public and non-public statements (generally taken out of context) that ignores contrary evidence in the record and (2) is unsupported by its own evidence.  For example, the SEC emphasizes (at 13, 19) that David Schwartz "said that Ripple was 'legally obligated' to its shareholders to maximize the value and liquidity of XRP."  But reasonable XRP buyers could not have interpreted Schwartz's "legally obligated" statement to mean that Ripple would take any actions for their benefit with respect to the value of XRP when he said in the same breath that Ripple was making "absolutely . . . no promises or representations about the value of XRP."  *Supra* p. 11.  The record shows that Defendants repeatedly made similar statements, which defeats any claim that purchasers could have reasonably relied on Ripple's efforts to expect profits.  56.1 Resp. ¶ 1625 (describing additional statements by Ripple that Ripple was making no promises to influence the price of XRP, all of which the SEC ignores); Ex. 172 ("there is no . . . agreement with Ripple

and holders of XRP:  we have never promised any profits or returns to holders of XRP," and
"[XRP holders] don't have a contract with anyone simply by owning XRP").

    Nor can the SEC establish its case by relying on (at 59) a few hand-picked declarations
from XRP purchasers that it failed to disclose in discovery.[24]  Those declarations show that XRP
purchasers were not looking to Ripple's efforts as the source of their profits.  For example, one
declarant described an investment fund's practice of buying XRP "to subsequently sell it as part
of various trading strategies" – not in order to realize profits expected to accrue based on
Ripple's efforts – and emphasized that the fund "typically sold it the same day, within minutes or
hours."  PX 173 ¶ 8.  Another emphasized that his trading firm purchased XRP "*only* when
engaging in arbitrage trading strategies" – again, not to hold while Ripple expended efforts to
increase its price.  PX 543 ¶ 9 (emphasis added).[25]

    Even the SEC's declaration from ███████████, the lead plaintiff in a class action
bringing similar claims against Ripple, establishes that ██████ did *not* have any expectation
(reasonable or otherwise) that he would receive profits from Ripple's efforts.  ██████ made all
of his purchases and sales in a two-week period in January 2018, typically selling just hours after

---

[24] The SEC introduced six declarations (only some of which relate to XRP purchasers'
expectations).  *See* PX 45, PX 173, PX 447, PX 542-544.  None of those six declarations was
produced in advance of summary judgment, nor did the declarants appear on the SEC's initial
disclosures list.  Defendants reserve all rights with regard to this violation.

[25] The "reasonable purchaser" standard is an objective one, but evidence of actual
purchasers' beliefs can bear on what hypothetical "reasonable purchasers" believed, particularly
where there is no reason to think the actual purchasers were unreasonable.  *See, e.g.*, *Warfield*,
569 F.3d at 1021 ("the subjective intent of the purchasers may have some bearing on the issue of
whether they entered into investment contracts"); *Energy Grp.*, 459 F. Supp. at 1239 n.2 (finding
it "not without significance that, of the two customers of EGA called as witnesses by the SEC,
one readily agreed on cross-examination that he considered entry into the lottery as 'a gamble, a
bet' "); *Jenson v. Cont'l Fin. Corp.*, 404 F. Supp. 792, 798 (D. Minn. 1975) (stressing that "the
typical margin account investor does not take or expect to take actual delivery of his commodity
and must be characterized as a speculator, rather than an actual user of the commodity").

making a purchase.[26]  That trading strategy is not consistent with a belief that returns would come from Ripple's efforts to develop new uses for XRP.  To state the obvious, developing uses that increase demand for a financial product takes more than nine hours.

These hand-picked declarations are the SEC's only evidence that "investors" reasonably expected profits based on Ripple's efforts.  The remainder of its argument (at 59-62) focuses only on what Ripple said in isolated tweets and interviews, not on what XRP purchasers believed.  That evidence is both insufficient to establish the absence of a genuine dispute and addressed to the wrong question.  Under *Howey*, what matters is not whether the alleged promoter promised it would put in efforts (though the SEC is wrong on that fact in any event); it is whether purchasers had a reasonable "expectation that they would earn a profit solely through the efforts of the promoter."  328 U.S. at 298.  The evidence about purchasers' expectations shows the opposite:  that they were expecting to earn profits not from Ripple's efforts, but through their own trading strategies.  56.1 Resp. ¶ 1606; Ex. 167 (declarations from purchasers explaining that they did not expect profits from Ripple's efforts).  Thus, even if the SEC's theory were legally viable, the jury would have to evaluate whether a handful of isolated statements support the inference the SEC urges this Court to draw after weighing that handful against the mountain of evidence showing that purchasers did not expect profits from Ripple's efforts.

In addition, even if the SEC could show that purchasers expected some part of their profits to come from Defendants' efforts, it cannot – and does not even try to – show that any

---

[26]          made his first XRP purchase on January 3, 2018, then purchased 37,000 XRP more between January 5 and 8; sold 30,000 XRP the next day, January 9; repurchased 30,000 XRP just 12 hours later; and sold 40,000 in the nine hours after that.  He then bought 27,000 more XRP on January 16 before selling all of his remaining XRP the next day on January 17. PX 544; Ex. 279,          Decl.

profits came "solely" or even principally from Defendants' efforts.  *Howey*, 328 U.S. at 298.[27]
That too is reason to deny the SEC's Motion.

*Finally*, even if the SEC could prove each of the *Howey* factors, it has failed to
substantiate the lengthy section of its Amended Complaint attempting to allege that XRP is not a
"currency" for purposes of the federal securities laws.  Am. Compl. ¶¶ 379-391.  The federal
securities laws expressly exclude "currencies" from the definition of "security" – so if XRP is a
currency, then, as a matter of law, it is not a security.  *See* 15 U.S.C. § 78c(a)(10) (Securities
Exchange Act of 1934 excluding "currency" from definition of "security"); *Gary Plastic*, 756
F.2d at 238 (scope of 1934 and 1933 Acts is "the same").  The evidence is more than sufficient
to conclude that it is a currency.  Defs.' 56.1 ¶¶ 60, 68-69, 71 (government agency conclusions
and expert testimony that XRP is a currency).

## III.   DEFENDANTS' FAIR NOTICE DEFENSE PRESENTS GENUINE DISPUTED ISSUES OF MATERIAL FACT FOR TRIAL

In seeking (at 69-75) summary judgment on Defendants' affirmative fair notice
defense,[28] the SEC ignores overwhelming evidence showing that no reasonable person trying to
apply the *Howey* test would have believed that Defendants' offers and sales of XRP – most of
which involved no contract at all – were "investment contracts," and thus securities.  Much of
this evidence is undisputed.  The SEC also ignores the years of uncertainty its vague and ever-
shifting guidance sowed.  At a minimum, Defendants have adduced facts – many from the SEC's

---

[27] The Second Circuit has said that the word "solely" in *Howey* should not be taken
literally.  *See SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 582 (2d Cir. 1982).  The Supreme
Court has declined to address whether that interpretation of *Howey* is correct.  *See Forman*, 421
U.S. at 852.  Defendants respectfully contend that the correct standard is "solely"; but whether
"solely" or "primarily," the SEC cannot meet it.

[28] The Individual Defendants have asserted an as-applied vagueness defense based on the
same facts and due process principles.

own files – showing that the laws did not "give fair notice" that selling XRP without registering was "forbidden."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see generally* 56.1 Resp. ¶¶ 1627-1721.  That precludes summary judgment.  *See United States v. Smith*, 985 F. Supp. 2d 547, 606-08 & nn.20-21 (S.D.N.Y. 2014) (whether defendant had constitutionally fair notice was factual question for jury to decide), *aff'd sub nom. United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016).

### A.   Whether the SEC Gave Market Participants Fair Notice That XRP Was a Security Is a Fact-Specific Inquiry

A law that fails to "'give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited'" violates due process.  *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (quoting *Grayned*, 408 U.S. at 108).  In assessing fair notice, courts look to a number of factors, including "whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices," and consider "the interpretation of the statute given by those charged with enforcing it."  *Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 621 (2d Cir. 2011) (internal quotation marks and citations omitted).  "The . . . context" in which a law or regulation is being enforced "is all important," *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 412 (1950); thus, courts "evaluate the underlying conduct by reference to the norms of the subject community," *Inturri v. City of Hartford*, 365 F. Supp. 2d 240, 254-55 (D. Conn. 2005), *aff'd*, 165 F. App'x 66 (2d Cir. 2006).  This Court has made clear that fair notice challenges are "objective" inquiries that focus "on the enforcing agency's behavior," not "the defendant's state of mind."  ECF No. 440 at 10 n.5; ECF No. 210 at 7 (Netburn, J.).

### B.   Market Participants Reasonably Believed That XRP Was Not a Security in the Face of Widespread Uncertainty and Evolving Guidance

#### 1.   Initial Lack of Clarity Regarding Regulation of Digital Assets

When bitcoin emerged as the first virtual currency in 2009, there was significant uncertainty as to *what* regulatory regime – if any – would apply to its sale.  That uncertainty lasted years, even as other virtual currencies, including XRP, developed and flourished.[29]  Not even the SEC was sure it had jurisdiction over virtual currencies:  in 2014, an internal SEC memorandum reflected that it was still "exploring positions regarding *whether or how* to regulate Bitcoin," stating that "the status of Bitcoin as either currency or securities is undetermined at this time."[30]  That same year, a report to Congress on virtual currency (to which the SEC contributed) stated that "federal agencies' responsibilities with respect to virtual currency [we]re *still being clarified*" – citing XRP as a "prominent example[]" of a "decentralized" "virtual currency" not based on the bitcoin protocol that performed a "key function" in facilitating currency conversions.  56.1 Resp. ¶ 1640; Ex. 144, RPLI_SEC 1079990 at -004 – -005, U.S. Gov't Accountability Office, *Virtual Currencies Report* 10-12 (May 2014) (emphasis added).

Ripple was founded in 2012, in the midst of this uncertainty.  As the SEC notes (at 8-9, 34, 40), Ripple's founders sought legal advice from a respected law firm regarding the possibility

---

[29] As of 2013, the market was still unsure whether bitcoin was (i) a commodity subject to Commodity Futures Trading Commission ("CFTC") regulation, *see, e.g.*, 56.1 Resp. ¶ 1636; Ex. 182, *SEC Stays Silent On Bitcoin As Currency Attracts New Controversies*, GIGAOM (May 3, 2013) (suggesting only the CFTC could directly regulate bitcoin trading), or (ii) a currency subject to U.S. Treasury regulation, *see, e.g.*, 56.1 Resp. ¶ 1636; Ex. 184, Todd Zerega & Tom Watterson, *Regulating Bitcoins:  CFTC vs. SEC?*, REED SMITH LLP (Dec. 31, 2013) (observing that no federal regulator other than the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN") has "issued any guidance on the treatment of Bitcoins"), or (iii) not subject to any regulation at all, *see, e.g.*, 56.1 Resp. ¶ 1636; Ex. 183, Tal Yellin, Dominic Aratari & Jose Pagliery, *What is bitcoin?*, CNN MONEY (Dec. 3, 2013) (noting that "payments [in bitcoin] are not . . . subject to regulation").

[30] 56.1 Resp. ¶ 1637; Ex. 185, SEC-LIT-EPROD-001345799.

that the federal securities laws might apply to XRP.  The firm told Ripple's founders that, by all existing indications, "[units of XRP] do not constitute 'securities' under the federal securities laws" and specifically noted "the lack of applicable case law."  PX 243 at RPLI_SEC 0099466.  The SEC relies heavily (at 8) on a passage that mentioned a "risk" that the SEC might deem XRP a security, but the firm actually said that such a risk was "small" and would involve the SEC taking a novel position that past case law did not support.  PX 243 at RPLI_SEC 0099466.

Over the next few years, other leading analysts likewise concluded that XRP was not a security.  A 2015 memo from another leading law firm advised Ripple that "XRP does not appear to be a security under the *Howey* test" and that it is "unlikely to be deemed a security under either federal or state law."  PX 245 at RPLI_SEC 1002121, -123.  It then went on to note the lack of SEC guidance, stating that, "[t]o date, the [SEC] has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law" and that "the treatment to date suggests that the SEC views virtual currencies as more akin to commodities than securities."  *Id*. at -125.

The widely held belief that XRP was not a security was reinforced when the U.S. Department of Justice ("DOJ") and FinCEN publicly described XRP as a "virtual currency" and required a Ripple subsidiary to register as a "money services business" – a designation that is mutually exclusive with SEC regulation.  56.1 Resp. ¶¶ 1643, 1719; Ex. 186, Settlement Agreement; 31 C.F.R. § 1010.100(ff)(8)(ii) ("money services business" excludes "[a] person registered with, and functionally regulated or examined by, the SEC").  That belief was further reinforced when, also in 2015, the CFTC declared that virtual currencies are "commodities."  56.1 Resp. ¶ 1647; Ex. 189, Coinflip, Inc. *et al*., CFTC Docket No. 15-29.  Individually and together, those statements strongly suggested XRP was not a security.

2.        **The SEC Enters the Regulatory Field and Injects Further Uncertainty**

In the second half of 2017, the SEC finally began issuing (limited) guidance to the market.  But that "guidance," beginning with the "DAO Report,"[31] made industry observers only more confident that XRP was not a security.  XRP is very unlike DAO Tokens, which "granted the DAO Token holder certain voting and ownership rights."  DAO Report at 5; *see* 56.1 Resp. ¶¶ 1610-1622 (SEC admissions that there are no comparable rights in XRP holders).  After the SEC issued the DAO Report, multiple digital asset exchanges added listings of XRP; at least 60 exchanges listed XRP by the end of 2017.  SEC 56.1 ¶ 482(a); PX 500.20; *see also* Defs.' 56.1 ¶ 73; Ex. 20, Long Decl. ¶ 4.  Exchanges that list "securities" must register with the SEC.  *See* 15 U.S.C. § 78e.  None of those digital asset exchanges believed it needed to register with the SEC, and none did.  In 2019, for example, Coinbase, a U.S.-located exchange subject to potential SEC supervision, determined that XRP was not a security and, on that basis, listed XRP for trading.  Indeed, Coinbase sent the SEC its analysis concluding that XRP was not a security prior to listing it; the SEC expressed no disagreement.[32]  Other market participants independent from Ripple likewise sent the SEC independent analyses (often prepared by reputable law firms) concluding that XRP was not a security.[33]  The SEC made no indications to the contrary.

---

[31] *See*, *e.g.*, *Rep. of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934: The DAO*, Release No. 81207, 2017 WL 7184670 (SEC July 25, 2017) ("DAO Report").  Other SEC guidance appeared limited to ICOs, which Ripple never held.  *E.g.*, 56.1 Resp. ¶ 1652; Ex. 194, RPLI_SEC 1093340 at -343 (Dec. 2017 public statement by Chair Jay Clayton posing "[a] key question *for all ICO market participants*:  'Is the coin or token a security?'" and noting that a significant concern that makes digital assets appear to be securities is when the asset offers "interests in a yet-to-be-built" system).

[32] 56.1 Resp. ¶¶ 1687, 1692; Ex. 229, SEC-LIT-EPROD-000038987 at -988 (Feb. 2019 Coinbase email to SEC officials); *id*. at -987 ("Our review process also identified, in consultation with outside counsel, credible arguments that XRP is not a security and thus may permissibly be listed on our U.S. trading platform").

[33] *E.g.*, 56.1 Resp. ¶ 1689; Ex. 228, SEC-LIT-EPROD-000738401 at -403 ("the Manager has concluded that none of bitcoin, ether or XRP should be considered an investment contract

A year after the DAO Report, the agency began to develop its own framework for regulating digital assets, independent of or supplemental to *Howey* – it never said which. That effort merely created additional uncertainty. Most significantly, in 2018, then-Director of the SEC Division of Corporation Finance William Hinman gave a speech announcing a completely new "decentralization" test for digital assets: "If the network on which the token or coin is to function is sufficiently decentralized . . . the assets may not represent an investment contract." PX 241 ("Hinman Speech") at 3. Hinman also stated that whether "the application [is] fully functioning or in early stages of development" is relevant to whether it is an investment contract. *Id*. at 4-5. Neither factor announced by Hinman has any basis in the statute or the *Howey* test. Yet Hinman pointed to bitcoin and ether as examples of cryptocurrencies that were decentralized and fully functioning and therefore "not securities transactions." *Id*. at 3.

Contemporaneous SEC communications suggest that the SEC's own officials were well aware that the speech would lead to "▮▮▮▮▮▮▮▮▮▮" and deliberately recommended giving industry participants "▮▮▮▮▮▮," presumably to give the agency more room to maneuver.[34] The SEC also equivocated as to whether Hinman's speech reflected official SEC guidance. Its

_____

and none should therefore be treated as a security"); 56.1 Resp. ¶ 1698; Ex. 220, SEC-LIT-EMAILS-000460257 (there are "reasonable grounds to conclude that XRP does not satisfy all elements of the *Howey* Analysis and is therefore not a 'security' for purposes of the federal securities laws"); 56.1 Resp. ¶ 1687; Ex. 230, RPLI_SEC 1094843 (it is "more likely than not" that XRP "will not be considered a security and, thus, not be subject to regulatory oversight by the SEC"); 56.1 Resp. ¶ 1701; Ex. 158, Pl.'s Answers & Objs. to Defs.' Fourth Set of Reqs. for Admis., SEC Answer to RFA No. 998 (Nov. 22, 2019 submission by MoneyGram to SEC detailing proposed accounting treatment for XRP, which did not treat XRP as a security; SEC did not object to non-security treatment).

[34] *See* 56.1 Resp. ¶ 1669; Ex. 209, SEC-LIT-EMAILS-000470992 (suggestion by senior SEC lawyer reviewing speech that "▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 211, SEC-LIT-EMAILS-000471315 at -318 (statement by SEC's Director of Trading and Markets that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" because Hinman's new test "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

Chairman, Jay Clayton, said yes,[35] but Hinman himself said no,[36] and the agency in this litigation said no[37] – before changing its mind and saying yes, the speech was indeed "advice to the market."[38] No wonder that market participants were unsure what to think in its wake.

Well-informed industry observers expressed that confusion to the SEC itself. The day after Hinman's speech, the Director of the Digital Currency Initiative at Massachusetts Institute of Technology wrote: "people from government agencies are throwing around the word 'decentralization' like we know what it means or how to evaluate it." 56.1 Resp. ¶ 1674; Ex. 222. A group of well-respected securities and enforcement lawyers met with the SEC in 2018 to convey the message (speaking as interested industry participants and not as representatives of specific clients) that there was "extremely unusual" and "largely unprecedented" confusion about the regulation of digital assets.[39]

Based on the information available to them after the Hinman Speech, numerous market participants – all of whom the SEC would now consider securities law violators – continued to

---

[35] 56.1 Resp. ¶ 1670; Ex. 218, Jay Clayton, *Testimony on "Oversight of the U.S. Securities and Exchange Commission"* (June 21, 2018), at 15 ("Our Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security.").

[36] ECF No. 255-2 ¶ 13.

[37] ECF No. 255 at 3 ("he expressed *his own* view . . . based on *his* understanding of the specific facts and circumstances" (emphases added)).

[38] ECF No. 588-11 at 10:14-16 ("[Hinman] presented the speech as the director of corp. fin. giving basically advice to the market.").

[39] 56.1 Resp. ¶ 1653; Ex. 201, SEC-LIT-EMAILS-000342982. The SEC communicated and met with numerous additional third parties who conveyed their "confusion" about how or whether securities laws applied to the blockchain industry or to XRP specifically. 56.1 Resp. ¶¶ 1675, 1688-1689, 1692-1695, 1709-1711; Exs. 228-231, 236, 278. In response, the SEC never said that it was. 56.1 Resp. ¶¶ 1690, 1694, 1710; Ex. SEC Answer to RFA No. 619; Ex. 275, SEC Answers to RFA Nos. 250-253. As late as October 2020, the SEC was telling the public it had not made any determination on XRP's status as a security and that the SEC would not comment on "whether" it would ever make any such determination. 56.1 Resp. ¶ 1714; Ex. 165, NYRO_RIPPLE_IRIS_000212.

list and trade XRP because they generally understood the new Hinman framework to exclude

XRP from the bucket of potential-securities; XRP, like bitcoin and ether, was "sufficiently

decentralized" with a fully functional ledger.  56.1 Resp. ¶¶ 1670-1672; PX 81 at 51:7-18 ("if

decentralization was an important component . . . that seemed like a positive indicator for how

the SEC may view XRP").

A year later, in 2019, the SEC's Strategic Hub for Innovation and Financial Technology

published a "Framework for 'Investment Contract' Analysis of Digital Assets," which

compounded the market's confusion.  56.1 Resp. ¶ 1681; Ex. 226, SEC, *Framework for*

*'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019) ("Framework").  The Framework

noted that digital assets would be less likely to be considered securities if "[t]he distributed

ledger network and digital asset are fully developed and operational" (as the XRP Ledger was,

*see* Defs.' 56.1 ¶ 19), if "[h]olders of the digital asset are immediately able to use it for its

intended functionality on the network" (as XRP holders could, *see* 56.1 Resp. ¶ 1682), and if "it

can immediately be used to make payments in a wide variety of contexts, or acts as a substitute

for real (or fiat) currency" (as XRP could, *see id.*).  Ex. 226 at 5.  The Framework thus confirmed

specific factors that market participants should look to in determining whether a digital asset was

a security, and those factors supported the conclusion that XRP was not one.  At the same time, it

appeared to abandon the "decentralization" analysis that the Hinman Speech had held out as a

key part of the inquiry.  56.1 Resp. ¶ 1664; PX 241 at 3; Ex. 226 (no discussion of "sufficient[]

decentraliz[ation]").  And it also appeared to abandon parts of the *Howey* test.  Ex. 226 at 8 n.10

(arguing that no "common enterprise" element should exist).

Again, as to XRP specifically, sophisticated market participants believed that all

available indications from the SEC were that XRP was *not* a security, regardless of which of the

SEC's conflicting tests applied.  From late 2017 to late 2020, the number of exchanges listing

XRP increased from around 60 to more than 200; the number of exchanges that registered with the SEC to do so remained at zero.  Defs.' 56.1 ¶ 73; Ex. 20, Long Decl. ¶ 4.

### 3.    The SEC Reverses Course

In December 2020, the SEC filed this lawsuit.  This case was unlike any previous SEC enforcement action:  it involved no ICO, no fraud allegations, and a fully functional blockchain – all factors that the SEC had previously suggested would mean an asset was not offered as a security.  The SEC also abandoned the guidance it had previously offered through Hinman and the Framework; its current Motion, for example, makes no mention of whether XRP was "sufficiently decentralized" or "fully function[ing]."  *Contra* PX 241 (Hinman Speech) at 3, 5. The SEC does mention the ability to use XRP immediately for cross-border payments, but now treats that as evidence supporting rather than contradicting its position that XRP was sold as a security.  *Compare*, *e.g.*, SEC Br. at 30-31 (arguing that Ripple sold XRP as a security because users of Ripple's cross-border payment product ODL "held XRP for mere seconds" while making cross-border payments), *with* Ex. 226 at 5 (explaining that an asset is unlikely to be a security if "it can immediately be used to make payments").[40]  It likewise reversed its own internal views about other factors that the SEC's staff previously thought are "███████████" or even demonstrate that an asset is *not* a security.[41]

---

[40] Should the SEC later dispute the extent of the XRP Ledger's decentralization, or its functionality, that would at most create a genuine dispute of material fact at trial.

[41] *Compare* 56.1 Resp. ¶ 1667; PX 241 at 4 (███████████████████████████████████████████████████████████████████████ " "███████████████████████"), *with* SEC Br. at 3 (arguing that XRP is a security because Ripple was "XRP's largest stakeholder" and therefore "had economic incentives . . . to make the price of XRP go up"); *compare* 56.1 Resp. ¶ 1669; Ex. 277, SEC-LIT-EMAILS-000470969, at -972 ("████████████████████████████████" are "████████████████████████████"), *with* SEC Br. at 25 (arguing that XRP is a security due to "founder lockups and [Ripple's XRP] escrow").

The SEC's filing evidently took the market by surprise, triggering estimated losses of approximately $15 billion based on the decline in XRP's market price.  Defs.' 56.1 ¶ 85.  It also began a cascade of XRP delistings from cryptocurrency exchanges.  Defs.' 56.1 ¶ 86.

## C. Defendants Have Adduced More Than Sufficient Facts To Support Their Due Process Defense

The SEC's case turns on the undefined term "investment contract" in the Securities Act. There is no genuine argument that the statute's language alone gives fair notice that XRP could be considered an investment contract:  Defendants' transfers of XRP often involved no "contracts" in the first place and never involved the essential ingredients that define the legal term "investment contract," so no person of ordinary intelligence would think they were "investment contracts" solely on the basis of the statute.  Defs.' MSJ at 13-28.[42]

The SEC implicitly concedes this point, jumping past the statutory language and pointing to court decisions and SEC-issued guidance.  But those sources only confirm that Defendants lacked fair notice.  In Ripple's early years, the law in this area was a vacuum.  The SEC had provided no guidance, no cases were remotely comparable, and the scant guidance available strongly suggested that the SEC would not consider XRP to be a security.  PX 243 at RPLI_SEC 0099466 (noting "the lack of applicable case law"); PX 245 at RPLI_SEC 1002125 (noting the lack of SEC guidance).

In the absence of any authority saying otherwise, a reasonable person trying to apply the *Howey* test would not have believed that Defendants' conduct was prohibited.  That is not speculation:  the record demonstrates that multiple reasonable people engaged in precisely that

---

[42] This case is readily distinguishable from *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017), cited by the SEC (at 73).  There, a due process challenge to the criminal spoofing statute was dismissed where the statute's language "standing alone" defined "spoofing" and prohibited spoofing, and where the defendant's conduct "clearly" fell within the ambit of what the statute expressly prohibited.  *Coscia*, 866 F.3d at 792.

exercise, and they all concluded that XRP should not be considered a security under existing law. PX 245 at RPLI_SEC 1002123, -124 ("XRP does not appear to be a security under the *Howey* test," and an argument that it is a security would be "superficial"); PX 243 at RPLI_SEC 0099466 (the "compelling" conclusion is "that [XRP] do[es] not constitute 'securities' under the federal securities laws"); 56.1 Resp. ¶ 1689; Ex. 278, SEC-LIT-EPROD-000738320 at -336 (concluding XRP is not a security because "XRP is designed to have primarily consumptive uses, rather than serve as an investment vehicle"). *See also supra* notes 32-33.  Even other government agencies stated publicly that XRP was a "virtual currency" being lawfully used and traded.  56.1 Resp. ¶¶ 1643, 1719; Ex. 186.  The SEC may argue that these observers and government agencies got it wrong or hedged their language, but that merely establishes a dispute of fact for the jury.

If that were not enough, the SEC's "guidance" beginning in 2017 injected additional confusion that would allow a jury to conclude that reasonable observers lacked notice.  Contrary to its current argument that the relevant inquiry is the *Howey* test and nothing more (*e.g.*, at 2), in the past, the SEC repeatedly suggested that something other than the *Howey* test should govern, such as Hinman's "sufficiently decentralized" test or the Framework's "fully developed and operational" standard.  A jury would be more than justified in concluding that Defendants' offers and sales of XRP were lawful without a registration statement under each of those tests.  *See*, *e.g.*, Defs.' 56.1 ¶ 19; Ex. 2, Schwartz Decl. ¶ 4 (XRP Ledger was "fully operational" at all relevant times); Defs.' 56.1 ¶ 13 (XRP Ledger was "decentralized" according to various key indicia, including the SEC's own allegation in the complaint); 56.1 Resp. ¶ 1640; Ex. 144 (calling XRP Ledger "decentralized").

A jury would be justified in concluding that the SEC introduced confusion into the marketplace, both because the agency has now abandoned each of those alternative tests in favor of (its novel reading of) the *Howey* test and based on incontrovertible evidence that there was

"unprecedented" confusion in the marketplace.  56.1 Resp. ¶¶ 1675-1676; Ex. 201, SEC-LIT-EMAILS-000342982, at -985.  Indeed, a jury can conclude that the SEC actually knew about all of this confusion, both generally and with respect to XRP specifically, yet did nothing to clarify it.  Similar circumstances drove the Second Circuit to dismiss the enforcement action in *Upton*.  *See* 75 F.3d at 97-98 (lack of fair notice where SEC "was aware" for years that conduct was commonplace, knew of the market's "substantial uncertainty" as to the SEC's interpretation of the law, but took few or "no steps" to advise the public it believed the practice was a violation).

This Court's decision on the SEC's Motion To Strike Ripple's Fair Notice Defense is further dispositive.  There, the Court held that the fair notice defense was viable in light of three factual allegations:  (1) "XRP's price bears no relation to Ripple's activities," (2) Ripple "has not sold XRP as an investment," and (3) Ripple "has no relationship with the vast majority of XRP holders."  ECF No. 440 at 8.  The record evidence is more than sufficient for a jury to conclude that each of those facts is true.  Defs.' 56.1 ¶ 123; Ex. 11, Ferrell Rep. ¶¶ 90-106 (expert analysis finding no relationship between Ripple's actions and XRP's price); Defs.' 56.1 ¶¶ 62-63; Ex. 2, D. Schwartz Decl. ¶ 11 (potentially millions of unknown and unrelated XRP holders, compared to just 1,700 contracts with counterparties related to XRP distributions over an eight-year period).  The SEC may dispute some of those facts; but, even if disputed, they preclude summary judgment under settled principles.

### D.    The SEC's Arguments Against Defendants' Fair Notice Defense Lack Merit

The SEC offers four contrary arguments.  All fail.  *First*, the SEC argues (at 70-71) that the *Howey* test alone provided notice.  This Court has already rejected this exact argument, including the SEC's mis-reliance on inapposite cases.  *See* ECF No. 440 at 9 & n.4 (rejecting SEC's cases as "ruling[s] on a motion to dismiss, where the court was obligated to draw

presumptions and inferences in favor of the SEC").[43]  In any event, the question is not whether any precedent applying the statute existed, but whether the law gave ordinary observers "fair notice" of what is "prohibited."  *Fox Television Stations*, 567 U.S. at 253.  The evidence – which the SEC ignores – demonstrates at least a genuine dispute over that question, given the parade of ordinary observers who applied the *Howey* test contemporaneously and concluded that Defendants' conduct was not prohibited.  *See supra* Section III.B.

 *Second*, the SEC argues (at 71-73) that other digital asset cases have rejected fair notice defenses, relying in particular on *Kik* (which it says "should end the inquiry").  That argument misunderstands the differences between these cases, and those differences are critical.  As this Court explained in its Motion To Strike opinion:  "This assessment cannot be conducted in the abstract; rather, the Court must consider whether the party claiming a lack of notice has shown 'that the statute in question provided insufficient notice that his or her behavior at issue . . . was prohibited.'"  ECF No. 440 at 8 (quoting *Copeland v. Vance*, 893 F.3d 101, 117 (2d Cir. 2018)).  The *Kik* defendants argued that they lacked fair notice that the securities laws and the *Howey* test could even apply to an ICO.  492 F. Supp. 3d at 182.[44]  That is not Defendants' argument here.  Defendants' argument is that they lacked fair notice that their offers and sales of XRP over an eight-year period were unlawful – particularly (though not exclusively) because Defendants' conduct was consistent with what minimal guidance the SEC had provided.  *See supra* Section III.B.

---

 [43] *See* ECF No. 440 at 9 & n.4 (rejecting SEC's reliance on *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973), and distinguishing *United States v. Bowdoin*, 770 F. Supp. 2d 142 (D.D.C. 2011), and *United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018)).

 [44] The same is true of *Zaslavskiy*, 2018 WL 4346339, at *8, on which the SEC also relies (at 23-26).

*Third*, the SEC argues (at 73-74) that its own guidance gave fair notice.  A jury could reasonably conclude that the SEC's guidance added to the confusion rather than removing it. That is what the industry told the SEC at the time and what the SEC's own Director of Trading and Markets recognized in candid internal comments.  56.1 Resp. ¶ 1669 (warning that Hinman's 2018 speech would cause "█████████████").  The SEC's other enforcement actions did not provide "guidance" either.  Unlike any prior cases, this action does not involve an ICO; instead, the SEC accused Defendants of staging an eight-year-long "offering."  This action also involves no allegations of fraud.  And it involves a blockchain that was fully functional at all relevant times and a digital coin that could be used for its intended purpose (among other uses) at all relevant times.  Defs.' 56.1 ¶ 19; Ex. 2, D. Schwartz Decl. ¶ 4.  The SEC does not and cannot point to any prior enforcement actions like this one; this case is completely different from those on which the SEC relies (at 73), all of which involved ICOs, fraud, and/or not-yet-functional blockchains.  Nor does this case involve contracts (at least in large part), post-sale obligations, or rights as against the seller, further distinguishing the SEC's other enforcement actions.  And those actions did not involve the SEC transgressing its own "guidance," as this one does.[45]  As Judge Netburn noted at the outset:  "This case is unique."  ECF No. 269 at 40:4.

*Fourth*, the SEC argues (at 74-75) that Defendants had "actual notice" that their conduct was prohibited.  That is wrong on the facts and on the law.  On the facts, the SEC ignores that the legal memos it relies on explained that XRP should not be considered a security under existing law.  The SEC attempts to pluck words out of context from those memos to suggest that they

---

[45] Once again, we need not guess how reasonable observers would have interpreted the "guidance" from prior enforcement actions, because the record contains facts showing how they did in real time:  "The SEC has also pursued enforcement actions related to virtual currencies. . . . These data points are not definitive by any stretch.  But taken together, they suggest that the SEC has viewed virtual currencies, particularly Bitcoin, as sources of value rather than securities."  PX 245 at RPLI_SEC 1002126.

warned Ripple that XRP would be a security, but that is not true; the language the SEC cites is

mere lawyerly hedging that there was some "risk[ ]" that the SEC may make a "superficial"

argument different from the one advised in the memo.  *E.g.*, PX 245 at RPLI_SEC 1002124.  At

the very least, a jury could read the memo to support Defendants' position rather than the SEC's.

The SEC's attempt to rely on its own investigation of Defendants as providing fair notice

is absurd; putting aside the factual dispute over what the SEC told Defendants and when, an

enforcement investigation is not reasonable notice as a matter of law.

> It is one thing to expect regulated parties to conform their conduct to an agency's
> interpretations once the agency announces them; it is quite another to require
> regulated parties to divine the agency's interpretations in advance or else be held
> liable when the agency announces its interpretations for the first time in an
> enforcement proceeding and demands deference.

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012).  Indeed, the SEC's

cover letter to Defendants attaching document requests stated (months after it claims it warned

Ripple) that "the investigation does not mean that we have concluded that anyone has violated

the law." ECF No. 172-1 at 3.  In any event, if the investigation alone constituted notice, it

would not affect a fair notice defense spanning 2013 to April 2018.[46]

On the law, the SEC misstates the applicable standard.  The agency's argument (at 74) is

that "Defendants had actual notice that their XRP distributions *could be* considered investment

---

[46] The SEC also claims (at 74) that the fair notice defense fails because Ripple "never
requested a No-Action letter from the SEC."  The fair notice defense focuses on the agency's
conduct, not the claimant's.  Also, there is a genuine dispute as to whether the no-action-letter
process was a viable path for digital asset participants before 2019.  The SEC did not issue any
no-action letters from 2013-2018 related to digital assets even when such entities requested them.
56.1 Resp. ¶ 1629; Ex. 158, Pl.'s Answers & Objs to Defs.' Fourth Set of Reqs. for Admis., SEC
Answers to RFA Nos. 465, 475, 480, 481.  In 2019, the SEC issued its first no-action letter to a
digital asset company (Turnkey), but that letter lent further support to the view that fully
functional digital assets outside of the ICO context, like XRP, were not securities.  The SEC's
own expert, ███████████, was unable to dispute that it would have been futile to seek a
no-action letter from the SEC prior to 2019.  56.1 Resp. ¶ 1680; Ex. 140, Dep. Tr. of ███
███████ 174:22-177:10.

contracts" (emphasis added).  Knowledge that there is some *risk* that an agency may take adverse

action does not extinguish a fair notice defense.  *See* ECF No. 440 at 10 n.5 (defense "does not

require inquiry into whether a particular party actually received a warning that alerted him or her

to the danger of being held to account for the behavior in question" (internal quotation marks and

brackets omitted)); *see also Upton*, 75 F.3d at 98 (express warning that relevant conduct "was

being looked at closely by the regulatory bodies" was not fair notice (citation omitted)).[47]  On

the correct standard – whether ordinary observers had fair notice that the relevant conduct was

"prohibited," not whether there was a "risk" that the agency might call it prohibited – there are

genuine disputes of material fact.

## IV.   THE SEC IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE AIDING-AND-ABETTING CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

Summary judgment is typically inappropriate for claims requiring proof of state of mind,

such as an aiding-and-abetting charge.  *See, e.g.*, *Wechsler v. Steinberg*, 733 F.2d 1054, 1058-59

(2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary

judgment.") (collecting cases); *SEC v. AT&T, Inc.*, 2022 WL 4110466, at *60 (S.D.N.Y. Sept. 8,

2022) ("A defendant's subjective state of mind – including that he took action knowing that he

was violating a legal standard or with recklessness as to that point – is a determination classically

and commonly made by juries.").  To prevail, the SEC must show that there is no genuine

dispute that:  (1) "Ripple violated the law"; (2) "the Individual Defendants knew of (or recklessly

---

[47] *See also Gates & Fox Co. v. OSHRC*, 790 F.2d 154, 157 (D.C. Cir. 1986) (warning that employer was in violation of Occupational Safety and Health Administration ("OSHA") regulation was not actual notice because "[t]he 'warning' . . . came not from OSHA but from the general contractor's safety inspector"); *Hosp. of Univ. of Pa. v. Sebelius*, 847 F. Supp. 2d 125, 142 (D.D.C. 2012) (third-party memo setting forth an interpretation of regulation was not actual notice because actual notice must derive from something the agency "actually said" or that it "informed plaintiffs [of] specifically"); *United States v. Ward*, 2001 WL 1160168, at *24 (E.D. Pa. Sept. 5, 2001) (internal company task list and third-party report indicating that company was required to comply with certain regulatory requirements did not constitute actual notice).

disregarded) Ripple's violation"; and (3) the Individual Defendants "substantially assisted" Ripple in its primary violation.  SEC Br. at 66.[48]  "[R]esolving all ambiguities and draw[ing] all reasonable inferences" in the Individual Defendants' favor, the SEC cannot meet its burden. *Vt. Teddy Bear*, 373 F.3d at 244.

### A.   Denial of the SEC's Summary Judgment Motion on Ripple's Alleged Section 5 Violation Ends the Inquiry

If the Court finds that Ripple did not violate Section 5 – either by granting Defendants' Motion or denying summary judgment to the SEC on its Section 5 claim – then it should deny summary judgment to the SEC on the aiding-and-abetting claim as well.  *See*, *e.g.*, *SEC v. Am. Growth Funding II, LLC*, 2018 WL 1626148, at *6 (S.D.N.Y. Mar. 29, 2018).

### B.   Even if the Court Finds a Section 5 Violation, a Genuine Issue of Material Fact Still Exists as to the Individual Defendants' Scienter

The SEC acknowledges that it must prove that the Individual Defendants "knew of (or recklessly disregarded) Ripple's violation."  SEC Br. at 66; *see* 15 U.S.C. § 77*o*(b).  The SEC has a heavy burden to show a culpable "state of mind *approximating actual intent*."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009).  Reckless conduct is "highly unreasonable"; "an extreme departure from the standards of ordinary care" to the extent "the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (citation omitted), and "*not merely a heightened form of negligence*," *S. Cherry St.*, 573 F.3d at 109.  Thus, "the showing as to the

---

[48] At the motion to dismiss stage, this Court rejected Individuals Defendants' argument that, pursuant to Section 15 of the Securities Act of 1933, the SEC must show that the Individual Defendants knew or recklessly disregarded that Ripple's actions were "improper."  ECF No. 441 at 16.  While the SEC has failed to meet its burden under any applicable standard, the Individual Defendants recognize this Court's prior decision as controlling for purposes of this Motion, but respectfully contend that the SEC must also meet this legal standard and has failed to do so.

[Individual Defendants'] states of mind required of the SEC here, while short of criminal intent, is formidable." *SEC v. AT&T*, 2022 WL 4110466, at *60.

The SEC argues (at 66-68) that the Individual Defendants knew or recklessly disregarded that XRP was a security. It also argues (at 38-43) that the Individual Defendants knew or recklessly disregarded that sales of XRP would satisfy *Howey*'s "common enterprise" and "expectation of profits from [Ripple's] efforts" elements individually. To reach those conclusions, the SEC relies on cherry-picked statements and asks the Court to draw adverse inferences that would preclude the Individual Defendants from testifying to their own mental states and ignores ample evidence supporting their lack of scienter. The Court should reject that effort.

The SEC's argument (at 40, 43) that the Individual Defendants "[u]nderstood that XRP *[c]ould* [b]e [c]onsidered a [s]ecurity" (emphasis added) fails both as a matter of law and as a matter of proof. That there was some risk that XRP "could be" considered a security is insufficient as a matter of law to establish knowledge or recklessness. A party cannot "know" or be reckless in not knowing of a violation of law if a reasonable basis exists for believing there was no violation. This is a long-accepted maxim in securities law. *See In re Bank of Am. AIG Discl. Sec. Litig.*, 980 F. Supp. 2d 564, 586 (S.D.N.Y. 2013) (holding that, if "reasonable minds could differ" on whether conduct constituted a violation of the securities laws, it "precludes scienter because reckless conduct must be 'highly *unreasonable*' and constitute 'an extreme departure from ordinary standards of care'") (citation omitted), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).[49] If reasonable minds could differ on whether XRP was an investment contract, the

---

[49] *See also Kalnit v. Eichler*, 264 F.3d 131, 144 (2d Cir. 2001) (holding that, because complaint "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness"); *Malik v. Network 1 Fin. Sec., Inc.*, 2022 WL 453439, at *3 (2d Cir. Feb. 15, 2022) (repeating same proposition); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) ("[R]eckless conduct is,

Individual Defendants are not liable.  A "small risk" of offers and sales of XRP constituting an investment contract is not sufficient.  *Cnty. Vanlines, Inc. v. Experian Info. Sols., Inc.*, 2005 WL 3117211, at *2 (2d Cir. Nov. 22, 2005) ("small risk of error, not a probability," did not render actions reckless).

Tellingly, after more than a two-year investigation and another 18 months of discovery, hundreds of thousands of pages of emails, and dozens of depositions, the SEC has identified no instance where either Individual Defendant even suggested a belief that XRP might be a security. Of the 1,600 "facts" in the SEC's 56.1 statement, none shows any indication that the Individual Defendants even suspected that XRP was an investment contract.  That is because they (correctly) believed the opposite.  A closer look at the evidence pertaining to each Individual Defendant confirms they reasonably believed that XRP was not a security and thus could not have been reckless in not concluding otherwise.  *See SEC* v. *Mattessich*, 523 F. Supp. 3d 624, 638 (S.D.N.Y. 2021) (denying SEC's motion for summary judgment because defendant's claim that he "reasonably believed" he had permission to act "raise[d] a disputed issue of fact" with respect to his scienter).

### 1.   Larsen Did Not Know and Was Not Reckless as to Whether XRP Was a Security

Larsen was CEO between September 2012 and December 2016.  56.1 Resp. ¶ 1722; Ex. 8, Larsen Tr. 49:16-18.  While he was CEO, Larsen focused on realizing Ripple's mission – to create an "Internet of Value" – that is, using technology to enable value to move as seamlessly as information does today over the Internet.  Defs.' 56.1 ¶ 35; Ex. 8, Larsen Tr. 232:19-234:4. Larsen has consistently considered XRP to have the attributes of a currency and, from time to

---

at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.") (citation omitted).

time, uses XRP to make purchases.  56.1 Resp. ¶¶ 1080-1081; Ex. 8, Larsen Tr. 90:3-7, 93:6-8.

During a presentation in October 2013 to federal regulators from approximately 12 different

agencies – including the SEC – Larsen described XRP as a "new currency."  56.1 Resp. ¶¶ 1632-

1633; Ex. 180 at -423; Ex. 181 at -270; Ex. 169, SJ Opp. Larsen Decl. ¶ 4.  The SEC stayed

silent for years after his presentation.[50]  56.1 Resp. ¶ 1635; Ex. 169, SJ Opp. Larsen Decl. ¶ 4.

Similarly, from 2012 to mid-2017, the SEC did not release any guidance on digital assets, nor

did it show any concern with XRP or Ripple's activities.  56.1 Resp. ¶ 1629; Ex. 169, SJ Opp.

Larsen Decl. ¶ 6.  In late 2015, Larsen spoke on a panel at the San Francisco Federal Reserve,

which was attended by both FinCEN and SEC personnel.  56.1 Resp. ¶ 1735; Ex. 8, Larsen Tr.

293:16-294:11.  The FinCEN panelist spoke about the settlement and said that it had made

Ripple "more regulator[ily] compliant"; the SEC panelist said nothing.  56.1 Resp. ¶ 1735; Ex. 8,

Larsen Tr. 293:16-294:11.  Larsen was also informed by government agencies' silence and

express statements.  Both FinCEN and the DOJ have labeled XRP a "virtual currency."  *See*

*supra* p. 42.  Larsen understood this as an "official United States government declaration that

XRP was a currency" and therefore "exempt from U.S. securities laws."  56.1 Resp. ¶ 1734; Ex.

8, Larsen Tr. 291:11-15; Ex. 169, SJ Opp. Larsen Decl. ¶ 5.

     The SEC points (at 8) to two legal memoranda issued in February and October 2012.  But

the February 2012 memo concerned a business plan that was never implemented.  The October

2012 memo analyzed the "revised business plan," "provide[d] additional analysis," and

concluded that a "compelling argument can be made" that XRP was *not* a security and noted only

---

[50] Director Hinman's speech, discussed *supra*, reinforced Larsen's view that XRP was
not a security – a belief further reinforced by the actions of foreign regulators, such as regulators
in the United Kingdom and Japan.  56.1 Resp. ¶ 1744; Ex. 8, Larsen Tr. 312:9-13 (the
"enormous markets of Japan, Singapore, United Kingdom, Switzerland, [and] UAE . . . have
made it crystal clear that XRP is a currency"); Ex. 169, SJ Opp. Larsen Decl. ¶ 8.

"some risk, *albeit small*," that the SEC would "disagree[ ] with [its] analysis."  SEC 56.1 ¶ 998;

PX 243 at -9463, -9466 (emphasis added).  Larsen testified that he understood that Ripple took

specific steps to ensure compliance with this memo.  56.1 Resp. ¶ 1730; Ex. 8, Larsen Tr.

252:19-253:15.  The SEC also asserts (at 40) that Larsen "understood that the XRP he received

was 'comp[ensation] for . . . personally assuming th[e] risk' of XRP being deemed a security."

In doing so, the SEC deliberately mischaracterizes the one, years-old email on which it relies

(from May 2014) and ignores Larsen's sworn deposition testimony that the email had nothing to

do with the securities laws but rather was focused on whether founders would be deemed

"issuers" of prepaid access for purposes of the money transmission laws.  *See* SEC 56.1 ¶ 999;

Ex. 8, Larsen Tr. 176:23-177:8.  These facts do not establish Larsen's scienter.

The best evidence that the SEC can muster – after years of investigation and litigation –

is an assertion (at 40) that Larsen "participated in Ripple's efforts to market XRP as an

investment" based on a handful of isolated emails, most of which Larsen did not write.  *See* SEC

56.1 ¶¶ 1063, 1066, 1067, 1070, 1075; PX 356, PX 363, PX 353, PX 360, PX 355.  It is

impossible to demonstrate the requisite mental state based on emails that Larsen received.  And

none shows Larsen promising any profits to XRP holders based on Ripple's efforts.

The SEC's attempt (at 39-41) to establish knowledge or recklessness on specific *Howey*

elements fares no better.  On the "common enterprise" element, throughout the relevant time

period, Larsen knew that XRP holders had no right to share in Ripple's earnings and profit.  56.1

Resp. ¶ 1745-1746; Ex. 169, SJ Opp. Larsen Decl. ¶ 9.  He knew that Ripple had no obligations

– contractual or otherwise – to XRP purchasers.  56.1 Resp. ¶ 1747; Ex. 169, SJ Opp. Larsen

Decl. ¶ 10.  He knew that his own sales proceeds were not combined with the proceeds of

Ripple's sales or any other XRP holder's proceeds, in a pool or in any other way.  Defs.' 56.1

¶ 291; Ex. 14, Larsen Decl. ¶ 4; 56.1 Resp. ¶ 1748; Ex. 169, SJ Opp. Larsen Decl. ¶ 11.  In

addition, to the extent the SEC vaguely claims that the "XRP ecosystem" was a common enterprise, Larsen knew that Ripple did not manage, control, or operate all parts of that ecosystem.  56.1 Resp. ¶ 1750; Ex. 169, SJ Opp. Larsen Decl. ¶ 12.

The SEC claims (at 39) that Larsen, like all XRP holders, had an interest in any XRP price appreciation and that Ripple funded certain of its operations through XRP sales.  As described above, none of that supports a finding of horizontal commonality.  *See supra* pp. 22-29; 56.1 Resp. ¶ 1751-1753; Ex. 169, SJ Opp. Larsen Decl. ¶ 13.  And none of it is supported by the facts – much less by undisputed facts – in any event.  56.1 Resp. ¶¶ 1056-1076.

The SEC's attempt (at 39) to establish knowledge or recklessness on the final *Howey* element is equally flawed.  It alleges that Larsen knew that XRP was being "offered and sold as an investment in Ripple's efforts," but the handful of old emails it cites falls far short of establishing this assertion – at most, those emails show that Larsen and a few others recognized the potential for XRP to increase in value.  56.1 Resp. ¶¶ 1062-1070; *see*, *e.g.*, PX 362.  It also asserts (at 39) that Larsen knew that investors were purchasing XRP because "he pitched XRP to them as an investment and because they told him so."  The SEC's broad assertion is based on out-of-context quotations from Larsen's testimony and from *ten* emails and interviews – *seven* of which are from 2013 and 2014.  56.1 Resp. ¶¶ 1063, 1065, 1066, 1067, 1068, 1069, 1070; PX 356, PX 503.01, PX 363, PX 353, PX 108, PX 58, PX 360.  None of the statements demonstrates that Larsen promoted XRP as giving holders rights to any share of Ripple's profits or dividends.  Only a few of the statements the SEC points to were even made by Larsen.

Larsen's statements and testimony at most point to the potential for XRP's value to increase or a recognition that XRP purchasers engage in speculation, which is insufficient as a matter of law.  *See supra* pp.32-34.  Even if it were relevant, the SEC points to no evidence that Larsen believed such speculation was in any way linked to Ripple's efforts.  The evidence

instead shows that Larsen *did not* consider the value of XRP to depend on Ripple's efforts because his view is that XRP has "an enormous market existing [on] hundreds of exchanges" and that "the XRP Ledger would continue on" "[i]f Ripple did not exist."  56.1 Resp. ¶ 1753; Ex. 8, Larsen Tr. 337:20-23.  Moreover, during the relevant period, Larsen understood the price of XRP to move with the price of bitcoin and ether, not because of any particular action by Ripple.  Resp. 56.1 ¶ 1752; Ex. 169, SJ Opp. Larsen Decl. ¶ 14.  The best the SEC can assert (at 39) is that "Larsen knew *that some investors* viewed XRP as an investment in Ripple" (emphasis added), but the SEC points only to a handful of emails, and only one links any appreciation in the value of XRP to the "TEAM," which is ambiguous and at best supports only the "investing in efforts" theory rejected by *Revak*.  56.1 Resp. ¶ 1070; SEC 56.1 ¶¶ 1063, 1066, 1067, 1070, 1075; PX 356, PX 360, PX 363, PX 353.  As noted above, that someone said something to Larsen, especially something ambiguous, is insufficient.

### 2. Garlinghouse Did Not Know and Was Not Reckless as to Whether XRP Was a Security

Garlinghouse became Ripple's Chief Operating Officer in April 2015, when XRP had been freely trading in the global marketplace for years, Defs.' 56.1 ¶¶ 18, 19, 32, 73; Ex. 2, D. Schwartz Decl. ¶ 4, and Ripple had already been developing products and commercial use cases for XRP, 56.1 Resp. ¶¶ 1756-1758.  In the first weeks after Garlinghouse joined the company, Ripple reached its settlement with FinCEN and the DOJ, under which XRP was labeled a "virtual currency."  *E.g.*, 56.1 Resp. ¶¶ 1759-1760; Ex. 76, Garlinghouse Tr. 278:14-279:25.  One of his first major projects at Ripple was helping it to achieve compliance with the settlement, and he rightly understood the settlement to mean that two government agencies classified XRP as a "virtual currency" and not a security.  *Id.*

Garlinghouse became CEO of Ripple in January 2017.  Defs.' 56.1 ¶ 143; Am. Compl. ¶ 17.  In this role, Garlinghouse frequently communicates with a variety of stakeholders, investors, colleagues, employees, and friends about XRP's regulatory status.[51]  Defs.' 56.1 ¶ 144; 56.1 Resp. ¶ 1761; Ex. 77, Garlinghouse SEC Test. 43:20-44:1.  Yet the SEC has not pointed to a single statement in which Garlinghouse expressed a view that XRP is – or even might be – a security or that he was reckless as to whether it was.  That is because, like Larsen, Garlinghouse does not believe and has never believed that XRP is a security.  56.1 Resp. ¶ 1762.[52]

Garlinghouse also understood that the SEC's limited guidance made clear that XRP was *not* a security.  *Id.*  Garlinghouse knew that XRP had never been offered through an ICO, a fact he found important in light of the SEC's prior enforcement actions.  56.1 Resp. ¶ 1768.  Garlinghouse also viewed XRP as sufficiently decentralized that it was not a security as framed by Hinman in his June 2018 speech.  56.1 Resp. ¶¶ 1769-1770; Ex. 76, Garlinghouse Tr. 51:7-18.  This view was all the more reasonable (and certainly not reckless) because XRP had been circulating for approximately four years when he became Ripple's CEO without any word from the SEC that it considered XRP a security.  It was further supported by a number of foreign

---

[51] The SEC suggests that Garlinghouse's use of the messaging app Signal, which pre-dated the SEC's investigation, Ex. 76, Garlinghouse Tr. 127:25-128:8, somehow bears on his knowledge or recklessness.  If the SEC had a valid basis for asserting that Garlinghouse engaged in evidence spoliation, it would have brought it to the Court.  *See* Fed. R. Civ. P. 37(e).  It has not because, it well knows, it lacks any basis for such a motion.  *See also* 56.1 Resp. ¶¶ 1170-1180.

[52] *See*, *e.g.*, Ex. 256, RPLI_SEC 0065738 (explaining in 2018 letter to Coinbase why XRP is not a security); Ex. 257, RPLI_SEC 0054426 ("I've never said I don't 'believe' [XRP is] a security.  I've said that it's NOT a security.  There is an important difference there."); Ex. 258, RPLI_SEC 0626650 (stating in 2018 email that he "continue[s] to gather evidence that the SEC (and those tangential to the SEC) do NOT believe that XRP is a security"); Ex. 259, RPLI_SEC 0491179 (telling Ripple shareholders in 2019 that "it's very clear to me that XRP is not a security").

regulators who concluded that XRP was not a security (including the U.K. and Japan), some of whom Garlinghouse met with personally.  56.1 Resp. ¶¶ 1782-1783.

As a prudent CEO in a nascent industry, Garlinghouse also proactively met with U.S. regulators to discuss XRP and digital assets.  56.1 Resp. ¶¶ 1772-1779; Ex. 76, Garlinghouse Tr. 46:22-47:2, 54:7-20, 55:1-14, 83:6-13, 213:9-12.  His interactions with regulators only confirmed his personal view that XRP was not a security.  56.1 Resp. ¶¶ 1772-1779; Ex. 76, Garlinghouse Tr. 56:25-57:16; Ex. 276, SEC-LIT-EMAILS-000456558.  When he met with then-Chairman Clayton and Director Hinman in late 2018, he was "encourag[ed]" to "continue [Ripple's] ongoing discussions with the staff of the Division of Corporation Finance," the very same policy Division whose leader had just publicly stated that ether was not a security for reasons that would seem to apply equally to XRP.  56.1 Resp. ¶¶ 1769-1770, 1776-1777.  A few months later, Garlinghouse recalls another Commissioner apologizing to him that he "even had to come here" to discuss XRP.  56.1 Resp. ¶ 1778.  As his contemporaneous communications confirm, and as he would explain to a jury, Garlinghouse rightly understood these interactions as confirmation that, at a minimum, the SEC had not determined that XRP was a security.  56.1 Resp. ¶¶ 1762, 1772-1779; *see also* 56.1 Resp. ¶¶ 171; 1780-1781.

The SEC relies on documents that would show, at best, that other people questioned whether, in light of the regulatory ambiguity that the SEC spent years cultivating, there was some risk that the agency might argue that XRP was a security.  But the evidence does not support even that insufficient inference.  For example, the SEC cites (at 43) what it purports to be suggestions by Ripple's former Chief Compliance Officer, Antoinette O'Gorman, that XRP had certain "'securities-type' characteristics."  The SEC misreads these statements.  O'Gorman was relaying the opinion of a third party, CoinCenter, that XRP *appeared to* have certain "securities-type characteristics"; O'Gorman herself disagreed.  56.1 Resp. ¶¶ 1763-1767; PX 18

at 217:23-218:14, 229:7-231:17, 235:17-20.  The SEC offers no serious argument for how Garlinghouse could have been reckless by *agreeing* with his own Chief Compliance Officer that XRP did not appear to be a security.  Nor does the SEC's reliance (at 35) on O'Gorman's advice about addressing the risks that the SEC might consider XRP to be a security help its case.  56.1 Resp. ¶ 1763; PX 18 at 234:2-21.  Identifying and mitigating a risk – for example, taking steps to accurately describe XRP to counter any misapprehension that it had "securities-type characteristics" – is not reckless, but prudent.  *See*, *e.g.*, *Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (finding no scienter where "defendants engag[ed] in a good-faith process to inform themselves and the public of the risks").[53]  At most, the SEC's evidence raises a genuine question of material fact.

The SEC's arguments for Garlinghouse's knowledge or recklessness on the "common enterprise" element also fail.  Garlinghouse knew that Ripple had its own equity shareholders; that XRP holders had no right to share in Ripple's revenue or profit; that none of Ripple's proceeds was pooled with others; and that Ripple owed no obligations – contractual or otherwise – to any purchasers of XRP.  56.1 Resp. ¶¶ 1784-1787.  He repeatedly expressed these sentiments both internally and publicly.  *E.g.*, *id.*; Ex. 172, RPLI_SEC 0579742 ("there is no . . . agreement with Ripple and holders of XRP:  we have never promised any profits or returns to holders of XRP"; "you don't have a contract with anyone simply by owning XRP").  Garlinghouse candidly acknowledged that, as a large holder of XRP, Ripple and its shareholders wanted the price of XRP to increase.  56.1 Resp. ¶¶ 1788-1790.  But, as explained above, this does not equate to joining in a common enterprise with other holders of that asset.

---

[53] *See also In re Tremont Sec. Law, State Law, & Ins. Litig.*, 2013 WL 5179064, at *6 (S.D.N.Y. Sept. 16, 2013) (defendant's recognition of generalized risks does not constitute recklessness), *aff'd*, *Elendow Fund, LLC v. Rye Inv. Mgmt.*, 588 F. App'x 27 (2d Cir. 2014).

The SEC points (at 41) to facts it alleges show that Garlinghouse knew that an increase in XRP's price meant an increase in Ripple's valuation.  But, again, mere alignment of incentives was not enough.  If it were, every commodity owned in significant share by a company would be transformed into a security.  56.1 Resp. ¶¶ 1788-1790; PX 503.18 at 19:8-15.  The SEC also claims (at 41-42) that Garlinghouse understood Ripple's valuation was driven by XRP's price and tied XRP's rise in price to Ripple's efforts.  But – even if that were enough standing alone to show the forming of a "common enterprise" (and it is not) – the sources the SEC cites to support this argument make clear that Garlinghouse did not actually "want to measure [Ripple's] success by the [price] gyrations here."  SEC 56.1 ¶ 1139; PX 408 at 37:10-14.

Nor can the SEC sustain its argument that Garlinghouse knew or was reckless as to whether *Howey*'s "expectation of profits based solely on the efforts of others" element was satisfied.  Garlinghouse correctly understood that as CEO his obligations were to Ripple's *shareholders*, not to XRP holders, and that Ripple was not making efforts for the purpose of benefiting XRP holders.  56.1 Resp. ¶¶ 1784, 1785, 1787.  The record demonstrates that his efforts were appropriately directed at developing Ripple's business interests, including its products and relationships with other firms and generating value for its shareholders.  56.1 Resp. ¶ 1791; Ex. 269, RPLI_SEC 0556099; Ex. 259, RPLI_SEC 0491179.  For example, Garlinghouse stated at internal Ripple "all hands" meetings that the "most important metric" for measuring Ripple's success was "bookings of software and services," not the value of XRP, and that the value of XRP was not Ripple's critical mission.  56.1 Resp. ¶¶ 1793-1794.  Garlinghouse also knew that purchasers of XRP obtained no ownership or other rights with respect to Ripple merely through their purchase of XRP, and conversely that Ripple owed purchasers of XRP no obligations merely because of their purchases.  56.1 Resp. ¶¶ 1784-1787.

The SEC tries (at 42) to make much of the fact that Garlinghouse was aware that some individuals were purchasing XRP for speculative purposes.  But, again, speculative intent does not convert an asset into a security as a matter of law, and the SEC does not even try to argue that Garlinghouse knew there was any link between XRP purchasers' speculative intent and Ripple's efforts.  *See supra* pp.32-34.  Nor could it; Garlinghouse did not and could not know why individuals bought XRP.  56.1 Resp. ¶ 1799; Ex. 76, Garlinghouse Tr. 372:4-373:13.[54]

Record evidence shows that Garlinghouse was aware of facts proving that the value of XRP was not tied to the success of Ripple.  In one email, Garlinghouse explained that Ripple had one of its best quarters based on signing new product customers, while the value of XRP and the broader digital asset market "was down over 70 percent."  56.1 Resp. ¶ 1795; Ex. 266, RPLI_SEC 0053629.  And the SEC has admitted that the market value of XRP could decrease even if Ripple expended substantial good-faith efforts to support its business endeavors, and the market value of XRP could increase even if Ripple reduced its business efforts related to XRP.  56.1 Resp. ¶¶ 1796-1797.  Garlinghouse also knew that, since at least 2018, the price of XRP has been closely correlated with the prices of bitcoin and ether, showing that XRP's price does not react to Ripple's actions, but to the overall market forces of supply and demand.  56.1 Resp. ¶ 1798.  That XRP moved in alignment with other digital assets and diverged from Ripple's profits or losses is, standing alone, dispositive of the SEC's argument.

In addition, Garlinghouse knew that anyone could and did develop applications and products that use the XRPL and XRP.  56.1 Resp. ¶ 1800; *see also* ECF No. 661 (explaining

---

[54] The SEC suggests that Garlinghouse himself attempted to drive speculative interest in XRP, but only cites to statements where he disclosed his own "long" position.  SEC 56.1 ¶¶ 1134, 1144.  These truthful statements of Garlinghouse's own holdings and positive outlook toward XRP (along with other digital assets like bitcoin) are irrelevant to the SEC's assertion that other XRP purchasers relied on Ripple's efforts to drive their profits.

XRP's use as currency in exchange for services).  In short, Garlinghouse understood that his mission was to develop the company's strategy, sign up customers, and problem-solve for existing customers, not to deliver profits to XRP holders as part of a common enterprise they had formed with Ripple.  56.1 Resp. ¶¶ 1791-1792.

### C.    Even if Ripple's Sales Violated Section 5, There Is a Genuine Dispute as to Whether the Individual Defendants Substantially Assisted Such Violations

The SEC has the burden of showing "substantial assistance" by the Individual Defendants.  If the Court credits the SEC's argument that Garlinghouse substantially assisted Ripple's alleged Section 5 violation on the established record (it should not), the SEC concedes (at 38) that his substantial assistance began only once he became Ripple's CEO in January 2017. Therefore, the SEC is not entitled to summary judgment on its aiding-and-abetting claim against Garlinghouse for any of Ripple's offers and sales of XRP that took place before January 2017.

The SEC alleges that Larsen substantially assisted all the way until December 2020.  But it ignores that he had transitioned from CEO to Executive Chairman of the Board as of January 1, 2017.  Defs.' 56.1 ¶¶ 128-129; 56.1 Resp. ¶¶ 1722-1723.  There is at least a genuine fact dispute as to whether Larsen provided "substantial assistance" from 2017 onward; indeed, the undisputed evidence is that Larsen had no significant day-to-day operational role at Ripple at that time.  56.1 Resp. ¶¶ 1724-1729; Ex. 1, D. Schwartz Tr. 396:2-17 (Larsen "shows up as a board member at board meetings, but his day-to-day responsibility was dropped"); Ex. 10, Vias Tr. 57:15-18 (Larsen "was mostly a listener.  He didn't – wasn't a ton of participation by Chris in those meetings.").  Indeed, the SEC does not cite a single document from 2017 onward showing Larsen "assisting" a single offer or sale of XRP in any way.  This is far from sufficient to carry the SEC's burden, which requires Larsen to have actively " 'participate[d] in' " an alleged Section 5 violation by Ripple.  ECF No. 441 at 18 (quoting *SEC v. Apuzzo*, 689 F.3d 204, 206

(2d Cir. 2012)).  "[M]ere awareness and approval of [a] primary violation is insufficient," *SEC v. Tecumseh Holdings Corp.*, 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009), but the SEC can prove no more than that – and indeed cannot prove awareness and approval in the first place.[55]

## V.  THE SEC HAS NOT SHOWN THAT ANY DEFENDANT'S OFFERS OR SALES WERE DOMESTIC

The U.S. securities laws do not apply extraterritorially.  Thus, the SEC has the burden to prove the domesticity of each and every offer to sell and sale of XRP.  *See*, *e.g.*, *SEC v. Ahmed*, 308 F. Supp. 3d 628, 660 (D. Conn. 2018) ("SEC must prove" domesticity "as to each transaction at issue").  This is a "merits question":  If the SEC cannot show that each specific challenged transaction is within the territorial scope of the securities laws, then no liability attaches to that transaction.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010); Defs.' MSJ at 58-60 (citing authority).

The SEC has not even attempted to meet its burden.  It points to no undisputed facts showing that any *specific* offer and sale of XRP by any Defendant was domestic, nor does it even argue that it has satisfied *Morrison*.  This is a complete failure of proof on an essential element of the SEC's claims, which requires denial of its Motion for Summary Judgment.  *See Giannullo*, 322 F.3d at 140-41.

The SEC's failure to address this element appears to have been strategic.  That is because it is beyond dispute that for at least some of Defendants' sales – including *all* offers to sell and

---

[55] The SEC's authority is not to the contrary.  In *SEC v. Wey*, the defendant "carried out [the primary defendant's] instructions."  246 F. Supp. 3d 894, 930 (S.D.N.Y. 2017).  In *SEC v. Grenda Group, LLC*, the defendant was at all times the "sole owner, Chief Compliance Officer, and sole member" of the corporate, primary defendant and decided, in violation of the Investment Advisers Act of 1940, to continue the business even after the primary defendant – his father – had impersonated him and violated applicable regulations.  2021 WL 1955330, at *11, *13 (W.D.N.Y. May 17, 2021).  In *SEC v. Mudd*, the court denied summary judgment where the defendant personally signed misleading disclosures.  2016 WL 815223, at *7 (S.D.N.Y. Feb. 29, 2016).

sales that occurred on foreign exchanges – the SEC could not prove the transactions were domestic even if it had tried.  Defs.' MSJ at 65-74 (citing authority); *see Morrison*, 561 U.S. at 267 ("We know of no one who thought the Act was intended to 'regulat[e]' foreign securities exchange—or indeed who even believe that . . . Congress had the power to do so.").  Had the SEC tried to prove domesticity for the full scope of offers and sales of XRP on which it seeks summary judgment – that is, every single one of them – it would have been obvious that the SEC's case is overbroad and untenable.  And this is no *de minimis* amount.  Roughly 95% of Garlinghouse's and 87% of Larsen's proceeds from their XRP transactions came from sales on just such foreign exchanges that are obviously not domestic.  Defs.' MSJ at 59.  A substantial portion of Ripple's did as well.  56.1 Resp. ¶ 1624; Ex. 11, Ferrell Report ¶ 49.

The SEC never even attempts to form an argument on domesticity as to any specific trade.  The few stray facts the SEC does reference – the locations of the sellers, buyers, and sellers' accounts – are plainly insufficient to establish domesticity as to any specific transaction for any Defendant for which the SEC seeks summary judgment.  And, as explained below, none of these factors establishes domesticity for the demonstrably foreign offers to sell and sales by the Individual Defendants for which they have affirmatively moved for summary judgment.

*First*, the SEC plainly cannot carry its burden as to all trades merely by claiming (at 41, 45) that "most of" the Individual Defendants' offers or sales were made from within the United States.  Offers to sell and sales on foreign exchanges are made on that exchange, as if the parties had "figuratively traveled" there.  Defs.' MSJ at 69-70; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014) (finding it insufficient to allege that a U.S. entity "placed a buy order [of a foreign security] in the United States that was then executed on a foreign exchange"); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 626 (S.D.N.Y. 2010).  Mere conduct within the United States does not factor into the *Morrison* analysis where sales

themselves occurred abroad.  *See, e.g.*, *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) ("[D]irection to wire transfer money to the United States is insufficient to demonstrate a domestic transaction" because the wire transfers "were actions needed to carry out the transactions, and not the transactions themselves.").  And the SEC has not even pointed to any evidence that any Defendant made any specific offer to sell or sale while they were in the United States, thus failing to carry its burden.

*Second*, it is equally irrelevant whether purchasers of XRP were located in the United States or whether Defendants restricted sales to non-U.S. purchasers.  The purchaser's location "does not affect where a transaction occurs."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012); *see Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 178 (S.D.N.Y. 2010).  And, again, the SEC does not point to any specific evidence that Defendants offered or sold XRP to U.S.-based purchasers.

*Third*, the SEC's assertion (at 41, 45) that the Individual Defendants – after completing transactions on foreign exchanges – withdrew U.S. dollars to accounts at U.S. banks and Bitstamp USA is irrelevant.  *See Loginovskaya*, 764 F.3d at 275 (moving assets into or out of a U.S.-based account is "insufficient to demonstrate a domestic transaction").  The SEC does not claim that Bitstamp is incorporated, is domiciled, or has its principal place of business in the United States, Ex. 83, SEC Answers to RFA Nos. 1112-1113, 1115; and Larsen's and Garlinghouse's accounts were not migrated from a U.K.-based account to a U.S.-based Bitstamp USA account until April 2020.  56.1 Resp. ¶ 1801; Ex. 272, BS-LTD-00000005 at -011.

Thus, the Court should deny summary judgment as to all transactions because the SEC has failed to make any offer of proof, let alone prove beyond dispute, that any specific transaction is domestic for any Defendant.  And it should grant summary judgment in favor of the Individual Defendants on their foreign exchange trades for which the SEC could never satisfy

its burden under *Morrison* because they are demonstrably outside the ambit of the SEC's regulatory authority.

## VI.  THE INDIVIDUAL DEFENDANTS' OFFERS AND SALES WERE EXEMPT UNDER SECTION 4(a)(1)

The SEC also is not entitled to summary judgment with respect to the Individual Defendants' sales of XRP because those transactions were exempt from registration.  Section 4(a)(1) of the Securities Act exempts "transactions by any person other than an issuer, underwriter, or dealer."  15 U.S.C. § 77d(a)(1).  The SEC contends (at 65-66) that the Individual Defendants are not exempt under Section 4(a)(1) because, as "affiliates" of Ripple, they are "issuer[s]."  Not so.  The Act does not define "issuers" to include affiliates, except when determining whether someone else qualifies as an "underwriter."[56]  In all the cases on which the SEC relies, the alleged affiliate sold not to the open market, but rather to parties who purchased with a view to resale.  *See*, *e.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 134 (2d Cir. 1998) (defendant was an active participant in sales to Spanish entities with a view to resell to the market).  Here, the Individual Defendants sold XRP directly on various cryptocurrency exchanges, largely overseas.  Defs.' 56.1 ¶¶ 280-285, 289, 306-310.  The SEC offers no evidence that any of them were "underwriters" who purchased with a "view to . . . distribution" of XRP.  15 U.S.C. § 77b(a)(11).

### CONCLUSION

The Court should deny the SEC's Motion.

---

[56] *Compare* 15 U.S.C. § 77b(a)(11) ("As used *in this paragraph* the term 'issuer' shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." (emphasis added)) *with id*. § 77b(a)(4) ("The term 'issuer' means every person who issues or proposes to issue any security . . . .").

Date:  October 18, 2022

/s/ Michael K. Kellogg
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer
Bethan R. Jones
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com
bjones@kellogghansen.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Counsel for Defendant Ripple Labs Inc.*

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
+1 (202) 974-1680

*Counsel for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Counsel for Defendant Christian A. Larsen*