# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

Case No. 20-cv-10832 (AT) (SN)

-against-

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN,

Defendants.

**BRIEF OF *AMICUS CURIAE* THE BLOCKCHAIN ASSOCIATION**

Jason Gottlieb
Michael Mix
Daniel C. Isaacs
MORRISON COHEN LLP
909 Third Avenue
New York, New York 10022
Telephone:  (212) 735-8600
Facsimile:   (212) 735-8708

*Attorneys for Amicus Curiae*
*The Blockchain Association*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

INTERESTS OF *AMICUS CURIAE* ........................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

ARGUMENT ................................................................................................................ 4

    I.     THE COURT SHOULD CONSIDER A TOKEN'S PARTICULAR USE OR
          PURPOSE ........................................................................................................ 4

    II     THE SEC UNLAWFULLY INCLUDES SECONDARY SALES AS EVIDENCE OF
          AN INVESTMENT CONTRACT ................................................................... 8

    III.   UNDER THE *HOWEY* TEST, MANY SECONDARY MARKET TRANSACTIONS
          IN TOKENS ARE NOT SECURITIES TRANSACTIONS ..................................... 10

        A.    The *Howey* Test ..................................................................................... 10

            1.   Many Blockchain Transactions Do Not Satisfy the "Investment of Money"
                Clause ................................................................................................. 11

            2.   Many Blockchain Transactions Do Not Satisfy the "Common Enterprise"
                Prong ................................................................................................. 13

            3.   Many Blockchain Transactions Do Not Satisfy the "Expectation of Profits"
                Prong ................................................................................................. 16

            4.   Many Blockchain Transactions Do Not Satisfy the "Efforts of
                Others" Prong ................................................................................... 18

    IV.   THE RIPPLE DEFENDANTS' FAIR NOTICE DEFENSE RAISES CONCERNS
          THAT ARE COMMON IN THE INDUSTRY ........................................... 20

    V.    UNDER *MORRISON*, THE SECURITIES LAWS ARE INAPPLICABLE TO
          EXTRATERRITORIAL TOKEN TRANSACTIONS ................................... 26

CONCLUSION ............................................................................................................ 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
 677 F.3d 60 (2d Cir. 2012)......................................................................................26, 27, 29

*Anderson v. Binance*,
 No. 1:20-cv-2803 (ALC), 2022 U.S. Dist. LEXIS 60703
 (S.D.N.Y. Mar. 31, 2022) .........................................................................................28

*Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*,
 763 F. Supp. 36 (S.D.N.Y. 1991) .............................................................................17

*Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.*,
 No. 16 Civ. 8800 (RMB), 2019 WL 2514056 (S.D.N.Y. June 18, 2019) ..............28

*Cavello Bay Reinsurance Ltd. v. Stein*,
 986 F.3d 161 (2d Cir. 2021) .....................................................................................27

*Davis v. Rio Rancho Estates, Inc.*,
 401 F. Supp. 1045 (S.D.N.Y. 1975)..........................................................................15

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
 608 F.2d 1297 (9th Cir. 1979) ..................................................................................15

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
 147 F.3d 118 (2d Cir. 1998).......................................................................................27

*Fraser v. Fiduciary Tr. Co. Int'l*,
 No. 04 Civ. 6958 (RMB) (GWG), 2005 U.S. Dist. LEXIS 48059
 (S.D.N.Y. June 23, 2005)...........................................................................................11

*Hart v. Pulte Homes of Michigan Corp.*,
 735 F.2d 1001 (6th Cir. 1984) ..................................................................................15

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel*,
 439 U.S. 551 (1979)...................................................................................................11

*Libaire v. Kaplan*,
 No. CV 06-1500 (DRH) (ETB), 2008 U.S. Dist. LEXIS 145311
 (E.D.N.Y. Jan. 17, 2008) ...........................................................................................17

*Loginovskaya v. Batratchenko*,
 764 F.3d 266 (2d Cir. 2014).......................................................................................28

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010)..............................................................................26, 27, 28, 29

*Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings SE*,
   763 F.3d 198 (2d Cir. 2014)............................................................................ 26-27

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994)....................................................................................13

*S&S N.Y. Holdings, Inc. v. Able Energy, Inc.*,
   No. 11 Civ. 2388 KBF, 2012 WL 3084112
   (S.D.N.Y. July 27, 2012) .....................................................................................15

*Schentag v. Nebgen*,
   No. 17 Cv. 8734 (GHW), 2018 WL 3104092
   (S.D.N.Y. June 21, 2018)....................................................................................28

*SEC v. Edwards*,
   540 U.S. 389 (2004)............................................................................................17

*SEC v. Gruss*,
   859 F. Supp. 2d 653 (S.D.N.Y. 2012)................................................................27

*SEC v. Kik Interactive Inc.*,
   19 Civ. 5244 (AKH) (S.D.N.Y.)...........................................................................9

*SEC v. Kik Interactive Inc.*,
   492 F. Supp. 3d 169 (S.D.N.Y. 2020).................................................................14

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020)....................................................16, 17, 25

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).................................................................................. *passim*

*United Housing Found., Inc. v. Forman*,
   421 U.S. 837 (1975)....................................................................................... 16-17

*Williams v. Block One*,
   No. 20-cv-2809 (LAK), 2022 U.S. Dist. LEXIS 171550
   (S.D.N.Y. Aug. 15, 2022) ...................................................................................29

*Woodward v. Terracor*,
   574 F.2d 1023 (10th Cir. 1978) ..........................................................................15

## STATUTES

15 U.S.C. § 77(e) ......................................................................................................25

iv

15 U.S.C. § 77b(1) ..................................................................................................................10

15 U.S.C. § 77v ......................................................................................................................27

CFR § 240.12g-1 ....................................................................................................................24

CFR § 240.15c2-11 .................................................................................................................24

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ...............................27

Investment Advisers Act of 1940 ...........................................................................................27

Rule 15c3 ................................................................................................................................23

Rule 144(c)(2) .........................................................................................................................24

Rule 901 ..................................................................................................................................27

Rule 903 ..................................................................................................................................27

Securities Act of 1933 ...................................................................................................... *passim*

Securities Exchange Act of 1934 ...........................................................................................20

**OTHER AUTHORITIES**

Alex Lielacher, *What Is A Governance Token? A Beginner's Guide*, Crypto.News (July 24,
    2022), https://crypto.news/learn/what-is-a-governance-token/ ................................7

Andrew Hayward, *Andreessen-Backed Helium Raises $111 Million to Grow Crypto Wireless
    Network*, Decrypt (Aug. 10, 2021), https://decrypt.co/78222/andreessen-backed-helium-
    raises-111-million-to-grow-crypto-wireless-network ..............................................6

Andrew Torba, *I Bought Subway With Bitcoin and It Was Awesome*, Coindesk (Nov. 22, 2013),
    https://www.coindesk.com/business/2013/11/22/i-bought-subway-with-bitcoin-and-it-was-
    awesome/ ...................................................................................................................5

*Blockchain for Supply Chain: Track and Trace*, Amazon Web Services,
    https://aws.amazon.com/blockchain/blockchain-for-supply-chain-track-and-trace/ (last
    visited Oct. 25, 2022) .................................................................................................7

Chris Katje, *AMC To Accept Bitcoin and Crypto For Payment,
    Are NFT Commemorative Tickets Next?*, Yahoo! Finance (Sept. 19, 2021),
    https://finance.yahoo.com/news/amc-accept-bitcoin-crypto-payment-205509000.html..........5

David Hollerith, *SEC Chair Gensler says "vast majority' of cryptocurrencies are securities*,
    Yahoo! Finance (Sept. 8, 2022), https://finance.yahoo.com/news/sec-chair-gensler-majority-
    cryptocurrencies-securities-124610154.html...............................................................9

DINNGO, *The Known and the Unsaid from the SEC's Framework* (Aug. 20, 2019), https://medium.com/dinngo-exchange/the-known-and-the-unsaid-from-the-secs-framework-ad8b2a7c6d2c ..................................................................................................................22

Framework for "Investment Contract" Analysis of Digital Assets, Securities and Exchange Commission (Apr. 3, 2019), *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets ...............................................................21

Gary Gensler, Chairman, *Securities and Exchange Comm'n, Prepared Remarks of Gary Gensler on Crypto Markets, Penn Law Capital Markets Association Annual Conference* (April 4, 2022), *available at* https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422...................................................................................................................................2

Gary Gensler, Chairman, *Securities and Exchange Comm'n, Remarks Before The Aspen Security Forum* (Aug. 3, 2021), *available at* https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03.................................................................................................2

Gary Gensler, Chairman, *Securities and Exchange Comm'n, Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulation Before the Financial Stability Oversight Council Open Meeting* (Oct. 3, 2022), *available at* https://www.sec.gov/news/speech/gensler-statement-fsoc-meeting-100322 ...........................2

Hester M. Peirce, Commissioner, *Securities and Exchange Comm'n*, *How We Howey* (May 9, 2019), *available at* https://www.sec.gov/news/speech/peirce-how-we-howey-050919..........22

*In the Matter of Block.one*, SEC Admin. Proc. 3-19568 (Sept. 30, 2019), *available at* https://www.sec.gov/litigation/admin/2019/33-10714.pdf .......................................................9

*In The Matter of Munchee Inc.*, SEC Admin. Proc. 3-18304 (Dec. 11, 2017), *available at* https://www.sec.gov/litigation/admin/2017/33-10445.pdf .......................................................9

*In the Matter of Tokenlot, LLC, Lenny Kugel, and Eli L. Lewitt*, SEC Admin. Proc. 3-18739 (Sept. 11, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10543.pdf ......9

*In The Matter of Tomahawk Exploration LLC and David Thomas Laurance*, SEC Admin Proc. 3-18641 (August 14, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10530.pdf ................................................................................................................................12

*In the Matter of Zachary Coburn*, SEC Admin. Proc. 3-18888 (Nov. 8, 2018), *available at* https://www.sec.gov/litigation/admin/2018/34-84553.pdf .......................................................9

Jazmin Goodwin, *What is an NFT? Non-fungible tokens explained*, CNN Business (Nov. 10, 2021), https://www.cnn.com/2021/03/17/business/what-is-nft-meaning-fe-series/index.html.7

Leeor Shimron, *Amazon.eth, Starbucks.bitcoin, Coke.dao? Crypto Domain Names Are The Next Big NFT Craze*, Forbes (Sept. 10, 2022), https://www.forbes.com/sites/leeorshimron/2022/09/10/amazoneth-starbucksbitcoin-cokedao-crypto-domain-names-are-the-next-big-nft-craze/?sh=4cc5e866b1dd .......................7

Mehnaz Yasmin and Saeed Azhar, *BNY Mellon to offer crypto services in digital asset push*, Yahoo! Finance (Oct. 11, 2022), https://finance.yahoo.com/news/bny-mellon-offer-crypto-services-143413827.html ........................................................................................................6

*Nexon America Accepts Cryptocurrencies for Purchase of In-Game Items*, Yahoo! Finance (Dec. 14, 2021), https://finance.yahoo.com/news/nexon-america-accepts-cryptocurrencies-purchase-150000404.html ........................................................................................................6

Oliver Knight, *Google Partners With Coinbase to Accept Crypto Payments for Cloud Services*, Yahoo! Finance (Oct. 11, 2022), https://ca.finance.yahoo.com/news/google-partners-coinbase-accept-crypto-121803385.html ........................................................................5

*Over-the-Counter Market*, Securities and Exchange Commission (May 9, 2013), https://www.sec.gov/divisions/marketreg/mrotc.shtml ........................................................25

*PayPal Users Can Now Transfer, Send, and Receive Bitcoin, Ethereum, Bitcoin Cash, and Litecoin*, Paypal (Aug. 12, 2022), https://newsroom.paypal-corp.com/2022-06-07-PayPal-Users-Can-Now-Transfer-Send-and-Receive-Bitcoin-Ethereum-Bitcoin-Cash-and-Litecoin ..6

Public Statement, Commissioner Hester Peirce and Commissioner Elad Roisman, SEC, In the Matter of Coinschedule (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule ........................................................................................................23

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Securities and Exchange Comm'n (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf ....................................................20

Roy Gaurav, *How The Gaming Industry Uses Crypto?*, CoinMarketCap (Jan. 2022), https://coinmarketcap.com/alexandria/article/how-the-gaming-industry-uses-crypto .............6

*Rule 144: Selling Restricted and Control Securities*, Securities and Exchange Comm'n (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html ............................................................................24

Samyuktha Sriram, *Customers Can Reload Starbucks Card With Bitcoin and Ethereum As Coffeehouse Explores 'Tokenizing Stars,'* Yahoo! Finance (Nov. 11, 2021), https://finance.yahoo.com/news/customers-reload-starbucks-card-bitcoin-154130368.html ...5

Shivani Vora, *The Global Restaurant Brand With The Million Dollar NFT Membership Club*, Forbes (Mar. 19, 2022), https://www.forbes.com/sites/shivanivora/2022/03/19/the-global-restaurant-brand-with-the-million-dollar-nft-membership-club/?sh=4ff4dab31a5f .................7

Tomio Geron, *Why Stablecoins Stand Out in the Cryptocurrency World*, The Wall Street Journal (June 10, 2019), https://www.wsj.com/articles/why-stablecoins-stand-out-in-the-cryptocurrency-world-11560218460 ........................................................................................7

*What Are Liquidity Pools?*, Gemini (Nov. 30, 2021), https://www.gemini.com/cryptopedia/what-is-a-liquidity-pool-crypto-market-liquidity ................................................................................6

*What Are Transaction Fees?*, Bitcoin.com, https://www.bitcoin.com/get-started/what-are-transactions-fees/ (last visited Oct. 25, 2022). ...........................................................................6

*Why Decentralized Data Storage Could be the Next Big Thing in Web 3.0*, Cryptonews (Sept. 19, 2022), https://cryptonews.com/news/why-decentralized-data-storage-could-next-big-thing-web-30.htm ......................................................................................................................6

William Hinman, *SEC, Digital Asset Transactions: When Howey Met Gary (Plastic), Remarks at the Yahoo Finance All Markets Summit: Crypto* (June 14, 2018), *available at* https://www.sec.gov/news/speech/speech-hinman-061418....................................................23

**INTERESTS OF *AMICUS CURIAE***

The Blockchain Association (the "Association") is a membership organization of industry leaders advocating for the innovation and collaboration necessary to support American leadership of the blockchain industry. The Association advocates for a public policy environment to help blockchain networks thrive in the United States. The Association accomplishes this goal by educating key constituencies about how blockchain technology can bring about a more secure, private, and competitive digital marketplace in the United States. It also advocates for regulatory clarity so that the United States can be the leader in blockchain innovation. It further coordinates with industry, government, and aligned groups to amplify the Association's message and effect meaningful change. The Association's nearly one hundred members range from blockchain projects to early stage investors, exchange platforms, and other infrastructure providers.[1]

The Association is keenly interested in major litigation regarding blockchain issues, because in this nascent area, overly broad court rulings could negatively affect the entire blockchain industry in entirely unanticipated and unintended ways. The Association, as a leader in the blockchain industry, has a significant interest in this litigation: a ruling that does not account for the many different types of blockchain technologies and industry uses, in ways that make material differences in legal outcomes, could deleteriously affect the Association and its members.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Statements made by the Securities and Exchange Commission (the "SEC") in this case and others illustrate that it views the United States securities laws, and in particular the registration provisions, as applying beyond the initial "investment contract" between the issuer of a blockchain product and its primary purchasers. In other words, even if an initial token issuance qualified as an investment contract, and thus had to be registered (or qualify for an exemption) under Section

---

[1]     This *amicus* brief reflects the views of the Association, but does not reflect the views of any individual member of the Association. While Ripple Labs, Inc. ("Ripple") is a member of the Association, it did not contribute to or participate in the preparation of this brief.

5 of the Securities Act of 1933, the SEC seems to believe that that token remains a "security" through further, downstream transactions, no matter what rights the initial purchaser kept for themselves (vis-à-vis the seller) before selling the token downstream, why the downstream user purchases that token, or how that token is used.  Indeed, the SEC Chair Gary Gensler recently opined, without significant explanation, that the "vast majority" of tokens are securities.[2]

Put simply, that view should not be – cannot be – the law.  A token is a piece of software. There is no doubt that anything, even software, can be issued as part of an investment contract. There is also no doubt that the software itself, transferred without any legal rights at all, is not that investment contract.

The SEC's extremely broad interpretation of the securities laws would have devastating effects on the industry (and even outside the industry).  Market participants acquire tokens in many different ways, and use them for many different purposes.  Many of those methods or uses have nothing to do with primary sales or distributions of tokens, such as payment for goods and services, conveyance of intellectual property rights, inventory tracking and other "back office" functions, or for a specific purpose in a given blockchain project.

In fact, numerous other examples from the industry demonstrate how tokens are used in practice, outside the ambit of anything that could possibly be considered an investment contract.

---

[2]     *See* Gary Gensler, Chairman, *Securities and Exchange Comm'n, Statement on Financial Stability Oversight Council's Report on Digital Asset Financial Stability Risks and Regulation Before the Financial Stability Oversight Council Open Meeting* (Oct. 3, 2022), *available at* https://www.sec.gov/news/speech/gensler-statement-fsoc-meeting-100322 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities"); *see also* Gary Gensler, Chairman, *Securities and Exchange Comm'n, Prepared Remarks of Gary Gensler on Crypto Markets, Penn Law Capital Markets Association Annual Conference* (April 4, 2022), *available at* https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422 ("many of the tokens trading on these platforms may well meet the definition of 'securities'"); Gary Gensler, Chairman, *Securities and Exchange Comm'n, Remarks Before The Aspen Security Forum* (Aug. 3, 2021), *available at* https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 ("I believe we have a crypto market now where many tokens may be unregistered securities").

Indeed, much of the industry focuses on building digital networks that utilize tokens that are not designed or intended to qualify as securities.  Applying the securities laws to those tokens – whether or not through the prism of the *Howey* test – would significantly restrict those networks from functioning.  In this case, a ruling not narrowly tailored to the particular facts at issue could create havoc across a wide array of individuals and entities in the blockchain space.

Additionally, the SEC's draconian view that a token initially sold in an investment contract continues to be inextricably linked with that investment contract when it is subsequently transferred – even when any legal rights between the issuer and the initial purchaser are not transferred with the token – would destroy nearly an entire industry.  Numerous tokens would not be able to function for their intended purpose, or at all.

Market participants across the industry already struggle to see through the fog as to how securities laws apply to digital assets due to the SEC's pattern of "regulation by enforcement," and its history of inconsistent, incomplete, and confusing public statements.  Here, for instance, the SEC asserts that any market participant of ordinary intelligence should not only understand that XRP was originally issued as part of an investment contract, but that XRP itself, in its current incarnation in a secondary market, is a security.  The SEC's position that market participants can simply follow the securities laws falls flat, because the securities laws do not contemplate how an asset that may have been issued as a security can exist when it is no longer attached to any form of investment contract, a crucial consideration when attempting to apply *Howey*.

The SEC's apparent response to these concerns – relegated to a footnote in its 75-page opposition brief, and (to our knowledge) not previously stated in any formal rule or guidance – is that the industry need not worry about secondary market transactions in tokens, because an initial token seller like Ripple should register its token as a security, and transactions between two public investors not involving affiliates, dealers, or underwriters are exempt from registration

requirements, "despite such transactions involving securities." This answer cannot suffice. Registration is not "just" registration. It necessitates following the securities laws and regulations for buying, selling, brokering, dealing, custodying, trading, and exchanging. And those regulations were not designed to, and do not, address a significant portion of how industry participants use tokens.

Finally, the SEC disregards clear Supreme Court and Second Circuit precedent instructing that securities transactions that take place abroad are beyond the jurisdictional reach of the SEC. Though the blockchain industry is global in nature, the federal securities laws are not. The Second Circuit has repeatedly re-emphasized the Supreme Court's lesson on this subject. Accordingly, both for liability and (if necessary) damages purposes, this Court should be mindful of the limits of the securities laws. Even if XRP (or any particular token) were found to be a security, this Court should properly cabin any findings to "territorial" transactions, and exempt transactions where the SEC has not sustained its burden to prove territoriality.

## **ARGUMENT**

## I.   **THE COURT SHOULD CONSIDER A TOKEN'S PARTICULAR USE OR PURPOSE**

Tokens can be designed or used in virtually any way that a piece of software can be programmed to be used. The possibilities are limitless.

The Association's members, counterparties, business partners, or customers acquire tokens in many different ways. Some participants may acquire tokens directly from a blockchain project, whether or not initially sold as part of an "investment contract." But those participants are just one part of the market. Other market participants acquire tokens in other ways. Some purchase tokens through a digital asset exchange like Coinbase, Kraken, Binance, FTX, or many others, or buy tokens directly from another party in a peer-to-peer transaction. Some acquire (or borrow) tokens from "liquidity pools," with no particular counterparty at all, such as in a decentralized

finance protocol.  Some acquire tokens by performing some service for a blockchain project, such as writing software, coding back-end processes or user interfaces, creating design work, or discovering bugs.  Some acquire tokens through a giveaway to jump-start a network, where there is no investment of money, time, effort, or anything else.  Some receive tokens as a gift, either welcome, or even uninvited, such as where an individual sends tokens to another's wallet out of the blue.  Some acquire tokens through "play-to-earn" models, where they receive tokens for achieving certain success in online games.  This list is not nearly exhaustive.

Once a person has acquired a token, that token can be used in just as many different ways. Certainly, some use it as they would any asset, attempting to profit from the appreciation in value of a given token, through sales, lending, or borrowing – and, depending on the project, those profits might or might not depend on the efforts of the initial issuers.  Some people use tokens as a currency or a payment method.  In the SEC's memorandum of law in support of its motion for summary judgment, ECF No. 640 (the "SEC Moving Brief" or the "SEC Moving Br."), the SEC quotes Mr. Garlinghouse saying, "I can't buy coffee with XRP."  SEC Moving Br. at 43.  But that quote is from 2018, and cryptocurrency has changed dramatically since then.  Many companies – including  Google,[3]  AMC,[4]  Subway,[5]  and  yes,  even  coffee  purveyor  Starbucks[6]  –  accept cryptocurrency as payment for goods and services.  Likewise, PayPal permits users to transfer

---

[3]      Oliver Knight, *Google Partners With Coinbase to Accept Crypto Payments for Cloud Services*, Yahoo! Finance (Oct. 11, 2022), https://ca.finance.yahoo.com/news/google-partners-coinbase-accept-crypto-121803385.html.

[4]      Chris Katje, *AMC To Accept Bitcoin and Crypto For Payment, Are NFT Commemorative Tickets Next?*, Yahoo! Finance (Sept. 19, 2021), https://finance.yahoo.com/news/amc-accept-bitcoin-crypto-payment-205509000.html.

[5]      Andrew Torba, *I Bought Subway With Bitcoin and It Was Awesome*, Coindesk (Nov. 22, 2013), https://www.coindesk.com/business/2013/11/22/i-bought-subway-with-bitcoin-and-it-was-awesome/.

[6]      Samyuktha Sriram, *Customers Can Reload Starbucks Card With Bitcoin and Ethereum As Coffeehouse Explores 'Tokenizing Stars,'* Yahoo! Finance (Nov. 11, 2021), https://finance.yahoo.com/news/customers-reload-starbucks-card-bitcoin-154130368.html.

cryptocurrency to other users, including to pay for goods and services.[7]  Others use cryptocurrency ATMs to transfer their tokens into cash for immediate use to pay for goods and services.  Recently, the venerable financial institution BNY Mellon announced that it would accept cryptocurrency deposits from retail users, just like it accepts fiat currency.[8]

Some tokens are used in a particular implementation in a blockchain-based infrastructure. Such tokens can be used, *inter alia*, to pay (or receive discounts on) transaction fees;[9] to serve as a "receipt" for liquidity provided to a liquidity pool;[10] as a payment for transferring data across a blockchain-based network for internet-connected devices that uses nodes as hotspots to connect wireless devices to the network;[11] to allow users access to decentralized online cloud storage;[12] to attain access to specific features in games;[13] to purchase in-game items;[14] and many more.  These tokens may or may not have been originally issued as part of an investment contract, but they can have many kinds of consumptive uses outside that initial issuance (and lack any or all of the rights that were transferred as part of the initial investment contract).

---

[7]     *PayPal Users Can Now Transfer, Send, and Receive Bitcoin, Ethereum, Bitcoin Cash, and Litecoin*, Paypal (Aug. 12, 2022), https://newsroom.paypal-corp.com/2022-06-07-PayPal-Users-Can-Now-Transfer-Send-and-Receive-Bitcoin-Ethereum-Bitcoin-Cash-and-Litecoin.

[8]     Mehnaz Yasmin and Saeed Azhar, *BNY Mellon to offer crypto services in digital asset push*, Yahoo! Finance (Oct. 11, 2022), https://finance.yahoo.com/news/bny-mellon-offer-crypto-services-143413827.html.

[9]     *What Are Transaction Fees?*, Bitcoin.com, https://www.bitcoin.com/get-started/what-are-transactions-fees/ (last visited Oct. 25, 2022).

[10]    *What Are Liquidity Pools?*, Gemini (Nov. 30, 2021), https://www.gemini.com/cryptopedia/what-is-a-liquidity-pool-crypto-market-liquidity.

[11]    Andrew Hayward, *Andreessen-Backed Helium Raises $111 Million to Grow Crypto Wireless Network*, Decrypt (Aug. 10, 2021), https://decrypt.co/78222/andreessen-backed-helium-raises-111-million-to-grow-crypto-wireless-network.

[12]    *Why Decentralized Data Storage Could be the Next Big Thing in Web 3.0*, Cryptonews (Sept. 19, 2022), https://cryptonews.com/news/why-decentralized-data-storage-could-next-big-thing-web-30.htm.

[13]    Roy Gaurav, *How The Gaming Industry Uses Crypto?*, CoinMarketCap (Jan. 2022), https://coinmarketcap.com/alexandria/article/how-the-gaming-industry-uses-crypto.

[14]    *Nexon America Accepts Cryptocurrencies for Purchase of In-Game Items*, Yahoo! Finance (Dec. 14, 2021), https://finance.yahoo.com/news/nexon-america-accepts-cryptocurrencies-purchase-150000404.html.

Token usage extends literally to the limits of imagination. Some tokens allow users to participate in community governance, such that a participant can vote on a proposal for a given project, or even create one.[15] Other tokens allow users to collectively own some asset like a domain name.[16] Some tokens are "stablecoins," pegged to the value of some other assets like fiat currency.[17] Some tokens represent digital embodiments of art, music, videos, or other media, and can convey intellectual property rights in a host of ways, with various encoded limits. A "non-fungible token" or "NFT" is a common example of such a token.[18] Such tokens sometimes come with attendant benefits, such as membership in a club, or rights to receive a signed album.[19] Separately, some blockchains (typically private blockchains) use tokens for back-office transactions like inventory tracking.[20]

With all of these uses (and many more), a token is functionally quite unlike, say, a stock certificate. In the old days, before digitalization, a stock certificate was printed on a piece of paper. The physical piece of paper itself was no more than a representation of ownership, voting rights, or dividends. It didn't matter if that physical piece of paper was treated as "the security" in the secondary market, because it was inseparable from the rights attendant to its investment contract.

---

[15]     Alex Lielacher, *What Is A Governance Token? A Beginner's Guide*, Crypto.News (July 24, 2022), https://crypto.news/learn/what-is-a-governance-token/.

[16]     Leeor Shimron, *Amazon.eth, Starbucks.bitcoin, Coke.dao? Crypto Domain Names Are The Next Big NFT Craze*, Forbes (Sept. 10, 2022), https://www.forbes.com/sites/leeorshimron/2022/09/10/amazoneth-starbucksbitcoin-cokedao-crypto-domain-names-are-the-next-big-nft-craze/?sh=4cc5e866b1dd.

[17]     Tomio Geron, *Why Stablecoins Stand Out in the Cryptocurrency World*, The Wall Street Journal (June 10, 2019), https://www.wsj.com/articles/why-stablecoins-stand-out-in-the-cryptocurrency-world-11560218460.

[18]     Jazmin Goodwin, *What is an NFT? Non-fungible tokens explained*, CNN Business (Nov. 10, 2021), https://www.cnn.com/2021/03/17/business/what-is-nft-meaning-fe-series/index.html.

[19]     Shivani Vora, *The Global Restaurant Brand With The Million Dollar NFT Membership Club*, Forbes (Mar. 19, 2022), https://www.forbes.com/sites/shivanivora/2022/03/19/the-global-restaurant-brand-with-the-million-dollar-nft-membership-club/?sh=4ff4dab31a5f.

[20]     *Blockchain for Supply Chain: Track and Trace*, Amazon Web Services, https://aws.amazon.com/blockchain/blockchain-for-supply-chain-track-and-trace/ (last visited Oct. 25, 2022).

The SEC could easily treat the stock certificate as the stock itself – it made little difference.

Because tokens are infinitely designable software, they fundamentally change this paradigm.  Both a stock certificate and a token can be provided to others in a secondary market.  But the token, unlike the stock certificate, can be acquired and used in untold ways that have nothing to do with an investment contract.  Treating the token itself as if it were a security makes no sense under the securities laws, and creates a host of "square peg, round hole" problems that the SEC has not addressed.  The lack of clear direction from the SEC as to all of the secondary effects of treating token themselves as securities makes it all the more important that any ruling in this case is narrowly tailored to the facts and circumstances presented here.

## II.     THE SEC UNLAWFULLY INCLUDES SECONDARY SALES AS EVIDENCE OF AN INVESTMENT CONTRACT

The SEC, in this case and others, has taken the position that a token itself is a security, such that subsequent, secondary transactions in that token constitute an unregistered securities offering in violation of the securities laws.  For example, the SEC cites, to support the argument that XRP purchasers reasonably expected to profit, the fact that XRP is tradeable on secondary cryptocurrency trading platforms.  SEC Moving Br. at 55-56.  In arguing that such profits would result from the efforts of Ripple, the SEC argues that Ripple intended to maintain a secondary market for users to sell XRP.  SEC Moving Br. at 62.  The SEC further argues that purchasers of XRP who resold XRP to others acted as "statutory underwriter[s]" of Ripple's offering.  SEC Moving Br. at 64.  And the SEC has previously stated in this case (in opposition to a motion to intervene by XRP holders) that, as an embodiment of the facts and circumstances under which it was offered and sold, "[t]he XRP traded, even in the secondary market … today represents that investment contract."  ECF No. 153 at 24.

These statements are not accidents.  The SEC has taken a similar position in other matters.  In a recently-filed complaint, *SEC v. The Hydrogen Tech. Corp., et al.*, Case 1:22-cv-08284-LAK

(S.D.N.Y.), ECF No. 3 (the "Hydrogen Complaint"), the SEC alleged that the defendants violated

the securities laws by selling tokens "in the secondary trading market." In *SEC v. Kik Interactive*

*Inc.*, 19 Civ. 5244 (AKH) (S.D.N.Y.), ECF No. 58, the SEC argued that "[a]ll purchasers of Kin –

those who bought Kin directly from Kik and those who bought in the secondary market – were

deprived of the important disclosures that a registration statement and SEC reporting would have

provided regarding their investments" (emphasis added). Several SEC settlement orders reflect

similar statements.[21] And SEC Chair Gary Gensler has recently stated that the "vast majority" of

tokens are – not <u>were</u>, but <u>are</u> – securities.[22]

The Association respectfully submits that even if this Court holds that the original issuance

of XRP was a security, the Court should refrain from deciding that secondary sales are investment

contracts, or that XRP itself is, today, a security. To the extent that the SEC is taking the position

that secondary market transactions of XRP – or any other token – can be considered securities,

that position is not legally supportable and would have disastrous effects in the industry at large.

The *amicus* brief filed by the Chamber of Digital Commerce (ECF No. 649, the "Chamber

*Amicus*") persuasively makes the legal argument that under existing law, tokens themselves – even

---

[21]     *See, e.g.*, *In the Matter of Block.one*, SEC Admin. Proc. 3-19568, at 4 (Sept. 30, 2019), *available at* https://www.sec.gov/litigation/admin/2019/33-10714.pdf ("Block.one did not take any steps to prevent the ERC-20 Tokens from being immediately resellable to U.S.-based purchasers in secondary market trades."); *In the Matter of Zachary Coburn*, SEC Admin. Proc. 3-18888, at 1-2 (Nov. 8, 2018), *available at* https://www.sec.gov/litigation/admin/2018/34-84553.pdf (finding that "an online platform that allow[ed] buyers and sellers to trade certain digital assets … in secondary market trading" was a securities exchange); *In the Matter of Tokenlot, LLC, Lenny Kugel, and Eli L. Lewitt*, SEC Admin. Proc. 3-18739, at 4 (Sept. 11, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10543.pdf (finding that respondents acted as brokers or dealers when they sold "digital tokens in secondary trading that occurred after those tokens' initial offering periods had ended"); *In the Matter of Munchee Inc.*, SEC Admin. Proc. 3-18304, at 5 (Dec. 11, 2017), *available at* https://www.sec.gov/litigation/admin/2017/33-10445.pdf (finding that MUN tokens were securities because, in part, "Munchee intended for MUN tokens to trade on a secondary market").

[22]     David Hollerith, *SEC Chair Gensler says "vast majority' of cryptocurrencies are securities*, Yahoo! Finance (Sept. 8, 2022), https://finance.yahoo.com/news/sec-chair-gensler-majority-cryptocurrencies-securities-124610154.html.

if the subject of an investment contract – are not themselves securities.  *See* Chamber *Amicus* at 5-7.  As a factual and policy matter, if a token initially sold in an investment contract is always inextricably linked with that investment contract every time it is subsequently transferred (even if it is transferred without any of that investment contract's attendant rights), then none of the above myriad applications of tokens – nearly an entire industry – could possibly function.  To the contrary, even if a token were originally sold in an investment contract, that token is separate and separable from the original investment contract.

### III.   UNDER THE *HOWEY* TEST, MANY SECONDARY MARKET TRANSACTIONS IN TOKENS ARE NOT SECURITIES TRANSACTIONS

#### A.   The *Howey* Test

The Securities Act defines the term "security" as including "any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, … transferable share, investment contract," or other listed instruments.  15 U.S.C. § 77b(1).  The question of whether an instrument is a security often turns on whether the instrument is an "investment contract" under that definition.  In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court articulated that test:  "an investment contract, for purposes of the Securities Act, means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-299 (emphasis added).

An analysis of the *Howey* factors reveals that many secondary market transactions – and most uses of tokens as listed above – do not meet the test of an "investment contract."  A token, by itself, is not a "contract, transaction or scheme," but rather an instrument, or asset, or just software.  The asset itself, once severed from any "contract, transaction or scheme" that may have existed, is not a security.  While, as the SEC points out numerous times, the *Howey* test is "flexible," *see* SEC's Memorandum of Law in Opposition to Defendants' Motion for Summary

Judgment, ECF No. 674 (the "SEC Opp.") at 1, 12, 13 15, it is not infinitely so.  The SEC should not be able to expand the definition of a "scheme" to cover any digital asset that was once relevant in any way to an investment contract, particularly when the token is no longer tied to that investment contract (if there ever was one).

1.  *Many Blockchain Transactions Do Not Satisfy the "Investment of Money" Clause*

The SEC Moving Brief asserts that the "investment of money" prong of *Howey* is undisputed.  SEC Moving Brief at 649 ("Defendants do not dispute that they offered and sold XRP in exchange for 'money,' which suffices to establish the 'investment of money' aspect of the *Howey* test"); SEC Opp. at 25.  However, some evidence in the public summary judgment record[23] belies that assertion.  According to Defendants Ripple, Bradley Garlinghouse, and Christian A. Larsen (collectively, the "Ripple Defendants"), Ripple gave XRP away for free, to charities and grant recipients.  ECF No. 643 (the "Defendants Moving Br.") at 10.  Ripple also used XRP to pay for services from vendors and employees.  *Id.* at 11.  Mr. Larsen also donated amounts of XRP to charity.  *Id.* at 12.

Such transactions are common in the industry.  Market recipients that receive tokens for free, or in exchange for services, did not make an "investment of money" under *Howey*.  *Cf. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Daniel,* 439 U.S. 551, 559-60 (1979) (rejecting argument that that exchange of labor in return for participation in employee pension plan was an investment of money; to meet "investment of money" prong, the purchaser must give up "some tangible and definable consideration in return for an interest that had substantially the characteristics of a security"); *Fraser v. Fiduciary Tr. Co. Int'l,* No. 04 Civ. 6958 (RMB) (GWG), 2005 U.S. Dist. LEXIS 48059, at *14 (S.D.N.Y. June 23, 2005) ("no

---

[23]    As a non-party to the instant matter, the Association only has access to the public filings. Accordingly, when discussing the case record, the Association is largely limited to the parties' redacted memoranda of law.  The Association does not have access to the parties' declarations and exhibits, or their Rule 56.1 statements.

purchase or sale where instead of giving up some tangible and definable consideration, participants in the employee stock ownership plan earn stock through labor for the employer. The notion that the exchange of labor will suffice to constitute the type of investment which the Securities Acts were intended to regulate was rejected in *Daniel*.") (quotation marks and brackets omitted).

This litigation is not the only place the SEC has asserted that an "investment of money" is not limited to investments of money. For example, in the Hydrogen Complaint, the SEC alleged that the defendants therein violated the securities laws by offering tokens to others "via bounty programs [and] employment compensation." Hydrogen Complaint ¶ 143. In a settlement with Tomahawk Exploration LLC ("Tomahawk") and David Thomas Laurance,[24] the SEC pointed to "online marketing" including "promotion," and asserted, "[t]he lack of monetary consideration for 'free' shares does not mean there was not a sale or offer for sale for purposes of Section 5 of the Securities Act. Rather, a 'gift' of a security is a 'sale' within the meaning of the Securities Act when the donor receives some real benefit." *Id*., citing *SEC v. Sierra Brokerage Servs., Inc*., 608 F. Supp. 2d 923, 940-43 (S.D. Ohio), *aff'd*, 712 F.3d 321 (6th Cir. 2013). The SEC further asserted that Tomahawk "received value in the creation of a public trading market for its securities." In other words, in the SEC's view, nobody needed to have made any investment of any money, or anything whatsoever, to satisfy the "investment of money" prong of the *Howey* test – the fact that the items given away could then be traded publicly is enough of a benefit. That interpretation renders the Supreme Court's "investment of money" jurisprudence a nullity.

Such a holding would have devastating real-world effects on the industry. As noted above, many projects try to attract participants to use their network through giveaways of tokens for use in their system. Requiring such projects to follow the registration rules for such giveaways is not

---

[24]     *In The Matter of Tomahawk Exploration LLC and David Thomas Laurance*, SEC Admin Proc. 3-18641 (August 14, 2018), https://www.sec.gov/litigation/admin/2018/33-10530.pdf.

consistent with the securities laws or with *Howey*. Any ruling addressing the "investment of money" prong should limit the SEC to the plain language of *Howey*.

The Supreme Court's language in *Howey* should be taken literally:  an investment contract requires an actual investment of tangible consideration.  Intangibles cannot suffice, because such concepts could include literally anything.  For example, "the creation of a public market" cannot suffice, because <u>anything</u> given away broadly might create a market.  *Howey* makes clear that courts should only find an investment contract when confronted with an issuer "who seek[s] the use of the money of others[.]"  *Howey*, 328 U.S. at 299.  The SEC has not carried, nor even tried to carry, that burden with respect to secondary market transactions in XRP.

## 2. *Many Blockchain Transactions Do Not Satisfy the "Common Enterprise" Prong*

The second element of the *Howey* test examines whether or not the investment of money is in a "common enterprise."  A "common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).  "In a common enterprise marked by horizontal commonality, the fortunes of each investor depend on the profitability of the enterprise as a whole."  *Id.* (citation omitted).

This Court's decision should recognize that tokens present a complicated and nuanced set of issues, and any findings of commonalities – horizontal or vertical – must be cabined not just to the specific facts of this case, but the specific purchases and purchasers at issue.

A common enterprise can exist if there is "vertical commonality," where the "investors' fortunes need not rise and fall together; a pro-rata sharing of profits and losses is not required." *Id.*  The Second Circuit has determined that "broad vertical commonality" – where "the fortunes of the investors need be linked only to the efforts of the promoter" – does not satisfy *Howey*.  *Id.*

The Second Circuit has not expressly determined whether "strict vertical commonality" – which "requires that the fortunes of investors be tied to the fortunes of the promoter" – satisfies *Howey*. *Id.*; *see also SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 n.5 (S.D.N.Y. 2020).

The SEC asserts that both horizontal and vertical commonality exist with respect to XRP. The SEC asserts that a "purchase of XRP is an investment in a common enterprise with other XRP holders and with Ripple" because "[a]ll units of XRP are fungible with each other, and the price of all units of XRP rise or fall equally." SEC Moving Br. at 2; *see also* SEC Opp. at 27. Elsewhere in the SEC's Moving Brief, the SEC states that XRP holders are in "horizontal commonality" with one another because XRP holders are "all identical to one another" and the "market price increases or decreases for all units of XRP together and equally." SEC Moving Br. at 50-51; *see also* SEC Opp. at 27. Ripple "pooled proceeds from its sale of XRP in an effort to boost the value of the investment, such that the stronger the ecosystem that Ripple built, the greater the demand for XRP and thus the greater the value of each purchaser's investment." *Id.* at 51. The SEC alternatively alleges "strict vertical commonality" because the "success of XRP affects the fortunes of Ripple, its executives, and XRP investors" and a "price decline would be detrimental for all." SEC Moving Br. at 52; *see also* SEC Opp. at 28. The SEC further analogizes to *Howey*, where investors' profits "came when the promoter sold the oranges and then, rather than pooling the cash from those sales, allocated those proceeds *pro rata*." SEC Opp. at 31 (emphasis omitted).

The SEC's argument for a "common enterprise" ignores the realities of how many market participants use tokens. As explained above, participants can acquire tokens like XRP for many reasons:  for payment for goods and services, for membership in a community, for community governance of a project, or for infinite other purposes. Those market participants who use tokens for these markedly different reasons cannot to be said to be in any sort of horizontal "common

14

enterprise," as their "fortunes" are not necessarily tied to the profitability of the enterprise as a whole, as they might be for a participant acquiring XRP to speculate on its value for a profit.

Even if tokens are originally sold with an aim that purchasers could profit, those tokens might continue to exist and be continually traded and used, regardless of whether those aims still apply. The lack of any privity or contractual rights between the original seller and downstream purchasers extinguishes the possibility of any common enterprise between token holders. *See Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1003 (6th Cir. 1984) (*Howey* test not met where "defendants were under no contractual duty to develop the subdivisions" and "plaintiffs had no right to share in the profits of successful development"); *Woodward v. Terracor*, 574 F.2d 1023, 1025 (10th Cir. 1978) (contract for real property was not an "investment contract" because "the mere fact that the plaintiffs bought lots from [the seller] does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise."); *S&S N.Y. Holdings, Inc. v. Able Energy, Inc.*, No. 11 Civ. 2388 KBF, 2012 WL 3084112, at *5 (S.D.N.Y. July 27, 2012) (finding no investment contract where the governing agreement was no longer valid); *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045, 1050 (S.D.N.Y. 1975) (finding no investment contract where promoter was not contractually obligated to manage or "run the development and distribute profits to the plaintiff, as did the operators of the orange groves in *Howey*"); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300–01 (9th Cir. 1979) (finding no investment contract despite marketing materials emphasizing promoter's efforts to develop surrounding land).

The SEC's theory that all holders of a fungible asset are in a common enterprise merely because that asset has a single market price is equally flawed. That characteristic is true of virtually every commodity. The SEC's theory would transform the holders of any particular commodity in existence into a common enterprise with each other. The "common enterprise" prong would be rendered meaningless.

The lack of commonality rings even more strongly if this Court considered "vertical commonality."   The fortunes of those who use XRP for the myriad other reasons besides appreciation in value are not necessarily tied to the fortunes of Ripple as a corporate entity. Similarly, in many other projects among the Association's membership, their counterparties, and the greater blockchain ecosystem, the fortunes of the project that originally issued the token may be completely unrelated to the value of the token.  If a token carries no rights to equity in the issuer, or dividends, or any share of profits, then the fortunes of the issuer may well be completely irrelevant to the value of the token.  In those cases, the token value derives not from any promise of equity or dividends, but rather its use in other projects or networks.  Or, as can be seen in the example of ETH (or other similar tokens in other blockchains), a token's value can arise from its flexibility as a base on which to build other software functionalities, completely independent of whatever entity first issued it.  And of course, for projects that have completely decentralized, and could pass the "Bahamas Test" referenced in *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 375 (S.D.N.Y. 2020), where the entire founding team could retire to the Bahamas and never again work on the project, there may be no fortunes of any issuer at all to which any token value could be tied.

Thus, even if this Court finds that <u>some</u> participants purchased XRP as part of some common enterprise at some point, we respectfully submit that the Court should cabin that finding, and not find that by necessity, <u>all</u> purchasers in the market at all times were part of a common enterprise.  In light of the innate complexity of tokens, a decision finding that "commonality" exists should be limited to the facts of this case, and a particular, articulated commonality.

### 3.  *Many Blockchain Transactions Do Not Satisfy the "Expectation of Profits" Prong*

The third element of the *Howey* test asks whether the investor has an expectation of profits. "By profits, the court has meant either capital appreciation resulting from the development of the initial investment … or a participation in earnings resulting from the use of investors' funds."

*United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975). "In such cases the investor is attracted solely by the prospects of a return on his investment[,]" *id.*, and "not the profits of the scheme in which they invest." *SEC v. Edwards*, 540 U.S. 389, 394 (2004). The Supreme Court has "used 'profits' in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." *Id.* "By contrast, when a purchaser is motivated by a desire to use or consume the item purchased … the securities laws do not apply." *Forman*, 421 U.S. at 852-53 (citation omitted). *See also Libaire v. Kaplan*, No. CV 06-1500 (DRH) (ETB), 2008 U.S. Dist. LEXIS 145311, at *16 (E.D.N.Y. Jan. 17, 2008) (no expectation of profits where plaintiff expected to "maintain his access to the hunting preserve and club facilities"); *Banco Espanol de Credito v. Sec. Pac. Nat'l Bank*, 763 F. Supp. 36, 44 (S.D.N.Y. 1991) (no expectation of profit where plaintiffs would receive repayment of their principal "plus a fixed rate of interest").

Although the "inquiry is an objective one focusing on the promises and offers made to investors" and "is not a search for the precise motivation of each individual participant," courts have considered "the stated intent of prospective and actual purchasers" in evaluating the "motivations of the hypothetical reasonable purchaser." *Telegram*, 448 F. Supp. at 371, 374.

Here, the SEC's argument for why it has met the "expectation of profits" prong focuses on what the Ripple Defendants did to market XRP to direct purchasers and help them profit. For example, the SEC argues that the Ripple Defendants promoted XRP as an investment; took steps to have XRP listed on secondary markets in order to enable investors to realize a profit; emphasized the existence of active and liquid trading markets; targeted its offers and sales of XRP to those speculating for profit; offered and sold XRP in unlimited quantities; and made statements that Ripple had a significant supply of XRP and therefore had an interest in increasing XRP's value. SEC Moving Br. at 53-58; SEC Opp. at 47.

However, the SEC ignores the expectations of downstream purchasers in the secondary market and participants who acquired XRP for reasons other than profit.  The Ripple marketing materials to which the SEC refers would have little to no impact on those market participants who use tokens as currency, or who use tokens for a specific use in a blockchain-based infrastructure, or who use tokens as a receipt for a transaction.  Such market participants would have different motivations rather than profit.  *See Forman*, 421 U.S. at 858 ("What distinguishes a security transaction – and what is absent here – is an investment where one parts with his money in the hope of receiving profits from the efforts of others, and not where he purchases a commodity for personal consumption …").  *Amici* by I-Remit, Inc. and TapJets, Inc. (ECF Nos. 656, 660) are two actual examples of such entities who use XRP for reasons other than profit.  The SEC contends that the "existence of, or even the desire for, some consumptive use does not defeat *Howey*'s 'expectation of profit' prong," SEC Opp. at 45, but here, as explained, the "consumptive use" can be completely separated from the original investment contract.

Accordingly, even if the Court finds that <u>some</u> participants purchased XRP with an expectation of profit, the Association respectfully requests that the Court is careful to not conclude that by necessity, all purchasers in the market for XRP had some expectation of profit.  Any ruling that treats the "expectation of profits" test in a way that imputes some market participants' expectations to all other participants, for all time, would risk transforming a few statements at the outset of a project to a permanent fixture, when those statements may have been targeted at an original investment contract, but not the token itself.  Such an overbroad approach would inject further confusion into the market, and negatively affect the American blockchain industry.

4.  <u>Many Blockchain Transactions Do Not Satisfy the "Efforts of Others" Prong</u>

For similar reasons, any ruling that the XRP purchasers expected profits based on the "efforts of others" should be restricted to include only primary purchasers of XRP.  The SEC

asserts that "no genuine dispute exists" that XRP investors expected that their profits would result from the efforts of the Ripple Defendants.  SEC Moving Br. at 59.  But, just as with the "expectation of profits" prong, the SEC's argument that XRP purchasers expected their profits to result from the efforts of the Ripple Defendants focuses on actions taken by the Ripple Defendants that would be relevant to <u>primary</u> purchasers of XRP.  For example, Ripple touted the expertise of its team and its considerable resources; Ripple told investors that it had a large financial stake in XRP; and Ripple funds itself from selling XRP.  SEC Moving Br. at 59-63; SEC Opp. at 47.  Any contractual obligations that Ripple may have undertaken with the initial sale of XRP were not passed to secondary purchasers.  Those secondary purchasers received a piece of software, but no legal rights vis-à-vis Ripple, reinforcing that their purchase of XRP had nothing to do with the efforts of Ripple – who owed those secondary purchasers no legal obligations.

Again, tokens can have many uses.  Users, especially in the secondary market, own tokens for all sorts of reasons, including those that have nothing to do with the efforts of the original promoter.  Token users may instead care about the functionality of those tokens for whatever their specific use may be, and not care in the least about the efforts of any promoter to make the value of those tokens appreciate.  Similarly, those who acquire tokens for use in community governance may be equally unconcerned about the original promoter.  Even if a project specifically promises at the outset to make efforts to increase its token's value, those statements may come with an "expiration date," a point at which the project is no longer engaged in such activities, and market participants acquire the token for other uses or purposes.  Unlike a traditional security certificate – where if the company goes out of business, the certificate is worthless – a token may still have significant value to a holder or purchaser, entirely separate from an original promoter.

Accordingly, even if this Court finds that <u>some</u> participants purchased XRP with an expectation of profit from the efforts of others, we respectfully request that the Court should be

careful not to conclude that by all necessity, all purchasers in the secondary market for XRP had

an expectation of profit from the efforts of Ripple (or anyone in particular).

## IV.   THE RIPPLE DEFENDANTS' FAIR NOTICE DEFENSE RAISES CONCERNS THAT ARE COMMON IN THE INDUSTRY

The Association strongly disagrees with some of the SEC's assertions regarding the Ripple

Defendants' "fair notice defense" concerning the lack of guidance provided by the SEC to market

participants.   The SEC's argument, if successful, could have detrimental consequences for the

market as a whole.   The notion that a token theoretically <u>could</u> be offered as part of an investment

contract is certainly well-known, but a host of unanswered questions remain, both as to the basic

question of what is a security, and the more complicated but equally important questions of what

rule-abiding market participants may do with their tokens even if they were classified as securities.

The SEC claims that the Ripple Defendants – and indeed any participant of "ordinary

intelligence" – had fair notice that the SEC would consider XRP to be a security because its

"message has been clear: those who sell digital assets to publicly raise capital must ensure their

actions comply with federal securities laws."   SEC Moving Br. at 6.   The SEC argues that *Howey*

itself, along with its progeny, provide defendants with fair notice "as to what conduct and

characteristics sufficed to meet the *Howey* test."   *Id.* at 71.   And the SEC claims that the Ripple

Defendants had fair notice as a result of various SEC enforcement actions and public statements,

including the 2017 Report of Investigation Pursuant to Section 21(a) of the Securities Exchange

Act of 1934: The DAO (the "DAO Report").[25]   *Id.* at 74.

But regulation of digital assets through enforcement actions and SEC public statements is

not sufficient to put market participants on notice as to what is or isn't a security.   The Association,

as an industry group, can certainly attest that its members – who all are possessed of at least

---

[25]      *See* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Securities and Exchange Comm'n (July 25, 2017), https://www.sec.gov/litigation/investreport/34-81207.pdf.

"ordinary intelligence" in this particular area – do not have a clear sense of what is or is not considered a security, much less how tokens could or should be treated and traded on secondary markets in a manner consistent with securities laws.[26]

The DAO Report itself is ineffective in putting participants at notice as to whether any particular token is a security.  For example, the DAO Report, which concerns initial rather than secondary market sales, repeatedly uses vague and conditional language, such as the "U.S. federal securities laws may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances…"  DAO Report at 10.  It also states that "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction."  DAO Report at 17-18.  Aside from merely citing *Howey*, the DAO Report does not provide further clarity for which issuances are securities, and which are not.

As explained above, all blockchain projects are different, and there are numerous issuances of and uses for tokens that are not for investment purposes.  The blockchain industry is much broader than the DAO tokens at issue in the now five-year-old DAO Report.  Moreover, it is unclear if or how the principles articulated in the DAO Report apply to secondary markets.

Other than through enforcement actions, the SEC last issued guidance on the question of whether a token was a security in April 2019,[27] a near-lifetime ago in a sector where technology is evolving at lightning speed.  That guidance provided a list of over sixty factors for analyzing whether a token is a security – without weighting any particular factors, or explaining whether any

---

[26]    As evidence that the determination of whether or not XRP or any other token is a security is not an easy task, more than 200 exchanges – many of which are sophisticated, and represented by counsel, apparently came to the conclusion that XRP was not a security.  ECF No. 673 (the "Ripple Defendants Opp.") at 49-51.

[27]    *Framework for "Investment Contract" Analysis of Digital Assets*, Securities and Exchange Commission (Apr. 3, 2019), *available at* https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

of them were dispositive.  It actually created <u>more</u> confusion in the industry.[28]  And it recognized

that tokens qualifying as securities at the time of an initial sale sometimes "should be reevaluated

at the time of later offers or sales," an explicit acknowledgment of the distinction between primary

and secondary market transactions that the SEC seems to ignore here.  It is disingenuous to claim

that the industry could possibly be on "fair notice" of whether any token that does not precisely fit

the facts of a previous token against which the SEC has sought enforcement is a security.

"Regulation by enforcement" does not provide the "fair notice" that the SEC argues.  It is

impossible to parse the existing enforcement decisions for some kind of unified theory as to what

is or isn't a security, because each SEC enforcement decision is based on the unique facts and

circumstances of that case.  Certainly, some common themes arise.  But most market participants

have moved far past the typical "initial coin offerings" that were commonplace in 2017, and the

lack of certainty forces many projects either into structures that are unnecessarily disadvantageous,

or outside the borders of the United States altogether.[29]

The SEC's argument about the apparent ease with which market participants should be

able to ascertain whether a token is a security is belied by the statements of its own commissioners.

In 2021, for example, Commissioner Hester M. Peirce and then-Commissioner Elad L. Roisman

---

[28]    *See, e.g.*, Hester M. Peirce, Commissioner, *Securities and Exchange Comm'n*, *How We Howey* (May 9, 2019), *available at* https://www.sec.gov/news/speech/peirce-how-we-howey-050919 ("Whether the framework gives anything new to the seasoned securities lawyer used to operating in the facts and circumstances world of *Howey* is an open question. I worry that non-lawyers and lawyers not steeped in securities law and its attendant lore will not know what to make of the guidance. Pages worth of factors, many of which seemingly apply to all decentralized networks, might contribute to the feeling that navigating the securities laws in this area is perilous business. Rather than sorting through the factors or hiring an expensive lawyer to do so, a wary company may reasonably decide to forgo certain opportunities or to pursue them in a more crypto-friendly jurisdiction overseas."); *see also* DINNGO, *The Known and the Unsaid from the SEC's Framework* (Aug. 20, 2019), https://medium.com/dinngo-exchange/the-known-and-the-unsaid-from-the-secs-framework-ad8b2a7c6d2c ("from a crypto exchange's perspective, [the SEC's 2019 Framework] has muddied the waters rather than clearing them").
[29]    Users are also not well-served by regulation by enforcement.  The decline of XRP's market price as a result of this litigation evidently led to losses of $15 billion.  Ripple Defendants Opp. at 52.

issued a public statement criticizing a settlement with a digital assets exchange that publicized upcoming digital token offerings.[30]   The Commissioners expressed that they were "disappointed that the Commission's settlement … did not explain *which* digital assets … were securities, an omission which is symptomatic of our reluctance to provide additional guidance about how to determine whether a token is being sold as part of a securities offering or which tokens are securities."  ECF No. 264-1 at 1 (emphasis in original).  They added that "[t]here is a decided lack of clarity for market participants around the application of the securities laws to digital assets and their trading."  *Id.*  The *Howey* test "is helpful, but, often, including with respect to many digital assets, the application of the test is not crystal clear."  *Id.*

Thus, there is considerable uncertainty, even at a very basic level, as to whether a token, at issuance, is a security.  But even past that "Securities Law 101" question, numerous other questions confound the issue of whether a token in the secondary market could be treated as a security.  The now-infamous June 2018 "Hinman Speech,"[31] of course, asked the basic question:  even if a token was a security when it was originally offered to purchasers as part of an investment contract, at what point does it become a non-security?  The following year, the SEC's aforementioned April 2019 guidance made a brief and unsatisfactory attempt at an answer.  Since then, silence.

Even assuming that a token were to be treated as a security, the SEC has issued no guidance on questions that were settled for traditional securities, but pose new and vital problems for tokens.  If a token is a security, on what secondary markets can it trade?  How does Rule 15c3-3 (the so-called "custody rule") apply to custody of tokens that are in users' own wallets?  How can tokens

---

[30]    *See* Public Statement, Commissioner Hester Peirce and Commissioner Elad Roisman, SEC, *In the Matter of Coinschedule* (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule.

[31]    William Hinman, SEC, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), *available at* https://www.sec.gov/news/speech/speech-hinman-061418.

be "legended" or "unlegended" under Regulation D?   If removing a restrictive legend is an issue of state law,[32] what if the issuer is not in any particular state?  Or is decentralized?  What if there are no "transfer agents" capable to effectuate such removal for a token, even if it could be legended?  How can Rule 144(c)(2) (for non-reporting issuers, which most token issuers would be) apply if a company can't meet the requirements of 17 CFR § 240.15c2-11 (which most could not)?  How does an issuer of tokens relying on an exemption under Section 12(g) (17 CFR § 240.12g-1) know when the tokens have come to be held by more than 2,000 persons, if tokens can be traded peer-to-peer (or peer-to-pool) on decentralized exchanges?

The SEC's assertions that market participants are on "fair notice" of how tokens are treated under the securities laws ring hollow when the market lacks clarity on even the most basic of points, like whether a token is a security, let alone all of these details as to how a token that was treated as a security could possibly conform to the securities regulations.  If a particular token were considered a security, the numerous "square peg, round hole" problems – some of which are listed above, with many others remaining – would preclude full compliance with the securities laws.  The technological essence of a token often makes it impossible for it to fully comply.  In that situation, what is a well-meaning, law-abiding project to do?  When so many questions remain regarding how a token could possibly function as a security, how can the SEC say that anyone is on "fair notice" that a token itself could be a security?

The SEC's rejoinder to these deep, persistent industry concerns is buried in a footnote of its opposition brief:  "XRP transactions between two public investors not involving Ripple's affiliates, dealers, or underwriters would be exempt from Section 5's registration requirements, despite such transactions involving securities," because such "public" transactions would not

---

[32]     *See, e.g.*, *Rule 144: Selling Restricted and Control Securities*, Securities and Exchange Comm'n (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html.

involve an issuer, underwriter, or dealer.  SEC Opp. at 45 n.25, *citing* 15 U.S.C. § 77d(a)(1).  For

that reason, the SEC asserts that the requirement that an initial issuer register tokens would not

impact the business of subsequent users of that token, and brushes off the concerns of the industry

*amici* that submitted briefs in this matter.  SEC Opp. at 46 n.26.

The SEC's theory – for which it tellingly does not cite any prior SEC statements or

guidance – does not answer the myriad problems articulated in this brief or in the other *amici*.

Even if a downstream user of tokens is exempted from the registration requirements of 15 U.S.C.

§ 77(e),[33] the fact that the token was originally considered to be a security means that the token

would have to trade as a security, on securities exchanges (or OTC).  And compliance with all of

the ongoing rules for registered securities would lead to a host of new "square peg, round hole"

problems.  What is the mechanism for users to take such tokens off-exchange?  How would users

be able to build software on top of the tokens?  What would happen if the original issuer went

bankrupt and the tokens were de-listed by the exchanges?  Would the tokens then trade OTC?

Since "only broker-dealers qualified with FINRA as market makers can apply to quote securities

on the OTCBB,"[34] what if no brokers were approved to broker such transactions?  Since

"companies that want to have their securities quoted on the OTCBB must seek the sponsorship of

a market maker as well as file current financial reports with the SEC or with their banking or

insurance regulator," *id*., what happens if there are no such qualified market makers?  Or no

"company" to file current financial reports?  The SEC has not begun to scratch the surface of all

the unanswered questions about how tokens could possibly trade in the secondary markets if they

were all securities.  In that context, it is impossible to conclude that the industry is on "fair notice"

---

[33]     If the SEC were to initiate such an action against such a downstream user, that user has
the burden to show that the tokens were exempt from the registration requirement.  *Telegram*,
448 F. Supp. 3d at 365.  Such exemptions are "construed strictly."  *Id.* at 366.

[34]     *See Over-the-Counter Market*, Securities and Exchange Commission (May 9, 2013),
https://www.sec.gov/divisions/marketreg/mrotc.shtml.

– not just of the elementary question of whether a token can even be a security, but if so, the myriad of questions about how that could possibly work consistent with securities regulations.

The lack of clarity on these key issues has plagued the blockchain industry and stifled innovation.  The Association respectfully requests that the Court seriously countenance the Ripple Defendants "due process" defense, in light of this rampant uncertainty in the industry.  This Court should lay down a marker:  before the SEC brings enforcement actions against blockchain industry participants for failing to abide by securities laws and regulations, those laws and regulations must be clear, understandable, and sensible in the context of a software token that has a fundamentally different technological nature than a traditional security.

## V.   UNDER *MORRISON*, THE SECURITIES LAWS ARE INAPPLICABLE TO EXTRATERRITORIAL TOKEN TRANSACTIONS

Finally, the Ripple Defendants argue that certain transactions on foreign securities exchanges cannot be redressed by the United States securities laws under the doctrine set forth in the landmark Supreme Court decision *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010). Ripple Defendants Moving Br. at 58-74.  Given the international nature of the blockchain industry, an appropriate application of *Morrison* is vital.

In *Morrison*, the Supreme Court held that the federal securities laws apply only to (i) transactions on U.S. securities exchanges and (ii) "domestic transactions in other securities." *Morrison*, 561 U.S. at 267.  To determine which transactions are domestic for purposes of *Morrison*, courts look to various facts relating to both the purchase and the sale of the security. Given these complexities, courts have focused on the "location of the transaction," as required under 561 U.S. at 268, as the location where "irrevocable liability" was incurred.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012) ("transactions involving securities that are not traded on a domestic exchange are domestic if irrevocable liability is incurred or title passes within the United States"); *Parkcentral Global HUB Ltd. v. Porsche Auto. Holdings*

*SE*, 763 F.3d 198 (2d Cir. 2014) (no U.S. jurisdiction of share swaps of a foreign issuer).  *Cf.*

*Cavello Bay Reinsurance Ltd. v. Stein*, 986 F.3d 161 (2d Cir. 2021) (no U.S. jurisdiction in a

private offering between a Bermudan investor and Bermudan issuer).

    The SEC argues that *Morrison* and *Absolute Activist* are inapplicable to Section 5 of the

Securities Act, and that instead the determination of domesticity for claims under Section 5 is

governed by Rule 901 of Regulation S, as clarified by certain "safe harbors" in Rule 903.  SEC

Opp. at 57 n.29, 69-72.  That test was set forth in the pre-*Morrison* case *Europe & Overseas*

*Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998), and already

rejected earlier in the litigation.  *See* ECF No. 441 at 224 ("Regulation S does not govern the

Court's analysis of whether the Individual Defendants' offers and sales occurred domestically for

the purposes of Section 5").  This Court should continue to reject the SEC's attempts to circumvent

the Supreme Court's and Second Circuit's clear precedent to create some new test.[35]

    The Association emphasizes the importance of the territorial limits of the securities laws

set forth in *Morrison*.  The blockchain industry is global in scope.  Many actors in the space are

operating outside of the United States, and even many U.S.-based actors have an international

presence.  Accordingly, many token transactions do not incur "irrevocable liability" in the United

States, and under *Morrison* such a transaction is not covered by U.S. securities laws.[36]

    In this case and others, the SEC has sought to undercut *Morrison* and expand the definition

of "domestic" transactions.  In support of its argument that certain defendants incurred irrevocable

liability to sell while in the United States, the SEC argues that, *inter alia*, certain transactions were

---

[35]    *SEC v. Gruss*, 859 F. Supp. 2d 653 (S.D.N.Y. 2012), cited by the SEC, SEC Opp. at 57,
was decided under the Investment Advisers Act of 1940, and is thus inapplicable to whether or
not *Morrison* applies to Section 5.
[36]    Section 929P of the Dodd-Frank Wall Street Reform and Consumer Protection Act of
2010 limited the holding of *Morrison* where fraud is concerned, but the territorial limits of
*Morrison* are in full effect for the registration provisions of the securities laws – all that is at
issue in this case.  15 U.S.C. § 77v.

"reflected on the XRP Ledger, which means each transaction had to be independently and simultaneously validated by each of the U.S. nodes of the ledger, because of how the ledger is programmed." SEC Opp. at 64. The SEC further argues that because, "in the XRP blockchain, all the nodes must validate a transaction for their own purposes by listening to the other nodes, including the many existing in the United States … all of the Individual Defendants' sales were validated in nodes that were in the U.S. that are therefore domestic transactions." SEC Opp. at 68. The SEC takes this same view in a recent lawsuit filed in the United States District Court for the Western District of Texas, *SEC v. Balina*, 22-cv-00950 (W.D. Tex.), ECF No. 1 ¶ 69, where the SEC alleged that certain transactions involving the cryptocurrency ETH "took place in the United States" because those contributions "were validated by a network of nodes on the Ethereum blockchain, which are clustered more densely in the United States than in any other country."

The SEC's theory is inconsistent with *Morrison*. Courts have rejected the approach of finding domestic jurisdiction based on the location of servers. *See Anderson v. Binance*, No. 1:20-cv-2803 (ALC), 2022 U.S. Dist. LEXIS 60703, at *11-12 (S.D.N.Y. Mar. 31, 2022) (to allege a "domestic" transaction, "Plaintiff must allege more than stating that … title passed in whole or in part over servers located in California that host [Defendant's] website").

Incidental contact with the United States is insufficient to render a foreign transaction predominantly domestic. *See, e.g.*, *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) ("The direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction."); *Banco Safra S.A. Cayman Islands Branch v. Samarco Mineracao S.A.*, No. 16 Civ. 8800 (RMB), 2019 WL 2514056, at *5 (S.D.N.Y. June 18, 2019) (allegations that purchases and sales "were conducted 'through' bank accounts in New York are insufficient to demonstrate a domestic transaction"); *Schentag v. Nebgen*, No. 17 Cv. 8734 (GHW), 2018 WL

3104092, at *12 (S.D.N.Y. June 21, 2018) ("[A]llegations that investors transferred money to or between U.S. bank accounts, without more, are insufficient to satisfy *Morrison*.").

The same rules should apply to nodes.  If a French seller sells a token to a French buyer, but the nodes validating the transaction happen to be based in the United States, those two parties are not incurring irrevocable liability within the United States – whether the nodes validating a transaction "listen[] to the other nodes, including the many existing in the United States" or whether the validating node is determined via a "first to the flag" mechanism to find the "first node to solve a complex computational problem," *see* SEC Opp. at 68.  Parties to a transaction occurring on the blockchain likely have no knowledge of, or control over, where the validating nodes are located.  The fact that a node validating a transaction happened to be located in the United States is a coincidence to the transaction.  It does not mean that the parties became "bound to effectuate the transaction" within the United States, or that "irrevocable liability was incurred or title was transferred within the United States." *Absolute Activist*, 677 F.3d at 67-68.[37]

Moreover, if the SEC's theory became law, the industry might deliberately avoid nodes in the United States, or restructure validation processes to avoid U.S. nodes, which in turn would be an extremely harmful deadweight loss to the U.S. blockchain industry.

The Association respectfully requests that the Court consider the international nature of the blockchain industry when deciding the parties' summary judgment motions.  To the extent that any transaction of XRP was predominantly extraterritorial, with "irrevocable liability" incurred outside the United States, such a transaction is outside the U.S. securities laws, and should not

---

[37]     To the extent that *Williams v. Block One*, No. 20-cv-2809 (LAK), 2022 U.S. Dist. LEXIS 171550 (S.D.N.Y. Aug. 15, 2022) found that the location of nodes was a relevant consideration to an extraterritoriality analysis under *Morrison*, SEC Opp. at 68, the Association respectfully submits *Block One* was incorrectly decided under *Morrison* and *Absolute Activist* for the reasons set forth herein.

either be a trigger for any liability, and (if this Court decided that liability was appropriate) such

transactions should not be counted for purposes of disgorgement or civil monetary penalties.

## **CONCLUSION**

The Association respectfully requests that the Court consider the issues presented herein

when determining the parties' summary judgment motions.

Dated: New York, New York
      October 28, 2022                      MORRISON COHEN LLP

                                  By: /s/ Jason Gottlieb
                                      Jason Gottlieb
                                      Michael Mix
                                      Daniel C. Isaacs
                                      909 Third Avenue
                                      New York, New York 10022
                                      (212) 735-8600

                                      *Attorneys for Amicus Curiae*
                                      *The Blockchain Association*