Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

v.

RIPPLE LABS INC., BRADLEY GARLINGHOUSE,
and CHRISTIAN A. LARSEN,

               Defendants.

---

20 Civ. 10832 (AT) (SN)

<u>**BRIEF OF *AMICUS CURIAE*, XRP HOLDERS, IN OPPOSITION OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………………iii

PRELIMINARY STATEMENT……………………………………………………………1

I.  RELEVANT FACTS PRIOR TO THE SEC ALLEGING XRP IS A SECURITY…………...3

    A. Decentralized Cryptocurrencies - Like Bitcoin And XRP - Do Not Satisfy Howey………3

    B. SEC Confirms Sufficiently Decentralized Digital Assets Are Not Securities……….……6

    C. SEC's Other External Conduct Also Strongly Suggests XRP Is Not A Security…………6

II.  UNPRECEDENTED ALLEGATIONS CAUSE UNPRECEDENTED LITIGTION………...8

    A.  Amici's Writ of Mandamus……………………………………………………………8

    B.  Amici's Motion To Intervene……………………………………………………….……9

    C.  The SEC Responds that All XRP, Including Amici's XRP, Are Securities………………9

III. AMICI CURIAE'S INTEREST………………………………………………………...10

    A.  Amici's Interest…………………………………………………………………………10

    B.  Section 4 Exemptions Do Not Protect Amici's Interests………………………………...10

    C.  Exemptions Are Amici's Burden……………………………………………………...11

IV. LEGAL STANDARDS AND LAW TO BE APPLIED………………………….…………11

    A. Summary Judgment……………………………………………………………………11

    B. The "Character in Commerce" Test……………………………………………………11

    C. The Howey Test…………………………………………………………….…………12

V.  ARGUMENT…………………………………………………………………………...12

    A. The Token Itself Is Never The Security…………………………………….…………12

    B. The SEC Claims XRP Itself Is A Security………………………………….…………14

    C.  SEC Offers No Precedent Supporting Its Theory And Abandons Its Expert……………16

D. XRP's Utility And Non-Investment Use Is A Material Fact In Dispute…………………17

E. The SEC Has Failed To Establish Or Even Identify A Common Enterprise….…………21

F. The SEC Cannot Prove Howey's Third Prong……………………………………………22

VI. VICTIMS OF REGULATORY OVEREACH…………………………………………………28

VII. CONCLUSION……………………………………………………………..……………30

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ....................................................3, 6, 12, 13, 19, 25, 26

*Deaton v. Roisman*,
    No. 1:21-cv-00001-WES-PAS (D.R.I. Jan. 1, 2021) ………………………………8, 9, 29

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ………………………………………………...……………10, 11, 25, 27

*SEC v. Cavanagh*,
    155 F.3d 129 (2d Cir. 1998) ………………………………………………...……………...11

*Giannullo v. City of New York*,
    322 F.3d 139 (2nd Cir. 2003) ………………………………………………...……………11

*Glen-Arden Commodities, Inc. v. Costantino*,
    493 F.2d 1027 (2d Cir. 1974) ………………………………………………...……....11,14

*United Hous. Found, Inc. v. Forman*,
    421 U.S. 837 (1975) ………………………...………………………………........12, 19, 22

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ........................................................................................12, 13, 27

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ………………………………...………………………12, 28

*SEC v. Telegram Grp. Inc.*,
    No. 19-cv-9439 (PKC), 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) ........................12, 13

*Miller v. Cent. Chinchilla Grp., Inc.*,
    494 F.2d 414 (8th Cir. 1974) ………………………………………………...……….14

*Kemmerer v. Weaver*,
    445 F.2d 76 (7th Cir. 1971) ………………………………………………...……...14

*SEC v. Shavers*,
    No. 4:13-cv-00416, 2013 WL 4028182 (E.D. Tex., Aug. 6, 2013) ………..…………...14

*SEC v. Aqua-Sonic Prods. Corp.*,
    524 F. Supp. 866 (S.D.N.Y. 1981) ………………………………...………....15, 23, 25

*Bobrowski v. Red Door Grp., Inc.*,
  No. CV 09-02077-PHX-FJM, 2011 WL 3875424 (D. Ariz) Aug. 31, 2011) ..................22

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ……………………………...………………...25

**Statutes**

15 U.S.C. § 77d(a)(1)-(2) ……………………………………..………………………………...11

**Regulations**

Fed. R. Civ. P. 56(a)……………………………………………………………………….…..…11

**Other Authorities**

*Selected SEC Accomplishments: May 2017 – December 2020*. U.S. Securities and Exchange
  Commission. Available at https://www.sec.gov/selected-sec-accomplishments-may-2017-
  2020………………….........................................................................................................4

*Attachment A: Statement of facts and violations*. U.S. Financial Crimes Service Network.
  Available at https://www.fincen.gov/sites/default/files/shared/Ripple_Facts.pdf…………4

*GAO Virtual Currencies Report: Emerging Regulatory, Law Enforcement, and Consumer
  Protection Challenges*. U.S. Government Accountability Office. Available at
  https://www.gao.gov/assets/gao-14-496.pdf……………..............................…4, 5, 18, 28

*Coinflip, Inc. et al*, CFTC Docket No. 15-29, *Order Instituting Proceedings Pursuant To
  Sections 6(C) And 6(D) Of The Commodity Exchange Act, Making Findings And Imposing
  Remedial Sanctions*. U.S. Commodity Futures Trading Commission. Available at
  https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/docume
  nts/legalpleading/enfcoinfliprorder09172015.pdf…………....................................……..5

*2019 Annual Report*. U.S. Financial Stability Oversight Council. Available at
  https://home.treasury.gov/system/files/261/FSOC2019AnnualReport.pdf……........…5, 28

*Bailard, Inc. Code of Ethics*. U.S. Securities and Exchange Commission. Available at
  https://www.sec.gov/Archives/edgar/data/1048702/000119312521047532/d119950dex992
  8p7.htm…………….........................................................................................................5, 6

*Framework for "Investment Contract" Analysis of Digital Assets*. U.S. Securities and Exchange
  Commission. Available at https://www.sec.gov/corpfin/framework-investment-contract-
  analysis-digital-assets ...……………………………..............…………………6, 13, 21, 28

iv

Hinman, W. (2018) *Digital Asset Transactions: When Howey Met Gary (Plastic)*. U.S. Securities and Exchange Commission. Available at https://www.sec.gov/news/speech/speech-hinman-061418 ……………………………………………………………….6, 13, 28

*Securities Purchase Agreement By and Between MoneyGram International, Inc. and Ripple Labs Inc.* U.S. Securities and Exchange Commission. Available at https://www.sec.gov/Archives/edgar/data/1273931/000119312519174813/d766773dex101.htm………………...............................................................................……7

*MoneyGram Announces Strategic Partnership with Ripple.* U.S. Securities and Exchange Commission. Available at https://www.sec.gov/Archives/edgar/data/1273931/000119312519174813/d766773dex991.htm…………………….............................................................………………………7

SEC Office of Investor Education and Advocacy Email correspondence………………………...8

*Mar. 7, 2019, Ltr. from Chairman J. Clayton to Congressman Ted Budd*. Coin Center. https://www.coincenter.org/app/uploads/2020/05/clayton-token-response.pdf ..................13

Press Rel. No. 33-5347. *Guidelines As To The Applicability of the Federal Securities Laws To Offers And Sales Of Condominiums Or Units In A Real Estate Development* (Jan. 4, 1973). U.S. Securities and Exchange Commission. Available at https://www.sec.gov/rules/interp/1973/33-5347.pdf …………………………………………14

*Gensler Remarks*. SEC Emblem. (2021, August 3) available at https://www.sec.gov/news/speech/gensler-aspen-security-forum-2021-08-03 …………..30

**Other Materials**

Duggan, W. (n.d.). *The History of Bitcoin, the First Cryptocurrency*. U.S. News. Available at https://money.usnews.com/investing/articles/the-history-of-bitcoin……...........................…3

*Former SEC Commissioner Grundfest's Dec. 17, 2020 Ltr. to SEC Chairman Clayton*. Available at CryptoLaw. https://www.crypto-law.us/wp-content/uploads/2021/12/FOIA-12092020-Grundfest-Ltr-to-SEC-Commsnrs-Copy.pdf …………....................................................4, 8, 29

McKenzie, W. (2018) *Ethereum, the ICO craze of 2017 and the Platform Wars*. Medium. Available at https://medium.com/@williammckenzie1997/ethereum-the-ico-craze-of-2017-and-the-platform-wars-d3c79fc2cf93…………….............................……………………4

Peterson Institute for International Economics. (2018) *The Impact of Blockchain Technology on Finance*. YouTube. Available at https://www.youtube.com/watch?v=v0zAadukczY …...5

*Ripple (XRP) overtakes Ethereum as second largest cryptocurrency on CEO's bullish bet*. Forbes. Available at https://www.forbes.com/sites/billybambrough/2018/09/26/ripple-

xrp-overtakes-ethereum-as-second-largest-cryptocurrency-on-ceos-bullish-
bet/?sh=52bedbaa1c22 …………………………………………………………..….6

*Cryptocurrency Market Capitalizations*. CoinMarketCap. Available at
https://web.archive.org/web/20180103125710/https:/coinmarketcap.com/.……...........…6

Lewitinn, L. (2019) *Coinbase announces acceptance of XRP, ripple ensues*. Modern Consensus.
Available at https://modernconsensus.com/cryptocurrencies/xrp/coinbase-pro-xrp-
trading-ripple/……………………...................................................................………7

*MGI February 24, 2020 Earnings Report*. MoneyGram International, Inc. Available at
https://ir.moneygram.com/node/20741/html………………….......................................….7

Wang, N. (2021) *Gensler Says Most Crypto Trading Platforms Need to Register With SEC*.
CoinDesk. Available at https://www.coindesk.com/policy/2021/09/13/gensler-says-most-
crypto-trading-platforms-need-to-register-with-sec/………....................................……11

Beyoud, L. (2022) *SEC's Gensler Steps Up Push to Get Crypto Exchanges to Register With
Regulator*. Bloomberg. Available at https://www.bloomberg.com/news/articles/2022-07-
28/sec-chair-gensler-hardens-line-on-crypto-exchange-
registration?leadSource=uverify%20wall………...................................................……11

Price, M. (2022) *Crypto intermediaries should register with U.S. SEC, agency chair says*.
Thomson Reuters. Available at https://www.reuters.com/technology/crypto-
intermediaries-should-register-with-us-sec-agency-chair-says-2022-09-08/………..…..11

Hadjiloizou, L. (2020) *The XRP TipBot lives on through Uphold*. XRP Arcade. Available at
https://www.xrparcade.com/news/the-xrp-tipbot-lives-on-through-uphold/…..................18

Khatri, Y. (2021) *Time Magazine now accepts bitcoin and other cryptocurrencies for digital
subscriptions*. The Block. Available at https://www.theblock.co/linked/102166/time-
magazine-bitcoin-digital-subscription-payments…………..........................................……18

*XRP directory - Top companies accepting XRP*. Cryptwerk. Available at
https://cryptwerk.com/pay-with/xrp/……...........................................................................18

GlobaliD. (2021) *Introducing the XRP MasterCard® Debit Card*. Medium. Available at
https://medium.com/global-id/introducing-the-xrp-mastercard-debit-card-
827c0b37445b…........................................................................................................18

Pirus, B. (2020) *Uphold's New Debit Card Lets You Pay With Bitcoin, XRP and Gold*.
Cointelegraph. Available at https://cointelegraph.com/news/upholds-new-debit-card-lets-
you-pay-with-bitcoin-xrp-and-gold………....................................................……19

*FTX Partners With Visa To Offer XRP And BTC To Millions Of Users*. ProCoinNews. Available at https://procoinnews.com/ftx-partners-with-visa-to-offer-xrp-and-btc-to-millions-of-users/……....................................................................................................19

Weeks, R. (2020) *Andreesen Horowitz-backed Deel launches crypto payroll tool*. The Block. Available at https://www.theblock.co/linked/84255/andreesen-horowitz-backed-deel-launches-crypto-payroll-tool……...................................................................…20

*BigCommerce Support - Connecting with BitPay*. BigCommerce. Available at https://support.bigcommerce.com/articles/Public/Connecting-with-BitPay…………........20

Thinking Crypto. (2021) *Hester Peirce Interview - The SEC & US Crypto Regulations, Bitcoin ETF, Gary Gensler, Ripple*. YouTube. Available at https://www.youtube.com/watch?v=_qihfMbIk_g……...........……………………………..22

Coinbase advertisement promoting the utility of XRP for international transfers………………24

Alexandre, A. (2019) *Coinbase Expands Into Cross-Border Payments*. Cointelegraph. Available at https://cointelegraph.com/news/coinbase-expands-into-cross-border-payments…....…24

Haselton, T. (2018) *How to buy XRP, one of the hottest bitcoin competitors*. CNBC. Available at https://www.cnbc.com/2018/01/02/how-to-buy-ripple.html……....................……….24

Khanzadaev, G. (2022) *XRP Can Now Be Easily Bought in Europe Straight from Bank Account, Here's How*. U.Today. Available at https://u.today/xrp-can-now-be-easily-bought-in-europe-straight-from-bank-account-heres-how………..................................……24

*XRPL Use Cases - Powering Innovation Technology*. XRPL.org. Available at https://xrpl.org/uses.html……..................................................................26

*Binance Rewards - Calculate your crypto earnings*. Binance. Available at https://www.binance.com/en/earn/xrp……….........................................................27

*Get a Loan Backed by Your XRP*. CoinLoan. Available at https://coinloan.io/crypto-backed-loans/xrp-loan/…..........................................................27

Ponnezhath, M., & Wilson, T. (2022) *Major crypto lender Celsius files for bankruptcy*. Thomson Reuters. Available at https://www.reuters.com/technology/crypto-lender-celsius-files-bankruptcy-2022-07-14/…..................................................……27

Gary Gensler, *Ethics and Governance in the Blockchain Era, Gary Gensler, MIT, April 23, 2018* https://www.youtube.com/watch?v=Bx4Q19xA7Oc…...........................…30

*XRPL services*. XRPL Services. Available at https://xrpl.services/xrpl-statistics…............……30

## PRELIMINARY STATEMENT

Amici curiae respectfully submit this brief in opposition of the Securities Exchange Commission's (SEC) motion for summary judgment that "a purchase of XRP is an investment in a common enterprise with other XRP holders and with Ripple." ECF 640 at 2. Had the SEC limited its allegations to specific XRP transactions by the Defendants, amici would not have engaged in the extensive litigation that transpired because of those sweeping allegations. From the Complaint to the motion for summary judgment, including all pleadings and arguments asserted in-between, the SEC asks this Court to conclude that XRP is always a security, and therefore that every offer, sale, or transaction involving XRP is subject to registration under Section 5 of the Securities Act of 1933 or must qualify for a Section 4 exemption. *Hr'g Tr.* 44:7-16 (Mar. 19, 2021) (SEC Attorney stating that not all sales of XRP are necessarily Section 5 violations because some sales may qualify under Section 4 exemptions); *also* ECF 556 at n.2 (stating "Section 4 could exempt investors in the market from registration."). More alarming, the SEC asks this Court to grant summary judgment in favor of the SEC, effectively giving the SEC jurisdiction over non-parties to this litigation, consisting of an entire digital asset ecosystem. Incredibly, the SEC asks this Court to effectively grant it carte blanche jurisdiction over the entire cryptocurrency market after proving nothing more than a Defendant sold an asset and undertook efforts to promote that asset.  ECF 640 at 49 ("Defendants do not dispute that they offered and sold XRP in exchange for 'money', which suffices to establish the 'investment of money' aspect of the *Howey* test. Defendants' statements and efforts as to XRP…establish the other aspects of the Howey test as a matter of law.") (citations omitted). Respectfully, that is not how the *Howey* test is applied, nor is it an example of how the law functions. Simply put, the allegations contained in the Amended Complaint are quite possibly the most overbroad far-

reaching claims ever made in an SEC enforcement action. ECF 46 ¶ 1 ("a digital asset security

called XRP"); ¶ 291 ("Because XRP is fungible"); ¶ 293 ("The nature of XRP itself made it the

common thread among Ripple, its management, and all other XRP holders"); ¶ 353 ("The very

nature of XRP"). Frankly, the SEC's unconstrained allegations are likely what caused this Court

to grant amicus status in the first place. ECF No. 372 at 5 ("Even if the allegations in the

complaint are as far-reaching as [amici] contend").

Since filing the original Complaint (ECF 4), the SEC had multiple opportunities to back-off

the extraordinary and unprovable allegations necessitating amici's involvement. Truth be told,

had the SEC limited its theory to specific transactions offered by the Defendants, amici may not

have been granted amicus status. ECF 86 at 3 (Defendants contending that if the SEC clarified

that "the SEC does not seek to establish that XRP is, *per se*, an investment contract, [it] would

minimize any interest [amici] have in the outcome of this litigation."); *Id*. at 4 (Defendants

stating "[i]f the SEC confirms…that it will not seek to establish that secondary market XRP

transactions violate the Securities Act… [amici's] need for participation…may be limited.").

Clearly, the SEC's goal here, and true intention, is to expand its regulatory reach beyond

specific sales offered by Ripple and regulate the secondary market. ECF 153 at 24 ("The XRP

traded, **even in the secondary market**, is the embodiment of those facts, circumstances,

promises, and expectations and today *represents* that investment contract.") (emphasis added).

When amici attempted to intervene (ECF 122), the SEC's response confirmed what the Court,

itself, quickly recognized: that under the SEC's all-encompassing theory, "every individual in the

world who is selling XRP [is] committing a Section 5 violation." *Hr'g Tr.* 44:7-9 (Mar. 19,

2021) (Netburn, J.). Amici curiae respectfully submit this brief because if the SEC is successful

in its claims against XRP, the SEC would have the authority to regulate a vast number of non-

parties, including digital asset exchanges, developers, vendors, and ordinary users and holders of

XRP, including amici. This would dramatically affect the entire secondary market for XRP and

possibly, the entire cryptocurrency market. While the SEC uses this enforcement action as a *test*

*case* for expanding its jurisdictional reach, millions of innocent holders suffer the harm.

## I.  RELEVANT FACTS PRIOR TO THE SEC ALLEGING XRP IS A SECURITY

### A. Decentralized Cryptocurrencies - Like Bitcoin And XRP - Do Not Satisfy Howey.

> Cryptocurrencies (sometimes called tokens or digital assets) are a lawful means of storing
> or **transferring value** and may fluctuate in value **as any commodity would**. In the
> abstract, an investment of money in a cryptocurrency utilized by **members of a
> decentralized community connected via blockchain technology**, which itself is
> **administered by this community of users** rather than by a common enterprise, is not
> likely to be deemed a security under the familiar test laid out in *S.E.C. v. W.J. Howey.*

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) (emphasis added). When

Judge Castel wrote the above passage, he perfectly summarized the application of securities laws

to cryptocurrencies and blockchain technologies, like XRP and the XRP Ledger (XRPL). In fact,

one would think Judge Castel had XRP in mind because his description and analysis is

remarkably accurate. Although XRP has been around for a decade, it was not the world's first

cryptocurrency. Bitcoin, created in 2009, was the world's first blockchain cryptocurrency. *See*

*The History of Bitcoin*, *the First Cryptocurrency*, Deaton Decl. <u>Ex</u>. A. Three years later, three

Bitcoin developers set out to build a better Bitcoin and thus, developed XRP and the XRPL. ECF

643 at 4. A blockchain's job is to validate the authenticity of a transfer of a unit of

cryptocurrency. 448 F. Supp. 3d at n.2. A blockchain network, like Bitcoin and the XRPL, is an

open source, widely distributed, secure ledger of transactions. *Id*. Each blockchain produces a

native cryptocurrency. *Id*. The Bitcoin Network produces Bitcoin; the Ethereum Network, Ether;

and the XRPL, XRP. Prior to filing this case on former Chairman Clayton's last full day in

charge,[1] he lauded the enforcement actions brought against companies and individuals participating in the offer and sale of securities involving digital assets. *See Selected SEC Accomplishments*: *May 2017 – December 2020*, Deaton Decl. Ex. C ("The SEC brought 57 cases involving ICOs, blockchain or distributed ledger technology, and/or digital assets since the July 2017 issuance of [The DAO Report] regarding the offers and sales of digital assets."). These 57 cases "involved efforts to defraud investors through the use of digital asset securities as well as violations of the registration provisions of the federal securities laws in the offer and sale of digital asset securities." *Id*. This period of time, 2017 to 2020, has been described as the "ICO Craze," wherein dozens of digital assets were introduced to the *Howey* test via an enforcement action. *See Ethereum, the ICO craze of 2017…,* Deaton Decl. Ex. D. Notably, these enforcement actions were being filed while XRP was one of the most known and visible digital assets in the world. By 2015, XRP was so well known and visible, it became the *first* digital asset regulated in the U.S. when FinCEN declared XRP "virtual currency." *See FinCEN Ripple Facts,* Deaton Decl. Ex. E at 1 (stipulating that "Ripple Labs facilitated transfers of virtual currency"). According to the terms, "XRP [was] the second-largest cryptocurrency by market capitalization, after Bitcoin." *Id.* FinCEN, however, was not the first agency to classify XRP as a virtual currency. A year earlier, the Government Accountability Office ("GAO") issued a report highlighting XRP as a "virtual currency" utilized in "a decentralized payment system." *See GAO***,** *Virtual Currencies Report,* 10-12 (**May 2014)**, ("*GAO Report*"), Deaton Decl. Ex. F ("One of the

---

[1] *See* Former SEC Commissioner Grundfest's Dec. 17, 2020 Ltr. to SEC Chairman Clayton ("*Grundfest Letter*") Deaton Decl. Ex. B (stating no exigency exists for filing this case; warning it will cause "substantial harm to innocent holders of XRP"; that the SEC "has offered no material distinction between Ether and XRP"; that "XRP and Ether should be treated similarly"; and stating that the "mass exodus" immediately following the filing of this case by "every senior staffer" responsible for bringing the case "calls into question the exercise of Commission discretion."

more prominent examples is XRP, which is used within a decentralized payment system called Ripple. Ripple allows users to make peer-to-peer transfers in any currency."). Also in 2015, the Commodity Futures Trading Commission (CFTC), declared: "Virtual Currencies Such as Bitcoin are Commodities." *See Coinflip, Inc. et al*, CFTC Docket No. 15-29, Deaton Decl. Ex. G ("Bitcoin and other virtual currencies are… properly defined as commodities.").

Before becoming Chairman and expanding the SEC's power beyond constitutional norms, Gary Gensler agreed with the *GAO Report* and described XRP as a "*bridge currency*." *See* Gary Gensler comments *at Peterson Institute for International Economics.* ECF 124-2 at 1:29. By 2019, XRP had become so well-known to the U.S. Government, it was highlighted again, except this time in the Financial Stability Oversight Council's (FSOC) 2019 Annual Report to the U.S. Treasury. *See 2019 FSOC Annual Report.* Deaton Decl. Ex. H.  at 96 ("The market capitalization of digital assets, such as Bitcoin, Ethereum, XRP, and Litecoin, has increased in recent years"). Ironically, former Chairman Clayton is a signatory on the FSOC 2019 Report. *Id.* at 1. Because XRP was never offered in an ICO, was created 5 years *before* the ICO Craze, declared a virtual currency and commodity by the U.S. Government, it is not surprising that XRP was not one of the 57 cryptocurrencies introduced to *Howey* via an SEC enforcement action. XRP was not involved in any of those prosecutions because, for almost a decade before former Chairman Clayton disregarded the *Grundfest Letter*, market participants *generally accepted* that three cryptocurrencies were *not* securities: Bitcoin, Ether, and XRP. *See e.g.* Bailard, Inc.[2] *Code of Ethics*, **January 4, 2021,** at 2-3, Deaton Decl. Ex. I, ("Bailard has decided to allow investments

---

[2] Bailard Inc., because it is an SEC registered investment adviser and serves as a sub-adviser to certain registered investment companies, is required by the SEC to adopt a code of ethics. *See* Rule 204A-1, Investment Advisers Act of 1940; and Rule 17j-1, Investment Company Act of 1940.

in three cryptocurrencies – Bitcoin, Ethereum, and XRP – that are generally accepted to be currencies and not currently subject to regulation by the SEC.").

**B. SEC Confirms Sufficiently Decentralized Digital Assets Are Not Securities.**

It is well-established that the SEC "does not contend that Bitcoins transferred on the Bitcoin blockchain are securities." *Telegram,* 448 F. Supp. 3d. at 358. On June 14, 2018, it was also established that the SEC does not consider Ether *and other* equally sufficiently decentralized networks, securities. *See* William Hinman, *Digital Asset Transformations: When Howey Met Gary (Plastic)* ("Hinman Speech"), ECF 124-3 ("[B]ased on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions…there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required."). After the Hinman Speech, the SEC's next form of guidance also strongly suggested XRP was not a security. *See Framework for "Investment Contract" Analysis of Digital Assets,* ("*Framework*"), ECF 429-4 (stating *Howey* is unlikely met when "a virtual currency…can immediately be used to make payments…or acts as a substitute for real (or fiat) currency.").

**C. SEC's Other External Conduct Also Strongly Suggests XRP Is Not A Security**.

Until January 16, 2018, "the SEC had no trading policy regarding digital assets." ECF 354 at 1. Around this time, XRP had regained the title of second largest cryptocurrency in the world. *See Ripple (XRP) Overtakes Ethereum…*, Deaton Decl. Ex. J. In fact, Bitcoin, Ether and XRP combined, represented well over 60% of the *entire* cryptocurrency market capitalization. *CoinMarketCap Archive*, Deaton Decl. Ex. K. These "Top 3" digital assets were generally accepted to be currencies, not subject to regulation by the SEC. *See* Ex. I. From amici's perspective, one of the most significant events related to XRP is when XRP was listed and began

trading on the Coinbase platform on February 26, 2019. *See Coinbase announces acceptance of XRP*, Deaton Decl. Ex. L. Although Rule 56.1 statements and exhibits are under seal, publicly available information shows in January 2019, Coinbase met with the SEC and informed the SEC of Coinbase's determination that XRP was not a security and intended to list XRP immediately, unless the SEC disagreed. *See* Ripple Labs Answer, ECF 51 at 98 (discussing the Coinbase meeting with the SEC but identifying Coinbase as "Platform A"); *and* ECF 643 at n.46 (identifying Platform A referenced in the Complaint as Coinbase). The SEC offered no disagreement because Coinbase listed XRP the next month and arguably began promoting XRP and XRP's unique utility on a much greater scale than the Defendants ever did. *See infra* at 24.

In June 2019, a Securities Purchase Agreement between MoneyGram International ("MGI") and Ripple was filed with the SEC. *See Securities Purchase Agreement*, Deaton Decl. Ex. M. This SEC form indicated that Ripple acquired an ownership stake in MGI. *Id.* More significantly, MGI notified the SEC, that "[t]his agreement will enable MoneyGram to utilize Ripple's xRapid product (XRP) in foreign exchange settlement as part of MoneyGram's cross-border payment process." *See MGI Announces Strategic Partnership with Ripple*, Deaton Decl. Ex. N. Hence, the SEC was well aware Ripple would be utilizing XRP to compensate MGI, who would then sell that same XRP into the secondary market to retail holders, like amici. *See* MGI February 24, *2020 Earnings Report*, Deaton Decl. Ex. O ("Revenue excludes $8.9 million of benefit from Ripple, which will be accounted for as a contra expense rather than revenue **based on a recent consultation with the SEC**.") (emphasis added). From amici's perspective, similar to the Coinbase listing, the MGI deal and its use of XRP, was very significant. If it was clear that XRP was a security, the SEC would have never allowed these so-called unregistered securities to flood the public market. Yet, at summary judgment, the SEC's theory is that all XRP sales - past,

present, and future - regardless of the seller - Ripple, Coinbase, MGI, or Amici - are securities. A truly remarkable claim.

Until filing this case, the SEC *always* provided exactly the same answer for Bitcoin, Ether and XRP, never making a material distinction between them. In October 2020, the SEC informed the public, that it had not determined XRP to be a security and that it may never do so. *OIEA Emails,* Deaton Decl. Ex. P. In other words, two months before this case was filed, and prior to the "mass exodus of every senior staffer responsible for [this] major enforcement decision", XRP was treated no differently than Bitcoin and Ether. *Id*., *Grundfest Letter* at 2.

## II. UNPRECEDENTED ALLEGATIONS CAUSE UNPRECEDENTED LITIGTION

**A. Amici's Writ of Mandamus**. Although the SEC purportedly filed this case to protect amici and other XRP Holders, the SEC has opposed amici at every turn. ECF 85, 153, 556. It even attacked amici's counsel - twice. ECF 153 at n.2, 556. The SEC has only itself to blame for amici's involvement, including the involvement of other amici curiae. ECF 649, 660, 661, 681-1, 683, 684. Candidly, the SEC's legal theory regarding XRP is likely the most overbroad far-reaching claim ever made in a non-fraud enforcement action. Simply put, since *Howey*, there has not been a single case where an investment contract has been found and there exists no privity whatsoever between the buyer and the promoter. Yet, according to the SEC, every purchase of XRP "is an investment in a common enterprise with other XRP holders and with Ripple." ECF 640 at 2. The SEC's theory first appeared in the original Complaint (ECF 4), filed on December 22, 2020. Almost immediately, on January 1, 2021, amici filed a Writ of Mandamus requesting the SEC "amend its complaint against Ripple to exclude the claim that the XRP owned by [amici] constitute securities." Pet. for Writ of Mandamus ¶ 89, ECF 1 at 26, *Deaton v. Roisman*, Case No. 1:21-cv-00001-WES-PSS (D.R.I. Jan. 1, 2021) ("Writ"). At its core, the Writ

challenged the SEC's good faith basis alleging that XRP is a security *per se*. ECF 4 ¶ 1 ("a digital asset security called XRP"); ¶ 267 ("The nature of XRP itself"); ¶ 327 ("The very nature of XRP"). After being served with amici's Writ, the SEC *doubled down* on its theory and filed the Amended Complaint ("AC"), re-asserting the same allegations. ECF 46 (¶ ¶ 1; 293; 353). The Court itself probed the SEC regarding its implausible theory. *Hr'g Tr.* 44:7-9 (Mar. 19, 2021) ("Presumably under this theory then, every individual in the world who is selling XRP would be committing a Section 5 violation based on what you just said."). The SEC could have "confirm[ed] that its suit is not intended to affect the secondary retail market for XRP in the United States." ECF 86 at 4. Instead, the SEC acknowledged that its theory on XRP *may not be validated* by this Court. *See* Writ at 12 (The "[SDNY] supplies the exclusive method for **testing** the validity of the Commission's complaint") (emphasis added).

**B. Amici's Motion To Intervene.** The SEC was provided yet another opportunity to clarify its theory. In fact, defense counsel's response to amici's motion letter (ECF 75) stated: "**The SEC Must Clarify Its Theory**." ECF 86 at 3 (original emphasis). In short, "[i]f the SEC [had] confirm[ed]…it [would] not seek to establish that secondary market XRP transactions violate the Securities Act…[amici's] need for participation…may be limited." *Id.* at 4.

**C. The SEC Responds That All XRP, Including Amici's XRP, Are Securities.** In response to amici's Motion to Intervene (ECF 122) and Defendants' letter (ECF 86), the SEC *tripled down* on its implausible theory and remarkably declared: "The XRP traded, **even in the secondary market**, is the embodiment of those facts, circumstances, promises, and expectations and **today represents that investment contract**." ECF 153 at 24 (emphasis added). In part, because of that remarkable declaration, this Court granted amicus status. ECF 372. When it granted amicus status to six individual XRP holders, this Court acknowledged that never before

had there been a case where thousands of individual asset holders[3] petitioned a Court, requesting

an order for the SEC to sue and name them as defendants in a pending action. *Id.* at 5

## III.     AMICI CURIAE'S INTEREST

**A.  Amici's Interest.** This Court already determined six individual XRP holders,

representing a broader public interest, "shall be permitted to act as amici curiae in this action."

*Id*. at 11. This Court "contemplate[d] that such assistance [would] be most beneficial during

briefing on dispositive motions." *Id.* Thus, this Court found that amici hold a significant interest

in the outcome of this case. *Id.* In fact, this Court "views the amici briefs as desirable because

[amici] represent third parties whose particular interests may be affected by the Court's ruling

and whose particular interests are echoed in broader public interests." *Id*. at 10.

**B.  Section 4 Exemptions Do Not Protect Amici's Interests.** When the Court probed

the SEC over its theory that every individual in the world selling XRP is violating the law, the

SEC did not dispute the premise of the Court's question. *Hr'g Tr.* 44:7-24 (Mar. 19, 2021)

("That's not quite correct, your Honor…Section 4 specifically exempts these transactions that

the court put in the hypothetical of all these other people [i.e. amici] buying and selling XRP in

the market."). Section 4 exemptions *only* apply to a security subject to registration under Section

5. *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344 (1943) at n.3 ("They had to be securities to

be exempt securities under the Act." (citing 15 U.S.C. Sec.77c)). In short, the SEC confirmed

---

[3] XRP Holders are a putative class, from the United States and 143 countries from around the world, of users, investors, holders, developers, content providers and small businesses who acquired and utilize XRP and the XRP Ledger, most of whom were completely unaware of Ripple or its executives when acquiring XRP. ECF 665-1-26.  When amici filed ECF 123, over 12,600 XRP Holders requested to join. ECF 123 at n.1. All parties opposed class-certification and due to concerns of delay, the Court instead, granted amicus status to six individual XRP holders. ECF 372 at n.1. Today, the putative class stands at 74,502 XRP holders. Although the public interest in this case cannot be overstated, amici continue to act in their individual capacities.

that - regardless of the seller or circumstances surrounding the sale - *XRP is always a security*, including the XRP owned by amici - a claim stretching *Howey* beyond recognition.

**C. Exemptions Are Amici's Burden.** If XRP are securities "the burden shifts to [amici] to show that the securities [are] exempt from the registration requirement." *S.E.C. v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). Section 4(a)(1) exempts "transactions by any person other than an issuer, underwriter, or dealer," while 4(a)(2) exempts "transactions by an issuer not involving a public offering." 15 U.S.C. § 77d(a)(1)-(2). Section 2(a)(11) defines "underwriter" as "any person who has purchased from an issuer with a view to . . . the distribution of any security." *Id.* Thus, any holder with an intent to sell, could be deemed an issuer or underwriter. *Id.* Exchanges, like Coinbase, by definition, constitute an issuer, underwriter or dealer, which likely explains why the SEC is pursuing its breathtakingly overbroad theory in this case - clearly a ***test*** case - attempting to expand the SEC's jurisdictional reach into a new emerging asset class. *See Gensler Comments Insisting Crypto Platforms Register with the SEC*, Deaton Decl. Ex. Q, R, S.

## IV.    LEGAL STANDARDS AND LAW TO BE APPLIED

**A. Summary Judgment**. The SEC's motion for summary judgment must be denied because the SEC has failed to show that no genuine issue of material fact exists. Fed. R. Civ. P. 56(a). All reasonable inferences must be drawn in the Defendants' favor. *Giannullo v. City of New York*, 322 F.3d 139, 140-41 (2nd Cir. 2003).

**B. The "Character in Commerce" Test.** Considering the inherent characteristics of the underlying asset (XRP) is critical *before* conducting a *Howey* analysis. *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974). "The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." 320 U.S. at 352-53. The bottom line is

that "[w]hen a purchaser is motivated by a desire to use or consume the item purchased…the securities laws do not apply." *United Hous. Found, Inc. v. Forman*, 421 U.S. 837, 852 (1975).

**C. The Howey Test.** An investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298-99. Thus, the three *Howey* factors are "(i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

**V.     ARGUMENT**

**A. The Token Itself Is Never The Security.** Fellow Amicus Digital Chamber of Commerce ("DCC") avowed that "there is no precedent that analyzes whether an underlying asset of an investment contract is itself a security." ECF 649 at 3. The reason there is no precedent, is because the underlying asset, *in an investment contract,* is *never* the security. *Howey*, 328 U.S. at 301 ("If that test be satisfied, it is immaterial… whether there is a sale of property with or without intrinsic value."); *Telegram,* 448 F. Supp. 3d at 379 ("the security…is not simply the Gram, which is little more than alphanumeric cryptographic sequence."). The same *must* be said about XRP. ECF 640 at 10 ("Stripped down, XRP is just computer code."). Claiming the token itself is the security is akin to calling the oranges, in *Howey,* the securities. In *Telegram*, the Court made it clear that the central issue in *Howey* and *Telegram* was not the underlying product, agreement, or the underlying asset. *Id*. The Court confirmed that the underlying asset (whether oranges or digital tokens) are not themselves investment contracts. *Id*. Any doubt or confusion regarding whether the Court considered the token itself a security was laid to rest when Judge Castel issued a second ruling in *Telegram*. 2020 WL 1547383 at *1 (clarifying that the central point of the Court's holding was that "the 'security' was **neither the**

**Gram Purchase Agreement** *nor the Gram*.") (emphasis added). In *Telegram*, there existed *actual written contracts* between the promoter and the investors, yet the underlying written contract, itself, was not the security. *Id.* Considering *Telegram* involved a pure ICO, with a blockchain yet to be built, if there ever existed a case where the token itself constituted the security, it would be *Telegram*. However, the Court made it crystal clear that the underlying asset, in an investment contract, is not the security. *Id.* In addition to disregarding precedent spanning from 1946 (*Howey*) to 2020 (*Telegram)*, the SEC's farfetched XRP theory also contradicts the SEC's own guidance. The most litigated piece of evidence in this case, the Hinman Speech, is instructive. Director Hinman unequivocally stated: "the token – or coin or whatever the digital information packet is called – **all by itself** is not a security, just as the orange groves in *Howey* were not." *Hinman Speech* (emphasis added). Director Hinman also noted "the digital asset itself is simply code." *Id*. Director Hinman emphasized "that the analysis of whether something is a security is not static and does not strictly inhere to the instrument." *Id.* Just like any other commodity, "investment contracts can be made out of virtually any asset (including virtual assets)." *Id*. Former Chairman Clayton agreed. *See Mar. 7, 2019 Ltr. from Chairman J. Clayton to Congressman Ted Budd,* ECF 124-5 ("I agree that the analysis of whether a digital asset is offered or sold as a security is not static and **does not strictly inhere to the instrument**.") (emphasis added). Even more significant, the SEC's 2019 *Framework* stated that a virtual currency being utilized in payments – the very thing XRP was designed to do - is unlikely to satisfy *Howey.* ECF 429-4.

The Hinman Speech and the *Framework* made perfect sense considering 76 years of caselaw has shown that practically any asset or commodity can be offered as a security, whether that asset be orange groves, whiskey, chinchillas, condos, beavers, or Bitcoin. *See Howey*, 328 U.S.

293 (1946); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1034 (2d Cir. 1974);

*Miller v. Cent. Chinchilla Grp., Inc*., 494 F.2d 414 (8th Cir. 1974); SEC Rel. No. 33-5347 (Jan.

4, 1973); *Kemmerer et al. v. Weaver et al*., 445 F.2d 76 (7th Cir. 1971); and *SEC v. Shavers*,

4:13-cv-00416, 2013 WL 4028182, Aug. 6, 2013, respectively. When an asset is offered and

sold as an investment contract, therefore a security, it does not transform the underlying asset

itself into a security. Oranges remain oranges and XRP remains XRP – digital code. Therefore,

even if Ripple offered XRP as a security - *related to specific transactions* – XRP would still

remain exactly what multiple government agencies classified it as, in 2014, 2015, and 2019 - a

decentralized virtual currency.

     **B. The SEC Claims XRP Itself Is A Security.** From the filing of the original complaint

(ECF 4) to the motion for summary judgment (ECF 640, 674), and filings in-between (ECFs 153,

556), the SEC has consistently argued XRP itself is a security. Although the SEC admits that

"*Howey* requires courts to look at the economic reality **of a transaction**" (ECF 640 at 2)

(emphasis added), and, that the SEC must prove *specific transactions* offered by Ripple violated

Section 5 of the Securities Act, the SEC *is not pursuing specific transactions*. Instead, it is asking

the Court to rule that every XRP transaction is either a section 5 violation or qualifies for an

exemption under Section 4. ECF 556 at Fn.2. The SEC asks this Court to validate its shorthand

and analytically lazy contention that Ripple has engaged in the functional equivalent of a nine

year-long, on-going, 24/7 ICO, and that each and every sale of XRP, from anywhere in the

world, offered by anyone, including amici, was, is, always has been, and always will be, the offer

and sale, of a security. ECF 640 at 49-50 ("a purchase of XRP **was** an investment of money into

a common enterprise with other XRP investors and with Defendants.") (emphasis added); *Id.* at 2

("a purchase of XRP **is** an investment in a common enterprise with other XRP holders and with

Ripple.") (emphasis added); *also,* ECF 153 at 24 ("The XRP traded, **even in the secondary market**…**today** *represents* that investment contract.") (emphasis added). The SEC's XRP theory is so farfetched, it travels through space and time, into the future, capturing all possible future sales, even in far-away lands. ECF 46 ¶ 391 ("Even if some country were to recognize XRP as fiat "currency" **at some point in the future**, that would result from Defendants' significant entrepreneurial and managerial efforts to date (**and likely in the future**), **on which public investors expecting profit relied when making an investment** of money into Defendants' common enterprise.") (emphasis added). The scope of the SEC's *Howey* argument has become so stretched that it is truly indefinable, in space, or in time. As discussed, *infra* at 23-24, the SEC asks this Court to assume private statements made by Ripple employees many years ago, to a handful of individuals, equals evidence that Ripple offered XRP to the world. The SEC is not allowed to shortcut the *Howey* analysis by alleging each and every sale of XRP from the beginning of time until the end of the world, meets all three *Howey* prongs, and therefore, doesn't have to offer specific transactional evidence. The *Howey* test must be applied to each transaction and "examined as of the time that the transaction took place." *S.E.C. v. Aqua–Sonic Prods. Corp.*, 524 F. Supp. 866, 876 (S.D.N.Y. 1981). Instead, the SEC argues: "[t]he XRP traded, even in the secondary market, is the embodiment of those facts, circumstances, promises, and expectations, and today represents that investment contract." ECF 153 at 24.  Notably missing at the end of that sentence is a single cite to any precedent or authority supporting such an inimitable claim. *Id*. Amici, and likely the SEC itself, have no idea what that sentence means under the law. The SEC's theory is the equivalent of arguing individual *oranges* were not only oranges, but also *represented* the investment contract with the W.J. Howey Company. The SEC's theory would be a bit amusing, if innocent holders weren't being severely harmed.

**C**.  **SEC Offers No Precedent Supporting Its Theory And Abandons Its Expert**. The SEC has offered no precedent supporting its representation theory. Because no precedent exists, the SEC's original intent was to rely on the rank speculation of an alleged expert ("Expert One"), who failed to interview a single XRP holder before forming his opinions. ECF 555 at n.1 The SEC intended to rely on Expert One to try and prove today's XRP, traded in the secondary market, *represents* an investment contract with Ripple. ECF 153 at 24. After significant litigation regarding Expert One (ECF 489, 555, 556, 567, 572), including the SEC's request for the Court to bar the undersigned from continued participation (ECF 556 at 4), the SEC chose not to rely on the opinions of Expert One. The SEC's reversal speaks volumes. According to the Court's scheduling Order (ECF 620), Rule 56.1 statements, exhibits and supporting documents remain sealed. The evidence available to amici, however, reveals why the SEC chose not to rely on this alleged expert –which serves as *a fatal blow to the SEC's case*. The SEC offers no evidence related to knowledge or conduct attributable to amici or any XRP holders. *See* ECF 556-8 at 4, line 24 (SEC expert testifying that he "didn't interview [XRP] purchasers"); *Id*. at lines 17-18 (SEC expert admitting that he "would need to do a lot more work analysis" upon learning that XRP holders, like amici, "acquired XRP because it was a top 10 cryptocurrency by market cap and listed at a lower price compared to others, not because of anything that Ripple said or did"); *Id.* at 5, lines 20-23 (SEC expert admitting that he "**might have come to a different conclusion**" upon learning that XRP holders acquired XRP for noninvestment purposes, such as to pay for goods and services or to use as a substitute for fiat currency); *see also* XRP Purchaser affidavits (ECF 665-1-26). The AC has entire sections dedicated to XRP holders/purchasers. *See e.g.,* ECF 46 at 50-51. Yet, at summary judgment, the SEC avoids any evidence regarding XRP purchasers. It avoids such evidence because it destroys the false narrative being presented by the SEC.

**D. XRP's Utility And Non-Investment Use Is A Material Fact In Dispute.** Instead of satisfying *Howey's* three prongs, the SEC asks this Court to declare, *as a matter of law*, all *Howey* prongs satisfied because Ripple sold XRP, for investment, to certain individuals (likely accredited investors) and undertook efforts to promote XRP. ECF 640 at 49 ("Defendants' statements and efforts as to XRP… establish the other aspects of the Howey test as a matter of law.") (citations omitted). The SEC literally asks this Court to skip over conducting an analysis of the second and third prongs of the *Howey* test – a truly remarkable ask. Even worse, the SEC, has failed to meet its burden regarding *Howey's* first prong. Throughout this case, the SEC has failed to take into account the non-investment use of XRP. ECF 46 at 63 (**"No Significant Non-Investment 'Use' for XRP Exists"**) (original emphasis). No single statement offered by the SEC could be further from the truth. While the SEC remains in a stage of perpetual denial, the rest of the world, including the Court, accepts XRP's unique utility. ECF 673 at n.50 (Japan, Switzerland, Singapore, the United Arab Emirates (UAE), and the United Kingdom (U.K.) have all declared XRP a currency - not a security.); *also*, *Hrg Tr.* at 11:4-7 (Mar. 19, 2021) ("My understanding of XRP is that not only does it have a sort of currency value, but it also has a utility, and that utility distinguishes it, I think, from Bitcoin and Ether.") (Netburn, J.). Disturbingly, despite the overwhelming and indisputable evidence to the contrary, the SEC disputes XRP's utility. *Id.* at 51:15-16 ("Now, the court referenced a utility for XRP. We dispute whether that utility actually exists, your Honor."). The *truth* is that amici, and millions like amici, use XRP for non-investment purposes. ECF 655-1-26. By asking this Court to find, as a matter of law, that all past, present and future sales of XRP are securities, the SEC wants this Court to ignore the millions of times XRP is used each day, as well as ignore all the non-investment acquisition of XRP. The SEC asks this Court to disregard companies like TapJets

(ECF 661), I-Remit (ECF 660) and SpendTheBits (ECF 684); and, of course, ignore the nearly three thousand XRP Purchaser affidavits. ECF 655-1-26. Since the 2014 *GAO Report*, the SEC has known that XRP is utilized "within a decentralized payment system" allowing "users to make peer-to-peer transfers." *GAO Report*. XRP holders have been utilizing this peer-to-peer decentralized payment system ever since. *See The XRP TipBot Lives,* Deaton Decl. <u>Ex</u>. T. (Describing the XRP TipBot as a "multi-platform application that monitors social media posts on Twitter, Reddit, or Discord, and allows one person to send another person XRP…The XRP TipBot has also been used for good, helping many charities."). According to the SEC's outlandish theory, those who received XRP as tips, for providing social media content, and the charities accepting XRP, are all holding unregistered securities and if they intend to sale the XRP they receive, they may need to prove a Section 4 exemption. Thousands of vendors, like Time Magazine, accept XRP as a form of payment or medium of exchange. *See Time Magazine Accepts Bitcoin and Other Crypto*, Deaton Decl. <u>Ex</u>. U ("Time will accept all cryptocurrencies currently supported by Crypto.com Pay [including] bitcoin, ether, dogecoin, XRP and Litecoin"); *Pay with XRP*, Deaton Decl. <u>Ex</u>. V (listing 1,500 plus companies, stores, services **accepting XRP as a payment** and helping XRP Holders, "[f]ind where to spend [their] XRP."); *see also* ECF 684 (showing how XRP is utilized to spend Bitcoin). Incredibly, the SEC writes: "And Ripple specifically *did not target* those who might view XRP as a currency." ECF 640 at 57 (original emphasis). The SEC emphasizes the fact that "Garlinghouse explained in multiple public interviews: '[T]hese aren't currencies…I can't buy coffee with XRP.'" *Id*. Yet, it is an indisputable fact that amici and millions like them, acquire and use XRP as a form of currency, including *to buy coffee*. *See Introducing The XRP Mastercard Debit Card,* Deaton Decl. <u>Ex</u>. W. (explaining the XRP Card is the first ever decentralized community-linked debit card of its kind,

available exclusively to members of the XRP community and accepted wherever Mastercard is accepted, while earning up to 5% cash back in XRP rewards); *Uphold XRP Debit Card*, Deaton Decl. Ex. X. (explaining that the XRP Uphold Debit Card will be accepted globally wherever Mastercard is accepted); *also*, *FTX Partners with Visa to offer XRP And BTC to Millions of Users*, Deaton Decl. Ex. Y ("This means that digital assets like XRP and Bitcoin are now available to Visa's large customer base to conduct transactions without having to convert crypto to fiat or actually having to withdraw the crypto from the exchange. As a result, this is a significant milestone that will boost the adoption of **crypto assets like XRP to be used for every-day transactions**.") (emphasis added). XRP debit cards, provided by MasterCard and Visa would not exist if XRP wasn't considered a currency or medium of exchange. To be granted summary judgment, the SEC must prove no dispute exists regarding the non-investment use of XRP. *Forman*, 421 U.S. at 852. *Telegram*, again, is instructive. To prove non-consumptive intent, in *Telegram*, the SEC relied on the **same expert** it has abandoned in this case. 448 F. Supp. 3d at 373. Judge Castel held that "a rational economic actor would not agree to freeze millions of dollars for up to 18 months…if the purchaser's intent was to obtain a substitute for fiat currency." *Id.* (*citing Expert One's Report ¶ 5*). In this case, the SEC offers no similar evidence proving non-consumptive intent. Defendants, on the other hand, submitted affidavits of XRP holders from the U.S. and abroad. ECF 655-1-26. *All* of the nearly three thousand XRP holders, represented in the affidavits, acquired XRP in the secondary market - not from Ripple or its executives. *Id.* The affidavits provide this Court with a complete picture of the truth and utterly destroys the false narrative promulgated by the SEC. *Id.* The SEC previously provided this Court with copies of unsigned affidavits, along with declarations and exhibits associated with the affidavits. *See* ECF 556-1, 556-10. The XRP purchaser affidavits establish

critical points for the Court's consideration regarding: (i) whether securities laws even apply to XRP transactions; and (ii) if certain XRP transactions fall within the scope of securities laws, the affidavits provide important factors to consider when conducting a *Howey* analysis.

The affidavits show, in addition to acquiring XRP for investment purposes, many holders acquired XRP for non-investment reasons. ECF 655-1-26.  XRP was acquired for use as a form of currency utilized to pay for goods and services. *Id*. For example, XRP has been used for payroll in the U.S. and abroad. *See Crypto Payroll Tool,* Deaton Decl. Ex. Z (reporting how Deel, a company partnered with Coinbase, launched a crypto-payroll service allowing international workers to be paid in Bitcoin, Ether, *and XRP*). The XRP holder affidavits include people who, prior to this lawsuit, received their paycheck in XRP. As an example, a company called BitPay, launched a massive crypto payments service for businesses in 225 countries allowing people to be paid in certain cryptocurrencies including Bitcoin, Ether, **XRP**, Litecoin, Bitcoin Cash and others. *See Connecting with Bitpay*, Deaton Decl. Ex. AA. Because of the grossly overbroad allegations asserted by the SEC, Bitpay today, only offers XRP payments outside of the United States. *Id.* In short, some international XRP holders, represented in the XRP purchaser affidavits (ECF 655-1-26), withdraw their paychecks in XRP because XRP is utilized as a substitute for fiat currency. *Id*. Included in the purchaser affidavits (ECF 655-1-26), are international XRP holders, being paid in XRP, living in Japan, Switzerland, Singapore, the United Arab Emirates (UAE), and the United Kingdom (U.K.). *Id*. In every one of those countries, XRP was evaluated by foreign regulators and declared a currency - not a security. ECF 673 at n.50. Yet, according to the SEC, these workers receiving XRP for pay, living in a country where their regulator designated XRP a non-security, is in a common enterprise with Ripple and all other XRP holders in the world, and must prove to the SEC that a Section 4 exemption

applies, if they use their XRP in the U.S. The SEC's argument is truly irrational. The XRP

purchaser affidavits also include holders who acquired XRP to establish a trust-line on the

XRPL, to send value, utilizing XRP as a bridge currency and to access the XRPL's decentralized

exchange (DEX), as described in the SpendTheBits brief. ECF 684 at 3-6. Simply put, the non-

investment acquisition of XRP creates a material issue of fact.

      **E. The SEC Has Failed To Establish Or Even Identify A Common Enterprise.** The

Defendants' opposition brief discusses how the SEC has shifted its theory regarding the common

enterprise XRP holders allegedly "bought into." ECF 675 at 19-21. In sum, the SEC has

struggled to pinpoint a viable common enterprise in this case. The SEC's struggle is

understandable considering the SEC has admitted that it ignores *Howey's* pesky second prong

when applied to digital assets. *See Framework* at n.10 ("The Commission, on the other hand,

does not require vertical or horizontal commonality *per se*, nor does it view a 'common

enterprise' as a distinct element of the term 'investment contract.'"). Whenever the SEC

struggles to reconcile its own position (which is often), it always falls back on "the token itself"

as its catchall answer. Discussed earlier, the SEC's theory is that "XRP traded, even in the

secondary market…represents [the] investment contract." ECF 153 at 24. Incredibly, the SEC

not only argues that XRP represents the investment contract, but that it also represents the

common enterprise. ECF 640 at 17 ("The escrow account's purpose was to remind investors of

the common enterprise XRP represented."); *Id*. at 63 ("Ripple offered and sold XRP, for money,

as a common enterprise"). According to the SEC, since it represents both the common enterprise

and investment contract, any purchase of XRP automatically satisfies all prongs of *Howey*. ECF

640 at 49. The SEC's obsession with focusing on the token, and not on the circumstances

surrounding the offering as a whole, allows the SEC to sidestep a legitimate *Howey* analysis. The

SEC's unconstitutional shortcut was criticized by Commissioner Hester Peirce. *See* Mar. 9, 2021 Hester Peirce Interview, *Thinking Crypto* ECF 124-8 at 18:58 ("We tend at the SEC **to talk about the token itself as a security** and that's really a shorthand…**what we've done now** is said that orange groves are kind of like the security.") (emphasis added). Focusing on the token itself, the SEC argues XRP meets the second and third prongs of *Howey "*as a matter of law." ECF 640 at 49. The SEC's argument takes unconstitutional bootstrapping to the highest level. The SEC is forced to argue XRP is the common enterprise because its expert "pivoted, pointing instead [of Ripple] to an amorphous 'XRP 'ecosystem' as the supposed common enterprise." ECF 675 at 20. Considering the SEC is no longer relying on its expert, it cannot satisfy *Howey's* second prong. The Defendants, on the other hand, have provided affidavits which establish that the majority of first-time purchasers, who acquired XRP as an investment, were unaware of a company named Ripple, selling software to banks. ECF 655-1-26. XRP investors affirm that they "did not believe they were acquiring a legal or financial interest in Ripple when acquiring XRP." *Id*.

The SEC conflates common enterprise with common interest. ECF 640 at 15. It asks the Court to substitute the latter for the former. The word "align(ed)" appears 22 times in the SEC's brief. ECF 640 at 2, 14-19, 24, 39, 50, 52-53, 61-62. But an alignment of interests is not enough to satisfy the common enterprise factor. *Bobrowski v. Red Door Grp., Inc*., 2011 WL 3875424, at *1 (D. Ariz. Aug. 31, 2011). If the Court were to adopt the SEC's argument, the SEC could substitute any cryptocurrency for XRP, and the same argument would apply. Then again, maybe that is the SEC's ultimate goal here because clearly, enforcing U.S. securities' laws, are not.

**F. The SEC Cannot Prove Howey's Third Prong.** To meet *Howey's* third prong, the SEC must prove XRP holders, like amici, had a reasonable expectation of profits derived from Ripple's efforts**.** 421 U.S. at 852. The evidence currently available in the public record, proves

the SEC cannot satisfy *Howey's* third prong. *See* ECF 556-8 at 6-7 (SEC expert admitting he "did not interview specific XRP purchasers or **attempt to validate" XRP holder's reliance on Ripple**) (emphasis added). Without evidence or an expert to establish a link between Ripple's efforts and the acquisition of XRP, the SEC cannot prevail at summary judgment. Although the SEC admits that "*Howey* requires courts to look at the economic reality of a transaction" (ECF 640 at 2), it does not attempt to establish each *Howey* factor with respect to any particular transactions. The failure to do so proves fatal to their motion for summary judgment because each transaction "must be examined as of the time that the transaction took place." *Aqua–Sonic Prods. Corp.*, 524 F. Supp. at 876. More troubling, is that the SEC references statements made by the Defendants almost a decade ago and then pretends that those statements led or induced present day XRP purchasers to acquire XRP in the secondary market. The SEC literally offers Tweets from April 2013, by Ripple, promoting Ripple and XRP price increases. ECF 640 at 12. However, not one of amici's six-individual XRP holders were on Twitter in 2013. The SEC refers to three documents from 2013 and 2014 as evidence of an aggressive marketing campaign promoting Ripple and XRP. *Id*. One example, involves the Gateways brochure that was sent to "at least 100 people." *Id.* The SEC has failed to demonstrate whether *those* 100 or so individuals, *who actually received the Gateways brochure,* were led to expect profits from Ripple's efforts, let alone prove anything related to present day holders. The SEC writes: "[i]n February 2017, Larsen and Miguel Vias…encouraged *an XRP investor* to think of XRP's potential appreciation over the long-term, including based on Ripple's entrepreneurial efforts." *Id.* at 20. Arguably, because there is at least some level of privity, communication and contact between Ripple and those identified in these isolated examples, the SEC could attempt to establish each *Howey* factor with respect to these specific transactions. The SEC does not! Instead, the SEC offers this decade

23

old marketing material in support of its request to classify every sale of XRP, past, present and future, as an investment contract with Ripple. There is no evidence that the information Ripple provided, many years ago, ever reached XRP holders, who then considered Ripple, or its management team, before acquiring XRP in the secondary market. From amici's perspective, companies, unrelated to Ripple, promoted XRP much more significantly. *See Coinbase Ad* Deaton Decl. Ex. BB (advertising the ability to "[s]end money across borders virtually instantly using XRP or USDC" and allowing **users** to experience "[n]o fees to send or receive XRP or USDC to another Coinbase account"). In the secondary market, it was Coinbase, and others, who exploited XRP's independent utility, attracting customers by offering them the ability to "[s]end money internationally for free." *Id.* Coinbase, **not Ripple**, promoted that it was expanding **Coinbase's business** into cross-border payments. *See Coinbase Expands into Cross Border Payments Using XRP & USDC,* Deaton Decl. Ex. CC. The SEC also references how Ripple undertook efforts to inform the public how to acquire XRP. ECF 640 at 33 ("Ripple listed on its website crypto trading platforms that traded XRP."). The SEC, however, offers no evidence that such efforts by Ripple led to a single transaction. The SEC asks this Court to *assume* a causal connection even though XRP was one of the Top 3 most popular digital assets in the world, and financial news outlets were encouraging and showing investors and users how to acquire XRP. *See* CNBC's *How to buy XRP, one of the hottest bitcoin competitors,* Deaton Decl. Ex. DD (walking viewers through the process of how to acquire XRP **by first acquiring Bitcoin or Ether**); *see also*, *XRP Can Now Be Easily Bought in Europe Straight From Bank Account*, Deaton Decl. Ex. EE (explaining how in the Netherlands XRP can be easily bought straight from a person's bank account.). Even assuming that the Court accepts the marketing efforts by Ripple as statements or promises intended to induce XRP holders to purchase XRP, there is no evidence

regarding the reasonable perspective of XRP purchasers who acquired XRP in the secondary market. The SEC writes: "*Howey* is an objective test" and "[c]ourts evaluate the 'entirety of the parties' understandings and expectations'" ECF 640 at 5. Yet, the SEC offers no evidence of the "understandings and expectations" of amici and all other XRP holders. Again, each *Howey* factor must be satisfied for each transaction and each transaction "must be examined as of the time that the transaction took place." 524 F. Supp. at 876. If underlying contracts, like the ones in *Kik or Telegram*, or some written communication constituting an offer**,** like in *Joiner*, existed between Ripple and specific XRP purchasers, thus establishing some level of contact or privity between them, then *maybe* the SEC could rely solely on Ripple's statements and efforts when applying an objective standard. But before this Court can evaluate the entirety of the parties' understandings and expectations, it requires some level of privity to exist between Ripple and the purchaser. Amici's extensive research has not found a single case where an investment contract was found absent some level of privity or contact between the promoter and the buyer. In sum, the SEC cannot offer this Court a single citation in 76 years of caselaw, handed down from the Supreme Court, or any federal appellate court within the U.S., where an investment contract was found when there existed absolutely no contact or privity between the promoter/seller and the purchaser. In fact, *every single case* the SEC cites in its motion papers (ECF 640, 674), involves actual contracts, express or implied, written or oral, between the promoter and the purchaser. Yet, even in cases where there were actual contracts between the promotor and the purchaser, the SEC often relies on expert testimony to provide a causal link, establishing the purchaser's reasonable expectation of profits derived from the promoter's statements and efforts. For example, in *Telegram*, to establish a reasonable expectation of profits derived from the promoter, the SEC relied on the *same expert* it discarded in this case. 448 F. Supp. 3d at fn.11 (**Citing**

**Expert One's report** at ¶ 28 establishing that the Gram token purchasers expected profits derived from Telegram's efforts because no consumptive intent or use existed).

In sum, the SEC has failed to show that XRP purchasers relied on Ripple's efforts. If anything, the SEC's own argument proves the exact opposite to be true. According to the SEC, Ripple failed to find a "use for XRP until the ODL product, which did not occur until 2018." ECF 674 at 45. Even worse, Ripple "did not sell XRP for its purported 'use' to any ODL customer until mid-2020." *Id*. According to the SEC, in 2012 "no use case existed" for XRP. ECF 46 ¶ 396. Thus, it took Ripple over 6 years to find a "use" for XRP and 8 years to make its first sale of XRP for "its purported use." ECF 674 at 45. No XRP holder could have a reasonable expectation of profits based on those efforts. The SEC's argument here, demonstrates a fundamental misunderstanding of how an open permission-less decentralized distributed ledger blockchain technology operates and functions. While Ripple was spending years attempting to disrupt an entrenched half-century old legacy banking system, XRP holders, comprising of users, developers, vendors, merchants, content distributors, and small businesses, like TapJets (ECF 661) and SpendTheBits (ECF 684) were developing independent use cases for XRP. *See e.g., XRPL Uses*, Deaton Decl. Ex. FF (listing companies and developers "around the world that leverage the XRP Ledger to solve interesting problems across a variety of industries and use cases."). The XRP purchaser affidavits demonstrate that XRP holders "do not need to rely on the efforts of Ripple to generate a profit or to receive any financial benefit." ECF 655-1-26. XRP holders explain how they receive a financial benefit - independent of Ripple - by owning XRP itself. *Id*. XRP holders explain how they "utilize [their] XRP as collateral to obtain financing" for a fiat loan or they "stake (i.e., loan) [their] XRP on digital trading platforms (i.e., Nexo, Celsius, Bitrue, and/or other trading platforms)." *Id*. XRP holders explain that by "staking/loaning [their]

26

XRP on these platforms, [they're] able to earn interest and/or receive additional compensation." *Id*. In short, the token itself generates a benefit to the holders by loaning or collateralizing their XRP. *Id*.; *see also, Binance Earn,* Deaton Decl. Ex. GG (offering 1-4% APR for staking XRP); *also*, *CoinLoan,* Deaton Decl. Ex. HH (stating "Get a loan backed by your XRP" at "4.9% annually"). The ability to loan or collateralize XRP requires denial of the SEC's summary judgment because the Supreme Court made clear that when a buyer "(has) been left to (its) own devices for realizing upon (its) rights" there is no investment contract. 320 U.S. 344 at 348. The SEC fails to understand, that if Ripple ceased to exist, XRP, XRP holders, and companies, like SpendTheBits (ECF 684) could flourish. In fact, if Ripple's XRP escrow were burned or confiscated, basic supply and demand economics suggests a price increase for XRP (assuming half of the existing supply were destroyed). In short, individual holders and businesses within the XRP ecosystem, could benefit in Ripple's demise. *See* ECF 684 ("[I]f STB were to scale, it could, in theory, become a competitor to Ripple's ODL system"). Amici are confident in stating, that such a scenario, certainly does not "fit" into the common enterprise or joint venture scheme the *Howey* Court envisioned capturing when determining an investment contract. *See Howey*, 328 U.S. at 300 ("The *Howey* test asks whether the transaction involves "all the elements of a profit-seeking business venture."). The indisputable *truth* is that XRP holders are not in a common enterprise with Ripple or each other. Some XRP holders loan out their XRP, while others do not. Thus, some XRP holders, who choose to stake/loan or collateralize their XRP, benefit financially while Ripple or other XRP holders do not. The opposite is also true. Recently, a company called Celsius, filed for bankruptcy. *See Celsius files for bankruptcy*, Deaton Decl. Ex. II. XRP holders who loaned Celsius their XRP, suffered financial losses Ripple and other XRP holders did not. The Celsius bankruptcy example destroys any claim of horizontal

27

commonality. *Revak,* 18 F.3d at 88 ("[t]he rents and expenses attributable to each unit were not shared…but were instead the sole responsibility of the unit owner."). XRP holders, like amici, maintain sole responsibility and can "make profits or sustain losses independent of the fortunes of other purchasers." *Id.*

## VI.    VICTIMS OF REGULATORY OVERREACH

As noted by Judge Netburn, XRP "has a utility, and that utility distinguishes it…from Bitcoin and Ether." *Hrg Tr.* at 11:4-7 (Mar. 19, 2021). XRP's unique utility is what attracted amici and millions of others to acquire XRP, not Ripple. Since "Howey is an objective test" (ECF 640 at 5), objectively speaking, XRP holders relied more on the statements regarding XRP, made by federal agencies, including the SEC, than by Ripple. To summarize: six years *before* this lawsuit was filed, the 2014 *GAO* Report classified XRP as a "virtual currency" utilized in "a decentralized payment system"; the 2015 FinCEN settlement declared XRP "virtual currency", forcing Ripple to comply with banking laws, not securities laws - making XRP *the first regulated cryptocurrency* in the U.S.; in 2015, the CFTC stated Bitcoin and *other* virtual currencies were properly classified *as commodities;* in 2018, during the time period XRP was either the second or third largest crypto in the world, the Hinman Speech gave Bitcoin, and more significantly, Ether, a regulatory free pass, but suggested that there were *other* cryptocurrencies not considered securities; in 2019, the FSOC Report highlighted *only* Bitcoin, Ethereum, XRP, and Litecoin and was signed by then-Chairman Clayton; also in 2019, SEC disclosure forms acknowledged that XRP was being utilized by MGI; and, the 2019's *Framework,* made it clear that a virtual currency that can "be used to make payments" (the use case that makes XRP the most popular crypto) (ECF 661 at 5) – "is unlikely to satisfy *Howey."* ECF 429-4. Considering these indisputable facts, it is difficult to comprehend, after seven and half years of XRP being publicly

traded, why the Grundfest warning was completely disregarded. The SEC was well aware that the mere filing of this case would cause "multi-billion losses to innocent third parties." *Grundfest Letter* at 2. His warning was more than accurate because the damages were "more than **$15 billion**, and the disruption of numerous innovative applications of XRP" resulted. ECF 86 at 2; *see also,* ECF 684 at 2. Buried underneath the $15 billion in losses are *real people* who have been severely harmed (ECF 665-1-26), not by market volatility, but because, at best, the SEC fundamentally misunderstands the underlying technology, or at worst, has been "deliberately misleading so as to arrogate for the SEC optionality as this litigation progresse[d]." ECF 86 at 2. Considering how this case was filed, coupled with unprovable allegations, "raises fundamental fairness questions about the exercise of Commission discretion." *Grundfest Letter* at 2. Ex. B; *see also* ECF 186 at 6, 567 at 4, n.2. There is no doubt that many acquired XRP for consumption. ECF 655-1-26. There is no doubt, XRP was also acquired for investment, usually in conjunction with Bitcoin and Ether. *Id.* XRP holders who did invest, however, didn't because of Ripple. But because of the sweeping allegations, thousands of innocent holders' life savings and retirement accounts are frozen, unable to convert their XRP into Bitcoin, Ether or USD. *Id.* Until this Court issues a ruling, these XRP holders are unable to access their funds, including if they experience a life-altering event. *Id*. In the meantime, blockchain innovation has halted at the American border. *Id.*; ECF 684 at 2. In truth, the SEC is using this case as a quasi-declaratory judgment to *test* an implausible theory, developed after conducting its own failed *Howey* analysis. *See* Writ at 12 ("The [SDNY] supplies the exclusive method for *testing the validity* of the Commission's complaint against Ripple."), *compared with,* ECF 413 at 8 (enforcement lawyers conducted an XRP *Howey* memorandum, dated June 13, 2018, but "did not present a recommendation to the SEC."). Hence, it becomes undeniable, that this case serves as a *test case* to expand the SEC's

jurisdictional reach into a burgeoning asset class, riddled in confusion and regulatory uncertainty - much of it caused by the SEC itself. It is undeniable because in 2018 (before becoming Chairman), Gary Gensler cautioned that the digital asset markets lacked regulatory clarity and that "**even for Ripple**, needs for there to be clarity in the market." *See Gensler Blockchain Interview*, Deaton Decl. <u>Ex.</u> JJ. But today, as Chair, he claims that "rules related to crypto assets are well-settled" and "[t]he test to determine whether a crypto asset is a security is clear." *See Gensler Remarks*, Deaton Decl. <u>Ex.</u> KK. The only thing clear, is that the SEC has asserted allegations it cannot prove. There are 4,343,575 XRP accounts, along with 7,723,297 Trust-Lines connected to the XRPL. *XRPL Stats*, Deaton Decl. <u>Ex.</u> LL. In other words, there are millions of XRP holders being held hostage as collateral damage while the SEC engages in a jurisdictional power grab. Those innocent holders have been abandoned by the SEC "adopting its litigation positions to further its desired goal, and not out of a faithful allegiance to the law." ECF 531 at 6.

On behalf of the six individual XRP holders, in their individual capacities, as well as the millions of XRP holders, whose interests are embodied in the interests of amici curiae, we extend deep and sincere gratitude to the Court for allowing and considering amici curiae's perspective during this litigation and at summary judgment. After two long years of tedious and distressing litigation, a decentralized community of users, investors, developers, and small businesses, anxiously await Your Honor's decision.

## VII.   CONCLUSION

Amici curiae respectfully request this Honorable Court deny the SEC's motion for summary judgment because genuine issues of material facts exist. Respectfully, the Court should grant the Defendants' motion for summary judgment because *no reasonable jury* could decide in favor of the SEC's exceedingly overbroad theory.

Respectfully Submitted,

_____
John E. Deaton (*admitted pro hac vice*)
Deaton Law Firm LLC
450 North Broadway
East Providence, RI 02914
Tel.: +1 (401) 351-6400
Email: all-deaton@deatonlawfirm.com

*Attorney for Amicus Curiae, XRP Holders*