# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| SECURITIES AND EXCHANGE COMMISSION, |
| Plaintiff, |
| v. |
| RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN, |
| Defendants. |

Case No. 20-CV-10832 (AT) (SN)

**BRIEF OF THE CRYPTO COUNCIL FOR INNOVATION AS *AMICUS CURIAE***
**IN SUPPORT OF DEFENDANTS**

Robert L. Boone
Tiffany J. Smith*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Avenue
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888

Kelly P. Dunbar*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Crypto Council for Innovation*

*\*Not admitted in S.D.N.Y.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF *AMICUS CURIAE* ....................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ....................................................................................................................... 4

I.  THE SEC'S ENFORCEMENT APPROACH TO DIGITAL ASSETS DEPRIVES
STAKEHOLDERS OF FAIR NOTICE AND RISKS CHILLING INVESTMENT AND
INNOVATION IN EMERGING DIGITAL TECHNOLOGIES. ........................................ 4

    A.  Blackletter Principles of Administrative Law Require Fair Notice,
Particularly When It Comes To Regulation Of New, Evolving
Technologies. .............................................................................................. 4

    B.  The SEC's Actions Here Reflect An Approach To Digital Assets That Is
Contrary To The Goal Of Predictability And Principles Of Fair Notice. ............... 5

    C.  The SEC's Approach Risks Chilling Innovation And Investment. ...................... 10

    D.  Rulemaking, Not Enforcement, Is The Proper Path Forward. .............................. 14

II.  THE CONSEQUENCES OF A RULING IN FAVOR OF THE SEC HERE UNDERSCORE
THE SERIOUS PROBLEMS WITH THE SEC'S APPROACH TO ENFORCEMENT. ..................... 17

    A.  The Existing Securities Regulatory Regime Cannot Mechanically Be
Applied To Digital Assets Such As XRP. ........................................................... 18

    B.  Holders Of Other Digital Assets, As Well As The U.S. Crypto Industry At
Large, Could Be Harmed By A Decision That Ripple Offered And Sold
XRP As An Investment Contract. ....................................................................... 26

CONCLUSION ................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Animal Legal Defense Fund, Inc. v. Vilsack*,
    237 F. Supp. 3d 15 (D.D.C. 2017) ...................................................................14

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012)...................................................................................4, 5

*Cunney v. Board of Trustees of Village of Grand View*,
    660 F.3d 612 (2d Cir. 2011)...........................................................................4

*District of Columbia v. USDA*,
    496 F. Supp. 3d 213 (D.D.C. 2020) ...............................................................15

*Estate of Landers v. Leavitt*,
    545 F.3d 98 (2d Cir. 2008)...........................................................................14

*FBME Bank Ltd. v. Lew*,
    209 F. Supp. 3d 299 (D.D.C. 2016) ...............................................................15

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) (*Fox I*)...........................................................................5

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) (*Fox II*)...........................................................................4

*NLRB v. Majestic Weaving Co.*,
    355 F.2d 854 (2d Cir. 1966)...........................................................................5

*Pinter v. Dahl*,
    486 U.S. 622 (1988).......................................................................................21

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946).........................................................................................2

*TSC Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).......................................................................................19

*Upton v. SEC*,
    75 F.3d 92 (2d Cir. 1996) ...............................................................................5

*Weyerhaeuser Co. v. Costle*,
    590 F.2d 1011 (D.C. Cir. 1978).....................................................................15

## STATUTES AND REGULATIONS

15 U.S.C. § 77d ........................................................................................................19

15 U.S.C. § 77e ...............................................................................................2, 19, 21

15 U.S.C. § 77g ........................................................................................................19

15 U.S.C. § 77l .........................................................................................................21

15 U.S.C. § 77r .........................................................................................................23

15 U.S.C. § 78cc .......................................................................................................22

15 U.S.C. § 78f .........................................................................................................22

15 U.S.C. § 78l ....................................................................................................20, 24

15 U.S.C. § 78o ........................................................................................................22

17 C.F.R. Part 229 ....................................................................................................20

17 C.F.R. § 230.144 ..................................................................................................21

17 C.F.R. § 240.15c2-11 ...........................................................................................25

17 C.F.R. § 240.15c3-1 .............................................................................................25

17 C.F.R. § 240.15c3-3 .............................................................................................25

Executive Order on Ensuring Responsible Development of Digital Assets, White
    House (March 9, 2022), https://tinyurl.com/3yvwyebb ...............................13, 27

*Amendments Regarding the Definition of "Exchange" and Alternative Trading
    Systems (ATSs) That Trade U.S. Treasury and Agency Securities, National
    Market System (NMS) Stocks, and Other Securities*, 87 Fed. Reg. 15,496
    (Mar. 18, 2022) ...........................................................................................10

*Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed.
    Reg. 11,627 (Apr. 27, 2021) ........................................................................25

*Further Definition of "As a Part of a Regular Business" in the Definition of
    Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054 (Apr. 18,
    2022) ...........................................................................................................10

## OTHER AUTHORITIES

American CryptoFed DAO, Filings, https://tinyurl.com/2p8anac8 ...........................23

Carrier EQ, LLC (f/k/a Airfox), Form 8-K (June 30, 2021),
https://tinyurl.com/5n8bpbme ..................................................................................23

Caselli & Somekh, *Access to Banking and the Role of Inequality and the
Financial Crisis*, 21 B.E. J. Econ. Analysis & Pol'y, 1373 (2021) ...................................12

Chacon, *Gladius Network Shuts Down As ICO Investors Cry Foul*, Decrypt (Nov.
25, 2019), https://tinyurl.com/54jb6477 ..........................................................23

CoinMarketCap.com, XRP, https://tinyurl.com/37nf6rhh (last visited Oct. 31,
2022) ..................................................................................26

Corso, *SEC's Gensler Suggests Crypto Rules Could Be Years Away*, Law360
(Sept. 15, 2022), https://tinyurl.com/36anp54p ..........................................20

Crenshaw, *Digital Asset Securities—Common Goals and a Bridge to Better
Outcomes*, SEC (Oct. 12, 2021), https://tinyurl.com/5x2umycv .....................9

De, *SEC's Gensler Holds Firm That Existing Laws Make Sense for Crypto*,
CoinDesk (Sept. 13, 2022), https://tinyurl.com/43jvjwy5 ...........................17

Electric Capital, *U.S. Share of Web3 Developers is Shrinking* (April 2022),
https://tinyurl.com/2p9868um .................................................................27

Engler, *Coinbase Enables Mexican Users to Easily Cash Out of Crypto Sent to
Them*, CoinDesk (Feb. 15, 2022), https://tinyurl.com/yj5a3mkb ...................13

Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://tinyurl.com/4525j4rk...............9, 19

Gensler, *Testimony at Hearing Before the Subcommittee on Financial Services
and General Government U.S. House Appropriations Committee*, SEC
(May 17, 2022), https://tinyurl.com/2s3jm9f4................................................17

Hinman, *Digital Asset Transactions:  When Howey Met Gary (Plastic)*, SEC
(June 14, 2018), https://tinyurl.com/4u883y85.........................................6, 21

Hinman, *Statement on "Framework for 'Investment Contract' Analysis of Digital
Assets,"* SEC (Apr. 3, 2019), https://tinyurl.com/mps5rvnn.............................7

Kiernan & Ge Huang, *Ether's New 'Staking' Model Could Draw SEC Attention*,
Wall St. J. (Sept. 15, 2022), https://tinyurl.com/2ve4w2f7 ..............................8

Lee, *Send Lawyers, Guns and Money: (Over-) Zealous Representation by
Corporate Lawyers*, SEC (Mar. 4, 2022), https://tinyurl.com/5d4km3bz.....................12

Letter from Chairman Jay Clayton to Hon. Ted Budd (Mar. 7, 2019),
https://tinyurl.com/3fdb3dkv ..................................................................7

Letter from Chamber of Digital Commerce to President's Working Group on Financial Markets (Oct. 18, 2021), https://tinyurl.com/ycku55za ....................................13

Letter from Coinbase to Sec. Vanessa A. Countryman, SEC, Re Coinbase Global, Inc., Petition for Rulemaking-Digital Asset Securities Regulation (July 21, 2022), https://tinyurl.com/3ujpsehs ...................................................................18

Monster Products, Inc., Filings, https://tinyurl.com/2wmz8sux ........................................23

Njanja, *Cryptocurrency Payments Key to Lowering Cross-Border Remittance Charges and Boosting Microwork Uptake in Africa, Study Shows*, TechCrunch (Feb. 23, 2022), https://tinyurl.com/55w2899z.............................................13

Paragon Coin, Paragon Coin Update, https://tinyurl.com/3spu3rt6 .............................................23

Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* (June 14, 2022), https://tinyurl.com/2s3eptjj ........................................................................................11

Peirce & Roisman, Statement, *In the Matter of Coinschedule*, SEC (July 24, 2021), https://tinyurl.com/4jxa6na7............................................................................11

Pimentel, *Ukraine Makes Crypto's Case in Washington*, Protocol (Mar. 18, 2022), https://tinyurl.com/4s8hekum ................................................................................13

Prentice, *U.S. SEC's Enforcement Cop Says Crypto Amnesty Is Not On The Table*, Reuters (Feb. 28, 2022), https://tinyurl.com/2p9emjp3........................................................12

Wagner, *CFTC Chair Says Ether Is a Commodity, Hints That SEC Disagrees*, Blockworks (Oct. 24, 2022), https://tinyurl.com/bdd2878w .........................................8, 11

*The Alliance*, Crypto Council for Innovation, https://tinyurl.com/bde699am (last visited Oct. 31, 2022).........................................................................................................1

*BitLicense FAQs*, N.Y. Dep't of Fin. Servs., https://tinyurl.com/4y7up38e ...............................26

Complaint, *CFTC v. Ooki DAO*, Civil Action No. 3:22-cv-05416 (N.D. Cal. Sept. 22, 2022). ...........................................................................................................................11

*CFTC Orders Bitcoin Options Trading Platform Operator and its CEO to Cease Illegally Offering Bitcoin Options and to Cease Operating a Facility for Trading or Processing of Swaps without Registering*, Release No. 7231-15, CFTC (Sept. 17, 2015), https://tinyurl.com/a2v3uavk ................................11

*ErisX Pioneers First U.S. Based Ether Futures Contract*, Cboe Digital Insights (May 11, 2020), https://tinyurl.com/4a76e7sj.....................................................................12

v

*Framework for 'Investment Contract' Analysis of Digital Assets*, SEC,
https://tinyurl.com/26cxh4hj (last modified Apr. 3, 2019). ....................................................7

*In Case You Missed It: Chairman Tarbert Comments on Cryptocurrency
Regulation at Yahoo! Finance All Markets Summit,* Release No. 8051-19,
CFTC (Oct. 10, 2019), https://tinyurl.com/mrxt978r ....................................................8, 11

*In the Matter of Coinschedule*, Exchange Act Release No. 10956 (July 24, 2021),
https://tinyurl.com/262neysm ....................................................................................10

*In re Poloniex, LLC*, Exchange Act Release No. 92607 (Aug. 9, 2021),
https://tinyurl.com/2ekdcthd ....................................................................................10

*Oversight of the U.S. Sec. & Exch. Comm'n: Hearing Before the S. Comm on
Banking*, 117th Cong. (Sept. 15, 2022)....................................................................9

*SEC Chair Gary Gensler Discusses Potential Crypto Regulation And Stablecoins*,
CNBC (June 27, 2022), https://tinyurl.com/b4s6fe23 ....................................................8

*Virtual Currencies: The Oversight Role of the U.S. Sec. & Exch. Comm'n and the
U.S. Commodity Futures Trading Comm'n: Hearing Before the S. Comm.
on Banking*, 115th Cong. (Feb. 6, 2018)....................................................................6

## INTEREST OF *AMICUS CURIAE*

The Crypto Council for Innovation ("CCI") is an alliance of industry leaders with a mission to communicate the opportunities presented by crypto (i.e., digital assets) and demonstrate its transformational promise.[1]  CCI members span the digital assets ecosystem; its membership includes nine of the leading global companies and investors operating in the industry.  *See The Alliance*, Crypto Council for Innovation, https://tinyurl.com/bde699am (last visited Oct. 31, 2022).  CCI's members share the goal of encouraging the responsible global regulation of crypto to unlock economic potential, improve lives, foster financial inclusion, protect national security, and disrupt illicit activity.  CCI believes that achieving these goals requires informed, evidence-based policy decisions realized through collaborative engagement.

CCI therefore has a strong interest in the resolution of this action.  This suit against Ripple Labs, Inc. ("Ripple") by the U.S. Securities and Exchange Commission ("SEC" or "Commission") is part of a series of enforcement efforts that the Commission has taken against market participants in the digital asset ecosystem.  As outlined below, this regulation-by-enforcement approach departs from the principle of meaningful public participation in agency decision-making, deprives market participants of fair notice as to what conduct is permissible, and risks curtailing innovation and investment in this cutting-edge sector of the economy.

As a coalition of industry leaders with substantial expertise in the crypto space, CCI has a vital perspective to offer on these issues—issues that are profoundly important not only for digital asset holders, but also for the developers, operators, and investors that are building the crypto ecosystem.  Unless these stakeholders can rely on clear, consistent guidance and work within a regulatory framework that makes compliance possible, crypto, and the growing industry

---

[1] No counsel for a party authored this brief in whole or in part and no person other than CCI or its counsel made a monetary contribution to its preparation or submission.

underlying it, will not achieve its full potential in the United States.  This context surrounding the SEC's approach to digital assets, and the potential ramifications of a holding that Ripple violated Section 5 of the Securities Act of 1933 (the "Securities Act") by offering and selling XRP as an investment contract in an unregistered securities offering, should inform the Court's analysis of the legal questions presented in this case.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The implications of this case could reverberate throughout the digital asset ecosystem. As the Court is aware, the SEC alleges that Ripple violated Section 5 of the Securities Act when it offered and sold or otherwise distributed XRP, the native currency of the XRP ledger.  The SEC's core theory is that, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946), Ripple was selling an "investment contract" involving XRP in an unregistered securities offering without qualifying for an exemption from registration, *see* 15 U.S.C. § 77e.  The statutory question underlying the SEC's suit is of momentous importance to the digital asset industry, as it could decide, or at least affect, the statutory classification of all manner of digital assets.

Ripple has and will ably brief the statutory question.  CCI writes separately as an amicus to bring to the Court's attention two important points from the industry's perspective:

*First*, this suit against Ripple is part of a larger pattern of enforcement actions against firms involved in the digital asset ecosystem.  To date, the SEC has largely chosen enforcement over rulemaking as the way to regulate this evolving ecosystem.  While CCI agrees that enforcement actions are necessary and important tools to root out fraud and other misconduct— which exist in the traditional financial markets as well—CCI is concerned by certain actions that have targeted alleged failures to register novel products under the federal securities laws notwithstanding the absence of a clear path to registration.  These actions have become more common even as market participants are seeking a path to compliance.  The Commission's

enforcement-centered approach has generated considerable uncertainty and risks reversing the gains that digital asset technologies have made possible, upsetting the reliance interests of market participants in the crypto space.  Sound regulation of this nascent marketplace should be accomplished through the rulemaking processes set forth under the Administrative Procedure Act ("APA").  Rulemaking has the virtues of ensuring fair notice, encouraging deliberation, inviting stakeholder input, and ensuring that federal agencies fully grasp the consequences— positive and negative, intended and incidental—of regulation.  Once the Commission has promulgated clear rules, it can more efficiently focus its enforcement resources on identifying and pursuing bad actors.

*Second*, a decision for the SEC could bless an impermissible extension of the Commission's jurisdiction beyond that provided by Congress, resulting in significant burdens on market participants.  The existing framework for securities regulation is simply not designed to enable effective compliance for digital asset market participants.  Important questions remain unanswered surrounding how issuers, asset holders, and intermediaries can fulfill traditional securities registration and disclosure requirements or meet statutory exemptions from those requirements, and how digital asset intermediaries can operate within the parameters imposed upon traditional securities intermediaries.  This is another reason that the SEC and other federal agencies should address the regulation of digital assets and digital asset market participants in rulemakings, not through enforcement actions.

Indeed, as CCI explains, a holding for the SEC here could disrupt the responsible growth of crypto and web3 in the United States, as well as ongoing state efforts to protect digital asset holders through considered regulation.  Such a decision also would risk pushing development of these promising new technologies offshore, harming U.S. digital asset holders and dealing a

substantial blow to this promising industry.  All of this counsels in favor of caution and

responsible regulation developed through rulemaking, not enforcement.

## ARGUMENT

I.   **THE SEC'S ENFORCEMENT APPROACH TO DIGITAL ASSETS DEPRIVES STAKEHOLDERS OF FAIR NOTICE AND RISKS CHILLING INVESTMENT AND INNOVATION IN EMERGING DIGITAL TECHNOLOGIES.**

In CCI's view, it is important for the Court to understand this enforcement action against

Ripple in the broader context of the SEC's regulation-by-enforcement approach to digital assets

and the ways that this approach both countermands basic principles of fair notice governing

administrative action and threatens innovation and investment.

### A.   Blackletter Principles of Administrative Law Require Fair Notice, Particularly When It Comes To Regulation Of New, Evolving Technologies.

The SEC's enforcement-first approach to the regulation of digital assets is in tension with

basic tenets of administrative law, which are meant to ensure that the public has a meaningful

opportunity to engage in policymaking and that federal agencies make clear in advance what

actions they deem unlawful.  This requirement is grounded in the "fundamental principle in our

legal system … that laws which regulate persons or entities must give fair notice of conduct that

is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (*Fox

II*).  In assessing fair notice, courts consider not only the statutory text but "the interpretation of

the statute given by those charged with enforcing it."  *Cunney v. Board of Trs. of Vill. of Grand

View*, 660 F.3d 612, 622 (2d Cir. 2011) (quotation omitted).  Lack of fair notice is thus of

particular concern when an agency changes its interpretation of a statute, *Fox II*, 567 U.S. at 254,

or when "an agency's announcement of its interpretation is preceded by a very lengthy period of

conspicuous inaction," *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158 (2012).

These unannounced departures create "the kind of 'unfair surprise' against which [Supreme

Court] cases have long warned." *Id.* at 156.  This principle, of course, applies fully to SEC enforcement actions; as the Second Circuit has explained, courts "cannot defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996).

Agencies, including the SEC, therefore are expected to provide notice—and a detailed justification—before taking action that upsets the reliance interests of regulated entities.  When, for example, an agency changes course after "its prior policy has engendered serious reliance interests that must be taken into account," the agency "<u>must</u>" provide a reasoned explanation for the shift.  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (*Fox I*) (emphasis added).  By refusing to stick to clear rules of the road, agencies run the risk of penalizing regulated entities "for action that might well have been avoided if the agency's changed disposition had been earlier made known, or might even have been taken in express reliance on the standard previously established." *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966).

> **B.  The SEC's Actions Here Reflect An Approach To Digital Assets That Is Contrary To The Goal Of Predictability And Principles Of Fair Notice.**

As Ripple explains, market participants have not received fair notice of their obligations under the securities laws; instead, they have faced uncertainty as a result of "vague and ever-shifting guidance."  Defs.' Opp. to Plf.'s Mot. for Summary Judgment, ECF No. 675, at 43 ("Ripple Opp.").  This enforcement action is part of that pattern and marks an unfortunate departure from the SEC's fruitful past efforts to engage with industry stakeholders.  In past years, statements by SEC staff gave market actors some indication of how the Commission would analyze whether a particular digital asset constituted a security.  But as detailed below, in more recent statements, SEC officials have implied that they may take a different view of the

factors that determine whether a given digital asset should be treated as a security.  This has raised questions as to whether—or to what extent—the Commission has retreated from earlier staff guidance, without explaining its basis for doing so or taking into account the reliance interests at stake.

The SEC's approach creates costly confusion for market participants, as it appears at odds with the public guidance that Commission staff provided in previous years.  In a 2018 speech, the SEC's then-Director of Corporation Finance William Hinman presented his view of "the application of the federal securities laws to digital asset transactions."  Dir. William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC (June 14, 2018), https://tinyurl.com/4u883y85.  Most notably, he cited Bitcoin and Ether as examples of "assets [that] may not represent an investment contract."  *Id.*  (stating, "when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise"—a necessary element of the *Howey* test); *id.* ("[P]utting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions.").  Director Hinman pointed to the fact that those digital assets operated on decentralized networks where "the efforts of [promoters] are no longer a key factor for determining the enterprise's success," highlighting his belief that "a token once offered in a security offering can, depending on the circumstances, later be offered in a non-securities transaction."  *Id.*  He further noted that digital assets sold for use or consumption often do not meet the definition of "security."  *Id.*

Director Hinman's guidance was affirmed by then-SEC Chairman Jay Clayton, who previously expressed his belief that "every [initial coin offering he had] seen is a security," *Virtual Currencies: The Oversight Role of the U.S. Sec. & Exch. Comm'n and the U.S. Commodity Futures Trading Comm'n: Hearing Before the S. Comm. on Banking*, 115th Cong.

(Feb. 6, 2018) (statement of Jay Clayton), yet agreed with Hinman that the designation of a digital asset "may change over time" such that "a digital asset transaction may no longer represent an investment contract," *see* Letter from Chairman Jay Clayton to Hon. Ted Budd (Mar. 7, 2019), https://tinyurl.com/3fdb3dkv.  The Commission staff then developed a *Framework for 'Investment Contract' Analysis of Digital Assets* consistent with Director Hinman's remarks, which the Division of Corporation Finance published in April 2019. *Framework for 'Investment Contract' Analysis of Digital Assets*, SEC, https://tinyurl.com/26cxh4hj (last modified Apr. 3, 2019).  In a statement, the Division described the *Framework* as "an analytical tool to help market participants assess whether the federal securities laws apply to the offer, sale, or resale of a particular digital asset."  Dir. William Hinman, *Statement on "Framework for 'Investment Contract' Analysis of Digital Assets*," SEC (Apr. 3, 2019), https://tinyurl.com/mps5rvnn.

Market participants, eager for guidance as to their obligations under the securities laws, relied on these statements.  *See* Ripple Opp. 48-52.  For example, Director Hinman's speech identified criteria that informed his analysis of whether a digital asset constituted a security; he "pointed to [B]itcoin and [E]ther as examples of cryptocurrencies that were decentralized and fully functioning and therefore 'not securities transactions.'"  *Id.* at 48.  The *Framework for 'Investment Contract' Analysis of Digital Assets* that followed provided some additional clarity, as it "confirmed specific factors that market participants should look to in determining whether a digital asset was a security."  *Id.* at 50.  This guidance shaped the approach that "sophisticated market participants" took toward digital assets such as XRP.  *Id.*  The SEC, however, now appears to distance itself from these statements, injecting further uncertainty into the regulatory landscape.

Recent statements about prominent digital assets are illustrative.  Despite Director Hinman's earlier speech proclaiming that Ether was not a security, in a recent interview, Bitcoin was "the only" digital asset that Chair Gary Gensler would identify as a non-security.  *SEC Chair Gary Gensler Discusses Potential Crypto Regulation And Stablecoins*, CNBC (June 27, 2022), https://tinyurl.com/b4s6fe23.  Although Chair Gensler's view marked a change from the prior view of SEC officials (such as the former Director of the Division of Corporation Finance), on which many market participants relied, no detailed analysis from the Commission or its staff has followed.  Instead, after the Ethereum network transitioned from a Bitcoin-style proof-of-work to proof-of-stake consensus mechanism, Chair Gensler stated that a proof-of-stake consensus mechanism should be considered an indicium of an investment contract under *Howey* because it involves the "efforts of others," suggesting but not explicitly stating that Ether may be best viewed as a security.  *See* Paul Kiernan & Vicky Ge Huang, *Ether's New 'Staking' Model Could Draw SEC Attention*, Wall St. J. (Sept. 15, 2022), https://tinyurl.com/2ve4w2f7.

Despite the change in view about the status of Ether by SEC officials, Commodity Futures Trading Commission ("CFTC") officials have been consistent in their view that Ether is a commodity.  The Chairman of the CFTC expressed that view as early as 2019.  *In Case You Missed It: Chairman Tarbert Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit,* Release No. 8051-19, CFTC (Oct. 10, 2019), https://tinyurl.com/mrxt978r.  Most recently, subsequent to the transition of the Ethereum network discussed above, CFTC Chair Benham reaffirmed his view that Ether is a commodity and suggested that there may be disagreement among regulators as to the status of Ether.  Casey Wagner, *CFTC Chair Says Ether Is a Commodity, Hints That SEC Disagrees*, Blockworks (Oct. 24, 2022), https://tinyurl.com/bdd2878w.  This disagreement causes industry confusion and further supports the contention that rulemaking, and not enforcement, is the best path forward.

And while SEC officials have consistently indicated that they do not view Bitcoin as a security, it is not clear what has led to this conclusion.  As an example, under recent questioning before the Senate Banking Committee, when Chair Gensler was asked to explain why Bitcoin is not viewed as security, he did not specify precisely what led him to conclude that Bitcoin is not a security.  Instead, he suggested that Bitcoin did not meet the "common enterprise" element of the *Howey* test because it lacked "a group of developers in the middle" for the investing public to look to, while caveating that "there are many factors" informing the analysis, and "it's not one spectrum of centralization vs. decentralization."  *See Oversight of the U.S. Sec. & Exch. Comm'n: Hearing Before the S. Comm on Banking*, 117th Cong. (Sept. 15, 2022) (statement of Chair Gensler).

Amid this uncertainty, the SEC has not provided further clarity as to the classification of digital assets.  The 2019 Framework is the last guidance the Commission staff has provided to help market participants assess whether the federal securities laws apply to the offer, sale, or resale of a particular digital asset, and the digital asset ecosystem has undergone significant changes in the intervening years.  Certain Commissioners have indicated that no further guidance is forthcoming.  Chair Gensler has stated that "the Commission has spoken with a pretty clear voice," and opined that, "[w]ithout prejudging any one token, most crypto tokens are investment contracts under the *Howey* Test."  *See* Chair Gary Gensler, *Kennedy and Crypto*, SEC (Sept. 8, 2022), https://tinyurl.com/4525j4rk.  Similarly, Commissioner Caroline A. Crenshaw has stated that the industry should not expect the SEC to provide "blanket definitions" or "proactively label all the specific projects, assets, and activities that are within [the Commission's] jurisdiction."  Comm'r Caroline A. Crenshaw, *Digital Asset Securities—Common Goals and a Bridge to Better Outcomes*, SEC (Oct. 12, 2021), https://tinyurl.com/5x2umycv.  And, unfortunately, recent SEC proposals that are likely to affect digital assets provide no guidance as to how market participants

can or should comply with regulatory requirements that were not designed with digital assets in mind.  *See, e.g.*, *Amendments Regarding the Definition of "Exchange" and Alternative Trading Systems (ATSs) That Trade U.S. Treasury and Agency Securities, National Market System (NMS) Stocks, and Other Securities*, 87 Fed. Reg. 15,496 (Mar. 18, 2022); *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer*, 87 Fed. Reg. 23,054 (Apr. 18, 2022).

Against this backdrop, the SEC's pattern of enforcement actions has not provided necessary guidance to market participants.  *See* Ripple Opp. 56.  The Commission's "'enforcement actions related to virtual currencies'" offer "'data points [that] are not definitive by any stretch,'" *id.* at 56 n.45, compounding the confusion created by public statements.  For example, many enforcement actions do not offer meaningful insights into the SEC's analysis of whether a particular digital asset is a security.  *See, e.g.*, *In the Matter of Coinschedule*, Exchange Act Release No. 10956 (July 24, 2021), https://tinyurl.com/262neysm ("The digital tokens publicized by Coinschedule included those that were offered and sold as investment contracts, which are securities …."); *In re Poloniex, LLC*, Exchange Act Release No. 92607 (Aug. 9, 2021), https://tinyurl.com/2ekdcthd (platform "displayed a limit order book that matched the orders of multiple buyers and sellers in digital assets, including digital assets that were investment contracts under [*Howey*], and therefore securities.").  Other actions elide complicated questions that deserve public input or focus on actors other than the asset's purported issuer, shedding little light on how the entities most eager to comply with the securities laws may effectively do so.  To be sure, SEC actions that target fraud and bad actors in the crypto space are commendable, but they offer little industrywide guidance for actors seeking to conform their conduct to the law.

### C.       The SEC's Approach Risks Chilling Innovation And Investment.

There can be no debate that the SEC's regulation-by-enforcement approach has created uncertainty that risks chilling innovation and investment.  Even certain SEC Commissioners have recognized—and called out—the resulting regulatory "void."  Comm'rs Hester M. Peirce & Elad L. Roisman, Statement, *In the Matter of Coinschedule*, SEC (July 24, 2021), https://tinyurl.com/4jxa6na7.  Commissioner Peirce has gone so far as to say that the SEC has "refuse[d] over the past four years to engage productively with crypto users and developers," and that "[i]t is time for the [SEC] to embark on a more productive path to crypto regulation." Comm'r Hester M. Peirce, *On the Spot: Remarks at "Regulatory Transparency Project Conference on Regulating the New Crypto Ecosystem: Necessary Regulation or Crippling Future Innovation?"* (June 14, 2022), https://tinyurl.com/2s3eptjj.

By contrast, other agencies have engaged with market participants in the crypto space by treating certain digital assets as non-securities, adopting a view in tension—if not conflict—with the SEC's.  For example, the CFTC ruled that "Bitcoin and other virtual currencies are properly defined as commodities."  *CFTC Orders Bitcoin Options Trading Platform Operator and its CEO to Cease Illegally Offering Bitcoin Options and to Cease Operating a Facility for Trading or Processing of Swaps without Registering*, Release No. 7231-15, CFTC (Sept. 17, 2015), https://tinyurl.com/a2v3uavk; *see also* Ripple Opp. 46.  As noted above, the CFTC Chairman stated in 2019 that Ether is a commodity falling under the CFTC's jurisdiction, Release No. 8051-19, and reiterated that view in recent days, *see* Wagner, *CFTC Chair Says Ether Is a Commodity, Hints That SEC Disagrees*.  The CFTC also has brought at least one enforcement action in which it asserted that Ether is a virtual currency under CFTC jurisdiction.  *See* Complaint, *CFTC v. Ooki DAO*, Civil Action No. 3:22-cv-05416 (N.D. Cal. Sept. 22, 2022). CFTC registrants, like LedgerX, CME, and ErisX, thus have been permitted to list and clear

certain Bitcoin and Ether derivatives.  *See, e.g.*, *ErisX Pioneers First U.S. Based Ether Futures Contract*, Cboe Digital Insights (May 11, 2020), https://tinyurl.com/4a76e7sj.

Faced with the resulting uncertainty, market participants must devote significant resources to assessing whether they are engaging in activities with respect to digital assets that the SEC will view as "investment contracts" and therefore securities under *Howey*.  They may even need to undertake costly protective actions, such as registration and disclosure, which could be difficult or impossible in the context of decentralized systems.  These costs are amplified by the harsh stance that the SEC has signaled toward members of the public who fail to predict the trajectory of the Commission's enforcement efforts.  SEC Director of Enforcement Gurbir Grewal, for example, has warned that the Commission will not "offer amnesty to cryptocurrency companies that self-report violations of securities laws," despite the SEC's refusal to offer clear guidance as to what the securities laws require in this space.  Chris Prentice, *U.S. SEC's Enforcement Cop Says Crypto Amnesty Is Not On The Table*, Reuters (Feb. 28, 2022), https://tinyurl.com/2p9emjp3.  And earlier this year, then-Commissioner Lee criticized "an entirely new, multi-trillion dollar industry [that has] develop[ed] around cryptocurrency and digital assets that largely defies existing laws and regulations."  Comm'r Allison Herren Lee, *Send Lawyers, Guns and Money: (Over-) Zealous Representation by Corporate Lawyers*, SEC (Mar. 4, 2022), https://tinyurl.com/5d4km3bz.

This atmosphere endangers the cutting-edge innovations that the growth of digital assets has produced, developments that have brought along immense benefits for businesses and everyday customers alike.  Digital assets have enabled the rise of the ownership-based digital economy, a new framework that empowers individual consumers rather than the traditional intermediaries that have so often profited at their expense.  *See, e.g.*, Mauro Caselli & Babak Somekh, *Access to Banking and the Role of Inequality and the Financial Crisis*, 21 B.E. J. Econ.

Analysis & Pol'y, 1373, 1374 (2021).  Thanks to the blockchain technology underlying digital

assets, consumers no longer have to trust these intermediaries with their data or their money;

instead, digital asset users can record ownership and verify peer-to-peer transactions in a secure,

transparent, and efficient manner.  Eliminating those middlemen and expanding consumer

choices has unlocked new banking and lending options for underserved communities.

Recent innovations in payment technologies underscore crypto's vast potential.  By

harnessing the power of digital assets, organizations have been able to deliver much-needed aid

in times of crisis, such as the war in Ukraine.  *See* Benjamin Pimentel, *Ukraine Makes Crypto's

Case in Washington*, Protocol (Mar. 18, 2022), https://tinyurl.com/4s8hekum.  And digital assets

like XRP have proven transformative in the world of cross-border payments, slashing fees and

expanding access across the globe by introducing more efficient payment systems.  *See* Annie

Njanja, *Cryptocurrency Payments Key to Lowering Cross-Border Remittance Charges and

Boosting Microwork Uptake in Africa, Study Shows*, TechCrunch (Feb. 23, 2022),

https://tinyurl.com/55w2899z; Andres Engler, *Coinbase Enables Mexican Users to Easily Cash

Out of Crypto Sent to Them*, CoinDesk (Feb. 15, 2022), https://tinyurl.com/yj5a3mkb.

But these innovations, and the investment that makes them possible, cannot be sustained

without a predictable regulatory framework governing digital assets.  If regulators continue to

rely on enforcement instead of rulemaking, U.S. consumers likely will pay the price.  Investment

and innovation will be driven offshore, to competing economies that are laying the groundwork

for digital assets—and their users—to thrive.  *See* Letter from Chamber of Digital Commerce to

President's Working Group on Financial Markets (Oct. 18, 2021), https://tinyurl.com/ycku55za.

Policymakers will not be able to serve as effective partners in the effort to educate consumers

about the opportunities and risks presented by digital assets.  And the role of the United States as

a beacon for innovation and entrepreneurial spirit will be diminished.  All of this runs counter to

the goals set forth in President Biden's recent Executive Order, including that the United States "remain[] at the forefront of responsible development and design of digital assets and the technology that underpins new forms of payments and capital flows in the international financial system." Executive Order on Ensuring Responsible Development of Digital Assets, White House (Mar. 9, 2022), https://tinyurl.com/3yvwyebb ("Executive Order").

### D.  Rulemaking, Not Enforcement, Is The Proper Path Forward.

None of the above is meant to say that regulators should not implement properly tailored rules or guidelines to address digital assets consistent with regulators' expertise and statutory authority. The cutting-edge developments surrounding digital assets raise a number of public policy questions, including how best to protect investors and everyday users, police fraud, increase transparency, and ensure that underserved communities can access the benefits created by these technologies. CCI strongly believes that this moment demands a clear and consistent regulatory approach informed by a genuine understanding of the challenges presented by digital assets and the promise that they hold. It is for that reason that notice-and-comment rulemaking, rather than enforcement or litigation actions, is the proper path forward for appropriate regulation. As Congress intended in enacting the APA, notice-and-comment rulemaking would ensure public and stakeholder input as well as agency deliberation on issues that could have serious consequences (intended and unintended), as described further below in Part II.

The SEC's enforcement-first approach departs from the principle that "[t]he law generally seeks to encourage public participation in agency decisionmaking." *Estate of Landers v. Leavitt*, 545 F.3d 98, 110 (2d Cir. 2008). Public participation is indeed a fundamental goal of the APA. "Because nearly every agency decision—including those made by the agency in individual adjudications—implicates public policy, broad participation in agency proceedings … is often necessary." *Animal Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 22 (D.D.C.

2017).  The notice-and-comment rulemaking process serves this "'central purpose' … to 'subject agency decisionmaking to public input and to obligate the agency to consider and respond to the material comments and concerns that are voiced.'"  *District of Columbia v. USDA*, 496 F. Supp. 3d 213, 228 (D.D.C. 2020); *see also FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 312 (D.D.C. 2016) (discussing "the goals of transparency and public participation that underlie the notice-and-comment process"); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1028 (D.C. Cir. 1978) (similar).  Where, as here, an agency claims jurisdiction to regulate emerging technologies without seeking public comment as to the scope of its authority and potential consequences, it runs the danger of overreaching its statutory authority through a "regulatory land grab."  Defs.' Memo. of Law in Support of Their Mot. for Summary Judgment, ECF No. 643, at 4 ("Ripple MSJ") (explaining that the SEC risks exceeding its authority through this enforcement action because other regulators such as the Department of Treasury and the CFTC regulate XRP as a non-security); *see also* Ripple Opp. 46 (actions of other regulators "reinforced" the "widely held belief that XRP was not a security").

A regulation-by-enforcement approach is no substitute for the development of serious policy proposals to address the complexities of the digital asset environment, particularly when it comes to the rise of decentralized systems.  Digital assets have enabled the rise of decentralized finance, an alternative to traditional centralized models that rely on intermediaries to facilitate transactions.  Decentralization, in turn, continues to power promising innovations in security, transparency, and efficiency—not just in finance but in the broader economy and the digital world.  Existing compliance regimes do not afford these decentralized systems an opportunity to participate because they cannot comply with traditional requirements, such as registration and

disclosure designed for a centralized financial system.[2]  Rather than help decentralized systems find a workable path toward compliance, regulators instead have pointed to existing financial regulations designed for centralized intermediaries—regulations that contain requirements difficult or impossible for these market participants to comply with and that fail to address the complexities of decentralized finance systems.  In addition, many of these laws are unsuitable for decentralized finance, as the risks they were meant to address are eliminated by the underlying technology.  An approach that does not take account of these differences thus harms market participants acting in good faith to try to comply with traditional requirements.

These complexities illustrate why regulators cannot assume that the digital assets underlying these systems are securities and pursue enforcement actions on that basis.  To the extent that the digital assets traded on decentralized systems are securities, thus giving the SEC jurisdiction, the Commission should articulate an approach tailored to this unique marketplace, including user-protection measures that account for the opportunities and risks presented by digital assets.  For example, the SEC could encourage code audits and auditor independence standards; issue guidance as to the steps that decentralized protocols can take to effectively reduce risk to digital asset holders, including collateralization, safety modules, and self-insurance; and incentivize both initial disclosure of risk factors by systems before they become decentralized and ongoing disclosure by decentralized systems on an automatic basis.  And the

---

[2] Systems operating in the crypto space may fall along a spectrum of decentralization.  To evaluate whether a system is truly decentralized, CCI believes that regulators should look to (1) whether the system relies on open-source code, including the front-end code; (2) whether the system is built on a blockchain consisting of many nodes managed by unrelated parties; (3) whether the system is subject to diverse and diffuse governance; (4) whether the system operates largely independently of its initial development team; and (5) whether the funds exchanged by the system's users remain in the control of a large number of users, rather than in a centralized account.

Commission should provide a meaningful opportunity for public input on these measures through notice-and-comment rulemaking.

Clear rules of the road announced via regulation will allow market participants acting in good faith to thrive, preserving the SEC's limited enforcement resources for bad actors. *See* Chair Gary Gensler, *Testimony at Hearing Before the Subcommittee on Financial Services and General Government U.S. House Appropriations Committee*, SEC (May 17, 2022), https://tinyurl.com/2s3jm9f4 (describing the challenges created by the SEC's limited enforcement resources). Rulemaking would conserve resources by putting market actors on notice and allow the SEC to pursue its investor protection mandate more effectively.

## II. THE CONSEQUENCES OF A RULING IN FAVOR OF THE SEC HERE UNDERSCORE THE SERIOUS PROBLEMS WITH THE SEC'S APPROACH TO ENFORCEMENT.

This litigation vividly illustrates CCI's concerns with the SEC's approach to digital assets—and why the Commission should proceed in a comprehensive, deliberate manner rather than by its current enforcement-centered approach. Despite Chair Gensler's repeated invitations for crypto firms to "come in and register" their products and services, in the view of CCI's members, the SEC has not adopted regulations that consider the unique attributes of digital asset technologies, nor has the Commission paved the way for firms seeking to register to do so under existing regulations. *See infra* note 3; Nikhilesh De, *SEC's Gensler Holds Firm That Existing Laws Make Sense for Crypto*, CoinDesk (Sept. 13, 2022), https://tinyurl.com/43jvjwy5.

Instead, in CCI's view, the SEC seeks to enforce registration, disclosure, and other regulatory requirements that are poorly suited to digital assets like XRP. In doing so, the SEC risks extending its authority to assets that may not necessarily fit within the SEC's jurisdiction as a securities regulator or within its existing rulebook. This extension of authority over digital assets has significant collateral consequences on digital asset market participants, who may find

themselves subject to requirements under the federal securities laws that are triggered once an underlying asset is categorized as a security but with no way to achieve compliance with those requirements.

To address these concerns, the SEC should engage in notice-and-comment rulemaking in order to give the public and stakeholders an opportunity to participate in its policymaking and to provide much-needed clarity as to how actors can comply with the applicable federal laws.

A.    **The Existing Securities Regulatory Regime Cannot Mechanically Be Applied To Digital Assets Such As XRP.**

An enforcement-first approach to digital assets creates serious complications because the existing U.S. securities regulatory framework was not designed to support digital assets like XRP.  That is why industry stakeholders have petitioned the Commission to promulgate new rules that address the complex and novel issues raised by its efforts to regulate certain digital assets as securities.  These industry stakeholders have highlighted areas where the traditional securities regulatory framework may not be compatible with digital assets.  *See, e.g.*, Letter from Coinbase to Sec. Vanessa A. Countryman, SEC, Re Coinbase Global, Inc., Petition for Rulemaking-Digital Asset Securities Regulation (July 21, 2022), https://tinyurl.com/3ujpsehs. Despite industry efforts to draw attention to the mismatch between the existing regulatory regime and market system for securities and the innovative attributes of digital assets, the SEC has yet to clarify how market participants can comply with existing regulatory requirements.  As a result, there is no viable path to achieve compliance.

*First,* new or amended rules are needed because there is no clear path under the traditional securities regulatory framework to permit the legal offer and sale of digital asset securities at the federal level.  Existing disclosure and registration requirements present particular challenges.  Under Section 5 of the Securities Act, no person, whether the "issuer" or a

seller in the secondary market, can offer or sell a security without an effective registration statement or an applicable exemption from registration.  *See* 15 U.S.C. §§ 77d, 77e.  But market participants hoping to sell digital assets cannot realistically follow either path.

To register a security, a market participant must file a registration statement containing certain disclosures.  *See* 15 U.S.C. § 77g.  Existing disclosure requirements are tailored to traditional securities and company issuers—they are likely unworkable as applied to digital assets and the potentially relevant participants on a digital asset network, which are often diffuse and decentralized groups or individuals.  The historical focus of securities disclosure requirements has been to provide investors with "material" information (*i.e.*, information for which "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision).  *TSC Indus., Inc. v. Northway, Inc*., 426 U.S. 438, 449 (1976).  But what is "material" in the context of digital assets differs from traditional securities.  For example, purchasers of digital assets likely seek information about the risk of a network attack, the type of governance rights embedded in assets, which party has the ability to change the code underlying the assets or the network, and other features that do not exist with the traditional securities markets.  And while important, this information is likely to be publicly available, making additional disclosures on these topics unnecessarily burdensome.  Other information typically disclosed about issuers in the context of traditional securities may be less relevant with respect to digital assets, to the extent it can be ascertained at all when there is not an obvious "issuer" involved in ongoing operations relating to the digital asset.

Chair Gensler has recognized that "it may be appropriate to be flexible in applying existing disclosure requirements [to digital assets]," highlighting that the Commission's approach to "asset-backed securities disclosure differs from that for equities" because different types of information are relevant to investors in that asset class.  Chair Gary Gensler, *Kennedy*

*and Crypto*.  Yet, to our knowledge, the Commission has not provided that flexibility, and Chair

Gensler has suggested that crypto disclosure rulemaking remains a distant goal.  *See* Jessica

Corso, *SEC's Gensler Suggests Crypto Rules Could Be Years Away*, Law360 (Sept. 15, 2022),

https://tinyurl.com/36anp54p (in discussing the application of disclosure requirements to digital

assets, Gensler noted that "[t]he SEC in the asset-backed securities market took 10 or 11 years

[to develop a rulemaking package]…..").  Chair Gensler has acknowledged that in other contexts

where rulemaking was far off, the Commission provided "exemptive orders or relief to

individual issuers," yet the Commission's focus with crypto has trended towards enforcement

rather than relief.  *Id.*  Without further guidance from Congress or the SEC on how to comply

with these disclosure requirements, or modifications to the existing disclosure regime, those

seeking to register digital asset securities offerings may be trapped in limbo.

What is more, the disclosures applicable to the offer and sale of securities differ

depending on the type of asset; equity securities and debt securities may, for example, have

different disclosure requirements.  Many digital assets, such as XRP, do not fit cleanly within the

category of debt or equity—using XRP as an example, XRP neither represents an amount

promised by Ripple to an XRP holder (like debt) nor does it provide an XRP holder a stake in

Ripple's assets or operations (like equity).  Consequently, it is unclear which disclosure regime

would apply.  It is further unclear whether many purported digital asset issuers would be able to

make the disclosures necessary to register digital assets under either regime.  For example,

registration under the Securities Act and Exchange Act of 1934 (the "Exchange Act") requires

disclosures regarding the issuer's structure, financials, and management, as well as significant

asset holders, that may not be feasible for purported digital asset issuers, which may be diffuse in

structure with no meaningful financials or management of which to speak.  *See, e.g.*, 17 C.F.R.

Part 229; 15 U.S.C. § 78l(b).

Despite the lack of clarity regarding how—or if—digital assets could be registered under the Securities Act, once a digital asset is categorized as a security, and assuming it remains a security and the issuer of the security—to the extent one is identifiable—does not register it, existing holders of that digital asset would be obliged to comply with an exemption from registration in order to dispose of that asset.  *See, e.g.*, Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (suggesting that a digital asset offered and sold as a security may change such that it is no longer offered and sold as a security).  This requirement would result in asset holders becoming subject to the requirements of an exemptive regime that imposes significant costs and limitations on resale (to the extent an exemption would be available at all). For example, the safe harbor of Exchange Act Rule 144 requires a holding period after acquisition and prior to disposing of a restricted security to ensure compliance with an exemption from registration.  *See* 17 C.F.R. § 230.144.  Several exemptions also are conditioned upon the availability of certain information with respect to the issuer of the security, but this information may not even be available when it comes to digital assets; if it is available, it may be wholly irrelevant.  Therefore, if future offers and sales of XRP are considered to be unregistered securities transactions, it is unclear whether holders of XRP—or other similarly situated digital assets—could meet the requirements under the Securities Act or any exemption therefrom to dispose of their digital assets.

This uncertainty presents a significant challenge under the securities regulation regime because the offer or sale of securities without registration or an exemption from registration are violations of Section 5 and Section 12 of the Securities Act—violations that could subject offerors and sellers to rescission of the transaction as well as other sanctions.  15 U.S.C. § 77e; *id.* § 77l.  These sanctions apply not only to actual sellers but also to intermediaries involved in soliciting purchasers on their behalf.  *See Pinter v. Dahl*, 486 U.S. 622 (1988).  SEC registrants

may be subject to additional penalties for facilitating unregistered digital asset securities transactions without an available exemption.  For example, a broker-dealer assisting a digital asset security holder with a sale in violation of Section 5 potentially could be viewed as aiding and abetting a Section 5 violation of the seller or committing its own primary violations of the federal securities laws or the rules of an applicable self-regulatory organization.

Unregistered digital asset intermediaries similarly may find themselves subject to the federal securities laws.  A determination that a digital asset is a security could subject unregistered intermediaries to potential liability under the broker-dealer and exchange registration provisions of the Exchange Act, which require registration to facilitate transactions in securities.  *See* 15 U.S.C. § 78f; *id.* § 78o.  Moreover, Section 29(b) of the Exchange Act provides that any contract made in violation of the statute (such as one improperly facilitated by an unregistered entity) is voidable, which could create additional risk of rescission for digital asset security transactions that did not comply with the federal securities laws, including those relating to secondary market transactions and intermediaries.  15 U.S.C. § 78cc(b).  Under normal circumstances, this would be an ordinary consequence of unregistered securities activity; however, in this case, Ripple's fair notice argument bears equal weight with respect to these intermediaries, which may have taken the Commission's prior guidance on digital assets and subsequent inaction to mean that XRP was among those digital assets that are not securities. Even if these entities desired to register with the SEC, without further guidance to address the important open questions we explain herein, it is unclear how digital asset trading platforms could comply with existing regulatory frameworks designed for traditional securities intermediaries.

Applying the existing securities regulatory framework to digital assets also runs the risk of subjecting market participants to onerous and duplicative requirements.  For example, the

Securities Act generally preempts state law registration and qualification requirements, but only for certain categories of securities, including securities that are listed on a national securities exchange or are offered or sold pursuant to certain exemptions from registration under the Securities Act. 15 U.S.C. § 77r(b). Absent the availability of registration under the Exchange Act or an exemption from registration under the Securities Act, state law registration and qualification regimes would apply to these transactions. These state requirements may be duplicative of federal requirements, depending on the jurisdiction, and therefore may impose a heavy burden on those seeking to engage in asset sales, particularly when multiple state "blue sky" regimes with potentially different requirements are implicated. Inevitably, the imposition of state securities law requirements would add to the costs and complexities of seeking to dispose of digital asset securities and would establish another layer of uncertainty and potential risk of sanctions for market participants.

These examples are just some of the complex questions raised by digital assets, and they demonstrate that it is unclear how digital asset market participants can comply with the existing securities regulatory regime. As a result, few actors have successfully registered a digital asset security, and many have failed in their attempts to do so.[3] The inability of the existing framework to accommodate digital assets illustrates the perils of the SEC's enforcement

---

[3] *See, e.g.*, American CryptoFed DAO, Filings, https://tinyurl.com/2p8anac8 (SEC staff rejecting S-1 filing for "serious deficiencies" relating to requirements to comply with the form, resulting in withdrawal); Monster Products, Inc., Filings, https://tinyurl.com/2wmz8sux (same). *See also* Carrier EQ, LLC (f/k/a Airfox), Form 8-K (June 30, 2021), https://tinyurl.com/5n8bpbme (noting the issuer would discontinue the development of AirTokens because "[c]urrent laws and regulatory regimes do not provide for the Company to utilize the AirTokens as envisioned by the Company…."); Paragon Coin, Paragon Coin Update, https://tinyurl.com/3spu3rt6 (explaining that the issuer was filing for bankruptcy after its "plans were impossible to achieve due to several legal mistakes"); Jamie Chacon, *Gladius Network Shuts Down As ICO Investors Cry Foul*, Decrypt (Nov. 25, 2019), https://tinyurl.com/54jb6477 (issuer shutting down after settling an SEC enforcement action that required the issuer to register).

approach and highlights why the SEC should proceed through a more deliberative, comprehensive rulemaking approach.

*Second*, even if the open questions regarding the registration of digital asset securities are resolved, it is not apparent how traditional securities intermediaries, such as broker-dealers and national securities exchanges, would be able to facilitate digital asset transactions under the existing securities regulatory framework.  Securities market infrastructure does not support blockchain transactions, which are a significant source of utility for XRP and other digital assets.  Blockchains can provide for near-instant settlement for peer-to-peer transactions (as opposed to the T+2 settlement cycle commonly associated with securities); initiate cross-border transactions with minimal time and resource costs (whereas securities infrastructure typically does not offer direct cross-border transactions); and interface with third-party software applications (which do not exist in the traditional securities market).  If digital assets are not permitted to trade on the blockchain, these benefits cannot be realized.  Moreover, broker-dealers and national securities exchanges are subject to separate regulatory requirements that are not compatible with transacting in digital assets like XRP.  Because these requirements are tailored to traditional securities and the existing infrastructure for handling securities transactions, they do not take into account digital assets and their unique characteristics.

This means that, even if Ripple could comply with the requirements for registration of XRP on a national securities exchange, it may not be possible to trade XRP or other digital assets alongside traditional securities.  *See* 15 U.S.C. § 78l.  The existing securities trading and market structure simply was not created with digital assets in mind—traditional securities trading operates through a system of clearing agencies, exchanges, and broker-dealers while blockchain transactions require none of this infrastructure.  In fact, part of the inherent utility of XRP and other digital assets is their ability to interface with a blockchain without a third-party

intermediary.  Therefore, it is unclear how blockchains or blockchain-based assets would be incorporated into the National Market System, which includes, for example, facilities to enable custody, clearance and settlement, establishment of a national best bid/offer, dissemination of consolidated quotations, and configuration of trade reporting.

Differences between traditional assets and digital assets appear to challenge regulators in developing a framework to permit traditional securities intermediaries to facilitate digital asset transactions.  These intermediaries face requirements that, like the securities registration regime, implicate disclosures that would not be suitable for many digital assets.  *See, e.g.*, 17 C.F.R. § 240.15c2-11 (requiring certain current information about an issuer to be publicly available prior to a broker-dealer publishing or submitting a quotation for publication).  They also face other requirements that similarly are not tailored to digital assets.  *See, e.g., id.* § 240.15c3-1 (establishing capital requirements and haircuts for broker-dealers); *id.* § 240.15c3-3 (establishing the requirement to obtain possession or control of customer securities).  CCI is unaware of instances where regulators have reconciled the complexities introduced by digital assets when attempting to integrate them with traditional securities.  For example, the SEC's special purpose broker-dealer regime does not provide for interfacing between non-security digital assets and digital asset securities or account for differences in clearance and settlement by blockchain, both essential elements of digital asset transactions.  *See Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 86 Fed. Reg. 11,627 (Apr. 27, 2021).

*Third*, a decision that Ripple offered and sold XRP as an investment contract could destabilize existing frameworks developed to facilitate the custody and transfer of digital assets. Outside of the federal securities framework, several states permit certain activities with respect to digital assets, including XRP.  For example, the New York Department of Financial Services has published a "greenlist" identifying digital assets, including XRP, that are approved for custody

and others that also are approved for listing by a trading platform.  *See BitLicense FAQs*, N.Y.

Dep't of Fin. Servs., https://tinyurl.com/4y7up38e.  If Ripple's offers and sales of XRP are

labeled investment contracts, it would inject uncertainty into whether states, such as New York,

would continue to allow licensed custodians to maintain custody of XRP and other similar assets.

If custodians are unable to continue providing their services with respect to a given

digital asset, it is unclear what impact this could have on holders of that asset.  However, we

expect any impact would be negative, disrupting asset holders' ability to maintain custody of and

transact in that asset.  For example, at the time the SEC filed its complaint against Ripple, XRP

was the third-largest cryptocurrency (behind Bitcoin and Ether), with a market capitalization of

around $50-60 billion.  Ripple MSJ at 8-9.  The price of XRP declined by approximately 70% in

the days following the filing of the initial complaint because many U.S.-based service providers,

like crypto trading platforms, stopped supporting XRP.  *See id.*  The current market

capitalization for XRP is under $24 billion.  *See* CoinMarketCap.com, XRP,

https://tinyurl.com/37nf6rhh (last visited Oct. 31, 2022).

**B.     Holders Of Other Digital Assets, As Well As The U.S. Crypto Industry At Large, Could Be Harmed By A Decision That Ripple Offered And Sold XRP As An Investment Contract.**

While the Court's decision may provide clarity with respect to whether Ripple offered or

sold XRP as an investment contract during the relevant period, a decision in favor of the SEC

could compound the uncertainty faced by the broader crypto market regarding the application of

*Howey* to digital assets.  *See* Br. of Amicus Curiae The Chamber of Digital Commerce, ECF No.

649, at 7-12 (Sept. 21, 2022) (highlighting the SEC's elision of important temporal distinctions

inherent in *Howey*'s potential application to XRP secondary market transactions).  In the absence

of further guidance from the SEC, a simple finding that Ripple offered and sold XRP as an

investment contract could deepen that uncertainty as market participants would be left to guess if this finding impacts the status of other digital assets, and if so, how such digital assets may be impacted.  This uncertainty could result in developers in the emerging crypto and web3 industry taking their innovations elsewhere.

In particular, this could lead to crypto and web3 companies leaving the United States to operate their businesses offshore, where more crypto-friendly regulatory regimes exist.  This burgeoning industry could find a home elsewhere—for example, XRP is not regulated as a security in the United Kingdom, Switzerland, Singapore, Japan, or the UAE.  Lack of engagement with the crypto and web3 industry already is impacting the United States' ability to compete in the international market for human capital.  In 2021, the United States made up only 29% of self-reported market share for web3 developers; down from 47% in 2015.  *See* Electric Capital, *U.S. Share of Web3 Developers is Shrinking* (April 2022), https://tinyurl.com/2p9868um.  An exodus of developer talent could have a chilling effect on innovation in the United States and inhibit the growth of an important emergent industry. Stunting the growth of this industry would be contrary to the stated goals of this Administration, which has expressed the desire to support responsible innovation in digital assets and reinforce the United States' leadership in the global financial system and in technological and economic competitiveness.  *See* Executive Order.

* * *

In short, the consequences of forcing digital assets into a securities framework that was not designed for such assets will be significant.  Resolution of these complicated questions of fact, law, and policy should be determined by the full SEC in the course of a rulemaking, based on a robust administrative record resulting from public and stakeholder input and resulting in a regulatory framework that provides clear rules of the road for all.  These questions are not

appropriately resolved in one-off enforcement actions.  CCI respectfully submits that these considerations should inform this Court's assessment of the SEC's claims here.

## CONCLUSION

For the reasons above and as set forth by Ripple, the Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Motion for Summary Judgment.


Dated:  October 31, 2022

Respectfully submitted,

*/s/ Robert L. Boone*
Robert L. Boone
Tiffany J. Smith*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Avenue
New York, NY 10007
Tel.: (212) 230-8800
Fax: (212) 230-8888
robert.boone@wilmerhale.com
tiffany.smith@wilmerhale.com

Kelly P. Dunbar*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, DC 20006
Tel.: (202) 663-6000
Fax: (202) 663-6363
kelly.dunbar@wilmerhale.com

*Counsel for Crypto Council for Innovation*

*\*Not admitted in S.D.N.Y.*