# Exhibit A

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X   Docket No.: 1:20-cv-10832-AT-SN

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   v.

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A. LARSEN,

        Defendants.
-------------------------------------------------------------X


**BRIEF OF AMICUS CURIAE REAPER FINANCIAL, LLC IN SUPPORT OF DEFENDANT RIPPLE LABS, INC.**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii
I.  INTEREST OF AMICUS CURIAE. ............................................................................... 1
II. RELEVANT FACTUAL BACKGROUND. ................................................................... 2
III. ARGUMENT. .................................................................................................................. 4
IV. CONCLUSION. ............................................................................................................... 8

## TABLE OF AUTHORITIES

Page

**<u>Cases</u>**

*In re: Celsius Network LLC*,
    Case No. 22-10964 (Bankr. S.D.N.Y. Oct. 17, 2022) ................................................... 4-5

*SEC v. C.M. Joiner Leason Corp.*,
    320 U.S. 344 (1943) ............................................................................................................6

*SEC v. LBRY, Inc.*,
    2022 WL 1674471 (S.D.N.Y. Nov. 7, 2022) .................................................................. 5-6

*SEC v. Telegram Group Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ...............................................................................5, 6

*SEC v. Telegram Group Inc.*,
    2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) .........................................................................5

*United Housing Foundation, Inc. v. Forman*,
    421 U.S. 837 (1975) ............................................................................................................6

**<u>Other Materials</u>**

"Tokens," XRPLedger.org, *available at* https://xrpl.org/tokens.html ............................................2

"Issue a Fungible Token," XRPLedger.org, *available at* https://xrpl.org/issue-a-fungible-
    token.html ...........................................................................................................................2

"Non-Fungible Tokens Overview," XRPLedger.org, *available at* https://xrpl.org/non-fungible-
    tokens.html .........................................................................................................................4

"Transaction Cost," XRPLedger.org, *available at* https://xrpl.org/transaction-cost.html ..............6

I.     INTEREST OF AMICUS CURIAE.

Reaper Financial, LLC's ("Reaper Financial") use of the XRP Ledger ("XRPL") has not been addressed by the parties or by current and proposed amici. As explained further below, Reaper Financial utilizes its own digital currency unit, RPR, that is: (i) overlayed upon the XRPL; (ii) has a use case entirely separate from Ripple Labs or amici in that it is a project based on token voting to eliminate the circulating supply of other tokens, including XRP itself; and (iii) uses XRP in fractional amounts in connection with the 'transactional cost' for using the XRPL. A finding by the Court that the XRPL and XRP are inherently securities would severely impair Reaper Financial's ability (as well as other similarly situated projects) to survive. Although Reaper Financial's interests overlap with those of other entities granted amici status by the Court, its use case of the XRPL and XRP are at the same time novel and distinct such that its interests are not adequately addressed by Defendants or amici.

Reaper Financial is greatly concerned with the SEC's apparent, years-long position that, in addition to XRP, the software code that comprises the XRPL is itself a security/investment contract. *See, e.g.*, ECF No. 153 at 24 ("The XRP traded, even in the secondary market, is the embodiment of those facts, circumstances, promises, expectations and today represents an investment contract"); ECF No. 674 at 28 ("the fortunes of XRP investors rise and fall with those of Ripple"); *id.* at 31 ("the XRP Ledger was but the first step of broader set of suites, products, and uses that Ripple promised to develop"). The SEC's argument, taken to its logical conclusion, goes even further than XRP token holders that merely buy, sell or trade XRP—it would negatively affect companies such as Reaper Financial that tangentially use XRP via transaction costs when utilizing the XRPL. In other words, by simply using the XRPL as a mechanism to transfer value of any type, Reaper Financial—according to the SEC's litigation theory in this case—is by definition engaging in the sale of unregistered securities. But such an argument would necessarily

render other electronic ledgers, such as Microsoft Excel or Google Sheets, securities *per se* as these users similarly rely on these programs' software code to properly use their spreadsheet functionality. This overly broad, all-encompassing standard sought by the SEC should not be allowed.

## II.    RELEVANT FACTUAL BACKGROUND.

The XRPL is software code that acts as a mechanism to verify transactions and maintain transactional history. Germane to Reaper Financial, "assets other than XRP can be represented in the XRP Ledger as **tokens**." *See* "Tokens," XRPLedger.org, *available at* https://xrpl.org/tokens.html (last accessed on Nov. 9, 2022) (emphasis in original). Types of tokens issued upon the XRPL vary widely and can include stablecoins backed by tangible assets, fiat digital tokens, and community credits. *Id.* Any project wishing to issue tokens on the XRPL requires funded XRPL accounts and a certain amount of XRP. *See* "Issue a Fungible Token," XRPLedger.org, *available at* https://xrpl.org/issue-a-fungible-token.html (last accessed Nov. 9, 2022).

Reaper Financial is an Austin, Texas-based limited liability company founded in December 2021 by Patrick L. Riley, its Chief Executive Officer and current U.S. Army Combat Medic. **Exhibit 1**, Declaration of Patrick L. Riley (11/9/22) ("Riley Decl.") ¶¶ 1-2. Reaper Financial's primary mission is to act as a reaper of assets by purchasing and subsequently destroying them. *Id.* at ¶ 3. The company began its mission by focusing on reaping excess and unvalued digital assets issued on various blockchain ledgers. *Id.* at ¶ 4. The goal is to prevent violent market swings by removing the excess and unvalued assets. *Id.* Digital assets are targeted for destruction through a decentralized voting mechanism that occurs on the XRPL. *Id.* at ¶ 5. The future goal of Reaper Financial is to allow reaping for any type of asset through decentralized voting, be it an auto loan, student loan, or mortgage. *Id.* at ¶ 6. Reaper Financial achieves its mission through RPR, its native digital token. *Id.* at ¶ 7. RPR is a fungible digital token created by Reaper Financial on the XRPL,

meaning RPR requires the use of the XRPL to function. *Id.* Reaper Financial has no professional relationship with Ripple Labs nor its employees. *Id.* ¶ 8. Ripple Labs did not market the XRPL or use of XRP to Reaper Financial. *Id.* Nor did any marketing efforts of Ripple Labs or its employees play any role in Reaper Financial selecting the XRPL for the company's decentralized voting mechanism. *Id*. Reaper Financial utilized the XRPL because, as compared to other blockchain mechanisms, the XRPL is more decentralized in nature, has the lowest transaction fees, and has the fastest transaction speed. *Id.* at ¶ 9.

Reaper Financial achieves its business objective of reaping assets through RPR where owners of RPR vote on which asset each owner chooses to eliminate through each holder's RPR voting share. *Id.* at ¶ 10. The value of RPR is used to purchase and destroy the assets which were voted for destruction. *Id*. at ¶ 11. These votes are called "Reapings" and occur bi-weekly. *Id.* at ¶ 12. With respect to digital assets, RPR owners that choose to vote in Reapings choose which asset they seek to destroy aka "burn," thereby permanently destroying those tokens. *Id.* at ¶ 13. The assets to be burned are purchased at market value so that holders of that asset class are not harmed by Reapings. *Id.* at ¶ 14. To date, Reaper Financial has purchased and permanently destroyed through Reapings over 500,000 XRP-worth of other XRPL, ERC-20, and XinFin tokens throughout twenty-three Reapings to date. *Id.* at ¶ 15. As the RPR ecosystem develops, Reapings will also begin burning XRP itself. *Id.* Reaper Financial does not require Ripple Labs or any other blockchain products' permission to purchase and destroy these digital tokens. *Id.* at ¶ 16.

RPR was created on the XRPL and is not a separate blockchain. *Id.* at ¶ 17. The functionality of RPR is matched to that of XRP in speed, transaction fees, and validation to decentralized XRP validators. *Id.* RPR would not function without the XRPL's decentralized network. *Id.* RPR was created on the XRPL by use of another third-party application, called

3

Xumm, for a fee of 100 XRP. *Id.* at ¶ 18. This fee is then "burnt" by sending XRP to a "blackholed" wallet address, which is publicly viewable at: rrnpnAny58ak5Q6po8KQyZXnkHMAhyjhYx. *Id.* A blackholed wallet is a digital wallet where assets may be sent *but cannot be withdrawn*, hence "burning" them. *Id.* In return the RPR token is issued to an XRP wallet address in the self-custodial Xumm wallet. *Id.* The creation of the wallets and RPR both require the forfeiture or burning of XRP as a mechanism of their utility. *Id.*

Every time an RPR holder votes to burn/destroy another digital currency unit or debtor account, the RPR Network—because it is hosted on the XRPL—must utilize minute fractions of XRP for each vote. *Id.* at ¶ 19. These votes are recorded and read from memoranda posted to the XRPL. *Id.* For example, when RPR holders vote in a Reaping, they must sign a transaction to vote, which typically costs 0.000012 XRP. *Id.* at ¶ 20. The Reaping of October 22, 2022, consisted of approximately 30,000 transactions, thereby utilizing approximately 0.36 XRP. *Id.*

Lastly, though not the primary function of Reaper Financial, the company also creates collectible non-fungible tokens ("NFTs") on the XRPL. *Id.* at ¶ 21.[1] The company created these NFTs in coordination with artists for a variety of reasons, including membership for future events and as digital artwork. *Id.* As these NFTs are minted through the utility of the XRPL, they are also effectively XRP-based tokens while representing a subjective value as art. *Id.* at ¶ 22.[2]

### III. ARGUMENT.

"Many, or [perhaps] most, cases involving cryptocurrency may raise legal issues for which there are no controlling legal precedents in this Circuit or elsewhere in the United States or in other

---

[1] "[NFT]s serve to encode ownership of unique physical, non-physical, or purely digital goods, such as works of art or in-game items." *See* "Non-Fungible Tokens Overview," XRPLedger.org, *available at* https://xrpl.org/non-fungible-tokens.html (last accessed Nov. 9, 2022).

[2] Illustrative examples of Reaper NFTs are included within ¶ 21 of the Riley Decl.

4

countries in which cases arise." *In re: Celsius Network LLC, et al.,* Case No. 22-10964 (Bankr. S.D.N.Y. Oct. 17, 2022), ECF No. 1073 at *1 (Chief Judge Glenn advising parties he may consider as "persuasive" the recommendations on cryptocurrency law by United Kingdom's Law Commission). The parties, amici, and requested amici have thoroughly addressed the case law—or rather the dearth of it—in their respective briefings. Succinctly put, neither Congress nor the SEC have articulated any meaningful statute, regulation or rule regarding the nascent cryptocurrency industry.

At the same time, no party has yet substantively addressed the legal implications of the SEC's argument in the context of other (non-XRP) tokens issued on the XRPL. Like amici I-Remit, TapJets and SpendTheBits, Reaper Financial has no "common enterprise" with Ripple Labs or its employees. Although these five companies do utilize the XRPL (along with countless other network users), there is no case law supporting the allegation this common usage transforms the XRPL into an investment contract any more than Microsoft Excel or Google Sheets are transformed into investment contracts solely because these software programs share millions of users. With respect to cryptocurrency tokens, although case law is minimal, there has not been a case to hold the digital asset tokens *per se* are securities. *See, e.g.*, *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) ("While helpful as a shorthand reference, the security in this case **is not simply the Gram [cryptocurrency]**, which is little more than alphanumeric cryptographic sequence") (emphasis added); *see also SEC v. Telegram grp. Inc.*, 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) at *1 (court clarifying the "one of the central points" of its order was "that the 'security' was neither the Gram Purchase Agreement nor the Gram but the entire scheme . . . made by Telegram"); *see also SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) at *8 (granting summary judgment to SEC on "whether [defendant] **offered** LBC as a

5

security" and not deciding whether digital currency token itself—LBC—was a security *per se*) (emphasis added).

Reaper Financial's use of the XRPL and XRP in the secondary market has no relation to any alleged 'scheme' of Ripple Labs, nor does such use satisfy the "character in commerce" test. *See SEC v. C.M. Joiner Leason Corp.*, 320 U.S. 344, 352-53 (1943) ("The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect"). *See also United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) (stating "the securities laws do not apply" where "a purchaser is motivated by a desire to use or consume the item purchased"); *id.* at 851-52 (holding courts "must examine the substance—the economic realities of the transaction—rather than the names that may have been employed by the parties").

For Reaper Financial and RPR holders to vote in Reapings, they must execute a transaction on the XRPL to exercise their vote. *See* **Ex. 1**, Riley Decl. ¶ 20. *See also Telegram*, 448 F. Supp. 3d at 360 n.3 (district court recognizing that cryptocurrency units "can be used to . . . offer voting or governance rights within the blockchain"). "To protect the XRP Ledger from being disrupted by spam and denial-of-service attacks, each transaction must destroy a small amount of XRP. This *transaction cost* is designed to increase along with the load on the network, making it very expensive to deliberately or inadvertently overload the network." "Transaction Cost," XRPLedger.org, *available at* https://xrpl.org/transaction-cost.html (last accessed Nov. 9, 2022) (emphasis in original). "The transaction cost is not paid to any party: **the XRP is irrevocably destroyed**." *Id.* (emphasis added). Thus, the very nature of the XRPL *requires* XRP to be burned as a transaction cost in order to execute that transaction.

Currently, the transactional cost to vote in a Reaping is roughly equivalent to

$0.0000055344 (valuing 1 XRP at $0.46). *See* **Ex. 1**, Riley Decl. ¶ 20. The approximately 30,000 transactions that occurred during the Reaping on October 22, 2022 cost a combined total of 0.36 XRP, which would be equivalent to $0.1656 with 1 XRP valued at $0.46. *Id.* In practical terms, the SEC would apparently seek to require Reaper Financial and similarly situated projects that build on the XRPL with digital currency units *other than* XRP to abide by the securities reporting requirements for tens of thousands of transactions that—in the above example—burn XRP at a cumulative US dollar cost of *less than two US dimes*. This simply is not the purpose of the Exchange Act; was not remotely contemplated by the Exchange Act (or its Blue Sky predecessors); and is not even feasible given the number of daily transactions on the XRPL and their pseudonymity.

Additionally, it does not appear that any party's briefing has addressed the concept that not only is XRP itself burned as a transaction cost in each transaction on the XRPL, but also that parties entirely unconnected to Ripple Labs can unilaterally destroy XRP as an inherent right to being an XRP owner. One of many unique aspects of blockchain technology, such as the XRPL, is that the software permits the creation of blackholed wallets from which XRP can never be recovered once sent. *See id.* at ¶ 18. In the context of traditional securities, such as shares of a company, Ripple Labs could—pursuant to securities reporting requirements—buy back its shares from the marketplace and absorb them, reducing the number of outstanding shares (commonly called a "share buyback"). But no investor in Ripple Labs may do the same. At best, a retail investor could maintain shares in Ripple Labs and hold those shares until death, but even then such shares would pass to the owner's heirs, by intestacy or escheat to the state. In contrast, Ripple Labs has no control or ability to prevent Reaper Financial from reducing the circulating supply of XRP by destroying it. The closest analog would be to owners of US dollars burning those dollars. And

even the SEC likely will not argue that setting fire to US dollars somehow constitute securities transactions.

Lastly, although not primary to Reaper Financial's business, like other individuals and entities Reaper Financial has created NFTs on the XRPL for a variety of reasons, including as membership for future events and for digital art creation. *See id.* at ¶ 21. Creating NFTs on the XRPL is similar to creating a token such as RPR on the network. Yet whereas RPR is fungible, NFTs are unique. Again, Ripple Labs has no control over how Reaper Financial chooses to create NFTs on the XRPL and Reaper Financial has no expectation that any NFT it creates will increase in value due to the efforts of Ripple Labs. Buying a Ford Mustang does not constitute ownership of Ford Motor Company and, again, it is unlikely the SEC would argue otherwise.

IV.     CONCLUSION.

For the reasons set forth above, Reaper Financial requests the Court grant Defendants' Motion for Summary Judgment.


Dated:  November 9, 2022                    Respectfully submitted,

                                            HODL LAW CALI, APC

                                        By: /s/ *Frederick A. Rispoli*
                                            Frederick A. Rispoli
                                            *Pro Hac Vice application pending*
                                            fred@hodllaw.org
                                            27762 Antonio Parkway
                                            Suite L-1, No. 232
                                            Ladera Ranch, CA 92694
                                            Telephone: (602) 284-5520

                                            *Counsel for Reaper Financial, LLC*

# Exhibit 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X   Docket No.: 1:20-cv-10832-AT-SN

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

   v.

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A. LARSEN,

        Defendant.
-------------------------------------------------------------X

## DECLARATION OF PATRICK L. RILEY, CHIEF EXECUTIVE OFFICER OF REAPER FINANCIAL, LLC

Patrick L. Riley, do declare as follows:

1. I am the Chief Executive Officer of Reaper Financial, LLC, an Austin, Texas-based limited liability company I founded in December 2021.

2. I am also currently an Active-Duty Staff Sergeant and U.S. Army Combat Medic stationed at Fort Hood, Texas. My educational background includes a Master of Forensic Psychology and I am completing my Masters in Business Administration in Finance at Syracuse University Online.

3. Reaper Financial's primary mission is to act as a reaper of assets by purchasing and subsequently destroying them.

4. Reaper Financial first started reaping excess and unvalued digital assets issued on various blockchain ledgers with the goal of preventing violent market swings that are common in the cryptocurrency space.

5. Digital assets are targeted for destruction through a decentralized voting mechanism that occurs on the XRPL.

6. Ultimately, at a future date Reaper Financial's goal is to permit reaping for any type of asset through decentralized voting, including auto loans, student loans or even mortgages.

7. Reaper Financial achieves this through RPR, its native digital token. RPR is a fungible digital token created by Reaper Financial on the XRP Ledger ("XRPL"), meaning RPR requires the use of the XRPL to function.

8. Reaper Financial has no professional relationship with Ripple Labs nor its employees. Ripple Labs did not market the XRPL or use of XRP to Reaper Financial. No marketing efforts of Ripple Labs or its employees played any role the decision of Reaper Financial in selecting the XRPL for the company's decentralized voting mechanism.

9. Reaper Financial utilized the XRPL because, as compared to other blockchain mechanisms, the XRPL is more decentralized in nature, has the lowest transaction fees, and has the fastest transaction speed.

10. Reaper Financial achieves its business objective of reaping assets through RPR where owners of RPR vote on which asset each owner chooses to eliminate with each RPR holder's voting share.

11. The value of RPR is used to purchase and destroy the assets which were voted for destruction.

12. Theses votes are called Reapings and occur bi-weekly.

13. With respect to digital assets, RPR owners that choose to vote in Reapings choose which asset they seek to destroy or 'burn.' Burning tokens permanently destroys those tokens.

14. The assets to be burned are purchased at market value so that holders of that asset class are not harmed by Reapings.

15. To date, Reaper Financial has purchased and permanently destroyed through the Reaping Process over 500,000 XRP-worth of XRPL, ERC-20, and XinFin tokens throughout twenty-three Reapings to date. As the RPR ecosystem develops, it will also begin burning XRP itself.

16. Reaper Financial does not require Ripple Labs or any other blockchain products' permission to purchase and destroy these digital tokens.

17. RPR was created on the XRPL and is not a separate blockchain. The functionality of RPR is matched to that of XRP in speed, transaction fees, and validated to decentralized XRP validators. RPR would not function without the XRPL's decentralized network.

18. RPR was created on the XRPL by use of another third-party application, called Xumm, for a fee of 100 XRP. This fee is then 'burnt' by sending the XRP to the following 'blackholed' wallet address: rrnpnAny58ak5Q6po8KQyZXnkHMAhyjhYx. A blackholed wallet is a digital wallet where assets may be sent but cannot be withdrawn, hence 'burning' them. In return the RPR token is issued to an XRP wallet address in the self-custodial Xumm wallet. The creation of the wallets and RPR both require the forfeiture or burning of XRP as a mechanism of their utility.

19. Every time an RPR holder votes to burn/destroy another digital currency unit or debtor account, the RPR Network—because it is hosted on the XRPL—must utilize minute fractions of XRP for each vote. Further, the votes are recorded and read from memorandums posted to the XRPL.

20. For example, when RPR holders vote in a Reaping, they must sign a transaction to vote, which typically costs 0.000012 XRP. The Reaping of October 22, 2022, consisted of approximately 30,000 transactions, thereby utilizing approximately 0.36 XRP.

21. Reaper Financial has also created collectible non-fungible tokens ("NFTs") on the XRPL. The company created these NFTs in coordination with artists for a variety of reasons, including membership for future events and as digital artwork. As an illustrative example, Reaper NFTs include the following:

  

22. As these NFTs are minted through the utility of the XRPL, they are also effectively XRP-based tokens while representing a subjective value as art.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Patrick L. Riley
Chief Executive Officer of Reaper Financial, LLC

Executed this the 9th day of November 2022, in Killeen, Texas.