

November 9, 2022

**VIA ELECTRONIC FILING AND EMAIL**

Hon. Analisa N. Torres
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312
Email: Torres_NYSDChambers@nysd.uscourts.gov

        Re:    Letter Motion of Accredify, Inc DBA InvestReady for Leave to File Brief <u>Amicus Curiae, SEC v. Ripple Labs, Inc.- InvestReady</u>

Dear Judge Torres:

      I am the Co-Founder and CEO of Accredify, Inc DBA InvestReady ("InvestReady"), as well as a licensed attorney in the state of Florida, and I submit this letter application pursuant to Your Honor's rules to respectfully request the Court's permission to file a brief *amicus curiae* in support of the Plaintiff's Motion for Summary Judgment in the above-captioned matter.

      InvestReady is a non-affiliated party and has no relationship whatsoever with any other parties. InvestReady is a for-profit corporation that provides issuers of Regulation D 506(c) issuances to scale their compliance requirements for accredited investor verifications which are required by that regulation. We've been in business since 2013 and recently acquired Early IQ Inc, a competitor of ours in the accredited investor verification space, which was around since 2012. We have seen how a lack of investor protections in the crypto markets has hurt the overall online fundraising market in the U.S. and we want to make sure the voices of those trying to follow the rules set forth are heard and not drowned out by many of the crypto-boom-fueled that jumped on the bandwagon to submit their own briefs. We've now seen how corrupt the markets were outside of regulatory scrutiny and the last thing we need now is another carve out for companies that endangers investor funds. Please consider the attached brief and we appreciate your time with this matter. Thank you.

                                                                               Respectfully submitted,

                                                                      **Adrian E. Alvarez, Esq.**
                                                                      CEO,  InvestReady
                                                                      e: adrian@investready.com
                                                                      p: 1-800-208-5819 Ext 711

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>- against -<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>*Defendants*. | 20 Civ. 10832 (AT) (SN) |

# *AMICUS CURIAE* BRIEF OF ACCREDIFY, INC.
# IN SUPPORT OF THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ADRIAN E. ALVAREZ, P.L.
　Adrian E. Alvarez, Esq.
　Florida Bar #0095875

　1395 Brickell Ave
　STE 800
　Miami, FL 33131
　(800) 208-5819
　adrian@investready.com

Attorney for *Amicus Curiae*
and CEO of Accredify, Inc.

## TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................ ii

TABLE OF AUTHORITIES ......................................................................................... iii

INTEREST OF AMICUS CURIAE ................................................................................ 1

PRELIMINARY STATEMENT ..................................................................................... 2

ARGUMENT .................................................................................................................. 6

    A.    Ripple's XRP Token is a Security. ............................................................. 6

        1.    The Plaintiff's Arguments In Their Brief Were Conclusive That Ripple's XRP Token Is A Security Under The Law (And So Was ETH). The SEC's Delay in Enforcement Does Not Change This Fact. ........................ 6

    B.    Ripple's Fair Notice Defense Should Be Denied. Other Companies Have Complied With Securities Laws That Ripple Chose To Ignore ................................. 8

SOLUTIONS .................................................................................................................. 9

    C.    Allow for Ripple and ETH holders to be grandfathered into compliance ................................................................................. 9

    D.    Expand the Definition of Accredited Investors ........................ 10

    E.    Create a Path to Decentralization/Commoditization for Tokens .. 11

CONCLUSION ............................................................................................................. 14

CERTIFICATE OF COMPLIANCE ............................................................................ 15

ii

## TABLE OF AUTHORITIES

**Cases**     **Page(s)**

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ..................................................................................................2

*Gary v. Plastic.*,
   903 F.2d 176 (2d Cir. 1990) ......................................................................................4

**Statutes & Regulations**

17 C.F.R. § 230.506(c)(2)(ii) (https://www.ecfr.gov/current/title-17/chapter-II/
   part-230/subject-group-ECFR6e651a4c86c0174/section-230.506) ........................1

17 C.F.R. § 230.144 (https://www.sec.gov/reportspubs/investor-publications/
   investorpubsrule144htm.html) ................................................................................10

**Other Authorities**

Kairos Facial Recognition Security Token
   (https://icodrops.com/kairos/) ....................................................................................1

Curzio Security Token listing (https://www.businesswire.com/news/home/
   20210930005357/en/tZERO-and-Curzio-Research-Partner-to-Trade-the-Curzio-
   Equity-Owners-Security) ...........................................................................................1

Director William Hinman, Digital Asset Transactions: When Howey Met Gary
   (Plastic) (June 14, 2018) available at https://www.sec.gov/news/speech/speech-
   hinman-061418. ........................................................................................................2

## INTEREST OF *AMICUS CURIAE*[1]

Accredify, Inc DBA InvestReady (herein, "InvestReady") was founded in 2013 with the express purpose of assisting with the compliance of the SEC's regulation 506c, specifically the requirement that the issuer take "reasonable steps" to verify any investor participating in their offering is, in fact, accredited. Since that time, we've onboarded over 50,000 users, assisted hundreds of issuers raise funds, and allowed for billions of dollars of investments into legal, compliant, and viable securities in our 9 years of operations.

InvestReady's mission is to help issuers comply with these regulations, even in novel circumstances. For instance, in 2018, we assisted facial recognition company Kairos with a tokenized Reg D 506c issuance, likely the first of its kind. Kairos not only acknowledged that the tokens were securities, but actively took steps to comply with existing regulations for their initial sale and continues to do so today.

Likewise, through our partner at the time, Securitize, we assisted with the verification of accredited investors for the Curzio Equity Owners (CEO) token. Since then, after the initial holding period and listing on another exchange, the CEO token was listed in the U.S. in 2021 via tZero.

---

[1] No person other than amicus or its counsel authored this brief in whole or in part, or made any monetary contribution intended to fund the preparation or submission of this brief.

1

Given that we have partnered with multiple issuers and platforms in the crypto space, it is in our interest to make sure that existing regulations and investor protections are not trampled by crypto-boom-fueled companies that have a vested interest in keeping crypto out of the SEC's purview where, if it's a security, it belongs.

**Corporate Disclosure:** Accredify, Inc has no parent corporation, and no publicly held corporation owns 10% or more of Accredify, Inc.

## PRELIMINARY STATEMENT

Just like this crypto industry, which suffered its latest huge failure yesterday morning as FTX fell into the hands of Binance, which itself is facing a multitude of investigations and lawsuits for their own practices, the arguments put forth by Ripple and the Amici are a house of cards that is falling faster than Luna's price did on the day it crashed[2]. Yes, XRP is a security. So was ETH when it launched as an ICO. They check all of the Howey test boxes, both were pushed by centralized entities, and both were bought primarily as a potential investment vehicle by most who did so considering that the utility of either was both dependent on the central team and did not surface until much later. Both are valuable utilities, but both were

---

[2] In July of 2022, the estimated losses for the crash were $2 Trillion, and that was before the latest FTX issues that popped up this week. https://www.pbs.org/newshour/show/after-2-trillion-crypto-crash-what-happens-next#:~:text=Digital%20currencies%20have%20now%20lost,financial%20bets%20than%20previously%20known.

securities under the laws at the time of their initial sales (even if Ripple didn't conduct a true ICO).

It is laughable that both Ripple and Coinbase base their entire arguments on the statement by Director William Hinman in 2018, when all that the director said was that certain ETH **transactions** may not be securities transactions, which I agree with since ETH has since transitioned into something that is more utility than security. However, in his direct quote, he disclaims ETH's start as an ICO from this analysis (emphasis added):

> *"But this also points the way to when a digital asset transaction may no longer represent a security offering. If the network on which the token or coin is to function is **sufficiently decentralized** – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.*
>
> *And so, when I look at Bitcoin today, I do not see a central third party whose efforts are a key determining factor in the enterprise. The network on which Bitcoin functions is operational and appears to have been decentralized for some time, perhaps from inception. Applying the disclosure regime of the federal*

*securities laws to the offer and resale of Bitcoin would seem to add little value.*

*[9]* ***And putting aside the fundraising that accompanied the creation of Ether,*** *based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions. And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value. Over time, there may be other sufficiently decentralized networks and systems where regulating the tokens or coins that function on them as securities may not be required. And of course there will continue to be systems that rely on central actors whose efforts are a key to the success of the enterprise. In those cases, application of the securities laws protects the investors who purchase the tokens or coins.*

*I would like to emphasize that the analysis of whether something is a security is not static and does not strictly inhere to the instrument.[10] Even digital assets with utility that function solely as a means of exchange in a decentralized network could be packaged and sold as an investment strategy that can be a security. If a promoter were to place Bitcoin in a fund or trust and sell interests, it would create a new security.* ***Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.****"*

The last part is emphasized to further argue against Coinbase's assertion that XRP is not a security and that Coinbase itself was not trading in securities. The

4

SEC stopped them from launching Coinbase Lend precisely because it was going to be a security, and that is precisely the same reason the SEC and other regulators settled with BlockFi for $100,000,000 because their lending products were securities. The fact is that the very topic of this speech, Gary v Plastic, is the case law that underlies this determination and it is remarkable that they would cite that case to promote their argument when it clearly undermines it on its face.

What we need to do is find a way forward that acknowledges the fact that these instruments were securities, allows for the continuation of the innovations and utility that both provide, and protects the investors, and they are investors, that are holding these tokens as they would be the ones to suffer if any draconian measures were taken. We need to acknowledge the truth in order to protect those that have both followed the rules and for the future of the crypto industry itself (again, see FTX, Voyager, Celsius, etc, for examples when regulations were not in place). This can be done with a combination of a settlement in the case, a subtle rule change for accredited investors, and a path to commodity/decentralization for tokens that are no longer securities via a decentralization audit. In this case, I would argue that ETH has been successfully converted into a commodity (and would pass a theoretical decentralization audit), whereas the supply of XRP is still more than 50% controlled by Ripple and therefore too centralized under the proposed rules. Part of my proposed settlement would be for XRP to release more

5

than 50% of the existing supply of tokens, and submit to a decentralization audit to certify sufficient decentralization to be considered a commodity.

## ARGUMENT
### A. Ripple's XRP Token is a Security.

#### 1. The Plaintiff's Arguments In Their Brief Were Conclusive That Ripple's XRP Token Is A Security Under The Law (And So Was ETH). The SEC's Delay in Enforcement Does Not Change This Fact.

See the SEC's arguments in their brief which relies on the 1946 case, *SEC v. W.J. Howey* (herein "Howey"). The Howey court found that an investment contract "means a contract, transaction or scheme whereby 1) a person invests their money 2) in a common enterprise and is led to 3) expect profits 4) solely from the efforts of the promoter or a third party.

**1 - Investment:** Here, especially during the 2017 boom, investors poured money into purchasing XRP as the price rose from well under a penny to its all time high of $3.84 in early 2018. Of course these people were buying this because of the price increase. Denying that reality is a useful tool for the industry, but denies abject the abject reality that this price increase was part of a huge crypto wave which included thousands of ICOs that would have overwhelmed any

than 50% of the existing supply of tokens, and submit to a decentralization audit to certify sufficient decentralization to be considered a commodity.

## ARGUMENT
### A. Ripple's XRP Token is a Security.

#### 1. The Plaintiff's Arguments In Their Brief Were Conclusive That Ripple's XRP Token Is A Security Under The Law (And So Was ETH). The SEC's Delay in Enforcement Does Not Change This Fact.

See the SEC's arguments in their brief which relies on the 1946 case, *SEC v. W.J. Howey* (herein "Howey"). The Howey court found that an investment contract "means a contract, transaction or scheme whereby 1) a person invests their money 2) in a common enterprise and is led to 3) expect profits 4) solely from the efforts of the promoter or a third party.

**1 - Investment:** Here, especially during the 2017 boom, investors poured money into purchasing XRP as the price rose from well under a penny to its all time high of $3.84 in early 2018. Of course these people were buying this because of the price increase. Denying that reality is a useful tool for the industry, but denies abject the abject reality that this price increase was part of a huge crypto wave which included thousands of ICOs that would have overwhelmed any

government agency, let alone one that was underfunded and dealing with the burgeoning crowdfunding rules it had put in place the year prior.

**2 - Common Enterprise:** Ripple develops and pushes XRP, and controls more than 50% of the supply. On its face, this is a common enterprise with the holders, as the payment system popularity and demand goes up, so does the price of the token.

**3 - Expect Profits**: Although Ripple took pains not to include expectation of profits in any of their marketing, that does not mean the expectation did not exist in the minds of the investors. One only needs to peruse reddit or YouTube videos at the time for a bombardment of people shilling XRP as the next big crypto investment after BTC and ETH.

**4 - Solely from the efforts of the promoter or a third party** - The token holders weren't building the payment system, Ripple was. They can argue that some of the nodes were non-Ripple owned and somewhat decentralized, but that decentralization does not alone account for the fact that they are the software engineers primarily working on the project and that they control more than half of the supply of the token.

Arguing that the SEC's delay was somehow intentional and that the existence of this delay disclaims the fact that the underlying asset is a security is a non-sequitur. Just as the CDC was overwhelmed during COVID, the SEC faced a similar regulatory barrage in 2017 with ICOs and again in 2020 with DeFi and

NFTs, obviating the need for more time to both understand what is actually happening on a technological level, and deciding from a policy standpoint which players to go after, likely targeting the most egregious actors first and moving on from there. The government may have unlimited resources, but this particular agency did not, and needed to triage their efforts.

### B. Ripple's Fair Notice Defense Should Be Denied. Other Companies Have Complied With Securities Laws That Ripple Chose To Ignore

Most crypto examples that the public sees are those that have flouted regulations, acting as if they were Uber in their early days, pushing forward with illegal actions, hoping that their market dominance, money, and influence will allow them to clean up the messes they made on their way to riches and market domination. Unfortunately for them, the SEC and the federal government are not as easily toppled as local taxi boards. But their notoriety also distracts from companies that are doing the right thing, following the regulations, and building things within the rule and spirit of the law, allowing for investor protection while allowing for innovation in the financial space without having billions disappear in bankruptcies and rug pulls overnight. We'd like to highlight a few of those examples here, some of which are InvestReady customers and partners, and some who are not.

First, we'd like to acknowledge the multiple blockchain-enabled Alternative Trading Systems that have applied for and have been granted a license by the SEC

to allow for tokenized trading, including Securitize, tZero, INX Securities and many others. These companies have submitted themselves to regulatory oversight, invested millions in security and compliance, and are able to provide the same level of investor protection and transparency as public markets while allowing for the innovation and speed of on-chain transactions. They follow SEC regulations regarding exemptions, and are poised to take the reins of the industry once most security tokens are rightfully classified as such.

Many tokens are now self identifying as securities. As my preliminary statement showed, both Kairos and Curzio issued security tokens that were compliant and are now tradable in the U.S. On top of these examples, many dozens of other tokens are listed on multiple regulated exchanges, and can be found via data services such as SecuritTokenMarket.com, which shows a combined market cap of over $14B in security token investments.

## SOLUTIONS
### C. Allow for Ripple and ETH holders to be grandfathered into compliance

Given that XRP is a security, the downstream effects must be considered. Although the SEC was overwhelmed with the 2017 crypto wave, giving them leave to take more time than would normally be acceptable to bring their 2020 suit against XRP, investors in the XRP token are likewise innocent from liability and should not be punished for failing to anticipate an event that even the SEC could not. Ripple the company should be made to compensate these early investors for

9

their transgressions, but at the same time, it is also not in the best interest of these investors to so destroy Ripple and XRP with a draconian punishment that the underlying utility as well as the investor's capital are destroyed. Unique circumstances should lead to unique solutions, and so in this case, the SEC should settle with Ripple, allowing the token to continue to be traded, be deemed a security after the fact and sold via a 144 exemption.

You could go back and try to apply Reg D 506c, requiring investors to be accredited, but this would most likely be too cumbersome and would unfairly hurt non-accredited investors holding XRP. Given that it has been around for years, and the initial holding period for a Reg D fundraise is one year, these investors should be grandfathered in, and the sale should be subject to a special exemption after the fact that minimizes industry disruption. This same analysis should be applied to ETH.

### D.     Expand the Definition of Accredited Investors

Currently, the definition only includes individuals that either have an enormous and consistent income (200,000+ for two years), or a significant net worth ($1M excluding primary residence). Recently, the SEC allowed for holders of Series 7, 65, and 82 licenses to qualify as well. But this is not enough. There is a growing desire by members of the public to participate in early stage securities. Reg CF and Reg A allow for some participation, but fundamentally, the process to

legally set up one of these issuances is time consuming and excludes many investable assets due to the smaller market.

The SEC should expand the definition to allow for a culture of informed consent to take hold over the industry, where retail investors that want to opt-in to the risk without the requisite financial means or licensure can participate. The simplest way to do so would be to simply add the qualification of a "passing score" on the Series 65 to qualify an investor as accredited. This exam can be taken without a sponsor and already covers materials the SEC has determined can qualify a licensee for accredited status. They can combine this along with some continuing education requirements every few years and will allow for any investor that has the wherewithal to pass this exam to participate. The SEC can also move to develop their own exam, but given how quickly these markets move, the faster solution of using the Series 65 as a defacto accredited exam is likely better, at least until a dedicated exam is created.

E.     **Create a Path to Decentralization/Commoditization for Tokens**

Finally, the path to decentralization and non-security status must be delineated. Director Hinman rightfully expressed what we all feel, that ETH has moved beyond its initial ICO status and is decentralized. It's an extraordinary achievement but we cannot allow one company to luck into this ability just because of the timing of the market. The SEC must work with the CFTC to come up with a framework for the transition between a security and a commodity for digital assets.

There could be a presumptive timeframe similar to hold periods (potentially 3 years after the initial sale?). There could also be a decentralization component and requirement. I would suggest that minimal decentralization is loss of control of the supply of the token by the initial issuer, but beyond that, there could also be implemented the requirement of a decentralization audit to be conducted by a licensed CPA or other firm. This would allow for investors to have confidence that their assets will not disappear overnight in a rug pull, and would solidify investments and paths for DeFi platforms to fully decentralize. Perhaps there could be a presumption of security status until a certain amount of time passes, then the presumption passes to a commodity. There are many potential paths forward, but what the SEC must do is protect the investors of XRP along with future crypto investors by providing a clear path to decentralization.

Alternatively, if the parties do not settle, the court can step in and, using the some of the language from Director Hinman's speech about decentralization, provide us with the *Ripple Decentralization Test*, where, if a particular asset such as a digital token is sufficiently decentralized, it would presumptively not be considered an investment contract, and therefore be classified as a commodity. The test can examine four factors: central control, utility, payment/ownership structure, and breadth of ownership.

Central control would focus on whether one or few centralized entities control 50% or more of the total issuance of the asset (such as the case with

Ripple). The more power the issuer or small circle around them have, the less likely it would be considered decentralized enough to qualify for the presumption.

Utility would examine the asset's stated and defacto purposes. Here, if a token was issued specifically to represent an equity stake in a particular entity, it would be a security no matter how decentralized it was. If it's a token primarily utilized for a payment system, with some speculative activities because of the volatility, this would lean more towards commodity (again like Ripple).

Payment/ownership structure deals with potential revenue or other monetary rewards benefits an asset could bestow upon its holders. If it is a token designed to collect dividends from a company's earnings, it's likely a security. If there is no monetary benefit other than buying or selling, this would move it more towards a commodity.

Finally breadth of ownership would take into account the shear number of asset holders, with more asset holders providing for greater decentralization whereas only a few holders would lean the decision towards non-decentralization and a presumption of security status.

This type of ruling would immediately provide concrete steps for issuers and service providers to assist with running compliant processes that can be followed to create predictability regarding a token's commodity or security status.

## CONCLUSION

For the foregoing reasons, the Court should grant the SEC's motion for summary judgment dismissing Ripple's fair notice defense, and rule in favor of the SEC's claims against Ripple.

Dated:    New York, New York
November 9, 2022

Respectfully Submitted,

_____
Adrian E. Alvarez, Esq.

ADRIAN E. ALVAREZ, P.L.
Adrian E. Alvarez, Esq.*
Florida Bar #0095875

1395 Brickell Ave
STE 800
Miami, FL 33131
(800) 208-5819
adrian@investready.com

Attorney for *Amicus Curiae*
and CEO of Accredify, Inc.

*Not admitted in New York*

## CERTIFICATE OF COMPLIANCE
### Court Rule 500.1 & 500.13(c)(l)

I hereby certify that the total number of words in the brief, inclusive of headings and footnote and exclusive of the brief cover, disclosure statement, table of contents, table of authorities, signature block, and certification of compliance is 3632.

I also certify that the body of this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman and the footnotes are printed in 12-point Times New Roman.

Dated:     New York, New York
           November 9, 2022

_____
Adrian E. Alvarez, Esq.