# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

        v.

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A. LARSEN

                              Defendants.

Case No. 1:20-cv-10832(AT)(SN)

**AMICUS CURIAE BRIEF OF PARADIGM OPERATIONS LP**

JENNER & BLOCK LLP

   Kayvan B. Sadeghi
   Shailee Diwanji Sharma
   1155 Avenue of the Americas
   New York, NY 10036
   Tel: (212) 891-1600
   Fax: (212) 891-1699
   ksadeghi@jenner.com
   ssharma@jenner.com

   Michelle S. Kallen*
   1099 New York Avenue, NW
   Suite 900
   Washington, DC 20001
   Tel: (202) 639-6000
   Fax: (202) 639-6066
   mkallen@jenner.com

COHEN WILSON LLP

   Lewis Rinaudo Cohen*
   Gregory Strong*
   331 Park Avenue South
   New York, NY 10010
   Tel: (212) 984-6845
   lewis.cohen@dlxlaw.com
   greg.strong@dlxlaw.com

PARADIGM OPERATIONS LP

   Rodrigo Seira*
   548 Market Street
   San Francisco, CA 94104
   Tel: (415) 986-9283
   rodrigo@paradigm.xyz

*pro hac vice motions forthcoming

Attorneys for *Amicus Curiae* Paradigm Operations LP

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

INTERESTS OF AMICUS CURIAE ............................................................................... 1

SUMMARY OF ARGUMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 3

I.      The Critical Distinction Between Investment *Transactions* or *Schemes*, and
        Underlying *Assets*, Will Define the Impact of This Case on International Markets ........... 3

II.     A Comprehensive Review of Federal Appellate Law Confirms that the *Howey*
        Test Cannot Be Used to Classify Crypto Assets, Themselves, as "Securities". ................. 6

        A.      Evaluating Fundraising Schemes as "Investment Contracts" Under *Howey*
                Is Not Novel, Whether They Involve a Crypto Asset or Any Other Asset ............. 7

        B.      *Howey* Cannot Be Used to Classify Underlying Assets as Securities,
                Especially When Exchanged in Secondary Market Transactions ........................... 8

        C.      No Federal Appellate Court Has Found an Investment Contract to Exist
                Without a Legal Relationship to the Issuer ............................................................ 10

III.    Extending *Howey* to Classify Crypto Assets Themselves as "Securities" Would
        Bypass the Role of Congress and Violate the Major Questions Doctrine. ....................... 13

        CONCLUSION ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
  141 S. Ct. 2485 (2021)..........................................................................................13

*Balestra v. ATBCOIN LLC,*
  380 F. Supp. 3d 340 (S.D.N.Y. 2019)........................................................................4

*Bamert v. Pulte Home Corp.,*
  445 F. App'x 256 (11th Cir. 2011) ............................................................................8

*Davis v. Rio Rancho Ests., Inc.,*
  401 F. Supp. 1045 (S.D.N.Y. 1975).........................................................................11

*Hart v. Pulte Homes of Michigan Corp.,*
  735 F.2d 1001 (6th Cir. 1984) .................................................................................11

*Hocking v. Dubois,*
  839 F.2d 560 (9th Cir.), *withdrawn*, 863 F.2d 654 (1988) ......................................9

*Hocking v. Dubois,*
  885 F.2d 1449 (9th Cir. 1989) (*en banc*) .............................................................9, 10

*In the Matter of Bloom Protocol, LLC,*
  Release No. 11089, 2022 WL 3273493 (Aug. 9, 2022) ............................................7

*In the Matter of Munchee Inc.,*
  Release No. 33-10445, 2017 WL 10605969 (Dec. 11, 2017).....................................7

*In the Matter of Zachary Coburn,*
  Release No. 34-84553, 2018 WL 5840155 (Nov. 8, 2018) .......................................8

*Jobanputra v. Kim,*
  No. 21 Civ 7071 (ER), 2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) .....................4

*Landreth Timber Co. v. Landreth,*
  471 U.S. 681 (1985)............................................................................................12, 13

*Miller v. Cent. Chinchilla Grp., Inc.,*
  494 F.2d 414 (8th Cir. 1974) ....................................................................................8

*Newmyer v. Philatelic Leasing, Ltd.,*
  888 F.2d 385 (6th Cir. 1989) ....................................................................................8

*Rodriguez v. Banco Cent.*,
    990 F.2d 7 (1st Cir. 1993) ..............................................................................8

*SEC v. AriseBank*,
    No. 3-18-cv-186-M, 2018 WL 623772 (N.D. Tex. Jan. 25, 2018) ...........................7

*SEC v. ETS Payphones, Inc.*,
    408 F.3d 727 (11th Cir. 2005) .........................................................................8

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) ........................................................ passim

*SEC v. LBRY, Inc.*,
    No. 21-cv-00260-PB (D.N.H. Nov. 7, 2022) .................................................6, 7

*SEC v. PlexCorps*,
    No. 17-cv-7007, 2017 WL 5988934 (E.D.N.Y. Dec. 1, 2017) ..............................7

*SEC v. Telegram Grp. Inc.*,
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ........................................................4, 5, 7

*SEC v. Telegram Grp. Inc.*,
    2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020) .....................................................5

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ............................................................................. passim

*SEC v. Wahi*,
    No. 22-cv-1009 (W.D. Wash. July 21, 2022) ....................................................8

*Shaw v. Hiawatha Inc*,
    884 F.2d 582 (9th Cir. 1989) ........................................................................12

*Smith v. Gross*,
    604 F.2d 639 (9th Cir. 1979) ..........................................................................8

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975) .....................................................................................7

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ........................................................................6

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ........................................................................3, 13, 15

STATUTES

15 U.S.C. § 78m..........................................................................................11

**BILLS AND ORDERS**

Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022).........................................................................................................................14

Digital Commodities Exchange Act of 2022, H.R. 7614, 117th Cong. (2022)...........................14

Exec. Order No. 14,067, 87 Fed. Reg. 14143 (March 14, 2022)....................................................14

Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong. (2022).........................................................................................................................14

**OTHER AUTHORITIES**

Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew Research Cntr (Nov. 11, 2021)......................................................14

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Hearing Before H. Comm. On Financial Services,* 117th Cong. 11 (2021) (statement of Hon. Gary Gensler, Chairman, SEC )......................................................................................................................14

Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022)............................................ passim

Lydia Beyoud, *SEC's Gensler Steps Up Push to Get Crypto Exchanges to Register with Regulator*, Bloomberg (July 28, 2022) ..................................................4

*Oversight of the SEC's Division of Enforcement: Hearing Before Subcomm. On Investor Protection, Entrepreneurship, and Capital Markets of the H. Comm. on Financial Services*, 117th Cong. (2022) (statement of Gurbir S. Grewal, Director, SEC Division of Enforcement)..................................................................4

*Statement of Commissioner Caroline D. Pham on SEC v. Wahi*, Commodity Futures Trading Commission (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122 .....................8

William Hinman, Director, Div. Corp. Fin., SEC, Remarks at the Yahoo Finance All Markets Summit: Digital Asset Transactions: When Howey Met Gary (June 14, 2018)..................................................................................................12

## INTERESTS OF AMICUS CURIAE

Paradigm is an investment firm that backs innovative crypto/web3 companies and protocols.  To help these projects achieve their full potential, Paradigm offers them a range of services, from the technical to the operational.  Issues placed before this Court have the potential to dramatically impact the design and operation of crypto/web3 companies.  Paradigm seeks leave to participate in this case because it is concerned that a decision casually adopting language advocated by the Securities and Exchange Commission ("SEC"), without appreciating its impact, could have sweeping and unintended effects on Paradigm and many others who seek to utilize new technology in a way that could benefit millions of users in the United States and around the world.

## SUMMARY OF ARGUMENT

A subtle distinction of monumental importance lurks beneath the surface of this case and threatens to displace Congress's role in deciding how crypto assets will be regulated.

On the surface, this case is about whether certain *offers* and *sales* of XRP tokens were securities offerings.  But the SEC's rhetoric goes further than its claims require or the law supports.  It asserts that XRP *tokens*, and by extension many other crypto assets, are themselves securities.

The SEC's apparent attempt to conflate an investment scheme with the crypto asset sold in that scheme is unsupported by legal precedent and fundamentally inconsistent with existing securities laws.  To this end, a comprehensive study conducted by one of the firms on this brief reviewed every single relevant federal appellate case to have applied the *Howey* test.  This study confirmed that no federal appellate court has held that an asset that is the object of an investment contract transaction is itself a security, nor that a subsequent transfer of that asset would be a securities transaction (nor has the SEC cited any such authority).  *See* Lewis Cohen *et al.*, *The*

*Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities*, ("*Why Fungible Crypto Assets Are Not Securities*") (Nov. 10, 2022), attached as <u>Exhibit 1</u>.

The distinction between offer and sale *transactions* and the underlying *crypto assets* is critical.  The SEC regulates a variety of fundraising schemes, and courts have evaluated those schemes for decades using the test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*").  That is not new.  But the SEC's effort to graft that same *Howey* analysis onto XRP tokens themselves is radically new, and it is the foundation upon which the SEC seeks to claim sweeping new authority to regulate not just investment offerings (its proper statutory role), but virtually the entire secondary market for crypto assets.

The SEC's objective may be understandable, but its approach is not founded in existing law.  A comprehensive analysis of federal appellate law reveals that no authority exists to support the SEC's attempt to transmute the *Howey* analysis of an investment contract transaction into a conclusion about the underlying asset.  In every application of *Howey* where an investment contract was found, there was some identifiable *legal relationship* between an ostensible "issuer" and the "investor" providing investment capital.

Put another way, the SEC's effort to construe XRP tokens as securities—even though XRP tokens create no legal relationship between the owner and Ripple Labs or any person or entity—invents a new form of "issuer-independent security" untethered from the powers conferred by Congress.  For instance, Ripple Labs could go bankrupt and emerge with new legal entities without impacting the owners of XRP tokens.  This is unlike any other type of security known to our securities laws, and instead resembles a commodity.

The SEC's attempt to obtain new authority through the courts is regulatory overreach. The SEC believes that *someone* should regulate crypto assets, and by branding the assets

themselves "securities" it is attempting to bypass Congress and bring crypto asset markets under its authority.  That is precisely what the Supreme Court cautioned against last term in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022).  It is not the proper place of the SEC, nor the courts, to usurp the role of Congress and choose a regulator for crypto assets by straining *Howey* to conflate fundraising transactions with the underlying assets outside the bounds of appellate authority.  Nor is it necessary to do so to resolve the claims before this Court.

Whatever decision the Court makes with respect to Defendants' *offers* and *sales* of XRP tokens, it should decline to pass judgment on the status of XRP tokens themselves.  When facing matters of this significance, outside the bounds of any appellate precedent or statutory guidance, and with the regulation of an entire market at stake, the power rests with Congress.

## ARGUMENT

I.   **THE CRITICAL DISTINCTION BETWEEN INVESTMENT *TRANSACTIONS* OR *SCHEMES*, AND UNDERLYING *ASSETS*, WILL DEFINE THE IMPACT OF THIS CASE ON INTERNATIONAL MARKETS.**

The SEC seeks to hold Defendants liable for their offers and sales of XRP, which does not require reaching any conclusion as to the nature of the XRP token itself.  As the SEC expressly argues, an investment contract can be structured around any ordinary asset.  SEC Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("SEC Opp'n Br.") 39–40, ECF No. 674.

Nevertheless, the SEC repeatedly refers to the XRP token itself as a security, in hopes that the Court might characterize it as such.  The first line of the SEC's Complaint states that "Defendants sold over 14.6 billion units of *a digital asset security called 'XRP'* . . . ."  First Am. Compl. ¶ 1, ECF No. 46.  In opposition to Defendants' motion for summary judgment, the SEC buries this crucial position in a footnote, explaining that it believes "XRP transactions between two public investors" in a secondary market would be exempt from registration "*despite such transactions involving securities.*"  SEC Opp'n Br. 45 n. 25 (emphasis added).  The same

3

footnote later asserts that secondary market investors exchanging nothing but the XRP token are "buying and selling *Ripple's* investment contracts from each other." *Id.* (emphasis in original).[1]

The SEC downplays the significance of its position and conceals what is really at stake, by asserting that secondary market transactions between two public investors would be exempt from registration. That is not the point. The SEC has made clear its ambition to regulate crypto asset secondary markets, with enforcement against intermediaries as a top priority.[2] Congress has not granted that wish. The SEC's unfounded position that crypto assets themselves are securities, slipped into a footnote, could provide the SEC the keys to the kingdom.

Given the central importance of this point to the SEC's regulatory ambition, it is particularly concerning that the SEC misstates the holding of *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ("*Telegram*"), to suggest that that court supported its position that crypto assets themselves are investment contracts. In its opposition brief, the SEC states that "[c]ourts apply these same principles to hold that crypto assets similar to XRP are investment contracts." SEC Opp'n Br. 49 (citing *Telegram* as the primary support). The *Telegram* court *twice rejected* the position that the Gram token itself was the security at issue:

---

[1] The only authority the SEC cites in that footnote is *Jobanputra v. Kim*, No. 21 Civ. 7071 (ER), 2022 WL 4538201 (S.D.N.Y. Sep. 28, 2022), for the proposition that "crypto assets 'sold . . . in the general market' may be securities." SEC Opp'n Br. 45 n. 25; *see also Jobanputra*, 2022 WL 4538201, at *8 n. 8. *Jobanputra* did not substantively address the question and instead denied a motion to dismiss, holding that it was plausibly alleged that crypto assets were securities, because it viewed two other opinions as having treated other crypto assets as securities. *See Jobanputra*, 2022 WL 4538201, at *8 n. 8. On inspection, neither of those two opinions supports the SEC's position. The first, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019), similarly held only that the token's status was plausibly alleged for purposes of a motion to dismiss. The second, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ("*Kik*"), is addressed further below. In short, none of these cases provide analytical support for the SEC's novel position conflating the offering with the underlying asset itself.

[2] *See, e.g.*, Lydia Beyoud, *SEC's Gensler Steps Up Push to Get Crypto Exchanges to Register with Regulator*, Bloomberg (July 28, 2022), https://www.bloomberg.com/news/articles/2022-07-28/sec-chair-gensler-hardens-line-on-crypto-exchange-registration; *see also Oversight of the SEC's Division of Enforcement: Hearing Before Subcomm. On Investor Protection, Entrepreneurship, and Capital Markets of the H. Comm. on Financial Services*, 117th Cong. (2022) (statement of Gurbir S. Grewal, Director, SEC Division of Enforcement), https://www.sec.gov/news/ statement/grewal-statement-house-testimony-071922. *See also* Brief for Amici Curiae Investor Choice Advocates Network & Philip Goldstein in Supp. of Defs.' Mot. for Summ. J. ("ICAN Br.") 1–15, ECF No. 683.

> While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence. . . . This case presents a "scheme" to be evaluated under <u>Howey</u> that consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram.   <u>Howey</u> requires an examination of the entirety of the parties' understandings and expectations.

448 F. Supp. 3d at 379.  On a motion for clarification, the court sharpened the point:

> But focusing upon the Initial Purchasers and their Gram Purchase Agreements misses *one of the central points* of the Court's Opinion and Order, specifically, that the "security" was neither the Gram Purchase Agreement *nor the Gram* but the entire scheme that comprised the Gram Purchase Agreements and the accompanying understandings and undertakings made by Telegram, including the expectation and intention that the Initial Purchasers would distribute Grams into a secondary public market.

No. 19-cv-9439 (PKC), 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (emphasis added).

The *Telegram* court rightly focused on the facts and circumstances of the offering scheme, not the Gram token itself, and found that the SEC had shown a substantial likelihood of success in proving that the overall scheme, including "the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the Initial Purchasers, including the intended and expected resale of Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5."  448 F. Supp. 3d at 381.

Two other courts, however, failed to address the nuanced distinction between the offering transaction and the crypto asset, and instead adopted language advocated by the SEC to construe a crypto asset itself as a security, with no critical analysis.  In *Kik*, the court addressed an offering similar to the one in *Telegram* and similarly held that the sales of Kin tokens were investment contract transactions.  Some dicta in *Kik* references the Kin token as a security, but it does so without providing any reasoning or legal support for projecting the analysis of the transaction onto the Kin token itself.  492 F. Supp. 3d at 177–82.  Most recently, on November 7, 2022, another court ruled that crypto asset sales violated Section 5.  *See* Memorandum and Order

at 18, *SEC v. LBRY, Inc*., No. 21-cv-00260-PB (D.N.H. Nov. 7, 2022), ECF No. 86 ("*LBRY* Slip Op.").[3]  Once again, the opinion appears to adopt the SEC's view that the token itself was a security, without any legal analysis or support for that proposition.  *See id.*

By construing the underlying crypto assets as securities, the *Kik* and *LBRY* courts strayed outside the bounds of all existing appellate precedent or statutory guidance.  While one of those cases evaded appellate review and the other may also, the spotlight on this case weighs strongly in favor of conducting a more rigorous analysis of this critically important distinction here.  There is no need to cross the line into opining on the nature of the XRP token itself.  Failure to respect that outer limit of existing precedent and statutory guidance would be an unforced error, opening any decision to potential reversal of an otherwise defensible holding, for needlessly running afoul of the major questions doctrine.

## II.  A COMPREHENSIVE REVIEW OF FEDERAL APPELLATE LAW CONFIRMS THAT THE *HOWEY* TEST CANNOT BE USED TO CLASSIFY CRYPTO ASSETS, THEMSELVES, AS "SECURITIES".

A comprehensive review of federal appellate jurisprudence confirms that the *Howey* test does not support a determination that the object of an investment contract—here the XRP token—is a security.  Thus, for a secondary transaction in a crypto asset to be a securities transaction, either (i) the asset itself would need to convey a bundle of rights and obligations sufficient to be considered a "security," or (ii) a new investment contract transaction would need to be formed based on the specific circumstances of that transaction.

This conclusion is supported by a review of 253 federal appellate court decisions and 13 Supreme Court decisions, which represent all relevant appellate cases identified as applying the

---

[3]  The only authority *LBRY* offers is *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009), for the unrelated proposition that a court should focus on what was promised and not the subjective intent of the purchasers.  *See LBRY* Slip Op. at 18.  *Warfield* has no bearing on the distinction between the offering and an underlying asset.

*Howey* test, either with reference to *Howey* or to *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975). *See Why Fungible Crypto Assets Are Not Securities*, Schedules 1–3.  The SEC has cited no contrary authority to support treating the object sold in an investment contract transaction as a security in itself.  This is because no such authority exists.

A.   **Evaluating Fundraising Schemes as "Investment Contracts" Under *Howey* Is Not Novel, Whether They Involve a Crypto Asset or Any Other Asset.**

The *Howey* test evaluates whether a "contract, transaction, or scheme"—not an asset—is an investment contract, considering whether the circumstances as a whole involve: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely from the efforts of the promoter or a third party.  328 U.S. at 298–99.

Since 1946, federal courts have found all manner of arrangements involving ostensibly commercial transactions to nevertheless be investment contracts.  *See Why Fungible Crypto Assets Are Not Securities* at Schedule 1 (collecting examples of cases involving whiskey warehouse receipts, beavers, cattle embryos, and chinchillas, among others).  The same logic has been applied to transactions and schemes involving crypto assets.  *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 381.  While the application of *Howey* to crypto assets is recent, the SEC's litigated cases involving crypto assets have hewed more closely to precedent by focusing on claims against a purported issuer and the circumstances of the offering.[4]  Those claims asserting that an

---

[4] *See, e.g.*, *Kik*, 492 F. Supp. 3d at 177–82; *LBRY* Slip Op. at 6; *In the Matter of Munchee Inc.*, Release No. 33-10445, 2017 WL 10605969 (Dec. 11, 2017); *In the Matter of Bloom Protocol, LLC*, Release No. 11089, 2022 WL 3273493 (Aug. 9, 2022); Complaint, *SEC v. PlexCorps*, No. 17-cv-7007, 2017 WL 5988934 (E.D.N.Y. Dec. 1, 2017) (alleging misrepresentations about the size and scale of PlexCorps' operations, the use of funds raised in an ICO, and the amount of funds raised in the ICO); Complaint, *SEC v. AriseBank*, No. 3-18-cv-186-M, 2018 WL 623772 (N.D. Tex. Jan. 25, 2018) (alleging "many" materially false statements and omissions in connection with an ICO transaction).  The SEC has previously asserted claims premised on tokens being securities in settled actions where its assertions will not be tested.  *See, e.g.*, *In the Matter of Zachary Coburn*, Release No. 34-84553, 2018 WL 5840155 (Nov. 8, 2018) (claiming that EtherDelta "operated as a market place for bringing together orders of multiple buyers and sellers in [digital assets] that included securities").  The SEC recently filed its first case directly placing at issue whether tokens in secondary market transactions are securities transactions.  *See* Complaint, *SEC v. Wahi*, No. 22-cv-1009 (W.D. Wash. July 21, 2022) (alleging that secondary transactions constituted insider trading under the securities laws).  That complaint has not yet been tested and has received much criticism.  *See, e.g.*, *Statement of Commissioner Caroline D.*

offering of crypto assets constitutes an investment contract, however, do not justify extrapolating from that conclusion to construe the crypto asset itself as a security.

**B.** ***Howey* Cannot Be Used to Classify Underlying Assets as Securities, Especially When Exchanged in Secondary Market Transactions.**

While many appellate cases apply *Howey* to the purported *sale* of an underlying asset which functions as the object of an investment scheme, these cases uniformly highlight a critical distinction between the documents, marketing materials, or oral statements that create the required "common enterprise" at the center of a *Howey* analysis and the "object" being sold pursuant to the purported investment scheme. *See Why Fungible Crypto Assets Are Not Securities* at 55–58 (collecting cases).[5]  In those transactions, a sales agreement was almost always accompanied by the seller or an affiliated entity performing post-purchase functions (such as picking, bundling and selling oranges; husbanding cattle and their embryos; or maturing whiskey in casks). *See id.*  And, in each of those cases, the investment package (*i.e.*, the set of formal or informal agreements or understandings between the seller and the purchaser) is clearly distinguishable from the object of the scheme itself (*i.e.*, the orange groves, cattle, or beavers).

Moreover, there is no suggestion in any of the appellate cases that the transfer of the underlying object to another "investor" *without an assignment or transfer of the surrounding*

---

*Pham on SEC v. Wahi*, Commodity Futures Trading Commission (July 21, 2022), https://www.cftc.gov/PressRoom/SpeechesTestimony/phamstatement072122.

[5] *E.g.*, *SEC v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005) (sale and leaseback of payphones); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414 (8th Cir. 1974) (sale and management agreements with respect to chinchillas); *Smith v. Gross*, 604 F.2d 639 (9th Cir. 1979) (earthworms); *Newmyer v. Philatelic Leasing, Ltd.*, 888 F.2d 385 (6th Cir. 1989) (printing plates for foreign postage stamps); *Rodriguez v. Banco Cent.*, 990 F.2d 7 (1st Cir. 1993) (finding that "a security *might* exist if the defendants had promised, along with the land sales, to develop [a thriving residential] community themselves," but that "[a] simple sale of land, whether for investment or use, is not a 'security'"); *Bamert v. Pulte Home Corp.*, 445 F. App'x 256 (11th Cir. 2011) (rejecting the plaintiffs contention that purchase agreements for at least one Orlando condominium unit were investment contracts because the plaintiffs were under no contractual obligation to join an offered rental pool or otherwise contract with the defendant's proposed rental agent, but finding that the plaintiff had sufficiently alleged the possible existence of an investment contract in considering exclusive rental agreements, if the rental agents were found to be affiliates of the condominium seller).

*promises or rights*, would result in another securities transaction.  There is no appellate case which suggests that the object of an investment scheme is a "security."

Of the hundreds of federal appellate and Supreme Court decisions applying the *Howey* analysis, *none* directly deals with secondary transactions in those assets and only one analyzed a transaction under *Howey* that did not directly involve as a party the entity that would purportedly be the "issuer" of the alleged investment scheme.  In that one case, *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ("*Hocking II*"), the circumstances of the secondary transaction provided independent grounds for conducting an investment contract analysis.[6]

The procedural history of the *Hocking* case demonstrates the difficulty of applying *Howey* to secondary market transactions, and the impossibility of expecting secondary market participants to do so under penalty of strict liability under federal securities laws.  The District Court held that Hocking's arrangement did not constitute an investment contract.  *See Hocking v. Dubois*, 839 F.2d 560, 562 (9th Cir.) (describing trial court opinion), *withdrawn*, 863 F.2d 654 (1988).  The Ninth Circuit reversed, finding that an "offering of a condominium with [a rental pool agreement] *automatically* makes the [transaction an investment contract]."'  *Id.* at 565.

After a rehearing *en banc*, the outcome was reversed again, to hold that the arrangement did not automatically constitute an investment contract transaction.  *Hocking II*, 885 F.2d at 1462.  The full court held that just because the purchase of an asset *could* have been based on an expectation of profit, did not support a holding that all transactions were *automatically* securities transactions.

---

[6] Hocking, an individual investor, purchased a rentable condominium unit in a secondary transaction through the encouragement of his real estate broker, then entered into a rental pool agreement with a company acting as the rental pool operator for the resort.  Hocking later brought a lawsuit against the real estate broker, claiming that the combination of the condominium purchase and the rental pool agreement constituted an unregistered securities transaction.  *See Hocking II*, 885 F.2d at 1452–53.

On rehearing *en banc*, the *Hocking* majority reasoned:

> We agree with defendants and *amici* that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security.  Such a *per se* rule would be ill-suited to the *examination of the economic reality of each transaction required by Howey*.

*Hocking II*, 885 F.2d at 1462 (emphasis added).

### C.  No Federal Appellate Court Has Found an Investment Contract to Exist Without a Legal Relationship to the Issuer.

Unlike all forms of securities recognized in our federal securities laws, XRP tokens do not bestow on the holder any legal relationship to Ripple Labs or any other issuer, and when traded in a secondary market they do not transfer any legal relationship to an issuer from the seller to the purchaser.  That distinction between XRP tokens and securities, is critical.

Every item on the enumerated list of instruments that comprise the definition of a security under federal securities laws reflects the presence of a *legal relationship* established between an identifiable legal entity that acts as the *issuer* of the security and the *owners* of that security.  *See Why Fungible Crypto Assets Are Not Securities* at 62–63 (addressing each of the enumerated list of instruments in the definition of "security" to show they each involve a legal relationship with an issuer).  The inclusion of the term "investment contract" is no exception.  Every federal appellate court finding an "investment contract" to exist under the *Howey* is consistent with this trend, and no such case has suggested that an investment contract can exist in the absence of any legal relationship.  *See id.*, Schedules 1–3.

Under current law, there is simply no such thing as an "issuer-independent security"—a security that exists independently of any legal relationship to an identifiable entity considered its "issuer."  Throughout the federal securities laws it is assumed that all securities will have an "issuer"—an identifiable person or entity against whom a securityholder's rights can be exercised.  When a security has been issued, many different obligations and potential liabilities

10

are imposed on the issuer of that security, including the responsibility for filing periodic reports where the security or issuer has registered with the SEC.  15 U.S.C. § 78m.

The survey of appellate jurisprudence presented in Annex A to *Why Fungible Crypto Assets Are Not Securities* demonstrates that a traditional written contract is present in virtually every instance where an investment contract has been found by an appellate court.  In those few appellate cases in which an investment contract was found without a written instrument between the parties, however, the elements necessary to find an implied-in-fact contract were present.[7]

No appellate decision holds or suggests that the ownership of an ordinary asset, without some ongoing business relationship to the issuer of the investment contract, would suffice to establish a "common enterprise" required for an investment contract.  Of the 266 decisions surveyed, approximately 62 had more than a cursory reference to the concept of "common enterprise."  *Why Fungible Crypto Assets Are Not Securities* at 48.  Of those, 37 decisions either found that an investment contract transaction or scheme was present or remanded for further fact finding.  *Id.*  In each of these decisions, the one constant was that commonality was based on a

---

[7] The SEC argues that "an ongoing contractual obligation" is not an essential element of an investment contract, but it fails to cite any binding or persuasive authority.  *See* SEC Opp'n Br. 49 (citing *Kik,* 492 F. Supp. 3d at 178).  The *Kik* court did make that assertion, but oddly based it on two cases that held the opposite.  *See Kik,* 492 F. Supp. 3d at 178 (citing *Davis v. Rio Rancho Ests., Inc.*, 401 F. Supp. 1045, 1049–50 (S.D.N.Y. 1975); *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1005 (6th Cir. 1984)).  *Davis* held that there was no investment contract despite an expectation of future efforts of the seller, *because there was no ongoing contractual relationship*.  The plaintiff had purchased near-worthless desert land, sold to purchasers with the expectations that the developer would take active steps to create a community.  The court held there was no investment contract despite that expectation of future efforts.  Central to the court's analysis was the fact that "[t]here was no management contract between plaintiff and defendants, nor were defendants obligated by the Purchase Agreement to perform any such services" and, "[i]n the absence of a 'common enterprise' between the parties, the expectation of a profit on resale is insufficient to transform what is essentially a sale of real property into the sale of an investment contract[.]"  *Davis,* 401 F. Supp. at 1050.  *Hart* similarly concluded that there was no common enterprise because the expectations were not substantiated by a contractual relationship.  *See Hart,* 735 F.2d at 1004 ("Even assuming that individual purchasers were assured of development, nothing in the pleadings suggests that the fortunes of individual purchasers were 'inextricably intertwined' *by contractual or financial arrangements*.") (emphasis added).
.

direct business relationship between the issuer and the participant.[8]  No such relationship exists between someone who obtained XRP tokens in the secondary market and Ripple Labs or any other person or entity, and the same holds true for many crypto assets.

The SEC's proposed creation of a security with no legal relationship to an issuer cannot be reconciled with existing law. Among other problems, the inherently transitory nature of *Howey*'s facts-and-circumstances analysis means that the outcome today may be different tomorrow.  The SEC staff sought to address this transitory problem in a 2018 speech by Director Hinman, which gave rise to the awkward concept that a crypto asset once classified as a security might morph into a non-security.[9]  But this novel morphing concept cannot be implemented in secondary markets.  If a crypto asset can morph from a security to a non-security based on extrinsic factors (such as the disappearance of the founding team), then it can just as easily morph back into a security (upon their return, or the ascendance of a new leader, or some other set of promises or assurances).  The securities laws drafted by Congress cannot accommodate crypto assets morphing in and out of transitory "security" status, untethered from any legal relationship to any issuer.  In a similar context, the Supreme Court rejected an analogous "morphing" concept, because:

> coverage by the Acts would in most cases be unknown and
> unknowable to the parties at the time the stock was sold.  These
> uncertainties attending the applicability of the Acts would hardly
> be in the best interests of either party to a transaction.  *Cf. Marine
> Bank v. Weaver*, 455 U.S. [551,] 559, n. 9 (rejecting the argument

---

[8]  A good example of this is *Shaw v. Hiawatha Inc*., in which the plaintiffs alleged that the defendants' agents told them that they "would be in business together" coupled with a letter from an officer of the defendant stating that he was looking forward to a "long and profitable relationship" with the defendants.  884 F.2d 582 (9th Cir. 1989).

[9]  *See* William Hinman, Director, Div. Corp. Fin., SEC, Remarks at the Yahoo Finance All Markets Summit: Digital Asset Transactions: When Howey Met Gary (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 ("And putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions.")

> that the certificate of deposit at issue there was transformed,
> chameleon-like, into a "security" once it was pledged).

*Landreth Timber Co. v. Landreth*, 471 U.S. 681, 696 (1985) (emphasis added).  Under current

law, the only rational approach is to regulate each *offering* according to its facts and

circumstances, recognizing that the crypto asset underlying the offering is not itself a security.

## III.    EXTENDING *HOWEY* TO CLASSIFY CRYPTO ASSETS THEMSELVES AS "SECURITIES" WOULD BYPASS THE ROLE OF CONGRESS AND VIOLATE THE MAJOR QUESTIONS DOCTRINE.

Courts "expect Congress to speak clearly when authorizing an agency to exercise powers

of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum.

Servs.*, 141 S. Ct. 2485, 2489 (2021) (internal quotation marks omitted).  Under the "major

questions doctrine," courts are "reluctant to read into ambiguous statutory text the delegation

claimed to be lurking there" in "extraordinary cases . . . in which the history and the breadth of

the authority that the agency has asserted, and the economic and political significance of that

assertion, provide a reason to hesitate before concluding that Congress meant to confer such

authority." *West Virginia*, 142 S. Ct. at 2608–09 (internal quotation marks and citations

omitted).  In such cases "both separation of powers principles and a practical understanding of

legislative intent" require an agency to point to "clear congressional authorization for the power

it claims." *Id.* at 2609 (internal quotation marks and citation omitted).

Regulation of the new class of crypto assets is matter of great economic and political

significance.  In May 2021, SEC Chair Gary Gensler stated that the market for crypto assets was

$2 trillion, and in November 2021, Pew Research Center estimated last year that 16% of

Americans have invested in, traded, or used cryptocurrency. [10]  That does not mean that all

---

[10] *See Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Hearing Before H. Comm. On Financial Services*, 117th Cong. 11 (2021) (statement of Hon. Gary Gensler, Chairman, SEC); Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used Cryptocurrency*, Pew

application of securities laws to crypto assets implicates the major questions doctrine.  Applying *Howey* to fundraising schemes involving crypto assets fits within the SEC's existing authority, just as *Howey* has applied to fundraising transactions involving innumerable other assets.

The SEC runs afoul of the major questions doctrine, however, by attempting to mutate analysis of the *transaction* into a conclusion about the *asset* itself.  *See* SEC Opp'n Br. 45 n. 25. It is in that leap that the SEC departs from the authority granted by Congress and all appellate precedent.  As demonstrated above, that novel argument would not only grant authority over the crypto asset secondary market not authorized by Congress, but create the first class of issuer-independent securities—a concept entirely foreign to the laws enacted by Congress.

To be sure, secondary markets for digital assets raise important investor protection and other policy concerns.  But that is all the more reason for judicial restraint.  Congress is well aware of these concerns and is in the process of performing its role of considering legislation to address them.[11]  Three such bills were introduced this year and remain pending.  *See* Lummis-Gillibrand Responsible Financial Innovation Act, S. 4356, 117th Cong. (2022); Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022); Digital Commodities Exchange Act of 2022, H.R. 7614, 117th Cong. (2022).  In addition, the Executive Branch is coordinating a "whole of government" approach to crypto assets.  Exec. Order No. 14,067, 87 Fed. Reg. 14143 (March 14, 2022).  This is not an issue for the SEC to decide, or for a court to decide through an unprecedented interpretation of *Howey*.

---

Research Cntr (Nov. 11, 2021), https://www.pewresearch.org/fact-tank/2021/11/11/16-of-americans-say-they-have-ever-invested-in-traded-or-used-cryptocurrency/.

[11] For a more complete recitation of the proceedings before Congress, *see* Br. for Amicus Curiae Investor Choice Advocs. Network & Philip Goldstein in Supp. of Defs.' Mot. for Summ. J. 7–11, ECF No. 683.

As the Supreme Court explained just this past term, we "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted). Under the SEC's approach, the agency would jump ahead of Congress. Amicus asks this Court to resist the impulse to allow a regulatory agency to expand its authority under a framework that was designed for an entirely different context. *Id.* ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (internal quotation marks, citation, and alteration omitted).

"Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* (internal quotation marks and citation omitted). Blockchain technology heralds a new era of programmable assets that does not fit neatly into existing legal classifications. As Congress finalizes legislation governing this novel industry, this Court should reject the SEC's effort to supersede Congress by reading into the Securities Act powers that are simply not there.

## **<u>CONCLUSION</u>**

For the reasons discussed above, this Court should decline to adopt the SEC's unsupported position that the XRP token itself is a security, or that any secondary market transactions in that token are securities transactions by virtue of the facts and circumstances presented in this case.

15

Dated:  November 11, 2022                   Respectfully submitted,

                                            JENNER & BLOCK LLP

                                            By:   /s/ Kayvan B. Sadeghi
                                            Kayvan B. Sadeghi
                                            Shailee Diwanji Sharma
                                            1155 Avenue of the Americas
                                            New York, NY 10036
                                            Tel.: (212) 891-1600
                                            Fax: (212) 891-1699
                                            ksadeghi@jenner.com
                                            ssharma@jenner.com

                                            Michelle S. Kallen (*pro hac vice motion forthcoming*)
                                            1099 New York Avenue, NW
                                            Suite 900
                                            Washington, DC 20001
                                            Tel: (202) 639-6000
                                            Fax: (202) 639-6066
                                            mkallen@jenner.com


                                            Lewis Rinaudo Cohen (*pro hac vice motion forthcoming*)
                                            Gregory Strong (*pro hac vice motion forthcoming*)
                                            COHEN WILSON LLP
                                            331 Park Avenue South
                                            New York, NY 10010
                                            Tel.: (212) 984-6845
                                            lewis.cohen@dlxlaw.com
                                            greg.strong@dlxlaw.com


                                            Rodrigo Seira (*pro hac vice motion forthcoming*)
                                            PARADIGM OPERATIONS LP
                                            548 Market Street
                                            San Francisco, CA 94104
                                            Tel: (415) 986-9283
                                            rodrigo@paradigm.xyz


                                            Attorneys for *Amicus Curiae* Paradigm Operations LP

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was filed on November 11 2022, with the Clerk of the Court by using the CM/ECF system, which will effect electronic service on all parties and attorneys registered to receive notifications via the CM/ECF system.

Dated:  November 11, 2022                     By: _____/s/ Kayvan B. Sadeghi_____
                                                                  Kayvan B. Sadeghi