# EXHIBIT 1

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

**DISCUSSION DRAFT**

PRESENTED BY

DLx LAW

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

LEWIS RINAUDO COHEN
GREGORY STRONG
FREEMAN LEWIN
SARAH CHEN

## ABSTRACT

*Securities regulators in the United States have repeatedly asserted that most fungible blockchain-based crypto assets are clearly securities under current law. This perspective may at first seem understandable. Much of the interest in crypto assets to date has been driven by their investment potential, and the judicial adoption of this position would give U.S. securities regulators jurisdiction over nearly all activity taking place with these assets. But this assertion is incorrect. An exhaustive review of the relevant appellate case law and the related legal scholarship demonstrates that this position is inconsistent with the Supreme Court's definition of the term "investment contract" as developed by federal appellate courts for nearly a century.*

*This Article addresses the federal securities law status of fungible crypto assets not intended to be a type of traditional security, with a focus on secondary transactions in these assets, such as those effected on a centralized crypto asset marketplace, like Coinbase, or through the use of a smart contract-based protocol, like Uniswap. Such crypto assets lack the ineluctable hallmarks of a security – (i) they neither create nor represent the necessary legal relationship between an identifiable person or entity and the owner of the asset and (ii) marketplace-based secondary transfers of these assets do not create investment contract transactions. Moreover, treating these fungible crypto assets as securities implies a need for the development of an entirely new concept in federal securities law: "issuer-independent securities".*

*Capital raising from investors, whether involving sales of crypto assets or anything else of value, is incontrovertibly subject to the protections provided by U.S. securities laws, as has been demonstrated through numerous successful enforcement actions by securities regulators. Expanding the reach of federal securities law to characterize fungible crypto assets as securities is both unnecessary and misguided. Instead, the legitimate policy concerns raised by non-capital raising activity involving crypto assets should be addressed by Congress. We examine these concerns and discuss the approaches adopted in several Congressional bills introduced during 2022, which the authors believe could form the basis of a reasonable and balanced solution to the unique issues raised by the trading of fungible crypto assets in non-fundraising transactions.*

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

# THE INELUCTABLE MODALITY OF SECURITIES LAW: WHY FUNGIBLE CRYPTO ASSETS ARE NOT SECURITIES

LEWIS RINAUDO COHEN*
GREGORY STRONG**
FREEMAN LEWIN***
SARAH CHEN****

*We waited the whole morning and made the best of it, watching the seals come up in hundreds to bask upon the seashore, till at noon the old man of the sea came up too, and when he had found his fat seals he went over them and counted them. We were among the first he counted, and he never suspected any guile, but laid himself down to sleep as soon as he had done counting. Then we rushed upon him with a shout and seized him; on which he began at once with his old tricks, and changed himself first into a lion with a great mane; then all of a sudden he became a dragon, a leopard, a wild boar; the next moment he was running water, and then again directly he was a tree, but we stuck to him and never lost hold, till at last the cunning old creature became distressed, and said, 'Which of the gods was it, Son of Atreus, that hatched this plot with you for snaring me and seizing me against my will? What do you want?'*

Homer, *The Odyssey*, Book IV.

\* Lewis Rinaudo Cohen is a graduate of the Benjamin N. Cardozo School of Law and co-founder of DLx Law, a law firm focusing on clients engaged in the use of crypto assets and blockchain technology. Mr. Cohen dedicates this Article to the loving memory of his father, Sydney Wolfe Cohen, 1927-2022.
\*\* Gregory Strong is a graduate of Temple University Beasley School of Law and a Partner at DLx Law where he focuses on advising entities on legal issues associated with the adoption of blockchain technology.
\*\*\* Freeman Lewin is a graduate of Benjamin N. Cardozo School of Law and a Lawyer at DLx Law where he focuses his practice on transactions involving the use of crypto assets and blockchain technology.
\*\*\*\* Sarah Chen is a graduate of Columbia Law School and a Lawyer at DLx Law where she advises clients on corporate, securities and financial regulatory matters relating to the use of crypto assets and blockchain technology.
The authors collectively wish to thank David M. Adlerstein, Olta Andoni, Angela Angelovska-Wilson, Marc Boiron, Bradley Bourque, Carmen Brugman, Claire Cohen, Patrick Daugherty, Alexander Drylewski, Erin Engelmann, Brandon Ferrick, Coy Garrison, Jason Gottlieb, Yuliya Guseva, Jed Halfon, Joseph Hall, Eric Hess, Miles Jennings, Kayla Joyce, David Kerr, Joshua Klayman, Gregory Lisa, TuongVy Le, Jill Lewin, Nada Ljubinovic, Jai Massari, Tom Momberg, Charles W. Mooney, Jr., John Pullman, Ron Quaranta, Mark Radcliffe, Donna Redel, Rebecca Rettig, Gabriel D. Rosenberg, Kayvan Sadeghi, Lee Schneider, Rodrigo Seira, Gabriel Shapiro, Ori Shimony, Colleen Sullivan, Andrea Tinianow, Stephen Wink, Eamon Wizner and Gregory E. Xethalis for their invaluable contributions to this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The subject of the applicability of federal securities law to crypto assets[1] has received extensive coverage from regulators,[2] academics,[3] practitioners[4] and others.[5]  Historically, much of this attention focused on transactions referred to as initial coin offerings (also known as ICOs).[6]  ICOs, which reached their zenith in 2018 and then, within the U.S. at least, largely disappeared from sight, are a type of fundraising transaction in which blockchain-based crypto assets are sold to investors, usually to raise funds intended to develop or promote a new technology platform, constructed around a finite or provably scarce number of fungible crypto assets.[7]

---

[1] Throughout this Article, we use the term "crypto asset" to refer to an asset that is uniquely identifiable through the use of cryptography and blockchain technology.  In various places, the term "token" is also used to refer to a crypto asset that conforms to a certain industry standard, such as ERC-20.  *See* Section I.B. *infra*.

[2] *See, e.g.,* William Hinman, Director, Division of Corporation Finance, U.S. Securities and Exchange Commission (the "SEC" or the "Commission"), Remarks at the Yahoo Finance All Markets Summit: Crypto (entitled "Digital Asset Transactions: When Howey Met Gary (Plastic)" (June 14, 2018) (the "Hinman Speech"), available at https://www.sec.gov/news/speech/speech-hinman-061418; *see also, Framework for "Investment Contract" Analysis of Digital Assets*, SEC Division of Corporation Finance (Apr. 3, 2019), available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (the "SEC Token Framework").

[3] *See, e.g.,* Primavera De Filippi & Aaron Wright, *Blockchain and the Law: The Rule of Code* (2018).

[4] *See, e.g.,* Joseph Hall and Jai Massari, *Regulating Crypto Shouldn't Hinge on Securities Status*, Law360 March 17, 2022, available at, https://www.law360.com/articles/1474636/regulating-crypto-shouldn-t-hinge-on-securities-status; *see also,* Gabriel Shapiro, *S.E.C. v. Telegram—Three Deeper Takeaways*, Medium (May 21, 2020), available at https://lex-node.medium.com/sec-v-telegram-three-deeper-takeaways-423b197f76d6.

[5] *See, e.g.,* Anna Baydakova, *Digital Chamber Asks Court to Draw Line Between Investment Contracts and Assets in Telegram Case*, CoinDesk (Jan. 22, 2020), https://www.coindesk.com/policy/2020/01/22/digital-chamber-asks-court-to-draw-line-between-investment-contracts-and-assets-in-telegram-case/.

[6] For these purposes, we also include within the term "ICO" arrangements in which a centralized crypto asset marketplace is used to facilitate a distribution of crypto assets (sometimes referred to as an "initial exchange offering" or "IEO") or where a "decentralized exchange is used for the same purpose (sometimes referred to as an "initial decentralized exchange offering" or "IDO").  More recently, some similar arrangements have been referred to as "initial farm offerings" or "IFOs", which may also have characteristics of ICOs, IEOs or IDOs.  Although most of these transactions are no longer made in the style and format of 2018-era ICOs, few of the platforms used effectively block U.S. persons able to master the minimal technology skills required to utilize the services of a virtual private network (known as VPN).

[7] This Article focuses primarily on fungible crypto assets created substantially all at one time using blockchain technology (usually referred to as a "pre-mine") and intended to be a functional part of a "decentralized" protocol of automated code that responds deterministically to validly formatted instructions (such protocols are referred to herein as a "project").  These are the crypto assets, like ether ("ether") that are most widely traded and discussed and are the assets that can be found listed among the "Top 100" crypto assets on sites like coinmarketcap.com and coingecko.com.  Separately, there is also increasing interest in crypto assets commonly known as "stablecoins" (*see infra* note [89] and accompanying text)—digital assets whose value is generally directly or indirectly pegged to a major fiat currency, some of which have indicia of money markets instruments or other types of securities—and non-fungible crypto assets (often referred to as "non-fungible tokens" or "NFTs") which can be very fluid in form and exhibit a range of characteristics.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The nature of ICOs and their brief, wild run of popularity for fundraising in the U.S. has obscured a critical distinction between the status of a crypto asset sold in the transaction under federal securities law[8], on one hand, and the status of the fundraising transaction of which that crypto asset was a part, on the other. Thus, we see regulators,[9] commentators[10] and private litigants[11] alike asserting that the subject crypto assets are themselves securities, at least temporarily.

Commentators considering crypto assets and federal securities law[12] have generally recognized[13] that most crypto assets do not fall directly within one of the enumerated categories in the definition of the term "security" in either the Securities Act of 1933, as amended (the "Securities Act")[14] or the Securities Exchange Act of 1934, as amended

---

Although there are cases where the issues discussed herein can also apply to stablecoins or NFTs, unless specifically identified, references to "crypto assets" or "tokens" herein should be read to apply to fungible, provably scarce blockchain-based crypto assets not purporting to have an intrinsic fiat money value. Finally, the original and most popular crypto asset, bitcoin, along with a small number of largely derivative crypto assets like litecoin, are generally not discussed as "securities" and outside the scope of this Article.

[8] This Article is generally limited to the application of the U.S. federal securities laws to crypto assets and transactions in these assets. Although state securities laws (generally known as "Blue Sky laws") are also relevant to transactions in crypto assets, a thorough consideration of the similarities and differences between these laws and the federal securities laws is beyond the scope of this Article.

[9] *See, e.g.*, SEC Chair Gary Gensler, Speech: "Kennedy and Crypto", September 8, 2022, available at https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ("Of the nearly 10,000 tokens in the crypto market, I believe the vast majority are securities" (footnote omitted)) ("Kennedy and Crypto").

[10] *See, e.g.*, Thomas L. Hazen, *Tulips, Oranges, Worms, and Coins – Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & Tech. 493 (2019) ("This article concludes that under most, if not all, circumstances, crypto currencies are likely to be securities.")

[11] *See, e.g.,* Complaint*, Risley v. Universal Navigation Inc. et al.,* 1:22-cv-02780-KPF (S.D.N.Y.) ("Risley") ("From April 5, 2021 through the present…Uniswap has offered and sold unregistered securities, including EthereumMax, Bezoge Earth, Matrix Samurai, Alphawolf Finance, Rocket Bunny, and BoomBaby.io…throughout the United States on its Exchange, without registering as a national securities exchange or as a broker-dealer, and without there being any registration statements in effect for the Tokens it was selling, all in violation of applicable law.")

[12] There has already been extensive legal scholarship on securities laws and crypto assets, including: Shaanan Cohney *et al*., *Coin-Operated Capitalism*, 119 Colum. L. Rev. 591 (2019); Carol R. Goforth, *Cinderella's Slipper: A Better Approach to Regulating Cryptoassets as Securities*, 17 Hastings Bus. L.J. 271 (2021); Yuliya Guseva, *A Conceptual Framework for Digital-Asset Securities: Tokens and Coins as Debt and Equity*, 80 Md. L. Rev. 166 (2021); Thomas L. Hazen, *Tulips, Oranges, Worms, and Coins -- Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & Tech. 493 (2019); Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis*, 22 Stan. Tech. L. Rev. 52 (2019) ("ICOs to Security Tokens"); James J. Park and Howard H. Park, *Regulation by Selective Enforcement: The SEC and Initial Coin Offerings*, 61 Wash. U. J. L. & Pol'y 99 (2020); and Usha Rodrigues, *Semi-Public Offerings?  Pushing the Boundaries of Securities Law* (2018) ("Semi-Public Offerings"); however, throughout all of this and other scholarship on securities law and crypto assets, much less focus has been placed on the particular characteristics of, and unique issues arising from, secondary transactions in these assets, as discussed in this Article.

[13] *See, e.g*., ICOs to Security Tokens and Semi-Public Offerings, *supra* note [12] (both applying the concept of "investment contract" to their analysis of ICOs and crypto assets).

[14] 15 U.S. Code § 77a et seq.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

(the "Exchange Act")[15] and, collectively with the Securities Act, the "Securities Acts").[16]   Instead, they have trained their focus on the

---

[15] 15 U.S. Code § 78a et seq.

[16] The Securities Act defines "security" as follows:

> (a)   When used in this title, unless the context otherwise requires-
> (1)   The term ''security'' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a ''security'', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

Securities Act § 2(1), 15 U.S.C. § 77b(a)(1).

Alternatively, the Exchange Act defines "security" as follows:

> (a)   When used in this title, unless the context otherwise requires-
> (10) the term "security" means any note, stock, treasury stock, security future, security-based swap, bond debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a ''security''; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

Securities Exchange Act of 1934 §3(a)(10), 15 U.S.C. §78(c)(a)(10).

Although the statutory definition of a security differs slightly between the Securities Act and the Exchange Act, courts generally recognize them as being functionally equivalent. *See, e.g.*, *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 847 (1974) ("Forman") (noting that the definitions of "security" in the Securities Act and Exchange Act are "virtually identical and, for present purposes, coverage of two Acts may be considered the same"). The most notable difference in the definition of the term "security" for purposes of the federal securities laws can be found in the Investment Company Act of 1940 (15 U.S.C. § 80a *et seq*.) which scopes in a much broader range of instruments within its ambit, including accounts receivable and commercial loans. However, because all of these exhibit

5

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

applicability of one of the statutory catch-all categories found in both Acts: "investment contract".[17]  This has led many to ask: "Is this crypto asset an investment contract?".  As we demonstrate below, this flawed question has resulted in significant confusion as to how federal securities law applies to crypto assets, resulting in inevitably flawed outcomes.[18]

This Article provides a robust examination of crypto assets under the Securities Acts, focusing on the regulatory framework applicable to the exchange of these assets in true secondary[19] transactions.  The correct analytical approach asks whether a given *contract, transaction, or scheme* involving the purchase or sale of a crypto asset would be considered an investment contract transaction—taking into account the full judicially-mandated definition of an "investment contract" as set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co*.[20]  This definition, in a case famously dealing with a sale of land parcels used as orange groves, known

---

[17] the same characteristics (*i.e.*, the necessity of a clear legal relationship between an "issuer" and an owner of the "security") as the somewhat narrower set found in the definition in the Securities Acts, we do not need to address that definition here.

[17] Where a crypto asset is intended by the seller to constitute a "security" of another type enumerated in the Securities Act or the Exchange Act (such as shares of stock or other identified equity interests, a bond, a voting-trust certificate, or a fractional undivided interest in oil, gas, or other mineral rights), that crypto asset is generally referred to as a "security token" and is outside the scope of this Article as the securities law status of the crypto asset is not in dispute.  In addition, depending on their design and features, stablecoins may raise additional issues that are also beyond the scope of this Article.  Likewise, if a crypto asset were to be "commonly known as a security" by users of the asset in the marketplace, other considerations would apply; however, to our knowledge, this is not currently the case with most crypto assets.  Finally, there are a limited number of cases that involve an instrument that is not one of the enumerated types of "securities" in the Securities Acts, but which would, but for the name given to the instrument or inconsequential features, be considered a "security".  We refer to these instruments as "securities equivalents" (*see infra* text at note [131])  Nevertheless, we recognize that because the definition of the term "security" is principles based, some case-by-case examination will always be required; the goal of this Article is to set out a framework for considering the federal securities law status of most fungible crypto assets, with a particular focus on when these assets are sold in secondary transactions.

[18] The conclusion that most crypto assets are *not* properly characterized as securities under current law should not be read to suggest that the authors believe that those who fundraise through sales of crypto assets and companies that are operators of marketplaces for secondary transactions in crypto assets should be free from disclosure obligations and regulatory oversight.  To the contrary, the authors support the implementation of a strong but appropriate regulatory framework – *see* Section [V.B], *infra*.

[19] We consider most sales of crypto assets by affiliates and persons acting, or deemed to be acting, as an agent of the person or entity that created the crypto asset as equivalent to a sale by the asset creator themselves.  References herein to "secondary" transactions in crypto assets refer to transactions in these assets by persons other than the person or entity that created the crypto asset, by affiliates of that person or entity, or by persons acting, or deemed to be acting, as an agent of that person or entity.  *See* discussion of the *Telegram* case, Section [III.C.1] *infra*.

[20] *S.E.C. v. W.J. Howey Co*., 328 U.S. 293 (1946) ("Howey").  Because Congress chose not to define the term "investment contract" in either the Securities Act or the Exchange Act, it was left to the courts to define the parameters of this term.  In *Howey*, the Supreme Court first articulated the test used to determine whether an investment contact is present.  Although this standard has been subject to considerable interpretation since 1946, its basic elements continue to be applied to this day.

6

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

as the *Howey* test", looks to whether the "circumstances"[21] of a given contract, transaction or scheme involves: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely from the efforts of the promoter or a third party.[22] Treating most crypto assets as securities without examining whether the circumstances in which these assets are offered or sold create investment contract transactions is not supported by current law.[23]

To better understand the correct application of federal securities law to crypto assets we will focus on first principles. Under federal securities law, the proper status of crypto assets themselves, as well as transactions in crypto assets, can only be ascertained, *first*, through an understanding of what, exactly, a crypto asset is and *then*, by applying this understanding to the extensive case law and legal scholarship on investment contract transactions.

Accordingly, we begin by examining crypto assets in some detail, both in terms of the technology used to create them and the legal rights, if any, that flow from them. This description takes into account the authors' direct experience advising a wide range of market participants about activities involving the use of crypto assets. We then examine relevant case law and legal scholarship in detail, concluding that that most crypto assets are not securities under the Securities Acts. Our conclusions are based on an analysis of 266 relevant federal appellate and Supreme Court

---

[21] *Id*. at p. 297. Justice Frankfurter's dissent adds further gloss on the majority's use of the term "circumstances": "'Investment contract' is not a term of art; it is conception dependent upon the circumstances of a particular situation." *Id*. at p. 301 (Frankfurter, J., dissenting). Later cases interpreting the term "investment contract" have repeatedly emphasized that the evaluation must be made based on all of the "facts and circumstances" of the transaction. *See, e.g., Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973) (considering the written agreement that governed the relationship at issue as well as the "facts and circumstances surrounding the agreement"); *Vincent et al. v. Moench, et al.,* 473 F.2d 430, 435 (10th Cir. 1973) (noting that "[w]hether a particular investment is a security depends upon the facts and circumstances of the case."); *Goodman v. Epstein*, 582 F.2d 388, 406 (7th Cir. 1978) ("…the existence or non-existence of an "investment contract" must be determined from the actual facts and circumstances of the investment arrangement and not from the existence or non-existence of a 'stock certificate' alone.").

[22] The last prong of the *Howey* test is generally regarded as having been modified by subsequent case law to require an expectation of profits derived from the essential entrepreneurial or managerial efforts of others. *See S.E.C. v. Glenn W. Turner Enter., Inc*., 474 F.2d 476, 482 (9th Cir. 1973), *cert. denied*, 414 U.S. 821 (1973), although it should be noted that while the Supreme Court acknowledged this position in footnote 16 of *Forman*, 421 U.S. 852 n. 16, (1975), it expressed no view in that respect, nor has it ever unequivocally adopted the position. The application of the law on investment contracts to crypto assets is made all the more challenging because it is based on constantly evolving judge-made rules around the definition and the inclusiveness of the term "investment contract", making it one of the most complex subjects in the field of securities law and itself the subject of extensive legal scholarship long before the advent of crypto assets. *See, e.g*., Rodney L. Moore, *Defining an Investment Contract: The Commonality Requirement of the Howey Test*, 43 WASH. & LEE L. REV. 1057 (1986).

[23] As will be seen in Section I.A., *infra*, whether dealing with crypto assets within scope of this Article (*see, supra,* note [17]), *Howey's* orange groves, or seeds for an entirely new type of fruit with characteristics more similar to those exhibited by crypto assets, none of these items are themselves securities.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

decisions[24] which considered whether a particular contract, transaction, or scheme should be deemed to constitute an investment contract transaction. A discussion and statistical analysis of these cases can be found in Annex A. Schedules 1 through 3 break out the relevant decisions based on whether the court found an investment contract to be present (Schedule 1), whether no investment contract was found to be present (or the decision was superseded by statute) (Schedule 2), or, generally, whether the court reversed, remanded, found a security, or determined that the question at issue related to the status of a "note" (Schedule 3). As an additional resource, Schedule 4 lists notable early "investment contract" decisions, state court decisions, and decisions discussing the applicability of securities laws to crypto assets and not otherwise discussed in this Article. For the convenience of readers, Schedule 5 sets out the complete list of cases reviewed in alphabetical order. We also reviewed substantially all of what we considered the most relevant legal scholarship on the topic of investment contracts and the definition of the term "security", a bibliography of which is contained in Annex B. The authors are not aware of any other equivalent comprehensive analysis in the published academic scholarship on this topic.

This is not to say that federal securities law has no role in providing investor protection in transactions involving crypto assets. Indeed, for the reasons frequently articulated by the staff and Commissioners of the SEC, we concur that many, if not most, ICOs and similar fundraising sales of crypto assets comfortably fit the mold of "contracts, transactions or schemes" that constitute investment contract transactions (and thus securities transactions).[25] There have been a variety of proposals to address concerns with fundraising sales of crypto assets as a practical means for sponsors of crypto asset-based projects intended not to be bound to a group of traditional equity investors to raise funds from the general public.[26] The most notable and well-developed of these is the Safe Harbor 2.0 proposal made by SEC Commissioner Hester Peirce.[27]

---

[24] Both Circuit Court and Supreme Court decisions were considered. To the best of the authors' knowledge, this constitutes a complete set of all relevant appellate decisions to date examining whether an investment contract was present in the matter before the relevant court. Those cases in which the concept of "investment contracts" arose tangentially, but was not relevant to the court's conclusions, are not cited (but nonetheless were reviewed).

[25] This will be the case regardless of whether the offers and sales are made by the legal entity seeking to raise funds or by other entities found effectively to be acting as agents of, or in concert with, the fundraising entity. *See, e.g.*, *S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ("Telegram").

[26] In the authors' experience, presently, substantially all fundraising sales of crypto assets conducted within the United States occur in transactions with accredited investors that qualify for the exemption from registration contained in Section 4(a)(2) of the Securities Act.

[27] *See* Hester Peirce, "Token Safe Harbor Proposal 2.0" (April 13, 2021), available at https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0. *See also*, LeXpunK Army, "Reg-X-Proposal-An-Exempt-Offering-Framework-for-

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The question we are interested in here, however, is not the regulatory treatment of these fundraising transactions, which is reasonably clear.  Rather, what concerns us is the applicability of federal securities law to the crypto assets themselves.[28]  Despite frequent incantations to the contrary by regulators[29] (and periodic obfuscations by defendants in these suits), the Securities Acts apply to transactions involving crypto assets *only* if: (i) the offer or sale of the crypto asset constituted or was part of an identifiable investment contract transaction meeting the four prongs of the *Howey* test at the time that the transaction occurred or (ii) the crypto asset itself constituted some type of security independent of the circumstances of the transaction in which it is sold.

The appropriate application of the Securities Acts thus encompasses the types of fundraising activities those laws were intended to address as well as those crypto assets that have the character of a security.  At the same time, this application inherently avoids much of the unnecessary confusion regarding the status of crypto assets themselves in secondary transactions and custodial situations that has arisen from the varied approaches taken by regulators in enforcement actions thus far.[30]

Unfortunately, the relatively clear two-part analytic path we set out in the penultimate paragraph above has so far not been pursued by regulators or the private plaintiff's bar.  Instead, three different approaches have been taken in securities law-based enforcement actions and private litigation involving crypto assets.  First, some statements made by the SEC suggest that the Commission may in fact take position set out in our prong

---

Token-Issuances" available at https://github.com/LeXpunK-Army/Reg-X-Proposal-An-Exempt-Offering-Framework-for-Token-Issuances.

[28] This distinction generally arises (i) in *non-fundraising transactions* involving crypto assets, such as those taking place on crypto asset marketplaces or facilitated by dealers or other intermediaries between parties other than the person or entity raising funds to develop the project to which the asset relates (or those acting on their behalf) and (ii) *custodial relationships* involving third parties holding crypto assets on behalf of others.  We consider most sales of crypto assets by affiliates and persons acting, or deemed to be acting, as an agent of the person or entity that created the crypto asset as equivalent to a sale by the asset creator themselves.  References in this Article to "secondary" transactions in crypto assets refer to transactions in these assets by persons other than the person or entity that created the crypto asset, by affiliates of that person or entity, or by persons acting, or deemed to be acting, as an agent of that person or entity.  *See* discussion of the *Telegram* case Section [III.C.1] *infra*.

[29] *See, e.g.,* Gary Gensler, SEC Chair, *Kennedy and Crypto, supra* note [9]; Prepared Remarks at the Penn Law Capital Markets Association Annual Conference (April 4, 2022) ("My predecessor Jay Clayton said it, and I will reiterate it: Without prejudging any one token, most crypto tokens are investment contracts under the *Howey* Test."); and Gurbir Grewal, Director of the Division of Enforcement, SEC, "2021 Regulation Outside the United States, Scott Friestad Memorial Keynote Address" (Nov. 8, 2021), available at: https://www.sec.gov/news/speech/grewal-regulation-outside-united-states-110821 (stating that "[t]he threshold issue in each of [the enforcement] cases is whether the crypto asset or token is a security, and therefore subject to the registration and disclosure requirements of the federal securities laws.").

[30] The failure by regulators to articulate a clear and consistent doctrine that underlies these approaches has also resulted in significant "coattail" private litigation in which putative class action lawsuits have been brought against companies developing blockchain technology by plaintiffs mimicking SEC statements.  *See, e.g., Risley, supra* note [11]).

9

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"(i)" above and agree that a separate examination of the circumstances of each transaction is required whenever crypto assets are exchanged between a buyer and a seller to see if all four elements of the *Howey* test have been met *in that transaction*.[31]  However, because of the particular enforcement circumstances in which this position has been taken, we have not yet seen the SEC's complete analysis of how this approach should be applied to other real-world situations that market participants may encounter.  For example, while relatively straightforward when applied to fundraising sales of crypto assets (at least as far as *Howey* analyses go), in the context of secondary transactions, this approach necessitates a dispositive determination that all four *Howey* prongs were met *at the particular time the relevant secondary transaction takes place*.[32]

Second, on other occasions, we see fungible crypto assets referred to simply as "securities" without any further modification or clarification.[33]  In these cases, the Commission's position appears to be that, once sold in an unregistered investment contract transaction in violation of Section 5 of the Securities Act, the crypto asset itself *becomes* a security such that any subsequent transfer of the crypto asset will also be a securities transaction, irrespective of the circumstances of that transaction or future circumstances.[34]

Apparently cognizant of analytic challenges both alternatives present, in at least one court filing the SEC combined these two ideas into a novel hypothesis: if a crypto asset is initially sold in an ICO or other investment contract transaction then, *so long as the original investment scheme is ongoing*, the crypto asset represents or "embodies" that investment scheme.[35]  This third approach, which we refer to as the

---

[31] *See, e.g.*, Complaint, *S.E.C. v. Ishan Wahi, Nikhil Wahi, and Sameer Ramani* (the "Wahi Complaint") at para. 94 ("These hallmarks of the definition of a security continue to be true for the nine crypto asset securities that are the subject of the trading in this complaint, including continuing representations by issuers and their management teams regarding the investment value of the tokens, the managerial efforts that contribute to the tokens' value, and the availability of secondary markets for trading the tokens.  *Thus, at all times relevant to the conduct alleged in this complaint*, a reasonable investor in the nine crypto asset securities would continue to look to the efforts of the issuer and its promoters, including their future efforts, to increase the value of their investment."). (Emphasis added.)

[32] *See, infra,* Section IV for a discussion of this idea.

[33] *See, e.g.*, *In the Matter of Poloniex, LLC*, Exchange Act Release No. 92607, August 9, 2021, at p. 1 ("Poloniex operated a digital asset trading platform (the 'Poloniex Trading Platform') that meets the definition of an 'exchange' under the federal securities laws.  The Poloniex Trading Platform displayed a limit order book that matched the orders of multiple buyers and sellers in digital assets, including digital assets that were investment contracts under *S.E.C. v. W.J. Howey Co*. … and therefore securities …" (citation omitted).

[34] We refer to this as the "original sin" theory inasmuch as it posits that a flaw in the manner in which the asset is initially distributed will continue to impact the characterization of the asset for all time.  The main benefit of this approach is that it at least provides a type of unwelcomed certainty.

[35] Pl. Mem. of Law in Opp'n to Mot. to Intervene at 24, *S.E.C. v. Ripple Labs, Inc*. (20 CIV. 10832 (AT)(SN)) (May 3, 2021), where the Commission acknowledged that the purported security in the case is not "simply" the crypto asset at issue, known as XRP, and instead asserting that the crypto asset is the "embodiment" of the facts, circumstances,

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"Embodiment Theory", would effectively treat crypto assets as securities on a temporary basis. That is, the crypto asset is a security, but only for so long as it is deemed to "embody" the original investment scheme. However, this position requires one to accept that, like the mythical Proteus, Homer's "old man of the sea" in *The Odyssey*, a crypto asset can transform, or "morph", out of being a security (and maybe back again) based solely on events extrinsic to the asset itself. This has led to well-intentioned but mistaken efforts on the part of numerous market participants to divine the moment when a crypto asset has "morphed" from a security to a "non-security".[36]

Based upon our review of the relevant case law and legal scholarship, neither treating crypto assets as *permanently* or, under the Embodiment Theory, *temporarily*, securities is supported by current *Howey* jurisprudence. Due to the absence of a legal relationship between

---

promises, and expectations that constitute the purported investment contract and therefore that the crypto asset *represents* the purported investment contract). Specifically, the Commission explained:

> Movants claim they must intervene to convince the Court that XRP is not "per se" a security. (Movant Br. at 8–9.) But this case presents no such question. "While helpful as a shorthand reference, the security in this case is not *simply* the [XRP], which is little more than alphanumeric cryptographic sequence," Telegram Grp., 448 F. Supp. 3d at 379 (emphasis added), it is all the facts and circumstances surrounding the crypto asset and the manner in which it is offered and sold (including the entirety of the representations Ripple made and purchasers' resulting expectations) that made the offers and sales of XRP the offers and sales of an investment contract. Id. The XRP traded, even in the secondary market, *is the embodiment of those facts, circumstances, promises, and expectations, and today represents that investment contract*. And, incorrectly reframing the inquiry from the legally correct view of what the investment contract is (the XRP's offer and sale in the particular context) to Movants' narrower view (the XRP itself) makes no difference to what Movants really care about—crypto asset trading platforms' listing of XRP. (Latter emphasis added by the authors.)

[36] *See, e.g.*, The National Law Review, "SEC Hints at Path for Digital Assets to Morph Into Non-Securities", August 18, 2022, available at https://www.natlawreview.com/article/sec-hints-path-digital-assets-to-morph-to-non-securities (noting that a statement in an enforcement action brought by the SEC against the sponsors of a digital asset project "… appears to be an admission by the SEC of a belief held by many practitioners in the digital asset industry – that a token that was once a security could, under the right circumstances, cease to be a security at some point in the future"); Robert M. Crea, *et al.*, "Metamorphosis: Digital Assets and the U.S. Securities Laws", June 27, 2018, available at https://www.lexology.com/library/detail.aspx?g=0358e48d-aa15-44d8-9c67-cb6c73b9c85d (quoting Franz Kafka's *The Metamorphosis* to explain the idea that digital assets can "morph" from being a security); Jacqueline Hennelly, "The Cryptic Nature of Crypto Digital Assets Regulations: The Ripple Lawsuit and Why the Industry Needs Regulatory Clarity", 27 Fordham J. Corp. & Fin. L. 259 (2022), available at https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=1508&context=jcfl ("Digital assets may be issued as a security but after time, as the crypto assets are transferred between users and the network decentralizes, they begin to function more like a consumer token."); and Web3 Foundation, "Less Trust, More Truth: Polkadot's Native Token (DOT) Has Morphed and Is Not a Security. It Is Software," November 4, 2022, available at https://medium.com/web3foundation/less-trust-more-truth-polkadots-native-token-dot-has-morphed-and-is-not-a-security-b2a8847a70cc ("Less Trust, More Truth").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

most crypto assets and an identifiable legal entity or individual, adoption of either approach would require the creation of a completely new concept under federal securities law: what we refer to as "issuer-independent" securities.   In addition, without more, marketplace-based secondary transfers of these assets do not create investment contract transactions.

Rather, under current jurisprudence, the majority of crypto assets are neither inherently and ineluctably securities themselves nor the transferrable "embodiment" of an investment scheme in any cognizable sense.[37]   Moreover, we argue that, even taking into account the broad remedial purposes of the Securities Acts, the Embodiment Theory would be neither an appropriate nor an effective extension or modernization of that jurisprudence as a matter of public policy.   Because the Embodiment Theory of necessity considers that the embodied scheme can both cease (at which point there is no longer a scheme for the crypto asset to embody) and re-commence (which would presumably "flip" the crypto asset back into being the embodiment of the scheme again), all "circumstances" relevant to determining the presence or absence of an investment scheme would need to be available for all market participants to evaluate at all times.   Yet, at any given time, all of the "circumstances" relevant to a full determination of the matter under the *Howey* case law will likely be *not* generally known (and, more importantly, likely will be unknowable) to the general public – neither crypto asset users nor market participants currently[38] have a way to require sponsors of projects to disclose to them the type of private information essential to determining whether an investment contract transaction occurred.   This is not an issue in primary transactions where the parties are dealing directly with each other.

---

[37] An alternative position is that fungible crypto assets should be characterized as commodities (that are not securities) under the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. (the "CEA").  Section 1(a)(9) of the CEA defines the term "commodity" as follows:

(a)   As used in this chapter:
  (9)   The term The term "commodity" means wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in.

However, whether fungible crypto assets should properly be considered "commodities" under the CEA is a separate and complex question and one that is beyond the scope of this Article.
[38] *See*, *infra*, Section V.B. for a discussion of how legislation pending in Congress would address this gap.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

However, in secondary transactions, without access to this private information, market participants would be left to guess whether under the Embodiment Theory a given token does, or does not, "embody" an investment scheme at a particular time.  Given that the Securities Acts provide for strict liability for violations of various provisions, this is simply an unacceptable result.

Nevertheless, regulators,[39] policymakers,[40] and commentators[41] have articulated legitimate and unaddressed policy concerns regarding the use and ownership of crypto assets.  A particular concern has been the potential for information asymmetries in transactions involving crypto assets.[42]  These can arise between the entities sponsoring and developing crypto asset-based projects (or their personnel),[43] who may have privileged access to non-public information about the project,[44] and everyday holders

---

[39] *See, e.g.*, SEC Division of Examinations, "Risk Alert: The Division of Examinations' Continued Focus on Digital Asset Securities", February 26, 2021, available at https://www.sec.gov/files/digital-assets-risk-alert.pdf ("a number of activities related to the offer, sale, and trading of crypto assets1 that are securities … present unique risks to investors").

[40] Most notably, in March 2022 the Biden Administration issued an Executive Order entitled "Ensuring Responsible Development of Digital Assets" establishing a "whole-of-government" approach to addressing the risks and harnessing the potential benefits of crypto assets and their underlying technology. *See*, Exec. Order No. 14067, 87, Fed. Reg. 14143, 14143 (Mar. 9, 2022).  The Fact Sheet announcing the results of various fact findings from the Executive Order on September 16, 2022, stated that "[d]igital assets pose meaningful risks for consumers, investors, and businesses.  Prices of these assets can be highly volatile … [;] sellers commonly mislead consumers about crypto assets' features and expected returns, and non-compliance with applicable laws and regulations remains widespread."  *See* "Fact Sheet: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets" available at https://www.whitehouse.gov/briefing-room/statements-releases/2022/09/16/fact-sheet-white-house-releases-first-ever-comprehensive-framework-for-responsible-development-of-digital-assets.

[41] *See, e.g.*, KPMG, "Assessing Crypto and Digital Asset Risks – Actions Amidst Evolving Regulation",     updated     May     2022,     available     at https://advisory.kpmg.us/content/dam/advisory/en/pdfs/2022/assessing-crypto-and-digital-asset-risks.pdf (noting risks including cybersecurity and systems failure; compliance with regulatory obligations, including risk management and AML/CFT programs; customer due diligence (KYC); tax implications; macroprudential economic risk and financial stability; and resource and energy consumption).

[42] *See, e.g.*, Moran Ofir and Ido Sadeh, "ICO vs. IPO: Empirical Findings, Information Asymmetry, and the Appropriate Regulatory Framework", 53 Vanderbilt Law Review 525 (2021), available at: https://scholarship.law.vanderbilt.edu/vjtl/vol53/iss2/3 (finding that a high degree of information asymmetry exists in ICOs, identifying sources of these asymmetries, and discussing the role of signaling theory and rating websites in mitigating these asymmetries); and Joyce Shen, "Information Asymmetry in Crypto", Medium, August 2, 2022, available at https://medium.com/@joycejshen/information-asymmetry-in-crypto-58c6a0b5fb9f (noting that one of the biggest problems of the crypto/crypto asset industry is information asymmetry).

[43] These persons are referred to as "Active Participants" by the SEC.  *See* SEC Token Framework, *supra* note [2].

[44] Although the underlying code base of crypto asset-based projects is almost always made publicly available for scrutiny by interested persons on websites like GitHub (www.github.com) and all activity on the platform created by the project is likewise available through a separate "block explorer" program like Etherscan (https://etherscan.io/) that provides user-friendly access to transaction data stored on a blockchain network, many

13

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

or users of the relevant crypto asset,[45] including persons who acquired the asset, especially those who acquired the asset with investment intent.[46] These information asymmetries can lead to manipulative or exploitive trading of the relevant assets by those who benefit from this information, at the expense of those who do not. These information gaps are also breeding grounds for "rug pull" scams.[47]

In addition, legitimate concerns have also been raised about "spoofing", "wash trading", "pump and dump" schemes[48] and a wide variety of other potentially manipulative practices by parties conducting secondary trading in crypto asset marketplaces that are not generally subject to comprehensive federal regulation. Outright Ponzi schemes and other more garden-variety fraud are also frequently seen.[49] Hacking intrusions, "exploits" of smart contract code (*i.e.*, permitted use of the code in ways that were, ostensibly at least, not intended by the code's developers),[50] and protocol design failures[51] are also matters of concern.

---

project companies employ large teams of software developers, community managers and partnership coordinators whose non-public managerial efforts can play an important role in the success of the project (and thus the value of the related crypto asset).

[45] Even in the absence of traditional information asymmetries, project teams may have a much higher level of technological sophistication relative to day-to-day users of, or investors in, these assets and their related smart contracts, which may limit these users' practical ability to effectively understand the software code or nuances that may exist therein and leave these users potentially vulnerable to exploitation.

[46] It is important to recall that any asset, whether real estate, a commodity, a collectable, or some other form of property, can be acquired expressly for investment purposes without triggering a requirement of securities law compliance so long as the entity acting as the seller of the asset to the buyer has not been deemed to have created an "investment contract" between that seller and the buyer under *Howey*. *See* discussion of *Hocking v. Dubois* in Section II.C *infra*.

[47] This scam, which gets its name from the expression "pulling the rug out," is when a fraudster attracts victims to purchase digital assets in a new cryptocurrency project and then disappears before the project or digital asset is completed or even started, leaving investors with a worthless token.

[48] *See, e.g.,* Josh Kamps and Bennett Kleinberg, "To the Moon: Defining and Detecting Cryptocurrency Pump-and-Dumps", Crime Science, Volume 7, Article number: 18 (2018), available at https://crimesciencejournal.biomedcentral.com/articles/10.1186/s40163-018-0093-5 (examining information on pump-and-dump schemes from classical economic literature, synthesizing this with data concerning cryptocurrencies, and proposing criteria that can be used to define and detect a cryptocurrency pump-and-dump scheme).

[49] *See, e.g., Securities and Exchange Commission v. BitConnect, et al.*, No. 1:21-cv-07349 (S.D.N.Y., filed September 1, 2021) and Investor Alert, "Ponzi Schemes Using Virtual Currencies", SEC.gov, available at https://www.sec.gov/files/ia_virtualcurrencies.pdf This fraud is not limited to securities transactions, and other regulatory bodies have engaged as well. Particularly relevant is the Federal Trade Commission (the "FTC"), whose mission includes protecting the public from deceptive or unfair business practices. *See* FTC, "What to Know About Cryptocurrency and Scams", available at https://consumer.ftc.gov/articles/what-know-about-cryptocurrency-and-scams.

[50] *See, e.g.,* Tomio Geron, "Crypto Bridges Are Coming Under Attack", Protocol, July 18, 2022, available at https://www.protocol.com/fintech/crypto-bridge-wormhole-hack (noting that, in one smart-contract-related incident, a security problem in the code of a bridge protocol known as "Wormhole" was exploited resulting in a loss of crypto assets valued at $325 million).

[51] *See, e.g.,* Rob Mannix, "Designed to Fail: Terra and the Limits of Arbitrage", Risk.net, May 22, 2022, available at https://www.risk.net/investing/7949321/designed-to-fail-terra-and-the-limits-of-arbitrage.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Even in the absence of primary or secondary market abuses and technical issues, crypto assets, when purchased for investment purposes, have historically demonstrated a level of volatility associated with new or emerging technologies,[52] such that coherent investor protection is desirable as a policy matter.[53]

Because existing federal regulatory law does not adequately address the issues applicable to the creation, dissemination, and trading of crypto assets that are not securities, rather than attempting to mischaracterize these assets as "issuer-independent" securities through regulation or unlitigated enforcement actions, this gap should be definitively addressed through an act of Congress, complemented by increased engagement by other relevant regulatory bodies, including the FTC, the Commodity Futures Trading Commission (the "CFTC"), the Department of Justice and state attorneys general.[54]

The last section of this Article examines the gaps in the current regulatory framework and discusses the approaches adopted in (i) the Digital Commodities Consumer Protection Act of 2022 (the "DCCPA"),[55] introduced in August 2022 in the Senate Committee on Agriculture, Nutrition, and Forestry by Senators Debbie Stabenow and John Boozman, along with Senators Cory Booker and John Thune, (ii) the Digital Commodity Exchange Act of 2022 (the "DCEA"),[56] introduced in the House Committee on Agriculture by Rep. GT Thompson (for himself and Rep. Ro Khanna, Rep. Darren Soto, and Rep. Thomas Emmer) and (iii) Title III of the Lummis-Gillibrand Responsible Financial Innovation Act (the "RFIA"),[57] introduced by Senators Cynthia Lummis and Kirsten Gillibrand, which the authors believe together provide the basis for a reasonable and balanced solution to the unique issues raised by the trading of crypto assets in secondary transactions.[58]

---

[52] See, e.g., "Healthy Volatility and Its Implications for Crypto Markets", Cryptopedia, June 28, 2022, available at https://www.gemini.com/cryptopedia/volatility-index-crypto-market-price.

[53] The SEC's conservative stance with respect to the holding and trading of crypto assets, frequently a source of friction with proponents of their use, can be better understood when viewed through the lens of the Commission's historic investor protection mandate. See, e.g., Martin Lipton et al., "Wachtell Lipton Discusses Cryptoassets and the SEC's Mandate", available at https://clsbluesky.law.columbia.edu/2022/10/19/wachtell-lipton-discusses-cryptoassets-and-the-secs-mandate/.

[54] We note that the U.S. Department of Justice has effectively used the federal wire fraud statute (18 U.S.C. § 1343), among other enforcement tools, to address a variety of criminal wrongdoing that has occurred in the crypto asset space.

[55] Available at https://www.congress.gov/bill/117th-congress/senate-bill/4760/all-actions?s=1&r=3&overview=closed.

[56] Available at https://www.congress.gov/bill/117th-congress/house-bill/7614/committees.

[57] Available at https://www.congress.gov/bill/117th-congress/senate-bill/4356?s=1&r=8.

[58] Also outside the scope of this Article is the regulatory treatment of the uses of crypto assets. One of the most intriguing and popular of these uses is known as decentralized finance (or DeFi). DeFi is a fascinating field that has already attracted significant academic study (see, e.g., Campbell R. Harvey, Ashwin Ramachandran, and Joseph Santoro, "DeFi and the Future of Finance" (April 5, 2021), available at https://ssrn.com/abstract=3711777).

15

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## TABLE OF CONTENTS

I.   WHAT ARE CRYPTO ASSETS?
     A.   The Parable of the Strowrange Seeds
     B.   Crypto Assets under the Hood
     C.   The Uses of Crypto Assets
     D.   The Exchange and Trading of Crypto Assets
     E.   Crypto Assets as Speculative Investments
     F.   Some Conclusions on Crypto Assets
II.  WHAT ARE INVESTMENT CONTRACTS?  A REVIEW OF
     THE *HOWEY* CASE LAW
     A.   Identifying Investment Contract Transactions
          Using the *Howey* Test
          1.   The Basics of *Howey* and the Critical
               Importance of a Transaction's Facts and
               Circumstances
          2.   Some Examples of Potential Investment
               Contract Transactions
          3.   The Common Element in "Common
               Enterprise"
          4.   Concluding Thoughts
     B.   Investment Schemes and Their "Objects" in
          the *Howey* Case Law
     C.   Secondary Sales under *Howey* and the
          *Hocking* Case
     D.   The Ineluctable Element of a Security: A
          Legal Relationship between an Issuer and an
          Owner
          1.   The Essential Element of a Security – A
               Bundle of Rights Created by an Issuer
          2.   Securities as Instruments
          3.   Application to Crypto Assets
          4.   Conclusion
III. THE SEC'S POSITION ON FUNDRAISING THROUGH THE
     SALE OF CRYPTO ASSETS
     A.   The Early Cases
     B.   The ICO Boom (and Bust)
     C.   *Telegram*, *Kik Interactive*, *Ripple Labs* and
          *LBRY*
          1.   *Telegram Group, Inc*.
          2.   *Kik Interactive, Inc*.
          3.   *Ripple Labs, Inc*.
          4.   *LBRY, Inc*.
          5.   Conclusion

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

IV.  APPLYING *HOWEY* CASE LAW TO SECONDARY
     TRANSACTIONS IN CRYPTO ASSETS AND THE SEC'S
     "EMBODIMENT" THEORY
     A.   "Morphing"
          1.   The "When *Howey* Met *Gary (Plastic)*"
               Speech
          2.   The Response to XRP Holders' Motion
               to Intervene in *SEC v. Ripple Labs, Inc.,
               et al.*
          3.   The Embodiment of Rights under Law
          4.   Conclusion
     B.   The *Wahi* Complaint and the Common
          Enterprise Problem
     C.   Why the Idea of a Security "Morphing" and
          the Embodiment Theory Should Not Be
          Adopted
V.   THE PROBLEM AND A SOLUTION
     A.   The Inadequacy of the Current Regulatory
          Framework for Secondary Markets in Crypto
          Assets
     B.   Legislative Responses
VI.  CONCLUSION

# I.   WHAT ARE CRYPTO ASSETS?

Although blockchain, the technology on which the creation of crypto assets is based, is relatively new, significant legal scholarship on the topic has emerged, including foundational descriptions of how blockchain technologies function.[59]  However, less abundant in the legal literature are a succinct discussions of what a blockchain-based crypto asset is, how these assets are created, and how they are exchanged. Because the creation and use of crypto assets can be misunderstood, we begin instead with a more relatable idea – a story about the development of a new type of fruit.

## A.   The Parable of the Strowrange Seeds[60]

A horticulturalist had an idea for a new type of fruit, which she called the "strowrange" because it combined elements of the strawberry

---

[59] *See, e.g.*, Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4 HASTINGS SCI. & TECH. L. J. 159 (2012).

[60] Like any parable, the story that follows does not map perfectly to the underlying concept which we seek to illustrate – the nature of crypto assets.  Our starting point is the frequently heard observation that "oranges are not securities".  While this statement is unquestionably true in itself, the implied analogy of oranges to crypto assets does not address the most important differences between most "natural" commodities (including oranges) and crypto assets.  Unlike most commodities, crypto assets are almost universally created "artificially"

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

and the orange.  She developed a technology to produce seeds that would grow into strowrange trees, which would bear the wonderful new fruit.  After some effort, the horticulturalist was ready to commercialize her idea, imaging a future world in which the strowrange would be as well-known and well-loved as the banana, the pineapple, or the watermelon – popular in its own right without the need for her support to maintain its place in the pantheon of great fruits.

The horticulturalist founded a new company ("Strowrange Labs LLC", which she usually referred to as just "Labs") and raised $15 million of … seed capital.  In exchange for the funding, the horticulturalist offered each of her early funders equity in Labs along with a warrant agreement for 1 million strowrange seeds, once the seeds were produced.  She told her funders that each seed could produce only one strowrange tree and the strowrange fruit themselves were seedless.  Projections of the possible price of the seeds, once available, were created and discussed.

Since Labs was creating a fixed supply of 1 billion seeds, there would be a fixed supply of stowrange trees.  Labs would informally agree to retain 400 million of these seeds to, as the horticulturalist told the funders in a pre-closing negotiation, "align their interests".  Labs also expected to create value for its equity holders by developing revenue-producing products and services relating to the strowrange fruit.  A further portion of seeds would be reserved for early partners that Labs planned to bring into the effort.  Some additional seeds were earmarked for a separate not-for-profit foundation (to be known as the Strowrange Foundation or just the "Foundation") that would have the sole purposes of supporting the anticipated community of strowrange tree growers, strowrange fruit product producers, and other strowrange aficionados, and promoting the many anticipated benefits of the strowrange fruit.

From a legal perspective, the seed capital fund raise involved a straightforward sale of equity securities by Labs to investors, along with a

_____

by an identifiable person or legal entity in a finite or deterministically limited number, resulting in very different economic characteristics when compared to natural commodities (these characteristics of crypto assets are discussed in detail further below).  In addition, unlike natural commodities, new crypto assets can be created with very little cost or expertise, resulting in a vast multiplicity of marginally distinguishable crypto assets available in the marketplace.  Accordingly, even after crypto assets have been created, significant marketing efforts generally need to be expended to allow potential users to become aware of the crypto asset and its potential uses and the only persons likely to undertake these efforts are those who created the asset and often continue to own significant amounts of the asset.  Unlike oranges though, the strowrange seeds in our parable exhibit both of these key characteristics, which the authors hope will help readers better understand the nature of crypto assets.  However, because strowrange seeds, if real, would exist in the physical world, there are still some important differences between them and crypto assets.  Among the notable differences are that many crypto assets can be "staked" – transferred or delegated to a different address on a blockchain network and locked there in exchange for the later return of more of the same (or another) crypto asset to the original sender.  In addition, unlike strowrange seeds, which once produced do not change their nature, the code governing a smart contract-based protocol may be altered or "upgraded" by a vote of community members in certain circumstances.  While these are fascinating characteristics, they do not fundamentally alter the primary points we seek to illustrate and so, regretfully, we must leave exploration of these and other unique elements of crypto assets to a future article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

warrant that constituted an investment contract. That is, the warrants issued by Labs to its investors comprised an investment of money (the funding the investor provided) in a common enterprise (Labs was pooling the funds raised from all investors and using it to build the business they had all invested in) with an expectation of profit on the part of the investors from the entrepreneurial and managerial efforts of Labs. The investors acquired the warrants from Labs, not because they were in the agriculture business and planned to grow strowrange trees with their seeds but rather because they believed that the horticulturalist and Labs would be successful in making the seeds more valuable. Thus, the horticulturalist and Labs conducted the funding round as a private placement securities transaction.

The project went well and, in due course, the 1 billion strowrange seeds had been created by Labs. As promised in the warrants, Labs delivered 1 million seeds to each of the early investors. Labs also rewarded its early employees with an allocation of seeds. Each seed, when properly planted and cared for in the right climate, could produce a strowrange tree that would bear fruit within 12 to 18 months of planting, but Labs did not inquire whether the employees were able to grow strowrange trees or had any interest in doing so. Ownership of the seeds was based on general principles of property law; broadly speaking, the person in rightful possession of any of the seeds would be considered the owner. In this sense, the seeds could be thought of as bearer-like assets in that the real-life identity of owners was not recorded or tracked anywhere.

Labs also worked hard to promote the strowrange "ecosystem", using funds from the financing to tell the world about the strowrange and create demand for the new fruit. This was no small task. In the early days, before word-of-mouth interest in strowranges spread and the Foundation was able to develop a community interested in the strowrange and its uses, promotion of the strowrange and its uses fell almost entirely on the horticulturalist and her employees at Labs. Any value that the seeds might acquire would clearly have to come from the horticulturalist and Labs' entrepreneurial and managerial efforts.

After some time, it became clear that Labs would need more money to fulfill the promise of the stowrange. Instead of another traditional financing, Labs wanted to sell the product they had developed—the stowrange seeds—directly to the public on a website. This approach, they reasoned, would have the benefit of building demand for the fruit from the ground up, one retail customer at a time, by giving individuals an economic incentive to promote the new fruit and act as "brand ambassadors".

Labs' lawyer advised the horticulturalist that there was real securities law risk in selling stowrange seeds to the public in the United States. The lawyer explained that, if Labs were to sell small numbers of seeds to what Labs liked to call backyard horticulturalists who had the knowledge and practical ability to actually grow strowrange trees and consume the strowranges themselves, then this would likely not be a problem. But if Labs instead sold large numbers of strowrange seeds to

19

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

anyone who came to the website, they would create speculative interest in the seeds, raising money from buyers who shared with Labs an economic interest in price increases in the seeds (which the buyers would inevitably expect were to come from Labs' entrepreneurial and managerial efforts). The risk was especially serious at this early stage because almost no one else knew much about strowranges yet.

Our horticulturalist and the Labs team took this advice seriously and decided not to sell stowrange seeds through their website—at least not to buyers in the United States. According to the lawyer, many other countries did not take the same view of the sale of seeds. Labs thus made stowrange seeds available through their website to customers outside the United States at a price of $0.10 each. Labs did give away small numbers of the seeds to early consumers of strowrange-based products produced by Labs (like strowrange tea). This sparked early demand for these products, even if those first attempts were not particularly enticing in their own right. After a while, seeds also became available for sale through third parties inside the United States as a result of sales of the seeds by the initial investors, who had not been restricted in selling the seeds they had received through their warrants.

All this activity caused interest in the strowrange to grow, even in the highly crowded global fruit market. Soon, both individuals and businesses in the United States wanted to get their hands on strowrange seeds and become part of the phenomenon. Every town seemed to have at least a few strowrange trees growing, taxi drivers were chatting about the strowrange with their passengers, and social media influencers were taking up an interest – there was even a popular Tik-Tok "strowrange dance". The strowrange started to become hip – people wanted to own some strowrange seeds, not to grow strowrange trees (who has time for that!?) but to speculate in the anticipated increase in demand for strowrange products that people had convinced themselves was sure to come.

Meanwhile, Labs continued to be the engine behind the growth in interest in the strowrange, using funds from the sales of their stockpile of strowrange seeds to run ads on broadcasts of major sporting events, signing partnerships with fast food companies, and developing new products, like strowrange-flavored shakes (which everyone seemed to love). The price of a single strowrange seed had skyrocketed up to nearly $5.00.

Labs had become profitable and continued to develop products and services like new stowrange-based foods and special containers to store both stowrange seeds and harvested fruit. Labs was well on its way toward fulfilling its goal of creating an independent strowrange ecosystem – one where there were enough unaffiliated persons interested in the strowrange fruit that Labs itself could became just one of many participants, rather than the sole driving force behind the value of strowrange seeds.

The horticulturalist believed that she was on the cusp of achieving her dream (and along the way becoming fabulously wealthy). But she still harbored a desire to sell some of the many seeds Labs retained directly to

20

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the public in the United States. However, Labs' lawyer noted that despite the good work of the Foundation, the increasing *bona fide* word of mouth engagement about strowranges on social media sites, and overall growing interest in all things strowrange, in the lawyer's judgment the value of strowrange seeds was still highly dependent on the efforts of Labs to continue building interest. Although the seeds would likely retain some value if Labs abandoned the project, it seemed likely that the expectations which had developed around the strowrange might take much longer to manifest (or perhaps interest in the strowrange would just wither away).

As a result, the lawyer continued to explain, fundraising sales of strowrange seeds to the general public in bulk amounts would likely be considered *investment contract transactions,* a type of securities offering. The lawyer laid out the process of conducting a public offering in the U.S. The horticulturalist was mortified – she had no interest in filing a registration statement with the SEC and going through perhaps a year-long process and $1 million or more in expenses to get the registration statement to be effective, as required by Section 5 of the Securities Act (not to mention subjecting herself and Labs to all the stories she heard about the risks of private securities litigation). More confusingly, the lawyer explained, it was possible that the stowrange seeds could themselves be considered securities of Labs, at least according to some statements by the regulator, and Labs could wind up being required to become a public reporting company if there were 2,000 or more U.S. owners of the seeds, or 500 or more non-accredited U.S. owners.

This result struck the horticulturalist as very odd. Weren't seeds of all types sold in markets, stores, in bulk, and to retail all the time in the United States? What had changed? Her lawyer simply shrugged and said, "the law is in a state of flux, and maybe this will be resolved someday. But for now, better that you don't sell your seeds in the United States."

Thus, it is with the imperfect but hopefully enlightening parable of the strowrange in mind that we turn back to our main concern – the nature of digital assets and their use in capital-raising transactions and decentralized protocols.

### B.    Crypto Assets under the Hood

Not all crypto assets are created, stored, or managed in the same way. The Bitcoin blockchain network is designed to perform a single function – it maintains an immutable distributed ledger of unspent transaction outputs (known as "UTXOs"). Other blockchain networks based on Bitcoin technology, including Litecoin, Bitcoin Cash, and Dash, use similar systems.

In these networks, the native crypto assets (*e.g.,* bitcoin in the case of the Bitcoin network) are the UTXOs – simply numbers representing amounts of the relevant crypto asset associated with a public address on the common ledger maintained by all nodes running the agreed-upon core client software. UTXOs are said to be owned by the person who rightfully has the ability to control the UTXO through knowledge of another number,

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

known as a private key, that is associated with a public address on the ledger with a positive balance of UTXOs. Like dollar bills, although UTXOs are generally considered fungible, each UTXO has its own distinct provenance that can be traced deterministically back to what is referred to as the coinbase transaction[61] in which its predecessor UTXO was originally created.

Like the distributed ledger model used by Bitcoin and other single-purpose blockchain networks, the Ethereum network has its own native crypto asset, ether, that follows very similar rules. However, the Ethereum network also enables the Ethereum Virtual Machine (the "EVM"), which can be thought of as a distributed state machine (rather than as a distributed ledger).[62] At any given point in time, the Ethereum network maintains a large data structure which holds not only all accounts and balances, but also the machine state of the EVM, which changes from block to block according to a pre-defined set of rules.

The EVM can execute software code, referred to as smart contracts,[63] which has been deployed to a public address on the network.[64] Unlike with privately owned commercial cloud computing services, like Amazon Web Services, no permissions are needed to deploy smart contract code to the Ethereum network other than the need to pay a "gas" charge denominated in sub-units of ether, known as gwei. In addition, anyone with access to the Internet can examine all code deployed to the Ethereum network as well as the outcome of each state transition occurring in each validated block.

Among other things, smart contract code deployed to the Ethereum network can be used to create an unlimited number of distinct crypto assets, each relating to particular code deployed to the network. Most Ethereum-based fungible crypto assets are created using some form

---

[61] *See* Bitcoin Wiki, "Coinbase", available at https://en.bitcoin.it/wiki/Coinbase. It is indeed from this technical term that the well-known digital asset marketplace takes its name.

[62] For a description of a "state machine", *see* Wikipedia, "Finite-state machine", available at https://en.wikipedia.org/wiki/Finite-state_machine.

[63] "Smart contracts", as used in the context of their applicability to blockchain protocols, can essentially be thought of as small, inert computer programs maintained within blockchain-based protocols. Using information inputs provided by network nodes, smart contracts can be "called" by users of the network to efficiently automate processes and increase outcome certainty. *See* De Filippi, P. & Wray, C. & Sileno, G., "Smart Contracts", Internet Policy Review, 10(2), available at https://doi.org/10.14763/2021.2.1549.

[64] As has been observed many times, the choice of the word "contract" in the term "smart contract" is unfortunate because the code comprising a "smart contract" does not comprise a "contract" in the legal sense any more than such code would if it were maintained on a series of "punch cards" used by mainframe computers in the 1960s and 1970s. *See generally* James Grimmelmann, *All Smart Contracts are Ambiguous*, 2 J.L. & Innovations 1 (2019); Quinn DuPont, *Ledgers and Law in the Blockchain*, King's Review, June 23, 2015, https://www.kingsreview.co.uk/essays/ledgers-and-law-in-the-blockchain; Stuart D. Levi & Alex B. Lipton, *An Introduction to Smart Contracts and Their Potential and Inherent Limitations*, Skadden (May 7, 2018), https://www.skadden.com/insights/publications/2018/05/an-introduction-to-smart-contracts.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of the ERC-20 Token Standard.[65] This standard is used to create smart contract code that will maintain a list of public addresses and corresponding balances of the relevant token associated with those addresses.

When code that creates a new token is deployed to the Ethereum network, that code will provide functionalities allowing users to transfer the tokens (*i.e.*, change numbers of units) from one public address to another in the record maintained by that code, among other actions. Thus, although the relevant smart contract contains a ledger of amounts of crypto asset units, because these amounts are associated only with a public address, crypto assets are said to be pseudonymous. While usually possible with significant effort to associate a public address with a real-world identity, the ability to do this is far from certain and often depends on some level of carelessness on the part of the person who controls the address.

Thus, in a legal sense, ownership of a token on the Ethereum network means only that the owner has the rightful knowledge of the related private key associated with a public address that has a positive balance of the token associated with it in the relevant smart contract. That private key is used to give an instruction to the network of computers maintaining the relevant smart contract to reduce the number of units of the token associated with the owner's public address and increase the number of units associated with another public address in the smart contract (which second address may also be controlled by that same owner).[66]

As a result, these crypto assets are quite distinct from the native tokens of the Bitcoin, Ethereum and other blockchain networks: it is the specific smart contract code that maintains the record of balances and related public addresses, not the overall network protocol code. This means that the crypto asset created by a given smart contract is subject to all of the features, and vulnerabilities, of that code and may behave very differently from other crypto assets maintained on the same network.[67] In

---

[65] *See* "ERC-20 Token Standard", https://ethereum.org/en/developers/docs/standards/tokens/erc-20/ (last visited May 15, 2022).

[66] Similar to the strowrange seeds, this makes tokens effectively "bearer" assets. Although the law may differentiate between persons who have rightful (versus improper) knowledge of a private key that controls one or more tokens, the network nodes that effect a transfer instruction are unaware of the person or entity giving the instruction and whether that instruction is being made either improperly (*i.e.,* by an unauthorized person) or by mistake by the rightful owner. For a detailed discussion of the bearer nature of crypto assets and the implications of their bearer status, *see* Lyn Alden, "Why Gold and Bitcoin are Popular (An Overview of Bearer Assets)", available at https://www.lynalden.com/gold-and-bitcoin/.

[67] Of particular note is that a given smart contract can have an "administration key", a private key that allows a person with knowledge of the key to give instructions to the Ethereum network that would alter parameters of the smart contract. *See infra* text at note [74].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

addition, the amounts of token balances in a given smart contract are truly fungible in that there is no provenance to the balances; they are simply numbers recorded by the relevant smart contract code that move up or down when a valid instruction concerning a balance is provided to the Ethereum network by a user.

Users of the Ethereum network, however, do not control the process of actually changing the state of the EVM (including transferring tokens through instructions to change the balance of an address maintained by the relevant contract).  Only full nodes[68] of the Ethereum network can do this.  To incentivize the operators of network nodes to include a given user's instructions in a block that will change the state of the EVM in a manner desired by the user, the user must pay a transaction fee in ether, thus resulting in the real-world economic value of the token – without it, use of the EVM cannot be paid for.[69]  This effectively results in an open bidding process for network resources in each block, with those willing to pay the highest transaction fee most likely to have their instructions executed in priority to others, something that may have significant value to the user.

Since most crypto assets that have been deemed to be securities are maintained on Ethereum or similar networks,[70] we focus our discussion in this Article on crypto assets or tokens not intended to represent stock, debt or another type of security identified in the Securities Acts' definitions.  As an example of the smart contract code used to create crypto assets on the Ethereum network, *Figure 1* shows an implementation of the ERC-20 token standard, as developed by crypto asset company, ConsenSys:

---

[68] In the Ethereum network, a "node" is any instance of Ethereum client software running on a privately owned or operated computer that is connected to other privately owned or operated computers also running Ethereum software.  A "client" is an implementation of one of any number of distinct open-source software packages (written in distinct computing languages for purposes of resilience) implementing a version of the Ethereum protocol and running on a node that verifies data received by the relevant computer against the protocol rules to keep the network secure.  Currently, Ethereum consists of two parts: an execution layer and a consensus layer.  Both layers are run by different client software.  The execution client listens to new transactions broadcasted in the network, executes them in the EVM, and holds the latest state and database of all current Ethereum data.  (The consensus client implements Ethereum's new proof-of-stake consensus algorithm, which enables the network to achieve agreement based on validated data from the execution client).  *See* Ethereum.org, "What Are Nodes and Clients?", available at https://ethereum.org/en/developers/docs/nodes-and-clients/.

[69] Despite suggestions to the contrary, many other tokens also have some similar tie to the real world, permitting in one way or another direct engagement with a blockchain-based protocol or dApp.  Nevertheless, given the ease with which new tokens can be created, the only "utility" of other tokens is the ability to transfer then control of them from one wallet to another, causing these tokens to resemble digital poker chips.  The absence of real world value of some crypto assets and its impact on the matters covered in this Article is discussed below.  *See infra* text at note [72].

[70] *See, e.g.,* Georgios Dimitropoulos, *The Law of Blockchain*, 95 Wash. L. Rev. 1117 (2020); Lianos, Ioannis *et al.,* Regulating Blockchain: Techno-Social and Legal Challenges, Oxford University Press (2019).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

```
1   /*
2   Implements EIP20 token standard: https://github.com/ethereum/EIPs/blob/master/EIPS/eip-20.md
3   .*/
4
5
6   pragma solidity ^0.4.21;
7
8   import "./EIP20Interface.sol";
9
10
11  contract EIP20 is EIP20Interface {
12
13      uint256 constant private MAX_UINT256 = 2**256 - 1;
14      mapping (address => uint256) public balances;
15      mapping (address => mapping (address => uint256)) public allowed;
16      /*
```

*Figure 1.  ConsenSys ERC-20 Implementation*[71]

This basic implementation, a mere six lines of code, forms the underpinning of many of the world's most prominent crypto asset projects.[72]  For those seeking further customization, *Figure 2* highlights some simple customizations (described in English in the annotations):

```
18      The following variables are OPTIONAL vanities. One does not have to include them.
19      They allow one to customise the token contract & in no way influences the core functionality.
20      Some wallets/interfaces might not even bother to look at this information.
21      */
22      string public name;                  //fancy name: eg Simon Bucks
23      uint8 public decimals;               //How many decimals to show.
24      string public symbol;                //An identifier: eg SBX
25
26      function EIP20(
27          uint256 _initialAmount,
28          string _tokenName,
29          uint8 _decimalUnits,
30          string _tokenSymbol
31      ) public {
32          balances[msg.sender] = _initialAmount;    // Give the creator all initial tokens
33          totalSupply = _initialAmount;             // Update total supply
34          name = _tokenName;                        // Set the name for display purposes
35          decimals = _decimalUnits;                 // Amount of decimals for display purposes
36          symbol = _tokenSymbol;                    // Set the symbol for display purposes
37      }
38
```

*Figure 2.  ConsenSys ERC-20 Implementation.*[73]

Absent a legally enforceable off-chain agreement (which could include terms and conditions on a website, if properly structured), ownership of such a token simply allows the person with knowledge of a private key that controls one or more tokens to be able to control the blockchain-based ledger maintained in the relevant smart contract by giving an instruction that will be recognized as valid to the network of

---

[71] ConsenSys/Tokens/contracts/eip20/EIP20.sol, https://github.com/ConsenSys/Tokens/blob/fdf687c69d998266a95f15216b1955a4965a0a6d/contracts/eip20/EIP20.sol.

[72] Most tokens are either "native" to a particular blockchain protocol itself (such as the ether token is to the Ethereum network, the SOL token is to the Solana network, and the ADA token is to the Cardano network) or form part of a "decentralized application" (often referred to as a "dApp") that is a "project" built on top of a given blockchain protocol that allows communities of users to interact with each other without the need for an intermediary entity.  Both types of tokens generally require the use of much more complex and involved smart contract code in addition to the specific code that manages the token itself.  The value of most tokens generally comes from the requirement that a user hold some number of tokens in order to *access* and utilize the relevant protocol or dApp.

[73] *See supra* note [71].

25

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

computers which maintains that smart contract – that's it.[74]  Crucially, the smart contract ledger maintaining the balance of token units associated with public addresses will remain available regardless of whether the company or person that raised funds through the sale of that token continues to exist or has been voluntarily or involuntarily dissolved.[75]  A discussion of specific illustrative tokens is included as Annex C.

When seeking to understand crypto assets, it is important also to understand the nature of the larger protocol of which the smart contract that creates a given crypto asset may only be part.  For these purposes, a "protocol" can be generalized as a set of rules (implemented as an integrated set of smart contracts) that govern the operation of a blockchain-based computer network (or, in the case of a smart contract-based token, a dApp deployed on that network).  That set of smart contracts – the software code which implements the protocol – can be replicated and altered (in blockchain parlance, forked), but to the extent the original smart contracts remain deployed, for example, on the Ethereum network, the EVM will behave deterministically (*i.e.*, in exactly the same way, reaching the exact same outcome, in response to the same set of instructions).

The vast majority of smart contract code used to implement blockchain protocols is made available under one or another type of open-source license[76] and, as a result, is generally available to be copied and

---

[74] For example, such an "instruction" might be to transfer the token to another address at a predetermined time or upon the occurrence of an event.  That address may be "owned" by a separate smart contract which, triggered by the transfer, executes further transactions.  Because of the deterministic nature of blockchain networks, once an instruction is given, the instructing party can have a very high degree of confidence that the network will execute the instruction as submitted.  In addition, these instructions can be combined in myriad ways involving multiple dApps to create complex logic that would be difficult or impossible to replicate without the use of blockchain technology and token-based instructions.  However, it is crucial to understand that there is no intrinsic "legal layer" to smart contracts – the relevant network will respond in an identical way regardless of whether an instruction came from the "lawful" owner of the token or a person who illicitly gained access to a relevant private key and wrongfully provided the instruction, although depending on the facts and circumstances, traditional legal remedies could apply to identifiable individuals or entities that utilized smart contract code.  *See, e.g.*, Andrew M. Hinkes, *Throw Away the Key, or the Key Holder?  Coercive Contempt for Lost or Forgotten Cryptocurrency Private Keys, or Obstinate Holders*, 16 Nw. J. Tech. & Intell. Prop. 225 (2019).

[75] Or at least so long as the smart contract code remains deployed to an address on a blockchain network, and that network continues to be maintained by a sufficient number of nodes (we refer to this as "unlimited existence").

[76] Opensource generally refers to software that uses a license which complies with what is known as the open-source definition and is approved by the Open Source Initiative.  *See* https://opensource.org/.  The terms of open-source licenses vary dramatically and are outside the scope of this Article but generally fall into three categories: "permissive", "copyleft", and "other".  *See, generally,* Greg R. Vetter, *"Infectious" Open Source Software: Spreading Incentives or Promoting Resistance?*, 36 Rutgers L. J. 53 (2004).  Although provided under an open-source license, smart contract code is still subject to copyright, which rights are often held by a non-profit entity, such as a foundation, that manages those rights.  The owner of a token who uses this smart contract code may not implicate rights under copyright, but if the interaction does implicate such rights, the token

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

altered by anyone,[77] and will continue to exist so long as a minimum number of nodes are running the relevant code and participating in the network.  By way of an example of a non-computer-based protocol, one can think of card games.  The 18th Century card game, whist[78] is rarely played today but, so long as the rules are known, groups can get together, follow those rules, and play the game.  The same holds true for computer protocols – so long as the codebase for the protocol is available, computers can be programmed to run that protocol, even if the protocol had not been run for some period of time.

## C.     The Uses of Crypto Assets

Tokens are best understood as technological *tools* that, once created, continue to exist and function with unlimited existence.  Although they generally provide the token owner an *ability* to take certain actions with respect to a blockchain network – for example, sending one type of token to a contract address that will return another type of token to the original address or calling a pre-coded "vote" function send instructions to a network of computers, most tokens do not in and of themselves confer, or purport to confer,[79] to the owner any *rights* against an identifiable third party cognizable under current law.[80]  Delivery of a token that is not itself a type of legal instrument is not currently recognized as a means of conveying legal rights that will be recognized in a court of law.[81]  Accordingly, to the extent that any judicially recognizable rights are

---

owner may benefit from an explicit or implicit grant of a license to engage with the relevant smart contract code by the copyright holder.  However, these are rights that *benefit* the copyright holder and *may impose duties or obligations* on a token holder – the opposite of the legal relationship between a securities issuer and a securities holder, where the security *grants rights to the holder* and *imposes duties or obligations* on the issuer.  *See infra* text and notes at [103 and 104] and Section II.D for a further discussion of this concept.

[77] Use of open source-licensed software may still be subject to certain conditions, such as "copy-left" requirements.  *See, e.g.*, "What is Copyleft?", GNU Operating System (available at https://www.gnu.org/licenses/copyleft.en.html).

[78] *See* Wikipedia, "Whist" available at https://en.wikipedia.org/wiki/Whist.

[79] Some "governance tokens" provide the owner with the *ability* to "vote" as to various matters by sending messages to the address of a smart contract which ensures that a given token-holding address only votes once for all tokens held.  The smart contract may then aggregate all votes and, potentially, give instructions to another smart contract based on the value created by the number of these "votes" recorded.  However, when such tokens are sold, it may be suggested by the seller that the token conveys not just an *ability* to vote but the *right* to vote – a right that may purport to be able to be enforceable against an identified entity, such as a foundation company (whether the transfer of a token is sufficient to create such a right under applicable law is another matter).  Tokens sold on this basis present more challenging analytic questions that are out of the scope of this Article and could potentially be considered as an equity interest in the related entity.  *See* discussion of The DAO Report, *supra,* Section III.A, *infra*.

[80] The function of a token can be analogized to a physical key that may give the holder the *ability* to open the associated lock, but not any *right* to do so.  That is, if the physical key fails to open the associated lock, in the absence of some legally cognizable promise by an identifiable person or entity (which, of necessity, would be extrinsic to the physical key), the owner of the physical key would be "out of luck", with no legal or economic recourse against anyone for the key's failure to open the lock.

[81] *See* discussion of "instruments" in Section [II.D.2] *infra*.

27

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

purported to be associated with a token, they would need to be created under a separate enforceable agreement or instrument, under an existing statute, or by operation of law, and be transferable by valid assignment of the agreement, physical delivery of the instrument, or by other valid recognition of the transfer by the related obligor or issuer.[82]

It may be tempting to view tokens as similar to paper-based certificates that evidence securities or other tradable financial instruments because they are often purchased for speculative purposes, can be easily transferred, and may be purchased on an exchange, among other reasons. However, current commercial law in the United States contemplates that securities and other financial instruments either be in physical (paper) form or, in the case of certain securities, be uncertificated -- *i.e.*, have no embodiment of the relevant legal rights between the parties.[83] Crypto assets however are not in paper form, and, as discussed below, there is no support in current securities law jurisprudence that crypto assets in and of themselves may be used to "embody" legal rights between counterparties.[84] This does not mean that there isn't some interesting

---

[82] The obverse is the case as well – any legally enforceable *duties* applicable to the person or entity that deployed the relevant smart contract code would need to be imposed by a separate enforceable agreement or instrument, under a statute, or by operation of law.

[83] U.C.C. § 8-102(15) defines a "security" in part as: "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer: (i) which is represented by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and (iii) which: (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (B) is a medium for investment and by its terms expressly provides that it is a security governed by [Article 8]."; U.C.C. § 8-102(16) defines a "security certificate" to mean a "certificate representing a security."; an "uncertificated security" is defined in U.C.C. § 8-102(18) as a "security that is not represented by a certificate."  U.C.C § 8-301 provides delivery of a security certificate occurs upon physical delivery of said certificate, and thus a security certificate must exist in physical form.  The U.C.C. defines "instruments" as negotiable instruments or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.  *See* U.C.C. § 9-102(a)(47) (emphasis added).

[84] *See* discussions in Section [IV.C] *infra*.  U.C.C. § 8-102(15) defines a "security" in part as "an obligation of an issuer or a share, participation, or other interest in an issuer or in property or an enterprise of an issuer: (i) which is *represented* by a security certificate in bearer or registered form, or the transfer of which may be registered upon books maintained for that purpose by or on behalf of the issuer; (ii) which is one of a class or series or by its terms is divisible into a class or series of shares, participations, interests, or obligations; and (iii) which: (A) is, or is of a type, dealt in or traded on securities exchanges or securities markets; or (B) is a medium for investment and by its terms expressly provides that it is a security governed by [Article 8]."   (Emphasis added); U.C.C. § 8-102(16) defines a "security certificate" to mean a "certificate representing a security."; an "uncertificated security" is defined in U.C.C. § 8-102(18) as a "security that is not represented by a certificate." U.C.C. § 8-301 provides delivery of a security certificate occurs upon physical delivery of said certificate, and thus a security certificate must exist in physical form.  The U.C.C. defines "instruments" as negotiable instruments *or any other writing* that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary indorsement or assignment.  *See* U.C.C. § 9-102(a)(47) (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

experimentation currently being undertaken where crypto assets are being contractually associated with off-chain rights or interests, but those use cases would have some identifiable off-chain agreement.

Nevertheless, crypto assets are still a type of property[85]. At a minimum they are a type of resource capable of being owned or controlled by a business or person and have a financial value based on what a seller of that crypto asset would expect to receive in return for validly transferring control of that crypto asset to another person.[86]

Why would one want to own a crypto asset? Many crypto assets are referred to colloquially as cryptocurrencies (or crypto for short), implying a use as a real-world payment or settlement asset. Although bitcoin and a few other crypto assets were created with the specific expectation that they would be used as a general tool for all payments, that use case, while possible[87] has a number of drawbacks[88] and has not yet become significant. Instead, crypto assets whose value is directly or indirectly pegged to a major fiat currency, such as the U.S. dollar (known as stablecoins), have taken over this role.[89] Another use of crypto assets is to allow users of a particular blockchain-based service to pay for that service. A good example of this use is the Ethereum blockchain network, which requires the native crypto asset of that network, ether, to be used to pay for the number of computing cycles a particular smart contract will consume to effect a transaction (although there is no correlation between these transaction costs and the price of ether).

Most commonly, though, like the horticulturalist's desire to sell strowrange seeds in bulk in order to create early interest in the success of

---

[85] The exact parameters of property law when applied to crypto assets are still under development. *See* James Grimmelmann and Cristina Mulligan, "Data Property" (October 18, 2022), AMERICAN UNIVERSITY LAW REVIEW, Forthcoming, available at https://ssrn.com/abstract=4251825 ("Bitcoin are possessed by the person who knows the private key needed to sign a transaction transferring them"). *See also* the UK Law Commission Consultation on Digital Assets, available at https://www.lawcom.gov.uk/project/digital-assets/ (considering principles of private English law, and particularly private property law, in relation to crypto assets).

[86] Note that the Uniform Law Commission recently approved amendments to the U.C.C. that add a new Article 12 on "controllable electronic records" (such as virtual currencies, electronic money, and nonfungible tokens). These amendments also update the U.C.C. to account for digital records, electronic signatures, and distributed ledger technology, provide rules for electronic negotiable instruments, and clarify the rules for U.C.C. applicability to hybrid transactions involving both goods and services. These amendments will not be effective, however, until adopted by the various states. *See* "ULC Wraps Up 131st Annual Meeting: Five New Acts Approved", available at https://www.uniformlaws.org/discussion/ulc-wraps.

[87] *See, e.g.*, New York Digital Investment Group's program for paying salaries in bitcoin, available at https://nydig.com/lp/savings-plan.

[88] *See* Izabella Kaminska, "Busting the myth that bitcoin is actually an efficient payment mechanism", Financial Times, December 13, 2017, available at https://www.ft.com/content/c7c8b0d08-a5e4-397c-b027-91fda883737a.

[89] *See* Alyssa Hertig, "What Is a Stablecoin?", CoinDesk, updated September 16, 2022, available at https://www.coindesk.com/learn/what-is-a-stablecoin/. Some stablecoins may have characteristics of a security and are beyond the scope of this Article. *See, supra*, note [7].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the strowrange ecosystem, crypto assets are often sold at an early stage to bootstrap interest in a new blockchain-based protocol by rewarding early adopters or supporters of the protocol with native tokens. While early-stage buyers of tokens understand that most new blockchain protocols will probably not gain much traction (and the associated tokens will likely lose most, if not all, of their value), some protocols, like the Ethereum network, will become tremendously popular, producing vastly outsized returns for those smart (or lucky) enough to "get in early" on owning the associated tokens.[90]

### D.    The Exchange and Trading of Crypto Assets

Crypto assets, once created, are generally transferred either through a centralized crypto asset marketplace (*i.e.*, one like Coinbase[91] that is operated by a company or other identifiable legal entity) or on a peer-to-peer basis, either directly between buyer and seller, or indirectly, through the use of decentralized exchange applications, such as Uniswap v3.[92] Centralized crypto asset markets initially grew up around the trading of bitcoin[93] and have since expanded into the trading of a wide variety of other crypto assets, as well as providing custody, analytics, and other services to customers.[94] In the United States, so long as the assets traded in a centralized crypto asset market are not considered securities, these markets are not subject to federal securities oversight or regulation, a state of affairs that has raised concerns for many.[95]

---

[90] *See, e.g.*, Alex Gailey, "How to Evaluate Any Cryptocurrency: A Guide for Investors", Time, July 19, 2022, available at https://time.com/nextadvisor/investing/cryptocurrency/how-to-evaluate-any-crypto-coins-potential/. *Cf.* Lori Schock, "Thinking About Buying the Latest New Cryptocurrency or Token?", Investor.gov, available at https://www.investor.gov/additional-resources/spotlight/directors-take/thinking-about-buying-latest-new-cryptocurrency-or.

[91] *See* https://www.coinbase.com/.

[92] The smart contract code for Uniswap v3 is available at https://github.com/Uniswap/v3-core.

[93] *See, e.g.*, "Coinbase Strategy Teardown: How Coinbase Grew into The King Midas of Crypto", CB INSIGHTS (October 19, 2021), available at: https://www.cbinsights.com/research/report/coinbase-strategy-teardown/.

[94] The most prominent U.S.-based centralized crypto asset exchange, Coinbase, went public in 2021 and is now a reporting company under the Exchange Act. *See* Michelle Chapman, Alex Veiga, "Coinbase soars in market debut, valued near $86 billion", AP NEWS (April 14, 2021), available at: https://apnews.com/article/coinbase-stock-ipo-price-c3b802074ce4349b5bccf9ba43022800. Because centralized crypto asset markets frequently provide multiple services to customers, including custodial and staking services, and have benefit from the leverage of rehypothecated customer assets, they have proven to be vulnerable to customer "runs". In 2022 a number of crypto asset marketplaces have suffered setbacks, either filing for bankruptcy protection or, in the case of FTX, a prominent non-U.S. market, entering into a distress sale to a competing market, Binance. *See* Hannah Lang and Tom Wilson, "Binance Plans to Buy Rival FTX in Bailout as Crypto Market Crumbles", REUTERS, November 8, 2022, available at https://www.reuters.com/markets/currencies/cryptocurrencies-slide-concerns-over-ftx-exchange-rattle-markets-2022-11-08/.

[95] *See, e.g.*, Letter of Sen. E. Warren to Gary Gensler, Chair, U.S. Securities and Exchange Commission, July 7, 2021, at p. 2 ("Although they describe themselves as cryptocurrency

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In addition, to the extent that such markets do not allow trading in commodity interests (generally, derivatives contracts), they will also not be subject to supervision by the CFTC.[96]  Generally centralized crypto asset marketplaces are considered money transmitters, a type of money service business that is subject to registration with the U.S. Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), which entails developing and maintaining a comprehensive anti-money laundering program, as well as implementing a variety of reporting and record-keeping requirements. These entities are also required to obtain licenses in most states under local money transmission statutes.  However, these entities are not currently subject to any form of comprehensive federal supervision or oversight.[97]

The process of locating other parties with whom to trade crypto assets on a purely peer-to-peer basis can be time-consuming, impractical, and risky.  At the same time, the desire of many crypto asset owners not to use (and be obliged to trust) centralized markets led to the development of so-called decentralized exchanges.  These platforms, commonly referred to as DEXes, are smart contract-based protocols deployed on blockchain networks that are designed to carry out functions similar to those performed by centralized crypto asset marketplaces, but programmatically and without the need for an entity to act as intermediary or operator.

Although there are different models for decentralized exchanges, as of this writing, most DEXes use automated market maker (of "AMM") technology.  In these systems, one or more persons act as liquidity providers by sending at least two crypto assets (a "pair") to the address of a smart contract.  The smart contract locks the crypto assets and, in exchange, returns to the sender a new crypto asset, representing the ability to retrieve a certain amount of the original assets from the smart contract at a later date.[98]  Other persons interested in trading for one of the assets

---

'exchanges,' these platforms lack the same types of basic regulatory protections as traditional national securities exchanges like the New York Stock Exchange or Nasdaq" (footnote omitted).), available at: https://www.warren.senate.gov/oversight/letters/warren-asks-sec-chair-gensler-about-risks-posed-by-cryptocurrency-exchanges.

[96] Although, to the extent that the assets traded on these exchanges are considered "commodities", the CFTC would have antifraud enforcement authority in accordance with 7 U.S.C. § 6b(a)(2), 7 U.S.C. § 9(1), and 17 CFR § 180.1(a)(1)-(3).

[97] Some crypto asset marketplace providers are structured as limited purpose trust companies, generally formed under state law.  *See, e.g.*, "Paxos – About Us", available at https://paxos.com/company/.

[98] AMM-based DEXes allow for peer-to-peer exchange of crypto assets through the use of smart contracts known as liquidity pools and AMM algorithms.  Users known as liquidity providers send two or more crypto assets they control in in a variable ratio to smart contracts that create "liquidity pools".  Then, other users can exchange the assets within a given pool and the AMM algorithm adjusts the relative amount (and, hence, the price) of the assets in the pool depending on the size of the trade and the number of assets in the pool prior to the trade.  The addresses to which liquidity providers have sent assets are subsequently sent a small amount of the crypto assets from each trade in the pool.  If a lack

31

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

in that pair will send a quantity of one of the crypto assets they control to that same contract and simultaneously receive back a certain amount of the other asset in the pair.[99]  The ratio of the two assets to each other is determined algorithmically based on the supply and demand of the two assets in the pair.

### E.    Crypto Assets as Speculative Investments

While any tokens that have been deployed to a blockchain network and are active have at least some inherent and present utility,[100] it must be recognized that, like the strowrange seeds, many tokens are purchased by a buyer, not for anticipated consumptive use of the relevant utility by that buyer but rather as an investment – an asset anticipated to be in greater demand in the future than it is currently (or at least to hold its value relative to the anticipated depreciation of alternative investment assets).  Again, like the strowrange seeds, because most tokens have a predetermined finite supply, an increase in the demand for the relevant functionality of the token or related dApp or network at some point in the future with a (relatively) constant supply of the tokens would be expected to lead to an increase in the price of the token.[101]  This characteristic allows users of the relevant technology to bypass purchasing an equity interest in a corporate owner of a given platform or technology and instead participate directly in the success or failure of the technology through direct ownership of the means by which the technology is used – the tokens.   This blending of consumptive use and potential for price appreciation has proven to be of great interest to market participants around the world.

Many crypto assets currently in the market relate to a technology platform that has not yet matured and may still depend on an identifiable entity or group of related entities (which we refer to generally as the "founders", irrespective of the exact time they enter the project).  These

---

of liquidity in a specific pool causes a large amount of slippage and a resulting price difference relative to external markets, the price should be restored by traders due to the arbitrage opportunity.  *See* Jiahua Xu *et al*., *Decentralized Exchanges (DEX) with Automated Market Maker (AMM) Protocols*, arXiv (Jan. 14, 2022), available at https://arxiv.org/pdf/2103.12732.pdf.

[99] That is, the blockchain network executes both sides of a transaction instruction or neither are executed.  This is generally known as an "atomic swap" when the transaction involves an exchange of crypto assets between two or more addresses.

[100] That is, an instruction can be given to the relevant network, moving a balance of the token from one address to the other.

[101] However, as noted above, unlike the strowrange seeds, crypto assets can be "staked" – sent to an address on a blockchain network not directly controlled by the sender, where the sender receives more of the same asset or a different as a result of "locking" (or "staking") her original tokens.  For a discussion of the securities law aspects of staking ether tokens, *see* Rodrigo Seira, Amy Aixi Zhang and Jake Chervinsky, "Ethereum's New 'Staking' Model Does Not Make ether a Security", October 5, 2022, available at https://www.paradigm.xyz/2022/10/ethereums-new-staking-model-does-not-make-eth-a-security.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

founders often promote the use of the platform, address bugs or exploits that may arise in the codebase of the platform, develop new elements that enhance the desirability of the platform for users, and undertake other activities that are intended to foster platform growth. In theory at least, over time, a sufficiently large community of individuals or legal entities with a personal or economic stake in the success of the platform will form—a network effect—supporting the platform without a high level of reliance on those founders.[102]

Critically, though, except in the uncommon case of tokens associated with a promise of profit interests in an off-chain business or with other off-chain undertakings associated with traditional securities, tokens and the on-chain abilities they may facilitate do not in and of themselves provide their owners with any actual or implied rights against, or interests in, these founder individuals or entities.[103] Instead, the activities of the platform founder(s) are better understood in economic terms as a positive externality: the possibility of the founder(s) undertaking one or more activities may create an expectation of a benefit but not an entitlement to that benefit.[104]

However, crypto assets are not the only speculative asset not representing an interest in a business or a contractual right to a return. Land in undeveloped (if not barren) areas has frequently been seen as providing the potential for outsized returns.[105] Many other examples

---

[102] This rather amorphous, inchoate, and potentially impermanent state is now commonly referred to in the blockchain world as "sufficiently decentralized". For a further discussion of this concept and its relationship to the federal securities laws, *see infra* text at note [301].

[103] Another way to understand this is that the absence of a legal relationship between the owners of the tokens and the founders means that the founders cannot be compelled to undertake any particular activities and any legal entities that they may have formed may be dissolved without reference to the interests of the owners of the tokens. This highly unusual dynamic is one factor that has allowed token-based projects to scale very rapidly and evolve in ways that would be difficult or impossible for traditional companies to mimic. It has also flung open a door to unscrupulous founders who exploit the good faith of early backers that buy tokens and find themselves without the type of statutory or contractual recourse they would have had if they had supported the founders with traditional equity or debt securities. We note that, in certain circumstances, token purchasers may impose contractual (*i.e.*, legally binding) obligations on project founders (such as those often found in so-called "Simple Agreements for Future Tokens" (*see infra* note [246] and accompanying text)). However, arrangements of this type are extrinsic to the tokens themselves and evidenced by traditional legal agreements.

[104] An "externality" is a positive or negative outcome of a given economic activity that affects a third party that is not directly related to that activity. *See* International Institute for Sustainable Development, "What Is an Externality?", available at https://www.iisd.org/savi/faq/what-is-an-externality/ ("Erosion and chemical runoff caused by building roads, which causes water pollution further downstream, is an example of a negative externality. By comparison, an increase in high-earning taxpayers, resulting from a university being built in a low-income area with limited higher education opportunities, is an example of a positive externality.").

[105] Unsurprisingly, undeveloped land has also frequently been the subject of investment contract litigation, accounting for approximately 10% of all appellate cases we reviewed. Moreover, despite occasional statements from courts and regulators about land having

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

abound, including art created by as-yet-unknown artists,[106] the offspring of thoroughbred horses,[107] limited edition vinyl records,[108] and even sports contracts provided to young athletes yet to prove themselves at the professional level.[109]  All of these assets have significant potential for a large or even total loss and only a small chance of an outsized return. Speculative interest in assets can of course also be found be found in the traditional equity markets.[110]

Nevertheless, this speculative economic characteristic *does not change the nature of the asset itself*.  In particular, some assets may be viewed as having primarily speculative value (*i.e.,* little or no value to the real economy).  A frequently offered modern example of this are the "Beanie Baby" series of plush toys from the 1990s created by Ty, Inc. which were sold in retail outlets and then "whimsically" withdrawn from circulation to create artificial scarcity.  This resulted in highly speculative secondary markets developing with rapid price increases, leading to an inevitable crash.[111]  As we will see, depending on how Beanie Babies were offered and sold, investment contract transactions may have been formed, but by no measure were the plush toys themselves securities.

---

"inherent value", to the contrary, land sold in investment schemes can have zero or even negative value.  For a good example, *see* "Visiting Our New Mexico Land Scam - Airstream RV Travel" available at https://www.youtube.com/watch?v=KzHzOqOBaoI. Interestingly, this video relates to a well-known investment contract case in the Southern District of New York, *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045 (S.D.N.Y. 1975).

[106] *See, e.g.*, Milica Jovic, "*How Art Collectors Can Increase the Value of their Collection*", Artacacia, January 17, 2019, available at https://www.artacacia.com/blogs/posts/how-art-collectors-can-increase-the-value-of-their-collection ("It's not a secret that collectors like to invest in promising young artists that are expected to shoot to stardom in the years to come.").

[107] *See, e.g.*, John J. Kropp, J. Jeffrey Landen, and Daniel C. Heyd, *Horse Sense and the UCC: The Purchase of Racehorses*, 1 Marq. Sports L. J. 171 (1991) ("Less than two percent of all horses ultimately become stakes winners.  Forty percent of the thoroughbreds ultimately win at least one race, and sixty-five percent of the thoroughbreds at least make it to the starting gate.  But approximately thirty-five percent of each year's crop of thoroughbred foals never make it to the track.  Therefore, the purchase of a horse for racing purposes is a transaction that involves significant financial risk." (footnotes omitted)).

[108] *See, e.g.*, Stefan Von Imhof, "Investing in Vinyl Records", November 16, 2021, available at https://alts.co/investing-in-vinyl-records/.

[109] *See, e.g.*, Joseph Stromberg, "How NFL Teams Ignore Basic Economics and Draft Players Irrationally" *Vox*, May 7, 2014, available at https://www.vox.com/2014/5/7/5683448/how-nfl-teams-ignore-basic-economics-and-draft-players-irrationally ("[Drafting college players is] basically a coin flip, … but teams are paying a great deal for the right to call which side of the coin.").

[110] *See, e.g.*, Shaun Davies, "Speculation Sentiment" (December 19, 2020), available at https://ssrn.com/abstract=3063551 (exploring demand from uninformed equity market traders and characterizing this as "speculation sentiment" – an uninformed belief about the future direction of the market similar to the beliefs of the gambler looking at the roulette wheel).

[111] *See* Zac Bissonnette, *The Great Beanie Baby Bubble*, Portfolio/Penguin (2015) at p. 165 (noting that increasing demand in Beanie Babies led to ever-rising secondary market prices, with certain Babies trading hands at prices as high as $625 each in May of 1997).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Adding to the speculative interest in crypto assets is their effective bearer status and ease of transferability.  Although this status can support legitimate privacy concerns, particularly among persons subject to hostile or exploitive governmental actors, it can also facilitate the use of these assets for illicit purposes, including money laundering or sanctions evasion.  For some, the possibility of outsized returns, coupled with an ability to obfuscate the identity of the person or entity benefitting from those gains, can be a powerful incentive for ownership.   The pseudonymous nature of assets also allows unscrupulous parties to engage in wash trading or other activity that can artificially inflate the market price of the asset, leading to pump-and-dump schemes that can cause serious financial harm to others.  Under current law, however, none of this activity brings either the Beanie Babies or crypto assets within the ambit of federal securities law.

## F.     Some Conclusions on Crypto Assets

Because fungible crypto assets created using the ERC-20 standard (or an equivalent) of the type we are discussing are simply ledger entries in a smart contract recording numerical units, these assets by themselves neither create nor provide their owner with any right against, or interest in, any other person.  As a granular unit of a technology platform, these assets will have as much or as little value as another party is willing pay for them at any time.  In this way, they allow for a new form of technology ownership where profit potential and functional utility are inextricably linked.   Because crypto assets are pseudonymous, or bearer-like, in nature,[112] they can also be used for a range of illicit or unscrupulous purposes.[113]   While these *uses* of crypto assets are appropriately concerning, they do not alter the *nature* of the crypto assets themselves, which is the subject of our inquiry here.

---

[112] A "bearer" financial instrument is similar to cash in that it is transferred (or "negotiated") exclusively through the physical delivery of the instrument by the holder (or "bearer" of the instrument); there is no ledger or record of ownership maintained by the issuer of the instrument.  *See* U.C.C. Section 1-201(5) ("'Bearer'" means a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or indorsed in blank.")  Like cash, if a bearer instrument is lost or stolen, it may be difficult or impossible to recover.  The pseudonymity of blockchain address and the complete responsibility of the owner of a crypto asset to main the seed phrase that allows the owner to control their wallet, gives crypto assets much of the same character as bearer instruments.

[113] The same is true for a variety of other bearer or quasi-bearer assets, like art and antiquities, as well.  *See, e.g.*, U.S. Department of the Treasury, "Study of the Facilitation of Money Laundering and Terror Finance Through the Trade in Works of Art" (February 4, 2022), available at https://home.treasury.gov/system/files/136/Treasury_Study_WoA.pdf.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## II.   WHAT ARE "INVESTMENT CONTRACTS"?  A REVIEW OF THE HOWEY CASE LAW[114]

Long before Congress enacted the Securities Act in 1933, the law recognized that the common good would benefit from the application of regulatory protections to certain commercial arrangements in which one party entrusted another with capital for the purpose of entering into, or funding, some sort of profit-seeking venture.  As has been well-covered elsewhere,[115] the Securities Acts were developed following the Stock Market Crash of 1929 and the ensuing Great Depression, taking elements of existing state securities laws to develop a federal regulatory regime. The definition of the term "security" in the Securities Act was intended to be "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the concept of a security."[116]  Thus, it should come as no surprise that the foundational question of exactly *which* commercial arrangements should be regulated as transactions in securities, and which should not, has been one of the most important, and also most controversial, questions in U.S. securities law.[117]

In this section, we briefly explore the history and purpose of the inclusion of the concept of "investment contract" in the definition of the term security in the Securities Acts.  Importantly, that term has been used by courts to refer both to *instruments* with substantially all of the economic characteristics of a security, but which do not fall within an enumerated category in the statutory definition, and, more commonly, to ostensibly commercial *transactions or schemes* that are not based on a single legal instrument but which nevertheless are deemed to fall within the policy ambit of the Securities Acts.[118]  We then examine the well-known *Howey* test, observing the importance placed by courts on the "facts and circumstances" of each potential investment contract transaction.

Following this, we delve into the specific fact patterns that may create an investment contract transaction, illustrating these with examples from the Strowrange Labs hypothetical and drawing parallels with transactions involving crypto assets in both primary and secondary transactions.  Finally, we focus more closely on the "common enterprise" prong of the *Howey* test and how it has been applied in various contexts.

---

[114] A complete list of the federal appellate investment contract cases reviewed for this Article is included in Annex A.

[115] *See, e.g.,* Louis Loss, Joel Seligman & Troy Paredes, "Securities Regulation" (Internet Ed.) (hereinafter, the "*Loss Treatise*"), Chapter 3.  *See also,* James M. Landis, *Legislative History of the Securities Act of 1933*, 28 Geo. Wash. L. Rev. 29 (1959).

[116] H.R. Rep. No. 85, 73d Cong., 1st Sess. 11 (1933).

[117] A bibliography of academic scholarship and other leading work on this topic over the years is included in Part I of Annex B.

[118] *See S.E.C. v. SG Ltd.,* 265 F.3d 42 (1st Cir. 2001) ("We do not gainsay the obvious correctness of the … observation that investment contracts lie within the commercial world.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

A.      **Identifying Investment Contract Transactions Using the *Howey* Test**

The Securities Acts define the term "security" to include an enumerated list of interests and instruments.[119]   These enumerated instruments are *prima facie* securities and, unless the context otherwise requires, if an interest or instrument falls within one of the enumerated categories, that interest or instrument will be considered a security.[120]  To effectuate the broad Congressional intent noted above, the term "investment contract" was borrowed from state Blue Sky laws without further definition and included in the definition of the term "security" in both the Securities Act and the Exchange Act.[121]  It is a catch-all category, intended to cover "novel, uncommon, or irregular devices, whatever they appear to be."[122]

Congress recognized that, to effect fully the remedial purposes of the Securities Acts, a rigid statutory definition involving only then-existing types of instruments or interests would not suffice.  Inclusion of the term "investment contract" and its open-ended definition in *Howey* facilitates these remedial purposes by providing flexible framework capable of encompassing a multitude of schemes, arrangements, or instruments which courts conclude fall within the principles of the Securities Acts and the ambit of the *Howey* test, even though the instrument or scheme created by the parties is not otherwise identified within one of the enumerated categories in the statutory definitions or otherwise commonly known as a security.[123]

---

[119] The Securities Act provides an enumerated list of 21 types of interests and instruments, whereas the Exchange Act enumerates 17 types of interests and instruments which while closely reflective of the Securities Act definition, does not include several interests and instruments, including, notably, "evidence of indebtedness".  *See also* FitzGibbon, *What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*, 64 Minn. L. Rev. 893 at 914 (1980) ("[t]he instruments listed in the statutory definition of "security" are the primary vehicles of [the public and major financial markets]—that is, they are, or represent, bundles of financial claims and liabilities.").

[120] *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985).

[121] For an excellent and thorough discussion of the state law underpinnings of the federal definition of the term "investment contract", *see* Joseph C. Long, *An Attempt to Return 'Investment Contracts' to the Mainstream of Securities Regulation*, 24 Okla. L. Rev. 135 (1971).

[122] *S.E.C. v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476 (9th Cir. 1973), citing *S.E.C. v. C.M. Joiner Leasing Corp*., 320 U.S. 344 (1943).  *See also A.T. Brod Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir. 1967) ("Novel or atypical methods should not provide immunity from the securities laws.").

[123] The Supreme Court has clarified that this latter clause should not be read as a limitation on the definition of "security", stating in *Tcherepnin v. Knight* that:

> We view the … conclusion [of the appellate court below] that the petitioners' withdrawable capital shares are not securities as a product of misplaced emphasis.  After reviewing the definition of security in § 3(a)(10), the Court of Appeals stated that "[t]he type of interest now before us, if it is covered by this definition, must be an instrument commonly known as a 'security.'"  Thus, the Court of Appeals read the words an "instrument commonly known as a

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Because "investment contract" is generally not a term parties utilize in the context of commercial arrangements,[124] it is left to courts in hindsight following a dispute between the parties or upon an enforcement action brought by the SEC to discern whether a given contract, transaction or scheme entered into by parties should be treated as an investment contract. Investment contracts are thus best understood as a tool utilized by courts to impose situation-specific *constructive* securities transactions on commercial parties in the context of the facts and circumstances of that specific transaction.[125] This means that an investment contract analysis is inherently and necessarily a *retrospective* concept – a remedial provision intended to address a wide variety of fraudulent, abusive or evasive schemes.[126] In short, the inquiry is whether there a securities transaction should be deemed to have occurred despite the fact that the parties did not label their arrangements this way.

A review of the federal appellate jurisprudence reveals that there are two basic types of arrangements which have been found to constitute investment contracts by courts – (i) those in which a legal instrument creating a financial relationship between the parties exists, but the relationship created is not one that contains all of the features of a type of enumerated security and (ii) those that involve one or more contractual agreements, often along with marketing materials, oral statements and other indicia of the parties' intent, but nothing that resembles a legal instrument of a type typically associated with a security.[127]

In the first group of cases, the entirety of the relationship is contained within the relevant instrument and the question presented is whether the instrument itself constitutes an investment contract. Examples

---

'security'" in § 3(a)(10) as a limitation on the other descriptive terms used in the statutory definition. This, of course, is contrary to our decision in *Joiner* where we rejected the respondents' invitation to "constrict the more general terms substantially to the specific terms which they follow."

*Tcherepnin v. Knight,* 389 U.S. 332, 343 (1967) (internal citations omitted).

[124] If a contract was identified by the parties as an "investment contract" then it would be clear to all concerned that a securities transaction was intended, and the entirety of the transaction would presumably be documented as such (failure to do so would be a clearly illegal transaction).

[125] *See generally*, Loss Treatise, Section 3.A.1.

[126] One of the most challenging jobs for a securities regulator is to determine when to bring an enforcement action in the absence of demonstrable fraudulent or abusive actions. And yet, if left unchecked through an absence of vigorous enforcement, there is a risk of a "race to the bottom" as possibly well-intentioned but likely increasingly reckless fundraisers find innovative ways of evading what is often perceived as the costly, time-consuming and "pointless" requirements of the federal registration process for public offerings of securities. At the same time, excessive enforcement actions against good faith actors can diminish the perception of securities regulators in the mind of the public. A further examination of this tension is outside the scope of this Article.

[127] The Loss Treatise subdivides "investment contracts" into six general categories: (i) dispositions of property with management agreements; (ii) partnerships; (iii) real estate with a collateral arrangement; (iv) franchises and distributorships; (v) membership plans; and (vi) installment and when-issued securities contracts.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of this type of arrangement include *S.E.C. v. United Benefit Life*,[128] in which an insurance company offered customers a product it called a Flexible Fund Annuity, and *Tcherepnin v. Knight*,[129] which concerned nonnegotiable capital shares in a state-chartered savings and loan association.  As courts have frequently observed, parties cannot avoid the reach of the Securities Acts through the nomenclature given to an instrument or by including (or removing) terms in the instrument that do not change the substance of the relationship between the parties.

In cases like these, where a court finds the instrument in question to constitute an investment contract, it would be wholly appropriate to characterize the instrument as itself a security such that the Securities Acts would apply equally to any transferee of that instrument, regardless of the "circumstances" of the transaction.   We refer to these as "securities equivalents".  As will be seen, this type of arrangement is not of interest to our inquiry because, in these cases, a legal, still often paper-based instrument exists and the terms of that instrument provide all the information needed by a court to determine the instrument's status – something that is not the case with crypto assets.  For example, in *United Benefit Life*, the Supreme Court focused on the fact that the contract entered into by customers of United Life contained "[t]wo entirely distinct promises" and evaluated each of the elements of the instrument, concluding that "the provisions to be examined are less difficult of classification than ones presented in VALIC" (an earlier case involving annuity contracts).[130]   Likewise, in *Tcherepnin*, the Court focused its inquiry on "the legal character imparted to [the capital] shares by the [state] statute" concluding that it had "little difficulty fitting the … shares … into that expansive concept of a security".[131]

The other, and significantly more common, category of investment contract transaction is that exemplified by the *Howey* case itself (discussed in detail below).   In these cases, rather than a legal instrument the character of which may be examined on its own terms, there is a more general transaction or scheme, typically involving one or more contractual agreements, along with written marketing or sales materials, oral statements or assurances, and assertions of unstated expectations (we refer to these generally as "investment schemes").

---

[128] 387 U.S. 202 (1967).

[129] 389 U.S. 332 (1967).

[130] *United Benefit Life*, 387 U.S. at pp. 387-88.  *See also Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) (charitable gift annuity agreements create investment contracts where the annuity agreements, financial instruments that are not of a type specifically enumerated as securities in the Securities Acts, are marketed as investments and not merely as vehicles for philanthropy).

[131] *Tcherepnin*, 389 U.S. 336-338.  *See also* S.*E.C. v. The Infinity Group*, 212 F.3d 180 (3d Cir. 2000) (offer of "property transfer agreements" and related guarantees which were each legal instruments).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In these cases, the capital providers, funders, or investors are often couched as ostensible "purchasers" of some commercial good, service or asset from the person or entity seeking to deploy that capital (referred to generally here as a "sponsor" of the scheme) in an arrangement intended to create profit for the funders based on the efforts of the sponsor (or, occasionally, some third party), along with some economic benefit for the sponsor.  In the case of investment schemes involving crypto assets, the typical fact pattern is fairly consistent.  Like the horticulturalist in our parable considering raising funds through bulk sales of strowrange seeds her company created, developers of crypto asset-based platforms will often seek to raise funds through sales of the crypto asset they create, falling into this second category.  It is this type of "investment contract transaction" on which we focus our attention.[132]

1. *The Basics of* Howey *and the Critical Importance of a Transaction's Facts and Circumstances*

The four-part test to determine whether a particular contract, transaction or scheme should properly be considered an "investment contract" within the meaning of the Securities Acts was established by the Supreme Court in *S.E.C. v. W.J. Howey Co.*[133] and has come to be known as the "*Howey* test".[134]  The *Howey* case not only established the namesake test for assessing whether a particular contract, transaction or scheme constituted an investment contract,[135] it also featured a paradigmatic fact pattern.

In *Howey*, a Florida company operating a local hotel encouraged guests to tour nearby orange groves, also owned by the company.  Guests

---

[132] There is a third case in which a legal instrument is part of the scheme, but other promises are required in addition to the terms of the instrument in order to trigger all four *Howey* prongs (*i.e.*, the instrument without the additional promises would not constitute a "security").  Examples of this pattern include *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir.1974) (where the instruments, warehouse receipts for whiskey, were coupled with additional services, including storing the whisky in casks during maturation; procuring insurance policies on the whiskey while being stored; and, without charge, assisting purchasers in selling the whiskey when it matured) and *Gary Plastic Packaging v. Merrill Lynch Pierce Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985) (where the instruments, bank certificates of deposit, were coupled with, among other things, professional selection and negotiation of terms by a financial advisor and a buy-back guarantee if liquidity was desired by the investor prior to maturity).  In neither of these cases would the relevant instrument, the warehouse receipts or the bank certificates of deposit, be "securities" unless the instruments were transferred along with a legal entitlement to the other benefits of the scheme in question.

[133] 328 U.S. 293 (1946)

[134] As set out above, the "*Howey* test", looks to whether the circumstances of a given contract, transaction or scheme involves: (1) an investment of money (2) in a common enterprise (3) with an expectation of profits to come (4) solely from the efforts of the promoter or a third party.  *Howey*, 328 U.S. at 299.  We will be most concerned with the second prong of the test here – whether and how a "common enterprise" is formed in secondary transactions of crypto assets.

[135] The *transaction-by-transaction* nature of a *Howey* analysis of a scheme (not involving a "securities equivalent") flows directly from a court's need to evaluate all the facts and

40

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

were given a sales pitch and offered the opportunity to acquire a modest patch of land containing orange trees. In a separately documented transaction, purchasing guests were also given the opportunity to have a Howey company affiliate manage the groves, harvest the oranges, and send the purchaser the net profits, if any. The purchasers, mostly out-of-state residents, as a practical matter could not have utilized the purchased land themselves due to the small size of the plots. It was only if the plots were combined into commercially feasible citrus groves and centrally managed that the purchasers could reasonably expect any return on their investment. Given these facts, the Supreme Court agreed with the SEC that the economic realities of the arrangements were that the guests were *functionally* investing in a business enterprise managed by the two Howey companies and therefore deserved the protections of the Securities Acts for these transaction to the same extent they would have received had they been offered shares of stock in the enterprise.

So long as each element of the *Howey* test is present, a commercial transaction will be deemed to involve an investment contract (and therefore be treated as a securities transaction). This will be true even though the transaction does not involve a type of security enumerated in one of the definitional sections of the Securities Acts (other than an "investment contract") or an instrument or interest commonly known as a security. Since 1946, federal courts have found all manner of arrangements involving ostensibly commercial transactions that do not, in and of themselves, purport to be offers of an otherwise enumerated type of security to nevertheless be investment contracts.[136] This has included schemes involving the sale of crypto assets.[137]

---

circumstances applicable to a given transaction or scheme at the time the transaction took place or value was otherwise provided in order to determine whether the federal securities laws should apply.

[136] *See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 756 F.2d 230 (2d Cir. 1985)(finding a scheme to offer bank certificates of deposit for sale to be an investment contract scheme due to the nature of the arrangement, despite the fact that the Supreme Court had determined that conventional certificates of deposit issued by a bank, in and of themselves, are not securities); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974)(finding that a pyramid selling scheme constituted an investment contract scheme); *S.E.C. v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974)(finding that the offer and sale of an investment package involving the sale of whisky warehouse receipts to be an investment contract scheme within the ambit of the Securities Act).

[137] *See, e.g., S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) (granting the SEC's request for a preliminary injunction against Telegram Group Inc. and TON Issuer Inc. and finding that the SEC had "shown a substantial likelihood of success in proving that the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the [i]nitial [p]urchasers, including the intended and expected resale of [the crypto asset known as] Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5."); *see also, S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020) (granting the SEC's request for summary judgment on its claims that Kik Interactive Inc. had violated Section 5(a) and 5(c) of the Securities Act by offering and selling its own "Kin" tokens without a registration statement or an exemption from registration and finding that Kik's public sale of Kin was

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

The Supreme Court and the federal appellate courts have frequently admonished us that a determination that an investment contract scheme is present will be based on all of the facts and circumstances involved.  Because this determination is of necessity made in hindsight and in the context of a specific transaction or scheme with parties that have already entered into some sort of commercial arrangement, courts almost always take into account private matters that would be known only to those parties.  This frequently includes testimony about oral statements, informal writings or other communications, marketing brochures, websites and other materials that may change from time to time.[138]  These circumstances mean that, except in cases involving "securities equivalents", courts do not – and cannot – rely solely on the contractual agreements between the parties to evaluate whether the arrangement constituted an investment contract transaction or scheme.[139]  In fact, the *transaction-by-transaction* nature of the *Howey* analysis of a scheme (not involving a "securities equivalent") flows directly from a court's need to evaluate all the applicable facts and circumstances at the time the transaction took place or value was otherwise provided in order to determine whether the federal securities laws apply.

---

a security offering, and its pre-public sale was part of an integrated offering with the public sale, and thus both constituted an unregistered offering of securities under Section 5 of the Securities Act.)

[138] *See, e.g., Baroi, et al. v. Platinum Condominium Development, LLC*, 914 F. Supp. 2d 1179 (D. Nev. 2012) (in determining whether an investment scheme was present in a condominium sale program, "the Court considers the applicable agreements, any other documents which structure the investment, any promotional materials, *the promoter's oral representations, the investor's experience and knowledge, the promoter's managerial skill, and the investor's practical ability to exercise powers possessed by virtue of the agreements*" (emphasis added)).

[139] This is well illustrated in an *amicus curiae* brief filed by the SEC in *Salameh, et al. v. Tarsadia Hotel et al.*, 726 F.3d 1124 (9th Cir. 2013), a case involving purchases of condominiums in the Hard Rock Hotel San Diego alleged to be a disguised securities transaction by the plaintiffs (the Ninth Circuit did not find these claims to be supported). In its *amicus* brief, the SEC stated:

> The district court, in concluding that the purchasers lacked an expectation of profits at the time they entered into the Purchase Contract, erroneously relied on disclaimers in the Purchase Contract that stated the purchasers were not acquiring the rooms "as an investment" and that Tarsadia had not "represented or offered the property as an investment opportunity."  The district court placed dispositive weight on these representations and, in doing so, *failed to fully consider the broader realities* of the overall transaction.  This was error because, as the Supreme Court has admonished, the economic reality of a transaction or scheme controls the investment contract analysis, irrespective of legal terminology or formalisms that may attempt to disguise it.  *See, e.g., Howey*, 328 U.S. at 298-301.  *See also, e.g., Davis v. Metro Productions, Inc.*, 885 F.2d 515, 524-25 (9th Cir. 1989) ("It is well established that courts look beyond contractual language to economic realities in determining whether a transaction is an investment contract.").  *This is particularly so where, as here, the representations and disclaimers are false.*

SEC Brief at pp. 16-17 (emphasis added).  However, persons not involved in the original transaction would be unable to ascertain whether statements made by one or more parties are in fact true or false.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

2. *Some Examples of Potential Investment Contract Transactions*

The process of retrospectively identifying whether a purportedly commercial sale would be deemed an investment contract transaction based on its specific facts and circumstances can best be illustrated by a few examples using the facts from our strowrange parable.

a. *Private Sale of Seeds to a Commercial Party*

First, let's say that, during its first year of operation, Strowrange Labs needs to raise additional funds to run its business. Labs may choose to undertake a one-off bulk commercial sale of strowrange seeds it reserved for itself to an agricultural company ("BigAg") with land available and appropriate for planting the seeds, documenting the transaction on a standard form of Supply Agreement which BigAg also uses for purchases of seeds and agricultural products from other suppliers. BigAg evaluates the value of the seeds on its own in the context of its business, taking into account its cost of planting the strowrange seeds, growing strowrange trees from them, and bringing the harvested strowranges to market. BigAg provides funding to Labs through the purchase price it pays and has a "consumptive" interest in the seeds. BigAg makes clear to Labs that they have no intention of holding the seeds any longer than the time needed to plant them in the next planting cycle.

This commercial sale would raise funds for Labs but is unlikely to be considered an investment contract transaction if challenged in court. This is because BigAg has a consumptive interest in using the seeds it acquired in its agriculture business and has a practical use for the quantity of seeds it is acquiring. In addition, there is no suggestion that BigAg is relying on the managerial efforts of Labs to make money from the seeds. As a result, if BigAg later believed that misrepresentations had been made to it by Labs or that Labs had failed to provide it with information that may have impacted the price BigAg was willing to pay for the seeds, their primary avenue for recourse would be to enforce the contractual provisions in the Supply Agreement or to make state law fraud claims[140] – federal securities law protections would (appropriately) not be available to them.

b. *Private Sale of Seeds to a Financial Party*

Alternatively, Labs could offer the same number of strowrange seeds to a venture capital fund ("Fund") that made it clear to Labs that Fund believed in the work the horticulturalist and her team were doing and saw huge opportunities for its investors in the anticipated price appreciation of the strowrange seeds. In this scenario, Fund plans to warehouse a portion of the seeds for at least four years for long-term gains and provide the remainder of the seeds back to Labs for planting to create

---

[140] It is possible that BigAg could also pursue a claim that they were subject to unfair or deceptive acts and practices and endeavor to get the FTC interested in investigating.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

more current income.  To effect this, Fund and Labs also document their relationship as a purely commercial one and enter into two legally binding agreements: a Strowrange Seed Sale Agreement and a Strowrange Seed Management Agreement.  Pursuant to the second of these, Labs agrees with Fund to plant a portion of the strowrange seeds sold in the Strowrange Seed Sale Agreement, cultivate the trees, and harvest and sell the fruit, remitting 80% of the net proceeds of all strowrange fruit sales to Fund and retaining 20% of the proceeds as a commission.

Unlike the first example however, the sale of seeds to Fund, coupled with the Strowrange Seed Management Agreement, would likely result in a court finding that the sale and management arrangement (but not the seeds themselves) constituted an investment contract transaction as the result of arrangement meeting all four prongs of the *Howey* test.  This is the case notwithstanding that the agreements which parties entered into on their face appeared to be purely commercial in nature – there was no suggestion of a securities offering anywhere to be found in the relevant documentation.

This conclusion is reached because Fund is not only providing economic value to Labs – an "investment of money" but is also expecting a profit to come, not from its "consumptive" use of the seeds, but from the entrepreneurial and managerial efforts of Labs, on which it is relying.[141] The presence of the Strowrange Management Agreement creates a *legal relationship* between the parties and, at least in certain Circuits,[142] also confirms that Fund and Labs are collaborating in a "common enterprise".  Fund is anticipating a dramatic increase in the price of the seeds they purchased as demand for strowranges increases over time.  The gains made from later sales of the seeds will benefit Fund's investors (who are simply looking for a high cash-on-cash return on capital deployed, not to get into the fruit business).

Although this arrangement would very likely be considered a securities transaction, assuming that Labs did not make a public offering of the opportunity to buy seeds from it on similar terms and took care in determining that Fund qualified as an accredited investor, the *transaction* would likely be exempt from registration under Section 4(a)(2) of the Securities Act as a transaction "by an issuer not involving any public offering".  The question of whether the strowrange seeds were themselves "securities" for purposes of the Securities Acts would not be relevant to the outcome of this analysis.  However, the transaction would still be

---

[141] Here we see an example of where strowrange seeds differ from crypto assets in important ways.  Unlike the seeds, for which a financial party like Fund would be unlikely to have a consumptive use, had we instead been considering a crypto asset that functioned as the native asset of a proof-of-stake "layer 1" blockchain network, Fund might well have elected to hold that asset for its intended consumptive use—staking to help secure the network.

[142] *See*, *also*, text at notes [149] to [160].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

subject to the antifraud rules in the Securities Acts.[143]   As a result, no addition to state law remedies for fraud or a possible state of federal investigation by the attorney general's office or the FTC, Fund may be able to pursue claims of material misrepresentations made by Labs in federal court and may be able to take advantage of other provisions of federal securities law.

### c.   *Direct Public Sale by Labs*

In a third alternative, the horticulturalist does not heed the advice of her counsel and announces on Twitter that what she calls a "once in a lifetime" opportunity will soon be presented in which anyone can join the "strowrange craze" and buy some strowrange seeds for themselves.  The Twitter post goes on to talk about "democratizing the fruit market" and putting power back into the hands of fruit eaters by widely distributing strowrange seeds.  A link to Strowrange Labs' website is provided that has a clock counting down to the time when the sale will start.  The website also hosts a "mauve paper" (in honor of the color of the strowrange fruit) that explains what it heralds as the many benefits of growing and consuming strowranges.  The paper extolls the many academic degrees and real-world experience of the horticulturalist and her team and provides a "roadmap" of steps Labs plans to take to develop the strowrange market over the next several years using the proceeds of the seed sale.  The sale of seeds is open to anyone who has gone through a know-your-customer check, but no effort is made to limit the number of seeds that any given purchaser can buy, to determine what purchasers intend to do with their seeds, or to ascertain whether purchasers are accredited investors.  Labs even offers to hold (or custody) purchased seeds for those customers who do not have the right equipment for this.  Social media posts are made by Labs implying that they are hard at work getting established seed marketplace providers to make strowrange seeds available for purchase and sale so that purchasers seeking to dispose of their seeds would have what Labs refers to as "liquidity".

This fact pattern differs from the prior one in two important ways.  First, although Labs published the mauve paper, which contains a great deal of puffery but makes no concrete promises, and posted Terms of Service on its website, which addresses the terms of the seed sale and contain numerous disclaimers but does not provide any ongoing undertakings, there is no equivalent to the Strowrange Management Agreement present in the prior example.  The disclaimers provided by Labs make clear that seed purchasers are expressly not to rely on Labs to undertake any particular "efforts" at all and that any plans mentioned in the mauve paper may be discontinued at any time.

---

[143] *See* Exchange Act Section 10(b) (15 U.S.C. § 78j(b) and Commission Rule 10b-5 (17 C.F.R. § 240.10b-5).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Second, unlike in the prior example, care was not taken by Labs to avoid offering the seed purchase opportunity to the general public in the United States. In fact, casting caution to the wind, U.S. residents were welcomed by Labs as seed purchasers with open arms. Many of these U.S. persons were retail individuals who had heard chatter about strowranges and other so-called "new fruits" that were emerging in the wake of the strowrange on social media but who had little understanding of the risks involved in buying and holding these new types of seeds. The mauve paper had only the lightest of risk factors and did not come close to providing the level of detailed information that would have been required in a public offering of securities. Unlike Fund however, which was highly sophisticated with access to specialists in the science of horticulture as well as unlimited direct contact with the Labs leadership team to help guide them in their decision-making, it was reasonable to conclude that these retail purchasers were mostly unsophisticated in matters of horticulture and whose purchases were likely mostly driven by market hype.

While this arrangement unquestionably raises important consumer protection issues, is it an investment contract transaction? Purchasers are paying for the seeds and the proceeds of those sales are being used by Labs to help them develop the strowrange "ecosystem", so the investment of money prong of the *Howey* test should be easily met. Likewise, seed purchasers almost certainly had a reasonable expectation of profit arising from the efforts of Labs. Strowrange seeds were being sold by Labs in large quantities and required a fair amount of expertise to plant and grow – factors that make it unlikely that many purchasers had a "consumptive interest" in the seeds (*i.e.,* a desire to plant the seeds themselves and use them for their intended purpose). Moreover, the prospect of liquidity through an ability to resell the seeds on secondary markets provided purchasers an easy path to realize profit. As to the final prong needed to establish an investment contract transaction – "common enterprise" – the position is less clear. We will look much more closely at this prong of the *Howey* test in the next section.

Regardless of the ultimate conclusion, the question of whether this third arrangement constitutes an investment contract transaction takes on much greater import in comparison with the two prior examples. In the privately negotiated sale of strowrange seeds to Fund the consequences of the arrangement being considered an investment contract transaction were relatively limited – no registration of the transaction with the SEC would be required either way. In the third example, however, an exemption from the registration requirements of the Securities Act is likely not available. If a court were to conclude that the offer and sale of the strowrange seeds constituted an investment contract transaction, then Labs' failure to register the transaction would be a violation of Section 5 of the Securities Act. The SEC would be entitled to seek an injunction stopping the sale,

46

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

disgorgement of amounts unable to be returned, and civil penalties.[144] Those purchasers who did acquire seeds would benefit from a right of rescission as well as the antifraud protections of the Exchange Act.[145]

> #### d.  Some Observations about Facts and Circumstances in a *Howey* Analysis

All three of the above transactions were ostensibly commercial sales of strowrange seeds – the documentation used by the parties did not in any way refer to the Securities Acts or suggest that the expectation of the parties was that the transaction was subject to the protections of those laws.  In the absence of a subsequent dispute or concern coming to light, the question of whether any of these arrangements should properly be recharacterized as investment contract transactions – *i.e.*, "constructive" securities offerings – simply does not arise.

It is only when things go wrong commercially between the parties or a regulator identifies and determines to investigate and, ultimately, pursue a violation that courts are charged with looking backwards and examining all of the facts and circumstances *of the particular transaction in question* to determine whether the federal securities laws should properly be applied to that transaction under the *Howey* jurisprudence.  For example, we noted in looking at Labs' sale of seeds to BigAg that there did not appear to be any reason to conclude that BigAg was relying on Labs for their expectation of profit or that the other factors of the *Howey* test were present.

But what if there were additional facts?  For example, what if after completing the sale, BigAg became disenchanted with their purchase. Let's say that the chief of procurement for BigAg was ready to testify that, at a meeting he had with Labs shortly before agreeing to the seed purchase, the horticulturalist stated that Labs was "weeks away" from inking a joint promotional deal with a major fast-food chain to roll out strowrange-flavored milkshakes nationwide and that Labs needed the proceeds of the seed sale to BigAg to fund the completion of the development of a secret formula crucial for making these shakes.  Let's say that this statement was a gross exaggeration and that no deal for strowrange shakes emerged with any fast-food chains.  In fact, shortly after BigAg's purchase, the strowrange seed bubble burst and prices, as well as interest, in the strowrange evaporated.  Perhaps the procurement chief was also ready to testify that BigAg had based their purchase entirely in reliance on the horticulturalist's statements at that meeting?  Would this be enough to allow BigAg to get past a motion to dismiss in federal court that their transaction with Labs was actually an investment contract transaction? Would it make a difference if BigAg negotiated an additional provision in

---

[144] *See, e.g.*, *S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[145] *See*, *supra*, note [143].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

their standard Supply Agreement containing a covenant on the part of Labs to use the proceeds of the sale to develop the secret formula?

Similarly, in the third scenario, what if Labs had been more circumspect, eliminating all promotional activity referencing anything other than the nutritional and taste benefits of the strowrange and making no references to "roadmaps" or other ongoing activities on the part of Labs?  Perhaps Labs also limited sales to 10 seeds per customer unless the customer submitted information to Labs demonstrating a legitimate consumptive need for more than that number of seeds.  Would these facts and circumstances tip the scales away from investment contract transaction status?  Alternatively, let's say that the terms of the sale on Labs' website contained a promise that the first 1,000 seed purchasers would be entitled to a "kicker" equal to 3% of all of Labs' revenue divided ratably based on the number of seeds purchased.  If a potential seed purchaser became concerned and complained to the SEC, would the Commission be entitled to an injunction to stop the sale?

As we can see from our examples, the *Howey* process is inherently backwards looking and fact dependent.  Small changes in the facts can significantly change the outcome.  Before we move from the facts in our parable to the facts in the various investment contract cases, we take a closer look at the "common enterprise" prong as this will prove to be essential when we examine secondary transactions in crypto assets.

3.  *The Common Element in "Common Enterprise"*

Our review of the appellate jurisprudence on investment contracts focused in particular on those decisions addressing the "common enterprise" prong of the test.[146]  Of the total of 266 relevant federal appellate and Supreme Court decisions reviewed, approximately 62 had more than a cursory reference to the concept of "common enterprise".  Of those, 37 decisions either found that an investment contract transaction or scheme was present or remanded for further fact finding.  In each of these decisions, the one constant, even in the decisions taking the most plaintiff-friendly position that *any* significant reliance on the part of the participant on the sponsor — irrespective of the nature of the sponsor's benefit from participating — would be sufficient to give rise to commonality (known as "broad vertical commonality"), was that the common enterprise was

---

[146] This prong has probably been the most controversial in the area of investment contract analysis, with many disputes and scholarly articles turning on how to correctly interpret the *Howey* Court's meaning.  There is a significant unresolved split in the Circuits on this issue between Circuits that require "horizontal" commonality to be shown in order for an investment contract to be present and those that will also accept either broad or narrow "vertical" commonality as well, which is easier for individual plaintiffs to establish.  *See generally Loss Treatise,* Chapter 3 at pp. 21-23 (discussing the difficulties of each of these approaches to common enterprise); James D. Gordon III, *Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes*, Colum. Bus. L. Rev. 635 (1988) ("Defining Investment Contracts") (evaluating the different approaches to common enterprise and proposing a novel "multiple investors test" which is "an enterprise that is in common among the promoter and multiple parallel investors.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

based on a direct business relationship between the sponsor and the participant.[147]

As we have seen, the *Howey* test is applied retrospectively to obtain the policy objective of providing a federal remedy to participants in "uncommon, irregular and unusual" investment schemes[148] who a court concludes merit the protections of federal securities law.  Accordingly, it should come as no surprise that some of the widest readings of the common enterprise element of *Howey* have been applied in the context of obviously fraudulent endeavors where courts have sought result-oriented interpretations.  Thus, we see the Fifth Circuit developing the "broad vertical commonality" test in the context of a Ponzi-like multi-level marketing scheme of independent distributorships, purportedly for the sale of cosmetics, operated by the infamous Glenn W. Turner.[149]

Nevertheless, broad vertical commonality has also been applied by courts in more traditional business settings.  A good example of this is *Villeneuve v. Advanced Business Concepts Corp.*[150]  In *Villeneuve*, the defendant, Advanced Business Concepts Corp. ("ABC"), sold area distributorships of self-watering planters, providing the planters, display merchandise, and a display rack as well as selecting the retail locations at which the planters would be sold.  The purchaser of the distributorship was expected periodically to check and restock the displays and received one-half of the proceeds planter sales (the remaining profits going to the retailer).  The rights and obligations of ABC and the distributor were set out in an "area purchaser agreement".  After approving the broad vertical commonality position taken in *Koscot*, the *Villeneuve* court concluded that "commonality" for purposes of the *Howey* test did exist between ABC and the plaintiff and was "evidenced by the obligation [in the area purchase agreement] of ABC to provide advertisements, training, products, and to select the areas where products are sold.  The failure to provide any of these services would definitely determine the success or failure of the scheme."[151]

---

[147] A good example of this is *Shaw v. Hiawatha Inc.*, an unpublished Fifth Circuit decision, in which the court noted that the plaintiffs alleged that the defendants' agents told them that they "would be in business together" coupled with a letter from an officer of the defendant stating that he was looking forward to a "long and profitable relationship" with the defendants.  *Shaw v. Hiawatha Inc.*, 884 F.2d 582 (9th Cir. 1989).

[148] *See* Defining Investment Contracts, *supra* note [146] at p. 658 (footnotes omitted).

[149] *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974) (finding that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the Koscot meetings.").  For more on Glenn Turner, *see* Molly Ivins, "*Dare to Be Great*", The New York Times, Feb. 20, 1977, available at https://www.nytimes.com/1977/02/20/archives/dare-to-be-great-a-sincere-con-man.html#:~:text=Glenn%20W.,called%20Dare%20to%20Be%20Great; *see also* Raji Isa Mas, "That's What Friends Are For", 56 Duke L. J. 111 (2007).

[150] 698 F.2d 1121 (11th Cir. 1983), *aff'd en banc*, 730 F.2d 1403 (11th Cir.1984) (rejecting a finding of an "investment contract" due to a lack of a sufficient reliance of the plaintiffs on the efforts of ABC).

[151] *Id.* at 9.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Another relevant example is *Long v. Shultz Cattle Co.,*[152] a case involving the sale of cattle embryos.  In *Schultz Cattle*, the Fifth Circuit focused on the relationship between the plaintiffs and the Shultz Cattle Company, Inc. ("SCCI"), emphasizing the "vertical commonality" between each of the plaintiffs and SCCI and noting that "the critical inquiry is confined to whether the fortuity of the investments collectively is essentially dependent upon the promoter expertise."[153]  Nonetheless, the *Schultz Cattle* decision cites to the SCCI's cattle feeding consulting agreements.  Pursuant to  these agreements SCCI "received substantial 'consulting fees' from its clients in exchange for its services in constructing and administering effective tax shelters through the cattle feeding business,"[154] thus demonstrating that there was an inextricable contractual and business link between the plaintiffs and SCCI.

The Fifth, Ninth, and Eleventh Circuits' adoption of a "vertical commonality" standard,[155] differs from that of the majority of the Circuits, which have rejected – or at least not (yet) recognized – that a showing of vertical commonality alone is sufficient to establish the common enterprise element of an investment contract transaction.  The horizontal commonality approach instead looks for a pooling of assets from multiple investors so that all investors share in the profits and risks of the enterprise.[156]  The cases focusing on the need for horizontal commonality also turn on a direct business relationship between the person or entity deemed to be the "investor" and the sponsor.

This is illustrated in *S.E.C. v. SG Ltd.*[157] a case in which the First Circuit was tasked with determining whether virtual shares of eleven different "virtual companies" fell within the purview of federal securities laws.  In affirming that the SEC had alleged sufficient facts to state a triable claim, the court applied the horizontal commonality test.  In addition to the "unambiguous" representation on the defendants' website that pooling of investors' money was occurring, the court observed that the "requisite" profit-and-risk sharing necessary to support a finding of horizontal commonality was also present.[158]  Critically, the *SG* court highlights the specific promises made by the defendants on their website to the new participants as being indicative of a finding of horizontal

---

[152] 881 F.2d 129 (5th Cir. 1989).

[153] *Id.* at 140, quoting *S.E.C. v. Continental Commodities Corp.*, 497 F.2d 516 (5th Cir. 1974).

[154] *Id.* at 142.

[155] The Ninth Circuit follows narrower version of vertical commonality, instead focusing on whether the fortunes of investors are linked with those of the promoters, as opposed to the vertical commonality of the Fifth and Eleventh Circuit, which focuses on the dependency of the investor on the promoter's expertise.

[156] *See Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001 (6th Cir. 1984) ("Horizontal commonality ties the fortunes of each investor in a pool of investors to the success of the overall venture.  In fact, a finding of horizontal commonality requires a sharing or pooling of funds." (internal citation omitted)).

[157] 265 F.3d 42 (1st Cir. 2001).

[158] *Id.* at 52.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

commonality.[159]   Indeed, even if those elements were not present, that court goes on to say that the defendants' "promise to pay referral fees to existing participants who induced others to patronize the virtual exchange provides an alternative basis for finding horizontal commonality."[160]

There has been an ongoing question as to whether a *written* contract is required to establish the presence of an investment contract transaction.   This issue recently came to a head in an exchange of memoranda in support of the plaintiff's and defendants' motions for summary judgment in *S.E.C. v. Ripple Labs, Inc. et al.* where the defendants took the position that the presence of a legal agreement was a necessary element of the *Howey* test – a position the SEC strongly disagreed with.[161]   Interestingly, our survey of the appellate jurisprudence found in Annex A demonstrates the contrary conclusion: a traditional written contract *is indeed present* in almost every instance where an investment contract transaction or scheme has been found by an appellate court.

In fact, appellate courts have frequently focused specifically on this issue and *declined* to find an investment contract scheme in cases where the plaintiff was not able to allege the presence of a written agreement that went beyond the sale of a non-financial asset, such as land. For example, in *Woodward v. Terracor*,[162] a land development case from

---

[159] The Defendant's "promise to divert a portion of its profits from website operations to support the privileged company's shares [is] a bond that ties together the collective fortunes of those who have purchased the shares". *Id*. at 51.

[160] *Id.*

[161] In support of its position that courts applying *Howey* do not require the existence of a written contract, the SEC stated that "many such cases exist, stretching back decades", citing quoted dicta in *Canadian Imperial Bank of Comm. Tr. Co. v. Fingland*, 615 F.2d 465 (7th Cir. 1980).  Notably, however, in *Fingland,* the court found that the plaintiff, a bank acting as trustee and seeking to demonstrate the presence of an investment contract with a bankrupt sub-trustee, failed to present a physical document or clear evidence of an oral agreement that evidenced the existence of an instrument that should be considered a "security", but nonetheless stated in dicta in a footnote that "oral agreements have been held to be securities".  Also cited were *Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014), a decision in which there was no *determination* that investment contracts existed based on unwritten agreements in a fraud case because the defendants had previously stipulated that certain transactions involving rare coins they had entered into with the plaintiff had constituted "investment contracts" and thus "securities transactions" in exchange for plaintiffs dropping related RICO claims; *S.E.C. v. SG Ltd*., 265 F.3d 42 (1st Cir. 2001), a case involving virtual shares purchased from defendant's website which expressly promised a guaranteed return (albeit without a formal written agreement); and *S.E.C. v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), in which the court found that sales of certain "adpacks" by the defendants met the *Howey* test, after noting that there was no document explaining how revenue is shared between the platform users and the defendant. However, in both of these latter two cases, the court was readily able to determine and identify the specific promises made by the defendants to platform users and there existed a direct business relationship between the parties.  *See* Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J at 19-21, *S.E.C. v. Ripple Labs, Inc.* (20 CIV. 10832 (AT)(SN)) (Oct 21, 2022).

[162] *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir. 1978).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the Fifth Circuit, the plaintiffs alleged fraudulent misrepresentations by the defendants as to the defendants' financial ability to carry the real estate project to final completion, causing the plaintiffs to sustain a loss. The court stated that "We particularly fail to see any common venture or common enterprise between the plaintiffs and Terracor."[163]  Elaborating on the issue, the court pointedly addressed the issue of whether a written contract was needed:

> Terracor itself was involved in a business venture. Terracor was developing a new residential community. As part of its venture Terracor sold lots to persons who either intended to build houses thereon, or intended to resell to others who would so build. But the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor. The only contractual agreement between plaintiffs and Terracor was the Uniform Real Estate Contract. Terracor was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met. *Unlike Howey, Terracor was not under any collateral management contract with the purchasers of its land.* In short, the record in the instant case simply shows the purchase by the plaintiffs of lots in a real estate development. Though it is possible that the plaintiffs may have a common-law remedy against the defendants arising out of the purchase of the lots, such does not mean that the transaction itself is an "investment contract," thereby invoking the provisions of the federal securities laws.[164]

Nevertheless, there are a small number of notable exceptions[165] and it is the authors' view that the broad remedial objectives of the Securities Acts do not support a formalistic requirement that a written agreement always be present in every investment contract scheme if the "facts and circumstances" of the particular transaction merit otherwise.[166]

---

[163] *Id*. at 1025.

[164] *Id.,* at p. 1026.

[165] The most significant of these, ironically, is *S.E.C. v. C.M. Joiner Leasing Corp.,* 320 U.S. 344 (1943), the very first Supreme Court case looking at the concept of an investment contract. In *Joiner*, the Court found an implied contract to drill test wells for oil to be present in a scheme in which leasehold interests in small parcels of land were sold along with a marketing brochure that promised the potential for high returns if oil was discovered, even though a traditional contractual promise was not part of the parties' bargain.

[166] An example of the unusual facts that need to be present such that the absence of a formal agreement is not considered an impediment to a potential investment contract finding is *McKinney v. Panico*, 2022 U.S. Dist. LEXIS 178068; 2022 WL 4551695 (N.D. Ill 2022). *McKinney* involved an alleged multi-year conspiracy in which the victim (since deceased) was alleged to have been defrauded out of over $20 million in a series of eight separate fraudulent business ventures over 10 years. The defendants stipulated as to the presence of securities law violations to induce the plaintiff to drop RICO claims relating to the same activity. However, the plaintiff (the son of the deceased victim) later had second thoughts and sought to argue that there was no securities transaction in fact because the arrangements

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

However, in those very limited appellate cases in which an investment contract was found without there being a written contract between the parties that related to the investment contract transaction, the elements of an implied-in-fact contract are always present.[167]

As discussed above, whether there is a written agreement or facts which would support the finding of an implied-in-fact contract, the one constant across all appellate cases finding an investment contract scheme is the presence of some form of *business relationship* between the parties. This point is further driven home by the Supreme Court's very use of the term "common enterprise".  Although, as discussed above, courts have debated the type of common enterprise that is required to be shown (*i.e.,* "horizontal", or broad or narrow "vertical"), some sort of enterprise or business relationship between the parties is a constant in the *Howey* case law finding an investment contract.  To this end, the definition of the word "enterprise" in Black's Law Dictionary is instructive: "1.  An organization or venture, esp. for business purposes. … 3.  One or more persons or organizations that have related activities, unified operation or common control, and a common business purpose."[168]  Although parties connected by a written contract or other arrangement that would support an implied-in-fact contract may have a "common business purpose", no appellate decision has found or suggested that the ownership of a non-financial asset, without some business relationship, would be in a "common enterprise".

### 4.  *Concluding Thoughts*

---

between the parties constituted a general partnership.  In these convoluted facts, the court declining to grant a motion to dismiss request by the defendants, nevertheless did not allow the absence of written agreements for the ventures to prevent the finding of sufficient support for the stipulated securities law violations, thus barring the plaintiff's RICO claims, citing dicta in *Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465 (7th Cir. 1980).

[167] A contract implied in fact requires the same elements as an express contract and differs only in the method of expressing mutual assent.  The Supreme Court has defined an implied in fact contract as one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding".  *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923).  For examples of federal appellate courts finding the presence of an investment contract transaction based on an implied-in-fact contract (rather than a traditional written contract), *see, e.g., SEC v. C. M. Joiner Leasing Corp.,* 320 U.S. 344 (1943) (finding that sales and assignments of oil leases were not merely the sale of naked leasehold rights but an investment contract, as the terms of the offering suggests "an implied agreement to complete the wells" without which the instruments had no value*) and  S.E.C. v. MacElvain*, 417 F.2d 1134 (5th Cir. 1969) (finding that the second offer of interests in underwater mining claims created an investment contract because the defendants "impliedly, but clearly and definitely, promised" to contest the U.S. Department of Interior's interest in the land with the money received from the purchasers, inuring to the benefit of all purchasers, despite the disclaimer of any "collateral offer, promise, or assurance of any nature whatsoever").

[168] Black's Law Dictionary, 11th Ed. (omitting definitions relation to government and RICO enterprises).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

We have seen that the term investment contract as used in the Securities Acts was borrowed from state Blue Sky laws to effectuate Congress' broad remedial intent of providing remedies for investment fraud.  Although the term has been used by courts to refer to certain instruments with terms outside of those of any other enumerated category in the statutory definition, it has been more commonly applied to ostensibly commercial transactions or schemes that are deemed to fall within the policy ambit of the Securities Acts.

A *post facto* application by a court of investment contract status on a commercial arrangement is of necessity dependent on the specific facts and circumstances present at a particular point in time.  Moreover, regardless of the type of common enterprise involved in the investment scheme, courts consistently look for a direct business relationship between the parties in the "enterprise".  In addition, in those rare cases where an investment contract is found without there being a written contract, the elements of an implied-in-fact contract between the party providing the "investment of money" and the party either undertaking the "entrepreneurial or managerial efforts" driving the funder's expectation of profits or otherwise soliciting the investment from the funder are present.

Critically, contrary to the frequent suggestion that the *Howey* test is somehow "outdated",[169] the development of crypto assets did not fundamentally change the test's application or render it unfit for purpose for transactions involving crypto assets.  Long before the advent of blockchain technology, significant uncertainty existed as to when a court would retrospectively apply federal securities law to an ostensibly commercial arrangement.

What becomes clear upon an examination of the *Howey* appellate jurisprudence is the blurring of a clear investor protection sentiment, particularly in those cases brought by the SEC (which historically has focused its enforcement efforts on circumstances where sponsor behavior has resulted in broad investor harm), with other cases in which one party to a commercial dispute seeks to impose *post facto* the application of the federal securities laws to gain an advantage in litigation.  Zealous counsel are well aware that there are the myriad substantive and procedural advantages available to a disgruntled party to a business arrangement if they are able successfully to assert the retrospective application of federal securities law.

---

[169] *See, e.g.*, Curt Levey, "For Clarity on Cryptocurrency, Look to Congress or the Supreme Court", The Federalist Society, Aug. 1, 2022, available at https://fedsoc.org/commentary/fedsoc-blog/for-clarity-on-cryptocurrency-look-to-congress-or-the-supreme-court ("90-year-old statutes [do] not include anything like crypto—that is, crypto assets existing only on a decentralized ledger … that's distributed across disparate computers—in their definition of a security. … Like the definition of a security in the statutes, the *Howey* test is a poor fit for crypto.").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Where the parties to a given transaction do not at the outset document that transaction as an offer and sale of securities of some type (thus clearly invoking federal jurisdiction), it is inevitable that disputes will arise – this the direct result of the policy choice made by Congress to utilize a broad, principles-based definition of the term "security" in the Securities Acts. Our survey shows that a significant majority (56%) of these relevant disputes taken to the appellate level end either in a conclusion by courts that no investment contract was present and thus that the Securities Acts should not apply to the transaction (42%) or remand the dispute for further fact finding (12%). These failed attempts to bring a commercial transaction within the ambit of the Securities Acts demonstrate the challenges of a principles-based definition of the term "security" and, regardless of whether crypto assets are involved, makes it difficult to argue that the applicability of the *Howey* test is clear as to any given fact pattern, even where all of the "facts and circumstances" and "economic realities" of commercial arrangement are known to both parties.

### B.   Investment Schemes and Their Objects in the *Howey* Case Law

We have seen that a wide range of circumstances can, in hindsight, be deemed to constitute an investment contract transaction or scheme that triggers the application of the Securities Acts. A large number of these cases involve the purported sale of an underlying non-financial asset[170] which functions as the *object* of the scheme.[171] These cases uniformly highlight a critical distinction between the documents, marketing materials or oral statements that create the required "common enterprise" at the

---

[170] *See, e.g., Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971) (sales of beavers coupled with service agreements to house, feed, and otherwise care for the beavers were investment contracts); *Albanese v. Florida Nat. Bank of Orlando*, 823 F.2d 408 (11th Cir. 1987) (in a scheme to sell nonexistent ice machines, the court found that the right of the investors to enforce a preference as to the location of the ice machines leased back to the lessee was insufficient to disqualify the agreements as "securities"); *Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918 (4th Cir. 1990) (a cattle breeding program comprised of a purchase agreement and management contract was found to be an investment contract where the investor had limited control over the program and relied on the efforts of the defendants for essential functions such as the expert selection of embryos and crossbreeding).

[171] Other investment contract cases involve some other type of purportedly commercial contract between the scheme's sponsor and the participants in the scheme. Examples include a purportedly commercial distributorship arrangement that is found, in retrospect, to be little more than a disguised means of attracting investment capital from the participants (*see, e.g., S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982)) or an advisory agreement, usually involving purchases by the participant of commodities or commodity interests, where a court finds a "common enterprise" to exist between the participant and the advisor, usually due to the participant's reliance on the advisor and a shared economic interest in the success of the participant's trading activity (*see, e.g., S.E.C. v. Continental Com. Corp.*, 497 F.2d 516 (5th Cir. 1974)). However, these types of investment contract arrangements have not, to date at least, applied to crypto assets and so are not discussed here.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

center of a *Howey* analysis and the "object" being sold pursuant to the purported investment scheme.

In these cases, our highest courts have thus far focused solely on the character of the underlying commercial arrangements and the expectations of the parties, and not the nature of the object purportedly being sold (which is generally considered irrelevant to the legal analysis).[172]   The inconsequential nature of the object of an alleged investment scheme was recently reacknowledged in a motion for summary judgement by the SEC in *S.E.C. v. LBRY, Inc.*,[173] a case involving sales of crypto assets to fund LBRY, Inc., the developer of a blockchain-based media platform known as "LBRY".  In its memorandum of law in support of its motion, the SEC correctly concludes that, "If crypto assets, *or anything else*, are offered in a way that meets the three prongs of *Howey*, an investment contract exists, and the securities laws apply".[174]

We can see this distinction play out in key investment contract cases, starting with *Howey* itself.  The investment scheme at issue in *Howey* involved two separate agreements: a land sale contract for the purchase of orange groves paired with a separate service contract for the harvesting and sale of the oranges.[175]  The orange groves were the object of the *Howey* investment scheme, with the overall contractual arrangement involving the land sale, the management agreement, and the right to proceeds together constituting the transaction that resulted in the finding of an investment contract scheme.  There is no suggestion in the Supreme Court's decision that the outcome of the *Howey* case would have been different if the Howey company had instead been selling lemon groves, other fruit tracts, or indeed just about anything else.  What was relevant to the Supreme Court was not the object sold but the terms of the sales and associated contractual undertakings made.

Similarly, in *Blackwell v. Bentsen*,[176] another orange grove case decided a few years after *Howey*, investors were invited to purchase land

---

[172]   *Compare S.E.C. v. Edwards*, 540 U.S. 389 (2004) (considering the "investment contracts" which promised a fixed return in finding that a scheme to sell and leaseback payphones was an investment contract), and *S.E.C. v. Int'l Loan Network, Inc.*, 968 F.2d 1304 (D.C. Cir. 1992) (examining the promoter's marketing scheme along with promotional literature to find that there was a reasonable expectation of profits to be had by investors in certain chain letter schemes), *with United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) (despite the plaintiffs' characterization of the purchase of shares in a cooperative housing development as involving "stock" creating a federal subject matter dispute, the Supreme Court found that this was not a securities transaction since there was a clear "consumptive use for the apartment and there was no reasonable expectation of profit in the form of either capital appreciation or participation in earnings").

[173]   Memorandum of Law in Support of Motion for Summary Judgment, *S.E.C. v. LBRY, Inc.*, No. 21-cv-00260 (D.N.H.) (May 4, 2022) (the "SEC LBRY Summary Judgment Memorandum").

[174]   SEC LBRY Summary Judgment Memorandum at p. 19 (emphasis added).  Note that the SEC will sometimes condense the *Howey* test in to three prongs, combining "reasonable expectation of profits" with "efforts of others".

[175]   *Howey*, 328 U.S. 293, 295 (1946).

[176]   203 F.2d 690 (5th Cir. 1953).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

from, and enter into management contracts with, a development company for the purpose of cultivating citrus groves.  The Fifth Circuit found that the scheme involved an investment contract transaction.  Significantly, the court very clearly separated the investment scheme from its object, the land being sold, stating explicitly that "[i]f [the plaintiffs] merely purchased land, without more, such a purchase would not constitute an investment contract within the meaning of the Securities Act."[177]  Clearly, the object of the purportedly commercial transaction that gave rise to an investment contract was not, in and of itself, considered a security.

There are, of course, many additional cases in which it is clear that the object of the transaction or scheme which was alleged to give rise to an investment contract was not, in and of itself, a security.  For example, it was the agreements for the sale and leaseback of payphones in *S.E.C. v. ETS Payphones, Inc.*[178] which were found to be investment contracts, not the payphones being leased; it was the sale and management agreements with respect to chinchillas in *Miller v. Cent. Chinchilla Grp., Inc.*[179] and earthworms in *Smith v. Gross*,[180] which were found to be investment contracts, not the chinchillas or earthworms, respectively; it was the lease and security agreements of printing plates for foreign postage stamps in *Newmyer v. Philatelic Leasing, Ltd.*,[181] that were the investment contracts, not the stamp plates themselves.

We are able to draw similar conclusions from the 70-plus year history of *Howey* jurisprudence which reveals a long line of cases in which courts distinguish transactions involving the sale of real estate, oil drilling rights, animals and sundry other objects of a purported commercial arrangement[182] from the business arrangements and other facts and circumstances that gave rise to a finding that there exists an investment contract.  Indeed, in those transactions a sales agreement was almost always accompanied by an expectation of profit on the part of the purchaser, based on the seller or an affiliated entity performing post-purchase functions (such as picking, bundling and selling oranges,

---

[177] *Id*. at 693.
[178] 408 F.3d 727 (11th Cir. 2005).
[179] 494 F.2d 414 (8th Cir. 1974).
[180] 604 F.2d 639 (9th Cir. 1979).
[181] 888 F.2d 385 (6th Cir. 1989).
[182] *See, e.g., Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) ("The mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor."); *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co*., 608 F.2d 1297 (9th Cir. 1979) (holding that when seller's only obligation is to transfer title to land, no security is involved); *Rice v. Branigar Org., Inc*., 922 F.2d 788 (11th Cir. 1991) (holding that the purchase of lots in a beach-club development were not investment contracts for purposes of the Act, noting that appellants purchases purchased the lots primarily to use them, rather than to derive profits from the entrepreneurial efforts of the developer); and *Lynn v. Caraway*, 379 F.2d 943 (5th Cir. 1967) (finding no investment contract where there was no additional promise or agreement made in addition to the sale of the naked leasehold right).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

husbanding cattle and their embryos, or maturing whiskey in casks).[183] And, in each of these cases, the investment package (*i.e.*, the set of formal or informal agreements or understandings between the seller and the purchaser) is clearly distinguishable from the object of the scheme itself. Moreover, there is no suggestion in any of the appellate cases that the transfer of the relevant object to another "investor" *without an assignment or transfer of the benefit of the underlying promises*, would result in another securities transaction.

## C.   Secondary Sales under *Howey* and the *Hocking* case.

For purposes of this Article, "secondary sales" of crypto assets are those that do not involve the original seller of the crypto assets[184] in a fundraising transaction (that itself constitute an investment contract transaction). These secondary transactions acutely raise the question of whether the object of the investment contract transaction—the crypto asset—are themselves securities or not. This is because if the crypto asset is a security, the secondary transaction will of necessity be subject to federal securities law. Alternatively, if the crypto asset is not a security, then the secondary transaction will not be subject to federal securities law unless a separate investment contract transaction has been formed by that sale. However, many secondary transactions involving crypto assets, particularly transactions conducted on centralized marketplaces or on DEXes or other DeFi platforms, lack the characteristics of investment contract transactions and, therefore, would not be considered a securities transaction if, in fact, crypto assets are not considered securities under *Howey*.

Of the many federal appellate and Supreme Court decisions in which the *Howey* analysis is applied, none directly dealt with secondary transactions in the objects of investment contracts by the original buyer. In fact, we are aware of only one case analyzing a transaction under *Howey* that did *not* directly involve as a party the entity that would normally be

---

[183] *See, e.g., Rodriguez v. Banco Cent.*, 990 F.2d 7 (1st Cir. 1993) (finding that "a security *might* exist if the defendants had promised, along with the land sales, to develop [a thriving residential] community themselves," but that "[a] simple sale of land, whether for investment or use, is not a "security."); *Roe v. United States*, 287 F.2d 435 (5th Cir. 1961) (oil leases sold with sales pitches which promised extraordinary returns were more than offerings of naked leasehold rights and were investment contracts because the returns were garnered through the activities of persons other than the purchasers and as such, "if credited" would constitute the sale or delivery of an investment contract); and *Bamert v. Pulte Home Corp.*, 445 F. App'x 256 (11th Cir. 2011) (rejecting the plaintiffs contention that purchase agreements for at least one Orlando condominium unit were investment contracts because the plaintiffs were under no contractual obligation to join an offered rental pool or otherwise contract with the defendant's proposed rental agent, but that the plaintiff had sufficiently alleged the possible existence of an investment contract as to the exclusive rental agreements, if the rental agents were to be found to be affiliates of the condominium seller.

[184] Where the seller of the crypto assets is a legal entity established exclusively for this purpose, we also include the entity directing the establishment of the seller and receiving all or most of the proceeds of the sale here.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

considered the "sponsor" of the alleged investment contract scheme. In that case, *Hocking v. Dubois*,[185] Hocking, an individual investor looking for an income-producing property, through the encouragement of his real estate broker, Dubois, purchased a rentable condominium unit in a Hawaii resort from the condominium's original purchasers, the Libermans, in a secondary transaction (rather than buying another condominium unit directly from the developer of the resort). Following a review of written information provided to Hocking by the broker, Dubois, including information about the anticipated range of daily average rental income, shortly after the closing of the condo sale, Hocking entered into a rental pool agreement with HCP, a company acting as the rental pool operator for the resort.

When a balloon payment on Hocking's condominium mortgage came due, he defaulted, losing his condo unit. Aggrieved about this turn of events, Hocking then sought to recover his loss by bringing a lawsuit against Dubois (the real estate broker), claiming that the combination of the condominium purchase and his entry into the rental pool agreement constituted an unregistered securities transaction because he entered into both the sale agreement and the rental pool agreement so he could generate yield from the condominium as a rental property and was dependent on the "efforts" of the rental pool operator.[186] The District Court, holding that the condominium resale and rental pool agreement did not constitute an investment contract transaction because the condominium purchase was not conditioned on Hocking's participation in the pooling agreement, rejected Hocking's claims.[187]

On appeal, a tribunal of the Ninth Circuit reversed, finding that an "offering of a condominium with [a rental pool agreement] *automatically* makes the [transaction an investment contract]."[188] However, in light of the broad holding of the tribunal, the full Ninth Circuit agreed to rehear the case *en banc*. The SEC took the highly unusual step of submitting an *amicus* brief to the court arguing that the facts did *not* warrant the finding of an investment contract transaction. A 5-4 majority of the Ninth Circuit disregarded the SEC however and held that, although the combination of the condominium purchase and the rental pool agreement did not *automatically* constitute an investment contract transaction, such a conclusion was still a possibility and thus, there was evidence of triable issues of material fact to deny summary judgment, remanding the case to the lower court for further fact finding.[189] In doing so, the *Hocking* majority on rehearing reasoned:

---

[185] *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ("*Hocking II*"), *cert. denied* 494 U.S. 1078 (1990).

[186] *Id.*

[187] *See Hocking v. Dubois*, No. 83-823, slip op. at 3 (D. Nev. Mar. 20, 1985).

[188] *Hocking v. Dubois*, 839 F.2d 560, 565 (9th Cir.) (emphasis in original), withdrawn, 863 F.2d 654 (1988).

[189] *Id.* at 1462.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

We agree with defendants and *amici* that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security.  Such a *per se* rule would be ill-suited to the *examination of the economic reality of each transaction required by Howey*.  In the context of isolated resales, each case requires an analysis of how the condominium was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreements.  The investor's intentions and expectations as communicated to the broker would be relevant in determining what investment package was actually offered.[190]

The majority went on to explain how this case can be distinguished from *Howey*:

> There is no doubt that, had Hocking purchased the condominium and the rental pool directly from the developer and an affiliated rental pool operator, and had the rental pool been for a long term without any provision for early termination, Hocking would have purchased a security.

> Hocking, however, did not purchase the condominium in the initial offering from the developer. He purchased in the secondary market from the Libermans.  Further, Hocking entered into the rental pool agreement with HCP [an entity not affiliated with the real estate broker, Dubois], and has, defendants argue, failed to demonstrate any link between HCP and the developer. Finally, unlike the investors in *Howey*, Hocking could legally terminate the [rental pool agreement] according to its terms and regain control over the condominium.  We must determine therefore whether these differences from *Howey* make Hocking's alleged transaction into an ordinary real estate purchase or whether it nevertheless could prove to be the purchase of a security.[191]

Critically, the majority in *Hocking* did not assume that because the purchase of the condominium and the rental pool agreement directly from the developer would have constituted an investment contract transaction, that the purchase of those same items from a secondary seller through the broker should *automatically* be treated as an investment contract transaction as well.[192]   Rather, the majority's analysis relied on an application of the *Howey* test to the specific facts and circumstances

---

[190] *Hocking II, supra* note [185] at p. 1462 (emphasis added).
[191] *Id.*
[192] *Id.* at 1456.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

surrounding Hocking's (secondary market) purchase of the condominium and the rental purchase agreement before them.

Moreover, the *Hocking* court's inquiry as to whether an investment contract transaction had been created by Dubois was "not limited to the contract or other written instrument."[193]  All of the facts and circumstances at issue, including those facts that would be known only to the parties, were important to the analysis.  That is because the Ninth Circuit reached what should be a self-evident conclusion: since the *Howey* test by its terms applies to "contracts, transactions or schemes", rather than assets, each time a court seeks to determine retrospectively whether an investment contract was present, they must analyze the facts and circumstances of a specific *transaction*.

### D.        The Ineluctable Element of a Security: A Legal Relationship between an Issuer and an Owner

To better understand the application of the Securities Acts to secondary transactions in crypto assets we have examined the unique characteristics of investment contract transactions, established that clearly non-financial objects of an investment contract transaction are not themselves securities as a result of being sold as part of such a transaction, and concluded that the *Howey* test is correctly applied on a transaction-by-transaction basis.

However, it could be argued that crypto assets are best understood as a new type of *instrument or interest* that itself constitutes a security independent of character the transactions in which it is transferred.  To address this proposition, we take a closer look at the most foundational question of all: what makes an instrument or interest a security in the first place?[194]

---

[193] *Id.* at 1457 ("Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale.  Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case" (quoting *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) (citations omitted)).

[194] This topic has been much discussed by scholars over the last several years. *See, e.g.*, Ronald J. Coffey, *The Economic Realities of a "Security" – Is There a More Meaningful Formula?*, 18 W. Res. L. Rev. 367 (1967); FitzGibbon, *What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*, *supra* note [119]; Michael P. Malloy, *The Definition of Security: Marine Bank v. Weaver*, 24 B.C. L. Rev. 1053 (1983); Williamson B.C. Chang, *Meaning, Reference, and Reification in the Definition of a Security*, U.C. Davis. Vol. 19:403 (1986); and Philip F. Franklin, Note, *Definition of a Security: Landreth Timber Co. v. Landreth*, 40 Sw L.J. 879 (1986).  A selected bibliography of scholarly articles on the definition of the term "security" under the federal securities laws and the subject of investment contracts more generally is provided in Annex B, grouped between pre- and post-crypto asset scholarship.  In addition, the leading treatise on federal securities law, the *Loss Treatise,* devotes over 230 pages and over 500 footnotes exclusively to assisting practitioners and others answer the question "What is a security?".

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

*1. The Essential Element of a Security – A Bundle of Rights Created by an Issuer*

As noted earlier, the Securities Acts enumerate a wide variety of instruments and interests that are considered *prima facie* securities (unless the context requires otherwise, of course), plus the catch-all categories of investment contract and "any interest commonly known as a security".[195] The one critical quality that can be found across each of the enumerated categories is the presence of a *legal relationship* volitionally established by an identifiable legal entity that acts as the *issuer* of the security and the various other parties who, from time to time, are *owners* of that security.

A review of the enumerated categories of security in the Securities Act provides detail on the nature of the types of legal relationship that can characterize a "security". Taken generally in the order listed in the Securities Act:

- A "note" is created through a legal relationship established by a writing containing a promise to pay a sum certain on a specified date allowing the holder to collect that debt at maturity or earlier, if acceleration is contemplated;
- "Stock", "treasury stock" and "transferable shares" are created by the board of directors of a corporation adopting a resolution that complies with applicable state law for the issuance of stock with any shares of stock issued creating a legal relationship between the issuer and the stockholder providing the stockholder with the rights prescribed by statute, as may be permissibly modified by the terms of the particular type of stock authorized;
- "Securities futures" and "securities-based swaps" are contractual arrangements that creates a legal relationship by providing the counterparties with rights to payment and other rights against the issuer negotiated for in the relevant documentation;
- "Bonds" and "indentures", like notes, are written documents that provide specifically enumerated rights to their holders, creating a legal relationship with the issuer;
- Although it is less clear what form an "evidence of indebtedness" could take, since of necessity some form of indebtedness is required, it is plain that the owner of the evidence of indebtedness would have a contractual claim for, and a legal relationship with, the person or entity that was subject to the indebtedness;
- A "certificate of interest or participation in any profit-sharing agreement" will provide the holder with the enumerated rights

---

[195] *See* Section II.D.3 *infra*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

set out in the relevant governing document, creating a legal relationship with the issuer;

- "Collateral-trust certificates" are a type of secured debt obligation and thus provide negotiated rights and create legal relationships;

- A "preorganization certificate or subscription" is described in the Loss Treatise as "stock in a corporation as yet unborn", which further notes that "preorganization certificates or subscriptions are securities distinct from the ultimate stock, and their issuers are the promoters", confirming that these instruments as well provide the owner with distinct rights against, and create a legal relationship with, an identified issuer;[196]

- A "voting-trust certificate" is an interest in a voting trust – a contractual arrangement created expressly to allocate voting rights among shareholders of a corporation thus also creating a legal relationship among these shareholders;

- A "certificate of deposit for a security" allows a security owner to create fractional interests in the security or to create a new security that references the underlying security and, in either event provides negotiated rights to the owner by the depositor entity thus creating a legal relationship between the owner and the depositor;

- A "fractional undivided interest in oil, gas, or other mineral rights" likewise is created to provide contractual rights to investors by the issuer of the interests – the individual or entity that owns the underlying rights and who thereby forces a legal relationship with the issuer;

- A final group of derivative rights, including a "put, call, straddle, option" or other similar interests, each of which are created in advance by a contract that sets out the investors' specific rights and that create a legal relationship with that issuer; and

- Any "certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase" any of the enumerated types of security, all of which will clearly prescribe a set of rights that the holder will benefit from and create a legal relationship between the holder and the issuer.

On its face, necessary presence of a legal relationship between the issuer of a security and its owners should not be surprising. Throughout the Securities Acts it is assumed that all securities will have an "issuer"— an identifiable person or entity that creates the security and against whom

---

[196] *See Loss Treatise* Chapter 1 at pp. 40-41.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

a securityholder's rights can be exercised.[197]  By way of example, in the case of a debt security, the issuer enters into an indenture or similar agreement and executes a note or other instrument that carries with it the various rights and benefits set out therein or in the associated agreement, such as the ability to receive a return of principal on a date certain as well as periodic interest on the principal balance.  Rights of the noteholder in a default will also be specified.[198]  These obligations on the part of the issuer (and rights of the noteholder) are readily discernible from an examination of the written documentation.  Likewise, in the case of equity, as a shareholder in a company, certain rights, such as the ability to vote in elections of board members and the ability to receive dividends, when declared, and a ratable share of the company's assets, if any, in a winding up of the company will be created by statute (which may be modified in some cases through the organizational documents of the issuer, such as a charter, by-laws or operating agreement in the case of a limited liability company).

The Exchange Act defines the term "issuer" as the "person who issues or proposes to issue any security"[199] – with the meaning of "issue

---

[197] In some circumstances, identifying the correct entity to be treated as the "issuer" can be complex.  For example, the definition of "asset-backed issuer" for purposes of Regulation AB under the Securities Act is "an issuer whose reporting obligation results from either the registration of an offering of asset-backed securities under the Securities Act, or the registration of a class of asset-backed securities under Section 12 of the Exchange Act".  Regulation AB, 17 C.F.R. § 229.1101(b).  Nevertheless, there is still a clearly determinable legal relationship between the issuer and the relevant security, even if that relationship is imposed by rule or regulation.

[198] The definition of "note" in the most current version of Black's Law Dictionary reflects the written nature of notes, providing that a note is "[a] written promise by one party (the maker) to pay money to another party (the payee) or to bearer."  In the same edition, "promissory notes" are defined as "[a]n unconditional written promise, signed by the maker, to pay absolutely and in any event a certain sum of money either to, or to the order of, the bearer or a designated person."  Black's Law Dictionary (11th ed. 2019) "Note" and "Promissory Note".  Only a small number of cases have undertaken to define a note at common law, perhaps on account of its well understood nature.  *See*, *e.g.*, *Latino Enters. v. Taco Maker, Inc.*, No. 1:17-cv-649-TCB, 2018 U.S. Dist. LEXIS 231757 (N.D. Ga. Feb. 9, 2018)(quoting *Kirkland v. Bailey*, 115 Ga. App. 726, 728, 155 S.E.2d 701, 703 (1967) (citing to Webster's Unabridged Dictionary as a note being defined as "a written paper acknowledging a debt and promising payment.")); *Almond v. Gilmer*, 188 Va. 1, 20, 49 S.E.2d 431, 442 (1948) (citing to the definition in Webster's New International Dictionary, Second Edition, "[t]he common and accepted definition of a note is a written acknowledgment of a debt and a promise to pay.").

[199] Exchange Act Section 3(a)(8).  In contrast, in the context of Section 5 of the Securities Act, the term "issuer" has been more flexibly construed by courts "as issuers devise new ways to issue their securities and the definition of a security itself expands."  *Doran v. Petroleum Mgmt. Corp.*, 545 F.2d 893, 909 (5th Cir. 1977).  An illustrative example of the challenge of defining the term "issuer" in even the Section 5 context can be found in *S.E.C. v. Murphy*, 626 F.2d 633, 644 (9th Cir. 1980).  In *Murphy*, the court in considering whether the private offering exemption applied to offers and sales of securities in the form of limited partnership interests first had to determine the appropriate entity acting as the "issuer" and looked to the entity that "organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed".  *Id.* at 644.  However, the court also notes the importance of identifying a particular entity as an "issuer", stating:

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

any security" left undefined, as presumably self-evident.  When a security has been issued, many different obligations and potential liabilities are imposed by the Securities Acts on the issuer of that security, including the responsibility for filing periodic reports where the security or issuer has registered with the SEC,[200] a wide range of corporate governance obligations on the part of the issuer under the Sarbanes-Oxley Act of 2002[201] (generally arising where the issuer has securities registered under the Exchange Act or is required to file reports under Section 15(d) of the Exchange Act) and other obligations in the event that a tender offer for the relevant securities is commenced.  It is essential that all parties concerned with a given security, including not only the owner but also intermediaries, like clearing agencies, broker-dealers, national exchanges that have listed the security, and self-regulatory organizations, are able to determine with certainty who the issuer of that security is and what rights or duties that issuer may have in respect of those securities.

This point is particularly well illustrated in *What is a Security? -- A Redefinition Based on Eligibility to Participate in the Financial Markets*.[202]  Focusing on the long-running challenge courts have had in setting forth a definitive rule to assist market participants in determining whether a particular transaction is one "whose characteristics distinguish it from the generality of transactions so as to create a need for the special fraud procedures, protections and remedies provided by the securities laws" (citing an earlier article by Professor John Coffee), Professor FitzGibbon proposes a broad new test to determine whether an interest or instrument should fall within the definition of "security" for purposes of the Securities Acts.  This proposed new definition turns on whether the interest in question is a "financial instrument" eligible to participate in a public market.  In this context, Prof. FitzGibbon defines "instrument" as "a set of *rights and duties* conferred (or purported to be conferred) by one

---

It is important to understand the limits of this conclusion.  We recognize that securities regulation "is often a matter of the hound chasing the hare as issuers devise new ways to issue their securities and the definition of a security itself expands." [*Doran* at 909] … We insert a cautionary note because, like the Fifth Circuit in *Doran*, "(w)e are conscious of the difficulty in formulating black letter law in this area in light of the multiplicity of security transactions and their multifarious natures."  *Id*.  Accordingly, we note that our holding today does not mean that anyone who has information material to an investment decision is transformed into an issuer.  We hold only that when a person organizes or sponsors the organization of limited partnerships and is primarily responsible for the success or failure of the venture for which the partnership is formed, he will be considered an issuer for purposes of determining the availability of the private offering exemption.

*Id.* at 644.

[200] 15 U.S.C. 78m.
[201] 15 U.S.C. § 7241
[202] FitzGibbon, "*What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets*", 64 Minn. L. Rev. 893 (1980).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

party upon another, under circumstances such that the rights and duties would normally be treated as a unit and would normally be transferred, if at all, as a unit".[203]

In all cases, these rights or duties that constitute the "security" cease to exist when the issuer of the security ceases to exist, whether as the result of a dissolution following a bankruptcy proceeding or a voluntary winding up.   During this wind-down process, attempts are required to be made to satisfy the issuer's obligations to its creditors (in appropriate priority order) and, where that can occur in full, any remaining assets of the issuer are distributed to its owners and other equity holders, as provided for in the company's organizational documents.   Once a company no longer exists, it no longer does any business, all of its contractual obligations will have been satisfied or discharged and any remaining assets distributed to its shareholder or other owners.   Any securities issued by the company will no longer exist.   From that point onwards, although a physical certificate (or set of written agreements) created by that issuer to represent those rights may continue to exist, these pieces of paper are merely mementos of solely historical interest -- they no longer convey any rights or represent any duties.

Thus, under current law, there is simply no such thing as an "issuer-independent security" – a security that exists independently of an identifiable entity that, under law, is dispositively considered its "issuer". Occasionally a security may be deemed to have more than one issuer,[204] but whether one or several, those entities must be clearly identifiable.   This is not a concern with investment contract fundraising transactions, as we have seen, as investment contract status is a remedial measure retrospectively imposed by a court where the prospective wrong-doer(s) have been identified by the plaintiff at the start of the proceeding – it is then left to the court to decide whether they agree.   However, the individuals or companies upon whose entrepreneurial efforts purchasers may rely with respect to non-financial assets like tokens have no such necessary relationship with the asset and thus these assets lose the quality of "securityness" when re-sold in secondary transactions by persons who are not promoters.

### 2.   Securities as Instruments

The principle that to have a security there must be a counterparty against which rights can be enforced is further supported by the use of the term "instrument" in the definition of the term "security" in the Securities

---

[203] *Id.*, at 919.

[204] *See, e.g.*, General Instructions to SEC Form D ("If more than one issuer has sold its securities in the same transaction, all issuers should be identified in one filing with the SEC").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Acts.[205]  For example, the definition of "security" in the Securities Act includes the phrase ". . . or, in general, any interest or *instrument* commonly known as a 'security'".[206]  The Exchange Act definition likewise includes the phrase ". . . or, in general, any *instrument* commonly known as a 'security'".[207]  When describing these definitions, the Supreme Court and many other courts refer to the specifically enumerated types of securities collectively as "instruments", highlighting the inherent legal relationships present in a writing deemed to constitute a security.  For example, in *Marine Bank*, the Supreme Court wrote, "Congress intended the securities laws to cover those *instruments* ordinarily and commonly considered to be securities in the commercial world."[208]  Similarly, the SEC has described the enumerated types of securities as "instruments" as well.[209]  The Exchange Act also makes frequent reference to the term "instrument" as a catch-all description for securities.[210]

Although frequently used in the Securities Acts, the term "instrument" is undefined there and presumably considered a term with a commonly understood meaning.  Black's Law Dictionary defines an instrument as "[a] written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate."[211]  Other commentators have noted that "[a]n 'instrument' seems to embrace contracts, deeds, statutes, wills, Orders in Council, orders, warrants, schemes, letters patent, rules, regulations, by-laws, whether in writing or in print, or partly in both; in fact, any written or printed document that may have to be interpreted by the Courts."[212]  Thus, an essential element of an instrument is the existence of some writing that evidences a legal arrangement, the parameters of which are capable of being interpreted by one who is not a party to the original

---

[205] Indeed, of all the federal appellate and Supreme Court cases considering whether or not a particular scheme or arrangement an investment contract transaction, only two, both of which resulted in the court finding that there lacked evidence for a finding of an investment contract, were brought without a physical instrument.  *See Canadian Imperial Bank of Commerce v. Fingland*, 615 F.2d 465 (7th Cir. 1980) (holding that the trial court's subject matter jurisdiction depended on the existence of securities and that appellant failed to present a physical document or an oral agreement skrimshaw that evidenced the existence of a security); *see also*, *Mason v. Unkeless*, 618 F.2d 597 (9th Cir. 1980) (rejecting plaintiff's allegations that he entered into an oral limited partnership agreement which formed the basis of a security as inadequate to form the basis of a federal securities fraud claim).

[206] *See* Securities Act of 1933 § 2(a)(1), 15 U.S.C. § 77b(a)(1) (2018).

[207] *See* Securities and Exchange Act of 1934 § 3(a)(10), 15 U.S.C. §78c(a)(10) (2012).

[208] *Marine Bank v. Weaver*, 455 U.S. at 559 (1982) (emphasis added).  *See also S.E.C. v. Edwards*, 540 U.S. 389, 393-94 (2004) (explaining that a security includes "virtually any *instrument* that might be sold as an investment." (emphasis added))

[209] *See, e.g.,* "Framework for "Investment Contract" Analysis of Digital Assets" ("The term 'security' includes an 'investment contract,' *as well as other instruments* such as stocks, bonds, and transferable shares." and "The focus of the *Howey* analysis is not only on the *form and terms of the instrument* itself.") (emphasis added).

[210] *See generally* Exchange Act of 1934, 15 U.S.C. § 78a (1934) (referring to the term "instrument" frequently throughout the Act to describe investment contracts).

[211] Black's Law Dictionary (11th ed. 2019).

[212] Edward Beal, *Cardinal Rules of Legal Interpretation* 55 (A.E. Randall ed., 3d ed. 1924).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

arrangement, including a court, an arbitrator or a prospective transferee, such that these third parties can understand and reach an objective understanding of the details and character of the arrangement.[213]

Accordingly, the legal arrangement that provides a security holder with a "bundle of rights" is inevitably evidenced by one or more writings including, for example, stock certificates, notes, and certificates of deposits, all of which are written instruments. These instruments allow courts to understand the associated legal arrangement intended and negotiated for by the parties in the event of a dispute. The instrument also allows a prospective transferee to understand what rights she may receive and puts her on notice of the nature of the legal arrangement between the issuer of the security and the initial purchaser or holder. Even where a security is uncertificated, it will reference identifiable and definitive rights and duties created either by statute or by contract that can be examined by courts and prospective purchasers alike.[214]

### 3.   *Application to Crypto Assets*

As we see from the above, under current law, for a secondary transaction in a crypto asset to be a securities transaction, either (i) the asset itself would need to convey a bundle of rights and obligations sufficient to be considered a security or (ii) a new investment contract

---

[213] Black's Law Dictionary, Second Edition, published in 1910 prior to the enactment of the Securities Acts, defined "instrument" as:

> A written document; a formal or legal document in writing, such as a contract, deed, will, bond, or lease. *State v. Phillips*, 157 Ind. 4S1, 62 N. E. 12; *Cardenas v. Miller*, 108 Cal. 250, 39 Pac. 783, 49 Am. St Rep. 84; *Benson v. McMahon*, 127 U. S. 457, 8 Sup. Ct. 1240, 32 L. Ed. 234; *Abbott v. Campbell*, 60 Neb. 371, 95 N.W. 592.

*Cf.* Black's Law Dictionary, Third Edition, published in 1933, which defined "instrument" as:

> A document or writing which gives formal expression to a legal act or agreement, for the purpose of creating, securing, modifying, or terminating a right; a writing executed and delivered as the evidence of an act or agreement.

*Cf.* Bouvier's Law Dictionary's (1853), which defines "instrument" as:

> The writing which contains some agreement, and is so called because it has been prepared as a memorial of what has taken place or been agreed upon. The agreement and the instrument in which it is contained are very different things, the latter being only evidence of the existence of the former. The instrument or form of the contract may be valid, but the contract itself may be void on account of fraud.

[214] While state commercial law contemplates the ability of an issuer to create "uncertificated securities" (*see* U.C.C. Section 8-102(18)) where the relevant rights are not evidenced by an "instrument", in these cases there is still an underlying agreement (*e.g.*, an Indenture) or other writing (*e.g.*, a corporate charter), such as a certificate of incorporation or operating agreement, that spells out the inchoate rights being created.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

transaction would need to be formed based on the specific circumstances of that transaction.

In the context of our hypothetical, if Fund concluded that it was overexposed to the giant stockpile of strowrange seeds in their warehouse and decided to sell some of those seeds, along with an assignment of its rights under the Strowrange Seed Management Agreement with Labs, to other investment funds, there is little doubt that those subsequent transactions would also be securities transactions. Although Fund was selling strowrange seeds (a non-security), they were also conveying specific rights against a third party (Labs) and fulfilling all four *Howey* prongs. If Fund made a public offer of its willingness to undertake this transaction with prior registration with the SEC, Fund may well violate Section 5 of the Securities Act (even if Fund ultimately only transacts with a single fund that was an accredited investor). Likewise, if Fund gave its limited partners a chance to receive strowrange seeds in exchange for a discharge of some of their investment in Fund, telling the LPs that the seeds were a "sure thing" and "a more tax efficient way of realizing gains in the strowrange space", this too would likely be considered a new investment contract transaction requiring registration with the SEC or the satisfaction of an exemption from registration.

However, in an alternative scenario, if some of the seeds Labs originally sold to BigAg were resold through various offshore seed dealers and others, and a portion thereof eventually wound up packaged for retail purchase by Tractor Supply Company (known as "TSC"),[215] we would not expect TSC to have to assess whether their customers were buying strowrange seeds to plant in their backyard ("consumptive use") or to hold onto in hopes of a later retail profit ("speculative use").[216] Nor, in order to avoid the threat of having to register as a national securities exchange, would we expect TSC to be required to review Strowrange Labs' Twitter feed, the activity in Labs' Discord server and conduct diligence on Labs to determine the presence and significance of non-public statements that could bear on whether the strowrange seeds they were reselling were originally sold in investment contract transactions (such as the statements made by the horticulturist to BigAg concerning the supposed deal she had with the fast-food chain to develop strowrange-flavored milkshakes).

In the same way, a crypto asset that neither creates, nor is intended to represent, a legal relationship between an identifiable issuer and the persons who, from time to time, own that asset cannot be an "instrument" (or any other type of security, for that matter) regardless of whether the transaction in which the asset is sold is an investment contract transaction. That is, there is usually nothing in the smart contract code that creates a

---

[215] *See* https://www.tractorsupply.com/.
[216] *See Allison v. Ticor Title Ins. Co.,* 907 F.2d 645, 648 (7th Cir. 1990) ("A [securities] violation does not stick to the instruments like tar.")

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

token or in any associated metadata that enables any set of legal rights or duties on the part of any person or entity.[217]

As a result, many separate individuals or legal entities typically can have, and often do have, varying degrees of responsibility for determining that value. For example, Strowrange Labs might want to run a "lean ship" and limit their business just to the science of the strowrange. A college friend of the horticulturalist, intrigued by the opportunity, might set up a separate company to develop and promote strowrange recipes, making money by charging fees for the recipes. One of the friend's former employees may have developed a particularly tasty recipe for strowrange health bars and decided to go out on her own with that business. Some others who got to know the horticulturalist when she was in discussions with Fund realize that seed storage can be greatly enhanced with a new "nano-fiber" technology and set off to take this on, directly competing with Labs' own proprietary strowrange seed solution. The horticulturalist's elderly Aunt Hildy, always good with her hands, decides to start an online crafts site selling products made exclusively from dried strowranges and material from strowrange trees. All of these new contributors to the strowrange ecosystem, as big believers in the future demand for strowranges, personally own significant amounts of strowrange seeds which they all announce one way or the other to the general public through press releases, blog posts and, in the case of Aunt Hildy, her Facebook page. All of them are contributing to demand in the market for the seeds and have a vested economic interest in the financial success of the seeds. Who matters more? This is not always going to be obvious. If Aunt Hildy winds up featured on the cover of Time Magazine with guest turns on Oprah and Late Night with Seth Meyers, she could well have a bigger impact on the market demand for strowrange seeds than the others.

Moreover, those individuals or entities frequently change over time, coming and going, or varying in importance, as their economic interests, their competing personal and commercial objectives, or simply their whims, change. For example, after a bitter dispute with her co-founder, the horticulturalist might decide to dissolve Labs, split the assets and liabilities with her (former) friend and move on in a new direction. The seed storage technology company might get bought by TSC and become a division of a much larger entity much less reliant on the strowrange for its success, diversifying its bets by developing tech for

---

[217] We note that a party deploying the relevant smart contracts *could* create legal rights related to ownership of a token. For example, a traditional company that deployed a smart contract that created a token intended to act as a so-called "stablecoin" could provide in the company's terms of service that an owner of the token that met certain designated criteria would be entitled send the token back to the company and receive an equal amount of fiat currency. While in this case, there would be a legally cognizable *right* associated with the token, this right would stem from the promises made by the company in its terms of service and could be identified and evaluated as potentially the type of promises that could be the basis of a "security".

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

storing seeds for other types of "new fruits". Aunt Hildy, flush with her success and notoriety, could form a new company, raise capital, and even conduct an IPO. None of this activity would in any way subject to the consent or approval of the community of seed owners, nor would it directly impact the "functionality" of the seeds.

This distributed responsibility, not driven by the presence of a legal relationship with any of these actors, coupled with the inherent fluidity of their engagement, makes it almost impossible at any given time to attribute the type of relationship between a particular entity, individual or group of individuals involved with a crypto asset project, on the one hand, and one or more owners or users of a crypto asset, on the other, that, as of necessity, exists between the issuer of a security and the holders of the relevant securities, who are legally bound together.[218]  Even basing a conclusion on the size of the stake in the underlying assets owned (be they strowrange seeds or crypto assets) can be misleading. The size of the stake held by a given actor does not need to corollate in any way with the relevance that actor has in driving the financial expectations of "retail" holders of related non-financial assets. Aunt Hildy could well have had the smallest stake of the various actors noted above but the biggest impact on the success of the demand for strowranges (and thus the price of the seeds). Moreover, the size of an actor's stake can change over time, both on its own (*i.e.*, the absolute amount held by the actor may increase or decrease) or relative to others who may have accumulated an increased stake or sold down over time. Without knowing *all of the facts and circumstances applicable at the time a given transaction in an asset occurs*, it is simply not possible to apply *Howey*.

Further, rather than taking their value from the bundle of rights and duties manifested in the legal relationship between an owner and an identified issuer, most crypto assets take their value from a combination of the economic value of the asset's present utility or functionality (whatever that may–or may not–be)[219] and the asset's provable scarcity, allowing owners to take a view as to the demand for that asset in the future (and, hence, the potential for price appreciation).[220]

---

[218] Even in token-based projects that currently exhibit a high degree of centralization – *i.e.*, reliance on the "efforts" of a single entity, the absence of a legal obligation or relationship between that entity and the owner of a token is a fundamental distinction between a token and any type of security.

[219] For example, in the case of ether, the utility is the ability of the owner to use the tokens to pay network validators a fee to deploy smart contract code to the Ethereum network, known as "gas".

[220] As discussed above under "Crypto Assets as Speculative Investments", this potential for expectation-driven price appreciation also encourages not only purely speculative activity (*i.e.,* activity that does not contribute to general economic growth), but also outright illicit activity, such as "pump-and-dump" schemes that take advantage of the unwary and gullible. While clearly a deeply concerning by-product of the technology, these characteristics do not convert a non-financial asset into a "security" under current law.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

By way of example, a smart contract creating a token could be deployed and sold by a company that dissolves immediately after the token is distributed.  The token and the abilities (if any) that the token enables will continue to exist so long as the smart contract remains deployed to the associated blockchain network, even though the entity that sold the token no longer does.  Absent idiosyncratic facts (such as particular obligations of a bankruptcy estate), this would not be the case with a security.[221]

### 4.  Conclusion

Absent a finding that a given token is intended by the seller to represent an obligation of, or an interest in, a business enterprise with identifiable rights or benefits in, or related to, that business,[222] tokens should not themselves be characterized as securities under current jurisprudence interpreting the Securities Acts.  Owning a token has the effect of aligning the economic interests of all owners.  However, simply owning a token, without more, does not create any sort of *legal relationship* between the token owner and the entity that deployed the smart contract creating the token or that raised funds from other parties through sales of the tokens.  Any such token would be effectively "issuer independent" – a concept wholly foreign to federal securities law.

---

[221] Some have raised concerns that *not* treating crypto assets as securities would give a "free pass" not just to bad actors who use crypto assets to raise money in fraudulent schemes (and who are already subject to our securities laws) but also to opportunistic third-party participants in fraudulent schemes who are not part of the group initiating the fraud, but who recognize the fraud and seek to benefit from it (or who create a separate fraudulent scheme with otherwise valid crypto assets).  First, this would only be the case if the fraud involved transactions in crypto assets that did not create or represent a legal relationship with a third party and meet the other elements of the *Howey* test (or are not another enumerated type of security).  As discussed herein, transactions constituting sales of crypto assets for capital raising purposes will very likely be properly considered investment contract transactions.  The same would be true for secondary transactions in crypto assets in which the elements of *Howey* are in fact met at the time of the transaction.  The federal securities laws do, and should, apply to those transactions to protect investors.  To the extent secondary transactions in crypto assets do *not* come within the purview of the securities laws (*i.e.,* because the crypto assets are not themselves securities or the elements of *Howey* are not meet for a given transaction in those assets), there are a variety of other regulatory schemes that might apply to address such misconduct.  To the extent the conduct rises to the level of criminal activity, criminal charges for theft, fraud or similar crimes may apply to such conduct.  Fraud that is not criminal in nature may be addressed by consumer protection laws, which are broad and flexible and have successfully been applied by regulators to address a wide variety of activity harmful to consumers.  Fraud, unfortunately, happens every day in a host of different non-securities markets and sectors markets and there are a variety of remedies to address frauds.  Even if the securities laws do not apply to a particular fraudulent transaction, there are other regulatory schemes that do and that are more than sufficient to address these issues.

[222] For an example of a crypto asset intended to represent an interest in a business enterprise with identifiable rights or benefits in that business, *see* Amendment 11 to INX Limited Registration Statement on Form F-1 ("each INX Token held by parties other than the Company, shall entitle its holder to receive a Pro Rata Portion … of an aggregate amount which equals 40% of our cumulative Adjusted Operating Cash Flow, net of Adjusted Operating Cash Flows that have already formed a basis for a prior distribution") available at https://www.sec.gov/Archives/edgar/data/0001725882/000121390020023078/ea125736-f1a11_inxlimited.htm#a_014.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

### III.  The SEC's Position on Fundraising Through the Sale of Crypto Assets

#### A.  The Early Cases

Much of the discussion of the applicability of securities law to crypto assets arose from the way in which crypto assets have been distributed.  Unlike most crypto assets offered and sold today, bitcoin and a handful of other very early crypto assets that followed it came into existence exclusively through the process of proof-of-work "mining".  For example, in the case of bitcoin, launched in early 2009, new bitcoins are created programmatically approximately every 10 minutes by the protocol code as a reward for those who expend energy and capital to verify the validity of proposed transactions.  This process takes a significant amount of time even where, as with bitcoin, the rate of new assets created starts out at a relatively high level and gradually slows over time.[223]

This changed significantly when Mastercoin was launched in 2013.  The Mastercoin launch is generally regarded as the first time a large number of crypto assets were created *prior* to the commencement of operation of the network (a process known as a "pre-mine") and then sold to fund the development of the related network.[224]  This process, known as an ICO, quickly gained popularity following the sale in 2015 of so-called "pre-mined" ether tokens.  Proceeds from the ether pre-mine and ICO were used to fund the development of the Ethereum Network.  By early 2018, the concept of ICOs had captivated the general public, with expectations of easy riches to be had if only the right tokens could be purchased.[225]  Promoters touted a new type of crowdfunding without all the messy securities law compliance obligations.  Unfortunately, the idea of making easy money through speculative investment in nascent blockchain projects (many of which consisted of nothing more than a brief "white paper" and marketing website) led to rampant fundraising abuse often at best

---

[223] *See* Satoshi Nakamoto, "Bitcoin: A Peer-to-Peer Electronic Cash System", available at https://bitcoin.org/bitcoin.pdf.

[224] *See* Vitalik Buterin, "Mastercoin: A Second-Generation Protocol on the Bitcoin Blockchain", Bitcoin Magazine, November 4, 2013 ("The project started off with a month-long fundraiser, in which anyone could buy mastercoins by sending bitcoins to the Mastercoin Exodus address … 1 BTC … would get you 100 MSC, and an additional 10 more for every week between the end of the fundraising period and the time at which you bought the mastercoins, encouraging investors to buy earlier."), available at https://bitcoinmagazine.com/technical/mastercoin-a-second-generation-protocol-on-the-bitcoin-blockchain-1383603310.

[225] *See, e.g.*, David Floyd, *$6.3 Billion: 2018 ICO Funding Has Passed 2017's Total*, COINDESK (April 19, 2018), https://www.coindesk.com/markets/2018/04/19/63-billion-2018-ico-funding-has-passed-2017s-total/; *see also*, "The SEC Has an Opportunity You Won't Want to Miss: Act Now!", U.S. SEC. & EXCH. COMM'N (May 16, 2018) available at https://www.sec.gov/news/press-release/2018-8.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

characterized by unjustified and exuberant optimism and at worst, by outright fraud.[226]

In one of the first SEC-led investigations into the application of U.S. federal securities law into fundraising through the offer and sale of crypto assets, the SEC applied the *Howey* test to sales of tokens in its July 2017 "Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO" (the "DAO Report").[227]   The DAO Report related to an attempt to construct a purportedly decentralized equivalent of a venture fund (called "The DAO"), where participants could pool funds in the form of ether to purchase tokens of The DAO.   The tokens would allow owners to vote on the projects in which The DAO would invest its "treasury" of ether.   The tokens would also be the vehicle for the token owners to realize anticipated gains from the success of these investments.

Although no enforcement action was taken by the SEC, the DAO Report expressed the SEC's view that the sale of these tokens, the value of which the SEC concluded was significantly dependent on the efforts of the sponsor, involved an unregistered offering of an investment contract, stating that "[b]ecause DAO Tokens were securities, The DAO was required to register the offer and sale of DAO Tokens, unless a valid exemption from such registration applied …".[228]   The SEC noted that "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction."[229]

Since the DAO Report, the SEC has actively sought to establish regulatory authority over fundraising transactions using tokens through

---

[226] *See, e.g.*, David Adlerstein, "The ICO Governance Deficit", CoinDesk (Sept. 10, 2017), https://www.coindesk.com/markets/2017/09/10/the-ico-governance-deficit/ (describing lack of investor protections in ICOs) and Daniel Dupuis, Deborah Smith, Kimberly Gleason, *Old Frauds with a New Sauce: Digital Assets and Space Transition*, Journal of Financial Crime, December 14, 2021 (describing the evolution of fraud schemes historically conducted with fiat money in physical space to the crypto assets in digital space).
[227] Exchange Act Rel. No. 34-81207, July 25, 2017.
[228] *Id*. at p. 16.
[229] The DAO Report, at 17-18.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

enforcement,[230] guidance,[231] and rulemaking.[232]  Further, the current Chair of the SEC, Gary Gensler, and its current Director of Enforcement, Gurbir Grewal, have each made statements suggesting that they plan to aggressively pursue enforcement actions targeting perceived violations of federal securities law in the context of transactions involving crypto assets and potential investment contracts, even where the violations are technical in nature (*i.e.*, not involving allegations of intentional fraud, recklessness or other willful misconduct).[233]

## B.      The ICO Boom (and Bust)

The lion's share of the SEC's enforcement actions relating to crypto assets to date have targeted fundraising transactions where the activity comfortably fit the model of pre-crypto asset enforcement actions. Similar to the public sale of strowrange seeds by Strowrange Labs in our prior example, *something* was sold in a purportedly commercial transaction, but the "economic reality" alleged was that the purchasers had no *bona fide* consumptive interest in the thing sold but rather sought to profit by later resale with the expectation that the seller would be driving the increase in value of whatever was being sold.  For the purposes of these actions, it is irrelevant whether the thing sold, be it a physical item, like the strowrange seeds or an intangible item, like crypto assets, was or was not a security for purposes of the Securities Acts (even though the SEC asserted in many of these complaints and related consent orders that the crypto assets were themselves securities).

Instead, as with the prior *Howey* cases, what was legally relevant to the outcome was the nature of the economic relationship between the buyer and seller.  Although many of these enforcement actions involved allegations of outright and knowing frauds, such as enforcement actions

---

[230] *See, e.g., BlockFi Lending LLC*, Securities Act Release No. 11029 (February 14, 2022); *In the Matter of Paragon Coin, Inc*., Release No. 33-10574 (November 16, 2018); *CarrierEQ, Inc., d/b/a Airfox*, Securities Act Release No. 33-10575 (November 16, 2018); *In the Matter of Munchee Inc*., SEC Release No. 10445 (Dec. 11, 2017), available at https://www.sec.gov/litigation/admin/2017/33-10445.pdf.

[231]   FinHub, *Framework for "Investment Contract" Analysis of Digital Assets* (the "Framework"), April 3, 2019, available at: https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.  It is important to keep in mind that the Framework is guidance and is not binding on the SEC in any way.  It explicitly expresses the views of the FinHub Staff and not of the SEC itself, who did not formally approve the Framework guidance.  Although non-binding, the Framework is the most encompassing affirmative guidance provided to date by the SEC.  As a result, we believe it is still important that it be carefully considered.

[232] *See, e.g.,* the Proposed Rule 3b-16 Amendments; Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer (March 28, 2022) ("Proposed Rule 3a5-4"), available at https://www.sec.gov/rules/proposed/2022/34-94524.pdf.

[233] *See, e.g.,* Gary Gensler, "Remarks Before the Aspen Security Forum", (Aug. 3, 2021), available at: https://www.sec.gov/news/public-statement/gensler-aspen-security-forum-2021-08-03; *see also*, Gurbir Grewal, Director, Division of Enforcement, 2021 SEC Regulation Outside the United States - Scott Friestad Memorial Keynote Address, (Nov. 8, 2021), available at: https://www.sec.gov/news/speech/grewal-sec-speaks-101321.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

against PlexCorps, which promised purchasers extravagant returns,[234] and AriseBank, which promised daily profits to token holders,[235] other actions focused on the more technical violation of failure to comply with Section 5 of the Securities Act, as a result of soliciting funds from the general public without registration, without alleging other fraudulent action.[236] Particularly notable are the successful enforcement actions for violations of Section 5 of the Securities Act brought by the SEC against Canadian social media company, Kik Interactive Inc.[237] and messaging giant Telegram Group Inc.,[238] as well as the currently ongoing enforcement actions against Ripple Labs, Inc. and LBRY Inc. (discussed in the next section below).[239]

## C.   *Telegram, Kik Interactive, Ripple Labs* and *LBRY*

Many of the SEC's early enforcement actions regarding fundraising sales of crypto assets were resolved without litigation, generally as a result of a consent decree being entered.[240] However, in the

---

[234] SEC Complaint, *S.E.C. v. PlexCorps*, 17-cv-7007 (filed Dec. 1, 2017), available at https://www.sec.gov/litigation/complaints/2017/comp-pr2017-219.pdf (alleging misrepresentations about the size and scale of PlexCorps' operations, the use of funds raised in an ICO, and the amount of funds raised in the ICO).

[235] SEC Complaint, *S.E.C. v. AriseBank* (filed Jan. 25, 2018), available at https://www.sec.gov/litigation/complaints/2018/comp-pr2018-8.pdf (alleging "many" materially false statements and omissions in connection with an ICO transaction).

[236] *See, e.g.,* In the Matter of Munchee Inc., SEC Release No. 10445 (Dec. 11, 2017), available at https://www.sec.gov/litigation/admin/2017/33-10445.pdf.; In the Matter of Bloom Protocol, LLC, SEC Release No. 11089 (Aug. 9, 2022), available at https://www.sec.gov/litigation/admin/2022/33-11089.pdf.

[237] *See* Complaint, *S.E.C. v. Kik Interactive Inc.*, 19-cv-5244 (June 4, 2019).

[238] *S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).

[239] *S.E.C. v. Ripple Labs, Inc., et al.*, No. 20-10832 (S.D.N.Y.).  Ripple Labs, along with a number of other companies that have raised funds through the sale of crypto assets and become the subject of an SEC enforcement action have raised concerns that they were not given "fair notice" that their fundraising sales of crypto assets might be considered "investment contracts" and thus required to be registered in order to be offered to the general public, pointing to some of the unique features of crypto assets.  However, the *Howey* case law makes clear that these allegations are largely unfounded, at least with respect to a distinction based on whether the asset sold in the alleged investment scheme was a token or some more conventional asset.  What is at issue in the enforcement actions involving fundraising through sales of crypto assets is not whether the crypto asset (*i.e.,* the "object" of the purported investment scheme) itself is a "security" (that has never been an issue in prior *Howey* cases).  Rather, the question is whether it reasonable to conclude that the offered asset was being purchased for *bona fide* consumptive use.  Should a court conclude that the "economic realities" were that purchasers were buying with a reasonable expectation of profit based the entrepreneurial or managerial efforts of others, a securities transaction will be present.  As discussed in the prior section, the principles-based Howey test leaves room for differences of opinion on which ostensibly commercial transactions constitute "investment contracts".  The principles applied by courts have and continue to remain the same regardless of whether the object sold is a cow embryo, a cask of whiskey or a crypto asset.  The unique elements of crypto assets should not be and are not a distinguishing factor for "fair notice" purposes.

[240] *See, e.g.*, In the Matter of Munchee Inc., SEC Release No. 10445 (December 11, 2017); *In the Matter of Zachary Coburn,* SEC Release No. 84553 (November 8, 2018); *In the Matter of Paragon Coin, Inc*., SEC Release No. 33-10574 (November 16, 2018); *CarrierEQ, Inc., d/b/a Airfox*, SEC Release No. 33-10575 (November 16, 2018); and *In the Matter of Block.one.*, SEC Release No. 10714 (September 30, 2019).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

last several years a few of these enforcement cases went before a court in a fully contested proceeding and were resolved with a judicial decision. The holdings in these cases provide insight into the evolution of *Howey*-related jurisprudence where crypto assets are the object of a purported investment contract transaction.

As non-appellate cases, the first two decisions from the Southern District of New York regarding fundraising sales of tokens —*S.E.C. v. Telegram Group Inc.*,[241] and *S.E.C. v. Kik Interactive Inc.*,[242] are outside our historical review of *Howey*-related appellate jurisprudence. Nonetheless, the courts' reasoning in these cases may act as important harbingers for what may come as and when the disputes move to the appellate level. In addition, two major enforcement actions remain in litigation at the time of this writing, *S.E.C. v. Ripple Labs, Inc. et al.*[243] and *S.E.C. v. LBRY, Inc.*,[244] with the former pending a decision on competing motions for summary judgment by the SEC and the defendants and an order granting the SEC's motion for summary judgment recently entered in the latter.

Critically, each of these cases involve some form of fundraising transaction by the entity that was responsible for the creation of the crypto assets. As a result, all four cases fall comfortably in the mainstream of *Howey* jurisprudence, as discussed in Section II above, in which the nature of the object sold is not germane to the determination of whether an investment contract transaction is present. Nevertheless, in all four of these actions, the SEC took pains to characterize the crypto asset sold as a "security" (sometimes referred to a as "crypto asset security" or, more recently—perhaps to distinguish these assets from crypto assets intended by their issuer to be securities, as a "crypto asset security"). Although not relevant for the successful prosecution of these actions, this nomenclature strongly suggests that a "marker" is being laid for the SEC's position on transactions in crypto assets outside of fundraising transactions. The validity of this position will be discussed below.

### 1. *Telegram Group, Inc.*

In the *Telegram*, Judge Kevin Castel granted the SEC's request for a permanent injunction against Telegram Group Inc. and TON Issuer Inc. (collectively, "Telegram") finding that the SEC had "shown a substantial likelihood of success in proving that the Gram Purchase Agreements, Telegram's implied undertakings, and its understandings with the [i]nitial [p]urchasers, including the intended and expected resale of [the crypto asset known as] Grams into a public market, amount to the distribution of securities, thereby requiring compliance with section 5."[245] In doing so, Judge Castel addressed what had then become a common form

---

[241] 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[242] 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[243] *S.E.C. v. Ripple Labs, Inc. et al.* No. 20-10832 (S.D.N.Y.).
[244] *S.E.C. v. LBRY, Inc.* No. 21-cv-00260 (D.N.H.).
[245] *Telegram* at 381.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of alternative fundraising with crypto assets—the Simple Agreement for Future Tokens (a "SAFT").[246]

In January 2018, Telegram, a private company known for its eponymous encrypted messaging application, Messenger, began raising funds in order to finance its operations and develop its own blockchain network, known as the "TON Blockchain". From January until March 2018, Telegram sold contractual rights to acquire approximately 2.9 billion crypto assets called "Grams" to 175 U.S. and international initial purchasers through a series of SAFTs, referred to as Gram Purchase Agreements.[247] Under these agreements, delivery of the Grams (and the launch of the TON Blockchain) was supposed to occur no later than October 31, 2019, at which time, after the launch of the TON Blockchain, the SAFT holders would have a contractual right to receive Grams, and members of the public would have the ability to purchase Grams for an active network. Telegram argued that the sale of the SAFTs, and the sale of Grams to the public after the launch of the TON Blockchain, were two distinct sets of transactions—the first which was subject to securities laws, and exempt from registration under Regulation D, and the second which was simply a purchase of a "utility token" due to their function and consumptive use.

Judge Castel rejected Telegram's argument—instead finding that, upon examination of the totality of the evidence and considering the economic realities, that the SEC had established a substantial likelihood of success in showing that (a) "at the time of the offers and sales to the [i]nitial [p]urchasers, a reasonable investor expected to profit from Telegram's continued support for Grams and the underlying TON Blockchain through the distribution of Grams by the [i]nitial [p]urchasers to the public" and (b) "Telegram's present plan to distribute Grams is an offering of securities under the *Howey* test to which no exemption applies."[248]

The *Telegram* decision collapses the initial sales of Gram tokens by Telegram to the initial purchasers and the proposed resales of Grams by these same persons (presumably to members of the general public) into one single "scheme" to distribute the Grams to the public. In doing so, the decision looks closely at the nature of investment contract transactions using tokens and rebuffs the SEC's claim that the Grams tokens were themselves securities. In their complaint, the SEC had alleged that Grams

---

[246] For a detailed review of the SAFT framework and its apparent shortcomings, *see* Juan Batiz-Benet, Marco Santori, and Jesse Clayburgh, The SAFT Project: Toward a Compliant Sale Framework, (October 2, 2017), http://www.saftproject.com/static/SAFT-Project-Whitepaper.pdf; *Cf.* Cardozo Blockchain Project, "Not So Fast—Risks Related to the Use of a "SAFT" for Token Sales" (2017) available at https://larc.cardozo.yu.edu/cgi/viewcontent.cgi?article=1000&context=blockchain-project-reports.
[247] *See S.E.C. v. Telegram Group, Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[248] *Id.* at 358-9.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

were securities "because the [i]nitial [p]urchasers and subsequent investors expect to profit from Telegram's work: the development of a TON "ecosystem," integration with Messenger, and implementation of the new TON Blockchain…. [and] there is an expectation on the part of investors that they will profit if Telegram builds out the functionalities it has promised."[249]  Telegram, however, argued that the Grams were distinct from the Gram Purchase Agreement (acknowledged by Telegram to be a security), and therefore must be evaluated separately under *Howey*.

In his decision, Judge Castel distinguishes between the two positions, and while he does not go so far as to reject the SEC's argument, he does not adopt the position that the Grams standing alone are securities, instead writing that "the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence," and highlighting that the transaction at issue is the "scheme" which "consists of the full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram."[250]  In doing so, Judge Castel highlights the importance of focusing on all of the facts and circumstances associated with fundraising sale transactions involving crypto assets, rather than on the crypto asset alone.  Nonetheless, given that it is irrelevant to the ultimate outcome of the case, the *Telegram* decision falls short of fully recognizing the jurisprudential importance of distinguishing between fundraising transaction and the asset sold.

Shortly after issuing his main order, Judge Castel made this position even more clear in a subsequent ruling, noting:

> [O]ne of the central points of the Court's [March 24, 2020] Opinion and Order [was], specifically, that the "security" was neither the Gram Purchase Agreement nor the Gram but *the entire scheme* that comprised the Gram Purchase Agreements and the accompanying understandings and undertakings made by Telegram, including the expectation and intention that the Initial Purchasers would distribute Grams into a secondary public market.[251]

### 2.  *Kik Interactive, Inc.*

Kik Interactive, Inc. ("Kik"), the Canadian developer of Kik Messenger, a messaging app, sought to develop a "digital ecosystem" using digital tokens called Kin as the digital currency.  During 2017, through a private SAFT "pre-sale" sale, and a subsequent public token distribution event ("TDE") Kik offered and sold one trillion Kin tokens to more than 10,000 purchasers for approximately $100 million dollars, with over half of this sum alleged to have come from persons located in the United States.  The proceeds of these sales were intended to fund Kik's

---

[249] Complaint, at 2, *SEC v. Telegram Group, Inc*., 448 F. Supp. 3d 352 (S.D.N.Y. 2020).
[250] 448 F. Supp. 3d (S.D.N.Y. 2020) at 379.
[251] *S.E.C. v. Telegram Group*, Inc., 19-cv-9439 (PKC) (S.D.N.Y. Apr. 1, 2020)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

operations and create, develop, and support a "Kin Ecosystem" in which Kin tokens, at a future date, could be used to buy goods and services.[252] The SEC claimed that the offer and sale of Kin through the SAFT and at the TDE, should be characterized as an investment contract transaction— which was sold without a registration statement being in effect, and without an exemption from registration—thereby violating Section 5(a) and 5(c) of the Securities Act.

Kik denied these allegations, arguing in a fashion similar to Telegram that the pre-sale transactions were exempt from registration as "private placements" that qualified for the safe harbor provided by Regulation D under the Securities Act, and that at the time of the TDE, the Kin tokens were not themselves "securities", but rather a medium for consumptive and functional use by users of Kik's social media platform."[253] The only contractual agreement with Kin users was a Terms of Use Agreement, which in part provided that the Kin tokens were provided on an "As Is and As Available basis without warranties or conditions of any kind, either express or implied."[254] Both the SEC and Kik moved for summary judgement on that basis.

In granting summary judgment to the SEC, the court agreed with the SEC's position that Kik had offered and sold unregistered securities through investment contract transactions involving sales of the Kin token. In particular, the court asserted that a common enterprise was present based on the pooling of proceeds from sales of Kin tokens for construction of the digital ecosystem promoted by Kik which the court stated was crucial to the "success of the ecosystem [which] drove demand for Kin and thus dictated investors' profits".[255] Finding that "Kik recognized and repeatedly emphasized this,"[256] the court stated that "contractual language is important to, but not dispositive of, the common enterprise inquiry, and courts regularly consider representations and behavior outside the contract."[257]

---

[252] Complaint, at 2-3, *S.E.C. v. Kik Interactive Inc*., 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[253] Answer to Complaint, at 16, *S.E.C. v. Kik Interactive Inc*., 492 F. Supp. 3d 169 (S.D.N.Y. 2020). Kik's focus on functionality of the Kin token demonstrates the confusion present in this area. As discussed in detail in Section II, in virtually all of the *Howey* cases involving asset sales, the assets in question had some functionality or "utility". The existence of some sort of functionality is also irrelevant to the whether an investment contract was present. Rather, attention should be focused on what a reasonable purchaser would have expected from her purchase. Did the "facts and circumstances" of the transaction suggest that the assets were being acquired for consumptive purposes (unlikely to give rise to an investment contract transaction) or were the purchasers likely primarily motivated by the prospect of a financial gain from the later resale of the asset (more likely that there would be an investment contract transaction present)?
[254] 492 F. Supp. 3d 169 (S.D.N.Y. 2020).
[255] *Id*. at p. 178.
[256] *Id*.
[257] *See, infra,* Section [167] for a discussion of the relationship between contractual privity between the parties and presence of an investment contract transaction. As noted there, in the context of a fundraising transaction, we believe that the position taken in *Kik* (*i.e.,* that

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Notwithstanding that the only question before the court was whether the fundraising sales by Kik of the Kin tokens constituted investment contract transactions, making the status of the Kin token irrelevant to the matter in dispute, the court nevertheless wrote in *dicta* that "Purchasers in the [private and public] sales received the same class of securities, fungible Kin that were equal in value. It is true that they received them via different instruments with different rights. However, the ultimate result was distribution of identical assets."[258] While the finding of investment contract transactions in *Kik* is consistent, philosophically at least, with prior *Howey* jurisprudence, the additional statement regarding the nature of Kin tokens, made without analysis or consideration of the factors discussed above, demonstrates how easy it is to conflate an investment contract transaction with its non-security object.

### 3.   *Ripple Labs, Inc.*

In December 2021, the SEC filed a complaint[259] against Ripple Labs, Inc. and two of its senior executives, Brad Garlinghouse and Chris Larson (together, the "Ripple Defendants"). The substance of the SEC's complaint against the Ripple Defendants was a "garden variety" claim of a violation of Section 5 of the Securities Act by them resulting from long-running fundraising sales of a crypto asset, known as XRP. These sales were conducted in a variety of ways, however, some of the sales were made to the general public in the United States without registering those transactions with the SEC.

Nevertheless, the first paragraph of the SEC's complaint against Ripple Labs states that "[f]rom at least 2013 through the present, Defendants sold over 14.6 billion units *of a crypto asset security called "XRP,"* in return for cash or other consideration worth over $1.38 billion U.S. Dollars ("USD"), to fund Ripple's operations and enrich Larsen and Garlinghouse."[260] This assertion regarding the securities law status of XRP tokens, irrelevant to the actual alleged violations by the Ripple Defendants, resulted in most U.S.-based crypto asset marketplaces to preemptively delisting XRP tokens, immediately and predictably

---

the absence of contractual privity between the fundraising party and the investor providing the funds should not prohibit the finding of an investment contract transaction), while very limited in precedent, and is the right policy outcome and one likely to be followed by subsequent courts.

[258] *Id.* at p. 182. Given that this statement is made in *dicta*, it is possible to construe the court's reference to Kin tokens as "securities" as mere shorthand for a conclusion that the sales of these assets constitute securities transactions, although reasonable people could differ on this.

[259] Complaint, *S.E.C. v. Ripple Labs, Inc. et al.*, No. 20-10832 (S.D.N.Y. Dec. 22, 2020), ECF No. 4 (the "Ripple Labs Complaint").

[260] Ripple Labs Complaint at p. 1 (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

removing a significant amount of the liquidity support for XRP causing in a significant decline in the price of the token.[261]

In response, the well-funded Ripple Defendants have mounted a vigorous and aggressive defense, alleging that they were not provided with "fair notice" of their potential violations and requesting extensive discovery about the inner workings of the SEC's decision-making as it developed its response to the proliferation of transactions involving crypto assets.[262]   The discovery issues, which have continued for over a year as of this writing, were referred to a federal magistrate judge and created a great deal of discussion among observers of the crypto asset space.[263]   In addition, as will be discussed below, following the price declines in the XRP token, a large group of disgruntled XRP owners unsuccessfully attempted to intervene in the case, alleging that they had been harmed as a result of the SEC's actions.[264]   At the time of this writing, both the SEC and Ripple Labs have filed motions for summary judgment, requesting the judge to make a ruling based on the arguments already made, and have subsequently filed their oppositions to the other party's summary judgment motion.

### 4. LBRY, Inc.

Most recently, the SEC commenced an action against LBRY, Inc., a company that developed what it refers to as a popular decentralized digital content marketplace (known as "LBRY") that runs on blockchain technology.   LBRY, Inc. asserts that it did not conduct an ICO (generally understood here as a public sale of pre-functional crypto assets) and that it developed its blockchain network using traditional funding, rather than through the sale of any digital tokens (which it claims it only sold well after the blockchain was fully launched and operational).   Nevertheless, in March of 2021, the SEC filed a complaint against LBRY, Inc. claiming that, starting in 2016 LBRY, Inc. had offered and sold unregistered securities in the form of a crypto asset called LBRY Credits ("LBC"), which it said LBRY, Inc. had told investors was to be used to fund its business and build its product.

---

[261] Olga Kharif, *Cryptocurrency XRP is in free fall with exchanges delisting coin*, Bloomberg News (Dec. 30, 2021) available at: https://www.bnnbloomberg.ca/cryptocurrency-xrp-is-in-free-fall-with-exchanges-delisting-coin-1.1542141.

[262] *See* Kara Kapp, "The 'Ripple Effect': A Striking Development on Defending Digital Asset Securities Litigation" (Reuters April 21, 2022), available at https://www.reuters.com/legal/legalindustry/ripple-effect-striking-development-defending-digital-asset-securities-litigation-2022-04-21/.  For a discussion of Ripple Labs' fair notice defense, *see supra* note [239].

[263] *See* Holly Barker, "Ripple Discovery Would Chill All Agency Debate, SEC Says (1)" (Bloomberg Law Aug. 2, 2022), available at https://news.bloomberglaw.com/litigation/ripple-discovery-threatens-to-chill-all-agency-debate-sec-says.

[264] *See* Motion to Intervene, *S.E.C. v. Ripple Labs, Inc., et al.*, No. 20-10832 (S.D.N.Y. March 14, 2021) (the "XRP Holder Motion").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

In their motion for summary judgement, however, the SEC equivocated. Most of the SEC's motion appears to acknowledge the scheme/object distinction, stating at one point that, "If crypto assets, *or anything else*, are offered in a way that meets the three prongs of *Howey*, an investment contract exists and the securities laws apply".[265] On the other hand, elsewhere in the motion the SEC refer to the LBC tokens sold by LBRY as "LBC investment contracts". Nevertheless, in order to draw support for a finding that LBRY Inc. had had "fair notice" of the application of the federal securities laws to LBRY Inc.'s fundraising transactions in LBC, the SEC described the *Howey* test as having been "satisfied for interests in: orange groves…payphone leases...investment packages to secure EB-5 visas…online ad services…licenses to sell dental products…films…multi-level marketing…chinchillas…and virtual shares…,"[266] and cited to the statement in *Kik* that "the law regarding the definition of investment contract gives a reasonable opportunity to understand what conduct and devices it covers."[267]

Of course, the various objects enumerated by the SEC in their summary judgment motion were not themselves found to be "investment contracts", but rather it was the specific transactions through which these non-financial assets were sold that constituted the relevant "security". The SEC did not cite any significant authority that would support the idea that the LBC tokens themselves were "securities". In fact, if that had been clearly asserted, such a position would almost certainly merit a finding of a lack of "fair notice" on the part of the defendants.

Notwithstanding the apparent recognition by the SEC in its briefing that the object of an investment scheme is not itself a security, the District Court in New Hampshire in a recent memorandum and order appears to characterize LBC itself as a security, ruling that the offer and sale of LBC tokens (apparently, *all* offers and sales, regardless of the specific circumstances of the transaction) violated Section 5 of the Securities Act and therefore granting the SEC's motion for summary judgment.[268] The LBRY Order frames the dispute as follows: "the issue to be decided is whether the economic realities surrounding LBRY's offerings of LBC led investors to have 'a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others'". The court then goes on to repeatedly say that "LBRY offered LBC *as a security*."[269]

Critically, while the court refers to it as "uncontested" that some unknown number of purchasers of LBC from LBRY acquired the token "at least in part" to use the token for its intended purpose, rather than to hold as an investment, no attempt is made in the LBRY Order to

---

[265] SEC, LBRY Summary Judgment Motion at p. 19 (emphasis added).

[266] *Id*. at p. 22.

[267] *Id*. at p. 23 (emphasis added).

[268] *See* Memorandum and Order at 18, *SEC v. LBRY, Inc.*, No. 21-cv-00260-PB (D.N.H. Nov. 7, 2022), ECF No. 86 ("LBRY Order").

[269] *Id*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

distinguish among the sales that were made to purchasers that had a *bona fide* consumptive intent and those who were offered, and who purchased, LBC tokens with a reasonable expectation of profit from the efforts of LBRY, Inc.[270]  In terms of finding a violation of Section 5, this distinction is not necessary.  So as long as there were at least *some* offers and sales of LBC tokens to the public as investments (and the record as presented in the LBRY Order suggests that there were), then *those* offers and sales would be illegal (as they were not registered with the SEC or otherwise exempt from registration).  Whether there were some *other* sales of LBC that did not violate Section 5 would be irrelevant to a finding that a violation occurred.

The LBRY Order continues, "Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract."  This is indeed correct.  To apply this to our strowrange parable, Strowrange Labs can sell some of the seeds in small amounts in a seed catalog that offers a wide variety of different seeds, and which is mailed to at-home gardeners (even though this may be considered a "public offering".  Some purchasers may even be aware of the hype around the seeds and thing that it might be "fun" to own some.  These transactions would not be occurring in a manner that in any way suggests an investment opportunity and there is nothing in *Howey* jurisprudence that suggests that sales made through the catalog should be considered investment contract transactions.

However, other of the strowrange seeds could be offered by Labs to investors like Fund with promises of value creation in transactions which are properly treated as securities offerings.  What matters in making this distinction are the *economic realities of the transaction*, not (as the SEC themselves observed) the nature of the object sold.  Unfortunately, the *LBRY* court did not correctly apply *Howey* and failed to assess the economic realities of each of the various transactions in LBC tokens conducted by LBRY Inc. – instead, it appears to have concluded that *all* transactions in LBC should be treated as investment contract transactions.

The *LBRY* court seems to thereby apply a new test not found in existing *Howey* jurisprudence – what we referred to above as the "original sin" theory.  Rather than applying *Howey* to particular transactions, the LBRY court makes the same mistake that the original Ninth Circuit appellate tribunal did in *Hocking*.  There, the tribunal misconstrued *Howey*, finding that the *potential* for a transaction to have investment character (*i.e.*, the availability of a rental pool agreement offered by the operator of the condominium development at issue) *automatically* resulted in the plaintiff's purchase being characterized as an investment contract transaction without examining the facts and circumstances of a specific transaction.[271]  As discussed above, the full Ninth Circuit in a rehearing *en banc*[272] strongly disagreed with the tribunal's position and reversed,

---

[270] *Id.*
[271] *Hocking v. Dubois*, 839 F.2d 560 (9th Cir.), *withdrawn*, 863 F.2d 654 (1988).
[272] *Hocking II*, *supra* note [185].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

remanding the case for fact-finding on the specific circumstances applicable to the transaction in question.

Demonstrating the difficulty in getting this right at the District Court level – something we observed in the relatively frequent appellate reversals in our survey, the LBRY Order continues:

> Despite LBRY's insistence to the contrary, I cannot reject the SEC's contention that LBRY offered LBC as a security simply because some LBC purchases were made with consumptive intent. Were it otherwise, the Securities Act would be unable to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" wherever a token held some consumptive utility. … Accordingly, statements from a subset of LBC holders that they purchased LBC for use on the LBRY Blockchain is of limited relevance in determining whether LBRY offered it as a security. *See Warfield*, 569 F.3d at 1021 ("[W]hile the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised.").

> In summary, what the evidence in the record discloses is that LBRY promoted LBC as an investment that would grow in value over time through the company's development of the LBRY Network. While some unknown number of purchasers may have acquired LBC in part for consumptive purposes, this does not change the fact that the objective economic realities of LBRY's offerings of LBC establish that it was offering it as a security.[273]

In articulating its position, the *LBRY* court demonstrates the underlying flaw in its reasoning by relying on a case involving fraudulent sales of annuity contracts, *Warfield v. Alaniz*.[274] *Warfield* concerned a criminal Ponzi scheme in the form of purported "charitable gift annuities" (no money was ever given to charity and the promoter wound up serving jail time). The plaintiff, an individual named Warfield, was a court-appointed receiver for what was left of the investors' assets. Warfield sued agents of the foundation that was used as the vehicle to operate the scheme, seeking to recover commissions paid to those agents from monies raised from investors. One issue the receiver faced in its pursuit of a Madoff-like recovery was whether the annuity contracts were "securities". The defense sought to counter this allegation by asserting that the ostensibly charitable nature of the arrangement defeated *Howey*'s "investment of money" prong.

Unsurprisingly, the *Warfield* court did not buy this argument, particularly in the context of a criminal Ponzi scheme. To reach this

---

[273] LBRY Order at pp.18-19.
[274] 569 F.3d 1015 (9th Cir. 2009).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

conclusion, the court focused its inquiry on what the annuity purchasers were offered or promised, which the court stated was "an objective inquiry into *the character of the instrument or transaction* offered based on what the purchasers were 'led to expect'".[275]  *Warfield*, however, involved an "instrument" – the charitable annuity contract – which proposed the same (fraudulent) arrangement for everyone by its terms.  The only slim reed to be batted away by the court was the suggestion by the defense that because the word "charitable" was used in the product, purchasers had no present expectation of financial gain.  This was easily dismissed by the court where the record showed that purchasers' returns were repeatedly being favorably compared to what could be earned in the stock market.

In contrast, given that the *LBRY* court acknowledged both that LBC had a *bona fide* consumptive use (something not the case with the purported financial contracts in *Warfield*) and that there were significant numbers of people acquiring LBC for that consumptive use, it was incumbent on the court not to fall into the same trap as the original *Hocking* tribunal who were reversed.  In fact, the court in *LBRY* made the very same assumption as that *Hocking* tribunal – that because the purchase of a non-financial asset *could* have been based on an expectation of profit or on the presence of financial inducements provided by others that the asset was *automatically* a security based on those considerations without any investigation into the circumstances of specific transactions.[276]  This is the exact opposite of the learnings from over 70 years of *Howey* jurisprudence.

The *LBRY* court lost sight of the question properly before it: were there one or more identifiable sales of LBC to persons that did not have a *bona fide* consumptive interest in the assets and instead were looking to profit through price increases reasonably expected to come from LBRY's efforts?  Instead, the court answered the wrong question – are LBC tokens themselves securities?  Because as we have seen, LBC tokens, like most other crypto assets, are not instruments and do not create a legal relationship between the owner and any other person, the proper inquiry is transaction-based; not asset-based.

### 5.  Conclusion

To date, *Telegram*, *Kik*, and *LBRY* are the only thoroughly briefed and decided cases relating to fundraising sales of crypto assets and none

---

[275] *Id.* at 1021 (emphasis added; footnotes omitted).

[276] The SEC in a recent complaint filed against Hydrogen Technology Corporation alleged that some means of distributing a particular crypto asset, known as Hydro, are securities transactions while other means of distributing the very same crypto asset were *not* alleged to constitute securities transactions.  *See,* Complaint, *U.S. Securities and Exchange Commission v. The Hydrogen Technology Corporation, Michael Ross Kane, and Tyler Oster*, Case No. 1:22-cv-08284-LAK (SDNY September 29, 2022) (describing four means of distributing the Hydro token: through bounty programs, employee compensation, sales in the open market, and airdrops – free giveaways –  and alleging that the transactions involving the first three were investment contract transactions but not alleging that the distributions via airdrop were investment contract transactions).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of these decisions are yet to have been appealed beyond the district court level. As a result, there is limited material to work with from a jurisprudential perspective when applying *Howey* to the crypto assets themselves. Nevertheless, we can observe the seeds of judicial tensions emerging. On the one hand, we see in Judge Castel's two *Telegram* decisions a clear skepticism about linking investment contract transactions to the crypto assets being sold.

Alternatively, although there is the *dicta* noted in the *Kik* decision, because that is not accompanied by any reasoning that would not also be applicable to the investment contract transactions found to be present, it is difficult to know whether much can be made of the court's statement, which can also be read as mere shorthand. Similarly, the thesis underlying the LBRY Order is difficult to decipher on this point. We will learn more when the remedies for the Section 5 violation found are determined. At that point, we may see a court for the first time fully embrace the Embodiment Theory, although the support such an approach would receive at the appellate level is unclear at best. For the time being at least, we are left with the 70-plus years of extant *Howey* jurisprudence from which to draw conclusions about the application of this law to non-fundraising secondary transactions in crypto assets.

## IV. Applying *Howey* Case Law to Secondary Transactions in Crypto Assets and the SEC's "Embodiment" Theory

Although the application of the *Howey* case law to fundraising sales of crypto assets is reasonably straightforward, the SEC has consistently implied that it is not just the fundraising transaction that is an "investment contract". Across a range of formal and informal statements, the crypto asset itself is referred to as an "investment contract" or even just a "security", a "crypto asset security" or a "crypto asset security" akin to a share of stock or a bond or other debt instrument. In particular, the SEC's current Chair, Gary Gensler, has taken this position even more aggressively than his predecessor, Jay Clayton, for example stating that "[w]ithout prejudging any one token, most crypto tokens are investment contracts under the Supreme Court's *Howey* Test."[277] By way of contrast, former SEC Chair Jay Clayton chose his words more carefully. When testifying before Congress in February 2018, he simply stated that "[e]very ICO I've seen is a security," clearly referring to the transactions pursuant

---

[277] *See* Gary Gensler, "Prepared Remarks of Gary Gensler on Crypto Markets Penn Law Capital Markets Association Annual Conference" (April 4, 2022), available at: https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

to which the relevant crypto assets were being sold rather than to the crypto assets themselves.[278]

This approach of proposing to treat a non-financial crypto asset (*i.e.,* one that is not a "securities equivalent")[279] as a security is notably in contrast with that of a number of other major jurisdictions, such as the European Union,[280] Switzerland,[281] and Singapore,[282] all of which generally do not consider non-financial crypto assets to be "securities".

What distinguishes tokens from the myriad of other assets that featured in earlier SEC "investment contract" enforcement actions are their ready transferability and the fact that, unlike the failed schemes that lead to many of the earlier enforcement actions (where investor loss was often the proximate cause of an SEC investigation), many tokens managed

---

[278] *See* Stan Higgins, *SEC Chief Clayton: 'Every ICO I've Seen Is a Security'*, COINDESK (Feb. 7, 2018), available at https://www.coindesk.com/sec-chief-clayton-everyico-ive-seen-security?amp.

[279] *See, infra,* text at note [131].

[280] In September 2020, the European Commission published a draft of the Markets on Crypto-assets (the "MiCA Regulation"). The MiCA Regulation limits its scope to those "crypto-assets" that do not qualify as financial instruments, deposits or structured deposits under the EU financial services legislation. Under the MiCa Regulation, the categorization of non-financial crypto assets includes "crypto asset[s]" "utility token[s]", "asset-referenced token[s]", and "electronic money token[s]". On June 30, 2022, the European Council presidency and the European Parliament announced that they had reached a provisional agreement on scope of the MiCA Regulation. *See* Council of the EU Press release "*Digital finance: agreement reached on European crypto-assets regulation (MiCA)*", June 30, 2022, available at https://www.consilium.europa.eu/en/press/press-releases/2022/06/30/digital-finance-agreement-reached-on-european-crypto-assets-regulation-mica/.

[281] In February 2018, the Swiss Financial Market Supervisory Authority ("FINMA") published guidance on how to apply Swiss financial markets laws in its guidelines regarding the regulatory framework for ICOs (the "ICO Guidelines). According to the ICO Guidelines, FINMA distinguishes between "Payment tokens" which have no further functionality or links to other development projects, "Utility tokens" which are intended to provide digital access to an application or service, and "Asset tokens" which represent assets such as participations in real physical underlyings, companies, earning stream, or an entitlement to dividends or interest payments. *See FINMA Publishes ICO Guidelines,* FINMA (Feb. 16, 2018)*,* available at https://www.finma.ch/en/news/2018/02/20180216-mm-ico-wegleitung/.

[282] In May 2020, the Monetary Authority of Singapore (the "MAS") published the "Guide to Digital Token Offerings" which details the regulations surrounding crypto assets and their applicability to securities, collective investments, and derivative contracts. In doing so, the MAS described the characteristics of crypto assets which would constitute capital markets products, and thus be regulated under Singapore's Securities and Futures Act ("SFA"), stating that the "MAS will examine the structure and characteristics of, including the rights attached to, a digital token in determining if the digital token is a type of capital markets product under the SFA." Monetary Authority of Singapore, "A Guide to Digital Token Offerings", 2 (May 26, 2020), available at https://www.mas.gov.sg/regulation/explainers/a-guide-to-digital-token-offerings. In April 2022, Ravi Menon, Managing Director of MAS stated during an interview that MAS "regulates crypto assets-related services and service providers on an activity basis rather than an entity-based approach," and clarified that crypto assets which represent securities, such as a share or a bond, are regulated under the Securities and Futures Act, and that "[i]f the crypto asset is used as a means of payment, then it is regulated as a digital payment token under the Payment Services Act." MAS Approach to the Crypto Ecosystem, MAS (April 27, 2022), available at https://www.mas.gov.sg/news/speeches/2022/mas-approach-to-the-crypto-ecosystem.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

to sustain or even increase their value when traded in secondary markets. The presence of vibrant secondary markets for tokens led to a completely unique type of SEC enforcement action – unprecedented in the investment contract jurisprudence to date: the pursuit of parties not involved in the original fundraising scheme for violations of the securities laws resulting from secondary dealings in tokens.  These enforcement actions required a leap from a focus on fundraising schemes to a focus on activities by infrastructure providers to the crypto asset community, such as operators of trading platforms.

Prior to the filing of the *Wahi* Complaint,[283] the two most notable such enforcement actions were taken against Zachary Coburn, the developer of a computer protocol for a DEX, known as "EtherDelta,"[284] and Poloniex, LLC, the operator of a centralized crypto asset marketplace.[285]  In the case of Coburn, he had no relationship with the original fundraising by any token project; rather, he was charged in connection with the operation of an unregistered national securities exchange based in part on the fact that he continued to benefit from trading fees extracted by the EtherDelta protocol from the protocol's users.  The SEC alleged that EtherDelta "operated as a marketplace for bringing together orders of multiple buyers and sellers in [crypto assets] that included securities…"[286]  This statement underlined the SEC's position that at least some of the crypto assets traded constituted securities.[287]

Similarly, the SEC alleged that Poloniex operated a crypto asset trading platform that met the definition of an "exchange" under federal securities law.  The platform displayed a limit order book that matched the orders of multiple buyers and sellers in crypto assets, including crypto assets that the SEC alleged were themselves "investment contracts" and thus "securities".  However, in neither the *Coburn* nor the *Poloniex* consent orders did the SEC specify which crypto assets it believed were securities, denying market participants the opportunity to evaluate the specific facts and circumstances related to the transactions in each of those assets to determine how such a conclusion may have been reached.

The status of secondary markets in crypto assets came into even greater focus in January 2022, when the SEC proposed a major overhaul of Exchange Act Rule 3b-16.[288]  The proposed amendments would bring

---

[283] *See, infra,* Section [IV.B].

[284] *In the Matter of Zachary Coburn,* S.E.C. Release No. 34-84553 (November 8, 2018).

[285] *In the Matter of Poloniex, LLC*, S.E.C. Release No. 34-92607 (August 9, 2021).

[286] *In the Matter of Zachary Coburn, supra* note [284] at 9.

[287] There is no suggestion in the SEC's complaint that Mr. Coburn was creating a new "investment contract" by allowing various crypto assets to be exchanged by third parties through the EtherDelta protocol.  For an article addressing the status of crypto asset exchanges under the federal securities laws, *see* Michael J. O'Connor, *Overreaching its Mandate?  Considering the SEC's Authority to Regulate Cryptocurrency Exchanges*, 11 Drexel L. Rev. 539 (2019) (distinguishing between the contractual promises that bind issuers of crypto assets, which may result in the formation of an investment contract, and the relationship between exchanges and their customers, which are not accompanied by the contractual promises of the issuer).

[288] Securities Exchange Act Release No. 94062 (Jan. 26, 2022) (Proposing Release), available at https://www.sec.gov/rules/proposed/2022/34-94062.pdf.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

"Communication Protocol Systems", a term not formally defined in the proposal, within the Exchange Act's definition of the term "national securities exchange". As a result, an entity deemed to be operating a Communication Protocol System that was not registered as a national securities exchange under Section 6 of the Exchange Act would be required to register with the Financial Industry Regulatory Authority ("FINRA") as a broker-dealer and comply with the SEC's existing Regulation ATS.[289]   To the extent that the position currently being advocated by the SEC were to prevail – *i.e.*, that most crypto assets are deemed to constitute either permanent securities (under the "original sin" theory) or temporary securities (under the Embodiment Theory), then secondary transactions in these assets would be severely constrained. For example, many tools used by market participants to exchange crypto assets (sometimes referred to as "decentralized exchanges" or "DEXes") could meet the proposed broad definition of Communication Protocol System and would likely be required to impose a centralized intermediary (eliminating any possibility of operating on a decentralized basis) or find a practicable way to exclude or U.S. persons.[290]

In this section, we trace the SEC's approach to the characterization of crypto assets and transactions therein outside of the fundraising context (*i.e.,* in secondary transactions between parties not directly or indirectly involved in the original fundraising scheme). This begins with the SEC's first major statement on the topic, the "When Howey Met Gary (Plastic)" speech.[291]   As noted above, the subsequent *Coburn* and *Poloniex* enforcement actions did not identify those crypto assets which the SEC believed were themselves securities. It was not until 2022 and the *Wahi* complaint that the SEC identified nine specific crypto assets that it alleged were securities, even when sold in a transaction that did not involve fundraising. Accordingly, we look closely at the arguments asserted there, concluding that current *Howey* jurisprudence does not support the position that these assets are securities. This section ends with a look at the policy reasons why such a position should not be adopted as a new interpretation of *Howey*.

---

[289] 17 CFR § 242.301, et seq.

[290] *See, e.g.,* Jamie Crawley, *Hester Peirce Warns Proposed SEC Reform of Securities Trading Platforms Could Threaten DeFi,* CoinDesk (Feb. 1, 2022), https://www.coindesk.com/policy/2022/02/01/hester-peirce-warns-proposed-sec-reform-of-securities-trading-platforms-could-threaten-defi/; ConsenSys Software, Inc., Comment Letter on Amendments to Exchange Act Rule 3b-16 Regarding the Definition of "Exchange"; Regulation ATS for ATSs That Trade U.S. Government Securities, NMS Stocks, and Other Securities; Regulation SCI for ATSs That Trade U.S. Treasury Securities and Agency Securities (April 14, 2022), available at https://www.sec.gov/comments/s7-02-22/s70222-20123694-279940.pdf- ("We write out of concern that some language in the proposed rule may inadvertently designate decentralized systems, such as some of those built on Ethereum, as exchanges within the meaning of the Exchange Act of 1934 … if those systems are used to transact in cryptocurrencies that are misconstrued as securities.").

[291] William Hinman, "Digital Asset Transactions: When Howey Met Gary (Plastic)" (June 14, 2018), available at https://www.sec.gov/news/speech/speech-hinman-061418 (the "Hinman Speech").

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

A.      **"Morphing"**

*1.   The "When Howey Met Gary (Plastic)" Speech*

In the summer of 2018, with ICO mania at full throttle and new crypto assets being introduced on a seemingly daily basis, the SEC's then Director of Corporation Finance, William Hinman, gave a speech in which he sought to introduce a general framework for determining when crypto assets initially sold in a transaction that would be considered an investment contract transaction (such as an ICO) could later be offered and sold without creating securities transactions.[292]  Highlighting the challenge in this effort, Director Hinman noted that "whether a transaction in a coin or token on the secondary market amounts to an offer or sale of a security requires a careful and fact-sensitive legal analysis".

The specific context of the speech was the rapidly growing interest in ether, the native token of the Ethereum network.  As discussed in Section I, ether is needed to pay the transaction fees to deploy smart contract code to the network (known as gas).  Similar to patterns seen with many other commodities, market participants acquired ether in secondary market transactions in anticipation that growing demand for the Ethereum network would drive demand (and therefore price) of ether.

However, it was recognized that if the SEC were to assert that ether tokens were securities, the consequences would be quite significant.  All secondary transactions in ether, regardless of the specific facts and circumstances, would then be securities transactions and it would not be possible to list ether on the same marketplaces that allowed trading in bitcoin and other non-security crypto assets.  Numerous other restrictions would also apply.  Many thought that such a determination could stifle, if not destroy, the nascent blockchain industry in the U.S.

Clearly sensitive to these concerns and eager to carve out a position that avoided this adverse outcome without giving a license to the rapidly proliferating token sales being used for fundraising, Director Hinman stated: "Returning to the ICOs I am seeing, strictly speaking, the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in *Howey* were not."[293]

---

[292] Hinman Speech.  As is almost universally the case with public discourse by the Staff and Commissioners of the SEC, the Hinman Speech included an important disclaimer: "The Securities and Exchange Commission disclaims responsibility for any private publication or statement of any SEC employee or Commissioner.  This speech expresses the author's views and does not necessarily reflect those of the Commission, the Commissioners, or other members of the staff."  This disclaimer took on much greater import after the defendants in Ripple Labs sought to gain access to internal SEC documents relating to the deliberation process that preceded the speech as part of their fair notice defense during the discovery phase of *S.E.C. v. Ripple Labs, Inc. et al.  See S.E.C. v. Ripple Labs, Inc. et al.*, 20-CV-10832 (AT) (SN) (S.D.N.Y. June 15, 2021) .

[293] *Id.*

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Using an apt example, Director Hinman illustrated the difference between a non-security asset and an investment contract transaction involving that asset. A housing unit purchased as a residence is not itself a security, he observed. However, under certain circumstances, the same asset can be offered and sold in a way that causes investors to have a reasonable expectation of profits based on the efforts of others (for example, as the result of a rental pool agreement also being offered). Thus, in these circumstances, whether what is being sold is a residence or a crypto asset, where the primary diver of the purchase is not its consumptive use and, *so long as a common enterprise has been formed between the parties to that transaction*, the offer and sale of the property would likely be considered an investment contract transaction. All this is a straightforward application of *Howey* jurisprudence. Clearly, it is not the housing unit that is the "security" in this example, as we saw with *Hocking*. The housing unit is and remains just that – a property interest, and not a financial instrument. However, when that property interest is sold in a transaction in which all four *Howey* factors are present, that transaction will be a type of securities transaction (that is, an investment contract transaction).

Things become more interesting when Director Hinman considered the bank certificates of deposit that were the object of an investment contract transaction in *Gary Plastic*.[294] Unlike housing units (and crypto assets), certificates of deposit are very much financial assets and properly classified as "instruments" – they represent a legal right against an identifiable entity (the ability to receive interest at a stated rate and a return of principal from the bank that issued the certificate).[295] However, in a separate case, *Marine Bank v. Weaver*,[296] the Supreme Court held that, although financial instruments, federally insured bank certificates of deposit were *not* securities for purposes of the Securities Acts. This led Director Hinman to observe:

> [W]hen a CD, exempt from being treated as a security …, is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and the potential to profit from changes in interest rates, the *Gary Plastic* case teaches us that the instrument *can be part of* an investment contract that is a security.[297]

This is exactly right: the object of the investment contract transaction in *Gary Plastic* was a type of financial instrument that entitled the original owner – as well as any transferee of the owner – to specifically identifiable rights against the bank issuer. More importantly, the separate promises

---

[294] *Gary Plastic Packaging Corporation v. Merrill Lynch Pierce Fenner & Smith Inc.*, 756 F.2d 230 (2d Cir. 1985).
[295] *See, infra*, text at note [131].
[296] *Marine Bank v. Weaver*, 455 U.S. 551 (1982).
[297] Hinman Speech (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

made by Merrill Lynch for the benefit of its customers were clearly defined in a "Money Market Information Bulletin", the key provisions of which the court set out in detail in its decision.  There is no suggestion in *Gary Plastic* that a non-customer of Merrill Lynch who bought a bank certificate of deposit previously in the program but without any of the express additional rights provided by Merrill Lynch would own a "security".  As a result, market participants always had *an objective and observable means* of determining whether they were engaging in an investment contract transaction.

However, this comparison to *Gary Plastic* led Director Hinman to state that "the same reasoning applies to digital assets", concluding that a [crypto] asset itself "can be, … and most often is, a security – *because it evidences an investment contract*."  This approach can be viewed as a laudable attempt to balance competing policy goals.  On the one hand, this allowed Director Hinman to clear the air on the questions swirling around use of the Ethereum blockchain at the time by confirming that secondary transfers of ether tokens in the present day were not investment contract transactions.  On the other hand, this also allowed Director Hinman to avoid unequivocally stating that ether tokens were simply "not securities", something that would have likely been perceived as a potential "opening of the floodgates" to all sorts of questionable new crypto assets that may have been initially sold in unregistered investment contract transactions in violation of Section 5 of the Securities Act and then traded in true secondary transactions before the original violations could be addressed by the SEC's enforcement staff.

If it had been left there, this would have been an effective and practical means of addressing the immediate issue.  In hindsight, though, the analogy to the *Gary Plastic* case was an unfortunate reference point to build from.  No case law was cited in the speech for the proposition that a *non-financial asset* can "evidence" an investment contract.  In fact, a review of the case law demonstrates that this is not something found elsewhere in the entirety of *Howey* appellate jurisprudence.

Yet, in the absence of a more appropriate solution from Congress,[298] this concept has gone on to become a backbone of the SEC's approach to enforcement in the area of crypto assets and introduced the idea that a crypto asset can transition (commonly referred to as "morphing") from something that evidences an investment contract to something that does not.  The speech goes on to develop this idea further, stating:

> [T]his also points the way to when a digital asset transaction may no longer represent a security offering.  If the network on which

---

[298] Subsequent to the speech, Congress has indeed taken up the mantle of addressing the legitimate policy concerns that may have originally driven Director Hinman's approach to applying the Securities Acts to crypto assets.  *See* Section V, *infra*.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the token or coin is to function is *sufficiently decentralized* – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.[299]

By retrospectively applying this new concept of "sufficient decentralization" to the Ethereum blockchain network, it was not necessary or relevant for Director Hinman to explain how market participants could determine the moment in time when *other* crypto assets might "morph" from a security to a non-security – something critical to third parties' ability to comply with the Securities Acts with respect to those assets. The introduction of the morphing concept subsequently gave rise to a near obsessive focus in the crypto asset community on the idea of a blockchain network or dApp becoming "sufficiently decentralized" as the skeleton key for unlocking the Holy Grail of "non-security" status for the related crypto asset.[300]

However, the absence of any case law authority for the idea that a non-financial asset that was initially treated as a security could later "morph" into a non-security based upon events extrinsic to the asset lead to a multitude of theories, ideas, and conjectures among members of the bar seeking to provide guidance to their clients. This leaves crypto asset market participants without *an objective and observable means* of determining with any reasonable certainty when and under what circumstances such a morphing "out of" security status might occur. It also left open the very real issue of what market participants were supposed to do to monitor whether a given crypto asset might later "return to" security status (a possibility clearly left open by the morphing hypothesis).[301]

---

[299] *Id.* (emphasis added).
[300] *See, e.g.*, Blockchain Association, "*Understanding the SEC's Guidance on Digital Tokens: The Hinman Token Standard*" Jan. 10, 2019, available at https://blockchainassoc.medium.com/understanding-the-secs-guidance-on-digital-tokens-the-hinman-token-standard-dd51c6105e2a.
[301] Notwithstanding the absence of any relevant jurisprudence applicable to "sufficient decentralization" in the context of federal securities law, a number of thoughtful attempts to elaborate on this concept have been made. *See, e.g.*, Gabriel Shapiro, "*Defining Decentralization for Law*", April 15, 2020, available at https://lex-node.medium.com/defining-decentralization-for-law-58ca54e18b2a; Marc Boiron, "*Sufficient Decentralization: A Playbook for web3 Builders and Lawyers*", available at https://variant.fund/wp-content/uploads/2022/08/Sufficient-Decentralization-by-Marc-Boiron.docx.pdf; and Jesse Walden, "*Progressive Decentralization: A Playbook for Building Crypto Applications*", available at https://a16z.com/2020/01/09/progressive-decentralization-crypto-product-management/.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Illustrating these issues, the Web3 Foundation recently announced that they believe DOT, the native cryptoasset to the Polkadot blockchain network, has morphed into something other than a security as of the three-year anniversary of their initial outreach to FinHub at the SEC regarding the status of DOT.[302]   The vision for Polkadot never contemplated DOT being a security, but the team understood that the SEC was likely to view DOT as a security.   The team also wanted to do anything they could to ensure DOT was or became a non-security in the eyes of the SEC, so they began a process of engagement with the SEC in order to reach that goal. Eventually, after three years of engagement, the Web3 Foundation was comfortable announcing that DOT had morphed from security to non-security.

While the Web3 Foundation likely never viewed DOT as a security, the implication of this announcement is that the SEC did, and, since the SEC has not commented, we do not know whether they still do or whether they agree that DOT has morphed from security to non-security.   This is practically unworkable because it does not provide market participants with a reliable basis to treat DOT as a non-security. An announcement from a sponsor entity that a crypto asset is no longer a security without confirmation from the SEC that they agree does not assuage regulatory concerns for those engaging in transactions in the crypto asset. Given that failure to register as either a broker, dealer, or exchange are strict liability violations of the Exchange Act and the obligation to register is triggered by activities involving securities, it is of critical importance that market participants have clear means of determining when a crypto asset is or is not a security.

Nevertheless, since most of enforcement actions at the time had properly related to addressing issues in ICO-era fundraising transactions that were conducted in violation of Section 5 of the Securities Act, the bellicose statements from the SEC about most crypto assets being securities, even if sold by third parties in secondary transactions, has generally not been examined closely by legal scholars.[303]

### 2.   The Response to XRP Holders' Motion to Intervene in SEC v. Ripple Labs, Inc., et al.

In connection with their litigation with Ripple Labs, the SEC was required to respond to the request to intervene raised by the XRP Holder Motion.   A large group of holders of XRP tokens, aggrieved as to the price

---

[302] *See* Web3 Foundation Team, *Less Trust, More Truth: Polkadot's Native Token (DOT) Has Morphed and Is Not a Security. It Is Software.*, Medium (November 4, 2022), available at https://medium.com/web3foundation/less-trust-more-truth-polkadots-native-token-dot-has-morphed-and-is-not-a-security-b2a8847a70cc.

[303] Until the *Wahi* Complaint, the SEC had not brought an enforcement action directly alleging that a secondary transaction in an identified crypto asset itself constituted a securities transaction.   Prior to the *Wahi* Complaint, the only SEC-led enforcement cases with respect to secondary transactions in crypto assets had involved non-litigated consent orders with intermediary entities that had facilitated trading of one or more unidentified crypto assets that the SEC deemed securities without further analysis.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

declines resulting from the sudden unavailability of XRP in U.S. marketplaces, initially sought to sue the SEC for their losses. When that attempt failed, they tried a new approach to getting their grievances against the SEC heard in court – they attempted to interplead in the case as defendants.

In doing so, in addition to making many of the expected arguments (*e.g.*, the need for prosecutorial discretion), the SEC also addressed its view with respect to the nature of secondary transactions in crypto assets originally sold in an investment contract transaction.[304] Similar to the approach taken in the Hinman Speech, the SEC wrote in their response that the security at issue in its litigation with the Ripple Defendants was *not* XRP, the crypto asset, but rather all the facts and circumstances surrounding the crypto asset and the manner in which XRP was *initially* offered and sold, asserting that the XRP token "is the *embodiment* of those facts, circumstances, promises, and expectations and today represents that investment contract."[305] Notably, the SEC cited no case law in support of this novel "embodiment" theory.

The SEC's Embodiment Theory is, however, inconsistent with post-*Howey* appellate jurisprudence and presents likely insurmountable difficulties for market participants in the U.S. seeking to buy, hold or sell crypto assets.   As discussed above, the *Howey* test is applied retrospectively and intended to address circumstances in which parties to an ostensibly commercial transaction have direct dealings with each other and thus are aware of both contractual and non-contractual circumstances relevant to the *Howey* analysis.  In contrast, the purchaser of a crypto asset in a secondary market transaction (*e.g.*, whether on a centralized or decentralized exchange) has no way of knowing or determining all of the "facts, circumstances, promises, and expectations" might be deemed by a court in hindsight to be "embodied" in any given crypto asset, many of which may not be matters of the public record and capable of discovery by third parties.

Unlike assets which constitute instruments (including what we refer to as "securities equivalents"[306]), where all relevant legal characteristics can be examined by a buyer or seller solely through the review of definitive written documentation, the "facts and circumstances" related to the finding of a constructive legal relationship that is imputed onto parties in direct dealings with each other under *Howey*'s "investment contract" doctrine when applied to investment schemes *are not capable* of

---

[304] Memorandum of Law in Opposition to Motion to Intervene, *S.E.C. v. Ripple Labs, Inc. et al.*, No. 20-10832 (S.D.N.Y. May 3, 2021), ECF No. 153 (the "Ripple Labs Memorandum of Law").

[305] *Id.* (emphasis in original).  This "embodiment" hypothesis differs from the position taken by the SEC in the Ripple Labs Complaint, where the very first line states: "From at least 2013 through the present, Defendants sold over 14.6 billion units of *a digital asset security called 'XRP' … "*.

[306] *See, infra*, text at note [131].

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

being determined with certainty on an ongoing basis by persons not part of the original scheme.[307]

Moreover, not only has the SEC not provided any means for third parties to "weigh" the relevance of various facts that may suggest that an original transaction met the *Howey* test against other facts that may suggest the contrary, such a weighting scheme is simply impossible to construct based on the diverse approaches taken by courts around the country over the past 70 years.

This is compounded by the reality that many relevant "facts and circumstances" may be private matters between the original parties and not capable of discovery by third parties who lack the SEC's subpoena power to access e-mail messages, Discord servers, and intra-company Slack channels (holding aside the rather obvious problem that these facts and circumstances are constantly changing and third parties seeking to own, use and transfer crypto assets do not have the economic resources or incentive to constantly monitor this information). Finally, *Hocking* and other cases teach us that the evaluation of whether an investment contract transaction is present must be made at the time the transaction takes place. Thus, to correctly apply *Howey*, a party would have to make their evaluation at the time each specific transaction takes place.

With the embodiment theory, the SEC is ignoring the correct application of *Howey* to each transaction and attempting to create a *de facto* presumption that all (or most) crypto assets are themselves investment contracts in the same way that "notes" are presumed to be securities. A note is presumed to be a security because it is enumerated as a type of security in both Securities Act (that presumption may be rebutted for notes entered into for certain commercial and personal purposes, which are excluded from the coverage of the securities laws).[308] In addition, a note is itself is legally enforceable of the relevant the issuer – *a readily determinable person or entity*. The issuer is the one responsible for making payments in accordance with the written promise to pay set forth in the note. If the issuer does not meet its payment obligations under the note, the holder of the note can present the note in court as evidence of those obligations and seek the remedies available under the circumstances.

---

[307] The SEC recently revalidated in this point in its Memorandum of Law in Support of its Motion for Summary Judgement in *S.E.C. v. Ripple Labs, Inc. (Oct. 21, 2022),* writing: "

> The use of [the words "transaction" and "scheme" in *Howey*] contemplates that "the security not be formed of one neat, tidy certificate, but [by] a general 'scheme' of profit seeking activities." *Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989). Thus, courts have held that in applying *Howey* a 'written contract does not control.' *Baroi v. Platinum Condo Dev., LLC*, 914 F. Supp. 2d 1179, 1192 (D. Nev. 2012) (citing *Hocking*, 885 F.2d at 1457).

Pl. Mem. of Law in Opp'n to Def. Mot. for Summ. J at 17, *S.E.C. v. Ripple Labs, Inc*. (20 CIV. 10832 (AT)(SN)) (Oct 21, 2022).

[308] *Reves v. Ernst & Young*, 494 U.S. 56 (1990).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

But crypto assets are *not* in the enumerated list of instruments in the definition of security and are very different than notes. Crypto assets are not written instruments that set forth the obligations of an issuer and the rights of a holder. Instead, crypto assets are merely strings of numbers that allows the person controlling the private key associated with the public blockchain address to which some number of the crypto assets are credited to interact with the relevant blockchain. Crypto assets do not generally provide the holder with specific legally enforceable rights and they do not impose obligations on an identifiable issuer.

Under these circumstances, there is no legal or logical basis for a presumption that crypto assets are securities. Instead, one must evaluate the facts and circumstances of each transaction in which a crypto asset is transferred to determine whether that transaction should be treated as an investment contract and subject to securities law compliance. To presume that crypto assets are all securities would require a legislative change recognizing crypto assets as a new category of issuer-independent securities and setting forth how such a presumption can be rebutted and by whom.

### 3. The Embodiment of Rights Under Law

Unlike the Embodiment Theory with respect to crypto assets and federal securities law, in other areas, a well-developed concept of the "embodiment" of rights under law does exist. For example, state commercial law provides for certain documents, such as "chattel paper" to embody rights. This formal embodiment concept results from centuries of common law developed by judges, codified over decades by state legislatures in the Uniform Commercial Code and other statutes.[309]

### 4. Conclusion

The SEC's morphing hypothesis, if adopted, could also be devastating for intermediaries involved in crypto asset transactions. In particular, because many elements of federal securities law impose strict liability on those who violate them (for example, operating an unregistered exchange for the transfer of securities or acting as an unregistered "broker" or "dealer" in securities), if a court were to adopt and apply the SEC's Embodiment Theory to secondary transactions in crypto assets, third parties dealing in such crypto assets might face significant consequences and penalties without ever having notice of the facts, circumstances, promises, and expectations giving rise to a determination that a particular asset is in hindsight deemed to "embody" a security.

---

[309] *See,* Thomas H. Jackson (1983) "Embodiment of Rights in Goods and the Concept of Chattel Paper", UNIVERSITY OF CHICAGO LAW REVIEW, Vol. 50: Iss. 3, Article 3 (1983), available at https://chicagounbound.uchicago.edu/uclrev/vol50/iss3/3/.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

B.        The *Wahi* Complaint and the Common Enterprise Problem

The Wahi Complaint was filed by the SEC in July 2022 in conjunction with a related criminal indictment filed by the U.S. Department of Justice.[310]  The Wahi Complaint provided the first insights into the SEC's reasoning as to why specifically enumerated crypto assets were themselves "crypto asset securities".  Rather than following the well-settled jurisprudence and applying the *Howey* test to an identified "contract, transaction or scheme", the Wahi Complaint instead states flatly that the defendants "traded in securities subject to federal securities law *because these crypto assets were investment contracts*", going on to state that these assets "were offered and sold to investors who made an investment of money in a common enterprise, with a reasonable expectation of profits to be derived from the efforts of others".[311]

Similar to complaints filed by the SEC against fundraising sellers of crypto assets in well-understood investment contract transactions, in the Wahi Complaint the SEC asserts:

> [E]ach of the nine crypto asset securities were offered and sold by an issuer to raise money that would be used for the issuer's business.  In the offerings, the issuers directly sold crypto asset securities to investors in return for consideration ….  The crypto asset securities then were issued and distributed to the investors' blockchain addresses.  [T]he issuers and their promoters solicited investors by touting the potential for profits to be earned from investing in these securities based on the efforts of others.  These statements focused on, among other things, the value of the token at issue and the ability for investors to engage in secondary trading of the token, with the success of the investment depending on the efforts of management and others at the company.  … [E]ach of the nine companies that offered these crypto asset securities and their promoters further emphasized, among other things, their efforts to get their crypto asset securities listed on secondary trading platforms, and the critical role that executives and others at the company played in turning the company into a success, thereby increasing the value of the crypto asset security.  In other words, each of the nine companies invited people to invest on the promise that it would expend future efforts to improve the value of their investment.[312]

The Wahi Complaint refers to the above as the "hallmarks" of the definition of a security without further explanation as to how they reach this conclusion.  It would appear that the SEC's theory is that the mere

---

[310] *See* Sealed Indictment, *United States v. Wahi,* No. 22 Crim. 392 (S.D.N.Y. filed Jul. 21, 2022).
[311] Wahi Complaint at p. 21 (emphasis added).
[312] *Id*. at p. 22.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

purchase of a crypto asset that was sold in an original investment contract transaction,[313] even if only very briefly held (as was the case in the purchases by the defendants in Wahi Complaint), is sufficient to put the asset holder in the position of being in a "common enterprise" with the original asset seller and that this relationship would be sufficient to support a finding that the crypto asset itself is a security.

As discussed above, this position relies on a court adopting the SEC's Embodiment Theory (since purchasers and sellers of crypto assets in secondary transactions are not providing funding to the original asset seller). Moreover, before radically expanding 70 years of *Howey* jurisprudence to embrace such a theory and creating a risk of violations of federal law due to strict liability regimes, it is incumbent both on the SEC and any court considering the matter to take into account how such a theory would be applied as a practical matter and how market participants would be able to determine at any point in time whether a given crypto asset did, or did not, "embody" a particular scheme.

At the conclusion of this Article, we suggest an alternative and substantially more practical way of achieving the SEC's desired policy outcome.

### C.    Why the Idea of a Security "Morphing" and the Embodment Theory Should Not Be Adopted

As noted above, it is perfectly appropriate for the SEC to propose new conceptual approaches to changes brought on by technology-driven developments, especially where the relevant enabling statutes (the Securities Acts) have a recognized remedial purpose. However, the Embodiment Theory would not only change existing law, it would also upset the delicate balance currently present in the construction of the Securities Acts. As we have observed, "investment contract" is a status imposed in retrospect by a court on a purportedly commercial transaction to remediate an attempt by one of the parties to circumvent required compliance with the Securities Acts. As a remedial provision intended to address prior wrongdoing, the inherent uncertainties of the precise application of the *Howey* test to any given situation are generally considered an acceptable trade-off for the protections it provides to the unwary.

However, applying the same approach to *secondary transactions* in non-financial assets creates a completely new set of incentives and risks. Rather than simply imposing a high degree of diligence on a single party indirectly raising money or inducing participation in a questionable business venture, adopting the Embodiment Theory would impose nearly insurmountable burdens on virtually all market participants dealing with

---

[313] An assertion not able to be disputed by the asset sellers in question since these entities were not named parties in the Wahi Complaint.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

crypto assets, since in order to ensure compliance with the Securities Acts an assessment of whether a given crypto asset is at the time – in fact, the exact moment – of the secondary transaction in fact "embodying" an investment scheme would need to be made.  It appears that the SEC's response to this concern is that, at the moment, the vast majority of crypto assets "embody" an investment scheme and so market participants should just assume all crypto assets are "securities" to be on the safe side.

We do not believe that this is an adequate or appropriate position. Even if the Embodiment Theory were to be adopted, it is not at all clear that, if a properly presented case with a full fact finding were to be brought before a court that the court would agree that there was an ongoing investment scheme of the type contemplated by the *Howey* test.[314]

Moreover, it is widely recognized that developments in the crypto asset space are happening very quickly[315] and the state of affairs that might give rise to a conclusion that a given crypto asset does "embody" an investment scheme could change at any time (and in either direction – with the relevant morphing being out of, but potentially also into, "security status"[316]), making the entire process beyond unwieldy.  Add to this, a variety of facts relevant to a full determination of the matter under the *Howey* case law will likely not be known (or knowable) to the general public, users of crypto assets, and other market participants, such as those facilitating exchanges of these assets or custodying the assets for users. These persons have no way to require sponsors of projects to disclose the relevant private information about their involvement in a project to them. Although this is not an issue in primary transactions where the parties are dealing directly with each other, in a secondary transaction, without access to this private information, market participants are left to guess about whether a given token does, or does not, embody a scheme at a particular

---

[314] In the Wahi Complaint, for reasons unclear, the SEC only claimed that nine of the 25 total crypto assets it said were traded by the defendants were "crypto asset securities".  (The SEC has previously used the term "digital asset securities" for crypto assets it maintains "are" securities.  It is unclear if this change in nomenclature is intended to have substantive significance.)  There is some uncertainty as to the overlap between the remaining unnamed assets referred to in the SEC's complaint and those covered by the Department of Justice in the related criminal complaint.  We note that, in our survey of appellate cases, a significant majority were determined by the court *not* to involve an investment scheme under *Howey*.  *See* Section [II.A.4] *infra*.

[315] *See, e.g.*, BNY Mellon, "*Digital Assets: From Fringe to Future*", September 2021, available at https://www.bnymellon.com/us/en/insights/all-insights/digital-assets-from-fringe-to-future.html ("Just as traditional markets have evolved by means of collaboration among stakeholders, we believe the same must be true for crypto assets, albeit more quickly. Decentralization is a built-in feature of the distributed technologies that underly crypto assets. … This new ecosystem, which must be grounded in both trust and innovation, will provide significant opportunities for growth.").

[316] *See, e.g.*, Frederick Munawa, "What's at Stake: Will the Merge Turn Ether into a Security?" (CoinDesk Aug. 10, 2022) available at https://www.coindesk.com/tech/2022/08/10/whats-at-stake-will-the-merge-turn-ether-into-a-security/.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

time.   Given that the Securities Acts provide for strict liability for violations of various provisions, this is simply an unacceptable result.

Finally, in a similar context considering whether a subjective test should be applied when the security in question was 100% of the shares of stock in a business being sold, the Supreme Court expressly rejected an analogous "morphing" concept, stating:

> More importantly, however, if applied to this case, the sale of business doctrine would also have to be applied to cases in which less than 100% of a company's stock was sold.  This inevitably would lead to difficult questions of line drawing.  The Acts' coverage would in every case depend not only on the percentage of stock transferred, but also on such factors as the number of purchasers and what provisions for voting and veto rights were agreed upon by the parties.  As we explain more fully in *Gould v. Ruefenacht*, … decided today as a companion to this case, *coverage by the Acts would in most cases be unknown and unknowable to the parties at the time the stock was sold.*  These uncertainties attending the applicability of the Acts would hardly be in the best interests of either party to a transaction.  *Cf. Marine Bank v. Weaver*, 455 U.S. at 455 U. S. 559, n. 9 (*rejecting the argument that the certificate of deposit at issue there was transformed, chameleon-like, into a "security"* once it was pledged).[317]

## V.   THE PROBLEM AND A SOLUTION

### A.      The Inadequacy of the Current Regulatory Framework for Secondary Markets in Crypto Assets

If most crypto assets are not securities, then the most likely categorization of these assets would be as "commodities" under the CEA.  However, under current law, spot transactions in commodities are subject only to limited oversight by the CFTC as, historically, such spot transactions have generally been wholesale commercial transactions (such as direct trade in crude oil, wheat, or pork bellies) and not practically available to the retail market (and certainly not through anonymous, order book-based trading platforms that provide analogous services as traditional securities intermediaries).

Although centralized crypto asset marketplaces are required to register with the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury, as money service businesses and obtain state money transmission licenses in those states in which they operate (to

---

[317] *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 696 (1985) (emphasis added).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

the extent so required), this regulation is designed for those businesses temporarily entrusted with customer funds and focuses mainly on the safety and soundness of the "money transmitter" and their adoption and implementation of the broad anti-money laundering and know-your-customer requirements found in the Bank Secrecy Act. Left unaddressed are matters relating to the fairness and integrity of the marketplaces themselves, including prohibitions on manipulative behavior by the marketplace operators and participants and addressing the inevitable conflicts of interest that arise from trading businesses.

Also lacking are requirements that persons or entities that raised money in a private fundraising sale of crypto assets (and thus not required to register the sale with the SEC) provide any ongoing disclosures to the marketplaces about their continued involvement with the project. Although there may not be a legally enforceable obligation on the part of a project sponsor to utilize the proceeds raised in a fundraising sale for a particular purpose, owners of crypto assets do indeed often rely on a select group of individuals to cause a project to grow and develop, thus driving up demand for the crypto asset and, most likely, the asset's price.

## B.  Legislative Responses

A number of important pending legislative initiatives in Congress aim to address these gaps.[318]  Bills looking at these issues from the commodities perspective have emerged from both the Senate and the House. The Digital Commodities Consumer Protection Act of 2022 (the "DCCPA"), introduced in August 2022 by Senators Debbie Stabenow, Chairwoman of the Senate Committee on Agriculture, Nutrition, and Forestry, and John Boozman, Ranking Member, along with Senators Cory Booker and John Thune, would give the CFTC new tools and authorities to regulate crypto asset commodities and would go a long way toward filling the current regulatory gap. However, in its current form, this bill does not provide a practical framework that would allow market participants to distinguish crypto assets that are securities from those that are not.

The DCEA, re-introduced in April 2022 by members of the House Agriculture Committee, would create a definition of "digital commodity". Consistent with our discussion above concerning the proper application of *Howey* jurisprudence to crypto assets, this definition would exclude crypto assets which purport to create obligations between an issuer and the holder of the asset. This definition does not contemplate "morphing" through some form of decentralization, as posited by the SEC. The DCEA definition of digital commodity is focused solely on the potential obligations between the issue and the holder.

---

[318] Pending legislation with respect to stablecoins is beyond the scope of this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

Spot transactions in digital commodities would then fall within under the CFTC's regulatory regime.  The DCEA would also create a new regulatory framework for digital commodity developers, dealers, and exchanges.  In the event of a "digital commodity presale" when a developer delivers a digital commodity as part of a securities offering, holders of such pre-sold digital commodities would only have limited options for secondary sale, among which they could sell on a digital commodity exchange registered with the CFTC.  "Presold digital commodity tokens" generally would include those received by an early investor, those given to developers (or relatives thereof), or those reserved for a development foundation.  Generally, those tokens received by individuals or entities which can be considered "insiders".  A registered digital commodity exchange would be subject to a self-certification process in order to list new digital commodities for trading.

Between the introduction of these two bills, Senators Cynthia Lummis and Kirsten Gillibrand announced the introduction of the Lummis-Gillibrand Responsible Financial Innovation Act (the "RFIA").  The RFIA provides a comprehensive and holistic approach to crypto asset activity and would tackle many of the issues arising at the intersection of traditional financial regulation and crypto assets, including taxation, custody, consumer protection, commodities regulation, and securities regulations, among other things.

The RFIA also takes an approach to providing a legislative answer to the question of when transactions involving crypto assets will be governed by federal securities law and when the federal commodities laws properly apply and has similarities to the current form of the DCEA.  In particular, Title III of the RFIA addressees the information asymmetry concerns raised by the SEC by imposing new SEC-governed disclosure obligations on companies that raise funds through the sale of crypto assets, even where the funds were raised in private placement transactions.

The RFIA introduces a new term, "ancillary asset" and various additional related provisions to what would be a new Section 41 of the Exchange Act to create a disclosure regime tailored to the needs of users of crypto assets.  The term "ancillary asset" in the RFIA is used to describe a fungible intangible asset (which is not necessarily a crypto asset) that is offered, sold or otherwise provided to a person in connection with the purchase and sale of an "investment contract" , but which does not provide the holder of the asset with: (i) a debt or equity interest in that entity, (ii) a profit or revenue share derived from that entity, (iii) an entitlement to an interest or dividend payment from that entity, (iv) a profit or revenue share in that entity derived solely from the entrepreneurial or managerial efforts of others, or (v) any other financial interest in that entity.

The concept of "ancillary assets" in the RFIA allows statutory law to align better with existing *Howey* jurisprudence by providing a clear way of distinguishing between assets sold in investment contract transactions

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

which are not otherwise "securities", and the transactions by which these assets are sold, which sometimes are.  The large majority of major crypto assets currently in the market would likely be considered "ancillary assets" under the RFIA, since very few of these assets provide the holder with equity or debt-like rights in a separate "business entity" – they simply allow for instructions to be given to a network of computers.

The proposed new Section 41 of the Exchange Act would introduce a presumption that ancillary assets are not "securities".  For a seller of ancillary assets (and certain of its affiliates) this presumption is conditional – for those persons to benefit from it, the seller must be in compliance with the above-mentioned tailored disclosure requirements, to the extent that they are applicable.  On the other hand, persons simply using the relevant crypto assets and not otherwise affiliated with the asset seller are provided with an unconditional presumption that the ancillary asset is not a "security", promoting liquidity but also bringing these assets within the newly expanded jurisdiction of the CFTC, which in Title IV of the RFIA is given jurisdiction over spot markets in fungible crypto assets.  With the CFTC in charge of secondary markets in most crypto assets[319] and the SEC charged with overseeing the disclosure regime applicable to sellers of crypto assets, the RFIA seeks to balance the competing policy concerns in a way that provides much enhanced protections to the market while allowing offering technologists seeking to build new projects in the U.S. a viable path forward.

At the same time, the RFIA recognizes that there is a broad design space available when crypto assets are created.  Where a crypto asset does create (or at least purports to create) actual legal rights that can be enforced in a traditional judicial proceeding (as would be the case with equity or debt rights), then the parties would need to carefully consider whether a "security" had been created.  This determination is left to existing *Howey* and related jurisprudence.

Under the RFIA, if a company with jurisdictional ties to the U.S. offers, sells, or otherwise executes investment contract transactions that provide their counterparty with an "ancillary asset", that company will be subject to the periodic disclosure requirements targeted at the asset sold and the involvement of the seller beginning on the date that is 180 days after the first date on which the investment contract is offered, sold, or otherwise provided by the company.  However, the disclosure is conditional upon there being an active trading market for the asset and the seller (or certain affiliated entities) remaining the driving force in determining the value of the relevant assets.  Said differently, the disclosure obligations under the RFIA continue until the project to which the relevant assets relate is "sufficiently decentralized".  Every six months this is tested again and when the seller entities are no longer actively

---

[319] How the CFTC would do this is outside the scope of this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

involved, the requirement for them to provide disclosure to the market ceases.

Although this Article does not endorse any of these legislative initiatives on their own, we do believe that these three legislative initiatives, taken together, form a strong starting point for a discussion of potential federal regulation of crypto asset marketplaces and uses that is wholly consistent with the conclusions of our work. Critically, it is the job of Congress, not unelected regulators, to balance the competing policy considerations and craft a solution that would address the current absence of required disclosures by crypto asset-based project sponsors necessary for fulsome consumer protection, without taking the untenable position that most tokens are themselves securities.

Such legislation could bring crypto asset marketplaces under a coordinated federal regulatory umbrella and ensure that these marketplaces had a level of oversight and supervision similar to other "designated contract markets" for commodity interests. In addition, by distinguishing between the "contract, transaction, or scheme" comprising an investment contract transaction, and the crypto asset sold as the "object" of that scheme, new legislation would codify existing jurisprudence while balancing the real need to protect consumers through added disclosure. This would provide a practical and balanced solution to a very real and expensive problem for participants in the crypto asset sector.

We are encouraged by the steps taken by Congress in 2022 and look forward to seeing an ongoing and transparent dialogue with all stakeholders as all of the work that has been done, together with significant and constructive work undertaken elsewhere in Congress (most notably the bi-partisan efforts made in the House Financial Services Committee to address the issuance, holding and use of stablecoins) eventually crystalize into one or more laws that set the U.S. on a course for sustainable leadership in the use of crypto assets.

## VI.   CONCLUSION

Securities regulators in the U.S. have attempted to address the many issues raised from the advent of crypto assets through a range of policy statements and enforcement actions, generally through an application of the *Howey* test to transactions in these assets. However, in their understandable efforts to protect those who have been the direct or indirect victims of fraudulent or misleading fundraising schemes utilizing crypto assets, regulators have gone beyond current jurisprudence to suggest that most fungible crypto assets are themselves "securities", a position that would provide them with jurisdiction over nearly all activity taking place with these assets.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

As we have demonstrated, there is no current basis in the law relating to "investment contracts" to classify most fungible crypto assets as "securities" when transferred in secondary transactions because an investment contract transaction is generally not present and these assets neither create nor represent the necessary cognizable legal relationship between an identifiable legal entity on the one hand and the owner of the crypto asset on the other that is the hallmark of a security.

Although it is perfectly appropriate for securities regulators to suggest new approaches to new "devices" that fall within their remit, we have endeavored to show that there are strong policy reasons against judicially or legislatively adopting the Embodiment Theory and the idea of securities "morphing" into and out of being a "security" due to the uncertainty it would bring to the marketplace and the near-impossible duty it would impose on market participants to constantly monitor changes to the "facts and circumstances" that might result in a court asserting that a given investment scheme was ongoing and "embodied" in a crypto asset. This would greatly disadvantage market participants in the United States in light of the regulatory approaches being taken in other major jurisdictions around the world.  The "morphing" of things should be left to Proteus and the stuff of Greek myths – modern market participants require an *objective and observable* means of determining at any particular point in time whether they may be engaging in securities activity, *i.e.,* certain rules that are rooted in the more than 70 years of existing *Howey* jurisprudence which can be applied clearly and plainly by good faith actors, something the SEC's current theory would simply foreclose.

At the same time, the authors acknowledge that changes are needed to address legitimate concerns about the protections currently available to market participants that own, and trade in, crypto assets. Accordingly, the authors argue that this gap should be addressed legislatively, through an act of Congress.  Aspects of the proposed legislation discussed above provide a basis to develop a constructive, insightful, and bi-partisan approach to the concerns raised by regulators and others and, together, point the way toward a practical solution without creating unworkable legal fictions that will inevitably cause the U.S. to fall behind the rest of the world in this critical technology infrastructure.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

**Annex A**

## ABOUT OUR SURVEY

In the course of researching for this Article, we examined whether there might exist jurisprudential precedents in the United States, particularly in federal appellate courts and the Supreme Court, to support the suggestion that non-financial assets that are the "object" of an investment scheme but which contain no contractual terms, such as crypto assets, oranges grove parcels, aging whiskey, animal pelts, and the like, could themselves be found to be "securities" when sold on the secondary market without an assignment of the related contractual promises that were a necessary part of the finding of an "investment contract". In order to undertake this examination, we identified each federal circuit court and Supreme Court decision[320] that raises the question of whether a particular "*contract, transaction, or scheme*" was an investment contract. To do this, we compiled a set of every such decision citing to *S.E.C. v. W.J. Howey Co.* along with the phrase "investment contract" (in order to isolate investment contract decisions citing to *Howey* from those which cite to *Howey* for other reasons). Additionally, because a handful of relevant cases cite to *United Hous. Found., Inc. v. Forman* but not *Howey* and use the term "common venture" rather than "common enterprise" we expanded our review to include relevant decisions citing to *Forman*. In total, we found 253 relevant federal appellate court decisions and 13 Supreme Court decisions as of November 7, 2022. The following summarizes certain trends and highlights several particularly relevant cases with respect to crypto assets. A detailed list of all decisions reviewed is set forth in Schedules 1-5.

SUPREME COURT AND FEDERAL APPELLATE COURT DECISIONS ASSESSING THE EXISTENCE OF AN "INVESTMENT CONTRACT"



Figure 1: Annual distribution of federal appellate and Supreme Court cases assessing the existence of an "investment contract".

Although the word "investment contract" has been a part of the United States jurisprudential lexicon since as early as 1868,[321] the first published reference to it in our highest court was in 1941 in the respondent's argument in *Helvering v. Le Gierse*, 312 U.S. 531 (1941), which was soon followed by the primary precursor to *Howey*, *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943). Since this time, the

---

[320] We limited our review to federal appellate and Supreme Court decisions both due to practicality (there are at least 1,600 district court cases on the topic), as well as jurisprudential significance.
[321] A LexisNexis search indicates that the first reference of the term was in 1868 in *Nicoll v. Mason*, 49 Ill. 358 (1868).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

majority of federal appellate and Supreme Court decisions have found that there lacked an investment contract or remanded the case for further proceedings on that question (*see* Figure 2).



Figure 2: Decisional outcomes of federal appellate and Supreme Court cases assessing the existence of an "investment contract".

In totality, of the 266 relevant federal appellate and Supreme Court decisions reviewed, courts have found an absence of an investment contract in approximately 42% of decisions, with a further 12% of cases being remanded back to the lower court for additional fact finding. 36% of the cases reviewed found the presence of an investment contract. (Opinions of the remaining cases either did not specifically discuss whether the transaction at issue constituted an "investment contract or were later withdrawn and substituted with a subsequent decision.)

The period between 1973 and 1996, the most active period for investment contract cases at the appellate level, saw decisions dealing primarily with interests in the real estate, banking, investment services and lending sectors. This is in contrast to the prior 25-year period, in which the primary interests at issue were associated with the oil and gas sector. Since 1997, the primary interests giving rise to disputes have been in the real estate sector, but this is closely followed by cases involving sale and leaseback arrangements, including *Cooper v. King*, 114 F.3d 1186 (6th Cir. 1997), *S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003), and *S.E.C. v. Edwards*, 540 U.S. 389 (2004). Overall, the primary interests at issue have been limited and general partnership interests, real estate, and leasehold interests (inclusive of leasehold interests in the oil and gas sector), discretionary trading account interests, and franchise interests across a variety of industries. What we see across all cases is a combination of promoters of capital-intensive businesses seeking to raise funds without committing to the process of a public offering of securities intermixed with more modest business ventures gone awry, with a disgruntled party seeking to avail itself through a remedy under federal securities law where one may not have been available in state court.

As has been discussed throughout the Article, in all circuit court and Supreme Court decisions which found an investment contract to be present, there existed some sort of business relationship between the parties.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

FEDERAL APPELLATE DECISIONS ASSESSING THE EXISTENCE OF AN "INVESTMENT CONTRACT"



Figure 3: Annual distribution of federal appellate cases assessing the existence of an "investment contract".



Figure 4: Distribution of federal appellate decisions assessing the existence of an investment contract since *Howey*, by circuit.

The Ninth Circuit, which has thus far been responsible for 27% of all federal appellate investment contract cases, has found no investment contract, or remanded for further proceedings, in 53% of all decisions. This approximately mirrors the Fifth Circuit, which has thus far been responsible for 17% of all federal appellate investment contract cases, and has similarly found no investment contract, or remanded for further proceedings, in 55% of all its decisions.

In the first 25 years following the Supreme Court's decision in *Howey* (1946-71), federal appellate courts issued just 18 opinions with respect to the status of certain schemes alleged to be investment

110

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

contracts.  Of those, the courts found an investment contract to have been formed in nine cases, which dealt primarily with interests related to the oil and gas industry,[322] but also two cases stemming from the sales of beaver interests (animal sales),[323] and real estate[324] and distributorships & franchises,[325] respectively.  In all 18 cases, the decisions referenced a written contractual relationship between the parties.



Figure 5: Distribution of industries at issue in the during the first 25-year period after *Howey*.

The Fifth Circuit, the single most active circuit with respect these 18 decisions, with a total of five opinions, focused primarily on issues related to oil and gas interests.  For example, in *Roe v. United States*, 287 F.2d 435 (5th Cir. 1961), the Fifth Circuit remanded the case for further proceedings after finding that that oil leases sold via a "high-pitched, hard-sell extravagant solicitation campaign" which promised extraordinary returns garnered through the activities of persons other than the purchasers were more than offerings of naked leasehold rights and as such, "if credited," would constitute the sale or delivery of an investment contract.  Contrast *Roe* with *Lynn v. Caraway*, 379 F.2d 943 (5th Cir. 1967) in which the court specifically differentiated the sale of certain fractional undivided interests in an oil and gas lease from *Roe* on account of there being no evidence to support a finding that the seller made any promise or agreement in addition to selling the naked leasehold right.  The courts' differentiation between those sales of property rights which are coupled with additional contractual promises, and those which are not reverberates throughout the jurisprudence on investment contracts.

---

[322] *Cross v. Pasley*, 270 F.2d 88 (8th Cir. 1959); *Moses v. Michael*, 292 F.2d 614 (5th Cir. 1961); *S.E.C.  v. MacElvain*, 417 F.2d 1134 (5th Cir. 1969), *cert. denied, 397* U.S. 972 (1970); *Johns Hopkins Univ. v. Hutton*, 422 F.2d 1124 (4th Cir. 1970).

[323] *Cont'l Mktg. Corp. v. S.E.C.*, 387 F.2d 466 (10th Cir. 1967); *Kemmerer v. Weaver*, 445 F.2d 76 (7th Cir. 1971).

[324] *Blackwell v. Bentsen*, 203 F.2d 690 (5th Cir. 1953).

[325] *United States v. Herr,* 338 F.2d 607 (7th Cir. 1964).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent



Figure 6: Types of interests sold during the first 25-year period after *Howey*.

Between 1972 and 1996, federal appellate courts issued what is thus far the majority of the opinions with respect to the presence of an investment contract. During this period, federal appellate courts disseminated 177 opinions discussing investment contracts, of which the leading type of transaction or scheme at issue were those associated with the status of partnerships, whether limited or general, in the real estate industry.[326] Other notable interests at issue related to discretionary trading accounts, for which the courts generally found that the business relationships at issue lacked the essential element of a "common enterprise."[327]



Figure 7: Top 10 types of interests sold during the second 25-year period after *Howey*.

The Ninth Circuit issued the most decisions during this time, finding investment contracts 35% of the time, and either finding no investment contract, or remanding for future fact finding 58% of the decisions during this time. The remaining 7% of decisions dealt with notes, or in the case of *Hocking v.*

---

[326] *See, e.g., Reeves v. Teuscher*, 881 F.2d 1495 (9th Cir. 1989); *Rodeo v. Gillman*, 787 F.2d 1175 (7th Cir. 1986); *Maritan v. Birmingham Properties*, 875 F.2d 1451 (10th Cir. 1989); and *Koch v. Hankins*, 928 F.2d 1471 (9th Cir. 1991).

[327] *See, e.g., Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 622 F.2d 216 (6th Cir. 1980); *Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 682 F.2d 459 (3d Cir. 1982); *Mordaunt v. Incomco*, 686 F.2d 815 (9th Cir. 1982); and *Lopez v. Dean Witter Reynolds, Inc*., 805 F.2d 880 (9th Cir. 1986).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

*Dubois*, 839 F.2d 560 (9th Cir. 1988), was withdrawn.[328]  A close runner up, the Fifth Circuit found instances of an investment contract in 16% of decisions during this period, and either found no investment contract, or remanded for further fact finding in 60% of the decisions during this time. The remaining 24% of decisions dealt with one or more of the enumerated types of securities set forth in the Securities Acts, other than an investment contract, or in the case of *Williamson v. Tucker*, 632 F.2d 579 (5th Cir. 1980), was withdrawn.[329]

In addition to the *Hocking* line of cases, described in Part II.C, notable amidst these 177 opinions is the Ninth Circuit's opinion in *S.E.C. v. Belmont Reid & Co.,* 794 F.2d 1388 (9th Cir. 1986).  In *Belmont Reid & Co.,* the SEC brought antifraud actions against salesmen who sold contracts for gold coins to investors on behalf of a Nevada natural resources developer who, in an effort to raise capital, sought to sell its gold directly to investors, with the option to either purchase the coins thirty days in advance of delivery, or prepay for the coins at a fixed price.  The SEC alleged only that the pre-payment plan was a security, as the prepayment price embodies a discount of between 33% and 48% of the prevailing market price of gold. In finding that the case failed to meet the "solely from the efforts of others" prong of *Howey*, the court found, along with the district court, that the profits of the coin buyer "depended upon the fluctuations of the gold market," not the seller, and therefore declined to accept that the contracts at issue were investment contracts.[330]

Finally, in the last 25 years, from 1997 through 2022, there have been 59 federal appellate opinions with respect to the status of certain schemes as investment contracts, 35 of which were decided by either the Ninth, Eleventh, or Fifth Circuits. During this time, the notable schemes at issue have included payphone leases packaged together with service contracts,[331] and a handful schemes involving virtual in-game shares, condominium interests, employee stock option plans, and recently, digital assets.[332]

---

[328] Withdrawn at 885 F.2d 1449 (1989).
[329] Withdrawn at 645 F.2d 404 (1981).
[330] 794 F.2d 1388 (9th Cir. 1986).
[331] *See, e.g.*, *S.E.C. v. ETS Payphones, Inc.*, 408 F.3d 727 (11th Cir. 2005); *S.E.C.  v. ETS Payphones, Inc.*, 300 F.3d 1281 (11th Cir. 2002), *rev'd sub nom.*, *S.E.C.* v. Edwards, 540 U.S. 389 (2004); *S.E.C. v. Ross*, 504 F.3d 1130 (9th Cir. 2007); *S.E.C. v. Rubera*, 350 F.3d 1084 (9th Cir. 2003).
[332] *Fedance v. Harris,* 1 F.4th 1278 (11th Cir. 2021).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent



Figure 8: Distribution of industries at issue in the during the third 25-year period after *Howey*.

Of those opinions, the federal appellate courts found investment contracts in 33 instances. Notable decisions during this period include *S.E.C. v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001) and *S.E.C. v. Edwards*, 540 U.S. 389 (2004), among others.

In *S.E.C. v. SG Ltd.*, the First Circuit was tasked with determining whether virtual shares in an enterprise existing only in cyberspace fell within the purview of federal securities law. In finding that the SEC alleged sufficient facts to state a triable claim, and thus reversing the lower court's decision, the First Circuit gave great weight to the economic realities of the situation, holding that the SEC had sufficiently proven that the offer to sell virtual shares in various "virtual companies" listed on a "virtual stock exchange" while promising a risk free investment, amounted to an invitation to enter into an investment contract, and was thus within the jurisdictional reach of federal securities law.

In *Edwards*, the Supreme Court was asked to decide whether a payphone sale-and-leaseback arrangement was excluded from the term "investment contract" because the scheme offered a contractual entitlement to a fixed, rather than a variable, return. There, the defendant sold payphones to the public packaged with a site lease, a five-year leaseback and management agreement, and a buyback agreement. The purchasers of the packages were not involved in the day-to-day operations of the payphones they owned and were promised a 14% annual return. As the payphones did not generate enough revenue to make payment under the leaseback agreements, the company became dependent on funds from investors to meet its obligations.

While the district court held that the arrangement was an investment contract, the Eleventh Circuit reversed on two grounds. First, the court read that an "investment contract" was an offer of either capital appreciation, or participation in the earning of the enterprise, thereby excluding schemes which offered a fixed rate of return. Second, the court held that "efforts of others" prong was not satisfied when the purchasers had contractual entitlement to the return. The Supreme Court concluded that the Eleventh Circuit erred on both accounts and held that an investment scheme promising a fixed rate of return can be an investment contract subject to federal securities law. In doing so, the Court analyzed the judicial history

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

of the *Howey* test, citing to the state courts interpretation of their "blue sky" laws to explain the meaning of the word "profit" within the definition set forth in *Howey* in order to find that there is no reason to distinguish between promises of fixed returns and promises of variable returns for purposes of the test.

What the *Edwards* court did not do was directly opine on whether or not there was a "common enterprise" involved in the investment contract at issue. Nor did the Supreme Court relieve courts from having to find a common enterprise. Notwithstanding the foregoing, the SEC took that silence to mean that the Supreme Court supported their interpretation of the "common enterprise" prong of the *Howey* test to be all but nullified. Addressing the issue in footnote 10 of the Framework, the SEC cites to the Opinion of the SEC in *In re Barkate*, 57 S.E.C. 488, 496 n.13 (Apr. 8, 2004), where the SEC lowered the bar for the finding of an investment contract by rejecting the "common enterprise" element of *Howey* and embracing the prior standards elucidated in state "blue sky" laws, thus redefining the traditional investment contract test as those adopted prior to *Howey*. In furtherance of the foregoing, in the same footnote 10 of the Framework, the SEC cited to their Supplemental Brief in *Edwards* in which the SEC writes:

> *Edwards* not only confirms broad vertical commonality as the correct interpretation of "common enterprise," but also supports the Commission's original interpretation of "investment contract" – first articulated in 1941 and recently reiterated in a post-*Edwards* adjudicatory opinion. As the Commission clarified in that recent opinion, a "common enterprise" does not impose "a distinct requirement for an investment contract." [333]

Accordingly, it appears that the SEC's definition of "investment contract" is notably broader than what is otherwise seen in the *Howey* jurisprudence. Specifically, the SEC cites to *In re Natural Resources Corp.*, 8 S.E.C. 637 (1941) in the aforementioned brief as describing an investment contract as being "transactions which in substance…involve the laying out of money by the investor on the assumption and expectation that the investment will return a profit without any active effort on his part, but rather as a result of the efforts of someone else." Nevertheless, courts considering questions of the application of *Howey* to transactions involving crypto assets continue to apply all four *Howey* prongs.

---

[333] Appellee Supplemental Br, *S.E.C. v. Edwards*, 540 U.S. 389, 14-15 (2004).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## SCHEDULE 1

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST-** *SEC V. W.J. HOWEY CO.* **IN WHICH THE COURT FOUND AN INVESTMENT CONTRACT.**

| Object Key | |
|---|---|
| Yes | Means that the court found that there was, or that the allegations were sufficient to determine that, the contract, transaction, or scheme at issue in the case was an investment contract. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344 (1943)[334] | Yes | Leasehold Interest | Oil & Gas | Finding the sale and assignment of an oil lease to be not merely the sale of naked leasehold rights but an "investment contract," because the exploration enterprise was woven into the oil lease enterprise. |
| 2. | S.E.C. v. Howey Co., 328 U.S. 293 (1946) | Yes | Real Estate Interest | Real Estate | Finding an offer for the sale of units of a citrus grove for real estate development to be an "investment contract" when coupled with a service contract for cultivating, marketing, and remitting net proceeds to purchasers. Establishing the *Howey* test, which is used to determine the existence of an "investment contract" when a given contract, transaction, or scheme involves (1) an investment of money (2) in a common enterprise (3) with an expectation of profits (4) solely from the efforts of the promoter or a third party. |
| 3. | Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953) | Yes | Real Estate Interest | Real Estate | Finding, post *Howey,* the sale of citrus groves coupled with a management contract to be an "investment contract" within the meaning of the term as defined in *Howey*. Finding "[i]f they merely purchased land, without more, such a purchase would not constitute an investment contract within the meaning of the Securities Act." |
| 4. | Cross v. Pasley, 270 F.2d 88 (8th Cir. 1959) | Yes | Leasehold Interest | Oil & Gas | Concluding that consideration paid for the cost of drilling in an oil and gas venture is consideration for an "investment contract," because the investor has an expectation of passive returns on the basis that existing and future drilling expenses are covered. |
| 5. | Los Angeles Trust Deed & Mortgage Exch. v. S.E.C., 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919 (1961) | Yes | Promissory Note | Trust Sales | Finding the economic inducement of prospective investors to be an offer to enter an "investment contract" under the Securities Act where resulting investor profits are inextricably linked to the efforts of managers in a common enterprise in exercising independent judgment to find and purchase discounted trust deeds secured by real estate. See Schedule 3 at 2 for prior history. |

---

[334] Decided prior to *S.E.C. v. W.J. Howey Co*., 328 U. S. 293 (1946) included as notable precedent for purposes of empirical accuracy.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 6. | Moses v. Michael, 292 F.2d 614 (5th Cir. 1961) | Yes | Leasehold Interest | Oil & Gas | Concluding the assignment of an undivided working interest in oil and gas leases constitutes an investment contract under the Securities Act. |
| 7. | United States v. Herr, 338 F.2d 607 (7th Cir. 1964) | Yes | Distributorship Rights | Sales Training Materials | Concluding a distributor agreement does not create a vendor-purchaser relationship but an investment contract where the purchasers were led to expect large profits through no efforts of their own. |
| 8. | S.E.C. v. United Benefit Life Ins. Co., 387 U.S. 202 (1967) | Yes | Variable Annuities | Insurance | Finding an annuity contract to be an "investment contract," unexcepted by the insurance exemption, under the Securities Act where policy payments accumulate as part of a flexible fund arrangement and establish an expectation of growth through sound investment management. |
| 9. | Cont'l Mktg. Corp. v. S.E.C., 387 F.2d 466 (10th Cir. 1967), *cert. denied*, 391 U.S. 905 (1968) | Yes | Beaver Interests | Animal Sales | Concluding the collection of investments in a scheme for the sale, care, management, replacement, and resale of live beavers for breeding creates an investment contract within the meaning of the Securities Act where returns are predicated on the efforts not of investors but of others. |
| 10. | S.E.C. v. MacElvain, 417 F.2d 1134 (5th Cir. 1969), *cert. denied*, 397 U.S. 972 (1970) | Yes | Title Interests | Oil & Gas | Finding the sale of interests in underwater mining claims to create an investment contract where the land promoter promised to contest the U.S. Department of Interior's interest in the land, impliedly to inure to the benefit of all purchasers, despite the promoter's disclaimer of any "collateral offer, promise, or assurance of any nature whatsoever." |
| 11. | Johns Hopkins Univ. v. Hutton, 422 F.2d 1124 (4th Cir. 1970), *cert. denied*, 416 U.S. 916 (1974) | Yes | Production Payment Interest | Oil & Gas | Holding a production payment representing mineral rights to oil and gas reserves to be an "investment contract" where extraction of those reserves is limited to specified wells maintained by efforts of persons other than the purchaser. |
| 12. | Kemmerer v. Weaver, 445 F.2d 76 (7th Cir. 1971) | Yes | Beaver Interests | Animal Sales | Affirming that the sale of live beavers constitutes an "investment contract" when coupled with a service agreement to house, feed, and otherwise care for the beavers. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 13. | S.E.C. v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973), *cert. denied*, 419 U.S. 900 (1974) | Yes | Promotions Agreement | Multi-Level Marketing | Finding the interests in a multi-level marketing scheme to create an "investment contract," broadening interpretation of the word "solely" under the fourth prong of the *Howey* test to be inclusive of the scheme's creation of an expectation of returns only primarily from the efforts of others. |
| 14. | Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir. 1973), *cert. denied*, 415 U.S. 977 (1973) | Yes | Leasehold Interest | Oil & Gas | Affirming that transactions involving investment in fractional undivided oil and gas interests create an "investment contract" where investors were led to expect profits as a result of the promoter's efforts. |
| 15. | Andrews v. Blue, 489 F.2d 367 (10th Cir. 1973) | Yes | Joint Venture Interests | Real Estate | Finding the award of an interest in a real estate venture to an investor to be a security where, although under contract as a "consultant" to the venture, the investor was a consultant in name only and relied only on the efforts of others in anticipation of profits. |
| 16. | Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974) | Yes | Warehouse Receipts | Commodities | Concluding the sale of warehouse receipts for whiskey creates an "investment contract" where the seller provides additional services, such as insuring the whiskey, storing the whiskey barrels to maturity, and, without additional charge, assisting purchasers with selling the whiskey upon maturity. |
| 17. | El Khadem v. Equity Sec. Corp., 494 F.2d 1224 (9th Cir. 1974) | Yes | Promissory Note | Banking, Investment Services & Lending | Finding that an investment plan involving the investor's contribution of cash and securities as collateral in exchange for a line of credit under an assignable promissory note is an investment contract where the creditor rehypothecates the investor's collateral, uses it to capitalize its own business, and allows the investor to gain investment leverage and tax benefits. |
| 18. | Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974) | Yes | Chinchilla Interests | Buy-Back Sales | Concluding that the interests in a multi-level marketing scheme involving chinchilla breeding create an "investment contract" where the expectation of profits is dependent not on the interest holders' own initial efforts but on the efforts of their recruits to persuade additional retail investment in the enterprise. |
| 19. | Forman v. Cmty. Servs., Inc., 500 F.2d 1246 (2d Cir. 1974), *rev'd*, 421 U.S. 837 (1975). | Yes | Cooperative Apartment Stock | Real Estate | Holding that jurisdiction existed to hear plaintiff's Securities Act allegations because plaintiff's ownership of stock in a housing cooperative constituted an investment contract within the meaning of the Securities Acts due to residents' expectation of profit by income derived from reduced carrying charges, tax benefits, and saved expenses.  Overturned at 421 U.S. 837 (1975). See Schedule 2 at 12 for subsequent history. |
| 20. | 1050 Tenants Corp. v. Jakobson, 503 | Yes | Housing Co-Op Stock Interests | Real Estate | Determining that the interests of homeowners in a cooperative housing corporation are securities where cooperative sponsors tout the tax benefits of incorporation to |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | F.2d 1375 (2d Cir. 1974) | | | | prospective residents, rents from commercial spaces are used to reduce maintenance charges, and the sponsors exercise control over the enterprise. |
| 21. | S.E.C. v. Koscot Inter., Inc., 497 F.2d 473 (5th Cir. 1974) | Yes | Promotions Agreement | Investment Marketing Scheme | Finding that a pyramid selling scheme constituted an investment contract where the promoters retained immediate control over the essential managerial conduct of the enterprise and investors' ability to profit was inextricably tied to defendants' recruitment meetings, guidelines, and sales. |
| 22. | S.E.C. v. Continental Com Corp., 497 F.2d 516 (5th Cir. 1974) | Yes | Commodities Options | Commodities Trading | Finding the scheme of trading on discretionary commodities accounts to create an investment contract where a common enterprise is established by traders' investment in an array commodity options and futures for different investors. |
| 23. | Safeway Portland Employees' Fed. Credit Union v. C. H. Wagner & Co., 501 F.2d 1120 (9th Cir. 1974) | Yes | Certificates of Deposit & Bonus Interest | Banking, Investment Services & Lending | Determining a certificate of deposit to be a non-exempt investment contract under the Securities Act where the terms of deposit included bonus payments create an expectation of profit reliant on the continued success and solvency of the issuer's business. |
| 24. | S.E.C. v. Commodity Options Int'l, Inc., 553 F.2d 628 (9th Cir. 1977) | Yes | Commodities Options | Commodities Trading | Finding the sale of naked double options for investment in a common venture to create an investment contract where purchasers have a reasonable expectation of profits derived from the entrepreneurial efforts of the venture. |
| 25. | Daniel v. International Bd. of Teamsters, 561 F.2d 1223 (7th Cir. 1977), *rev'd*, 439 U.S. 551 (1979). | Yes | Pension Interest | Pension Plans | Holding that union members' interest in a pension fund managed by trustees with exclusive control over investment decisions was an investment contract under the Securities Acts where union members contributed via employer contributions and expected capital appreciation. Overturned at 439 U.S. 551 (1979). See Schedule 2 at 26 for subsequent history. |
| 26. | Melton v. Unterreiner, 575 F.2d 204 (8th Cir. 1978) | Yes | Trust Interest | Trust Sales | Affirming the lower court's conclusion that the sale of "revocable inter vivos trusts" creates an investment contract where the sale proceeds are used to invest in real estate mortgages and contracts from which the purchaser can expect passive returns. |
| 27. | United States v. Carman, 577 F.2d 556 (9th Cir. 1978) | Yes | Loan Sale Interests | Education | Finding the sale of federally insured student loan debt to create an investment contract when coupled with a service contract and repurchase agreement as part of an integrated investment package. |

119

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 28. | Goodman v. Epstein, 582 F.2d 388 (7th Cir. 1978) | Yes | Limited Partnership Interests | Real Estate | Remanding for new trial on error but finding that plaintiff's limited partnership interest was an investment contract under the Securities Acts by reason that, as a limited partner, plaintiff was precluded from participating in essential management decisions affecting the profit-seeking business venture. |
| 29. | Smith v. Gross, 604 F.2d 639 (9th Cir. 1979) | Yes | Earthworm Interests | Buy-Back Sales | Finding an investment in an earthworm farming venture to be an investment contract, because the promoter promised that its instructions would enable investors to reap profits with little effort, and that it would buy back all bait-sized worms at a set price per pound. |
| 30. | United States v. Farris, 614 F.2d 634 (9th Cir. 1979) | Yes | Real Estate Interest | Real Estate | Affirming that the sale of real estate mortgage notes establishes an investment contract where noteholders are led to place substantial trust in the management skill and solvency of the issuer. |
| 31. | Cameron v. Outdoor Resorts of America, Inc, 608 F.2d 187 (5th Cir. 1980) | Yes | Rental Income | Real Estate | Finding the sale of condominium campsite blocks to create an investment contract when coupled with a rental arrangement that promises rental income relying on the promoter's management efforts and materially restricts the investor's independent involvement. |
| 32. | S.E.C. v. Murphy, 626 F.2d 633 (9th Cir. 1980) | Yes | Limited Partnership Interests | Partnerships | Determining the sale of shares in a limited partnership in a cable television system to create an investment contract where investors assume no managerial role but expect profit solely based on the efforts of others. |
| 33. | Rosenberg v. Collins, 624 F.2d 659 (5th Cir. 1980) | Yes | Cash Interests | Commodities | Finding commodity trading accounts sold by a bankrupt trader to create an investment contract where investors' fortunes were inextricably linked with and dependent upon the company's solvency and trading efforts. |
| 34. | Kosnoski v. Bruce, 669 F.2d 944 (4th Cir. 1982) | Yes | Limited Partnership Interests | Real Estate | Concluding limited partnership interests in two real estate ventures to be securities where the limited partner's role is almost entirely passive. |
| 35. | S.E.C. v. G. Weeks Secur., Inc., 678 F.2d 649 (6th Cir. 1982) | Yes | Mortgage Interests | Government Securities | Finding that the court could, as a matter of law, preliminarily determine that the pair-off contract sold by appellants was an investment contract and thus a security subject to registration because, unlike standard forward contracts, purchasers were guaranteed a return in the form of interest generated by appellants' own investing efforts, and affirming the District Court's order enjoining appellants from further violating the registration provisions of the Securities Act. |
| 36. | S.E.C. v. Aqua-Sonic Prods. Corp., 687 F.2d 577 (2d Cir. 1982) | Yes | Distributorship Rights | Distributorships & Franchises | Concluding that a licensing scheme for promotion and distribution of new dental devices creates an investment contract when coupled with an optional sales agency agreement, at least where the licensor makes economic inducements and expects licensees to enter the optional agreement to rely primarily on the efforts of others. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 37. | United States v. Jones, 712 F.2d 1316 (9th Cir. 1983) | Yes | Sale/Leaseback Interests | Leaseback Arrangement | Finding that a tractor trailer sale and leaseback arrangement creates an investment contract where investors make minimal down payments, finance the remaining balances using bank loans, receive monthly payments on the lease obligations, and assume a purchase option at the end of each lease. |
| 38. | Mayer v. Oil Field Sys. Corp., 721 F.2d 59 (2d Cir. 1983) | Yes | Limited Partnership Interests | Oil & Gas | Concluding that a limited partnership interest constitutes a security where limited partners exercise no managerial role in partnership affairs. |
| 39. | Siebel v. Scott, 725 F.2d 995 (5th Cir. 1984) | Yes | Limited Partnership Interests | Partnerships | Finding a limited partnership interest to create an investment contract where the holder relies not his own entrepreneurial talents but on the managerial efforts of the general partners for profit. |
| 40. | S.E.C. v. Prof'l Assocs., 731 F.2d 349 (6th Cir. 1984) | Yes | Escrow, Trust & Joint Venture Interests | Phonographic Record Master Tapes | Applying the "horizontal commonality" test under the "common enterprise" prong of the *Howey* test to conclude that a beneficiary trust account interest creates an investment contract where, citing *Union Planters Nat'l Bank*, the "fortunes of each investor in a pool of investors" are tied "to the success of the overall venture." Finding contributions to a joint venture designed to exploit master record leases to create an investment contract where at least some investors are passive and contribute money in reasonable reliance on the promoters' skills and efforts. |
| 41. | Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985) | Yes | Certificate of Deposit | Banking, Investment Services & Lending | Finding that the sale of certificates of deposit, although conventionally not in and of themselves securities, creates an investment contract when coupled with, among other things, the depositor's (1) buy-back right to retrieve his deposit before maturity, and (2) reliance on a financial advisor to select and negotiate terms of investments. |
| 42. | S.E.C. v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459 (9th Cir. 1985) | Yes | Ore Purchase Program Interests | Mining & Refining | Finding interests in an ore sale and processing arrangement to create an investment contract where the promoter used investors' contributions to fund a common enterprise from which the investors expect to reap profit as a result of the efforts of the promoter to process ore using proprietary techniques. |
| 43. | San Francisco-Oklahoma Petro. v. Carstan Oil, 765 F.2d 962 (10th Cir. 1985) | Yes | Leasehold Interest | Oil & Gas | Concluding a fractional interest in a producing oil well to be an investment contract where the investor does not have a bare leasehold but relies exclusively on the promoter's efforts to maintain the oil well and extract and sell its production in anticipation of profit. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 44. | United States v. Morse, 785 F.2d 771 (9th Cir. 1986) | Yes | Tax Shelter Interests | Various | Affirming conviction for securities fraud and rejecting contention that "common enterprise" and "efforts of others" prongs of Howey were not met. The court found the "solely through the efforts of others" prong of Howey to have been met because "the efforts made by those other than the investor [we]re the undeniably significant ones." Further, common enterprise was met because the fortunes of the investor [we]re dependent upon the efforts and success of the party seeking the investment. |
| 45. | Albanese v. Florida Nat. Bank of Orlando, 823 F.2d 408 (11th Cir. 1987) | Yes | Sale/Leaseback Interests | Leaseback Arrangement | Determining that a fraudulent ice machine sales and leaseback scheme creates an investment contract where the promoter sells and agrees to lease the machines back from investors under various agreements to place them in commercial establishments, service them, collect rents, and distribute earnings to the investors. |
| 46. | Waterman v. Alta Verde Indus., 833 F.2d 1006 (4th Cir. 1987) | Yes | Cattle Interests | Animal Sales | Affirming that interests in a cattle-feeding operation create an investment contract where the failure or success of the enterprise, and therefore investors' expected profit, relies on the efforts of third parties to purchase, care for, and sell cattle. |
| 47. | Buhler v. Audio Leasing Corp., No. 86-4162, 1988 U.S. App. LEXIS 21714 (9th Cir. Feb. 26, 1988) | Yes | Audio Leasing Program | Master-Recording Leasing | Finding interests in an audio leasing scheme to be securities where the promoter sells those interests to investors together with a distribution agreement to manage leasing functions, creating an expectation for passive returns. |
| 48. | United States v. Kessi, 868 F.2d 1097 (9th Cir. 1989) | Yes | Profit-Sharing Interests | Commodities Trading | Affirming the appropriateness of a jury instruction asserting that profit-sharing agreements are securities, because profit-sharing agreements would naturally meet all prongs of the Howey test. |
| 49. | Long v. Shultz Cattle Co., Inc., 881 F.2d 129 (5th Cir. 1989) | Yes | Cattle Poundage Interests | Animal Sales | Finding a cattle-feeding consulting agreement to create an investment contract where investors retain little to no control over operations, have no experience in the cattle business, and can only reasonably expect to receive profits based on the promoter's ability to raise and market cattle. See entry 52 for subsequent history. |
| 50. | Reeves v. Teuscher, 881 F.2d 1495 (9th Cir. 1989) | Yes | Limited Partnership Interests | Real Estate | Finding a partnership's limited partner but not general partner interests to be securities where limited partners only supply capital and expect returns based on the expertise of general partners, and the general partnership interests not to be securities where exclusively general partners control and supervise enterprise operations. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 51. | Davis v. Metro Prods., Inc., 885 F.2d 515 (9th Cir. 1989) | Yes | Tax Shelter Interests | Tax Shelter Scheme | Finding that the videotape sales agreements were investment contracts. Rejecting that only the four corners of a video tape sales agreement can supply evidence of the existence of a "common enterprise" without examining the underlying economic realities. |
| 52. | Long v. Shultz Cattle Co., 896 F.2d 85 (5th Cir. 1990) | Yes | Cattle Poundage Interests | Animal Sales | Denying petition for rehearing and request to reconsider the holding of Continental Com Corp. and the 5th Circuit's approach to the "common enterprise" prong of the Howey test; holding that cattle feeding operation agreements are investment contracts where investors have an ownership interest in a business where the promoter solicits and pools together contributions from hundreds of investors to support the enterprise and its profitability depends on defendants. See entry 49 for prior history. |
| 53. | Eberhardt v. Waters, 901 F.2d 1578 (11th Cir. 1990) | Yes | Cattle Embryo Interests | Cattle Breeding | Finding an interest in a scheme for the sale of cattle embryos to establish an investment contract where investors with no knowledge or experience in the cattle industry must rely on the promoter's efforts and technical know-how to purchase, manage, and sell the embryos and care for calves. |
| 54. | Bailey v. J.W.K. Props., Inc., 904 F.2d 918 (4th Cir. 1990) | Yes | Cattle Embryo Interests | Cattle Breeding | Concluding that a cattle purchase agreement coupled with a management contract creates an investment contract where investors' expectations of profit from cattle breeding operations are dependent on the promoter performing essential functions as an expert in embryo selection and crossbreeding. |
| 55. | Uselton v. Commercial Lovelace Motor Freight, 940 F.2d 564 (10th Cir. 1991) | Yes | Employee Stock Option Plan | ESOP | Concluding interests in an employee stock ownership program to be securities where employees' purchases are contributory and voluntary, contributions are pooled to fund the employer's operations, and employees could reasonably anticipate profit from dividend distributions and stock appreciation in stock resulting from the efforts of the employer's managers. |
| 56. | McCoy v. Hilliard, 940 F.2d 660 (6th Cir. 1991) | Yes | Limited Partnership Interests | Barges | Finding an investment in a barge operation to be a security where investors cannot realistically expect to exert any control over the barge. |
| 57. | In re United Energy Corp., 944 F.2d 589 (9th Cir. 1991) | Yes | Production Payment Interest | Solar Farming | Discussing that the overall scheme perpetuated under a model purchase agreement and power sale agreement creates an investment contract where investors agree to purchase solar energy production modules and sell power back to the promoter, because the purchase and resulting profits from power sales are intimately intertwined. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 58. | S.E.C. v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125 (9th Cir. 1991) | Yes | Managed Account, Promissory Note, and Gold Refining Interests | Investment Program | Finding that interests, both in an investment account and in a gold refining venture, are securities under the *Howey* test, because investors reasonably expect passive profit based on the efforts of others and underlying contributions are pooled to support the enterprise on which the expectation of profit depends. |
| 59. | S.E.C. v. International Loan Network, Inc., 968 F.2d 1304 (D.C. Cir. 1992) | Yes | Payment Interests | Multi-Level Marketing | Determining that interests sold in a chain-letter marketing scheme are securities where sales are solicited using promotional literature from which investors could discern a reasonable expectation of profit. |
| 60. | Stone v. Kirk, 8 F.3d 1079 (6th Cir. 1993) | Yes | Tax Shelter Interests | Investment Program | Finding contributions to a joint venture to be the sale of securities under *Howey* where the venturers pool their funds together to jointly empower the promoter to act as their agent to maintain tax shelters for their benefit. |
| 61. | S.E.C. v. Eurobond Exchange, Ltd., 13 F.3d 1334 (9th Cir. 1994) | Yes | Eurobond Interests | Investment Program | Finding interests in a Eurobond investment program to create an investment contract where investors share in the risk of loss and depend on the promoter's efforts and expertise to manage certain interest-bearing treasury bonds issued by foreign governments in expectation of profit from the spread in interest rates. |
| 62. | United States v. Brooks, 62 F.3d 1425 (9th Cir. 1995) | Yes | Gold Mining Interests | Mining & Refining | Affirming that the sale of "units" in a gold mining operation does not constitute the sale of goods but instead creates an investment contract where the promoter's efforts were the "undeniably significant ones" necessary to make the investment a success. |
| 63. | United States SEC v. Better Life Club of Am., Inc., No. 98-5079, 1999 U.S. App. LEXIS 7319 (D.C. Cir. Mar. 24, 1999) | Yes | Payment Interests | Multi-Level Marketing | Affirming the district courts finding that the advertising of pooled notes in a multi-level marketing scheme is not a purely commercial transaction and instead constitutes the offer of securities where investors contribute substantial funds to a common enterprise, and where the promoter promises to double investors' money, and analyzing the same notes under *Reves*. |
| 64. | S.E.C. v. Unique Fin. Concepts, Inc., 196 F.3d 1195 (11th Cir. 1999) | Yes | Forex Interests | Forex | Concluding the sale of foreign exchange contracts to create an investment contract where the promoter pools investors' funds to apply toward advertising, salary, and finding new investors. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 65. | Jeanne Piaubert, S.A. v. Sefrioui, 208 F.3d 221 (9th Cir. 2000) | Yes | Limited Partnership Interests | Cosmetics | Summary judgment reversed and case remanded because plaintiff Fragrance Group, Ltd pled sufficient facts to prove that limited partnership interest it purchased in JP Limited Partnership was an investment contract. |
| 66. | S.E.C. v. Banner Fund International, 211 F.3d 602 (D.C. Cir. 2000) | Yes | Arbitrage Interests | Arbitrage Trading | Determining the beneficial interests in a banner fund program to be securities where the promoter pools investors' funds and investors expect passive returns. |
| 67. | SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000) | Yes | Property Transfer Interests | Investment Program | Finding a property transfer contract to create an investment contract where investors contribute money in common to investment trusts in anticipation of returns resulting from the efforts of others. |
| 68. | S.E.C. v. SG Ltd., 265 F.3d 42 (1st Cir. 2001) | Yes | Virtual In-Game Shares | Entertainment | Concluding that the opportunity to invest in the virtual shares in a fantasy game enterprise existing only in cyberspace is an offer for the sale of securities under the *Howey* test. |
| 69. | S.E.C. v. Alliance Leasing Corp., 28 F. App'x 648 (9th Cir. 2002) | Yes | Equipment Leasing Program | Leaseback Program | Affirming that the sale of investments in an equipment leasing program marketed by a third party creates an investment contract. |
| 70. | S.E.C. v. Rubera, 350 F.3d 1084 (9th Cir. 2003) | Yes | Telephone Investment Program | Payphone & Service Contracts | Finding interests in a payphone investment program to create an investment contract where the sale of payphones accompanies a service agreement placing management in the hands of the promoter and promising a return. |
| 71. | S.E.C. v. Edwards, 540 U.S. 389 (2004) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | Sale of payphones with leaseback agreement for a fixed monthly payment representing a 14 percent annual return where Purchasers were not involved in the day to day operation of the payphones they owned, as the company (1) selected the site for the phone, (2) installed the equipment, (3) arranged for connection and long-distance service, (4) collected coin revenues, and (5) maintained and repaired the phones, could be properly considered an investment of contract. Fixed returns sufficient profit to satisfy expectation of profit prong of Howey test. See Schedule 2 at 99 for prior history and entry 73 for subsequent history. |
| 72. | United States v. Dale, 374 F.3d 321 (5th Cir. 2004), vacated & remanded | Yes | Trading Program Interests | Investment Program | Concluding that investment programs offered to investors, although fraudulent, meet the *Howey* test. Vacated & Remanded at 543 U.S. 1113 (2005) |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 543 U.S. 1113 (2005) | | | | |
| 73. | S.E.C. v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | On remand after the Supreme Court clarifies that investments with a fixed rate of return could constitute an "investment contract", finding that the SEC meets its burden of showing a reasonable probability of success in finding that a payphone sale and leaseback agreement creates an investment contract. See Schedule 2 at 99 and entry 71 for prior history. |
| 74. | S.E.C. v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005) | Yes | Viatical Settlement Interests | Insurance | Holding that investments in viatical settlement contracts are securities. |
| 75. | S.E.C. v. Merchant, 483 F.3d 747 (11th Cir. 2007) | Yes | Limited Partnership Interests | Consumer Debt | Finding limited partner interests in a registered limited liability partnership to be securities after applying the *Williamson* factors, because the partners have no real ability to remove the firm and are completely inexperienced in the debt purchasing industry. |
| 76. | S.E.C. v. Ross, 504 F.3d 1130 (9th Cir. 2007) | Yes | Sale/Leaseback Interests | Payphone & Service Contracts | Maintaining that an "investment opportunity" offered by Alpha Telcom is the offer of a security. |
| 77. | United States v. Leonard, 529 F.3d 83 (2d Cir. 2008) | Yes | LLC Interests | Entertainment | Concluding that the interests in limited liability companies formed to finance the production and distribution of motion pictures could create an investment contract given that the members play only a passive role in the management of the companies, despite the organizational agreements. |
| 78. | S.E.C. v. U.S. Reservation Bank and Trust., 289 F. App'x 228 (9th Cir. 2008) | Yes | Profit Interests | Banking, Investment Services & Lending | Holding a two-part investment to be a security when consisting of a certificate of deposit and a leveraged profit-sharing agreement. |
| 79. | Warfield v. Alaniz, 569 F.3d 1015 (9th Cir. 2009) | Yes | Annuity Interests | Annuity Sales | Finding the sale of charitable gift annuities to create an investment contract where the annuities are marketed as investments and not merely as vehicles for philanthropy. |

126

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 80. | Liberty Prop. Tr. v. Republic Props. Corp., 388 U.S. App. D.C. 70, 577 F.3d 335 (2009) | Yes | Limited Partnership Interests | Real Estate | Holding that certain investors do not exercise sufficient control of a limited partnership (when disregarding corporate form) to disqualify their units from being considered securities. |
| 81. | Affco Invs. 2001 LLC v. Proskauer Rose L.L.P., 625 F.3d 185 (5th Cir. 2010) | Yes | LLC Interests | Tax Shelter Scheme | Holding that membership interests in a limited liability company operating a tax shelter scheme are securities, because the investors are passive investors who depend on the efforts of others for their profits. |
| 82. | U.S. v. Wetherald, 636 F.3d 1315 (11th Cir. 2011) | Yes | Limited Partnership Interests | Telecommunications | Finding partnership interests in the competitive local exchange carriers to be securities under the *Williamson* factors. |
| 83. | Minn. Lawyers Mut. Ins. Co. v. Ahrens, 432 F. App'x 143 (3d Cir. 2011) | Yes | Investment Interests | Commodities Trading | Noting that a lawyer's solicitation of an investment would likely meet the *Howey* test and would not be covered under the attorney's malpractice policy. |
| 84. | Bamert v. Pulte Home Corp., 445 F. App'x 256 (11th Cir. 2011) | Yes | Condominium Interests | Real Estate | Rejecting the plaintiffs contention that purchase agreements for at least one Orlando condominium unit were investment contracts because the plaintiffs were under no contractual obligation to join an offered rental pool or otherwise contract with the defendant's proposed rental agent, but finding that the plaintiff had sufficiently alleged facts to establish the existence of an investment contract as to the exclusive rental agreements, if the rental agents were to be found to be affiliates of the condominium seller. |
| 85. | S.E.C. v. Merklinger, 489 F. App'x 937 (6th Cir. 2012) | Yes | LLC Interests | Recycling | Finding that the membership interests in a limited liability company are securities where the promoter fraudulently raises funds from investors and purports to be in the business of collecting, shredding, and recycling used tires. |
| 86. | United States v. Wosotowsky, 527 F. App'x 207 (3d Cir. 2013) | Yes | Variable Annuities | Annuity Sales | Affirming that the fraudulent sale of variable annuities meets the *Howey* test. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 87. | S.E.C. v. Radical Bunny LLC, 532 F. App'x 775 (9th Cir. 2013) | Yes | Loan Interests | Investment Program | Affirming that contracts with investors in the form of "directions to purchase" are securities, because the investments are made in a common enterprise to purchase loans from another company and all profits are derived from the promoter's efforts. |
| 88. | United States v. Rowzee, 550 F. App'x 452 (9th Cir. 2013) | Yes | Loan Interests | Banking, Investment Services & Lending | Finding that an investment in a bridge loan enterprise is a security where investors could typically expect returns within a few months without exercising any control over the loans. |
| 89. | United States v. McKye, 638 F. App'x 680 (10th Cir. 2015) | Yes | Investment Notes | Real Estate | Finding strong evidence that investment notes are securities under both the "investment contract" theory and "note theory" where investors contribute money to a common enterprise with the expectation of receiving payments based on the promoter's efforts. |
| 90. | S.E.C. v. Schooler, 905 F.3d 1107 (9th Cir. 2018) | Yes | General Partnership Interests | Real Estate | Concluding general partner interests to be securities under the *Williamson* factors where partners relinquish near-total control over the investments to a single person to manage and trade on underlying investments. |
| 91. | S.E.C. v. Liu, 754 F. App'x 505 (9th Cir. 2018), vacated and remanded, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020) | Yes | EB-5 Immigrant Investor Program | EB-5 Investment Program | Affirming membership interests in a limited liability company to be securities when sold as part of the EB-5 immigrant investor program, under which investors are promised an opportunity to earn profit, even if profits are not investors' primary motivation. |
| 92. | S.E.C. v. Sethi, 910 F.3d 198 (5th Cir. 2018) | Yes | Joint Venture Interests | Oil & Gas | Concluding that partnership interests in an oil and gas joint venture create an investment contract where contractual powers in the partnership are illusory in practice. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 93. | S.E.C. v. Scoville, 913 F.3d 1204 (10th Cir. 2019) | Yes | Revenue Interests | Internet | Finding the sale of "adpacks," when bundled with internet advertising services, to establish an investment contract where the advertising services agreement allows a purchaser to share in some of the promoter's revenue. |
| 94. | Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.), 916 F.3d 528 (5th Cir. 2019) | Yes | Life Settlements | Insurance | Finding that life insurance settlements create an investment contract where the investor relies on the promoter's substantial expertise and pre-purchase efforts to profit from the investments in the underlying life settlements. |
| 95. | Masel v. Villarreal, 924 F.3d 734 (5th Cir. 2019) | Yes | Limited Partnership Interests | Medical Billing | Finding a limited partner interest to create an investment contract where, despite having the power to block certain enumerated business decisions, limited partners rely solely on general partners to operate and manage the enterprise. |
| 96. | S.E.C. v. Hui Feng, 935 F.3d 721 (9th Cir. 2019) | Yes | EB-5 Immigrant Investor Program | EB-5 Investment Program | Affirming that EB-5 immigrant investor program interests create an investment contract where corresponding contributions fund the operations of the limited partnership in anticipation of a promised fixed rate of return. |
| 97. | Fedance v. Harris, 1 F.4th 1278 (11th Cir. 2021) | Yes | Digital Asset Interests | Digital Assets | Affirming lower court and finding token sale satisfied "expectation of profits" element where issuers sold tokens pursuant to an ICO and the tokens had no utility at the time of sale—"any supposed *future* utility of the tokens on FLiK's 'end-to-end entertainment ecosystem'  is beside the point" |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

## SCHEDULE 2

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST- *SEC V. W.J. HOWEY CO.* IN WHICH THE COURT FOUND <u>NO</u> INVESTMENT CONTRACT (OR THE DECISIONS WERE SUPERSEDED BY STATUTE).**

| Object Key | |
|---|---|
| **No** | Means that the court did not find that the contract, transaction, or scheme at issue in the case at issue was an investment contract. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959) | No | Leasehold Interest | Oil & Gas | Finding that a sale of an oil and gas lease created fractional undivided interests in oil and gas within the meaning of securities under the Securities Act, but rejecting the argument that the lease assignment constituted an investment contract because plaintiffs retained dominant and controlling interest in the property. |
| 2. | Tcherepnin v. Knight, 371 F.2d 374 (7th Cir. 1967), *rev'd*, 389 U.S. 332 (1967). | No | Capital Shares & Capital Interest | Banking, Investment Services & Lending | Determining that a savings and loan association's acceptance of deposits in a withdrawable capital account does not constitute the sale of securities according to the contemplated meaning and legislative history of the Securities Exchange Act of 1934. Reversed at 389 U.S. 332 (1967). See Schedule 3 at 6 for subsequent history. |
| 3. | Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967) | No | Leasehold Interest | Oil & Gas | Finding the sale of naked leasehold rights not to be an investment contract where no additional promise or agreement is made by the seller. |
| 4. | Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969) | No | Distributorship Rights | Distributorships & Franchises | Concluding a distributorship agreement not to be an investment contract where the distributor must assume efforts to market products under the agreement and therefore does not rely exclusively on the efforts of others within the meaning of the fourth prong of the *Howey* test. |
| 5. | Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250 (10th Cir. 1969) | No | Insurance Interests | Insurance | Finding that neither the sale of an additional premium on a life insurance policy bearing an endorsement nor the special fund created by the additional premium under the policy constitutes a "security" where the purchaser "was not investing his money in a security, speculative or otherwise, from which he might receive much, little, or no benefit." |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 6. | Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir. 1972), *cert. denied*, 409 U.S. 887 (1972) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Finding that a discretionary trading account lacks the requisite qualities of commonality under the second prong of the *Howey* test where funds are not pooled for a common purpose and separate accounts or customers are not contractually tied. |
| 7. | Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973) | No | Partnership Interest | Family Fund | Holding that the sale of a partnership interest from one family member to another in a family partnership is not the sale of a security under the Securities Exchange Act of 1934. |
| 8. | Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973) | No | Franchise Interests | Distributorships & Franchises | Holding a franchise agreement not to be an investment contract where the franchisee is required to perform vital duties in connection with the agreement, including opening and staffing a sales center and devoting significant time and best efforts to the business. |
| 9. | Nash & Assocs., Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973) | No | Franchise Interests | Distributorships & Franchises | Holding a fast food chain's franchise agreement not to be an investment contract where "nothing more than assistance [from the franchisor] was contemplated and … the ultimate responsibility for local success rested with the franchisee." |
| 10. | Bitter v. Hoby's Int'l, Inc., 498 F.2d 183 (9th Cir. 1974) | No | Franchise Interests | Distributorships & Franchises | Finding a restaurant franchise agreement not to create an investment contract where, despite franchise guidelines, the franchisee is responsible for day-to-day restaurant management and operations. |
| 11. | Bellah v. First Natl. Bk. of Hereford, Texas, 495 F.2d 1109 (5th Cir. 1974) | No | Certificate of Deposit | Banking, Investment Services & Lending | Finding that a promissory note, together with an ancillary deed of trust securing the note, does not create an investment contract, where no evidence exists to indicate the creditor sought to profit from the noteholders' enterprise; also holding that a certificate of deposit issued in exchange for cash only involves currency and therefore does not create an investment contract. Adopting a distinction between commercial and investment banking to determine whether a loan transaction is a security. |
| 12. | United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975) | No | Cooperative Apartment Stock | Real Estate | Finding the purchase of "stock" from an apartment lessor not to be a securities transaction where the instrument merely represents a leasehold interest in an apartment and residents have "no reasonable expectation of profit in the form of either capital appreciation or participation in earnings." See Schedule 1 at 19 for prior history. |

131

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 13. | Grenader v. Spitz, 537 F.2d 612 (2d Cir. 1976) | No | Cooperative Apartment Stock | Real Estate | Following *Forman* in holding that the private sale of non-transferable apartment stock does not create an investment contract where the funds from the sale are not intended for anything other than for purchasing and maintaining the apartment building. |
| 14. | Fargo Partners v. Dain Corp., 540 F.2d 912 (8th Cir. 1976) | No | Partnership Interest | Real Estate | Finding a real estate transaction involving a management contract not to create an investment contract where the investor does not substantially rely on the efforts of the seller or third parties in expectation of a return. |
| 15. | Ballard & Cordell Corp. v. Zoller & Danneberg Expl., Ltd., 544 F.2d 1059 (10th Cir. 1976) | No | Leasehold Interest | Oil & Gas | Concluding that the sale of a 50% interest in a group of oil and gas lease units does not establish an investment contract where the operator offers the units in whole and evidence indicates that with the expectation of profits, the investor would be relying not only on the operator's efforts but on his own knowledge and skill. |
| 16. | Hirk v. Agri-Research Council, Inc., 561 F.2d 96 (7th Cir. 1977) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Affirming that a discretionary trading agreement is not an investment contract because it falls short of the *Howey* test's "common enterprise" prong, even where the trader may be interacting with other trading accounts, because these actions do not transform the purchaser's trading account into a joint account with other holders |
| 17. | McGovern Plaza Joint Ven. v. First of Denver, 562 F.2d 645 (10th Cir. 1977) | No | Loan Commitment | Real Estate | Finding that neither a construction loan commitment nor permanent loan commitment create an investment contract, because a real estate developer's interest in obtaining financing are purely commercial, and the developer is in no way relying on the efforts of others to gain profit. |
| 18. | Schultz v. Dain Corp., 568 F.2d 612 (8th Cir. 1978) | No | Real Estate Interest | Real Estate | Finding an investor's interest in an apartment complex not to create an investment contract where, despite delegating responsibility to a managing agent, the investor retains ultimate control over the apartment enterprise and did not rely on the efforts of third parties with the expectation of profit. |
| 19. | Crowley v. Montgomery Ward Co., Inc., 570 F.2d 877 (10th Cir. 1978) | No | Franchise Interests | Distributorships & Franchises | Finding a catalog sales agreement not to be an investment contract where catalog franchisees are required to establish and maintain stores at their own expense and devote substantial time and best efforts to support the venture. See Schedule 3 at 9 for prior history. |
| 20. | Moody v. Bache Co., Inc., 570 F.2d 523 (5th Cir. 1978) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Rejecting that commodities futures contracts are investment contracts in and of themselves. |
| 21. | Woodward v. Terracor, 574 F.2d 1023 (10th Cir. 1978) | No | Real Estate Interest | Real Estate | Concluding that a developer's sale of residential real estate does not create an investment contract where the developer has no contractual obligations to the |

132

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | purchasers other than to deliver good title upon satisfaction of the purchase terms. |
| 22. | Commander's Palace Park Assocs. v. Girard & Pastel Corp., 572 F.2d 1084 (5th Cir. 1978) | No | Real Estate Interest | Real Estate | Finding that the sale of park land coupled with a management contract does not create an investment contract where the seller does not lead the purchaser to expect profits solely as a result of the services provided under the management contract. |
| 23. | Robertson v. Humphries, No. 77-1156., 1978 U.S. App. LEXIS 9196 (10th Cir. Sept. 7, 1978) | No | Oil & Gas Leases | Oil & Gas | Affirming the lower court's finding that the sale of oil and gas leases do not create fractional interests to be sold as part of an investment contract, despite retention of an overriding royalty interest. |
| 24. | Peyton v. Morrow Electronics, Inc., 587 F.2d 413 (9th Cir. 1978) | No | Employee Stock Option Plan | ESOP | Determining that an employment contract and memorandum do not establish an investment contract where the employee believes he is compensated for less than what he is worth and the employee is himself the marketing manager of the purported "promoter." |
| 25. | United Sportfishers v. Buffo, 597 F.2d 658 (9th Cir. 1978) | No | Real Estate Interest | Banking, Investment Services & Lending | Finding that notes and land sales contracts given as consideration for two boats are not "securities" but mere commercial arrangements, because the seller of the boats did not induce the buyer into any expectations of returns on the investment. |
| 26. | Teamsters v. Daniel, 439 U.S. 551 (1979) | No | Pension Interest | Pension Plans | Finding a noncontributory, compulsory pension plan not to create an investment contract, because employer plan contributions are not equitable with an investment by the employee and therefore do not constitute an "investment of money" under the *Howey* test. See Schedule 1 at 25 for prior history. |
| 27. | Black v. Payne, 591 F.2d 83 (9th Cir. 1979) | No | Pension Interest | Pension Plans | Determining that participation in a contributory pension plan does not create an investment contract, because participation does not involve a "reasonable expectation of profits" derived from the efforts of others. |
| 28. | Brodt v. Bache Co., Inc., 595 F.2d 459 (9th Cir. 1979) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Concluding a discretionary commodities trading account does not satisfy the "common enterprise" prong of the *Howey* test and therefore does not establish an investment contract under the Securities Act. |

133

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 29. | De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co., 608 F.2d 1297 (9th Cir. 1979) | No | Real Estate Interest | Real Estate | Finding a land sale contract not to be an investment contract where the seller is obligated to do no more than transfer title to the land and otherwise makes no representations that it would develop, improve, or manage the land sold. |
| 30. | Canadian Imperial Bank of Commerce v. Fingland, 615 F.2d 465 (7th Cir. 1980) | No | Certificate of Deposit | Banking, Investment Services & Lending | Affirming dismissal and determining the complaint does not allege sufficient facts to conclude that a certificate of deposit issued by an offshore bank and trust entity is a security under the Securities Exchange Act. |
| 31. | Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Affirming that facts must be proven to establish the presence of a "common enterprise" among commodity trading account investors to conclude whether an investment contract exists. |
| 32. | Mason v. Unkeless, 618 F.2d 597 (9th Cir. 1980) | No | Limited Partnership Interests | Photocopy Venture | Rejecting an oral limited partnership agreement as any adequate basis for a federal securities fraud claim. |
| 33. | United Am. Bank v. Gunter, 620 F.2d 1108 (5th Cir. 1980) | No | Loan Interests | Banking, Investment Services & Lending | Finding a loan participation agreement not to be an investment contract where participation is part of a routine commercial loan transaction in which the debtor does not rely on the entrepreneurial efforts of the creditor. |
| 34. | Noa v. Key Futures, Inc., 638 F.2d 77 (9th Cir. 1980) | No | Silver Interests | Buy-Back Sales | Finding the sale of silver bars not to create an investment contract where profits are dependent only on fluctuations in the silver market and not on the seller's managerial efforts. |
| 35. | Westchester Corp. v. Peat, Marwick, Mitchell & Co., 626 F.2d 1212 (5th Cir. 1980) | No | Real Estate Interest | Real Estate | Determining that land sold under an installment contract does not create an investment contract where no common enterprise exists. |
| 36. | Martin v. T. V. Tempo, Inc., 628 F.2d 887 (5th Cir. 1980) | No | Franchise Interests | Distributorships & Franchises | Concluding a franchise agreement that requires the franchisee to sell advertisements and manage magazine distribution within in a defined area does not create an investment contract, because the franchisee has immediate control over essential management of the enterprise, which is significantly determinative of resulting profits or losses. |
| 37. | Am. Fletcher Mortg. Co. v. U. S. Steel Credit Corp., 635 F.2d 1247 (7th Cir. 1980) | No | Loan Interests | Loan Syndication | Holding that loan participations are not securities where the loans bare a particular rate of interest, mature in a relatively short time, and do not accompany "a reasonable expectation of profits but rather a commercial real estate loan transaction." |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 38. | Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174 (6th Cir. 1981) | No | Loan Interests | Loan Syndication | Finding a loan participation agreement not to be an investment contract because, even where the lead lender had "practically unlimited discretion" in servicing the loan, the arrangement has no common enterprise and does not depend on the lender's entrepreneurial or managerial efforts. |
| 39. | Frazier v. Manson, 651 F.2d 1078 (5th Cir. 1981) | No | Limited Partnership Interests | Real Estate | Precluding a limited partner from characterizing his partnership interest as a security where the partner's rights and responsibilities sufficiently distinguish his status from that of a "passive" investor. |
| 40. | Marine Bank v. Weaver, 455 U.S. 551 (1982) | No | Certificate of Deposit | Banking, Investment Services & Lending | Finding that a certificate of deposit issued by a federally regulated bank, which is subject to a comprehensive set of regulations, is different from other long-term debt obligations commonly deemed securities, and the protections afforded to the depositor make federal securities laws unnecessary. Finding that a separate business agreement providing the creditor a share of the company's profits is also not in itself sufficient to create a security. See Schedule 3 at 20 for prior history. |
| 41. | Bd. of Trade v. S.E.C., 677 F.2d 1137 (7th Cir. 1982), *vacated as moot*, 459 U.S. 1026 (1982). | No (Superseded by Statute) | Mortgage Options | Government Securities | Rejecting that Ginnie Mae options contracts are securities where specifically exempted under the Securities Act and Securities Exchange Act and carved out exclusively under the Commodity Futures Trading Commission's jurisdiction.  Vacated at 459 U.S. 1026 (1982). |
| 42. | Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459 (3d Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Determining that a commodity trading account does not satisfy the "common enterprise" prong of the *Howey* test where it is not part of a pooled group of trading funds. |
| 43. | Coward v. Colgate-Palmolive Co., 686 F.2d 1230 (7th Cir. 1982) | No | Pension Interest | Pension Plans | Finding participation in a pension plan not to create an investment contract where employee participants bear no real economic risk and do not depend on the efforts of plan managers in expectation of a return. |
| 44. | Gordon v. Terry, 684 F.2d 736 (11th Cir. 1982) | No | Real Estate Interest | Real Estate | Reversing the grant of summary judgment with respect to one defendant and holding that it could not be determined whether that defendant had unique knowledge and expertise warranting dependence by investors such that the real estate syndication fell within a special exception resulting in definition as |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | a security, and affirming the grant of summary judgment for the rest of the defendants on the grounds that the real estate syndications were not securities. |
| 45. | Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc., 686 F.2d 818 (9th Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Rejecting any meaningful presence of a "common enterprise" in a discretionary commodities trading account where the promoter takes quarterly commissions as part of a set fee structure, because the promoter profits even when the account loses value and cannot withdraw profits as they accrue. |
| 46. | Mordaunt v. Incomco, 686 F.2d 815 (9th Cir. 1982) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Citing *Brodt* to conclude that a discretionary commodities trading account does not satisfy the "common enterprise" prong of the *Howey* test because there is no vertical commonality between the investor and the promoter merely where the success or failure of investments is essentially and collectively dependent on the promoter's expertise. See Schedule 3 at 29 for subsequent history. |
| 47. | Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121 (11th Cir. 1983) | No | Distributorship Rights | Distributorships & Franchises | Holding a distributorship contract not to be an investment contract where purchasers exercise extensive control over their profit potential. See entry 52 for subsequent history. |
| 48. | Odom v. Slavik, 703 F.2d 212 (6th Cir. 1983) | No | Limited Partnership Interests | Real Estate | Finding that the interest of a general partner with expertise in a partnership does not create an investment contract merely because the partner voluntarily reduces his participation and therefore no longer relies on his own efforts in expectation of profit distributions. |
| 49. | LTV Fed. Credit Union v. UMIC Gov't Sec., Inc., 704 F.2d 199 (5th Cir. 1983) | No | Mortgage Interests | Government Securities | Determining a forward standby commitment for a mortgage loan not to be a security because it is not the product of a commercial endeavor. |
| 50. | Landreth Timber Co. v. Landreth, 731 F.2d 1348 (9th Cir. 1984), *rev'd*, 105 S. Ct. 2297 (1985) | No | Stock | Stock Sale | Affirming under the sale of business doctrine that the sale of 100% of a company's stock does not create an investment contract. Reversed at 105 S. Ct. 2297 (1985). See Schedule 3 at 30 for subsequent history. |
| 51. | Goodwin v. Elkins Co., 730 F.2d 99 (3d Cir. 1984) | No | General Partnership Interests | General Partnership | Finding a general partner interest not to be a security, because a general partner is naturally and unavoidably personally involved in the enterprise's management, even if unwilling. |
| 52. | Villeneuve v. Advanced Bus. Concepts Corp., 730 F.2d 1403 (11th Cir. 1984) | No | Distributorship Rights | Distributorships & Franchises | Affirming that the rights of a purchaser under a distributorship agreement do not create an investment contract where the distributor does not sufficiently rely on the principal's efforts in anticipation of profit. See entry 47 for prior history. |

136

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 53. | Hart v. Pulte Homes of Mich. Corp., 735 F.2d 1001 (6th Cir. 1984) | No | Sale/Leaseback Interests | Real Estate | Finding a real estate sale and lease-back arrangement not to create an investment contract where the investor's contribution is not involved in a common scheme or inextricably intertwined with the investments of others, therefore lacking any sense of a "common enterprise." |
| 54. | Kan. State Bank v. Citizens Bank of Windsor, 737 F.2d 1490 (8th Cir. 1984) | No | Loan Participation Certificates | Banking, Investment Services & Lending | Finding participation interests in a standard commercial loan not to be securities, because the participant has no prospect of capital appreciation and the creditor's entrepreneurial and managerial efforts are limited to remitting the participant's share of principal and interest. |
| 55. | Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144 (7th Cir. 1984) | No | Art | Art Sales | Determining that the sale of a painting, accompanied by an appraisal and contractual return and repurchase right, does not to create an investment contract, because proceeds are not invested in any "common enterprise" under either the horizontal or vertical commonality tests. |
| 56. | Paulsen v. Commissioner, 469 U.S. 131 (1985) | No | Mutual Association Shares | Banking, Investment Services & Lending | Rejecting the petitioner's characterization of mutual association shares as securities following *Tcherepnin*. |
| 57. | Futura Development Corp. v. Centex Corp., 761 F.2d 33 (1st Cir. 1985) | No | Promissory Note | Real Estate | Determining that a promissory note does not create an investment contract, even where the parties negotiate a custom sales agreement with predetermined rates of interest, because the lender does not depend on the entrepreneurial efforts of others in anticipation of profit and the nature of the transaction is purely commercial. |
| 58. | Phillips v. Kaplus, 764 F.2d 807 (11th Cir. 1985) | No | Joint Venture Interests | Real Estate | Finding a joint venture interest not to be an investment contract where evidence suggests only that the interest is compensation to the holder for his efforts supporting the enterprise and not that the interest is awarded in exchange for an investment of money or services with the hope of making a profit. |
| 59. | S.E.C. v. Belmont Reid & Co., 794 F.2d 1388 (9th Cir. 1986) | No | Prepaid Gold Coin Interests | Prepaid Gold Coin Contracts | Finding that expected profits from the sale of gold coins do not meet the "efforts of others" prong of the *Howey* test where profits are realized not as a result of the seller's efforts but due to market movements. |
| 60. | Lopez v. Dean Witter Reynolds, Inc., 805 F.2d 880 (9th Cir. 1986) | No | Discretionary Trading Account | Banking, Investment Services & Lending | Finding a discretionary commodities trading account to lack any sense of "common enterprise" necessary to establish an investment contract solely where the commodities broker has discretionary trading authority over the account. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 61. | Deutsch Energy Co. v. Mazur, 813 F.2d 1567 (9th Cir. 1987) | No | Partnership Interests | Oil & Gas | Finding interests in a general partnership connected to oil lease sales not to create an investment contract where the partners possess significant managerial powers and a high degree of business acumen and therefore could not rightfully expect their profits to result solely from the efforts of anyone other than themselves. |
| 62. | Meyer v. Dans un Jardin, S.A., 816 F.2d 533 (10th Cir. 1987) | No | Franchise Interests | Distributorships & Franchises | Concluding a perfumery franchise agreement does not to create an investment contract, because franchisees cannot anticipate profit resulting solely from the franchisor's efforts where the franchise's economic success depends on functions controlled by franchisees. |
| 63. | First Fin. Fed. Sav. & Loan Assoc. v. E.F. Hutton Mortg. Corp., 834 F.2d 685 (8th Cir. 1987) | No | Mortgage Loans | Banking, Investment Services & Lending | Applying the *Howey* test to conclude that a mortgage sale, even where accompanied by a mortgage servicing agreement, is not a sale of securities under Arkansas law, because mortgage servicing activities are merely administrative, the purchaser could assume control over those activities at other time, and the purchaser therefore could not be said to reasonably rely on the servicer's efforts to generate a return. |
| 64. | Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th Cir. 1988) | No | General Partnership Interests | Commercial Fishing | Finding that partnership interests in a general partnership engaged in commercial fishing do not create an investment contract where partners retain and exercise express authority to manage the enterprise's investments. Maintaining the presumption that partnership interests in a general partnership are not securities, which may only be rebutted by evidence that partners could not in practice exercise control over the enterprise or its investments. |
| 65. | Stuckey v. Geupel, 854 F.2d 1317 (4th Cir. 1988) | No | General Partnership Interests | Mining & Leasing | Affirming that the sale of a general partnership interest does not create an investment contract, even where a single managing partner is appointed to manage primary operations related to the partnership's mineral interests, because all partners assume an active role in partnership management and mineral interests are not divided among partners for speculative purposes. |
| 66. | Secon Service System v. St. Joseph Bk. Trust, 855 F.2d 406 (7th Cir. 1988) | No | Purchase Agreement | Transportation | Finding that a unique purchase agreement entitling the purchaser to 2% of the seller's gross revenue for 6 years creates an ordinary extension of credit outside the Securities Act's reach, because the purchaser does not invest funds that are pooled to support a common enterprise and cannot reasonably expect gains solely from the efforts of others. |
| 67. | Sparks v. Baxter, 854 F.2d 110 (5th Cir. 1988) | No | Joint Venture Interests | Oil & Gas | Applying the *Howey* test to conclude that an interest in a joint venture that manages oil and gas leases does not create an investment contract under Texas law where the holder is entitled to exercise considerable power over the oil and gas enterprise. |

138

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 68. | Danner v. Himmelfarb, 858 F.2d 515 (9th Cir. 1988) | No | Promissory Note | Forex | Finding a promissory note not to create an investment contract where the purchaser does not expect profits from capital appreciation and is not awarded a share in the enterprise formed using the borrowed capital. |
| 69. | Mace Neufeld Productions, Inc. v. Orion Pictures Corp., 860 F.2d 944 (9th Cir. 1988) | No | Joint Venture Interests | Entertainment | Determining a privately negotiated production agreement not to create an investment contract where the producer is required to consult with the investor and obtain his approval over all substantial matters and therefore does not instill a reasonable expectation of profit in the investor resulting solely from the producer's efforts. |
| 70. | Matek v. Murat, 862 F.2d 720 (9th Cir. 1988) | No | General Partnership Interests | Fish Processing | Affirming that a general partnership interest in a partnership engaged in a fish processing operation does not establish an investment contract where all partners possess sufficient power to protect their investments and no evidence suggests that power is hindered in any way. |
| 71. | Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. 1989) | No | Limited Partnership Interests | Oil & Gas | Determining that the sale of limited partner interests in a partnership engaged in oil and gas exploration does not create an investment contract where the interest holder's only expectation of profit is from a fixed rate of interest. |
| 72. | Deckebach v. La Vida Charters, Inc., 867 F.2d 278 (6th Cir. 1989) | No | Yacht Interests | Yachting | Concluding the sale of a yacht, even when coupled with a management agreement, not to create an investment contract where the seller has no other investors or joint purchasers, which would be necessary to establish "horizontal commonality." |
| 73. | Maritan v. Birmingham Properties, 875 F.2d 1451 (10th Cir. 1989) | No | Joint Venture Interests | Real Estate | Finding an interest in a housing development project not to create an investment contract where the governing agreement's terms provide the investor with substantial managerial powers uncharacteristic of a passive investor. |
| 74. | Crawford v. Glenns, Inc., 876 F.2d 507 (5th Cir. 1989) | No | Limited Partnership Interests | Pork Brokerage | Rejecting that someone can be considered the seller of a security where that person has no title to or ownership interest in the security or the assets or enterprise underlying the security and did not pass title to the commodity fund investment contract to the purchaser. |
| 75. | Banghart v. Hollywood Gen. P'ship, 902 F.2d 805 (10th Cir. 1990) | No | General Partnership Interests | General Partnership | Finding a partner interest in a general partnership not to create an investment contract were the governing partnership agreement does not restrict the customary powers of the general partners. |
| 76. | Boldy v. McConnell's Fine Ice Creams, Inc., | No | Franchise Interests | Distributorships & Franchises | Determining that a fast food franchise agreement does not create an investment contract where franchisees have clearly defined obligations that are essential to the franchise's success. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 904 F.2d 710 (9th Cir. 1990) | | | | |
| 77. | First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A., 919 F.2d 510 (9th Cir. 1990) | No | Loan Interests | Real Estate | Finding a loan participation agreement not to establish an investment contract, even where the lender is obligated to administer and service the loan with the same degree of care as if it is servicing and administering the loan on its own account, because the participants do not rely on the lender's managerial skills for a fixed rate of return, making the transaction primarily commercial in nature. |
| 78. | Harman v. Harper, 914 F.2d 262 (9th Cir. 1990) | No | Real Estate Interest | Real Estate | Finding that an interest in a joint venture invested in real property does not create an investment contract where the interest holder cannot reasonably expect to reap profits based solely on the other venturers' managerial efforts and the successes of the underlying investments in no way depend on the entrepreneurial efforts of third parties. |
| 79. | Stewart v. Ragland, 934 F.2d 1033 (9th Cir. 1991) | No | General Partnership Interests | Oil & Gas | Working interests in oil and gas wells were not "investment contracts" because investors retained sustained managerial powers under operating agreement to receive results of title examinations, to remove the operator and secure successor operator, to have access to drilling site and documents pertaining to operator's work, and to decide that wells should be reworked, etc. |
| 80. | Klaers v. St. Peter, 942 F.2d 535 (8th Cir. 1991) | No | General Partnership Interests | Real Estate | Finding partner interests in a general partnership not to create an investment contract where the partners are personally liable for the partnership's debts and retain voting power to affect the partnership's affairs. |
| 81. | Rice v. Branigar Org., Inc., 922 F.2d 788 (11th Cir. 1991) | No | Real Estate Interests & Country Club Memberships | Real Estate | Concluding that the sale of lots in a beach club development do not establish an investment contract where the purchasers merely intend to enjoy use of the property and do not expect to retain profit from the developer's entrepreneurial efforts. |
| 82. | Guidry v. Bank of LaPlace, 954 F.2d 278 (5th Cir. 1992) | No | Checks | Ponzi Scheme | Finding that an oral agreement and sale of post-dated checks made as part of a ponzi scheme does not create an investment contract, because the investor could expect no more than the face value of the post-dated checks, therefore failing to meet the "expectation of profit" prong of the *Howey* test. |
| 83. | Cty. of Santa Cruz v. Cal. Health Facilities Fin. Auth., No. 91-15309, 1992 U.S. App. LEXIS | No | Lease Agreement | Real Estate | Affirming that a loan does not create an investment contract where borrowed funds are used merely to acquire property and not for investment. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 18213 (9th Cir. July 30, 1992) | | | | |
| 84. | Holden v. Hagopian, 978 F.2d 1115 (9th Cir. 1992) | No | General Partnership Interests | Horsebreeding | Maintaining *Williamson*'s three-prong test to determine whether the general partnership interests in a thoroughbred association can satisfy the "efforts of others" prong of the *Howey* test.  Affirming that appellants failed to plead allegations sufficient to establish that general partnership interests were investment contracts. |
| 85. | Rodriguez v. Banco Cent. Corp., 990 F.2d 7 (1st Cir. 1993) | No | Real Estate Interest | Real Estate | Discussing that "a security *might* exist" if a developer promises to create a thriving residential community together with its sale of land but that the "simple sale of land, whether for investment or use, is [typically] not a security." |
| 86. | Resolution Trust Corp. v. Stone, 998 F.2d 1534 (10th Cir. 1993) | No | Loan Receipts | Banking, Investment Services & Lending | Determining that the purchase and resale of car loans does not establish an investment contract where the purchaser receives specialized interest payments rather than dividends. |
| 87. | Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994) | No | Condominium Interests | Real Estate | Concluding that a condominium purchase contract does not create an investment contract where there is "simply no indicia of horizontal commonality" when the rents and expenses attributable to each unit are the exclusive responsibility of the unit owner. |
| 88. | Wals v. Fox Hills Development Corp., 24 F.3d 1016 (7th Cir. 1994) | No | Condominium Interests | Real Estate | Finding interests in a time-share condominium unit not to be securities when holders separately arrange to share certain income from the unit with the developer, because no horizontal commonality exists to support the "common enterprise" prong of the *Howey* test where the holders do not own an undivided share of the entire complex but a single condominium unit, and where holders do not receive a share of profit from a pool of rents but in the rental income of a single apartment. |
| 89. | Pamaco P'ship Mgmt. Corp. v. Enning, 27 F.3d 563 (4th Cir. 1994) | No | Limited Partnership Interests | Car Wash | Finding that interests in touchless carwash technology fail to meet the "efforts of others" prong under the *Howey test,* because the terms of each holder's agreement show that holders retain partnership interests necessary to practically exercise control over the venture. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 90. | Berry v. Carnaco Transp., 43 F.3d 1478 (9th Cir. 1994) | No | Financing Interests | Transportation | Affirming that trucker financing and driver contracts do not create investment contracts where financiers do not rely on the management or control efforts of others. |
| 91. | S.E.C. v. Life Partners, 87 F.3d 536 (D.C. Cir. 1996) | No | Viatical Settlement Interests | Insurance | Distinguishing between pre- and post-purchase efforts by the promoter and holding that pre-purchased services as a finder-promoter and the largely ministerial post-purchase services is not enough to satisfy the "efforts of others" prong under Howey. |
| 92. | Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996) | No | Lawsuit Interests | Insurance | Determining that a plan to reinsure prior obligations and discharge preexisting obligations fails to meet the "expectation of profit" prong of the Howey test such that corresponding interests in a reconstruction and renewal plan are not considered securities. |
| 93. | S.E.C. v. Life Partners, 102 F.3d 587 (D.C. Cir. 1996) | No | Viatical Settlement Interests | Insurance | "Viatical settlement" investment contracts, where payment is made to terminally ill insureds at discount based upon anticipated life expectancy, were not "investment contracts": limitation of prepurchase services to finder function and absence of any but ministerial post-purchase services combined to support conclusion that investors' profits did not flow predominantly from efforts of others. |
| 94. | Cooper v. King, 114 F.3d 1186 (6th Cir. 1997) | No | Sale/Leaseback Interests | Leaseback Arrangement | Finding that interests in a payphone sale and leaseback program are not "inextricably intertwined" by contractual or financial arrangements among investors and therefore fail to meet the "common enterprise" prong under the Howey test. |
| 95. | Steinhardt Grp. v. Citicorp, 126 F.3d 144 (3d Cir. 1997) | No | Limited Partnership Interests | Structured Products | Finding a limited partner interest in a partnership not to be a security where the limited partner retains powers "far afield of the typical limited partnership agreement," including the power to remove the general partner without notice, propose and approve a new business plan, and veto the business plan of the general partners if proposed. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 96. | Teague v. Bakker, 139 F.3d 892 (4th Cir. 1998) | No | Partnership Interests | Lifetime Partnerships | Affirming the lower court's jury instruction that the sale of a vacation park does not create an investment contract where purchasers seek only to use the park and are not motivated by any expectation of financial returns on their investment. Reversed at 35 F.3d 978 (4th Cir. 1994). See Schedule 3 at 54 for prior history. |
| 97. | Matassarin v. Lynch, 174 F.3d 549 (5th Cir. 1999) | No | Employee Stock Option Plan | ESOP | Holding that an employee stock ownership plan does not create an "investment contract" where employee investment is optional and employer funding is mandatory. |
| 98. | Great Rivers Cooperative v. Farmland Industries, Inc., 198 F.3d 685 (8th Cir. 1999) | No | Cooperative Interests | Agricultural Cooperative | Holding that capital credits in a regional agricultural cooperative fail to meet the *Howey* test where there is no investment of money and the only distribution of profit is from patronage refunds. |
| 99. | S.E.C. v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002), *rev'd sub nom.* S.E.C. v. Edwards, 540 U.S. 389 (2004) | No | Sale/Leaseback Interests | Payphone & Service Contracts | Holding that interests in a payphone sale and leaseback arrangement are not securities where the returns are contractually guaranteed and derived not from the efforts of others but from the contractual bargain. Reversed at 540 U.S. 389 (2004). See Schedule 1 at 71 and 73 for subsequent history. |
| 100. | Robinson v. Glynn, 349 F.3d 166 (4th Cir. 2003) | No | Membership Interests | Telecommunications | Determining an individual membership interest in a technology company not to be a security where the investor is not merely passive but has the power to appoint board members, participate as a member of the executive committee, and affect control of management. |
| 101. | Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007) | No | Bond Interests | Insurance | Concluding that municipal bonds do not create an investment contract where the purchaser does not acquire any "profit to come solely from the efforts of others and expected profits come from the consideration paid for the issuance of an insurance policy rather than from the bonds. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 102. | Nunez v. Robin, 415 F. App'x 586 (5th Cir. 2011) | No | LLC Interests | Mining & Leasing | Affirming that the partners in a sand and gravel mining facility together controlled the scope and course of their joint venture such that the partners are not passive investors and their interests are not securities. |
| 103. | Alunni v. Dev. Res. Grp., 445 F. App'x 288 (11th Cir. 2011) | No | Condominium Interests | Real Estate | Holding that the purchase of fee simple interests in real estate do not create an investment contract because neither the "common enterprise" prong, nor the "efforts of others" prong of *Howey* are satisfied where the purchasers are free to control the units themselves after existing long-term leases expire, at which time there is no longer a rent guarantee. |
| 104. | Salameh v. Tarsadia Hotel, Corp., 726 F.3d 1124 (9th Cir. 2013) | No | Condominium Interests | Real Estate | Affirming that the sale of condominiums, together with a subsequent rental management agreement, does not create an investment contract, because the rental management agreement is not shown to be promoted at the time of the sale, and because no evidence suggests investors are induced to purchase the condominiums, meaning these are two distinct transactions. |
| 105. | Goldberg v. 401 North Wabash Venture LLC, 755 F.3d 456 (7th Cir. 2014) | No | Condominium Interests | Real Estate | Determining a condominium purchase agreement not to meet the "common enterprise" prong of the *Howey* test where the seller does not pool investors' assets and no revenue generation is contemplated by the terms of the agreement. |
| 106. | Rossi v. Quarmley, 604 F. App'x 171 (3d Cir. 2015) | No | LLC Interests | Manufacturing | Finding no investment contract where the managerial prerogatives of an enterprise's operating agreement give investors sufficient leverage and ability to participate in enterprise management, and where the investor's dissatisfaction with the majority's decisions do not convert his participation as a partner to an investment contract. |
| 107. | Iguaçu, Inc. v. Filho, 637 F. App'x 407 (9th Cir. 2016) | No | LLC Interests | Banking, Investment Services & Lending | Affirming that membership interests in the Brazilian equivalent of a limited liability company are purchased with the full expectation of shared management and operation of the enterprise and therefore do not create an investment contract. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 108. | Keeton v. Flanagan (In re Flanagan), 642 F. App'x 784 (9th Cir. 2016) | No | Loan Interests | Real Estate | Finding that investors' financial interests in a loan are not "inextricably interwoven" with the interests of the promoter or third party such that there is an investment in any sense of a "common enterprise." |
| 109. | Ave. Capital Mgmt. II, Ltd. P'ship v. Schaden, 843 F.3d 876 (10th Cir. 2016) | No | LLC Interests | Franchise and Distributorship | Finding that where investors collectively control the profitability of their investments in the enterprise (considering their contribution of time and effort to the success of the enterprise, their contractual powers, their access to information, the adequacy of financing, the level of speculation, and the nature of the business risks), no investment contract exists. |
| 110. | NE. Revenue Servs., LLC v. Maps Indeed, Inc., 685 F. App'x 96 (3d Cir. 2017) | No | Technology Interests | Transportation | Finding an investor's interest in a technology and marketing agreement not to create an investment contract where the investor is contractually required to contribute "significant efforts" to support the underlying venture. |
| 111. | Lampkin v. UBS Fin'l Servs., Inc., 925 F.3d 727 (5th Cir. 2019) | No | Employee Stock Option Plan | ESOP | Affirming that grant of options under the employee stock option plan is not a sale of securities because employees' participation is compulsory and non-contributory. |
| 112. | N. Am. Wellness Ctr. Holdings, LLC v. Temecula Valley Real Estate, Inc., 771 F. App'x 793 (9th Cir. 2019) | No | Land Sale | Real Estate | Affirming that a land sale agreement, together with an advisory agreement, does not create an investment contract where purchasers fail to present evidence they have a reasonable expectation of profit from the efforts of others. |
| 113. | Foxfield Villa Assocs., LLC v. Robben, 967 F.3d 1082 (10th Cir. 2020) | No | LLC Interests | Real Estate | Adopting the six *Schaden* factors to determine that the investors have sufficient control in their membership interests in the joint venture investments in real estate developments. |

145

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

**SCHEDULE 3**

**FEDERAL APPELLATE AND SUPREME COURT DECISIONS POST- SEC V. W.J. HOWEY CO. IN WHICH THE COURT REVERSED, REMANDED, FOUND A "SECURITY" OR DETERMINED THAT THE QUESTION AT ISSUE RELATED TO THE STATUS OF A "NOTE" OR THE QUESTION OF WHETHER THERE WAS AN INVESTMENT CONTRACT WAS IMMATERIAL OR "NOT RELEVANT" TO THE DECISION.**

| Object Key | |
|---|---|
| NR and NR* | Means that the decision in the case was immaterial or not relevant to whether there was an investment contract. Notations with an asterisk "*" mean that the court withdrew or substituted the decision with a subsequent decision, or the relevant analysis was found in the courts dissenting opinion—these decisions are included in our analytical review as relevant. |
| Remand | Means that the court remanded the matter for further proceedings consistent with their decision in order to determine whether the contract, transaction, or scheme was an investment contract, independent of other issues raised or decided in the case. |
| Security | Means that the court determined that the question at issue related to one of the enumerated types of securities set forth in the Securities Acts (with the exception of "notes" and "investment contracts"), and did not opine on its status as an "investment contract". |
| Note Case | Means that the court determined that the question at issue related to the status of a "note" and examined it pursuant to the related jurisprudence. |

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 1. | Jung v. K. & D. Mining Co., 260 F.2d 607 (7th Cir. 1958) | Remand | Stock | Oil & Gas | Finding that the complaint alleged facts, which if proven upon the trial, would establish that the plaintiffs invested their money in a common enterprise whereby they were led to expect profits solely from the efforts of the defendants as the promoters and not from any effort or activity on the part of the plaintiffs except their financial contribution, and thus would constitute an investment contract. |
| 2. | L.A. Tr. Deed & Mortg. Exch. v. S.E.C., 264 F.2d 199 (9th Cir. 1959) | Remand | Promissory Note | Trust Sales | Remanding for further fact finding to determine whether sale of promissory notes secured by deeds of trusts which include collections undertakings by the defendants was an investment in a "common enterprise" and whether the purchaser was led to expect profits solely from the efforts of the promoter or a third party. See Schedule 1 at 5 for subsequent history. |
| 3. | SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65 (1959) | Security | Variable Annuities | Insurance | Holding that "variable annuity" contracts are securities not falling within the insurance exemption under the Securities Act, since the issuer assumes no underwriting risks and such contracts are not insurance policies or annuity contracts. |
| 4. | Roe v. United States, 287 F.2d 435 (5th | Remand | Leasehold Interest | Oil & Gas | Finding that the sale of oil leases as part of a "high-pitched, hard-sell extravagant solicitation campaign" promising extraordinary returns, if credited, would constitute an investment contract, because the returns are not |

146

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | Cir.), *cert. denied*, 368 U.S. 824 (1961) | | | | made possible solely under the naked leasehold rights but as a result of the activities of others. Remanding for jury determination if the evidence is credited. See entry 5 for subsequent history. |
| 5. | Roe v. U.S., 316 F.2d 617 (5th Cir. 1963) | NR | Leasehold Interest | Oil & Gas | Affirming district court decision to permit admission of promotional materials as evidence, where promotional materials were sufficient to establish that mineral leases were investment contracts because purchasers would expect a return on investment from the activities of others. See entry 4 for prior history. |
| 6. | Tcherepnin v. Knight, 389 U.S. 332 (1967) | Security | Capital Shares & Capital Interest | Banking, Investment Services & Lending | Holding that withdrawable capital shares in a savings and loan association are securities within the meaning of the Securities Act and emphasizing that form should be disregarded for substance and the emphasis of the Securities Act analysis should be based on economic reality. See Schedule 2 at 2 for prior history. |
| 7. | Ahrens v. Am.-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970) | Remand | Beaver Interests | Animal Sales | Finding that the jury question of whether contracts relating to beavers are investment contracts under the Securities Act was improperly submitted and noting that the court resolved the question in the affirmative in a previous case against the same defendant. |
| 8. | Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1973) | Remand | Discretionary Trading Account | Banking, Investment Services & Lending | Remanding due to dispute of material fact as to whether seller of copper contracts promised returns based on his managerial efforts. |
| 9. | Crowley v. Montgomery Ward & Co., 570 F.2d 875 (10th Cir. 1975) | Remand | Franchise Interests | Distributorships & Franchises | Reversing and remanding the question of whether a catalog sales agency agreement is an investment contract under the Securities Acts for a factual inquiry into the economic reality of the transaction. See Schedule 2 at 19 for subsequent history. |
| 10. | McGreghar Land Co. v. Meguiar, 521 F.2d 822 (9th Cir. 1975) | Remand | Limited Partnership Interests | Partnerships | Remanding for further fact finding and reversing the lower court's finding that a limited partnership interest does not establish an investment contract where the interest holder was induced to make capital contributions, because the general partners made misrepresentations about the value and permanency of their own contributions and other partnership assets. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 11. | McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975) | Remand | Real Estate Interest | Real Estate | Holding that there is a factual question as to whether the sale of Timberlake lots constitutes sales of securities, and allowing purchasers of undeveloped land to amend complaint to allege security law violations where purchasers had no control over improvement of the land and promoters committed to performing meaningful post-purchase functions. |
| 12. | Hector v. Wiens, 533 F.2d 429 (9th Cir. 1976) | Remand | Promissory Note | Banking, Investment Services & Lending | Remanding for further consideration of the existence of an investment contract where plaintiff invested money via transfer of a promissory note and holding that genuine dispute of material fact existed regarding the existence of a common enterprise and which party had control of essential managerial efforts of the enterprise. |
| 13. | Exch. Nat. Bank, Chicago v. Touche Ross Co., 544 F.2d 1126 (2d Cir. 1976) | Note Case | Promissory Note | Banking, Investment Services & Lending | Dismissing the second prong *Howey* test as unhelpful and dubious when determining whether a loan transaction constitutes an investment contract, because the mere existence of a debt relationship does cannot be deemed to establish a "common enterprise." |
| 14. | Emisco Indus., Inc. v. Pro's, Inc., 543 F.2d 38 (7th Cir. 1976) | Note Case | Promissory Note | Asset Sale | Considering the issuance of a promissory note in exchange for purchased assets to amount not to a security but to no more than a cash substitute. |
| 15. | Bell v. Health-Mor, Inc., 549 F.2d 342 (5th Cir. 1977) | Remand | Referral Fee Interests | Consumer Sales | Sustaining plaintiffs' Securities Acts claims  where there was a factual question of whether the vendee undertook significant efforts to produce a referral fee, which may have indicated that the referral sales scheme was an investment contract. |
| 16. | United Cal. Bank v. THC Fin'l Corp., 557 F.2d 1351 (9th Cir. 1977) | Note Case | Promissory Note | Banking, Investment Services & Lending | Finding that a put letter requiring a debtor to enter promissory notes underlying a line of credit with the creditor does not involve a security. |
| 17. | Piambino v. Bailey, 610 F.2d 1306 (5th Cir. 1980) | Remand | Distributorship Rights | Multi-Level Marketing | Remanding question of whether the sale of distribution contracts was an investment contract under the Securities Act where there was genuine dispute of material fact as to whether reasonable investors did (or did not) believe they were buying into an enterprise. |
| 18. | Aldrich v. McCulloch Props., Inc., 627 F.2d 1036 (10th Cir. 1980) | Remand | Real Estate Interest | Real Estate Interests | Reversing and remanding the securities laws claims because the determination of whether or not they purchased an investment contract in a real estate development scheme where allegations included that defendants |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | promised post-purchase efforts to provide development, amenities, and a trust for their common benefit, could not be made based on pleadings. |
| 19. | Williamson v. Tucker, 632 F.2d 579 (5th Cir. 1980), *withdrawn*, 645 F.2d 404 (1981)* | NR* | Joint Venture Interests | Real Estate | Remanding for further proceedings as to whether the plaintiffs were so dependent on the expertise of one of the partners for the management, sale, or development of a real estate property such that they could not effectively exercise their partnership powers. Withdrawn at 645 F.2d 404 (1981). See entry 21 for subsequent history. |
| 20. | Weaver v. Marine Bank, 637 F.2d 157 (3d Cir. 1980), *rev'd*, 455 U.S. 551 (1982) | Remand | Certificates of Deposit & Profit Interests | Banking, Investment Services & Lending | Holding that trier of fact could find that both a certificate of deposit and a related business agreement involving the pledge of a certificate of deposit in exchange for profit-sharing could be an investment contract, and remanding for determination. See Schedule 2 at 40 for subsequent history. |
| 21. | Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981) | Remand | Joint Venture Interests | Real Estate | Considering whether a joint venture interest in undeveloped real estate is a security by applying three factors, the venturers' (1) contractual power, (2) knowledge or expertise, and (3) dependence on the managerial ability of the developer and promoter. See entry 19 for prior history. |
| 22. | Meason v. Bank of Miami, 652 F.2d 542 (5th Cir. 1981) | Remand | Certificate of Deposit | Banking, Investment Services & Lending | Remanding issue of whether certificates of deposit were an investment contract under the Securities Act and emphasizing the importance of considering the economic realities of the transaction. |
| 23. | Golden v. Garafalo, 678 F.2d 1139 (2d Cir. 1982) | Security | Stock | Stock Sale | Holding that conventional stock in business corporations are a security within the meaning of the Securities Acts, noting that the investment contract analysis is of "little help" in determining the meaning of "stock" which refers to an instrument with commonly agreed upon characteristics. |
| 24. | Seagrave Corp. v. Vista Res., Inc., 696 F.2d 227 (2d Cir. 1982) | Security | Stock | Stock Sale | Remanding for further proceedings to determine whether subsidiary corporations' stock purchased by plaintiff corporation as part of an asset buy-out had sufficient characteristics of stock to be considered securities under the rule that the instruments themselves, and only if the instruments lack the ordinarily accepted attributes of stock need the court ascertain whether these instruments may be an uncommon form of securities, such as an investment contract. |
| 25. | Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320 (7th Cir. 1983) | Remand | Annuity Interest | Insurance | Remanding for further fact finding to determine whether a group deposit administration annuity contract is an investment contract, noting that an "investment contract" is a "catch-all" phrase meant to include instruments that "have the functional attributes of stock and other formal securities but are not so denominated". |

149

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

|  | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 26. | Daily v. Morgan, 701 F.2d 496 (5th Cir. 1983) | Security | Stock | Stock Sale | Holding that a business' stock may still be considered a security if a purchaser buys 100 percent of it with the intent to operate and manage the business and the *Howey* criteria does not apply to all securities. |
| 27. | Ruefenacht v. O'Halloran, 737 F.2d 320 (3d Cir. 1984) | Security | Stock | Stock Sale | Holding that the Howey test does not apply to the sale of all or part of a business via a transaction involving stock with the traditional characteristics of stock ownership, which qualifies as the sale of securities. |
| 28. | Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484 (7th Cir. 1984) | Note Case | Fixed Interest Notes | Banking, Investment Services & Lending | Reversing and remanding to the lower court to look not just to the four corners of a fixed-interest promissory note but to the distribution plan and transaction terms, noting that an instrument failing to satisfy all four requirements of the *Howey* test may still fall under one of the other statutory terms in the definitional sections of the Securities Act. |
| 29. | Mordaunt v. Incomco, 469 U.S. 1115 (1985) | NR* | Discretionary Trading Account | Banking, Investment Services & Lending | Justice White, joined by Chief Justice Burger and Justice Brennan, dissenting from denial of certiorari of a case that asked the Supreme Court to consider whether discretionary futures contracts qualify as securities and resolve a circuit split regarding whether the "common enterprise" prong of *Howey* required horizontal or vertical commonality.  See Schedule 2 at 46 for prior history. |
| 30. | Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985) | Security | Stock | Stock Sale | Holding that the common stock of a closely held lumber business possessed all of the characteristics traditionally associated with common stock and thus was a security within the definition of the Acts by declining to adopt the sale of business doctrine and limiting *Howey* to determine investment contracts only. See Schedule 2 at 50 for prior history. |
| 31. | Underhill v. Royal, 769 F.2d 1426 (9th Cir. 1985) | Note Case | Promissory Note | Banking, Investment Services & Lending | Affirming the lower court's application of the six-factor "risk capital" test to conclude that a mortgage lender's collateralized loan agreement is a security. Citing *Howey* to emphasize that, if a particular transaction is an investment, it is within the scope of securities laws. |
| 32. | McGill v. American Land Exploration Co., 776 F.2d 923 (10th Cir. 1985) | Remand | Joint Venture Interests | Real Estate | Finding that Plaintiff's investment in a joint real estate venture satisfied the "common enterprise" element of *Howey* based on the economic realities of the transaction because plaintiff expected to passively receive a share of the profits of the venture. |
| 33. | Penturelli v. Spector, Cohen, Gadon Rosen, 779 F.2d 160 (3d Cir. 1985) | Security | Coal Mine Interests | Mining & Refining | Holding that following *Landreth*, fractional undivided working interests in a coal mining operation were securities for federal securities law purposes regardless of *Howey*. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 34. | Rodeo v. Gillman, 787 F.2d 1175 (7th Cir. 1986) | Remand | Limited Partnership Interests | Real Estate | Remanding for further fact finding to determine whether limited partnership interests in form are securities or, perversely, do not fall under federal securities laws because they are not limited partnership interests in practice because their sale may only be part of a sham transaction designed to preserve existing mortgage financing, especially where general partners retain the unilateral right to require limited partners to purchase additional partnership units. |
| 35. | Less v. Lurie, 789 F.2d 624 (8th Cir. 1986) | Remand | Partnership Interests | Oil & Gas | Finding that Plaintiff investors had stated a claim for relief under Rule 10b-5 by alleging that a partnership was itself formed as part of a scheme to defraud them and noting that even when a partnership agreement provides the partners with control over the activities of the partnership, under Williamson v. Tucker if the partners lack actual expertise and bargaining power to exercise such control in the operations of the enterprise the efforts of others prong of Howey may still be satisfied. |
| 36. | Youmans v. Simon, 791 F.2d 341 (5th Cir. 1986) | Remand | General Partnership Interests | Real Estate | Finding that a general partnership interest in one partnership was not an investment contract under Howey because the purchasers retained substantial power and exercised expertise over the venture as general partners and affirming grant of summary judgment dismissing claims, but reversing the grant of summary judgment with respect to interests in a different general partnership where questions of fact remained with respect to whether the purchasers were deprived of the power to replace the Managing Venturer and did not have the power to manage the venture and therefore relied "on the efforts of others." |
| 37. | Schaafsma v. Morin Vermont Corp., 802 F.2d 629 (2d Cir. 1986) | Security | Stock | Real Estate | Rejecting the "sale of business" doctrine consistent with Landreth and finding that the purchase of 100 percent of the stock of a corporation in order to obtain control of corporate assets was a purchase of securities. The instruments at issue were stock as a matter of law and it was error to submit to the jury the question of whether the federal securities laws applied. Remanded for a new trial on the federal securities law claim. |
| 38. | Hocking v. Dubois, 839 F.2d 560 (9th Cir. 1988), withdrawn, 885 F.2d 1449 (1989)* | NR* | Condominium Interests | Real Estate | Reversing and remanding to the lower court to determine whether secondary condominium sales coupled with a rental pool "option" create an investment contract. Suggesting that as long as a rental pool "option" exists, all secondary market condominium sales would necessarily meet the "efforts of others" prong of the Howey test.  Withdrawn at 885 F.2d 1449 (1989). See entry 46 for subsequent history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 39. | One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988) | Security | Stock Options | Restaurants | Holding that an option to purchase stock is a security under the reasoning of Landreth - options to purchase stock are such traditional securities instruments that they may be shown by proving the document itself without need to look beyond the character of the instrument and without need to apply the Howey investment contract test. Although the District Court  incorrectly applied the Howey test to determine that the option to purchase stock  was not a security, this only provided an alternative basis to dismiss the securities claim and the error by the District Court does not alter the outcome of the appeal. |
| 40. | Arthur Young Co. v. Reves, 856 F.2d 52 (8th Cir. 1988), *rev'd sub nom*. Reves v. Ernst & Young, 494 U.S. 56 (1990) | Note Case | Promissory Note | Agricultural Cooperative | Finding promissory notes payable on the holder's demand not to be securities where they merely provide for a short-term loan with a fixed interest rate, more akin to a commercial lending arrangement than an investment transaction.  Reversed at 494 U.S. 56 (1990). |
| 41. | Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242 (5th Cir. 1988) | Security | Fractional Undivided Oil & Gas Interests | Oil & Gas | Holding that undivided fractional interests in oil and gas are securities explicitly provided for in the definition of security and under Landreth the economic reality test does not apply and a Howey analysis was not required. |
| 42. | Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989) | NR | Investment Interests | Banking, Investment Services & Lending | Holding, inter alia, that predispute agreements to arbitrate claims arising under the '33 Act are enforceable. Investors opened brokerage accounts and alleged their money was invested in unauthorized and fraudulent securities giving rise to violations of the Securities Act and Exchange Act.  There is no allegations that the investments did not constitute securities. |
| 43. | Holloway v. Peat, Marwick, Mitchell Co., 879 F.2d 772 (10th Cir. 1989),  vacated & remanded, 494 U.S. 1014 (1990), *reaffirmed on reconsideration*, 900 F.2d 1485 (10th Cir. | Note Case | Debt Instruments | Banking, Investment Services & Lending | After remand from the Supreme Court instructing the Court of Appeals to consider its decision in light of Reves, the Court of Appeals found that the passbook savings certificates and thrift certificates offered and sold to the general public were securities because they were "notes" under Reves and did not meet the family resemblance test. The court relied on its prior analysis, which overlapped substantially with the four factors in the Reves family resemblance test and noted that the Supreme Court rejected the application of Howey to "notes".  Vacated & Remanded, at 494 U.S. 1014 (1990), Reaffirmed on Reconsideration, 900 F.2d 1485 (10th Cir. 1990), |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | 1990), *cert. denied*, 498 U.S. 958 (1990) | | | | |
| 44. | Shaw v. Hiawatha, Inc., 884 F.2d 582 (9th Cir. 1989) | Remand | Sale/Leaseback Interests | Lottery Machines & Sales Rights | Reversed district court's order dismissing case for lack of subject matter jurisdiction and remanded for factual determination regarding whether the common enterprise and efforts of others prongs of the Howey test were satisfied. |
| 45. | Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir. 1989) | NR | Cattle Embryo Interests | Cattle Breeding | This case involves cross appeals and 8 different issues on appeal in total. Finding that in a dispute over the "efforts of others" prong of Howey, the essential question is whether the investor retained ultimate control over his property, not whether he actually exercised such control, and that is a question of fact that should be submitted to a jury so the district court acted properly in refusing to direct a verdict on this issue. Further finding that whether the investment was classified as a security was a question of fact for the jury. |
| 46. | Hocking v. Dubois, 885 F.2d 1449 (9th Cir. 1989) | Remand | Condominium Interests | Real Estate | Summary judgement for appellee reversed. There were issues of material fact as to whether the sale of a condominium by Dubois, the appellee real estate broker, to Hocking, the appellant purchaser, and the related components of the package offered to Hocking were part of one scheme or transaction, whether there was a common enterprise, and whether there was the expectation of profits produced by the efforts of others. Hocking claimed that the condominium was promoted by Dubois "with an emphasis on the economic benefits to be derived from the managerial efforts of third parties designated or arranged for by Dubois," and by including with the condominium an offer for a rental arrangement or rental pool arrangement the entire package constituted a security. Dubois argued that the sale of the condominium was separate and distinct from the rental pooling arrangement and there was no investment of money in the RPA and that the RPA allowed Hocking to control the condominium such that he was not reliant on the efforts of others.  See entry 38 for subsequent history. |
| 47. | Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385 (6th Cir. 1989) | Remand | Tax Shelter Interests | Tax Shelter Scheme | Whether plaintiffs could show that their investments  were securities because they were investment contracts under Howey is a question of material fact where lessees received leasehold interest in plates for printing postage stamps, right to sell specified numbers of stamps, and right to claim investment tax credit in return for lease payments of a fixed amount, and |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| | | | | | where certain contracts for printing and distribution were arguably related to the lessor. |
| 48. | L & B Hosp. Ventures, Inc. v. Healthcare Int'l, Inc., 894 F.2d 150 (5th Cir. 1990) | Remand | Limited Partnership Interests | Hospital Development | Summary judgment reversed and case remanded because an issue of material fact existed as to whether Howey elements met when psychiatrists, who were limited partners in psychiatric treatment facility, held essential managerial functions in the partnership or depended on the managerial efforts of general partners. |
| 49. | Reves v. Ernst & Young, 494 U.S. 56 (1990) | Note Case | Promissory Note | Agricultural Cooperative | Holding that demand notes sold by farmer's co-op to members and non-members fell under the "note" category of instruments in the definition of security and they did not resemble categories of notes that should not be treated as securities. Setting forth the family resemblance test for determining when notes, which are presumptively securities because they are a specifically enumerated instrument in the definition of security, should not be treated as securities. |
| 50. | Allison v. Ticor Title Ins. Co., 907 F.2d 645 (7th Cir. 1990) | NR | Leasehold Interests | Real Estate | Investors sued Title company claiming they did not get good title to land that they leased with a related rental pool agreement because that arrangement instead constituted an investment contract that was an unregistered security. The court found that whether the arrangement constituted an investment contract or not, it did not make the leasehold itself any less of an interest in real property and any violation of Section 5 of the securities act does not negate the existence of title. |
| 51. | Koch v. Hankins, 928 F.2d 1471 (9th Cir. 1991) | Remand | General Partnership Interests | Real Estate | Under Williamson v. Tucker, the court finds that question of material fact exists as to investors' participation in control over 2700-acre plantation to produce income from smaller general partnership acreage and as to investors' ability to affect decision making regarding the larger plantation. |
| 52. | DCD Programs, Ltd. v. Hill, Farrer & Burrill, No. 90-55523, 1991 U.S. App. LEXIS 19723 (9th Cir. Aug. 15, 1991) | Remand | Limited Partnerships | Banking, Investment Services & Lending | Holding that, at a minimum, plaintiff had raised a genuine issue of material fact that the agreements could be construed as investment contracts where money was raised by means of limited partnerships for investment in a larger venture; there was a "direct correlation" between the larger venture and the monies received from the limited partnerships; and general partner had "contractual power" to delegate significant managerial functions |
| 53. | Zolfaghari v. Sheikholeslami, 943 F.2d 451 (4th Cir. 1991) | Remand | Mortgage Interests | Investment Program | Reversing summary judgment where participation interests in managed pool of mortgage notes could be "securities," considering profits depend on the managerial efforts of those who run the pool and make decisions such as determining which mortgages should be in the pool, how the individual notes will be serviced and managed, and other fund decisions. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 54. | Teague v. Bakker, 35 F.3d 978 (4th Cir. 1994) | Remand | Partnership Interests | Lifetime Partnerships | Court reversed judgment as a matter of law for defendants with respect to securities claims finding that the lifetime partnership interests could not be excluded from the definition of security as a matter of law where promotional materials used to market "lifetime partnership"(LTP) in hotel emphasized its profit potential, referred to the LTP as investments, and offered purchasers the possibility of realizing capital appreciation; references to increasing value of partnership and records tabulating transfers of partnership also indicated that partnerships could be transferred. See Schedule 2 at 96 for subsequent history. |
| 55. | Webster v. Omnitrition Intern., Inc., 79 F.3d 776 (9th Cir. 1996) | Remand | Payment Interests | Multi-Level Marketing | In a scheme involving distributors of health and skin care products that could become "supervisors" by purchasing specified large amount of product after which they would be entitled to commissions earned by bringing more participants into the scheme, the court found that the record contained sufficient evidence to present a genuine issue of disputed material fact as to whether Omnitrition promoted a pyramid scheme, reversing the grant of summary judgement. |
| 56. | Nolfi v. Ohio Ky. Oil Corp., 675 F.3d 538 (6th Cir. 2012) | Security | Joint Venture & Limited Partnership Interests | Oil & Gas | Finding the *Howey* test to be inapplicable, as the statute specifically lists "fractional undivided interests in oil, gas, or other mineral rights" as a security. |
| 57. | S.E.C. v. Thompson, 732 F.3d 1151 (10th Cir. 2013) | Note Case | Promissory Note | Investment Program | Finding that certain unsecured promissory notes are securities under the family-resemblance test articulated in *Reves*, and despite the district court also finding that the notes were investment contracts, declining to reach that conclusion in light of their finding that the notes were "notes" under *Reves*. |
| 58. | S.E.C. v. Shields, 744 F.3d 633 (10th Cir. 2014) | Remand | Joint Venture Interests | Oil & Gas | Remanding for further fact finding after holding that the SEC's allegations in the complaint were sufficient to rebut the presumption that the purported general partnerships were not securities where the allegations demonstrated that investors were locked into turnkey drilling and completion contracts with business as contractor, so that even if they exercised their power to remove business as managing venturer, they were still required to rely on business for success of joint venture, and managing partner allegedly marketed interests to investors with little to no experience in oil and gas industry and was their sole source of access to information. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

DISCUSSON DRAFT: NOVEMBER 10, 2022
Do not cite in academic work without authors' consent

| | Case Caption | Investment Contract Found? | Object or Interest | Industry | Finding |
|---|---|---|---|---|---|
| 59. | Chadbourne & Parke LLP v. Troice, 571 U.S. 377 (2014) | NR | Certificate of Deposit | Investment Program | Held that a fraudulent misrepresentation or omission was not made "in connection with" a purchase or sale of a covered security unless it was material to a decision to buy or sell a covered security. |
| 60. | S.E.C. v. Arcturus Corp., 912 F.3d 786 (5th Cir. 2019), *withdrawn*, 928 F.3d 400 (2019)* | NR* | Oil & Gas Interests | Oil & Gas | Finding issues of material fact as to whether investors in six oil and gas well drilling projects called joint ventures were so inexperienced and unknowledgeable in business affairs that they were incapable of intelligently exercising their powers with regards to projects; were so dependent on some unique entrepreneurial or managerial ability of managers of Florida and Texas consulting limited liability companies (LLC) which offered projects that they could not replace managers or otherwise exercise meaningful powers. Withdrawn and substituted at 928 F.3d 400 (5th Cir. 2019). See entry 62 for subsequent history. |
| 61. | Lorenzo v. S.E.C., 587 U.S. ___, 2019 WL 1369839 (Mar. 27, 2019) | NR | Convertible Debt | Banking, Investment Services & Lending | Concluding that limited partnership interests between medical service entities and billing and management companies were investment contracts; declining to expand the law to state that veto powers to block certain enumerated business decisions, standing alone, would suffice to negate the existence of an investment contract. |
| 62. | S.E.C. .v. Arcturus Corp., 928 F.3d 400 (5th Cir. 2019) | Remand | Oil & Gas Interests | Oil & Gas | Finding issues of fact as to whether the investors were given significant control over the drilling projects, utilized their powers, the voting structure's impact on the investors' power, and the communication among the investors. See entry 60 for prior history. |

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

## SCHEDULE 4

**NOTABLE PRE-** *SEC V. W.J. HOWEY CO.* **"INVESTMENT CONTRACT" DESCISIONS, STATE COURT DECISIONS, AND DECISIONS DISCUSSING THE APPLICABILITY OF SECURITIES LAWS TO CRYPTO ASSETS AND NOT OTHERWISE DISCUSSED IN THIS ARTICLE.**[335]

1. State v. Summerland, 150 Minn. 266, 185 N.W. 255 (1921)
2. State v. Ogden, 154 Minn. 425, 191 N.W. 916 (1923)
3. People v. McCalla, 63 Cal. App. 783 (Dist. Ct. App. 1923)
4. State v. Swenson, 172 Minn. 277, 215 N.W. 177 (1927)
5. Kerst v. Nelson, 171 Minn. 191, 213 N.W. 904 (1927)
6. Barrett v. Gore, 88 Cal. App. 372 (Dist. Ct. App. 1928)
7. Gracchi v. Friedlander, 93 Cal. App. 770 (Dist. Ct. App. 1928)
8. State v. Code, 178 Minn. 492, 227 N.W. 652 (1929)
9. Barnhill v. Young, 46 F.2d 804 (S.D. Cal. 1931)
10. Black v. Solano Co., 114 Cal. App. 170, 299 P. 843 (Dist. Ct. App. 1931)
11. O'Connell v. Union Drilling & Petroleum Co., 121 Cal. App. 302, 8 P.2d 867 (Dist. Ct. App. 1932)
12. People v. Craven, 21 P.2d 459 (Cal. Dist. Ct. App. 1933)
13. W. Oil & Ref. Co. v. Venago Oil Corp., 218 Cal. 733, 24 P.2d 971 (1933)
14. People v. Reese, 136 Cal. App. 657, 29 P.2d 450 (Dist. Ct. App. 1934)
15. S.E.C. v. Crude Oil Corp., 93 F.2d 844 (7th Cir. 1937)
16. S.E.C. v. Universal Serv. Asso., 106 F.2d 232 (7th Cir. 1939)
17. S.E.C. v. Bailey, 41 F. Supp. 647 (S.D. Fla. 1941)
18. Atherton v. United States, 128 F.2d 463 (9th Cir. 1942)
19. Penfield Co. of Cal. v. Sec. and Exch. Com'n, 143 F.2d 746 (9th Cir. 1944)
20. United States v. Zaslavskiy, No. 17CR647(RJD), 2018 U.S. Dist. LEXIS 156574 (E.D.N.Y. Sep. 11, 2018)
21. Hodges v. Monkey Capital, Ltd. Liab. Co., No. 17-81370-CV-MIDDLEBROOKS, 2018 U.S. Dist. LEXIS 229669 (S.D. Fla. Aug. 14, 2018)
22. Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340 (S.D.N.Y. 2019)
23. S.E.C. v. Blockvest, LLC, No. 18CV2287-GPB(BLM), 2019 U.S. Dist. LEXIS 24446 (S.D. Cal. Feb. 14, 2019)
24. Beranger v. Harris, No. 1:18-CV-05054-CAP, 2019 U.S. Dist. LEXIS 195107 (N.D. Ga. Apr. 23, 2019)
25. In re BitConnect Sec. Litig., No. 18-cv-80086, 2019 U.S. Dist. LEXIS 231976 (S.D. Fla. Aug. 23, 2019)
26. Shea v. Best Buy Homes, 533 F. Supp. 3d 1321 (N.D. Ga. 2021)
27. Diamond Fortress Techs., Inc. v. EverID, Inc., 274 A.3d 287 (Del. Super. Ct. 2022)
28. S.E.C. v. Pacheco, No. EDCV 19-958-MWF (AFMx), 2022 U.S. Dist. LEXIS 93459 (C.D. Cal. Apr. 4, 2022)
29. Audet v. Fraser, No. 3:16-cv-940 (MPS), 2022 U.S. Dist. LEXIS 99304 (D. Conn. June 3, 2022)

---

[335] The enumerated decisions in this list have not been included in the empirical calculations referenced throughout this Article.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

## SCHEDULE 5

## ALL FEDERAL APPELLATE AND SUPREME COURT DECISIONS REVIEWED FOR ANNEX A IN CHRONOLOGICAL ORDER.

1. SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344 (1943)
2. SEC v. Howey Co., 328 U.S. 293 (1946)
3. Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953)
4. Jung v. K. & D. Mining Co., 260 F.2d 607 (7th Cir. 1958)
5. L.A. Tr. Deed & Mortg. Exch. v. Sec. & Exch. Com., 264 F.2d 199 (9th Cir. 1959)
6. Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959)
7. SEC v. Variable Annuity Life Ins. Co., 359 U.S. 65 (1959)
8. Cross v. Pasley, 270 F.2d 88 (8th Cir. 1959)
9. Los Angeles Trust Deed & Mortgage Exch. v. SEC, 285 F.2d 162 (9th Cir. 1960), cert. denied, 366 U.S. 919 (1961)
10. Moses v. Michael, 292 F.2d 614 (5th Cir. 1961)
11. Roe v. United States, 287 F.2d 435 (5th Cir.), cert. denied, 368 U.S. 824 (1961)
12. Roe v. US, 316 F.2d 617 (5th Cir. 1963)
13. United States v. Herr, 338 F.2d 607 (7th Cir. 1964)
14. Tcherepnin v. Knight, 371 F.2d 374 (7th Cir. 1967), rev'd, 389 U.S. 332 (1967).
15. SEC v. United Benefit Life Ins. Co., 387 U.S. 202 (1967)
16. Lynn v. Caraway, 379 F.2d 943 (5th Cir. 1967)
17. Tcherepnin v. Knight, 389 U.S. 332 (1967)
18. Cont'l Mktg. Corp. v. Sec. & Exch. Com., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905 (1968)
19. Chapman v. Rudd Paint & Varnish Co., 409 F.2d 635 (9th Cir. 1969)
20. Securities and Exchange Comm. v. MacElvain, 417 F.2d 1134 (5th Cir. 1969), cert. denied, 397 U.S. 972 (1970)
21. Olpin v. Ideal Nat'l Ins. Co., 419 F.2d 1250 (10th Cir. 1969)
22. Johns Hopkins Univ. v. Hutton, 422 F.2d 1124 (4th Cir. 1970), cert. denied, 416 U.S. 916 (1974)
23. Ahrens v. Am.-Canadian Beaver Co., 428 F.2d 926 (10th Cir. 1970)
24. Kemmerer v. Weaver, 445 F.2d 76 (7th Cir. 1971)
25. Milnarik v. M-S Commodities, Inc., 457 F.2d 274 (7th Cir. 1972), cert. denied, 409 U.S. 887 (1972)
26. Vincent v. Moench, 473 F.2d 430 (10th Cir. 1973)
27. SEC v. Glenn W. Turner Enters., Inc., 474 F.2d 476 (9th Cir. 1973), cert. denied, 419 U.S. 900 (1974)
28. Commercial Iron & Metal Co. v. Bache & Co., 478 F.2d 39 (10th Cir. 1973)
29. Nor-Tex Agencies, Inc. v. Jones, 482 F.2d 1093 (5th Cir. 1973), cert. denied, 415 U.S. 977 (1974)
30. Lino v. City Investing Co., 487 F.2d 689 (3d Cir. 1973)
31. Nash & Assocs., Inc. v. Lum's of Ohio, Inc., 484 F.2d 392 (6th Cir. 1973)
32. Andrews v. Blue, 489 F.2d 367 (10th Cir. 1973)
33. Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027 (2d Cir. 1974)
34. El Khadem v. Equity Sec. Corp., 494 F.2d 1224 (9th Cir. 1974)
35. Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974)
36. Bitter v. Hoby's Int'l, Inc., 498 F.2d 183 (9th Cir. 1974)
37. Forman v. Cmty. Servs., Inc., 500 F.2d 1246 (2d Cir. 1974), rev'd, 421 U.S. 837 (1975).
38. Bellah v. First Natl. Bk. of Hereford, Texas, 495 F.2d 1109 (5th Cir. 1974)
39. 1050 Tenants Corp. v. Jakobson, 503 F.2d 1375 (2d Cir. 1974)
40. Securities Exch. Com. v. Koscot Inter., Inc., 497 F.2d 473 (5th Cir. 1974)
41. Sec. Exchange Com'n v. Continental Com Corp., 497 F.2d 516 (5th Cir. 1974)
42. Safeway Portland Employees' Fed. Credit Union v. C. H. Wagner & Co., 501 F.2d 1120 (9th Cir. 1974)
43. Crowley v. Montgomery Ward & Co., 570 F.2d 875 (10th Cir. 1975)
44. United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

45. McGreghar Land Co. v. Meguiar, 521 F.2d 822 (9th Cir. 1975)
46. McCown v. Heidler, 527 F.2d 204 (10th Cir. 1975)
47. Hector v. Wiens, 533 F.2d 429 (9th Cir. 1976)
48. Grenader v. Spitz, 537 F.2d 612 (2d Cir. 1976)
49. Exch. Nat. Bank, Chicago v. Touche Ross Co., 544 F.2d 1126 (2d Cir. 1976)
50. Fargo Partners v. Dain Corp., 540 F.2d 912 (8th Cir. 1976)
51. Emisco Indus., Inc. v. Pro's, Inc., 543 F.2d 38 (7th Cir. 1976)
52. Ballard & Cordell Corp. v. Zoller & Danneberg Expl., Ltd., 544 F.2d 1059 (10th Cir. 1976)
53. Bell v. Health-Mor, Inc., 549 F.2d 342 (5th Cir. 1977)
54. SEC v. Commodity Options Int'l, Inc., 553 F.2d 628 (9th Cir. 1977)
55. United Cal. Bank v. THC Fin. Corp., 557 F.2d 1351 (9th Cir. 1977)
56. Daniel v. International Bd. of Teamsters, 561 F.2d 1223 (7th Cir. 1977), rev'd, 439 U.S. 551 (1979).
57. Hirk v. Agri-Research Council, Inc., 561 F.2d 96 (7th Cir. 1977)
58. McGovern Plaza Joint Ven. v. First of Denver, 562 F.2d 645 (10th Cir. 1977)
59. Schultz v. Dain Corp., 568 F.2d 612 (8th Cir. 1978)
60. Crowley v. Montgomery Ward Co., Inc., 570 F.2d 877 (10th Cir. 1978)
61. Moody v. Bache Co., Inc., 570 F.2d 523 (5th Cir. 1978)
62. Woodward v. Terracor, 574 F.2d 1023 (10th Cir. 1978)
63. Commander's Palace Park Assocs. v. Girard & Pastel Corp., 572 F.2d 1084 (5th Cir. 1978)
64. Melton v. Unterreiner, 575 F.2d 204 (8th Cir. 1978)
65. United States v. Carman, 577 F.2d 556 (9th Cir. 1978)
66. Goodman v. Epstein, 582 F.2d 388 (7th Cir. 1978)
67. Robertson v. Humphries, No. 77-1156., 1978 U.S. App. LEXIS 9196 (10th Cir. Sep. 7, 1978)
68. Peyton v. Morrow Electronics, Inc., 587 F.2d 413 (9th Cir. 1978)
69. United Sportfishers v. Buffo, 597 F.2d 658 (9th Cir. 1978)
70. Teamsters v. Daniel, 439 U.S. 551 (1979)
71. Black v. Payne, 591 F.2d 83 (9th Cir. 1979)
72. Smith v. Gross, 604 F.2d 639 (9th Cir. 1979)
73. Brodt v. Bache Co., Inc., 595 F.2d 459 (9th Cir. 1979)
74. United States v. Farris, 614 F.2d 634 (9th Cir. 1979)
75. De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co., 608 F.2d 1297 (9th Cir. 1979)
76. Cameron v. Outdoor Resorts of America, Inc, 608 F.2d 187 (5th Cir. 1980)
77. Piambino v. Bailey, 610 F.2d 1306 (5th Cir. 1980)
78. Canadian Imperial Bank of Commerce v. Fingland, 615 F.2d 465 (7th Cir. 1980)
79. Curran v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 622 F.2d 216 (6th Cir. 1980)
80. Mason v. Unkeless, 618 F.2d 597 (9th Cir. 1980)
81. United Am. Bank v. Gunter, 620 F.2d 1108 (5th Cir. 1980)
82. Noa v. Key Futures, Inc., 638 F.2d 77 (9th Cir. 1980)
83. SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980)
84. Aldrich v. McCulloch Props., Inc., 627 F.2d 1036 (10th Cir. 1980)
85. Rosenberg v. Collins, 624 F.2d 659 (5th Cir. 1980)
86. Westchester Corp. v. Peat, Marwick, Mitchell & Co., 626 F.2d 1212 (5th Cir. 1980)
87. Martin v. T. V. Tempo, Inc., 628 F.2d 887 (5th Cir. 1980)
88. Am. Fletcher Mortg. Co. v. U. S. Steel Credit Corp., 635 F.2d 1247 (7th Cir. 1980)
89. Williamson v. Tucker, 632 F.2d 579 (5th Cir. 1980), withdrawn, 645 F.2d 404 (1981)*
90. Weaver v. Marine Bank, 637 F.2d 157 (3d Cir. 1980), rev'd, 455 U.S. 551 (1982)
91. Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc., 651 F.2d 1174 (6th Cir. 1981)
92. Williamson v. Tucker, 645 F.2d 404 (5th Cir. 1981)
93. Frazier v. Manson, 651 F.2d 1078 (5th Cir. 1981)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

94. Meason v. Bank of Miami, 652 F.2d 542 (5th Cir. 1981)

95. Kosnoski v. Bruce, 669 F.2d 944 (4th Cir. 1982)

96. Marine Bank v. Weaver, 455 U.S. 551, 102 S. Ct. 1220 (1982)

97. Bd. of Trade v. SEC, 677 F.2d 1137 (7th Cir. 1982), vacated as moot, 459 U.S. 1026 (1982).

98. Golden v. Garafalo, 678 F.2d 1139 (2d Cir. 1982)

99. SEC v. G. Weeks Secur., Inc., 678 F.2d 649 (6th Cir. 1982)

100. SEC v. Aqua-Sonic Prods. Corp., 687 F.2d 577 (2d Cir. 1982)

101. Salcer v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 682 F.2d 459 (3d Cir. 1982)

102. Coward v. Colgate-Palmolive Co., 686 F.2d 1230 (7th Cir. 1982)

103. Gordon v. Terry, 684 F.2d 736 (11th Cir. 1982)

104. Meyer v. Thomas & McKinnon Auchincloss Kohlmeyer, Inc., 686 F.2d 818 (9th Cir. 1982)

105. Mordaunt v. Incomco, 686 F.2d 815 (9th Cir. 1982)

106. Seagrave Corp. v. Vista Res., Inc., 696 F.2d 227 (2d Cir. 1982)

107. Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320 (7th Cir. 1983)

108. Villeneuve v. Advanced Bus. Concepts Corp., 698 F.2d 1121 (11th Cir. 1983)

109. Odom v. Slavik, 703 F.2d 212 (6th Cir. 1983)

110. Daily v. Morgan, 701 F.2d 496 (5th Cir. 1983)

111. LTV Fed. Credit Union v. UMIC Gov't Sec., Inc., 704 F.2d 199 (5th Cir. 1983)

112. United States v. Jones, 712 F.2d 1316 (9th Cir. 1983)

113. Mayer v. Oil Field Sys. Corp., 721 F.2d 59 (2d Cir. 1983)

114. Siebel v. Scott, 725 F.2d 995 (5th Cir. 1984)

115. Landreth Timber Co. v. Landreth, 731 F.2d 1348 (9th Cir. 1984), rev'd, 105 S. Ct. 2297 (1985)

116. Goodwin v. Elkins Co., 730 F.2d 99 (3d Cir. 1984)

117. SEC v. Prof'l Assocs., 731 F.2d 349 (6th Cir. 1984)

118. Villeneuve v. Advanced Bus. Concepts Corp., 730 F.2d 1403 (11th Cir. 1984)

119. Hart v. Pulte Homes of Mich. Corp., 735 F.2d 1001 (6th Cir. 1984)

120. Ruefenacht v. O'Halloran, 737 F.2d 320 (3d Cir. 1984)

121. Kan. State Bank v. Citizens Bank of Windsor, 737 F.2d 1490 (8th Cir. 1984)

122. Stenger v. R.H. Love Galleries, Inc., 741 F.2d 144 (7th Cir. 1984)

123. Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484 (7th Cir. 1984)

124. Mordaunt v. Incomco, 469 U.S. 1115 (1985)

125. Paulsen v. Commissioner, 469 U.S. 131 (1985)

126. Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985)

127. Landreth Timber Co. v. Landreth, 471 U.S. 681 (1985)

128. S.E.C. v. Goldfield Deep Mines Co. of Nevada, 758 F.2d 459 (9th Cir. 1985)

129. Futura Development Corp. v. Centex Corp., 761 F.2d 33 (1st Cir. 1985)

130. San Francisco-Oklahoma Petro. v. Carstan Oil, 765 F.2d 962 (10th Cir. 1985)

131. Phillips v. Kaplus, 764 F.2d 807 (11th Cir. 1985)

132. Underhill v. Royal, 769 F.2d 1426 (9th Cir. 1985)

133. McGill v. American Land Exploration Co., 776 F.2d 923 (10th Cir. 1985)

134. Penturelli v. Spector, Cohen, Gadon Rosen, 779 F.2d 160 (3d Cir. 1985)

135. United States v. Morse, 785 F.2d 771 (9th Cir. 1986)

136. Rodeo v. Gillman, 787 F.2d 1175 (7th Cir. 1986)

137. Less v. Lurie, 789 F.2d 624 (8th Cir. 1986)

138. Youmans v. Simon, 791 F.2d 341 (5th Cir. 1986)*

139. SEC v. Belmont Reid & Co., 794 F.2d 1388 (9th Cir. 1986)

140. Schaafsma v. Morin Vermont Corp., 802 F.2d 629 (2d Cir. 1986)

141. Lopez v. Dean Witter Reynolds, Inc., 805 F.2d 880 (9th Cir. 1986)

142. Deutsch Energy Co. v. Mazur, 813 F.2d 1567 (9th Cir. 1987)

143. Meyer v. Dans un Jardin, S.A., 816 F.2d 533 (10th Cir. 1987)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

144. Albanese v. Florida Nat. Bank of Orlando, 823 F.2d 408 (11th Cir. 1987)

145. Waterman v. Alta Verde Indus., 833 F.2d 1006 (4th Cir. 1987)

146. First Fin. Fed. Sav. & Loan Asso. v. E.F. Hutton Mortg. Corp., 834 F.2d 685 (8th Cir. 1987)

147. Hocking v. Dubois, 839 F.2d 560 (9th Cir. 1988), withdrawn, 885 F.2d 1449 (1989)*

148. Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc., 840 F.2d 236 (4th Cir. 1988)

149. Buhler v. Audio Leasing Corp., No. 86-4162, 1988 U.S. App. LEXIS 21714 (9th Cir. Feb. 26, 1988)

150. One-O-One Enterprises, Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988)

151. Stuckey v. Geupel, 854 F.2d 1317 (4th Cir. 1988)

152. Secon Service System v. St. Joseph Bk. Trust, 855 F.2d 406 (7th Cir. 1988)

153. Arthur Young Co. v. Reves, 856 F.2d 52 (8th Cir. 1988), rev'd sub nom. Reves v. Ernst & Young, 494 U.S. 56 (1990)

154. Sparks v. Baxter, 854 F.2d 110 (5th Cir. 1988)

155. Danner v. Himmelfarb, 858 F.2d 515 (9th Cir. 1988)

156. Mace Neufeld Productions, Inc. v. Orion Pictures Corp., 860 F.2d 944 (9th Cir. 1988)

157. Adena Exploration, Inc. v. Sylvan, 860 F.2d 1242 (5th Cir. 1988)

158. Matek v. Murat, 862 F.2d 720 (9th Cir. 1988)

159. Schlifke v. Seafirst Corp., 866 F.2d 935 (7th Cir. 1989)

160. Deckebach v. La Vida Charters, Inc., 867 F.2d 278 (6th Cir. 1989)

161. United States v. Kessi, 868 F.2d 1097 (9th Cir. 1989)

162. Maritan v. Birmingham Properties, 875 F.2d 1451 (10th Cir. 1989)

163. Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477 (1989)

164. Crawford v. Glenns, Inc., 876 F.2d 507 (5th Cir. 1989)

165. Holloway v. Peat, Marwick, Mitchell Co., 879 F.2d 772 (10th Cir. 1989),  vacated & remanded, 494 U.S. 1014 (1990), reaffirmed on reconsideration, 900 F.2d 1485 (10th Cir. 1990), cert. denied following reconsideration on remand, 498 U.S. 958 (1990)

166. Long v. Shultz Cattle Co., Inc., 881 F.2d 129 (5th Cir. 1989)

167. Reeves v. Teuscher, 881 F.2d 1495 (9th Cir. 1989)

168. Shaw v. Hiawatha, Inc., 884 F.2d 582 (9th Cir. 1989)

169. Davis v. Metro Prods., Inc., 885 F.2d 515 (9th Cir. 1989)

170. Tanenbaum v. Agri-Capital, Inc., 885 F.2d 464 (8th Cir. 1989)

171. Hocking v. Dubois, 885 F.2d 1449 (9th Cir. 1989)

172. Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385 (6th Cir. 1989)

173. L & B Hosp. Ventures, Inc. v. Healthcare Int'l, Inc., 894 F.2d 150 (5th Cir. 1990)

174. Reves v. Ernst & Young, 494 U.S. 56 (1990)

175. Long v. Shultz Cattle Co., 896 F.2d 85 (5th Cir. 1990)

176. Banghart v. Hollywood Gen. P'ship, 902 F.2d 805 (10th Cir. 1990)

177. Eberhardt v. Waters, 901 F.2d 1578 (11th Cir. 1990)

178. Bailey v. J.W.K. Props., Inc., 904 F.2d 918 (4th Cir. 1990)

179. Boldy v. McConnell's Fine Ice Creams, Inc., 904 F.2d 710 (9th Cir. 1990)

180. First Citizens Fed. Sav. & Loan Ass'n v. Worthen Bank & Tr. Co., N.A., 919 F.2d 510 (9th Cir. 1990)

181. Allison v. Ticor Title Ins. Co., 907 F.2d 645 (7th Cir. 1990)

182. Harman v. Harper, 914 F.2d 262 (9th Cir. 1990)

183. Koch v. Hankins, 928 F.2d 1471 (9th Cir. 1991)

184. Stewart v. Ragland, 934 F.2d 1033 (9th Cir. 1991)

185. Uselton v. Commercial Lovelace Motor Freight, 940 F.2d 564 (10th Cir. 1991)

186. McCoy v. Hilliard, 940 F.2d 660 (6th Cir. 1991)

187. DCD Programs, Ltd. v. Hill, Farrer & Burrill, No. 90-55523, 1991 U.S. App. LEXIS 19723 (9th Cir. Aug. 15, 1991)

188. Klaers v. St. Peter, 942 F.2d 535 (8th Cir. 1991)

189. Zolfaghari v. Sheikholeslami, 943 F.2d 451 (4th Cir. 1991)

190. In re United Energy Corp., 944 F.2d 589 (9th Cir. 1991)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

191. S.E.C. v. R.G. Reynolds Enterprises, Inc., 952 F.2d 1125 (9th Cir. 1991)

192. Rice v. Branigar Org., Inc., 922 F.2d 788 (11th Cir. 1991)

193. Guidry v. Bank of LaPlace, 954 F.2d 278 (5th Cir. 1992)

194. S.E.C. v. International Loan Network, Inc., 968 F.2d 1304 (D.C. Cir. 1992)

195. Cty. of Santa Cruz v. Cal. Health Facilities Fin. Auth., No. 91-15309, 1992 U.S. App. LEXIS 18213 (9th Cir. July 30, 1992)

196. Holden v. Hagopian, 978 F.2d 1115 (9th Cir. 1992)

197. Rodriguez v. Banco Cent. Corp., 990 F.2d 7 (1st Cir. 1993)

198. Resolution Trust Corp. v. Stone, 998 F.2d 1534 (10th Cir. 1993)

199. Stone v. Kirk, 8 F.3d 1079 (6th Cir. 1993)

200. Securities & Exchange Commission v. Eurobond Exchange, Ltd., 13 F.3d 1334 (9th Cir. 1994)

201. Revak v. SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994)

202. Wals v. Fox Hills Development Corp., 24 F.3d 1016 (7th Cir. 1994)

203. Pamaco P'ship Mgmt. Corp. v. Enning, 27 F.3d 563 (4th Cir. 1994)

204. Teague v. Bakker, 35 F.3d 978 (4th Cir. 1994)

205. Berry v. Carnaco Transp., 43 F.3d 1478 (9th Cir. 1994)

206. United States v. Brooks, 62 F.3d 1425 (9th Cir. 1995)

207. Webster v. Omnitrition Intern., Inc., 79 F.3d 776 (9th Cir. 1996)

208. Securities Exch. Comm. v. Life Partners, 87 F.3d 536 (D.C. Cir. 1996)

209. Allen v. Lloyd's of London, 94 F.3d 923 (4th Cir. 1996)

210. S.E.C. v. Life Partners, 102 F.3d 587 (D.C. Cir. 1996)

211. Cooper v. King, 114 F.3d 1186 (6th Cir. 1997)

212. Steinhardt Grp. v. Citicorp, 126 F.3d 144 (3d Cir. 1997)

213. United States SEC v. Better Life Club of Am., Inc., No. 98-5079, 1999 U.S. App. LEXIS 7319 (D.C. Cir. Mar. 24, 1999)

214. Teague v. Bakker, 139 F.3d 892 (4th Cir. 1998)

215. Matassarin v. Lynch, 174 F.3d 549 (5th Cir. 1999)

216. SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195 (11th Cir. 1999)

217. Great Rivers Cooperative v. Farmland Industries, Inc., 198 F.3d 685 (8th Cir. 1999)

218. Jeanne Piaubert, S.A. v. Sefrioui, 208 F.3d 221 (9th Cir. 2000)

219. Securities & Exchange Commission v. Banner Fund International, 211 F.3d 602 (D.C. Cir. 2000)

220. SEC v. Infinity Grp. Co., 212 F.3d 180 (3d Cir. 2000)

221. Securities & Exchange Commission v. SG Ltd., 265 F.3d 42 (1st Cir. 2001)

222. SEC v. Alliance Leasing Corp., 28 F. App'x 648 (9th Cir. 2002)

223. Securities & Exchange Commission v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002), rev'd sub nom. SEC v. Edwards, 540 U.S. 389 (2004)

224. Robinson v. Glynn, 349 F.3d 166 (4th Cir. 2003)

225. Securities and Ex. Com. v. Rubera, 350 F.3d 1084 (9th Cir. 2003)

226. SEC v. Edwards, 540 U.S. 389 (2004)

227. United States v. Dale, 374 F.3d 321 (5th Cir. 2004), vacated & remanded  543 U.S. 1113 (2005)

228. SEC v. ETS Payphones, Inc., 408 F.3d 727 (11th Cir. 2005)

229. S.E.C. v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005)

230. S.E.C. v. Merchant, 483 F.3d 747 (11th Cir. 2007)

231. Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276 (11th Cir. 2007)

232. S.E.C. v. Ross, 504 F.3d 1130 (9th Cir. 2007)

233. United States v. Leonard, 529 F.3d 83 (2d Cir. 2008)

234. S.E.C. v. U.S., 289 F. App'x 228 (9th Cir. 2008)

235. Warfield v. Alaniz, 569 F.3d 1015 (9th Cir. 2009)

236. Liberty Prop. Tr. v. Republic Props. Corp., 388 U.S. App. D.C. 70, 577 F.3d 335 (2009)

237. Affco Invs. 2001 LLC v. Proskauer Rose L.L.P., 625 F.3d 185 (5th Cir. 2010)

238. Nunez v. Robin, 415 F. App'x 586 (5th Cir. 2011)

239. U.S. v. Wetherald, 636 F.3d 1315 (11th Cir. 2011)

162

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

240. Minn. Lawyers Mut. Ins. Co. v. Ahrens, 432 F. App'x 143 (3d Cir. 2011)

241. Bamert v. Pulte Home Corp., 445 F. App'x 256 (11th Cir. 2011)

242. Alunni v. Dev. Res. Grp., 445 F. App'x 288 (11th Cir. 2011)

243. Nolfi v. Ohio Ky. Oil Corp., 675 F.3d 538 (6th Cir. 2012)

244. United States SEC v. Merklinger, 489 F. App'x 937 (6th Cir. 2012)

245. United States v. Wosotowsky, 527 F. App'x 207 (3d Cir. 2013)

246. United States Securities & Exchange Commission v. Radical Bunny LLC, 532 F. App'x 775 (9th Cir. 2013)

247. Salameh v. Tarsadia Hotel, Corp., 726 F.3d 1124 (9th Cir. 2013)

248. Sec. & Exch. Comm'n v. Thompson, 732 F.3d 1151 (10th Cir. 2013)

249. United States v. Rowzee, 550 F. App'x 452 (9th Cir. 2013)

250. Sec. & Exch. Comm'n v. Shields, 744 F.3d 633 (10th Cir. 2014)

251. Chadbourne & Parke LLP v. Troice, 571 U.S. 377 (2014)

252. Goldberg v. 401 North Wabash Venture LLC, 755 F.3d 456 (7th Cir. 2014)

253. Rossi v. Quarmley, 604 F. App'x 171 (3d Cir. 2015)

254. United States v. McKye, 638 F. App'x 680 (10th Cir. 2015)

255. Iguaçu, Inc. v. Filho, 637 F. App'x 407 (9th Cir. 2016)

256. Keeton v. Flanagan (In re Flanagan), 642 F. App'x 784 (9th Cir. 2016)

257. Ave. Capital Mgmt. II, Ltd. P'ship v. Schaden, 843 F.3d 876 (10th Cir. 2016)

258. Ne. Revenue Servs., LLC v. Maps Indeed, Inc., 685 F. App'x 96 (3d Cir. 2017)

259. U.S. Sec. & Exch. Comm'n v. Schooler, 905 F.3d 1107 (9th Cir. 2018)

260. SEC v. Liu, 754 F. App'x 505 (9th Cir. 2018), vacated and remanded, 140 S. Ct. 1936, 207 L. Ed. 2d 401 (2020)

261. Sec. & Exch. Comm'n v. Sethi, 910 F.3d 198 (5th Cir. 2018)

262. SEC v. Arcturus Corp., 912 F.3d 786 (5th Cir. 2019), withdrawn, 928 F.3d 400 (2019).

263. SEC v. Scoville, 913 F.3d 1204 (10th Cir. 2019)

264. Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co. (In re Living Bens. Asset Mgmt., L.L.C.), 916 F.3d 528 (5th Cir. 2019)

265. Lorenzo v. SEC, 139 S. Ct. 1094 (2019)

266. Masel v. Villarreal, 924 F.3d 734 (5th Cir. 2019)

267. Lampkin v. UBS Fin. Servs., Inc., 925 F.3d 727 (5th Cir. 2019)

268. N. Am. Wellness Ctr. Holdings, LLC v. Temecula Valley Real Estate, Inc., 771 F. App'x 793 (9th Cir. 2019)

269. SEC v. Arcturus Corp., 928 F.3d 400 (5th Cir. 2019)

270. U.S. Sec. & Exch. Comm'n v. Hui Feng, 935 F.3d 721 (9th Cir. 2019)

271. Foxfield Villa Assocs., LLC v. Robben, 967 F.3d 1082 (10th Cir. 2020)

272. Fedance v. Harris, 1 F.4th 1278 (U.S. 11th Cir. 2021)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

In the course of researching for this Article, we reviewed approximately 256 articles, law reviews, and practitioner publications on the subject of investment contracts and the definition of the term "security" under federal securities laws, many of which were not directly cited in this Article.  The following list comprises those articles which we found relevant to our review, grouped in alphabetical order by the first listed author's last name, and separated into two groups: First, scholarship which did not contemplate crypto assets, and second, scholarship which focused on the application of the investment contract doctrine to crypto assets.

---

**Selected Bibliography of Non-Crypto Asset Scholarship**

1. Harlan S. Abrahams, Commercial Notes and Definition of "Security" under Securities Exchange Act of 1934: A Note Is a Note Is a Note?, 52 Neb. L. Rev. 478 (1973).

2. Miriam Albert, The Future of Death Futures: Why Viatical Settlements Must be Classified as Securities, 19 Pace L.Rev. 345 (1999).

3. Miriam R. Albert, The Howey Test Turn 64: Are the Courts Grading This Test on A Curve?, William and Mary Business Law Review, volume 2, issue 1 (February 2011).

4. Robin Jackson Allen, Continuing Confusion In The Definition Of A Security: The Sale Of Business Doctrine, Discretionary Trading Accounts, And Oil, Gas And Mineral Interests, 40 Wash. & Lee L. Rev. 1255 (1983).

5. Tom Arnold, The Definition of a Security Under the Federal Securities Law Revisited, 34 Clev. St. L. Rev. 249 (1985).

6. Tom Arnold, "When is a Car a Bicycle?"" and Other Riddles: The Definition of a Security Under the Federal Securities Laws, 33 CLEV. ST. L. REV. 449 (1984).

7. Ian Ayres and Robert Gernter, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, The Yale Law Journal, vol. 99. no. 1 (1989).

8. Lloyd J. Bandy Jr., Securities Regulation--Investment Contracts and the Common Enterprise Requirement--Hirk v. Agri-Research Council, Inc. , 43 MO. L. REV. (1978).

9. Barbara Black, Is Stock a Security? A Criticism of the Sale of Business Doctrine in Securities Fraud Litigation, (1982). Faculty Articles and Other Publications. Paper 74.

10. Jerry C. Bonnett, How Common Is a Common Enterprise, 1974 ARIZ. St. L.J. 339 (1974).

11. Ryan Borneman, Why the Common Enterprise Test Lacks a Common Definition: A Look into the Supreme Court's Decision of SEC v. Edwards, 5 U.C. Davis Bus. L.J. 16 (2005).

12. Christopher L. Borsani, A "Common" Problem: Examining the Need for Common Ground in the "Common Enterprise" Element of the Howey Test. Duq Bus. Law. Journal. Volume 10 (2012).

13. Steven C. Bradford, Crowdfunding and the Federal Securities Laws, Columbia Business Law Review, Vol. 2012, No. 1, (2012).

14. Steven C. Bradford, Shooting the Messenger: The Liability of Crowdfunding Intermediaries for the Fraud of Others, 83 University of Cincinnati Law Review 371 (2015).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

15. Steven C. Bradford, Online Arbitration as a Remedy for Crowdfunding Fraud, 45 Fla. St. U. L. Rev. (2018).

16. Robert B. Brannen Jr., The Economic Realities of Condominium Registration under the Securities Act of 1933, 19 GA. L. Rev. 747, 759 (1985).

17. Douglas M. Branson, Collateral Participant Liability under the Securities Laws - Charting the Proper Course, 65 OR. L. REV. 327 (1986).

18. Douglas M. Branson and Karl Shumpei Okamoto, The Supreme Court's Literalism And The Definition Of "Security" In The State Courts, 50 Wash. & Lee L. Rev. 1043 (1993).

19. Alan R. Bromberg, Are There Limits to Rule 10b-5?, 29 Bus. LAW. 167 (1974).

20. Chris Brummer, How International Financial Law Works (and How it Doesn't), 99 Geo. L.J. 257 (2011).

21. Naran Uchur Burchinow, Liabilities of Lead Banks in Syndicated Loans under the Securities Acts, 58 B.U. L. REV. 45 (1978).

22. William J. Carney & Barbara G. Fraser, Defining a Security: Georgia's Struggle with the Risk Capital Test, 30 EMORY L. J. 73 (1981).

23. William J. Carney, Defining a Security: The Addition of a Market-Oriented Contextual Approach to Investment Contract Analysis, 33 EMORY L. J. 311 (1984).

24. Woodward L. Carter Jr., Bank Loans and Bank Credit Agreements: Federal Securities Laws Status, 93 BANKING L.J. 1020 (1976).

25. William L. Case II. and Jack D. Jester, Securities Regulation of Interstate Land Sales and Real Estate Development - A Blue Sky Administrator's Viewpoint: Part I, 7 URB. LAW. 215 (1975).

26. William L. Case II. and Jack D. Jester, Securities Regulation of Interstate Land Sales and Real Estate Development - A Blue Sky Administrator's Viewpoint: Part II, 7 URB. LAW. 385 (1975).

27. Eric C. Chaffee, Securities Regulation in Virtual Space, 74 Wash. & Lee L. Rev. 1387 (2017).

28. Williamson B.C. Chang, Meaning, Reference, and Reification in the Definition of a Security, U.C. Davis. Vol. 19:403 (1986).

29. Eric A. Chiappinelli, Reinventing A Security: Arguments For A Public Interest Definition, 49 Wash. & Lee L. Rev. 957 (1992).

30. Glenn Willett Clark, Genealogy and Genetics of Contract of Sale of a Commodity for Future Delivery in the Commodity Exchange Act, 27 Emory L. J. 1175 (1978)

31. Cochran, Dare to be Great, Inc.!: A Case Study of Pyramid Sales Plan Regulation, 33 Ohio St. L.J. 676 (1972).

32. John C. Cody, The Dysfunctional "Family Resemblance" Test: After Reves v. Ernst & Young, When Are Mortgage Notes "Securities"?, 42 Buff. L. Rev. 761 (1994).

33. John C. Coffee Jr., The Rise of Dispersed Ownership: The Role of Law in the Separation of Ownership and Control, YALE LAW JOURNAL, VOL. 111, P. 1, 2001; COLUMBIA LAW & ECONOMICS WORKING PAPER NO. 182 (2000).

34. John C. Coffee Jr., Market Failure and the Economic Case for a Mandatory Disclosure System, 70 VA. L. REV. 717 (1984).

35. Ronald J. Coffey and James d'A. Welch, Federal Regulation of Land Sales: Full Disclosure Comes Down to Earth, 21 Case W. Res. L. Rev. 5 (1969).

36. Ronald J. Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula?, 18 W. RES. L. Rev. 367 (1967).

37. Manuel F. Cohen, Federal Legislation Affecting the Public Offering of

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Securities, 28 GEO. Wash. L. REV. 119 (1959).

38. Manuel F. Cohen & Robert C. Hacker, Applicability of the Investment Company Act of 1940 to Real Estate Syndications, 36 OHIO St. L.J. 482 (1975).

39. Stuart R. Cohn, Keep Securities Reform Moving: Eliminate the SEC's Integration Doctrine, 44 Hofstra L. Rev. 3 (2015).

40. J. Thomas Cookson, Loan Participation Agreements as Securities: Judicial Interpretations of the Securities Act of 1933 and the Securities Exchange Act of 1934, 24 Wm. & Mary L. Rev. 295 (1983).

41. Patrick M. Creaven, Inside Outside Leave Me Alone: Domestic and Ec Motivated Reform in the UK Securities Industry, 60 FORDHAM L. REV. S285 (1992).

42. Kenneth D. Crews, Real Estate As Securities: Sales of Residential Subdivision Lots, 1979 Wash. U. L. Q. 0965 (1979).

43. Leslie J. Crocker, Investment Contracts under Federal and State Law, 17 W. Rsrv. L. Rev. 1108 (1966).

44. Timothy P. Davis, Should Viatical Settlements be Considered Securities under the 1933 Securities Act, 6 KAN. J.L. & PUB. POL'y 75 (1996).

45. William B. Dawson, Securities Regulation - A Promissory Note Evidencing Commercial Indebtedness Is Not a Security Nor Is Its Issuance a Purchase or Sale within the Meaning of the Securities Exchange Act of 1934, 5 TEX. TECH L. REV. 200 (1973).

46. Leonard J. De Pasquale, Helping to Ameliorate the Doctrine of Caveat Emptor in the Securities Market: Reves v. Ernst & (and) Young, 26 NEW ENG. L. REV. 893 (1992).

47. John Deacon and James D. Prendergast, Defining a" Security" after the Forman Decision, 11 Pac. L. J. 213 (1980).

48. C. Drew DeMaray, When Is A Security Not A Security? Promissory Notes, Loan Participations, And Stock In Close Corporations, 39 Wash. & Lee L. Rev. 1123 (1982).

49. Reza Dibadj, Reconceiving the Firm, 26 Cardozo Law Review 1459 (2005).

50. Reza Dibadj, Crowdfunding Delusions, 12 Hastings Bus. L.J. 15 (2015).

51. Reza Dibadj, Disclosure as Delaware's New Frontier, Hastings Law Journal (2019).

52. William O. Douglas & George E. Bates, The Federal Securities Act of 1933, 43 YALE L.J. 171 (1933).

53. Nathan W. Drage, Are Limited Partnership Interests Securities? A Different Conclusion under the California Limited Partnership Act, 18 Pac. L. J. 125 (1986).

54. Stephen J. Easley, Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional Context-Based Analysis for Federal Securities Jurisdiction, 39 Bus. LAW. 929 (1984).

55. Frank H. Easterbrook & Daniel R. Fischel, "Mandatory Disclosure and the Protection of Investors," 70 Virginia Law Review 669 (1984).

56. Alan L. Feld, The Control Test for Limited Partnerships, 82 HARV. L. REV. 1471 (1969).

57. Allen Ferrell, The Case for Mandatory Disclosure In Securities Regulation Around the World, 2 Brook. J. Corp. Fin. & Com. L. (2007).

58. FitzGibbon, "What is a Security? – A Redefinition Based on Eligibility to Participate in the Financial Markets", 64 Minn. L. Rev. 893 (1980).

59. Bernard Forseter, Rule 10b-5 Violations in the Ninth Circuit: I Know It When I See It, 30 Bus. LAW. 773 (1975).

60. Merritt B. Fox, Regulating Public Offerings of Truly New Securities: First Principles, 66 Duke L.J. 673 (2016).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

61. Merritt B. Fox, Lawrence R. Glosten & Gabriel V. Rauterberg, Stock Market Manipulation and Its Regulation, 35 Yale J. on Reg (2018).

62. Philip F. Franklin, Note, Definition of a Security: Landreth Timber Co. v. Landreth, 40 Sw L.J. 879 (1986).

63. Thomas Roe II Frazer, Catch-All Investment Contracts: The Enomomic Realities Otherwise Require, 14 CUMB. L. REV. 135 (1983).

64. Douglas M. Fried, General Partnership Interests as Securities Under the Federal Securities Laws: Substance over Form, 54 Fordham L. Rev. 303 (1985).

65. Renee M. Friedman, Regulation of Interstate Land Sales: Is Full Disclosure Sufficient?, 20 Urb. L. Ann. 137 (1980).

66. Theresa A. Gabaldon, A Sense of a Security: An Empirical Study, 25 J. CORP. L. 307 (2000).

67. David J. Gilberg, Regulation of New Financial Instruments Under the Federal Securities and Commodities Laws, 39 Vanderbilt Law Review 1599 (1986).

68. Ronald J. Gilson, Engineering a Venture Capital Market: Lessons from the American Experience, 55 STAN. L. REV. 1067 (2003).

69. Carol R. Goforth, Why Limited Liability Company Membership Interests Should Not be Treated as Securities and Possible Steps to Encourage this Result, 45 Hastings L.J. 1223 (1994).

70. James D. Gordon III, Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes, Colum. Bus. L. Rev. 635 (1988).

71. James D. Gordon III, Essay: Interplanetary Intelligence About Promissory Notes as Securities, 69 Tex. L. Rev. 383 (1990).

72. Zohar Goshen & Gideon Parchomovsky, The Essential Role of Securities Regulation, 55 Duke Law Journal 711-782 (2006).

73. Matthew W. Goulding, Making It Easier to Milk the Cow: The Southern District of New York Collapses the Culpable Participation Doctrine and Sidesteps the Private Securities Litigation Reform Act, 49 Vill. L. Rev. 551 (2004).

74. Joseph M. Green, John F. Coyle, Crowdfunding and the Not-So-Safe SAFE, 102 Virginia Law Review Online 168 (2016).

75. Kevin S. Haeberle and M. Todd Henderson, Making a Market for Corporate Disclosure, 35 Yale J. on Reg. (2018).

76. Thomas A. Halleran and John N. Calderwood, Effect of Federal Regulation on Distribution of and Trading in Securities, 28 GEO. Wash. L. REV. 86 (1959).

77. Harold D. Hammett, Any Promissory Note: The Obscene Security-A Search for the Non-Commercial Investment, 7 Tex. Tech L. Rev. 25 (1975-1976).

78. Kenneth V. Handal, The Commercial Paper Market and the Securities Acts, The University of Chicago Law Review, vol. 39, no. 2, (1972).

79. J. Thomas Hannan and William E. Thomas, "The Importance of Economic Reality and Risk in Defining Federal Securities", 25 Hastings L.J. 219 (1974)"

80. Thomas L. Hazen, Taking Stock of Stock and the Sale of Closely Held Corporations: When Is Stock Not a Security, 61 N.C. L. Rev. 393 (1983).

81. Joan MacLeod Heminway, Selling Crowdfunded Equity: A New Frontier, 70 Okla. L. Rev. 189 (2017).

82. JW Hicks, Commercial Paper: An Exempted Security Under Section 3 (a) (3) of the Securities Act of 1933, (1976).

83. B.L. Hoisington, Condominiums and the Corporate Securities Law, 14 Hastings L.J. 241 (1963).

84. M.E. Hughes Jr, William J. Howey and His Florida Dreams, Florida Historical

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

Quarterly: Vol. 66: No. 3, Article 3. (1987).

85. Robert S. Hunt and Madame El Khadem, The Ninth Circuit, and the Risk Capital Approach, 57 OR. L. REV. 3 (1977).

86. Christine Hurt, Pricing Disintermediation: Crowdfunding and Online Auction IPOs, ILL. L. REV. 217 (2015).

87. Darian M. Ibrahim, Crowdfunding Signals, 53 Ga. L. Rev. 197 (2019).

88. Benjamin F. Jackson, Danger Lurking in the Shadows: Why Regulators Lack the Authority to Effectively Fight Contagion in the Shadow Banking System, 127 Harv. L. Rev. 729 (2013).

89. David S. Jeans, Country Club Memberships: Are They Securities under the Federal Securities Laws, 26 U. KAN. L. REV. 439 (1978).

90. Bradley D. Johnson, Discretionary Commodity Accounts as Securities: An Application of the Howey Test, 53 Fordham L. Rev. 639 (1984).

91. Ronald A. Johnston, The Interstate Land Sales Full Disclosure Act: An Analysis of Administrative Policies Implemented in the Years 1968-1975, 26 CATH. U. L. REV. 348 (1977).

92. Stephen Jurman, Bank Loan Participations as Securities: Notes, Investment Contracts, and the Commercial/Investment Dichotomy, 15 DUQ. L. REV. 261 (1976).

93. George D. Kappus Jr., The Franchise as a Security: Application of the Securities Laws to Owner-Operated Franchises, 11 B.C. Indus. & COM. L. REV. 228 (1970).

94. Elisabeth Keller, Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934, Ohio State Law Journal 49 (1988).

95. Edmund H. Kerr, The Inadvertent Investment Company: Section 3(a)(3) of the Investment Company Act, 12 Stan. L. REV. 29 (1959).

96. Janet Kerr and Karen M. Eisenhauer, Reves Revisited, 19 Pepp. L. Rev. Iss. 3 (1992).

97. Michael S. Knoll, The Ancient Roots of Modern Financial Innovation: The Early History of Regulatory Arbitrage, 87 OR. L. REV. 93 (2008).

98. Anzhela Knyazeva, Regulation A+: What Do We Know So Far?, SEC, Staff White Paper, Dec. 7, 2016.

99. Arthur B Laby, The Definition of 'Security' Under the Federal Securities Laws, Research Handbook on Securities Regulation in the United States (2014).

100. James M. Landis, Legislative History of the Securities Act of 1933, 28 GEO. Wash. L. REV. 29 (1959).

101. Patricia Hureston Lee, Access to Capital or Just More Blues? Issuer Decision-Making Post SEC Crowdfunding Regulation, Tenn. J. Bus. L. 19 (2016).

102. Mark A. Lemley and Nathan Myhrvold, How to Make a Patent Market, 36 Hofstra L. REV. 257 (2007)

103. Martin Lipton and George A. Katz, Notes are (are Not) Always Securities - A Review, 29 Bus. LAW. 861 (1974).

104. Joseph C. Long, An Attempt to Return Investment Contracts to the Mainstream of Securities Regulation, 24 OKLA. L. REV. 135 (1971)

105. Joseph C. Long, Partnership, Limited Partnership, and Joint Venture Interests As Securities, 37 MO. L. REV. (1972).

106. Joseph C. Long, Don't Forget the Securities Acts, 26 OKLA. L. REV. 160 (1973).

107. Louis Loss, Joel Seligman & Troy Parades, "Securities Regulation" (Internet Ed.)

108. Lewis D. Lowenfels and Alan R. Bromberg, What Is a Security under

168

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

the Federal Securities Laws, 56 ALB. L. REV. 473 (1993).

109.     M.A.L., International Loan Syndications, The Securities Acts, and the Duties of a Lead Bank, 64 Va. L. REV. 897 (1978).

110.     Michael C. Macchiarola, Securities Linked To The Performance of Tiger Woods? Not Such A Long Shot, 42 Creighton L. Rev. 29 (2008-2009).

111.     Jonathan Macey and Hideki Kanda, Stock Exchange as a Firm: The Emergence of Close Substitutes for the New York and Tokyo Stock Exchanges , 75 Cornell L. Rev. 1006 (1990).

112.     Jonathan R. Macey and Geoffrey P. Miller, Article: Orgin of Blue Sky Laws, Texas L.R. Vol 70, No. 2 (1991).

113.     Lawrence G. Mackowiak, Securities Regulation--Securities Covered--Shares in Cooperative Housing Corporation as Securities under the Federal Securities Acts, 26 Case W. Res. L. Rev. 735 (1976).

114.     Michael P. Malloy, The Definition of Security: Marine Bank v. Weaver, 24 B.C. L. Rev. 1053 (1983).

115.     Corey Matthews, Using a Hybrid Securities Test to Tackle the Problem of Pyramid Fraud, 88 Fordham L. Rev. 2045 (2020).

116.     Therese H. Maynard, What is an Exchange--Proprietary Electronic Securities Trading Systems and the Statutory Definition of an Exchange, 49 Wash. & LEE L. REV. 833 (1992).

117.     Frederick H. C. Mazando, The Taxonomy of Global Securities: is the U.S. Definition of a Security too Broad?, 33 Nw. J. Int'l L. & Bus. 121 (2012).

118.     Thaddeus A. Mazurek Jr., Securities: Defining Investment Contracts - Alternatives for Arizona, 1984 ARIZ. St. L.J. 489 (1984).

119.     Park McGinty, What is a Security?, 3 WIS. L. REV. 1033, 1035 (1993).

120.     Donald E. Miehls, The Applicability of the Federal Securities Law to Transfers of Stock Appurtenant to the Sale of a Business--The Golden Opportunity Lost: Golden v. Garafalo, St Johns Law Rev Vol 57 (1983).

121.     Walter H. Miller Jr., Cooperative Apartments: Real Estate or Securities, 45 B.U. L. REV. 465 (1965).

122.     James S. Mofsky, Some Comments on the Expanding Definition of "Security", 27 U. Miami L. Rev. 395 (1973).

123.     Maura K. Monaghan, An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis, 63 Fordham L. Rev. 2135 (1995).

124.     Rodney L. Moore, Defining An "Investment Contract": The Commonality Requirement Of The Howey Test, 43 Wash. & Lee L. Rev. 1057 (1986).

125.     Marc H. Morgenstern, Real Estate Joint Venture Interests as Securities: The Implications of Williamson v. Tucker, 59 Wash. U. L. Q. 1231 (1982).

126.     Susan K. Mosich, The Qualification of Loan Participations as Securities - The Potential for Lead Bank Liability under Rule 10B-5 and Section 12(2): An Impact with International Ramifications, 8 CAL. W. INT'L.J. 510 (1978).

127.     Aidan D. Mulry, A True Sense of Security: How Kirschner v. J.P. Morgan Chase Illustrates the Failings of the Reves Family-Resemblance Test and the Need to Recognize Some Syndicated Loans as Securities for the Sake of the Financial System, 87 Brook. L. Rev. 979 (2022).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

128.     Robert H. Mundheim and Gordon D. Henderson, Applicability of the Federal Securities Laws to Pension and Profit-Sharing Plans, 29 LAW & CONTEMP. Probs. 795 (1964).

129.     Craig W. Murray, Definition of a Security: Long-Term Promissory Notes, 35 La. L. Rev. (1975).

130.     John B. Nesbitt, Bank Loan Participations: The Affirmative Duty to Disclose under SEC Rule 10b-5, 27 Syracuse L. REV. 807 (1976).

131.     William H. Newton II., What Is a Security: A Critical Analysis, 48 Miss. L.J. 167 (1977).

132.     William J. Ohle, Hocking v. Dubois: The Ninth Circuit Finds a Security in the Secondary Resort Condominium Market, 27 Willamette L. Rev. 147 (1991).

133.     Seth C. Oranburg, Democratizing Startups, 68 Rutgers U. L. Rev. 1013 (2015).

134.     Lawrence Page, Even after Reves, Securities Do Not Have Families: Returning to Economic and Legal Realities through a Connotative Definition of a Security, 1992 U. ILL. L. REV. 249 (1992).

135.     Sergio Pareja, Sales Gone Wild: Will the FTC's Business Opportunity Rule Put an End to Pyramid Marketing Schemes?, 39 McGeorge Law Review 83 (2008).

136.     James J. Park, The Competing Paradigms of Securities Regulation, 57 Duke Law Journal 625-689 (2007).

137.     James J. Park, Rule 10b-5 and the Rise of the Unjust Enrichment Principle, 60 Duke Law Journal 345-409 (2010).

138.     James J. Park, Rules, Principles, and the Competition to Enforce the Securities Laws, 100 Cal. L. Rev. 115, 159 (2012).

139.     Janet G. Perelson, State Securities Law: A Valuable Tool for Regulating Investment Land Sales, 7 N.M. L. REV. 265 (1977).

140.     Robert Pitofsky, Beyond Nader: Consumer Protection and the Regulation of Advertising, 90 Harv. L. Rev. 661 (1977).

141.     Eric Posner, There Are No Penalty Default Rules in Contract Law, 33 Fla. St. U. L. Rev. 563 (2006).

142.     Cheryl B. Preston and Eli W. McCann, Unwrapping Shrinkwraps, Clickwraps, and Browsewraps: How the Law Went Wrong from Horse Traders to the Law of the Horse, 26 BYU J. Pub. L. 1 (2011).

143.     Randall W. Quinn and Paul Gonson, Development of the Securities Law in the Supreme Court: The Definition of Security and the Implication of Private Rights of Action, 35 HOWARD L.J. 319 (1992).

144.     Curtis R. Reitz, Reflections on the Drafting of the 1944 Revision of Article 8 of the US Uniform Commercial Code, 10 UNIF. L. REV. n.s. 357 (2005).

145.     Larry E. Ribstein, Form and Substance in the Definition of a "Security": The Case of Limited Liability Companies, 51 Wash. & Lee L. Rev. 807 (1994).

146.     Larry E. Ribstein, Private Ordering and the Securities Laws: The Case of General Partnerships, 42 Case W. Res. L. Rev. 1 (1992)

147.     David Rich, Betting the Farm: The TIC Turf War and Why TICs Constitute Investment Contracts Under Federal Securities Laws, 1 Wm. & Mary Bus. L. Rev. 451 (2010).

148.     Morgan Ricks, A Regulatory Design for Monetary Stability, 65 VAND. L. REV. 1287 (2012).

149.     Michael Risch, Patent Portfolios as Securities, 63 Duke Law Journal 89-154 (2013).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

150.      Anne P. Ritchey, "A Definition of 'Investment Contracts' and Equitable Defenses to Suit for Rescission for Nonregistration under the Arkansas Securities Act, 1 U. ARK. LITTLE ROCK L. REV. 366 (1978)

151.      Usha Rodrigues, Entity and Identity, 60 Emory L.J. 1257 (2011).

152.      Usha Rodrigues, Securities Law's Dirty Little Secret , 81 Fordham L. Rev. 3389 (2013).

153.      Margaret V. Sachs, Judge Friendly and the Law of Securities Regulation: The Creation of a Judicial Reputation (1997).

154.      Mark A. Sargent, Are Limited Liability Company Interests Securities?, 19 Pepp. L. Rev. Iss. 3 (1992).

155.      Dennis Scholl & Ronald L. Weaver, Loan Participations: Are They Securities, 10 FLA. St. U. L. REV. 215 (1982).

156.      Jeanne L. Schroeder, Is Article 8 Finally Ready This Time: The Radical Reform of Secured Lending on Wall Street, COLUM. Bus. L. REV. 291 (1994).

157.      Andrew A. Schwartz, Article: The Digital Shareholder, 100 Minn. L. Rev. 609 (2015).

158.      Irving P. Seldin, When Stock Is Not a Security: The Sale of Business Doctrine under the Federal Securities Laws, 37 Bus. LAW. 637 (1982).

159.      Jerome M. Selvers, Investment Contracts: Expanding Effective Securities Regulation, 48 St. John's L. Rev. 525 (1973-1974)

160.      Ronald M. Shapiro, The Expanding Definition of a Security (Or Scotch Whisky Isn't Always Scotch Whisky), 61 A.B.A. J. 1504 (1975).

161.      Jonathan E. Shook, The Common Enterprise Test: Getting Horizontal or Going Vertical in Wals v. Fox Hills Development Corp., 30 Tulsa L. J. 727 (2013).

162.      H. Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 239 (1933).

163.      John G. Sobieski, What is a Security?, 25 MERCER L. REV. 381 (1974).

164.      Edward Sonnenschein Jr., Federal Securities Law Coverage of Note Transactions: The Antifraud Provisions, 35 Bus. LAW. 1567 (1980).

165.      Travis Stegemoller, Refocusing Commonality: An Economic Approach that Shares Something in Common with Howey, 46 Val. U. L. Rev. 657 (2012).

166.      Marc I. Steinberg and William E. Kaulbach, The Supreme Court and the Definition of "Security": The "Context" Clause, "Investment Contract" Analysis, and Their Ramifications, 40 Vand. L. Rev. 489 (1987).

167.      Marc I. Steinberg, Notes as Securities: Reves and Its Implications, 51 Ohio St. L.J. 675 (1990).

168.      Mark I. Steinberg and Karen L. Conway, The Limited Liability Company as a Security, 19 Pepp. L. Rev. Iss. 3 (1992).

169.      Michael E. Stevenson and John J. O'Leary, III, Definition of a Security: Risk Capital and Investment Contracts in Washington, 3 SEATTLE U. L. REV. 83 (1979).

170.      Cass R. Sunstein, Interpreting Statutes in the Regulatory State, 103 HARV. L. REV. 405 (1989).

171.      Jeffrey Allen Tew and David Freedman, In Support of SEC v. W.J. Howey Co.: A Critical Analysis of the Parameters of the Economic Relationship Between an Issuer of Securities and the Securities Purchaser, 27 U. Miami L. Rev. 407 (1973).

172.      Steve Thel and Harvey E. Bines, Investment Management Arrangements and the Federal Securities Laws, 58 Ohio St. L. J. 459 (1997-1998).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

173.     Robert B. Thompson, The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction, 57 N.Y.U. L. REV. 225 (1982).

174.     The Expanding Definition of Security: Sale-Leasebacks and Other Commercial Leasing Arrangements, 1972 DUKE L.J. 1221 (1972).

175.     Interstate Land Sales Regulations, 1974 Wash. U. L. Q. 123 (1974).

176.     Cooperative Housing Corporations and the Federal Securities Laws, 71 COLUM. L. REV.118 (1971).

177.     Cooperative Apartments and the UCC, 29 Wash. & Lee L. Rev. 189 (1972).

178.     Stuart J. Vogelsmeier, Evaluating Bank Commercial Paper Placement Activity Under the Glass-Steagall Act, 65 WASH. U. L. Q. 615 (1987).

179.     Manning Gilbert Warren III, The Treatment of Reves "Notes" and Other "Securities" under State Blue Sky Laws, The Business Lawyer Vol. 47, No. 1 (November 1991).

180.     William C. Whitford, The Functions of Disclosure Regulation in Consumer Transactions, 1973 Wis. L. REV. 400 (1973).

181.     Gene H. Williams, The Continued Demise of the Howey Test: The Supreme Court Adopts the Family Resemblance Test for Identifying Notes as Securities, 20 Stetson L. REV. 613 (1991).

182.     Jack Wroldsen, Crowdfunding Investment Contracts, 11 Virginia Law & Business Review 543 (2017).

183.     John S. Zieser, Security Under the Glass-Steagall Act: Analyzing the Supreme Court's Framework for Determining Permissible Bank Activity , 70 CORNELL L. REV. 1194 (1984-1985).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

**Selected Bibliography of Crypto Asset Scholarship**

1. Digital and Digitized Assets: Federal and State Jurisdictional Issues, ABA (Dec. 2020).

2. Miriam Albert & J. Scott Colesanti, Cryptocurrency Meets Bankruptcy Law: A Call for Creditor Status for Investors in Initial Coin Offerings, 36 GA. ST. U. L. REV. (2020).

3. Shlomit Azgad-Tromer, Crypto Securities: On the Risks of Investments in Blockchain-Based Assets and the Dilemmas of Securities Regulation, 68 AM. U. L. REV. 69 (2018).

4. Andrew Bull and Tyler Harttraf, Article: Cryptocurrency and Blockchain Law: SEC's Heightened Enforcement Against Digital Assets, 27 Rich. J.L. & Tech. 1 (2021).

5. Lewis R. Cohen, "Ain't Misbehavin': An Examination of Broadway Tickets and Blockchain Tokens", WAYNE LAW REVIEW, Vol. 65, No. 1, (2019).

6. Shaanan Cohney et al., Coin-Operated Capitalism, 119 Colum. L. Rev. 591, 595-98 (2019).

7. J. Scott Colesanti, Article: Sorry, They Were on Mute: The SEC's "Token Porposal 2.0" as Blueprint for Regulatory to Cryptocurrency, 3 Corp. & Bus. L.J. (2022).

8. Nate Crosser, Comment, Initial Coin Offerings as Investment Contracts: Are Blockchain Utility Tokens Securities?, 67 U. KAN. L. REV. 379 (2018).

9. Primavera De Filippi & Aaron Wright, Blockchain and the Law: The Rule of Code (2018)

10. Marco Dell'Erba, Note, Initial Coin Offerings: The Response of Regulatory Authorities, 14 N.Y.U. J.L. & BUS. 1107 (2018).

11. Georgios Dimitropoulos, The Law of Blockchain, 95 Wash. L. Rev. 1117 (2020).

12. Quinn DuPont, Ledgers and Law in the Blockchain, King's Review, June 23, 2015.

13. Daniel Dupuis, Deborah Smith, Kimberly Gleason, Old Frauds with a New Sauce: Digital Assets and Space Transition, Journal of Financial Crime, December 14, 2021.

14. Douglas S. Eakeley et al. Article: Crypto-Enforcement Around the World, 94 S. Cal. L. Rev. Postscript 99 (2021).

15. Nareg Essaghoolian, Comment, Initial Coin Offerings: Emerging Technology's Fundraising Innovation, 66 UCLA L. REV. 294 (2019).

16. Carol R. Goforth, ARTICLE: Cinderella's Slipper: A Better Approach to Regulating Cryptoassets as Securities, 17 Hastings Bus. L.J. 271 (2021).

17. Carol R. Goforth, Article: SEC v. Telegram: A Global Message, 52 U. Mem. L. Rev 199 (2021).

18. Carol Goforth, Neither a Borrower nor a Lender Be* – Analyzing the SEC's Reaction to Crypto Lending, 18 U. Mass L. Rev. ___ (2023) (forthcoming).

19. Gary B. Gorton, and Jeffery Zhang, Taming Wildcat Stablecoins University of Chicago Law Review, Vol. 90, Forthcoming.

20. James Grimmelmann, Article: All Smart Contracts are Ambiguous, 2 J.L. & Innovations 1 (2019).

21. Reuben Grinberg, Bitcoin: An Innovative Alternative Digital Currency, 4 HASTINGS SCI. & TECH. L. J. 159 (2012).

22. Yuliya Guseva, A Conceptual Framework for Digital-Asset Securities: Tokens and Coins as Debt and Equity, 80 Md. L. Rev. 166 (2021).

23. Yuliya Guseva,  Article: The SEC, Digital Assets, and Game Theory, 46 Iowa J. Corp. L. 629 (2021).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

24. Yuliya Guseva, Article: When the Means Undermine the End: The Leviathan of Securities Law and Enforcement in Digital-Asset Markets, 5 Stan J. Blockchain L. & Pol'y 1 (2022).

25. Thomas L. Hazen, Tulips, Oranges, Worms, and Coins -- Virtual, Digital, or Crypto Currency and the Securities Laws, 20 N.C. J.L. & TECH. 493 (2019).

26. M. Todd Henderson and Max Raskin, A Regulatory Classification of Digital Assets: Toward an Operation Howey Test for Cryptocurrencies, ICOs, and Other Digital Assets, Colum. Bus. L. Rev. 433 (2019).

27. Jacqueline Hennelly, "The Cryptic Nature of Crypto Digital Assets Regulations: The Ripple Lawsuit and Why the Industry Needs Regulatory Clarity", 27 Fordham J. Corp. & Fin. L. 259 (2022).

28. Justin Henning, "The Howey Test: Are Crypto-Assets Investment Contracts?", 27 U. Miami Bus. L. Rev. 51 (2018).

29. Kristin N. Johnson, Article: Decentralized Finance: Regulating Cryptocurrency Exchanges, 62 Wm. & Mary L. Rev. 1911 (2021).

30. Lindsay Sain Jones, Article: Beyond the Hype: A Practical Approach to CryptoReg, 25 Va. J.L. & Tech. 175 (2022).

31. Josh Kamps & Bennett Kleinberg, "To the Moon: Defining and Detecting Cryptocurrency Pump-and-Dumps", Crime Science, Volume 7, Article number: 18 (2018).

32. Patricia H. Lee, Crowdfunding Capital in the Age of Blockchain-Based Tokens, 92 St. John's L. Rev. 833 (2018).

33. Stuart D. Levi & Alex B. Lipton, An Introduction to Smart Contracts and Their Potential and Inherent Limitations, Skadden (May 7, 2018).

34. H. M. Liu, , "Why do People Invest in Initial Coin Offerings (ICOs)?," Joseph Wharton Scholars (2019).

35. William Magnuson, Financial Regulation in the Bitcoin Era, 23 STAN. J.L. BUS. & FIN. 159 (2018).

36. Michael Mendelson, From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis, 22 STAN. TECH. L. REV. 52 (2019).

37. Joel Monegro, Stop Burning Tokens - Buyback and Make Instead, Placeholder VC (Sept 1. 2020).

38. Joseph D. Moran, Comment, The Impact of Regulatory Measures Imposed on Initial Coin Offerings in the United States Market Economy, 26 CATH. U.J.L. & TECH. 7 (2018).

39. Michael J. O'Connor, Overreaching its Mandate?  Considering the SEC's Authority to Regulate Cryptocurrency Exchanges, 11 Drexel L. Rev. 539 (2019).

40. Moran Ofir and Ido Sadeh, "ICO vs. IPO: Empirical Findings, Information Asymmetry, and the Appropriate Regulatory Framework", 53 Vanderbilt Law Review 525 (2021).

41. Ori Oren, Note, ICO's, DAO's, and the SEC: A Partnership Solution, 2018 COLUM. BUS. L. REV. 617 (2018).

42. Troy A. Paredes & Scott H. Kimpel, From Orange Groves to Cryptocurrency: How Will the SEC Apply Longstanding Tests to New Technologies?, Hunton Andrews Kurth, (March 29, 2019).

43. James J. Park, When Are Tokens Securities? Some Questions from the Perplexed, Lowell Milken Institute Policy Report (Dec. 2018).

44. James J. Park and Howard H. Park, Regulation by Selective Enforcement: The SEC and Initial Coin Offerings, 61 Wash. U. J. L. & Pol'y 099 (2020).

45. James J. Park, The Rise of Fintech: Regulation by Selective Enforcement:

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

The SEC and Initial Coin Offerings, 61 Wash. U. J.L. & Pol'y 99 (2020).

46. Jay Preston, Note, Initial Coin Offerings: Innovation, Democratization and the SEC, 16 DUKE L. & TECH. REV. 318 (2018).

47. Lee Reiners, Cryptocurrency and the State: An Unholy Alliance, 30 S. CAL. INTERDISC. L.J. 695 (2021).

48. Carla L. Reyes, (Un)Corporate Crypto-Governance, 2021 RUSS. J. ECON. & L. 135 (2021).

49. Lachlan Robb et al., The Blockchain Conundrum: Humans, Community Regulation and Chains, 13 L. INNOVATION & TECH. 355 (2021).

50. Randolph A. Robinson II, The New Digital Wild West: Regulating the Explosion of Initial Coin Offerings, 85 Tenn. L. Rev. 897 (2018).

51. Usha Rodrigues, "Semi-Public Offerings? Pushing the Boundaries of Securities Law" (2018).

52. Usha Rodrigues, Law and the Blockchain , 104 Iowa L. Rev. 679 (2018).

53. Usha Rodrigues, Financial Contracting with the Crowd, 69 Emory L. J. 397 (2019).

54. Usha Rodrigues, Embrace the SEC, 61 Wash. U. J. L. & Pol'y 133 (2020).

55. Jonathan Rohr and Aaron Wright, Blockchain-Based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets, 70 HASTINGS L.J. 463 (2019).

56. Sonija Šafro, Regulation of security tokens as financial instruments in the EU: is there a need for amendments?, Riga Graduate School of Law (2022)

57. Darren J. Sandler, Citrus Groves in the Cloud: Is Cryptocurrency Cloud Mining a Security?, 34 SANTA CLARA HIGH TECH. L.J. 250 (2018).

58. Rodrigo Seira et al. Ethereum's New 'Staking' Model Does Not Make ETH A Security, Paradigm (2022)

59. Gabriel Shapiro, Debunking Securities Law Myths About Tokens, Lexnode.Substack (Sept 6. 2020).

60. Gabriel Shapiro, Why YFI Are Not Investment Contracts , Lexnode.Substack (Oct 18. 2020).

61. Gabriel Shapiro, How SEC vs. Ripple Stems from an Age-Old Philosophical Debate, Lexnode.Substack (May 10. 2021).

62. Gabriel Shapiro, SEC v. Telegram—Three Deeper Takeaways, MEDIUM (May 21, 2020).

63. Nathan J. Sherman, Note, A Behavioral Economics Approach to Regulating Initial Coin Offerings, 107 GEO. L.J. ONLINE 17 (2018).

64. Carol W. Sherman, What to Expect from New SEC Chair Gary Gensler on Cryptocurrency, 138 BANKING L.J. 502 (2021).

65. Christian Smith-Bishop, "A Ripple-Turned-Tidal Wave: SEC v. Ripple Labs as an Inflection Point in the Regulatory Approach to Innovation in Complex Systems", 44 CAMPBELL L. REV. 335 (2022).

66. Ximeng Tang, Seventy Years After Howey: An Overview of the SEC's Developing Jurisdiction over Digital Assets, ABA BUS. L. TODAY (Oct. 12, 2018).

67. Benjamin Van Adrichem, Howey Should be Distributing New Cryptocurrencies: Applying the Howey Test to Mining, Airdropping, Forking, and Initial Coin Offerings, 20 COLUM. SCI. & TECH. L. REV. 388, 399 (2019).

68. Alfonso Osorio Vassalo, Initial Coin Offerings (ICO): Legal challenges from an Investor Protection Perspective, Tilburg University (2019).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

69. Fennie Wang et al. Financing Open Blockchain Ecosystems: Toward Compliance and Innovation in Initial Coin Offerings. [Research Report] Blockchain Research Institute and COALA. (2018).

70. Kevin Werbach and Nicolas Cornell, Contracts Ex Machina, 67 Duke L.J. 313-382 (2017).

71. Amy D. Westbrook, Digital Finance Platforms: Toward a New Regulatory Paradigm, 23 J. BUS. L. 505 (2021).

72. Dirk A. Zetzsche et al, The ICO Gold Rush: It's A Scam, It's a Bubble, It's a Super Challenge for Regulators, UNSWLRS 83 (2018).

73. Lianos, Ioannis et al., Regulating Blockchain: Techno-Social and Legal Challenges, Oxford University Press (2019)

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

**Annex C**

A Closer Look at "Governance Tokens"

Drawing inspiration from the basic ERC-20 token standard,[336] several protocols have introduced their own crypto asset token standards, some of which include governance-related features as part of their functionality.  Colloquially described as "governance" tokens, crypto assets which allow token owners to "vote" or delegate others to vote on their behalf.

Compound Labs, a software development company supporting the Compound Protocol, created one of the first widely adopted standards for "governance tokens" when it launched the crypto asset known as "COMP" in July 2020.[337]  The COMP token is a particularly useful example as its design inspired the development of other similar crypto assets, such as UNI, the native token of the Uniswap Protocol, AAVE, the native token of the Aave protocol, as well as Gitcoin's GTC and the Ethereum Name Service's ENS token.

The COMP token is part of the overall Compound protocol which allows for simple token voting and vote delegation.  As illustrated in Figure 1, the COMP token contract allows for token-weighted voting—a function which enables proposals to ensure that votes are weighted only in reference to the voter's balance at the moment the proposal was created, rather than at a voter's balance at the time of voting.  This voting structure is intended to enhance perceived fairness by ascertaining that token owners are not able to vote multiple times by moving their tokens between different blockchain addresses—indeed, without this feature, it is likely that token transfers would have to be paused every time there was a new voting proposal.  COMP's delegation feature is similarly highlighted in Figure 2, which allows token owners to indefinitely, and freely, delegate their ability to vote to another address.

However, unlike voting shares in a corporation (which is based on the legal rights provided to shareholders under applicable state law and the corporation's governing legal documents), all that happens with "voting" with the COMP tokens is that the protocol checks for inputs from addresses holding one or more COMP tokens at the relevant time and responds with a pre-determined action to the aggregate of those inputs.  The protocol codebase is oblivious to whether the person initiating a related instruction for a given address holding COMP was entitled to do so (had any "rights") and is unable to alter the outcome of the collective instruction if it was later established that one or more of the inputs was provided "wrongfully".

---

[336] *See* Section [I.B.] *infra*.

[337] *See* "Compound Governance Token Begins Its First Day of Trading", Celia Wan, The Block, June 15, 2020, available at https://www.theblock.co/linked/68369/compound-governance-tokens-begin-its-first-day-of-trading.  *See also* "Compound Protocol", available at https://github.com/compound-finance/compound-protocol.

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law

```
182   /**
183    * @notice Determine the prior number of votes for an account as of a block number
184    * @dev Block number must be a finalized block or else this function will revert to prevent misinformation.
185    * @param account The address of the account to check
186    * @param blockNumber The block number to get the vote balance at
187    * @return The number of votes the account had as of the given block
188    */
189   function getPriorVotes(address account, uint blockNumber) public view returns (uint96) {
190       require(blockNumber < block.number, "Comp::getPriorVotes: not yet determined");
191
192       uint32 nCheckpoints = numCheckpoints[account];
193       if (nCheckpoints == 0) {
194           return 0;
195       }
196
197       // First check most recent balance
198       if (checkpoints[account][nCheckpoints - 1].fromBlock <= blockNumber) {
199           return checkpoints[account][nCheckpoints - 1].votes;
200       }
201
202       // Next check implicit zero balance
203       if (checkpoints[account][0].fromBlock > blockNumber) {
204           return 0;
205       }
206
207       uint32 lower = 0;
208       uint32 upper = nCheckpoints - 1;
209       while (upper > lower) {
210           uint32 center = upper - (upper - lower) / 2; // ceil, avoiding overflow
211           Checkpoint memory cp = checkpoints[account][center];
212           if (cp.fromBlock == blockNumber) {
213               return cp.votes;
214           } else if (cp.fromBlock < blockNumber) {
215               lower = center;
216           } else {
217               upper = center - 1;
218           }
219       }
220       return checkpoints[account][lower].votes;
221   }
```

Figure 1: Token weighted voting feature as set forth in the COMP token.

```
223   function _delegate(address delegator, address delegatee) internal {
224       address currentDelegate = delegates[delegator];
225       uint96 delegatorBalance = balances[delegator];
226       delegates[delegator] = delegatee;
227
228       emit DelegateChanged(delegator, currentDelegate, delegatee);
229
230       _moveDelegates(currentDelegate, delegatee, delegatorBalance);
231   }
```

Figure 2: Vote delegation feature as set forth in the COMP token.


Another common variant of the ERC-20 token standard is the "vote escrow". As pioneered by Curve Finance in August 2020, vote escrows allow protocols to incentivize liquidity providers by rewarding them for their continued participation in liquidity pools. Using Curve Finance as an example, users owning CRV tokens are rewarded with veCRV tokens, *i.e.*, vote-escrowed CRV, for holding, "locking" or staking CRV tokens for a period of time—sometimes as long as four years. The longer a holder locks its CRV, the more veCRV the protocol allocates to it. veCRV tokens are non-transferable governance tokens which have an added feature of allowing the address at which the tokens are held to receive a share of the Curve Finance platform fees. Other decentralized liquidity platforms have similarly implemented this "vote escrow" model due to the popularity of distributing voting rights amongst active users and providing an incentive for greater commitment to the protocol. For example, in February 2022, Balancer, a protocol for programmable liquidity, forked the Curve model by shortening the maximum lock time to one year (as opposed to four years with Curve), and requiring users to lock up Balancer's BAL token, along with wrapped ETH (WETH).

© 2022 Lewis Rinaudo Cohen, Gregory Strong, Freeman Lewin and Sarah Chen, DLx Law



Copyright 2022 DLx Law.  All rights reserved.

DLXLAW.COM