# Exhibit B

**From:** Joe Grundfest
**To:** (b)(6); (b)(7)(C)
**Subject:** Confidential Communication
**Date:** Thursday, December 17, 2020 10:01:08 AM
**Attachments:** XRP SEC Grundfest 201217 (final) .pdf

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear (b)(6); (b)(7)(C)

Attached is a copy of a letter sent to the Commission earlier this morning addressing an enforcement matter relating to transactions in XRP.

Regards,

Joe Grundfest


Professor Joseph A. Grundfest
The William A. Franke Professor of Law and Business
Senior Faculty, Rock Center on Corporate Governance
Stanford Law School
559 Nathan Abbott Way
Stanford Ca 94305
Tel: 650.723.0458
Fax: 650.723.8229

Stanford

**FOIA CONFIDENTIAL TREATMENT
REQUESTED BY RIPPLE LABS, INC.**

December 17, 2020

The Honorable Jay Clayton
    Chairman
The Honorable Caroline A. Crenshaw
The Honorable Allison Herren Lee
The Honorable Hester M. Peirce
The Honorable Elad L. Roisman
    Commissioners
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

Dear Chairman Clayton and Commissioners:

    I am informed that the Commission's Staff is contemplating enforcement proceedings relating to transactions in XRP. I express no views as to the substantive merits of any such action.[1]

    As a procedural matter, however, a decision to advance an enforcement proceeding at this time is highly problematic and contra-indicated. A new Administration soon takes office. A new Secretary of the Treasury will be appointed. The Chairmanship will soon change hands. So too will leadership of key divisions. Important new key players in the regulatory process will emerge. A new Congress portends changes in committee leadership and Congressional policy. The views of a soon-incoming Administration and Congress as to the regulation of transactions similar to those at issue can differ substantially from current perspectives.

    Deferring this matter for consideration by a new Chair, who can coordinate with a new Administration and Congress, generates substantial benefits. The contemplated proceedings implicate a broad range of policy concerns with significant consequences for the nation's financial and securities markets. Those proceedings can have significant effects on the evolution of emerging technologies involving novel forms of financial transactions, as well as for banking, money transfer,

---

[1] The views expressed in this letter are my own. They do not reflect the views of Stanford University or of Stanford Law School, neither of which have any knowledge of the matters addressed herein. (b)(4)
(b)(4)
(b)(4)

The Honorable Jay Clayton, et al.
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

and other markets far beyond the Commission's legal remit. The implications are international. They are not narrowly limited to technical matters of securities law interpretation.

In contrast, the cost of allowing a new Chair, selected by a new Executive, confirmed by a new Senate, coordinating with new senior Commission personnel, to address the multiple significant policy questions implicated by the contemplated proceeding are insignificant. No pressing reason compels immediate enforcement action.

The contemplated enforcement proceeding alleges no fraud, misrepresentation, or omission. But simply initiating the action will impose substantial harm on innocent holders of XRP, regardless of the ultimate resolution. Upon learning of the proceeding, intermediaries will cease transacting in XRP because of the associated legal risk. The resulting reduction in liquidity will cause XRP's value to decline. XRP's aggregate market capitalization as of December 16, 2020, was approximately $23.8 billion, making it the third largest form of cryptocurrency in the world.[2] Given the significance of liquidity to the XRP market, the withdrawal of intermediaries will most likely cause billions of dollars of losses to innocent third-party holders. This result would, to my knowledge, be unprecedented. I am aware of no instance in which the simple announcement of a Commission enforcement proceeding has, absent allegations of fraud, misrepresentation, or omission, caused multi-billion-dollar losses to innocent third parties. Creating precedent, and imposing losses, of this sort raises public policy concerns that would benefit from the views of an incoming administration.

The directors of the Divisions of Enforcement, Corporate Finance, and Trading and Markets have all been deeply involved in the decision to recommend these proceedings. Each of these key Commission staffers has announced their departure from the agency by the end of this calendar year. None of the key staffers with senior-most responsibility for recommending this action will therefore remain at the Commission to take any form of responsibility for the consequences of a systemically important decision that they advocate only on their way out the door. It is far from clear that the next generation of Division Directors, to whom this litigation would be bequeathed, would concur that the contemplated proceedings are superior to the various forms of settlement that have been the subject of detailed negotiation. A mass exodus of every senior staffer responsible for a major enforcement decision with broad policy implications is, to my knowledge, unprecedented in agency history. It raises obvious concerns.

The contemplated proceedings also raise the securities law equivalent of "equal protection" concerns. Fairness is a hallmark of the Commission's enforcement and rulemaking activities. The Commission strives to treat like as like, and to address similarly situated instruments similarly. The contemplated proceedings break with that tradition. The staff has articulated no material distinction between the operation of Ether and of XRP that is relevant to the application of the federal securities laws. Imposing securities law obligations on XRP while leaving Ether untouched raises fundamental fairness questions about the exercise of Commission discretion. If the Commission is to maintain its tradition of fairness, Ether and XRP should be treated similarly: if Ether is to be allowed to trade freely in the market, so too must XRP, and if XRP is to be subject to restrictions, so

---

[2]   CoinMarketCap, available at https://coinmarketcap.com (viewed on Dec. 16, 2020, at 5:01pm EDT).

2

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE**

The Honorable Jay Clayton, et al.
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

too should Ether. Any other result creates a competitive imbalance that cannot be rationalized with reference to fair enforcement of the federal securities laws.

The contemplated proceedings will also reinforce the view that the agency is anti-innovation, and that it applies the federal securities laws inflexibly in a manner that impedes fundamental forms of technological progress. While I understand that many in the agency hold the view that the federal securities laws can co-exist with virtually any form of cryptographic innovation, the reality is that this enforcement action can only drive innovation offshore. Developers will evaluate the international regulatory landscape and rationally conclude that, of all jurisdictions, the United States is among the least welcoming. Investors will reach the same conclusion. They will be reticent to fund innovative technologies targeting the United States market. Fintech in the United States will thus likely fall behind foreign markets, with a range of potential adverse consequences as foreign enterprises take the lead – as many already have – in various forms of payment and transfer technology.

National security considerations are also at stake. Correspondence from the United States Senate to the Director of National Intelligence and to the National Security Advisor regarding national security concerns arising from Chinese control over Bitcoin and Ether underscore the benefits of measured inter-agency coordination regarding matters implicated by the contemplated proceedings.[3] The Director of National Intelligence has also reportedly written directly to the Commission's Chair regarding this issue, and has offered the Chair a briefing on the threat to national security posed by the dominance of Bitcoin and Ether with no effective U.S.-based competition.[4] The red flag raised by national security authorities is further cause for coordinated decision making with the incoming Chair and Administration.

Simply put, an incoming Chair will ideally not be bound as to important, long term matters of national policy by eleventh-hour enforcement decisions made absent compelling cause for immediate action, particularly when there are substantial benefits from inter-agency cooperation.

It is also apparent that central challenges raised by the contemplated proceedings can be addressed through rulemaking. Rulemaking can generate a rich, nuanced record informed by sophisticated technologists, economists, legal experts, and policy analysts. Rulemaking can allow the Commission to craft a sophisticated regulatory response to the larger policy challenges raised by the contemplated proceedings. Indeed, from a pragmatic perspective, rulemaking gives the Commission far greater control than litigation over the evolution of the law governing matters raised by the contemplated proceedings.

A litigated resolution will lack all of the nuance attainable through rulemaking, and could limit the Commission's ability to control the evolution of the law as it relates to important emerging

---

[3] Letter of Tom Cotton, United States Senator to The Honorable John L. Ratcliffe, Director of National Intelligence and The Honorable Robert C. O'Brien, National Security Advisor, July 30, 2020.

[4] Jerry Dunleavy, Trump Spy Chief Seeks SEC Scrutiny of Chinese Dominance in Cryptocurrency, Washington Examiner, Nov. 24, 2020.

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE

The Honorable Jay Clayton, et al.
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

technology. Litigation cannot, by design, address, and much less resolve, important structural questions at the heart of the contemplated proceedings. A court can only decide the controversy before it, and cannot make broad policy judgments or set broadly applicable standards governing the evolution of new technology as applied to important emerging markets. Litigation is inevitably backward-looking, and is highly constrained in its ability to consider the prospective implications of any decision that a court might reach. Litigation therefore presents a material risk that, by resolving the narrow case and controversy before it, a court will inadvertently rule in a manner that generates collateral consequences adverse to the nation's long-term interests. Rulemaking is less likely to generate these negative consequences.

Commissioners have long debated the merits of regulation by prosecution, as Commissioner Karmel described the process, or of regulation by enforcement, as sitting commissioners apply the term. The contemplated proceedings reprise that debate, but with an important variation. Here, the Commission retains the option of first initiating a rulemaking and then considering whether enforcement proceedings are appropriate in light of the rulemaking record. There is no binary choice between litigation and regulation. The ability to sequence the process so that enforcement decisions are informed by a rulemaking record adds significantly to the agency's ability to fashion an effective approach to the challenges presented by evolving new technology. Decisions as to whether to proceed by enforcement or regulation, and how to sequence the process, are also best made by an incoming Chair, informed by larger policy considerations that are consistent with the views of a new Administration and Congress.

Again, I express no view as to the merits of any decision that the Commission might make. My views are limited to matters of procedure and timing. There is powerful reason to conclude that the questions raised by the contemplated proceedings are of sufficient import that, absent cause for immediate enforcement action, an incoming Chair, who reflects the views of a new Administration and Congress, should participate in the decision as to whether and how to proceed in this matter.

***

Pursuant to 17 C.F.R. § 200.83, Ripple requests that confidential treatment be accorded to all copies of this letter and to any notes, memoranda, or other records created by or at the direction of the SEC, its officers or staff members, that reflect, refer, or relate to this letter.

Please promptly inform Ripple of any request under the Freedom of Information Act seeking access to any documents or materials provided to you on behalf of Ripple, including this letter, to enable Ripple to substantiate the grounds for confidential treatment. Should the SEC be inclined to grant such a request, Ripple expects that it will be given at least ten (10) business days' advance notice of any such decision to enable it to pursue any remedies that might be available. In such event, Ripple requests that you telephone Andrew Ceresney, Esq., from Debevoise & Plimpton LLP, counsel for Ripple, at (212) 909-6947.

The confidential information contained herein remains the property of Ripple. Accordingly, Ripple request that this letter (and all copies thereof) be returned after the SEC has completed its efforts on this matter. Furthermore, production of the confidential material is not intended to, and does not, waive any applicable privilege or other legal basis under which information may not be subject to production. If it were found that production of any confidential material constitutes

4

The Honorable Jay Clayton, et al.
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549

disclosure of otherwise privileged matters, such disclosure would be inadvertent. By production of such information, Ripple does not intend to and has not waived the attorney-client privilege or any other protections.

Sincerely,

*Joseph A. Grundfest* (signature)

Joseph A. Grundfest

cc: (b)(6); (b)(7)(C), Division of Corporation Finance
    (b)(6); (b)(7)(C), Division of Corporation Finance
    (b)(6); (b)(7)(C), Division of Corporation Finance
    (b)(6); (b)(7)(C), Division of Corporation Finance
    (b)(6); (b)(7)(C), Division of Enforcement
    (b)(6); (b)(7)(C), Division of Enforcement
    (b)(6); (b)(7)(C), Division of Trading and Markets
    (b)(6); (b)(7)(C), Division of Trading and Markets
    (b)(6); (b)(7)(C), Strategic Hub for Innovation and Financial Technology
    (b)(6); (b)(7)(C), Ripple Labs, Inc.
    Andrew J. Ceresney, Debevoise & Plimpton LLP

**FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE**