Exhibit C

# Selected SEC Accomplishments: May 2017 – December 2020

"The accomplishments listed below are a testament to the 4,500 women and men of the SEC and their unwavering, collective commitment to the SEC's mission to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation. The Main Street investor-focused achievements of the Commission outlined below are impressive by any measure, but particularly when considered in light of the unprecedented professional and personal challenges currently facing the members of our team and the investing public we serve.

It has been the privilege and honor of a lifetime to serve alongside the women and men of the SEC."

- Jay Clayton

## PROTECTING MAIN STREET INVESTORS THROUGH STRONG ENFORCEMENT AND OVERSIGHT

The Commission remained focused on protecting our nation's investors—particularly Main Street investors—at all points through which they interact with our markets. The SEC's Enforcement Division worked tirelessly to bring high-quality enforcement actions, hold bad actors accountable and return money to harmed investors. The actions brought by the Commission include actions against Wall Street firms, publicly-traded corporations, private companies, corporate executives, investment professionals, and others.

Since May 2017, the Commission:

- brought over 2,800 enforcement actions,
- obtained over $15 billion in financial remedies,
- returned approximately $3.5 billion to harmed investors, and
- paid awards of over $580 million to whistleblowers.

In fiscal year 2020, the Commission ordered financial remedies of $4.68 billion, which is the highest ever ordered in a single year since the Commission began reliably tracking this figure. In 2019, the Commission ordered the second-highest amount, at $4.3 billion.i

### BRINGING SIGNIFICANT ACTIONS TO PROTECT MAIN STREET INVESTORS, HOLD INDIVIDUALS ACCOUNTABLE AND RETURN MONEY TO VICTIMS

- Brought investor-focused actions addressing conduct that spanned the securities markets, including conduct involving financial fraud, insider trading, offering fraud, Foreign Corrupt Practices Act violations, misconduct by broker-dealers and investment advisers, and more.
- Brought strong actions to stop frauds targeting members of identifiable communities and exploiting existing relationships of trust and friendship within the groups (often referred to as "affinity fraud").

- Cases that were brought involved frauds that victimized military service members, seniors, African immigrants, and members of the Hispanic, Amish and Mennonite, and deaf, hard of hearing, and hearing loss communities, among others.

- Brought charges against a Houston-based financial services vendor for failing to disclose to teachers practices that generated millions of dollars in fees and other financial benefits for the company.

- Launched the Share Class Selection Disclosure Initiative to address the substantial number of investment advisers who had not disclosed to investors conflicts of interest created by obtaining fees for placing clients in higher-cost mutual funds share classes, where lower- cost share classes were available. As result, more than $139 million has been or is scheduled to be returned to investors.

- Obtained more than 90 asset freezes in emergency actions to stop ongoing fraudulent conduct and freeze illicit profits, in an effort to preserve funds for distribution to victims.

- Brought charges against individuals in more than two-thirds of its cases for a range of violations, from misleading statements, to fraudulent fundraising, to inappropriately sharing confidential data. The individuals charged include those at the top of the corporate hierarchy—including chief executive officers, chief financial officers, and chief operating officers—as well as gatekeepers including accountants, auditors, and attorneys.

- Created a new office of Bankruptcy, Collections, Distributions, and Receiverships in the Enforcement Division, designed to streamline current processes and maximize distributions to and results for investors.

## STRENGTHENING THE WHISTLEBLOWER PROGRAM

- Awarded over $580 million to eligible whistleblowers, including:

  - a record $175 million to 39 whistleblowers in fiscal year 2020, which is both the highest dollar amount and the highest number of individuals awarded in any fiscal year, and

  - the largest single award to date under the history of the program – $114 million to a single whistleblower – as well as the five next largest awards.

- Approved final rule amendments to improve the efficiency, clarity and transparency of the whistleblower award program, helping get more money into the hands of whistleblowers, and at a faster pace.

- Implemented changes to make the process of evaluating and issuing awards substantially more efficient, resulting in a substantial increase in the rate at which whistleblower claims are evaluated and awards are issued.

## MAINTAINING INVESTOR PROTECTION EFFORTS DURING COVID-19

- Suspended trading in the securities of 36 issuers in connection with inadequate or inaccurate information in the marketplace in connection with the virus followed by six fraud cases involving false and misleading claims relating to COVID-19. A full list of trading suspensions and enforcement actions related to COVID-19 is available here.

- The Division of Examinations (formerly the Office of Compliance Inspections and Examinations (OCIE)) remained fully operational nationwide and, with adjustments to take into account health and safety measures, business continuity plans, firm-specific operational matters and other factors, continued to execute on its investor protection mission.

- Issued a risk alert for registered entities highlighting operational, technological, commercial, cybersecurity and other challenges caused by COVID-19.

- Issued investor alerts outlining the types of frauds Main Street investors should be especially wary of during COVID-19.

- Issued a statement emphasizing to corporate issuers and other market participants the importance of maintaining market integrity and following corporate controls and procedures, particularly with respect to non-public information.

## BRINGING ACTIONS AGAINST CYBER-RELATED MISCONDUCT

- Established the Cyber Unit in the Division of Enforcement focused on violations involving digital assets and cryptocurrency, cyber-related trading violations such as hacking to obtain material nonpublic information, and cybersecurity disclosures and procedures at public companies and financial institutions.

- Brought 57 cases involving ICOs, blockchain or distributed ledger technology, and/or digital assets since the July 2017 issuance of an investigative report regarding the offers and sales of digital assets. Among others, cases involved efforts to defraud investors through the use of digital asset securities as well as violations of the registration provisions of the federal securities laws in the offer and sale of digital asset securities.

- Halted 18 suspected frauds involving blockchain or distributed ledger technology and/or digital assets.

## ESTABLISHING INVESTOR-FOCUSED INITIATIVES

- Created the Retail Strategy Task Force to focus on proactive, targeted initiatives to identify misconduct impacting retail investors. Historically, these types of misconduct have included offering frauds, microcap frauds and Ponzi schemes, as well as other areas targeted by the Enforcement Division more broadly, such as:

  - investment professionals placing customers in higher-fee mutual fund share classes, when lower-fee share classes of the same fund are available;

  - abuses in wrap-fee accounts, including with respect to trading away or the purchase of alternative products generating fees;

  - investment professionals recommending customers buying and holding products for long-term investment when those products were designed for short-term holding periods, such as inverse exchange-traded funds (ETFs);

  - sales practice concerns with structured products, including inadequate disclosures regarding fees and mark-ups; and

  - churning, excessive trading and other abusive practices.

- Established the Teacher Initiative to focus enforcement and investor education resources on informing and protecting America's teachers. Among other things, the initiative helps teachers become better informed about the investment options available to them and the costs associated with them. The initiative resulted in a number of multimedia resources and tools for teachers, including podcasts, digital resource guide, and information on basics of investing.

- Established the Military Service Members Initiative, which increased enforcement resources as well as proactive outreach to the active military service and veterans communities to help educate them about savings and investment, investment fees and expenses, retirement programs specific to service members, and the red flags of investment fraud through events hosted by SEC staff and Regional Offices across the country.

- Created a new online search tool for retail investors to research their financial professionals. The SEC Action Lookup for Individuals – or SALI – enables anyone to find out if the individual he or she is dealing with on an investment has been sanctioned as a result of SEC enforcement actions, whether or not the individual is registered.

## EXAMINING FOR COMPLIANCE WITH THE SECURITIES LAWS

- Since May 2017, Examinations (formerly OCIE):

  - completed over 10,000 examinations,

  - improved the coverage ratio of investment adviser examinations to a 15-17% range, up from a 10-11% range in the years prior, and

  - referred hundreds of examinations to the Division of Enforcement.

- In fiscal year 2019, which included a government shutdown, Examinations staff completed nearly 3,100 exams, up over 25% from 2016, covering registered investment advisers, investment companies, broker-dealers, national securities exchanges, municipal advisors, transfer agents, FINRA and clearing agencies.

- At the outset of each year, Examinations continued its practice of publishing its national examination priorities for the year. These priorities included:

  - The protection of retail investors, including seniors and those saving for retirement, including with respect to compliance with Regulation Best Interest and the fiduciary duty. Among others, specific priority areas included management of conflicts of interest, cost and fee disclosures, sales practices, wrap fee programs, retail-targeted products (including mutual funds and ETFs, municipal and other fixed-income securities, and microcap securities), products and accounts focused on senior investors, and fixed income order execution.

  - Compliance and risk in registrants responsible for critical market infrastructure, including clearing agencies, national securities exchanges, transfer agents, and Regulation Systems Compliance and Integrity (SCI) entities.

  - Financial technology and innovation, including with respect to digital assets and automated/digital investment advisory platforms (such as "robo-advisers").

  - The activities of the Financial Industry Regulatory Authority (FINRA) and the Municipal Securities Rulemaking Board (MSRB).

  - Cybersecurity efforts, including with respect to governance and risk assessment, access rights and controls, data loss prevention, vendor management, training, and incident response and resiliency.

  - The effectiveness of anti-money laundering programs, including with respect to identifying customers, performing customer due diligence, monitor accounts for suspicious activity, and filing suspicious activity reports.

  - Additional areas specific to broker-dealers, including with respect to the safeguarding of customer cash and securities, risk management, certain types of trading activity (including, for example, trading in odd lots and the use of automated trading algorithms), the effects of evolving commissions and other cost structures, best execution, and payment for order flow arrangements

  - Additional areas involving registered investment advisers and investment companies, including compliance programs of dually-registered entities, the accuracy of disclosures concerning new and emerging investment strategies, and issues specific to advisers to private funds.

- Issued 24 Risk Alerts to help inform registrants, investors and other market participants of potential risk areas and OCIE's observations, including in the areas of cybersecurity, LIBOR transition, management of conflicts of interest, best execution, compliance programs, and the safeguarding of assets, among other areas.

- Created the forward-thinking Event and Emerging Risks Examination Team (EERT) to proactively engage with financial firms about emerging threats and current market events, and to quickly mobilize to provide expertise and resources to the SEC's regional offices when critical matters arise.

- Issued a statement on conducting more focused examinations that assess the implementation of specific requirements of Regulation Best Interest, including those that go beyond suitability standards and require

broker-dealers to have a reasonable basis to believe that recommendations are in retail customers' best interests.

- Renamed OCIE, which since its inception has grown to represent the second largest office or division at the SEC, as the Division of Examinations.

## ADVANCING DIVERSITY, INCLUSION AND OPPORTUNITY AT THE SEC AND IN THE SECURITIES INDUSTRY

The SEC focused on efforts to promote diversity, inclusion and opportunity, including building and maintaining a diverse workforce, cultivating an inclusive work environment, and fostering diversity in the network of suppliers and in the regulated entities the SEC oversees. For more information, visit this dedicated page.

### DIVERSITY, INCLUSION AND OPPORTUNITY AT THE SEC

- Developed the SEC's first Diversity and Inclusion Strategic Plan, with input from staff throughout the Commission, which outlines measurable goals and strategies for continuing to build a workforce that will deliver on the SEC's mission for fiscal years 2020-2022.

  - The plan also recognizes that diversity, inclusion and opportunity should be reflected in the outward-facing aspects of the Commission's work, including through seeking to ensure that education, outreach and capital formation promotion efforts better include traditionally underserved communities.

- Established a Diversity and Inclusion Senior Policy Advisor position in partnership with the Office of Minority and Women Inclusion (OMWI), which advises the Chairman, the Commission and staff on diversity and inclusion issues and engages with thousands of SEC employees in groups large and small, formal and informal.

- Improved the gender diversity of the SEC's Senior Officers. As of November 2020, 44% of the SEC's Senior Officers were women, up from 31.3% at the end of fiscal year 2012. In addition, as of the end of fiscal year 2020, nearly half (46%) of the divisions and offices that report directly to the Chairman were led by women.

- Minorities held over 25% of the SEC's supervisory and managerial positions as of November 2020, up from 18.1% in fiscal year 2012.

- Continued to see improvements in diversity as the SEC increased hiring. The SEC onboarded nearly 300 new hires during fiscal year 2020, of whom 45% were women and 38% were minorities.

- Established the SEC's first agency-wide mentor program.

- Established, in coordination with the National Treasury Employees Union (NTEU), the SEC's first paid parental leave program.

- Chairman Clayton led the SEC's Diversity Council, and sponsored three Employee Affinity Groups: the African American Council (AAC), Hispanic and Latino Opportunity, Leadership, and Advocacy Committee (HALO), and the Veterans Committee.

- Promoted diversity, inclusion and opportunity through some of SEC's most important shared experiences, such as, among many, an African American History Month celebration featuring Harvard University Professor Henry Louis Gates, Jr., and recognition of diverse government leaders such as U.S. Treasurer Jovita Carranza during Hispanic Heritage Month and retired Army General Flora Darpino during Women's History Month.

- Sponsored events focusing attention on the contributions of, and supporting, "first generation professionals."

- Continued a tradition of strong Federal Employee Viewpoint Survey (FEVS) scores, with an average SEC Engagement Score from 2017-2019 of 80.1, above the mid-size agency score of 67.8 during that time

period. In each of the four key FEVS indices – Employee Engagement, Global Satisfaction, Leader Effectiveness, and Overall FEVS Average – the SEC in 2020 met or exceeded its highest scores since the agency began tracking this data in 2012.

- Ranked in the top five for mid-sized agencies in the Partnership for Public Service's "Best Places to Work in the Federal Government" rankings, in each year from 2017 to 2019.
- Launched, in partnership with NTEU, the SEC internal FEVS Insights Dashboard to provide data to all SEC colleagues on how various subgroups report their work experience in the survey.

## DIVERSITY, INCLUSION AND OPPORTUNITY WITH SEC VENDORS

- Hosted monthly Vendor Outreach Days that gave hundreds of minority-owned and women-owned businesses (MWOBs) that are potential SEC vendors the chance to share their capabilities with the Commission. Participated in dozens of national supplier business conferences in-person and virtually; jointly hosted a national supplier diversity event at George Mason University in Arlington, VA.
- Awarded MWOBs $185 million in fiscal year 2020, representing 34% of the SEC's total contract awards, up from 32% in fiscal year 2019. The average dollar value of a MWOB contract award with the SEC increased from $1.1 million in fiscal year 2015 to $1.9 million in fiscal year 2020.

## DIVERSITY, INCLUSION AND OPPORTUNITY IN THE FINANCIAL INDUSTRY

- Launched the Diversity Assessment Report to help regulated entities conduct self- assessments of their diversity policies and practices, as envisioned by the Joint Standards, and provided these entities with a template for submitting information about their self- assessments to OMWI.
- Established procedures to promote the selection of a diverse slate of new members appointed to SEC Advisory Committees.
- Encouraged (see also here) Advisory Committees to highlight issues relating to diverse and underrepresented investors and other market participants, and to promote diversity, inclusion and opportunity in their respective industries. These events included:

  - A meeting of the Small Business Capital Formation Advisory Committee, focusing on how capital markets are serving underrepresented founders, including minorities and women.
  - Three meetings (here, and here here) of the Asset Management Advisory Committee, featuring discussions on improving diversity and inclusion in the asset management industry.
  - A special panel on minority community investor inclusion through the Investor Advisory Committee.
  - A panel discussion on diversity and capital formation during the 2018 and 2020 Government-Business Forum on Small Business Capital Formation.

## MODERNIZING REGULATIONS TO BENEFIT INVESTORS, ISSUERS AND MARKETS

### ENHANCING STANDARDS OF CONDUCT FOR INVESTMENT PROFESSIONALS WHO PROVIDE RECOMMENDATIONS TO MAIN STREET INVESTORS

The Commission adopted over 70 rules from the policy divisions and offices, one of the busiest rulemaking calendars in Commission history. Chairman Clayton's rulemaking agenda included long-overdue modernization efforts and transformative market structure initiatives. The SEC enhanced disclosures and protections for retail investors, increased capital formation opportunities for smaller issuers, and expanded investment opportunities

while maintaining important investor protections. The SEC also worked to finalize a number of the remaining Dodd-Frank mandates, including standing up the Title VII regime for security-based swaps.

- The Commission adopted several investor-focused rules to enhance important investor protections. For example, the Commission adopted a strong package of rules and interpretations to enhance the quality and transparency of Main Street investors' relationships with their investment professionals. Rather than favoring one type of service or relationship, these actions were designed to increase investor protection across the landscape, while preserving access for Main Street investors—both in terms of choice and cost —to a variety of investment services and products.

- For the first time, regardless of whether investors choose a broker-dealer or an investment adviser, investors are entitled to a recommendation that is in the investor's best interest and does not place the interests of the firm or the financial professional ahead of the investor.

- Enhanced the standard of conduct applicable to broker-dealers by establishing Regulation Best Interest, which requires broker-dealers to not put their interests ahead of their retail customers.

- Reaffirmed and clarified the Commission's views on the fiduciary duty that investment advisers owe to their clients under the Advisers Act to provide greater clarity about advisers' legal obligations.

- Required financial professionals to provide retail investors with simple, easy-to-understand information about the nature of their relationship by establishing Form CRS.

- Clarified when a broker-dealer's performance of advisory activities causes it to become an investment adviser within the meaning of the Advisers Act.

- Established a new investor-focused website page to assist investors in reading and understanding Form CRS and its benefits.

- Created a staff Standards of Conduct Implementation Committee to assist the Commission, regulators, and market participants in preparing for the timely implementation of Regulation Best Interest and Form CRS.

- Issued more than 70 responses to frequently asked questions about Regulation Best Interest and Form CRS compliance obligations.

- Held a roundtable where staff from the Commission and FINRA discussed initial observations on implementation of Regulation Best Interest and Form CRS.

## IMPROVING TRANSPARENCY AND INVESTOR PROTECTIONS FOR EMERGING MARKETS INVESTMENTS

- As part of the President's Working Group on Financial Markets (PWG), developed several key recommendations outlined in the Report on Protecting United States Investors from Significant Risks from Chinese Companies (PWG Report) designed to strengthen protections for investors and promote the integrity of our capital markets with respect to the risks associated with increased investment exposure to emerging markets.

  - The recommendations are centered on (1) leveling the playing field and (2) improving disclosure and consideration by financial professionals of the risks of investing in emerging markets, including China.

- Directed staff to begin developing recommendations consistent with each of the PWG Report recommendations and December 2020 congressional mandate.

- Held an Emerging Markets Roundtable in July 2020 to discuss risks – and potential ways to address those risks – related to the increase in exposure by U.S. investors and capital markets to companies with significant operations in emerging markets, including China.

- Issued several joint statements to highlight concerns with access to information and other regulatory barriers related to Chinese companies listed in the U.S., and to inform investors of the SEC's ongoing efforts to address related investor protection issues, including in December 2018, February 2020 and April 2020.

## IMPROVING THE EXPERIENCE FOR MAIN STREET INVESTORS WHO INVEST IN FUNDS

The Commission sought to improve investor protections by advancing efforts to modernize the design, delivery and content of fund disclosures and other information for the benefit of investors. These initiatives recognize that Main Street investors are increasingly using mutual funds, ETFs and other investment vehicles to invest for their futures. These initiatives are an important part of how the Commission can better serve investors in the 21st century, including through enhancements enabled by technology.

### Modernizing How Investors Receive Information About Their Fund Investments, Including Through Layered Disclosures and Technological Advancements

- Proposed comprehensive improvements to the mutual fund and ETF disclosure framework for investors. The improvements would feature concise and visually engaging shareholder reports that would highlight information that is particularly important for retail investors to assess and monitor their fund investments.

- Enhanced disclosures for investors about variable annuities and variable life insurance contracts, including through the use of a concise, reader-friendly prospectus designed to improve investors' understanding of the contracts' features, fees, and risks. The framework's use of layered disclosure and technology provides investors with a roadmap so that they can more easily access information that they need to make an informed investment decision.

- Finalized reforms to modernize rules that govern investment adviser advertisements and payments to solicitors to comprehensively and efficiently regulate investment advisers' marketing communications.

- Modernized the permitted methods for delivering fund shareholder reports by providing an optional "notice and access" method to allow funds to satisfy their obligations to transmit shareholder reports, while ensuring that investors who prefer to receive paper can continue to do so.

- Requested comment on current requirements that restrict the use of potentially misleading fund names to determine whether the existing rule continues to accomplish its purpose to protect investors and help ensure they are not misled by a fund's name.

### Modernizing and Improving Regulation of the Asset Management Industry

- Created a standardized framework for the regulation of the vast majority of ETFs operating today, leveling the playing field and facilitating greater competition and innovation. The new standardized framework replaced one in which ETFs were required to obtain individualized exemptive orders, and the new framework includes important investor- protection measures designed to enhance transparency and disclosure.

- Issued exemptive orders that for the first time permit certain actively managed ETFs to operate without being subject to daily portfolio transparency, further promoting opportunity and choice for Main Street investors.

- Created a consistent, rules-based framework for fund of funds arrangements that provides robust protections for retail investors who use these arrangements as a convenient way to allocate and diversify their portfolio through a single, professionally managed investment.

- Established an expedited review procedure for exemptive and other applications under the Investment Company Act to make the application process more efficient as well as to provide additional certainty and transparency.

- Modernized the registration, offering and investor communications processes for business development companies (BDCs) as well as other closed-end funds to use the securities offering rules that are already available to operating companies.

- Modernized the regulation of the use of derivatives by registered investment companies, including mutual funds, ETFs, and closed-end funds, as well as BDCs.

- Established an updated framework for fund valuation practices.

- To facilitate more informed decision making, reduced obstacles to providing research on investment funds by harmonizing the treatment of such research with research on other public companies.

- Established the Asset Management Advisory Committee to provide the Commission with diverse perspectives on asset management and related advice and recommendations.

- Launched a smaller fund outreach initiative to better understand regulatory compliance costs and barriers smaller and mid-size fund sponsors encounter.

## FACILITATING CAPITAL FORMATION FOR AMERICAN BUSINESSES AND EXPANDING INVESTMENT OPPORTUNITIES FOR MAIN STREET INVESTORS

The Commission has focused on helping American businesses – particularly small businesses – access capital to grow and create new jobs. The Commission's efforts recognized that historically, much of our nation's capital has been directed at narrow segments of the U.S., and more work is needed to help small businesses "between the coasts." In turn, the Commission's efforts helped provide investors, including Main Street investors, expanded investment opportunities to participate in America's growth. Through modernizing our regulatory structure, the Commission effectively advanced capital formation and investor protection objectives for the benefit of Main Street investors and businesses alike.

### Focusing on Smaller and Medium-sized Businesses

- Simplified, improved and harmonized the "patchwork" exempt offering framework to promote capital formation for smaller and medium-sized businesses, while preserving and enhancing important investor protections. Among a number of other enhancements, these rule amendments:

  - provided additional flexibility to "test the waters" for an exempt offering and to conduct "demo day" communications;

  - increased the offering limits for Regulation A, Regulation Crowdfunding, and Rule 504 offerings, and revised certain individual investment limits; and

  - establish more clearly, in one broadly applicable rule, the ability of issuers to move from one exemption to another.

- Updated the accredited investor definition to allow individuals to participate in our private capital markets based not only on income or net worth, but on established, clear measures of financial sophistication. The amendments also add tribal governments and other organizations to the list of entities qualified to participate.

- Expanded the amount of securities that private companies may issue to employees, consultants and advisors as compensatory awards without registration, allowing for participation in the company's growth. Also issued a concept release soliciting comment on additional potential modernization efforts in light of, for example, the evolution of the "gig economy." In response to feedback on the concept release:

- Proposed amendments to modernize the framework for compensatory offerings by reporting companies and non-reporting companies;

- Proposed temporary rules to permit companies, subject to certain conditions, to issue compensatory awards to certain workers who provide services available through the company's technology-based marketplace platform.

- Encouraged capital formation in rural areas by implementing congressionally-mandated exemptions for investment advisers to rural business investment companies (RBICs), which make venture capital investments mostly in smaller enterprises located primarily in rural areas.

- Issued a statement explaining the potential application of state and federal securities laws to fundraising for Opportunity Zones.

- In an effort to assist small businesses to raise capital and to provide regulatory clarity to investors, issuers, and finders who assist them, proposed a new limited, conditional exemption from broker registration requirements for "finders" who assist issuers with raising capital in private markets from accredited investors.

- Named the first Advocate for Small Business Capital Formation in response to congressional directive. The Office of the Advocate for Small Business Capital Formation (OASB) is dedicated to continuing to advance the interests of small businesses and their investors at the SEC and in our capital markets.

  - In its first two years, OASB conducted 14 in-person events, meeting with entrepreneurs, small businesses, and investors in 12 states including Kansas, Missouri, Nebraska, Arkansas, Colorado, and others.

- Established the Small Business Capital Formation Advisory Committee, which provides a formal mechanism for the Commission to receive advice and recommendations on issues affecting small businesses and their investors.

- Regularly engaged with entrepreneurs, small business, and investors, resulting in valuable feedback on many Commission initiatives affecting small businesses. As the COVID-19 pandemic took hold, OASB maintained its regular outreach efforts, quickly pivoting to launch a series of Virtual Coffee Breaks to engage with small businesses and their investors.

## Tailoring Regulations for Smaller Public Companies

- Expanded the JOBS Act's "test the waters" rules allowing all issuers to increase the likelihood of successful public securities offerings.

- Tailored the accelerated and large accelerated filer definitions to exclude a subset of lower- revenue, smaller companies where the additional requirement of an internal control over financial reporting (ICFR) auditor attestation may not be an efficient way of benefiting and protecting investors, allowing those companies to redirect the associated cost savings into growing their businesses.

- Modernized and expanded the definition of "smaller reporting company," allowing more companies to qualify for existing scaled disclosure requirements.

- Expanded to all companies the ability to have draft registration statements reviewed non- publicly by SEC staff prior to an IPO or a follow-on offering within one year of an IPO.

## Updating, Simplifying and Improving Public Company Disclosures

- Updated and expanded the statistical disclosures that bank and savings and loan registrants provide to investors, in light of changes in the sector over the past 30 years.

- Modernized the description of business, legal proceedings, and risk factor disclosures that registrants are required to make pursuant to Regulation S-K to improve disclosures for investors and to simplify compliance efforts for registrants. These amendments further modernized the rules to include descriptions of issuers' human capital, to the extent material to an understanding of a company's business, recognizing human capital as an important driver of long-term value.

- Took steps to improve the quality and accessibility of the information companies provide their investors in Management's Discussion and Analysis, giving investors greater insight into the information management uses to monitor and manage the business, including:

  - Issued guidance designed to improve the quality of companies' presentation of key performance indicators and metrics.

  - Adopted amendments to modernize, simplify and enhance the focus of certain financial disclosures on material information, while simplifying compliance efforts.

- Enhanced the quality of information that investors receive regarding significant acquisitions or dispositions while reducing unnecessary complexity and compliance costs.

- Updated disclosures to provide investors with a more comprehensive understanding of a registrant's mining properties and more closely align disclosures with international standards.

- Simplified financial disclosures by eliminating requirements that are outdated, overlapping, or duplicative with other Commission rules or U.S. GAAP, thereby reducing compliance burdens without significantly altering the total mix of information available to investors.

- Simplified and streamlined disclosures for guarantors and issuers of guaranteed securities, to improve the quality of disclosure and increase the likelihood that issuers will conduct debt offerings on a registered basis.

- Proposed amendments to modernize, clarify and strengthen Rule 144 and to update and simplify Form 144 filing requirements, including to require electronic filing.

- Adopted amendments to require the use of Inline XBRL for financial statement information and risk/return summaries, designed to increase the quality and accessibility of data.

- Adopted rules to require resource extraction issuers to disclose payments made to foreign governments or the U.S. federal government for the commercial development of oil, natural gas, or minerals, consistent with requirements of Dodd-Frank and the Congressional Review Act.

- Adopted congressionally mandated rules requiring companies to describe practices and policies regarding hedging by directors, officers, and other employees.

- Adopted interpretive guidance to assist companies in complying with the pay ratio disclosure rule and reduce the costs associated with preparing disclosures.

- Clarified public company disclosure obligations for self-identified diversity characteristics of board members and nominees.

- Issued staff guidance for publicly traded companies, auditors, and others to help ensure timely public disclosures of the accounting impacts of the Tax Cuts and Jobs Act.

## Modernizing the Proxy Process to Improve Shareholder Engagement

- Updated the criteria, including the ownership requirements, that a shareholder must satisfy to be eligible to require a company to include a proposal in its proxy statement for consideration by all of the company's shareholders. The amendments facilitate shareholder engagement and ensure an appropriate alignment of interests between shareholder- proponents and their fellow shareholders.

- Modernized rules to provide investors using proxy voting advice access to more transparent, accurate, and complete information on which to make voting decisions.

- Clarified the responsibilities of investment advisers when proxy voting on behalf of their clients, as well as the application of federal proxy rules to proxy voting advice.

- Held a roundtable on the proxy process to hear the views of investors, issuers and other market participants on the SEC's proxy rules.

## Strengthening the Reliability and Effectiveness of Audits

- Modernized the loan provision and additional provisions of the auditor independence rules to focus the rules on those relationships and services that may pose threats to an auditor's objectivity and impartiality, recognizing the evolving complexity of registrant capital structures.

- Approved a PCAOB rule that requires significant enhancements to certain public company audit reports, including the communication of critical audit matters and the disclosure of auditor tenure, in an effort to make auditors' reports more informative.

- Approved a PCAOB rule designed to strengthen and enhance the requirements for auditing accounting estimates, including fair value measurements, by replacing the existing three standards (the accounting estimates standard, the fair value standard, and the derivatives standard) with a single standard that sets forth a uniform, risk-based approach.

# IMPROVING AND MODERNIZING MARKETS TO PROMOTE TRANSPARENCY AND MARKET INTEGRITY

The Commission focused on ensuring our markets remain fair, orderly and efficient while advancing initiatives that modernize our markets and enhance transparency that can energize competitive forces to benefit investors.

## Modernizing Equity Market Structure

- Adopted rules to modernize market data infrastructure to update and significantly expand the content of NMS market data and better meet the diverse needs of today's investors. Notably, these rules expand the content of NMS market data and foster a competitive environment for processing and distributing NMS market data.

- Rescinded a rule exception in order to ensure public notice and comment and Commission approval prior to the effectiveness of amendments to national market system plans (NMS plans) that would establish or change a fee or other charge.

- Directed the equity exchanges and FINRA to modernize the governance of the NMS plans that produce public consolidated equity market data and disseminate trade and quote data from trading venues.

- Issued staff guidance to assist the national securities exchanges and FINRA in preparing Fee Filings that meet their burden to demonstrate that proposed fees are consistent with the requirements of the Securities Exchange Act of 1934 and rules thereunder.

- Invited exchanges and other market participants to submit innovative proposals designed to improve the secondary market structure for exchange listed equity securities that trade in lower volumes.

- Hosted roundtables to address critical market structure issues, including combatting retail investor fraud, market structure for thinly traded securities, and market data and market access.

- Conducted an extensive series of external outreach and coordination meetings to facilitate market participants' transition from a T+3 to a T+2 settlement cycle.

## Enhancing Main Street Investor Protections in the Over-the-Counter (OTC) Market

- Substantially enhanced disclosure and investor protections in the OTC market to address microcap fraud and to modernize the rules in light of technological and communications innovations that have taken place over the past 30 years. The Commission's amended rules provide that, subject to certain exceptions, broker-dealers may not publish quotations for an issuer's security when current issuer information is not publicly available.

- Highlighted for broker-dealers various risks arising from illicit activities associated with transactions in low-priced securities through omnibus accounts.

## Enhancing Market Transparency and Resiliency

- Enhanced operational transparency and regulatory oversight of ATSs that trade NMS stocks, thereby promoting greater transparency in stock order interaction, matching, and execution, which will help empower investors and their intermediaries to find those trading venues that best meet their trading and investing objectives.

- Enhanced disclosures by broker-dealers to investors about the way they handle investors' orders, to help investors better understand and assess the impact of their broker-dealers' routing decisions on order execution quality.

- Jointly with the FDIC, and in consultation with the Securities Investor Protection Corporation (SIPC), adopted rules to clarify and implement provisions relating to the orderly liquidation of covered broker-dealers in the event the FDIC is appointed receiver under Title II of the Dodd-Frank Act.

- Enhanced standards for SEC-registered central counterparties and central securities depositories for the purpose of both enhancing and clarifying the definition of a covered clearing agency.

## Updating "Volcker Rule" Regulations

- In coordination with other federal financial regulators, modified regulations implementing the Volcker Rule's covered fund provisions. In part, the amendments facilitate the ability of banking entities to provide important financing through venture capital funds to businesses, particularly small businesses in areas "between the coasts" where financing is less readily available, as banks currently do directly.

- In coordination with our partner agencies, simplified compliance relating to the Volcker Rule for firms that do not have significant trading activity, with more stringent compliance requirements applying to firms with significant trading activity.

- Consistent with congressional mandate, excluded community banks from the Volcker Rule.

## Moving the Consolidated Audit Trail from Concept to Reality

- Employed project management best practices – effective oversight, engagement with stakeholders and talented, dedicated personnel – to firmly establish the the Consolidated Audit Trail (CAT) moved forwardas an operational regulatory reporting system.

- Enhanced transparency and financial accountability for CAT's implementation by amending the CAT NMS Plan to require the publication of an implementation plan and quarterly progress reports. In addition, the amendments include financial accountability provisions that establish deadlines for four implementation milestones and reduce the amount of fee recovery available if those critical deadlines are missed.

- Exempted SROs from collecting and retaining most sensitive retail customer information in the CAT.

- Proposed amendments to the CAT NMS plan to accomplish a number of data security enhancing goals that provide greater oversight, consistency and transparency regarding the appropriate use of CAT data while reducing the amount of sensitive PII data collected by the CAT.

- Addressed operational issues through several exemptive orders including establishing a phased timeline for broker-dealer CAT reporting. The SROs and the industry have achieved key milestones outlined in this timeline, including the start of equities reporting on June 22, 2020 and the start of options reporting on July 20, 2020.

- Established the role of Senior Policy Advisor for Regulatory Reporting in the Chairman's Office, bringing substantial project management experience to coordinate the Commission's efforts to monitor the SROs' development of the CAT.

## Improving Fixed Income Markets and Transparency in Our Municipal Markets

- Established the Fixed Income Market Structure Advisory Committee (FIMSAC), which provides the Commission with diverse perspectives on the structure and operations of the U.S. fixed income markets, as well as advice and recommendations on matters related to fixed income market structure.

- Proposed rules to enhance operational transparency and system integrity for alternative trading systems trading U.S. Treasuries and other government securities by extending Regulations ATS and SCI to those markets.

- Issued a concept release soliciting public comment on the regulatory framework for electronic platforms that trade corporate debt and municipal securities.

- Approved a FINRA rule filing establishing a New Issue Reference Data Service for corporate bond data.

- Increased transparency of municipal issuers' financial obligations to better inform investors and other market participants about the current financial condition of issuers of municipal securities and obligated persons.

- Hosted, along with the MSRB, and FINRA, Compliance Outreach Programs for Municipal Advisors to provide municipal market participants an opportunity to hear from SEC, MSRB, and FINRA staff on timely regulatory and compliance matters for municipal advisors

- Held *The Road Ahead: Municipal Securities Disclosure in an Evolving Market* conference which brought together municipal securities market participants and regulators to discuss important developments, current trends in disclosure, and potential opportunities for regulatory and industry improvement.

- Held *Spotlight on Transparency: A Discussion of Secondary Market Municipal Securities Disclosure Practices* conference which brought together municipal securities market participants and regulators to discuss current secondary market disclosure practices, including COVID-19 related disclosure and potential opportunities for regulatory and industry improvement.

- Published a series of investor bulletins designed to increase retail investor awareness of municipal bonds, the structure of the municipal securities market, and risks associated with investing in municipal securities.

## Fostering Regulatory Cooperation to Enhance Competition in the Securities Industry

- With Assistant Attorney General Makan Delrahim, Chairman Clayton announced an historic Memorandum of Understanding with the Justice Department's Antitrust Division, formalizing the exchange of knowledge between the agencies to ensure the maintenance of the efficient and competitive markets that American investors rely on.

## STANDING UP THE REGULATORY FRAMEWORK FOR THE SECURITY-BASED SWAPS MARKET

- Harmonized significant aspects of the security-based swaps regulatory framework the CFTC.

- Expanded and improved the framework for regulating cross-border security-based swaps, including single-name credit default swaps, which triggered the compliance date for registration by security-based swap entities and stood up the Commission's broad security- based swap regulatory regime under Title VII of the Dodd-Frank Act.

- Adopted rules requiring the application of risk mitigation techniques to portfolios of uncleared security-based swaps.

- Adopted new rules and amendments under Title VII of the Dodd-Frank Act related to the recordkeeping and reporting requirements for security-based swap dealers, major security- based swap participants, and broker-dealers.

- Adopted rules and rule amendments under Title VII of the Dodd-Frank Act to enhance the risk mitigation practices and ensure the financial integrity of firms that stand at the center of our security-based swap market, thereby protecting investors and counterparties and reducing risk to the market as a whole. These rules established capital, margin, and segregation requirements for swap entities.

- Held the first-ever joint meeting of the SEC and CFTC to vote on joint releases, which led to (i) the adoption of a joint final rule to harmonize the minimum margin level for security futures held in a futures account with the minimum margin level for security futures held in a securities portfolio margin account, and (ii) the issuance of a joint request for comment on the portfolio margining of uncleared swaps and non-cleared security-based swaps.

- Issued the first substituted compliance order, in response to an application by Germany's BaFin, as well as a notice of a proposed order to conditionally provide substituted compliance in response to an application by France's Autorité des Marchés Financiers (AMF) and Autorité de Contrôle Prudential et de Résolution (ACPR).

- Consistent with the SEC and CFTC's shared commitment to greater harmonization under Title VII of the Dodd-Frank Act, issued a statement setting forth a time-limited Commission position regarding documentation implementation issues that may arise when security-based swap entities are registered with both the SEC and CFTC, in order to minimize potential market disruptions to existing counterparty relationships.

- Adopted a rule to create a transparent, efficient and comprehensive process for registered security-based swap entities to submit applications to the Commission regarding the statutory disqualification prohibition, and to harmonize the Commission's approach for a related exclusion with that of the CFTC.

- Adopted a rule to limit the potential for overlapping or duplicative regulation within the security-based swap regulatory regime.

- Established the Security-Based Swaps Joint Venture, a collaborative venture among several SEC divisions and offices that will be responsible for coordinating functions related to the regulation of security-based swaps and oversight of certain entities that will be required to register with the Commission.

## RESPONDING TO INTERNATIONAL REGULATORY AND POLITICAL DEVELOPMENTS

- In response to the European Union's 2018 Markets in Financial Instruments Directive (MiFID II), the Commission issued a number of no-action letters to enable U.S. market participants to ensure compliance with U.S. federal securities laws:

- Providing relief for money managers to operate within the Exchange Act Section 28(e) safe harbor if the money manager makes payments for research to an executing broker-dealer out of client assets alongside payments for execution in certain specified circumstances.

- Providing that money managers may continue to aggregate orders for mutual funds and other clients, where some clients may pay different amounts for research because of MiFID II requirements.

- Providing that broker-dealers, on a temporary basis, may receive research payments from money managers through client commission arrangements in hard dollars or from advisory clients' research payment accounts, without having to register as investment advisers.

- Signed the IOSCO Administrative Arrangement and the FCA Administrative Arrangement to facilitate transfers of personal data between EU and UK securities regulators, respectively, and the SEC, and the IOSCO Enhanced Multilateral Memorandum of Understanding, which makes available several new forms of cross-border assistance in connection with enforcement investigations.

- Signed, with the CEO of the UK's Financial Conduct Authority (FCA), two updated Memoranda of Understanding (MOUs) to ensure the continued ability to cooperate and consult with each other regarding the effective and efficient oversight of regulated entities across national borders, as well as a new supervisory cooperation arrangement with the Commissione Nazionale per la Societa e la Borsa (CONSOB).

- Released staff guidance encouraging market participants to proactively manage their transition away from LIBOR and outlining several potential areas that may warrant their increased attention during that time.

- Provided technical assistance to more than 6,400 foreign regulatory and law enforcement officials – across more than 100 countries and approximately 200 foreign authorities – to help with a variety of topics. Topics included international standards and best practices for cross border enforcement and supervisory cooperation, insider trading, market manipulation, pyramid schemes, corporate governance, inspections and compliance, anti- money laundering, and a host of other market development and enforcement issues.

- Cooperated on 7,680 cross-border actions, including with respect to bad actors transferring assets abroad or basing their scams and fraudulent activities overseas.

## SUPPORTING MARKET INTEGRITY IN THE FACE OF COVID-19

The Commission responded quickly and effectively to the onset of the COVID-19 pandemic and its effects that created economic stress and historic volatility in the capital markets. A complete list of these actions is available here.

## MONITORING MARKET FUNCTIONS AND SYSTEM RISKS

- In early February 2020, assembled a cross-divisional working group to prepare for the possible adverse effects of COVID-19. The working group conducted ongoing outreach efforts with public companies, clearing agencies, exchanges, issuers, broker-dealers, investment companies, public accounting firms, investor representatives, credit rating agencies, fund sponsors, investment advisers, and other market participants. The agency also collaborated with other domestic and foreign authorities and participated in international work streams as the pandemic and related market volatility unfolded.

- In April 2020, announced the members of the COVID-19 Market Monitoring Group, an internal, cross-divisional, senior-level group that assists the Commission and its various divisions and offices in (1) Commission and staff actions and analysis related to the effects of COVID-19 on markets, issuers, and investors, and (2) responding to requests for information, analysis, and assistance from fellow regulators and other public sector partners.

## PROVIDING PROMPT TARGETED GUIDANCE AND REGULATORY RELIEF TO ISSUERS, FINANCIAL PROFESSIONALS AND OTHER REGISTRANTS IMPACTED BY COVID-19

- A summary of the Commission's targeted guidance and relief to market participants can be found here. These actions include:

  - Worked closely with national securities exchanges to, among other things, facilitate the closing of physical trading floors and the transition to all-electronic trading.

  - Approved temporary rules to expedite the offering process for smaller, previously established companies directly or indirectly affected by COVID-19 that are seeking to meet crowdfunding needs through Regulation Crowdfunding.

  - Provided conditional temporary relief to registrants and others unable to meet certain filing deadlines due to certain circumstances related to COVID-19.

  - Issued a number of statements and guidance documents to facilitate timely and robust disclosures by issuers on the impact of COVID-19 on their operations.

  - Highlighted the importance of disclosure, particularly of forward looking information, to help investors, suppliers, vendors and other market participants understand companies' current status and plans for addressing the effects of COVID-19.

  - Provided staff views regarding disclosure and other securities law obligations that companies should consider with respect to COVID-19 and related business and market disruptions; provided additional staff views regarding operations, liquidity and capital resource disclosures in anticipation of the second fiscal quarter.

  - Issued a statement on financial reporting issues in connection with COVID-19, including with respect to significant estimates, reasonable judgments, internal controls, and other complex or emerging issues.

  - Issued a statement highlighting the importance for municipal issuers to provide updated financial and other disclosures – including with respect to sources of liquidity; the availability of federal, state and local aid; and reports prepared for other governance purposes – to investors, and for financial professionals to discuss these matters with Main Street investors.

  - Provided staff no-action relief on receiving electronic submissions of required paper filings.

  - Provided staff guidance for conducting shareholder meetings in light of COVID-19 concerns

  - Issued exemptive relief facilitating remote board meetings and remote approval of certain agreements, plans and arrangements by directors of registered funds.

  - Issued exemptive relief providing additional flexibility for business development companies to issue and sell senior securities in order to provide capital to small and medium-sized portfolio companies in which they invest, and to participate in investments in these portfolio companies alongside certain affiliated private funds.

## MAINTAINING CONTINUITY OF COMMISSION OPERATIONS

- Prepared for SEC telework readiness in the weeks prior to March 9, including conducting network capacity tests, preparing for remote Commission meetings, and encouraging all employees to test their remote connectivity.

- Prior to March 2020, and as a result of modernization efforts that started many months prior to the onset of the COVID-19 pandemic, the agency transitioned to electronic voting and distribution for most Commission

actions. As a result of these efforts, the Commission was able to act more efficiently in a remote work environment, while saving an estimated 2 million pages of paper per year.

- Established protocols for remote open and closed Commission meetings, allowing Commission to remain fully operational after transitioning to a full telework posture in March.

- Released statements from SEC divisions and offices to inform market participants and others about their operating status and how to best engage with staff during this time.

## PROMOTING INNOVATIONS IN FINANCIAL TECHNOLOGIES WHILE PROTECTING INVESTORS AND MARKETS

- Issued an investigative report in July 2017, explaining the application of the federal securities laws to the offer and sale of a digital asset security called the "DAO Token," which was offered through an initial coin offering (ICOs).

- Established position of Senior Advisor for Digital Assets and Innovation to coordinate efforts across the SEC regarding the application of the federal securities laws to emerging digital asset technologies and innovations.

- Launched the Strategic Hub for Innovation and Financial Technology (FinHub) and established it as a stand-alone office to lead the agency's work to identify and analyze emerging financial technologies affecting the future of the securities industry, and engage with market participants on FinTech-related issues and initiatives, such as distributed ledger technology (including digital assets), automated investment advice, digital marketplace financing, and artificial intelligence/machine learning.

- Released, through the FinHub staff, a framework to assist market participants in analyzing whether a digital asset is offered and sold as a security under the federal securities laws.

- Issued a statement to provide the staff's views to market participants on securities laws issues affecting digital assets, including with respect to offers and sales, secondary market trading, and investment vehicles investing in digital assets.

- Issued a statement and request for comment to set forth the Commission's position that, for a period of five years, a special-purpose broker-dealer operating under certain circumstances will not be subject to an enforcement action if it custodies digital asset securities for its customers on the basis that the broker-dealer deems itself to have custody of digital asset securities for purposes of rule 15c3-3.

- Promoted engagement among fund sponsors, the digital asset community and interested members of the public regarding fund innovation and cryptocurrency-related holdings, including with respect to non-DVP custodial practices.

- Issued no-action letters (see, e.g., here and here) with respect to the offer and sale of certain digital assets, and with respect to a securities settlement system.

- Hosted a staff public forum focusing on distributed ledger technology and digital assets where panelists explored topics such as initial coin offerings, digital asset platforms, distributed ledger technology innovations, and how these technologies impact investors and the markets.

- Issued a series of investor bulletins to educate investors on the characteristics and risks of digital assets and ICOs.

- Established a fake ICO page, "HoweyCoins," replete with a bogus white paper and other elements common to ICO investment schemes, as an educational awareness initiative designed to educate investors about the red flags of fraud in the ICO space.

- In addition, Chairman Clayton:

  - Issued a statement on cryptocurrencies and initial coin offerings in late 2017, including potential considerations for Main Street investors.

  - Testified before Congress, together with the CFTC Chairman, on the roles of the SEC and CFTC with respect to virtual currencies.

  - Issued a joint statement, together with the Director of FinCEN and the CFTC Chairman, reminding persons engaged in activities involving digital assets of their anti-money laundering and countering the financing of terrorism obligations under the Bank Secrecy Act.

## FOCUSING ON CYBERSECURITY

Cybersecurity and minimizing cyber risks at the SEC have been a top priority for the Commission. In 2017, the agency discovered that its EDGAR system was the target of a successful hacking effort in 2016. Since 2017, the agency has added new functions, dedicated additional resources, and established a governance structure to strengthen the agency's cybersecurity posture.

Further, recognizing the increasing seriousness of cybersecurity threats and the potential consequences to investors, issuers, other market participants, the financial markets and the economy, the Commission enhanced its participation in interagency, international and private sector outreach initiatives to help encourage greater attention to cybersecurity and coordination by all parties in the financial sector.

### FOCUSING ON THE SEC'S INTERNAL CYBERSECURITY AND RESILIENCY

- Implemented a number of information security enhancements, including through increased resources and hiring, designed to strengthen the agency's posture to address the increased sophistication and complexity of threats.

- Made additional investments in cyber defenses, information assurance capabilities, incident response preparation, compliance and audit requirements, and security training and awareness, recognizing that additional work remains to be done.

- Advanced efforts to limit the intake of PII and sensitive data, including by eliminating the collection of social security numbers on EDGAR forms and modifying submission deadlines to reduce the market sensitivity of certain data at the time it is transmitted.

- Established the Office of the Chief Risk Officer to strengthen the agency's risk management program and coordinate enterprise risk management efforts, including those related to cybersecurity and operational resilience.

- Established the position of the Chief Data Officer with a focus on developing the SEC's data management strategy and priorities; enabling data analytics to support enforcement, examinations and policymaking; and advancing efforts to ensure that the agency collects only the data it needs to fulfill its mission.

- Established a Cybersecurity and Data Protection Policy office to lead efforts to further enhance, integrate and coordinate the SEC's interagency work in this area, and to inform internal cybersecurity policy.

### STRENGTHENING CYBERSECURITY IN THE FINANCIAL INDUSTRY

- Issued guidance to assist public companies in preparing disclosures about cybersecurity risks and incidents.

- Published a first-ever report on Cybersecurity and Resiliency Observations to assist market participants navigating increasingly complex threats by providing considerations on how to enhance cybersecurity preparedness and operational resiliency.

- Increased issuance of risk alerts on key cybersecurity issues including credential stuffing, ransomware attacks, and safeguarding customer records.

## ENHANCING THE SEC'S INTERAGENCY, INTERNATIONAL AND PRIVATE SECTOR CYBERSECURITY PARTNERSHIPS

- Enhanced interagency partnerships and cybersecurity initiatives, including by strengthening the SEC's support to the Financial and Banking Information Infrastructure Committee (FBIIC).

- Worked closely with the Department of Treasury and FBIIC members on numerous initiatives, including the development of the first comprehensive sector specific incident response plan and of an enhanced information sharing framework among financial regulators in support of critical infrastructure requirements.

- Supported international cybersecurity initiatives by providing expertise to several cybersecurity initiatives, including the G-7 CEG's initiatives as well as participation in cyber incident response protocols among G-7 financial authorities; the FSB's development of a Cyber Lexicon, Regulatory and Supervisory Issues Relating to Outsourcing and Third Party Relationships, Report on a Toolkit of Effective Practices Related to Cyber Inciden Response and Recovery; and IOSCO's Cyber Task Force Report and Principles of Outsourcing Consultation Report.

## ENGAGING WITH INVESTORS, MARKET PARTICIPANTS AND POLICYMAKERS

The SEC focused on meeting investors where they are and providing educational materials that help them make more informed investment decisions. The SEC has also provided the public access to high-quality, informative and timely research and analysis on issues important to policymakers and market participants.

### MAIN STREET INVESTOR-FOCUSED EDUCATION AND OUTREACH EFFORTS

- Recorded "Notes from the Chairman" video series which provides Main Street investors with Chairman's personal notes on investing.

- Conducted more than 600 investor education events focused on seniors, military personnel, teachers, younger investors, and other affinity groups, including large town-hall style events for the Military Service Members Initiative at Scott Air Force Base, the Pentagon and Marine Forces Reserve Headquarters.

- Met directly with Main Street investors at seven roundtables held across the country to solicit their views on the Commission's proposed rules regarding the obligations of financial professionals.

- Held a roundtable on combating elder investor fraud and a conference on combating community-based financial fraud, among other events.

- Interacted with hundreds of investors at "Investing in America: Atlanta Town Hall" in Atlanta, GA with the Chairman, Commissioners and senior SEC staff.

- Created the "Before You Invest, Investor.gov" public service campaign, encouraging investors to use Investor.gov to check the background of investment professionals and learn more about investing wisely.

- Designed a short, electronic feedback form to engage everyday investors with Commission rulemaking proposals by providing them with a series of targeted questions.

- Issued nearly 150 investor alerts, investor bulletins, and Director's Take articles to educate Main Street investors on investment-related matters, including possible fraudulent schemes. Together with the public service campaign, the new content helped more than double the visits to Investor.gov.

- Assisted individual investors with complaints and inquiries about the securities markets and market participants, closing nearly 75,000 files, and encouraging people to report possible securities fraud using the SEC's online TCR system.

## SEC RESEARCH AND EVENTS ON CRITICAL MARKET MATTERS

- Published "U.S. Credit Markets: Interconnectedness and the Effects of the COVID-19 Economic Shock," a staff report which focuses on the origination, distribution and secondary market flow of credit across U.S. credit markets amid the COVID-19 pandemic. Staff hosted a Roundtable on Interconnectedness and Risk in U.S. Credit Markets to discuss the issues raised in the report.

- Published quarterly the "DERA Economic and Risk Outlook," which provides a quarterly examination of economic and risk indicators, providing real-time insight to the Commission and the public on the status of the financial markets.

- Report on Algorithmic Trading in the U.S. Capital Markets," which reviewed risks and benefits of algorithmic trading in the capital markets.

- Issued report to Congress on "Access to Capital and Market Liquidity," which reviewed the impacts of the Dodd-Frank Act and other financial regulations on access to capital and market liquidity.

- Published a staff report on the regulation of clearing agencies which provided historical information, an overview of the current landscape, and a discussion of current trends, all in an effort to facilitate further discussion developments in the national system for clearance and settlement since the 2007– 2009 financial crisis.

- Hosted "The State of Our Securities Markets," a conference which brought together experts from government and the private sector to discuss the economic trends impacting our securities markets.

---

[i] Consistent with prior practice, historical amounts do not include certain monies ordered in Securities and Exchange Commission v. Medical Capital Holdings, Inc., Civil Action No. SA CV 09-818 DOC (RNBx) (C.D. Cal.) ($831 million); Securities and Exchange Commission v. Enrica Cotellessa-Pitz, Civil Action No. 11 CV 9302 (LTS) (S.D.N.Y.) ($97.3 billion); and Securities and Exchange Commission v. Eric Lipkin, Civil Action No. 11 CV 3826 (LTS) (S.D.N.Y.) ($30.6 billion).

*Modified: Dec. 23, 2020*