**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | 20 Civ 10832 (AT) (SN) |
| RIPPLE LABS, INC., BRADLEY | ) | |
| GARLINGHOUSE, and CHRISTIAN A. | ) | |
| LARSEN, | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**BRIEF OF *AMICUS CURIAE***
**THE NEW SPORTS ECONOMY INSTITUTE**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Scott D. Brenner, Esq.
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, NY 10007
Telephone: (212) 603-9918
scott.brenner@parlatorelawgroup.com
*Attorney for Amicus Curiae*

November 10, 2022

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICUS CURIAE ……………………………………………………...1

. PRELIMINARY STATEMENT …………………………………………………………2

ARGUMENT …………………………………………………………………………..3

    I.     XRP "Investors" Need The Protection of the Securities Act ......................3

        A.     The Needs of Today's Investors Are Very Different ……………...3

        B.     XRP is A Speculative Tool Powered By the Greater Fool Theory .8

        C.     *Howey* Controls Through Fundamental Principles, Not Its Exact Mechanics …………………………………………………………11

        D.     *Howey*, When Applied Broadly, Still Points to the XRP Scheme Being a Security ……………………………………………………13

    II.    Speculative Intent Far Outweighs Consumptive Intent ……………........17

        A.     Crypto As a Currency is Largely a Failed Vision ……...………..17

        B.     Market Behavior Is Strongly Indicative of Speculative Intent ….18

        C.     Consumptive Intent Is Miniscule Compared to the Overall Scheme ………………………………………………………..19

    III.   The Court Should Take The Long Term View …………………………21

CONCLUSION ...................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**

*Basic, Inc. v. Levinson,*

      485 U.S. 224 (1988) ………………………………...………………………...5, 10

*Reves v. Ernst & Young,*

      494 U.S. 56 (1990) …………………………………………………11, 14, 18

*SEC v. Capital Gains Research Bureau, Inc.,*

      375 U.S. 180 (1963) …………….....................................................................3, 4

*SEC v. Telegram Group, Inc.,*

      448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020) ………………………………….…7

*SEC v. W.J. Howey Co.,*

      328 U.S. 293 (1946) …………………………………………………...…11

*State v. Gopher Tire & Rubber Co.,*

      146 Minn. 52, 56, 177 N.W. 937, 938 (1920) …………………………….…11

**Other Authorities**

Aswath Damodaran, *The Bitcoin Boom: Asset, Currency, Commodity or Collectible?*
      *Musings on Markets,* October 24, 2017, available at
      https://aswathdamodaran.blogspot.com/2017/10/the-bitcoin-boom-asset-
      currency.html ……………………………………………………………22

*CoinCarp, XRP/Richlist,* available at
      https://www.coincarp.com/currencies/ripple/richlist/ …………………………...20

*David S. Ruder, Chairman, SEC, Before the 10th Annual Conference on Securities Regulation and Business Law Problems*, Austin, Texas, March 10, 1988, The Evolution of Disclosure Regulation, available at https://www.sec.gov/news/speech/1988/031088ruder.pdf …………………….…5

Elisabeth Keller, *"Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934."* Ohio State Law Journal 49 (1988): 329-352 …...……………………………………………………...…4, 9

Gary Gensler*, Kennedy and Crypto*, Speech, Washington D.C., Sept. 8, 2022, available at https://www.sec.gov/news/speech/gensler-sec-speaks-090822 ………5

James D. Gordon III, *Common Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and Notes*, 1988 Colum. Bus. L. Rev. 635 (1988) ………………………………………………………………………14

Jim Cramer, *Crypto's investment case may rest on the 'greater fool theory,'* available at https://www.youtube.com/watch?v=r7F15tlVUOQ ………………...8

John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, available at https://www.jstor.org/stable/1281038 ……………...10

Jonathan Stempel*, Elon Musk $258 billion Dogecoin lawsuit expands*, available at https://www.reuters.com/markets/us/elon-musk-258-billion-dogecoin-lawsuit-expands-2022-09-07/ …………………………………….……………….16

Josh Howarth, *How Many Cryptocurrencies Are There In 2022?* Available at https://explodingtopics.com/blog/number-of-cryptocurrencies …………………9

Louis Brandeis, *Other People's Money* (1914) ………………………...………………..…12

MacKenzie Sigalos, *FTX's token plunges 80% on liquidity concerns, wiping out over $2 billion in value*, November 8, 2022, available at https://www.cnbc.com/2022/11/08/ftxs-ftt-token-plunges-80percent-wiping-out-over-2-billion-in-value.html …………………………………….……….23

MacKenzie Sigalos and Kate Rooney, *Binance backs out of FTX rescue, leaving the crypto exchange on the brink of collapse*, November 9, 2022, available at https://www.cnbc.com/2022/11/09/binance-backs-out-of-ftx-rescue-leaving-the-crypto-exchange-on-the-brink-of-collapse.html ……………………………23

Matt Levine, *Elon Musk Picks the Money Now*, February 8, 2021, available at https://www.bloomberg.com/opinion/articles/2021-02-08/elon-musk-works-his-Magic-on-dogecoin-and-bitcoin ……………………………………….…16, 17

Matt Levine, *The Elon Markets Hypothesis*, February 10, 2021, available at
https://news.bloomberglaw.com/banking-law/matt-levines-money-stuff-the-elon-markets-hypothesis ……………………………………………………………..16

Maura K. Monaghan, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L. Rev. 2135 (1995),
available at https://ir.lawnet.fordham.edu/flr/vol63/iss6/6 ….…………..11, 13, 14

Osato Avan-Nomayo, *Bitcoin has failed miserably as currency, says NYU's 'dean of valuation'*,  June 30, 2021, available at
https://cointelegraph.com/news/bitcoin-has-failed-miserably-as-currency-says-nyu-s-dean-of-valuation …………………………………………….……..17

*SEC Charges Kim Kardashian for Unlawfully Touting Crypto Security*, available at
https://www.sec.gov/news/press-release/2022-183 ……………………………..16

*Security Analysis: The Classic 1934 Edition*, Benjamin Graham and David L. Dodd,
Mc-Graw Hill (1934) ……………………………………………………..……6

*Tesla, Inc. (TSLA) Stock Historical Prices & Data*
available at https://finance.yahoo.com/quote/TSLA/history/ ……………………4

Warren Buffett, *2022 Berkshire Hathaway Annual Meeting*, available at
https://buffett.cnbc.com/2022-berkshire-hathaway-annual-meeting/ …………….8

## INTEREST OF AMICUS CURIAE

NSEI's mission is to transform society through sports by, 1) promoting responsible financial innovation; 2) building a stronger economy with stronger ethics; and 3) bringing financial literacy to the masses. NSEI's principal website is at www.thenewsportseconomy.org. NSEI has been an active participant in the courts and has submitted four amicus briefs, including one to the Supreme Court of the United States in *Murphy v. National Collegiate Athletic Association*, No. 16-476, 584 U.S. ___ (2018), and one to New York Court of Appeals in *White v. Cuomo*, 2022 N.Y. Slip Op. 1954 (N.Y. 2022). NSEI is also actively engaging in public policy discussions by submitting comment letters to regulators on financial innovation. NSEI submitted two comment letters to the Commodity Futures Trading Commission ("CFTC") regarding CFTC's review of i) proposed KalshiEx Congressional Control Contracts; and ii) proposed RSBIX NFL futures contracts, and a comment letter to the Securities and Exchange Commission ("SEC") on its concept release re: Harmonization of Securities Offering Exemptions.

As an innovator of financial products for more than 10 years, NSEI has interacted with the SEC, the CFTC and the Ontario Securities Commission. NSEI has always taken a cautious and collaborative approach to financial innovation; opting to obtain regulatory clarity first, rather than opening up the floodgates to the masses and operating under regulatory uncertainty. NSEI does not operate in the crypto industry; rather, its primary goal is to foster an environment where innovation is respected, but only to the extent it is transparent and serves the public interest.

This case requires the application of legal principles to a novel set of facts that need to be put in both proper historical and financial context. Offering key insights from finance, this amicus brief focuses on identifying key aspects of cryptocurrencies, contrasts them with

traditional financial instruments and revisits statutory and case law through that lens.  It is that holistic, multi-disciplinary view that will provide the Court with a novel and unique perspective.

## PRELIMINARY STATEMENT

The correct resolution in this case starts with observing a simple fact: 21st century finance looks very different from 20th century finance. The securities laws were introduced to combat the information asymmetry problem; investors bought common stocks, which were expected to generate cash flows now (via dividends) or in the future, and to the extent material information was withheld from them, they couldn't make informed investment decisions.

While information asymmetry generally continues to exist in the context of cryptocurrencies, they pose a much different problem: cryptocurrencies are, for the most part, *not* cash flow generating assets. Thus, people cannot *invest* in them, they can just speculate on them. Against the backdrop of the SEC's main mission being investor protection, the question of what constitutes an investment in the first place is the threshold question that needs to be answered for a proper resolution of this case. In fact, this case is an invaluable opportunity for this Court to start establishing consensus on definitions. In any event, this fundamental difference between common stocks and cryptocurrencies makes it even more important for the overarching principle that led to the securities laws in the first place, *i.e.*, investor protection, to guide this case, not the mechanical details.

To the extent a cryptocurrency actually has a hope of achieving what the second half of the word implies, i.e., being a currency to facilitate commerce, the inquiry then shifts to weighing speculative intent against consumptive intent. Perhaps XRP is a multi-purpose tool, a speculative device for many and a quasi-currency that some derive utility from. Even if that is

presumed to be the case, the Court cannot throw the proverbial baby out with the bathwater unless the primary use case is consumption, not speculation. The evidence, as laid out in this brief, overwhelmingly points to XRP's main use case being speculation.

Crypto is like a chameleon engaging in regulatory arbitrage, branding itself as an asset when it wants to attract capital and appeal to "investors", but a currency when it faces regulatory scrutiny. This flip-flopping is not only disingenuous, but also improbable. The fundamental tension in crypto is that what makes it an appealing tool of speculation is precisely what makes it a bad currency; volatility. Even if the Court finds XRP is more of a currency and less a speculative asset proxy, that would make it an exception rather than the rule, and any ruling of that nature should be constructed narrowly to avoid significant harm to future speculators of crypto, who, in all likelihood, don't even realize that they are not investing in the first place.

## ARGUMENT

## I.     XRP "Investors" Need The Protection of the Securities Act.

### A.     The Needs of Today's Investors Are Very Different.

The Securities Act of 1933 ("the 1933 Act") and the subsequent foundation of the U.S. Securities and Exchange Commission ("SEC") in 1934 was largely a reaction to "abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).

According to congressional reports, in the decade after World War I, approximately

fifty billion dollars of new securities were floated in the United States, and half of them were worthless." Elisabeth Keller. "Introductory Comment: *A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934*." Ohio State Law Journal 49, (1988): 329-352, 334. Using an inflation calculator like https://www.in2013dollars.com/, it translates to approximately $867.9 billion today. Interestingly, that is fairly close to the global crypto market capitalization, which, according to https://coinmarketcap.com, was approximately $836 billion as of November 9, 2022. It appears that every hundred years or so, there is nearly $1 trillion worth of speculative desire that is looking for an opportunity.

A century ago, the asset that filled that speculative need was common stocks. Common stocks can obviously be an investment, but only *at the right price.* Tesla's closing price on November 9, 2022 was $177.59. *Tesla, Inc. (TSLA) Stock Historical Prices & Data*, available at https://finance.yahoo.com/quote/TSLA/history/. Assuming no material change in facts and outlook, it would likely be a terrible investment at $1,000, but a terrific one at $1. Investing, ultimately, is about estimating the value of an asset based on the cash flows it is expected to generate and buying it if the price is substantially lower than its value. Because reasonable people can agree to disagree on the intrinsic value of an asset in light of future uncertainty, the exact boundary where investing starts turning into speculation may be hard to pinpoint. Yet, it is clear that directionally, the cheaper cash flows can be bought, the closer a trade is to an investment than it is to speculation.

It was in this context why 20th century investors needed protection. "A fundamental purpose … was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*, and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963) (emphasis original). "Instead of utilizing

a system of merit regulation based on state law models, the Securities Act of 1933 … was drafted as a 'Truth in Securities' Act emphasizing public disclosure of material information as the primary mechanism for federal regulation of the securities markets." *David S. Ruder, Chairman, SEC, Before the 10th Annual Conference on Securities Regulation and Business Law Problems*, Austin, Texas, March 10, 1988, The Evolution of Disclosure Regulation, available at https://www.sec.gov/news/speech/1988/031088ruder.pdf.  34 years later, SEC Chair Gary Gensler concurred: "The Securities Act of 1933 was about companies raising money from the public. Investors could decide which risks to take; companies that issued securities to the public were required to provide full, fair, and truthful disclosures to the public. FDR called this law the 'Truth in Securities Act'" Gary Gensler, *Kennedy and Crypto*, Speech, Washington D.C., Sept. 8, 2022, available at https://www.sec.gov/news/speech/gensler-sec-speaks-090822.

The Securities Exchange Act of 1934 "covered intermediaries, such as the exchanges themselves and the broker-dealers. The basic idea was that the public deserves disclosure and protections not only when a security is initially issued, but also on an ongoing basis when the security is traded in the secondary markets." *Ibid*. "In drafting that Act Congress expressly relied on the premise that securities markets are affected by information, and enacted legislation to facilitate an investor's reliance on the integrity of those markets: 'No investor, no speculator, can safely buy and sell securities upon the exchanges without having an intelligent basis for forming his judgment as to the value of the securities he buys or sells.'" *Basic, Inc. v. Levinson*, 485 U.S. 224, 245-46 (1988) (internal citations omitted).[1]

---

[1] It is worth noting that the Supreme Court recognized that purchasers of common stocks can be investors or speculators, a distinction that is largely forgotten now. The focal point, naturally, was information, which, once fully and fairly disclosed, could form the basis for informed decisions in which traders could choose to be an investor or a speculator.

Today, the flashy financial vehicle is cryptocurrencies. Standing alone, practically none of them generate cash flows.[2] What was until recently a fairly standard tenet of finance, that investing is all about cash flow generating assets, seems to be lost in the cryptocurrency frenzy. The legendary investor Benjamin Graham astutely observed right around the time when the 1933 Act was passed: "An investment operation is one which, upon thorough analysis, promises safety of principal and a satisfactory return. Operations not meeting these requirements are speculative." *Security Analysis: The Classic 1934 Edition*, Benjamin Graham and David L. Dodd, Mc-Graw Hill (1934), at 54. Investing, then, comes with a threshold requirement that the asset needs to generate cash flows. Once that threshold condition is satisfied, *and only then*, rigorous research will produce a value estimate, and an investment decision can be made. Investing, in other words, involves two separate considerations, both what type of asset is being bought *and* at what price. Ultimately, investing is buying a cash flow generating asset at the right price.

The buying decision is not one that the investor makes in a vacuum; rather, the investor estimates, thoroughly, the value of those cash flows given all available information. Then, the investor would buy the asset only if there is sufficient *margin of safety*, *i.e.*, if the price is sufficiently lower than the value estimate. Coupled with the option to diversify, a low price acts as a safety valve against inherent uncertainty of the future as well as potential errors in estimating the value. Exacerbating this uncertainty with dishonesty was unfair to investors, so Congress stepped in and mandated full and fair disclosure so investors could then make their decisions accordingly. This setup does not preclude anybody from speculating if they wish to do

---

[2] Staking contracts denominated in cryptocurrencies can obviously generate cash flows. But that is no different from USD generating cash flows when it is lent to a counterparty in exchange for interest as part of a loan or bond. In both cases, it's the lending arrangement with the counterparty that gives rise to the cash flows, not the denomination in which staking or borrowing happens.

so. For example, any trader can buy without regard to value and instead try to estimate the direction of the price, but with the 1933 Act, investors knew they had the comfort of knowing that there are mechanisms in place to ensure that they have full and fair disclosure and they are not being taken advantage of.

To be clear, the information asymmetry problem is not necessarily irrelevant in the context of cryptocurrencies, either. In *Telegram*, this Court sided with the SEC, which successfully argued that "unless Telegram is enjoined from providing them Grams, will soon engage in a distribution of Grams in the public market, whose participants would have been deprived of the information that a registration statement would reveal." *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 358 (S.D.N.Y. 2020). However, the overarching issue for 21st century finance is very different; large amounts of capital are going to vehicles that are not designed to generate cash flows, despite trading side by side with equities. Thus, the 20th century problem of information asymmetry continues; crypto purchasers may still not be able to make informed decisions, if they are denied material information. However, there is a new problem, and that one appears to be the primary one: the masquerading of speculation as investment.

The 21st century finance problem, then, is not the second half of the investment puzzle, which is at what price the asset is being purchased (relative to its intrinsic value, which depends on information that would have not been equally dispersed among market participants in the absence of the securities laws), but it is the threshold determination of what type of asset is being purchased in the first place. Acknowledging this subtle but critical difference is necessary in reaching a successful resolution of any crypto case, including this one.

**B.      XRP is A Speculative Tool Powered By the Greater Fool Theory.**

People respond to incentives. When Bitcoin's price appreciated from a few dollars to tens of thousands of dollars in a matter of a few years, it was inevitable that thousands of other coins would try to capitalize on the speculative mania (not dissimilar to the Dutch Tulip Mania of the 1630's on the demand side, but even more dangerous on the supply side; one cannot artificially create 20,000 flowers out of thin air, but one can create 20,000 digital coins). Nobody buys cryptocurrency because they value the future cash flows (for the most part, there aren't any); rather, they buy them because they think they can sell them to somebody else for a higher price, dubbed in finance as the Greater Fool Theory.

Warren Buffett, arguably the greatest investor of the last half-century, often provides spectacular insights in this regard. Buffet's views on cryptocurrencies are solicited often, and in response to one, he contrasted cryptocurrencies with common stocks and similar assets: "The difference between productive assets and something that depends on the next guy paying you more than the last guy got." Warren Buffett, *2022 Berkshire Hathaway Annual Meeting*, available at https://buffett.cnbc.com/2022-berkshire-hathaway-annual-meeting/. Jim Cramer, the host of *Mad Money* on CNBC, erred in characterizing crypto as an investment, but was otherwise on target when he said: "As long as you recognize the very real possibility that the whole investment case for crypto rests on the **greater fool theory**, you've got my blessing to speculate on it." Jim Cramer, *Crypto's investment case may rest on the 'greater fool theory,'* available at https://www.youtube.com/watch?v=r7F15tlVUOQ. He was very honest as to why *he* owns Ethereum when he said: "I'm holding onto my Ethereum because I believe there could be millions of greater fools out there. I think that's a decent bet." *Ibid.*

The problem is that average investors do *not* realize that they are speculating. They think they are investing because that's the word that has been inaccurately used for so long that they have inadvertently accepted it as the norm. Speculation, in and of itself, is neither immoral nor unethical, but *selling* investment as speculation certainly is; that is what has been sold to novice investors and why they need protection. The current state of the crypto industry is, at best, an unfettered competition among 10,000 to 20,000 cryptocurrencies[3], and at worst, artificially created speculative opportunities to fill the nearly $1 trillion speculative pool looking for greater fools, which will end badly for speculators fancying themselves as investors, the same way it ended badly in 1929.

While federal securities laws are undoubtedly a substantial improvement over the blue sky laws of the state, with respect to one disclosure at least, they have taken a step back.  Under the blue sky laws, "[i]n some instances, securities with no record of earnings could be sold by issuers only with the express label: 'This is a speculative security.'" *See*, Elisabeth Keller, *"Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934."* Ohio State Law Journal 49, (1988): 329-352, 332 (internal citations omitted). Its disappearance was a real concern, memorialized contemporaneously by at least one prominent law school faculty member: "[T]he registration may show that the corporation has never had a record of earnings that will assure the payments of dividends or interest on the securities sold, unless the rosy hopes of promoters are realized, but such securities can be safely sold without fear of penalty, although they could never be sold in a State with a properly administered licensing act unless expressly labeled: 'This is a speculative security.'"

---

[3] The exact number of cryptocurrencies is unknown. One source claims that there are 20,268 cryptocurrencies as of July 2022, of which 10,953 are considered to be active. Josh Howarth, *How Many Cryptocurrencies Are There In 2022?* Available at https://explodingtopics.com/blog/number-of-cryptocurrencies.

*See*, John Tracy, *The New Federal Securities Act*, Mich. L. Rev., Vol. 31, No. 8 (Jun., 1933), pp. 1117-1124, 1123, available at https://www.jstor.org/stable/1281038. "Not even the most stringent of laws will protect people against *unfortunate investments*." Ibid, at 1124 (emphasis original).

Having the advantage of 90 years of hindsight, Professor Tracy's concern can be contextualized properly. His concern was valid, but ultimately an unworkable one because stocks can not be labeled as speculative *without reference to price*. As mentioned earlier in the context of Tesla, *see*, *supra*, p. 4, the act of purchasing a stock can be a fantastic investment at a low enough price, but largely speculative at a much higher price. These disagreements are what makes a market, "[t]he idea of a free and open public market is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings *[sic]* about a situation where the market price reflects as nearly as possible a just price." *Basic, Inc. v. Levinson*, 485 U.S. 224, 246 (1988) (internal citations omitted). The mere fact that a corporation never had earnings *in the past* does not necessarily make the stock speculative. It's all about earning power *in the future* and any stock can be a good investment insofar as the price it is being purchased for is lower than one's value estimate.

Professor Tracy's foresight, however, finds a true home in cryptocurrencies 90 years later. Provided that they don't generate cash flows, cryptocurrencies are *always* speculative. Therefore, any regulatory solution that falls short of such labeling would be to deny investors the protection they direly need. Defendants appear to want to turn back the clock to pre-1933, perhaps not realizing that what was common practice back then would result in them being expressly labeled as speculative.

Barring any showing of substantial consumptive intent for any specific cryptocurrency, cryptocurrencies are simply being used as asset proxies; not true financial assets, but speculative

10

tools with prices moving 24/7. Investors in assets that generate cash flows need the protection of the 1933 Act because they need to know that the information they are relying on is full and fair. Investors in assets that do not generate cash flows on the other hand, which is the case with substantially all cryptocurrencies, need the protection of the 1933 Act, because they need to understand they are speculating, not investing.

## C.    *Howey* Controls Through Fundamental Principles, Not Its Exact Mechanics.

The appearance of the phrase "investment contract" in the 1933 Act is not random. "The term … was common in state blue sky laws that existed prior to the adoption of the federal statutes." *See*, Maura K. Monaghan, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L. Rev. 2135, 2144 (1995), available at: https://ir.lawnet.fordham.edu/flr/vol63/iss6/6. *Howey* itself recognized this: "An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'" *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946), citing *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N.W. 937, 938 (1920).

"In defining the scope of the market that it wished to regulate, Congress painted with a broad brush." *Reves v. Ernst & Young*, 494 U.S. 56, 60 (1990). "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Id.*, at 61. *Howey,* certainly, is not in conflict with that view: An investment contract "embodies a flexible, rather than a static, principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

*Howey* remains the gold standard when it comes to cash flow generating assets. Its first and third prongs, investing money and expectation of profits are timeless and mimic pre-1933 cases like *State v. Gopher Tire*: placing of capital or laying out of money and securing income or profit from its employment. Those two prongs look at the economics from the investor side and are agnostic to *what* is being purchased.

*Howey*'s second and fourth prongs, "common enterprise" and reliance on "efforts of the promoter or a third party", on the other hand, focus on information disclosure and evaluate the non-investor (promoter or third party) behavior.[4] They are best understood as elements of fairness and transparency, but viewed through the lens of the 1940s and the dominant financial instruments at the time. Since information impacts cash flows and a full picture of cash flows are needed to make informed investment decisions, the focus is on "sunlight," which "is said to be the best of disinfectants." *See*, Louis Brandeis, *Other People's Money* (1914), at 92.

What if investors are buying something that is not designed to generate cash flows? As a threshold matter, they are not investors in this case, rather, they are speculators hoping to flip at a higher price, earning a profit. If that profit, albeit not driven by cash flows, is nevertheless impacted by information, information disclosure is needed to prevent information asymmetry and to provide protection. If there is potential of information being withheld from them, as was the case with *Telegram*, then they still need the protection of the 1933 Act and *Howey* applies. That does not mean, however, that *Howey* stops being relevant even if there is no information asymmetry problem.

The main teaching of *Howey*, then, is *not* that investors do not need protection unless all four prongs of Howey are satisfied. That would make it a static principle, precisely what it advised against. The main message of *Howey* is that investor protection depends on what the

---

[4] Analyzed this way, the best assessment of Howey seems to be that it has four prongs, not three.

investor is buying. Any asset that generates cash flows, almost by definition, implies that there may be material information out there that would have an impact on cash flows, thus leading to more informed investment decisions. Investors in that asset, by virtue of common sense fairness, need to know all that can be known regardless of whether they are buying on the primary or secondary market.

If an asset does not generate cash flows (in which case it is not a true financial asset in the first place), then the focus shifts, as it should, to arming the "investor" (speculator) with the disclosure that their only way out is to sell to somebody else. In other words, the key protection that the purchaser should obtain is the *knowledge* that the asset is not designed to generate income, only profit, and the only path toward profit is to find another speculating buyer.

### D. *Howey*, When Applied Broadly, Still Points to the XRP Scheme Being a Security.

Defendants are reading too far into the common enterprise element of the *Howey* test, nitpicking at every turn and misconstruing the true intent. These technicalities miss the broader point of what the "common enterprise" prong is truly meant to accomplish: addressing the potential inability of investors to fend for themselves.

Generally, there is strength in numbers, but in the case of securities, it is the opposite: there is weakness in numbers. *Mano a mano*, a potential investor generally knows that his incentives are in direct conflict with the counterparty and is prepared to handle the information asymmetry. Many-to-one investment settings, on the other hand, shift the balance of power to the short side of the transaction. "Requiring that an enterprise be 'common' seems designed to exclude one-on-one contracts, bargained for at arm's length." *See*, Maura K. Monaghan, *An Uncommon State of Confusion: The Common Enterprise Element of Investment Contract*

13

*Analysis*, 63 Fordham L. Rev. 2135, 2148 (1995), available at:

https://ir.lawnet.fordham.edu/flr/vol63/iss6/6. *See*, also, James D. Gordon III, *Common*

*Enterprise and Multiple Investors: A Contractual Theory for Defining Investment Contracts and*

*Notes*, 1988 Colum. Bus. L. Rev. 635 (1988).[5] "I have also argued that the *Howey* test, as

modified by the multiple investors definition of a common enterprise, is a meaningful test for

determining which promissory notes are securities, and that the Supreme Court essentially

adopted this test in *Reves v. Ernst & Young*." *Id.*, at 62.

　　It's not that information asymmetry does not exist in one-on-one transactions, it is the

fact that the buyer is generally well aware of this asymmetry and is prepared to close the gap

through robust due diligence. Such investors do not need the securities laws to do the work for

them.

　　The focus on arm's length behavior contextualizes the pooling considerations and

properly recasts it as an incidental byproduct, rather than a potential showstopper that could alter

broad characterizations of purported assets like cryptocurrencies[6], to the detriment of society and

create suboptimal outcomes relative to what securities laws are intended to do. "Horizontal

commonality is also overly exclusive in its unduly mechanical reliance on pooling, a formal

requirement that is largely irrelevant to the question of whether there is a special need for

enhanced disclosure." *See*, Maura K. Monaghan, *An Uncommon State of Confusion: The*

*Common Enterprise Element of Investment Contract Analysis*, 63 Fordham L. Rev. 2135,

2156-2157 (1995), available at: https://ir.lawnet.fordham.edu/flr/vol63/iss6/6. If *Howey* is truly

to be interpreted as the yardstick that looks at investment contracts in a flexible manner, the

focus should be on disclosure, not how investors come together. It is clear that the XRP holders

---

[5] Both Monaghan and Gordon take the position that the *Howey* test has four prongs.
[6] A cryptocurrency can be characterized as a digital asset, but that does not turn it into a *financial* asset. For the latter label to apply, cash flow generation is a prerequisite.

substantially outnumber the people who can materially influence its success, and in that sense, they are disadvantaged. It is that disadvantage that calls for the securities laws to step in to prevent unsuspecting investors being taken advantage of.

The starting point for the fourth prong is the acknowledgment that the sole profit opportunity from a crypto trade is a sale to someone else. Standing alone, cryptocurrencies do not generate income, so a "greater fool" needs to buy it. It is true that if the purchaser speculates on a use case to develop in the future, the next buyer may end up being not a fool per se, but somebody who actually derives utility from the purchase. But use case or not, profits can only be achieved if another buyer can be found.[7]

The main difference between common stock and crypto, then, is the impact of willingness of buyers on the price. It is true that a lack of buyers in the short term could depress the price in the near term, but it doesn't matter in the long run if the investor can weather the storm. In some ways, disagreeing with everybody else is the best way to realize returns from a stock trade provided that the investor is right; he will be able to acquire the stock at a more advantageous price and generate a higher return, either by generating income or through price appreciation, which is bound to happen eventually if there is high income potential and the market catches up to the facts. With crypto purchases on the other hand, the  purchaser is completely dependent on how others *feel* about the crypto. If nobody else likes it, the "investor" is out of luck.

Thus, it is well understood that the ability to market and promote crypto is critical, and that ability often does *not* lie in the crypto purchaser's hands. The decision makers in that ecosystem can often have a much larger impact on the price. It can also be another third party; a

---

[7] Thus, amici XRP Holders' argument, that "it took  Ripple over 6 years to find a 'use' for XRP and 8 years to make its first sale of XRP for 'its purported use.' ECF 674 at 45. No XRP holder could have a reasonable expectation of profits based on those efforts." is irrelevant. A use case is helpful, but not necessary for a crypto owner to realize a profit. Brief of *Amicus Curiae*, XRP Holders, at 26.

celebrity (which is why celebrity endorsements are common in the industry) or somebody like

Elon Musk who can broadcast their views into a large platform. It is no wonder why such

promotions, paid for or not, end up in litigation. *See*, *SEC Charges Kim Kardashian for*

*Unlawfully Touting Crypto Security*, available at

https://www.sec.gov/news/press-release/2022-183. *See*, also, Jonathan Stempel, *Elon Musk $258*

*billion Dogecoin lawsuit expands*, available at

https://www.reuters.com/markets/us/elon-musk-258-billion-dogecoin-lawsuit-expands-2022-09-

07/.

Thus, in the broad sense, an XRP "investor" is certainly dependent on the efforts of

others. In 21st century finance, that reliance can be, as it was the case in the last century, on the

managerial efforts of others, but that doesn't have to be the case. Instead, the *efforts of others* can

be as simple as a tweet. Or, as Matt Levine, the Bloomberg columnist and writer of the popular

*Money Stuff* newsletter puts it more colorfully: "The way finance works now is that things are

valuable not based on their cash flows but on their proximity to Elon Musk." Matt Levine, *Elon*

*Musk Picks the Money Now*, February 8, 2021, available at

https://www.bloomberg.com/opinion/articles/2021-02-08/elon-musk-works-his-magic-on-dogeco

in-and-bitcoin. He later called this theory, again colorfully, as the Elon Markets Hypothesis. Matt

Levine, *The Elon Markets Hypothesis*, February 10, 2021, available at

https://news.bloomberglaw.com/banking-law/matt-levines-money-stuff-the-elon-markets-hypoth

esis.

Simply put, when Elon Musk tweets, people listen. His tweets about Dogecoin are

presumably what led to the aforementioned $258 billion lawsuit in the first place. In another

tweet, Elon Musk simply said: "Use Signal," referring to a messaging app. "Investors'' got

confused (or perhaps rational speculators jumped on the bandwagon) and bid up the price of a completely unrelated publicly traded company, Signal Advance, Inc. As a result, Matt Levine commented on the impact of this tweet on the price of the company: "Signal Advance, Inc., a penny stock … soared 5,100% after Musk tweeted 'Use Signal.'"  Matt Levine, *Elon Musk Picks the Money Now*, February 8, 2021, available at

https://www.bloomberg.com/opinion/articles/2021-02-08/elon-musk-works-his-magic-on-dogecoin-and-bitcoin. Whether a third party promoting, or even simply mentioning a coin, constitutes a potential securities violation depends on facts and circumstances. However, the indisputable fact is that a third party other than the purchaser may have a material impact on the price.

**II.      Speculative Intent Far Outweighs Consumptive Intent.**

**A.      Crypto As a Currency is Largely a Failed Vision.**

It is quite possible that cryptocurrency genuinely desired to be an electronic payment system or potentially a better version of a fiat currency and that vision seems to have failed. The position of Aswath Damodaran, professor of finance at New York University's Stern School of Business is instructive. "A good currency, in my view, is one that's used to buy coffee, buy your house, buy a car, and on that count, Bitcoin has failed, and not just failed, it's failed miserably." Osato Avan-Nomayo*, Bitcoin has failed miserably as currency, says NYU's 'dean of valuation'*, June 30, 2021, available at

https://cointelegraph.com/news/bitcoin-has-failed-miserably-as-currency-says-nyu-s-dean-of-valuation.

It is conceivable that the Defendants could take the position that XRP is not Bitcoin and that it has a better chance of succeeding. The broader point, though, is that Bitcoin was promoted to a variety of investors as the future of digital currency, which may have very well prevented its

demise. When faced with regulatory pressure, Bitcoin gladly took on the currency moniker. At other times, when it needed to appeal to traders, the narrative shifted to Bitcoin being an investment opportunity. Crypto is like a chameleon engaging in regulatory arbitrage, branding itself as an asset when it wants to attract capital and appeal to "investors," but a currency when it faces regulatory scrutiny.

In that sense, the SEC, by seeing through the currency narrative would not be overreaching. If anything, in NSEI's opinion, it is underreaching, to the extent it is declaring that securities laws do not reach Bitcoin. *Howey* may or may not reach Bitcoin, depending on how expansively one deciphers it. That doesn't change the fact that Bitcoin, and most cryptocurrencies for that matter, are primarily used as an asset proxy with a speculative motive. A speculative device disguised as an investment, in turn, could imply that the SEC has jurisdiction. "Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

### B.   Market Behavior Is Strongly Indicative of Speculative Intent.

If XRP is truly a currency intended for consumptive use and everything else is incidental, why did Uphold, a crypto exchange send the following notification titled: "Top Trading Assets on November 1, 2022: '92%, 87% & 81% of customers trading XRP, XDC & DOGE last 24 hrs are buying'", followed by a fire emoji for added impact? No reasonable person who cares about the USD as a currency would care whether his fellow citizens are long or short the U.S. dollar when it comes to consumptive intent; the USD is legal tender, after all, and they can buy coffee with it, regardless of whether the dollar is appreciating or not. For an FX speculator, however,

that information has value, because it will move the *price*, offering the trader hope to lock in a speculative profit.

As of November 9, 2022, there are approximately 146,000 "watchers" of XRP on stocktwits.com, a website which describes itself as "the largest social network for investors and traders. Stocktwits is available at https://stocktwits.com/about/. A quick glance at the XRP feed (available at https://stocktwits.com/symbol/XRP.X) confirms what a reasonable person suspects; the vast majority of these people are not there to discuss how they are "consuming" XRP. They are there for speculation, plain and simple. Sample twits include: "greatest investment ever 0 doubt", "Remember our plan. We hold and get rich," and "sell on Sunday and buy on Wednesday."

That the main use case for cryptocurrency is speculation may be an inconvenient fact for Ripple *et al.*, and there is little doubt that's what it has become. XRP, arguably has more potential for consumption than the average cryptocurrency, but that doesn't say much. What really matters is whether the consumptive motive outweighs the speculative motive, which, in NSEI's opinion, it does not. The engagement of the average purchaser of XRP seems to be more driven by speculation and less by consumption, with crypto exchanges gladly capitalizing on that desire.

### C.     Consumptive Intent Is Miniscule Compared to the Overall Scheme.

The Defendants and their amici could point out to the more than 3,000 XRP purchaser affidavits and take the position that there is some XRP for investment use but its *primary* use is consumptive. Deceptively appealing at first glance based on the sheer number of affidavits filed by the XRP holders, this argument, however, does not hold up when evaluated through the lens

of basic math and common sense. As of November 9, 2022, there are approximately 241,000 holders of XRP. *CoinCarp, XRP/Richlist*, available at https://www.coincarp.com/currencies/ripple/richlist/. Thus, the number of filed affidavits indicate a little more than 1% of consumptive intent.

It is of course conceivable that not everybody who purchased XRP with a consumptive intent has filed an affidavit, thus 1% may be a conservative proxy for the purposes of measuring consumptive intent. That said, the universe of current XRP holders is so substantial that making that assumption less conservative is unlikely to change the conclusion that people that genuinely have a consumptive intent are simply a small portion of the overall purchaser pool. For example, even if one assumes, quite generously, that *everybody* in the putative class has a consumptive intent, approximately 75,000 people, that would still translate to less than one third of the entire XRP pool.

Defendants and their amici could argue that no matter the overall numbers, the consumptive intent still outweighs the speculative intent because there were *some* affidavits on record pointing to that conclusion, more so than those indicating speculative intent. That argument, too, would fail because it would be nothing more than a classic conflation of evidence of absence with absence of evidence. This is simply an *incentive* problem. Those who truly use XRP for consumptive intent derive utility from it, thus, they want Ripple *et al.* to win this litigation; therefore, they have an incentive to file an affidavit in this case. At the same time, holders of XRP who bought it for investment purposes have the *same* incentives: they also want Ripple *et al.* to win, because otherwise the price of XRP will very likely go down, making their "investments" less valuable. Thus, the dominant strategy for XRP speculators is to stay silent and not declare their true intent for the simple reason that declaring their true intent could lead the

Court to lean toward declaring securities laws have been violated, which would depress the price further. Once the coin is in the public's hands, a finding of a securities violation is neither good for the promoters *nor* the people that own the coin, regardless of whether it reached them lawfully. The proverbial "horse" has left the barn; closing the door now will certainly protect future investors, but it will not do much for the current owners of XRP.

**III.      The Court Should Take The Long Term View.**

While it seems unlikely that the court will find sufficient consumptive intent, if it does, then at a minimum, we urge the Court to differentiate XRP from other cryptocurrencies to prevent an all-sweeping generalization that could incentivize future buyers to own crypto under the guise of investment. Declaring that the XRP scheme is not an offer or sale of securities would give investors a false sense of security in that they would think purchases of crypto are on par with equity transactions when they are not.

An analogy from real life could be a helpful reference point in understanding the involved parties' motives and help the court develop a proper resolution. We respectfully ask the Court to consider the following hypothetical scenario that we call the "Crypto Intersection":  A careless driver enters an intersection after the yellow light turns red, another car who is driving well above the speed limit recklessly crashes into him because the cops have not yet had a chance to pull him over for a speeding violation. There are three ways this accident could have been prevented: a careful driver would have slowed and stopped at the traffic lights, playing it safe and avoiding putting themselves in a position of danger; or, the crashing car could have observed the speed limit, or the police could have pulled over the speeding car before he reached the intersection.

Similarly, the careless driver that runs the yellow light is a speculator who thinks he is investing (investing is all about margin of safety, after all), the speeding car is the broader crypto community that markets speculation to the masses as investing and the cop is the SEC. It is not exactly an unfair point that the "rules of the road" have not fully developed for the novel crypto industry, but to lay the blame on the SEC under the guise of the fair notice defense simply misses the main point: provided that there are no cash flows, one cannot *invest* in crypto in the first place. *See*, *e.g.*, Aswath Damodaran, *The Bitcoin Boom: Asset, Currency, Commodity or Collectible?* Musings on Markets, October 24, 2017, available at

https://aswathdamodaran.blogspot.com/2017/10/the-bitcoin-boom-asset-currency.html ("You don't invest in Bitcoin, you trade it: Since you cannot value Bitcoin, you don't have a critical ingredient that you need to be an investor.") In essence, true investor protection requires establishing a consensus on the word "investing."

In resolving this case, we urge the Court to look a step further than what occurred at this particular intersection, and consider what expectations it might create with this ruling. A ruling that goes against Ripple *et al.* may very well harm current holders of XRP. On the flip side, a finding that the overall scheme was not a securities offering or sale will likely be perceived as carte blanche that crypto is a legitimate investment vehicle. The unintended, yet significant consequence will be even more people buying crypto thinking they are investing when they are actually just speculating that their coin will somehow reach widespread adoption and become a winner. For a handful of them, that may turn out to be the case. It is also conceivable that a few cryptocurrencies will prove to have utility, as a currency or otherwise. For the remaining 10,000 to 20,000 currencies (nobody really knows how many exist), they are likely to become worthless.

At the turn of the 20th century, Congress estimated that half of the stocks were worthless. *See*, *supra*, pp. 3-4. The crypto industry has the potential to make that failure ratio pale in comparison. In fact, if one takes the industry estimate of approximately 10,000 inactive coins at face value, *see, supra*, footnote 3, it would indicate that half of the crypto instruments are *already* worthless. Given the inconvenient fact that no intrinsic value exists for cryptocurrencies in general, and use cases are still being developed, the unavoidable conclusion is that most of the remaining coins are *bound* to fail.[8]

In any event, large swaths of capital will shift back and forth from stocks and other productive assets (as we have already witnessed, even these last couple of weeks) to crypto in the hopes of finding (or creating) the winners, and that, in and of itself, is a net loss for America without proper protection. Thus, at a minimum, if this Court decides that XRP's primary use was consumption, not speculation, it should make clear that the ruling is based on specific facts, to avoid generalizations to all cryptocurrencies.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the SEC's motion for summary judgment, while also clarifying the definition of "investment" and affirmatively state that assets which do not generate cash flows should not be marketed, promoted or sold as investments.

---

[8] FTT, the token native to the crypto exchange FTX and one of the higher profile cryptocurrencies, has lost 80% of its "value" on November 8, 2022, after rival Binance announced its plans to acquire FTX. MacKenzie Sigalos, *FTX's token plunges 80% on liquidity concerns, wiping out over $2 billion in value*, November 8, 2022, available at https://www.cnbc.com/2022/11/08/ftxs-ftt-token-plunges-80percent-wiping-out-over-2-billion-in-value.html. After falling to $5 the day before, it fell again by more than half to $2.30 after Binance called the deal off. MacKenzie Sigalos and Kate Rooney, *Binance backs out of FTX rescue, leaving the crypto exchange on the brink of collapse*, November 9, 2022, available at https://www.cnbc.com/2022/11/09/binance-backs-out-of-ftx-rescue-leaving-the-crypto-exchange-on-the-brink-of-collapse.html.

Dated:  November 10, 2022                                    Respectfully submitted,


                                                    By:   _____


                                                        Scott D. Brenner, Esq.
                                                      Parlatore Law Group, LLP
                                                 One World Trade Center, Suite 8500
                                                         New York, NY 10007
                                                     Telephone: (212) 603-9918
                                                 scott.brenner@parlatorelawgroup.com
                                                       *Attorney for Amicus Curiae*