**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

      v.

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                Defendants.

Case No. 1:20-cv-10832-AT-SN

---

**BRIEF OF *AMICUS CURIAE* VALHIL CAPITAL, LLC**
**IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

George Mastoris
Kerry Donovan
Thania (Athanasia) Charmani
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY
(212) 294-6700
gmastoris@winston.com
kcdonovan@winston.com
acharmani@winston.com

Brandon Duke
WINSTON & STRAWN LLP
800 Capitol Street, Suite 2400
Houston, TX 77008
(713) 651-2600
bduke@winston.com

Jeffrey L. Steinfeld
(*pro hac vice application forthcoming*)
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
(213) 615-1700
jlsteinfeld@winston.com

*Counsel for Amicus Curiae Valhil Capital, LLC*

## TABLE OF CONTENTS

**Page**

INTEREST OF AMICUS CURIAE ................................................................... 1

ARGUMENT ................................................................................................... 2

I. XRP Is a Virtual Currency with Unique Utility and Is Not a Security ...................................... 2

    A.   XRP Serves a Unique Function in the Digital Economy Because of Its Interoperability and Efficiency ....................................................... 3

    B.   Valhil Relies on XRP for Its Operations and Management of Its Portfolio ................... 5

    C.   The SEC Lacks Clear Authority to Regulate Digital Currencies and the SEC Efforts to Regulate XRP Have Harmed Holders and Users of Digital Currencies, Like Valhil .......................................................................... 8

II. Market Participants Have Operated on a Good-Faith Belief that XRP Is a Currency ........... 11

    A.   The Department of Treasury Determined that XRP is a Virtual Currency.................... 11

    B.   SEC and Other Government Officials Confirm that XRP Cannot Constitute a Security ................................................................................... 12

CONCLUSION ............................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
141 S. Ct. 2485 (2021)........................................................................................8

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..........................................................................................11

*Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*,
493 F. Supp. 499 (S.D.N.Y. 1980) .....................................................................9

*Gugick v. Melville Capital LLC*,
No. 11-CV-6294 (CS), 2014 WL 349526 (S.D.N.Y. Jan. 31, 2014)....................8

*Hart v. Pulte Homes of Michigan Corp.*,
735 F.2d 1001 (6th Cir. 1984) ...........................................................................7

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005)..........................................................................................10

*Merrill Lynch, Pierce, Fenner & Smith v. Curran*,
456 U.S. 353 (1982)............................................................................................9

*Murr v. Wisconsin*,
137 S. Ct. 1933 (2017)......................................................................................11

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922)..........................................................................................10

*Penn Cent. Transp. Co. v. New York City*,
438 U.S. 104 (1978)..........................................................................................11

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)..................................................................................... *passim*

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975)........................................................................................2, 7

*Util. Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014)............................................................................................8

*West Virginia v. EPA*,
142 S. Ct. 2587 (2022)....................................................................................8, 9

**Statutes**

7 U.S.C. § 2...................................................................................................................9

**Other Authorities**

David Schwartz, *The Environmental Impact: Cryptocurrency Mining vs.
    Consensus*, Ripple.com (July 8, 2020),
    https://bit.ly/3SSyHGp.................................................................................5

Director William Hinman, Digital Asset Transactions: When Howey Met Gary
    (Plastic) (June 14, 2018),
    https://www.sec.gov/news/speech/speech-hinman-061418.............................13, 14

France and Sweden. Press Release, *Ripple Continues European Expansion,
    Bringing the Benefits of On-Demand Liquidity to France and Sweden*
    (Oct. 11, 2022),
    https://bit.ly/3N9R20p ..................................................................................3

Chris Giancarlo, Cryptocurrencies and US securities laws: beyond bitcoin and
    ether, IFLR,
    https://www.iflr.com/article/2a644yk131snh9bzqpou8/cryptocurrencies-and-
    us-securities-laws-beyond-bitcoin-and-ether  ..................................................15, 16

Ripple, Q3 2022 XRP Markets Report, https://ripple.com/insights/q3-2022-xrp-
    markets-report/ ..............................................................................................7

Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws To Cater To
    Cryptocurrencies*, CNBC (June 6, 2018),
    https://cnb.cx/3Wv4WP0................................................................................13

Letter from Jay Clayton to Ted Budd (Mar. 7, 2019),
     https://coincenter.org/files/2019-03/clayton-tokenresponse.pdf.........................14

Letter from Prof. Joseph A. Grundfest, Stanford Law School, to Hon. Jay Clayton,
    Chairman, SEC (Dec. 17, 2020),
    https://bit.ly/3sHJxUX ..................................................................................10, 11

Libby George, *Emirates plans to reduce Nigeria service due to trapped revenue*,
    REUTERS (Aug. 1, 2022), https://reut.rs/3DmImiJ..............................................3

Nimi Princewill, *Emirates airline suspends all flights to Nigeria as it struggles to
    repatriate funds*, CNN (Aug. 19, 2022),
    https://cnn.it/3gWIcXJ ..................................................................................3

*Ripple and FINCI Introduce the Benefits of On-Demand Liquidity to Lithuania*,
    Fintech Finance News (May 19, 2022), https://ffnews.com/newsarticle/ripple-
    and-finci-introduce-the-benefits-of-on-demand-liquidity-to-lithuania/....................3

S. Rep. No. 95-850 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2087, 2101 ..................................9

Sarah Tran, *Bitcoin is 57,000 Times Less Environmentally Friendly Than the
    "Green Cryptocurrency" XRP, Says Ripple* (July 9, 2020),
    https://bit.ly/3WicFjf;................................................................................................................5

U.S. Securities and Exchange Commission, Framework for "Investment Contract"
    Analysis of Digital Assets, modified April 3, 2019, available at
    https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-
    assets ....................................................................................................................................7, 14

## INTEREST OF AMICUS CURIAE

Valhil Capital, LLC is a private equity firm based in Houston, Texas, which owns a portfolio of early-stage companies, brands, and alternate asset classes.  Valhil's business model is centered around promoting innovation and unlocking unrealized potential in emerging economies, primarily using blockchain technology and digital assets.  *See* James Vallee Affidavit ("Vallee Aff.") ¶ 3.  XRP plays a critical role in the operation and management of Valhil's portfolio.

As a participant in the digital assets market and an entity that uses XRP in its daily operations and investments, Valhil has a significant interest in the outcome of this action and can offer the Court a practical perspective on the numerous use-cases of XRP.  As an initial matter, Valhil compensates its executives in XRP and its portfolio investments maintain their excess cash in digital assets, including XRP.  *See id.* ¶ 5, 6.  Further, given XRP's determinative role in the emerging digital economy, Valhil has focused its resources and portfolio on companies and investments that utilize XRP's unique consumptive attributes.  Thus, Valhil has major investment projects, both domestic and international, that are premised and dependent on XRP and the XRP Ledger ("XRPL").  *See id.* ¶ 7.

Valhil is also well-suited to describe the perspective of market participants regarding the drastic shift in the regulatory landscape applicable to XRP.  Valhil and other market participants specifically relied on guidance from federal agencies and officials (including officials at the Securities and Exchange Commission ("SEC")) in forming and acting upon a good-faith belief that XRP, consistent with its apparent function, enjoys legal status as a currency.  Until the SEC filed this lawsuit, the information provided by the government to the market heavily favored the considered view that XRP is a virtual currency and not a security within the SEC's regulatory purview.  In reversing course, the SEC has created uncertainty in the market regarding XRP's

designation as a digital currency where none existed and threatened the increasing utilization of a digital currency that promises to exponentially improve the speed, efficiency, and certainty of financial transactions the world over.  This unwarranted action by the SEC has clouded the title of XRP users and holders in the United States and throughout the world.  Should the SEC be allowed to convert these digital currencies into securities, such regulation would go too far and be tantamount to a taking without due process or just compensation.

## ARGUMENT

**I.**     **XRP Is a Virtual Currency with Unique Utility and Is Not a Security**

From Valhil's position as a market participant, XRP's functionality and consumptive use cases make it an indispensable digital asset that bears none of the hallmarks of a security subject to regulation by the SEC under the Securities Act.  *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–300 (1946); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852–53 (1975) ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased … the securities laws do not apply").  As detailed below, XRP plays a fundamental role for the central banking system in improving cross-border payments (primarily because of its interoperability), as well as increasing efficiency of peer-to-peer payments at the micro level (because it is energy-efficient, faster and more cost-efficient than other virtual currencies).  And because of XRP's unique functions as a digital currency, Valhil relies on its ability to use XRP as a critical component of its operations and management of its assets.[1]

---

[1] The parties and other amici have extensively briefed whether the terms "security" and "investment contract," as defined under the U.S. securities laws, can be extended to include XRP and other digital currencies under *Howey* and its progeny.  Instead of duplicating those arguments, Valhil focuses its arguments on the practical considerations of market participants and users of XRP, a perspective that has not been fully represented and may help inform the Court's consideration of the pending motions for summary judgment.

A.     **XRP Serves a Unique Function in the Digital Economy Because of Its Interoperability and Efficiency**

XRP occupies a unique role in the digital economy ecosystem as it primarily serves as a wholesale payment method among central banks and large financial institutions.  XRP is used as a settlement mechanism among central banks, eliminating the need for nostro/vostro accounts that require the maintenance of enormous amounts of fiat currency in reserve to settle trillions of dollars' worth of transactions every day.   Under that legacy system, cross-border payments are particularly challenging for payment service providers and small and medium-sized enterprises, as they are required to maintain large prefunding accounts that serve only to trap capital.[2] Ripple's On-Demand Liquidity transforms this burdensome process and delivers instant and cost-effective retail remittances and business-to-business payments leveraging XRP for crypto-enabled cross-border payments.[3]  For market participants like Valhil, central banks, and others, XRP's use as a settlement mechanism eliminates the need for central clearinghouses, freeing up capital, and reducing the complexity, time constraints, and significant transaction costs imposed

---

[2] The "trapped capital" problem has become particularly acute for even the largest international corporations making cross-border payments.  For example, airlines like Emirates are in the process of—or considering—canceling routes to Lagos, Nigeria because Nigeria was holding onto huge amounts of revenue belonging to foreign air carriers. *See* Nimi Princewill, *Emirates airline suspends all flights to Nigeria as it struggles to repatriate funds*, CNN (Aug. 19, 2022), https://cnn.it/3gWIcXJ.  As of June 2022, nearly $450 million in revenue belonging to foreign carriers was trapped in Nigeria. *See id.*  As of July 2022, Emirates alone had "$85 million stuck in the country," as a result of funds being blocked by the Nigerian government. *See* Libby George, *Emirates plans to reduce Nigeria service due to trapped revenue*, REUTERS (Aug. 1, 2022), https://reut.rs/3DmImiJ.

[3] Ripple recently announced a partnership with FINCI, the Lithuanian online international money transfer provider, to provide such services and enable FINCI's customers to make seamless payments between Europe and Mexico while eliminating the need for FINCI to pre-fund accounts abroad, giving them the opportunity to return capital into their businesses. *Ripple and FINCI Introduce the Benefits of On-Demand Liquidity to Lithuania*, Fintech Finance News (May 19, 2022), https://bit.ly/3WaUls8.  Ripple has also announced similar partnerships with companies in France and Sweden. Press Release, *Ripple Continues European Expansion, Bringing the Benefits of On-Demand Liquidity to France and Sweden* (Oct. 11, 2022), https://bit.ly/3N9R20p.

by the legacy banking system.

Further, by reducing these barriers, smaller customers and emerging economies can also turn to XRP to fund financial ecosystems that have been traditionally excluded from the banking system, such as trading in goods and services by individuals in emerging economies. For example, in certain regions of Africa, individual farmers trade their products in exchange for phone points (a system not unlike airline miles). Using XRP, such individuals can find new customers and play an increased role in the global economy even without access to a bank account. XRP provides for a more efficient payment structure than traditional currency, thereby opening access to previously disempowered groups, by enabling users to make small, fractional, and even micro payments without the need for intermediaries, fees, or bureaucracy.

The key feature of XRP that makes this feasible is the interoperability of the XRPL—XRP's associated decentralized and public blockchain ledger—with other digital currencies and assets. Each of the many digital currencies currently in circulation exists within its own specific network and operates pursuant to its own specific protocol, such as proof-of-work, proof-of-stake, or consensus protocols. Because of these network-specific attributes, many digital currencies cannot communicate value from one protocol to another when they involve digital assets different from the "native value-transmitting asset." Just like when a native English-speaker tries to converse with a native Japanese-speaker (neither of whom knows the other's language), the language protocols are simply not compatible—or "interoperable," as that term is used in the digital-asset sector.

Unlike other networks, however, the XRPL is interoperable with other network protocols supporting other digital currencies and assets—the value of items tokenized in XRP can be converted into value on another network protocol that utilizes a different digital asset currency.

XRPL's interoperability significantly enhances overall liquidity in the broader currency and asset markets because a user may utilize a wide range of assets to transact business on the XRPL blockchain (so long as the value of any such asset can be denominated digitally).  In this way, XRP and the XRPL help form a bridge between financial networks and individuals who do not have the capacity to participate in the traditional financial system by providing access to the digital economy through a mobile phone, making peer-to-peer transactions of different assets possible within seconds.

### B.  Valhil Relies on XRP for Its Operations and Management of Its Portfolio

Valhil's use of XRP instead of other digital currencies is driven by pragmatic concerns. According to Ripple's CTO, XRP is approximately 57,000 times more energy-efficient than Bitcoin.[4]  XRP transaction costs are significantly less than those associated with other virtual currencies, resulting in significant material savings for the company.  And, perhaps most importantly, XRP is fast: transactions are settled within five seconds, as opposed to more than an hour for Bitcoin and more than two minutes for Ether.  Because of these characteristics, Valhil has integrated XRP in its day-to-day operations and portfolio management.  *See* Vallee Aff. ¶ 4.

From a treasury function, Valhil implemented a policy in April 2020 that the firm and each of its portfolio companies would be required to maintain all "excess cash" (i.e., cash not needed for "fiat dollar-denominated" payables within the forward 30 days) in XRP.  *See* Vallee Aff. ¶ 5.  On average, this amounted to approximately 80% of cash and cash equivalents on a

---

[4] Sarah Tran, *Bitcoin is 57,000 Times Less Environmentally Friendly Than the "Green Cryptocurrency" XRP, Says Ripple*, Blockchain.News (July 9, 2020), https://bit.ly/3WicFjf; *see also* David Schwartz, *The Environmental Impact: Cryptocurrency Mining vs. Consensus*, Ripple.com (July 8, 2020), https://bit.ly/3SSyHGp ("[N]ot all blockchains are made equally. For example, for every 1 million transactions, XRP could power 79,000 lightbulb hours. In contrast, for every 1 [million] transactions, Bitcoin could power 4.51 billion lightbulb hours. This means that the energy consumption of XRP [i]s 57,000x more efficient.").

consolidated basis being maintained in XRP.  *Id*.  Additionally, at the request of the individuals, Valhil compensates its executives and one of its portfolio company CEOs in XRP, many of whom use XRP for everyday activities, such as purchasing groceries or gas.  *See* Vallee Aff. ¶ 6.

Valhil has also invested significant capital in projects premised on XRP's functionality as a digital currency.  For example, one of Valhil's most significant investments is in its portfolio company Deltawave Energy.  *See id*. ¶ 8.  Deltawave is among the first transparent carbon-accounting protocols to harness digital-asset blockchain technology for use in the oil and gas industry.  *See id*. ¶ 9.  Deltawave is currently valued at approximately $50 million and seeks to create an operating system that substantially streamlines the oil and gas supply chain by matching the distribution and allocation of value to the various stakeholders across the industry (e.g., operators, working interest holders, royalty interest owners, service providers, taxing authorities, and others) to the actual physical flow of hydrocarbons through natural-gas distribution systems.  *See id*. ¶ 10.  Deltawave will provide an automated carbon-emissions analysis service accelerating the energy sector's transition to an "on-chain" carbon economy, ultimately making it easier to build a more sustainable, carbon-neutral energy industry.  *See id*. ¶ 11.  Deltawave will also include an ESG ("environmental, social, and governance") carbon-tracking component.  *See id*.  And one of the core advantages of Deltawave is that it will accelerate payments sent and received among the various stakeholders to near real-time.  *See id*. ¶ 12.  These transactions and carbon accounting rely on XRP to provide instant and cost-efficient settlements and will be recorded on the XRPL blockchain, rendering the records of those transactions auditable, immutable, and secure.  *See id*. ¶ 13.  Relying on XRP, Deltawave is projected to reduce operating costs for back-office accounting and administrative expenses by up to 40%.  *See id*. ¶ 14.

Valhil's integration of XRP in its day-to-day operations, as well as its XRP-related projects and investments, are premised on XRP and XRPL's functionality as a virtual currently that can effectuate payments in a speedy and cost-efficient way and are in no way dependent on Ripple's efforts. *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975) ("when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply"); *see also* SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (stating that the *Howey* test is "less likely met" when, inter alia, "[the] virtual currency,. . .can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.). Importantly, XRP's uses and their implantation are not only independent of Ripple's efforts at a practical level, but Valhil has never operated under the assumption that Ripple's operations are in any way integral to XRP's functionality. This was the case for XRP at the time of its launch and it is certainly the case today, given the level of decentralization of XRPL at this stage of its lifecycle.[5]

Indeed, Valhil has no legal relationship with Ripple, no expectation of profit based on Ripple's performance as an entity, and none of its projects or investments involve any direct interests in Ripple. This alone is fatal to the SEC's position. *See*, *e.g.*, *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004-05 (6th Cir. 1984) (concluding that given the absence of a contractual relationship between the real estate developer and purchasers of model homes, there was no common enterprise with expectation of profits from the efforts of others under *Howey*

---

[5] This belief is in line with the fact that as disclosed in Ripple's Q3 2022 XRP Markets Report, across Ripple's various wallets, the amount of XRP held is now below 50Bn or 50% of the total outstanding supply. *See* https://ripple.com/insights/q3-2022-xrp-markets-report/; *see also* https://www.coinbase.com/price/xrp#:~:text=The%20current%20circulating%20supply%20is%2050%2C232%2C406%2C634%20XRP (stating that as of November 17, 2022, the current circulating supply of XRP is 50,232,406,634).

where "even assuming that individual purchasers were assured of development, nothing in the pleadings suggests that the fortunes of individual purchasers were 'inextricably intertwined' by contractual or financial arrangements"); *Gugick v. Melville Capital LLC*, No. 11-CV-6294 (CS), 2014 WL 349526, at *4 (S.D.N.Y. Jan. 31, 2014 ("Strict vertical commonality requires that 'the fortunes of plaintiff and defendants are linked so that they rise and fall together.")).

**C.     The SEC Lacks Clear Authority to Regulate Digital Currencies and the SEC Efforts to Regulate XRP Have Harmed Holders and Users of Digital Currencies, Like Valhil**

Congress has not clearly authorized the SEC's encroachment into the digital currency market, which (unlike the securities market) is based on the concept of decentralization and does not give rise to concerns regarding informational asymmetries between investors and the entity issuing the relevant asset.  As the Supreme Court recently confirmed, there are "extraordinary cases in which the history and the breadth of the authority that the agency has asserted and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2595, 2609 (2022).  The Supreme Court emphasized that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line."  *Id.*  ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.); *see also Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (cleaned up); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021) ("The sheer scope of [the agency's] claimed authority. . . would counsel against the Government's interpretation.").

8

In the Commodity Futures Trading Commission Act, Congress specifically entrusted the Commodity Futures Trading Commission ("CFTC") with "*exclusive jurisdiction* [over] transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated . . . or any other board of trade, exchange, or market, and transactions." 7 U.S.C. § 2 (emphasis added). As the Supreme Court has explained, the purpose of this exclusive jurisdiction of the CFTC was to "separate the functions of the [CFTC] from those of the Securities and Exchange Commission and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 386 (1982); *see also Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 493 F. Supp. 499, 503 (S.D.N.Y. 1980) (noting that the provision was "intended to oust other federal agencies, such as the Securities Exchange Commission, of jurisdiction over commodities transaction").[6]    XRP bears none of the characteristics of a security, and, like every other currency, it has real-world consumptive uses that preclude its categorization as a security. Accordingly, this Court should "hesitate" before allowing the SEC to expand its authority and begin regulating commodities markets that never have and simply do not fall within its purview. *West Virginia*, 142 S. Ct. at 2612–13.

And here, a ruling embracing the SEC's position that XRP—and by extension, other virtual currencies bearing similar characteristics—constitute "securities" or "investment contracts" would have tremendous implications for the digital economy and the entities and individuals that rely on XRP and other virtual currencies for their operations and transactions.

---

[6] Further, a Congressional report regarding the exclusive-jurisdiction provision stated that the CFTC was "created in order to assure that a single expert agency would have the responsibility for developing a coherent regulatory program encompassing futures trading and related activities" and the jurisdictional delineation was meant to "build upon the foundation provided by the Commodity Exchange Act in erecting a sound and strong Federal regulatory policy governing futures trading." S. Rep. No. 95-850 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2087, 2101.

Indeed, a determination by the Court that XRP is a security notwithstanding its consumptive uses would severely prejudice Valhil, materially and adversely impacting the value of Valhil and its portfolio companies that seek to make use of XRP.

As Prof. Joseph A. Grundfest of Stanford Law School (also a former SEC Commissioner) explained to the SEC before it initiated this action against Ripple:

> [S]imply initiating the action will impose substantial harm on innocent holders of XRP, regardless of the ultimate resolution.  Upon learning of the proceeding, intermediaries will cease transacting in XRP because of associated legal risk. The resulting reduction in liquidity will cause XRP's value to decline . . . . Given the significance of liquidity to the XRP market, the withdrawal of intermediaries will most likely cause billions of dollars of losses to innocent third-party holders.[7]

Prof. Grundfest added that this litigation "presents a material risk that, by resolving the narrow case and controversy before it," this Court may "inadvertently rule in a manner that generates collateral consequences adverse to the nation's long-term interests."[8]

Should this Court allow the SEC to regulate XRP as a security (an authority that it would not otherwise have), the magnitude of the economic impact and the degree of interference with the assets of third parties who reasonably expected that XRP was not a security would be tantamount to a regulatory taking of private property.  *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("if regulation goes too far it will be recognized as a taking")*; Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005) (noting that the "primary" factors in assessing a "regulatory taking" are "the economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations") (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).  Indeed, as Prof.

---

[7] Letter from Prof. Joseph A. Grundfest, Stanford Law School, to Hon. Jay Clayton, Chairman, SEC at 2 (Dec. 17, 2020), https://bit.ly/3sHJxUX.

[8] *Id.* at 4.

Grundfest recognized, the entities that would bear most of the burden of an adverse ruling in this action are innocent third-party holders and users of XRP, like Valhil.[9]

## II.     Market Participants Have Operated on a Good-Faith Belief that XRP Is a Currency

Valhil, like other market participants, conducted extensive due diligence before integrating XRP into its day-to-day operations and portfolio.  *See* Vallee Aff. ¶ 15.  A 2015 designation by the U.S. Treasury Department of XRP as a "virtual currency," as well as public comments by agencies and high-ranking CFTC and SEC officials, including former SEC Commissioner Jay Clayton, informed Valhil's good-faith belief that XRP is not a security.  Until the SEC filed this action in December 2020, market participants such as Valhil had no reason to believe that XRP—a virtual currency operating in a manner substantially identical to Bitcoin and Ether—would be deemed a security by the SEC, which had already explicitly stated that neither of those digital assets constitute securities.  Such reliance on the government's considered view that XRP is a currency (not a security) as expressed by these officials should also give this Court "reason to hesitate" before embracing the SEC's changed view.  *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).

### A.     The Department of Treasury Determined that XRP is a Virtual Currency

In a 2015 civil enforcement action, the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN") agreed that XRP is "a virtual currency" rather than a security.[10]

---

[9] *Id.* at 2.  As there is no basis for forcing XRP users to bear the significant costs of this regulatory change, just compensation would be required to account for the harm to their property.  *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017) (explaining that in regulatory takings cases, "the analysis must be driven by the purpose of the Takings Clause, which is to prevent the government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole").

[10]     FinCEN/Ripple Settlement Agreement, Statement of Facts at ¶ 17, https://www.fincen.gov/sites/default/files/shared/Ripple_Facts.pdf ("From at least March 6, 2013, through April 29, 2013, Ripple Labs sold convertible virtual currency known as 'XRP'").

Specifically, FinCEN had accused Ripple Labs of violating the Bank Secrecy Act by acting as a money services business and selling XRP without properly registering with the agency.[11]  The action resulted in a settlement in which FinCEN permitted the trading of XRP, stating that XRP is "a virtual currency."[12]  Valhil and other market participants reasonably relied on FinCEN's 2015 classification of XRP as a currency and acted with the understanding that it would not be effectively annulled by an SEC determination made years later.

### B.  SEC and Other Government Officials Confirm that XRP Cannot Constitute a Security

In addition to FinCEN's characterization of XRP as a virtual currency, numerous high-ranking CFTC and SEC officials have also advised the markets that digital assets structured and operating in a similar way as XRP are not securities and allowed market participants to operate in reliance on that understanding.  Specifically, several SEC officials have opined that Bitcoin and Ether and other virtual currencies bearing the same characteristics, such as XRP, are presumed to not be securities subject to the SEC's regulation.

For example, on June 6, 2018, then-SEC Chairman Jay Clayton described cryptocurrencies like XRP as replacements for traditional currencies in an interview with CNBC:

> Cryptocurrencies: These are replacements for sovereign currencies, replace the dollar, the euro, the yen with bitcoin . . . . ***That type of currency is not a security.*** A token, a digital asset, where I give you my money and you go off and make a venture, and in return for giving you my money I say "you can get a return" that is a security and we regulate that[.][13]

---

[11] *Id.* at ¶¶ 16-21.

[12] *Id*. at ¶ 17 ("From at least March 6, 2013, through April 29, 2013, Ripple Labs sold convertible virtual currency known as 'XRP.'").

[13] Kate Rooney, *SEC Chief Says Agency Won't Change Securities Laws To Cater To Cryptocurrencies*, CNBC (June 6, 2018) (emphasis added), https://www.cnbc.com/2018/06/06/sec-chairman-clayton-says-agency-wont-change-definition-of-a-security.html.

William Hinman, former Director of the SEC's Division of Corporate Finance, also publicly announced during his tenure with the agency that virtual currencies like XRP do not fall within the purview of the securities laws.  For example, on June 14, 2018, then-Director Hinman gave a speech discussing why a digital currency on its own "is not a security."  He explained: "Central to determining whether a security is being sold is how it is being sold and the reasonable expectations of purchasers."[14]  In connection with an Initial Coin Offering, while "[t]he digital asset itself is simply code," "the way it is sold" determines whether it is a security.[15]  Director Hinman added that this perspective:

> [A]lso points the way to when a digital asset transaction may no longer represent a security offering.  If the network on which the token or coin is to function is sufficiently decentralized—where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts—the assets may not represent an investment contract.  Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede.  As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful.[16]

Director Hinman pointed to Bitcoin and Ether as virtual currencies that do not bear the characteristics of securities and argued that confining them within the contours of the securities laws "would seem to add little value."[17]

Moreover, in March 2019, then-Chairman Clayton publicly endorsed Director Hinman's comments in a letter to Representative Ted Budd, including the assertion that Ether is not a security:

---

[14] Director William Hinman, Digital Asset Transactions: When Howey Met Gary (Plastic) (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.

[15] *Id.*

[16] *Id.*

[17] *Id.*

> I agree with Director Hinman's explanation of how a digital asset transaction may no longer represent an investment contract if, for example, purchasers would no longer reasonably expect a person or group to carry out the essential managerial or entrepreneurial efforts.  Under those circumstances, the digital asset may not represent an investment contract under the *Howey* framework."[18]

The SEC has also issued guidance that led the market participants to believe that XRP was not, and could be, viewed as a security by the Commission.  For example, in April 2019, the SEC's Strategic Hub for Innovation and Financial Technology released a "Framework for 'Investment Contract' Analysis of Digital Assets," (the "SEC Framework").[19] The objective of the Framework was to provide guidance "for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."  *Id*.  The SEC Framework explained that in assessing whether there is a reasonable expectation of profit derived from the efforts of others, federal courts should look to "the economic reality of the transaction," and consider "whether the instrument is offered and sold for use or consumption by purchasers."  *Id*.  The SEC Framework goes on to list several factors that would make the *Howey* test "less likely" to be met, including:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.
  
  \*\*\*

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  - This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

---

[18] Letter from Jay Clayton to Ted Budd (Mar.  7, 2019), https://coincenter.org/files/2019-03/clayton-tokenresponse.pdf.

[19] https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

*Id.* Valhil, and numerous other market participants, have been using XRP as a virtual currency, making micro-payments, compensating their executives, and investing in projects that were designed and developed for (and because of) XRP's and XRPL's functionality as a substitute for fiat currency in paying for goods and services. *See supra* at 5–9.

Additionally, Chris Giancarlo (former Chair of the CFTC), has argued that Ripple Labs has not violated any U.S. securities laws or regulations because XRP is not a security.[20]  Writing in the *International Financial Law Review*, Chair Giancarlo and his co-author explained that XRP, the third-largest virtual currency by market capitalization, is essentially indistinguishable from the two largest virtual currencies, Bitcoin and Ether, which the SEC has recognized are not securities:

> Much like bitcoin and ether, XRP is a digital currency supported by a distributed ledger that uses cryptography to store and transfer assets.  However, XRP and the underlying XRP Ledger were designed in 2011 and 2012 specifically as a payment mechanism by software developers who later founded Ripple Labs (Ripple).  Ripple today utilises XRP to address liquidity challenges faced by financial institutions, including high transaction fees, long processing times and the need for third-party monitoring interposed by traditional clearinghouses and settlement mechanisms.[21]

Chair Giancarlo also detailed why XRP does not satisfy any of the prongs under the *Howey* test.  First, XRP involves no investment of money because "[t]he mere fact that an individual holds XRP does not create any relationship, rights or privileges with respect to Ripple."[22]  Second, there is no common enterprise in the absence of horizontal commonality because "[al]though broad price fluctuations uniformly affect those who hold XRP, the currency is not pooled in any sense, much less by Ripple or another central party," and "XRP holders who

---

[20] https://www.iflr.com/article/2a644yk131snh9bzqpou8/cryptocurrencies-and-us-securities-laws-beyond-bitcoin-and-ether.

[21] *Id.*

[22] *Id.*

utilize the coins for different purposes have divergent interests with respect to XRP."[23]  Further,

no vertical commonality exists, "because XRP and Ripple exist independently of one another,

such that the XRP Ledger would continue to function even without Ripple's involvement."[24]

Finally, "given Ripple's marketing forbearance and the autonomy of the XRP architecture," the

third prong of the *Howey* test (requiring a reasonable expectation of profits derived from the

efforts of others) is also absent because:

> Ripple has not marketed XRP as an investment product, nor has it promised XRP
> holders any sort of profit or return on investment.  To the contrary, Ripple has
> repeatedly emphasized the functionality of XRP as a liquidity tool and a
> settlement mechanism.  The fact that certain parties may acquire XRP with the
> hope that it may appreciate in value cannot be dispositive as the same is equally
> true of the large number of bitcoin and ether speculators.[25]

Thus, Chair Giancarlo concluded, "under a fair application of the *Howey* test and the SEC's

presently expanding analysis, XRP should not be regulated as a security, but instead considered a

currency or a medium of exchange, consistent with interpretations offered by other federal

regulators."[26]

*     *     *

FinCEN's designation of XRP as a virtual currency, along with the SEC Framework and

repeated statements by governmental agencies and high-ranking officials at the SEC and CFTC

that based on its characteristics, XRP could not constitute a security, provided clear guidance to

the market.  Valhil and other market participants correctly and reasonably understood that XRP

was not a security subject to regulation by the SEC and built their businesses accordingly.  The

---

[23] *Id*.

[24] *Id*.

[25] *Id*.

[26] *Id*.  The op-ed goes on to quote former SEC Chairman Jay Clayton's speech noting that cryptocurrencies functioning "as replacements for sovereign currencies" do not constitute securities.  *See supra* at 11.

expectations of and reliance on XRP's classification as a digital currency by its users is an important factor for this Court's analysis and weighs heavily against the SEC's newfound belief regarding the appropriate legal classification for XRP.  Should the SEC nonetheless prevail, market entities like Valhil would be severely and irreparably harmed and would likely have to seek judicial redress of their own.  This Court should hold that XRP is not a security.

## CONCLUSION

For these reasons, this Court should grant Defendants' motions for summary judgment.

Dated: November 18, 2022                    Respectfully submitted,


By: */s/Brandon Duke*

**WINSTON & STRAWN LLP**

| | |
|---|---|
| George Mastoris | Brandon Duke |
| Kerry Donovan | 800 Capitol Street, Suite 2400 |
| Thania (Athanasia) Charmani | Houston, TX 77008 |
| 200 Park Avenue | (713) 651-2600 |
| New York, New York | bduke@winston.com |
| (212) 294-6700 | |
| gmastoris@winston.com | |
| kcdonovan@winston.com | |
| acharmani@winston.com | Jeffrey L. Steinfeld |
| | (*pro hac vice application forthcoming*) |
| | 333 South Grand Avenue, 38th Floor |
| | Los Angeles, CA 90071 |
| | (213) 615-1700 |
| | jlsteinfeld@winston.com |

***Counsel for Amicus Curiae Valhil Capital, LLC***