UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,          :
                                             :
                              Plaintiff,     :        20 Civ. 10832 (AT) (SN)
                                             :
                - against -                  :        ECF Case
                                             :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,     :
and CHRISTIAN A. LARSEN,                      :
                                             :
                              Defendants.     :
                                             :
------------------------------------------------------------------------x


### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Benjamin Hanauer
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................iv

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND .................................................................................................3

ARGUMENT ..........................................................................................................................5

I.    DEFENDANTS OFFERED AND SOLD INVESTMENT CONTRACTS. ........................5

    A.   XRP Purchasers Tendered Money or Other Consideration. ...................................5

    B.   The Undisputed Evidence Establishes a Common Enterprise. .................................6

        1.   The SEC Has Established Horizontal Commonality. ....................................7

        2.   Defendants' Invented "Other Necessary Requirements" For Horizontal Commonality Should be Rejected ...................................................................8

        3.   Alternatively, the SEC Has Established Strict Vertical Commonality ........12

    C.   Defendants' Public Statements and the Economic Reality of XRP Led XRP Investors to Reasonably Expect Profits from Ripple's Efforts. ............................14

    D.   Comparisons of Sales of XRP to Sales of Supermarket Items Fail. ....................20

        1.   Economic Reality Forecloses Any Argument that Ripple Offered and Sold XRP Primarily for Consumptive Use. ........................................................20

        2.   Subjective Intent Cannot Defeat Summary Judgment. ...............................23

        3.   XRP Is Not Like A Tangible Asset with Intrinsic Value. ..........................24

II.   DEFENDANTS' "ESSENTIAL INGREDIENTS" TEST FAILS. ..............................26

III.  DEFENDANTS' DUE PROCESS DEFENSES FAIL AS A MATTER OF LAW. ............28

    A.   Juries Do Not Decide Fair Notice or Vagueness Defenses. ..................................29

    B.   Defendants and *Amici* Premise Their Arguments on Laches and Estoppel Defenses that Fail as a Matter of Law. ...............................................................31

    C.   Defendants Received Extensive Notice in Addition to *Howey*. ...........................33

        1.   The SEC's 35 Prior Crypto Asset Cases Provided Additional Notice. ......33

        2.   Defendants Do Not Dispute they Received Additional Actual Notice. ......36

        3.   Other SEC Crypto Asset Guidance Provided Additional Notice ...............37

    D.   The Views of Financially-Motivated Third Parties Are Irrelevant. .....................40

    E.   The SEC's Nonpublic Internal Communications Are Irrelevant ..........................42

IV.  DEFENDANTS ENGAGED IN DOMESTIC OFFERS AND SALES. .............................43

V.   THE SEC IS ENTITLED TO SUMMARY JUDGMENT AGAINST THE INDIVIDUAL DEFENDANTS. ..............................................................................47

    A.   The Individual Defendants Violated Section 5 as Issuers. ...................................47

B.   The Individual Defendants Aided and Abetted Ripple's Violations. ...................................49

VI.   OTHER ARGUMENTS DO NOT COUNSEL A DIFFERENT OUTCOME. ..................52

CONCLUSION....................................................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036 (10th Cir. 1980) ....................................... 8, 26

*Brodt v. Bache & Co., Inc.*, 595 F.2d 459 (9th Cir. 1978) ....................................................13

*CFPB v. Ocwen Fin Corp.*, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) ..............................33

*Chicago Mercantile Exch. v. SEC*, 883 F.2d 537 (7th Cir. 1989) ..........................................9

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142 (2012) ..........................................36

*Consol Buchanan Mining Co. v. Sec'y of Labor*, 841 F.3d 642 (4th Cir. 2016) ...................29

*Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045 (S.D.N.Y. 1975) ...............................11

*Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971) ....................................................44

*Dubin v. E.F. Hutton Grp. Inc.*, 695 F. Supp. 138 (S.D.N.Y. 1988) .....................................6

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d
    118 (2d Cir. 1998) *abrogated in part on other grounds by Morrison*, 561 U.S. 247 ......46

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ..................................................33

*Fedance v. Harris*, 1 F.4th 1278 (11th Cir. 2021) ...........................................................21

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) ...........................34, 41, 43

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ...............................................................................7, 10, 14

*Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000) ...............................................................31

*Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984) .............................11

*In re Lehman Bros. Mortgage-Backed Secs. Litig.*, 650 F.3d 167 (2d Cir. 2011) ....................6

*Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979) ......................................................6

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ...................................................51

*Khudan v. Lee*, 2016 WL 4735364 (S.D.N.Y. Sept. 8, 2016) ..............................................51

*KPMG, LLC v. SEC*, 289 F.3d 109 (D.C. Cir. 2002) .........................................................33

*Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684 (S.D.N.Y. 2020) ...................51

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) .....................................................................17, 44

*Marini v. Adamo*, 812 F. Supp. 2d 243 (E.D.N.Y. 2011) ...................................................13

*Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2011),
    *aff'd* 644 F. App'x 33 (2d Cir. 2016) .....................................................................27

*Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274 (7th Cir. 1972) .......................................12

*NLRB v. Majestic Weaving Co.*, 355 F.2d 854 (2d Cir. 1966) .............................................33

*Poindexter v. Merrill Lynch, Pierce, Fenner & Smith*, 684 F. Supp. 478 (E.D. Mich. 1988) ...................................................................................................13

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ........................................passim

*Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7 (1st Cir. 1993) ......................................9, 14

*Rodriguez v. Banco Cent.*, 727 F. Supp. 759 (D.P.R. 1989) *appeal dismissed* 917 F.2d 664 (1st Cir. 1990)......................................................10

*Rojas-Reyes v. INS*, 235 F.3d 115 (2d Cir. 2000) ......................................................33

*Ruefenacht v. O'Halloran*, 737 F.2d 320 (3d Cir. 1984) ...............................................9

*SEC v. Ahmed*, 308 F. Supp. 3d 628 (D. Conn. 2018) ..............................................44

*SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577 (2d Cir. 1982) .............................9, 16, 23

*SEC v. AT&T, Inc.*, 2022 WL 4110466 (S.D.N.Y. Sept. 8, 2022) ............................29, 33

*SEC v. Blockvest, LLC*, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019).........................23, 44

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) ............................................11

*SEC v. Cap. Gains Research Bureau, Inc.*, 375 U.S. 180 (1963) ..................................44

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) .......................................................48

*SEC v. Cavanagh*, 445 F.3d 105 (2d Cir. 2006) .......................................................48

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ...........................................................33

*SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959) .......................................................32

*SEC v. Edwards*, 540 U.S. 389 (2004).........................................................11, 14, 17

*SEC v. Esposito*, 2018 WL 2012688 (D. Mass. Apr. 30, 2018) .....................................35

*SEC v. Feng*, 935 F.3d 721 (9th Cir. 2019) ............................................................29

*SEC v. GenAudio Inc.*, 32 F.4th 902 (10th Cir. 2022)...............................................48

*SEC v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974) *aff'd sub nom Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974)...............................................................10, 19, 24

*SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027 (2d Cir. 1974)..................10, 17, 20, 24

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000) ..................................................8

*SEC v. Kahlon*, 141 F. Supp. 3d 675 (E.D. Tex. 2015) ..........................................32, 33

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ............................................................49

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020)..........................passim

*SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) ..............................passim

*SEC v. Liberty Petroleum Corp.*, 1971 WL 294 (N.D. Ohio Sept. 2, 1971) .....................45

*SEC v. Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002)........................................48, 49

*SEC v. Mattessich*, 407 F. Supp. 3d 264 (S.D.N.Y. 2019) ........................................49

*SEC v. McCaskey*, 56 F. Supp. 2d. 323 (S.D.N.Y. 1999) ............................................................32

*SEC v. McNamee*, 481 F.3d 451 (7th Cir. 2007) .......................................................................48

*SEC v. Merchant Cap., LLC*, 483 F.3d 747 (11th Cir. 2007) ....................................................17

*SEC v. Miller*, 2022 WL 16575719 (D. Md. Nov. 1, 2022)........................................................30

*SEC v. Murphy*, 50 F.4th 832 (9th Cir. 2022)..............................................................22, 30, 34

*SEC v. Mut. Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005)......................................................10

*SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988 (N.D. Cal. 2021)...................................... 13, 17

*SEC v. Pac. W. Cap. Grp. Inc.*, 2015 WL 9694808 (C.D. Cal. June 16, 2015).........................20

*SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019) ......................................................................17

*SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001)........................................................................passim

*SEC v. Telegram Grp., Inc.*, 2020 WL 1547383 (S.D.N.Y. Apr. 1, 2020)..................................45

*SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ......................................passim

*SEC v. Thompson*, 732 F.3d 1151 (10th Cir. 2013) .............................................................. 2, 23

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)......................................................................passim

*Shotto v. Laub*, 635 F. Supp. 835 (D. Md. 1986) ......................................................................13

*Trinity Broad. of Florida, Inc. v. FCC*, 211 F.3d 618 (D.C. Cir. 2000)......................................33

*United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975) ....................................11, 21, 22

*United States v. Cinergy Corp.*, 495 F. Supp. 2d. 892 (S.D. Ind. 2007) .....................................36

*United States v. Halloran*, 664 F. App'x 23 (2d Cir. 2016) ......................................................30

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ...........................................................30

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) .........................................................9, 16

*United States v. NGL Crude Logistics, LLC*, 2018 WL 4762901
    (N.D. Iowa July 3, 2018) ........................................................................................................36

*United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014) ..................................................30

*United States v. Wolfson*, 405 F.2d 779 (2d Cir. 1968)...................................................... 48, 49

*United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ...................17, 37, 38

*Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996) .................................................................................34

*Wals v. Fox Hill Dev. Corp.*, 24 F.3d 1016 (7th Cir. 1994) .........................................................9

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009)...................................................................23

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022) ..........................................................................32

**Statutes**

Commodities Exchange Act, Section 1a, 7 U.S.C. § 1a ..............................................................54

Commodities Exchange Act, Section 2, 7 U.S.C. § 2 .................................................................54

Securities Act of 1933, Section 2(a), 15 U.S.C. § 77b(a) ........................................................ 1, 48

Securities Act of 1933, Section 4, 15 U.S.C. § 77d ...............................................................47

Securities Act of 1933, Section 15, 15 U.S.C. § 77o ...............................................................49

Securities Exchange Act of 1934, Section 4(a), 15 U.S.C. § 78d(a) ......................................43

Securities Exchange Act of 1934, Section 12, 15 U.S.C. § 78*l* ...............................................54

**Regulations**

17 C.F.R. § 203.5 ........................................................................................................................37

**SEC No-Action Letters**

*Am. Diamond Co.*, 1977 WL 10907 (Aug. 15, 1977) ................................................................22

*Future Sys., Inc.*, 1973 WL 9653 (June 8, 1973) ......................................................................22

*IMVU, Inc.*, (Nov. 19, 2020) *available at* https://www.sec.gov/corpfin/imvu-
        111920-2a1 ....................................................................................................................22

*London Diamond Exch.*, 1972 WL 8488 (Oct. 3, 1972) ............................................................22

*Pocketful of Quarters*, Fed. Sec. L. Rep. ¶ 79,003 (July 25, 2019) .........................................22

*TurnKey Jet, Inc.*, 2019 WL 1471132 (Apr. 3, 2019) ...............................................................22

**Treatises**

Thomas Lee Hazen, 1 *Law of Securities Regulation* § 1:49 (7th ed. 2016) ..............................21

**Other Authorities**

SEC, *Framework for 'Investment Contract' Analysis of Digital Assets* (Apr. 3, 2019)
        *available at* https://www.sec.gov/corpfin/framework-investment-contract-
        analysis-digital-assets ....................................................................................................39

*Written Testimony of Chairman J. Christopher Giancarlo before the Senate Banking
        Committee* (Feb. 6, 2018) *available at*
        http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37 ..........................55

## PRELIMINARY STATEMENT[1]

The SEC is entitled to summary judgment because Defendants do not dispute the material facts establishing that their unregistered offers and sales of XRP were offers and sales of "investment contracts" under Section 2(a)(1) of the Securities Act of 1933, and the Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), in violation of Section 5 of the Act.

*First*, Defendants do not dispute that investors contributed over $2 billion in value to Ripple in exchange for XRP, via the unregistered offers and sales that form the basis of the SEC's claims.

*Second*, Defendants do not dispute the facts that establish a "common enterprise": Ripple did not separately manage funds raised from investors, but rather pooled the proceeds from sales of XRP (Ripple's most valuable holding at all times) and, as it promised investors, used them to fund efforts to find use and value for XRP. All of this tied XRP investors' fortunes to each other, and to Ripple's, as crystallized by XRP holders' claim as *amici* that a Ripple loss would harm them, too.

*Third*, and most critically, Defendants do not dispute the facts that establish investors reasonably "expected profits from the efforts of others": Defendants made an avalanche of public statements representing that they would take steps to "increase XRP's value." Def. Opp. 38. Partly because of Ripple's "giant pile" of XRP, potential and actual investors understood that Ripple was financially compelled to do just that. Thus, when XRP price increases occurred, Defendants tied them to their own efforts and tellingly touted them as increases in "Ripple's price."

Defendants' principal contrary argument is that due to an alleged "substantial number of XRP holders who did not view XRP as investment in Ripple," a jury must determine "reasonable expectations." Def. 56.1 Opp., p. 353; *see also* Def. Opp. at 42. That is not the law. The question is

---

[1]     "SEC Opp." and "Def. Opp." mean the briefs in opposition (D.E. 667, 662) to the "Def. Br." and the "SEC Br." (D.E. 622, 628). "SEC 56.1 Opp." and "Def. 56.1 Opp." mean the Counter 56.1 statements in opposition (D.E. 668, 663) to the "Def. 56.1" and the "SEC 56.1" (D.E. 623, 629). Citations to *amici* briefs are to their docket entry numbers in the format "D.E. __." Capitalized terms not defined herein shall have the meaning ascribed to them in the SEC Br. and SEC Opp.

whether *Ripple led* potential investors to *reasonably expect profits* from its efforts. That is an objective question answered by economic reality and Ripple's representations, not by individual motivations. Otherwise, summary judgment would never be granted in Section 5 cases, a notion inconsistent with the multitude of cases doing just that, including another recent decision considering and rejecting arguments similar to those raised by Defendants here. *SEC v. LBRY, Inc.*, 2022 WL 16744741, at *6-7 (D.N.H. Nov. 7, 2022). To the contrary, "whether an instrument is a security is 'a question of law and not of fact.'" *SEC v. Thompson*, 732 F.3d 1151, 1160-61 (10th Cir. 2013) (collecting cases).

Here, the Court should analyze all the undisputed facts and circumstances. This includes Defendants' statements and actions, the economic reality of XRP and Ripple's financial motivations, and contractual terms for XRP sales if any (such as pricing discounts, indicating an investment intent). These undisputed facts show that investors paid money for XRP and Ripple stated it would use those funds to promote and try to find use and value for XRP. Ripple also told investors that if it was successful, demand for XRP would increase, permitting Ripple and investors to profit. XRP investors, including institutional ones, paid Ripple over $2 billion for XRP because they reasonably expected Ripple and its principal decisionmakers—who had a "giant pile" of or who were "very long" XRP—to honor the promises they had made and to do what they were financially compelled to do: use XRP sales proceeds to fund extensive efforts to increase XRP's value.

Given this economic reality, Defendants' comparisons (at 4, 19, 37) of XRP to items on a shopping list do not help them. The law recognizes that "ordinary assets" can be offered and sold as securities when accompanied by statements, such as those by Defendants, creating a reasonable expectation of profits from the efforts of others. Unlike ordinary assets such as groceries, XRP is nothing but computer code represented on an electronic ledger. It has no historical existence and no intrinsic value absent a market for its transfer. When investors paid money to receive XRP, they were purchasing the value that XRP embodies. These investors objectively expected others could

and would promote that value by expending effort to create use and further value for XRP (as Ripple promised to do) so that the investors could resell their XRP at a higher price. Regardless of the technology used to track the ownership of that value, this set of undisputed facts involves a straightforward investment offering to which the securities laws routinely apply.

None of Defendants' arguments to the contrary precludes summary judgment. Defendants' primary tactic is to deflect controlling precedent with fictional tests, muddy the facts, and shift blame to the SEC. Defendants go so far as to dismiss the two indistinguishable crypto asset Section 5 decisions from this District (*Kik* and *Telegram*) as poorly reasoned, and to invoke standards they candidly acknowledge the Second Circuit has rejected. Defendants also reassert their made-up "essential ingredients" test, which lacks any basis in *Howey* or any other securities law jurisprudence.

Nor does the "fair notice" defense preclude summary judgment. This enforcement action is based not on the SEC's interpretation of any promulgated rule but on the application of Supreme Court precedent. *LBRY*, 2022 WL 16744741, at *8. Defendants unsurprisingly ignore the multiple decisions rejecting virtually identical attempts to raise this defense, including in similar crypto asset cases. To the extent the argument is that the SEC took too long or is required to give specific warnings before filing suit, those are laches and equitable defenses that fail as a matter of law.

The SEC is also entitled to summary judgment against the Individual Defendants. They were control persons at the time of their unlawful offers and sales and thus cannot escape Section 5 liability. Their claim that they did not understand the legal consequences of their acts is irrelevant.

## FACTUAL BACKGROUND

Defendants do not materially dispute that Ripple: (i) publicly stated it owned between 50 and 80 billion units of XRP at all times, SEC 56.1 ¶¶ 15, 35-36, 208, 252, 256, 274; (ii) received $1.509 billion in cash for its sales of XRP and $609 million in additional proceeds for other XRP distributions, *id.* ¶¶ 147-48; and (iii) conducted a public marketing campaign for XRP.

The thrust of this expansive marketing campaign was that Ripple's large pile of XRP gave it unique financial incentives to take specific steps to create "uses" that could lead to an increase in XRP's "demand," "value," or "price." *E.g.*, *id.* ¶¶ 63-65, 68, 83, 100, 117, 130, 201-03, 265, 274-75, 388-89, 430, 708.[2] The campaign also included statements that Ripple's and XRP holders' interests were aligned and that Ripple was a good "steward" of XRP, because Ripple had a "vested interest" in and was dedicated to the "health and success" of the XRP "ecosystem," including XRP trading markets. *E.g.*, SEC 56.1 ¶¶ 77, 81, 109, 111-13, 117-18, 122, 126-27, 130-31, 133-35, 201-03, 208, 213-14, 252, 258-59, 270-71, 396, 471, 476, 481, 484, 1065, 1211, 1219. And it included touting XRP price rallies, detailing Ripple's own XRP-related activities (including buying XRP in the market and escrowing it), and tying the two concepts together. *E.g.*, *id.* ¶¶ 83, 99, 100, 117, 136, 183, 185, 187, 192, 194, 201-03, 255-56, 263-68, 274-75, 295-98, 331-32, 340, 388-89, 402-05, 419, 421-22, 425-26, 428, 430, 434-36, 461-62, 500, 507-10, 539-40, 588-90, 708, 770-72, 774, 779-81, 926-27, 1212, 1214.

The undisputed facts also show Ripple did not manage separate projects for XRP investors. Instead, Ripple stated it would, and then did, use XRP sales proceeds collectively to fund XRP-related efforts. *E.g.*, *id.* ¶¶ 156-57, 161-65, 167-68, 255-56, 1059, 1127; DX 170. There is also no dispute that XRP is a fungible crypto asset (such that the price of all units rise and fall in the same manner and each investor's XRP holdings appreciate in amounts proportional to each investor's XRP holdings), and that Ripple was always its largest holder. SEC 56.1 ¶¶ 18, 118, 206, 274, 462.

Finally, it is undisputed that Ripple engaged in *three* categories of XRP offers and sales resulting in pecuniary gains: (1) Programmatic Sales for which it received $757 million (indirectly from the public through market makers), *id.* ¶¶ 621, 625, 649-51; PX 746-51; (2) Institutional Sales

---

[2]     Defendants unsuccessfully attempt to draw a contrast between "value" and "price." *E.g.*, Def. 56.1 Opp. ¶ 173. *But see* PX 7 at 100:17-101:8 (Schwartz understands "value" to mean "price"). Even if "value" means "utility," as Defendants now contend, promising to engage in efforts to "increase value" or find more "utility" for a token, is the type of activity that satisfies *Howey*. *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020); *LBRY*, 2022 WL 16744741, at *6-7.

under written contracts for which it received $728 million, SEC 56.1 ¶¶ 575, 713, 716, 728, 731, 789, 796, 798, 814-16; and (3) Other Distributions under written contracts for which it recorded $609 million in "consideration other than cash" in its audited financial statements. *Id.* ¶¶ 147-48, 829, 838-39; SEC 56.1 Opp. ¶¶ 141, 455; PX 750; PX 751. The Individual Defendants received at least $450 million (Larsen) and $150 million (Garlinghouse) for their XRP sales. SEC 56.1 ¶¶ 868, 870.[3]

The SEC is entitled to summary judgment based on these undisputed facts.

## ARGUMENT

### I. DEFENDANTS OFFERED AND SOLD INVESTMENT CONTRACTS.

#### A. XRP Purchasers Tendered Money or Other Consideration.

The SEC's claims concern the above-described *three* categories of XRP offers and sales where Defendants received over $2 billion in cash or other consideration, satisfying *Howey*'s first prong. SEC Br. 27-32; SEC Opp. 25-27. Defendants bury in a footnote (at 17 n.7) their concession that they "sometimes" sold XRP for money, but then attempt to distract the Court by arguing (at 8-9, 17-18) about giveaways, donations, and secondary market transactions. Those transactions are not part of the SEC's claims here. SEC Opp. 26 n.15, 45.

Defendants' argument that money paid indirectly to Ripple via underwriters does not constitute an "investment of money" under *Howey* also fails. Ripple received money from selling XRP to persons who then offered and resold it for cash to public investors just as the proceeds of traditional securities offerings flow through underwriters. *See SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 380 (S.D.N.Y. 2020) (*Howey* was satisfied when token issuer planned to distribute token

---

[3]     Defendants quibble over the precise dollar amounts of their sales. Def. 56.1 Opp. ¶¶ 647, 716. But the question of specific amounts is a question for remedies, not liability. Without disputing the accuracy of the figures contained therein, Defendants also attack PX 45 as an improper expert report. *E.g.*, *id.* ¶¶ 145-48, 644, 1055. But PX 45 is a Rule 1006 summary witness declaration that summarizes factual information contained in the record, which Defendants have, and that avoids further burdening the Court. And the Court should ignore Larsen's attempt to dispute whether he made at least $450 million in XRP sales, *id.* ¶ 868, since his Answer admitted them. D.E. 463 ¶ 175.

through sophisticated initial purchaser, as this was a "disguised public distribution"); *see generally In re Lehman Bros. Mortgage-Backed Secs. Litig.*, 650 F.3d 167, 171 (2d Cir. 2011) (describing process whereby issuer sells securities to underwriters who then resells them to investors).

Defendants also argue (at 18-19, n.8) that *Howey* requires not just a payment of money but also an "intent" to invest; that the SEC relies "exclusively" on *Telegram* for its assertion that a payment of money is sufficient; and that XRP purchasers are akin to shoppers buying "oranges at the supermarket." None of this is correct. Multiple cases besides *Telegram* hold that a tender of money suffices. *See* SEC Opp. 25 (collecting cases). The purpose of this prong of the inquiry is to distinguish "exchang[ing] something of tangible value" in return for the investment, *Dubin v. E.F. Hutton Grp. Inc.*, 695 F. Supp. 138, 145 (S.D.N.Y. 1988), from giving no "specific consideration." *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 559-60 (1979). It is not to identify the "intent" of the buyer. In any event, as *amici*'s submissions show, XRP buyers who are concerned about their XRP losing value have purchased XRP with the intent to invest. *See also infra* note 20.

Defendants' attempt to compare buying XRP to buying something at the supermarket is an incomplete hypothetical that fails because it reduces *Howey*'s analysis to a single element. The question is not whether some assets may be bought and sold in transactions that meet *one element* of the *Howey* test, but rather whether Defendants' offers and sales of XRP satisfies *all* of *Howey*'s elements. They do. *See also infra* § I.D.[4]

### B.      The Undisputed Evidence Establishes a Common Enterprise.

Though either suffices, both common enterprise tests, "horizontal" and "strict vertical" commonality, are met. *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994); SEC Br. 50-53.

---

[4]      Defendants' cannot distinguish *Telegram* by noting that the purchasers there "risked investment losses," Def. Opp. 19 n.8, because XRP investors also risked losses, as Defendants repeatedly remind the Court. *E.g.*, Def. Opp. 52 (claiming $15 billion in losses).

### 1.    The SEC Has Established Horizontal Commonality.

Horizontal commonality is met because: (1) all investors held the same fungible XRP such that their fortunes with respect to XRP's value rose and fell together and in proportion to their holdings; and (2) Ripple took the funds it received in payment for XRP, pooled those funds in its various bank accounts, and spent that money on the promised efforts to promote and find uses for XRP and establish and protect its trading markets. SEC 56.1 ¶¶ 18, 156-57, 161-68, 206, 255-56, 650, 1059, 1127; SEC 56.1 Opp. ¶ 457; DX 170. Investors "reaped their profits in the form of the increased value of" the token that all investors held and Ripple "established a common enterprise" by pooling the funds and using them "for its operations, including the construction of the digital ecosystem it promoted. This ecosystem was crucial. The success of the ecosystem drove demand for [the token] and thus dictated investors' profits." *Kik*, 492 F. Supp. 3d at 178. Ripple, by "marketing the [investments], and creating a secondary market … was engaged in a common enterprise." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985).[5]

Defendants contend (at 22-23) the SEC has not proven pooling of assets, ignoring the vast evidentiary record, including their own declaration, *see* DX 170 (D.E. 665-29) ¶¶ 3-4, establishing that Ripple controlled a network of bank accounts, into which XRP proceeds were funneled. *E.g.*, SEC 56.1 ¶¶ 795-98, 815-16; PX 296, 753-63. Ripple's own lawyers contemporaneously confirmed that Ripple "pools the money that it receives from the sale of XRP." SEC 56.1 ¶ 1004; PX 245. Ripple's accountants accordingly recorded all XRP-related proceeds together. *See id.* ¶¶ 147-48.

---

[5]     Defendants accuse the SEC (at 19-21) of improperly defining the "enterprise" by referring to an XRP "ecosystem," a word they claim (at 20) is "amorphous." But "ecosystem" is a common term used by the crypto asset industry to refer to a crypto venture's promised package of goods and services, as Defendants' own marketing and the *amici*'s briefing reflects. *E.g.*, SEC 56.1 ¶¶ 270, 372; D.E. 706 at 16; D.E. 684 at 5; D.E. 708 at 22, 27; D.E. 705 at 1, 2, 6; D.E. 711 at 1, 2; *see also Kik*, 492 F. Supp. 3d at 178; *Telegram*, 448 F. Supp. 3d at 377 (using the term "ecosystem"). Contradicting themselves, Defendants next contend the SEC actually did *not* define the "enterprise," and then also argue that if the enterprise is defined by any reference to the promoter's plans, this is "in direct contravention of *Revak*." Def. Opp. 20-21. That is not the law. *See infra* note 10.

Defendants' argument (at 23) that there can be no pooling because Ripple sold XRP through various subsidiaries is fundamentally inconsistent with *Howey*'s substance-over-form approach. Ripple does not and cannot dispute that it controlled its subsidiaries' bank accounts, D.E. 665-29 at ¶¶ 3-4, and, as it promised, could and did deploy the funds raised from Ripple's XRP sales toward the enterprise of finding use and value for XRP. While Ripple undoubtedly set up a complicated network of bank accounts, it indisputably did not "segregate[] and separately manage[]" investor funds or "allow[] for profits to remain independent." *Kik*, 492 F. Supp. 3d at 179.

### 2. Defendants' Invented "Other Necessary Requirements" For Horizontal Commonality Should be Rejected.

Without any real basis to challenge the straightforward application of controlling precedent, Defendants try again to mangle the tests for commonality by imposing invented "Other Necessary Requirements." Def. Opp. 25. The SEC has explained why these made-up requirements fail. SEC Opp. 29-31. Defendants still cite no case to the contrary.

#### (a) The "Economic Equivalent" of Stock Theory Fails.

Defendants persist in arguing (at 23-25) that commonality requires that investors retain an "undivided interest in a shared pool of assets." But "a common enterprise does not require the sale of undivided interests or an entirely separable and express management contract." *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980) (citations omitted). Defendants claim (at 24 n.12) that *SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000), and *SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001), do not refute their invented prong. But they do. In *Infinity Grp.* investors entered into separate contracts providing for fixed returns. The defendant disputed horizontal commonality, emphasizing that the investors had no "direct interest" in the promoter's business and their funds "were not earmarked for any particular purpose." 212 F.3d at 188. The court squarely rejected this argument, finding it sufficient that "the investor's return was directly proportional to the amount of th[eir] investment." *Id.* at 188; *see also SG Ltd.*, 265 F.3d at 50-51 (following *Infinity Grp.*).

None of the cases Defendants cite hold otherwise. *Wals v. Fox Hill Dev. Corp.* (Def. Opp. 23) mentioned a *stock* "is an undivided interest in an enterprise." 24 F.3d 1016, 1018 (7th Cir. 1994). But "investment contracts" are not "stock," nor need they be "an interest equivalent to a stock." Def. Opp. 25; *see Ruefenacht v. O'Halloran*, 737 F.2d 320, 322-23 (3d Cir. 1984) ("certain novel economic transactions [are] encompassed" by "investment contract," "even though not embraced by the[] [statute's] more specific provisions," such as "stock"). Accordingly, in *Howey* the "company [was] accountable *only* for an allocation of the net profits based upon a check made at the time of picking," 328 U.S. at 296 (emphasis added), not for some "retained interests." *See also* SEC Opp. 35-37.[6]

Defendants also incorrectly suggest that *Revak* supports their "retained interests" theory. But *Revak* did not find horizontal commonality lacking "because investors retained no interests in a shared pool of assets." Def. Opp. 24. The quoted language is Defendants' alone. *Revak*'s analysis was straightforward: no commonality existed because each investor bought her own condominium, and the promoter managed each condo separately from the others. 18 F.3d at 88. This is unlike Ripple here, who admittedly pooled and deployed investor funds together.

### (b)      Ongoing Contractual Obligations Are Not Required.

No case cited by Defendants holds that ongoing contractual obligations are required to find commonality—including the four Second Circuit cases that Defendants misleadingly cite for that proposition. While ongoing contractual obligations were part of the *fact pattern* in *SEC v. Aqua-Sonic Prod. Corp.*, 687 F.2d 577 (2d Cir. 1982) and *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008), neither relied on them for any of the *legal* analysis. The *facts* of a case cannot be transformed into the *legal* test. To the contrary, courts must look "beyond the formal terms of a relationship to the reality of the parties' positions," *Leonard*, 529 F.3d at 85, and apply *Howey*'s elements to the facts at hand.

---

[6]      Defendants' theories (at 24 n.13, 25) also find no support in *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11-12 (1st Cir. 1993), or *Chicago Mercantile Exch. v. SEC*, 883 F.2d 537, 543 (7th Cir. 1989), as neither case states or even suggests that an investment contract must be the "equivalent to stock."

The other two cases that Defendants cite *did not* involve ongoing contractual obligations at all. *SEC v. Glen-Arden Commodities, Inc.* involved oral "assertions" made during "sales pitch[es]" or in "newspapers advertisements and … mailing lists." 368 F. Supp. 1386, 1389 (E.D.N.Y. 1974) *aff'd sub nom Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974). Similarly, *Gary Plastic* did not mention contractual obligations, nor did it hold that any contracts or contractual obligations were required. Instead, the court relied on a marketing bulletin stating Merrill "intends to maintain a secondary market," and on an "implicit promise" to continue marketing. 756 F.2d at 233, 240.

Given the emphasis of *Howey* and its progeny on the economic realities of a transaction, it is unsurprising that courts that have considered whether ongoing contractual obligations are required for commonality have concluded they are not. In *Rodriguez v. Banco Cent.*, for example, "[d]efendants argue[d] that they were under no contractual obligation" to engage in further efforts, but the court found an investment contract by looking "beyond boilerplate disclaimers to the economic reality." 727 F. Supp. 759, 767 (D.P.R. 1989) (citation omitted), *appeal dismissed* 917 F.2d 664 (1st Cir. 1990).

Defendants attempt to distinguish *Kik*, which is squarely on point, but their arguments are unavailing. *First*, Defendants argue (at 26, 38-39) that at the time of their offers and sales, the XRP Ledger was operational, but that in *Kik* the issuer still had to create one. This fact is irrelevant to commonality because "investment schemes may often involve a combination of both pre- and post-purchase managerial activities." *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 743-44 (11th Cir. 2005). And it is also incorrect. Kik argued that its tokens were functional by the time Kik issued them. *See* No 19 Civ. 5244 (S.D.N.Y. 2019), D.E. 62 ("Kik Mem.") at 10-13. The court nevertheless granted the SEC summary judgment while recognizing this fact. *Kik*, 492 F. Supp. 3d at 175.[7]

---

[7]     It is also irrelevant that "Ripple does not own the XRP Ledger." Def. Opp. 7. The issuers of securities do not own the systems upon which they are transferred or traded (such as the NYSE), and issuers of crypto asset securities typically distribute them on pre-existing, working blockchains they do not own. *E.g.*, *Kik*, 492 F. Supp. 3d at 173-74.

*Second*, Defendants argue (at 26-27) Kik was under a legal obligation to expend the funds it received for the benefit of investors. That, too, is wrong. As the court found, Kik sold its tokens pursuant to a "Terms of Use Agreement" stating that the tokens "are provided on an 'as is' and 'as available' basis without warranties or conditions of any kind, either express or implied." *Kik*, 492 F. Supp. at 175. Like Ripple, Kik argued that it owed purchasers no ongoing or firm contractual obligations. *See, e.g.*, Kik Mem. at 18. The court still found a common enterprise. 492 F. Supp. at 178.

*Third*, Defendants argue the two cases *Kik* relies on do not support the court's holding that commonality does not require ongoing contractual obligations. But *Davis v. Rio Rancho Estates, Inc.*, 401 F. Supp. 1045 (S.D.N.Y. 1975), and *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001 (6th Cir. 1984) *do* support *Kik*'s holding. Both cases involved analysis of economic reality and of extra-contractual representations in promotional materials. Neither held that contractual obligations are required to establish commonality. Instead, both found a lack of commonality because there was no pooling of interests. *Davis*, 401 F. Supp. at 1049-50; *Hart*, 735 F.2d at 1005. The point of these cases and others such as *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943), *Howey*, *Glen-Arden*, *Gary Plastic*, and the district court cases involving crypto asset issuances cited herein, is that an investment contract may be established by extra-contractual statements. These cases are consistent with *Howey*'s focus on the economic reality of a transaction and are fundamentally contrary to Defendants' notion that contracts or contractual obligations are *required* to establish commonality or *any* part of *Howey*.[8]

---

[8]     Nor is a *pro rata* distribution of profits necessary to prove horizontal commonality. Defendants suggest (at 27) this notion comes only from *Telegram*. But it actually derives from *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975), which explained that "profits" in "expectation of profits" can be "capital appreciation resulting from the development of the initial investment." The Supreme Court reaffirmed this point in *SEC v. Edwards*, 540 U.S. 389, 396 (2004) (noting "commonsense understanding of 'profits' in the *Howey* test as simply 'financial returns on … investments'" (citing *Forman*, 421 U.S. at 853)). *Kik* also explicitly held that *pro rata* profits are not required. 492 F. Supp. 3d at 178. And *SG Ltd.* similarly found the pooling of assets plus the fact that the value of "shares" investors bought would go up and down together was sufficient to establish horizontal commonality. 265 F.3d at 50-51. *SG Ltd.* later noted the existence of *pro rata* distributions simply "boost[ed]" the showing the SEC had already made. *Id.* at 53 n.6.

Finally, Defendants argue (at 41-42) that there can be no common enterprise because one XRP investor may sell his XRP at different times than another and because different XRP investors may have different trading strategies. These arguments make no sense. No court has ever held that investors must sell their investments at the same time and adopt the same trading strategies in order to find a common enterprise or an "investment contract," and for good reason. Such prerequisites would be nonsensical, unduly restrictive, and contrary to the flexible and adaptable philosophy animating the *Howey* test. *See also* SEC Opp. 34, 38. Defendants also incorrectly argue that *Revak* required the fortune of one investor have a "direct impact" on the fortune of another investor. But *Revak* says no such thing. The language Defendants cite instead comes from *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276-77 (7th Cir. 1972), where the commonality analysis was straightforward and plainly distinguishable from the facts here: each condominium was managed separately, there was no pooling of funds, and each investor's profits depended on separate efforts.

### 3.     Alternatively, the SEC Has Established Strict Vertical Commonality.

XRP investors' fortunes were also tied to Ripple's as a result of Ripple retaining a "giant pile" of XRP as its largest holding. PX 457 at 23:10-17. The clear alignment of their interests establishes strict vertical commonality. The Court should reject Defendants' invitation (at 29) to become the first in this Circuit to reject strict vertical commonality. *See* SEC Opp. 32-33.

Defendants also seek (at 30) to reduce XRP to "merely" an "asset" Ripple holds, such that they only "have an interest in an asset they own and that interest is aligned with other XRP holders." But this assertion ignores the existential importance of XRP to Ripple's business model. XRP was not "merely" an "asset" Defendants happen to "own." XRP was and is Ripple's "north star," SEC 56.1 ¶¶ 913, 1129, the asset that has always constituted the overwhelming majority of its balance sheet. Strict vertical commonality exists because the promoter's largest single holding remains the

very tokens it sells to investors such that the "company's financial fortunes," and not merely its interests, are "link[ed]" to the price of the token. *Telegram*, 448 F. Supp. 3d at 370; SEC Opp. 32-33.

Defendants also argue (at 28-30) there is no strict vertical commonality because Ripple can be profitable even if XRP's price goes down. They rely on language in *Marini v. Adamo* that there must be "interdependence of both profits and losses of the investment." 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011). But Defendants' argument reads "of the investment" out of the opinion. Likening *Ripple's* overall *corporate* profits to investors' (and Ripple's) profits as *to XRP* is an inapt comparison. And it is particularly unavailing here considering that XRP has always been Ripple's single largest holding and source of funding.[9]

Finally, Defendants attempt (at 31-32) to distinguish the holdings in *Telegram* and *SEC v. NAC Found., LLC*, 512 F. Supp. 3d 988, 996 (N.D. Cal. 2021), that strict vertical commonality exists when the token promoter retains a large stash of the token. Defendants contend that those cases involved a "pledge" to undertake efforts on behalf of investors and the tokens there did not have an "important use case" when the sale began. These are just regurgitated versions of their failed horizontal commonality arguments. Neither of those facts was germane to either case and neither held nor suggested those facts are required for strict vertical commonality. In fact, in *Telegram* the token had the same "important use case" Defendants argue XRP had: to confirm transactions on a blockchain. None of this says anything about whether Ripple's financial and business fortunes would be tied to XRP's future success, just as XRP investors' fortune would be.[10]

---

[9]     Defendants' renewed citations (at 29-31 & n.15) to cases involving one-to-one arrangements, typically between brokers and their customers, are still inapposite. *See* SEC Opp. 34-35. In most of these cases the brokers collected commissions from clients and, unlike Ripple, had no further exposure to the same assets the clients held. *See Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir. 1978); *Poindexter v. Merrill Lynch, Pierce, Fenner & Smith*, 684 F. Supp. 478, 481 (E.D. Mich. 1988).

[10]     Defendants spend pages responding to arguments about broad vertical commonality that the SEC did not make. *See* Def. Opp. 2, 20-22; *see also* SEC Opp. 39 n.22. Their claim that the SEC is

* * *

Defendants' manufactured commonality requirements improperly distort *Howey* and demonstrate a fundamental misunderstanding of the purpose of requiring commonality. The point of the commonality requirement is to ensure investors' respective fortunes, or alternatively the investors' and promoters' fortunes, are tied together, such that all profit or lose together and in a manner proportionate to their investments. The "enterprise" at issue is formed when the economic relationship between the investors (as demonstrated, for example, by the fungible nature of the asset) is such that all fortunes rise and fall together.

Here, Ripple promised to leverage its blockchain expertise to undertake to find use and value for XRP. The fortunes of all XRP holders and of Ripple would rise and fall together depending on Ripple's success. XRP's transferability and liquidity in the market (that Ripple started the "flywheel" for and promised to promote, SEC 56.1 ¶¶ 111, 130, 214, 1140), and Ripple's efforts to attract users, buyers, sellers, and speculators into these markets, all gave XRP its value. *Gary Plastic*, 756 F.2d at 240 ("[b]y investigating issuers, marketing the CDs, and creating a secondary market, Merrill Lynch was engaged in a common enterprise"); *Rodriguez*, 990 F.2d at 11 ("at some point, however, the commitments and promises incident to a[n asset sale], and the network of relationships related to the project, can cross over the line and make the interest … one in an ongoing business enterprise").

### C.   Defendants' Public Statements and the Economic Reality of XRP Led XRP Investors to Reasonably Expect Profits from Ripple's Efforts.

The undisputed facts show that XRP investors had "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Edwards*, 540 U.S. at 395. The

---

improperly defining the "enterprise" in "common enterprise" by referring to Ripple's efforts is yet another distraction. *Revak* held that the existence of efforts on behalf of an enterprise "may tend to demonstrate that (at least some) investors expected profits to be derived from the efforts of others." 18 F.3d at 88. In other words, there is nothing wrong with *defining* the enterprise by reference to a promoter's efforts. What courts may not do under *Revak* is take the *existence* of these efforts as *proof of* a common enterprise. The SEC has not done that nor has it asked the Court to do so.

SEC has previously shown that the economic reality of the XRP transactions at issue, and an objective analysis of Defendants' promotions, make the *material* facts of this case indistinguishable from a long series of cases finding this prong satisfied, including those involving crypto assets (in this District alone, *Balestra*, *Kik*, and *Telegram*). *See* SEC Br. 49, 53-63; SEC Opp. 24-25, 53-56.

Another court recently granted the SEC summary judgment on Section 5 claims where a promoter offered and sold crypto asset tokens under largely indistinguishable material facts. *See LBRY*, 2022 WL 16744741, at *8. The *LBRY* promoter first raised funds by selling equity, but also retained and sold a significant portion of its LBRY holdings, and over the course of years made statements ensuring that investors knew that the LBRY tokens could go up in value if LBRY's efforts to attract "users" to its fully-functional blockchain were successful. *Id.* at *2-7. The promoter also made clear to investors that its large stash of the token gave it strong incentives to undertake these efforts, that "the interests of LBRY and the holders of [the token] are aligned," that "if our product has the utility we plan, the [token] should appreciate accordingly," and that the promoter's efforts were "a work in progress." *Id.* at *4, 7.

The economic reality here is akin to that of *LBRY*. Larsen explained "our incentives are very well-aligned … that for Ripple Labs to do well, we have to do a very good job in protecting the value of XRP and the value of the network," and urged investors to "[g]ive us time." SEC 56.1 ¶¶ 377, 461. Garlinghouse publicly stated on varied occasions: "XRP … is Ripple's digital asset," the "more utility you can derive from [XRP] … the more valuable" XRP would be, and Ripple was "very interested in the success and the health of the ecosystem and will continue to invest in [it]." *Id.* ¶¶ 387, 469; PX 503.12 at 3:1-4:20; PX 503.03; PX 503.13. Ripple's promotional brochures explained its "business model [was] predicated on a belief that demand for XRP will rise (resulting in price appreciation) if the Ripple protocol becomes widely adopted." SEC 56.1 ¶¶ 60-61, 183, 185. Schwartz noted that if Ripple succeeded in getting people to use XRP, its price would go up. *Id.*

¶¶ 386, 389, 439. When sharp XRP price increases occurred Defendants tied them to their own efforts and tellingly touted them as increases in "Ripple's price." *Id.* ¶¶ 34, 421-22, 431.[11]

In demonstrating that Ripple's "promotional materials" objectively gave rise to an expectation of profits from Ripple's entrepreneurial and managerial efforts, the SEC laid out page after page of "economic inducements" Ripple disseminated for years. *See* SEC Br. 18-26, 53-63. These are not "snippets," "isolated," or "samplings," as Defendants' claim. *E.g.*, Def. Opp. 3, 34, 39, 40, 42. In fact, the SEC presents so many public statements that Defendants elsewhere complain about their large number and ask the Court to entirely "disregard" the SEC's facts. *Id.* at 6, n.4. Beyond that, Defendants' kitchen-sink arguments are all wrong and none raises an issue of fact.[12]

*First*, faced with their own public statements, Defendants repeatedly and erroneously contend that the SEC must identify "commitment[s]" or contractual "post-sale obligations." But these common law contract terms are not required to satisfy *Howey*'s "expectation of profits" inquiry. This part of the test is about *expectations*, not about *commitments*, a point supported by far more than just "out-of-circuit cases." Def. Opp. 35. As noted, the Second Circuit has found such reasonable expectations derived from the seller's marketing, outside of any contractual obligations to engage in such efforts (if any such provisions even existed). *See supra* § I.B.2(b); SEC Opp. 47-50.

---

[11] Facing a slew of public statements by Schwartz that are damaging to Defendants' *Howey* arguments, Defendants attempt to distance themselves from him. *E.g.*, Def. 56.1 Opp. ¶ 22. But Ripple publicly touted a Forbes article which quoted Larsen as saying: "[Schwartz is], if not the soul, he's a key part of the soul of what we're trying to do here." https://twitter.com/Ripple/status/1039223786631884801; https://twitter.com/MonicaLongSF/status/1037474780239151104. More generally, Defendants' attempts to minimize unfavorable admissions as belonging to a "single employee," *e.g.*, Def. 56.1 Opp. ¶ 487, are unavailing given the high-ranking status of the employee at issue.

[12] It is ironic for Defendants to incorrectly claim (at 32-34) the SEC seeks to add elements to *Howey* considering Defendants' attempt to add "essential ingredients" to the test and their attempt (at 33, 43 n.27) to sneak the word "solely" back into the "efforts of others" part of the analysis. The Second Circuit has repeatedly held that the word "solely" is not a literal part of the test. *E.g.*, *Leonard*, 529 F.3d at 88; *Aqua-Sonic*, 687 F.2d at 582; *see also LBRY*, 2022 WL 16744741, at *3 n.2.

Aware of this, Defendants pivot subtly by saying the "promised profit-generating efforts" do not necessarily have to be in "contractual obligation[s]," Def. Opp. 34 n.20, but can instead be "either within *or accompanying* a contract." *Id.* at 35 (emphasis added). The ever-shifting nature of Defendants' invented tests reflects the sort of gamesmanship that animated *SEC v. Merchant Cap., LLC* to hold, in analyzing whether an investment contract exists, that "[a] focus on the bare terms of the legal agreement … would be an invitation to artful manipulation of business forms." 483 F.3d 747, 760 (11th Cir. 2007). In any event, Defendants' new "accompanying a contract" version of the test fails too. The courts in *SG Ltd.*, *SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), and numerous crypto asset cases cited did not identify contracts or conclude they were required in concluding *Howey* was satisfied. Even if they had, here Ripple *did sell* XRP pursuant to over 1,700 *written contracts* (DX 40 ¶ 5) and additional implicit contracts created when orders matched on trading platforms.

*Second*, Defendants attempt to downplay their promotional statements as being of a "general nature" or mere "touting" or "puffery." Def. Opp. 36-38. But courts have repeatedly found a reasonable expectation of profits where promoters make statements "enticing" investors with "fancy brochures touting" efforts by the promoter, *Glen-Arden*, 493 F.2d at 1034-35; from "blog post[s]," articles on the promoter's website, and video interviews online promising general efforts, *LBRY*, 2022 WL 16744741, at *4-5; from a "marketing campaign" that includes "press releases [and] social media posts," *NAC Found.*, 512 F. Supp. 3d at 992; and from statements "touting" the experience of the team, *United States v. Zaslavskiy*, 2018 WL 4346339, at *2-3 (E.D.N.Y. Sept. 11, 2018). Tellingly, the Supreme Court's opinion in *Edwards* begins by repeating a crafty marketing slogan from the "promotional brochure." 540 U.S. at 391.[13]

---

[13]     Defendants' arguments (at 4, 11; Def. 56.1 Opp. ¶¶ 188, 472, 587) that the SEC must show that buyers saw the particular statements at issue and purchased after those statements were made is foreclosed by the objective nature of the *Howey* test and decades of case law that reliance is not an element in SEC actions. *Lorenzo v. SEC*, 139 S. Ct. 1094, 1104 (2019) ("[T]he Commission, unlike

To distinguish the promotional statements in *Glen-Arden* and *Gary Plastic*, Defendants argue (at 37-38) those cases found a reasonable expectation of profits because the promoter promised to buy back the investments. But while the "buy back" statements in those cases were one of the many showing that it was reasonable for investors to expect profits, neither case held that such a statement is *required*. Here, Ripple's promised efforts were extensive and its strong financial incentive to protect and augment XRP's price, value, liquidity, and market were obvious even if Ripple "never said a word about" them. *LBRY*, 2022 WL 16744741, at *6. Of course Ripple *did say* lots about all of this, including about how it was buying back XRP, how Ripple's buybacks were steps to promote the "health" of the market, and how its buybacks would continue. *See* SEC 56.1 ¶¶ 770-72, 779-81.

And Ripple engaged in more than just "puffery." It gave specific details of the efforts it would undertake to find "uses" for XRP, to attract others to the "ecosystem," to manage the supply of XRP, to get platforms to list XRP, and to develop uses for the ledger. SEC 56.1 ¶¶ 63-65, 68, 83, 100, 117, 130, 137, 201-03, 265, 388-89, 428, 430, 1205. This is not like a consumer or collectible product that may be sold while touting a potential increase in the item's value. *See also infra* § I.D.[14]

*Third*, any disclaimers in Defendants' XRP marketing cannot defeat summary judgment. While a facts-and-circumstances test encompasses consideration of disclaimers, a "disclaimer cannot

---

private parties, need not show reliance in its enforcement actions."); *Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963) ("The Commission's duty is to enforce the remedial and preventive terms of the statute … not merely to police those whose plain violations have already caused … loss"); SEC Opp. 55-56.

[14]     The cases involving real estate are likewise distinguishable. There, the promoters typically "never offered specialized or particularized skills … and did not perform any skilled activities … after the land changed hands." *Happy Inv. Grp. v. Lakeworld Props., Inc.*, 396 F. Supp. 175, 180-81 (N.D. Cal. 1975). Or the purchaser bought inhabitable land and took "complete control," and the promotional campaign did not represent that the promoter would "develop, improve, or manage" those parcels. *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300-01 (9th Cir. 1979); *Johnson v. Nationwide Indus. Inc.*, 450 F. Supp. 948, 953 (N.D. Ill. 1978) *aff'd* 715 F.2d 1233 (7th Cir. 1983). Another case held that an investment contract may be involved in the sale of land when it is "expressly or *impliedly* understood" that the land will be developed by others, but that a simple purchase of real estate hoping the land value increases does not suffice. *See Woodward v. Terracor*, 574 F.2d 1023, 1026 (10th Cir. 1978) (citations omitted) (emphasis added).

undo the objective economic realities of a transaction." *LBRY*, 2022 WL 16744741, at *6 (citing *SG Ltd.*, 265 F.3d at 54); *see also Telegram*, 448 F. Supp. 3d at 374-75 ("disclaimers and public statements emphasizing the consumptive use" are insufficient to "negate the substantial evidence" that a "reasonable purchaser expected to profit"); *Kik*, 492 F. Supp. 3d at 178 (summary judgment for SEC although "Kik expressly disclaimed any ongoing obligation[s]"); SEC Opp. 22, 53-54.

An illustrative statement is one Defendants themselves emphasize (at 3, 40-41): Schwartz said Ripple was "legally obligated" to try to increase XRP's price, which was followed by a disclaimer that Ripple could not guarantee anything about XRP's "value." This is exactly what public company executives often do on earnings calls—not make promises about the future price of the securities, but discuss the steps they plan to attempt to *affect* their value. Schwartz's statement does not show that Ripple had *legal* obligations to XRP holders. His statement simply made explicit what economic reality already makes obvious. Ripple, "by retaining" billions of XRP "for itself … signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any" XRP purchasers. *LBRY*, 2022 WL 16744741, at *6. "The structure, which any reasonable purchaser would understand, would lead purchasers of" XRP "to expect that they too would profit from their holdings of" XRP "as a result of" Ripple's "assiduous efforts." *Id.* No amount of purported disclaimers can erase this reality. And, when Ripple touted its *actual* efforts or ascribed XRP price increases to them, referring to them as increases in "Ripple's price," it further cemented the objective expectation and economic reality that Ripple was committed to making efforts to increase XRP's value, regardless of whether it had a formal obligation to do so.

*Fourth*, that market forces may affect XRP's price does not preclude reasonable expectations of profits from Ripple's efforts, as Defendants incorrectly contend (at 39-40). *Howey* does not require the existence of a monopoly. The price of nearly every security is affected by the forces of supply and demand. *E.g.*, *Glen-Arden*, 368 F. Supp. at 1390 n.3 (observing "strong evidence that the

value of whisky is determined by laws of supply and demand"); *Glen-Arden*, 493 F.2d at 1032

(reaching same conclusion); *Kik*, 492 F. Supp. 3d at 180 (rejecting "market forces" argument given

Kik's "unique incentive to increase demand for Kin"); SEC Opp. 37-39, 50-53.[15]

> ### D.   Comparisons of Sales of XRP to Sales of Supermarket Items Fail.

Defendants compare XRP to tangible assets (rare earth metals, soybeans, and oil) and accuse

the SEC (at 4, 14-15, 19, 37) of trying to regulate their commercial sale. They also argue (at 19, 39-

43) there is an issue of fact because some persons bought XRP for a purpose other than to invest.

But Defendants' attempt to prolong this litigation with a jury trial, based on the notion XRP has

some "use," fails for three reasons: (1) Defendants do not attempt to and could not meet the test to

determine whether something was sold as an asset or as an investment; (2) the test is an objective

inquiry that courts, not juries, make; and (3) XRP is nothing like assets with intrinsic value.[16]

> ### 1.   Economic Reality Forecloses any Argument that Ripple Offered and Sold XRP Primarily for Consumptive Use.

As *amici* recognize: "76 years of caselaw has shown that practically any asset or commodity

can be offered as a security." D.E. 708 at 13-14; *see also* D.E. 649 at 5-6; D.E. 706 at 2. Such items

include: "scotch whiskey, self-improvement courses, cosmetics, earthworms, virtual, digital, or

crypto currency, beavers, muskrats, rabbits, chinchillas, animal breeding programs, cattle embryos,

rare coin investment programs, fishing boats, vacuum cleaners, cemetery lots, coin operated

---

[15]     Defendants' cite (at 39-40) to *SEC v. Pac. W. Cap. Grp. Inc.*, 2015 WL 9694808 (C.D. Cal. June 16, 2015), does not help. *Pac. W.* did not hold that when profits result "primarily from market forces of supply and demand" there can be no "efforts of others." Def. Opp. 39. It instead held that because the life insurance settlements' profitability was based *entirely* on an "extrinsic factor" that the promoter could not affect (when the insurance beneficiaries died) it would not preliminarily conclude that the promoters' efforts were the "undeniably significant ones." *Pac. W.* at *6-7.

[16]     As Defendants note (at 19), *Howey* aims to "distinguish[] between consumptive use" and "investment[s]." That distinction is part of the "expectation of profits" analysis, but Defendants go to great lengths to confuse this issue by claiming at different times (at 18-19, 32,-34, 42-44) that the analysis must be part of all three *Howey* prongs. The absurd comparison of XRP to oranges at supermarkets fails no matter which *Howey* prong is analyzed. *See* SEC Br. 56-58; SEC Opp. 39-46.

telephones, health insurance… and fruit trees." Thomas Lee Hazen, 1 *Law of Securities Regulation* § 1:49 at 116–19 (7th ed. 2016) (cited in *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021)).

*Forman* provides the test to distinguish between sales of assets for consumption and sales of securities. 421 U.S. at 847-48. Under *Forman*, courts analyze whether (a) the amount sold was restricted to what the buyer could reasonably be expected to consume, (b) it is reasonable to expect the purchasers who bought the item to "use" it, and (c) the promoter said anything that "fueled expectation of profits." *SG Ltd.*, 265 F.3d at 53-54; *see also* SEC Opp. 41-46 (collecting cases).

Neither Defendants nor *amici* even attempt to argue Defendants *offered and sold XRP* as an item for use under *Forman*.[17] Instead they proclaim: XRP has uses, therefore its offers and sales were not securities transactions. But as *Forman* shows, it is not enough to simply invoke an asset's "use" (or "utility") as a talisman that keeps the securities laws at bay. Indeed, Defendants and the *amici* cannot cite a single case that shortcuts the analysis on the mere basis that the asset has uses.

Consistent with *Howey*'s dictates, all these cases analyze the facts and circumstances to determine whether an investment contract was offered and sold. That the facts in cases applying *Howey* and *Forman* include the offer and sale of assets that may or not be usable by a purchaser is typical but beside the point. *Howey* requires that courts examine how the asset was offered and sold and what reasonable purchasers were led to expect. "Nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract" or that a token was not offered "as a security simply because some … purchases were made with consumptive intent." *LBRY*, 2022 WL 16744741, at *7.

---

[17]     The *amici* who claim to "use" XRP in connection with their businesses all state that they never bought XRP from Ripple, and argue only that *Forman* exempts *their* transactions, not Ripple's. *E.g.*, D.E. 660 at 2; D.E. 661 at 8; D.E. 684 at 8, 11; D.E. 710 at 6; D.E. 722 at 2. No *amicus* explains why their businesses could not survive if Ripple filed a registration statement. Moreover, the *amici* who make these arguments have been able to continue buying and selling XRP even after this case was filed. *E.g.*, D.E. 660 at 2-3; D.E. 684-1 at ¶¶ 35-36; D.E. 710 1-2; D.E. 722 at 1.

The SEC No-Action letters Defendants cite (at 15) do not help them. In each, the SEC staff noted the sales *could* involve investment contracts if the sales were accompanied by the seller's statements that would lead the buyer to expect profits or the maintenance of a trading market based on the seller's efforts, but determined there were no such statements. *See Future Sys., Inc.*, 1973 WL 9653, at *3 (June 8, 1973); *London Diamond Exch.*, 1972 WL 8488, at *2 (Oct. 3, 1972); *Am. Diamond Co.*, 1977 WL 10907, at *3 (Aug. 15, 1977). Here, Ripple made repeated statements about its efforts. Thus, there has been no "reversal in position" by the SEC, as Defendants claim (at 15).[18]

Nor could Defendants satisfy *Forman*, given their sales demonstrate that none of the consumptive features of the co-op "stock" in *Forman* are present with respect to XRP. Defendants do not dispute they did not restrict XRP sales amounts to those someone would "use." Instead, the sale limitations they imposed related to what the market could absorb without tanking XRP's price. SEC 56.1 ¶¶ 537-38, 634-38. They also do not dispute their statements marketing XRP as an investment. *E.g.*, *id.* ¶¶ 83, 100, 117, 130, 201-03, 265, 274-75. Nor do they dispute that they sold XRP "to an untold number of counterparties," Def. Opp. 8, including sophisticated market players, "accredited investors," SEC 56.1 ¶¶ 6-7, 619-20, 713, 1071, those buying XRP to speculate on Ripple, *id.*, and unknown persons on crypto trading platforms. *Id.* ¶¶ 627, 631-32, 652-53. In other

---

[18]     It is, at best, inconsistent for Defendants to cite No-Action letters while elsewhere arguing (at 57 n.46) the futility of seeking one because the SEC supposedly never responds to such inquiries. Defendants know this is not true, as they themselves repeatedly cite a crypto offering No-Action letter from April 2019. Def. 56.1 Opp. ¶¶ 1018-21; *see also TurnKey Jet, Inc.*, 2019 WL 1471132 (Apr. 3, 2019); *Pocketful of Quarters*, Fed. Sec. L. Rep. ¶ 79,003 (July 25, 2019); *IMVU, Inc.*, (Nov. 19, 2020) *available at* https://www.sec.gov/corpfin/imvu-111920-2a1 (responses to requests from crypto asset issuers stating staff would not recommend enforcement). They also cite no evidence they actually believed it would be futile to seek relief or explain why they did not seek No-Action relief *after* that April 2019 date. On the other hand, they do not dispute being advised: "obtaining a no-action letter [from the SEC] would provide further comfort that Ripple Credits [now known as XRP] are not securities." Def. 56.1 Opp. ¶ 997. This failure cuts against any fair notice defense. *See SEC v. Murphy*, 50 F.4th 832, 845 n.6 (9th Cir. 2022) (rejecting defense where, "[i]f [defendant] had concerns about the legality of his business …, he could have requested … a 'No-Action Letter.'").

words, whatever "use" XRP may have for some hypothetical person, the relevant inquiry is what

purchasers were offered or promised. *LBRY*, 2022 WL 16744741, at *7 (citing *Warfield v. Alaniz*, 569

F.3d 1015, 1021 (9th Cir. 2009)); *see also* SEC Br. 56-58; SEC Opp. 42-44.[19]

### 2.    Subjective Intent Cannot Defeat Summary Judgment.

Rather than analyze *Forman*, Defendants and *amici* seek to avoid summary judgment by

pointing to evidence that because some persons *bought* XRP with consumptive *intent*, a jury must

decide whether Defendants *sold* investment contracts. *E.g.*, Def. Opp. 19; D.E. 708 at 19-21.

That is not the law. Rather, "courts [applying *Howey*] … examine the offering from an

objective perspective." *Aqua-Sonic*, 687 F.2d at 584. While individual subjective views are relevant,

courts make objective legal determinations because *Howey* is "not a search for the precise motivation

of each individual participant." *Telegram*, 448 F. Supp. 3d at 371. Were the law otherwise, a lone

purchaser willing to say he bought for consumptive intent would create a material factual dispute in

*every* case. But "whether an instrument is a security is 'a question of law and not of fact,' such that

submitting the question to a jury [is] error." *Thompson*, 732 F.3d at 1160-61; *see also SEC v. Blockvest,*

*LLC*, 2019 WL 625163, at *5 (S.D. Cal. Feb. 14, 2019) ("the *Howey* test is … an objective one").

Even if some purchased XRP for reasons other than to invest, that is not dispositive of

whether *Defendants* offered and sold XRP as a security. Thus, *LBRY* awarded the SEC summary

judgment even though "some … purchases were made with consumptive intent. Were it otherwise,

the Securities Act would be unable to adapt to the 'countless and variable schemes devised by those

who seek the use of the money of others on the promise of profit' wherever a token held some

---

[19]    Defendants state that their efforts to create ODL have "paid off for both Ripple and its
customers." Def. Opp. 7-8. The record shows the opposite, that Ripple simply paid people to
"suffer" use of its product. SEC 56.1 Opp. ¶¶ 178, 210-12, 224-28, 230-33, 251-57, 262, 271-72, 281.
But any dispute over ODL's commercial viability or the product being a "disruptive innovation"
need not be resolved for purposes of the SEC's motion. It shows, at most, that Ripple *did engage* in
the efforts it promised to find uses for XRP. *See also* SEC Opp. 30-31, 44-45.

consumptive utility … [S]tatements from a subset of [token] holders that they purchased … for use on the … [b]lockchain is of limited relevance" to whether the issuer "offered it as a security." 2022 WL 16744741, at *7 (citing *Howey*, 328 U.S. at 299). Thus, Defendants' "I was only selling a commodity" argument has been explicitly rejected on countless occasions.[20] For example, given a defendant's "solicitation, its advertisements, its sales literature and, most importantly, the statements of its salesmen," the "contention that [defendants] were merely selling gallons of raw unblended whiskey that could be consumed, sold or dealt with as a purchaser saw fit is untenable." *Glen-Arden*, 368 F. Supp. at 1390. As the Second Circuit has held, "it ill behooves [defendants], after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity." *Glen-Arden*, 493 F.2d at 1034-35.

### 3.    XRP Is Not Like A Tangible Asset with Intrinsic Value.

Underlying Defendants' entire "use" argument is their superficial claim that XRP is no different than a precious metal or fruit. While the Court need not address this issue to grant the SEC summary judgment for the reasons set forth above, it should not accept these illogical comparisons.

At its founding, Ripple obtained its huge cache of XRP without making any "commitments in exchange." Def. Opp. 7. Indeed, "Ripple's advantage is that it was gifted the XRP and didn't have to spend capital or other types of funds in order to acquire it." PX 6 at 275:17-21. This is nothing like the owner of a "rare earth metal" who, in large part because of the intrinsic value and existing market price for the item, has to expend money and effort to mine, process, and then resell it.

---

[20]    There is, of course, undisputed evidence that buyers purchased XRP as an investment, *e.g.*, SEC 56.1 ¶¶ 877, 903-06, 911-12, 918, 1070, and repeated acknowledgments by *amici* of this as well. *E.g.*, D.E. 708 at 20, 22, 29 (XRP holders "acquir[e] XRP for investment purposes," and "there is no doubt, XRP was also acquired for investment"); DX 167 (affidavits Categories 2A, 2B, 5, and 6 stating investment purposes for acquiring XRP). That said, these affidavits—many from U.S.-based investors—are impossible to authenticate and are of little to no evidentiary value given some of the facts cavalierly sworn under oath thereto, such as that the affiants did not buy XRP from Ripple. Given the pseudonymous nature of these transactions, affiants cannot know who they bought XRP from any more than Ripple can know who it sold it to. SEC 56.1 ¶¶ 627, 631-32, 652-53.

Despite fanciful hypotheticals (at 14-15) about an imagined owner of most of the world's supply of a metal, no company realistically controls the majority of the world's supply of such an item. Thus, as Schwartz explained candidly to the public: "[o]ne big advantage we have—we control a lot of XRP and we're heavily focused on promoting" its potential uses, but "[n]obody has this kind of focused interest on promoting bitcoin in this way." PX 508.06. No one had the financial incentives to make "efforts [that] would benefit" bitcoin owners like Ripple had the incentive to expend efforts to boost the value of XRP given that Ripple held the majority of the world's XRP. SEC 56.1 ¶¶ 274, 437-38, 440, 445-46, 448; *see also id.* ¶¶ 452, 458, 903; PX 508.18; PX 509.54.

For these reasons, Ripple understandably never treated XRP like oranges in a supermarket. Ripple published quarterly "Market Reports" that mimic stock analysts' reports with information about XRP's price, trading volume, and sales activity, and of Ripple's XRP-related efforts. *E.g.*, SEC 56.1 ¶¶ 501, 504, 506-10; PX 501.01-501.10. In this respect, Ripple is quite comparable to Exxon (Def. Opp. 4), which publishes periodic reports (under the securities laws) not for those who buy Exxon gas for their cars, but for the benefit of those who invest in Exxon's business endeavors.

Also, quite unlike the seller of grocery items, Ripple took care to *stop* selling XRP to lower the "footprint" of sales on its price, placed its XRP in escrow, and even bought back XRP it was selling, and then touted all these steps, including stating it "may continue to undertake purchases [of XRP] in the future" in order "to support healthy markets" for XRP. SEC 56.1 ¶¶ 136, 295-98, 331-32, 340, 539-40, 544-45, 547, 549, 551-52, 770-72, 779-81. Grocers (who did not invent their items or control most of their supply at inception) are not in the business of buying back their products and do not put their goods in escrow to give comfort to the markets about their price.

As all of this shows, XRP is not reducible to items like diamonds, oranges, rare earth metals, or gasoline. Focusing *only* on XRP as "just computer code," Def. Opp. 8, and ignoring *how* it was sold, this myopic approach may offer superficial similitudes to the sale of a good for consumption.

But precedent precludes Defendants' cramped analysis. *See also Aldrich*, 627 F.2d at 1039-40 ("[t]he nature of the asset involved is not important'" (citations omitted)); *Revak*, 18 F.3d at 88 (*Howey* may be satisfied if "at least some" investors "expected profits to be derived from the efforts of others"). Ripple's founders created XRP. XRP had no intrinsic value *absent Ripple's efforts*. The economic reality is that XRP's value could potentially grow based on the efficacy and success of Ripple's efforts to create some demand and value for XRP, so it may be resold at a higher price. Offering and selling such instruments is squarely within the scope of the federal securities laws.

\* \* \*

In sum, even assuming Ripple found "uses" for XRP and that some bought XRP to "use" it, the legal question is whether Ripple <u>offered</u> and <u>sold</u> XRP as an asset or as a part of an investment scheme. Defendants do not argue that they <u>offered</u> and <u>sold</u> XRP as an asset, and the undisputed facts foreclose any such argument. Instead, Defendants rely on hypotheticals about groceries. By contrast, the SEC has cited a litany of *actual* cases involving the most comparable product possible, other crypto assets sold by their issuer. *See* SEC Br. 49; SEC Opp. 21-24. Each of those decisions involved crypto assets like XRP, each considered and rejected arguments like those raised by Defendants, and each found that crypto assets had been offered and sold in violation of Section 5.[21]

## II.   DEFENDANTS' "ESSENTIAL INGREDIENTS" TEST FAILS.

Offering no new cases or facts, Defendants rehash the same "essential ingredients" argument from their opening brief. They now insist (at 12-14) that before applying *Howey*, courts must engage in a threshold review of the facts to ensure they satisfy a new three-part test no court

---

[21]   Defendants' (at 43) and *amici*'s throwaway argument, that XRP is currency, fails for the same reasons. Ripple never offered or sold XRP as a currency and Ripple received years of legal advice that, even if XRP were a currency, it could concurrently be regulated as a virtual currency, a commodity, and a security. *E.g.*, SEC 56.1 ¶¶ 1010-11; *see also id.* ¶ 1003; PX 245 (Ripple would face an "uphill argument" to establish XRP is exempt from the securities laws as a "currency"). Thus, Ripple's settlement with FinCEN (which does not regulate securities) that did not include the SEC and did not mention securities (DX 186), is no defense. *See also* SEC Opp. 5 n.2.

has ever recognized. This made-up test requires: (1) a written contract; (2) contractual obligations for the "promoter to take specific actions for the investor's benefit"; and (3) contractual rights for the investor to receive profits. Not even the *amici* endorse this extreme position.

For the same reasons Defendants' opening "essential ingredients" arguments fails, they fail here too. First, *Howey* and its progeny, not pre-*Howey* state law cases, govern this action. *See* SEC Opp. 13-15. Defendants still cite no case applying any test other than *Howey*'s to a Section 5 dispute, or conducting any threshold review before applying *Howey*. That is because their made-up test is based on a distorted reading of *Howey*. *See id.* at 15-19. *Howey* does not require the existence of any of Defendants' essential ingredients, or hold they are even relevant factors. 328 U.S. at 298-99 ("an investment contract … means a contract, *transaction or scheme*…" (emphasis added)).

Defendants also ignore the various cases finding investment contracts despite the absence of "essential" ingredients. *See* SEC Opp. 19-24 (collecting cases). Curiously, they repeatedly cite (at 24 n.13, 29-31) *Marini v. Adamo*, without noting that in a subsequent decision in that case defendants were found liable for selling securities in the absence of written contracts. *Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd* 644 F. App'x 33 (2d Cir. 2016); *see also* SEC Opp. 20 n.12.

Defendants' efforts to distinguish the steady stream of crypto asset cases imposing Section 5 liability similarly fail. Courts repeatedly apply the federal securities laws and find investment contracts to exist. *See* SEC Opp. 21-24 (collecting cases); *see also LBRY*, 2022 WL 16744741, at *8. Defendants try to downplay those cases by merely labeling them as Initial Coin Offerings ("ICOs"). But that distinction neither matters legally nor is it correct (*Telegram* considered but ultimately did not do an ICO, only one part of *Kik*'s offering occurred in that way, and *LBRY* did not involve an ICO at all). In any event, whether an offering was conducted as an "ICO" is beside the point. Each case the SEC cited involved offers and sales of crypto assets that were not governed by contracts or contractual obligations that Defendants claim to be essential.

Given Defendants' demands that the Court use a test they created from whole cloth, their accusations (at 5, 16) that the SEC has shown a "repeated disregard of the law," is "invent[ing] new elements," or is seeking to apply "made-up factors," are particularly specious and meritless.

## III. DEFENDANTS' DUE PROCESS DEFENSES FAIL AS A MATTER OF LAW.

In its opening brief, the SEC demonstrated that Defendants' "fair notice" and the Individual Defendants' vagueness defenses, which Defendants concede (at 43 n.28) are "based on the same facts and due process principles," fail as a matter of law. The SEC cited various cases rejecting these defenses at the summary judgment stage, including where the defense focused on whether the term "investment contract" provide fair notice. *See* SEC Br. 71-73. The SEC noted that no court has ever denied summary judgment based on such a defense, or allowed such a defense to be decided by a jury. *Id.* at 69-70. Nor has a court sustained the defense in regards to any federal securities statute, as opposed to very limited instances where the SEC was applying rules it had promulgated. *Id.* It is telling that Defendants still cannot cite a single case that refutes *any* of these propositions.

In sum, these defenses fail as a matter of law because *Howey* is a "venerable Supreme Court precedent that has been applied by hundreds of federal courts across the country over more than 70 years" and provides all of the notice that the Constitution requires. *LBRY*, 2022 WL 16744741, at *7-8; *see also Kik*, 492 F. Supp. 3d at 183 ("*Howey* provides a clearly expressed test…and an extensive body of case law provides guidance on how to apply that test"); D.E. 707 at 2 (*amicus* noting that application of *Howey* to XRP transactions is "not new"); SEC Br. 71-73 (collecting cases).

Defendants nevertheless insist this Court should become the first ever to hold that the SEC's conduct rendered an application of *Howey* or Section 5 unconstitutional, and the first ever to permit this defense to be tried to a jury. This invitation should be rejected, as Defendants are unable to muster a single case with any such holding.

In any event, even if the Court looked past *Howey*, the issue is ripe for summary judgment because, as Defendants concede (at 43), "much of th[e] evidence" relating to these defenses "is undisputed." *See also* Def. 56.1 Opp. ¶¶ 944, 946-1015, 1017-27, 1028-31, 1035, 1038-41, 1045, 1048.

Facing undisputed facts and an unbroken chain of cases rejecting the defense on summary judgment, Defendants try to dissect the SEC's extensive guidance in the crypto space, claiming that factual differences between *excerpts* from SEC guidance and this case rise to the level of a constitutional violation. They thus allege that because the SEC never *publicly* stated that *XRP itself* could be offered and sold as a security, and never brought an earlier action involving offers and sales that were 100% identical to Ripple's offers and sales of XRP, the SEC did not provide fair notice.

These arguments should also be rejected. It is like saying an apple-orchard investment program otherwise identical to *Howey* would fall victim to a fair notice defense simply because it involved apple orchards, and not orange groves. Accepting this argument would eviscerate *Howey*'s guidance to apply the term "security" in a "flexible rather than a static" manner. 328 U.S. at 299. *Cf. Consol Buchanan Mining Co. v. Sec'y of Labor*, 841 F.3d 642, 649 (4th Cir. 2016) ("a rule requiring explicit notice of any conceivable violation … would leave open 'large loopholes allowing conduct which should be regulated to escape regulation.'") (citations omitted).

A.  **Juries Do Not Decide Fair Notice or Vagueness Defenses.**

Whatever the legal or factual basis of Defendants' due process defenses, the one common procedural outcome in all cases that involve this defense (whether involving a statute or a regulation), is that they are all decided by the court as a matter of law, and not by a jury.

In its opening brief, the SEC cited seven decisions rejecting fair notice defenses on summary judgment, including the recent and on-point *Kik* and *SEC v. AT&T, Inc.*, 2022 WL 4110466 (S.D.N.Y. Sept. 8, 2022) decisions from this District. SEC Br. 72-74; *see also SEC v. Feng*, 935 F.3d 721, 734 n.8 (9th Cir. 2019). Since then, three more courts have rejected the fair notice defense in

SEC cases at the summary judgment stage, including one in a crypto Section 5 case. *LBRY*, 2022 WL 16744741, at *7-8; *Murphy*, 50 F.4th at 845 n.6; *SEC v. Miller*, 2022 WL 16575719, at *5-9 (D. Md. Nov. 1, 2022). Defendants and *amici* still cite no contrary case.[22]

Defendants' attempt (at 44) to distort *United States v. Smith*, 985 F. Supp. 2d 547 (S.D.N.Y. 2014), into a case requiring the fair notice defense to be heard by a jury is unavailing. Instead of saving the due process defense for the jury, *Smith* expressly rejected it at the pleadings stage. 985 F. Supp. 2d at 605, 608. The Second Circuit affirmed. *United States v. Halloran*, 664 F. App'x 23, 26 (2d Cir. 2016); *see also United States v. Halloran*, 821 F.3d 321, 337-38 (2d Cir. 2016) ("Halloran argues that § 1346 fails the "fair notice" prong [of a vagueness challenge] … We are not persuaded.").

Defendants cite two footnotes in *Smith*, but neither supports their position. The first, footnote 20, states that while the court rejected the defense at the indictment stage, the government might later "open the door" for the defense to be re-asserted, depending on the evidence offered at trial. 985 F. Supp. 2d at 606 n.20. The possibility that the court might allow the defense to be re-asserted later in the litigation does not mean that the *jury*—rather than the court—would necessarily decide whether the defense applied. The second footnote, note 21, rejected a defense that the indictment failed to charge a crime by noting that whether the acts *were a crime* presents a "jury question." *Id.* at 608 n.21. It said nothing about the jury deciding whether to apply a fair notice defense. Thus, the *Smith* jury was never asked to decide any constitutional defenses. *See United States v. Smith*, No. 13 Cr. 297 (S.D.N.Y.), D.E. 192, 200, 224, 231, 319, 325, 392 (jury instructions).[23]

---

[22]     The Court has already ruled that it "will not permit…amici, to offer evidence or present witnesses" and "will limit their participation to legal as opposed to factual issues." D.E. 372 at 10-11. Thus, even if the individual *amici*'s self-serving views were somehow relevant to a defense the Court has recognized involves only an *objective* inquiry (D.E. 440 at 10 n.5), the *amici* are prohibited from proffering evidence that would create a factual dispute that otherwise prevents summary judgment.

[23]     One a*micus* similarly argues that the fair notice defense is "highly fact-intensive, which makes it particularly ill-suited for adjudication on summary judgment." D.E. 705 at 5. Yet the *amicus* cites

**B.**      **Defendants and *Amici* Premise Their Arguments on Laches and Estoppel Defenses that Fail as a Matter of Law.**

Defendants know that any claim about the supposed vagueness of "investment contracts" is doomed from inception. They accordingly attempt to refashion their defense premised on the idea that the time the SEC took to investigate this case created uncertainty and confusion rising to a constitutional violation. The implication of this argument is that the Constitution *requires* the government to preemptively reach a conclusion about the legality of a person's conduct before it can gather all the facts—which are often in that person's possession—that inform legality. But they do not stop there. According to Defendants and *amici*, the Constitution requires the government not only to jump to conclusions, but also to then specifically and publicly warn that it has actually jumped to a conclusion and views the party's conduct as problematic. That is simply not the law.

Specifically, Defendants premise their arguments on the *time* that it took the SEC to bring this case and on the notion the SEC had silently *acquiesced* to their conduct. *E.g.*, Def. Opp. 4-5 (SEC provided "belated guidance"); *id.* at 7 (claiming Larsen "presented [his] vision to the SEC" in 2013); *id.* at 47 (the SEC "expressed no disagreement"); *id.* at 62 (the SEC "stayed silent for years"); *id.* at 66 (XRP "had been circulating for approximately four years"); *see also* D.E. 705 at 3, 10.

These are improper laches or estoppel defenses that fail as a matter of law. Congress provided the SEC with specific statutes of limitations, 15 U.S.C. § 78u(d)(8), which Defendants cannot shorten under the guise of a fair notice defense. Thus, "the SEC's failure to prosecute at an earlier stage does not estop the agency from proceeding once it finally accumulated sufficient evidence to do so." *Graham v. SEC*, 222 F.3d 994, 1007-08 (D.C. Cir. 2000). Accordingly, courts

---

no case where a jury decided the defense or fact disputes prevented its rejection on summary judgment. There are practical reasons why such defenses are not and should not be heard by juries. Allowing the defense would greatly lengthen government enforcement trials by permitting defendants to proffer evidence about the SEC's internal deliberations and the beliefs of "countless" market participants. This would require rebuttal from the SEC, further lengthening the trial. All of this is unnecessary here, especially since Section 5 is a strict liability offense.

regularly reject defenses that the SEC "allowed" conduct to occur while it investigated the conduct. *See, e.g.*, *id.* (disallowing defense); *SEC v. Kahlon*, 141 F. Supp. 3d 675, 681 (E.D. Tex. 2015) (rejecting defense, on summary judgment, that because the SEC "had interviewed and requested documents from [defendant] in connection with two other investigations but did not bring [suit] until much later … means that the SEC 'explicitly permit[ted]' his conduct"); *SEC v. McCaskey*, 56 F. Supp. 2d. 323, 327 (S.D.N.Y. 1999) ("'The settled precedent in this circuit holds that laches is not an available defense in an SEC enforcement action'") (citations omitted); *SEC v. Culpepper*, 270 F.2d 241, 248 (2d Cir. 1959) (the SEC "would not now be estopped even if it had acquiesced in the … transaction").

Defendants suggest and various *amici* also argue that the SEC's approach to digital assets has been "regulation by enforcement," which itself sustains the fair notice defense. *E.g.*, D.E. 706 at 3, 20-22; D.E. 711 at 1, 14-17; D.E. 705 at 2-4, 13, 16, 20-21. Some *amici* claim that the SEC must issue rules in this space before enforcing the law. D.E. 705 at 13, 20-21, D.E. 711 at 2-3, 14-17. Conversely, others claim that the SEC lacks the authority to do so. D.E. 683 at 2 (citing mostly the *concurrence* in *West Virginia v. EPA*, 142 S. Ct. 2587 (2022)); D.E. 707 at 13-15; D.E. 722 at 8-11.[24]

While the complaint of "regulation through enforcement" may be a pithy soundbite or even a recurring policy dispute, it is not a valid legal defense. Enforcement of well-established laws that Congress enacted is not "regulation by enforcement," it is simply enforcing the law. Accordingly, "the law does not require the Government to reach out and warn all potential violators on an

---

[24]     *West Virginia* describes the "major question doctrine" that limits agency authority to promulgate certain extraordinary *rules* pursuant to general enabling statutes that intrude on Congressional power to write the law. This case involves no such conflict between the legislative and executive branches. It was Congress—not the SEC—that "enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment," to effectuate its "purpose … to regulate investments, in whatever form they are made and by whatever name they are called." *Edwards*, 540 U.S. at 393 (cleaned up). And it was the Supreme Court that further defined the nature of an "investment contract." Whether Ripple illegally offered and sold securities turns on what Congress legislated by statute and what the Supreme Court has decided, not a rule promulgated by an agency, and the SEC is explicitly authorized to enforce the statute. *See* 15 U.S.C. § 77t.

individual or industry level." *Kik*, 492 F. Supp. 3d at 183. Thus, the *amici* cite no case holding that

"regulation by enforcement" is a defense to liability or otherwise a factor to a constitutional defense.

To the contrary, courts uniformly reject such arguments. *E.g.*, *SEC v. Chenery Corp.*, 332 U.S.

194, 203 (1947) ("the choice made between proceeding by general rule or by individual, *ad*

*hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.");

*Rojas-Reyes v. INS*, 235 F.3d 115, 126 (2d Cir. 2000) ("the Attorney General was not required to

promulgate … regulations at all…and her failure to do so constitutes a legitimate exercise of her

discretion."); *Kahlon*, 141 F. Supp. 3d at 681 (granting SEC summary judgment on Section 5 claim

and rejecting defense based on "regulation by enforcement"); *CFPB v. Ocwen Fin Corp.*, 2019 WL

13203853, *16-19 (S.D. Fla. Sept. 5, 2019) (rejecting fair notice defense based on "regulation

through enforcement" and noting: "Federal courts have rejected this argument.").[25]

## C.   Defendants Received Extensive Notice in Addition to *Howey*.

### 1.   The SEC's 35 Prior Crypto Asset Cases Provided Additional Notice.

Though *Howey* provides all the notice that is constitutionally required with respect to the

application of *a statutory term*, courts hold that prior enforcement actions can provide *additional* notice

that *agency rules* (not at issue here) apply to conduct. *E.g.*, *AT&T*, 2022 WL 4110466, at *38-39; *see*

---

[25]     One *amicus* in particular argues the SEC cannot provide fair notice until it engages in formal "notice-and-comment rulemaking" regarding digital assets. D.E. 705 at 13, 20-21. Beyond failing to cite any case holding out of rule-making sustains a fair notice defense, *amicus* profoundly misunderstands the cases where the fair notice defense actually succeeded. In the cases it cites (*id.* at 14-16 (citing *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996) and *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012))), the defendants were charged with violating a *rule* that had already been promulgated and taken effect. *See also KPMG, LLC v. SEC*, 289 F.3d 109 (D.C. Cir. 2002); *Trinity Broad. of Florida, Inc. v. FCC*, 211 F.3d 618, 629-30 (D.C. Cir. 2000). The fair notice defenses succeeded *not* because the agency had yet to promulgate rules, but because the agency had not given sufficient notice it would apply the *rule* to defendant's conduct. Notably, *Upton* and *KPMG* are the *only* decisions Defendants or *amici* cite where the fair notice defense has succeeded against the SEC, and both involved the SEC interpreting its *rules* (not a statute and Supreme Court decision) and applying them outside of federal court. Finally, *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 861-62 (2d Cir. 1966) considered whether the *complaint* provided notice that the alleged conduct was illegal.

*also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 257 (3d Cir. 2015) (enforcement actions "certainly help[] companies with similar practices apprehend the possibility" that their conduct violates rule at issue). By contrast, *Upton v. SEC*, the principal case upon which Defendants rely, involved only a single prior action involving the regulation. 75 F.3d at 97-98. Here, the SEC filed 35 actions claiming that unregistered offers and sales of crypto assets violated Section 5 before suing Defendants. SEC Br. 73-74. Unable to dispute these actions, Defendants argue (at 27 n.14, 38, 51, 55-56) the prior SEC cases differ from this case because they involved ICOs, or that some of the cases involved fraud charges, and that these distinctions matter for fair notice purposes.

Even assuming the incorrect factual predicate that all of the prior SEC cases involved ICOs, Defendants' attempt to raise a constitutional defense based on factual differences between cases fails. This is another way of arguing the SEC must *specifically warn* about *the specific fact pattern* at issue. No court has ever accepted this argument in any context and doing so here would fundamentally alter the enforcement of the law. Again, "the law does not require the Government to reach out and warn all potential violators on an individual or industry level." *Kik*, 492 F. Supp. 3d at 183 (emphasis added); *see also* D.E. 440 at 10 n.5.

Defendants' argument is particularly ill-suited to sustain a fair notice defense with respect to the application of *Howey*, which does not turn on the name appended to the transaction. *Edwards*, 540 U.S. at 393. Calling something an "ICO" does not transform it into a security any more than calling something a "stock" does. *See Forman*, 421 U.S. at 847-48. Conversely, calling a crypto asset offering that satisfies *Howey* a non-ICO does not magically remove it from the scope of the securities laws. *Howey* must be applied to the facts and circumstances at hand, and the existence of factual distinctions between this case and the prior ones does not create a constitutional violation. *Cf. Murphy*, 50 F.4th at 845 n.6 (rejecting defense because "[a]lthough we are unaware of any case that has applied § 15(a) to directly analogous conduct, [defendant's] conduct falls within the … statute.").

As *LBRY* found in rejecting the same argument, the SEC has never "suggest[ed] that companies need only comply with the registration requirement if they conduct an ICO"; and no "persuasive reading of *Howey*…would cause a reasonable issuer to conclude that only ICOs are subject to the registration requirement." *LBRY*, 2022 WL 16744741, at \*8. For this reason, while an offering being "an ICO may be relevant … it will not determine the outcome in a [crypto] case." *Id.*[26]

Defendants also attempt to distinguish the SEC's prior crypto asset cases (at 51, 56) by noting that 20 of those actions involved fraud allegations but this case does not. Defendants fail to grapple with the fact that 15 of those actions *did not* allege fraud, and they do not and cannot explain how the presence or absence of fraud claims impacts the application of *Howey* to their offers and sales. The myriad cases the SEC has cited apply *Howey* identically to situations where the SEC *also* alleged separate fraud charges as to situations where no such additional claims were made. Dismissing clear guidance as to how the agency applies *Howey* to crypto assets on the basis of arbitrary distinctions strongly suggests that "fair notice" is not what Defendants and *amici* are after. Rather, as they themselves have put it, Defendants "disagree with the regulatory certainty so [they are] going to call it regulatory uncertainty." SEC 56.1 ¶ 1028; PX 503.11.

---

[26]    As a factual matter, Defendants are incorrect when they assert that this is the SEC's first non-ICO case alleging Section 5 violations. Citing an excerpt from an SEC investor alert, Defendants narrowly define "ICO" as a "pre-sale of digital assets in which the seller 'tell[s] purchasers that the capital raised from the sales will be used to fund development of a digital platform.'" Def. Opp. 27 n.14 (citing SEC, *Investor Bulletin: Initial Coin Offerings* (July 25, 2017)). The bulletin actually goes on to describe ICOs broadly to cover any instance where a company sells digital tokens to fund its business operations and product development. *See* DX 142 (ICOs may be sold "to fund development of a digital platform, *software*, or *other projects*" (emphasis added)). That is precisely what Ripple did here. Thus, Ripple contemporaneously believed its XRP offering was the "first ever ICO." *See* PX 526 ("I'm pretty sure Ripple counts as an ICO"). The arbitrary manner in which Ripple has deployed the ICO label to suit its marketing and legal strategies only underscores why a defense based on a label must fail as a matter of law. To the extent Defendants claim that, unlike ICOs, their XRP offers were not "initial," Perkins Coie earlier advised Ripple that Section 5 is not limited to "initial" offerings. PX 242 at 7879 ("**Coins not initially sold may still constitute securities if sold at a later date.**"). Rather, Section 5 speaks generally to any type of "offer" of securities. 15 U.S.C. § 77e(c); *see also SEC v. Esposito*, 2018 WL 2012688, at \*5 (D. Mass. Apr. 30, 2018) (Section 5 applies to second and third offerings).

## 2.    Defendants Do Not Dispute They Received Additional Actual Notice.

The SEC is not required to provide, or prove that someone received, *actual* notice to negate a fair notice defense. D.E. 440 at 10 n.5. But doing so, as the SEC has done here, is an additional reason to grant the SEC summary judgment. *United States v. NGL Crude Logistics, LLC*, 2018 WL 4762901, at *17-20 (N.D. Iowa July 3, 2018) (summary judgment for EPA where defendant "had actual notice of the *potential liability* associated with its actions") (emphasis added); *United States v. Cinergy Corp.*, 495 F. Supp. 2d. 892, 900-05 (S.D. Ind. 2007) (same result where defendant "had actual knowledge of the EPA's interpretation"). The undisputed evidence shows Defendants received repeated warnings and were aware their XRP distributions *could* violate Section 5. This included the 2012 Perkins Coie memos, and the 2015 Paul Hastings memo. SEC 56.1 ¶¶ 989-96, 1002-06.[27] Defendants' awareness was further reflected in the guidance they provided their employees and public relations firm to avoid talking about XRP using language that implicates *Howey. Id.* ¶¶ 1024-27. Defendants' awareness is also shown by their repeated efforts to sway various government decision-makers in Washington, including efforts to shape legislation that would prevent the securities laws from applying to XRP. *Id.* ¶¶ 1048, 1050.

Whatever "confusion" Defendants claim existed about whether their conduct could implicate the securities laws was extinguished when they learned the SEC was investigating their XRP distributions by April 2018. Defendants' argument that an SEC investigation does not provide notice rests entirely on *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012). But that

---

[27]    Perkins Coie advised: "[i]f sold to Investors, [Ripple Credits] are likely to be securities," the more Ripple and Larsen "promote Ripple Credits as an investment opportunity, the more likely it is that the SEC will take action," and Ripple should "steer clear of promoting Ripple Credits as an investment opportunity or as a speculative investment trading vehicle." Def. 56.1 Opp. ¶¶ 989-996. While Perkins Coie may have concluded XRP was not a security, it reached that conclusion by assuming a course of conduct that Defendants did not follow. PX 243 at 99478-79 ("We understand that the primary reason for purchasing Ripple Credits is to facilitate online commerce, not to engage in speculative investment trading" and "it appears that neither the Founders nor Company will be collecting or retaining funds from the distribution of Ripple Credits").

case did not involve any fair notice defense, but rather whether an agency's interpretation of its *own rules* was "owed deference." *Id.* at 153. Here, the SEC is not interpreting or enforcing one of its *rules*. It is enforcing Congress's statute, guided by the Supreme Court's interpretation of that statute in *Howey* and its progeny.

Defendants also fail to genuinely dispute the deposition testimony of former Director William Hinman that, in the course of the SEC's investigation, he told Ripple he viewed its unregistered XRP distributions as illegal. Def. 56.1 Opp. ¶¶ 1042-1044. Defendants cannot cite to any witness (including Garlinghouse and various Ripple attorneys who attended the meetings) that contradicts Hinman. *Id.* To the contrary, Garlinghouse *admitted* that SEC staff informed Ripple in 2019 it was likely to conclude it viewed Ripple's XRP distributions as securities transactions. *Id.* ¶ 1045. Defendants' only rebuttal—that Hinman's testimony about what *he said* is hearsay—is simply wrong. The SEC is not proffering Hinman's testimony for the truth of the matter asserted—*i.e.*, it is not proffering the testimony to prove what Hinman believed—but to prove what he told Ripple.[28]

### 3.    Other SEC Crypto Asset Guidance Provided Additional Notice.

In addition to the ample notice that Defendants received from *Howey* itself and the cases applying it, from their sophisticated lawyers, and from the SEC's multiple crypto asset enforcement actions, Defendants also received notice through abundant public guidance issued by the SEC. Defendants thus received notice that was at least comparable to, if not greater than, the notice that was received by the defendants in the three crypto cases that already have rejected fair notice defenses: *Zaslavskiy*, *Kik*, and *LBRY*.

---

[28]    Defendants complain that "[a]s late as October 2020, the SEC was telling the public it had not made any determination on XRP's status as a security." Def. Opp. 49 n.39. But the SEC was prohibited from disclosing its investigation and attendant deliberations. Federal regulations provide: "all formal investigative proceedings shall be non-public." 17 C.F.R. § 203.5. Defendants cannot validly argue the SEC unconstitutionally deprived them of notice by not making public statements in the course of an ongoing investigation.

Unable to dispute all the notice Defendants actually received, Defendants argue (at 48, 50, 53, 55) that the SEC's extensive guidance "created additional uncertainty" and confusion. Defendants' argument, however, requires ignoring the parts of the guidance that do not suit them. For example, Defendants dismiss the DAO Report, which analyzed crypto token sales under *Howey*, by noting the DAO token granted "certain voting and ownership rights." Def. Opp. 47. But Defendants ignore the report's detailed discussion about how "these voting rights were limited" and "did not provide [investors] with meaningful control over the enterprise," such that the underlying point was that investors were "substantially reliant on the managerial efforts of" the token's sellers. https://www.sec.gov/litigation/investreport/34-81207.pdf ("DAO Report") at 13, 14. Tellingly, the tokens in *Zaslavskiy*—like XRP—did not provide voting or ownership rights, but the court in that case still held there was fair notice based solely on *Howey* and the DAO Report.

Defendants next dismiss former SEC Chair Clayton's 2017 public statement that the SEC was going to file crypto asset enforcement actions by falsely describing his statements as "limited to ICOs." Def. Opp. 47 n.31. That is simply not the case. Both the title of Clayton's "Statement on Cryptocurrencies *and* Initial Coin Offerings" and the substance of the remarks (repeatedly using the phrase "cryptocurrencies *and* ICOs") show otherwise. DX 194 at 1-3, 5 (emphasis added). And as explained above, Defendants' focus on ICOs is unavailing. The fact that Chair Clayton referred to actions involving ICOs and the fact that prior enforcement actions have involved ICOs has never meant that only offerings called "ICOs" would be subject to enforcement actions.  Moreover, Clayton reiterated that "[m]erely calling a token a 'utility' token or structuring it to provide some utility does not prevent the token from being a security,'" *id.* at 3, a fact to which Ripple's P.R. Agency specifically alerted Ripple. PX 450.

Next, Defendants argue that two features of Director Hinman's June 2018 speech resulted in confusion. Def. Opp. 48 (citing PX 241 at 3, 4-5). *First*, they argue that the speech created a "new

'decentralization' test for digital assets" and that this term was confusing. Hinman explained

"decentralization" (in the context of broader commentary about *Howey*'s "efforts of others" prong)

by pointing to Bitcoin and Ether. Hinman noted that, at the time of his speech, those tokens did

not: (a) involve "a central third party whose efforts are a key determining factor in the enterprise" or

(b) "rely on central actors whose efforts are a key to the success of the enterprise." PX 241 at 3. But

Ripple cannot claim that Hinman's speech was confusing when Ripple itself has continuously

distinguished itself from Bitcoin and Ether on the basis of those very characteristics. Ripple has thus

distinguished XRP by pointing to: Ripple being a central actor that could provide information with

respect to XRP; Ripple expending efforts with respect to XRP; Ripple having the resources to do so;

and Ripple having received for free large quantities of XRP. SEC 56.1 ¶¶ 345-48, 350, 352, 354-56,

358-59, 903. No one could claim these things about Bitcoin or Ether.

     *Second*, Defendants focus on one factor referred to in the speech as relevant to whether

something was not an investment contract—whether the application was "fully functional or in early

stages of development." They contend that inclusion of this factor in the speech led them to believe

their conduct did not implicate the securities laws. Defendants ignore that Hinman's speech referred

not just to this one factor, but rather provided thirteen expressly non-exhaustive factors that market

participants could consider when asking "whether a third party—be it a person, entity or

coordinated group of actors—drives the expectation of a return." PX 241 at 4-5. Nearly all of those

factors aptly describe Ripple's relationship with XRP. Defendants cannot ignore agency guidance

that is unhelpful to their cause and claim confusion by selectively focusing on a single factor in a

long list of non-dispositive factors.

     Defendants engage (at 50) in similar acrobatics with respect to the SEC staff's April 2019

*Framework for 'Investment Contract' Analysis of Digital Assets*. This guidance also provides a list of factors

that would make an offering of crypto assets more likely an offering of securities, the majority of

which apply to Ripple and XRP. DX 226 at 3-8. Nevertheless, Defendants seize on the few factors they claim do *not* apply to them and argue the existence of those factors created unconstitutional "confusion." Again, if this were the law, agencies' ability to give guidance would be hobbled. And Defendants' incorrect claims (at 50-51) that this guidance "abandon[ed]" Hinman's decentralization analysis or *Howey*'s common enterprise prong are foreclosed by the language of the guidance itself. DX 226 at 3 (decentralization); *id.* at 11 n.10 (commonality (citing *Revak*)).[29]

Of course, that there is even all of this guidance for Defendants and *amici* to scrutinize belies their complaint that the SEC issued no guidance to the industry. The issue here is not the lack of guidance, but that the existing guidance is not what many crypto market participants want to hear.

### D.   The Views of Financially-Motivated Third Parties Are Irrelevant.

Defendants also argue that because third-parties (or their lawyers) were supposedly confused about whether XRP was a security, the SEC violated due process. This argument fails as a matter of law, since the government does not need to warn would-be violators before bringing suit. *Kik*, 493 F. Supp. 3d at 183. It would be an odd result to hold that, nevertheless, the government must warn *third parties it did not sue* that the conduct of another person is illegal.

Unsurprisingly, Defendants cite no case holding that the claimed confusion of select attorneys for third-party market participants can support a finding of a constitutional violation. Taken to its logical end, such a rule would allow any defendant to override regulatory action by finding a few industry players who disagreed with the agency who hired sophisticated counsel to

---

[29]     *Amici* should not be allowed to provide evidence of their own supposed confusion, *see supra* note 22. In any event, the views they offer do not help Defendants. The *amici* cite the same public statements: the DAO Report, Hinman's speech, and other SEC guidance, statements by individual SEC Commissioners, and statements by other regulators or politicians. *See, e.g.*, D.E. 683 at 7-11; D.E. 706 at 21-23; D.E. 708 at 4-8, 28; D.E. 711 at 5-6, 11; D.E. 722 at 11-14; D.E. 705 at 8-11, 20. As with Defendants, a review of the public statements cited by the *amici* shows that while they *disagree* with the SEC's approach, they very much understood the SEC would evaluate crypto asset offerings under *Howey* and that the SEC was suing crypto asset issuers where *Howey* was satisfied.

construct an opposing legal argument. The standard for finding a due process violation is not whether disagreement exists in the marketplace. It is whether the laws "fail to provide a person of ordinary intelligence fair notice of what is prohibited." D.E. 440 at 7 (citations and alterations omitted). For fair notice purposes, Defendants and *amici* are "only entitled to notice of the meaning of the statute and not to the agency's interpretation of the statute." *Wyndham*, 799 F.3d at 255.

Tellingly, rather than coming from a "parade of ordinary observers," as Defendants claim (at 55), their evidence of purported market "confusion" comes from a limited number of defense lawyers. Those lawyers represent crypto asset clients or market participants who otherwise have their own financial motivations to avoid SEC oversight. Defendants also cite (at 47, 49-50) the fact that 200 exchanges listed XRP following the DAO Report, supposedly reflecting a belief that XRP is not a security.[30] And they rely primarily on one particular platform, Coinbase, citing an email it sent the SEC before listing XRP in February 2019. DX 229. But Coinbase listed XRP despite concluding "XRP *may pose an elevated risk of being deemed a security in comparison to other digital assets we currently support*," and despite giving XRP a "*Howey* score" of 4.25 out of 5 (with 5 the most likely XRP would be a security). *Id.* at 8988 (emphasis added). Coinbase very much understood that *Howey* and the federal securities laws could apply to XRP.[31] Its decision to nevertheless list XRP shows that Coinbase—like Defendants—was financially willing to accept the risk of being wrong under the law, not that the SEC failed to provide fair notice to the market.

---

[30]     This argument directly conflicts with Defendants' claims (at 73) that nearly all of their XRP sales occurred on *foreign* exchanges. It simply cannot be relevant for fair notice purposes whether foreign exchanges not regulated by the SEC chose to list XRP.

[31]     Coinbase's 4.25 "*Howey* score" also disproves its contention XRP did not "fit within any of the categories of financial instruments recognized as 'securities'" and that it had difficulty analyzing whether XRP "qualifies as a security under Howey." D.E. 705 at 6-8. The same is true of another *Howey* analysis performed by a law firm on behalf of a money-transmitter client that wanted to transact in XRP. DX 230 at 4843, 52-54. This lawyer noted that "Ripple's XRP" was assigned a 4.00 (out of 5) on a scale to determine whether it was likely to be classified as security. *Id.* at 4855, 4857.

Defendants also cite (at 47 & n.33) a submission by an investment fund that wanted to continue investing in XRP. DX 228. As did Coinbase, the fund recognized that *Howey* provided the proper framework. *Id.* The fund concluded that in order for it to invest in XRP, "the SEC *need not take a position on whether…XRP is a security.*" *Id.* at 8403 (emphasis added)).[32] Defendants also proffer a submission by lawyers at two large firms that represent crypto clients (DX 201 at 42983). One firm currently represents Ripple in private securities litigation. *See In re Ripple Labs Inc. Litig.*, No. 18 Civ. 06753 (D.E. 114) (N.D. Cal. Sept. 25, 2020). This "evidence" merely shows that members of the securities defense bar advocated a legal position that benefited their clients. If defense bar disagreement with an agency's enforcement position could prove "confusion" or otherwise sustain a fair notice defense, it is hard to imagine any regulatory enforcement action being viable.

### E.       The SEC's Nonpublic Internal Communications Are Irrelevant.

This Court has already ruled that internal, non-public SEC materials "do not bear on the notice parties received." D.E. 652 at 3. This is consistent with the Court's earlier holding that "the evaluation of any fair notice defense is objective." D.E. 440 at 10 n.5. Defendants nevertheless cite (at 45 & n.30) certain internal SEC communications, including one from 2014 discussing ongoing deliberations as to Bitcoin, but not XRP.[33]

The cited emails cannot sustain a fair notice defense. *See* Def. Opp. 15, 48 n.34, 51 n.41 (citing DX 152, 209, 211, 277); *see also* Def. 56.1 Opp. ¶ 1669 (citing additional internal SEC emails). At best, these emails reflect frank deliberations, healthy debate, and differing opinions among a few

---

[32]       Defendants cite three other *Howey* analyses by the *same attorney* that conducted this analysis. DX 220, 231, 278; DX 228 at 8422. The lawyer merely concluded "there are *reasonable grounds* for determining that XRP does not satisfy each prong of the *Howey* test." DX 220 at 0258 (emphasis added). One attorney performing the same analysis multiple times cannot establish the widespread market confusion Defendants claim to have existed.

[33]       To the extent that Defendants complain that the SEC engaged in such deliberations in 2014, their complaint is simply a backdoor laches argument that fails as a matter of law. *See supra* § III.D.

of the SEC's thousands of employees. Defendants cite no case holding that differing opinions among agency staff support their defense.[34]

Defendants' citations to statements by individual SEC Commissioners, Def. 56.1 Opp. ¶ 1716, are likewise unavailing. Defendants knew that as long as a majority of Commissioners voted to take a particular action, any dissenting views could not prevent the SEC from taking action. PX 19 (D.E. 630-19) at 275-76. Defendants cite no authority that dissenting Commissioner views can sustain a fair notice defense. Such a holding here would have far-reaching implications, since the SEC is statutorily required to be comprised of five Commissioners. 15 U.S.C. § 78d(a). Differing viewpoints are to be expected. To allow the positions of dissenting commissioners to sustain a fair notice defense would mean that vast numbers of enforcement actions brought by an agency could be defeated on those grounds. *See Wyndham*, 799 F.3d at 249, 252 (rejecting fair notice defense, noting "how an agency will construe a statute or regulation" depends on the changing views of different members of the executive branch).

The same holds true for Defendants' and *amici*'s citations to the views of individual members of Congress or competing bills that were introduced but have not become law. *E.g.*, Def. 56.1 Opp. ¶ 1717; D.E. 649 at 12; D.E. 683 at 7-11. To sustain the fair notice defense on those grounds would allow a single legislator to veto agency action by making a speech or introducing a competing bill.

## IV.   DEFENDANTS ENGAGED IN DOMESTIC OFFERS AND SALES.

Defendants argue (at 72) the SEC has failed to establish that "any *specific* offer and sale by any Defendant was domestic." Defendants are wrong.

*First*, to establish Section 5 liability, the SEC is not required to prove that Defendants' offers *and* sales were domestic. Either one will do. Indeed, Section 5 prohibits unregistered offers even if

---

[34]   Moreover, where it suits their purposes, Defendants advise that Hinman is not a Commissioner, and thus cannot bind the SEC. Def. 56.1 Opp. ¶¶ 1039-40. If Hinman cannot bind the SEC, views of Hinman's *subordinates* certainly should not defeat SEC action.

no offers have resulted in a sale. Section 5(c) prohibits an issuer from *offering* its securities before it has filed a registration statement. 15 U.S.C. § 77e(c). Section 5(a)(1) separately prohibits an issuer from *selling* securities until a filed registration becomes effective. *Id.* § 77e(a)(1). And Section 5(a)(2) separately prohibits using interstate instrumentalities to carry or cause to be carried securities for the purpose of sale or *delivery after sale. Id.* § 77e(a)(2); *see also* SEC Opp. 69.

    *Second*, the SEC need not prove the domesticity of *each* offer or *each* sale by Defendants. Rather, *any* domestic offer or sale by Defendants—indisputably present here—is enough for Section 5 liability. Defendants cite to a Section 10(b) case noting the SEC must prove the domesticity of "each transaction at issue." Def. Opp. 72 (citing *SEC v. Ahmed*, 308 F. Supp. 3d 628, 660 (D. Conn. 2018)). But this Court has already held that the extraterritoriality inquiry for "offer" under Section 5 is different from Section 10(b)'s "purchase or sale" analysis. D.E. 441 at 25.

    Indeed, Defendants' focus on "each transaction" is contrary to the breadth of the term "offer." Section 5 says nothing about the issuer's offer being directed at any particular investor or purchaser, and courts have rejected the argument that the SEC must show reliance by, or damages to, any particular investor. *Lorenzo*, 139 S. Ct. at 1104; *SEC v. Cap. Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963). Rather, the term "offer" is interpreted broadly and goes beyond the common law concept of an offer. *See Diskin v. Lomasney & Co.*, 452 F.2d 871, 875-76 (2d Cir. 1971); *Blockvest*, 2019 WL 625163, at *5 ("[T]he Securities Act prohibits not only the sale but also the offer of an unregistered, non-exempt security so the fact that purchasers choose not to accept the full offer is not relevant") (*citing Howey*, 328 U.S. at 300-01).

    An offer thus includes, for example, "any communication which is designed to procure orders for a security," "furnishing to the press by representatives of the issuer and underwriters of various communications concerning the forthcoming public offering," and a "press release which was communicated into interstate commerce." *SEC v. Liberty Petroleum Corp.*, 1971 WL 294 (N.D.

Ohio Sept. 2, 1971) (citations omitted). The breadth of a Section 5 offer was recognized in *Telegram*, where Judge Castel found "the *intended* resale of Grams by Telegram's conduits into the secondary market is likely to involve U.S. purchasers and would likely satisfy *Morrison*'s transactional test." *SEC v. Telegram Grp., Inc.*, 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020) (emphasis added).

*Third*, all Defendants undisputedly *offered* XRP from the United States. The SEC has already responded to Individual Defendants' argument that their offers were "foreign." Opp. Br. 56-61.[35] Defendants' argument that the purchaser's location "does not affect where a transaction occurs" (Def. Opp. 74), ignores that this Court has already held that what matters for offers (as distinct from sales) is the location of the offeror: "[D]irect solicitation via placement of XRP onto ... digital asset trading platforms," is offering conduct, as are attempts "to dispose of XRP via a broker" under "even a narrow interpretation of the term." D.E. 441 at 28 (citations omitted). Defendants certainly did that, entering into agreements with market makers to sell their XRP from within the U.S.[36]

Defendants also engaged in domestic offering acts when they communicated with U.S. investors who were looking to buy XRP. And they engaged in domestic efforts to foster U.S. investor appetite for XRP, including by offering to pay and actually paying platforms in connection with their XRP trading, and touting XRP to investors through a comprehensive U.S.-based media campaign, as well as Ripple's own website that advised U.S. investors how and where to buy XRP. *E.g.*, SEC 56.1 ¶¶ 488-99, 500-27; SEC Opp. 56.1 ¶¶ 385-99, 498-99; PX 389, 500.13, 583, 584, 586, 589, 590, 591, 595, 598. Unregistered offers of securities issued by a U.S. company, by that company

---

[35]     To the extent Ripple adopts Individual Defendants' arguments that the use of offshore platforms escapes this enforcement action under Section 5, the SEC proffers the same response as its opposition brief. Under the facts of this case, Ripple disposed of its XRP when it transferred it to market makers, including U.S.-based ones, to offer and sell XRP. This domestic conduct violates Section 5. *See* SEC Opp. 56-74; SEC 56.1 ¶¶ 56, 559, 621, 625, 633, 649-52, 676, 770-72, 774.

[36]     *See, e.g.*, SEC 56.1 Opp. ¶¶ 441-54; PX 660 (████████████████████ Programmatic Market Activity Agreement); PX 661 (███████████████ Programmatic Market Activity Agreement); *see also* SEC Opp. 57-61 (detailing Individual Defendants' domestic offers).

and its U.S.-based control persons, whether on U.S.-based platforms or directly to U.S investors, are quintessential domestic offers prohibited under Section 5. *See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 126-27 (2d Cir. 1998) *abrogated in part on other grounds by Morrison*, 561 U.S. 247 (creating a domestic market for unregistered securities includes using U.S. financial entities in transactions, soliciting U.S. investors, and domestic directed selling efforts).

*Finally*, all Defendants *sold* XRP from the United States and their sales were not "foreign" for the reasons the SEC set forth previously. SEC Opp. at 61-66. All Defendants, including Ripple, committed themselves to sell their XRP from the U.S. when they transferred XRP to be offered and sold on crypto asset platforms. *See id.* Furthermore, Ripple admits that it used a U.S. market maker, ▮▮▮▮▮, to sell XRP on digital asset platforms. Def. 56.1 ¶ 95. And, ▮▮▮▮▮, another U.S.-market maker, sold XRP for Ripple on domestic exchanges like Coinbase. PX 564.

Ripple's own expert describes the hundreds of contracts in which Ripple conveyed XRP to direct purchasers. These include "programmatic" sellers who regularly resell XRP on crypto asset platforms using algorithms approved by Defendants and on their behalf, market makers as incentive payments to develop XRP liquidity in the secondary market, and Ripple employees as compensation or bonuses. DX 40 ¶ 18 and Exhibits C, D, E, F. The SEC has also presented evidence showing Ripple's 2020 ODL contracts are just another iteration of Ripple's Programmatic Sales into the market. SEC 56.1 ¶¶ 817, 819-21, 823-24, 826. That universe includes U.S. market makers, U.S. programmatic sellers, and U.S. ODL partners.[37] As the SEC has explained, Defendants distributed XRP, without restricting resales to U.S.-based investors, to entities who promptly resold into the

---

[37]     For example, Ripple distributed XRP to a U.S.-based entity to make markets for XRP and to engage in Programmatic Sales. *See* PX 661. Ripple also distributed XRP to MoneyGram as incentives, rebates and bonuses, and it also used ODL to sell XRP through ▮▮▮▮▮, both of which are U.S. entities. *See* PX 704 (XRP distributions for FY'19 and FY'20); PX 329.

market, making them underwriters. As a result, Ripple, the issuer, and the Individual Defendants, the

issuer's control persons, are liable for their distribution to public investors. SEC Br. at 63-66.

Defendants' argument, that the SEC does not point to any specific evidence they offered or

sold XRP to U.S.-based purchasers, is thus frivolous. The record is replete with evidence of Ripple's

unlawful distributions and sales of XRP to dozens of U.S. entities. Ripple met with U.S. venture

capital firms to discuss investments in XRP.[38] Ripple and U.S.-based purchasers executed sales

contracts in the United States and title passed upon Ripple's transfer of the XRP from its

domestically held wallets.[39] DX 40 at ¶ 29 ("The governing Sales Contracts typically [provide] …

that all title and risk of loss to all purchased units of XRP passes to the purchaser immediately upon

delivery"). Ripple's bank accounts show its receipt of proceeds from those companies. PX 296; PX

704 (Ripple internal tracking of XRP sales in FY 2019 & FY 2020).

## V.     THE SEC IS ENTITLED TO SUMMARY JUDGMENT AGAINST THE INDIVIDUAL DEFENDANTS.

### A.     The Individual Defendants Violated Section 5 as Issuers.

Under the Section 4(a)(1) exemption, Section 5's registration requirements do *not* apply to

"transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a). The

---

[38]     *See, e.g.*, SEC 56.1 ¶ 290 (describing pitching of XRP to a venture capital company in Connecticut which owns a fund); PX 46 at 6968 (email exchange between that fund and Ripple on what ██████████████████████████████████████████████████████████ ████████████████████████████").

[39]     Neither the SEC nor Defendants have included all of the hundreds of contracts Ripple used to sell XRP directly to identifiable purchasers or all of Ripple's 1,700 XRP sales contracts. *See* Def. 56.1 ¶ 105, n.3. But the SEC has included the following contracts that show on their face U.S. purchasers: PX 283 (executed by CEO in Boston); PX 285 (executed in New York); PX 324 and Form D, *available at* https://www.sec.gov/Archives/edgar/data/1717932/000171793218000001/xslFormDX01/primar y_doc.xml (showing company is a Delaware entity); PX 771 (Delaware company); PX 770 (same); PX 284 (executed in New York); PX 300 (purchase agreement for a U.S.-based company), SEC 56.1 ¶ 290 (noting Connecticut-based parent of that same company). Professor Schwartz's expert report also lists XRP purchase contracts for two other Delaware companies. *See* DX 40, Ex. C.

Individual Defendants contend (at 75) the SEC "offers no evidence that any of them were 'underwriters' who purchased with a 'view to … distribution' of XRP." This fails for three reasons.

*First*, it is the Individual Defendants' burden to claim an exemption under Section 4(a)(1), not the SEC's. The SEC establishes its prima facie case by showing the offer and sale of securities (the issue in dispute here) without registration (which all Defendants admit did not happen). *See SEC v. Lybrand*, 200 F. Supp. 2d 384, 392 (S.D.N.Y. 2002). At summary judgment, defendants have the burden to prove exemptions. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *Lybrand*, 200 F. Supp. 2d at 392. They cannot avoid this burden by claiming that the SEC has failed to disprove their claimed affirmative defense. *SEC v. GenAudio Inc.*, 32 F.4th 902, 941-42 (10th Cir. 2022).

*Second*, the Individual Defendants are *issuers* of XRP who used an underwriter to sell their XRP. An underwriter is defined as any person who sells for an issuer or a control person of the issuer. *See SEC v. Cavanagh*, 155 F.3d 129, 134 n.19 (2d Cir. 1998); 15 U.S.C. § 77b(a)(11). The Individual Defendants were undisputedly Ripple control persons when they sold XRP, including by virtue of controlling Ripple's management, policies, and decisions about when and whether to offer or sell XRP or file a registration statement. *See* SEC Br. 66; SEC 56.1 ¶¶ 41-42, 860-62, 864, 867. A person who is "[a] control person, such as an officer [or] director" is "treated as an issuer when there is a distribution of securities" and "ordinarily may not rely upon the Section 4[(a)](1) exemption." *Cavanagh*, 155 F.3d at 134 (citations omitted); *see also SEC v. McNamee*, 481 F.3d 451, 455 (7th Cir. 2007) (defendant was an "'issuer' for the purpose of identifying an underwriter, given the clause of § 2(a)(11) defining as an 'issuer' anyone who controls the securities' issuer.").

*Third*, the Individual Defendants' argument that they are not liable because they are not themselves underwriters is wrong. The relevant question is whether their XRP sales were *transactions involving an underwriter* because Section 4(a)(1) "by its terms exempts only 'transactions,' not classes of persons." *United States v. Wolfson*, 405 F.2d 779, 782 (2d Cir. 1968) (citation omitted). "[I]f *any* person

involved in a transaction is a statutory underwriter, then *none of the persons* involved may claim exemption under Section 4(1)." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) (emphases added). Moreover, the Individual Defendants erroneously focus (at 75) on only one of the definitions of underwriter: any person who has purchased from an issuer *with a view to distribution*. They ignore that an underwriter under Section 2(a)(11) also includes someone who "sells for" an issuer. *See Lybrand*, 200 F. Supp. 2d at 392. Here, the Individual Defendants used GSR to sell their XRP in exchange for ███████████. GSR sold XRP for Ripple's control persons—"issuers"—and GSR was thus acting as an underwriter in transactions that were not exempt. *Wolfson*, 405 F.2d at 782 ("In short, the brokers provided outlets for the stock of issuers and thus were underwriters.").

## B.     The Individual Defendants Aided and Abetted Ripple's Violations.

"[L]iability can be imposed on a person who aids and abets a violation of Section 5 if that person 'knowingly or recklessly provides substantial assistance to another person in violation of [Section 5].'" D.E. 441 at 15 (quoting 15 U.S.C. § 77o(b)). As to substantial assistance, there is no genuine dispute: Defendants concede that Garlinghouse provided substantial assistance to Ripple after becoming CEO in January 2017, and that Larsen provided substantial assistance before 2017 when he was Ripple's CEO. Def. Opp. 71.[40] The sole issue for the Court, thus, is whether Larsen and Garlinghouse had knowledge of, or recklessly disregarded, Ripple's violations. They did.

To show knowledge "the SEC need not demonstrate that the Individual Defendants were aware that Ripple's scheme *was* illegal." D.E. 441 at 15; *see also SEC v. Mattessich*, 407 F. Supp. 3d 264, 272-73 (S.D.N.Y. 2019). The relevant inquiry is whether they "knew, or recklessly disregarded, the

---

[40]     Defendants' sole argument (at 71-72) is that Larsen did not provide substantial assistance during his time as Chairman of Ripple's Board starting in 2017. Defendants ignore that the Court has already found that Larsen's now-proven and undisputable position on the XRP Sales Committee and his personal sales of XRP—both of which continued after 2017 (SEC 56.1 ¶¶ 1099, 1100; PX 46; PX 370; PX 202)—can establish substantial assistance. D.E. 441 at 19.

facts that made Ripple's scheme illegal." D.E. 441 at 15; D.E. 652 at 3. The SEC may establish this by proving the Individual Defendants were "involved in Ripple's strategy for supporting XRP's price," assisted with "Ripple's distribution and the creation of a market for XRP investment," and "knew that purchasers of XRP may have viewed those purchases as investment in a common enterprise with a reasonable expectation of profits based on Ripple's efforts." D.E. 441 at 19.[41]

Larsen and Garlinghouse's attempts to attack the evidence showing they knew the underlying facts that made Ripple's scheme illegal are unavailing. For example, they claim the SEC has not shown that Larsen "participated in Ripple's efforts to market XRP as an investment" because the SEC has supposedly relied only on "a handful of isolated emails, most of which Larsen did not write." Def. Opp. 63. But they ignore ample evidence of Larsen's knowledge or reckless disregard of efforts to market XRP as an investment—particularly his own. In 2014 Larsen stated in an interview that one of Ripple's "key roles is making sure that we distribute [XRP] as broadly and in a way that adds as much utility and liquidity as we possibly can," that "our incentives are very well aligned," and "that for Ripple Labs to do well we have to do a very good job in protecting the value of XRP," SEC 56.1 ¶¶ 461, 1065. Further, in 2017, Larsen stated to an XRP investor that "[m]ost volume in the space is speculation." *Id.* ¶ 1072.

Likewise, the Individual Defendants offer nothing to rebut evidence showing Larsen knew investors viewed XRP as an investment in Ripple's efforts other than Larsen's self-serving

---

[41] The Individual Defendants do not materially dispute the core facts that establish their approval of Ripple's XRP sales including at discounted prices, their efforts to create and protect a market for XRP and to support XRP's price, their steps to tout these efforts to XRP purchasers, and the decision for Ripple to not file a registration statement for its XRP sales. *E.g.*, SEC 56.1 ¶¶ 285, 308, 310-12, 317-18, 444, 446, 448, 452, 801, 805, 809-12, 1074-76, 1098-1100, 1114-17, 1119-21, 1123-27, 1131, 1135, 1137-39, 1141-45, 1151-53, 1182, 1184-86, 1188-89, 1205. Nor do they dispute that they did not restrict their XRP sales to "users" of XRP and that investors purchased XRP. *E.g.*, *id.* ¶¶ 658-59, 1071, 1079-82, 1084-85, 1088-91, 1155, 1158. Moreover, given that the Individual Defendants themselves took or failed to take all of these steps, they do not and cannot materially dispute their knowledge or reckless disregard of all of these facts.

deposition testimony, which is insufficient to defeat summary judgment. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (finding court did not err in granting summary judgment to defendant notwithstanding the plaintiff's testimony "largely unsubstantiated by any other direct evidence"); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020) (plaintiff's "self-serving comments from her deposition after the filing of this lawsuit cannot create an issue of fact"); *Khudan v. Lee*, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's 'self-serving' and 'incomplete' testimony … is insufficient to create a genuine dispute of fact").

Unable to dispute the facts establishing their aiding and abetting liability, Larsen and Garlinghouse's primary argument is to dispute whether they knew XRP *was* a security. Def. Opp. 60-61, 65-67. In other words, unable to offer contrary evidence to establish a genuine dispute of fact, the Individual Defendants instead resort to conflating knowledge or reckless disregard of *illegality* with knowledge or reckless disregard of the underlying *facts*. But, even if they were unclear as to whether Ripple could be violating Section 5 (they were not), that is not the relevant inquiry.

For example, Garlinghouse points (at 67) to discussions with SEC staff as evidence that he did not believe XRP was a security. But he tellingly ignores the fact that he was aware of the SEC's investigation into Ripple and that Hinman told him that Hinman viewed XRP to be a security. SEC 56.1 ¶¶ 1039-41, 1045, PX 258 at 380. Garlinghouse also ignores that he reviewed and deleted from his Twitter account instances where he had liked "anything XRP price related." SEC 56.1 Opp. ¶ 1787; PX 671 (chat including tweets that in 2018 had Garlinghouse "likes" but that no longer have those likes today). And though Garlinghouse does not dispute that he "was aware that some individuals were purchasing XRP for speculative purposes," he argues "speculative intent does not convert an asset into a security as a matter of law." Def. Opp. 70. But the SEC does not have to show Garlinghouse knew that speculative purchases of XRP meant XRP *was* a security. Rather, the SEC need only show he was aware of the underlying fact that Garlinghouse admits he was aware of.

Similarly, the Individual Defendants do not dispute the facts offered by the SEC showing they "had an interest in any XRP price appreciation and that Ripple funded certain of its operations through XRP sales." Def. Opp. 64; *see also id.* at 68-69 (Garlinghouse "acknowledged that … Ripple and its shareholders wanted the price of XRP to increase"). Instead, they argue these facts are not sufficient for a finding of commonality. *Id.* at 64, 68-69. Again, however, even if they were right (they are not, *supra* § I.B), the SEC need not show they believed there *was* commonality between XRP buyers and Ripple. The SEC need only show they knew of or recklessly disregarded the facts underlying any such commonality, as Defendants admit they did.[42]

## VI.    OTHER ARGUMENTS DO NOT COUNSEL A DIFFERENT OUTCOME.

In addition to arguments addressed above, *amici* offer a host of other arguments, most of which stretch far beyond the scope of this litigation, and none of which withstands scrutiny.

For example, the two *amici* trade associations and a firm that invests in crypto companies focus on the status of secondary market transactions in digital assets. D.E. 649 at 7-13; D.E. 706 at 10-20 (focusing on "downstream purchasers"); D.E. 707 at 8-10 (focusing on "secondary market transactions"). But these arguments exceed the scope of this litigation as all three *amici* acknowledge. Notably, neither trade association nor the investment firm claim there is *any* uncertainty as to the principles governing whether *Defendants'* offers and sales of XRP are subject to the federal securities laws. To the contrary, they agree with the SEC that *Howey*'s test governs and should be applied. *E.g.*, D.E. 649 at 4-5, D.E. 706 at 10, 20 (noting the test is "well-known"); D.E. 707 at 2, 7-8 (noting it is "not new" and "not novel" to apply *Howey* to Ripple's offers and sales of XRP). One even states that it "seems clear that where a company raises funds in exchange for a promise to use those funds to

---

[42]    The Individual Defendants elsewhere repeat (at 62, 65-68) many of the same claims they make in support of their fair notice defense, including that their views were "informed by government agencies' silence and express statements." As discussed (*supra* § III), this ignores the voluminous, indisputable evidence that they understood that XRP could be considered a security.

develop and deliver a yet-to-be-created product, the transaction is an investment contract subject to the federal securities laws." D.E. 649 at 10. This is exactly what Ripple did here.[43]

Another major theme is that the SEC is seeking with this case to regulate an entire industry. *E.g.*, D.E. 683 at 2, 6-7 (critiquing alleged "SEC's efforts to assert regulatory control over digital assets" as a whole and that this lawsuit would "empower[] the SEC to regulate an entire (and entirely new) industry"); D.E. 705 at 18 (implying the SEC wants "that all digital assets should simply be registered with the SEC"); D.E. 708 at 3, 11, 22, 29 (speculating about "the SEC's ultimate goal here" and that this is a "test case"); D.E. 711 at 15 (noting supposed "regulatory land grab").

Others complain about the opposite: that rather than taking an approach that governs the entire industry, the SEC has taken a case-by-case, fact-driven approach, which some of these *amici* view as unsatisfactory. *E.g.*, D.E. 705 at 2 (decrying "burdensome asset-by-asset analysis"); D.E. 706 at 22 (an SEC enforcement action is about "the unique facts and circumstances of that case").

The registration regime established by the federal securities laws does not regulate "industries." It regulates conduct (the offer and sale of securities) for the benefit of investors. When the SEC enforces the congressional mandate that issuers like Exxon register *their* offers and sales of securities, the SEC is not seeking to regulate the oil industry. It is regulating the offer and sale of securities by Exxon to ensure public investors receive fulsome disclosures.

These disclosures are required of issuers regardless of the industry in which they operate. Like other issuers who offer and sell securities to the public, Ripple should comply with Section 5 by filing a Form S-1 (*see* https://www.sec.gov/files/forms-1.pdf), and providing the disclosures to investors therein required. Similarly, Ripple should file a Form S-8 with the SEC before offering or selling XRP as compensation to the Individual Defendants (or any other employees). *See*

---

[43]     Other far-fetched arguments well-beyond the scope of this case include that the SEC has advanced a "years-long position that … the software code that comprises the [XRP Ledger] is itself a security," or about "non-XRP" tokens issued on that ledger. D.E. 710 at 1-2, 5.

https://www.sec.gov/files/forms-8.pdf. And Ripple and the Individual Defendants should file additional, appropriate registration statements covering any other sales or resales for which there is no Securities Act exemption from registration available.

One *amicus* argues registration is infeasible for the crypto industry, because the law requires disclosures from issuers which in this industry "may be diffuse in structure with no meaningful financials or management." D.E. 711 at 20 (citing 17 C.F.R. Part 229; 15 U.S.C. § 78*l*(b)). Whatever merit this concern has generally, it is not true here. Ripple did in fact prepare internal, audited financial statements, and has an easily identifiable, non-diffuse management structure. The impact of the SEC's claim for registration would be for Ripple to make this and other required information available to the public. This would allow XRP investors to fully evaluate their investment decisions.

*Amici*'s remaining arguments are less legal points and more a list of contradictory grievances against the SEC. Some accuse the SEC of providing inadequate guidance to market participants, *e.g.*, D.E. 705 at 7-10, while others rely on the SEC's guidance. *E.g.*, D.E. 649 at 6 n.5, 9 n.8, 11 n.10; D.E. 711 at 6-7. One *amicus* claims the SEC has provided *no* guidance and then in the same breath complains of *too much* guidance. D.E. 706 at 20-22 (guidance supposedly created "*more* confusion"); *see also* D.E. 705 at 10-11; D.E. 708 at 13 (guidance made "perfect sense"). At least one *amicus* simultaneously criticizes the SEC's supposed *failure to take any position* as to whether crypto assets trading in secondary markets are investment contracts, as well as the supposed position they claim *the SEC has taken* as to that issue, a position with which the *amicus* does not agree. D.E. 649 at 8-10.[44]

---

[44]     *Amici* also argue that the CFTC should regulate these activities, an argument best directed at Congress. *E.g.*, D.E. 649 at 12; D.E. 705 at 2; D.E. 722 at 9. Of note, Section 2(a)(1) of the Commodities Exchange Act expressly states that nothing in that statute shall be construed as superseding or limiting the SEC's jurisdiction. 7 U.S.C. § 2(a)(1). Moreover, the statute, by its terms, is limited to futures or derivative transactions in commodities, not spot sales, unless fraud is involved. *Id.* at §§ 1a(47)(B), 2(c)(2); *see also Written Testimony of Chairman J. Christopher Giancarlo* (Feb. 6, 2018) *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opagiancarlo37 (CFTC "does not have authority to conduct regulatory oversight over spot virtual currency platforms or other cash commodities, including imposing registration requirements").

All of this echoes Garlinghouse's mantra that "regulatory uncertainty … means … that I disagree with the regulatory certainty so I'm going to call it regulatory uncertainty." SEC 56.1 ¶ 1028; PX 503.11. The "thread" that runs through all these "beads," *Joiner*, 320 U.S. at 348, is that *amici* view regulatory oversight as something that does not, or should not, apply to their industry. While many *amici* accuse the SEC of seeking pronouncements as to an "entire industry," it is in fact the *amici* that do so. However, as with any other industry, those conducting activities that fall within the remit of the federal securities laws must comply with those laws. No industry may flout requirements that exist to protect investors and the markets when offers and sales of securities are made to the public.

## CONCLUSION

For the foregoing reasons and those stated in its moving papers, the SEC respectfully requests that the Court grant the SEC's motion for summary judgment on liability in its entirety.

Dated: New York, New York
      November 30, 2022

 

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

Benjamin Hanauer
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, Illinois 60604