# Exhibit 31

## FILED UNDER SEAL

# XRP/EUR Volume Incentive Program

**Overview:**

This Volume Incentive Agreement (the "Agreement") is made as of January 11, 2017 (the "Effective Date") by and between Ripple Markets Inc. ("Ripple"), a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129, and █████████████████, a corporation, doing business at ███████████████ █████████████████████. In this Agreement Ripple and ████████ may be referred to individually as "Party" and together as "Parties."

**Purpose:**

The Parties are entering into this Agreement in an effort to increase the liquidity of XRP, a asset native to the Ripple Consensus Ledger ("RCL"), through the application of certain XRP transaction volume incentives.   Pursuant to the terms and conditions of this Agreement, ████████ agrees to engage in efforts to promote the liquidity of XRP on its exchange platform by implementing an incentive program applicable to a selection of its qualified registered members of ████████s services.   In return for ████████ efforts intended to increase XRP liquidity, Ripple agrees to reserve certain and defined incentives, as described in this Agreement, and will compensate ████████ in XRP or US Dollars.  Lock Up Periods are referenced in the below terms.

**Duties of ████████**

████████ has implemented systems and procedures to meet anti-money laundering, sanctions and other regulations.  These systems and procedures include risk-based customer due diligence such as identification, verification and "know your customer" procedures and enhanced due diligence for those customers presenting higher risk, such as Politically Exposed Persons. ████████ also maintains a sanctions policy which prohibits it from transacting with individuals, companies and countries on proscribed sanctions lists, including the UK Treasury and the US Office of Foreign Assets Control. ████████ will continue to maintain these policies and procedures to ensure that its services comport with applicable law, including, but not limited to, those discussed above. The Parties agree that ████████ will adhere to these requirements for the duration of the Parties' Agreement.

For market transparency and to engage ████████s registered members who meet ████████s user requirements ("Participants"), ████████ will announce the terms of the Volume Incentive Program (the "Program") on or before January 10, 2017. ████████ will

Confidential - 1

publish the material terms of the Program in an effort to notify and encourage participation, and to inform the market of these Program incentives.

█████ will enroll Participants in the Program between January 10, 2017 and January 17, 2017.

Enrolled █████ Participants trading XRP/EUR for the period of January 17, 2017 at 12:00 am EST to January 31, 2017 at 11:59 pm EST, will be ranked, highest to lowest, based on dollar notional trading volume in XRP/EUR, excluding any and all self-matching volume ("Ranking").

From the Ranking, █████ will select the top three (3) Participants as eligible for the Program. Participants in the Program will receive a monthly rebate of 1% on a maximum 20% market share of monthly notional trade volume in XRP/EUR. Self-matching volume will be excluded. The monthly rebate will not exceed $50,000 per participant. The Program will be live for period of February 1, 2017 at 12:00 am EST to March 31, 2017 at 11:59 pm EST.

█████ agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program.

**Incentives and Payment:**
Ripple agrees to reserve an incentive pool with the maximum $█████, or equivalent amount in XRP based on the previous trading day's XRP/USD (volume weighted average price) on █████ on February 1, 2017 and March 1, 2017. By no later than the first Monday of the following month (Mar 2017, Apr 2017) that the Program is live (Feb 2017, March 2017) █████ will inform Ripple of the total calculated incentive payout. The payout will be deducted from the incentive pool and paid to █████ by no later than the third Monday of the applicable month. Ripple reserves the right to deduct payment from the incentive pool in either USD or XRP. If deducted in XRP, the conversion from USD to XRP will be based upon the previous trading day's XRP/USD VWAP (volume weighted average price) on █████'s exchange.

**Desired Outcome of the Volume Incentive Program**
The Parties anticipate that the end result of the Program will be a liquid and robust XRP/EUR market on █████'s exchange. If the Program is successful, the Parties may extend the Program through an additional agreement.

Confidential - 2

**Compliance with Laws:** Each party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, each party shall at all times at its own expense, obtain and maintain all certifications, authorizations, licenses, and permits materially necessary to the exercise of its rights and the performance of its obligations under this Agreement.

**Intellectual Property:** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

**Confidentiality:** The parties agree to hold all non-public, proprietary information about their businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The parties further agree that the contents of this Agreement constitutes Confidential Information and shall be protected as such.

**Limitation of Liability:** Except for a breach of confidentiality, to the maximum extent permitted by applicable law, each party's liability to the other for any breach of this Agreement, and other party's sole and exclusive remedy, for any cause whatsoever and regardless of the form of action (whether in contract or it tort, including negligence) will be limited to actual, direct damages. In no event will Ripple or ▮▮▮▮▮▮ Aggregate Liability for any losses and damages arising out of or related to this Agreement exceed the total amount paid to ▮▮▮▮▮▮ or received from Ripple. Furthermore, in no event will either party be liable to the other party for any lost profits, loss of business, or other consequential, special, incidental, indirect, exemplary or punitive damages arising out of or related to this Agreement, even if the party has been advised of the possibility of such damages. Each party shall defend, indemnify and hold the other party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to the other party's breach of this Agreement.

**Warranties:** Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or

Confidential - 3

RPLI_SEC 0507281

in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

**Termination:** This Agreement shall continue until the earliest of:

1) The expiration of the Volume Incentive Program on March 31, 2017 at 11:59 pm EST;
2) Upon written notice of termination by a party if the other party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or
3) Upon the mutual agreement of the Parties to terminate this Agreement.

**Relationship of the Parties:** This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors. Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

**Assignment:** Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party. Any purported assignment made in violation of this provision will be deemed to be and will be void. Notwithstanding the foregoing, each party shall be entitled to assign this Agreement to in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

**Entire Agreement:** This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

**Severability:** If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

Confidential - 4

**Law and Disputes:**

1.  Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.

2.  Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3.  Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**



January 13, 2017

Ripple      Date                           Date
Patrick Griffin, EVP Business Development

Confidential - 5

**Law and Disputes:**

1. Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.

2. Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

_____    ____          1/16/2017

Ripple             Date                          Date

Confidential - 5

CONFIDENTIAL

# XRP/EUR Fee Rebate Program

**Overview:**

This Fee Rebate Agreement (the "Agreement") is made as of January 11, 2017 (the "Effective Date") by and between Ripple Markets Inc. ("Ripple"), a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129, and ▮▮▮▮▮▮ ▮▮▮▮▮▮"), a corporation, doing business at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In this Agreement Ripple and ▮▮▮▮▮ may be referred to individually as "Party" and together as "Parties."

**Purpose:**

The Parties are entering into this Agreement in an effort to increase the liquidity of XRP, an asset native to the Ripple Consensus Ledger ("RCL"), through the application of certain XRP transaction volume incentive rebates. Pursuant to the terms and conditions of this Agreement, ▮▮▮▮▮ agrees to engage in efforts to promote the liquidity of XRP on its exchange platform by implementing an incentive rebate program for its qualified registered members of ▮▮▮▮▮ services. In return for ▮▮▮▮▮ efforts intended to increase XRP liquidity, Ripple agrees to fund certain rebates, as described in this Agreement, and will compensate ▮▮▮▮▮ in US Dollars.

**Duties of** ▮▮▮▮▮▮

▮▮▮▮▮ has implemented systems and procedures to meet anti-money laundering, sanctions and other regulations. These systems and procedures include risk-based customer due diligence such as identification, verification and "know your customer" procedures and enhanced due diligence for those customers presenting higher risk, such as Politically Exposed Persons. ▮▮▮▮▮ also maintains a sanctions policy which prohibits it from transacting with individuals, companies and countries on proscribed sanctions lists, including the UK Treasury and the US Office of Foreign Assets Control. ▮▮▮▮▮ will continue to maintain these policies and procedures to ensure that its services comport with applicable law, including, but not limited to, those discussed above. The Parties agree that ▮▮▮▮ will adhere to these requirements for the duration of the Parties' Agreement.

For market transparency and to engage ▮▮▮▮▮ registered members who meet ▮▮▮▮▮s user requirements ("Participants"), ▮▮▮▮▮ will announce the Fee Rebate Program (the "Program") on or before January 10, 2017 in an effort to notify and encourage participation, and to inform the market of the Program.

Confidential - 1

RPLI_SEC 0507285

████████ will apply applicable fee rebates to Participants in the Program between January 17, 2017 through April 30, 2017 (the "Program Duration"). Participants in XRP/EUR during the Program Duration will be eligible for XRP/EUR fee rebates. Volume must exclude any and all self-matching volume. All other criteria related to eligibility will be developed and administered by ████████ but such criteria will be consistent with the Purpose of this Agreement.

████████ agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program.

**Rebates:**

For the Program, Ripple agrees to reserve a rebate pool on a monthly basis for the Program Duration with a maximum reserved of $███████, (the "Pool"). For the months of February 2017 through April 2017, Ripple will reserve the Pool on the first day of the month, and no later than the first Monday of each month. For January, the Program will be live on January 17, 2017 and the Pool will be reserved no later than January 17, 2017. The amount reserved for January 2017 will not exceed $██████ By no later than the first Monday of the following month (Feb, Mar, Apr, May 2017) that the Program is live (Jan, Feb, Mar, Apr 2017) ████████ will inform Ripple of the total calculated rebate due. That amount will be deducted from the rebate Pool and paid to ████████ by no later than the third Monday of that following month. For clarity and to provide an example, for the Pool reserved February 1 for the Program live in February, ████████ will inform Ripple of the February total calculated rebate by March 6 (the first Monday), and Ripple will pay ████████ (from the applicable Pool) no later than March 20 (the third Monday).

The Parties agree that ████████ will apply the Pool to Participants as a percentage rebate of ████████ fees, with the percentage of rebate to decline over Program Duration. The agreed percentage of rebate and the maximum Pool for each month of the Program will be as follows:

| Date | Percentage of Rebate | Maximum Rebate Pool |
|---|---|---|
| Until 10 February 2017 | 100% of ████████ trading fees | up to $██████ |
| Until 28 February 2017 | 75% of ████████ trading fees | up to $██████ |
| Until 31 March 2017 | 50% of ████████ trading fees | up to $██████ |
| Until 30 April 2017 | 25% of ████████ trading fees | up to $██████ |

Confidential - 2

Any and all allocation of the Pool to Participants will be under the sole discretion of ▮▮▮▮▮▮, following the percentage of rebate of Program Participant fees up to the maximum rebate pool and all other applicable restrictions, consistent with the terms and purpose of this Agreement. Any amount of the Pool not allocated to Participant fees will revert to Ripple.

### Desired Outcome of the Fee Rebate Program

The Parties anticipate that the end result of the Program will be a liquid and robust XRP/EUR market on ▮▮▮▮▮▮'s exchange. If the Program is successful, the Parties may extend the Program through an additional agreement.

**Compliance with Laws:** Each party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, each party shall at all times at its own expense, obtain and maintain all certifications, authorizations, licenses, and permits materially necessary to the exercise of its rights and the performance of its obligations under this Agreement.

**Intellectual Property:** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

**Confidentiality:** The parties agree to hold all non-public, proprietary information about their businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The parties further agree that the contents of this Agreement constitutes Confidential Information and shall be protected as such.

Confidential - 3

**Limitation of Liability:** Except for a breach of confidentiality, to the maximum extent permitted by applicable law, each party's liability to the other for any breach of this Agreement, and other party's sole and exclusive remedy, for any cause whatsoever and regardless of the form of action (whether in contract or it tort, including negligence) will be limited to actual, direct damages. In no event will Ripple or ▄▄▄▄ Aggregate Liability for any losses and damages arising out of or related to this Agreement exceed the total amount paid to ▄▄▄▄ or received from Ripple. Furthermore, in no event will either party be liable to the other party for any lost profits, loss of business, or other consequential, special, incidental, indirect, exemplary or punitive damages arising out of or related to this Agreement, even if the party has been advised of the possibility of such damages. Each party shall defend, indemnify and hold the other party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to the other party's breach of this Agreement.

**Warranties:** Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

**Termination:** This Agreement shall continue until the earliest of:

1) The expiration of the Fee Rebate Program on April 30, 2017 at 11:59 pm EST;
2) Upon written notice of termination by a party if the other party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or
3) Upon the mutual agreement of the Parties to terminate this Agreement.

**Relationship of the Parties:** This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors. Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

Confidential - 4

**Assignment:** Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party. Any purported assignment made in violation of this provision will be deemed to be and will be void. Notwithstanding the foregoing, each party shall be entitled to assign this Agreement to in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

**Entire Agreement:** This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

**Severability:** If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

**Law and Disputes:**

1.  Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.
2.  Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to

Confidential - 5

RPLI_SEC 0507289

negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**



January 13, 2017

Ripple        Date

Patick Griffin, EVP Business Development

Date

Confidential - 6

negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

3. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

**Signatures:**

_____   _____
Ripple            Date

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛  _____   1/16/2017
                               Date

Confidential - 6

# Exhibit 51

## FILED UNDER SEAL

# RIPPLE CURRENCY WHOLESALE SALES ORDER

This Ripple Currency Wholesale Sales Order ("**Sales Order**"), together with the Terms of Sale attached as **Attachment A** and the Definitions attached as **Attachment B** (collectively, this "**Agreement**"), dated as of the "Effective Date" specified on this Sales Order, is made and entered into by and between XRP Fund II, a South Carolina LLC ("**XRP Fund II**"), and the "**Company**" specified on this Sales Order. XRP Fund II and Company are sometimes referred to collectively as the "**Parties**" and each individually as a "**Party**." Capitalized terms not otherwise defined will have the meanings set forth in **Attachment B** to this Agreement.

This Agreement governs the purchase and sale of the Purchased Ripple Currency specified below. XRP Fund II will not be bound by, and specifically objects to, any term, condition or other provision that is different from or in addition to the provisions of this Agreement that is submitted by Company in any purchase order, receipt, acceptance, confirmation, correspondence, or otherwise, unless XRP Fund II specifically agrees to such provision in a written instrument signed by XRP Fund II. XRP Fund II's acceptance of any order by Company is expressly conditioned on Company's acceptance of the terms of this Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, XRP Fund II and Company agree to all the terms of this Agreement.

| | |
|---|---|
| **Company:** | |
| **Effective Date:** | November 12, 2013 |
| **Purchased Ripple Currency (XRP)** | |
| **Purchase Price in USD** | |
| **XRP Fund II's Notice Address:** | XRP Fund II, LLC<br>268 Bush St, #2724<br>San Francisco, CA 94104-3503<br>Facsimile: 415.520.5585<br>Attention: Chris Larsen, CEO |
| **Company's Notice Address:** | Attention: |

The Parties have executed this Agreement as of the Effective Date.

| XRP Fund II, LLC | | |
|---|---|---|
| By: _____ | By: _____ | Digitally signed by |
| Name: Chris Larsen | Name: | Reason: I agree with the sales order<br>Location:<br>Date: 2013-11-13 23:13+01:00 |
| Title: Manager | Title: | |

**ATTACHMENT A**
**Terms of Sale**

1. **Purchase and Sale of Ripple Currency.**

1.1 Wholesale Purchase Transaction. XRP Fund II hereby agrees to sell, and Company agrees to purchase, the Purchased Ripple Currency on a wholesale basis at the Purchase Price. Company is purchasing the Purchased Ripple Currency solely to resell or otherwise distribute the Purchased Ripple Currency to Purchasers, and not to use the Purchased Ripple Currency as an End User or for any other purpose. As between Company and XRP Fund II, Company shall be fully responsible for any use or further distribution of the Purchased Ripple Currency by any Purchaser.

1.2 Company's Acknowledgement. Company represents and warrants that it is familiar with open source decentralized crypto currencies and that it understands the nature and uses of Ripple Currency. Without limiting the generality of the foregoing, Company acknowledges and agrees that: (a) Ripple Currency do not represent a right to make any demand on XRP Fund II, (b) XRP Fund II has no obligation to redeem or exchange Ripple Currency for monetary value, goods, services, or any other item, and (c) although XRP Fund II owns, and under this Agreement will transfer, title to the Purchased Ripple Currency to Company, XRP Fund II is not the "issuer" of Ripple Currency and does not set terms of use applicable to End User of Ripple Currency.

1.3 No Right to Use as End User. Company shall not use the Purchased Ripple Currency as an End User.

1.4 No Investment Purpose. Company represents and warrants that it is not purchasing the Purchased Ripple Currency for any Investment purpose. Company shall not: (a) market, promote or otherwise offer the Purchased Ripple Currency as an Investment to any other party, or (b) resell or otherwise distribute the Purchased Ripple Currency to any other party if Company has actual or reasonable knowledge that such other party intends to purchase or acquire the Ripple Currency as an Investment.

1.5 Payment Terms.

1.5.1. Payment. Within two (2) business days after the Effective Date of this Agreement, Company shall pay the Purchase Price to XRP Fund II in immediately available funds to one or more accounts specified by XRP Fund II.

1.5.2. Taxes. The Purchase Price for Purchased Ripple Currency is exclusive of any applicable taxes. To the extent any taxes are applicable on the sale of the Purchased Ripple Currency, Company shall be obligated to pay all applicable taxes. To the extent XRP Fund II fails to collect any applicable taxes but it is later determined that taxes were collectible by XRP Fund II, Company shall pay such applicable taxes to XRP Fund II upon notice of the applicable taxes. XRP Fund II is not liable for any taxes that Company is legally obligated to pay in, any jurisdiction, which are incurred or arise in connection with or related to Company's business activities (under this Agreement or

otherwise), and all these taxes will be the financial responsibility of Company.

1.6 Delivery of Purchased Ripple Currency.

1.6.1. Delivery. Within one (1) business day after XRP Fund II has received the full Purchase Price in accordance with the terms of Section 1.5.1, XRP Fund II shall transmit the Purchased Ripple Currency to Company via the Ripple Payment Network to the Ripple Payment Network address specified by Company.

1.6.2. Risk of Loss. Upon XRP Fund II's transmission of Purchased Ripple Currency to Company or its designated recipient(s), title to and risk of loss of the Purchased Ripple Currency passes to Company. Company acknowledges and agrees that XRP Fund II has no liability to Company or to any third party for any loss, theft or misuse of any Purchased Ripple Currency that XRP Fund II has transmitted to Company (or its designated recipient(s)) pursuant to this Agreement. XRP Fund II has no obligation under this Agreement to monitor or investigate the use or distribution of any Purchased Ripple Currency.

2. **Other Obligations of Company.**

2.1 Applicable Laws. Company shall comply with all Applicable Laws, including but not limited to Applicable Laws related to the resale or distribution of Purchased Ripple Currency.

2.2 Regulatory Approvals. Company shall obtain and keep in full force and effect, at its expense, any permits, licenses, consents, approvals, registrations or authorizations ("**Regulatory Approvals**") necessary to resell or otherwise distribute the Purchased Ripple Currency to Purchasers, including without limitation any applicable money transmitter or money service business Regulatory Approvals. Upon XRP Fund II's request, Company shall provide to XRP Fund II evidence of any Regulatory Approvals required for Company to resell or otherwise distribute the Purchased Ripple Currency to Purchasers.

2.3 Responsibility to Purchasers. Company is responsible for all customer service or other issues or claims that relate to the distribution or resale of Purchased Ripple Currency from Company to Purchasers. Company shall not make any representations or warranties to any other party on behalf of or concerning XRP Fund II.

3. **Company Representations and Warranties.** In addition to the representations and warranties otherwise set forth in this Agreement, Company hereby represents and warrants to XRP Fund II that: (a) it has all right, power, and authority necessary to enter into and perform this Agreement, (b) when executed and delivered, this Agreement will constitute its legal, valid and binding obligation enforceable against it in accordance with its terms, (c) it is in compliance with all Applicable Laws, including without limitation any such laws that may apply to Company's resale or distribution of Purchased Ripple

Currency to Purchasers, and (d) it is not and has not been a party to any current, pending, threatened or resolved enforcement action of any government agency, or any consent decree or settlement with any governmental agency or private person or entity regarding the distribution or resale of any type of currency, prepaid access, or other items of monetary value.

4. **Publicity.** Neither Party may issue any press release or other public statement with respect to this Agreement or its terms unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party, which approval may be withheld at the other Party's sole discretion.

5. **Confidentiality.** Confidential Information is the confidential and proprietary information of the disclosing Party, and each Party shall maintain all Confidential Information it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of this Agreement. The obligations in this Section 5 are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreements between the Parties.

6. **Term; Termination.**

6.1 Term. This Agreement will commence on the Effective Date and will continue for ninety (90) calendar days (the "**Term**").

6.2 Termination. Without limiting any other rights or remedies that XRP Fund II may have at law or otherwise, XRP Fund II may terminate this Agreement immediately upon Notice to Company if Company breaches any of its obligations under this Agreement, including its obligation to provide payment in accordance with Section 1.5 of this Agreement.

6.3 Survival. In the event of any termination or expiration of this Agreement, the following provisions shall survive: the Sales Order, Sections 1.2, 1.3, 1.4, 1.5, 1.6.2, 2, 3, and 5 through 9 of Attachment A, and all of the definitions in Attachment B.

7. **Indemnification.**

7.1 Company Indemnity. Company shall defend, indemnify and hold harmless XRP Fund II (and its employees, shareholders, directors and representatives) (each an "**Indemnified Party**") from and against any Claim or Loss to the extent any Claim or Loss is based on (a) any breach of any representation, warranty or covenant of this Agreement by Company or caused by Company's employees, contractors or agents, (b) any use, distribution or resale of the Purchased Ripple Currency by Company or Company's employees, contractors or agents, and all associated marketing and promotional activities undertaken by Company (including without limitation any activities related to any sweepstakes or contests), or (c) any taxes that Company is legally obligated to pay in any jurisdiction, which are incurred or arise in connection with or related to its business activities (under this Agreement or otherwise).

7.2 Indemnification Procedure. In connection with any Claim or Loss described in Section 7.1, XRP Fund II shall: (a) give Company prompt Notice of the Claim or Loss (however, any delay in notification will not relieve Company of its obligations under Section 7.1 except and solely to the extent that the delay materially impairs Company's ability to defend the Claim or Loss), (b) cooperate reasonably with Company (at Company's expense) in connection with the defense and settlement of the Claim or Loss, and (c) permit Company to control the defense and settlement of the Claim or Loss, except that Company shall not enter into any settlement or compromise of any Claim or Loss without XRP Fund II's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit or proceeding or contains a stipulation to or admission or acknowledgment of, any liability or wrongdoing (whether in contract, tort or otherwise) on the part of XRP Fund II or otherwise requires XRP Fund II to take or refrain from taking any material action (such as the payment of fees). XRP Fund II (at its cost) may participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

8. **Disclaimers, Limitations and Reservations.**

8.1 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, XRP FUND II MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED RIPPLE CURRENCY, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

8.2 XRP FUND II SHALL NOT BE LIABLE TO COMPANY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, EVEN IF XRP FUND II HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES (AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY REMEDY). XRP FUND II'S ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE PURCHASE PRICE XRP FUND II RECEIVES UNDER THIS AGREEMENT.

9. **Miscellaneous.**

9.1 Responsibility for Costs. Each Party shall be responsible for its own costs and expenses in connection with this Agreement.

9.2 Relationship of the Parties. Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties.

9.3 No Third Party Beneficiaries. This Agreement is only for the benefit of, and will be enforceable only by, XRP Fund II and Company. This Agreement is not intended to

confer any right or benefit on any third party (including any Purchaser), and (b) no action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

9.4   Notices. Any notice or other communication under this Agreement given by either Party to the other Party will be in writing and must be sent to the intended recipient by registered letter, receipted commercial courier, or electronically receipted facsimile transmission (acknowledged in like manner by the intended recipient) at its notice address as specified on the Sales Order ("**Notice**"). Either Party may from time to time change such address or individual by giving the other Party Notice of such change.

9.5   Non-waiver; Remedies Cumulative. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available in law.

9.6   Choice of Law; Jurisdiction and Venue. This Agreement will be governed by the Laws of the State of California, U.S.A., without reference to any applicable conflict of laws rules or provisions. Each Party irrevocably consents to the non-exclusive jurisdiction and venue of the federal and state courts located at San Francisco County, California, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement or the transactions contemplated in this Agreement, and Company agrees not to commence or prosecute any such claim, action or proceeding other than in the aforementioned courts. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

9.7   Entire Agreement; Amendment; Severability. This Agreement represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes any previous or contemporaneous oral or written agreements regarding such subject matter. Except as expressly set forth in this Agreement, this Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions.

9.8   Counterparts. This Agreement may be executed in multiple counterparts, each of which will be an original, but all of which taken together will constitute one instrument.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

CONFIDENTIAL

## ATTACHMENT B

### Definitions

Capitalized terms not otherwise defined in this Agreement have the following meanings:

"**Applicable Law**" means all applicable U.S. and foreign, national, federal, state, provincial or local laws, statutes, regulations, rules or court orders, including without limitation: (a) state and federal laws related to banking, money transmission or sale of checks, currency exchange, anti-money laundering (including, but not limited to the U.S. Bank Secrecy Act), money service businesses, gift certificates/gift cards, unclaimed property, electronic funds transfers, consumer credit, usury, privacy and data security, and data breach remediation and notification; (b) state and federal laws related to customer identity verification and screening (e.g., the Office of Foreign Assets Control ("OFAC") list of Specially Designated Nationals; and (c) the Financial Modernization Act of 1999, also known as the "Gramm-Leach-Bliley Act."

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against XRP Fund II (and/or one or more of its respective employees, shareholders, directors or representatives) by a person or entity other than Company or its affiliates or subsidiaries.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in order to comply with Applicable Laws, administrative process or governmental or court orders; provided, however, that in a circumstance in which disclosure is compelled by Applicable Laws, administrative process or governmental or court orders, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the order and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"**Effective Date**" means the effective date of this Agreement, as specified on the Sales Order.

"**End User**" means any party who sends Ripple Currency to any other party through the Ripple Payment Network in connection with an e-commerce or payment transaction between such parties.

"**Investment**" means the purchase or acquisition of Ripple Currency with the expectation that such Ripple Currency will generate income or appreciate in value in the future.

"**Loss**" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**Purchase Price**" means the purchase price for the Purchased Ripple Currency under this Agreement, as specified on the Sales Order.

"**Purchased Ripple Currency**" means the Ripple Currency purchased under this Agreement by Company from XRP Fund II on a wholesale basis, as specified on the Sales Order.

"**Purchaser**" means an End User that purchases or otherwise acquires Ripple Currency from Company.

"**Ripple Currency**" means the units of the decentralized, crypto or math based currency that are native to the Ripple Payment Network. Also referred to as ripples or XRP.

"**Ripple Payment Network**" means the decentralized, open source, global, peer-to-peer, crypto currency payment network that allows users to transfer Ripple Currency and other currencies between Ripple Payment Network accounts.

RPLI_SEC 0304345

# Exhibit 91

**FILED UNDER SEAL**

| ▮▮▮-31170] | ▮▮▮▮▮ | **Account access reset request** Created: 24/Aug/18 Updated: 31/Aug/18 Resolved: 31/Aug/18 |
|---|---|---|

| Status: | DONE |
|---|---|
| Project: | ▮▮▮▮ |
| Component/s: | None |
| Affects Version/s: | None |
| Fix Version/s: | None |
| Security Level: | Default |

| Type: | Reachout | Priority: | Normal |
|---|---|---|---|
| Reporter: | Christian Anton Larsen | Assignee: | ▮▮▮▮▮ |
| Resolution: | Done | Votes: | 0 |
| Labels: | None | | |
| Remaining Estimate: | Not Specified | | |
| Time Spent: | Not Specified | | |
| Original Estimate: | Not Specified | | |

| Attachments: | ' ~WRD000.jpg |
|---|---|
| Customer mail: | ▮▮▮▮ |
| Ticket Status: | Unseen |
| Ticket Origin: | Mail |
| user_link: | |
| Support Level: | Level_1 |
| Department: | Support |
| ManagedBy: | 3804714 |

| Other customers issues:: | **Last customer issues(up to 5)** | | | |
|---|---|---|---|---|
| | **Summary** | **Status** | **Attachments** | **Other customer issues** |
| | Unmatched hit | Open | | Other customer issues |
| | Timer based review – document expired | Open | | Other customer issues |
| | 11443 | Unreviewed | | Other customer issues |
| | [Verification] | DONE | 1 | Other customer issues |
| | [Bank Withdrawal] Bank Withdrawal | DONE | 1 | Other customer issues |

| Main Execution Method: | |
|---|---|
| Legal: | PRIVATE |
| Legal Financial Institution Subtype: | |
| Commercial: | |
| Lead State: | DORMANT CLIENT |
| Value: | PREMIUM |

**Comments**

Comment by ▮▮▮▮ 24/Aug/18 ]

Dear Shristian,

thank you for submitting the requested document.

However, the request has been denied since the submitted photo does not meet our requirements. We unfortunately can not accept printed passport and note.

I kindly ask you to provide a high quality photograph of yourself holding your ID document with a handwritten note of when the image was submitted following the example below:

"[current date] For ▮▮▮▮ Only"

Make sure that you, the ID and handwritten note are visible in the same photo.

Please submit a new request by following the same link provided in the email notifying you that you ▮▮▮ account is blocked. In case the link is expired, we

CONFIDENTIAL TREATMENT REQUESTED BY ▮▮▮▮▮

00000164
SEC-LIT-EPROD-000663573

RPLI_01956976

suggest you request a password recovery. You should receive the desired link.

We will review your request in the shortest time possible.

Should you have any additional concerns, feel free to ask.

Comment by Christian Anton Larsen [ 2◼/Aug/18 ]

I've been a customer of your's for 6 years - can you please ask ◼ to vouch for me.
You're holding ◼ in USD - which is unacceptable.
Please handle immediately.

Comment by ◼ [ 2◼/Aug/18 ]

Chris,

Thanks for reaching to me directly.

One of our top clearing banks ◼ has received letter from their corresponding bank ◼ to stop processing wire transactions on behalf of cryptocurrency companies.

Now, we are still working our way through finding an alternative bank that can clear transactions. As a temporary solution we integrated payment service provider called ◼ it works but is much more expensive and has a cap on max size per tx.

Is there a bank you know that is crypto friendly and could clear USD wires? Let me know.

In the meantime, I will get this sorted out for you. Someone will get in touch.

Again, I apologize for the inconvenience.

Best

◼
Chief executive officer

◼

Skype: ◼ web: www.◼.net

*This e-mail and any attachments may contain confidential and/or privileged information and is intended solely for the addressee. Any unauthorized use, review, retransmission, dissemination, copying or other use of this information by persons or entities other than the intended recipient is strictly prohibited.*

Comment by ◼ [ 2◼/Aug/18 ]

◼

No worries. it happens  J

Can Chris call me on Skype sometime today/tomorrow, just to get confirmation to unblock via video call?

Let me know.

CONFIDENTIAL TREATMENT REQUESTED BY ◼

(moving payments department and service desk to BCC).

Best

Chief executive officer

Skype:          | web: www

*This e-mail and any attachments may contain confidential and/or privileged information and is intended solely for the addressee. Any unauthorized use, review, retransmissions, dissemination, copying or other use of this information by persons or entities other than the intended recipient is strictly prohibited.*

Generated at Tue Feb 02 13:08:09 UTC 2021 by                    sing Jira 7.13.2#713002-sha1:e794ca7f765e33db99fba702fc81ff5094795e24.

CONFIDENTIAL TREATMENT REQUESTED BY                    _00000166
SEC-LIT-EPROD-000663575

RPLI_01956978

# PX 411

# Bradley Kent Jr Garlinghouse

| Verified | YES |
|---|---|
| Customer ID | 457379 |
| Deposit reference | 002457379599 |
| First and last name | Bradley Kent Jr Garlinghouse |
| Address | 39 Laburnum |
| Postal code and city | 94027 Atherton |
| Country of residence | United States of America |
| Nationality | United States of America |
| State | California |
| Date of birth (day.month.year) | REDACTED - PII |
| Document ID | REDACTED - PII |
| Document type | Driver's License |
| Expiry date | Feb. 6, 2021 |
| Tax ID | None |
| SSN | **REDACTED - PII** |
| E-mail address | brad@garlinghouse.org |
| Date joined | Feb. 23, 2017, 8:45 p.m. |
| Last login | Jan. 18, 2021, 7:31 p.m. |
| Account value | 115022.53 USD |
| USD balance | 110083.55 USD |
| BCH balance | 0.00902590 BCH |
| XRP balance | 12015.48000000 XRP |
| BTC balance | 0.00967770 BTC |
| Bank Deposits | 49980.00 USD |
| Astropay Deposits | 0.00 USD |
| Vogogo Echeck Deposits | 0.00 USD |
| Vogogo Credit Cards Deposits | 0.00 USD |
| Ripple USD Deposits | 117497475.20 USD |
| Credit Card USD Deposits | 0.00 USD |
| Ripple BTC Deposits | 0.00000000 BTC |
| Bank withdrawals | 155845000.00 USD |
| Intercash withdrawals | 0.00 USD |
| Ripple USD Withdrawals | 3774990.00 USD |
| Gold Withdrawals | 0.00 USD |
| XRP purchases made | 0.00000000 XRP |

| | |
|---|---|
| All Deposit Addresses | 1. BTC - 3Ko5goh8tQrUh1TcmuWbDpD6eGkTepnrFv (Created: Aug. 17, 2020)<br>2. XRP - rDsbeomae4FXwgQTJp9Rs64Qg9vDiTCdBv?dt=59198988 (Created: Oct. 14, 2020) |
| BTC deposits SUM | 0.00000000 BTC |
| BTC withdrawals SUM | 21.75000000 BTC |
| BTC withdrawal addresses | **BTC:**<br><br>1. 3NPS7d3oAN6pJV13VTN7MezyqCQoMi2n1R (1.00100000)<br>2. 1LM6aZhXptUqMRiyNJZSv8tcKH9xdsLxkK (20.75000000) |
| XRP deposits SUM | 93046951.80999000 XRP |
| XRP withdrawals SUM | 0.00000000 XRP |
| XRP withdrawal addresses | |
| LTC deposits SUM | 0.00000000 LTC |
| LTC withdrawals SUM | 0.00000000 LTC |
| LTC withdrawal addresses | |
| ETH deposits SUM | 0.00000000 ETH |
| ETH withdrawals SUM | 0.00000000 ETH |
| ETH withdrawal addresses | |
| BCH deposits SUM | 0.00902590 BCH |
| BCH withdrawals SUM | 0.00000000 BCH |
| BCH withdrawal addresses | |
| XLM deposits SUM | 0.00000000 XLM |
| XLM withdrawals SUM | 0.00000000 XLM |
| XLM withdrawal addresses | |
| PAX deposits SUM | 0.00000000 PAX |
| PAX withdrawals SUM | 0.00000000 PAX |
| PAX withdrawal addresses | |
| LINK deposits SUM | 0.00000000 LINK |
| LINK withdrawals SUM | 0.00000000 LINK |
| LINK withdrawal addresses | |
| OMG deposits SUM | 0.00000000 OMG |
| OMG withdrawals SUM | 0.00000000 OMG |
| OMG withdrawal addresses | |
| USDC deposits SUM | 0.00000000 USDC |
| USDC withdrawals SUM | 0.00000000 USDC |
| USDC withdrawal addresses | |
| KYC Q&A | |
| Your current occupation: | Employed |

| Your current profession: | Other |
|---|---|
| Your annual income: | More than $300,000 |
| Your net worth: | More than $1,000,000 |
| Your source of funds: | Savings |
| Your annual deposit estimation: | |
| Your annual transaction number estimation: | More than 50 |
| What are your intended activities on our platform? | Investing |
| Do you intend to cash out at ████? | Yes |
| What is the origin of your crypto assets? | Investment/trading proceeds, Salary/dividends received in crypto |

Support tickets

1.  134262

    ████ (21460)

    March 2, 2017, 9:22 a.m.

    None

    "Dear Bradley, we have received a deposit from "THE OAK STREET TRUST" that seems to be intended for your ████ account. We kindly ask you to provide documentation confirming that you are the originator of the arrived funds. Please make sure that your name, account number and amount are clearly visible. Thank you for your cooperation. Should you have any questions or require any assistance in the meantime, please do not hesitate to ask. I look forward to your reply. Best regards, ████

2.  134262

    Bradley Kent Jr Garlinghouse (457379)

    March 6, 2017, 3:10 a.m.

    73.222.245.197

    "Hi there... I am a Trustee of the Oak Street Trust and you received these funds as directed by me. What kind of documentation are you seeking? here is the email I sent to my bank to execute the wire: ---------- Forwarded message ---------- From: Brad Garlinghouse <bgarlinghouse@gmail.com> Date: Tue, Feb 28, 2017 at 4:29 PM Subject: Re: wire request (int;I) To: Gabriela Ponce-Gomez <GPonce-Gomez@svb.com> Cc: Otila Dominguez-Estrada <ODominguez-E@svb.com> apologies!! adding those details here: Bank name: GORENJSKA BANKA d.d. Address: Bleiweisova cesta 1 City: 4000 Kranj Country: Slovenia BIC (SWIFT): GORESI2X On Tue, Feb 28, 2017 at 4:16 PM, Gabriela Ponce-Gomez <GPonce-Gomez@svb.com> wrote: Hi Brad, I am happy to assist with your outgoing wire transfer. I am in the process of populating your DocuSign wire form, however I will need additional information. Please confirm the bank name and SWIFT code. Very Best, Gabriela Ponce-Gomez Relationship Advisor, Private Bank Private Bank Customer Service 866.238.0872 ext.60480 Email: privatebank@svb.com 2770 Sand Hill Road Menlo Park 94025

CONFIDENTIAL TREATMENT REQUESTED BY ████ ████00000003

cid:image001.png@01D229EA.DAB421D0cid:image002.png@01D229EA.DAB421D0 cid:image003.png@01D229EA.DAB421D0 cid:image004.png@01D229EA.DAB421D0 cid:image001.png@01D0568B.5935B800 From: Otila Dominguez-Estrada Sent: Tuesday, February 28, 2017 4:05 PM To: brad@garlinghouse.org Cc: Gabriela Ponce-Gomez <GPonce-Gomez@svb.com> Subject: RE: wire request (int;l) Hi Brad, I am looping in Gaby whom will send you the wire via DocuSign as I am currently in a meeting. Thank you, cid:image007.png@01D20F66.E2DEF8B0 Otila Dominguez-Estrada Relationship Advisor, Private Bank 2770 Sand Hill Road Menlo Park 94025 Direct Line 866-238-0872 ext. 60152| Private Bank 866-238-0872| Fax 650 275 9152 Privatebank@svb.com Odominguez@svb.com cid:image008.png@01D20F66.E2DEF8B0 cid:image009.png@01D20F66.E2DEF8B0 cid:image010.png@01D20F66.E2DEF8B0 cid:image011.png@01D20F66.E2DEF8B0 The Private Bank Team hours are M-F 6AM PT - 8PM PT, Saturday & Sunday 8 AM -5 PM PT and we can be reached at 866.238.0872 or Privatebank@svb.com From: Brad Garlinghouse [mailto:bgarlinghouse@gmail.com] Sent: Tuesday, February 28, 2017 3:58 PM To: Otila Dominguez-Estrada <ODominguez-E@svb.com> Subject: wire request (int;l) Otila, Can you please wire $50,000 from the account for The Oak Street Trust (ending *5979) to the following: Account owner: ███████████ Address: ██ City ███████ ███████ Country: ████████████ IBAN: ██████████████████

Message: 002457379599 Please let me know if questions. Brad "

3.  134262

    ███████ (617829)

    March 8, 2017, 8:18 a.m.

    None

    "Dear Brad, apologies for not getting back to you sooner. In order to proceed we kindly ask you to provide the following information and documentation: 1. Please provide Trust agreement documentation where trustees, beneficiaries and other individuals are clearly visible. 2. What is the source of funds? Please describe how were the funds acquired. 3. Please describe your intended ██████ account usage. 4. How much do you intend to deposit in the next coming months? 5. Please provide a recent trust bank account statement. Thank you for your cooperation. Should you have any questions or require any assistance in the meantime, please do not hesitate to ask. Looking forward to hearing from you. Best regards, ██████
    ██"

4.  134262

    Bradley Kent Jr Garlinghouse (457379)

    March 8, 2017, 7:30 p.m.

    206.80.4.190

    "1, attached 2. The trust is a pass through trust and the $50,000 USD represents personal funds from investments and salary 3. I plan to buy / sell XRP 4. I expect I may deposit another $100,000 USD 5. attached"

5.  134262