# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| **Plaintiff,** | : | **20 Civ. 10832** |
| **- against -** | : | **ECF Case** |
| **Ripple Labs, Inc., Bradley Garlinghouse, and Christian A. Larsen,** | : | |
| **Defendants.** | | |

**Expert Report of** [redacted]

**October 4, 2021**

## I. INTRODUCTION

At the request of the Securities and Exchange Commission ("SEC"), I have reviewed the Amended Complaint ("Complaint") in the matter of *SEC v. Ripple Labs, Inc., et al*., alleging that Defendants Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse ("Garlinghouse"), and Christian A. Larsen ("Larsen") engaged in unregistered offers and sales of a digital asset, XRP. In the Complaint, the SEC contends Defendants' XRP offers and sales are "securities" transactions requiring registration as prescribed by the Securities Act of 1933.

The primary opinions offered in this report are summarized as follows:

- Based on industry custom and practice, which is informed by federal securities law, investors typically receive various important disclosures when they are offered to purchase the securities that a company sells in a public offering.

- Under industry custom and practice, once a company engages in a public offering, it must provide to the owners of its securities, and to any market in which the securities trade, various ongoing disclosures that inform these parties about the company and the securities it has publicly issued.

- An issuer that triggers the registration requirements for a public offering of securities under the securities laws typically expends significant resources in connection with that offering and in providing ongoing information to investors and markets following that offering.

- There are various best practices for practitioners to ensure compliance with the securities laws, including by working with regulators and others to achieve a high degree of comfort that their actions are in keeping with the securities industry's high standards of investor protection.

- Those who offer and sell certain digital assets have been and can come within the purview of the regulatory requirements of the federal securities laws.

- Based on industry custom and practice, and regulatory requirements, the Defendants would have been required to make various important disclosures to the public, including certain ongoing disclosures, assuming Ripple had registered its offer and sale of XRP as securities transactions.

This report also generally summarizes a number of regulatory requirements and industry practices, in order to provide context to and basis for the expert opinions expressed in this report. These include:

- A brief background and history of securities regulation as they pertain to new offerings of securities;

- The underlying animating principle of "full and fair disclosure" which forms the cornerstone of those regulations;
- A general description of the Securities Act of 1933 ("the '33 Act") and the Securities Exchange Act of 1934 ("the '34 Act") and how these laws are structured around initial and ongoing disclosure for the protection of the investing public;
- The requirement to register an offering of securities or qualify for an exemption from registration;
- A general description of what's contained in a registration statement;
- A description of regulations related to sales of securities by company affiliates and others;
- Protection of investors through disclosure of material information in initial offerings and on an ongoing basis;
- Important disclosures which are considered material by the SEC for investor protection; and
- How the framework of disclosure in the securities laws forms the basis and approach in regulating new and innovative products.

To prepare this report, I have applied the knowledge and experience that I have accumulated in my nearly 50 years of regulatory and consulting experience. My background as a former regulator and consultant enables me to review and detail various industry and regulatory conventions, standards, and norms that govern the issuance of securities to the investing public.

My opinions are based on my knowledge, experience, professional expertise, the materials cited herein, and review of the documents listed in Exhibit A attached to this report. The direct quotations that are particularly important to this opinion have been italicized for emphasis.

This report takes no position as to whether Defendants' XRP transactions involved offers and sales of "securities" as defined by the '33 Act or '34 Act. Rather, it explains the regulatory requirements for companies and their control persons when they invite public investors to purchase securities and the customary disclosures that protect public investors and maintain the integrity of the markets in which securities are traded. The report concludes by opining on certain of the disclosures Ripple, Garlinghouse, and Larsen would have been required to make assuming that Defendants' offers and sales of XRP were considered offers and sales of securities and that Ripple had registered those XRP offerings.

## II. QUALIFICATIONS

### A. Employment History

I have over y and consulti , I have served as the President of [redacted] Inc. located in [redacted]. In this capacity, I have been retained by various law firms, broker/dealers, and the government, mostly regarding trading and market related regulatory issues. My areas of expertise include the NASDAQ, exchange-listed, and Over the Counter ("OTC") markets and the rules, regulations, customs, and best practices that govern those markets. I have also testified as an expert on issues such as the role of market makers in OTC securities markets, best execution, suitability, market maker compensation, supervision, books and records, and the use of shell companies and reverse mergers in "pump and dump" schemes. I have testified as an expert regarding the presence of unregistered securities distributions in manipulative schemes and the use of shell companies in reverse mergers as a way of going public. My regulatory and consulting background has provided me with extensive expertise related to public and private offerings and the disclosures that customarily accompany both primary market and secondary market trading.

My consulting experience includes engagements by law firms, broker/dealers, foreign governments, stock exchanges, the SEC and the United States Department of Justice. I have also been retained as an expert by defendants in several instances where they were the subject of actions brought by the federal government including the SEC. Beyond my litigation related work, I also perform consulting services regarding securities regulation, compliance, and technology. My work as a consultant has required me to remain current with respect to industry rules, regulations, policy, procedures, practices and customs. One way I do so is to regularly review SEC, FINRA, and other securities industry resources, publications and research.

During my many years as an industry regulator, I have spoken as an industry expert on numerous topics including presentations before the SEC. I have also spoken on many occasions to a wide range of industry groups and have participated in regulatory conferences and training programs for NASD,[1] SEC, and state securities authorities. I have also provided training to the staffs of both the NASD and SEC regarding market surveillance procedures and techniques.

I have been featured in publications including *Wall Street & Technology*, *The Wall Street Journal*, and *Institutional Investor*, where I have been quoted as an authority on regulatory and technology issues.

Prior to my current position, I worked at NASDAQ for 5 years and NASD for 27 years, in various capacities, as described below.

From 1999 to 2004, I was Senior Vice President of Regulation and Controls for the NASDAQ Stock Market Inc. In that capacity I was responsible for developing and recommending policies related to the regulation of NASDAQ, overseeing NASDAQ's regulatory budget, and monitoring

---

[1] The entity formerly known as the National Association of Securities Dealers, Inc., and now known as FINRA, is the primary self-regulatory authority for the securities industry.

the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD. I retired from NASDAQ in 2004 and started my own consulting firm.

From 1986 through 1999, I was Senior Vice President of Market Regulation for NASD. While in that role, I was the senior NASD executive in charge of regulatory oversight for both the OTC securities markets and the NASDAQ Stock Market Inc. In that regard, I established surveillance and examination policies and procedures for NASD in the area of small cap and microcap fraud. I also was actively involved in establishing regulatory policy for all trading practices in the NASDAQ Stock Market, the OTC Bulletin Board, and the OTC markets generally. I worked extensively with the SEC, the Securities Industry Association, and the Securities Traders Association in developing and enhancing regulatory policies and practices relating to better and more efficient equity markets.

When I assumed responsibility for market regulation in 1986, I oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ and OTC markets. An immediate and continuing priority for the department was the focus on detecting and preventing fraud, primarily in the NASDAQ Small Cap, the OTC equity, and penny stock markets. I established a dedicated fraud unit to focus on the issues of market manipulation, including "pump and dump" schemes, "marking the close" activities, and other fraudulent devices such as "wash sales," and "matched orders." Working with my associates at NASD, many of the policies relating to fraud investigations and evidentiary standards in place today were developed during my tenure. My personal involvement in both the investigations and management of hundreds of fraud and manipulation cases have made me extremely knowledgeable as to the characteristics that are typically present in these types of cases, including cases where unregistered distributions have occurred.

I was also responsible for maintaining the integrity of prices that were publicly disseminated by the NASDAQ Stock Market to industry professionals and investors. In that regard I made assessments concerning the validity of prices being disseminated by data vendor services to the public. Where I determined the existence of prices that were not consistent with the then-quoted market or "clearly erroneous," I had the authority to remove those prices from the "tape" and from historical records.

As Senior Vice President of Market Regulation for NASD, I was also responsible for initiating trading halts to permit NASDAQ listed companies to report material information to the marketplace. In that regard, I reviewed thousands of public statements and press releases to determine whether a trading halt should be imposed based on the materiality of the information. In analyzing the materiality of corporate news announcements, I made the final determination as to what information NASDAQ listed companies were required to disclose.

Prior to assuming responsibility for market surveillance in 1986, I held various managerial and executive positions for NASD. I began my career with the NASD in 1972 as a District Examiner in New York City, the NASD's largest district office conducting on-site inspections of broker-dealers for violations of NASD and SEC rules and regulations. I assumed various management positions within the district and was promoted to Assistant Director of the NASD's Washington,

D.C. district office in 1975. I served as the District Director of the NASD's Kansas City District in 1980 and I was Corporate Secretary for NASD from 1984 to 1986.

Throughout my career at NASD, I routinely worked on or supervised regulatory endeavors that dealt with and analyzed both public and private offerings and the disclosures that customarily accompany both primary market and secondary market trading. This includes working with NASDAQ issuers on a regular basis on issues regarding ongoing material disclosures and investigative matters related to initial and ongoing disclosure by NASDAQ and OTC companies.

I graduated from St. Francis College in Brooklyn, New York with a BA in English and completed 30 credits of graduate studies in English at St. John's University in Jamaica, New York. I also attended the New York Institute of Finance for two years and completed courses in brokerage accounting and recordkeeping, investment banking and finance.

My C/V and Resume are attached as Exhibit B to this report.

**B. Testimony and Publications – Last Ten Years**

I have not authored any publications in the last ten years.

I have been granted "expert" status by several federal district courts and FINRA Arbitration panels. My experience testifying as an expert over the last 10 years is highlighted below:

- In February 2011, I was deposed in connection with *SEC v. Irwin Boock, et.al.*, No. 09 Civ. 8261 (S.D.N.Y.), a case involving the identity theft of dormant OTC companies, in which I was retained as an expert on behalf of the SEC. The areas of my expert opinion included NASDAQ operations, including how companies go public, stock splits, corporate reorganizations, trading symbols, transfer agents, and '33 Act Regulation S.

- In March 2011, I testified as an expert for the SEC in *SEC v. East Delta Resources Corp. et al.*, No. 10 Civ. 0310 (E.D.N.Y.), a case that involved the market manipulation of a small cap OTC company. I testified concerning the defendants' use of "wash trades" and "matched orders," "domination and control" of the market for an OTC security by the defendants, and the elements of a typical "pump and dump" operation, including unregistered distributions.

- In May 2012, I testified as an expert for the United States in a criminal jury trial, *U.S. v. Roger Lee Shoss, et al.*, No. 8:11-CR-366-T-30TBM (M.D. Fla.), regarding how companies go public, and the use of "shell" companies in schemes involving OTC securities and other manipulative practices in the OTC markets.

- In June 2017, I testified in a FINRA arbitration, *Charles Peter Wallace v. Morgan Stanley Smith Barney LLC, et al.* (Master Case No. 14-00259), on behalf of the claimant who alleged that he had been the subject of a wrongful termination. My testimony concerned Wallace's handling of an annuity transaction for a client and whether his actions were appropriate under FINRA rules.

- In May 2018, I was deposed as an expert in *SEC v. Luke C. Zouvas, et al.,* Civil No. 17-00427-phx-spl (D. Ariz.), where I was retained by the SEC to provide an expert opinion regarding the existence of characteristics of a pump and dump scheme. My opinions included the use of "shell" companies going public, their use in pump and dump schemes and the various artificial devices that typically occur in a pump and dump.

- In June 2019, I provided expert testimony in a criminal jury trial, *U.S. v. Homm, et al.,* No. 13 Crim. 183 (C.D. Cal.). I was retained by the United States and testified regarding the use of manipulative devices in a portfolio pumping scheme and other matters involving a broker/dealer and a hedge fund manager. The testimony included descriptions of devises such as wash and matched trading, marking the close and "portfolio pumping."

- In July 2020, I was deposed as an expert for the SEC in *SEC v. Spartan Securities Group, LTD.* Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). In that case I provided an expert opinion with regard to the characteristics of entities known in the industry as "shell factories," issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents and promoters in commencing trading after a reverse merger.

- In August 2020, I was deposed in *SEC v. Contrarian Press, LLC, et al.*, Case No. 16 Civ. 06964 (VSB) (S.D.N.Y.). In that case I was retained by the SEC to provide a rebuttal opinion relating to questions posed by the Defendant's expert relevant to a statistical analysis of certain price and volume movements during the Defendant's initial promotional campaign relevant to a recently formed microcap security.

- In July 2021, I provided expert testimony in a jury trial in *SEC v. Spartan Securities Group, LTD.* Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). I testified on behalf of the SEC providing an expert opinion regarding characteristics of issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents, promoters, and others in creating 19 sham companies that would later be sold in a "shell factory" scheme.

### C. Compensation

I am being compensated at the rate of $400 per hour for this engagement. In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein, or on the outcome of this matter.

## III. INVESTOR DISCLOSURES AND OTHER REGULATORY REQUIREMENTS

Companies often start with a good idea or unique product or service. At times, future success may require an expansion of the current business. A company may want to finance key acquisitions, fund its business operations, retire existing debt, invest in research and

development, or add lines of business in an expanding market. This is when a business often considers the need to raise additional capital to provide the funding for its future plans.

While a company can privately solicit capital investment from other businesses and sophisticated investors like hedge funds and venture capitalists, those investors may demand outsized returns, discounted prices, or a significant control stake in the business. An attractive alternative for the company may be to seek public investors where the company can access a large pool of capital from diverse sources.

A company may solicit public investors in what is known as an Initial Public Offering (an "IPO"). In a traditional IPO, potential investors are solicited to provide capital to the company for its future business plans in exchange for shares representing an ownership in the company.[2] In purchasing shares from the company, the investor anticipates making a profit based on the efforts of company management to generate new business and revenue, which could increase the value of shares that may be traded in a secondary market. Those who participate in a traditional IPO now have invested in an enterprise where investors' monies are pooled and become part of the assets of the company for use as management sees fit.

The company's undertaking after a public securities offering is to manage the enterprise to produce profits for the company, which stands to benefit public investors who have provided their capital with an expectation that it will produce some type of return and that this success will result in price appreciation as the security trades in the secondary market.

Unlike sophisticated private investors who can have a greater say in the conduct of the enterprise, public investors are generally not proximate to the company and lack the same degree of access and control as those who can fend for themselves in efforts to protect their investment. Instead, the public investor who has been persuaded to invest in the company must rely on federally mandated disclosures to keep abreast of current developments and the financial performance of the company.

Investors take risk when they invest in an enterprise. One reason is that profits are derived through the efforts of those who run and manage the company and not those members of the public who have invested in the enterprise. Profits may take the form of distributions, i.e., dividends, but more often profits are made by investors through price appreciation of the securities in the secondary trading market where investors can buy and sell those securities. If the company is successful, the price for its securities in the secondary market may appreciate, making the investment more attractive to future investors. If the company does not fare well or is not perceived as being successful by the market, investors could lose money should the price of the company's securities fall.

[2] Most IPOs consist of common stock, however, they could consist of units that include both common stock and warrants to purchase additional shares. Some companies issue debt, preferred stock, multiple voting shares or units that include common stock and convertible debentures.

In order to protect public investors, our securities markets are heavily regulated. Federal securities law governs the process, and guides industry custom and practice, when companies seek investment by the public. These laws are designed to ensure that investors have the essential information necessary to make an informed investment decision. These laws are primarily disclosure-based. As such, they are not meant to be a predictor of success, failure, or whether the company is a good investment. Rather, the laws require the company to make certain disclosures to investors at various times. They ensure that investors have the opportunity to be informed of information relevant to their decision whether to risk their capital to invest in an enterprise. So, for example, the laws prescribe information to investors when a company first attempts to sell its securities to the public. The securities laws require the company to make additional disclosures after the public offering, when a company has widely dispersed its securities and those securities have come to rest in the hands of public investors. Those securities are then generally traded in a secondary market and are subject to ongoing disclosure requirements as described below.

These required disclosures rest on the premise that when a company solicits public capital, investors do not have access to the everyday workings of the company (unlike company insiders or sophisticated private investors who negotiate for ongoing access and information).

When a company issues securities and seeks to offer them to public investors, the company typically registers the offer and sale of those securities with the SEC and files what is called a registration statement, the heart of which is the "prospectus" or "offering circular." These required filings provide information about the company and its offering. The information provided in a registration statement includes the terms of the securities being offered as well as disclosure regarding the company's business, financial condition, management, and other matters that are key factors used by investors in deciding whether to invest. Other disclosures include risks faced by the business, how the company will use the proceeds of the offering, how the new offering might affect the price of securities already held, selected financial data, management statements and biographies, and details about executives' compensation. The registration statement also includes audited financial statements that show the company's financial condition and how the company makes and spends its money. The registration statement includes information about who is selling the securities. In an IPO, it may be the company offering the securities or it could be company insiders who are publicly selling off their existing stake, or some combination of the two.

Public investors rely on these required disclosures when deciding whether to provide capital to the company.

In a typical public offering, once investors have purchased securities or otherwise invested in the company's offering, they are now entitled to ongoing disclosures by the company, which is how public investors supervise their investment. Investors often then have the ability to trade their securities in the "secondary" trading market. The secondary market is extremely important to the capital raising function in that it provides public investors with the ability to liquidate their interests should they so choose. This gives investors the ability to profit from their investment if its price has gone up or avoid further loss if its price declines. The company's obligations to provide ongoing disclosures are designed to provide current information to the marketplace on

an annual and quarterly basis, and to provide additional information upon the occurrence of certain specified events.

Another important need for public disclosures is due to the fact that people who manage the company – sometimes called "insiders" – have access to important information that is not generally known to the public. These insiders often have their own stake in the company and/or in a particular venture that the company is pursuing, usually obtained before the company first goes public. A public offering allows for founders to exit and cash in on their personal holdings. Those insiders may also have received their stake when the company compensates them in whole or in part through issuing them securities. Since these positions are often acquired upon formation of the enterprise, the founders typically have a zero or extremely low-cost basis.

Disclosures about insider transactions provide important information to investors. This is particularly true for companies that have not previously publicly offered their securities and thus have no prior reporting history. Insiders of a company have first access to important information that could affect the company's investors and the price of the securities in the market ("asymmetry of information"). For this reason, it is crucial that the company share important information with investors or prospective investors, who are also stakeholders and are entitled to a detailed, truthful disclosure of material information regarding the enterprise. Therefore, the company must not only provide ongoing disclosures, but insiders are also typically required to file their own disclosures when they buy and sell their company's securities.

The federal securities laws are designed to put investors on an equal playing field and reduce information asymmetry, which in turn makes our markets among the most liquid and transparent markets in the world. There is a reason why investors and companies choose the United States markets – because our laws are robust and protect investors while promoting free flow of capital investment. When a company files a registration statement and makes a public offering of its securities, investors part with their money assured of the protections of federal law. This is a cornerstone of a functional economy – one where people can buy and sell assets over an impersonal exchange, and buyers and sellers do not have to transact with each other directly. This is what provides liquidity, and trust in this system is essential to the proper functioning of our capital markets.

Full and fair disclosure protects investors, which leads to greater investor confidence, more efficient markets, and as a result also lowers the cost of capital for the issuer of securities. Before these positive outcomes can occur, it is crucial that the highly effective framework, put in place by Congress, the SEC and the courts, not be circumvented and that issuers comply fully with all the requirements governing the issuance of and secondary market activity for securities. Conversely, investors and prospective investors who invest in unregistered securities offerings often lack the information and the significant protections envisioned by Congress when it determined that securities offerings be regulated by federal law.

To provide background to my opinions, below is a brief description of the statutory regulatory framework surrounding public securities offerings. In a heavily regulated industry such as the securities markets, industry custom and practice, including the activities of companies offering

securities and their management, is influenced strongly by the relevant statutes, rules, and their interpretation by the SEC and the courts.

**A. Regulation of Securities Offerings**

Prior to 1933, securities offerings were loosely regulated by states and lacked federal oversight. Congress first entered the field of securities regulation primarily in response to the stock market crash of 1929. Congress recognized that one of the major causes of the crash was the widespread practice of offering and selling securities to unsophisticated investors who were defrauded out of their money. Stock manipulation was widespread as was insider trading, wash and matched trading by "investment pools," and over-leveraging due to low margin rates.

Lack of disclosure was a significant cause of the 1929 crash and Great Depression which followed. More recent market "crashes" did not have the same severe consequences as the one in 1929, in part due to the scheme of federal regulation put into place in the 1930s. As one observer put it:

> *First, one of the most immediate causes of the crash of the securities markets in the period from 1929 to 1932 was a lack of publicly available information concerning the companies whose securities were being traded. And second, the federal system of mandatory disclosure-the government's response to the 1929 crash-worked as it was designed to work.*[3]

In enacting the federal securities laws, Congress sought to reverse the prevailing rule of commerce –"caveat emptor – buyer beware." Instead, Congress acted to require companies to provide truthful disclosures at the time securities were issued and hold companies and insiders liable for false disclosures. Therefore, "caveat vendor – seller beware" became the warning to those who sought to access the public markets outside of the protections afforded by the laws that would be enacted by Congress.

To achieve these objectives, Congress created the framework of disclosure through the Securities Act of 1933 and the Securities Exchange Act of 1934. Those Acts contain provisions that provide for registration of securities offerings with the SEC, and ongoing disclosure by companies when their securities are publicly traded in secondary markets. They also provide the backdrop for the regulatory and compliance regime under which participants in the securities markets operate.

The Supreme Court described the central tenet of these two acts in 1963:

---

[3] C. Edward Fletcher III, *Of Crashes, Corrections, and the Culture of Financial Information What They Tell Us about the Need for Federal Securities Regulation,* 54 MO. L. REV. 3 (1989). Available at *https://scholarship.law.missouri.edu/mlr/vol54/iss3/2/*

> *"A fundamental purpose [of securities regulation] . . . was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."*[4]

There are two principal purposes to the '33 and '34 Acts, the first being the registration provisions designed to require companies to fully disclose relevant information to public investors upon which rational investment decisions can be based. The second was to protect investors from deceit, misrepresentation, and fraudulent activities in the securities markets. Under the Acts, those involved in the process of offering and selling securities became liable for any material misrepresentations or omissions in their disclosures. If an investor is defrauded, the Acts enable them to file a lawsuit for recovery. The Acts also allow the SEC to bring enforcement actions against those market participants that defraud investors or otherwise violate the securities laws. The Acts' enforcement mechanisms thus incentivize the provision of fulsome disclosure.

The regulation and enforcement of these Acts is carried out in a framework that provides for collaboration between the government and the securities industry. The SEC is the government agency responsible for the primary regulation of the industry. FINRA is an industry funded "self-regulatory" organization with examination and enforcement powers. The individual stock exchanges also have regulatory authority over their members. The oversight is designed not only to ensure adequate disclosures but also to regulate the behavior of industry professionals. The result is a multi-layered structure designed to protect public investors.

### B. The Securities Act of 1933, Section 5

Under the '33 Act, issuers and underwriters (entities that assist the issuer by purchasing securities directly from the issuer or helping to sell its securities to investors) have a duty to disclose relevant information when offering or selling securities to the public or face regulatory and civil liability if they do not. Section 2(a)(1) contains the definition of security which includes conventional instruments such as stocks and bonds, but also includes the concept of an "investment contract," a term purposely broad in order to provide the protections of the Act beyond traditional investment vehicles to non-traditional ventures.

Once an instrument, scheme, or series of transactions meets the definition of a security, Section 5(a) of '33 Act mandates that it is unlawful for any person, directly or indirectly, to engage in the sale of securities in interstate commerce unless a registration statement is in effect as to a security. Section 5(c) of the '33 Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.

The '33 Act provides the procedures for registration and general guidance on the type of information which must be disclosed. SEC rules provide more specific textual and financial

---

[4] SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963).

disclosure requirements. As discussed above, a registration statement typically provides disclosures including, but not limited to:

- the terms of the securities being offered;
- who is selling the securities;
- disclosures regarding the company's business, financial condition, and management;
- amount of any monies intended to be paid to any promoter;
- how the company will use the proceeds of the offering;
- management statements and biographies, and details about executives' compensation; and
- audited financial statements for the company.

The SEC's Division of Corporation Finance reviews a registration statement for compliance with the disclosure requirements and the applicable accounting standards. It should be noted that registration with the SEC does not imply that the SEC "approves" any offer or sale of securities. Rather, the SEC conducts a detailed review to "monitor and enhance" compliance with the disclosure requirements and the applicable accounting standards.

A publicly offered security is generally not sold until the registration statement has been declared effective by the SEC staff. The Division of Corporation Finance will work with an issuer in assuring that the disclosures are complete and accurate. Once the Division is satisfied that the issuer has met the applicable criteria, the issue is declared "effective" and it may be sold to the investing public. The fact that the SEC declares a registration statement effective does not imply that the SEC staff have ruled on the quality of the investment, since the SEC staff does not judge, opine, or comment on whether the investment is good for investors. The Division of Corporation Finance review enhances investor protection by helping to ensure the thoroughness and quality of disclosure in the registration filing and thereby puts investors in a position where they have access to facts that bear on their investment decision.[5]

In short, the '33 Act's requirements of full and fair disclosure combined with the civil liability provisions of the Act and the SEC's detailed review of issuer filings provide a scheme of protection for the public investor. This protection is provided not by supervising the quality or appropriateness of securities being offered for investment, but by ensuring that the investor has sufficient information to make an informed investment decision.

### C. Securities Exchange Act of 1934

While the '33 Act regulates the process where a company offers and sells securities to public investors, the '34 Act primarily regulates the purchase and sale transactions that take place after securities offered and sold by the issuer have come to rest in the hands of the investing public. The '34 Act regulates that secondary market, notably, national securities exchanges and brokers and dealers. Most important to this opinion is that the '34 Act requires ongoing disclosures by

---

[5] See the link to *"Filing Review Process"* as contained in the Division of Corporation Finance Section of SEC.gov; https://www.sec.gov/divisions/corpfin/cffilingreview.htm.

companies that have publicly offered their securities. Should a company have a registration statement declared effective by the SEC, reach a certain size with a certain number of shareholders, or if it lists a class of its securities directly on a national securities exchange, it would then have to become a "reporting company" and comply with '34 Act regulations. Specifically, the '34 Act's ongoing disclosure obligations are generally triggered, and a company becomes a "reporting company," in one of the three following ways:

- **Securities exchange listing - Section 12(b)** – if an issuer qualifies a class of securities (*e.g.*, common stock or notes) for listing on a national securities exchange (*e.g.*, the NASDAQ, the New York Stock exchange ("NYSE") or another national securities exchange). When an issuer undertakes an initial public offering, it may also list its securities for trading on a national securities exchange.

- **Issuer size - Section 12(g)** - An issuer must register a class of securities under Section 12(g) of the '34 Act if that class of its equity securities (other than exempted securities) is held of record by either (i) 2,000 persons, or (ii) 500 persons who are not accredited investors and, on the last day of the issuer's fiscal year, its total assets exceed $10 million.

- **Public offering (no securities exchange listing) - Section 15(d)** - An issuer that files a registration statement under the '33 Act becomes subject to ongoing reporting under the '34 Act upon the effectiveness of the registration statement. The issuer will be obligated to continue to provide '34 Act reports covering at least through the end of the fiscal year in which its registration statement becomes effective.

To protect investors, the '34 Act requires "reporting companies" to, on an ongoing basis, disclose information that investors would find important in making investment decisions relative to secondary market trading. When investors trade in the secondary market, they trade on the assumption that the company is complying with these disclosure requirements.

"Reporting companies" make these periodic disclosures by filing annual reports on Form 10-K and quarterly reports on Form 10-Q. Reporting companies must also promptly disclose to the public certain specified corporate events on Form 8-K. Once filed, these reports are available to the public on the SEC's website.

These periodic and current reports contain disclosures similar to those in the registration statement, including the type of information that would help investors decide whether to buy, sell or hold the company's securities. Like a registration statement, these ongoing reports are designed to include information about the company's officers and directors, the company's line of business, audited financial statements, and management's discussion and analysis of the company's financial condition and results of operations (commonly known as the "MD&A"). The '34 Act also periodically requires a company to describe the record of its stock price and whether the company has made further distributions or sales of securities either privately or publicly.

**D. Ongoing '34 Act Disclosures**

If a company meets certain conditions, including by filing a registration statement that has become effective, the '34 Act contains disclosure requirements that provide investors with information on an ongoing basis. These include an obligation to file periodic reports with the SEC on Form 10-K (the annual report), Form 10-Q (quarterly), and current reports on Form 8-K.

The items typically included on a Form 10-K are similar to those that are found in a registration statement and contain important disclosures for current and potential investors. These include:

- A description of the company's business;
- Risk factors facing the company;
- Whether the company is being sued and a general description of the lawsuits;
- A description of the market for the company's securities and whether the company had engaged in repurchasing any of its securities;
- MD&A;
- Audited financial statements;
- A listing of the directors and executive officers of the company as well as executive compensation;
- A listing of major shareholders and their percent of ownership; and
- Related party transactions.

Form 10-Q provides interim, unaudited financial and other information between annual audits. Items include, among other things:

- Interim financial statements for each of three quarters following the end of the fiscal year;
- MD&A;
- Changes in Risks Factors from earlier reports;
- Unregistered Sales of Equity Securities and Use of Proceeds; and
- Any information required to be disclosed in a report on Form 8-K during the period covered by the Form 10-Q.

Form 8-K obliges "reporting companies" to report certain "material" events within four days of the triggering event. Form 8-K provides investors with disclosure of material information on a current basis as opposed to regularly scheduled reporting. Within the securities industry, information is regarded as "material" if there is a substantial likelihood that a reasonable investor

would consider the information important in making an investment decision.[6] The events below are some examples of material events requiring disclosure on Form 8-K.[7]

- The company acquires or disposes of a significant amount of assets, including a description of the terms of the transaction.
- Private sales of securities exceeding one percent (1%) of the company's outstanding shares of any class or 5 percent (5%) for issuers who qualify as smaller reporting companies. Public offerings registered with the SEC need not be disclosed.
- The issuer is required to disclose changes to any material compensation arrangements with certain executives.
- Changes with respect to any vendors or end users of any product or services if they represent material transactions to the enterprise.
- The company may also disclose other events that it believes to be material but are not specifically required by the item numbers specified on Form 8-K.

These three key reports are the foundation of the ongoing reporting framework for companies that publicly offer their securities, and provide continuing investor protection for investors when a security trades in the secondary markets.

In addition to corporate disclosures, company insiders who resell their securities in the secondary market may be required to file a Form 144 disclosing their personal transactions. Insider transactions are commonly monitored by investors, and can affect the price of a publicly traded security. This is because insiders have the most informed perspective, and insider selling could be interpreted by investors as a negative outlook for the company with a positive outlook implied if insiders are buying.

Without the required ongoing disclosures mandated by the '34 Act, the investing public is denied important information designed to inform their investment decisions, impacting the integrity of the marketplace.

---

[6] See SEC adopting release for Regulation Fair Disclosure, Release Nos. 33-7881, 34-43154, and notes 38, 39 (citing TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) ("Information is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision. To fulfill the materiality requirement, there must be a substantial likelihood that a fact 'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'")

[7] For a complete list of disclosable events see Form 8-K Instructions, pp. 4-22 on current Form 8-K (OMB approved form expiring 9/30/21).

### E. Secondary Offerings

A "Secondary" or "Follow-on" offering is a type of offering conducted after a company has already publicly offered its securities in a capital-raising offering, such as an IPO. Such offerings involve a company making additional securities available for sale to the public, should the company seek to raise additional capital. These types of offerings are sometimes referred to as "dilutive" since they increase the number of securities in circulation. Another type of secondary offering involves existing securities holders and does not require the creation of additional securities by the company. This type of offering is considered "non-dilutive" since these transactions involve existing securities holders selling their holdings to other investors.

Registration statements for follow-on and secondary offerings to the public contain disclosures equivalent to those in an IPO. The prospectus for these types of secondary offerings identifies the specific securities to be sold, including the identities of the sellers. This disclosure is important as the secondary offering may involve a major shareholder, such as a founder, CEO, or institutional investor selling their shares to the public. Typically, these secondary offerings involve securities of insiders and significant holders who received securities in, or prior to, the IPO. In the case of insiders reselling securities in a secondary offering, money raised from the sale goes directly to the sellers and not the company itself.

Other authorized securities are sometimes used to pay for services, or for employees or contractors who may accept securities as compensation. Securities paid as compensation to others, including employees, that were not covered in the original registration statement are "restricted" securities under the '33 Act and may not be resold to the public. These securities must therefore be registered to enable the company to issue securities for this purpose. This is typically done on a Form S-8 registration statement.

No matter the type of secondary offering, the securities to be offered are specifically covered by a registration statement. This ensures that each offering is accompanied by adequate disclosure. Again, disclosure remains the critical cornerstone behind regulations relating to sales of additional securities, including when insiders register their intent to resell their securities on the registration statement.

### F. '33 Act Exemptions and Underlying Rationale

Perhaps the best way to understand what constitutes a "public" offering is to understand the exemption provisions of the '33 Act and principles governing the availability of exemptions, as explained in a U.S. Supreme Court case.[8] In other words, we can understand what the elements of a "public offering" are by knowing what *it's not* and understanding the limitations and rationale behind these exemptive provisions.

---

[8] For those involved in securities regulation and compliance, the Supreme Court decision in Ralston Purina Co. remains landmark guidance in determining the standards necessary to avail oneself of the exemptive provisions of the '33 Act. See SEC v. Ralston Purina Co., 346 U.S. 119 (1953).

Section 5 broadly prohibits any transaction involving unregistered securities offerings. Through exemptive provisions, however, Congress distinguished between (1) the distribution of securities to the public by a company or its control persons and (2) subsequent trading transactions in the market by investors. Section 4(a)(1) of the '33 Act provides an exemption for a transaction "by a person other than an issuer, underwriter, or dealer" and is intended to exempt only trading transactions between individual investors with relation to securities already issued. It is not intended as an exemption for public distributions of securities by issuers or their affiliates or agents.

Section 4(a)(2) provides an exemption for sales by the issuer not involving a public offering, sometimes called the "private offering" exemption. Essentially, the premise of the Section 4(a)(2) exemption is that the protections afforded through registration and mandated disclosure may be unnecessary where the offering is made to a limited number of sophisticated investors who are able to "fend for themselves," *i.e.*, obtain relevant information from the company in determining whether to invest. To protect public investors, a purchaser in a private exempt offering receives shares that may not be resold to the public unless an effective registration statement covers their resale or such resale qualifies for its own exemption. Thus, a company may not privately offer shares to a conduit who intends to resell to the public.

Two general principles have been well-established in industry custom and practice relative to exemptions from registration. First, the applicability of an exemption is not assumed, and those who claim the exemption must establish their entitlement to the exemption. Second, the governing standard in determining whether an issue is a public offering is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have the information that a registration would have disclosed, or have access to such information. If not, they will require the protections afforded by a registration statement.[9] The fundamental principle of adequate disclosure discussed earlier continues to be the key factor underlying the exemptions. Thus, the exemptive provisions under the '33 Act are premised on the notion of relief from the registration requirements when investors are sufficiently informed through other means such that registration is no longer necessary. Only *those who are sufficiently informed do not need the protections afforded by the '33 Act.*

The following discussion is not meant to be a complete analysis of all private offering exemptions, but is provided with a view towards explaining the philosophy, principles, and regulatory best practices surrounding the exemptive provisions.

The SEC has provided some criteria for who would generally be considered persons not needing the "protection of the Act," by adopting the concept of "accredited investor."[10] The definition seeks to provide objective standards such as financial sophistication and ability to sustain a loss of the investment, in order to provide greater certainty about exempt offerings consistent with the guidance put forth in Ralston Purina. This concept is an important one as it provides insight into who would then *need* the protections afforded under the '33 Act, i.e., non-accredited investors.

[9] These concepts are recognized in Ralston Purina Co., 346 U.S. at 125-127.

[10] Rule 501 promulgated under '33 Act Regulation D sets forth the definition of an "accredited investor."

Stated another way, a limited distribution to highly sophisticated investors, rather than a general distribution to other less well-informed investors, is not a public offering.

However, as the SEC stated over 50 years ago:

> *"An important factor to be considered is whether the securities offered have come to rest in the hands of the initially informed group or whether the purchasers are merely conduits for wider distribution. It is essential that the issuer of the securities take careful precautions to assure that a public offering not result through resales of securities purchased in transactions meeting the tests set forth in the Ralston Purina case, for, if in fact the purchasers do acquire the securities with a view to distribution, the seller assumes the risk of possible violation of the ['33] Act and consequent civil and criminal liabilities*."[11]

Among other factors to be considered is whether the ultimate purchaser is far removed from the issuer:

> *"The transaction tends to become public when promoters begin to bring in a diverse group of uninformed friends, neighbors, and associates."*[12]

The size of the offering is also relevant:

> *"An offering of millions of dollars to non-institutional and non-affiliated investors or one divided, or convertible, into many units would suggest that a public offering may be involved."*[13]

The method of distribution is also a consideration:

> "*When the services of an investment banker, or other facility through which public distributions are normally effected, are used to place securities, special care must be taken to avoid a public offering…the use of the facilities of a securities exchange to place the securities necessarily involves an offering to the public."*[14]

In addition to statutory exemptions, SEC rules provide "safe harbors" from registration under certain circumstances. Any sales of securities in reliance on these safe harbors depend on strict compliance with the terms and restrictions specified in the safe harbor rules. For example, control persons of the company may resell their securities to the public if they comply with, among other things, holding periods and restrictions on sale volumes over time. Another safe

---

[11] SEC Release 33-5121 "Use of Legends and Stop-Transfer Instructions as Evidence of Nonpublic Offering." (Dec. 30, 1970).
[12] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).
[13] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).
[14] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).

harbor covers a company's offers and sales made solely to accredited investors and certain sophisticated investors who meet certain standards.[15]

In short, in attempting to distinguish a private from a public offering, SEC rules look at the scope, size, and type of offering including whether the purchasers have an appropriate association with and knowledge of the issuer so as to not need the protections afforded by the '33 Act. From a regulatory perspective, the key distinctions between a public and private offering relate to the question of whether the ultimate purchasers (such as less sophisticated members of the widespread investing public) need the protections associated with the full disclosure provided in a registered offering.

In addition to characterizing qualified purchasers, the SEC also prescribes other precautions that prevent issuers from engaging in public distributions without registration. Such measures include holding periods before resale and taking reasonable precautions to prevent an unregistered distribution to public investors.[16] In most private offerings, securities are restricted from resale and must be held for a specified period of time. Additionally, restrictive legends placed on stock certificates must be removed before the security can be sold in the public market.[17] These restrictions, along with rules applicable to market participants such as broker-dealers and transfer agents, help to curb immediate resales into the secondary market of any non-registered security and ensure that sales are not in fact part of a public distribution.

The issuer, corporate insiders and affiliates are uniquely positioned since they have an asymmetry of information relevant to the company. The SEC has thus imposed on issuers, affiliates and control persons certain obligations as they relate to the sale of securities into the public markets. These obligations are there to ensure that the issuer refrain from selling securities to the public without the disclosure protections afforded by registration and periodic reporting so that, as an appellate court recognized, those "possessing superior access to information and the power to compel registration from abusing their privileged position to foist unregistered securities on an unwitting public."[18]

As previously stated, the above discussion is not meant to be a legal analysis or purport to be a complete rendering of the nuances of all available exemptions under the '33 Act. It is meant to provide a description of the concepts that underlie the exemptions contained under the '33 Act and the regulatory efforts market participants customarily make to comply. These are, in my opinion, in place to assure that the protections provided by the registration of each public offering of securities are reasonably afforded to purchasers, especially unsophisticated investors.

---

[15] For example see, 17 CFR 230.506(b)(2)(ii) ("Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.").

[16] See 17 C.F.R. § 230.502(d). Rule 502(d) defining "reasonable care."

[17] SEC Investor Bulletin: Rule 144: Selling Restricted and Control Securities (January 16, 2013).

[18] SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1090 (9th Cir. 2010).

Key concepts of the exemption framework that are essential to insure investor protection can be summarized as follows:

- *Investor requirements*, i.e., "accreditation," signifying that they possess the wherewithal to "fend for themselves" without the benefit of a registration statement. (See FN 15).
- *Holding periods* so that there is no immediate resale to the general downstream investor. (See FN 17).
- *Restrictive legends* as a further deterrent to immediate resale. (See FN 16).
- *Rules relating to sales by "insiders" and "affiliates"* including volume limitations and insuring that during resale '34 Act reporting rules are followed, and the public has current information available. (See FN 17).
- In certain cases disclosure continues to be present via private placement memoranda, filings of various forms with the SEC, certified or audited financial reports, and being current with '34 Act reporting requirements. (See, for example, '33 Act Form D).

In my opinion, when these criteria are *not* followed, the set of facts surrounding the transaction may look more like a *public offering* demanding the protections afforded by registration. Again, in industry custom and practice, a company's process for determining the availability of an exemption or safe harbor from registration must adhere to the conditions of the particular statutory provision or rule. The company should likewise look to the principle that exemptions under the '33 Act are appropriate under circumstances where the purposes of registration are otherwise satisfied or unnecessary. In enforcing the '33 Act's registration requirements and evaluating its exemptive provisions, the SEC has consistently emphasized the importance of full disclosure and investor protection.

## IV. A PUBLIC SECURITIES OFFERING IS A MAJOR UNDERTAKING WITH SUBSTANTIAL COSTS

As discussed above, a company that seeks to access the public capital markets to raise funds needs to prepare a document, the registration statement, that complies with the SEC's disclosure requirements. Such an undertaking typically requires the assistance of professionals versed in corporate and securities laws, and accounting regulations, among other professional matters. It is this deliberative and time-consuming process, involving the time and expertise of seasoned professionals, that typically makes the registration of public offerings a costly and resource-intensive endeavor.

For example, a public securities offering typically involves significant changes to corporate, capital and management structures, and, as described above, a company will be subject to a number of rules, reporting, and disclosure obligations. This is why in a typical public securities offering, myriad resources are brought to bear before the decision is made to go public. Underwriters' commissions are typically 3.5%–7% of the proceeds of an IPO; expenses are

additional. Legal, accounting, printing, and filing fees associated with a public offering are typically quite costly. And, to the extent a company is subject to SEC periodic reporting requirements, it will face additional ongoing legal, accounting, compliance, and others costs associated with its regulatory obligations.

The auditing firm PWC has on its website a tool for estimating the cost of an IPO. PWC has estimated that in an offering looking to raise $1 billion where the company's revenues were less than $100 million, the costs associated with an IPO would range between $46.7 million to $70.8 million.[19] PWC further estimates that a significant percent of costs associated with public offerings relate to costs for financial reporting, legal and regulatory compliance.[20] Other considerations are not monetary but are significant nonetheless. These can include corporate governance standards and answering to a public board of directors or shareholder activists.

As previously noted, public securities offerings are accompanied by disclosures allowing for public scrutiny of the company. Financial results, share price, management and director performance, executive compensation, corporate governance practices and insider transaction information will all be available to the public. So too will be the controlling or founding shareholders' percentage equity interest and voting interest. Also, founders' securities transactions are more restricted, as previously discussed, since transactions must now be made in compliance with various securities rules and regulations.

Because a company has obligations to the investors that purchase its securities, once a company offers its securities to the public the potential for investor lawsuits against the company and its directors and management is increased. Similarly, a company publicly offering or selling securities, and its insiders, can become subject to regulation by the SEC and, in the case of certain violations, criminal securities laws. The exposure to SEC or criminal liability greatly incentives a company to implement robust compliance programs, which can be very expensive depending on the size of the company or the nature of its operations.

The SEC has alleged that Ripple raised $1.38 billion dollars in sales of XRP. Assuming this figure is accurate and based on the estimation tool available on PWC's website, had Ripple sought to raise that capital via a traditional IPO, rather than selling XRP on an unregistered basis, this could have placed their estimated IPO costs, excluding underwriting fees (the largest component of a traditional IPO's cost), in excess of $10 million dollars. This figure does not include substantial recurring legal, accounting, and compliance costs associated with ongoing reporting obligations.

---

[19] See PWC.com: "Considering an IPO?, First, Consider the Costs." Available at https://www.pwc.com/us/en/services/deals/library/cost-of-an-ipo.html
[20] *Id.*

## V. DIGITAL ASSETS AND DISCLOSURE

### A. Background

In recent years, a high degree of speculation in digital assets has fostered an atmosphere that many observers have likened to other highly speculative periods in investment history, e.g. the "Roaring Twenties," and the Internet or ".Com" era for example. In the same way, many retail investors buying digital assets are doing so with a high degree of speculation and an expectation of profit.[21]

Adam Ludwin, founder of *Chain*, an enterprise blockchain company started in 2014, points this out in his widely read "Letter to Jamie Dimon" first published in October 2017 which summarizes his view of the viability of crypto assets:

> *"there is a pervasive narrative out there that supports entrepreneurs looking to create new crypto assets. The idea is that by selling assets to users before your network launches, you create "evangelists" who will be early users and promoters you wouldn't otherwise have if there were no financial incentive to participate in your community.*
>
> *The problem with this line of thinking is that it conflates early investors with early users. The overlap between people who buy your crypto asset and the people who actually want to use the service you are building is likely very, very small, especially during market manias like this one."*[22]

I have found in my experience that, generally, the higher the degree of speculation, the greater risk associated with the investment. For this reason, more speculative investments increase the need for the type of disclosures associated with public securities offerings.

With the rapid growth of offers and sales of digital assets it is important to note that, where warranted, the application of the federal securities laws can provide important information to investors with the goal of enabling them to make informed investment decisions. Absent this critical step, prospective investors are denied such important disclosures about the company offerings and selling the digital assets, including:

- Explanation of the company's business;

---

[21] See EY research: initial coin offerings (ICOs), December 2017, available at https://assets.ey.com/content/dam/ey-sites/ey-com/en_gl/topics/banking-and-capital-markets/ey-research-initial-coin-offerings-icos.pdf; see also FINRA Investor Alert: Initial Coin Offerings (ICOs)—What to Know Now and Time-Tested Tips for Investors, August 16, 2018, available at https://www.finra.org/investors/alerts/icos-what-know-now.

[22] Letter to Jamie Dimon from Adam Ludwin, CEO of Chain, published October 16, 2017, available at ceresaig.com/wp-content/uploads/2017/11/A-Letter-to-JP-Morgan-Jamie-Dimon-–-Block-Chain-Crypto-FX.pdf.

- Corporate strategies;
- Plans for using the funds raised;
- Risk factors;
- Management, including biographies and compensation;
- Whether existing holders of the digital asset are selling their assets in the offering;
- Dilution, including holdings, and cost basis for founders, officers and early investors;
- Nature of the secondary market for the digital asset, including marketing and promotional efforts;
- The company's financial condition, results of operations and ability to generate profits; and
- Audited financial statements and notes.

As previously noted, securities laws disclosures are primarily concerned with reducing the potential for exploiting informational asymmetries which exist between the management and promoters of the enterprise on the one hand, and investors and prospective investors on the other. Even in exempt offerings, the SEC has defined rules which protect investors through disclosure and the other steps noted above to ensure that that those who obtain securities in a non-public offering environment do not immediately resell their holdings to downstream investors who would otherwise need the disclosures ordinarily provided by registration. Consequently, the rigorous principles of disclosure which Congress defined in crafting the securities laws have been flexibly applied to protect investors, even in times of higher speculation and with the introduction of novel investments, breakthrough technologies, and new products.

The SEC's approach to digital asset investments has been consistent with its adaptive regulation of other new or exotic investment products. In fact, there are a long line of unique products, whose offer and sale the SEC and the courts have concluded involved "investment contracts" and therefore subject to federal securities laws. As previously noted, the '33 Act definition of a "security" includes "investment contracts," a purposefully broad concept which provides the flexibility needed to address all manner of offerings no matter how imaginative or novel.

It is customary that for those involved in securities regulation and compliance, a threshold question is frequently whether the investment product at issue is an "investment contract." When determining whether a company's efforts to raise capital involve the offering of securities, the landmark authority that securities regulators and market participants look to for guidance in this inquiry is SEC v. W.J. Howey Co., 328 U.S. 293 (1946), a case that dealt with citrus groves.[23] Securities professionals also look to the line of decisions that apply *Howey*'s guidance to find that a range of other non-traditional investment products' offer and sale involved "investment contracts." Such novel investment products whose offer and sale have triggered the federal securities laws include a wide range of instruments such as automobile trailers,

---

[23] In *Howey*, the Supreme Court observed that the definition of "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of returns." *Howey*, 328 U.S. at 299.

payphones, and whiskey.[24] This authority serves to guide market participants who seek to offer novel investment products. And it advises that simply because an investment product is new or unusual, that product can be subject to the federal securities laws, government regulation, and the above-described disclosure regime so long as the conditions laid out in *Howey* and later decisions are satisfied.

The next section of this report will discuss how these determinations are made using the regulatory framework discussed above. Industry professionals and market participants routinely analyze how that framework applies to offerings involving novel instruments, including, recently, digital assets.

### B. Securities Regulation Involving New Investment Products

Since the 1930s, the federal securities laws have regulated innovative or novel products that have been far removed from the plain vanilla stock or bond. Some products have literally changed major paradigms in the industry such as the creation of organized options exchanges, the trading of index funds, and other investment vehicles that were originally considered exotic when introduced. Indeed, Wall Street, and today, Silicon Valley have been very adept at creating new products that have not been previously regulated. Simply stated, innovation is not new on Wall Street, or Main Street.[25]

The SEC, in my observation over many years, has been particularly adept at keeping up with new and dynamic products both in the past and now in a digitally driven world. This is due to the fact that the SEC's approach to regulating new products has as its basis the above-described doctrines underlying the '33 and '34 Acts. This helps promote positive outcomes for investors. My observation is that when a company raises money from public investors, the approach to regulation and compliance has been consistent. The standards defined in Howey have stood the test of time, and as noted herein, have been capable of dealing with issues including those related to investments involving digital assets.

### C. Industry Practices Involving Innovative Products and the Applicability of the Existing Regulatory Framework

While the SEC has continued to apply its standards, how then does the industry typically deal with selling innovative investment products and not run afoul of regulators? Due to the previously mentioned notion of "caveat vendor," it is important to note that those who engage in the sale of such products will typically employ a team of advisors available to them to help manage the risk that they are operating within the framework of the law. Specifically, for companies contemplating raising funds from public investors, hiring lawyers, accountants,

---

[24] *See SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594 (1965) (automobile trailers); *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) (whiskey).

[25] The defendants in Howey operated a hotel and developed orange groves in Florida, far from Wall Street. Their capital-raising scheme, however, was innovative.

compliance professionals, and consulting firms helps manage that risk since they are up to date with the regulatory environment and can advise their clients accordingly. It is extremely important that innovators surround themselves with the appropriate legal and compliance resources before engaging in offerings involving novel or innovative products. Based on custom and practice in the securities industry, an issuer cannot shift its responsibility for compliance to the regulator.

In December 2015 a prominent law firm issued a "Client Advisory" recounting digital asset enforcement actions brought by various government agencies to date. It concluded:

> *Recent enforcement actions demonstrate that existing laws and regulations apply with equal force to businesses and financial institutions transacting in cryptocurrency. Businesses built upon or using cryptocurrencies should be mindful to implement strict internal controls and compliance standards and comply with relevant regulatory requirements in order to build successful businesses outside of a regulators' crosshairs. No doubt in the coming years, cryptocurrencies will face increasing scrutiny and it behooves both businesses and legal practitioners to monitor the enforcement and regulatory landscape.*[26]

The same firm also advised that the SEC itself is a resource when businesses are in doubt as to the applicability of the law to digital asset related transactions and are concerned about regulatory liability:

> *"Much has been made of the need for certainty, and perhaps even innovation, in application various laws, including the US securities and commodities laws, to commercial activities relating to blockchain, cryptocurrencies and related technologies. After all, the applicable federal securities statute is 85 years old, and the seminal case, Howey, is more than 70 years old. That said, the SEC has not retreated from the application of existing precedent when examining [digital] token transactions…. We suggest, however, that it continues to be prudent for interested parties to seek guidance directly from the SEC staff before proceeding."*[27]

The SEC is an important resource for those seeking guidance should a particular set of facts, circumstances, or transactions potentially implicate the federal securities laws. The SEC's website, sec.gov, for example, is a resource for material related to current regulatory issues. The SEC provides practitioners the ability to conduct extensive research through their website which

---

[26] See Latham and Watkins LLP, Client Alert Commentary No. 1904, *Enforcement Trends in Cryptocurrency*, December 9, 2015. Available at: https://www.lw.com/thoughtLeadership/lw-enforcement-trends-cryptocurrency

[27] See "The Yellow Brick Road for Consumer Tokens: The Path to SEC and CFTC Compliance," as contained in Global Legal Insights- Blockchain and Cryptocurrency Regulation 1st Edition 2019, published by Global Legal Group Inc., London, UK. Available at: https://www.lw.com/thoughtLeadership/yellow-brick-road-for-consumer-tokens-path-to-sec-cftc-compliance

provides access to extensive information concerning the securities laws and their application.[28] The site also welcomes parties to engage the staff concerning legal issues, including whether a proposed transaction involves the offer and sale of securities, and whether a particular exemption from registration may be available.

The website provides the ability to research a variety of information including:

- Statutes (the Securities Laws) and Legislative History
- SEC Rules and Regulations;
- SEC Concept Releases
- SEC Interpretive Releases
- SEC Rulemaking
- SEC Policy Statements
- Staff Legal and Accounting Bulletins
- No-Action, Exemptive and Interpretive Letters
- SEC Proposed Rules
- SEC Final Rules
- Links to the Applicable Federal Register and Code of Regulation
- SEC Staff Interpretations
- Enforcement actions filed by the SEC
- Reports of Investigations[29]

For market participants uncertain whether their conduct, or proposed conduct, implicates the securities laws, input may be sought from the SEC staff directly. One way to do so is to request a "No-Action" letter from the SEC staff. No-Action letters analyze the particular facts and circumstances involved, discuss applicable laws and rules, and may provide guidance as to whether or not the SEC staff would recommend to the Commission to take an enforcement action against the requester based on the facts and representations described in the individual or entity's request.[30] The SEC staff sometimes responds, in the form of an interpretive letter, to requests for clarifications of certain rules and regulations.[31] The No-Action letter process is a routine and common practice for market participants to gain an understanding of whether their

---

[28] For a full description of the SEC's research availability through their website see, https://www.investor.gov/introduction-investing/investing-basics/role-sec/researching-federal-securities-laws-through-sec

[29] For example, in July 2017 the SEC issued a Report of Investigation communicating to the public and market participants its views on the application of the securities laws, including the principles of Howey, to offers and sales of digital assets. *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, July 25, 2017. Available at https://www.sec.gov/litigation/investreport/34-81207.pdf

[30] See https://www.investor.gov/introduction-investing/investing-basics/glossary/no-action-letters

[31] *Id.*

proposed activity complies with the federal securities laws, including whether offers and sales of an instrument involves an "investment contract."[32]

Another, less formal, practice for market participants to gain insight into the SEC's view of their current or proposed conduct is to secure meetings with SEC commissioners or staff members. That said, based on industry custom and practice, market participants typically place less weight on the views of individual commissioners or staff members, who lack the authority to speak for the SEC or bind the Commission to their position. The same holds true for public statements by SEC officials who will issue disclaimers that their views are their own and not the Commission's, and do not have any legal force. In any event, it is common understanding in the securities industry that the SEC takes action based on a majority of the voting commissioners to consider an issue, no matter how vocal the opposition of any dissenting commissioner.

Another common practice for market participants unsure of how the SEC would consider whether their activity violates the securities laws is to review enforcement actions filed by the SEC and court cases adjudicating relevant issues in those actions. In my experience as a regulator, SEC Enforcement actions and adjudicated cases are a key source of guidance for practitioners since those decisions and settlements often include specific rationale as to the findings of the SEC or the courts and may directly relate to a set of facts that the practitioner seeks to address.

Additionally, a market participant can gain insight into the SEC's view of its conduct once it has become the subject of an inquiry or investigation by the SEC's Division of Enforcement. After receiving notice of such inquiry or investigation, a participant should have heightened awareness that its conduct may violate the securities laws and that it could become the subject of an enforcement action. For this reason, it is common practice in the industry for entities or individuals that become aware of enforcement investigations into their conduct to dialogue with enforcement and other SEC staff to determine whether a change in conduct or other corrective action should take place in order to become compliant with the securities laws.

### D. Enforcement Activity Involving Digital Assets

The SEC has been active in bringing enforcement cases involving digital assets since July 2013, when it filed *SEC v. Trendon Shavers and Bitcoin Savings and Trust,* which dealt with a bitcoin related Ponzi scheme.[33] Prior to the end of 2020, the SEC brought 74 more enforcement actions

---

[32] It is my understanding that the Defendants in this case claim the SEC provided insufficient clarity and notice regarding its position as to whether offers and sales of digital assets, including XRP, violated the federal securities laws. Based on industry custom and practice, a prime means of ascertaining the SEC's position regarding their XRP transactions would have been for Defendants to submit a No-Action letter request to the SEC. For examples of some No-Action letters issued by SEC staff since 2002 that address whether an instrument or scheme involves a security, including an "investment contract," see: https://www.sec.gov/corpfin/corpfin-no-action-letters#2a1.

[33] Case No. 13-cv-00416 (E.D. Tex.).

related to digital assets, with the December 2020 lawsuit against Ripple being the third-to-last.[34] Defendants and respondents included digital asset issuers, brokers, exchanges, and other service providers. More than two thirds of these enforcement actions (52) alleged unregistered securities offerings involving digital assets.[35] Based on my experience as a regulator and industry custom and practice, this large number of cases involving digital assets provided guidance to market participants that the SEC is an active regulator in the digital asset space. These cases also provided guidance that, where appropriate, the SEC brings enforcement actions against issuers of digital assets that offer investments that meet the customary standards for an "investment contract."

## VI. POTENTIAL DISCLOSURES BY RIPPLE

Once again, it is important to note that full and fair disclosure to the investor is critical to our capital markets' success. With the backdrop and concepts noted above, this section provides an explanation of certain disclosures investors would customarily have been entitled to receive about Ripple and XRP if Ripple's offers and sales of XRP were registered. To be clear, I have not been asked to provide, and am not providing, an opinion as to whether Ripple's XRP transactions constituted offers and sales of securities. For purposes of this section of my report, I have been asked to assume that these transactions were in fact offers and sales of securities, and to provide an opinion on what disclosures Ripple would typically be required to make to the investing public if that was the case.

Because Ripple has been a private company, it did not make public SEC filings about the company or XRP. A prospectus and a registration statement would have been the customary way for the investing public to learn material facts surrounding Ripple and XRP if Ripple offered and sold securities to the public. Ripple did not file any prospectus, nor did it provide the periodic ongoing filings required once a company registers its offering. Without periodic reporting, as Ripple continued to offer and sell XRP investors would not be alerted to the ongoing status of the enterprise, the company's financial statements, MD&A, recent sales of securities, insider transactions, and new products or services.

In addition to all the routine corporate disclosures associated with public companies such as financial disclosure, results of operations, and executive compensation, there would be a number of other important disclosures that, in my opinion, would be material to investors with respect to Ripple and XRP. These disclosures include both initial and ongoing disclosures. Examples of notable disclosures would include:

---

[34] *SEC Cryptocurrency Enforcement, Q3 2013-Q4 2020*, Cornerstone Research, available at: https://www.cornerstone.com/Publications/Reports/SEC-Cryptocurrency-Enforcement%E2%80%94Q3-2013%E2%80%93Q4-2020.pdf. This report was issued by Cornerstone Research, an economic financial consulting firm, and lists the 75 digital asset related enforcement actions through 2020 as well as SEC Trading Suspension Orders, SEC Press Releases, SEC Public Statements, and SEC Investor Alerts dealing with digital assets.

[35] Id.

- Ripple's revenues generated from its XRP sales.
- Ripple's use of proceeds from its XRP sales.
- The amounts by which insiders will be compensated with XRP.
- Whether management is subject to XRP lock-up periods and dilution.
- Insider sales of XRP.
- Ripple's use of XRP to pay third party promotors, market makers and digital asset trading platforms to facilitate trading in XRP.
- Ripple's use of promotions, incentives and payments to Ripple's customers and third parties in developing its products and uses for XRP.
- Ripple's sales of XRP to institutional investors at substantial discounts to current XRP market price.

Without the benefit of registration and further periodic and current reporting, investors were deprived of what I believe were important disclosures which could have shone substantial light on the nature of XRP, Ripple, and Ripple's key employees.

## VII. CONCLUSION

It has been my observation over my career in securities regulation and compliance that the philosophy established by Congress in formulating the federal securities laws has served the investing public well while balancing the need for capital formation and investor protection. The concepts presented in this report have survived the test of time and remain relevant today notwithstanding the emergence of new and sophisticated investment products.

In that regard I have attempted to give the Court and jury the information which they may find useful in their deliberations of this case. Key concepts and opinions underlying this report are summarized as follows:

- Selling securities to the public requires that the offering be registered with the SEC.

- Registration provides for "full and fair disclosure" to investors in order that they may have the pertinent facts necessary to make informed investment decisions.

- The doctrine of full disclosure is grounded in the Securities Act of 1933 and the Securities Exchange Act of 1934 which were promulgated in response to the stock market crash of 1929.

- Critical disclosures are found in a registration statement and prospectus and cover such items as a company's operations, financial condition, executive compensation, use of funds raised, nature of the secondary market for shares, incentives paid to third parties for promotion, and consulting fees.

- Companies that have an effective registration statement for a class of securities must file continued disclosures including annual, quarterly, and timely disclosure of material information when it occurs.

- The private offering exemption is reserved for where investors are able to fend for themselves and do not need the protections of registration, and subject to volume limitations and resale restrictions on the securities sold in the offering to ensure what is characterized as private is not a disguised public offering. A public offering requires the full panoply of disclosures provided by registration.

- Where large amounts of securities are offered to investors with no limitations as to resale and end up in the hands of widespread public investors, this is a public offering with a need for registration.

- The SEC has brought many enforcement actions involving digital assets since 2013.

- There is a "safety net" of advisers available to those who bring new products to market and are unsure of the applicability of the federal securities laws. These include lawyers, consultants, accountants, and the SEC staff.

- There are substantial initial and incremental costs associated with publicly offering securities.

- Had Ripple registered its XRP offerings, the disclosures that would be required would be substantial and meaningful to investors both on an initial and ongoing basis.

**LIMITING FACTORS AND OTHER ASSUMPTIONS**

This report is delivered subject to the conditions, scope of engagement, limitations and understandings set forth in this report. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to supplement or amend this report should any additional information become available, including, but not limited to, any expert reports submitted on behalf of the defendants, deposition transcripts, and other information unavailable as of the date of this report.

If I am called to testify, I may prepare, employ, or use demonstrative aids such as graphs, charts, or tables to assist in my testimony.

Respectfully submitted,



President, [redacted] Inc.

**EXHIBIT A: Litigation Documents Considered in Forming Opinions**

**Pleadings**

Plaintiff's Amended Complaint
Ripple's Answer to Amended Complaint
Ripple's Responses and objections to Plaintiffs Second Set of Interrogatories
Ripple's Responses and objections to Plaintiffs Fifth Set of Requests for Admission

**Documents Produced in Discovery**

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2020 and December 31, 2019, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2019 and December 31, 2018, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2016 and December 31, 2017, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2015 and December 31, 2014, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2014 and December 31, 2012, and the Independent Auditors Report for those years

Master XRP Lease Agreement between Ripple Payments Inc. and GSR Markets Limited dated September 9, 2019 (GSR00000640-56) and Amendment to that Agreement (GSR00000639)

Master XRP Purchase Agreement between Ripple Labs Inc. and SBI Virtual Currencies Co., Ltd. dated September 24, 2018 (RPLI_SEC 0492576-94)

Amendment #3 to Master Purchase Agreement between Ripple Labs Inc. and SBI VC Co., Ltd (RPLI_SEC 0492596-98)

Master xRapid Market Maker Services Agreement between Ripple Payments Inc and GSR Markets dated September 6, 2019 (GSR00000988-1002)

Programmatic Market Activity Agreement between Ripple Markets Inc. and GSR Holdings Limited dated June 1, 2017 (GSR00017429-35)

Amendment to the Programmatic Market Activity Agreement between Ripple Markets Inc. and GSR Holdings Limited dated March 2, 2018 (GSR00018580-81)

Fourth Amendment to Negotiable Promissory Notes between Ripple Payments Inc. and GSR Markets Limited dated March 31, 2020 (GSR00000037)

Signed Declaration of Lawrence Angelilli, Executive Vice President and Chief Financial Officer of Money Gram International Inc. dated March 14, 2021

Email dated March 26, 2020 from Dinuka Samarasinghe to Senad Prusac and others (RPLI_SEC 0492574-75)

Email dated May 29, 2020 from Dinuka Samarasinghe to Boris Alergant (RPLI_SEC 0503730-33)

**EXHIBIT B: C/V and Resume**

[redacted]

Cell: [redacted]
Office: [redacted]

**PROFILE**

[redacted] brings nearly 50 years of corporate lea d regulatory experience to his work as a consultant and securities industry expert. Mr. [redacted] retired in February of 2004 as e President of Regulation and Controls for the NASDAQ Stock Market. In that role Mr. [redacted] as NASDAQ's chief regulatory officer and liaison with NASD, its former parent. Mr. [redacted] had joined the NASDAQ Stock Market in 2001.

Formerly he was Senior Vice President of Market Regulation for NASD Inc. (the predecessor of FINRA) and was responsible for real-time and historical surveillance and regulation of all matters pertaining to The NASDAQ Stock Market and the U.S. Over-the-Counter market.

Mr. [redacted] played a leading role in establishing regulatory policy for all trading practices in The NASDAQ Stock Market and the Over-the-Counter Bulletin Board (OTCBB). He also worked extensively with the Securities and Exchange Commission, the Securities Industry Association and the Securities Traders Association in developing and enhancing policies and practices relating to the regulation and surveillance of equity markets.

Mr. [redacted] is a recognized leader in the area of technology enablement. Under his direction, Market Regulation became known as a leader in real-time and historical surveillance technology.

Mr. [redacted] has been featured in a number of magazine articles including Wall Street & Technology, the Wall Street Journal, and Institutional Investor, where he has been quoted as an authority on regulatory, surveillance and technology issues. He has also spoken publicly in conferences dealing with regulatory and technological matters.

Mr. [redacted] began his career with the NASD in 1972 as a District Examiner in New York, the NASD's largest district office. He quickly assumed various management positions within the District and was promoted to Assistant Director of the NASD's Washington, D.C. district office in 1975. He was named District Director of the NASD's Kansas City District in 1980. Prior to his assuming the responsibility for Market Surveillance in 1986, he held various managerial and executive positions including Corporate Secretary for the NASD.

When he assumed the role of Director of Market Regulation, it was a relatively small department of approximately 38 staff. He oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ market. Since that

time the department has grown to its current level of over 300 individuals including significant legal and technology staff.

Mr. [redacted] had full responsibility for real time and historical surveillance of both The NASDAQ Stock Market and all other OTC markets. During his tenure, he instituted a department within Market Regulation to deal exclusively with fraudulent trading practices in the OTC markets. The department was very successful in identifying and addressing major frauds within that marketplace.

He was responsible for the real time surveillance of the NASDAQ Stock Market Inc. including the authorization for trading halts for NASDAQ Companies who were disseminating material news. In that regard he worked daily with Nasdaq listed companies on disclosure obligations and the materiality of news.

More recently, he has been retained as an industry consultant and expert witness. As an industry expert he has testified in a number of proceedings regarding trading practices in the OTC market and unregistered distributions of securities.

After his SD, in February 2004, Mr. [redacted] founded his own consulting company, [redacted] Inc., which specializes in providing expert and consulting services to law firms, broker/dealers, US DOJ, the Securities and Exchange Commission, foreign governments and stock exchanges.

In addition to numerous consultancy assignments, Mr. [redacted] has been granted expert status by the court in a number of jurisdictions over the past ten years.

He testified in March 2011 as an expert on behalf of the SEC in a bench trial before the U.S. District Court for the Eastern District of New York in SEC v. East Delta Resources Corp., et al.[1] There he testified concerning the use of wash and matched trades and other manipulative devices commonly used in market manipulations.

He testified in May 201 trial in the U.S. Middle District of Florida, Tampa Division, in US. v. Shoss, et al.[2] Mr. [redacted] testified as an expert for the US government in the trading of securities and the use of reverse mergers as a method of going public.

He testified in June 2 riminal jury trial in the U.S. Central District of California in US. v. Homm, et al.[3] Mr. [redacted] testified as an expert for the US government concerning the use

---

[1] In the United States District Court for the Eastern District of New York, Case No. 8:08-CV-10–0310.

[2] In the United States District Court for the Middle District of Florida, Tampa Division, No. 8:11-CR-366-T-30TBM.

[3] In the United States District Court for the Central District of California, 2:13-cr-00183-VAP.

of shell companies in market manipulations and the use of various manipulative devices such as "marking the close," "wash sales," and "cross trading."

In July 2021, He provided expert testimony in a jury trial in SEC v. Spartan Securities Group, LTD. Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). He testified on behalf of the SEC providing an expert opinion regarding characteristics of issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents, promoters and others in creating 19 sham companies that would later be sold in a "shell factory" scheme.[4]

He is a graduate of St. Francis College in Brooklyn, New York and did extensive graduate studies at St. John's University in Jamaica, New York.

**PROFESSIONAL EXPERIENCE AND SELECTED ACCOMPLISHMENTS**

**President, [redacted] Consultant Inc.**
May 2004-present

Provides consultation and expert witness services as a securities industry regulatory expert to governments, broker/dealers and law firms including market surveillance technology and investigative procedures.

Areas of expertise include all market related issues particularly: market manipulation and fraud, underwriting, unregistered distributions, suitability, supervision and policies and procedures, FINRA and NASDAQ rules and regulations, FINRA disciplinary actions and arbitrations.

**NASDAQ INC.**
**Senior Vice President, Regulation and Controls, NASD Liaison**
Feb.2001- Feb. 2004

Was responsible for NASDAQ's relationship with NASD, its former parent. Oversaw the multi-million-dollar regulatory services contract with NASD and was responsible for managing NASDAQ's relationship with NASD, including the provision of market regulation services. Responsible for developing and recommending policies related to the regulation of NASDAQ, negotiating NASDAQ's regulatory budget and monitoring the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD.

**NASD Inc.**
Jan.1999-Feb.2001
**Senior Vice President, Regulatory Technology, NASD Inc.**

Was responsible for all line of business support and development of NASD regulatory technology. Responsible for the "business" oversight of the multi-million dollar outsourcing contract with EDS and strategic business, regulatory and technological direction.

---

[4] SEC v. Spartan Securities Group, LTD. Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.).

**NASD Regulation, Inc.**
**Senior Vice President, Market Regulation**
May 1986- Dec. 1998

Achieved progressively higher positions in Market Regulation starting as Director in 1986, Vice President in 1989 and Senior Vice President in 1993. Had total responsibility for the department, overseeing regulatory policy and enforcement efforts in The NASDAQ Stock Market and other markets operated by the NASD.

- As NASD Regulation's senior market executive, was responsible for overseeing regulatory policy issues with respect to trading practices in the NASDAQ Stock Market.
- Responsible for all real-time and historical surveillance of the NASDAQ Stock Market and all OTC markets including the investigation and adjudication of many of the NASD's most significant disciplinary actions. These actions included many significant fraud cases that resulted in substantial investor protection.
- Successfully achieved departmental goals relating to financial performance and quality of regulatory programs.
- Served as a member of NASD Regulation's senior management team, which set direction and policy for NASD Regulation, overall, as an organization.
- Headed the NASD's regulation strategic planning efforts in 1992 and 1993.
- Served on a number of NASD Regulation and NASDAQ policy committees for strategic planning, employee satisfaction, and NASD corporate technology initiatives.
- Served as a member of the Intermarket Surveillance Group consisting of the market surveillance heads of the six primary markets in the United States and the heads of surveillance for numerous foreign exchanges throughout the world. Served as president of the Intermarket Surveillance Group in 1991 and, again, in 1996.
- Managed the development and implementation of several award-winning surveillance systems including "RADAR" and the Advanced Detection System, "ADS," pioneering the use of AI in surveillance technology. Their implementation resulted in dramatic increases in efficiencies within the Market Regulation Department with gains of well over 50% in productivity and recognition by leading publications such as Wall Street & Technology and ComputerWorld.
- Senior executive in charge of the Order Audit Trail ("OATS") project, a $22 million-dollar project that significantly enhanced regulatory reporting for US capital markets. Met SEC imposed deadlines while remaining within budget.
- Assumed responsibility for the leadership of the NASD's strategic reengineering of its regulatory functions through a ground-up analysis of people, process and technology including the development of a future vision for NASD Regulation.

**Corporate Secretary**
**NASD, Washington, D.C.**
1984-1986

Executive responsibility for administration of the NASD's Strategic Plan. Extensive meeting planning experience in carrying out the responsibility for all NASD Board of Governor meetings.

• Created extensive programs and gave presentations to all visitors to the NASD representing foreign and domestic markets and foreign/domestic government officials.
• Provided executive assistance to NASD's president, including extensive correspondence, planning and participation in high-level meetings including all meetings of the NASD's Senior Management Group.

**Associate Director**
**NASD Regulatory Policies/Procedures, Washington, D.C.**
1981-1984

Worked extensively in the areas of NASD regulatory policy including all NASD and SEC rule proposals. Also developed extensive examination programs and policies for NASD field examiners.

• Worked extensively on NASD and SEC rule proposals including drafting of NASD comment letters.
• Acted as liaison to the NASD's Municipal Securities Committee, the Capital and Margin Committee and the NASD Operations Committee.
• Performed extensive industry liaison work with the SEC, Municipal Securities Rule-Making Board (MSRB), and the Options Self-Regulatory Council concerning the adoption of industry rules and proposals.

**1975-1981**
Held various managerial positions in the NASD's field examination offices including District Director in Kansas City. NASD District Offices are responsible for implementing examinations and enforcement efforts with respect to all NASD member firms and registered individuals within the district's jurisdiction.

**EDUCATION**
St. Francis College, Brooklyn, New York, Bachelor of Arts, English 1968
St. John's University, Jamaica, New York, 30 Graduate Credits in English 1968-1970
New York Institute of Finance (1972-1973), Various Brokerage, Accounting, and Finance Courses