# EXHIBIT 2

1

2        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

3   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
4   ---------------------------------------x

5   SECURITIES AND EXCHANGE COMMISSION,

6                        Plaintiff,

7                  -against-                Civil Action
                                            No.
8   RIPPLE LABS, INC., BRADLEY              20-cv-10832
    GARLINGHOUSE and CHRISTIAN A. LARSEN,   (AT)(SN)
9
                        Defendants.
10
    ---------------------------------------x

11

12                        November 18, 2021

13                        9:29 a.m.

14

15        Videotaped Deposition of ███████████,

16   taken by Defendants, held at the offices of

17   Debevoise & Plimpton LLP, 919 Third Avenue,

18   New York, New York, before Joseph R. Danyo, a

19   Shorthand Reporter and Notary Public within

20   and for the State of New York.

21

22

23   Job No. 202259

24

25

```
 1    A P P E A R A N C E S :

 2

 3         U.S. SECURITIES and EXCHANGE COMMISSION
           Attorney for Plaintiff
 4            175 W. Jackson Boulevard
              Chicago, Illinois 60604
 5            By:   BENJAMIN HANAUER, ESQ.
                    MARK SYLVESTER, ESQ.
 6                  LADAN STEWART, ESQ.

 7

 8

 9

10         DEBEVOISE & PLIMPTON LLP
           Attorneys for Defendant Ripple Labs, Inc.
11            919 Third Avenue
              New York, New York 10022
12         By:   ANDREW CERESNEY, ESQ.
                 KYLE CHERMAK, ESQ.
13               ANNA GRESSEL, ESQ.
                 EMILY JENAB, ESQ. (Via Zoom)
14

15

16

17

18
           KELLOGG HANSEN TODD FIGER & FREDERICK
19         Attorneys for Defendant Ripple Labs, Inc.
              1615 M Street, N.W.
20            Washington, D.C. 20036
              By:   BETHAN JONES, ESQ. (Via Zoom)
21

22

23

24

25
```

```
 1

 2    A P P E A R A N C E S : (Continued)

 3

 4        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          Attorneys for Defendant Christian Larsen
 5           535 Mission Street
             San Francisco, California 94105
 6        By:   ROBIN LINSENMAYER, ESQ.

 7

 8        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          Attorneys for Defendant Bradley Garlinghouse
 9           One Liberty Plaza
             New York, New York 10006
10        By:   SAMUEL LEVANDER, ESQ.
                JACKIE BRUNE, ESQ. (Via Zoom)
11

12

13
    Also Present:
14
          LARRY MOSKOWITZ, Videographer
15
                    ~oOo~
16

17

18

19

20

21

22

23

24

25
```

1     ████████  - Confidential Pursuant to Protective Order

2              THE VIDEOGRAPHER:   Good morning,

3         this is the start of media label number 1

4         of the video-recorded deposition of ████

5         ████████  in the matter of Securities and

6         Exchange Commission versus Ripple Labs,

7         Inc., et al.   This deposition is being

8         held at Debevoise & Plimpton, 919 Third

9         Avenue, New York, New York on November 18,

10        2021 at approximately 9:29 a.m.

11             My name is Larry Moskowitz, and I am

12        the legal video specialist with TSG

13        Reporting, Inc., headquartered at 228 East

14        45th Street, New York, New York.   The

15        court reporter is Joe Danyo, also in

16        association with TSG Reporting.   All

17        counsel appearances will be noted on the

18        stenographic record.

19             Will the reporter please administer

20        the oath.

21   ████████████████████, having been first

22   duly sworn by Joseph R. Danyo, a Notary Public,

23   was examined and testified as follows:

24   EXAMINATION BY MS. GRESSEL:

25             Q.   Good morning, Mr. ████████.   My name

1    ███████    - Confidential Pursuant to Protective Order

2    is Anna Gressel and with me is my colleague

3    Andrew Ceresney.   We're attorneys at Debevoise &

4    Plimpton, and we represent defendant Ripple Labs

5    in this case.   This is an expert witness

6    deposition in the case of SEC versus Ripple Labs

7    pending in the Southern District of New York.

8              Before we go any further, I would

9    like to designate as confidential this transcript

10   pursuant to the protective order in this case.

11   Is there any reason why you cannot testify

12   completely and truthfully today?

13        A.   No.

14        Q.   Are you taking any medication or

15   suffering from any medical or other physical

16   condition that would prevent you from testifying

17   completely and truthfully?

18        A.   No, I'm not.

19        Q.   Please state your full name for the

20   record.

21        A.   ████████████████.

22        Q.   Do you sometimes go by ███?

23        A.   Yes, I do.

24        Q.   What's your home address?

25        A.   20612 Chestnut Ridge Drive, North

1    ███████ - Confidential Pursuant to Protective Order

2    Fort Myers, Florida.

3         Q.   Alright.  Mr. ███████, your

4    testimony today is under oath.   It may be taken

5    down by a stenographer and videographer, and it

6    may be read or played at trial or used for other

7    purposes related to this lawsuit.   Is that

8    understood?

9         A.   Yes.

10         Q.   Because the court reporter is taking

11    down all of the testimony, it is important your

12    answers be verbalized.   Please always give a

13    clear spoken answer rather than nodding or

14    shaking your head.  Okay?

15         A.   Yes.

16         Q.   Great. In addition, it is important

17    that you allow me to finish my questions before

18    you begin your answer, so we don't talk over each

19    other.  Okay?

20         A.   Yes.

21         Q.   If you don't understand my question,

22    ask me to clarify.   If you answer a question, I

23    will assume you understood it.   Okay?

24         A.   Yes.

25         Q.   We will take breaks during the

 1      ████████ - Confidential Pursuant to Protective Order

 2      deposition.  If at any time you need one, just

 3      let me know.  I will just ask that you wait

 4      until the question pending has been answered and

 5      we can take a momentary pause.

 6              A.   Thank you so much.

 7              Q.   Great.  Have you ever been deposed

 8      before?

 9              A.   Yes, I have.

10              Q.   How many times?

11              A.   I believe it was five or six.  It is

12      in my resumé which is attached to my report.   I

13      didn't add them up before I came, so it's

14      probably right around that number.

15              Q.   And all the times you have been

16      deposed have been disclosed in your report?

17              A.   Yes, they have.  Well, the last ten

18      years.  There may have been one or two prior to

19      the last ten years.

20              Q.   For the purpose of this deposition, I

21      am going to refer to defendant Ripple Labs as

22      Ripple.  Is that okay?

23              A.   That's fine.

24              Q.   I am also going to refer to the

25      defendants Ripple, Brad Garlinghouse or Chris

Page 8

1    ██████ - Confidential Pursuant to Protective Order

2    Larsen either individually or collectively as

3    defendant or the defendants.   Okay?

4           A.   Yes.

5           Q.   What did you do to prepare for your

6    deposition today?

7           A.   Basically I went through my report in

8    great detail, looked again at whatever cites were

9    footnoted, the attachments to the report, my CV

10   to make sure it was in order.   That's basically

11   it.

12          Q.   And how long did you prepare?

13          A.   Approximately 8 hours, basically one

14   day.

15          Q.   Did you meet with counsel?

16          A.   Yes, I did.

17          Q.   With the counsel present today?

18          A.   Yes.

19          Q.   Did you speak with anyone else to

20   prepare for your deposition?

21          A.   No, I did not.

22          Q.   Did you review any documents other

23   than the ones disclosed in the appendix to your

24   report or cited in your report?

25          A.   No, I did not.

1   ███████ - Confidential Pursuant to Protective Order

2        Q.   Okay.  Did you make any notes?

3             MR. HANAUER:  Objection.  At what

4        time did he review documents?

5        Q.   During your preparation for the

6   deposition.

7        A.   I don't believe so.

8        Q.   Did you bring any documents with you

9   today?

10       A.   No, I did not.

11       Q.   How did you come to be engaged in

12  this case?

13       A.   I received a call from the SEC.  Mr.

14  Dugan Bliss, who asked if I was interested in

15  helping out on this particular case.

16            MR. HANAUER:  ███, I am just going

17       to instruct you not to get into any

18       specifics of what you and anyone at the

19       SEC talked about.

20            THE WITNESS:  Sure.

21       A.   We reviewed my qualifications and so

22  on, and they go through a process of selecting

23  experts.  I don't know exactly what it is, but,

24  you know, he looked at my credentials, went back,

25  and a couple of days later I got an e-mail back

1    ███████  - Confidential Pursuant to Protective Order

2    saying they want to talk to me further, and we

3    did that, and then they retained me.

4         Q.   Do you have a written retention

5    agreement?

6         A.   I do.   I have a contract.   Yes.

7         Q.   At that point, what did you

8    understand your assignment to be?

9         A.   Well, it is in my report, but, to

10   verbalize it, it is basically to ensure that the

11   court, the jury particularly, is educated as to

12   basically what is involved in, A, the securities

13   acts overall and the importance, primarily the

14   importance of disclosures in the securities laws

15   and how over the years those concepts have been

16   applied in various circumstances.

17        Q.   Since your initial retention, has the

18   scope of your assignment changed?

19        A.   No.

20        Q.   Okay.   Have you been engaged before

21   by the SEC?

22        A.   Yes.

23        Q.   How many times before?

24        A.   I believe it is 20.

25        Q.   Were all of those engagements for

1    ████████ - Confidential Pursuant to Protective Order

2    expert witness work?

3         A.   No.   Some of it was consultancy.

4         Q.   What is the nature of the consulting

5    work you have done for the SEC?

6              MR. HANAUER:   Generally.

7         A.   Generally, they would send me

8    documents to take a look at, get my opinion as to

9    whether my opinion would jibe with their thinking

10   on possibly bringing a case, for example, so I

11   would consult with them on different -- well,

12   let's take, for example, a trading case or a

13   market manipulation case.   I would look at

14   trading data for them and make a recommendation

15   as to whether, you know, they were on the right

16   track or not basically.

17        Q.   When you say you would look at

18   trading data for them, what does that usually

19   involve?

20        A.   I'm sorry.   I have trouble hearing.

21        Q.   When you say you look at trading

22   data, what does that normally involve?

23        A.   Oh gosh, a lot of data, a lot of

24   trading records, audit trail, quotation

25   information, bids and offers.   Sometimes I look

1    ▮▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2    at press releases by issuers.  If there is a

3    promotion involved, I will look at that, so it is

4    a wide variety of things.

5         Q.   Did they ask you to look at any

6    trading data in this case?

7         A.   No.

8         Q.   Or any press releases?

9         A.   No.

10        Q.   Okay.  Did they retain you in each

11   of those matters, or do you have a standing

12   retention?

13        A.   Well, I believe on some cases they

14   did retain me.  In other cases based on, you

15   know, conversations back and forth.  I think they

16   elected at least in one case, maybe two, to not

17   move forward with the case, so they dropped it.

18        Q.   Okay.  What about your expert

19   testimony?  In what kinds of cases have you

20   offered expert testimony?

21        A.   Well, there are a number of different

22   venues I have offered testimony in.  FINRA

23   arbitrations.  I have done a number of work for

24   the U.S. Attorney in LA and Tampa.  When you say

25   expert, are you saying that I have been

1    ██████████   - Confidential Pursuant to Protective Order

2    designated and approved as an expert in a court

3    or just generally?

4         Q.   I would say retained for the purpose

5    of potentially offering expert testimony in a

6    case.

7         A.   Okay.   So, you know, I have been

8    retained by law firms to take a look at certain

9    situations.   So it is a wide variety of

10   different clients.   I have worked for the London

11   stock exchange on an expert case that they had.

12   So it is, I would say the SEC constitutes maybe

13   50 percent of my engagements maybe.

14        Q.   And you work with the same SEC

15   attorneys on those matters you do for the SEC?

16        A.   There may have been an overlap in one

17   or two cases, but generally it is different

18   attorneys.

19        Q.   Did you review any documents from

20   your prior work for the SEC in connection with

21   this matter?

22        A.   I don't believe so.

23        Q.   Is the majority of your expert

24   witness work on behalf of the government?

25        A.   No.   Well, it's about 50 percent, I

1      ███████ - Confidential Pursuant to Protective Order

2    would say.

3         Q.   50 percent for the SEC or 50 percent

4    for any government agency?

5         A.   Well, the U.S. Attorney was about

6    three cases, so slightly over 50 percent.

7         Q.   Okay.   So about 50 percent for the

8    SEC, and then just three additional cases for

9    other government agencies?

10        A.   Yes.

11        Q.   Okay.   Did anyone assist you in

12   connection with your work on this case?

13        A.   No.

14        Q.   Okay.   In general with your expert

15   witness work, does anyone ever assist you with

16   your expert witness work?

17        A.   You mean in forming an expert opinion

18   or doing clerical work or exactly what do you

19   mean by assistance?

20        Q.   Does anyone assist you in your expert

21   work with research?

22        A.   No.

23        Q.   Does anyone assist you in your expert

24   work with, you said clerical assistance?

25        A.   Yes.

1      ███████ - Confidential Pursuant to Protective Order

2           Q.   Perhaps you could tell me how you

3      define that?

4           A.   Well, if you want the explanation,

5      there was a couple of cases where my daughter who

6      is pretty good in Excel would take the massive

7      amounts of trading data that I want to look at

8      and put it in there while I did other things.

9           Q.   Okay, and no one assisted you in any

10     manner with your work in this case?

11          A.   They did not.

12          Q.   Okay.   I am going to hand you what

13     has been marked as Defendant's Exhibit ██ 1.

14               (Defendant Exhibit ██ 1, Report of

15               ████████████████ dated October 4, 2021, was

16               so marked for identification, as of this

17               date.)

18          Q.   Mr. █████████, is this a copy of the

19     report that you prepared in connection with this

20     case?

21          A.   Yes, it appears to be, sure.

22          Q.   And that is your signature on page

23     30, right?

24          A.   It is electronic.   Yes.

25          Q.   And your report is dated October 4,

1   ███████ - Confidential Pursuant to Protective Order

2   2021, correct?

3           A.   It is.

4           Q.   This is the current version of your

5   report, right?

6           A.   Yes.

7           Q.   So throughout this deposition I may

8   refer to this as Exhibit ██ 1 or I may just call

9   it your report.   Is that okay?

10          A.   Sure.

11          Q.   Your report lists 19 documents in

12  Exhibit A which is appended to the report at the

13  end.   Is that right?

14          A.   I didn't count them, but if you say

15  so, yes.

16          Q.   You can take a moment to look at it.

17  And you understand you are obligated to disclose

18  any facts or data that you considered in forming

19  your opinions, right?

20          A.   Yes.

21          Q.   Apart from the information contained

22  in the documents identified in the report or in

23  Exhibit A to the report, did you consider any

24  other facts or data in forming the opinions

25  stated in your report?

1    ███████ - Confidential Pursuant to Protective Order

2         A.   If I did, they are all documented in

3    footnotes within the report.

4         Q.   Okay, so the footnotes including the

5    footnotes and Exhibit A to your report, you

6    disclosed all of the documents and data you

7    considered?

8         A.   Yes.

9         Q.   Did you do any research that is not

10   reflected in the materials listed in Exhibit A or

11   in the footnotes to your report?

12        A.   I did.

13        Q.   What additional research did you do?

14        A.   Just general perusing of the internet

15   trying to familiarize myself more with the

16   cryptocurrency space in general just for my own

17   edification.

18        Q.   What steps did you take to do that

19   research?

20        A.   You know, basically do a search and

21   look at articles, look at certain YouTube videos

22   that purport to teach everybody about crypto and

23   so on, so there is a whole variety of things that

24   you can look at.

25        Q.   So the nature of -- it would answer

1    ████████ - Confidential Pursuant to Protective Order

2    the nature of questions like what is a block

3    chain?

4            A.   Yes.

5            Q.   What is a digital asset?

6            A.   Sure.

7            Q.   Maybe what is Ripple?   Did you do

8    any research on what Ripple is?

9            A.   Yeah, I did, just so I could

10   familiarize myself with what Ripple does and what

11   their product was and what XRP was.   I thought

12   that was important for my understanding of the

13   facts here.

14           Q.   Do you recall what sources you

15   consulted?

16           A.   For Ripple?

17           Q.   Yes.

18           A.   Mostly a website.

19           Q.   Mostly Ripple's website?

20           A.   Yes.   You know, there are certain

21   blogs that are on YouTube regarding Ripple and

22   XRP has gone to a thousand, you know, those I

23   kind of look at, but discount, I mean I don't put

24   much faith in those, but basically I would say

25   the Ripple website is the primary one.

1    ███████████ - Confidential Pursuant to Protective Order

2         Q.   So you primarily consulted Ripple's

3    website to learn more about Ripple and other

4    sources you may have looked at but discounted, is

5    that accurate?

6         A.   Right.  Yeah, I think that is

7    accurate.

8         Q.   And what websites do you consult to

9    learn about block chains generally?

10        A.   Well, if you look at my resumé, I

11   mean I have an extensive technology background in

12   addition to being a regulator, and I found it

13   interesting that the technology in fact is

14   evolving.  I think the jury is out on whether it

15   will be a success or not.  It's for the

16   marketplace to figure out, but it was kind of

17   interesting to read, you know, about

18   decentralization, cryptography and so on.  So it

19   is all up my alley and my background and so on.

20        Q.   When you say the jury is out on

21   whether it will be successful, do you mean block

22   chain technology as a whole?

23        A.   Yes.

24        Q.   When you said you read about

25   decentralization and cryptography, do you recall

1     ███████  - Confidential Pursuant to Protective Order

2     the sources that you looked at in your research?

3          A.    Not specifically, no.

4          Q.    Prior to doing the research, were you

5     familiar with block chain technologies?

6          A.    You know, just what I read in the

7     Wall Street Journal or, you know, whatever, you

8     know, I would follow with great interest the

9     phenomenon if you would.   That's about it.

10    Just curiosity.

11         Q.    Prior to your work on this matter,

12    were you familiar with digital assets?

13         A.    Somewhat.   I wouldn't consider

14    myself an expert in digital assets, but I kind of

15    knew what they were.   Sure.

16         Q.    Prior to your work on this matter,

17    had you ever heard the term decentralization of a

18    block chain, for example?

19         A.    No.

20         Q.    Prior to your work on this matter,

21    were you familiar with cryptography?

22         A.    Generally, yes.

23         Q.    In what sense were you familiar?

24         A.    Well, you know, cryptography was

25    important to winning World War II.

1      ████████  - Confidential Pursuant to Protective Order

2           Q.   Very true.   Okay.   Great.   Prior

3      to your work on this matter, were you familiar

4      with cryptography as it was used in digital

5      assets?

6           A.   You know, I don't know what the

7      timing was, but probably either in preparation

8      for them making an offer for me to be an expert

9      because I felt I had to learn about it.   I don't

10     know if it was after the engagement, immediately

11     before the engagement, so I'm not sure of the

12     timing, but it was in the context of the

13     engagement.

14          Q.   Other than doing research on the

15     Internet or looking at Ripple's website, those

16     were the sources you mentioned, did you speak to

17     anyone about block chain technologies or digital

18     assets to learn further about them?

19          A.   No, I did not.

20          Q.   Did you ask the SEC to provide you

21     with any further resources on or explanations of

22     those technologies?

23          A.   No.

24          Q.   Okay.   Did you read any of the other

25     expert reports submitted in this matter?

1      ███████ - Confidential Pursuant to Protective Order

2           A.   I did not.

3           Q.   Are you aware that there were other

4      expert reports submitted in this matter?

5           A.   No.   Just, you know, just because

6      you mentioned them.   Not before that.

7           Q.   Sitting here today, you wouldn't be

8      able to name any other expert?

9           A.   I would not.   No.

10          Q.   Okay.   Did any of the attorneys at

11     SEC provide you with any other documents or

12     information that are not reflected in Exhibit A

13     to your report or in the footnotes?

14          A.   No.

15          Q.   Did you request any information that

16     was not provided to you?

17          A.   No.

18          Q.   Okay.   Have you reviewed any other

19     documents or information since you signed the

20     report that are relevant to the opinions you

21     expressed since October 4?

22               MR. HANAUER:   Other than what?

23          Q.   Other than the documents listed in

24     Exhibit A or reflected in the footnotes to your

25     report?

1     ███████  - Confidential Pursuant to Protective Order

2            A.   I don't believe so.  No.

3            Q.   Okay.  Did you create or maintain a

4     file containing your research and search history

5     related to your research?

6            A.   No.  Just what's reflected in the

7     report, in the footnotes.  I put the URL sites

8     and the Internet sites.

9            Q.   You put in the Internet sites of some

10    of your research but not other things like

11    YouTube or Ripple's?

12           A.   No.  You guys have Lexis.

13           Q.   Okay, but, just to be clear for the

14    record, you did not include the research that you

15    did on block chain or on Ripple in the footnotes

16    or Exhibit A?

17           A.   No.

18           Q.   Okay.  Mr. ████████, among the

19    documents listed in Exhibit A are the SEC's

20    amended complaint and Ripple's answer to the

21    SEC's amended complaint, correct?

22           A.   Yes.

23           Q.   Did you review the allegations in the

24    amended complaint?

25           A.   I did.

1   ████████  - Confidential Pursuant to Protective Order

2          Q.   And did you review Ripple's responses

3   to those allegations and the answer to the

4   amended complaint?

5          A.   I did.

6          Q.   Have you been instructed by the SEC

7   to rely on the facts as set forth in the amended

8   complaint?

9          A.   No.

10         Q.   Okay.  Have you independently formed

11  a view as to the truth or falsity of the

12  allegations in the amended complaint?

13         A.   I have not.

14         Q.   Okay.  Did counsel for the SEC ask

15  you to make any assumptions in connection with

16  your report?

17         A.   Assumptions regarding?

18         Q.   Any facts or legal conclusions?   Did

19  they ask you to assume as true any facts for the

20  purpose of your analysis?

21         A.   No.

22              MR. HANAUER:   Objection.   Beyond

23         the ones he identifies in his report?

24         Q.   Why don't we start with that.   What

25  did the SEC ask you to assume -- sorry.   Let me

1      ███████  - Confidential Pursuant to Protective Order

2      rephrase that.   What facts did the SEC ask you

3      to assume as true for the purpose of your report?

4              A.   What facts?

5              Q.   Um-hum.

6              A.   Facts concerning the complaint

7      itself.   Is that what you're saying?

8              Q.   Any facts underlying the report.

9      Did they ask you to assume those as true?

10             A.   All they asked me to assume was to

11     approach the report as if Ripple would have been

12     required to register.   That's basically the

13     assumption that underlies the whole report, and I

14     state that, I believe, right up front, so that

15     was, no further assumptions other than that one.

16             Q.   Okay.   Did they ask you to assume

17     any other legal conclusions to be true for the

18     purpose of your analysis?

19             A.   No.

20             Q.   Okay.  So you say in your report that

21     the SEC or you said, you testified right now that

22     the SEC asked you to assume that Ripple's sales

23     or offers of XRP would have to be registered as

24     securities.   Is that correct?

25                  MR. HANAUER:   Objection.   He states

1     ███████  - Confidential Pursuant to Protective Order

2          the assumptions explicitly in his report.

3          If you want to take them one by one,

4          please do, but it's not a memory test.

5          Q.   Other than the attorneys for the SEC,

6     have you communicated with anyone else in

7     connection with your work on this case?

8          A.   I have not.

9          Q.   Mr. ███████, could you please

10    describe the opinions you are offering in this

11    case?

12         A.   Yeah, again, they are in the report,

13    and primarily, as I go back and restate, what the

14    SEC retained me for is primarily to provide the

15    jury with background concerning what the

16    securities acts are, how they form a framework,

17    if you will, for regulation on the industry, how

18    custom and practice and other things that are

19    typically carried out in the industry as they

20    relate, the public offerings, how that gets done,

21    what disclosures are triggered by registration,

22    both initially and ongoing, so it's how the SEC

23    has approached new and unique products over the

24    years and so on.  So it's more of a tutorial, I

25    would say, than an opinion.

1     ████████    - Confidential Pursuant to Protective Order

2          Q.   What do you mean when you say it is

3     more of a tutorial than an opinion?

4          A.   Well, as I said before, it is

5     primarily to educate the jury as to what some of

6     these concepts are and the industry practices and

7     regulations in a general state, so that there is

8     a greater understanding by them of the context of

9     what the SEC is talking about with Ripple.

10         Q.   So you view a tutorial as educational

11    for the jury, correct?

12         A.   Yes.

13         Q.   What is an opinion in contrast to

14    that?

15         A.   With respect to these particular set

16    of facts?

17         Q.   Sure.   Why not?

18         A.   You know, I mean I guess I could have

19    an opinion about a lot of things.   I mean, so,

20    you know, I could offer an opinion as I do in

21    some of the other SEC cases as to whether, you

22    know, violations had occurred or if this set of

23    facts would indicate to a seasoned regulator that

24    violations have occurred, but I did not do that

25    here.

1    ████████ - Confidential Pursuant to Protective Order

2         Q.   So you are not offering an opinion

3    here about whether any violations of any laws

4    occurred?

5         A.   Correct.

6         Q.   And you are not offering an opinion

7    as to the specific facts of this case?

8         A.   I'm not.  No.

9         Q.   Mr. ████████, this report contains

10   all of the opinions that you intend to offer in

11   this case, correct?

12        A.   It does.

13        Q.   I see on page 30 you have reserved

14   the right to supplement your report.  As you sit

15   here today, do you have any reason to supplement

16   or revise your report?

17        A.   No, I do not.

18        Q.   Have you been asked by the SEC to

19   supplement your report in any way?

20        A.   No, I have not.

21        Q.   Sitting here today, do you intend to

22   further supplement or revise your report?

23        A.   Unless asked, no.

24        Q.   Have you been asked by the SEC to

25   perform any additional work in connection with

1      ████████  - Confidential Pursuant to Protective Order

2      this case?

3              A.    Not at the moment, no.

4              Q.    Were you asked to analyze any issues

5      that are not reflected or discussed in your

6      report?

7              A.    No.

8              Q.    Have you performed any work not

9      reflected in your report other than the

10     background research on block chain and Ripple

11     that you discussed earlier?

12                  MR. HANAUER:   Related to what?

13             A.    No.

14             Q.    I can just restate the question.   In

15     the course of your engagement for this matter,

16     have you performed any work not reflected in your

17     report?

18             A.    I did not.

19             Q.    Okay.   Your report discloses in

20     Exhibit A that you received several of Ripple's

21     contracts concerning XRP sales as well as two

22     e-mails.   Why did you consider these documents

23     in the course of your work on this matter?

24             A.    Why did I consider them?

25             Q.    Um-hum.

1     ███████ - Confidential Pursuant to Protective Order

2          A.    They pertain to the disclosure

3     section where in my opinion I listed some of the

4     things if, you know, we are always going under

5     the basic assumption that if Ripple had

6     registered, okay?   So these would be some of the

7     disclosures in my opinion that would be mandated

8     by that registration.

9          Q.    Your opinion, and we can --

10         A.    So that one relates to --

11              MR. HANAUER:   Hold on, ███.   Let

12         her ask a question.

13              THE WITNESS:   I'm sorry.

14         Q.    Why did you think those contracts

15    were relevant to that part of your opinion?

16         A.    Because I think it, as I said before

17    on these, it provides the basis for my comment

18    and the particular disclosure that it relates to.

19         Q.    And which comment is that?

20         A.    So, for example, the last one, Ripple

21    sales of XRP to institutional investors at

22    substantial discounts to current XRP market

23    price, for example.

24              So that set of e-mails and other

25    disclosures were the ones that would support

1   ███████ - Confidential Pursuant to Protective Order

2   making -- my opinion of making that disclosure.

3          Q.   Were you asked to provide any opinion

4   concerning Ripple's over-the-counter sales of

5   XRP?

6          A.   I have not, no.

7          Q.   Were you asked to provide an opinion

8   concerning the provisions in Ripple's contracts

9   related to sales of XRP?

10          A.   No.

11          Q.   Were you asked to provide an opinion

12   concerning Ripple's relationships with market

13   makers?

14          A.   No.

15          Q.   Were you asked to provide any other

16   opinion concerning Ripple's sales or offers of

17   XRP?

18          A.   No.

19          Q.   Let's turn to page 34 of your report

20   which is entitled Exhibit B, and there is a

21   heading CV and resumé.

22          A.   Yes.

23          Q.   Is that an accurate and current

24   statement of your resumé?

25          A.   It is.

1   ██████████ - Confidential Pursuant to Protective Order

2          Q.   Okay.   Let's turn back --

3               MR. HANAUER:   Excuse me one second.

4               (Discussion off the record between

5          witness and his counsel.)

6               THE WITNESS:   Just to make the

7          record clear, there is an error.

8          Q.   Sure.

9          A.   In my background in the report

10   actually.   It says that from, and this is on

11   page 3 of my report, qualifications.   It says

12   from -- bottom of the page, last paragraph, "From

13   1999 to 2004, I was senior vice president of

14   regulation and controls for NASDAQ, but, if you

15   look at the resumé, that is incorrect.

16               My tenure at NASDAQ started in

17   February of 2001 to 2004.   From January of '99 to

18   February 2001, and again I'm in the next to last

19   page of my resumé where I talk about professional

20   experiences and selected accomplishments.   From

21   1999 to 2001 I was senior vice president of

22   regulatory technology at NASD regulation.

23          Q.   Okay.   Thank you for the correction.

24          A.   Sure.

25          Q.   Under page 5 of your report and

1      ████████   - Confidential Pursuant to Protective Order

2      continuing to page 6, you have the heading

3      "Testimony and publications last ten years."   Is

4      that a complete and accurate listing of your

5      experiences giving testimony over the past ten

6      years?

7           A.   Yes, it is.

8           Q.   Have you testified in any other

9      matters since you signed your report?

10          A.   No, I have not.

11          Q.   You previously testified you have

12     been engaged on numerous occasions by the SEC,

13     correct?

14          A.   I'm sorry, would you repeat that.

15          Q.   You previously testified that you

16     have been engaged on numerous occasions by the

17     SEC, correct?

18          A.   Yes.

19          Q.   Okay.   How many times have you

20     testified on behalf of defendants charged with

21     violations of the securities laws?

22          A.   No testimony, but there was -- there

23     is three engagements.   One had a deposition.

24     It is not on here, because it was prior to ten

25     years.

1   ███████   - Confidential Pursuant to Protective Order

2         Q.   So how many times have you been

3   engaged on behalf of defendants charged with

4   violations of the securities laws?

5         A.   Three.

6         Q.   Okay.   What percentage roughly would

7   you say that is compared to all the times you

8   have been engaged to work as an expert witness on

9   a case?

10        A.   Probably 10 percent.

11        Q.   Mr. ██████, how would you describe

12  your areas of expertise as an expert witness?

13        A.   Areas of expertise?

14        Q.   Um-hum.

15        A.   Wow.   That is a good question.   You

16  know, I've been in the industry a long time.   I

17  was at NASDAQ and NASD for approximately 32 years

18  and have been consulting ever since, so the range

19  of my engagements relate, you know, I think it's

20  in my resumé, but, you know, it is a wide

21  spectrum of expertise.

22             I have testified on best execution,

23  market maker compensation, sales credits, insider

24  trading, you know, I can keep going, but it's a

25  wide variety.

 1     ███████    - Confidential Pursuant to Protective Order

 2                    Most recently I testified in a court

 3     case for the SEC in Tampa this summer where it

 4     was rule 15c2-11 which is market-making rules.

 5     So it's a wide spectrum of NASD and FINRA

 6     regulations.

 7             Q.   Is it accurate to say that most of

 8     your prior testimony in the securities context

 9     has involved cases alleging market manipulation

10     or fraud?

11             A.   There have been a number of those,

12     yes.

13             Q.   What percentage of the total would

14     you say?

15             A.   Oh, boy.   I didn't count them up.

16     Can I take a quick look?

17             Q.   Sure.

18             A.   Are you talking the ones where I gave

19     testimony?

20             Q.   Yeah, why don't we talk about the

21     ones where you gave testimony.

22             A.   Excuse me.

23                   (Discussion off the record between

24                   witness and his counsel)

25             A.   If you want to go one by one, I can,

1    ████████  - Confidential Pursuant to Protective Order

2    because not all of them are trading cases.   As I

3    said before, you know, maybe there's some nuances

4    to what you call a trading case, so, you know,

5    there are pump and dumps, there is a portfolio

6    pumping case, there is a corporate identity theft

7    case, so it is generally in the fraud area.

8         Q.   Generally in the fraud area?

9         A.   Yeah.   Um-hum.

10         Q.   And you would say what percent of the

11    total of all of your cases where you have

12    testified involved fraud?

13              MR. HANAUER:   Over the last ten

14         years or ever?

15         Q.   Let's do over the last ten years, and

16    then I will ask you ever.

17         A.   Are you including the FINRA

18    arbitrations in that?

19         Q.   Sure.

20         A.   I would say 80 percent of them,

21    90 percent of them.

22         Q.   90 percent involved some allegations

23    of fraud?

24         A.   Yes.

25         Q.   And how many, over your lifetime, how

1      ███████ - Confidential Pursuant to Protective Order

2      many cases in which you have testified as an

3      expert over your lifetime involved some

4      allegations of fraud?

5          A.   You know, I can't recall

6      specifically.   I would say that obviously many

7      of the SEC cases would, but, you know, I have

8      done a lot more than just the SEC cases, you

9      know, so probably a similar percentage, you know,

10     somewhere between 40 and 50 percent if we go

11     strictly on a guess of the math.

12         Q.   How many cases over the last ten

13     years in which you have testified involved

14     disclosure obligations?

15         A.   I would say disclosure as part of the

16     overall case, even if there is fraud involved,

17     there is a disclosure aspect of them, so I would

18     say the majority really.

19         Q.   What about how many cases involved

20     disclosure obligations where there were no

21     allegations of fraud present?

22         A.   Where there were no allegations of

23     fraud present, in the ones that I have testified

24     in?

25         Q.   Yes.

1   ██████  - Confidential Pursuant to Protective Order

2           MR. HANAUER:   Are we back at ten

3        years or lifetime?

4        Q.   Let's do ten years.

5        A.   Probably not as a standalone context.

6   They were all in connection with as I look at

7   them now.

8        Q.   And what about over the course of

9   your lifetime?

10       A.   Give me a moment to think.  I just

11  can't recall.

12       Q.   Sitting here today you can't recall a

13  case?

14       A.   Right.

15       Q.   In which you testified that involved

16  disclosure obligations under the securities laws,

17  but no allegations of fraud?

18       A.   Right.  There may have been one.  I

19  don't know.  I would have to go back and look.

20       Q.   Mr. ██████, is it accurate that the

21  SEC has not alleged any fraud in connection with

22  this litigation against Ripple?

23       A.   I don't recall.  It has been a while

24  since I read the complaint.  I'm not sure.

25       Q.   Okay.  Is it also accurate that the

1    ████████    - Confidential Pursuant to Protective Order

2    SEC is not alleging that Ripple engaged in any

3    market manipulation, wash sales or pump and dump

4    schemes?

5         A.    I believe that is true.  Yeah.

6         Q.    Have you ever offered expert

7    testimony on what constitutes material

8    disclosures under the Securities Act or the

9    Exchange Act?

10        A.    Specifically or in connection, again

11   in connection with other activities?

12        Q.    In connection is fine.

13        A.    Probably in connection with.

14        Q.    Have you ever testified as an expert

15   concerning whether an entity was obligated to

16   file disclosures under the Securities Act or

17   Exchange Act for a private offering of

18   securities?

19        A.    For private offerings, so have I ever

20   testified?   No.

21        Q.    Have you ever testified as an expert

22   concerning whether an entity was obligated to

23   file disclosures under the Securities Act or

24   Exchange Act for a public offering of securities?

25        A.    You know, it's all interwoven at

1   ████████ - Confidential Pursuant to Protective Order

2   times, if you know what I mean.   There could be

3   aspects of a particular case which touches on

4   that.   Standalone, probably no.

5           Q.   Have you ever testified as to whether

6   an asset or a financial instrument was a security

7   under the Securities Act or the Exchange Act?

8           A.   I have not.

9           Q.   Have you ever rendered an opinion

10  that a company's public disclosures were

11  sufficient under the Securities Act or the

12  Exchange Act?

13          A.   I have not.

14          Q.   Has a court ever disagreed with an

15  opinion you expressed?

16          A.   I'm sorry, I didn't hear you.

17          Q.   Sorry.   Has a court ever disagreed

18  with an opinion you expressed?

19              MR. HANAUER:   Objection.

20          Foundation.

21              Only that you are aware of.

22          A.   Yeah.   Not that I am aware of.

23          Q.   To your knowledge, has a court ever

24  precluded or limited your testimony in a case

25  pursuant to a Daubert motion?

1    ███████ - Confidential Pursuant to Protective Order

2          A.   Yes.

3          Q.   What was that case?

4          A.   Okay.   Actually coincidentally it

5    was one of the ones where I was on the other side

6    of the case from the SEC, believe it or not, and

7    that was SEC versus LEK Securities, and there was

8    a Daubert -- well, to give you the background,

9    the law firm came to me and said, look, we are

10   not happy with our expert.   We want to hire you.

11              MR. HANAUER:   ███, you can't be

12              talking about communications with a law

13              firm on another case.

14         A.   I just want to give the background to

15   the Daubert, which was the judge wouldn't allow

16   them a second bite at the apple, so they said Mr.

17   ███████ cannot substitute for this guy.   You

18   have already made your choice, and you have to

19   live by it.   So it was a technical kind of

20   thing.

21         Q.   Have you ever testified as a fact

22   witness?

23         A.   No.

24         Q.   Have you ever been arrested?

25         A.   No.

1    ███████ - Confidential Pursuant to Protective Order

2         Q.   On page 5, it says that you have not

3    authored any publications in the last ten years.

4    Is that accurate?

5         A.   That is accurate, yes.

6         Q.   To the best of your memory, what was

7    the last article or publication that you

8    authored?

9         A.   Wow.  It had to be back, that I

10   authored?  Probably -- I don't recall any.

11        Q.   Okay.  How much are you being

12   compensated for your work on this case?

13        A.   $400 an hour.

14        Q.   Is that contingent on the outcome of

15   the case?

16        A.   No, it is not.

17        Q.   Do you generally charge on an hourly

18   basis for your expert witness work?

19        A.   Yes, I do.

20        Q.   Mr. ███████, I am going to ask you

21   some questions about your personal background.

22   Where did you attend college?

23        A.   I went to St. Francis College in

24   Brooklyn, New York.

25        Q.   Did you earn a degree?

1         █████████  - Confidential Pursuant to Protective Order

2              A.   Yes, I did.

3              Q.   What was your degree?

4              A.   Bachelor of arts in English.

5              Q.   Did you attend graduate school?

6              A.   I did.

7              Q.   Did you earn a degree?

8              A.   I did not.

9              Q.   Did you ever go to law school?

10             A.   I did not.

11             Q.   Have you ever been licensed to

12  practice law?

13             A.   I have not.

14             Q.   Have you ever been admitted to any

15  state or federal bar?

16             A.   I have not.

17             Q.   Your CV states that you worked at the

18  NASD from 1972 to 2001.   Is that accurate, or

19  maybe that should be 2004.   My apologies.

20             A.   NASD, excuse me, one second.   Let me

21  just take a quick look if I may refresh my

22  recollection here.

23             Q.   Yep.

24             A.   I worked at NASD up until 2001.

25  February 2001, and then I went over to NASDAQ.

Page 44

1          ▮▮▮▮▮▮   - Confidential Pursuant to Protective Order

2          Q.   Okay.   Then NASD was charged with

3    supervising NASDAQ's market operations, correct?

4          A.   I'm sorry.

5          Q.   Then NASD was charged with

6    supervising NASDAQ's market operations?

7          A.   Yes.

8          Q.   What did this market supervision

9    activity entail?

10          A.   Well, I was head of market regulation

11    for 15 years, and we had a responsibility for all

12    of the over-the-counter market in terms of

13    surveillance, examination, enforcement at that

14    time, and the surveillance was both realtime of

15    the NASDAQ market where I had day-to-day

16    responsibility for realtime surveillance and

17    trading halts actually in the NASDAQ market, and

18    then market, what I call market maker compliance

19    rules, you know, and then we got into things like

20    insider trading, market manipulation, fraud, and

21    so on.

22          So it entailed a wide variety of

23    online and offline surveillance, and it entailed

24    a lot of technology as well.

25          Q.   During your time at NASD, did you

1      ███████ - Confidential Pursuant to Protective Order

2      ever work with security exchanges other than

3      NASDAQ?

4              A.    Explain work with.

5              Q.    Did you ever do any market

6      surveillance activities with respect to any

7      markets other than NASDAQ?

8              A.    Let me think.   We did contract with

9      a few other exchanges, but that was when I had

10     moved over to the technology space, and now FINRA

11     actually does surveillance for every market

12     including New York Stock Exchange.

13             Q.    And you --

14             A.    Not during my tenure I guess is the

15     point.

16             Q.    You left NASD before it became FINRA,

17     correct?

18             A.    Yes.

19             Q.    So you never worked at FINRA?

20             A.    No.

21             Q.    Your report frequently refers to your

22     experience as a regulator.   Is that a reference

23     to your work at NASD?

24             A.    It is.

25             Q.    Mr. ███████, have you ever worked at

1     ███████  - Confidential Pursuant to Protective Order

2     the SEC?

3          A.   I have not.

4          Q.   Your CV states that from 1986 to 1999

5     you were senior vice president of market

6     regulation for NASD, correct?

7          A.   Yes.

8          Q.   What were your responsibilities in

9     that role?

10          A.   As I mentioned before, I was head of

11     the department, and so I had the entire

12     responsibility for surveillance and regulation of

13     the over-the-counter market including NASDAQ at

14     the time, which was not as yet registered as a

15     national securities exchange.

16          Q.   And your report states you

17     established a dedicated fraud unit to focus on

18     issues of market manipulation.  So from 1986 to

19     1999 how much of your work at NASD involved

20     identifying fraud or market manipulation?

21          A.   You know, it really depends on the

22     periods of time you are talking about.   You

23     know, in the late 80's it occupied a lot of my

24     time, because you had a penny stock issue in the

25     industry with, you know, household names, First

Page 47

1    ███████ - Confidential Pursuant to Protective Order

2    Jersey Securities, Stratton Oakmont, you know, if

3    you've ever watched The Wolf of Wall Street,

4    you'll know what I'm talking about, so I wanted

5    Brad Pitt to play me in a movie, but that never

6    happened.

7             So, you know, at that time it

8    occupied quite a bit of time.  Other times we

9    had, you know, kind of, as head of the

10   department, you had to manage resources, okay?

11   And so like the SEC, you know, we were limited in

12   resources to address issues.

13            So part of my job was to allocate

14   resources where the most pressing regulatory

15   issues were.  So it could be fraud during a

16   period, two or three years, and then it could be

17   market maker conduct of some type, trading ahead,

18   not protecting limit orders, whatever the flavor

19   of the day was.  So it is kind of hard to

20   allocate specific time.

21       Q.   If you look back on that period of

22   time, what percentage of that work involved some

23   sort of conduct that was alleged to be deceptive?

24       A.   I would say most of it.  Yeah.

25       Q.   In your time at NASD, so outside of

1    ███████   - Confidential Pursuant to Protective Order

2    those roles as well, were you responsible for

3    making a final determination about required

4    disclosures under the securities laws?

5          A.    Yes.

6          Q.    What was that work?

7          A.    Well, let's start with the realtime

8    surveillance.   Part of my responsibility was to

9    initiate trading halts in NASDAQ securities, and

10   the reason why we would halt trading is to permit

11   dissemination of material news to the

12   marketplace.   Once the news was absorbed, it was

13   generally a 30-minute time frame that we halted

14   the stock.   So we presume that the news was out,

15   and we would reopen the stock, so I would say on

16   an average of four to six times a day, I was

17   looking at press releases and talking to NASDAQ

18   issuers and making decisions as to materiality of

19   those announcements.

20           Then in the offline space, again, in

21   the investigatory and, you know, other issues

22   that we were dealing with on a non- realtime

23   basis, again I would say I was part of the mix of

24   everything that we looked at.

25          Q.    And what sources of authority did you

1     ████████ - Confidential Pursuant to Protective Order

2     look to to determine whether those disclosures

3     were material?

4          A.   We had within our listing agreement

5     for NASDAQ, there was a definition of what we

6     viewed to be material news, and it tracked pretty

7     much with what the standard concept, industry

8     concept is for materiality, and, as a matter of

9     fact, I think it is footnoted somewhere.

10               If you look at footnote 6, as

11    background to SEC adopting regulation FD, they

12    define materiality, and that is kind of the

13    standard.

14               MR. HANAUER:   ████, you are talking

15         of footnote 6 of your report?

16               THE WITNESS:   Of my report.   Yes.

17          A.   That is kind of the standard

18    approach.  If it's something that investors think

19    it is important to the mix of overall

20    information, then it would be material, but I had

21    to bring my judgment obviously.   There could be

22    disputes as to and often there were with the

23    issuer concerning materiality of the release, and

24    I can give you some anecdotal stories but

25    probably bore you, but some of them were kind of

1    ███████ - Confidential Pursuant to Protective Order

2    funny actually.

3         Q.   Maybe during a break we can chat

4    about those.

5         A.   Yes.

6         Q.   So you said that you were looking at

7    that time at NASD policies or guidance to

8    determine materiality?

9         A.   No, I said that we had within our

10   listing agreement an obligation for issuers to

11   disclose material news, and there was a

12   definition in there, I can't quote it verbatim,

13   but the definition would track pretty much to

14   what that footnote says based on, you know, that

15   particular SEC quote there.

16        Q.   So you were basing your

17   determinations roughly on the standard in that

18   Supreme Court case?

19        A.   Yeah, you know, I kind of brought my

20   own judgment to bear, but, with that as a

21   backdrop and whether it had been important to

22   investors, whether it would move the market was

23   another consideration.  We also would halt the

24   stock if, you know, the stock could be moving.

25   There might not be news on the wire, and we would

1       ██████ - Confidential Pursuant to Protective Order

2    want to know why.

3            We would contact the issuer and

4    sometimes there was news that needed to be

5    disclosed.  We had halted the stock, and we

6    essentially recommended that they -- strongly

7    recommended that they put that news out.

8       Q.   And your CV states that you employed

9    significant legal and technological staff at

10   NASD.  What were the responsibilities of your

11   legal staff?

12      A.   When I was there, the legal staff,

13   they had not yet, Mary Shapiro had not yet

14   created the Department of Enforcement, so

15   enforcement of market regulation rules were

16   contained within my department, so I had a number

17   of, I had a head lawyer, and he had about, we had

18   maybe five lawyers reporting up through him and

19   him into me, and they did, you know, they drafted

20   the complaints.  They did depositions.  They

21   did hearings and so on.  So anything that related

22   to the disciplinary function, that was the role

23   of the legal department.

24      Q.   Did they also interpret relevant

25   statutes and regulations?

1    ███████  - Confidential Pursuant to Protective Order

2         A.   They may have in the context of

3    writing a complaint, for example.

4         Q.   After you were at NASD, you went to

5    NASDAQ as the senior vice president of regulation

6    and controls.   What did that role entail?

7         A.   Well, let me give you a little bit of

8    background.   NASDAQ elected to spin off from the

9    NASD, as you probably know, and become its own

10   separate self-regulatory organization, and they

11   contracted with NASD to carry out -- they didn't

12   have their own regulatory staff.   They

13   contracted with NASD to do regulation of the

14   market, and, in doing so, they wanted to ensure

15   that there was a Chinese wall between what the

16   marketplace was doing and what the regulators

17   were doing, and so I kind of sat in the middle of

18   the Chinese wall and then was the liaison to NASD

19   for regulatory issues that related to the NASDAQ

20   market.

21             It could work both ways.  I mean

22   NASDAQ might say, hey, you know, there is a

23   particular market maker practice we want NASD to

24   look at.   Go tell them to look at that, and it

25   could work this way.  NASD would say, you know,

```
 1    ███████  - Confidential Pursuant to Protective Order
 2    NASDAQ market makers are right, go tell NASDAQ to
 3    promulgate a rule to stop that.
 4                    So it was that, plus I had
 5    responsibility for overseeing the contractual
 6    commitment with NASD making sure that they were
 7    doing their role, negotiating regulatory budgets
 8    with them and so on.
 9         Q.   And other than your time at NASD or
10    NASDAQ, do you have any other experience serving
11    in a regulatory or self-regulatory role?
12         A.   No, not specifically.
13         Q.   Your CV states you're currently
14    employed as the president of ████████████████
15    Is that accurate?
16         A.   Yes.
17         Q.   What is ████████████████
18         A.   It's a consulting firm that I formed
19    in May of 2004.  As I said before, I've done, I'm
20    pretty much a sole proprietor on my own, and I've
21    done a number of engagements for a lot of people
22    in the areas that are noted in my CV, resumé and
23    elsewhere.
24         Q.   And I am going to call ███████████
25    ████████████████████.   Is that okay?
```

1  ███████ - Confidential Pursuant to Protective Order

2        A.   Yes.

3        Q.   Does ███████ have any employees?

4        A.   No.

5        Q.   How many hours a week do you say you

6  devote to your work at ███████

7        A.   Sometimes zero and sometimes a lot

8  depending on whether I'm doing one case, two

9  cases at a time or no cases or depending on how

10  big the case is, so I could be spending a lot of

11  hours or no hours.

12        Q.   Since 2004, have you been employed by

13  any other entity outside of ███████

14        A.   No, other than, you know, I don't

15  consider consulting employment, but I have been

16  retained by other people.

17        Q.   Is your consulting work through

18  ███████

19        A.   Yes.

20        Q.   Have you ever provided services to a

21  client in connection with filing an IPO?

22        A.   No.

23        Q.   Have you ever provided services to a

24  client in connection with seeking no action

25  letters from the SEC?

1   ████████   - Confidential Pursuant to Protective Order

2            A.   No.

3            Q.   Have you ever provided services to a

4    client in connection with a client's

5    investigation by the SEC?

6            A.   Could you clarify that for me.

7            Q.   Sure.   Have you ever provided

8    services to a client that had been or was in the

9    process of being investigated by the SEC?

10           A.   When you say services, are you

11   meaning consultancy services?

12           Q.   Let's say consultancy or expert

13   witness services.

14           A.   Well, not specifically the SEC, but I

15   have in other cases, yes.

16           Q.   When you say not specifically the SEC

17   bur other cases, do you mean other government

18   agencies?

19           A.   No.

20           Q.   Sorry.   Can you clarify what you

21   mean, please.

22           A.   Sure.   I was retained by a law firm

23   to assist them in a criminal case which was a

24   very complex market maker compensation case

25   involving foreign equity markets, and it was

1    █████████  - Confidential Pursuant to Protective Order

2    complicated, and so it was a criminal -- the U.S.

3    Attorney was coming after an individual, and I

4    consulted with the law firm on addressing that

5    issue.

6        Q.    And that case was not brought by the

7    SEC, correct?

8        A.    I believe there was a plea bargain.

9        Q.    Have you ever provided services to a

10   client including through a law firm in connection

11   with an investigation by the SEC under section 5?

12       A.    No.

13       Q.    Of the Securities Act?

14       A.    No.

15       Q.    Have you ever provided services to a

16   client in connection with reviewing disclosures

17   made pursuant to the securities laws?

18       A.    Let me think for a second.   Would

19   you just repeat that.   I want to make sure I

20   give you the proper answer.

21       Q.    Of course.   Have you ever provided

22   services to a client in connection with reviewing

23   disclosures made pursuant to the securities laws?

24            MR. HANAUER:   Objection.   Are we

25            back to all clients, or are we just

1        ██████    - Confidential Pursuant to Protective Order

2              talking about nongovernment clients?

3                   MS. GRESSEL:   All clients.

4              A.   Well, you know, that case I just

5    mentioned, I mean, involved disclosure, and there

6    was a disclosure aspect to it, so I guess the

7    answer would partially be yes.

8              Q.   The case you mentioned is the one

9    brought by the U.S. Attorney in which you were

10   engaged by a law firm?

11             A.   Yes.  There I was on the defendant's

12   side.

13             Q.   Got it.  Have you ever provided

14   services to a client in connection with a

15   litigation brought by the SEC?

16             A.   By the SEC?

17             Q.   Um-hum.

18             A.   Yes.

19             Q.   And what case was that?

20             A.   Well, it's not on the sheet because

21   it was more than ten years ago, but that was a

22   case down in Florida brought by the Miami

23   regional office.   It was SEC versus Zacharia.

24   It was an insider trading case, and I was on the

25   defendant's side.   I submitted an expert report,

Page 58

1      ██████████  - Confidential Pursuant to Protective Order

2      but did not testify.

3              Q.   How was that case resolved?

4              A.   I believe the defendant prevailed

5      over the SEC.

6              Q.   Do you now hold or have you ever

7      previously held any other professional licenses

8      or certifications?

9              A.   In any field?

10             Q.   Sure.

11             A.   I'm a certified personal trainer.

12             Q.   Oh, great.  Impressive.   Have you

13     ever had any other licensures or certifications?

14             A.   No.

15             Q.   Okay.  Have you ever had any

16     disciplinary or ethics complaints filed against

17     you?

18             A.   No.

19             Q.   I want to circle back to block chain

20     technology briefly.   I know we talked about that

21     earlier.   When did you first become aware of

22     block chain technology?

23             A.   Well, again, you know, I have

24     throughout my career a great interest in

25     technology in that I was the main officer in NASD

1   ████████   - Confidential Pursuant to Protective Order

2   that dealt with all the surveillance systems and

3   the evolution of trying to keep up with the

4   explosion of NASDAQ trading and trying to get

5   your arms around the data that we needed to get

6   our arms around, so I always had an interest in

7   technology.

8           I managed a number of really, really

9   big technology projects such as OATS, for

10  example.  That was the Order Audit Trail System.

11  So technology always interested me.  So, when the

12  crypto phenomenon started, just like anybody

13  else, I mean it naturally piqued my curiosity, so

14  I started reading a little bit about it.

15          Q.   When was that?

16          A.   Oh, gosh.   You know, I can't give

17  you a specific date, but probably several years

18  ago.

19          Q.   Like ballpark five years ago, ten

20  years ago?

21          A.   I would say more three to five years

22  probably.

23          Q.   How familiar are you with block chain

24  technologies?

25          A.   It depends on what you mean by how

1    ███████  - Confidential Pursuant to Protective Order

2    familiar.   You know.   I can't do code for it,

3    for example, but, you know, I kind of know, have

4    a general understanding of what it is.

5          Q.   Are you familiar with what the term

6    "ledger" means with respect to block chain

7    technologies?

8          A.   Yes.

9          Q.   What does the term "ledger" mean?

10         A.   Well, a ledger is, and again I'm not

11   an expert, and I'm not offering an opinion on

12   block chain technology, but my understanding is

13   that that is the block that constitutes the block

14   chain, so that there is a ledger of all the

15   individual blocks in the chain.

16         Q.   Are you familiar with the information

17   that is recorded on a ledger?

18              MR. HANAUER:   Objection to form.

19         A.   Again, you know, my very general

20   understanding and I'm not an expert, I'm not

21   offering an opinion, but I know, for example,

22   that each one has its own unique cryptographic

23   designation that can't be tampered with, and I

24   think, you know, from what I've read that is the

25   key ingredient in the block chain technologies

1    ███████    - Confidential Pursuant to Protective Order

2    that it's kind of foolproof.

3           Q.   And are you familiar with what

4    information is publicly visible on a block chain

5    ledger generally?

6           A.   No.

7                MR. HANAUER:   Objection to form.

8           Q.   Have you ever transacted on a block

9    chain ledger?

10          A.   I have not.

11          Q.   Okay.  When did you first become

12   aware of digital assets?

13          A.   Probably around the same time.

14          Q.   For the purpose of this deposition, I

15   may use the term digital asset and virtual

16   currency interchangeably.  Is that okay with

17   you?

18          A.   Yes.

19          Q.   Alright.  Are you involved in any

20   professional groups whose work have involved

21   digital assets?

22          A.   No.

23          Q.   Did your work at NASD or NASDAQ

24   involve block chain technologies?

25          A.   It did not.

1      ████████ - Confidential Pursuant to Protective Order

2            Q.   Did your work at NASD or NASDAQ

3      involve digital assets?

4            A.   It did not, no.

5            Q.   Has any of your prior consulting or

6      expert work involve the applicability of

7      securities laws to digital assets?

8            A.   No.

9            Q.   When did you first become aware of

10     XRP?

11           A.   I believe it was when the SEC was

12     making inquiry regarding my retention.

13           Q.   So, prior to the SEC calling you, you

14     would not have known what XRP referred to?

15           A.   I don't believe so.  No.

16           Q.   Prior to the SEC calling you, had you

17     heard of the company Ripple?

18           A.   No.

19           Q.   Is it an accurate statement that you

20     have never offered expert testimony in an

21     enforcement action involving block chain

22     technologies?

23           A.   That's correct.

24           Q.   Is it an accurate statement you have

25     never offered expert testimony in a case or

1    ███████  - Confidential Pursuant to Protective Order

2    enforcement action involving digital assets?

3        A.    That's correct.

4        Q.    Have you ever represented a client

5    before the SEC in an attempt to seek regulatory

6    clarity on digital assets?

7        A.    No.

8        Q.    Have you ever authored any

9    scholarships, articles or any other written

10   materials related to digital assets or block

11   chain technologies?

12       A.    No.

13       Q.    Are you familiar with digital asset

14   exchanges?

15       A.    Somewhat.   Yes.   Generally.

16       Q.    When did you first become aware of

17   digital asset exchanges?

18       A.    Again, probably, you know, as I was

19   learning and as I was, you know, my curiosity was

20   piqued.  I know that there were a number of

21   articles, for example, on Coinbase going public,

22   so I read about that.   Generally.

23       Q.    So Coinbase is an example of a

24   digital asset exchange.   Are you familiar with

25   any other digital asset exchanges?

1     ███████████  - Confidential Pursuant to Protective Order

2          A.    I know there are more than people

3     think.

4          Q.    And do you have any expert or

5     consulting experience involving digital asset

6     exchanges?

7          A.    No.

8          Q.    Do you have any experience concerning

9     what constitutes speculative trading in digital

10    asset markets?

11         A.    Would you repeat that again.   I just

12    want to make sure.

13         Q.    Sure.   Do you have any experience

14    concerning what constitutes speculative trading

15    in digital asset markets?

16              MR. HANAUER:   Objection to the form.

17         A.    I mean, you know, I could -- just say

18    it one more time.   I'm sorry.

19         Q.    No problem.   Do you have any

20    experience concerning what constitutes

21    speculative trading in digital asset exchanges?

22              MR. HANAUER:   Just objection, and I

23              will make it clear the term "speculative

24              trading."   You may need to help him out

25              with that.

1       ▆▆▆▆▆▆     - Confidential Pursuant to Protective Order

2               A.    Yeah.

3               Q.    What do you understand the term

4       "speculative trading" to mean?

5               A.    Well, you know, it depends on what

6       aspect that you're looking at.   I mean, you

7       know, if you ask Warren Buffett, he thinks there

8       is a lot of speculative trading, so I don't know.

9       You know, there has been talk that there is a

10      bubble, and, you know, I discount all that stuff.

11      I'm not really offering an opinion on any of

12      that.

13              So, you know, do I believe personally

14      there may be speculative trading?   You know, I'm

15      sure that, you know, the volatility in crypto has

16      hurt people, so I mean I don't know if that

17      answers your question, but, as I said before, I'm

18      not really offering any opinions on speculation

19      or anything like that.

20              Q.    I just want to ask a question to make

21      sure I understand.   Do you think there is an

22      agreed upon definition of what constitutes

23      speculative trading?

24              A.    I don't think so.  No.

25              Q.    Okay, and are you familiar with what

1    ██████████ - Confidential Pursuant to Protective Order

2    might or might not constitute speculative trading

3    with respect to digital assets?

4              MR. HANAUER:   Objection.   Form.

5         Counsel, why don't you ask him what

6         speculative trading means to him.

7         Q.   I'm just going to repeat that

8    question again.

9         A.   Okay.

10        Q.   Are you familiar, or do you have an

11   understanding of what speculative trading means

12   with respect to digital assets?

13        A.   Well, you know, it's a wide-open

14   question.   I mean by whose standards, for

15   example?   I mean, you know, somebody defined

16   speculative trading?   I don't think so.   Not

17   that I know of.   As I said before, I'm sure that

18   there's some highly speculative trading going on

19   somewhere, you know, but maybe people in Robin

20   Hood shouldn't be buying crypto.   I don't know.

21              So, again, I don't know if there's a

22   defined standard.   I don't think so.   I haven't

23   heard of one.

24        Q.   Okay, and have you ever purchased any

25   digital assets?

```
 1   ████████   - Confidential Pursuant to Protective Order

 2            A.   I have not.

 3            Q.   Okay.  Have you ever sold any digital

 4   assets?

 5            A.   I have not.

 6                 MS. GRESSEL:   Is now a good time for

 7            a break?

 8                 THE WITNESS:   I was just looking at

 9            my watch.

10                 MS. GRESSEL:   Okay.

11                 THE VIDEOGRAPHER:   We are going off

12            the record.   The time is 10:38 a.m.

13                 (Recess taken)

14                 THE VIDEOGRAPHER:   We are back on

15            the record.   The time is 10:56 a.m.

16   BY MS. GRESSEL:

17            A.   I have a quick question for you.   I

18   would like to go back and correct the record.   I

19   believe that, when I was speaking about the time

20   I was not approved by the court as an expert that

21   I characterized it as a Daubert.   It wasn't a

22   Daubert.   It was just an order from the judge

23   saying I'm not reopening discovery.   These two

24   experts can hit the road.

25            Q.   Understood.   Thank you.
```

1     ███████ - Confidential Pursuant to Protective Order

2          A.   Okay.

3          Q.   Mr. ███████, I would like to turn

4     back to your report briefly.

5          A.   Sure.

6          Q.   There are two sets of bullets one on

7     page 1 and one on page 29 to 30 of your report.

8     Can you take a look at those two lists of bullets

9     briefly?

10         A.   Sure.

11         Q.   I am going to point you to a bullet

12    in each list.   So looking at those two lists on

13    page 1 and pages 29 to 30, only the last bullet

14    in each list pertains to Ripple, correct?

15              MR. HANAUER:   Can you give him some

16         time to review the list?

17              MS. GRESSEL:   Of course.

18         A.   Yes.

19         Q.   Do you want to look at the other

20    bullet?

21         A.   I'm sorry.

22         Q.   The other set of bullets is pages 29

23    to 30, and I will ask you the same question.

24    Only the last bullet in that list pertains to

25    Ripple, correct?

 1   █████████   - Confidential Pursuant to Protective Order

 2           A.   Yes.  That's right.

 3           Q.   Okay.  Would it be fair to summarize

 4   your opinion as follows:   If Ripple were

 5   required to register its offers or sales of XRP,

 6   it would have been required to make substantial

 7   and meaningful disclosures to investors?

 8               MR. HANAUER:   Objection to the form.

 9           Are you talking about his opinion, his

10           entire opinion?

11           Q.   Your opinion in those two bullets.

12           A.   Yeah.  With the caveat of assuming

13   Ripple had to register its offers and sales of

14   XRP, yes.

15           Q.   Okay.  With that assumption?

16           A.   With that assumption, yes.

17           Q.   So that seems like a pretty basic

18   premise.  If a company is offering a security, it

19   needs to comply with the various disclosures and

20   SEC reporting obligations that apply to

21   securities offerings, right?

22           A.   Yes.

23           Q.   And, conversely, if a company is not

24   offering a security, then it does not need to

25   comply with the disclosure and SEC reporting

1    ██████████  - Confidential Pursuant to Protective Order

2    obligations that apply to securities offerings?

3    Is that accurate?

4              A.    That was a long sentence.

5              Q.    Sure.  So the converse point would

6    be, if a company is not offering a security, then

7    it does not need to comply with the disclosure

8    and SEC reporting obligations that apply to

9    securities offerings.   Is that accurate?

10             A.    If it's not a security, is that what

11   you said?

12             Q.    Um-hum.

13             A.    You know, I don't think I can offer

14   an opinion on that, but probably not.   You know,

15   I would need more information as to what they

16   would be doing or not doing.

17             Q.    How about as a general proposition.

18             A.    In general, okay.

19             Q.    If companies are not offering

20   securities, they generally do not need to comply

21   with the disclosures and SEC reporting

22   obligations that apply to securities offerings?

23             A.    I would say that is a general

24   assumption, yes.

25             Q.    Okay, and that is not a particularly

 1      ███████   - Confidential Pursuant to Protective Order

 2      complicated statement, is it?

 3           A.    No.

 4           Q.    Okay.  It's pretty straightforward?

 5           A.    I think so, yeah.

 6           Q.    Okay.  We just spoke about the

 7      amended complaint a moment ago.   You understand

 8      the SEC is alleging that Ripple sales or offers

 9      of XRP constituted investment contracts under the

10      securities laws, correct?

11           A.    Correct.

12           Q.    And you understand that the ultimate

13      legal issue for the court or the jury to decide

14      in this litigation is whether Ripple's sales or

15      offers of XRP constituted investment contracts

16      under the securities laws, correct?

17           A.    I believe that is the central tenet

18      of the case, yes.

19           Q.    Okay.  Let's look briefly at page 1

20      of your report.   Could you please read out loud

21      the sentence beginning with "This report takes no

22      position."

23           A.    Page 1.

24           Q.    I will point you to it.   Apologies.

25      It is page 2.  Thank you for correcting me.

1    ██████     - Confidential Pursuant to Protective Order

2              A.   Yes.

3              Q.   So at the bottom of page 2, can you

4    read the sentence that starts, "This reports

5    takes no position"?

6              A.   "This report takes no position as to

7    whether defendants' XRP transactions involved

8    offers and sales of securities as defined by the

9    '33 Act or '34 Act."

10             Q.   Okay.   Great.   Let's take a look at

11   page 28 as well.   Under the header "Potential

12   Disclosures by Ripple," you have a sentence that

13   starts midway through the first paragraph, "To be

14   clear, I have not been asked to provide."

15             Do you see that?

16             A.   Yes.

17             Q.   Could you please read out loud that

18   sentence?

19             A.   "To be clear, I have not been asked

20   to provide, and I am not providing an opinion as

21   to whether Ripple's XRP transactions constituted

22   offers and sales of securities."

23             Q.   Could you please read the following

24   sentence?

25             A.   "For purposes of this section of my

1      ███████   - Confidential Pursuant to Protective Order

2      report, I have been asked to assume that these

3      transactions were in fact offers and sales of

4      securities and to provide an opinion on what

5      disclosures Ripple would typically be required to

6      make to the investing public if that was the

7      case."

8              Q.    Thank you.   I want to spend a moment

9      just clarifying what you meant by those

10     statements.  You're not offering an opinion in

11     this matter about whether XRP itself is a

12     security, correct?

13             A.    I am not.

14             Q.    And you're not offering an opinion in

15     this matter about whether XRP itself is an

16     investment contract, correct?

17             A.    That's correct.

18             Q.    You're also not offering an opinion

19     in this matter about whether Ripple's

20     transactions of XRP constituted sales or offers

21     of investment contracts under the securities

22     laws, correct?

23             A.    Correct.

24             Q.    You are also not offering an opinion

25     in this matter about whether defendant Chris

1          ███████  - Confidential Pursuant to Protective Order

2    Larsen's transactions of XRP constituted sales or

3    offers of investment contracts under the

4    securities laws, correct?

5          A.    Correct.

6          Q.    You're also not offering an opinion

7    in this matter about whether defendant Brad

8    Garlinghouse's transactions of XRP constituted

9    sales or offers of investment contracts under the

10   securities laws, correct?

11         A.    That's correct.

12         Q.    You're not offering an opinion that

13   defendant Chris Larsen's sales or offers of XRP

14   are within the territorial reach of the U.S.

15   securities laws, correct?

16         A.    I am not, no.

17         Q.    You're not offering an opinion that

18   defendant Brad Garlinghouse's sales or offers of

19   XRP are within the territorial reach of the U.S.

20   securities laws, correct?

21         A.    Correct.

22         Q.    Okay.  We can agree that the

23   securities laws governing registration would

24   apply in this case only if Ripple's XRP

25   transactions were found to constitute offers or

1   ██████████ - Confidential Pursuant to Protective Order

2   sales of securities, is that right?

3        A.   I would agree with that, yes.

4        Q.   Do you agree that, if the court were

5   to determine that XRP itself is not a security or

6   an investment contract, then none of the

7   securities laws governing registration would

8   apply to those sales or offers of XRP?

9             MR. HANAUER:   Objection to the form

10            and the term "XRP" itself.

11       A.   Yeah.   I think if the court

12   determines it's not a security, then as far as I

13   know, there would be no requirement to register.

14       Q.   Okay.   I will just ask that slightly

15   differently.   If the court were to determine

16   that Ripple's sales and offers of XRP did not

17   constitute an investment contract or security,

18   then none of the securities laws governing

19   registration would apply to those sales and

20   offerings, correct?

21       A.   I think that's reasonable.

22       Q.   Okay, and then in that event you

23   would not be offering any opinion about what

24   disclosure obligations apply to defendants in

25   connection with XRP, correct?

1   ███████ - Confidential Pursuant to Protective Order

2            A.   Right.

3            Q.   Okay.  So, Mr. ██████, several

4   times in your report you state you're basing your

5   opinion on industry custom and practice, right?

6            A.   Yes.

7            Q.   Which industry's customs and

8   practices are you referring to?

9            A.   The securities industry.

10           Q.   And why did you elect to use that

11  term, industry custom and practice, in your

12  report?

13           A.   Why?  I think it's a customary term

14  that experts use in kind of defining their role.

15  You know, sometimes you come close to -- let me

16  make sure I state this okay before he objects.

17  Sometimes you come close to either stating a law

18  or stepping into where the trier of fact is the

19  real authority there, so you have to be, you

20  know, you want to look at what the customs and

21  practices are in the industry rather than making

22  a legal conclusion, for example.

23           Q.   So your purpose in speaking about

24  industry custom and practice is to avoid making

25  any legal conclusions in your opinion?

1   ████████ - Confidential Pursuant to Protective Order

2          A.   No.   Not solely, but there are, the

3   way it usually works is that, you know, the law

4   is there, correct, and that trickles down or

5   feeds, if you will, the customs and practices and

6   procedures that the industry adopts to, you know,

7   stay in compliance with that law, so it's more

8   underneath the law that I'm talking about.

9          Q.   So industry custom and practice is

10  generally based on the law?

11         A.   Yes.

12         Q.   And industry custom and practice

13  would also be based on things like SEC guidance

14  or other regulations that would be promulgated

15  under the law?

16         A.   It could be part of the mix that the

17  industry considers in, you know, adopting those

18  customs, practices.  Best practices is another

19  term that's frequently used and so on.

20         Q.   So I just want to -- go ahead,

21  please.

22         A.   But it starts with the law, and then

23  the law feeds down.

24         Q.   And I just want to go back to a

25  question I asked before.  I asked you, I'll ask

1    ███████  - Confidential Pursuant to Protective Order

2    it in a slightly different way.

3              Was one of the purposes in using the

4    term industry custom and practice in your report

5    to avoid drawing legal conclusions?

6         A.   You know, I think as an expert, you

7    have to do that anyway.  You know.  I don't want

8    to hook the two together permanently, because

9    there are differences, but it's a consideration.

10        Q.   When you say you have to do that

11   anyway, do you mean you have to draw legal

12   conclusions anyway?

13        A.   No.  I have to avoid drawing legal

14   conclusions.

15        Q.   I see.  So one of your purposes in

16   writing this report was to avoid drawing a legal

17   conclusion, correct?

18             MR. HANAUER:   Objection.   Misstates

19        his testimony.

20        A.   Yeah, I would state it another way.

21        Q.   Sure.   How would you state it?

22        A.   I would state it that in writing this

23   report I have to avoid having a legal conclusion

24   in mind.

25        Q.   And is that true of your testimony in

1      ███████ - Confidential Pursuant to Protective Order

2    this deposition today as well?

3           A.   Yeah, I would say so.

4           Q.   Okay.  So, going back to industry

5    customs and practices, how did you come to be

6    aware of industry customs and practices for the

7    securities industry?

8           A.   Oh, my gosh.  That's a really broad

9    question, and I will give you a broad answer.

10   You know, I've been at this a long time, and you

11   know, there are so many different sources,

12   conversations, examinations, research,

13   enforcement actions, talking with firms,

14   reviewing compliance procedures with firms.

15              One of the things I did, which is

16   again in a consultancy role is I worked with

17   Boston Consulting in a review of BNP, Paribas, of

18   their risk management procedures.

19              MR. HANAUER:  Don't get into the

20          specifics of that.

21          A.   Yeah, no, just as an example.  So,

22   in talking with the practitioners, okay, we come

23   to know what their expectations and practices and

24   norms are for that particular firm.  So it's a

25   whole variety of things.

Page 80

1 ████████ - Confidential Pursuant to Protective Order

2      Q.   And when you say the practitioners,

3 do you mean lawyers?

4      A.   No.  I mean people in the securities

5 industry that are transacting business.

6      Q.   So generally people who operate

7 within the securities industry?

8      A.   Yeah, right.

9      Q.   Have you ever offered expert

10 testimony on industry custom and practice?

11      A.   All the time.

12      Q.   All the time.  Okay.  Has your

13 testimony ever included opinions on whether an

14 entity should register securities offerings on

15 the basis of industry custom and practice?

16      A.   Well, let me put it this way.  A lot

17 of my testimony and opinions relate to the space

18 that relates to unregistered distributions and

19 offerings and so on.

20           So, in the context of things like

21 unregistered distributions, removal of restricted

22 legends to sell stock, roles of transfer agents,

23 broker dealers as gatekeepers for fraud.  I mean

24 there is a whole variety of things that relate to

25 that.

```
 1        ████████  - Confidential Pursuant to Protective Order

 2              Q.   In the securities industry, where

 3     would someone look if they wanted to find a

 4     respected source for industry customs and

 5     practices?

 6              A.   Well, as I point out in my report,

 7     there's a whole, it depends on, you know, what

 8     you want to do.   I mean there's a whole industry

 9     around helping out the brokerage industry in

10     terms of compliance, and so, you know, I'm sure

11     you guys have broker-dealer clients.   I'm sure

12     the accounting firm up the street has

13     broker-dealer clients.   So there's, you know,

14     legal advice.   There's accounting advice.

15     There's consultancy advice relating to best

16     practices around an issue.

17                   So there's a lot, and, as I said

18     before, you could probably add the SEC to that

19     mix.

20              Q.   In your report on pages 9 to 10 you

21     state, "In such a heavily regulated industry such

22     as the securities markets, industry custom and

23     practice including activities of companies

24     offering securities and their management is

25     influenced strongly by the relevant statutes,
```

1       ███████   - Confidential Pursuant to Protective Order

2    rules and their interpretation by the SEC and the

3    courts."

4              Do you see that sentence?

5         A.   Let me take a minute to read that,

6    please.

7         Q.   Sure.

8         A.   Yeah.   I think --

9              MR. HANAUER:   Let her ask you a

10        question.

11             THE WITNESS:   I'm sorry.   Go ahead.

12        Q.   Is that statement accurate?

13        A.   Yeah, I think it summarizes what I

14   just said prior to that.

15        Q.   In the securities industry, are there

16   industry customs and practices that are not

17   strongly influenced by relevant statutes, rules

18   and their interpretation by the SEC and the

19   courts?

20        A.   I'm sure there could be.   Yeah.   By

21   that, I mean it may not be tied to a specific SEC

22   or FINRA rule.   So how to consolidate how a audit

23   trail gets built or, you know, where you have a

24   industry-wide endeavor, the industry is good at

25   coming together to solve those problems on a

1    ███████ - Confidential Pursuant to Protective Order

2    collaborative basis often with, you know,

3    different firms and different systems and

4    different technology, but still coming together

5    on a best practice basis to collaborate in a

6    nonregulatory fashion.

7         Q.   If someone were to deviate from those

8    industry customs and practices, would they be in

9    violation of the law?

10        A.   It would depend.

11             MR. HANAUER:   Objection to the form.

12        A.   Yeah.  I mean it is all facts and

13   circumstances.   I can't express an opinion on

14   that.

15        Q.   Does the violation of industry custom

16   and practices alone amount to a violation of the

17   law?

18             MR. HANAUER:   Objection to the form.

19        A.   I have no opinion on that I mean

20   without delving into what the particular facts

21   are.

22        Q.   In the securities industry who is

23   generally responsible for determining what

24   constitutes industry custom and practice?

25        A.   Well, you know, sometimes there are

1    [REDACTED] - Confidential Pursuant to Protective Order

2    various committees and so on, so, as I mentioned

3    before, it could be a collaborative thing, and

4    other times it can be done through osmosis, so to

5    speak.  You know, it's just that this is just

6    what everybody does.  You know, firms talk to one

7    another, and they share these kinds of things, as

8    I said before, particularly best practices in

9    that area, and, you know, there is a I don't want

10   to say a system, but there is a whole, you know,

11   as I said before, firms talk to one another.

12   There is a whole, it is not a process, but it is

13   an informal arrangement amongst compliance

14   directors, technology directors, heads of firms,

15   and they explore that through organizations like

16   SIFMA, STA and so on to come up with, you know,

17   practices that the industry can, you know, live

18   by.

19                I'm sure you guys have gone to

20   conferences, for example, of SIFMA, and I've

21   spoken at many conferences where we talk about

22   best practice in the market regulation area.

23                So it's that kind of whole spectrum

24   of things that develops that, standards, norms,

25   customs, assisting one another to aid in

1       ███████  - Confidential Pursuant to Protective Order

2   compliance, because generally I would say the

3   industry is very compliance-focused.

4           Q.   So I just want to make sure I

5   understand.   You talk a lot about best practices

6   and compliance.   Do you mean best practices for

7   compliance with the securities laws?

8           A.   It could be.  Sure.  That could be

9   part of it.   It could be something else too.

10          Q.   What's an example of something else

11  it could be?

12          A.   Back office administration,

13  communication protocols, I mean you name it.

14          Q.   So, as relevant to your report, let's

15  just take your report as a standalone, not the

16  full industry.   When you're talking about

17  industry customs and practices, are you really

18  talking about best practices for compliance with

19  the securities laws?

20          A.   I'm talking about how the industry

21  would generally approach something based on a

22  rule or a regulation.   It may not be best

23  practices per se, but it's how it's generally in

24  my experience approached.

25          Q.   So general approaches towards

1    ███████  - Confidential Pursuant to Protective Order

2    compliance with laws and regulations?

3         A.   Yes.  I would say that is a fair

4    characterization.

5         Q.   Okay.  Mr. ████████, isn't it fair

6    to say the question of whether an asset or other

7    financial instrument is a security or investment

8    contract is a legal question?

9         A.   A determination of that?

10        Q.   I'll just repeat it.

11        A.   Yeah.

12        Q.   Mr. ████████, is it fair to say that

13   the question of whether an asset or other

14   financial instrument is a security or an

15   investment contract is a legal question.

16             MR. HANAUER:   Objection to form.

17        A.   If somebody is trying to make a

18   determination whether or not it's a security, it

19   can be a legal question.

20        Q.   Are there situations in which the

21   question of whether an asset or other financial

22   instrument is a security or an investment

23   contract is not a legal question?

24        A.   I think the ultimate determination is

25   a legal question, but certainly you could figure

1    ██████████ - Confidential Pursuant to Protective Order

2    that out without coming to a legal conclusion.

3         Q.   So you could figure out whether

4    something is a security or investment contract

5    without consulting a lawyer?

6         A.   If you know the law, sure.

7         Q.   You could -- go ahead.

8         A.   You know, if you know what the

9    elements of what constitutes an investment

10   contract is, if I'm a compliance director and I

11   know I'm familiar with how and somebody brings a

12   new product to me, I want to make sure that, you

13   know, I don't have to go any further with it in

14   terms of recognizing a potential that it could be

15   an investment contract.

16        Q.   And can you determine whether an

17   asset or other financial instrument is a security

18   or investment contract without consulting the

19   SEC?

20             MR. HANAUER:   Can who determine?

21        Q.   A company or person.

22        A.   I think they can make a

23   determination, an initial determination, as to

24   whether or not it is, sure, because they know

25   what the elements of that particular thing is.

1    ████████   - Confidential Pursuant to Protective Order

2              So we have a saying in compliance and

3    regulation, and it is called the duck theory.

4         Q.   What's the duck theory?

5         A.   The duck theory is by a poet James

6    Whitcomb Reilly from Indiana who said, if it

7    walks like a duck, looks like a duck, it quacks

8    like a duck, it's probably a duck, and we

9    regulators like to spout that once in a while.

10             So, if somebody is looking at a set

11   of facts or circumstances, and it looks like a

12   Howey duck, then you've got to proceed with

13   caution, but I don't need a judge or a jury to

14   tell me that is what I'm saying.

15        Q.   And you're saying any compliance

16   officer could sit down with Howey to make a

17   determination about whether something is an

18   investment contract or a security?

19             MR. HANAUER:   Objection.   Misstates

20        his testimony.

21        A.   Well, first of all, we would hope

22   that the compliance director knows what Howey is,

23   but he can bring some judgment to bear on those

24   facts, yes.

25        Q.   Okay.   So let me continue going.

1     ████████ - Confidential Pursuant to Protective Order

2     Whether a company, is it fair to say, Mr.

3     ████████, that whether a company must register

4     its sales or offers of a security is a legal

5     question, correct?

6          A.   You know, at the end of the day, it

7     probably is.   I think, again, they can figure

8     that out probably without, depending on facts and

9     circumstances, they might be able to figure it

10    out before they have to, you know, go to a lawyer

11    or a legal conclusion, but I would say in

12    general, yes.

13         Q.   And whether a company's sales or

14    offers of securities qualify for any exemptions

15    from registration is a legal question, correct?

16         A.   Yeah, as long as that is the last

17    step.   Again, somebody who has the training and

18    knowledge and in this business the securities

19    business as heavily compliance-oriented as this,

20    you would expect somebody to know if they are

21    offering sales in a private offering exemption

22    space they should know what they're doing

23    irrespective of somebody concluding that this

24    complies with Reg S or Reg A or whatever.

25         Q.   And whether a person or an entity is

1      ███████ - Confidential Pursuant to Protective Order

2    a company insider or affiliate is a legal

3    question, correct?

4              MR. HANAUER:   Objection to form.

5         A.   Yeah.  I wouldn't characterize it as

6    a legal question or not.   I mean somebody should

7    know if they're a control person or affiliate.

8    They might have to look at Rule 144, but a CEO

9    should know he's a control person, right?

10        Q.   But it's based on an understanding of

11   what the laws and regulations say.  Correct?

12        A.   Yeah.   Again, I think any CEO that

13   is knowledgeable or worth his salt and this is

14   particularly, you know, in a public company

15   should know what his obligations are as a control

16   person.

17        Q.   And if they didn't know, where would

18   they look to find out?

19        A.   You know, I find it hard in this day

20   and age to find somebody who didn't know, but

21   obviously they would go to in-house counsel or

22   outside counsel or whatever.

23        Q.   Okay, and whether sales of securities

24   are being offered to the public or to an

25   accredited investor is a legal question.

1    ███████     - Confidential Pursuant to Protective Order

2    Correct?

3              MR. HANAUER:   Objection to form.

4         A.   I guess it's the same answer.

5         Q.   Whether public disclosures must be

6    filed with the SEC in connection with an offering

7    or sale of securities is a legal question.

8    Correct?

9         A.   Say it again.   I'm sorry, I lost my

10   train of thought.

11        Q.   Sure.   Is the question of whether

12   public disclosures must be filed with the SEC in

13   connection with an offering or sale of securities

14   a legal question?

15        A.   Public disclosures meaning what?   A

16   registration statement?

17        Q.   That's a good example.

18        A.   You know, again, I think that before

19   you get to a set of facts or circumstances where

20   a judge or a jury makes that determination, which

21   I agree is the ultimate determination, that there

22   are degrees along the way which somebody should

23   recognize that they need to do something.

24        Q.   So someone might have an

25   understanding that they would have to make

```
 1    ████████ - Confidential Pursuant to Protective Order

 2    disclosures even if the ultimate legal question

 3    of whether they are obligated to do so rests with

 4    a court or a jury?

 5         A.   Yeah.

 6              MR. HANAUER:   Objection to form,

 7         and, ████, please wait for her to finish

 8         asking her question.

 9         A.   Yeah.  Okay.

10         Q.   Okay, and whether certain information

11    must be disclosed in a company's public filings

12    is a legal question, right?

13              MR. HANAUER:   Objection to form.

14         A.   Same answer.   You know, it could be

15    a legal determination down the road, but, if I'm

16    your compliance director, I'm telling you, you

17    know, before it needs to become a legal question.

18         Q.   Right.  So someone could make that

19    determination about a company on whether it has

20    to publicly disclose certain information, but the

21    ultimate question of whether they are obligated

22    to is a legal question, right?

23         A.   Yeah.  I would say that's right.

24         Q.   So you mentioned the Securities Act

25    of 1933 and the Securities and Exchange Act of
```

1      ██████████  - Confidential Pursuant to Protective Order

2      1934 several times, right?

3          A.   Yes.

4          Q.   Okay.  I just want to go through the

5      terminology.  By Securities Act or '33 Act, if I

6      use those terms, you'll understand I'm referring

7      to the Securities Act of 1933, correct?

8          A.   Yes.

9          Q.   And, by the Exchange Act or the '34

10     Act, you understand I'm referring to the

11     Securities and Exchange Act of 1934, correct?

12         A.   Yes.

13         Q.   Okay.  You testified that you served

14     as a regulator at NASD.  Is your opinion that

15     regulators can bring securities enforcement

16     actions based solely on alleged violations of

17     industry custom and practice?

18         A.   Again, you know, it depends on the

19     facts and circumstances, what the customs and

20     practices involve, whether there was a rule

21     violation involved, so I don't have enough

22     information to answer that correctly I don't

23     think.

24         Q.   If there is a rule violation involved

25     and a regulator brings a securities enforcement

Page 94

1    ██████████ - Confidential Pursuant to Protective Order

2    action, is that based on a violation of industry

3    custom and practice?

4              MR. HANAUER:   Objection to form.

5         Q.   I'll retract that one.   Mr.

6    ██████████, when the SEC brings an enforcement

7    action, can they do so based solely on alleged

8    violation of industry custom and practice?

9         A.   It would have to be, you know, a rule

10   violation also.   Sure.

11        Q.   Okay.   So they have to have a

12   violation of an underlying law or regulation?

13        A.   They have to have a basis.   It has

14   to be, I would agree with that.   It would have

15   to be tied to some type of regulation, although

16   the industry custom and practice may have,

17   whatever that was may have been in the mix of

18   facts that you would need to consider.

19        Q.   Okay.   Let's turn to page 25 of your

20   report.   So, at the top of the page, the last

21   sentence of that paragraph, do you see that?   It

22   says, "Based on custom and practice"?

23        A.   Yeah.

24        Q.   Can you read that sentence out loud

25   for us, please.

1    ████████  - Confidential Pursuant to Protective Order

2         A.   "Based on custom and practice in the

3    securities industry, the issuer cannot not shift

4    its responsibility for compliance to the

5    regulator."

6         Q.   What do you mean when you say an

7    issuer cannot shift its responsibility for

8    compliance to the regulator?

9         A.   That means that the responsibility

10   for compliance with the securities laws do not

11   rest with the government.  It rests with the

12   entity that's involved.  You know, it's my

13   responsibility, and the government really does

14   not have the responsibility for whether I'm in

15   compliance or not.   That's my responsibility,

16   and I can't say to the government, oh, it's your

17   fault that I'm in this pickle.

18        Q.   And why did you include this

19   observation in your report?

20        A.   Why?   I think it's in the -- can I

21   look at the context real quick?

22        Q.   Sure.

23        A.   I believe it's in the context of

24   firms spending an awful lot of money for

25   compliance, legal and accounting advice, because

1     ████████ - Confidential Pursuant to Protective Order

2     it's their responsibility to ensure that they're

3     in compliance with the rules, and so, you know,

4     what follows is part of what I call the safety

5     net where they can rely on advice of counsel such

6     as you guys or accounting firms and so on,

7     because they have the responsibility to spend

8     that money and bring in that safety net of

9     advisors to ensure that they're in compliance.

10         Q.   So firms can spend a lot of money to

11    make sure that they're in compliance with laws

12    and regulations, and your view is that it is

13    custom and practice for them to do so, correct?

14         A.   No, I don't think that was my

15    testimony.  I think what I said was they're

16    responsible for it, and they spend a lot of money

17    because of that.

18         Q.   And would you agree that a regulator

19    should be clear about what conduct amounts to a

20    violation of law?

21         A.   Repeat that again.  It's clear that?

22         Q.   Would you agree that a regulator

23    should be clear about what conduct amounts to a

24    violation of law?

25         A.   You know, as I said before, it's not

1    ██████████  - Confidential Pursuant to Protective Order

2    their responsibility.   Now they could be, you

3    know, they could be asked.   They could put out

4    statements regarding the view of the commission,

5    for example.   They could put out, you know,

6    other proposed rule changes, releases where they

7    explain rationale.   So there's a lot of different

8    areas that they could speak to that, but it's not

9    their responsibility to do so, if they choose not

10   to.

11        Q.   So your testimony is that, if a

12   regulator chooses to be unclear about laws and

13   regulations, it's entitled to do so?

14             MR. HANAUER:   Objection, misstates

15        his testimony.

16        A.   Yeah.   No.   I think what it says is

17   that most of the regulators in the securities

18   industry are really good about doing that.   So

19   FINRA, for example, will put out release after

20   release after news release and so on to keep the

21   industry apprised of what is going down.

22             The SEC does that at times as well

23   through different bulletins, through, well,

24   there's different ways that the SEC can

25   communicate, as I said before.   It could be a

1    ███████ - Confidential Pursuant to Protective Order

2    bulletin.  It could be a no action letter.  It

3    could be a rule filing.  It could be an

4    enforcement action.

5              So there's a whole, you know, there's

6    a whole system.  I wouldn't even call it a

7    system, but there's a lot of interaction between

8    the regulator and the securities industry that it

9    regulates in terms of what the expectations are

10   for compliance with certain rules.

11        Q.   Mr. ███████, your report discusses

12   the costs associated with initial public

13   offerings or IPOs, correct?

14        A.   Yes.

15        Q.   Do you have any personal or

16   professional experience working on IPOs?

17        A.   I don't.

18        Q.   Have you ever consulted for a company

19   concerning an IPO?

20        A.   I have not.

21        Q.   Have you ever represented a client in

22   connection with an IPO?

23        A.   I have not.

24        Q.   Have you ever been responsible for

25   estimating costs associated with an IPO?

1    ████████  - Confidential Pursuant to Protective Order

2         A.   I have not.

3         Q.   Do you have any other training or

4    experience related to costs associated with IPOs?

5         A.   No.

6         Q.   Okay.  Isn't it the case that some

7    large companies have decided to remain private

8    rather than engaging in an IPO?

9         A.   Yes.

10         Q.   And isn't that because companies

11    don't necessarily need to raise capital through

12    an IPO?

13         A.   Well, I don't know what their

14    individual decisions might be, but I think the

15    one that's most generally used is that IPOs are

16    expensive, and they find ways to try and avoid

17    that expense through different means.

18         Q.   Isn't it the case that companies can

19    also raise money in the private market?

20         A.   Yes.   That's one of them.

21         Q.   What are some other reasons that a

22    company might choose to not engage in an IPO?

23         A.   Well, ironically enough, NASDAQ, when

24    it went public, did not engage in an IPO.   They

25    just went to an exchange listing.   SPACs are

1    ██████████ - Confidential Pursuant to Protective Order

2    very popular now, and that's a way of raising

3    capital without going the IPO route, although at

4    some point there will be a registration statement

5    made.

6              So private offerings is probably

7    where the most capital lies, but there are other

8    ways.

9         Q.   Based on your review of the amended

10   complaint and the other materials cited in your

11   report, are you aware that as of today Ripple has

12   not conducted an IPO?

13        A.   Say it again.  I missed the first

14   part.

15        Q.   Sure.  Based on your review of the

16   amended complaint and the other materials cited

17   in your report, are you aware that as of today

18   Ripple has not conducted an IPO?

19        A.   I believe that's true.

20        Q.   Okay.  I'm going to be looking at

21   page 21 of your report.

22        A.   Okay.

23        Q.   So on the bottom of page 1, you say,

24   "had Ripple sought to raise that capital via a

25   traditional IPO rather than" --

1      ████████  - Confidential Pursuant to Protective Order

2                    MR. HANAUER:   1?  You said 21.

3           A.   Excuse me.  Yeah.

4           Q.   21.  21.  Why don't you read it

5      actually.  That's probably easier.  So the second

6      sentence of the last paragraph starts with

7      "Assuming this."  Do you see that?

8           A.   Yes.

9           Q.   Can you just read that sentence for

10     me, please?

11          A.   "Assuming this figure is accurate and

12     based on the estimation tool available on PWC's

13     website, had Ripple sought to raise that capital

14     via a traditional IPO, rather than selling XRP on

15     an unregistered basis, this could have placed

16     their estimated IPO costs, excluding underwriting

17     fees, the largest component of a traditional

18     IPO's cost, in excess of $10 million."

19          Q.   I just want to make sure I understand

20     what you mean by that sentence.

21          A.   Sure.

22          Q.   Do you mean that, if Ripple had

23     structured its sales of XRP as an IPO rather than

24     selling XRP over time, these XRP -- this

25     XRP-related IPO would have cost Ripple over $10

1      ██████  - Confidential Pursuant to Protective Order

2    million to complete?

3           A.   You know, again, it depends on the

4    facts and circumstances, but, if you look at the

5    beginning of that sentence, I say assuming these

6    estimations are accurate on PWC's website just

7    based on that particular set of tools, that's

8    what it calculated out to be.

9           Q.   And I just want to just look at one

10   particular part of this.   You say, had Ripple

11   sought to raise that capital via a traditional

12   IPO rather than selling XRP on an unregistered

13   basis.

14          A.   Right.

15          Q.   Do you mean that, had Ripple engaged

16   in an IPO with respect to its XRP, or do you

17   mean, had Ripple engaged in a traditional IPO

18   with respect to its -- to equity stock in the

19   company Ripple?

20          A.   No.   That would be XRP.

21          Q.   XRP.   So you're talking about an IPO

22   related to XRP?

23          A.   Yes.

24          Q.   Okay.   Sitting here today, is it your

25   opinion that Ripple did not register its sales of

1     ████████  - Confidential Pursuant to Protective Order

2     XRP as a public offering in order to avoid the

3     costs associated with an IPO?

4          A.   I have no opinion on that.  I don't

5     have the facts.

6          Q.   Okay.  So you're not drawing any

7     opinion either way about why Ripple did not

8     conduct an IPO?

9          A.   I am not.

10          Q.   Okay. Did you consider any

11     explanations as to why Ripple might have decided

12     to not conduct an IPO?

13          A.   Did I consider?  I'm sorry.  Could

14     you repeat that again.

15          Q.   That's okay.  I'll just retract that

16     question.  Okay.  Mr. ██████o, in your report

17     you opine on the registration requirements

18     applicable to both public and private offerings

19     of securities under the securities laws.

20     Correct?

21          A.   Yes.  There's a portion in there.  I

22     don't know if I'm opining about anything in

23     particular.  It's just merely a recounting

24     philosophically of how those work.

25          Q.   So you're talking just at a

1    ████████ - Confidential Pursuant to Protective Order

2    philosophical level about the securities laws?

3                    MR. HANAUER:   Objection, misstates

4         his testimony.

5         A.   Yeah.   General overview.

6         Q.   Okay.

7         A.   Comparing, and I think I say that in

8    the report that it's not meant to be a detailed

9    discussion of what private offering exemption

10   applies where, but contrasting public versus

11   private offering and what's involved.

12        Q.   Okay.   During your career at NASD or

13   NASDAQ, were you responsible for advising

14   companies on how to comply with the registration

15   requirements under the securities laws?

16        A.   Not advising, but certainly involved

17   from the regulatory standpoint.

18        Q.   And were you responsible for advising

19   companies or individuals on which exemptions or

20   safe harbors would apply to their sales or offers

21   of securities?

22        A.   I'm trying to think.   You know, I

23   don't recall any specific instance, but it's not

24   beyond the realm of possibility where a firm

25   would come in, and, you know, seek guidance from

1    ███████  - Confidential Pursuant to Protective Order

2    NASD.  We had our own corporate finance division,

3    and CorpFin may work with that, may have worked

4    with that company to ensure that compliance

5    offering exemption was appropriate.

6              We also policed our member firms, our

7    broker-dealer firms, in terms of whether they

8    complied with private offering exemptions, and so

9    we review things like offering memorandum and

10   those types of things, so, you know, that's my

11   familiarity with it.

12             It's more from the regulatory

13   standpoint as opposed to the business standpoint.

14        Q.   And when you said we at NASD did

15   this, was that part of your role personally?

16        A.   I could be involved, sure, but it was

17   mostly CorpFin, and if there was an issue that

18   they wanted to bring market regulation in on

19   either from a consultant standpoint or refer to

20   us for further inquiry from a regulatory

21   standpoint, then we would get involved.

22        Q.   And, when they brought you in or

23   referred issues to you, what would you be asked

24   to consult on?

25        A.   It would depend again on the

1    ███████ - Confidential Pursuant to Protective Order

2    circumstances or facts, you know.  You know, it

3    could be a number of different things from what's

4    my opinion on something.   I mean the lawyers

5    were forever coming in to me and saying, you

6    know, what do you think of this approach, that

7    approach.

8              So, even though I'm not a lawyer, I

9    at times directed them in certain ways.

10        Q.   And what about specifically with

11   respect to companies' compliance with

12   registration requirements under the securities

13   laws?  What were you brought in to consult on?

14        A.   Well, again, that was mostly our work

15   dealing with unregistered distributions, and, if

16   it was, you know, I had a lot of responsibility

17   and wore a lot of hats, but, you know, if it was

18   a major issue or a major firm or a giant fraud or

19   something, they would bring me in and make sure I

20   was kept apprised of the most visible types of

21   actions that we were working on, and it could

22   involve and often did involve unregistered

23   offerings.

24        Q.   Mr. ███████, do companies typically

25   hire lawyers to determine whether they need to

1    ███████████  - Confidential Pursuant to Protective Order

2    register with the SEC in connection with their

3    sales or offers of securities?

4         A.   I don't know if it's typical or not,

5    but it's certainly a resource that's available to

6    them, and, you know, if I was unsure about

7    something, as I've said before, if I was standing

8    in somebody's shoes, I would certainly bring in

9    counsel.

10        Q.   And this is a relatively specialized

11   area of the law, isn't it?

12        A.   Yeah.   I think it's, you know,

13   securities, a firm that, you know, specializes in

14   the securities industry.   Sure.

15        Q.   Are you aware of the credentials of

16   the legal experts who focus on securities

17   registration or exemptions?

18        A.   The credentials?

19             MR. HANAUER:   And which experts?

20        A.   Yeah.

21        Q.   Of legal experts that are focused on

22   securities registration or exemptions.

23        A.   Not every one.   You know, I'm

24   assuming that they're qualified to offer opinions

25   in the securities area.   I'm sure you guys go

1      ██████  - Confidential Pursuant to Protective Order

2      through different interviewing techniques to see

3      if you're bringing on a securities expert, right?

4           Q.   Mr. ██████, what regulations

5      provide exemptions and safe harbors from

6      registration under the Securities Act or the

7      Exchange Act?

8           A.   What rules or regulations?   I'm

9      sorry.

10          Q.   What regulations provide the

11     exemptions and safe harbors from registration

12     under the Securities Act or the Exchange Act?

13          A.   Well, there's a whole variety of

14     regulations that the commission has put out.

15     You know, it's all in the report.   It's a

16     very -- it can be a very complex area, so I'm not

17     opining on any of those rules or regulations, but

18     you have, you know, Regulation A, Regulation D

19     are the two primary ones.   You have regulation

20     crowd funding.   You have Regulation S, and you

21     can be afforded an exemption without, you know.

22     Those are kind of safe harbor kind of rules, so,

23     if you're within the characteristics or the

24     details of Reg D, it's pretty much sure that

25     you're not engaged in unregistered distribution,

1    ████████ - Confidential Pursuant to Protective Order

2    because you can do a private offering without

3    saying I'm complying with reg D or reg A, but it

4    gives you the comfort or safe harbor that you are

5    in compliance with the exemption.

6         Q.   And, Mr. ████████, you're not

7    providing testimony or an opinion about the

8    applicability of any exemptions or safe harbors

9    from registration in this case?

10        A.   I am not, and I state that I think in

11   my report.

12        Q.   Okay.  Aside from the Section 4

13   exemptions you note in your report, are you aware

14   of any other exemptions from registration under

15   the '33 Act?

16        A.   Not off the top of my head.  I mean

17   there may be one I missed.  I don't remember.

18        Q.   Are you familiar with the exemption

19   provisions in Section 3 of the '33 Act?

20        A.   Not off the top of my head, no.  I

21   would have to look at it.

22        Q.   Okay.  Are you offering an opinion in

23   this case about whether any of Ripple's sales or

24   offers of XRP including its over-the-counter XRP

25   sales would qualify for the private placement

1     ████████ - Confidential Pursuant to Protective Order

2     exemption in Section 4A2?

3              A.   I have no opinion on that.

4              Q.   Okay.  Are you offering an opinion

5     about whether Ripple implemented any holding

6     periods in its over-the-counter contracts to

7     prevent immediate resale to downstream purchasers

8     of XRP?

9              A.   I have no opinion.  No.

10             Q.   Are you offering an opinion as to

11    whether Ripple implemented any other deterrents

12    on immediate resale of XRP?

13             A.   No, I'm not.

14             Q.   Okay.  Are you offering any opinion

15    about whether Brad Garlinghouse or Chris Larsen

16    are or were Ripple affiliates or insiders as

17    defined by the securities laws?

18             A.   I am not.

19             Q.   Are you offering any opinion on

20    whether Ripple placed any rules on insider or

21    affiliate sales of XRP?

22             A.   I am not.

23             Q.   Okay.  Do you want to take a break?

24             A.   A lunch break?   What time do you

25    generally break?

1      ████████    - Confidential Pursuant to Protective Order

2                    MR. HANAUER:    We've been going for

3           about 40 minutes.

4           A.    I'm fine for another ten or 15

5    minutes.

6           Q.    Okay.  Great.

7           A.    Thank you.

8           Q.    Mr. ████████, you state in your

9    report that registration provides for full and

10   fair disclosure to investors that they may have

11   the pertinent -- so that they may have the

12   pertinent facts necessary to make informed

13   decisions.

14                    MR. HANAUER:    Are you reading from

15           his report?

16                    MS. GRESSEL:    I am.   I can direct

17           you to the page.

18           Q.    So it's page 29.   It's the second

19   bullet in the second set of bullets on page 29.

20   Maybe you could read it out loud for us.

21           A.    The second set of bullets.

22   "Registration provides for full and fair

23   disclosure to investors in order that they may

24   have the pertinent facts necessary to make

25   informed investment decisions."

1   ███████ - Confidential Pursuant to Protective Order

2        Q.   Isn't it accurate that the relevant

3   legal standard for what information must be

4   publicly disclosed by registrants is materiality?

5             MR. HANAUER:   Objection to form.

6        A.   Say it again.  I want to make sure I

7   answer you properly.

8        Q.   Let me start slightly differently.

9        A.   Okay.

10        Q.   Are you familiar with the materiality

11   standard for public disclosures under the

12   securities laws?

13        A.   Yes.

14        Q.   And how did you become familiar with

15   that materiality standard?

16        A.   I think we testified, I testified

17   earlier as to what constituted materiality in the

18   NASDAQ world and my familiarity with it.   There

19   are actually specific rules relating to

20   disclosure in the IPO world.   Form S1,

21   regulation S-K I believe and S-X.

22             So, you know, whether that gets to,

23   there can be those disclosures, but there can be

24   other disclosures, for example, where CorpFin

25   when they review an offering prior to its

1    ████████ - Confidential Pursuant to Protective Order

2    becoming effective will work with the company to

3    clean up disclosure or make them make other

4    disclosures based on the facts and circumstances.

5    So hopefully that answers your question.

6         Q.   And so the facts and circumstances

7    are very important in determining what is

8    material, correct?

9         A.   I would say so, yes.

10        Q.   And you cite, we talked earlier about

11   the Supreme Court case you cite on page 15 of

12   your report, which provides that legal standard

13   for materiality, correct?

14        A.   Yes.

15        Q.   Why don't you read what you have in

16   that parenthetical on page 15 in the footnote.

17        A.   Okay.   "Information is material if

18   there is a substantial likelihood that a

19   reasonable shareholder would consider it

20   important in making an investment decision.   To

21   fulfill the materiality requirement, there must

22   be a substantial likelihood that a fact would

23   have been viewed by the reasonable investor as

24   having significantly altered the total mix of

25   information made available."

1    ███████  - Confidential Pursuant to Protective Order

2         Q.   So we can agree based on this Supreme

3    Court standard you quoted it's important to look

4    at the total mix of information available to a

5    reasonable investor to determine what is

6    material?

7         A.   I think that's right.

8         Q.   Okay, and undertaking the analysis

9    for your report, what steps, if any, did you take

10   to determine the total mix of information

11   available to potential XRP purchasers?

12        A.   You know, just say it one more time.

13        Q.   In undertaking the analysis for your

14   report, what steps, if any, did you take to

15   determine the total mix of information available

16   to potential XRP purchasers?

17        A.   None.

18        Q.   None.  Why not?

19        A.   Well, it's not the purpose of my

20   report.  I don't have an opinion on that, nor am

21   I offering an opinion.

22        Q.   So you didn't view it as part of your

23   assignment?

24        A.   Right.

25        Q.   Okay.  So, sitting here today, you

1    █████████ - Confidential Pursuant to Protective Order

2    have not done research into the total mix of

3    information concerning either XRP or Ripple

4    that's publicly available to potential XRP

5    purchasers?

6         A.   Not totally.  I have looked at some

7    of their marketing reports that are available

8    online.  I don't know if that is what you're

9    talking about.

10        Q.   Do you recall which market reports

11   you looked at?

12        A.   I believe it was several years ago.

13        Q.   And what information did you look at

14   in those market reports?

15        A.   Just how they were reporting their

16   sales of XRP and some of the other information

17   that was available on there like I think there

18   were trending prices and had other disclosures

19   regarding what was happening at the company and

20   so on.

21        Q.   And did those, your review of those

22   XRP market reports inform your opinion about what

23   information would be material about Ripple or

24   XRP?

25        A.   No, it did not.

1   ███████ - Confidential Pursuant to Protective Order

2          Q.   It did not.  Sitting here today, are

3   you offering an opinion about what information

4   would be material to purchasers of XRP under the

5   standard we discussed from the Supreme Court and

6   relevant SEC regulations?

7          A.   Well, I think that, if this is what

8   you're asking me, I think we have to go back to

9   the presumption that drives everything else is

10  that this is based on an assumption that XRP

11  would have registered, right?   So the material

12  disclosures, some of which I list, you know, on

13  page 29, so.

14         Q.   So, sitting here today, you are

15  offering the opinion that the disclosures you

16  list on page 29 would be material to purchasers

17  of XRP under the legal standard set forth by the

18  Supreme Court and relevant SEC regulations?

19         A.   I would say it would be important to

20  investors to know that.   Yes.

21         Q.   In your mind, is there a difference?

22         A.   I think I wouldn't have put them in

23  here unless they were material in my view.

24         Q.   Okay.  So your opinion is that that

25  list of disclosures on page 29 would be material

1   ████████ - Confidential Pursuant to Protective Order

2   to purchasers of XRP?

3        A.   Right.   As I said in the report, the

4   list is by no means exhaustive or, you know,

5   cherry-picked for whatever reason.

6        Q.   Okay.   Do you understand the

7   question of what is material information under

8   the securities laws to be a legal issue?

9        A.   Certainly when I was making those

10  determinations at NASD, I don't recall, it may

11  have been one or two occasions where I consult my

12  counsel before I made a determination on issuing

13  a trading halt, and so again I was making the

14  calls on materiality based on facts and

15  circumstances, and, you know, I think generally

16  somebody can figure out on their own what's

17  important, what's not important.

18        Q.   Do companies normally consult lawyers

19  on what's considered sufficiently material that

20  it should be disclosed in the company's SEC

21  filings?

22        A.   I would say that would be typical.

23  Yeah.

24        Q.   Mr. ████████, let's take a closer

25  look at that list you have on page 29.   So you

1    ███████  - Confidential Pursuant to Protective Order

2    conclude your report on page 29 with a statement

3    -- well, it's above the title Conclusion.   Why

4    don't you read that statement to us, that last

5    paragraph right above the conclusion header?

6           A.   "Without the benefit"?

7           Q.   Um-hum.

8           A.   "Without the benefit of registration

9    and further periodic and current reporting,

10   investors were deprived of what I believe were

11   important disclosures, which could have shone

12   substantial light on the nature of XRP, Ripple

13   and Ripple's key employees."

14          Q.   Did you write that sentence?

15          A.   I did.

16          Q.   What's your basis for your statement

17   that XRP purchasers were deprived of what you

18   believe were important disclosures concerning

19   XRP, Ripple or Ripple's employees?

20          A.   Okay.   Again let's go back to the

21   presumption, right?  The presumption is, if they

22   were required to register, then these would be

23   important disclosures to investors.

24          Q.   And what's your basis for concluding

25   that they would be important disclosures to

1      ███████  - Confidential Pursuant to Protective Order

2      investors?

3           A.   Again, my own personal experience in

4      dealing with thousands of material disclosures

5      over the years as well as the standards that we

6      employed at NASDAQ, the Supreme Court decision,

7      which I cited.  So the concept of materiality is

8      one that's pretty well generally accepted

9      throughout the industry.

10          Q.   Did you do any research concerning

11     what information was actually provided to

12     purchasers of XRP other than looking at those XRP

13     market reports we talked about earlier?

14          A.   I did not.

15          Q.   Okay.  You state on page, let's turn

16     back to page 28, just back one page.

17          A.   Um-hum.

18          Q.   So I'm looking at the second to last

19     paragraph, the last sentence in that that starts

20     "Without periodic."

21          A.   Oh, in the middle of the paragraph.

22          Q.   Can you read Starting from "Without

23     periodic" to the end of that paragraph.

24          A.   "Without periodic reporting, as

25     Ripple continued to offer and sell, XRP investors

1    ██████  - Confidential Pursuant to Protective Order

2    would not be alerted to the ongoing status of the

3    enterprise, the company's financial statements,

4    MD&A, recent sales of securities, insider

5    transactions and new products or services."

6         Q.   What was your basis for that

7    statement?

8         A.   Okay.   Again, we go back to the

9    presumption that, if they were registered, these

10   are the important disclosures that would flow

11   from that registration process, so, as I say in

12   the sentence before that, which I didn't read, is

13   that the prospectus and registration statement

14   would be the customary way for the investing

15   public to learn about Ripple, for example, if in

16   fact they had registered as a security.

17        Q.   So is it correct, is it generally

18   correct that you view those disclosures in that

19   last sentence you read as being typical of what

20   is generally in a prospectus or registration

21   statement?

22        A.   Yes.

23        Q.   Okay.   Did you conduct any research

24   into what information was publicly available to

25   XRP purchasers concerning Ripple's enterprise?

1   ███████   - Confidential Pursuant to Protective Order

2          A.   No, I did not, other than those

3   market reports that I mentioned.

4          Q.   Did you conduct any research into

5   what information was publicly available to XRP

6   purchasers concerning Ripple sales of equity

7   stock?

8          A.   No.

9          Q.   Did you conduct any research into

10  what information was publicly available to XRP

11  purchasers concerning Ripple sales of XRP?

12         A.   Just the market reports which I think

13  report sales.

14         Q.   Did you conduct any research into

15  what information was publicly --

16            MR. HANAUER:   Anna, do you mind

17         slowing down a little bit?

18            MS. GRESSEL:   I do not mind.

19         Q.   So I'll just let me start that one

20  again.   Did you conduct any research into what

21  information was publicly available to XRP

22  purchasers concerning sales of XRP by Brad

23  Garlinghouse?

24         A.   No.

25         Q.   Did you conduct any research into

1        ███████ - Confidential Pursuant to Protective Order

2    what information was publicly available to XRP

3    purchasers concerning sales of XRP by Chris

4    Larsen?

5           A.    No.

6           Q.    Okay.   Did you conduct any research

7    into what information was publicly available to

8    XRP purchasers concerning Ripple's products or

9    services?

10          A.    No, other than those market reports

11   again.

12          Q.    Okay.   Now let's go back to 29 to

13   the bullets you have there.   Mr. ███████, in

14   order to determine what specific disclosure

15   obligations apply to a sale or offer of

16   securities, isn't it important first to determine

17   which disclosure obligations are -- let me take

18   that question back.

19               In order to determine what disclosure

20   obligations apply to a sale or offer of

21   securities, isn't it important first to determine

22   what type of offer or sale of securities is at

23   issue?

24          A.    I'm not understanding the question.

25          Q.    So let me just take an example.   An

1    ████████  - Confidential Pursuant to Protective Order

2    IPO contains different disclosure requirements

3    than other public or private offerings of

4    securities, correct?

5         A.   It may or may not.   I mean I've seen

6    some private offering memorandums that are as

7    detailed as any prospectus you want to see.

8         Q.   Are you providing an opinion in this

9    case about which registration requirements apply

10   to Ripple sales or offers of XRP?

11        A.   I think the theme, and it may be

12   stated somewhere, is that it's the IPO.  So it

13   would be full registration.

14        Q.   So your view is, if Ripple were

15   required to register its sales or offerings as a

16   security, it would be required to do so as an

17   IPO?

18        A.   No.   That's not what I'm saying.

19   I'm saying that the context of the report is,

20   assuming that Ripple registered as an IPO, this

21   is what would fall.  Okay.  I'm not saying Ripple

22   should have done a private placement or should

23   have done an IPO or anything.

24        Q.   And there are other frameworks for

25   disclosure that could apply other than an IPO,

1       ███████ - Confidential Pursuant to Protective Order

2       correct?

3               A.   For example, what?

4                    (Discussion off the record between

5               witness and counsel)

6               Q.   For example, Section 12G of the

7       Exchange Act.

8               A.   Right.

9               Q.   Okay.

10              A.   So, when I say IPO as I said before,

11      I think it's in the report, it is registration

12      generally, you know.  Those terms are

13      interchangeable, but it relates to the

14      registration process, and, yes, they could avail

15      themselves of other methods of going public or

16      you know.  The thing is, though, even with the

17      series of Section 12, that triggers other

18      reporting down the road.

19              Q.   But the disclosure requirements are

20      different under Section 12G than they would be

21      for an IPO, correct?

22              A.   I'd have to look at more information

23      on that.  I can't answer honestly off the top of

24      my head.

25              Q.   Okay.  So I just want to go back to

Page 125

1      ██████████  - Confidential Pursuant to Protective Order

2      these bullets.   You mentioned that you -- I

3      don't want to characterize your testimony.

4                   MR. HANAUER:   What page are we on,

5            Counsel?

6            Q.   The top of 29.   The top set of

7      bullets in 29.   Is it your opinion that these

8      bullets are typical of the information that would

9      be required to be disclosed on a Form S1

10     registration statement with respect to an IPO?

11           A.   If the facts and circumstances are

12     similar, sure.

13           Q.   Similar to what?

14           A.   Similar to other things that, you

15     know, similar to what the company is doing.   You

16     know, so, if you look at an S1, for example, you

17     will see a lot of these things, you'll see

18     insider sales, you'll see whether the lockup

19     periods or dilution factors are in there, how

20     insiders are compensated, so these are general,

21     the use of proceeds, so these are general

22     disclosures that are made in a typical

23     prospectus.

24           Q.   The second to last of these bullets

25     references "Ripple's use of promotions,

1      ███████  - Confidential Pursuant to Protective Order

2      incentives and payments to Ripple's customers and

3      third parties in developing its products and uses

4      for XRP."  Do you see that, the second to last

5      of the bullets?

6           A.   Yes.

7           Q.   Is it your opinion that incentives

8      and payments to a company's customers and third

9      parties in developing products is information

10     required to be disclosed in a company's public

11     SEC filings?

12                MR. HANAUER:   Objection to form.

13          A.   Again, I'll fall back on facts and

14     circumstances.  I'd have to look at the

15     individual facts.  You know, certainly I have

16     seen these disclosures many times as I said

17     before in a prospectus.  It goes to the nature

18     of the market for the securities, for example.

19     It goes to the dilution factor.  It goes to how

20     vendors are being compensated, which I think is

21     an important disclosure.  So it pretty much is

22     pretty standard.

23          Q.   Maybe I'll ask that a different way.

24     Is information concerning incentives and payments

25     to a company's customers and third parties in

1      ████████ - Confidential Pursuant to Protective Order

2     developing products typically called for in a

3     form S1?

4          A.   It can be called for depending on

5     what the circumstances are.  Yes.

6          Q.   And, when you say depending on what

7     the circumstances are, do you mean depending on

8     whether that information is material?

9          A.   Yeah.

10          Q.   Okay.  Are you drawing a conclusion,

11     perhaps you testified to this earlier, but are

12     you drawing a conclusion that each of these

13     bullets on the top of 29 would be material to XRP

14     purchasers?

15          A.   Should it have been registered, I

16     think these disclosures in my opinion should have

17     been in there, sure.

18          Q.   And what is your basis?

19          A.   As I said before, my basis is that

20     these are typically seen in, you know, S1's, and

21     I'm not familiar enough, you know, it has been a

22     while since I looked at regulation S-K and S-X,

23     for example, which detailed the disclosures, but

24     certainly where an issue rises to, as you

25     suggested, to the level of materiality that's

1      ███████  - Confidential Pursuant to Protective Order

2      involved based on the particular facts and

3      circumstances of that individual company, then,

4      you know, it should be disclosed, and that

5      determination can be made by the company, through

6      its counsel, through conversations with CorpFin

7      at the SEC.

8              So it's not -- I wouldn't say it's an

9      automatic thing, but certainly I have seen it

10     many, many times in different offerings or

11     prospectuses.

12         Q.   And did you undertake any research

13     concerning the facts and circumstances specific

14     to Ripple or XRP?

15         A.   I did not.

16         Q.   You did not, so have you ever spoken

17     to a purchaser of XRP?

18         A.   I have not.

19         Q.   Have you ever reviewed any material

20     reflective of the views and opinions of

21     purchasers of XRP?

22         A.   I have not.

23         Q.   Have you ever reviewed any material

24     reflecting the views of purchasers of digital

25     assets more generally?

1   ███████ - Confidential Pursuant to Protective Order

2              MR. HANAUER:   Beyond what is cited

3        in his report?

4        Q.   Beyond what is cited in your report.

5        A.   I have not.

6        Q.   In your opinion, would the same

7   information be material for a purchaser of

8   Bitcoin as for a purchaser of XRP?

9              MR. HANAUER:   Objection to form.

10       A.   I have no opinion on that.

11       Q.   Okay.

12       A.   I do have an opinion regarding a

13  break, though, if you don't mind, either a break

14  or break for lunch or however you want to handle

15  it.

16             MS. GRESSEL:   Yep.   Let's go off

17       the record and take at least a ten-minute

18       break.

19             THE VIDEOGRAPHER:   We are going off

20       the record.   The time is 12:10 p.m.

21             (Recess taken:   12:10 p.m.)

22             THE VIDEOGRAPHER:   We are back on

23       the record.   The time is 12:24 p.m.

24  BY MS. GRESSEL:

25       Q.   Mr. ███████, have you ever heard the

1        ▮▮▮▮▮▮▮  - Confidential Pursuant to Protective Order

2   term "XRP ledger"?

3        A.   Yes.

4        Q.   What is your understanding of what

5   that term means?

6        A.   Well, again, I'm not an expert in

7   cryptocurrency, but I believe that is, correct me

8   if I'm wrong, that is the block chain component

9   of what they do maybe.

10        Q.   So, if I said the XRP ledger is the

11   underlying block chain to which the digital asset

12   XRP is native, would you understand what that

13   was?

14        A.   I think that's what I said, yeah.

15        Q.   Okay.  Do you know what information

16   is publicly recorded on the XRP ledger?

17        A.   No, I don't.   Not specifically.

18        Q.   Are you aware that the XRP ledger

19   publicly records information concerning addresses

20   in digital wallets that transact on the XRP

21   ledger?

22        A.   I'm not aware of that, no.

23        Q.   Are you aware that the XRP ledger

24   publicly records information concerning balances

25   of those digital wallets?

1   ████████ - Confidential Pursuant to Protective Order

2          A.   I'm not aware of that either.

3          Q.   Are you aware that the XRP ledger

4   publicly records information concerning the

5   transaction history related to digital wallets?

6          A.   No.

7          Q.   Are you aware that as publicly

8   recorded information on the XRP ledger this

9   information is actually available to the public

10   on websites like XRPscan.com?

11          A.   I'm not aware of that.

12          Q.   Have you ever visited the website

13   XRPscan.com?

14          A.   No.

15          Q.   Are you aware that certain

16   individuals analyze the XRP ledger to determine

17   what sales of XRP or other assets are being

18   recorded on the ledger?

19          A.   Not specifically, no.

20          Q.   Are you aware that individuals

21   analyze the XRP ledger to determine who may be

22   engaging in transactions of XRP?

23          A.   I'm not aware of that, no.

24          Q.   Okay.  Are you aware that certain

25   information regarding sales by Ripple's founders

1      ███████  - Confidential Pursuant to Protective Order

2      is publicly available by virtue of being recorded

3      on the XRP ledger?

4              A.    I'm not aware of that.

5              Q.    Okay.  Mr. ████████, your report

6      states that section 2A1 of the Securities Act

7      provides the definition of a security, which

8      includes the concept of an investment contract,

9      is that correct?

10             A.    Yes.

11             Q.    Okay, and whether or not something

12     qualifies as an investment contract under this

13     definition is a legal conclusion, correct?

14                  MR. HANAUER:    Objection to form.

15             A.    I'll go to my prior answer earlier

16     on, and that's ultimately it could be determined

17     in a legal conclusion, but, you know, there are

18     steps, or there could be some recognition either

19     through compliance or counsel or whatever that

20     possibly we could be dealing with an investment

21     contract here without the legal conclusion.

22                  So, again, it's what I testified this

23     morning, kind of grades with the legal conclusion

24     being the ultimate determination.

25             Q.    And your report states the term

1   ██████████   - Confidential Pursuant to Protective Order

2   "investment contract" is purposefully broad.   Is

3   that statement accurate?

4          A.   Yeah.   That's very accurate, and,

5   you know, as an aside, and I don't mean to get,

6   put my professor hat on again, but that's the

7   purpose of this report.

8                So, you know, Congress in its wisdom

9   crafted two very important areas to be as broad

10  as possible.   One is the investment contract

11  concept, which I thought was brilliant in the

12  definition section, and, as you know, 10(b)5 is a

13  fraud statute, and that's purposefully broad,

14  because there is all kinds, there's flexibility

15  needed for all kinds of new and innovative

16  products and services and activities and actions

17  and everything else that comes down the road, so

18  that it can be encompassed in either the

19  investment contract definition or in the

20  anti-fraud provision, so there are certain ones

21  that are purposefully broad to take that into

22  consideration.

23          Q.   What sources would someone in the

24  securities field look to as authoritatively

25  answering the question of whether a statutory

1     ██████████  - Confidential Pursuant to Protective Order

2     term such as investment contract is broad or

3     narrow?

4          A.   You know, I guess they can ask their

5     counsel or, you know, again, I go back to the

6     safety net where, if these questions come up,

7     there's a bunch of people you can ask including

8     the SEC.

9          Q.   And are there court cases

10    interpreting whether terms like investment

11    contract are broad or narrow?

12         A.   Whether they're broad or narrow, I

13    think there are some language which points to the

14    fact that investment contract is purposefully

15    broad.  I can't cite the exact, you know, legal

16    decision, but I think that's mentioned in a

17    couple of decisions or footnoted at least that

18    I've seen.

19         Q.   And, if lawyers had a dispute about

20    whether a term like investment contract from a

21    statute is broad or narrow, is that something

22    that a court might be asked to weigh in on?

23         A.   Depending on facts and circumstances,

24    sure.

25         Q.   Okay.  Do you have any expertise in

 1     ▮▮▮▮▮▮   - Confidential Pursuant to Protective Order

 2     determining whether an asset or financial

 3     instrument is an investment contract?

 4          A.   That what kind of financial

 5     instrument?

 6          Q.   An asset or a financial instrument is

 7     an investment contract.

 8          A.   Specifically, no, but I do have, you

 9     know, the principles that have been, you know,

10     put forth in Howey, for example, which is the

11     industry guiding principle in that space.

12          Q.   So you look to guiding principles

13     from Supreme Court cases?

14          A.   Sure.

15          Q.   And you're not a lawyer, right?

16          A.   No.

17          Q.   Okay.  If a company wants to

18     determine whether their assets or financial

19     instruments are investment contracts, they

20     generally hire lawyers to provide them with legal

21     advice on this question, right?

22          A.   They could, sure.

23          Q.   And those lawyers would consult legal

24     sources like statutes, regulations and case law,

25     right?

1  ███████████ - Confidential Pursuant to Protective Order

2        A.   I presume so, sure.

3        Q.   Are you aware of whether Ripple hired

4   lawyers to provide them with advice on whether

5   XRP might be considered an investment contract?

6        A.   I believe there's a portion, and

7   again I feel bad because it has been a while

8   since I read the complaint, but I think there is

9   a portion in the complaint where it said that

10  they had consults with attorneys regarding that

11  question.   Yes.

12       Q.   Did you review any of the legal memos

13  concerning XRP in connection with your work on

14  this case?

15       A.   I did not.

16       Q.   Okay, and your report states you

17  received a copy of the answer to the amended

18  complaint in the course of preparing your report,

19  correct?

20       A.   I did.

21       Q.   Did you read that document?

22       A.   I did a while ago.   Um-hum.

23       Q.   Okay, and it's included in the list

24  of materials reviewed in Appendix A to your

25  report, correct?

1      ███████  - Confidential Pursuant to Protective Order

2              A.   Say it again.

3              Q.   It's included in the list of

4      materials reviewed in Appendix A to your report?

5              A.   Yes.  I'm sorry.

6              Q.   I would like to show you what has

7      been marked as Exhibit ██ 3.

8                   (Defendant Exhibit ██ 3, Amended

9                   complaint, was so marked for

10                  identification, as of this date.)

11             Q.   Please turn to paragraph 53 of the

12     answer to the amended complaint.  I will give

13     you a moment to get to paragraph 53.

14                  Did you find it?

15             A.   Yes.

16             Q.   Could you please read out loud the

17     first two sentences of that paragraph?

18             A.   "Ripple denies the allegations in

19     paragraph 53, which selectively quote and

20     mischaracterize portions of a legal memorandum

21     dated February 8, 2012 from a law firm that was

22     addressed to co-founder and another individual

23     and a second legal memorandum dated October 19,

24     2012 from the same law firm that was addressed to

25     Mr. Larsen, co-founder, and OpenCoin."

 1      ███████  - Confidential Pursuant to Protective Order

 2                      Next one?   "Ripple avers that any

 3      reasonable reader of the true and accurate

 4      contents of the memorandum dated October 19, 2012

 5      would understand that counsel's ultimate

 6      conclusion was that Ripple Credits as described

 7      did not constitute securities under the federal

 8      securities laws.   The documents speak for

 9      themselves, and Ripple respectfully refers the

10      Court to the full text of the documents for an

11      accurate and complete record of their contents."

12          Q.   Mr. ███████, do you recall reading

13      this paragraph in your review of the answer to

14      the amended complaint?

15          A.   Not specifically, but I've read it.

16          Q.   Do you know what Ripple Credits are?

17          A.   No.

18          Q.   Is it correct that the answer to the

19      amended complaint states that Ripple's founders

20      received legal advice as early as 2012 with the

21      ultimate conclusion XRP did not constitute

22      securities under the federal securities laws?

23                      MR. HANAUER:   Objection.  Ripple's

24          answer speaks for itself.

25          A.   I mean that's what it says, so I'm

```
 1   ████████ - Confidential Pursuant to Protective Order
 2   assuming that's correct.
 3            Q.   Okay.  You understand that whether or
 4   not Ripple sales or offers of XRP constituted an
 5   investment contract is a legal issue in this
 6   litigation?
 7            A.   I think that's right.
 8            Q.   And that's why you're not providing
 9   an opinion today on whether Ripple sales or
10   offers of XRP constituted an investment contract,
11   right?
12            A.   That's right.  It's not my role.
13            Q.   And you understand the question of
14   whether XRP the token itself is an investment
15   contract is a legal question in this litigation,
16   right?
17            A.   In this litigation, yes.
18            Q.   And that's why you're not providing
19   an opinion today on whether XRP is an investment
20   contract, correct?
21            A.   That's right.
22            Q.   Okay.  In your report, you mention
23   the Supreme Court case SEC versus W.J. Howey,
24   right?
25            A.   Yes.
```

1    ██████████ - Confidential Pursuant to Protective Order

2            Q.   Are you offering an opinion on how

3    Howey applies to the facts of this case?

4            A.   No.

5            Q.   Okay.  You have stated the SEC has

6    brought 75 or more enforcement actions related to

7    digital assets by the end of 2012, right?  Oh.

8    2020.

9            A.   Yeah.  No.  That was in the context

10   of a report that I footnote in my report.  A

11   Cornerstone report.   That wasn't me.

12           Q.   Did you read the Cornerstone report

13   in preparing your report?

14           A.   I glanced through it.  Yeah.

15           Q.   Okay.  Were you personally involved

16   in any of those enforcement actions brought by

17   the SEC?

18           A.   I was not.

19           Q.   What have you done in connection with

20   your assignment in this case to review those

21   enforcement actions?

22           A.   I have reviewed some of the

23   enforcement actions, not all of them.   Kick

24   Interactive rings a bell.   There was one more

25   that I don't recall offhand.   Kick was the

1   ███████ - Confidential Pursuant to Protective Order

2   primary one.

3        Q.   Okay.  So you read the Kick

4   Interactive case, and your testimony is

5   potentially one other enforcement action.

6             Did you read any other enforcement

7   actions or just those two?

8             MR. HANAUER:   Objection to form.

9        Are you still talking about the

10       Cornerstone report?

11       Q.   Yes, of the 75 enforcement actions

12   cited in that report that you referred to.

13       A.   No.  I believe those were the only

14   ones.  I think they're in there.  I did read

15   the SEC litigation release regarding the first

16   one, which was the Ponzi scheme, and I forget the

17   name of the case, but I didn't read the

18   complaint.  I read the summary of the SEC.

19       Q.   The SEC's first enforcement action

20   regarding digital assets, is that correct?

21       A.   That's correct.

22       Q.   Okay.  How did you select which of

23   those enforcement actions to review?

24       A.   I had no specific reason to do that.

25   I think in my overall research I picked that up

1      ████████  - Confidential Pursuant to Protective Order

2      somewhere in a footnote or whatever.   As a

3      matter of fact, I think I read Kick prior to my

4      retention at the SEC as background for they were

5      interviewing me as a potential expert, so I

6      wanted to bone up on what was involved.

7              Q.   So you had previously -- you read

8      Kick prior to your engagement on this matter, and

9      then, in the course of reading the Cornerstone

10     report, you selected one other case to read?

11             A.   Yeah, just to see what was going on,

12     right.

13             Q.   Okay.  Are you aware of how many of

14     those 75 enforcement actions involved a

15     determination that a digital asset is an

16     investment contract under Howey?

17             A.   Not specifically, no.

18             Q.   Okay.  Do you have a rough estimate

19     of how many?

20             MR. HANAUER:   Objection.  A

21             determination by who?

22             Q.   A legal determination that a digital

23     asset is an investment contract.

24             MR. HANAUER:   Same objection.   By

25             who?

1      ███████  - Confidential Pursuant to Protective Order

2           Q.   Are you aware -- I'll just rephrase

3      the question.   How many of those 75 enforcement

4      actions involved a finding in the order that a

5      digital asset was an investment contract under

6      Howey?

7                MR. HANAUER:   Objection to form.

8           What order?

9           Q.   In the administrative order filed as

10     part of the settlement.

11               MR. HANAUER:   Again, objection to

12          form.

13          Q.   In the administrative order filed as

14     part of the settlement with the SEC.

15               MR. HANAUER:   Are you talking about

16          all 75 actions?

17               MS. GRESSEL:   Yes.

18          Q.   Within the universe of all those 75

19     actions, how many involved a determination that a

20     digital asset is an investment contract or an

21     allegation by the SEC?

22          A.   I don't know.

23          Q.   Okay.  So, to avoid a similar

24     objection, I'm just going to tell you, I'm still

25     talking about the 75 enforcement actions, and I'm

1      ████████  - Confidential Pursuant to Protective Order

2      still talking about allegations.   So just up

3      front or findings.

4                So how many of those 75 enforcement

5      actions had findings or allegations that focused

6      on initial coin offerings or ICOs?

7           A.   I don't know.

8           Q.   Okay.  Isn't it the case that --

9      well, Mr. ████████, do you recall whether the

10     Cornerstone report spoke to that question?

11          A.   Whether there was a determination by

12     somebody about a security for a digital asset?

13          Q.   Did the Cornerstone report in your

14     recollection speak to how many of those 75

15     enforcement actions had allegations or findings

16     focused on initial coin offerings or ICOs?

17          A.   I don't have a specific recollection,

18     but I think there was a breakdown, I don't know

19     if it was by date or subject matter, there was a

20     breakdown that was in there.   I mean, you know,

21     and again I go back to the purpose of my report

22     was not to read all those cases.   It was that

23     the only point is that the SEC was active in the

24     enforcement area.

25          Q.   Mr. ████████, what is your

1   ████████  - Confidential Pursuant to Protective Order

2   understanding of the term "initial coin

3   offering"?

4           A.   An ICO?

5           Q.   Um-hum.

6           A.   Again, it may not be the correct one,

7   but, you know, it's a, and, again, you probably

8   know better than I do, correct me if I'm wrong,

9   it's an initial coin offering, so it's a sale of

10  a digital asset or a coin by somebody.

11          Q.   Isn't it the case that ICO -- that

12  enforcement actions focused on allegations or

13  findings regarding ICOs would not provide

14  guidance to individuals that are not engaged in

15  ICOs, but seek instead to determine whether a

16  digital asset is a security?

17              MR. HANAUER:   Objection to form.

18          A.   I'm not aware.   You know, again, I

19  don't have an opinion on that.

20          Q.   Mr. ████████, isn't it the case that,

21  when people look at enforcement actions to seek

22  guidance from them, they generally focus on

23  enforcement actions with similar facts and

24  circumstances?

25          A.   They can.   Sure.

1    ████████ - Confidential Pursuant to Protective Order

2           Q.   Okay, and, if the facts and

3    circumstances are very different, is it the case

4    that they would provide less guidance?

5           A.   If it was not applicable to their

6    particular facts and circumstances, sure.

7           Q.   Okay.   Again, we're going back to

8    the Cornerstone report.

9           A.   Um-hum.

10          Q.   Do you recall how many of those 75

11   enforcement actions had findings or orders,

12   findings or allegations involving fraud?

13          A.   Almost certainly the Ponzi scheme one

14   did, but that's the only one that I know of.

15          Q.   So you don't know either way?

16          A.   No.   I mean, like I said, I didn't

17   look at all 75.

18              MR. HANAUER:   Counsel, is this a

19          memory test?  Do you want to just put the

20          report in front of him and see what it

21          says?

22              MS. GRESSEL:   No, I'm okay, I think.

23              MR. HANAUER:   Okay.

24          Q.   Mr. ████████, isn't it the case that

25   enforcement actions involving fraud allegations

1    ███████ - Confidential Pursuant to Protective Order

2    would not necessarily provide guidance in cases

3    that don't involve allegations of fraud?

4              MR. HANAUER:   Objection to form.

5         A.   You know, I don't know.   They could.

6    They couldn't.   Again, it's a hypothetical that

7    I really can't answer.

8         Q.   Mr. ██████, of those 75 enforcement

9    actions, are you aware of how many were resolved

10   through settlements?

11        A.   No.   It may have been one of those

12   breakdowns I talked about, but, again, I'm going

13   from memory now, which is not too good.

14        Q.   Is it your view that settlements

15   provide the same type of binding precedent as

16   court opinions?

17        A.   They can.   Sure.

18        Q.   Isn't it the case that settlements

19   only reflect what an alleged securities violator

20   agreed constituted a violation of the securities

21   laws?

22        A.   Say it again, please.

23        Q.   Isn't it the case that settlements

24   only reflect what an alleged securities law

25   violator agreed constituted a violation of the

1    ██████████ - Confidential Pursuant to Protective Order

2    securities laws?

3              MR. HANAUER:   Objection to form.

4         A.   Certainly you could say that, but

5    I've seen SEC pronouncements that or releases

6    that show that an offer of settlement has been

7    accepted and provides specific rationale, well,

8    actually they'll describe the conduct and say the

9    specific rationale that they're accepting, why

10   they're accepting the settlement, what was

11   involved.

12             So it depends on how detailed the

13   decision is.   I've seen some very detailed ones.

14        Q.   But it's the case that those

15   settlements don't necessarily reflect what an

16   independent factfinder determined to have been

17   the facts at issue in the case, correct?

18        A.   Well, as you stated earlier, it's a

19   settled case.  So the parties are agreeing on

20   what the facts are and for whatever reason

21   agreeing to accept whatever SEC sanctions or

22   conclusions or censures are involved, so I don't

23   know.   I can't offer an opinion on an

24   independent factfinder.

25        Q.   Okay.  Is it your opinion that the

1   ███████  - Confidential Pursuant to Protective Order

2   SEC's prior enforcement actions provide guidance

3   to the market about whether a digital asset that

4   was not the subject of those actions should be

5   considered an investment contract?

6          A.   I'm not following.  I don't even know

7   if there is such a thing.

8          Q.   Is such a thing as what?

9          A.   As a decision that points to.   You

10  had better read it again.

11         Q.   Okay.   Is it your opinion that the

12  SEC's prior actions, prior enforcement actions,

13  provide guidance to the market about whether a

14  digital asset that was not the subject of that

15  action or those actions should be considered an

16  investment contract?

17         A.   But how would they do that?   Through

18  an aside or if it's not the subject of the

19  action, why would they reference another asset?

20  I'm not following.

21         Q.   Are you offering an opinion on how

22  many of the SEC's prior enforcement actions

23  involved facts, circumstances or transactions

24  similar to Ripple and XRP?

25         A.   No.

1    ███████████ - Confidential Pursuant to Protective Order

2          Q.   Are you aware of the ways in which

3    the SEC versus Ripple litigation differs

4    significantly from the SEC's prior enforcement

5    actions?

6          A.   I'm not aware of any.  No.

7          Q.   Okay.  So you have not analyzed the

8    differences between the SEC's prior enforcement

9    actions and this litigation?

10               MR. HANAUER:   Objection.   What SEC

11          enforcement actions?

12          Q.   Sorry.   Sitting here today, Mr.

13    ████████, you have not analyzed the differences

14    between the SEC's 75 prior enforcement actions

15    cited in the Cornerstone report and this SEC

16    versus Ripple litigation, correct?

17          A.   That's right.

18          Q.   Alright.  You mentioned you're

19    familiar with the Kick case.   Are you offering

20    an opinion today on how the SEC versus Ripple

21    litigation is similar to or different from the

22    Kick case?

23          A.   I'm not.

24               MS. GRESSEL:   Okay.  Do you want to

25          break for lunch now?

1    ███████ - Confidential Pursuant to Protective Order

2             THE WITNESS:   Yeah.  That would be

3        terrific.

4             MS. GRESSEL:   Alright.  Great.

5             THE VIDEOGRAPHER:   We are going off

6        the record.   The time is 12:48 p.m.

7             (Lunch recess:  12:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     ███████ - Confidential Pursuant to Protective Order

2                      Afternoon Session

3                           1:49 p.m.

4     J A M E S   C A N G I A N O,  having been

5     previously duly sworn, was examined and testified

6     further as follows:

7                THE VIDEOGRAPHER:   We are back on

8            the record.   The time is 1:49 p.m.

9     EXAMINATION (Continued)

10    BY MS. GRESSEL:

11         Q.   Mr. ███████, I would like to refer

12    you to page 24 of your report.   I would like you

13    to take a look at under header B the second

14    paragraph.   Could you please read the sentence

15    that starts "The SEC in my observation"?

16         A.   "The SEC, in my observation over many

17    years, has been particularly adept at keeping up

18    with new and dynamic products both in the past

19    and now in the digitally driven world."

20              You said two sentences?

21         Q.   Just that one.

22         A.   Okay.   That's fine.

23         Q.   Thank you.   Mr. ███████, you state

24    this is your observation based on many years.

25    What's your basis for this statement?

1    ███████ - Confidential Pursuant to Protective Order

2          A.   Well, you know, we have personal

3    experience of interaction between NASD and the

4    SEC and how to regulate, you know, new products.

5    I can give you a specific example if you want,

6    but, you know, there's no end to Wall Street's

7    creativity and how they package products, market

8    them and so on.

9          So I think the most vivid one that I

10   can recall is when the concept of an index fund

11   or an index option was introduced, and somebody

12   said, well, you know, why would you want to buy

13   that?  Don't you want to buy a company, and

14   doesn't this go against capital raising which is

15   the purpose of the capital markets and so on?

16   There was a whole big debate as to what the

17   product was, how do we get it regulated, and now

18   they are in everyone's 401K, so this just is par

19   for the course.  I mean, you know, Wall Street

20   innovates.  I think I say something in there

21   about that.  They innovate, and then we have to

22   regulate.

23          Q.   And what in your view has the SEC

24   done that you see as particularly adept at

25   keeping up with new and dynamic products?

1       ████████ - Confidential Pursuant to Protective Order

2              A.   As I said before, they, as the

3       government agency that is in charge of securities

4       markets, they have to ensure that they have a

5       regulatory approach to anything that, you know,

6       can meet the definition of a security, investment

7       contract, whatever their jurisdiction is, right?

8                   So, you know, they have, as I said

9       before, they have an obligation to do that as the

10      government agency in charge, and I think I say

11      somewhere in the report that, you know, they have

12      been, although, by its very nature, regulation

13      catches up, and sometimes you have enforcement

14      predating rulemaking, for example.

15                  It doesn't mean that they're not

16      carrying out their obligation to protect the

17      investor.

18             Q.   With respect to digital assets in

19      particular, have you seen the SEC do anything

20      that you view as particularly adept by keeping

21      up?

22             A.   Well, we talked earlier about the

23      enforcement actions.   We talked about a whole

24      mix of information from investor.gov releases to

25      speeches by individual commissioners and other

1      ████████  - Confidential Pursuant to Protective Order

2      things that as -- I like to call it a mix of

3      different information that you can take bits and

4      pieces of or the whole thing, but it alerts the

5      public that they are interested in a particular

6      set of circumstances or a particular product and

7      that, you know, they are going to regulate it

8      even before there are statutes on the books that

9      address that particular course of conduct.

10             Q.   And why do you view that as adept?

11             A.   As what?   I'm sorry.

12             Q.   As adept.   You used the word

13     "adept," particularly adept in your report.

14             A.    Because I think that, because their

15     first approach is usually enforcement, that they

16     are usually on top of new or different types of

17     investment scams, for example.   I think the 2013

18     Bitcoin or whatever it was, Ponzi scheme, the

19     first enforcement action, is a good indicator of

20     that, because here was a new product, a new

21     technique that was being foisted on the public

22     and, you know, yet they still brought the

23     enforcement action, even though it involved the

24     digital assets, and they didn't shy away or turn

25     their back on the fact that this was a new

1     ███████ - Confidential Pursuant to Protective Order

2     investment product that was being foisted on the

3     public.

4          Q.   And you mentioned that this

5     enforcement sometimes precedes regulation, right?

6          A.   Yes.

7          Q.   Is it difficult for the public to

8     understand or expect how enforcement actions will

9     evolve, if there's no regulation on the books?

10         A.   Well, that's, again, again, the SEC

11    is adept at putting out notification of that

12    enforcement action, putting out investor beware

13    kind of things.

14              So, in that regard, I don't know if

15    they did or not, but as an example they may have

16    said, look, we just brought an enforcement action

17    in the digital asset space.  Here's what

18    investors need to know about.  A, you know, do

19    you understand anything about the digital

20    product?  B, if it sounds too good to be true, it

21    probably is.  You know, so they would lay out,

22    and that is typically what they do, and

23    investor.gov is a great resource for the

24    investing public.

25         Q.   It sounds like that you see those as

1   ▮▮▮▮▮▮▮▮  - Confidential Pursuant to Protective Order

2   guidance that's provided to investors.   What

3   about to companies that might engage in those

4   activities?  Is the SEC particularly adept at

5   providing guidance to them?

6          A.   You know, I don't want to

7   characterize it as good or bad, but, you know, I

8   think we had that discussion a little bit this

9   morning where the obligation falls on the company

10  to, and not the government, to ensure that

11  they're keeping up, you know.   SEC goal number 1

12  is investor protection.   I'm not sure, you know,

13  I'm not sure, and I'm not speaking for the SEC,

14  trust me, but, you know, in my view and I think

15  it's their view that the obligation would fall on

16  the company itself.

17          Now that doesn't mean that they turn

18  their back and don't do anything for them.   I

19  think we went over some of the things this

20  morning that I testified to that there's a total

21  mix of information, there's a safety net of

22  advisors, lawyers, accountants, SEC releases, SEC

23  enforcement actions and so on.

24          So it's not like they turn their back

25  totally and say ah-ha I got you.

 1   ███████████  - Confidential Pursuant to Protective Order

 2          Q.   And, if the SEC wanted to provide

 3   more clarity to companies about what they were

 4   doing, what would you expect them to do?

 5          A.   You know, again, I don't feel that

 6   that's their primary role.   You know, I would

 7   put the shoe back on the company to say, okay,

 8   SEC, here's a set of facts, here's a set of

 9   circumstances.   Assuming or presuming or

10   hypothetically, if we go forward with this, what

11   would be your feeling, and that's essentially,

12   you know, a no action position if it gets to

13   that.   Certainly before the no action position,

14   they can go to the SEC informally and talk and

15   get some indication, although, you know, if they

16   want a more formal response, then the no action

17   way is the way to go.

18          Q.   So, in your view, companies can

19   engage in some compliance activities, and then,

20   if they want assurances from the SEC, they can go

21   to the SEC and seek those assurances that what

22   they're doing is in compliance with the law?

23          A.   Yes, and they can do that formally or

24   informally, although the informal assurances are

25   not, you know, certainly not binding, neither is

Page 159

1    ███████  - Confidential Pursuant to Protective Order

2    a no action letter for that matter, because

3    there's a disclaimer, but, you know, it's a

4    little bit more formal response, and you have a

5    response back in writing.

6         Q.   And what does that disclaimer say on

7    the no action letter?

8         A.   You know, it's been a while since

9    I've looked at one, but I think it says --

10             MR. HANAUER:   Don't speculate.

11        A.   Okay.  I'm speculating.  Generally, I

12   think it says, you know, this doesn't preclude,

13   you know, an enforcement action down the road or

14   whatever, you know.

15        Q.   And that is based on no action

16   letters you've seen in the past?

17        A.   Sure.

18        Q.   Okay.  Mr. ████████, I would like you

19   to turn to page 1 of your report.  So this is,

20   looking at the bullets, this is the fourth bullet

21   down.  Can you read that for us.  It starts

22   with "There are various best practices."

23        A.   "There are various best practices for

24   practitioners to ensure compliance with the

25   securities laws, including by working with

1    ██████████ - Confidential Pursuant to Protective Order

2    regulators and others to achieve a high degree of

3    comfort that their actions are in keeping with

4    the securities industry's high standards of

5    investor protection."

6         Q.   Mr. ████████, did you write this

7    sentence?

8         A.   I did.

9         Q.   What's your basis for this opinion?

10        A.   Again, you know, it's basically my

11   experience and knowledge over the years as to

12   what firms do and what the best practice is in

13   this area in terms of getting advice and what the

14   industry norm is.  The industry norm is, you

15   know, working with regulators and others.

16        Q.   And, when you say firms in that

17   sentence, you mean companies, not law firms,

18   correct?

19        A.   Well, I mean companies or broker

20   dealers or whoever is, you know, whoever is

21   seeking the advice.

22        Q.   What do you mean there by high degree

23   of comfort?

24        A.   Well, rather than speculating

25   themselves as to whether they should move forward

1   ███████ - Confidential Pursuant to Protective Order

2   with a transaction, they can, you know, they do

3   have some comfort in that, you know, hey, I've

4   got this from the SEC now, and this is what

5   they're saying, and, you know, I would view that

6   as some form of comfort that, you know, they're

7   proceeding on the right way if the SEC has said

8   that they would not recommend enforcement action

9   based on a set of circumstances.

10         Q.   And what types of statements or

11   indications from the SEC do you think gives

12   companies that sense of high degree of comfort?

13         A.   Just that, that, you know, we would

14   not recommend enforcement action if you do ABC

15   and D.

16         Q.   And those would be statements in

17   writing?

18         A.   Yeah.

19         Q.   Would they also be statements during

20   meetings?

21         A.   It could be.

22         Q.   What about statements with

23   disclaimers like we discussed before?

24         A.   Well, like I said, it's a boilerplate

25   response in any no action letter.

1      ███████  - Confidential Pursuant to Protective Order

2           Q.   Are there other steps that a company

3      could take to get a high degree of comfort that

4      their actions are in keeping with the securities

5      laws?

6           A.   Yes.  So I go back to my safety net

7      comment, you know.  That's why you guys have

8      this big building, very nice, because people hire

9      you to do things.  That's why Ernst & Young and

10     Price Waterhouse have their big buildings, and,

11     you know, there are advisors, there are attorneys

12     and, you know, just even talking to other

13     practitioners, I mentioned this morning, other

14     companies, hey, what are you guys doing, how are

15     you guys addressing this new rule, what systems

16     have you put in place.

17          So granted I'm coming from the

18     broker-dealer point of view, but I think it would

19     work too with a company or an issuer.

20          Q.   And does the term "high degree of

21     comfort" have a generally accepted meaning in the

22     securities industry?

23          A.   That's my own words.  You know, I

24     could have chose other words maybe, but some

25     recognition that they've made the inquiry that

1   ████████ - Confidential Pursuant to Protective Order

2   they have some guidance and that's the proper way

3   to do it.

4       Q.   So they have inquired of their

5   lawyers, and their lawyers have told them, okay,

6   we think, you know, you have minimal risk here?

7           MR. HANAUER:   Objection to form.

8       A.   I don't know, you know, what their

9   lawyers would tell them under any, you know,

10  specific circumstances, but I think they can

11  certainly heed a lawyer's advice.

12          And, by the way, the safety net again

13  does not relieve their obligation for compliance,

14  you know.   They still have to do that, but they

15  can use tools and other resources to mitigate

16  that somewhat.

17      Q.   Well, let me ask you this.   Does

18  having a high degree of comfort the way you

19  understand it mean that there has to be zero risk

20  that their actions don't comply with the

21  securities laws?

22      A.   No, and, you know, that's totally the

23  decision of the company.   Okay?   They can

24  determine and take on a lot of risk, or they can

25  determine not to do any risk at all and not do

1    ███████ - Confidential Pursuant to Protective Order

2    the transaction.   So that's up to the board of

3    directors, the CEO, and whoever else is the

4    decision makers.

5         Q.   How much risk is too big to have a

6    high degree of comfort that a company's actions

7    comply with the securities laws?

8              MR. HANAUER:   Objection to form.

9         A.   You know, I don't want to quantify

10   it.

11        Q.   Is it quantifiable?

12        A.   I don't know.   Probably not.   I

13   mean I guess the highest amount of risk is if you

14   want to commit a fraud and hope you don't get

15   caught.   So, you know.   Then we go down from

16   there.

17        Q.   And then the lowest amount of risk is

18   what?

19        A.   Not doing the deal.

20        Q.   Right, and then what is a high degree

21   of comfort that you're compliant?

22        A.   I've got this statement from my

23   lawyer.   I've got this statement from my

24   accountant.   I've got this conversation with the

25   SEC.   I have this no action letter.   You know.

1     ██████████  - Confidential Pursuant to Protective Order

2     You have a file this thick of why you make a

3     decision on behalf of the corporation.

4              Now you're absolutely right.  Can a

5     corporation put other factors ahead of that?

6     They might, but at least they've got the file to

7     show whoever wants to see it as they proceed. So.

8          Q.   Does a company have to obtain a no

9     action letter from the SEC to have a high degree

10    of comfort that they're complying with the

11    securities laws?

12         A.   They may not.   They may not.   I

13    contend it's the best way to do it, but that may

14    not be their decision.

15         Q.   Do most companies seek no action

16    letters from the SEC before they embark on a

17    business decision?

18              MR. HANAUER:   Objection to form.

19         A.   I don't know, you know, if most do or

20    not.  The enlightened ones do.  The best

21    companies do.

22         Q.   The best companies do?

23         A.   Well, the most compliance-conscious

24    or however you want to in my experience.

25         Q.   Do you have any experience advising

1   ███████ - Confidential Pursuant to Protective Order

2   clients on how to get a high degree of comfort

3   their actions are in keeping with the standards

4   of the industry?

5        A.   You know, over my long career I'm

6   sure people have come to me and said, you know,

7   ███, what do you think of this circumstance, and,

8   you know, ███, you know, this is the way we're

9   going to set up, this is a hypothetical example,

10  this is the way we're going to set up our

11  automated interface that captures the spread and,

12  you know, pays the rep, you know, two cents

13  commission.  What do you think of that?

14            Well, you know, I can say, well, gee,

15  I don't know.  You know, I don't know if it

16  comports with 11Ac1 or whatever SEC rule.  I

17  said, you know, you may want to go down there and

18  ask.  I'm sure that has happened, you know,

19  quite a few times when I was running market

20  regulation, because, in those days, you know, I

21  had relationships with almost every head of every

22  NASDAQ trading desk on the Street.

23            So I was getting constant calls and

24  constant inquiries about new things or new

25  products or new systems or new approaches.

1    ████████ - Confidential Pursuant to Protective Order

2          Q.   And your response was call the SEC

3    and ask them and have a conversation?

4          A.   If it was appropriate, yes.

5          Q.   Were there situations in which it

6    wasn't appropriate?

7          A.   If we could resolve it within the

8    NASD and in the context of NASD rules and if I

9    felt that they were going down the right path, I

10   would say, you know, I think you guys are doing

11   the right thing.

12          Now the fact that I said it again

13   does not absolve them.  They can't shift the

14   burden to me and say, you know, ████████ told

15   me it was alright to do this.  No, you know, it's

16   still their burden.

17          Q.   And, just to be clear, were any of

18   these people who were coming to you clients of

19   yours?

20          A.   They weren't clients.  They were

21   member firms of the NASD.

22          Q.   Okay, and do you have any experience

23   advising clients on how to get a high degree of

24   comfort that their activities with respect to

25   digital assets are specifically in keeping with

```
 1  [REDACTED]      - Confidential Pursuant to Protective Order

 2  the securities laws?

 3          A.   In relation to my consulting

 4  business?   Is that what you're saying?

 5          Q.   Ever.

 6          A.   Well, just in the context that I

 7  mentioned of me dealing with NASD member firms.

 8          Q.   And did those questions ever involve

 9  digital assets?

10          A.   No.

11          Q.   Okay.  So you've talked several times

12  about this idea that you have about a safety net

13  of advisors that involve lawyers and accountants

14  and others to manage risks, that companies are

15  operating in the framework of the law.   Is that

16  correct?

17          A.   Yes.

18          Q.   So lawyers are part of that safety

19  net.  You've mentioned that.   Does that include

20  outside counsel?

21          A.   Sure.

22          Q.   Okay, and outside counsel are law

23  firms, right?

24          A.   Sure.

25          Q.   How about in-house counsel?
```

1    ███████ - Confidential Pursuant to Protective Order

2              A.   Sure.

3              Q.   Those are lawyers at the company,

4    right?

5              A.   Yes, absolutely.

6              Q.   Why does it include in-house counsel?

7    What role do they play?

8              A.   I think in-house counsel is your

9    first go-to person.   You know, and assuming that

10   you've hired somebody who is competent, they are

11   really the go-to initial person to run something

12   by.   He may come back with some very good

13   advice.   He may come back with very bad advice,

14   or he may come back and say let's check with our

15   outside counsel, but in-house counsel is your

16   first line of defense, so to speak, when you're

17   seeking information.

18             Q.   What about outside counsel?   What

19   role do they play?

20             A.   Well, I think, as the next step, if

21   in-house counsel is doing his job right, if he's

22   not satisfied with, you know, whatever he's

23   telling his client which happens to be, you know,

24   the boss of his company or whoever, then I think

25   outside counsel would certainly play a role.

1    ▮▮▮▮▮▮▮▮  - Confidential Pursuant to Protective Order

     They would bring him in when the issue can't get

3    resolved internally.

4         Q.   So outside counsel comes in you said

5    when the issue can't get resolved internally?

6         A.   I would think so.   I think that's a

7    good example.

8         Q.   What work do you do, if any, in this

9    case to evaluate whether lawyers, including

10   outside or in-house counsel, experienced

11   uncertainty or confusion about how the securities

12   laws applied to digital assets between 2013 and

13   December 20, 2021?

14        A.   I don't have an opinion on that.

15        Q.   Did you undertake any work to form an

16   opinion on that?

17        A.   No.

18        Q.   Okay.  Did you undertake any research

19   related to that question?

20        A.   Not specifically, no.

21        Q.   Okay.  Were you asked by the SEC to

22   undertake any research related to that question?

23        A.   No.

24        Q.   Okay.  What work did you do, if any,

25   as part of your work in this case to evaluate

1   █████████ - Confidential Pursuant to Protective Order

2   whether accountants experienced uncertainty or

3   confusion about how the securities laws applied

4   to digital assets between 2013 and December 20,

5   2021?

6          A.   None.

7          Q.   Okay.   Mr. ████████, let's look at

8   pages 26 to 27 of your report.   I want you to

9   look at the very last sentence that begins on 26,

10  but continues on to the top of 27 starting "The

11  no action letter process."   Can you please read

12  that out loud?

13         A.   Sure.   "The no action letter process

14  is a routine and common practice for market

15  participants to get an understanding of whether

16  their proposed activity complies with federal

17  securities laws including whether offers and

18  sales of an instrument involves an investment

19  contract."

20         Q.   What personal or professional

21  experiences have you had with the SEC's no action

22  letter process?

23         A.   Oh, gosh.   You know, over the years,

24  lots.   I mean, if you go back early in my career

25  with NASD, one of the major issues for the

1    ██████ - Confidential Pursuant to Protective Order

2    industry then was net capital and how not only

3    net capital, but the customary protection rule,

4    how that all intertwined, and I don't know if you

5    know, Andy probably knows Mike Macciarole.  I

6    mean he was dealing with these things day in and

7    day out, and, you know, we had a slew of no

8    action letters in the Capitol area back in those

9    days in the 15C33 area, so I mean I've looked at

10   tons.

11        Q.   Mr. ██████, what personal or

12   professional experiences have you ever had with

13   the SEC's no action letter process in the context

14   of registration of securities?

15        A.   I can't recall one specifically.  It

16   may have been over the years, but I don't recall

17   them.

18        Q.   Have you ever made a no action letter

19   request to the SEC for yourself?

20        A.   No.

21        Q.   Have you ever assisted a client with

22   a no action letter request to the SEC?

23        A.   What do you mean assist?  I mean I've

24   recommended, as I said before, that people go to

25   the SEC and seek no action relief.

1    ███████ - Confidential Pursuant to Protective Order

2              Q.   What about a client of yours in a

3    consulting relationship or any other client

4    you've had over the years?   Have you ever

5    assisted them with a no action letter request to

6    the SEC?

7              A.   No.

8              Q.   Okay.  Specifically with respect to

9    the digital asset space, what personal or

10   professional experience have you had with the

11   SEC's no action letter process?

12             A.   Right.  None.

13             Q.   Okay.  So you've never consulted or

14   worked with a company in the digital asset space

15   in connection with obtaining a no action letter?

16             A.   No.

17             Q.   Okay.  What work have you done in

18   this case to assess how well the no action letter

19   request procedure has worked with respect to

20   digital assets?

21             A.   I'm not following.

22             Q.   Well, let me rephrase that.   Have

23   you done any work in this case to assess how well

24   the no action letter request process has worked

25   with respect to digital assets?

1   ███████   - Confidential Pursuant to Protective Order

2           A.   No.   Not specifically.

3           Q.   Okay.  Do you know when the SEC

4   issued its first no action letter in the digital

5   asset space?

6           A.   I know I footnote it there, but it's

7   a while since I had looked at that cite, so I'm

8   not, it must have been, you know, I wrote 2002,

9   so I think that was probably it, but I would have

10  to go back and look at the cite.   I apologize

11  for that.

12          Q.   That's fine.   Do you have a

13  recollection of the case that you're thinking of?

14          A.   No, I don't.

15          Q.   And can you point me to the footnote

16  that you're referring to?

17          A.   32.

18          Q.   I see.   So it's at the link that you

19  cite here, www.sec.gov/corpfin/corpfin-no-action-

20  letters#2a1?

21          A.   Right.

22          Q.   Okay.  Are you aware that the SEC --

23  that the first SEC no action letter related to

24  digital assets was not issued until April 3rd,

25  2019?

1 ███████ - Confidential Pursuant to Protective Order

2          A.   Can you give me more information.   I

3 might be.

4          Q.   Sure.   Why don't we actually show

5 you what we have marked as Exhibit 15.   ██ 15.

6          (Defendant Exhibit ██ 15, No action

7          letter, was so marked for identification,

8          as of this date.)

9          Q.   Take a moment to read that document.

10         A.   Okay.

11         Q.   Mr. ███████, does this refresh your

12 recollection that the first no action letter that

13 the SEC issued with respect to digital assets was

14 on April 3rd, 2019?

15         A.   Not specifically, but I'll take your

16 word for it.   I don't recall reading this

17 release either.

18              MR. HANAUER:   I would just state for

19         the record this exhibit is not an SEC

20         release.

21              MS. GRESSEL:   No.   This exhibit is

22         a news article titled "SEC issues first

23         ever no action letter for digital token

24         sales."

25         A.   Right.

1    ███████   - Confidential Pursuant to Protective Order

2         Q.    Have you heard of the no action

3    letter with respect to TurnKey Jet Incorporated?

4         A.    No, I haven't.

5         Q.    Okay.  Do you know how many entities

6    or persons in the digital asset space sought no

7    action relief from the SEC prior to April 2019?

8         A.    I don't.

9         Q.    Did you ask the SEC for any

10   information on how many persons have sought no

11   action relief from the SEC related to digital

12   assets?

13        A.    No.

14        Q.    Why not?

15        A.    You know, my reference again in the

16   report is not to laser focus on the no action

17   process, but to characterize it as a place where

18   again people can go for comfort, and, you know,

19   there's a lot of other places besides no action

20   letters which, you know, I list and talk about as

21   resources, so basically a no action letter my

22   point is that it's a resource that you can

23   utilize.

24            You know, I never intended to get

25   into the nitty-gritty of who did what.  I'm just

1  ███████  - Confidential Pursuant to Protective Order

2  putting it forward as a resource.

3       Q.   And so did you undertake any analysis

4  of no action letters with respect to digital

5  assets for your report?

6            MR. HANAUER:   Objection.   Asked and

7            answered.

8       A.   You know, the answer is no, because

9  it wasn't my intent in making the point in my

10  report.  I didn't think I needed to do that.

11       Q.   Okay.   Let's take a look at page 26

12  of your report.   So you say here, well, we've

13  already read this quote, but I'll read it back,

14  "The no action letter process is a routine and

15  common practice for market participants to gain

16  an understanding of whether their proposed

17  activity complies with the federal securities

18  laws."

19            In making that statement, is it fair

20  to say you're making a general statement not

21  specific to how the no action relief process has

22  worked in the digital asset space?

23            MR. HANAUER:   Objection to form.

24       A.   So again help me out here.   Can you

25  just repeat that.

1     ███████  - Confidential Pursuant to Protective Order

2          Q.   So I'll just read this sentence back

3     to you.   It's at the bottom of 26 up to the top

4     of 27.   You say, "The no action letter process

5     is a routine and common practice for market

6     participants to gain an understanding of whether

7     their proposed activity complies with the federal

8     securities laws, including whether offers or

9     sales of an instrument involves an investment

10    contract."

11              And my question is, is it fair to say

12    that in that sentence you're making a general

13    statement not specific to how the no action

14    relief process has worked in the digital asset

15    space?

16         A.   Yeah, I would say it's a general

17    statement, and I would say again it's putting

18    forth a tool or a process or a custom in the

19    industry as to what they do when they need, when

20    they seek advice.

21         Q.   And does this general statement

22    assume that the SEC always engages with the

23    requester on a relief, on a request for no action

24    relief?

25         A.   Not necessarily.

1   ███████████ - Confidential Pursuant to Protective Order

2          Q.   Are you familiar with whether how

3   often the SEC has engaged with no action requests

4   related to digital assets?

5          A.   No, but, you know, that's, you know,

6   their call.   I know some they answer, and some

7   they don't.   What their criteria is I don't know

8   specifically.

9          Q.   And a requester of no action relief

10  can only gain an understanding of the SEC's

11  views, as you wrote, if the SEC engages with

12  them, right?

13         A.   By engage, you mean talk about no

14  action letter and eventually produce it?  Is that

15  what engage means or call them on the phone?

16         Q.   Any kind of response to the no action

17  request.

18              MR. HANAUER:   Objection to form.

19         A.   So I'm sorry.   You had better repeat

20  it again.

21         Q.   I'll repeat it.  No problem.   The

22  requester of a no action letter can only gain an

23  understanding of the SEC's views if the SEC

24  engages with the requester, right?

25              MR. HANAUER:   Objection to form.

1    ██████████   - Confidential Pursuant to Protective Order

2              A.   Are you talking strictly about the no

3    action process, or are you talking overall in

4    general?

5              Q.   The no action process.

6              MR. HANAUER:   Same objection.

7              A.   Right.  Well, presumably, if they're,

8    you know, seeking the no action letter, I guess

9    it would be important for that to occur, yes.

10             Q.   For that to occur, you mean for the

11   SEC to respond?

12             A.   Right.  Now, you know, if they don't

13   respond, then, you know, they can take other

14   action again.  They can have their in-house or

15   outhouse counsel, you know, put some pressure on

16   them or find out the reason.  I mean there's

17   other forms of engagement other than, you know,

18   if it was me and the SEC is not acting on my no

19   action request, I would bring in some resources

20   to bear to find out why and then see if I can get

21   some kind of response.  I don't just walk away

22   and say okay, have a nice day.

23             Q.   So you would open up other avenues,

24   create back-channel communications?

25             A.   That's what I would do, yes.

1      ███████      - Confidential Pursuant to Protective Order

2           Q.    That's what you would do.  Put some

3      pressure on the SEC to respond?

4           A.    Exactly.

5           Q.    You state on page 27, we can actually

6      look at this, it's in the footnote there,

7      footnote 32, "Based on industry custom and

8      practice."   Can you read that sentence for me.

9           A.    "Based on industry custom and

10     practice, a prime means of ascertaining the SEC's

11     position regarding their XRP transactions would

12     have been for defendants to submit a no action

13     letter request to the SEC."

14          Q.    What custom and practice are you

15     referring to here?

16          A.    The one that we were, you know,

17     talking about this afternoon, and that is, you

18     know, if it was me and I was unsure and, you

19     know, at the recommendation of in-house or

20     outhouse counsel, and I do not have the degree of

21     comfort I would want, the best avenue to pursue

22     is the SEC no action letter.

23          Q.    And what work have you done in this

24     case, if any, to determine whether there was an

25     industry custom and practice for block chain

```
 1  ████████ - Confidential Pursuant to Protective Order
 2  technology companies to seek no action relief
 3  from the SEC?
 4       A.   Well, I think that, are you talking
 5  block chain technology specifically, or are you
 6  talking the digital world generally?
 7       Q.   Block chain technology specifically.
 8       A.   I'm not aware of any.
 9       Q.   Okay, and you used this term here
10  "prime means."   What do you mean by "prime
11  means"?
12       A.   You know, I guess prime probably in
13  that context means the most definitive, you know,
14  being number 1.  Prime means number 1, so.
15       Q.   So, in your view, it's the best
16  option?
17       A.   The SEC, right, putting a stamp on
18  it.
19       Q.   Okay, and this sentence makes an
20  assumption that the SEC would have provided its
21  position in response to questions about XRP
22  transactions, correct?
23            MR. HANAUER:   Objection to form.
24       A.   I think it says for defendants to
25  submit the no action request.  I don't think I
```

1   ███████ - Confidential Pursuant to Protective Order

2   speculate on whether the SEC would answer it or

3   not.

4        Q.   You just testified that prime to you

5   means that the SEC puts a stamp on it.   What did

6   you mean by that?

7        A.   That again, and I testified before

8   that the no action request says under these set

9   of circumstances we will not recommend an

10  enforcement action, and I think that's a high

11  degree of comfort for a company to have a

12  statement from the SEC that they can put in their

13  folder with anything else they got, but it's the

14  number one and prime, because it's from the SEC

15  directly.

16       Q.   Right, so one can only get that prime

17  means of ascertaining the SEC's position if the

18  SEC responds to the request, right?

19       A.   Yeah.   Maybe prime is wrong.   Maybe

20  I should have said optimal or something like

21  that.

22       Q.   And the SEC's position can only be

23  ascertained if the SEC provides a position?

24       A.   That's correct.

25       Q.   Okay.   So what work have you done in

1    ██████████  - Confidential Pursuant to Protective Order

2    this case to determine whether the SEC was

3    willing to answer questions about its position on

4    XRP at any time before December 22, 2020?

5          A.   None.

6          Q.   Okay.  Have you reviewed any

7    inquiries made to the SEC about XRP?

8          A.   No.

9          Q.   Did you ask the SEC to provide you

10   any inquiries that it received about XRP?

11         A.   No.

12         Q.   Why not?

13         A.   Because that's not what the report is

14   all about.  I'm not offering an opinion on XRP

15   or what they did or didn't do.  I'm just stating

16   that there is a practice, a general practice in

17   the industry to take these steps to gain comfort

18   and a high degree of confidence about moving

19   forward without running afoul of the rules and

20   regulations.

21         Q.   So you just said you're not offering

22   an opinion on XRP or what they did or didn't do.

23         A.   Right.

24         Q.   So in that sentence that we just read

25   in footnote 32, you're not offering an opinion

1    ███████  - Confidential Pursuant to Protective Order

2    there on what Ripple should or shouldn't have

3    done with respect to obtaining a no action

4    letter?

5         A.   No.  Right.

6         Q.   Okay.  Are you aware that as late as

7    October 2020 the SEC was still informing market

8    participants it had not yet decided whether XRP

9    was or was not a security?

10        A.   I'm not aware of that.

11        Q.   Okay, and that is because you haven't

12   seen any document saying that either way?

13        A.   Right.

14        Q.   Okay.  I would like to show you what

15   has been marked as Exhibit ██ 10.

16             (Defendant Exhibit ██ 10, e-mail

17             chain between Mr. Frank Mossmann and SEC's

18             Office of Investor Education and Advocacy,

19             was so marked for identification, as of

20             this date.)

21        Q.   Would you take a moment to review

22   this document.

23             THE WITNESS:  Excuse me.  One

24             second.

25             MR. HANAUER:  I was actually going

 1   ██████  - Confidential Pursuant to Protective Order

 2           to say what you just said.

 3           A.   Should I go back to front or front to

 4   back?

 5           Q.   I would go back to front.  The last

 6   message is the earliest, and the first message on

 7   page 1 is the most recent.

 8           A.   Okay.  Is there a difference between

 9   the first two here?  They look the same unless

10   I'm missing something.

11           Q.   You're correct.  There is some

12   portions here that have been redacted, and it

13   appears that some of these messages were repeated

14   or replicated.

15           A.   Okay.  Is it appropriate to ask who

16   Frank Mossmann is?  Okay.  It doesn't matter.

17           Q.   He's an individual.

18           A.   Okay.  I gathered that.  Okay.  I

19   think I get it.

20           Q.   Mr. ██████, do you recognize this

21   document to be an e-mail chain between a Mr.

22   Frank Mossmann and the SEC's Office of Investor

23   Education and Advocacy?

24           A.   I don't.

25           Q.   You don't recognize this to be an

1    █████████ - Confidential Pursuant to Protective Order

2    e-mail chain between someone named --

3              MR. HANAUER:   Objection, foundation.

4         Q.   Mr. ████████ --

5              MR. HANAUER:   You're asking him to

6         authenticate an e-mail he has never seen

7         before and he's not on?

8         Q.   Mr. ████████, this is an e-mail chain

9    between Mr. Frank Mossmann and the SEC's office

10   of investor education and advocacy.   Have you

11   ever seen this document before?

12        A.   I have not.

13        Q.   Were you aware that the SEC produced

14   this document to Ripple in discovery in this

15   litigation?

16        A.   No.

17        Q.   Alright.   Mr. ████████, do you know

18   what the SEC's office of investor education and

19   advocacy is?

20        A.   Generally, yes.

21        Q.   What is it?

22        A.   It's a separate, I don't know if it's

23   a division or department of the SEC, which deals

24   with investor kind of issues for the general

25   public.

1       ███████  - Confidential Pursuant to Protective Order

2            Q.    And are you aware that members of the

3       public can contact the office of investor

4       education and advocacy with questions?

5            A.    Yes.

6            Q.    Okay.   Let's turn to page 5 of this

7       document.   This is the e-mail chain below all of

8       the redactions.

9            A.    Okay.

10           Q.    Is it accurate that this e-mail

11      states that Mr. Mossmann originally e-mailed the

12      SEC Chairman Jay Clayton on August 21st, 2020

13      asking whether the SEC had determined that

14      cryptocurrency XRP (Ripple) and other digital

15      currencies are considered securities?

16                 MR. HANAUER:   Objection.   Are you

17                 asking if you just read the e-mail

18                 correctly?

19                 MS. GRESSEL:   Yes.

20           A.    You said the e-mail was dated

21      August 21st, 2020?

22           Q.    Why don't you read that sentence that

23      begins, "Thank you for your August 21st, 2020

24      e-mail."

25           A.    "Dear Mr. Mossmann:   Thank you for

1     ███████ - Confidential Pursuant to Protective Order

2     your August 21, 2020 e-mail to the U.S.

3     Securities and Exchange Commission Chairman Jay

4     Clayton."

5                I was looking for a date in the

6     header.   That's why I didn't see it.

7          Q.   And you see in the next sentence it

8     says that his correspondence was forwarded to the

9     SEC's office of investor education and advocacy

10    for response?

11         A.   Right.

12         Q.   Okay, and then, in the following

13    sentence it says that Mr. Mossmann's question is

14    whether the cryptocurrency XRP (Ripple) and other

15    digital currencies are considered securities,

16    correct?

17         A.   Right.

18         Q.   Okay.   Now the e-mail chain

19    continues, and I want to -- actually I want to

20    look at just the next sentence right there.

21         A.   Um-hum.

22         Q.   Can you read the SEC's response

23    beginning with "Whether," just that sentence?

24         A.   Yeah.   "Whether a cryptocurrency is

25    considered a security will depend on the

1     ███████  - Confidential Pursuant to Protective Order

2     characteristics and use of the cryptocurrency."

3              Q.   Did the SEC provide a direct response

4     to Mr. Mossmann's question concerning whether XRP

5     is considered a security?

6                   MR. HANAUER:   In this specific

7              e-mail at the bottom of the chain?

8              Q.   Yes, in the specific e-mail at the

9     bottom of the chain.

10             A.   That specific sentence or the whole

11    e-mail?

12             Q.   In that whole e-mail.

13             A.   Give me one second, so I can read it

14    again, please.

15             Q.   Sure.

16             A.   Your question was?

17             Q.   My question was did the SEC provide a

18    direct response to Mr. Mossmann's question

19    concerning whether XRP was considered a security?

20             A.   You know, I'm not going to

21    characterize the response.   The response speaks

22    for itself.   You know, it did refer him to other

23    websites and other information, so I'm not going

24    to characterize it.  It's their response.

25             Q.   There is no yes or no answer in here

Page 191

1    ██████████ - Confidential Pursuant to Protective Order

2    as to the SEC's view, correct?

3              MR. HANAUER:   Objection.

4         Argumentative.  The e-mail speaks for

5         itself, Counsel.

6              MS. GRESSEL:   That's okay.   He can

7         answer.

8         A.   Yeah.  Again, I'm not going to

9    characterize it.  I think it speaks for itself.

10   You know.  The SEC may consider it in direct

11   response.

12        Q.   Okay.  Mr. Mossmann, can you keep

13   reading --

14             MR. HANAUER:   Mr. ████████?

15        Q.   I'm sorry.  Mr. ██████████.

16        A.   I didn't write this e-mail.

17        Q.   Can you please keep reading from the

18   next sentence which starts, "For additional

19   information" through the end of the e-mail,

20   please.

21             MR. HANAUER:   Into the record or to

22        himself?

23             MS. GRESSEL:   Into the record.

24        A.   "For additional information on this

25   topic, we suggest that you review Chairman

1     █████████ - Confidential Pursuant to Protective Order

2     Clayton's statement on Cryptocurrencies and

3     Initial Coin Offerings at" blah, blah, blah blah.

4     Do you want me to read the whole --

5          Q.   Sure.

6          A.   -- "www.sec.gov/news/public-

7     statement/statement-clayton-2017-12-11.

8     Additionally, the SEC has created a spotlight

9     section on its website to help address questions

10    and concerns about the rising interest in ICOs

11    and other digital assets

12    (see:https://www.sec.gov/ICO).   The spotlight

13    section contains ICO updates, which provide

14    information about recent SEC's actions involving

15    ICOs.   You may also wish to review the SEC's

16    spotlight on Initial Coin Offerings and Digital

17    Assets which also has links to investor alerts

18    and investor bulletins regarding cryptocurrency.

19    You can find this information at

20    https://www.investor.gov/additional-resources/

21    specialized-resources/spotlight-initial-coin-

22    offerings-digital-assets.   Once again, thank you

23    for contacting the SEC.   If you have any

24    questions , please call an OIEA staff member at

25    202.551.6327.   Sincerely."

1 ███████ - Confidential Pursuant to Protective Order

2           Q.   Thanks, Mr. ██████.   In all of

3 what you read, do you see any yes or no response

4 to whether XRP was considered to be a security by

5 the SEC?

6                MR. HANAUER:   Objection.   Asked and

7           answered.

8           A.   Again, I'll go back and say, you

9 know, it's not appropriate for me to characterize

10 their response.   Their response is their

11 response.

12          Q.   So you're not going to say whether

13 you see a yes or a no in this e-mail chain you

14 just read into the record?

15          A.   No.   You know, I think that the

16 e-mail is the e-mail.   It speaks for itself.

17          Q.   Alright.   Let's turn to the bottom

18 of page 3 which is the page ending in 000214.

19          A.   Yeah, I have it.

20          Q.   Could you please read Mr. Mossmann's

21 response at the bottom of the page starting with

22 "Thanks for your answer."

23          A.   "Thanks for the answer to my

24 question, but it really, it isn't really answer,

25 but it isn't really answer.   I want to know when

1   ████████ - Confidential Pursuant to Protective Order

2   there will be regulatory clarity especially for

3   XRP.   The statement from Jay Clayton is three

4   years old and not really actual?   It would be

5   really nice to hear that there will be clarity

6   this year or the next year?   Regards, Frank

7   Mossmann."

8          You want me to read the German?

9          Q.   No.   Thanks.   Is it fair to say that

10   in this communication Mr. Mossmann expresses to

11   the SEC that he does not perceive there's

12   regulatory clarity around XRP and then asks when

13   the SEC will provide that clarity?

14          MR. HANAUER:   Objection.   The

15          document speaks for itself.

16          A.   Would you state your question again.

17   I just want to make sure.

18          Q.   Sure.   Is it fair to say in this

19   communication Mr. Mossmann expresses to the SEC

20   that he does not perceive there is regulatory

21   clarity around XRP and asks when the SEC will

22   provide that clarity?

23          MR. HANAUER:   Same objection.

24          A.   The way I read it, it is objecting

25   that there's not really an answer.   I don't

1   ████████  - Confidential Pursuant to Protective Order

2   know.  I think he's asking when there will be

3   regulatory clarity, but you can read it yourself.

4   I mean.

5          Q.   Well, how do you read it?

6          A.   Again, it sounds like he feels that

7   he didn't get an answer and was wondering when

8   there will be regulatory clarity.  I mean that's

9   how I read it.

10         Q.   Okay.  Let's go to the next page

11  over, like the middle message on that page.

12  Starting with "Dear Mr. Mossmann."  It is the

13  response dated 10/20/2020.

14         A.   Okay.  You want me to read the whole

15  thing?

16              MR. HANAUER:  Well, read it to

17         yourself first.

18         Q.   Yeah.  Read it to yourself first.

19         A.   Okay.

20         Q.   I would like you to read the two

21  sentences that begin, "As we explained

22  previously."

23         A.   "As we explained previously, the SEC

24  has not issued a determination on whether the

25  cryptocurrency XRP is a security.  Also, this

1       ███████ - Confidential Pursuant to Protective Order

2    office cannot comment on whether the SEC will

3    make a determination as to whether XRP is a

4    security or otherwise provide a timeframe for

5    which any determination might be made.   Thank

6    you for contacting the SEC.   Sincerely, Amy

7    Rosenthal, investor assistant specialist, office

8    of investor education and advocacy U.S.

9    Securities and Exchange Commission."

10            Q.   That's fine.   Thanks, and looking up

11    the chain, is it fair to say Mr. Mossmann

12    responds, but that's the last response in the

13    chain from the SEC, correct?

14            A.   This is his response.

15            MR. HANAUER:   Objection to the form

16        of the question.   Objection, foundation.

17            Q.   After this message, which is dated

18    October 20, 2020, do you see any further

19    communications from the SEC to Mr. Mossmann?

20            MR. HANAUER:   On this exhibit?

21            Q.   On this exhibit.

22            A.   That would be the one in the front,

23    right, you're talking about?

24            Q.   I believe the e-mail message on the

25    front is from Mr. Mossmann to the SEC.

1      ████████ - Confidential Pursuant to Protective Order

2              A.   Right, and you asked if there were

3      any others from the SEC that I see?

4              Q.   That are more recent than October 20,

5      2020.

6              A.   I don't see any.

7              Q.   Okay.  So is it accurate that the

8      SEC stated it had not yet determined whether XRP

9      was a security as of the date of that message on

10     October 20, 2020?

11             A.   That's what it appears to say.  Yes.

12             Q.   Okay.  Now let's assume, this is a

13     hypothetical, let's assume the SEC received

14     dozens of similar outreach messages over a period

15     of years asking for guidance on whether XRP is a

16     security, and the SEC each time provided a

17     response it had not yet issued a determination on

18     whether the cryptocurrency XRP is a security and

19     could not provide a time frame for when that

20     determination might be made.

21                  Assuming that's true, would that

22     change your opinion on whether the SEC provides

23     guidance on the application of the securities

24     laws to digital assets to individuals who contact

25     them directly?

1   ███████ - Confidential Pursuant to Protective Order

2        A.   You know, I can't characterize what

3   the SEC response or nonresponse is, you know.

4   There may be privileged reasons why.  You know,

5   there could be a thousand reasons why they can't

6   respond at this point, and I'm sure they have

7   their reason, but you would have to ask them what

8   it was, so I can't characterize that for you.

9        Q.   So let's take that as an assumption

10  that the SEC for some reason can't respond.   Is

11  it the case then that people who have asked for

12  guidance received it?

13            MR. HANAUER:   Objection.   Form.

14       Foundation.

15       A.   You know, I'll just stay with my

16  first answer.  If the SEC does not respond, I'm

17  sure there's pretty good reasons why they're not

18  doing that.

19            Now, you know, is Mr. Mossmann upset

20  about that?   You know, it sounds like he is,

21  but, you know, as an agency of course they have

22  to weigh what they're doing behind closed doors

23  versus what they're public with, and I don't know

24  what's going on here.

25            Obviously you feel that or Mr.

1    ██████████ - Confidential Pursuant to Protective Order

2    Mossmann rather feels that he's not getting a

3    straight answer, but again the agency has to

4    weigh what they say and not say and have reasons

5    for it.

6            Q.   Mr. ██████, so, putting aside why

7    the SEC might or might not have commented on

8    requests that they received and focusing on what

9    guidance was issued to members of the public who

10   sought further responses and clarity, is it the

11   case that, if the SEC did not provide guidance in

12   response to these requests, that members of the

13   public would not have received that clarity?

14           MR. HANAUER:   Objection to the form.

15      Objection to the hypothetical.

16           Q.   Putting this objection to the

17   hypothetical aside, staying with the

18   hypothetical, you say in your report, Mr.

19   ██████, that "for market participants uncertain

20   of whether their conduct or proposed conduct

21   implicates the securities laws, input may be

22   sought from the SEC staff directly."

23           A.   Um-hum.

24           Q.   If the SEC declines to provide that

25   input, are market participants left with

1      ███████  - Confidential Pursuant to Protective Order

2      uncertainty about whether their conduct might

3      violate the securities laws?

4              MR. HANAUER:   Objection.   Are you

5          going back to these e-mails, or are you

6          talking about the statements in his

7          report?

8              MS. GRESSEL:   I'm talking about the

9          statement in your report.

10      A.   Again, I think that's where, if it

11  was me and my firm, that's where the escalation

12  would take place.   By the way, just glancing

13  down here, I mean there is some guidance here.

14  The guidance is whether cryptocurrency is a

15  security will depend on characteristics and the

16  use of cryptocurrency.   That's guidance, right?

17  I think.

18          So it depends on the facts and

19  circumstances of that individual asset, and then

20  you may want to review Jay Clayton's speech.

21  That's guidance, right?   And then their public

22  statement on cryptocurrency is guidance.

23          So, if they're not getting the

24  satisfaction of what they feel is an appropriate

25  answer, they've got a couple of channels that

1      ████████    - Confidential Pursuant to Protective Order

2      they can do.   They can back-channel.   They can

3      ask their attorneys to contact the SEC, or,

4      barring that, they can go back, weigh all the

5      factors in their decision and make their own

6      decision, because at the end of the day it's not

7      the SEC who's going to determine, you know, their

8      compliance or not.   That burden rests with them.

9              So they've got to make the best

10     decision that they possibly can.   I mean it

11     might be unfortunate that -- let me put it

12     another way.   It might be the case where they

13     would like a lot more information and a lot more

14     guidance, but they may choose to, you know, move

15     forward on another basis, but at the end of the

16     day it's them, and they can't point to the SEC

17     and say it's your fault.

18         Q.   And for, you know, members of the

19     public who don't have back-channel options to the

20     SEC and who might not have big law firms

21     representing them, is their only option to read

22     this kind of guidance and draw whatever

23     conclusions they can draw?

24              MR. HANAUER:   Objection to the form

25          of the question.

1    ███████ - Confidential Pursuant to Protective Order

2         A.    You know, if the member of the public

3    is unhappy with the SEC and what the SEC is doing

4    and the guidance or no guidance, I would pick up

5    the phone and call my congressman.

6         Q.    Fair enough.   So you're saying, for

7    people who are unhappy with what the SEC is

8    doing, it makes sense to call for legislative

9    action and additional legislative clarity?

10        A.    Or put a bug in some congressman's

11   ear and have them get on the phone with, I don't

12   know whether Jay Clayton was there or not, you

13   know.   That's the only way I think in my mind the

14   public can escalate it.   So.

15        Q.    Okay.   Your report talks a lot about

16   custom and practice.   We've talked about that

17   before.

18        A.    Um-hum.

19        Q.    Do you have an opinion on whether

20   between 2013 and 2020 there was a custom and

21   practice for XRP to be sold on the secondary

22   market by market participants without registering

23   under Section 5?

24        A.    You've got to repeat that because

25   that's a new twist.   Secondary market.   And I

1    ████████ - Confidential Pursuant to Protective Order

2    want to make sure I understand what you're

3    saying.

4         Q.   Yeah.  It's a question about the

5    secondary market.

6         A.   Right.

7         Q.   Do you have an opinion on whether

8    between 2013 and 2020 there was a custom and

9    practice for XRP to be sold on the secondary

10   market by market participants without registering

11   under Section 5"?

12              MR. HANAUER:   Objection to form.

13         Objection, vague.

14         A.   You know, I'm sorry.  It must be me,

15   but I'm having trouble understanding.

16              Are you saying am I aware that XRP

17   was traded on a secondary market without

18   registration?

19         Q.   Let's start with that.  Are you

20   aware?

21         A.   I think I know.  You know, I know

22   that it trades on a secondary market.  I just

23   don't know offhand what the dates would be.  I'm

24   sure you're right in saying it's between this and

25   this, but I don't know the exact date.

1      ███████ - Confidential Pursuant to Protective Order

2              Q.   Did you do any research in the course

3      of your work on this matter to examine the

4      secondary market for XRP?

5              A.   I did not.

6              Q.   Okay.  Did you request any documents

7      from the SEC concerning the secondary market for

8      XRP?

9              A.   I did not.

10             Q.   Okay.  Have you ever provided

11     consultation services that involved directly

12     contacting the SEC on whether a proposed

13     transaction involved the offer or sale of a

14     security?

15             A.   Not that I can recall.

16             Q.   Okay.  Have you ever provided expert

17     testimony in connection with a matter that

18     involved directly contacting the SEC on whether a

19     proposed transaction involved the offer or sale

20     of a security?

21             A.   Not that I recall.

22             Q.   Have you ever secured meetings with

23     the SEC to discuss their views on the legality of

24     any conduct related to digital assets?

25             A.   I have not.

1      ███████  - Confidential Pursuant to Protective Order

2              Q.    Okay.  Have you ever secured meetings

3      with the SEC concerning their views on whether a

4      particular digital asset was a security?

5              A.    I have not.

6              Q.    Are you aware that in this litigation

7      the SEC was ordered by the court to produce all

8      communications with distributed ledger

9      stakeholders or groups concerning XRP, Bitcoin

10     and Ether?

11             A.    I'm not aware of that.

12             Q.    Okay.  Are you aware that in response

13     to that order the SEC has produced certain

14     communications in which individuals requested

15     guidance on digital asset regulation?

16             A.    If you say so.

17             Q.    You were not previously aware of

18     that?

19             A.    No.

20             Q.    Okay.  Have you reviewed any

21     communications in which individuals requested

22     guidance on digital asset regulations from the

23     SEC?

24                   MR. HANAUER:    Beyond the e-mails you

25             have shown him?

1    ███████  - Confidential Pursuant to Protective Order

2              MS. GRESSEL:   Yes.

3         A.   Beyond this, no.  No, I have not.

4         Q.   In the process of working on the

5    report, did you request from the SEC to see any

6    communications between the SEC and individuals or

7    companies trying to or concerning the application

8    of the securities laws to digital assets?

9         A.   No, I did not.

10        Q.   Mr. ███████, at any point did the

11   SEC make you aware it maintained records of such

12   communications?

13        A.   No, it did not.

14        Q.   What other research, if any, have you

15   conducted concerning whether market participants

16   have been able to obtain meaningful guidance on

17   the regulation of digital assets through meetings

18   with SEC commissioners or staff members?

19             MR. HANAUER:   Beyond what is in his

20        report?

21             MS. GRESSEL:   Including what's in

22        his report.

23        A.   Can I take a look at my report real

24   quick?

25        Q.   Sure.

1    ████████    - Confidential Pursuant to Protective Order

2         A.   You know, other than what's in the

3    report and what we've discussed here today in

4    detail, I don't recall any offhand.   There may

5    have been a few.

6         Q.   My apologies if I've forgotten this,

7    but maybe I will just ask it more broadly.   Have

8    you conducted any research about whether market

9    participants have been able to obtain meaningful

10   guidance on the regulation of digital assets

11   through meetings with SEC commissioners or staff

12   members?

13              MR. HANAUER:   Objection to form.

14        A.   Yeah, just repeat it, because I want

15   to make sure I'm answering correctly, because --

16   go ahead.

17        Q.   Sure.   Have you conducted any

18   research concerning whether market participants

19   have been able to obtain meaningful guidance on

20   the regulation of digital assets through meetings

21   with SEC commissioners or staff members?

22              MR. HANAUER:   Same objection.

23        A.   I have not conducted research, no.

24        Q.   Okay.   In preparing your report on

25   this case, did you review any evidence reflecting

```
 1   ███████  - Confidential Pursuant to Protective Order

 2   the content of meetings between third parties and

 3   the SEC?

 4         A.   I did not.

 5         Q.   Okay.  So you can't speak to whether

 6   the SEC in the course of any such meetings

 7   provided useful guidance to any market

 8   participant on issues concerning how the

 9   securities laws applied to digital assets?

10         A.   Not directly, no.

11         Q.   Alright.  What do you mean not

12   directly?  Did you indirectly speak to them?

13         A.   You know, I didn't sit in the

14   meetings with them or look at correspondence or

15   you know.

16         Q.   Do you have any basis --

17         A.   I think -- I'm sorry.

18         Q.   Go ahead.

19         A.   I want to finish the question, but I

20   do recall seeing that I believe some of the

21   principals of Ripple, and I don't know if it was

22   in, it may have been in your answer.  Again, I

23   know that there were some meetings by Ripple

24   executives.  So, you know.   I'm aware from that

25   standpoint.
```

1       ████████ - Confidential Pursuant to Protective Order

2              Q.    Okay, but you're not aware of any

3       other meetings with the SEC about digital assets?

4              A.    No, I didn't research that which is

5       what your question was.

6              Q.    Did you review any evidence in this

7       case reflecting that sophisticated market

8       participants who obtained legal advice from

9       outside counsel told the SEC they did not

10      consider XRP to be a security and shared the

11      basis for their determinations with the SEC?

12             A.    I'm not aware of that.

13             Q.    Did you review any evidence in this

14      case reflecting that, even after the SEC received

15      this information from sophisticated market

16      participants, the SEC never told those

17      participants that the XRP was a security or that

18      the SEC's position was that it was a violation of

19      securities laws to engage in transactions

20      involving XRP?

21             A.    That was a long sentence.   I'm

22      sorry.

23             Q.    Okay.   I'll take it more slowly.

24      Did you review any evidence in this case

25      reflecting that, even after the SEC received this

1    ██████████  - Confidential Pursuant to Protective Order

2    information from sophisticated market

3    participants, the SEC never told those market

4    participants that XRP was a security or that the

5    SEC's position was that it was a violation of the

6    securities laws to engage in transactions

7    involving XRP?

8         A.   I'm not aware of that.  No.

9         Q.   Did you review any evidence in this

10   case reflecting that, before and after such

11   meetings between the SEC and sophisticated market

12   participants to discuss XRP, these market

13   participants transacted in XRP and did not stop

14   those transactions after their meetings with the

15   SEC?

16        A.   No.

17        Q.   Okay.  Is it accurate that your

18   opinion doesn't take into account any SEC

19   communications at all from individuals or

20   companies seeking guidance on the applicability

21   of the securities laws to digital assets?

22             MR. HANAUER:  Objection to form.

23        A.   Are you speaking in general or with

24   respect to Ripple?  I don't understand.

25        Q.   In general.  Is it accurate that

```
 1           - Confidential Pursuant to Protective Order

 2     your opinion does not take into account any SEC

 3     communications from individuals or companies

 4     seeking guidance on the applicability of the

 5     securities laws to digital assets?

 6               MR. HANAUER:   Beyond what's in his

 7          report?

 8          Q.   You can identify something in your

 9     report.

10          A.   Well, certainly with no individuals,

11     and I'm trying to think about others, but, you

12     know, other than what's in my report, probably

13     not.

14          Q.   Okay, and you can't think of anything

15     in your report off the top of your head?

16          A.   No.

17          Q.   Okay.  Did you review any specific

18     SEC statements or speeches in preparing your

19     report?

20          A.   Yes.

21          Q.   Which statements or speeches did you

22     review?

23          A.   Jay Clayton.   I read, I don't know,

24     I think his name is pronounced Hinman, William

25     Hinman.   Did you say SEC releases too or
```

1      ████████      - Confidential Pursuant to Protective Order

2      statements?

3             Q.    I said statements or speeches.

4             A.    Or speeches specifically?   Those are

5      the two I recall.

6             Q.    Okay.  You stated that it's industry

7      custom and practice to place less weight on

8      public statements of SEC officials, is that

9      right?

10            A.    What was the context of that?

11                  MR. HANAUER:   Less weight than what?

12            Q.    It's in your report on page 27.   I

13      can direct you to that statement.  So you say

14      it's in the second sentence in the second --

15      well, the first full paragraph.  It says, "That

16      said, based on industry custom and practice,

17      market participants typically place less" --

18            A.    Hang on.  I'm not with you.   Where

19      is it?

20            Q.    Okay.  Top of the page, first full

21      paragraph, second sentence.

22            A.    Got it.

23            Q.    Why don't you read that into the

24      record.

25            A.    Okay.  "That said, based on industry

Page 213

1     ██████████  - Confidential Pursuant to Protective Order

2     custom and practice market participants typically

3     place less weight on the views of individual

4     commissioners or staff members who lack the

5     authority to speak to the SEC or bind the

6     commission to their position."

7          Q.   And what's your basis for this

8     opinion?

9          A.   Well, I mean I think we can start

10    with the standard SEC disclaimer in any public

11    speech or statement which says I am speaking on

12    behalf of my own individual opinions and not on

13    behalf of the commission, and that's standard in

14    every speech that I've ever read, so, you know,

15    that's the start of it, and again it takes 3 out

16    of 5 commissioners to establish policy or enact

17    an enforcement action or whatever.

18               So it's the majority of the

19    commission rather than one individual.   The

20    individual is stating his or her own views.

21          Q.   But people still do place some weight

22    on those statements, right?

23          A.   Sure.   It's just, you know, if it was

24    me, it would be interesting and again another

25    part of the mix of information that's out there,

1   ███████  - Confidential Pursuant to Protective Order

2   but, you know, not binding.

3            Q.   And you mentioned that you're

4   familiar with the speech given by William Hinman

5   on June 14, 2018 who was at that time the SEC's

6   director of the division of corporate finance,

7   correct?

8            A.   You know, I read it a while ago.

9            Q.   Okay.

10            A.   The same thing with Jay Clayton.   I

11   mean it was one of the first things I read in the

12   case.

13            Q.   So you read those after you were

14   engaged on the case?

15            A.   I think I read Jay Clayton before

16   that.  I think I read Hinman afterwards.

17            Q.   Is it okay if I call the speech the

18   Hinman speech as a shorthand?

19            A.   Sure.

20            Q.   So you weren't present when Mr.

21   Hinman give the Hinman speech on June 14, 2018?

22            A.   I was not.

23            Q.   Okay.  Do you recall the first time

24   you read it when it was?

25            A.   Maybe August.

1    ███████ - Confidential Pursuant to Protective Order

2         Q.   August of 2021?

3         A.   Yeah.

4         Q.   Have you written any articles or

5    publications relating to the Hinman speech?

6         A.   I have not.

7         Q.   Have you advised any clients on the

8    meaning of the Hinman speech?

9         A.   I have not.

10        Q.   In this case, are you offering an

11   opinion on the meaning of the Hinman speech?

12        A.   I am not.

13        Q.   Do you recall that in the speech that

14   Mr. Hinman used the term "sufficiently

15   decentralized" when talking about block chain

16   technology?

17        A.   Not specifically.

18        Q.   Okay, and do you know what that term

19   "sufficiently decentralized" means in the context

20   of Mr. Hinman's speech?

21             MR. HANAUER:   Objection.   A term in

22             a speech that is not in front of him that

23             he didn't recall reading?

24        Q.   Okay.   You don't really recall that

25   term.

1       ██████   - Confidential Pursuant to Protective Order

2               A.    No.

3               Q.    Okay.  As part of your assignment in

4       this case, what work did you do, if any, to

5       assess the weight market participants gave to the

6       Hinman speech?

7               A.    None.

8               Q.    Okay.  As part of your work in the

9       case, what did do you, if anything, to assess the

10      meaning that market participants gave to the

11      Hinman speech?

12              A.    None.

13              Q.    Did the SEC give you to review their

14      communications with market participants that were

15      produced in this litigation about the Hinman

16      speech?

17              A.    No.

18              Q.    Were you aware that the SEC had

19      produced those documents to Ripple?

20              A.    No.

21              Q.    Did you ask the SEC to review any

22      communications with market participants

23      concerning digital asset regulation?

24              A.    No.

25              Q.    How about communications with market

1    ███████████ - Confidential Pursuant to Protective Order

2    participants concerning XRP?

3         A.   No.

4         Q.   Okay.  So, when you wrote on page 27

5    of your report, we just read that sentence, that

6    market participants typically place less weight

7    on the views of individual commissioners or staff

8    members and the same holds true for public

9    statements by SEC officials, you meant that as a

10   general statement, correct?

11        A.   Yes.

12        Q.   And you wrote typically, not always?

13        A.   Right.

14        Q.   Do you think certain speeches by SEC

15   officials can have more weight than others in the

16   minds of market participants?

17        A.   Yes and no.  Some do, some don't.

18   I can give you a perfect example.  Back I forget

19   the dates exactly.  Commissioner Aquilar gave a

20   speech.  The disclaimer was there, and it was

21   about a SEC proposed rule governing transfer

22   agents, and there was a 128-page release, and he

23   laid out I thought very beautifully in a speech

24   why the need to amend the transfer agent

25   regulations was critical.  Well, guess what?

1      ████████   - Confidential Pursuant to Protective Order

2      They never got done.

3               So some commissioners get listened

4      to, and others don't.  So it just depends.

5           Q.   So, even if a commissioner gives a

6      speech, it's not necessarily the case that it

7      leads directly to a new regulation or a new rule,

8      correct?

9           A.   Right.  It doesn't compel on anything

10     on the other end.   He's just stating his opinion

11     or her opinion.

12          Q.   Do you know either way whether the

13     SEC's chairman pointed to the Hinman speech in

14     his communications with Congress?

15               MR. HANAUER:   Which chairman?

16               THE WITNESS:  I believe Clayton.

17               MR. HANAUER:   It's your question.

18          A.   I'm not aware of that.  No.

19          Q.   Do you know whether the SEC itself

20     directed market participants to analyze whether

21     digital assets were securities under the factors

22     that Hinman outlined in the Hinman speech?

23          A.   The SEC in general or somebody at the

24     SEC or who at the SEC?

25          Q.   That staff members at the SEC.

1    ███████ - Confidential Pursuant to Protective Order

2          A.   I'm not aware of any.  No.

3          Q.   Are you offering any opinion in this

4    case as to how much weight market participants

5    gave to the Hinman speech?

6          A.   No.

7          Q.   Are you offering any opinion about in

8    this case about how the SEC used the Hinman

9    speech in its communications with market

10   participants?

11         A.   No.

12         Q.   Okay.  In your report you cite a

13   client --

14              THE WITNESS:   We might take a break

15         for a moment if you don't mind.

16              MS. GRESSEL:   No problem.

17              THE VIDEOGRAPHER:   We are going off

18         the record.   The time is 3:10 p.m.

19              (Recess taken)

20              THE VIDEOGRAPHER:   We are back on

21         the record.   The time is 3:29 p.m.

22   BY MS. GRESSEL:

23         Q.   Mr. ███████, on page 25 of your

24   report, you cite a client alert written by the

25   prominent law firm of Latham & Watkins.   Is that

1    ███████  - Confidential Pursuant to Protective Order

2    correct?

3         A.   Yes.

4         Q.   How did you come to select this

5    client alert to cite in your report?

6              MR. HANAUER:   I'm sorry if I missed

7         it.  Which alert are you talking about?

8         A.   The first one, right?

9         Q.   Actually, you know, both of them for

10   that question.  These client alerts.  How did you

11   select these client alerts to cite in your

12   report?

13        A.   Just through my own search efforts.

14        Q.   So was this part of a broader review

15   you conducted about law firm analysis of digital

16   assets?

17        A.   Yeah.  I could characterize it as

18   that.  You know, I was looking at what

19   pronouncements were out there in the legal

20   community that dealt with not only digital

21   assets, but the need for clients to gear up and

22   be careful in the crypto space.

23        Q.   Do you recall what steps you took in

24   that research?

25        A.   Not specifically, but, you know, it

1    ███████  - Confidential Pursuant to Protective Order

2    could be as basic as using, I used duckduckgo,

3    and they're pretty good, and I keep, you know,

4    I'm a fairly good researcher, so I keep plugging

5    away and following different threads and lines

6    and so on.

7         Q.   And, just for the record, duckduckgo

8    is a search engine, correct?

9         A.   Yes.

10         Q.   Did you review any client alerts by

11    any other law firms concerning digital asset

12    regulation?

13         A.   Not that I recall.

14         Q.   So this is the only, these two Latham

15    & Watkins alerts were the only two alerts you

16    recall reading by law firms that relate to

17    regulation?

18         A.   Yeah, that relate specifically to

19    regulation and the need for, you know, linking it

20    to a cautionary tale for, you know, for those who

21    are venturing into that space.

22         Q.   Did you look for any, whether any law

23    firms provided client alerts that didn't express

24    that same cautionary tale?

25         A.   I didn't look for that specifically,

1    ███████  - Confidential Pursuant to Protective Order

2    no.

3            Q.   Okay.  So you sought out law firm

4    client alerts that spoke to the need for caution

5    in this regard?

6            A.   Yeah.  There may have been others.

7    I just don't recall.  You know, I used these two

8    because they were spot on, and Latham & Watkins

9    is, you know, one of the biggest firms in the

10   country, as you know probably.

11           Q.   And are you aware of other law firms

12   that have written on the SEC's regulation of

13   digital assets?

14           A.   Not sitting here trying to remember.

15   There may be, but I can't recall at the moment.

16           Q.   Okay.  So no other law firms come to

17   mind sitting here right now?

18           A.   They don't come to mind.  Right.

19           Q.   Okay, and do you view Latham &

20   Watkins as having specialized knowledge

21   concerning SEC regulation that other law firms

22   don't possess?

23           A.   I don't know if I can compare them to

24   other law firms.  So I really can't answer that

25   question.  I know they're prominent in the

1    ██████    - Confidential Pursuant to Protective Order

2    securities field.   They hired me for LEK

3    Securities, so they must know what they're doing.

4    No, I'm only kidding.   So, yeah, I mean it's

5    just the weight of the name, and they have a

6    robust securities practice.

7         Q.   Are you aware of any other law firms

8    with a robust securities practice?

9         A.   Oh, sure.

10        Q.   What firms?

11        A.   Yours, for example.  Sidley.  Wilmer

12   Cutler, Greenberg Traurig.  I could name, you

13   know, a half-dozen, some of which I've worked

14   for.

15        Q.   So Latham & Watkins, you didn't

16   choose Latham & Watkins because you viewed them

17   as an author -- a solely authoritative voice on

18   securities laws issues?

19        A.   I think it was a two-step process.

20   I think the quotes really fit with the point that

21   I was trying to make and put forward and secondly

22   that they were of enough weight and repute to be

23   meaningful.

24        Q.   Okay.  So I want to take, well, I'm

25   not going to take a look at it, but I just want

1   ███████ - Confidential Pursuant to Protective Order

2   to mention, I'm clarifying which one of these

3   alerts I'm talking about to Ben's helpful point.

4   So in footnote 27 you cite a client alert called

5   "The Yellow Brick Road for Consumer Tokens:  The

6   Path to SEC and CFTC Compliance," which is

7   written by Latham & Watkins, correct?

8           A.   Yes.  Actually, this was a conference

9   over in London, and, in addition to Latham &

10  Watkins, there were other discussions that were

11  not on point, but, if you go and look at the

12  global legal insight block chain cryptocurrency

13  cite, you'll see a whole bunch of discussion.

14          Q.   Did you attend that conference in

15  person?

16          A.   No.

17          Q.   Did you attend that conference

18  virtually?

19          A.   No, I did not.

20          Q.   You read the reports from the

21  conference?

22          A.   I read the reports.  That's right.

23          Q.   Okay, and are you aware that that

24  client alert or conference report titled The

25  Yellow Brick Road for Consumer Tokens refers to

1    ███████   - Confidential Pursuant to Protective Order

2    Director Hinman's speech?

3         A.   I don't recall that.   Not

4    specifically, no.

5         Q.   Are you aware that Latham & Watkins

6    stated that Director Hinman's speech indicated a

7    possible path for token transactions to no longer

8    be characterized exclusively as security

9    transactions?

10        A.   Are you saying that that was part of

11   this report?

12        Q.   Yes, that that was quoted in that

13   Latham article.

14        A.   Yeah.   I guess, you know, at that

15   point I was really focused on --

16             MR. HANAUER:   Hold on.   She's

17             asking if you know if what's in, if that's

18             in the report.

19        A.   I don't know for sure, because I was

20   focused on the regulatory issue and the

21   appropriate quote to put in here, so either I

22   read it and didn't think twice about it, or I

23   missed it.

24        Q.   Okay.   I'm just going to mention a

25   few other things in that piece.   Are you aware

1   ████████   - Confidential Pursuant to Protective Order

2   that Latham & Watkins stated the Director Hinman

3   speech said that a digital asset offered as a

4   security can over time become something other

5   than a security?

6          A.   I'm not aware of that.

7          Q.   Do you recall that from reading

8   Director Hinman's speech?

9          A.   I do recall that.  Yes.

10          Q.   Okay.  Are you aware that Latham &

11   Watkins also stated that Director Hinman's speech

12   indicated that digital assets are not necessarily

13   securities?

14          A.   That specifically I don't recall.

15          Q.   Okay.  Are you aware that Latham &

16   Watkins believed Director Hinman's speech

17   indicated that there's less of a public policy

18   need to correct information asymmetries that the

19   securities laws aim to prevent when digital

20   assets are sufficiently decentralized?

21          A.   I don't recall that portion either.

22          Q.   Okay.

23          A.   And again it's not because I didn't

24   read it, but I wasn't focused on it.

25          Q.   Okay.  So you were focused on the

1     ████████  - Confidential Pursuant to Protective Order

2     quote that you put into your report, but not on

3     the other quotes?

4          A.   Right, and that portion I'm trying to

5     remember, yeah, it could have occurred later on

6     after I decided to put this quote in, you know,

7     what I'm saying, later on in the article, so

8     that's maybe why I missed it, because I stopped

9     right there.

10          Q.   Okay.  Do you mean that, once you

11     found that quote, that --

12          A.   I didn't go any further.

13          Q.   Meaning you're not sure you read the

14     whole article?

15          A.   Exactly.

16          MS. GRESSEL:   Okay.  Alright.  I

17          think we're done.

18     EXAMINATION BY MR. HANAUER:

19          Q.   Mr. ████████, do you remember being

20     asked questions whether you did work representing

21     clients related to IPOs?

22          A.   Yes.

23          Q.   During your time at the NASD, did you

24     have experience working with IPOs?

25          A.   Oh, yes, sure.

Page 228

1    ██████████ - Confidential Pursuant to Protective Order

2              Q.    Approximately how many?

3              A.    Well, if you want to say that, you

4    know, we had a regulatory interest in every IPO

5    that traded on NASDAQ from day 1, so it ranged

6    from ensuring that, for example, no trades were

7    taking place prior to SEC effectiveness, so even

8    though, you know, the SEC could declare effective

9    at noon we wanted to make sure there were no

10   transactions between 9:30 and 12, so from that

11   standpoint, that was one.

12              You know, the other SEC and FINRA,

13   NASD rules that pertain to trading of IPOs,

14   10(b)16, short sales, there is a bunch.  So we

15   policed all those IPOs, and of course IPO trading

16   could be very volatile as well, so we often had

17   to contact the company and make sure everything

18   was copacetic with them.

19              Q.    So --

20              A.    In terms of the trading and so on.

21              Q.    So you worked on a lot of IPOs when

22   you were at NASD?

23              A.    Every one that traded on NASDAQ, yes.

24              Q.    I want to refer you to page 29 of

25   your report.  Do you remember counsel asking you

1    ███████ - Confidential Pursuant to Protective Order

2    some questions about what assumptions you made

3    when you were stating things that Ripple would

4    have been required to disclose if those

5    assumptions were true?

6         A.   Sure.   Quite a few.

7         Q.   I just want to clarify.   Was the

8    assumption that Ripple filed a registration

9    statement and conducted an IPO or that Ripple

10   filed a registration statement period?

11        A.   I think it goes to the latter.   You

12   know, you could be registered and not do an IPO I

13   guess is the answer.   There would be a variety

14   of reasons for that, not the least of which is

15   market conditions, for example.

16        Q.   And then the last question I want to

17   ask about is do you recall counsel asking you

18   questions about an investor making inquiries to

19   the SEC about the status of XRP?

20             MS. GRESSEL:   Objection.

21        A.   Yes.

22        Q.   And, in your experience, if the SEC's

23   enforcement division is conducting an enforcement

24   investigation, does the enforcement division

25   typically disclose the existence of that

```
 1    ███████ - Confidential Pursuant to Protective Order

 2    investigation to the public?

 3             A.   No.

 4                  MR. HANAUER:   Thank you, Mr.

 5        ██████.

 6                  THE WITNESS:   Thank you.

 7                  MS. GRESSEL:   Nothing else from us.

 8        Thanks, Mr. ██████.

 9                  THE WITNESS:   Thank you so much.

10                  THE VIDEOGRAPHER:   We are going off

11        the record.   The time is 3:42 p.m.

12                  (Time noted:   3:42 p.m.)

13

14                           _____

15                           ██████████████

16    Subscribed and sworn to

17    before me this____day of_____, 2021.

18

19    _____

20    Notary Public

21

22

23

24

25
```

1

2              C E R T I F I C A T I O N

3

4              I, JOSEPH R. DANYO, a Shorthand

5    Reporter and Notary Public, within and for the

6    State of New York, do hereby certify:

7              That I reported the proceedings in

8    the within entitled matter, and that the within

9    transcript is a true record of such proceedings.

10             I further certify that I am not

11   related, by blood or marriage, to any of the

12   parties in this matter and that I am in no way

13   interested in the outcome of this matter.

14             IN WITNESS WHEREOF, I have hereunto

15   set my hand this 19th day of November, 2021.

16

17   _____

18                JOSEPH R. DANYO

19

20

21

22

23

24

25

```
1

2                    I N D E X

3   Witness                                    Page

4   ███████████████                              4

5

6                  E X H I B I T S

7   Defendant                                  Page

8     Exhibit ██ 1   Report of ██████████ dated   15
                     October 4, 2021
9
      Exhibit ██ 3   Amended complaint          137
10
    Exhibit ██ 15   No action letter            175
11
    Exhibit ██ 10   e-mail chain between Mr. Frank  185
12                   Mossmann and SEC's Office of
                     Investor Education and Advocacy
13

14                      ~oOo~

15

16

17

18

19

20

21

22

23

24

25
```

1    NAME OF CASE:

2    DATE OF DEPOSITION:

3    NAME OF WITNESS:

4    Reason Codes:

5         1.  To clarify the record.

6         2.  To conform to the facts.

7         3.  To correct transcription errors.

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24

25                        _____