UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                              Plaintiff, :        20 Civ. 10832 (AT) (SN)
                                         :
               - against -               :        ECF Case
                                         :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, :
and CHRISTIAN A. LARSEN,                  :
                                         :
                            Defendants.  :
                                         :
------------------------------------------------------------------------x

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS OMNIBUS MOTION TO EXCLUDE
THE TESTIMONY OF DEFENDANTS' EXPERT WITNESSES

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND ................................................................................................................4

I.  The SEC's Claims ..............................................................................................4

II.  The Legal Standard Applicable to This Case:  The *Howey* Test .....................5

    A.  *Howey* Prong 2: Common Enterprise ..................................................6

    B.  *Howey* Prong 3: Expectation of Profits from the Efforts of Others.............7

III.  Factual Background Relevant to Defendants' Expert Testimony .....................8

IV.  The SEC's Proffered Experts ............................................................................9

    A.  ▮▮▮▮▮ Opinions ..................................................................................9

    B.  ▮▮▮▮▮ Opinions ................................................................................10

    C.  ▮▮▮▮ Opinions ..................................................................................11

    D.  ▮▮▮▮▮ Opinions ...............................................................................11

STANDARD OF REVIEW ............................................................................................ 11

ARGUMENT ..................................................................................................................12

I.  Schwartz's Testimony Should Be Excluded in Its Entirety...........................12

    A.  Schwartz's Background, Work Conducted, and Opinions .........................13

        1.  Schwartz's Background..................................................13
        2.  The Work Schwartz Did (and Did Not) Perform ...............................13
        3.  Schwartz's Opinions about Ripple's Written Contracts .....................14
        4.  Schwartz's Analysis of *Howey* ......................................................16

    B.  The Court Should Exclude Schwartz's Testimony. ...................................17

        1.  Schwartz's Opinions Are Impermissible Legal Conclusions
           as to Contract Interpretation.............................................17
        2.  Schwartz's Opinions on Common Law Contracts Incorrectly Apply
           *Howey* and Are Irrelevant to the "Investment Contract" Analysis. ...................18

II.  Adriaens's Testimony Should Be Excluded in Its Entirety. .........................22

    A.  Adriaens's Background and Relationship with Ripple............................22

    B.  Adriaens's Opinions ...........................................................................23

C.   The Court Should Exclude Adriaens's Testimony...........................................................23

    1.   Adriaens's Opinions Should Be Excluded Because They Are Not His Own and They Are Not Based on Any Methodology Whatsoever. ..................23

    2.   Adriaens's Opinions Regarding Ripple's Business Model and the Innovative Nature of XRP and the XRP Ledger Should Be Excluded.............27

    3.   Adriaens's Opinions Regarding Decentralization of the XRP Ledger Should Be Excluded.........................................................................................27

    4.   Adriaens's Opinions Regarding the "Commercial Utility" of XRP and the XRP Ledger Should Be Excluded. ..........................................................29

III.  Borden's Testimony Should Be Excluded in Its Entirety.................................................33

    A.   Borden's Background and Opinions...............................................................................34

        1.   Borden's Background..............................................................................................34

        2.   Borden's Opinions..................................................................................................34

    B.   The Court Should Exclude Borden's Testimony. ...........................................................35

        1.   Borden's Opinions about XRP's Federal Tax Treatment Are Irrelevant and Should Be Excluded. ..................................................................35

        2.   Borden's Opinions Are Improper *Ipse Dixit*...........................................................36

        3.   Borden Is Unqualified to Render His Opinions. ....................................................37

IV.  Easton's Testimony Should Be Excluded in Its Entirety. ...............................................38

    A.   Easton's Background and Opinions................................................................................38

        1.   Easton's Background ...............................................................................................38

        2.   Easton's Affirmative Opinions...............................................................................39

        3.   Easton's Rebuttal Opinions ...................................................................................40

    B.   The Court Should Exclude Easton's Affirmative and Purported Rebuttal Testimony........................................................................................................................41

        1.   Easton's Affirmative and Rebuttal Opinions Are Irrelevant. .............................41

        2.   Easton's Purported Rebuttal Opinions Do Not Address the Subject Matters of ████ and ████ Reports. ....................................................43

V.   Yadav's Testimony Should Be Excluded in Its Entirety. ................................................44

    A.   Yadav's Background and Opinions.................................................................................44

    B.   The Court Should Exclude Yadav's Testimony. ............................................................45

        1.   Yadav Offers an Improper and Incorrect Legal Opinion. ...................................45

        2.   Opinion 3 Should Be Excluded for the Additional Reason that It Is Based on an Unreliable and Internally Inconsistent Methodology. ..................48

VI.  Ferrell's Testimony Should Be Excluded in Its Entirety. ...............................................51

    A.   Ferrell's Background.......................................................................................................51

B.     Ferrell's Reports ............................................................................ 52

    1.    Ferrell's Opening Report ............................................... 52
    2.    Ferrell's Rebuttal Report ............................................... 52
    3.    Ferrell's Supplemental Report ....................................... 53

C.     Ferrell's Legal Opinions Should Be Excluded as Improper and Irrelevant. .............53

D.     Ferrell's Remaining Opening Opinions Should Be Excluded on Other Grounds. ................................................................................. 55

    1.    Ferrell's Opinions that Ripple Did Not Affect the Price of XRP Are Unreliable. ................................................ 55
    2.    Ferrell's Opinion that XRP Is a Virtual Currency Is Irrelevant. ....................... 60
    3.    Ferrell's Opinion that ODL "Uses" XRP Is Irrelevant. ................................. 62

E.     Ferrell's Additional Opinions Should Be Excluded. ........................................ 63

VII. Osler's Initial Opinions Should Be Excluded in Their Entirety. .................................... 65

A.     Osler's Background. .......................................................................... 65

    1.    Osler's Education, Training and Experience. ................................. 65
    2.    Osler's Initial Report ...................................................... 66
    3.    Rebuttals by the SEC's Experts ..................................... 68

B.     The Court Should Exclude Osler's Testimony in Its Entirety. ..............................71

    1.    Osler's Opinions are Not Relevant or Helpful to the Trier of Fact. ...............71
    2.    Osler's Opinions Are Unreliable and Restate Ripple's Factual Arguments. ................................................................... 72
    3.    Osler Lacks the Necessary Qualifications to Offer Her Opinions. ................ 76

VIII. Fischel's First and Fourth Purported Rebuttal Opinions Should Be Excluded. ................ 77

A.     Fischel's Background and Rebuttal Opinions. ............................................... 77

    1.    Fischel's Background. ..................................................... 77
    2.    The Expert Reports Fischel Purports to Rebut ............... 78
    3.    Fischel's Rebuttal Opinions .......................................... 79

B.     Fischel's *Howey* Opinions Are Impermissible and Incorrect Legal Conclusions That Should Be Excluded. ................................................ 80

    1.    Fischel's *Howey* Opinions Are Impermissible Legal Conclusions. ............... 80
    2.    Fischel's *Howey* Opinions Misstate the Law. ............... 81
    3.    The Court Should Exclude Fischel's *Howey* Opinions as Improper Rebuttal. ...................................................... 84
    4.    Fischel's Fourth Opinion Is Unsupported and Unreliable. ................ 85

IX. Marais's Testimony Should Be Excluded in Its Entirety. ............................................. 86

A.     Marais's Background. ........................................................................ 86

B.     Marais's Rebuttal Opinions .................................................................. 86

C.    Marais's Rebuttal Opinion that ███ Event Study Does Not Show that XRP Price Movements Do Not "Solely or Predominantly" Reflect Reactions to Ripple's Actions Should Be Excluded.......................................................87

    1.    Marais's Opinion Goes Beyond the Scope of ███ Opening Report. ...........88
    2.    Marais's Opinion Is Unreliable Because It Introduces a Novel, Unrecognized Step for Event Studies...................................................................88
    3.    Marais's Opinion Is Contradicted by His Own Methodology and His Supplemental Rebuttal Opinion. ...........................................................................89

D.    Marais's Supplemental Rebuttal Opinion that ███ Counterfactual Price Methodology Is Unreliable Should Be Excluded. ......................................................91

X.    Shampanier's Purported Rebuttal Testimony Should Be Excluded in Its Entirety. ...............92

A.    Shampanier's Background and Purported Rebuttal Opinions .....................................93

    1.    Shampanier's Background ......................................................................................93
    2.    ███ Background and Opinions ............................................................................93
    3.    Shampanier's Purported Rebuttal Opinions ......................................................95

B.    The Court Should Exclude Shampanier's Purported Rebuttal Testimony....................97

    1.    Shampanier's Purported Rebuttal Fails to Address the Subject of ███ Opinions.........................................................................97
    2.    Shampanier's Purported Rebuttal Includes Improper Speculation....................99
    3.    Shampanier Is Unqualified to Rebut ███ Opinions.......................................99

**CONCLUSION**.................................................................................................................... **100**

**TABLE OF AUTHORITIES**

<b>Pages(s)</b>

<u>**CASES**</u>

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ................................................................................................. 46

*Aldrich v. McCulloch Properties, Inc.,*
    627 F.2d 1036 (10th Cir. 1980) ................................................................................... 30, 62

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ............................................................................................... 91

*AmTrust N. Am., Inc. v. KF&B, Inc.,*
    No. 17 Civ. 5340, 2020 WL 5578675 (S.D.N.Y. Sept. 16, 2020) ............................... 85, 99

*Arista Records LLC v. Usenet.com, Inc.,*
    608 F. Supp. 2d 409 (S.D.N.Y. 2009) ........................................................................... 26, 72

*Balestra v. ATBCOIN LLC,*
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................................................ 62

*Berk v. St. Vincent's Hosp. & Med. Ctr.,*
    380 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................................................ 65

*Cameron v. Outdoor Resorts of America,*
    608 F.2d 187 (5th Cir. 1979) ............................................................................................. 31

*CFTC v. Moncada,*
    No. 12 Civ. 8791, 2014 WL 2945793 (S.D.N.Y. June 30, 2014) ....................................... 86

*CFTC v. Wilson,*
    No. 13 Civ. 7884(AT), 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ........................ 49, 85-86, 89

*Chen-Oster v. Goldman, Sachs & Co.,*
    No. 10 Civ. 6950 (AT), 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ......................... *passim*

*Choi v. Tower Research Cap. LLC,*
    2 F.4th 10 (2d Cir. 2021) .................................................................................................... 81

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ....................................................................................................... *passim*

*Epic Sys. Corp. v. Lewis,*
    138 S. Ct. 1612 (2018) ...................................................................................................36

*Fedance v. Harris,*
    1 F.4th 1278 (11th Cir. 2021) .............................................................................. 30, 62

*F.H. Krear & Co. v. Nineteen Named Trustees,*
    810 F.2d 1250 (2d Cir. 1987) .........................................................................................18

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
    No. 12 Civ. 7372, 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ..................................*passim*

*Forte v. Liquidnet Holdings, Inc.,*
    No. 14 Civ. 2185 (AT), 2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015), *aff'd,* 675 F. App'x 21
    (2d Cir. 2017) .................................................................................................................19

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985) ........................................................................................ 7-8

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ........................................................................................................37

*Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.,*
    No. 08 Civ. 0802, 2022 WL 2122655 (M.D. Fla. June 14, 2022) ......................................26

*Grenader v. Spitz,*
    537 F.2d 612 (2d Cir. 1976) ..........................................................................................31

*Hebert v. Lisle Corp.,*
    99 F.3d 1109 (Fed. Cir. 1996) .......................................................................................19

*Highland Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) ........................................................................ 80-81

*Hygh v. Jacobs,*
    961 F.2d 359 (2d Cir. 1992) ..........................................................................................17

*In re J.P. Jeanneret Assocs., Inc.,*
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) .............................................................................7

*In re Kind LLC Healthy & All Nat. Litig.,*
    337 F.R.D. 581 (S.D.N.Y. 2021) ...................................................................................43

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
    299 F. Supp. 3d 430 (S.D.N.Y. 2018) ...................................................................... 29, 58

*In re Rezulin Products Liability Litig.,*
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).............................................................................99

*In re Virtus Inv. Partners, Inc. Sec. Litig.,*
    No. 15 Civ. 1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ......................................56

*In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis With Kinectiv Tech. & Versys Femoral Head Prod. Liab. Litig.,*
    No. 18 MD 2859, 2021 WL 1405185 (S.D.N.Y. Apr. 14, 2021)................................. 43, 98

*Island Int'l Property LLC v. Deutsche Bank AG,*
    No. 09 Civ. 2675, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ............................... 73, 75

*Kemmerer v. Weaver,*
    445 F.2d 76 (7th Cir. 1971).............................................................................................31

*Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.,*
    392 F. Supp. 3d 382 (S.D.N.Y. 2019)..............................................................................18

*Krause v. CSX Transp.,*
    984 F. Supp. 2d 62 (N.D.N.Y. 2013) ........................................................................ 37, 76

*Liddle v. Cirrus Design Corp.,*
    No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009)..........................63, 85, 99

*Luizzi v. Pro Transp., Inc.,*
    No. 02 Civ. 4388, 2011 WL 1655567 (E.D.N.Y. May 2, 2011).........................................18

*Malletier v. Dooney & Bourke, Inc.,*
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)........................................................................ 23, 58

*Marx & Co. v. Diners' Club, Inc.,*
    550 F.2d 505 (2d Cir. 1977) ................................................................................17, 46, 54

*Mason Capital, Ltd. v. Kaman Corp.,*
    No. 05 Civ. 1470, 2005 WL 2850083 (D. Conn. Oct. 31, 2005).......................................17

*McBeth v. Porges,*
    No. 15 Civ. 2742, 2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018)................................. 43, 99

*McCullock v. H.B Fuller Co.,*
    981 F.2d 656 (2d Cir. 1992) ...........................................................................................76

*Morrison v. Nat'l Australia Bank,*
    561 U.S. 247 (2010) .......................................................................................... 3, 46-48, 50

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005) ............................................................................................47

*Olin Corp. v. Lamorak Ins. Co.*,
    No. 84 Civ. 1968, 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) .................................. 19, 81

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
    No. 17 Civ. 1388, 2021 WL 5299193 (S.D.N.Y. Nov. 15, 2021) .............................. 23, 26

*Packard v. City of New York*,
    No. 15 Civ. 7130 (AT), 2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) ...........................19

*Pride v. BIC Corp.*,
    218 F.3d 566 (6th Cir. 2000) ...........................................................................................63

*Rekor Sys., Inc. v. Loughlin*,
    No. 19 Civ. 7767, 2022 WL 2063857 (S.D.N.Y. June 8, 2022) ............................ 43, 64, 84

*Revak v. SEC Realty, Corp.*,
    18 F.3d 81 (2d Cir. 1994) .................................................................................5, 6, 42, 82

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990) ............................................................................................................5

*Rice v. Braniger Org., Inc.*,
    922 F.2d 788 (11th Cir. 1991) ..........................................................................................30

*Riegel v. Medtronic, Inc.*,
    451 F.3d 104 (2d Cir. 2006) .........................................................................................23-24

*Scentsational Techs. LLC v. Pepsi, Inc.*,
    No. 13 Civ. 8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ....................27, 32, 63, 99

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) .................................................................................. 17, 43

*SEC v. Alpine Sec. Corp.*,
    982 F.3d 68 (2d Cir. 2020) ...............................................................................................36

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982) ................................................ 5, 7, 19, 20, 54, 83-84

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ...............................................................................................4

*SEC v. C. M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943)..................................................................................20, 27, 42, 59

*SEC v. Edwards*,
  540 U.S. 389 (2004)...............................................................................5, 6, 7, 62

*SEC v. Feng*,
  935 F.3d 721 (9th Cir. 2019).............................................................................8

*SEC v. Glen-Arden Commodities, Inc.*,
  493 F.2d 1027 (2d Cir. 1974).................................................................6, 19, 20, 30

*SEC v. Goldman Sachs & Co.*,
  790 F. Supp. 2d 147 (S.D.N.Y. 2011).................................................................46

*SEC v. Infinity Grp. Co.*,
  212 F.3d 180 (3d Cir. 2000) ...............................................................................6

*SEC v. Int'l Loan Network, Inc.*,
  968 F.2d 1304 (D.C. Cir. 1992)..........................................................................21

*SEC v. Kik Interactive, Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020)...................................... 4, 6, 20-21, 62, 82-83

*SEC v. Martino*,
  255 F. Supp. 2d 268 (S.D.N.Y. 2003)..................................................................30

*SEC v. Merchant Cap., LLC*,
  483 F.3d 747 (11th Cir. 2007) ...........................................................................59

*SEC v. Scoville*,
  913 F.3d 1204 (10th Cir. 2019) .........................................................................21

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001) ...........................................................................6, 31

*SEC v. Shields*,
  744 F.3d 633 (10th Cir. 2014) ..........................................................................20

*SEC v. Telegram Grp., Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020).................................. 5-8, 10, 31, 62, 83, 98

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) .................................... 21, 22, 42, 72, 81

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) .................................................................................*passim*

*Showers v. Pfizer, Inc.,*
    819 F.3d 642 (2d Cir. 2016) ....................................................................................59

*Solis v. Latium Network, Inc.,*
    No. 18 Civ. 10255, 2018 WL 6445543 (D.N.J. Dec. 10, 2018) .......................................62

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967) ................................................................................................6, 54

*United Hous. Found., Inc. v. Forman,*
    421 U.S. 837 (1975) ............................................................................5-7, 21, 29-31, 84

*U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.,*
    112 F. Supp. 3d 122 (S.D.N.Y. 2015) .....................................................................26

*United States v. Amuso,*
    21 F.3d 1251 (2d Cir. 1994) ................................................................................73

*United States v. Bilzerian,*
    926 F.2d 1285 (2d Cir. 1991) ...........................................................17, 45-47, 54, 81

*United States v. Duncan,*
    42 F.3d 97 (2d Cir. 1994) ...................................................................................17

*United States v. Leonard,*
    529 F.3d 83 (2d Cir. 2008) .........................................................................20, 42, 83-84

*United States v. Naftalin,*
    441 US. 768 (1979) ..............................................................................................46

*United States v. Napout,*
    963 F.3d 163 (2d Cir. 2020) ...............................................................................12

*United States v. Romano,*
    794 F.3d 317 (2d Cir. 2015) .............................................................................48, 72

*United States v. Scop,*
    846 F.2d 135 (2d Cir. 1988) .............................................................................46, 81

*United States v. Tin Yat Chin,*
    371 F.3d 31 (2d Cir. 2004) .............................................................................76, 99

*United States v. Williams,*
    506 F.3d 151 (2d Cir. 2007) .................................................................................................... 12

*United States v. Zaslavskiy,*
    No. 17 Cr. 647 (RJD), 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) ........................................ 6, 62

*Warfield v. Alaniz,*
    569 F.3d 1015 (9th Cir. 2009) ............................................................................................... 5, 83

*Zuchowicz v. United States,*
    140 F.3d 381 (2d Cir. 1998) .................................................................................................... 72

## STATUTES

15 U.S.C. § 77b(a) ........................................................................................................................ 5

15 U.S.C. §§ 77e ........................................................................................................................... 4

15 U.S.C. § 78c(a)(10) ................................................................................................................ 60

## RULES & REGULATIONS

Fed. R. Civ. P. 26 .......................................................................................................... 24, 43, 84

Fed. R. Evid. 702 ......................................................................... 11, 12, 29, 35, 59, 65, 91

31 C.F.R. 1010.100(m) ............................................................................................................. 61

## REGULATORY AUTHORITIES

Exec. Order No. 14067 of Mar. 9, 2022 § 9(d), 87 Fed. Reg. 14143 (Mar. 14, 2022) *available at*
https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/ ......................................................... 61 n.13

Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using
Virtual Currencies (Mar. 18, 2013) ........................................................................................... 61

*In re BTC Trading Corp.,*
    SEC Rel. No. 9685, 2014 WL 6872955 (Dec. 8, 2014) ............................................... 61 n.13

I.R.S. Notice 2014-21, 2014-16 I.R.B. 938 (Apr. 14, 2014) ................................................. 34, 35, 61 n.13

*Requirements for Certain Transactions Involving Convertible Virtual Currency or Digital Assets,* 86 FR 3897-01,
2021 WL 136609, at n.4 (Jan. 15, 2021) .......................................................................... 61 n.13

## <u>OTHER SOURCES</u>

A. Craig MacKinlay, "Event Studies in Economics and Finance," Journal of Economic Literature, Vol. XXXV (Mar. 1997) .................................................................................................56 & n.12

Allen Ferrell & Atanu Saha, "The Loss Causation Requirement for Rule 10b-5 Causes-of-Action: The Implication of *Dura Pharmaceuticals v. Broudo*," John M. Olin Center for Law, Economics, and Business, Harvard (Aug. 2007) ............................................................................................... 64-65

Joshua D. Angrist and Jörn-Steffen Pischke, "*Mostly harmless econometrics: An empiricist's companion,*" Princeton University Press (1st ed. 2008), *available at* https://www.dsecoaching.com/pdf/ 2008%20Angrist%20Pischke%20MostlyHarmlessEconometrics.pdf ....................................................98

M. Laurentius Marais, et al., *Application of Event Study Methods in Litigation Services*, Litigation Services Handbook, 3d Ed. (2002) ..................................................................................................... 51 n.11

Paul A. Gompers, et al., "Corporate Governance and Equity Prices," The Quarterly Journal of Economics (2003) .......................................................................................................... 63 n.15

"The Environmental Impact: Cryptocurrency Mining vs. Consensus" (July 8, 2020) https://ripple.com/insights/the-environmental-impact-cryptocurrency-mining-vs-consensus/ .......24

The Internet of Value: What It Means and How It Benefits Everyone" (June 21, 2017), *available at* https://ripple.com/insights/the-internet-of-value-what-it-means-and-how-it-benefits-everyone .....25

The Modern Webster Dictionary 112 (1933 Ed.) .........................................................................61

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this memorandum of law in support of its consolidated motion to exclude, in whole or in part, testimony of the following expert witnesses proffered by Defendants Ripple Labs, Inc. ("Ripple"), Christian A. Larsen, and Bradley Garlinghouse (together, "Defendants"):  Alan Schwartz, Peter Adriaens, Bradley Borden, Peter Easton, Yesha Yadav, Allen Ferrell, Carol Osler, Daniel Fischel, M. Laurentius Marais, and Kristina Shampanier.  For the reasons below, the Court should grant the SEC's motion.[1]

## PRELIMINARY STATEMENT

The core issue in this case is whether Defendants sold "securities" as that term is defined in the Securities Act of 1933 (the "Securities Act").  Courts resolve this legal question by following the three-prong test established in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and the 75 years of precedent that has followed.  Facing decades of case law that supports the SEC's claims, Defendants seek to distract and inundate this Court with a parade of experts offering a host of opinions that have nothing to do with *Howey*'s three prongs or are otherwise improper.

The Securities Act defines a "security" to include "an investment contract."  Under *Howey* and its progeny, a person offers or sells an "investment contract" if she engages in any transaction, contract, or scheme that constitutes (1) an investment of money, (2) into a common enterprise, (3) with a reasonable expectation of profit from the efforts of others.  Courts analyze the *Howey* test by looking to objective facts, namely, the marketing of the asset, the parties' reasonable expectations, and the economic reality of the investment.  To do so, courts look primarily to the totality of an issuer's representations, statements, and promises (whether written or oral).  Defendants and their experts ignore *Howey* and controlling precedent and instead ask the Court to decide the question of whether Defendants offered and sold XRP as part of "investment contracts" by looking to other legal regimes or to facts that courts have repeatedly held are irrelevant to the *Howey* analysis.

---

[1] For brevity, this brief refers to all individuals by their last names.

Defendants rely on a law professor (Schwartz) who purports to review some of the 1,700 written contracts through which Ripple offered and sold XRP, and then seeks to answer the ultimate legal question of whether the written contracts alone meet the *Howey* test. Schwartz's proffered expert testimony has previously been excluded for attempting to usurp the role of the court. Here too, Schwartz's opinions should be excluded because contract interpretation is an inappropriate subject for expert testimony. Equally important, Schwartz's opinions are irrelevant to the *Howey* analysis. The *Howey* test is not confined to a contract law analysis of written sales contracts (if any written contracts even exist) but instead looks to the totality of representations made by an issuer including statements made in the course of marketing and promoting the offering. Schwartz considers none of this as he offers to interpret Defendants' written contracts for the Court.

Defendants proffer experts (Adriaens, Ferrell, and Osler) opining that XRP has a "use" other than for investment purposes. But the existence of a "use" does not advance the *Howey* inquiry because courts routinely hold that items that have an actual or potential "use" nevertheless can be sold as part of investment contracts. Indeed, courts have held that items with inherent use (such as orange groves, chinchillas, whiskey caskets, certificates of deposits, online game certificates, and visas), and items with theoretical or promised uses (such as so-called "cryptocurrencies") were offered and sold as part of investment contracts. The relevant inquiry is not whether something has "use" but whether, considering the entirety of the economic inducements and realities, an investment was *sold primarily for use* or sold for its potential for profit.

Defendants also seek to offer expert opinions on XRP's treatment under legal regimes other than the federal securities laws, such as tax law (Borden) and accounting principles (Easton), and whether XRP has the attributes of a currency used as legal tender (a/k/a "fiat" currency, such as the U.S. Dollar). But courts do not analyze the securities law question presented by *Howey* by reference to the tax or accounting treatment of an asset, or based on labels a promoter may append to the

instrument, including that an instrument is a so-called "cryptocurrency."  Whatever their attributes, assets that may function as mediums of exchange can also be offered and sold as securities.

Under *Howey*, all of the foregoing opinions are irrelevant to whether Defendants' offers and sales of XRP were securities offerings.  Accordingly, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), compels that they be excluded for this reason alone.

In addition, much of Defendants' proffered expert testimony should be excluded because it is unreliable, offers improper legal conclusions, and/or because the expert does not have the requisite qualifications to render his or her opinion.  For example, Adriaens's opinions are not actually his but were copied *verbatim*, without attribution, from various sources including Ripple's blogs, and in any event are inconsistent and methodologically unsound.  Osler is unqualified to opine as to XRP's attributes as a medium of exchange or as to a software product offered by Ripple (she has no experience in evaluating digital assets as currencies), and her methodology is unreliable because it is untested and applied without the requisite rigor or consistency.

Another defense expert (Yadav) should be excluded because she purports to instruct the Court on the legal question of whether Defendants' XRP offers and sales occurred in the United States, and reaches her (improper) legal conclusions by excluding facts that this Court has already held to be relevant to the analysis under *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

Defendants' rebuttal experts fare no better.  Three of the rebuttal witnesses (Fischel, Marais, and Ferrell) seek to rebut the opinion of an SEC expert, Dr. ███ ██████████ conducted an event study and found that XRP's price rose significantly in response to 95 public announcements by Ripple.  But none of the rebuttal witnesses offer their own event studies.  Rather, they offer improper and incorrect legal conclusions (Fischel), improper, unreliable, and inconsistent opinions (Marais), or otherwise rebut points that ███ did not make.  Likewise, the opinions of another

defense rebuttal expert (Shampanier) should be excluded because they are also beyond the scope of the SEC expert's report and because Shampanier is unqualified to offer the opinions she puts forth.

The SEC respectfully requests that the Court reject Defendants' attempt to upend decades of settled precedent under *Howey*, and their attempt to inject, through purported expert testimony, issues that are irrelevant to this case at summary judgment (or at trial). For this reason, and the other reasons outlined in more detail herein, the SEC respectfully asks the Court to exclude the expert testimony identified in this motion.

## BACKGROUND

### I.     The SEC's Claims

The SEC claims that Defendants' unregistered offers and sales of XRP violated Sections 5(a) and (c) of the Securities Act, and that Garlinghouse and Larsen aided and abetted Ripple's Section 5 violations. Section 5 makes it "unlawful for any person, directly or indirectly," to "sell," "offer to sell," or "offer to buy" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c).

To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly sold or offered to sell the securities (3) through interstate commerce. *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (collecting cases). Defendants admit that they have never filed or had in effect a registration statement as to any offer or any sale of XRP. *See* Ripple Ans. (D.E. 51) ¶¶ 1, 393; Garlinghouse Ans. (D.E. 462) ¶¶ 1, 2, 4, 8, 27-30, 60, 72, 76, 222, 393; Larsen Ans. (D.E. 463) ¶¶ 1, 2, 4, 8, 27-30, 60, 72, 76, 222, 393. Defendants further admit that their offers and sales occurred in interstate commerce. *See* Ripple Ans. ¶¶ 14, 366; Garlinghouse Ans. ¶¶ 14, 392; Larsen Ans. ¶¶ 14, 392. The dispute is whether Defendants offered or sold "securities" as that legal term is used in the Securities Act.

II.    **The Legal Standard Applicable to This Case:  The *Howey* Test**

Under Securities Act Section 2(a)(1), a "security" includes "an investment contract."  15

U.S.C. § 77b(a).  Although the Securities Act does not define "investment contract," the Supreme

Court defined the term more than 75 years ago, based on established state law definitions of

securities, as a "contract, transaction or scheme," *Howey*, 328 U.S. at 298-99, that is (1) an investment

of money, (2) in a common enterprise, (3) "premised on a reasonable expectation of profits to be

derived from the entrepreneurial or managerial efforts of others."  *SEC v. Edwards*, 540 U.S. 389,

395 (2004) (internal quotation marks and citation omitted); *see also Revak v. SEC Realty Corp.*, 18 F.3d

81, 87 (2d Cir. 1994) (outlining "elements of the *Howey* test").

*Howey* sets forth a broad, flexible test that aims to answer a simple question:  whether the

transaction involves "all the elements of a profit-seeking business venture." *Howey*, 328 U.S. at 300;

*see also Edwards*, 540 U.S. at 393 (the "broad definition of 'security,' [is] sufficient 'to encompass

virtually any instrument that might be sold as an investment'" (quoting *Reves v. Ernst & Young*, 494

U.S. 56, 61 (1990)); *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) (the Securities Act's

focus is "on the capital market of the enterprise system").  This "inquiry is an objective one focusing

on the promises and offers made to investors; it is not a search for the precise motivation of each

individual participant."  *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) (citing

*Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009)); *see also SEC v. Aqua-Sonic Prods. Corp.*, 687

F.2d 577, 584 (2d Cir. 1982) ("[I]n determining whether the offering is an investment contract courts

are to examine the offering from an objective perspective.").

The definition of "security" is "capable of adaptation to meet the countless and variable

schemes devised by those who seek the use of the money of others on the promise of profits."

*Howey*, 328 U.S. at 299; *see also Reves*, 494 U.S. at 61 ("Congress' purpose in enacting the securities

laws was to regulate investments, in whatever form they are made and by whatever name they are

5

called"); *Forman*, 421 U.S. at 847 (Congress "sought to define the term security in sufficiently broad and general terms") (internal quotation marks and citation omitted). "'[F]orm should be disregarded for substance and the emphasis should be on economic reality.'" *Telegram*, 448 F. Supp. 3d at 365 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). The *Howey* test turns "'on the economic realities underlying a transaction, and not on the name appended thereto.'" *Id.* (quoting *Forman*, 421 U.S. at 849); *see also Edwards*, 540 U.S. at 393; *SEC v. Glen-Arden Commodities, Inc.*, 493 F.2d 1027, 1034 (2d Cir. 1974); *United States v. Zaslavskiy*, No. 17 Cr. 647 (RJD), 2018 WL 4346339, at *3 (E.D.N.Y. Sept. 11, 2018).

Neither *Howey* nor the legion of decisions applying *Howey* treat classifications under any body of law other than the securities laws as determinative of what constitutes an "investment contract" or "security" under the Securities Act. "As long as the three-pronged *Howey* test is satisfied, the instrument must be classified as an investment contract.'" *SEC v. SG Ltd.*, 265 F.3d 42, 48 (1st Cir. 2001) (citing *Howey*, 328 U.S. at 301).

### A.    *Howey* Prong 2: Common Enterprise

The "common enterprise" prong of *Howey*'s three-part test may be satisfied by a showing of what is known as "horizontal commonality," *i.e.*, that the fortunes of each investor are tied to the fortunes of other investors and to the success of the overall enterprise. *Revak*, 18 F.3d at 87. One way to show this is to demonstrate that "each investor was entitled to receive returns directly proportionate to his or her investment stake" as an "increase in the value of the investment." *SG Ltd.*, 265 F.3d at 46-47, 51 (citation omitted); *accord SEC v. Infinity Grp. Co.*, 212 F.3d 180, 187-88 (3d Cir. 2000) (finding horizontal commonality where the "return on investment was…directly proportional to the amount of that investment"); *see also Kik*, 492 F. Supp. 3d at 178-79 (finding horizontal commonality in the context of purchases of digital assets where "investors reaped their profits in the form of the increased value" of the asset because "the nature of a common enterprise

[is] to pool invested proceeds to increase the range of goods and services from which income and profits could be earned or … to increase the range of goods and services that holders of [the investment] would find beneficial to buy and sell with [their investment]").

Alternatively, the "common enterprise" prong may be met by a showing of "vertical commonality," *i.e.*, that the fortunes of the investors are tied to the fortunes of the promoter.  *See, e.g.*, *Telegram*, 448 F. Supp. 3d at 369 ("[C]ommon enterprise[] may be demonstrated through either horizontal commonality or vertical commonality."); *In re J.P. Jeanneret Assocs., Inc.*, 769 F. Supp. 2d 340, 360 (S.D.N.Y. 2011) ("[S]trict vertical commonality (like horizontal commonality) is sufficient to establish a common enterprise under *Howey*.") (collecting cases).

### B.      *Howey* Prong 3: Expectation of Profits from the Efforts of Others

Courts find that the "expectation of profits from the efforts of others" prong is met if, for example, the promoter markets the instrument's potential to increase in value or generate profit, touts the expertise of the promoter in pursuing a particular endeavor, markets the instrument to "buyers who possess[] investment intent," or sells the instrument to persons who cannot reasonably be expected to expend the necessary efforts to make the venture a success.  *Telegram*, 448 F. Supp. 3d at 372-74; *see also Howey*, 328 U.S. at 298-300 (considering all of these factors); *Aqua-Sonic*, 687 F.2d at 584 (marketing efforts were directed at "passive investors, not persons with experience").

By "profit" the Supreme Court "has meant either capital appreciation resulting from the development of the initial investment … or a participation in earnings."  *Forman*, 421 U.S. at 852 (citations omitted).  Thus, an expectation of "increased value of the investment" suffices.  *Edwards*, 540 U.S. at 394; *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir. 1985) ("realizing profits from capital appreciation" meets *Howey* test).  The potential for profit need not be the sole reason why an investor participates.  Even when the expectation of profit is secondary to another motive, the requisite expectation of profit exists.  *See,*

*e.g.*, *Telegram*, 448 F. Supp. 3d at 371; *SEC v. Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019). Efforts to "creat[e] and maintain[]" a "secondary market" to dispose of an investment, because they provide the "significant advantages" of "liquidity and capital appreciation," are among the types of "efforts" that establish this prong. *Gary Plastic*, 756 F.2d at 240.

### III.    Factual Background Relevant to Defendants' Expert Testimony

Defendants offered and sold more than a billion dollars of XRP to institutional and individual investors over the course of many years to fund Ripple's business activities and enrich Defendants. Defendants did so while repeatedly publicly stating that their team of experts would work to create a "use" for XRP by banks or other financial institutions (which had the potential to increase the "demand" and, therefore, the "value" of XRP). Defendants likewise repeatedly proclaimed that they were the most interested parties in the long-term success of XRP, were responsible "stewards" of XRP, and were "long, very long" XRP. Defendants actively encouraged purchasers to focus on the potential for profit from an investment in XRP, including by: selling XRP to institutional investors at prices discounted from then-prevailing market prices; publicly celebrating increases in the price of XRP; alerting investors to the ability to buy and sell XRP for trading profits; encouraging investors to focus on the long-term price of XRP; and touting XRP's supposed superiorities over other digital assets that were similarly increasing in investment value.

Defendants offered and sold XRP almost exclusively into public markets (mostly through contractual arrangements with conduits), not to banks that could supposedly one day "use" XRP, and not in amounts reasonably expected to be for "use." Indeed, Defendants did not restrict their XRP sales to anyone who could "use" it for anything other than to make an investment profit. To the contrary, Defendants targeted their XRP sales to speculators, using conduits such as market makers or institutional investors who would distribute XRP into the public market. At the same time, Defendants engaged in a public marketing campaign that touted Ripple's efforts to create a use

8

for XRP (using proceeds from XRP sales) in the hopes of increasing demand for XRP.  Even when

Ripple eventually developed software called "On-Demand Liquidity" or "ODL"—which facilitates

two exchanges of XRP by a money transmittal business (the first from fiat currency (like U.S.

Dollars) to XRP and the second from XRP to another fiat currency (like Mexican Pesos))—Ripple

did not sell XRP to users of "ODL."  Instead, ODL users simply bought and sold XRP in the public

XRP markets, in transactions that are not Defendants' transactions and thus are not at issue in this

case.[2]

## IV.    The SEC's Proffered Experts

The SEC has proffered the opinions of four experts— ███  ████  ████  ████

and  ████  ████ on matters that are probative to whether Defendants' XRP transactions

meet the second and third *Howey* prongs.[3]  Defendants have offered rebuttals to these experts.

### A.    ████  Opinions



opinions analyze: (1) whether Defendants took steps to influence XRP prices and (2) Ripple's

incentives to attempt to influence the price of XRP.  (*Id.*)  He proffered the following opinions:

---

[2] Ripple finally sold limited amounts of XRP to ODL users in the last half of 2020.  However, the
ODL users immediately resold the XRP into public markets, in order to avoid any investment risk
exposure to the asset, thus acting as conduits, or "underwriters," under the law for Ripple's sales of
XRP into public markets.  Thus, Ripple also violated Section 5 with these late-stage offers and sales
of XRP.

[3] A fifth expert, ████  ████ opined on industry custom and practice for companies seeking to
raise funds in the public capital markets.  He specifically opined that companies raising funds from
public investors typically provide various important disclosures to investors that Ripple did not
provide.  ████ opinions are not relevant to this motion and are thus not discussed in detail.

[4] "Ex. __" refers to exhibits attached to the accompanying Declaration of Pascale Guerrier.  These
exhibits include the expert report(s) ("Report") and deposition testimony transcript ("Tr.") of each
defense expert who is the subject of the current motion, as well as certain SEC experts.

- Ripple and its executives directed GSR, a digital asset trading and market making firm, to buy XRP in a manner consistent with i) pushing XRP prices upward, or ii) providing a price floor to stabilize and keep XRP prices from falling;

- Ripple sold XRP through market making firms in a manner designed to minimize downward pressure on the price of XRP and employed trading strategies to protect the price of XRP;

- Ripple restricted certain sales of XRP to mitigate selling pressure and protect the price of XRP from falling;

- Ripple and its executives are incentivized to influence the price of XRP;

- Ripple used XRP sales to supplement a very significant funding gap; and

- Ripple used XRP in a similar manner as companies use stock.

(*Id.* ¶¶ 9(a)-(f).)

### B.   ███████   Opinions

███████ has extensive experience investing in cryptocurrencies and using blockchain technology and digital trading platforms.   (███ Report (Ex. 2) ¶ 2; ███ Rebuttal (Ex. 3) ¶¶ 1-2.) ███████ █████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████ ███████ opening report concerns the perspective of a hypothetical, reasonable market participant presented with Ripple's statements, actions, and product offerings. (███ Report ¶ 2.) ███████ opines that: (1) a reasonable XRP purchaser would have had an expectation of future profit derived from the efforts of Ripple; and (2) there are certain features of the design of XRP and the XRP Ledger (the cryptographically-secured ledger on which XRP exists), that appealed more to a profit-seeking purchaser of XRP than to financial institutions seeking to use XRP as a "bridge asset" to facilitate cross-border payments.  *(Id.* ¶ 8.) ███████ also offers rebuttals to several defense experts.



**C.** ██████ **Opinions**

██ has a ████████████████████████████ (██ Report (Ex. 4) ¶ 3.)
He has spent the past five years as an economics consultant after serving for 15 years ████████
████████████████████████ where he was responsible for developing credit models and
analytical methodologies. (*Id.* ¶ 4.) In his opening report, ███ analyzed whether the price of XRP
moved in response to certain categories of news announcements by Ripple. ███ opined: "Using a
well-accepted event study methodology, I find statistically significant evidence that XRP prices react
to news about Ripple's actions." (*Id.* ¶ 12.) ███ also critiqued Defendants' expert Ferrell's
methodology, finding that Ferrell's conclusions that XRP prices are not affected by Ripple simply
because XRP price movements follow "broader movements in the digital token market" are not
supported by any valid economic or statistical analysis. (██ Rebuttal (Ex. 5) ¶ 5.) Finally, in a
supplemental report, ███ concluded that, but for Ripple's news announcements, the price of XRP
would rarely have exceeded $0.02. (██ Supp. Report (Ex. 6) ¶ 16.)

**D.** ██████ **Opinions**

██████ is a computer scientist with 18 years of specialization in the area of computer
science "at the core of blockchain and decentralized systems." (██████ Report (Ex. 7) at 3.)
██████ opined that (i) the XRP Ledger "does not satisfy a basic definition of a decentralized
system" because ledger participants need to trust a single party, Ripple; (ii) the XRP Ledger is less
decentralized than the Bitcoin or Ethereum blockchains; and (iii) if Ripple were to abandon its
current role with respect to the XRP Ledger, "serious risks" to its correct operation might arise. (*Id.*
at 28.)

STANDARD OF REVIEW

The admissibility of expert opinions is governed principally by Rule 702 of the Federal Rules
of Evidence, which allows a qualified expert to testify if: (a) the expert's scientific, technical, or

11

other specialized knowledge will help the trier of fact to understand the evidence or to determine a

fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to

the facts of the case. *United States v. Napout*, 963 F.3d 163, 187-88 (2d Cir. 2020). As gatekeepers of

expert testimony, courts are "responsible for 'ensuring that an expert's testimony both rests on a

reliable foundation and is *relevant to the task at hand*.'" *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ.

6950 (AT), 2022 WL 814074, at *3 (S.D.N.Y. Mar. 17, 2022) (Torres, J.) (quoting *Daubert*, 509 U.S.

at 597) (emphasis added); *see also* Fed. R. Evid. 702(a)-(d). "'Expert testimony which does not relate

to any issue in the case is not relevant and, ergo, non-helpful.'" *Fin. Guar. Ins. Co. v. Putnam Advisory*

*Co., LLC*, No. 12 Civ. 7372 (AT), 2020 WL 4251229, at *9 (S.D.N.Y. Feb. 19, 2020) (Torres, J.)

(quoting *Daubert*, 509 U.S. at 591). "'The proponent of expert testimony has the burden of

establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are

satisfied.'" *Id.* at *2 (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)).

## ARGUMENT

### I.     Schwartz's Testimony Should Be Excluded in Its Entirety.

Schwartz analyzes and opines on approximately 1,700 Ripple written contracts (of which he

admits he read fewer than 10% before preparing his report) related to certain Ripple sales of XRP

and contrasts them with the written contracts at issue in *Howey*. These impermissible legal

conclusions should be excluded. As this Court, the Second Circuit, and other courts in this District

have concluded, contract interpretation is an inappropriate topic for expert testimony. Schwartz's

opinions should further be excluded for two independent reasons: he premises them on an

incorrect reading of *Howey*, and they are irrelevant in any event based on the legal standards

applicable to this case.

### A.   Schwartz's Background, Work Conducted, and Opinions

#### 1.   Schwartz's Background

Schwartz has been a Yale Law School professor since 1987.  (Schwartz Tr. (Ex. 8) 12:11-14.)
Schwartz's areas of academic expertise—contracts, commercial law, corporate finance, mergers and
acquisitions, and bankruptcy—do not include securities.  (Schwartz Report (Ex. 9) ¶ 2.)  Schwartz is
not an expert in the federal securities laws and admittedly is not qualified to opine on how courts
interpret the securities laws term "investment contracts."  (Schwartz Tr. 14:19-15:8.)  Nor is he an
expert in blockchain technologies or cryptocurrencies.  (*Id.* at 15:24-16:7.)

#### 2.  The Work Schwartz Did (and Did Not) Perform

Schwartz's assignment was to "review, analyze, categorize, and describe the various
contracts, and contractual provisions" relating to the written contracts by which Ripple offered and
sold XRP.  (Schwartz Report ¶ 4.)  Schwartz was "asked to identify and categorize the contracts by
type and discuss certain provisions, and the absence of provisions" in the contracts.  (*Id.* ¶ 4.)
Schwartz purports to analyze and categorize approximately 1,700 Ripple contracts related to its XRP
distributions.  (*Id.* ¶¶ 5-7, n.2 & Exs. C-F.)

In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700
Ripple contracts categorized in his report.  (*Id.* ¶ 7; Schwartz Tr. 26:9-10; 34:20-22.)  Indeed,
Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed, and he
cannot identify the remaining contracts he reviewed.  (Schwartz Tr. 26:20-28:23; 29:22-25; 114:9-18.)
He did not even have access to the 1,700 contracts when he prepared his report and does not recall
how many he had at that time.  (*Id.* at 41:5-18.)  Nor does Schwartz know who reviewed and
categorized the more than 1,550 contracts listed in his report that he did not personally review.  (*Id.*
at 30:1-4.)  Schwartz did not do anything to verify the work of whoever reviewed and categorized
those contracts.  (*Id.* at 35:16-36:4.)

Attached to Schwartz's report are exhibits that purport to categorize the written contracts by which Ripple offered and sold XRP.  (Schwartz Report ¶ 2 & Exs. C-F.)  Schwartz did not prepare those exhibits and does not know who did.  (Schwartz Tr. 17:13-21.)  Schwartz directed Ripple's attorneys to categorize those contracts into various categories that Schwartz had come up with after reviewing just "a few" Ripple contracts.  (*Id.* at 39:17-24; 44:17-22.)  According to Schwartz, the "overarching question" he was trying to answer was whether any of Ripple's contracts "could sustain an inference that Ripple assumed post-sale obligations towards buyers."  (*Id.* at 50:7-21.)

After signing his report, Schwartz reviewed more than 1,000 Ripple contracts categorized in his report that he had not previously reviewed.  (*Id.* at 21:11-22:22.)  Schwartz claims to have reviewed all of these 1,000-plus contracts in less than 10 hours.  (*Id.* at 22:14-23:17; 25:14-17.)  Yet Schwartz has not reviewed the entirety of each contract identified in his report, and certain of those contracts he did not review whatsoever.  (*Id.* at 23:11-17; 42:3-44:16; 94:6-17.)  Schwartz is also unaware whether the contracts he reviewed were the only contracts governing the commercial relationship between Ripple and its counterparty.  (*Id.* at 94:23-95:17.)

Schwartz acknowledges that the 1,700 contracts identified in his report do not reflect all of Ripple's offers and sales of XRP at issue in this case.  (*Id.* at 36:5-9.)  Schwartz does not know how many such offers and sales are not reflected by the contracts identified in his report and is not offering an opinion about those offers or sales.  (*Id.* at 36:10-37:13.)  Schwartz did not review any representations made by Ripple outside the four corners of any written contract.  (*Id.* at 51:20-22.)

### 3.  Schwartz's Opinions about Ripple's Written Contracts

Schwartz opines that the Ripple contracts he reviewed can be grouped into four categories: (1) contracts by which "Ripple sold XRP directly to a counterparty"; (2) "programmatic" contracts by which Ripple's counterparty "agreed to sell Ripple's XRP to third parties on Ripple's behalf over digital asset exchanges"; (3) "services contracts" where Ripple paid providers in XRP, such as

14

market-making contracts, "product incentive" contracts, and employee compensation contracts; and (4) "other" contracts that do not fit into any of the prior categories. (Schwartz Report ¶ 18.) Schwartz then discusses how he chose to group the contracts by category based on their inclusion or absence of various types of contractual provisions. (*Id.* ¶¶ 19-55.)

Schwartz opines that Ripple's contracts contain similar terms, primarily: (1) provisions stating that Ripple's counterparty assumes title and risk of loss for the purchased XRP; (2) statements that the purchased XRP does not grant the purchaser the right to make any demand on Ripple; (3) disclaimers of warranties; (4) integration clauses; and (5) provisions stating that the agreements confer no rights on third parties. (*See, e.g., id.* ¶¶ 29, 34, 41, 54.) Conversely, Schwartz opines that Ripple's contracts do *not* contain provisions: (1) "pursuant to which Ripple promises to make efforts to increase the price of XRP"; (2) "in which Ripple represents or warrants that the price or value of XRP will increase"; (3) "that entitles the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source"; (4) "that imposes on Ripple any fiduciary or similar duty owed to the counterparty"; and (5) "that creates an ongoing obligation owed by Ripple to the counterparty with respect to any XRP transferred pursuant to the contract." (*See, e.g., id.* ¶¶ 30, 35, 42, 55.)[5]

---

[5] Schwartz concedes he is *not* rendering an opinion on a number of topics, including: (1) whether Ripple's XRP contracts comprise "investment contracts" (Schwartz Report ¶ 4); (2) any public statements or representations made by Ripple, such as on its website or social media posts (Schwartz Tr. 37:19-38:5); (3) the motives or intentions of any XRP purchaser (*id.* at 38:15-17); (4) whether any type of contractual provision is required to establish the existence of an investment contract under the securities laws (*id.* at 66:14-67:9); and (5) whether the presence of any combination of contractual provisions is required to establish, or precludes, the existence of an investment contract (*id.* at 67:18-68:3; 104:21-105:6). Schwartz further admits that he is *not* opining that: (1) the presence of any contractual provision precludes the existence of an investment contract (*id.* at 68:4-7); (2) the absence of any contractual provision is required to establish, or precludes, the existence of an investment contract (*id.* at 67:11-17; 68:10-15); (3) "investment contracts" are limited to common law contracts (*id.* at 15:9-13); or (4) "investment contracts" cannot include representations beyond the four corners of a written contract (*id.* at 15:14-18).

#### 4.   Schwartz's Analysis of *Howey*

Schwartz's report discusses *Howey* and the written contracts at issue in the Supreme Court's decision.  (Schwartz Tr. 53:4-10; Schwartz Report ¶¶ 8-11.)  Beyond reading the Supreme Court's opinion, Schwartz also read the underlying materials comprising the record the Supreme Court reviewed in *Howey*.  (Schwartz Tr. 54:16-21; 55:21-56:16.)  But, in forming his opinions, Schwartz did not consider any subsequent court case applying *Howey* or providing guidance for determining the existence of an investment contract.  (*Id.* at 53:16-54:11.)

Schwartz opines that, unlike the two written contracts governing the orange grove investments in *Howey*, Ripple's written contracts "do not include terms that obligate Ripple to perform post-sale actions."  (Schwartz Report ¶ 11.)  But Schwartz concedes that, in deciding *Howey*, the Supreme Court looked beyond the two written contracts, and also examined a standard "sales talk" given by the company that sold the orange grove investment to investors.  (Schwartz Tr. 56:57:23; *see also Howey*, 328 U.S. at 297 (investors "are told that the [orange] groves are for sale; if they indicate an interest in the matter they are then given a sales talk").)  Schwartz acknowledges that the representations that led the *Howey* investors to expect substantial profits came from the sales talk, *not* the two written contracts.  (Schwartz Tr. 61:10-64:25; 63:25-64:25; *Howey* Sales Talk (Schwartz Dep. Ex. AS-5, pp. 20-28 (Ex. 10)).)

Schwartz claims that Ripple's contracts are distinguishable from the written contracts in *Howey*.  But Schwartz did not consider whether Ripple's representations on its website and social media posts are distinguishable or similar to the *Howey* sales talk which gave the *Howey* investors an expectation of profits.  (Schwartz Tr. 93:9-22.)  Schwartz also is not opining as to whether Ripple's contracts are distinguishable from any contract in any court case applying *Howey*.  (*Id.* at 93:23-94:5.)

Schwartz acknowledges that the written contracts in *Howey* did *not* entitle the investors to: (a) share in the orange grove companies' profits; (b) voting rights in any company; or (c) any dividends.

(*Id.* at 65:1-21). He also concedes that the contracts in *Howey* did not confer any third-party rights. (*Id.* at 68:22-25.) He also does not identify any term in the *Howey* written contracts that promised investors they would profit from their investments. In other words, key features that Schwartz opined are absent from Ripple's contracts were also absent from the written contracts in *Howey*.

### B.   The Court Should Exclude Schwartz's Testimony.

#### 1.   Schwartz's Opinions Are Impermissible Legal Conclusions as to Contract Interpretation.

"As a general rule an expert's testimony on issues of law is inadmissible." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Thus, the Second Circuit "requires the exclusion of [expert] testimony which states a legal conclusion." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992) ("Even if a jury were not misled into adopting outright a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard—explicit or implicit—to the jury."); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("[C]ourts exclude expert testimony that provide[s] legal opinions, legal conclusions, or interpret[s] legal terms; those roles fall solely within the province of the court.") (internal quotation marks and citation omitted). This Court, too, has recognized the black-letter proposition that experts may not offer legal conclusions. *Fin. Guar.*, 2020 WL 4251229, at *5, 7 (granting motion to exclude expert opinions "for impermissibly opining on legal issues").

Indeed, Schwartz himself has had his testimony excluded on these very grounds in another case. *See Mason Capital, Ltd. v. Kaman Corp.*, No. 05 Civ. 1470, 2005 WL 2850083, at *6 n.2 (D. Conn. Oct. 31, 2005) (excluding Schwartz's opinions about a statute's meaning and construction); *see also* Schwartz Tr. 10:23-11:14.

Here, Schwartz's opinions analyzing Ripple's contracts and comparing them to the written contracts in *Howey* are precisely the sort of contract interpretation that courts, including this Court, routinely exclude. *See, e.g.*, *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508-11 (2d Cir. 1977) (trial

court improperly allowed expert to "construe" a contract, and provide "opinions as to the meaning of the contract terms at issue," "the legal obligations of the parties under the contract," and "the legal standards which he believed to be derived from the contract"); *Fin. Guar.*, 2020 WL 4251229, at *7 (excluding opinion regarding parties' "rights under a contract"); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1256-58 (2d Cir. 1987) (court properly excluded testimony that contracts "lacked essential terms"); *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 392 F. Supp. 3d 382, 401 (S.D.N.Y. 2019) ("[Expert]'s interpretation of the Project Agreement and the seeding relationship it creates need not be considered because a court is well-equipped to interpret contractual provisions."); *Luizzi v. Pro Transp., Inc.*, No. 02 Civ. 54388, 2011 WL 1655567, at *3 (E.D.N.Y. May 2, 2011) ("[A]n opinion as to the scope of the obligations created by the contract…is not a proper subject matter for an expert opinion.").

As in these cases, the Court does not need Schwartz to analyze *Howey* or compare or contrast the *Howey* contracts from Ripple's contracts. Similarly, the Court is well positioned to interpret Ripple's contracts and the written contracts in *Howey*— and, if necessary, explain them to the jury— without Schwartz's assistance. And, to the extent Defendants believe that such an analysis is necessary to resolve this case, Defendants' attorneys are more than capable of providing that legal argument to the Court. Accordingly, the Court should exclude Schwartz's entire opinion as impermissible and unnecessary contractual interpretation.

## 2. Schwartz's Opinions on Common Law Contracts Incorrectly Apply *Howey* and Are Irrelevant to the "Investment Contract" Analysis.

Schwartz's opinions should also be excluded because they are both legally incorrect and irrelevant. Namely, *Howey* and its progeny do not require (a) the existence of written contracts between an issuer and an investor, or (b) that the investors' expectation of profits derive from a written contractual provision. Schwartz's analysis, which he limits to Ripple's written contracts and the written contracts in *Howey*, will be of no help to the Court and would only serve to confuse the

jury.  And, to the extent Schwartz's proposed testimony consists almost entirely of recitations—namely, that Ripple's written agreements did not contain certain provisions binding Ripple to take certain courses of action—these facts are irrelevant under *Howey*.  Similarly, a witness should not be allowed to simply recite facts under the guise of providing expert testimony.

First, this Court has recognized that an expert opinion that is irrelevant or otherwise lacks probative value should be excluded.  *Forte v. Liquidnet Holdings, Inc.*, No. 14 Civ. 2185 (AT), 2015 WL 5820976, at *8 (S.D.N.Y. Sept. 30, 2015) (Torres, J.) (excluding expert report that "lacks probative value"), *aff'd*, 675 F. App'x 21 (2d Cir. 2017); *Chen-Oster*, 2022 WL 814074, at *10, 13-14 (excluding expert opinions not relevant to issues in dispute); *Packard v. City of New York*, No. 15 Civ. 7130 (AT), 2020 WL 1479016, at *2 (S.D.N.Y. Mar. 25, 2020) (Torres, J.) (expert "testimony must be relevant").  Courts likewise exclude expert testimony that is legally incorrect or inconsistent with applicable law.  *See, e.g., Fin. Guar.*, 2020 WL 4251229, at *8-9 ("Dr. Snow's projections, therefore, are contrary to New York law, and courts routinely exclude expert opinions in such circumstances."); *Olin Corp. v. Lamorak Ins. Co.*, No. 84 Civ. 1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) ("Expert testimony also should be excluded when it applies the wrong legal standard."); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.").

Schwartz's opinions are irrelevant and incorrect, in the first instance, because *Howey* does not require the existence of a "contract."  In *Howey* itself, the Supreme Court held that an "investment contract" is "a contract, *transaction, or scheme*" and noted that the terms of one of the legal contracts at issue was "purely incidental."  328 U.S. at 298-99 (emphasis added).  Similarly, the Second Circuit has noted that the definition of security is "intended to apply … whether or not such interests are represented by any document or not."  *Glen-Arden*, 493 F.2d at 1033 & n.4 (citing H.R. Rep. No. 1838 at 39, 73d Cong., 2d Sess. (1934)); *see also Aqua-Sonic*, 687 F.2d at 584 ("[I]t would be

incongruous [with *Howey*] to attach decisive significance to mere legal formality."); *Kik*, 492 F. Supp. 3d at 178 (holding that "ongoing contractual obligation[s]" are "not a necessary requirement" for establishing the *Howey* elements, and collecting cases).

Schwartz's opinions are likewise irrelevant and incorrect because the *Howey* inquiry is not limited to the terms of written contracts (if any) between the promoter and the investor.  Instead, courts look to "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."  *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943).  Indeed, "in applying the *Howey* factors, courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions to evaluate" reasonable expectations.  *United States v. Leonard*, 529 F.3d 83, 85 (2d Cir. 2008).

Thus, in both *Howey* and the legion of cases applying its guidance, courts routinely look at representations made to investors, beyond the four corners of written contracts, when determining investors' expectation of profits and the existence of an "investment contract" more broadly.  *See, e.g., Howey*, 328 U.S. at 296-97 (discussing "represent[ations]" of past profits and the "sales talk" given to prospective buyers); *Joiner*, 320 U.S. at 345-47, 352-53 (analyzing "sales campaign" and "sales literature"); *Glen-Arden*, 493 F.2d at 1031-32 (relying on "sales literature" and a "canned sales pitch" to determine reasonable expectations of investors); *Kik*, 492 F. Supp. 3d at 178-79 ("[C]ourts regularly consider representations and behavior outside the contract."); *Aqua-Sonic*, 687 F.2d at 583 (citing *Joiner* and examining "promotional materials"); *SEC v. Shields*, 744 F.3d 633, 646 (10th Cir. 2014) ("[W]e look at all the representations made by the promoter in marketing the interests, not just at the legal agreements underlying the sale of the interest.").

Because *Howey* and its progeny look beyond the four corners of common law contracts, the fact that Ripple's written contracts contain or omit certain provisions in a *contract law* sense of the term does not answer whether investment contracts exist under the *securities laws*.  Accordingly,

Schwartz's approach—which he concedes ignores Ripple's (repeated) representations to the public via its website, social media and blog posts, public pitches and appearances, and other means—is fundamentally inconsistent with the breadth of the legal inquiry under *Howey* itself.

Further, the contractual provisions on which Schwartz opines are wholly irrelevant in this case. Courts have routinely held that the lack of guarantee of profits is not relevant to the *Howey* test. For example, in *SEC v. International Loan Network, Inc.*, the D.C. Circuit rejected the argument that an investment program was not an investment contract because there was no guaranteed return, noting that "[v]ery few investments 'guarantee' a return—all that *Howey* requires is a 'reasonable expectation of profits.'" 968 F.2d 1304, 1308 (D.C. Cir. 1992) (quoting *Forman*, 421 U.S. at 852). As another Court of Appeals noted in similarly rejecting the relevance of the lack of guaranteed profits:

> [N]either were the citrus grove purchasers in *Howey* guaranteed a return on their investment in the citrus crop. So long as a transaction satisfies *Howey's* test for an 'investment contract,' 'it is immaterial whether the enterprise is speculative or non-speculative.' To qualify as an 'investment contract,' the purchaser just has to have a 'reasonable expectation of profits.'

*SEC v. Scoville*, 913 F.3d 1204, 1222 (10th Cir. 2019) (citations omitted).

Similarly, post-sale obligations, which Schwartz opines are the key provisions absent from Ripple's contracts, are not necessary to satisfy *Howey*. *Kik*, 492 F. Supp. 3d at 178 ("[A]n ongoing contractual obligation is not a necessary requirement for a finding of a common enterprise.") (citations omitted). Thus, the written contractual terms on which Schwartz opines are irrelevant, and Schwartz's interpretation of those contracts—even if found not to be legal conclusions—will not assist the Court or jury.

Beyond being unhelpful, because Schwartz's opinions are based on an incorrect reading of *Howey* and its progeny, they only serve to risk confusing the jury should this case proceed to trial, and should be excluded on that ground alone. *See, e.g., SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (incorrect expert opinion, that the proper inquiry for fraud charge was

"economically material," was "excludable under Rule 403 as unduly confusing to a jury"). As in *Tourre*, Schwartz's opinions about Ripple's written agreements could give jurors the false impression that their deliberations are limited to the four corners of those documents, as opposed to Ripple's persistent public sales pitches for XRP. In other words, because Schwartz's opinions do not focus the jury on the proper facts that form the basis for investors' reasonable expectation of profits, those opinions should be excluded. *Fin. Guar.*, 2020 WL 4251229, at \*9 ("The relevant inquiry in assessing Plaintiff's claim, therefore, is whether the assets Defendant selected for Pyxis, performed differently than the assets Plaintiff believed were to be included, as indicated in the PCS ... Dr. Longstaff's analysis does not help the trier of fact answer this question.").

## II.    Adriaens's Testimony Should Be Excluded in Its Entirety.

Adriaens's testimony should be excluded in its entirety because his opinions are not his own; his opinions regarding the "innovative" nature of XRP and the XRP Ledger, as well as Ripple's business and product iteration, are irrelevant and inappropriate factual summary; his opinions regarding whether the XRP Ledger is decentralized are inconsistent and contradictory, and he is not qualified to offer them; and his opinion about "use cases" for XRP and the XRP Ledger is irrelevant and methodologically unsound.

### A.    Adriaens's Background and Relationship with Ripple

Adriaens is a professor of engineering, finance, and entrepreneurship at the University of Michigan. (Adriaens Report (Ex. 11) ¶ 1.) Since 2018, Adriaens's professional work has been funded in part by Ripple, via its University Blockchain Research Initiative, through which Ripple donated $1.5 million to the University of Michigan. (*Id.* ¶¶ 12-15.) Adriaens was asked to develop a program to use Ripple's gift, and he co-founded the university's FinTech Collaboratory, which is funded by the gift. (Adriaens Tr. (Ex. 12) 78:11-81:6; 83:8-15.) The research group that Adriaens supervises is

also funded in part by Ripple's gift.  (*Id.* at 84:6-9.)  Adriaens regularly updates a Ripple employee as to how the university is using Ripple's gift funds.  (*Id.* at 88:20-89:15.)

While his professional interest in blockchain technology began in 2015 (Adriaens Report ¶ 4), he has never taught a computer science course or any course exclusively devoted to blockchain technology (Adriaens Tr. 22:22-23:12).  None of his previous expert witness engagements related to blockchain technology or digital assets.  (*Id.* at 23:20-25:2.)  He has published approximately six papers regarding blockchain technology, none of which address the topic of decentralization or compare the relative decentralization of two or more blockchains.  (*Id.* at 26:12-29:11.)

**B.      Adriaens's Opinions**

Adriaens submitted two expert reports, dated October 4, 2021 ("Adriaens Report") and November 12, 2021 ("Adriaens Rebuttal").  In his Report, Adriaens offered three opinions: (i) XRP and the XRP Ledger were important innovations in blockchain technology; (ii) Ripple's iterative business model is consistent with start-up practice in the technology industry; and (iii) XRP and the XRP Ledger have "commercial utility" that "demonstrate[s] the decentralized nature of the XRP Ledger."  (Adriaens Report ¶¶ 19-21.)  In his Rebuttal, Adriaens asserted that ████████ opinions—that the XRP Ledger "does not satisfy a basic definition of a decentralized system" and is less decentralized than the Bitcoin or Ethereum blockchains—are incorrect because there is no generally accepted definition of, or criteria used to measure, decentralization.  (Adriaens Rebuttal (Ex. 13) ¶ 4.)

**C.      The Court Should Exclude Adriaens's Testimony.**

**1.      Adriaens's Opinions Should Be Excluded Because They Are Not His Own and They Are Not Based on Any Methodology Whatsoever.**

An "expert witness must in the end be giving his *own* opinion." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (emphasis in original); *see also Pac. Life Ins. Co. v. Bank of New York Mellon*, No. 17 Civ. 1388, 2021 WL 5299193, at *5 (S.D.N.Y. Nov. 15, 2021) (excluding

expert testimony because an expert cannot "simply aggregate or recite the opinions of others"

(citation omitted)).  The Federal Rules of Civil Procedure require an expert to attribute facts or data

considered to its proper sources.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii).  Moreover, an expert's opinions

must be explained based upon on some methodology, so that their reliability can be tested.  *E.g.,*

*Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some

explanation as to how the expert came to his conclusion and what methodologies or evidence

substantiate that conclusion.").  As set forth below, Adriaens's opinions are not his own, they are

instead copied from other sources, many without attribution, and are, relatedly, not based on any

methodology.  They should therefore be excluded.

Adriaens testified that he was assisted by three Ripple attorneys in preparing his Report and

Rebuttal, but Ripple's counsel would not permit him to answer whether counsel drafted any part of

either report.[6]  (Adriaens Tr. 15:8-19:2.)  He further testified that he did not copy language from any

source into his report without using quotation marks, nor did he rely upon any sources not cited in

his reports.  (*See id.* at 55:6-58:2; 138:11-15 ("Q. Okay. In general, in your report, when you drew a

definition or a description from another source, was it your practice to cite that source?  A. Yes.").)

Yet, on at least 43 occasions, Adriaens's Report copies text word-for-word from uncited

sources—running the gamut from Investopedia to the Harvard Business Review—as a comparison

of the Adriaens Report with certain public sources readily confirms.  (*See* Adriaens Report ¶¶ 26-29,

32, 36, 38-39, 42-50, 52-54, 57, 61-62, 79-82, 119-20; Appendix A (displaying text from Adriaens

Report together with source text for comparison).)

Even more troubling, Adriaens's Report copies text directly from Ripple without attribution.

(*Compare* Adriaens Report ¶ 53 *with* "The Environmental Impact: Cryptocurrency Mining vs.

Consensus" (July 8, 2020), *available at* https://ripple.com/insights/the-environmental-impact-

---

[6] An assistant helped Adriaens prepare his Report, but not his Rebuttal. (Adriaens Tr. 15:8-19:2.)

cryptocurrency-mining-vs-consensus/ (Ripple blog authored by Ripple's Chief Technology Officer); *compare also* Adriaens Report ¶ 119 *with* "The Internet of Value: What It Means and How It Benefits Everyone" (June 21, 2017), *available at* https://ripple.com/insights/the-internet-of-value-what-it-means-and-how-it-benefits-everyone/ (Ripple blog authored by "Team Ripple") ("Ripple Internet-of-Value Blog").)  When asked whether he had written a specific sentence in his Report that had been copied word-for-word from a Ripple blog, Ripple's counsel directed Adriaens not to answer, citing attorney work product.  (*See* Adriaens Tr. 274:13-276:14; *compare* Adriaens Report ¶ 101 *with* Ripple Internet-of-Value Blog.)

At his deposition, Adriaens was unable to explain how text from another uncited source (an Amazon web page) found its way into his Report.  (Adriaens Tr. 154:2-157:2.)  He denied that he had personally copied it into the Report, but did not know whether anyone else had.  (*See id.* at 156:4-10: ("Q. Did anyone else copy the text from the Amazon web page at Exhibit 24 into your report at paragraph 43?  A. That is outside of my knowledge.  I wouldn't know."); *id.* at 156:21-157:2 ("Q. You would agree with me, though, that it's an almost word-for-word recreation of the Amazon document in your expert report?  A. It is very close, yes.  Q. And sitting here today, you're not sure why?  A. That's correct. I don't know.").)

On other occasions, Adriaens struggled to explain certain terminology that appeared in his Report.  (*See id.* at 244:3-18 ("Q. The last bullet [of Adriaens Report ¶ 124] says 'Third, I examined the applications for the remaining use cases.'  What does the word 'applications' mean in that sentence?  A. 'Applications'?  Seems like an odd word here.  Basically this is I examined all the remaining use cases after Step 1 and Step 2.  Q. Okay. Is that -- A. I'm not sure what -- how the word 'applications' and why the word 'applications' is in here.  Q. Did -- did you put the word 'applications' in your report?  A. It may have been a carryover on one of the iterations."); *id.* at

258:13-260:3 (testifying he did not have the technical expertise to explain the meaning of certain terms used in his Report ¶ 58 & Table 1).)

Similarly, as to his conclusions, Adriaens merely recited other sources (*see, e.g.*, Adriaens Tr. 186:3-12), and conceded at his deposition he had not done any independent analysis to reach many of his conclusions.  (*See, e.g.*, *id.* at 257:12-260:3 (explaining that the entries in Adriaens Report ¶ 58 & Table 1, comparing the relative strengths and weaknesses of bitcoin, ethereum, and XRP, were drawn from another source and that he did not have the technical expertise to understand the entries); *id.* at 260:20-262:1 (conceding that his statement that "XRP became the digital standard for currency exchange, asset settlement and remittances" [Adriaens Report ¶ 60] was not his expert opinion and was drawn from one of the sources he reviewed in preparing the Report); *see also id.* at 237:19-238:5; *id.* at 208:19-209:6.)[7]

Because Adriaens did not write large swaths of his Report (parts of which he does not even understand), while failing to provide attribution for the parts he (or his assistant or Ripple's lawyers) copied from other sources, his opinions should be excluded.  *See Pac. Life*, 2021 WL 5299193, at *5-6 (excluding expert opinion where his deposition testimony reflected that "his level of involvement in the preparation of his report was. . .deficient"); *Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009) (excluding expert opinions that were "merely a restatement of Defendant['s] views" and were "not the product of independent analysis");  *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (an expert witness "may not … merely adopt another expert's opinions as his or her own reflexively and without understanding the materials or methods underlying the other expert's opinions"); *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, No. 20 Civ. 0802, 2022 WL 2122655, at *5 (M.D. Fla. June 14, 2022) (excluding expert

---

[7] Even this data aggregation exercise was performed unreliably, as Adriaens simply disregarded a paper that opined that the XRP Ledger was less secure than the bitcoin ledger, stating that he did not have the technical background to assess this conclusion.  (Adriaens Tr. 209:16-214:13.)

where, "[i]n the light of the blatant signs of ghostwriting, [a party's] attorneys exceeded the level of assistance contemplated in Rule 26…." (citation omitted)).

### 2. Adriaens's Opinions Regarding Ripple's Business Model and the Innovative Nature of XRP and the XRP Ledger Should Be Excluded.

Adriaens opines that XRP and the XRP Ledger were important innovations in blockchain technology (Adriaens Report ¶¶ 19, 26-78) and that Ripple's business model, in particular its product iteration, is consistent with high-tech start-ups. (*Id.* ¶¶ 20, 79-121). Both opinions should be excluded. First, these opinions are irrelevant to whether Ripple offered and sold XRP as an investment contract. Assuming XRP and the XRP Ledger are in fact, "innovative" creations, or that Ripple engaged in an innovative business, "[n]ovel, uncommon, or irregular devices, whatever they appear to be, are also reached [by the Securities Act]." *Joiner*, 320 U.S. at 351. Moreover, these opinions are factual narrative that merely aggregate record facts to tell Ripple's "story." (*See, e.g.,* Adriaens Report ¶¶ 100-03 (reciting Ripple's "vision" as a company); ¶¶ 104-09 (reciting rounds of equity investment in Ripple); ¶¶ 113-118 & Charts 6-7 (reciting history of Ripple's product rollout).) They should be excluded for this additional reason. *See Scentsational Techs. LLC v. Pepsi, Inc.*, No. 13 Civ. 8645, 2018 WL 1889763, at \*4 (S.D.N.Y. Apr. 18, 2018) (experts may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'") (citation omitted).

### 3. Adriaens's Opinions Regarding Decentralization of the XRP Ledger Should Be Excluded.

Adriaens offers two conflicting opinions as to the so-called "decentralization" of the computer software on which XRP exists, the XRP Ledger—(i) that the XRP Ledger *is* decentralized (Adriaens Report ¶ 21); and (ii) that ▮▮▮▮▮▮ opinion that the XRP Ledger *is not* decentralized is unsupported because there is no generally accepted definition of, or criteria to measure, decentralization (Adriaens Rebuttal ¶ 4). Adriaens's opinions should be excluded.

27

Adriaens offers conflicting opinions that reveal an inconsistent (and biased) methodology. In his opening Report, Adriaens purports to opine that the XRP Ledger is decentralized. (Adriaens Report ¶¶ 21, 119-34.)  Of course, in order to opine that something is or is not decentralized, Adriaens needed to provide a definition of decentralization, which he did in his Report: "[D]ecentralization refers to the transfer of control and decision-making from a centralized entity (individual, organization, or group thereof) to a distributed network. … [T]he purpose of decentralized validation is to avoid one party having outsized control over another to make a network decision (to validate a transaction)."  (*Id.* ¶ 43.)  Adriaens further testified that there exists a "working understanding" and an "understanding and expectation" of the term "decentralization," in "the venture capital context, in the business context, business literature context, and in other academic lenses."  (Adriaens Tr. 102:34-105:7.)

In his Rebuttal, Adriaens takes the opposite position, stating that there is *no* accepted definition of decentralization, either in the scientific or the blockchain community.  (Adriaens Rebuttal ¶ 4.)  Adriaens's entire rebuttal is premised on this purported inability to pin down the concept of decentralization, notwithstanding that his own "working understanding" of decentralization is fully consistent with the "basic definition" that ███████ provides.  (*Compare* Adriaens Report ¶ 43 (decentralized decisionmaking "avoid[s] one party having outsized control over another to make a network decision (to validate a transaction)" *with* ███████ Report at 5 ("basic definition of a decentralized system" is one in which "multiple parties control different system components" but no single authority is "fully trusted by all").  Adriaens's opinions should be excluded because they are the product of a flawed, biased, and inconsistent methodology, under which he is willing to accept a "working understanding" of "decentralization" for his own opinion (Adriaens Tr. 103:16-104:3), but then demands complete scientific consensus on a definition when

critiquing ▮▮▮▮▮▮▮  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 478 & n.23 (S.D.N.Y. 2018) (excluding expert testimony premised on "internally inconsistent" modeling).

Moreover, Adriaens is not qualified to offer an opinion regarding the decentralization of the XRP Ledger, individually or as compared with other blockchains. Adriaens is not a computer scientist, and testified repeatedly that he does not have the technical expertise necessary to evaluate the decentralization of consensus mechanisms—the process by which transactions on a blockchain such as the XRP Ledger are validated—or to compare technical aspects of various blockchains. (*See* Adriaens Tr. at 167:25-168:18 ("[M]y knowledge on blockchain and consensus and the features are at the business implementation and business development level. And some of the technical aspects and underlying code and protocol, issues like what you're referring to right now [regarding validation of transactions on the XRP Ledger], I cannot -- I cannot directly answer. I do not have that level of expertise."); *see also id.* at 172:4-175:16; 177:11-18; 191:9-193:20; 202:23-204:6.) Adriaens thus lacks the technical expertise to offer opinions as to the decentralization of the XRP Ledger, and his opinions should be excluded. *See Fin. Guar.*, 2020 WL 4251229, at *3 ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." (citation omitted)).

### 4. Adriaens's Opinions Regarding the "Commercial Utility" of XRP and the XRP Ledger Should Be Excluded.

Adriaens opined that XRP and the XRP Ledger have "commercial utility that third parties have leveraged in the creation or advancement of their business models," premising this opinion on an analysis of "use cases" for XRP and the XRP Ledger. (Adriaens Report ¶¶ 21, 119-34). This opinion should be excluded as irrelevant and unsupported by any reliable methodology.

Defendants appear to argue that because XRP has "use," offers and sales of XRP do not meet *Howey's* third prong. The "use" or "consumption" concept derives from *Forman*, where the Supreme Court held that stock of a housing co-op, entitling the holder to nothing other than to

lease an apartment, did not constitute "investment contracts" because "[t]he sole purpose of acquiring the[] shares [was] to enable the purchaser to occupy an apartment." 421 U.S. at 842.

That something has "use," however, does not preclude offers or sales of that instrument from meeting *Howey*'s expectation of profits prong. "Plenty of items that can be consumed or used—from cosmetics to boats to Scotch whisky—have been the subject of transactions determined to be securities because they had the attributes of an investment." *Fedance v. Harris*, 1 F.4th 1278, 1288-89 (11th Cir. 2021) (citing Hazen, 1 Law of Secs. Reg. § 1:49 (listing examples)). Thus, the Second Circuit has recognized a "long line of cases where purported sales of tangible property … were held to be investment contracts." *Glen-Arden*, 493 F.2d at 1035.

Under *Howey* and its progeny, the relevant question is whether an item, considering the entirety of the economic inducements and realities, was *offered and sold primarily for use* or instead primarily for its potential for profit. *See Rice v. Braniger Org., Inc.*, 922 F.2d 788, 790-91 (11th Cir. 1991) (holding lots in beach club development not to be securities because "people buy [the lots] primarily to use them, not to derive profits from the entrepreneurial efforts of the developers" (citing *Forman*, 421 U.S. at 853); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1040 (10th Cir. 1980) ("Clearly the lots are not securities if the purchasers were induced to obtain them *primarily* for residential purposes 'to occupy the land or develop it themselves'" (quoting *Howey*, 328 U.S. at 300)).

A court's assessment under *Howey* must include consideration of all statements that make up the "offer," a term construed broadly. *See Aldrich*, 627 F.2d at 1039-40 ("Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case."); *SEC v. Martino*, 255 F. Supp. 2d 268, 286 (S.D.N.Y. 2003) ("offer" as used in Section 5 of the Securities Act is "construed broadly").

In *Forman* itself, the Supreme Court did not reach the conclusion that stock in the co-op had "use" simply by relying on the tautology that apartments have use.  Instead, the Court engaged in a comprehensive analysis that looked at the *totality* of the offers and sales of the stocks in the condominium.  Among other relevant facts, the Court noted that the shares could not be "transferred to a nontenant" and had to be sold back to the co-op at the price originally paid, that a purchaser could only buy 18 shares (exactly the number of shares he needed to occupy an apartment), and that the promotional materials for the stocks in the condominium "[n]owhere…[sought] to attract investors by the prospect of profits."  421 U.S. at 838, 842, 854.

Consistent with *Forman*, courts analyze whether something was offered and sold primarily for use by looking at objective facts surrounding the offer and sale, including the: (i) number of instruments sold (and whether it was limited to a number that could reasonably be expected to be used), *compare Grenader v. Spitz*, 537 F.2d 612, 618 (2d Cir. 1976) (co-op shares were not investment contracts because "[t]he number of shares [available was] … clearly in proportion to the size and location of the apartment … .") *with Cameron v. Outdoor Resorts of America*, 608 F.2d 187, 193 (5th Cir. 1979) (since investors were sold many units, they "manifestly could not use" all of them, and the shares were investment contracts); (ii) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SG Ltd.*, 265 F.3d at 53-54 (statements discussing potential returns "constitute a not-very-subtle form of economic inducement"); (iii) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (contract for sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals"); and (iv) the identity and nature of the prospective purchasers targeted by the promoter, to determine whether they could reasonably be expected to "use" the item, *e.g.*, *Telegram*, 448 F. Supp. 3d at 373-74

31

(promoter targeted investment funds that could not reasonably be expected to have "use" to freeze up $1.7 billion in "currency").  Adriaens's opinions related to XRP's "use cases" do not bear on any of these relevant facts, all of which can be presented by traditional evidentiary means and not through expert opinion.

Second, Adriaens's opinion is unsupported by any reliable methodology.  Much of the "use case" section of Adriaens's Report is factual narrative recounting Ripple's history of developing and funding projects related to XRP or the XRP Ledger (Adriaens Report ¶¶ 119-22), and should be excluded as such.  *See Scentsational Techs.*, 2018 WL 1889763, at *4.  The remainder of the section pertains to specific "use cases" identified for Adriaens by Ripple's counsel, who sent him a list of 660 purported "use cases" for XRP or the XRP Ledger.  (Adriaens Report ¶ 124.)  He does not know who prepared this list; he made no changes to the list prior to appending it to his Report as Appendix C; and, with the limited exception of a subset of 91 entries described below, he undertook no investigation to determine whether the entries on Appendix C were accurate in any way.  (Adriaens Tr. 38:6-19; 216:20-217:9; 220:7-223:1.)

Instead, for the 660 purported use cases he received, Adriaens determined which of the companies or projects associated with such cases received equity funding after Ripple's founding (based not on evidence in the case but on the hearsay of a public website, called Crunchbase).  Based on this, Adriaens created a narrower list of 91 "use cases" that received funding, and displayed it on Appendix D.  (Adriaens Report ¶ 124; Adriaens Tr. 40:15-43:6 (correcting Report, which inaccurately described methodology).)  He did not take any steps to determine whether the equity funding received by these companies had anything to do with their engagement with XRP or the XRP Ledger.  (Adriaens Tr. 227:2-8; 228:23-229:3.)

As a last step, Adriaens conducted an internet search related to the 91 "use cases" listed on Appendix D to "understand which innovations are being powered by the XRP Ledger or which

support the cryptocurrency XRP for payments or other commercial uses." (Adriaens Report ¶ 124; Adriaens Tr. 46:18-48:1.) He did not, however, determine whether or to what extent any of the businesses listed on Appendix D actually used XRP or the XRP Ledger, or derived any revenue therefrom, so his opinion that "third parties have leveraged [XRP or the XRP Ledger] in the creation or advancement of their business models" is an unsupported logical leap. (*See* Adriaens Report ¶ 21; Adriaens Tr. 236:14-22; *see also id.* at 239:15-25 ("Q. … [D]id you take any steps at all to determine whether or not any company listed on Appendix D as accepting XRP actually in the course of its business receives payment in XRP? A. Not as part of this analysis, no."); *id.* at 256:19-22 ("Q. Are there any companies on your Appendix D that accept XRP as payment but as to which nobody has ever paid in XRP? A. I did not do that analysis.").

Adriaens's conclusions regarding the "commercial utility" or "use cases" for XRP and the XRP Ledger do not logically follow from his identification of 91 companies that happened to have received equity funding after Ripple's founding and had some connection—possibly only tenuous, temporary, and with little or no economic significance—to XRP or the XRP Ledger. Prior to his Report, Adriaens had not employed this methodology to evaluate the existence of a "use" for a digital asset (*id.* at 233:17-234:1), nor did he cite any academic or other literature suggesting this is a reliable methodology. It is not, and his opinions around the "use" cases for XRP should be excluded. *See Chen-Oster*, 2022 WL 814074, at *8 ("Exclusion is appropriate when an expert does not show that his data is 'a fair proxy' for the process he claims to be analyzing ….").

## III.   Borden's Testimony Should Be Excluded in Its Entirety.

Ripple retained Borden to provide an "expert opinion on matters of U.S. tax law," including the federal income tax classification of XRP and whether a reasonable buyer would expect XRP to be classified as a security for income tax purposes. The Court should exclude Borden's testimony in its entirety because the tax classification of XRP is wholly irrelevant to its treatment under the

securities laws.  Moreover, Borden's tax opinions are not supported by the Internal Revenue Service

("IRS") notice he primarily relies on (or any other documents he relies on) and are therefore

inadmissible *ipse dixit* opinions.  Borden's opinions therefore cannot assist the Court or jury in

determining whether Ripple violated the federal securities laws.

## A.    Borden's Background and Opinions

### 1.  Borden's Background

Borden is a Professor of Law at Brooklyn Law School.  (Borden Report (Ex. 14) ¶ 1.)  While

he considers himself an expert in the taxation of "virtual currencies" for federal income tax

purposes, he has never been qualified as an expert on virtual currencies in any court or provided

prior expert testimony regarding virtual currencies.  (Borden Tr. (Ex. 15) 124:7-19; 125:5-17.)  He

has never provided any consultation or advice about virtual currencies or digital assets in his

professional capacity or otherwise.  (*Id.* at 129:24-130:6.)  He has no recollection of having discussed

virtual currencies or digital assets in any academic setting, seminars, or presentations.  (*Id.* at 132:1-

14; 135:22-136:11.)  Nor has he ever published any books or articles about virtual currencies, digital

assets, or cryptocurrencies or provided any testimony on these subjects prior to this case.  (*Id.* at

139:12-16; 140:25-141:11; 142:6-16; 142:19-143:25; 144:10-23; 145:13-146:6.)  He became aware of

the term "digital asset" because it was used in proposed legislation and from his "general reading [of]

the news."  (*Id.* at 135:5-17.)

### 2.  Borden's Opinions

Borden opines that: (1) IRS Notice 2014-21 (the "IRS Notice") treats XRP as a property that

is not a security;[8] (2) no relevant, legal taxation authority or precedent has classified XRP as a

security for federal income tax purposes; and (3) based on the IRS Notice, a reasonable buyer or

---

[8] In 2014, the IRS issued Notice 2014-21, which provides guidance in the form of frequently asked
questions about how the IRS applies U.S. tax principles to transactions involving virtual currency.
*See* https://www.irs.gov/businesses/small-businesses-self-employed/virtual-currencies.

seller of XRP would not expect it to be classified as a security for federal income tax purposes. (Borden Report ¶ 9; Borden Tr. 146:21-147:23; 154:14-156:25; 211:4-21.)

In his report, Borden describes certain characteristics of assets that are securities under federal income tax law—*e.g.*, corporate stock, debt instruments, and options—and opines that the absence of those characteristics from a "virtual currency such as XRP" is evidence that the federal income tax laws do not treat XRP as a security. (Borden Report ¶¶ 13-17; Borden Tr. 150:25-153:5.) He concedes, however, that the IRS Notice makes no reference to securities. (Borden Tr. 167:21-24.) He also concedes that the scope of the IRS Notice is limited to virtual currencies specifically described in the IRS Notice—which states that "[n]o inference should be drawn with respect to virtual currencies not described in this notice," (*id.* at 169:9-170:9)—*and* that it does not mention XRP (*id.* at 249:21-250:4).

In addition to the IRS Notice, Borden relies upon the Internal Revenue Code, "a settlement with the U.S. Department of [Justice]," and "FinCen guidance" regarding virtual currencies in support of his opinions. (*Id.* at 153:6-18; 200:4-201:3; 224:7-25; 244:7-245:8.)

**B.     The Court Should Exclude Borden's Testimony.**

**1.     Borden's Opinions about XRP's Federal Tax Treatment Are Irrelevant and Should Be Excluded.**

Expert testimony is properly excludable if, as with Borden's proposed opinions, it is not germane to any issues in a case. *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (internal quotation marks and citation omitted); *Fin. Guar.*, 2020 WL 4251229, at *9. To ensure relevance, the Court must find that the expert's testimony "'is sufficiently tied to' the facts of the case." *Daubert*, 509 U.S. at 591-92. Thus, courts will exclude an expert's report if his analysis is "irrelevant" to the legal issues presented, *Chen-Oster*, 2022 WL 814074, at *13-14; *see also* Fed. R. Evid. 702(a)-(c), or if he opines on an issue

that "is not implicated in [the] case" under the law governing the case. *Fin. Guar.*, 2020 WL 4251229, at *8-10.

As explained in Background Section II above, the SEC alleges that Defendants engaged in unregistered offers and sales of "securities" as that term is used in the *federal securities laws*. But no case interpreting *Howey* relies on classifications of an instrument for federal income tax purposes to determine the character of the instrument under the federal securities laws. Borden's opinions about the classification of XRP for federal income tax purposes, whether under the Internal Revenue Code or the IRS Notice, are therefore irrelevant to this case. And the Court should reject Defendants' attempts to substitute the federal tax code's judgment as to the character of an instrument for the federal securities laws' treatment of the same instruments. As the Second Circuit has held, "when confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." *SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 79-80 (2d Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018)) (internal quotation marks and citation omitted). Thus, the classification of virtual currencies by the IRS for federal income tax purposes—even if any such classification were inconsistent with the status of XRP offers and sales as securities under the federal securities laws, which it is not—does not affect the determination in this case as to whether Defendants sold "securities" for purposes of Securities Act Section 5. *Id.*

Borden's opinions on matters of federal tax law are thus irrelevant and incapable of helping the Court or jury understand the evidence. *See Chen-Oster*, 2022 WL 814074, at *13-14.

### 2. Borden's Opinions Are Improper *Ipse Dixit*.

Borden has offered unsupported, sweeping conclusions about the application of federal income tax laws to XRP, including its taxation as something other than a security. He mainly relies on the IRS Notice—which makes no reference to securities and is limited to the virtual currencies it

specifically references, which does not include XRP—to form the basis for his opinion.  His reliance

on FinCen and the DOJ's treatment of XRP is equally flawed, since they do not even address federal

tax issues.  And while Borden claims that he also looked to the Internal Revenue Code, the topic of

digital assets is not covered by the Internal Revenue Code.  Thus, Borden's opinion that XRP is

treated as property that is not a security for federal tax purposes is based simply on his say-so.

When an expert's opinion is connected to facts only by mere *ipse dixit* (because "he, himself, said

it"), as it is here, the opinion should be excluded.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)

("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

### 3.   Borden Is Unqualified to Render His Opinions.

The opinions Borden expresses about the federal income taxation of XRP stray far beyond

his areas of expertise.  Although Borden claims to be an expert in the taxation of "virtual currency,"

he has never published any material about virtual currencies, digital assets, or cryptocurrencies.

Before his deposition in this case, he had never testified about cryptocurrencies, virtual currencies,

or digital assets.  Nor has he ever addressed the topic of virtual currencies in seminars or

presentations.  Indeed, Borden's understanding of virtual currencies stems from the IRS's definition

of the term in the IRS Notice and FinCEN's and the DOJ's classifications of XRP for those

agencies' purposes, and he only learned about the term "digital assets" through proposed legislation

and what he read in the news.  Thus, Borden lacks the requisite qualifications to offer any testimony

about whether XRP is a so-called virtual currency or security for federal income tax purposes, much

less what a reasonable buyer or seller of XRP would expect based on the IRS Notice.  *Krause v. CSX

Transp.*, 984 F. Supp. 2d 62, 79 (N.D.N.Y. 2013) (excluding railroad safety expert who offered

opinions regarding a worker's stress and fatigue because his expertise was deficient).

**IV.     Easton's Testimony Should Be Excluded in Its Entirety.**

Easton, an accounting professor, has submitted an expert report about the application of
Generally Accepted Accounting Principles ("U.S. GAAP")—a set of accounting principles that
companies use to report their financials to the public—to XRP.  Easton has also submitted a
rebuttal report in which he opines that certain opinions provided by two of the SEC's experts,
█████     and █████  are inconsistent with U.S. GAAP.  As with Borden's opinions as to XRP's tax
treatment, whether XRP is a security for accounting purposes under U.S. GAAP has no bearing on
whether Defendants' offers and sales of XRP were investment contracts and therefore securities
under the federal securities laws.  In addition, Easton's rebuttal report exceeds the permissible scope
of a proper rebuttal because it fails to rebut any subject matter addressed in █████  and █████
reports.  As Easton concedes, neither █████ nor █████ has proffered any opinions about the
accounting treatment of XRP under U.S. GAAP or otherwise.  Therefore, Easton's opening and
rebuttal testimony should be excluded in their entirety.

**A.     Easton's Background and Opinions**

**1.  Easton's Background**

Easton is an accountancy professor at the University of Notre Dame.  (Easton Tr. (Ex. 16)
44:23-45:5.)  He does not consider himself an expert in the accounting of digital assets and has never
taught a course on this topic.  (*Id.* at 49:21-50:1.)  He has also never provided any professional
advice concerning the accounting treatment of digital assets to any professional organization of
which he is a member.  (*Id.* at 52:6-11.)  Nor has he ever testified about the accounting treatment of
digital assets, conducted any seminars about the accounting treatment of digital assets, or published
any articles or books about digital assets.  (*Id.* at 52:18-53:19; 54:9-23.)  Easton concedes that the
SEC's complaint does not contain any allegations concerning the accounting treatment of XRP (*id.*

at 59:11-15), and that he is not providing any opinion on whether XRP is a security under the federal securities laws (*id.* at 58:15-18).

### 2. Easton's Affirmative Opinions

Easton's opening report analyzes: (1) how a hypothetical purchaser or holder of XRP would understand the proper accounting for XRP transactions based on the applicable accounting guidance; (2) whether Ripple accounted for the offer and sales of XRP in accordance with the applicable accounting guidance; and (3) whether Ripple, consistent with the applicable accounting guidance, could properly account for transactions in XRP as securities transactions. (Easton Report (Ex. 17) ¶ 9; Easton Tr. 56:9-57:6.) For purposes of his analysis, Easton defines a "hypothetical purchaser" as "an individual – as an entity understanding the proper accounting for XRP based on the accounting guidance that applies in the case of an asset such as XRP." (Easton Tr. 61:15-62:3.) Specifically, Easton opines that:

- Ripple and other companies holding cryptocurrencies account for those holdings as intangible assets. Ripple accounts for monetary and non-monetary sales of XRP as revenues. And MoneyGram International, Inc. ("MoneyGram"), an entity that used Ripple's "ODL" product, accounts for its receipt of XRP in exchange for providing services to Ripple as a reduction in the cost of providing those services.

- The available guidance, analogous U.S. GAAP, and the practices of other publicly traded companies are all consistent with Ripple's accounting for XRP as an intangible asset and are inconsistent with the notion that XRP is a security under U.S. GAAP.

- It would be improper for Ripple to account for offers and sales of XRP as involving an offer or sale of securities under U.S. GAAP and that Ripple's accounting for its sales of XRP as revenues—and not as issuances of debt or equity securities—is consistent with U.S. GAAP's guidance. (Easton Report ¶ 10.)

In his deposition, Easton testified that XRP should be reported as an intangible asset for accounting purposes because it does not have characteristics of a "security" under U.S. GAAP and the definition provided by the Financial Accounting Standards Board ("FASB"). (*Id.* at 68:4-13; 69:5-70:8; 90:13-91:10.) He concedes that there currently is no authoritative U.S. GAAP directly applicable to the accounting for "cryptocurrencies." (Easton Report ¶ 10.ii.) He relies upon the

purported authoritative guidance for the treatment of digital assets from the International
Accounting Standards Board, the American Institute of Chartered Public Accountants, and "each of
the Big 4 accounting firms" as the bases for his opinions concerning the accounting treatment for
XRP. (Easton Tr. 78:3-79:23.) Easton concedes that "[FASB] has not weighed in on accounting for
[digital assets]." (*Id.* at 111:4-17.)

Easton further testified that the analysis in support of the opinions in his original report
entailed reviewing the economic substance of the transactions and determining what accounting
principles would comport with the substance. (*Id.* at 117:4-11.) He did not know whether the
standard for "economic substance" under U.S. GAAP governs what constitutes "economic
substance" for purposes of the federal securities laws, but he makes clear that he provides no
opinion on this issue. (*Id.* at 121:25-122:9.)

### 3. Easton's Rebuttal Opinions

Easton concedes that ███ and ███ "do not mention U.S. GAAP" in their reports or
otherwise provide any opinions regarding the accounting treatment of XRP under U.S. GAAP, or
the economic substance of XRP transactions under U.S. GAAP. (Easton Tr. 152:22-25; 153:1-4;
157:16-22; 167:20-168:17.) Indeed, Easton specifically concedes that none of ███ or ███
analysis of various features of Defendants' XRP transactions relate to U.S. GAAP, including an
escrow Ripple created for XRP (*id.* at 177:20-178:8) and Ripple's use of lock-up provisions (*id.* at
178:18-179:25). Easton also concedes that neither ███ nor ███ analyze Ripple's treatment of
XRP or payments in XRP to third-party service providers under U.S. GAAP (*id.* at 180:8-23); and
that neither analyzes the accounting treatment of XRP by MoneyGram (*id.* at 182:16-184:10; 186:22-
188:17; 189:13-190:3; 199:25-200:6).

Despite these fatal concessions, Easton purports to "rebut" ███ and ███ opinions
through the lens of U.S. GAAP and by noting their alleged "disregard' for or "inconsistenc[y] with

U.S. GAAP."  (Easton Rebuttal (Ex. 18) ¶ 3; Easton Tr. 109:18-110:4.)  Moreover, Easton's rebuttal

is limited to the U.S. GAAP treatment of "equity" or "debt" securities—even though the SEC

alleges that Defendants' XRP transactions were transactions in other types of securities, *i.e.*,

investment contracts, and not "equity" or "debt" securities.  (Easton Rebuttal ¶ 3.)  Easton opines

that:  (1) █████ opinion that Ripple used XRP in a similar manner to the way companies use stock

does not change the conclusion under *U.S. GAAP* that those transactions should not be accounted

for as sales of *equity or debt securities*; (2) assuming Ripple used mechanisms to limit the supply or

otherwise support the market price of XRP, as █████ opines, that does not mean that, under *U.S.

GAAP*, the economic substance of those transactions were sales of *equity or debt securities*; (3) Ripple's

payment to business partners and vendors for services in XRP rather than fiat currency does not

mean that, *under U.S. GAAP*, the economic substance of those transactions were sales of *equity or

debt securities*; and (4) MoneyGram's accounting for XRP does not reflect a determination that

Ripple's transfers and sales of XRP to MoneyGram constituted sales *of equity or debt securities*.  (*Id.*)

Easton also claims that his report rebuts both █████ and █████ "incorrect conflation of

the economic substance of two independent transactions," including "[t]he sale of XRP and the

subsequent use of the funds obtained from sale of XRP" under U.S. GAAP, (Easton Tr. 167:20-

168:6), but again concedes that neither █████ nor █████ addresses any of these subjects (*id.* at

156:6-11; 168:7-17).  Asked to specify whether █████ or █████ reports examine the economic

substance of XRP transactions under U.S. GAAP, Easton further conceded that they do not

mention U.S. GAAP.  (*Id.* at 157:16-22; 167:20-168:17.)

### B.   The Court Should Exclude Easton's Affirmative and Purported Rebuttal Testimony.

#### 1.   Easton's Affirmative and Rebuttal Opinions Are Irrelevant.

As discussed in Argument Section I.B.2, courts exclude an expert's testimony if his analysis

is "irrelevant" to the legal issues presented, *see, e.g., Chen-Oster,* 2022 WL 814074, at *13-14; if he

opines on an issue that "is not implicated in [the] case" under the law governing the case, *Fin. Guar.*, 2020 WL 4251229, at *2; or if it is a vehicle for a factual narrative, *Tourre*, 950 F. Supp. 2d at 675.

As further discussed in Background Section II, whether something constitutes an "investment contract" under the Securities Act is governed exclusively by Supreme Court and Second Circuit precedent—*Howey* and its progeny. *See, e.g.*, *Leonard,* 529 F.3d at 85; *Revak*, 18 F.3d at 87. Here, Easton's opinions about XRP's accounting treatment under U.S. GAAP in his opening report—including how a hypothetical purchaser or holder of XRP understands the proper accounting for XRP transactions and whether Ripple accounted for XRP offers and sales in accordance with the applicable accounting guidance—are irrelevant. Indeed, Easton's focus on the accounting treatment of "equity" (such as stock) or "debt" securities underscores the irrelevance of his proffered testimony. The SEC alleges that Defendants sold securities that were "investment contracts," not traditional debt or equity securities.

Easton's rebuttal report suffers from the same flaw because he purports to rebut alleged inconsistencies in ████████ and ████████ opinions under U.S. GAAP. Easton's opinions offer no insight into any legal issues pending before the Court, including any *Howey* factors. Again, *Howey* does not ask whether market participants expect any given legal treatment under any particular legal regime, as Defendants apparently would have the Court conclude. Instead, it asks whether offerees and purchasers reasonably expected profits from their purchase, based on "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Joiner*, 320 U.S. at 352-53. The accounting issues Easton opines on are not relevant under governing law, will not be helpful to the Court or a jury, will in fact confuse a jury, and should therefore be excluded. *See Fin. Guar.*, 2020 WL 4251229, at *13-14.

## 2. Easton's Purported Rebuttal Opinions Do Not Address the Subject Matters of ██████ and ██████ Reports.

Rule 26(a)(2)(D)(ii) only allows the admission of rebuttal testimony that is "'intended solely to contradict or rebut evidence on the same subject matter' of the party's expert report." *Rekor Sys., Inc. v. Loughlin*, No. 19 Civ. 7767, 2022 WL 2063857, at *7-9 (S.D.N.Y. June 8, 2022) (quoting Fed R. Civ. P. 26(a)(2)(D)(ii)); *see also In re Zimmer M/L Taper Hip Prosthesis or M/L Taper Hip Prosthesis With Kinectiv Tech. & Versys Femoral Head Prod. Liab. Litig.*, No. 18 MD 2859, 2021 WL 1405185, at *2 (S.D.N.Y. Apr. 14, 2021); *Scott*, 315 F.R.D. at 44. The scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report. Fed. R. Civ. P. 26; *McBeth v. Porges*, No. 15 Civ. 2742, 2018 WL 5997918, at *7 (S.D.N.Y. Nov. 15, 2018); *In re Kind LLC Healthy & All Nat. Litig.*, 337 F.R.D. 581, 607 (S.D.N.Y. 2021). And while a rebuttal expert may use new methodology, a "rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice." *In re Kind*, 337 F.R.D. at 607 (citation omitted).

Easton's rebuttal falls well outside the scope of the opinions in ██████ and ██████ reports. Easton's rebuttal exclusively addresses accounting for XRP transactions by Ripple and certain third parties, under U.S. GAAP and other accounting guidance. Yet ██████ opines about the steps Defendants took and the incentives that may have been present to influence XRP prices, while ██████ opines about the reasonable expectation of XRP purchasers. Easton's rebuttal is unrelated to any subject matter encompassed in ██████ and ██████ reports and does not contradict or rebut evidence on the same subject matter identified in those reports. Indeed, Easton concedes that ██████ and ██████ do not mention U.S. GAAP or proffer any opinion about XRP's accounting treatment or any other accounting opinions in their respective reports. Thus, Easton's rebuttal report, which exclusively addresses accounting matters, is beyond the scope of a proper rebuttal of ██████ and ██████ reports and should be excluded. *See McBeth*, 2018 WL 5997918, at *7

(rejecting portion of rebuttal expert's testimony on the tax treatment of certain compensation because the challenged expert "report did not address tax treatment, and a rebuttal report is limited to 'the same subject matter identified by another party'") (citation omitted).

## V.      Yadav's Testimony Should Be Excluded in Its Entirety.

Yadav's entire report should be excluded because it offers a legal conclusion on the question of where offers and sales of securities under Section 5 of the Securities Act occur for purposes of determining whether those offers and sales were made in the United States.  Moreover, the facts chosen by Yadav to reach her legal conclusion incorrectly exclude facts that this Court has already held to be relevant to the analysis.  Yadav's Opinion 3 should be excluded for the additional reasons that it is based on a flawed methodology, invented by Yadav for purposes of this litigation and one that she applies inconsistently, and because it is not relevant since it does not answer the fundamental question it purports to answer.

### A.      Yadav's Background and Opinions

Yadav has been a professor at Vanderbilt Law School since 2011.  (Yadav Tr. (Ex. 19) 27:12-16.)  Yadav's areas of academic expertise are market microstructure, innovation, and financial markets.  (*Id.* at 43:25-44:18.)  The goal of Yadav's academic research is to consider the ways in which current regulatory paradigms are ill-suited to address innovations in the financial marketplace. (*Id.* at 37:9-43:24.)  Yadav has published multiple papers that criticize the current U.S. regulatory regime.  (*Id.* at 36:25-43:24.)

Yadav offers three opinions on Defendants' behalf:  (1) offers to buy and sell cryptocurrencies on an exchange are made on the exchange and, once matched, become final and binding trades at the geographic location of the exchange; (2) trades of cryptocurrencies on exchanges become final when orders are matched by an exchange; and (3) for 21 of the 25 exchanges Yadav considered, there is no indication that trades on the exchange become final and

44

binding in the U.S.  (Yadav Report (Ex. 20) Sections V, VI, VII.)  Yadav's Opinion 3 is based on

analyzing a list of 25 cryptocurrency exchanges that defense counsel provided to Yadav.  (Yadav Tr.

275:20-24.)  While Yadav did not compile the list of 25 exchanges, her understanding is that "there

may have been trades of XRP on the exchanges."  (*Id.* at 275:25-276:9.)  To arrive at Opinion 3,

Yadav applies to each of these 25 exchanges four "indicia to determine the location of exchanges":

(a) "where is the exchange's place of business, registered office and domicile?"; (b) "what location is

mentioned in the exchange's terms of use or terms of service?"; (c) "in what country do market

participants and the public believe the exchange does business?"; and (d) "where do regulators

believe an exchange is located for purposes of addressing requests to the corporation operating the

exchange?"  (Yadav Report ¶ 103.)[9]

> **B.     The Court Should Exclude Yadav's Testimony.**
>
> > **1.     Yadav Offers an Improper and Incorrect Legal Opinion.**

At its core, Yadav's report offers a *legal opinion* on a *legal issue* that this Court has already

addressed—how to determine whether certain offers and sales of XRP occurred within or outside

the United States.  The entire report should be excluded on this basis alone because an expert

cannot opine on the law or how to apply facts to the law.

"As a general rule an expert's testimony on issues of law is inadmissible." *Bilzerian*, 926 F.2d

at 1294; *see Fin. Guar.*, 2020 WL 4251229, at *5 (granting motion to exclude expert opinions "for

impermissibly opining on legal issues"); *see also supra* Argument Section I.B.1.  Courts are particularly

vigilant in securities law cases and routinely exclude expert opinions "embodying legal conclusions

that encroach upon the court's duty to instruct on the law" or provide "ultimate legal conclusions."

---

[9] In forming her Opinion 3, Yadav ignores another platform used by Ripple to sell XRP—the XRP on-ledger trading platform hosted in the XRP Ledger.  (▓▓▓▓ Rebuttal ¶ 96.)  The XRP Ledger is validated and recorded by servers located in the U.S.  (*Id.*)  Yadav also ignores the fact that Ripple offered XRP through over-the-counter sales to U.S.-based institutions and individuals and did not include any restrictions to prevent resale to U.S. purchasers.  (*Id.* ¶ 97.)

*Bilzerian*, 926 F.2d at 1295 (affirming exclusion of testimony "related directly to the issue of whether Bilzerian's actual [SEC filings] complied with the legal requirements"); *United States v. Scop*, 846 F.2d 135, 138-142 (2d Cir. 1988) (reversible error to allow expert to opine that defendants "engaged in a manipulative and fraudulent scheme" drawing "directly upon the language of the statute and accompanying regulations"); *Marx*, 550 F.2d at 511-12 (concluding that testimony on date by which "registration statement should have become effective" was "highly prejudicial" and should have been excluded).

The SEC has sued Defendants for their "offers" and "sales" of XRP. The Individual Defendants have argued that neither their "offers" nor their "sales" of XRP occurred in the United States under *Morrison*. As this Court has already held in rejecting these arguments at the motion to dismiss stage, in assessing the domesticity of *offers* of securities, "the focus is on the person or entity [offering] securities" and therefore "it is the location of the offerors … that is relevant." D.E. 441 at 27 (citing *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y. 2011)). The Court found that the SEC's complaint plausibly alleged domestic offers when Defendants made their offers from the United States through either "direct solicitation via placement of XRP onto the digital asset trading platforms or an attempt to dispose of XRP via a broker." D.E. 441 at 28 (citing *Goldman Sachs*, 790 F. Supp. 2d at 165; *United States v. Naftalin*, 441 U.S. 768, 773 (1979)). With respect to *sales* of securities, the Court held sales are domestic if "irrevocable liability attached or title was transferred in the United States." D.E. 441 at 26-27 (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67 (2d Cir. 2012)). The "specific facts that suggest that irrevocable liability attached or title was transferred in the United States" may include those "concerning the formation of the contracts, the placement of the purchase orders, the passing of title, or the exchange of money." *Id.* Thus, *where* offers and sales of securities took place is a legal question that the Court may decide at summary judgment based on undisputed facts, and Yadav's attempt to opine as to this

ultimate legal issue is improper.  *See Fin. Guar.*, 2020 WL 4251229, at *5 (excluding portions of expert testimony opining on legal issues and ultimate issues of fact).

Yadav's report illustrates the legal nature of her proposed testimony.  Yadav first opines that the geographical location of the digital asset exchange that matches offers to buy with offers to sell a digital asset determines the location of an offer or sale.  (Yadav Report ¶ 22.)  Applying this first legal conclusion to her analysis of 25 exchanges on which Defendants purportedly offered and sold XRP, Yadav makes a second legal conclusion—that most of those exchanges "lack any significant indicia showing that offers on those exchanges are made in the United States, or that trades being matched on these exchanges become final and binding in the United States, or that those exchanges could be properly considered to be domestic exchanges."  (*Id.*)

In other words, Yadav sets forth *her own legal test* (focused on the geographical location of an exchange), and then *applies her test* based on factors she invented (the four "indicia" of a United States presence) and that appear nowhere in *Morrison*, its Second Circuit progeny, or this Court's decision on this very question.  From this purely legal exercise, Yadav then arrives at her *ultimate legal conclusion* about whether certain of Defendants' offers and sales of XRP were domestic.  This line of testimony is improper and should be excluded because "by definition [it] does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks and citation omitted); *see also Bilzerian*, 926 F.2d at 1294 (expert testimony is not permitted if it will "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it").

Not only are Yadav's opinions improper legal conclusions, they are also wrong.  Yadav's proposed legal test is incompatible with *Morrison* as applied by this Court.  Yadav focuses solely on the location of the exchange, and concludes that the location of the individual or entity making an

offer to buy or sell a security—the relevant fact applied by this Court to determine whether an "offer" is domestic—is *entirely irrelevant* to the analysis.  (Yadav Tr. 188:20-189:11; 280:10-281:2.) Similarly, with respect to "sales," Yadav again looks solely to the location of the exchange and concludes that facts regarding where contracts were formed, where orders were placed, or where title was passed—facts relevant to whether a "sale" is domestic under this Court's prior holding— are not relevant to this analysis.  (*Id.* at 187:10-192:25.)  Yadav's opinions are thus inconsistent with the Court's legal conclusions and should be excluded for that reason too.  *See Fin. Guar.*, 2020 WL 4251229, at *8-9 (excluding portions of expert testimony offering incorrect legal opinions); *see also* Argument Section I.B.2.

> ### 2. Opinion 3 Should Be Excluded for the Additional Reason that It Is Based on an Unreliable and Internally Inconsistent Methodology.

Even accepting Yadav's proposed legal test, in which she looks solely to the location of the exchange—which, as discussed above, is inconsistent with the Court's reading of *Morrison* and therefore wholly irrelevant to this case—the methodology she uses to apply her legal test and arrive at her Opinion 3 is unreliable and inconsistent.  Yadav uses a methodology she entirely made up for purposes of her engagement by Defendants, and she then inconsistently applies her own made-up methodology.  Her Opinion 3 should therefore be excluded for this additional reason too.

Yadav admits that she created the four indicia herself, without consultation with or input from any other researcher in her field and without reliance on any academic literature, and that her four indicia are therefore entirely new and unknown to other researchers in her field.  (Yadav Tr. 175:7-179:9; 250:12-25; 257:8-13.)  By definition, then, Yadav's four indicia are not generally accepted in her field, and her Opinion 3 should therefore be excluded as unreliable.  *See United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (in determining reliability, courts should consider "theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the

'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community'" (*quoting Daubert*, 509 U.S. at 593-94); *CFTC v. Wilson*, No. 13 Civ. 7884 (AT), 2016 WL 7229056, at *11 (S.D.N.Y. Sept. 30, 2016) (Torres, J.) (excluding portions of expert testimony where expert "provides no support for his testimony" and "all evidence in the record suggests that it is not a generally accepted method"); *Chen-Oster*, 2022 WL 814074, at *6, 8 (excluding opinions based on insufficient data and inadequate explanations of the experts' methodology).

Yadav offers little explanation for how she arrived at these four indicia other than that they were based on her "professional experience." (Yadav Tr. 177:24-179:1; Yadav Report ¶ 103.) Nor can she offer any credible justification for ignoring other factors that would be relevant if the proper focus were, as Yadav (incorrectly) suggests, on the geographic location of an exchange, such as the location of an exchange's computer servers (where the exchange's order books and other internal books and records are typically maintained). Yadav concedes that part of the order matching process by an exchange occurs on a server (Yadav Tr. 99:11-101:13; 125:13-19; 180:25-184:22), that exchanges typically have servers located across the world (*id.* at 117:19-119:12; 241:25-243:10), and that traders sometimes seek out servers located close to an exchange's servers in order to maximize trading speed (*id.* at 122:2-18). Still, she maintains that the actual physical location of an exchange's servers is not relevant to her analysis because exchanges typically place servers all around the world to facilitate global trading. (*Id.* at 241:25-242:23.) Indeed, Yadav took no steps to determine where the servers of the exchanges she considered were located (*id.* at 243:14-244:21) and when asked whether "any cryptocurrency exchanges that are based outside the United States have computer servers located in the United States," she responded "I have no idea" (*id.* at 119: 21-24).[10]

---

[10] Several of the exchanges that Yadav classifies as foreign-based do in fact have servers in the United States. (████ Rebuttal ¶¶ 131-33.)

Finally, Yadav's analysis focuses on two subjective "indicia" that are inherently unreliable—where market participants and regulators *believe* the exchange does business. Yadav offers no credible explanation for why either of these factors is relevant to an analysis of where an exchange *actually* exists, let alone where a transaction occurs for purposes of *Morrison*. Further, her methodology consisted solely of reviewing news sources, with no effort made to tie those news sources to what market participants actually trading on those exchanges believed. (*Id.* at 203:7-16.) Nor did she contact market participants or the exchanges themselves. (*Id.* at 267:10-17.)

The other two "indicia" that form Yadav's methodology are also flawed because they focus on the geographical location of the *parent company* of the exchange, and not on the affiliate of the exchange that was *actually* involved in XRP offers and sales, as discussed below. Indeed, Yadav admitted that she did not analyze whether any of those 21 exchanges she concluded were foreign-based even had U.S.-based affiliates. (*Id.* at 229:24-230:11.) And she conceded in her deposition (from memory and not based on research) that several of the 21 exchanges did in fact have U.S.-based affiliates. (*Id.* at 230:12-233:11.)

Moreover, Opinion 3 is unreliable because Yadav fails to apply her indicia consistently to her data. Based on her (flawed) methodology, Yadav determines that for four of the 25 exchanges she considered, "there are indicia that a trade may occur within the United States" but that "these indicia do not conclusively determine that any given offer or trade on any of these four exchanges definitively took place and became final in the U.S." because these exchanges had foreign-based affiliates. (Yadav Report ¶ 111.) Yadav concludes that "[i]n analyzing trades purported to have occurred on these four exchanges, it is important to proceed on a case-by-case basis to establish on which platform/unit of the exchange, in fact, offers were being made and trades were being executed and finalized." (*Id.*) But Yadav does not apply a similar, case-by-case analysis for the 21 exchanges that she determines are foreign-based under her indicia and, as noted, does not even

50

consider whether these 21 exchanges have U.S.-based affiliates.  Thus, in addition to relying on flawed "indicia" she invented for her expert engagement in this matter, Yadav's methodology is unreliable because she does not apply them consistently to all 25 exchanges included in her analysis.

## VI.    Ferrell's Testimony Should Be Excluded in Its Entirety.

In three expert reports, dated October 4, 2021 ("Ferrell Report" (Ex. 21)), November 12, 2021 ("Ferrell Rebuttal Report" (Ex. 22)), and May 13, 2022 ("Ferrell Supp. Report" (Ex. 23)), Ferrell—a law professor—offers a hodgepodge of opinions touching various aspects of this case. Ferrell's proposed testimony should be excluded in its entirety because he: (1) offers a series of legal conclusions (including whether certain facts are "relevant" to *Howey*, whether others tend to show an element of the *Howey* test, and how the Court and jury should interpret contractual provisions); (2) opines that Ripple's actions, including its public statements, had no effect on the price of XRP without analyzing a single such public statement; and (3) offers irrelevant opinions premised on an incorrect legal question (such as the status of XRP as a "currency" or that it has "use").

### A.    Ferrell's Background

Ferrell is a law professor at Harvard Law School who has served as an expert witness on more than 100 occasions.  (Ferrell Tr. (Ex. 24) 61:18-62:20.)  Ferrell has performed an event study as part of his previous expert work possibly more than 50 times.[11]  (*Id.* at 66:16-67:4.)  He also has conducted and provided instruction on event studies for his academic work.  (*Id.* at 67:20-68:1.)

---

[11] An event study is a statistical method commonly used in litigation to determine whether a "disclosure caused any price reaction" in a given asset's market price.  M. Laurentius Marais, et al. "Application of Event Study Methods in Litigation Services," Litigation Services Handbook, 3d Ed. (2002) (Ex. 25).

B.      **Ferrell's Reports**

1.      **Ferrell's Opening Report**

Ferrell offers six opinions in his opening report, including on the ultimate questions in this case: (i) Ripple's contracts for the distribution of XRP do not entitle the counterparties to a share of Ripple's profits or require Ripple to take steps to increase the price of XRP; (ii) speculative demand for an asset is "neither unique to nor indicative of an investment contract"; (iii) XRP purchasers "can have no reasonable expectation of profits from the efforts of Ripple" because, according to Ferrell, XRP's long-term price movements cannot be attributed to Ripple's actions; (iv) Ripple's distribution of XRP did not affect XRP's price; (v) Ripple and XRP purchasers "are not part of a common enterprise"; and (vi) XRP is "properly viewed as a virtual currency." (Ferrell Report ¶ 15.)

2.      **Ferrell's Rebuttal Report**

Ferrell also purports to rebut ███████ opinions. (*See* Ferrell Rebuttal Report ¶ 7.) Ferrell opines that (i) ███ does not establish that Defendants' trading caused "any long-term sustained effect" on XRP's price; (ii) ███████ conclusion that Defendants executed XRP sales in a manner designed to increase, or minimize any decrease in, XRP's price is "not relevant to determining whether the economic substance of [D]efendants' offers and sales of XRP constitute an investment contract"; (iii) the "long-run prices of XRP" were influenced by changes in other cryptocurrencies' prices and not by Ripple; (iv) ███████ conclusions that Ripple sold XRP to fund its operations, repurchase equity, and pay executive compensation are "irrelevant to whether the economic substance of XRP constitutes an investment contract"; and (v) "[a]s a matter of economic substance, holders of XRP are holders of a virtual currency." (*Id.* ¶ 11.)

Three out of five of Ferrell's rebuttal opinions consist—much like his opening opinions—of his views as to whether something is "relevant" to whether the "economic substance" of XRP constitutes an "investment contract." (*See id.* (opining that ███████ conclusions that (i) Defendants

executed XRP sales in a manner consistent with increasing, or minimizing any decrease in, XRP's price "are not *relevant* to determining whether the economic substance of [D]efendants' offers and sales of XRP constitute an investment contract" and "do[] not support an opinion that XRP is a security"; (ii) Ripple sold XRP to fund its operations is "*irrelevant* to whether the economic substance of those [XRP] sales constitutes an investment contract"; and (iii) Ripple used XRP to compensate executives is "*irrelevant* to whether the economic substance of XRP constitutes an investment contract") (emphasis added)); *see also id.* ¶¶ 8, 14, 31, 33, 41, 47, 48, 54, 62, 65 (same).)

### 3. Ferrell's Supplemental Report

Ferrell also offers rebuttal opinions to ████ supplemental report, (Ferrell Supp. Report ¶ 2), opining that:  (i) ████ methodology for determining the counterfactual XRP price but-for Ripple news was flawed (*id.* ¶¶ 8-13); and (ii) ████ opinions are inconsistent with Ferrell's opinion that "XRP's long-run price return are associated with factors outside Ripple's control, namely, price returns of cryptocurrencies" (*id.* ¶¶ 14-21).  Ferrell also describes a statistical analysis he performed prior to submitting his Report that he did not disclose therein.  (*Id.* ¶ 19; Ferrell Tr. 33:24-34:6.)

### C. Ferrell's Legal Opinions Should Be Excluded as Improper and Irrelevant.

The core legal issue in this case is whether Defendants offered and sold XRP as an "investment contract," as that term is used in the Securities Act.  As Ferrell concedes, an "investment contract," the "economic substance" of an investment contract, and "common enterprise" are all legal—*not* economic—concepts.  (*See* Ferrell Tr. 14:4-8 ("Q. So my question is, does 'investment contract' have a generally accepted meaning in the field of economics?  A. My understanding of the phrase 'investment contract' is it's a legal term."); *see also id.* at; 16:24-17:7, 17:10-16; 23:15-22, 295:2-6.)

Accordingly, each and every opinion interpreting what an "investment contract" is (*e.g.*, Ferrell Report ¶¶ 11-13, 15, 33-81; Ferrell Rebuttal ¶ 11), what its "economic substance" entails (*e.g.*,

Ferrell Report ¶¶ 12, 15, 82-83, 89; Ferrell Rebuttal ¶¶ 11, 41, 65), whether there existed a "common enterprise" (*e.g.*, Ferrell Report ¶¶ 15, 140-45), or whether particular evidence is "relevant" to these inquiries (*e.g.*, Ferrell Report ¶¶ 15, 83-89; Ferrell Rebuttal ¶¶ 8, 11, 14, 31, 33, 47, 48, 62, 65) is a legal opinion and should be excluded.  To permit an expert to testify as to the "relevance" of a piece of evidence to the legal test at issue here, or whether a particular prong of that test has been met, would plainly usurp the Court and the jury's roles, and is fundamentally contrary to *Daubert* and the Federal Rules of Evidence.  *See Bilzerian*, 926 F.2d at 1294; *Fin. Guar.*, 2020 WL 4251229, at *5, 7 (granting motion to exclude expert opinions "for impermissibly opining on legal issues"); *see also supra* Argument Sections I.B.1 & V.B.1.

Similarly, Ferrell's opinions interpreting the terms of Ripple's XRP sales contracts plainly invade the province of this Court—which does not need assistance in interpreting contracts—and should be excluded as impermissible legal opinion.  *See, e.g., Marx*, 550 F.2d at 508-11 (holding that experts may not "construe" contracts and that "opinions as to the meaning of the contract terms at issue," "the legal obligations of the parties under the contract," and "the legal standards which [expert] believed to be derived from the contract" should have been excluded).

Moreover, at least some of these improper legal opinions are also irrelevant.  Ferrell opines that the contracts he reviewed do not provide XRP purchasers with certain rights traditionally associated with common stock such as dividends or voting rights.  But the Supreme Court has rejected the argument that a lack of rights traditionally associated with equity securities is relevant to the investment contract analysis.  *See Tcherepnin*, 389 U.S. at 343 (rejecting conclusion that asset in question was not a security simply because purchase of the asset did not provide investor access to promoter's books and records); *Aqua-Sonic*, 687 F.2d at 578 (holding that a private company that had "retained … voting rights to all of [its] stock" had sold an investment contract).  Indeed, in *Howey*, investors did not have rights to dividends from, or voting rights over, either of the two separate legal

entities that marketed and sold the instruments, as the *Howey* record shows and as another Ripple expert—Easton—recognizes.  (*See* Easton Rebuttal Report ¶ 17 (no right to profits of Howey-in-the-Hills Corp. sold as part of investment contracts).)

### D.   Ferrell's Remaining Opening Opinions Should Be Excluded on Other Grounds.

#### 1.   Ferrell's Opinions that Ripple Did Not Affect the Price of XRP Are Unreliable.

Ferrell's principal opinion is that the "long-run price of XRP for the period August 2013 to December 2020 has not resulted from Ripple's efforts" (Ferrell Report ¶ 15), or that, in other words, "the economic reality [is] that Ripple's efforts do not impact XRP prices" (*id.* ¶ 90).  In reaching this conclusion, Ferrell focuses on (1) changes in the price of other digital assets and their correlation to changes in the price of XRP and (2) Ripple's distributions of XRP—not all of which were known to investors—and whether Ripple sold XRP in ways that affected the price of XRP.  As to the former, Ferrell concludes that XRP's price movements can be explained by changes in the price of other digital assets in the broader crypto markets—although, as his data shows, only *in part*—and, from there, jumps to the conclusion that Ripple's efforts did not affect XRP's price *at all*.  (*Id.* ¶ 118.) As to the latter, Ferrell examines a single Ripple action, its distributions of XRP, and concludes they did not affect XRP's long-run price changes.  Neither analysis adequately supports Ferrell's opinion that the long-run price of XRP was not impacted by Ripple's public statements.  The opinion should therefore be excluded.

##### a.   Ferrell's Factor Model Methodology Is Unreliable and Does Not Support His Conclusion.

Ferrell's opinion that "variation in long-run XRP price return can be explained by non-XRP cryptocurrency market factors that are outside of Ripple's control" (Ferrell Report ¶ 103) is based on an improperly narrow methodology.  This portion of his analysis is not based on an event study— the standard method for determining whether a company's actions affect an asset's price.  *See, e.g., In*

*re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017) (the "generally accepted event study approach" is employed "[t]o prove that a stock was responding to a specific piece of information on a specific day" (citations omitted)).

Instead of applying this generally accepted methodology, Ferrell employs a factor model to examine XRP's long-term price. (Ferrell Report ¶ 91.) His selection of a factor model is novel and unsupported. Ferrell cites no academic or professional studies in his Report which employs a factor model to assess whether a company action (particularly those not known to the public—the focus of Ferrell's analysis of Ripple's XRP distributions) affected an asset's price. (*See id.* ¶¶ 90-106.) Ferrell himself has performed an event study more than 50 times in previous expert engagements but never a factor model. (*See* Ferrell Tr. 66:16-67:4; 79:14-80:17.)

Moreover, it is missing a critical piece, with the result that his conclusion about Ripple's actions and XRP's prices is unsupported. Using an event study, researchers determine whether non-company, market, and sector wide news affect the price of the asset and *also* whether company-specific actions affect the price of the asset. Ferrell's analysis of this issue, by contrast, is incomplete and illogical. It answers only the question of whether non-company factors affected the price of XRP and concludes that because the answer is "yes," the answer to the whether Ripple's actions had an affect must be "no," based on nothing other than Ferrell's own say-so.

An early step of an event study is to estimate the asset price change one would expect on a given day (the "predicted return"), by incorporating "factors" that may affect the asset's price, such as news that has market-wide relevance (*i.e.*, an unexpected change in the economic and market environment), and news that is sector-specific (*i.e.*, the introduction of a new competitor).[12] *See* A. Craig MacKinlay, "Event Studies in Economics and Finance," Journal of Economic Literature, Vol.

---

[12] The prefatory step is to identify an "event of interest" to be studied, which Ferrell does not here. *See* MacKinlay (Ex. 26) at 14.

XXXV, at 15 (March 1997) (Ex. 26).  This predicted return therefore estimates the portion of the asset's return on the event day that can be explained by market and sector "factors" and not by the at-issue event.  In the next step, a researcher compares the predicted return with the actual price change on the event day.  (*Id.*)  This difference between the actual and predicted returns (the "abnormal return") represents the estimated impact of the event, *i.e.*, the portion of the price change on the event day that cannot be explained by market and sector "factors."  (*Id.* at 15-16.)  Finally, an event study assesses the statistical significance of the calculated abnormal return on the event day, by employing a statistical test (often a "t-test") to assess whether a given day's abnormal return is large enough in magnitude, relative to historical daily price fluctuations, to be deemed unusual or statistically significant and, thus, statistically related to the disclosure or event at issue.  (*Id.* at 15-16.)

      Ferrell's "factor model" is improper because it stops at the first step, calculating returns due to *non-Ripple* market and sector "factors" (Ferrell Report ¶ 103)), without actually asking if XRP is correlated with *Ripple* factors.  Other than a single exception limited to Ripple's distributions of XRP (discussed below), Ferrell makes no attempt to investigate if Ripple's actions actually affected XRP returns.  Without this inquiry, Ferrell lacks any methodological basis to conclude that Ripple's actions did not impact XRP returns.  Unsurprisingly, in his deposition, Ferrell conceded that in order to draw a conclusion as to what or whether additional factors might explain XRP returns, an expert would have to analyze those specific factors, a step Ferrell himself did not take.  (*See* Ferrell Tr. 223:11-224:16.)

      Ferrell attempts to sidestep this problem by premising his conclusion that Ripple did not impact XRP's price on his observation that the "alphas" in his factor model are not statistically significant.  (Ferrell Report ¶¶ 102-03.)  From this, he concludes he cannot reject the null hypothesis that alpha is zero, which he interprets as evidence "consistent with the average monthly Ripple price