UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>　　　　　　　　　　Defendants. | Case No. 20-CV-10832 (AT) (SN) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF ▮▮▮▮▮▮▮▮**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................. 1

BACKGROUND .............................................................................................................................. 2

LEGAL STANDARD ....................................................................................................................... 4

ARGUMENT ................................................................................................................................... 5

    I.    ▆▆▆▆ Opinions on Defendants' Trading Activity Should Be Excluded. ................... 5

        A.    ▆▆▆▆ Opinions on Defendants' Trading Activity Are Not Based on a Reliable Methodology Applied to Sufficient Facts or Data. ................................ 5

        B.    ▆▆▆▆ Opinions on Defendants' Trading Activity Exceed the Limits of What His Methodology Could Support. ............................................................... 9

    II.    ▆▆▆▆ Remaining Opinions Are Not Based on Any Reliable Methodology and Should Also Be Excluded. ...................................................................................... 11

    III.    ▆▆▆▆ Opinions Are Irrelevant and Outweighed By Rule 403 Concerns. ................. 13

CONCLUSION .............................................................................................................................. 14

i

**TABLE OF AUTHORITIES**

**Cases**

*Conti v. Doe*,
  2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020)..........................................................................14

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................................ *passim*

*E.E.O.C. v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) .................................................................................................6

*Forte v. Liquidnet Holdings, Inc.*,
  2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015)......................................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018)....................................................................7, 9, 10, 12

*In re Mirena IUD Prod. Liab. Litig.*,
  169 F. Supp. 3d 396 (S.D.N.Y. 2016)..................................................................................12

*In re Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004).............................................................................9, 11

*Israel v. Spring Indus., Inc.*,
  2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006).......................................................................10

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
  2015 WL 545662 (S.D.N.Y. Sept. 16, 2015).......................................................................14

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005)...................................................................................................4

*SEC v. Lek Sec. Corp.*,
  370 F. Supp. 3d 384 (S.D.N.Y. 2019).........................................................................5, 6, 10

*United States v. Dukagjini*,
  326 F.3d 45 (2d Cir. 2003).....................................................................................................4

*United States v. Tuzman*,
  2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017) .......................................................................8

**Other Authorities**

Fed. R. Evid. 403 .......................................................................................................... *passim*

Fed. R. Evid. 702 .......................................................................................................... *passim*

██████████████████████████████████████████████████
████ (2003).................................................................................................................7

# INTRODUCTION

▓▓▓▓▓▓ seeks to offer expert opinion testimony about whether Ripple Labs Inc. ("Ripple"), Bradley Garlinghouse, and Christian A. Larsen (together, "Defendants"), "took steps to influence XRP prices," and whether "incentives . . . might have been present for Ripple to attempt to influence the price of XRP."[1] Rep. ¶ 1.  Specifically, ▓▓▓▓ seeks to offer six opinions: two "trading activity" opinions concluding that Defendants purchased and sold XRP in a manner "consistent with" attempting to influence the price of XRP, *id.* ¶ 9a-b, and four additional opinions about Defendants' incentives and sales practices relating to XRP, *id.* ¶ 9c-f.[2] None of these opinions satisfy the standards of *Daubert* and Rule 702.

*First*, ▓▓▓▓▓ "trading activity" opinions are not supported by a reliable methodology or by sufficient facts or data.  To reach his first opinion—that Defendants purchased XRP "in a manner consistent with" trying to increase prices or create a price floor, *see* Rep. Sections IV and V—▓▓▓▓ analyzed an extremely limited, cherry-picked set of data.  Specifically, he considered just portions of a cumulative 19 days from across a nearly eight-year period, and from that already-miniscule time period selected even narrower slices of XRP market trading data—all while inconsistently choosing different aspects of that trading data to analyze on different dates. And to reach his second opinion—that Ripple sold XRP "to minimize downward pressure on the price of XRP," *see id.* Section VI—▓▓▓▓ omitted key steps from the statistical methodology he claimed to follow; had he included those steps, they would have undermined his conclusion.

---

[1] *See* Ex. 1, Amended Expert Report of ▓▓▓▓▓▓ (Oct. 13, 2021) ("Rep.") ¶ 1. Citations to "Ex. __" refer to exhibits attached to the accompanying Declaration of Andrew J. Ceresney.

[2] ▓▓▓▓▓ expert report identified six conclusions, which he labeled "a" through "f." *See* Rep. Section II.  Opinions "a" and "b" are referred to herein as the "trading activity" opinions, and are addressed in Section I, *infra*.  Opinions "c" through "f" are addressed in Section II, *infra*.

*Second*, ▆▆▆ conclusions far exceed the bounds of what his "trading activity" analyses could support even if they were done correctly. ▆▆▆ repeatedly opines that Defendants appear to have been "successful" in influencing XRP's price. But he admits he did not do anything to test whether Defendants' actions caused any XRP price changes, and he made no effort to examine alternatives that he admitted were "obvious" possible explanations for those price changes. Case law forecloses the admission of junk science of this sort.

*Third,* ▆▆▆ four additional opinions about Defendants' incentives and sales practices lack any reliable methodology. They are based on nothing more than ▆▆▆ say-so, rendering them unreliable, and would provide nothing meaningful to the jury beyond what is already in the factual record. On each of those bases, these other opinions should also be excluded.

*Fourth*, ▆▆▆ opinions should be excluded as irrelevant and unduly prejudicial. ▆▆▆ opinions about fluctuations in the price of XRP and Ripple's purported incentives to influence XRP's price may have been relevant in a case involving claims of fraud, market manipulation, or other similar conduct, but the SEC has made no such allegations. The question here is whether XRP was an "investment contract" within the meaning of the federal securities laws. Am. Compl. (ECF No. 46) ¶¶ 31, 231. On that question, ▆▆▆ testimony has no bearing whatsoever and should be excluded for this threshold reason alone. Even if there were any probative value to ▆▆▆ opinions, they are highly likely to mislead the jury and unfairly prejudice Defendants. The obvious purpose of ▆▆▆ testimony is to paint Defendants as market manipulators and invite the jury to rule against them on that improper and unfounded basis. The Court should not allow it.

## BACKGROUND

▆▆▆ is a Professor of Finance at ▆▆▆ University of ▆▆▆, and the founder, owner, and president of Integra FEC, LLC ("Integra"), an

expert consulting firm.  Rep. ¶¶ 3, 5.  Three of the SEC's experts in this case hail from Integra. Integra ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇."[3]  Integra has received $17.6 million in government contracts since 2012, of which approximately $15 million came from the SEC.[4]  During his deposition, ▇▇▇▇ acknowledged that the SEC accounts for more than 50 percent of Integra's annual revenue.  *See* Ex. 2, Dep. Tr. ▇▇▇▇▇▇ ("Tr.") 34:14-25.

▇▇▇▇ opines that Ripple and its executives purchased and sold XRP on particular dates in 2016 and 2017 "in a manner consistent" with attempting to influence the price of XRP, though he did no analysis to determine whether Defendants' actions *correlated* with changes in the price of XRP, much less *caused* any price movement.  Rep. ¶ 9.  To reach his findings, ▇▇▇▇ reviewed trading data from just a handful of days (portions of seven non-consecutive days for Ripple and twelve days for Larsen) out of the nearly eight-year period at issue in the SEC's complaint, drawn from just a single digital asset marketplace (the XRP Ledger for Ripple, Poloniex for Larsen) and relating to a single currency pair (XRP to US Dollars (USD) for Ripple, XRP to bitcoin (BTC) for Larsen).  *Id*. Figures 1-5.  He looked at no trading data at all with respect to Garlinghouse.  ▇▇▇▇ plotted the short-term price of XRP during those narrow windows to conclude that Defendants purchased XRP "in a manner consistent with" positively influencing XRP prices.  *Id*. Sections IV and V.  ▇▇▇▇ also performed a regression analysis to conclude that Ripple sold XRP "in a manner consistent with" seeking to minimize downward pressure on XRP prices.  *Id*. Section VI.  Finally, without applying any methodology beyond his

---

[3]  *Integra FEC*, https://www.integrafec.com (last visited July 12, 2022).
[4]  GovTribe, *Integra FEC, LLC*, https://govtribe.com/vendors/integra-fec-llc-6ppl5 (last visited July 12, 2022).

own *ipse dixit*, ▬▬▬ goes further to opine about Defendants' supposed "incentives" to attempt to influence the price of XRP—for example, that Defendants' "sales of XRP functioned similarly to that of a public equity offering for Ripple." *Id.* ¶ 9.

## LEGAL STANDARD

Expert testimony is admissible under Rule 702 only if the trial court determines that: (*i*) the witness is "qualified as an expert" to testify on a particular matter, (*ii*) the opinion is based upon reliable data and methodology, and (*iii*) the expert's testimony will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005); Fed. R. Evid. 702. Expert testimony must also be "based on sufficient facts or data." Fed. R. Evid. 702(b). "[T]he trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony must also satisfy Rule 403: "Its probative value must not be substantially outweighed by unfair prejudice [or] juror confusion." *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003); Fed. R. Evid. 403. Because "[e]xpert evidence can be both powerful and quite misleading," the "judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (citation omitted). The SEC bears the burden of establishing by a preponderance of the evidence that its proposed expert and his testimony meet the requirements of Rule 702. *Daubert*, 509 U.S. at 592-93 n.10.

# ARGUMENT

I. ▇▇▇▇ **Opinions on Defendants' Trading Activity Should Be Excluded.**

   A. ▇▇▇▇ **Opinions on Defendants' Trading Activity Are Not Based on a Reliable Methodology Applied to Sufficient Facts or Data.**

▇▇▇▇ first trading activity opinion—that Defendants purchased XRP "in a manner consistent with" positively influencing the price of XRP, Rep. Sections IV and V—applies an inconsistent methodology to a miniscule, unrepresentative data set to support a preordained conclusion. His second opinion—that Ripple sold XRP "to minimize downward pressure on the price of XRP," *id*. Section VI—ignores critical steps from the methodology he claimed to follow that, if applied, would have fatally undermined his conclusion. These defects render ▇▇▇▇ trading activity opinions unreliable and they should be excluded.

   1. ▇▇▇▇ **Opinion on Defendants' Purported Attempt to Positively Influence XRP Price Is Based on Insufficient Data and an Inconsistent Methodology.**

To reach his opinion that Defendants purchased XRP "in a manner consistent with" positively influencing XRP's price, *id*. ¶ 9a, ▇▇▇▇ failed to apply a reliable methodology and failed to consider "sufficient facts or data." Fed. R. Evid. 702(b). Where experts analyze an "extremely limited set of data [that] provides no reliable basis from which to form an opinion about the larger set of" data, it is grounds for exclusion. *SEC v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 414 (S.D.N.Y. 2019) (excluding expert's "broad conclusions based on an examination of a miniscule set of trades," including opinions premised on analysis of trading in a single security over a short period of time). That is what ▇▇▇▇ did here: he considered miniscule amounts of data, and at every step took inconsistent approaches in selecting which data to consider.

*First*, the trading windows analyzed by ▇▇▇▇ are extremely short-lived and irregular. For Ripple's purchases of XRP, ▇▇▇▇ considered four non-continuous windows: a 48-hour

5

window on April 10-11, 2016; a 30-hour window on September 15-16, 2016; a 48-hour window on September 25-26, 2016; and a two-and-a-half-hour window on November 1, 2016. *See* Rep. Figures 1-4. For Larsen, ▮ considered a single continuous purchasing window, but still a very small one—just June 3-14, 2017. *Id*. Figure 5. There were 2,912 total days during the "offering" alleged in the Amended Complaint;[5] ▮ analysis covers portions of just seven of them (0.2%) for Ripple, twelve (0.4%) for Larsen, and none for Garlinghouse. That alone requires exclusion. *See Lek*, 370 F. Supp. 3d at 414 (excluding expert whose opinion was limited to a "miniscule set of trades"); *E.E.O.C. v. Freeman*, 778 F.3d 463, 469-70 (4th Cir. 2015) (Agee, J., concurring) ("omitting data might distort the result by overlooking unfavorable data").

*Second*, even within these very brief windows of time, ▮ analysis is further confined to only a small subset of Defendants' XRP purchases. For Ripple's purchases of XRP, the analysis is confined to transactions (*i*) by a single market maker (GSR), (*ii*) on the XRP Ledger, and (*iii*) in the XRP/USD currency pair. Putting aside the thousands of days of trading activity that ▮ ignores (amounting to more than 99% of the days within the relevant period), ▮ omits significant aspects of trading activity data from the days he does consider: he does not, for example, (*i*) assess XRP purchases by other market makers, (*ii*) consider purchases on any centralized digital asset exchanges (companies like Coinbase or Poloniex) or foreign exchanges, or (*iii*) consider prices for any currency pair other than XRP/USD. Nor does ▮ ever explain why such data was excluded from his analysis, or whether, had he examined this other data, his conclusions would change. Even ▮ admits that his restrictions omitted an enormous amount of data; the decision to focus solely on XRP Ledger trading rather than

---

[5] The SEC does not specify the start date of the alleged "securities offering," beyond alleging that it took place "[f]rom *at least* 2013 to the present." Am. Compl. (ECF No. 46) ¶ 1 (emphasis added). For purposes of the analysis here, Defendants assume that the alleged "securities offering" began on January 1, 2013.

centralized exchanges, for example, resulted in ignoring roughly 85% of XRP trades, even before considering the other exclusions. *See* Tr. 143:13-22.

▇▇▇ analysis for Larsen is also extremely limited, but takes largely the opposite approach: there, ▇▇▇ limited his analysis to purchases of XRP (*i*) made by GSR, (*ii*) on the digital asset exchange Poloniex (not on any other digital asset exchange and not on the XRP Ledger), and (*iii*) in the XRP/BTC currency pair (not XRP/USD or any other pair). In other words, not only did ▇▇▇ consider tiny trading windows for Ripple and Larsen (and none at all for Garlinghouse), but he chose completely different benchmarks to evaluate for Ripple and Larsen even within those tiny windows. ▇▇▇ offers no methodology for this haphazard, inconsistent sample selection, and no explanation for why he chose different parameters for Larsen than for Ripple. He sheds no light at all about what fraction of the total trading data these parameters would capture. ▇▇▇ inconsistent and cherry-picked approach for measuring XRP price movements represents "the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that is properly excluded." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 502 (S.D.N.Y. 2018) (citation omitted).

2. ▇▇▇ **Opinion on Seeking to Minimize Downward Pressure on XRP Prices Skips Critical Methodological Steps.**

▇▇▇ opinion about Ripple's supposed intent to avoid decreasing the price of XRP, Rep. ¶ 9b, is equally unreliable. To reach that opinion, ▇▇▇ performed a regression analysis, claiming to "follow[] the same buy-sell imbalance regression methodology as ▇▇▇  " *Id*. ¶ 34 n.41 (citing Ex. 3, ▇▇▇ ▇▇▇ (2003)). But he admitted at his deposition

7

that in fact he did not follow that methodology.[6] *See* Tr. 226:9-18. Rather, he departed from it in two important ways, both of which would have undercut his opinion had he adhered to the methodology from his own published ▇. Because ▇ failed to follow the methodology on which his testimony purports to rely, the Court should exclude his testimony. *See United States v. Tuzman*, 2017 WL 6527261, at *17 (S.D.N.Y. Dec. 18, 2017) (finding that an expert's "failure to follow the methodology set forth in his two research papers on which he purports to rely renders his testimony unreliable.").

*First*, Griffin's regression analysis deviates from his 2003 methodology by failing to examine "price return" as a dependent variable.[7] That failure is critical: ▇ could not dispute that, had he followed this step, his regression would have shown that there was no statistically significant impact of Ripple's trading activity on XRP price returns. *See* Ex. 4, Rebuttal Expert Report of Allen Ferrell (Nov. 12, 2021) ("Ferrell Rebuttal Rep.") ¶¶ 44-45 (recalculating results using ▇ 2003 methodology); Tr. 258:8-18. *Second*, ▇ regression analysis deviates from his 2003 methodology by not examining "contemporaneous imbalance"—meaning, in general terms, whether Ripple's market makers were net sellers or net buyers of XRP *at the same time* that prices were going up or down. The 2003 methodology examines contemporaneous imbalance; here, however, ▇ only looked at trading balances on the days *after* those price changes. ▇ does not dispute that had he employed the 2003 methodology here, he would have found *no* statistically significant correlations, Ferrell Rebuttal Rep. ¶ 45 (recalculating results using ▇ 2003 methodology); Tr. 248:2-7—and therefore would not have reached

---

[6] For purposes of this motion, Defendants assume *arguendo* that the methodology set forth in ▇ 2003 ▇ is generally accepted and would have provided a reliable basis for ▇ opinion had he followed it.

[7] Price return generally refers to the change in price of XRP, whether increasing or decreasing.

the conclusion that Ripple's trades were "designed to minimize downward pressure on the price of XRP." Rep. ¶ 9b.

██████ report offers no justification for, nor even mention of, these departures from *his own* methodology. They make no sense as a matter of economic principles either: if the goal is to learn whether someone is attempting to influence prices, it makes sense to look at their trading patterns *while* prices are changing (*i.e.*, contemporaneous imbalance)—not their trading patterns in the days *after* prices already changed. ██████ failure to follow *his own* methodology demonstrates that he was "not employing in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field, or at the very least this particular expert." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 564 (S.D.N.Y. 2004). This is grounds for exclusion.

      **B.**     **██████ Opinions on Defendants' Trading Activity Exceed the Limits of What His Methodology Could Support.**

Even if he had applied his methodology reliably, ██████ seeks impermissibly to offer conclusions that far exceed the bounds of what his methodology would support. This also requires exclusion. *See In re LIBOR*, 299 F. Supp. 3d at 468 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.") (citation omitted).

To take just a few examples in which ██████ repeats this practice—*first*, he opines that Defendants made efforts to "positively influence XRP prices," citing "emails from as early as 2016." Rep. ¶ 17. But ██████ does not examine a single Ripple purchase after November 2016, nor a single trade by a Ripple executive from any date outside of June 2017. *Second*, he opines that "from at least April 2016 to June 2017 certain Ripple executives also expended efforts that

9

appear aimed at protecting the price of XRP at certain price floors," *id*. ¶ 19—but he analyzes only two supposed price floors, consisting of a two-and-a-half-hour window of Ripple trading on November 1, 2016, *id*. Figure 2, and a twelve-day window of Larsen's trading in June 2017, *id*. Figure 5. He points to no "price floors" any time on or before October 31, 2016, nor on any dates *between* November 1, 2016 and June 3, 2017. *See Lek*, 370 F. Supp. 3d at 414 (excluding expert testimony drawing conclusions from an "extremely limited set of data" and applying those to a larger set).[8]  *Third*, ▓▓▓ repeatedly opines that Defendants were apparently "successful" or "succeeded" in influencing the price of XRP, Rep. ¶¶ 18, 20, 25—even though he admits that he did not employ any methodology to test whether Defendants' actions actually caused any changes in XRP prices.[9]  These purported conclusions are all unmoored from any methodology ▓▓▓ employs. That further mandates the exclusion of ▓▓▓ opinions. *See In re LIBOR*, 299 F. Supp. 3d at 468.

▓▓▓ error with respect to his opinions about Defendants' "success[]" in causing XRP price changes is particularly pronounced because he failed to consider obvious alternative explanations for those price changes. "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the [opposing party]." *Israel v. Spring Indus., Inc.*, 2006 WL 3196956, at *5 (E.D.N.Y. Nov. 3,

---

[8]  Indeed, ▓▓▓ "price floor" conclusion does not hold even within the two tiny windows he analyzes; ▓▓▓ own analysis shows that XRP's price dropped below the supposed Larsen-supported "floor" of "around 0.00009 XRP/BTC" multiple times during the twelve-day window he examined. *See* Rep. Figure 5.

[9]  *See, e.g.*, Tr. 103:17-18 ("I'm not opining on whether the price—the price was influenced."); *id*. 126:4-6 ("I'm not opining on whether there is causation. That's beyond the scope of my assignment."); *id*. 132:2-3 ("I'm not opining on causality. That's beyond the scope of my report."); *id*. 167:10 ("I'm not doing a formal causal analysis here."); *id*. 310:25-311:4 ("[I]f you're asking me questions of causality, I'm not opining in this figure. I'm not saying this relationship was causal.").

2006), *aff'd sub nom.*, 2007 WL 9724896 (E.D.N.Y. July 30, 2007); *see also Forte v. Liquidnet Holdings, Inc.*, 2015 WL 5820976, at *7 (S.D.N.Y. Sept. 30, 2015) (Torres, J.) ("[C]ourts routinely find statistical analyses that fail to control for any pertinent nondiscriminatory variables inadmissible."), *aff'd*, 675 F. App'x 21 (2d Cir. 2017).  Here, ▓▓▓▓ admitted that "[o]bviously, all crypto assets move together," Tr. 114:12-13—*i.e.*, that the price of XRP changes based on the price of other digital assets like bitcoin and ether.  But despite conceding this "obvious" relationship, ▓▓▓▓ failed to analyze whether changes in XRP's price were caused by or moved consistently with the price of other crypto assets during his windows of analysis.  This, too, mandates exclusion.

## II.      ▓▓▓▓ Remaining Opinions Are Not Based on Any Reliable Methodology and Should Also Be Excluded.

▓▓▓▓ ends his report with four breezy, conclusory opinions concerning Defendants' XRP sales practices and incentives and suggesting that certain XRP disposed of by Larsen and Garlinghouse could be traced on the blockchain to various other blockchain addresses.  Rep. ¶¶ 9c-f, 36-56.  These opinions are based on no accepted methodology whatsoever and must be excluded.

*First*, ▓▓▓▓ opines that lock-up periods and restrictions on the buyer's resale of XRP in some of Ripple's sales contracts "functioned similarly to lock-up restrictions" in an IPO.  Rep. ¶ 9c.  ▓▓▓▓ performed no expert analysis at all to reach this conclusion.  ▓▓▓▓ offers nothing beyond a factual "narrative" that could have been created through record evidence, thus warranting exclusion.  *See In re Rezulin*, 309 F. Supp. 2d at 551.

*Second*, ▓▓▓▓ opines that Defendants are "incentivized to influence XRP prices in order to maximize the proceeds raised from XRP sales." Rep. ¶ 9d.  ▓▓▓▓ conclusions about Defendants' underlying motivations are based on no methodology, simply ▓▓▓▓ *ipse dixit*.

11

And this conclusion is obvious in any event: almost anyone who owns a fungible asset would hope to see that asset increase in value. "[T]he jury does not need expert opinion because its common sense will suffice." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016).

*Third*, ▓ opines that Ripple "relied on XRP sales to supplement a very significant funding gap." Rep. ¶ 9e. He reaches that "opinion" simply by pointing to Ripple's financial statements, which are already in the record in this case, and reproducing data from them. *See id.* Figures 9-12 (citing to Ripple's audited annual financial statements). This is not an opinion at all, but a presentation of financial data.

*Fourth*, ▓ opines that Ripple "used XRP in a similar manner as companies use stock." *Id.* ¶¶ 9f, 53. ▓ applies no accepted methodology to analyze this issue. Instead, he identifies two specific attributes of stocks (he does not and cannot claim that there are no others, nor does he claim that these attributes are unique to stocks),[10] and says that those same attributes appear in Ripple's treatment of XRP. *See id.* ¶¶ 53-54. ▓ expressly concedes that Ripple's use of XRP is *not* completely similar to how companies use stock, providing several examples, *see id*. ¶¶ 55-56, but he dismisses these exceptions as "peculiar," citing absolutely nothing. This kind of results-driven, *ipse dixit* opinion should be excluded. *See In re LIBOR*, 299 F. Supp. 3d at 502.

*Finally*, ▓ opinion purporting to "trace" certain alleged transfers of XRP by Larsen and Garlinghouse, Rep. ¶¶ 37-40; App'x E, should be excluded. ▓ tracing analysis is irrelevant as it does not include an opinion about whether the XRP was sold by GSR,

---

[10] To illustrate, ▓ asserts that "[c]ompanies also use equity or options on equity as a means to deliver substantial compensation to company executives and top managers," and that Ripple paid executive compensation in XRP. *Id.* ¶ 54. But that is equally true of currency—companies use *dollars* to deliver compensation to executives too.

12

*see, e.g.*, Tr. 322:9-17, if the XRP was sold, when it was sold, *see, e.g.*, *id*. 322:2-7, whether the XRP was originally sold by Larsen, *see id*. 327:16-328:8, and if it was sold, the precise proceeds of any sale. *See, e.g.*, *id*. 306:9-24. Even if the opinion was relevant, it is speculative and unreliable because even ▮ admits that after the first direct transfer from a wallet, the analysis decreases in reliability after each transfer, *see, e.g.*, *id*. 330:23-331:4, 336:19-20, 338:24-25, the analysis does not establish who controls the XRP, *see, e.g.*, *id*. 340:8-18, and the certainty about who controls the XRP decreases after each transfer. *See, e.g.*, *id*. 329:8-14; Rep. ¶ 38.

### III. ▮ Opinions Are Irrelevant and Outweighed By Rule 403 Concerns.

▮ himself frames the questions he seeks to answer as (*i*) whether Defendants "took steps to influence XRP prices," and (*ii*) what "incentives" "might have been present for Ripple to attempt to influence the price of XRP." *Id*. ¶ 1. Any answers to those questions—and thus all of the testimony ▮ seeks to offer—are facially irrelevant.

The SEC's claim in this case is that Defendants sold unregistered securities in violation of 15 U.S.C. § 77e, on the theory that XRP was an "investment contract" and therefore a "security" under the federal securities laws. *See* Am. Compl. (ECF No. 46) ¶¶ 1, 9, 231. There are no claims for market manipulation, fraud, or anything else of the sort. Accordingly, ▮ opinions, which seek to establish that Defendants attempted to influence the price of XRP and had incentives to do so, have no bearing on the claims and defenses in this case. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (citation omitted). Even if a jury credited ▮ opinions in full, attempting to influence the price of XRP or having an incentive to do so would make it no more or less likely that XRP was an investment contract; it could just as easily be a commodity or

13

some other type of asset beyond the scope of SEC regulation. ▇ opinions should be excluded for that reason alone. *See Conti v. Doe*, 2020 WL 6162104, at *5, *7 (S.D.N.Y. Oct. 21, 2020) (excluding expert opinion that was "wholly irrelevant" to the claim at issue and noting "[t]he relevance of an expert opinion depends primarily on the parties' claims and defenses").

The real purpose of this irrelevant testimony—to tar Defendants as bad actors—is unfairly prejudicial, and that prejudice far outweighs any probative value ▇ testimony may have. The very framing of the questions that the SEC asked ▇ to address, to say nothing of his answers to them, invites the jury to conclude improperly that Defendants engaged in some sort of fraudulent scheme and to find against them on that inappropriate basis. *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *8 (S.D.N.Y. Sept. 16, 2015) (excluding expert opinions that were "untethered to the [legal] standard at issue, [as] they are irrelevant and would be unhelpful and misleading to the trier of fact"). Indeed, at his deposition, ▇ testified at length about his credentials relating to studying ▇ and his belief that there is manipulation among "major cryptocurrency assets," which include XRP. *See, e.g.*, Tr. 52:11-25 ▇ on "▇" in digital asset market); *id*. 160:25-162:1 ("[I]t's definitely possible and our ▇ show that other digital assets were—were moved and manipulated"). These not-at-all-subtle winks to the jury are deeply prejudicial to Defendants and far outweigh any probative value ▇ can offer; allowing ▇ to present them at trial would run afoul of Rule 403.

## **CONCLUSION**

For the reasons above, the Court should exclude ▇ testimony in its entirety.

Dated: New York, New York
July 12, 2022

14

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

By: /s/ *Andrew J. Ceresney*
      Andrew J. Ceresney
      Erol Gulay

      919 Third Avenue
      New York, NY  10022
      (212) 909-6000
      aceresney@debevoise.com
      egulay@debevoise.com

KELLOGG, HANSEN, TODD, FIGEL, & FREDERICK PLLC

*Counsel for Defendant Ripple Labs Inc.*

CLEARY GOTTLIEB STEEN & HAMILTON LLP

*Counsel for Defendant Bradley Garlinghouse*

PAUL, WEISS, WHARTON, RIFKIND & GARRISON LLP

*Counsel for Defendant Christian A. Larsen*