# Exhibit 15

1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4     SECURITIES AND EXCHANGE          )
      COMMISSION,                      )
5                                      )
                     Plaintiff,        )
6                                      ) Case No.
            v.                         ) 20-Civ-10832(AT)(SN)
7                                      )
      RIPPLE LABS, INC., BRADLEY       )
8     GARLINGHOUSE, and CHRISTIAN      )
      LARSEN,                          )
9                                      )
                     Defendants.       )
10    _____)

11

12

13                    VIDEOTAPED DEPOSITION OF

14                       BRADLEY T. BORDEN

15                    Friday, December 3, 2021

16

17

18

19

20

21

22

23

      Reported by:
24    BRIDGET LOMBARDOZZI,
      CSR, RMR, CRR, CLR
25    JOB No. 211203BLO

2

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                    Plaintiff,      )
6                                   ) Case No.
              v.                    ) 20-Civ-10832(AT)(SN)
7                                   )
     RIPPLE LABS, INC., BRADLEY     )
8    GARLINGHOUSE, and CHRISTIAN    )
     LARSEN,                        )
9                                   )
                    Defendants.     )
10   _____)

11

12

13

14

15          Videotaped deposition of BRADLEY T. BORDEN

16   taken on behalf of Plaintiff, held at the offices of

17   Debevoise & Plimpton, 919 Third Avenue, New York,

18   New York, commencing at 9:15 a.m. and ending at

19   3:55 p.m., on Friday, December 3, 2021, before

20   Bridget Lombardozzi, CCR, RMR, CRR, CLR, and Notary

21   Public of the States of New York and New Jersey,

22   pursuant to notice.

23

24

25

3

1    A P P E A R A N C E S (Via Remote where indicated):

2

3

4    For the Plaintiff:

5

6

7            UNITED STATES SECURITIES AND EXCHANGE

8            COMMISSION, NEW YORK REGIONAL OFFICE

9            BY:  PASCALE GUERRIER, ESQUIRE

10                MARK SYLVESTER, ESQUIRE

11           200 Vesey Street

12           Suite 400

13           New York, New York  10281-1022

14           Telephone:  212.336.0153

15           Email:  guerrierp@sec.gov

16                   sylvesterm@sec.gov

17

18

19

20

21

22

23

24

25

4

1    A P P E A R A N C E S (Continued):

2

3    For Defendant Ripple Labs Inc. and the Witness:

4

5              DEBEVOISE & PLIMPTON LLP

6              BY:  CHRISTOPHER S. FORD, ESQUIRE

7                   LISA ZORNBERG, ESQUIRE

8                   DANIEL MARCUS, ESQUIRE

9              919 Third Avenue

10             New York, New York  10022

11             Telephone:  212.909.6000

12             E-Mail:  csford@debevoise.com

13                      lzornberg@debevoise.com

14                      djmarcus@debevoise.com

15

16

17   For Defendant Bradley Garlinghouse:

18

19             CLEARY GOTTLIEB STEEN & HAMILTON

20             BY:  JORGE BONILLA LOPEZ, ESQUIRE

21             2112 Pennsylvania Avenue, NW

22             Washington, D.C.  20037

23             Telephone:  202.974.1517

24             E-mail:  jbonillalopez@cgsh.com

25

5

```
 1    For Defendant Christian A. Larsen:

 2

 3            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 4            By:  ELI J. ADELMAN, ESQUIRE

 5                 ROBIN LINSENMAYER, ESQUIRE (Remote)

 6            1285 Avenue of the Americas

 7            New York, New York  10019-6064

 8            Telephone:  212.373.3067

 9            E-mail:  eadelman@paulweiss.com

10                     rlinsenmayer@paulweiss.com

11

12    ALSO PRESENT:

13

14            STELLA UVAYDOVA, Paralegal, SEC

15            ERIC NOLAN, Videographer
              Shereck Video Service
16

17

18

19

20

21

22

23

24

25
```

6

1                          INDEX

2     WITNESS                              EXAMINATION

3     BRADLEY T. BORDEN

4         BY MS. GUERRIER                      10

5

6

7

8

9

10                         EXHIBITS

11    SEC
      NUMBER              DESCRIPTION              PAGE
12

13    Exhibit 1    Expert Report of Bradley        14

14                 T. Borden dated 10-4-21

15                 NO BATES, 36 pages

16

17    Exhibit 2    Curriculum Vitae of Professor   107

18                 Bradley T. Borden from

19                 Brooklyn Law School website

20                 NO BATES, 19 pages

21

22    Exhibit 3    Notice 2014-21 Guideline        158

23                 from IRS

24                 NO BATES, 6 pages

25

7

1                          EXHIBITS

2    SEC
     NUMBER              DESCRIPTION              PAGE
3

4    Exhibit 4    Plaintiff's Answers and        177

5                 Objections to Defendants'

6                 First Set of Requests

7                 for Admission

8                 NO BATES, 35 pages

9

10   Exhibit 5    26 CRF 1.61-1:  Gross Income    189

11                Rev. Rul. 2019-24

12                NO BATES, 5 pages

13

14   Exhibit 6    IRS Form 1040 Schedule D        253

15                Capital Gains and Losses

16                NO BATES, 2 pages

17

18   Exhibit 7    IRS Form 8949, Sales and        258

19                Other Dispositions of

20                Capital Assets

21                NO BATES, 2 pages

22

23

24

25

8

1                    DEPOSITION SUPPORT INDEX

2

3      DIRECTION TO WITNESS NOT TO ANSWER

4         Page    Line

5          43       7

6          49       8

7          66      23

8

9

10     STIPULATIONS

11        Page    Line

12         10      20

13

14

15     PORTION MARKED HIGHLY CONFIDENTIAL

16        Page    Line

17         - -none- -

18

19

20     REQUEST FOR DOCUMENTS

21        Page     Line

22         - -none- -

23

24

25

9

```
 1                     -  -  -

 2                  9:15 a.m.

 3              December 3, 2021

 4                     -  -  -

 5              THE VIDEOGRAPHER:  Good

 6         morning.  We are now on the video

 7         record.  Today is Friday, December

 8         3rd, 2021.  The time on the video

 9         monitor is now 9:15 a.m.

10              We're here today for the video

11         deposition of Mr. Bradley Borden in the

12         matter of Securities and Exchange

13         Commission versus Ripple Labs, et al.,

14         filed in the United States District Court

15         of the Southern District of New York with

16         the case index file docket number of

17         20-cv-10832(AT)(SN).

18              My name is Eric Nolan, legal

19         videographer with Shereck Video.

20              Today we're at the offices of

21         Debevoise & Plimpton at 919 Third Avenue,

22         New York, New York.

23              At this time, typically all

24         attorneys enter their appearance, but we

25         have many people in the room and those
```

1          will be as per the written court reporter

2          transcript.

3                    The court reporter today is

4          Ms. Bridget Lombardozzi with AIM.

5                    Ms. Lombardozzi, will you

6          please swear in the witness at this time,

7          after which we may proceed.

8                    B R A D L E Y   B O R D E N,

9          having been duly sworn, was examined and

10          testified as follows:

11                    THE REPORTER:  Thank you.

12                    You may proceed.

13                    MS. GUERRIER:  Thank you.

14     DIRECT-EXAMINATION

15     BY MS. GUERRIER:

16        Q.   Good morning.  I'm Pascal Guerrier.  I'm

17     with the SEC.  I'll be asking questions today.

18     Here with me is my colleague, Mark Sylvester, and

19     we have some SEC staff on the phone.

20                    MR. FORD:  Pascal, before we

21             begin, just to put on the record our

22             usual stipulation that an objection

23             by any one defendant is an objection

24             by all.  We're not going to designate

25             the transcript confidential at this

1          time, but reserve our right to do

2          show if you show Mr. Borden anything

3          that has been marked confidential or

4          highly confidential.

5                    MS. GUERRIER:  That's fine.

6          Okay.

7    BY MS. GUERRIER:

8         Q.   Can you state your full name, please?

9         A.   Bradley Borden.

10        Q.   And where do you reside?

11        A.   Brooklyn, New York.

12        Q.   Are you represented by counsel today?

13        A.   No.

14        Q.   Okay.  You understand that you're giving

15   your testimony under oath?

16        A.   Yes.

17        Q.   Okay.  And do you understand that your

18   questions to my -- my -- your answers to my

19   questions today have the same force and effect as

20   if we were in a courtroom?

21        A.   Yes.

22        Q.   Okay.  Is there anything that will

23   prevent you from testifying truthfully and

24   accurately today?

25        A.   No.

```
 1          Q.   Okay.  If you don't understand my

 2     questions, please let me know and I'll rephrase

 3     them or ask them again.

 4               Please allow me to finish my questions

 5     before you answer so that the court reporter can

 6     get an accurate record.

 7               Also, please verbalize your answers

 8     because nods of the head and other nonverbal

 9     movements cannot be recorded.

10               Do you have any questions?

11          A.   No.

12          Q.   Okay.  If -- also, if you need a break,

13     let me know and we'll accommodate you.

14          A.   Thank you.

15          Q.   Okay.  Just in general, have you had

16     your deposition taken before?

17          A.   Yes.

18          Q.   Okay.  And do you recall when?

19          A.   I had a deposition taken earlier this

20     year, like January or February.

21          Q.   And -- I'm sorry, go ahead.

22          A.   And I think I've had it taken two other

23     times before that.

24          Q.   Okay.  The one -- the deposition that

25     was taken earlier this year, do you recall what
```

13

1   case that was?

2       A.   It's cited in -- in my report.

3       Q.   Okay.  So all the depositions that you

4   just referred to today, are they cited in your

5   report?

6       A.   No.  The ones that were -- I think it

7   was last four years.

8       Q.   Okay.  So we'll get into that later on.

9               MS. GUERRIER:  Exhibit 1.

10          Thank you.

11              MR. FORD:  Bridget, do you

12          need one?

13              THE REPORTER:  Yes.  Thank

14          you.

15              MS. GUERRIER:  Ready?

16   BY MS. GUERRIER:

17       Q.   I've handed you a document premarked

18   Exhibit 1.

19          Do you recognize the document?

20       A.   Yes.  This is my report.

21       Q.   Okay.

22       A.   My expert report.

23       Q.   Okay.  And have you prepared any

24   documents, reports, other than the document that

25   I've listed?

1                    MR. FORD:  Object to the

2              form.  Do you mean in this case --

3                    MS. GUERRIER:  Yes.

4                    MR. FORD:  -- or other

5              cases?

6       A.   In this case this is the only report

7    that I've prepared.

8       Q.   Okay.  And when did you prepare this

9    report?

10      A.   This report was prepared -- it's dated

11   October 4th, 2021.

12      Q.   Okay.  Do you recall when you started

13   preparing the report?

14      A.   I don't know if I recall exactly, but

15   maybe the early part of September 2021.

16      Q.   Okay.  And did you sign the report?

17      A.   Yes.

18      Q.   Do you recall when you signed the

19   report?

20      A.   October.  October 4th, 2021.

21      Q.   Okay.

22                    MS. GUERRIER:  If we could

23              please mark this as Exhibit 1.

24                    (Whereupon, exhibit is

25              presented and marked SEC Borden

1              Deposition Exhibit 1 for identification.)

2     BY MS. GUERRIER:

3         Q.   Have you finished all the work that you

4     were asked to do in this case?

5         A.   Yes.

6         Q.   Okay.  And has any information come to

7     light since you've signed this report that has

8     affected or altered your opinions that are set in

9     your report in any way?

10        A.   No.

11        Q.   Okay.  So are you ready to testify about

12    the final report you're offering in this case?

13        A.   Yes.

14        Q.   Okay.  Do you consider yourself an

15    expert?

16                    MR. FORD:  Object to the

17            form.

18        A.   I'm an expert with respect to the

19    material in the report.

20        Q.   Okay.  Do you advertise yourself as an

21    expert?

22        A.   Yes.

23        Q.   Where do you advertise yourself as an

24    expert?

25        A.   I have a website that says that I

16

```
1    provide expert opinion.

2         Q.   What is the website?

3         A.   Bradborden.com.

4         Q.   Do you -- is this the only advertisement

5    that you have for your services as an expert?

6         A.   My CV lists some cases that I have been

7    retained to be an expert in.

8         Q.   My question is:  Do you advertise your

9    services as an expert other than on your website?

10        A.   Well, that may -- my CV is public on the

11   law school's website.  So it would appear there.

12        Q.   And what is the law school?

13        A.   Brook -- Brooklyn Law School.

14        Q.   Okay.  Do you belong to any expert

15   witness databases?

16                   MR. FORD:  Object to the

17             form.

18        A.   I'm not sure what that -- what that

19   means.

20        Q.   Is there any service that lists you as

21   an expert?

22                   MR. FORD:  Object to the

23             form.

24        A.   Yeah.  I -- I'm -- I'm not -- I'm not

25   sure that any do.
```

17

 1      Q.   Okay.

 2      A.   I...

 3      Q.   Is it possible that you are listed on

 4  expert witness services?

 5                  MR. FORD:  Object to the

 6          form.

 7      A.   Yeah.  When you say -- can you -- can

 8  you describe what you mean by "expert witness

 9  services"?

10      Q.   Well, I asked if you were -- there were

11  any databases that provide expert services where

12  you are listed.

13                  MR. FORD:  Sorry.  There

14          isn't a question pending.

15                  MS. GUERRIER:  Well, he

16          asked me to clarify so I did.  So the

17          question is pending.

18      A.   All right.  Let me just make sure.

19                  MR. FORD:  Do you understand

20          the question?

21                  THE WITNESS:  No.

22      Q.   All right.  So my question was:  Do you

23  belong to any expert witness databases or any

24  services that provide experts?

25                  MR. FORD:  Object to the

1          form; asked and answered.

2     A.   Yeah, I'm not -- I'm not sure how to --

3     to -- to answer that question.  I'm not exactly

4     sure what you're asking.

5     Q.   Are you listed with any company that

6     helps provide expert services?

7               MR. FORD:  Object to the

8          form.

9     A.   That helps provide expert services?

10    Q.   Yes.

11    A.   Again, I don't -- I'm not aware of

12    companies that provide expert services.

13    Q.   Okay.  So is the -- is the answer that

14    you're -- you're not listed on any -- other than

15    the websites that you've described today, are you

16    listed on any other websites --

17               MR. FORD:  Object to the

18          form.

19    Q.   -- for your services?

20               MR. FORD:  Sorry.

21    A.   Not --

22               MR. FORD:  Object to the form.

23    A.   Yeah.  Not that I'm aware of.

24    Q.   Okay.  Do you have a set charge for

25    particular types of services that you provide?

19

1              MR. FORD:  Object to the

2         form.

3      A.   I have -- I can tell you what my billing

4 rate is in this case.

5      Q.   That's not what I'm asking.

6      A.   Okay.

7      Q.   I'm asking do you have a set charge for

8 expert services that you provide?

9      A.   Yes.

10     Q.   What is your charge for expert services

11 that you provide?

12     A.   It's $1,290 per hour.

13     Q.   Is this the same rate that you charge

14 to -- for all your services?

15              MR. FORD:  Object to the

16         form.

17              Do you mean his expert witness

18         services?

19              MS. GUERRIER:  Yes, clearly.

20     A.   Yes.

21     Q.   Okay.  Do you charge a fee based on the

22 types of service that you would be providing as an

23 expert?

24     A.   As an expert witness?

25     Q.   Yes.

1        A.   Expert witness is the -- is the same

2   fee.

3        Q.   Okay.  So do you have a set charge for

4   depositions?

5        A.   No.

6        Q.   Do you have a set charge for trial

7   testimony?

8        A.   No.

9        Q.   Do you have a set charge for file

10  review?

11       A.   What -- what do you mean by "file

12  review"?

13       Q.   Do you review documents when you are

14  preparing or formulating your opinion in a case?

15       A.   Yes.

16       Q.   Do you have a set charge for those types

17  of services?

18       A.   If it's related to providing an expert

19  report or preparing for testimony, it's the same.

20  It's the same rate.

21       Q.   The 1,290?

22       A.   (Indicating.)

23                  THE REPORTER:  Verbal

24            response, please.

25                  MR. FORD:  Just answer yes

21

```
 1              or no.
 2         A.   Oh.  Yes.  Sorry.
 3                   MR. FORD:  For the court
 4         reporter.
 5         Q.   How much of your income is from expert
 6    services?
 7                   MR. FORD:  Object to the
 8         form.
 9         A.   How -- how much as a percentage?
10         Q.   How much of your income is from expert
11    services?  Yes, a percentage of your income.
12                   MR. FORD:  Object to the
13         form.
14         A.   Yeah, I -- I don't know off the top of
15    my head.
16         Q.   Okay.  Would you say more than 50
17    percent of your income is from expert services?
18                   MR. FORD:  Object to the
19         form.
20         A.   I'd have to -- I'd have to go back and
21    look.  I don't want to speculate on that.
22         Q.   Which party in a case do you mainly work
23    with?
24                   MR. FORD:  Object to the
25         form.
```

22

```
 1        A.   Yeah.  I was retained by Kellogg,

 2   Hansen, Todd, Figel on behalf of Ripple Labs.

 3        Q.   So when you work as an expert witness,

 4   do you represent mainly defendants or mainly

 5   plaintiffs?

 6                    MR. FORD:  Object to the

 7            form.

 8        A.   Yeah.  As an expert witness, I'm not

 9   hired to represent a party.

10        Q.   Okay.  So who do you testify on behalf

11   of, plaintiffs or defendants?

12        A.   I --

13                    MR. FORD:  Object to the

14            form.

15        A.   Yeah.  Again, I've -- I've been retained

16   by the law firm Kellogg Hansen on behalf of Ripple

17   Labs.

18        Q.   Other than this case, what percentage of

19   your expert services you provide for plaintiffs

20   versus defendants?

21                    MR. FORD:  Object to the

22            form.

23        A.   Yeah.  That I -- yeah.  I'd -- I'd have

24   to think to -- so I'm retained by law firms that

25   represent --
```

23

1      Q.   Okay.

2      A.   -- plaintiffs and defendants.

3      Q.   Okay.  So what percentage of your

4    services are provided for defendants versus

5    plaintiffs?

6                    MR. FORD:  Object to the

7           form.

8      A.   Yeah.  That would be -- that would be --

9    I don't know off the top of my head.

10     Q.   Do you mostly represent defendants?

11                   MR. FORD:  Object to the

12          form.

13     A.   Yeah.  As an expert, I -- I don't

14   represent a party.

15     Q.   Well, do you mostly provide expert

16   services on behalf of defendants?

17                   MR. FORD:  Object to the

18          form.

19     A.   Yeah.  I -- if you're asking am I mostly

20   retained by attorneys for defendants or

21   plaintiffs, that would be -- I'd -- I'd -- I'd

22   have to -- it's -- it's hard to quantify that.

23   It's hard to quantify that.

24     Q.   Okay.  So how many cases have you

25   testified as an expert witness in?

24

1      A.   Yeah.  I think this --

2                  MR. FORD:  Object to the

3           form.

4                  Do you mean at deposition or

5           trial or both?

6                  MS. GUERRIER:  I'm talking

7           in testimony all together.

8      A.   So this is the fourth time that I have

9   given deposition testimony.

10     Q.   And how many times have you testified at

11  trial?

12     A.   I've not testified at trial.

13     Q.   In the four times that you've given

14  expert testimony, how many of those times were you

15  testifying on behalf of defendants?

16                 MR. FORD:  Object to the

17          form.

18     A.   I would have to -- it -- that -- it's

19  hard to -- I'd have to go back and look at the

20  specific cases because sometimes it's difficult to

21  determine which party is the plaintiff and the

22  defendant in a case.

23     Q.   So you --

24     A.   If their claims are counterclaims, it

25  may be difficult to identify which one is the

1   plaintiff, which one is the defendant.

2        Q.   So do you recall who you were re -- who

3   retained you in the four cases where you testified

4   at dep?

5        A.   So the one in the -- the one that -- the

6   deposition testimony I gave earlier this year --

7   let me see if it's in here.

8             So, yeah, on page 10 of 10 of my CV.  So

9   this is -- yeah.  This case was Bernstein v. NN --

10  NNN Realty Investors, LLC.  In that case I was

11  retained by the defendant's counsel.

12       Q.   Okay.  So the three other cases where

13  you testified --

14       A.   It would be two others, right.

15       Q.   Did you testify that you -- you stated

16  that you testified in four cases.

17       A.   Right.  So this -- this is the fourth.

18  I said this is the fourth.

19       Q.   Okay.  I'm talking in total, the number

20  four.

21       A.   Yeah.

22       Q.   Four cases.  Is that -- that was your

23  testimony?

24       A.   My -- this is the fourth time that I've

25  given testimony at deposition.

26

```
 1        Q.   Okay.  So the other three times that you

 2   gave testimony, who retained you in the other

 3   three cases?

 4        A.   So in the one, the case that I gave

 5   testimony earlier in this year in, I was retained

 6   by the defendant's counsel.

 7        Q.   Okay.  I'm asking about the three other

 8   cases where you testified at deposition.

 9        A.   So there -- there are two --

10                  MR. FORD:  Object to the

11        form.

12        A.   There are two other cases that I

13   testified in deposition --

14        Q.   Okay.

15        A.   -- other than this one and the one that

16   I gave deposition testimony in earlier this year.

17        Q.   What case did you give deposition

18   testimony earlier this year?

19        A.   This is -- the one I gave testimony,

20   deposition testimony, in earlier this year was

21   Bernstein v. NNN Realty Investors, LLC.

22        Q.   Okay.  What are the three other cases

23   that you -- where you gave deposition testimony?

24                  MR. FORD:  Object to the

25        form.
```

```
1                    Counselor, I think he's

2          testified repeatedly that there aren't

3          three other cases.  There are -- is this

4          case --

5                    MS. GUERRIER:  I don't need

6          --

7                    MR. FORD:  -- and the

8          Bernstein case.

9                    MS. GUERRIER:  Excuse me.

10         Please, just state your objection.

11         You don't need to testify.  He can

12         explain himself.

13                   MR. FORD:  Okay.

14   BY MS. GUERRIER:

15      Q.   So let me just try to clarify.

16           Did you testify that you -- did you just

17   testify that you gave four deposition testimonies?

18      A.   I -- this is -- this is the fourth

19   deposition testimony that -- that I've given.

20      Q.   Okay.

21      A.   So counting this one, I've given three

22   others.

23      Q.   So I'm asking you about the three other

24   cases where you gave deposition testimony.

25      A.   Right.
```

28

1        Q.   Do you recall who retained you in those

2   three cases?

3        A.   So one of the other three cases was this

4   case that's cited in my CV.

5        Q.   What case?

6        A.   Bernstein v. NNN Realty Investors, LLC.

7        Q.   Okay.  So what other cases where you

8   gave deposition testimony?

9        A.   I don't know if I can remember the names

10  of the other cases.

11       Q.   Okay.  Do you recall who retained you in

12  those cases?

13       A.   One case -- again, I'd have to go back

14  and look.  It would be -- the one case I believe

15  it was the plaintiff and the other case I don't

16  recall.

17       Q.   Okay.  So did we talk of the four cases

18  where you testified at deposition?

19                    MR. FORD:  Object to the

20            form.

21       A.   So this case is one.  This deposition is

22  one.

23       Q.   Mm-hmm.

24       A.   Bernstein v. NNN Realty Investors, LLC

25  is another case where I gave deposition testimony.

29

1          Q.    Mm-hmm.

2          A.    And then there was another one.  I said

3    I believe the plaintiff's counsel retained me.

4    And then the fourth I don't recall if it was

5    plaintiffs or defendants.

6          Q.    Okay.  Do you recall what the case where

7    the defendant retained you, what that was about?

8                         MR. FORD:  Object to the

9              form.

10                        Do you understand the question?

11                        THE WITNESS:  No.

12         Q.    You don't recall what the --

13         A.    I don't understand the question.

14         Q.    Do you recall what the issue in the case

15   where the defendants retained you was?

16                        MR. FORD:  Object to the

17             form.

18         A.    Can you be more specific?  So you -- so

19   you -- yeah.

20         Q.    Well, do you know what the case was

21   about?

22                        MR. FORD:  Object to the

23             form.

24         A.    So in Bernstein v. NNN Realty Investors,

25   LLC, I was retained by the defendant's counsel.

30

1          Q.   Okay.  What type of case was Bernstein?

2          A.   So as the CV describes, there are

3     several issues and several claims in that case.

4          Q.   Okay.  And what type of case was that?

5          A.   It --

6                    MR. FORD:  Object to the

7               form; asked and answered.

8          Q.   Can you answer the question, please?

9          A.   So the type of case, if you look at the

10    CV --

11         Q.   No, I'd like you to answer me the

12    question verbally, not, you know, point me to the

13    CV, please.

14                   MR. FORD:  Counsel, you

15              can't direct him to answer you in a

16              specific way.

17                   MS. GUERRIER:  I can.  So if

18              you can just let me ask my questions.

19              You can object.  Put your objection

20              on the record, but please stop

21              interrupting and verbalizing and

22              testifying.

23         A.   Okay.  So in -- in Bernstein v. NNN

24    Realty Investors, LLC --

25         Q.   Mm-hmm.

1    A.   -- this was a -- this was a case where I

2   did -- I was -- I gave deposition testimony

3   earlier this year.

4    Q.   Okay.

5    A.   In that case, the -- there were several

6   claims.  There was an action for claimed breach of

7   contract, breach of implied covenant of good faith

8   and fair dealing, negligent misrepresentation,

9   market manipulation, securities fraud, control

10   person liability, setting aside fraudulent

11   transfers -- constructive fraud, setting aside

12   fraudulent transfers, actual fraud and --

13                    THE REPORTER:  Could you

14          slow down, please.

15                    THE WITNESS:  Sorry.  Would

16          you like me to restate any part of

17          that?

18                    THE REPORTER:  Securities

19          fraud, control person liability?

20    A.   Setting aside fraudulent transfers,

21   constructive fraud, setting aside fraudulent

22   transfers, actual fraud, and common-law fraud.

23    Q.   Okay.  And in the case where you were

24   retained by the plaintiff that you described, do

25   you recall what the case was about?

32

1          MR. FORD:  Object to the

2      form.

3      A.   That case -- yeah, that was several

4  years ago.

5      Q.   Okay.

6      A.   I believe that, as I remember, fraud was

7  one of the issues in that case.

8      Q.   Okay.  And is it your testimony that

9  there's another case where you don't recall what

10  that case was about?

11          MR. FORD:  Object to the

12      form.

13      A.   So there -- there is another case where

14  I gave expert test -- deposition.  That case dealt

15  with title and the valid -- validity of title,

16  validity of a transfer.

17      Q.   What kind of transfer?

18      A.   A transfer of title.

19      Q.   Is this in connection with real

20  property?

21      A.   That was in connection with real

22  property.

23      Q.   Okay.  All right.  When were you first

24  contacted in this case?

25      A.   In August or September of this year.

33

1          Q.   Do you recall who contacted you?

2          A.   I don't recall the individuals.  There

3    were attorneys at Debevoise and actually an -- an

4    attorney at Kellogg.  Kellogg Hansen.

5          Q.   Okay.  Do you recall if you initiated

6    the contact?

7          A.   I did not initiate the contact.

8          Q.   Okay.  Had you previous -- previously

9    worked with any of the attorneys who contacted

10    you to be an -- provide expert testimony in this

11    case?

12         A.   No.

13         Q.   Had you previously worked with anyone at

14    Ripple prior to this case?

15         A.   No.

16         Q.   Do you know how these attorneys knew how

17    to contact you?

18                    MR. FORD:  Object to the

19            form.  Just a yes-or-no answer.

20         A.   Will you repeat the question?

21         Q.   Do you know how the attorneys who

22    contacted you knew how to contact you?

23                    MR. FORD:  Same objection.

24            Same instruction.

25         A.   Yes.

34

1      Q.   Okay.  And how did they know how to

2  contact you?

3                   MR. FORD:  So I'm going to

4           direct you not to answer to the

5           extent you only know that through

6           your conversations with counsel.  If

7           you have an independent understanding

8           outside of conversations with

9           counsel, you can answer.

10                  THE WITNESS:  Okay.

11      A.   I -- a colleague at Brooklyn Law School

12  replied to an email that he received I think from

13  someone at Debevoise.

14      Q.   What is the name of this colleague?

15      A.   Steven Dean.

16      Q.   Does he work at Brooklyn Law School?

17      A.   Yes.

18      Q.   In what capacity does he work?

19      A.   He's a professor.

20      Q.   Okay.  And you stated he replied to an

21  email.

22           Do you know what the content of the

23  email was that he replied to?

24      A.   Someone had asked him if he knew a

25  professor who could be an expert.

35

1        Q.   Was there anything else in the email

2    that he replied to?

3                    MR. FORD:  Object to the

4         form.

5        A.   Not that I recall.

6        Q.   Okay.  So did -- I'm sorry, can you

7    repeat the name of the individual who replied to

8    the email?

9        A.   Steven Dean.

10       Q.   Dean.

11            So did Steven Dean then reach out to you

12   after he saw that email?

13                   MR. FORD:  Object to the

14        form.

15       A.   I was cc'd on the email.

16       Q.   You were cc'd.

17            Do you know why you were cc'd on the

18   email?

19                   MR. FORD:  Object to the

20        form.

21       A.   So, as I said, someone had asked Steven

22   Dean if he knew someone who could be -- be an

23   expert in this case, and he replied cc'ing me

24   saying -- and giving my name.

25       Q.   Okay.  What is Steven Dean's title at

36

1    Brooklyn Law School?

2        A.   Professor of law.

3        Q.   Professor of law.

4             Do you know what type of expert that

5    Steven Dean was asked to look for?

6        A.   I was --

7                      MR. FORD:  Object to the

8             form.

9        A.   So Steven Dean is a -- he's a tax

10   professor.

11       Q.   All right.

12       A.   He was the director of the NYU LL.M.

13   program for the last couple of years.  I don't

14   remember the content of the email offhand, but the

15   substance was they were looking for an expert to

16   provide expert testimony regarding tax issues --

17       Q.   Okay.

18       A.   -- in a case.

19       Q.   Did the email identify who was looking

20   for the expert services?

21       A.   I believe the -- the email to Steven

22   Dean was from -- he -- he was also a former -- I

23   believe he might have been an associate at

24   Debevoise.  So it probably came from a former

25   colleague in the tax department.

37

1      Q.   Okay.  Did you have any other -- did you

2   have any conversations with Steven Dean regarding

3   the email that you described?

4      A.   I don't remember having any

5   conversations with him about it.  I probably

6   replied saying "Thanks for the introduction.  I

7   would be happy to talk to the attorneys at

8   Debevoise."

9      Q.   Did the email describe the type of

10  expert service that the attorneys were looking

11  for?

12     A.   Again, I'd have to go back and look at

13  it.  It -- it might have said they're looking for

14  someone who's familiar with the tax consequences

15  or the tax treatment of property transactions.

16     Q.   Okay.  Do you recall if the email stated

17  property transactions in general?

18     A.   I -- I don't recall the specific wording

19  of the email.

20     Q.   Was there any discussion about digital

21  assets in the email?

22            MR. FORD:  Object to the

23       form.

24     A.   Again, I don't -- I don't recall what

25  the specifics are of that email.

38

```
 1        Q.   Okay.  Do you recall the date of the
 2   email?
 3        A.   I do not.
 4        Q.   Okay.  When did you reply to the
 5   email?
 6        A.   Probably shortly after receiving it.
 7        Q.   Do you recall what you stated in your
 8   reply to the email?
 9        A.   Probably would have said "Thanks for the
10   introduction.  I would be happy to talk to the
11   attorneys."
12        Q.   Okay.  If you -- if you recall
13   specifically what you said and not in speculation
14   of what you thought --
15        A.   I don't recall specifically what I said.
16        Q.   Okay.  Was this the only email
17   communication that you had with the attorneys in
18   this case when -- after you were cc'd on the email
19   to Mr. Dean?
20                  MR. FORD:  So object to the
21          form.
22                  And just give a yes-or-no
23          answer to that question.
24        A.   Will you repeat the question?
25        Q.   Okay.  Was this the only email
```

39

```
1    communication that you had with the attorneys when

2    you case -- on this case after you were cc'd on

3    the email with Mr. Dean in August?

4        A.   No.

5                    MR. FORD:  Same -- same

6             objection.

7                    And just yes or no.

8        A.   No.

9        Q.   Were there other emails that followed up

10   in August 2021 from the attorneys in this case to

11   you?

12                   MR. FORD:  Object to the

13            form.

14                   Just a yes-or-no answer.

15       A.   Yes.

16       Q.   Do you recall how many emails came from

17   the attorneys in this case to you in August?

18       A.   No.

19       Q.   When did you meet with the attorneys in

20   this case in person for the first time?

21                   MR. FORD:  Object to the

22            form.

23                   And just provide a -- a date if

24            you recall.

25       A.   The first time I met with the attorneys
```

```
 1    in this case in person was Tuesday of this week.

 2        Q.   Okay.  After you replied to the email

 3    from the attorneys in this case in August 2001

 4    (sic), were you provided with an assignment for

 5    this case?

 6                     MR. FORD:  Object to the

 7             form.

 8        A.   Yes.

 9        Q.   When were you provided with your

10    assignment in this case?

11                     MR. FORD:  Object to the

12             form.

13        A.   I -- I don't recall the exact date.

14        Q.   Okay.  After the reply that you sent to

15    the attorneys in this case in August of 2001

16    (sic), did you follow up with any inquiry about

17    the case?

18                     MR. FORD:  Object to the

19             form.  I think you mean August of

20             2021.

21                     MS. GUERRIER:  I think I

22             said -- 2021, yes.

23        A.   Will you repeat the question?

24        Q.   After the reply that you sent to the

25    attorneys in this case in August 2021, did you
```

[12/3/2021] Borden, Bradley Expert Dep. Tr. 12.3.2021

41

```
 1   follow up with any inquiry about the case?
 2                   MR. FORD:  Object to the
 3            form.
 4                   And just a yes-or-no answer.
 5       A.   Yeah.  One more time.  Sorry.  Could you
 6   repeat the question?
 7       Q.   Okay.  So after the reply that you sent
 8   to the attorneys in this case in August 2021, did
 9   you follow with -- up with any inquiry about the
10   case?
11                   MR. FORD:  Object to the
12            form.
13                   Just a yes-or-no answer if you
14         understand the question.
15       A.   Yeah.  I don't know that I understand
16   the question.
17       Q.   All right.
18                   MS. GUERRIER:  I'm going to
19            ask that you just please state your
20            objection and not coach the witness.
21            It's really inappropriate.
22                   MR. FORD:  I'm directing him
23            as to privilege and I'm fully
24            permitted to direct him as
25            to privilege.
```

1              MS. GUERRIER:  I understand,

2         but to tell him whether he

3         understands, I think he can verbalize

4         that, not you.

5              MR. FORD:  I don't want to

6         direct him to give just a yes-or-no

7         answer --

8              MS. GUERRIER:  Again --

9              MR. FORD:  -- if he doesn't

10        understand the question.

11             MS. GUERRIER:  -- the --

12        right, but you went further than

13        that.  And so I'm just asking that

14        you just state your objection.  And

15        then if he has questions, like I've

16        explained to him, he can ask me.

17             MR. FORD:  I -- I didn't go

18        further than that and the record will

19        reflect that.

20   BY MS. GUERRIER:

21        Q.   Okay.  After you replied to the email

22   that was first sent to Mr. Dean in -- did you

23   contact the attorneys in this case to inquire

24   about the case?

25             MR. FORD:  Object to the

43

```
 1              form.
 2                      A "yes" or "no" or an "I don't
 3              know" answer.
 4                      THE WITNESS:  I don't know
 5              what all I can answer, which
 6              privilege.  In other words --
 7                      MR. FORD:  If you don't know
 8              what you can answer without going
 9              into privilege, then I'm going to
10              instruct you not to answer.
11                      THE WITNESS:  Okay.
12     BY MS. GUERRIER:
13         Q.  Were you provided with any facts about
14     the case after you replied to the email -- the
15     email in August 2021?
16         A.  Yes.
17         Q.  Do you recall when you were provided
18     with any facts about the case after you replied to
19     the email in August 2021?
20         A.  I don't know the exact date.
21         Q.  Okay.  Were you provided with any
22     documents about the case after you replied to the
23     email in August 2021?
24         A.  Yes.
25         Q.  Do you recall when you were provided
```

44

1    with any documents in the case?

2         A.   No.  I don't recall exact date.

3         Q.   Did you have any initial consultation

4    with the attorneys in this case about the case?

5                        MR. FORD:  Object to the

6              form.

7                        Just a yes-or-no answer if you

8         can answer.

9         A.   Well, repeat the question again.

10        Q.   Did you have any initial consultation

11   with the attorneys in this case about the case?

12                       MR. FORD:  Object to the

13             form.

14                       And just a yes-or-no answer if

15        you can answer.

16        A.   Yes.

17        Q.   When did you have an initial

18   consultation with the attorneys in this case?

19        A.   Again, I don't know the exact date.  It

20   would have been August or early September.

21        Q.   Was this initial consultation in person?

22        A.   No.

23        Q.   Okay.  Was this initial consultation by

24   Zoom?

25        A.   I believe it was by Zoom.  It was either

45

```
1    Zoom or -- or phone.
2         Q.   Okay.  Were you provided with any
3    facts during this initial consultation about the
4    case?
5                        MR. FORD:  So object to the
6              form.
7                        And only answer with respect to
8         facts you were provided.  Nothing
9         further.
10        A.   There may have been a general -- general
11   statement of facts or general information about
12   facts.
13        Q.   What -- what was the general statement
14   of fact that you were provided with at the initial
15   consultation?
16                        MR. FORD:  Object to the
17             form.
18                        And, again, keep your answer
19        just to facts.  Nothing further.
20        A.   The facts probably included identifying
21   Ripple as a party in the case and XRP.
22        Q.   When you say "probably included," are
23   you speculating or do you recall specifically?
24        A.   I -- I don't recall specifically.  I --
25   I do -- my recollection is that Ripple Labs would
```

46

1    have been mentioned and then XRP was mentioned in

2    that initial call.

3         Q.   Do you recall what was mentioned about

4    Ripple Labs with regard to the facts?

5         A.   No.

6                   MR. FORD:  So -- sorry.

7              Again, with these questions, just

8              stick to the facts.

9         Q.   Do you recall what was mentioned about

10   XRP --

11        A.   No.

12        Q.   -- during this initial consultation?

13        A.   No.

14        Q.   Okay.  Were you shown any documents by

15   counsel during this initial consultation?

16        A.   No.

17        Q.   Okay.  Were you provided with any

18   assumptions by counsel during this initial

19   consultation?

20                   MR. FORD:  Object to the

21              form.

22        A.   Not that I recall.

23        Q.   Okay.  Do you recall when you were

24   retained as an expert in this case?

25        A.   I don't recall the exact date.

47

1      Q.   Okay.  Do you recall approximately what

2   month of the year that you were retained as an

3   expert in this case?

4      A.   It -- it would be in the

5   August/September, early September, range.

6      Q.   Do you recall how long after the initial

7   cons -- consultation that you had with the

8   attorneys in this case that you were retained as

9   an expert?

10     A.   I -- I don't -- don't recall.

11     Q.   Okay.  Did you receive any records for

12   this case after you were retained as an expert?

13                  MR. FORD:  Object to the

14          form.

15     A.   I -- I received documents cited in my

16   report.

17     Q.   Okay.  What specific documents did you

18   receive after you were retained as an expert?

19     A.   So if you -- I -- I can read them or I

20   can point to the reference.

21     Q.   You can point me to the record.

22     A.   Yeah.  So it's on page 7, Footnote 7

23   through -- Footnote 7 through probably 16, 15 or

24   16.

25     Q.   Do you recall who specifically provided

48

1   you with the records that you just described?

2       A.   I don't know if I recall specifically

3   who provided me these records.

4       Q.   Okay.  So other than the records that

5   you described in Footnotes 7 through 16, were you

6   provided with any other records in this case after

7   you were retained as an expert?

8                       MR. FORD:  Object to the

9           form of the question.

10      A.   I believe these are the only docu --

11  the -- the -- the documents cited in Footnotes 7

12  through 15 are the only documents -- maybe 16

13  also -- are the only documents that I recall

14  receiving from counsel in this case.

15      Q.   Was there any communication about the

16  records that you just cited with counsel?

17                      MR. FORD:  Object to the

18          form.

19                      And I'll instruct you just to

20          answer that yes or no if you understand

21          the question.

22      A.   Will you repeat the question?

23      Q.   Was there any communication about the

24  records that you cited with counsel?

25                      MR. FORD:  Object to the

49

```
1              form.

2                    Same instruction.

3        A.   Yes.

4        Q.   Okay.  Did counsel tell you to use these

5    documents in your report?

6                    MR. FORD:  Object to the

7              form.

8                    I'm going to direct you not to

9         answer that question.

10                    MS. GUERRIER:  Why?  I mean,

11         I'm asking him about documents that

12         he listed in his report.  So why --

13                    MR. FORD:  You can ask him

14         whether counsel provided him with

15         facts or assumptions, but what --

16                    MS. GUERRIER:  I --

17                    MR. FORD:  -- counsel

18         directed or did not direct him to do

19         is -- is not the appropriate subject

20         of questioning.

21                    MS. GUERRIER:  Well,

22         documents that he considered which

23         are clearly listed in his report are

24         not protected -- communications about

25         these documents are not protected
```

```
 1          communications.
 2                  MR. FORD:  Communications
 3          about the documents are protected to
 4          the extent that all -- that you're
 5          asking him about facts or assumptions
 6          he was given by counsel, that's
 7          completely fair and you can ask him
 8          questions about that.
 9                  MS. GUERRIER:  No, I can ask
10          him about the documents that he
11          considered and communications with
12          counsel about the documents that he
13          considered.  Yes.  That's Rule
14          26(b) --
15                  MR. FORD:  You can ask
16          him --
17                  MS. GUERRIER:  -- (4)(c).
18                  MR. FORD:  -- whether
19          counsel gave him facts or
20          assumptions.
21                  MS. GUERRIER:  No, I can
22          also ask him about the data that he
23          received and that's what I'm doing
24          right now.
25                  MR. FORD:  Sure.  You can
```

```
1            ask him about the data.  You can't

2            ask him about conversations with

3            counsel about the substance of --

4                     MS. GUERRIER:  I can ask him

5            about the conversation that has to do

6            with the documents that he considered

7            in his report.

8                     MR. FORD:  That's -- that's

9            work product.

10                    MS. GUERRIER:  That is not

11           work product.  That's 26(b)(4)(c).

12                    MR. FORD:  26(b)(4)(c)

13           allows you to ask him whether and

14           what facts and assumptions he

15           received --

16                    MS. GUERRIER:  And data.

17                    MR. FORD:  And data.

18                    MS. GUERRIER:  And I'm

19           asking him about the communications

20           regarding the data that he received.

21           That's not privileged.

22                    MR. FORD:  You're not

23           allowed to ask him about the

24           communications about that except to

25           the extent he can identify what facts
```

52

1          or assumptions or data he received

2          from counsel.

3                   MS. GUERRIER:  I'm asking

4          him about the communications with

5          counsel about the data that he

6          received and that he considered.  I'm

7          not asking him about anything else.

8          So I think that is allowed under

9          26(b)(4)(c).

10                  MR. FORD:  Okay.  So why

11         don't we do this.  Why don't we take

12         it question by question.

13                  I don't want you to stray into

14         the substance of communications with

15         counsel about the report other than to

16         the extent that you can describe what

17         facts, assumptions or data counsel gave

18         you.  And if there is a case or some

19         other citation, we can talk about it over

20         a break.

21                  MS. GUERRIER:  Okay.

22  BY MS. GUERRIER:

23      Q.  Well, what specifically did counsel

24  identify for you in the documents that you listed

25  in Footnote 7 through 15?

53

```
 1        A.   I don't know that I recall anything

 2   being specifically identified by counsel in

 3   those -- in those footnotes.

 4        Q.   Okay.  So were you just -- let me -- how

 5   did you know where to look for the specific

 6   answers that you've cited in your Footnote 7

 7   through 15?

 8                     MR. FORD:  Object to the

 9           form.

10                     And, again, to the extent your

11           answer would get into substantive

12           conversations you had with counsel, I

13           direct you not to answer.

14        A.   So -- so these -- these -- these

15   documents provide information about the

16   characteristics of XRP as discussed in the report.

17   So the relevant RFA answers that address these

18   specific characteristics were what I used in

19   drafting the report.

20        Q.   Did anyone point you to the specific RFA

21   answers that you cited in your report?

22                     MR. FORD:  Object to the

23           form.

24        A.   I'm trying to -- to remember how these

25   were delivered.  Yeah.  There -- the -- I don't
```

54

```
 1    know if I recall.  So I don't know if I re -- I
 2    don't know if I -- I don't know.  I can't re --
 3    boy.
 4              So I know that -- that they had -- that
 5     these RFA answers provide information about the
 6     characteristics of XRP.
 7        Q.   Okay.  Well, my -- I'm sorry.  Were you
 8    done?
 9        A.   Yeah.  Go ahead.  You can -- yes, I'm
10    done with that.
11        Q.   So you -- for example, RFA --
12    Plaintiff's RFA answer that you cited in Footnote
13    8 --
14        A.   Mm-hmm.
15        Q.   -- how did you know where to look for
16    the paragraphs that you listed in the footnote?
17                  MR. FORD:  Object to the
18              form of the question.
19        A.   Right.  Well, those -- so in Footnote 8,
20    those answers deal with whether the holders of XRP
21    are entitled to receive dividends.
22        Q.   Mm-hmm.
23        A.   And so that -- I read those answers and
24    recognized that they identify those
25    characteristics of XRP.
```

1    Q.   Did you read each and every RFA that you

2    cited in your Footnote 7 -- footnotes on page 7?

3    A.   Yes.

4    Q.   Did anyone at Ripple tell you to look at

5    a specific RFA answer in response to any questions

6    that you had about the report?

7              MR. FORD:  Object to the

8         form.

9    A.   No.

10   Q.   Are the -- all the RFA answers that you

11   listed in that report, you listed them from your

12   own independent review of the RFAs?

13             MR. FORD:  Object to the

14        form of the question.

15   A.   I cited them from my own independent

16   review of the RFAs.

17   Q.   Okay.

18             MS. GUERRIER:  All right.

19        We're going to take a short break.

20             THE WITNESS:  Okay.

21             MS. GUERRIER:  We'll go off

22        the record.

23             THE VIDEOGRAPHER:  The time

24        on the video monitor is 10:04 a.m.

25        End of Media Unit No. 1.  We're off

56

1          the video record.

2                    (Whereupon, a recess is taken.)

3                    THE VIDEOGRAPHER:  The time

4          on the video monitor is now 10:20

5          a.m.  Start of Media Unit Number 2.

6          We're back on the video record.

7                    MS. GUERRIER:  Okay.

8     BY MS. GUERRIER:

9          Q.   May I call you professor?

10         A.   Sure.

11                   MS. GUERRIER:  Ready?

12                   MR. FORD:  Yeah.

13    BY MS. GUERRIER:

14         Q.   Okay.  Were you retained to provide

15    expert services on behalf of all three defendants

16    in this case?

17         A.   I was -- my report says the nature of

18    the -- of the retention.  I was retained by

19    Kellogg Hansen on behalf of Ripple Labs to provide

20    expert opinion in this case.

21         Q.   So only Ripple is your client in this

22    case?

23         A.   Well, I was retained by Kellogg Hansen.

24         Q.   Okay.  Do you know who you represent --

25    I mean who you're providing services, which of the

57

1    defendants?

2                         MR. FORD:  Object to the

3              form.

4         A.   Yeah.  I mean, what I know is I was

5    retained by Kellogg Hansen.

6         Q.   Okay.  Do you know if you were retained

7    to provide expert services for Ripple?

8         A.   I don't know.

9         Q.   Okay.  Are you expected to provide any

10   additional expert services outside of the report

11   that you drafted?

12        A.   I've only been retained to work on this

13   report.

14        Q.   Okay.

15        A.   Or to -- as I've said, I've been

16   retained -- obviously I'm here also providing this

17   deposition.

18        Q.   Okay.  So do you know if you're going to

19   be retained to provide testimony at trial?

20        A.   I -- I don't know that.

21        Q.   Okay.  Have you asked whether you would

22   be retained for any additional services?

23        A.   I -- I have -- I have not.

24        Q.   Okay.  How much have you billed so far

25   for your expert services in this case?

58

1          A.   The number of hours is probably around

2    130.

3          Q.   Do you recall what you specifically

4    billed for?

5                    MR. FORD:  Object to the

6               form of the question.

7          A.   I sent an -- I -- I submitted an

8    invoice.

9          Q.   Okay.  Do you know for what services

10   specifically you submitted the invoice for?

11                   MR. FORD:  Object to the

12              form of the question.

13         A.   I -- I sub -- I submitted an invoice

14   after the report was submitted.

15         Q.   Okay.

16         A.   So it was worked on prior to the

17   report --

18         Q.   Okay.  What --

19         A.   -- being submitted.

20         Q.   What kind of work did you do prior to

21   the report that you submitted the invoice for?

22         A.   Worked on the report.

23         Q.   What specifically did you bill for your

24   work on the report?

25         A.   Draft --

59

1                    MR. FORD:  I'm sorry.  Hold

2           on one second.

3                    Object to the form of the

4           question.

5                    I don't want you to get into

6           the substance of the nature of your work

7           in answering.  If you can answer

8           generally without getting into the

9           substance, you can answer the question.

10      A.   So I billed for drafting the report.

11      Q.   Did you bill for anything else?

12                   MR. FORD:  Same objection.

13           Same instruction.

14      A.   I'd have to go back and look at the

15  invoice, but I would suspect that most entries

16  were -- were drafting the report.

17      Q.   Do you know how much you've been paid so

18  far for the work that you've done in this case?

19      A.   I think it's around 110,000.

20      Q.   Do you know how many hours that you've

21  worked on this case thus far?

22      A.   I think it's around 130 hours.

23      Q.   Did you work alone on the report in this

24  case?

25      A.   I -- I did work alone --

60

1      Q.   Okay.

2      A.   -- on the report.

3      Q.   Was there anyone that is --

4               MS. ZORNBERG:  Just one

5          moment.  The Zoom is apparently

6          muted.

7               MR. FORD:  I'm sorry.  That

8          should -- that should do it.

9  BY MS. GUERRIER:

10     Q.   Did anyone assist you with drafting the

11 report outside of counsel?

12     A.   Can you be more specific about that to

13 make sure I understand what you're asking?

14     Q.   Did anyone assist you with drafting the

15 report?

16     A.   You said outside of counsel?

17     Q.   Yes.

18     A.   Can you be more specific about, like,

19 what you would be talking about there?

20     Q.   Did you work with anyone outside of

21 counsel drafting the report?

22     A.   No.

23     Q.   Did you have a budget for your work in

24 this case?

25     A.   No.

61

1          Q.   Okay.  Prior to your involvement in

2     being retained as an expert in this case, were you

3     acquainted with any of the attorneys on this case?

4          A.   No, not that I recall.

5          Q.   Other than Mr. Dean, whom you testified

6     was a former associate of Debevoise, were you --

7     do you know anyone who was acquainted with the

8     attorneys in this case?

9                    MR. FORD:  Object to the

10               form.

11         A.   Yeah.  I -- I -- yeah.  I don't -- I --

12    I don't know that I know anyone that is -- that --

13    that -- that is acquainted with the people in this

14    case, the attorneys in this case.

15         Q.   Okay.  Are you familiar with the name

16    "Bradley Garlinghouse"?

17         A.   Will you -- will you repeat that name?

18         Q.   Bradley Garlinghouse.

19         A.   Yeah.  My understanding is that Bradley

20    Garlinghouse is a defendant in this case.

21         Q.   Okay.  So do you have any personal

22    relationship with Bradley Garlinghouse?

23         A.   No.

24         Q.   Okay.  Are you familiar with the name

25    "Christian Larsen"?

62

1          A.   Again, he's a named defendant in this

2    case.  He or she.

3          Q.   Do you have say personal relationship

4    with Christian Larsen?

5          A.   No.

6          Q.   Do you own any XRP?

7          A.   No.

8          Q.   Have you ever bought or sold XRP?

9          A.   No.

10         Q.   Have you received any compensation in

11   XRP?

12         A.   No.

13         Q.   Do you expect to receive any

14   compensation in XRP?

15         A.   No.

16         Q.   Did you do anything to prepare for your

17   deposition?

18         A.   Yes.

19         Q.   What did you do to prepare for your

20   deposition?

21         A.   I reviewed the report; reviewed the

22   materials cited in the report; and met with

23   attorneys --

24         Q.   Okay.

25         A.   -- at -- at Debevoise.

63

1       Q.   Now, did you review the report on your

2   own time?

3                   MR. FORD:  Object to the

4           form of the question.

5       A.   What -- what do you mean by my "own

6   time"?

7       Q.   Did you review the report -- the report

8   without counsel present?

9       A.   Yes.

10      Q.   Okay.  Do you know how much time you

11  spent reviewing the report to prepare for your

12  deposition?

13      A.   I don't know specifically.

14      Q.   When did you meet with the attorneys to

15  prepare for the deposition in this case?

16      A.   We met once by Zoom before Thanksgiving,

17  we met on Tuesday of this week, and we met

18  yesterday.

19      Q.   How long was your meeting by Zoom with

20  the attorneys in this case?

21      A.   Probably an hour.

22                  MR. FORD:  I'm sorry.

23          Object to the form.

24      Q.   And how long was your meeting on Tuesday

25  with the attorneys in this case?

64

1          A.   It was two and a half, three hours.  Two

2     or three hours.

3          Q.   And how long was your meeting with the

4     attorneys in this case yesterday?

5          A.   It was, again, in the three-hour range.

6          Q.   Okay.  Who was present during the Zoom

7     meeting?

8                    MR. FORD:  Object to the

9            form.

10         A.   So the -- I was in the -- the Zoom

11    meeting on Tuesday before -- or I don't know if it

12    was a Tuesday.  I can't remember what day it was.

13    Before Thanksgiving.  We met by Zoom.  I was

14    there.  As I recall, Chris Ford was there, Lisa

15    Zornberg was there, and Dan Marcus.

16         Q.   Okay.  Is this the -- this is the Zoom

17    meeting before Thanksgiving?

18         A.   Before Thanksgiving.

19         Q.   So the Zoom meeting on Tuesday --

20         A.   Tuesday.

21         Q.   -- was that Tuesday this week?

22         A.   Tuesday was in person this week.

23         Q.   Okay.  Who was present at the meeting on

24    Tuesday?

25         A.   It was me and the same three attorneys.

1      Q.   And your meeting today with the

2   attorneys, who was present?

3                    MR. FORD:  Object to the

4            form.  You mean yesterday?

5      Q.   Did you say that -- I'm sorry.

6   Yesterday.

7      A.   Yeah.  Yesterday, again, it was the same

8   three attorneys from Debevoise, and then there

9   were attorneys on -- connected through Zoom.

10     Q.   Do you know who was connected through

11  Zoom?

12     A.   The only one I recall is Reid Figel and

13  then there was someone else, but I don't -- I

14  don't know if remember his name.

15     Q.   Do you know how many attorneys were

16  connected through Zoom?

17     A.   I don't.  There was more than one, but

18  I -- my focus -- Zoom was there; my focus was

19  here, so...

20     Q.   Okay.  Did you do anything else to

21  prepare for your deposition other than reviewing

22  the report and meeting with the attorneys in this

23  case?

24                    MR. FORD:  Object to the

25            form of the question.

66

1          A.   So -- so that's right.  I reviewed the

2     report and then I also reviewed the materials

3     cited in the report.

4          Q.   Okay.  When did you -- I'm sorry.

5               When did you review the materials cited

6     in the report?

7          A.   As -- as part of the preparation.

8          Q.   Okay.  Did you review the materials

9     cited in the report when you met with the

10    attorneys yesterday?

11         A.   Did -- during that meeting did we review

12    the materials?

13         Q.   Yes, review --

14         A.   Did I review the materials during that

15    meeting --

16         Q.   Yes.

17         A.   -- yesterday?

18              I definitely reviewed materials.  I

19    don't know if we reviewed all the materials, but

20    definitely reviewed materials in the meeting.

21         Q.   Do you recall what specific materials

22    you reviewed at the meeting yesterday?

23                   MR. FORD:  So, actually, I

24              think I'm going to direct you not to

25              answer that.

67

```
 1                MS. GUERRIER:  On what

 2        grounds?

 3                MR. FORD:  Because the

 4        specific materials we chose or did

 5        not choose to show him during our

 6        prep is work product.

 7                MS. GUERRIER:  Okay.  He

 8        stated that he reviewed materials

 9        cited in his report.  So I'm asking

10        him what specific materials he

11        reviewed that were cited in the

12        report.

13                MR. FORD:  You can ask him

14        what materials he reviewed on his

15        own, but the materials we chose to --

16                MS. GUERRIER:  I --

17                MR. FORD:  -- show him

18        during the meeting yesterday is work

19        product.

20                MS. GUERRIER:  That's not

21        what I asked him.

22                MR. FORD:  It is.  You --

23        you asked him "Do you recall what

24        specific materials you reviewed at

25        the meeting yesterday?"
```

68

1              MS. GUERRIER:  I didn't ask

2        whether you showed the meeting -- the

3        material.  I asked what he reviewed

4        at the meeting.

5              MR. FORD:  He testified that

6        the meeting yesterday was with

7        counsel and so the materials that he

8        reviewed were materials he reviewed

9        with counsel.

10              MS. GUERRIER:  Well, he

11        didn't testify to that.

12              MR. FORD:  He -- he

13        testified that the mater --

14              MS. GUERRIER:  Again.

15        Okay --

16              MR. FORD:  -- that the

17        meeting was with counsel.

18              MS. GUERRIER:  I'm -- we're

19        not going to have this on the record.

20        I mean, I'm asking him about specific

21        materials that he reviewed at the

22        meeting.

23              MR. FORD:  And I'm

24        instructing him not to answer.

25              MS. GUERRIER:  Okay.  Well,

69

1              I think that that's an improper

2              instruction, but I'm going to move

3              forward from that question.

4    BY MS. GUERRIER:

5         Q.   Did you discuss this case with anyone

6    other than counsel?

7         A.   No.

8         Q.   And did you discuss any of the opinions

9    that you formed in this case with anyone other

10   than counsel?

11        A.   No.

12        Q.   Okay.  Can you walk me through the

13   process that you undertook for preparing your

14   report?

15        A.   Sure.  So I was asked the questions that

16   are -- that are presented in the report.

17        Q.   Mm-hmm.

18        A.   And the questions deal with whether XRP

19   and virtual currency such as XRP are securities

20   under the federal income tax rules.

21              So I looked for places in the Internal

22   Revenue Code where "securities" is used and looked

23   at the definitions of securities as used in the

24   Internal Revenue Code, in particular as provisions

25   relate to the federal income tax classification of

70

1  securities or defined securities for federal

2  income tax purposes.

3      Q.   And is this your entire process for

4  preparing your report?

5                     MR. FORD:  Object to the

6           form.

7      A.   So I did a search for places where the

8  term "securities" is used in the Internal Revenue

9  Code focusing on where it's used for federal

10 income tax purposes.

11                    THE REPORTER:  Focusing on?

12                    THE WITNESS:  Focusing on

13          places where the term "securities" is

14          used for federal income tax purposes

15          in the Internal Revenue Code.

16     A.   When -- and then I began the process of

17 reading how "securities" was used in the Internal

18 Revenue Code and reading definitions of

19 "securities" that appeared in the Internal Revenue

20 Code with the focus on the federal income tax; how

21 the term "securities" affects the application of

22 federal income tax rules.

23     Q.   Who did the actual writing of the

24 report?

25                    MR. FORD:  Object to the

71

1           form of the question.

2      A.   So I -- I wrote the report.

3      Q.   Did anyone else assist you with writing

4  the report?

5      A.   I received comments and edits from

6  counsel.

7      Q.   Do you recall how much time you spent

8  drafting the report?

9      A.   I -- I -- I don't know if I recall the

10  exact time, as I said earlier.  The invoice that I

11  submitted after the report was submitted was in

12  the neighborhood of $110,000.

13      Q.   But you can't recall what specific time

14  you spent on the report?

15      A.   Well, about --

16               MR. FORD:  Object to the

17           form.

18      A.   So the -- so the time spent before that

19  invoice was on -- on the report.

20      Q.   Okay.  Well, what part of that was spent

21  drafting the report?  Do you recall?

22      A.   What do you mean by "drafting"?

23      Q.   What part of your time was spent

24  drafting the report?

25      A.   What do you mean by "drafting"?

72

1        Q.   Did you write the report?

2        A.   Yes.

3        Q.   How much time did you spend writing the

4    report?

5        A.   Like, actually at the keyboard?

6        Q.   I believe -- however --

7        A.   That, I -- that I would not -- I don't

8    know.

9        Q.   So when you bill for the time that you

10   work on this case, do you bill for the time that

11   you drafted the report?

12       A.   I -- I --

13                 MR. FORD:  Object to the

14            form of the question.

15       A.   I'd have to go back and look at the

16   invoice, but it probably has something to the

17   effect of "draft report."  That would be most of

18   the time.

19       Q.   Can you assign a percentage of the time

20   that you spent drafting the report?

21       A.   No, I can't.

22                 MR. FORD:  Object to the

23            form of the question.

24                 Just give me a second.

25                 THE WITNESS:  Okay.

73

```
 1    BY MS. GUERRIER:

 2        Q.   Were there any drafts of the report that

 3    you finally submitted?

 4                     MR. FORD:  Object to the

 5              form of the question.

 6                     And just answer that yes or no.

 7        A.   I -- I don't understand that question.

 8        Q.   Is this the only draft of the report

 9    that you submitted in this case?

10        A.   Yes.

11                     MR. FORD:  Same objection.

12                     And just answer the question

13            yes or no if you understood it.

14        Q.   Did you have a work in progress in the

15    report that you were drafting?

16                     MR. FORD:  Object to the

17              form of the question.

18                     If you can answer the question

19            yes or no.

20        A.   I don't -- I don't understand what

21    you're -- what you're asking.  This was submitted.

22        Q.   Okay.

23        A.   It's the only thing that was submitted.

24        Q.   That's not my question.

25        A.   Okay.
```

74

```
 1        Q.   Were there any other drafts of this
 2   report that you submitted?
 3                    MR. FORD:  Object to the
 4           form of the question.
 5                    And, again, same instruction.
 6           To the extent you can answer, yes or no.
 7        A.   This -- yeah, this is the only -- this
 8   is the only report I submitted.
 9        Q.   Okay.  Did you sit down and write this
10   report at once?
11        A.   No.
12                    MR. FORD:  Object to the
13           form of the question.
14        Q.   Were there different versions of this
15   report?
16                    MR. FORD:  Same objection.
17                    Just answer yes or no to the
18           extent you understand.
19        A.   This is -- this is the report.
20        Q.   That's not my question.
21        A.   There are no other versions of the
22   report.
23        Q.   I'm sorry?
24        A.   This is the report.
25        Q.   When did you write the report?
```

75

```
1          A.   I wrote the report -- again, I was -- I
2     was retained to prepare a report.  So after being
3     retained, I worked on the report.  And during the
4     time that I was retained, I wrote the report.
5          Q.   Did you just write one report?
6                    MR. FORD:  Object to the
7               form of the question.
8                         Yes or no if you understand the
9          question.
10         A.   This is the only report that I have in
11    this case.
12         Q.   Are there -- there are no drafts of the
13    report?
14                   MR. FORD:  Same objection.
15                        Same instruction.
16         A.   Yeah.  I don't -- I'm not -- sorry.  I'm
17    not trying to be difficult.  I just don't
18    understand what you're -- this is -- this is the
19    report.
20         Q.   Do you understand what a draft is?
21         A.   Maybe would -- could you explain to me
22    what you mean by "draft"?
23         Q.   Why don't you tell me what you
24    understand the word "draft" to mean in terms of a
25    report?
```

76

1              MR. FORD:  Object to the

2         form of the question.

3    A.   Yeah.  I'm -- I'm sorry.  I don't --

4    again, I don't -- I'm not sure what you're

5    referring to when you say "draft" --

6    Q.   Were there --

7    A.   -- "of the report."

8    Q.   Was this the sole report that you used

9    and drafted in this case?

10             MR. FORD:  Object to the

11        form of the question.

12             Same instruction.

13   A.   Yeah.  This is the only report that I

14   provided in this case.

15   Q.   Okay.  Do you -- do you have another

16   version of this report?

17             MR. FORD:  Object to the

18        form of the question.

19             To the extent you can answer,

20        yes or no.

21   A.   This is the only version of the report.

22   Q.   Okay.  So did you write this report in

23   one sitting?

24   A.   No.

25   Q.   Okay.  Were there different parts of the

77

1   report that you wrote prior to submitting this

2   report?

3                      MR. FORD:  Object to the

4          form of the question.

5       A.   Yes.

6       Q.   Okay.  Where are those parts of the

7   report?

8                      MR. FORD:  Object to the

9          form of the question.

10      A.   I wrote all of the parts to the report

11  before submitting it.

12      Q.   Okay.  Did you draft this in Word

13  document?

14      A.   Yes.

15      Q.   Okay.  When you started drafting the

16  Word document, did you have another version of the

17  document in Word?

18                     MR. FORD:  Object to the

19         form of the question.

20                     Yes-or-no answer to the extent

21         you understand the question.

22      A.   I don't know what you mean by "version."

23      Q.   Can you walk me through how you drafted

24  the document in Word?

25      A.   So --

78

```
 1                    MR. FORD:  Object to the
 2           form of the question.
 3                    To the extent you can answer
 4           that without discussing your
 5           conversations with counsel, please limit
 6           your answer just to...
 7      A.   So when -- when I draft a --
 8      Q.   Okay.  So you do know what the word
 9   "draft" is.  Okay.
10                    MR. FORD:  No, no.  I'm
11           sorry, Counsel, please don't
12           interrupt him.  Let him finish his
13           answer.
14                    MS. GUERRIER:  Sure.
15      A.   You used "draft" as a noun.  I just used
16   it as a verb.
17      Q.   Okay.
18      A.   So it's -- there's a distinction there.
19      Q.   Mm-hmm.
20      A.   So when I draft something, I usually put
21   together -- write something and then may add to it
22   and then edit it.
23      Q.   Okay.
24      A.   And re-edit it.
25      Q.   So did you do -- did you do any of those
```

79

1    steps when drafting this report?

2        A.   Yes.

3        Q.   Okay.  Did you -- when did you put

4    something together, as you just stated, regarding

5    this report?

6                    MR. FORD:  Object to the

7            form of the question.

8            Mischaracterizes the testimony.

9        A.   Can -- can you be more specific?

10       Q.   I'm using the word that you used.  You

11   said that when you draft something, you usually

12   put something together.

13       A.   Right.

14       Q.   So -- and you stated that you followed

15   these steps for this report.

16           So when did you first put this report

17   together?

18                   MR. FORD:  Object to the

19           form of the question.

20           Mischaracterizes the testimony.

21       A.   Yeah.  I -- I don't recall the exact

22   date when I started drafting the report.

23       Q.   Okay.  And did you do any edits on the

24   report that you started drafting?

25       A.   Yes.

80

1          Q.   Can you describe whether you saved these
2    edits to Word?
3                        MR. FORD:  Object to the
4              form of the question.
5                        Answer that yes or no to the
6              extent you understand it.
7          A.   Can you repeat it?
8          Q.   Can you describe whether you saved these
9    edits that you made to the report to Word?
10                        MR. FORD:  Same objection.
11              Same instruction.
12          A.   Yes, I saved edits.
13          Q.   Okay.  Did you have a name for the
14    document when you drafted it on -- in Word?
15                        MR. FORD:  Object to the
16              form of the question.
17                        And, again, just a yes-or-no
18              answer to the extent you understand the
19              question.
20          A.   Yes.
21          Q.   Okay.  Were you saving over the same
22    document when you made edits to the document?
23                        MR. FORD:  Object to the
24              form of the question.
25                        Just answer yes or no to the

81

1          extent you understand it.

2          A.   I did save over the same document when

3     making edits.

4          Q.   Okay.  So did you not save a separate

5     document when you made edits to the document?

6                    MR. FORD:  Object to the

7               form of the question.

8                    A yes-or-no answer to the

9               extent you understand.

10         A.   Yeah.  I made -- I made edits to the

11    document without saving it as a different file.

12         Q.   Okay.  So from the time that you started

13    writing the document until your final product, did

14    you just have one Word document?

15         A.   No.

16                   MR. FORD:  Sorry.  Sorry.

17              Give me a second.

18         Q.   So how many --

19                   MR. FORD:  Counsel, let me

20              object to the form of the question.

21                   And thank you for keeping your

22              answer yes or no, but please do keep your

23              answers to yes or no.

24    BY MS. GUERRIER:

25         Q.   How many Word documents of the report

82

1    exist?

2         A.   I don't know.

3         Q.   Okay.  Less than five?

4                   MR. FORD:  Object to the

5              form of the question.

6         A.   I -- I would have to go back and count.

7    I don't -- I don't know.

8         Q.   Would those be drafts of the document --

9    the report that you saved --

10                  MR. FORD:  Object to the --

11        Q.   -- to Word?

12                  MR. FORD:  Object to the

13             form of the question.

14        A.   Yes.

15        Q.   Okay.  So there were drafts of the

16   report that you prepared?

17                  MR. FORD:  Object to the

18             form of the question.

19                  Just a yes-or-no answer if you

20          understand the question.

21        A.   Yeah.

22        Q.   Is the answer yes?

23        A.   There were --

24                  MR. FORD:  Again, just yes

25             or no answers to these questions.

83

```
 1        A.   Yeah.  It -- yeah.  Can you repeat the

 2    question?  Because -- yeah.

 3        Q.   Well, did -- you testified that there

 4    were different versions of the Word document that

 5    you prepared.  And -- and I'm talking about your

 6    report.

 7                    MR. FORD:  So, yeah, again,

 8            object to the form of the question.

 9                     If you understand the question,

10            please answer yes or no.

11                    MS. GUERRIER:  That's not a

12            proper objection, "if you

13            understand."  You can object to the

14            form, but you should not be

15            inserting, you know, cues and words

16            into these questions.  So that's

17            improper.  I'm going to ask you to

18            please just keep your questions (sic)

19            to the form.

20                    MR. FORD:  That's not an

21            objection.

22                    MS. GUERRIER:  Your

23            objections to the form.

24                    MR. FORD:  That's an

25            instruction to the witness on
```

84

1              privilege.  And I'm permitted to

2              instruct the witness on --

3                   MS. GUERRIER:  You're

4              not instructing --

5                   MR. FORD:  -- privilege

6              however I want.

7                   MS. GUERRIER:  You did not

8              instruct the witness on privilege.

9              You are telling him if he

10             understands.  That's not a privilege

11             objection.

12                  MR. FORD:  It -- it is a

13             privilege objection.

14                  MS. GUERRIER:  It is not.

15                  MR. FORD:  You don't

16             understand it to be a privilege

17             objection.  I'll put on the record

18             that my instructions were for --

19                  MS. GUERRIER:  You should --

20                  (Indiscernible cross talk;

21          reporter requests one speaker.)

22                  MR. FORD:  For privilege

23          purposes, to the extent you

24          understand the question, please

25          answer only yes or no.  That's the

85

```
 1            instruction.

 2                      MS. GUERRIER:  Okay.

 3     BY MS. GUERRIER:

 4        Q.   So how many times did you save the

 5     report to Word?

 6                      MR. FORD:  Object to the

 7            form of the question.

 8        A.   Yeah.  That's -- I type, if I take a

 9     break, I push control S.  And that happens.  Type,

10     control S, type, control S.  I don't want to lose

11     a file.  So I have no idea how many times I save

12     that to the system.

13        Q.   Well, did you testify that you --

14                      MR. FORD:  Counsel, will you

15            please let him finish --

16        Q.   Did you --

17                      MR. FORD:  -- him answer

18            before you ask another question?

19        Q.   Did you testify that you had five

20     documents that you created in Word?

21                      MR. FORD:  Object to the

22            form of the question, the

23            characterization of the testimony.

24        A.   I'm -- I'm pretty sure I did not testify

25     I had five.
```

86

1            (Pause)

2       Q.   Okay.  I asked you "From the time you

3   started writing the document until your final

4   product, did you have just one Word document?"

5   And your answer was no.

6            So do you recall how many Word documents

7   that you had before this report?

8       A.   No.

9                 MR. FORD:  Object to the

10            form of the question.

11       Q.   Okay.  Did you receive any comments from

12   counsel regarding the report that you drafted?

13                 MR. FORD:  Object to the

14            form of the question.

15                 And just answer this yes or no

16            to the extent you can answer.

17       A.   Yes.

18       Q.   Who did you receive those comments from?

19                 MR. FORD:  Object to the

20            form of the question.

21                 And just provide names to the

22            extent you remember.

23       A.   Debevoise and then attorneys at Kellogg

24   Hansen.

25       Q.   Okay.  Did you save any of the comments

87

1    that you received from the attorneys onto your

2    Word document?

3                         MR. FORD:  Object to the

4              form of the question.

5                         Same instruction:  Yes or no.

6        A.   Will you repeat -- will you repeat that?

7        Q.   Did you save any of the comments that

8    you received from the attorneys in this case onto

9    your report?

10                        MR. FORD:  Object to the

11             form of the question.

12                        And, again, to the extent you

13             can answer, yes or no.

14       A.   Yes.

15       Q.   Okay.  And are those comments reflected

16   in the final report that you provided in this

17   case?

18                        MR. FORD:  Object to the

19             form of the question.

20                        To the extent you can answer...

21       A.   I -- I received comments and would have

22   considered the comments in drafting the report.

23       Q.   Well, you stated that you saved some

24   of the comments onto your report.  Is that

25   accurate?

88

1                    MR. FORD:  Object to the

2              form of the question, the

3              characterization of the testimony.

4         A.   What -- I'd have to go back.  Can you

5    read -- can you read that portion of the

6    testimony?

7         Q.   Sure.

8              The question was:  "Did you save any of

9     the comments that you received from the attorneys

10     in this case onto your report?"

11             And the attorney objected and you

12     answered "Yes."

13        A.   Okay.

14        Q.   So did the comments make it to the final

15    report that you submitted in this case?

16                    MR. FORD:  Object to the

17             form of the question.

18        A.   Read your first question again.

19        Q.   Did you save any of the comments that

20    you received from the attorneys in this case onto

21    your report?

22        A.   And -- and then --

23                    MR. FORD:  Sorry.  Object to

24             the form of the question.

25        Q.   Your answer was yes.

89

 1      A.   Okay.

 2      Q.   And my question is:  Did the comments

 3   make it into the final report that you submitted

 4   in this case?

 5                    MR. FORD:  Object to the

 6              form of the question.

 7                    A yes-or-no answer to the

 8              extent you understand.

 9                    THE WITNESS:  Okay.

10      A.   I think I answered that I received

11   comments and I took comments into account in

12   drafting the report.

13      Q.   My question is:  Did the comments make

14   it into the final report that you submitted in

15   this case?

16                    MR. FORD:  Object to the

17              form of the question.  Asked and

18              answered.

19      A.   Yeah.  Yeah.  I said I took comments

20   into account in drafting the report.

21      Q.   My question is:  Did the comments make

22   it onto the final report that you submitted in

23   this case?

24                    MR. FORD:  Object to the

25              form of the question.  Asked and

90

1              answered.

2        A.   There -- yeah.

3        Q.   Is that a yes?

4              MR. FORD:  Sorry, Counselor.

5        Same objection.

6        A.   Yeah.  So what did I say?  I received

7    comments, I considered the comments, and I drafted

8    the report.  Right?  Are those the three things

9    that I've said?

10        Q.   Actually you stated that you saved the

11    comments in this case to your report.

12        A.   Okay.

13        Q.   So my question is, are these -- did the

14    comments make it into the final version that you

15    submitted in this case?

16              MR. FORD:  Object to the

17              form of the question and to the

18              characterization of the testimony.

19        Asked and answered.

20        A.   I don't -- I don't know if I have

21    anything else to answer on that.

22        Q.   Well, you have to answer the question,

23    sir.

24              Did the comments make it into your

25    report, the final report that you submitted in

91

1    this case?

2                    MR. FORD:  Object to the

3              form of the question and to the

4              characterization of the testimony.

5              Asked and answered.

6         A.   So I received comments.  I considered

7    them in drafting the report.

8         Q.   Did you include them in the final report

9    that you submitted in this case?

10                   MR. FORD:  Object to the

11             form of the question.

12                   To the extent you can answer,

13         answer that yes or no.

14        A.   I can answer the way I answered.  I

15   received comments.  I took them into consideration

16   in drafting the report.

17        Q.   So are you not answering the question of

18   whether the comments that you received are

19   included in the final version of your report?

20        A.   I --

21                   MR. FORD:  Object -- sorry.

22             Object to the form of the question

23             and to the characterization of the

24             testimony.

25                   You can answer however you

92

```
 1            want.

 2       A.   Yeah.  I think I've answered that

 3  question.

 4       Q.   You have not answered the question.  You

 5  have not answered whether the comments that you

 6  received are included in the final report that you

 7  submitted in this case.

 8                      MR. FORD:  There isn't a

 9            question pending.

10                      MS. GUERRIER:  There is a

11            question pending and he needs to

12            answer the question.  You can't

13            instruct him not to answer.

14                      MR. FORD:  That wasn't a

15            question.

16                      MS. GUERRIER:  That is a

17            question.

18                      MR. FORD:  What's the

19            question?

20                      MS. GUERRIER:  Can you

21            please read the last question that I

22            asked the witness?

23                      (Whereupon, the record was read

24            back.)

25       A.   I don't --
```

93

1              MR. FORD:  Object to the

2          form to the extent that's a question.

3      A.   Yeah.  I don't hear the question in

4  that --

5      Q.   The question --

6      A.   -- in that comment.

7      Q.   -- is:  Are the comments that you

8  received from counsel included in the report that

9  you submitted in this case?

10             MR. FORD:  Object to the

11         form of the question.  Asked and

12         answered.

13     A.   Yeah.  So I -- I may not understand what

14  you mean by "included" in the report.

15     Q.   Did you include -- do you know what --

16  what -- do you understand what the meaning of

17  "include" is?

18             MR. FORD:  Object to the

19         form of the question.

20     A.   I mean, I have a general understanding

21  of the word "include."  I -- I don't know if it

22  has one definition.

23     Q.   Did you take any of the comments that

24  were provided by counsel and include those

25  comments in your report?

1           MR. FORD:  Object to the

2           form of the question.

3      A.   So my -- based on my understanding of

4  "include," I -- I received comments and I took

5  those comments into consideration in drafting the

6  report.

7      Q.   So is the answer yes?

8           MR. FORD:  Object to the

9           form of the question.  Asked and

10          answered.

11     A.   Under -- under my -- under what I

12  understand "include" to mean?

13     Q.   Yes.

14     A.   Yes.

15     Q.   Okay.  Is there any language in your

16  report that are not your words?

17     A.   No.

18          MR. FORD:  Object to the

19          form of the question.

20     Q.   Is there any language in your report

21  that were written by counsel?

22          MR. FORD:  Object to the

23          form of the question.

24     A.   I don't know.

25     Q.   You don't know?

95

```
 1      A.   Yeah.

 2      Q.   Why don't you know?

 3      A.   I would have to -- as I said, I received

 4  comments and took those comments into

 5  consideration.

 6      Q.   Okay.  So is there any part of your

 7  report where there are sections that were written

 8  by counsel?

 9              MR. FORD:  Object to the

10         form of the question.

11      A.   Yeah.  I -- I don't re -- I -- I don't

12  think counsel would have written any section in

13  this report.

14      Q.   Is there anything in the report that's

15  written by counsel?

16              MR. FORD:  Object to the

17         form of the question.  Asked and

18         answered.

19      A.   Yeah.  So that's a hard -- a hard

20  question.  I mean, counsel would have written -- I

21  mean, he uses words like "and" and "the," right,

22  for example?  So they probably have written those

23  words.

24              MR. FORD:  I'm going to

25         instruct you not to get into the
```

96

```
1              drafting process in the report.
2                    THE WITNESS:  Okay.
3                    MR. FORD:  If you can answer
4              these questions yes or no --
5                    THE WITNESS:  Mm-hmm.
6                    MR. FORD:  -- you can answer
7              them yes or no.
8   BY MS. GUERRIER:
9        Q.   So --
10       A.   Ask the question again.
11       Q.   -- when you say -- I'll -- I'll ask
12   another question.
13            When you say words such as "and" and
14   "the" that they probably wrote in your report, is
15   there anything else that counsel wrote in your
16   report?
17                   MR. FORD:  Object to the
18            form of the question.
19       A.   I mean, the -- the re -- the report is
20   mine.  Right?
21       Q.   I don't know.  I'm asking you --
22       A.   The report is mine.
23       Q.   -- who wrote the -- if counsel wrote
24   anything in the report.
25                   MR. FORD:  Object to the
```

97

```
 1              form of the question.  Asked and

 2              answered.

 3       A.    Yeah.  I -- I mean, the report is mine.

 4       Q.    That's not my question, sir.

 5              My question is:  Did counsel write any

 6  part of your report?

 7                   MR. FORD:  Object to the

 8              form of the question.  Asked and

 9              answered.  That is his answer.

10       Q.    Can you answer the question?

11       A.    I can't answer.

12                   MR. FORD:  Object to the

13              form of the question.

14       Q.    Did counsel write anything in your

15  report?

16                   MR. FORD:  Object to the

17              form of the question.  Asked and

18              answered.

19       Q.    You have to answer the question, sir.

20       A.    The -- the -- the report is mine.

21       Q.    That's not my question.

22              My question is:  Did counsel write

23  anything in the report?

24                   MR. FORD:  Counselor, he

25              gave you an answer and at this point
```

1            you're badgering the witness by

2            asking him the same question it must

3            be a dozen times.

4                  MS. GUERRIER:  Well, if he's

5            not answering the question, I'm going

6            to ask him until he does.

7                  MR. FORD:  If you don't like

8            the answer that you're getting,

9            that's not --

10                  MS. GUERRIER:  We're not

11            going to do this on the record.  I'm

12            sorry.  But --

13                  MR. FORD:  But --

14                  MS. GUERRIER:  -- you are

15            allowed --

16                  (Indiscernible cross talk;

17          reporter requests one speaker.)

18                  MS. GUERRIER:  Yes.  You can

19            object to the form of my question,

20            but you cannot have speaking, ongoing

21            or -- you know, statements or

22            testimony on this record.

23                  MR. FORD:  You can't direct

24            the witness to answer you in a

25            certain way.

99

```
 1                    MS. GUERRIER:  I'm not.

 2                    MR. FORD:  The objection is

 3            to form and that it's asked and

 4            answered.

 5                    You can answer.

 6  BY MS. GUERRIER:

 7       Q.   So is there anything in the report

 8  that's written by counsel?

 9                    MR. FORD:  Objection to the

10            form.  Asked and answered.

11       A.   There's nothing I can re -- that I can

12  point to that would have been written by counsel.

13       Q.   Other than the "the" and "and" that you

14  claimed earlier --

15       A.   Well, what --

16       Q.   -- could have been written by counsel?

17                    MR. FORD:  Objection to the

18            form.  Mischaracterizes the

19            testimony.  Asked and answered.

20       A.   I can't, and -- yeah.  I can't recall.

21       Q.   Okay.  Were you asked for your opinion

22  on any topic that was -- that is not included in

23  your report by counsel?

24       A.   No.

25       Q.   Okay.  All right.  If you turn to your
```

100

1    report, does the Exhibit A that you provided

2    include your complete risumi?

3                    MR. FORD:  Object to the

4         form of the question.

5         A.   I didn't hear a question.

6         Q.   Does Exhibit A that you provided with

7    your report include your complete risumi?

8                    MR. FORD:  Object to the

9         form of the question.

10        A.   I just want to...

11             So -- so the report says "Attached as

12   Exhibit A is my CV."

13        Q.   Mm-hmm.  Yes?

14        A.   And I think you asked if it's my

15   complete risumi.

16        Q.   Okay.  So what's the difference between

17   a CV and your risumi?

18        A.   I don't know.

19        Q.   Okay.  So is this a risumi that you've

20   submitted with your report?

21        A.   This is the --

22                    MR. FORD:  Object to the

23        form of the question.

24        A.   This is the CV that I submitted with the

25   report.

```
 1        Q.   What is your definition of "CV"?

 2        A.   I think -- so a CV would be something

 3   like Exhibit A that includes professional

 4   experience and publications.

 5        Q.   Okay.  Are you making a distinction

 6   between a CV and a risumi?

 7                     MR. FORD:  Object to the

 8             form of the question.

 9        A.   I don't know if there's a distinction.

10        Q.   Okay.

11        A.   "CV" is -- is the word that -- that I

12   use in the report.

13        Q.   Is the CV that you've submitted

14   accurate?

15        A.   It -- it's accurate to the best of my

16   knowledge.

17        Q.   Okay.  When was the CV created?

18        A.   I think October 4th.

19        Q.   October 4th of 2021?

20        A.   Of 2021.

21        Q.   Okay.  Who created the CV?

22        A.   I believe I created the CV.

23        Q.   Are you for -- do you know this for

24   certain that you created the CV?

25        A.   Counsel may have assisted with the
```

1    organization of the CV.

2         Q.   Okay.  Did you have a CV prior to

3    October 4th, 2021?

4         A.   Yes.

5         Q.   And is the CV that's attached to your

6    report the same as the one that you had prior to

7    October 4th, 2021?

8         A.   I believe the organization on this is

9    different.  And this CV has publications for the

10   past ten years.  It has some selected academic

11   presentations for the past -- past ten years.  And

12   it has expert testimony for the past four years.

13   I -- that may differ from other CVs --

14        Q.   Okay.

15        A.   -- that I have that may provide

16   information extending beyond that period of time.

17        Q.   Okay.  So do you -- how many versions of

18   your CV do you have?

19                  MR. FORD:  Object to the

20             form of the question.

21        A.   Yeah.  Can you be more specific about

22   that?

23        Q.   You stated that this may -- this CV

24   that's attached to your report may differ from

25   other CVs that you may have.  So I'm asking how

103

1    many versions of your CV that you have.

2                        MR. FORD:  Object to the

3            form of the question.

4        A.    Yeah.  I don't -- I don't know.

5        Q.    Prior to October 4th, 2021, when -- when

6    was the last time that you updated your CV?

7        A.    I don't know.

8        Q.    Do you recall the last time you drafted

9    a CV?

10                       MR. FORD:  Object to the

11           form of the question.

12       A.    No.

13       Q.    Okay.  Is there anything in your other

14   CV that's not included in the Exhibit A that you

15   provided with your report which is your CV?

16                       MR. FORD:  Object to the

17           form of the question.

18       A.    I believe so.

19       Q.    What specifically is not included?

20       A.    So --

21                       MR. FORD:  Object to the

22           form of the question.  Sorry.

23       A.    So the -- I don't know if I can be

24   specific.  But the -- so the CV that's included in

25   the materials has publications for the past ten

```
 1    years.

 2         Q.   Mm-hmm.

 3         A.   If you look at -- and my CV is posted on

 4    the Brooklyn Law School website.  If you looked at

 5    it, for example, it doesn't stop with publications

 6    for the past ten years and it may not include

 7    every publication.

 8                        THE REPORTER:  Include what

 9         publication?

10                        THE WITNESS:  Every

11         publication.

12    BY MS. GUERRIER:

13         Q.   Which CV may not include every

14    publication?

15         A.   Well, Exhibit A goes back ten years.

16         Q.   Okay.

17         A.   So it wouldn't include every

18    publication.  And the one on the Brooklyn Law

19    School website isn't limited to the past ten

20    years.  So it may include other publications that

21    aren't on here --

22         Q.   Okay.

23                        MS. GUERRIER:  Let me --

24         A.   -- that also --

25                        MS. GUERRIER:  -- hand this
```

```
 1              over to you.  If you could give one

 2              to the court reporter, please.

 3                      THE REPORTER:  Exhibit 2.

 4                      MS. GUERRIER:  Yes.

 5   BY MS. GUERRIER:

 6        Q.   I've handed you what's been premarked as

 7   Exhibit 2.

 8              Do you recognize Exhibit 2?

 9        A.   Not that -- I believe the law school

10   maintains a list of articles and publications and

11   this appears to be that.

12        Q.   Okay.  So --

13                      MR. FORD:  Sorry.  Just --

14              Counsel, just a question.  It looks

15              like there's language at the bottom

16              of the page that "this site uses

17              cookies" that appears to be cutting

18              off some of the text on page 3, page

19              9, at least just from looking

20              through.

21                      Is this the only version that

22          you have?

23                      MS. GUERRIER:  That's the

24              only version.

25   BY MS. GUERRIER:
```

106

1     Q.   Okay.  So have you seen this document

2   before, Professor?

3     A.   No.

4     Q.   Okay.

5     A.   I don't think this is a document.  I've

6   never seen this document.  I think this is an

7   elec -- yeah.  I think this is on the website

8   only, something --

9     Q.   Okay.

10     A.   -- that the law school doesn't print.

11     Q.   Is this the BrooklynLaw.edu website?

12     A.   Yes.

13               MR. FORD:  Sorry.  Object to

14          the form of the question.

15     Q.   Okay.  So --

16     A.   Okay.

17     Q.   So does this document on the first page

18   list your education and areas of ex -- of

19   expertise accurately?

20     A.   It's -- it acc -- it accurately

21   identifies those areas as areas of expertise.

22     Q.   Okay.

23     A.   But there are -- it doesn't necessarily

24   list all areas of expertise.

25     Q.   Okay.  And how about your education?

1    Does it list your education accurately?

2        A.   Yes.

3                    MS. GUERRIER:  Can you

4            please mark the document as Exhibit

5            2.

6                    (Whereupon, exhibit is

7            presented and marked SEC Borden

8            Deposition Exhibit 2 for identification.)

9                    THE REPORTER:  Exhibit 2.

10                   MS. GUERRIER:  Yes.

11   BY MS. GUERRIER:

12       Q.   Can you please tell us your post-high

13   school education?

14       A.   Post-high school education?

15       Q.   Yes.

16       A.   I have a B.B.A. from Idaho State

17   University.  And that was -- majored in

18   accounting.

19       Q.   Mm-hmm.

20       A.   An M.B.A. from Idaho State University

21   with an emphasis on accounting.  And then a J.D.

22   from the University of Florida School of Law.  And

23   an LL.M. in taxation from the University of

24   Florida School of Law.

25       Q.   What year did you get your accounting

108

1    degree from -- yes.  Your accounting degree in --

2    your B.B.A. in accounting, what year did you

3    obtain that?

4         A.   That was 1995.

5         Q.   Okay.  And what year did you obtain your

6    M.B.A.?

7         A.   1996.

8         Q.   What year did you obtain your J.D.?

9         A.   1999.

10        Q.   And what year did you obtain your LL.M.

11   in tax?

12        A.   2000.

13        Q.   Okay.  Have you had any additional

14   educational training after your LL.M. in tax?

15                    MR. FORD:  Object to the

16             form of the question.

17        A.   Yeah.  Can you be more specific?

18        Q.   Have you had any postgraduate education

19   after your LL.M. in tax?

20        A.   I mean, I've done CLE and CP courses.

21        Q.   Okay.  Other --

22        A.   Is that what you're talking about or --

23        Q.   Any degrees after the LL.M. in tax?

24        A.   No other degrees.

25        Q.   Okay.  So other than the CLE courses,

109

1    have you had any additional training after 2000 in

2    your field?

3                    MR. FORD:   Object to the

4          form of the question.

5          A.   In my field?   I've -- I think I've taken

6    two other -- two or three other college courses.

7          Q.   What were those courses?

8          A.   They were math related.

9          Q.   Do you recall specifically what courses?

10         A.   No.

11         Q.   Do you recall when you took those

12   college courses?

13         A.   I took them when we lived in Kansas.

14         Q.   Do you recall what year?

15         A.   No.   We were there between 2004 and

16   2010.   Somewhere in that range.

17         Q.   You're currently employed as a professor

18   at Brooklyn Law School?

19         A.   Yes.

20         Q.   How long have you been employed at

21   Brooklyn Law School?

22         A.   Since 2010.

23         Q.   Are you tenured at Brooklyn Law School?

24         A.   Yes.

25         Q.   When did you receive your tenure?

110

```
1        A.   I came to Brooklyn Law School with

2   tenure.

3        Q.   You came with.

4             What classes do you currently teach at

5   Brooklyn Law School?

6                    MR. FORD:   Object to the

7             form of the question.

8        A.   Yeah.  So this semester I'm teaching

9   federal income tax.  Actually not teaching it; we

10  had our last class on Monday.

11       Q.   Is that the only class that you teach at

12  Brooklyn Law School?

13       A.   This semester.

14       Q.   Okay.  What other courses have you

15  taught at Brooklyn Law School?

16       A.   So I -- partnership taxation, taxation

17  in real estate transactions, and LLCs and

18  partnerships.

19       Q.   Anything else?

20       A.   No, I don't think so.

21       Q.   Okay.  Prior to Brooklyn Law School,

22  where did you work?

23       A.   At Washburn University School of Law in

24  Topeka, Kansas.

25       Q.   How long were you employed at Washburn
```

111

1    University School of Law?

2         A.   From August of 2004 until 2010.

3         Q.   Were you tenured at Washburn University

4    School of Law?

5         A.   I received tenure.

6         Q.   When did you receive tenure?

7         A.   So I left in 2010, and that was the year

8    I was going through the tenure process.  So I -- I

9    believe -- I know that the faculty at the law

10   school had voted for my tenure.  And then

11   there's -- there's a process, right?  So the

12   faculty votes for tenure.  That happened.  Then it

13   goes to the university and then the university,

14   something happens there administratively, and then

15   it goes to the university board is my

16   understanding.

17            So I think all of that happened before I

18   left in May of 2010.

19        Q.   Okay.  So when you left in May 2010, the

20   Washburn University -- sorry.  I'll ask again.

21            When you left Washburn University School

22   of Law in May of 2010, were you tenured?

23        A.   I -- I -- I'm not sure how it works

24   technically, everything that happened for -- for

25   me to have tenure, but it may have been effective

1   that fall and I was gone that fall.  I was at

2   Brooklyn Law School that fall.  So I -- yeah.  It

3   may not -- the tenure may have been approved but

4   not become effective by the time I left.

5        Q.   Okay.  When did you -- I'm sorry.

6             Why did you leave your job at Washburn

7   University?

8        A.   I left the job at Washburn University to

9   come to Brooklyn Law School.

10        Q.   Okay.  Do you recall what courses you

11   taught at Washburn University School of Law?

12        A.   They're listed in my CV, in Exhibit A.

13        Q.   Okay.  Can you tell me what courses you

14   taught?

15        A.   Absolutely.  Tax policy seminar,

16   taxation of business entities, taxation of

17   individual income, taxation of corporations and

18   shareholders, taxation of partnerships and

19   partners.

20        Q.   Anything else?

21        A.   I -- I believe that was it.

22        Q.   Prior to working at Washburn University

23   School of Law, where did you work?

24        A.   I was in private practice in San

25   Antonio.

113

1      Q.   And what kind of employment were you

2   doing in San Antonio?

3      A.   I was a -- a tax associate at a law

4   firm.

5      Q.   What was the name of the law firm?

6      A.   Oppenheimer Blend Harrison & Tate, Inc.

7      Q.   Do you recall what year you worked

8   there?

9      A.   I started in 2000, is what I remember,

10   and then I left full-time employment in 2004.  I

11   believe I remained of counsel with the firm after

12   leaving full time to go -- when we moved to Kansas

13   to go -- to teach at Washburn.

14      Q.   What was the firm's area of practice?

15      A.   The firm was a -- a commercial law firm.

16      Q.   What did you specifically -- what -- I'm

17   sorry.

18           What type of work did you specifically

19    do at the firm?

20      A.   Federal income tax.

21      Q.   In what context did you do the federal

22   income tax work?

23      A.   It was generally in the property

24   transaction context.

25      Q.   Any other type of work at the firm?

114

1      A.   It's been a long time.  I -- I might

2  have done some corporate work.  I might have done

3  something related to estates and trusts.

4      Q.   So prior to Oppenheimer, Blend, Harris,

5  where did you work?

6      A.   That was my first job out of law school.

7      Q.   So other than the employment that we

8  discussed today, did you work anywhere else after

9  you graduated from college?

10              MR. FORD:  Object to the

11          form of the question.

12      A.   After I graduated from college, I

13  started at Oppenheimer, Blend, Harrison & Tate.  I

14  went to Washburn University, then Brooklyn Law

15  School.  And then I've -- I've done of counsel

16  work and then I have my own practice.

17      Q.   Okay.

18              MR. FORD:  Counsel, if we're

19          going to leave this document, we've

20          been going for about an hour, is it a

21          good time to take a break?

22              MS. GUERRIER:  Can I ask one

23          question so we can just break off

24          at --

25              MR. FORD:  Okay.

115

1   BY MS. GUERRIER:

2        Q.   All right.  What kind of practice do you

3   have?

4        A.   It's a -- it's a tax law practice.

5        Q.   Okay.  What is the name of your

6   practice?

7        A.   Bradley T. Borden, PLLC.

8        Q.   And what kind of tax law do you do at

9   the company?

10        A.   It's transactional.

11        Q.   Can you explain what you mean by

12   "transactional"?

13        A.   Yeah.  It's -- it's people buying and

14   selling property.

15        Q.   What type of property?

16        A.   It varies.

17        Q.   Okay.  So can you give me some examples?

18        A.   Yeah.  Real property.

19        Q.   Okay.  Any other type of property?

20        A.   Interest in corporations.

21        Q.   Okay.  Anything else?

22        A.   Interest in partnerships.

23        Q.   Anything else?

24        A.   Well, when you get into real property,

25   there are leases.

116

1        Q.    Anything else?

2        A.    There -- there are contracts and -- and

3    options.

4        Q.    Is this a practice that you're doing now

5    with the Brooklyn Law School work?

6        A.    It's --

7                    MR. FORD:  Object to the

8              form of the question.

9        A.    So I'm -- I'm a professor at Brooklyn

10   Law School and I also have an advisory practice

11   work.  Yeah.

12       Q.    What percentage of your time do you

13   spend at the advisory practice?

14       A.    I don't -- I don't know.

15       Q.    Okay.  How often do you teach classes at

16   Brooklyn Law School?

17       A.    So this semester I had classes twice a

18   week.

19       Q.    Prior to this semester, what was your

20   time spent at Brooklyn Law School teaching

21   classes?

22       A.    So I -- I teach -- usually I teach

23   two -- one class in the fall and I teach two

24   classes in the spring.

25       Q.    Okay.  Has this been the case since you

1    started working there in 2010?

2         A.   I -- I took a sabbatical one semester

3    and it seems like I was asked to teach another

4    class one semester.  So I might have had either

5    three courses one semester or, like, a fall with

6    two.

7         Q.   Okay.  And is your tax practice a

8    full-time job?

9         A.   I don't think so.

10        Q.   How many hours a week do you work at

11   your tax practice?

12        A.   It depends.  There's not, like, fixed

13   hours.

14        Q.   Okay.  Is it less than 40 hours?

15        A.   It -- it -- it depends.

16        Q.   Okay.

17        A.   I mean, I don't mean to -- yeah.  I

18   mean, if there's -- if there's work, then it could

19   be -- it could be 40 hours or more.

20        Q.   Okay.

21        A.   If there's less work, then it could be,

22   you know, a few hours or not -- or no hours at

23   all.

24        Q.   Okay.

25                    MS. GUERRIER:  We can take a

118

1          break now.

2                    How long did you want?

3                    MR. FORD:  Oh, just 10, 15

4          minutes.

5                    MS. GUERRIER:  Sure.

6                    MR. FORD:  Come back at

7          11:35.

8                    MS. GUERRIER:  That's fine.

9                    THE VIDEOGRAPHER:  The time

10         on the video monitor is 11:25.  End

11         of Media Unit Number 2, going off the

12         video.

13                    (Whereupon, a recess is taken.)

14                    THE VIDEOGRAPHER:  The time

15         on the video monitor is now 11:43

16         p.m. (sic).  Start of Media Unit

17         Number 3.  Back on the video record.

18    BY MS. GUERRIER:

19        Q.   Professor, are all of your memberships

20    and professional organizations listed in your

21    report?

22                    MR. FORD:  Object to the

23         form of the question.

24        A.   I don't -- so there's -- what do we have

25    here?  So the report itself, paragraph 4, talks

```
 1    about I was the past chair of the Sales, Exchange

 2    and Basis Committee of the American Bar

 3    Association Section of Taxation.

 4                     THE REPORTER:  You're going

 5              to have to slow down when you're

 6              reading.

 7                     THE WITNESS:  Yeah.  Sorry

 8              about that.  Yeah.

 9                     THE REPORTER:  Repeat.

10        A.   So as it says, I was the past chair of

11    the Sales, Exchanges and Basis Committee of the

12    American Bar Association Section of Taxation.

13              I am currently or formerly a member of

14    the following professional organizations:  The

15    American College of Tax Counsel, the New York

16    State Bar Association, the New York City Bar

17    Association, the Texas Bar Association and the Tax

18    Forum.  I'm also American of the -- also a fellow

19    of the American Bar Foundation.

20              And then there -- if we go to the CV, it

21    looks like the CV, I believe, so far lists all of

22    those.

23              I'm trying to think if there's any,

24    so -- yeah.  It goes back.  What -- so these are

25    professional organizations that I have been a
```

1    member of or am currently a member of.  There are

2    probably some that aren't on there that I've been

3    a member of.

4        Q.   Do you know what they are?

5        A.   I don't know if I can recollect.

6    There's -- there -- down below they have -- you

7    asked about professional organizations --

8        Q.   Yes.

9        A.   -- specifically?

10           Texas Bar Association.  In Texas I might

11   have been a member of the -- the CPA association,

12   whatever it's called.

13       Q.   Okay.

14       A.   I don't know.  New York State -- so,

15   yeah, this doesn't have the New York -- it doesn't

16   have New York City or New York County.

17       Q.   What specifically for New York City?

18       A.   Yeah, sorry.  The New York -- the New

19   York City -- I think it's the New York City Bar

20   Association and the New York County, the law

21   association.  I don't know if I remember the exact

22   names of those.

23       Q.   Anything else?

24       A.   Nothing else comes to mind.

25       Q.   Okay.  Have you ever had any complaints

121

1    filed against you at any of the professional

2    organizations that you belong to?

3         A.   Not that I'm aware of.

4         Q.   Okay.  Are all of your professional

5    licenses listed in your report including the

6    appendix to the report?

7         A.   So, licenses.  New York, Texas, United

8    States Tax Court.  Yeah, I can't think of -- I

9    don't think there are any others.  It says Florida

10   CPA.  Yeah.

11        Q.   Are you a currently active CPA?

12        A.   I'm -- so the CPA designation in Florida

13   I -- I put on inactive status.  The CPA

14   designation in Texas is still active.

15        Q.   Okay.  When did you obtain your CPA

16   license?

17        A.   In Florida I believe it was 1998.

18        Q.   How about in Texas?

19        A.   I believe 2001.

20        Q.   Any other license that is not listed on

21   this Exhibit A?

22        A.   Professional licenses?

23        Q.   Professional licenses, yes.

24        A.   I think the only other license I have is

25   a driver's license.

122

1      Q.    Okay.

2      A.    It does have a motorcycle certification.

3      Q.    Okay.  That's good.

4      A.    That is good.

5      Q.    Have you ever been disciplined by any of

6  the -- the organizations that issued you a

7  professional license?

8      A.    Not -- no.

9      Q.    Okay.  Have any of your professional

10  licenses ever been revoked?

11      A.    No.

12      Q.    Have they been suspended at any time?

13      A.    No.

14      Q.    Okay.  Have you ever applied for a

15  professional license that was denied?

16      A.    I don't think so.  I think these are the

17  only ones I've applied for.

18      Q.    Okay.  Now, can you tell me what your

19  area of expertise is in your profession?

20      A.    Sure.

21                  MR. FORD:  Sorry.  Object to

22          the form of the question.

23      A.    Yeah.  So I'm a -- a tax law professor.

24  And then transactional tax classification of -- of

25  property for federal income tax purposes is -- is

123

1    an area that I have, sort of, particular

2    expertise.

3        Q.   Anything else?

4        A.   I think if we look at the -- the CV, you

5    can see that some of the -- a lot of the

6    publications relate to tax, but there are some

7    that relate to partnerships and LLCs.

8        Q.   So are you claiming an expertise in

9    partnerships and LLCs?

10                   MR. FORD:  Object to the

11               form of the question.

12       A.   I'm a -- I mean, I'm a co-author of --

13   of a treatise called "Limited Liability Entities:

14   State by State Guide to LLCs, LPs and LLPs."

15       Q.   Mm-hmm.

16       A.   So it's a -- it's a ten-volume treatise

17   that I'm a co-author on.

18           And then there's also another book in

19   here, "LLCs and Partnerships."

20           And then a number of -- it looks like

21    there was at least -- there -- there's probably

22    more than that, but there's a Law Review article

23    there, "Interest Dilution as a

24    Contribution-Default Remedy in LLCs and

25    Partnerships."  So I do have expertise in that

124

1      area as well.

2          Q.   Okay.  Anything else?

3          A.   So what did I say?  Federal income tax

4      and partnerships and LLCs.  I -- that -- I mean,

5      that would be -- that would be the -- those would

6      be the primary areas for sure.

7          Q.   Okay.  Do you consider yourself an

8      expert in the taxation of digital -- federal

9      taxation of digital assets?

10                     MR. FORD:  Object to the

11             form of the question.

12         A.   So I -- I -- I do consider myself an

13     expert regarding the -- the classification of

14     virtual currency such as XRP for federal income

15     tax purposes.

16         Q.   Has any court ever qualified you as an

17     expert in the federal taxation of virtual

18     currency?

19         A.   Not that I'm aware of.

20         Q.   What is the basis for your claim that

21     you have -- you are an expert in the

22     classification of virtual currency for federal tax

23     purposes?

24                     MR. FORD:  Object to the

25             form of the question.

1       A.   So I have a -- a general expertise in

2   the federal income tax classification of property.

3   And virtual currency such as XRP is -- is a type

4   of property.

5       Q.   Did you have a specific example of when

6   you were determined an expert in the

7   classification of virtual currency --

8                    MR. FORD:  Object to the

9              form of the question.

10      Q.   -- for tax purposes?

11                   MR. FORD:  Sorry.

12      A.   Yeah.  In this case I've been hired as

13   an expert in that area.

14      Q.   Other than this case, have you been --

15   ever been hired as an expert in the classification

16   of virtual currency for federal tax purposes?

17      A.   No.

18      Q.   Has any court ever qualified you as an

19   expert in the area of federal taxation of digital

20   assets?

21                   MR. FORD:  Object to the

22              form of the question.

23      A.   Yeah.  I'm not sure what it means to be

24   qualified by a court as an expert witness.

25      Q.   Have you ever testified as an expert

126

1    in -- regarding the federal taxation of digital

2    assets?

3                      MR. FORD:  Object to the

4              form of the question.

5         A.   This is -- can you -- can you be more --

6    the answer is no.

7         Q.   Okay.  In general, has any court ever

8    qualified you as an expert in any subject matter?

9                      MR. FORD:  Object to the

10             form of the question.

11        A.   Yeah.  I'm not sure what it means for a

12   court to qualify me as an expert.

13        Q.   Has the court ever accepted your report

14   in any case that you've been retained as an expert

15   in?

16                     MR. FORD:  Object to the

17             form of the question.

18        A.   Yeah.  I -- I don't know.

19        Q.   Do you know if you've ever failed to

20   qualify as an expert by a judge in any case?

21                     MR. FORD:  Object to the

22             form of the question.

23        A.   No.

24        Q.   Have you received any educational

25   training in the federal taxation of digital

127

1   assets?

2                    MR. FORD:  Object to the

3          form of the question.

4          A.   So I have a -- I have a CPA.  I took --

5   I have, as we talked about, a bachelor's degree in

6   accounting.  So I took tax courses there.  I have

7   an LL.M. in accounting.  And I have written

8   extensively about federal income taxation of

9   property transactions and classification of

10  property.

11         Q.   Okay.  So the CPA that -- have you ever

12  had a CPA course regarding digital assets?

13                   MR. FORD:  Object to the

14         form of the question.

15         A.   I have been to conferences where that

16  taxation -- I use the term "virtual currency," so

17  I'm going to use that -- that -- that -- that

18  language here.  But I've been to courses where

19  there has been discussion -- CLE courses where

20  there's been discussions of virtual currency.

21         Q.   Did you conduct the CLE courses where

22  there've been discussions of virtual currency?

23                   MR. FORD:  Object to the

24         form of the question.

25         A.   Can you say a little bit more about what

[12/3/2021] Borden, Bradley Expert Dep. Tr. 12.3.2021

128

```
1    you mean by "conduct"?

2         Q.   Were you the one giving the course on

3    the virtual currency?

4         A.   No.

5         Q.   Okay.  Other than the CLE course that

6    you attended where there was a discussion about

7    virtual currency, did you have any other courses

8    regarding virtual currency?

9                    MR. FORD:  Object to the

10              form of the question.

11        A.   I don't think so.

12        Q.   How about digital assets in general?

13   Did you have any courses regarding digital

14   assets --

15                   MR. FORD:  Objection.

16        Q.   -- other than virtual currency?

17                   MR. FORD:  Sorry.  Object to

18              the form of the question.

19        A.   Not that I know of.

20        Q.   You talked about your LL.M.

21             Did you have a course in your LL.M.

22    classes -- all to -- your LL.M. program regarding

23    digital assets?

24                   MR. FORD:  Object to the

25              form of the question.
```

129

1      A.   Not that I recall.

2      Q.   When did you graduate?

3      A.   2000.

4      Q.   Would there have been a course about

5   digital assets in your LL.M. in -- in the 2000

6   era?

7                MR. FORD:  Object to the

8           form of the question.

9      A.   I don't know.

10      Q.   Were digital assets in existence in

11   2000?

12      A.   I don't know.

13                MR. FORD:  Object -- sorry.

14           Object to the form of the question.

15      Q.   Okay.  Now, you have an accounting

16   degree?

17      A.   Yes.

18      Q.   Did you take any courses when you were

19   doing your accounting degree on digital assets?

20      A.   Not that I re --

21                MR. FORD:  Object to the

22           form of the question.

23      A.   Not that I recall.

24      Q.   In your tax practice, have you provided

25   any service with regards to the federal taxation

130

```
1    of digital assets?

2                    MR. FORD:  Object to the

3              form of the question.

4        A.   Yeah.  I've -- I -- I think I've never

5    been hired to provide advice with respect to

6    virtual currency.

7        Q.   Do you understand a virtual currency to

8    be a digital asset?

9                    MR. FORD:  Object to the

10             form of the question.

11       A.   So "virtual currency" is a -- it's a

12   term that's defined and used by the IRS.  And so

13   that's a firm -- a term I'm familiar with.

14       Q.   How are you defining the term "virtual

15   currency"?

16       A.   I'm -- I'm using the IRS's definition of

17   virtual currency.

18       Q.   Okay.  We'll get to that shortly.

19       A.   Yeah.

20       Q.   Have you ever taught a class about the

21   federal taxation of digital assets?

22                    MR. FORD:  Object to the

23             form of the question.

24       A.   Yeah.  I'm not -- I don't know exactly

25   what digital assets is.
```

131

1        Q.    Okay.  Well, have you ever taught a

2    class about the federal taxation of virtual

3    currency?

4        A.    I don't think so.

5        Q.    Have you -- have you -- are you familiar

6    with the term "cryptocurrency"?

7        A.    Yes.

8        Q.    Have you ever taught a class about the

9    federal taxation of cryptocurrency?

10       A.    No.

11       Q.    Have you ever taught a class about the

12   federal taxation of similar types of virtual

13   currency or cryptocurrency?

14                    MR. FORD:  Object to the

15            form of the question.

16       A.    It -- yeah.  In -- in many ways virtual

17   currency is similar to property.

18       Q.    That's not my question.

19            My question is:  Do you have a specific

20   class that you've ever taught about virtual

21   currency?

22                    MR. FORD:  Object to the

23            form of the question.

24       A.    Is that the -- yeah.  Would you ask that

25   question again?

132

```
 1        Q.   Is there a specific class that you've

 2   ever taught about virtual currency?

 3                    MR. FORD:  Object to the

 4             form of the question.

 5        A.   I don't recall ever specifically

 6   covering virtual currency in a class.

 7        Q.   Okay.  Any -- did you ever have a class

 8   about bitcoin?

 9                    MR. FORD:  Sorry.  Object to

10             the form of the question.

11        A.   Yeah.  I don't recall ever teaching a

12   class about bitcoin.

13        Q.   Have you ever taught a class about XRP?

14        A.   No.

15        Q.   Okay.  Do you have an understanding of

16   the word "digital asset"?

17                    MR. FORD:  Object to the

18             form of the question.  Asked and

19             answered.

20        A.   Yeah.  Virtual -- I use the term

21   "virtual currency" because, again, it's used by

22   the IRS.  And so it's a -- it's a term that I am

23   familiar with that has some -- something of a

24   technical connotation.

25        Q.   So --
```

1          A.   Digital assets -- yeah.  I don't have

2     the same understanding of what digital assets

3     means.

4          Q.   Okay.  So something that's not a virtual

5     currency but is -- do you know of anything other

6     than a virtual currency in that world?

7                         MS. ZORNBERG:  I'm sorry.

8               Can you keep your voice up?  I -- I

9               can't hear you.

10                        MS. GUERRIER:  I'm sorry.

11              I'll repeat the question.

12    BY MS. GUERRIER:

13         Q.   So with an asset that's not a virtual --

14    I'll repeat the question verbatim.

15              Something that's not a virtual currency,

16    but do you know of anything other than a virtual

17    currency in that world?

18                        MR. FORD:  Object to the

19              form of the question.

20         A.   I -- so -- so my understanding is -- and

21    I'm going to frame it in -- in -- in terms of the

22    tax law.  So we have the guidance from the IRS

23    that talks about virtual currency and then we also

24    have guidance from the IRS that says that

25    cryptocurrency is a subset of virtual currencies.

134

1          So that's...

2     Q.   So other than virtual currency and

3    cryptocurrency, do -- are you aware of any other

4    type of similar assets?

5                    MR. FORD:  Object to the

6               form of the question.

7     A.   I don't know if I understand the

8    question, but I -- I can read what virtual

9    currency is and then read that cryptocurrency is a

10   subclass or subset of a virtual currency.

11    Q.   So is it your testimony today that you

12   don't know what a digital asset is?

13                   MR. FORD:  Object to the

14              form of the question.

15    A.   I don't know what -- I don't know the

16   definition of -- hold on.  I'm trying to think if

17   there's a context.

18          So I believe the term "digital asset"

19   was used in -- actually, let me not guess.

20          Yeah.  So there -- there -- there was

21   legislation proposed regarding Section 6045 of the

22   Internal Revenue Code that uses the term "digital

23   asset."

24    Q.   Do you have an understanding of what

25   that term means under that section of the --

135

1              MR. FORD:  Sorry.  Object to

2          the form of the question.

3      A.   I -- I don't have the definition in

4  front of me.

5      Q.   Okay.  But have you heard of the term

6  "digital asset" before?

7      A.   Yes.

8      Q.   Okay.  In what context did you hear of

9  the term "digital asset"?

10     A.   Well, as I said, it was -- it was in

11  legislation that was proposed with respect to

12  Section 6045.

13     Q.   Other than the context of proposed

14  legislation, have you heard of the term "digital

15  asset"?

16     A.   I mean, I -- I suppose it showed up in

17  my just general reading the news --

18     Q.   Okay.

19     A.   -- and being a part of society, but I

20  don't have, like, a specific knowledge or

21  recollection of how that would have been used.

22     Q.   Okay.  Have you conducted any seminars

23  about the federal taxation of a virtual

24  currency?

25              MR. FORD:  Object to the

136

1          form of the question.

2          A.   So I've never specifically, that I

3     recall, addressed virtual currency in any talk

4     that I've given, any presentation that I've

5     given.

6          Q.   Okay.  And is it fair to say the same

7     for digital assets?

8                    MR. FORD:  Object to the

9               form of the question.

10         A.   I don't recall using the term "digital

11    asset" in a presentation.

12         Q.   Okay.  Okay.  So sitting here today, do

13    you have a working understanding of what the --

14    the term "digital asset" means?

15                   MR. FORD:  Object to the

16              form of the question.  Asked and

17              answered.

18         A.   Yeah.  So -- so, again, I know "digital

19    asset" was used in proposed legislation under

20    Section 6045.

21         Q.   Mm-hmm.

22         A.   And I -- I believe it was defined in

23    that proposed legislation but I don't have that

24    definition.

25         Q.   All right.  If you turn to the

137

```
 1    publications that you've listed for the last ten

 2    years.

 3              So have you listed all of your

 4    publications in the last ten years in Exhibit A to

 5    the report?

 6         A.   I believe so.

 7         Q.   Okay.  Can you state all the articles

 8    that you've published that specifically discuss

 9    virtual currencies?

10                        MR. FORD:  Object to the

11              form of the question.

12         A.   Yeah.  I'm not aware of ever using the

13    term "virtual currency" in any publication.

14         Q.   Have you ever published any articles

15    regarding cryptocurrencies?

16                        MR. FORD:  Object to the

17              form of the question.

18         A.   Yeah.  I'm not aware of ever using the

19    term "cryptocurrency" in a publication.

20         Q.   Have you ever published any articles

21    regarding digital assets in general?

22                        MR. FORD:  Object to the

23              form of the question.

24         A.   Yeah.  I'm not aware of ever using the

25    term "digital assets" in a publication.
```

1      Q.   All right.  So going to the books that

2  you've published, have you ever published any book

3  that specifically discuss virtual currencies?

4      A.   Not that it -- not that I'm aware of.

5      Q.   Have you published any books that

6  discuss cryptocurrencies?

7      A.   Not that I'm aware of.

8      Q.   Have you published any books that

9  discuss digital assets?

10                  MR. FORD:  Object to the

11             form of the question.

12     A.   Yeah.  I'm not aware of using the term

13  "digital assets" in any book.

14     Q.   Can you state any reviews that you've

15  published that specifically discuss digital

16  assets?

17                  MR. FORD:  Object to the

18             form of the question.

19     A.   Yeah.  I'm not -- I can't recall and I'm

20  not aware that I've ever used the term "digital

21  assets" in any publication.

22     Q.   Have you ever published any reviews that

23  specifically discuss cryptocurrencies?

24                  MR. FORD:  Object to the

25             form of the question.

139

1          A.   Yeah.  I'm not totally sure what -- when

2     you say "review," are you referring to something

3     in particular?

4          Q.   Any articles that -- any reviews that

5     you've done regarding cryptocurrencies.

6          A.   Yeah --

7                    MR. FORD:  Object to the

8               form of the question.

9          A.   I'm not aware of ever publishing

10    anything that used the word "cryptocurrency"

11    before.

12         Q.   Okay.  Have you ever published anything

13    about virtual currencies at all?

14         A.   Well, I've never used -- I'm not -- I

15    don't recall ever using the word "virtual

16    currency" in a publication.

17         Q.   Did you use a word that's similar to

18    virtual currency in any publication that have to

19    do with the virtual currencies that you -- the IRS

20    has defined that you referred to?

21                    MR. FORD:  Object to the

22              form of the question.

23         A.   Yeah.  Can -- yeah.  There's -- there's

24    a -- I just want to be very specific in what I

25    heard you ask.

140

```
 1              Can you ask it again?

 2         Q.   Yes.  I'll ask a better question.

 3         A.   Okay.

 4         Q.   Have you ever published anything about

 5   "virtual currencies" as you understand that term

 6   to mean?

 7                    MR. FORD:  Object to the

 8              form of the question.

 9         A.   Yeah.  I've never -- I've never used the

10   word "virtual currency" in a publication that I

11   can recall.

12         Q.   Have you published anything about the

13   subject matter of virtual currencies?

14                    MR. FORD:  I'm sorry.

15              Object to the form of the question.

16         A.   Yeah.  So -- yeah.  Yeah.  I've -- I've

17   definitely published -- I definitely have

18   publications that talk about the taxation of

19   property transactions.

20         Q.   Mm-hmm.

21         A.   Yeah.  So I'm just saying that -- would

22   that cover virtual currency?  The answer is yes.

23         Q.   That's not my question, though.

24         A.   Okay.

25         Q.   My question is specifically with regard
```

141

1    to the types of virtual currencies that you --

2    that you -- you claim the IRS defined.

3          A.   Yeah.

4          Q.   Have you published anything at all about

5    that subject matter?

6                    MR. FORD:  Object to the

7                form of the question.  Asked and

8                answered.

9          A.   So I've never -- I don't recall ever

10   using the word "virtual currency" in a

11   publication.

12         Q.   Okay.  So what percentage of your

13   publications concern property, real property?

14                    MR. FORD:  Object to the

15               form of the question.

16         A.   Yeah.  That would be -- that would be

17   very hard to quantify.  I'm happy to walk

18   through --

19         Q.   Would you --

20         A.   -- the publications and --

21         Q.   Okay.

22         A.   -- talk about which ones are real

23   property and which ones aren't.

24         Q.   No.

25               How about you -- do you think you can

142

```
1     give a percentage?

2         A.   No.

3                    MR. FORD:  Sorry.  Object to

4              the form of the question.  Asked and

5              answered.

6         Q.   Well, what percentage of your

7     publications concern the subject matter of digital

8     assets?

9                    MR. FORD:  Object to the

10             form of the question.

11        A.   So none of them --

12        Q.   Okay.

13        A.   Yeah.  None of them include -- as far as

14    I'm aware, none of them include the term "digital

15    asset."

16        Q.   Okay.  So going back to your -- the

17    publications that you listed in Exhibit A --

18        A.   Mm-hmm.

19        Q.   -- is it fair to say that nothing in

20    here includes any reference to virtual currencies

21    specifically?

22                    MR. FORD:  Object to the

23             form of the question.

24        A.   It -- my -- I -- there's a lot of words

25    that are representative in -- in these -- in these
```

143

 1    publications, right?  So I've said that I don't

 2    recall ever using the word "virtual currency" in a

 3    publication.

 4         Q.   Okay.  So in the Exhibit A to your

 5    report --

 6         A.   Mm-hmm.

 7         Q.   -- is it fair to say that there's

 8    nothing in here about virtual currency --

 9                   MR. FORD:  Object --

10         Q.   -- specifically?

11                   MR. FORD:  Object to the

12              form of the question.

13         A.   The -- I'm not aware of the term ever

14    being used --

15         Q.   Okay.

16         A.   -- "virtual currency."  I am not trying

17    to be difficult.  I just don't know how it stands

18    with that.

19         Q.   Okay.  So it's not in your Exhibit A?

20         A.   Exhibit A --

21                   MR. FORD:  Sorry.  Object to

22              the form of the question.

23         A.   Yeah.  I have -- I don't recall ever

24    using the -- the term "virtual currency" in a

25    publication.

144

1       Q.   Okay.  And do you recall ever writing

2    anything about the subject matter of virtual

3    currency in any publication?

4                    MR. FORD:  Object to the

5           form of the question.  Asked and

6           answered.

7       A.   Yeah.  I'm not sure what the -- the

8    distinction is between not using the term "virtual

9    currency."

10      Q.   Well, I just want to make sure that I

11   understand what you're saying.

12           So is it that you've never even covered

13   the topic of virtual currency in any of your

14   publications?

15      A.   I've --

16                   MR. FORD:  Sorry.  Object to

17          the form of the question.

18      A.   Yeah.  I -- I -- I don't recall ever

19   using the term "virtual currency" in a

20   publication.  I don't recall ever using the term

21   "digital asset" in a publication.  I don't recall

22   ever using the term "cryptocurrency" in a

23   publication.

24      Q.   Okay.  Thank you.

25      A.   Yeah.

145

1          Q.   Have you listed all of the testimony

2     that you provided in the past four years --

3          A.   Yes.

4          Q.   -- in your report?

5                    MR. FORD:  Just let her

6               finish.

7          Q.   So in the past four years, is it that

8     you've only provided one testimony?

9          A.   Yes.

10          Q.   And is that the Bernstein case that we

11     discussed earlier?

12          A.   Yes.

13          Q.   Okay.  Now, prior to the past four

14     years, did you give any deposition testimony about

15     any cryptocurrency?

16          A.   No.

17          Q.   And prior to the past four years, did

18     you give any trial testimony regarding

19     cryptocurrency?

20          A.   No.

21          Q.   Did you give any deposition testimony

22     prior to the past four years regarding digital

23     assets in general?

24                    MR. FORD:  Object to the

25               form of the question.

146

1        A.    So, again, I use -- "digital assets" is

2    a term that's a little bit more difficult to use.

3    It would be nice to have -- we don't have the --

4    the definition in front of us.  But if we used

5    the -- the term in the proposed legislation, I

6    would say no.

7        Q.    Okay.  And prior to the past four

8    years, did you give any trial testimony regarding

9    any digital assets as you defined the term?

10        A.    Yeah.

11                   MR. FORD:  Sorry.  Object to

12             the form of the question.

13        A.    No.

14        Q.    Okay.

15                   MR. FORD:  Sorry.  Can we

16             just take --

17                   MS. ZORNBERG:  No.  Just

18             keep going.

19                   MR. FORD:  Never mind.

20    BY MS. GUERRIER:

21        Q.    Okay.  Can you describe the scope of

22    your assignment in this case?

23        A.    So I was asked to offer an opinion on

24    these three questions that are presented in the

25    report.

147

1          Q.   Okay.  Can you just summarize the three

2    questions that you were asked to provide an

3    opinion on?

4          A.   So --

5                    MR. FORD:  Object to the

6               form of the question.

7          A.   First, I was asked whether -- I'm

8    probably going to read.  It will be easier than

9    summarizing.

10              "Has authoritative guidance been issued

11     regarding the federal income tax classification

12     of virtual currency such as XRP?

13              "Does that or any other guidance

14     classify virtual currency such as XRP as a

15     security for federal income tax purposes?

16              And "From the perspective of federal

17     income tax law and focusing specifically on the

18     period prior to December 22nd, 2020, would a

19     reasonable buyer or seller expect virtual

20     currencies such as XRP to be classified as a

21     security for federal income tax purposes and

22     qualify for application of federal income tax

23     rules specific to securities?"

24          Q.   Okay.  Where in your report did you

25    describe the scope of the assignment that you were

148

1    provided in this case?

2        A.   That is where I describe the scope of

3    it.

4        Q.   What paragraph of the report?

5        A.   I -- I believe that describes the -- I

6    think paragraph 8 --

7        Q.   Okay.

8        A.   -- describes the scope of it.

9        Q.   All right.

10       A.   Sorry.

11       Q.   Did you review the complaint in this

12   case?

13       A.   I --

14               MR. FORD:  Sorry.  Object to

15           the form of the question.

16       A.   So Footnote 6 identifies the complaint

17   filed in SEC Ripple and then, also, the amended

18   complaint.

19       Q.   Okay.

20       A.   I -- I looked at those, that complaint

21   and the amended complaint.

22       Q.   So are you familiar what this case is

23   about?

24               MR. FORD:  Object to the

25           form of the question.

1     A.   I have a very general understanding of

2  what the case is about.

3     Q.   Can you tell me what your general

4  understanding of this case is?

5     A.   Yeah.  I'm -- it's that the SEC is

6  bringing an action against Ripple Labs, Inc.,

7  Bradley Garlinghouse, Christian A. Larsen, and

8  they're claiming that they offered and sold XRP

9  and that those XRP constitute investment

10  contracts and those offers and sells were

11  unlawful because they were not registered with the

12  SEC.

13     Q.   Okay.  Is the issue of XRP's federal tax

14  treatment one that you saw in the complaint?

15                MR. FORD:  Object to the

16          form of the question.

17     A.   Yeah.  I -- again, I don't -- I didn't

18  study the complaint, read it thoroughly, but I

19  don't recall seeing any reference to federal

20  income tax in the complaint.

21     Q.   Okay.  So do you know whether XRP's

22  federal tax treatment is an issue before the court

23  in this case?

24     A.   I do not.

25                MR. FORD:  Object -- sorry.

150

1           Object to the form of the question.

2           Calls for a legal conclusion.

3       Q.   Do you know why you were asked to

4   provide an expert opinion about the federal tax

5   treatment of virtual currency in this case?

6               MR. FORD:  Object to the

7           form of the question.

8               To the extent you can answer

9           that without revealing any conversations

10          that you had with counsel, you can

11          answer, but otherwise I would direct you

12          not to answer.

13      A.   Do you want to re -- reask the question?

14   Sorry.

15      Q.   Yeah.

16          Do you know why you were asked to

17   provide an expert opinion about the federal tax

18   treatment of virtual currency in this case?

19               MR. FORD:  Same objection

20          and same instruction.

21      A.   Yeah.  I -- I think -- I really don't

22   know.

23      Q.   Do you know were you asked to provide --

24   I'm sorry.

25          Were you asked to provide an opinion

1    about the federal tax treatment of XRP?

2                    MR. FORD:  Object to the

3            form of the question.

4        A.   The -- the question is -- the questions

5    presented were -- were very specific.  Virtual

6    currency such as XRP is what I was asked to

7    provide an opinion on.

8        Q.   Okay.  Well, I'm asking you about XRP

9    itself.

10       A.   Yeah.

11       Q.   Do you know why you were asked to

12   provide an expert opinion about the federal tax

13   treatment of XRP?

14                   MR. FORD:  So object to the

15           form of the question.  Asked and

16           answered.

17                   And, again, to the extent you

18           can answer that without revealing

19           conversations with counsel, you can

20           answer, but otherwise I direct you not to

21           answer.

22       A.   Yeah.  I -- I think I said I was asked

23   to -- to discuss the federal income tax

24   classification of virtual currency such as XRP.

25       Q.   Okay.  Now, are you making an assumption

152

1    that XRP is a virtual currency or are you

2    providing an opinion that XRP is a virtual

3    currency?

4          A.   So paragraph 11 lists the

5    characteristics of XRP.

6          Q.   So my question is:  Are you making an

7    assumption --

8                    MS. ZORNBERG:  I think he

9          answered --

10         Q.   -- that XRP is a virtual currency or are

11   you providing an opinion that XRP is a virtual

12   currency?

13                   MR. FORD:  Object to the

14         form of the question.  Asked and

15         answered.

16         A.   So what -- what I'm saying is there are

17   characteristics of XRP in paragraph 11 and there's

18   a definition of virtual currency.  So my -- my

19   opinion is that virtual currency such as XRP does

20   not come within the federal income tax definition

21   of securities.

22         Q.   Okay.  Well, my question specifically --

23   so is it that your -- your opinion that XRP is a

24   virtual currency?

25                   MR. FORD:  Object to the

153

1          form of the question.

2     A.   Yeah.  I am not -- and I think I -- I

3  was asked to provide an opinion on virtual

4  currency such as XRP.  And so my opinion relates

5  to virtual currency such -- such as XRP.

6     Q.   Okay.  So are you making an -- is it

7  your opinion based on your professional education

8  that XRP is a virtual currency?

9               MR. FORD:  Object to the

10              form of the question.  Asked and

11              answered.

12     A.   So I know that XRP has been treated as

13  virtual currency.  In paragraph 12 it cites a

14  settlement with the U.S. Department of Treasury

15  and it also cites FinCEN guidance.

16     Q.   Okay.

17     A.   And so my understanding is XRP was

18  treated as virtual currency in -- in that setting.

19     Q.   Is it your professional opinion or is

20  this an assumption that you're making?

21               MR. FORD:  Object to the

22              form of the question.

23     A.   This is me stating what is -- what I

24  understand to be in the -- in the settlement with

25  the U.S. Department of -- the -- the U.S.

154

```
1    Attorney.
2         Q.   Okay.  So is this the -- your claim that
3    XRP is a virtual currency, is that based on your
4    independent opinion about the status of XRP as a
5    virtual currency or are you relying solely on the
6    Department of Justice settlement?
7                    MR. FORD:  Object to the
8              form of the question.  Asked and
9              answered.
10        A.   So there is -- there is the settlement
11   out there that identifies XRP as virtual currency.
12        Q.   Okay.
13        A.   I'm saying -- I'm saying that.
14        Q.   All right.  Let's go back to the
15   opinions that you've actually formed in this case.
16        A.   Okay.
17        Q.   So can you tell me all of the opinions
18   that you formed in response to the questions in --
19        A.   Sure.
20        Q.   -- paragraph 8(a) and (c)?
21        A.   Sure.
22                    MR. FORD:  Object to the
23              form of the question.
24        A.   So my opinions are listed in paragraph
25   9.
```

1         Q.   Mm-hmm.  Can you tell us what your

2    opinions are?

3         A.   Well, so with respect to the first

4    question, "Has authoritative guidance been issued

5    regarding the federal income tax classification of

6    virtual currency such as XR" --

7                        THE REPORTER:  Excuse me.

8              When you read, please slow down.

9                        THE WITNESS:  Sorry.  I'm so

10             sorry about that.

11        A.   Okay.  "Has authoritative guidance been

12   issued regarding the federal income tax

13   classification of virtual currency such as XRP?"

14             And my answer to that is yes.

15        Q.   Any other opinion that you've formulated

16   in this case?

17        A.   So the next question is:  "Does that or

18   any other guidance classify virtual currency such

19   as XRP as security for federal income" -- "income

20   tax purposes?"  And the answer to that is no.

21        Q.   And any other opinion?

22        A.   So, again, would a -- the third

23   question -- it's limited by the date, but it's

24   asking generally whether a reasonable buyer or

25   seller would expect virtual currency such as XRP

1  to be classified as a security for federal income

2  tax purposes and qualify for a rule -- for

3  security specific exception to the -- the general

4  rules.  And my answer there is no.

5      Q.   Okay.  So when you use the word -- the

6  term "such as XRP," what are you basing these

7  terms on?

8              MR. FORD:  Object to the

9          form of the question.

10     A.   It -- yeah.  Would -- would you restate

11 that?

12     Q.   When you use the term "such as XRP,"

13 what is the basis for these terms?

14     A.   Okay.

15              MR. FORD:  Object to the

16          form of the question.

17     A.   So -- so virtual currency is defined in

18 the -- what I call the Notice 2014 guidance.  The

19 IRS issued Notice 2014-21 in 2014.  And in there

20 they used the term "virtual currency" and they

21 provide a definition.

22          And then in paragraph 11 I identify the

23 characteristics of XRP.  And so my opinion is

24 limited to virtual currency that has the type of

25 characteristics that are listed in paragraph 11.

157

```
 1          Q.   So have you formulated an opinion that

 2     XRP is a virtual currency?

 3                          MR. FORD:  Object to the

 4               form of the question.

 5          A.   Yeah.  That is not part of my opinion.

 6          Q.   Okay.  Were you told that XRP is a

 7     virtual currency other than what you've described

 8     that you -- were you told by anyone that XRP is a

 9     virtual currency?

10                          MR. FORD:  Object to the

11               form of the question.

12          A.   I -- I -- I don't believe so.

13          Q.   Going to -- back to your -- the first

14     question that you were assigned with, what is the

15     basis for your opinion in paragraph 9(a) that the

16     IRS's guidance classifies virtual currency and,

17     using your words, "such as XRP as property"?

18                          MR. FORD:  Object to the

19               form of the question and to the

20               characterization of the document.

21          A.   Okay.  So -- so the basis of the -- I'm

22     sorry.  The -- the primary basis of the opinion in

23     Question (a) is IRS Notice 2014-21.

24          Q.   And what in IRS Notice 2014-21 supports

25     your opinion?
```

158

```
1        A.   So the -- the notice provides that for

2   federal tax purposes, virtual currency is treated

3   as property.

4        Q.   Let me hand you -- I've handed you

5   what's been premarked Exhibit 72.

6             Do you recognize Exhibit 72?

7        A.   This exhibit appears to be Notice

8   2014-21.

9        Q.   Is this the Notice 2014-21 that you are

10  referencing in your Opinion 9(a)?

11       A.   Yes.

12                  MS. GUERRIER:  Can you

13             please mark the notice?  I believe

14             that's Exhibit 3.

15                  THE WITNESS:  Let me make

16             sure.  You said 9 --

17                  THE REPORTER:  Did you want to

18             mark it 3 or --

19                  MS. GUERRIER:  Yes, 3, please.

20             Can you mark it 3, please?

21                  (Whereupon, previously marked

22             Exhibit 72 is presented and marked SEC

23             Borden Deposition Exhibit 3 for

24             identification.)

25                  MS. GUERRIER:  Thank you.
```

159

1          A.   You asked about paragraph 9(a) versus

2     IRS 2014 guidance?

3          Q.   Yes.

4          A.   Yeah.

5          Q.   Did anyone assist you with forming the

6     opinion that you've provided in paragraph 9(a)?

7          A.   No.

8          Q.   I'm sorry?

9          A.   No.

10         Q.   Okay.  Did you rely on any facts in

11    support of the opinion that you formulated in

12    paragraph 9(a)?

13         A.   So --

14                   MR. FORD:  Object to the

15              form of the question.

16         A.   So paragraph 9(a) answers whether

17    authoritative guidance has been issued regarding

18    the federal income tax classification of virtual

19    currency such as XRP.  This is that authoritative

20    guidance.

21         Q.   Okay.  So is this -- are you referring

22    to this as a fact that -- fact that you relied

23    upon in support of your opinion?

24                   MR. FORD:  Sorry.  Object to

25              the form of the question.

160

1          A.   Yeah.  Yeah.  Could you -- I'm sorry,

2     could you re -- could you restate that?

3          Q.   Okay.  Were -- were you provided with

4     any facts in support of your opinion in paragraph

5     9(a)?

6                         MR. FORD:  Object to the

7               form of the question.

8          A.   Yeah.  Can you clarify what you mean by

9     "provided"?

10         Q.   Well, did you consider any facts at all

11    in support of your opinion that you formulated

12    regarding your answer to question 8(a)?

13         A.   Yeah, so --

14                        MR. FORD:  Sorry.  Object to

15              the form of the question.  I think

16              you mean 9(a).  Or, sorry, the

17              question did.

18         A.   Okay.  So the question is:  Has

19    authoritative guidance been issued regarding the

20    federal income tax classification of virtual

21    currency such as XRP?

22         Q.   Mm-hmm.

23         A.   And the answer is, yes, there's Notice

24    2014-21.

25         Q.   Right.  So --

161

1      A.   That -- yeah.

2      Q.   Will that be considered data rather than

3  fact?

4                MR. FORD:  Object to the

5           form of the question.

6      A.   Yeah.  I don't know that I'm -- I'm

7  familiar with the distinction between data and

8  fact.

9      Q.   Okay.  Were you -- so do you understand

10  what facts are?

11      A.   I would say I generally understand what

12  a fact -- facts are.

13      Q.   Okay.  So were there any facts provided

14  to you by counsel regarding -- to help you

15  formulate your opinion in paragraph 9(a)?

16      A.   I would say that the -- the -- the

17  facts -- so to go to paragraph 11 that list the

18  characteristics of XRP.  So the opinion in nine --

19  in 9(a), opinion stated in 9(a), addresses virtual

20  currency such as XRP.

21          So I did rely upon the RFAs in forming

22   that opinion because the opinion relates to

23   virtual currency such as XRP.

24      Q.   Okay.  So the -- you -- are you

25  identifying the documents that you considered in

162

1   formulating your opinion in support of paragraph

2   9(a)?

3                    MR. FORD:  Object to the

4           form of the question.

5       A.   So I identified some of the facts that

6   I -- that I relied upon in -- in formulating the

7   opinion in 9(a).

8       Q.   Okay.  So what are the specific facts

9   that you considered in formulating the opinion in

10  9(a)?

11      A.   Notice 2014-21.

12      Q.   Anything else?

13      A.   So 9(a) say -- it talks about the IRS

14  2014 guidance.  That guidance continues to

15  represent the IRS's public position on virtual

16  currency such as XRP.  And if you look at the body

17  of the report, it cites the -- it cites Notice

18  2014-21.

19                And then it also talks about -- if -- if

20  you go over to paragraph 22, it talks about

21  Frequently Asked Questions on virtual currency

22  transactions and it also cites to Revenue Ruling

23  2019-24.

24      Q.   So are all these the documents that you

25  relied on in support of your opinion in 9(a)?

163

1          A.   I relied upon these documents in support

2     of my opinion in 9(a).

3          Q.   Did counsel provide you with any other

4     documents in support of your opinion in 9(a)?

5                         MR. FORD:  Object to the

6                form of the question.

7          A.   Other than -- the documents that counsel

8     provided me with are listed in Footnote 7 through,

9     I think, 16.

10         Q.   Okay.  And were you provided with any

11    assumptions in support of your opinion in 9(a)?

12                        MR. FORD:  Object to the

13               form of the question.

14         A.   Can you be specific about who would have

15    provided them?

16         Q.   Well, I'm -- I don't -- I'm asking you

17    if you were provided with any assumptions.

18                        MR. FORD:  Same objection.

19         A.   No.

20         Q.   Did you make any assumptions in support

21    of your opinion in 9(a)?

22         A.   I don't believe so.

23         Q.   Okay.  Can you -- did you conduct any

24    analysis in support of your opinion in 9(a)?

25         A.   Yes.

164

1          Q.   Okay.  And is the analysis included in

2     your report?

3          A.   Yes.

4          Q.   Where is it in your report?

5          A.   It would begin on paragraph 18.

6          Q.   Okay.  So going back to the documents

7     that you relied on in support of your opinion in

8     paragraph 9(a), can you tell me what specific

9     documents support your opinion?

10                    MR. FORD:  Object to the

11              form of the question.

12         A.   So Notice -- we're talking about 9(a)

13     just to make sure.  That's the same question we've

14     been talking about, right?  Same opinion we've

15     been talking about?

16         Q.   Yes.  We're still on 9(a) unless I say

17     otherwise.

18         A.   Okay.  So paragraph 18.  So we're ask --

19     you ask -- re -- restate the question.  Sorry.

20         Q.   So going back to the documents that you

21     relied on in support of your opinion in 9(a), can

22     you tell me what specific documents support your

23     opinion?

24                    MR. FORD:  Object to the

25              form of the question.

1        A.    Okay.   So 9(a), the answer is, "Yes, the

2    IRS has issued authoritative guidance regarding

3    the federal income tax classification of virtual

4    currency such as XRP?"  That's -- that's the

5    question.

6             I relied upon IRS Notice 2014-21.  And,

7    also, the Frequently Asked Questions on virtual

8    currency transactions and Revenue Ruling 2019-24

9    are specific guides that I relied upon.

10       Q.    Okay.  Now, if you look at the IRS

11   guidance, can you explain to me who is the

12   audience for the IRS's guidance 2014-21?

13                 MR. FORD:  Object to the

14             form of the question.

15       A.    So the IRS publishes guidances like

16   Notice 2014 to the -- it's available to the

17   general public.

18       Q.    Okay.  And what does -- what type of

19   guidance does 2014-21 provide?

20       A.    So it says that virtual currency -- it

21   provides a definition for virtual currency.  And

22   then it says "Virtual currency is treated as

23   property."

24       Q.    Okay.

25       A.    And "General tax principles applicable

166

1    to property transactions apply to transactions

2    using virtual currency."

3         Q.   Does the -- how does the IRS define

4    virtual currency in the notice?

5         A.   So it says that virtual -- so the report

6    cites it.  Let me just see what the report says.

7    So it defines virtual currency as "a digital

8    representation of value that functions as a medium

9    of exchange, a unit of account, and/or a store of

10   value."

11        Q.   Does the IRS notice make any mention of

12   a virtual currency that's considered a security --

13                  MR. FORD:  Object to the

14             form of the question.

15        Q.   -- under the federal securities laws?

16                  MR. FORD:  Apologies.

17             Object to the form of the question.

18        A.   Yeah.  Can you answer that one -- ask

19   that one more time?

20        Q.   Does the IRS guidance make any reference

21   to a virtual currency that's considered a security

22   under the federal securities laws?

23                  MR. FORD:  Object to the

24             form of the question.

25        A.   So -- say it one more time.  Sorry.  I

1    need to make sure I understand that.

2         Q.   Does the IRS guidance make any reference

3    to a virtual currency that's considered a security

4    under the federal securities laws?

5                        MR. FORD:  Same objection.

6         A.   Okay.  I am not an expert on securities

7    laws.

8         Q.   Okay.  That wasn't my question.

9         A.   Okay.

10        Q.   My question was:  Does the IRS guidance

11   make any reference to a virtual currency that's

12   considered a security under the federal securities

13   laws?

14                       MR. FORD:  Object to the

15              form of the question.  Asked and

16              answered.

17        A.   Yeah.  I -- I -- I do not know

18   securities laws, so I can't speak to whether

19   anything mentioned in this notice would qualify

20   within the securities laws.

21        Q.   Does the notice make any reference to

22   securities?

23        A.   I am not aware of it making any

24   reference to securities.

25                       MR. FORD:  If you need to

168

```
 1            review the document --

 2                    THE WITNESS:  Okay.

 3                    MR. FORD:  -- you can feel

 4            free to do that.

 5       Q.   Do you need to review the document,

 6   Professor?

 7       A.   Yeah, I can -- I actually can take a

 8   break but --

 9                    MR. FORD:  Yeah.

10       Q.   Well --

11                    MR. FORD:  Yeah.  I mean --

12                    THE WITNESS:  Do you want me

13            to do this --

14                    MR. FORD:  Let's --

15                    MS. ZORNBERG:  He can do it

16            here.

17                    MR. FORD:  Read the

18            document.

19                    THE WITNESS:  Okay.

20                    MR. FORD:  And then we can

21            take a break.  We can take a break

22            sometime soon when you're finished

23            with this line of questioning.

24                    (Pause)

25                    THE WITNESS:  Okay.
```

169

1    BY MS. GUERRIER:

2        Q.   Now, is the scope of Notice 2014-21

3    limited solely to the virtual currencies as

4    defined in the notice?

5        A.   It's -- it's -- you're asking me what

6    the scope is?

7        Q.   Yes.

8        A.   So the -- the scope is in Section 3.

9        Q.   So what is the scope of the notice?

10       A.   The scope of the notice is transactions

11   that use convertible virtual currency.  "The term

12   'virtual currency' as used in Section 4 refers

13   only to convertible virtual currency."

14       Q.   Can you read that last sentence?

15       A.   "No inference should be drawn with

16   respect to virtual currencies not described in

17   this notice."

18       Q.   Does the IRS define convertible --

19   convertible virtual currency in the notice?

20       A.   Yes.

21       Q.   How does the IRS define virtual

22   currency?

23       A.   "Virtual currency that has an equivalent

24   value in real currency, or that acts as substitute

25   for real currency, is referred to as 'convertible'

1   virtual currency."  Virtual -- "Bitcoin is one

2   example of convertible virtual currency.  Bitcoin

3   can be digitally traded between users and can be

4   purchased for, or exchanged into, U.S. dollars,

5   Euros, and other real or virtual currencies."

6        Q.   So is it -- is the scope of the notice

7   limited only to convertible virtual currency as

8   that term is defined by the IRS?

9        A.   Yes.

10        Q.   Okay.  So did you make any assumption

11   regarding XRP status as a convertible virtual

12   currency?

13                  MR. FORD:  Object to the

14             form of the question.

15        A.   So what did I say?

16             So if you look at paragraph 18, where it

17   says "The IRS presented bitcoin as" a -- "as an

18   example of such virtual currency."  And it

19   talks -- and it says that it "can be digitally

20   traded between users and can be purchased with, or

21   exchanged into, U.S. dollars, Euros, or other real

22   virtual currencies.  XRP has similar

23   characteristics and is subject to the IRS 2014

24   guidance."

25        Q.   Okay.  So is this an opinion that you're

171

1    providing regarding the claimed characteristics of

2    XRP in paragraph 18?

3                         MR. FORD:  Object to the

4              form of the question.

5         A.   I'm relying upon the characteristics

6    that are described in paragraph 11, presented in

7    paragraph 11 --

8         Q.   Okay.

9         A.   -- to say that XRP has similar

10   characteristics and is subject to the 2014

11   guidance.

12        Q.   Okay.  How did you come up with the

13   characteristics that you described in paragraph 11

14   of your report?

15        A.   I relied upon -- let me go back to

16   paragraph 11.

17             So paragraph 11, as it says, "From My

18   review of materials in this case, including facts

19   the SEC has admitted..."  Based on -- based on

20   review of those materials, "I understand that XRP

21   has the following features and characteristics."

22             And then it cites to the RFAs and the --

23   is that called the Proc.?

24        Q.   Okay.  So what specific facts are you

25   referring to --

1      A.   Okay.

2      Q.   -- where you were able to identify XRP's

3   claimed characteristics?

4                MR. FORD:  Object to the

5           form of the question.

6      A.   Okay.  So -- so it says "XRP has similar

7   characteristics to" the -- the sentence before it

8   talked about bitcoin.  And then in Notice 2014-21,

9   there's a discussion of bitcoin as an example of

10   convertible currency.  So it says that bitcoin can

11   be digitally traded between users and can be

12   purchased.

13           So if you look at the -- Footnote 7 says

14   that XRP can be bought and sold on global

15   exchanges and then can be purchased for or

16   exchanged for U.S. dollars.  I don't know if I

17   have that -- so bought and sold.

18           So if we go back and -- I'd have to go

19   back and look specifically at some of these RFAs,

20   and we can do that, but they can be bought and

21   sold or exchanged -- they can be purchased or

22   exchanged into U.S. dollars, Euros, and other real

23   virtual currencies.

24           So XRP, based on the RFAs, has those --

25   has those characteristics.

173

```
1        Q.   Okay.

2                     MR. FORD:  I think we've

3             been going for about 90 minutes.  If

4             this is a good time to break for

5             lunch...

6                     MS. GUERRIER:  Let me

7             just -- before one -- I just want to

8             clarify that.

9    BY MS. GUERRIER:

10       Q.   Does your paragraph 11 include all of

11   the claimed characteristics of XRP based on your

12   opinion?

13                    MR. FORD:  Object to the

14            form of the question.

15       A.   So these are factors and characteristics

16   that are relevant to my opinion.

17       Q.   Okay.  All right.

18                    MS. GUERRIER:  So why don't

19            we take a break --

20                    THE WITNESS:  Okay.

21                    MS. GUERRIER:  -- because

22            this is going to take a lot longer.

23                    MR. FORD:  Want to just take

24            half an hour and we'll come back --

25                    MS. GUERRIER:  Half an hour
```

174

1                is fine.

2                       MR. FORD:  Great.

3                       THE VIDEOGRAPHER:  Time on

4           the monitor, 12:57 p.m.  End of Media

5           Unit Number 3.  Going off the video

6           record.

7                       (Whereupon, a luncheon recess

8           is taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                      THE VIDEOGRAPHER:  The time

3              on the video monitor is 1:34 p.m.  We

4              are back on the video record, start

5              of Media Unit 4.

6    BY MS. GUERRIER:

7         Q.   Professor, is there any reference to XRP

8    in the IRS's Notice 2014-21?

9              (Pause)

10        A.   I don't see any reference.

11        Q.   Okay.  Going back to paragraph 11 of

12   your report, you were -- you listed the claim

13   characteristics of XRP.  And one of those

14   characteristics you say is that it can be bought

15   and sold on global exchanges.

16             What is the basis for this statement?

17        A.   So that statement would be found in

18   the -- in what's cited there.

19        Q.   And what is cited there?

20        A.   This is the plaintiff's answers and

21   objectives.  The -- and also some of the RFAs.

22        Q.   Okay.  So is Footnote 7 the reference

23   for that statement that the features -- one of the

24   features of XRP is that it can be bought and sold

25   on global exchanges?

```
 1       A.   That's one place where it talks about

 2   buying and selling --

 3       Q.   Well, did you cite --

 4       A.   -- XRP.

 5       Q.   I'm sorry.

 6       A.   I was finished.

 7       Q.   Did you cite in Footnote 7 to all of the

 8   references that you relied upon for the statement

 9   that XRP can be bought and sold on global

10   exchanges?

11                    MR. FORD:  Object to the

12            form of the question.

13       A.   There may be other references in the

14   RFAs that talk about buying and selling virtual

15   currency.

16       Q.   Does it -- I'm sorry.

17       A.   Go -- go ahead.

18       Q.   What other references in the RFAs that

19   you're referring to?

20       A.   I would have to go back through the RFAs

21   individually to see if there's any other

22   references to buying and selling.

23       Q.   Okay.  And are you just speaking to

24   buying and selling -- selling generally or buying

25   and selling on global exchanges as you've stated
```

1    in paragraph 11 of your report?

2         A.   I -- I would need to go back and look to

3    see specifically if that's -- if some of those

4    cites are dealing with buying and selling and some

5    are dealing with global exchanges.

6         Q.   Okay.  So why didn't your Footnote 7

7    include all of the cites that refer to global

8    exchanges?

9                   MR. FORD:  Object to the

10              form of the question and the

11              characterization of the footnote.

12        A.   So the characteristic is that XRP is

13   bought and sold and the footnotes cited support

14   that conclusion.

15        Q.   So are you saying that the footnotes

16   support the conclusion that XRP is bought and sold

17   on global exchanges?

18        A.   The footnotes, that's what the -- that's

19   what I'm saying.

20        Q.   Okay.

21        A.   That the footnote -- you have a

22   statement in a footnote.  The footnotes provide

23   the support for that statement.

24                   (Whereupon, previously marked

25            Exhibit 35 is presented and marked SEC

178

```
 1          Borden Deposition Exhibit 4 for

 2          identification.)

 3   BY MS. GUERRIER:

 4      Q.   I've handed you what's been premarked

 5   Exhibit 35.

 6          Do you recognize the document that I've

 7   handed you?

 8      A.   This appears to be the first set of

 9   RFAs.

10      Q.   Okay.  Is this the document that you --

11   you cited in para -- in Footnote 7 of your

12   report?

13      A.   Yes.

14      Q.   Okay.  So you specifically cite to RFAs

15   Numbers 50, 51 and 52.

16      A.   Okay.

17      Q.   Can you show me in those RFAs where you

18   find the reference to global exchanges?

19          (Pause)

20      A.   Okay.  So these -- so 50, RFA 50, says

21   "Admit that holders of XRP that acquired XRP

22   through any market makers, or on the open market,

23   were free to determine, in their unilateral

24   discretion and without knowledge and consent,

25   approval or authorization of the defendants,
```

179

1    whether and when to buy, continue to hold, or sell

2    any XRP at any time."

3            And the answer is "The Commission admits

4    that certain" purchases -- "certain purchasers

5    enjoyed unrestricted discretion to buy, sell, and

6    hold their XRP."

7            So there's unrestricted discretion about

8    how to buy it.

9        Q.   Do you see the word "global exchanges"

10   in any of these admissions?

11       A.   What I -- what I see is unrestricted

12   discretion to buy, sell or hold.

13       Q.   So what is your basis that

14   unrestricted --

15       A.   The -- the statement in the -- in the

16   report is it can be bought and sold on global

17   exchanges.  There is nothing that restricts the

18   buying and selling of XRP on global exchanges.

19       Q.   But can you point me to anything in

20   paragraph 50 that references global exchanges?

21       A.   So paragraph 50 admits that there is

22   unrestricted discretion to buy, sell and hold

23   XRP."  So it -- it -- it allows XRP -- it

24   doesn't restrict.  So it can be sold on global

25   exchanges.  There's no restriction or prohibition

180

1    against it.

2        Q.   So how did you arrive from that XRP's

3    purchase -- purchasers enjoyed unrestricted

4    discretion to buy, sell or hold their XRP to the

5    conclusion that this is referring to global

6    exchanges?

7                     MR. FORD:  Object to the

8             form of the question.

9        A.   So the -- the statement in the report is

10   that XR -- "it," referring to XRP, can be bought

11   and sold on global exchanges.

12            And the Answer 50, or answer to Request

13   for Admission No. 50, says that the holders of XRP

14   enjoy "unrestricted discretion to buy, sell, or

15   hold their XRP."

16       Q.   Again, is there any reference to the

17   term "global exchanges" in any of the paragraphs

18   that -- in these RFAs that you cited in support of

19   your Footnote 7?

20                     MR. FORD:  Objection to the

21            form.  Asked and answered.

22       A.   The -- the questions provide

23   unrestricted.

24       Q.   Right.

25            Is the -- is the term "global exchanges"

1    used in any of the paragraphs that you cited in

2    your Footnote 7?

3                    MR. FORD:  Object to the

4              form.  Asked and answered.

5         A.   So footnote -- I do not see the term

6    "global exchange" in RFA 50, 51 or 52.

7         Q.   Why did you use the term "global

8    exchanges"?

9         A.   I -- I -- I -- I don't know.  There's...

10        Q.   Were you done with your answer?

11        A.   Yes.

12        Q.   Okay.  Would the unrestricted

13   exchange -- unrestricted direction -- discretion

14   to buy, sell, hold XRP be limited to domestic

15   exchanges?

16                    MR. FORD:  Object to the

17             form of the question and to the

18             characterization of the document.

19        A.   So "unrestricted" suggests there are

20   no restrictions on where it can be bought and

21   sold.

22        Q.   Could it be limited to just domestic?

23        A.   Un --

24                    MR. FORD:  Object -- sorry.

25             Object to the form of the question.

182

```
 1              Asked and answered.
 2         A.   "Unrestricted" suggests there is no
 3    limitation.
 4         Q.   Did counsel tell you that XRP was bought
 5    and sold on global exchanges?
 6         A.   Not that I recall.
 7         Q.   And is it your testimony that you don't
 8    recall how you came up with the term "global
 9    exchanges"?
10         A.   That -- that -- so I -- I know that RFA
11    50 says there's unrestricted discretion.  And --
12    and global exchanges would be broad enough to
13    capture any place where these could be sold.
14         Q.   Why didn't you use domestic and global
15    exchanges in your paragraph 11 when referring to
16    where XRP could be bought and sold?
17                   MR. FORD:  Object to the
18              form of the question.
19         A.   Yeah.  I don't -- I don't recall.
20         Q.   Okay.  Are the characteristics that
21    you've identified in paragraph 11 solely based on
22    the evidentiary record that you've cited in
23    Footnotes 7 through 15?
24         A.   So there are a few words there that
25    probably are not based solely on what's cited in
```

183

```
 1    the footnotes.
 2        Q.   Why didn't you include them in the
 3    footnotes?
 4                    MR. FORD:  Object to the
 5              form of the question and to the
 6              characterization of the testimony.
 7        A.   Can you repeat the question?
 8        Q.   Sure.
 9              My question was, are there
10    characteristics -- "Are the characteristics that
11    you've identified in paragraph 11 solely based on
12    the evidentiary record that you cited in Footnotes
13    7 through 15?"
14              You answered "So there are a few words
15     there that probably are not based solely on
16      what's cited in the footnotes."
17              I said "Why didn't you include them in
18    the footnotes?"
19                    MR. FORD:  Object to the
20              form of the question.
21        A.   The words are in the text.
22        Q.   Do Footnotes 7 through 15 provide a
23    basis in support of the characteristics that
24    you've identified in paragraph 11?
25        A.   Yes.
```

184

1       Q.   Okay.  Is there anything else that you

2   relied upon or -- in support of the char --

3   characteristics that you've identified in

4   paragraph 11?

5       A.   Yes.

6       Q.   What else did you rely on?

7       A.   My experience.  My knowledge.

8       Q.   What specifically in your experience did

9   you rely on?

10      A.   So there are a few words that says that

11   XRP is not recognized as an interest in any legal

12   person and then says -- referring to XRP -- it

13   cannot own property and cannot track -- transact

14   business in its own name.

15      Q.   And how do these statements support your

16   opinion that you provided in paragraph 9(a) in

17   your report?

18                 MR. FORD:  Object to the

19           form of the question.

20      A.   So paragraph 9(a) responds to the

21   question "Has authoritative guidance been issued

22   regarding the federal income tax classification of

23   virtual currency?"  And I answer yes and I refer

24   to the 2014 guidance and say that that guidance

25   continues to represent the IRS -- IRS's public

1    position on virtual currency such as XRP.

2            And, so, as we've -- we've been through,

3    we talked about how Rev. Proc. 2014-21 refers to

4    virtual currency and has characteristics related

5    to virtual currency and how the characteristics

6    listed in paragraph 11 demonstrate that XRP is the

7    type of virtual currency to which Notice 2014-21

8    would apply.

9        Q.   Have you conducted this type of analysis

10   where you're comparing the characteristics of one

11   digital asset to the characteristics of a virtual

12   currency?

13                   MR. FORD:  Object to the

14           form of the question.

15       A.   I did that for the purpose of this

16   opinion.

17       Q.   Other than this opinion, have you

18   conducted this type of analysis?

19       A.   Not that I can --

20                   MR. FORD:  I'm sorry.  Same

21           objection to the form.

22       Q.   What was the answer?

23       A.   I don't recall ever applying this

24   analysis outside -- to -- to virtual currency --

25       Q.   Okay.

1          A.    -- outside of this opinion.

2          Q.    Has anyone in your -- your -- in your

3     field applied the analysis that you've applied

4     here comparing virtual currency to the

5     characteristics of XRP?

6                        MR. FORD:  Object to the

7               form of the question.

8          A.    Yeah.  I would have to -- there are a

9     few publications that are cited in the materials.

10    I'd have to go back and review.

11         Q.    Can you identify them?

12         A.    Yes.  On page -- on page 2 and 3 of

13    Exhibit -- of Exhibit B.

14         Q.    What specific publications?

15         A.    So there's one by Keyes and Knapp.

16    There's one by --

17         Q.    I'm sorry.  Can you give the full name

18    for the Keyes and Knapp one?

19         A.    Yeah.  That one -- so that one says

20    "Federal Taxation of Financial Instruments and

21    Transactions," is the title of that publication.

22         Q.    I'm sorry, what page are you on?

23         A.    I'm on page 2 of Exhibit -- I think it's

24    Exhibit B.  Exhibit B.

25         Q.    So that -- that's a book written in

187

1    1997?

2        A.   Correct.

3        Q.   So is your testimony that in 1997 there

4    was an analysis conducted comparing virtual

5    currencies to digital assets?

6        A.   No.

7                    MR. FORD:  I'm sorry.

8             Object to the form of the question.

9        Q.   So how is this book relevant to the

10   analysis that you conducted?

11       A.   I -- I think that what I was saying is

12   they're academic authorities -- or there's a

13   category called "Academic Authorities."  And I

14   don't know if I said it or made it clear, but it

15   begins with this publication by Keyes and Knapp.

16       Q.   What -- does this publication address

17   virtual currencies at all?

18       A.   Not that I know of.

19       Q.   Does this publication compare digital

20   assets that you're aware of?

21       A.   Not that I'm aware of.

22                    MR. FORD:  Object to the

23             form of the question.

24                    Please just give me a second.

25                    THE WITNESS:  Yeah.

188

```
 1        Q.   What other publication that you're

 2   referring to that -- where your methodology was

 3   applied?

 4        A.   So I haven't claimed that my methodology

 5   has been applied in these other settings.

 6        Q.   Okay.  So what other book that you

 7   reference in your response to my question applied

 8   the analysis that you applied to XRP versus

 9   virtual currencies?

10                    MR. FORD:  Object to the

11             form of the question.

12        A.   Yeah.  I'm not -- I'm not aware of any

13   other publication that applies my analysis to

14   virtual currencies.

15        Q.   Okay.  Any other basis in support of

16   your opinion in paragraph 9(a)?

17                    MR. FORD:  Object to the

18             form.

19        A.   "Has authoritative guidance been issued

20   by the federal..."

21             So we have -- we've -- we've gone

22   through Notice 2014-21.  And then also identified

23   the -- the -- the Frequently Asked Questions and

24   then Revenue Ruling 2019-24.  And then it says

25   "That guidance continues to represent the IRS
```

189

```
 1    public position on virtual currency."
 2              The -- the rest of this -- the rest of
 3      the report talks about virtual currency and how
 4      it does not come within the definition of
 5      security for federal income tax purposes.
 6              And so they support the position that
 7    this is the authoritative guidance on this issue.
 8      Q.   Okay.  Let me give you a copy of that.
 9                    (Whereupon, previously marked
10              Exhibit 70 is presented and marked SEC
11              Borden Deposition Exhibit 5 for
12              identification.)
13    BY MS. GUERRIER:
14      Q.   I've handed you what's been premarked
15    Exhibit 70.
16              Do you recognize the document that's
17    been premarked Exhibit 70?
18      A.   Yes.
19      Q.   What is the document that you're
20    reviewing?
21      A.   This is Revenue Ruling 2019-24.
22      Q.   And what does Revenue Ruling 2019-24
23    address?
24      A.   It addresses certain types of
25    transactions that occur with respect to
```

190

1    cryptocurrency.

2        Q.   Do you know what types of transactions

3    that the Revenue Ruling 2019-24 addresses

4    specifically?

5        A.   So it specifically applies to hard forks

6    of cryptocurrency, is one type of -- and, also, an

7    airdrop.

8        Q.   Do you have an understanding of the

9    meaning of a "hard fork" as that term is used in

10   Revenue Ruling 2019-24?

11       A.   I don't have extensive knowledge

12   regarding the concept of hard fork.

13       Q.   Do you have a general understanding of

14   what a hard fork is?

15       A.   It would be very, very general.

16       Q.   Can you tell me what your understanding

17   of hard fork is?

18       A.   Yeah.  I mean, it's stated here in -- on

19   page 2 of Revenue Ruling 2019-24.  It says that "A

20   hard fork is unique to distributed ledger

21   technology and occurs when a cryptocurrency on a

22   distributed ledger undergoes a protocol change

23   resulting in a permanent diversion from legacy or"

24   -- "or existing distributed ledger."

25       Q.   Okay.  Other than reading from the

191

1    Revenue Ruling the definition of a hard fork, did

2    you have a prior understanding of what a hard fork

3    was?

4        A.   No.

5        Q.   So you also stated that the Revenue

6    Ruling addresses airdrops.

7             Do you have any understanding of the

8    meaning of an airdrop under the Revenue Ruling

9    2019-24?

10       A.   Not beyond Revenue Ruling 2019-24.

11       Q.   Okay.  So you referred to Revenue Ruling

12   2019-24 as a basis for your Opinion 9(a).

13            How does the Revenue Ruling 2019-24

14   support your opinion in paragraph 9(a)?

15       A.   So I think paragraph 23 of the report

16   addresses that.

17       Q.   And can you explain what you're

18   describing in paragraph 23 of the report?

19       A.   Yes.  If you look at the first sentence

20   under the heading "Background," it says "Virtual

21   currency is a digital representation of value that

22   functions as a medium of exchange, a unit of

23   account, or a store of value other than a

24   representation of the U.S. dollar or a foreign

25   currency."

192

1              That's the language that was used in

2     Notice 2014-21.

3         Q.   Were you just reading from Revenue

4     Ruling 2019 --

5         A.   Yes.

6         Q.   -- 24?

7         A.   Yes.

8         Q.   Okay.  So how does this language support

9     your opinion in 9(a)?

10        A.   So -- so Revenue Ruling 2019-24 is

11    adopting and it applies to the same type of asset

12    described in Notice 2014-21.

13        Q.   What specific asset does it apply to?

14        A.   Virtual currency.

15        Q.   Okay.  So does -- does it matter that

16    it -- Revenue Ruling 2019-24 refers to hard forks

17    and airdrops?

18        A.   The -- so Revenue Ruling 2019-24 is

19    drawing upon the general principles provided in

20    Notice 2014-21.  That says that -- Notice 2014-21

21    says virtual currency is property and the general

22    property transaction rules apply to virtual

23    currency.

24              So Notice 2000 -- or Revenue Ruling

25    2019-24 is demonstrating the application of those

1    general property transaction rules to specific

2    types of transactions.

3         Q.   What's the question being asked in

4    Revenue Ruling 2019-24?

5                        MR. FORD:  Object to the

6              form of the question.

7         A.   So we're looking at 2019-24?  And you

8    asked about question --

9         Q.   What is the question being asked by

10   Revenue Ruling 2019-24?

11        A.   So there are two --

12                       MR. FORD:  Object to the

13             form of the question.

14                       Go ahead.

15        A.   Okay.  So Revenue Ruling 2019-24

16   addresses two questions.

17        Q.   Okay.  So what are the questions that

18   are being addressed?

19        A.   "Does a taxpayer have gross income under

20   Section 61 of the Internal Revenue Code as a

21   result of a hard fork of cryptocurrency the

22   taxpayer owns if the taxpayer does not receive

23   units of a new cryptocurrency?"

24        Q.   And the second question?

25        A.   "Does a taxpayer have gross income under

194

1    Section" 20 -- "under Section 61 as a result of an

2    airdrop of a new cryptocurrency following a hard

3    fork if the taxpayer receives units of new

4    cryptocurrency?"

5         Q.   So do any of these questions or issues

6    that are being asked in Revenue 2019-24 have

7    anything to do with the guidance that's being

8    provided in IRS Notice 2014-21?

9         A.   So in Revenue Ruling 2019-24, the IRS

10   draws upon the principles that it announced in

11   Notice 2014-21 to answer these two questions.

12        Q.   Does it -- does the Revenue Ruling

13   2019-24 make a reference to the IRS Notice

14   2014-21?

15        A.   I don't see any reference in Revenue

16   Ruling 2019-24 to Notice 2014-21.

17        Q.   Okay.  Going back to paragraph 18 of

18   your report, I believe you stated that this is

19   where you conducted the analysis in support of

20   paragraph -- of opinion -- of your opinion in

21   paragraph 9(a), is that correct?

22                   MR. FORD:  Object to the

23             form of the question.

24             Mischaracterizes the testimony.

25        A.   So 9(a), yeah, has -- "Has authoritative

195

1    guidance been issued regarding the federal income

2    tax classification of virtual currency such as

3    XRP?" My answer is yes. There's the 2014

4    guidance. And then paragraph 18 talks about the

5    2014 guidance.

6         Q.   Okay. Is there anywhere else in your

7    report where you're conducting any analysis in

8    support of your opinion in 9(a)?

9                   MR. FORD: Object to the

10              form of the question. Asked and

11              answered.

12        A.   So -- right. So, again, in 9(a) we

13   talked -- I had -- I -- I talked about Notice

14   2014-21. That's the IRS guidance. That's the IRS

15   2014 guidance, is how it's referred to in

16   paragraph 9(a).

17             And then I also mentioned specifically

18   that that -- and we flip over to 22, it -- it

19   identifies Frequently Asked Questions on virtual

20   currency transactions.

21             And then there's also this 2019-24

22   guidance that supports that.

23             And then, you know, throughout the

24   report, as the report considers and analyzes

25   whether virtual currency such as XRP is a security

1    for federal income tax purposes, it cites other

2    authorities that support the conclusion that there

3    is authoritative guidance issued and that guidance

4    continues to represent the IRS's public position

5    on virtual currency such as XRP.

6         Q.   Okay.  Let's move on to the second --

7    second question that you were asked to answer in

8    your report.

9              Can you tell us in summary what you were

10   asked to answer in your second opinion?

11        A.   Yeah.  I'm just -- I'm going to read it

12   just to be accurate.

13             "Does that or any other guidance

14   classify virtual currency such as XRP as a

15   security for federal income tax purposes?"

16        Q.   Okay.  So -- and can you tell us the

17   opinion you formed in response to the question in

18   paragraph 8(b)?

19        A.   Yes, I -- I can -- I can tell you the

20   opinion I formed.  So the opinion I formed is that

21   the existing guidance does not classify virtual

22   currency such as XRP as a security for federal

23   income tax purposes.

24        Q.   Is that the complete opinion that you

25   formed in response to the Question 8(b)?

197

```
1          A.    There's more.  To the best of my
2    knowledge, the IRS has not classified virtual
3    currency as a security for federal income tax
4    purposes and any regulation, rule, public
5    proceeding or any other guidance.
6              And I'm also not aware of any federal
7     income tax statute, administrative rule, or
8     judicial decision that classifies virtual
9     currency as a security for federal income tax
10     purposes or concludes the federal income tax
11     definition of security includes virtual currency.
12          Q.    Okay.  What is your meaning of security
13    in paragraph 9(b) of your opinion?
14          A.    So paragraph 28 of the report begins the
15    analysis of what -- of how federal income tax law
16    defines security.
17          Q.    So can you -- is there a specific
18    definition that you're referring to?
19                        MR. FORD:  Object to the
20          form.
21          A.    Okay.  So the -- the report -- the
22    report says "federal income tax law does not have
23    a single definition of securities that applies
24    throughout the code."
25          Q.    Okay.  When you're using the term
```

198

```
1    "security" in your opinion, how are you using that

2    term?

3         A.   So my opinion addresses whether virtual

4    currency such as XRP comes within the federal

5    income tax definition of security.

6         Q.   All right.  And I believe in paragraph

7    9(b) you state that virtual currency such as --

8    the answer is no.  "Existing guidance does not

9    classify virtual currency such as XRP as a

10   security for" tax purposes.

11        So what do you mean by "security" in

12   that sentence that -- in your opinion?

13                  MR. FORD:  Object to the

14             form and to the characterization of

15             the report.

16        A.   Yeah.  So my opinion says that virtual

17   currency such as XRP is not classified as a

18   security for federal income tax purposes.

19        Q.   Earlier you stated that there are

20   different definitions of security for federal

21   tax -- income tax purposes.

22        So which definition are you assigning

23   here in your Opinion 9(b) to the -- to security?

24        A.   Right.

25                  MR. FORD:  Object to the
```

199

1          form.

2                    Go ahead.

3      A.   So I am saying that there are multiple

4  definitions of security in federal income tax law

5  and virtual currency such as XRP does not come

6  within any of those definitions.

7      Q.   Okay.  What is the difference between

8  the question you're answering in 8(a) and 8(b) of

9  your opinion?

10                   MR. FORD:  Object to the

11         form.

12     A.   So 8(a) specifically asks about whether

13 there's authorita -- whether authoritative

14 guidance exists.  And then 8(b) asks whether that

15 authoritative guidance classifies virtual currency

16 such as XRP as a security for federal income tax

17 purposes.

18     Q.   Okay.  Now, can you walk me through the

19 basis of your opinion that the Notice 2014 and

20 other guidances do not classify virtual currency

21 as a security for tax purposes?

22                   MR. FORD:  Object to the

23         form of the question.

24                   MS. ZORNBERG:  Ms. Guerrier,

25         may I ask you to keep your voice up?

200

1                  MS. GUERRIER:  Sure.

2                  MS. ZORNBERG:  Thank you.

3        A.   Would you repeat that question?

4        Q.   So can you provide the basis for your

5    opinion in paragraph 9(b)?

6        A.   Okay.  So 9(b) says that there is no

7    guidance that classifies virtual currency such as

8    XRP as a security for federal income tax purposes.

9    And I'm also unaware of any federal income tax

10   statute, administrative rule or judicial decision

11   that classifies virtual currency as a -- as a

12   security for federal income tax purposes or

13   concludes that the federal income tax definition

14   of security includes virtual currency.

15            And I then said that -- so the analysis,

16   first of all, looks at the definition of -- of

17   security.

18       Q.   Where did you specifically look for the

19   definition of security?

20       A.   I looked in the Internal Revenue Code.

21       Q.   Which specific sections of the Internal

22   Revenue Code did you refer to?

23       A.   So if you look at paragraph 29.  So that

24   identify -- paragraph 9 (sic), Footnote 42,

25   identifies the definition of security in Section

201

```
 1    165(g)(2) and Section 1236(c).
 2              Footnote 43 refers to Section -- a
 3    definition of security in Section 475(c)(2).
 4         Q.   What is Section 165(g)(2) of the
 5    Internal Revenue Code?
 6         A.   I -- I don't know if I understood.
 7    Section 165(g)(2) is in the Internal Revenue Code.
 8         Q.   I said what is it?  What does the
 9    section address?
10         A.   So Section 1 -- do you happen to have a
11    copy of it?
12         Q.   I'm citing to -- I'm referring to your
13    report.
14         A.   Yeah.  So if you look in Section -- at
15    Footnote 42, it says "165(g)(2) defines security
16    for purposes of the worthless-security rules."
17         Q.   Okay.  So what is the opinion that
18    you're offering regarding the application of
19    165(g)(2) here?
20         A.   My -- my opinion is that --
21              MR. FORD:  Sorry.  Hold on
22         one second.
23              Your question's done?
24              MS. GUERRIER:  Yes.
25              MR. FORD:  Okay.  Object to
```

202

1              the form of the question.

2                        Just make sure that she's fully

3              finished and give it a beat.

4                   THE WITNESS:  Okay.

5         A.   My opinion is that virtual currency such

6    as XRP does not come within the definition of

7    security used in Section 165(g)(2).

8         Q.   And Section 165(g)(2) addresses what

9    type of property?

10        A.   Section 165(g)(2) defines security.

11        Q.   Mm-hmm.  And what specific security does

12   Section 165(g)(2) define?

13        A.   Okay.  Yeah.

14                   MR. FORD:  Object to the

15             form of the question.

16        A.   As Section 165 -- as Footnote 42

17   provides, Section 1 -- Section -- Section

18   165(g)(2) defines security for the purpose of

19   worthless-security rules as -- this is a quote --

20   "A, a share of stock in a corporation; B, a right

21   to subscribe for, or to receive, a share of stock

22   in a corporation; or, C, a bond, debenture, note,

23   or certificate, or other evidence of indebtedness,

24   issued by a corporation or by a government or

25   political subdivision thereof, with interest

203

1    coupons or in registered form."

2         Q.   Does Section 165 address losses under

3    the Federal Tax Code?

4                   MR. FORD:  Object to the

5             form.

6         A.   So, yeah, Section 165 does address

7    losses under the Internal Revenue Code.

8         Q.   So is the definition of securities under

9    Section 165(g)(2) in the context of losses under

10   the Internal Revenue Code?

11                  MR. FORD:  Object to the

12            form.

13        A.   So, yeah.  So 165(g)(2) is providing a

14   definition with respect to losses that relate to

15   worthless securities.

16        Q.   Okay.  And what other section did you

17   identify where the term "security" was used in

18   your report?

19        A.   Section 1236(c).

20        Q.   Okay.  And what does Section 1236 of the

21   Internal Revenue Code address?

22        A.   So --

23                  MR. FORD:  Object to the

24            form.

25        A.   So Section -- Section 1236 of the

204

1    Internal Revenue Code deals with the character of

2    gain or losses recognized by a dealer in

3    securities.

4         Q.   Okay.  So the definition of securities

5    under Section 1236 refers to the character of gain

6    or losses in the context that you've described?

7                        MR. FORD:  Object -- object

8              to the form of the question.

9         A.   Yeah.  The definition in 1236(c)(2) --

10   yeah.  Actually, it might be helpful if we look at

11   the -- at the opinion because the opinion says

12   that the -- the code has these rules that apply

13   specifically to securities.  And so there's a rule

14   in Section 1236 that applies specifically to

15   securities.  And in many situations the section of

16   the code will include -- that -- that provides a

17   rule to securities will include a definition of

18   securities that defines the scope of that rule.

19        Q.   So there -- are there multiple

20   definitions of security under the Internal Revenue

21   Code?

22                        MR. FORD:  Object to the

23             form.

24        A.   Yes, there -- federal income tax law

25   does not have a single definition of securities

1    that applies throughout the code.

2         Q.   Okay.

3         A.   Particular security specific exceptions

4    often include their own particular definition of

5    securities.

6              So there are multiple definitions of

7    securities in the Internal Revenue Code.

8         Q.   Are you -- are you providing any opinion

9    regarding the status of XRP as a security under

10   the federal securities laws?

11        A.   No.

12        Q.   Okay.  Can you tell me the documents

13   that you relied upon for your opinion in 9(a) --

14   I'm sorry, 9(b)?

15        A.   So 9(b) -- so 9(b) says that the IRS has

16   not issued guidance that classifies virtual

17   currency such as XRP as a security.  And to the

18   best of my knowledge -- well, it also says "I'm

19   unaware of any federal income tax statute,

20   administrative rule, or judicial decision that

21   classifies virtual currency as a security for

22   federal income tax purposes."

23             And so you asked what documents I relied

24   upon for that conclusion.  The analysis of what --

25   of the definition of security begins in earnest

206

1    with paragraph 28.  And that analysis runs through

2    the end of the report.  So, I mean, I'm happy

3    to --

4        Q.   Well --

5        A.   -- walk through footnote by footnote and

6    identify each of the -- each of the -- each of

7    the -- the sources that I relied upon if you'd

8    like.

9        Q.   All the documents that support your

10   opinion in 9(b) are included in your report?

11       A.   Yes.

12       Q.   Okay.  Are they cited in the footnotes

13   to the report in the paragraphs that you just

14   described?

15       A.   I -- I believe all of them are in the

16   footnotes.

17       Q.   So in footnote -- I'm sorry.

18            In paragraph 9(b) of your opinion, is

19   your opinion based on the assumption that XRP is a

20   virtual currency?

21                 MR. FORD:  Object to the

22            form of the question.

23       A.   So as I -- as I said earlier, I

24   understand that XRP is a virtual currency.

25       Q.   So is the opinion based on the

207

```
 1    assumption that XRP is a virtual currency?
 2                    MR. FORD:  Object to the
 3           form.  Asked and answered.
 4       A.   Yeah.  I don't know if I'm perfectly
 5    familiar with the term "assumption."
 6       Q.   Did you assume that XRP is a virtual
 7    currency in formulating your Opinion 9(b)?
 8                    MR. FORD:  Object to the
 9           form of the question.
10       A.   Yeah.  I didn't have to make that
11    assumption.
12       Q.   Why not?
13       A.   Because as -- as we discussed earlier,
14    Notice 2014-21 defines what virtual currency is
15    and we have the characteristics of XRP in -- in
16    section -- in paragraph 11 of the report.  And
17    based on those characteristics, it comes with --
18    XRP comes within the definition of virtual
19    currency as defined in Notice 2014-21.
20            And then, also, if you look at paragraph
21    12, there's a -- it says "United States Attorney's
22    Office for the Northern District of California
23    expressly recognized XRP as virtual currency."
24       Q.   Yeah.
25       A.   So I don't have to make the assumption.
```

1    It's been stated that XRP is virtual currency.

2         Q.   Does the opinion or decision by the

3    United States Department of Justice govern what

4    securities laws are applicable to an asset?

5                        MR. FORD:  Object to the

6               form of the question.  Beyond the

7               scope.

8         A.   I don't know.

9         Q.   So why are you relying on the definition

10   of the Justice Department for virtual currency to

11   apply that to XRP?

12                       MR. FORD:  Object to the

13              form of the question.

14        A.   So the -- the -- it's a -- it's a

15   settlement with the -- between -- well, it's with

16   the U.S. Attorney and it specifically says that

17   XRP is virtual currency.

18        Q.   Do you know what type of case was before

19   the U.S. Attorney when that determination was

20   made?

21        A.   Very generally.

22        Q.   So did you do any inquiry to determine

23   whether this case is applicable to the XRP that's

24   at issue in this case?

25                       MR. FORD:  Object to the

209

```
 1              form of the question.
 2         A.   I -- I read the settlement and I know it
 3    referred to XRP.  That said XRP is virtual
 4    currency.
 5         Q.   So based upon the U.S. Attorney's
 6    decision that -- or statement in a document that
 7    XRP is a virtual currency, you used that as a
 8    basis for your opinion that XRP is a virtual
 9    currency in your report?
10                   MR. FORD:  Object to the
11              form of the question.
12              Mischaracterizes the testimony.
13         A.   So I -- I rely upon the definition of
14    virtual currency in Notice 2014.  I rely upon the
15    characteristics of XRP to say that XRP is virtual
16    currency.  And then I also look at the U.S.
17    Attorney's Office settlement that says that XRP is
18    virtual currency.
19         Q.   So are you opining that the documents
20    that you identified control the definition of
21    virtual currency as that relates to XRP?
22                   MR. FORD:  Object to the
23              form of the question.
24         A.   So I am -- my -- so I have determined
25    that there's a definition of virtual currency in
```

1    Notice 2014-21.  There were characteristics of XRP

2    that I identified in paragraph 11.  And XRP is

3    virtual currency under that definition based upon

4    these characteristics.

5              Also, we have the -- the sources in --

6    cited in -- on paragraph 12 where XRP is referred

7    to specifically as virtual currency and identified

8    specifically as virtual currency.

9         Q.   And you are referring to the Department

10   of the Treasury's Financial Crimes Enforcement

11   Network and the United States Attorney's Office's

12   statements about XRP --

13        A.   Correct.

14        Q.   -- in paragraph 12?

15        A.   Correct.

16        Q.   Have we discussed all the bases for your

17   opinion in paragraph 9(b) of your report?

18        A.   I've identified where the support is for

19   my opinion in -- in paragraph 9(b).

20        Q.   Okay.  Is there anything else that we

21   haven't discussed with regard to your opinion in

22   paragraph 9(b)?

23                   MR. FORD:  Object to the

24             form of the question.  Asked and

25             answered.

211

```
 1          A.   Yeah, I think I've identified it.

 2          Q.   Okay.

 3          A.   Yeah.

 4          Q.   What is the third opinion that you

 5     formulated in this case?

 6          A.   So the quest -- the third question was

 7     "From the perspective of federal income tax

 8     law" -- and that's focusing on the period prior to

 9     December 22nd, 2022 (sic), when the complaint was

10     filed in this matter -- "would a reasonable buyer

11     or seller expect virtual currency such as XRP to

12     be classified as a security for federal income tax

13     purposes and qualify for application of federal

14     income tax rules specific to securities?"  So

15     that's the question.

16               And my answer is -- is -- is, "No.  A

17     reasonable buyer or seller of virtual currency

18     such as XRP would not expect it to be classified

19     as a security for federal income tax purposes or

20     to qualify for federal income tax treatment

21     specific to securities."

22          Q.   Okay.  What do you mean by "reasonable

23     buyer" in your opinion?

24                    MR. FORD:  Object to the

25               form and to the characterization.
```

212

1          A.   So if you look at paragraph 22, it says

2     that "In my experience, and as a general matter,

3     reasonable buyers and sellers of property take the

4     tax treatment" into consideration when they're

5     making commercial decisions.  And then it also

6     talks about how they take those considerations

7     into account when deciding whether, when, and how

8     to buy property.

9               So a reasonable buyer -- reasonable

10    buyers and sellers is -- is that group of people.

11         Q.   What standard are you using to define

12    the term "reasonable"?

13                    MR. FORD:  Object to the

14               form of the question.

15         A.   Yeah.  I -- I -- I think that paragraph

16    22 identifies the standard.  I'm using my

17    experience and speaking generally.

18         Q.   Have you provided an expert opinion on

19    reasonableness prior to this case?

20                    MR. FORD:  Object to the

21               form of the question.

22         A.   I have been hired in malpractice cases

23    to provide testimony as to whether attorneys have

24    breached their standard of care.

25         Q.   Okay.

213

```
 1        A.   And the definition of standard of care

 2   often includes reasonable.

 3        Q.   Okay.  Is the issue of a breach of a

 4   standard of care in this case present?

 5                    MR. FORD:  Object to the

 6             form of the question.

 7        A.   So the -- the issue of standard of care

 8   for an attorney is not present in this case.

 9        Q.   So are you providing a legal opinion on

10   reasonableness in this case?

11                    MR. FORD:  Object to the

12             form of the question.

13        A.   So my opinion addresses behavior and

14   action of reasonable buyers and sellers.

15        Q.   Right.

16             So you used the term "reasonable."  So

17    is that a legal term that you're using in your

18    opinion?

19                    MR. FORD:  Object to the

20             form of the question.

21        A.   In my opinion I'm speaking generally

22   based upon my experience.

23        Q.   Why are you providing an opinion on

24   reasonableness in this report?

25                    MR. FORD:  Object to the
```

214

1          form of the question and to the

2          characterization of the report and

3          the testimony.

4      A.   Yeah.  So I was asked "Would a

5  reasonable buyer or seller expect virtual currency

6  such as XRP to be classified as a security for

7  federal income tax purposes?"

8          So I provided my opinion as to whether a

9  reasonable buyer or seller would expect virtual

10 currency such as XRP to be classified as a

11 security for federal income tax purposes.

12     Q.   Did counsel ask you to provide an

13 opinion about a reasonable buyer and seller of

14 XRP's actions?

15              MR. FORD:  Object to the

16          form of the question, the

17          characterization of the report.

18     A.   They asked me to provide an opinion as

19 to whether a reasonable buyer or seller would

20 expect virtual currency such as XRP to be

21 classified as a security for federal income tax

22 purposes.

23     Q.   Okay.  Can you walk me through the facts

24 that you relied on in support of your opinion in

25 response to the question in 8(c)?

1        A.    Sure.  So if you go to beginning with

2    paragraph 22 of the report.  So it -- it talks in

3    there about the -- first of all, there's

4    Frequently Asked Questions on virtual currency

5    transactions issued by the IRS which shows that

6    reasonable buyers and sellers of virtual currency

7    want to know what the tax treatment is when they

8    transact in virtual -- virtual currency.

9            And then, as you continue through the

10   analysis, you'll -- you'll -- the -- the report

11   discusses the general property transaction rules

12   and --

13       Q.    I asked about the facts in support of

14   your opinion --

15               MR. FORD:  Sorry.  Were --

16           were you done with your answer before

17           she started?

18               MS. GUERRIER:  Well, I'm

19           redirecting him to the answer -- the

20           question that I asked.

21               MR. FORD:  Okay.  But I'd

22           ask that you let him finish his

23           answer before you ask the next

24           question.

25               MS. GUERRIER:  I believe he

216

```
 1              was done.
 2                   MR. FORD:  That's why I
 3              asked him.
 4                   Were you done?
 5                   THE WITNESS:  I -- I -- we
 6              can move on.
 7   BY MS. GUERRIER:
 8        Q.   Okay.  Can you -- I'm not asking for the
 9   analysis that you conducted.  I'm asking you for
10   the facts that support your opinion that you
11   formulated in paragraph 9(c) of your report.
12        A.   And I was --
13                   MR. FORD:  Okay.  I'm sorry.
14              Object to the form.  Asked and
15              answered, or attempted to answer.
16                   So you can resume your answer.
17              Continue.
18        A.   Yeah.  I was answering based upon my
19   understanding of the question.
20        Q.   So what are the facts that you relied
21   upon in formulating your opinion in 9(c)?
22                   MR. FORD:  Same objection.
23        A.   So the -- the -- one fact is this, the
24   Frequently Asked Questions issued by the IRS.  And
25   as the report says, "This signals that reasonable
```

217

1  buyers and sellers of virtual currency seek

2  guidance regarding the federal income tax

3  classification and tax consequences of

4  transactions of such virtual currency."  So that

5  would be -- that would be one fact that I relied

6  upon.

7          And then, also, we have the body of law

8  that deals with property transactions.

9      Q.   Is that a fact?

10              MR. FORD:  Sorry.  Again,

11          Counselor, if he's not done

12          answering --

13              MS. GUERRIER:  I think

14          you're the one interrupting here.

15          Okay?  I -- I'm listening to him.  So

16          if you would stop interrupting every

17          time I try to ask a question --

18              MR. FORD:  You were

19          interrupting his answer --

20              MS. GUERRIER:  He was --

21          this would work --

22              (Indiscernible cross talk;

23          reporter requests one speaker.)

24              MR. FORD:  This is the

25          second time you've interrupted his

1          answer --

2                    MS. GUERRIER:  I don't need

3          you to reprimand me about -- can we

4          go off the record for one second,

5          please?

6                    MS. ZORNBERG:  I think we

7          should stay on the record.

8                    MR. FORD:  There's --

9          there's nothing to go off the record

10         about.

11                   MS. GUERRIER:  Well, I don't

12         need you to interrupt me --

13                   MR. FORD:  It's not --

14                   (Indiscernible cross talk;

15         reporter requests one speaker.)

16                   MR. FORD:  If he's not

17         finished with an answer, I'd ask that

18         you let him finish his answer before

19         you begin your next question.

20                   MS. GUERRIER:  I've done

21         that.  And I've -- I've asked -- I'm

22         asking that you stop cutting me off

23         and interrupting me every time I try

24         to ask a question.

25                   MR. FORD:  Were you finished

1           with your answer when she asked her

2           next question?

3                    THE WITNESS:  I was -- I was

4           talking about what I understand the

5           facts to be that I relied upon in

6           this -- in this opinion.

7                    MR. FORD:  Okay.

8                    THE WITNESS:  The expert

9           opinion.

10   BY MS. GUERRIER:

11       Q.   Okay.  Can restate the facts that you

12   relied upon in support of your opinion --

13       A.   Right.

14       Q.   -- in paragraph 9(c)?

15       A.   Yes.

16                    MS. GUERRIER:  Object to the

17           form.  Asked and answered.

18                    Go ahead.

19       A.   So, again, there's the Frequently Asked

20   Questions on virtual currency transactions that's

21   identified in paragraph 22.  And that shows that

22   reasonable buyers and sellers of virtual currency

23   want to have guidance from the IRS.  So that's one

24   fact.

25                    And then, also, if you proceed through

220

1      the report, you see that the report talks about

2      the general property transaction rules.

3          Q.   Did you rely on any evidentiary facts in

4      this case in support of your opinion?

5          A.   What do you mean by --

6                    MR. FORD:  Object -- I'm

7               sorry.  Object to the form of the

8               question.

9          Q.   Did you rely on any facts from the

10     record that you reviewed in support of this case?

11                   MR. FORD:  Object to the

12              form of the question.

13         A.   So the documents I received are --

14     they're cited in those -- in those footnotes, 7

15     through 16.

16         Q.   Okay.

17         A.   I relied upon those in forming my

18     opinion.

19         Q.   Okay.  Now, what are the specific

20     documents that you relied upon in support of your

21     opinion?

22                   MR. FORD:  Object to the

23              form of the question.  Asked and

24              answered.

25         A.   Are we -- what part of the -- are we

221

1   talking about a specific part of the opinion?

2       Q.   What documents did you rely upon in

3   support of your opinion?  And I'm referring to the

4   opinion in 9(c).

5       A.   In 9(c)?

6       Q.   Yes.

7                   MR. FORD:  Object to the

8               form of the question.

9       A.   So -- so, as -- as I said, the analysis

10  for 9(c) begins in paragraph 22 and the footnotes

11  cite what was relied upon as far as documents

12  received from counsel.  That's in Footnotes 7

13  through 16.

14      Q.   Okay.  What specific documents did you

15  rely on in support of your opinion in 9(c)?

16                  MR. FORD:  Object to the --

17  BY MS. GUERRIER:

18      Q.   Can you identify those documents?

19      A.   Will you --

20                  MR. FORD:  Object to the

21              form of the question.  Asked and

22              answered.

23      A.   Will you be specific about what you mean

24  when you say "documents"?

25      Q.   Do you understand what a document is?

222

1      A.   No.

2      Q.   Okay.  Is the paper in front of you a

3   document?

4      A.   I don't understand what a document is,

5   so I wouldn't -- wouldn't know.  I've seen

6   contracts that are sometimes called documents.

7      Q.   I'm asking you for the documents that

8   you relied on in your report in --

9      A.   I'm asking --

10     Q.   I'm sorry.

11     A.   And I'm asking, what do you mean by

12   "document"?

13     Q.   I'm talking about a document like paper

14   and similar types of documents that you relied on

15   in support of your opinion in paragraph 9(c).

16               MR. FORD:  Object to the

17          form of the question.

18     A.   So is a document anything that is

19   delivered in paper form?

20     Q.   What is your understanding of a

21   document?

22     A.   Well, I think it can have specific

23   meanings.

24     Q.   What is your understanding of a

25   document?

223

```
 1                    MR. FORD:  Sorry.  Object to
 2            the form of the question and asked
 3            and answered.
 4      A.    It can have various meanings.
 5      Q.    Okay.  Can you tell me what you think is
 6   a document?
 7                    MR. FORD:  Object to the
 8            form of the question.  Asked and
 9            answered.
10      A.    I can give you an example of a document.
11      Q.    Okay.
12      A.    A contract is sometimes referred to as a
13   document.
14      Q.    Okay.  Is there any data that you relied
15   upon in support of your opinion in 9(a)?
16                    MR. FORD:  Object to the
17            form of the question.
18      A.    Can you be more specific about what you
19   mean by "data"?
20      Q.    Earlier today you testified that you
21   did receive documents from the attorneys in this
22   case.
23            What specific documents did you rely on
24   in support of your opinion in 9(a) -- in 9(c)?
25   I'm sorry.
```

1          MR. FORD:  Object to the

2          form of the question.  Asked and

3          answered.

4      A.   Yeah.  So -- so I said that I received

5  documents in Section -- identified in Footnote 7

6  through 16 from counsel.

7      Q.   Okay.  Did you rely on those documents

8  in support of your opinion in 9(a) -- I'm sorry,

9  9(c) -- of your opinion in 9(c)?

10          MR. FORD:  Object to the

11          form of the question.

12      A.   So -- so 9(c) references virtual

13  currency such as XRP.  And as -- as I've -- so

14  virtual currency such as XRP.  I'd start with

15  Notice 2014-21 which defines virtual currency.

16  And then we have the characteristics in paragraph

17  11 of XRP.  So I used the definition in Notice

18  2014 and the characteristics in -- in paragraph 11

19  to determine that virtual -- that XRP is a virtual

20  currency.

21          And then, also, paragraph 12 has the

22  U.S. Department of -- has the FinCEN settlement

23  and, also, the United States Attorney's Office

24  settlement that's cited there that says XRP is

25  virtual currency.

1            So I relied upon those when I say that a

2     reasonable buyer or seller would expect virtual

3     currency such as XRP to be classified as a

4     security for federal income tax purpose.

5            So I'm relying upon those documents when

6     I'm talking about what a reasonable buyer or

7     seller would do with respect to virtual currency

8     such as XRP.

9        Q.   Did you make any assumptions in support

10    of your opinion in paragraph 9(c)?

11                    MR. FORD:  Object to the

12            form of the question.

13                    THE WITNESS:  Oh, thank you.

14       A.   I -- I can't think of any assumptions

15    that I make to form my opinion in 9(c).

16       Q.   Can you walk me through the analysis

17    that you conducted in support of the opinion?

18       A.   Sure.

19                    MR. FORD:  Object to the

20            form of the question.

21                    Do you mean in 9(c)

22            specifically?

23    BY MS. GUERRIER:

24       Q.   Do you understand the question?

25       A.   If you would ask it again.  Ask it

226

1      again, please.

2          Q.   Okay.  Can you walk me through the

3      analysis that you conducted in support of your

4      opinion that we've been talking about for a few

5      minutes now in 9(c) that you just read?

6          A.   Yes.

7          Q.   Okay.  Could you please walk me through

8      the analysis?

9          A.   Of the opinion in 9(c)?

10         Q.   Yes.

11         A.   Okay.  So 9(c) is talking about a

12     reasonable buyer and a reasonable -- and a

13     reasonable seller.  And, again, the question is

14     whether a reasonable buyer or -- or seller would

15     expect virtual currency such as XRP to be

16     classified as a security for federal income tax

17     purposes and qualify for application of federal

18     income tax rules specific to securities.

19              So that analysis really begins on page

20     11 with paragraph 22.

21         Q.   Okay.  What analysis are you conducting

22     in paragraph 22?

23         A.   So in paragraph 22, setting the stage to

24     say that reasonable buyers and sellers of property

25     take tax treatment into -- into account when

1    they're making decisions whether to and when and

2    how to buy or sell property.  And so it says

3    that -- that reasonable buyers and sellers take

4    the tax considerations into account.

5            And then it gets into a discussion of

6    what are the tax considerations?  And federal

7    income tax provides general property transaction

8    rules that apply to property transactions unless

9    there's a specific exception that a -- that

10   provides otherwise.

11           And then, if you look at page 12, it

12   provides a very high-level overview of what the

13   general property transaction rules are.  It talks

14   about how federal income tax treats the

15   acquisition of property.  And it talks about that

16   if a person acquires property for services, then

17   the value of the property received would be

18   included in gross income.

19           And, also, if a person acquires property

20    by windfall, then the -- the value of that

21    property could also be included in income.  And

22    it cites to cases and regulations that support

23    that conclusion.

24           And then if you have a situation where a

25   person acquires property for cash, then there's no

228

1  gross income on that acquisition.

2      Q.   Okay.

3      A.   And then, also, in a -- if there's an

4  exchange of property, then generally that can give

5  rise to gross income based upon the fair market

6  value of the property received.

7      Q.   Were you done?

8      A.   No.  I can keep going.  I don't know

9  what level...

10     Q.   All right.  Well, let me ask you about

11 the general property transaction rules.

12     A.   Sure.

13     Q.   What are the general property

14 transaction rules that you're referring to in your

15 report?

16     A.   So those are on page 12.  I was just

17 starting to go through how they apply to

18 acquisitions.

19     Q.   Okay.  So do all property fall under the

20 general transaction -- general property

21 transaction rules under the Internal Revenue Code?

22     A.   So the -- the general property

23 transaction rules apply to all property unless

24 there's a specific exception that provides a rule

25 that differs from the general property transaction

229

```
 1    rules.
 2         Q.   And when you talk about general property
 3    transaction rules, are you talking, for example,
 4    how to treat gain or loss on property?
 5         A.   So the general property transaction
 6    rules, they -- they govern, generally speaking,
 7    the acquisition, the holding, and the disposition
 8    of property.
 9         Q.   Do the general property transaction
10    rules apply to XRP in general?
11         A.   Yes.
12              MR. FORD:  Object to the
13         form of the question.  Sorry.
14         A.   Yes.  The general -- the general
15    property transactions would apply to XRP.
16         Q.   Would the general property transaction
17    rules apply to a stock?
18         A.   The general property transaction rules
19    apply to stock unless there's a specific exception
20    that provides otherwise.
21         Q.   Okay.  So is it possible for the general
22    property transaction rules to apply to a security
23    that is defined as a security under the federal
24    securities laws but not under the federal tax
25    laws?
```

230

```
 1              MR. FORD:  I'll object to

 2         the form of the question.

 3      A.   Would you -- yeah.  Would you ask that

 4   again, please?

 5      Q.   Is it possible for the general property

 6   transaction laws to apply to a security that is

 7   defined as such under the federal securities laws

 8   but not under the federal tax laws?

 9              MR. FORD:  Object to the

10         form of the question.

11      A.   Yeah.  So the general -- if you look on

12   page 11 in paragraph 23, it's talking about the

13   general property transaction rules.  And it says

14   "In fact, the general property transaction rules

15   apply to all types of property:  Real estate,

16   trucks, cows, commodities, virtual currency,

17   foreign currency, securities, (and many others)

18   unless a special, narrowly tailored exception

19   overrides the application of the general property

20   transaction rules."

21      Q.   Okay.  Can a digital asset be considered

22   a security for federal security laws but not a

23   security for federal tax purposes?

24              MR. FORD:  Object to the

25         form of the question.  Beyond the
```

231

1           scope.

2           A.   Yeah.  I can -- I can address whether --

3    so we have the IRS guidance that applies to

4    virtual currency.  And so I -- I can talk about

5    the federal income tax treatment of something that

6    comes within the definition of -- of virtual

7    currency.  I don't -- I don't have familiarity

8    with the securities laws to -- yeah, to know how

9    to answer that question.

10          Q.   Do you know how options are treated

11   under the Internal Revenue Code?

12                    MR. FORD:  Object to the

13            form of the question.  Beyond the

14            scope.

15          A.   Yes.

16          Q.   How are options treated under the

17   Internal Revenue Code?

18          A.   So if you look at paragraph 47, it...

19          Q.   What specifically in paragraph 7 are you

20   referring to?

21          A.   Paragraph -- I'm sorry -- 47.

22          Q.   47?

23          A.   Yes.

24          Q.   Yes.  What specifically in paragraph 47

25   are you referring to?

1        A.   So if you look at Footnote 62, it cites

2   to Revenue Ruling 78-182.  That discusses the

3   track -- the tax treatment of options traded on

4   the Chicago Board Options Exchange.

5        Q.   So how are options treated under the

6   Internal Revenue Code?

7                 MR. FORD:  Object to the

8             form of the question.

9        A.   So -- so this -- this revenue ruling

10   provides -- it provides very specific rules for

11   the taxation of options or transactions dealing

12   with options.  And it provides that -- there's --

13   so there are multiple transactions that occurred

14   in -- in transactions involving options, right?

15   There's the purchase of the option and you have

16   the purchaser of the option and you have the

17   issuer.

18             And there's -- if you -- if you -- we

19    can talk through the rules in -- in detail if

20    you'd like, but this Revenue Ruling says what

21    happens -- what is the tax treatment when that

22    initial transaction occurs when somebody -- when

23    an option is issued and someone purchases an

24    option from the issuer?  What are the tax

25    consequences there?

233

1          And then the option can lapse.  And

2     Revenue Ruling 78-182 talks about what are the tax

3     consequences to the person who purchased the

4     option and the person who issued the option if the

5     option lapses?

6          And then the option can also be sold.

7     And this Revenue Ruling talks about what are the

8     tax consequences when an option are sold.  And

9     finally an option can be exercised.  And so this

10    Revenue Ruling talks about what are the tax

11    consequences when the option is exercised.

12         Q.   Is the -- an option defined as a

13    security under the Internal Revenue Code?

14         A.   So --

15               MR. FORD:  Object to the

16          form of the question.

17         A.   So if we look at the definition of

18    security or the section that talks about the

19    definitions of security, that's in paragraph 29.

20         Q.   Okay.

21         A.   So it says "As a general matter, the

22    federal income tax definitions of securities

23    includes stock, evidences of indebtedness, and

24    options to purchase and sell assets..."

25         And if we go down and look at, you know,

1   Footnote 42, which is cited there, so the

2   definition of security for purposes of the

3   worthless-security rules includes a right to

4   subscribe to -- to subscribe for, or receive, a

5   share of stock in a corporation.

6          And then if you look at Section 1236(c)

7   of the Internal Revenue Code, it provides a

8   definition of securities.  It includes "any share

9   of stock in a corporation, certificate of stock or

10  interest in any corporation, note, bond,

11  debenture, or evidence of indebtedness, or any

12  evidence of an interest in or right to subscribe

13  to or purchase any of the foregoing."

14       Q.   Were options always treated as

15  securities under the Internal Revenue Code?

16              MR. FORD:  Object to the

17          form of the question.  Beyond the

18          scope.

19       A.   So if you look at the definition of

20  securities in Section 1091, there's a discussion

21  of Section 1091 which applies to the wash-sale

22  rules.  If you look to that, you will see that

23  there's a case cited in Footnote 48 called Gantner

24  v. Commissioner.  In that case the tax court held

25  that option does not come within the definition of

1    security for purposes of Section 1091.

2         Q.   Okay.  So as you sit here today, do

3    options come under the definition of securities

4    under Section 1091 of the wash-sale provisions of

5    the code?

6         A.   Yes.

7         Q.   So what happened from the time that the

8    tax court ruled that the -- options were not

9    securities for the purpose of wash-sale rules

10   until now that it's considered a security for

11   wash-sale purposes?

12        A.   Right.  Congress amended the statute to

13   provide that the term "stock" or "securities"

14   shall include contracts or options to acquire or

15   sell stock or securities.  So Congress amended the

16   statute.

17        Q.   So is it possible for a property that's

18   not currently a security under the federal tax

19   rules to become a security under the federal tax

20   rules?

21                   MR. FORD:  Object to the

22             form of the question.

23        A.   Yes, it's -- it's -- I mean, that's an

24   example of where something that was ruled to not

25   be a security under a definition of security in

 1    the Internal Revenue Code was later added to the

 2    definition of security by Congress.

 3         Q.   Do you know if options were considered

 4    securities for -- under the securities laws prior

 5    to being considered a -- securities for federal

 6    tax purposes?

 7         A.   I --

 8                   MR. FORD:  Object to the

 9              form of the question.

10         A.   I missed the -- I missed the first part

11    of your question.

12         Q.   Do you know whether options were

13    considered securities under the federal securities

14    laws prior to being considered securities under

15    the Internal Revenue Code?

16                   MR. FORD:  Object to the

17              form of the question.

18         A.   Yeah.  I'm not familiar with the

19    securities laws definition of securities.

20         Q.   Okay.  So is your opinion in this report

21    that because XRP has not yet been determined to be

22    a security for federal securities laws purposes,

23    that it can't be a security for federal tax

24    purposes?

25                   MR. FORD:  Object to the

237

```
1              form of the question.
2         A.   So my opinion relies upon the definition
3    of virtual currency in Notice 2014-21 and it
4    relies upon the definition of security that
5    appears multiple times in the Internal Revenue
6    Code.
7         Q.   And you're referring to the Internal --
8    Internal Revenue Code as it exists today?
9         A.   So my opinion -- I was asked to give an
10   opinion as of December 22nd, 2020.
11             So my opinion would be based upon how
12   the Internal Revenue -- would be based on how
13   the -- what the law was on that date.
14        Q.   Do you know if Congress is contemplating
15   including digital assets in the definition of
16   securities under the Internal Revenue Code?
17                       MR. FORD:  Object to the
18             form of the question.
19        A.   So I cite in here Section 6045 in
20   Footnote 40.
21        Q.   And what is Section 6045?
22        A.   6045 is a section -- it's actually
23   outside of the federal income tax rules, but
24   it's a provision of the Internal Revenue Code
25   that governs or provides rules for broker
```

238

```
1    reporting.

2         Q.   Okay.  So my question was whether you

3    are aware of any pending legislation by Congress

4    contemplating making digital assets securities for

5    federal tax purposes.

6         A.   So --

7                   MR. FORD:  Sorry.  Object to

8              the form of the question and to the

9              characterization of the prior

10             question.

11                  You can answer.

12        A.   So Section 6045 is part of the federal

13   tax laws.  It's -- it's part of the Internal

14   Revenue Code.  And Congress proposed adding

15   digital assets to the definition of specified

16   security.

17        Q.   Okay.  Would that be for wash-sale rule

18   purposes?

19        A.   No.

20        Q.   What exactly does the section

21   contemplate treating digital assets as

22   securities?

23                  MR. FORD:  Object to the

24             form of the question.

25        A.   So 6045 has reporting rules that apply
```

1    to brokers.  And so this amendment contemplates

2    requiring brokers to provide information related

3    to digital assets.

4        Q.   Do you know if there's any pending

5    legislation as we sit here today where Congress is

6    contemplating including digital assets as

7    securities for wash-sale purposes?

8                    MR. FORD:  Object -- I'm

9            sorry.  Object to the form.

10       A.   I'm not aware of any legislation where

11   Congress is -- is contemplating determining

12   virtual currency within the definition of security

13   for Section 1091 purposes.

14       Q.   Okay.  So that -- that wasn't my

15   question.  I'm talking about digital assets.

16           So are you aware of any pending

17   legislation where Congress is contemplating

18   treating digital assets as securities for the

19   wash-sale purposes?

20                    MR. FORD:  Object to the

21           form of the question and asked and

22           answered.

23       A.   So I'm not aware of any pending

24   legislation related to the wash-sale rules that

25   would include within the definition of

240

1    securities -- I'm going to rely upon the

2    definition in this -- in -- in -- in Notice

3    2014-21.

4           So that would include a digital

5    representation of value in the definition of

6    securities for Section 1091 purposes.

7       Q.   Are you aware of any pending legislation

8    that deals with digital assets for wash-sale rule

9    purposes?

10                 MR. FORD:  Object to the

11             form of the question.

12       A.   Yeah.  I'm not aware of any pending

13    legislation -- would -- would you repeat it again?

14       Q.   Are you aware of any pending legislation

15    that deals with digital assets for purposes of the

16    wash-sale rules?

17                 MR. FORD:  Same objection.

18       A.   Yeah.  I would want to see the

19    definition of -- of digital assets.

20       Q.   Okay.

21       A.   But I...

22       Q.   Are you done with your answer?

23       A.   Yeah.

24       Q.   Okay.  Is it that you're not aware of

25    any such legislation that's pending before

241

```
 1    Congress?
 2                    MR. FORD:  Object to the
 3              form of the question.  Asked and
 4              answered.
 5        A.   I'm not aware of any pending legislation
 6    related to Section 1091 that would include within
 7    the definition of securities what I -- what I just
 8    said:  A digital representation of value.
 9        Q.   Okay.  So I -- I believe my question was
10    a bit broader.  I was asking about any pending
11    legislation that would deal with digital assets
12    for wash-sale purposes.
13                    MR. FORD:  Object to the
14              form.  Asked and answered now three
15              or four times.
16        A.   I -- I don't know how else to answer
17    that question.
18        Q.   Is the answer that you're not aware of
19    any such legislation that's pending before
20    Congress?
21                    MR. FORD:  Object to the
22              form of the question.  Asked and
23              answered.  And to the
24              characterization of the testimony.
25        A.   Do -- do you want to ask your -- did you
```

1    ask if I'm aware of any legislation pending before

2    Congress?

3         Q.   Regarding digital assets for wash-sale

4    purposes.

5                   MR. FORD:  Same objection.

6         A.   The report talks about a legislate --

7    about legislation that is pending with Congress

8    under Section 1091.

9         Q.   Okay.  So is that the only legislation

10   that you're aware of that's cited in your report

11   that's pending before Congress?

12        A.   With respect to Section 1091?

13        Q.   Yes.

14        A.   I'm not sure what the status of the

15   bills are.  So, yeah, I -- I'm not sure.  And

16   I'm -- I don't remember how it was introduced and

17   it was introduced into multiple bills and those

18   bills have been consolidated into one.

19                So I -- I -- yeah.

20                I'm aware of the one that's cited in the

21   materials, in the report, and -- and understand

22   that it is still pending before Congress.

23        Q.   Okay.

24                   MS. GUERRIER:  Why don't we

25                take a ten-minute break.

243

```
 1                    THE VIDEOGRAPHER:  The time

 2            on the video monitor is 3:06 p.m.

 3            End of Media Unit Number 4.  Going

 4            off the video record.

 5                    (Whereupon, a recess is taken.)

 6                    THE VIDEOGRAPHER:  3:21,

 7            start of Media 5.  Back on the video

 8            record.

 9    BY MS. GUERRIER:

10        Q.   Professor Borden, is it your opinion

11    that the classification of XRP as a virtual

12    currency by the Department of Justice is

13    determinative of XRP's classification as a virtual

14    currency under the federal tax laws?

15                    MR. FORD:  Object to the

16            form of the question.

17        A.   So I can do an analysis using Notice

18    2014-21 and the definition in there of virtual

19    currency and reach the conclusion that XRP is

20    virtual currency.

21        Q.   Okay.  Well, I think my question is

22    whether the Department of Justice's classification

23    of XRP as virtual currency is determinative of

24    XRP's classification as a virtual currency for

25    purposes of federal tax law.
```

[12/3/2021] Borden, Bradley Expert Dep. Tr. 12.3.2021

244

```
 1                    MR. FORD:  Same objection.

 2       A.   Would you say it again?

 3                    MR. FORD:  I'm sorry.  Yeah.

 4            Same objection.  Asked and answered.

 5                    Go ahead.

 6       A.   The first part in particular.

 7       Q.   Is it your opinion that the

 8  classification of XRP as a virtual currency by the

 9  Department of Justice is determinative of XRP's

10  classification as a virtual currency under the

11  federal tax laws?

12                    MR. FORD:  Same objection.

13       A.   So the -- the -- the analysis is we have

14  the -- we have the settlement and we have -- with

15  the U.S. Department -- U.S. Attorney's Office and

16  FinCEN with -- regarding XRP, treating --

17  treated -- treating it as virtual currency.

18            If you look at -- if you look at Notice

19  2014-21, it cites to the FinCEN guidance that

20  defines virtual currency.  So Notice 2014-21 draws

21  from the same -- draws from authority issued by

22  FinCEN, which was a party to the settlement

23  discussed therein, in paragraph 12.

24            So I -- I -- I -- I don't know that the

25  IRS would have to -- would be bound to rely upon
```

1      that charactera -- characterization, but it's

2      using the same authority that was used there to

3      determine -- to -- to define virtual currency.  So

4      XRP would -- would be -- the -- the settlement and

5      the treatment of XRP as virtual currency in the

6      settlement is -- is, at a minimum, very persuasive

7      that it's virtual currency for federal income tax

8      purposes.

9           Q.   Okay.  And do you know whether the

10     Department of Justice's classification of a

11     property governs how a property is treated under

12     the federal tax laws?

13                    MR. FORD:  Object to the

14          form of the question.

15          A.   So federal -- so federal tax law

16     originates with the -- with the Internal Revenue

17     Code and it's its own body of law.

18               And then there's case law that

19     interprets and addresses provisions in the

20     Internal Revenue Code.  And those would be

21     authoritative with respect to the Internal Revenue

22     Code.  The courts aren't bound necessarily by --

23     in applying the Internal Revenue Code by decisions

24     that relate to other bodies of law.

25          Q.   Going back to your Opinion 9(c) where

1    you just opine about a reasonable buyer's and

2    seller's expectations, did you conduct any

3    experiment to test whether buyers and sellers of

4    XRP rely on what -- buyers and -- I'm sorry.  Let

5    me -- did you conduct any experiments to test what

6    buyers and sellers of XRP rely on when making

7    decisions related to transactions of such virtual

8    currency as you described it in your report?

9                        MR. FORD:  Object to the

10              form of the question and to the

11              characterization of the report.

12        A.    That was -- that was a long question.

13   Can you repeat the first part?

14        Q.    Sure.

15              Did you conduct any experiment to test

16    whether buyers and sellers of XRP rely on when

17    making decisions related to transactions of -- I

18    quote in your paragraph 22 -- "such virtual

19    currency"?

20                        MR. FORD:  Object to the

21              form of the question.

22        A.    Can -- can you be more specific about

23   what you mean when you use the term "experiment"?

24        Q.    As an expert in federal tax law, do you

25   conduct any types of experiments with respect to

```
 1    any matters that you're asked to opine about?
 2                    MR. FORD:  Object to the
 3              form of the question.
 4         A.   Yeah.  Again, we have trouble with -- so
 5    what do you mean by "experiment"?
 6         Q.   Did you conduct any tests to determine
 7    whether buyers and sellers of XRP, what they rely
 8    on when making decisions related to transactions
 9    regarding a virtual currency?
10                    MR. FORD:  Object to the
11              form of the question and to the
12              characterization of the report.
13         A.   Yeah.  You're using terms that are --
14    that are hard -- "tests" can have multiple
15    meanings.  Do you have -- can you be more specific
16    about -- can you give an example of what a -- what
17    tests you would be talking about?
18         Q.   Well, what is your understanding of
19    "test" in the context of the question that I
20    posed?
21                    MR. FORD:  Object to the
22              form of the question and to the
23              characterization of his testimony.
24         A.   Right.  So, I mean, to keep it very
25    simple, I'm a law professor, right?  So a test --
```

248

```
 1   I mean, we give tests at the end of a semester.

 2             Is that -- is that what you're referring

 3    to?

 4        Q.   Did you go out and talk to buyers and

 5   sellers of XRP to determine what they rely on when

 6   they're making decisions related to transactions

 7   regarding virtual currency?

 8        A.   No.

 9                  MR. FORD:  I'm sorry.

10             Object to the form of the question.

11        Q.   Did you conduct any survey of buyers and

12   sellers of XRP regarding what they rely on when

13   making decisions related to the transactions

14   regarding virtual currency?

15                  MR. FORD:  Object to the

16             form of the question.

17        A.   No.

18        Q.   Did you examine any data related to what

19   buyers and sellers of XRP rely on when making

20   decisions related to transactions regarding

21   virtual currency?

22                  MR. FORD:  Object to the

23             form of the question.

24        A.   Can you be specific about "data"?

25        Q.   Did you examine any document related to
```

1    what buyers and sellers of XRP rely on when making

2    decisions related to transactions regarding

3    virtual currency as you've described it in your

4    paragraph 22 of your report?

5                    MR. FORD:  Objection to the

6              form of the question and to the

7              characterization of the report.

8         A.   So the -- the -- the report cites the

9    Frequently Asked Questions on virtual currency

10   transactions.

11        Q.   What Frequently Asked Questions are you

12   referring to?

13        A.   Look on page -- page 11, paragraph 22.

14        Q.   Are you referring to the Frequently

15   Asked Questions in the Notice 2014-21?

16        A.   So, yeah, 2014-21 includes Frequently

17   Asked Questions.  From time to time, those

18   questions have been updated and republished -- or

19   Frequently Asked Questions on virtual currency

20   transactions have been updated and republished.

21        Q.   Does the Notice 2014-21 including --

22   include any data related to what actual XRP buyers

23   and sellers rely on when making decisions

24   regarding transactions in XRP?

25                    MR. FORD:  Object to the

250

1           form of the question.

2           A.   So I recall that I indicated earlier

3    that Rev -- that Notice 2014-21 doesn't include

4    any reference to XRP.

5           Q.   Okay.  Did you interview any XRP

6    purchasers?

7           A.   No.

8           Q.   Did you interview any XRP buyer --

9    sellers?

10          A.   No.

11          Q.   Going to the general property

12   transaction rules, how are -- how is property

13   that's held for investment treated for tax

14   purposes when there is a gain on that property?

15                    MR. FORD:  Object to the

16           form of the question.

17          A.   So do you want to be more specific about

18   what you mean when there's a gain?

19          Q.   If a holder of a property held for

20   investment sells that property, what is the gain

21   characterized from the holder's purchase?

22                    MR. FORD:  Object to the

23           form of the question.

24          A.   So when -- when gain is recognized on

25   the sale of property, there's an analytical

251

```
1   framework to go through to determine what the

2   character of the gain is.

3        Q.   Mm-hmm.

4        A.   The asset, first of all, has to be a

5   capital asset.  And it also -- if it's a capital

6   asset, the gain -- I'm trying to think if there's

7   an exception.  The general rule -- I'm going to

8   say what the general rule is.  When a capital

9   asset is sold, the gain recognized on the sale of

10  that capital asset would be a capital gain.

11       Q.   How -- how would a gain on an asset

12  that's held -- that is used in the ordinary course

13  of business be treated under the Internal Revenue

14  Code?

15                  MR. FORD:  Objection to the

16            form of the question.

17       A.   So if -- if you look at the definition

18  of capital asset, it excludes from the definition

19  property held for use in a trade or business

20  that's subject to depreciation and it also

21  excludes real property held for use in a trade or

22  business.  And then there's another provision,

23  Section 1231, that talks about how to determine

24  the character of gain or loss on the sale of that

25  type of asset.
```

252

1          Q.   Okay.  So what kind of form would an

2     entity who had a gain on capital assets file with

3     the IRS to report the gain on the capital asset?

4                    MR. FORD:  Object to the

5               form of the question.

6          A.   Yeah.  I'd have to go back and look at

7     the exact -- I don't remember the exact number of

8     the form.

9          Q.   Are you familiar with the Schedule D?

10         A.   I have familiarity with Schedule D, but

11    I don't -- I have -- I have very limited

12    familiar -- familiarity with Schedule D.

13         Q.   Have you ever seen a Schedule D?

14         A.   I've probably seen Schedule Ds.

15         Q.   In your tax practice, have you ever

16    filled out a Schedule D for a client?

17         A.   I would think I have not.

18         Q.   I'm sorry?

19         A.   I'm pretty sure I have not.

20         Q.   Okay.

21                    MS. GUERRIER:  I'm not --

22               I'm going to hand this out.  I'm not

23               going to mark them.  I just want

24               to --

25                    MR. FORD:  Well, let's give

253

1         it a number just for --

2                  MS. GUERRIER:  Yeah.

3                  MR. FORD:  In case we need

4         to reference it.

5                  MS. GUERRIER:  Actually,

6         I'll mark it.  So I think this is

7         going to -- we'll just show --

8                  MR. FORD:  Yes.  Do you want

9         to give both copies to the reporter

10        so she can put a sticker on it?

11                 THE REPORTER:  What did you

12        want to mark it as?

13                 MS. GUERRIER:  I believe

14        that's Number 4?  Is that Exhibit 4?

15        I think we marked --

16                 THE REPORTER:  No, I think

17        we might be up to 6 or 7 here.  I'll

18        make it Exhibit 6 and if that's

19        wrong, I'll fix it.

20                    (Whereupon, exhibit is

21        presented and marked SEC Borden

22        Deposition Exhibit 6 for identification.)

23   BY MS. GUERRIER:

24        Q.   I've handed you what's been marked

25   Exhibit 6.

254

1          Have you ever seen this type of

2     document?

3          A.   I'm sure I have.

4          Q.   Okay.  Are you familiar with the

5     Schedule D that I've handed you?

6          A.   I -- I -- like I said, I -- I've

7     probably seen it.  I don't prepare tax returns.

8          Q.   Okay.  So in -- in your expert capacity,

9     is -- would a Schedule D be outside of the scope

10    of your expertise?

11         A.   Yes --

12                   MR. FORD:  Object to the

13              form of the question.  I'm sorry.

14         Q.   Okay.  Are you --

15         A.   Well, knowledge about schedule D is

16    outside the scope of my expertise.

17         Q.   Okay.  So in your tax practice, do you

18    have clients that report capital gains --

19                   MR. FORD:  Object to the

20              form.

21         Q.   -- to the IRS?

22         A.   I'm sure I --

23                   MR. FORD:  Sorry.  Object to

24              the form of the question.

25         A.   I'm sure I do.

255

1      Q.   Okay.  Do you provide any advice to any

2   clients regarding how to report capital gains to

3   the IRS?

4      A.   So -- so transactional tax lawyers

5   provide advice with respect to transactions.  And

6   a question may come up, one that you alluded to

7   earlier, is an asset a capital asset?  And if it's

8   not a capital asset, are there things that could

9   be done for it to be characterized as a capital

10   asset?  And so the tax advisor would help with

11   that question.

12            And then after helping to say that

13    the -- that the -- that the goal is to have an

14    asset be treated as a capital asset and do what

15    is necessary to have it be treated as a capital

16    asset, the asset is then sold.  At that point the

17    tax advisor may not be involved.  Information

18    would -- would be provided to the return preparer

19    and the return preparer at that point, you know,

20    would work -- may reach out to the tax advisor or

21    may complete the tax return.

22      Q.   In your CPA practice, did you ever

23   encounter a Schedule D?

24      A.   I -- I went from undergraduate into the

25   master's M.B.A. program and went from the M.B.A.

256

1    program directly into law school, and then from

2    law school I went directly into law practice.  So

3    I -- I -- I never had a practice preparing tax

4    returns.

5         Q.   Okay.  Do you know how capital gains

6    would be reported to the IRS based on your

7    experience with federal tax laws?

8                        MR. FORD:  Object to the

9              form of the question.  Beyond the

10             scope.

11        A.   So they -- they -- they would be -- be

12   reported on -- on a tax return.

13        Q.   Okay.

14        A.   But how the tax return is prepared and

15   what line of the -- of a Schedule D they would go

16   on, whether they're listed in the aggregate or

17   netted, these are things that -- that I don't --

18   it's beyond the scope of what -- of what I do.

19        Q.   Would they reported as capital gains to

20   the IRS?

21                        MR. FORD:  Object to the

22             form of the question.

23        A.   So if somebody sells a capital asset and

24   recognizes gain on the disposition of that capital

25   asset, that gain should be reported as a capital

1    gain to the IRS.

2         Q.   Okay.  Did you state earlier that,

3    excuse me, property held for sale in the ordinary

4    course of business would not be considered a

5    capital asset?

6         A.   What I --

7                   MR. FORD:  Object -- sorry.

8              Objection to the form and to the

9              characterization of the testimony.

10        A.   I believe what I said earlier was

11   property held for use in a trade or business does

12   not come within the definition of capital asset.

13        Q.   Okay.

14        A.   So I --

15        Q.   I'm sorry, were you done?

16        A.   That -- that's what I said earlier.  I

17   think your -- the question you just asked deals

18   with property held primarily for sale to customers

19   in the ordinary course of a trade or business.

20        Q.   Okay.

21        A.   That property is also excluded from the

22   definition of capital asset.

23        Q.   Are you familiar with an IRS Form 8949?

24        A.   I -- I -- I don't know off the top of my

25   head what it is.  Yeah.  I don't know off the top

```
1    of my head what it is.  I might have seen one

2    recently.

3                        MR. FORD:  Should we mark

4           this as Exhibit 7?

5                        MS. GUERRIER:  Seven,

6            please.

7                        (Whereupon, exhibit is

8            presented and marked SEC Borden

9            Deposition Exhibit 7 for identification.)

10                       THE REPORTER:  Exhibit 7.

11                       MS. GUERRIER:  Thank you.

12   BY MS. GUERRIER:

13       Q.   I've provided you with a copy of a Form

14   8949.

15            Have you seen such a form prior to

16    today?

17       A.   I believe I have.

18       Q.   Do you know what the Form 8949 is used

19   for?

20                       MR. FORD:  Object to the

21           form.  Still beyond the scope.

22       A.   Yeah.  Off the top of my head, if you

23   ask me what the 89 -- Form 8949 is used for, I

24   wouldn't know.

25       Q.   Mm-hmm.
```

259

```
 1        A.   I can look at it really quickly and get

 2   some information about what -- or I could spend

 3   time reading it and get more information about --

 4   about what it's used for.

 5        Q.   So your testimony is that you're not

 6   familiar with the Form 8949?

 7        A.   Well, like I said, I -- I've -- I think

 8   I've seen Form 8949 within the last year or two.

 9        Q.   Mm-hmm.

10        A.   And I may have given it some thought at

11   that point, but to -- to go into detail about what

12   it is and what it's used for would be difficult.

13   You know, I could take time to look at it and, you

14   know, there -- there are spaces here.  Like, I

15   could have thoughts about what the spaces are for.

16   And, you know, I could take some time and -- and

17   read instructions and have more of an idea of what

18   it's used for.

19             But, yeah, I would have to become

20   familiar, more familiar, with it to have, like,

21   any type of discussion about it.

22        Q.   Did you review Ripple's federal tax

23   returns in formulating your opinion in this case?

24        A.   No.

25                  MR. FORD:  Sorry.  Give me a
```

260

1        second.  All right?

2                      THE WITNESS:  Sorry.

3                      MR. FORD:  Object to the

4            form.

5    BY MS. GUERRIER:

6        Q.   Why didn't you review Ripple's federal

7    tax returns in formulating your opinion in this

8    case?

9                      MR. FORD:  Objection to the

10            form of the question.

11       A.   So, in formulating my opinion in the --

12   in this case, I was able to answer the questions

13   and form an opinion without reviewing the Ripple

14   tax return.

15       Q.   Did you think that Ripple's tax returns

16   were not important to your opinions in this case?

17                     MR. FORD:  Objection to the

18            form of the question.

19       A.   Yeah.  I -- I didn't need the -- to see

20   the Ripple tax return to form the opinion in this

21   case.

22       Q.   Okay.  So would it matter to your

23   opinion if Ripple filed -- let me rephrase that.

24            Would it matter to your opinion if

25   Ripple reported gains on sales as capital gains to

261

```
1    the IRS?

2                    MR. FORD:  Objection to the

3              form of the question.  Beyond the

4              scope.

5         A.   So my -- my -- my -- my opinion -- I'm

6    just going to look at it again.

7              So has authoritative guidance been

8    issued regarding the federal income tax treatment?

9    That's Notice 2014-21.  That -- that -- the answer

10   to that question wouldn't charge.

11             Does any other guidance classify virtual

12   currency such as XRP as a security for federal

13   income tax purposes?  That answer wouldn't change.

14             And then with respect to a reasonable

15   buyer or a reasonable -- reasonable seller, that

16   answer wouldn't -- wouldn't change.

17        Q.   So with regard to the Opinion 9(c),

18   would a reasonable buyer and seller factor in the

19   capital gains on a sale of a digital asset in

20   determining how that asset should be treated for

21   tax purposes?

22                    MR. FORD:  Object to the

23              form of the question.

24        A.   So, actually, I believe if we go to

25   Notice 2014-21, this applies to virtual currency.
```

262

1        If you look at Question 7 -- can you --

2   can you repeat your question?  I think this

3   question can answer -- addresses your question.

4        Q.   With regard to the Opinion 9(c), would a

5   reasonable buyer and seller factor in the capital

6   gains on the sale of a digital asset in

7   determining how that asset should be treated for

8   tax purposes?

9        A.   Okay.

10                 MR. FORD:  Same -- sorry.

11        Same objection.

12        A.   So -- yeah.  So Question 7 and Answer 7

13   are dealing with -- with virtual currency and

14   talking about what the character of gain or loss

15   would be when virtual currency is -- is

16   transferred in a transaction that creates gain or

17   loss.  And it says it depends upon whether the

18   virtual currency is a capital asset in the hands

19   of the taxpayer.

20        Q.   So would it matter to know how the

21   taxpayer is holding the -- the asset to know how

22   it should be treated under federal tax law?

23                 MR. FORD:  Objection to the

24        form of the question.

25        A.   So determining whether an asset is a

1    capital asset, the manner in which it is -- which

2    it is held is important.

3        Q.   Okay.  Does that factor into your

4    opinion at all?

5                    MR. FORD:  Objection to the

6            form of the question.

7        A.   So my opinion is that reasonable buyers

8    and sellers take into account the federal income

9    tax consequences of transactions.  And so a

10   reasonable buyer or seller would take into account

11   whether the asset is or can be a capital asset.

12       Q.   Okay.

13                   MS. GUERRIER:  I don't think

14           I have any more questions.

15                   MR. FORD:  Okay.  Why don't

16           we take just a very short break

17           and --

18                   MS. GUERRIER:  Sure.

19                   MR. FORD:  -- I'll let you

20           know if we have anything.

21                   MS. GUERRIER:  Sure.

22                   THE VIDEOGRAPHER:  The time

23           on the video monitor is 3:48 p.m.

24           End of Media Unit Number 5.

25                   (Whereupon, a recess is taken.)

264

1           THE VIDEOGRAPHER:  The time

2      on the video monitor, 3:55.  Start of

3      Vid -- Media Unit Number 6.  We're

4      back on the video record.

5           MR. FORD:  We don't have any

6      questions for Mr. Borden.  And I

7      understand that counsel for the

8      individual defendants does not have

9      any questions either so the

10      deposition is concluded.  Thank you

11      very much.

12           MS. GUERRIER:  Thank you for

13      your time, Professor.

14           THE WITNESS:  Thank you.

15           THE VIDEOGRAPHER:  Thank

16      you.  The time on the video monitor,

17      3:55 p.m.  End of Media Unit Number 6

18      and the end of today's video

19      deposition of Mr. Bradley Borden here

20      in New York, New York.

21           Thank you, everyone.

22           (Whereupon, the deposition

23      concluded at 3:55 p.m.)

24

25

265

1    STATE OF NEW YORK       )

2                            ) ss:

3    COUNTY OF NEW YORK      )

4            I hereby certify that the witness in the

5    foregoing deposition, BRADLEY T. BORDEN was by me duly

6    sworn to testify to the truth, the whole truth and

7    nothing but the truth, in the within-entitled cause; that

8    said deposition was taken at the time and place herein

9    named; and that the deposition is a true record of the

10   witness's testimony as reported by me, a duly certified

11   shorthand reporter and a disinterested person, and was

12   thereafter transcribed into typewriting by computer.

13           I further certify that I am not interested in

14   the outcome of the said action, nor connected with nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17           IN WITNESS WHEREOF, I have hereunto set my hand

18   this 7th day of December, 2021.

19           Reading and Signing was:

20    ___ requested   ___ waived   _X_ not requested.

21

22

23   _____

24       BRIDGET LOMBARDOZZI, CSR, RMR, CRR

25

**&**

**&**
  2:17 4:5,19 5:3 9:21 113:6
  114:13

**1**

**1**
  6:13 13:9,18 14:23 15:1
  55:25 201:10 202:17
**1,290**
  19:12 20:21
**1.61-1**
  7:10
**1:34**
  175:3
**10**
  6:4 8:12 25:8,8 118:3
**10:04**
  55:24
**10:20**
  56:4
**10019-6064**
  5:7
**10022**
  4:10
**10281-1022**
  3:13
**1040**
  7:14
**10-4-21**
  6:14
**107**
  6:17
**10832**
  1:6 2:6 9:17
**1091**
  234:20,21 235:1,4 239:13
  240:6 241:6 242:8,12
**11**
  152:4,17 156:22,25 161:17
  171:6,7,13,16,17 173:10
  175:11 177:1 182:15,21
  183:11,24 184:4 185:6
  207:16 210:2 224:17,18
  226:20 230:12 249:13
**11:25**
  118:10
**11:35**
  118:7
**11:43**
  118:15
**110,000**
  59:19 71:12
**12**
  153:13 207:21 210:6,14
  224:21 227:11 228:16

**12 (cont.)**
  244:23
**12:57**
  174:4
**1231**
  251:23
**1236**
  201:1 203:19,20,25 204:5,9
  204:14 234:6
**1285**
  5:6
**130**
  58:2 59:22
**14**
  6:13
**15**
  47:23 48:12 52:25 53:7
  118:3 182:23 183:13,22
**158**
  6:22
**16**
  47:23,24 48:5,12 163:9
  220:15 221:13 224:6
**165**
  201:1,4,7,15,19 202:7,8,10
  202:12,16,18 203:2,6,9,13
**177**
  7:4
**18**
  164:5,18 170:16 171:2
  194:17 195:4
**189**
  7:10
**19**
  6:20
**1995**
  108:4
**1996**
  108:7
**1997**
  187:1,3
**1998**
  121:17
**1999**
  108:9

**2**

**2**
  6:17 7:16,21 56:5 105:3,7,8
  107:5,8,9 118:11 186:12,23
  190:19 201:1,3,4,7,15,19
  202:7,8,10,12,18 203:9,13
  204:9
**20**
  1:6 2:6 8:12 9:17 194:1
**200**
  3:11

**2000**
  108:12 109:1 113:9 129:3,5
  129:11 192:24
**2001**
  40:3,15 121:19
**20037**
  4:22
**2004**
  109:15 111:2 113:10
**2010**
  109:16,22 111:2,7,18,19,22
  117:1
**2014**
  156:18,19 159:2 162:14
  165:16 170:23 171:10
  184:24 195:3,5,15 199:19
  209:14 224:18
**2014-21**
  6:22 156:19 157:23,24
  158:8,9 160:24 162:11,18
  165:6,12,19 169:2 172:8
  175:8 185:3,7 188:22 192:2
  192:12,20,20 194:8,11,14
  194:16 195:14 207:14,19
  210:1 224:15 237:3 240:3
  243:18 244:19,20 249:15
  249:16,21 250:3 261:9,25
**2019**
  192:4
**2019-24**
  7:11 162:23 165:8 188:24
  189:21,22 190:3,10,19
  191:9,10,12,13 192:10,16
  192:18,25 193:4,7,10,15
  194:6,9,13,16 195:21
**202.974.1517**
  4:23
**2020**
  147:18 237:10
**2021**
  1:15 2:19 9:3,8 14:11,15,20
  39:10 40:20,22,25 41:8
  43:15,19,23 101:19,20
  102:3,7 103:5 265:18
**2022**
  211:9
**2112**
  4:21
**211203blo**
  1:25
**212.336.0153**
  3:14
**212.373.3067**
  5:8
**212.909.6000**
  4:11

**22**
  162:20 195:18 212:1,16
  215:2 219:21 221:10
  226:20,22,23 246:18 249:4
  249:13
**22nd**
  147:18 211:9 237:10
**23**
  8:7 191:15,18 230:12
**24**
  192:6
**253**
  7:14
**258**
  7:18
**26**
  7:10 50:14 51:11,12 52:9
**28**
  197:14 206:1
**29**
  200:23 233:19

**3**

**3**
  1:15 2:19 6:22 9:3 105:18
  118:17 158:14,18,19,20,23
  169:8 174:5 186:12
**3:06**
  243:2
**3:21**
  243:6
**3:48**
  263:23
**3:55**
  2:19 264:2,17,23
**35**
  7:8 177:25 178:5
**36**
  6:15
**3rd**
  9:8

**4**

**4**
  7:4 50:17 51:11,12 52:9
  118:25 169:12 175:5 178:1
  243:3 253:14,14
**40**
  117:14,19 237:20
**400**
  3:12
**42**
  200:24 201:15 202:16
  234:1
**43**
  8:5 201:2

**[47 - analysis]**

**47**
231:18,21,22,24
**475**
201:3
**48**
234:23
**49**
8:6
**4th**
14:11,20 101:18,19 102:3,7
103:5

**5**

**5**
7:10,12 189:11 243:7
263:24
**50**
21:16 178:15,20,20 179:20
179:21 180:12,13 181:6
182:11
**51**
178:15 181:6
**52**
178:15 181:6

**6**

**6**
6:24 7:14 148:16 253:17,18
253:22,25 264:3,17
**6045**
134:21 135:12 136:20
237:19,21,22 238:12,25
**61**
193:20 194:1
**62**
232:1
**66**
8:7

**7**

**7**
7:18 8:5 47:22,22,23 48:5
48:11 52:25 53:6 55:2,2
163:8 172:13 175:22 176:7
177:6 178:11 180:19 181:2
182:23 183:13,22 220:14
221:12 224:5 231:19
253:17 258:4,9,10 262:1,12
262:12
**70**
189:10,15,17
**72**
158:5,6,22
**78-182**
232:2 233:2
**7th**
265:18

**8**

**8**
8:6 54:13,19 148:6 154:20
160:12 196:18,25 199:8,8
199:12,14 214:25
**89**
258:23
**8949**
7:18 257:23 258:14,18,23
259:6,8

**9**

**9**
105:19 154:25 157:15
158:10,16 159:1,6,12,16
160:5,16 161:15,19,19
162:2,7,10,13,25 163:2,4
163:11,21,24 164:8,12,16
164:21 165:1 184:16,20
188:16 191:12,14 192:9
194:21,25 195:8,12,16
197:13 198:7,23 200:5,6,24
205:13,14,15,15 206:10,18
207:7 210:17,19,22 216:11
216:21 219:14 221:4,5,10
221:15 222:15 223:15,24
223:24 224:8,9,9,12 225:10
225:15,21 226:5,9,11
245:25 261:17 262:4
**9:15**
2:18 9:2,9
**90**
173:3
**919**
2:17 4:9 9:21

**a**

**a.m.**
2:18 9:2,9 55:24 56:5
**able**
172:2 260:12
**absolutely**
112:15
**academic**
102:10 187:12,13
**acc**
106:20
**accepted**
126:13
**accommodate**
12:13
**account**
89:11,20 166:9 191:23
212:7 226:25 227:4 263:8
263:10
**accounting**
107:18,21,25 108:1,2 127:6

**accounting (cont.)**
127:7 129:15,19
**accurate**
12:6 87:25 101:14,15
196:12
**accurately**
11:24 106:19,20 107:1
**acquainted**
61:3,7,13
**acquire**
235:14
**acquired**
178:21
**acquires**
227:16,19,25
**acquisition**
227:15 228:1 229:7
**acquisitions**
228:18
**action**
31:6 149:6 213:14 265:14
265:15
**actions**
214:14
**active**
121:11,14
**acts**
169:24
**actual**
31:12,22 70:23 249:22
**add**
78:21
**added**
236:1
**adding**
238:14
**additional**
57:10,22 108:13 109:1
**address**
53:17 187:16 189:23 201:9
203:2,6,21 231:2
**addressed**
136:3 193:18
**addresses**
161:19 189:24 190:3 191:6
191:16 193:16 198:3 202:8
213:13 245:19 262:3
**adelman**
5:4
**administrative**
197:7 200:10 205:20
**administratively**
111:14
**admission**
7:7 180:13

**admissions**
179:10
**admit**
178:21
**admits**
179:3,21
**admitted**
171:19
**adopting**
192:11
**advertise**
15:20,23 16:8
**advertisement**
16:4
**advice**
130:5 255:1,5
**advisor**
255:10,17,20
**advisory**
116:10,13
**aggregate**
256:16
**ago**
32:4
**ahead**
12:21 54:9 176:17 193:14
199:2 219:18 244:5
**aim**
10:4
**airdrop**
190:7 191:8 194:2
**airdrops**
191:6 192:17
**al**
9:13
**allow**
12:4
**allowed**
51:23 52:8 98:15
**allows**
51:13 179:23
**alluded**
255:6
**altered**
15:8
**amended**
148:17,21 235:12,15
**amendment**
239:1
**american**
119:2,12,15,18,19
**americas**
5:6
**analysis**
163:24 164:1 185:9,18,24
186:3 187:4,10 188:8,13

[analysis - audience]

**analysis (cont.)**
194:19 195:7 197:15
200:15 205:24 206:1
215:10 216:9 221:9 225:16
226:3,8,19,21 243:17
244:13
**analytical**
250:25
**analyzes**
195:24
**announced**
194:10
**answer**
8:3 12:5 18:3,13 20:25 30:8
30:11,15 33:19 34:4,9
38:23 39:14 41:4,13 42:7
43:3,5,8,10 44:7,8,14,15
45:7,18 48:20 49:9 53:11
53:13 54:12 55:5 59:7,9
66:25 68:24 73:6,12,18
74:6,17 76:19 77:20 78:3,6
78:13 80:5,18,25 81:8,22
82:19,22 83:10 84:25 85:17
86:5,15,16 87:13,20 88:25
89:7 90:21,22 91:12,13,14
91:25 92:12,13 94:7 96:3,6
97:9,10,11,19,25 98:8,24
99:5 126:6 140:22 150:8,11
150:12 151:18,20,21
155:14,20 156:4 160:12,23
165:1 166:18 179:3 180:12
180:12 181:10 184:23
185:22 194:11 195:3 196:7
196:10 198:8 211:16
215:16,19,23 216:15,16
217:19 218:1,17,18 219:1
231:9 238:11 240:22
241:16,18 260:12 261:9,13
261:16 262:3,12
**answered**
18:1 30:7 88:12 89:10,18
90:1,19 91:5,14 92:2,4,5
93:12 94:10 95:18 97:2,9
97:18 99:4,10,19 132:19
136:17 141:8 142:5 144:6
151:16 152:9,15 153:11
154:9 167:16 180:21 181:4
182:1 183:14 195:11 207:3
210:25 216:15 219:17
220:24 221:22 223:3,9
224:3 239:22 241:4,14,23
244:4
**answering**
59:7 91:17 98:5 199:8
216:18 217:12

**answers**
7:4 11:18 12:7 53:6,17,21
54:5,20,23 55:10 81:23
82:25 159:16 175:20
**antonio**
112:25 113:2
**apologies**
166:16
**apparently**
60:5
**appear**
16:11
**appearance**
9:24
**appeared**
70:19
**appears**
105:11,17 158:7 178:8
237:5
**appendix**
121:6
**applicable**
165:25 208:4,23
**application**
70:21 147:22 192:25
201:18 211:13 226:17
230:19
**applied**
122:14,17 186:3,3 188:3,5
188:7,8
**applies**
188:13 190:5 192:11
197:23 204:14 205:1 231:3
234:21 261:25
**apply**
166:1 185:8 192:13,22
204:12 208:11 227:8
228:17,23 229:10,15,17,19
229:22 230:6,15 238:25
**applying**
185:23 245:23
**appropriate**
49:19
**approval**
178:25
**approved**
112:3
**approximately**
47:1
**area**
113:14 122:19 123:1 124:1
125:13,19
**areas**
106:18,21,21,24 124:6
**arrive**
180:2

**article**
123:22
**articles**
105:10 137:7,14,20 139:4
**aside**
31:10,11,20,21
**asked**
15:4 17:10,16 18:1 30:7
34:24 35:21 36:5 57:21
67:21,23 68:3 69:15 86:2
89:17,25 90:19 91:5 92:22
93:11 94:9 95:17 97:1,8,17
99:3,10,19,21 100:14 117:3
120:7 132:18 136:16 141:7
142:4 144:5 146:23 147:2,7
150:3,16,23,25 151:6,11,15
151:22 152:14 153:3,10
154:8 159:1 162:21 165:7
167:15 180:21 181:4 182:1
188:23 193:3,8,9 194:6
195:10,19 196:7,10 205:23
207:3 210:24 214:4,18
215:4,13,20 216:3,14,24
218:21 219:1,17,19 220:23
221:21 223:2,8 224:2 237:9
239:21 241:3,14,22 244:4
247:1 249:9,11,15,17,19
257:17
**asking**
10:17 18:4 19:5,7 23:19
26:7 27:23 42:13 49:11
50:5 51:19 52:3,7 60:13
67:9 68:20 73:21 96:21
98:2 102:25 151:8 155:24
163:16 169:5 216:8,9
218:22 222:7,9,11 241:10
**asks**
199:12,14
**asset**
130:8 132:16 133:13
134:12,18,23 135:6,9,15
136:11,14,19 142:15
144:21 185:11 192:11,13
208:4 230:21 251:4,5,6,9
251:10,11,18,25 252:3
255:7,7,8,10,14,14,16,16
256:23,25 257:5,12,22
261:19,20 262:6,7,18,21,25
263:1,11,11
**assets**
7:20 37:21 124:9 125:20
126:2 127:1,12 128:12,14
128:23 129:5,10,19 130:1
130:21,25 133:1,2 134:4
136:7 137:21,25 138:9,13
138:16,21 142:8 145:23

**assets (cont.)**
146:1,9 187:5,20 233:24
237:15 238:4,15,21 239:3,6
239:15,18 240:8,15,19
241:11 242:3 252:2
**assign**
72:19
**assigned**
157:14
**assigning**
198:22
**assignment**
40:4,10 146:22 147:25
**assist**
60:10,14 71:3 159:5
**assisted**
101:25
**associate**
36:23 61:6 113:3
**association**
119:3,12,16,17,17 120:10
120:11,20,21
**assume**
207:6
**assumption**
151:25 152:7 153:20
170:10 206:19 207:1,5,11
207:25
**assumptions**
46:18 49:15 50:5,20 51:14
52:1,17 163:11,17,20 225:9
225:14
**attached**
100:11 102:5,24
**attempted**
216:15
**attended**
128:6
**attorney**
33:4 88:11 154:1 208:16,19
213:8
**attorneys**
9:24 23:20 33:3,9,16,21
37:7,10 38:11,17 39:1,10
39:17,19,25 40:3,15,25
41:8 42:23 44:4,11,18 47:8
61:3,8,14 62:23 63:14,20
63:25 64:4,25 65:2,8,9,15
65:22 66:10 86:23 87:1,8
88:9,20 212:23 223:21
**attorney's**
207:21 209:5,17 210:11
224:23 244:15
**audience**
165:12

[august - call]

**august**
32:25 39:3,10,17 40:3,15
40:19,25 41:8 43:15,19,23
44:20 47:5 111:2
**author**
123:12,17
**authorita**
199:13
**authoritative**
147:10 155:4,11 159:17,19
160:19 165:2 184:21
188:19 189:7 194:25 196:3
199:13,15 245:21 261:7
**authorities**
187:12,13 196:2
**authority**
244:21 245:2
**authorization**
178:25
**available**
165:16
**avenue**
2:17 4:9,21 5:6 9:21
**aware**
18:11,23 121:3 124:19
134:3 137:12,18,24 138:4,7
138:12,20 139:9 142:14
143:13 167:23 187:20,21
188:12 197:6 238:3 239:10
239:16,23 240:7,12,14,24
241:5,18 242:1,10,20

**b**

**b.b.a.**
107:16 108:2
**bachelor's**
127:5
**back**
21:20 24:19 28:13 37:12
56:6 59:14 72:15 82:6 88:4
92:24 104:15 118:6,17
119:24 142:16 154:14
157:13 164:6,20 171:15
172:18,19 173:24 175:4,11
176:20 177:2 186:10
194:17 243:7 245:25 252:6
264:4
**background**
191:20
**badgering**
98:1
**bar**
119:2,12,16,16,17,19
120:10,19
**based**
19:21 94:3 153:7 154:3
171:19,19 172:24 173:11

**based (cont.)**
182:21,25 183:11,15
206:19,25 207:17 209:5
210:3 213:22 216:18 228:5
237:11,12 256:6
**bases**
210:16
**basing**
156:6
**basis**
119:2,11 124:20 156:13
157:15,21,22 175:16
179:13 183:23 188:15
191:12 199:19 200:4 209:8
**bates**
6:15,20,24 7:8,12,16,21
**beat**
202:3
**began**
70:16
**beginning**
215:1
**begins**
187:15 197:14 205:25
221:10 226:19
**behalf**
2:16 22:2,10,16 23:16
24:15 56:15,19
**behavior**
213:13
**believe**
28:14 29:3 32:6 36:21,23
44:25 48:10 72:6 101:22
102:8 103:18 105:9 111:9
112:21 113:11 119:21
121:17,19 134:18 136:22
137:6 148:5 157:12 158:13
163:22 194:18 198:6
206:15 215:25 241:9
253:13 257:10 258:17
261:24
**belong**
16:14 17:23 121:2
**bernstein**
25:9 26:21 27:8 28:6,24
29:24 30:1,23 145:10
**best**
101:15 197:1 205:18
**better**
140:2
**beyond**
102:16 191:10 208:6
230:25 231:13 234:17
256:9,18 258:21 261:3
**bill**
58:23 59:11 72:9,10

**billed**
57:24 58:4 59:10
**billing**
19:3
**bills**
242:15,17,18
**bit**
127:25 146:2 241:10
**bitcoin**
132:8,12 170:1,2,17 172:8
172:9,10
**blend**
113:6 114:4,13
**board**
111:15 232:4
**bodies**
245:24
**body**
162:16 217:7 245:17
**bond**
202:22 234:10
**bonilla**
4:20
**book**
123:18 138:2,13 186:25
187:9 188:6
**books**
138:1,5,8
**borden**
1:14 2:15 6:3,14,18 9:11
11:2,9 14:25 107:7 115:7
158:23 178:1 189:11
243:10 253:21 258:8 264:6
264:19 265:5
**bottom**
105:15
**bought**
62:8 172:14,17,20 175:14
175:24 176:9 177:13,16
179:16 180:10 181:20
182:4,16
**bound**
244:25 245:22
**boy**
54:3
**bradborden.com.**
16:3
**bradley**
1:7,14 2:7,15 4:17 6:3,13
6:18 9:11 11:9 61:16,18,19
61:22 115:7 149:7 264:19
265:5
**breach**
31:6,7 213:3
**breached**
212:24

**break**
12:12 52:20 55:19 85:9
114:21,23 118:1 168:8,21
168:21 173:4,19 242:25
263:16
**bridget**
1:24 2:20 10:4 13:11
265:24
**bringing**
149:6
**broad**
182:12
**broader**
241:10
**broker**
237:25
**brokers**
239:1,2
**brook**
16:13
**brooklyn**
6:19 11:11 16:13 34:11,16
36:1 104:4,18 109:18,21,23
110:1,5,12,15,21 112:2,9
114:14 116:5,9,16,20
**brooklynlaw.edu**
106:11
**budget**
60:23
**business**
112:16 184:14 251:13,19
251:22 257:4,11,19
**buy**
179:1,5,8,12,22 180:4,14
181:14 212:8 227:2
**buyer**
147:19 155:24 211:10,17
211:23 212:9 214:5,9,13,19
225:2,6 226:12,14 250:8
261:15,18 262:5 263:10
**buyers**
212:3,10 213:14 215:6
217:1 219:22 226:24 227:3
246:3,4,6,16 247:7 248:4
248:11,19 249:1,22 263:7
**buyer's**
246:1
**buying**
115:13 176:2,14,22,24,24
177:4 179:18

**c**

**california**
207:22
**call**
46:2 56:9 156:18

**[called - comments]**

**called**
120:12 123:13 171:23
187:13 222:6 234:23
**calls**
150:2
**capacity**
34:18 254:8
**capital**
7:15,20 251:5,5,8,10,10,18
252:2,3 254:18 255:2,7,8,9
255:14,15 256:5,19,23,24
256:25 257:5,12,22 260:25
261:19 262:5,18 263:1,11
**capture**
182:13
**care**
212:24 213:1,4,7
**case**
1:6 2:6 9:16 13:1 14:2,6
15:4,12 19:4 20:14 21:22
22:18 24:22 25:9,10 26:4
26:17 27:4,8 28:4,5,13,14
28:15,21,25 29:6,14,20
30:1,3,4,9 31:1,5,23,25
32:3,7,9,10,13,14,24 33:11
33:14 35:23 36:18 38:18
39:2,2,10,17,20 40:1,3,5,10
40:15,17,25 41:1,8,10
42:23,24 43:14,18,22 44:1
44:4,4,11,11,18 45:4,21
46:24 47:3,8,12 48:6,14
52:18 56:16,20,22 57:25
59:18,21,24 60:24 61:2,3,8
61:14,14,20 62:2 63:15,20
63:25 64:4 65:23 69:5,9
72:10 73:9 75:11 76:9,14
87:8,17 88:10,15,20 89:4
89:15,23 90:11,15 91:1,9
92:7 93:9 116:25 125:12,14
126:14,20 145:10 146:22
148:1,12,22 149:2,4,23
150:5,18 154:15 155:16
171:18 208:18,23,24 211:5
212:19 213:4,8,10 220:4,10
223:22 234:23,24 245:18
253:3 259:23 260:8,12,16
260:21
**cases**
14:5 16:6 23:24 24:20 25:3
25:12,16,22 26:3,8,12,22
27:3,24 28:2,3,7,10,12,17
212:22 227:22
**cash**
227:25
**category**
187:13

**cause**
265:7
**cc'd**
35:15,16,17 38:18 39:2
**cc'ing**
35:23
**ccr**
2:20
**certain**
98:25 101:24 179:4,4
189:24
**certificate**
202:23 234:9
**certification**
122:2
**certified**
265:10
**certify**
265:4,13
**cgsh.com**
4:24
**chair**
119:1,10
**change**
190:22 261:13,16
**char**
184:2
**character**
204:1,5 251:2,24 262:14
**charactera**
245:1
**characteristic**
177:12
**characteristics**
53:16,18 54:6,25 152:5,17
156:23,25 161:18 170:23
171:1,5,10,13,21 172:3,7
172:25 173:11,15 175:13
175:14 182:20 183:10,10
183:23 184:3 185:4,5,10,11
186:5 207:15,17 209:15
210:1,4 224:16,18
**characterization**
85:23 88:3 90:18 91:4,23
157:20 177:11 181:18
183:6 198:14 211:25 214:2
214:17 238:9 241:24 245:1
246:11 247:12,23 249:7
257:9
**characterized**
250:21 255:9
**charge**
18:24 19:7,10,13,21 20:3,6
20:9,16 261:10
**chicago**
232:4

**choose**
67:5
**chose**
67:4,15
**chris**
64:14
**christian**
1:8 2:8 5:1 61:25 62:4
149:7
**christopher**
4:6
**citation**
52:19
**cite**
176:3,7 178:14 221:11
237:19
**cited**
13:2,4 28:4 47:15 48:11,16
48:24 53:6,21 54:12 55:2
55:15 62:22 66:3,5,9 67:9
67:11 175:18,19 177:13
178:11 180:18 181:1
182:22,25 183:12,16 186:9
206:12 210:6 220:14
224:24 234:1,23 242:10,20
**cites**
153:13,15 162:17,17,22
166:6 171:22 177:4,7 196:1
227:22 232:1 244:19 249:8
**citing**
201:12
**city**
119:16 120:16,17,19,19
**civ**
1:6 2:6
**claim**
124:20 141:2 154:2 175:12
**claimed**
31:6 99:14 171:1 172:3
173:11 188:4
**claiming**
123:8 149:8
**claims**
24:24 30:3 31:6
**clarify**
17:16 27:15 160:8 173:8
**class**
110:10,11 116:23 117:4
130:20 131:2,8,11,20 132:1
132:6,7,12,13
**classes**
110:4 116:15,17,21,24
128:22
**classification**
69:25 122:24 124:13,22
125:2,7,15 127:9 147:11

**classification (cont.)**
151:24 155:5,13 159:18
160:20 165:3 184:22 195:2
217:3 243:11,13,22,24
244:8,10 245:10
**classified**
147:20 156:1 197:2 198:17
211:12,18 214:6,10,21
225:3 226:16
**classifies**
157:16 197:8 199:15 200:7
200:11 205:16,21
**classify**
147:14 155:18 196:14,21
198:9 199:20 261:11
**cle**
108:20,25 127:19,21 128:5
**clear**
187:14
**clearly**
19:19 49:23
**cleary**
4:19
**client**
56:21 252:16
**clients**
254:18 255:2
**clr**
1:24 2:20
**coach**
41:20
**code**
69:22,24 70:9,15,18,20
134:22 193:20 197:24
200:20,22 201:5,7 203:3,7
203:10,21 204:1,12,16,21
205:1,7 228:21 231:11,17
232:6 233:13 234:7,15
235:5 236:1,15 237:6,8,16
237:24 238:14 245:17,20
245:22,23 251:14
**colleague**
10:18 34:11,14 36:25
**college**
109:6,12 114:9,12 119:15
**commencing**
2:18
**comment**
93:6
**comments**
71:5 86:11,18,25 87:7,15
87:21,22,24 88:9,14,19
89:2,11,13,19,21 90:7,7
90:11,14,24 91:6,15,18
92:5 93:7,23,25 94:4,5 95:4
95:4

[commercial - crf]

**commercial**
113:15 212:5
**commission**
1:4 2:4 3:8 9:13 179:3
**commissioner**
234:24
**committee**
119:2,11
**commodities**
230:16
**common**
31:22
**communication**
38:17 39:1 48:15,23
**communications**
49:24 50:1,2,11 51:19,24
52:4,14
**companies**
18:12
**company**
18:5 115:9
**compare**
187:19
**comparing**
185:10 186:4 187:4
**compensation**
62:10,14
**complaint**
148:11,16,18,20,21 149:14
149:18,20 211:9
**complaints**
120:25
**complete**
100:2,7,15 196:24 255:21
**completely**
50:7
**computer**
265:12
**concept**
190:12
**concern**
141:13 142:7
**concluded**
264:10,23
**concludes**
197:10 200:13
**conclusion**
150:2 177:14,16 180:5
196:2 205:24 227:23
243:19
**conduct**
127:21 128:1 163:23 246:2
246:5,15,25 247:6 248:11
**conducted**
135:22 185:9,18 187:4,10
194:19 216:9 225:17 226:3

**conducting**
195:7 226:21
**conferences**
127:15
**confidential**
8:15 10:25 11:3,4
**congress**
235:12,15 236:2 237:14
238:3,14 239:5,11,17 241:1
241:20 242:2,7,11,22
**connected**
65:9,10,16 265:14
**connection**
32:19,21
**connotation**
132:24
**cons**
47:7
**consent**
178:24
**consequences**
37:14 217:3 232:25 233:3,8
233:11 263:9
**consider**
15:14 124:7,12 160:10
**consideration**
91:15 94:5 95:5 212:4
**considerations**
212:6 227:4,6
**considered**
49:22 50:11,13 51:6 52:6
87:22 90:7 91:6 161:2,25
162:9 166:12,21 167:3,12
230:21 235:10 236:3,5,13
236:14 257:4
**considers**
195:24
**consolidated**
242:18
**constitute**
149:9
**constructive**
31:11,21
**consultation**
44:3,10,18,21,23 45:3,15
46:12,15,19 47:7
**contact**
33:6,7,17,22 34:2 42:23
**contacted**
32:24 33:1,9,22
**contemplate**
238:21
**contemplates**
239:1
**contemplating**
237:14 238:4 239:6,11,17

**content**
34:22 36:14
**context**
113:21,24 134:17 135:8,13
203:9 204:6 247:19
**continue**
179:1 215:9 216:17
**continued**
4:1
**continues**
162:14 184:25 188:25
196:4
**contract**
31:7 223:12
**contracts**
116:2 149:10 222:6 235:14
**contribution**
123:24
**control**
31:9,19 85:9,10,10 209:20
**conversation**
51:5
**conversations**
34:6,8 37:2,5 51:2 53:12
78:5 150:9 151:19
**convertible**
169:11,13,18,19,25 170:2,7
170:11 172:10
**cookies**
105:17
**copies**
253:9
**copy**
189:8 201:11 258:13
**corporate**
114:2
**corporation**
202:20,22,24 234:5,9,10
**corporations**
112:17 115:20
**correct**
187:2 194:21 210:13,15
**counsel**
11:12 25:11 26:6 29:3,25
30:14 34:6,9 46:15,18
48:14,16,24 49:4,14,17
50:6,12,19 51:3 52:2,5,15
52:17,23 53:2,12 60:11,16
60:21 63:8 68:7,9,17 69:6
69:10 71:6 78:5,11 81:19
85:14 86:12 93:8,24 94:21
95:8,12,15,20 96:15,23
97:5,14,22 99:8,12,16,23
101:25 105:14 113:11
114:15,18 119:15 150:10
151:19 161:14 163:3,7

**counsel (cont.)**
182:4 214:12 221:12 224:6
264:7 265:16
**counselor**
27:1 90:4 97:24 217:11
**count**
82:6
**counterclaims**
24:24
**counting**
27:21
**county**
120:16,20 265:3
**couple**
36:13
**coupons**
203:1
**course**
127:12 128:2,5,21 129:4
251:12 257:4,19
**courses**
108:20,25 109:6,7,9,12
110:14 112:10,13 117:5
127:6,18,19,21 128:7,13
129:18
**court**
1:1 2:1 9:14 10:1,3 12:5
21:3 105:2 121:8 124:16
125:18,24 126:7,12,13
149:22 234:24 235:8
**courtroom**
11:20
**courts**
245:22
**covenant**
31:7
**cover**
140:22
**covered**
144:12
**covering**
132:6
**cows**
230:16
**cp**
108:20
**cpa**
120:11 121:10,11,12,13,15
127:4,11,12 255:22
**created**
85:20 101:17,21,22,24
**creates**
262:16
**crf**
7:10

[crimes - depositions]

crimes
210:10
cross
84:20 98:16 217:22 218:14
crr
1:24 2:20 265:24
cryptocurrencies
137:15 138:6,23 139:5
cryptocurrency
131:6,9,13 133:25 134:3,9
137:19 139:10 144:22
145:15,19 190:1,6,21
193:21,23 194:2,4
csford
4:12
csr
1:24 265:24
cues
83:15
currencies
133:25 137:9 138:3 139:13
139:19 140:5,13 141:1
142:20 147:20 169:3,16
170:5,22 172:23 187:5,17
188:9,14
currency
69:19 124:14,18,22 125:3,7
125:16 127:16,20,22 128:3
128:7,8,16 130:6,7,11,15
130:17 131:3,13,17,21
132:2,6,21 133:5,6,15,17
133:23 134:2,9,10 135:24
136:3 137:13 139:16,18
140:10,22 141:10 143:2,8
143:16,24 144:3,9,13,19
147:12,14 150:5,18 151:6
151:24 152:1,3,10,12,18,19
152:24 153:4,5,8,13,18
154:3,5,11 155:6,13,18,25
156:17,20,24 157:2,7,9,16
158:2 159:19 160:21
161:20,23 162:16,21 165:4
165:8,20,21,22 166:2,4,7
166:12,21 167:3,11 169:11
169:12,13,19,22,23,24,25
170:1,2,7,12,18 172:10
176:15 184:23 185:1,4,5,7
185:12,24 186:4 189:1,3
191:21,25 192:14,21,23
195:2,20,25 196:5,14,22
197:3,9,11 198:4,7,9,17
199:5,15,20 200:7,11,14
202:5 205:17,21 206:20,24
207:1,7,14,19,23 208:1,10
208:17 209:4,7,9,14,16,18
209:21,25 210:3,7,8 211:11

currency (cont.)
211:17 214:5,10,20 215:4,6
215:8 217:1,4 219:20,22
224:13,14,15,20,25 225:3,7
226:15 230:16,17 231:4,7
237:3 239:12 243:12,14,19
243:20,23,24 244:8,10,17
244:20 245:3,5,7 246:8,19
247:9 248:7,14,21 249:3,9
249:19 261:12,25 262:13
262:15,18
currently
109:17 110:4 119:13 120:1
121:11 235:18
curriculum
6:17
customers
257:18
cutting
105:17 218:22
cv
9:17 16:6,10 25:8 28:4 30:2
30:10,13 100:12,17,24
101:1,2,6,11,13,17,21,22
101:24 102:1,2,5,9,18,23
103:1,6,9,14,15,24 104:3
104:13 112:12 119:20,21
123:4
cvs
102:13,25

**d**

d.c.
4:22
dan
64:15
daniel
4:8
data
50:22 51:1,16,17,20 52:1,5
52:17 161:2,7 223:14,19
248:18,24 249:22
databases
16:15 17:11,23
date
38:1 39:23 40:13 43:20
44:2,19 46:25 79:22 155:23
237:13
dated
6:14 14:10
day
64:12 265:18
deal
54:20 69:18 241:11
dealer
204:2

dealing
31:8 177:4,5 232:11 262:13
deals
204:1 217:8 240:8,15
257:17
dealt
32:14
dean
34:15 35:9,10,11,22 36:5,9
36:22 37:2 38:19 39:3
42:22 61:5
dean's
35:25
debenture
202:22 234:11
debevoise
2:17 4:5 9:21 33:3 34:13
36:24 37:8 61:6 62:25 65:8
86:23
debevoise.com
4:12,13,14
december
1:15 2:19 9:3,7 147:18
211:9 237:10 265:18
deciding
212:7
decision
197:8 200:10 205:20 208:2
209:6
decisions
212:5 227:1 245:23 246:7
246:17 247:8 248:6,13,20
249:2,23
default
123:24
defendant
4:3,17 5:1 10:23 24:22 25:1
29:7 61:20 62:1
defendants
1:9 2:9 7:5 22:4,11,20 23:2
23:4,10,16,20 24:15 29:5
29:15 56:15 57:1 178:25
264:8
defendant's
25:11 26:6 29:25
define
166:3 169:18,21 202:12
212:11 245:3
defined
70:1 130:12 136:22 139:20
141:2 146:9 156:17 169:4
170:8 207:19 229:23 230:7
233:12
defines
166:7 197:16 201:15
202:10,18 204:18 207:14

defines (cont.)
224:15 244:20
defining
130:14
definitely
66:18,20 140:17,17
definition
93:22 101:1 130:16 134:16
135:3 136:24 146:4 152:18
152:20 156:21 165:21
189:4 191:1 197:11,18,23
198:5,22 200:13,16,19,25
201:3 202:6 203:8,14 204:4
204:9,17,25 205:4,25
207:18 208:9 209:13,20,25
210:3 213:1 224:17 231:6
233:17 234:2,8,19,25 235:3
235:25 236:2,19 237:2,4,15
238:15 239:12,25 240:2,5
240:19 241:7 243:18
251:17,18 257:12,22
definitions
69:23 70:18 198:20 199:4,6
204:20 205:6 233:19,22
degree
108:1,1 127:5 129:16,19
degrees
108:23,24
delivered
53:25 222:19
demonstrate
185:6
demonstrating
192:25
denied
122:15
dep
25:4
department
36:25 153:14,25 154:6
208:3,10 210:9 224:22
243:12,22 244:9,15 245:10
depends
117:12,15 262:17
deposition
1:13 2:15 8:1 9:11 12:16,19
12:24 15:1 24:4,9 25:6,25
26:8,13,16,17,20,23 27:17
27:19,24 28:8,18,21,25
31:2 32:14 57:17 62:17,20
63:12,15 65:21 107:8
145:14,21 158:23 178:1
189:11 253:22 258:9
264:10,19,22 265:5,8,9
depositions
13:3 20:4

[depreciation - email]

**depreciation**
251:20
**describe**
17:8 37:9 52:16 80:1,8
146:21 147:25 148:2
**described**
18:15 31:24 37:3 48:1,5
157:7 169:16 171:6,13
192:12 204:6 206:14 246:8
249:3
**describes**
30:2 148:5,8
**describing**
191:18
**description**
6:11 7:2
**designate**
10:24
**designation**
121:12,14
**detail**
232:19 259:11
**determination**
208:19
**determinative**
243:13,23 244:9
**determine**
24:21 178:23 208:22
224:19 245:3 247:6 248:5
251:1,23
**determined**
125:6 209:24 236:21
**determining**
239:11 261:20 262:7,25
**differ**
102:13,24
**difference**
100:16 199:7
**different**
74:14 76:25 81:11 83:4
102:9 198:20
**differs**
228:25
**difficult**
24:20,25 75:17 143:17
146:2 259:12
**digital**
37:20 124:8,9 125:19 126:1
126:25 127:12 128:12,13
128:23 129:5,10,19 130:1,8
130:21,25 132:16 133:1,2
134:12,18,22 135:6,9,14
136:7,10,14,18 137:21,25
138:9,13,15,20 142:7,14
144:21 145:22 146:1,9
166:7 185:11 187:5,19

**digital (cont.)**
191:21 230:21 237:15
238:4,15,21 239:3,6,15,18
240:4,8,15,19 241:8,11
242:3 261:19 262:6
**digitally**
170:3,19 172:11
**dilution**
123:23
**direct**
10:14 30:15 34:4 41:24
42:6 49:8,18 53:13 66:24
98:23 150:11 151:20
**directed**
49:18
**directing**
41:22
**direction**
8:3 181:13
**directly**
256:1,2
**director**
36:12
**disciplined**
122:5
**discretion**
178:24 179:5,7,12,22 180:4
180:14 181:13 182:11
**discuss**
69:5,8 137:8 138:3,6,9,15
138:23 151:23
**discussed**
53:16 114:8 145:11 207:13
210:16,21 244:23
**discusses**
215:11 232:2
**discussing**
78:4
**discussion**
37:20 127:19 128:6 172:9
227:5 234:20 259:21
**discussions**
127:20,22
**disinterested**
265:11
**disposition**
229:7 256:24
**dispositions**
7:19
**distinction**
78:18 101:5,9 144:8 161:7
**distributed**
190:20,22,24
**district**
1:1,2 2:1,2 9:14,15 207:22

**diversion**
190:23
**dividends**
54:21
**djmarcus**
4:14
**docket**
9:16
**docu**
48:10
**document**
13:17,19,24 77:13,16,17,24
80:14,22,22 81:2,5,5,11,13
81:14 82:8 83:4 86:3,4 87:2
106:1,5,6,17 107:4 114:19
157:20 168:1,5,18 178:6,10
181:18 189:16,19 209:6
221:25 222:3,4,12,13,18,21
222:25 223:6,10,13 248:25
254:2
**documents**
8:20 13:24 20:13 43:22
44:1 46:14 47:15,17 48:11
48:12,13 49:5,11,22,25
50:3,10,12 51:6 52:24
53:15 81:25 85:20 86:6
161:25 162:24 163:1,4,7
164:6,9,20,22 205:12,23
206:9 209:19 220:13,20
221:2,11,14,18,24 222:6,7
222:14 223:21,23 224:5,7
225:5
**doing**
50:23 113:2 116:4 129:19
**dollar**
191:24
**dollars**
170:4,21 172:16,22
**domestic**
181:14,22 182:14
**dozen**
98:3
**draft**
58:25 72:17 73:8 75:20,22
75:24 76:5 77:12 78:7,9,15
78:20 79:11
**drafted**
57:11 72:11 76:9 77:23
80:14 86:12 90:7 103:8
**drafting**
53:19 59:10,16 60:10,14,21
71:8,21,22,24,25 72:20
73:15 77:15 79:1,22,24
87:22 89:12,20 91:7,16
94:5 96:1

**drafts**
73:2 74:1 75:12 82:8,15
**drawing**
192:19
**drawn**
169:15
**draws**
194:10 244:20,21
**driver's**
121:25
**ds**
252:14
**duly**
10:9 265:5,10

**e**

**eadelman**
5:9
**earlier**
12:19,25 25:6 26:5,16,18
26:20 31:3 71:10 99:14
145:11 198:19 206:23
207:13 223:20 250:2 255:7
257:2,10,16
**early**
14:15 44:20 47:5
**earnest**
205:25
**easier**
147:8
**edit**
78:22,24
**edits**
71:5 79:23 80:2,9,12,22
81:3,5,10
**education**
106:18,25 107:1,13,14
108:18 153:7
**educational**
108:14 126:24
**effect**
11:19 72:17
**effective**
111:25 112:4
**either**
44:25 117:4 264:9
**elec**
106:7
**eli**
5:4
**email**
3:15 34:12,21,23 35:1,8,12
35:15,18 36:14,19,21 37:3
37:9,16,19,21,25 38:2,5,8
38:16,18,25 39:3 40:2
42:21 43:14,15,19,23

[emails - federal]

emails
39:9,16
emphasis
107:21
employed
109:17,20 110:25
employment
113:1,10 114:7
encounter
255:23
enforcement
210:10
enjoy
180:14
enjoyed
179:5 180:3
enter
9:24
entire
70:3
entities
112:16 123:13
entitled
54:21 265:7
entity
252:2
entries
59:15
equivalent
169:23
era
129:6
eric
5:15 9:18
esquire
3:9,10 4:6,7,8,20 5:4,5
estate
110:17 230:15
estates
114:3
et
9:13
euros
170:5,21 172:22
evidence
202:23 234:11,12
evidences
233:23
evidentiary
182:22 183:12 220:3
ex
106:18
exact
40:13 43:20 44:2,19 46:25
71:10 79:21 120:21 252:7,7

exactly
14:14 18:3 130:24 238:20
examination
6:2 10:14
examine
248:18,25
examined
10:9
example
54:11 95:22 104:5 125:5
170:2,18 172:9 223:10
229:3 235:24 247:16
examples
115:17
exception
156:3 227:9 228:24 229:19
230:18 251:7
exceptions
205:3
exchange
1:4 2:4 3:7 9:12 119:1
166:9 181:6,13 191:22
228:4 232:4
exchanged
170:4,21 172:16,21,22
exchanges
119:11 172:15 175:15,25
176:10,25 177:5,8,17
178:18 179:9,17,18,20,25
180:6,11,17,25 181:8,15
182:5,9,12,15
excluded
257:21
excludes
251:18,21
excuse
27:9 155:7 257:3
exercised
233:9,11
exhibit
6:13,17,22 7:4,10,14,18
13:9,18 14:23,24 15:1
100:1,6,12 101:3 103:14
104:15 105:3,7,8 107:4,6,8
107:9 112:12 121:21 137:4
142:17 143:4,19,20 158:5,6
158:7,14,22,23 177:25
178:1,5 186:13,13,23,24,24
189:10,11,15,17 253:14,18
253:20,22,25 258:4,7,9,10
exhibits
6:10 7:1
exist
82:1
existence
129:10

existing
190:24 196:21 198:8
exists
199:14 237:8
expect
62:13 147:19 155:25
211:11,18 214:5,9,20 225:2
226:15
expectations
246:2
expected
57:9
experience
101:4 184:7,8 212:2,17
213:22 256:7
experiment
246:3,15,23 247:5
experiments
246:5,25
expert
6:13 13:22 15:15,18,21,24
16:1,5,7,9,14,21 17:4,8,11
17:23 18:6,9,12 19:8,10,17
19:23,24 20:1,18 21:5,10
21:17 22:3,8,19 23:13,15
23:25 24:14 32:14 33:10
34:25 35:23 36:4,15,16,20
37:10 46:24 47:3,9,12,18
48:7 56:15,20 57:7,10,25
61:2 102:12 124:8,13,17,21
125:6,13,15,19,24,25 126:8
126:12,14,20 150:4,17
151:12 167:6 212:18 219:8
246:24 254:8
expertise
106:19,21,24 122:19 123:2
123:8,25 125:1 254:10,16
experts
17:24
explain
27:12 75:21 115:11 165:11
191:17
explained
42:16
expressly
207:23
extending
102:16
extensive
190:11
extensively
127:8
extent
34:5 50:4 51:25 52:16
53:10 74:6,18 76:19 77:20
78:3 80:6,18 81:1,9 84:23

extent (cont.)
86:16,22 87:12,20 89:8
91:12 93:2 150:8 151:17

f

fact
45:14 159:22,22 161:3,8,12
216:23 217:5,9 219:24
230:14
factor
261:18 262:5 263:3
factors
173:15
facts
43:13,18 45:3,8,11,12,19
45:20 46:4,8 49:15 50:5,19
51:14,25 52:17 159:10
160:4,10 161:10,12,13,17
162:5,8 171:18,24 214:23
215:13 216:10,20 219:5,11
220:3,9
faculty
111:9,12
failed
126:19
fair
31:8 50:7 136:6 142:19
143:7 228:5
faith
31:7
fall
112:1,1,2 116:23 117:5
228:19
familiar
37:14 61:15,24 130:13
131:5 132:23 148:22 161:7
207:5 236:18 252:9,12
254:4 257:23 259:6,20,20
familiarity
231:7 252:10,12
far
57:24 59:18,21 119:21
142:13 221:11
features
171:21 175:23,24
february
12:20
federal
69:20,25 70:1,9,14,20,22
110:9 113:20,21 122:25
124:3,8,14,17,22 125:2,16
125:19 126:1,25 127:8
129:25 130:21 131:2,9,12
135:23 147:11,15,16,21,22
149:13,19,22 150:4,17
151:1,12,23 152:20 155:5
155:12,19 156:1 158:2

[federal - form]

**federal (cont.)**
159:18 160:20 165:3
166:15,22 167:4,12 184:22
186:20 188:20 189:5 195:1
196:1,15,22 197:3,6,9,10
197:15,22 198:4,18,20
199:4,16 200:8,9,12,13
203:3 204:24 205:10,19,22
211:7,12,13,19,20 214:7,11
214:21 217:2 225:4 226:16
226:17 227:6,14 229:23,24
230:7,8,22,23 231:5 233:22
235:18,19 236:5,13,22,23
237:23 238:5,12 243:14,25
244:11 245:7,12,15,15
246:24 256:7 259:22 260:6
261:8,12 262:22 263:8
**fee**
19:21 20:2
**feel**
168:3
**fellow**
119:18
**field**
109:2,5 186:3
**figel**
22:2 65:12
**file**
9:16 20:9,11 81:11 85:11
252:2
**filed**
9:14 121:1 148:17 211:10
260:23
**filled**
252:16
**final**
15:12 81:13 86:3 87:16
88:14 89:3,14,22 90:14,25
91:8,19 92:6
**finally**
73:3 233:9
**financial**
186:20 210:10
**fincen**
153:15 224:22 244:16,19
244:22
**find**
178:18
**fine**
11:5 118:8 174:1
**finish**
12:4 78:12 85:15 145:6
215:22 218:18
**finished**
15:3 168:22 176:6 202:3
218:17,25

**firm**
22:16 113:4,5,11,15,15,19
113:25 130:13
**firms**
22:24
**firm's**
113:14
**first**
7:6 32:23 39:20,25 42:22
79:16 88:18 106:17 114:6
147:7 155:3 157:13 178:8
191:19 200:16 215:3
236:10 244:6 246:13 251:4
**five**
82:3 85:19,25
**fix**
253:19
**fixed**
117:12
**flip**
195:18
**florida**
107:22,24 121:9,12,17
**focus**
65:18,18 70:20
**focusing**
70:9,11,12 147:17 211:8
**follow**
40:16 41:1,9
**followed**
39:9 79:14
**following**
119:14 171:21 194:2
**follows**
10:10
**footnote**
47:22,23 52:25 53:6 54:12
54:16,19 55:2 148:16 163:8
172:13 175:22 176:7 177:6
177:11,21,22 178:11
180:19 181:2,5 200:24
201:2,15 202:16 206:5,5,17
224:5 232:1 234:1,23
237:20
**footnotes**
48:5,11 53:3 55:2 177:13
177:15,18,22 182:23 183:1
183:3,12,16,18,22 206:12
206:16 220:14 221:10,12
**force**
11:19
**ford**
4:6 10:20 13:11 14:1,4
15:16 16:16,22 17:5,13,19
17:25 18:7,17,20,22 19:1
19:15 20:25 21:3,7,12,18

**ford (cont.)**
21:24 22:6,13,21 23:6,11
23:17 24:2,16 26:10,24
27:7,13 28:19 29:8,16,22
30:6,14 32:1,11 33:18,23
34:3 35:3,13,19 36:7 37:22
38:20 39:5,12,21 40:6,11
40:18 41:2,11,22 42:5,9,17
42:25 43:7 44:5,12 45:5,16
46:6,20 47:13 48:8,17,25
49:6,13,17 50:2,15,18,25
51:8,12,17,22 52:10 53:8
53:22 54:17 55:7,13 56:12
57:2 58:5,11 59:1,12 60:7
61:9 63:3,22 64:8,14 65:3
65:24 66:23 67:3,13,17,22
68:5,12,16,23 70:5,25
71:16 72:13,22 73:4,11,16
74:3,12,16 75:6,14 76:1,10
76:17 77:3,8,18 78:1,10
79:6,18 80:3,10,15,23 81:6
81:16,19 82:4,10,12,17,24
83:7,20,24 84:5,12,15,22
85:6,14,17,21 86:9,13,19
87:3,10,18 88:1,16,23 89:5
89:16,24 90:4,16 91:2,10
91:21 92:8,14,18 93:1,10
93:18 94:1,8,18,22 95:9,16
95:24 96:3,6,17,25 97:7,12
97:16,24 98:7,13,23 99:2,9
99:17 100:3,8,22 101:7
102:19 103:2,10,16,21
105:13 106:13 108:15
109:3 110:6 114:10,18,25
116:7 118:3,6,22 122:21
123:10 124:10,24 125:8,11
125:21 126:3,9,16,21 127:2
127:13,23 128:9,15,17,24
129:7,13,21 130:2,9,22
131:14,22 132:3,9,17
133:18 134:5,13 135:1,25
136:8,15 137:10,16,22
138:10,17,24 139:7,21
140:7,14 141:6,14 142:3,9
142:22 143:9,11,21 144:4
144:16 145:5,24 146:11,15
146:19 147:5 148:14,24
149:15,25 150:6,19 151:2
151:14 152:13,25 153:9,21
154:7,22 156:8,15 157:3,10
157:18 159:14,24 160:6,14
161:4 162:3 163:5,12,18
164:10,24 165:13 166:13
166:16,23 167:5,14,25
168:3,9,11,14,17,20 170:13
171:3 172:4 173:2,13,23

**ford (cont.)**
174:2 176:11 177:9 180:7
180:20 181:3,16,24 182:17
183:4,19 184:18 185:13,20
186:6 187:7,22 188:10,17
193:5,12 194:22 195:9
197:19 198:13,25 199:10
199:22 201:21,25 202:14
203:4,11,23 204:7,22
206:21 207:2,8 208:5,12,25
209:10,22 210:23 211:24
212:13,20 213:5,11,19,25
214:15 215:15,21 216:2,13
216:22 217:10,18,24 218:8
218:13,16,25 219:7 220:6
220:11,22 221:7,16,20
222:16 223:1,7,16 224:1,10
225:11,19 229:12 230:1,9
230:24 231:12 232:7
233:15 234:16 235:21
236:8,16,25 237:17 238:7
238:23 239:8,20 240:10,17
241:2,13,21 242:5 243:15
244:1,3,12 245:13 246:9,20
247:2,10,21 248:9,15,22
249:5,25 250:15,22 251:15
252:4,25 253:3,8 254:12,19
254:23 256:8,21 257:7
258:3,20 259:25 260:3,9,17
261:2,22 262:10,23 263:5
263:15,19 264:5
**foregoing**
234:13 265:5
**foreign**
191:24 230:17
**fork**
190:9,12,14,17,20 191:1,2
193:21 194:3
**forks**
190:5 192:16
**form**
7:14,18 14:2 15:17 16:17
16:23 17:6 18:1,8,18,22
19:2,16 21:8,13,19,25 22:7
22:14,22 23:7,12,18 24:3
24:17 26:11,25 28:20 29:9
29:17,23 30:7 32:2,12
33:19 35:4,14,20 36:8
37:23 38:21 39:13,22 40:7
40:12,19 41:3,12 43:1 44:6
44:13 45:6,17 46:21 47:14
48:9,18 49:1,7 53:9,23
54:18 55:8,14 56:7 57:3 58:6,12
59:3 61:10 63:4,23 64:9
65:4,25 70:6 71:1,17 72:14
72:23 73:5,17 74:4,13 75:7

[form - gross]

**form (cont.)**
76:2,11,18 77:4,9,19 78:2
79:7,19 80:4,16,24 81:7,20
82:5,13,18 83:8,14,19,23
85:7,22 86:10,14,20 87:4
87:11,19 88:2,17,24 89:6
89:17,25 90:17 91:3,11,22
93:2,11,19 94:2,9,19,23
95:10,17 96:18 97:1,8,13
97:17 98:19 99:3,10,18
100:4,9,23 101:8 102:20
103:3,11,17,22 106:14
108:16 109:4 110:7 114:11
116:8 118:23 122:22
123:11 124:11,25 125:9,22
126:4,10,17,22 127:3,14,24
128:10,18,25 129:8,14,22
130:3,10,23 131:15,23
132:4,10,18 133:19 134:6
134:14 135:2 136:1,9,16
137:11,17,23 138:11,18,25
139:8,22 140:8,15 141:7,15
142:4,10,23 143:12,22
144:5,17 145:25 146:12
147:6 148:15,25 149:16
150:1,7 151:3,15 152:14
153:1,10,22 154:8,23 156:9
156:16 157:4,11,19 159:15
159:25 160:7,15 161:5
162:4 163:6,13 164:11,25
165:14 166:14,17,24
167:15 170:14 171:4 172:5
173:14 176:12 177:10
180:8,21 181:4,17,25
182:18 183:5,20 184:19
185:14,21 186:7 187:8,23
188:11,18 193:6,13 194:23
195:10 197:20 198:14
199:1,11,23 202:1,15 203:1
203:5,12,24 204:8,23
206:22 207:3,9 208:6,13
209:1,11,23 210:24 211:25
212:14,21 213:6,12,20
214:1,16 216:14 219:17
220:7,12,23 221:8,21
222:17,19 223:2,8,17 224:2
224:11 225:12,15,20
229:13 230:2,10,25 231:13
232:8 233:16 234:17
235:22 236:9,17 237:1,18
238:8,24 239:9,21 240:11
241:3,14,22 243:16 245:14
246:10,21 247:3,11,22
248:10,16,23 249:6 250:1
250:16,23 251:16 252:1,5,8
254:13,20,24 256:9,22

**form (cont.)**
257:8,23 258:13,15,18,21
258:23 259:6,8 260:4,10,13
260:18,20 261:3,23 262:24
263:6
**formed**
69:9 154:15,18 196:17,20
196:20,25
**former**
36:22,24 61:6
**formerly**
119:13
**forming**
159:5 161:21 220:17
**formulate**
161:15
**formulated**
155:15 157:1 159:11
160:11 211:5 216:11
**formulating**
20:14 162:1,6,9 207:7
216:21 259:23 260:7,11
**forum**
119:18
**forward**
69:3
**found**
175:17
**foundation**
119:19
**four**
13:7 24:13 25:3,16,20,22
27:17 28:17 102:12 145:2,7
145:13,17,22 146:7 241:15
**fourth**
24:8 25:17,18,24 27:18
29:4
**frame**
133:21
**framework**
251:1
**fraud**
31:9,11,12,19,21,22,22
32:6
**fraudulent**
31:10,12,20,21
**free**
168:4 178:23
**frequently**
162:21 165:7 188:23
195:19 215:4 216:24
219:19 249:9,11,14,16,19
**friday**
1:15 2:19 9:7
**front**
135:4 146:4 222:2

**full**
11:8 113:10,12 117:8
186:17
**fully**
41:23 202:2
**functions**
166:8 191:22
**further**
42:12,18 45:9,19 265:13

**g**

**gain**
204:2,5 229:4 250:14,18,20
250:24 251:2,6,9,10,11,24
252:2,3 256:24,25 257:1
262:14,16
**gains**
7:15 254:18 255:2 256:5,19
260:25,25 261:19 262:6
**gantner**
234:23
**garlinghouse**
1:8 2:8 4:17 61:16,18,20,22
149:7
**garrison**
5:3
**general**
12:15 37:17 45:10,10,11,13
93:20 125:1 126:7 128:12
135:17 137:21 145:23
149:1,3 156:3 165:17,25
190:13,15 192:19,21 193:1
212:2 215:11 220:2 227:7
227:13 228:11,13,20,20,22
228:25 229:2,5,9,10,14,14
229:16,18,21 230:5,11,13
230:14,19 233:21 250:11
251:7,8
**generally**
59:8 113:23 155:24 161:11
176:24 208:21 212:17
213:21 228:4 229:6
**getting**
59:8 98:8
**give**
26:17 38:22 42:6 72:24
81:17 105:1 115:17 142:1
145:14,18,21 146:8 186:17
187:24 189:8 202:3 223:10
228:4 237:9 247:16 248:1
252:25 253:9 259:25
**given**
24:9,13 25:25 27:19,21
50:6 136:4,5 259:10
**giving**
11:14 35:24 128:2

**global**
172:14 175:15,25 176:9,25
177:5,7,17 178:18 179:9,16
179:18,20,24 180:5,11,17
180:25 181:6,7 182:5,8,12
182:14
**go**
12:21 21:20 24:19 28:13
37:12 42:17 54:9 55:21
59:14 72:15 82:6 88:4
113:12,13 119:20 154:14
161:17 162:20 171:15
172:18,18 176:17,17,20
177:2 186:10 193:14 199:2
215:1 218:4,9 219:18
228:17 233:25 244:5 248:4
251:1 252:6 256:15 259:11
261:24
**goal**
255:13
**goes**
104:15 111:13,15 119:24
**going**
10:24 34:3 41:18 43:8,9
49:8 55:19 57:18 66:24
68:19 69:2 83:17 95:24
98:5,11 111:8 114:19,20
118:11 119:4 127:17
133:21 138:1 142:16
146:18 147:8 157:13 164:6
164:20 173:3,22 174:5
175:11 194:17 196:11
228:8 240:1 243:3 245:25
250:11 251:7 252:22,23
253:7 261:6
**good**
9:5 10:16 31:7 114:21
122:3,4 173:4
**gottlieb**
4:19
**govern**
208:3 229:6
**government**
202:24
**governs**
237:25 245:11
**graduate**
129:2
**graduated**
114:9,12
**great**
174:2
**gross**
7:10 193:19,25 227:18
228:1,5

[grounds - indicating]

**grounds**
67:2
**group**
212:10
**guerrier**
3:9 6:4 10:13,15,16 11:5,7
13:9,15,16 14:3,22 15:2
17:15 19:19 24:6 27:5,9,14
30:17 40:21 41:18 42:1,8
42:11,20 43:12 49:10,16,21
50:9,17,21 51:4,10,16,18
52:3,21,22 55:18,21 56:7,8
56:11,13 60:9 67:1,7,16,20
68:1,10,14,18,25 69:4 73:1
78:14 81:24 83:11,22 84:3
84:7,14,19 85:2,3 92:10,16
92:20 96:8 98:4,10,14,18
99:1,6 104:12,23,25 105:4
105:5,23,25 107:3,10,11
114:22 115:1 117:25 118:5
118:8,18 133:10,12 146:20
158:12,19,25 169:1 173:6,9
173:18,21,25 175:6 178:3
189:13 199:24 200:1
201:24 215:18,25 216:7
217:13,20 218:2,11,20
219:10,16 221:17 225:23
242:24 243:9 252:21 253:2
253:5,13,23 258:5,11,12
260:5 263:13,18,21 264:12
**guerrierp**
3:15
**guess**
134:19
**guidance**
133:22,24 147:10,13
153:15 155:4,11,18 156:18
157:16 159:2,17,20 160:19
162:14,14 165:2,11,12,19
166:20 167:2,10 170:24
171:11 184:21,24,24
188:19,25 189:7 194:7
195:1,4,5,14,15,22 196:3,3
196:13,21 197:5 198:8
199:14,15 200:7 205:16
217:2 219:23 231:3 244:19
261:7,11
**guidances**
165:15 199:20
**guide**
123:14
**guideline**
6:22
**guides**
165:9

**h**

**half**
64:1 173:24,25
**hamilton**
4:19
**hand**
104:25 158:4 252:22
265:17
**handed**
13:17 105:6 158:4 178:4,7
189:14 253:24 254:5
**hands**
262:18
**hansen**
22:2,16 33:4 56:19,23 57:5
86:24
**happen**
201:10
**happened**
111:12,17,24 235:7
**happens**
85:9 111:14 232:21
**happy**
37:7 38:10 141:17 206:2
**hard**
23:22,23 24:19 95:19,19
141:17 190:5,9,12,14,17,20
191:1,2 192:16 193:21
194:2 247:14
**harris**
114:4
**harrison**
113:6 114:13
**head**
12:8 21:15 23:9 257:25
258:1,22
**heading**
191:20
**hear**
93:3 100:5 133:9 135:8
**heard**
135:5,14 139:25
**held**
2:16 234:24 250:13,19
251:12,19,21 257:3,11,18
263:2
**help**
161:14 255:10
**helpful**
204:10
**helping**
255:12
**helps**
18:6,9
**hereunto**
265:17

**high**
107:12,14 227:12
**highly**
8:15 11:4
**hired**
22:9 125:12,15 130:5
212:22
**hmm**
28:23 29:1 30:25 54:14,22
69:17 78:19 96:5 100:13
104:2 107:19 123:15
136:21 140:20 142:18
143:6 155:1 160:22 202:11
251:3 258:25 259:9
**hold**
59:1 134:16 179:1,6,12,22
180:4,15 181:14 201:21
**holder**
250:19
**holders**
54:20 178:21 180:13
**holder's**
250:21
**holding**
229:7 262:21
**hour**
19:12 63:21 64:5 114:20
173:24,25
**hours**
58:1 59:20,22 64:1,2
117:10,13,14,19,22,22

**i**

**idaho**
107:16,20
**idea**
85:11 259:17
**identification**
15:1 107:8 158:24 178:2
189:12 253:22 258:9
**identified**
53:2 162:5 182:21 183:11
183:24 184:3 188:22
209:20 210:2,7,18 211:1
219:21 224:5
**identifies**
106:21 148:16 154:11
195:19 200:25 212:16
**identify**
24:25 36:19 51:25 52:24
54:24 156:22 172:2 186:11
200:24 203:17 206:6
221:18
**identifying**
45:20 161:25
**implied**
31:7

**important**
260:16 263:2
**improper**
69:1 83:17
**inactive**
121:13
**inappropriate**
41:21
**include**
91:8 93:15,17,21,24 94:4
94:12 100:2,7 104:6,8,13
104:17,20 142:13,14
173:10 177:7 183:2,17
204:16,17 205:4 235:14
239:25 240:4 241:6 249:22
250:3
**included**
45:20,22 91:19 92:6 93:8
93:14 99:22 103:14,19,24
164:1 206:10 227:18,21
**includes**
101:3 142:20 197:11
200:14 213:2 233:23 234:3
234:8 249:16
**including**
121:5 171:18 237:15 239:6
249:21
**income**
7:10 21:5,10,11,17 69:20
69:25 70:2,10,14,20,22
110:9 112:17 113:20,22
122:25 124:3,14 125:2
127:8 147:11,15,17,21,22
149:20 151:23 152:20
155:5,12,19,19 156:1
159:18 160:20 165:3
184:22 189:5 193:19,25
195:1 196:1,15,23 197:3,7
197:9,10,15,22 198:5,18,21
199:4,16 200:8,9,12,13
204:24 205:19,22 211:7,12
211:14,19,20 214:7,11,21
217:2 225:4 226:16,18
227:7,14,18,21 228:1,5
231:5 233:22 237:23 245:7
261:8,13 263:8
**indebtedness**
202:23 233:23 234:11
**independent**
34:7 55:12,15 154:4
**index**
6:1 8:1 9:16
**indicated**
3:1 250:2
**indicating**
20:22

**[indiscernible - laws]**

**indiscernible**
84:20 98:16 217:22 218:14
**individual**
35:7 112:17 264:8
**individually**
176:21
**individuals**
33:2
**inference**
169:15
**information**
15:6 45:11 53:15 54:5
102:16 239:2 255:17 259:2
259:3
**initial**
44:3,10,17,21,23 45:3,14
46:2,12,15,18 47:6 232:22
**initiate**
33:7
**initiated**
33:5
**inquire**
42:23
**inquiry**
40:16 41:1,9 208:22
**inserting**
83:15
**instruct**
43:10 48:19 84:2,8 92:13
95:25
**instructing**
68:24 84:4
**instruction**
33:24 49:2 59:13 69:2 74:5
75:15 76:12 80:11 83:25
85:1 87:5 150:20
**instructions**
84:18 259:17
**instruments**
186:20
**interest**
115:20,22 123:23 184:11
202:25 234:10,12
**interested**
265:13
**internal**
69:21,24 70:8,15,17,19
134:22 193:20 200:20,21
201:5,7 203:7,10,21 204:1
204:20 205:7 228:21
231:11,17 232:6 233:13
234:7,15 236:1,15 237:5,7
237:8,12,16,24 238:13
245:16,20,21,23 251:13
**interprets**
245:19

**interrupt**
78:12 218:12
**interrupted**
217:25
**interrupting**
30:21 217:14,16,19 218:23
**interview**
250:5,8
**introduced**
242:16,17
**introduction**
37:6 38:10
**investment**
149:9 250:13,20
**investors**
25:10 26:21 28:6,24 29:24
30:24
**invoice**
58:8,10,13,21 59:15 71:10
71:19 72:16
**involved**
255:17
**involvement**
61:1
**involving**
232:14
**irs**
6:23 7:14,18 130:12 132:22
133:22,24 139:19 141:2
156:19 157:23,24 159:2
162:13 165:2,6,10,15 166:3
166:11,20 167:2,10 169:18
169:21 170:8,17,23 184:25
188:25 194:8,9,13 195:14
195:14 197:2 205:15 215:5
216:24 219:23 231:3
244:25 252:3 254:21 255:3
256:6,20 257:1,23 261:1
**irs's**
130:16 157:16 162:15
165:12 175:8 184:25 196:4
**issue**
29:14 149:13,22 189:7
208:24 213:3,7
**issued**
122:6 147:10 155:4,12
156:19 159:17 160:19
165:2 184:21 188:19 195:1
196:3 202:24 205:16 215:5
216:24 232:23 233:4
244:21 261:8
**issuer**
232:17,24
**issues**
30:3 32:7 36:16 194:5

## j

**j.d.**
107:21 108:8
**january**
12:20
**jbonillalopez**
4:24
**jersey**
2:21
**job**
1:25 112:6,8 114:6 117:8
**jorge**
4:20
**judge**
126:20
**judicial**
197:8 200:10 205:20
**justice**
154:6 208:3,10 243:12
244:9
**justice's**
243:22 245:10

## k

**kansas**
109:13 110:24 113:12
**keep**
45:18 81:22 83:18 133:8
146:18 199:25 228:8
247:24
**keeping**
81:21
**kellogg**
22:1,16 33:4,4 56:19,23
57:5 86:23
**keyboard**
72:5
**keyes**
186:15,18 187:15
**kind**
32:17 58:20 113:1 115:2,8
252:1
**knapp**
186:15,18 187:15
**knew**
33:16,22 34:24 35:22
**know**
12:2,13 14:14 21:14 23:9
28:9 29:20 30:12 33:16,21
34:1,5,22 35:17 36:4 41:15
43:3,4,7,20 44:19 48:2 53:1
53:5 54:1,1,2,2,4,15 56:24
57:4,6,8,18,20 58:9 59:17
59:20 61:7,12,12 63:10,13
64:11 65:10,14,15 66:19
71:9 72:8 77:22 78:8 82:2,7

**know (cont.)**
83:15 90:20 93:15,21 94:24
94:25 95:2 96:21 98:21
100:18 101:9,23 103:4,7,23
111:9 116:14 117:22 120:4
120:5,14,21 126:18,19
128:19 129:9,12 130:24
133:5,16 134:7,12,15,15
136:18 143:17 149:21
150:3,16,22,23 151:11
153:12 161:6 167:17
172:16 181:9 182:10
187:14,18 190:2 195:23
201:6 207:4 208:8,18 209:2
215:7 222:5 228:8 231:8,10
233:25 236:3,12 237:14
239:4 241:16 244:24 245:9
255:19 256:5 257:24,25
258:18,24 259:13,14,16
262:20,21 263:20
**knowledge**
101:16 135:20 178:24
184:7 190:11 197:2 205:18
254:15

## l

**labs**
1:7 2:7 4:3 9:13 22:2,17
45:25 46:4 56:19 149:6
**language**
94:15,20 105:15 127:18
192:1,8
**lapse**
233:1
**lapses**
233:5
**larsen**
1:8 2:8 5:1 61:25 62:4
149:7
**law**
6:19 16:11,12,13 22:16,24
31:22 34:11,16 36:1,2,3
104:4,18 105:9 106:10
107:22,24 109:18,21,23
110:1,5,12,15,21,23 111:1
111:4,9,22 112:9,11,23
113:3,5,15 114:6,14 115:4
115:8 116:5,16,20
120:20 122:23 123:22
133:22 147:17 197:15,22
199:4 204:24 211:8 217:7
237:13 243:25 245:15,17
245:18,24 246:24 247:25
256:1,2,2 262:22
**laws**
166:15,22 167:4,7,13,18,20
205:10 208:4 229:24,25

[laws - meeting]

**laws (cont.)**
230:6,7,8,22 231:8 236:4
236:14,19,22 238:13
243:14 244:11 245:12
256:7
**lawyers**
255:4
**leases**
115:25
**leave**
112:6 114:19
**leaving**
113:12
**ledger**
190:20,22,24
**left**
111:7,18,19,21 112:4,8
113:10
**legacy**
190:23
**legal**
9:18 150:2 184:11 213:9,17
**legislate**
242:6
**legislation**
134:21 135:11,14 136:19
136:23 146:5 238:3 239:5
239:10,17,24 240:7,13,14
240:25 241:5,11,19 242:1,7
242:9
**level**
227:12 228:9
**liability**
31:10,19 123:13
**license**
121:16,20,24,25 122:7,15
**licenses**
121:5,7,22,23 122:10
**light**
15:7
**limit**
78:5
**limitation**
182:3
**limited**
104:19 123:13 155:23
156:24 169:3 170:7 181:14
181:22 252:11
**line**
8:4,11,16,21 168:23 256:15
**linsenmayer**
5:5
**lisa**
4:7 64:14
**list**
105:10 106:18,24 107:1

**list (cont.)**
161:17
**listed**
13:25 17:3,12 18:5,14,16
49:12,23 52:24 54:16 55:11
55:11 112:12 118:20 121:5
121:20 137:1,3 142:17
145:1 154:24 156:25 163:8
175:12 185:6 256:16
**listening**
217:15
**lists**
16:6,20 119:21 152:4
**little**
127:25 146:2
**lived**
109:13
**ll.m.**
36:12 107:23 108:10,14,19
108:23 127:7 128:20,21,22
129:5
**llc**
25:10 26:21 28:6,24 29:25
30:24
**llcs**
110:17 123:7,9,14,19,24
124:4
**llp**
4:5 5:3
**llps**
123:14
**lombardozzi**
1:24 2:20 10:4,5 265:24
**long**
47:6 63:19,24 64:3 109:20
110:25 114:1 118:2 246:12
**longer**
173:22
**look**
21:21 24:19 28:14 30:9
36:5 37:12 53:5 54:15 55:4
59:14 72:15 104:3 123:4
162:16 165:10 170:16
172:13,19 177:2 191:19
200:18,23 201:14 204:10
207:20 209:16 212:1
227:11 230:11 231:18
232:1 233:17,25 234:6,19
234:22 244:18,18 249:13
251:17 252:6 259:1,13
261:6 262:1
**looked**
69:21,22 104:4 148:20
200:20
**looking**
36:15,19 37:10,13 105:19

**looking (cont.)**
193:7
**looks**
105:14 119:21 123:20
200:16
**lopez**
4:20
**lose**
85:10
**loss**
229:4 251:24 262:14,17
**losses**
7:15 203:2,7,9,14 204:2,6
**lot**
123:5 142:24 173:22
**lps**
123:14
**lunch**
173:5
**luncheon**
174:7
**lzornberg**
4:13

**m**

**m.b.a.**
107:20 108:6 255:25,25
**mail**
4:12,24 5:9
**maintains**
105:10
**majored**
107:17
**makers**
178:22
**making**
81:3 101:5 151:25 152:6
153:6,20 167:23 212:5
227:1 238:4 246:6,17 247:8
248:6,13,19 249:1,23
**malpractice**
212:22
**manipulation**
31:9
**manner**
263:1
**marcus**
4:8 64:15
**mark**
3:10 10:18 14:23 107:4
158:13,18,20 252:23 253:6
253:12 258:3
**marked**
8:15 11:3 14:25 107:7
158:21,22 177:24,25 189:9
189:10 253:15,21,24 258:8

**market**
31:9 178:22,22 228:5
**master's**
255:25
**mater**
68:13
**material**
15:19 68:3
**materials**
62:22 66:2,5,8,12,14,18,19
66:20,21 67:4,8,10,14,15
67:24 68:7,8,21 103:25
171:18,20 186:9 242:21
**math**
109:8
**matter**
9:12 126:8 140:13 141:5
142:7 144:2 192:15 211:10
212:2 233:21 260:22,24
262:20
**matters**
247:1
**mean**
14:2 17:8 19:17 20:11 24:4
40:19 49:10 56:25 57:4
63:5 65:4 68:20 71:22,25
75:22,24 77:22 93:14,20
94:12 95:20,21 96:19 97:3
108:20 115:11 117:17,17
117:18 123:12 124:4 128:1
135:16 140:6 160:8,16
168:11 190:18 198:11
206:2 211:22 220:5 221:23
222:11 223:19 225:21
235:23 246:23 247:5,24
248:1 250:18
**meaning**
93:16 190:9 191:8 197:12
**meanings**
222:23 223:4 247:15
**means**
16:19 125:23 126:11 133:3
134:25 136:14
**media**
55:25 56:5 118:11,16 174:4
175:5 243:3,7 263:24 264:3
264:17
**medium**
166:8 191:22
**meet**
39:19 63:14
**meeting**
63:19,24 64:3,7,11,17,19
64:23 65:1,22 66:11,15,20
66:22 67:18,25 68:2,4,6,17
68:22

**[member - object]**

**member**
119:13 120:1,1,3,11
**memberships**
118:19
**mention**
166:11
**mentioned**
46:1,1,3,9 167:19 195:17
**met**
39:25 62:22 63:16,17,17
64:13 66:9
**methodology**
188:2,4
**mind**
120:24 146:19
**mine**
96:20,22 97:3,20
**minimum**
245:6
**minute**
242:25
**minutes**
118:4 173:3 226:5
**mischaracterizes**
79:8,20 99:18 194:24
209:12
**misrepresentation**
31:8
**missed**
236:10,10
**mm**
28:23 29:1 30:25 54:14,22
69:17 78:19 96:5 100:13
104:2 107:19 123:15
136:21 140:20 142:18
143:6 155:1 160:22 202:11
251:3 258:25 259:9
**moment**
60:5
**monday**
110:10
**monitor**
9:9 55:24 56:4 118:10,15
174:4 175:3 243:2 263:23
264:2,16
**month**
47:2
**morning**
9:6 10:16
**motorcycle**
122:2
**move**
69:2 196:6 216:6
**moved**
113:12

**movements**
12:9
**multiple**
199:3 204:19 205:6 232:13
237:5 242:17 247:14
**muted**
60:6

**n**

**name**
9:18 11:8 34:14 35:7,24
61:15,17,24 65:14 80:13
113:5 115:5 184:14 186:17
**named**
62:1 265:9
**names**
28:9 86:21 120:22
**narrowly**
230:18
**nature**
56:17 59:6
**necessarily**
106:23 245:22
**necessary**
255:15
**need**
12:12 13:12 27:5,11 167:1
167:25 168:5 177:2 218:2
218:12 253:3 260:19
**needs**
92:11
**negligent**
31:8
**neighborhood**
71:12
**netted**
256:17
**network**
210:11
**new**
1:2 2:2,17,18,21,21 3:8,13
3:13 4:10,10 5:7,7 9:15,22
9:22 11:11 119:15,16
120:14,15,16,16,17,18,18
120:19,20 121:7 193:23
194:2,3 264:20,20 265:1,3
**news**
135:17
**nice**
146:3
**nine**
161:18
**nn**
25:9
**nnn**
25:10 26:21 28:6,24 29:24
30:23

**nods**
12:8
**nolan**
5:15 9:18
**nonverbal**
12:8
**northern**
207:22
**notary**
2:20
**note**
202:22 234:10
**notice**
2:22 6:22 156:18,19 157:23
157:24 158:1,7,9,13 160:23
162:11,17 164:12 165:6,16
166:4,11 167:19,21 169:2,4
169:9,10,17,19 170:6 172:8
175:8 185:7 188:22 192:2
192:12,20,20,24 194:8,11
194:13,16 195:13 199:19
207:14,19 209:14 210:1
224:15,17 237:3 240:2
243:17 244:18,20 249:15
249:21 250:3 261:9,25
**noun**
78:15
**number**
6:11 7:2 9:16 25:19 56:5
58:1 118:11,17 123:20
174:5 243:3 252:7 253:1,14
263:24 264:3,17
**numbers**
178:15
**nw**
4:21
**nyu**
36:12

**o**

**oath**
11:15
**object**
14:1 15:16 16:16,22 17:5
17:25 18:7,17,22 19:1,15
21:7,12,18,24 22:6,13,21
23:6,11,17 24:2,16 26:10
26:24 28:19 29:8,16,22
30:6,19 32:1,11 33:18 35:3
35:13,19 36:7 37:22 38:20
39:12,21 40:6,11,18 41:2
41:11 42:25 44:5,12 45:5
45:16 46:20 47:13 48:8,17
48:25 49:6 53:8,22 54:17
55:7,13 57:2 58:5,11 59:3
61:9 63:3,23 64:8 65:3,24
70:5,25 71:16 72:13,22

**object (cont.)**
73:4,16 74:3,12 75:6 76:1
76:10,17 77:3,8,18 78:1
79:6,18 80:3,15,23 81:6,20
82:4,10,12,17 83:8,13 85:6
85:21 86:9,13,19 87:3,10
87:18 88:1,16,23 89:5,16
89:24 90:16 91:2,10,21,22
93:1,10,18 94:1,8,18,22
95:9,16 96:17,25 97:7,12
97:16 98:19 100:3,8,22
101:7 102:19 103:2,10,16
103:21 106:13 108:15
109:3 110:6 114:10 116:7
118:22 122:21 123:10
124:10,24 125:8,21 126:3,9
126:16,21 127:2,13,23
128:9,17,24 129:7,13,14,21
130:2,9,22 131:14,22 132:3
132:9,17 133:18 134:5,13
135:1,25 136:8,15 137:10
137:16,22 138:10,17,24
139:7,21 140:7,15 141:6,14
142:3,9,22 143:9,11,21
144:4,16 145:24 146:11
147:5 148:14,24 149:15,25
150:1,6 151:2,14 152:13,25
153:9,21 154:7,22 156:8,15
157:3,10,18 159:14,24
160:6,14 161:4 162:3 163:5
163:12 164:10,24 165:13
166:13,17,23 167:14
170:13 171:3 172:4 173:13
176:11 177:9 180:7 181:3
181:16,24,25 182:17 183:4
183:19 184:18 185:13
186:6 187:8,22 188:10,17
193:5,12 194:22 195:9
197:19 198:13,25 199:10
199:22 201:25 202:14
203:4,11,23 204:7,7,22
206:21 207:2,8 208:5,12,25
209:10,22 210:23 211:24
212:13,20 213:5,11,19,25
214:15 216:14 219:16
220:6,7,11,22 221:7,16,20
222:16 223:1,7,16 224:1,10
225:11,19 229:12 230:1,9
230:24 231:12 232:7
233:15 234:16 235:21
236:8,16,25 237:17 238:7
238:23 239:8,9,20 240:10
241:2,13,21 243:15 245:13
246:9,20 247:2,10,21
248:10,15,22 249:25
250:15,22 252:4 254:12,19

[object - paper]

**object (cont.)**
254:23 256:8,21 257:7
258:20 260:3 261:22
**objected**
88:11
**objection**
10:22,23 27:10 30:19 33:23
39:6 41:20 42:14 59:12
73:11 74:16 75:14 80:10
83:12,21 84:11,13,17 90:5
99:2,9,17 128:15 150:19
163:18 167:5 180:20
185:21 216:22 240:17
242:5 244:1,4,12 249:5
251:15 257:8 260:9,17
261:2 262:11,23 263:5
**objections**
7:5 83:23
**objectives**
175:21
**obtain**
108:3,5,8,10 121:15
**obviously**
57:16
**occur**
189:25
**occurred**
232:13
**occurs**
190:21 232:22
**october**
14:11,20,20 101:18,19
102:3,7 103:5
**offer**
146:23
**offered**
149:8
**offering**
15:12 201:18
**offers**
149:10
**offhand**
36:14
**office**
3:8 207:22 209:17 224:23
244:15
**offices**
2:16 9:20
**office's**
210:11
**oh**
21:2 118:3 225:13
**okay**
11:6,14,17,22 12:1,12,15
12:18,24 13:3,8,21,23 14:8
14:12,16,21 15:6,11,14,20

**okay (cont.)**
16:14 17:1 18:13,24 19:6
19:21 20:3 21:16 22:10
23:1,3,24 25:12,19 26:1,7
26:14,22 27:13,20 28:7,11
28:17 29:6 30:1,4,23 31:4
31:23 32:5,8,23 33:5,8 34:1
34:10,20 35:6,25 36:17
37:1,16 38:1,4,12,16,25
40:2,14 41:7 42:21 43:11
43:21 44:23 45:2 46:14,17
46:23 47:1,11,17 48:4 49:4
52:10,21 53:4 54:7 55:17
55:20 56:7,14,24 57:6,9,14
57:18,21,24 58:9,15,18
60:1 61:1,15,21,24 62:24
63:10 64:6,16,23 65:20
66:4,8 67:7 68:15,25 69:12
71:20 72:25 73:22,25 74:9
76:15,22,25 77:6,12,15
78:8,9,17,23 79:3,23 80:13
80:21 81:4,12 82:3,15 85:2
86:2,11,25 87:15 88:13
89:1,9 90:12 94:15 95:6
96:2 99:21,25 100:16,19
101:5,10,17,21 102:2,14,17
103:13 104:16,22 105:12
106:1,4,9,15,16,22,25
108:5,13,21,25 110:14,21
111:19 112:5,10,13 114:17
114:25 115:5,17,19,21
116:15,25 117:7,14,16,20
117:24 120:13,25 121:4,15
122:1,3,9,14,18 124:2,7
126:7 127:11 128:5 129:15
130:18 131:1 132:7,15
133:4 135:5,8,18,22 136:6
136:12,12 137:7 139:12
140:3,24 141:12,21 142:12
142:16 143:4,15,19 144:1
144:24 145:13 146:7,14,21
147:1,24 148:7,19 149:13
149:21 151:8,25 152:22
153:6,16 154:2,12,16
155:11 156:5,14 157:6,21
159:10,21 160:3,18 161:9
161:13,24 162:8 163:10,23
164:1,6,18 165:1,10,18,24
167:6,8,9 168:2,19,25
170:10,25 171:8,12,24
172:1,6 173:1,17,20 175:11
175:22 176:23 177:6,20
178:10,14,16,20 181:12
182:20 184:1 185:25 186:6
188:15 189:8 190:25
191:11 192:8,15 193:15,17

**okay (cont.)**
194:17 195:6 196:6,16
197:12,21,25 199:7,18
200:6 201:17,25 202:4,13
203:16,20 204:4 205:2,12
206:12 210:20 211:2,22
212:25 213:3 214:23
215:21 216:8,13 217:15
219:7,11 220:16,19 221:14
222:2 223:5,11,14 224:7
226:2,7,11,21 228:2,19
229:21 230:21 233:20
235:2 236:20 238:2,17
239:14 240:20,24 241:9
242:9,23 243:21 245:9
250:5 252:1,20 254:4,8,14
254:17 255:1 256:5,13
257:2,13,20 260:22 262:9
263:3,12,15
**once**
63:16 74:10
**ones**
13:6 122:17 141:22,23
**ongoing**
98:20
**open**
178:22
**opine**
246:1 247:1
**opining**
209:19
**opinion**
16:1 20:14 56:20 99:21
146:23 147:3 150:4,17,25
151:7,12 152:2,11,19,23
153:3,4,7,19 154:4 155:15
155:21 156:23 157:1,5,15
157:22,25 158:10 159:6,11
159:23 160:4,11 161:15,18
161:19,22,22 162:1,7,9,25
163:2,4,11,21,24 164:7,9
164:14,21,23 170:25
173:12,16 184:16 185:16
185:17 186:1 188:16
191:12,14 192:9 194:20,20
195:8 196:10,17,20,20,24
197:13 198:1,3,12,16,23
199:9,19 200:5 201:17,20
202:5 204:11,11 205:8,13
206:10,18,19,25 207:7
208:2 209:8 210:17,19,21
211:4,23 212:18 213:9,13
213:18,21,23 214:8,13,18
214:24 215:14 216:10,21
219:6,9,12 220:4,18,21
221:1,3,4,15 222:15 223:15

**opinion (cont.)**
223:24 224:8,9 225:10,15
225:17 226:4,9 236:20
237:2,9,10,11 243:10 244:7
245:25 259:23 260:7,11,13
260:20,23,24 261:5,17
262:4 263:4,7
**opinions**
15:8 69:8 154:15,17,24
155:2 260:16
**oppenheimer**
113:6 114:4,13
**option**
232:15,16,23,24 233:1,4,4
233:5,6,8,9,11,12 234:25
**options**
116:3 231:10,16 232:3,4,5
232:11,12,14 233:24
234:14 235:3,8,14 236:3,12
**ordinary**
251:12 257:3,19
**organization**
102:1,8
**organizations**
118:20 119:14,25 120:7
121:2 122:6
**originates**
245:16
**outcome**
265:14
**outside**
34:8 57:10 60:11,16,20
185:24 186:1 237:23 254:9
254:16
**overrides**
230:19
**overview**
227:12
**owns**
193:22

**p**

**p.m.**
2:19 118:16 174:4 175:3
243:2 263:23 264:17,23
**page**
6:11 7:2 8:4,11,16,21 25:8
47:22 55:2 105:16,18,18
106:17 186:12,12,22,23
190:19 226:19 227:11
228:16 230:12 249:13,13
**pages**
6:15,20,24 7:8,12,16,21
**paid**
59:17
**paper**
222:2,13,19

[para - profession]

para
178:11
paragraph
118:25 148:4,6 152:4,17
153:13 154:20,24 156:22
156:25 157:15 159:1,6,12
159:16 160:4 161:15,17
162:1,20 164:5,8,18 170:16
171:2,6,7,13,16,17 173:10
175:11 177:1 179:20,21
182:15,21 183:11,24 184:4
184:16,20 185:6 188:16
191:14,15,18 194:17,20,21
195:4,16 196:18 197:13,14
198:6 200:5,23,24 206:1,18
207:16,20 210:2,6,14,17,19
210:22 212:1,15 215:2
216:11 219:14,21 221:10
222:15 224:16,18,21
225:10 226:20,22,23
230:12 231:18,19,21,24
233:19 244:23 246:18
249:4,13
paragraphs
54:16 180:17 181:1 206:13
paralegal
5:14
part
14:15 31:16 66:7 71:20,23
95:6 97:6 135:19 157:5
220:25 221:1 236:10
238:12,13 244:6 246:13
particular
18:25 69:24 123:1 139:3
205:3,4 244:6
parties
265:15
partners
112:19
partnership
110:16
partnerships
110:18 112:18 115:22
123:7,9,19,25 124:4
parts
76:25 77:6,10
party
21:22 22:9 23:14 24:21
45:21 244:22
pascal
10:16,20
pascale
3:9
paul
5:3

paulweiss.com
5:9,10
pause
86:1 168:24 175:9 178:19
pending
17:14,17 92:9,11 238:3
239:4,16,23 240:7,12,14,25
241:5,10,19 242:1,7,11,22
pennsylvania
4:21
people
9:25 61:13 115:13 212:10
percent
21:17
percentage
21:9,11 22:18 23:3 72:19
116:12 141:12 142:1,6
perfectly
207:4
period
102:16 147:18 211:8
permanent
190:23
permitted
41:24 84:1
person
31:10,19 39:20 40:1 44:21
64:22 184:12 227:16,19,25
233:3,4 265:11
personal
61:21 62:3
perspective
147:16 211:7
persuasive
245:6
phone
10:19 45:1
place
176:1 182:13 265:8
places
69:21 70:7,13
plaintiff
1:5 2:5,16 3:4 24:21 25:1
28:15 31:24
plaintiffs
22:5,11,19 23:2,5,21 29:5
plaintiff's
7:4 29:3 54:12 175:20
please
10:6 11:8 12:2,4,7 14:23
20:24 27:10 30:8,13,20
31:14 41:19 78:5,11 81:22
83:10,18 84:24 85:15 92:21
105:2 107:4,12 155:8
158:13,19,20 187:24 218:5
226:1,7 230:4 258:6

plimpton
2:17 4:5 9:21
pllc
115:7
point
30:12 47:20,21 53:20 97:25
99:12 179:19 255:16,19
259:11
policy
112:15
political
202:25
portion
8:15 88:5
posed
247:20
position
162:15 185:1 189:1,6 196:4
possible
17:3 229:21 230:5 235:17
post
107:12,14
posted
104:3
postgraduate
108:18
practice
112:24 113:14 114:16
115:2,4,6 116:4,10,13
117:7,11 129:24 252:15
254:17 255:22 256:2,3
premarked
13:17 105:6 158:5 178:4
189:14,17
prep
67:6
preparation
66:7
prepare
14:8 62:16,19 63:11,15
65:21 75:2 254:7
prepared
13:23 14:7,10 82:16 83:5
256:14
preparer
255:18,19
preparing
14:13 20:14,19 69:13 70:4
256:3
present
5:12 63:8 64:6,23 65:2
213:4,8
presentation
136:4,11
presentations
102:11

presented
14:25 69:16 107:7 146:24
151:5 158:22 170:17 171:6
177:25 189:10 253:21
258:8
pretty
85:24 252:19
prevent
11:23
previous
33:8
previously
33:8,13 158:21 177:24
189:9
primarily
257:18
primary
124:6 157:22
principles
165:25 192:19 194:10
print
106:10
prior
33:14 58:16,20 61:1 77:1
102:2,6 103:5 110:21
112:22 114:4 116:19
145:13,17,22 146:7 147:18
191:2 211:8 212:19 236:4
236:14 238:9 258:15
private
112:24
privilege
41:23,25 43:6,9 84:1,5,8,10
84:13,16,22
privileged
51:21
probably
36:24 37:5 38:6,9 45:20,22
47:23 58:1 63:21 72:16
95:22 96:14 120:2 123:21
147:8 182:25 183:15
252:14 254:7
proc
171:23 185:3
proceed
10:7,12 219:25
proceeding
197:5
process
69:13 70:3,16 96:1 111:8
111:11
product
51:9,11 67:6,19 81:13 86:4
profession
122:19

[professional - questioning]

**professional**
101:3 118:20 119:14,25
120:7 121:1,4,22,23 122:7
122:9,15 153:7,19

**professor**
6:17 34:19,25 36:2,3,10
56:9 106:2 109:17 116:9
118:19 122:23 168:6 175:7
243:10 247:25 264:13

**program**
36:13 128:22 255:25 256:1

**progress**
73:14

**prohibition**
179:25

**proper**
83:12

**property**
32:20,22 37:15,17 113:23
115:14,15,18,19,24 122:25
125:2,4 127:9,10 131:17
140:19 141:13,13,23
157:17 158:3 165:23 166:1
184:13 192:21,22 193:1
202:9 212:3,8 215:11 217:8
220:2 226:24 227:2,7,8,13
227:15,16,17,19,21,25
228:4,6,11,13,19,20,22,23
228:25 229:2,4,5,8,9,15,16
229:18,22 230:5,13,14,15
230:19 235:17 245:11,11
250:11,12,14,19,20,25
251:19,21 257:3,11,18,21

**proposed**
134:21 135:11,13 136:19
136:23 146:5 238:14

**protected**
49:24,25 50:3

**protocol**
190:22

**provide**
16:1 17:11,24 18:6,9,12,25
19:8,11 22:19 23:15 33:10
36:16 39:23 53:15 54:5
56:14,19 57:7,9,19 86:21
102:15 130:5 147:2 150:4
150:17,23,25 151:7,12
153:3 156:21 163:3 165:19
177:22 180:22 183:22
200:4 212:23 214:12,18
235:13 239:2 255:1,5

**provided**
23:4 40:4,9 43:13,17,21,25
45:2,8,14 46:17 47:25 48:3
48:6 49:14 76:14 87:16
93:24 100:1,6 103:15

**provided (cont.)**
129:24 145:2,8 148:1 159:6
160:3,9 161:13 163:8,10,15
163:17 184:16 192:19
194:8 212:18 214:8 255:18
258:13

**provides**
158:1 165:21 202:17
204:16 227:7,10,12 228:24
229:20 232:10,10,12 234:7
237:25

**providing**
19:22 20:18 56:25 57:16
152:2,11 171:1 203:13
205:8 213:9,23

**provision**
237:24 251:22

**provisions**
69:24 235:4 245:19

**public**
2:21 16:10 162:15 165:17
184:25 189:1 196:4 197:4

**publication**
104:7,9,11,14,18 137:13,19
137:25 138:21 139:16,18
140:10 141:11 143:3,25
144:3,20,21,23 186:21
187:15,16,19 188:1,13

**publications**
101:4 102:9 103:25 104:5
104:20 105:10 123:6 137:1
137:4 140:18 141:13,20
142:7,17 143:1 144:14
186:9,14

**published**
137:8,14,20 138:2,2,5,8,15
138:22 139:12 140:4,12,17
141:4

**publishes**
165:15

**publishing**
139:9

**purchase**
180:3 232:15 233:24
234:13 250:21

**purchased**
170:4,20 172:12,15,21
233:3

**purchaser**
232:16

**purchasers**
179:4 180:3 250:6

**purchases**
179:4 232:23

**purpose**
185:15 202:18 225:4 235:9

**purposes**
70:2,10,14 84:23 122:25
124:15,23 125:10,16
147:15,21 155:20 156:2
158:2 189:5 196:1,15,23
197:4,10 198:10,18,21
199:17,21 200:8,12 201:16
205:22 211:13,19 214:7,11
214:22 226:17 230:23
234:2 235:1,11 236:6,22,24
238:5,18 239:7,13,19 240:6
240:9,15 241:12 242:4
243:25 245:8 250:14
261:13,21 262:8

**pursuant**
2:22

**push**
85:9

**put**
10:21 30:19 78:20 79:3,12
79:16 84:17 121:13 253:10

**q**

**qualified**
124:16 125:18,24 126:8

**qualify**
126:12,20 147:22 156:2
167:19 211:13,20 226:17

**quantify**
23:22,23 141:17

**quest**
211:6

**question**
16:8 17:14,17,20,22 18:3
29:10,13 30:8,12 33:20
38:23,24 40:23 41:6,14,16
42:10 44:9 48:9,21,22 49:9
52:12,12 54:18 55:14 58:6
58:12 59:4,9 63:4 65:25
69:3 71:1 72:14,23 73:5,7
73:12,17,18,24 74:4,13,20
75:7,9 76:2,11,18 77:4,9,19
77:21 78:2 79:7,19 80:4,16
80:19,24 81:7,20 82:5,13
82:18,20 83:2,8,9 84:24
85:7,18,22 86:10,14,20
87:4,11,19 88:2,8,17,18,24
89:2,6,13,17,21,25 90:13
90:17,22 91:3,11,17,22
92:3,4,9,11,12,15,17,19,21
93:2,3,5,11,19 94:2,9,19,23
95:10,17,20 96:10,12,18
97:1,4,5,8,10,13,17,19,21
97:22 98:2,5,19 100:4,5,9
100:23 101:8 102:20 103:3
103:11,17,22 105:14
106:14 108:16 109:4 110:7

**question (cont.)**
114:11,23 116:8 118:23
122:22 123:11 124:11,25
125:9,22 126:4,10,17,22
127:3,14,24 128:10,18,25
129:8,14,22 130:3,10,23
131:15,18,19,23,25 132:4
132:10,18 133:11,14,19
134:6,8,14 135:2 136:1,9
136:16 137:11,17,23
138:11,18,25 139:8,22
140:2,8,15,23,25 141:7,15
142:4,10,23 143:12,22
144:5,17 145:25 146:12
147:6 148:15,25 149:16
150:1,7,13 151:3,4,15
152:6,14,22 153:1,10,22
154:8,23 155:4,17,23 156:9
156:16 157:4,11,14,19,23
159:15,25 160:7,12,15,17
160:18 161:5 162:4 163:6
163:13 164:11,13,19,25
165:5,14 166:14,17,24
167:8,10,15 170:14 171:4
172:5 173:14 176:12
177:10 180:8 181:17,25
182:18 183:5,7,9,20 184:19
184:21 185:14 186:7 187:8
187:23 188:7,11 193:3,6,8
193:9,13,24 194:23 195:10
196:7,17,25 199:8,23 200:3
202:1,15 204:8 206:22
207:9 208:6,13 209:1,11,23
210:24 211:6,15 212:14,21
213:6,12,20 214:1,16,25
215:20,24 216:19 217:17
218:19,24 219:2 220:8,12
220:23 221:8,21 222:17
223:2,8,17 224:2,11 225:12
225:20,24 226:13 229:13
230:2,10,25 231:9,13 232:8
233:16 234:17 235:22
236:9,11,17 237:1,18 238:2
238:8,10,24 239:15,21
240:11 241:3,9,17,22
243:16,21 245:14 246:10
246:12,21 247:3,11,19,22
248:10,16,23 249:6 250:1
250:16,23 251:16 252:5
254:13,24 255:6,11 256:9
256:22 257:17 260:10,18
261:3,10,23 262:1,2,3,3,12
262:24 263:6

**questioning**
49:20 168:23

[questions - repeat]

**questions**
10:17 11:18,19 12:2,4,10
30:18 42:15 46:7 50:8 55:5
69:15,18 82:25 83:16,18
96:4 146:24 147:2 151:4
154:18 162:21 165:7
180:22 188:23 193:16,17
194:5,11 195:19 215:4
216:24 219:20 249:9,11,15
249:17,18,19 260:12
263:14 264:6,9

**question's**
201:23

**quickly**
259:1

**quote**
202:19 246:18

**r**

**range**
47:5 64:5 109:16

**rate**
19:4,13 20:20

**reach**
35:11 243:19 255:20

**read**
47:19 54:23 55:1 88:5,5,18
92:21,23 134:8,9 147:8
149:18 155:8 168:17
169:14 196:11 209:2 226:5
259:17

**reading**
70:17,18 119:6 135:17
190:25 192:3 259:3 265:19

**ready**
13:15 15:11 56:11

**real**
32:19,21 110:17 115:18,24
141:13,22 169:24,25 170:5
170:21 172:22 230:15
251:21

**really**
41:21 150:21 226:19 259:1

**realty**
25:10 26:21 28:6,24 29:24
30:24

**reask**
150:13

**reasonable**
147:19 155:24 211:10,17
211:22 212:3,9,9,12 213:2
213:14,16 214:5,9,13,19
215:6 216:25 219:22 225:2
225:6 226:12,12,13,14,24
227:3 246:1 261:14,15,15
261:18 262:5 263:7,10

**reasonableness**
212:19 213:10,24

**recall**
12:18,25 14:12,14,18 25:2
28:1,11,16 29:4,6,12,14
31:25 32:9 33:1,2,5 35:5
37:16,18,24 38:1,7,12,15
39:16,24 40:13 43:17,25
44:2 45:23,24 46:3,9,22,23
46:25 47:1,6,10,25 48:2,13
53:1 54:1 58:3 61:4 64:14
65:12 66:21 67:23 71:7,9
71:13,21 79:21 86:6 99:20
103:8 109:9,11,14 112:10
113:7 129:1,23 132:5,11
136:3,10 138:19 139:15
140:11 141:9 143:2,23
144:1,18,20,21 149:19
182:6,8,19 185:23 250:2

**receive**
47:11,18 54:21 62:13 86:11
86:18 109:25 111:6 193:22
202:21 223:21 234:4

**received**
34:12 47:15 50:23 51:15,20
52:1,6 62:10 71:5 87:1,8,21
88:9,20 89:10 90:6 91:6,15
91:18 92:6 93:8 94:4 95:3
111:5 126:24 220:13
221:12 224:4 227:17 228:6

**receives**
194:3

**receiving**
38:6 48:14

**recess**
56:2 118:13 174:7 243:5
263:25

**recognize**
13:19 105:8 158:6 178:6
189:16

**recognized**
54:24 184:11 204:2 207:23
250:24 251:9

**recognizes**
256:24

**recollect**
120:5

**recollection**
45:25 135:21

**record**
9:7 10:21 12:6 30:20 42:18
47:21 55:22 56:1,6 68:19
84:17 92:23 98:11,22
118:17 174:6 175:4 182:22
183:12 218:4,7,9 220:10
243:4,8 264:4 265:9

**recorded**
12:9

**records**
47:11 48:1,3,4,6,16,24

**redirecting**
215:19

**refer**
177:7 184:23 200:22

**reference**
47:20 142:20 149:19
166:20 167:2,11,21,24
175:7,10,22 178:18 180:16
188:7 194:13,15 250:4
253:4

**references**
176:8,13,18,22 179:20
224:12

**referencing**
158:10

**referred**
13:4 139:20 169:25 191:11
195:15 209:3 210:6 223:12

**referring**
76:5 139:2 159:21 171:25
176:19 180:5,10 182:15
184:12 188:2 197:18
201:12 210:9 221:3 228:14
231:20,25 237:7 248:2
249:12,14

**refers**
169:12 185:3 192:16 201:2
204:5

**reflect**
42:19

**reflected**
87:15

**regard**
46:4 140:25 210:21 261:17
262:4

**regarding**
36:16 37:2 51:20 79:4
86:12 124:13 126:1 127:12
128:8,13,22 134:21 137:15
137:21 139:5 145:18,22
146:8 147:11 155:5,12
159:17 160:12,19 161:14
165:2 170:11 171:1 184:22
190:12 195:1 201:18 205:9
217:2 242:3 244:16 247:9
248:7,12,14,20 249:2,24
255:2 261:8

**regards**
129:25

**regional**
3:8

**registered**
149:11 203:1

**regulation**
197:4

**regulations**
227:22

**reid**
65:12

**relate**
69:25 123:6,7 203:14
245:24

**related**
20:18 109:8 114:3 185:4
239:2,24 241:6 246:7,17
247:8 248:6,13,18,20,25
249:2,22 265:15

**relates**
153:4 161:22 209:21

**relationship**
61:22 62:3

**relevant**
53:17 173:16 187:9

**relied**
159:22 162:6,25 163:1
164:7,21 165:6,9 171:15
176:8 184:2 205:13,23
206:7 214:24 216:20 217:5
219:5,12 220:17,20 221:11
222:8,14 223:14 225:1

**relies**
237:2,4

**rely**
159:10 161:21 184:6,9
209:13,14 220:3,9 221:2,15
223:23 224:7 240:1 244:25
246:4,6,16 247:7 248:5,12
248:19 249:1,23

**relying**
154:5 171:5 208:9 225:5

**remained**
113:11

**remedy**
123:24

**remember**
28:9 32:6 36:14 37:4 53:24
64:12 65:14 86:22 113:9
120:21 242:16 252:7

**remote**
3:1 5:5

**repeat**
33:20 35:7 38:24 40:23
41:6 44:9 48:22 61:17 80:7
83:1 87:6,6 119:9 133:11
133:14 183:7 200:3 240:13
246:13 262:2

[repeatedly - rule]

**repeatedly**
27:2
**rephrase**
12:2 260:23
**replied**
34:12,20,23 35:2,7,23 37:6
40:2 42:21 43:14,18,22
**reply**
38:4,8 40:14,24 41:7
**report**
6:13 13:2,5,20,22 14:6,9,10
14:13,16,19 15:7,9,12,19
20:19 47:16 49:5,12,23
51:7 52:15 53:16,19,21
55:6,11 56:17 57:10,13
58:14,17,21,22,24 59:10,16
59:23 60:2,11,15,21 62:21
62:22 63:1,7,7,11 65:22
66:2,3,6,9 67:9,12 69:14,16
70:4,24 71:2,4,8,11,14,19
71:21,24 72:1,4,11,17,20
73:2,8,15 74:2,8,10,15,19
74:22,24,25 75:1,2,3,4,5,10
75:13,19,25 76:7,8,13,16
76:21,22 77:1,2,7,10 79:1,5
79:15,16,22,24 80:9 81:25
82:9,16 83:6 85:5 86:7,12
87:9,16,22,24 88:10,15,21
89:3,12,14,20,22 90:8,11
90:25,25 91:7,8,16,19 92:6
93:8,14,25 94:6,16,20 95:7
95:13,14 96:1,14,16,19,22
96:24 97:3,6,15,20,23 99:7
99:23 100:1,7,11,20,25
101:12 102:6,24 103:15
118:21,25 121:5,6 126:13
137:5 143:5 145:4 146:25
147:24 148:4 162:17 164:2
164:4 166:5,6 171:14
175:12 177:1 178:12
179:16 180:9 184:17 189:3
191:15,18 194:18 195:7,24
195:24 196:8 197:14,21,22
198:15 201:13 203:18
206:2,10,13 207:16 209:9
210:17 213:24 214:2,17
215:2,10 216:11,25 220:1,1
222:8 228:15 236:20 242:6
242:10,21 246:8,11 247:12
249:4,7,8 252:3 254:18
255:2
**reported**
1:23 256:6,12,19,25 260:25
265:10
**reporter**
10:1,3,11 12:5 13:13 20:23

**reporter (cont.)**
21:4 31:13,18 70:11 84:21
98:17 104:8 105:2,3 107:9
119:4,9 155:7 158:17
217:23 218:15 253:9,11,16
258:10 265:11
**reporting**
238:1,25
**reports**
13:24
**represent**
22:4,9,25 23:10,14 56:24
162:15 184:25 188:25
196:4
**representation**
166:8 191:21,24 240:5
241:8
**representative**
142:25
**represented**
11:12
**reprimand**
218:3
**republished**
249:18,20
**request**
8:20 180:12
**requested**
265:20,20
**requests**
7:6 84:21 98:17 217:23
218:15
**requiring**
239:2
**reserve**
11:1
**reside**
11:10
**respect**
15:18 45:7 130:5 135:11
155:3 169:16 189:25
203:14 225:7 242:12
245:21 246:25 255:5
261:14
**respective**
265:16
**responds**
184:20
**response**
20:24 55:5 154:18 188:7
196:17,25 214:25
**rest**
189:2,2
**restate**
31:16 156:10 160:2 164:19
219:11

**restrict**
179:24
**restriction**
179:25
**restrictions**
181:20
**restricts**
179:17
**result**
193:21 194:1
**resulting**
190:23
**resume**
216:16
**retained**
16:7 22:1,15,24 23:20 25:3
25:11 26:2,5 28:1,11 29:3,7
29:15,25 31:24 46:24 47:2
47:8,12,18 48:7 56:14,18
56:23 57:5,6,12,16,19,22
61:2 75:2,3,4 126:14
**retention**
56:18
**return**
255:18,19,21 256:12,14
260:14,20
**returns**
254:7 256:4 259:23 260:7
260:15
**rev**
7:11 185:3 250:3
**revealing**
150:9 151:18
**revenue**
69:22,24 70:8,15,18,19
134:22 162:22 165:8
188:24 189:21,22 190:3,10
190:19 191:1,5,8,10,11,13
192:3,10,16,18,24 193:4,10
193:15,20 194:6,9,12,15
200:20,22 201:5,7 203:7,10
203:21 204:1,20 205:7
228:21 231:11,17 232:2,6,9
232:20 233:2,7,10,13 234:7
234:15 236:1,15 237:5,8,12
237:16,24 238:14 245:16
245:20,21,23 251:13
**review**
20:10,12,13 55:12,16 63:1
63:7 66:5,8,11,13,14
123:22 139:2 148:11 168:1
168:5 171:18,20 186:10
259:22 260:6
**reviewed**
62:21,21 66:1,2,18,19,20
66:22 67:8,11,14,24 68:3,8

**reviewed (cont.)**
68:8,21 220:10
**reviewing**
63:11 65:21 189:20 260:13
**reviews**
138:14,22 139:4
**revoked**
122:10
**rfa**
53:17,20 54:5,11,12 55:1,5
55:10 178:20 181:6 182:10
**rfas**
55:12,16 161:21 171:22
172:19,24 175:21 176:14
176:18,20 178:9,14,17
180:18
**rifkind**
5:3
**right**
11:1 17:18,22 25:14,17
27:25 32:23 36:11 41:17
42:12 50:24 54:19 55:18
66:1 79:13 90:8 95:21
96:20 99:25 111:11 115:2
136:25 138:1 143:1 148:9
154:14 160:25 164:14
173:17 180:24 195:12
198:6,24 202:20 213:15
219:13 228:10 232:14
234:3,12 235:12 247:24,25
260:1
**ripple**
1:7 2:7 4:3 9:13 22:2,16
33:14 45:21,25 46:4 55:4
56:19,21 57:7 148:17 149:6
260:13,20,23,25
**ripple's**
259:22 260:6,15
**rise**
228:5
**risumi**
100:2,7,15,17,19 101:6
**rlinsenmayer**
5:10
**rmr**
1:24 2:20 265:24
**robin**
5:5
**room**
9:25
**rul**
7:11
**rule**
50:13 156:2 197:4,7 200:10
204:13,17,18 205:20
228:24 238:17 240:8 251:7

[rule - shortly]

**rule (cont.)**
251:8
**ruled**
235:8,24
**rules**
69:20 70:22 147:23 156:4
192:22 193:1 201:16
202:19 204:12 211:14
215:11 220:2 226:18 227:8
227:13 228:11,14,21,23
229:1,3,6,10,17,18,22
230:13,14,20 232:10,19
234:3,22 235:9,19,20
237:23,25 238:25 239:24
240:16 250:12
**ruling**
162:22 165:8 188:24
189:21,22 190:3,10,19
191:1,6,8,10,11,13 192:4
192:10,16,18,24 193:4,10
193:15 194:9,12,16 232:2,9
232:20 233:2,7,10
**runs**
206:1

**s**

**sabbatical**
117:2
**sale**
234:21 235:4,9,11 238:17
239:7,19,24 240:8,16
241:12 242:3 250:25 251:9
251:24 257:3,18 261:19
262:6
**sales**
7:18 119:1,11 260:25
**san**
112:24 113:2
**save**
81:2,4 85:4,11 86:25 87:7
88:8,19
**saved**
80:1,8,12 82:9 87:23 90:10
**saving**
80:21 81:11
**saw**
35:12 149:14
**saying**
35:24 37:6 140:21 144:11
152:16 154:13,13 177:15
177:19 187:11 199:3
**says**
15:25 56:17 100:11 119:10
121:9 133:24 165:20,22
166:5,6 170:17,19 171:17
172:6,10,13 178:20 180:13
182:11 184:10,12 186:19

**says (cont.)**
188:24 190:19 191:20
192:20,21 197:22 198:16
200:6 201:15 204:11
205:15,18 207:21 208:16
209:17 212:1 216:25
224:24 227:2 230:13
232:20 233:21 262:17
**schedule**
7:14 252:9,10,12,13,14,16
254:5,9,15 255:23 256:15
**school**
6:19 16:12,13 34:11,16
36:1 104:4,19 105:9 106:10
107:13,14,22,24 109:18,21
109:23 110:1,5,12,15,21,23
111:1,4,10,21 112:2,9,11
112:23 114:6,15 116:5,10
116:16,20 256:1,2
**school's**
16:11
**scope**
146:21 147:25 148:2,8
169:2,6,8,9,10 170:6
204:18 208:7 231:1,14
234:18 254:9,16 256:10,18
258:21 261:4
**search**
70:7
**sec**
5:14 6:11 7:2 10:17,19
14:25 107:7 148:17 149:5
149:12 158:22 171:19
177:25 189:10 253:21
258:8
**sec.gov**
3:15,16
**second**
59:2 72:24 81:17 187:24
193:24 196:6,7,10 201:22
217:25 218:4 260:1
**section**
95:12 119:3,12 134:21,25
135:12 136:20 169:8,12
193:20 194:1,1 200:25
201:1,2,3,4,7,9,10,14 202:7
202:8,10,12,16,17,17,17
203:2,6,9,16,19,20,25,25
204:5,14,15 207:16 224:5
233:18 234:6,20,21 235:1,4
237:19,21,22 238:12,20
239:13 240:6 241:6 242:8
242:12 251:23
**sections**
95:7 200:21

**securities**
1:4 2:4 3:7 9:12 31:9,18
69:19,22,23 70:1,1,8,13,17
70:19,21 147:23 152:21
166:15,22 167:4,6,12,18,20
167:22,24 197:23 203:8,15
204:3,4,13,15,17,18,25
205:5,7,10 208:4 211:14,21
226:18 229:24 230:7,17
231:8 233:22 234:8,15,20
235:3,9,13,15 236:4,4,5,13
236:13,14,19,19,22 237:16
238:4,22 239:7,18 240:1,6
241:7
**security**
147:15,21 155:19 156:1,3
166:12,21 167:3,12 189:5
195:25 196:15,22 197:3,9
197:11,12,16 198:1,5,10,11
198:18,20,23 199:4,16,21
200:8,12,14,17,19,25 201:3
201:15,16 202:7,10,11,18
202:19 203:17 204:20
205:3,9,17,21,25 211:12,19
214:6,11,21 225:4 226:16
229:22,23 230:6,22,22,23
233:13,18,19 234:2,3 235:1
235:10,18,19,25,25 236:2
236:22,23 237:4 238:16
239:12 261:12
**seeing**
149:19
**seek**
217:1
**seen**
106:1,6 222:5 252:13,14
254:1,7 258:1,15 259:8
**selected**
102:10
**sell**
179:1,5,12,22 180:4,14
181:14 227:2 233:24
235:15
**seller**
147:19 155:25 211:11,17
214:5,9,13,19 225:2,7
226:13,14 261:15,18 262:5
263:10
**sellers**
212:3,10 213:14 215:6
217:1 219:22 226:24 227:3
246:3,6,16 247:7 248:5,12
248:19 249:1,23 250:9
263:8
**seller's**
246:2

**selling**
115:14 176:2,14,22,24,24
176:25 177:4 179:18
**sells**
149:10 250:20 256:23
**semester**
110:8,13 116:17,19 117:2,4
117:5 248:1
**seminar**
112:15
**seminars**
135:22
**sent**
40:14,24 41:7 42:22 58:7
**sentence**
169:14 172:7 191:19
198:12
**separate**
81:4
**september**
14:15 32:25 44:20 47:5,5
**service**
5:15 16:20 19:22 37:10
129:25
**services**
16:5,9 17:4,9,11,24 18:6,9
18:12,19,25 19:8,10,14,18
20:17 21:6,11,17 22:19
23:4,16 36:20 56:15,25
57:7,10,22,25 58:9 227:16
**set**
7:6 15:8 18:24 19:7 20:3,6
20:9,16 178:8 265:17
**setting**
31:10,11,20,21 153:18
226:23
**settings**
188:5
**settlement**
153:14,24 154:6,10 208:15
209:2,17 224:22,24 244:14
244:22 245:4,6
**seven**
258:5
**share**
202:20,21 234:5,8
**shareholders**
112:18
**shereck**
5:15 9:19
**short**
55:19 263:16
**shorthand**
265:11
**shortly**
38:6 130:18

[show - store]

**show**
11:2,2 67:5,17 178:17
253:7
**showed**
68:2 135:16
**shown**
46:14
**shows**
215:5 219:21
**sic**
40:4,16 83:18 118:16
200:24 211:9
**sign**
14:16
**signals**
216:25
**signed**
14:18 15:7
**signing**
265:19
**similar**
131:12,17 134:4 139:17
170:22 171:9 172:6 222:14
**simple**
247:25
**single**
197:23 204:25
**sir**
90:23 97:4,19
**sit**
74:9 235:2 239:5
**site**
105:16
**sitting**
76:23 136:12
**situation**
227:24
**situations**
204:15
**slow**
31:14 119:5 155:8
**sn**
1:6 2:6 9:17
**society**
135:19
**sold**
62:8 149:8 172:14,17,21
175:15,24 176:9 177:13,16
179:16,24 180:11 181:21
182:5,13,16 233:6,8 251:9
255:16
**sole**
76:8
**solely**
154:5 169:3 182:21,25
183:11,15

**somebody**
232:22 256:23
**soon**
168:22
**sorry**
12:21 17:13 18:20 21:2
31:15 35:6 41:5 46:6 54:7
59:1 60:7 63:22 65:5 66:4
74:23 75:16 76:3 78:11
81:16,16 88:23 90:4 91:21
98:12 103:22 105:13
106:13 111:20 112:5
113:17 119:7 120:18
122:21 125:11 128:17
129:13 132:9 133:7,10
135:1 140:14 142:3 143:21
144:16 146:11,15 148:10
148:14 149:25 150:14,24
155:9,10 157:22 159:8,24
160:1,14,16 164:19 166:25
176:5,16 181:24 185:20
186:17,22 187:7 201:21
205:14 206:17 215:15
216:13 217:10 220:7
222:10 223:1,25 224:8
229:13 231:21 238:7 239:9
244:3 246:4 248:9 252:18
254:13,23 257:7,15 259:25
260:2 262:10
**sort**
123:1
**sources**
206:7 210:5
**southern**
1:2 2:2 9:15
**spaces**
259:14,15
**speak**
167:18
**speaker**
84:21 98:17 217:23 218:15
**speaking**
98:20 176:23 212:17
213:21 229:6
**special**
230:18
**specific**
24:20 29:18 30:16 37:18
47:17 53:5,18,20 55:5
60:12,18 66:21 67:4,10,24
68:20 71:13 79:9 102:21
103:24 108:17 125:5
131:19 132:1 135:20
139:24 147:23 151:5 156:3
162:8 163:14 164:8,22
165:9 171:24 186:14

**specific (cont.)**
192:13 193:1 197:17
200:21 202:11 205:3
211:14,21 220:19 221:1,14
221:23 222:22 223:18,23
226:18 227:9 228:24
229:19 232:10 246:22
247:15 248:24 250:17
**specifically**
38:13,15 45:23,24 47:25
48:2 52:23 53:2 58:3,10,23
63:13 103:19 109:9 113:16
113:18 120:9,17 132:5
136:2 137:8 138:3,15,23
140:25 142:21 143:10
147:17 152:22 172:19
177:3 178:14 184:8 190:4,5
195:17 199:12 200:18
204:13,14 208:16 210:7,8
225:22 231:19,24
**specifics**
37:25
**specified**
238:15
**speculate**
21:21
**speculating**
45:23
**speculation**
38:13
**spend**
72:3 116:13 259:2
**spent**
63:11 71:7,14,18,20,23
72:20 116:20
**spring**
116:24
**ss**
265:2
**staff**
10:19
**stage**
226:23
**standard**
212:11,16,24 213:1,4,7
**stands**
143:17
**start**
56:5 118:16 175:4 224:14
243:7 264:2
**started**
14:12 77:15 79:22,24 81:12
86:3 113:9 114:13 117:1
215:17
**starting**
228:17

**state**
11:8 27:10 41:19 42:14
107:16,20 119:16 120:14
123:14,14 137:7 138:14
198:7 257:2 265:1
**stated**
25:15 34:20 37:16 38:7
67:8 79:4,14 87:23 90:10
102:23 161:19 176:25
190:18 191:5 194:18
198:19 208:1
**statement**
45:11,13 175:16,17,23
176:8 177:22,23 179:15
180:9 209:6
**statements**
98:21 184:15 210:12
**states**
1:1 2:1,21 3:7 9:14 121:8
207:21 208:3 210:11
224:23
**stating**
153:23
**status**
121:13 154:4 170:11 205:9
242:14
**statute**
197:7 200:10 205:19
235:12,16
**stay**
218:7
**steen**
4:19
**stella**
5:14
**steps**
79:1,15
**steven**
34:15 35:9,11,21,25 36:5,9
36:21 37:2
**stick**
46:8
**sticker**
253:10
**stipulation**
10:22
**stipulations**
8:10
**stock**
202:20,21 229:17,19
233:23 234:5,9,9 235:13,15
**stop**
30:20 104:5 217:16 218:22
**store**
166:9 191:23

**[stray - testimonies]**

**stray**
52:13

**street**
3:11

**study**
149:18

**sub**
58:13

**subclass**
134:10

**subdivision**
202:25

**subject**
49:19 126:8 140:13 141:5
142:7 144:2 170:23 171:10
251:20

**submitted**
58:7,10,13,14,19,21 71:11
71:11 73:3,9,21,23 74:2,8
88:15 89:3,14,22 90:15,25
91:9 92:7 93:9 100:20,24
101:13

**submitting**
77:1,11

**subscribe**
202:21 234:4,4,12

**subset**
133:25 134:10

**substance**
36:15 51:3 52:14 59:6,9

**substantive**
53:11

**substitute**
169:24

**suggests**
181:19 182:2

**suite**
3:12

**summarize**
147:1

**summarizing**
147:9

**summary**
196:9

**support**
8:1 159:11,23 160:4,11
162:1,25 163:1,4,11,20,24
164:7,9,21,22 177:13,16,23
180:18 183:23 184:2,15
188:15 189:6 191:14 192:8
194:19 195:8 196:2 206:9
210:18 214:24 215:13
216:10 219:12 220:4,10,20
221:3,15 222:15 223:15,24
224:8 225:9,17 226:3
227:22

**supports**
157:24 195:22

**suppose**
135:16

**sure**
16:18,25 17:18 18:2,4
50:25 56:10 60:13 69:15
76:4 78:14 85:24 88:7
111:23 118:5 122:20 124:6
125:23 126:11 139:1 144:7
144:10 154:19,21 158:16
164:13 167:1 183:8 200:1
202:2 215:1 225:18 228:12
242:14,15 246:14 252:19
254:3,22,25 263:18,21

**survey**
248:11

**suspect**
59:15

**suspended**
122:12

**swear**
10:6

**sworn**
10:9 265:6

**sylvester**
3:10 10:18

**sylvesterm**
3:16

**system**
85:12

**t**

**tailored**
230:18

**taken**
2:16 12:16,19,22,25 56:2
109:5 118:13 174:8 243:5
263:25 265:8

**talk**
28:17 37:7 38:10 52:19
84:20 98:16 136:3 140:18
141:22 176:14 217:22
218:14 229:2 231:4 232:19
248:4

**talked**
127:5 128:20 172:8 185:3
195:13,13

**talking**
24:6 25:19 60:19 83:5
108:22 164:12,14,15 219:4
221:1 222:13 225:6 226:4
226:11 229:3 230:12
239:15 247:17 262:14

**talks**
118:25 133:23 162:13,19
162:20 170:19 176:1 189:3

**talks (cont.)**
195:4 212:6 215:2 220:1
227:13,15 233:2,7,10,18
242:6 251:23

**tate**
113:6 114:13

**taught**
110:15 112:11,14 130:20
131:1,8,11,20 132:2,13

**tax**
36:9,16,25 37:14,15 69:20
69:25 70:2,10,14,20,22
108:11,14,19,23 110:9
112:15 113:3,20,22 115:4,8
117:7,11 119:15,17 121:8
122:23,24,25 123:6 124:3
124:15,22 125:2,10,16
127:6 129:24 133:22
147:11,15,17,21,22 149:13
149:20,22 150:4,17 151:1
151:12,23 152:20 155:5,12
155:20 156:2 158:2 159:18
160:20 165:3,25 184:22
189:5 195:2 196:1,15,23
197:3,7,9,10,15,22 198:5
198:10,18,21,21 199:4,16
199:21 200:8,9,12,13 203:3
204:24 205:19,22 211:7,12
211:14,19,20 212:4 214:7
214:11,21 215:7 217:2,3
225:4 226:16,18,25 227:4,6
227:7,14 229:24 230:8,23
231:5 232:3,21,24 233:2,8
233:10,22 234:24 235:8,18
235:19 236:6,23 237:23
238:5,13 243:14,25 244:11
245:7,12,15 246:24 250:13
252:15 254:7,17 255:4,10
255:17,20,21 256:3,7,12,14
259:22 260:7,14,15,20
261:8,13,21 262:8,22 263:9

**taxation**
107:23 110:16,16 112:16
112:16,17,18 119:3,12
124:8,9,17 125:19 126:1,25
127:8,16 129:25 130:21
131:2,9,12 135:23 140:18
186:20 232:11

**taxpayer**
193:19,22,22,25 194:3
262:19,21

**teach**
110:4,11 113:13 116:15,22
116:22,23 117:3

**teaching**
110:8,9 116:20 132:11

**technical**
132:24

**technically**
111:24

**technology**
190:21

**telephone**
3:14 4:11,23 5:8

**tell**
19:3 42:2 49:4 55:4 75:23
107:12 112:13 122:18
149:3 154:17 155:1 164:8
164:22 182:4 190:16 196:9
196:16,19 205:12 223:5

**telling**
84:9

**ten**
102:10,11 103:25 104:6,15
104:19 123:16 137:1,4
242:25

**tenure**
109:25 110:2 111:5,6,8,10
111:12,25 112:3

**tenured**
109:23 111:3,22

**term**
70:8,13,21 127:16 130:12
130:13,14 131:6 132:20,22
134:18,22,25 135:5,9,14
136:10,14 137:13,19,25
138:12,20 140:5 142:14
143:13,24 144:8,19,20,22
146:2,5,9 156:6,12,20
169:11 170:8 180:17,25
181:5,7 182:8 190:9 197:25
198:2 203:17 207:5 212:12
213:16,17 235:13 246:23

**terms**
75:24 133:21 156:7,13
247:13

**test**
32:14 246:3,5,15 247:19,25

**testified**
10:10 23:25 24:10,12 25:3
25:13,16 26:8,13 27:2
28:18 61:5 68:5,13 83:3
125:25 223:20

**testify**
15:11 22:10 25:15 27:11,16
27:17 68:11 85:13,19,24
265:6

**testifying**
11:23 24:15 30:22

**testimonies**
27:17

[testimony - undergoes]

**testimony**
11:15 20:7,19 24:7,9,14
25:6,23,25 26:2,5,16,18,19
26:20,23 27:19,24 28:8,25
31:2 32:8 33:10 36:16
57:19 79:8,20 85:23 88:3,6
90:18 91:4,24 98:22 99:19
102:12 134:11 145:1,8,14
145:18,21 146:8 182:7
183:6 187:3 194:24 209:12
212:23 214:3 241:24
247:23 257:9 259:5 265:10

**tests**
247:6,14,17 248:1

**texas**
119:17 120:10,10 121:7,14
121:18

**text**
105:18 183:21

**thank**
10:11,13 12:14 13:10,13
81:21 144:24 158:25 200:2
225:13 258:11 264:10,12
264:14,15,21

**thanks**
37:6 38:9

**thanksgiving**
63:16 64:13,17,18

**thereof**
202:25

**thing**
73:23

**things**
90:8 255:8 256:17

**think**
12:22 13:6 22:24 24:1 27:1
34:12 40:19,21 42:3 52:8
59:19,22 66:24 69:1 89:10
92:2 95:12 100:14 101:2,18
106:5,6,7 109:5 110:20
111:17 117:9 119:23
120:19 121:8,9,24 122:16
122:16 123:4 128:11 130:4
131:4 134:16 141:25 148:6
150:21 151:22 152:8 153:2
160:15 163:9 173:2 186:23
187:11 191:15 211:1
212:15 217:13 218:6
222:22 223:5 225:14
243:21 251:6 252:17 253:6
253:15,16 257:17 259:7
260:15 262:2 263:13

**third**
2:17 4:9 9:21 155:22 211:4
211:6

**thoroughly**
149:18

**thought**
38:14 259:10

**thoughts**
259:15

**three**
25:12 26:1,3,7,22 27:3,21
27:23 28:2,3 56:15 64:1,2,5
64:25 65:8 90:8 109:6
117:5 146:24 147:1 241:14

**time**
9:8,23 10:6 11:1 24:8 25:24
39:20,25 41:5 55:23 56:3
63:2,6,10 71:7,10,13,18,23
72:3,9,10,18,19 75:4 81:12
86:2 102:16 103:6,8 112:4
113:10,12 114:1,21 116:12
116:20 117:8 118:9,14
122:12 166:19,25 173:4
174:3 175:2 179:2 217:17
217:25 218:23 235:7 243:1
249:17,17 259:3,13,16
263:22 264:1,13,16 265:8

**times**
12:23 24:10,13,14 26:1
85:4,11 98:3 237:5 241:15

**title**
32:15,15,18 35:25 186:21

**today**
9:7,10,20 10:3,17 11:12,19
11:24 13:4 18:15 65:1
114:8 134:11 136:12
223:20 235:2 237:8 239:5
258:16

**today's**
264:18

**todd**
22:2

**told**
157:6,8

**top**
21:14 23:9 257:24,25
258:22

**topeka**
110:24

**topic**
99:22 144:13

**total**
25:19

**totally**
139:1

**track**
184:13 232:3

**trade**
251:19,21 257:11,19

**traded**
170:3,20 172:11 232:3

**training**
108:14 109:1 126:25

**transact**
184:13 215:8

**transaction**
113:24 192:22 193:1
215:11 220:2 227:7,13
228:11,14,20,21,23,25
229:3,5,9,16,18,22 230:6
230:13,14,20 232:22
250:12 262:16

**transactional**
115:10,12 122:24 255:4

**transactions**
37:15,17 110:17 127:9
140:19 162:22 165:8 166:1
166:1 169:10 186:21
189:25 190:2 193:2 195:20
215:5 217:4,8 219:20 227:8
229:15 232:11,13,14 246:7
246:17 247:8 248:6,13,20
249:2,10,20,24 255:5 263:9

**transcribed**
265:12

**transcript**
10:2,25

**transfer**
32:16,17,18

**transferred**
262:16

**transfers**
31:11,12,20,22

**treasury**
153:14

**treasury's**
210:10

**treat**
229:4

**treated**
153:12,18 158:2 165:22
231:10,16 232:5 234:14
244:17 245:11 250:13
251:13 255:14,15 261:20
262:7,22

**treating**
238:21 239:18 244:16,17

**treatise**
123:13,16

**treatment**
37:15 149:14,22 150:5,18
151:1,13 211:20 212:4
215:7 226:25 231:5 232:3
232:21 245:5 261:8

**treats**
227:14

**trial**
20:6 24:5,11,12 57:19
145:18 146:8

**trouble**
247:4

**trucks**
230:16

**true**
265:9

**trusts**
114:3

**truth**
265:6,6,7

**truthfully**
11:23

**try**
27:15 217:17 218:23

**trying**
53:24 75:17 119:23 134:16
143:16 251:6

**tuesday**
40:1 63:17,24 64:11,12,19
64:20,21,22,24

**turn**
99:25 136:25

**twice**
116:17

**type**
30:1,4,9 36:4 37:9 85:8,9
85:10 113:18,25 115:15,19
125:3 134:4 156:24 165:18
185:7,9,18 190:6 192:11
202:9 208:18 251:25 254:1
259:21

**types**
18:25 19:22 20:16 131:12
141:1 189:24 190:2 193:2
222:14 230:15 246:25

**typewriting**
265:12

**typically**
9:23

**u**

**u.s.**
153:14,25,25 170:4,21
172:16,22 191:24 208:16
208:19 209:5,16 224:22
244:15,15

**un**
181:23

**unaware**
200:9 205:19

**undergoes**
190:22

[undergraduate - witness]

**undergraduate**
255:24
**understand**
11:14,17 12:1 17:19 29:10
29:13 41:14,15 42:1,10
48:20 60:13 73:7,20 74:18
75:8,18,20,24 77:21 80:6
80:18 81:1,9 82:20 83:9,13
84:16,24 89:8 93:13,16
94:12 130:7 134:7 140:5
144:11 153:24 161:9,11
167:1 171:20 206:24 219:4
221:25 222:4 225:24
242:21 264:7
**understanding**
34:7 61:19 93:20 94:3
111:16 132:15 133:2,20
134:24 136:13 149:1,4
153:17 190:8,13,16 191:2,7
216:19 222:20,24 247:18
**understands**
42:3 84:10
**understood**
73:13 201:6
**undertook**
69:13
**unilateral**
178:23
**unique**
190:20
**unit**
55:25 56:5 118:11,16 166:9
174:5 175:5 191:22 243:3
263:24 264:3,17
**united**
1:2 2:1 3:7 9:14 121:7
207:21 208:3 210:11
224:23
**units**
193:23 194:3
**university**
107:17,20,22,23 110:23
111:1,3,13,13,15,20,21
112:7,8,11,22 114:14
**unlawful**
149:11
**unrestricted**
179:5,7,11,14,22 180:3,14
180:23 181:12,13,19 182:2
182:11
**updated**
103:6 249:18,20
**use**
49:4 101:12 127:16,17
132:20 139:17 146:1,2
156:5,12 169:11 181:7

**use (cont.)**
182:14 246:23 251:19,21
257:11
**users**
170:3,20 172:11
**uses**
95:21 105:16 134:22
**usual**
10:22
**usually**
78:20 79:11 116:22
**uvaydova**
5:14

**v**

**valid**
32:15
**validity**
32:15,16
**value**
166:8,10 169:24 191:21,23
227:17,20 228:6 240:5
241:8
**varies**
115:16
**various**
223:4
**verb**
78:16
**verbal**
20:23
**verbalize**
12:7 42:3
**verbalizing**
30:21
**verbally**
30:12
**verbatim**
133:14
**version**
76:16,21 77:16,22 90:14
91:19 105:21,24
**versions**
74:14,21 83:4 102:17 103:1
**versus**
9:13 22:20 23:4 159:1
188:8
**vesey**
3:11
**vid**
264:3
**video**
5:15 9:6,8,10,19 55:24 56:1
56:4,6 118:10,12,15,17
174:5 175:3,4 243:2,4,7
263:23 264:2,4,16,18

**videographer**
5:15 9:5,19 55:23 56:3
118:9,14 174:3 175:2 243:1
243:6 263:22 264:1,15
**videotaped**
1:13 2:15
**virtual**
69:19 124:14,17,22 125:3,7
125:16 127:16,20,22 128:3
128:7,8,16 130:6,7,11,14
130:17 131:2,12,16,20
132:2,6,20,21 133:4,6,13
133:15,16,23,25 134:2,8,10
135:23 136:3 137:9,13
138:3 139:13,15,18,19
140:5,10,13,22 141:1,10
142:20 143:2,8,16,24 144:2
144:8,13,19 147:12,14,19
150:5,18 151:5,24 152:1,2
152:10,11,18,19,24 153:3,5
153:8,13,18 154:3,5,11
155:6,13,18,25 156:17,20
156:24 157:2,7,9,16 158:2
159:18 160:20 161:19,23
162:15,21 165:3,7,20,21,22
166:2,4,5,7,12,21 167:3,11
169:3,11,12,13,16,19,21,23
170:1,1,2,5,7,11,18,22
172:23 176:14 184:23
185:1,4,5,7,11,24 186:4
187:4,17 188:9,14 189:1,3
191:20 192:14,21,22 195:2
195:19,25 196:5,14,21
197:2,8,11 198:3,7,9,16
199:5,15,20 200:7,11,14
202:5 205:16,21 206:20,24
207:1,6,14,18,23 208:1,10
208:17 209:3,7,8,14,15,18
209:21,25 210:3,7,8 211:11
211:17 214:5,9,20 215:4,6
215:8,8 217:1,4 219:20,22
224:12,14,15,19,19,25
225:2,7 226:15 230:16
231:4,6 237:3 239:12
243:11,13,18,20,23,24
244:8,10,17,20 245:3,5,7
246:7,18 247:9 248:7,14,21
249:3,9,19 261:11,25
262:13,15,18
**vitae**
6:17
**voice**
133:8 199:25
**volume**
123:16

**voted**
111:10
**votes**
111:12

**w**

**waived**
265:20
**walk**
69:12 77:23 141:17 199:18
206:5 214:23 225:16 226:2
226:7
**want**
21:21 42:5 52:13 59:5 84:6
85:10 92:1 100:10 118:2
139:24 144:10 150:13
158:17 168:12 173:7,23
215:7 219:23 240:18
241:25 250:17 252:23
253:8,12
**wash**
234:21 235:4,9,11 238:17
239:7,19,24 240:8,16
241:12 242:3
**washburn**
110:23,25 111:3,20,21
112:6,8,11,22 113:13
114:14
**washington**
4:22
**ways**
131:16
**website**
6:19 15:25 16:2,9,11 104:4
104:19 106:7,11
**websites**
18:15,16
**week**
40:1 63:17 64:21,22 116:18
117:10
**weiss**
5:3
**went**
42:12 114:14 255:24,25
256:2
**we've**
114:19 164:13,14 173:2
185:2,2 188:21,21 226:4
**wharton**
5:3
**whereof**
265:17
**windfall**
227:20
**witness**
4:3 6:2 8:3 10:6 16:15 17:4
17:8,21,23 19:17,24 20:1

[witness - zornberg]

**witness (cont.)**
22:3,8 23:25 29:11 31:15
34:10 41:20 43:4,11 55:20
70:12 72:25 83:25 84:2,8
89:9 92:22 96:2,5 98:1,24
104:10 119:7 125:24 155:9
158:15 168:2,12,19,25
173:20 187:25 202:4 216:5
219:3,8 225:13 260:2
264:14 265:4,17

**witness's**
265:10

**word**
75:24 77:12,16,17,24 78:8
79:10 80:2,9,14 81:14,25
82:11 83:4 85:5,20 86:4,6
87:2 93:21 101:11 132:16
139:10,15,17 140:10
141:10 143:2 156:5 179:9

**wording**
37:18

**words**
43:6 83:15 94:16 95:21,23
96:13 142:24 157:17
182:24 183:14,21 184:10

**work**
15:3 21:22 22:3 34:16,18
51:9,11 57:12 58:20,24
59:6,18,23,25 60:20,23
67:6,18 72:10 73:14 110:22
112:23 113:18,22,25 114:2
114:5,8,16 116:5,11 117:10
117:18,21 217:21 255:20

**worked**
33:9,13 58:16,22 59:21
75:3 113:7

**working**
112:22 117:1 136:13

**works**
111:23

**world**
133:6,17

**worthless**
201:16 202:19 203:15
234:3

**write**
72:1 74:9,25 75:5 76:22
78:21 97:5,14,22

**writing**
70:23 71:3 72:3 81:13 86:3
144:1

**written**
10:1 94:21 95:7,12,15,20
95:22 99:8,12,16 127:7
186:25

**wrong**
253:19

**wrote**
71:2 75:1,4 77:1,10 96:14
96:15,23,23

**x**

**xr**
155:6 180:10

**xrp**
45:21 46:1,10 53:16 54:6
54:20,25 62:6,8,11,14
69:18,19 124:14 125:3
132:13 147:12,14,20 149:8
149:9 151:1,6,8,13,24
152:1,2,5,10,11,17,19,23
153:4,5,8,12,17 154:3,4,11
155:13,19,25 156:6,12,23
157:2,6,8,17 159:19 160:21
161:18,20,23 162:16 165:4
170:11,22 171:2,9,20 172:6
172:14,24 173:11 175:7,13
175:24 176:4,9 177:12,16
178:21,21 179:2,6,18,23,23
180:4,10,13,15 181:14
182:4,16 184:11,12 185:1,6
186:5 188:8 195:3,25 196:5
196:14,22 198:4,9,17 199:5
199:16 200:8 202:6 205:9
205:17 206:19,24 207:1,6
207:15,18,23 208:1,11,17
208:23 209:3,3,7,8,15,15
209:17,21 210:1,2,6,12
211:11,18 214:6,10,20
224:13,14,17,19,24 225:3,8
226:15 229:10,15 236:21
243:11,19,23 244:8,16
245:4,5 246:4,6,16 247:7
248:5,12,19 249:1,22,24
250:4,5,8 261:12

**xrp's**
149:13,21 172:2 180:2
214:14 243:13,24 244:9

**y**

**yeah**
16:24 17:7 18:2,23 21:14
22:1,8,15,23,23 23:8,13,19
24:1 25:8,9,21 29:19 32:3
41:5,15 47:22 53:25 54:9
56:12 57:4 61:11,11,19
65:7 74:7 75:16 76:3,13
79:21 81:10 82:21 83:1,1,2
83:7 85:8 89:19,19 90:2,6
92:2 93:3,13 95:1,11,19
97:3 99:20 102:21 103:4
106:7 108:17 110:8 112:2

**yeah (cont.)**
115:13,18 116:11 117:17
119:7,8,24 120:15,18 121:8
121:10 122:23 125:12,23
126:11,18 130:4,19,24
131:16,24 132:11,20 133:1
134:20 136:18 137:12,18
137:24 138:12,19 139:1,6
139:23,23 140:9,16,16,16
140:21 141:3,16 142:13
143:23 144:7,18,25 146:10
149:5,17 150:15,21 151:10
151:22 153:2 156:10 157:5
159:4 160:1,1,8,13 161:1,6
166:18 167:17 168:7,9,11
182:19 186:8,19 187:25
188:12 190:18 194:25
196:11 198:16 201:14
202:13 203:6,13 204:9,10
207:4,10,24 211:1,3 212:15
214:4 216:18 224:4 230:3
230:11 231:2,8 236:18
240:12,18,23 242:15,19
244:3 247:4,13 249:16
252:6 253:2 257:25 258:22
259:19 260:19 262:12

**year**
12:20,25 25:6 26:5,16,18
26:20 31:3 32:25 47:2
107:25 108:2,5,8,10 109:14
111:7 113:7 259:8

**years**
13:7 32:4 36:13 102:10,11
102:12 104:1,6,15,20 137:2
137:4 145:2,7,14,17,22
146:8

**yesterday**
63:18 64:4 65:4,6,7 66:10
66:17,22 67:18,25 68:6

**york**
1:2 2:2,17,18,21 3:8,13,13
4:10,10 5:7,7 9:15,22,22
11:11 119:15,16 120:14,15
120:16,16,17,18,19,19,20
121:7 264:20,20 265:1,3

**z**

**zoom**
44:24,25 45:1 60:5 63:16
63:19 64:6,10,13,16,19
65:9,11,16,18

**zornberg**
4:7 60:4 64:15 133:7
146:17 152:8 168:15
199:24 200:2 218:6