# Exhibit 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Case No. 20-CV-10832 (AT) |
| RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN, | |
| Defendants. | |

**Expert Rebuttal Report of Peter Easton**

November 12, 2021

*Designated Highly Confidential Pursuant to the Protective Order Filed March 9, 2021*

## I.      INTRODUCTION AND ASSIGNMENT

1.      I submitted an expert report in this matter on October 4, 2021 (the "Easton Report"),

in which I provided, in substance, the following opinions:[1]

    i.  Ripple Labs Inc. ("Ripple" or "the Company"), and other companies holding cryptocurrencies (including XRP), account for those holdings as indefinite-lived intangible assets ("Intangible Assets"). Ripple properly accounts for monetary and non-monetary transfers of XRP as revenue on its income statement; and for the cost of purchases of XRP subsequently re-sold as an expense on its income statement. None of Ripple's transactions in XRP are treated, under U.S. Generally Accepted Accounting Principles ("U.S. GAAP"), as involving a security. MoneyGram International, Inc. ("MoneyGram"), a publicly traded holder of XRP, properly accounted for its receipt of XRP in exchange for providing services to Ripple, under U.S. GAAP, as a reduction in the cost of providing those services.[2]

    ii.  While there currently is no authoritative U.S. GAAP directly applicable to the accounting for cryptocurrencies, the available guidance, analogous U.S. GAAP, and the practices of other publicly traded companies holding cryptocurrencies are all consistent with the manner in which Ripple accounts for XRP on its balance sheet (*i.e.*, as an Intangible Asset), and are inconsistent with the notion that transactions involving cryptocurrencies (including XRP) are treated as transactions involving securities under U.S. GAAP.[3]

    iii.  Based on my understanding of Ripple's offers and sales of XRP as alleged in the Complaint, it would be improper for Ripple to account for those transactions as involving an offer or sale of securities under U.S. GAAP. In contrast, Ripple's accounting for its transactions involving XRP as revenues – and not as debt or equity securities – is consistent with U.S. GAAP's guidance for the accounting for consideration received in return for a company delivering goods, or providing or receiving services, as part of its on-going operations.[4]

2.      I have reviewed the expert reports of Professor ▇▇▇▇▇▇▇▇▇ (the "▇▇▇

Report") and ▇▇▇▇▇▇▇▇ (the "▇▇▇ Report") submitted on behalf of Plaintiff Securities

---

[1] *See* Easton Report, ¶¶ 1-6 and Appendix A for a summary of my qualifications along with a list of my prior testimonies given in the past five years and the articles I have written.

[2] Easton Report, ¶ 10.

[3] Easton Report, ¶ 10. As discussed later in this report, there is U.S. GAAP for debt and equity securities but not for investment contracts, as the SEC uses that term.

[4] Easton Report, ¶ 10.

*Highly Confidential*

Exchange Commission ("SEC") and dated October 4, 2021. I have been asked by counsel for Defendant Ripple ("Counsel") to respond to certain of the opinions proffered in the ████ Report and in the ████ Report.[5] This rebuttal report addresses the following issues:

i.    Do Ripple's transfers and sales of XRP in order to, among other things, finance operations or generate funds for share repurchases support the determination, under U.S. GAAP, that the economic substance of those transactions are sales of stock as Professor ████ opines?[6]

ii.   Assuming, *arguendo*, as set forth in the SEC's expert reports, that "Ripple used XRP in a similar manner as companies use stock" by, for example, compensating executives with XRP[7] and engaging in actions to limit the supply or otherwise support the market price of XRP (*e.g.*, through lock-up provisions, Ripple's escrow and limited release of not more than 1 billion XRP per month, and XRP purchases),[8] does this require a determination under U.S. GAAP that Ripple's transfers and sales of XRP were sales of equity or debt securities?

iii.  Does the fact that Ripple paid certain business partners and vendors for services in XRP rather than fiat currency, require a determination under U.S. GAAP that Ripple's transfers and sales of XRP were sales of equity or debt securities?

iv.   Do MoneyGram's disclosures in its SEC filings, with respect to the XRP it received from Ripple for facilitating international foreign exchange transactions on Ripple's ODL platform, reflect a determination that, under U.S. GAAP, Ripple's transfers and sales of XRP to MoneyGram constituted sales of equity or debt securities?[9]

## II.   SUMMARY OF OPINIONS

3.    Based on my academic training and teaching experience,[10] my familiarity with the academic literature and other references set forth in the portions of the ████ and ████ reports to which I respond, as well as my analysis and review of the record evidence and relevant

---

[5] This report does not attempt to identify every point of agreement or disagreement with either the ████ Report or the ████ Report. Therefore, any omission of a response to a point in either of those reports does not necessarily reflect agreement with that point.

[6] *See* ████ Report, ¶¶ 44-46.

[7] *See* ████ Report, ¶¶ 9.f. and 53-54.

[8] *See* ████ Report, ¶ 47; ████ Report, ¶¶ 41-47.

[9] *See* ████ Report, ¶¶ 38-40.

[10] *See* Easton Report, Appendix A.

*Highly Confidential*

accounting guidance, I conclude that certain of the opinions expressed in the ▮▮ Report and in the ▮▮ Report disregard, or are inconsistent with, U.S. GAAP. In particular:

    i. I find Professor ▮▮ opinion that Ripple used XRP in a similar manner to the way companies use stock incorrectly conflates the economic substance of the sales of XRP with Ripple's subsequent use of the proceeds from those sales.[11] However, even assuming, *arguendo*, that his opinion were informative, and accepting that Ripple used the proceeds from sales of XRP to fund operations and used XRP to compensate or incentivize executives, that would not change the conclusion under U.S. GAAP that those transactions should not be accounted for as sales of equity or debt securities.

    ii. Assuming, *arguendo*, that Ripple used mechanisms to limit the supply or otherwise support the market price of XRP (*e.g.*, through lock-up provisions, an escrow system, and purchases),[12] that does not mean that, under U.S. GAAP, the economic substance of those transactions were sales of equity or debt securities.

    iii. The fact that Ripple may have paid business partners and vendors for services in XRP rather than fiat currency[13] does not mean that, under U.S. GAAP, the economic substance of those transactions were sales of equity or debt securities.

    iv. MoneyGram's accounting for and disclosures of its receipt of XRP pursuant to its commercial agreement with Ripple do not reflect a determination that Ripple's transfers and sales of XRP to MoneyGram constituted sales of equity or debt securities. MoneyGram accounted for its commercial agreement with Ripple as an operating activity and not as an investing activity, as it would have done had its receipt of XRP been considered the receipt of a security. The disclosures were not because MoneyGram had received and subsequently sold a security, but rather because Ripple and MoneyGram had entered into a material commercial agreement as well as a separate securities purchase agreement, the combination of which triggered disclosure requirements under U.S. GAAP's guidance for related party transactions.

4.      This expert report summarizes the results of my analyses, my opinions, and the supporting evidence. **Appendix A** lists the documents I have considered and relied upon in performing my analyses and reaching my opinions. I have been assisted in my work by a team of

---

[11] ▮▮ Report, ¶ 9 f.

[12] ▮▮ Report, ¶¶ 9.c, 42-43, 53; ▮▮ Report, ¶¶ 48-49. I have not been asked to express an opinion on whether these mechanisms do in fact limit the supply or otherwise support the market price of XRP.

[13] ▮▮ Report, ¶¶ 38-40.

*Highly Confidential*

professionals at Compass Lexecon working under my direct supervision.[14] My compensation and

the compensation received by Compass Lexecon is not contingent on the outcome of this litigation.

### III.   RIPPLE'S ALLEGED USE OF XRP "IN A SIMILAR MANNER AS COMPANIES USE STOCK" DOES NOT, ACCORDING TO U.S. GAAP, SUPPORT AN OPINION THAT THOSE TRANSACTIONS CONSTITUTED SALES OF EQUITY OR DEBT SECURITIES

5.      The ▮▮▮▮ Report includes the following opinion:

> Ripple used XRP in a similar manner as companies use stock. Ripple employees receiving XRP were incentivized to work together to increase the price of XRP similar to the incentives of employees at public companies who work to increase company share value. XRP was also used to fund Ripple operations and to enrich Ripple's founders, directors, and early investors.[15]

6.      In this section, I discuss the basis for my opinion that Professor ▮▮▮▮ opinion incorrectly conflates the economic substance of Ripple's sales of XRP with Ripple's subsequent use of the proceeds from those sales. I further explain the reason that, even accepting Professor ▮▮▮▮ incorrect opinion, Ripple's use of XRP in a similar manner as companies use stock would not change the economic substance of the transaction such that, under U.S. GAAP, those transactions would be considered sales of equity or debt securities. I also explain why Ripple's subsequent use of the proceeds from its sales of XRP has no bearing on the appropriate accounting treatment of the sale and transfer of XRP under U.S. GAAP. In particular, I provide the basis for my opinion that, even if Ripple may have used the proceeds from sales of XRP to fund operations or to fund Ripple equity share repurchases, it does not follow that those XRP sales constituted sales of equity or debt securities.

---

[14] Compass Lexecon is being compensated for its professional services at its standard rates. My standard rate is $1,100 per hour, while those of my colleagues range from $250-$955 per hour.

[15] ▮▮▮▮ Report, ¶ 9 f.

*Highly Confidential*

A. **Ripple's Use of XRP To Compensate Executives**

7.      The ▮▮▮▮▮ Report finds that there are purported similarities between how Ripple utilized XRP and how companies utilize common stock, including Ripple's use as compensation to reward and incentivize employees.[16]

8.      As discussed in the Easton Report, Ripple engaged in certain non-monetary transactions in XRP to compensate its executives:

> [I]n 2019 Ripple granted its CEO 250 million XRP. The XRP were transferred at the time of grant, with 50% vested at the time of grant, and the remaining vesting on a quarterly basis over the next four years. Ripple records the compensation cost as the XRP vest as general and administrative expense.[17]

9.      Under U.S. GAAP, these non-monetary XRP compensation transactions are materially different from compensating employees with common stock. When a company issues shares to an employee as stock-based compensation, "common stock and additional paid-in-capital [equity accounts] increase in the same manner as for cash-based stock issuances."[18] In other words, stock issued to an employee is accounted for similarly to stock sold to an outside investor because the employee receiving those shares has the same benefits (and the company, the same obligations) associated with stock issued to external parties. The same is not true with respect to compensation paid in XRP, which – as a matter of economic substance and under U.S. GAAP – does not result in the same obligations on the part of Ripple. As I explained in the Easton Report, "Ripple's issuance of XRP in non-monetary transactions are distinguishable from situations in which Ripple

---

[16] ▮▮▮ Report, ¶¶ 53-56.

[17] Easton Report, note 71 (quoting Ripple 2020 Audited Financial Statements ("AFS") p. 40).

[18] Easton, Peter D., John J. Wild, Robert F. Halsey, and Mary Lea McAnally, *Financial Accounting for MBAs*, Eighth Edition (2021) ("Easton et al. (2021)"), at 8-14.

*Highly Confidential*

provides shares of the Company as stock-based compensation to consultants and employees" because "the holder has no future claim to Ripple's equity."[19]

10.   Moreover, employees can be compensated in many forms – cash, in-kind payments, or the provision of other benefits. Regardless of the form of payment, these non-equity forms of compensation to an employee are each accounted for as an operating expense (*i.e.*, as a component of the company's net income from operating activities).

## B.   Ripple's Use of Proceeds from Sales of XRP To Fund Operations

11.   To support his opinion that Ripple uses XRP in a similar manner as companies use stock, Professor █████ explains that early-stage companies often fund their operations and new investments with equity issuances.[20] But all companies fund their operations through either operating or financing activities, and the fact that Ripple funded its operations (in part) with sales of XRP does not mean XRP sales are security issuances.

12.   U.S. GAAP requires that a company record a transaction based on the economic substance of the arrangement between the relevant parties.[21] I understand that Ripple's On-Demand Liquidity product uses XRP to facilitate cross-border foreign exchange transactions. Given that XRP is integral to services that Ripple provides its customers, and is used to fund operations, the cash proceeds of Ripple's sales of XRP are properly accounted for as revenues

---

[19] Easton Report, ¶ 89. *See also id.*, ¶ 86 (noting that holders "of XRP have no claims against the assets or future profits of Ripple and no right to influence the operations of Ripple" nor is there any "creditor relationship between Ripple and holders of XRP").

[20] █████ Report, ¶ 53.

[21] FASB Statement of Financial Accounting Concepts No. 8: Conceptual Framework for Financial Reporting (as Amended, August 2018), at BC3.26 ("Faithful representation means that financial information represents the substance of an economic phenomenon rather than merely representing its legal form. Representing a legal form that differs from the economic substance of the underlying economic phenomenon could not result in a faithful representation.").

*Highly Confidential*

under U.S. GAAP.[22, 23] Cash proceeds from the sales of XRP are properly recorded as cash on the company's balance sheet to reflect cash inflows from operating activities. Any subsequent use of the cash on the company's balance sheet in a separate, independent transaction must be evaluated, and accounted for, based on the terms of that transaction, and, therefore, has no relevance to the prior accounting for the sale of XRP as revenues.[24] Accordingly, Professor ███ opinion is fundamentally flawed in as much as it contradicts basic analytical requirements of U.S. GAAP. In particular, Professor ███ opinion that "Ripple used XRP in a similar manner as companies use stock"[25] improperly disregards the economic substance of these transactions, and improperly conflates Ripple's initial sale of XRP with the subsequent use of the proceeds from those sales. To the extent that Professor ███ opinion that proceeds from the sale of XRP are used to fund operations implies that the sale was the equivalent to a sale of debt or equity securities, such an opinion is inconsistent with fundamental accounting principles.

---

[22] Easton Report, ¶ 82 ("Ripple generates revenue from the sales of XRP to customers to facilitate cross-border payments. Ripple properly accounts for this revenue in accordance with the FASB's guidance on revenue generated from contracts with customers"), ¶ 88 ("I understand that Ripple engages in transactions in XRP in order to facilitate transactions using the ODL platform. In these circumstances, Ripple's transfers of XRP are typical operating transactions, and are, therefore, properly treated as Revenue on the income statement.").

[23] As I explained in the Easton Report, "[r]evenues are inflows or other enhancements of assets of an entity or settlements of its liabilities (or a combination of both) from delivering or producing goods, rendering services, or other activities that constitute the entity's ongoing major or central operations." Easton Report, note 36 (quoting FASB Statement of Financial Accounting Concepts No. 6: Elements of Financial Statements, at CON6-2).

[24] In contrast, transactions in which the arrangement includes a sale, but the proceeds from a sale are used to make a purchase of similar goods from the party to the original transaction, are treated as one transaction for accounting purposes under ASC 606. *See, e.g.*, Doug Carmichael, *New Revenue Recognition Guidance and the Potential for Fraud and Abuse: Are Companies and Auditors Ready?* The CPA Journal (April 2019) ("In a round-trip transaction, an entity recognizes revenue in one transaction with the customer and, in a separately structured transaction, provides the consideration to the customer that offsets the amount to be received in the revenue transaction. Some well-known examples are Qwest and Global Crossing buying and selling line capacity between them in what was, in substance, a nonmonetary exchange."), https://www.cpajournal.com/2019/04/08/new-revenue-recognition-guidance-and-the-potential-for-fraud-and-abuse/. In contrast with these examples, Ripple's use of the proceeds are separate, independent transactions that are not linked with the sale of XRP. Therefore, there is no basis for considering the use of the proceeds in determining the appropriate accounting for sales of XRP under U.S. GAAP.

[25] ███ Report, ¶ 9 f.

*Highly Confidential*

13.     Moreover, Professor ███ acknowledges that Ripple's sales of XRP are, as a matter of economic substance, readily distinguishable from the sale of debt or equity securities in respects that are determinative under U.S. GAAP. Among other things, Professor ███ acknowledges that Ripple's sales of XRP do not grant the recipient the rights (or Ripple, the obligations) associated with the issuance of a debt or equity security:

> However, Ripple enjoyed the benefits of capital raising through sale of XRP, without the costs typically associated with such sales. XRP did not grant holders any formal voting rights in the governance of Ripple. Thus, Ripple executives did not have to give up any control of company operations as they normally would when selling dilutive shares with voting rights. Additionally, by not issuing publicly traded stock Ripple was not obligated to provide regular investor disclosures of financial records and corporate activities that companies typically make.[26]

14.     In the Easton Report, I explained that "[g]iven the substance of [Ripple's] XRP transactions . . . it is my opinion that XRP is not a security according to U.S. GAAP."[27] My opinion was based, in part, on my understanding that, as a matter of economic substance and contract, the "[p]urchasers of XRP have no claims against the assets or future profits of Ripple and no right to influence the operations of Ripple" nor is there any "creditor relationship between Ripple and holders of XRP."[28]

15.     Given that holders of XRP have none of the rights, and no ability to make any of the claims on Ripple that are provided to holders of debt or equity securities, there is no equivalent

---

[26] ███ Report, ¶ 55. Even if XRP sales are sales of equity in Ripple (they are not), the sales of XRP are not of sufficient magnitude for the executives of Ripple to "give up any control of company operations" as Professor ███ opines.  *Id.*

[27] Easton Report, ¶ 86.

[28] Easton Report, ¶ 86; *see also id.*, ¶ 88 (noting that Ripple's accounting for sales of XRP "as Revenue on the income statement . . . is appropriate because, unlike the case for issuances of equity and debt securities, Ripple has no future obligation to the holder of XRP. In particular, based on my understanding of Ripple's XRP Transactions, Ripple has no 'creditor relationship' with the purchaser of XRP, nor does the purchase of XRP provide the holder with 'an ownership interest in' Ripple").

*Highly Confidential*

need to require Ripple "to provide regular investor disclosures of financial records and corporate activities that companies typically make" when they sell equity or debt securities to the public.[29]

16.     Had sales of XRP been accounted for as issuances of stock (which Professor █████ claims is analogous), instead of recorded as Revenues on Ripple's income statement, Ripple would have recorded an equity transaction on its balance sheet.[30] The presence of an equity balance on a company's balance sheet reflects the claim the holder of the security has on the company's net assets.

17.     There is no equivalent claim to the company's net assets held by an owner of XRP. As my co-authors and I explain in our financial accounting textbook for MBA students, acquirers of a company's equity receive certain benefits that allow the holders to participate in the ongoing operations of the issuing company:

> Companies raise funds by selling shares of stock to investors in addition to borrowing. But, unlike debtholders and other lenders to the company, shareholders elect a Board of Directors that hires executives to oversee the company's operations. While interest and principal paid to lenders is fixed by contract, shareholders have no contractual return. There is, however, the potential for shareholders to receive dividends and derive large value from future price appreciation of company stock.

> The stockholders' equity section of the balance sheet reports the book value of the stockholders' investment, as determined under accounting rules (GAAP). . . . There are two types of stockholders' equity accounts: contributed capital and earned capital. . . . Over time, stockholders expect their equity to increase and the stockholders' equity section of the balance sheet represents a score card, in a sense, that records how well management has performed with the capital entrusted to them by the shareholders.[31]

---

[29] ████ Report, ¶ 55.

[30] Easton Report, ¶ 40 ("the proceeds for issuances of equity (*e.g.*, common stock, preferred stock) are accounted for as equity on the company's balance sheet. Unlike a sale of goods held on a company's balance sheet as inventory, there is no income statement impact (*i.e.*, no revenue or expenses) associated with issuing debt or equity.").

[31] Easton et al. (2021), at 8-3.

*Highly Confidential*

18.    Based on my understanding of Ripple's sales of XRP (and as Professor ██████ acknowledges), no holder of XRP has a right to any of the benefits (or imposes on Ripple any of the obligations) associated with sales of common stock.

19.    Nor does XRP have any of the economic substance of a debt security. Generally, the holder of a debt security expects to receive two types of cash flow streams in exchange for that investment: (1) periodic (usually semi-annual) interest payments over the life of the debt instrument; and (2) the repayment of the principal of the debt (*i.e.*, the face value on which the interest payments are calculated) as a return on investment upon maturity of the debt instrument.[32] But, unlike an issuer of a debt security, Ripple has no contractual or other obligation to pay a purchaser of XRP either periodic interest payments or a return of principal (*i.e.*, to purchase XRP at a given price).

20.    Thus, contrary to Professor ██████ opinion, all companies fund their operations through either operating or financing activities, and the fact that Ripple funded its operations (in part) with sales of XRP does not mean XRP sales are security issuances. Ripple's sales of XRP would not be accounted for under U.S. GAAP as the issuance of a debt or equity security.

## IV.    RIPPLE'S ALLEGED EFFORTS TO SUPPORT THE PRICE OF XRP DOES NOT CAUSE TRANSACTIONS IN XRP TO BE TRANSACTIONS IN EQUITY OR DEBT SECURITIES UNDER U.S. GAAP

21.    The ██████ Report assumes that Ripple utilized the escrow feature of the XRP Ledger, the lock-up provisions of various contracts, and purchases of XRP from the open market,[33] to provide price support for XRP. From this, he reaches an opinion that these actions were important to "investment-oriented" purchasers of XRP, but not to "utility-oriented" purchasers of

---

[32] *See, e.g.*, Easton et al. (2021), pp. 7-9 to 7-10.

[33] ██████ Report, ¶¶ 41-47.

*Highly Confidential*

XRP.[34] The ███ Report concludes that Ripple's use of lock-up provisions further demonstrates that Ripple's sales and transfers of XRP were used in a manner similar to common stock.[35] In this section, I discuss the reasons why, as a matter of economic substance under U.S. GAAP, even assuming Ripple engaged in actions to restrict the supply of XRP, and to otherwise support the market price of XRP (*e.g.*, through lock-up provisions, the escrow restrictions, and XRP purchases),[36] this does not result in Ripple's sales or transfers of XRP being treated as transactions in equity or debt securities under U.S. GAAP. In this section, I also address the reasons that Professor ███ and Mr. ███ observations about Ripple's alleged efforts to provide market price support for XRP do not alter my opinion that, as a matter of economic substance under U.S. GAAP, Ripple's sales of XRP were properly viewed as transactions in Intangible Assets and not involving securities.

### A.   Ripple's Use of an Escrow Feature

22.   In the Easton Report, I summarized the disclosure in Ripple's audited financial statements of Ripple's escrow feature:

> The Company utilizes a cryptographic escrow feature of the XRP Ledger to create certainty of [the amount of] XRP available to Ripple at any given time. The Company uses the escrow feature to establish escrow contracts that will expire on the first day of every month, with each monthly expiration representing 1 billion XRP. Only after the contracts expire do the XRP become available for Ripple's use. At the beginning of each month XRP are placed in new escrow contracts with expiration scheduled for the first month which does not yet have 1 billion XRP scheduled for escrow expiration. As of December 31, 2020, 48.2 billion XRP were subject to these time-based escrow contracts. During the years ended December 31, 2020 and 2019, of the 12.0 billion XRP released annually from escrow contracts 10.3 billion XRP and 9.4 billion XRP, respectively, were placed into new escrow contracts, with the last contract expiring on January 1, 2025.[37]

---

[34] ███ Report, ¶¶ 48-49.

[35] ███ Report, ¶ 53.

[36] I am not offering an opinion on whether Ripple engaged in actions to maintain or increase the market price of XRP. However, even assuming Professor ███ and Mr. ███ opinions were well-founded, they do not result in Ripple's sales or transfers of XRP being accounted for as transactions in a security under U.S. GAAP.

[37] Easton Report, ¶ 45 (quoting from Ripple 2020 AFS, p. 21).

*Highly Confidential*

23.     From the perspective of U.S. GAAP, and as a matter of economic substance, Ripple's disclosures of the use and purpose of this escrow feature is analogous to situations in which a company selling a good or service elects to manage the amount sold into the market (*e.g.*, as with an agricultural commodity, oil, or precious metal).

24.     Notwithstanding this analogy, how a company stores its inventory of goods available for sale, and whether and the extent to which it limits the supply of goods sold, is an operational decision that has no bearing on how sales of those goods are accounted for under U.S. GAAP.[38] Therefore, the economic substance of Ripple's management of the total amount of XRP Ripple could sell in a given month does not support the opinion that Ripple's transfers or sales of XRP were sales of stock under U.S. GAAP. The sale of inventory does not become a sale of a security simply because a company selling the inventory may use an escrow or other mechanism to restrict supply. Instead, as discussed above in **Section III**, what matters in determining the appropriate accounting for a transaction is the economic substance of the contractual arrangement between the buyer and seller.

### B.     Ripple's Use of Lock-Up Provisions

25.     The ████ Report observes that "Ripple also placed lock-up restrictions on certain sales of XRP sold in over-the-counter sales agreements to individual or institutional investors, that would mitigate selling pressure."[39] According to Professor ████ these contractual provisions

---

[38] While the method in which a company physically (or virtually) stores the inventory of goods available for sale does not impact the accounting for subsequent sales, the choice of accounting inventory methods for determining the cost of the inventory sold (*e.g.*, first-in-first-out ("FIFO"), last-in-first-out ("LIFO"), average cost, specific identification) does impact the amount of expense (cost of goods sold) recorded in connection with those sales.

[39] ████ Report, ¶ 9.c.

*Highly Confidential*

"functioned similarly to lock-up restrictions in a traditional company's Initial Public Offering and allowed Ripple to protect the price of XRP from falling."[40]

26.     Professor ███ suggests that Ripple's use of lock up restrictions has the same purpose as the use of the escrow feature (*i.e.*, to support the XRP price). However, as discussed in detail above, a decision by a company to limit the supply of goods or services in order to support pricing is an operational decision that has no bearing on the character of the asset or how those sales are accounted for under U.S. GAAP.

**C.     Ripple's Purchases of XRP**

27.     As I explained in the Easton Report, Ripple purchased XRP from the market in 2020 and held Purchased XRP with a cost basis of ███████ as an Intangible Asset on its balance sheet as of December 31, 2020.[41] Ripple's financial statements show that the amount of cash paid for Purchased XRP in 2020 was ██████ (and ██ in 2019), in comparison with Revenue recognized on monetary sales of XRP of ███████ in 2020 and ████████ in 2019.[42] Ripple's accounting for Purchased XRP as an Intangible Asset was proper, and not treated differently under U.S. GAAP from how other companies purchasing XRP (*e.g.*, MoneyGram) accounted for their purchases of XRP.[43]

28.     In contrast, Ripple paid ████████ in 2020, and ████████ in 2019, to repurchase common and preferred stock.[44] Ripple's repurchases of its own common stock are recorded either as a direct reduction in the Common Stock and Additional Paid in Capital accounts

---

[40] ████ Report, ¶ 9.c.

[41] Easton Report, ¶ 51.

[42] Ripple 2020 AFS, p. 3 & 6. Ripple did not purchase any XRP in 2019. *Id*., p. 6 & 21.

[43] Easton Report, ¶ 78 (citing MoneyGram 2020 10-K, p. F-45).

[44] Ripple 2020 AFS, p. 6.

*Highly Confidential*

(the accounts used to record issuances of common stock) or as Treasury Stock, which represents a reduction in the equity balance of Common Stock.[45] Similarly, Ripple's repurchases of preferred stock are recorded as a reduction in the equity balance of Preferred Stock.[46] These purchases are accounted for as a reduction in equity because those repurchases reduce the amount of total shareholder claims on Ripple's net assets and, in the case of Preferred Stock, the amount of preferred dividends owed to holders of those shares.

29.     Even if Ripple's purchases of XRP were intended to serve the same purposes as its use of an escrow feature or lock-up provisions (*i.e.*, to support the price or control the supply of XRP), that doesn't result in Ripple's transactions in XRP being treated as the sales of a security under U.S. GAAP, for the reasons I describe above (*supra*, ¶¶ 12, 23-24).

## V.     NEITHER RIPPLE'S USE OF XRP TO MAKE PAYMENTS IN EXCHANGE FOR GOODS AND SERVICES, NOR THE SUBSEQUENT DISPOSITION OF XRP BY THOSE COUNTERPARTIES, CAUSES RIPPLE'S TRANSACTIONS IN XRP TO BECOME A SECURITY UNDER U.S. GAAP

30.     The ▮▮▮▮ Report offers the opinion that Ripple's transactions in XRP were designed to create "an expectation of future profit derived from the efforts of Ripple."[47] Mr. ▮▮▮▮ states that "[c]reating new partnerships with financial institutions was a key aspect of the bull case for XRP," and that "Ripple's distributions of XRP to business partners were another mechanism . . . by which Ripple effectively sold XRP into the broader XRP ecosystem."[48] Mr. ▮▮▮▮ points to Ripple's commercial agreement with MoneyGram as one example of such a business relationship.[49]

---

[45] Ripple 2020 AFS, p. 5 & 35.

[46] *Id.*

[47] ▮▮▮▮ Report, ¶ 8.

[48] ▮▮▮▮ Report, ¶ 38.

[49] ▮▮▮▮ Report, ¶ 39.

*Highly Confidential*

31.     In this section, I discuss the basis for my opinion that neither Ripple's use of XRP

as currency for the payment of services received from business partners, nor the decision by those

recipients whether to sell or hold XRP, causes those transactions to constitute a sale of an equity

or debt security under U.S. GAAP. Moreover, the accounting disclosures made by MoneyGram

refute Mr. ███████ conclusion. MoneyGram accounted for its receipt of XRP as an operating

transaction pursuant to a commercial agreement with Ripple. MoneyGram made disclosures about

its receipt of XRP in its audited financial statements filed with the SEC not because it had received

and subsequently sold a security, but rather because Ripple and MoneyGram had entered into a

material commercial agreement as well as a securities purchase agreement, the combination of

which triggered disclosure requirements under U.S. GAAP's guidance for related party

transactions.

### A.      Ripple's Payments to Service Providers in XRP Are Not Sales of a Security Under U.S. GAAP

32.     In the Easton Report, I discussed Ripple's payment to certain service providers in

XRP rather than fiat currency:

> Ripple also generates non-monetary revenue from XRP transactions in which the Company pays
> for services with XRP. These transactions are akin to barter transactions, and are properly
> accounted for in accordance with the FASB's guidance on non-monetary transactions. Since the
> XRP that Ripple sells has a cost basis of zero, its transfer results in profit equal to the fair value of
> the amount of XRP transferred. As discussed above, however, these non-monetary transactions
> result in a net profit that approximates zero in any given period (*i.e.*, the only difference between
> the amount of revenue and expense recorded for non-monetary XRP transactions is the result of
> differences in timing between when the services are performed and Ripple pays for them by
> distributing XRP).[50]

33.     I also explained why Ripple's payment in XRP was distinguishable from a payment

of equity, for example the payment of stock-based compensation:

> Ripple's issuance of XRP in non-monetary transactions are distinguishable from situations in which
> Ripple provides shares of the Company as stock-based compensation to consultants and employees.

---

[50] Easton Report, ¶ 82 (citation omitted).

*Highly Confidential*

In the case of stock-based compensation, the stock options or warrants issued provide the holder with a claim on the equity of Ripple and they are accounted for as such. In contrast, Ripple's distributions of XRP as compensation to employees or as consideration to contractors are properly recorded as current period expenses for services provided. This is because, unlike for transactions involving debt, equity, or employee stock options, once the XRP is distributed, Ripple has no future obligation to the holder and the holder has no future claim to Ripple's equity.[51]

34.    As is the case with Ripple's use of proceeds from sales of XRP (*supra*, ¶ 12), how the recipient of XRP disposes of XRP in an independent transaction is irrelevant to the proper accounting of a transaction. Therefore, neither the fact that Ripple paid certain business partners for services rendered in XRP instead of cash, nor whether those recipients continued to hold or sold the XRP, results in those transactions involving sales of stock according to U.S. GAAP.

**B.    MoneyGram's Accounting for and Disclosures of Its XRP Transactions with Ripple Do Not Result in XRP Being a Security Under U.S. GAAP**

35.    MoneyGram is an example of a Ripple service provider that received payment in XRP. In the Easton Report, I explained that MoneyGram disclosed that, "[a]s part of a commercial agreement with Ripple, MoneyGram received XRP for facilitating international foreign exchange transactions on Ripple's ODL platform."[52] MoneyGram's 2020 10-K included the following disclosure with respect to its agreement with Ripple:

In June 2019, we entered into a commercial agreement with Ripple Labs, Inc., a developer of blockchain technology and a cryptocurrency named XRP, to utilize their On Demand Liquidity ('ODL') platform, as well as XRP, for cross-border foreign exchange transaction for the Company's own account. The Company is compensated by Ripple for developing and bringing liquidity to certain foreign exchange markets, facilitated by the ODL platform, and providing a reliable level of foreign exchange trading activity. We refer to this compensation as market development fees. Per the terms of the commercial agreement, the Company does not pay fees to Ripple for its usage of the ODL platform or the related software and there are no claw-back or refund provisions. The market development fees are recorded as a reduction of the 'Transaction and operations support' line in the accompanying Consolidated Statements of Operations."[53]

---

[51] Easton Report, ¶ 89 (citations omitted).

[52] Easton Report, ¶ 77.

[53] Easton Report, ¶ 77 (quoting MoneyGram 2020 10-K, p.2).

*Highly Confidential*

36.     The Easton Report also summarized MoneyGram's disclosures in which it accounted for the XRP it received from Ripple as an Intangible Asset.[54] Had MoneyGram viewed the receipt of XRP as a security, it would have accounted for its holdings of XRP as an investment in debt or equity securities.

37.     The Easton Report also explained that "MoneyGram's accounting for the fees received from Ripple in the form of XRP as a reduction in its cost of providing the XRP transactions (*i.e.*, as a contra-expense on its income statement) is consistent with the accounting treatment it would have used had the fees been paid instead with U.S. dollars."[55] MoneyGram's disclosures make clear that it viewed its commercial agreement with Ripple, including subsequent sales of XRP, as part of its operating activities and not as the sale of a security (a financing activity): "All activity related to the Ripple commercial agreement, including purchases and sales of XRP and consideration received in XRP, is presented as part of operating activities in the Consolidated Statement of Cash Flows."[56]

38.     In addition to a commercial agreement, Ripple and MoneyGram also entered into a securities purchase agreement ("SPA") whereby "Ripple agreed to purchase and the Company agreed to issue up to $50.0 million of common stock and ten-year warrants to purchase common stock."[57] Ripple paid MoneyGram a total of $50 million in two transactions during 2019 and MoneyGram accounted for "[t]he proceeds from the issuance to Ripple . . . in 'Additional paid-in capital' with the corresponding par value of the common stock issued in 'Common stock' on the

---

[54] *See* Easton Report, ¶ 78.

[55] Easton Report, ¶ 79.

[56] MoneyGram 2020 10-K, p. F-45.

[57] MoneyGram 2019 10-K, p. F-44.

*Highly Confidential*

Consolidated Balance Sheets as of December 31, 2019."[58] In other words, Ripple's exercise of its rights under the SPA was accounted for by MoneyGram as the issuance of equity and a financing cash flow.

39.     MoneyGram also disclosed that "[t]he Company evaluated the fair values of each element within the multiple element arrangement and determined that it was not necessary to allocate any proceeds from the SPA to the commercial agreement."[59] In other words, MoneyGram considered the SPA with Ripple to be distinct from the commercial agreement, which it explicitly recognized as an operating activity and not as an investing activity as it would have done had its receipt of XRP been considered the receipt of a security.

40.     Finally, as part of his argument that "the overall effect of [Ripple's] XRP payments [to MoneyGram] was to sell additional XRP into the open market in exchange for cash," Mr. ███ noted that "MoneyGram regularly updated its investors in public filings to the U.S. Securities and Exchange Commission about the compensation it received from Ripple."[60] To the extent that Mr. ███ intended to infer as much, MoneyGram's disclosures of its commercial agreement with Ripple in its SEC filings do not mean that its receipt of XRP represented the receipt of a security that it subsequently sold on the market. MoneyGram disclosed the commercial agreement as part of the discussion of the company's operating results and significant accounting policies, likely due to the materiality of the commercial agreement to its operating results (*e.g.*, MoneyGram recorded $50.2 million in "market development fees" in 2020).[61] Moreover, U.S. GAAP required that MoneyGram disclose both the SPA and the commercial agreement as related

---

[58] MoneyGram 2019 10-K, p. F-44.

[59] MoneyGram 2019 10-K, p. F-44.

[60] ███ Report, ¶ 39.

[61] MoneyGram 2020 10-K, pp. 32, F-17, & F-45.

*Highly Confidential*

party transactions given that Ripple became a significant holder of MoneyGram common stock as a result of the SPA.[62]

41.     In summary, MoneyGram's accounting for and disclosures of its receipt of XRP pursuant to its commercial agreement with Ripple are inconsistent with an interpretation that XRP is a security.

## VI.    CONCLUSION

42.     Based on my analysis and review of the record evidence and relevant accounting guidance, I find that certain of the opinions expressed in the ███████ Report and in the ███████ Report disregard, or are inconsistent with, U.S. GAAP. After consideration of those opinions expressed in the ███████ and ███████ reports, my opinion that sales and transactions involving XRP would not be accounted for as the offer and sale of securities under U.S. GAAP is unchanged.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November 12, 2021.

*[signature]*

_____

Peter Easton

---

[62] MoneyGram 2020 10-K, p. F-44.

*Highly Confidential*

# APPENDIX A
## List of Materials Considered

### Expert Reports

- Expert Report of ███████████ dated October 4, 2021
- Expert Report of Peter Easton dated October 4, 2021
- Expert Report of ███████████ dated October 4, 2021

### Ripple Financial Statements

- Ripple Lab Inc., Consolidated Financial Statements as of December 31, 2020 and 2019 and for the years then ended and Independent Auditors' Report (RPLI_SEC 0920429-75)

### SEC Filings

- MoneyGram International, Inc. Form 10-K for the fiscal year ended December 31, 2019
- MoneyGram International, Inc. Form 10-K for the fiscal year ended December 31, 2020

### Accounting Guidance

- FASB ASC 606: Revenue from Contracts
- FASB Statement of Financial Accounting Concepts No. 6: Elements of Financial Statements
- FASB Statement of Financial Accounting Concepts No. 8: Conceptual Framework for Financial Reporting

### Other Public Documents and Data

- Carmichael, Doug, "New Revenue Recognition Guidance and the Potential for Fraud and Abuse: Are Companies and Auditors Ready?" *The CPA Journal* (April 2019) https://www.cpajournal.com/2019/04/08/new-revenue-recognition-guidance-and-the-potential-for-fraud-and-abuse/
- Easton, Peter D., John J. Wild, Robert F. Halsey, and Mary Lea McAnally, *Financial Accounting for MBAs*, Eighth Edition (2021)

All other

*Highly Confidential*