# Exhibit 31

1. I am the Executive Vice President and Chief Financial Officer of MoneyGram International, Inc. ("MGI" or the "Company"), a money transfer company based in the United States with headquarters in Dallas, Texas. As part of my job responsibilities, I am familiar with the transactions discussed below.

2. MGI is a leading global financial technology company that provides services around the world. The Global Funds Transfer segment is our primary revenue segment, providing immediate money transfer services and bill payment services with pricing considerably lower than banks to banking customers as well as unbanked and underbanked customers. Our money transfer services accounted for 87% of MGI's total revenue for the year ended December 31, 2019. The majority of our remittances constitute transactions in which cash is collected by one of MGI's agents and funds are made available for pick-up at another agent location. The Company also offers digital money transfer solutions directly to consumers, who access the service through a mobile app, the Company website, and funded through a debit card, credit card, or direct debit from a bank account or mobile wallet. Typically, the designated recipient may receive the transferred funds within ten minutes at any MGI agent location, and in the case of the Company's mobile solutions, in a bank account or mobile wallet.

3. To meet our consumer obligations, MGI must have sufficient highly liquid assets at all times and be able to move funds globally on a timely basis. On average, we receive and pay out a similar amount of funds on a daily basis to collect and settle the principal amount of our payment instruments sold, as well as related fees and commissions with our end-consumers and agents. We preposition cash in various countries and currencies to facilitate the settlement of our transactions, which we accomplish with foreign currency trades. On

average, MGI typically has over $250 million in working capital to support its settlement in foreign currencies, and approximately $120 million of foreign currency prefunds in selective countries each day.

4. In 2017, MGI was operating an internal lab exploring use cases for blockchain technology.

5. In 2017, a California based company, Ripple Labs, Inc. ("Ripple"), and MGI began discussions regarding a proposed commercial relationship in which MGI would utilize Ripple's blockchain technology and the digital asset XRP to facilitate cross border transactions.

6. From February 2018 through March 2019, MGI conducted a series of pilot tests using Ripple's ODL platform to determine whether MGI could benefit from utilizing XRP and Ripple's blockchain technology. The pilots involved MGI sending a series of small transactions in XRP in the ordinary course of MGI's foreign exchange ("FX") trading. In total, MGI conducted approximately 13 trades involving XRP, each for the U.S. dollar equivalent of approximately $100 each for a grand total of $1,225. Twelve of the trades consisted of MGI purchasing XRP with U.S. dollars ("USD") and then selling XRP to buy Mexican pesos ("MXN"). MGI also had one test that involved purchasing Euros with XRP.

7. The results of these pilot tests showed that the speed of the cross-border transactions was faster using XRP than the company's traditional FX transactions, but that MGI recognized significantly higher trading costs by using XRP as a bridge asset in the above FX transactions. Specifically, the average spread for the XRP trades was approximately 68 basis points ("bps") for the MXN market, whereas the cost of traditional FX trading was less than 5 bps in the same market.

8. In addition to the larger spreads, MGI also saw higher volatility in the XRP trades as compared to traditional FX trading because of the relatively larger changes in the exchange rate between XRP and fiat.

9. Based on the results of these pilot tests, MGI concluded that the use of XRP in the ODL platform was cost prohibitive to MGI's business.

10. In 2018 and early 2019, MGI represented to Ripple – including its senior management – that the pilot tests did not produce better economic results for the Company than MGI's existing FX trading practices due to the excessive cost of transacting in XRP.

11. In August 2018, Ripple responded to MGI's concerns by suggesting that a commercial agreement – including an integration of MGI's system with the ODL platform – would solve most of MGI's issues relating to XRP trade execution. By creating reliable XRP transaction flows as a result of the proposed agreement, Ripple also claimed that it could develop a network of trading counterparties and prioritize certain foreign currency markets over time, thereby ensuring that MGI could execute transactions in the same manner as its existing FX trading.

12. On June 17, 2019, MGI entered into a Securities Purchase Agreement (the "SPA") with Ripple pursuant to which it sold MGI common stock, par value $0.01, ("Common Stock") and a Warrant to purchase Common Stock at a per share purchase price of $4.10 to Ripple, for a total consideration of $30 million (collectively, the "Equity Investment"). Under the terms of the SPA, at any time through June 30, 2020, MGI had the right to require that Ripple purchase up to $20 million in additional Common Stock and Warrants to purchase Common Stock at a per share price of at least $4.10 per share.

3

13. On June 17, 2019, the same day it entered into the Equity Investment, MoneyGram Payment Systems, Inc. (a wholly-owned subsidiary of MGI, "MPSI") and Ripple entered into a Ripple Master Hosted Services Agreement and Work Order relating to Ripple's ODL platform (the "Commercial Agreement"). Based on discussions between the two companies, MGI understood that Ripple's primary interest at the time was in the Commercial Agreement with MGI rather than its Equity Investment.

14. The fact that Ripple agreed, as part of the Commercial Agreement, to reimburse MGI sufficiently to be within 5 basis points of the prevailing Reuters Benchmark spot FX rate ("spot market foreign exchange rate") on each transaction (such difference largely attributable to XRP market inefficiencies, volatility and exchange fees), meant that MGI would not incur the excessive costs of trading XRP that MGI had experienced in the pilots during 2018 and 2019.

15. Under the terms of the Commercial Agreement, Ripple agreed to make the Ripple ODL platform available to MPSI (the "Hosted Services") and provide related support services and training to MPSI (the "Support Services"). Neither MGI nor MPSI pays any fees to Ripple for the Hosted Services or Support Services.

16. Pursuant to the terms of the Commercial Agreement, MPSI is to "…use commercially reasonable efforts to deploy and use the Hosted Service to send and receive cross-border payments…" Depending on the volume of USD equivalent purchases of XRP that MPSI transacts during the term of the Commercial Agreement, Ripple Services will pay MPSI certain amounts of XRP as set forth in the Commercial Agreement as compensation for MPSI's services. Effectively, MPSI is compensated for developing and bringing liquidity to the XRP marketplace and providing a reliable level of foreign exchange trading activity with

XRP. MPSI achieves this liquidity by executing purchases and sales of XRP on a daily basis on third party exchanges around the world that facilitate the trading of XRP.

17. From January 1, 2020 through November 30, 2020, MGI traded the USD equivalent of $2,085,197,587 of XRP through the ODL platform. The XRP transacted by MPSI in connection with the ODL platform is purchased and sold through public digital asset exchanges. MGI does not know the identities of the counterparties but believes they are parties other than Ripple.

18. During the course of operating under the Commercial Agreement, MGI learned that Ripple's primary and possibly sole source of revenue was selling XRP pursuant to its "drip program," which is Ripple's systematic approach for slowly selling XRP into the marketplace. As a result, it was in Ripple's best interest to market and promote XRP by providing potential users of XRP with proven use-cases for the utility of XRP, as well as to increase the overall liquidity of XRP with multiple commercial users of the product, thereby creating a deeper and more liquid marketplace for the buying and selling of XRP.

19. Based on this understanding, MGI views itself as providing a distinct service to Ripple under the Commercial Agreement, which is to provide the XRP marketplace with liquidity by executing consistent purchases and sales of XRP, on a daily basis on third-party exchanges. MGI has not paid any compensation to Ripple at any point in the arrangement and has no obligation to do so under the Commercial Agreement.

20. As discussed below, Ripple compensates MGI in XRP for its use of the ODL platform, but Ripple does not sell any XRP to MGI for MGI's uses on the ODL platform—rather, MGI buys and disposes of the XRP on third party exchanges. MGI does not hold XRP for any meaningful amount of time, and XRP is not utilized as part of consumer transactions in any

way, nor are these customers aware that XRP is being used by MGI to as part of its back office foreign currency trading.

21. MGI is being compensated by Ripple, pursuant to the Commercial Agreement, in XRP based on the amount of fiat currency transacted through the ODL platform. As discussed below, there are three distinct types of payments specified in the Commercial Agreement related to such services: Net Rebates, Performance Bonuses and Market Development Fees.

22. Ripple has guaranteed that the exchange rates charged by the ODL platform will be within 0.05% (5 basis points) of the spot market foreign exchange rate at the time of each transaction, inclusive of all XRP trading spreads, volatility and exchange fees. In order to ensure this guarantee is met, there are certain make-whole provisions in the Commercial Agreement whereby Ripple will pay XRP to MGI to meet the requirements of the Commercial Agreement ("Net Rebate"). The Net Rebate is paid to MGI in XRP and is withdrawn daily from a designated digital asset wallet. In the event that the daily net exchange rate difference is favorable to MGI – in other words, if the ODL exchange rate was better than the spot FX rate – then no Net Rebate is required to be made by MGI to Ripple.

23. In addition to the Net Rebate, Ripple has also incentivized MPSI under the Commercial Agreement by paying performance bonuses. Ripple initially agreed to pay MPSI an amount of XRP equal to USD $3,500,000 if the XRP transaction volume met or exceeded $30,000,000 on or before March 31, 2020 (the "Performance Bonus").

24. Ripple pre-funds wallets with XRP so that MPSI may withdraw, on a daily basis, the XRP that Ripple pays MPSI under the Commercial Agreement. After withdrawing the Net Rebate, Performance Bonuses, and Market Development Fees paid by Ripple in XRP, MPSI exits these XRP positions typically within one trading day from when the payment is

received, or as soon as possible due to holidays or operational impediments. MPSI is not permitted to use XRP withdrawn from the wallet to buy foreign currency on the ODL platform.

25. On September 25, 2019, MPSI and Ripple entered into an amendment to the Commercial Agreement. In the first few months of operating under the Commercial Agreement, the parties had recognized the challenges of achieving the original contemplated transaction volume levels. As a result, this amendment accelerated a $3.5 million bonus to MPSI from March 31, 2020 to September 30, 2019 if the transaction volume in XRP traded by MPSI reached $15 million, as opposed to the previously agreed $30 million.

26. The parties also agreed to amend the impact of a provision addressing the impact of MPSI using a non-ODL product that utilizes a cryptocurrency as a bridge currency for cross-border settlement; previously, such an action would have resulted in a reduction of fees payable to MPSI under the Commercial Agreement, but the September 2019 amendment made this a material breach of the Commercial Agreement.

27. On November 22, 2019, the remaining $20 million equity investment was made by Ripple at a purchase price of $4.10 per share.

28. On December 31, 2019, the parties entered into an amendment to the Commercial Agreement. This amendment, among other changes, added new bonus opportunities, adjusted certain bonus related thresholds, and added a $5 million bonus payable to MPSI at the end of 2019. MGI was no longer identified as a customer of Ripple, but instead was referred to as the "Service Provider" for Ripple under this revision to the Commercial Agreement.

29. The December 2019 amendment to the Commercial Agreement also added terms intended to encourage MPSI's utilization of RippleNet.

30. In June 2020, Ripple expressed a desire to further amend the Commercial Agreement to significantly reduce the volume of XRP transacted by MGI under the existing agreement. This was due to the projection of further increases in MGI trading volume on the ODL platform, and the widening of spreads against the spot market foreign exchange rate, which increased the cost of the make-whole payments to MGI. The inability of Ripple to support the volume of trading, especially in PHP and AUD, resulted in widening of spreads required by counterparties to accept the higher volumes. In addition, Ripple also requested that any trade in excess of 300 basis points over the spot rate would be denied, so as to limit their exposure if FX spreads continued to deteriorate. MGI understood, based on conversations with Ripple, that this amendment was intended to significantly reduce Ripple's costs under the Net Rebate provision of the Commercial Agreement.

31. In a June 16, 2020 amendment to the Commercial Agreement, MPSI agreed to the XRP volume reduction and in exchange, Ripple agreed to offset the decrease in XRP volume with an increase in the percentage of transaction volume to be paid as fees to MGI from 0.75% to 4.0%. The parties also agreed to reduce the total maximum amount that could be earned by MGI under the Commercial Agreement from $110 million to $100 million. In addition, the amount of XRP earned by MGI under the agreement would be converted to U.S. dollars at the daily market rate.

32. From the start of the Commercial Agreement, MGI understood that Ripple had financial arrangements with market makers trading XRP at digital asset trading platforms in the receiving country of a cross-border payment to ensure sufficient liquidity for MPSI's

transactions using ODL. MPSI increased volume and sent payments to specific countries that corresponded to the liquidity and infrastructure that Ripple had created through agreements with these market makers and other strategic partners.

33. From January 1, 2020 through November 30, 2020, Ripple has paid $38,639,885 in XRP to MPSI in market development fees and $10,101,545 in Net Rebates intended to ensure that the exchange rates charged by the ODL platform would be within 0.05% (5 basis points) of the spot market foreign exchange rate. MPSI has sold all of the XRP received from Ripple on public digital asset exchanges.

34. One potential future benefit identified by the parties at the outset of the Commercial Agreement was that if such trading were performed by MPSI at "scale" (i.e., a significant majority of its total foreign currency trading is performed through ODL), MPSI might be able to pre-position less capital around the world and thereby achieve significant cost savings through this less-capital intensive process.

35. MGI had only achieved a level of trading volume that could be considered reflective of "scale" for two currencies during the term of the Commercial Agreement: Mexican pesos ("MXN") and Philippine pesos ("PHP"). Even at the peak of MGI's XRP trading in May-June 2020, MGI was not able to actually reduce the working capital in those foreign markets necessary to support trading. This is due to the capital required to provide liquidity to the crypto-exchanges, and insufficient XRP liquidity in the public markets. Also, MGI's risk management protocols discourage the use of a single counterparty as the sole source of sourcing an individual currency.

36. As a result of the inability to achieve scale under the Commercial Agreement, MGI has not yet realized any cost savings from reductions in working capital needs – or any other transaction-related cost savings – from its arrangement with Ripple.

37. The lack of cost savings is due to the off-market execution of FX trading on the ODL platform, and the high level of fees that are required for each ODL transaction. In addition, MGI's trading experience is consistently 5 basis points off the spot market in all currencies, for which MPSI is not reimbursed under the Commercial Agreement.

38. In a traditional foreign exchange trade, MGI enters into a trade with a commercial bank to sell fiat currency and purchase a secondary fiat currency. For highly liquid currencies, such as the Euro, MGI would pay 1 basis point (0.01%) of the notional amount of the transfer as the foreign exchange spread to sell one fiat currency and buy the second fiat currency. MGI also incurs a flat fee of $15 to transfer funds cross border which does not vary, regardless of the size of the transaction.

39. When MGI transfers funds using the ODL platform, it has to pay fees to both the third party digital asset exchanges who facilitate the exchange of fiat currency to XRP as well as the second digital asset exchange converting the XRP to fiat currency. These fees are variable based on the individual exchange and can be a fixed fee rather than basis points of the notional amount of the transfer. MGI has been required by Ripple to include frequent and very small (typically less than $50,000) trades in its integration with the ODL platform. This requirement was due to a lack of liquidity in the market, and also because large XRP trades were more expensive versus the spot market foreign exchange rate and sometimes difficult to execute. In addition, Ripple was unable to establish FX counterparties capable of placing trades above $50,000. Because MGI has had to trade very small amounts, the exchange fees

have averaged 15 basis points (0.15%) of the notional amount of the transfer. Additionally, MGI has incurred a foreign exchange spread to sell one fiat currency and buy the second fiat currency. Since the XRP foreign exchange markets are immature markets with limited liquidity, MGI typically pays 50 to 70 basis points (0.5% to 0.7%) of the notional amount of the transaction, prior to the reimbursement under the Net Rebate provision of the Commercial Agreement.

40. To take an example,[1] if MGI wanted to send a notional value of approximately $1,000 USD and convert it to MXN using the traditional commercial bank transfer system, MGI would incur a $15 bank transfer fee and approximately $2.25 from the estimated average FX spread, for a total cost incurred of $17.25. For an equivalent transfer using the ODL platform, MGI would incur a fee of approximately $22.63 at the third-party US exchange; a fee of approximately $11.22 at the third party Mexico exchange; and the estimated average FX spread would be approximately $122.90, for a total cost incurred of $156.75. The impact of the fixed fees is magnified because MGI will typically trade more than $1.0 million at a time in traditional markets, vs less than $50,000 in an ODL trade. For the same transaction, Ripple pays MPSI Rebate Fees of approximately $145 as well as a Transaction Fee of $560, generating a profit to MGI of $548.25 – despite the fact that the actual cost of the transaction itself is significantly higher using the ODL platform.

41. MGI has repeatedly communicated to Ripple the lack of transaction-related cost savings from the ODL platform, without including the incentive payments. In addition, Ripple was constantly made aware of the lack of transaction-related costs saving from the platform due to the large amount that Ripple was required to pay under the Net Rebate provision of the

---

[1] For purposes of this illustration, these scenarios assume that the foreign exchange rates remain constant.

Commercial Agreement. Ripple was tracking their make-whole payments, and proactively taking steps to reduce that stress on their company.

42. As MGI has disclosed publicly, the company achieves significant financial benefits from using the ODL platform. However, these benefits are not due to any reduction in transaction-related or prefunding costs. Instead, the benefits are entirely due to the substantial incentive payments provided by Ripple to MGI. The Commercial Agreement provides a net cash benefit to MGI because the company is largely made whole on the excessive costs from transacting in XRP as opposed to traditional FX transactions, and – in addition to these make-whole (Net Rebate) payments – MGI also receives significant compensation based on the volume of XRP that MGI trades.

43. Based on discussions with MGI, Ripple and its senior management are aware of the lack of transaction-related cost savings and the lack of prefunding savings from MGI's use of the ODL platform.

44. As of the date of this declaration, the Commercial Agreement has been terminated by both parties effective March 7, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 3-14 2021

_____
Lawrence Angelilli