# Exhibit 37

1

1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE      )
    COMMISSION,                  )
5                                )
                Plaintiff,       )
6                                )
         vs.                     ) Case No.
7                                ) 20-Civ-10832(AT)(SN)
    RIPPLE LABS, INC., BRADLEY   )
8   GARLINGHOUSE, and CHRISTIAN  )
    A. LARSEN,                   )
9                                )
                Defendants.      )
10  _____)

11

12

13

14              HIGHLY CONFIDENTIAL

15        VIDEO-RECORDED DEPOSITION OF

16             M. LAURENTIUS MARAIS

17             New York, New York

18        Tuesday, December 21, 2021

19

20

21

22

23   Reported Stenographically By:
     PATRICIA A. BIDONDE
24   Registered Professional Reporter
     Realtime Certified Reporter
25   JOB No. 211220PBI

2

1

2

3                          December 21, 2021
                           9:17 a.m.
4

5

6               HIGHLY CONFIDENTIAL

7        Video-Recorded Deposition of M.

8        LAURENTIUS MARAIS, held at the offices

9        of Debevoise & Plimpton, 919 Third

10       Avenue, New York, New York, before

11       Patricia A. Bidonde, Stenographer,

12       Registered Professional Reporter,

13       Realtime Certified Reporter, Certified

14       eDepoze Court Reporter, Notary Public of

15       the States of New York, New Jersey, and

16       Connecticut.

17

18

19

20

21

22

23

24

25

3

1                    A P P E A R A N C E S

2

3     UNITED STATES SECURITIES AND EXCHANGE

4     COMMISSION

5     Attorneys for Plaintiff

6            200 Vesey Street

7            Suite 400

8            New York, New York 10281

9     BY:    MARK R. SYLVESTER, ESQ.

10           212-336-0159

11           sylvesterm@sec.gov

12    BY:    PASCALE GUERRIER, ESQ.

13           212-336-5473

14           guerrierp@sec.gov

15           (Via Videoconference)

16

17           100 F Street, Northeast

18           Washington, D.C. 20549

19    BY:    EUGENE P. CANJELS, ESQ.

20           202-551-8515

21           canjelse@sec.gov

22    BY:    ARTUR MINKIN, ESQ.

23           (Via Videoconference)

24    BY:    NICOLE FORBES, ESQ.

25           (Via Videoconference)

4

1              A P P E A R A N C E S (Continued)

2     DEBEVOISE & PLIMPTON LLP

3     Attorneys for Defendant Ripple Labs, Inc.

4              919 Third Avenue

5              New York, New York  10022

6     BY:    DANIEL J. MARCUS, ESQ.

7              212-909-6564

8              djmarcus@debevoise.com

9              (Via Videoconference)

10    BY:    MICHAEL BRENNER, ESQ.

11             212-909-6921

12             mabrenne@debevoise.com

13             (Via Videoconference)

14

15    KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC

16    Sumner Square

17             1615 M Street, Northwest

18             Suite 400

19             Washington, D.C. 20036

20    BY:    REID M. FIGEL, ESQ.

21             202-326-7918

22             rfigel@kellogghansen.com

23    BY:    GAVAN GIDEON, ESQ.

24             202-326-7958

25             ggideon@kellogghansen.com

5

1              A P P E A R A N C E S   (CONTINUED)

2    CLEARY GOTTLIEB STEEN & HAMILTON

3    Attorneys for Defendant Bradley Garlinghouse

4         2112 Pennsylvania Avenue, Northwest

5         Washington, D.C. 20037

6    BY:    JORGE BONILLA LOPEZ, ESQ.

7         202-974-1517

8         jbonillalopez@cgsh.com

9

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

11   Attorneys for Defendant Christian A. Larsen

12         1285 Avenue of the Americas

13         New York, New York 10019-6064

14   BY:    JUSTIN D. WARD, ESQ.

15         212-373-3446

16         jward@paulweiss.com

17         (Via Videoconference)

18   BY:    EMILY M. GLAVIN, ESQ.

19         212-373-3912

20         eglavin@paulweiss.com

21         (Via Videoconference)

22

23   ALSO PRESENT:

24   CHRISTIAN BIDONDE, Videographer

25                        - - -

6

1                     E R R A T A

2    EXAMINATION                          PAGE    LINE
     BY MR. SYLVESTER                      9       21
3
                    E X H I B I T S
4    LM                                    PAGE    LINE

5    Exhibit LM-1    Rebuttal Expert Report of

6                    M. Laurentius Marais.......11     18

7    Exhibit LM-10   Applied Economics article

8                    by Mohammad Hashemi Joo....87     1

9    Exhibit LM- 2   Amended expert report of

10                   Dr. ██████████████155     12

11   Exhibit LM-3    Copy of Table 2 from

12                   report LM-1................185     6

13   Exhibit LM-4    Enlarged copy of Table 3

14                   from M. Laurentius

15                   Marais' expert report......208    17

16   Exhibit LM-5    Summary table of data

17                   provided by M. Laurentius

18                   Marais.....................224    18

19   Exhibit LM-6    Summary table referencing

20                   data provided by M.

21                   Laurentius Marais for the

22                   same 2,007 day trading

23                   period in ██████ Model

24                   Number 5...................229    12

25

1          IT IS HEREBY STIPULATED AND

2      AGREED, by and between the attorneys for

3      the respective parties, that all

4      objections, except as to the form of the

5      questions, shall be reserved to the time

6      of the trial.

7          IT IS FURTHER STIPULATED AND

8      AGREED that the within examination may

9      be signed and sworn to before any Notary

10     Public with the same force and effect as

11     if signed and sworn to before the court.

12         IT IS FURTHER STIPULATED AND

13     AGREED that the filing of the original

14     transcript of the examination is waived.

15

16

17

18

19

20

21

22

23

24

25

8

```
 1                        - - -

 2               P R O C E E D I N G S

 3                        - - -

 4               THE VIDEOGRAPHER:  This is the

 5      video-recorded deposition of M. Laurentius

 6      Marais, in the matter of Securities and

 7      Exchange Commission versus Ripple Labs, Inc.,

 8      Bradley Garlinghouse, and Christian A.

 9      Larsen, Case Number 20 Civ. 10832 (AT)(SN).

10               This deposition is being held at

11      the offices of Debevoise & Plimpton, 919

12      Third Avenue, New York, New York.  Today's

13      date is December 21, 2021.  The time on the

14      video monitor is 9:16 a.m.

15               My name is Christian Bidonde, I am

16      the Legal Video Specialist with Gradillas

17      Court Reporters, located at 400 North Brand

18      Boulevard, Suite 950, Glendale, California.

19               Would counsel and all present

20      please voice identify themselves.

21               MR. SYLVESTER:  My name is Mark

22      Sylvester.  I am for the plaintiff, the SEC.

23      I'm here with my colleague Eugene Canjels.

24               MR. FIGEL:  Reid Figel from Kellogg

25      Hansen with Gavan Gideon representing Ripple
```

1     Labs.

2              MR. SYLVESTER:  Justin Ward from

3     Paul, Weiss, Rifkind, Wharton & Garrison on

4     behalf of Christian Larsen and joined by my

5     colleague Emily Glavin.

6              MR. LOPEZ:  Jorge Bonilla Lopez

7     from Cleary Gottlieb on behalf of defendant

8     Bradley Garlinghouse.

9              MR. SYLVESTER:  There may be other

10    of our colleagues.  Sometimes we just put the

11    names on the record so that we don't have to

12    work through everyone if that's agreeable.

13    Okay.

14              THE VIDEOGRAPHER:  Would the

15    certified stenographer please swear in the

16    deponent.

17  M.   L A U R E N T I U S   M A R A I S, called

18         as a witness, having been duly sworn by

19         a Notary Public, was examined and

20         testified as follows:

21    EXAMINATION BY

22    MR. SYLVESTER:

23         Q.   Could you please state your name

24  for the record.

25              A.   M. Laurentius Marais.  The spelling

1   is L-a-u-r-e-n-t-i-u-s.  Marais is M-a-r-a-i-s.

2            Q.    And, again, I'm Mark Sylvester.

3   I'm here with the plaintiff in this case, the SEC,

4   with my colleague Eugene in the room.  Other of my

5   SEC colleagues are joining us remotely.

6                  You've had your deposition taken

7   before.  Is that right, Mr. Marais?

8            A.    Yes.

9            Q.    Is there anything that would

10   prevent you from testifying fully and truthfully

11   here today?

12           A.    Nothing that I'm aware of.

13           Q.    Were you retained to provide expert

14   services in this case?

15           A.    Yes.

16           Q.    Who retained you?

17           A.    I understand that my retention is

18   on behalf of Ripple Labs.

19           Q.    Did any other defendant in this

20   case retain you?

21           A.    I can't absolutely rule it out, but

22   I've had no contact with any other defendant.

23   And, to the best of my knowledge, my retention is

24   by Ripple Labs.

25           Q.    Okay.  On occasion today, when I

1    use the word "Ripple," I'll be referring to Ripple

2    Labs, the defendant in this case.   Okay?

3              A.    I'll try to keep that in mind.

4              Q.    Are you familiar with the term XRP?

5              A.    Yes.

6              Q.    What is XRP?

7              A.    XRP is a kind of cryptocurrency.

8              Q.    Are you familiar with the term

9    "digital asset"?

10             A.    I've come across the term.  I'm not

11   sure I can define it for you in a comprehensive

12   way.

13             Q.    To the best of your knowledge, is

14   XRP a digital asset?

15             A.    In my layperson's interpretation of

16   that term -- in other words, not as an expert term

17   of art -- I would consider it a digital asset.

18                   (Exhibit LM-1, Rebuttal Expert

19        Report of M. Laurentius Marais, marked for

20        identification, as of this date.)

21             Q.    Dr. Marais, I'm going to hand you

22   what's been marked -- premarked LM-1.

23                   Dr. Marais, is exhibit LM-1 the

24   expert rebuttal report that you submitted in this

25   case?

1          A.     It appears to be, yes.

2          Q.     Does your signature appear on page

3    17 of LM-1?

4          A.     It does.  I see it there.

5          Q.     Okay.  In LM-1, you are offering

6    opinions on the opinions offered by Dr. Albert

7    ███  in his expert report in this case.  Is that

8    right?

9          A.     That's fair.

10         Q.     Is Attachment A to LM-1 your CV?

11         A.     Yes.

12         Q.     Looking at your CV now, do you see

13   any inaccuracies?

14         A.     (Document review.)

15                MR. FIGEL:  Objection to form.

16         A.     I don't see any.  And I was -- I'm

17   not aware of any.

18         Q.     Does the education section of your

19   CV accurately list the degrees you earned?

20         A.     Yes.

21         Q.     Have you had any formal education

22   after 1985 that is not listed here?

23         A.     Other than traffic school, no.

24         Q.     Your CV lists your membership in a

25   number of associations.  Is that right?

13

1          A.     Yes.

2          Q.     Do any of the associations of which

3     you're a member have any relationship with any

4     defendant in this case?

5          A.     None that I'm aware of, but these

6     associations are so broad in their range of

7     activity and interest that I can't rule it out.

8                 They are membership associations,

9     and it's entirely possible that people with an

10    interest in this litigation in some manner are

11    members of these organizations.  So I suppose that

12    would be a kind of association, which I'm not

13    aware of but can't rule out.

14         Q.     Have you ever held any professional

15    licenses?

16         A.     No.

17         Q.     Have you ever been the subject of

18    any disciplinary action related to your

19    professional activities?

20         A.     None that ever came to my

21    attention.

22         Q.     Dr. Marais, you've served as an

23    expert witness prior to this case.  Is that right?

24         A.     I have.

25         Q.     When was the very first occasion

14

1    you were retained as an expert witness?

2                 MR. FIGEL:  Objection.

3                 You can answer.

4         A.    I'm not able to answer that without

5    delving into dusty archive at this point.  It

6    would have been in the -- roughly, though -- in

7    the mid-1990s when I was retained as a designated

8    expert.  I did some expert work as a confidential

9    consultant on other occasions prior to that.

10        Q.    When you say a "designated expert,"

11   do you mean a testifying expert witness?

12        A.    I mean -- that's really what I

13   mean, somebody who provided live testimony.

14        Q.    So between the mid-'90s and now,

15   approximately how many times have you been

16   retained as an expert witness to testify?

17        A.    That's a number I've never

18   calculated and don't have any need in the ordinary

19   course of business to keep a record of.

20                So at best, I can give you my

21   impressionistic estimate, which is at least 200

22   times and possibly -- possibly, depending on how

23   one counts, 400 times.

24                I say "depending on how one counts"

25   because I have been retained on numerous occasions

1    when the retention did not lead to any actual

2    work.  But I was asked if I was available to do

3    something.

4                    So does that mean I was retained to

5    provide expert testimony?  Who knows.  I'm not

6    sure I could even distinguish those occasions.

7                    The easiest part of that is how

8    many times have I actually provided expert

9    testimony.  And that's somewhere in the 1 to 200

10   range.

11        Q.    On those occasions when you

12   provided expert testimony, did you also prepare an

13   expert report?

14                    MR. FIGEL:  Objection.

15        A.    Sometimes yes and sometimes no.

16        Q.    Would you say in those 100 to 200

17   occasions, the majority of the time you prepared

18   an expert report?

19        A.    Yes.  That -- I think

20   that -- that's pretty secure impressionistic

21   estimate without having a tally.

22        Q.    You're currently an executive vice

23   president at Compass Lexecon?

24        A.    Yes, that is correct.

25        Q.    What work do you do in that role?

```
 1              A.    I provide consulting services in

 2    the areas of my own expertise to clients who

 3    approach me or who approach Compass Lexecon

 4    insiders, other than me, who identify me as a

 5    suitable candidate for providing certain -- for

 6    providing the kind -- the kinds of services that

 7    I -- that fall within my areas of expertise.

 8              Q.    What are your areas of expertise?

 9              A.    Generally, applied mathematics,

10    applied statistics including econometrics.  And I

11    have some expertise in the area that, at the

12    University of Chicago, used to be called

13    managerial accounting, which is a kind of applied

14    mathematics for managers for the analysis of

15    processes inside firms.

16              Q.    Approximately how much of your

17    professional time at Compass Lexecon is spent in

18    connection with duties as a retained expert

19    witness?

20                   MR. FIGEL:  Objection.

21              A.    Approximately 100 percent.

22              Q.    Has that been true throughout the

23    time that you've been an executive vice president

24    at Compass Lexecon?

25                   MR. FIGEL:  Same objection.
```

1          A.    Yes.  I should probably clarify my

2     previous answer by saying, since expert analysis

3     is the one thing that I do in my work -- that's

4     why I give you, say, the answer is approximately

5     100 percent -- if you meant -- when you said

6     "retained expert" in that previous question, if

7     you meant retained expert in the sense of an

8     expert involved in litigation, that's not

9     100 percent.

10               But -- so my answer was accurate as

11    stated.  I'm just expanding on it a little bit.

12          Q.    Sure.  If I use the term "expert

13    witness" for purposes of this deposition, I'll

14    mean a retained testifying expert.  Is that fair?

15          A.    I will try and keep that in mind.

16    That's how I understood -- that's what I

17    understood you to be referring to

18    pre- -- actually, that's not what I understood you

19    to be referring to previously.

20               So the answer would be

21    approximate -- my revised answer, in light of what

22    you've just explained, would be approximately

23    90 percent.

24          Q.    Prior to Compass Lexecon, you

25    worked for William E. Wecker Associates.  Is that

18

1    right?

2           A.    Yes.

3           Q.    What sort of work did you do in

4    that role?

5           A.    Exactly the same sort of work that

6    I have just described in connection with Compass

7    Lexecon.

8           Q.    And approximately how much of your

9    professional time at William E. Wecker was spent

10   as an expert witness?

11               MR. FIGEL:  Objection.  Withdrawn

12      with your definition.

13          A.    The -- over the entire time I was

14   with Wecker Associates, probably 60 or 65 percent

15   of my time.

16          Q.    Okay.  And prior to William

17   E. Wecker Associates, you were a consulting

18   professor at Stanford University School of Law.

19   Is that right?

20          A.    Yes.

21          Q.    And did you serve as a retained

22   expert witness at all during your time at

23   Stanford?

24          A.    Yes.  And I should clarify my

25   previous answer, because the premise of your

19

1    question was mistaken, actually.

2              You said prior to my time at

3    William E. Wecker Associates.  Actually, that

4    happened during my time at William E. Wecker

5    Associates.  My appointment at Stanford was not a

6    full-time position.  It was something that I did

7    even while I was working at William E. Wecker

8    Associates.

9         Q.    Understood.  Thank you for that

10   clarification.

11             Prior to joining William E. Wecker

12   Associates in 1992, you had a variety of roles at

13   the University of Chicago graduate school of

14   business.  Is that right?

15        A.    Correct.

16        Q.    And during the time that you were

17   at the University of Chicago, did you ever serve

18   as an expert witness?

19        A.    No.

20        Q.    Do you advertise your services as

21   an expert witness?

22        A.    I do not.  I know that there is a

23   profile of me on the Compass Lexecon website.

24   There may be -- may still be a profile on the

25   William E. Wecker Associates website.  I did not

20

 1   personally post those profiles.  So I think it's

 2   fair to say I do not advertise myself as an expert

 3   witness.

 4            Q.    Do you know what kinds of

 5   information those profiles you just described

 6   contain?

 7            A.    I have looked at them from time to

 8   time.  So I think I know that they very briefly

 9   describe something about my background.  And they

10   have a photograph -- a now somewhat outdated

11   photograph.  And that they offer a link to contact

12   the organization or to get a copy of my CV.

13            Q.    Is it your understanding that the

14   purpose of those profiles is to advertise your

15   services as an expert witness?

16                  MR. FIGEL:  Objection.

17            A.    That's not how I would characterize

18   them, no.

19            Q.    Have you ever been retained as an

20   expert witness by a plaintiff?

21            A.    Yes.

22            Q.    Prior to this case, have you ever

23   been retained as an expert witness by a defendant?

24            A.    Yes.

25            Q.    In all of your prior engagements as

1    an expert witness, approximately what percentage

2    of those cases were you retained by the plaintiff?

3              A.    I can only give you an

4    impressionistic estimate of that.  I would say

5    that it is a low percentage, probably in single

6    digits.

7                    If not -- if we took the trouble to

8    research it, if it were not in single digits, I

9    would be amazed if it were much above 10 percent.

10             Q.    Prior to this case, have you ever

11   been retained in a case where a governmental

12   entity was a party?

13             A.    I'm pausing to think about that.

14   Yes.

15             Q.    How many times?

16             A.    At least half a dozen times.  But I

17   suspect the true -- the accurate answer is

18   substantially more than half a dozen.  It's just

19   that half a dozen occasions come easily to mind.

20                   But you've -- you -- the level of

21   specificity of what you're asking me now is such

22   that, to even give you a reasonably accurate

23   answer for even the past five years, I would have

24   to consult my list of testimony attached to my

25   report.

```
 1            Q.    In any of the cases that you can

 2   recall, were you retained as an expert witness by

 3   the government?

 4            A.    Only one case comes to mind.  I

 5   can't -- I'm not certain.  As you know, I've been

 6   doing this for 30 years.  So I'm not being coy

 7   here.

 8                  Only one case comes to mind.  I

 9   can't absolutely rule out that there weren't other

10   examples, but one case comes to mind.

11            Q.    Which is the case in which you were

12   retained by a governmental entity which you can

13   recall today?

14            A.    Even though it was a really long

15   time ago, I am not sure that I was ever actually

16   disclosed in that case.  And so I would need to

17   look into that, I believe, as a -- out of respect

18   to that client, to learn whether it's okay to

19   disclose that.

20            Q.    Looking at Attachment B to LM-1,

21   which is your expert report, is it fair to say

22   that you were not retained by any governmental

23   entity listed in any of these 45 cases?

24            A.    I'm looking at the list briefly

25   just to remind myself.  I think the answer is
```

23

```
 1    going to be yes, but just to be sure, I'm taking a
 2    look at it.
 3                    (Document review.)
 4                    The one questionable case -- the
 5    one question mark for me, out of the 45, is
 6    Item 19 where I was retained by the California
 7    Insurance Guarantee Association, which I
 8    understand to be a, at least some kind of
 9    quasi-governmental entity.  It is -- has some
10    affiliation with or connection to the state
11    government of California.
12            Q.    Has your expert opinion ever been
13    excluded in any case?
14                    MR. FIGEL:  Objection.
15            A.    It has.
16            Q.    How many times has that happened?
17            A.    There are two occasions I can think
18    of that -- where my opinion was -- was excluded to
19    the extent that I was not permitted to testify at
20    all.
21            Q.    Which cases were those?
22            A.    One of the those is in the State of
23    Washington.  It is called Ngethpharat.  I know
24    you're going to ask me for spelling on that.
25    N-g-e-t-h-p-h-a-r-a-t versus State Farm.  It's
```

24

```
 1    closely associated with a case called Jama,

 2    J-a-m-a, versus State Farm.  I believe that was

 3    in -- that is in federal court in the State of

 4    Washington.

 5              The other instance that I'm aware

 6    of is from seven or so years ago in a case called

 7    Walden v. Chrysler in state court in Georgia.

 8         Q.   In the State Farm case in

 9    Washington federal court, for what reason was your

10    expert opinion excluded?

11              MR. FIGEL:  Objection.

12         A.   I understand that the reasons were

13    two-fold.  One was that in a determination of

14    damages, the Court was persuaded that the opinion

15    I was providing on the definition -- the proper

16    definition of damages, of economic damages, was

17    not -- was actually a legal opinion and,

18    therefore, outside my area of expertise.

19              The rest of my opinion pertained to

20    whether certain calculations were -- involved

21    multiplication or division and why that

22    distinction was material to issues in the case.

23              And I understand that the Court

24    held that it did not need to be instructed on the

25    definition between -- the difference between
```

25

1    multiplication and division.

2         Q.    How about the Walden case.  Why was

3    your opinion excluded in the Walden case?

4         A.    In the Walden case, my -- I had the

5    assignment of examining the federal NASS

6    database -- that's the -- that's all caps N-A-S-S,

7    the National Accident Sampling System, in order to

8    determine whether certain events had or had not

9    been recorded in that database.

10               The Court determined that the

11    accidents that I was looking at in the NASS

12    database were not substantially similar to the

13    accident that gave rise to the litigation.  I

14    believe that was the -- the Court's primary ground

15    for excluding my testimony, that there was a

16    requirement in that jurisdiction for substantial

17    similarity.

18         Q.    To the best of your knowledge, is

19    your expert report that you submitted in the State

20    Farm case publicly available?

21         A.    I have no idea.

22         Q.    Same answer for the Walden case?

23               MR. FIGEL:  Objection.

24         A.    Correct.

25         Q.    Are you familiar with the term

26

1    "event study"?

2           A.    Yes.

3           Q.    Have you conducted event studies as

4    part of your expert witness work in the past?

5           A.    Yes.

6           Q.    Was an event study any part of any

7    of your excluded expert opinions?

8           A.    No.

9           Q.    Approximately how many times have

10   you conducted an event study in connection with

11   your expert witness work?

12          A.    We are now talking about an era

13   from the late 1990s into the early 2000s.  So it's

14   particularly hard for me to be precise.  But my

15   best estimate sitting here is half a dozen

16   occasions.

17          Q.    So the total number of event

18   studies that you've conducted in connection with

19   your expert witness work or your best

20   approximation is approximately six?

21                MR. FIGEL:  Objection.

22          A.    Yes.

23          Q.    Is it fair to say that you're

24   familiar with the requirement that expert

25   witnesses set forth the basis and reasons for

27

1    their opinions in their expert reports?

2              A.    I certainly do not have a lawyer's

3    expert knowledge of the procedural rules that

4    govern those questions.  But I have been

5    instructed over the years by lawyers on elements

6    that need to be in my reports, and I generally try

7    to put them there.

8              Q.    Is it fair to say that it's your

9    practice to include a description of your

10   methodology in your expert reports?

11             MR. FIGEL:  Objection.

12             A.    As a very general characterization,

13   I think it's a fair characterization.  What that

14   actually means in different instances depends on

15   the circumstances.

16             Q.    When you describe your methodology

17   in your expert reports, do you include all steps

18   that you consider material to reach your opinion?

19             MR. FIGEL:  Objection.

20             A.    I do.  Sometimes they're visible in

21   the body of the report.  Sometimes they are

22   visible in the backup materials that I produce in

23   conjunction with a report which I deem to be part

24   of the report.

25             Q.    Limiting this question only to

1   event studies that you've conducted as an expert

2   witness, are there any steps that you routinely

3   take as part of conducting an event study but do

4   not include in your expert report?

5               MR. FIGEL:  Objection.

6          A.    As I indicated in a previous

7   answer, it has been a long time since I last

8   actually conducted an event study as opposed to

9   replicating an event study, which is what I did in

10  the present case.

11              And so it would be, at best,

12  leading for me to try to vaguely characterize what

13  are my standard practices when I perform an event

14  study.

15              It may well be that if I were

16  called upon to resume performing event studies,

17  that I would look at reports from long ago and

18  look at literature, scholarly and professional

19  literature, that has appeared since then, and I

20  may -- my standard practices may, in future, not

21  be what they were 20 years ago.

22              So I -- that was a long-winded way

23  of saying I don't think I can give you a fair

24  answer or a fair catalog of what are my standard

25  practices, because I -- performing event studies

29

1    is not a standard practice of mine.

2            Q.    Limiting ourselves to the time when

3    you were performing event studies in the past,

4    were there any steps that you routinely took then

5    as part of conducting those event studies but did

6    not include in your expert reports?

7                 MR. FIGEL:  Objection.

8            A.    I would have to look at the expert

9    reports from that era to be able to answer that

10   question.  I would doubt it, subject to the

11   qualification I stated a moment ago of providing

12   electronic backup along with the event study,

13   given -- interpreting my report as the -- as

14   including the electronic backup, I doubt that

15   there was any step that I took that I did not

16   document in my expert report.

17                But I can't speak to that with

18   specificity today.  I simply don't have a clear

19   enough and fresh enough recollection of the work

20   that I did on event studies 20 years ago.

21           Q.    How did you come to be retained as

22   an expert witness in this case?

23           A.    I received either a telephone call

24   or an e-mail from counsel for Ripple asking me

25   whether I was available to discuss some issues

30

 1    concerning this litigation.

 2              Q.    Which attorney contacted you?

 3              A.    Mr. Figel to my left.

 4              Q.    When did you receive this contact

 5    from Mr. Figel?

 6              A.    Not very long before I delivered my

 7    report.  I would say -- I don't have a precise

 8    recall of the date of that, but whatever the date

 9    is on which I signed the report is -- I -- I would

10    say, again, impressionistically, it was no more

11    than three weeks after when Mr. Figel called me.

12              Q.    Prior to your retention as an

13    expert witness in this case, did you know anything

14    about Ripple?

15              A.    Yes.

16              Q.    What did you know?

17              MR. FIGEL:  Objection.

18              A.    I knew that Ripple was, in some

19    way, entirely, vaguely defined in my own mind,

20    associated with XRP, with the cryptocurrency

21    called XRP.  And when I say "associated with,"

22    what I mean by that is just when I looked up

23    articles on XRP, I would tend to find the name

24    Ripple showing up somewhere in the article.

25              Q.    Did you look up articles about XRP

31

1    prior to your retention as an expert witness in

2    this case?

3              A.    Yes.

4              Q.    Why?

5              A.    As part of learning how to acquire

6    and use XRP.

7              Q.    Why were you interested in learning

8    how to acquire and use XRP?

9              A.    I retained some supporting services

10   for family members in another country where the

11   vendor of those services had a preference for

12   being paid in XRP.

13             Q.    What vendor is that?

14             A.    An IT consultant and a general

15   personal assistant in -- as well as providing IT

16   consulting services.

17             Q.    Is this an individual or a company?

18             A.    An individual.

19             Q.    Did that person tell you why they

20   preferred to receive payment in XRP?

21             A.    Partly yes, partly no.

22             Q.    Can you explain your answer?

23             A.    Since the person was in another

24   country, being paid in cryptocurrency avoided the

25   complications of wire transfers and currency

1    conversions from one -- from US dollars to a

2    different currency.  I understood why that was a

3    convenience.  That's the partly yes part.

4              Why specifically XRP as opposed to

5    something -- some other kind of cryptocurrency, I

6    do not know.  That's the partly no part of my

7    answer.

8        Q.    Setting aside your interaction with

9    this person, prior to your retention in this case,

10   did you know anything else about XRP?

11             MR. FIGEL:  Objection.

12       A.    No.

13       Q.    Do you own XRP?

14       A.    Yes.

15       Q.    How did you acquire it?

16       A.    On a cryptocurrency exchange.

17       Q.    How much XRP do you own?

18       A.    At present I think about $5 worth.

19       Q.    Why did you purchase it?

20       A.    I purchased it in the course of

21   making payments to the vendor I described in a

22   previous answer.  So I have a small remaining

23   balance of XRP from that transaction.

24       Q.    Other than your payments to the

25   vendor that we've discussed, are there any other

1   occasions -- strike that.

2            Other than for purposes of paying

3   the vendor we just discussed, are there any other

4   reasons why you've purchased XRP?

5            MR. FIGEL:  Objection to form.

6        A.   Yes.

7        Q.   What are those reasons?

8        A.   Curiosity about how cryptocurrency

9   purchases and transactions work.  In other words,

10  before the -- having been made aware of XRP by my

11  interaction -- by my early conversations with the

12  person who I knew might later be interested in

13  pursuing the conversation, I went ahead and

14  purchased some XRP and set up an account on an

15  exchange just to gain some experience at how

16  transactions like that can be conducted and what

17  unexpected holdups might occur.

18       Q.   Other than XRP, have you purchased

19  any other digital assets?

20       A.   No.

21       Q.   Sitting here today, do you have any

22  plans to acquire more XRP in the future?

23       A.   I have no specific plan as I sit

24  here.  It may be that I may need to make such

25  plans in order to continue paying my vendor in the

34

1    other country that I talked about.

2            Q.    Prior to your retention as an

3    expert witness in this case, did you know anything

4    about the SEC's case against Ripple?

5            A.    Yes.

6            Q.    What did you know?

7            A.    Essentially only that there was a

8    case and that it -- I -- I had some inkling of

9    what the case was about, but certainly no detailed

10   knowledge.

11           Q.    Prior to your retention in this

12   case, had you ever met Brad Garlinghouse?

13           A.    Not knowingly.

14           Q.    Prior to your retention in this

15   case, had you ever met Chris Larsen?

16           A.    Not knowingly.

17           Q.    Prior to your retention in this

18   case, had you ever knowingly met anyone who worked

19   at Ripple?

20           A.    No.

21           Q.    Prior to your retention in this

22   case, had you ever knowingly met any of the

23   lawyers representing defendants in this case?

24           A.    No.

25           Q.    Prior to retention, had you ever

1  been retained by Debevoise & Plimpton?

2          A.    Not that I recall.  I should

3  qualify that answer by saying that I have from

4  time to time been involved in complex cases with

5  multiple counsel for different parties, and

6  sometimes there are joint defense arrangements.

7              And so even though my direct

8  contact may be with law firm A, I can't always

9  know that law firm B and law firm C are involved.

10 But with that qualification, I have no

11 recollection, as I sit here, of ever being

12 retained by Debevoise & Plimpton.

13         Q.    Prior to your retention here, had

14 you ever been retained by Kellogg Hansen?

15         A.    Yes.

16         Q.    How many times?

17         A.    Once.

18         Q.    When?

19         A.    Approximately three months ago.

20         Q.    Prior to your retention, to your

21 knowledge, had Compass Lexecon ever been retained

22 by Debevoise & Plimpton?

23         A.    It would not surprise me, but I

24 have no specific knowledge of it.

25         Q.    Prior to your retention, and

36

1    setting aside the retention we just talked about

2    three months ago, to your knowledge, had Compass

3    Lexecon ever been retained by Kellogg Hansen?

4            A.    Yes.

5            Q.    How many times?

6            A.    I have no idea.  I have no way of

7    knowing.  It's not within my area of

8    responsibility to know such things.

9            Q.    Are you charging defendants a fee

10   for your expert services in this case?

11           A.    Broadly, yes, in the sense that I

12   am here as an employee of Compass Lexecon.  And

13   Compass Lexecon does charge for my time.

14           Q.    How much does Compass Lexecon

15   charge for your time?

16           A.    I think the number is stated in my

17   expert report in this case.  It is $1,040 per

18   hour.

19           Q.    Is this your standard hourly fee

20   for expert services?

21           A.    Yes.

22           Q.    How long has $1,040 per hour been

23   your standard fee for expert services?

24           A.    Since approximately January 1 of

25   2021.

37

1          Q.     What was it before then?

2          A.     $1,000 per hour.

3          Q.     How much have -- strike that.

4                 How much has Compass Lexecon billed

5    for your services in this case so far?

6          A.    I do not know the answer to that.

7    Obviously somebody does.  I'm not suggesting that

8    it's not a knowable thing, but it's not a thing

9    that I happen to know.

10         Q.     Approximately how many hours have

11   you worked on this case so far?

12         A.     That will have to be one of my now

13   famous impressionistic estimates.  I would

14   estimate that at somewhere in the range of 30 to

15   45 hours.

16         Q.     Have you received any compensation

17   in connection with this case in XRP?

18         A.     No.

19         Q.     Do you have any plans to receive

20   XRP as compensation in connection with this case?

21         A.     I'm hoping not.

22         Q.     To your knowledge, is Compass

23   Lexecon planning to receive any payment in XRP in

24   connection with your services provided in this

25   case?

38

```
 1              A.    I'm not aware of it, but I can't
 2    rule it out.  I'm -- but as I say, I'm not aware
 3    of it.
 4              Q.    Do you --
 5              A.    It hadn't occurred -- in fact,
 6    before you asked, it hadn't occurred to me as a
 7    possibility.
 8              Q.    In your position at Compass
 9    Lexecon, is your compensation tied to the amount
10    that you bill to clients?
11                   MR. FIGEL:  Objection.
12              A.    Yes.
13              Q.    How so?
14              A.    My compensation is tied to what --
15    to the hourly billings of Compass Lexecon for time
16    that I devote to client engagements.
17              Q.    Is your compensation at Compass
18    Lexecon also tied to the total amount that Compass
19    Lexecon bills to clients?
20              A.    Yes.
21              Q.    How so?
22              A.    There is an -- I get some so-called
23    attribution, a portion of billings, hourly
24    billings for staff working under my direction.
25              Q.    Did others assist you with
```

39

```
1    providing your expert services in this case?

2            A.    Yes.

3            Q.    Who?

4            A.    Principally Dr. Dzmitry Asinski.

5    That is D-z-m-i-t-r-y.  Asinski is A-s-i-n-s-k-i.

6            Q.    What is Dr. Asinski's role at

7    Compass Lexecon?

8            A.    He is a senior vice president or

9    something -- he has a -- a three-word title,

10   something like senior vice president.  Maybe --

11           Q.    How did Dr. -- sorry.  Were you --

12           A.    Maybe some hyphens in there.

13           Q.    How did Dr. Asinski assist you with

14   your -- providing your expert services in this

15   case?

16           A.    When computers needed to be

17   programmed, when data needed to be reformatted in

18   order to become accessible to the kind of software

19   that we used, when analyses had to be performed

20   and audited, all of that was done under my

21   direction but done, actually implemented by -- on

22   my behalf by Dr. Asinski, assisted as needed by

23   additional staff.

24           Q.    Other than Dr. Asinski, is there

25   anyone else that assisted in -- assisted with
```

40

1    providing your expert services in this case?

2                 MR. FIGEL:  Objection.

3           A.    Yes.

4           Q.    Who?

5           A.    Narsid Golic.  N-a-r-s-i-d

6    G-o-l-i-c.

7           Q.    And how did Narsid Golic assist you

8    with providing your expert services in this case?

9           A.    Narsid Golic is a -- is junior

10   relative to Dr. Asinski but assisted Dr. Asinski

11   with the practical implementation of the work that

12   I had directed -- that I had directed be done.

13          Q.    When you say "assisted with the

14   practical implementation," what does that mean?

15          A.    Program computers.

16          Q.    Other than the two individuals we

17   just discussed, is there anyone else at Compass

18   Lexecon that assisted you with providing your

19   expert services in this case?

20                MR. FIGEL:  Objection.

21          A.    No one else comes to mind, but I

22   can't absolutely rule out that Dr. Asinski or

23   Mr. Golic at some point may not -- may have

24   brought in additional help.  But it's my

25   understanding and it's my belief, as I sit here,

41

1    that virtually all of the work that I did not do

2    myself was done by them.

3              Q.    How much, if anything, have

4    Dr. Asinski and Mr. Golic billed defendants in

5    this case?

6              A.    That was a little too muffled.  I

7    think you asked how much they billed?

8              Q.    That's right.

9              A.    I don't know the answer to that.

10   As I indicated previously, I'm certainly not

11   suggesting and -- it's unknowable.  I just don't

12   happen to know it.

13             Q.    Those billing records would be with

14   Compass Lexecon.  Is that right?

15             A.    Correct.

16             Q.    Do you know what their billing

17   rates are?

18             A.    Only within ranges.

19             Q.    What's the range for Dr. Asinski?

20             A.    I believe his range, his billing

21   rate is somewhere within the 800s.

22             Q.    How about Mr. Golic?

23             A.    Five to 600 is what I believe

24   the -- where his range sits.

25             Q.    Do you know approximately how many

42

1   hours each of them have billed to this matter?

2          A.    I do not.

3          Q.    Did you do anything to prepare for

4   your deposition today?

5          A.    Yes.

6          Q.    What did you do?

7          A.    I reread my own report.  I actually

8   first reread Dr. ███ report.  Then I reread my

9   own report.  I glanced at the complaint in this

10  matter, the first amended complaint.

11              I looked briefly at the materials

12  that I cite as materials considered.  I looked

13  briefly at the electronic disclosure -- disclosure

14  package that Mr. -- that Dr. Asinski produced

15  under my direction and at my request in support of

16  and in conjunction with my report in this matter.

17  I met with counsel.

18              Those are the things that occur to

19  me.  If something else occurs to me that I should

20  have mentioned and I'm -- it's simply not coming

21  to mind right now.  But if I -- if I have a flash

22  of insight or recollection, I will certainly

23  volunteer it if it happens in the course of this

24  depo.

25          Q.    Thank you, Doctor.  How many times

43

1    did you meet with counsel in preparation for your

2    deposition?

3                A.    Once.

4                Q.    Who did you meet with?

5                A.    Mr. Figel and his colleague,

6    Mr. Gideon.  Mr. Gideon has so many names.  I'm

7    hoping I'm getting his last name.

8                      MR. GIDEON:  You got it.

9                Q.    Anyone else?

10               A.    No.

11               Q.    Other than counsel, did anyone

12   assist you with preparation for your deposition

13   today?

14               A.    Yes.

15               Q.    Who?

16               A.    Dr. Asinski.

17               Q.    How did he assist you with

18   preparation?

19               A.    He reminded me where to look for

20   copies of my backup materials.  He reminded me how

21   we had performed certain calculations at my

22   request.  He reminded me at my request.  I think

23   that's about it.

24               Q.    Going back to your meeting with

25   counsel, how long did you meet with counsel?

44

1          A.    Three and a half -- I think it was

2     three and a half hours, thereabouts.

3                MR. FIGEL:  Mr. Sylvester, I don't

4          mean to interrupt your questioning.  But

5          there is a point that I think Dr. Marais may

6          have overlooked that I just would like to

7          refresh his recollection about so the record

8          is clear.

9                MR. SYLVESTER:  Absolutely.  Go

10         ahead.

11               MR. FIGEL:  Can I just -- literally

12         five seconds.

13               MR. SYLVESTER:  Feel free.

14               (Witness confers with counsel.)

15    BY MR. SYLVESTER:

16         Q.    Any answers that you'd like to

17    clarify, Dr. Marais?

18         A.    A flash of recollection has

19    occurred to me.  There was a Zoom screen in the

20    meeting yesterday.  And I could not tell you with

21    precision who was on that screen.  They were

22    mostly represented by black rectangles with small

23    names.

24               But I do understand that other

25    couns- -- that counsel for other defendants in

1    this case were on.  That's what occurs to me to

2    add.

3               Q.    Focusing just on yesterday's Zoom

4    call with counsel, were there any others that

5    weren't counsel on that call?

6               A.    Yes.

7               Q.    Who?

8               A.    Dr. Asinski was on that call via

9    Zoom.  I think I saw Mr. Golic's name.  And beyond

10   that, I can't think of -- I cannot think, as I sit

11   here, of anyone else I recognized as not counsel.

12              Q.    Have you written any publications

13   pertaining to event studies?

14              A.    Yes.

15              Q.    How many?

16              A.    A relative handful, maybe as many

17   as five or six.

18              Q.    When was the most recent of such

19   publications?

20              A.    The best way for me to answer that

21   is to turn to my CV.

22              Q.    Please do.

23              A.    (Document review.)

24                    2005.

25              Q.    Which article are you referring to,

46

1    Dr. Marais?

2              A.    It's the fifth from the end on page

3    3 of my CV.  It's called "Event study methods:

4    detecting and measuring the security price effects

5    of disclosures and interventions (with Katherine

6    Schipper)."

7              Q.    The paper you just described, that

8    paper explains how event studies can be used in

9    litigation.  Is that right?

10             A.    Yes.

11             Q.    Is that topic, how event studies

12   can be used in litigation, also the topics of your

13   other five or so papers that you've written

14   regarding event studies?

15                   MR. FIGEL:  Objection.

16             A.    I'm sorry, somehow the middle part

17   of that question just dropped out.  Would you --

18   would you repeat it, please.

19             Q.    I'll ask a better question.

20                   Setting aside the paper that we

21   just discussed, what was the topic of the other

22   papers that you wrote that pertain to event

23   studies?

24             A.    I would say various.

25             Q.    Were any of the other papers that

1    you wrote pertaining to event studies also about

2    the topic of how event studies are used in

3    litigation?

4                    MR. FIGEL:  Objection.

5            A.    Yes.  In a certain sense.  And

6    let -- I'll -- assuming you were about to ask me

7    what sense is that.

8            Q.    Please go ahead.

9            A.    The event study article with

10   Katherine Schipper that I described appeared in

11   several editions of this publication.  And I

12   revised it on each of those occasions.

13                  So even though not visible on my

14   CV, since I list only the most current version of

15   it, there were more versions having -- and they

16   all had to do with the use of event studies in

17   litigation.

18                  But other writings of mine on event

19   studies did not have to do with litigation.

20           Q.    Have you taught any classes that

21   cover the topic of event studies?

22           A.    Yes, I would say so.

23           Q.    When was the most recent such

24   class?

25           A.    Probably 199- -- around 1998.

48

1          Q.     Am I recalling your testimony

2     correctly that the last time you performed an

3     event study as an expert witness was in the early

4     2000s?

5                MR. FIGEL:  Objection.

6          A.     Yes.

7          Q.     Prior to your retention in this

8     case, have you submitted an expert rebuttal report

9     commenting on an event study conducted by another

10    expert witness?

11         A.     That is possible although I don't

12    remember it specifically.  And if it happened, it

13    would have been in that era.

14         Q.     And by "that era," do you mean the

15    late 1990s to the early 2000s?

16         A.     Yes, I do.  I can't absolutely rule

17    out that it hasn't happened in the interim as

18    well.  I'm fairly sure I have not created an event

19    study and sponsored it as part of an expert report

20    since the early 2000s.

21                But I can't absolutely rule out

22    that I haven't responded to an event study.  It

23    was not very recent because, if it had happened

24    very recently, I would remember it.

25         Q.     So is it fair to say that, of the

49

1    cases that appear on your Attachment B, none of

2    these cases involved event studies?

3                    MR. FIGEL:  Objection.

4         A.    I think the answer is going to be

5    yes, but I'm going to look very quickly.

6                    (Document review.)

7                    The reason I took the time is that

8    I do recall that there have been occasions when I

9    recognized something I was doing as a direct

10   analogue of an event study, even though it was not

11   in the conventional securities litigation format.

12   And I was trying to remind myself of when that

13   might have occurred.

14                   It is fair to say that I have

15   not -- in the list of engagements that I just

16   looked at, there is nothing that I would call a

17   conventional event study in the context of a

18   securities litigation.

19                   There are instances in work that I

20   performed in some of those cases where I did

21   recognize and may even have mentioned in a report

22   that this is the analogue of an event study as

23   applied in the securities litigation format.

24        Q.    Which cases fall into that latter

25   analogous category, I'll call it?

1              MR. FIGEL:  Objection.

2         A.    The one that is easiest to recall

3    is one in which I -- is one that is so recent that

4    it is not on that list.  It is a critical case,

5    United States versus Tyson Rhame, et al.  Tyson is

6    T-y-s-o-n.  Rhame is R-h-a-m-e.

7         Q.    Are there any other retentions as

8    an expert witness or -- strike that.

9              Are there any other occasions on

10   which you've offered deposition or trial testimony

11   in the last four years that are not listed in

12   Attachment B?

13        A.    I know that there is at least one

14   more.

15             (Document review.)

16             I was -- yes, so there was Rhame,

17   and there was -- I've also been deposed since I

18   created this list.

19        Q.    You're referencing a case other

20   than Rhame.  Is that right?

21        A.    Correct.

22        Q.    What's that case?

23        A.    It is entitled, I think, Greenway

24   of West Palm Beach versus Kia Motors of America,

25   Kia being K-i-a.

51

```
 1            Q.    Going back to the Rhame case, at a
 2   very high level, what was the expert opinion that
 3   you offered in that case?
 4            A.    At a very high level, that the
 5   government's calculation of the so-called actual
 6   loss amount in that case was unfounded.
 7            Q.    How would you define the term
 8   "event study"?
 9            A.    In much the same way as the
10   definition stated in -- I think I gave some -- a
11   terse definition in my report.  And Dr. ████ also
12   defines an event study and refers to literature
13   that defines event studies such as Craig
14   MacKinlay's article and Binder's review article.
15   So I would give you a perfectly conventional
16   definition.
17                 Now, I've -- now that I described
18   how -- described the manner in which I would
19   define it, if you want the actual definition, I
20   could give you that too.
21            Q.    Let me ask it -- this question:  Is
22   it fair to say that event studies are used to
23   provide answer to two questions:  Did an
24   announcement cause a price reaction, and what was
25   the price reaction to the announcement alone?
```

1          MR. FIGEL:  Objection.

2      A.    I think what you're asking me about

3  from a statistician's perspective is statistical

4  significance and point estimate of an announcement

5  effect.

6          And your question does seem to

7  focus on litigation -- the way you say that seems

8  to focus on litigation applications as opposed to

9  how event studies are really and widely and mostly

10 used in academic research.

11         So with that qualification, I -- I

12 agree that those are key kinds of questions that

13 are addressed using event studies.

14         Those are not the only questions

15 that can be addressed by event studies, and I'm

16 sure they are not the only questions that have

17 been addressed, even in litig- -- even in

18 litigation settings alone.  But I'll grant you

19 that those are two things that one could approach

20 via an event study.

21     Q.    Are those two questions the

22 questions that are typically addressed by event

23 studies in litigation?

24         MR. FIGEL:  Objection.

25     A.    Being a statistician and not a

1  diviner, I would need data on -- I would need to

2  go out and collect instances of event studies used

3  in litigation and then code them up in a

4  systematic way.

5         It wouldn't -- so the fair answer

6  to your question is I -- I couldn't possibly say.

7  But I can be a little bit more helpful and say it

8  would not surprise me to discover that those are

9  the most frequently asked questions.

10        Q.    Limiting event studies to their use

11  in litigation, how does an event study answer the

12  question of whether an announcement caused a price

13  reaction?

14              MR. FIGEL:  Objection.

15        A.    So that I understand what you're

16  asking me, you're asking about the actual process

17  of using an event study.  Is that right?  You

18  would like me to describe the steps of the method?

19              In other words, your -- your

20  question is a little bit ambiguous.  Possible

21  answer might be, they do it very well or they

22  don't do it very well.  But I think you're not

23  asking -- you ask how -- how do they do it.

24        Q.    Let me ask a better question.

25  Would you agree with the statement:  The

54

1    statistical significance of the event parameter

2    shows that we can conclude with 95 percent

3    confidence that the value of a specific security

4    being examined declined or increased as a result

5    of the information event?

6                    MR. FIGEL:  Objection.

7            A.    Would I agree or -- your question

8    is would I agree or disagree with that statement?

9            Q.    That's right.

10           A.    I couldn't possibly agree or

11   disagree with that statement without knowing the

12   context, what had -- the calculations that had

13   been performed, whether they'd been performed

14   correctly.

15                 When you're -- you seem -- with due

16   respect, sir, you seem to be reading the

17   conclusion of an elaborate calculation and -- that

18   you have not specified and then asking me whether

19   I agree with the conclusion.  Sorry.  I'm unable

20   to say without more information.

21           Q.    In your experience, is a 95 percent

22   confidence level sufficient for an expert to opine

23   that a given news event caused a price impact?

24                    MR. FIGEL:  Objection.

25           A.    I will answer that -- I think the

1    only fair way to answer that is in two parts, one

2    of which is yes and the other of which is no.  And

3    I will have to make that a fair and informative

4    answer, which was certainly my intention.  I will

5    have to explain the yes and the no.

6                Q.    Please do.

7                A.    The confidence level at which

8    statistical inferences of all kinds are performed,

9    the confidence level, and in particular an event

10   study type of analysis, that is a choice.  It --

11   the data does not -- neither the question nor the

12   data dictates that 95 percent be the confidence

13   level.

14                It is a choice that the researcher

15   makes, how certain do I want to be that I -- that

16   the conclusions that I arrive at do correspond to

17   a real -- a real effect, an empirical effect.

18                And one can prespecify a confidence

19   level of 99 percent or of 95 percent or of

20   90 percent.  It's a choice.  So it's not the data

21   speaking.  It's the researcher speaking.

22                I generally counsel against picking

23   any of those as a prespecified threshold.  But if,

24   nevertheless, a researcher was going to go --

25   plunge ahead and follow that path, it is -- I

1    would agree with the proposition -- this is the

2    yes part of my answer -- I would agree with the

3    proposition that 95 percent is the overwhelmingly

4    predominant choice of a level of confidence for a

5    statistical analysis.  It's not the only choice.

6    And there's no genuinely principled reason why

7    that has to be the level of confidence.

8              But in reality, across the entire

9    domain of applied statistics, including

10   econometrics and other areas of application, that

11   is the level of confidence that researchers pick.

12   So that -- so, yes, that's the yes part.

13             The no part is that event studies

14   are, by their nature, studies of observational

15   data.  And one cannot infer causation solely from

16   observing an apparently statistically significant

17   finding.

18             So your question, which we've all

19   forgotten by now, involved whether 95 percent

20   confidence is sufficient to infer that one thing

21   had caused another thing.  And in observational

22   data, you can never really get to causation merely

23   by observing a statistically significant outcome

24   from a calculation.

25             MR. SYLVESTER:  We've been going

57

1            for about an hour 15.  Can we take a quick

2            break?  Is that all right?

3                      THE WITNESS:  Works for me.

4                      THE VIDEOGRAPHER:  The time is

5            10:29 a.m. This concludes Media 1.  Off the

6            record.

7                      (Recess taken from 10:29 a.m. to

8            10:50 a.m.)

9                      THE VIDEOGRAPHER:  The time now is

10           10:50 a.m.  This begins Media 2.  On the

11           record.

12      BY MR. SYLVESTER:

13           Q.    Dr. Marais, other than the State

14      Farm and Walden cases that we discussed earlier,

15      has there been any occasion in which a portion of

16      any of your expert report has been excluded?

17                      MR. FIGEL:  Objection.

18           A.    Yes.

19           Q.    How many times has that happened?

20           A.    There are two occasions I'm aware

21      of.

22           Q.    What were those two cases?

23           A.    One of them was a case called

24      Hernandez versus Crown Corporation.  The other was

25      a case called Tuf Racing, T-u-f Racing, versus

58

1    Suzuki.

2           Q.    Why was a portion of your expert

3    report excluded in the Hernandez case?

4           A.    In one portion of my report, I

5    compared the rate of injuries of the subject type

6    of forklift truck to every -- to the rate of

7    injuries from the tools of the trade in every

8    other private sector occupation in the United

9    States.

10                And the Court held that that was a

11   form of comparative risk testimony and that, in

12   that jurisdiction, comparative risk was not

13   admissible as a defense against whatever it was

14   that was being alleged.

15                And so that was only a portion of

16   my work.  I had -- it was a small portion of my

17   work.  And that portion was excluded.

18          Q.    What jurisdiction was the Hernandez

19   case?

20          A.    I don't recall.  It was somewhere

21   on the east coast.

22          Q.    For what reason was a portion of

23   your expert report excluded in the Tuf Racing

24   case?

25                MR. FIGEL:  Objection.

59

```
1              A.    In Tuf Racing, I was responding to

2     an opposing expert on damages allegedly suffered

3     by the Tuf Racing enterprise.

4                    Among my multiple opinions in that

5     case, I had opined that the -- that first

6     principles dictated that the proper target date

7     for discounting allegedly lost earnings to a

8     present value was the date on which the harm

9     occurred, the breach.

10                   And so the present value should be

11    calculated as of the breach date and then carried

12    forward maybe at a pretrial or posttrial interest

13    rate from that date, but that that was the target

14    date.

15                   The Court held that in Cook County,

16    Illinois, it was not first principles that

17    mattered, it was legal precedence and that that

18    was -- the choice of target date was not a topic

19    for expert testimony.

20                   I was allowed, however, to testify

21    on every other aspect of my work, and we -- the

22    side that retained me prevailed in that case

23    based, in part, on my testimony.

24              Q.   Do you recall testifying earlier

25    today that you've performed approximately six
```

60

1   event studies in connection with prior expert

2   witness retentions?

3          A.   I did.  I also recall qualifying

4   that answer because all of that was a very long

5   time ago.

6          Q.   Which of those six cases can you

7   recall sitting here today?

8          A.   I recall a case in which I was

9   retained by a pension fund for firemen and a

10  pension fund for nurses.

11          It was a securities litigation, and

12  the union pension funds were suing somebody in

13  connection with inadequate disclosure or something

14  of the kind.  And I recall my work as involving an

15  event study.

16          Q.   Do you remember the somebody who

17  was being sued in that case?

18          A.   I do not.

19          Q.   Do you remember which -- what the

20  name was of the pension fund you referenced?

21          A.   No, it's -- as I've testified, it's

22  20 years ago.  I don't recall.

23          Q.   Do you remember what court that was

24  in?

25          A.   I have a vague sense that it was in

61

1    California, that the case was venued in

2    California.  But whether it was in state court or

3    federal court, I don't recall.

4          Q.    What other cases, if any, can you

5    recall, sitting here today, where you provided an

6    expert report that contained an event study?

7                MR. FIGEL:  Objection.

8          A.    The name Time Warner comes to mind

9    as a defendant in one such case.  I can't be sure

10   that's not the widows and the -- not widows, the

11   nurses and firemen case.

12               But I -- I vaguely recall that

13   there was such a -- such a case -- such an

14   instance.  Those are the two that I remember, even

15   though only partially and vaguely.

16         Q.    So just for the record, those are

17   the only two cases in which you performed an event

18   study in connection with your expert witness work

19   that you can recall sitting here today?

20               MR. FIGEL:  Objection.

21         A.    That I -- that I think I recall

22   involving an event study, yes.

23         Q.    Do you recall what jurisdiction the

24   Time Warner case was in?

25         A.    No.  I'm -- as I indicated in a

62

1   previous answer, I'm not even sure that is not the

2   same case as the one that I referred to.  But

3   other than that, I don't remember.

4           Q.    Have you ever made any profits or

5   losses from trading XRP?

6           A.    In -- yes, although only

7   incidentally.

8           Q.    Can you explain what you mean by

9   "only incidentally."

10          A.    I purchased some XRP to pay my

11  vendor in the matter I referred to earlier.  I

12  held those XRP for some time, for a few weeks.  By

13  the time I was making the payments, the value of

14  XRP had dropped.

15                And so in that sense I, incidental

16  to a transaction, I suffered a tiny loss by

17  holding XRP for some period of time.

18          Q.    Other than the loss that you just

19  described, were there any other occasions where

20  you either made a profit or suffered a loss on XRP

21  trading?

22                MR. FIGEL:  Objection.

23          A.    No.  I -- I should revise that

24  answer.  I've testified already that I have a

25  balance that's probably about $5 in XRP.  So I may

63

1    be making a profit or a loss as we sit here.  But

2    it's not on a large scale.

3           Q.    Is it fair to say that on some

4    occasions, event studies establish that prices

5    react to news?

6           A.    That's broadly what event studies

7    are used for.  So on some occasions, that does

8    seem to be the case, yes.

9           Q.    In performing an event study, an

10   expert has to undertake a number of steps.  Is

11   that fair?

12              MR. FIGEL:  Objection.

13          A.    An expert would have to do some

14   work, and work can often be divided up into steps.

15          Q.    In conducting an event study, the

16   expert must identify the announcement or

17   announcements whose potential effect on the

18   security price is in question.  Is that right?

19          A.    Hard to disagree with that the

20   expert has to do something like that.

21          Q.    At some point in conducting an

22   event study, the expert will have to determine

23   which trading days he's examining.  Is that right?

24              MR. FIGEL:  Objection.

25          A.    Explicitly or implicitly, yes.

1          Q.    And at some point, the expert would

2    have to determine which days within the period he

3    observes an abnormal price reaction for the

4    security at issue.  Correct?

5               MR. FIGEL:  Objection.

6          A.    Event studies typically involve

7    something along those lines.

8          Q.    When performing an event study,

9    would an expert typically start with identifying

10   all significant price changes and then check to

11   see if any of these changes could be linked to the

12   news events, or does the expert start with the

13   news events and see if there were significant

14   price changes on the news event days?

15              MR. FIGEL:  Objection.

16         A.    Event studies are performed in

17   multiple different ways.  I've already indicated

18   in my testimony earlier today, there are things

19   that don't even look like conventional event

20   studies that can be considered event studies.  So

21   the best answer I can give you is:  It depends.

22              There is an event study at issue in

23   this case, as I think we all know, in which

24   Dr. ███ performed a distinctly nonstandard kind

25   of analysis that -- for which he doesn't provide a

65

1    specific citation, and that may be because no

2    citation exists.

3              So I mention that to point out that

4    it is an event study of a kind.  And it has

5    features that are pretty much unique to it, in my

6    experience.  Although I can't rule out that there

7    might not be some precedence for it.

8              So it would be misleading to

9    generalize that an event study always has feature

10   X and never has feature Y.  Because Dr. ████

11   surprises us with a nonstandard kind of event

12   study formulation, which I would not have -- you

13   might have asked me about yesterday and I would

14   have said that I had never seen such a thing.

15   Well, not yesterday, but the day before Mr. Figel

16   called me.

17        Q.   On the occasions on which you've

18   conducted event studies, have you typically

19   investigated abnormal price reactions on all

20   no-news days before and after the news event days

21   in question?

22             MR. FIGEL:  Objection.

23        A.   I would have to go back both to the

24   event studies that I performed in litigation more

25   than 20 years ago and the event studies with which

1    I was involved in as an academic researcher before

2    I became a private consultant to -- and refresh my

3    recollection of what I did on those occasions --

4    I'm -- to really give you an accurate answer to

5    that question.

6              But I'm sorry, what -- maybe I

7    misheard, I -- could we just go back.  Could you

8    restate the question so I'm sure I'm answering the

9    right thing.

10             Q.    Sure.  On the occasions on which

11   you've conducted event studies, have you typically

12   investigated abnormal price reactions on all

13   no-news days -- strike that.

14             Yeah.  Okay.  On the occasions on

15   which you've conducted event studies in the past,

16   have you typically investigated abnormal price

17   reactions on all no-news days in addition to

18   investigating price reactions on the news event

19   days within the period you're examining?

20             MR. FIGEL:  Objection.

21             A.    I don't think I can -- I'm able --

22   for the reasons that I've testified about, I don't

23   think I'm able to characterize what I have

24   typically done at this point without refreshing my

25   recollection on -- I'm fairly sure that there were

67

1    occasions where I did something that seems to

2    resemble what you're asking about, and on other

3    occasions, I did nothing that resembles what

4    you're asking me about.

5              But to apply the characterization

6    of "typically," I'm not able to do that at

7    this -- at a 20-year distance in time.

8         Q.    Can you recall an occasion where,

9    as part of conducting an event study, you

10   investigated abnormal price reactions on days on

11   which there was not a news event in question?

12        A.    Not as I sit here today for the

13   simple reason that I've testified about,

14   repeatedly, of the 20-year remove.

15             I -- as a -- as a -- I will add

16   that as a -- as an academic, I performed many more

17   event studies than I ever did once I left

18   academia.  And so it was one of my research areas.

19             So I applied a wide range of

20   methodologies and -- to a wide range of questions

21   in a wide range of ways, none of which I can

22   testify about as fresh recollections, sitting here

23   today.

24        Q.    And just for the record, when I

25   asked that last question about event studies, were

68

1    you answering for all event studies you've ever

2    conducted, or event studies limited to your work

3    as an expert witness?

4              A.    When I understood your question to

5    be about work as an expert witness, I answered

6    about those event studies.  And when you did not

7    qualify the event studies you were asking me

8    about, I was asking about event studies throughout

9    my life.

10             Q.    Thank you.  Is it fair to say that,

11   if you had investigated abnormal price reactions

12   that occurred on days other than news event days,

13   and you prepared an expert report in connection

14   with the event study, you would have documented

15   those investigative steps in your invest- -- in

16   your expert report?

17                   MR. FIGEL:  Objection.

18             A.    If those investigative steps,

19   whatever they may have been, fitting somewhere

20   under the -- in the category you're asking about,

21   if they had been a material part of the basis of

22   my opinions, I would have described them as such.

23                   And if they had been -- not been a

24   material part of the basis of opinions, expert

25   opinions I was rendering, I may not necessarily

69

1    have, although I may still have referred to them

2    in passing.

3              Q.    Can you recall any of your previous

4    expert reports in which you did document any steps

5    you took to investigate abnormal price reactions

6    that occurred on days other than news event days?

7                   MR. FIGEL:  Objection.

8              A.    If we -- I cannot recall such an

9    instance for the reason that I have testified

10   about repeatedly.

11                  Although, if you -- if we drop the

12   word "price" and just refer to reactions, I can

13   recall an instance.

14             Q.    Can you tell me what steps you took

15   in the instance you just referenced?

16                  MR. FIGEL:  Objection.

17             A.    I am thinking of an analysis, not

18   of price, but in effect, of trading volume and in

19   a matter with a set of news days and announcement

20   days and a number of extremely prominent changes

21   in trading volume.

22                  And the step that I took -- I took

23   multiple steps, not all of which I remember, but

24   one step that I took is to make a time series

25   graph showing trading volumes overlaid on a set of

70

```
 1    timelines showing announcement dates and onset

 2    dates of various key events and key announcements,

 3    key disclosures in the case, whose -- so I created

 4    such a -- such a picture and then wrote text

 5    surrounding it, describing what the graphical

 6    illustration showed and what it did not show and

 7    what conclusion I drew from it.

 8            Q.   What case is it that you are

 9    discussing in connection with which you performed

10    the work you just discussed?

11            A.   It is the United States versus

12    Rhame matter.

13            Q.   So this is a rather recent

14    engagement.  Is that right?

15            A.   Yes.

16            Q.   What question were you

17    investigating in the Rhame matter?

18            A.   Whether there was evidence in one

19    kind of volume data versus a different kind of

20    volume data of -- that would support the -- the

21    hypothesis of a causal link from the announcement

22    or the disclosure or the event -- there were some

23    of each of those in the case -- with changes in

24    volume, in trading volumes.

25            Q.   Did you find such a link?
```

71

```
 1              A.    I found what appeared to be the
 2     absence of such a link.
 3              Q.    Was part of the basis for your
 4     finding of an absence of such a link your
 5     identification of abnormal reactions in trading
 6     volume on days other than the news event days in
 7     question in that case?
 8              A.    I'd say so, yes.  I think that
 9     fairly describes what I did.
10              Q.    Is your reasoning -- strike that.
11              Have you disclosed your expert
12     report in that case?
13              A.    I have -- I submitted a report in
14     that case.  I am not -- if that -- yeah.  It was
15     disclosed to the government in that case.  I don't
16     know what other sense of disclosure you might have
17     in mind.
18              Q.    Is there any other
19     expert's -- strike that.
20              Is there any other event study that
21     you performed, in connection with your expert work
22     or otherwise, in which you have reached a
23     conclusion that there was no link between the
24     event or events in question and an effect on price
25     or volume on the basis of abnormal movements in
```

1   price or volume on non-news event days?

2                  MR. FIGEL:  Objection.

3          A.    Could I hear the question read

4    back.

5                  MR. SYLVESTER:  I'm going to ask

6          the court reporter to read that one back,

7          please.

8                  (Record read by the certified

9          stenographer as follows:

10                 "QUESTION:  Is there any other

11         event study that you performed, in connection

12         with your expert work or otherwise, in which

13         you have reached a conclusion that there was

14         no link between the event or events in

15         question and an effect on price or volume on

16         the basis of abnormal movements in price or

17         volume on non-news event days?")

18         A.    The question begins with a

19   premise -- or begins "is there any other event

20   study."  It's not clear to me what other events --

21   when you say "other," other than what?

22                 The Rhame analysis was not, per se,

23   an event study, as I testified earlier and

24   explained earlier.  It -- one could recognize an

25   analogue in there, but it wasn't really an event

73

1    study.  So when you say "any other," do you mean

2    any other than Rhame?

3      BY MR. SYLVESTER:

4           Q.    If we amend my question to include

5    any expert work you've performed, can you answer

6    the question amended to any expert work you

7    performed?

8           A.    Okay.  Let me make sure I've got

9    the question straight then.

10          Q.    Sure.

11          A.    In any expert work, where by

12   "expert" we mean potentially testifying expert,

13   not just that I was an expert as an academic on a

14   certain topic, so test- -- in any work as a

15   retained testifying expert.

16          Q.    Let's expand it to any work you've

17   performed as a statistician examining the impact

18   of a news event on something like price or volume.

19          A.    Okay.  So I'm a statistician for

20   this hype- -- this setup.  Any work I have

21   performed that relates to identifying the effect

22   of an event on price or volume, that's the

23   situation.

24               And in such a situation, have I

25   ever reached the conclusion that there was no

74

1    impact by investigating ab- -- statistically

2    significant abnormal somethings not coinciding

3    with a news event or with the event that is the

4    subject.  Was -- have I got that -- was that

5    right?

6            Q.    Yes.

7            A.    Okay.  I don't recall such an

8    instance, and I don't even think that fairly

9    describes my work in this case.  So sitting here,

10   I can't recall any such instance.

11           Q.    Does that describe your work in

12   Rhame?

13              MR. FIGEL:  Objection.

14           A.    I think -- understanding that it

15   was not an event study in the normal sense of that

16   term, yes, I think that fairly -- that's -- it's

17   not how I did or would describe my work in Rhame.

18   But you -- obviously, you get to ask

19   the -- formulate the question.  I've -- I think I

20   can agree that that sounds a lot like what I did

21   in Rhame.

22           Q.    In the papers that you've written

23   about event studies, Dr. Marais, have you ever

24   mentioned that the investigation of abnormal price

25   reactions on non-news event days is a step that

1    someone performing an event study should take?

2                MR. FIGEL:  Objection.

3           A.    If I did it, there would have been

4    a context for it that I don't recall sitting here

5    today.  I will frankly admit, I have not reread my

6    papers on event studies in many years, at least,

7    multiple years.

8                So I -- I am -- you know, it's

9    either there or not.  And I don't recall -- I

10   can't testify to that with any definite

11   recollection sitting here today.

12          Q.    Is it fair to say that when you

13   wrote your papers regarding event studies, that

14   you included within those papers the procedures

15   that you considered necessary to perform a proper

16   event study?

17          A.    Certainly the procedures that I

18   considered necessary to perform a proper event

19   study for the purposes for which those event --

20   the event studies I was writing about were being

21   conducted.

22          Q.    You've also written at least one

23   paper that addresses the topic, in general terms,

24   of how event studies can be used in litigation.

25   Is that right?

76

```
 1              A.    Yes.

 2              Q.    And in those -- strike that.

 3                    In that paper, you describe the

 4    procedures that one undertakes to use an event

 5    study in litigation.  Is that right?

 6              A.    That, as a general, high-level

 7    characterization, that's fair enough.

 8              Q.    And when describing in that paper

 9    the procedures that one undertakes to use an event

10    study in litigation, did you include within that

11    description all steps that you would consider

12    necessary to undertake a proper event study for

13    the purposes of litigation?

14              A.    The purposes of litigation is a

15    pretty broad category.  I described how event

16    studies are -- how single-firm event studies are

17    typically employed in securities litigation, but

18    your phrase "for purposes of litigation" is

19    pretty -- it covers a lot of ground.

20                    So I wouldn't want to -- I

21    certainly wouldn't want to say that I included in

22    that writing a -- any -- every way an event study

23    could meaningfully and validly be used for

24    purposes of litigation.

25                    Depending -- how an event study is
```

```
 1    used depends on exactly what is at issue.  And I

 2    was writing about a particular context, which I

 3    believe I set forth in -- when I was writing about

 4    single-firm event studies in securities cases, for

 5    measuring the effect, say, of a -- for quantifying

 6    the effect of a particular disclosure.

 7                  For -- I mention that because that

 8    is an example that distinguishes the event studies

 9    that I was writing about in litigation, for

10    example, from the event study that -- and this is

11    just as an example -- distinguishes it from the

12    event study that Dr. ███ performed in this case

13    in which he nowhere quantifies the effect on price

14    of any event.  He doesn't report such a thing.

15                  That just goes to the point -- just

16    to be clear on what I'm answering, that goes to my

17    point that different event studies are conducted

18    in different ways for answering different

19    questions.

20          Q.    Let me pose a hypothetical.  Let's

21    say you've conducted an event study and you

22    observe an abnormal price reaction on each of the

23    news days in question.  And let's further say that

24    you also observe abnormal price reactions on days

25    on which there was no news event in question.
```

78

```
1                    Does the existence of abnormal
2      price reactions on the no-news days change your
3      opinion about the observed price reactions on the
4      news days?
5                    MR. FIGEL:  Objection.
6              A.    That would depend on what opinion I
7      was expressing.
8              Q.    Let's say you were asked to
9      determine whether there was any effect of the
10     news -- whether there was any
11     statistically-significant relationship between the
12     no-news days and price movement -- sorry.  Strike
13     that.
14                   Let's say you were asked to
15     determine whether there was a price effect caused
16     by the news event.
17                   MR. FIGEL:  Objection.
18             A.    The -- okay.  So that sounds very
19     much like a standard litigation format event study
20     which, as I've testified, is a little different
21     from what Dr. ▮▮▮ did in the present case, which
22     I understand is what all of this is about.
23                   That's a question that can be
24     answered, narrowly formulated as it -- as you have
25     formulated it, by computing a cumulative abnormal
```

1    return and a T statistic for a cumulative abnormal

2    return over the -- for the event days.  And one

3    could stop there.

4          Q.    When you say "one could stop

5    there," does that mean that you would not need to

6    take the step of investigating abnormal price

7    reactions on no-news days?

8              MR. FIGEL:  Objection.

9          A.    The -- one could answer, if given

10   the narrow assignment that your question asks me

11   to assume as part of a hypothetical, if that were

12   the narrow assignment, you could answer it without

13   reference to test to the statistical significance

14   of abnormal returns on days other than the news

15   days.

16           And that typically is what

17   litigation-style event studies look like, the ones

18   that I have encountered, in any case.

19        Q.    Dr. Marais, did you conduct an

20   event study in this case?

21        A.    I would say no.  There is a, kind

22   of, an event study in this case that is at the

23   core of my work in this case.  But it's not my

24   event study, it's somebody else's event study.

25   It's Dr. ████ event study.

80

```
 1            Q.    If you had been asked to conduct an

 2   event study that assessed claims of any link

 3   between Ripple news and XRP prices, would you have

 4   been able to do so?

 5            MR. FIGEL:  Objection.

 6            A.    I can't think of a reason why I

 7   would not have been able to do so.  I never was

 8   asked that assignment.  And as you know, it's

 9   unwise to give off-the-cuff answers to questions

10   like -- to large assignment questions like that

11   while sitting at the deposition table.

12            But I can't -- I would have needed

13   to know more than is in your question, obviously,

14   to determine ultimately if I could do that.  But I

15   can't think of a reason why I would not be able to

16   do it.

17            Q.    Have you -- strike that.

18            Do you have any expertise with

19   regard to digital assets?

20            A.    "Digital assets" is a fuzzy

21   concept.  It doesn't have bright line boundaries.

22   I am not, for example, a skilled trader with a

23   track record of earning large profits in digital

24   assets.  So I have no -- I don't have that kind of

25   expertise.
```

81

1            But there are many -- what I'm

2    trying to say is, there are many aspects to

3    digital assets, and one aspect of digital assets

4    is scholars in financial economics studying

5    digital assets.  And they, as I'm sure you know,

6    they use statistical and, more specifically,

7    econometric methods.

8                 And so to the extent that they use

9    methods that were inside my area of expertise,

10   that is the kind of expertise that I have.  It's a

11   generalized expertise, but it does relate in

12   particular to certain studies of digital assets.

13                 But with that qualification and

14   background, no, I would not -- I have never and I

15   would not describe myself as an expert in the area

16   of digital assets.  All that I have just said is

17   that I have -- there are no bright lines that

18   divide digital assets from my areas.  And in those

19   frontier regions, I do have expertise.

20        Q.    Have you authored any publications

21   pertaining to digital assets?

22        A.    No, I have not.

23        Q.    Have you taught any courses that

24   cover the topic of digital assets?

25        A.    No.

82

1        Q.     Have you taken any courses that

2   have covered the topic of digital assets?

3        A.     I have not done that.

4        Q.     Prior to this case, have you been

5   retained as an expert in any case involving

6   digital assets in any way?

7        A.     No, I have not.

8        Q.     Other than your work in this case,

9   have you ever conducted an event study involving

10  digital assets?

11       A.     Even including my work in this

12  case, I have never conducted an event study.

13       Q.     Are you offering any opinion on the

14  suitability of event study methodology to evaluate

15  the effects of disclosures on digital asset

16  prices?

17              MR. FIGEL:  Objection.

18       A.     I am offering no expert opinion in

19  this matter on that specific area.  I have

20  questions.  I have come to understand that it's

21  no -- there's no slam dunk simple answer.

22              But that -- that is an -- that

23  doesn't rise to the level of an expert opinion

24  that I'm offering in this case.  And I express no

25  such opinion in my report.

83

```
1              Q.    Are you offering any opinion in

2     this case on the informational efficiency of the

3     XRP market?

4              A.    Actually, no.

5              Q.    Are you offering any opinion in

6     this case on the informational efficiency of the

7     market for any digital asset?

8              A.    Again, no, I am not.

9              Q.    Turning to Attachment C of LM-1,

10    your expert report.  Is Attachment C to your

11    report a list of materials you considered in

12    preparing your report?

13             A.    Yes.

14             Q.    Did you personally review each of

15    the materials listed at Numbers 1 through 5 of

16    Attachment C?

17             A.    Yes.

18             Q.    Did defense counsel supply you with

19    the items listed in Attachment C?

20                   MR. FIGEL:  Start by answering yes

21       or no.

22             A.    Some yes, some no.

23             Q.    Which of the items listed on

24    Attachment C did defense counsel supply you with?

25                   MR. FIGEL:  Just identify by number
```

84

1          on your Exhibit C, please.

2                    A.    1, 3, and 5.

3                    Q.    You reviewed the Gerritsen paper

4      listed at Number 3.  Is that right?

5                    A.    Yes.

6                    Q.    What, if anything, did you learn

7      from reading the Gerritsen paper?

8                    A.    That there's no precedent in it for

9      the kind of analysis that -- for the specific kind

10     of analysis that Dr. █████ performed in the course

11     of his purported event study in this matter.

12     There are precedents for portions of it, but not

13     for the core method.

14                    MR. FIGEL:  Mr. Sylvester, I

15          just -- I mean, maybe to avoid you asking

16          questions, can I just clarify whether he

17          meant to say Number 3 as opposed to Number 2

18          with respect to the information that was

19          provided by counsel?

20                    MR. SYLVESTER:  Oh, sure.  That's

21          fine.

22                    Q.    Do you recall, Dr. Marais, if it

23     was, in fact, Number 2 that was provided by

24     counsel and not Number 3?

25                    A.    I recall clearly that what I meant

85

1    to say when asked that question was 1, 2, and 5.

2    And if I said 1, 3, and 5, I misspoke.

3              Q.    Going back to your reading of the

4    Gerritsen paper, is it your testimony that the

5    Gerritsen paper provides some precedent for

6    Dr. ███ work in this case?

7              A.    Yes.

8              Q.    What precedent does the Gerritsen

9    paper provide for Dr. ███ work in this case?

10             A.    To be crisp about that, I'd

11   probably have to look at a copy of the Gerritsen

12   paper, which I did not commit to memory.  So I

13   don't have a verbatim recall.

14             The measurement of profiting from

15   predictions requires I -- some benchmark modeling

16   for how profits were measured.  And it may be -- I

17   believe that one or -- one or the other of these

18   articles -- it may be the Gerritsen article -- did

19   use the most basic form of index model, the

20   constant mean return model from -- that Dr. ███

21   also used.

22             It did not, however, use in any

23   way, shape, or form the hypergeometric

24   distribution analysis that Dr. ███ also relies

25   on.  In fact, that -- the analysis that Dr. ███

1    relies on for his ultimate conclusions.

2            Q.    How did your reading of the

3    Gerritsen paper inform your opinions here, if it

4    did?

5            A.    Only as background.  I'm not -- I'm

6    not relying on anything in Gerritsen as a basis

7    for any opinion that I express in my report.

8            Q.    What, if anything, did you learn

9    from reading the Joo, J-o-o, et al., paper listed

10   in Number 4?

11           A.    I found a description of it in the

12   generalized rank test that to which Dr. ████

13   refers.  I also found in it some degree of

14   precedent for using index models, using an index

15   model.

16                 And I don't recall if Joo, et al.,

17   may, in fact, be the source where I found a

18   precedent for the constant mean return model,

19   which is Dr. ████ Model 1.  But in particular,

20   Dr. ███ cites Joo in at least one -- I think he

21   cites -- has multiple citations to Joo.

22                 But one topic for which he cites

23   Joo is the generalized rank test that he applies.

24   And so I was interested in the nature of that

25   particular generalized rank test.

87

```
 1              (Exhibit LM-10, Applied Economics

 2         article by Mohammad Hashemi Joo, marked for

 3         identification, as of this date.)

 4         Q.    I'm going to hand you, Dr. Marais,

 5    what's been marked as LM-10.  Once you've had a

 6    chance to look at it, my question is just:  Is

 7    LM-10 a copy of the Joo article that you cite in

 8    your report?

 9         A.    (Document review.)

10               Yes.

11         Q.    And this article in LM-10 appeared

12    in Applied Economics.  Is that right?

13         A.    Yes.

14         Q.    Do you have any views on the

15    reputation of Applied Economics in the economics

16    community?

17         A.    I do not.

18         Q.    Do you know if the Joo article was

19    peer reviewed?

20         A.    I assume so but I don't know that

21    to be a fact.

22         Q.    In part, the Joo paper discusses

23    event studies conducted with the respect

24    of -- strike that.

25               In part, Joo's paper describes
```

88

1    event studies conducted with respect to the effect

2    of certain announcements on the price of three

3    digital assets.  Is that right?

4            A.    I have to remind myself if there

5    are really three digital assets.

6            Q.    If it's helpful, I'm looking at

7    page -4796 under the subhead "Data and methodology

8    sample."

9            A.    Got it.

10               (Document review.)

11               I'm also looking at Table 2 on page

12   -4800 where some results are -- some summary

13   statistics are reported for the same three

14   cryptocurrencies and also the tables around major

15   events that I see on pages -4802, and all of which

16   refer to Bitcoin, Ripple, and Ethereum.

17               So I think by now I've satisfied

18   myself that the answer to your question is yes.

19           Q.    Do you understand the reference in

20   the JOO article to Ripple to be a reference to

21   XRP?

22           A.    That's how I read it when I saw it.

23           Q.    What was the basis for your

24   understanding that Joo's reference to Ripple was a

25   reference to XRP when you read the article?

89

```
1            A.    Initially and primar- -- and
2     primarily, it was that by the time I saw this
3     article, I was familiar with seeing references to
4     Ripple and XRP occurring together.
5                  As I testified earlier today, I do
6     not have a fresh recall as I sit here of whether
7     the article actually confirmed that expressly.
8     But I don't recall learning anything from it that
9     changed my understanding.
10           Q.    Did you first read the Joo article
11    after your retention in this case?
12           A.    Yes.
13           Q.    In reading this Joo article, did
14    you have any critique of the author's design of
15    the event studies described?
16                 MR. FIGEL:  Objection.
17           A.    The test statistics that these
18    authors used are part of the design of their event
19    study.  And I have some -- I do have some
20    questions about that.  But because I didn't need
21    to go to delve into the background of this article
22    and read yet other articles, I never fully
23    resolved those questions.
24                 For the purposes of my assignment
25    in this case and for the opinions that I actually
```

90

1    express in my report, I didn't need to -- to delve

2    behind the questions.  So criticism, potential

3    criticism, depending on the questions that

4    occurred to me.

5              Q.    Did you review the portion of the

6    Joo paper regarding selection of major events,

7    starting on page -4797?

8              A.    Only in a cursory way.

9              Q.    Do you recall having any critique

10   of the Joo paper's authors' design of their

11   selection of major events for their event study?

12                   MR. FIGEL:  Objection.

13             A.    I don't recall focusing enough on

14   the section -- their section on the selection of

15   their events, since that isn't what Dr. ███ cited

16   this article for, to develop a basis for

17   endorsement or criticism.

18             Q.    Have you finished all of the work

19   you were assigned to do in this case?

20             A.    Yes, in the sense that I have no

21   pending projects or outstanding assignments, so

22   that it's fair to say I have no plans to do

23   additional work as I sit here today.

24                   If I am asked to do anything

25   additional, I would certainly entertain such a

91

1    request if it came to me.

2              Q.    Have you come to learn any

3    information since you signed the report at LM-1

4    that in any way affects the opinions set forth in

5    your report?

6              A.    No.  None that I can think of at

7    least.

8              Q.    Who wrote the text of your report

9    at LM-1?

10             A.    It was a collaborative writing

11   effort in which Dr. Asinski provided portions of

12   the -- of a draft text which I then, in most

13   cases, thoroughly and extensively rewrote so that

14   the collaboration ended with a document that is

15   entirely my own.

16             Q.    Do you recall any portions of your

17   report that you did not, as you describe it,

18   thoroughly and extensively rewrite?

19             A.    No.

20             Q.    Is there anyone else who assisted

21   with the drafting of your report other than

22   Dr. Asinski?

23             A.    I've already mentioned Mr. Narsid

24   Golic, who performed various tasks in support of

25   Dr. Asinski.  I can't know -- I don't know whether

92

1    Mr. Golic had a role in creating material

2    delivered to me by Dr. Asinski.  But except for

3    that, I can't think of anybody.

4            Q.    Is there any portion of your report

5    where you wrote the first draft?

6            A.    I can't answer that from memory,

7    but I would be happy to page through the report

8    and tell you if I recognize such a section.

9            Q.    Sure.  Why don't you go ahead.

10           A.    (Document review.)

11                Much of the boilerplate on

12   introduction and background, I certainly wrote the

13   first draft.  And I didn't write it for this

14   engagement.  I've used similar language elsewhere.

15   It seems to me Section 2 is mostly my writing, as

16   a first draft, I mean.  All of it is entirely my

17   writing but I drafted that.

18                Paragraph 11, I wrote the first

19   draft.  Paragraph 13 looks to me like something

20   that I drafted.  Paragraph 17 looks to me like

21   something that I drafted.  Paragraph 20 and 21

22   were likely my work as in creating the initial

23   draft.

24                I am -- I created the first draft

25   of tables, like Tables 2 and 3, but certainly the

93

```
 1    insertion of the bulk of the numbers into those

 2    tables, that was done -- I didn't do that from the

 3    source computer outputs that we used for those.

 4              Paragraph 25 looks like something I

 5    drafted.  Paragraph 30 looks like something I

 6    wrote the first draft of.

 7              So I -- while Dr. Asinski and

 8    others assisting me had a substantial role, it

 9    looks like I -- and helped with comments -- it

10    looks like to me as if the -- much of the

11    substance of this document I drafted.

12              Q.    You mentioned that you likely

13    prepared the first draft of Tables 2 and 3 and

14    others input the numbers.  Is that right?

15              A.    With a few numbers but that the

16    bulk of the numbers, I testified, were not

17    inserted by me.

18              Q.    Right.  Are you nevertheless

19    familiar with the numbers that appear in Tables 2

20    and 3?

21              A.    Yes, I am.

22              Q.    Other than Dr. Asinski and possibly

23    Mr. Golic, was there anyone else who assisted with

24    the drafting of your report?

25              A.    No.
```

1          Q.    Did counsel provide comments on

2    your report?

3          A.    Yes.

4          Q.    Which counsel?

5          A.    Mr. Figel and possibly, for all I

6    know, anybody working with him.

7          Q.    Did counsel draft any part of your

8    report?

9                MR. FIGEL: You can answer yes or

10       no.

11         A.    No.

12         Q.    Did you incorporate counsel's

13   comments into the final version of your report?

14         A.    Where counsel's comments seemed to

15   me to be useful and/or to suggest useful ideas or

16   changes, I made improvements to the language

17   prompted by counsel's comments, and where they did

18   not, I did not.

19         Q.    Item 5 of Attachment C to your

20   report is ███ electronic backup.  Is that right?

21         A.    Yes.

22         Q.    Did you personally review the ████

23   electronic backup?

24         A.    I reviewed at least portions of it.

25   I had access to the whole of it, but I won't say

1    that I personally scrutinized every part of it.

2           Q.    In your review of the portions of

3    Dr. ███ electronic backup that you reviewed, did

4    you find any errors?

5           A.    None that I can recall.  I'm fairly

6    sure I would remember since all of this is quite

7    recent.  I did not find errors.

8           Q.    Did you instruct others to review

9    Dr. ███ electronic backup?

10          A.    Yes.

11          Q.    What instructions, if any, did you

12   provide them as to their review?

13          A.    To explore the backup material in

14   order to report back to me its nature, to

15   replicate the calculations performed by Dr. ███

16   and verify that when using the inputs, the input

17   data provided by him, that the calculations

18   described by him actually produced the outputs

19   reported by him.

20                So that would be a routine process

21   of replication, of auditing the work, to confirm

22   that the inputs -- to confirm at least by checking

23   a number of individual input data items that the

24   inputs actually did appear to come from the, I

25   think, coin-based source, whatever the name of the

96

1    source is that Dr. ███ reports, and that we could

2    see the same numbers looking at those sources; and

3    then to report back to me that -- whether or not

4    we were able replicate and thereby fully

5    understand what it is that Dr. ████ had done.

6              Q.    Were you able to replicate

7    Dr. ████ calculations?

8              A.    Yes.

9              Q.    From the review that you just

10   described, did anyone on your team discover any

11   errors in Dr. ████ backup files?

12                   MR. FIGEL:  Objection.

13             A.    I recall none.

14             Q.    Are you aware that defense counsel

15   in this case produced a set of files entitled

16   "Marais Backup" to the SEC?

17             A.    Yes.

18             Q.    Did you prepare the materials

19   contained within Marais Backup?

20             A.    Yes, at least in the sense that the

21   files were created under my direction by the

22   Compass Lexecon staff whose names I have already

23   testified about.

24             Q.    What do the Marais Backup files

25   contain?

97

1           A.    They contain computer code used to

2     produce the results reported in my own report

3     that -- that is two flavors of computer code.

4                 They contain input files which are

5     very largely derived and may, in fact, come

6     straight from Dr. ████ own production in this

7     case.

8                 They contain intermediate files

9     that were produced as -- in the course of

10    executing the computer code produced in that

11    backup, they contain output files.  Some of those

12    outputs, if I remember correctly, are in

13    relatively unfriendly computer output-like format.

14                Other outputs are in the form of

15    Excel spreadsheets, which were the basis of

16    exhibits to my report.

17                So I think that fairly fully

18    describes what is in those backup materials.  And

19    they -- in the form I believe they were delivered,

20    they -- the components are labeled.  They're in

21    file folders.  And those folders are labeled to

22    make it fairly easy to understand the relation of

23    the computer files we produced to the description

24    that I've just given.

25           Q.    Did you do anything to check the

98

1      accuracy of the materials contained within your

2      backup files?

3                    MR. FIGEL:  Objection.

4            A.    I routinely -- I followed my

5      routine practice of asking about whether the

6      materials in the backup files tied to the exhibits

7      where there was -- in my report and whether we had

8      reason to think that the calculations that we had

9      performed were performed accurately.

10                   And in part, we verified -- I had

11     that verified by confirming that we were able to

12     produce -- to reconcile to numbers reported by

13     Dr. ████ or appearing in Dr. ████ backup

14     materials, even though the chain of computer steps

15     that we were using were not identical to the set

16     of steps used by Dr. ████  So yes.

17           Q.    You said in part that you followed

18     your routine practice of asking about whether the

19     materials in the backup files tied to the exhibits

20     in your report.

21                   Who did you ask?

22           A.    Dr. Asinski.

23           Q.    Okay.

24                   THE WITNESS:  I would like to take

25         a break at some point soon.  It doesn't have

99

1          to be at this exact moment.

2                    MR. FIGEL:  Now is fine by me.

3                    Let's go off the record.

4                    THE VIDEOGRAPHER:  The time is

5          12:02 p.m.  This concludes Media 2.  Off the

6          record.

7                    (Lunch recess taken from 12:02 p.m.

8          to 12:58 p.m.)

9                         - - -

10           A F T E R N O O N   S E S S I O N

11                        - - -

12                (Time noted:  12:58 p.m.)

13                        - - -

14                    THE VIDEOGRAPHER:  The time now is

15         12:58 p.m.  This begins Media 3.  On the

16         record.

17       M.   L A U R E N T I U S   M A R A I S,

18               resumed and testified further as

19               follows:

20         CONTINUED EXAMINATION

21         BY MR. SYLVESTER:

22               Q.   Dr. Marais, earlier today you

23       testified that, prior to your retention as an

24       expert witness in this case, you had been retained

25       about three months ago by Kellogg Hansen.  Is that

1    right?

2            A.    Yes.

3            Q.    Did that retention have anything to

4    do with this case?

5            A.    No.

6            Q.    Earlier today I believe you

7    testified that Dr. ███ study as expressed in his

8    expert report is a nonstandard analysis.  Is that

9    right?

10           A.    Yes.

11           Q.    And I believe that you also

12   testified that you could not rule out that there

13   was precedent for that nonstandard analysis.  Is

14   that right?

15           A.    Correct.

16           Q.    Did you look for any such

17   precedent?

18           A.    Yes.

19           Q.    What did you find, if anything?

20           A.    Nothing.

21           Q.    I believe you testified earlier

22   that the Joo and Gerritsen papers might provide

23   some precedent for some portions of Dr. ███

24   study.  Is that right?

25           A.    Yes.

1        Q.      And what precedent do either of

2    those two papers provide for Dr. ████ study?

3        A.      The use of some kind of index

4    model, even if it is the -- the no index model

5    that Dr. ████ calls the constant mean returns

6    model.  But at least the use of some kind of index

7    model for estimating a normal return on a

8    cryptocurrency in some test period.

9        Q.      Is there any other precedent that

10   either of those two papers provide for Dr. ████

11   study?

12       A.      Not in a methodological sense.

13   They both have superficial characteristics but --

14   that don't go to the method that resembled

15   Dr. ████   They both -- they both have to do with

16   cryptocurrencies of a -- for instance.

17                But that's what I call superficial.

18   That doesn't -- that's not enough to make them

19   precedent, a methodological precedent.

20       Q.      When were you retained in the Rhame

21   case we discussed earlier?

22       A.      In the -- at some point in the

23   first half of 2020, maybe around the end of the

24   first quarter of 2020.

25       Q.      And when was it that your expert

102

1    report was provided to the other side in Rhame?

2              A.    In either late October or early

3    November of 2021.

4              Q.    Who retained you in the Rhame

5    matter?

6              A.    I was retained through counsel,

7    counsel being Alston & Bird, on behalf of

8    defendant Tyson Rhame.

9              Q.    In your professional career, and

10   setting aside Rhame, was there any occasion in

11   which you endeavored to assess whether there was a

12   link between a news event and a reaction in volume

13   and you concluded there was no such link, based in

14   whole or in part, on your observation of abnormal

15   reactions in volume on days with no-news events?

16              MR. FIGEL:  Objection.

17              A.    I testified at some length this

18   morning about the passage of time since I

19   performed event studies as a routine part of my

20   consulting practice.  And I testified that,

21   because really 20 or more years have passed, I

22   can't today testify with fresh recollection or

23   specificity about the content of those event

24   studies.

25              So I can only say I don't -- I do

103

1     not recall the nature of everything that I did

2     when I last did this kind of -- most recently did

3     work that seems to be covered by your question.

4            Q.    So fair to say, other than Rhame,

5     sitting here today, you cannot think of any other

6     occasion that would be responsive to my previous

7     question?

8                  MR. FIGEL:  Objection.

9            A.    I can think of many occasions that

10    could be covered by your previous question, but

11    none where my -- none that I would have thought to

12    describe in that way.

13                 But your question is broad enough

14    that there are matters that I would describe

15    differently if asked to describe what they were

16    about, but upon reflection might well recognize as

17    fitting into the category you are asking me about.

18           Q.    Can you describe, setting aside

19    Rhame, another occasion in which you endeavored to

20    assess whether there was a link between a news

21    event and a reaction in volume and you concluded

22    there was no such link, based in whole or in part,

23    on your observation of abnormal reactions in

24    volume on days with no-news events?

25                 MR. FIGEL:  Objection.

104

```
 1              A.    I've already testified that I
 2     can't -- that concerning my work on event studies
 3     per se, it's too long ago.  I don't -- I don't
 4     have that recollection.
 5                    I've also given you -- I've also
 6     pointed out that your characterization is broad
 7     enough to cover situations that wouldn't -- that
 8     might not have been labeled event studies per se.
 9                    And because they were not labeled
10     event studies per se, I would need to remind
11     myself, however briefly, of the nature of what the
12     work was.
13                    And so with that in mind, I've
14     picked up my report, and I've turned to Attachment
15     B.  And I would like to run my finger down these
16     matters and just think about what they involved
17     and whether they fit under the heading of what you
18     were asking me about.
19              Q.    Please go ahead.
20              A.    (Document review.)
21                    The -- Item 14 on my -- on the list
22     is called Cotromano v United Technologies and
23     Adinolfe versus United Technologies.  That seems
24     to me to be an example of the second kind of case
25     that I mentioned.
```

105

```
 1                  I -- I identified two categories.

 2      One was work that I had done on event studies,

 3      which is now too long ago for me to recall clearly

 4      what it was.

 5                  Cotromano is also some time ago.

 6      But my recollection of Cotromano is that it falls

 7      into the second category, where there is something

 8      that one can recognize as a kind of event study,

 9      even though not called that in the context.

10                  And that fits the rest of the

11      characterization that you provided.  And I -- as

12      it's now coming back to mind, I think that's not

13      the only one.

14                  I think Pinares versus United

15      Technologies in Item 17 had something of that same

16      character.

17                  (Document review.)

18                  The -- there are aspects of the

19      opiate litigation identified in Item 22 that fit

20      that character.  The same would hold in 23, also

21      26, also 34, also 38, also 40, also 44.

22                  And, of course, this list begins in

23      January of 2017 because it's meant to cover only a

24      full four-year period.  And so were we looking at

25      older versions of this list, there might well be
```

 1    others that are even better candidates than what

 2    I've identified for you on this list.

 3              Q.    In any of the cases that you just

 4    identified, was it your assignment to evaluate the

 5    link between a news event and the price of a

 6    security?

 7                    MR. FIGEL:  Objection.

 8              A.    No.

 9              Q.    In any of the cases that you just

10    identified, was it your assignment to evaluate the

11    link between a news event and the volume of a

12    securities trading?

13                    MR. FIGEL:  Objection.

14              A.    Certainly the volume of something,

15    but not the volume of securities necessarily.

16              Q.    Was your assignment for any of the

17    cases you just identified substantially identical

18    for any of them?

19                    MR. FIGEL:  Objection.

20              A.    Identical to what?

21              Q.    That's a fair point.  I'll give you

22    an example so you know what I mean.

23                    Assignments 34 and 44 both appear

24    to involve the client JUUL Labs.  Were you

25    retained by JUUL Labs?

107

```
 1              A.    Yes.

 2              Q.    Was your assignment in 34 and 44

 3     substantially identical?

 4                    MR. FIGEL:  Objection.

 5              A.    (Document review.)

 6                    There was certainly an overlap

 7     between 30 -- 33, 34, and 44.  To the best of my

 8     recollection, sitting here, though, the

 9     differences were so substantial that I would not

10     call the assignments substantially identical.

11              Q.    Let's start with 14.  What opinion

12     did you offer in the Cotromano case?

13              A.    The opinion that I offered in

14     Cotromano had to do with the statistics

15     surrounding a putative -- a putative cancer

16     cluster in an area of Florida -- in a subdivision

17     of Florida that was near a -- somewhat near a

18     Pratt & Whitney jet engine production and research

19     facility.

20                    My opinion was about the

21     investigation that had been performed by the State

22     of Florida and the federal EPA on the causation,

23     or lack thereof, of the pediatric brain cancers

24     that had been observed in the acreage subdivision

25     and the presence of the plant.
```

108

1          Q.     Did you provide any opinion related

2     to causation that you just described?

3          A.     Yes.

4          Q.     What was your opinion?

5          A.     That it had -- that it had not been

6     established and that despite a -- and a fairly

7     intensive investigation, no link had ever been --

8     no actual link had ever been documented.

9          Q.     What is it about the work that you

10    performed in the Cotromano case that you believe

11    may be responsive to my question as to whether in

12    your professional career there was any occasion in

13    which you endeavored to assess whether there was a

14    link between a news event and a reaction in volume

15    and you concluded there was no such link, based in

16    whole or in part, on your observation of abnormal

17    returns in volume on days with no-news events?

18                 MR. FIGEL:  Objection.

19         A.     My -- I -- my answer to that

20    question was that this case involved such a thing.

21    As it turns out, the opinions I ultimately

22    expressed did not involve my work on that

23    question.

24                 But that question did arise in that

25    case in the form of the disclosure of the

```
1    investigation itself, various disclosures
2    concerning the discovery of the cluster, various
3    disclosures concerning the outcome of the
4    investigation by the various state and federal
5    authorities, and the prices of housing.  And I --
6    there may even have been a volume question in
7    terms of turnover.
8                  So there were news releases
9    concerning this event in the vicinity of the area.
10   And there were questions about the price of
11   housing.
12           Q.    Did your expert work address those
13   questions regarding price of housing?
14           A.    I did initially, yes.
15           Q.    And -- but you didn't ultimately
16   end up offering an opinion about any questions
17   related to price of housing.  Is that right?
18           A.    That is correct.
19           Q.    Okay.  Limiting your answers only
20   to work that you did that was ultimately presented
21   in an expert report, and setting aside Cotromano,
22   which we just discussed, which of Items 17, 22,
23   23, 26, 34, 38, 40, and 44 do you view as
24   responsive to my question as to whether there was
25   any occasion in which you endeavored to assess
```

110

1    whether there was a link between a news event and

2    a reaction in volume and you concluded there was

3    no such link, based in whole or in part, on your

4    observation of abnormal returns in volume on days

5    with no-news events?

6                    MR. FIGEL:  Objection.

7             A.    (Document review.)

8                    In work that was -- that I

9    ultimately did include in what I produced, there

10   is -- there's some question on my mind as to

11   whether the declaration of an epidemic of opioid

12   abuse is a news event or not.

13                   It's -- it is a news event.  It is

14   also a very substantive event.  But it is at least

15   news that the administration, the national

16   administration has declared it to be an epidemic.

17   There was an element of that in Item 22.

18            Q.    What opinion did you provide in

19   connection with Item 22?

20            A.    That none of the events on the

21   timeline of that case, including the disclosure

22   and announcement of -- that the problems

23   associated with opioids are now viewed as an

24   epidemic and a crisis, a national emergency,

25   public health emergency, appear to be related in a

1   documentable way to the trajectory of sales of

2   Johnson & Johnson products or of opioids

3   generally.

4          Q.    What abnormal reactions did you

5   observe in connection with your work in Item 22

6   that impacted your opinion in that case?

7                MR. FIGEL:  Objection.

8          A.    Movements in the trajectory that

9   were statistically large increases or changes,

10  turning points that did not appear to coincide

11  with events on the timeline to which changes had

12  been attributed or linked in purported causal

13  claims by various experts in the matter.

14         Q.    When you used the word "trajectory"

15  in your previous response, trajectory of what?

16         A.    Sales.

17         Q.    Sales of Johnson & Johnson

18  products?

19         A.    Yes.  So volumes, in other words.

20         Q.    Is there any other item among the

21  items you identified, and setting aside Cotromano

22  and the case we just discussed, in which you

23  offered an opinion in an expert report that you

24  believed to be responsive to my question as to

25  whether there was any occasion in which you

1    endeavored to assess whether there was a link

2    between a news event and a reaction in volume and

3    you concluded there was no such link, based in

4    whole or in part, on your observation of abnormal

5    reactions in volume on days with no news-events?

6                    MR. FIGEL:  Objection.

7             A.     Setting aside the character and

8    similar analyses with different details to the one

9    that I have just described, there are -- in the

10   JUUL matter, one or more JUUL matters,

11   JUUL-related matters, there is a similar -- I -- I

12   take it back.

13                   The -- I suppose youth usage can be

14   described as volume.  So it's not a price effect.

15   But there is a volume effect, and there are

16   disclosures along -- arranged along a timeline,

17   and there are marked changes in volume.

18                   And there is a question of whether

19   the marked changes in volume are -- can be related

20   in a statistically reliable way to disclosures.

21                   Now, again, as in the opioid

22   matter, there is a question in my mind about

23   whether the disclosure is just a disclosure, a

24   news event or, whether, as a news event, it is

25   describing some underlying real event that may be

113

```
 1    the driver of any consequence.

 2                I suppose there is always a real

 3    event that is described in news unless it's fake

 4    news.

 5                But the analysis that I have

 6    performed of -- of youth usage in relation to

 7    timeline markers are of that character where there

 8    are marked statistical changes, statistically

 9    large changes in youth usage that do not coincide

10    with the disclosed events that are held to be or

11    hypothesized to be possibly causal.

12          Q.    And was the existence of those

13    marked statistical changes that you just described

14    influential on your opinion that you presented in

15    the JUUL matter?

16          A.    Yes.

17                MR. FIGEL:  Objection.

18                Sorry.

19          Q.    In what way?

20          A.    The fact that they were held to be,

21    by some opinions in the case, causally related but

22    were, in fact, not -- did not coincide in a

23    rationally recognizable way with the changes that

24    they are supposed to have caused was part of my

25    support for the opinion that the causation -- that
```

114

1    certain causation claims had simply not been

2    established on a statistically reliable basis.

3              Q.    I've asked a series of questions

4    relating to reactions in volume.  I'll ask for

5    your patience.  I'm going to ask the same question

6    with price to make sure we covered the whole

7    ground here.

8                   In your professional career, was

9    there any occasion in which you endeavored to

10   assess whether there was a link between a news

11   event and a reaction in price and you concluded

12   there was no such link, based in whole or in part,

13   on your observation of abnormal reactions in price

14   on days with no-news events?

15              MR. FIGEL:  Objection.

16             A.    If I heard the preamble correctly,

17   you asked in my professional career, which goes

18   back to about 1982 at the University of Chicago.

19                  I've already testified at some

20   length about the fact -- I hope understandable

21   fact -- that I simply cannot testify about the

22   content of event study related or event study

23   analogous work that I did 20 years ago, and

24   certainly 40 years ago is not any easier.

25                  So I would have to say

1    almost -- almost certainly yes, there have been

2    such occasions, but I cannot recall sitting --

3    that sitting here today.  I can't identify a

4    specific instance for you today.

5              It is most likely that that

6    occurred while I was still doing academic

7    research.

8         Q.    When was that?

9         A.    That was a period that spanned

10   approximately 40 years ago to 30 years ago.

11        Q.    Why is it most likely that it

12   occurred when you were doing your academic

13   research?

14        A.    Because I was looking at many more

15   event study-type analyses then and at a much

16   greater variety of -- in the main, much more

17   interesting questions than the ones that arise in

18   narrow litigation assignments.

19        Q.    In this case, you are offering

20   solely an expert rebuttal opinion.  Is that right?

21        A.    It is right to the extent that I am

22   responding in a focused way to the report of

23   Dr. ███ in this case.  That said, if Dr. ███

24   were, God forbid, to vanish off the face of the

25   earth and somebody else presented opinions that

116

1   overlap with the ███ issues that I address, my

2   opinions would be pertinent, more broadly because

3   I address issues.  I don't address the person,

4   Dr. -- Dr. ███

5            Q.   As it stands today, does your

6   rebuttal opinion pertain solely to opinions set

7   forth in Dr. ███ expert report?

8            A.   Yes.  I think that is a fair

9   characterization.

10           Q.   Are all of the opinions --

11           A.   It -- sorry.  Can I just add?

12           Q.   Please.

13           A.   It refers to the -- to what

14  those -- what the Dr. ███ findings do and not --

15  and do not convey and imply about what I

16  understand are issues in this case.  And in that

17  sense, my opinions go beyond Dr. ███ because

18  Dr. ███ is not very explicit on that point.

19                But it is certainly the case

20  that -- and I view my work as rebuttal to

21  Dr. ███  It just happens that in discussing what

22  Dr. ███ conclusions mean and what their

23  significance is, I end up going a little bit

24  beyond what Dr. ███ himself says.

25           Q.   Can you identify for me the

117

1   occasions on which you go a little bit beyond what

2   Dr. ▮▮ says?

3          A.    I'm not sure I will get all of them

4   from memory, but I can give you an illustration.

5          Q.    Please.

6          A.    (Document review.)

7               I'm looking, for instance, at

8   paragraph 5 of my report.  And I'm going to skip

9   the first part of -- it's a single-sentence

10  paragraph, which is remarkable in itself.

11              I will skip over the first half of

12  it and say that I was asked to address:

13              "Whether, based on my expertise,

14      his opinions support the contention that, in

15      economic substance, movements in XRP prices

16      solely or predominantly reflect responses to

17      disclosures about Ripple's actions."

18              Now, I don't know that I can -- it

19  may be that I can, but I'm not sure that I can

20  find in Dr. ▮▮ report a claim or an opinion

21  that movements in XRP prices solely or

22  predominantly reflect responses to disclosures

23  about Ripple's actions.

24              So in that sense, my addressing

25  that question does go beyond what Dr. ▮▮ seems

118

1    to assert directly in his own conclusions and go

2    to exactly what I just explained as what do these

3    conclusions say or not about what an issue -- a

4    question that I understand to be important in this

5    case.

6            Q.    Do you believe from your reading of

7    Dr. ████ report that he's contending:

8                 "In economic substance, movements

9           in XRP prices solely or predominantly reflect

10          responses to disclosures about Ripple's

11          actions"?

12           A.    I think he does not, to the best of

13   my recollection.  Without actually paging through

14   it, I think -- I doubt that I can find a place

15   where Dr. ████ states a proposition that I would

16   say amounts to this.

17                But I would say that Dr. ████ is

18   careless about not alerting the reader of his

19   report to the rather extreme limitations of what

20   his findings really show.

21                And in that sense, he rather

22   invites a reader of his report to fill in the

23   missing piece that gets you to these words in

24   paragraph 5.  And he does nothing to -- to -- he

25   doesn't put in any railing or fencing to keep the

119

1    reader of his report away from drawing that

2    inference.

3                    That's what I mean in paragraph 7,

4    what the words in paragraph 7 of my report.

5            Q.    Which words are you referring to,

6    Dr. Marais?

7            A.    Where I say, I quote -- in

8    paragraph 6, I quote him in his expansive

9    conclusion:

10                   "Statistically significant evidence

11        XRP prices react to news about Ripple's

12        actions ... the results hold for nearly all

13        statistical models ...  taken together, this

14        indicates" -- bottom line conclusion -- "XRP

15        prices react to the news of actions by Ripple

16        Labs."

17                   Now, for somebody who has in mind

18    what I understand to be the question in this

19    case -- Do XRP purchasers purchase XRP looking for

20    value from Ripple Labs? -- that statement doesn't

21    contain any user warnings about the limitations of

22    Dr. ████ work.  And that's why I say this

23    language -- your question to me was what language

24    am I referring to in my own paragraph.  And the

25    language I'm -- I was referring to is where I say:

120

1          "This language invites a reader of

2      the ██ report to conclude that Dr. ██ has

3      identified statistical evidence showing that

4      XRP price movements are driven largely -- and

5      causally" -- which he certainly has not

6      done -- "by actions taken by Ripple."

7          Q.    So is it fair to say that your view

8  is not that Dr. ██ contends that, in economic

9  substance, movements in XRP prices solely or

10 predominantly reflect responses to disclosures

11 about Ripple actions, but that a reader could draw

12 that inference from reading his report?

13          MR. FIGEL:  Objection.

14          A.    I think that is so close to fair

15 that it's almost not possible to see the daylight

16 between it and fairness, but I do see some

17 daylight there.

18          I would not testify that Dr. ██

19 does not test- -- contend that.  I have testified

20 that he does not ex- -- I can't point to express

21 language in Dr. ██   But Dr. ██ is a little

22 unclear in his restatements of his assignments.

23          The assignments can be read as

24 being fairly broad.  And Dr. ██ conclusion is

25 so strongly positive on discovering what he says

121

1    he was asked to look for, as quoted here, that

2    it's almost a contention.  That's why I say there

3    is little daylight between what I actually am

4    testifying to and your characterization of it.

5                 Of course, if Dr. ██████ were here

6    and simply disavowed these opinions, I would say,

7    "Sorry, I stand corrected.  You are not saying

8    anything causal and you are not saying that."

9                 But since I have only his report to

10   work with, this is where I end up.

11        Q.    Is it possible that XRP prices

12   could react to the news of actions by Ripple Labs

13   and also, at the same time, that XRP prices do not

14   solely or predominantly reflect responses to

15   disclosures about Ripple's actions?

16                 MR. FIGEL:  Objection.

17        A.    I think that that is not only

18   possible, but as far as I can tell, that is -- I

19   can't say the -- I will disavow any causal

20   conclusion, because I'm not sure -- I don't see

21   any simple -- any sufficient basis for genuine

22   causal conclusions.

23                 So I'll stick with "associate"

24   rather than "caused by."  With that qualification,

25   I think what you've -- the possibility you've

122

1    asked me about is the pos- -- is where we are.

2              Dr. █████ does document that

3    a -- what I will characterize as a sliver of the

4    large abnormal returns on XRP do coincide

5    with -- different from causation -- do coincide

6    with Ripple news events.  Most of the large price

7    movements that he identifies do not coincide with

8    Ripple news events.

9              So the nature of the coincidence

10   that he finds is a statistically significant

11   association.  It is an association with a sliver

12   of the large price movements in XRP, and I

13   would -- that -- that's my basis for saying yes,

14   with my caveat.  I do -- I think that it's not

15   only possible, I think that's what the evidence

16   that I'm aware of shows.

17             Q.   Do you think that the evidence that

18   you just described that Dr. █████ identified in his

19   report is sufficient to support the sentence:

20   "This evidence indicates that XRP prices react to

21   the news of actions by Ripple Labs"?

22             MR. FIGEL:  Objection.

23             A.   Properly understood, the problem --

24   and I'm happy -- I realize I've been giving rather

25   long answers.  I'll stop there.

123

```
1              Properly -- properly understood,

2    yes, and I'm -- if you would like, I would be

3    happy to explain what I mean by that.

4              Q.    I think -- let's return to this

5    line of questioning.

6              Other than Dr. ████ report, have

7    you read any other expert reports in this case?

8              A.    I have -- "read" is perhaps too

9    strong.  I have reviewed -- I've reviewed one

10   report, one other report.

11             Q.    Which one?

12             A.    The report of Dr. or Professor

13   Allen Ferrell.

14             Q.    You characterized your review as

15   "'read' is too strong."  Why is that?

16             A.    I paged through it, paused on the

17   most rivetingly interesting pages, which are the

18   ones that have statistics on them, long enough to

19   understand what is being done there and read

20   with -- and perused, reviewed with very little

21   attention the substantial discussion in that

22   report of things that I think, if I remember

23   right, are called the Howey factors.  The Howey

24   factor, H-o-w-i-e, I think.  Or is it e-y?  I'm

25   not sure.
```

124

```
 1                    MR. FIGEL:  Mr. Sylvester and I
 2         both know but we're not testifying.  Can I
 3         spare the court reporter?
 4                    MR. SYLVESTER:  Go ahead.
 5                    MR. FIGEL:  It's e-y.
 6         Q.    Okay.  Other than Dr. Ferrell's
 7    report, have you read any other expert reports in
 8    this case?
 9         A.    Other than Dr. Ferrell's report and
10    Dr. ██████  report?
11         Q.    I stand corrected.  Other than
12    those two.
13         A.    No, I've read no other reports.
14         Q.    Okay.  Are you offering any
15    opinions in this case about the contents of any
16    expert reports other than Dr. █████ expert report?
17         A.    Not as I sit here today.  I've
18    already indicated that if asked -- I've already
19    testified that I have no pending projects or
20    requests.  I've also testified that if asked, I
21    would consider a request within reason.
22         Q.    Do you know Dr. █████
23         A.    I thought about that when I read
24    that he was at the ████████████████.  But we
25    did not overlap, I believe, at ███████████████
```

125

1      ████████

2               So the -- so I didn't remember him,

3      and then I looked at his CV, and I still did not

4      remember him.

5               Q.    Other than any information that you

6      obtained from Dr. █████ CV, do you know anything

7      about him?

8               A.    No.

9               Q.    Did you review the portions of

10     Dr. █████ report that sets forth his

11     qualifications?

12               A.    Yes.  So I suppose I should have

13     said yes, do I know anything else?  Anything that

14     it says in his report about him that is not also

15     in his CV, I learned from that source.

16               Q.    Is it your view that Dr. █████ is

17     qualified to offer the opinions he offered in his

18     expert report?

19               MR. FIGEL:  Objection.

20               A.    Based on his description of his

21     background and what his CV says about him, I have

22     no basis to question Dr. █████ technical

23     qualifications.

24               Q.    Do you know Dr. Ferrell?

25               A.    No.

126

1          Q.      Do you know anything about

2    Dr. Ferrell?

3          A.      Yes.

4          Q.      What do you know?

5          A.      The things that I learned from his

6    CV and from his description of his qualifications

7    in his -- in the report that I looked at briefly.

8          Q.      Are you aware that defendants

9    submitted an expert report by Daniel Fischel?

10         A.      Yes, I am.

11         Q.      Did you read his report?

12         A.      No.

13         Q.      Did you communicate with him about

14   his report?

15         A.      No.

16         Q.      Did you communicate with him about

17   your report?

18         A.      No.

19         Q.      Have you communicated with

20   Mr. Fischel at all about the topic of this case?

21         A.      No.

22         Q.      You do know Mr. Fischel though?

23         A.      Yes.

24         Q.      You work together?

25         A.      Yes.

127

1          Q.     Do you work closely with him?

2          A.     That would overstate it.  I've

3    known Mr. Fischel for much longer than I've been

4    at Compass Lexecon.  So I say that to explain that

5    I know Mr. Fischel, but I don't work closely with

6    him.

7          Q.     Outside of Dr. ███ report, has

8    defense counsel provided you with any other event

9    study regarding XRP's price?

10             MR. FIGEL:  Why don't you start by

11       answering yes or no.

12         A.     No.

13         Q.     Outside of Dr. ███ report and the

14   Joo paper that we discussed earlier, are you aware

15   of any other event study conducted regarding XRP's

16   price?

17         A.     I have no specific knowledge of any

18   other event study.

19         Q.     Okay.  Turning to paragraph 4 of

20   your report.  Fair to say that paragraph 4, among

21   other things, summarizes certain of Dr. ███

22   conclusions?

23         A.     (Document review.)

24                Yes.

25         Q.     In addition to the conclusions that

128

1    you summarize in your paragraph 4, Dr. ██ also

2    reached certain conclusions regarding the

3    relationship between XRP returns and the returns

4    of other digital assets.  Correct?

5         A.    Yes.

6         Q.    Are you offering any opinion in

7    this case regarding Dr. ██ conclusions

8    regarding the link between XRP prices and the

9    prices of other digital assets?

10        A.    I am not unless there is some way

11   in which that topic is implicated in the topics

12   that I do address that I'm not recognizing at the

13   moment.

14        Q.    I think we covered this earlier,

15   but for the record, the concluding part of

16   paragraph 5, the -- that, as I understand

17   it -- let me -- strike that.

18             Paragraph 5 describes your

19   assignment.  Is that right?

20        A.    Yes.

21        Q.    Okay.  And the concluding part of

22   paragraph 5 in which -- which ends:

23             "His opinions support the

24        contention that, in economic substance,

25        movements in XRP prices solely or

1          predominantly reflect responses to

2          disclosures about Ripple's actions."

3                    That assignment was given to you by

4     counsel.  Is that right?

5               A.    As I say in that paragraph, the

6     whole paragraph is my assignment from counsel.  It

7     begins:  "Counsel for Ripple has asked me to

8     assess."

9               Q.    Does Dr. ████ use the phrase

10    "economic substance" anywhere in his report?

11              A.    I would have to use Acrobat tools

12    like the search function to tell that.  I don't

13    have a verbatim recall.

14              Q.    Do you recall whether Dr. ████ used

15    the words "solely or predominantly" in his report?

16              A.    Again, I can't be certain of that,

17    but I have no reason to think that he did.  I

18    believe that is the

19    characterize- -- characterization of my

20    assignment, not a characterization of -- not a

21    quote from Dr. ████.

22                    And you did ask me earlier, as you

23    know, and I did testify earlier about this entire

24    half paragraph, and I did indicate at some length

25    its relation, in my mind, to what Dr. ████ does

130

1    conclude expressly.

2            Q.    Taking a look at paragraph 30 of

3    your report.

4            A.    I'm there.

5            Q.    Do you summarize your opinions in

6    paragraph 30, starting with this phrase "in sum"?

7            A.    Yes.

8            Q.    Okay.  You first write:

9                  "It would be wrong to interpret

10          Dr. ████  event study as establishing that

11          XRP price movements are essentially a

12          function of Ripple's actions."

13                  Do you see that?

14          A.    Yes.

15          Q.    Okay.  Are you opining in this case

16   as to whether or not XRP price movements are

17   essentially a function of Ripple's actions?

18          A.    I am opining that there is nothing

19   in Dr. ████  work that supports that conclusion

20   and, rather, that Dr. ████  work seems to refute

21   rather than support that conclusion.

22          Q.    Have you performed any analysis to

23   determine whether or not XRP price movements are

24   essentially a function of Ripple's actions?

25          A.    I have performed such an analysis

1    only in my review and assessment of Dr. ██████ work

2    in this case.  I have not undertaken that

3    assignment from scratch.

4              Q.    You next write:

5                    "Instead, the ████ event study

6         cannot prove a causal relationship between

7         Ripple's actions and XRP price movements."

8                    Do you see that?

9              A.    Yes.

10             Q.    Are you -- setting aside your

11   critique of Dr. ████ report, are you offering any

12   other opinions in this case as to whether or not

13   there is a causal relationship between Ripple's

14   actions and XRP price movements?

15                   MR. FIGEL:  Objection.

16             A.    So to be clear, we're setting aside

17   entirely Dr. █████ work and my response to

18   Dr. ████ work.  Outside of my response to

19   Dr. █████ work, I am not offering any other

20   opinion independently of my review of Dr. ████ on

21   a causal relation of this kind.

22             Q.    Other than your review of Dr. █████

23   work, have you performed any analysis to determine

24   whether or not there's a causal relationship

25   between Ripple's actions and XRP price movements?

132

1              MR. FIGEL:  Objection.

2         A.    I have not.  Doing such a thing was

3    not part -- has never been part of my assignment,

4    as I understood it, in this case.

5         Q.    In the next sentence, Dr. Marais,

6    do you see the phrase "and, even if it could do

7    so"?

8         A.    Yes.

9         Q.    Does that phrase "even if it could

10   do so" reference, essentially, even if the ███

11   event study could prove a causal relationship

12   between Ripple's actions and XRP price movements?

13        A.    Yes.

14        Q.    Okay.  The sentence continues:

15              "The ███ event study documents at

16        best that any dependence of XRP price

17        movements on Ripple-related news accounts for

18        no more than a modest, far-from-preponderant

19        portion of XRP's unusual price movements

20        since 2014."

21              Do you see that?

22        A.    Yes.

23        Q.    When you say "XRP's unusual price

24   movements since 2014," what is it that you are

25   referring to?

133

1          A.    "Unusual" is written with a capital

2     U, and that is because it's a defined term that I

3     define early on in my report.

4                I'm happy to recount the -- that

5     definition that I give earlier.  But if you are

6     going to be taking me through that portion of my

7     report anyway, we might as well just go there and

8     not do it twice.

9          Q.    Sure.  Why not.  Do you want to

10    point me to the paragraph that you're identifying,

11    Dr. Marais?

12         A.    Yes.  Page 6, Footnote 13, which

13    ties to the first full sentence on that page.

14         Q.    In Footnote 13, you define your use

15    of the term "unusual"?

16         A.    Yes.  Actually, not only

17    Footnote 13, but paragraph 13 that -- near the

18    foot of the previous page.

19         Q.    What is your definition for

20    "unusual" for the purposes of your report?

21         A.    Well, I use, as I define the term

22    here, having noted that Dr. ████ has several

23    different ways of identifying what he calls

24    significantly positive trading days or event days,

25    any one of those, whichever one happens to be

134

1    pertinent at any given point in the discussion is

2    what I call capital U "Unusual" trading days.

3            Q.    Are unusual trading days the days

4    on which Dr. ████ observed abnormal returns in

5    XRP?

6                  MR. FIGEL:  Objection.

7            A.    No.

8            Q.    Why not?

9                  MR. FIGEL:  Objection.

10           A.    Because there is an abnormal return

11   in XRP every -- on every single trading day.  In

12   fact, there are abnormal returns of various

13   flavors on every single trading day, and they are

14   not all unusual returns, that's why not.

15           Q.    And can you, once again, just

16   define for me what an unusual return is for

17   purposes of your report?

18           A.    Yes, it is a -- it is an abnormal

19   return of the kind that Dr. ████ labels as

20   significantly positive by either a parametric or a

21   nonparametric procedure applied in either a

22   two-sided or a one-sided way and with the, sort

23   of, small, local data mining exercise that he

24   performs at each trading day.

25           Q.    Are unusual days days in which

135

1    there is a statistically significant abnormal XRP

2    return?

3                    MR. FIGEL:  Objection.

4         A.    No, that is -- that's not -- that's

5    moving in the right direction but it's not --

6    doesn't quite get there yet.

7         Q.    Is it fair to say that you take

8    issue with Dr. ███ calling specific trading days,

9    quote, "significantly positive"?

10        A.    I -- "taking issue" is stronger.

11   This is just a small difference of opinion in what

12   is a fair -- a reasonably informative term to use.

13   I don't particularly take issue with him.

14                    But statistically significantly

15   positive has a meaning from a textbook.  And what

16   Dr. ███ actually does doesn't quite conform to

17   any standard textbook definition.  That's why I

18   introduced the term "unusual" rather than using

19   a -- rather than misusing a term of art.

20        Q.    Is there any component to your

21   definition of "unusual" that involves statistical

22   significance?

23        A.    Yes.

24        Q.    What is that component?

25        A.    It is the -- what I call the small

1    local data mining exercise of picking a target

2    day, picking one of the four approaches -- the

3    parametric, nonparametric, one-sided, two-sided,

4    whatever, pick the approach.  Then that approach

5    gives you a means of determining textbook-type

6    statistical significance.

7                But what you then do is you look

8    for the target -- the single target day with which

9    you began alone, and separately for the single

10   target day as well as the day following it, and

11   separately again for the target day, the day

12   following it, and day plus two following it.

13               You apply the more or less standard

14   textbook notion of statistical significance to all

15   three of those, and you pick the best of three, as

16   it were, if -- meaning, if any of them crosses the

17   threshold for statistical significance, now your

18   day -- your single target day with which you began

19   is, at least, a candidate for being labeled what

20   Dr. ███ calls significantly positive.

21               But now there's more.  You now do

22   the same thing in the opposite direction.  You

23   look at the target day, the target day plus the

24   next day, and finally, the target day plus the

25   next two days, and you look for a significantly

1    negative indication by the usual textbook version

2    of what that means.

3                    In each of those three cases, you

4    look for the most significant of the three and

5    check to see that that most significantly negative

6    outcome does not actually reach significance.

7                    And only if you have done all of

8    those steps do you finally -- and reach the

9    judgments, the conclusions that I have outlined

10   here -- only then do you call the day, label that

11   trading day with which you began, as significantly

12   positive.

13                   So there are many pieces involved

14   there, many more than in a standard textbook

15   definition or procedure for determining

16   statistical significance.

17                   That whole -- that's what I call

18   the small local data mining exercise.  And if you

19   pass -- if a -- the day with which you began

20   passes that threshold, that's what I call

21   "unusual," an unusual day, as a defined term.

22            Q.    Let's return to your paragraph 7.

23                   Before I ask a question on 7, do

24   you agree that Dr. ███ procedure flags days with

25   large positive price reactions?

1           MR. FIGEL:  Objection.

2       A.   Broadly, yes.  It's a screen

3  that -- of course, it has all of the texture in it

4  that -- or all of the details that I just

5  testified about.

6           So just saying "large positive,"

7  well, there will be some positive -- there may be

8  some large positive price react- -- price

9  movements, not reactions, but price movements,

10 that it may be that there are some that somebody

11 would think is large, but that don't get flagged

12 by this procedure.

13          But it's broadly a fair description

14 that it -- it sifts out larger from smaller upward

15 price movements, in the sense I testified about.

16      Q.   We discussed briefly earlier the

17 start of paragraph 7 where you write that

18 Dr. ███████

19          "Language invites a reader of the

20     ████ report to conclude that Dr. ████ has

21     identified statistical evidence showing that

22     XRP price movements are driven largely and

23     causally by actions taken by Ripple."

24          Do you remember that conversation

25 earlier?

139

1          A.     I can bring it back to mind.

2          Q.     Other than the portion of Dr. ████

3    report that you quote in paragraph 6 of your

4    report, is there other language in Dr. ████

5    report that extends the invitation you describe

6    here?

7                 MR. FIGEL:  Objection.

8          A.     There may be.  I have not committed

9    Dr. ████ report to memory.  If you want a more

10   definite answer to that, I would have to have you

11   provide me a copy of Dr. ████ report.

12                I could -- I could answer the

13   question fairly quickly with his report in hand

14   because I know where to look if -- for any

15   additional language of that kind, if there is any.

16         Q.     Let's return to that a bit later.

17                Are you offering any opinion in

18   this case as to whether or not XRP prices are

19   driven largely by Ripple's actions?

20         A.     I am of -- as to -- yes, I am

21   offering the opinion that nothing in Dr. ████

22   work establishes that proposition and that

23   Dr. ████ work, rather than support that

24   proposition, tends, instead, to refute it.

25         Q.     And what you just described, is

140

```
 1    that the entirety of any opinion you're offering

 2    with respect to whether XRP prices are driven

 3    largely by Ripple's actions?

 4           A.    I hesitate to say yes because I say

 5    a lot in my report, all of which goes to that

 6    proposition.  But -- so to say that that's the

 7    entirety of what I have to say about that subject

 8    is -- would not be accurate.

 9                 But I think, as a summary statement

10    of what I conclude from it all, I think it's fair.

11           Q.    Returning back to paragraph 7, you

12    write in your second sentence:

13                 "As I explained below, Dr. ████

14        event study is not designed to investigate

15        this proposition and does not, in fact,

16        support such a conclusion."

17                 Do you see that?

18           A.    Yes.

19           Q.    Is the "this proposition" in that

20    sentence that XRP price movements are driven

21    largely and causally by actions taken by Ripple?

22           A.    Yes.

23           Q.    Do you believe that Dr. ████

24    assignment was to investigate whether XRP price

25    movements were driven largely and causally by
```

141

1    actions taken by Ripple?

2         A.    I can't rule it out, but it's not

3    clearly -- it's not clearly enough stated for me

4    to rule it in either.  Specifically, Dr. ███ --

5    Dr. ███ provides more than one statement of what

6    he was asked to do.

7              And one of them begins with, the

8    SEC asked him to perform statistical analyses.

9    Oh, good, well, now we know what it's about.  So

10   that doesn't help us very much.

11             And then it goes on to say,

12   concerning the relationship, as I -- I'm

13   paraphrasing at this point, I would have to go

14   back to Dr. ███ report to get the wording

15   right -- the formulation of concern -- statistical

16   analyses concerning the relationship is broad

17   enough to include this proposition or not.

18             So I -- I will say this:  Dr. ███

19   does not expressly say that this proposition, or

20   words very like it, captures his assignment.  But

21   I can't -- I'm left, after reading the ███

22   report, not entirely clear on where the bright

23   lines were.  And given the apparent breadth of his

24   conclusions, it seems like he may think that he

25   was asked to opine on causation, for example.

142

1          Q.     And that -- strike that.

2                 Is your basis for believing that

3     there's some possibility that Dr. ████ assignment

4     included investigating whether XRP price movements

5     are driven largely and causally by actions taken

6     by Ripple the breadth of Dr. ████ conclusions?

7                 MR. FIGEL:  Objection.

8          A.     It's not a basis for believing this

9     to be the case.  It's just a basis for being

10    unable to rule this out.

11                Again, if Dr. ████ were here and

12    were willing to stipulate that he's not trying to

13    say anything about causation and -- or about

14    substantial causation of XRP price movements,

15    if -- which I can't rule out, he may -- maybe he

16    would say that, and in that case, presumably, we

17    would be done.

18         Q.     So is it fair to say that sitting

19    here today, you don't believe one way or the other

20    that Dr. ████ assignment was to investigate

21    whether XRP price movements are driven largely and

22    causally by actions taken by Ripple?

23         A.     I don't --

24                MR. FIGEL:  Objection.

25                THE WITNESS:  I'm sorry.

143

```
 1            A.    I don't have an opinion or belief
 2   about that one way or another, other than that
 3   Dr. ███ does not entirely rule it out either in
 4   his statement of his assignment or in his -- in
 5   the manner in which he states his conclusions.
 6            I don't need to have an opinion
 7   about that to reach my opinion, which is simply
 8   that his work does not support that conclusion.
 9            Q.    You don't need to understand the
10   scope of his assignment to reach your opinion?
11            MR. FIGEL:  Objection.
12            A.    I don't need to resolve whether
13   this language is or is not, in his mind, part of
14   his assignment to be able to say that regard- --
15   that either way, the work that he performed and
16   presents in his report does not support this
17   proposition.
18            That opinion stands if Dr. -- the
19   hypothetical Dr. ███ I've referred to a time or
20   two, the ███ avatar came into the room and said,
21   "But that's not what I was trying to prove," then
22   I would say in response, "Well, great.  Then we
23   agree that that's not even what you were trying
24   to, but you certainly didn't prove it."
25            And if Dr. ███ avatar came in and
```

144

1    said that he was trying to prove it, I would say

2    the same, "Your work does not prove it."

3                   That's why -- that is why it

4    doesn't matter, to my opinion, ultimately, what a

5    completely clear statement of his assignment was.

6                   THE WITNESS:  I'm noticing that

7          we've been going for about an hour and a

8          quarter --

9                   MR. SYLVESTER:  Would you like the

10         take a break?

11                  THE WITNESS:  Yes.  It doesn't have

12         to be at this moment.

13                  MR. SYLVESTER:  Now's great.  Let's

14         take a break.

15                  THE WITNESS:  Thank you,

16         Mr. -- you're Mr. Sylvester?

17                  MR. SYLVESTER:  I am.

18                  THE WITNESS:  Mr. Sylvester, thank

19         you.

20                  MR. SYLVESTER:  Sure.

21                  THE VIDEOGRAPHER:  The time is

22         2:13 p.m.  This concludes Media 3.  Off the

23         record.

24                  (Recess taken from 2:13 p.m. to

25         2:36 p.m.)

145

1          THE VIDEOGRAPHER:  The time now is

2      2:36 p.m.  This begins Media 4.  On the

3      record.

4    BY MR. SYLVESTER:

5          Q.    Dr. Marais, turning back to

6    paragraph 5 of your report.

7          A.    I am there.

8          Q.    Okay.  Thank you.  I believe that

9    you testified earlier that the question of whether

10   movements in XRP prices solely or predominantly

11   reflect responses to disclosures about Ripple's

12   actions was a central issue in this case.  Is that

13   right?

14         A.    I qual- -- as qualified by my

15   saying "I understand."

16         Q.    What is the basis for your

17   understanding?

18              MR. FIGEL:  You can answer it but

19       don't reveal communications with counsel.

20         A.    The basis of my understanding is my

21   nonexpert paraphrase of what I understand the

22   expressions "investors in" or "purchasers of XRP

23   look to Ripple to create value."

24              Now, even though that may not be a

25   direct quote from anybody, the "create value"

1    idea, that phrase, I think, comes straight from

2    Dr. ██████ report.  And I understand as a

3    layperson -- and, again, I need to be completely

4    clear, I'm confident that there is shelves full of

5    case law and legal understanding of this point,

6    and I'm not purporting to summarize any of that.

7    I'm just describing my layperson's understanding.

8                    But looking to Ripple for creating

9    value as an investor in XRP, to me, does not

10   convey very occasionally looking to Ripple for a

11   sliver of the value creation or the sliver of the

12   value that might be created by my position in XRP.

13                    But it strongly suggests to me

14   the -- - what I par- -- what I paraphrase in my

15   own statement that I gave you about what I -- my

16   understanding that that is a central issue in the

17   case.

18                    So I do recall from the first

19   amended complaint in this case repeated references

20   by the SEC itself to -- to the economic substance

21   in -- and the actual phrase "in economic" -- "in

22   economic reality" I think actually is the phrase,

23   "economic reality dictates" or "in economic

24   reality."

25                    Now, putting together, as an

1    educated layperson, the idea of economic -- in

2    economic reality investors in XRP look to Ripple

3    for value creation, without any qualification that

4    says for some infinitesimal portion of that value

5    creation or some sliver, that, to me, suggests

6    this, what I've characterized here as the

7    contention that in economic substance, read

8    economic reality, movements in XRP prices solely,

9    or, if solely is too strong, predominantly reflect

10   responses to disclosures about Ripple's actions.

11            So I -- that was a longer answer

12   than I realized I was embarking on, but the -- you

13   were asking for my basis, and I did describe my

14   basis.

15            Q.    Okay.  Let's move on to paragraph

16   17 of your report, please.

17            A.    That suggests to me, at this rate,

18   we'll be done in ten minutes.

19            Q.    Why would we want to cut our time

20   short, Dr. Marais?

21            So paragraph 17, among other

22   things, contains your Table 1.  Is that right?

23            A.    Yes.

24            Q.    And as I understand your Table 1,

25   it displays, among other information, tallies of

148

1    numbers of days related to Dr. ████ Model 5, key

2    milestone news events model.  Is that correct?

3          A.    Yes.  But for the statement to be

4    entirely correct, you also have to include

5    one -- you also have to include one-sided

6    parametric approach.

7          Q.    Okay.  Thank you.  So looking at

8    the table, the top row is labeled -- or rather, I

9    should say the columns are labeled "Daily XRP

10   Return."

11              Do you see that?

12         A.    Yes.

13         Q.    And the Daily XRP Return columns

14   are split into "unusual" and "regular."

15              Do you see that?

16         A.    Yes.

17         Q.    And "unusual" there, is that the

18   same meaning of unusual that you explained to us

19   earlier today?

20         A.    Yes.

21         Q.    Okay.

22         A.    Throughout my report, there's only

23   one meaning.

24         Q.    And "regular" essentially means not

25   unusual.  Is that right?

149

1          A.    That's exactly correct.

2          Q.    Okay.  And on the left side of the

3     table, addressing the rows, there's "News Event?"

4     question mark.

5                Do you see that?

6          A.    Yes.

7          Q.    And for "News Event?" question

8     mark, there are two values, "Yes" and "No."

9                Do you see that?

10          A.    Yes.

11          Q.    Does "Yes" indicate those days on

12     which Dr. ███ identified a Ripple key milestone

13     news event?

14          A.    Yes.

15          Q.    And "No" indicates any of the days

16     within this period in which Dr. ███ did not

17     identify a key milestone news event?

18          A.    Yes.

19          Q.    Okay.  And the total number of days

20     in the entire Model 5, using a one-sided

21     parametric approach, is 2,007?

22          A.    Yes.

23          Q.    Okay.  And -- go ahead.

24          A.    Actually 2,008 but ...

25          Q.    Do you want to elaborate on why --

1    the difference between 2,007 and 2,008?

2         A.    Well, to get returns, you have to

3    have one extra day -- right? -- it takes two days

4    to calculate one return.  Then you can reuse the

5    second of those days for the second return.

6              So the number of day -- your

7    question was about the number of days involved,

8    and the days and the returns are not identical.

9         Q.    I see.  Okay.  So the -- but the

10   number of days -- the Number 2,007 in this chart

11   does refer to days.  Is that right?

12        A.    It refer- -- it does refer to days,

13   but it does not count all of the days that are

14   involved in creating this little chart.  There's

15   one more day involved.  That's all I meant to

16   point out.  And it's only because of the way you

17   framed your question.

18        Q.    Okay.  Turning to the "News Event?

19   Yes" row.

20              Do you see that?

21        A.    Yes.

22        Q.    And on "News Event?  Yes," it

23   appears that Dr. █████ has identified four days on

24   which there was a Ripple key milestone news event

25   and also unusual daily XRP returns.  Is that

151

```
1     right?

2              A.    Yes.

3              Q.    Okay.  And the Number 1 is one day

4     on which Dr. ███ has identified a Ripple key

5     milestone news event, and that day there were

6     regular daily XRP returns.  Is that right?

7              A.    Correct.

8              Q.    Okay.  And the total number of days

9     on which Dr. ███ observed a Ripple key milestone

10    news event in this period is five.  Is that right?

11             A.    Yes.

12             Q.    Okay.  Do you agree that there is a

13    statistically significant correlation between the

14    Ripple key milestone news events identified by

15    Dr. ███ and the categorization of trading days

16    into unusual and regular?

17                   MR. FIGEL:  Objection.

18             A.    Despite my coffee, I do need -- I

19    apologize, I do need to hear the question again.

20             Q.    Of course.  Do you agree that there

21    is a statistically significant correlation between

22    Ripple key news event- -- strike that.

23                   Do you agree that there is a

24    statistically significant correlation between

25    Ripple key milestone news events, identified by
```

152

1    Dr. ████  and the categorization of trading days

2    into the categories "Unusual" and "Regular"?

3                    MR. FIGEL:  Objection.

4            A.    Measured in terms of the

5    hyp- -- the nonstandard hypergeometric

6    distributional analysis that Dr. ████ introduces

7    for his work in this case, I do agree that there

8    is a p-value that is significant in relation to

9    the 95 percent confidence level.

10                   Measured in terms of a standard

11   event study, I don't know because Dr. ████ doesn't

12   tell us.

13           Q.    What is it that's missing from

14   Dr. ████ analysis that leads you to say that,

15   measured in terms of a standard event study, you

16   don't know?

17                   MR. FIGEL:  Objection.

18           A.    Well, one completely standard

19   approach would be to have a pooled regression

20   analysis that encompasses all of the event dates

21   of the particular kind he's interested in here

22   with an indicator variable that turns on for

23   events of that kind included in the regression.

24                   That's a zero-one variable that

25   turns -- that exists, is populated for all of the

153

1    dates in the analysis, but is mostly equal to zero

2    and equal to 1 just on the event dates.  That

3    variable would have a coefficient.  That

4    coefficient would have a corresponding T

5    statistic.

6              And although it is likely that,

7    based on what I'm seeing here, that the -- that

8    that approach would yield -- it may well yield a

9    statistically significant result, we don't

10   actually know, because Dr. ███ analysis doesn't

11   actually produce that result.

12             So that's what I mean when I say I

13   can't really tell what a stand- -- what a standard

14   event study using indicator -- an indicator

15   variable would tell us.

16             But in terms of Dr. ███ somewhat

17   peculiar hypergeometric analysis, yes, I agree,

18   there's -- he gets a p-value that is less than

19   .05.

20        Q.   It looks like, at least in part,

21   your paragraph 18 summarizes Dr. ███ analysis

22   with respect to these four unusual days that are

23   displayed in Table 1.  Is that fair?

24        A.   I need to read it.

25        Q.   Sure.

154

```
1           A.     (Document review.)

2                  Yes, it's intended to be an

3    explanation of Dr. ███ finding.

4           Q.    And is it fair to say that, as

5    described in your paragraph 18, you do not dispute

6    Dr. ███ finding with respect to his

7    characterization of these four unusual days?

8                  MR. FIGEL:  Objection.

9           A.    I certainly strongly stand by my

10   paragraph 18.  So I -- if that's what -- if you're

11   asking me whether I agree with what I say in my

12   paragraph 18, unambiguously, yes.

13          Q.    Okay.  And to make sure I'm reading

14   your paragraph 18 correctly --

15          A.    Yes.

16          Q.    -- at least with respect to

17   Dr. ███ conclusions based on his analysis of the

18   four unusual daily XRP return days that correspond

19   with the Ripple key milestone news events, you

20   don't dispute his conclusion of statistical

21   significance?

22          A.    Within -- yes, with the important

23   proviso that we are talking about this framework

24   of performing the analysis within a hypergeometric

25   distribution looking for what he calls a
```

155

```
1    correlation, but in -- again, not in the sense in

2    which that term is usually used.

3                    It's not a correlation coefficient.

4    It's not a nonparametric correlation coefficient.

5    It -- it measures the English language concept of

6    correlation, not the statistical concept, and it

7    is a statistically significant finding within that

8    framework.  I do agree with that.

9              Q.    Do you believe -- actually, strike

10   that.

11                   Let me hand you Exhibit 2.

12                   (Exhibit LM-2, Amended expert

13        report of Dr. ██████████ marked for

14        identification, as of this date.)

15             Q.    Dr. Marais, I'm handing you

16   Exhibit 2.  Is LM-2 Dr. ██████ amended expert

17   report submitted in this case?

18             A.    I recognize it as being that.

19             Q.    Okay.  Let's turn to paragraph 12a

20   of Exhibit 2, please.

21             A.    I'm there.

22             Q.    Okay.  The first bolded sentence in

23   12a of Dr. ██████ report says:

24                   "XRP prices react to certain news

25        and public statements about Ripple's
```

156

1        actions."

2                Do you see that?

3        A.    Yes.

4        Q.    Do you dispute Dr. █████ conclusion

5   that I just read?

6        A.    I would say, at best, unproven.

7        Q.    Okay.  Let's move on to the next

8   sentence:

9                "Using a well-accepted event study

10       methodology, I find statistically significant

11       evidence that XRP prices react to news about

12       Ripple's actions."

13                Do you see that?

14       A.    I see.  I do see it.

15       Q.    Okay.  Do you dispute that

16   sentence?

17       A.    Properly read and interpreted in

18   the context of his report, I understand what the

19   sentence means.  The sentence is misleading.

20       Q.    Please tell me why.

21       A.    The statistically significant

22   evidence that he finds is the correlation, the

23   coincidence between certain days that he's labeled

24   news days and certain days that he has labeled, in

25   my terminology, unusual returns days.

157

```
 1              Now, there is the well-known

 2    truism -- which doesn't mean it is false, it is

 3    true -- that association is not causation.  And

 4    correlation is association.

 5              So the statistical significance of

 6    the finding is suggestive of correlation and

 7    causes us, if we accept the evidence of the

 8    p-value of the statistical significance, causes me

 9    to agree that this is -- this is evidence that has

10    passed the usual thresholds for association.

11              It is a large step from there to

12    causation.  And p-values don't tell you causation.

13    And observational studies have great difficulty in

14    telling you causation.  And event studies are

15    observational studies.

16              And where event studies are used in

17    scholarly research, they have a property that is

18    simply absent from Dr. ████ work in this case

19    that goes to the issue of causation.

20         Q.   What property is absent from

21    Dr. ████ work in this case that goes to the issue

22    of causation?

23              MR. FIGEL:  Objection.

24         A.   Event studies including the event

25    studies that are referred to by Dr. ████ Joo
```

158

1   reference to an article by a pair of Scandinavians

2   with unpronounceable names for the generalized

3   rank test, that Dr. ████ ultimately imports into

4   his own work, are typically, in academic research,

5   performed for groups of firms.

6                   For example, do financial firms'

7   stock prices respond to their earnings

8   announcements?  What that means is that there are

9   large cross sections, and ideally in those large

10  cross sections, the event dates don't coincide for

11  different firms.  So different firm announcements

12  on different dates.

13                  That adds a dimension that helps --

14  it doesn't fully distinguish between correlation

15  and causation, but it adds a dimension that is

16  helpful in moving towards a causal conclusion.

17                  In the case of Dr. ████ work in

18  this case, as is often the case in

19  litigation-related event studies -- so this is --

20  this is not -- I'm not criticizing Dr. ████

21  personally for this -- but the problem here is

22  that this is a single price series.

23                  It's like a single firm event

24  study, which is not the same thing as a portfolio

25  event study.  That makes it particularly difficult

159

1    to move from association to causation, as Dr. █████

2    himself expressly acknowledges in his report.  And

3    I don't see Dr. █████ bridging that gap in this

4    report.

5             Q.   Can you point me to the place in

6    your report where you set forth the critique that

7    you just articulated?

8             A.   We've been there already.  But we

9    can go back.  Let's see.  In my conclusion, where

10   you asked me whether these are my conclusions, I

11   note that:

12               "Instead, the █████ event study

13        cannot prove a causal relationship between

14        Ripple's actions and XRP price movements."

15               That's in the middle of paragraph

16   30.  And you spent some time asking me about that

17   earlier, I recall.

18               You -- I remember -- I recall you

19   asking me what I meant when I said "even if it

20   could do so," and I said that refers to the

21   proposition that the █████ event study cannot prove

22   a causal relationship.

23               Now, that's just the summary

24   statement.  I say it back in paragraph 7 where we

25   just were, I think.  Paragraph 7 is not the right

1    paragraph reference.

2                    (Document review.)

3                    Oh, in paragraph 7, I -- yes, "this

4    language invites a reader ... 'evidence' showing

5    that" it's -- blah, et cetera:

6                    "'Evidence' showing that XRP price

7         movements are driven largely" -- and then set

8         apart in between em dashes:

9                    "And causally -- by actions taken

10        by Ripple.  As I explain below, Dr. █████

11        event study is not designed to investigate

12        this proposition."

13                   So that's where I am setting it up.

14   I -- so I book-ended it.  There are 12 pages in

15   between that I would need to go through to point

16   to where else I reach this point.

17             Q.    I would be particularly interested

18   in any places where you could point to that --

19   where you explain why, in your view, the █████

20   event study cannot prove a causal relationship

21   between Ripple's actions and XRP prices?

22             A.    I take it you mean apart from the

23   virtually universally known limitation of

24   observational studies which I've referred to.

25             Q.    Where are you reading from, Doctor?

161

1              A.    I'm not reading.

2              Q.    Oh.

3              A.    I was thinking about what kind of

4     statement I'm looking for.

5                    (Document review.)

6                    In paragraph 20, I bring up,

7     without using the term "confounding," the

8     confounding hypothesis of the -- the point being

9     the apparent absence of any attempt by Dr. ███ to

10    rule out, even by searching for news events

11    related to cryptocurrency other than going to

12    Ripple's repository of news releases and links, I

13    mean, there's no indication that I find that

14    Dr. ███ has searched widely for answers to the

15    question, Well, what else happened on those days?

16                    That's called confounding.  And if

17    there is a confounding factor operating, you

18    really can't say what the association is with or

19    what the potential cause is.

20                    So I'm noting confounding as a

21    discussion in paragraph 20.  In sum, I say "the

22    association," and that's a carefully chosen word:

23                    "Between Dr. ███ subjectively

24        selected days with Ripple news events and

25        un-" -- "as a matter of fundamental

162

1       statistical principles," in which I'm

2       referring to the confounding idea that I just

3       brought up.

4              But the princ- -- when I say

5  "fundamental statistical principle," I've already

6  said -- quoted here the fundamental principle of

7  association is not causation.  That is so

8  well-known that most middle schoolers can quote

9  it.

10         So the fact that I'm referring to

11  the association that he has documented here, "as a

12  matter of fundamental statistical principles, does

13  not per se, establish that the key milestones news

14  caused" -- in italics -- the abnormal XRP

15  coincident returns.

16         So he overreaches in his apparent

17  causal claim, I say.  That -- I would concede that

18  that is terse, which is unlike me.  But it is an

19  explanation of confounding, and the -- a reference

20  to the extreme limitations of observational data.

21  Now, there's probably more.  I just paused on

22  paragraph 20.

23      Q.   May I ask, in paragraph 20, why you

24  did not use the word "confounding"?

25      A.   Because I explained the concept.

163

1          Q.     No reason not to use the word?

2                 MR. FIGEL:  Objection.

3          A.     There is no -- there is no specific

4   reason not to use the word.  I'm not writing for a

5   technical audience in this report.  And I could

6   have said "confounding," but then I would have had

7   to explain it anyway.

8          Q.     Are single firm event studies used

9   in securities litigation to establish causation

10  from correlation?

11                MR. FIGEL:  Objection.

12         A.     They are used to find evidence that

13  may then be interpreted based on other

14  considerations as possibly causal or not.

15                They -- the event study per se is

16  incapable of establishing causation for all -- for

17  all of the reasons and more that I've been -- that

18  I've just alluded to.

19                May I ask respectfully, are we done

20  with the previous question, or should I continue

21  finding references to where I flesh out what I am

22  saying about association is not causation and

23  there is a potential for confounding?

24         Q.     I think I understand those two

25  principles that you've identified.

164

```
 1            Did you, in your work on this case,
 2   check for whether there was confounding
 3   information on, for instance, the four unusual
 4   news days identified in Dr. ███ Model 5?
 5            MR. FIGEL:  Objection.
 6        A.    I did not.  I did not need to to
 7   arrive at the conclusions that I have arrived at.
 8   It was enough for me to -- since that's not a --
 9   that's not really front and center in -- in my own
10   opinions, it's enough for me to note that -- it
11   seemed enough for me to note that Dr. ███ does
12   not seem to have done anything to rule out other
13   factors.
14        Q.    And just so the record is clear
15   because I limited my last question, did you check
16   for any confounding information at all as part of
17   your work in this case?
18        A.    No, I've -- I -- to be clear, and
19   this may save us some time, I did not change or
20   add to -- except in presentation of some results
21   that Dr. ███ chose not to highlight -- to
22   Dr. ███ work, I'm not endorsing his modeling,
23   his index modeling, and I'm not endorsing his news
24   search.  But I do accept both as the premise of my
25   work in this case.
```

165

```
 1              Q.    Do you have any objection to

 2   Dr. ████  index modeling in this case?

 3                    MR. FIGEL:  Objection.

 4              A.    I question aspects of his index

 5   modeling.  It seems to me perfect -- it seems to

 6   me fairly reasonable as, sort of, the first

 7   preliminary thing that one would try.

 8                    But then there are -- there are

 9   other kinds of things that I would think one would

10   want to do that Dr. ████ does not seem to give any

11   indication that he did as the -- as a, kind of, an

12   obvious refinement of his work.

13              Q.    Did you undertake any such

14   refinements to determine whether Dr. ████ results

15   would change if he had taken the approach that you

16   would prefer?

17                    MR. FIGEL:  Objection.

18              A.    No, I didn't do -- I did not

19   attempt to do what Dr. ████ seems to have failed

20   to do.  And I really didn't need to do anything of

21   the kind to arrive at my key opinions in this

22   case.

23              Q.    Turning back to Dr. ████ paragraph

24   12a.  Just want to focus on a portion of a

25   sentence that we've already looked at to make sure
```

166

1    I understand your views.  And that's -- Dr. ███

2    writes -- this is the first sentence, the second

3    half:

4               "I find statistically significant

5          evidence that XRP prices react to news about

6          Ripple's actions."

7               Is it true, Dr. Marais, that,

8    typically, event studies provide statistically

9    significant evidence of a price reaction to a

10   particular piece of news?

11              MR. FIGEL:  Objection.

12        A.    Event studies typically measure an

13   association.  There is then a question of whether

14   that association represents a reaction.  Reaction

15   implies a causal effect that -- in other words,

16   that if the news had not happened, the price

17   movement that is documented would not have

18   happened.

19              That part is sort of an extra

20   statistical meaning and be outside of the strict

21   p-value calculation, regression calculation

22   inference.  And that is almost always true with

23   observational data, that you can't just look at

24   what the -- comes out of a statistical calculation

25   and call it a causal effect.

1          Dr. ███ recognizes that expressly

2     and writes as much in his own report.  Now, he

3     says there are things that you have to do to reach

4     a causal -- causal conclusion, and then he doesn't

5     appear to do them.

6          And yet, here at the beginning, he

7     states that he has evidence of a price reaction,

8     meaning causation.  That's kind of a gap in -- a

9     logical gap in ███

10         Q.    Let me make sure I understand your

11    answer.  There's one set of circumstances in which

12    an event study could per se prove causation, and

13    there's another set of circumstances in which an

14    event study could provide evidence of causation.

15         Are you with me so far?

16         A.    No, I'm not.

17         Q.    Okay.  I'm just trying to

18    understand your answer.  I think it's your view,

19    correct me if I'm wrong, that -- backing up from

20    Dr. ███ report -- in general, the results of an

21    event study do not per se prove causation.

22         A.    I think that's fair.

23         Q.    Okay.  Again, at a level of

24    generality, I'm asking, are event studies

25    typically used to provide evidence toward or

168

1    against a conclusion of causation?

2            A.    Yes.

3            Q.    Okay.

4            A.    That's fair as a very general

5    characterization.

6            Q.    Okay.  And is it your view in this

7    case that Dr. ████ study fails to provide

8    statistically significant evidence that XRP prices

9    react to news about Ripple's actions?

10           A.    No, that's not my view.

11           Q.    Okay.  What evidence does Dr. ████

12   study -- let me rephrase.

13                What statistically significant

14   evidence does Dr. ████ study provide that XRP

15   prices react to news about Ripple's actions?

16                MR. FIGEL:  Objection.

17           A.    We have already discussed in the

18   context of one -- a paragraph in my report, my

19   explication of Table 1, that is Table 1 from my

20   report.  So I have Table 1 on page 7, and then I

21   have paragraph 18.  And you asked me whether

22   paragraph 18 describes what I understand to be

23   Dr. ████ process of logic.

24                And I -- I agree that that is his

25   process of logic, which leads to a finding of

169

```
 1   statistical significance.  But it is a

 2   statistically significant correlation, a

 3   statistically significant association in a certain

 4   way.  I test -- well.

 5            Q.    So is it your view that -- I'm now

 6   looking at your Table 1.

 7            A.    I'm there.

 8            Q.    Okay.  Is it your view that

 9   Dr. ████ conclusion that there was a

10   statistically significant correlation between --

11   in Model 5 news events and unusual daily XRP

12   returns, is that, in your view, evidence, that at

13   least for this set of occasions, Ripple's actions

14   affected XRP's prices?

15            MR. FIGEL:  Objection.

16            A.    It is evidence.  It is a -- it's

17   small, but it documents -- it's a little patch of

18   evidence that documents the idea of association

19   between a category of Ripple news events and

20   unusual trading days for XRP.

21                 It's an association.  That -- that

22   is evidence that weighs in favor but does not

23   establish causation.  It's just -- it's one --

24   it's one tiny weight on a scale.  It is that.  But

25   you need some more stuff as Dr. ████ himself
```

170

1    explains.

2         Q.    What is the "more stuff" that is

3    needed -- strike that.

4              Well, let me ask the question.

5    I'll use your terminology.

6              What is the "more stuff" that is

7    needed in your view?

8              MR. FIGEL:  Objection.

9         A.    Well, it is generally accepted by

10   people in my field that you can never get exactly

11   all the way by pure deductive logic.  There will

12   remain a leap at the end.  But you can search hard

13   for confounding factors and rule them out.

14             You can construct explanations for

15   the plausibility of the effect that -- for

16   example, discussions by analysts or market

17   commemorators on the crypto space or on XRP, in

18   particular, saying at about the same time or the

19   day after that this was a really important move

20   for XRP, and speaking to the plausibility of the

21   causal linkage.

22             I think Dr. ████ where he refers

23   to this, mentions three things, and I'm forgetting

24   his third thing.  But there is -- he refers to,

25   under certain conditions, an event study finding

171

```
 1    can point to causation.
 2                   And I've mentioned two kinds of
 3    factors which look kind of like Bradford Hill
 4    criteria for the case of inferring causation from
 5    an event study.
 6          Q.    When you say you've mentioned two
 7    kinds of factors, is one of those factors
 8    confounding news?
 9          A.    The search for confounding factors.
10          Q.    Okay.  That I understand.  And I
11    understand is embodied perhaps in other places,
12    but you've identified as embodied in paragraph 20
13    of your report?
14          A.    Yes.
15          Q.    Okay.  The second factor I don't
16    understand -- I think you just articulated it.  I
17    didn't follow it.  Can you point it to me in your
18    report?
19          A.    No, my report doesn't -- my report
20    has -- my report makes the point association is
21    not causation.  And we are now well beyond the
22    level of detail that I get into in my report.
23          Q.    I see.
24          A.    On the theme, prompted I hope by
25    your questions, I hope I'm not just on a riff
```

172

1    here.  But I thought that you were asking me

2    about, well, what's necessary to get from

3    association to causation.  So I did not mean to be

4    pointing to something that is in my report.

5               These are very, completely general

6    statistical precepts that do apply to event

7    studies, but this is not event study stuff I'm

8    talking about now.  This is general analysis of

9    observational data as opposed to experimental

10   data.

11        Q.    Okay.  You've mentioned that

12   confounding news is a factor that can break the

13   link between correlation and causation.  Is that

14   fair?

15        A.    That can -- what was the verb in

16   that sentence?

17        Q.    Break the link.

18        A.    Break.  No, well, that's not really

19   what I meant to convey.  It's a -- I think I can

20   sign on to that statement, but it's not what I was

21   testifying about.  I was -- the -- I should wait

22   for a question.

23        Q.    Other than -- I want to return to

24   Table 1.

25        A.    Whose Table 1?

173

```
 1              Q.    I'm sorry.  Your Table 1, Doctor.

 2   Other than Ripple key milestone events -- strike

 3   that.

 4              I think it's fair to characterize

 5   Dr. ███ conclusions in his report that Ripple

 6   key milestone events are the cause of the unusual

 7   daily XRP returns on the four days identified in

 8   your Table 1.

 9              Would you agree with that?

10              A.    I don't know from memory alone

11   whether he actually says that.  I do agree that

12   he -- where he is summarizing in his summary of

13   opinions he has landed on XRP prices react.

14              But whether -- when he is

15   specifically talking about the milestone events,

16   whether he has language in there that suggests

17   there that he concludes that, I don't recall.  The

18   report is right in front of me.  I can find it.

19              Q.    That's okay, Doctor.  It's a fair

20   point.  I may have overstated it.  Let me put it

21   this way:  One of the things -- just looking at

22   Dr. ███ results as summarized in your Table 1,

23   one of the things that may have caused the unusual

24   daily XRP return on the four days reported in this

25   chart is the Ripple key milestone news events.
```

1           That's one possibility, right?

2           A.     That is a hypothesis, yes.

3           Q.     And there's also a possibility that

4    there were confounding news events that caused

5    XRP's price to be unusual, the daily XRP returns

6    to be unusual on that day.  Is that right?

7           A.     That is also possible.

8           MR. FIGEL:  Objection.

9           Q.     Okay.  Is there anything else that

10   you can think of besides Ripple key milestone news

11   events or confounding news events that might have

12   caused the unusual daily XRP return on those four

13   unusual days in your Table 1?

14          A.     I can't think of anything else that

15   is a, as Dr. ███ puts it, a nonrandom systematic

16   cause.  As long as one defines confounding news

17   events broadly enough.  And what I mean by that is

18   there could be, you know, here's a hypothetical:

19              So the European Central Bank takes

20   some action to either outlaw or to authorize the

21   use of XRP for paying taxes in European countries.

22   I suppose -- we get back to the point of, you

23   know, is it news or is it the action or is it --

24   are those distinguishable at all, because how

25   would you know about the action if the news didn't

1    get to you?

2              Well, maybe you would know about

3    the action because the action was taken but not

4    reported, but somebody traded an enormous chunk

5    of -- I can think of stories that don't quite

6    involve news, but that -- so events more in a

7    broader category than just news disclosures.  But

8    something happened, some confounding thing.

9              Whether or not it's the sort of

10   thing that you would pick up in a news index

11   looking for XRP-related news on that day.

12             Q.    Can we take a look at -- let's go

13   back to your report, please, paragraphs 13 and 15.

14             A.    13 and 15.

15             Q.    Yes.

16             A.    I'm there.

17             Q.    Okay.  Is it fair to say that in

18   paragraphs 13 and 15, you summarize certain

19   aspects of Dr. ████ methodological design?

20             A.    Give me just a moment to ...

21                   (Document review.)

22                   That seems like a fair

23   characterization to me.

24             Q.    Do you have any critique of

25   Dr. ████ methodological design as set forth in

176

1    your paragraphs 13 and 15?

2            MR. FIGEL:  Objection.

3            A.    Well, paragraphs 13 and 15 are

4    really just a tabulation of how in the world is it

5    that he comes up with 400 alternative ways of

6    doing the thing.

7               The methodological design isn't

8    really set forth in paragraphs 13 and 15.  I do

9    have some critiques.  You asked me earlier and I

10   said I do.  But they aren't identified or easily

11   linked to paragraphs 13 and 15 for the reason that

12   I just testified about.

13           Q.    And -- understood.  Thank you.

14   What -- to make sure we have a clear record, what

15   are your critiques -- -- strike that.

16              Setting aside the confounding news

17   issue, which we've discussed, what are your other

18   critiques of Dr. ███ methodological design, if

19   any?

20           A.    I want to clarify first.  I said

21   critiques.  And I was actually more accurate in

22   characterizing what I am talking about here in a

23   previous answer when I explained that we are --

24   we've reached issues that I did not need to go

25   into for my opinions in this case.

```
 1                And so they are questions in my
 2      mind about what is this?  This is fine for the
 3      first thing you would think of doing, but what is
 4      the second thing you would think of doing and what
 5      might you learn from that?
 6                So these are questions that might
 7      very well lead to critiques.  But I did not
 8      develop a detailed critique.  I didn't need to.
 9                But given that qualification, it is
10      striking to me that Dr. ████ analysis is
11      concerned with distinguishing nonsystematic,
12      nonrandom systematic effects as he calls them in
13      his technical appendix from everyday price
14      movement, and yet he allows days of putative
15      nonrandom systemic price movements into his
16      estimation -- his rolling estimation periods.
17                So when he is analyzing, for
18      example, the five milestone event days, he has --
19      as he explains this, he calls them rolling -- I
20      think they're actually sliding, not rolling -- he
21      has this sliding 180-day window that follows along
22      each analysis day.
23                But when he comes to his other
24      analysis, he has different event days.  And he
25      simply ignores the fact that he is allowing to
```

178

1    creep into his estimation days the same days that

2    a moment ago he was treating as event days with

3    potential nonrandom systematic effects.

4              And I -- I note that there are as

5    many as 500 days of potential nonrandom systematic

6    effects during the 2,000 or so days of his event

7    period, of his analysis period.

8              And because of the way he does his

9    analysis, every time he switches gears to a new

10   category of news events, it's as if he forgets

11   about the fact that he just a moment ago was

12   talking about days with nonrandom systematic

13   effects, and he now includes them in the

14   estimation period, the baseline estimation period.

15   So I -- I question that element of his -- of his

16   work.

17             But I -- so let me be clear, that

18   is not a detailed critique, and it -- I don't know

19   what one would learn from exploring that point.

20   But there would be a logical coherence to

21   excluding all of the event -- the potential event

22   days from estimating the index model.

23        Q.   Is the critique that you just

24   described one of the bases for the opinions that

25   you're providing in this case?

```
 1                   A.    No.  I don't need to get into this.
 2       As I've already testified, I think expressly just
 3       a minute ago, I don't need to get into that
 4       territory to arrive at my opinions in this case.
 5                   Q.    Other than your -- strike that.
 6                         Other than confounding news, which
 7       we've discussed, are there other critiques of
 8       Dr. ████ methodology in this case that underlie
 9       your opinions set forth in your report?
10                   A.    I'm sorry, but your question as you
11       frame it seems to say something about my testimony
12       that I don't think I meant to convey in the way
13       that your question characterizes it.
14                   Q.    Do you think that Dr. ████ in
15       your -- it's your view that Dr. ████ failed to
16       look for confounding news.  Is that correct?
17                   A.    Yes.
18                   Q.    Is this a methodological flaw in
19       your view?
20                   A.    It's a question I would raise, and
21       it has a strong potential to be a methodological
22       flaw.  It certainly means that he can't rule out
23       confounding.
24                   Q.    Is the failure to look
25       for -- strike that.
```

180

1             Does Dr. █████ failure to look for

2 confounding news render his opinions about

3 statistical significance unreliable?

4             A.     No. I don't see how it does quite

5 that, for the -- within the narrow scope of what

6 his opinions about statistical significance are

7 about and what they convey, I don't think that

8 they are rendered unreliable by that oversight per

9 se period.

10             Q.     Is there anything about Dr. █████

11 methodological design that, in your view, renders

12 his results unreliable?

13             A.     With an appropriate understanding

14 of what I mean, and what we mean about his

15 results, I don't -- I've replicated his

16 hypergeometric probability calculations, and I

17 believe they were correctly performed. Those are

18 results.

19             From there on, things get more

20 complicated. What do these results mean? What do

21 they convey? But as far as those results are

22 concerned; in other words, p-values attached to

23 certain two-by-two tables like my table,

24 illustrative Table 1, his calculations are not --

25 are neither unreliable nor wrong.

181

1          Q.    In paragraph 14 of your report, you

2    discuss Dr. ████ categorization of Ripple news.

3    Is that right?

4          A.    Yes.

5          Q.    Is there anything about Dr. ████

6    categorization of Ripple news that renders his

7    results unreliable here?

8          A.    There's nothing beyond what I say

9    in paragraph 14 that comes to mind that I would

10   point to sitting here this afternoon.  That is not

11   the same as an endorsement.  I don't have an

12   opinion -- I really am not expressing an opinion

13   one way or another to begin with about what it

14   would even mean for a categorization of news to be

15   unreliable and then whether this is such an

16   unreliable categorization.

17               I note that there's a certain

18   subjectivity in it.  I have no quibble, I have no

19   fight with Dr. ████ about that.  He says himself

20   that it's subjective.

21               There may be other things that, if

22   I had reason to delve into what he did that I

23   might find at least questionable, but I don't have

24   such a thing in mind as I sit here this afternoon.

25   That's just not an area I needed to go into for

182

1    the opinions I have in this -- arrived at in this

2    case.

3                Q.    Okay.  Is there a generally

4    accepted statistical or economic methodology to

5    identify relevant news days?

6                MR. FIGEL:  Objection.

7                A.    There are informal professional

8    standards that have emerged in scholarly work and

9    separately in litigation settings informed by

10   different imperatives in those two cases.  But

11   I -- I wouldn't say there's a set of bright-line

12   standards.

13               Q.    Do you have an opinion as to

14   whether Dr. ███  did or did not follow those

15   standards that you just described in selecting

16   news events?

17               A.    I don't -- I don't have -- I'm not

18   proffering an expert opinion on that subject in

19   this matter.  I have noted in my report the

20   confounding issue.  And I have noted in my

21   testimony here the fact that I find no indication

22   that he's looked for any kind of news other than

23   really the most -- the path of least resistance

24   and effort, which is to go to Ripple's website.

25               Q.    Do you --

183

1           A.    But that doesn't rise to the level

2    of an expert -- a distinct expert opinion that I'm

3    proffering.

4           Q.    Do you believe that Dr. ███

5    omitted any important news events from his

6    analysis?

7           A.    As far as I know, he includes no

8    news event that isn't -- doesn't happen to be

9    listed in some form on Ripple's website.  I don't

10   have any reason to think that everything that is

11   important in the world of cryptocurrency price

12   movements generally is listed on Ripple's website.

13   So I don't have a -- I'm not offering an expert

14   opinion.

15           I don't have a fully established

16   and supported belief, but it seems likely to me

17   there -- that things must have happened.  It can't

18   be that the only cryptocurrency pricing-related

19   events in the world in these 2,000 days all happen

20   to have to be related to Ripple and XRP.

21           Q.    But you did not identify any such

22   events.  Is that right?

23           A.    That's -- I have not done any

24   independent work on searching for news events that

25   Dr. ███ omitted.

184

1          Q.    In some of Dr. ███ regression

2   models, he constructs a returns index of multiple

3   digital assets.

4                Do you have any critiques of that

5   index that Dr. ███ used in his work in this case?

6          A.    I have questions.  It raises

7   questions for me that, if I were engaged in work

8   like what Dr. ███ is doing, I would attempt to

9   answer, and I would write up as part of my work if

10  I ended up propounding anything like what Dr. ███

11  propounds.

12         Q.    And is it your view that his

13  failure to take those steps renders his results

14  unreliable?

15         A.    That's -- I haven't reached that

16  opinion as an independent expert opinion.  And I

17  didn't need to go there for purposes of my work in

18  this case.

19                MR. SYLVESTER:  I think it would be

20       useful to take a brief break if that's all

21       right, Dr. Marais.

22                THE WITNESS:  Certainly.

23                THE VIDEOGRAPHER:  The time is 3:41

24       p.m.  This concludes Media 4.  Off the

25       record.

185

1               (Recess taken from 3:41 p.m. to

2          4:04 p.m.)

3                    THE VIDEOGRAPHER:   The time is

4          4:04 p.m.   This begins Media 5.   On the

5          record.

6                    (Exhibit LM-3, Copy of Table 2

7          from report LM-1, marked for

8          identification, as of this date.)

9      BY MR. SYLVESTER:

10               Q.    Dr. Marais, I'm going to hand you

11     what's been marked LM-3.  And I will represent to

12     you that LM-3 is just a larger copy of the Table 2

13     that appears in your report, LM-1.  So if you

14     prefer to look at your report, that's fine.   I

15     just figured that this might be a little easier.

16                    Okay.  Taking a look at your

17     Table 2, other than the column where it says " █████

18     Model Number," are all of the numbers in your

19     Table 2 numbers of days?

20               A.    Yes.

21               Q.    Okay.  And the "Notes" section at

22     the bottom of Table 2 supplies information

23     regarding the ratio of non-coincident unusual days

24     to the number of coincident unusual days.  Is that

25     right?

186

1          A.    Yes.

2          Q.    Okay.  Turning back to paragraphs

3     25 and 26 of your report.

4          A.    I am there.

5          Q.    Okay.  Do those paragraphs also

6     discuss the ratio between no Ripple news unusual

7     days and Ripple news unusual days?

8          A.    Yes.

9          Q.    In paragraph 26 --

10         A.    I'm sorry, can I --

11         Q.    Sure.

12         A.     -- define that.  Paragraph 25

13    obviously speaks to that ratio.  It begins with

14    the words "The ratio."

15              Paragraph 26 is a summary paragraph

16    that does not address ratios per se.  It's just a

17    summary of what I would call the upshot of the

18    discussion before, including but not limited to

19    paragraph 25.

20         Q.    In addition to the contents of

21    paragraph 25, what are the other bases for your

22    statements in paragraph 26?

23         A.    Okay.  Well, let me read it

24    carefully.

25              (Document review.)

187

```
 1              I would say the actual counts are
 2    as important as the -- the ratios are just a way
 3    of summarizing disparities.  That's all they are.
 4    The ratios are not an object in and of themselves.
 5              And the only reason I get into
 6    ratios at all is that when I was discussing
 7    Table 1, I pointed to a disparity in which I ended
 8    up saying that -- just to make the point about the
 9    disparity, that there was a ratio of -- I thought
10    I had mentioned a ratio in connection with -- I'm
11    not sure if it's there or not.  I'm not seeing it
12    right now.
13              But my point is that the discussion
14    is a discussion of disparities in numbers, and the
15    ratios is secondary.  It's just illustrative.
16         Q.    In that sentence that you just
17    said, disparities of numbers --
18         A.    Yes.
19         Q.    -- in the case of 26, paragraph 26,
20    do you mean numbers of days?
21         A.    Yes.
22         Q.    Okay.  Looking at Table 2 again,
23    ███ Model Number 5, there are 2,007 -- strike
24    that.
25              On Table 2, there's a column that
```

188

```
1    says: "All Trading Days and Analysis Period."

2              Do you see that?

3         A.    Yes.

4         Q.    Under ████ -- the corresponding

5    entry for ████ Model Number 5 is 2,007.  Correct?

6         A.    Yes.

7         Q.    Okay.  And is that 2,007 the same

8    2,007 that is displayed in the bottom-right corner

9    of your Table 1?

10        A.    Yes.

11        Q.    Okay.  Turning back to Table 2,

12   there's a column labeled:  "'Unusual' trading days

13   in analysis period."

14             Do you see that?

15        A.    Yes.

16        Q.    And for Model Number 5, that's a

17   total of 183.  Is that right?

18        A.    Yes.  Yes, it is.

19        Q.    Okay.  And that corresponds to the

20   183 total unusual days in the first column of

21   Table 1.  Is that right?

22        A.    Yes.

23        Q.    Okay.  Similarly, the four unusual

24   yes news event days in Table 1 correspond to the

25   entry of 4 under unusual trading days coincident
```

189

1    with Ripple news in Table 2.  Correct?

2              A.    Yes.

3              Q.    Okay.  And the entry of one in

4    regular trading days in Table 2 corresponds to the

5    entry of one in the news event yes regular daily

6    XRP return cell in Table 1.  Correct?

7              A.    Yes.

8              Q.    Okay.  And just for the record,

9    the -- starting -- on Table 2 again, there's two

10   categories of unusual trading days, the first

11   coincident with Ripple news, that column

12   identifies days with unusual returns on which

13   there was also a Ripple news event.  Correct?

14             A.    Yes.

15             Q.    Okay.  And the next column,

16   no-coincident Ripple news, that identifies days

17   with unusual returns in which there was not a

18   Ripple news event.  Correct?

19             A.    Yes.

20             Q.    Okay.  And finally, the third

21   column -- or the column immediately to the right

22   of no-coincident Ripple news -- is regular trading

23   days, and that identifies days in which there was

24   a Ripple news event but no unusual returns.

25   Correct?

190

```
1              A.    Again, correct.

2              Q.    Okay.  Great.  For Model Number 5,

3     how many days did Dr. ███ identify as days with

4     unusual returns on which there was a Ripple news

5     event, any Ripple news event?

6              A.    In other words, not limited to key

7     milestones?

8              Q.    That's exactly right.

9              A.    I don't know that with precision,

10    sitting here, other than to say that the ███

11    select categories over near the right-hand end of

12    this table refer to just as the -- just as the 4

13    plus 1 on -- are -- I'm sorry.

14                   How many days did he identify with

15    news events?  And the answer is the maximum in the

16    select categories, which is the same as the first

17    four categories on this page.  It's the union of

18    those with some acquisition dates thrown in, as he

19    describes it.  There are 100 and -- a maximum of

20    105, but in the case of Model 5, actually, an

21    actual total of only 90.

22             Q.    Can you show me where you're seeing

23    90?

24             A.    (Document review.)

25                   Coincident?
```

191

1          Q.    Let me --

2          A.    Yes, I can show you where I'm

3     seeing 90.  I am seeing 90 -- the trading days in

4     those three columns are -- the ones with news in

5     the select category are the 24 plus the 66.

6          Q.    I see.  And that adds up 90?

7          A.    That sums to 90.  In every other

8     case, you will notice the -- actually what I was

9     about to say is not quite correct.  So I'll just

10    stop there.

11         Q.    Okay.  And just for the record, the

12    right-hand three columns of Table 2 report unusual

13    trading days coincident with Ripple news, unusual

14    trading days not coincident with Ripple news, and

15    regular trading days coincident with Ripple news

16    for all of Dr. ████ news categories combined.  Is

17    that right?

18         A.    It's almost right.

19         Q.    Go ahead.  I'm sorry.  Will you

20    explain why it's almost right?

21         A.    There are -- these are the ████ --

22    these are the news categories that Dr. ████ chose

23    to include in Figure 1 of his report.

24               So I think it's fair to say these

25    are the news categories on which Dr. ████ -- to

1   which Dr. ▓▓ directs the attention of his reader

2   as the basis for -- the key basis for whatever

3   opinions that he arrives at.

4           When one reads the news-gathering

5   section of Dr. ▓▓ report, he doesn't have only

6   four or maybe five categories in there.  He has a

7   total of 14 categories of news events, some of

8   which I gather he just sets aside a priori as not

9   of interest, one of which he tests expressly as a,

10  sort of, a -- from his perspective, internal test

11  of validity.  And that is staffing decisions and

12  appointments.

13          And that doesn't show up in his

14  Figure 1.  And it doesn't show up as generating

15  significant correlations or associated with

16  significant correlations.

17          So your question was all of -- no,

18  there's a more textured story.  I've given you

19  some out -- some elements of it, but it's in

20  Dr. ▓▓ report anyway.  That -- he's the author

21  of it.  I'm not the author.  I'm just the Cliff's

22  Notes version.

23          Q.   In choosing the categories of

24  Dr. ▓▓ news categorizations to include in

25  Table 2, how did you go about choosing those to

193

1    include?

2              A.    I just explained, in substance, how

3    I went about it.  Dr. █████ has a Figure 1 in his

4    report.  I excerpt, in paragraph 8 of my report,

5    Dr. █████ Figure 1 from his report which is around

6    page 9 -- no.  Page 3.  So that's Figure 1 of the

7    █████ report.

8                    Dr. █████ never, as I read his

9    report, never fully explains the transition from

10   the 14 news categories to what he ends up

11   reporting as the basis of his opinion.

12                   But whatever that story is, I go to

13   his Figure 1 for my guidance in -- and you will

14   see that my headings of milestones, trading

15   platforms, customers, commercialization, and

16   select categories track the headings of Dr. █████

17   Figure 1.

18              Q.    Understood.  Thank you.  Turning

19   back to your Table 2, for Model 5, how many days

20   did Dr. █████ identify as days with unusual returns

21   on which there was a Ripple news event, any Ripple

22   news event?

23              A.    Table 2 shows for that number

24   exactly what Table 1 showed for that number, which

25   is four.

194

```
 1              Q.    And what about the select category

 2    that combines all the different news category that

 3    Dr. ███ looked at?

 4                    MR. FIGEL:  Objection.

 5              A.    In the case of Model 5, the answer

 6    is 24.

 7              Q.    Okay.  Turning to paragraph 19 of

 8    your report, you write:

 9                    "One striking feature of Dr. ███

10         analysis of the tallies shown in Table 1

11         above -- not highlighted by Dr. ███ -- is

12         that it offers no account of what factors or

13         events caused the remaining 179 (equals 183 -

14         4) unusual trading days to have unusual XRP

15         returns."

16                    If we look at Table 2, isn't it

17    true that Dr. ███ actually offers an opinion as

18    to 20 additional days as being coincident with

19    Ripple news?

20              A.    That would be a fair statement if

21    Dr. ███ did not point to Model 5 and key

22    milestones as an element of evidence in itself.

23    It is -- it ought to be clear to the reader of my

24    paragraph 19 that paragraph 19 is a discussion of

25    Table 1.
```

1           And Table 1 is a discussion of a

2     cell from Dr. ███ Figure 1, which like so many

3     other cells, is shaded in green with a check mark

4     and is discussed all on its own in an entire

5     section of Dr. ███ report being Section 6(a),

6     ranging from page 29 to 34.

7               In all of those places,

8     table -- Model 5, in conjunction with milestone

9     events, is presented as a piece of evidence that

10    stands on its own.

11              So against that background, it's an

12    entirely reasonable space statement that he

13    presents no account in the context of this

14    purported independent autonomous piece of evidence

15    of what happened on the remaining 179 days.

16              I'll pause there because that, I

17    think, is a fair answer to your question.  But I

18    have a whole lot more to say about it.

19         Q.    I appreciate the answer to the

20    question.  Is it also true that Dr. ███ presents

21    in his report the results of his various news

22    categories combined in a select category?

23         A.    Yes.

24         Q.    Okay.  You note in paragraph 21

25    that --

196

1          A.     Whose paragraph 21?

2          Q.     Great point, Doctor.  In your

3    paragraph 21 of your report, you note that for

4    the -- let me just quote it.  That will be easier.

5                 In about the middle of the

6    paragraph, you note:

7                 "In striking contrast, the same

8          dollar invested and reinvested for the 179

9          non-coincident unusual trading days (plus the

10         two days following each non-coincident day)

11         would have compounded to a total value of

12         $4,198,673, more than 2.1 million times

13         $1.99."

14                Do you know what portion of the

15   approximately $4.2 million in cumulative proceeds

16   you identify as associated with the 179 days was,

17   in fact, associated with the 20 additional news

18   days identified by Dr. ██████

19                MR. FIGEL:  Objection.

20         A.    I don't know that offhand as I sit

21   here, but I do know one can get some sense of it

22   from Table 3 of my report, which may not answer

23   precisely that question, but comes close and

24   teaches that in the same spot where the $1.99 that

25   is tailored to Dr. ██████ Model 5 and key

197

1    milestones appears, adding the additional 20 days,

2    to which you have drawn my attention, gets us to

3    $482.20 in comparison to $7,776 with an additional

4    number for the regular trading days.

5              So, yes, one can tell from the way

6    that I have laid out Table 3 that the disparity is

7    different in magnitude but the disparity

8    continues.

9         Q.    The disparity laid out in your

10   paragraph 19 is 2.1 million times.  Is that right?

11        A.    I think you must be referring to

12   paragraph 21?

13        Q.    I am.  Thank you for the

14   correction.

15        A.    Yes.

16        Q.    And the disparity between 7,776 and

17   $482.20, roughly what's that disparity?

18        A.    It is roughly -- sorry.  I'm still

19   making my way there.

20              (Document review.)

21              It's -- in very rough, round

22   numbers, it's a 15-fold disparity.

23        Q.    So the disparity drops from

24   2.1 million X to approximately 15X?

25        A.    That's correct.

198

1          Q.    Turning to paragraph 21 of your

2     report -- actually 21 this time -- you discuss

3     consideration of magnitudes of returns.

4               Do you see that?

5          A.    I'm sorry.  We're in paragraph 21

6     of my report?

7          Q.    That's right.  And the first

8     sentence says:

9               "Simple tallies of news event

10          occurrences with and without coincidences

11          with unusual XRP returns, lacking any

12          consideration of the magnitudes of these

13          returns, provide no indication of the

14          economic magnitude of the disparity between

15          the four coincident and 179

16          non-coincident trading days."

17               Do you see that?

18          A.    Yes, I do.

19          Q.    Okay.  What do you mean by

20     magnitude of returns and/or magnitude of disparity

21     in that sentence?

22          A.    I mean that contrary to what I

23     would expect to find in a standard event study

24     where there are concepts like end-point metrics,

25     like cumulative abnormal returns, possibly turned

1    into total amounts of dollar value changes so

2    frequently expressed in dollar magnitudes.

3                    There's nothing in Dr. ████ dry

4    abstraction of colored marbles in

5    a -- hypothetical colored marbles in -- and

6    p-values that he analogizes to, draws from an urn

7    full of marbles, that measures the magnitude of

8    what he purports to identify or measures the

9    magnitude of what he does not explain, which is

10   the -- in the case of each discrete analysis that

11   he performs, such as the milestones or the select

12   category, each of which he rep- -- he presents as

13   yet another application of the same results.  See,

14   here's another of the same -- of the same general

15   result.

16                    They all look like just a check

17   mark against a green background in Dr. ████ work.

18   That gives no indication of the economic magnitude

19   which -- you know, which is sometimes called

20   practical significance or clinical significance of

21   the result that he arrives at.

22                    Now, what I show is in the case

23   looking only at the milestones, there is a

24   2.1 million fold discrepancy as -- I have no

25   trouble calling the piece of the total abnormal

1   day unusual return that is associated with the

2   effect that he documents under milestones a sliver

3   at 1.21 millionth.

4                    And if you go to the other end of

5   his table, where he has flung all of his

6   categories -- his key four categories plus

7   acquisitions into the hopper -- I have no problem

8   calling, 1 -- in my own mental arithmetic of a

9   moment ago, I have no trouble calling 1/15 a

10  sliver.

11                   That's what I mean by the tallies.

12  Four out of one or four out of five or four out of

13  183 don't tell you anything about the magnitude in

14  the sense -- in the same manner that an ordinary

15  standard event study would do.

16                   It doesn't reveal to you the

17  slivery nature of what Dr. ███ has related to

18  purportedly associated with -- not related to in

19  any causal sense -- associated with Ripple news

20  events.

21       Q.    What is the result that an ordinary

22  standard event study would typically provide that

23  is, in your view, missing from Dr. ███ report?

24       A.    I have -- it is typically a result,

25  especially in a litigation setting, that has some

1    dollar magnitudes associated with the purportedly

2    statistically significant effects.

3              Q.    Let's turn to paragraph 7 of your

4    report.

5              A.    I'm there.

6              Q.    Is this issue of the -- strike

7    that.

8                    You just responded that, in a

9    litigation setting, an event study typically

10   prevents -- strike that.

11                   I believe you just testified in a

12   litigation setting, an event study typically

13   presents some dollar magnitudes associated with a

14   purportedly statistically significant effect.  Is

15   that right?

16             A.    Yes.

17             Q.    Okay.  Is that concept that you

18   just testified related in any way to the

19   conclusions you reach in paragraph 7?

20                   MR. FIGEL:  Objection.

21             A.    I need to read the paragraph.

22             Q.    Please.

23             A.    (Document review.)

24                   Yes.

25             Q.    How are those, the concept that you

1    just testified about and your conclusions in

2    paragraph 7, related?

3            A.    Paragraph 7 covers several patches

4    of territory.  But I am thinking of the final

5    sentence:

6                    "Properly interpreted, Dr. ███████

7        event study rebuts rather than supports the

8        conclusion that the price of XRP is primarily

9        a function of disclosures about Ripple's

10       actions."

11                Now, understanding that I am not at

12   all implying that, if I were asked that question

13   de novo, that this is how I would approach --

14   Dr. ██████  analysis is how I would approach that

15   question.

16                Nevertheless, having been asked to

17   assess Dr. ██████  work, I note that in terms of

18   these unusual returns that are a fundamental

19   ingredient of his analysis, most of the pricing --

20   price change action that is captured by the

21   unusual returns happens on days that he does not

22   relate to Ripple news, so that is my basis.

23                That plus the counting of days, but

24   the dollar value as even more than the counting of

25   days, although those two are mutually

1   corroborative, go -- stands for the proposition

2   that these events that he rebuts rather than

3   supports the conclusion that the price of XRP is

4   primarily a function of disclosures about Ripple

5   actions.

6          Q.    So in your view, it's fair to say

7   the magnitude of returns is important to examine

8   in the context of determining whether or not

9   there's a price reaction?

10          MR. FIGEL:  Objection.

11          A.    As general as that statement is,

12   it's easy to agree with.

13          Q.    Let's go back to paragraph 21,

14   please.

15          A.    Paragraph --

16          Q.    Back to 21, please.

17          A.    I'm there.

18          Q.    Okay.  In paragraph 21 you supply

19   an accumulated total value figure of $1.99 for the

20   four days reflected in Table 1.  Is that right?

21          A.    Yes.

22          Q.    Okay.  Those four days are the days

23   in which there was a key milestone news event and

24   an unusual daily XRP return.  Is that right?

25          A.    Correct.

204

1        Q.    Okay.  Can you please explain how

2    you arrived at the $1.99 figure?

3        A.    Yes.  The -- as I disclose in

4    Footnote 19, in performing this calculation,

5    although I refer to it as "the days," the

6    co- -- four representing the coincident days, I

7    follow in Dr. ████ footsteps, in that, when he

8    calls a day -- when he labels it as coinciding

9    with -- when he labels it as an unusual return

10   day, that is actually based as, I explained much

11   earlier today, on a small data-mining exercise

12   over the up to three-day window.

13            The -- so while I say these are

14   returns measured over four certain days, as I say

15   in Footnote 19, I use three-day windows.  That

16   gives rise to a small complication in that what if

17   a three-day window overlaps with a successor day

18   that is also of the same kind?  We wouldn't want

19   to double count the return.

20            So I'm supposing, for

21   example -- and I have not committed these data to

22   memory, so I don't know whether this happens for

23   the milestone events, but it does happen

24   elsewhere, if not for the milestone events.

25            So the  -- to be really explicit,

1    the complication that I am pointing to is what if

2    day two of the first milestone event day of the

3    window, of the three-day window -- day three of

4    the window coincides with another milestone event

5    day?  I wouldn't want to double count that day.

6              So the -- the, I guess, economical

7    explanation is:  Take a calendar, color in all of

8    the coincident return days -- "coincident" meaning

9    coincident with news -- and color in the two

10   following days.

11             It may be that in that process of

12   coloring some cells get colored more than once.

13   They get colored because of a preceding coincident

14   day and they also overlap with another coincident

15   day.  But ignore the fact that you've

16   double-colored some days.  They're still -- if the

17   color is blue, they're still blue.

18             Now, invest $1 -- now that we've

19   got that part laid out on the calendar, invest $1

20   at the closing price of midnight of the day before

21   the first blue streak on the calendar and hold

22   that investment until the end of that blue streak.

23   Whether it's three days later or five days later,

24   whenever that blue streak ends, hold that $1.

25             Cash-out at the -- so you're

1    starting at midnight, universal time, on the day

2    before the first blue color day, and you are

3    cashing out at the price of midnight of the last

4    day colored in blue.  Take those proceeds and

5    reinvest at the beginning midnight of the day

6    before the beginning of the next blue streak on

7    the calendar.  And hold until that blue streak

8    ends.  Cash-out at midnight.  Take those proceeds

9    and reinvest until you run -- continue that

10   process until you run out of blue streaks.

11              So this is assuming that you really

12   can -- it's a hypothetical in that it assumes that

13   you can -- you can actually execute your

14   transaction at the recorded closing price of both

15   the day before you invest and the last day of your

16   investment.  That's exactly how you'd calculate

17   the $1.99 or the 2.1 -- the 4.199 million.

18        Q.    And is that the methodology that

19   you set forth in Footnote 20 of your report?

20        A.    Yes.  Footnote 20 doesn't provide

21   all of the detail that I just did about how to

22   handle overlaps.  But in substance, that is what

23   Footnote 20 was meant to convey.

24        Q.    Is there any part of your report

25   that addresses your methodology when overlaps, as

207

1    you just described, occur?

2          A.    The answer is certainly yes,

3    although I don't know without paging through the

4    report whether it's visible on the face of the

5    report.  But what I mean by that "yes" is that, as

6    I testified earlier, I provided electronic

7    supporting materials for all of these

8    calculations; and in my view, the electronic

9    supporting materials produced along with the

10   report are part of the report.

11               So far better and far more precise

12   than a verbal description is the fact that the

13   actual calculation including the computer code

14   that performs the calculation are part of what I

15   produced in this case.

16         Q.    Was there ever any overlap in

17   three-day windows where one window contained a

18   news day with regular returns and one window

19   contained a no-news day with unusual returns?

20         A.    There were some mixed overlaps of

21   that kind which required that I define a way of

22   breaking the tie between -- in a mixed overlap of

23   that kind.

24               In other words, would I include the

25   day in -- would I label it -- would I tag it as

1    a -- the extended -- with it falling within the

2    extended span of a coincident unusual return day

3    or something else.

4              And the answer is -- well, there is

5    an answer.  And there were such days and there is

6    an answer to what I did.

7         Q.   And is that answer set forth in the

8    face of your expert report, or in your backup

9    materials, or elsewhere?

10             A.   It is certainly set forth in my

11   backup materials.  I do not recall whether I make

12   reference to that complication in the body of the

13   report.

14             Q.   Okay.  Let's take a look

15   at -- handing you LM-4, which is just an enlarged

16   copy of your Table 3 in your report.

17             (Exhibit LM-4, Enlarged copy of

18        Table 3 from M. Laurentius Marais' expert

19        report, marked for identification, as of

20        this date.)

21             Q.   In your Table 3, Dr. Marais, are

22   the values displayed calculated using actual XRP

23   daily returns?

24             A.   In mathematical substance, yes.  I

25   don't recall whether they are actually calculated

209

1    in terms of recorded prices on -- at discrete

2    end-points.  The same calculation could be

3    performed with returns by adding up -- by summing

4    log returns and taking the exponential function or

5    simply taking the ratio of prices at discrete

6    days.  And I could tell with a code in front of,

7    me but I don't recall offhand.

8                    What I'm explaining here is that

9    the mathematical -- the same mathematical

10   calculation can be performed via different

11   pathways.  And I don't recall whether the express

12   pathway expressly used daily XRP returns or

13   whether it jumped to without going via -- without

14   involving returns.

15           Q.    The numbers that are displayed in

16   Table 3 of your report are rounded.  Correct?

17           A.    Well, yes.

18           Q.    If I were to examine your backup

19   materials and click on the Excel spreadsheet that

20   you produced for Table 3, I would see digits up to

21   several places.  Correct?

22           A.    If you clicked -- if you

23   interrogated my backup materials at the

24   appropriate point in the chain of calculation, you

25   would -- you could certainly achieve the result --

1    get the information you are asking about.

2                What I don't know anymore as I sit

3    here, whether that point extends all the way down

4    to the Excel tables or whether the information was

5    rounded by the time it reached the Excel tables.

6                But if that turns out to be the

7    case, then going upstream in the materials that I

8    have produced would allow you to get the full

9    precision of the number.  So they are there.  I

10   just am not testifying that they are in the Excel

11   spreadsheet, although they may be.

12          Q.    Understood.  Okay.  For -- looking

13   at Table 3 for the Model 5 row, the entry under

14   "'unusual' trading days coincident with Ripple

15   news" is $1.99.

16                Do you see that?

17          A.    Yes, I do.

18          Q.    And is that the total accumulated

19   proceeds for the four Ripple key milestone news

20   unusual return days that you reference in

21   paragraph 21 of your report?

22          A.    Yes.  The $1.99 from paragraph 21

23   is the same as the $1.99 that I think you are

24   directing my attention to.

25          Q.    Okay.  For the Model 5 row in

211

1    Table 3, is the $4,198,673 figure under

2    no-coincident Ripple news the total accumulated

3    proceeds for the 179 Ripple news -- no Ripple

4    news -- strike that.

5                    It's important to get this right.

6                    For the Model 5 row of your

7    Table 3, is the $4,198,673 figure under

8    no-coincident Ripple news the total accumulated

9    proceeds for the 179 no-news unusual return days

10   that is referenced in your paragraph 21?

11        A.    Yes.

12        Q.    Okay.  If I -- looking at Table 3

13   again.  If I multiply the $1.99 in the unusual

14   trading days coincident with Ripple news column

15   with the approximately 4.2 million in the unusual

16   trading days no-coincident Ripple news column,

17   will I get, at least in rough terms, the

18   approximately 8.3 million figure in the unusual

19   trading days in ███ analysis period, third

20   column in Table 3?

21        A.    With your qualification of "at

22   least in rough terms," which I take to mean

23   approximately in the same ballpark, you will get a

24   number that is close but not mathematically -- I

25   actually don't know about the particular case of

212

1    Model 5.

2                    But there are some instances where

3    that multiplication will not get you an exact, a

4    mathematically exact reconciliation for reasons

5    that have to do with testimony I've already given.

6            Q.    Okay.  And setting aside the issue

7    of whether or not there's an exact mathematical

8    reconciliation.  What's the principle behind the

9    phenomenon that if you multiply the $1.99 for the

10   unusual trading days coincident with Ripple news

11   with the approximately 4.2 million for the unusual

12   trading days no-coincident Ripple news, you will

13   get approximately the 8.3 million and the unusual

14   trading days in █████ analysis period?

15                MR. FIGEL:  Objection.

16           A.    Well, the principle behind that is

17   the principle of commutativity of multiplication.

18           Q.    Okay.  And how does that principle

19   apply to multiplying together the coincident with

20   Ripple news unusual trading day returns and the

21   no-coincident Ripple news unusual trading day

22   returns to get the total unusual trading days in

23   █████ analysis period figure?

24           A.    In the following way:  The -- one

25   can take that same calendar with the blue streaks

1     that I referred to earlier and write into every

2     cell of that hypothetical calendar, hanging in

3     midair here between us, the total return for that

4     day of un-Ripple.

5                  Now, things get a little bit

6     complicated because what I -- because of the

7     overlapping of the streaks and the fact that you

8     have already asked me about that, there is more

9     than one classification of the kinds of days that

10    we are talking about here.

11                 So now we have to have in mind that

12    there are red -- there are blue streaks but also

13    yellow streaks and green streaks and there may

14    be -- those streaks may collide.  And to make an

15    overall coherent table, I had to impose some

16    priority rules on what do I do in the cases where

17    the streaks overlap to some extent.

18                 But for answering your pending

19    question, I'm going to assume away that

20    complication, so there are no overlaps to be

21    concerned about.  And there's only one color

22    involved here.

23                 Well, one way of describing the

24    calculation of the -- that we're talking about

25    here is to start at the far left-hand end of the

1    blue streaks with $1 and to multiply it by the

2    total return -- one -- 100 percent, plus the total

3    return for that first day, and then multiply the

4    result of that by 100 percent, plus the total

5    return for the second color of the streaked -- the

6    "streaky" day, and so on.

7                   And then skip to the next

8    place -- over the white space, to the next space

9    where a blue streak has been colored in on this

10   chart.

11                  Now some of those event days are --

12   some of those blue streaky days are of the

13   coincident kind, and -- but we are now talking

14   about combining them with the not-coincident kind.

15   And so I've added in some more blue streaks for

16   the not-coincident kind.

17                  Now the commutative law of

18   multiplication says that if I do a whole bunch of

19   multiplications, it doesn't really matter whether

20   I multiply the second or the third things first

21   and then multiply by the first, the order of the

22   multiplications doesn't matter.

23                  And since the total return over

24   unusual trading days is simply the

25   multi- -- consists of the multiplication of all of

1    the days that I have colored in blue, and the two

2    components that are reported separately under the

3    milestones day is simply the multiplication of

4    some of them, those are the coincident ones.

5                    And the no confounding Ripple news

6    are -- represents the multiplication of others of

7    them.  It's easy to see that if I multiply all of

8    them together, I must get the result from

9    multiplying them together in groups.

10                   So that is why my testimony was

11   that the -- yes, there is a principle behind it,

12   and it is the principle of the commutativity of

13   multiplication, the commutative law.

14              Q.   Thank you, Doctor.  For -- going

15   back to your Table 3, for the Model 5 row, what

16   does the entry for -- of $1.03 under the regular

17   trading days heading for key milestones reflect?

18              A.   That over all of the regular

19   trading days that -- so those are trading days

20   that are not individually labeled as unusual and

21   that do not coincide with news.  Let me see.

22                   So if you refer back to Table 2,

23   and you look in the same spot, you would see that

24   there is a count of one.

25              Q.   Yes.

216

1        A.    And this $1.03 is really just what

2   the proceeds of trading over a three-day -- for

3   consistency, over a three-day window holding a $1

4   investment starting on that one day.  So no

5   multiplication is involved.

6        Q.    And the regular trading days column

7   on both your Table 2 and your Table 3 corresponds

8   to days in which there was a Ripple news event but

9   there was not an unusual daily XRP return.  Is

10  that right?

11       A.    Correct.

12       Q.    Okay.  If I wanted to know -- going

13  back to Table 3, if I wanted to know the total

14  cumulative proceeds for the five days of Ripple

15  news events in the key milestones data set, would

16  I multiply $1.99 and $1.03?

17       A.    Yes.  Subject only to the

18  complications about which I have already testified

19  about the possibility of overlapping streaks and

20  how those are dealt with and my testimony about

21  how one -- about what I had to do to make for an

22  overall coherence and how that can be found in

23  precise detail in my backup materials.

24       Q.    Okay.  The product of $1.99 and

25  $1.03 is approximately $2.05.  Correct?

217

```
 1              A.    That seems about right.

 2              Q.    Okay.  And what is the -- strike

 3      that.

 4                    Okay.  Returning to Table 3 of your

 5      report, again, sticking with Model number 5, is

 6      the $92.55 figure the total compounded proceeds

 7      for all trading days in the ███ analysis period

 8      for Dr. ███ Model Number 5?

 9                    MR. FIGEL:  Objection.

10              A.    Yes.

11              Q.    Okay.  Now, I'm going to move to

12      the right-hand side of Table 3 and look at the

13      ███ select categories columns.

14                    Is $482.20 the total compounded

15      proceeds for unusual trading days coincident with

16      Ripple news in Dr. ███ Model 5?

17              A.    Yes.

18              Q.    And is $7,776 the total compounded

19      proceeds for unusual trading days not coincident

20      with Ripple news in Dr. ███ Model 5?

21              A.    Yes.

22              Q.    Okay.  Now, I'm going to look at

23      Tables 2 and 3 together.  Is the $482.20 figure in

24      Table 3 the total compounded proceeds for the 24

25      days of unusual returns coincident with Ripple
```

1      news displayed in Table 2?

2           A.    Yes.  Subject to all of the minor

3      complications that I testified about earlier in

4      response to questions from you.

5           Q.    Setting aside those same minor

6      complications, is the $7776 figure in Table 3 the

7      total compounded proceeds for the 159 unusual

8      trading days no-coincident Ripple news displayed

9      in Table 2?

10          A.    Yes.

11          Q.    Okay.  If we compare all 24 Ripple

12     news events unusual return days within the Model 5

13     trading period -- strike that.

14               Okay.  Going back to Table 3.  The

15     unusual trading days in Dr. ███   analysis period

16     for Model 5 is the approximately $8.3 million

17     figure.  Right?

18          A.    Yes.

19          Q.    And is that approximately

20     $8.3 million figure the total compounded proceeds

21     for all unusual return days in Model 5?

22          A.    Yes.  Again, subject to everything

23     I've testified about here.  With details that can

24     be found in my electronic backup materials.

25          Q.    Okay.  Okay.  Going back to the

219

```
 1    Ripple news days within Model 5, is it fair to say
 2    that if one undertook an investment strategy where
 3    $1 is invested in all five of the key milestone
 4    news days plus the two days as described in your
 5    Footnote 20, the proceeds would be an accumulated
 6    total value of $2.05?
 7            A.    Something close to that.  I don't
 8    know whether this is one of the instances where a
 9    simple multiplication yields exactly the right
10    number.  I've -- for reasons I've already
11    testified about.
12            Q.    Okay.  And looking now at Tables 2
13    and 3 together, would you agree that the total
14    compounded proceeds for all trading days in ███████
15    analysis period is $92.55?
16            A.    I'm sorry.  Looking at both tables
17    together --
18            Q.    Yeah.  Strike that.  Let me ask
19    another question.
20            A.    You're asking me about a dollar
21    figure which only appears in one.
22            Q.    You're right.  Let me not do that.
23    Withdrawn.
24            Does the $92.55 figure displayed in
25    all trading days in ██████ analysis period
```

220

1    correspond with the 2,007 all trading days in

2    analysis period identified in Table 2?

3              A.    Yes.

4              Q.    Okay.  So it's fair to say that we

5    know that the total compounded proceeds for all

6    2,007 days in ████ Model 5 is $92.55?

7              A.    That's what this number means.

8              Q.    Okay.  And we know that the total

9    compounded proceeds for the five Ripple news days

10   in the ████ Model Number 5 is $2.05

11   approximately?

12             A.    Again -- again, that is correct.

13             Q.    So if we wanted to determine the

14   compounded total proceeds for the remaining 2,002

15   days in Dr. ████ Model Number 5, we can divide

16   92.55 by 205.  Is that right?

17             A.    I have to think about that.

18             Q.    Okay.

19             A.    Yes.  The compounded return over

20   the five days alone is $2.05.  And over the entire

21   period, all 2,007 is 92.55.  And those should --

22   subject to the same complications that I described

23   earlier, those should multiply.

24             Q.    The $2.05 for the five days should

25   multiply by some number assigned to the 2,002 days

221

1    to get us the total 92.55 for the 2,007 days.  Is

2    that right?

3            A.    Yes.  I hesitate just in case there

4    is some complication arising from different

5    numbers of total days in these calculations, but I

6    -- as I sit here, I can't think of a reason why

7    the days covered in the various columns here would

8    change from group to group.

9            Q.    Okay.  And if we divide $92.55 by

10   $2.05 to try to reach an approximation for the

11   cumulative total proceeds for the 2,002 days,

12   that's approximately $45.06.  Is that right?

13           A.    That seems about right.

14           Q.    Okay.  So is it fair to say that if

15   one undertook an investment strategy where $1 is

16   invested on all of the 2,002 no Ripple news days

17   plus the additional days described in your

18   methodology in Footnote 20, the proceeds of that

19   investment strategy would be an accumulated total

20   value of $45.06 approximately?

21           A.    I'm sorry.  The -- I need to hear

22   the premise of the question again.  I heard the

23   trailing end, but what is the premise again?

24           Q.    Sure.  So the premise is someone is

25   undertaking an investment strategy where they

222

1    invest $1 on the 2,002 no Ripple news days in

2    █████ Model 5.

3                    And my question is:  Is the

4    cumulative proceeds of that strategy approximately

5    $45.06?

6            A.    Yes.  With -- that sounds right

7    with one adjustment to the series of questions to

8    which -- of which this is a part.  There was a

9    point in which you mentioned 2,002 days.

10           Q.    Yes.

11           A.    Recall that the returns that I am

12   measuring here are measured over three-day

13   periods.  That is -- I explained that in part

14   using the concept of the blue streaks drawn onto

15   the calendar.  I think you got to 2,002 by

16   subtracting five from 2,007.

17                   The $90 that we are seeing on row

18   five is for the entire run of the calendar, and

19   the $2.05 that you have calculated and that I've

20   broadly agreed to is for five days.

21                   But each of those five days, if

22   they're widely separated so that there are no

23   overlaps, each of those five days could account

24   for three trading days because of the way this

25   calculation is performed.

223

```
1                  So what I won't agree to -- or

2      can't agree to -- is that it's, in fact, exactly

3      2,002 trading days because there are complications

4      resulting from the extent of the blue streaks.

5              Q.    I see.  So would it be fair to say

6      that the proceeds for -- the cumulative total

7      proceeds for the days coded as no news days within

8      the 2,007 is approximately $45.06?

9                  MR. FIGEL:  Objection.

10             A.    That's -- that is a -- that seems

11     to me to be fair.

12             Q.    Okay.

13             A.    When -- when it works for you,

14     could we take another break?  It's getting late

15     and I need to get some blood flow.

16                 MR. SYLVESTER:  Sure.  We can take

17        a quick break.  Thanks.  Off the record.

18                 THE VIDEOGRAPHER:  The time is

19        5:13 p.m.  This concludes Media 5.  Off the

20        record.

21                 (Recess taken from 5:14 p.m. to

22        5:35 p.m.)

23                 THE VIDEOGRAPHER:  The time is 5:35

24        p.m.  This begins Media 6.  On the record.

25        BY MR. SYLVESTER:
```

1          Q.     Okay.  Now, Dr. Marais, turning to

2     Table 3, I believe that you testified earlier that

3     in applying your methodology for calculating the

4     cumulative proceeds, you applied a method such

5     that a single day would not be counted in both the

6     unusual trading days coincident with Ripple news

7     column and also the unusual trading days

8     no-coincident Ripple news column.  Is that right?

9          A.     Yes.

10          Q.     Okay.  Is it also true that you

11     applied a methodology such that if a day were

12     counted in the regular trading day's column, it

13     was then not counted in either of the two unusual

14     trading days columns?

15          A.     Yes.

16          Q.     Okay.  I would like to show you

17     what I have marked LM-5.

18                    (Exhibit LM-5, Summary table of

19          data provided by M. Laurentius Marais,

20          marked for identification, as of this

21          date.)

22          Q.     LM-5 is a summary table of data

23     that you provided displaying many of the numbers

24     that we were just discussing before the break.

25     And it's formatted in the same format as the

225

1    Table 1 of your report, which is to say that the

2    columns are cumulative XRP return and categorized

3    in unusual daily XRP return days and regular XRP

4    return days.

5              And the news events are categorized

6    by milestones again into, yes, there was a Ripple

7    milestone news day or, no, there was not a Ripple

8    milestones news day.

9              But instead of the number of days,

10   what I've inserted into this chart is largely

11   numbers drawn from your Table 3.  So if we start

12   at the top-left cell of LM-5, you'll see $1.99.

13   And $1.99 is the cumulative return for the four

14   unusual return days with Ripple milestone news

15   according to your Table 3.  Correct?

16        A.    Yes.

17        Q.    Okay.  And the top middle cell is

18   $1.03.  And $1.03 is the total cumulative return

19   for the one regular return day with Ripple

20   milestone news according to your Table 3.

21   Correct?

22        A.    That's correct.  As you indicated

23   yourself, a rounded number, but --

24        Q.    Approximately.

25        A.    -- yes, that is the number that is

1    reported in my Table 3.

2         Q.    Okay.  And turning to the middle

3    left cell, 4,198,673 is the cumulative return for

4    the 179 unusual return days with no Ripple news in

5    ██████ Model Number 5.  Correct?

6         A.    I'm just checking that out.

7         Q.    Yes.

8         A.    673 unusual trading days, key

9    milestone.  Yes, that -- that is correct.

10        Q.    Okay.  The bottom left cell is

11   labeled "all."  And you can see it's 8,352,186.

12   And that is the total cumulative return for all

13   183 unusual return days in █████ Model Number 5.

14   Correct?

15        A.    Yes.

16        Q.    Okay.  Now, moving to the

17   right-most cells on LM-5, $2.05 is the approximate

18   total cumulative return for all five Ripple

19   milestone news days in Dr. █████ Model Number 5.

20   Correct?

21        A.    That's correct.

22        Q.    Okay.  And the bottom-right cell,

23   the $92.55, that's the total cumulative return for

24   the entire period in █████ Model Number 5.

25   Correct?

227

1          A.    Yes.

2          Q.    Okay.  And before the break, we

3     determined that the total return for all trading

4     days in ███ Model Number 5 period, taking out

5     the days associated with the five Ripple milestone

6     days, is approximately $45.06.  Is that correct?

7          A.    Correct.

8          Q.    Okay.  Looking at this table, is it

9     correct that to reach the missing values that we

10    haven't discussed, the way you would fill in those

11    numbers is to reach the total that's in the "all"

12    column, you would multiply across the rows.

13              So for instance, for the yes news

14    event it's $1.99 times $1.03 equals approximately

15    $2.05?

16         A.    Oh, yes.  Yes.

17         Q.    Okay.  And then when you're

18    examining just no-news event days, to reach the

19    $45.06 in the "all" column, you would have to

20    multiply the approximately 4.1 million times a

21    very small number.  Is that right?

22         A.    Right.  The $45.06 itself comes

23    from -- I mean, I see a $45.06 there, but ...

24         Q.    That was if we wanted to determine

25    the compounded total proceeds for the remaining

228

1    days in ▮▮▮ Model Number 5.  I initially had

2    called that 2,002, but you pointed out that you

3    can't really just take 2,007 minus five.

4            A.    Mm-hmm.

5            Q.    So I think we'd agreed before the

6    break that one way to put it is that if you take

7    the total 2,007 ▮▮▮ Model 5 trading day period

8    and you subtract out the returns associated with

9    the Ripple key milestone days, the way to reach

10   that is to divide the total returns for the entire

11   period on all days, $92.55, by the returns

12   associated with the yes Ripple milestones days

13   which is $2.05.

14               Is that right?

15           A.    Yes.  I testified that you could do

16   that calculation, but it would be subject to the

17   various qualifications in my prior testimony and

18   -- which may be -- have unusual mag- -- relative

19   magnitudes because of the small number of news

20   days we're talking about here.

21           Q.    When you say --

22           A.    But broadly -- broadly, that is

23   what I testified to.

24           Q.    Okay.  So if we look, Dr. Marais,

25   just at the "all" column in LM-5, is it fair to

229

1    conclude that without the five days of cumulative

2    returns from days with Ripple key milestone

3    announcements, the total compounded proceeds for

4    the entire 2,007 day trading period are about cut

5    in half?

6            A.    Subject to gain to the

7    qualifications in my previous testimony, I would

8    have to agree that dividing anything by two about

9    cuts it in half.

10           Q.    Okay.  All right.  I'd like to show

11   you another exhibit.  This one is labeled LM-6.

12                 (Exhibit LM-6, Summary table

13        referencing data provided by M. Laurentius

14        Marais for the same 2,007 day trading

15        period in ████ Model Number 5, marked for

16        identification, as of this date.)

17           Q.    So LM-6 is also a summary table

18   referencing data you provided.  And this is for

19   the same 2,007 day trading period in ████ Model

20   Number 5.  The difference is that this, instead of

21   the key milestone period, is the select event

22   period.

23           A.    Got it.

24           Q.    Okay.  So looking at the numbers on

25   this table, is the $482.20 in the top-left cell,

230

1    is that the total compounded proceeds on unusual

2    return days coincident with Ripple news from your

3    Table 3?

4              A.    That is the number from Table 3 for

5    Model 5.

6              Q.    Okay.  And just for the record, the

7    way this is displayed in LM-6 is that the $482.20

8    is in the cell reflecting yes news event and

9    unusual return for daily XRP return.

10                   All right.  Looking at the top

11   middle cell, the 29 cents figure, is that the 29

12   cents figure that appears in the regular trading

13   days column for the select category in your

14   Table 3?

15             A.    That is indeed that figure.

16             Q.    Okay.  And if we wanted to know

17   for -- I'm turning to the "all" category.  If we

18   wanted to know the total cumulative proceeds for

19   all news event days, the way we would reach that

20   is we would multiply 482.20 by .29.  Is that

21   right?

22             A.    Yes.  Subject to all of the

23   qualifications in my previous testimony on such

24   multiplications.

25             Q.    And 48 -- sorry.  Strike that.

231

1           482.20 times .29 is approximately

2   139.95.  Would you agree?

3           A.    That's a level of precision and a

4   kind of mental arithmetic that I don't do anymore.

5   But it's certainly the ballpark -- the right

6   ballpark.  It's about .3 times 480.

7           Q.    Looking at the middle left cell in

8   LM-6, that 7,776, that corresponds with the

9   unusual trading days, no-coincident Ripple news in

10  your Table 3.  Correct?

11          A.    I'm sorry.  It's the seven thousand

12  seven hundred and -- yes, I do see that number.

13          Q.    Okay.  And the bottom-right cell,

14  "all," "all," that's still $92.55 because this is

15  the same total compounded proceeds figure for the

16  2,007 trading days.  Correct?

17          A.    Yes, that is correct.

18          Q.    Okay.  Now, if we want to get the

19  figure -- so we've established the 139.95 in

20  approximate terms.  We've established the 92.55

21  from your chart.  If we want to get the figure for

22  the cumulative returns for all no Ripple news

23  days, would we do that by dividing 92.55 by

24  139.95?

25          A.    If there were no peculiarities that

1    of the kind that I alluded to in my earlier

2    testimony, the qualifications about these

3    multiplications, that would be a way of getting a

4    number for that cell.

5           Q.    And what -- just to make sure we're

6    on the same page, what peculiarities are you

7    referring to in your last answer?

8           A.    I'm referring to the peculiarities

9    that arise from classifying potentially

10   indeterminate cells in my hypothetical image that

11   I drew in the air, as it were, of streaks of

12   different colors overlapping and making a

13   calculation involving or completing filling out a

14   table involving categories of events that might

15   have overlaps.

16          Q.    Mm-hmm.  Is it fair to say that

17   applying the sort of, methodological selections

18   you made in the event, that there were these

19   overlaps, the way you would reach the total

20   cumulative proceeds for no-news events in

21   Exhibit 6 would be to divide 92.55 by 139.95?

22          A.    I'm sorry.  Say -- say that again.

23   The --

24          Q.    Sure.  I want to -- I want to say,

25   like, assuming that we apply the methodological

1    choices that you made with respect to overlapping

2    windows, taking those as a given, as a

3    construction of how to determine the returns, the

4    total cumulative proceeds associated with all of

5    the days in which there were no Ripple news

6    events, the way we would approach that is to

7    divide the returns for all trading days in the

8    period, 92.55, by the returns for the yes Ripple

9    news event trading days in the period, 139.95.

10           A.    The -- your question refers to

11   my -- what I've -- the qualification that I've

12   been stating, and then appears to make an abrupt

13   U-turn and to simply ignore that qualification.

14                 I have been -- I've consistently

15   testified that the multiplic- -- ones ability to

16   multiply numbers in tables like this is qualified

17   by, limited by anomalies that arise from the

18   classification -- the hierarchical classification

19   that I provided that I needed to implement.  And

20   that does not yield perfect multiplications.

21                 And then you -- your question

22   appears to recognize that and then to immediately

23   deny it.  The -- one's ability -- the correctness

24   of multiplying cell entries in these tables to get

25   to the margins, so dividing the margins by cell

234

```
1    entries to get other cell entries, is all limited

2    by the effect of the classifications I needed to

3    make and the fact that those classifications do

4    not affect different columns in this table in the

5    same way.

6              So the answer -- the long answer

7    I'm giving you here is really the same as the

8    answer I gave you -- I have just given you about

9    five times in a row.  If those complications did

10   not exist then we could multiply and divide as you

11   suggest.

12             The complications do exist, and so

13   I have no reason to expect that you can replicate

14   calculations that can be done with the actual

15   returns by multiplying round and dividing rounded

16   numbers from my Table 3 in the format of tables

17   like the LM-6 and whatever the previous, LM-5.

18        Q.    Turning to LM-6, I want to make

19   sure I understand your methodology with respect to

20   overlapping days.

21             The value represented, the

22   480 -- maybe it's easier to point to your chart,

23   to your Table 3.  The $482.20 that's reported as

24   coincident with Ripple news -- do you see that?

25        A.    Yes.
```

1          Q.    Is it true that for that period,

2     whatever days make up the total proceeds of

3     $482.20, none of those days overlap with either

4     the no-coincident Ripple news period or the

5     regular trading days period?

6          A.    I'm not certain whether that is

7     true because of the way the hierarchy of rules

8     that I applied affects the calculation behind

9     different cells in this table.  But the way to

10    know that is to look at the actual computer code

11    that created the actual calculations without

12    rounding and without truncation, and with no

13    ambiguity about potentially overlapping colored

14    streaks in the hypothetical calendar that I have

15    referred to.

16         Q.    The methodology that you applied to

17    reach the figures in your Table 3 for $482.20 for

18    unusual trading days coincident with Ripple news,

19    $7,776 associated with -- or rather, cumulative

20    proceeds for unusual trading days no-coincident

21    Ripple news, do you believe that you applied that

22    correctly?

23         A.    I do.

24         Q.    Okay.  And is the same true with

25    the methodology that you applied with respect to

236

1    determining that 29 cents total cumulative

2    proceeds associated with the regular trading days

3    in your Table 3?

4            A.    "The same" meaning I believe that I

5    applied the methodology that I applied correctly?

6            Q.    I guess I'm asking more for your

7    own value judgment on your methodology.  It seems

8    that you are confronted with a situation where you

9    had overlapping windows between several

10   categories.  Is that fair?

11           A.    That is fair.

12           Q.    And you also decided that the right

13   thing to do was to implement a strategy so that

14   you didn't double count any day in any of those

15   categories, notwithstanding the overlapping

16   windows.

17           A.    That was my intention.

18           Q.    And is that -- do you think that

19   was the appropriate methodology to apply to this

20   exercise set forth in Table 3?

21           A.    I think that there is no -- because

22   of the nature of the data and the nature of the

23   issue that we're discussing, I think that there is

24   no uniquely correct way of dealing with the issue.

25                 But I believe that what I -- I

237

```
1    certainly think that what I applied, the method

2    that I did apply and the hierarchy of

3    classification that I did apply was an entirely

4    reasonable and appropriate method for illustrating

5    the point that I am -- that I intended to

6    illustrate.

7              Q.    So given your familiarity with your

8    data and your methodology, sitting here today, if

9    you look at LM-6, are these returns for, say, the

10   news event yes category of 139.95 in the ballpark

11   of what you'd expect?

12             A.    I have no particular expectation.

13   I don't have a preformed expectation.  If I were

14   attempting to make tables like LM-5 and LM-6

15   entirely consistently with my previous testimony,

16   I would not be attempting to multiply and divide

17   numbers from Table 3 of my report.

18                   I would turn instead to the

19   electronic supporting materials for my report,

20   which not only set forth the full precision

21   numbers so that they're not subject to rounding,

22   but also reveal exactly what was multiplied to get

23   to the dollar figure reported in a truncated or a

24   rounded form in each cell of Table 3.

25                   So if I had an interest in
```

```
1    calculating, in filling in a table like Table LM-6

2    or Table LM-7, I've just described the method that

3    I would follow which is not the method --

4    certainly not relying on somebody else's

5    arithmetic and isn't even based on starting from

6    the numbers that are reported on the visible face

7    of Table 3.

8              Q.    You would not start with such

9    numbers?

10             MR. FIGEL:  Objection.

11             Q.    I wanted to make sure I heard you

12   correctly.

13             A.    For filling in the cells of tables

14   like LM-6 and LM-5, I would not start with the

15   rounded numbers that I have just -- as I just

16   explained.

17             I would go to the source material

18   for Table 3 where I would have the benefit of full

19   precision and full understanding of how potential

20   overlaps had been dealt with.

21             Q.    If you had the -- your Table 3

22   Excel spreadsheet in front of you, and you wanted

23   to undertake the exercise set forth in the yes

24   news event row in LM-6, would you do that by

25   multiplying the cell that corresponds with $482.20
```

1   on LM-4 with the cell that corresponds with 29

2   cents on LM-4?

3           A.    No.

4           Q.    Why not?

5           A.    Because, first, as I've testified

6   already, I do not know, sitting here, whether

7   there is a level of rounding that occurred before

8   the numbers got into the spreadsheets like the one

9   that created Table 3.

10          You may recall that I explained

11  that I would go upstream from that table as far as

12  was necessary to get full precision.

13          But I would also, in order to avoid

14  any possibility of misunderstanding due to

15  overlapping cell products, I would go upstream far

16  enough not only to get the full precision, but

17  upstream far enough to be completely clear about

18  what were the -- which cells in the hypothetical

19  calendar that I have referred to a number of

20  times, contributed to each of the products

21  reported in Table 3, in order to understand

22  whether I should expect a multiplicative

23  relationship like the ones in Tables LM-5 and

24  LM-6, and if not, to apply suitable footnotes to

25  account for whatever it was that I discovered.

240

```
 1              Q.    If one wanted to undertake the
 2    exercise that you just described, could one do so
 3    with the data that you supplied in Marais backup?
 4              A.    Yes.  That's -- in fact, those
 5    materials are exactly what I have meant to refer
 6    to -- what I did -- was, in fact referring to as
 7    my electronic backup for every -- in every answer
 8    in the past ten minutes or so.
 9              Q.    When you undertook your assignment
10    in this case, did you investigate to what
11    extent -- strike that.
12                   Let's assume, as a hypothetical,
13    that the numbers on LM-6 are roughly correct.
14                   Would it change your opinion at all
15    with respect to your rebuttal of Dr. ████ report
16    in this case, if, in fact, Ripple news events were
17    responsible for returns of 139.95 and all news
18    events were 92.55?
19                   MR. FIGEL:  Objection.
20              A.    I would turn instead to Table 3 and
21    assume that the numbers on Table 3 were
22    approximately correct, where the -- I'm using the
23    word "approximate" only to refer to the
24    complications resulting from the overlapping
25    phenomena that I have testified about.  And I
```

1    would continue to base my opinions and conclusions

2    on the Table 3 numbers on that assumption.

3           Q.    Okay.  The Table 3 numbers, though,

4    are the -- I think we established the Table 3

5    numbers for 482.20 for unusual trading days

6    coincident with Ripple news and 29 cents for

7    regular trading days are from your Table 3.  Is

8    that right?

9           MR. FIGEL:  Objection.

10          A.    There are certain inputs in

11   table -- I'm sorry, I may have missed the gist of

12   that question.  But I think you were asking me,

13   did certain input numbers on LM-6 and/or LM-5 come

14   from Table 3?

15          Q.    I was, but I was -- I thought your

16   answer to my hypothetical was, I wouldn't look at

17   LM-6, I would look at LM-4, which is your Table 3.

18   And I was just pointing out that it seems that to

19   supply at least certain of the numbers in LM-6,

20   you can look at LM-4 and identify those numbers.

21          MR. FIGEL:  Objection.

22          A.    The fact that someone else had

23   transcribed some numbers from my Table 3 into

24   their table and done some arithmetic with them is

25   immaterial to me.  Any number of people can do any

242

1    number of things with numbers from Table 3.

2              Table 3 is organized the way I

3    would organize these data.  And I don't really

4    care what somebody else might -- how they might

5    rearrange the numbers.  I would continue to base

6    my conclusions and opinion in this matter on

7    Table 3.

8         Q.    Okay.  Understood.  But backing up

9    from what tables are in front of you, let's assume

10   the hypothetical case where, for a given period,

11   this 2,007-day period, the total returns for all

12   days are 92.55, and the total returns attributed

13   just to Ripple news events days are 139.95.

14   That's the hypothetical.

15             Does that affect your opinion at

16   all in this case?

17             MR. FIGEL:  Objection.

18        A.    No.

19        Q.    Why not?

20        A.    Because the total return for all

21   trading days of 92.95 -- 92.55 or whatever the

22   $92 -- 92.55, describes a -- obscures a

23   complicated history of ups and downs, including an

24   up that went all the way to $3.50 and then came

25   down again.

243

```
 1                    Dr. ██████ purports to draw

 2      conclusions from a two-part procedure, one of

 3      which involves three-day trading

 4      windows -- trading day windows in which he

 5      identifies a certain number of those snippets of

 6      time as being unusual in the sense in which I have

 7      identified that term with a -- defined that term

 8      with a capital U.

 9                    And he labels certain other days as

10      being categorized as having -- being associated

11      with Ripple news events.  He finds highly

12      statistically significant coincidences between the

13      trading day snippets and the news days.

14                    $95 versus $136 are two average

15      statements about -- two statements about certain

16      averages that really have very -- have nothing to

17      do, that I recognize as I sit here, with the

18      substance of my commentary and set of conclusions

19      on Dr. ██████ work, which is that he has identified

20      a highly statistically significant correlation of

21      Ripple news with a sliver of the days -- of the

22      trading day snippets that he has also identified

23      as ones potentially containing nonrandom

24      systematic effects of something.

25                    The averages that you were asking
```

244

```
1    me about just have next to nothing -- they have

2    nothing to do, that I recognize, with Dr. ██████

3    analysis in the first place.

4              With due respect, Mr. Sylvester,

5    you're off on a tangent, and on a very slender

6    limb of that tangent.  And it has nothing to do,

7    that I recognize, with Dr. ██████ purported

8    analysis or with my opinion that Dr. ██████

9    analysis, although it has identified a seemingly

10   highly statistically significant correlation, has

11   identified a correlation with only a sliver of the

12   event, the trading day snippets that he, that he

13   himself has identified as the candidates for

14   nonrandom systemic price effects.

15         Q.   Is there any place in your report,

16   Dr. Marais, where you set forth the total

17   cumulative proceeds for the 2,007-day period in

18   ██████ Model Number 5?

19         A.   For the 2,007 days?

20              (Document review.)

21              I see that in -- I believe that

22   spot is visible in the counterpart of the

23   2,007-day number, if you just go to that same cell

24   in Table 3.

25         Q.   I see.  Is there any part of your
```

245

1    expert report where you compare the total

2    cumulative proceeds attributable to Ripple news

3    days with the total cumulative proceeds for the

4    entire period?

5            A.    I do not -- I could flip through my

6    report and see if I'm reminded of something.

7    Sitting here, without doing that, I don't recall

8    any place where I do that, because that is simply

9    not a comparison that is pertinent to what I do,

10   in fact, do, which I set forth again in a -- in a

11   longish answer about two minutes ago.

12               MR. SYLVESTER:  I think we're very

13          close to the end.  Can we just take five

14          minutes off the record to wrap up?

15               MR. FIGEL:  Gladly.

16               MR. SYLVESTER:  Off the record.

17               THE VIDEOGRAPHER:  The time is

18          6:14 p.m.  This concludes Media 6.  Off the

19          record.

20               (Recess taken from 6:14 p.m. to

21          6:28 p.m.)

22               THE VIDEOGRAPHER:  The time is now

23          6:28 p.m.  This begins Media 7.  On the

24          record.

25       BY MR. SYLVESTER:

246

1          Q.    Dr. Marais, turning to your Table 1

2   again in your expert report.

3          A.    I'm there.

4          Q.    Okay.  There are 179 days that

5   correspond with unusual daily XRP returns and no

6   Ripple news events.  Is that right?

7          A.    Yes.

8          Q.    Did you undertake any analysis to

9   determine what unaccounted for factors might have

10  driven unusual returns on those 179 days?

11         A.    I did not.  I did not need to do

12  that to arrive at the opinions I have in this

13  case.

14         Q.    Did you undertake any analysis to

15  determine what unaccounted for factors might have

16  driven unusual returns on any days that were not

17  coincident with Ripple news days?

18              MR. FIGEL:  Objection.

19         A.    I -- as I have testified earlier

20  today, I did not undertake any brand new work

21  outside of what Dr. ████ reported and delivered.

22  Dr. ████ as far as I can tell, undertook no such

23  analysis.  And I do point that out, but I did not

24  attempt to fill in that gap.

25         Q.    Are you familiar with the concept

247

1       of false positives in statistical tests?

2              A.    Yes.

3              Q.    Turning again to the 179 days, is

4       it possible that some of those days could be false

5       positives?

6                    MR. FIGEL:  Objection.

7              A.    It is -- it is certainly possible

8       as it is possible that some of the four days

9       identified by Dr. █████ are false positives.

10             Q.    What is a typical expectation, if

11      any, for false positive observations?

12                   MR. FIGEL:  Objection.

13             A.    That they are flagged by a

14      statistical procedure as being significant such as

15      Dr. █████ procedure in this case.

16             Q.    As the percentage --

17             A.    And --

18             Q.    Go ahead.

19             A.    I'm sorry.  But that, in reality,

20      they do not correspond to a nonrandom, systematic

21      effect of the kind that Dr. █████ refers to when he

22      describes his procedure for identifying them.

23             Q.    Is the typical expectation in

24      percentage terms for false positives around 5 or

25      10 percent?

248

```
 1          A.    It depends on the nature of the
 2    data and on the nature of the procedure for
 3    identifying them.  I -- I would not say there is
 4    such a thing as a typical rate of -- for -- that
 5    fits all situations.
 6          Q.    I want to turn now to page 4 of
 7    your report in which Dr. █████ Figure 1 is
 8    reproduced.
 9          A.    I see it sitting right there.
10          Q.    Okay.  Is it fair to say that the
11    check-marks in Dr. █████ Figure 1 are intended to
12    indicate significance at the 5 percent level
13    according to Dr. █████
14          A.    Yes.
15          Q.    Okay.  Do you dispute any of
16    Dr. █████ conclusions regarding statistical
17    significance as is indicated in his Figure 1?
18          A.    I agree that the arithmetic that
19    Dr. █████ arrive -- performed to arrive at the
20    coloring of the cells and the check-marks in the
21    cells appears to me to be correct.  In fact, I've
22    replicated it and I think he got the arithmetic
23    correct.
24          Q.    And that includes his conclusions
25    regarding significance at the 5 percent level
```

249

1    displayed in Figure 1?

2              A.    Within the framework of

3    Mr. -- Dr. ███ analysis, I do agree that his

4    hypergeometric calculation, probability

5    calculations produced p-values below 5 percent --

6    actually, below 5 percent wherever he indicates

7    that he got such an outcome.

8                        MR. SYLVESTER:  I have nothing

9         further.  Thank you very much for your time.

10                       Reid?

11                       MR. FIGEL:  We don't have any

12        follow-up, obviously reserving all our rights

13        to check the transcript and to have him

14        consider some of the questions you asked.

15                       But I think we need to ask the

16        Cleary folks and the Paul Weiss folks if they

17        have questions.

18                       MR. SYLVESTER:  Sure.  Are they on?

19        Cleary?  Paul Weiss?

20                       MR. BONILLA LOPEZ:  Nothing on my

21        end from Cleary.

22                       MR. WARD:  Nothing from Paul Weiss.

23        Thank you.

24                       MR. SYLVESTER:  Okay.  Great.

25                       Thank you very much, Dr. Marais.

250

1          Appreciate your time.

2                    THE WITNESS:  Thank you.

3                    CERTIFIED STENOGRAPHER:  So would

4          counsel please state your orders for the

5          transcript on the record, please; if you

6          would like a rough draft and when you would

7          like the final.

8                    I have SEC's order already.

9                    MR. FIGEL:  What are our choices?

10         Expedited.

11                   CERTIFIED STENOGRAPHER:  If you

12         would like a rough and when you would like

13         the final.

14                   MR. FIGEL:  How soon can we get the

15         final?

16                   CERTIFIED STENOGRAPHER:  Tomorrow?

17                   (Continued on the next page.)

18

19

20

21

22

23

24

25

1           MR. FIGEL:  That's fine.  We'll

2     just do that.  You can skip the rough.  Just

3     give us the final tomorrow.  Thank you.

4           And I assume this is highly

5     confidential?

6           MR. SYLVESTER:  It's up to you.

7           MR. FIGEL:  Yeah, I think we should

8     keep it highly confidential.  That's how his

9     report was designated and we agreed to that.

10    So let's keep the deposition consistent with

11    the report.

12          That's it for us.

13          THE VIDEOGRAPHER:  The time is 6:35

14    p.m.  This concludes Media 7 of 7 of today's

15    deposition.  Off the record.

16          (Time noted:  6:35 p.m.)

17

18

19

20

21

22

23

24

25

252

CERTIFICATE OF WITNESS

I, M. LAURENTIUS MARAIS, do hereby declare under

penalty of perjury that I have read the entire

foregoing transcript of my deposition testimony,

or the same has been read to me, and certify that

it is a true, correct and complete transcript of

my testimony given on December 21, 2021, save and

except for changes and/or corrections, if any, as

indicated by me on the attached Errata Sheet, with

the understanding that I offer these changes and/or

corrections as if still under oath.

_____ I have made corrections to my deposition.

_____ I have NOT made any changes to my deposition.


Signed: _____
          M. LAURENTIUS MARAIS


Dated this _____ day of _____ of 20____.

253

1

2                    C E R T I F I C A T E

3        STATE OF NEW YORK    )

4                              : ss.

5        COUNTY OF NASSAU     )

6

7                 I, PATRICIA A. BIDONDE, a Notary

8            Public within and for the State of New

9            York, do hereby certify:

10                 That M. LAURENTIUS MARAIS, the

11           witness whose deposition is hereinbefore

12           set forth, was duly sworn by me, and

13           that such deposition is a true record of

14           the testimony given by the witness.

15                 I further certify that I am not

16           related to any of the parties to this

17           action by blood or marriage, and that I

18           am in no way interested in the outcome

19           of this matter.

20                 IN WITNESS WHEREOF, I have

21           hereunto set my hand this day,

22           December 22, 2021.

23           _____
                 PATRICIA A. BIDONDE
24               Stenographer
                 Registered Professional Reporter
25               Realtime Certified Reporter

254

1                       E R R A T A

2      ERRATA SHEET FOR THE TRANSCRIPT OF:

3      Case Name:      SEC v Ripple

4      Dep Date:       December 21, 2021

5      Deponent:      M. Laurentius Marais

6      Pg. Ln.  Now Reads        Should Read           Reason

7      ____ ____ _____ _____ _____

8      ____ ____ _____ _____ _____

9      ____ ____ _____ _____ _____

10     ____ ____ _____ _____ _____

11     ____ ____ _____ _____ _____

12     ____ ____ _____ _____ _____

13     ____ ____ _____ _____ _____

14     ____ ____ _____ _____ _____

15     ____ ____ _____ _____ _____

16     ____ ____ _____ _____ _____

17     ____ ____ _____ _____ _____

18     ____ ____ _____ _____ _____

19     ____ ____ _____ _____ _____

20     ____ ____ _____ _____ _____

21     ____ ____ _____ _____ _____

22     ____ ____ _____ _____ _____

23     ____ ____ _____ _____ _____

24     ____ ____ _____ _____ _____

25     ____ ____ _____ _____ _____

255

1                    E R R A T A (Continued)

2      Pg. Ln.  Now Reads         Should Read          Reason

3      ___ ____  _____   _____   _____

4      ___ ____  _____   _____   _____

5      ___ ____  _____   _____   _____

6      ___ ____  _____   _____   _____

7      ___ ____  _____   _____   _____

8      ___ ____  _____   _____   _____

9      ___ ____  _____   _____   _____

10     ___ ____  _____   _____   _____

11     ___ ____  _____   _____   _____

12     ___ ____  _____   _____   _____

13     ___ ____  _____   _____   _____

14     ___ ____  _____   _____   _____

15     ___ ____  _____   _____   _____

16     ___ ____  _____   _____   _____

17     ___ ____  _____   _____   _____

18

19     _____    _____

20     Date                       M. Laurentius Marais

21

22

23

24

25

[& - 212-336-5473]

| & |
|---|
| **&** |
| 2:9 4:2,15 5:2,10 8:11 9:3 |
| 35:1,12,22 102:7 107:18 |
| 111:2,17 |

| 0 |
|---|
| **05** |
| 153:19 |

| 1 |
|---|
| **1** |
| 6:5,8,12 11:18,22,23 12:3,5 |
| 12:10 15:9 22:20 36:24 |
| 57:5 83:9,15 84:2 85:1,2 |
| 86:19 91:3,9 147:22,24 |
| 151:3 153:2,23 168:19,19 |
| 168:20 169:6 172:24,25 |
| 173:1,8,22 174:13 180:24 |
| 185:7,13 187:7 188:9,21,24 |
| 189:6 190:13 191:23 |
| 192:14 193:3,5,6,13,17,24 |
| 194:10,25 195:1,2 200:8 |
| 203:20 205:18,19,24 214:1 |
| 216:3 219:3 221:15 222:1 |
| 225:1 246:1 248:7,11,17 |
| 249:1 |
| **1,000** |
| 37:2 |
| **1,040** |
| 36:17,22 |
| **1.03** |
| 215:16 216:1,16,25 225:18 |
| 227:14 |
| **1.03.** |
| 225:18 |
| **1.21** |
| 200:3 |
| **1.99** |
| 196:24 203:19 204:2 |
| 206:17 210:22,23 211:13 |
| 212:9 216:16,24 225:13 |
| 227:14 |
| **1.99.** |
| 196:13 210:15 225:12 |
| **1/15** |
| 200:9 |
| **10** |
| 6:7 21:9 87:1,5,7,11 247:25 |
| **10:29** |
| 57:5,7 |
| **10:50** |
| 57:8,10 |
| **100** |
| 3:17 15:16 16:21 17:5,9 |
| 190:19 214:2,4 |

**10019-6064**
5:13
**10022**
4:5
**10281**
3:8
**105**
190:20
**10832**
1:7 8:9
**11**
6:6 92:18
**12**
6:10,24 160:14
**12:02**
99:5,7
**12:58**
99:8,12,15
**1285**
5:12
**12a**
155:19,23 165:24
**13**
92:19 133:12,14,17,17
175:13,14,18 176:1,3,8,11
**136**
243:14
**139.95**
231:19,24 232:21 237:10
240:17
**139.95.**
231:2 233:9 242:13
**14**
104:21 107:11 181:1,9
192:7 193:10
**15**
57:1 175:13,14,18 176:1,3
176:8,11 197:22
**155**
6:10
**159**
218:7
**15x**
197:24
**1615**
4:17
**17**
6:15 12:3 92:20 105:15
109:22 147:16,21
**179**
194:13 195:15 196:8,16
198:15 211:3,9 226:4 246:4
246:10 247:3
**18**
6:6,18 153:21 154:5,10,12
154:14 168:21,22

**180**
177:21
**183**
188:17,20 194:13 200:13
226:13
**185**
6:12
**19**
23:6 194:7,24,24 197:10
204:4,15
**1982**
114:18
**1985**
12:22
**199**
47:25
**1990s**
14:7 26:13 48:15
**1992**
19:12
**1998**
47:25

| 2 |
|---|
| **2** |
| 6:9,11 57:10 84:17,23 85:1 |
| 88:11 92:15,25 93:13,19 |
| 99:5 155:11,12,16,16,20 |
| 185:6,12,17,19,22 187:22 |
| 187:25 188:11 189:1,4,9 |
| 191:12 192:25 193:19,23 |
| 194:16 215:22 216:7 |
| 217:23 218:1,9 219:12 |
| 220:2 |
| **2,000** |
| 178:6 183:19 |
| **2,002** |
| 220:14,25 221:11,16 222:1 |
| 222:9,15 223:3 228:2 |
| **2,007** |
| 6:22 149:21 150:1,10 |
| 187:23 188:5,7,8 220:1,6 |
| 220:21 221:1 222:16 223:8 |
| 228:3,7 229:4,14,19 231:16 |
| 242:11 244:17,19,23 |
| **2,008** |
| 149:24 150:1 |
| **2.05** |
| 219:6 220:10,24 221:10 |
| 222:19 226:17 227:15 |
| **2.05.** |
| 216:25 220:20 228:13 |
| **2.1** |
| 196:12 197:10,24 199:24 |
| 206:17 |
| **2:13** |
| 144:22,24 |

**2:36**
144:25 145:2
**20**
1:7 8:9 28:21 29:20 60:22
65:25 67:7,14 92:21 102:21
114:23 161:6,21 162:22,23
171:12 194:18 196:17
197:1 206:19,20,23 219:5
221:18 252:19
**200**
3:6 14:21 15:9,16
**2000s**
26:13 48:4,15,20
**20036**
4:19
**20037**
5:5
**2005**
45:24
**2014**
132:20,24
**2017**
105:23
**2020**
101:23,24
**2021**
1:18 2:3 8:13 36:25 102:3
252:9 253:22 254:4
**202-326-7918**
4:21
**202-326-7958**
4:24
**202-551-8515**
3:20
**202-974-1517**
5:7
**205**
220:16
**20549**
3:18
**208**
6:15
**21**
1:18 2:3 6:2 8:13 92:21
195:24 196:1,3 197:12
198:1,2,5 203:13,16,18
210:21,22 211:10 252:9
254:4
**2112**
5:4
**211220pbi**
1:25
**212-336-0159**
3:10
**212-336-5473**
3:13

**[212-373-3446 - able]**

**212-373-3446**
5:15
**212-373-3912**
5:19
**212-909-6564**
4:7
**212-909-6921**
4:11
**22**
105:19 109:22 110:17,19
111:5 253:22
**224**
6:18
**229**
6:24
**23**
105:20 109:23
**24**
191:5 194:6 217:24 218:11
**25**
93:4 186:3,12,19,21
**26**
105:21 109:23 186:3,9,15
186:22 187:19,19
**29**
195:6 230:11,11,20 231:1
236:1 239:1 241:6

**3**

**3**
6:11,13 46:3 84:2,4,17,24
85:2 92:25 93:13,20 99:15
144:22 185:6,11,12 193:6
196:22 197:6 208:16,18,21
209:16,20 210:13 211:1,7
211:12,20 215:15 216:7,13
217:4,12,23,24 218:6,14
219:13 224:2 225:11,15,20
226:1 230:3,4,14 231:6,10
234:16,23 235:17 236:3,20
237:17,24 238:7,18,21
239:9,21 240:20,21 241:2,3
241:4,7,14,17,23 242:1,2,7
244:24
**3.50**
242:24
**3:41**
184:23 185:1
**30**
22:6 37:14 93:5 107:7
115:10 130:2,6 159:16
**33**
107:7
**34**
105:21 106:23 107:2,7
109:23 195:6

**38**
105:21 109:23

**4**

**4**
6:13 86:10 127:19,20 128:1
145:2 184:24 188:25
190:12 194:14 208:15,17
239:1,2 241:17,20 248:6
**4,198,673**
196:12 211:1,7 226:3
**4.1**
227:20
**4.199**
206:17
**4.2**
196:15 211:15 212:11
**4:04**
185:2,4
**40**
105:21 109:23 114:24
115:10
**400**
3:7 4:18 8:17 14:23 176:5
**44**
105:21 106:23 107:2,7
109:23
**45**
22:23 23:5 37:15
**45.06**
221:20 222:5 223:8 227:19
227:22,23
**45.06.**
221:12 227:6
**4796**
88:7
**4797**
90:7
**48**
230:25
**480**
231:6 234:22
**4800**
88:12
**4802**
88:15
**482.20**
197:3,17 217:14,23 229:25
230:7,20 231:1 234:23
235:3,17 238:25 241:5

**5**

**5**
6:16,24 32:18 62:25 83:15
84:2 85:1,2 94:19 117:8
118:24 128:16,18,22 145:6
148:1 149:20 164:4 169:11

**5 (cont.)**
185:4 187:23 188:5,16
190:2,20 193:19 194:5,21
195:8 196:25 210:13,25
211:6 212:1 215:15 217:5,8
217:16,20 218:12,16,21
219:1 220:6,10,15 222:2
223:19 224:17,18,22
225:12 226:5,13,17,19,24
227:4 228:1,7,25 229:15,20
230:5 234:17 237:14
238:14 239:23 241:13
244:18 247:24 248:12,25
249:5,6
**5:13**
223:19
**5:14**
223:21
**5:35**
223:22,23
**500**
178:5

**6**

**6**
6:12,19 119:8 133:12 139:3
195:5 223:24 229:11,12,17
230:7 231:8 232:21 234:17
234:18 237:9,14 238:1,14
238:24 239:24 240:13
241:13,17,19 245:18
**6:14**
245:18,20
**6:28**
245:21,23
**6:35**
251:13,16
**60**
18:14
**600**
41:23
**65**
18:14
**66**
191:5
**673**
226:8

**7**

**7**
119:3,4 137:22,23 138:17
140:11 159:24,25 160:3
168:20 201:3,19 202:2,3
238:2 245:23 251:14,14
**7,776**
197:3,16 217:18 231:8
235:19

**7776**
218:6

**8**

**8**
193:4
**8,352,186**
226:11
**8.3**
211:18 212:13 218:16,20
**800s**
41:21
**87**
6:8

**9**

**9**
6:2 193:6
**9:16**
8:14
**9:17**
2:3
**90**
17:23 55:20 190:21,23
191:3,6,7 222:17
**90s**
14:14
**919**
2:9 4:4 8:11
**92**
242:22
**92.55**
217:6 219:15,24 220:6,16
221:1,9 226:23 228:11
231:14,20,23 232:21 233:8
240:18 242:12,21,22
**92.55.**
220:21
**92.95**
242:21
**95**
54:2,21 55:12,19 56:3,19
152:9 243:14
**950**
8:18
**99**
55:19

**a**

**a.m.**
2:3 8:14 57:5,7,8,10
**ab**
74:1
**ability**
233:15,23
**able**
14:4 29:9 66:21,23 67:6
80:4,7,15 96:4,6 98:11

**[able - analysis]**

**able (cont.)**
143:14
**abnormal**
64:3 65:19 66:12,16 67:10
68:11 69:5 71:5,25 72:16
74:2,24 77:22,24 78:1,25
79:1,6,14 102:14 103:23
108:16 110:4 111:4 112:4
114:13 122:4 134:4,10,12
134:18 135:1 162:14
198:25 199:25
**abrupt**
233:12
**absence**
71:2,4 161:9
**absent**
157:18,20
**absolutely**
10:21 22:9 40:22 44:9
48:16,21
**abstraction**
199:4
**abuse**
110:12
**academia**
67:18
**academic**
52:10 66:1 67:16 73:13
115:6,12 158:4
**accept**
157:7 164:24
**accepted**
156:9 170:9 182:4
**access**
94:25
**accessible**
39:18
**accident**
25:7,13
**accidents**
25:11
**account**
33:14 194:12 195:13
222:23 239:25
**accounting**
16:13
**accounts**
132:17
**accumulated**
203:19 210:18 211:2,8
219:5 221:19
**accuracy**
98:1
**accurate**
17:10 21:17,22 66:4 140:8
176:21

**accurately**
12:19 98:9
**achieve**
209:25
**acknowledges**
159:2
**acquire**
31:5,8 32:15 33:22
**acquisition**
190:18
**acquisitions**
200:7
**acreage**
107:24
**action**
13:18 174:20,23,25 175:3,3
202:20 253:17
**actions**
117:17,23 118:11 119:12
119:15 120:6,11 121:12,15
122:21 129:2 130:12,17,24
131:7,14,25 132:12 138:23
139:19 140:3,21 141:1
142:5,22 145:12 147:10
156:1,12 159:14 160:9,21
166:6 168:9,15 169:13
202:10 203:5
**activities**
13:19
**activity**
13:7
**actual**
15:1 51:5,19 53:16 108:8
146:21 187:1 190:21
207:13 208:22 234:14
235:10,11
**add**
45:2 67:15 116:11 164:20
**added**
214:15
**adding**
197:1 209:3
**addition**
66:17 127:25 186:20
**additional**
39:23 40:24 90:23,25
139:15 194:18 196:17
197:1,3 221:17
**address**
109:12 116:1,3,3 117:12
128:12 186:16
**addressed**
52:13,15,17,22

**addresses**
75:23 206:25
**addressing**
117:24 149:3
**adds**
158:13,15 191:6
**adinolfe**
104:23
**adjustment**
222:7
**administration**
110:15,16
**admissible**
58:13
**admit**
75:5
**advertise**
19:20 20:2,14
**affect**
234:4 242:15
**affiliation**
23:10
**afternoon**
181:10,24
**ago**
22:15 24:6 28:17,21 29:11
29:20 35:19 36:2 60:5,22
65:25 99:25 104:3 105:3,5
114:23,24 115:10,10 178:2
178:11 179:3 200:9 245:11
**agree**
52:12 53:25 54:7,8,10,19
56:1,2 74:20 137:24 143:23
151:12,20,23 152:7 153:17
154:11 155:8 157:9 168:24
173:9,11 203:12 219:13
223:1,2 229:8 231:2 248:18
249:3
**agreeable**
9:12
**agreed**
7:2,8,13 222:20 228:5
251:9
**ahead**
33:13 44:10 47:8 55:25
92:9 104:19 124:4 149:23
191:19 247:18
**air**
232:11
**al**
50:5 86:9,16
▮▮▮▮▮▮▮
6:10 12:6 155:13
**alerting**
118:18

**alleged**
58:14
**allegedly**
59:2,7
**allen**
123:13
**allow**
210:8
**allowed**
59:20
**allowing**
177:25
**allows**
177:14
**alluded**
163:18 232:1
**alston**
102:7
**alternative**
176:5
**amazed**
21:9
**ambiguity**
235:13
**ambiguous**
53:20
**amend**
73:4
**amended**
6:9 42:10 73:6 146:19
155:12,16
**america**
50:24
**americas**
5:12
**amount**
38:9,18 51:6
**amounts**
118:16 199:1
**analogizes**
199:6
**analogous**
49:25 114:23
**analogue**
49:10,22 72:25
**analyses**
39:19 112:8 115:15 141:8
141:16
**analysis**
16:14 17:2 55:10 56:5
64:25 69:17 72:22 84:9,10
85:24,25 100:8,13 113:5
130:22,25 131:23 152:6,14
152:20 153:1,10,17,21
154:17,24 172:8 177:10,22
177:24 178:7,9 183:6 188:1

[analysis - assisted]

**analysis (cont.)**
188:13 194:10 199:10
202:14,19 211:19 212:14
212:23 217:7 218:15
219:15,25 220:2 244:3,8,9
246:8,14,23 249:3
**analysts**
170:16
**analyzing**
177:17
**announcement**
51:24,25 52:4 53:12 63:16
69:19 70:1,21 110:22
**announcements**
63:17 70:2 88:2 158:8,11
229:3
**anomalies**
233:17
**answer**
14:3,4 17:2,4,10,20,21
18:25 21:17,23 22:25 25:22
28:7,24 29:9 31:22 32:7,22
35:3 37:6 41:9 45:20 49:4
51:23 53:5,11,21 54:25
55:1,4 56:2 60:4 62:1,24
64:21 66:4 73:5 79:9,12
82:21 88:18 92:6 94:9
108:19 139:10,12 145:18
147:11 167:11,18 176:23
184:9 190:15 194:5 195:17
195:19 196:22 207:2 208:4
208:5,6,7 232:7 234:6,6,8
240:7 241:16 245:11
**answered**
68:5 78:24
**answering**
66:8 68:1 77:16,18 83:20
127:11 213:18
**answers**
44:16 80:9 109:19 122:25
161:14
**anybody**
92:3 94:6 145:25
**anymore**
210:2 231:4
**anyway**
133:7 163:7 192:20
**apart**
160:8,22
**apologize**
151:19
**apparent**
141:23 161:9 162:16
**apparently**
56:16

**appear**
12:2 49:1 93:19 95:24
106:23 110:25 111:10
167:5
**appeared**
28:19 47:10 71:1 87:11
**appearing**
98:13
**appears**
12:1 150:23 185:13 197:1
219:21 230:12 233:12,22
248:21
**appendix**
177:13
**application**
56:10 199:13
**applications**
52:8
**applied**
6:7 16:9,10,13 49:23 56:9
67:19 87:1,12,15 134:21
224:4,11 235:8,16,21,25
236:5,5 237:1
**applies**
86:23
**apply**
67:5 136:13 172:6 212:19
232:25 236:19 237:2,3
239:24
**applying**
224:3 232:17
**appointment**
19:5
**appointments**
192:12
**appreciate**
195:19 250:1
**approach**
16:3,3 52:19 136:4,4 148:6
149:21 152:19 153:8
165:15 202:13,14 233:6
**approaches**
136:2
**appropriate**
180:13 209:24 236:19
237:4
**approximate**
17:21 226:17 231:20
240:23
**approximately**
14:15 16:16,21 17:4,22
18:8 21:1 26:9,20 35:19
36:24 37:10 41:25 59:25
115:10 196:15 197:24
211:15,18,23 212:11,13
216:25 218:16,19 220:11

**approximately (cont.)**
221:12,20 222:4 223:8
225:24 227:6,14,20 231:1
240:22
**approximation**
26:20 221:10
**archive**
14:5
**area**
16:11 24:18 36:7 81:9,15
82:19 107:16 109:9 181:25
**areas**
16:2,7,8 56:10 67:18 81:18
**arising**
221:4
**arithmetic**
200:8 231:4 238:5 241:24
248:18,22
**arranged**
112:16
**arrangements**
35:6
**arrive**
55:16 164:7 165:21 179:4
246:12 248:19,19
**arrived**
164:7 182:1 204:2
**arrives**
192:3 199:21
**art**
11:17 135:19
**article**
6:7 30:24 45:25 47:9 51:14
51:14 85:18 87:2,7,11,18
88:20,25 89:3,7,10,13,21
90:16 158:1
**articles**
30:23,25 85:18 89:22
**articulated**
159:7 171:16
**artur**
3:22
**aside**
32:8 36:1 46:20 102:10
103:18 109:21 111:21
112:7 131:10,16 176:16
192:8 212:6 218:5
**asinski**
39:4,5,13,22,24 40:10,10
40:22 41:4,19 42:14 43:16
45:8 91:11,22,25 92:2 93:7
93:22 98:22
**asinski's**
39:6
**asked**
15:2 38:6 41:7 53:9 65:13

**asked (cont.)**
67:25 78:8,14 80:1,8 85:1
90:24 103:15 114:3,17
117:12 121:1 122:1 124:18
124:20 129:7 141:6,8,25
159:10 168:21 176:9
202:12,16 213:8 249:14
**asking**
21:21 29:24 52:2 53:16,16
53:23 54:18 67:2,4 68:7,8
68:20 84:15 98:5,18 103:17
104:18 147:13 154:11
159:16,19 167:24 172:1
210:1 219:20 236:6 241:12
243:25
**asks**
79:10
**aspect**
59:21 81:3
**aspects**
81:2 105:18 165:4 175:19
**assert**
118:1
**assess**
102:11 103:20 108:13
109:25 112:1 114:10 129:8
202:17
**assessed**
80:2
**assessment**
131:1
**asset**
11:9,14,17 82:15 83:7
**assets**
33:19 80:19,20,24 81:3,3,5
81:12,16,18,21,24 82:2,6
82:10 88:3,5 128:4,9 184:3
**assigned**
90:19 220:25
**assignment**
25:5 79:10,12 80:8,10
89:24 106:4,10,16 107:2
128:19 129:3,6,20 131:3
132:3 140:24 141:20 142:3
142:20 143:4,10,14 144:5
240:9
**assignments**
90:21 106:23 107:10
115:18 120:22,23
**assist**
38:25 39:13 40:7 43:12,17
**assistant**
31:15
**assisted**
39:22,25,25 40:10,13,18
91:20 93:23

**[assisting - bonilla]**

**assisting**
93:8
**associate**
121:23
**associated**
24:1 30:20,21 110:23
192:15 196:16,17 200:1,18
200:19 201:1,13 227:5
228:8,12 233:4 235:19
236:2 243:10
**associates**
17:25 18:14,17 19:3,5,8,12
19:25
**association**
13:12 23:7 122:11,11 157:3
157:4,10 159:1 161:18,22
162:7,11 163:22 166:13,14
169:3,18,21 171:20 172:3
**associations**
12:25 13:2,6,8
**assume**
79:11 87:20 213:19 240:12
240:21 242:9 251:4
**assumes**
206:12
**assuming**
47:6 206:11 232:25
**assumption**
241:2
**attached**
21:24 180:22 252:11
**attachment**
12:10 22:20 49:1 50:12
83:9,10,16,19,24 94:19
104:14
**attempt**
161:9 165:19 184:8 246:24
**attempting**
237:14,16
**attention**
13:21 123:21 192:1 197:2
210:24
**attorney**
30:2
**attorneys**
3:5 4:3 5:3,11 7:2
**attributable**
245:2
**attributed**
111:12 242:12
**attribution**
38:23
**audience**
163:5
**audited**
39:20

**auditing**
95:21
**author**
192:20,21
**authored**
81:20
**authorities**
109:5
**authorize**
174:20
**authors**
89:18 90:10
**author's**
89:14
**autonomous**
195:14
**available**
15:2 25:20 29:25
**avatar**
143:20,25
**avenue**
2:10 4:4 5:4,12 8:12
**average**
243:14
**averages**
243:16,25
**avoid**
84:15 239:13
**avoided**
31:24
**aware**
10:12 12:17 13:5,13 24:5
33:10 38:1,2 57:20 96:14
122:16 126:8 127:14

**b**

**back**
43:24 51:1 65:23 66:7 72:4
72:6 85:3 95:14 96:3
105:12 112:12 114:18
139:1 140:11 141:14 145:5
159:9,24 165:23 174:22
175:13 186:2 188:11
193:19 203:13,16 215:15
215:22 216:13 218:14,25
**background**
20:9 81:14 86:5 89:21
92:12 125:21 195:11
199:17
**backing**
167:19 242:8
**backup**
27:22 29:12,14 43:20 94:20
94:23 95:3,9,13 96:11,16
96:19,24 97:11,18 98:2,6
98:13,19 208:8,11 209:18
209:23 216:23 218:24

**backup (cont.)**
240:3,7
**balance**
32:23 62:25
**ballpark**
211:23 231:5,6 237:10
**bank**
174:19
**base**
241:1 242:5
**based**
59:23 95:25 102:13 103:22
108:15 110:3 112:3 114:12
117:13 125:20 153:7
154:17 163:13 204:10
238:5
**baseline**
178:14
**bases**
178:24 186:21
**basic**
85:19
**basis**
26:25 68:21,24 71:3,25
72:16 86:6 88:23 90:16
97:15 114:2 121:21 122:13
125:22 142:2,8,9 145:16,20
147:13,14 192:2,2 193:11
202:22
**beach**
50:24
**began**
136:9,18 137:11,19
**beginning**
167:6 206:5,6
**begins**
57:10 72:18,19 99:15
105:22 129:7 141:7 145:2
185:4 186:13 223:24
245:23
**behalf**
9:4,7 10:18 39:22 102:7
**belief**
40:25 143:1 183:16
**believe**
22:17 24:2 25:14 41:20,23
77:3 85:17 97:19 100:6,11
100:21 108:10 118:6
124:25 129:18 140:23
142:19 145:8 155:9 180:17
183:4 201:11 224:2 235:21
236:4,25 244:21
**believed**
111:24
**believing**
142:2,8

**benchmark**
85:15
**benefit**
238:18
**best**
10:23 11:13 14:20 25:18
26:15,19 28:11 45:20 64:21
107:7 118:12 132:16
136:15 156:6
**better**
46:19 53:24 106:1 207:11
**beyond**
45:9 116:17,24 117:1,25
171:21 181:8
**bidonde**
1:23 2:11 5:24 8:15 253:7
253:23
**bill**
38:10
**billed**
37:4 41:4,7 42:1
**billing**
41:13,16,20
**billings**
38:15,23,24
**bills**
38:19
**binder's**
51:14
**bird**
102:7
**bit**
17:11 53:7,20 116:23 117:1
139:16 213:5
**bitcoin**
88:16
**black**
44:22
**blah**
160:5
**blood**
223:15 253:17
**blue**
205:17,17,21,22,24 206:2,4
206:6,7,10 212:25 213:12
214:1,9,12,15 215:1 222:14
223:4
**body**
27:21 208:12
**boilerplate**
92:11
**bolded**
155:22
**bonilla**
5:6 9:6 249:20

[book - caveat]

**book**
160:14
**bottom**
119:14 185:22 188:8
226:10,22 231:13
**boulevard**
8:18
**boundaries**
80:21
**brad**
34:12
**bradford**
171:3
**bradley**
1:7 5:3 8:8 9:8
**brain**
107:23
**brand**
8:17 246:20
**breach**
59:9,11
**breadth**
141:23 142:6
**break**
57:2 98:25 144:10,14
172:12,17,18 184:20
223:14,17 224:24 227:2
228:6
**breaking**
207:22
**brenner**
4:10
**bridging**
159:3
**brief**
184:20
**briefly**
20:8 22:24 42:11,13 104:11
126:7 138:16
**bright**
80:21 81:17 141:22 182:11
**bring**
139:1 161:6
**broad**
13:6 76:15 103:13 104:6
120:24 141:16
**broader**
175:7
**broadly**
36:11 63:6 116:2 138:2,13
174:17 222:20 228:22,22
**brought**
40:24 162:3
**bulk**
93:1,16

**bunch**
214:18
**business**
14:19 19:14

**c**

**calculate**
150:4 206:16
**calculated**
14:18 59:11 208:22,25
222:19
**calculating**
224:3 238:1
**calculation**
51:5 54:17 56:24 166:21,21
166:24 204:4 207:13,14
209:2,10,24 213:24 222:25
228:16 232:13 235:8 249:4
**calculations**
24:20 43:21 54:12 95:15,17
96:7 98:8 180:16,24 207:8
221:5 234:14 235:11 249:5
**calendar**
205:7,19,21 206:7 212:25
213:2 222:15,18 235:14
239:19
**california**
8:18 23:6,11 61:1,2
**call**
29:23 45:4,5,8 49:16,25
101:17 107:10 134:2
135:25 137:10,17,20
166:25 186:17
**called**
9:17 16:12 23:23 24:1,6
28:16 30:11,21 38:22 46:3
51:5 57:23,25 65:16 104:22
105:9 123:23 161:16
199:19 228:2
**calling**
135:8 199:25 200:8,9
**calls**
101:5 133:23 136:20
154:25 177:12,19 204:8
**cancer**
107:15
**cancers**
107:23
**candidate**
16:5 136:19
**candidates**
106:1 244:13
**canjels**
3:19 8:23
**canjelse**
3:21

**capital**
133:1 134:2 243:8
**caps**
25:6
**captured**
202:20
**captures**
141:20
**care**
242:4
**career**
102:9 108:12 114:8,17
**carefully**
161:22 186:24
**careless**
118:18
**carried**
59:11
**case**
1:6 8:9 10:3,14,20 11:2,25
12:7 13:4,23 20:22 21:10
21:11 22:4,8,10,11,16 23:4
23:13 24:1,6,8,22 25:2,3,4
25:20,22 28:10 29:22 30:13
31:2 32:9 34:3,4,8,9,12,15
34:18,22,23 36:10,17 37:5
37:11,17,20,25 39:1,15
40:1,8,19 41:5 45:1 48:8
50:4,19,22 51:1,3,6 57:23
57:25 58:3,19,24 59:5,22
60:8,17 61:1,9,11,13,24
62:2 63:8 64:23 70:3,8,23
71:7,12,14,15 74:9 77:12
78:21 79:18,20,22,23 82:4
82:5,8,12,24 83:2,6 85:6,9
89:11,25 90:19 96:15 97:7
99:24 100:4 101:21 104:24
107:12 108:10,20,25
110:21 111:6,22 113:21
115:19,23 116:16,19 118:5
119:19 123:7 124:8,15
126:20 128:7 130:15 131:2
131:12 132:4 139:18 142:9
142:16 145:12 146:5,17,19
152:7 155:17 157:18,21
158:17,18,18 164:1,17,25
165:2,22 168:7 171:4
176:25 178:25 179:4,8
182:2 184:5,18 187:19
190:20 191:8 194:5 199:10
199:22 207:15 210:7
211:25 221:3 240:10,16
242:10,16 246:13 247:15
254:3
**cases**
21:2 22:1,23 23:21 35:4

**cases (cont.)**
49:1,2,20,24 57:14,22 60:6
61:4,17 77:4 91:13 106:3,9
106:17 137:3 182:10
213:16
**cash**
205:25 206:8
**cashing**
206:3
**catalog**
28:24
**categories**
105:1 152:2 189:10 190:11
190:16,17 191:16,22,25
192:6,7,23 193:10,16
195:22 200:6,6 217:13
232:14 236:10,15
**categorization**
151:15 152:1 181:2,6,14,16
**categorizations**
192:24
**categorized**
225:2,5 243:10
**category**
49:25 68:20 76:15 103:17
105:7 169:19 175:7 178:10
191:5 194:1,2 195:22
199:12 230:13,17 237:10
**causal**
70:21 111:12 113:11 121:8
121:19,22 131:6,13,21,24
132:11 158:16 159:13,22
160:20 162:17 163:14
166:15,25 167:4,4 170:21
200:19
**causally**
113:21 120:5 138:23
140:21,25 142:5,22 160:9
**causation**
56:15,22 107:22 108:2
113:25 114:1 122:5 141:25
142:13,14 157:3,12,12,14
157:19,22 158:15 159:1
162:7 163:9,16,22 167:8,12
167:14,21 168:1 169:23
171:1,4,21 172:3,13
**cause**
51:24 161:19 173:6 174:16
**caused**
53:12 54:23 56:21 78:15
113:24 121:24 162:14
173:23 174:4,12 194:13
**causes**
157:7,8
**caveat**
122:14

**[cell - colleagues]**

**cell**
189:6 195:2 213:2 225:12
225:17 226:3,10,22 229:25
230:8,11 231:7,13 232:4
233:24,25 234:1 237:24
238:25 239:1,15 244:23
**cells**
195:3 205:12 226:17
232:10 235:9 238:13
239:18 248:20,21
**center**
164:9
**central**
145:12 146:16 174:19
**cents**
230:11,12 236:1 239:2
241:6
**certain**
16:5 22:5 24:20 25:8 43:21
47:5 55:15 73:14 81:12
88:2 114:1 127:21 128:2
129:16 155:24 156:23,24
169:3 170:25 175:18
180:23 181:17 204:14
235:6 241:10,13,19 243:5,9
243:15
**certainly**
27:2 34:9 41:10 42:22 55:4
75:17 76:21 90:25 92:12,25
106:14 107:6 114:24 115:1
116:19 120:5 143:24 154:9
179:22 184:22 207:2
208:10 209:25 231:5 237:1
238:4 247:7
**certificate**
252:1
**certified**
1:24 2:13,13 9:15 72:8
250:3,11,16 253:25
**certify**
252:7 253:9,15
**cetera**
160:5
**cgsh.com**
5:8
**chain**
98:14 209:24
**chance**
87:6
**change**
78:2 164:19 165:15 202:20
221:8 240:14
**changed**
89:9
**changes**
64:10,11,14 69:20 70:23

**changes (cont.)**
94:16 111:9,11 112:17,19
113:8,9,13,23 199:1 252:10
252:12,15
**character**
105:16,20 112:7 113:7
**characteristics**
101:13
**characterization**
27:12,13 67:5 76:7 104:6
105:11 116:9 121:4 129:19
129:20 154:7 168:5 175:23
**characterize**
20:17 28:12 66:23 122:3
129:19 173:4
**characterized**
123:14 147:6
**characterizes**
179:13
**characterizing**
176:22
**charge**
36:13,15
**charging**
36:9
**chart**
150:10,14 173:25 214:10
225:10 231:21 234:22
**check**
64:10 97:25 137:5 164:2,15
195:3 199:16 248:11,20
249:13
**checking**
95:22 226:6
**chicago**
16:12 19:13,17 114:18
124:24 125:1
**choice**
55:10,14,20 56:4,5 59:18
**choices**
233:1 250:9
**choosing**
192:23,25
**chose**
164:21 191:22
**chosen**
161:22
**chris**
34:15
**christian**
1:8 5:11,24 8:8,15 9:4
**chrysler**
24:7
**chunk**
175:4

**circumstances**
27:15 167:11,13
**citation**
65:1,2
**citations**
86:21
**cite**
42:12 87:7
**cited**
90:15
**cites**
86:20,21,22
**civ**
1:7 8:9
**claim**
117:20 162:17
**claims**
80:2 111:13 114:1
**clarification**
19:10
**clarify**
17:1 18:24 44:17 84:16
176:20
**class**
47:24
**classes**
47:20
**classification**
213:9 233:18,18 237:3
**classifications**
234:2,3
**classifying**
232:9
**clear**
29:18 44:8 72:20 77:16
131:16 141:22 144:5 146:4
164:14,18 176:14 178:17
194:23 239:17
**clearly**
84:25 105:3 141:3,3
**cleary**
5:2 9:7 249:16,19,21
**click**
209:19
**clicked**
209:22
**client**
22:18 38:16 106:24
**clients**
16:2 38:10,19
**cliff's**
192:21
**clinical**
199:20
**close**
120:14 196:23 211:24

**close (cont.)**
219:7 245:13
**closely**
24:1 127:1,5
**closing**
205:20 206:14
**cluster**
107:16 109:2
**coast**
58:21
**code**
53:3 97:1,3,10 207:13
209:6 235:10
**coded**
223:7
**coefficient**
153:3,4 155:3,4
**coffee**
151:18
**coherence**
178:20 216:22
**coherent**
213:15
**coin**
95:25
**coincide**
111:10 113:9,22 122:4,5,7
158:10 215:21
**coincidence**
122:9 156:23
**coincidences**
198:10 243:12
**coincident**
162:15 185:23,24 188:25
189:11,16,22 190:25
191:13,14,15 194:18 196:9
196:10 198:15,16 204:6
205:8,8,9,13,14 208:2
210:14 211:2,8,14,16
212:10,12,19,21 214:13,14
214:16 215:4 217:15,19,25
218:8 224:6,8 230:2 231:9
234:24 235:4,18,20 241:6
246:17
**coincides**
205:4
**coinciding**
74:2 204:8
**collaboration**
91:14
**collaborative**
91:10
**colleague**
8:23 9:5 10:4 43:5
**colleagues**
9:10 10:5

[collect - construct]

**collect**
53:2
**collide**
213:14
**color**
205:7,9,17 206:2 213:21
214:5
**colored**
199:4,5 205:12,13,16 206:4
214:9 215:1 235:13
**coloring**
205:12 248:20
**colors**
232:12
**column**
185:17 187:25 188:12,20
189:11,15,21,21 211:14,16
211:20 216:6 224:7,8,12
227:12,19 228:25 230:13
**columns**
148:9,13 191:4,12 217:13
221:7 224:14 225:2 234:4
**combined**
191:16 195:22
**combines**
194:2
**combining**
214:14
**coming**
42:20 105:12
**commemorators**
170:17
**commentary**
243:18
**commenting**
48:9
**comments**
93:9 94:1,13,14,17
**commercialization**
193:15
**commission**
1:4 3:4 8:7
**commit**
85:12
**committed**
139:8 204:21
**communicate**
126:13,16
**communicated**
126:19
**communications**
145:19
**community**
87:16
**commutative**
214:17 215:13

**commutativity**
212:17 215:12
**company**
31:17
**comparative**
58:11,12
**compare**
218:11 245:1
**compared**
58:5
**comparison**
197:3 245:9
**compass**
15:23 16:3,17,24 17:24
18:6 19:23 35:21 36:2,12
36:13,14 37:4,22 38:8,15
38:17,18 39:7 40:17 41:14
96:22 127:4
**compensation**
37:16,20 38:9,14,17
**complaint**
42:9,10 146:19
**complete**
252:8
**completely**
144:5 146:3 152:18 172:5
239:17
**completing**
232:13
**complex**
35:4
**complicated**
180:20 213:6 242:23
**complication**
204:16 205:1 208:12
213:20 221:4
**complications**
31:25 216:18 218:3,6
220:22 223:3 234:9,12
240:24
**component**
135:20,24
**components**
97:20 215:2
**compounded**
196:11 217:6,14,18,24
218:7,20 219:14 220:5,9,14
220:19 227:25 229:3 230:1
231:15
**comprehensive**
11:11
**computer**
93:3 97:1,3,10,13,23 98:14
207:13 235:10
**computers**
39:16 40:15

**computing**
78:25
**concede**
162:17
**concept**
80:21 155:5,6 162:25
201:17,25 222:14 246:25
**concepts**
198:24
**concern**
141:15
**concerned**
177:11 180:22 213:21
**concerning**
30:1 104:2 109:2,3,9
141:12,16
**conclude**
54:2 120:2 130:1 138:20
140:10 229:1
**concluded**
102:13 103:21 108:15
110:2 112:3 114:11
**concludes**
57:5 99:5 144:22 173:17
184:24 223:19 245:18
251:14
**concluding**
128:15,21
**conclusion**
54:17,19 70:7 71:23 72:13
73:25 119:9,14 120:24
121:20 130:19,21 140:16
143:8 154:20 156:4 158:16
159:9 167:4 168:1 169:9
202:8 203:3
**conclusions**
55:16 86:1 116:22 118:1,3
121:22 127:22,25 128:2,7
137:9 141:24 142:6 143:5
154:17 159:10 164:7 173:5
201:19 202:1 241:1 242:6
243:2,18 248:16,24
**conditions**
170:25
**conduct**
79:19 80:1
**conducted**
26:3,10,18 28:1,8 33:16
48:9 65:18 66:11,15 68:2
75:21 77:17,21 82:9,12
87:23 88:1 127:15
**conducting**
28:3 29:5 63:15,21 67:9
**confers**
44:14

**confidence**
54:3,22 55:7,9,12,18 56:4,7
56:11,20 152:9
**confident**
146:4
**confidential**
1:14 2:6 14:8 251:5,8
**confirm**
95:21,22
**confirmed**
89:7
**confirming**
98:11
**conform**
135:16
**confounding**
161:7,8,16,17,20 162:2,19
162:24 163:6,23 164:2,16
170:13 171:8,9 172:12
174:4,11,16 175:8 176:16
179:6,16,23 180:2 182:20
215:5
**confronted**
236:8
**conjunction**
27:23 42:16 195:8
**connecticut**
2:16
**connection**
16:18 18:6 23:10 26:10,18
37:17,20,24 60:1,13 61:18
68:13 70:9 71:21 72:11
110:19 111:5 187:10
**consequence**
113:1
**consider**
11:17 27:18 76:11 124:21
249:14
**consideration**
198:3,12
**considerations**
163:14
**considered**
42:12 64:20 75:15,18 83:11
**consistency**
216:3
**consistent**
251:10
**consistently**
233:14 237:15
**consists**
214:25
**constant**
85:20 86:18 101:5
**construct**
170:14

[construction - cumulative]

**construction**
233:3
**constructs**
184:2
**consult**
21:24
**consultant**
14:9 31:14 66:2
**consulting**
16:1 18:17 31:16 102:20
**contact**
10:22 20:11 30:4 35:8
**contacted**
30:2
**contain**
20:6 96:25 97:1,4,8,11
119:21
**contained**
61:6 96:19 98:1 207:17,19
**containing**
243:23
**contains**
147:22
**contend**
120:19
**contending**
118:7
**contends**
120:8
**content**
102:23 114:22
**contention**
117:14 121:2 128:24 147:7
**contents**
124:15 186:20
**context**
49:17 54:12 75:4 77:2
105:9 156:18 168:18
195:13 203:8
**continue**
33:25 163:20 206:9 241:1
242:5
**continued**
4:1 5:1 99:20 250:17 255:1
**continues**
132:14 197:8
**contrary**
198:22
**contrast**
196:7
**contributed**
239:20
**convenience**
32:3
**conventional**
49:11,17 51:15 64:19

**conversation**
33:13 138:24
**conversations**
33:11
**conversions**
32:1
**convey**
116:15 146:10 172:19
179:12 180:7,21 206:23
**cook**
59:15
**copies**
43:20
**copy**
6:11,13 20:12 85:11 87:7
139:11 185:6,12 208:16,17
**core**
79:23 84:13
**corner**
188:8
**corporation**
57:24
**correct**
15:24 19:15 25:24 41:15
50:21 64:4 100:15 109:18
128:4 148:2,4 149:1 151:7
167:19 179:16 188:5 189:1
189:6,13,18,25 190:1 191:9
197:25 203:25 209:16,21
216:11,25 220:12 225:15
225:21,22 226:5,9,14,20,21
226:25 227:6,7,9 231:10,16
231:17 236:24 240:13,22
248:21,23 252:8
**corrected**
121:7 124:11
**correction**
197:14
**corrections**
252:10,13,14
**correctly**
48:2 54:14 97:12 114:16
154:14 180:17 235:22
236:5 238:12
**correctness**
233:23
**correlation**
151:13,21,24 155:1,3,4,6
156:22 157:4,6 158:14
163:10 169:2,10 172:13
243:20 244:10,11
**correlations**
192:15,16
**correspond**
55:16 154:18 188:24 220:1
246:5 247:20

**corresponding**
153:4 188:4
**corresponds**
188:19 189:4 216:7 231:8
238:25 239:1
**corroborative**
203:1
**cotromano**
104:22 105:5,6 107:12,14
108:10 109:21 111:21
**couns**
44:25
**counsel**
8:19 29:24 35:5 42:17 43:1
43:11,25,25 44:14,25 45:4
45:5,11 55:22 83:18,24
84:19,24 94:1,4,7 96:14
102:6,7 127:8 129:4,6,7
145:19 250:4
**counsel's**
94:12,14,17
**count**
150:13 204:19 205:5
215:24 236:14
**counted**
224:5,12,13
**counterpart**
244:22
**counting**
202:23,24
**countries**
174:21
**country**
31:10,24 34:1
**counts**
14:23,24 187:1
**county**
59:15 253:5
**course**
14:19 32:20 42:23 84:10
97:9 105:22 121:5 138:3
151:20
**courses**
81:23 82:1
**court**
1:1 2:14 7:11 8:17 24:3,7,9
24:14,23 25:10 58:10 59:15
60:23 61:2,3 72:6 124:3
**court's**
25:14
**cover**
47:21 81:24 104:7 105:23
**covered**
82:2 103:3,10 114:6 128:14
221:7

**covers**
76:19 202:3
**coy**
22:6
**craig**
51:13
**create**
145:23,25
**created**
48:18 50:18 70:3 92:24
96:21 146:12 235:11 239:9
**creating**
92:1,22 146:8 150:14
**creation**
146:11 147:3,5
**creep**
178:1
**crisis**
110:24
**crisp**
85:10
**criteria**
171:4
**critical**
50:4
**criticism**
90:2,3,17
**criticizing**
158:20
**critique**
89:14 90:9 131:11 159:6
175:24 177:8 178:18,23
**critiques**
176:9,15,18,21 177:7 179:7
184:4
**cross**
158:9,10
**crosses**
136:16
**crown**
57:24
**crypto**
170:17
**cryptocurrencies**
88:14 101:16
**cryptocurrency**
11:7 30:20 31:24 32:5,16
33:8 101:8 161:11 183:11
183:18
**cuff**
80:9
**cumulative**
78:25 79:1 196:15 198:25
216:14 221:11 222:4 223:6
224:4 225:2,13,18 226:3,12
226:18,23 229:1 230:18

[cumulative - described]

cumulative (cont.)
231:22 232:20 233:4
235:19 236:1 244:17 245:2
245:3
curiosity
33:8
currency
31:25 32:2
current
47:14
currently
15:22
cursory
90:8
customers
193:15
cut
147:19 229:4
cuts
229:9
cv
12:10,12,19,24 20:12 45:21
46:3 47:14 125:3,6,15,21
126:6

d

d.c.
3:18 4:19 5:5
daily
148:9,13 150:25 151:6
154:18 169:11 173:7,24
174:5,12 189:5 203:24
208:23 209:12 216:9 225:3
230:9 246:5
damages
24:14,16,16 59:2
daniel
4:6 126:9
dashes
160:8
data
6:16,20 39:17 53:1 55:11
55:12,20 56:15,22 70:19,20
88:7 95:17,23 134:23 136:1
137:18 162:20 166:23
172:9,10 204:11,21 216:15
224:19,22 229:13,18
236:22 237:8 240:3 242:3
248:2
database
25:6,9,12
date
8:13 11:20 30:8,8 59:6,8,11
59:13,14,18 87:3 155:14
185:8 208:20 224:21
229:16 254:4 255:20

dated
252:19
dates
70:1,2 152:20 153:1,2
158:10,12 190:18
day
6:22 65:15 134:11,13,24
136:2,8,10,10,11,11,12,18
136:18,23,23,24,24 137:10
137:11,19,21 150:3,6,15
151:3,5 170:19 174:6
175:11 177:21,22 196:10
200:1 204:8,10,12,15,17,17
205:2,2,3,3,5,5,14,15,20
206:1,2,4,5,15,15 207:17
207:18,19,25 208:2 212:20
212:21 213:4 214:3,6 215:3
216:2,3,4 222:12 224:5,11
225:7,8,19 228:7 229:4,14
229:19 236:14 242:11
243:3,4,13,22 244:12,17,23
252:19 253:21
daylight
120:15,17 121:3
days
63:23 64:2,14 65:20,20
66:13,17,19,20 67:10 68:12,12
69:6,6,19,20 71:6,6 72:1,17
74:25 77:23,24 78:2,4,12
79:2,7,14,15 102:15 103:24
108:17 110:4 112:5 114:14
133:24,24 134:2,3,3,25,25
135:8 136:25 137:24 148:1
149:11,15,19 150:3,5,7,8
150:10,11,12,13,23 151:8
151:15 152:1 153:22 154:7
154:18 156:23,24,24,25
161:15,24 164:4 169:20
173:7,24 174:13 177:14,18
177:24 178:1,1,2,5,6,12,22
182:5 183:19 185:19,23,24
186:7,7 187:20 188:1,12,20
188:24,25 189:4,10,12,16
189:23,23 190:3,3,14 191:3
191:13,14,15 193:19,20
194:14,18 195:15 196:9,10
196:16,18 197:1,4 198:16
202:21,23,25 203:20,22,22
204:5,6,14 205:8,10,16,23
205:23 208:5 209:6 210:14
210:20 211:9,14,16,19
212:10,12,14,22 213:9
214:11,12,24 215:1,17,19
215:19 216:6,8,14 217:7,15
217:19,25 218:8,12,15,21
219:1,4,4,14,25 220:1,6,9

days (cont.)
220:15,20,24,25 221:1,5,7
221:11,16,17 222:1,9,20,21
222:23,24 223:3,7,7 224:6
224:7,14 225:3,4,9,14
226:4,8,13,19 227:4,5,6,18
228:1,9,11,12,20 229:1,2
230:2,13,19 231:9,16,23
233:5,7,9 234:20 235:2,3,5
235:18,20 236:2 241:5,7
242:12,13,21 243:9,13,21
244:19 245:3 246:4,10,16
246:17 247:3,4,8
day's
224:12
de
202:13
dealing
236:24
dealt
216:20 238:20
debevoise
2:9 4:2 8:11 35:1,12,22
debevoise.com
4:8,12
december
1:18 2:3 8:13 252:9 253:22
254:4
decided
236:12
decisions
192:11
declaration
110:11
declare
252:4
declared
110:16
declined
54:4
deductive
170:11
deem
27:23
defendant
4:3 5:3,11 9:7 10:19,22
11:2 13:4 20:23 61:9 102:8
defendants
1:9 34:23 36:9 41:4 44:25
126:8
defense
35:6 58:13 83:18,24 96:14
127:8
define
11:11 51:7,19 133:3,14,21
134:16 186:12 207:21

defined
30:19 133:2 137:21 243:7
defines
51:12,13 174:16
definite
75:10 139:10
definition
18:12 24:15,16,25 51:10,11
51:16,19 133:5,19 135:17
135:21 137:15
degree
86:13
degrees
12:19
delivered
30:6 92:2 97:19 246:21
delve
89:21 90:1 181:22
delving
14:5
deny
233:23
dep
254:4
depend
78:6
dependence
132:16
depending
14:22,24 76:25 90:3
depends
27:14 64:21 77:1 248:1
depo
42:24
deponent
9:16 254:5
deposed
50:17
deposition
1:15 2:7 8:5,10 10:6 17:13
42:4 43:2,12 50:10 80:11
251:10,15 252:6,14,15
253:11,13
derived
97:5
describe
20:9 27:16 53:18 74:11,17
76:3 81:15 91:17 103:12,14
103:15,18 139:5 147:13
described
18:6 20:5 32:21 46:7 47:10
51:17,18 62:19 68:22 76:15
89:15 95:18 96:10 108:2
112:9,14 113:3,13 122:18
139:25 154:5 178:24
182:15 207:1 219:4 220:22

[described - dollars]

described (cont.)
221:17 238:2 240:2
describes
71:9 74:9 87:25 97:18
128:18 168:22 190:19
242:22 247:22
describing
70:5 76:8 112:25 146:7
213:23
description
27:9 76:11 86:11 97:23
125:20 126:6 138:13
207:12
design
89:14,18 90:10 175:19,25
176:7,18 180:11
designated
14:7,10 251:9
designed
140:14 160:11
despite
108:6 151:18
detail
171:22 206:21 216:23
detailed
34:9 177:8 178:18
details
112:8 138:4 218:23
detecting
46:4
determination
24:13
determine
25:8 63:22 64:2 78:9,15
80:14 130:23 131:23
165:14 220:13 227:24
233:3 246:9,15
determined
25:10 227:3
determining
136:5 137:15 203:8 236:1
develop
90:16 177:8
devote
38:16
dictated
59:6
dictates
55:12 146:23
difference
24:25 135:11 150:1 229:20
differences
107:9
different
27:14 32:2 35:5 64:17
70:19 77:17,18,18 78:20

different (cont.)
112:8 122:5 133:23 158:11
158:11,12 177:24 182:10
194:2 197:7 209:10 221:4
232:12 234:4 235:9
differently
103:15
difficult
158:25
difficulty
157:13
digital
11:9,14,17 33:19 80:19,20
80:23 81:3,3,5,12,16,18,21
81:24 82:2,6,10,15 83:7
88:3,5 128:4,9 184:3
digits
21:6,8 209:20
dimension
158:13,15
direct
35:7 49:9 145:25
directed
40:12,12
directing
210:24
direction
38:24 39:21 42:15 96:21
135:5 136:22
directly
118:1
directs
192:1
disagree
54:8,11 63:19
disavow
121:19
disavowed
121:6
disciplinary
13:18
disclose
22:19 204:3
disclosed
22:16 71:11,15 113:10
disclosure
42:13,13 60:13 70:22 71:16
77:6 108:25 110:21 112:23
112:23
disclosures
46:5 70:3 82:15 109:1,3
112:16,20 117:17,22
118:10 120:10 121:15
129:2 145:11 147:10 175:7
202:9 203:4

discounting
59:7
discover
53:8 96:10
discovered
239:25
discovering
120:25
discovery
109:2
discrepancy
199:24
discrete
199:10 209:1,5
discuss
29:25 181:2 186:6 198:2
discussed
32:25 33:3 40:17 46:21
57:14 70:10 101:21 109:22
111:22 127:14 138:16
168:17 176:17 179:7 195:4
227:10
discusses
87:22
discussing
70:9 116:21 187:6 224:24
236:23
discussion
123:21 134:1 161:21
186:18 187:13,14 194:24
195:1
discussions
170:16
disparities
187:3,14,17
disparity
187:7,9 197:6,7,9,16,17,22
197:23 198:14,20
displayed
153:23 188:8 208:22
209:15 218:1,8 219:24
230:7 249:1
displaying
224:23
displays
147:25
dispute
154:5,20 156:4,15 248:15
distance
67:7
distinct
183:2
distinction
24:22
distinctly
64:24

distinguish
15:6 158:14
distinguishable
174:24
distinguishes
77:8,11
distinguishing
177:11
distribution
85:24 154:25
distributional
152:6
district
1:1,2
divide
81:18 220:15 221:9 228:10
232:21 233:7 234:10
237:16
divided
63:14
dividing
229:8 231:23 233:25
234:15
diviner
53:1
division
24:21 25:1
djmarcus
4:8
doctor
42:25 160:25 173:1,19
196:2 215:14
document
12:14 23:3 29:16 45:23
49:6 50:15 69:4 87:9 88:10
91:14 92:10 93:11 104:20
105:17 107:5 110:7 117:6
122:2 127:23 154:1 160:2
161:5 175:21 186:25
190:24 197:20 201:23
244:20
documentable
111:1
documented
68:14 108:8 162:11 166:17
documents
132:15 169:17,18 200:2
doing
22:6 49:9 115:6,12 132:2
176:6 177:3,4 184:8 245:7
dollar
196:8 199:1,2 201:1,13
202:24 219:20 237:23
dollars
32:1

**[domain - endeavored]**

**domain**
56:9
**double**
204:19 205:5,16 236:14
**doubt**
29:10,14 118:14
**downs**
242:23
**dozen**
21:16,18,19 26:15
**dr**
6:10 11:21,23 12:6 13:22
39:4,6,11,13,22,24 40:10
40:10,22 41:4,19 42:8,14
43:16 44:5,17 45:8 46:1
51:11 57:13 64:24 65:10
74:23 77:12 78:21 79:19,25
84:10,22 85:6,9,20,24,25
86:12,19,20 87:4 90:15
91:11,22,25 92:2 93:7,22
95:3,9,15 96:1,5,7,11 97:6
98:13,13,16,22 99:22 100:7
100:23 101:2,5,10,15
115:23,23 116:4,4,7,14,17
116:18,21,22,24 117:2,20
117:25 118:7,15,17 119:6
119:22 120:2,8,18,21,24
121:5 122:2,18 123:6,12
124:6,9,10,16,22 125:6,10
125:16,22,24 126:2 127:7
127:13,21 128:1,7 129:9,14
129:21,25 130:10,19,20
131:1,11,17,18,19,20,22
132:5 133:11,22 134:4,19
135:8,16 136:20 137:24
138:18,20 139:2,4,9,11,21
139:23 140:13,23 141:4,5
141:14,18 142:3,6,11,20
143:3,18,19,25 145:5 146:2
147:20 148:1 149:12,16
150:23 151:4,9,15 152:1,6
152:11,14 153:10,16,21
154:3,6,17 155:13,15,16,23
156:4 157:18,21,25 158:3
158:17,20 159:1,3 160:10
161:9,14,23 164:4,11,21,22
165:2,10,14,19,23 166:1,7
167:1,20 168:7,11,14,23
169:9,25 170:22 173:5,22
174:15 175:19,25 176:18
177:10 179:8,14,15 180:1
180:10 181:2,5,19 182:14
183:4,25 184:1,5,8,10,21
185:10 190:3 191:16,22,25
192:1,5,20,24 193:3,5,8,16
193:20 194:3,9,11,17,21

**dr (cont.)**
195:2,5,20 196:18,25 199:3
199:17 200:17,23 202:6,14
202:17 204:7 208:21 217:8
217:16,20 218:15 220:15
224:1 226:19 228:24
240:15 243:1,19 244:2,7,8
244:16 246:1,21,22 247:9
247:15,21 248:7,11,13,16
248:19 249:3,25
**draft**
91:12 92:5,13,16,19,23,24
93:6,13 94:7 250:6
**drafted**
92:17,20,21 93:5,11
**drafting**
91:21 93:24
**draw**
120:11 243:1
**drawing**
119:1
**drawn**
197:2 222:14 225:11
**draws**
199:6
**drew**
70:7 232:11
**driven**
120:4 138:22 139:19 140:2
140:20,25 142:5,21 160:7
246:10,16
**driver**
113:1
**drop**
69:11
**dropped**
46:17 62:14
**drops**
197:23
**dry**
199:3
**due**
54:15 239:14 244:4
**duly**
9:18 253:12
**dunk**
82:21
**dusty**
14:5
**duties**
16:18
**dzmitry**
39:4

|  | e |  |
| --- | --- | --- |

**earlier**
57:14 59:24 62:11 64:18
72:23,24 89:5 99:22 100:6
100:21 101:21 127:14
128:14 129:22,23 133:5
138:16,25 145:9 148:19
159:17 176:9 204:11 207:6
213:1 218:3 220:23 224:2
232:1 246:19
**early**
26:13 33:11 48:3,15,20
102:2 133:3
**earned**
12:19
**earning**
80:23
**earnings**
59:7 158:7
**earth**
115:25
**easier**
114:24 185:15 196:4
234:22
**easiest**
15:7 50:2
**easily**
21:19 176:10
**east**
58:21
**easy**
97:22 203:12 215:7
**econometric**
81:7
**econometrics**
16:10 56:10
**economic**
24:16 117:15 118:8 120:8
128:24 129:10 146:20,21
146:22,23,23 147:1,2,7,8
182:4 198:14 199:18
**economical**
205:6
**economics**
6:7 81:4 87:1,12,15,15
**edepoze**
2:14
**editions**
47:11
**educated**
147:1
**education**
12:18,21
**effect**
7:10 52:5 55:17,17 63:17
69:18 71:24 72:15 73:21

**effect (cont.)**
77:5,6,13 78:9,15 88:1
112:14,15 166:15,25
170:15 200:2 201:14 234:2
247:21
**effects**
46:4 82:15 177:12 178:3,6
178:13 201:2 243:24
244:14
**efficiency**
83:2,6
**effort**
91:11 182:24
**eglavin**
5:20
**either**
29:23 62:20 75:9 101:1,10
102:2 134:20,21 141:4
143:3,15 174:20 224:13
235:3
**elaborate**
54:17 149:25
**electronic**
29:12,14 42:13 94:20,23
95:3,9 207:6,8 218:24
237:19 240:7
**element**
110:17 178:15 194:22
**elements**
27:5 192:19
**else's**
79:24 238:4
**em**
160:8
**embarking**
147:12
**embodied**
171:11,12
**emerged**
182:8
**emergency**
110:24,25
**emily**
5:18 9:5
**empirical**
55:17
**employed**
76:17
**employee**
36:12
**encompasses**
152:20
**encountered**
79:18
**endeavored**
102:11 103:19 108:13

[endeavored - exhibit]

**endeavored (cont.)**
109:25 112:1 114:9
**ended**
91:14 160:14 184:10 187:7
**endorsement**
90:17 181:11
**endorsing**
164:22,23
**ends**
128:22 193:10 205:24
206:8
**engaged**
184:7
**engagement**
70:14 92:14
**engagements**
20:25 38:16 49:15
**engine**
107:18
**english**
155:5
**enlarged**
6:13 208:15,17
**enormous**
175:4
**enterprise**
59:3
**entertain**
90:25
**entire**
18:13 56:8 129:23 149:20
195:4 220:20 222:18
226:24 228:10 229:4 245:4
252:5
**entirely**
13:9 30:19 91:15 92:16
131:17 141:22 143:3 148:4
195:12 237:3,15
**entirety**
140:1,7
**entitled**
50:23 96:15
**entity**
21:12 22:12,23 23:9
**entries**
233:24 234:1,1
**entry**
188:5,25 189:3,5 210:13
215:16
**epa**
107:22
**epidemic**
110:11,16,24
**equal**
153:1,2

**equals**
194:13 227:14
**era**
26:12 29:9 48:13,14
**errata**
252:11 254:2
**errors**
95:4,7 96:11
**especially**
200:25
**esq**
3:9,12,19,22,24 4:6,10,20
4:23 5:6,14,18
**essentially**
34:7 130:11,17,24 132:10
148:24
**establish**
63:4 162:13 163:9 169:23
**established**
108:6 114:2 183:15 231:19
231:20 241:4
**establishes**
139:22
**establishing**
130:10 163:16
**estimate**
14:21 15:21 21:4 26:15
37:14 52:4
**estimates**
37:13
**estimating**
101:7 178:22
**estimation**
177:16,16 178:1,14,14
**et**
50:5 86:9,16 160:5
**ethereum**
88:16
**eugene**
3:19 8:23 10:4
**european**
174:19,21
**evaluate**
82:14 106:4,10
**event**
26:1,3,6,10,17 28:1,3,8,9
28:13,16,25 29:3,5,12,20
45:13 46:3,8,11,14,22 47:1
47:2,9,16,18,21 48:3,9,18
48:22 49:2,10,17,22 51:8
51:12,13,22 52:9,13,15,20
52:22 53:2,10,11,17 54:1,5
54:23 55:9 56:13 60:1,15
61:6,17,22 63:4,6,9,15,22
64:6,8,14,16,19,20,22 65:4
65:9,11,18,20,24,25 66:11

**event (cont.)**
66:15,18 67:9,11,17,25
68:1,2,6,7,8,12,14 69:6
70:22 71:6,20,24 72:1,11
72:14,17,19,23,25 73:18,22
74:3,3,15,23,25 75:1,6,13
75:16,18,19,20,24 76:4,9
76:12,15,16,22,25 77:4,8
77:10,12,14,17,21,25 78:16
78:19 79:2,17,20,22,24,24
79:25 80:2 82:9,12,14
84:11 87:23 88:1 89:15,18
90:11 102:12,19,23 103:21
104:2,8,10 105:2,8 106:5
106:11 108:14 109:9 110:1
110:12,13,14 112:2,24,24
112:25 113:3 114:11,22,22
115:15 127:8,15,18 130:10
131:5 132:11,15 133:24
140:14 149:3,7,13,17
150:18,22,24 151:5,10,22
152:11,15,20 153:2,14
156:9 157:14,16,24,24
158:10,19,23,25 159:12,21
160:11,20 163:8,15 166:8
166:12 167:12,14,21,24
170:25 171:5 172:6,7
177:18,24 178:2,6,21,21
183:8 188:24 189:5,13,18
189:24 190:5,5 193:21,22
198:9,23 200:15,22 201:9
201:12 202:7 203:23 205:2
205:4 214:11 216:8 227:14
227:18 229:21 230:8,19
232:18 233:9 237:10
238:24 244:12
**events**
25:8 64:12,13 70:2 71:24
72:14,20 88:15 90:6,11,15
102:15 103:24 108:17
110:5,20 111:11 112:5
113:10 114:14 122:6,8
148:2 151:14,25 152:23
154:19 161:10,24 169:11
169:19 173:2,6,15,25 174:4
174:11,11,17 175:6 178:10
182:16 183:5,19,22,24
190:15 192:7 194:13 195:9
200:20 203:2 204:23,24
216:15 218:12 225:5
232:14,20 233:6 240:16,18
242:13 243:11 246:6
**everyday**
177:13
**evidence**
70:18 119:10 120:3 122:15

**evidence (cont.)**
122:17,20 138:21 156:11
156:22 157:7,9 160:4,6
163:12 166:5,9 167:7,14,25
168:8,11,14 169:12,16,18
169:22 194:22 195:9,14
**ex**
120:20
**exact**
99:1 212:3,4,7
**exactly**
18:5 77:1 118:2 149:1
170:10 190:8 193:24
206:16 219:9 223:2 237:22
240:5
**examination**
6:2 7:8,14 9:21 99:20
**examine**
203:7 209:18
**examined**
9:19 54:4
**examining**
25:5 63:23 66:19 73:17
227:18
**example**
77:8,10,11 80:22 104:24
106:22 141:25 158:6
170:16 177:18 204:21
**examples**
22:10
**excel**
97:15 209:19 210:4,5,10
238:22
**excerpt**
193:4
**exchange**
1:4 3:3 8:7 32:16 33:15
**excluded**
23:13,18 24:10 25:3 26:7
57:16 58:3,17,23
**excluding**
25:15 178:21
**execute**
206:13
**executing**
97:10
**executive**
15:22 16:23
**exercise**
134:23 136:1 137:18
204:11 236:20 238:23
240:2
**exhibit**
6:5,7,9,11,13,16,19 11:18
11:23 84:1 87:1 155:11,12
155:16,20 185:6 208:17

[exhibit - figel]

**exhibit (cont.)**
224:18 229:11,12 232:21
**exhibits**
97:16 98:6,19
**exist**
234:10,12
**existence**
78:1 113:12
**exists**
65:2 152:25
**expand**
73:16
**expanding**
17:11
**expansive**
119:8
**expect**
198:23 234:13 237:11
239:22
**expectation**
237:12,13 247:10,23
**expedited**
250:10
**experience**
33:15 54:21 65:6
**experimental**
172:9
**expert**
6:5,9,15 10:13 11:16,18,24
12:7 13:23 14:1,8,8,10,11
14:16 15:5,8,12,13,18
16:18 17:2,6,7,8,12,14
18:10,22 19:18,21 20:2,15
20:20,23 21:1 22:2,21
23:12 24:10 25:19 26:4,7
26:11,19,24 27:1,3,10,17
28:1,4 29:6,8,16,22 30:13
31:1 34:3 36:10,17,20,23
39:1,14 40:1,8,19 48:3,8,10
48:19 50:8 51:2 54:22
57:16 58:2,23 59:2,19 60:1
61:6,18 63:10,13,16,20,22
64:1,9,12 68:3,5,13,16,24
69:4 71:11,21 72:12 73:5,6
73:11,12,12,13,15 81:15
82:5,18,23 83:10 99:24
100:8 101:25 109:12,21
111:23 115:20 116:7 123:7
124:7,16,16 125:18 126:9
155:12,16 182:18 183:2,2
183:13 184:16 208:8,18
245:1 246:2
**expertise**
16:2,7,8,11 24:18 80:18,25
81:9,10,11,19 117:13

**experts**
111:13
**expert's**
71:19
**explain**
31:22 55:5 62:8 123:3
127:4 160:10,19 163:7
191:20 199:9 204:1
**explained**
17:22 72:24 118:2 140:13
148:18 162:25 176:23
193:2 204:10 222:13
238:16 239:10
**explaining**
209:8
**explains**
46:8 170:1 177:19 193:9
**explanation**
154:3 162:19 205:7
**explanations**
170:14
**explication**
168:19
**explicit**
116:18 204:25
**explicitly**
63:25
**explore**
95:13
**exploring**
178:19
**exponential**
209:4
**express**
82:24 86:7 90:1 120:20
209:11
**expressed**
100:7 108:22 199:2
**expressing**
78:7 181:12
**expressions**
145:22
**expressly**
89:7 130:1 141:19 159:2
167:1 179:2 192:9 209:12
**extended**
208:1,2
**extends**
139:5 210:3
**extensively**
91:13,18
**extent**
23:19 81:8 115:21 213:17
223:4 240:11
**extra**
150:3 166:19

**extreme**
118:19 162:20
**extremely**
69:20

**f**

**face**
115:24 207:4 208:8 238:6
**facility**
107:19
**fact**
38:5 84:23 85:25 86:17
87:21 97:5 113:20,22
114:20,21 134:12 140:15
162:10 177:25 178:11
182:21 196:17 205:15
207:12 213:7 223:2 234:3
240:4,6,16 241:22 245:10
248:21
**factor**
123:24 161:17 171:15
172:12
**factors**
123:23 164:13 170:13
171:3,7,7,9 194:12 246:9
246:15
**failed**
165:19 179:15
**fails**
168:7
**failure**
179:24 180:1 184:13
**fair**
12:9 17:14 20:2 22:21
26:23 27:8,13 28:23,24
48:25 49:14 51:22 53:5
55:1,3 63:3,11 68:10 75:12
76:7 90:22 103:4 106:21
116:8 120:7,14 127:20
135:7,12 138:13 140:10
142:18 153:23 154:4
167:22 168:4 172:14 173:4
173:19 175:17,22 191:24
194:20 195:17 203:6 219:1
220:4 221:14 223:5,11
228:25 232:16 236:10,11
248:10
**fairly**
48:18 66:25 71:9 74:8,16
95:5 97:17,22 108:6 120:24
139:13 165:6
**fairness**
120:16
**fake**
113:3
**fall**
16:7 49:24

**falling**
208:1
**falls**
105:6
**false**
157:2 247:1,4,9,11,24
**familiar**
11:4,8 25:25 26:24 89:3
93:19 246:25
**familiarity**
237:7
**family**
31:10
**famous**
37:13
**far**
37:5,11 121:18 132:18
167:15 180:21 183:7
207:11,11 213:25 239:11
239:15,17 246:22
**farm**
23:25 24:2,8 25:20 57:14
**favor**
169:22
**feature**
65:9,10 194:9
**features**
65:5
**federal**
24:3,9 25:5 61:3 107:22
109:4
**fee**
36:9,19,23
**feel**
44:13
**fencing**
118:25
**ferrell**
123:13 125:24 126:2
**ferrell's**
124:6,9
**field**
170:10
**fifth**
46:2
**figel**
4:15,20 8:24,24 12:15 14:2
15:14 16:20,25 18:11 20:16
23:14 24:11 25:23 26:21
27:11,19 28:5 29:7 30:3,5
30:11,17 32:11 33:5 38:11
40:2,20 43:5 44:3,11 46:15
47:4 48:5 49:3 50:1 52:1,24
53:14 54:6,24 57:17 58:25
61:7,20 62:22 63:12,24
64:5,15 65:15,22 66:20

[figel - frederick]

**figel (cont.)**
68:17 69:7,16 72:2 74:13
75:2 78:5,17 79:8 80:5
82:17 83:20,25 84:14 89:16
90:12 94:5,9 96:12 98:3
99:2 102:16 103:8,25 106:7
106:13,19 107:4 108:18
110:6 111:7 112:6 113:17
114:15 120:13 121:16
122:22 124:1,5 125:19
127:10 131:15 132:1 134:6
134:9 135:3 138:1 139:7
142:7,24 143:11 145:18
151:17 152:3,17 154:8
157:23 163:2,11 164:5
165:3,17 166:11 168:16
169:15 170:8 174:8 176:2
182:6 194:4 196:19 201:20
203:10 212:15 217:9 223:9
238:10 240:19 241:9,21
242:17 245:15 246:18
247:6,12 249:11 250:9,14
251:1,7

**fight**
181:19

**figure**
191:23 192:14 193:3,5,6,13
193:17 195:2 203:19 204:2
211:1,7,18 212:23 217:6,23
218:6,17,20 219:21,24
230:11,12,15 231:15,19,21
237:23 248:7,11,17 249:1

**figured**
185:15

**figures**
235:17

**file**
97:21

**files**
96:11,15,21,24 97:4,8,11
97:23 98:2,6,19

**filing**
7:13

**fill**
118:22 227:10 246:24

**filling**
232:13 238:1,13

**final**
94:13 202:4 250:7,13,15
251:3

**finally**
136:24 137:8 189:20

**financial**
81:4 158:6

**find**
30:23 70:25 95:4,7 100:19

**find (cont.)**
117:20 118:14 156:10
161:13 163:12 166:4
173:18 181:23 182:21
198:23

**finding**
56:17 71:4 154:3,6 155:7
157:6 163:21 168:25
170:25

**findings**
116:14 118:20

**finds**
122:10 156:22 243:11

**fine**
84:21 99:2 177:2 185:14
251:1

**finger**
104:15

**finished**
90:18

**firemen**
60:9 61:11

**firm**
35:8,9,9 76:16 77:4 158:11
158:23 163:8

**firms**
16:15 158:5,6,11

**first**
13:25 42:8,10 59:5,16
89:10 92:5,13,16,18,24
93:6,13 101:23,24 117:9,11
130:8 133:13 146:18
155:22 165:6 166:2 176:20
177:3 188:20 189:10
190:16 198:7 205:2,21
206:2 214:3,20,21 239:5
244:3

**fischel**
126:9,20,22 127:3,5

**fit**
104:17 105:19

**fits**
105:10 248:5

**fitting**
68:19 103:17

**five**
21:23 41:23 44:12 45:17
46:13 151:10 177:18 192:6
200:12 205:23 216:14
219:3 220:9,20,24 222:16
222:18,20,21,23 226:18
227:5 228:3 229:1 234:9
245:13

**flagged**
138:11 247:13

**flags**
137:24

**flash**
42:21 44:18

**flavors**
97:3 134:13

**flaw**
179:18,22

**flesh**
163:21

**flip**
245:5

**florida**
107:16,17,22

**flow**
223:15

**flung**
200:5

**focus**
52:7,8 165:24

**focused**
115:22

**focusing**
45:3 90:13

**fold**
24:13 197:22 199:24

**folders**
97:21,21

**folks**
249:16,16

**follow**
55:25 171:17 182:14 204:7
238:3 249:12

**followed**
98:4,17

**following**
136:10,12,14 196:10
205:10 212:24

**follows**
9:20 72:9 99:19 177:21

**foot**
133:18

**footnote**
133:12,14,17 204:4,15
206:19,20,23 219:5 221:18

**footnotes**
239:24

**footsteps**
204:7

**forbes**
3:24

**forbid**
115:24

**force**
7:10

**foregoing**
252:6

**forgets**
178:10

**forgetting**
170:23

**forgotten**
56:19

**forklift**
58:6

**form**
7:4 12:15 33:5 58:11 85:19
85:23 97:14,19 108:25
183:9 237:24

**formal**
12:21

**format**
49:11,23 78:19 97:13
224:25 234:16

**formatted**
224:25

**formulate**
74:19

**formulated**
78:24,25

**formulation**
65:12 141:15

**forth**
26:25 77:3 91:4 116:7
125:10 159:6 175:25 176:8
179:9 206:19 208:7,10
236:20 237:20 238:23
244:16 245:10 253:12

**forward**
59:12

**found**
71:1 86:11,13,17 216:22
218:24

**four**
50:11 105:24 136:2 150:23
153:22 154:7,18 164:3
173:7,24 174:12 188:23
190:17 192:6 193:25
198:15 200:6,12,12,12
203:20,22 204:6,14 210:19
225:13 247:8

**frame**
179:11

**framed**
150:17

**framework**
154:23 155:8 249:2

**frankly**
75:5

**frederick**
4:15

[free - heading]

**free**
44:13
**frequently**
53:9 199:2
**fresh**
29:19 67:22 89:6 102:22
**front**
164:9 173:18 209:6 238:22
242:9
**frontier**
81:19
**full**
19:6 105:24 133:13 146:4
199:7 210:8 237:20 238:18
238:19 239:12,16
**fully**
10:10 89:22 96:4 97:17
158:14 183:15 193:9
**function**
129:12 130:12,17,24 202:9
203:4 209:4
**fund**
60:9,10,20
**fundamental**
161:25 162:5,6,12 202:18
**funds**
60:12
**further**
7:7,12 77:23 99:18 249:9
253:15
**future**
28:20 33:22
**fuzzy**
80:20

**g**

**gain**
33:15 229:6
**gap**
159:3 167:8,9 246:24
**garlinghouse**
1:8 5:3 8:8 9:8 34:12
**garrison**
5:10 9:3
**gather**
192:8
**gathering**
192:4
**gavan**
4:23 8:25
**gears**
178:9
**general**
27:12 31:14 75:23 76:6
167:20 168:4 172:5,8
199:14 203:11

**generality**
167:24
**generalize**
65:9
**generalized**
81:11 86:12,23,25 158:2
**generally**
16:9 27:6 55:22 111:3
170:9 182:3 183:12
**generating**
192:14
**genuine**
121:21
**genuinely**
56:6
**georgia**
24:7
**gerritsen**
84:3,7 85:4,5,8,11,18 86:3
86:6 100:22
**getting**
43:7 223:14 232:3
**ggideon**
4:25
**gideon**
4:23 8:25 43:6,6,8
**gist**
241:11
**give**
14:20 17:4 21:3,22 28:23
51:15,20 64:21 66:4 80:9
106:21 117:4 133:5 165:10
175:20 251:3
**given**
29:13 54:23 79:9 97:24
104:5 129:3 134:1 141:23
177:9 192:18 212:5 233:2
234:8 237:7 242:10 252:9
253:14
**gives**
136:5 199:18 204:16
**giving**
122:24 234:7
**gladly**
245:15
**glanced**
42:9
**glanvin**
5:18 9:5
**glendale**
8:18
**go**
44:9 47:8 53:2 55:24 65:23
66:7 89:21 92:9 99:3
101:14 104:19 116:17
117:1,25 118:1 124:4 133:7

**go (cont.)**
141:13 149:23 159:9
160:15 175:12 176:24
181:25 182:24 184:17
191:19 192:25 193:12
200:4 203:1,13 238:17
239:11,15 244:23 247:18
**god**
115:24
**goes**
77:15,16 114:17 140:5
141:11 157:19,21
**going**
11:21 23:1,24 43:24 49:4,5
51:1 55:24 56:25 72:5 85:3
87:4 114:5 116:23 117:8
133:6 144:7 161:11 185:10
209:13 210:7 213:19
215:14 216:12 217:11,22
218:14,25
**golic**
40:5,7,9,23 41:4,22 91:24
92:1 93:23
**golic's**
45:9
**good**
141:9
**gottlieb**
5:2 9:7
**govern**
27:4
**government**
22:3 23:11 71:15
**governmental**
21:11 22:12,22 23:9
**government's**
51:5
**gradillas**
8:16
**graduate**
19:13
**grant**
52:18
**graph**
69:25
**graphical**
70:5
**great**
143:22 144:13 157:13
190:2 196:2 249:24
**greater**
115:16
**green**
195:3 199:17 213:13
**greenway**
50:23

**ground**
25:14 76:19 114:7
**group**
221:8,8
**groups**
158:5 215:9
**guarantee**
23:7
**guerrier**
3:12
**guerrierp**
3:14
**guess**
205:6 236:6
**guidance**
193:13

**h**

**half**
21:16,18,19 26:15 44:1,2
101:23 117:11 129:24
166:3 229:5,9
**hamilton**
5:2
**hand**
11:21 87:4 139:13 155:11
185:10 190:11 191:12
213:25 217:12 253:21
**handful**
45:16
**handing**
155:15 208:15
**handle**
206:22
**hanging**
213:2
**hansen**
4:15 8:25 35:14 36:3 99:25
**happen**
37:9 41:12 183:8,19 204:23
**happened**
19:4 23:16 48:12,17,23
57:19 161:15 166:16,18
175:8 183:17 195:15
**happens**
42:23 116:21 133:25
202:21 204:22
**happy**
92:7 122:24 123:3 133:4
**hard**
26:14 63:19 170:12
**harm**
59:8
**hashemi**
6:8 87:2
**heading**
104:17 215:17

[headings - indicated]

**headings**
193:14,16
**health**
110:25
**hear**
72:3 151:19 221:21
**heard**
114:16 221:22 238:11
**held**
2:8 8:10 13:14 24:24 58:10
59:15 62:12 113:10,20
**help**
40:24 141:10
**helped**
93:9
**helpful**
53:7 88:6 158:16
**helps**
158:13
**hereinbefore**
253:11
**hereunto**
253:21
**hernandez**
57:24 58:3,18
**hesitate**
140:4 221:3
**hierarchical**
233:18
**hierarchy**
235:7 237:2
**high**
51:2,4 76:6
**highlight**
164:21
**highlighted**
194:11
**highly**
1:14 2:6 243:11,20 244:10
251:4,8
**hill**
171:3
**history**
242:23
**hmm**
228:4 232:16
**hold**
105:20 119:12 205:21,24
206:7
**holding**
62:17 216:3
**holdups**
33:17
**hope**
114:20 171:24,25

**hoping**
37:21 43:7
**hopper**
200:7
**hour**
36:18,22 37:2 57:1 144:7
**hourly**
36:19 38:15,23
**hours**
37:10,15 42:1 44:2
**housing**
109:5,11,13,17
**howey**
123:23,23
**hundred**
231:12
**hyp**
152:5
**hype**
73:20
**hypergeometric**
85:23 152:5 153:17 154:24
180:16 249:4
**hyphens**
39:12
**hypothesis**
70:21 161:8 174:2
**hypothesized**
113:11
**hypothetical**
77:20 79:11 143:19 174:18
199:5 206:12 213:2 232:10
235:14 239:18 240:12
241:16 242:10,14

**i**

**idea**
25:21 36:6 146:1 147:1
162:2 169:18
**ideally**
158:9
**ideas**
94:15
**identical**
98:15 106:17,20 107:3,10
150:8
**identification**
11:20 71:5 87:3 155:14
185:8 208:19 224:20
229:16
**identified**
105:1,19 106:2,4,10,17
111:21 120:3 122:18
138:21 149:12 150:23
151:4,14,25 163:25 164:4
171:12 173:7 176:10
196:18 220:2 243:7,19,22

**identified (cont.)**
244:9,11,13 247:9
**identifies**
122:7 189:12,16,23 243:5
**identify**
8:20 16:4 63:16 83:25
115:3 116:25 149:17 182:5
183:21 190:3,14 193:20
196:16 199:8 241:20
**identifying**
64:9 73:21 133:10,23
247:22 248:3
**ignore**
205:15 233:13
**ignores**
177:25
**illinois**
59:16
**illustrate**
237:6
**illustrating**
237:4
**illustration**
70:6 117:4
**illustrative**
180:24 187:15
**image**
232:10
**immaterial**
241:25
**immediately**
189:21 233:22
**impact**
54:23 73:17 74:1
**impacted**
111:6
**imperatives**
182:10
**implement**
233:19 236:13
**implementation**
40:11,14
**implemented**
39:21
**implicated**
128:11
**implicitly**
63:25
**implies**
166:15
**imply**
116:15
**implying**
202:12
**important**
118:4 154:22 170:19 183:5

**important (cont.)**
183:11 187:2 203:7 211:5
**imports**
158:3
**impose**
213:15
**impressionistic**
14:21 15:20 21:4 37:13
**impressionistically**
30:10
**improvements**
94:16
**inaccuracies**
12:13
**inadequate**
60:13
**incapable**
163:16
**incidental**
62:15
**incidentally**
62:7,9
**include**
27:9,17 28:4 29:6 73:4
76:10 110:9 141:17 148:4,5
191:23 192:24 193:1
207:24
**included**
75:14 76:21 142:4 152:23
**includes**
178:13 183:7 248:24
**including**
16:10 29:14 56:9 82:11
110:21 157:24 186:18
207:13 242:23
**incorporate**
94:12
**increased**
54:4
**increases**
111:9
**independent**
183:24 184:16 195:14
**independently**
131:20
**indeterminate**
232:10
**index**
85:19 86:14,14 101:3,4,6
164:23 165:2,4 175:10
178:22 184:2,5
**indicate**
129:24 149:11 248:12
**indicated**
28:6 41:10 61:25 64:17
124:18 225:22 248:17

**[indicated - juul]**

indicated (cont.)
252:11
indicates
119:14 122:20 149:15
249:6
indication
137:1 161:13 165:11
182:21 198:13 199:18
indicator
152:22 153:14,14
individual
31:17,18 95:23
individually
215:20
individuals
40:16
infer
56:15,20
inference
119:2 120:12 166:22
inferences
55:8
inferring
171:4
infinitesimal
147:4
influential
113:14
inform
86:3
informal
182:7
information
20:5 54:5,20 84:18 91:3
125:5 147:25 164:3,16
185:22 210:1,4
informational
83:2,6
informative
55:3 135:12
informed
182:9
ingredient
202:19
initial
92:22
initially
89:1 109:14 228:1
injuries
58:5,7
inkling
34:8
input
93:14 95:16,23 97:4 241:13
inputs
95:16,22,24 241:10

inserted
93:17 225:10
insertion
93:1
inside
16:15 81:9
insiders
16:4
insight
42:22
instance
24:5 61:14 69:9,13,15 74:8
74:10 101:16 115:4 117:7
164:3 227:13
instances
27:14 49:19 53:2 212:2
219:8
instruct
95:8
instructed
24:24 27:5
instructions
95:11
insurance
23:7
intended
154:2 237:5 248:11
intensive
108:7
intention
55:4 236:17
interaction
32:8 33:11
interest
13:7,10 59:12 192:9 237:25
interested
31:7 33:12 86:24 152:21
160:17 253:18
interesting
115:17 123:17
interim
48:17
intermediate
97:8
internal
192:10
interpret
130:9
interpretation
11:15
interpreted
156:17 163:13 202:6
interpreting
29:13
interrogated
209:23

interrupt
44:4
interventions
46:5
introduced
135:18
introduces
152:6
introduction
92:12
invest
68:15 205:18,19 206:15
222:1
invested
196:8 219:3 221:16
investigate
69:5 140:14,24 142:20
160:11 240:10
investigated
65:19 66:12,16 67:10 68:11
investigating
66:18 70:17 74:1 79:6
142:4
investigation
74:24 107:21 108:7 109:1,4
investigative
68:15,18
investment
205:22 206:16 216:4 219:2
221:15,19,25
investor
146:9
investors
145:22 147:2
invitation
139:5
invites
118:22 120:1 138:19 160:4
involve
64:6 106:24 108:22 175:6
involved
17:8 24:20 35:4,9 49:2
56:19 66:1 104:16 108:20
137:13 150:7,14,15 213:22
216:5
involves
135:21 243:3
involving
60:14 61:22 82:5,9 209:14
232:13,14
issue
64:4,22 77:1 118:3 135:8
135:10,13 145:12 146:16
157:19,21 176:17 182:20
201:6 212:6 236:23,24

issues
24:22 29:25 116:1,3,16
176:24
italics
162:14
item
23:6 94:19 104:21 105:15
105:19 110:17,19 111:5,20
items
83:19,23 95:23 109:22
111:21

**j**

jama
24:1
january
36:24 105:23
jbonillalopez
5:8
jersey
2:15
jet
107:18
job
1:25
johnson
111:2,2,17,17
joined
9:4
joining
10:5 19:11
joint
35:6
joo
6:8 86:9,16,20,21,23 87:2,7
87:18,22 88:20 89:10,13
90:6,10 100:22 127:14
157:25
joo's
87:25 88:24
jorge
5:6 9:6
judgment
236:7
judgments
137:9
jumped
209:13
junior
40:9
jurisdiction
25:16 58:12,18 61:23
justin
5:14 9:2
juul
106:24,25 112:10,10,11
113:15

**[jward - little]**

jward
  5:16

**k**

katherine
  46:5 47:10
keep
  11:3 14:19 17:15 118:25
  251:8,10
kellogg
  4:15 8:24 35:14 36:3 99:25
kellogghansen.com
  4:22,25
key
  52:12 70:2,2,3 148:1
  149:12,17 150:24 151:4,9
  151:14,22,25 154:19
  162:13 165:21 173:2,6,25
  174:10 190:6 192:2 194:21
  196:25 200:6 203:23
  210:19 215:17 216:15
  219:3 226:8 228:9 229:2,21
kia
  50:24,25
kind
  11:7 13:12 16:6,13 23:8
  32:5 39:18 60:14 64:24
  65:4,11 70:19,19 79:21
  80:24 81:10 84:9,9 101:3,6
  103:2 104:24 105:8 131:21
  134:19 139:15 152:21,23
  161:3 165:11,21 167:8
  171:3 182:22 204:18
  207:21,23 214:13,14,16
  231:4 232:1 247:21
kinds
  16:6 20:4 52:12 55:8 165:9
  171:2,7 213:9
knew
  30:18 33:12
know
  19:22 20:4,8 22:5 23:23
  30:13,16 32:6,10 34:3,6
  35:9 36:8 37:6,9 41:9,12,16
  41:25 50:13 64:23 71:16
  75:8 80:8,13 81:5 87:18,20
  91:25,25 94:6 106:22
  117:18 124:2,22 125:6,13
  125:24 126:1,4,22 127:5
  129:23 139:14 141:9
  152:11,16 153:10 173:10
  174:18,23,25 175:2 178:18
  183:7 190:9 196:14,20,21
  199:19 204:22 207:3 210:2
  211:25 216:12,13 219:8
  220:5,8 230:16,18 235:10
  239:6

knowable
  37:8
knowing
  36:7 54:11
knowingly
  34:13,16,18,22
knowledge
  10:23 11:13 25:18 27:3
  34:10 35:21,24 36:2 37:22
  127:17
known
  127:3 157:1 160:23 162:8
knows
  15:5

**l**

label
  137:10 207:25
labeled
  97:20,21 104:8,9 136:19
  148:8,9 156:23,24 188:12
  215:20 226:11 229:11
labels
  134:19 204:8,9 243:9
labs
  1:7 4:3 8:7 9:1 10:18,24
  11:2 106:24,25 119:16,20
  121:12 122:21
lack
  107:23
lacking
  198:11
laid
  197:6,9 205:19
landed
  173:13
language
  92:14 94:16 119:23,23,25
  120:1,21 138:19 139:4,15
  143:13 155:5 160:4 173:16
large
  63:2 80:10,23 111:9 113:9
  122:4,6,12 137:25 138:6,8
  138:11 157:11 158:9,9
largely
  97:5 120:4 138:22 139:19
  140:3,21,25 142:5,21 160:7
  225:10
larger
  138:14 185:12
larsen
  1:8 5:11 8:9 9:4 34:15
late
  26:13 48:15 102:2 223:14
laurentius
  1:16 2:8 6:6,14,17,21 8:5
  9:25 11:19 208:18 224:19

laurentius (cont.)
  229:13 252:4,17 253:10
  254:5 255:20
law
  18:18 35:8,9,9 146:5
  214:17 215:13
lawyers
  27:5 34:23
lawyer's
  27:2
layperson
  146:3 147:1
layperson's
  11:15 146:7
lead
  15:1 177:7
leading
  28:12
leads
  152:14 168:25
leap
  170:12
learn
  22:18 84:6 86:8 91:2 177:5
  178:19
learned
  125:15 126:5
learning
  31:5,7 89:8
left
  30:3 67:17 141:21 149:2
  213:25 225:12 226:3,10
  229:25 231:7
legal
  8:16 24:17 59:17 146:5
length
  102:17 114:20 129:24
level
  21:20 51:2,4 54:22 55:7,9
  55:13,19 56:4,7,11 76:6
  82:23 152:9 167:23 171:22
  183:1 231:3 239:7 248:12
  248:25
lexecon
  15:23 16:3,17,24 17:24
  18:7 19:23 35:21 36:3,12
  36:13,14 37:4,23 38:9,15
  38:18,19 39:7 40:18 41:14
  96:22 127:4
licenses
  13:15
life
  68:9
light
  17:21

limb
  244:6
limitation
  160:23
limitations
  118:19 119:21 162:20
limited
  68:2 164:15 186:18 190:6
  233:17 234:1
limiting
  27:25 29:2 53:10 109:19
line
  6:2,4 80:21 119:14 123:5
  182:11
lines
  64:7 81:17 141:23
link
  20:11 70:21,25 71:2,4,23
  72:14 80:2 102:12,13
  103:20,22 106:5,11 108:7,8
  108:14,15 110:1,3 112:1,3
  114:10,12 128:8 172:13,17
linkage
  170:21
linked
  64:11 111:12 176:11
links
  161:12
list
  12:19 21:24 22:24 47:14
  49:15 50:4,18 83:11 104:21
  105:22,25 106:2
listed
  12:22 22:23 50:11 83:15,19
  83:23 84:4 86:9 183:9,12
lists
  12:24
literally
  44:11
literature
  28:18,19 51:12
litig
  52:17
litigation
  13:10 17:8 25:13 30:1 46:9
  46:12 47:3,17,19 49:11,18
  49:23 52:7,8,18,23 53:3,11
  60:11 65:24 75:24 76:5,10
  76:13,14,17,18,24 77:9
  78:19 79:17 105:19 115:18
  158:19 163:9 182:9 200:25
  201:9,12
little
  17:11 41:6 53:7,20 78:20
  116:23 117:1 120:21 121:3
  123:20 150:14 169:17

**[little - memory]**

**little (cont.)**
185:15 213:5

**live**
14:13

**llp**
4:2 5:10

**lm**
6:4,5,7,9,11,12,13,16,19
11:18,22,23 12:3,5,10
22:20 83:9 87:1,5,7,11 91:3
91:9 155:12,16 185:6,7,11
185:12,13 208:15,17
224:17,18,22 225:12
226:17 228:25 229:11,12
229:17 230:7 231:8 234:17
234:17,18 237:9,14,14
238:1,2,14,14,24 239:1,2
239:23,24 240:13 241:13
241:13,17,17,19,20

**ln**
254:6 255:2

**local**
134:23 136:1 137:18

**located**
8:17

**log**
209:4

**logic**
168:23,25 170:11

**logical**
167:9 178:20

**long**
22:14 28:7,17,22 30:6
36:22 43:25 60:4 104:3
105:3 122:25 123:18
174:16 234:6

**longer**
127:3 147:11

**longish**
245:11

**look**
22:17 23:2 28:17,18 29:8
30:25 43:19 49:5 64:19
79:17 85:11 87:6 100:16
121:1 130:2 136:7,23,25
137:4 139:14 145:23 147:2
166:23 171:3 175:12
179:16,24 180:1 185:14,16
194:16 199:16 208:14
215:23 217:12,22 228:24
235:10 237:9 241:16,17,20

**looked**
20:7 30:22 42:11,12 49:16
125:3 126:7 165:25 182:22
194:3

**looking**
12:12 22:20,24 25:11 88:6
88:11 96:2 105:24 115:14
117:7 119:19 146:8,10
148:7 154:25 161:4 169:6
173:21 175:11 187:22
199:23 210:12 211:12
219:12,16 227:8 229:24
230:10 231:7

**looks**
92:19,20 93:4,5,9,10
153:20

**lopez**
5:6 9:6,6 249:20

**loss**
51:6 62:16,18,20 63:1

**losses**
62:5

**lost**
59:7

**lot**
74:20 76:19 140:5 195:18

**low**
21:5

**lunch**
99:7

**m**

**mabrenne**
4:12

**mackinlay's**
51:14

**mag**
228:18

**magnitude**
197:7 198:14,20,20 199:7,9
199:18 200:13 203:7

**magnitudes**
198:3,12 199:2 201:1,13
228:19

**mail**
29:24

**main**
115:16

**major**
88:14 90:6,11

**majority**
15:17

**making**
32:21 62:13 63:1 197:19
232:12

**managerial**
16:13

**managers**
16:14

**manner**
13:10 51:18 143:5 200:14

**marais**
1:16 2:8 6:6,15,18,21 8:6
9:25 10:1,7 11:19,21,23
13:22 44:5,17 46:1 57:13
74:23 79:19 84:22 87:4
96:16,19,24 99:22 119:6
132:5 133:11 145:5 147:20
155:15 166:7 184:21
185:10 208:18,21 224:1,19
228:24 229:14 240:3
244:16 246:1 249:25 252:4
252:17 253:10 254:5
255:20

**marbles**
199:4,5,7

**marcus**
4:6

**margins**
233:25,25

**mark**
3:9 8:21 10:2 23:5 149:4,8
195:3 199:17

**marked**
11:19,22 87:2,5 112:17,19
113:8,13 155:13 185:7,11
208:19 224:17,20 229:15

**markers**
113:7

**market**
83:3,7 170:16

**marks**
248:11,20

**marriage**
253:17

**material**
24:22 27:18 68:21,24 92:1
95:13 238:17

**materials**
27:22 42:11,12 43:20 83:11
83:15 96:18 97:18 98:1,6
98:14,19 207:7,9 208:9,11
209:19,23 210:7 216:23
218:24 237:19 240:5

**mathematical**
208:24 209:9,9 212:7

**mathematically**
211:24 212:4

**mathematics**
16:9,14

**matter**
8:6 42:1,10,16 62:11 69:19
70:12,17 82:19 84:11 102:5
111:13 112:10,22 113:15
144:4 161:25 162:12
182:19 214:19,22 242:6
253:19

**mattered**
59:17

**matters**
103:14 104:16 112:10,11

**maximum**
190:15,19

**mean**
14:11,12,13 15:4 17:14
30:22 40:14 44:4 48:14
62:8 73:1,12 79:5 84:15
85:20 86:18 92:16 101:5
106:22 116:22 119:3 123:3
153:12 157:2 160:22
161:13 172:3 174:17
180:14,14,20 181:14
187:20 198:19,22 200:11
207:5 211:22 227:23

**meaning**
135:15 136:16 148:18,23
166:20 167:8 205:8 236:4

**meaningfully**
76:23

**means**
27:14 136:5 137:2 148:24
156:19 158:8 179:22 220:7

**meant**
17:5,7 84:17,25 105:23
150:15 159:19 172:19
179:12 206:23 240:5

**measure**
166:12

**measured**
85:16 152:4,10,15 204:14
222:12

**measurement**
85:14

**measures**
155:5 199:7,8

**measuring**
46:4 77:5 222:12

**media**
57:5,10 99:5,15 144:22
145:2 184:24 185:4 223:19
223:24 245:18,23 251:14

**meet**
43:1,4,25

**meeting**
43:24 44:20

**member**
13:3

**members**
13:11 31:10

**membership**
12:24 13:8

**memory**
85:12 92:6 117:4 139:9

[memory - multiplication]

**memory (cont.)**
173:10 204:22
**mental**
200:8 231:4
**mention**
65:3 77:7
**mentioned**
42:20 49:21 74:24 91:23
93:12 104:25 171:2,6
172:11 187:10 222:9
**mentions**
170:23
**merely**
56:22
**met**
34:12,15,18,22 42:17
**method**
53:18 84:13 101:14 224:4
237:1,4 238:2,3
**methodological**
101:12,19 175:19,25 176:7
176:18 179:18,21 180:11
232:17,25
**methodologies**
67:20
**methodology**
27:10,16 82:14 88:7 156:10
179:8 182:4 206:18,25
221:18 224:3,11 234:19
235:16,25 236:5,7,19 237:8
**methods**
46:3 81:7,9
**metrics**
198:24
■■■■
6:10,23 12:7 42:8 51:11
64:24 65:10 77:12 78:21
79:25 84:10 85:6,9,20,24
85:25 86:12,19,20 90:15
94:20,22 95:3,9,15 96:1,5,7
96:11 97:6 98:13,13,16
100:7,23 101:2,5,10,15
115:23,23 116:1,4,7,14,17
116:18,21,22,24 117:2,20
117:25 118:7,15,17 119:22
120:2,2,8,18,21,21,24
121:5 122:2,18 123:6
124:10,16,22 125:6,10,16
125:22 127:7,13,21 128:1,7
129:9,14,21,25 130:10,19
130:20 131:1,5,11,17,18,19
131:20,22 132:10,15
133:22 134:4,19 135:8,16
136:20 137:24 138:18,20
138:20 139:2,4,9,11,21,23
140:13,23 141:4,5,14,18,21

■■■ **(cont.)**
142:3,6,11,20 143:3,19,20
143:25 146:2 148:1 149:12
149:16 150:23 151:4,9,15
152:1,6,11,14 153:10,16,21
154:3,6,17 155:13,16,23
156:4 157:18,21,25 158:3
158:17,20 159:1,3,12,21
160:10,19 161:9,14,23
164:4,11,21,22 165:2,10,14
165:19,23 166:1 167:1,9,20
168:7,11,14,23 169:9,25
170:22 173:5,22 174:15
175:19,25 176:18 177:10
179:8,14,15 180:1,10 181:2
181:5,19 182:14 183:4,25
184:1,5,8,10 185:17 187:23
188:4,5 190:3,10 191:16,21
191:22,25 192:1,5,20,24
193:3,5,7,8,16,20 194:3,9
194:11,17,21 195:2,5,20
196:18,25 199:3,17 200:17
200:23 202:6,14,17 204:7
211:19 212:14,23 217:7,8
217:13,16,20 218:15
219:14,25 220:6,10,15
222:2 226:5,13,19,24 227:4
228:1,7 229:15,19 240:15
243:1,19 244:2,7,8,18
246:21,22 247:9,15,21
248:7,11,13,16,19 249:3
**michael**
4:10
**mid**
14:7,14
**midair**
213:3
**middle**
46:16 159:15 162:8 196:5
225:17 226:2 230:11 231:7
**midnight**
205:20 206:1,3,5,8
**milestone**
148:2 149:12,17 150:24
151:5,9,14,25 154:19 173:2
173:6,15,25 174:10 177:18
195:8 203:23 204:23,24
205:2,4 210:19 219:3 225:7
225:14,20 226:9,19 227:5
228:9 229:2,21
**milestones**
162:13 190:7 193:14
194:22 197:1 199:11,23
200:2 215:3,17 216:15
225:6,8 228:12

**million**
196:12,15 197:10,24
199:24 206:17 211:15,18
212:11,13 218:16,20
227:20
**millionth**
200:3
**mind**
11:3 17:15 21:19 22:4,8,10
30:19 40:21 42:21 61:8
71:17 104:13 105:12
110:10 112:22 119:17
129:25 139:1 143:13 177:2
181:9,24 213:11
**mine**
29:1 47:18
**mining**
134:23 136:1 137:18
204:11
**minkin**
3:22
**minor**
218:2,5
**minus**
228:3
**minute**
179:3
**minutes**
147:18 240:8 245:11,14
**misheard**
66:7
**misleading**
65:8 156:19
**missed**
241:11
**missing**
118:23 152:13 200:23
227:9
**misspoke**
85:2
**mistaken**
19:1
**misunderstanding**
239:14
**misusing**
135:19
**mixed**
207:20,22
**mm**
228:4 232:16
**model**
6:23 85:19,20 86:15,18,19
101:4,4,6,7 148:1,2 149:20
164:4 169:11 178:22
185:18 187:23 188:5,16
190:2,20 193:19 194:5,21

**model (cont.)**
195:8 196:25 210:13,25
211:6 212:1 215:15 217:5,8
217:16,20 218:12,16,21
219:1 220:6,10,15 222:2
226:5,13,19,24 227:4 228:1
228:7 229:15,19 230:5
244:18
**modeling**
85:15 164:22,23 165:2,5
**models**
86:14 119:13 184:2
**modest**
132:18
**mohammad**
6:8 87:2
**moment**
29:11 99:1 128:13 144:12
175:20 178:2,11 200:9
**monitor**
8:14
**months**
35:19 36:2 99:25
**morning**
102:18
**motors**
50:24
**move**
147:15 156:7 159:1 170:19
217:11
**movement**
78:12 166:17 177:14
**movements**
71:25 72:16 111:8 117:15
117:21 118:8 120:4,9 122:7
122:12 128:25 130:11,16
130:23 131:7,14,25 132:12
132:17,19,24 138:9,9,15,22
140:20,25 142:4,14,21
145:10 147:8 159:14 160:7
177:15 183:12
**moving**
135:5 158:16 226:16
**muffled**
41:6
**multi**
214:25
**multiple**
35:5 59:4 64:17 69:23 75:7
86:21 184:2
**multiplic**
233:15
**multiplication**
24:21 25:1 212:3,17 214:18
214:25 215:3,6,13 216:5
219:9

[multiplications - objection]

**multiplications**
214:19,22 230:24 232:3
233:20
**multiplicative**
239:22
**multiplied**
237:22
**multiply**
211:13 212:9 214:1,3,20,21
215:7 216:16 220:23,25
227:12,20 230:20 233:16
234:10 237:16
**multiplying**
212:19 215:9 233:24
234:15 238:25
**mutually**
202:25

**n**

**name**
8:15,21 9:23 30:23 43:7
45:9 60:20 61:8 95:25
254:3
**names**
9:11 43:6 44:23 96:22
158:2
**narrow**
79:10,12 115:18 180:5
**narrowly**
78:24
**narsid**
40:5,7,9 91:23
**nass**
25:5,11
**nassau**
253:5
**national**
25:7 110:15,24
**nature**
56:14 86:24 95:14 103:1
104:11 122:9 200:17
236:22,22 248:1,2
**near**
107:17,17 133:17 190:11
**nearly**
119:12
**necessarily**
68:25 106:15
**necessary**
75:15,18 76:12 172:2
239:12
**need**
14:18 22:16 24:24 27:6
33:24 53:1,1 79:5 89:20
90:1 104:10 143:6,9,12
146:3 151:18,19 153:24
160:15 164:6 165:20

**need (cont.)**
169:25 176:24 177:8 179:1
179:3 184:17 201:21
221:21 223:15 246:11
249:15
**needed**
39:16,17,22 80:12 170:3,7
181:25 233:19 234:2
**negative**
137:1,5
**neither**
55:11 180:25
**nevertheless**
55:24 93:18 202:16
**new**
1:2,17,17 2:10,10,15,15 3:8
3:8 4:5,5 5:13,13 8:12,12
178:9 246:20 253:3,8
**news**
54:23 63:5 64:12,13,14
65:20,20 66:13,17,18 67:11
68:12 69:6,19 71:6 72:1,17
73:18 74:3,25 77:23,25
78:2,4,10,12,16 79:7,14
80:3 102:12,15 103:20,24
106:5,11 108:14,17 109:8
110:1,5,12,13,15 112:2,5
112:24,24 113:3,4 114:10
114:14 119:11,15 121:12
122:6,8,21 132:17 148:2
149:3,7,13,17 150:18,22,24
151:5,10,14,22,25 154:19
155:24 156:11,24 161:10
161:12,24 162:13 164:4,23
166:5,10,16 168:9,15
169:11,19 171:8 172:12
173:25 174:4,10,11,16,23
174:25 175:6,7,10,11
176:16 178:10 179:6,16
180:2 181:2,6,14 182:5,16
182:22 183:5,8,24 186:6,7
188:24 189:1,5,11,13,16,18
189:22,24 190:4,5,15 191:4
191:13,14,15,16,22,25
192:4,7,24 193:10,21,22
194:2,19 195:21 196:17
198:9 200:19 202:22
203:23 205:9 207:18,19
210:15,19 211:2,3,4,8,9,14
211:16 212:10,12,20,21
215:5,21 216:8,15 217:16
217:20 218:1,8,12 219:1,4
220:9 221:16 222:1 223:7
224:6,8 225:5,7,8,14,20
226:4,19 227:13,18 228:19
230:2,8,19 231:9,22 232:20

**news (cont.)**
233:5,9 234:24 235:4,18,21
237:10 238:24 240:16,17
241:6 242:13 243:11,13,21
245:2 246:6,17
**ngethpharat**
23:23
**nicole**
3:24
**non**
72:1,17 74:25 185:23 196:9
196:10 198:16
**nonexpert**
145:21
**nonparametric**
134:21 136:3 155:4
**nonrandom**
174:15 177:12,15 178:3,5
178:12 243:23 244:14
247:20
**nonstandard**
64:24 65:11 100:8,13 152:5
**nonsystematic**
177:11
**normal**
74:15 101:7
**north**
8:17
**northeast**
3:17
**northwest**
4:17 5:4
**notary**
2:14 7:9 9:19 253:7
**note**
159:11 164:10,11 178:4
181:17 195:24 196:3,6
202:17
**noted**
99:12 133:22 182:19,20
251:16
**notes**
185:21 192:22
**notice**
191:8
**noticing**
144:6
**noting**
161:20
**notion**
136:14
**notwithstanding**
236:15
**november**
102:3

**novo**
202:13
**now's**
144:13
**number**
6:24 8:9 12:25 14:17 26:17
36:16 63:10 69:20 83:25
84:4,17,17,23,24 86:10
95:23 149:19 150:6,7,10,19
151:3,8 185:18,24 187:23
188:5,16 190:2 193:23,24
197:4 210:9 211:24 217:5,8
219:10 220:7,10,15,25
225:9,23,25 226:5,13,19,24
227:4,21 228:1,19 229:15
229:20 230:4 231:12 232:4
239:19 241:25 242:1 243:5
244:18,23
**numbers**
83:15 93:1,14,15,16,19
96:2 98:12 148:1 185:18,19
187:14,17,20 197:22
209:15 221:5 224:23
225:11 227:11 229:24
233:16 234:16 237:17,21
238:6,9,15 239:8 240:13,21
241:2,3,5,13,19,20,23
242:1,5
**numerous**
14:25
**nurses**
60:10 61:11

**o**

**oath**
252:13
**object**
187:4
**objection**
12:15 14:2 15:14 16:20,25
18:11 20:16 23:14 24:11
25:23 26:21 27:11,19 28:5
29:7 30:17 32:11 33:5
38:11 40:2,20 46:15 47:4
48:5 49:3 50:1 52:1,24
53:14 54:6,24 57:17 58:25
61:7,20 62:22 63:12,24
64:5,15 65:22 66:20 68:17
69:7,16 72:2 74:13 75:2
78:5,17 79:8 80:5 82:17
89:16 90:12 96:12 98:3
102:16 103:8,25 106:7,13
106:19 107:4 108:18 110:6
111:7 112:6 113:17 114:15
120:13 121:16 122:22
125:19 131:15 132:1 134:6
134:9 135:3 138:1 139:7

[objection - overlaps]

**objection (cont.)**
142:7,24 143:11 151:17
152:3,17 154:8 157:23
163:2,11 164:5 165:1,3,17
166:11 168:16 169:15
170:8 174:8 176:2 182:6
194:4 196:19 201:20
203:10 212:15 217:9 223:9
238:10 240:19 241:9,21
242:17 246:18 247:6,12
**objections**
7:4
**obscures**
242:22
**observation**
102:14 103:23 108:16
110:4 112:4 114:13
**observational**
56:14,21 157:13,15 160:24
162:20 166:23 172:9
**observations**
247:11
**observe**
77:22,24 111:5
**observed**
78:3 107:24 134:4 151:9
**observes**
64:3
**observing**
56:16,23
**obtained**
125:6
**obvious**
165:12
**obviously**
37:7 74:18 80:13 186:13
249:12
**occasion**
10:25 13:25 57:15 67:8
102:10 103:6,19 108:12
109:25 111:25 114:9
**occasionally**
146:10
**occasions**
14:9,25 15:6,11,17 21:19
23:17 26:16 33:1 47:12
49:8 50:9 57:20 62:19 63:4
63:7 65:17 66:3,10,14 67:1
67:3 103:9 115:2 117:1
169:13
**occupation**
58:8
**occur**
33:17 42:18 207:1
**occurred**
38:5,6 44:19 49:13 59:9

**occurred (cont.)**
68:12 69:6 90:4 115:6,12
239:7
**occurrences**
198:10
**occurring**
89:4
**occurs**
42:19 45:1
**october**
102:2
**offer**
20:11 107:12 125:17
252:12
**offered**
12:6 50:10 51:3 107:13
111:23 125:17
**offering**
12:5 82:13,18,24 83:1,5
109:16 115:19 124:14
128:6 131:11,19 139:17,21
140:1 183:13
**offers**
194:12,17
**offhand**
196:20 209:7
**offices**
2:8 8:11
**oh**
84:20 141:9 160:3 161:2
227:16
**okay**
9:13 10:25 11:2 12:5 18:16
22:18 66:14 73:8,19 74:7
78:18 98:23 109:19 124:6
124:14 127:19 128:21
130:8,15 132:14 145:8
147:15 148:7,21 149:2,19
149:23 150:9,18 151:3,8,12
154:13 155:19,22 156:7,15
167:17,23 168:3,6,11 169:8
171:10,15 172:11 173:19
174:9 175:17 182:3 185:16
185:21 186:2,5,23 187:22
188:7,11,19,23 189:3,8,15
189:20 190:2 191:11 194:7
195:24 198:19 201:17
203:18,22 204:1 208:14
210:12,25 211:12 212:6,18
216:12,24 217:2,4,11,22
218:11,14,25,25 219:12
220:4,8,18 221:9,14 223:12
224:1,10,16 225:17 226:2
226:10,16,22 227:2,8,17
228:24 229:10,24 230:6,16
231:13,18 235:24 241:3

**okay (cont.)**
242:8 246:4 248:10,15
249:24
**older**
105:25
**omitted**
183:5,25
**once**
35:17 43:3 67:17 87:5
134:15 205:12
**ones**
79:17 115:17 123:18 191:4
215:4 233:15 239:23
243:23
**one's**
233:23
**onset**
70:1
**operating**
161:17
**opiate**
105:19
**opine**
54:22 141:25
**opined**
59:5
**opining**
130:15,18
**opinion**
23:12,18 24:10,14,17,19
25:3 27:18 51:2 78:3,6
82:13,18,23,25 83:1,5 86:7
107:11,13,20 108:1,4
109:16 110:18 111:6,23
113:14,25 115:20 116:6
117:20 128:6 131:20
135:11 139:17,21 140:1
143:1,6,7,10,18 144:4
181:12,12 182:13,18 183:2
183:14 184:16,16 193:11
194:17 240:14 242:6,15
244:8
**opinions**
12:6,6 26:7 27:1 59:4 68:22
68:24,25 86:3 89:25 91:4
108:21 113:21 115:25
116:2,6,10,17 117:14 121:6
124:15 125:17 128:23
130:5 131:12 164:10
165:21 173:13 176:25
178:24 179:4,9 180:2,6
182:1 192:3 241:1 246:12
**opioid**
110:11 112:21
**opioids**
110:23 111:2

**opposed**
28:8 32:4 52:8 84:17 172:9
**opposing**
59:2
**opposite**
136:22
**order**
25:7 33:25 39:18 95:14
214:21 239:13,21 250:8
**orders**
250:4
**ordinary**
14:18 200:14,21
**organization**
20:12
**organizations**
13:11
**organize**
242:3
**organized**
242:2
**original**
7:13
**ought**
194:23
**outcome**
56:23 109:3 137:6 249:7
253:18
**outdated**
20:10
**outlaw**
174:20
**outlined**
137:9
**output**
97:11,13
**outputs**
93:3 95:18 97:12,14
**outside**
24:18 127:7,13 131:18
166:20 246:21
**outstanding**
90:21
**overall**
213:15 216:22
**overlaid**
69:25
**overlap**
107:6 116:1 124:25 205:14
207:16,22 213:17 235:3
**overlapping**
213:7 216:19 232:12 233:1
234:20 235:13 236:9,15
239:15 240:24
**overlaps**
204:17 206:22,25 207:20

[overlaps - personal]

**overlaps (cont.)**
213:20 222:23 232:15,19
238:20
**overlooked**
44:6
**overreaches**
162:16
**oversight**
180:8
**overstate**
127:2
**overstated**
173:20
**overwhelmingly**
56:3

**p**

**p.m.**
99:5,7,8,12,15 144:22,24
144:25 145:2 184:24 185:1
185:2,4 223:19,21,22,24
245:18,20,21,23 251:14,16
**package**
42:14
**page**
6:2,4 12:2 46:2 88:7,11
90:7 92:7 133:12,13,18
168:20 190:17 193:6,6
195:6 232:6 248:6 250:17
**paged**
123:16
**pages**
88:15 123:17 160:14
**paging**
118:13 207:3
**paid**
31:12,24
**pair**
158:1
**palm**
50:24
**paper**
46:7,8,20 75:23 76:3,8 84:3
84:7 85:4,5,9,12 86:3,9
87:22,25 90:6 127:14
**papers**
46:13,22,25 74:22 75:6,13
75:14 100:22 101:2,10
**paper's**
90:10
**par**
146:14
**paragraph**
92:18,19,20,21 93:4,5
117:8,10 118:24 119:3,4,8
119:24 127:19,20 128:1,16
128:18,22 129:5,6,24 130:2

**paragraph (cont.)**
130:6 133:10,17 137:22
138:17 139:3 140:11 145:6
147:15,21 153:21 154:5,10
154:12,14 155:19 159:15
159:24,25 160:1,3 161:6,21
162:22,23 165:23 168:18
168:21,22 171:12 181:1,9
186:9,12,15,15,19,21,22
187:19 193:4 194:7,24,24
195:24 196:1,3,6 197:10,12
198:1,5 201:3,19,21 202:2
202:3 203:13,15,18 210:21
210:22 211:10
**paragraphs**
175:13,18 176:1,3,8,11
186:2,5
**parameter**
54:1
**parametric**
134:20 136:3 148:6 149:21
**paraphrase**
145:21 146:14
**paraphrasing**
141:13
**part**
15:7 26:4,6 27:23 28:3 29:5
31:5 32:3,6 46:16 48:19
56:2,12,13 59:23 67:9
68:21,24 71:3 79:11 87:22
87:25 89:18 94:7 95:1
98:10,17 102:14,19 103:22
108:16 110:3 112:4 113:24
114:12 117:9 128:15,21
132:3,3 143:13 153:20
164:16 166:19 184:9
205:19 206:24 207:10,14
222:8,13 243:2 244:25
**partially**
61:15
**particular**
55:9 77:2,6 81:12 86:19,25
152:21 166:10 170:18
211:25 237:12
**particularly**
26:14 135:13 158:25
160:17
**parties**
7:3 35:5 253:16
**partly**
31:21,21 32:3,6
**parts**
55:1
**party**
21:12

**pascale**
3:12
**pass**
137:19
**passage**
102:18
**passed**
102:21 157:10
**passes**
137:20
**passing**
69:2
**patch**
169:17
**patches**
202:3
**path**
55:25 182:23
**pathway**
209:12
**pathways**
209:11
**patience**
114:5
**patricia**
1:23 2:11 253:7,23
**paul**
5:10 9:3 249:16,19,22
**paulweiss.com**
5:16,20
**pause**
195:16
**paused**
123:16 162:21
**pausing**
21:13
**pay**
62:10
**paying**
33:2,25 174:21
**payment**
31:20 37:23
**payments**
32:21,24 62:13
**peculiar**
153:17
**peculiarities**
231:25 232:6,8
**pediatric**
107:23
**peer**
87:19
**penalty**
252:5
**pending**
90:21 124:19 213:18

**pennsylvania**
5:4
**pension**
60:9,10,12,20
**people**
13:9 170:10 241:25
**percent**
16:21 17:5,9,23 18:14 21:9
54:2,21 55:12,19,19,20
56:3,19 152:9 214:2,4
247:25 248:12,25 249:5,6
**percentage**
21:1,5 247:16,24
**perfect**
165:5 233:20
**perfectly**
51:15
**perform**
28:13 75:15,18 141:8
**performed**
39:19 43:21 48:2 49:20
54:13,13 55:8 59:25 61:17
64:16,24 65:24 67:16 70:9
71:21 72:11 73:5,7,17,21
77:12 84:10 91:24 95:15
98:9,9 102:19 107:21
108:10 113:6 130:22,25
131:23 143:15 158:5
180:17 209:3,10 222:25
248:19
**performing**
28:16,25 29:3 63:9 64:8
75:1 154:24 204:4
**performs**
134:24 199:11 207:14
**period**
6:23 62:17 64:2 66:19
101:8 105:24 115:9 149:16
151:10 178:7,7,14,14 180:9
188:1,13 211:19 212:14,23
217:7 218:13,15 219:15,25
220:2,21 226:24 227:4
228:7,11 229:4,15,19,21,23
233:8,9 235:1,4,5 242:10
242:11 244:17 245:4
**periods**
177:16 222:13
**perjury**
252:5
**permitted**
23:19
**person**
31:19,23 32:9 33:12 116:3
**personal**
31:15

[personally - president]

**personally**
20:1 83:14 94:22 95:1
158:21
**perspective**
52:3 192:10
**persuaded**
24:14
**pertain**
46:22 116:6
**pertained**
24:19
**pertaining**
45:13 47:1 81:21
**pertinent**
116:2 134:1 245:9
**perused**
123:20
**pg**
254:6 255:2
**phenomena**
240:25
**phenomenon**
212:9
**photograph**
20:10,11
**phrase**
76:18 129:9 130:6 132:6,9
146:1,21,22
**pick**
56:11 136:4,15 175:10
**picked**
104:14
**picking**
55:22 136:1,2
**picture**
70:4
**piece**
118:23 166:10 195:9,14
199:25
**pieces**
137:13
**pinares**
105:14
**place**
118:14 159:5 214:8 244:3
244:15 245:8
**places**
160:18 171:11 195:7
209:21
**plaintiff**
1:5 3:5 8:22 10:3 20:20
21:2
**plan**
33:23
**planning**
37:23

**plans**
33:22,25 37:19 90:22
**plant**
107:25
**platforms**
193:15
**plausibility**
170:15,20
**please**
8:20 9:15,23 45:22 46:18
47:8 55:6 72:7 84:1 104:19
116:12 117:5 147:16
155:20 156:20 175:13
201:22 203:14,16 204:1
250:4,5
**plimpton**
2:9 4:2 8:11 35:1,12,22
**pllc**
4:15
**plunge**
55:25
**plus**
136:12,23,24 190:13 191:5
196:9 200:6 202:23 214:2,4
219:4 221:17
**point**
14:5 40:23 44:5 52:4 63:21
64:1 65:3 66:24 77:15,17
98:25 101:22 106:21
116:18 120:20 133:10
134:1 141:13 146:5 150:16
159:5 160:15,16,18 161:8
171:1,17,20 173:20 174:22
178:19 181:10 187:8,13
194:21 196:2 198:24
209:24 210:3 222:9 234:22
237:5 246:23
**pointed**
104:6 187:7 228:2
**pointing**
172:4 205:1 241:18
**points**
111:10 209:2
**pooled**
152:19
**populated**
152:25
**portfolio**
158:24
**portion**
38:23 57:15 58:2,4,15,16
58:17,22 90:5 92:4 132:19
133:6 139:2 147:4 165:24
196:14
**portions**
84:12 91:11,16 94:24 95:2

**portions (cont.)**
100:23 125:9
**pos**
122:1
**pose**
77:20
**position**
19:6 38:8 146:12
**positive**
120:25 133:24 134:20
135:9,15 136:20 137:12,25
138:6,7,8 247:11
**positives**
247:1,5,9,24
**possibility**
38:7 121:25 142:3 174:1,3
216:19 239:14
**possible**
13:9 48:11 53:20 120:15
121:11,18 122:15 174:7
247:4,7,8
**possibly**
14:22,22 53:6 54:10 93:22
94:5 113:11 163:14 198:25
**post**
20:1
**posttrial**
59:12
**potential**
63:17 90:2 161:19 163:23
178:3,5,21 179:21 238:19
**potentially**
73:12 232:9 235:13 243:23
**practical**
40:11,14 199:20
**practice**
27:9 29:1 98:5,18 102:20
**practices**
28:13,20,25
**pratt**
107:18
**pre**
17:18
**preamble**
114:16
**precedence**
59:17 65:7
**precedent**
84:8 85:5,8 86:14,18
100:13,17,23 101:1,9,19,19
**precedents**
84:12
**preceding**
205:13
**precepts**
172:6

**precise**
26:14 30:7 207:11 216:23
**precisely**
196:23
**precision**
44:21 190:9 210:9 231:3
237:20 238:19 239:12,16
**predictions**
85:15
**predominant**
56:4
**predominantly**
117:16,22 118:9 120:10
121:14 129:1,15 145:10
147:9
**prefer**
165:16 185:14
**preference**
31:11
**preferred**
31:20
**preformed**
237:13
**preliminary**
165:7
**premarked**
11:22
**premise**
18:25 72:19 164:24 221:22
221:23,24
**preparation**
43:1,12,18
**prepare**
15:12 42:3 96:18
**prepared**
15:17 68:13 93:13
**preparing**
83:12
**preponderant**
132:18
**presence**
107:25
**present**
5:23 8:19 28:10 32:18 59:8
59:10 78:21
**presentation**
164:20
**presented**
109:20 113:14 115:25
195:9
**presents**
143:16 195:13,20 199:12
201:13
**president**
15:23 16:23 39:8,10

**prespecified**
55:23
**prespecify**
55:18
**presumably**
142:16
**pretrial**
59:12
**pretty**
15:20 65:5 76:15,19
**prevailed**
59:22
**prevent**
10:10
**prevents**
201:10
**previous**
17:2,6 18:25 28:6 32:22
62:1 69:3 103:6,10 111:15
133:18 163:20 176:23
229:7 230:23 234:17
237:15
**previously**
17:19 41:10
**price**
46:4 51:24,25 53:12 54:23
63:18 64:3,10,14 65:19
66:12,16,18 67:10 68:11
69:5,12,18 71:24 72:1,15
72:16 73:18,22 74:24 77:13
77:22,24 78:2,3,12,15 79:6
88:2 106:5 109:10,13,17
112:14 114:6,11,13 120:4
122:6,12 127:9,16 130:11
130:16,23 131:7,14,25
132:12,16,19,23 137:25
138:8,8,9,15,22 140:20,24
142:4,14,21 158:22 159:14
160:6 166:9,16 167:7 174:5
177:13,15 183:11 202:8,20
203:3,9 205:20 206:3,14
244:14
**prices**
63:4 80:3 82:16 109:5
117:15,21 118:9 119:11,15
120:9 121:11,13 122:20
128:8,9,25 139:18 140:2
145:10 147:8 155:24
156:11 158:7 160:21 166:5
168:8,15 169:14 173:13
209:1,5
**pricing**
183:18 202:19
**primar**
89:1

**primarily**
89:2 202:8 203:4
**primary**
25:14
**princ**
162:4
**principally**
39:4
**principle**
162:5,6 212:8,16,17,18
215:11,12
**principled**
56:6
**principles**
59:6,16 162:1,12 163:25
**prior**
13:23 14:9 17:24 18:16
19:2,11 20:22,25 21:10
30:12 31:1 32:9 34:2,11,14
34:17,21,25 35:13,20,25
48:7 60:1 82:4 99:23
228:17
**priori**
192:8
**priority**
213:16
**private**
58:8 66:2
**probability**
180:16 249:4
**probably**
17:1 18:14 21:5 47:25
62:25 85:11 162:21
**problem**
122:23 158:21 200:7
**problems**
110:22
**procedural**
27:3
**procedure**
134:21 137:15,24 138:12
243:2 247:14,15,22 248:2
**procedures**
75:14,17 76:4,9
**proceeds**
196:15 206:4,8 210:19
211:3,9 216:2,14 217:6,15
217:19,24 218:7,20 219:5
219:14 220:5,9,14 221:11
221:18 222:4 223:6,7 224:4
227:25 229:3 230:1,18
231:15 232:20 233:4 235:2
235:20 236:2 244:17 245:2
245:3
**process**
53:16 95:20 168:23,25

**process (cont.)**
205:11 206:10
**processes**
16:15
**produce**
27:22 97:2 98:12 153:11
**produced**
42:14 95:18 96:15 97:9,10
97:23 110:9 207:9,15
209:20 210:8 249:5
**product**
216:24
**production**
97:6 107:18
**products**
111:2,18 239:15,20
**professional**
1:24 2:12 13:14,19 16:17
18:9 28:18 102:9 108:12
114:8,17 182:7 253:24
**professor**
18:18 123:12
**proffering**
182:18 183:3
**profile**
19:23,24
**profiles**
20:1,5,14
**profit**
62:20 63:1
**profiting**
85:14
**profits**
62:4 80:23 85:16
**program**
40:15
**programmed**
39:17
**projects**
90:21 124:19
**prominent**
69:20
**prompted**
94:17 171:24
**proper**
24:15 59:6 75:15,18 76:12
**properly**
122:23 123:1,1 156:17
202:6
**property**
157:17,20
**proposition**
56:1,3 118:15 139:22,24
140:6,15,19 141:17,19
143:17 159:21 160:12
203:1

**propounding**
184:10
**propounds**
184:11
**prove**
131:6 132:11 143:21,24
144:1,2 159:13,21 160:20
167:12,21
**provide**
10:13 15:5 16:1 51:23
64:25 85:9 94:1 95:12
100:22 101:2,10 108:1
110:18 139:11 166:8
167:14,25 168:7,14 198:13
200:22 206:20
**provided**
6:17,20 14:13 15:8,12
37:24 61:5 84:19,23 91:11
95:17 102:1 105:11 127:8
207:6 224:19,23 229:13,18
233:19
**provides**
85:5 141:5
**providing**
16:5,6 24:15 29:11 31:15
39:1,14 40:1,8,18 178:25
**proviso**
154:23
**public**
2:14 7:10 9:19 110:25
155:25 253:8
**publication**
47:11
**publications**
45:12,19 81:20
**publicly**
25:20
**purchase**
32:19 119:19
**purchased**
32:20 33:4,14,18 62:10
**purchasers**
119:19 145:22
**purchases**
33:9
**pure**
170:11
**purported**
84:11 111:12 195:14 244:7
**purportedly**
200:18 201:1,14
**purporting**
146:6
**purports**
199:8 243:1

[purpose - recess]

**purpose**
20:14
**purposes**
17:13 33:2 75:19 76:13,14
76:18,24 89:24 133:20
134:17 184:17
**pursuing**
33:13
**put**
9:10 27:7 118:25 173:20
228:6
**putative**
107:15,15 177:14
**puts**
174:15
**putting**
146:25

**q**

**qual**
145:14
**qualification**
29:11 35:10 52:11 81:13
121:24 147:3 177:9 211:21
233:11,13
**qualifications**
125:11,23 126:6 228:17
229:7 230:23 232:2
**qualified**
125:17 145:14 233:16
**qualify**
35:3 68:7
**qualifying**
60:3
**quantifies**
77:13
**quantifying**
77:5
**quarter**
101:24 144:8
**quasi**
23:9
**question**
17:6 19:1 23:5 27:25 29:10
46:17,19 51:21 52:6 53:6
53:12,20,24 54:7 55:11
56:18 63:18 65:21 66:5,8
67:11,25 68:4 70:16 71:7
71:24 72:3,10,15,18 73:4,6
73:9 74:19 77:23,25 78:23
79:10 80:13 85:1 87:6
88:18 103:3,7,10,13 108:11
108:20,23,24 109:6,24
110:10 111:24 112:18,22
114:5 117:25 118:4 119:18
119:23 125:22 137:23
139:13 145:9 149:4,7 150:7

**question (cont.)**
150:17 151:19 161:15
163:20 164:15 165:4
166:13 170:4 172:22
178:15 179:10,13,20
192:17 195:17,20 196:23
202:12,15 213:19 219:19
221:22 222:3 233:10,21
241:12
**questionable**
23:4 181:23
**questioning**
44:4 123:5
**questions**
7:5 27:4 51:23 52:12,14,16
52:21,22 53:9 67:20 77:19
80:9,10 82:20 84:16 89:20
89:23 90:2,3 109:10,13,16
114:3 115:17 171:25 177:1
177:6 184:6,7 218:4 222:7
249:14,17
**quibble**
181:18
**quick**
57:1 223:17
**quickly**
49:5 139:13
**quite**
95:6 135:6,16 175:5 180:4
191:9
**quote**
119:7,8 129:21 135:9 139:3
145:25 162:8 196:4
**quoted**
121:1 162:6

**r**

**racing**
57:25,25 58:23 59:1,3
**railing**
118:25
**raise**
179:20
**raises**
184:6
**range**
13:6 15:10 37:14 41:19,20
41:24 67:19,20,21
**ranges**
41:18
**ranging**
195:6
**rank**
86:12,23,25 158:3
**rate**
41:21 58:5,6 59:13 147:17
248:4

**rates**
41:17
**ratio**
185:23 186:6,13,14 187:9
187:10 209:5
**rationally**
113:23
**ratios**
186:16 187:2,4,6,15
**reach**
27:18 137:6,8 143:7,10
160:16 167:3 201:19
221:10 227:9,11,18 228:9
230:19 232:19 235:17
**reached**
71:22 72:13 73:25 128:2
176:24 184:15 210:5
**react**
63:5 119:11,15 121:12
122:20 138:8 155:24
156:11 166:5 168:9,15
173:13
**reaction**
51:24,25 53:13 64:3 77:22
102:12 103:21 108:14
110:2 112:2 114:11 166:9
166:14,14 167:7 203:9
**reactions**
65:19 66:12,17,18 67:10
68:11 69:5,12 71:5 74:25
77:24 78:2,3 79:7 102:15
103:23 111:4 112:5 114:4
114:13 137:25 138:9
**read**
72:3,6,8 88:22,25 89:10,22
120:23 123:7,8,15,19 124:7
124:13,23 126:11 147:7
153:24 156:5,17 186:23
193:8 201:21 252:5,7 254:6
255:2
**reader**
118:18,22 119:1 120:1,11
138:19 160:4 192:1 194:23
**reading**
54:16 84:7 85:3 86:2,9
89:13 118:6 120:12 141:21
154:13 160:25 161:1
**reads**
192:4 254:6 255:2
**real**
55:17,17 112:25 113:2
**reality**
56:8 146:22,23,24 147:2,8
247:19
**realize**
122:24

**realized**
147:12
**really**
14:12 22:14 52:9 56:22
66:4 72:25 88:5 102:21
118:20 153:13 161:18
164:9 165:20 170:19
172:18 176:4,8 181:12
182:23 204:25 206:11
214:19 216:1 228:3 234:7
242:3 243:16
**realtime**
1:24 2:13 253:25
**rearrange**
242:5
**reason**
24:9 49:7 56:6 58:22 67:13
69:9 80:6,15 98:8 124:21
129:17 163:1,4 176:11
181:22 183:10 187:5 221:6
234:13 254:6 255:2
**reasonable**
165:6 195:12 237:4
**reasonably**
21:22 135:12
**reasoning**
71:10
**reasons**
24:12 26:25 33:4,7 66:22
163:17 212:4 219:10
**rebuts**
202:7 203:2
**rebuttal**
6:5 11:18,24 48:8 115:20
116:6,20 240:15
**recall**
22:2,13 30:8 35:2 49:8 50:2
58:20 59:24 60:3,7,8,14,22
61:3,5,12,19,21,23 67:8
69:3,8,13 74:7,10 75:4,9
84:22,25 85:13 86:16 89:6
89:8 90:9,13 91:16 95:5
96:13 103:1 105:3 115:2
129:13,14 146:18 159:17
159:18 173:17 208:11,25
209:7,11 222:11 239:10
245:7
**recalling**
48:1
**receive**
30:4 31:20 37:19,23
**received**
29:23 37:16
**recess**
57:7 99:7 144:24 185:1
223:21 245:20

**recognizable**
113:23
**recognize**
49:21 72:24 92:8 103:16
105:8 155:18 233:22
243:17 244:2,7
**recognized**
45:11 49:9
**recognizes**
167:1
**recognizing**
128:12
**recollection**
29:19 35:11 42:22 44:7,18
66:3,25 75:11 102:22 104:4
105:6 107:8 118:13
**recollections**
67:22
**reconcile**
98:12
**reconciliation**
212:4,8
**record**
9:11,24 14:19 44:7 57:6,11
61:16 67:24 72:8 80:23
99:3,6,16 128:15 144:23
145:3 164:14 176:14
184:25 185:5 189:8 191:11
223:17,20,24 230:6 245:14
245:16,19,24 250:5 251:15
253:13
**recorded**
1:15 2:7 8:5 25:9 206:14
209:1
**records**
41:13
**recount**
133:4
**rectangles**
44:22
**red**
213:12
**refer**
69:12 88:16 150:11,12,12
190:12 204:5 215:22 240:5
240:23
**reference**
79:13 88:19,20,24,25
132:10 158:1 160:1 162:19
208:12 210:20
**referenced**
60:20 69:15 211:10
**references**
89:3 146:19 163:21
**referencing**
6:19 50:19 229:13,18

**referred**
62:2,11 69:1 143:19 157:25
160:24 213:1 235:15
239:19
**referring**
11:1 17:17,19 45:25 119:5
119:24,25 132:25 162:2,10
197:11 232:7,8 240:6
**refers**
51:12 86:13 116:13 159:20
170:22,24 233:10 247:21
**refinement**
165:12
**refinements**
165:14
**reflect**
117:16,22 118:9 120:10
121:14 129:1 145:11 147:9
215:17
**reflected**
203:20
**reflecting**
230:8
**reflection**
103:16
**reformatted**
39:17
**refresh**
44:7 66:2
**refreshing**
66:24
**refute**
130:20 139:24
**regard**
80:19 143:14
**regarding**
46:14 75:13 90:6 109:13
127:9,15 128:2,7,8 185:23
248:16,25
**regions**
81:19
**registered**
1:24 2:12 253:24
**regression**
152:19,23 166:21 184:1
**regular**
148:14,24 151:6,16 152:2
189:4,5,22 191:15 197:4
207:18 215:16,18 216:6
224:12 225:3,19 230:12
235:5 236:2 241:7
**reid**
4:20 8:24 249:10
**reinvest**
206:5,9

**reinvested**
196:8
**relate**
81:11 202:22
**related**
13:18 108:1 109:17 110:25
112:11,19 113:21 114:22
132:17 148:1 158:19
161:11 175:11 183:18,20
200:17,18 201:18 202:2
253:16
**relates**
73:21
**relating**
114:4
**relation**
97:22 113:6 129:25 131:21
152:8
**relationship**
13:3 78:11 128:3 131:6,13
131:24 132:11 141:12,16
159:13,22 160:20 239:23
**relative**
40:10 45:16 228:18
**relatively**
97:13
**releases**
109:8 161:12
**relevant**
182:5
**reliable**
112:20 114:2
**relies**
85:24 86:1
**relying**
86:6 238:4
**remain**
170:12
**remaining**
32:22 194:13 195:15
220:14 227:25
**remarkable**
117:10
**remember**
48:12,24 60:16,19,23 61:14
62:3 69:23 95:6 97:12
123:22 125:2,4 138:24
159:18
**remind**
22:25 49:12 88:4 104:10
**reminded**
43:19,20,22 245:6
**remotely**
10:5
**remove**
67:14

**render**
180:2
**rendered**
180:8
**rendering**
68:25
**renders**
180:11 181:6 184:13
**rep**
199:12
**repeat**
46:18
**repeated**
146:19
**repeatedly**
67:14 69:10
**rephrase**
168:12
**replicate**
95:15 96:4,6 234:13
**replicated**
180:15 248:22
**replicating**
28:9
**replication**
95:21
**report**
6:5,9,12,15 11:19,24 12:7
15:13,18 21:25 22:21 25:19
27:21,23,24 28:4 29:13,16
30:7,9 36:17 42:7,8,9,16
48:8,19 49:21 51:11 57:16
58:3,4,23 61:6 68:13,16
71:12,13 77:14 82:25 83:10
83:11,12 86:7 87:8 90:1
91:3,5,8,17,21 92:4,7 93:24
94:2,8,13,20 95:14 96:3
97:2,16 98:7,22 100:8
102:1 104:14 109:21
111:23 115:22 116:7 117:8
117:20 118:7,19,22 119:1,4
120:2,12 121:9 122:19
123:6,10,10,12,22 124:7,9
124:10,16 125:10,14,18
126:7,9,11,14,17 127:7,13
127:20 129:10,15 130:3
131:11 133:3,7,20 134:17
138:20 139:3,4,5,9,11,13
140:5 141:14,22 143:16
145:6 146:2 147:16 148:22
155:13,17,23 156:18 159:2
159:4,6 163:5 167:2,20
168:18,20 171:13,18,19,19
171:20,22 172:4 173:5,18
175:13 179:9 181:1 182:19
185:7,13,14 186:3 191:12

**[report - right]**

report (cont.)
191:23 192:5,20 193:4,4,5
193:7,9 194:8 195:5,21
196:3,22 198:2,6 200:23
201:4 206:19,24 207:4,5,10
207:10 208:8,13,16,19
209:16 210:21 217:5 225:1
237:17,19 240:15 244:15
245:1,6 246:2 248:7 251:9
251:11

reported
1:23 88:13 95:19 97:2
98:12 173:24 175:4 215:2
226:1 234:23 237:23 238:6
239:21 246:21

reporter
1:24,24 2:12,13,14 72:6
124:3 253:24,25

reporters
8:17

reporting
193:11

reports
27:1,6,10,17 28:17 29:6,9
69:4 96:1 123:7 124:7,13
124:16

repository
161:12

represent
185:11

represented
44:22 234:21

representing
8:25 34:23 204:6

represents
166:14 215:6

reproduced
248:8

reputation
87:15

request
42:15 43:22,22 91:1 124:21

requests
124:20

required
207:21

requirement
25:16 26:24

requires
85:15

reread
42:7,8,8 75:5

research
21:8 52:10 67:18 107:18
115:7,13 157:17 158:4

researcher
55:14,21,24 66:1

researchers
56:11

resemble
67:2

resembled
101:14

resembles
67:3

reserved
7:5

reserving
249:12

resistance
182:23

resolve
143:12

resolved
89:23

respect
22:17 54:16 84:18 87:23
88:1 140:2 153:22 154:6,16
233:1 234:19 235:25
240:15 244:4

respectfully
163:19

respective
7:3

respond
158:7

responded
48:22 201:8

responding
59:1 115:22

response
111:15 131:17,18 143:22
218:4

responses
117:16,22 118:10 120:10
121:14 129:1 145:11
147:10

responsibility
36:8

responsible
240:17

responsive
103:6 108:11 109:24
111:24

rest
24:19 105:10

restate
66:8

restatements
120:22

result
54:4 153:9,11 199:15,21
200:21,24 209:25 214:4
215:8

resulting
223:4 240:24

results
88:12 97:2 119:12 164:20
165:14 167:20 173:22
180:12,15,18,20,21 181:7
184:13 195:21 199:13

resume
28:16

resumed
99:18

retain
10:20

retained
10:13,16 14:1,7,16,25 15:4
16:18 17:6,7,14 18:21
20:19,23 21:2,11 22:2,12
22:22 23:6 29:21 31:9 35:1
35:12,14,21 36:3 59:22
60:9 73:15 82:5 99:24
101:20 102:4,6 106:25

retention
10:17,23 15:1 30:12 31:1
32:9 34:2,11,14,17,21,25
35:13,20,25 36:1 48:7
89:11 99:23 100:3

retentions
50:7 60:2

return
79:1,2 85:20 86:18 101:7
123:4 134:10,16,19 135:2
137:22 139:16 148:10,13
150:4,5 154:18 172:23
173:24 174:12 189:6 200:1
203:24 204:9,19 205:8
208:2 210:20 211:9 213:3
214:2,3,5,23 216:9 218:12
218:21 220:19 225:2,3,4,13
225:14,18,19 226:3,4,12,13
226:18,23 227:3 230:2,9,9
242:20

returning
140:11 217:4

returns
79:14 101:5 108:17 110:4
122:4 128:3,3 134:4,12,14
150:2,8,25 151:6 156:25
162:15 169:12 173:7 174:5
184:2 189:12,17,24 190:4
193:20 194:15 198:3,11,13
198:20,25 202:18,21 203:7
204:14 207:18,19 208:23

returns (cont.)
209:3,4,12,14 212:20,22
217:25 222:11 228:8,10,11
229:2 231:22 233:3,7,8
234:15 237:9 240:17
242:11,12 246:5,10,16

reuse
150:4

reveal
145:19 200:16 237:22

review
12:14 23:3 45:23 49:6
50:15 51:14 83:14 87:9
88:10 90:5 92:10 94:22
95:2,8,12 96:9 104:20
105:17 107:5 110:7 117:6
123:14 125:9 127:23 131:1
131:20,22 154:1 160:2
161:5 175:21 186:25
190:24 197:20 201:23
244:20

reviewed
84:3 87:19 94:24 95:3
123:9,9,20

revise
62:23

revised
17:21 47:12

rewrite
91:18

rewrote
91:13

rfigel
4:22

rhame
50:5,6,16,20 51:1 70:12,17
72:22 73:2 74:12,17,21
101:20 102:1,4,8,10 103:4
103:19

riff
171:25

rifkind
5:10 9:3

right
10:7 12:8,25 13:23 18:1,19
19:14 41:8,14 42:21 46:9
50:20 53:17 54:9 57:2
63:18,23 66:9 70:14 74:5
75:25 76:5 84:4 87:12 88:3
93:14,18 94:20 100:1,9,14
100:24 109:17 115:20,21
123:23 128:19 129:4 135:5
141:15 145:13 147:22
148:25 150:3,11 151:1,6,10
159:25 173:18 174:1,6
181:3 183:22 184:21

**[right - series]**

**right (cont.)**
185:25 187:12 188:8,17,21
189:21 190:8,11 191:12,17
191:18,20 197:10 198:7
201:15 203:20,24 211:5
216:10 217:1,12 218:17
219:9,22 220:16 221:2,12
221:13 222:6 224:8 226:17
226:22 227:21,22 228:14
229:10 230:10,21 231:5,13
236:12 241:8 246:6 248:9

**rights**
249:12

**ripple**
1:7 4:3 8:7,25 10:18,24
11:1,1 29:24 30:14,18,24
34:4,19 80:3 88:16,20,24
89:4 119:15,20 120:6,11
121:12 122:6,8,21 129:7
132:17 138:23 140:21
141:1 142:6,22 145:23
146:8,10 147:2 149:12
150:24 151:4,9,14,22,25
154:19 160:10 161:24
169:19 173:2,5,25 174:10
181:2,6 183:20 186:6,7
189:1,11,13,16,18,22,24
190:4,5 191:13,14,15
193:21,21 194:19 200:19
202:22 203:4 210:14,19
211:2,3,3,8,14,16 212:10
212:12,20,21 213:4 215:5
216:8,14 217:16,20,25
218:8,11 219:1 220:9
221:16 222:1 224:6,8 225:6
225:7,14,19 226:4,18 227:5
228:9,12 229:2 230:2 231:9
231:22 233:5,8 234:24
235:4,18,21 240:16 241:6
242:13 243:11,21 245:2
246:6,17 254:3

**ripple's**
117:17,23 118:10 119:11
121:15 129:2 130:12,17,24
131:7,13,25 132:12 139:19
140:3 145:11 147:10
155:25 156:12 159:14
160:21 161:12 166:6 168:9
168:15 169:13 182:24
183:9,12 202:9

**rise**
25:13 82:23 183:1 204:16

**risk**
58:11,12

**rivetingly**
123:17

**role**
15:25 18:4 39:6 92:1 93:8

**roles**
19:12

**rolling**
177:16,19,20

**room**
10:4 143:20

**rough**
197:21 211:17,22 250:6,12
251:2

**roughly**
14:6 197:17,18 240:13

**round**
197:21 234:15

**rounded**
209:16 210:5 225:23
234:15 237:24 238:15

**rounding**
235:12 237:21 239:7

**routine**
95:20 98:5,18 102:19

**routinely**
28:2 29:4 98:4

**row**
148:8 150:19 210:13,25
211:6 215:15 222:17 234:9
238:24

**rows**
149:3 227:12

**rule**
10:21 13:7,13 22:9 38:2
40:22 48:16,21 65:6 100:12
141:2,4 142:10,15 143:3
161:10 164:12 170:13
179:22

**rules**
27:3 213:16 235:7

**run**
104:15 206:9,10 222:18

**s**

**sales**
111:1,16,17

**sample**
88:8

**sampling**
25:7

**satisfied**
88:17

**save**
164:19 252:9

**saw**
45:9 88:22 89:2

**saying**
17:2 28:23 35:3 121:7,8
122:13 138:6 145:15

**saying (cont.)**
163:22 170:18 187:8

**says**
116:24 117:2 120:25
125:14,21 147:4 155:23
167:3 173:11 181:19
185:17 188:1 198:8 214:18

**scale**
63:2 169:24

**scandinavians**
158:1

**schipper**
46:6 47:10

**scholarly**
28:18 157:17 182:8

**scholars**
81:4

**school**
12:23 18:18 19:13

**schoolers**
162:8

**scope**
143:10 180:5

**scratch**
131:3

**screen**
44:19,21 138:2

**scrutinized**
95:1

**se**
72:22 104:3,8,10 162:13
163:15 167:12,21 180:9
186:16

**search**
129:12 164:24 170:12
171:9

**searched**
161:14

**searching**
161:10 183:24

**sec**
8:22 10:3,5 96:16 141:8
146:20 254:3

**sec.gov**
3:11,14,21

**second**
104:24 105:7 140:12 150:5
150:5 166:2 171:15 177:4
214:5,20

**secondary**
187:15

**seconds**
44:12

**sec's**
34:4 250:8

**section**
12:18 90:14,14 92:8,15
185:21 192:5 195:5,5

**sections**
158:9,10

**sector**
58:8

**secure**
15:20

**securities**
1:4 3:3 8:6 49:11,18,23
60:11 76:17 77:4 106:12,15
163:9

**security**
46:4 54:3 63:18 64:4 106:6

**seeing**
89:3 153:7 187:11 190:22
191:3,3 222:17

**seemingly**
244:9

**seen**
65:14

**select**
190:11,16 191:5 193:16
194:1 195:22 199:11
217:13 229:21 230:13

**selected**
161:24

**selecting**
182:15

**selection**
90:6,11,14

**selections**
232:17

**senior**
39:8,10

**sense**
17:7 36:11 47:5,7 60:25
62:15 71:16 74:15 90:20
96:20 101:12 116:17
117:24 118:21 138:15
155:1 196:21 200:14,19
243:6

**sentence**
117:9 122:19 132:5,14
133:13 140:12,20 155:22
156:8,16,19,19 165:25
166:2 172:16 187:16 198:8
198:21 202:5

**separated**
222:22

**separately**
136:9,11 182:9 215:2

**series**
69:24 114:3 158:22 222:7

**[serve - spot]**

**serve**
18:21 19:17
**served**
13:22
**services**
10:14 16:1,6 19:20 20:15
31:9,11,16 36:10,20,23
37:5,24 39:1,14 40:1,8,19
**set**
26:25 33:14 69:19,25 77:3
91:4 96:15 98:15 116:6
159:6 160:7 167:11,13
169:13 175:25 176:8 179:9
182:11 206:19 208:7,10
216:15 236:20 237:20
238:23 243:18 244:16
245:10 253:12,21
**sets**
125:10 192:8
**setting**
32:8 36:1 46:20 102:10
103:18 109:21 111:21
112:7 131:10,16 160:13
176:16 200:25 201:9,12
212:6 218:5
**settings**
52:18 182:9
**setup**
73:20
**seven**
24:6 231:11,12
**shaded**
195:3
**shape**
85:23
**sheet**
252:11 254:2
**shelves**
146:4
**short**
147:20
**show**
70:6 118:20 190:22 191:2
192:13,14 199:22 224:16
229:10
**showed**
70:6 193:24
**showing**
30:24 69:25 70:1 120:3
138:21 160:4,6
**shown**
194:10
**shows**
54:2 122:16 193:23
**side**
59:22 102:1 149:2 217:12

**sided**
134:22,22 136:3,3 148:5
149:20
**sifts**
138:14
**sign**
172:20
**signature**
12:2
**signed**
7:9,11 30:9 91:3 252:17
**significance**
52:4 54:1 79:13 116:23
135:22 136:6,14,17 137:6
137:16 154:21 157:5,8
169:1 180:3,6 199:20,20
248:12,17,25
**significant**
56:16,23 64:10,13 74:2
78:11 119:10 122:10 135:1
137:4 151:13,21,24 152:8
153:9 155:7 156:10,21
166:4,9 168:8,13 169:2,3
169:10 192:15,16 201:2,14
243:12,20 244:10 247:14
**significantly**
133:24 134:20 135:9,14
136:20,25 137:5,11
**similar**
25:12 92:14 112:8,11
**similarity**
25:17
**similarly**
188:23
**simple**
67:13 82:21 121:21 198:9
219:9
**simply**
29:18 42:20 114:1,21 121:6
143:7 157:18 177:25 209:5
214:24 215:3 233:13 245:8
**single**
21:5,8 76:16 77:4 117:9
134:11,13 136:8,9,18
158:22,23 163:8 224:5
**sir**
54:16
**sit**
33:23 35:11 40:25 45:10
63:1 67:12 89:6 90:23
124:17 181:24 196:20
210:2 221:6 243:17
**sits**
41:24
**sitting**
26:15 33:21 60:7 61:5,19

**sitting (cont.)**
67:22 74:9 75:4,11 80:11
103:5 107:8 115:2,3 142:18
181:10 190:10 237:8 239:6
245:7 248:9
**situation**
73:23,24 236:8
**situations**
104:7 248:5
**six**
26:20 45:17 59:25 60:6
**skilled**
80:22
**skip**
117:8,11 214:7 251:2
**slam**
82:21
**slender**
244:5
**sliding**
177:20,21
**sliver**
122:3,11 146:11,11 147:5
200:2,10 243:21 244:11
**slivery**
200:17
**small**
32:22 44:22 58:16 134:23
135:11,25 137:18 169:17
204:11,16 227:21 228:19
**smaller**
138:14
**sn**
1:7 8:9
**snippets**
243:5,13,22 244:12
**software**
39:18
**solely**
56:15 115:20 116:6 117:16
117:21 118:9 120:9 121:14
128:25 129:15 145:10
147:8,9
**somebody**
14:13 37:7 60:12,16 79:24
115:25 119:17 138:10
175:4 238:4 242:4
**somethings**
74:2
**somewhat**
20:10 107:17 153:16
**soon**
98:25 250:14
**sorry**
39:11 46:16 54:19 66:6
78:12 113:18 116:11 121:7

**sorry (cont.)**
142:25 173:1 179:10
186:10 190:13 191:19
197:18 198:5 219:16
221:21 230:25 231:11
232:22 241:11 247:19
**sort**
18:3,5 134:22 165:6 166:19
175:9 192:10 232:17
**sounds**
74:20 78:18 222:6
**source**
86:17 93:3 95:25 96:1
125:15 238:17
**sources**
96:2
**southern**
1:2
**space**
170:17 195:12 214:8,8
**span**
208:2
**spanned**
115:9
**spare**
124:3
**speak**
29:17
**speaking**
55:21,21 170:20
**speaks**
186:13
**specialist**
8:16
**specific**
33:23 35:24 54:3 65:1
82:19 84:9 115:4 127:17
135:8 163:3
**specifically**
32:4 48:12 81:6 141:4
173:15
**specificity**
21:21 29:18 102:23
**specified**
54:18
**spelling**
9:25 23:24
**spent**
16:17 18:9 159:16
**split**
148:14
**sponsored**
48:19
**spot**
196:24 215:23 244:22

[spreadsheet - subtract]

**spreadsheet**
209:19 210:11 238:22
**spreadsheets**
97:15 239:8
**square**
4:16
**ss**
253:4
**staff**
38:24 39:23 96:22
**staffing**
192:11
**stand**
121:7 124:11 153:13 154:9
**standard**
28:13,20,24 29:1 36:19,23
78:19 135:17 136:13
137:14 152:10,15,18
153:13 198:23 200:15,22
**standards**
182:8,12,15
**stands**
116:5 143:18 195:10 203:1
**stanford**
18:18,23 19:5
**start**
64:9,12 83:20 107:11
127:10 138:17 213:25
225:11 238:8,14
**starting**
90:7 130:6 189:9 206:1
216:4 238:5
**state**
9:23 23:10,22,25 24:2,3,7,8
25:19 57:13 61:2 107:21
109:4 250:4 253:3,8
**stated**
17:11 29:11 36:16 51:10
141:3
**statement**
53:25 54:8,11 119:20 140:9
141:5 143:4 144:5 146:15
148:3 159:24 161:4 172:20
194:20 195:12 203:11
**statements**
155:25 186:22 243:15,15
**states**
1:1 2:15 3:3 50:5 58:9
70:11 118:15 143:5 167:7
**stating**
233:12
**statistic**
79:1 153:5
**statistical**
52:3 54:1 55:8 56:5 79:13
81:6 113:8,13 119:13 120:3

**statistical (cont.)**
135:21 136:6,14,17 137:16
138:21 141:8,15 154:20
155:6 157:5,8 162:1,5,12
166:20,24 169:1 172:6
180:3,6 182:4 247:1,14
248:16
**statistically**
56:16,23 74:1 78:11 111:9
112:20 113:8 114:2 119:10
122:10 135:1,14 151:13,21
151:24 153:9 155:7 156:10
156:21 166:4,8 168:8,13
169:2,3,10 201:2,14 243:12
243:20 244:10
**statistician**
52:25 73:17,19
**statistician's**
52:3
**statistics**
16:10 56:9 88:13 89:17
107:14 123:18
**steen**
5:2
**stenographer**
2:11 9:15 72:9 250:3,11,16
253:24
**stenographically**
1:23
**step**
29:15 69:22,24 74:25 79:6
157:11
**steps**
27:17 28:2 29:4 53:18
63:10,14 68:15,18 69:4,14
69:23 76:11 98:14,16 137:8
184:13
**stick**
121:23
**sticking**
217:5
**stipulate**
142:12
**stipulated**
7:1,7,12
**stock**
158:7
**stop**
79:3,4 122:25 191:10
**stories**
175:5
**story**
192:18 193:12
**straight**
73:9 97:6 146:1

**strategy**
219:2 221:15,19,25 222:4
236:13
**streak**
205:21,22,24 206:6,7 214:9
**streaked**
214:5
**streaks**
206:10 212:25 213:7,12,13
213:13,14,17 214:1,15
216:19 222:14 223:4
232:11 235:14
**streaky**
214:6,12
**street**
3:6,17 4:17
**strict**
166:20
**strike**
33:1 37:3 50:8 66:13 71:10
71:19 76:2 78:12 80:17
87:24 128:17 142:1 151:22
155:9 170:3 173:2 176:15
179:5,25 187:23 201:6,10
211:4 217:2 218:13 219:18
230:25 240:11
**striking**
177:10 194:9 196:7
**strong**
123:9,15 147:9 179:21
**stronger**
135:10
**strongly**
120:25 146:13 154:9
**studies**
26:3,18 28:1,16,25 29:3,5
29:20 45:13 46:8,11,14,23
47:1,2,16,19,21 49:2 51:13
51:22 52:9,13,15,23 53:2
53:10 56:13,14 60:1 63:4,6
64:6,16,20,20 65:18,24,25
66:11,15 67:17,25 68:1,2,6
68:7,8 74:23 75:6,13,20,24
76:16,16 77:4,8,17 79:17
81:12 87:23 88:1 89:15
102:19,24 104:2,8,10 105:2
157:13,14,15,16,24,25
158:19 160:24 163:8 166:8
166:12 167:24 172:7
**study**
26:1,6,10 28:3,8,9,14 29:12
46:3 47:9 48:3,9,19,22
49:10,17,22 51:8,12 52:20
53:11,17 55:10 60:15 61:6
61:18,22 63:9,15,22 64:8
64:22 65:4,9,12 67:9 68:14

**study (cont.)**
71:20 72:11,20,23 73:1
74:15 75:1,16,19 76:5,10
76:12,22,25 77:10,12,21
78:19 79:20,22,24,24,25
80:2 82:9,12,14 84:11
89:19 90:11 100:7,24 101:2
101:11 105:8 114:22,22
115:15 127:9,15,18 130:10
131:5 132:11,15 140:14
152:11,15 153:14 156:9
158:24,25 159:12,21
160:11,20 163:15 167:12
167:14,21 168:7,12,14
170:25 171:5 172:7 198:23
200:15,22 201:9,12 202:7
**studying**
81:4
**stuff**
169:25 170:2,6 172:7
**style**
79:17
**subdivision**
107:16,24
**subhead**
88:7
**subject**
13:17 29:10 58:5 74:4
140:7 182:18 216:17 218:2
218:22 220:22 228:16
229:6 230:22 237:21
**subjective**
181:20
**subjectively**
161:23
**subjectivity**
181:18
**submitted**
11:24 25:19 48:8 71:13
126:9 155:17
**substance**
93:11 117:15 118:8 120:9
128:24 129:10 146:20
147:7 193:2 206:22 208:24
243:18
**substantial**
25:16 93:8 107:9 123:21
142:14
**substantially**
21:18 25:12 106:17 107:3
107:10
**substantive**
110:14
**subtract**
228:8

[subtracting - terse]

**subtracting**
222:16
**successor**
204:17
**sued**
60:17
**suffered**
59:2 62:16,20
**sufficient**
54:22 56:20 121:21 122:19
**suggest**
94:15 234:11
**suggesting**
37:7 41:11
**suggestive**
157:6
**suggests**
146:13 147:5,17 173:16
**suing**
60:12
**suitability**
82:14
**suitable**
16:5 239:24
**suite**
3:7 4:18 8:18
**sum**
130:6 161:21
**summarize**
128:1 130:5 146:6 175:18
**summarized**
173:22
**summarizes**
127:21 153:21
**summarizing**
173:12 187:3
**summary**
6:16,19 88:12 140:9 159:23
173:12 186:15,17 224:18
224:22 229:12,17
**summing**
209:3
**sumner**
4:16
**sums**
191:7
**superficial**
101:13,17
**supplied**
240:3
**supplies**
185:22
**supply**
83:18,24 203:18 241:19
**support**
42:15 70:20 91:24 113:25

**support (cont.)**
117:14 122:19 128:23
130:21 139:23 140:16
143:8,16
**supported**
183:16
**supporting**
31:9 207:7,9 237:19
**supports**
130:19 202:7 203:3
**suppose**
13:11 112:13 113:2 125:12
174:22
**supposed**
113:24
**supposing**
204:20
**sure**
11:11 15:6 17:12 22:15
23:1 48:18 52:16 61:9 62:1
66:8,10,25 73:8,10 81:5
84:20 92:9 95:6 114:6
117:3,19 121:20 123:25
133:9 144:20 153:25
154:13 165:25 167:10
176:14 186:11 187:11
221:24 223:16 232:5,24
234:19 238:11 249:18
**surprise**
35:23 53:8
**surprises**
65:11
**surrounding**
70:5 107:15
**suspect**
21:17
**suzuki**
58:1
**swear**
9:15
**switches**
178:9
**sworn**
7:9,11 9:18 253:12
**sylvester**
3:9 6:2 8:21,22 9:2,9,22
10:2 44:3,9,13,15 56:25
57:12 72:5 73:3 84:14,20
99:21 124:1,4 144:9,13,16
144:17,18,20 145:4 184:19
185:9 223:16,25 244:4
245:12,16,25 249:8,18,24
251:6
**sylvesterm**
3:11

**system**
25:7
**systematic**
53:4 174:15 177:12 178:3,5
178:12 243:24 247:20
**systemic**
177:15 244:14

**t**

**table**
6:11,13,16,19 80:11 88:11
147:22,24 148:8 149:3
153:23 168:19,19,20 169:6
172:24,25 173:1,8,22
174:13 180:23,24 185:6,12
185:17,19,22 187:7,22,25
188:9,11,21,24 189:1,4,6,9
190:12 191:12 192:25
193:19,23,24 194:10,16,25
195:1,8 196:22 197:6 200:5
203:20 208:16,18,21
209:16,20 210:13 211:1,7
211:12,20 213:15 215:15
215:22 216:7,7,13 217:4,12
217:24 218:1,6,9,14 220:2
224:2,18,22 225:1,11,15,20
226:1 227:8 229:12,17,25
230:3,4,14 231:10 232:14
234:4,16,23 235:9,17 236:3
236:20 237:17,24 238:1,1,2
238:7,18,21 239:9,11,21
240:20,21 241:2,3,4,7,11
241:14,17,23,24 242:1,2,7
244:24 246:1
**tables**
88:14 92:25,25 93:2,13,19
180:23 210:4,5 217:23
219:12,16 233:16,24
234:16 237:14 238:13
239:23 242:9
**tabulation**
176:4
**tag**
207:25
**tailored**
196:25
**taken**
10:6 57:7 82:1 99:7 119:13
120:6 138:23 140:21 141:1
142:5,22 144:24 160:9
165:15 175:3 185:1 223:21
245:20
**talked**
34:1 36:1
**talking**
26:12 154:23 172:8 173:15
176:22 178:12 213:10,24

**talking (cont.)**
214:13 228:20
**tallies**
147:25 194:10 198:9
200:11
**tally**
15:21
**tangent**
244:5,6
**target**
59:6,13,18 136:1,8,8,10,11
136:18,23,23,24
**tasks**
91:24
**taught**
47:20 81:23
**taxes**
174:21
**teaches**
196:24
**team**
96:10
**technical**
125:22 163:5 177:13
**technologies**
104:22,23 105:15
**telephone**
29:23
**tell**
31:19 44:20 69:14 92:8
121:18 129:12 152:12
153:13,15 156:20 157:12
197:5 200:13 209:6 246:22
**telling**
157:14
**ten**
147:18 240:8
**tend**
30:23
**tends**
139:24
**term**
11:4,8,10,16,16 17:12
25:25 51:7 74:16 133:2,15
133:21 135:12,18,19
137:21 155:2 161:7 243:7,7
**terminology**
156:25 170:5
**terms**
75:23 109:7 152:4,10,15
153:16 202:17 209:1
211:17,22 231:20 247:24
**territory**
179:4 202:4
**terse**
51:11 162:18

**[test - trading]**

**test**
73:14 79:13 86:12,23,25
89:17 101:8 120:19 158:3
169:4 192:10
**testified**
9:20 60:21 62:24 66:22
67:13 69:9 72:23 78:20
89:5 93:16 96:23 99:18,23
100:7,12,21 102:17,20
104:1 114:19 120:19
124:19,20 138:5,15 145:9
176:12 179:2 201:11,18
202:1 207:6 216:18 218:3
218:23 219:11 224:2
228:15,23 233:15 239:5
240:25 246:19
**testify**
14:16 23:19 59:20 67:22
75:10 102:22 114:21
120:18 129:23
**testifying**
10:10 14:11 17:14 59:24
73:12,15 121:4 124:2
172:21 210:10
**testimony**
14:13 15:5,9,12 21:24
25:15 48:1 50:10 58:11
59:19,23 64:18 85:4 179:11
182:21 212:5 215:10
216:20 228:17 229:7
230:23 232:2 237:15 252:6
252:9 253:14
**tests**
192:9 247:1
**text**
70:4 91:8,12
**textbook**
135:15,17 136:5,14 137:1
137:14
**texture**
138:3
**textured**
192:18
**thank**
19:9 42:25 68:10 144:15,18
145:8 148:7 176:13 193:18
197:13 215:14 249:9,23,25
250:2 251:3
**thanks**
223:17
**theme**
171:24
**thereabouts**
44:2
**thereof**
107:23

**thing**
17:3 37:8,8 56:20,21 65:14
66:9 77:14 108:20 132:2
136:22 158:24 165:7
170:24 175:8,10 176:6
177:3,4 181:24 236:13
248:4
**things**
36:8 42:18 52:19 64:18
123:22 126:5 127:21
147:22 165:9 167:3 170:23
173:21,23 180:19 181:21
183:17 213:5 214:20 242:1
**think**
15:19 20:1,8 21:13 22:25
23:17 27:13 28:23 32:18
36:16 41:7 43:22 44:1,5
45:9,10,10 49:4 50:23
51:10 52:2 53:22 54:25
61:21 64:23 66:21,23 71:8
74:8,14,16,19 80:6,15
86:20 88:17 91:6 92:3
95:25 97:17 98:8 103:5,9
104:16 105:12,14 116:8
118:12,14 120:14 121:17
121:25 122:14,15,17 123:4
123:22,24 128:14 129:17
138:11 140:9,10 141:24
146:1,22 159:25 163:24
165:9 167:18,22 170:22
171:16 172:19 173:4
174:10,14 175:5 177:3,4,20
179:2,12,14 180:7 183:10
184:19 191:24 195:17
197:11 210:23 220:17
221:6 222:15 228:5 236:18
236:21,23 237:1 241:4,12
245:12 248:22 249:15
251:7
**thinking**
69:17 161:3 202:4
**third**
2:9 4:4 8:12 170:24 189:20
211:19 214:20
**thoroughly**
91:13,18
**thought**
103:11 124:23 172:1 187:9
241:15
**thousand**
231:11
**three**
30:11 35:19 36:2 39:9 44:1
44:2 88:2,5,13 99:25
136:15,15 137:3,4 170:23
191:4,12 204:12,15,17

**three (cont.)**
205:3,3,23 207:17 216:2,3
222:12,24 243:3
**threshold**
55:23 136:17 137:20
**thresholds**
157:10
**thrown**
190:18
**tie**
207:22
**tied**
38:9,14,18 98:6,19
**ties**
133:13
**time**
7:5 8:13 15:17 16:17,23
18:9,13,15,22 19:2,4,6,16
20:7,8 22:15 28:7 29:2 35:4
36:13,15 38:15 48:2
49:7 57:4,9 60:5 61:8,24
62:12,13,17 67:7 69:24
89:2 99:4,12,14 102:18
105:5 121:13 143:19
144:21 145:1 147:19
159:16 164:19 170:18
178:9 184:23 185:3 198:2
206:1 210:5 223:18,23
243:6 245:17,22 249:9
250:1 251:13,16
**timeline**
110:21 111:11 112:16
113:7
**timelines**
70:1
**times**
14:15,22,23 15:8 21:15,16
23:16 26:9 35:16 36:5
42:25 57:19 196:12 197:10
227:14,20 231:1,6 234:9
239:20
**tiny**
62:16 169:24
**title**
39:9
**today**
10:11,25 22:13 29:18 33:21
42:4 43:13 59:25 60:7 61:5
61:19 64:18 67:12,23 75:5
75:11 89:5 90:23 99:22
100:6 102:22 103:5 115:3,4
116:5 124:17 142:19
148:19 204:11 237:8
246:20
**today's**
8:12 251:14

**todd**
4:15
**tomorrow**
250:16 251:3
**tools**
58:7 129:11
**top**
148:8 225:12,17 229:25
230:10
**topic**
46:11,21 47:2,21 59:18
73:14 75:23 81:24 82:2
86:22 126:20 128:11
**topics**
46:12 128:11
**total**
26:17 38:18 149:19 151:8
188:17,20 190:21 192:7
196:11 199:1,25 203:19
210:18 211:2,8 212:22
213:3 214:2,2,4,23 216:13
217:6,14,18,24 218:7,20
219:6,13 220:5,8,14 221:1
221:5,11,19 223:6 225:18
226:12,18,23 227:3,11,25
228:7,10 229:3 230:1,18
231:15 232:19 233:4 235:2
236:1 242:11,12,20 244:16
245:1,3
**track**
80:23 193:16
**trade**
58:7
**traded**
175:4
**trader**
80:22
**trading**
6:22 62:5,21 63:23 69:18
69:21,25 70:24 71:5 106:12
133:24 134:2,3,11,13,24
135:8 137:11 151:15 152:1
169:20 188:1,12,25 189:4
189:10,22 191:3,13,14,15
193:14 194:14 196:9 197:4
198:16 210:14 211:14,16
211:19 212:10,12,14,20,21
212:22 214:24 215:17,19
215:19 216:2,6 217:7,15,19
218:8,13,15 219:14,25
220:1 222:24 223:3 224:6,7
224:12,14 226:8 227:3
228:7 229:4,14,19 230:12
231:9,16 233:7,9 235:5,18
235:20 236:2 241:5,7
242:21 243:3,4,13,22

[trading - validly]

**trading (cont.)**
244:12
**traffic**
12:23
**trailing**
221:23
**trajectory**
111:1,8,14,15
**transaction**
32:23 62:16 206:14
**transactions**
33:9,16
**transcribed**
241:23
**transcript**
7:14 249:13 250:5 252:6,8
254:2
**transfers**
31:25
**transition**
193:9
**treating**
178:2
**trial**
7:6 50:10
**trouble**
21:7 199:25 200:9
**truck**
58:6
**true**
16:22 21:17 157:3 166:7,22
194:17 195:20 224:10
235:1,7,24 252:8 253:13
**truism**
157:2
**truncated**
237:23
**truncation**
235:12
**truthfully**
10:10
**try**
11:3 17:15 27:6 28:12
165:7 221:10
**trying**
49:12 81:2 142:12 143:21
143:23 144:1 167:17
**tuesday**
1:18
**tuf**
57:25 58:23 59:1,3
**turn**
45:21 155:19 201:3 233:13
237:18 240:20 248:6
**turned**
104:14 198:25

**turning**
83:9 111:10 127:19 145:5
150:18 165:23 186:2
188:11 193:18 194:7 198:1
224:1 226:2 230:17 234:18
246:1 247:3
**turnover**
109:7
**turns**
108:21 152:22,25 210:6
**twice**
133:8
**type**
55:10 58:5 115:15 136:5
**typical**
247:10,23 248:4
**typically**
52:22 64:6,9 65:18 66:11
66:16,24 67:6 76:17 79:16
158:4 166:8,12 167:25
200:22,24 201:9,12
**tyson**
50:5,5 102:8

**u**

**ultimate**
86:1
**ultimately**
80:14 108:21 109:15,20
110:9 144:4 158:3
**un**
161:25 213:4
**unable**
54:19 142:10
**unaccounted**
246:9,15
**unambiguously**
154:12
**unclear**
120:22
**underlie**
179:8
**underlying**
112:25
**understand**
10:17 23:8 24:12,23 44:24
53:15 78:22 82:20 88:19
96:5 97:22 116:16 118:4
119:18 123:19 128:16
143:9 145:15,21 146:2
147:24 156:18 163:24
166:1 167:10,18 168:22
171:10,11,16 234:19
239:21
**understandable**
114:20

**understanding**
20:13 40:25 74:14 88:24
89:9 145:17,20 146:5,7,16
180:13 202:11 238:19
252:12
**understood**
17:16,17,18 19:9 32:2 68:4
122:23 123:1 132:4 176:13
193:18 210:12 242:8
**undertake**
63:10 76:12 165:13 238:23
240:1 246:8,14,20
**undertaken**
131:2
**undertakes**
76:4,9
**undertaking**
221:25
**undertook**
219:2 221:15 240:9 246:22
**unexpected**
33:17
**unfounded**
51:6
**unfriendly**
97:13
**union**
60:12 190:17
**unique**
65:5
**uniquely**
236:24
**united**
1:1 3:3 50:5 58:8 70:11
104:22,23 105:14
**universal**
206:1
**universally**
160:23
**university**
16:12 18:18 19:13,17
114:18 124:24,25
**unknowable**
41:11
**unpronounceable**
158:2
**unproven**
156:6
**unreliable**
180:3,8,12,25 181:7,15,16
184:14
**unusual**
132:19,23 133:1,15,20
134:2,3,14,16,25 135:18,21
137:21,21 148:14,17,18,25
150:25 151:16 152:2

**unusual (cont.)**
153:22 154:7,18 156:25
164:3 169:11,20 173:6,23
174:5,6,12,13 185:23,24
186:6,7 188:12,20,23,25
189:10,12,17,24 190:4
191:12,13 193:20 194:14
194:14 196:9 198:11 200:1
202:18,21 203:24 204:9
207:19 208:2 210:14,20
211:9,13,15,18 212:10,11
212:13,20,21,22 214:24
215:20 216:9 217:15,19,25
218:7,12,15,21 224:6,7,13
225:3,14 226:4,8,13 228:18
230:1,9 231:9 235:18,20
241:5 243:6 246:5,10,16
**unwise**
80:9
**ups**
242:23
**upshot**
186:17
**upstream**
210:7 239:11,15,17
**upward**
138:14
**urn**
199:6
**usage**
112:13 113:6,9
**use**
11:1 17:12 31:6,8 47:16
53:10 76:4,9 81:6,8 85:19
85:22 101:3,6 129:9,11
133:14,21 135:12 162:24
163:1,4 170:5 174:21
204:15
**useful**
94:15,15 184:20
**user**
119:21
**usual**
137:1 157:10
**usually**
155:2

**v**

**vague**
60:25
**vaguely**
28:12 30:19 61:12,15
**validity**
192:11
**validly**
76:23

[value - world]

**value**
54:3 59:8,10 62:13 119:20
145:23,25 146:9,11,12
147:3,4 152:8 153:18 157:8
166:21 196:11 199:1
202:24 203:19 219:6
221:20 234:21 236:7

**values**
149:8 157:12 180:22 199:6
208:22 227:9 249:5

**vanish**
115:24

**variable**
152:22,24 153:3,15

**variety**
19:12 115:16

**various**
46:24 70:2 91:24 109:1,2,4
111:13 134:12 195:21
221:7 228:17

**vendor**
31:11,13 32:21,25 33:3,25
62:11

**venued**
61:1

**verb**
172:15

**verbal**
207:12

**verbatim**
85:13 129:13

**verified**
98:10,11

**verify**
95:16

**version**
47:14 94:13 137:1 192:22

**versions**
47:15 105:25

**versus**
8:7 23:25 24:2 50:5,24
57:24,25 70:11,19 104:23
105:14 243:14

**vesey**
3:6

**vice**
15:22 16:23 39:8,10

**vicinity**
109:9

**video**
1:15 2:7 8:5,14,16

**videoconference**
3:15,23,25 4:9,13 5:17,21

**videographer**
5:24 8:4 9:14 57:4,9 99:4
99:14 144:21 145:1 184:23

**videographer (cont.)**
185:3 223:18,23 245:17,22
251:13

**view**
109:23 116:20 120:7
125:16 160:19 167:18
168:6,10 169:5,8,12 170:7
179:15,19 180:11 184:12
200:23 203:6 207:8

**viewed**
110:23

**views**
87:14 166:1

**virtually**
41:1 160:23

**visible**
27:20,22 47:13 207:4 238:6
244:22

**voice**
8:20

**volume**
69:18,21 70:19,20,24 71:6
71:25 72:1,15,17 73:18,22
102:12,15 103:21,24
106:11,14,15 108:14,17
109:6 110:2,4 112:2,5,14
112:15,17,19 114:4

**volumes**
69:25 70:24 111:19

**volunteer**
42:23

**vs**
1:6

**w**

**wait**
172:21

**waived**
7:14

**walden**
24:7 25:2,3,4,22 57:14

**want**
51:19 55:15 76:20,21 133:9
139:9 147:19 149:25
165:10,24 172:23 176:20
204:18 205:5 231:18,21
232:24,24 234:18 248:6

**wanted**
216:12,13 220:13 227:24
230:16,18 238:11,22 240:1

**ward**
5:14 9:2 249:22

**warner**
61:8,24

**warnings**
119:21

**washington**
3:18 4:19 5:5 23:23 24:4,9

**ways**
64:17 67:21 77:18 133:23
176:5

**website**
19:23,25 182:24 183:9,12

**wecker**
17:25 18:9,14,17 19:3,4,7
19:11,25

**weeks**
30:11 62:12

**weighs**
169:22

**weight**
169:24

**weiss**
5:10 9:3 249:16,19,22

**went**
33:13 193:3 242:24

**west**
50:24

**we've**
32:25 56:18,25 144:7 159:8
165:25 176:17,24 179:7
205:18 231:19,20

**wharton**
5:10 9:3

**whereof**
253:20

**whichever**
133:25

**white**
214:8

**whitney**
107:18

**wide**
67:19,20,21

**widely**
52:9 161:14 222:22

**widows**
61:10,10

**william**
17:25 18:9,16 19:3,4,7,11
19:25

**willing**
142:12

**winded**
28:22

**window**
177:21 204:12,17 205:3,3,4
207:17,18 216:3

**windows**
204:15 207:17 233:2 236:9
236:16 243:4,4

**wire**
31:25

**withdrawn**
18:11 219:23

**witness**
9:18 13:23 14:1,11,16
16:19 17:13 18:10,22 19:18
19:21 20:3,15,20,23 21:1
22:2 26:4,11,19 28:2 29:22
30:13 31:1 34:3 44:14 48:3
48:10 50:8 57:3 60:2 61:18
68:3,5 98:24 99:24 142:25
144:6,11,15,18 184:22
250:2 252:1 253:11,14,20

**witnesses**
26:25

**word**
11:1 39:9 69:12 111:14
161:22 162:24 163:1,4
240:23

**wording**
141:14

**words**
11:16 33:9 53:19 111:19
118:23 119:4,5 129:15
141:20 166:15 180:22
186:14 190:6 207:24

**work**
9:12 14:8 15:2,25 17:3 18:3
18:5 26:4,11,19 29:19 33:9
40:11 41:1 49:19 58:16,17
59:21 60:14 61:18 63:14,14
68:2,5 70:10 71:21 72:12
73:5,6,11,14,16,20 74:9,11
74:17 79:23 82:8,11 85:6,9
90:18,23 92:22 95:21 103:3
104:2,12 105:2 108:9,22
109:12,20 110:8 111:5
114:23 116:20 119:22
121:10 126:24 127:1,5
130:19,20 131:1,17,18,19
131:23 139:22,23 143:8,15
144:2 152:7 157:18,21
158:4,17 164:1,17,22,25
165:12 178:16 182:8
183:24 184:5,7,9,17 199:17
202:17 243:19 246:20

**worked**
17:25 34:18 37:11

**working**
19:7 38:24 94:6

**works**
57:3 223:13

**world**
176:4 183:11,19

[worth - zoom]

**worth**
  32:18
**wrap**
  245:14
**write**
  92:13 130:8 131:4 138:17
  140:12 184:9 194:8 213:1
**writes**
  166:2 167:2
**writing**
  75:20 76:22 77:2,3,9 91:10
  92:15,17 163:4
**writings**
  47:18
**written**
  45:12 46:13 74:22 75:22
  133:1
**wrong**
  130:9 167:19 180:25
**wrote**
  46:22 47:1 70:4 75:13 91:8
  92:5,12,18 93:6

**x**

**xrp**
  11:4,6,7,14 30:20,21,23,25
  31:6,8,12,20 32:4,10,13,17
  32:23 33:4,10,14,18,22
  37:17,20,23 62:5,10,12,14
  62:17,20,25 80:3 83:3
  88:21,25 89:4 117:15,21
  118:9 119:11,14,19,19
  120:4,9 121:11,13 122:4,12
  122:20 128:3,8,25 130:11
  130:16,23 131:7,14,25
  132:12,16 134:5,11 135:1
  138:22 139:18 140:2,20,24
  142:4,14,21 145:10,22
  146:9,12 147:2,8 148:9,13
  150:25 151:6 154:18
  155:24 156:11 159:14
  160:6,21 162:14 166:5
  168:8,14 169:11,20 170:17
  170:20 173:7,13,24 174:5
  174:12,21 175:11 183:20
  189:6 194:14 198:11 202:8
  203:3,24 208:22 209:12
  216:9 225:2,3,3 230:9
  246:5
**xrp's**
  127:9,15 132:19,23 169:14
  174:5

**y**

**yeah**
  66:14 71:14 219:18 251:7

**year**
  67:7,14 105:24
**years**
  21:23 22:6 24:6 27:5 28:21
  29:20 50:11 60:22 65:25
  75:6,7 102:21 114:23,24
  115:10,10
**yellow**
  213:13
**yesterday**
  44:20 65:13,15
**yesterday's**
  45:3
**yield**
  153:8,8 233:20
**yields**
  219:9
**york**
  1:2,17,17 2:10,10,15 3:8,8
  4:5,5 5:13,13 8:12,12 253:3
  253:9
**youth**
  112:13 113:6,9

**z**

**zero**
  152:24 153:1
**zoom**
  44:19 45:3,9