# Exhibit 43

1

1                IN THE UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                     Plaintiff,     ) Case No.:
6            v.                     ) 20-Civ-10832(AT)(SN)
                                    )
7    RIPPLE LABS, INC., BRADLEY     )
     GARLINGHOUSE, and CHRISTIAN    )
8    LARSEN,                        )
                                    )
9                    Defendants.    )
     _____)
10

11

12

13

14

15                   VIDEOTAPED DEPOSITION OF

16               KRISTINA S. SHAMPANIER, Ph.D.

17                 Monday, December 20, 2021

18

19

20

21

22

23

     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 211220BLO

2

1              IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                     Plaintiff,     ) Case No.:
6            v.                     ) 20.Civ.10832(AT)(SN)
                                    )
7    RIPPLE LABS, INC., BRADLEY     )
     GARLINGHOUSE, and CHRISTIAN    )
8    LARSEN,                        )
                                    )
9                    Defendants.    )
     _____)
10

11

12

13

14

15          Videotaped Deposition of KRISTINA S. SHAMPANIER,

16   Ph.D. taken on behalf of Plaintiff, held at the offices

17   of Debevoise & Plimpton, 919 Third Avenue, New York, New

18   York, commencing at 9:01 a.m. and ending at 4:41 p.m., on

19   Monday, December 20, 2021, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States of

21   New York and New Jersey, pursuant to notice.

22

23

24

25

3

1    A P P E A R A N C E S (Via Remote where indicated):

2

3

4    For the Plaintiff:

5

6

7            UNITED STATES SECURITIES AND EXCHANGE COMMISSION

8            NEW YORK REGIONAL OFFICE

9            BY:  PASCALE GUERRIER, ESQUIRE

10               MARK SYLVESTER, ESQUIRE

11           New York Regional Office

12           200 Vesey Street

13           Suite 400

14           New York, New York  10281-1022

15           Telephone:  212.336.0153

16           Email:   guerrierp@sec.gov

17                    sylvesterm@sec.gov

18

19

20

21

22

23

24

25

```
                                                                 4
 1    A P P E A R A N C E S (Continued):

 2    For Defendant Ripple Labs Inc.:

 3            DEBEVOISE & PLIMPTON LLP

 4            BY:  PETER URMSTON, ESQUIRE (Remote)

 5                 LISA ZORNBERG, ESQUIRE (Remote)

 6                 ASHLEY HAHN, ESQUIRE (Remote)

 7            919 Third Avenue

 8            New York, New York  10022

 9            Telephone:  212.909.6000

10            E-Mail:  pcurmston@debevoise.com

11                     lzornberg@debevoise.com

12                     ahahn@debevoise.com

13                        -and-

14    For Defendant Ripple Labs Inc. and the Witness:

15

16            KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

17            BY:  BRADLEY E. OPPENHEIMER, ESQUIRE

18                 JUSTIN BERG, ESQUIRE (Remote)

19            Sumner Square

20            1615 M Street, N.W.

21            Suite 400

22            Washington, D.C.  20036

23            Telephone:  202.326.7999

24            E-mail:  Boppenheimer@kellogghansen.com

25                     jberg@kellogghansen.com
```

5

1    A P P E A R A N C E S (Continued):

2

3    For Defendant Bradley Garlinghouse:

4

5           CLEARY GOTTLIEB STEEN & HAMILTON

6           BY:  JACKIE M. BRUNE, ESQUIRE (Remote)

7           One Liberty Plaza

8           New York, New York  10006

9           Telephone:  212.225.2951

10          E-mail:  jabrune@cgsh.com

11

12   For Defendant Christian A. Larsen:

13

14          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15          BY:  SARAH PROSTKO, ESQUIRE (Remote)

16          1285 Avenue of the Americas

17          New York, New York  10019-6064

18          Telephone:  212.373.3067

19          E-mail:  sprostko@paulweiss.com

20

21   ALSO PRESENT:

22

23          NICOLE FORBES, Paralegal, SEC

24          DAVID SHERECK, Videographer
            Shereck Video Service
25

6

```
 1                        INDEX

 2    WITNESS                        EXAMINATION

 3    KRISTINA S. SHAMPANIER, Ph.D.

 4        BY MS. GUERRIER                10

 5        BY MR. OPPENHEIMER            219

 6

 7

 8                      EXHIBITS

 9    SEC
      NUMBER             DESCRIPTION           PAGE
10

11    Exhibit 1   Curriculum Vitae of  ████     97

12                     ████    Undated

13                NO BATES, 3 pages

14

15    Exhibit 4   Expert Rebuttal Report of    24

16                Kristina Shampanier, Ph.D.

17                dated November 12, 2021

18                NO BATES, 45 pages

19

20    Exhibit 5   Thesis Dissertation "Essays    64

21                in Behavioral Decision-

22                Making" dated May 2007 by

23                Dr. Shampanier

24                NO BATES, 159 pages

25
```

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

7

1                              EXHIBITS

2      SEC
       NUMBER                   DESCRIPTION                PAGE
3

4      Exhibit 7    Expert Report of ████████          96

5                   B. ██████ dated October 4,

6                   2021

7                   NO BATES, 50 pages

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8

```
 1                    DEPOSITION SUPPORT INDEX

 2

 3      DIRECTION TO WITNESS NOT TO ANSWER

 4         Page    Line

 5          16        6

 6          17       22

 7          33        9

 8          34       18

 9          34       21

10

11

12      STIPULATIONS

13         Page    Line

14          12        1

15

16

17      PORTION MARKED HIGHLY CONFIDENTIAL

18         Page    Line

19          - -none- -

20

21

22      REQUEST FOR DOCUMENTS

23         Page     Line

24          - -none- -

25
```

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

9

1                        -  -  -

2                     9:01 a.m.

3                  December 20, 2021

4                        -  -  -

5            THE VIDEOGRAPHER:  Okay.  We

6       are on the record.  The time is

7       approximately 9:01 a.m.  Today's date

8       is Monday, December 20th, 2021.  This

9       is the video deposition of Kristina

10      Shampanier in the matter of the

11      Securities and Exchange Commission

12      versus Ripple Labs, et al.  Index

13      number is 20-Civ-10832 in the United

14      States District Court, Southern

15      District of New York.

16            My name is David Shereck,

17      certified legal videographer with Shereck

18      Video, in association with Gradillas

19      Reporting of Glendale, California.

20            We're located today at the

21      offices of Debevoise & Plimpton located

22      at 919 Third Avenue, New York, New York.

23            All counsel that are present

24      will be noted on the stenographic record.

25            And the court reporter today is

10

1          Bridget Lombardozzi, also with Gradillas,

2          and will you please swear in the witness.

3                    K R I S T I N A

4          S H A M P A N I E R, Ph.D., having been

5          duly sworn, was examined and testified as

6          follows:

7                    THE REPORTER:  Thank you.

8                    You may proceed.

9   DIRECT-EXAMINATION

10  BY MS. GUERRIER:

11      Q.   Good morning.  I'm Pascal Guerrier with

12  the SEC.  I'll be asking you questions today.

13  With me is my -- is also counsel, Mark Sylvester.

14          If you could please state your name for

15  the record.

16      A.   Kristina Shampanier.

17      Q.   Are you represented by counsel today?

18      A.   Yes.

19      Q.   Who's your counsel?

20      A.   Brad Oppenheimer.

21      Q.   And who is Brad Oppenheimer with?

22      A.   Kellogg Hansen.

23      Q.   Before we get started, I want to just

24  give you some of the rules that are going to

25  govern the deposition today so that the deposition

can go smoothly.

You understand that you're giving testimony under oath?

A. Yes.

Q. And do you understand that your answers today to my questions have the same force and effect as if we were in a courtroom?

A. Yes.

Q. Is there anything that will prevent you from testifying truthfully and accurately today?

A. No.

Q. If you don't understand any question that I ask, I -- please let me know and I'll rephrase it.

Please allow me to finish my question before you start answering so that the court reporter can have a clear record of your testimony and my questions.

And if you could please respond verbally because the court reporter cannot transcribe nods and other nonverbal actions.

Do you have any questions about any of the rules that I've just described to you?

A. No questions.

Q. Okay. Have you had --

1          MR. OPPENHEIMER:  Could I

2          just put on the record here we'd like

3          to continue our prior practice of

4          having an objection by one defendant

5          count as an objection by all.

6          MS. GUERRIER:  Sure.

7          MR. OPPENHEIMER:  Thank you.

8   BY MS. GUERRIER:

9      Q.   Have you had your deposition taken

10  before today?

11     A.   Yes.

12     Q.   Okay.  Do you recall when you had your

13  deposition taken?

14     A.   2016.

15     Q.   Any other time?

16     A.   No.

17     Q.   Do you recall the case where you had

18  your deposition taken in 2016?

19     A.   It was several cases combined.  One of

20  them was United States versus Florida.

21     Q.   Do you recall what the case was about?

22     A.   Was a health care case.

23     Q.   When you say "it was several cases

24  combined," can you elaborate on that?

25     A.   Why don't we open my report and it's

13

```
 1    listed in my CV.
 2         Q.   Why don't you answer my questions,
 3    please.
 4                   MR. OPPENHEIMER:   Objection.
 5         A.   There were several cases combined
 6    together.  One of them had a very long name that I
 7    cannot recollect from memory.  The other one was
 8    United States versus Florida.
 9         Q.   Okay.  Were they all health care cases?
10         A.   Yes.
11         Q.   Did you do anything to prepare for your
12    deposition today?
13         A.   Yes.
14         Q.   What did you do to prepare for your
15    deposition?
16         A.   I reviewed my report, Mr. ████████
17    report, the complaint, materials considered in my
18    report, Ripple's answer.  I had several meetings
19    with my colleagues and with counsel.
20         Q.   Which colleagues did you have meetings
21    with in preparation for your deposition?
22         A.   Niall MacMenamin and Vendela Fehrm.
23         Q.   And Vendela?  I'm sorry?
24         A.   Fehrm.
25         Q.   Who is Niall MacMenamin?
```

14

1        A.   He's a -- and I apologize in advance to

2    any of my colleagues whose names I mispronounce.

3    Same for counsel.  Niall is my colleague at

4    Compass Lexecon.

5        Q.   Does Mr. Niall MacMenamin work with you

6    at Con Lexecon?

7        A.   Niall works with me at Compass Lexecon.

8        Q.   Compass Lexecon.

9             So do you supervise Mr. Mc -- am I

10    saying his name correctly?  Mc -- MacMenamin?

11       A.   MacMenamin.

12       Q.   MacMenamin.

13            Do you supervise Mr. MacMenamin?

14                    MR. OPPENHEIMER:  Objection.

15                    You can answer.

16       A.   No.

17       Q.   Okay.  So what is his role at Con

18    Lexecon?

19       A.   His role at Compass Lexecon -- his

20    position at Compass Lexecon is senior vice

21    president.

22       Q.   Were any attorneys present when you met

23    with Mr. MacMenamin?

24       A.   Sometimes yes, sometimes no.

25       Q.   Okay.  Do you recall the times when the

15

1    attorneys were not present when you met with

2    Mr. MacMenamin?

3                    MR. OPPENHEIMER:  You can

4            answer that yes or no if you recall.

5        A.   Yes.

6        Q.   So can you tell me which times you met

7    with Mr. MacMenamin without your attorneys

8    present?

9        A.   This would --

10                   MR. OPPENHEIMER:  Objection

11           to the form.

12                   You can answer as to which

13           times you met with him if you understand

14           that.

15       A.   This would be in the past two weeks or

16   so.

17       Q.   Was Mr. MacMenamin involved in preparing

18   the report that you submitted in this case?

19       A.   He assisted me.

20       Q.   How did he assist you?

21       A.   We had discussions about the report.

22       Q.   Did he help you write the report?

23       A.   He reviewed the report and gave me

24   feedback.

25       Q.   Is Mr. MacMenamin your supervisor?

16

1      A.   No.

2      Q.   When you met with Mr. MacMenamin without

3   your attorneys present, did -- what did you

4   discuss?

5                      MR. OPPENHEIMER:   Objection.

6                      I'll instruct you not to answer

7           that.  That calls for privileged

8           information.

9      Q.   Okay.  Is Mr. -- was Mr. MacMenamin

10   retained by your counsel to assist you in this

11   case?

12                     MR. OPPENHEIMER:   Objection.

13                     You can answer if you know.

14     A.   I'm not sure about the technicalities.

15   I understand he was retained to assist me.

16     Q.   You also mentioned Mr. -- I'm sorry,

17   Vendela Fehrm?

18     A.   Vendela Fehrm.  It's a she.

19     Q.   Vendela Fehrm.

20          And who is Vendela Fehrm?

21     A.   She's my colleague -- colleague at

22   Compass Lexecon.

23     Q.   What is her title at Compass Lexecon?

24     A.   Vice president.

25     Q.   Does Ms. La Fehrm assist you with

17

1    preparing the report you submitted in this case?

2                    MR. OPPENHEIMER:  Objection.

3                    You can answer.

4         A.   Ms. Fehrm assisted me with the report.

5         Q.   How did Ms. La Fehrm assist you with the

6    report?

7         A.   She helped finding certain citations.

8                    THE REPORTER:  Repeat.

9         A.   She helped finding certain citations.

10        Q.   Are those citations report -- included

11   in the report you submitted?

12        A.   That's correct.

13        Q.   Do you recall which citations she helped

14   find for you?

15                   MR. OPPENHEIMER:  Objection.

16                   You can answer that yes or no

17        if you recall.

18        A.   To a degree.

19        Q.   What do you recall regarding the

20   citations that she assisted you with?

21                   MR. OPPENHEIMER:  Objection.

22                   I instruct you not to answer

23        that.

24                   MS. GUERRIER:  What is the

25        basis for your objection?

18

```
 1                    MR. OPPENHEIMER:   You're

 2            asking -- as I understand it, you're

 3            asking about the substance of the

 4            discussions that she had with her own

 5            support team who are Compass Lexecon

 6            employees retained by and acting at

 7            the direction of counsel.  I think

 8            that's attorney work product and it's

 9            privileged from discovery.

10                    MS. GUERRIER:   Okay.

11    BY MS. GUERRIER:

12        Q.   You also stated you met with attorneys

13    in this case, is that correct?

14        A.   That's correct.

15        Q.   Who did you meet with?

16        A.   Bradley Oppenheimer, Justin Berg, Andrew

17    whose last name I don't remember, Sarah Prostko.

18        Q.   Do you recall how many times you met

19    with the attorneys in this case?

20        A.   I haven't finished answering.

21        Q.   I'm sorry.

22        A.   And Jackie Brune, I believe.

23        Q.   Can you repeat that, please?

24        A.   Jackie Brune.

25        Q.   Jackie Brune?
```

19

1      A.   Yes.

2      Q.   Okay.  Okay.  Did you meet with the

3   individuals that you've identified all together at

4   once?

5      A.   I had several meetings.  Some of them

6   were at all the meetings; some of them were at

7   only some of the meetings.

8      Q.   Do you recall how many sessions you had

9   with the attorneys that you identified to prepare

10  for your deposition?

11     A.   I do.

12     Q.   How many sessions did you have?

13     A.   Three.

14     Q.   When was the first session?

15     A.   Within the past two weeks.

16     Q.   Do you recall the date?

17     A.   No.

18     Q.   When was the second session?

19     A.   Within the past two weeks.

20     Q.   Do you recall the date?

21     A.   No.

22     Q.   When was the third session?

23     A.   Yesterday.

24     Q.   Were all of the attorneys that you've

25  identified present at yesterday's session to

20

```
 1    prepare you for your deposition?
 2         A.    No.
 3         Q.    Who was present?
 4         A.    Bradley Oppenheimer and Justin Berg.
 5         Q.    Do you recall how long the session
 6    lasted?
 7         A.    About two hours.
 8         Q.    And the session -- the first session
 9    that you had with the attorneys in the past two
10    weeks, do you recall how long the first session
11    lasted?
12         A.    Yes.
13         Q.    How long did the first session last?
14         A.    Four hours.
15         Q.    Do you recall how long the second
16    session that you had in the past two weeks with
17    your attorneys lasted?
18         A.    Yes.
19         Q.    How long did the first session last?
20    I'm sorry, the second session that you had with
21    your attorneys in the past two weeks last.
22         A.    Three hours.
23         Q.    Was anyone who was not an attorney
24    present during any of the sessions that you had
25    with your attorneys?
```

21

1      A.   Yes.

2      Q.   Who was present during the sessions that

3  you had with your attorney?

4      A.   In the first two sessions, Niall

5  MacMenamin and Vendela Fehrm were also present.

6      Q.   Anyone else?

7      A.   No.

8      Q.   Other than counsel, did you speak

9  with -- and -- other than counsel and the

10  individuals at Compass Lexecon that you described,

11  did you speak with anyone else about your

12  deposition?

13      A.   My family knows I'm at a deposition.

14      Q.   Who did you speak with in your family

15  about the deposition?

16      A.   My husband and my parents know I'm in a

17  deposition.

18      Q.   When did you speak with your husband

19  about the deposition?

20      A.   I don't recall.

21      Q.   Do you recall what you told your husband

22  about the deposition?

23               MR. OPPENHEIMER:  You can

24          answer yes or no.

25      A.   Yes.

```
1         Q.   What did you tell your husband about the
2    deposition?
3         A.   That I would be --
4                     MR. OPPENHEIMER:   Objection.
5                     I don't think you are obligated
6              to disclose the substance of your
7              communications with your husband.
8                     Counsel, maybe we can try
9              laying some foundation as to whether she
10             discussed any --
11                    MS. GUERRIER:   Well --
12                    MR. OPPENHEIMER:   --
13              substance relating to the deposition
14              with him before --
15                    MS. GUERRIER:   -- I'm
16              getting there, but I don't think
17              that's a proper objection.   Your
18              objections are to form.   I don't know
19              what privilege you're preserve --
20              preserving here.
21                    MR. OPPENHEIMER:   I believe
22              there's a marital communications
23              privilege between husbands and wives.
24                    MS. GUERRIER:   Are you
25              claiming the marital priv --
```

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

23

```
 1            privilege here?
 2                    MR. OPPENHEIMER:  I think
 3            the witness may choose to claim that
 4            if she wishes.
 5                    MS. GUERRIER:  Do you
 6            represent her personally?
 7                    MR. OPPENHEIMER:  I'm here
 8            representing Ripple Labs.
 9                    MS. GUERRIER:  Right.  So
10            how are you -- okay.  So you -- you
11            cannot object to her own marital
12            privilege if she does choose to claim
13            it or not.
14    BY MS. GUERRIER:
15        Q.   So what did you talk to your husband
16    about regarding the deposition?
17        A.   I told him I would be deposed.
18        Q.   Did you talk to him about the substance
19    of this case?
20        A.   No.
21        Q.   You also said you spoke with your
22    parents about the case?
23        A.   That's correct.
24        Q.   What did you tell your parents about the
25    case?
```

24

```
 1        A.   That I would be deposed.

 2        Q.   Did you speak about any substantive

 3   aspect of the case?

 4        A.   No.

 5        Q.   Did you tell them what the case was

 6   about?

 7        A.   No.

 8        Q.   Did you speak with anyone else other

 9   than your family about the case?

10        A.   No.

11                  MS. GUERRIER:  I'm going

12             to -- if you could also pass it down

13             to the court reporter.

14                  THE REPORTER:  Exhibit 4?

15                  MS. GUERRIER:  Yes.

16                  (Whereupon, exhibit is received

17             and marked SEC Shampanier Deposition

18             Exhibit 4 for identification.)

19                  THE REPORTER:  Exhibit 4 for

20             identification.

21   BY MS. GUERRIER:

22        Q.   I've handed you what's been premarked as

23   Exhibit 4.

24             Do you recognize the document that I've

25   handed you that's been premarked as Exhibit 4?
```

1           (Pause)

2      A.   Yes.

3      Q.   What is the document that's been

4  premarked as Exhibit 4?

5      A.   This appears to be a copy of my report

6  in this case.

7      Q.   Okay.  If you could turn to page 34 of

8  the report.

9           Is that your signature on page 34 of the

10 report?

11     A.   Yes.

12     Q.   Do you recall when you finalized the

13 report?

14     A.   November 12th.

15     Q.   Do you recall when you started drafting

16 the report?

17     A.   Yes.

18     Q.   When did you start drafting the report?

19     A.   October.

20     Q.   Do you recall what date?

21     A.   No.

22     Q.   Is this the -- Exhibit 4 the only draft

23 of the report?

24     A.   No.

25     Q.   Okay.  How many drafts are there of the

26

1    report?

2         A.   I don't know.

3         Q.   Where are the drafts of the report?

4         A.   On the Compass Lexecon network.

5         Q.   Is the report that you submitted today

6    final?

7         A.   It is final but if new information comes

8    in, I reserve the right to change my opinions.

9         Q.   Okay.  Has any information since you

10   signed this report affected or altered the

11   opinions that are set forth in the report?

12        A.   No.

13        Q.   Are you ready to testify about the

14   opinions that you're offering in this case?

15        A.   Yes.

16        Q.   Do you recall when you were retained to

17   provide your expert services in this case?

18        A.   Yes.

19        Q.   When were you retained?

20        A.   October.

21        Q.   What year?

22        A.   October 2021.

23        Q.   Okay.  Do you recall who retained you to

24   provide expert services in this case?

25        A.   Counsel for Ripple.

27

```
 1        Q.   Do you recall what firm?

 2        A.   Kellogg Hansen.

 3        Q.   Okay.  Are you just representing -- I'm

 4   sorry.

 5             Are -- did you submit the report on

 6   behalf of Ripple only?

 7                      MR. OPPENHEIMER:  Objection.

 8                      You can answer.

 9        A.   That's correct.

10        Q.   Did you come to any arrangements with

11   Ripple regarding your fees in this case?

12                      MR. OPPENHEIMER:  Objection

13             to the form.

14                      You can answer.

15        A.   I didn't personally discuss my fees with

16   counsel.

17        Q.   Well, do you know how much you're

18   charging for your services in this case?

19        A.   Compass Lexecon is charging $975 per

20   hour for my work.

21        Q.   Okay.  Do you know if you're expected to

22   provide any additional expert services other than

23   the report that you submitted in this case?

24                      MR. OPPENHEIMER:  Objection

25             to the form.
```

28

1          A.   I don't know that -- that for sure.  I

2      understand that I may testify at trial.

3          Q.   Mm-hmm.

4               Do you know if your -- the rate that's

5       being charged for your services will change if

6       you testify at trial?

7          A.   I know that.

8          Q.   I'm sorry?

9          A.   I know whether it will change or not.

10         Q.   So what is the answer?  Will it change

11     or not?

12         A.   It -- it will not change.

13         Q.   Do you -- do you know how many billable

14     hours you've spent on this case thus far?

15         A.   No.

16         Q.   How do you keep your time on this case?

17         A.   I enter time usually daily in the system

18     in Compass Lexecon.

19         Q.   Do you know what specific work that you

20     billed for in the case?

21         A.   Yes, generally.

22         Q.   So what -- what specific work have you

23     billed for in this case?

24              MR. OPPENHEIMER:  Objection.

25              You can answer as to the types

1          of work you've performed.  You should not

2          reveal the substance of any discussions

3          with counsel.

4      A.   Reviewing case materials, meetings,

5  drafting report, preparation to deposition.  These

6  are the major ones.

7      Q.   What are the -- are -- are there other

8  types of work that you've done in the case other

9  than the ones that you just described?

10     A.   Not that I recall.

11     Q.   Do you have any --

12              THE VIDEOGRAPHER:  Go ahead.

13     Q.   Do you have any personal relationship

14  with any of -- with the defendants in this case?

15     A.   No.

16     Q.   Okay.  Do you have any financial

17  relationships with the defendants in this case?

18              MR. OPPENHEIMER:  Objection.

19              You can answer.

20     A.   Compass Lexecon is compensated for my

21  work in this case.

22     Q.   Are you familiar with XRP?

23     A.   Yes.

24     Q.   What is XRP?

25     A.   It is --

30

1                    MR. OPPENHEIMER:  Objection.

2                    You can answer.

3          A.   XRP is the digital asset at issue in

4     this case.

5          Q.   Do you own any XRP?

6          A.   No.

7          Q.   Does anyone in your family own any XRP?

8          A.   No.

9          Q.   Have you bought any XRP?

10         A.   No.

11         Q.   Have you sold any XRP?

12         A.   No.

13         Q.   Do you know if Compass Lexecon has

14    received any compensation in XRP?

15         A.   I don't know the full extent of Compass

16    Lexecon's compensation, but I would be very

17    surprised if they received any compensation in

18    XRP.

19         Q.   Why?

20         A.   I've been in economic consulting for 15

21    years and I've never seen anyone being compensated

22    in anything but U.S. dollars or other traditional

23    currencies.

24         Q.   Do you recall when you were first

25    contacted to render your expert services in this

1    case?

2          A.   October.

3          Q.   Do you know how the defendant knew how

4    to contact you in this case?

5          A.   No.

6          Q.   Was anyone present during this initial

7    contact from the defendant in this case?

8          A.   Yes.

9          Q.   Who was present at your initial contact

10   with the defendant in this case?

11         A.   Just to clarify, by "defendant" I assume

12   you mean counsel.  And the person present was

13   Niall MacMenamin.

14         Q.   Were you provided with any assignment

15   during the first contact that you had with the

16   defendant in this case?

17         A.   Yes.

18         Q.   Do you recall what your assignment was

19   in your first contact in this case?

20         A.   Yes.

21         Q.   What was the assignment?

22         A.   To evaluate the expert report of ███████

23   █████

24         Q.   Were you asked to render an opinion on

25   this initial contact?

32

```
1              MR. OPPENHEIMER:  Objection.
2         I think the substance of individual
3         conversations is -- is privileged.  I
4         think if you want to ask her what her
5         assignment was, you're welcome to do
6         that; but if you want to ask her the
7         substance of any particular
8         conversation, I'll instruct you not
9         to answer.
10             MS. GUERRIER:  First of all,
11        I asked her whether she was asked to
12        render any opinion on the initial
13        contact.  Number two, you shouldn't
14        be having any speaking objections.
15        I'm not sure what your objection is,
16        frankly.
17             MR. OPPENHEIMER:  It's a
18        privilege objection.  I just
19        explained the basis for it.  If you'd
20        like me to elaborate, I can.
21             MS. GUERRIER:  She can
22        answer yes or no.
23             MR. OPPENHEIMER:  Hang on.
24             MS. GUERRIER:  So I'll
25        repeat my question unless you have
```

33

1           anything else to add.

2                      MR. OPPENHEIMER:  Go ahead.

3           Why don't you ask your question.

4    BY MS. GUERRIER:

5        Q.   Were you asked to render any opinion on

6    the initial contact?

7                      MR. OPPENHEIMER:  Objection.

8                      I'm going to instruct you not

9            to answer that.

10                     MS. GUERRIER:  What's the

11             basis for your objection?

12                     MR. OPPENHEIMER:  It's

13             privileged.  You're -- you're asking

14             her -- in substance that question

15             asks what the lawyers discussed with

16             her in the initial conversation and,

17             in particular, whether this

18             particular sentence, essentially

19             "Please render an opinion" came up.

20                     You're not allowed to ask

21             questions that go --

22                     MS. GUERRIER:  You don't

23             have to tell me what I'm not allowed

24             to do.  Your objection is noted.

25             We'll have that on the record and we

34

1          can deal with that later.

2                    MR. OPPENHEIMER:  Counsel,

3          you asked me the basis for the

4          objection.  I'm giving you the basis

5          for the objection.  It -- it is

6          within the scope of attorney work

7          product to inquire as to the

8          particular conversations the witness

9          had with counsel.  I'm not going to

10         allow her to answer that.

11                   MS. GUERRIER:  Okay.  Your

12         objection is noted.

13   BY MS. GUERRIER:

14       Q.   Were you provided with any facts about

15   the case at the initial consultation?

16                   MR. OPPENHEIMER:  Same

17         objection.

18                   I instruct you not to answer.

19       Q.   Were you provided with any documents

20   about the case at the initial consultation?

21                   MR. OPPENHEIMER:  Same

22         objection.  Same instruction.

23       Q.   Did you receive any records for this

24   case when you were retained as an expert?

25                   MR. OPPENHEIMER:  You can

35

```
1              answer.
2       A.    What do you mean by "records"?
3       Q.    Do you have an understanding what the
4   term "records" means?
5                    MR. OPPENHEIMER:  Objection.
6              She -- objection to the form.
7                    You can answer if you
8         understand.
9       A.    It has several meanings.
10      Q.    Did you get any documents when you were
11  retained in this case?
12      A.    Yes.
13      Q.    When did you receive the documents for
14  this case?
15      A.    October.
16      Q.    From whom did you receive the documents?
17      A.    From Niall MacMenamin.
18      Q.    Were there any facts that were provided
19  to you by your attorneys that you considered in
20  forming your opinion in this case?
21      A.    Can you repeat that, please?
22      Q.    Sure.
23            Were there any facts that were provided
24  to you by your attorneys that you considered in
25  forming your opinion in this case?
```

36

```
 1        A.   No.

 2        Q.   Okay.  Were there any documents that

 3   were provided by your attorneys that you

 4   considered in forming your opinion in this case?

 5        A.   I under -- under -- I understand that

 6   the documents I received from Niall were provided

 7   to him by counsel.

 8        Q.   Did you consider any of the documents

 9   that were provided to you by counsel in forming

10   your opinions?

11                  MR. OPPENHEIMER:  Objection.

12                  You can answer if you know.

13        A.   Not directly received.

14        Q.   What do you mean by "not directly

15   received"?

16        A.   Niall received documents from counsel.

17   I received documents from Niall.

18        Q.   Okay.  So the documents that ended up in

19   front of you, did you consider any of them in

20   forming your opinion?

21        A.   Yes.

22        Q.   What documents did you consider in

23   forming your opinions in this case?

24        A.   The complaint, Ripple's response to the

25   complaint, Mr. ██████ report, the Howey case.
```

37

1    Q.    Anything else?

2    A.    Nothing else.

3    Q.    Were there any assumptions that you

4    relied on in formulating your opinions in this

5    case that were provided to you by counsel?

6    A.    No.

7    Q.    Did you personally do all the work in

8    support of the report that you submitted in this

9    case?

10                    MR. OPPENHEIMER:   Objection.

11    A.    I had assistance from my team.

12    Q.    Who makes up the "team" that you're

13    referring to?

14    A.    Niall MacMenamin, Vendela Fehrm.  And

15    there might have been -- there was another person

16    who worked directly with Vendela.

17    Q.    Who is this other person who worked

18    directly with Vendela Fehrm?

19    A.    I don't remember the name.

20    Q.    Did you supervise this other person who

21    worked directly with Vendela Fehrm?

22    A.    Vendela supervised this other person.

23    Q.    Do you recall this other person's title?

24    A.    No.

25    Q.    Do you know what role this other person

38

1    played in form -- helping you formulate your

2    opinions in this case?

3         A.   Yes.

4         Q.   What role did this person play?

5         A.   He verified citations.

6         Q.   Do you recall which citations he

7    verified?

8         A.   All of them or the majority.

9         Q.   What did Vendela Fehrm do in support of

10   you -- your work in this case?

11        A.   She helped finding certain citations.

12        Q.   Did she do anything else?

13        A.   She supervised this other person who

14   checked the citations.

15        Q.   Is this other person that you're

16   referring to an employee of Compass Lexington --

17   Lexecon?

18        A.   He's an employee of Compass Lex --

19   Lexecon.

20        Q.   Other than finding certain citations and

21   supervising the person that you can't recall, what

22   else did Vendela Fehrm do?

23        A.   Nothing else as I recall.

24        Q.   Did you supervise Vendela Fehrm's work?

25        A.   Yes.

39

1          Q.   How did you supervise Vendela Fehrm's

2     work?

3                         MR. OPPENHEIMER:  Objection.

4                         You can answer.

5          A.   I asked her to look for citations and I

6     asked her to find someone to verify the cita --

7     citations and oversee them.

8          Q.   Anything else?

9          A.   Not that I recall.

10         Q.   What exactly did Niall MacMenamin do in

11    support of your work in this case?

12                        MR. OPPENHEIMER:  Objection.

13         A.   He reviewed the draft and provided me

14    with feedback.

15         Q.   Anything else?

16         A.   Not that I recall.

17         Q.   Were you present when -- at all times

18    when Vendela Fehrm was performing the work that

19    you described in support of your report?

20         A.   Present for?

21         Q.   Well, where was Vendela Fehrm performing

22    the work that she -- you described that she

23    performed in support of your report?

24         A.   These days everybody works from home, so

25    I assume she was working from home.  I was working

40

1    from home.

2        Q.   Okay.  Well, how did you supervise her

3    work while she was working from home?

4                    MR. OPPENHEIMER:  Objection.

5        A.   We had periodic Zoom calls.

6        Q.   Did you have any Zoom calls with the

7    person that you cannot recall who helped your --

8    write your report?

9                    MR. OPPENHEIMER:  Objection

10            to the form.

11       A.   The person whose name I cannot recall

12   did not help write the report.  That person

13   verified footnotes and citations.  I did not have

14   a Zoom call with that person.

15       Q.   Other than Niall MacMen -- MacMenamin,

16   Vernon La Fehrm -- I'm sorry.  Let -- Vendela

17   Fehrm and the person that you cannot recall, did

18   anyone else assist you with your report?

19       A.   Not that I recall.

20       Q.   Did any attorney help you draft your

21   report?

22                    MR. OPPENHEIMER:  Objection.

23                    You can answer.

24       A.   Counsel provided feedback.

25       Q.   Which counsel provided feedback?

41

1        A.   I don't recall.

2        Q.   Is there any part of the report that

3   counsel drafted?

4        A.   No.

5        Q.   Is there any language in your report

6   that is not yours?

7        A.   No.

8        Q.   Did anyone check your work other than

9   the people that -- Niall MacMenamin and counsel?

10                  MR. OPPENHEIMER:   Objection.

11                  You can answer.

12       A.   The person whose last name or first name

13   I cannot recall verified citations.

14       Q.   Did anyone verify any statements that

15   you made in the body of the report?

16                  MR. OPPENHEIMER:   Objection.

17       A.   Can you clarify what you mean?

18       Q.   Did anyone review any of the statements

19   that you made in the body of your report?

20                  MR. OPPENHEIMER:   Objection

21              to the form.

22                  You can answer.

23       A.   Niall reviewed my report and counsel

24   reviewed my report.

25       Q.   Are all the records that you considered

42

1    in formulating your opinion listed in your report?

2         A.   What do you mean by "records"?

3         Q.   Everything that you've considered in

4    formulating your opinion, did you list that

5    information in your report?

6                   MR. OPPENHEIMER:  Objection

7         to form.

8         A.   Materials considered are in my Appendix

9    B.

10        Q.   Does that include all of the materials

11   that you've considered in formulating your

12   opinion?

13        A.   Yes.

14        Q.   Okay.  Are there materials that you

15   reviewed that were not listed in your report?

16        A.   No.

17        Q.   Were there any documents that you wanted

18   to review but could not obtain?

19        A.   No.

20        Q.   What is the Appendix A that you've

21   attached to your report?

22        A.   Appendix A is my CV.

23        Q.   Okay.  Is your CV complete?

24                   MR. OPPENHEIMER:  Objection.

25        A.   Can you clarify what you mean by

43

1    "complete"?

2         Q.   Does -- does your CV contain all of the

3    information that's current regarding your

4    professional position?

5                        MR. OPPENHEIMER:   Objection

6              to form.

7         A.   I have been in economic consulting for

8    over 15 years and prior to that I obtained three

9    degrees.   So in this document, which is under ten

10   pages, it would be impossible to list everything

11   that I ever did in my professional career and in

12   my time at school.

13        Q.   Okay.   Is there any education that

14   you -- that is not listed on your Appendix A?

15                       MR. OPPENHEIMER:   Objection;

16             form.

17        A.   My secondary education is not listed

18   here.

19        Q.   What do you mean by "secondary

20   education"?

21        A.   High school, middle school, primary

22   school, --

23        Q.   Okay.

24        A.   -- kindergarten.

25        Q.   Any education after high school that's

44

1    not listed on your CV?

2                        MR. OPPENHEIMER:   Objection

3            to the form.

4        A.   The big ones are listed.   There could

5    have been seminars, web -- webinars, lectures that

6    I'm not including, conferences.

7        Q.   When was this Appendix A created?

8        A.   Sometime between October and November.

9        Q.   Did you have another CV prior to the one

10   that's attached to your report as Appendix A?

11       A.   I first created a CV in the early 2000s

12   and it's been evolving since.

13       Q.   Have you removed anything from the prior

14   CVs that's not included in the CV that you have

15   attached as Appendix A to your report?

16                       MR. OPPENHEIMER:   Objection

17           to form.

18       A.   As I said, my CV is evolving.   Some

19   items become more -- I include new items and

20   sometimes I retire something that's irrelevant or

21   just for space or old.

22       Q.   What are some of the things that you

23   retired from your CV?

24       A.   I had a brief internship back in Russia.

25   Probably prior to 2000.   That's no longer in my

45

1    CV.

2         Q.    Where was the internship?

3         A.    At -- at a company selling consumer

4    goods.  They were participating in an exhibition.

5    I worked at the exhibition.

6         Q.    What did you do at the exhibition?

7         A.    I presented the products.  I sold some

8    products.

9         Q.    Anything else that's been retired from

10   your CV?

11        A.    There's probably a lot of things as my

12   CV has evolved in the past 20 years.

13        Q.    So what else has been retired from your

14   CV?

15        A.    I'm sure I would not be able to recall

16   all of them.  There was a paper in mathematics

17   that at one point was accepted to a journal that I

18   listed for several years, but as I moved to the

19   United States I had different priorities so I

20   never finished the final touches on the paper and

21   it's never been published.

22        Q.    Do you recall the -- the name of the

23   paper in mathematics?

24        A.    It had to do with free nonassociative

25   algebras.

46

1       Q.   Is this a paper that you were working

2    on?

3       A.   I was working on this paper.

4       Q.   Were you employed by a company when you

5    were working on this paper?

6       A.   No.

7                    MR. OPPENHEIMER:  Objection

8           to form.

9       Q.   Were you in school when you were working

10   on this paper?

11      A.   Yes.

12      Q.   What school?

13      A.   Moscow State University, and then I

14   might have continued working on it when I was

15   already at the New Economic School.  And I might

16   have brought it with me at MIT, but I don't think

17   I worked on that at MIT.

18      Q.   Okay.  Anything else?

19      A.   I wouldn't be able to recall all the

20   changes I've made to my CV within the past 20

21   years.

22      Q.   How about within the past ten years?

23      A.   Same.  I wouldn't be able to recall.

24      Q.   Okay.  Have you made any changes within

25   the past five years to your CV?

47

1        A.   Yes.  It's constantly evolving.

2        Q.   So do you recall what changes you've

3   made in the past five years to your CV?

4        A.   I can recall examples.

5        Q.   Okay.  Can you provide the examples?

6        A.   Well, one example, I changed jobs this

7   past summer, so I added Compass Lexecon to my CV

8   and changed how I describe my prior employment.

9        Q.   How did you change how you describe your

10  prior employment?

11       A.   Well, I put a final date to it.  Until

12  then it said "2005 to present."

13       Q.   Other than those three schools that you

14  listed on your CV, is there anything -- other

15  school missing?

16                MR. OPPENHEIMER:  Objection.

17       A.   These are my three degrees.  While I was

18  at MIT and Sloan School of Management, I also took

19  classes at MIT Economic Department and Harvard

20  Business School and Harvard Psychology Department.

21  Since I started my career, I've gone to several

22  conferences, some of which have educational

23  aspects; webinars, seminars.  I don't think those

24  are listed.

25       Q.   Anything else that's missing from your

48

1    CV?

2                    MR. OPPENHEIMER:  Objection

3            to form.

4        A.   Nothing is missing from my CV.

5        Q.   Well, anything else that you did not

6    list on your CV?

7        A.   I did not list a lot of things that I've

8    done in the past 20 years or so.

9        Q.   Other than what we discussed, is there

10   anything else that you did not list on your CV?

11                   MR. OPPENHEIMER:  Objection.

12                   You can answer.

13       A.   Well, I could give you more examples.

14       Q.   That would be good.

15       A.   The section of my CV that's titled

16   "Selective Consulting Experience" lists cases

17   where I supported other experts.  And the list

18   here is short relative to all the cases I've done.

19   The majority of them are not listed here.

20       Q.   Anything else that's not listed on your

21   CV?

22                   MR. OPPENHEIMER:  Objection.

23       A.   I'm sure there are plenty of other

24   things I've done in the past 20 years that are not

25   listed on my CV.  The point of a CV is not to have

49

1    an exhaustive list of every single little thing

2    I've done.

3        Q.   Okay.  Well, for the purpose of this

4    deposition, do you recall anything else that's not

5    listed on your CV other than what you just

6    discussed?

7                      MR. OPPENHEIMER:  Objection

8         to form.

9        A.   I'll give you one more example.  While I

10   was at the Analysis Group for many years, I

11   participated in teaching a Stata class and --

12                      THE REPORTER:  Repeat.

13                      THE WITNESS:  Stata class.

14       A.   And for several years I was also the

15   head of the Stata teaching group.

16       Q.   You testified that you took classes at

17   the Harvard Business School.

18            Do you recall when you took those

19   classes?

20       A.   Yes.

21       Q.   When did you take the classes at the

22   Harvard Business School?

23       A.   One class I took in 2002 and there might

24   have been one other class, but I don't recall

25   precisely.  But all of that would be during my

50

1    time at MIT.

2         Q.   Okay.  Do you recall what the subject of

3    the course you took at -- in 2002 at Harvard

4    Business School was?

5         A.   Experimental economics.

6         Q.   Do you recall the subject of the course

7    in 2004?

8                   MR. OPPENHEIMER:   Objection

9         to the form.

10        A.   I don't think I mentioned anything about

11   2004.

12        Q.   Well, let me read back.  You said there

13   may have been another class.

14        Do you recall what year you took that

15   other class?

16        A.   I'm not sure --

17        Q.   Well --

18        A.   -- the year or whether there even was

19   another class.  I might have taken it without

20   credit.  I don't recall the details.

21        Q.   You also testified that you took a class

22   at the Harvard Psychology Department, is that

23   correct?

24        A.   That's correct.

25        Q.   Do you recall what year you took the

1   class at the Harvard Psychology Department?

2        A.   I took several classes in Harvard

3   Psychology Department, at least three for credit

4   and some without credit.  And that would be

5   probably starting in 2003 and until I graduated

6   from MIT.

7        Q.   You testified that you participated in

8   teaching a statistics tass -- teaching a class

9   when you were at the Analysis Group, is that

10  correct?

11                  MR. OPPENHEIMER:  Objection

12            to the form.  Mischaracterizes

13            testimony.

14       A.   I didn't say that.

15       Q.   So what did -- what did you teach when

16  you were at Analysis Group?

17       A.   Among other things, Stata.

18       Q.   Stata?

19       A.   Yes.

20       Q.   Can you spell that?

21       A.   S-T-A-T-A.

22       Q.   What is Stata?

23       A.   It's a statistical package to analyze

24  data.

25       Q.   Okay.  Is there anything else that you

1    taught when you were at Analysis Group?

2          A.    Yes.

3          Q.    What else?

4          A.    Survey and experimental design.

5                      THE REPORTER:   Repeat.

6          A.    Survey and experimental design.

7          Q.    Anything else?

8          A.    That's possible.  I was there for over

9    15 years, but I don't recall anything other big.

10         Q.    When did you graduate from the Moscow

11   State University?

12         A.    2001.

13         Q.    What degree did you obtain from Moscow

14   State University?

15         A.    MS in mathematics.

16         Q.    When did you graduate from the New

17   Economic School in Russia?

18         A.    2002.

19         Q.    What degree did you obtain from the New

20   Economic School in Russia?

21         A.    MA in economics.

22         Q.    When did you start attending MIT Sloan

23   School of Management?

24         A.    2002.

25         Q.    And when did you obtain your degree from

53

1    MIT Sloan School of Management?

2         A.   2007.

3         Q.   What did you obtain your degree in?

4         A.   My diploma says management science, but

5    effectively it's a degree in marketing as I spent

6    over five years in the marketing group.

7         Q.   What year did you -- I'm sorry.  You did

8    answer that.

9              Were there any breaks between 2002 and

10   2007 that you took in your schooling?

11                     MR. OPPENHEIMER:  Objection.

12                     You can answer.

13        A.   No.

14        Q.   Are you a member of any professional

15   organization?

16        A.   I'm a member of American Marketing

17   Association.

18        Q.   How long have you been a member of

19   American Marketing Association?

20        A.   Several years.

21        Q.   Do you -- do you have a number for the

22   several years?

23        A.   No.

24        Q.   Is it less than five years?

25        A.   I'm not sure.

54

1        Q.   What is the American Marketing

2    Association?

3        A.   It's an association of economics and

4    practitioners doing marketing.

5        Q.   Is your membership current in the

6    American Marketing Association?

7        A.   I believe so.

8        Q.   Any other professional associations or

9    organizations that you're a member of?

10       A.   No.

11       Q.   Have you taken any marketing courses

12   regarding digital assets?

13       A.   No.

14       Q.   Have you taken any courses regarding

15   digital assets?

16       A.   No.

17       Q.   Have you received any training in the

18   area of digital assets?

19       A.   No.

20       Q.   Have you conducted any marketing work in

21   the area of digital assets?

22       A.   No.

23       Q.   Have you ever taught a class about

24   digital assets?

25       A.   No.

55

1          Q.   Have you ever conducted any experiments

2     regarding digital assets?

3          A.   No.

4          Q.   Have you ever conducted any surveys

5     regarding digital assets?

6          A.   No.

7          Q.   How long have you been employed at

8     Compass Lexecon?

9          A.   I've been employed at Compass Lexecon

10    since this past summer.

11         Q.   What is your role at Compass Lexecon?

12         A.   Senior vice president.

13         Q.   Where did you work prior to this last

14    summer?

15         A.   Analysis Group.

16         Q.   I'm sorry?

17         A.   Analysis Group.

18         Q.   Did you start working at Compass Lexecon

19    while you were still working at Analysis Group?

20         A.   No.

21         Q.   Okay.  So in your CV, you listed your

22    experience at Compass Lexecon from 2005 to 2021,

23    is that correct?

24         A.   That's a typo.  That should be 2021 to

25    present as it says next to "Senior Vice

56

1    President."

2         Q.   Okay.  What are your job duties at

3    Compass Lexecon?

4         A.   I focus on causal inference, designing

5    and conducting experiments, surveys, analyzing and

6    evaluating experiments and surveys conducted by

7    others, assisting experts or serving myself in an

8    expert role, among other things.

9         Q.   What are some of the other things that

10   you do at Compass Lexecon?

11        A.   One example is hiring.

12        Q.   Anything else?

13        A.   Overseeing the work of junior colleagues

14   or more junior colleagues.

15        Q.   Anything else?

16        A.   It's an economic consulting environment,

17   so the standard economic consulting experience.

18        Q.   What's the "standard economic consulting

19   experience"?

20        A.   Communicating with clients,

21   communicating with experts, reviewing materials.

22        Q.   Anything else?

23                    MR. OPPENHEIMER:  Objection

24            to the form.

25        A.   I'm sure there are other more nuanced

1    tasks that I carry out and it's probably a very

2    long list.  Similar as with the CV, I can only

3    give you examples.

4         Q.   So can you give some of the examples of

5    the other tasks that you conduct at Compass

6    Lexecon?

7         A.   Review of academic literature.

8                   THE REPORTER:  Repeat.

9         A.   Review of academic literature.

10        Q.   Anything else?

11                   MR. OPPENHEIMER:  Objection

12         to form.

13        A.   Another example would be review of data.

14        Q.   Anything else?

15        A.   Another example would be review of

16   documents.

17        Q.   Is there anything else?

18        A.   There probably is a lot of else.

19        Q.   Do you recall what else?

20        A.   Assisting lawyers with preparation for

21   depositions, assisting experts with preparation

22   for a deposition, preparing for my own deposition.

23        Q.   Any other job duties that you have at

24   Compass Lexecon?

25        A.   Drafting my report or assisting others

58

1    with drafting their reports.

2         Q.   Have you discussed all the job duties

3    that you have at Compass Lexecon?

4         A.   I'm sure the list is very long and I'm

5    probably missing something, but I've given you

6    plenty of examples.

7         Q.   Is there anything that you recall that

8    you have not stated?

9                   MR. OPPENHEIMER:  Objection

10          to form.

11        A.   Zoom calls.

12        Q.   Is that a job duty?

13        A.   What do you mean by a "duty"?

14        Q.   Well, what are you hired to do at

15   Compass Lexecon?  That's what I mean by "duty."

16        A.   All of those things that I listed and

17   probably more things.

18        Q.   Okay.  Other than everything that we've

19   discussed including the Zoom calls, is there

20   anything else that you recall and have not stated?

21                   MR. OPPENHEIMER:  Objection

22          to form.

23        A.   I can recall more if you'd like.

24        Q.   If you can recall your job duties, if

25   you could state what they are for the record other

59

1    than what you've already described.

2        A.   Reviewing case documents.

3        Q.   Have you described all of your job

4    duties at Compass Lexecon?

5                     MR. OPPENHEIMER:  Objection

6            to form.

7        A.   I don't think it's feasible to describe

8    all the duties because it's a very long list and

9    not specifically defined.

10       Q.   Well, what else have you not told us

11   about today?

12                    MR. OPPENHEIMER:  Objection

13           to form.

14       A.   I believe I've given you the major

15   things but if you'd like I can try to remember

16   more nuanced details.

17       Q.   Well, if you can recall.

18       A.   Well, I'm relatively new at Compass

19   Lexecon, so I haven't done all of these -- all of

20   the calling, but I'm pretty sure it will happen

21   soon.

22       Q.   Can I --

23       A.   For example, being present at someone

24   else's deposition --

25       Q.   Can I stop you right there?  If you have

60

1    not -- I'm asking you for the duties that you

2    currently have.

3            A.   Right.

4            Q.   I -- I -- I'm not asking you about what

5    could happen in the future or not.

6            A.   Right.  So it is part of my job, but it

7    maybe hasn't happened yet, but I'm sure I'll be

8    present at someone else's deposition eventually.

9    For this case I will be reviewing the transcript

10   for the errata sheet.  I will probably do this for

11   other people's depositions in the future.  I

12   communicate with survey panels and other vendors

13   who help carrying out surveys and experiments.

14           Q.   Okay.  Where did you work prior to

15   Compass Lexecon?

16           A.   Analysis Group.

17           Q.   How long did you work at Analysis Group?

18           A.   Be -- between 2005 and 2021.  In 2005, I

19   was an intern associate for a summer, and then in

20   2007, I started full time.

21           Q.   Okay.  Were you an associate between

22   2007 and 2009?

23           A.   Yes.

24           Q.   Okay.  What were your duties as an

25   associate at Analysis Group, Inc.?

1          A.   I did a lot of data analysis.  I

2     assisted with drafting reports.  I taught the

3     Stata class.  I probably assisted with depositions

4     or were present at depositions, but I cannot say

5     for sure whether it was while I was still an

6     associate or once I became manager.

7               In many respects the job definition is

8     the same throughout the career in economic

9     consulting.  It's the level of responsibility that

10    shifts.

11         Q.   Okay.  So you became a manager in 2009?

12         A.   Yes.

13         Q.   How long were you a manager at Analysis

14    Group?

15         A.   Until 2015.

16         Q.   Did your responsibilities change from

17    the time you were an associate until when you

18    became a manager in 2009?

19         A.   The way things work at Analysis Group is

20    that there is really no dramatic shift.  Once a

21    person is promoted, they say there that you should

22    already be working at a manager level for a year

23    before you are promoted to a manager.

24              But, generally, as one grows there in

25    their career, that means more responsibility, less

1    day-to-day activities such as programming and data

2    analysis, more communication with clients and

3    experts and possibly starting as an expert

4    yourself.

5         Q.   Okay.  You became a vice president at

6    Analysis Group?

7         A.   That's correct.

8         Q.   When did you become a vice president at

9    Analysis Group?

10        A.   2016.

11        Q.   And how long were you a vice president?

12        A.   Until 2020.

13        Q.   What did you do at Analysis Group after

14   2020?

15        A.   I was a consultant.

16        Q.   What were your duties as a consultant?

17        A.   Largely similar to my duties as vice

18   president.  The structure of my compensation

19   changed.

20                  THE REPORTER:  The structure

21        of the organization?

22                  THE WITNESS:  Compensation.

23        Of my compensation.

24        Q.   Can you describe your duties as a

25   consultant?

63

1          A.   I was an expert on one case.  I

2     supported other experts on other cases, assisted

3     with data analysis, drafting reports, with

4     developing rebuttals.  In the case where I was the

5     expert, I conducted a conjoined analysis survey

6     and market simulations.

7          Q.   Okay.  And how long were you a

8     consultant at Analysis Group?

9          A.   Until 2021.

10         Q.   Did you have any jobs between the time

11    you left Analysis Group and started at Compass

12    Lexecon?

13         A.   No.

14         Q.   Okay.  Going back to your Ph.D. at MIT

15    Sloan School of Management, what was the topic of

16    your dissertation?

17         A.   Essays in behavioral decision-making.

18         Q.   Okay.  Can you describe what your

19    dissertation was about at MIT Sloan School?

20         A.   It consisted of three chapters that were

21    largely unrelated streams of research.  One stream

22    of research had to do with consumers overvaluing

23    products that are -- that they can get for free

24    and wanting them more than they should from a

25    standard economics perspective.

64

1            Another stream of research was related

2     to mood regulation.  For example, what kind of

3     movie would you see in a good mood or in a bad

4     mood?

5            And the third stream of research had to

6     do with whether wanting and liking are aligned.

7                       (Whereupon, exhibit is received

8            and marked SEC Shampanier Deposition

9            Exhibit 5 for identification.)

10                      THE REPORTER:  Exhibit 5 for

11            identification.

12     BY MS. GUERRIER:

13       Q.   Okay.  I've handed you what's been

14     marked as Exhibit 5.

15            Do you recognize the document that's

16     been marked as Exhibit 5?

17       A.   This appears to be a copy of my

18     dissertation.

19       Q.   Okay.  Were you examining causal

20     relationships in the subject matter of your

21     dissertation?

22       A.   Yes.

23       Q.   Can you explain the type of causal

24     relationships you were examining?

25       A.   I'll need to refresh my memory.

65

1          For example, the first essay in my

2     dissertation is entitled "Zero as a Special Price:

3     The True Value of Free Products."

4          The main causal proposition tested in

5     this chapter in my dissertation is whether when

6     consumers are exposed to a free product they

7     reacted in a way that is essentially rational.

8     Q.   Are you done?

9     A.   This is a very short summary of the

10    first chapter of my dissertation.

11    Q.   Were you evaluating perceptions of

12    consumers in your dissertation?

13    A.   Can you repeat the question, please?

14    Q.   Sure.

15         Were you evaluating perceptions of

16    consumers in your dissertation?

17    A.   Yes.

18    Q.   Okay.  Can you summarize what

19    perceptions you were evaluating in your

20    dissertation with respect to consumers?

21              MR. OPPENHEIMER:  Objection

22         to form.

23    A.   Participants in the experiment were

24    asked to evaluate how attractive they found

25    certain offers.

66

1          Q.   Okay.  So was there a cause-and-effect

2     connection with the perception that you were

3     evaluating?

4          A.   Yes.

5          Q.   What was the cause-and-effect

6     connection?

7          A.   The cause was the presence of a free

8     product.

9          Q.   And what was the effect?

10          A.   Attitude.  Attitude.

11          Q.   How did you connect the cause and effect

12     of the perception of the consumer?

13          A.   Using an experiment.

14          Q.   What type of experiment?

15          A.   Randomized control experiments.

16                    THE REPORTER:  Randomized?

17                    THE WITNESS:  Control.

18          Q.   What's a randomized control experiment?

19          A.   In a randomized control experiment, a

20     group of participants is randomly split into two

21     groups.  We can call them a test group and a

22     control group.  And they go through a similar

23     procedure, but there is a difference and that

24     difference is the cause that we're testing.

25                    Then we measure those participants which

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

67

```
1    is a measure of interest to us.  And if there is a

2    difference in the outcome between the two groups

3    which is statistically significant, we can

4    conclude -- or at least we cannot reject the

5    hypothesis that there is no impact.  So usually --

6                    THE REPORTER:  There is no?

7                    THE WITNESS:  Impact.

8         A.   So in lay terms that means we conclude

9    that there is a cause and effect.

10        Q.   Okay.  Would it be possible to evaluate

11   the perception of these consumers without

12   conducting a randomized control experiment?

13                   MR. OPPENHEIMER:  Objection

14        to form.

15        A.   If you simply want to record perceptions

16   without investigating the cause of those

17   perceptions, then we can conduct other studies.

18        Q.   What types of other studies can you

19   conduct if you just want to look at perception and

20   not cause and effect?

21        A.   For example, a survey.

22        Q.   Anything else?

23        A.   At the preliminary stage of research,

24   when we want to simply hypothesize of what the

25   perceptions are, we can conduct qualitative
```

68

1    studies such as focus groups or phone interviews.

2        Q.   Can you explain what qualitative studies

3    are?

4        A.   Qualitative studies are studies from

5    which we don't make numeric conclusions such as X

6    percent of people think Y.

7        Q.   Is this different from quantitative

8    studies?

9        A.   That's correct.

10       Q.   What's a quantitative study?

11       A.   In quantitative studies, we make

12   quantitative conclusions.

13       Q.   What are quantitative conclusions?

14       A.   An example would be X percent of

15   purchasers of this yogurt believe that this yogurt

16   is very tasty.

17       Q.   Do you need to rely on data to conduct

18   quantitative studies?

19       A.   Yes.

20       Q.   We'll get back to that.

21            So going back to your CV, did you have

22   any other professional employment that's not

23   listed on your risumi or your CV?

24                    MR. OPPENHEIMER:   Objection

25            to form.

69

1        A.    Not anything major.

2        Q.    Do you recall what else you didn't list

3    with regards to your professional employment?

4                    MR. OPPENHEIMER:  Objection.

5        A.    Can you repeat the question, please?

6        Q.    I had asked you whether you had any

7    other professional employment that's not listed on

8    your risumi or CV.  And you responded "not

9    anything major."

10               So my question is, do you recall what

11   else you didn't list with regard to your

12   professional employment?

13                    MR. OPPENHEIMER:  Same

14           objection.

15       A.    I did not list my minor and very old

16   engagements like the internship and the exhibition

17   I described previously.

18                    MS. GUERRIER:  Do you want

19           to take a --

20                    MR. OPPENHEIMER:  Sure.

21                    MS. GUERRIER:    --

22           ten-minute break?

23                    MR. OPPENHEIMER:  That's

24           fine.

25                    MS. GUERRIER:  Okay.

70

```
1                      THE VIDEOGRAPHER:  Okay.

2              Going off the record at 10:36.

3                    (Whereupon, a recess is taken.)

4                      THE VIDEOGRAPHER:  Okay.

5              Back on the record at 10:52.

6    BY MS. GUERRIER:

7         Q.   Okay.  Did you testify that you have

8    experience conducting quantitative studies?

9         A.   I don't know if I testified to that, but

10   I do have experience.

11        Q.   Is it, yes, you have experience

12   conducting quantitative studies?

13        A.   I have experience conducting

14   quantitative studies.

15        Q.   When you've conducted those studies, on

16   occasion, have you observed a statistically

17   significant correlation between two variables?

18                      MR. OPPENHEIMER:  Objection

19           to form.

20                    You can answer.

21        A.   I've observed statistically significant

22   effects.  I'm not sure specifically if I ever

23   looked at correlations.  Most likely I have.

24        Q.   So is it most likely you have observed

25   statistically significant correlations?
```

71

```
1                    MR. OPPENHEIMER:   Objection

2           to form.

3        A.   I have observed statistically

4    significant effects.  Those could have been

5    correlations, but usually I don't look at

6    correlations.

7        Q.   Okay.  If you observe a statistically

8    significant correlation, what, if anything,

9    does -- does that observation permit you to

10   conclude regarding cause and effect?

11                   MR. OPPENHEIMER:   Objection

12          to form.

13       A.   There could be a causal relationship or

14   there could be no causal relationship.

15       Q.   Can you please elaborate on what you

16   mean by "there could be a causal relationship or

17   there could be no causal relationship"?

18       A.   If there is a statistically significant

19   correlation between two variables, it could be

20   because one of them causes the other or it could

21   -- it could be that none of them causes that.

22       Q.   I believe you testified that you have

23   observed statistically significant effects, is

24   that correct?

25       A.   That's correct.
```

72

```
1         Q.   So in such studies, are you able to

2    observe a statistically significant effect between

3    two variables?

4                   MR. OPPENHEIMER:   Objection

5         to form.

6         A.   In an experiment, a statistically

7    significant effect is usually the difference,

8    statistically significant difference, between the

9    outcomes of the test group and the control group.

10        Q.   If you observe a statistically

11   significant effect, does that observation permit

12   you to conclude -- make any conclusions regarding

13   cause and effect?

14                  MR. OPPENHEIMER:   Objection

15        to form.

16        A.   If I conduct a randomized controlled

17   experiment and there's a statistically significant

18   difference between the outcomes in the test group

19   and the control group, I can conclude in lay terms

20   that there is a causal effect between the

21   manipulated variable and the outcome.

22        Q.   Okay.  Do you have an area of expertise?

23                  MR. OPPENHEIMER:   Objection

24        to form.

25        A.   I'm an expert in several areas.
```

73

1          Q.   What are your areas of expertise?

2          A.   Experimental design, survey design,

3     consumer behavior, judgment and decision-making.

4          Q.   Do you consider yourself an expert with

5     regards to surveys of digital asset holders?

6                         MR. OPPENHEIMER:  Objection

7               to form.

8          A.   I consider myself an expert in surveys

9     done with -- if I am provided background on

10    digital assets or another product, I can design a

11    reliable survey on that topic.  In fact, I have

12    designed numerous surveys or assisted others in

13    designing them and oftentimes the subject matter

14    or the exact product in those cases was relatively

15    new to me or entirely new to me.

16         Q.   Have you designed a survey concerning

17    digital assets?

18         A.   No.

19         Q.   Have you assisted anyone in designing a

20    survey concerning digital assets?

21         A.   I believe that's covered by an NDA.

22         Q.   Well, I don't need to know the substance

23    of what you've done.  I'm asking you if you've

24    actually designed -- assisted anyone in conducting

25    a survey regarding digital assets.

74

```
 1        A.   That's covered by an NDA.

 2        Q.   You need to answer the question yes or

 3   no.

 4        A.   Can I consult counsel?

 5                  MR. OPPENHEIMER:  Why don't

 6             you start with a yes or a no to just

 7             whether you've assisted anyone in

 8             designing a survey concerning digital

 9             assets.  We can take each question as

10             we go.

11        A.   Yes.

12        Q.   Do you recall when you assisted in

13   conducting a survey in -- regarding digital

14   assets?

15        A.   Within the last couple of years.

16        Q.   Was the survey done in connection with

17   this case?

18        A.   No.

19        Q.   Was the survey that you assisted with

20   with regard to the digital assets in connection

21   with litigation?

22        A.   That's covered by an NDA.

23        Q.   You need to answer yes or no.

24        A.   Can I consult counsel?

25                  MR. OPPENHEIMER:  Why don't
```

75

```
1              we go off the record for a minute.

2                    MS. GUERRIER:  No.  The

3              question is still pending.  I'm

4              sorry.

5                    MR. OPPENHEIMER:  Counsel,

6              if she believes she's subject to an

7              NDA, then I'm not sure she can

8              answer.  If we go off the record, we

9              can try to sort this out.  That's --

10                    MS. GUERRIER:  Well, I'm not

11             asking her about names.  I'm asking

12             her a general question.  Was her

13             survey that she assisted with in

14             connection with litigation?

15                    MR. OPPENHEIMER:  Without

16             the opportunity to discuss that with

17             her, I don't know whether that would

18             be covered by the NDA.

19                    MS. GUERRIER:  Well, you

20             don't represent her in that capacity

21             so you wouldn't have a role in

22             determining whether or not it's

23             covered by anything.

24                    MR. OPPENHEIMER:  I'm not

25             sure that's accurate.
```

76

1              But if you -- if you understand

2          the question and you think you can answer

3          it as asked, you can go ahead.  I think

4          you can answer yes or no.

5                    THE WITNESS:  Can you repeat

6           the question, please?

7    BY MS. GUERRIER:

8      Q.   Was the survey that you assisted with

9    with regard to the digital assets in connection

10   with litigation?

11     A.   To the best of my recollection, yes.

12     Q.   Did you submit an expert report in

13   connection with the survey that you assisted with

14   with regard to the digital assets?

15     A.   If I'm assisting another expert, I do

16   not submit reports.

17                    THE REPORTER:  I'm sorry,

18           repeat.

19     A.   If I assist other experts, I do not

20   submit reports.

21     Q.   So is the answer no?

22     A.   The answer is no.

23     Q.   Did the person you assisted submit an

24   expert report in connection with the survey that

25   was done regarding the digital assets?

77

1      A.   No.

2      Q.   Have you listed all of the publications

3    that you have made in the last ten years in your

4    report?

5      A.   That's correct.

6      Q.   Okay.  Do any of the publications that

7    you've listed in your report concern digital

8    assets?

9      A.   No.

10      Q.   Have you listed all of the cases where

11    you testified at trial in the past four years in

12    your report?

13             MR. OPPENHEIMER:   Objection

14        to form.

15      A.   Can you repeat the question, please?

16      Q.   Have you listed all of the cases where

17    you testified at trial in the past four years in

18    your report?

19             MR. OPPENHEIMER:   Same

20        objection.

21      A.   I have not testified at trial in the

22    past four years.

23      Q.   Okay.  Does your report identify all

24    deposition testimony that you gave in the last

25    four years?

78

```
 1                    MR. OPPENHEIMER:  Objection

 2          to form.

 3          A.   I did not testify at deposition in the

 4   past four years.

 5          Q.   Did you testify at trial prior to the

 6   last four years?

 7          A.   No.

 8          Q.   Did you testify at a deposition prior to

 9   the last four years?

10          A.   Yes.

11          Q.   Okay.  Is that -- what -- is that what

12   you described earlier in your deposition today?

13          A.   Yes, I did.

14          Q.   Okay.  Any other time that you testified

15   at a deposition prior to the last four years?

16          A.   No.

17          Q.   Turning to page 36 of your report, what

18   is the "Selected Expert Casework" that you've

19   listed?

20          A.   This section of my CV, these cases where

21   I was retained as an expert.

22          Q.   In the household chemical advertising

23   class action, were you evaluating causation in

24   that case?

25          A.   Yes.
```

79

```
 1        Q.   Okay.  Do you know if your -- the expert

 2   declaration that you submitted in the household

 3   chemicals false advertising class action was

 4   submitted to the court?

 5        A.   There are two declarations here and I

 6   believe they were submitted just like any other

 7   declaration.

 8        Q.   What do you mean?

 9        A.   I submitted it to counsel.  Counsel must

10   have done what counsel usually does with

11   declarations.

12        Q.   Do you know for a fact whether this

13   declaration was submitted to the court?

14                     MR. OPPENHEIMER:  Objection

15          to form.

16        A.   I haven't verified, but I believe they

17   did submit it -- them.

18        Q.   Did the court in that case accept you as

19   an expert?

20                     MR. OPPENHEIMER:  Objection

21          to form.

22        A.   Could you clarify on that?

23        Q.   Do you know if the court accepted your

24   expert declaration in that case?

25                     MR. OPPENHEIMER:  Objection
```

1              to form.

2         A.   So regarding the first case, the case

3    settled so I don't know what kind of opinion the

4    court had.

5         Q.   Okay.

6         A.   And regarding the second case, I believe

7    it's ongoing.

8         Q.   When you say "the second case," are you

9    referring to the last sentence where you state

10   that you "conducted similar analysis for a related

11   case..."?

12        A.   Yes.

13        Q.   Okay.  Did that case also involve

14   causation?

15        A.   Yes.

16        Q.   Okay.  So the second item listed under

17   your "Selected Expert Casework," do you recall

18   when you filed an expert report in the beauty

19   products trademark infringement case?

20        A.   That was a few years ago.

21        Q.   Do you know if the call -- the court

22   accepted the report that you filed in that case?

23                    MR. OPPENHEIMER:  Objection

24        to form.

25        A.   This was a case before the Trademark

81

1    Trial and Appeal Board of the U.S. Patent and

2    Trademark Office.  I don't know if the court was

3    involved.

4         Q.   Okay.  In the banking false advertising

5    class action, did you prepare an expert report?

6         A.   No.

7         Q.   Did you prepare an expert report in the

8    fast food employment litigation?

9         A.   No.

10        Q.   In the Next of Friend Susan Root -- and

11   I'm paraphrasing -- case that's listed, you

12   submitted a rebuttal report?

13        A.   That's correct.

14        Q.   Did your rebuttal report involve

15   causation?

16                  MR. OPPENHEIMER:  Objection

17        to form.

18        A.   Yes.

19        Q.   And you -- were you deposed in that

20   case, the Susan Root case?

21        A.   Yes.

22        Q.   Do you recall when you were deposed in

23   the Susan Root case?

24        A.   2016.

25        Q.   Okay.  Is that the deposition that you

82

1    described earlier?

2         A.   Yes.

3         Q.   Do you know if the court accepted your

4    rebuttal report?

5                        MR. OPPENHEIMER:   Objection

6              to form.

7         A.   To the best of my recollection, the

8    client won the case in court and the court never

9    ruled on the Daubert motion.  So I assume that

10   means that the court accepted it.

11        Q.   Well, do you know for a fact if the

12   court accepted your report for this --

13                       MR. OPPENHEIMER:   Objection

14             to form.

15        A.   What specifically do you mean by

16   "accepted"?  I know how a court can reject an

17   expert report by Dauberting it.  I'm not sure what

18   means "accepting."

19        Q.   So was your report subject to a Daubert

20   motion?

21        A.   I believe there was a Daubert motion.

22   And to the best of my recollection, the court

23   never ruled on it and ruled on the overall matters

24   in the case in favor of my client.

25        Q.   Okay.  So there was no ruling on your

83

1  report?

2       A.  To the best of my recollection last time

3  I checked.

4       Q.  Okay.  Did you submit an expert report

5  in the hospitality business trademark infringement

6  case?

7       A.  No.

8       Q.  Did -- so you submitted three reports in

9  the electronics false advertising case?

10      A.  That's correct.

11      Q.  What types of reports did you submit in

12 the electronic false advertising case?

13      A.  I opined on the merits of the design of

14 the consumer electronics product test conducted

15 for advertising claims.

16      Q.  So was it three reports on the same

17 subject matter?

18      A.  Yes.

19      Q.  Do you know if your report, any of your

20 reports, that you submitted in the electronics

21 false advertising case were accepted?

22                  MR. OPPENHEIMER:  Objection

23           to form.

24      A.  Accepted by who?

25      Q.  Well, was this a litigation?

84

 1       A.   This was a case in front of the National

 2   Advertising Division of the Council of Better

 3   Business Bureaus.

 4       Q.   Well, do you -- you know if the National

 5   Advertising Division of the Council of Better

 6   Business Bureaus accepted your report?

 7                    MR. OPPENHEIMER:   Objection

 8          to form.

 9       A.   To the best of my knowledge.

10       Q.   So what is the answer?

11       A.   I'm not sure what you mean by

12   "accepted."  It wasn't rejected.

13       Q.   How do you know it wasn't rejected?

14       A.   Because I would have been informed.

15   I -- this is to the best of my knowledge, and no

16   one ever informed me that it was rejected, so I

17   have no reason to believe that it was rejected.

18       Q.   Did anyone inform you that your report

19   was accepted?

20                    MR. OPPENHEIMER:   Objection

21          to form.

22       A.   I never heard anyone say to anyone that

23   their report was accepted.  I understand in -- in

24   a court setting, which I'm not sure this is

25   considered a court setting, there can be a Daubert

85

1    motion and the court can reject a -- a report.

2           In this particular case, for example, I

3     don't think there was a Daubert motion.

4       Q.   Okay.  Did anybody tell you anything

5    about the report that you submitted with regard to

6    whether or not the accountant -- the report that

7    you submitted to the Council of Better Business

8    Bureaus was accepted by the Council of Business

9    Bureaus?

10                    MR. OPPENHEIMER:  Objection

11         to form.

12      A.   I don't think anyone used those specific

13   words with me, but my general understanding is

14   this report was not rejected in any form.

15      Q.   Did someone tell you that the report was

16   not rejected?

17                    MR. OPPENHEIMER:  Objection

18         to form.

19      A.   I don't recall specifics.

20      Q.   Other than the case that you described

21   where your report was -- your rebuttal was subject

22   to a Daubert challenge and you don't know -- that

23   the court did not rule on, have you ever submitted

24   a -- an expert report in any litigation that was

25   subject to a Daubert motion?

86

```
 1                    MR. OPPENHEIMER:   Objection
 2          to form.
 3       A.   Regarding the case where there was a
 4  Daubert motion, my understanding is that the court
 5  did not rule on the motion and ruled on the
 6  overall case in favor of my client.  There were no
 7  other Daubert motions against me as far as I know.
 8       Q.   Have you ever qualified as an expert in
 9  any court?
10                    MR. OPPENHEIMER:   Objection
11          to form.
12       A.   That sounds like a legal statement.
13       Q.   Do you know if your report ever -- have
14  you ever submitted a report in any case that was
15  accepted by the court?
16                    MR. OPPENHEIMER:   Objection
17          to form.
18       A.   As I explained, I'm not sure what you
19  mean by "accepted."  I know that none of my
20  reports were explicitly rejected by a court.
21       Q.   Has a court ruled on any report that
22  you've ever submitted in a litigation?
23                    MR. OPPENHEIMER:   Objection
24          to form.
25       A.   I'm not sure what you mean by the "court
```

87

1    ruled" other than in the Daubert motion situation.

2    And in one Daubert motion, I know the court did

3    not rule on that and ruled on the overall case in

4    favor of my client.

5         Q.   Do you know if any expert report that

6    you've submitted in any litigation was subject to

7    a motion to strike the report?

8         A.   I don't know the difference between

9    Daubert motion and motion to strike.

10        Q.   Okay.  Have you ever testified as an

11   expert in court?

12                   MR. OPPENHEIMER:  Objection;

13            asked and answered.

14        A.   No.

15        Q.   Is the answer no?

16        A.   The answer is no.

17        Q.   Okay.  Moving on to page 37 of your

18   report, the trademark and trade dress infringement

19   matter, did that involve determining causation?

20        A.   Yes.

21        Q.   Were you testing consumer perception in

22   that case?

23        A.   These are numerous cases and all of them

24   involved testing causation and consumer

25   perception.

88

1        Q.   Okay.  Did any of these cases in the

2    trademark and trade dress infringement matters

3    involve testing perception only?

4        A.   What do you mean by "only"?

5        Q.   Without cause and effect.

6                    MR. OPPENHEIMER:  Objection

7           to form.

8        A.    In trademark and trade dress cases, we

9    would want to understand how the trademark at

10   issue impacts consumer perception.  So there is

11   always a causal link of interest.  I don't recall

12   all the cases, whether one of the experts said --

13   was on the other side maybe did not test the

14   causal link.  I don't recall.

15       Q.   Is it poss -- I'm sorry.  Were you done?

16       A.    Standard trademark/trade dress cases all

17   are interested in causal effect of the trademark

18   on consumer perception.

19       Q.   Okay.  Is it possible to test consumer

20   perception without conducting a quantitative

21   analysis?

22                    MR. OPPENHEIMER:  Objection

23          to form.

24       A.   What do you mean by "test consumer

25   perception"?

89

1          Q.   Can you evaluate consumer perception

2     without conducting a cause-and-effect analysis?

3                    MR. OPPENHEIMER:   Objection

4          to form.

5          A.   If one is interested in consumer

6     perception as -- as it exists currently without

7     any interest in to what caused those perceptions,

8     one can evaluate those perceptions without

9     conducting an experiment.

10         Q.   Have you ever evaluated a consumer

11    perception without conducting a causal-and-effect

12    analysis?

13                   MR. OPPENHEIMER:   Objection

14         to the form.

15         A.   Can you rephrase, please?

16         Q.   Have you ever evaluated a consumer

17    perception without conducting a causal-and-effect

18    analysis?

19                   MR. OPPENHEIMER:   Objection

20         to the form.

21         A.   Do you mean cause-and-effect analysis?

22         Q.   Yes.

23         A.   I don't recall specifically.  I might

24    have evaluated others' work of this type.

25         Q.   In your -- the page 38 of your report

90

1    where you list the "False Advertising" heading --

2        A.   Yes.

3        Q.   -- did you conduct a survey in the

4    Kenneth Hobbs v. Brother International Corp. case?

5                    MR. OPPENHEIMER:   Objection

6            to form.

7        A.   Can you repeat the question?

8        Q.   On page 38 of your report where you list

9    the "False Advertising" heading, did you conduct a

10   survey in the Kenneth Hobbs v. Brother

11   International Corp. case?

12                   MR. OPPENHEIMER:   Same

13           objection.

14       A.   I supported Professor Joel Steckel.

15       Q.   Did he conduct a survey in that case?

16       A.   He conducted two surveys.

17       Q.   Were those surveys -- did those surveys

18   have to do with cause and effect?

19       A.   One of them.

20       Q.   I'm sorry?

21       A.   One of them.

22       Q.   Which one?

23       A.   There is a sentence that starts with

24   "The other, a survey/experiment, addressed the

25   materiality of this limitation to consumers.  In

1    its order denying class certification, the court

2    cited the experiment involving more than 450

3    people who had purchased or planned to purchase a

4    printer close to the time of the survey, which

5    found that 'consumers chose the Brother printer

6    with nearly identical frequency regardless of

7    whether they were made aware of the unscannable

8    margin at the time of their selection.'"

9        Q.   What was the second survey about?

10                    MR. OPPENHEIMER:   Objection

11            to form.

12       A.   The survey that's listed here as the

13   first is described as "One survey evaluated

14   consumer awareness of a printer's alleged

15   malfunctioning."

16       Q.   Okay.  So did that survey that evaluated

17   the consumer awareness of printer's alleged

18   malfunctioning involve cause and effect?

19       A.   No.

20       Q.   So what was being evaluated in that

21   survey?

22       A.   Awareness.

23       Q.   Was this a quantitative survey or a

24   qualitative survey?

25       A.   What is a qualitative survey?

92

1      Q.   I don't know.  Is there such a thing as

2  a qualitative survey?

3      A.   If there is, it's an obscure term.

4      Q.   Can you explain what you mean?

5      A.   Normally --

6                MR. OPPENHEIMER:   Objection.

7      A.   -- when one speaks about surveys, it's a

8  quantitative matter.

9      Q.   Okay.  So was there a qualitative

10  analysis with regards to the first survey?

11      A.   There was no qualitative analysis.

12      Q.   So what type of analysis was conducted?

13      A.   Quantitative.

14      Q.   With regards to the E-Retailor false

15  advertising matter, did that case involve

16  cause-and-effect relationships?

17      A.   Yes.

18      Q.   Okay.  And the online services false

19  advertising matter, did that case involve

20  cause-and-effect relationships?

21      A.   Yes.

22      Q.   In the cigarette false advertising

23  matter, did that case involve cause-and-effect

24  relationships?

25      A.   This was a rebuttal.  I believe the

1    subject matter involved the causal relationship,

2    but the method proposed by the opposing counsel

3    did not address it properly.

4                    THE REPORTER:  Address it?

5                    THE WITNESS:  Properly.

6        Q.   Who submitted the rebuttal in the case?

7                    MR. OPPENHEIMER:  Objection

8         to form.

9        A.   The expert is not listed in my CV, which

10   means that information is not public or was not

11   public when I drafted this portion of my CV.

12       Q.   Did you submit a rebuttal in that case?

13       A.   No.  I supported an expert.

14       Q.   Do you know whether the rebuttal was the

15   subject of a Daubert motion?

16       A.   I don't recall.

17       Q.   Under your "Corporate Acquisitions"

18   heading, did the AT&T case involve a causal --

19   cause-and-effect analysis?

20       A.   Yes.

21       Q.   Okay.  And on page 39, the cases you

22   listed under the "Antitrust" heading, did they all

23   involve cause-and-effect relationships?

24       A.   Not to the best of my recollection.

25       Q.   Okay.

94

1          A.   The cases themselves might -- might have

2     involved causal relationships, but not the parts I

3     worked on.

4          Q.   Okay.  So which case -- did you perform

5     any cause-and-effect work in the Microsoft

6     antitrust matters?

7                    MR. OPPENHEIMER:  Objection

8          to form.

9          A.   I don't recall the specifics.

10         Q.   Did you perform any cause-and-effect

11    work in the credit cards antitrust matter?

12                   MR. OPPENHEIMER:  Objection

13         to form.

14         A.   The opposing expert developed a survey

15    in an experimental form to test causal

16    propositions.  The expert I assisted with revised

17    that survey to expose its drawbacks.

18                   THE REPORTER:  Its?

19                   THE WITNESS:  Drawbacks.

20         Q.   So was your deposition taken in the

21    high-tech antitrust matter?

22         A.   I was not an expert in this case and my

23    deposition was not taken.

24         Q.   Do you recall what your assignment was

25    in this case?

95

1       A.   Could you repeat that, please?

2       Q.   Do you recall what your assignment was

3  in this case?

4       A.   Yes.

5       Q.   What was your assignment?

6       A.   To evaluate the expert report of

7  Mr. ███████

8       Q.   Is there a specific subject matter that

9  you were evaluating with regard to Mr. ██████

10  report?

11                MR. OPPENHEIMER:  Objection

12       to form.

13       A.   I am evaluating the entire report.

14       Q.   What specifically were you evaluating?

15                MR. OPPENHEIMER:  Objection.

16       A.   The entire report.

17       Q.   Do you recall what subject matter you

18  evaluated in the ██████ report?

19                MR. OPPENHEIMER:  Objection;

20       asked and answered.

21                Answer again.

22       A.   The entire report.

23       Q.   Well, let's go through the report.  Let

24  me hand you...

25                THE WITNESS:  Can I have one

96

1          more?

2                    MR. OPPENHEIMER:  There's

3          two there.

4                    THE WITNESS:  Oh.

5                    (Whereupon, exhibit is received

6          and marked SEC Shampanier Deposition

7          Exhibit 7 for identification.)

8                    THE REPORTER:  Exhibit 7 for

9          identification.

10   BY MS. GUERRIER:

11      Q.   I've handed you what's been marked as

12   Exhibit 7.

13          Do you recognize the document that's

14   been premarked as Exhibit 7?

15      A.   Yes.  This appears to be Mr. ██████

16   report but without the appendices.

17                    MS. GUERRIER:  I'm going to

18          mark this as an exhibit.  This is the

19          appendix to Mr. ██████ report.

20                    MR. OPPENHEIMER:  Do you

21          have additional copies?

22                    MS. GUERRIER:  I don't.  I

23          don't know why this wasn't included

24          in the report.

25                    THE REPORTER:  What did you

97

```
 1              want to mark this?

 2                         MS. GUERRIER:  That could be

 3              1, Exhibit 1.

 4                         (Whereupon, exhibit is received

 5              and marked SEC Shampanier Deposition

 6              Exhibit 1 for identification.)

 7                         THE REPORTER:  Exhibit 1 for

 8              identification.

 9  BY MS. GUERRIER:

10         Q.   Okay.  Are you providing any rebuttal

11  regarding the summary of findings in ███████

12  report which starts on page 6 of the report?

13         A.   Just for the record, we still don't have

14  the full report.  Exhibit 1 is some of the

15  appendices, I believe.

16         Q.   Okay.  Right now I'm looking at Exhibit

17  7.  That -- the last page where he signed on page

18  49, that's -- I'm looking at that document, not

19  the document marked Exhibit 1.  I don't have any

20  questions about Exhibit 1.

21         A.   Okay.  Exhibit 7 is a partial report of

22  ███████████████

23         Q.   Okay.  Is there a signature page on

24  Exhibit 7?

25         A.   There is a signature page.
```

98

1        Q.   Okay.  Who -- who signed it as far as

2    you can see on page 49 of the report?

3        A.   ███████████

4        Q.   Okay.  So going back to page 6 of the

5    report, are you providing any rebuttal regarding

6    the summary of findings outlined in Mr. ██████

7    report on page 6 --

8                      MR. OPPENHEIMER:  Objection

9            to form.

10       Q.   -- to 8?

11       A.   I provide rebuttal to Mr. ██████ entire

12   report.

13       Q.   Okay.  So what specifically on the

14   summary of findings are you rebutting?

15       A.   The entire summary of findings.

16       Q.   So what in -- what exactly are you

17   rebutting?

18                      MR. OPPENHEIMER:  Objection;

19           asked and answered.

20       A.   Mr. ██████ report.

21       Q.   Are there any facts under the summary of

22   findings that you're rebutting?

23                      MR. OPPENHEIMER:  Objection

24           to form.

25       A.   I'm rebutting the entire summary of

99

```
 1    findings.

 2         Q.   Okay.  So what -- can you show -- can

 3    you let me know exactly in paragraph 8 what you

 4    are rebutting?

 5                    MR. OPPENHEIMER:   Objection

 6         to form.

 7         A.   I'm rebutting entire summary of

 8    findings, including all of paragraph 8 and 7 and

 9    9.

10         Q.   Okay.  So in paragraph 8, the first

11    sentence, "The design of XRP as a fixed-supply..."

12              You see that sentence?

13         A.   I see that sentence.

14         Q.   What exactly are you rebutting?

15                    MR. OPPENHEIMER:   Objection

16         to form.

17         A.   This sentence, as well as Mr. ████

18    general conclusion in this report, is causal.

19         Q.   Okay.

20         A.   It says that "Statements made by Ripple

21    were consistent with promoting an investment use

22    case for XRP as well as the design of XRP as a

23    fixed-supply coin."  So he is saying that those

24    two items caused investment use case for XRP.

25         Q.   So you stated that you're rebutting the
```

100

1    first sentence.

2            What -- what are you rebutting in the

3    first sentence?

4                    MR. OPPENHEIMER:   Objection

5            to form.

6        A.   The entire first sentence.

7        Q.   So what specifically?

8                    MR. OPPENHEIMER:   Objection

9            to form; asked and answered.

10       A.   The entire first sentence.

11       Q.   What -- can you explain what you mean by

12   that?

13                   MR. OPPENHEIMER:   Objection.

14                   You can answer.

15       A.   I rebut the entire first sentence.

16       Q.   What are you presenting to contradict

17   that sentence?

18       A.   This is a causal statement and Mr. █████

19   did not use any reliable methodology to test it.

20       Q.   Are you rebutting Mr. ██████

21   methodology or are you rebutting the facts that he

22   used in this paragraph --

23                   MR. OPPENHEIMER:   Objection

24           to form.

25       Q.   -- 8?

101

1       A.   I'm rebutting Mr. ███ methodology

2  and, as a result, I also rebut his conclusions.

3       Q.   So are you rebutting any facts that are

4  stated in this paragraph?

5               MR. OPPENHEIMER:  Objection

6         to form.

7       A.   Which specific facts are you referring

8  to?

9       Q.   I'm asking you.

10              MR. OPPENHEIMER:  Objection

11        to form.

12      A.   I'm rebutting the entirety of the

13  sentence.

14      Q.   Okay.  So what -- what critique do you

15  have with the first sentence?

16             MR. OPPENHEIMER:  Objection;

17        asked and answered.

18      A.   It's a causal statement and Mr. ███

19  did not use any reliable methodology to test that

20  causal proposition.

21      Q.   What facts are you relying on in support

22  of your rebuttal of the first sentence in

23  paragraph 8?

24             MR. OPPENHEIMER:  Objection.

25      A.   I rely on the materials listed as

102

1    materials considered --

2         Q.   Can you list the --

3         A.   -- in my report.

4         Q.   Can you list the specific materials that

5    you're relying on that rebut this first sentence

6    in paragraph 8?

7                        MR. OPPENHEIMER:  Objection

8              to form.

9         A.   Appendix B of my report lists materials

10   I considered.  I rely on all of them.

11        Q.   Can you point to the materials that

12   you're specifically relying on for your rebuttal

13   of paragraph 8?

14                       MR. OPPENHEIMER:  Were you

15             done with that last answer?

16                       THE WITNESS:  Sorry, I

17             didn't hear you.

18                       MR. OPPENHEIMER:  Were you

19             done with that last answer?

20                       THE WITNESS:  I was done,

21             yes.

22                       MR. OPPENHEIMER:  Okay.

23        A.   I rely on all of my materials

24   considered.

25        Q.   Can you name the materials that you

103

1    considered in support of your rebuttal of

2    paragraph 8?

3                        MR. OPPENHEIMER:   Objection;

4              asked and answered.

5        A.    I rely on court documents for background

6    and I rely on the remainder of my materials

7    considered to support the appropriate methodology

8    for testing causal proposition.

9        Q.    Can you -- I'm sorry, were you done?

10       A.    Mr. ████ did not use a reliable

11   methodology to test his causal propositions.

12       Q.    Can you identify by name the specific

13   documents that you're relying on in support of

14   paragraph 8?

15                       MR. OPPENHEIMER:   Objection;

16             asked and answered for probably the

17             eighth time now.

18       A.    As I said, it's the entirety of my

19   materials considered, but I can give you examples.

20       Q.    Go ahead, please.

21       A.    For example, third item from bottom on

22   page 41 discusses "Experimental and

23   Quasi-Experimental Designs for Generalized Causal

24   Inference."  And this book discusses specifically

25   the gold standard of testing causal propositions

```
 1    is an experiment.

 2            And I'll actually read what it says.

 3    Paragraph -- paragraph 18 on page 10 of my report

 4    cites the book of Shadish, Cook and Campbell, the

 5    sentence that adds in Footnote 22, and it reads:

 6    "Shadish, et al, (2002) also state that

 7    'experiments are well-suited to studying causal

 8    relationships.  No other scientific method

 9    regularly matches the characteristics of causal

10    relationships so well.'"

11        Q.   Can you turn to page 3 of Mr. ██████

12    report?

13        A.   Yes, I'm there.

14        Q.   Can you please read the first sentence

15    of paragraph 2 of Mr. ██████ assignment?

16        A.   Mr. █████ states "The SEC retained me to

17    independently analyze and render opinions on the

18    perspective of a reasonable purchaser of XRP on

19    Ripple's statements, actions, and product

20    offerings."  Footnote 1.  I will -- Footnote 1

21    says "I also was retained to provide analysis

22    and/or rebuttal to defendants' expert reports, if

23    and as needed."

24        Q.   Does Mr. █████ state that he was

25    retained to evaluate cause-and-effect
```

1    relationships between Ripple's statements,

2    actions, and specific outcomes or behaviors?

3                    MR. OPPENHEIMER:   Objection

4            to form.

5        A.   Yes.

6        Q.   Does he state that he was retained to

7    evaluate cause and effect?

8                    MR. OPPENHEIMER:   Objection.

9        A.   He's evaluating the perspective of a

10   reasonable purchaser of XRP on Ripple's

11   statements, actions, and product offerings.   In

12   other words, he evaluates the impact of

13   statements, actions, and product offerings of

14   Ripple on the perspective of a reasonable

15   purchaser of XRP.

16       Q.   Is that your interpretation of this

17   sentence that you -- you read?

18                   MR. OPPENHEIMER:   Objection

19           to form.

20       A.   That is what the sentence states.

21       Q.   Does the sentence use the term "cause

22   and effect"?

23       A.   The sentence does not use those two

24   words.

25       Q.   So where did you come up with the cause

106

```
1    and effect in the sentence that you just read?

2                      MR. OPPENHEIMER:  Objection

3           to form.

4         A.   That's the content of the sentence.

5         Q.   Is that your interpretation of the

6    sentence?

7                      MR. OPPENHEIMER:  Objection.

8         A.   This is what the sentence states.

9         Q.   Is the word "cause" used anywhere in

10   this sentence?

11                     MR. OPPENHEIMER:  Objection;

12          asked and answered.

13        A.   The word "cause" is not used in the

14   sentence.

15        Q.   Is the word "effect" used anywhere in

16   this sentence?

17                     MR. OPPENHEIMER:  Objection;

18          asked and answered.

19        A.   The word "effect" is not used in the

20   sentence.

21        Q.   Do you have an understanding what the

22   term "perspective" means?

23        A.   Yes.

24        Q.   What does the term "perspective" mean?

25        A.   Perception and behavior.
```

107

1          Q.    Do you have an understanding of the term

2     "cause"?

3          A.    Yes.

4          Q.    What does cause mean?

5          A.    Impact a fact.

6          Q.    I'm sorry?

7          A.    Impact a fact.

8          Q.    Does the term "perspective" mean the

9     same thing as the term "cause"?

10         A.    Perspective is the outcome here.

11         Q.    My question is, does the term

12    "perspective" mean the same thing as the term

13    "cause"?

14         A.    No.

15         Q.    Is the rebuttal that you provided in

16    this case based on applying cause and effect to

17    Ripple's statements and actions?

18                    MR. OPPENHEIMER:  Objection

19          to form.

20         A.    I'm not sure what the sentence means.

21         Q.    Did you conduct a cause-and-effect

22    analysis in your rebuttal report?

23                    MR. OPPENHEIMER:  Objection.

24         A.    I evaluated Mr. ████████ "analysis."  I

25    did not conduct my own analysis.

108

```
 1        Q.   And when you describe the methodology

 2   that you reviewed in your report, are you using a

 3   cause-and-effect methodology?

 4                  MR. OPPENHEIMER:  Objection.

 5

 6        A.   I'm using the literature on cause and

 7   effect to evaluate Mr. ██████ report which, in

 8   paragraph 2, states that he was retained to

 9   evaluate the causal proposition.

10        Q.   Where does it say that he was retained

11   to evaluate the causal proposition in paragraph 2?

12                  MR. OPPENHEIMER:  Objection;

13           asked and answered.

14        A.   Paragraph 2 has a cause and an effect.

15   The cause is the statement, actions, and product

16   offerings of Ripple; and the effect is the

17   perspective of a reasonable purchaser of XRP.

18        Q.   Is that an opinion that you're rendering

19   regarding what paragraph 2 means?

20                  MR. OPPENHEIMER:  Objection

21           to form.

22        A.   That's what the paragraph states.

23        Q.   Can you point to the word "cause" in

24   paragraph 2?

25                  MR. OPPENHEIMER:  Objection;
```

109

```
 1              asked and answered.
 2         A.   There is no word "cause" in paragraph 2.
 3         Q.   Okay.  Turning to page 8 of Mr. █████
 4    report, "Background," is there anything in the
 5    background section that you're providing a
 6    rebuttal to?
 7                        MR. OPPENHEIMER:  Objection
 8              to form.
 9                        (Pause)
10         A.   Section 3 is called "Background."  It's
11    provided in Mr. █████ report for background.
12    And I rebut his entire report.
13         Q.   So what are the facts that you're
14    providing a rebuttal to in paragraph 10?
15                        MR. OPPENHEIMER:  Objection
16              to form.
17         A.   I take the background of this case as
18    given as provided in Mr. █████ report and the
19    complaint and the answer to the complaint.  My
20    opinions are regarding Mr. █████ conclusions and
21    the unreliable methodology which he reached them
22    with.
23         Q.   Okay.  I want -- I just want to clarify
24    because you stated earlier that you are rebutting
25    the entire report.
```

110

1        So are you rebutting the conclusions and

2    methodology that Mr. ████ provided or is there

3    anything in addition to the conclusions and

4    methodology that you're rebutting?

5                        MR. OPPENHEIMER:  Objection

6            to form.

7        A.   I'm rebutting the entire report.

8        Q.   Okay.  So with regard to the background,

9    did you state that you're -- let me -- that you're

10   taking the background as a given?

11                       MR. OPPENHEIMER:  Objection.

12       A.   I don't recall anymore that I stated.

13   What is it that I said?

14                       MS. GUERRIER:  Could you --

15                       THE WITNESS:  Could you read

16           my answer, please?

17                       MS. GUERRIER:  Could you

18           read her answer to the question "So

19           what are the facts that are you

20           providing a rebuttal to in paragraph

21           10?"  I think it starts at line 34,

22           10.  Her answer starts at line 34,

23           13.

24                   (Whereupon, the record was read

25           back.)

111

1    BY MS. GUERRIER:

2        Q.   So can you clarify whether you're

3    rebutting any facts in the background section?

4                    MR. OPPENHEIMER:   Objection

5            to form.

6        A.   I am taking the background as given and

7    I'm rebutting the entire report.

8        Q.   Okay.  Is there anything in paragraph 10

9    that you disagree with?

10                   MR. OPPENHEIMER:   Objection

11           to form.

12                   (Pause)

13       A.   I take this paragraph as given.

14       Q.   Is there anything in paragraph 11 that

15   you disagree with?

16                   MR. OPPENHEIMER:   Objection

17           to form.

18       A.   I take paragraph 11 as given.

19       Q.   Is there anything in paragraph 12 that

20   you disagree with?

21                   MR. OPPENHEIMER:   Objection

22           to form.

23       A.   I take paragraph 12 as given.

24       Q.   Is there anything in paragraph 13 that

25   you disagree with?

112

1                    MR. OPPENHEIMER:   Objection

2          to form.

3      A.   I take paragraph 13 as given.

4      Q.   Moving on to Section 4 of Mr. ███████

5  report titled "Ripple Platform Overview," is there

6  anything under Section 4, including the

7  subsections 4.1, 4.2, that you disagree with?

8                    MR. OPPENHEIMER:   Objection

9          to form.

10                    (Pause)

11      A.   Can you repeat the question, please?

12      Q.   The question was "Moving on to Section 4

13  of Mr. ███████ report titled 'Ripple" Plat --

14                    THE REPORTER:   Platform.

15      Q.   -- "'Ripple Platform Overview,' is there

16  anything under Section 4, including the

17  subsections 4.1 and 4.2, that you disagree with?"

18                    MR. OPPENHEIMER:   Objection

19          to form.

20      A.   To the extent that this section

21  describes background facts and history, I take it

22  as given.  To the extent that this section

23  describes or implies perspective of a reasonable

24  purchaser of XRP on Ripple's statement, action,

25  product offering, those conclusions are not

113

1   supported by any valid methodology and, thus, are

2   unreliable.

3        Q.   Is there any statement in paragraph 14

4   of Mr. ██████ report where he implies the

5   perspective of a reasonable purchaser of XRP on

6   Ripple's statements, actions, product offerings?

7            (Pause)

8        A.   All of these sentences describe Ripple's

9   actions.  If there is any implications about how

10   those actions affected prospective purchasers or

11   purchasers, Mr. ██████ did not provide reliable

12   methodology for those implications if they exist

13   here.

14        Q.   So were you able to identify

15   specifically where Mr. ██████ makes those

16   implications in paragraph 14?

17                      MR. OPPENHEIMER:  Objection

18            to form.

19        A.   I don't see anything explicit, but if

20   Mr. ████ implies something, then he has no

21   support for such implications.

22        Q.   Well, when you say "if" he implies

23   something, did he, in fact, imply any of the

24   perspective that you describe --

25                      MR. OPPENHEIMER:  Objection

114

1          to form.

2          Q.   -- in paragraph 14?

3          A.   If Mr. ███   implies here that any of

4    the actions of Ripple that he lists caused certain

5    perspective -- for example, he mentions the

6    public; he implies the public cause and

7    perspective of the actions of Ripple -- then those

8    implications are not supported by a valid

9    methodology.

10         Q.   What were you just reading?

11         A.   Second sentence of paragraph 14 mentions

12   the public.

13         Q.   So what -- what do you take issue with

14   in the second sentence of paragraph 14?

15                    MR. OPPENHEIMER:  Objection

16         to form.

17         A.   If this sentence is used by Mr. ███ to

18   imply any perspective of the public, even though

19   such a perspective is not stated here explicitly,

20   but if there is such an implication, that

21   implication is not based on any methodology.

22         Q.   Can you identify anywhere in the report

23   where there's an implication regarding perspective

24   of XRP purchasers with regard to the second

25   sentence in paragraph 14?

115

1              MR. OPPENHEIMER:   Objection

2         to form.

3         A.   Throughout his report, Mr. ███

4    discusses numerous cases of the public

5    perspective; specifically, the perspective of the

6    purchasers or prospective purchasers of XRP.

7         Q.   Okay.  Is there any statement about

8    perspective in the second sentence of paragraph

9    14?

10        A.   The word "perspective" is not in the

11   second paragraph.

12        Q.   Do you disagree with the statement that

13   "In 2012, the XRP blockchain was released to the

14   public and went live for the first time with a

15   maximum supply of 100 billion XRP created"?

16             MR. OPPENHEIMER:   Objection

17        to form.

18        A.   I take it as given.

19        Q.   Okay.

20        A.   I'm not opining here on the history or

21   mechanics of XRP or Ripple.

22        Q.   Is there anything in paragraph 15 that

23   you disagree with?

24             MR. OPPENHEIMER:   Objection,

25        form.

```
 1          A.   The first sentence says "In the early

 2    years, Ripple released products geared towards

 3    prospective individual users and traders."

 4               If there is an implication here of how

 5    the prospective purchasers end up -- what they

 6    ended up doing with XRP or this other products

 7    that Ripple released, if there is such an

 8    implication here, then it's not supported by any

 9    reliable methodology.

10          Q.   Is there such an implication, in fact,

11    in paragraph 15?

12                    MR. OPPENHEIMER:   Objection

13          to form.

14          A.   To the extent that they reach such an

15    implication and if there is such an implication,

16    it's not supported by any reliable methodology.

17          Q.   Well, what do you mean "to the extent"

18    that there is such ampli -- implication?

19          A.   If Mr. ████   implies here that

20    prospective purchasers of Ripple products engaged

21    in certain activities with those products after

22    the purchase, there is no systematic analysis of

23    what those individuals did.

24          Q.   Do you disagree with the -- the

25    statement that "Ripple released products geared
```

117

1    towards prospective individual users and traders"?

2                    MR. OPPENHEIMER:  Objection

3            to form.

4        A.   To the extent that it describes

5    historical -- history of XRP and Ripple, I take it

6    as given.  If there is any implication about the

7    perspective of purchasers and how it was caused by

8    actions, statements, and offerings of Ripple,

9    Mr. ████ did not provide a reliable methodology

10   to support such statements.

11       Q.   Do you disagree with the second -- the

12   facts in the second sentence in paragraph 15?

13                   MR. OPPENHEIMER:  Objection

14           to form.

15       A.   To the extent this sentence describes

16   the history of XRP and Ripple, I take it as given.

17   To the extent there is an implication of what

18   individuals did with this app, there is no

19   systematic analysis.

20       Q.   Do you disagree with the next

21   sentence -- the facts contained in the next

22   sentence following the third sentence in paragraph

23   15?

24                   MR. OPPENHEIMER:  Objection

25           to form.

                                                                        118

1              A.    I'm not offering any opinions on the

2      history or mechanics of XRP or Ripple's other

3      products.  To the extent that the statements --

4      any statements in this report imply a causal

5      relationship between XRP -- between Ripple's

6      statements, actions, and offerings and perspective

7      of purchasers and potential purchasers, Mr. ███████

8      did not offer a reliable methodology to evaluate

9      such a causal relationship.

10                        THE REPORTER:  Did not offer

11             a reliable?

12                        THE WITNESS:  Methodology to

13             evaluate such a causal relationship.

14             Q.    Can you -- I'm sorry.

15                  Can you identify any statement in

16     paragraph 15 that implies a causal relationship

17     between XRP, Ripple's statements, actions, and

18     offerings and the perspective of purchasers and

19     potential purchasers of XRP?

20                        MR. OPPENHEIMER:  Objection

21             to form.

22             A.    There may be an implied relationship

23     here between the upgrades and the branding on the

24     one hand and trading becoming number one use case.

25                        THE REPORTER:  Number one?

119

1                  THE WITNESS:  Use case.

2        Q.   How is there an implied relationship

3   between the upgrades and the branding and on --

4   and the trading becoming number one --

5                  MR. OPPENHEIMER:  Objection

6         to form.

7        Q.   -- on use case of Ripple?

8        A.   The sentence read -- reads "After

9   several upgrades, Ripple Client was rebranded in

10  2014 as Ripple Trade, with Ripple recognizing that

11  'Trading has rapidly become the number one use

12  case of Ripple.'"

13       Q.   Okay.  So where is the implication of

14  the relationship between the upgrade and the

15  branding?

16                  MR. OPPENHEIMER:  Objection;

17        asked and answered.

18       A.   The implication is in the sentence.

19       Q.   Okay.  So do you disagree that Ripple

20  Client was rebranded in 2014 as Ripple Trade?

21                  MR. OPPENHEIMER:  Objection

22        to form.

23       A.   I'll answer the question, but maybe we

24  can take a break soon.

25       Q.   Yeah, you can -- yes.  I'll finish with

120

1    this section and we can take a break.

2         A.   Can you repeat the last question,

3    please?

4         Q.   Do you disagree that Ripple Client was

5    rebranded in 2014 as Ripple Trade?

6                   MR. OPPENHEIMER:  Objection;

7         form.

8         A.   I don't offer any opinions about the

9    history or mechanics of XRP or Ripple and its

10   other products.

11        Q.   Okay.  Do you disagree with the

12   quotation that "Trading has rapidly become the

13   number one use case of Ripple," which includes the

14   footnote citation in Footnote 8?

15                   MR. OPPENHEIMER:  Objection

16        to form.

17        A.   I don't offer any opinions regarding the

18   history of Ripple or the veracity of statements

19   cited in -- cited -- cited in the report of

20   Mr. ██████

21        Q.   Okay.  So is this your position with

22   regard to the last sentence in paragraph 15?

23                   MR. OPPENHEIMER:  Objection

24        to form.

25        A.   I'm not offering any opinions about the

121

1    history of Ripple or XRP.

2         Q.   Okay.  Thank you.

3                   MS. GUERRIER:  I think this

4         is a good time for a break.  We can

5         go off the record.

6                   THE VIDEOGRAPHER:  Okay.

7         Going off the record at 12:22.

8                   (Whereupon, a luncheon recess

9         is taken.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

122

```
 1              A F T E R N O O N   S E S S I O N

 2                     (Record notes the appearance of

 3           Attorney Lisa Zornberg and Attorney

 4           Justin Berg at this time.)

 5                     THE VIDEOGRAPHER:  Okay.

 6           Back on the record at 1:07.

 7   BY MS. GUERRIER:

 8       Q.   Okay.  Doctor, if you could turn to page

 9   11 of Mr. ████████ report.

10           Are you providing any rebuttal to any of

11   the statements in paragraph 16 of Mr. ████████

12   report?

13                     MR. OPPENHEIMER:  Objection

14           to the form.

15       A.   I don't offer any opinions with respect

16   to the history of Ripple.  To the extent any of

17   the statements have other implications, Mr. ██████

18   has not supported them with a reliable

19   methodology.

20       Q.   Can you identify any statements in

21   paragraph 16 that have causal implications?

22                     MR. OPPENHEIMER:  Objection

23           to form.

24       A.   The sentence that states "Next, the

25   RippleNet Committee was announced, laying the
```

123

```
1   foundation for various products geared towards

2   global payment problems," this sentence might have

3   an implication of how the announcement of

4   RippleNet Committee impacted perceptions of

5   potential Ripple clients and Ripple clients.

6        Q.   Is that your interpretation of this

7   sentence that you just read?

8                    MR. OPPENHEIMER:  Objection;

9        form.

10       A.   This is what the state -- this is what

11  the sentence says.

12       Q.   Did you check Footnote 12 to determine

13  whether or not that sentence could be verified?

14       A.   Did I specifically click on the URL in

15  Footnote 12?  I don't recall.

16       Q.   So how does this sentence have an

17  implication of how the announcement of RippleNet

18  Committee impacted perceptions of potential Ripple

19  clients and Ripple -- Ripple clients?

20                   MR. OPPENHEIMER:  Objection

21       to form.

22       A.   The statement -- the sentence mentions

23  that the committee was announced and then it says

24  that that laid a "foundation for various products

25  geared toward global payments problems."  The
```

124

```
 1    impli -- possible implication here is that the

 2    future users of RippleNet Committee or any

 3    associated products took something away from the

 4    announcement as relating to the global payment

 5    problem.

 6         Q.    Does Mr. ███████ in his report, state --

 7    make the implication that the users of RippleNet

 8    Committee or any associated products took

 9    something away from the announce -- announcement,

10    announcement as relating to the global payments

11    problem?

12                    MR. OPPENHEIMER:   Objection

13         to form.

14         A.    That's a possible implication.   There

15    are numerous places in Mr. ███████ report where he

16    makes a specific connection between statements and

17    perceptions.   I'm looking for an example.

18            For example, in my report, in Appendix

19    C, in the row of the table that starts with number

20    85, which is a reference to Mr. ███████ report

21    paragraph, the last sentence says "Indeed, the use

22    of terms such as 'traction,' 'market fit,' 'total

23    addressable market,' and even 'investors' when

24    describing Ripple's progress and growth" -- "and

25    growth potential are words typically understood by
```

125

```
1    market participants to mean that they should be

2    buying XRP as a potentially profitable

3    investment."

4             So this specifically discusses that

5    certain words used by Ripple are predicted by

6    Mr. ████ to have an effect on market partic --

7    market participants and, in particular, on the

8    understanding or perception of the market

9    participants.

10        Q.   Well, can you identify where Mr. ████

11   connects the RippleNet Committee that was

12   announced laying a foundation for various products

13   geared towards global payments problems to the

14   perception of XRP purchases?

15                     MR. OPPENHEIMER:   Objection

16        to form.

17        A.   I don't say that he connected to the

18   perception of XRP purchasers, but he mentions the

19   announcement and he stated that it's laid a

20   foundation for various products geared towards

21   global payment problems.

22             Laying a foundation is potentially a

23   causal proposition.  There might be a causal

24   inference implied here by Mr. ████

25                     THE REPORTER:  By?
```

126

```
1                    THE WITNESS:  Mr. ████

2        Q.   Do you know whether Ripple, in the

3   Footnote 12, the URL, made the statement that

4   Mr. ████  included in his report in the sentence

5   that we're discussing?

6                    MR. OPPENHEIMER:  Objection

7        to form.

8        A.   Mr. ████  does not use direct quotes.

9   Whether the substance of the sentence feeds the

10  source, I don't recall if I checked.

11       Q.   So you -- do you recall -- I'm sorry,

12  did you testify you don't recall if you checked to

13  see if the sentence is included in the URL that's

14  on -- in Footnote 12?

15       A.   I --

16                    MR. OPPENHEIMER:  Objection.

17       A.   It's unlikely that this exact sentence

18  is included in the source because Mr. ████  does

19  not use quotation marks.  I did not check -- or I

20  don't recall whether I checked whether the

21  substance of the sentence reflects the source.

22       Q.   So assume that the statement is included

23  in "Our Story" link at Footnote 12, would that

24  change your opinion regarding the so-called

25  implications that you claim Mr. ████  made with
```

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

```
 1    respect to this sentence?

 2                   MR. OPPENHEIMER:  Objection

 3             to form.

 4         A.   You're saying Mr. ███ quoted the

 5    sentence without using quotation --

 6         Q.   Assuming that --

 7         A.   -- without using a quotation mark?

 8         Q.   Yeah.  Assuming that he did, does that

 9    change your statement that Mr. ███ is making an

10    implication here?

11                   MR. OPPENHEIMER:  Objection.

12         A.   If Mr. ███ quoting directly someone

13    else, then he's just quoting someone else.

14         Q.   So how does that affect your opinion

15    regarding the connection that you testified

16    Mr. ███ made between this statement and the

17    perspective of XRP purchasers?

18                   MR. OPPENHEIMER:  Objection;

19             mischaracterizes testimony.

20         A.   Can you repeat the question, please?

21         Q.   So I'll start with your answer.  You

22    stated "If Mr. ███ quoting directly someone

23    else, then he's just quoting someone else."

24             And I asked "So how does that affect

25    your opinion regarding the connection that you
```

128

1      testified Mr. ████ made between this statement

2      and the perspective of XRP purchasers?"

3                          MR. OPPENHEIMER:  Same

4              objection.

5          A.   If Mr. ████ did not write this

6      sentence, then Mr. ████ is just using someone

7      else's sentence.

8          Q.   How does this affect your opinion

9      regarding the connection between this statement

10     and the perspective of XRP purchasers?

11                         MR. OPPENHEIMER:  Objection

12             to form.

13         A.   If Mr. ████ quotes without quotation

14     marks someone else's statement, then he is quoting

15     that statement.  Whether he put in some additional

16     meaning into it, that you'll have to ask

17     Mr. ████   But if it's just someone else's

18     statement quoted here without quotation marks,

19     then that's someone else's statement.

20         Q.   Is there anything you're rebutting in

21     paragraph 17 of Mr. ████ report?

22                         MR. OPPENHEIMER:  Objection

23             to form.

24                     (Pause)

25         A.   I don't offer any opinion with respect

1    to the history of XRP or Ripple or ODL.  To the

2    extent that Mr. ███ implies here any causal

3    relationships between action, statements, and

4    offerings of Ripple and perspective -- perspective

5    of a reasonable purchaser or potential purchaser,

6    such implications are unsupported by any valid

7    methodology.

8        Q.   Can you identify any statement in

9    paragraph 17 where Mr. ███ implies a causal

10   relationship between action, statements, and

11   offerings of Ripple and the perspective of a

12   reasonable purchaser of XRP?

13                    MR. OPPENHEIMER:  Objection

14        to form.

15       A.   The state -- the sentence starts by

16   saying "ODL was intended to facilitate

17   cross-border transactions between money

18   transmitters' domestic and foreign accounts," and

19   then it lists three steps.

20            If there is a potential implication here

21   that the presence of ODL indeed facilitated

22   cross-border transactions and that the purchasers

23   or clients perceived it in that way, that

24   statement has not been tested by Mr. ███   That

25   implication has not been tested by Mr. ███

130

1      Q.   Is there, in fact, the implication that

2   the presence of ODL facilitated cross-border

3   transactions and that the purchasers of ODL

4   proceeded "in that way"?

5                   MR. OPPENHEIMER:  Objection

6           to form.

7      A.   Can you please repeat the question?

8      Q.   Is there, in fact, the implication that

9   the presence of ODL facilitated cross-border

10   transactions and that the purchasers of ODL

11   proceeded "in that way" --

12                   MR. OPPENHEIMER:  Objection.

13      Q.   -- in paragraph 17 of Mr. ███████

14   report?

15      A.   I don't think that's what I said.

16                   MS. GUERRIER:  Could you

17           please read her answer which starts

18           at 7, 10 please.

19                   (Whereupon, the record was read

20           back.)

21                   THE WITNESS:  I believe the

22           word was perceived, not proceeded.

23   BY MS. GUERRIER:

24      Q.   So are you prepared to answer the

25   question or would you like me to repeat the

131

1    question again?

2              MR. OPPENHEIMER:   Objection.

3         A.   Can you repeat the question again?

4         Q.   Yeah.

5              Is there, in fact, the implication that

6    the presence of ODL facilitated cross-border

7    transactions and that the purchasers of ODL

8    perceived it in that way?

9              MR. OPPENHEIMER:   Objection

10             to form; asked and answered.

11        A.   If there is such an implication, Mr.

12   ▬▬   did not --

13             THE REPORTER:   Repeat.

14        A.   If there is such an implication,

15   Mr. ▬▬ did not test it.

16        Q.   Is there such an implication?

17             MR. OPPENHEIMER:   Objection

18             to form.

19        A.   I'm reading what the sentence states.

20        Q.   So is this your interpretation of the

21   sentence that Mr. ▬▬ wrote in his report in

22   paragraph 17?

23             MR. OPPENHEIMER:   Objection.

24        A.   There may have been an implication here.

25        Q.   Is there -- are you offering any

```
 1    rebuttal to any statement in paragraph 18 of

 2    Mr. █████  report?

 3                         MR. OPPENHEIMER:  Objection

 4         to form.

 5         A.   I don't define the mechanics of ODL.

 6         Q.   Are you providing any -- any rebuttal to

 7    paragraph 19 of Mr. █████  report?

 8                         MR. OPPENHEIMER:  Objection

 9         to form.

10         A.   He, Mr. █████ mentions the promotion of

11    the growth of ODL and he specifically mentions an

12    excerpt from an announcement on the Ripple

13    website.  In general, in his report, he eventually

14    links actions and announcements of Ripple with

15    pro -- with the perspective of the purchaser of

16    XRP.

17              To the extent that he plans to do -- or

18    does this elsewhere in the report with this

19    particular statement and this particular

20    promoted -- promotion of the growth, he's -- the

21    causal link has not been established by Mr. █████

22    with a reliable methodology.

23         Q.   Do you disagree with the statement that

24    Ripple promoted the growth of ODL users and

25    transaction volume?
```

133

```
 1                    MR. OPPENHEIMER:  Objection

 2          to form.

 3     A.   I don't opine on what Ripple did or --

 4                    THE REPORTER:  I'm sorry.  I

 5          don't what on what Ripple did?

 6                    THE WITNESS:  I don't opine

 7          on what Ripple did.

 8     Q.   Are you providing any opinion on Figure

 9   3 referenced in paragraph 19?

10                    MR. OPPENHEIMER:  Objection

11          to form.

12     A.   I don't opine on the mechanics of ODL or

13   Ripple.

14     Q.   Are you providing any rebuttal to

15   paragraph 20 of Mr. ▆▆▆▆▆ report?

16                    MR. OPPENHEIMER:  Objection

17          to form.

18     A.   I don't opine on the history of Ripple

19   or MoneyGram.

20     Q.   Are you providing any rebuttal to

21   paragraph 21 of Mr. ▆▆▆▆▆ report?

22                    MR. OPPENHEIMER:  Objection

23          to form.

24     A.   I don't offer any opinions with respect

25   to the history of ODL or MoneyGram.
```

134

1       Q.   Turning to your report, does paragraph 9

2   contain all of the opinions that you formulated in

3   this case?

4                   MR. OPPENHEIMER:   Objection

5           to form.

6       A.   My opinions are my entire report.  This

7   is a summary.

8       Q.   Does -- does the summary that you've

9   included in paragraph 9.a through f include

10  summaries of all the opinions that you formulated

11  in this case?

12                  MR. OPPENHEIMER:  Objection;

13          form.

14      A.   All my opinions are my entire report.

15  This is a summary.

16      Q.   Well, my question is whether the summary

17  that you've included -- the summaries that you've

18  included in paragraphs 9.a through f include

19  summaries of all the opinions that you formulated

20  in this case.

21                  MR. OPPENHEIMER:  Objection;

22          asked and answered.

23      A.   All my opinions are my entire report.

24  Paragraph 9 is a summary.

25      Q.   Are you providing any opinion of whether

135

1    or not XRP is a security for federal securities

2    laws purposes?

3         A.    I'm not offering any legal opinions.

4         Q.    So is the question -- I'm sorry.

5               Is the answer no?

6         A.    I'm not offering --

7                         MR. OPPENHEIMER:   Objection

8          to form.

9         A.    -- any legal opinions.

10        Q.    Okay.  Are you offering any factual

11   opinion regarding whether or not XRP is a

12   security?

13                        MR. OPPENHEIMER:   Objection

14         to the form.

15        A.    Could you clarify what you mean by

16   "factual opinion"?

17        Q.    Is XRP a security in fact?

18                        MR. OPPENHEIMER:   Objection

19         to form.

20        A.    I'm not offering any legal opinions.

21        Q.    Okay.  Can you turn to paragraph 15 of

22   your report?  And if you could please read

23   paragraph 15 into the record.

24        A.    "Mr. ▮▮▮▮▮▮ opinions concern the

25   effects that Ripple's 'statements, actions, and

1    product offerings' supposedly had on the

2    'perspectives' of reasonable purchasers of XRP.

3    For example, he opines that actions by Ripple

4    'would create' certain expectations for 'a

5    reasonable purchaser.'"  Footnote 20 refers to

6    ███ report, paragraph 8.  "Conclusions of this

7    sort are considered 'causal,' in the sense that he

8    implies that Ripple's 'statements, actions, and

9    product offerings' caused changes in the

10   'perspective of a reasonable purchaser.'"

11        Q.    What do you mean by "conclusions of this

12   sort"?

13        A.    Conclusions that have a cause and an

14   effect.

15        Q.    And you stated that the so-called

16   conclusions are considered causal.

17             Are considered causal by whom?

18                  MR. OPPENHEIMER:  Objection.

19        A.    I did not say "so-called conclusions."

20        Q.    That's my term.

21             So the question is:  You stated that the

22   so-called conclusions are considered causal.

23                  MR. OPPENHEIMER:  Objection.

24        Q.    So going back to your statement about

25   the conclusions are considered causal, who are

137

1    they considered causal by?

2                    MR. OPPENHEIMER:  Objection

3          to form.

4          A.   My sentence states "Conclusions of this

5    sort are considered 'causal' in the sense that he

6    implies that Ripple's 'statements, actions, and

7    product offerings caused changes in the

8    'perspective of a reasonable purchaser.'"

9                I might have missed a closing quotation

10   mark after "offerings."

11               So conclusions that have a cause and an

12   effect are causal conclusions.  And who considers

13   them causal?  That's the academic world and the

14   economic consulting world, the literature in

15   social sciences.

16         Q.   So are you providing a legal opinion

17   here in your paragraph 15 about what is considered

18   causal or not?

19                    MR. OPPENHEIMER:  Objection.

20         A.   I'm not offering any legal opinions.

21         Q.   Why isn't your statement analyzing

22   Mr. ████ sentence a legal opinion?

23                    MR. OPPENHEIMER:  Objection

24         to form.

25         A.   I'm not offering any legal opinions.

138

1        Q.   What is your basis for the statement

2   that Mr. ███ implies that Ripple's statements,

3   actions, and product offerings cause changes in

4   the perspective of a reasonable purchaser?

5                      MR. OPPENHEIMER:   Objection

6          to form.

7        A.   So in paragraph 8 of his report,

8   Mr. ███ makes numerous causal statements of this

9   sort.  For example, he says, in the second

10  sentence, "I conclude that a reasonable purchaser

11  would have had an expectation of future profit

12  derived from the efforts of Ripple." Efforts of

13  Ripple falls under statements, actions, and

14  product offerings.  And execution falls under

15  perspective.  And reasonable purchaser -- let me

16  restate.  Expectations of reasonable purchaser

17  falls under perspective of reasonable purchaser.

18                 Next, he says "Specifically, purchasers

19  would have expected or hoped to profit by later

20  reselling their" XIP -- "XRP at a higher price on

21  a secondary market after XRP substantially

22  increased in value."  Here he expands on what that

23  perspective or that expectation would be.

24                 Later in the paragraph he says "Ripple

25  also promoted a variety of its achievements,

1    initiatives, and strategy that created a

2    well-understood bullish thesis for the price of

3    XRP and encouraged speculative investment flows

4    into the digital asset."  Here, Ripple's promotion

5    of a variety of its achievements, initiatives, and

6    strategy is an example of statements, actions, and

7    product offerings.

8           And then the "speculative investment

9    flows into digital assets," that's a perspective.

10   That's the characterization of Mr. ████ of the

11   perspective of the purchasers because it implies

12   here that they purchased to invest.

13          Next, he states "This promotional

14   activity included advertising new partnerships

15   with financial institutions, highlighting the

16   experience and expertise of Ripple's team members,

17   making public statements about why XRP was poised

18   to increase in price, publishing positive

19   commentary about the future growth trajectory of

20   Ripple's products, and describing the plans for

21   developing the XRP ecosystem."  Here Mr. ████

22   expands on what statements, actions, and product

23   offerings were.

24          Next, he says "Although Ripple's

25   development of the blockchain and broader XRP

1    ecosystem, along with its promotion of the bull

2    case for buying XRP, would not guarantee a profit,

3    it would create the hope that a purchaser could

4    passively earn profits by owning XRP while Ripple

5    took steps to increase the value of the coin."

6    Here the statements, actions, and product

7    offerings are Ripple's development of the

8    blockchain and broader XRP ecosystem along with

9    its promotion of the bull case for buying XRP.

10   And the perspective is the hope that the purchaser

11   could possibly earn profit by owning XRP while

12   Ripple took steps to increase the value of the

13   coin.

14          Next, he says "In my experience as an

15    investor and close observer of the digital asset

16    space, the statements, actions, background, and

17    competence of the founders and companies that

18    create and support a blockchain project are

19    extremely important to the decision-making

20    process of purchasers of digital assets."  Here

21    he expands his causal proposition outside of

22    Ripple and XRP to founders and companies that

23    create and support blockchain projects.  And here

24    he refers to that statements, actions, and

25    product offerings of such companies and their

141

```
1    founders, and that's the cause.  And the effect

2    is the decision-making process of purchasers of

3    digital assets.

4           So pretty much every word in this

5    paragraph is either a -- as -- a discussion of

6    the statements, actions, and product offerings of

7    Ripple and in one case of a broad category of

8    founders and companies.  And then -- or it is a

9    discussion of a perspective of a reasonable

10   purchaser or it's a statement that connects the

11   two in a causal statement -- in a causal form.

12        Q.   So going back to your statement in the

13   second sentence where you quote Mr. ███████

14   statement, "I conclude that a reasonable purchaser

15   would have had an expectation of future profit

16   derived from the efforts of Ripple," you stated

17   that "an expectation falls under perspective" --

18   I'm sorry, I think you stated -- "expectations of

19   reasonable purchaser falls under perspective of

20   reasonable purchaser."

21           What do you mean by that?

22                   MR. OPPENHEIMER:  Objection

23        to form.

24        A.   Expectation is the type of a

25   perspective.
```

1      Q.   Is perspective causation?

2                     MR. OPPENHEIMER:  Objection.

3      A.   No.   A perspective can be caused by

4    something.

5      Q.   Next you say "Specifically, purchasers

6    would have expected or hoped to profit by later

7    reselling their XRP at a higher price on a" second

8    -- "secondary market after XRP substantially

9    increased in value," and then you state "he

10   expands on what that perspective or that

11   expectation would be."

12                    Can you explain what you mean here?

13                    MR. OPPENHEIMER:  Objection

14            to form.

15     A.   Mr. ████ talks about what purchasers

16   would expect when he describes the purchaser's

17   expectations or purchaser's perspective.

18     Q.   So the next sentence you highlighted in

19   the paragraph, you state Ripple also promoted a

20   variety of its achievements, initiatives, and

21   strategy that created a well understood bullish

22   thesis for the price of XRP.  It encouraged

23   speculative investment into the digital asset.

24   I'm paraphrasing.  And you state that Ripple's

25   promotion of a variety of its achievements,

143

```
 1    initiatives, and strategy is an example of

 2    statements, actions, and product offerings.

 3              Could you please explain what you mean?

 4                   MR. OPPENHEIMER:   Objection

 5              to form.

 6         A.    Where we initially started the

 7    discussion or where you initially started your

 8    questioning, this last line of questioning, was

 9    the last sentence of my paragraph 15 where I

10    mention Mr. ███████ causal -- causal --

11    Mr. ██████ -- let me restart.

12              This line of questioning started when

13    you directed me to the last sentence of my

14    paragraph 15.  Here I state that Mr. ██████

15    conclusions are causal because he links what he

16    calls statements, actions, and product offerings

17    of Ripple in a causal manner with what he calls

18    perspective of a reasonable purchaser.

19              I don't remember the exact question you

20    asked me about paragraph 8, but my long answer was

21    to point out which of the pieces in paragraph 8

22    reflect statements, actions, and product

23    offerings, which ones reflect the perspective of

24    reasonable purchasers, and where Mr. █████ makes a

25    causal link.
```

144

```
1        Q.   Okay.  So with respect to this statement

2   where you stated that he -- you read into -- from

3   his report that Ripple also promoted a variety of

4   its achievements, initiatives, and strategies.  So

5   that -- that would be the last -- before the last

6   sentence in paragraph 8 on page 6.

7            Can you identify the cause and effect in

8   this statement?

9                    MR. OPPENHEIMER:  Objection

10           to form.

11       A.   Ripple's promotion of a variety of its

12   achievements, initiatives, and strategy here

13   serves as a cause.  The bullish thesis may be an

14   effect, but more generally the effect is at the

15   end of this paragraph where Mr. ████ makes a more

16   general conclusion not just about Ripple, but

17   generally about founders and companies.  And he

18   says that statements and actions and background

19   and competence of the founders impact or create an

20   -- impact decision-making process of purchasers of

21   digital assets.  So the decision-making process of

22   purchasers of digital assets is the outcome.

23       Q.   Okay.  So going back to the sentence

24   before the last on page 6, is there no effect in

25   that sentence?
```

145

1              MR. OPPENHEIMER:   Objection

2         to form.

3         A.   The well-understood bullish thesis may

4    be an effect in this particular sentence, but the

5    general purpose of this sentence is to list all

6    the actions and statements and product offerings

7    of Ripple that eventually culminated in the end of

8    this paragraph, led to the decision-making

9    process -- or impacted the decision-making process

10   -- process of purchasers of digital assets.

11        Q.   How do you know what the general purpose

12   of this single statement is?

13              MR. OPPENHEIMER:   Objection.

14        A.   I'm taking this paragraph in this report

15   as a whole.

16        Q.   So is this your interpretation of the

17   sentence before the last in paragraph 8 of

18   Mr. ██████ report?

19        A.   This is what the paragraph states.

20        Q.   According to your interpretation --

21              MR. OPPENHEIMER:   Objection

22        to form.

23        Q.   -- of the paragraph?

24              MR. OPPENHEIMER:   Objection

25        to form.

146

1        A.   This is what the paragraph states.

2        Q.   Are you equating expectation with

3    causation?

4                    MR. OPPENHEIMER:  Objection;

5            asked and answered.

6        A.   Expectations can be caused by something;

7    but, generally speaking, the word "expectation"

8    and "causation" mean different things.

9        Q.   Okay.  Are you opining about Mr. ▌▌▌▌

10   state of mind?

11       A.   I'm not offering any psychological

12   evaluation.

13       Q.   So how do you know what he implied?

14                    MR. OPPENHEIMER:  Objection

15           to form.

16       A.   I'm reading the text and, in certain

17   places, there appears to be an implication, but

18   generally based on the totality of his report.

19       Q.   Were you done with your answer?

20       A.   Yes.

21       Q.   So if you turn to paragraph 16 of --

22   of -- of your report where you discuss the

23   scientific grounded methodology to assess whether

24   causal relationships "of this sort exist."

25                    Can you give us some examples of the

1    scientifically grounded methodology?

2         A.   The sentence reads "There are

3    scientifically grounded and reliable methodologies

4    to assess whether causal relationships of this

5    sort exist."

6              My next section is titled "The

7    established, reliable, and supportable method for

8    evaluating causal propositions is the experimental

9    method."  And that section describes experiments.

10                    THE REPORTER:  Describes?

11                    THE WITNESS:  Experiments.

12        Q.   Can you give us some examples of these

13   types of experiments that are used to evaluate

14   causal relationships?

15        A.   Well, for example, the 2019 -- and I'm

16   reading from paragraph 18.  "The 2019 Sveriges

17   Riksbank Prize in Economic Sciences in Memory of

18   Alfred Nobel (commonly referred to as the 'Nobel

19   Prize' in economics) was awarded to Abhijit

20   Banerjee, Esther Duflo, and Michael Kremer for

21   their use of experiments in the field of

22   developmental economics and, similarly, in 2021,

23   Nobel Prize in Economics was awarded to do David

24   Card, Joshua Angrist, and Guido Imbens for their

25   work related to experiments and

1    quasi-experiments."

2         Q.   Is an experiment and survey the same

3    thing scientifically?

4         A.   An experiment can be conducted in the

5    survey form, but not necessarily.  A survey can be

6    conducted in experimental form, but not

7    necessarily.

8         Q.   Are the methodologies described in your

9    report applicable to determining causal

10   relationships?

11                    MR. OPPENHEIMER:  Objection

12        to form.

13        A.   Which methodologies are you referring

14   to?

15        Q.   The methodologies you described in your

16   report.

17                    MR. OPPENHEIMER:  Objection;

18        vague.

19        A.   Well, the first sentence in paragraph 18

20   says "The gold standard for testing a causal

21   hypothesis is an experiment."  That's the gold

22   standard.  Then I discuss experiments.

23            Then in paragraph 28 I say "Other,

24   non-experimental options are also available to

25   evaluate perceptions and expected behavior,

149

```
1    although they are less effective in isolating

2    causal effects than the gold standard methodology

3    of conducting an experiment."

4              And then I discuss examples.

5         Q.   Does paragraph 26 of your report contain

6    the steps that would be used, in your opinion, to

7    evaluate the perception of a reasonable XRP

8    purchaser?

9                        MR. OPPENHEIMER:  Objection

10             to form.

11        A.   Paragraph 26 describes some elements of

12   how a causal hypothesis that certain statements,

13   actions, and offerings caused perception and

14   perspective of -- or generally the perspective of

15   purchasers and potential purchasers of XRP can be

16   tested.

17        Q.   Did you conduct any test in the manner

18   described in paragraph 26 with regard to this

19   case?

20        A.   No.

21        Q.   Are you providing a rebuttal to

22   Mr. ████    analysis of the perceptions of XRP

23   purchasers?

24                       MR. OPPENHEIMER:  Objection

25             to form.
```

150

```
1        A.    I don't believe what Mr. ███ provided

2   is an appropriate or reliable analysis.  I do

3   provide rebuttal for his entire report.

4        Q.    If you did not conduct any tests in this

5   case, how are you able to rebut Mr. ███

6   analysis of XR -- the reasonable expectations of

7   XRP purchasers' perception?

8              I'm sorry, let me repeat the sentence.

9              If you did not conduct any tests in this

10  case, how are you able to rebut Mr. ███

11  analysis of the perception of a reasonable XRP

12  purchaser?

13                    MR. OPPENHEIMER:   Objection

14        to form.

15        A.    If you are quoting anything I said

16  previously, I believe I've been using the word

17  "perspective" over "perception" words to an

18  extent.

19             I also wouldn't call what Mr. ███ did

20   an analysis.  Mr. ███ makes causal conclusions

21   and he did not use a methodology, a reliable

22   methodology, that would allow him to make such

23   conclusions and, as such, his conclusions are

24   invalid.

25        Q.    Is the methodology that you described
```

```
 1    the only manner of evaluating the perception of a

 2    reasonable purchaser of XRP?

 3                    MR. OPPENHEIMER:   Objection

 4         to form.

 5         A.    An experiment is a gold standard of

 6    evaluating a causal relationship between the

 7    actions, statements, and offerings of Ripple and

 8    the perspective of purchasers or potential

 9    purchasers, including perceptions.

10         Q.    Assuming that -- I'm sorry, were you

11    done?

12         A.    No.

13         Q.    Well, go ahead.  You can finish your

14    sentence.

15         A.    I'm figuring out my thoughts because I

16    was interrupted.

17                There are, as I discuss in paragraph 28,

18    "Other, nonexperimental options also available to

19    evaluate perceptions and expected behavior" --

20    which is perspective -- "although they're less

21    effective in isolating causal effects than the

22    gold standard methodology of conducting an

23    experiment."

24                I'm done with my answer.

25         Q.    Assume that you -- Mr. ████ is only
```

1    evaluating perception without cause and effect.

2    Are you familiar with the type of analysis that

3    could be conducted to evaluate perception without

4    cause and effect?

5                    MR. OPPENHEIMER:  Objection.

6                    You can answer.

7         A.   With respect to perceptions or beliefs,

8    in paragraph 22 of my report, I explain that the

9    most direct outcome -- the most direct way of

10   measuring such an outcome is through a survey.

11            And then, in paragraph 23, I describe

12   surveys that can be appropriate when the goal is

13   to learn about prevalent opinions -- again,

14   perceptions -- or preferences rather than causal

15   relationships.  And there are examples in

16   parentheses.

17        Q.   Is the survey the only means of

18   determining perception when you're not looking at

19   cause and effect?

20        A.   Surveys are the most direct ways.  There

21   are indirect ways of measuring perception.

22        Q.   What are the indirect ways of measuring

23   perception?

24        A.   For example, a conjoined analysis survey

25   or any other choice experiment can establish the

```
 1    impact of a certain feature of a product on

 2    consumer choices.  And to the extent that we

 3    establish that the feature impacts the choices or

 4    doesn't impact the choices, we often can make

 5    inference about the underlying perceptions.

 6         Q.   Can an expert in your field rely on his

 7    or her experience to evaluate perception when

 8    cause and effect is not at issue?

 9                   MR. OPPENHEIMER:  Objection

10          to form.

11         A.   In my field, perceptions are an

12    empirical question.

13         Q.   What do you mean by "perceptions are an

14    empirical question"?

15         A.   Researchers in my field would want some

16    data or would conduct a study to obtain such data

17    in order to evaluate perceptions.

18         Q.   Are you aware of any percept -- consumer

19    perception evaluations that are conducted without

20    scientific data?

21                   MR. OPPENHEIMER:  Objection

22          to form.

23         A.   I've assisted others and, in fact, in

24    rebutting other experts -- and, in fact, I

25    rebutted one such expert other than Mr. ███ --
```

154

1    where nonscientific matters or pure introspection

2    is used.  And in all those cases they -- either

3    the expert I supported or myself as the expert

4    held the opinion that that approach is

5    unscientific and meritless and unreliable.

6         Q.   Would it surprise you to know that

7    courts in this district that govern this case

8    allow experts to testify about consumer perception

9    without presenting scientific information?

10                    MR. OPPENHEIMER:  Objection

11             to form.

12        A.   I'm not offering any legal opinions.

13        Q.   Have you ever heard of experts

14   testifying about consumer perception without

15   offering scientific analysis?

16                    MR. OPPENHEIMER:  Objection

17             to form.

18        A.   I already answered that question.

19        Q.   I don't think I asked you if you've ever

20   heard of experts testifying about consumer

21   perception without offering scientific analysis.

22             So can you please answer the question?

23        A.   I'll repeat.

24                    MR. OPPENHEIMER:  Objection.

25                    You can answer.

155

```
 1        A.   I rebutted an expert who was offering
 2   nonscientific testimony and I supported several
 3   experts in rebutting nonscientific testimony with
 4   respect to consumer perceptions.
 5        Q.   In all the cases where you rebutted
 6   experts who were providing nonscientific testimony
 7   with respect to consumer perception, did you
 8   submit a report?
 9                  MR. OPPENHEIMER:  Objection.
10                  You can answer.
11        A.   I was an expert in one such case.  In
12   that case, the expert I rebutted did a little bit
13   more than Mr. ███ and actually conducted a
14   study.  However, she herself admitted it was not
15   scientific.  And I submitted a rebuttal report in
16   that case.
17             And in other cases where I supported
18   experts, I did not submit reports, but the experts
19   I supported submitted their own reports.
20        Q.   In the case where you submitted a
21   rebuttal report, was your rebuttal report subject
22   to a Daubert challenge?
23                  MR. OPPENHEIMER:  Objection;
24             asked and answered.
25        A.   We discussed the case previously where
```

1    the court chose not to rule on the Daubert motion

2    and rule on the merits of the case and rule in

3    favor of my client.

4        Q.   So is it fair to say you've never

5    presented your expert opinion about the

6    methodology to test consumer perception to a

7    court?

8                    MR. OPPENHEIMER:   Objection

9            to form.

10       A.   Can you repeat the question?

11       Q.   Is it fair to say that you've never

12   presented your expert opinion about the mailed --

13   methodology to test consumer perception to a

14   court?

15                   MR. OPPENHEIMER:   Same

16           objection.

17       A.   I don't think it's fair to say this.

18       Q.   So have you ever presented your -- an

19   expert opinion about the methodology to test

20   consumer perception to a judge?

21                   MR. OPPENHEIMER:   Objection

22           to form.

23       A.   I have never testified in court.  I have

24   submitted reports.

25       Q.   Have you conducted any surveys in a case

1    similar to the case before the court?

2                      MR. OPPENHEIMER:  Objection

3            to form.

4        A.   What do you mean, "before the court"?

5        Q.   Did you review the complaint in this

6    case?

7        A.   I reviewed the complaint in this case.

8        Q.   Do you recall the claims against Ripple

9    in this case?

10       A.   I cannot restate the entire complaint,

11   but the background section of my report offers a

12   summary of the claims.

13       Q.   Okay.  So have you conducted a survey

14   with regard to expectation of a reasonable

15   purchaser in a case that's similar to the case

16   that you were asked to submit a report?

17                      MR. OPPENHEIMER:  Objection

18           to form.

19       A.   I have conducted surveys in cases where

20   the subject matter was the impact of certain

21   stimuli on consumer perceptions and behavior,

22   which is similar to this report in this -- and to

23   this case in the sense that Mr. ████  makes causal

24   propositions about how stimuli impacted the

25   perspective of the purchasers and potential

158

1    purchasers.

2        Q.   Have you submitted a survey in a case

3    where the SEC was the plaintiff in a case?

4                    MR. OPPENHEIMER:   Objection

5            to form.

6        A.   No.

7        Q.   I believe you testified that you

8    reviewed the Howey case, is that correct?

9        A.   That is correct.

10       Q.   Did the Howey case inform your opinions

11   in your -- in the report that you submitted?

12       A.   I reviewed it for background.

13       Q.   If you could please turn to Appendix C

14   of your report.

15           Could you describe Appendix C to your

16   report?

17                   MR. OPPENHEIMER:   Objection

18           to the form.

19                   You can answer.

20       A.   These are examples of Mr. ██████

21   unsupported causal propositions.

22       Q.   How are the statements that you

23   highlighted of Mr. ████ unsupported?

24       A.   These are causal propositions and they

25   are not supported by any reliable methodology that

1    would allow Mr. ███ to test a causal

2    proposition.

3         Q.    Okay.  To clarify, when you say "they

4    are not supported," are you limiting your critique

5    to methodology?

6                       MR. OPPENHEIMER:   Objection

7              to form.

8         A.    If you are asking me whether the

9    outcomes of Mr. -- if Mr. ███ conclusions

10   themselves of the methodology match reality, that

11   could happen by total coincidence, just like a

12   broken clock shows correct time twice a day.

13             But all Mr. ███ causal propositions,

14   all his conclusions, are not supported by any

15   reliable methodology.  So any match between his

16   conclusions and reality would be purely

17   coincidental.

18        Q.    Going to the para -- I guess paragraph

19   31 on -- that you've listed on Appendix C, can you

20   identify the cause in this statement?

21        A.    Look at the last sentence here.  It says

22   "From the perspective of a utility-oriented

23   purchaser, as discussed above, the fixed-supply

24   and variable price model of XRP presents

25   significant disadvantages."

160

1            The cause here is the fixed-supply

2     variable price model of XRP and the effect is the

3     perspective of a utility-oriented purchaser if

4     such purchaser indeed exists.

5            The previous sentence is more

6     complicated.

7        Q.   How so?

8        A.   It has multiple causes.

9        Q.   Can you identify the causes in the

10    previous sentence?

11       A.   Well, it also lists the perspective and

12    that perspective is the effect.

13                   THE REPORTER:   Is?

14                   THE WITNESS:   The effect.

15       A.   And that perspective is all the

16    investment-oriented purchaser -- purchasers -- it

17    says purchasers -- indeed exist, and the cause is

18    the fixed-supply and variable price models

19    provide -- and variable price models.

20       Q.   What is the effect in that sentence?

21                   MR. OPPENHEIMER:   Objection

22          to form.

23       A.   The fact that the perspective of "a

24    reasonable investment-oriented purchasers."

25       Q.   And if you go to paragraph 47, that's on

161

1    the next page of Appendix C, page 44.

2            Can you identify the cause in this

3    statement?

4        A.    The cause is the buyback activity.  And

5    the effect -- there are two effects:  One is the

6    perspective of utility-oriented purchasers if

7    those exist, as stated by Mr. ██████  and the other

8    is the perception of the investment-oriented

9    purchasers if those exist.

10       Q.    The same question for paragraph 48:

11   What is the cause and what is the effect?

12       A.    The cause is the manner and mechanism of

13   Ripple's ongoing sales, distribution, escrow, and

14   buybacks of XRP, and the effect is the perspective

15   of the potential investment-oriented purchaser of

16   XRP if said purchaser exists.

17       Q.    Same question for paragraph 49:  What is

18   the cause and the effect?

19       A.    The cause is these heavily promoted

20   sales and distribution mechanisms.  The effect is

21   the perspective of the reasonable purchaser of XRP

22   that is exclusively considering the utility use of

23   the coin if such a reasonable purchaser exists.

24       Q.    Paragraph 86, can you identify the cause

25   and effect?

```
 1        A.   There are several causes here.  They're
 2   all combined into specific topics.  Examples are
 3   the liquidity of the digital asset trading
 4   platforms it needs to rely on to complete the ODL
 5   transaction.  And another example is
 6   communications about the bull case for the price
 7   of XRP.  And the effect is the perspective of
 8   purchasers of XRP for cross-border payments.  I
 9   also referred to, I believe, as a money
10   transmitter.
11        Q.   Anything else?
12                    MR. OPPENHEIMER:  Objection
13        to form.
14        A.   The causes are also called some of these
15   topics.
16        Q.   I'm sorry, what do you mean "the causes
17   are also called some of these topics"?
18        A.   Some of these topics is a cause from
19   this paragraph.  Mr. ████ refers to the causes in
20   different ways.  He uses the term "some of these
21   topics," and then for some of these topics, he
22   says "specific topics" and he leaves those
23   specific topics and then he has another example
24   about communications.
25        Q.   Turning to -- staying with paragraph 86
```

```
 1    that you -- did Ripple's communications cause a

 2    money transmitter to be interested of some of

 3    these topics --

 4                    MR. OPPENHEIMER:  Objection.

 5        Q.   -- or does the interest in certain

 6    aspects or lack of interest in other aspects exist

 7    prior to the Ripple communication?

 8                    MR. OPPENHEIMER:  Objection

 9         to form.

10        A.   So Mr. ████ is saying here that a money

11    transmitter is less interested in Ripple's

12    communications about the bull case for the price

13    of XRP.  If there are no such communications, then

14    we cannot measure the interest of -- of the money

15    transmitter in such communications.  So it's the

16    communication that causes or doesn't cause or

17    causes less interest on the part of the money

18    transmitter.

19        Q.   So assume that a company is a

20    money-transmitting institution and its executives'

21    perspective is that, you know, they like economic

22    incentives such as rebates and volumes -- and

23    volume bonuses.

24                 If Ripple announced that it would

25    provide economic incentives in the form of rebates
```

1    and volume bonuses, would that cause its

2    executives to have a perspective to like the

3    economic incentive or would that perspective have

4    already existed prior to the announcement?

5                        MR. OPPENHEIMER:  Objection

6            to form.

7        A.   While taking this incomplete

8    hypothetical, a company can have a preference for

9    higher profits or smaller costs and high revenues,

10   its actions can be impacted by announcements and

11   other stimuli.

12                       THE REPORTER:  Other?

13                       THE WITNESS:  Stimuli.

14       Q.   Are you done?

15       A.   Yes.

16       Q.   Why is the hypothetical incomplete?

17       A.   Because it's missing the majority of

18   information that we could potentially have in --

19   in the marketplace.

20       Q.   Such as?

21       A.   Such as what is the company?  What is

22   the product?  What is the company that sells the

23   product?

24       Q.   Why does that matter?

25       A.   What?

165

1       Q.   Why does that matter?

2       A.   Because perspective is an empirical

3   matter.  We can hypothesize about it from

4   theoretical perspective and from incomplete

5   hypothetical, but ultimately such hypotheses need

6   to be tested empirically.

7       Q.   So assume a digital asset investor views

8   it favorably when a wealthy businessperson

9   announces that they will buy a digital asset such

10  as bitcoin.  So if a wealthy investor announces

11  that he's buying bitcoin, would the invest -- the

12  hypothetical investor view bitcoin more favorably

13  because of the announcement?

14                    MR. OPPENHEIMER:  Objection

15          to form.

16      A.   It's an incomplete hypothesis.

17      Q.   Well, this is the hypothetical.  So

18  can -- would the perspective change after the

19  announcement that the wealthy investor will be

20  buying bitcoin?

21                    MR. OPPENHEIMER:  Objection

22          to form.

23      A.   It may change; it may not change.  Both

24  cases are possible.

25      Q.   Okay.

166

1        A.   It's an empirical question.

2                     THE WITNESS:  Can we take a

3           break?  Should we take break?

4                     MS. GUERRIER:  Okay.  You

5           can take a break.

6                     THE VIDEOGRAPHER:  Okay.

7           Going off the record at 2:34.

8                     (Whereupon, a recess is taken.)

9                     THE VIDEOGRAPHER:  Okay.

10          Back on the record at 2:49.

11   BY MS. GUERRIER:

12       Q.   Are you aware of any survey results

13   related to the perspect -- perspective of a

14   reasonable purchaser on which the SEC -- in which

15   the SEC was a plaintiff?

16                     MR. OPPENHEIMER:  Objection;

17          form.

18       A.   That's covered by NDA.

19       Q.   Well, the answer -- you can answer yes

20   or no.

21       A.   Yes.

22       Q.   Did you review any of those reports in

23   writing the report that you submitted in this

24   case?

25                     MR. OPPENHEIMER:  Objection

167

1          to form.

2                    You can answer.

3      A.   I believe your previous question was not

4  about the report.  If it was, I will need to

5  answer differently.

6      Q.   I'm sorry, what was that answer?

7      A.    In your previous question, I believe you

8  didn't ask about the report.  So in your current

9  question, there is no logical link, but maybe I

10 misheard.  And if so, I'll change -- I'll respond.

11 Maybe you can go back to the previous question.

12     Q.   You want me to ask the question again?

13     A.   The --

14                    MR. OPPENHEIMER:  Counsel,

15          she stated her answer.

16                    MS. GUERRIER:  I'm -- I'm

17          not -- let me fin -- you know, let

18          her answer the question.

19                    MS. JONES:  She has answered

20          the question repeatedly.

21                    MS. GUERRIER:  I'm asking

22          her if she -- you're interrupting for

23          no reason.  I'm asking her if she

24          wants me to ask the question again.

25     A.   I would like the previous question to be

168

1    read back.

2         Q.   Are you aware of any survey results

3    relating to the perspective of a reasonable

4    purchaser on which the SEC -- in which the SEC was

5    the plaintiff?

6         A.   Now you can ask your current question.

7         Q.   No, you -- let me finish.

8              You answered "That's covered by an NDA."

9              And I said, "Well, you can answer yes or

10   no."

11             And you answered "Yes."

12             And I asked, "Did you review any of

13   those reports in writing the report that you

14   submitted in this case?"

15        A.   What --

16                  MR. OPPENHEIMER:  Objection.

17                  You can answer.

18        A.   What reports are you referring to?

19        Q.   How are the survey results provided?

20        A.   That's covered by NDA.

21        Q.   Well, were they provided in a document?

22        A.   That's covered by NDA.

23        Q.   What's covered by an NDA?

24        A.   Everything I learned in that case.

25        Q.   I'm not asking you what you learned in

169

1    the case.  I'm asking you how those survey results

2    were provided.

3                        MR. OPPENHEIMER:   Objection

4         to the form.

5                        You can answer if you believe

6         you're able to.

7         A.   That's covered by NDA.

8         Q.   Did you rely on any of the survey

9    results relating to the perspective of a

10   reasonable purchaser in which the SEC was a

11   plaintiff in formulating your opinion in this

12   case?

13                        MR. OPPENHEIMER:   Objection

14        to form.

15        A.   No.

16        Q.   If you could turn to paragraph 26 of

17   your report.

18             Looking at Footnote 39 to paragraph 26,

19   the first sentence refers to "Mr. ████ claims

20   that in a certain passage in an interview with

21   Bloomberg Technology, Ripple's CEO, Brad

22   Garlinghouse, contributed to certain underrating

23   of XRP potential purchasers about XRP."

24             Is that -- did you mean understanding?

25        A.   I mean understanding.

170

```
 1        Q.   Is that a typo?

 2        A.   That's a typo.

 3        Q.   Going to the second paragraph, you

 4   state, I believe the third sentence, "Mr. █████

 5   believes that because of" his statement -- "this

 6   statement, 'potential purchasers of XRP would have

 7   understood XRP, as designed, provided a mechanism

 8   for passive XRP owners to benefit financially from

 9   Ripple's success as a provider of financial

10   service products built on the XRP ledger, as a

11   developer of the XRP ecosystem, and as a driver of

12   demand for XRP.'"

13            What is the basis for the claim that

14   Mr. █████  believed that because of the statement

15   that I read from Footnote 39, that potential

16   purchasers of XRP would have understood that XRP

17   as designed provided mechanisms for passive XRP

18   owners, et cetera?

19                    MR. OPPENHEIMER:   Objection

20            to form.

21        A.   Well, setting aside that this may not be

22   a perfect rendering of the footnote, looking at

23   paragraph 25 and 26 of Mr. █████  report, that's

24   what he says.

25        Q.   What specifically does he say in
```

171

```
 1    paragraph 26 of his report that supports your

 2    claim that because of the statement read into the

 3    record that, "Potential purchasers of XRP would

 4    have understood that XRP, as designed, provided a

 5    mechanism for passive XRP owners to benefit

 6    financially from Ripple's success as a provider of

 7    financial service products built on the XRP

 8    ledger, as a developer of the XRP ecosystem, and

 9    as a driver of demand for XRP"?

10                    MR. OPPENHEIMER:   Objection

11         to form.

12         A.    Paragraph 26 of Mr. ████████ report

13    states "Potential purchasers of XRP would have

14    understood the simple economics behind the message

15    being promoted by Ripple on this subject:  XRP, as

16    designed, provided a mechanism for passive XRP

17    owners to benefit financially from Ripple's

18    success as a provider of financial service

19    products built on the XRP ledger" -- Footnote 25,

20    which I'll read later -- "as a developer of the

21    XRP ecosystem and as a driver of demand for XRP."

22                    And Footnote 25 states "Although some

23    Ripple products did not use XRP, this report

24    focuses on what Ripple communicated publicly,

25    including its assertions that usage of its
```

172

1    products by financial institutions would

2    ultimately lead to greater demand for XRP.  This

3    is further discussed in Section 7."

4         Q.   Is Mr. ████ describing perception or

5    causation in paragraph 26?

6                   MR. OPPENHEIMER:  Objection

7              to form.

8         A.   He's describing perception that's caused

9    by Ripple's statements.

10                  THE REPORTER:  Ripple?

11                  THE WITNESS:  Ripple's

12             statements, among possibly other

13             things.

14        A.   To quote from his paragraph, he is

15   describing the understanding that's caused by

16   the -- the message being promoted by Ripple.

17        Q.   Is he describing the effect on the

18   reasonable purchaser of XRP as opposed to whether

19   or not the messaging caused the reaction?

20        A.   He's describing --

21                  MR. OPPENHEIMER:  Object to

22             form.

23        A.   He is describing both the cause and the

24   effect and, in particular, one example of the

25   cause is described in paragraph 25.

173

1      Q.   Can you describe specifically what

2   you're referring to in paragraph 25?

3      A.   It states "Ripple directly and publicly

4   made the case for this relationship between

5   increased demand for XRP and the future price of

6   XRP.  In an interview with Bloomberg Technology,

7   for example, Garlinghouse ties Ripple's efforts to

8   provide payment solutions with increased demand

9   and higher prices, all enabled by XRP's fixed

10  supply model," colon, and that's followed by the

11  quote "When Ripple uses XRP, we're solving a

12  payments problem.  I believe that the more utility

13  you draw, the more demand you're going to drive.

14  And for most of these digital assets, you have

15  fixed supply.  If you have fixed supply and

16  increasing demand, it's going to drive price up."

17          And footnote "YouTube.  Ripple CEO

18  Garlinghouse sees real value in bitcoin at 2:06."

19  And a URL to a YouTube video and year, in

20  parentheses, 2017.

21      Q.   Can you describe the cause and effect in

22  paragraph 25?

23                  MR. OPPENHEIMER:  Objection

24          to form.

25      A.   This mainly discusses the cause.  The

[12

174

```
 1   effects are discussed in paragraph 26.  They made

 2   some implications here about the effect when it

 3   says "the case for this relationship between

 4   increased demand for XRP and the future price of

 5   XRP."  There is an implication here that that was

 6   the perception of purchasers or potential

 7   purchasers.  And it also states the effect, but

 8   mostly it focuses on the cause.

 9        Q.   How did you determine the implication

10   that you just described?

11                  MR. OPPENHEIMER:  Objection

12        to form.

13        A.   That's what the sentence states.

14        Q.   Does the sentence use the term

15   "implications"?

16        A.   The sentence does not use the word

17   "implications."

18        Q.   Okay.  Going back to Footnote 39 where

19   you're describing what Mr. ████ believed.

20             How do you know what Mr. ████ believes?

21                  MR. OPPENHEIMER:  Objection;

22        asked and answered.

23        A.   I'm describing what he states in his

24   report.

25        Q.   Are you providing any opinion about
```

175

1    Mr. ██████  state of mind?

2          A.   I'm not offering a psychological

3    evaluation of Mr. ██████

4          Q.   In Footnote 39 you also refer, in the

5    third paragraph, to the Garlinghouse's message

6    being replaced by a placebo, is that correct?

7          A.   I state "In the experiment, respondents

8    in the test group could be exposed to the

9    interview the way it occurred, while the control

10   group respondents could be exposed to the same

11   interview but where the passage identified by

12   Mr. ██████  would be removed or replaced by a

13   'placebo.'"

14         Q.   What do you mean by a "placebo?

15         A.   A placebo would be a different statement

16   that does not cause concern to SEC.

17         Q.   I'm sorry, can you repeat your answer,

18   please?

19         A.   A placebo would be a statement that does

20   not cause concern to SEC or to Mr. ██████

21         Q.   So what -- what is the placebo that

22   would be used that would not cause concern to the

23   SEC or to Mr. ██████

24                    MR. OPPENHEIMER:  Objection

25              to form.

176

```
 1                    You can answer.

 2         A.   That would be part of developing the

 3    survey/experiment.  I outlined in my report some

 4    elements at the very high level of a potential

 5    survey/experiment.  One of the decisions that

 6    would need to be made while developing, designing,

 7    such a study and possibly even after pretesting or

 8    through the help of pretesting is whether the

 9    statement can be removed entirely, whether it

10    needs to be replaced with placebo, and what's the

11    appropriate placebo.

12         Q.   How would you phrase the survey question

13    to understand the perspective of a reasonable

14    purchaser of XRP in this context?

15                    MR. OPPENHEIMER:  Objection

16          to form.

17         A.   On page 17, paragraph h. of my report, I

18    say "Both groups will then be evaluated on a

19    'dependent measure' which would aim at gaining the

20    unbiased 'perspective of a reasonable purchaser.'

21    For example, respondents could be asked in

22    open-ended and closed-ended formats about their

23    perception of the digital asset described to them,

24    whether they would expect its price to grow

25    because of the efforts of the company discussed in
```

1    the study, whether they would expect the digital

2    asset to be usable in transactions, including

3    cross-border transactions, and what their own

4    intentions would be with respect to the asset

5    discussed (e.g., whether they would consider

6    purchasing it, and what they would potentially do

7    with it afterwards)."

8         Q.   Would there be a focus group?

9                   MR. OPPENHEIMER:  Objection

10              to form.

11        A.   One potential stage of designing a

12   survey/experiment is to conduct focus groups.

13        Q.   So in the context of Footnote 35, who

14   would be -- I'm sorry, Footnote 39, who would be

15   part of the focus group?

16                  MR. OPPENHEIMER:  Objection.

17                  You can answer.

18        A.   In Footnote 39, I don't think I

19   mentioned focus groups.

20        Q.   I'll repeat the question.

21                  In the context of Footnote 39, who would

22   be part of the focus group?

23                  MR. OPPENHEIMER:  Objection.

24                  You can answer again.

25        A.   Paragraph 39 describes an experiment not

178

1    a focus group.

2         Q.   Do you use focus groups for experiments?

3         A.   Some --

4                   MR. OPPENHEIMER:  Objection.

5                   You can answer.

6         A.   Sometimes focus groups are used as part

7    of the -- of designing of an experiment or a

8    survey.

9         Q.   With regard to paragraph h. of your

10   report, page 17, paragraph h., would you use a

11   focus group?

12                  MR. OPPENHEIMER:  Objection.

13        A.   Paragraph h. discusses potential

14   questions or other dependent measures that can be

15   measured in a survey or experiment.  It does not

16   discuss specifically a focus group.

17        Q.   I'm asking you, would you use a focus

18   group?

19                  MR. OPPENHEIMER:  Objection

20        to form.

21        A.   In designing a survey or an experiment,

22   focus groups is a potential step.  Sitting here

23   today, I cannot tell you whether, in this

24   particular study, a focus group would be used as

25   part of designing a study.  And I would need much

179

1    more time than this deposition to design a study.

2         Q.   Okay.  Other than designing a study,

3    which I don't think I asked about, how would you

4    recruit a focus group to participate in a survey

5    in the context of your paragraph h.?

6                        MR. OPPENHEIMER:  Objection

7              to form.

8         A.   Would you read back the question,

9    please?

10                       (Whereupon, the record was read

11             back.)

12        A.   You asked about focus groups which are

13   used as part of designing a survey or an

14   experiment.  That's why I answered about focus

15   groups.

16        Q.   How would you recruit members of a focus

17   group in the context of conducting a survey?

18                       MR. OPPENHEIMER:  Objection

19             to form.

20        A.   Focus groups would be carried out in the

21   context of designing a survey if they need to be

22   conducted.

23        Q.   Assume you're conducting a survey to

24   determine the effect of Mr. Garlinghouse's

25   statements with respect to XRP.  How would you

180

1    recruit a focus group for that survey?

2                    MR. OPPENHEIMER:  Objection

3            to form.

4        A.   I don't understand what it means to

5    "recruit" a focus group for a survey.

6        Q.   Well, how do you get people to

7    participate in a focus group?

8        A.   Usually you target the same population

9    as you would eventually target in your survey or

10   experiment unless the focus groups or some

11   intermediate step changes that design decision.

12       Q.   In paragraph -- in Footnote 39 of your

13   report, you refer to the "test group."

14           Does "test group" mean something

15    different than "focus group"?

16       A.   Yes.

17       Q.   What is a test group?

18       A.   On page 16, paragraph d., I say

19   "Respondents who qualify would be randomly

20   assigned to a test group or a control group."

21       Q.   What is a test group?

22       A.   I then say in paragraph e., "Test group

23   respondents would be exposed to a set of tested

24   statements and actions by Ripple:  Specifically,

25   the 'statements, actions, and product offerings'

181

1      that Mr. ███ describes in his report.  These

2      could be presented in a form of a vignette

3      accompanied by news articles, video interviews, or

4      other stimuli approximating the marketplace

5      realities."  Footnote 38, which I'll read

6      afterward.

7              "The" name "Ripple and XRP" -- sorry.

8       "The names Ripple and XRP could be an anonymized

9       to control for prior knowledge."

10             And Footnote 38 describes the importance

11     of realism in experiments.

12                     THE REPORTER:  The

13             importance of?

14                     THE WITNESS:  Realism.

15         Q.   What kind of people would be members of

16     the test group?

17                     MR. OPPENHEIMER:  Objection

18             to form.

19         A.   On page 15, paragraph d., I state

20     "Actual and potential purchasers of XRP (the

21     target population) would be recruited to

22     participate in a survey.  Those could be drawn,

23     for example, from the three types of purchasers

24     that Mr. ███ highlighted:  'individuals,

25     institutional investors, and financial services

182

1    companies.'"

2         Q.   What do you mean by "control group" in

3    Footnote 39 of your report?

4         A.   Control group is the other group that is

5    not a test group.

6         Q.   Is that the scientific definition for

7    control group?

8                   MR. OPPENHEIMER:   Objection;

9         form.

10        A.   Yes, in part.  If you'd like more

11   details, the control group is the group that's not

12   exposed to the tested stimulus and is exposed to

13   something else, usually with placebo elements.

14        Q.   Does control group mean the same thing

15   as focus group?

16        A.   No.

17        Q.   How are the two terms different?

18        A.   Test group and control group, in terms

19   for splitting the sample in a survey or experiment

20   into two subsamples which have a different

21   experience within that experiment and whose

22   outcomes are eventually measured as a part of the

23   experiment.

24             A focus group is a separate study that

25   may or may not be conducted prior to the

183

1    experiment as part of designing the experiment or

2    surveys.

3                        THE REPORTER:  The last

4          part?

5                        THE WITNESS:  Or surveys.

6                        THE REPORTER:  Thank you.

7          Q.   Going back to your paragraph 9 of your

8    rebuttal, you state -- could you please read

9    paragraph 9.d into the record?

10         A.   "Mr. ████ does not evaluate whether and

11   to what degree XRP purchasers were exposed to

12   Ripple's statement that he 'reviews and analyzes.'

13   A proper analysis of the impact of such statements

14   on potential purchasers would include such an

15   evaluation.

16         Q.   What is the basis of your statement that

17   Mr. ████ does not evaluate whether and to what

18   degree XRP purchasers were exposed to Ripple's

19   statements that he -- and I'm -- in your quotes

20   "reviews and analyzes"?

21         A.   Such an evaluation would often result in

22   a conclusion that a certain percentage of relevant

23   population was exposed to the relevant statements.

24   I did not see such a conclusion in Mr. ████

25   report.

184

```
 1        Q.   Well, if -- can you turn to paragraph 56

 2   of Mr. ████████ report on page 32?

 3             Can you read the last sentence on page

 4   32 starting with "In a public statement..." and

 5   going on to page 33 up to the Footnote 66?

 6        A.   Do you want me to read the sentence that

 7   starts with "In a public statement..."?

 8        Q.   Yes.

 9        A.   "In a public statement on CoinDesk, one

10   of the leading digital asset news sites,

11   Garlinghouse commented, 'We have had a significant

12   rally in XRP prices, but it is reflective of a lot

13   of work we have done to make Ripple a very

14   compelling solution.'"

15             Footnote 66.  "CoinDesk.  Use or

16    speculation:  What's driving Ripple's price to"

17    all high -- "to all-time highs?"  2017, and there

18    is a URL.

19        Q.   So is the statement that you just read a

20   statement that's made by Mr. Garlinghouse

21   according to Mr. ██████ report?

22                  MR. OPPENHEIMER:  Objection

23             to form.

24                  You can answer.

25        A.   According to Mr. ██████ report,
```

185

1    Mr. Garlinghouse made this statement.

2         Q.   If you could please look at paragraph 57

3    of Mr. ███ report, does Mr. ███ include

4    another statement by Mr. Garlinghouse in paragraph

5    57 of his report?

6         A.   Paragraph 57 contains another statement

7    by Mr. Garlinghouse.

8         Q.   If you could go to paragraph 58 of

9    Mr. ███ report, does Mr. ███ quote another

10   statement by Mr. Garlinghouse?

11        A.   Paragraph 58 lists another statement by

12   Mr. Garlinghouse.  However, for all of the

13   statements we just discussed in paragraph 56, 57

14   and 58, there is no analysis of exposure.

15        Q.   Is it possible that XRP purchasers might

16   have been exposed to the statements that Mr. ███

17   includes in paragraphs 56, 57 and 58 of his

18   report?

19                  MR. OPPENHEIMER:  Objection;

20            calls for speculation.

21                  You can answer.

22        A.   It's a testable hypothesis.

23                  THE REPORTER:  It's a what

24            hypothesis?

25                  THE WITNESS:  Testable.

186

1       A.   It is possible that some purchasers were

2   exposed; however, how many and what percent of

3   relative population, whether it's zero or more

4   than zero but still negligible or whether it's

5   substantial, that's all testable hypothesis.  And

6   Mr. ████ does not offer any analysis to evaluate

7   to what degree purchasers or potential purchasers

8   of XRP were exposed to any of these statements.

9       Q.   Was that -- was Mr. ████ assigned with

10  evaluating whether and to what degree XRP

11  purchasers were exposed to Ripple's statements?

12                  MR. OPPENHEIMER:  Objection

13          to form.

14      A.   Mr. ████ was asked to evaluate a causal

15  relationship between the statement, actions, and

16  product offering on the one hand and the

17  perspective of a reasonable purchaser on the other

18  hand.  And in order to evaluate whether certain

19  statements had an effect on the perspective of a

20  reasonable purchaser, we first need to establish

21  whether the reasonable purchaser was ever exposed

22  to those statements and to what degree.

23      Q.   Can you point to where in Mr. ████

24  report, where he states that he was asked to

25  evaluate a causal relationship between the

187

```
 1    statements, actions, and product offering on the

 2    one hand and the perspective of a reasonable

 3    purchaser on the other hand?

 4                   MR. OPPENHEIMER:  Objection

 5            to the form.

 6        A.   In paragraph 2, Mr. Ripple -- Mr. ████

 7    states "The SEC retained me to independently

 8    analyze and render opinions on the perspective of

 9    a reasonable purchaser of XRP on Ripple's

10    statements, actions, and product offerings."

11        Q.   Is there any word that -- let me

12    rephrase this.

13            Does the sentence include the word

14    "cause"?

15        A.   The sentence does not involve -- include

16    the word "cause."

17        Q.   And going back to your opinion in

18    paragraph 9.c, can you read for the record

19    paragraph 9.c?

20        A.   "Mr. ████  'analysis' does not allow

21    him to separate the supposed impact of Ripple's

22    conduct on the purchaser's 'perspective' from

23    other potential influences, such as preexisting

24    beliefs or general principles of economics."

25        Q.   Can you explain what you mean by this
```

188

```
1    sentence?

2         A.   The reason that experiments are gold

3    standard of testing causal propositions is because

4    they can separate the impact of what's

5    hypothesized to be the cause on the outcome from

6    the impact of all other potential inferences.

7    Because Mr. ████ did not conduct an experiment or

8    any other reliable -- he did not use any other

9    reliable approach to test a causal proposition, he

10   cannot separate the impact of the specific alleged

11   conduct from the impact of all other inferences

12   such as preexisting beliefs or general economic

13   principles.

14        Q.   Assuming that Mr. ████ is not testing

15   any causal proposition, would your opinion in

16   paragraph 9.c change?

17                    MR. OPPENHEIMER:   Objection

18        to form.

19                    You can answer.

20        A.   If Mr. ████ is not testing any causal

21   proposition, then his report does not exist, so I

22   wouldn't need -- I would not need to rebut it.

23        Q.   Can you explain what you mean by your

24   statement that his report does not exist if he's

25   not causing -- if -- I'm sorry, if he's not
```

1    testing causal proposition?

2        A.   Well, to start with, he's not testing

3    causal propositions, but he is making causal

4    conclusions.  And he cannot make those conclusions

5    and not make them at the same time.

6        Q.   And the determination that Mr. █████ is

7    making causal conclusions, is that an opinion that

8    you're providing in this case?

9                 MR. OPPENHEIMER:  Objection

10          to form.

11        A.   If I look at Mr. █████ summary of

12    findings, for example, I think I've gone in great

13    detail for paragraph 8 where almost every -- every

14    word is either a part of the cause or an effect;

15    every sentence either -- almost every sentence

16    either describes a cause or an effect or a causal

17    combined proposition.

18        Q.   Is that an expert opinion that you're

19    providing?

20                 MR. OPPENHEIMER:  Objection

21          to form.

22        A.   That is what paragraph 8 states.

23        Q.   I'm sorry?

24        A.   That is what paragraph 8 states.

25        Q.   Is that your interpretation of paragraph

190

```
1    8?
2                    MR. OPPENHEIMER:  Objection
3            to form.  Asked and answered
4            repeatedly.
5                    You can answer again.
6        A.   That's what the paragraph states.
7        Q.   Okay.  In paragraph 9.d of your report,
8    you state that "██████ does not explain how he
9    selected Ripple's statements that he 'reviews and
10   analyzes.'"
11                What is the basis for this statement?
12       A.   "That Mr. ██████ does not explain how he
13   selected Ripple's statements that he 'reviews and
14   analyzes.'"
15       Q.   In your expert opinion, how is he
16   supposed to explain how he selected Ripple's
17   statements that he reviews and analyzes?
18                    MR. OPPENHEIMER:  Objection
19            to form.
20       A.   There are multiple ways to do it.  For
21   example, Mr. ██████ could have a section in his
22   report where he could list all the statements that
23   he reviews and analyzes and say, for example, all
24   the statements come from the complaint; which
25   would not be the case here, but if it were the
```

1    case, he could say I have read the complaint.  The

2    complaint makes me think I should be testing these

3    statements and I'm going to test them.  None of

4    this is happening in Mr. ███ report.

5            Another example is that SEC could have

6    instructed him to test specific statements and he

7    could have described that in his report.  That

8    also doesn't happen.

9        Q.   Can you turn to paragraph 68 of

10   Mr. ███ report?

11           The sentence in quotations that's

12   included in paragraph 68, the first quotation, is

13   that a sentence that Mr. ███ included in his

14   report?  Is that -- I'm sorry.  Is that a

15   statement that Mr. ███ reported in his report?

16                   MR. OPPENHEIMER:  Objection

17           to form.

18                   You can answer.

19       A.   Mr. ███ states that this sentence

20   comes -- this quote comes from a Ripple --

21   Ripple's post on its blog.

22       Q.   Does Mr. ███ state who is the author

23   of the statement?

24       A.   If by "who" you refer to a particular

25   person, then I don't see it here.

192

```
 1        Q.   Okay.  If you turn to page 38, does

 2   the -- is there a reference to Miguel Vias in

 3   paragraph 68?

 4        A.   He does mention Miguel Vias.

 5        Q.   And who is Miguel Vias according to

 6   Mr. ██████?

 7        A.   According to Mr. ██████ Miguel Vias is

 8   the head of Ripple's XRP markets team, or was

 9   at -- at that time.

10        Q.   Okay.  Does Mr. ██████ cite in his report

11   to -- I'm sorry.

12             Does Mr. ██████ provide a cite in his

13   report with regard to that statement?

14        A.   I'm not sure what you mean.

15        Q.   Does -- what does Footnote 90 refer to?

16        A.   Footnote 90 refers to presumably the

17   source of this, where Mr. ██████ found this

18   statement.

19        Q.   Okay.  So if you look at paragraph 39 --

20   I'm sorry, 69 of Mr. ██████ report, does

21   paragraph 30 -- 69 include a statement?

22                       MR. OPPENHEIMER:  Objection

23             to form.

24        A.   Paragraph 69 of Mr. ██████ report

25   quotes a statement on Ripple's Insights blog
```

193

1    supposedly made by Garlinghouse.

2         Q.   Is there a citation to the statement in

3    paragraph 69?

4                   MR. OPPENHEIMER:   Objection.

5                   You can answer.

6         A.   There is a Footnote 93, which is

7    cross-referencing Footnote 92.

8         Q.   And what -- what is Footnote 92?

9         A.   It says "Ripple.  Zoe Cruz Joins

10   Ripple's Board of Directors (2017)" and the URL.

11        Q.   If you turn to paragraph 73 of

12   Mr. ███████ report, does paragraph 73 include a

13   statement?

14                  MR. OPPENHEIMER:   Objection

15        to form.

16        A.   Paragraph 73 includes a portion of an

17   interview which was a part of the Cryptocurrency

18   Investor Forum.

19        Q.   According to Mr. ███████ whose statement

20   is included in paragraph 73?

21        A.   According to Mr. ███████ the statement

22   was made by Breanne Magidan, Ripple's former head

23   of Global Institutional Markets.

24        Q.   Going back to your report, in paragraph

25   9.e, can you explain what you mean by "market

194

1    segmentation"?

2        A.   Market segmentation is an analysis that

3    allows to split one's addressable markets into

4    segments.

5                    THE REPORTER:  Allows what

6            markets?

7                    THE WITNESS:  Addressable.

8        Q.   Why would market segmentation be

9    applic -- applicable in evaluating the perception

10   of reasonable XRP purchasers?

11                   MR. OPPENHEIMER:  Objection

12           to form.

13                   You can answer.

14       A.   Mr. ███   throughout his report

15   describes two types of perspectives or two

16   different perspectives:  One of investor-oriented

17   purchasers and the other cross-border

18   transfer-oriented purchase -- purchasers.  Nowhere

19   in his report does Mr. ███  offer any empirical

20   evidence that would support the existence of these

21   two types of purchasers or that those are the only

22   two types of purchasers.

23                   One way to establish whether purchasers

24   of a particular product are, indeed -- indeed

25   belong to two separate segments is to conduct

195

1    market segmentation.

2         Q.   Does Mr. ██████ state anywhere in his

3    report that investment-oriented purchasers and

4    cross-border transfer-oriented purchasers are the

5    only two types of XRP purchasers?

6         A.   He evaluates only those two types.  And

7    in particular, he seems to suggest that

8    investment-oriented purchasers are predominant,

9    but he offers no empirical support for that.

10        Q.   But does he state that these are the

11   only two types of XRP purchasers anywhere in the

12   report?

13                      MR. OPPENHEIMER:   Objection

14            to form.

15        A.   His assignment is to "analyze and render

16   opinions on the perspective of a reasonable

17   purchaser of XRP on Ripple's statements, actions,

18   and product offerings."  So "reasonable purchaser"

19   is very general here.

20             Then further in his report, he offers

21   two perspectives:  One of investment-oriented

22   purchaser and one of a cross-border

23   transfer-oriented purchaser.  He doesn't mention

24   any other type.  For his report to be exhaustive,

25   if there -- if he believes there are other types,

196

```
 1    he would need to mention them.
 2         Q.   Is that an opinion?
 3                   MR. OPPENHEIMER:   Objection
 4         to form.
 5         A.   My entire report is that of my opinions
 6    in this case.
 7         Q.   And so the answer is yes?
 8                   MR. OPPENHEIMER:   Objection.
 9         A.   Everything I state in my report is my
10    opinion in this case.
11         Q.   Have you provided any expert opinion
12    about the qualifications or experience of an
13    expert in your professional capacity?
14                   MR. OPPENHEIMER:   Objection
15         to form.
16         A.   In paragraph f on page 5, I state
17    "Mr. ████ does not appear to possess the
18    qualifications or experience needed to address
19    certain aspects of the 'perspective of a
20    reasonable purchaser' or the effect of Ripple's
21    'statements, actions, and product offerings' on
22    those aspects of the purchaser's perspective, such
23    as purchasers' perceptions of Ripple's at-issue
24    statements."
25                   I might have missed a closing quotation
```

1    mark after "reasonable purchaser."

2         Q.   Other than paragraph f in this case,

3    have you provided any expert opinion about the

4    qualifications or experience of an expert in your

5    professional capacity?

6                        MR. OPPENHEIMER:  Objection

7              to form.

8         A.   I might have in the United States versus

9    Florida case.  I don't remem -- I don't recall the

10   specifics.

11        Q.   Has an expert report ever been rejected

12   based on your expert opinion about that expert's

13   qualifications or experience?

14                       MR. OPPENHEIMER:  Objection

15             to form.

16        A.   To the best of my recollection, in the

17   United States versus Florida case, the court chose

18   not to opine on any Daubert motions and instead

19   opined on the case's merits and ruled in favor of

20   my client.

21                       MR. OPPENHEIMER:  Counsel, I

22             don't know if you're planning on

23             starting a new topic, but if we could

24             take a break sometime soon.

25                       MS. GUERRIER:  Sure.  Why

1        don't we take a break now.   Ten

2        minutes?

3                    THE VIDEOGRAPHER:   Okay.

4        Going off the record, 3:47.

5                    (Whereupon, a recess is taken.)

6                    THE VIDEOGRAPHER:   Okay.

7        Back on the record at 4:01.

8    BY MS. GUERRIER:

9        Q.   In Section --

10                   THE VIDEOGRAPHER:   Your mic.

11                   MS. GUERRIER:   Oh, yes,

12       that's important.

13   BY MS. GUERRIER:

14       Q.   Okay.   In Section B to your report on

15   page 21, you state that "Mr. ████ does not

16   evaluate whether and to what degree XRP purchasers

17   were exposed to the at-issue communications and

18   does not attempt to empirically evaluate the

19   causal effect, if any, of Ripple's public

20   communications on perceptions or purchase

21   decisions of actual or potential purchasers of

22   XRP."

23                   Was this part of Mr. ████ assignment?

24                   MR. OPPENHEIMER:   Objection

25       to form.

199

```
 1        A.   Going back to paragraph 2 of Mr. ██████

 2   report, the SEC retained him "to independently

 3   analyze and render opinions on the perspective of

 4   a reasonable purchaser of XRP on Ripple's

 5   statements, actions" -- "statements, actions, and

 6   product offerings."

 7             And then throughout his report, he lists

 8   numerous communications by Ripple and arrives at

 9   causal conclusions regarding what effect those

10   communications had on perceptions or purchase

11   decisions of actual or potential purchasers of

12   XRP.

13             So that's part of his assignment and his

14   report.

15        Q.   Is that your interpretation of

16   Mr. ██████  assign -- assignment?

17                  MR. OPPENHEIMER:   Objection

18        to form.

19        A.   That's what's in his report.

20        Q.   Is this an opinion that you're providing

21   concerning whether or not Mr. █████ was asked to

22   do what I've described in Section B on page 21 of

23   your report?

24                  MR. OPPENHEIMER:   Objection

25        to form.
```

[12/20/2021] Shampanier, Kristina Expert Dep. Tr. 12.20.2021

     1        A.    My entire report is my opinions.

     2        Q.    Do you have a criticism of Section 5 of

     3   Mr. ████ expert report which starts on page 15

     4   of his report and goes through page 19 of the

     5   report?

     6        A.    One of the sections in my report

     7   specifically addresses Section 5 of Mr. ████

     8   report.

     9        Q.    What is the specific rebuttal that

    10   you're providing with respect to Section 5 of

    11   Mr. ████ report?

    12                    MR. OPPENHEIMER:  Objection;

    13          form.

    14        A.    Section -- Section VI.B.a. of my report

    15   is called "████ Report Section 5" featured --

    16   "Features of XRP Coin Economics and Suitability as

    17   a Bridge Asset."

    18               In that section I specifically address

    19   Section 5 of Mr. ████ report.

    20        Q.    So what is the specific criticism that

    21   you have of Section 5 of Mr. ████ report?

    22                    MR. OPPENHEIMER:  Objection

    23          to form.

    24        A.    That's my entire Section VI.B.a.

    25        Q.    I'm sorry?

1          A.    That's my entire Section VI.B.a.

2          Q.    Can you verbalize what your rebuttal is

3    on Section 5 of Mr. ███████ report?

4                        MR. OPPENHEIMER:   Objection

5          to form.

6          A.    I can read to you examples from my

7    Section VI.B.a.  For example, in paragraph 39, I

8    state "In Section 5.3 of his report, Mr. ██████

9    summarizes the 'Perspective of a reasonable

10   purchaser with respect to XRP's fixed-supply

11   model,' again splitting the purchasers into

12   'investment-oriented purchasers of XRP' and

13   'purchasers who are exclusively interested in the

14   utility use of the cross-border payment product.'

15   Again, he does not explain whether these two types

16   of purchasers were exposed or paid attention to

17   the specific Ripple statements, whether the

18   perspectives (perceptions and purchase behaviors)

19   of these two types of potential purchasers were

20   affected by those statements or by general

21   economic logic, why these two types of customers

22   represent a relevant market segmentation, and

23   whether there is any basis to say these two are

24   the only types of potential purchasers that should

25   be considered."

202

1      Q.   Turning to Section 6 of Mr. ████

2  report, which starts on page 19 of his report and

3  ends on page 26, are you providing any rebuttal to

4  Section 6 of Mr. ████ report?

5                    MR. OPPENHEIMER:   Objection

6            to form.

7      A.   Well, as I stated before, all of my

8  report is my opinions and my rebuttal of

9  Mr. ████ entire report.  With respect to

10 Section 6 of his report, there is a section in my

11 report, that's Section VI.B.b, called "████

12 Report Section 6 'XRP Sale and Escrow'" mechanism

13 -- 'Mechanics.'"

14     Q.   Can you verbalize the rebuttal that

15 you're providing to Section 6 of Mr. ████

16 report?

17                    MR. OPPENHEIMER:   Objection

18           to form.

19     A.   I can read to you excerpts from my

20 Section B.b, but my entire Section VI.B.b is the

21 rebuttal.  It's the one that specifically

22 addresses Mr. ████ Section 6.  It's only one

23 paragraph, so I'll read it in its entirety.

24          "In Sections 6.1-6.5" in -- "of his

25 report, Mr. ████ discusses 'XRP Sale and Escrow

1    Mechanics,' again intermingling theoretical logic,

2    statements made by Ripple, and actions taken by

3    Ripple."

4              Footnote 55, which I'll -- which reads

5    "█████ Report, paragraphs 32 to 47.

6    Occasionally, Mr. █████ would interject these

7    descriptions with what appears to be his take on

8    purchaser 'perspective.'  For example, he states

9    that various aspects of institutional purchasing

10   of XRP, 'repeatedly communicated by Ripple in the

11   XRP markets reports,' 'would appeal to an

12   individual purchaser with a long-term investment

13   mindset.'  █████ report, paragraph 37.  He does

14   not identify any basis for distinguishing between

15   subsets of potential XRP purchasers (for example,

16   his 'individual purchaser with a long-term

17   investment mindset' versus an individual

18   purchaser with a short-term investment mindset,

19   or an individual purchaser with no investment

20   mindset, or an entity purchaser, but also makes

21   no attempt to argue that his conclusions hold as

22   to all subsets of potential XRP purchasers."

23             Continuing with the paragraph:  "This

24   intermingling is flawed for the reason I explain

25   above.  Then, in Section 6.6, Mr. █████ describes

1    the supposed 'perspective of a reasonable

2    purchaser with regards to Ripple's XRP sales and

3    escrow,' again discussing separately the

4    perspective of 'a potential investment-oriented

5    purchaser of XRP' and 'a reasonable purchaser of

6    XRP that is exclusively considering the utility

7    use of the coin.'"

8            Footnote 56, "███ report, paragraphs

9    48 to 49."

10           "Again, he does not explain why his

11   segmentation into these two types of purchasers is

12   valid, or whether these two types of purchasers

13   were exposed or paid attention to the specific

14   Ripple statements, whether they interpreted the

15   statements the same way as Mr. ███ or whether

16   the perspectives (perceptions and purchase

17   behaviors) of these two types of potential

18   purchasers are affected by those statements or by

19   general economic logic.  Each of these omissions

20   is" critic -- "is a critical flaw in Mr. ███

21   reasoning."

22           So both for Section 5 and Section 6 of

23   Mr. ███ report, the general rebuttal that I

24   offer -- and there is more detail in my report,

25   but at a high level is that the statements that

1    Mr. █████ highlights in those sections, it

2    doesn't test whether the perspective of the

3    purchaser was affected by these statements.

4            He doesn't -- he also doesn't analyze

5    whether purchasers or potential purchasers were

6    even exposed to those statements.  And he

7    repeatedly made separate conclusions for two types

8    of potential purchasers, but he offers no

9    explanation -- or let me rephrase -- no reliable

10   methodology that would allow one to conclude that

11   these two types of potential purchasers or

12   purchasers exist and those are the only two types.

13       Q.   Okay.  Did you conduct any of the tests

14   that you described in paragraph 40 of your report?

15                   MR. OPPENHEIMER:  Objection

16           to form.

17       Q.   In this case.

18       A.   I don't know if I used the word "test"

19   here specifically.

20       Q.   Well, did you do any of the things that

21   you've described in paragraph 40 of your report in

22   this case?

23                   MR. OPPENHEIMER:  Objection

24           to form.

25       A.   My assignment in this case is to

1    evaluate Mr. ███████ report.  In order to do that,

2    I do not need to conduct an empirical study.

3         Q.   So is the answer no?

4         A.   The answer is I did not conduct

5    empirical studies because I didn't need to.

6         Q.   Okay.  Looking at Section 7 of

7    Mr. ███████ report, which starts at page 26 of the

8    report and ends at page 49, are you -- what

9    rebuttal are you providing to Section 7 of

10   Mr. ███████ report?

11                    MR. OPPENHEIMER:  Objection

12            to form.

13        A.   If you're referring to Section 7 of

14   Mr. ███████ report, it ends on page 47 of his

15   report.

16        Q.   Yes, I'm sorry.  Page 47.

17             What rebuttal are you providing to

18   Section 7 of Mr. Ripple's -- I'm sorry,

19   Mr. ███████ report?

20        A.   Section VI.B.c. of my report is called

21   "███████ Report Section 7 'Ripple Communications and

22   Promotional Statements.'"  And that section of my

23   report specifically addresses Section 7 of

24   Mr. ███████ report.

25        Q.   Can you verbalize the rebuttal that

207

1    you're providing to Section 7 of Mr. ██████

2    report?

3                    MR. OPPENHEIMER:   Objection

4            to form.

5        A.   My entire opinion is in my report.   The

6    general, the main highlights of it is that, again,

7    Mr. ████  lists numerous statements and makes

8    causal conclusions about how those statements

9    affected the perspective of purchasers and

10   potential purchasers of XRP, but he doesn't

11   evaluate that causal proposition with any reliable

12   methodology.   He doesn't evaluate whether a

13   relevant population was even exposed or to what

14   degree to those statements.

15           He, again, offers two separate

16   perspectives for the two types of purchasers he

17   defines without offering any empirical evidence

18   that those two types exist or that no other types

19   exist.

20           I have not finished.

21           Another criticism of Section 7, as well

22   as 5 and 6, is that with respect to the statements

23   of Mr. ████  -- it's not all -- he doesn't

24   evaluate to what degree potential and actual

25   purchasers were exposed to this statement.   He

208

1    doesn't evaluate whether they paid any attention

2    to the statement or whether they recall them at

3    the time of the potential purchase.

4           In Section 7, on my Sections V and VI,

5    he has an incremental section that is called

6    Section 7.1 and it's called -- it starts on page

7    26 of his report and it's called "Promotional

8    Factors Considered by an Investment-Oriented

9    Purchaser."

10          Mr. ████ does not have a parallel

11   subsection for the other type of purchaser he

12   claims exist and that suggests that Mr. ████

13   believes that the promotional -- that the

14   investment-oriented purchaser is the predominant

15   purchaser type or he's not interested or less

16   interested than the other type for some reason.

17          I'm done with my answer.

18      Q.   Could you go to page 29, your header

19   paragraph C.  You state that "Mr. ████ 'review

20   and analysis' does not evaluate any actual or

21   potential XRP purchaser's perspective except for

22   his own."

23          Is -- is it possible to evaluate

24   perception of a consumer based upon the expert's

25   experience alone?

209

```
 1                    MR. OPPENHEIMER:  Objection

 2          to form.

 3      A.   From a scientific point of view, if you

 4  are interested in the perceptions of purchasers or

 5  perspective purchasers, we should measure those

 6  perceptions empirically or evaluate them in some

 7  indirect way empirically.

 8      Q.   Do you know whether any experts have

 9  evaluated the perception of a hypothetical

10  consumer without conducting any scientific

11  analysis but relying on this expert's experience?

12                    MR. OPPENHEIMER:  Objection

13          to form.

14      A.   I have supported several experts

15  providing such opinions.

16      Q.   Were the cases that you supported in

17  rebutting an expert that may have evaluated the

18  perception of a hypothetical purchaser based on

19  that expert's experience, were those cases

20  litigation cases?

21                    MR. OPPENHEIMER:  Objection;

22          form.

23      A.   Yes.  And I think I should clarify that

24  the cases, or at least one case I'm referring to,

25  the expert on the other side did not present an
```

1    opinion of his own introspections as a potential

2    consumer but, rather, what he believed the

3    consumers would think based on literature.

4         Q.   Is it possible that an expert can

5    evaluate the perception of a hypothetical consumer

6    without the need to conduct an experiment?

7                   MR. OPPENHEIMER:  Objection;

8         form.

9         A.   From a scientific perspective, we have a

10   hypothesis about the impact of stimulus on

11   perceptions.

12                   THE REPORTER:  I'm sorry,

13        repeat.

14        A.   From a scientific perspective, we have

15   an hypothesis about the impact of a stimulus on

16   perceptions or perspectives.  The gold standard is

17   to conduct a sur -- an experiment.

18        Q.   So my question is, is it possible that

19   an expert can evaluate the perception of a

20   hypothetical consumer without the need to conduct

21   any experiment?

22                   MR. OPPENHEIMER:  Objection

23        to form.

24        A.   There are some other methods that are

25   less effective in establishing causation but

211

```
 1    nevertheless can establish causation to some

 2    degree.  Mr. ████ did not use any of those

 3    methods.

 4         Q.   Assuming that we're not trying to

 5    establish causation and we're just looking at the

 6    perception of a hypothetical consumer, is it

 7    possible that an expert can evaluate the

 8    perception of that hypothetical consumer without

 9    the need to conduct an experiment?

10                   MR. OPPENHEIMER:  Objection

11         to form.

12         A.   If we're not going after a causal

13    proposition and they're evaluating perceptions,

14    the most direct way of doing that would be a

15    survey.

16              If we are looking at some hypothetical

17    imaginary person, then the question is:  Who is to

18    decide what that person's thinking?  From a

19    scientific perspective, the best way -- or the

20    most direct way.  The most direct way to establish

21    what a person is thinking is to ask about people

22    who are similar to that imaginary hypothesized

23    person.

24         Q.   Can an expert evaluate the perception of

25    a hypothetical consumer based on specialized
```

212

```
1    experience alone, without talking about cause and

2    effect?

3                    MR. OPPENHEIMER:  Objection

4            to form.

5        A.   If we're evaluating perceptions of

6    consumers -- was it consumers in your question?

7        Q.   I'll repeat the question.

8             Can an expert evaluate the perception of

9    a hypothetical consumer based on specialized

10   experience alone, without talking about cause and

11   effect?

12                   MR. OPPENHEIMER:  Same

13           objection.

14       A.   From a scientific perspective, that way

15   to -- one way, a direct way, to identify what a

16   hypothetical consumer thinks is to ask actual

17   consumers what they think.  Otherwise, it's not

18   clear how we're going to figure out what this

19   imaginary person imaginary thoughts -- imaginary

20   person's imaginary thoughts are.

21       Q.   Is it your testimony that no expert has

22   evaluated the perception of a hypothetical

23   consumer based on specialized knowledge alone?

24                   MR. OPPENHEIMER:  Objection

25           to form.
```

213

```
 1          A.   I am not offering any legal opinions in

 2    this case.   There might have been experts who did

 3    something.   That's not scientifically valid.

 4          Q.   What is the basis for your statement

 5    that analyze -- evaluating consumer perception

 6    based on specialized knowledge alone, without

 7    trying to determine cause and effect, is not

 8    scientifically valid?

 9                    MR. OPPENHEIMER:  Objection

10          to form.

11          A.   So the base case scenario of this

12    methodology, quote/unquote, is that we're getting

13    the perception of a single person, a person who

14    knows the hypothesis in the current case, knows

15    the sponsor of this, quote/unquote, study and is

16    just one person.  That does not allow us to

17    evaluate what a representative consumer believes.

18          Q.   Are you aware that experts have been

19    accepted in courts in this jurisdiction based on

20    their specialized knowledge alone with respect to

21    evaluating the perspective of a hypothetical

22    consumer?

23                    MR. OPPENHEIMER:  Objection

24          to form.

25          A.   If you represent that to me, I believe
```

1    you, and I'm not offering any legal opinions.

2    From a scientific perspective, introspecting will

3    give us perception of one person, not of a

4    representative consumer.  And that one person is

5    not even necessarily the consumer of the product

6    of interest.

7                          THE REPORTER:  The consumer

8            of --

9                          THE WITNESS:  Of the product

10           of interest.  Or a potential consumer

11           of the product of interest.

12       Q.   Could the expert look at online -- for

13   example, online reviews by consumers to determine

14   the perception of hypothetical consumers without

15   trying to determine cause and effect but just

16   perception?

17                          MR. OPPENHEIMER:  Objection

18           to form.

19       A.   There is a scientific methodology called

20   content analysis as discussed in Footnote 67 of my

21   report.  "Content analysis is a method of

22   collecting social data through carefully

23   specifying and counting social artifacts such as

24   books, songs, speeches, and paintings.  Without

25   making any personal contact with people, you can

1    use this method to examine a wide variety of

2    social phenomena.  Content analysis is the study

3    of recorded human communications.  Among the forms

4    suitable for study are books, magazines, web

5    pages, poems, newspapers, songs, paintings,

6    speeches, letters, email messages, bulletin board

7    postings on the internet, laws, and constitutions,

8    as well as any components or collections thereof.

9    Content analysis is particularly well suited to

10   the study of communications and to answering the

11   classic question of communications research:  'Who

12   says what, to whom, why, how, and with what

13   effect?'  Common units of analysis in content

14   analysis include elements of communications -

15   words, paragraphs, books and so forth.  Standard

16   probability-sampling techniques are sometimes

17   appropriate in content analysis."

18              If an expert wanted to conduct content

19   analysis of product reviews, that would, if

20   properly conducted, be a reliable methodology.

21        Q.   So is scientific -- I'm sorry.

22              Is a -- is a scientific analysis

23   mandatory for determining the perspective of a

24   reasonable purchaser if all you're doing is

25   determining the perspective of a reasonable

1    purchaser?

2              MR. OPPENHEIMER:  Objection

3         to form.

4         A.   From a scientific perspective, the

5    perspective of a reasonable purchaser can be

6    measured as the perspective of -- on average, of a

7    sample of relevant purchasers.

8              There could be also indirect methods but

9    also empirical methods.  Introspecting into what I

10   think about this product will, at best, only tell

11   you what I think about it, not what consumers of

12   this product think.  And even if I am a consumer

13   of this product or a potential consumer of this

14   product, I'm only one person.  That could be an

15   outlier.

16             And obviously the same applies to

17   Mr. ████   His introspections into what he

18   believes, what his perspective is in this case,

19   it's only his perspective.  Even if he's a

20   relevant purchaser or potential purchaser of XRP,

21   that's only his belief and his belief may be

22   biased because he knows the sponsor of -- of his,

23   quote/unquote, analysis.

24        Q.   So can Mr. ████ provide a nonscientific

25   opinion regarding the perspective of a reasonable

217

1   XRP purchaser based on his specialized experience

2   in digital assets?

3                    MR. OPPENHEIMER:  Objection

4            to form.

5        A.   From the scientific perspect -- from a

6   scientific point of view, the reasonable

7   purchaser -- until -- unless we're talking about

8   imaginary people and their imaginary thoughts, a

9   reasonable purchaser is a representation of an

10  average -- of average across actual purchasers.

11           Usually it's infeasible to reach every

12  single purchaser, so a sample of the purchasers is

13  evaluated.  That becomes a survey.  If we're also

14  interested in a causal proposition with respect to

15  the perspective, that would be a survey with a

16  control group or some other experiment.

17       Q.   So if we're not talking about a

18  cause-and-effect situation and we're just speaking

19  about evaluating how XRP purchasers viewed certain

20  statements and actions by Ripple, is your

21  testimony that there's no nonscientific method of

22  doing this?

23                    MR. OPPENHEIMER:  Objection;

24           asked and answered.

25                    You can answer again.

218

```
 1        A.   When you say that consumers viewed
 2   certain statements, that's the impact of those
 3   statements on consumers' perception.  So that's a
 4   causal proposition.
 5        Q.   Isn't that a separate theory from
 6   viewing -- from having a perspect -- a perception
 7   about a statement and whether the statement caused
 8   a certain perception?
 9                  MR. OPPENHEIMER:  Objection
10            to form.
11        A.   If a person has a perception of a
12   statement and wouldn't have the same perception
13   without that statement, then the statement causes
14   that perception.
15        Q.   Is there any way that the perception
16   could exist prior to the person even hearing the
17   statement?
18        A.   If a perception exists prior to the
19   person hearing the statement, then that perception
20   is not caused by the statement.
21        Q.   Okay.
22        A.   And if such a perception exists, that's
23   what's called a preexisting belief and that's what
24   an experiment controls for.
25        Q.   You would do the experiment if you're
```

219

```
 1    trying to determine cause and effect?

 2                        MR. OPPENHEIMER:  Objection

 3              to form.

 4        A.   An experiment is a gold standard of

 5    evaluating causal propositions.

 6        Q.   Okay.

 7                        MS. GUERRIER:  Okay.  I

 8              don't have any other questions.

 9                        MR. OPPENHEIMER:  Okay.  Can

10              we go off the record for just a

11              minute for me to circle my notes?

12                        THE VIDEOGRAPHER:  Okay.

13              Going off the record at 4:38.

14                        (Whereupon, a recess is taken.)

15                        THE VIDEOGRAPHER:  Okay.

16              Back on the record, 4:41.

17    CROSS-EXAMINATION

18    BY MR. OPPENHEIMER:

19        Q.   You were asked some questions earlier

20    about the meaning of the term "placebo."

21              Can you clarify what the scientific

22    definition of a placebo is?

23        A.   A placebo is a stimulus that's the same

24    as a test stimulus except for the aspect that's

25    being tested.
```

220

```
1        Q.    You were also asked some questions about

2     whether certain causal statements in Mr. ████████

3     report used the word "cause."

4             Is it possible to state a causal

5     inference or a causal conclusion without using the

6     word "cause"?

7        A.    Yes, it's possible.

8                         MR. OPPENHEIMER:  No further

9             questions.

10                        MS. GUERRIER:  I don't have

11            anything.

12                        THE VIDEOGRAPHER:  Okay.

13            This concludes the video deposition

14            of Kristina Shampanier.  I said it

15            right.  The time is 4:41.  Going off

16            the record.

17                        (Whereupon, the deposition

18            concluded at 4:41 p.m.)

19

20

21

22

23

24

25
```

221

```
1    STATE OF NEW YORK        )

2                             ) ss:

3    COUNTY OF NEW YORK       )

4           I hereby certify that the witness in the

5    foregoing deposition, KRISTINA SHAMPANIER, Ph.D. was by

6    me duly sworn to testify to the truth, the whole truth

7    and nothing but the truth, in the within-entitled cause;

8    that said deposition was taken at the time and place

9    herein named; and that the deposition is a true record of

10   the witness's testimony as reported by me, a duly

11   certified shorthand reporter and a disinterested person,

12   and was thereafter transcribed into typewriting by

13   computer.

14           I further certify that I am not interested in

15   the outcome of the said action, nor connected with nor

16   related to any of the parties in said action, nor to

17   their respective counsel.

18           IN WITNESS WHEREOF, I have hereunto set my hand

19   this 22nd day of December, 2021.

20           Reading and Signing was:

21    ___ requested    ___ waived   _X_ not requested.

22

23

24           _____

25           BRIDGET LOMBARDOZZI, CSR, RMR, CRR
```

# Transcript Word Index

**[& - 5]**

| & |
|---|
| **&** |
| 2:17 4:3,16 5:5,14 9:21 |

| 1 |
|---|
| **1** |
| 6:11 8:14 97:3,3,6,7,14,19 |
| 97:20 104:20,20 |
| **1:07** |
| 122:6 |
| **10** |
| 6:4 104:3 109:14 110:21,22 |
| 111:8 130:18 |
| **10:36** |
| 70:2 |
| **10:52** |
| 70:5 |
| **100** |
| 115:15 |
| **10006** |
| 5:8 |
| **10019-6064** |
| 5:17 |
| **10022** |
| 4:8 |
| **10281-1022** |
| 3:14 |
| **10832** |
| 1:6 9:13 |
| **11** |
| 111:14,18 122:9 |
| **12** |
| 6:17 8:14 111:19,23 123:12 |
| 123:15 126:3,14,23 |
| **12:22** |
| 121:7 |
| **1285** |
| 5:16 |
| **12th** |
| 25:14 |
| **13** |
| 110:23 111:24 112:3 |
| **14** |
| 113:3,16 114:2,11,14,25 |
| 115:9 |
| **15** |
| 30:20 43:8 52:9 115:22 |
| 116:11 117:12,23 118:16 |
| 120:22 135:21,23 137:17 |
| 143:9,14 181:19 200:3 |
| **159** |
| 6:24 |
| **16** |
| 8:5 122:11,21 146:21 |
| 180:18 |

| **1615** |
|---|
| 4:20 |
| **17** |
| 8:6 128:21 129:9 130:13 |
| 131:22 176:17 178:10 |
| **18** |
| 8:8 104:3 132:1 147:16 |
| 148:19 |
| **19** |
| 132:7 133:9 200:4 202:2 |

| 2 |
|---|
| **2** |
| 104:15 108:8,11,14,19,24 |
| 109:2 187:6 199:1 |
| **2:06** |
| 173:18 |
| **2:34** |
| 166:7 |
| **2:49** |
| 166:10 |
| **20** |
| 1:6,17 2:19 9:3,13 45:12 |
| 46:20 48:8,24 133:15 136:5 |
| **20.civ.10832** |
| 2:6 |
| **200** |
| 3:12 |
| **2000** |
| 44:25 |
| **2000s** |
| 44:11 |
| **2001** |
| 52:12 |
| **2002** |
| 49:23 50:3 52:18,24 53:9 |
| 104:6 |
| **2003** |
| 51:5 |
| **20036** |
| 4:22 |
| **2004** |
| 50:7,11 |
| **2005** |
| 47:12 55:22 60:18,18 |
| **2007** |
| 6:22 53:2,10 60:20,22 |
| **2009** |
| 60:22 61:11,18 |
| **2012** |
| 115:13 |
| **2014** |
| 119:10,20 120:5 |
| **2015** |
| 61:15 |
| **2016** |
| 12:14,18 62:10 81:24 |

| **2017** |
|---|
| 173:20 184:17 193:10 |
| **2019** |
| 147:15,16 |
| **202.326.7999** |
| 4:23 |
| **2020** |
| 62:12,14 |
| **2021** |
| 1:17 2:19 6:17 7:6 9:3,8 |
| 26:22 55:22,24 60:18 63:9 |
| 147:22 221:19 |
| **20th** |
| 9:8 |
| **21** |
| 8:9 133:21 198:15 199:22 |
| **211220blo** |
| 1:25 |
| **212.225.2951** |
| 5:9 |
| **212.336.0153** |
| 3:15 |
| **212.373.3067** |
| 5:18 |
| **212.909.6000** |
| 4:9 |
| **219** |
| 6:5 |
| **22** |
| 8:6 104:5 152:8 |
| **22nd** |
| 221:19 |
| **23** |
| 152:11 |
| **24** |
| 6:15 |
| **25** |
| 170:23 171:19,22 172:25 |
| 173:2,22 |
| **26** |
| 149:5,11,18 169:16,18 |
| 170:23 171:1,12 172:5 |
| 174:1 202:3 206:7 208:7 |
| **28** |
| 148:23 151:17 |
| **29** |
| 208:18 |

| 3 |
|---|
| **3** |
| 6:13 104:11 109:10 133:9 |
| **3:47** |
| 198:4 |
| **30** |
| 192:21 |
| **31** |
| 159:19 |

| **32** |
|---|
| 184:2,4 203:5 |
| **33** |
| 8:7 184:5 |
| **34** |
| 8:8,9 25:7,9 110:21,22 |
| **35** |
| 177:13 |
| **36** |
| 78:17 |
| **37** |
| 87:17 203:13 |
| **38** |
| 89:25 90:8 181:5,10 192:1 |
| **39** |
| 93:21 169:18 170:15 |
| 174:18 175:4 177:14,18,21 |
| 177:25 180:12 182:3 |
| 192:19 201:7 |

| 4 |
|---|
| **4** |
| 6:15 7:5 24:14,18,19,23,25 |
| 25:4,22 112:4,6,12,16 |
| **4.1** |
| 112:7,17 |
| **4.2** |
| 112:7,17 |
| **4:01** |
| 198:7 |
| **4:38** |
| 219:13 |
| **4:41** |
| 2:18 219:16 220:15,18 |
| **40** |
| 205:14,21 |
| **400** |
| 3:13 4:21 |
| **41** |
| 103:22 |
| **44** |
| 161:1 |
| **45** |
| 6:18 |
| **450** |
| 91:2 |
| **47** |
| 160:25 203:5 206:14,16 |
| **48** |
| 161:10 204:9 |
| **49** |
| 97:18 98:2 161:17 204:9 |
| 206:8 |

| 5 |
|---|
| **5** |
| 6:20 64:9,10,14,16 196:16 |

[5 - analysis]

**5 (cont.)**
200:2,7,10,15,19,21 201:3
204:22 207:22
**5.3**
201:8
**50**
7:7
**55**
203:4
**56**
184:1 185:13,17 204:8
**57**
185:2,5,6,13,17
**58**
185:8,11,14,17

**6**

**6**
8:5 97:12 98:4,7 144:6,24
202:1,4,10,12,15,22 204:22
207:22
**6.1-6.5**
202:24
**6.6**
203:25
**64**
6:20
**66**
184:5,15
**67**
214:20
**68**
191:9,12 192:3
**69**
192:20,21,24 193:3

**7**

**7**
7:4 96:7,8,12,14 97:17,21
97:24 98:8 130:18 172:3
206:6,9,13,18,21,23 207:1
207:21 208:4
**7.1**
208:6
**73**
193:11,12,16,20

**8**

**8**
98:10 99:3,8,10 100:25
101:23 102:6,13 103:2,14
109:3 120:14 136:6 138:7
143:20,21 144:6 145:17
189:13,22,24 190:1
**85**
124:20
**86**
161:24 162:25

**9**

**9**
8:7 99:9 134:1,24 183:7
**9.a**
134:9,18
**9.c**
187:18,19 188:16
**9.d**
183:9 190:7
**9.e**
193:25
**9:01**
2:18 9:2,7
**90**
192:15,16
**919**
2:17 4:7 9:22
**92**
193:7,8
**93**
193:6
**96**
7:4
**97**
6:11
**975**
27:19

**a**

**a.m.**
2:18 9:2,7
**abhijit**
147:19
**able**
45:15 46:19,23 72:1 113:14
150:5,10 169:6
**academic**
57:7,9 137:13
**accept**
79:18
**accepted**
45:17 79:23 80:22 82:3,10
82:12,16 83:21,24 84:6,12
84:19,23 85:8 86:15,19
213:19
**accepting**
82:18
**accompanied**
181:3
**accountant**
85:6
**accounts**
129:18
**accurate**
75:25

**accurately**
11:10
**achievements**
138:25 139:5 142:20,25
144:4,12
**acquisitions**
93:17
**acting**
18:6
**action**
78:23 79:3 81:5 112:24
129:3,10 221:15,16
**actions**
11:21 104:19 105:2,11,13
107:17 108:15 113:6,9,10
114:4,7 117:8 118:6,17
132:14 135:25 136:3,8
137:6 138:3,13 139:6,22
140:6,16,24 141:6 143:2,16
143:22 144:18 145:6
149:13 151:7 164:10
180:24,25 186:15 187:1,10
195:17 196:21 199:5,5
203:2 217:20
**activities**
62:1 116:21
**activity**
139:14 161:4
**actual**
181:20 198:21 199:11
207:24 208:20 212:16
217:10
**add**
33:1
**added**
47:7
**addition**
110:3
**additional**
27:22 96:21 128:15
**address**
93:3,4 196:18 200:18
**addressable**
124:23 194:3,7
**addressed**
90:24
**addresses**
200:7 202:22 206:23
**adds**
104:5
**admitted**
155:14
**advance**
14:1
**advertising**
78:22 79:3 81:4 83:9,12,15

**advertising (cont.)**
83:21 84:2,5 90:1,9 92:15
92:19,22 139:14
**affect**
127:14,24 128:8
**afterward**
181:6
**ago**
80:20
**ahahn**
4:12
**ahead**
29:12 33:2 76:3 103:20
151:13
**aim**
176:19
**al**
9:12 104:6
**alfred**
147:18
**algebras**
45:25
**aligned**
64:6
**alleged**
91:14,17 188:10
**allow**
11:15 34:10 150:22 154:8
159:1 187:20 205:10
213:16
**allowed**
33:20,23
**allows**
194:3,5
**altered**
26:10
**american**
53:16,19 54:1,6
**americas**
5:16
**ampli**
116:18
**analysis**
49:10 51:9,16 52:1 55:15
55:17,19 60:16,17,25 61:1
61:13,19 62:2,6,9,13 63:3,5
63:8,11 80:10 88:21 89:2
89:12,18,21 92:10,11,12
93:19 104:21 107:22,24,25
116:22 117:19 149:22
150:2,6,11,20 152:2,24
154:15,21 183:13 185:14
186:6 187:20 194:2 208:20
209:11 214:20,21 215:2,9
215:13,14,17,19,22 216:23

[analyze - average]

analyze
51:23 104:17 187:8 195:15
199:3 205:4 213:5
analyzes
183:12,20 190:10,14,17,23
analyzing
56:5 137:21
andrew
18:16
angrist
147:24
announce
124:9
announced
122:25 123:23 125:12
163:24
announcement
123:3,17 124:4,9,10 125:19
132:12 164:4 165:13,19
announcements
132:14 164:10
announces
165:9,10
anonymized
181:8
answer
8:3 13:2,18 14:15 15:4,12
16:6,13 17:3,16,22 21:24
27:8,14 28:10,25 29:19
30:2 32:9,22 33:9 34:10,18
35:1,7 36:12 39:4 40:23
41:11,22 48:12 53:8,12
70:20 74:2,23 75:8 76:2,4
76:21,22 84:10 87:15,16
95:21 100:14 102:15,19
109:19 110:16,18,22
119:23 127:21 130:17,24
135:5 143:20 146:19
151:24 152:6 154:22,25
155:10 158:19 166:19,19
167:2,5,6,15,18 168:9,17
169:5 175:17 176:1 177:17
177:24 178:5 184:24
185:21 188:19 190:5
191:18 193:5 194:13 196:7
206:3,4 208:17 217:25
answered
87:13 95:20 98:19 100:9
101:17 103:4,16 106:12,18
108:13 109:1 119:17
131:10 134:22 146:5
154:18 155:24 167:19
168:8,11 174:22 179:14
190:3 217:24
answering
11:16 18:20 215:10

answers
11:5
antitrust
93:22 94:6,11,21
anybody
85:4
anymore
110:12
apologize
14:1
app
117:18
appeal
81:1 203:11
appear
196:17
appearance
122:2
appears
25:5 64:17 96:15 146:17
203:7
appendices
96:16 97:15
appendix
42:8,20,22 43:14 44:7,10
44:15 96:19 102:9 124:18
158:13,15 159:19 161:1
applic
194:9
applicable
148:9 194:9
applies
216:16
applying
107:16
approach
154:4 188:9
appropriate
103:7 150:2 152:12 176:11
215:17
approximately
9:7
approximating
181:4
area
54:18,21 72:22
areas
72:25 73:1
argue
203:21
arrangements
27:10
arrives
199:8
articles
181:3

artifacts
214:23
ashley
4:6
aside
170:21
asked
31:24 32:11,11 33:5 34:3
39:5,6 65:24 69:6 76:3
87:13 95:20 98:19 100:9
101:17 103:4,16 106:12,18
108:13 109:1 119:17
127:24 131:10 134:22
143:20 146:5 154:19
155:24 157:16 168:12
174:22 176:21 179:3,12
186:14,24 190:3 199:21
217:24 219:19 220:1
asking
10:12 18:2,3 33:13 60:1,4
73:23 75:11,11 101:9 159:8
167:21,23 168:25 169:1
178:17
asks
33:15
aspect
24:3 219:24
aspects
47:23 163:6,6 196:19,22
203:9
assertions
171:25
assess
146:23 147:4
asset
30:3 73:5 139:4 140:15
142:23 162:3 165:7,9
176:23 177:2,4 184:10
200:17
assets
54:12,15,18,21,24 55:2,5
73:10,17,20,25 74:9,14,20
76:9,14,25 77:8 139:9
140:20 141:3 144:21,22
145:10 173:14 217:2
assign
199:16
assigned
180:20 186:9
assignment
31:14,18,21 32:5 94:24
95:2,5 104:15 195:15
198:23 199:13,16 205:25
assist
15:20 16:10,15,25 17:5
40:18 76:19

assistance
37:11
assisted
15:19 17:4,20 61:2,3 63:2
73:12,19,24 74:7,12,19
75:13 76:8,13,23 94:16
153:23
assisting
56:7 57:20,21,25 76:15
associate
60:19,21,25 61:6,17
associated
124:3,8
association
9:18 53:17,19 54:2,3,6
associations
54:8
assume
31:11 39:25 82:9 126:22
151:25 163:19 165:7
179:23
assuming
127:6,8 151:10 188:14
211:4
assumptions
37:3
at&t
93:18
attached
42:21 44:10,15
attempt
198:18 203:21
attending
52:22
attention
201:16 204:13 208:1
attitude
66:10,10
attorney
18:8 20:23 21:3 34:6 40:20
122:3,3
attorneys
14:22 15:1,7 16:3 18:12,19
19:9,24 20:9,17,21,25
35:19,24 36:3
attractive
65:24
author
191:22
available
148:24 151:18
avenue
2:17 4:7 5:16 9:22
average
216:6 217:10,10

[awarded - case]

**awarded**
147:19,23
**aware**
91:7 153:18 166:12 168:2
213:18
**awareness**
91:14,17,22

**b**

**b.b**
202:20
**back**
44:24 50:12 63:14 68:20,21
70:5 98:4 110:25 122:6
130:20 136:24 141:12
144:23 166:10 167:11
168:1 174:18 179:8,11
183:7 187:17 193:24 198:7
199:1 219:16
**background**
73:9 103:5 109:4,5,10,11
109:17 110:8,10 111:3,6
112:21 140:16 144:18
157:11 158:12
**bad**
64:3
**banerjee**
147:20
**banking**
81:4
**base**
213:11
**based**
107:16 114:21 146:18
197:12 208:24 209:18
210:3 211:25 212:9,23
213:6,19 217:1
**basis**
17:25 32:19 33:11 34:3,4
138:1 170:13 183:16
190:11 201:23 203:14
213:4
**bates**
6:13,18,24 7:7
**beauty**
80:18
**becoming**
118:24 119:4
**behalf**
2:16 27:6
**behavior**
73:3 106:25 148:25 151:19
157:21
**behavioral**
6:21 63:17
**behaviors**
105:2 201:18 204:17

**belief**
216:21,21 218:23
**beliefs**
152:7 187:24 188:12
**believe**
18:22 22:21 54:7 59:14
68:15 71:22 73:21 79:6,16
80:6 82:21 84:17 92:25
97:15 130:21 150:1,16
158:7 162:9 167:3,7 169:5
170:4 173:12 213:25
**believed**
170:14 174:19 210:2
**believes**
75:6 170:5 174:20 195:25
208:13 213:17 216:18
**belong**
194:25
**benefit**
170:8 171:5,17
**berg**
4:18 18:16 20:4 122:4
**best**
76:11 82:7,22 83:2 84:9,15
93:24 197:16 211:19
216:10
**better**
84:2,5 85:7
**biased**
216:22
**big**
44:4 52:9
**billable**
28:13
**billed**
28:20,23
**billion**
115:15
**bit**
155:12
**bitcoin**
165:10,11,12,20 173:18
**blockchain**
115:13 139:25 140:8,18,23
**blog**
191:21 192:25
**bloomberg**
169:21 173:6
**board**
81:1 193:10 215:6
**body**
41:15,19
**bonuses**
163:23 164:1
**book**
103:24 104:4

**books**
214:24 215:4,15
**boppenheimer**
4:24
**border**
129:17,22 130:2,9 131:6
162:8 177:3 194:17 195:4
195:22 201:14
**bottom**
103:21
**bought**
30:9
**brad**
10:20,21 169:21
**bradley**
1:7 2:7 4:17 5:3 18:16 20:4
**branding**
118:23 119:3,15
**break**
69:22 119:24 120:1 121:4
166:3,3,5 197:24 198:1
**breaks**
53:9
**breanne**
193:22
**bridge**
200:17
**bridget**
1:24 2:19 10:1 221:25
**brief**
44:24
**broad**
141:7
**broader**
139:25 140:8
**broken**
159:12
**brother**
90:4,10 91:5
**brought**
46:16
**brune**
5:6 18:22,24,25
**built**
170:10 171:7,19
**bull**
140:1,9 162:6 163:12
**bulletin**
215:6
**bullish**
139:2 142:21 144:13 145:3
**bureaus**
84:3,6 85:8,9
**business**
47:20 49:17,22 50:4 83:5
84:3,6 85:7,8

**businessperson**
165:8
**buy**
165:9
**buyback**
161:4
**buybacks**
161:14
**buying**
125:2 140:2,9 165:11,20

**c**

**california**
9:19
**call**
40:14 66:21 80:21 150:19
**called**
109:10 126:24 136:15,19
136:22 162:14,17 200:15
202:11 206:20 208:5,6,7
214:19 218:23
**calling**
59:20
**calls**
16:7 40:5,6 58:11,19
143:16,17 185:20
**campbell**
104:4
**capacity**
75:20 196:13 197:5
**card**
147:24
**cards**
94:11
**care**
12:22 13:9
**career**
43:11 47:21 61:8,25
**carefully**
214:22
**carried**
179:20
**carry**
57:1
**carrying**
60:13
**case**
1:5 2:5 12:17,21,22 15:18
16:11 17:1 18:13,19 23:19
23:22,25 24:3,5,9 25:6
26:14,17,24 27:11,18,23
28:14,16,20,23 29:4,8,14
29:17,21 30:4 31:1,4,7,10
31:16,19 34:15,20,24 35:11
35:14,20,25 36:4,23,25
37:5,9 38:2,10 39:11 59:2
60:9 63:1,4 74:17 78:24

[case - colleagues]

**case (cont.)**
79:18,24 80:2,2,6,8,11,13
80:19,22,25 81:11,20,20,23
82:8,24 83:6,9,12,21 84:1
85:2,20 86:3,6,14 87:3,22
90:4,11,15 92:15,19,23
93:6,12,18 94:4,22,25 95:3
99:22,24 107:16 109:17
118:24 119:1,7,12 120:13
134:3,11,20 140:2,9 141:7
149:19 150:5,10 154:7
155:11,12,16,20,25 156:2
156:25 157:1,6,7,9,15,15
157:23 158:2,3,8,10 162:6
163:12 166:24 168:14,24
169:1,12 173:4 174:3 189:8
190:25 191:1 196:6,10
197:2,9,17 205:17,22,25
209:24 213:2,11,14 216:18
**cases**
12:19,23 13:5,9 48:16,18
63:2 73:14 77:10,16 78:20
87:23 88:1,8,12,16 93:21
94:1 115:4 154:2 155:5,17
157:19 165:24 209:16,19
209:20,24
**case's**
197:19
**casework**
78:18 80:17
**category**
141:7
**causal**
56:4 64:19,23 65:4 71:13
71:14,16,17 72:20 88:11,14
88:17 89:11,17 93:1,18
94:2,15 99:18 100:18
101:18,20 103:8,11,23,25
104:7,9 108:9,11 118:4,9
118:13,16 122:21 125:23
125:23 129:2,9 132:21
136:7,16,17,22,25 137:1,5
137:12,13,18 138:8 140:21
141:11,11 143:10,10,15,17
143:25 146:24 147:4,8,14
148:9,20 149:2,12 150:20
151:6,21 152:14 157:23
158:21,24 159:1,13 186:14
186:25 188:3,9,15,20 189:1
189:3,3,7,16 198:19 199:9
207:8,11 211:12 217:14
218:4 219:5 220:2,4,5
**causation**
78:23 80:14 81:15 87:19,24
142:1 146:3,8 172:5 210:25
211:1,5

**cause**
66:1,5,7,11,24 67:9,16,20
71:10 72:13 88:5 89:2,21
90:18 91:18 92:16,20,23
93:19,23 94:5,10 104:25
105:7,21,25 106:9,13 107:2
107:4,9,13,16,21 108:3,6
108:14,15,23 109:2 114:6
136:13 137:11 138:3 141:1
144:7,13 152:1,4,19 153:8
159:20 160:1,17 161:2,4,11
161:12,18,19,24 162:18
163:1,16 164:1 172:23,25
173:21,25 174:8 175:16,20
175:22 187:14,16 188:5
189:14,16 212:1,10 213:7
214:15 217:18 219:1 220:3
220:6 221:7
**caused**
89:7 99:24 114:4 117:7
136:9 137:7 142:3 146:6
149:13 172:8,15,19 218:7
218:20
**causes**
71:20,21 160:8,9 162:1,14
162:16,19 163:16,17
218:13
**causing**
188:25
**ccr**
2:20
**ceo**
169:21 173:17
**certain**
17:7,9 38:11,20 65:25
114:4 116:21 125:5 136:4
146:16 149:12 153:1
157:20 163:5 169:20,22
183:22 186:18 196:19
217:19 218:2,8 220:2
**certification**
91:1
**certified**
9:17 221:11
**certify**
221:4,14
**cetera**
170:18
**cgsh.com**
5:10
**challenge**
85:22 155:22
**change**
26:8 28:5,9,10,12 47:9
61:16 126:24 127:9 165:18
165:23,23 167:10 188:16

**changed**
47:6,8 62:19
**changes**
46:20,24 47:2 136:9 137:7
138:3 180:11
**chapter**
65:5,10
**chapters**
63:20
**characteristics**
104:9
**characterization**
139:10
**charged**
28:5
**charging**
27:18,19
**check**
41:8 123:12 126:19
**checked**
38:14 83:3 126:10,12,20
**chemical**
78:22
**chemicals**
79:3
**choice**
152:25
**choices**
153:2,3,4
**choose**
23:3,12
**chose**
91:5 156:1 197:17
**christian**
1:7 2:7 5:12
**cigarette**
92:22
**circle**
219:11
**cita**
39:6
**citation**
120:14 193:2
**citations**
17:7,9,10,13,20 38:5,6,11
38:14,20 39:5,7 40:13
41:13
**cite**
192:10,12
**cited**
91:2 120:19,19,19
**cites**
104:4
**civ**
1:6 9:13

**claim**
23:3,12 126:25 170:13
171:2
**claiming**
22:25
**claims**
83:15 157:8,12 169:19
208:12
**clarify**
31:11 41:17 42:25 79:22
109:23 111:2 135:15 159:3
209:23 219:21
**class**
49:11,13,23,24 50:13,15,19
50:21 51:1,8 54:23 61:3
78:23 79:3 81:5 91:1
**classes**
47:19 49:16,19,21 51:2
**classic**
215:11
**clear**
11:17 212:18
**cleary**
5:5
**click**
123:14
**client**
82:8,24 86:6 87:4 119:9,20
120:4 156:3 197:20
**clients**
56:20 62:2 123:5,5,19,19
129:23
**clock**
159:12
**close**
91:4 140:15
**closed**
176:22
**closing**
137:9 196:25
**clr**
1:24 2:20
**coin**
99:23 140:5,13 161:23
200:16 204:7
**coincidence**
159:11
**coincidental**
159:17
**coindesk**
184:9,15
**colleague**
14:3 16:21,21
**colleagues**
13:19,20 14:2 56:13,14

[collecting - correct]

**collecting**
214:22
**collections**
215:8
**colon**
173:10
**combined**
12:19,24 13:5 162:2 189:17
**commencing**
2:18
**commentary**
139:19
**commented**
184:11
**commission**
1:4 2:4 3:7 9:11
**committee**
122:25 123:4,18,23 124:2,8
125:11
**common**
215:13
**commonly**
147:18
**communicate**
60:12
**communicated**
171:24 203:10
**communicating**
56:20,21
**communication**
62:2 163:7,16
**communications**
22:7,22 162:6,24 163:1,12
163:13,15 198:17,20 199:8
199:10 206:21 215:3,10,11
215:14
**companies**
140:17,22,25 141:8 144:17
182:1
**company**
45:3 46:4 163:19 164:8,21
164:22 176:25
**compass**
14:4,7,8,19,20 16:22,23
18:5 21:10 26:4 27:19
28:18 29:20 30:13,15 38:16
38:18 47:7 55:8,9,11,18,22
56:3,10 57:5,24 58:3,15
59:4,18 60:15 63:11
**compelling**
184:14
**compensated**
29:20 30:21
**compensation**
30:14,16,17 62:18,22,23

**competence**
140:17 144:19
**complaint**
13:17 36:24,25 109:19,19
157:5,7,10 190:24 191:1,2
**complete**
42:23 43:1 162:4
**complicated**
160:6
**components**
215:8
**computer**
221:13
**con**
14:6,17
**concern**
77:7 135:24 175:16,20,22
**concerning**
73:16,20 74:8 199:21
**conclude**
67:4,8 71:10 72:12,19
138:10 141:14 205:10
**concluded**
220:18
**concludes**
220:13
**conclusion**
99:18 144:16 183:22,24
220:5
**conclusions**
68:5,12,13 72:12 101:2
109:20 110:1,3 112:25
136:6,11,13,16,19,22,25
137:4,11,12 143:15 150:20
150:23,23 159:9,14,16
189:4,4,7 199:9 203:21
205:7 207:8
**conduct**
57:5 67:17,19,25 68:17
72:16 90:3,9,15 107:21,25
149:17 150:4,9 153:16
177:12 187:22 188:7,11
194:25 205:13 206:2,4
210:6,17,20 211:9 215:18
**conducted**
54:20 55:1,4 56:6 63:5
70:15 80:10 83:14 90:16
92:12 148:4,6 152:3 153:19
155:13 156:25 157:13,19
179:22 182:25 215:20
**conducting**
56:5 67:12 70:8,12,13
73:24 74:13 88:20 89:2,9
89:11,17 149:3 151:22
179:17,23 209:10

**conferences**
44:6 47:22
**confidential**
8:17
**conjoined**
63:5 152:24
**connect**
66:11
**connected**
125:17 221:15
**connection**
66:2,6 74:16,20 75:14 76:9
76:13,24 124:16 127:15,25
128:9
**connects**
125:11 141:10
**consider**
36:8,19,22 73:4,8 177:5
**considered**
13:17 35:19,24 36:4 41:25
42:3,8,11 84:25 102:1,10
102:24 103:1,7,19 136:7,16
136:17,22,25 137:1,5,17
201:25 208:8
**considering**
161:22 204:6
**considers**
137:12
**consisted**
63:20
**consistent**
99:21
**constantly**
47:1
**constitutions**
215:7
**consult**
74:4,24
**consultant**
62:15,16,25 63:8
**consultation**
34:15,20
**consulting**
30:20 43:7 48:16 56:16,17
56:18 61:9 137:14
**consumer**
45:3 66:12 73:3 83:14
87:21,24 88:10,18,19,24
89:1,5,10,16 91:14,17
153:2,18 154:8,14,20 155:4
155:7 156:6,13,20 157:21
208:24 209:10 210:2,5,20
211:6,8,25 212:9,16,23
213:5,17,22 214:4,5,7,10
216:12,13

**consumers**
63:22 65:6,12,16,20 67:11
90:25 91:5 210:3 212:6,6
212:17 214:13,14 216:11
218:1,3
**contact**
31:4,7,9,15,19,25 32:13
33:6 214:25
**contacted**
30:25
**contain**
43:2 134:2 149:5
**contained**
117:21
**contains**
185:6
**content**
106:4 214:20,21 215:2,9,13
215:17,18
**context**
176:14 177:13,21 179:5,17
179:21
**continue**
12:3
**continued**
4:1 5:1 46:14
**continuing**
203:23
**contradict**
100:16
**contributed**
169:22
**control**
66:15,17,18,19,22 67:12
72:9,19 75:9 180:20 181:9
182:2,4,7,11,14,18 217:16
**controlled**
72:16
**controls**
218:24
**conversation**
32:8 33:16
**conversations**
32:3 34:8
**cook**
104:4
**copies**
96:21
**copy**
25:5 64:17
**corp**
90:4,11
**corporate**
93:17
**correct**
17:12 18:13,14 23:23 27:9

[correct - designs]

**correct (cont.)**
50:23,24 51:10 55:23 62:7
68:9 71:24,25 77:5 81:13
83:10 158:8,9 159:12 175:6

**correctly**
14:10

**correlation**
70:17 71:8,19

**correlations**
70:23,25 71:5,6

**costs**
164:9

**council**
84:2,5 85:7,8

**counsel**
9:23 10:13,17,19 13:19
14:3 16:10 18:7 21:8,9 22:8
26:25 27:16 29:3 31:12
34:2,9 36:7,9,16 37:5 40:24
40:25 41:3,9,23 74:4,24
75:5 79:9,9,10 93:2 167:14
197:21 221:17

**count**
12:5

**counting**
214:23

**county**
221:3

**couple**
74:15

**course**
50:3,6

**courses**
54:11,14

**court**
1:1 2:1 9:14,25 11:16,20
24:13 79:4,13,18,23 80:4
80:21 81:2 82:3,8,8,10,12
82:16,22 84:24,25 85:1,23
86:4,9,15,20,21,25 87:2,11
91:1 103:5 156:1,7,14,23
157:1,4 197:17

**courtroom**
11:7

**courts**
154:7 213:19

**covered**
73:21 74:1,22 75:18,23
166:18 168:8,20,22,23
169:7

**create**
136:4 140:3,18,23 144:19

**created**
44:7,11 115:15 139:1
142:21

**credit**
50:20 51:3,4 94:11

**critic**
204:20

**critical**
204:20

**criticism**
200:2,20 207:21

**critique**
101:14 159:4

**cross**
129:17,22 130:2,9 131:6
162:8 177:3 193:7 194:17
195:4,22 201:14 219:17

**crr**
1:24 2:20 221:25

**cruz**
193:9

**cryptocurrency**
193:17

**csr**
1:24 221:25

**culminated**
145:7

**currencies**
30:23

**current**
43:3 54:5 167:8 168:6
213:14

**currently**
60:2 89:6

**curriculum**
6:11

**customers**
201:21

**cv**
13:1 42:22,23 43:2 44:1,9
44:11,14,18,23 45:1,10,12
45:14 46:20,25 47:3,7,14
48:1,4,6,10,15,21,25,25
49:5 55:21 57:2 68:21,23
69:8 78:20 93:9,11

**cvs**
44:14

**d**

**d.c.**
4:22

**daily**
28:17

**data**
51:24 57:13 61:1 62:1 63:3
68:17 153:16,16,20 214:22

**date**
9:7 19:16,20 25:20 47:11

**dated**
6:17,22 7:5

**daubert**
82:9,19,21 84:25 85:3,22
85:25 86:4,7 87:1,2,9 93:15
155:22 156:1 197:18

**dauberting**
82:17

**david**
5:24 9:16 147:23

**day**
62:1,1 159:12 221:19

**days**
39:24

**deal**
34:1

**debevoise**
2:17 4:3 9:21

**debevoise.com**
4:10,11,12

**december**
1:17 2:19 9:3,8 221:19

**decide**
211:18

**decision**
6:21 63:17 73:3 140:19
141:2 144:20,21 145:8,9
180:11

**decisions**
176:5 198:21 199:11

**declaration**
79:2,7,13,24

**declarations**
79:5,11

**defendant**
4:2,14 5:3,12 12:4 31:3,7
31:10,11,16

**defendants**
1:9 2:9 29:14,17 104:22

**define**
132:5

**defined**
59:9

**defines**
207:17

**definition**
61:7 182:6 219:22

**degree**
17:18 52:13,19,25 53:3,5
183:11,18 186:7,10,22
198:16 207:14,24 211:2

**degrees**
43:9 47:17

**demand**
170:12 171:9,21 172:2
173:5,8,13,16 174:4

**denying**
91:1

**department**
47:19,20 50:22 51:1,3

**dependent**
176:19 178:14

**deposed**
23:17 24:1 81:19,22

**deposition**
1:15 2:15 8:1 9:9 10:25,25
12:9,13,18 13:12,15,21
19:10 20:1 21:12,13,15,17
21:19,22 22:2,13 23:16
24:17 29:5 49:4 57:22,22
59:24 60:8 64:8 77:24 78:3
78:8,12,15 81:25 94:20,23
96:6 97:5 179:1 220:13,17
221:5,8,9

**depositions**
57:21 60:11 61:3,4

**derived**
138:12 141:16

**describe**
47:8,9 59:7 62:24 63:18
108:1 113:8,24 152:11
158:15 173:1,21

**described**
11:23 21:10 29:9 39:19,22
59:1,3 69:17 78:12 82:1
85:20 91:13 148:8,15
149:18 150:25 172:25
174:10 176:23 191:7
199:22 205:14,21

**describes**
112:21,23 117:4,15 142:16
147:9,10 149:11 177:25
181:1,10 189:16 194:15
203:25

**describing**
124:24 139:20 172:4,8,15
172:17,20,23 174:19,23

**description**
6:9 7:2

**descriptions**
203:7

**design**
52:4,6 73:2,2,10 83:13
99:11,22 179:1 180:11

**designed**
73:12,16,24 170:7,17 171:4
171:16

**designing**
56:4 73:13,19 74:8 176:6
177:11 178:7,21,25 179:2
179:13,21 183:1

**designs**
103:23**

[detail - educational]

**detail**
189:13 204:24
**details**
50:20 59:16 182:11
**determination**
189:6
**determine**
123:12 174:9 179:24 213:7
214:13,15 219:1
**determining**
75:22 87:19 148:9 152:18
215:23,25
**developed**
94:14
**developer**
170:11 171:8,20
**developing**
63:4 139:21 176:2,6
**development**
139:25 140:7
**developmental**
147:22
**difference**
66:23,24 67:2 72:7,8,18
87:8
**different**
45:19 68:7 146:8 162:20
175:15 180:15 182:17,20
194:16
**differently**
167:5
**digital**
30:3 54:12,15,18,21,24
55:2,5 73:5,10,17,20,25
74:8,13,20 76:9,14,25 77:7
139:4,9 140:15,20 141:3
142:23 144:21,22 145:10
162:3 165:7,9 173:14
176:23 177:1 184:10 217:2
**diploma**
53:4
**direct**
10:9 126:8 152:9,9,20
211:14,20,20 212:15
**directed**
143:13
**direction**
8:3 18:7
**directly**
36:13,14 37:16,18,21
127:12,22 173:3
**directors**
193:10
**disadvantages**
159:25

**disagree**
111:9,15,20,25 112:7,17
115:12,23 116:24 117:11
117:20 119:19 120:4,11
132:23
**disclose**
22:6
**discovery**
18:9
**discuss**
16:4 27:15 75:16 146:22
148:22 149:4 151:17
178:16
**discussed**
22:10 33:15 48:9 49:6 58:2
58:19 155:25 159:23 172:3
174:1 176:25 177:5 185:13
214:20
**discusses**
103:22,24 115:4 125:4
173:25 178:13 202:25
**discussing**
126:5 204:3
**discussion**
141:5,9 143:7
**discussions**
15:21 18:4 29:2
**disinterested**
221:11
**dissertation**
6:20 63:16,19 64:18,21
65:2,5,10,12,16,20
**distinguishing**
203:14
**distribution**
161:13,20
**district**
1:1,2 2:1,2 9:14,15 154:7
**division**
84:2,5
**doctor**
122:8
**document**
24:24 25:3 43:9 64:15
96:13 97:18,19 168:21
**documents**
8:22 34:19 35:10,13,16
36:2,6,8,16,17,18,22 42:17
57:16 59:2 103:5,13
**doing**
54:4 116:6 211:14 215:24
217:22
**dollars**
30:22
**domestic**
129:18

██████

6:12 7:5 31:23 95:7,18
97:22 98:3 100:18 101:18
103:10 104:16,24 110:2
113:11,15,20 114:3,17
115:3 116:19 117:9 118:7
120:20 122:17 124:6 125:6
125:10,24 126:1,4,8,18,25
127:4,9,16 128:1,5,6,13,17
129:2,9,24,25 131:12,15,21
132:10,21 136:6 138:2,8
139:10,21 142:15 143:24
144:15 150:1,19,20 151:25
153:25 155:13 157:23
158:23 159:1 161:7 162:19
163:10 169:19 170:4,14
172:4 174:19,20 175:3,12
175:20,23 181:1,24 183:10
183:17 185:3,9,16 186:6,9
186:14 187:6 188:7,14,20
189:6 190:8,12,21 191:13
191:15,19,22 192:6,7,10,12
192:17 193:19,21 194:14
194:19 195:2 196:17
198:15 199:21 200:15
201:8 202:11,25 203:5,6,13
203:25 204:8,15 205:1
206:21 207:7,23 208:10,12
211:2 216:17,24

██████

13:16 36:25 95:9 96:15,19
97:11 98:6,11,20 99:17
100:20 101:1 104:11,15
107:24 108:7 109:3,11,18
109:20 112:4,13 113:4
122:9,11 124:15,20 127:12
127:22 128:21 130:13
132:2,7 133:15,21 135:24
137:22 141:13 143:10,11
143:14 145:18 146:9
149:22 150:5,10 158:20
159:9,13 170:23 171:12
175:1 183:24 184:2,21,25
185:3,9 186:23 187:20
189:11 191:4,10 192:20,24
193:12 198:23 199:1,16
200:3,7,11,19,21 201:3
202:1,4,9,15,22 204:20,23
206:1,7,10,14,19,24 207:1
208:19 220:2
**dr**
6:23
**draft**
25:22 39:13 40:20
**drafted**
41:3 93:11

**drafting**
25:15,18 29:5 57:25 58:1
61:2 63:3
**drafts**
25:25 26:3
**dramatic**
61:20
**draw**
173:13
**drawbacks**
94:17,19
**drawn**
181:22
**dress**
87:18 88:2,8,16
**drive**
173:13,16
**driver**
170:11 171:9,21
**driving**
184:16
**duflo**
147:20
**duly**
10:5 221:6,10
**duties**
56:2 57:23 58:2,24 59:4,8
60:1,24 62:16,17,24
**duty**
58:12,13,15

**e**

**e.g.**
177:5
**earlier**
78:12 82:1 109:24 219:19
**early**
44:11 116:1
**earn**
140:4,11
**economic**
30:20 43:7 46:15 47:19
52:17,20 56:16,17,18 61:8
137:14 147:17 163:21,25
164:3 188:12 201:21
204:19
**economics**
50:5 52:21 54:3 63:25
147:19,22,23 171:14
187:24 200:16
**ecosystem**
139:21 140:1,8 170:11
171:8,21
**education**
43:13,17,20,25
**educational**
47:22

[effect - expectation]

**effect**
11:7 66:1,5,9,11 67:9,20
71:10 72:2,7,11,13,20 88:5
88:17 89:2,11,17,21 90:18
91:18 92:16,20,23 93:19,23
94:5,10 104:25 105:7,22
106:1,15,19 107:16,21
108:3,7,14,16 125:6 136:14
137:12 141:1 144:7,14,14
144:24 145:4 152:1,4,19
153:8 160:2,12,14,20 161:5
161:11,14,18,20,25 162:7
172:17,24 173:21 174:2,7
179:24 186:19 189:14,16
196:20 198:19 199:9 212:2
212:11 213:7 214:15
215:13 217:18 219:1
**effective**
149:1 151:21 210:25
**effectively**
53:5
**effects**
70:22 71:4,23 135:25 149:2
151:21 161:5 174:1
**efforts**
138:12,12 141:16 173:7
176:25
**eighth**
103:17
**either**
141:5 154:2 189:14,15,16
**elaborate**
12:24 32:20 71:15
**electronic**
83:12
**electronics**
83:9,14,20
**elements**
149:11 176:4 182:13
215:14
**else's**
59:24 60:8 128:7,14,17,19
**email**
3:16 215:6
**empirical**
153:12,14 165:2 166:1
194:19 195:9 206:2,5
207:17 216:9
**empirically**
165:6 198:18 209:6,7
**employed**
46:4 55:7,9
**employee**
38:16,18
**employees**
18:6

**employment**
47:8,10 68:22 69:3,7,12
81:8
**enabled**
173:9
**encouraged**
139:3 142:22
**ended**
36:18 116:6 176:22,22
**ends**
202:3 206:8,14
**engaged**
116:20
**engagements**
69:16
**enter**
28:17
**entire**
95:13,16,22 98:11,15,25
99:7 100:6,10,15 109:12,25
110:7 111:7 134:6,14,23
150:3 157:10 196:5 200:1
200:24 201:1 202:9,20
207:5
**entirely**
73:15 176:9
**entirety**
101:12 103:18 202:23
**entitled**
65:2 221:7
**entity**
203:20
**environment**
56:16
**equating**
146:2
**errata**
60:10
**escrow**
161:13 202:12,25 204:3
**esquire**
3:9,10 4:4,5,6,17,18 5:6,15
**essay**
65:1
**essays**
6:20 63:17
**essentially**
33:18 65:7
**establish**
152:25 153:3 186:20
194:23 211:1,5,20
**established**
132:21 147:7
**establishing**
210:25

**esther**
147:20
**et**
9:12 104:6 170:18
**evaluate**
31:22 65:24 67:10 89:1,8
95:6 104:25 105:7 108:7,9
108:11 118:8,13 147:13
148:25 149:7 151:19 152:3
153:7,17 183:10,17 186:6
186:14,18,25 198:16,18
206:1 207:11,12,24 208:1
208:20,23 209:6 210:5,19
211:7,24 212:8 213:17
**evaluated**
89:10,16,24 91:13,16,20
95:18 107:24 176:18 209:9
209:17 212:22 217:13
**evaluates**
105:12 195:6
**evaluating**
56:6 65:11,15,19 66:3
78:23 95:9,13,14 105:9
147:8 151:1,6 152:1 186:10
194:9 211:13 212:5 213:5
213:21 217:19 219:5
**evaluation**
146:12 175:3 183:15,21
**evaluations**
153:19
**eventually**
60:8 132:13 145:7 180:9
182:22
**everybody**
39:24
**evidence**
194:20 207:17
**evolved**
45:12
**evolving**
44:12,18 47:1
**exact**
73:14 126:17 143:19
**exactly**
39:10 98:16 99:3,14
**examination**
6:2 10:9 219:17
**examine**
215:1
**examined**
10:5
**examining**
64:19,24
**example**
47:6 49:9 56:11 57:13,15
59:23 64:2 65:1 67:21

**example (cont.)**
68:14 85:2 103:21 114:5
124:17,18 136:3 138:9
139:6 143:1 147:15 152:24
162:5,23 172:24 173:7
176:21 181:23 189:12
190:21,23 191:5 201:7
203:8,15 214:13
**examples**
47:4,5 48:13 57:3,4 58:6
103:19 146:25 147:12
149:4 152:15 158:20 162:2
201:6
**excerpt**
132:12
**excerpts**
202:19
**exchange**
1:4 2:4 3:7 9:11
**exclusively**
161:22 201:13 204:6
**execution**
138:14
**executives**
163:20 164:2
**exhaustive**
49:1 195:24
**exhibit**
6:11,15,20 7:4 24:14,16,18
24:19,23,25 25:4,22 64:7,9
64:10,14,16 96:5,7,8,12,14
96:18 97:3,4,6,7,14,16,19
97:20,21,24
**exhibition**
45:4,5,6 69:16
**exhibits**
6:8 7:1
**exist**
113:12 146:24 147:5
160:17 161:7,9 163:6
188:21,24 205:12 207:18
207:19 208:12 218:16
**existed**
164:4
**existence**
194:20
**exists**
89:6 160:4 161:16,23
218:18,22
**expands**
138:22 139:22 140:21
142:10
**expect**
142:16 176:24 177:1
**expectation**
138:11,23 141:15,17,24

[expectation - food]

**expectation (cont.)**
142:11 146:2,7 157:14
**expectations**
136:4 138:16 141:18
142:17 146:6 150:6
**expected**
27:21 138:19 142:6 148:25
151:19
**experience**
48:16 55:22 56:17,19 70:8
70:10,11,13 139:16 140:14
153:7 182:21 196:12,18
197:4,13 208:25 209:11,19
212:1,10 217:1
**experiment**
65:23 66:13,14,18,19 67:12
72:6,17 89:9 90:24 91:2
104:1 148:2,4,21 149:3
151:5,23 152:25 175:7
176:3,5 177:12,25 178:7,15
178:21 179:14 180:10
182:19,21,23 183:1,1 188:7
210:6,17,21 211:9 217:16
218:24,25 219:4
**experimental**
50:5 52:4,6 73:2 94:15
103:22,23 147:8 148:6,24
**experiments**
55:1 56:5,6 60:13 66:15
104:7 147:9,11,13,21,25
148:1,22 178:2 181:11
188:2
**expert**
6:15 7:4 26:17,24 27:22
30:25 31:22 34:24 56:8
62:3 63:1,5 72:25 73:4,8
76:12,15,24 78:18,21 79:1
79:19,24 80:17,18 81:5,7
82:17 83:4 85:24 86:8 87:5
87:11 93:9,13 94:14,16,22
95:6 104:22 153:6,25 154:3
154:3 155:1,11,12 156:5,12
156:19 189:18 190:15
196:11,13 197:3,4,11,12
200:3 209:17,25 210:4,19
211:7,24 212:8,21 214:12
215:18
**expertise**
72:22 73:1 139:16
**experts**
48:17 56:7,21 57:21 62:3
63:2 76:19 88:12 153:24
154:8,13,20 155:3,6,18,18
209:8,14 213:2,18
**expert's**
197:12 208:24 209:11,19

**explain**
64:23 68:2 92:4 100:11
142:12 143:3 152:8 187:25
188:23 190:8,12,16 193:25
201:15 203:24 204:10
**explained**
32:19 86:18
**explanation**
205:9
**explicit**
113:19
**explicitly**
86:20 114:19
**expose**
94:17
**exposed**
65:6 175:8,10 180:23
182:12,12 183:11,18,23
185:16 186:2,8,11,21
198:17 201:16 204:13
205:6 207:13,25
**exposure**
185:14
**extent**
30:15 112:20,22 116:14,17
117:4,15,17 118:3 122:16
129:2 132:17 150:18 153:2
**extremely**
140:19

**f**

**facilitate**
129:16
**facilitated**
129:21 130:2,9 131:6
**fact**
73:11 79:12 82:11 107:5,7
113:23 116:10 130:1,8
131:5 135:17 153:23,24
160:23
**factors**
208:8
**facts**
34:14 35:18,23 98:21
100:21 101:3,7,21 109:13
110:19 111:3 112:21
117:12,21
**factual**
135:10,16
**fair**
156:4,11,17
**falls**
138:13,14,17 141:17,19
**false**
79:3 81:4 83:9,12,21 90:1,9
92:14,18,22

**familiar**
29:22 152:2
**family**
21:13,14 24:9 30:7
**far**
28:14 86:7 98:1
**fast**
81:8
**favor**
82:24 86:6 87:4 156:3
197:19
**favorably**
165:8,12
**feasible**
59:7
**feature**
153:1,3
**featured**
200:15
**features**
200:16
**federal**
135:1
**feedback**
15:24 39:14 40:24,25
**feeds**
126:9
**fees**
27:11,15
**fehrm**
13:22,24 16:17,18,19,20,25
17:4,5 21:5 37:14,18,21
38:9,22 39:18,21 40:16,17
**fehrm's**
38:24 39:1
**field**
147:21 153:6,11,15
**figel**
4:16
**figure**
133:8 212:18
**figuring**
151:15
**filed**
80:18,22
**fin**
167:17
**final**
26:6,7 45:20 47:11
**finalized**
25:12
**financial**
29:16 139:15 170:9 171:7
171:18 172:1 181:25
**financially**
170:8 171:6,17

**find**
17:14 39:6
**finding**
17:7,9 38:11,20
**findings**
97:11 98:6,14,15,22 99:1,8
189:12
**fine**
69:24
**finish**
11:15 119:25 151:13 168:7
**finished**
18:20 45:20 207:20
**firm**
27:1
**first**
19:14 20:8,10,13,19 21:4
30:24 31:15,19 32:10 41:12
44:11 65:1,10 80:2 91:13
92:10 99:10 100:1,3,6,10
100:15 101:15,22 102:5
104:14 115:14 116:1
148:19 169:19 186:20
191:12
**fit**
124:22
**five**
46:25 47:3 53:6,24
**fixed**
99:11,23 159:23 160:1,18
173:9,15,15 201:10
**flaw**
204:20
**flawed**
203:24
**florida**
12:20 13:8 197:9,17
**flows**
139:3,9
**focus**
56:4 68:1 177:8,12,15,19
177:22 178:1,2,6,11,16,17
178:22,24 179:4,12,14,16
179:20 180:1,5,7,10,15
182:15,24
**focuses**
171:24 174:8
**followed**
173:10
**following**
117:22
**follows**
10:6
**food**
81:8

[footnote - growth]

**footnote**
104:5,20,20 120:14,14
123:12,15 126:3,14,23
136:5 169:18 170:15,22
171:19,22 173:17 174:18
175:4 177:13,14,18,21
180:12 181:5,10 182:3
184:5,15 192:15,16 193:6,7
193:8 203:4 204:8 214:20
**footnotes**
40:13
**forbes**
5:23
**force**
11:6
**foregoing**
221:5
**foreign**
129:18
**form**
15:11 22:18 27:13,25 35:6
38:1 40:10 41:21 42:7 43:6
43:16 44:3,17 46:8 48:3
49:8 50:9 51:12 56:24
57:12 58:10,22 59:6,13
65:22 67:14 68:25 70:19
71:2,12 72:5,15,24 73:7
77:14 78:2 79:15,21 80:1
80:24 81:17 82:6,14 83:23
84:8,21 85:11,14,18 86:2
86:11,17,24 88:7,23 89:4
89:14,20 90:6 91:11 93:8
94:8,13,15 95:12 98:9,24
99:6,16 100:5,9,24 101:6
101:11 102:8 105:4,19
106:3 107:19 108:21 109:8
109:16 110:6 111:5,11,17
111:22 112:2,9,19 113:18
114:1,16 115:2,17,25
116:13 117:3,14,25 118:21
119:6,22 120:7,16,24
122:14,23 123:9,21 124:13
125:16 126:7 127:3 128:12
128:23 129:14 130:6
131:10,18 132:4,9 133:2,11
133:17,23 134:5,13 135:8
135:14,19 137:3,24 138:6
141:11,23 142:14 143:5
144:10 145:2,22,25 146:15
148:5,6,12 149:10,25
150:14 151:4 153:10,22
154:11,17 156:9,22 157:3
157:18 158:5,18 159:7
160:22 162:13 163:9,25
164:6 165:15,22 166:17
167:1 169:4,14 170:20

**form (cont.)**
171:11 172:7,22 173:24
174:12 175:25 176:16
177:10 178:20 179:7,19
180:3 181:2,18 182:9
184:23 186:13 187:5
188:18 189:10,21 190:3,19
191:17 192:23 193:15
194:12 195:14 196:4,15
197:7,15 198:25 199:18,25
200:13,23 201:5 202:6,18
205:16,24 206:12 207:4
209:2,13,22 210:8,23
211:11 212:4,25 213:10,24
214:18 216:3 217:4 218:10
219:3
**formats**
176:22
**former**
193:22
**forming**
35:20,25 36:4,9,20,23
**forms**
215:3
**formulate**
38:1
**formulated**
134:2,10,19
**formulating**
37:4 42:1,4,11 169:11
**forth**
26:11 215:15
**forum**
193:18
**found**
65:24 91:5 192:17
**foundation**
22:9 123:1,24 125:12,20,22
**founders**
140:17,22 141:1,8 144:17
144:19
**four**
20:14 77:11,17,22,25 78:4
78:6,9,15
**frankly**
32:16
**frederick**
4:16
**free**
45:24 63:23 65:3,6 66:7
**frequency**
91:6
**friend**
81:10
**front**
36:19 84:1

**full**
30:15 60:20 97:14
**further**
172:3 195:20 220:8 221:14
**future**
60:5,11 124:2 138:11
139:19 141:15 173:5 174:4

**g**

**gaining**
176:19
**garlinghouse**
1:7 2:7 5:3 169:22 173:7,18
184:11,20 185:1,4,7,10,12
193:1
**garlinghouse's**
175:5 179:24
**garrison**
5:14
**geared**
116:2,25 123:1,25 125:13
125:20
**general**
75:12 85:13 99:18 132:13
144:16 145:5,11 187:24
188:12 195:19 201:20
204:19,23 207:6
**generalized**
103:23
**generally**
28:21 61:24 144:14,17
146:7,18 149:14
**getting**
22:16 213:12
**give**
10:24 48:13 49:9 57:3,4
103:19 146:25 147:12
214:3
**given**
58:5 59:14 109:18 110:10
111:6,13,18,23 112:3,22
115:18 117:6,16
**giving**
11:2 34:4
**glendale**
9:19
**global**
123:2,25 124:4,10 125:13
125:21 193:23
**go**
11:1 29:12 33:2,21 66:22
74:10 75:1,8 76:3 95:23
103:20 121:5 151:13
160:25 167:11 185:8
208:18 219:10
**goal**
152:12

**goes**
200:4
**going**
10:24 24:11 33:8 34:9
63:14 68:21 70:2 96:17
98:4 121:7 136:24 141:12
144:23 159:18 166:7 170:3
173:13,16 174:18 183:7
184:5 187:17 191:3 193:23
198:4 199:1 211:12 212:18
219:13 220:15
**gold**
103:25 148:20,21 149:2
151:5,22 188:2 210:16
219:4
**good**
10:11 48:14 64:3 121:4
**goods**
45:4
**gottlieb**
5:5
**govern**
10:25 154:7
**gradillas**
9:18 10:1
**graduate**
52:10,16
**graduated**
51:5
**great**
189:12
**greater**
172:2
**grounded**
146:23 147:1,3
**group**
49:10,15 51:9,16 52:1 53:6
55:15,17,19 60:16,17,25
61:14,19 62:6,9,13 63:8,11
66:20,21,22 72:9,9,18,19
75:8,10 177:8,15,22 178:1
178:11,16,18,24 179:4,17
180:1,5,7,13,14,15,17,20
180:20,21,22 181:16 182:2
182:4,4,5,7,11,11,14,15,18
182:18,24 217:16
**groups**
66:21 67:2 68:1 176:18
177:12,19 178:2,6,22
179:12,15,20 180:10
**grow**
176:24
**grows**
61:24
**growth**
124:24,25 132:11,20,24

[growth - increased]

**growth (cont.)**
139:19
**guarantee**
140:2
**guerrier**
3:9 6:4 10:10,11 12:6,8
17:24 18:10,11 22:11,15,24
23:5,9,14 24:11,15,21
32:10,21,24 33:4,10,22
34:11,13 64:12 69:18,21,25
70:6 75:2,10,19 76:7 96:10
96:17,22 97:2,9 110:14,17
111:1 121:3 122:7 130:16
130:23 166:4,11 167:16,21
197:25 198:8,11,13 219:7
220:10
**guerrierp**
3:16
**guess**
159:18
**guido**
147:24

**h**

**hahn**
4:6
**hamilton**
5:5
**hand**
95:24 118:24 186:16,18
187:2,3 221:18
**handed**
24:22,25 64:13 96:11
**hang**
32:23
**hansen**
4:16 10:22 27:2
**happen**
59:20 60:5 159:11 191:8
**happened**
60:7
**happening**
191:4
**harvard**
47:19,20 49:17,22 50:3,22
51:1,2
**head**
49:15 192:8 193:22
**header**
208:18
**heading**
90:1,9 93:18,22
**health**
12:22 13:9
**hear**
102:17

**heard**
84:22 154:13,20
**hearing**
218:16,19
**heavily**
161:19
**held**
2:16 154:4
**help**
15:22 40:12,20 60:13 176:8
**helped**
17:7,9,13 38:11 40:7
**helping**
38:1
**hereunto**
221:18
**high**
43:21,25 94:21 164:9 176:4
184:17 204:25
**higher**
138:20 142:7 164:9 173:9
**highlighted**
142:18 158:23 181:24
**highlighting**
139:15
**highlights**
205:1 207:6
**highly**
8:17
**highs**
184:17
**hired**
58:14
**hiring**
56:11
**historical**
117:5
**history**
112:21 115:20 117:5,16
118:2 120:9,18 121:1
122:16 129:1 133:18,25
**hmm**
28:3
**hobbs**
90:4,10
**hold**
203:21
**holders**
73:5
**home**
39:24,25 40:1,3
**hope**
140:3,10
**hoped**
138:19 142:6

**hospitality**
83:5
**hour**
27:20
**hours**
20:7,14,22 28:14
**household**
78:22 79:2
**howey**
36:25 158:8,10
**human**
215:3
**husband**
21:16,18,21 22:1,7 23:15
**husbands**
22:23
**hypotheses**
165:5
**hypothesis**
67:5 148:21 149:12 165:16
185:22,24 186:5 210:10,15
213:14
**hypothesize**
67:24 165:3
**hypothesized**
188:5 211:22
**hypothetical**
164:8,16 165:5,12,17 209:9
209:18 210:5,20 211:6,8,16
211:25 212:9,16,22 213:21
214:14

**i**

**identical**
91:6
**identification**
24:18,20 64:9,11 96:7,9
97:6,8
**identified**
19:3,9,25 175:11
**identify**
77:23 103:12 113:14
114:22 118:15 122:20
125:10 129:8 144:7 159:20
160:9 161:2,24 203:14
212:15
**imaginary**
211:17,22 212:19,19,19,20
217:8,8
**imbens**
147:24
**impact**
67:5,7 105:12 107:5,7
144:19,20 153:1,4 157:20
183:13 187:21 188:4,6,10
188:11 210:10,15 218:2

**impacted**
123:4,18 145:9 157:24
164:10
**impacts**
88:10 153:3
**impli**
124:1
**implication**
114:20,21,23 116:4,8,10,15
116:15,18 117:6,17 119:13
119:18 123:3,17 124:1,7,14
127:10 129:20,25 130:1,8
131:5,11,14,16,24 146:17
174:5,9
**implications**
113:9,12,16,21 114:8
122:17,21 126:25 129:6
174:2,15,17
**implied**
118:22 119:2 125:24
146:13
**implies**
112:23 113:4,20,22 114:3,6
116:19 118:16 129:2,9
136:8 137:6 138:2 139:11
**imply**
113:23 114:18 118:4
**importance**
181:10,13
**important**
140:19 198:12
**impossible**
43:10
**incentive**
164:3
**incentives**
163:22,25
**include**
42:10 44:19 134:9,18
183:14 185:3 187:13,15
192:21 193:12 215:14
**included**
17:10 44:14 96:23 126:4,13
126:18,22 134:9,17,18
139:14 191:12,13 193:20
**includes**
120:13 185:17 193:16
**including**
44:6 58:19 99:8 112:6,16
151:9 171:25 177:2
**incomplete**
164:7,16 165:4,16
**increase**
139:18 140:5,12
**increased**
138:22 142:9 173:5,8 174:4

**[increasing - laid]**

**increasing**
173:16
**incremental**
208:5
**independently**
104:17 187:7 199:2
**index**
6:1 8:1 9:12
**indicated**
3:1
**indirect**
152:21,22 209:7 216:8
**individual**
32:2 116:3 117:1 203:12,16
203:17,19
**individuals**
19:3 21:10 116:23 117:18
181:24
**infeasible**
217:11
**inference**
56:4 103:24 125:24 153:5
220:5
**inferences**
188:6,11
**influences**
187:23
**inform**
84:18 158:10
**information**
16:8 26:7,9 42:5 43:3 93:10
154:9 164:18
**informed**
84:14,16
**infringement**
80:19 83:5 87:18 88:2
**initial**
31:6,9,25 32:12 33:6,16
34:15,20
**initially**
143:6,7
**initiatives**
139:1,5 142:20 143:1 144:4
144:12
**inquire**
34:7
**insights**
192:25
**institution**
163:20
**institutional**
181:25 193:23 203:9
**institutions**
139:15 172:1
**instruct**
16:6 17:22 32:8 33:8 34:18

**instructed**
191:6
**instruction**
34:22
**intended**
129:16
**intentions**
177:4
**interest**
67:1 88:11 89:7 163:5,6,14
163:17 214:6,10,11
**interested**
88:17 89:5 163:2,11 201:13
208:15,16 209:4 217:14
221:14
**interject**
203:6
**intermediate**
180:11
**intermingling**
203:1,24
**intern**
60:19
**international**
90:4,11
**internet**
215:7
**internship**
44:24 45:2 69:16
**interpretation**
105:16 106:5 123:6 131:20
145:16,20 189:25 199:15
**interpreted**
204:14
**interrupted**
151:16
**interrupting**
167:22
**interview**
169:20 173:6 175:9,11
193:17
**interviews**
68:1 181:3
**introspecting**
214:2 216:9
**introspection**
154:1
**introspections**
210:1 216:17
**invalid**
150:24
**invest**
139:12 165:11
**investigating**
67:16

**investment**
99:21,24 125:3 139:3,8
142:23 160:16,24 161:8,15
195:3,8,21 201:12 203:12
203:17,18,19 204:4 208:8
208:14
**investor**
140:15 165:7,10,12,19
193:18 194:16
**investors**
124:23 181:25
**involve**
80:13 81:14 87:19 88:3
91:18 92:15,19,23 93:18,23
187:15
**involved**
15:17 81:3 87:24 93:1 94:2
**involving**
91:2
**irrelevant**
44:20
**isolating**
149:1 151:21
**issue**
30:3 88:10 114:13 153:8
196:23 198:17
**item**
80:16 103:21
**items**
44:19,19 99:24

**j**

**jabrune**
5:10
**jackie**
5:6 18:22,24,25
**jberg**
4:25
**jersey**
2:21
**job**
1:25 56:2 57:23 58:2,12,24
59:3 60:6 61:7
**jobs**
47:6 63:10
**joel**
90:14
**joins**
193:9
**jones**
167:19
**joshua**
147:24
**journal**
45:17
**judge**
156:20

**judgment**
73:3
**junior**
56:13,14
**jurisdiction**
213:19
**justin**
4:18 18:16 20:4 122:4

**k**

**keep**
28:16
**kellogg**
4:16 10:22 27:2
**kellogghansen.com**
4:24,25
**kenneth**
90:4,10
**kind**
64:2 80:3 181:15
**kindergarten**
43:24
**knew**
31:3
**know**
11:13 16:13 21:16 22:18
26:2 27:17,21 28:1,4,7,9,13
28:19 30:13,15 31:3 36:12
37:25 70:9 73:22 75:17
79:1,12,23 80:3,21 81:2
82:3,11,16 83:19 84:4,13
85:22 86:7,13,19 87:2,5,8
92:1 93:14 96:23 99:3
126:2 145:11 146:13 154:6
163:21 167:17 174:20
197:22 205:18 209:8
**knowledge**
84:9,15 181:9 212:23 213:6
213:20
**knows**
21:13 213:14,14 216:22
**kremer**
147:20
**kristina**
1:16 2:15 6:3,16 9:9 10:16
220:14 221:5

**l**

**la**
16:25 17:5 40:16
**labs**
1:7 2:7 4:2,14 9:12 23:8
**lack**
163:6
**laid**
123:24 125:19

[language - maximum]

**language**
41:5
**largely**
62:17 63:21
**larsen**
1:8 2:8 5:12
**lasted**
20:6,11,17
**laws**
135:2 215:7
**lawyers**
33:15 57:20
**lay**
67:8 72:19
**laying**
22:9 122:25 125:12,22
**lead**
172:2
**leading**
184:10
**learn**
152:13
**learned**
168:24,25
**leaves**
162:22
**lectures**
44:5
**led**
145:8
**ledger**
170:10 171:8,19
**left**
63:11
**legal**
9:17 86:12 135:3,9,20
137:16,20,22,25 154:12
213:1 214:1
**letters**
215:6
**level**
61:9,22 176:4 204:25
**lex**
38:18
**lexecon**
14:4,6,7,8,18,19,20 16:22
16:23 18:5 21:10 26:4
27:19 28:18 29:20 30:13
38:17,19 47:7 55:8,9,11,18
55:22 56:3,10 57:6,24 58:3
58:15 59:4,19 60:15 63:12
**lexecon's**
30:16
**lexington**
38:16

**liberty**
5:7
**liking**
64:6
**limitation**
90:25
**limiting**
159:4
**line**
8:4,13,18,23 110:21,22
143:8,12
**link**
88:11,14 126:23 132:21
143:25 167:9
**links**
132:14 143:15
**liquidity**
162:3
**lisa**
4:5 122:3
**list**
42:4 43:10 48:6,7,10,17
49:1 57:2 58:4 59:8 69:2,11
69:15 90:1,8 102:2,4 145:5
190:22
**listed**
13:1 42:1,15 43:14,17 44:1
44:4 45:18 47:14,24 48:19
48:20,25 49:5 55:21 58:16
68:23 69:7 77:2,7,10,16
78:19 80:16 81:11 91:12
93:9,22 101:25 159:19
**lists**
48:16 102:9 114:4 129:19
160:11 185:11 199:7 207:7
**literature**
57:7,9 108:6 137:14 210:3
**litigation**
74:21 75:14 76:10 81:8
83:25 85:24 86:22 87:6
209:20
**little**
49:1 155:12
**live**
115:14
**llp**
4:3 5:14
**located**
9:20,21
**logic**
201:21 203:1 204:19
**logical**
167:9
**lombardozzi**
1:24 2:19 10:1 221:25

**long**
13:6 20:5,10,13,15,19
53:18 55:7 57:2 58:4 59:8
60:17 61:13 62:11 63:7
143:20 203:12,16
**longer**
44:25
**look**
39:5 67:19 71:5 159:21
185:2 189:11 192:19
214:12
**looked**
70:23
**looking**
97:16,18 124:17 152:18
169:18 170:22 206:6 211:5
211:16
**lot**
45:11 48:7 57:18 61:1
184:12
**luncheon**
121:8
**lzornberg**
4:11

**m**

**ma**
52:21
**macmen**
40:15
**macmenamin**
13:22,25 14:5,10,11,12,13
14:23 15:2,7,17,25 16:2,9
21:5 31:13 35:17 37:14
39:10 40:15 41:9
**magazines**
215:4
**magidan**
193:22
**mail**
4:10,24 5:10,19
**mailed**
156:12
**main**
65:4 207:6
**major**
29:6 59:14 69:1,9
**majority**
38:8 48:19 164:17
**making**
6:22 63:17 73:3 127:9
139:17 140:19 141:2
144:20,21 145:8,9 189:3,7
214:25
**malfunctioning**
91:15,18

**management**
47:18 52:23 53:1,4 63:15
**manager**
61:6,11,13,18,22,23
**mandatory**
215:23
**manipulated**
72:21
**manner**
143:17 149:17 151:1
161:12
**margin**
91:8
**marital**
22:22,25 23:11
**mark**
3:10 10:13 96:18 97:1
127:7 137:10 197:1
**marked**
8:17 24:17 64:8,14,16 96:6
96:11 97:5,19
**market**
63:6 124:22,23 125:1,6,7,8
138:21 142:8 193:25 194:2
194:8 195:1 201:22
**marketing**
53:5,6,16,19 54:1,4,6,11,20
**marketplace**
164:19 181:4
**markets**
192:8 193:23 194:3,6
203:11
**marks**
126:19 128:14,18
**match**
159:10,15
**matches**
104:9
**materiality**
90:25
**materials**
13:17 29:4 42:8,10,14
56:21 101:25 102:1,4,9,11
102:23,25 103:6,19
**mathematics**
45:16,23 52:15
**matter**
9:10 64:20 73:13 83:17
87:19 92:8,15,19,23 93:1
94:11,21 95:8,17 157:20
164:24 165:1,3
**matters**
82:23 88:2 94:6 154:1
**maximum**
115:15

**[mc - nonscientific]**

**mc**
14:9,10
**mean**
31:12 35:2 36:14 41:17
42:2,25 43:19 58:13,15
71:16 79:8 82:15 84:11
86:19,25 88:4,24 89:21
92:4 100:11 106:24 107:4,8
107:12 116:17 125:1
135:15 136:11 141:21
142:12 143:3 146:8 153:13
157:4 162:16 169:24,25
175:14 180:14 182:2,14
187:25 188:23 192:14
193:25
**meaning**
128:16 219:20
**meanings**
35:9
**means**
35:4 61:25 67:8 82:10,18
93:10 106:22 107:20
108:19 152:17 180:4
**measure**
66:25 67:1 163:14 176:19
209:5
**measured**
178:15 182:22 216:6
**measures**
178:14
**measuring**
152:10,21,22
**mechanics**
115:21 118:2 120:9 132:5
133:12 202:13 203:1
**mechanism**
161:12 170:7 171:5,16
202:12
**mechanisms**
161:20 170:17
**meet**
18:15 19:2
**meetings**
13:18,20 19:5,6,7 29:4
**member**
53:14,16,18 54:9
**members**
139:16 179:16 181:15
**membership**
54:5
**memory**
13:7 64:25 147:17
**mention**
143:10 192:4 195:23 196:1
**mentioned**
16:16 50:10 177:19

**mentions**
114:5,11 123:22 125:18
132:10,11
**meritless**
154:5
**merits**
83:13 156:2 197:19
**message**
171:14 172:16 175:5
**messages**
215:6
**messaging**
172:19
**met**
14:22 15:1,6,13 16:2 18:12
18:18
**method**
93:2 104:8 147:7,9 214:21
215:1 217:21
**methodologies**
147:3 148:8,13,15
**methodology**
100:19,21 101:1,19 103:7
103:11 108:1,3 109:21
110:2,4 113:1,12 114:9,21
116:9,16 117:9 118:8,12
122:19 129:7 132:22
146:23 147:1 149:2 150:21
150:22,25 151:22 156:6,13
156:19 158:25 159:5,10,15
205:10 207:12 213:12
214:19 215:20
**methods**
210:24 211:3 216:8,9
**mic**
198:10
**michael**
147:20
**microsoft**
94:5
**middle**
43:21
**miguel**
192:2,4,5,7
**mind**
146:10 175:1
**mindset**
203:13,17,18,20
**minor**
69:15
**minute**
69:22 75:1 219:11
**minutes**
198:2
**mischaracterizes**
51:12 127:19

**misheard**
167:10
**mispronounce**
14:2
**missed**
137:9 196:25
**missing**
47:15,25 48:4 58:5 164:17
**mit**
46:16,17 47:18,19 50:1
51:6 52:22 53:1 63:14,19
**mm**
28:3
**model**
159:24 160:2 173:10
201:11
**models**
160:18,19
**monday**
1:17 2:19 9:8
**money**
129:17 162:9 163:2,10,14
163:17,20
**moneygram**
133:19,25
**mood**
64:2,3,4
**morning**
10:11
**moscow**
46:13 52:10,13
**motion**
82:9,20,21 85:1,3,25 86:4,5
87:1,2,7,9,9 93:15 156:1
**motions**
86:7 197:18
**moved**
45:18
**movie**
64:3
**moving**
87:17 112:4,12
**multiple**
160:8 190:20

**n**

**n.w.**
4:20
**name**
9:16 10:14 13:6 14:10
18:17 37:19 40:11 41:12,12
45:22 102:25 103:12 181:7
**named**
221:9
**names**
14:2 75:11 181:8

**national**
84:1,4
**nda**
73:21 74:1,22 75:7,18
166:18 168:8,20,22,23
169:7
**nearly**
91:6
**necessarily**
148:5,7 214:5
**need**
64:25 68:17 73:22 74:2,23
165:5 167:4 176:6 178:25
179:21 186:20 188:22,22
196:1 206:2,5 210:6,20
211:9
**needed**
104:23 196:18
**needs**
162:4 176:10
**negligible**
186:4
**network**
26:4
**nevertheless**
211:1
**new**
1:2 2:2,17,17,21,21 3:8,11
3:14,14 4:8,8 5:8,8,17,17
9:15,22,22 26:7 44:19
46:15 52:16,19 59:18 73:15
73:15 139:14 197:23 221:1
221:3
**news**
181:3 184:10
**newspapers**
215:5
**niall**
13:22,25 14:3,5,7 21:4
31:13 35:17 36:6,16,17
37:14 39:10 40:15 41:9,23
**nicole**
5:23
**nobel**
147:18,18,23
**nods**
11:20
**non**
148:24
**nonassociative**
45:24
**nonexperimental**
151:18
**nonscientific**
154:1 155:2,3,6 216:24
217:21

[nonverbal - opinion]

**nonverbal**
11:21
**normally**
92:5
**notary**
2:20
**noted**
9:24 33:24 34:12
**notes**
122:2 219:11
**notice**
2:21
**november**
6:17 25:14 44:8
**nuanced**
56:25 59:16
**number**
6:9 7:2 9:13 32:13 53:21
118:24,25 119:4,11 120:13
124:19
**numeric**
68:5
**numerous**
73:12 87:23 115:4 124:15
138:8 199:8 207:7

**o**

**oath**
11:3
**object**
23:11 172:21
**objection**
12:4,5 13:4 14:14 15:10
16:5,12 17:2,15,21,25 22:4
22:17 27:7,12,24 28:24
29:18 30:1 32:1,15,18 33:7
33:11,24 34:4,5,12,17,22
35:5,6 36:11 37:10 39:3,12
40:4,9,22 41:10,16,20 42:6
42:24 43:5,15 44:2,16 46:7
47:16 48:2,11,22 49:7 50:8
51:11 53:11 56:23 57:11
58:9,21 59:5,12 65:21
67:13 68:24 69:4,14 70:18
71:1,11 72:4,14,23 73:6
77:13,20 78:1 79:14,20,25
80:23 81:16 82:5,13 83:22
84:7,20 85:10,17 86:1,10
86:16,23 87:12 88:6,22
89:3,13,19 90:5,13 91:10
92:6 93:7 94:7,12 95:11,15
95:19 98:8,18,23 99:5,15
100:4,8,13,23 101:5,10,16
101:24 102:7 103:3,15
105:3,8,18 106:2,7,11,17
107:18,23 108:4,12,20,25
109:7,15 110:5,11 111:4,10

**objection (cont.)**
111:16,21 112:1,8,18
113:17,25 114:15 115:1,16
115:24 116:12 117:2,13,24
118:20 119:5,16,21 120:6
120:15,23 122:13,22 123:8
123:20 124:12 125:15
126:6,16 127:2,11,18 128:4
128:11,22 129:13 130:5,12
131:2,9,17,23 132:3,8
133:1,10,16,22 134:4,12,21
135:7,13,18 136:18,23
137:2,19,23 138:5 141:22
142:2,13 143:4 144:9 145:1
145:13,21,24 146:4,14
148:11,17 149:9,24 150:13
151:3 152:5 153:9,21
154:10,16,24 155:9,23
156:8,16,21 157:2,17 158:4
158:17 159:6 160:21
162:12 163:4,8 164:5
165:14,21 166:16,25
168:16 169:3,13 170:19
171:10 172:6 173:23
174:11,21 175:24 176:15
177:9,16,23 178:4,12,19
179:6,18 180:2 181:17
182:8 184:22 185:19
186:12 187:4 188:17 189:9
189:20 190:2,18 191:16
192:22 193:4,14 194:11
195:13 196:3,8,14 197:6,14
198:24 199:17,24 200:12
200:22 201:4 202:5,17
205:15,23 206:11 207:3
209:1,12,21 210:7,22
211:10 212:3,13,24 213:9
213:23 214:17 216:2 217:3
217:23 218:9 219:2
**objections**
22:18 32:14
**obligated**
22:5
**obscure**
92:3
**observation**
71:9 72:11
**observe**
71:7 72:2,10
**observed**
70:16,21,24 71:3,23
**observer**
140:15
**obtain**
42:18 52:13,19,25 53:3
153:16

**obtained**
43:8
**obviously**
216:16
**occasion**
70:16
**occasionally**
203:6
**occurred**
175:9
**october**
7:5 25:19 26:20,22 31:2
35:15 44:8
**odl**
129:1,16,21 130:2,3,9,10
131:6,7 132:5,11,24 133:12
133:25 162:4
**offer**
118:8,10 120:8,17 122:15
128:25 133:24 186:6
194:19 204:24
**offering**
26:14 112:25 118:1 120:25
131:25 135:3,6,10,20
137:20,25 146:11 154:12
154:15,21 155:1 175:2
186:16 187:1 207:17 213:1
214:1
**offerings**
104:20 105:11,13 108:16
113:6 117:8 118:6,18 129:4
129:11 136:1,9 137:7,10
138:3,14 139:7,23 140:7,25
141:6 143:2,16,23 145:6
149:13 151:7 180:25
187:10 195:18 196:21
199:6
**offers**
65:25 157:11 195:9,20
205:8 207:15
**office**
3:8,11 81:2
**offices**
2:16 9:21
**oftentimes**
73:13
**oh**
96:4 198:11
**okay**
9:5 11:25 12:12 13:9 14:17
14:25 16:9 18:10 19:2,2
23:10 25:7,25 26:9,23 27:3
27:21 29:16 34:11 36:2,18
40:2 42:14,23 43:13,23
46:18,24 47:5 49:3 50:2
51:25 55:21 56:2 58:18

**okay (cont.)**
60:14,21,24 61:11 62:5
63:7,14,18 64:13,19 65:18
66:1 67:10 69:25 70:1,4,7
71:7 72:22 77:6,23 78:11
78:14 79:1 80:5,13,16 81:4
81:25 82:25 83:4 85:4
87:10,17 88:1,19 91:16
92:9,18 93:21,25 94:4
97:10,16,21,23 98:1,4,13
99:2,10,19 101:14 102:22
109:3,23 110:8 111:8 115:7
115:19 119:13,19 120:11
120:21 121:2,6 122:5,8
135:10,21 144:1,23 146:9
157:13 159:3 165:25 166:4
166:6,9 174:18 179:2 190:7
192:1,10,19 198:3,6,14
205:13 206:6 218:21 219:6
219:7,9,12,15 220:12
**old**
44:21 69:15
**omissions**
204:19
**once**
19:4 61:6,20
**ones**
29:6,9 44:4 143:23
**one's**
194:3
**ongoing**
80:7 161:13
**online**
92:18 214:12,13
**open**
12:25 176:22
**opine**
133:3,6,12,18 197:18
**opined**
83:13 197:19
**opines**
136:3
**opining**
115:20 146:9
**opinion**
31:24 32:12 33:5,19 35:20
35:25 36:4,20 42:1,4,12
80:3 108:18 126:24 127:14
127:25 128:8,25 133:8
134:25 135:11,16 137:16
137:22 149:6 154:4 156:5
156:12,19 169:11 174:25
187:17 188:15 189:7,18
190:15 196:2,10,11 197:3
197:12 199:20 207:5 210:1
216:25

**[opinions - particularly]**

**opinions**
26:8,11,14 36:10,23 37:4
38:2 104:17 109:20 118:1
120:8,17,25 122:15 133:24
134:2,6,10,14,19,23 135:3
135:9,20,24 137:20,25
152:13 154:12 158:10
187:8 195:16 196:5 199:3
200:1 202:8 209:15 213:1
214:1

**oppenheimer**
4:17 6:5 10:20,21 12:1,7
13:4 14:14 15:3,10 16:5,12
17:2,15,21 18:1,16 20:4
21:23 22:4,12,21 23:2,7
27:7,12,24 28:24 29:18
30:1 32:1,17,23 33:2,7,12
34:2,16,21,25 35:5 36:11
37:10 39:3,12 40:4,9,22
41:10,16,20 42:6,24 43:5
43:15 44:2,16 46:7 47:16
48:2,11,22 49:7 50:8 51:11
53:11 56:23 57:11 58:9,11
59:5,12 65:21 67:13 68:24
69:4,13,20,23 70:18 71:1
71:11 72:4,14,23 73:6 74:5
74:25 75:5,15,24 77:13,19
78:1 79:14,20,25 80:23
81:16 82:5,13 83:22 84:7
84:20 85:10,17 86:1,10,16
86:23 87:12 88:6,22 89:3
89:13,19 90:5,12 91:10
92:6 93:7 94:7,12 95:11,15
95:19 96:2,20 98:8,18,23
99:5,15 100:4,8,13,23
101:5,10,16,24 102:7,14,18
102:22 103:3,15 105:3,8,18
106:2,7,11,17 107:18,23
108:4,12,20,25 109:7,15
110:5,11 111:4,10,16,21
112:1,8,18 113:17,25
114:15 115:1,16,24 116:12
117:2,13,24 118:20 119:5
119:16,21 120:6,15,23
122:13,22 123:8,20 124:12
125:15 126:6,16 127:2,11
127:18 128:3,11,22 129:13
130:5,12 131:2,9,17,23
132:3,8 133:1,10,16,22
134:4,12,21 135:7,13,18
136:18,23 137:2,19,23
138:5 141:22 142:2,13
143:4 144:9 145:1,13,21,24
146:4,14 148:11,17 149:9
149:24 150:13 151:3 152:5
153:9,21 154:10,16,24

**oppenheimer (cont.)**
155:9,23 156:8,15,21 157:2
157:17 158:4,17 159:6
160:21 162:12 163:4,8
164:5 165:14,21 166:16,25
167:14 168:16 169:3,13
170:19 171:10 172:6,21
173:23 174:11,21 175:24
176:15 177:9,16,23 178:4
178:12,19 179:6,18 180:2
181:17 182:8 184:22
185:19 186:12 187:4
188:17 189:9,20 190:2,18
191:16 192:22 193:4,14
194:11 195:13 196:3,8,14
197:6,14,21 198:24 199:17
199:24 200:12,22 201:4
202:5,17 205:15,23 206:11
207:3 209:1,12,21 210:7,22
211:10 212:3,12,24 213:9
213:23 214:17 216:2 217:3
217:23 218:9 219:2,9,18
220:8

**opportunity**
75:16

**opposed**
172:18

**opposing**
93:2 94:14

**options**
148:24 151:18

**order**
91:1 153:17 186:18 206:1

**organization**
53:15 62:21

**organizations**
54:9

**oriented**
159:22 160:3,16,24 161:6,8
161:15 194:16,18 195:3,4,8
195:21,23 201:12 204:4
208:8,14

**outcome**
67:2 72:21 107:10 144:22
152:9,10 188:5 221:15

**outcomes**
72:9,18 105:2 159:9 182:22

**outlier**
216:15

**outlined**
98:6 176:3

**outside**
140:21

**overall**
82:23 86:6 87:3

**oversee**
39:7

**overseeing**
56:13

**overvaluing**
63:22

**overview**
112:5,15

**owners**
170:8,18 171:5,17

**owning**
140:4,11

**p**

**p.m.**
2:18 220:18

**package**
51:23

**page**
6:9 7:2 8:4,13,18,23 25:7,9
78:17 87:17 89:25 90:8
93:21 97:12,17,17,23,25
98:2,4,7 103:22 104:3,11
109:3 122:8 144:6,24 161:1
161:1 176:17 178:10
180:18 181:19 184:2,3,5
192:1 196:16 198:15
199:22 200:3,4 202:2,3
206:7,8,14,16 208:6,18

**pages**
6:13,18,24 7:7 43:10 215:5

**paid**
201:16 204:13 208:1

**paintings**
214:24 215:5

**panels**
60:12

**paper**
45:16,20,23 46:1,3,5,10

**para**
159:18

**paragraph**
99:3,8,10 100:22 101:4,23
102:6,13 103:2,14 104:3,3
104:15 108:8,11,14,19,22
108:24 109:2,14 110:20
111:8,13,14,18,19,23,24
112:3 113:3,16 114:2,11,14
114:25 115:8,11,22 116:11
117:12,22 118:16 120:22
122:11,21 124:21 128:21
129:9 130:13 131:22 132:1
132:7 133:9,15,21 134:1,9
134:24 135:21,23 136:6
137:17 138:7,24 141:5
142:19 143:9,14,20,21
144:6,15 145:8,14,17,19,23

**paragraph (cont.)**
146:1,21 147:16 148:19,23
149:5,11,18 151:17 152:8
152:11 159:18 160:25
161:10,17,24 162:19,25
169:16,18 170:3,23 171:1
171:12 172:5,14,25 173:2
173:22 174:1 175:5 176:17
177:25 178:9,10,13 179:5
180:12,18,22 181:19 183:7
183:9 184:1 185:2,4,6,8,11
185:13 187:6,18,19 188:16
189:13,22,24,25 190:6,7
191:9,12 192:3,19,21,24
193:3,11,12,16,20,24
196:16 197:2 199:1 201:7
202:23 203:13,23 205:14
205:21 208:19

**paragraphs**
134:18 185:17 203:5 204:8
215:15

**paralegal**
5:23

**parallel**
208:10

**paraphrasing**
81:11 142:24

**parentheses**
152:16 173:20

**parents**
21:16 23:22,24

**part**
41:2 60:6 163:17 176:2
177:15,22 178:6,25 179:13
182:10,22 183:1,4 189:14
193:17 198:23 199:13

**partial**
97:21

**partic**
125:6

**participants**
65:23 66:20,25 125:1,7,9

**participate**
179:4 180:7 181:22

**participated**
49:11 51:7

**participating**
45:4

**particular**
32:7 33:17,18 34:8 85:2
125:7 132:19,19 145:4
172:24 178:24 191:24
194:24 195:7

**particularly**
215:9

[parties - potential]

**parties**
221:16
**partnerships**
139:14
**parts**
94:2
**pascal**
10:11
**pascale**
3:9
**pass**
24:12
**passage**
169:20 175:11
**passive**
170:8,17 171:5,16
**passively**
140:4
**patent**
81:1
6:11 7:4 31:22 97:22 98:3
**paul**
5:14
**paulweiss.com**
5:19
**pause**
25:1 109:9 111:12 112:10
113:7 128:24
**payment**
123:2 124:4 125:21 173:8
201:14
**payments**
123:25 124:10 125:13
162:8 173:12
**pcurmston**
4:10
**pending**
75:3
**people**
41:9 68:6 91:3 180:6
181:15 211:21 214:25
217:8
**people's**
60:11
**perceived**
129:23 130:22 131:8
**percent**
68:6,14 186:2
**percentage**
183:22
**percept**
153:18
**perception**
66:2,12 67:11,19 87:21,25
88:3,10,18,20,25 89:1,6,11

**perception (cont.)**
89:17 106:25 125:8,14,18
149:7,13 150:7,11,17 151:1
152:1,3,18,21,23 153:7,19
154:8,14,21 155:7 156:6,13
156:20 161:8 172:4,8 174:6
176:23 194:9 208:24 209:9
209:18 210:5,19 211:6,8,24
212:8,22 213:5,13 214:3,14
214:16 218:3,6,8,11,12,14
218:15,18,19,22
**perceptions**
65:11,15,19 67:15,17,25
89:7,8 123:4,18 124:17
148:25 149:22 151:9,19
152:7,14 153:5,11,13,17
155:4 157:21 196:23
198:20 199:10 201:18
204:16 209:4,6 210:11,16
211:13 212:5
**perfect**
170:22
**perform**
94:4,10
**performed**
29:1 39:23
**performing**
39:18,21
**periodic**
40:5
**permit**
71:9 72:11
**person**
31:12 37:15,17,20,22,25
38:4,13,15,21 40:7,11,12
40:14,17 41:12 61:21 76:23
191:25 211:17,21,23
212:19 213:13,13,16 214:3
214:4 216:14 218:11,16,19
221:11
**personal**
29:13 214:25
**personally**
23:6 27:15 37:7
**person's**
37:23 211:18 212:20
**perspect**
166:13 217:5 218:6
**perspective**
63:25 104:18 105:9,14
106:22,24 107:8,10,12
108:17 112:23 113:5,24
114:5,7,18,19,23 115:5,5,8
115:10 117:7 118:6,18
127:17 128:2,10 129:4,4,11
132:15 136:10 137:8 138:4

**perspective (cont.)**
138:15,17,23 139:9,11
140:10 141:9,17,19,25
142:1,3,10,17 143:18,23
149:14,14 150:17 151:8,20
157:25 159:22 160:3,11,12
160:15,23 161:6,14,21
162:7 163:21 164:2,3 165:2
165:4,18 166:13 168:3
169:9 176:13,20 186:17,19
187:2,8,22 195:16 196:19
196:22 199:3 201:9 203:8
204:1,4 205:2 207:9 208:21
209:5 210:9,14 211:19
212:14 213:21 214:2
215:23,25 216:4,5,6,18,19
216:25 217:15
**perspectives**
136:2 194:15,16 195:21
201:18 204:16 207:16
210:16
**peter**
4:4
**ph.d.**
1:16 2:16 6:3,16 10:4 63:14
221:5
**phenomena**
215:2
**phone**
68:1
**phrase**
176:12
**pieces**
143:21
**place**
221:8
**placebo**
175:6,13,14,15,19,21
176:10,11 182:13 219:20
219:22,23
**places**
124:15 146:17
**plaintiff**
1:5 2:5,16 3:4 158:3 166:15
168:5 169:11
**planned**
91:3
**planning**
197:22
**plans**
132:17 139:20
**plat**
112:13
**platform**
112:5,14,15

**platforms**
162:4
**play**
38:4
**played**
38:1
**plaza**
5:7
**please**
10:2,14 11:13,15,19 13:3
18:23 33:19 35:21 65:13
69:5 71:15 76:6 77:15
89:15 95:1 103:20 104:14
110:16 112:11 120:3
127:20 130:7,17,18 135:22
143:3 154:22 158:13
175:18 179:9 183:8 185:2
**plenty**
48:23 58:6
**plimpton**
2:17 4:3 9:21
**pllc**
4:16
**poems**
215:5
**point**
45:17 48:25 102:11 108:23
143:21 186:23 209:3 217:6
**poised**
139:17
**population**
180:8 181:21 183:23 186:3
207:13
**portion**
8:17 93:11 193:16
**position**
14:20 43:4 120:21
**positive**
139:18
**poss**
88:15
**possess**
196:17
**possible**
52:8 67:10 88:19 124:1,14
165:24 185:15 186:1
208:23 210:4,18 211:7
220:4,7
**possibly**
62:3 140:11 172:12 176:7
**post**
191:21
**postings**
215:7
**potential**
118:7,19 123:5,18 124:25

**[potential - public]**

**potential (cont.)**
129:5,20 149:15 151:8
157:25 161:15 169:23
170:6,15 171:3,13 174:6
176:4 177:11 178:13,22
181:20 183:14 186:7
187:23 188:6 198:21
199:11 201:19,24 203:15
203:22 204:4,17 205:5,8,11
207:10,24 208:3,21 210:1
214:10 216:13,20

**potentially**
125:2,22 164:18 177:6

**practice**
12:3

**practitioners**
54:4

**precisely**
49:25

**predicted**
125:5

**predominant**
195:8 208:14

**preexisting**
187:23 188:12 218:23

**preference**
164:8

**preferences**
152:14

**preliminary**
67:23

**premarked**
24:22,25 25:4 96:14

**preparation**
13:21 29:5 57:20,21

**prepare**
13:11,14 19:9 20:1 81:5,7

**prepared**
130:24

**preparing**
15:17 17:1 57:22

**presence**
66:7 129:21 130:2,9 131:6

**present**
5:21 9:23 14:22 15:1,8 16:3
19:25 20:3,24 21:2,5 31:6,9
31:12 39:17,20 47:12 55:25
59:23 60:8 61:4 209:25

**presented**
45:7 156:5,12,18 181:2

**presenting**
100:16 154:9

**presents**
159:24

**preserve**
22:19

**preserving**
22:20

**president**
14:21 16:24 55:12 56:1
62:5,8,11,18

**presumably**
192:16

**pretesting**
176:7,8

**pretty**
59:20 141:4

**prevalent**
152:13

**prevent**
11:9

**previous**
160:5,10 167:3,7,11,25

**previously**
69:17 150:16 155:25

**price**
65:2 138:20 139:2,18 142:7
142:22 159:24 160:2,18,19
162:6 163:12 173:5,16
174:4 176:24 184:16

**prices**
173:9 184:12

**primary**
43:21

**principles**
187:24 188:13

**printer**
91:4,5

**printer's**
91:14,17

**prior**
12:3 43:8 44:9,13,25 47:8
47:10 55:13 60:14 78:5,8
78:15 163:7 164:4 181:9
182:25 218:16,18

**priorities**
45:19

**priv**
22:25

**privilege**
22:19,23 23:1,12 32:18

**privileged**
16:7 18:9 32:3 33:13

**prize**
147:17,19,23

**pro**
132:15

**probability**
215:16

**probably**
44:25 45:11 51:5 57:1,18
58:5,17 60:10 61:3 103:16

**problem**
124:5,11 173:12

**problems**
123:2,25 125:13,21

**procedure**
66:23

**proceed**
10:8

**proceeded**
130:4,11,22

**process**
140:20 141:2 144:20,21
145:9,9,10

**product**
18:8 34:7 65:6 66:8 73:10
73:14 83:14 104:19 105:11
105:13 108:15 112:25
113:6 136:1,9 137:7 138:3
138:14 139:7,22 140:6,25
141:6 143:2,16,22 145:6
153:1 164:22,23 180:25
186:16 187:1,10 194:24
195:18 196:21 199:6
201:14 214:5,9,11 215:19
216:10,12,13,14

**products**
45:7,8 63:23 65:3 80:19
116:2,6,20,21,25 118:3
120:10 123:1,24 124:3,8
125:12,20 139:20 170:10
171:7,19,23 172:1

**professional**
43:4,11 53:14 54:8 68:22
69:3,7,12 196:13 197:5

**professor**
90:14

**profit**
138:11,19 140:2,11 141:15
142:6

**profitable**
125:2

**profits**
140:4 164:9

**programming**
62:1

**progress**
124:24

**project**
140:18

**projects**
140:23

**promoted**
61:21,23 132:20,24 138:25
142:19 144:3 161:19
171:15 172:16

**promoting**
99:21

**promotion**
132:10,20 139:4 140:1,9
142:25 144:11

**promotional**
139:13 206:22 208:7,13

**proper**
22:17 183:13

**properly**
93:3,5 215:20

**proposed**
93:2

**proposition**
65:4 101:20 103:8 108:9,11
125:23 140:21 159:2 188:9
188:15,21 189:1,17 207:11
211:13 217:14 218:4

**propositions**
94:16 103:11,25 147:8
157:24 158:21,24 159:13
188:3 189:3 219:5

**prospective**
113:10 115:6 116:3,5,20
117:1

**prostko**
5:15 18:17

**provide**
26:17,24 27:22 47:5 98:11
104:21 113:11 117:9 150:3
160:19 163:25 173:8
192:12 216:24

**provided**
31:14 34:14,19 35:18,23
36:3,6,9 37:5 39:13 40:24
40:25 73:9 107:15 109:11
109:18 110:2 150:1 168:19
168:21 169:2 170:7,17
171:4,16 196:11 197:3

**provider**
170:9 171:6,18

**providing**
97:10 98:5 109:5,14 110:20
122:10 132:6 133:8,14,20
134:25 137:16 149:21
155:6 174:25 189:8,19
199:20 200:10 202:3,15
206:9,17 207:1 209:15

**psychological**
146:11 175:2

**psychology**
47:20 50:22 51:1,3

**public**
2:20 93:10,11 114:6,6,12
114:18 115:4,14 139:17
184:4,7,9 198:19

**[publications - recall]**

publications
77:2,6
publicly
171:24 173:3
published
45:21
publishing
139:18
purchase
91:3 116:22 194:18 198:20
199:10 201:18 204:16
208:3
purchased
91:3 139:12
purchaser
104:18 105:10,15 108:17
112:24 113:5 129:5,5,12
132:15 136:5,10 137:8
138:4,10,15,16,17 140:3,10
141:10,14,19,20 143:18
149:8 150:12 151:2 157:15
159:23 160:3,4,16 161:15
161:16,21,23 166:14 168:4
169:10 172:18 176:14,20
186:17,20,21 187:3,9
195:17,18,22,23 196:20
197:1 199:4 201:10 203:8
203:12,16,18,19,20 204:2,5
204:5 205:3 208:9,11,14,15
209:18 215:24 216:1,5,20
216:20 217:1,7,9,12
purchasers
68:15 113:10,11 114:24
115:6,6 116:5,20 117:7
118:7,7,18,19 125:18
127:17 128:2,10 129:22
130:3,10 131:7 136:2
138:18 139:11 140:20
141:2 142:5,15 143:24
144:20,22 145:10 149:15
149:15,23 150:7 151:8,9
157:25 158:1 160:16,17,24
161:6,9 162:8 169:23 170:6
170:16 171:3,13 174:6,7
181:20,23 183:11,14,18
185:15 186:1,7,7,11 194:10
194:17,18,21,22,23 195:3,4
195:5,8,11 196:23 198:16
198:21 199:11 201:11,12
201:13,16,19,24 203:15,22
204:11,12,18 205:5,5,8,11
205:12 207:9,10,16,25
209:4,5 216:7 217:10,12,19
purchaser's
142:16,17 187:22 196:22
208:21

purchases
125:14
purchasing
177:6 203:9
pure
154:1
purely
159:16
purpose
49:3 145:5,11
purposes
135:2
pursuant
2:21
put
12:2 47:11 128:15

**q**

qualifications
196:12,18 197:4,13
qualified
86:8
qualify
180:19
qualitative
67:25 68:2,4 91:24,25 92:2
92:9,11
quantitative
68:7,10,11,12,13,18 70:8
70:12,14 88:20 91:23 92:8
92:13
quasi
103:23 148:1
question
11:12,15 32:25 33:3,14
65:13 69:5,10 74:2,9 75:3
75:12 76:2,6 77:15 90:7
107:11 110:18 112:11,12
119:23 120:2 127:20 130:7
130:25 131:1,3 134:16
135:4 136:21 143:19
153:12,14 154:18,22
156:10 161:10,17 166:1
167:3,7,9,11,12,18,20,24
167:25 168:6 176:12
177:20 179:8 210:18
211:17 212:6,7 215:11
questioning
143:8,8,12
questions
10:12 11:6,18,22,24 13:2
33:21 97:20 178:14 219:8
219:19 220:1,9
quotation
120:12 126:19 127:5,7
128:13,18 137:9 191:12
196:25

quotations
191:11
quote
141:13 172:14 173:11
185:9 191:20 213:12,15
216:23
quoted
127:4 128:18
quotes
126:8 128:13 183:19
192:25
quoting
127:12,13,22,23 128:14
150:15

**r**

rally
184:12
randomized
66:15,16,18,19 67:12 72:16
randomly
66:20 180:19
rapidly
119:11 120:12
rate
28:4
rational
65:7
reach
116:14 217:11
reached
109:21
reacted
65:7
reaction
172:19
read
50:12 104:2,14 105:17
106:1 110:15,18,24 119:8
123:7 130:17,19 135:22
144:2 168:1 170:15 171:2
171:20 179:8,10 181:5
183:8 184:3,6,19 187:18
191:1 201:6 202:19,23
reading
114:10 131:19 146:16
147:16 221:20
reads
104:5 119:8 147:2 203:4
ready
26:13
real
173:18
realism
181:11,14
realities
181:5

reality
159:10,16
really
61:20
reason
84:17 167:23 188:2 203:24
208:16
reasonable
104:18 105:10,14 108:17
112:23 113:5 129:5,12
136:2,5,10 137:8 138:4,10
138:15,16,17 141:9,14,19
141:20 143:18,24 149:7
150:6,11 151:2 157:14
160:24 161:21,23 166:14
168:3 169:10 172:18
176:13,20 186:17,20,21
187:2,9 194:10 195:16,18
196:20 197:1 199:4 201:9
204:1,5 215:24,25 216:5,25
217:6,9
reasoning
204:21
rebates
163:22,25
rebranded
119:9,20 120:5
rebut
100:15 101:2 102:5 109:12
150:5,10 188:22
rebuttal
6:15 81:12,14 82:4 85:21
92:25 93:6,12,14 97:10
98:5,11 101:22 102:12
103:1 104:22 107:15,22
109:6,14 110:20 122:10
132:1,6 133:14,20 149:21
150:3 155:15,21,21 183:8
200:9 201:2 202:3,8,14,21
204:23 206:9,17,25
rebuttals
63:4
rebutted
153:25 155:1,5,12
rebutting
98:14,17,22,25 99:4,7,14
99:25 100:2,20,21 101:1,3
101:12 109:24 110:1,4,7
111:3,7 128:20 153:24
155:3 209:17
recall
12:12,17,21 14:25 15:4
17:13,17,19 18:18 19:8,16
19:20 20:5,10,15 21:20,21
25:12,15,20 26:16,23 27:1
29:10 30:24 31:18 37:23

[recall - reporter]

**recall (cont.)**
38:6,21,23 39:9,16 40:7,11
40:17,19 41:1,13 45:15,22
46:19,23 47:2,4 49:4,18,24
50:2,6,14,20,25 52:9 57:19
58:7,20,23,24 59:17 69:2
69:10 74:12 80:17 81:22
85:19 88:11,14 89:23 93:16
94:9,24 95:2,17 110:12
123:15 126:10,11,12,20
157:8 197:9 208:2

**receive**
34:23 35:13,16

**received**
24:16 30:14,17 36:6,13,15
36:16,17 54:17 64:7 96:5
97:4

**recess**
70:3 121:8 166:8 198:5
219:14

**recognize**
24:24 64:15 96:13

**recognizing**
119:10

**recollect**
13:7

**recollection**
76:11 82:7,22 83:2 93:24
197:16

**record**
9:6,24 10:15 11:17 12:2
33:25 58:25 67:15 70:2,5
75:1,8 97:13 110:24 121:5
121:7 122:2,6 130:19
135:23 166:7,10 171:3
179:10 183:9 187:18 198:4
198:7 219:10,13,16 220:16
221:9

**recorded**
215:3

**records**
34:23 35:2,4 41:25 42:2

**recruit**
179:4,16 180:1,5

**recruited**
181:21

**refer**
175:4 180:13 191:24
192:15

**reference**
124:20 192:2

**referenced**
133:9

**referencing**
193:7

**referred**
147:18 162:9

**referring**
37:13 38:16 80:9 101:7
148:13 168:18 173:2
206:13 209:24

**refers**
136:5 140:24 162:19
169:19 192:16

**reflect**
143:22,23

**reflective**
184:12

**reflects**
126:21

**refresh**
64:25

**regard**
69:11 74:20 76:9,14 85:5
95:9 110:8 114:24 120:22
149:18 157:14 178:9
192:13

**regarding**
17:19 23:16 27:11 43:3
54:12,14 55:2,5 71:10
72:12 73:25 74:13 76:25
80:2,6 86:3 97:11 98:5
108:19 109:20 114:23
120:17 126:24 127:15,25
128:9 135:11 199:9 216:25

**regardless**
91:6

**regards**
69:3 73:5 92:10,14 204:2

**regional**
3:8,11

**regularly**
104:9

**regulation**
64:2

**reject**
67:4 82:16 85:1

**rejected**
84:12,13,16,17 85:14,16
86:20 197:11

**related**
64:1 80:10 147:25 166:13
221:16

**relating**
22:13 124:4,10 168:3 169:9

**relationship**
29:13 71:13,14,16,17 93:1
118:5,9,13,16,22 119:2,14
129:10 151:6 173:4 174:3
186:15,25

**relationships**
29:17 64:20,24 92:16,20,24
93:23 94:2 104:8,10 105:1
129:3 146:24 147:4,14
148:10 152:15

**relative**
48:18 186:3

**relatively**
59:18 73:14

**released**
115:13 116:2,7,25

**relevant**
183:22,23 201:22 207:13
216:7,20

**reliable**
73:11 100:19 101:19
103:10 113:11 116:9,16
117:9 118:8,11 122:18
132:22 147:3,7 150:2,21
158:25 159:15 188:8,9
205:9 207:11 215:20

**relied**
37:4

**rely**
68:17 101:25 102:10,23
103:5,6 153:6 162:4 169:8

**relying**
101:21 102:5,12 103:13
209:11

**remainder**
103:6

**remem**
197:9

**remember**
18:17 37:19 59:15 143:19

**remote**
3:1 4:4,5,6,18 5:6,15

**removed**
44:13 175:12 176:9

**render**
30:25 31:24 32:12 33:5,19
104:17 187:8 195:15 199:3

**rendering**
108:18 170:22

**repeat**
17:8 18:23 32:25 35:21
49:12 52:5 57:8 65:13 69:5
76:5,18 77:15 90:7 95:1
112:11 120:2 127:20 130:7
130:25 131:3,13 150:8
154:23 156:10 175:17
177:20 210:13 212:7

**repeatedly**
167:20 190:4 203:10 205:7

**rephrase**
11:14 89:15 187:12 205:9

**replaced**
175:6,12 176:10

**report**
6:15 7:4 12:25 13:16,17,18
15:18,21,22,23 17:1,4,6,10
17:11 25:5,8,10,13,16,18
25:23 26:1,3,5,10,11 27:5
27:23 29:5 31:22 36:25
37:8 39:19,23 40:8,12,18
40:21 41:2,5,15,19,23,24
42:1,5,15,21 44:10,15
57:25 76:12,24 77:4,7,12
77:18,23 78:17 80:18,22
81:5,7,12,14 82:4,12,17,19
83:1,4,19 84:6,18,23 85:1,5
85:6,14,15,21,24 86:13,14
86:21 87:5,7,18 89:25 90:8
95:6,10,13,16,18,22,23
96:16,19,24 97:12,12,14,21
98:2,5,7,12,20 99:18 102:3
102:9 104:3,12 107:22
108:2,7 109:4,11,12,18,25
110:7 111:7 112:5,13 113:4
114:22 115:3 118:4 120:19
122:9,12 124:6,15,18,20
126:4 128:21 130:14
131:21 132:2,7,13,18
133:15,21 134:1,6,14,23
135:22 136:6 138:7 144:3
145:14,18 146:18,22 148:9
148:16 149:5 150:3 152:8
155:8,15,21,21 157:11,16
157:22 158:11,14,16
166:23 167:4,8 168:13
169:17 170:23 171:1,12,23
174:24 176:3,17 178:10
180:13 181:1 182:3 183:25
184:2,21,25 185:3,5,9,18
186:24 188:21,24 190:7,22
191:4,7,10,14,15 192:10,13
192:20,24 193:12,24
194:14,19 195:3,12,20,24
196:5,9 197:11 198:14
199:2,7,14,19,23 200:1,3,4
200:5,6,8,11,14,15,19,21
201:3,8 202:2,2,4,8,9,10,11
202:12,16,25 203:5,13
204:8,23,24 205:14,21
206:1,7,8,10,14,15,19,20
206:21,23,24 207:2,5 208:7
214:21 220:3

**reported**
1:23 191:15 221:10

**reporter**
9:25 10:7 11:17,20 17:8
24:13,14,19 49:12 52:5

[reporter - second]

**reporter (cont.)**
57:8 62:20 64:10 66:16
67:6 76:17 93:4 94:18 96:8
96:25 97:7 112:14 118:10
118:25 125:25 131:13
133:4 147:10 160:13
164:12 172:10 181:12
183:3,6 185:23 194:5
210:12 214:7 221:11
**reporting**
9:19
**reports**
58:1 61:2 63:3 76:16,20
83:8,11,16,20 86:20 104:22
155:18,19 156:24 166:22
168:13,18 203:11
**represent**
23:6 75:20 201:22 213:25
**representation**
217:9
**representative**
213:17 214:4
**represented**
10:17
**representing**
23:8 27:3
**request**
8:22
**requested**
221:21,21
**research**
63:21,22 64:1,5 67:23
215:11
**researchers**
153:15
**reselling**
138:20 142:7
**reserve**
26:8
**respect**
65:20 122:15 127:1 128:25
133:24 144:1 152:7 155:4,7
177:4 179:25 200:10
201:10 202:9 207:22
213:20 217:14
**respective**
221:17
**respects**
61:7
**respond**
11:19 167:10
**responded**
69:8
**respondents**
175:7,10 176:21 180:19,23

**response**
36:24
**responsibilities**
61:16
**responsibility**
61:9,25
**restart**
143:11
**restate**
138:16 157:10
**result**
101:2 183:21
**results**
166:12 168:2,19 169:1,9
**retailor**
92:14
**retained**
16:10,15 18:6 26:16,19,23
34:24 35:11 78:21 104:16
104:21,25 105:6 108:8,10
187:7 199:2
**retire**
44:20
**retired**
44:23 45:9,13
**reveal**
29:2
**revenues**
164:9
**review**
41:18 42:18 57:7,9,13,15
157:5 166:22 168:12
208:19
**reviewed**
13:16 15:23 39:13 41:23,24
42:15 108:2 157:7 158:8,12
**reviewing**
29:4 56:21 59:2 60:9
**reviews**
183:12,20 190:9,13,17,23
214:13 215:19
**revised**
94:16
**rifkind**
5:14
**right**
23:9 26:8 59:25 60:3,6
97:16 220:15
**riksbank**
147:17
**ripple**
1:7 2:7 4:2,14 9:12 23:8
26:25 27:6,11 99:20 105:14
108:16 112:5,13,15 114:4,7
115:21 116:2,7,20,25 117:5
117:8,16 119:7,9,10,10,12

**ripple (cont.)**
119:19,20 120:4,5,9,13,18
121:1 122:16 123:5,5,18,19
123:19 125:5 126:2 129:1,4
129:11 132:12,14,24 133:3
133:5,7,13,18 136:3 138:12
138:13,24 140:4,12,22
141:7,16 142:19 143:17
144:3,16 145:7 151:7 157:8
163:7,24 171:15,23,24
172:10,16 173:3,11,17
180:24 181:7,8 184:13
187:6 191:20 193:9 199:8
201:17 203:2,3,10 204:14
206:21 217:20
**ripplenet**
122:25 123:4,17 124:2,7
125:11
**ripple's**
13:18 36:24 104:19 105:1
105:10 107:17 112:24
113:6,8 118:2,5,17 124:24
135:25 136:8 137:6 138:2
139:4,16,20,24 140:7
142:24 144:11 161:13
163:1,11 169:21 170:9
171:6,17 172:9,11 173:7
183:12,18 184:16 186:11
187:9,21 190:9,13,16
191:21 192:8,25 193:10,22
195:17 196:20,23 198:19
199:4 204:2 206:18
**risumi**
68:23 69:8
**rmr**
1:24 2:20 221:25
**role**
14:17,19 37:25 38:4 55:11
56:8 75:21
**root**
81:10,20,23
**row**
124:19
**rule**
85:23 86:5 87:3 156:1,2,2
**ruled**
82:9,23,23 86:5,21 87:1,3
197:19
**rules**
10:24 11:23
**ruling**
82:25
**russia**
44:24 52:17,20

**s**

**sale**
202:12,25
**sales**
161:13,20 204:2
**sample**
182:19 216:7 217:12
**sampling**
215:16
**sarah**
5:15 18:17
**saying**
14:10 99:23 127:4 129:16
163:10
**says**
53:4 55:25 99:20 104:2,21
116:1 123:11,23 124:21
138:9,18,24 139:24 140:14
144:18 148:20 159:21
160:17 162:22 170:24
174:3 193:9 215:12
**scenario**
213:11
**school**
43:12,21,21,22,25 46:9,12
46:15 47:15,18,20 49:17,22
50:4 52:17,20,23 53:1
63:15,19
**schooling**
53:10
**schools**
47:13
**science**
53:4
**sciences**
137:15 147:17
**scientific**
104:8 146:23 153:20 154:9
154:15,21 155:15 182:6
209:3,10 210:9,14 211:19
212:14 214:2,19 215:21,22
216:4 217:5,6 219:21
**scientifically**
147:1,3 148:3 213:3,8
**scope**
34:6
**sec**
5:23 6:9 7:2 10:12 24:17
64:8 96:6 97:5 104:16
158:3 166:14,15 168:4,4
169:10 175:16,20,23 187:7
191:5 199:2
**sec.gov**
3:16,17
**second**
19:18 20:15,20 80:6,8,16

[second - speculation]

**second (cont.)**
91:9 114:11,14,24 115:8,11
117:11,12 138:9 141:13
142:7 170:3
**secondary**
43:17,19 138:21 142:8
**section**
48:15 78:20 109:5,10 111:3
112:4,6,12,16,20,22 120:1
147:6,9 157:11 172:3
190:21 198:9,14 199:22
200:2,7,10,14,14,15,18,19
200:21,24 201:1,3,7,8
202:1,4,10,10,11,12,15,20
202:20,22 203:25 204:22
204:22 206:6,9,13,18,20,21
206:22,23 207:1,21 208:4,5
208:6
**sections**
200:6 202:24 205:1 208:4
**securities**
1:4 2:4 3:7 9:11 135:1
**security**
135:1,12,17
**seen**
30:21
**segmentation**
194:1,2,8 195:1 201:22
204:11
**segments**
194:4,25
**selected**
78:18 80:17 190:9,13,16
**selection**
91:8
**selective**
48:16
**selling**
45:3
**sells**
164:22
**seminars**
44:5 47:23
**senior**
14:20 55:12,25
**sense**
136:7 137:5 157:23
**sentence**
33:18 80:9 90:23 99:11,12
99:13,17 100:1,3,6,10,15
100:17 101:13,15,22 102:5
104:5,14 105:17,20,21,23
106:1,4,6,8,10,14,16,20
107:20 114:11,14,17,25
115:8 116:1 117:12,15,21
117:22,22 119:8,18 120:22

**sentence (cont.)**
122:24 123:2,7,11,13,16,22
124:21 126:4,9,13,17,21
127:1,5 128:6,7 129:15
131:19,21 137:4,22 138:10
141:13 142:18 143:9,13
144:6,23,25 145:4,5,17
147:2 148:19 150:8 151:14
159:21 160:5,10,20 169:19
170:4 174:13,14,16 184:3,6
187:13,15 188:1 189:15,15
191:11,13,19
**sentences**
113:8
**separate**
182:24 187:21 188:4,10
194:25 205:7 207:15 218:5
**separately**
204:3
**serves**
144:13
**service**
5:24 170:10 171:7,18
**services**
26:17,24 27:18,22 28:5
30:25 92:18 181:25
**serving**
56:7
**session**
19:14,18,22,25 20:5,8,8,10
20:13,16,19,20
**sessions**
19:8,12 20:24 21:2,4
**set**
26:11 180:23 221:18
**setting**
84:24,25 170:21
**settled**
80:3
**shadish**
104:4,6
**shampanier**
1:16 2:15 6:3,16,23 9:10
10:16 24:17 64:8 96:6 97:5
220:14 221:5
**sheet**
60:10
**shereck**
5:24,24 9:16,17
**shift**
61:20
**shifts**
61:10
**short**
48:18 65:9 203:18

**shorthand**
221:11
**show**
99:2
**shows**
159:12
**side**
88:13 209:25
**signature**
25:9 97:23,25
**signed**
26:10 97:17 98:1
**significant**
67:3 70:17,21,25 71:4,8,18
71:23 72:2,7,8,11,17
159:25 184:11
**signing**
221:20
**similar**
57:2 62:17 66:22 80:10
157:1,15,22 211:22
**similarly**
147:22
**simple**
171:14
**simply**
67:15,24
**simulations**
63:6
**single**
49:1 145:12 213:13 217:12
**sites**
184:10
**sitting**
178:22
**situation**
87:1 217:18
**sloan**
47:18 52:22 53:1 63:15,19
**smaller**
164:9
**smoothly**
11:1
**sn**
1:6 2:6
**social**
137:15 214:22,23 215:2
**sold**
30:11 45:7
**solution**
184:14
**solutions**
173:8
**solving**
173:11

**songs**
214:24 215:5
**soon**
59:21 119:24 197:24
**sorry**
13:23 16:16 18:21 20:20
27:4 28:8 40:16 53:7 55:16
75:4 76:17 88:15 90:20
102:16 103:9 107:6 118:14
126:11 133:4 135:4 141:18
150:8 151:10 162:16 167:6
175:17 177:14 181:7
188:25 189:23 191:14
192:11,20 200:25 206:16
206:18 210:12 215:21
**sort**
75:9 136:7,12 137:5 138:9
146:24 147:5
**sounds**
86:12
**source**
126:10,18,21 192:17
**southern**
1:2 2:2 9:14
**space**
44:21 140:16
**speak**
21:8,11,14,18 24:2,8
**speaking**
32:14 146:7 217:18
**speaks**
92:7
**special**
65:2
**specialized**
211:25 212:9,23 213:6,20
217:1
**specific**
28:19,22 85:12 95:8 101:7
102:4 103:12 105:2 124:16
162:2,22,23 188:10 191:6
200:9,20 201:17 204:13
**specifically**
59:9 70:22 82:15 89:23
95:14 98:13 100:7 102:12
103:24 113:15 115:5
123:14 125:4 132:11
138:18 142:5 170:25 173:1
178:16 180:24 200:7,18
202:21 205:19 206:23
**specifics**
85:19 94:9 197:10
**specifying**
214:23
**speculation**
184:16 185:20

[speculative - summer]

**speculative**
139:3,8 142:23
**speeches**
214:24 215:6
**spell**
51:20
**spent**
28:14 53:5
**split**
66:20 194:3
**splitting**
182:19 201:11
**spoke**
23:21
**sponsor**
213:15 216:22
**sprostko**
5:19
**square**
4:19
**ss**
221:2
**stage**
67:23 177:11
**standard**
56:17,18 63:25 88:16
103:25 148:20,22 149:2
151:5,22 188:3 210:16
215:15 219:4
**start**
11:16 25:18 52:22 55:18
74:6 127:21 189:2
**started**
10:23 25:15 47:21 60:20
63:11 143:6,7,12
**starting**
51:5 62:3 184:4 197:23
**starts**
90:23 97:12 110:21,22
124:19 129:15 130:17
184:7 200:3 202:2 206:7
208:6
**stata**
49:11,13,15 51:17,18,22
61:3
**state**
10:14 46:13 52:11,14 58:25
80:9 104:6,24 105:6 110:9
123:10 124:6 129:15 142:9
142:19,24 143:14 146:10
170:4 175:1,7 181:19 183:8
190:8 191:22 195:2,10
196:9,16 198:15 201:8
208:19 220:4 221:1
**stated**
18:12 58:8,20 99:25 101:4

**stated (cont.)**
109:24 110:12 114:19
125:19 127:22 136:15,21
141:16,18 144:2 161:7
167:15 202:7
**statement**
86:12 100:18 101:18
108:15 112:24 113:3 115:7
115:12 116:25 118:15
123:22 126:3,22 127:9,16
128:1,9,14,15,18,19 129:8
129:24 132:1,19,23 136:24
137:21 138:1 141:10,11,12
141:14 144:1,8 145:12
159:20 161:3 170:5,6,14
171:2 175:15,19 176:9
183:12,16 184:4,7,9,19,20
185:1,4,6,10,11 186:15
188:24 190:11 191:15,23
192:13,18,21,25 193:2,13
193:19,21 207:25 208:2
213:4 218:7,7,12,13,13,17
218:19,20
**statements**
41:14,18 99:20 104:19
105:1,11,13 107:17 113:6
117:8,10 118:3,4,6,17
120:18 122:11,17,20
124:16 129:3,10 135:25
136:8 137:6 138:2,8,13
139:6,17,22 140:6,16,24
141:6 143:2,16,22 144:18
145:6 149:12 151:7 158:22
172:9,12 179:25 180:24,25
183:13,19,23 185:13,16
186:8,11,19,22 187:1,10
190:9,13,17,22,24 191:3,6
195:17 196:21,24 199:5,5
201:17,20 203:2 204:14,15
204:18,25 205:3,6 206:22
207:7,8,14,22 217:20 218:2
218:3 220:2
**states**
1:1 2:1,20 3:7 9:14 12:20
13:8 45:19 104:16 105:20
106:8 108:8,22 122:24
131:19 137:4 139:13
145:19 146:1 171:13,22
173:3 174:7,13,23 186:24
187:7 189:22,24 190:6
191:19 197:8,17 203:8
**statistical**
51:23
**statistically**
67:3 70:16,21,25 71:3,7,18
71:23 72:2,6,8,10,17

**statistics**
51:8
**staying**
162:25
**steckel**
90:14
**steen**
5:5
**stenographic**
9:24
**step**
178:22 180:11
**steps**
129:19 140:5,12 149:6
**stimuli**
157:21,24 164:11,13 181:4
**stimulus**
182:12 210:10,15 219:23
219:24
**stipulations**
8:12
**stop**
59:25
**story**
126:23
**strategies**
144:4
**strategy**
139:1,6 142:21 143:1
144:12
**stream**
63:21 64:1,5
**streams**
63:21
**street**
3:12 4:20
**strike**
87:7,9
**structure**
62:18,20
**studies**
67:17,18 68:1,2,4,4,8,11,18
70:8,12,14,15 72:1 206:5
**study**
68:10 153:16 155:14 176:7
177:1 178:24,25 179:1,2
182:24 206:2 213:15 215:2
215:4,10
**studying**
104:7
**subject**
50:2,6 64:20 73:13 75:6
82:19 83:17 85:21,25 87:6
93:1,15 95:8,17 155:21
157:20 171:15

**submit**
27:5 76:12,16,20,23 79:17
83:4,11 93:12 155:8,18
157:16
**submitted**
15:18 17:1,11 26:5 27:23
37:8 79:2,4,6,9,13 81:12
83:8,20 85:5,7,23 86:14,22
87:6 93:6 155:15,19,20
156:24 158:2,11 166:23
168:14
**subsamples**
182:20
**subsection**
208:11
**subsections**
112:7,17
**subsets**
203:15,22
**substance**
18:3 22:6,13 23:18 29:2
32:2,7 33:14 73:22 126:9
126:21
**substantial**
186:5
**substantially**
138:21 142:8
**substantive**
24:2
**success**
170:9 171:6,18
**suggest**
195:7
**suggests**
208:12
**suitability**
200:16
**suitable**
215:4
**suite**
3:13 4:21
**suited**
104:7 215:9
**summaries**
134:10,17,19
**summarize**
65:18
**summarizes**
201:9
**summary**
65:9 97:11 98:6,14,15,21
98:25 99:7 134:7,8,15,16
134:24 157:12 189:11
**summer**
47:7 55:10,14 60:19

[sumner - times]

**sumner**
4:19
**supervise**
14:9,13 37:20 38:24 39:1
40:2
**supervised**
37:22 38:13
**supervising**
38:21
**supervisor**
15:25
**supply**
99:11,23 115:15 159:23
160:1,18 173:10,15,15
201:10
**support**
8:1 18:5 37:8 38:9 39:11,19
39:23 101:21 103:1,7,13
113:21 117:10 140:18,23
194:20 195:9
**supportable**
147:7
**supported**
48:17 63:2 90:14 93:13
113:1 114:8 116:8,16
122:18 154:3 155:2,17,19
158:25 159:4,14 209:14,16
**supports**
171:1
**supposed**
187:21 190:16 204:1
**supposedly**
136:1 193:1
**sur**
210:17
**sure**
12:6 16:14 28:1 32:15
35:22 45:15 48:23 50:16
53:25 56:25 58:4 59:20
60:7 61:5 65:14 69:20
70:22 75:7,25 82:17 84:11
84:24 86:18,25 107:20
192:14 197:25
**surprise**
154:6
**surprised**
30:17
**survey**
52:4,6 60:12 63:5 67:21
73:2,11,16,20,25 74:8,13
74:16,19 75:13 76:8,13,24
90:3,10,15,24 91:4,9,12,13
91:16,21,23,24,25 92:2,10
94:14,17 148:2,5,5 152:10
152:17,24 157:13 158:2
166:12 168:2,19 169:1,8

**survey (cont.)**
176:3,5,12 177:12 178:8,15
178:21 179:4,13,17,21,23
180:1,5,9 181:22 182:19
211:15 217:13,15
**surveys**
55:4 56:5,6 60:13 73:5,8,12
90:16,17,17 92:7 152:12,20
156:25 157:19 183:2,5
**susan**
81:10,20,23
**sveriges**
147:16
**swear**
10:2
**sworn**
10:5 221:6
**sylvester**
3:10 10:13
**sylvesterm**
3:17
**system**
28:17
**systematic**
116:22 117:19

**t**

**table**
124:19
**taken**
2:16 12:9,13,18 50:19
54:11,14 70:3 94:20,23
121:9 166:8 198:5 203:2
219:14 221:8
**talk**
23:15,18
**talking**
212:1,10 217:7,17
**talks**
142:15
**target**
180:8,9 181:21
**tasks**
57:1,5
**tass**
51:8
**tasty**
68:16
**taught**
52:1 54:23 61:2
**teach**
51:15
**teaching**
49:11,15 51:8,8
**team**
18:5 37:11,12 139:16 192:8

**tech**
94:21
**technicalities**
16:14
**techniques**
215:16
**technology**
169:21 173:6
**telephone**
3:15 4:9,23 5:9,18
**tell**
15:6 22:1 23:24 24:5 33:23
85:4,15 178:23 216:10
**ten**
43:9 46:22 69:22 77:3
198:1
**term**
35:4 92:3 105:21 106:22,24
107:1,8,9,11,12 136:20
162:20 174:14 203:12,16
203:18 219:20
**terms**
67:8 72:19 124:22 182:17
182:18
**test**
66:21 72:9,18 83:14 88:13
88:19,24 94:15 100:19
101:19 103:11 131:15
149:17 156:6,13,19 159:1
175:8 180:13,14,17,20,21
180:22 181:16 182:5,18
188:9 191:3,6 205:2,18
219:24
**testable**
185:22,25 186:5
**tested**
65:4 129:24,25 149:16
165:6 180:23 182:12
219:25
**testified**
10:5 49:16 50:21 51:7 70:9
71:22 77:11,17,21 78:14
87:10 127:15 128:1 156:23
158:7
**testify**
26:13 28:2,6 70:7 78:3,5,8
126:12 154:8 221:6
**testifying**
11:10 154:14,20
**testimony**
11:3,18 51:13 77:24 127:19
155:2,3,6 212:21 217:21
221:10
**testing**
66:24 87:21,24 88:3 103:8
103:25 148:20 188:3,14,20

**testing (cont.)**
189:1,2 191:2
**tests**
150:4,9 205:13
**text**
146:16
**thank**
10:7 12:7 121:2 183:6
**theoretical**
165:4 203:1
**theory**
218:5
**thereof**
215:8
**thesis**
6:20 139:2 142:22 144:13
145:3
**thing**
49:1 92:1 107:9,12 148:3
182:14
**things**
44:22 45:11 48:7,24 51:17
56:8,9 58:16,17 59:15
61:19 146:8 172:13 205:20
**think**
18:7 22:5,16 23:2 32:2,4
46:16 47:23 50:10 59:7
68:6 76:2,3 85:3,12 110:21
121:3 130:15 141:18
154:19 156:17 177:18
179:3 189:12 191:2 209:23
210:3 212:17 216:10,11,12
**thinking**
211:18,21
**thinks**
212:16
**third**
2:17 4:7 9:22 19:22 64:5
103:21 117:22 170:4 175:5
**thoughts**
151:15 212:19,20 217:8
**three**
19:13 20:22 43:8 47:13,17
51:3 63:20 83:8,16 129:19
181:23
**ties**
173:7
**time**
9:6 12:15 28:16,17 43:12
50:1 60:20 61:17 63:10
78:14 83:2 91:4,8 103:17
115:14 121:4 122:4 159:12
179:1 184:17 189:5 192:9
208:3 220:15 221:8
**times**
14:25 15:6,13 18:18 39:17

**[title - vi]**

**title**
16:23 37:23
**titled**
48:15 112:5,13 147:6
**today**
9:20,25 10:12,17,25 11:6
11:10 12:10 13:12 26:5
59:11 78:12 178:23
**today's**
9:7
**todd**
4:16
**told**
21:21 23:17 59:10
**topic**
63:15 73:11 197:23
**topics**
162:2,15,17,18,21,22,23
163:3
**total**
124:22 159:11
**totality**
146:18
**touches**
45:20
**traction**
124:22
**trade**
87:18 88:2,8,16 119:10,20
120:5
**trademark**
80:19,25 81:2 83:5 87:18
88:2,8,9,16,17
**traders**
116:3 117:1
**trading**
118:24 119:4,11 120:12
162:3
**traditional**
30:22
**training**
54:17
**trajectory**
139:19
**transaction**
132:25 162:5
**transactions**
129:17,22 130:3,10 131:7
177:2,3
**transcribe**
11:20
**transcribed**
221:12
**transcript**
60:9

**transfer**
194:18 195:4,23
**transmitter**
162:10 163:2,11,15,18
**transmitters**
129:18
**transmitting**
163:20
**trial**
28:2,6 77:11,17,21 78:5
81:1
**true**
65:3 221:9
**truth**
221:6,6,7
**truthfully**
11:10
**try**
22:8 59:15 75:9
**trying**
211:4 213:7 214:15 219:1
**turn**
25:7 104:11 122:8 135:21
146:21 158:13 169:16
184:1 191:9 192:1 193:11
**turning**
78:17 109:3 134:1 162:25
202:1
**twice**
159:12
**type**
64:23 66:14 89:24 92:12
141:24 152:2 195:24
208:11,15,16
**types**
28:25 29:8 67:18 83:11
147:13 181:23 194:15,21
194:22 195:5,6,11,25
201:15,19,21,24 204:11,12
204:17 205:7,11,12 207:16
207:18,18
**typewriting**
221:12
**typically**
124:25
**typo**
55:24 170:1,2

**u**

**u.s.**
30:22 81:1
**ultimately**
165:5 172:2
**unbiased**
176:20
**undated**
6:12

**underlying**
153:5
**underrating**
169:22
**understand**
11:2,5,12 15:13 16:15 18:2
28:2 35:8 36:5 76:1 84:23
88:9 176:13 180:4
**understanding**
35:3 85:13 86:4 106:21
107:1 125:8 169:24,25
172:15
**understood**
124:25 139:2 142:21 145:3
170:7,16 171:4,14
**united**
1:1 2:1 3:7 9:13 12:20 13:8
45:19 197:8,17
**units**
215:13
**university**
46:13 52:11,14
**unquote**
213:12,15 216:23
**unrelated**
63:21
**unreliable**
109:21 113:2 154:5
**unscannable**
91:7
**unscientific**
154:5
**unsupported**
129:6 158:21,23
**upgrade**
119:14
**upgrades**
118:23 119:3,9
**url**
123:14 126:3,13 173:19
184:18 193:10
**urmston**
4:4
**usable**
177:2
**usage**
171:25
**use**
99:21,24 100:19 101:19
103:10 105:21,23 118:24
119:1,7,11 120:13 124:21
126:8,19 147:21 150:21
161:22 171:23 174:14,16
178:2,10,17 184:15 188:8
201:14 204:7 211:2 215:1

**users**
116:3 117:1 124:2,7 132:24
**uses**
162:20 173:11
**usually**
28:17 67:5 71:5 72:7 79:10
180:8 182:13 217:11
**utility**
159:22 160:3 161:6,22
173:12 201:14 204:6

**v**

**vague**
148:18
**valid**
113:1 114:8 129:6 204:12
213:3,8
**value**
65:3 138:22 140:5,12 142:9
173:18
**variable**
72:21 159:24 160:2,18,19
**variables**
70:17 71:19 72:3
**variety**
138:25 139:5 142:20,25
144:3,11 215:1
**various**
123:1,24 125:12,20 203:9
**vendela**
13:22,23 16:17,18,19,20
21:5 37:14,16,18,21,22
38:9,22,24 39:1,18,21
40:16
**vendors**
60:12
**veracity**
120:18
**verbalize**
201:2 202:14 206:25
**verbally**
11:19
**verified**
38:5,7 40:13 41:13 79:16
123:13
**verify**
39:6 41:14
**vernon**
40:16
**versus**
9:12 12:20 13:8 197:8,17
203:17
**vesey**
3:12
**vi**
208:4

**[vi.b.a. - zornberg]**

**vi.b.a.**
200:14,24 201:1,7
**vi.b.b**
202:11,20
**vi.b.c.**
206:20
**vias**
192:2,4,5,7
**vice**
14:20 16:24 55:12,25 62:5
62:8,11,17
**video**
5:24 9:9,18 173:19 181:3
220:13
**videographer**
5:24 9:5,17 29:12 70:1,4
121:6 122:5 166:6,9 198:3
198:6,10 219:12,15 220:12
**videotaped**
1:15 2:15
**view**
165:12 209:3 217:6
**viewed**
217:19 218:1
**viewing**
218:6
**views**
165:7
**vignette**
181:2
**vitae**
6:11
**volume**
132:25 163:23 164:1
**volumes**
163:22

---

**w**

**waived**
221:21
**want**
10:23 32:4,6 67:15,19,24
69:18 88:9 97:1 109:23,23
153:15 167:12 184:6
**wanted**
42:17 215:18
**wanting**
63:24 64:6
**wants**
167:24
**washington**
4:22
**ways**
152:20,21,22 162:20
190:20
**wealthy**
165:8,10,19

**web**
44:5 215:4
**webinars**
44:5 47:23
**website**
132:13
**weeks**
15:15 19:15,19 20:10,16,21
**weiss**
5:14
**welcome**
32:5
**went**
115:14
**we've**
58:18
**wharton**
5:14
**whereof**
221:18
**wide**
215:1
**wishes**
23:4
**witness**
4:14 6:2 8:3 10:2 23:3 34:8
49:13 62:22 66:17 67:7
76:5 93:5 94:19 95:25 96:4
102:16,20 110:15 118:12
119:1 126:1 130:21 133:6
147:11 160:14 164:13
166:2 172:11 181:14 183:5
185:25 194:7 214:9 221:4
221:18
**witness's**
221:10
**wives**
22:23
**won**
82:8
**word**
106:9,13,15,19 108:23
109:2 115:10 130:22 141:4
146:7 150:16 174:16
187:11,13,16 189:14
205:18 220:3,6
**words**
85:13 105:12,24 124:25
125:5 150:17 215:15
**work**
14:5 18:8 27:20 28:19,22
29:1,8,21 34:6 37:7 38:10
38:24 39:2,11,18,22 40:3
41:8 54:20 55:13 56:13
60:14,17 61:19 89:24 94:5
94:11 147:25 184:13

**worked**
37:16,17,21 45:5 46:17
94:3
**working**
39:25,25 40:3 46:1,3,5,9,14
55:18,19 61:22
**works**
14:7 39:24
**world**
137:13,14
**write**
15:22 40:8,12 128:5
**writing**
166:23 168:13
**wrote**
131:21

---

**x**

**xip**
138:20
**xr**
150:6
**xrp**
29:22,24 30:3,5,7,9,11,14
30:18 99:11,22,22,24
104:18 105:10,15 108:17
112:24 113:5 114:24 115:6
115:13,15,21 116:6 117:5
117:16 118:2,5,17,19 120:9
121:1 125:2,14,18 127:17
128:2,10 129:1,12 132:16
135:1,11,17 136:2 138:20
138:21 139:3,17,21,25
140:2,4,8,9,11,22 142:7,8
142:22 149:7,15,22 150:7
150:11 151:2 159:24 160:2
161:14,16,21 162:7,8
163:13 169:23,23 170:6,7,8
170:10,11,12,16,16,17
171:3,4,5,7,8,9,13,15,16,19
171:21,21,23 172:2,18
173:5,6,11 174:4,5 176:14
179:25 181:7,8,20 183:11
183:18 184:12 185:15
186:8,10 187:9 192:8
194:10 195:5,11,17 198:16
198:22 199:4,12 200:16
201:12 202:12,25 203:10
203:11,15,22 204:2,5,6
207:10 208:21 216:20
217:1,19
**xrp's**
173:9 201:10

---

**y**

**yeah**
119:25 127:8 131:4

**year**
26:21 50:14,18,25 53:7
61:22 173:19
**years**
30:21 43:8 45:12,18 46:21
46:22,25 47:3 48:8,24
49:10,14 52:9 53:6,20,22
53:24 74:15 77:3,11,17,22
77:25 78:4,6,9,15 80:20
116:2
**yesterday**
19:23
**yesterday's**
19:25
**yogurt**
68:15,15
**york**
1:2 2:2,17,18,21 3:8,11,14
3:14 4:8,8 5:8,8,17,17 9:15
9:22,22 221:1,3
**youtube**
173:17,19

---

**z**

**zero**
65:2 186:3,4
**zoe**
193:9
**zoom**
40:5,6,14 58:11,19
**zornberg**
4:5 122:3