UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,   :

   :

                Plaintiff,   :    20 Civ. 10832 (AT) (SN)

   :

       - against -   :    ECF Case

   :

RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,   :
and CHRISTIAN A. LARSEN,

   :

           Defendants.   :

   :

-------------------------------------------------------------------------x

 

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
REPLY IN SUPPORT OF ITS OMNIBUS MOTION TO EXCLUDE
<u>THE TESTIMONY OF DEFENDANTS' EXPERT WITNESSES</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................v

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ......................................................................................................................2

    I.    The Court Should Exclude Defendants' Proffered Expert Testimony That Is Not Relevant Under Governing Law ....................................................................2

        A.  Defendants' Proffered Expert Testimony Regarding Defendants' Contracts..............5

        B.  Defendants' Proffered Expert Testimony Regarding Uses for XRP and the XRP Ledger...................................................................................................7

        C.  Defendant's Proffered Expert Testimony Regarding XRP's Treatment Under Other Legal Regimes.........................................................................9

    II.   Schwartz's Testimony Should Be Excluded in Its Entirety ..................................12

        A.  Schwartz's Testimony Is Irrelevant.................................................................12

        B.  Schwartz's Testimony Consists of Impermissible Legal Opinions ..............................16

        C.  Schwartz Should Not Be Permitted to Offer Summary Witness Testimony as Expert Opinion ......................................................................18

    III.  Adriaens's Testimony Should Be Excluded in Its Entirety....................................20

        A.  Adriaens's Opinions Should Be Excluded Because Merely Repeating the Views of Ripple and Others Is Not a Reliable Methodology .......................................21

        B.  Adriaens's Opinions Regarding Ripple's Business Model and the "Innovative" Nature of XRP and the XRP Ledger Are Irrelevant and Should Be Excluded .........23

        C.  Adriaens Is Not Qualified to Offer Opinions Regarding Decentralization and Those Purported Opinions Should Be Excluded ........................................................24

        D.  Adriaens's Opinions Regarding the "Commercial Utility" of XRP and the XRP Ledger Are Unreliable and Should Be Excluded ............................................26

    IV.  Borden's Testimony Should Be Excluded in Its Entirety ....................................27

        A.  Borden's Opinions about the Tax Treatment of XRP Are Irrelevant.........................27

B.   Borden's Opinions Are Improper Ipse Dixit ............................................. 29

C.   Borden is Not Qualified to Testify about the Tax Treatment of XRP ....................... 30

V.   Easton's Testimony Should Be Excluded in Its Entirety ................................... 31

A.   XRP Accounting under GAAP Is Not Relevant under *Howey* ............................... 31

B.   Easton's Rebuttal Opinions Are Not Responsive to ████ and ████
     Opinions ................................................................................. 34

VI.   Yadav's Testimony Should Be Excluded in Its Entirety ................................... 35

A.   Yadav Offers Improper and Incorrect Legal Opinions ................................... 36

B.   Yadav's Opinion 3 Is Based on an Unreliable Methodology ............................. 40

VII.   Ferrell's Testimony Should Be Excluded in Its Entirety ............................... 41

A.    Ferrell's Legal Opinions Should Be Excluded as Improper and Irrelevant ............... 41

B.   Ferrell's Opinion that Ripple Did Not Affect the Price of XRP Should Be Excluded
     as Unreliable ........................................................................... 45

     1.   Ferrell's Opinion Is Predicated on a Single Statistical Observation That Neither
          Courts Nor Academic Literature Recognize as Supporting the Conclusion He
          Draws ............................................................................. 45
     2.   Ferrell's Own Factor Model Demonstrates That There Is "Room" for Other
          Factors to Influence XRP's Price ................................................. 47
     3.   Ferrell's Opinion that Ripple's XRP's Distributions Did Not Affect XRP's Price
          Is Irrelevant and Unreliable ..................................................... 50

C.   Ferrell's Opinion that XRP Is a Virtual Currency Should Be Excluded as Irrelevant 52

D.   Ferrell's Opinions Related to ODL Should Be Excluded as Irrelevant ................... 52

E.   Ferrell's Additional Rebuttal and Supplemental Opinions Should Be Excluded ........ 53

VIII.   Osler's Initial Opinions Should Be Excluded in Their Entirety ....................... 56

A.   Osler Is Not an Expert on XRP, ODL, or Disruptive Innovation ....................... 57

B.   Osler's Opinions about XRP and ODL Are Not Relevant ............................... 58

C.   Osler's Analysis of ODL's Capabilities and Benefits Is Not Reliable ................ 59

IX.    Fischel's First and Fourth Purported Rebuttal Opinions Should Be Excluded.................62

    A.  Fischel's *Howey* Opinions Are Impermissible Legal Conclusions................................62

    B.  Fischel's *Howey* Opinions Misstate the Law......................................................64

    C.  Fischel's *Howey* Opinions Are Improper Rebuttal...........................................66

    D.  Fischel's "Common Enterprise" Opinion Is Unsupported and Unreliable ...............66

X.    Marais's Testimony Should Be Excluded in Its Entirety.........................................67

    A.  Marais's Rebuttal Opinions Are Unreliable Because They Have No Basis In Economics or Statistics.............................................................................67

    B.  Marais's Rebuttal Opinions Are Unreliable Because They Are Unsupported by His Own Methodology and Internally Inconsistent ...............................................71

    C.  Marais's Supplemental Rebuttal Opinions Are Unreliable Because They Have No Basis in Economics or Statistics ..............................................................73

    D.  Marais's Rebuttal Opinion Goes Beyond the Scope of ████ Opening Report .......73

XI.    Shampanier's Purported Rebuttal Testimony Should Be Excluded in Its Entirety...........74

    A.  Shampanier's Rebuttal Does Not Address the Substance of ████ Opinions .......74

    B.  Shampanier's Opinions about Causation Are Not Appropriate Rebuttal...................75

    C.  Shampanier's Speculation about ████ Knowledge or Opinions Is Improper ......76

    D.  Shampanier Is Not Qualified to Testify about the Perceptions of XRP Holders ......77

**CONCLUSION**.................................................................................**78**

## TABLE OF AUTHORITIES

### CASES

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir. 2012) ................................................................................ 36, 37, 38

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
    303 F.3d 256 (2d Cir. 2002) ........................................................................ 37, 60, 70, 72

*Arista Records LLC v. Usenet.com, Inc.,*
    608 F. Supp. 2d 409 (S.D.N.Y. 2009) .................................................................... 23, 60

*Arista Records, LLC v. Lime Group, LLC,*
    No. 06 Civ. 5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) .......................... 57

*Blake v. Securitas Sec. Servs., Inc.,*
    292 F.R.D. 15 (D.D.C. 2013) ................................................................................ 66

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996) .................................................................................... 35, 58

*Broadspring v. Congoo, LLC,*
    No. 13 Civ. 1866 (JMF), 2014 WL 4100615 (S.D.N.Y. Aug. 20, 2014) .................. 19 fn.13

*Cameron v. Outdoor Resorts of America,*
    608 F.2d 187 (5th Cir. 1979) ................................................................................ 8

*Capri Sun GmbH v. Am. Beverage Corp.,*
    19 Civ. 1422 (PAE)(DCF), 2022 WL 976270 (S.D.N.Y. Mar. 31, 2022) .............. 19 fn.13

*CFTC v. Wilson,*
    No. 13 Civ. 7884(AT), 2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ........................ 67

*Chen-Oster v. Goldman, Sachs & Co.,*
    No. 10 Civ. 6950 (AT), 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ............ 1, 2, 3, 24, 26

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.,*
    815 F. Supp. 2d 673 (S.D.N.Y. 2011) .................................................................... 17 fn.9

*Clarke v. Dutton Harris & Co.,*
    No. 20 Civ. 00160, 2022 WL 717611 (D. Nev. Mar. 10, 2022) .................................. 29

*Cornwell v. Credit Suisse Grp.,*
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) .................................................................... 40

*Cummins v. Lyle Indus.,*
    93 F.3d 362 (7th Cir. 1996) ................................................................................... 70

*Daubert v. Merrell Dow Pharm., Inc.,*
    509 U.S. 579 (1993) ................................................................................... *passim*

*Dora Homes, Inc. v. Epperson,*
    344 F. Supp. 2d 875 (E.D.N.Y. 2004) ................................................................... 69

*Estate of Jaquez v. City of New York,*
    104 F. Supp. 3d 414 (S.D.N.Y. 2015) .................................................................... 69

*Faulkner v. Arista Records LLC,*
    46 F. Supp. 3d 365 (S.D.N.Y. 2014) ...................................................................... 61

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,*
    No. 12 Civ. 7372, 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ........................... 1, 16, 77

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    756 F.2d 230 (2d Cir. 1985) ................................................................................... 11

*Gen. Elec. Co. v. Joiner,*
    522 U.S. 136 (1997) ............................................................................................... 40

*Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.,*
    No. 11 Civ. 1299 (HB), 2012 WL 1372150 (S.D.N.Y. Apr. 18, 2012) ................... 19 fn.13

*Haliburton Co. v. Erica P. John Fund, Inc.,*
    573 U.S. 258 (2014) ............................................................................................... 55

*Harris v. Koenig,*
    815 F. Supp. 2d 6 (D.D.C. 2011) ............................................................................ 3

*Hatala v. Port Authority of New York & New Jersey,*
    No. 15 Civ. 9218 (AT)(JCF), 2017 WL 9832293 (S.D.N.Y. Oct. 30, 2017) .......... 17 fn.11

*HBC Ventures, LLC v. Holt MD Consulting, Inc.,*
    Nos. 06 Civ. 190, 07 Civ. 342, 2012 WL 4483625 (E.D.N.C. Sept. 27, 2012) ....... 17 fn.8

*Highland Capital Mgmt., L.P. v. Schneider,*
    379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................................... 64

*In re Aluminum Warehousing Antitrust Litig.,*
    336 F.R.D. 5 (S.D.N.Y. 2020) ................................................... 19 fn.13, 34, 43 fn.26, 63, 64

*In re Bear Stearns Cos. Sec.,*
   No. 09 Civ.8161, 2016 WL 4098385 (S.D.N.Y. July 25, 2016) ....................................... 47, 54

*In re Fosamax Prods. Liab. Litig.,*
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................................................................ 18

*In re LIBOR-Based Fin. Instruments Antitrust Litig.,*
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................................ 24

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,*
   643 F. Supp. 2d 482 (S.D.N.Y. 2009) .......................................................................... 44, 63

*In re Natural Gas Commodity Litig.,*
   337 F. Supp. 2d 498 (SDNY 2004) ............................................................................ 9 fn.4

*In re Pfizer Inc. Sec. Litig.,*
   819 F.3d 642 (2d Cir. 2016) .................................................................................................. 3

*In re Rezulin Products Liability Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...................................................................... 3, 30, 77

*In re Rezulin Prods. Liab. Litig.,*
   441 F. Supp. 2d 567 (S.D.N.Y. 2006) .................................................................................. 2

*Intern'l Broth. of Teamsters v. Daniel,*
   439 U.S. 551 (1979) ................................................................................................... 34, 44

*Kemmerer v. Weaver,*
   445 F.2d 76 (7th Cir. 1971) .............................................................................................. 8, 9

*Kumho Tire Co., Ltd. v. Carmichael,*
   526 U.S. 137 (1999) .......................................................................................... 45, 60, 70

*Landreth Timber Co. v. Landreth,*
   471 U.S. 681 (1985) ........................................................................................................... 43

*Liddle v. Cirrus Design Corp.,*
   No. 08 Civ. 1253, 2009 WL 4907201 (S.D.N.Y. Dec. 18, 2009) ...................................... 35

*Lion Oil Trading & Transp., Inc. v. Statoil Marketing and Trading Inc.,*
   Nos. 08 Civ 11315 (WHP), 09 Civ. 2081 (WHP), 2011 WL 855876
   (S.D.N.Y. Feb. 28, 2011) .............................................................................................. 57, 77

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.,*
   97 F. Supp. 3d 485 (S.D.N.Y. 2015) .......................................................................... 19 fn.13

*Marine Bank v. Weaver,*
   455 U.S. 551 (1982)...............................................................................10-11, 28, 32, 52

*Marx & Co. v. Diners' Club, Inc.,*
   550 F.2d 505 (2d Cir. 1977) ................................................................................16

*McBeth v. Porges,*
   No. 15 Civ. 2742, 2018 WL 5997918 (S.D.N.Y. Nov. 15, 2018)........................75

*McCullock v. H.B. Fuller Co.,*
   61 F.3d 1038 (2d Cir. 1995) ...........................................................................30, 77

*McIntire v. China MediaExpress Holdings, Inc.,*
   38 F. Supp. 3d 415 (S.D.N.Y. 2014)....................................................................71

*Moody v. CSX Transp., Inc.,*
   271 F. Supp. 3d 410 (W.D.N.Y. 2017)...................................................................2

*Morrison v. Nat'l Australia Bank,*
   561 U.S. 247 (2010).............................................................................................36

*Nimely v. City of N.Y.,*
   414 F.3d 381 (2d Cir. 2005) ..................................................................................4

*Olin Corp. v. Lamorak Ins. Co.,*
   No. 84 Civ. 1968, 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) ...................3, 13, 19 fn.13

*Pac. Life Ins. Co. v. Bank of New York Mellon,*
   571 F. Supp. 3d 106 (S.D.N.Y. 2021)...................................................................21

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.,*
   753 F. Supp. 2d 166 (S.D.N.Y. 2010)...................................................................40

*R.F.M.A.S., Inc. v. So,*
   748 F. Supp. 2d 244 (S.D.N.Y. 2010)...................................................................45

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
   No. 94 Civ. 5587 (PKL)(RLE), 2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) ..............47

*Rodriguez v. Transportes de Carga FEMA, S.A. de C.V.,*
   No. 18 Civ. 114, 2020 WL 6938329 (S.D. Tex. July 28, 2020).......................19-20

*Rypkema v. Time Mfg. Co.,*
   263 F. Supp. 2d 687 (S.D.N.Y. 2003)...................................................................70

*Scentsational Techs. LLC v. Pepsi, Inc.*,
No. 13 Civ. 8645, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) ................................................. 23, 76

*Schwab v. Philip Morris USA, Inc.*,
449 F. Supp. 2d 992 (E.D.N.Y. 2006) ............................................................................................ 2

*Scottsdale Ins. Co. v. McGrath*,
506 F. Supp. 3d 216 (S.D.N.Y. 2020) .......................................................................................... 43

*SEC v. Addison*,
194 F. Supp. 709 (N.D. Tex. 1961) ................................................................................................ 6

*SEC v. Alpine Sec. Corp.*,
982 F.3d 68 (2d Cir. 2020) ......................................................................................................... 9, 27

*SEC v. Aqua-Sonic Prods. Corp.*,
687 F.2d 577 (2d Cir. 1982) ........................................................................................................ 6, 7

*SEC v. Arvida Corp.*,
169 F. Supp. 211 (S.D.N.Y. 1958) .............................................................................................. 39

*SEC v. Cavanagh*,
155 F.3d 129 (2d Cir. 1998) ........................................................................................................ 39

*SEC v. Chinese Consol. Benev. Ass'n*,
120 F.2d 738 (2d Cir. 1941) ........................................................................................................ 15

*SEC v. C. M. Joiner Leasing Corp.*,
320 U.S. 344 (1943) ................................................................................................... 10, 11, 50, 52

*SEC v. Das*,
No. 10 Civ. 102, 2011 WL 4375787 (D. Neb. Sept. 20, 2011) ..................................... 17 fn.7

*SEC v. Edwards*,
540 U.S. 389 (2004) .................................................................................................................... 5, 44

*SEC v. Glen-Arden Commodities, Inc.*,
493 F.2d 1027 (2d Cir. 1974) ............................................................................................... 5, 9, 32

*SEC v. Goldman Sachs & Co.*,
790 F. Supp. 2d 147 (S.D.N.Y. 2011) ............................................................................. 36, 38, 39

*SEC v. Kik Interactive, Inc.*,
492 F. Supp. 3d 169 (S.D.N.Y. 2020) ..................................................................................... 6, 12

*SEC v. Ralston Purina Co.,*
    346 U.S. 119 (1953) ...................................................................................................... 15

*SEC v. Scoville,*
    913 F.3d 1204 (10th Cir. 2019) ........................................................................................ 6

*SEC v. SG Ltd.,*
    265 F.3d 42 (1st Cir. 2001) ............................................................................................ 6, 8

*SEC v. Telegram Group, Inc.,*
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................................................. 43, 44, 74

*SEC v. Telegram Group, Inc.,*
    No. 19-cv-9439 (PKC), D.E. 71 (Defs'. Mot. for Summ. J.) (S.D.N.Y. Jan. 14, 2020) ................ 10

*SEC v. Tourre,*
    950 F. Supp. 2d 666 (S.D.N.Y. 2013) ............................................................................. 43

*SEC v. W.J. Howey Co.,*
    328 U.S. 293 (1946) ................................................................................................. *passim*

*Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    618 F. Supp. 436 (S.D.N.Y. 1985) ......................................................................... 65 fn.40

*Sitts v. Dairy Farmers of Am., Inc.,*
    No. 16 Civ. 287, 2020 WL 3467993 (D. Vt. June 24, 2020) ..................................... 17, 18

*Sonos, Inc. v. D & M Holdings Inc.,*
    297 F. Supp. 3d 501 (D. Del. 2017) ................................................................................ 20

*Stackhouse v. Toyota Motor Co.,*
    No. 10 Civ. 0922, 2010 WL 3377409 (C.D. Cal. July 16, 2010) ...................................... 40

*Stagl v. Delta Air Lines, Inc.,*
    117 F.3d 76 (2d Cir. 1997) .............................................................................................. 77

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967) ................................................................................................... 43, 44

*Tolbert v. Queens Coll.,*
    242 F.3d 58 (2d Cir. 2001) ........................................................................................ 42 fn.25

*United Hous. Found., Inc. v. Forman,*
    421 U.S. 837 (1975) ...................................................................................... 7-8, 9, 43-44

*United States v. Bilzerian,*
   926 F.2d 1285 (2d Cir. 1991) ............................................................................................17

*United States v. Duncan,*
   42 F.3d 97 (2d Cir. 1994) ..................................................................................................17

*United States v. Feliciano,*
   223 F.3d 102 (2d Cir. 2000) ..............................................................................................16

*United States v. Gentile,*
   233 F. Appx. 86 (2d Cir. 2007) ...........................................................................................4

*United States v. Jiau,*
   734 F.3d 147 (2d Cir. 2013) ..............................................................................................24

*United States v. Lumpkin,*
   192 F.3d 280 (2d Cir. 1999) ....................................................................................36 fn.22

*United States v. Smith,*
   985 F. Supp. 2d 547 (S.D.N.Y. 2014) ...............................................................................27

*United States v. Stewart,*
   433 F.3d 273 (2d Cir. 2006) ................................................................................................4

*United States v. Tomasetta,*
   No. 10 Cr. 1205, 2011 WL 6382562 (S.D.N.Y. Dec. 12, 2011) .........................................4

*United States v. Williams,*
   506 F.3d 151 (2d Cir. 2007) ..............................................................................................78

*Upton v. SEC,*
   75 F.3d 92 (2d Cir. 1996) ...................................................................................11, 28, 33

*Warfield v. Alaniz,*
   569 F.3d 1015 (9th Cir. 2009) ...........................................................................................67

*Wells Fargo & Co. v. WhenU.com, Inc.,*
   293 F. Supp. 2d 734 (E.D. Mich. 2003) ..................................................................75 fn. 49, 78

*WH Smith Hotel Servs., Inc. v. Wendy's Int'l., Inc.,*
   25 F.3d 422 (7th Cir. 1994) .....................................................................................17 fn.10

*Willow Bend Ventures, LLC v. Van Hook,*
   554 F. Supp. 3d 808 (E.D. La. 2020) ................................................................................29

## STATUTES

15 U.S.C. § 77e .................................................................................................................*passim*

15 U.S.C. § 77q(a) ........................................................................................................... 36

## RULES & REGULATIONS

Fed. R. Civ. P. 26 ..................................................................................................... 21, 34

Fed. R. Evid. 401 ......................................................................................... 2, 12, 16, 27, 53

Fed. R. Evid. 402 ................................................................................................. 4, 12, 16

Fed. R. Evid. 403 ...................................................................................... 4, 5, 12, 14, 53, 65

Fed. R. Evid. 702 ............................................................................................... 2, 34, 37

## REGULATORY AUTHORITIES

I.R.S. Notice 2014-21, 2014-16 I.R.B. 938 (Apr. 14, 2014) ................................................. 28, 29

## OTHER SOURCES

Allen Ferrell, et al., "The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implication of *Dura Pharmaceuticals, Inc. v. Broudo*," The Business Lawyer (Nov. 2007)...............54 fn.33

Paul A. Gompers, et al., "Corporate Governance and Equity Prices," The Quarterly Journal of Economics (2003) ...........................................................................................................46 fn.28

S.P. Kothari & Jerold B. Warner, "Econometrics of Event Studies," Handbook of Empirical Corporate Finance (2007) .................................................................................................46 fn.28

L. Bebchuk, A. Cohen & A. Ferrell, "What Matters in Corporate Governance?," 22 Rev. Fin. Stud. 783 (2009)...................................................................................................................46 fn.28

L. Bebchuk, A. Cohen & C. Wang, "Learning and the Disappearing Association Between Governance and Returns," 108 J. Fin. Econ. 323 (2013) .................................................................46 fn.28

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this reply in support of its omnibus motion to exclude, in whole or in part, testimony of expert witnesses proffered by Defendants Ripple Labs, Inc. ("Ripple"), Christian A. Larsen, and Bradley Garlinghouse (together, "Defendants"). For the reasons set forth below and in the SEC's opening brief (D.E. 536), the Court should grant the SEC's motion.[1]

## PRELIMINARY STATEMENT

The Court must decide, for each of Defendants' expert witnesses, whether Defendants have shown that: (1) the expert is qualified to testify on matters described in his or her reports; (2) the expert's opinions are the product of a reliable methodology applied to the facts of this case; and (3) the expert's proposed testimony is relevant to the legal and factual issues in this case. *See Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *3 (S.D.N.Y. Mar. 17, 2022) (Torres, J.); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 4251229, at *2 (S.D.N.Y. Feb. 19, 2020) (Torres, J.).

These questions cannot be decided in the abstract. They all relate to, and cannot be separated from, the SEC's claim that Defendants sold "investment contracts" as that term is used in the Securities Act of 1933 (the "Securities Act"). The Supreme Court's decision in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), supplies the legal test the Court must apply at summary judgment, and if necessary, the jury must apply at trial. The *Howey* test establishes the parameters for relevant evidence, including expert evidence. Accordingly, the SEC's motion to exclude began with a summary of the *Howey* test, and from there addressed each of Defendants' experts in turn, demonstrating that the experts' opinions are inadmissible largely because they are focused on issues far afield from those relevant under *Howey*. The SEC also demonstrated that certain of Defendants' expert opinions should be excluded because they are based on unreliable methodologies, analysis, or evidence, and that certain experts are not qualified to offer the specific opinions at issue.

---

[1] This reply uses the same abbreviations as the SEC's opening brief (D.E. 536).

In response, Defendants argued generally that their experts' opinions are relevant because they support their "theory" of the case, and launched individualized defenses on qualifications and reliability grounds for each of their experts.  Because Defendants' purported theory of the case is itself irrelevant under *Howey*, their experts' opinions in support of that theory are irrelevant, too. Defendants simply do not and cannot show that the Court should admit their proffered expert testimony under Rule 702 of the Federal Rules of Evidence.  The SEC's motion should be granted.

## ARGUMENT

### I.  The Court Should Exclude Defendants' Proffered Expert Testimony That Is Not Relevant Under Governing Law.

The SEC's opening brief established that much of Defendants' proffered expert testimony is wholly irrelevant.  In response, Defendants rely heavily on the assertion that their proffered experts' testimony is relevant to *their* "theory of the case," as if this alone were sufficient.  (*E.g.*, D.E. 596 at 1-3.)  The law, not the parties, sets the parameters for what evidence is relevant.  *See Chen-Oster*, 2022 WL 814074, at *4 ("Expert evidence is not immune from the relevance requirement of Federal Rule of Evidence 401."); Fed. R. Evid. 401 (relevant evidence is probative of a fact "of consequence in determining the action").  If a party's theory of choice governed admissibility, Rule 401's relevance requirement would be nullified.

Courts routinely exclude expert testimony where it is legally irrelevant and therefore cannot aid the court or factfinder in resolving the action.  *See Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 421 (W.D.N.Y. 2017) (excluding expert opinions regarding defendant's various purportedly negligent actions as irrelevant because they were not probative of the remaining claims in the case); *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 578 (S.D.N.Y. 2006) (excluding expert opinion as irrelevant to the causation elements it was proffered to prove); *Schwab v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 992, 1159 (E.D.N.Y. 2006) (excluding expert's ethics opinions that were not "relevant to the triers' consideration of the evidence relevant to findings of fact required by the rules of law").

2

Indeed, this Court recently excluded expert testimony as "irrelevant and unhelpful to the jury" where the expert's opinion was contrary to the Court's prior legal ruling. *See Chen-Oster*, 2022 WL 814074, at *13. Of course, in each of these decisions, the party proffering the excluded testimony offered it as relevant to its theory of the case.

Defendants' argument that their "theory" controls admissibility is unsupported by the cases they cite. (D.E. 596 at 2-3.) In *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642 (2d Cir. 2016), the Second Circuit held Fischel's testimony was (in part) admissible because it supported a legal theory that the Second Circuit considered *viable* at that stage of the proceedings, where defendants had failed to challenge the viability of plaintiff's legal theory under governing law. *See id.* at 648 n.4, 655, 661 n.9 (noting that whether plaintiff's theory of the case was "legally sustainable" was an open question); *see also Harris v. Koenig*, 815 F. Supp. 2d 6, 11 (D.D.C. 2011) (expert's damages theory was among "the possible loss formulas applicable to this litigation"). Similarly, in *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018), the court recognized that "where the legal or factual sustainability of a party's theory has not yet been decided," expert testimony in support of that theory may be admissible. *Id.* at *21. The court nevertheless excluded various expert opinions on the ground that "they are not relevant to any issue before the Court." *Id.* None of these cases suggests that Defendants' proffered expert testimony should be admissible because it espouses their "theory," regardless of whether it is consistent with governing law. Indeed, proffered expert testimony that merely parrots the arguments and "theories" advanced by the parties and their counsel is inadmissible. *See In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) ("[E]xperts should not be permitted to supplant the role of counsel in making argument at trial." (citation omitted)).

Defendants' assertion that their "theory" governs admissibility is also contrary to basic rules of evidence and procedure. If the parties were permitted to introduce evidence supporting *any* legal

theory whatsoever, this would eviscerate the relevance requirements of the Rules of Evidence.  Trial would become an interminable parade of all sorts of evidence that as a matter of law has nothing to do with the case.  Today, Defendants proffer evidence of how XRP is treated under federal tax law because their "theory" is that federal tax law is relevant to this case.  Tomorrow, Defendants may proffer evidence about how XRP is treated by "[s]ecurities regulators in the United Kingdom, Japan, and Singapore."  (Ripple Am. Ans. (D.E. 51) ¶ 3.)  The SEC would be forced to respond with its own evidence on foreign law, and the Court and jury would needlessly sit through this presentation, when the only legally relevant issue is whether the *Howey* test is satisfied.

Federal Rule of Evidence 402 mandates that courts prevent this absurdity.  The rule requires exclusion of *any evidence*—including expert testimony—that has no probative value.  Simply put, the parties may not override the law governing the case by propounding fanciful theories supported by expert testimony as an end-run around Rule 402.  *E.g.*, *United States v. Stewart*, 433 F.3d 273, 311-12 (2d Cir. 2006) (affirming exclusion of securities law expert in part because facts on which his opinion was based "were not relevant to the charges under consideration"); *United States v. Tomasetta*, 2011 WL 6382562, at *2 (S.D.N.Y. Dec. 12, 2011) (excluding expert accountant's testimony re GAAP principles on the grounds that it was irrelevant, improper, and "would confuse the jury and waste time" where "[t]he Government does not charge Defendants with violating GAAP").

Nor are experts immune from scrutiny of their opinions as potentially wasteful, prejudicial, or confusing to the jury, as Rule 403 requires.  *E.g.*, *United States v. Gentile*, 233 F. Appx. 86, 88 (2d Cir. 2007) ("[E]ven relevant expert testimony, like all relevant evidence, may be excluded under [Federal Rule of Evidence] 403, if its probative value is outweighed by the danger that it would confuse the jury, be unfairly prejudicial, cause undue delay, waste judicial resources, or be cumulative." (citation omitted)); *see also Nimely v. City of New York*, 414 F.3d 381, 397-398 (2d Cir.

2005) (noting "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations").

### A.    Defendants' Proffered Expert Testimony Regarding Defendants' Contracts

Defendants preview that they intend to ask this Court to disregard decades of governing Supreme Court and Second Circuit precedent and hold, as a matter of law, that the terms of 1,700 written contracts by which Ripple distributed XRP to public investors through conduits are "dispositive" of the SEC's claims.  (D.E. 596 at 5, 16.)

The notion that a common law contract is required, let alone that its terms might end the *Howey* inquiry, is contrary to governing law.  Under *Howey*, the definition of "investment contract" includes, not just a "contract," but also a "transaction" or "scheme."  328 U.S. at 298-99. Defendants note that in *SEC v. Edwards*, 540 U.S. 389 (2004), the Supreme Court emphasized the word "contracts," and use that to suggest that proof of a common law contract is required.  (D.E. 596 at 3.)  But *Edwards* itself forecloses this argument.  There, the Court said: "We hold that an investment *scheme promising* a fixed rate of return can be an 'investment contract.'"  540 U.S. at 397 (emphasis added).  Moreover, the Court held that a specific contract term was *not* dispositive of the "investment contract" analysis, and looked, as it has done for decades, at representations the defendant made in its promotional materials and on its website.  *Id.* at 391-92, 396.  Expert opinions limited to Ripple's written *sales* contracts necessarily ignore Defendants' *offers* of XRP, on which Section 5 liability is also premised.

Consistent with the foregoing, the Second Circuit has persistently rejected Defendants' legal theories.  For instance, the court held that interests in whiskey casks were investment contracts "whether or not such interests are represented by any document," *Glen-Arden Comms., Inc. v. SEC*, 493 F.2d 1027, 1033 & n.4 (2d Cir. 1974).  The Second Circuit likewise held that "it would be incongruous to attach decisive significance to mere legal formality when the [*Howey*] Court explicitly

refused to be bound by 'the legal terminology in which such contracts are clothed', and preceded its conclusion with a discussion of the purposes of the securities laws, which require disregarding form for substance and placing emphasis upon economic reality." *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) (citation omitted).

It is simply not true that "every single post-*Howey* case starts (and often ends) with a close discussion of the contracts." (D.E. 596 at 4.)  Courts routinely hold defendants offered and sold "investment contracts" without any discussion whatsoever of common law contracts.  *See, e.g., SEC v. Scoville*, 913 F.3d 1204, 1209-11(10th Cir. 2019) (examining terms displayed on defendant's website); *SEC v. SG Ltd.*, 265 F.3d 42, 44-45 (1st Cir. 2001) (same).  *See also SEC v. Addison*, 194 F. Supp. 709, 722 (N.D. Tex. 1961) ("The legislative history of the Securities Act of 1933 makes it clear that this statute cannot be circumvented by simply refraining from issuing a written instrument evidencing the security transaction. The statute applies regardless of whether such securities are represented by any document." (citations omitted)).  As a court in this District recently held in another Section 5 digital asset case, "an ongoing contractual obligation is not a necessary requirement."  *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020).

To be sure, the terms of written contracts may be relevant to the *Howey* analysis.[2]  But, contrary to Defendants' assertion, the SEC does not seek to exclude the contracts or "any discussion of contract language." (D.E. 596 at 5.)  Rather, the SEC seeks to exclude Defendants' expert opinions because they both purport to interpret the contractual terms (by providing legal opinions as to, *e.g.*, whether or not they create obligations for Ripple), and then purport to apply an incorrect legal standard in doing so (by providing legal opinions as to, *e.g.*, whether *Howey* requires such written

---

[2] Although the contracts may be relevant to demonstrate the ways in which Ripple orchestrated its illegal distribution of XRP to investors through intermediaries, they do not constitute the universe of evidence on the illegal offering and sales alleged in the Complaint. (*E.g.*, Am. Compl. (D.E. 46) ¶¶ 65-189.)  The SEC's claims encompass Defendants' offers and sales of XRP to the public, whether directly or through intermediaries, through contracts with market participants or otherwise.  (*Id.*)

contractual provisions).  Schwartz, for example, compares Ripple's contracts with *Howey*'s contracts, without examining the extra-contractual representations of the promoter (here, Ripple), as he acknowledged the Court did in *Howey* by looking to the promoter's "sales talk."  (Schwartz Tr. (D.E. 548, Ex. 8) 63:18-64:25.)  Similarly, Ferrell offers opinions about whether Ripple's contracts have the "economic substance" of "investment contracts."  As Ferrell conceded, these terms describe legal—not economic—tests (Ferrell Tr. (D.E. 548, Ex. 24) 14:4-8, 16:24-17:16; 23:15-22, 295:2-12) that the Court or factfinder should conduct.  Like Schwartz, Ferrell's opinions suggest that the presence or absence of terms in Ripple's contracts indicates they are not "investment contracts" without undertaking any examination of Defendants' statements promoting XRP sales.  (Ferrell Rep. (D.E. 548, Ex. 21) ¶¶ 33-81.)  Because the opinions of Schwartz and Ferrell are based on an incorrect understanding of the legal test under *Howey*, they cannot assist the Court, which is well-qualified to interpret contracts, at summary judgment.  And, should this case proceed to trial, their opinions will confuse the jury.

### B.    Defendants' Proffered Expert Testimony Regarding Uses for XRP and the XRP Ledger

Defendants concede that "items with 'actual or potential use' *can* be sold as part of an investment contract," but argue that evidence of such actual and potential use is relevant.  (D.E. 596 at 5.)  But Defendants' expert opinions that describe XRP's "use" do not supply evidence relevant to the test set forth in *United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975) and its progeny.

*Forman* held that shares in a housing co-op were not "investment contracts" because they *were sold* for "use" or "consumption," as opposed to for "profit."  *Id.* at 857-59.  In so holding, the Court did not simply look at the obvious fact that apartments have use and end the *Howey* analysis. Instead, the Court evaluated the use *a reasonable investor* would ascribe to the venture *as it was being offered.  See Forman*, 421 U.S. at 853 ("[I]nvestors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments."); *see also Aqua-Sonic*, 687 F.2d at 584

("[I]n determining whether the offering is an investment contract courts are to examine the offering from an objective perspective...."). In support of this conclusion, *Forman* observed that purchasers were *motivated to purchase* the shares by a desire to "use" (i.e., live in) the apartments, and the shares were non-transferable to non-tenants and required to be resold to the co-op at the same price paid, eliminating any opportunity to profit. 421 U.S. at 842-43; 853-54.

Courts applying *Forman* typically consider the following factors to determine whether an asset is sold "primarily for use":  (i) whether the amount sold was indicative of a true consumptive purpose; *see Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193 (5th Cir. 1979) (campsites were sold as investment contracts where investors purchased many units and "manifestly could not use" all of them); (ii) whether the promoter, despite disclaiming that the instruments could only be "used," also made representations that "fueled expectations of profit," *SG Ltd.*, 265 F.3d at 53-54 (statements discussing potential returns "constitute a not-very-subtle form of economic inducement" at odds with the bulletin in *Forman* that "nowhere" sought "to attract investors by the prospect of profits" (citing *Forman*, 421 U.S. at 854)); and (iii) whether it is reasonable to expect purchasers to "use" the item, *e.g.*, *Kemmerer v. Weaver*, 445 F.2d 76, 79-80 (7th Cir. 1971) (contract for sale and care of beavers was investment contract because "as a practical matter, it would have been physically impossible for the average purchaser of live breeding beaver to take absolute possession of his animals").

Rather than addressing these factors, Defendants' experts extol the possibilities of a Ripple cross-border remittance product, ODL (Ferrell, Osler) or the potential ways XRP or the XRP Ledger may be used (Adriaens).[3]  But none of this assesses what would attract a reasonable person

---

[3] In noting the SEC offered an expert to opine on ODL (D.E. 596 at 5), Defendants omit that ▮▮▮▮▮ analyzed the economic viability of ODL to *rebut* Defendants' experts. (▮▮▮▮ Rebuttal (D.E. 548, Ex. 3) ¶¶ 6-49.) ▮▮▮▮▮▮ opening opinions related to ODL were focused on analyzing what a reasonable XRP purchaser would have understood regarding the potential to profit from Ripple's statements about ODL.  (▮▮▮▮ Rep. (D.E. 548, Ex. 2) ¶¶ 17-22, 86-87.)

to purchase XRP, by examining the facts surrounding Defendants' offering and sales of XRP, which is what *Forman* requires.  Defendants' experts do not address these facts, such as:  (i) Was the amount of XRP sold by Defendants indicative that purchasers bought XRP to use or consume it in some way?  (ii) Did Defendants make representations about XRP that reasonably would fuel purchasers' expectations of profit?  (iii) Is it reasonable to expect XRP purchasers to use or consume the XRP they purchased?  Defendants' attempt to "expertise" the soundness of "Ripple's business plans generally" (D.E. 596 at 5) demonstrates the irrelevance and potentially prejudicial effect of this testimony—the *Howey* or *Forman* tests do not put the quality of business plans on trial.  The question is whether Ripple's offering and sales of XRP were of securities under a clearly defined legal test set forth by the Supreme Court.

## C.   Defendants' Proffered Expert Testimony Regarding XRP's Treatment Under Other Legal Regimes

Defendants do not contend that because XRP may be treated as something other than a security under different legal and regulatory regimes it cannot be a security under the federal securities laws.  (D.E. 596 at 6-7.)  Nor could they.  *See SEC v. Alpine Sec. Corp.*, 982 F.3d 68, 78 (2d Cir. 2020) ("[W]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at liberty to pick and choose among congressional enactments and must instead strive to give effect to both." (citation omitted)).  And even a cursory review of cases applying *Howey* shows that courts routinely conclude that items subject to various regulatory regimes were nevertheless also sold as investment contracts—oranges are a "food" subject to food safety regulations[4] (*Howey*); beavers are "animals" subject to animal possession regulations (*Kemmerer*); whiskey is an "alcoholic beverage" subject to marketing regulations (*Glen-Arden*).  That these items

---

[4] Oranges are also a commodity.  *See In re Natural Gas Commodity Litig.*, 337 F. Supp. 2d 498, 501-502 (S.D.N.Y. 2004).  (*See* Ripple Am. Ans. (D.E. 51) ¶ 11 (suggesting XRP is a commodity).)

were subject to other legal regimes was no obstacle to these courts concluding they were offered and sold as securities.

For the same reasons, Defendants' specific argument—that FinCEN treats a digital asset issuer as a money services business and therefore its digital asset cannot be a security—fails.  Indeed, the same argument has been rejected by a court in this district.  *E.g.*, *SEC v. Telegram Group, Inc.*, No. 19-cv-9439 (PKC), D.E. 71 (Defs'. Mot. for Summ. J.) (S.D.N.Y. Jan. 14, 2020) at 28 n.16.  There are a variety of economic regulatory regimes in the United States with distinct, and even overlapping, jurisdiction among regulators.  Defendants cannot contend otherwise.

Defendants pivot to arguing that expert evidence regarding XRP's treatment under other "legal and industry regimes" is relevant to show XRP's "character in … commerce," citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943), or whether XRP would be considered a security "in the commercial world," citing *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982).  (D.E. 596 at 6-7.)  But these cases do not stand for the proposition Defendants would read into them, i.e., that the "character" given to the instrument by third parties or by the promoter privately is relevant. What matters under *Joiner* and *Marine Bank* is the same thing that matters under *Howey*:  how the promoters offered the scheme or instrument to the investing public.  Preceding *Howey*, the *Joiner* Court held that oil lease assignments were "investment contracts."  320 U.S. at 352.  In observing that "the reach of the [Securities] Act does not stop with the obvious and commonplace," the Court stated that "[n]ovel, uncommon, or irregular devices" were nevertheless "securities" within the meaning of the statute if proven that "they were widely offered or dealt under terms or courses of dealing which established their character in commerce as 'investment contracts.'"  *Id.* at 351 (emphasis added).

*Joiner* thus instructs that an asset's "character in commerce" is "established" by the terms by which the promoter offers and sells it.  *Id.*  Making this point even more explicit, the Court stated

that the "character the instrument is given in commerce" is defined by "the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Id.* at 352-53. All of these criteria used to determine an asset's "character in commerce" focus on the promoter's statements and actions. *See also Marine Bank*, 455 U.S. at 556, 559-60 (noting the Court had "repeatedly held that the test is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect"; finding the agreement at issue was not an investment contract where it entailed a "private transaction," not "offers to a number of investors," and the "unique agreement [the parties] negotiated was not designed to be traded publicly" and included terms (use of a barn and pastures) that illustrated the singular nature of the transaction (citation omitted)). How legal or industry regimes outside of the securities laws treat XRP has nothing to do with the questions posed by *Joiner* as to what "character in commerce" was given it by Defendants. Indeed, the Second Circuit has recognized that *Howey* supplies the "specific requirements" that constitute "the analytical foundation for determining what constitutes an investment contract." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 239 (2d Cir. 1985).

Similarly, Defendants cite no authority whatsoever for their assertion that the treatment of XRP under another legal regime is relevant to their "fair notice" defense. (D.E. 596 at 7.) Ripple's "fair notice" defense is premised on *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996), which focused on the *SEC's* interpretation of its *own* rules. (D.E. 172 at 11-12.) Nothing in *Upton*, or any other case, suggests that the Court should consider the treatment of XRP by other legal or industry regimes to determine whether the SEC provided fair notice. Indeed, Defendants' Answers, in which they assert fair notice defenses (*e.g.*, D.E. 51 at 97; D.E. 462 at 97; D.E. 463 at 103), make no reference to "CFTC regulations, federal tax law, and GAAP," regimes they now claim are relevant to the defense. (D.E. 596 at 7.)

Moreover, Defendants' attempt to connect such treatment to this case through their assertion of "the SEC's long silence about that treatment" (*id.*) should be rejected. The "law does not require the Government to reach out and warn all potential violators on an individual or industry level." *Kik,* 492 F. Supp. 3d at 183 (citations omitted). Simply put, "actually receiv[ing] a warning" alerting defendants to their misconduct is not a prerequisite to an enforcement action. (*See* D.E. 440 at 10 n.5.) And if Defendants premise their defense on the SEC's purported silence or inaction, expert testimony is not required to establish what the SEC did or did not do. Expert testimony regarding XRP's classification under other legal and industry regimes has no probative value and would only delay resolution of the real issues in this case and confuse the jury, and it should therefore be excluded. *See* Fed. R. Evid. 401, 402, 403.[5]

## II.   Schwartz's Testimony Should Be Excluded in Its Entirety.

Schwartz opines on the contents of approximately 1,700 written contracts related to certain Ripple sales of XRP, and contrasts them with the written contracts at issue in *Howey*. These impermissible legal conclusions should be excluded because contract interpretation is an inappropriate topic for expert testimony. Schwartz's opinions should also be excluded because they are premised upon an incorrect reading of *Howey*, and they are irrelevant.

### A.   Schwartz's Testimony Is Irrelevant.

Defendants urge the Court to admit Schwartz's testimony on the basis that it supports their "legal theory," under which "Ripple's contracts are dispositive." (D.E. 596 at 16.) While arguing that having a "theory" is enough to justify Schwartz's testimony, Defendants do not cite a *single case* showing their "theory" is a valid articulation of the law. As demonstrated in the SEC's opening brief, this "theory" is contrary to governing law, in light of the legion of cases finding the existence

---

[5] The SEC's challenges to certain Defendants' experts' qualifications and to the overbroad scope of certain of their opinions (D.E. 596 at 8-11) are lodged only where appropriate and will be addressed on an expert-by-expert basis.

of an investment contract based on representations beyond the four corners of a written contract. (D.E. 536 at 20-22.)

To begin, Defendants' "theory" that their 1,700 contracts are dispositive is directly refuted by *Howey* itself.  First, under *Howey*, Section 5 liability does not require evidence of any sale at all, much less a sale memorialized by a written contract.  *See* 328 U.S. at 300-01 ("The Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities.  Hence it is enough that the respondents merely offer the essential ingredients of an investment contract.").  Second, as Defendants (and Schwartz) acknowledge, *Howey* looked outside the four corners of the contracts to the representations made in the defendants' oral sales pitch "to address the enterprise's historical and *expected* future profits."  (D.E. 596 at 18-19 (emphasis added).)  Third, *Howey* expressly held that an investment contract can be established not only by a contract, but also by a "transaction or scheme."  328 U.S. at 298-99 (citing state courts' prior interpretation of the term "investment contract").  There is thus no support in *Howey* for Defendants' "theory" that the terms of the 1,700 Ripple contracts are dispositive of the SEC's claims, and Schwartz's testimony accordingly cannot be admissible on this basis.  *See Olin*, 2018 WL 1901634, at *21.

In a similar vein, Defendants argue that the SEC "cannot prove Defendants offered 'investment contracts' based on the parties' written contracts, which alone establishes the relevance of these contracts."  (D.E. 596 at 17.)  This is also inconsistent with the precedent outlined above.  The SEC *need not* rely solely on the terms of Ripple's contracts to prove its case.  Defendants *cannot* rely solely on such terms to defeat the SEC's claims, which are founded upon Defendants' myriad extra-contractual statements and actions directed to the general public as potential downstream XRP purchasers (*e.g.*, D.E. 536 at 8-9), who were undoubtedly unaware of the existence of the 1,700 contracts or their terms.  (*Cf.* D.E. 596 at 18.)

Defendants next assert (inconsistently with their argument that the written contracts are dispositive) that Schwartz's testimony is relevant because, under *Howey*, courts can look to *both* contract terms and to the promoter's extra-contractual representations to determine whether an instrument was offered and sold as an investment contract.  (D.E. 596 at 17-19.)  Even if Ripple's contracts are relevant, that does not make Schwartz's interpretation of those contracts relevant (or admissible).[6]

Schwartz's myopic interpretation—premised on Defendants' untenable legal theory that the presence or absence of specific contractual terms can absolve them from liability here (D.E. 596 at 14)—is irrelevant.  Because *Howey* and its progeny look beyond the four corners of common law contracts, the fact that Ripple's written contracts contain or omit certain provisions does not answer whether Defendants offered and sold XRP as an investment contract.  (*See* D.E. 536 at 20 (collecting cases).)  Moreover, the contractual terms that Schwartz opines are "absent" from Ripple's contracts are also irrelevant to the investment contract analysis.  (*See id.* at 21 (collecting cases).)  Defendants do not cite any case law to the contrary.

In addition, even if Schwartz's testimony did not constitute impermissible legal conclusions (it does) or was relevant (it is not), it should be excluded on Federal Rule of Evidence 403 grounds.  Because Schwartz's opinions are based on an incorrect reading of *Howey* and its progeny, they only serve to risk confusing the jury if this case goes to trial.  (*See* D.E. 536 at 21-22 (citing cases).)

Defendants pivot to other terms of the 1,700 contracts, which they do not argue are relevant to the *Howey* analysis—e.g., varying counterparties, dates, and economic terms—asserting these are relevant to rebut the SEC's claims of a single, integrated offering of XRP.  (D.E. 596 at 19.)

---

[6] Defendants suggest in a footnote that the SEC is asking the Court to "evaluate the correctness of facts underlying" Schwartz's opinions.  (D.E. 596 at 18 n.11 (citation omitted).)  But the SEC does not contest the *contents* of the contracts, only the legal conclusions and interpretive significance that Schwartz assigns to the presence or absence of certain terms.

14

Defendants again conflate the relevance of the contracts with the relevance of their proffered expert testimony. Schwartz's opinions do not address whether a single or multiple offers occurred, nor is he an expert in the securities laws. (Schwartz Tr. (D.E. 548, Ex. 8) 14:19-15:23.) If Defendants wish to argue that the timing, counterparties, or economic terms of their 1,700 contracts militate against a single offering, they do not need expert testimony, even if their expert was qualified to address, or actually had addressed, the issue in his expert report (neither of which apply to Schwartz). Again, these are legal questions for which the Court does not need expert assistance.

In any event, Defendants' argument ignores that an "offering" includes the entire process by which securities emanate from an issuer, through intermediaries, to come to rest in the hands of the ultimate investing public. *SEC v. Chinese Conol. Benev. Ass'n*, 120 F.2d 738, 740 (2d Cir. 1941); *SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953). In this case, the SEC has alleged that Ripple offered and sold XRP as an investment contract when it solicited the general public to buy XRP in the market based on its promised efforts to improve the value of XRP. The contracts Ripple focuses on are, if anything, evidence of an issuer-underwriter relationship, a negotiated means of distribution of XRP to public investors, an issue which Schwartz testified was outside the scope of his opinions. (Schwartz Tr. 98:9-13, 105:10-13, 106:10-12.)

Finally, Defendants suggest that Magistrate Judge Netburn's discovery ruling compelling supplementation of the SEC's discovery responses is dispositive of the relevance question here. (D.E. 596 at 14 n.9, 16.) Of course, Magistrate Judge Netburn did not have Schwartz's testimony before her and accordingly did not rule on its relevance. Moreover, Defendants mischaracterize her ruling, which did *not* state that Ripple's contractual terms were "central to this action" (D.E. 596 at 16). Rather, Magistrate Judge Netburn observed that the parties' "disagreement over the application of the controlling legal standards" and dispute as to "how *Howey* should apply in this case" were "the contested issues … central to this action." (D.E. 397 at 2.) Magistrate Judge Netburn expressly

took "no position on these legal issues in resolving this motion" (*id.*), implicitly relying on the broader "relevance" standard of Federal Rule of Civil Procedure 26. In contrast, the instant motion is governed by the more restrictive Rules of Evidence, which require exclusion of expert testimony that is not relevant to any claim or defense. Fed. R. Evid. 401, 402.

**B.      Schwartz's Testimony Consists of Impermissible Legal Opinions.**

In its opening brief, the SEC established that "opinions as to the meaning of the contract terms at issue" are impermissible. (D.E. 536 at 17-18 (quoting *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 508-11 (2d Cir. 1977) and collecting cases).). Defendants seek to avoid this black-letter proposition by arguing that "Schwartz's testimony contains no legal conclusions" because he "does not offer any legal analysis of the contracts in *Howey* or those at issue in this case." (D.E. 596 at 14.) Defendants are wrong on both scores. Indeed, Defendants' own description of Schwartz's contractual interpretations belies this claim. (*See id.* at 15-16 (Schwartz interprets the contractual terms he examined as not imposing particular *obligations* on Ripple; interprets other contractual terms as inconsistent with such *obligations*).) Schwartz also devotes many pages of his report to discussing *Howey*, thereafter opining on Ripple's contracts based on his reading of *Howey*. (Schwartz Rep. (D.E. 548, Ex. 9) ¶¶ 8-18.) As Defendants acknowledge, interpretation of *Howey* is for the Court, not the experts. (D.E. 596 at 18.)

Contrary to Defendants' assertion, Schwartz does not offer "factual conclusions" (D.E. 21 & n.13) when he opines on the rights and obligations that Ripple's contract do or do not create. *See, e.g., Fin. Guar.*, 2020 WL 4251229, at *7 (excluding expert opinion regarding parties' "rights under a contract"). None of the cases Defendants cite in support of the proposition that "expert testimony is not inadmissible simply because it draws on legal source material or offers a factual conclusion that bears on an ultimate issue of law" involved an expert's interpretation of contracts. (D.E. 21 & n.13.) *See United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) (testimony of fact witness and

dual expert and fact witness regarding an organization's involvement in drug trafficking was admissible); *United States v. Duncan*, 42 F.3d 97, 101-02 (2d Cir. 1994) (testimony of investigating agent, dual expert and fact witness, which relied on his review of the defendant's IRS filings and "his own investigation of the facts" was admissible); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (expert testimony on "general background on federal securities regulation and the filing requirements of Schedule 13D" was admissible).

Defendants cite a host of cases in support of their argument that Schwartz should be permitted to testify to Ripple's "commercial practices informed by legal standards." (D.E. 596 at 21-22.) But these cases are inapposite because Defendants never proffered Schwartz as an industry custom and practice expert. Indeed, Schwartz does not even purport to opine on "practices and procedures generally used in corporate governance,"[7] "corporate norms and governance,"[8] "industry custom and practice,"[9] "custom and usage …relevant to the interpretation of ambiguous language in a contract,"[10] or the "meaning of contract terms" in a specific industry "based on industry custom and experience."[11] Schwartz's report does not even contain the words "custom" or "practice" or "norm," nor does he offer any specific industry expertise. (*See generally* Schwartz Rep.). Rather, he expressly disavows expertise in the securities or digital asset industries. (Schwartz Dep. 14:19-16:4).

Defendants rely on a single case for the proposition that Schwartz should be permitted to opine as to "how Ripple's XRP contracts operate in the marketplace." (D.E. 596 at 22 (quoting *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020) (cleaned up).). *Sitts*

---

[7] *SEC v. Das*, 2011 WL 4375787, at *9 (D. Neb. Sept. 20, 2011); (D.E. 596 at 21).
[8] *HBC Ventures, LLC v. Holt MD Consulting, Inc.*, 2012 WL 4483625, at *8-9 (E.D.N.C. Sept. 27, 2012); (D.E. 596 at 21-22).
[9] *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011); (D.E. 596 at 22).
[10] *WH Smith Hotel Servs., Inc. v. Wendy's Int'l., Inc.*, 25 F.3d 422, 429 (7th Cir. 1994); (D.E. 596 at 22).
[11] *Hatala v. Port Authority of New York & New Jersey*, 2017 WL 9832293, at *5 (S.D.N.Y. Oct. 30, 2017); (D.E. 596 at 23 n.14).

observed that "[a]lthough interpretation of an unambiguous agreement is the province of the judge, expert witness testimony may explain how a contract operates in the marketplace." *Id.* at *7. The court accordingly precluded the expert from "interpret[ing] non-technical contractual terms for the jury" but permitted him, in light of ambiguity in the contacts at issue, "to opine as to how a contract or contractual term operates in the marketplace." *Id.* Unlike in *Sitts*, Schwartz does not opine as to how Ripple's contracts "operate[] in the marketplace." *Id.* Rather, he merely interprets those contracts by opining on the presence and absence of obligations imposed by those contracts. And, unlike *Sitts,* neither Defendants nor Schwartz asserts that any terms in Ripple's contracts are ambiguous. (Schwartz Tr. 44:9-12.)

Defendants also suggest that Schwartz's testimony should be admissible on the basis that the contract terms he interprets are undisputed. (D.E. 596 at 22-23 & n.14.) Defendants cite no authority suggesting that courts permit experts to construe contractual terms so long as they are undisputed.

Finally, Defendants suggest that Schwartz can offer legal conclusions as long as they are not "about the applicable law *that governs the case*." (D.E. 596 at 23 (quoting *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 n.16 (S.D.N.Y. 2009)).) As an initial matter, Schwartz does offer legal conclusions about the law governing this case, *Howey*, because his opinions (improperly) purport to interpret both *Howey* and the contracts at issue in *Howey*. (Schwartz Rep. ¶¶ 8-11.) If Schwartz is also offering legal conclusions that are not about the law governing this case, they should be excluded on relevance grounds as well. Moreover, the lone case Defendants cite for this proposition is *Fosamax*, which only permitted expert testimony regarding "the complex regulatory framework that informs the standard of care" in a highly regulated industry. *Id.* at 191 (pharmaceutical industry). Again, Schwartz does not purport to offer general or industry-specific custom-and-practice testimony.

## C.   Schwartz Should Not Be Permitted to Offer Summary Witness Testimony as Expert Opinion.

Defendants assert that Schwartz's testimony should be admitted for effective case management because reviewing each of the 1,700 contracts would be too burdensome for the jury or the Court.[12]  (D.E. 596 at 20-21.)  To be sure, experts are permitted to synthesize complex or esoteric data, but the cases cited by Defendants do not involve the interpretation or "synthesizing" of contracts or other legal documents, especially ones the expert did not read.[13]  Simply put, if Schwartz is applying his expertise to interpret contractual provisions as Defendants contend (D.E. 596 at 20), then his opinions are impermissible expert testimony.

If instead the purpose of Schwartz's testimony is to describe and categorize the terms of Ripple's 1,700 contracts in furtherance of "sound trial management" (D.E. 596 at 21), then Schwartz

---

[12] It was apparently too burdensome for Schwartz, who declined to undertake such a review prior to issuing his expert opinion. Defendants do not dispute that Schwartz (i) reviewed less than 10% of Ripple's contracts prior to issuing his report; (ii) reviewed an additional 1000+ contracts after his report was issued, in under 10 hours; (iii) still has not reviewed all of the contracts on which he opined; and (iv) did not take any steps to verify the work of whoever (unknown to Schwartz) reviewed and categorized the contracts.  (D.E. 536 at 12-14.)  Defendants' cited cases—that experts need not "review every single piece of paper" related to their opinions nor "sort through all of the discovery in a case in order to determine the relevant evidence" (D.E. 596 at 24 (citations omitted))—are inapplicable here.  Neither case involved experts opining on the contents of documents they never read, as Schwartz did here prior to issuing his report.

[13] In the primary case Defendants cite (D.E. 596 at 20), *Broadspring v. Congoo, LLC*, 2014 WL 4100615, at *16 (S.D.N.Y. Aug. 20, 2014), the expert "relied on his specialized knowledge in the field of information security to synthesize information from his diverse sources and to form an opinion as to whether" certain software constituted spyware.  Schwartz's review of contract terms—to the extent he actually conducted such review—does not resemble this exercise.  *See also Capri Sun GmbH v. Am. Beverage Corp.*, 2022 WL 976270, at *20 (S.D.N.Y. Mar. 31, 2022) (marketing expert relied on review of "media reports, statistical reports, and advertisements across several decades"); *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d 485, 504-05 (S.D.N.Y. 2015) (expert economist's opinion relied on compilation and aggregation of sales report data); *Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 2012 WL 1372150, at *2-3 (S.D.N.Y. Apr. 18, 2012) (declarant, whose employer was a party's accounting consultant, was permitted to summarize terms of a contract related to the consultant's retention where the summary was not "impermissible legal interpretations"); *Olin*, 332 F. Supp. 3d at 837 (stating experts can "synthesize and digest reams of otherwise admissible evidence" in context of expert testimony regarding historical environmental contamination); *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 31 (S.D.N.Y. 2020) (expert conducted empirical analysis "grounded in accepted economic principles and statistical analysis").

is more appropriately considered a summary witness.  But Defendants should not be permitted to present summary witness testimony cloaked as expert opinion.  *See Rodriguez v. Transportes de Carga FEMA, S.A. de C.V.*, 2020 WL 6938329, at *6 (S.D. Tex. July 28, 2020) ("The danger of allowing an expert to simply summarize evidence provided to the expert by the party that retained him is, of course, that the expert will become a vehicle through whom the party can summarize its case for the jury, with the imprimatur of the expert's asserted 'expertise.'  Courts have regularly barred experts from testifying in that manner." (citation omitted)); *Sonos, Inc. v. D & M Holdings Inc.*, 297 F. Supp. 3d 501, 521-22 (D. Del. 2017) (excluding expert testimony consisting of "summaries of evidence and conclusory statements that impl[ied]" the expert's opinion on the legal question at issue (copying of plaintiff's technology); noting that the plaintiff could "still present evidence of copying to the jury; it just may not do so by invoking the special imprimatur that accompanies its presentation by an expert").  The Court should grant the SEC's motion to exclude Schwartz as an "expert."  If Defendants wish to call him as a summary witness to summarize Ripple's contracts in a legally permissible manner, Defendants should identify him as such on their Rule 26(a) disclosures and the parties can resolve that issue with a motion *in limine* before trial.

## III.    Adriaens's Testimony Should Be Excluded in Its Entirety.

Adriaens's testimony should be excluded in its entirety because his opinions largely serve as advocacy for Defendants and do not reflect any genuine application of expertise.  His opinions regarding the "innovative" nature of XRP and the XRP Ledger, as well as Ripple's business and product iteration, are irrelevant and inappropriate factual summary; his opinions regarding whether the XRP Ledger is decentralized are inconsistent and contradictory, and he is not qualified to offer them; and his opinion about "use cases" for XRP and the XRP Ledger is irrelevant and methodologically unsound.

## A. Adriaens's Opinions Should Be Excluded Because Merely Repeating the Views of Ripple and Others Is Not a Reliable Methodology.

Contrary to Defendants' assertion, the SEC's objection is not limited to Adriaens's "drafting process." (D.E. 596 at 98.)  Whatever the process, the final result was an "expert opinion" that Adriaens not only did not draft but in many cases did not even understand.  (D.E. 536 at 23-27.) This is precisely the type of opinion courts exclude as unreliable.  *See Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 115-116 (S.D.N.Y. 2021) (excluding opinion of expert who did not substantially participate in preparation of his report).

Defendants also offer no explanation for Adriaens's blatant failure to comply with Federal Rule of Civil Procedure 26, which requires an expert to disclose "'the facts or data considered … in forming' the expert's opinions."  (D.E. 596 at 98 (quoting Fed. R. Civ. P. 26(a)(2)(B)).)  As the 2010 advisory committee's notes to Rule 26(a)(2)(B) make clear, an expert must disclose any "any material considered … from whatever source, that contains factual ingredients."  *Id.*  The SEC identified a minimum of 43 occasions in which Adriaens violated this Rule by failing to disclose materials he evidently "considered," given that he (or someone) copied them word-for-word into his Report. (*See* D.E. 536, Appx. A.)

Instead, Defendants seek to miscast statements Adriaens sourced from Ripple as "facts" that in their view Adriaens may appropriately rely on, as opposed to "Ripple's views," which Defendants concede he may not. (D.E. 596 at 100.)  But Ripple (or its lawyers) denominating something as "fact"—or a "common background fact" or "uncontroversial" or not "material"—does not make it so.  (D.E. 596 at 96, 100-01.)  Among Adriaens's "core opinions" (D.E. 596 at 97, 99) is that XRP and the XRP Ledger have achieved "marketplace validation," citing 91 purported "use cases."  (D.E. 596 at 97; D.E. 536 at 32-33.) This opinion relies on purported "facts" Adriaens lifted from Ripple and other sources, without attribution or investigation.  For example, Adriaens conceded he merely copied from another (unidentified) source, and did not investigate the veracity of, the claim that

"XRP became the digital standard for currency exchange, asset settlement and remittances." (Adriaens Tr. (D.E. 548, Ex. 12) 260:20-262:1; Adriaens Rep. (D.E. 548, Ex 11) ¶ 60).  He also copied language from a Ripple blog regarding a predicted future "Internet of Value" to support his opinion that: "The Ecosystem of the XRP Ledger and XRP Is Decentralized, and Has Many Different Uses and Potential Uses."  (Adriaens Rep. ¶ 119; *see also id.* ¶ 21); The Internet of Value: What It Means and How It Benefits Everyone" (June 21, 2017), *available at* https://ripple.com/insights/the-internet-of-value-what-itmeans-and-how-it-benefits-everyone/. And certain of the "facts" Adriaens copied into his Report were demonstrably false, which presumably he would have learned had he done more than transcribe them.  (*E.g.*, Adriaens Rep. ¶ 120 (incorrectly stating that ODL is a liquidity solution "for banks" when banks do not use ODL); D.E. 536 at A-17.)

Defendants' attempt to distinguish the SEC's example illustrates the problem.  Defendants concede Adriaens copied a Ripple blog post "regarding the environmental advantages of the XRP Ledger over bitcoin" (D.E. 596 at 101), arguing this was inconsequential because these facts were not "material."  But Adriaens used these "facts"—copied from a Ripple blog and without any independent analysis—to highlight certain purported deficiencies in ▮▮▮▮ opinions regarding the XRP Ledger.[14]  (Adriaens Rebuttal (D.E. 548, Ex. 13) ¶ 56 (citing Adriaens Rep. at 24-25).)  Simply repeating a party's views, without any application of expertise, is not a permissible expert opinion.

---

[14] Defendants defend Adriaens's report by asserting ▮▮▮▮ "used language found elsewhere in his own report without attribution," providing two examples, neither of which survives scrutiny.  (D.E. 596 at 100-01.)  First, ▮▮▮▮ cites the authoritative source for his description of Bitcoin's consensus validation—the initial white paper authored by Satoshi Nakamoto (presumably also the source of Wikipedia's text).  (▮▮▮▮ Rep. (D.E. 548, Ex. 7) at 14-15.)  Second, the only similarities between ▮▮▮▮ Report and the Carnegie Mellon lecture slides is the use of the names "Alice" and "Bob" in a hypothetical Bitcoin transfer.  But "Alice" and "Bob" are the names commonly used in academic literature to describe participants on the blockchain, as demonstrated by the fact that a search for Alice, Bob, and Bitcoin on Google Scholar generates over 5,000 papers.  *See* https://scholar.google.com/.

Contrary to Defendants' contention, Adriaens's wholesale adoption of "facts" from Ripple and other sources without citation or investigation does "impact[] the reliability of his opinions." (D.E. 596 at 102 (citation omitted).)  This practice is part and parcel of his broader methodological failure to apply any real expertise, instead serving as a mouthpiece for Ripple's "story."  *See Scentsational Techs. LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018) (experts may not "act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'" (citation omitted)).

Finally, Defendants argue both that Adriaens was "substantially involved in preparing [his] report" (D.E. 596 at 99 (citation omitted)) and that there is "no evidence that Adriaens bore any dishonest intention in assembling his report."  (*Id.* at 101.)  Defendants cannot have it both ways. Adriaens testified that he neither copied language from any source into his report without using quotation marks nor relied upon any sources not cited in his report.  (Adriaens Tr. 55:6-57:2; 138:11-15.)  He either was not testifying truthfully, or he was simply so unfamiliar with his own Report that he was unaware of the 43 occasions that contradicted that testimony.  The Court should exercise its gatekeeping function to prevent this unreliable testimony from reaching the jury.  *See Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 429 (S.D.N.Y. 2009) (excluding expert testimony that "simply repeats the hearsay of the client who retained [the expert], without any independent investigation or analysis").

**B.    Adriaens's Opinions Regarding Ripple's Business Model and the "Innovative" Nature of XRP and the XRP Ledger Are Irrelevant and Should Be Excluded.**

Defendants assert that Adriaens's opinions "that the XRP Ledger's innovations were commercially important and that Ripple's product evolution is typical of high-tech startups" should

be admissible to provide "context in assessing XRP's 'character in commerce.'"[15]  (D.E. 596 at 102-04.)  For the reasons set forth at I.C *supra*, these opinions are irrelevant because, even assuming they are true, they shed no light on whether Defendants offered and sold XRP as a security, and should be excluded.  *See Chen-Oster*, 2022 WL 814074, at *13-14 (excluding irrelevant expert testimony).  These opinions also fail *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993*)*, not because they *include* factual narrative (D.E. 596 at 103), but because they are *only* factual narrative, bereft of any methodology.  Adriaens's recitation of facts, together with a conclusory endorsement of Ripple's business as "important," "innovative," or "typical," does not provide any expert opinion that will be helpful to the jury in this case.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y. 2018) ("[E]xpert testimony that seeks to address lay matters which the trier of fact is capable of understanding and deciding without the expert's help is not relevant and is therefore inadmissible." (quoting *United States v. Jiau*, 734 F.3d 147, 154 (2d Cir. 2013) (cleaned up)).

### C.   Adriaens Is Not Qualified to Offer Opinions Regarding Decentralization and Those Purported Opinions Should Be Excluded.

A large portion of the "facts" Adriaens copied without attribution into his Report (*e.g.*, D.E. 536 at A-3-A-4, A-7-A-14) create the false impression that Adriaens has sufficient qualifications to offer an opinion about decentralization and to assess the XRP Ledger against the Bitcoin and Ethereum blockchains, as Adriaens purported to do.  (*See* Adriaens Rep. ¶¶ 21, 58 & Table 1.)  After initially claiming to be an expert in "consensus" (Adriaens Tr. 109:1-12)—the process by which blockchains process transactions—Adriaens ultimately disclaimed any technical blockchain expertise after struggling to answer a series of related questions.  (Adriaens Tr. 167:25-168:18; *see also id.* at

---

[15] Setting aside the inapt comparison between Adriaens's sweeping conclusion of XRP and the XRP Ledger's "commercial importance" and ▮▮▮▮ narrow conclusion that a specific product, ODL, is not "commercially viable," Defendants also miscast the latter as "baseless."  (D.E. 596 at 102.) ▮▮▮▮ undertook an empirical analysis of the costs associated with ODL, finding that even using Defendants' own expert's (Ferrell's) methodology, ODL was uneconomical without Ripple subsidies.  (▮▮▮▮ Rebuttal ¶¶ 30-49.)

258:13-260:3 (testifying he did not have the technical expertise to understand the relative advantages and disadvantages of the Bitcoin and Ethereum blockchains and the XRP Ledger, as displayed in his Report, Adriaens Rep. ¶ 58 & Table 1).)

Perhaps as a consequence, Defendants have abandoned Adriaens's opening decentralization opinion (Adriaens Rep. ¶ 21), assuring the Court he will not testify on the topic except on rebuttal. (D.E. 596 at 97.)  Adriaens is equally unqualified to offer a rebuttal opinion.  His primary contention on rebuttal is that he reads the relevant computer science literature differently than ████ in his view, that literature does not provide a consensus definition of "decentralization."[16] (*E.g.*, Adriaens Rebuttal ¶ 4.)  This opinion is purportedly based on his "expertise in the blockchain industry and a review of relevant literature."  (D.E. 596 at 108.)  Defendants do not explain how Adriaens's blockchain industry experience, as a business professor or otherwise, enables him to be a sophisticated reader of the relevant computer science literature on which ████ opinion relies. Indeed, Adriaens does not have that capability, having conceded that he does not even understand the portions of his own Report that touch upon technical computer science topics.  (*See* Adriaens Tr. at 167:25-168:18; 172:4-175:16; 177:11-18; 191:9-193:20; 202:23-204:6.)  Because he is unqualified to offer an expert opinion as to "decentralization," as that term is used in computer science, i.e., how ████ undisputedly uses it (D.E. 596 at 107), Adriaens's rebuttal opinion should be excluded.[17]

---

[16] Defendants advance a new argument in support of Adriaens's reading of the relevant literature, that the "SEC's own allegations show the word 'decentralized' has different meanings depending on context."  (D.E. 596 at 107 n.65 (quoting Am. Comp. ¶ 382 (D.E. 46) ("A 'native currency' that operates, for example, on Ripple's decentralized network of blockchain technology, is a specialized instrument for a particular computer network, not legal tender.")  This allegation is perfectly consistent with ████ views that decentralization has several aspects, including the "network layer," but it is incorrect to make the claim that the system, as a whole, is decentralized if it does not satisfy the Troncoso definition.  (D.E. 591 at 7-8, 10.)

[17] Contrary to Defendants' claims (D.E. 596 at 108), ████ published a peer-reviewed paper outlining the same methodology, drawn from scientific literature, that he employed here; did not abandon any of his methodology at deposition; and applied it without bias.  (*See* D.E. 591 at 6-9.)

### D. Adriaens's Opinions Regarding the "Commercial Utility" of XRP and the XRP Ledger Are Unreliable and Should Be Excluded.

Defendants concede that simply finding that XRP has a "use" does not mean that they did not offer and sell XRP as an investment contract. (D.E. 596 at 104.) Defendants argue instead that Adriaens's "use case opinion" is relevant because "a fact-finder cannot assess whether XRP '*was offered and sold primarily for use* or instead primarily for its potential for profit' without knowing what the uses for XRP are in the first place." (*Id.*) Adriaens does not supply an answer to this question.

Adriaens's methodology to reach his opinions about the "marketplace's validation of XRP and the XRP Ledger" (D.E. 596 at 105) consisted of: (i) receiving a list of businesses from Ripple; (ii) reviewing a website to determine which of those businesses received financing after Ripple's founding (*without* determining whether such funding had anything to do with any "use" of XRP or the XRP Ledger), locating a total of 91; and (iii) reviewing the 91 businesses' websites to familiarize himself with the type of business (e.g., "cryptocurrency exchange," "wallet").[18] (D.E. 536 at 32-33.) Adriaens asserts this exercise answers the question of whether there existed "high-growth companies or companies that are viewed to be high growth with a market presence in different industry sectors *that use* XRP or XRPL." (D.E. 596 at 106 (citation omitted; emphasis added).) But Adriaens conceded he took no steps to determine whether or to what extent any of the 91 businesses *actually* used XRP or the XRP Ledger, or whether the financing he noted had any connection to such purported use. (*See* Adriaens Tr. 236:14-22; 239:15-25; 256:19-22.) Adriaens thus did not provide the required "valid, reasonable explanation" for employing a methodology that did not involve obtaining the data necessary to answer the question asked. *Chen-Oster*, 2022 WL 814074, at *7.

---

[18] A review of this "methodology" is sufficient to explain why one need not be a "professor of entrepreneurship" to critique it (D.E. 596 at 106), which ▮▮▮▮ effectively did in locating numerous errors in Adriaens's website review. (*E.g.*, ▮▮▮▮ Rebuttal ¶¶ 54-55.)

**IV.     Borden's Testimony Should Be Excluded in Its Entirety.**

Borden's opinions should be excluded because:  (1) XRP's classification for tax purposes is not relevant to the question of whether Defendants offered or sold XRP as a security; (2) Borden's opinions about XRP's tax status are not supported by the IRS Notice or other documents he relies upon, and therefore are inadmissible *ipse dixit*; and (3) Borden is not qualified to render an opinion regarding the federal tax treatment of XRP as a virtual currency, because he has no prior experience with virtual currencies, or to testify regarding the reasonable expectations of XRP buyers or sellers. (*See* D.E. 536 at 33-37.)

**A.     Borden's Opinions about the Tax Treatment of XRP Are Irrelevant.**

Defendants do not dispute that, in applying the *Howey* test, no court has ever relied on the federal tax treatment of an asset to determine whether that asset had been offered and sold as a security.  (*Id.* at 36.)  Nor do Defendants dispute that the Court must give appropriate effect to both the federal tax code and the federal securities laws.  (*Id.* (citing *Alpine Sec. Corp.*, 982 F.3d at 79-80).)

Instead, Defendants argue that the tax treatment of XRP is relevant to their own "theory" of the case, particularly to their fair notice defense.  (D.E. 596 at 73-74.)  They also assert that Borden's experience in other tax matters is sufficient to permit him to opine about the appropriate tax treatment of XRP, and that by considering a variety of IRS and other publications he applied an appropriate methodology in reaching his opinions.  (*Id.* at 75-76.)  However, each of these arguments is insufficient to permit Borden's testimony.

In order to be considered "relevant" to Defendants' fair notice defense, Borden's opinions must tend to make some fact "of consequence'" more or less probable in determining the outcome of that defense.  *See* FRE 401.  In adjudicating Ripple's fair notice defense, the Court will consider "the application of the challenged statute to the person challenging the statute based on the charged conduct."  (D.E. 440 at 7-8 (*citing United States v Smith*, 985 F. Supp. 2d 547, 592-93 (S.D.N.Y.

27

2014)).)  In other words, Ripple must show that Section 5 of the Securities Act provided insufficient notice that its XRP distributions were prohibited absent registration.  While the SEC's public-facing conduct may be relevant to the fair notice defense, *Upton*, 75 F.3d at 98, the IRS's tax treatment of XRP is not.  Indeed, Defendants cite no case sustaining the fair notice defense based on the conduct of an agency other than the one asserting regulatory violations.  And, in any event, Defendants do not need an expert to tell the jury what is contained in publicly available IRS guidance.

In addition, Borden's opinions are not relevant to an understanding of XRP's status in commerce.  Contrary to Defendants' assertion (D.E. 596 at 73), *Marine Bank* does not suggest that Borden's opinions could be relevant to determine whether XRP is considered a security in the "commercial world."  In *Marine Bank*, the Supreme Court noted that the definition of "security" is not limited to instruments traded at securities exchanges, "but extends to uncommon and irregular instruments." 455 U.S. at 556.  The Court did not consider how the investments at issue in that case were treated or structured for tax purposes.  Instead, the Court focused on the promoter's representations and actions, stating that the "character the instrument is given in commerce" is evidenced "by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."  *Id.*

Here, Borden only opines on the federal tax treatment of virtual currencies, and whether and how XRP holders file tax returns accounting for their investment gains (or losses).  Borden offers no opinions regarding the circumstances under which Defendants offered and sold XRP. Defendants have not explained how or why other parties' tax treatment of XRP have any relevance to their conduct at issue here.  And Borden's observations (they are not really expert opinions) that *other* regulators like FINCEN and the Department of Justice have not treated XRP as a security have nothing to do with federal taxation—the only topic for which he was offered as an expert.  They add nothing helpful to his opinions.

**B.**     **Borden's Opinions Are Improper** *Ipse Dixit.*

Defendants also significantly overstate the reliability of Borden's analysis, claiming that before rendering an opinion in this case he "carefully considered" the tax code, case law, regulations, IRS guidance, legislative history, and IRS rulings.  (*See* D.E. 596 at 75-76.)  However, as stated previously (D.E. 536 at 36-37), Borden's opinion that XRP is a virtual currency and taxed as property, rather than as a security, is mainly derived from a single document, IRS Notice 2014-21.  That notice expressly limits its applicability to a subclass of virtual currencies, defined by the notice, called "convertible" virtual currencies and their treatment as property for federal income tax purposes.  *See* IRS Notice 2014-21 § 2.  The notice identifies Bitcoin as a convertible virtual currency, but not XRP.  *See id.*  Borden cites no other publications, including IRS rulings, court decisions, academic studies, or news articles that identify XRP as a convertible virtual currency for federal income tax purposes.[19]  (*See* Borden Rep. (D.E. 548, Ex. 14) ¶¶ 18-21-27.)  He does not claim to know how any purchaser or seller of XRP has treated those transactions on his or her own tax returns.  (*Id.* ¶¶ 28-33.)  Accordingly, his opinion on the tax status of XRP truly stands alone.

Nothing in the cases cited by Defendants (*see* D.E. 596 at 75-76) suggests that Borden's opinions are supported by appropriate analysis.  To the contrary, in *Clarke v. Dutton Harris & Co.*, 2022 WL 717611, at *2 (D. Nev. Mar. 10, 2022), the court found an accountant qualified to testify about damages arising from defendants' accounting errors—precisely because the accountant had created a damages calculation using his professional experience and the relevant tax principles. Here, Borden offers an opinion about the federal income tax treatment of virtual currencies based entirely on what he learned about XRP and virtual currencies in this case.  And in *Willow Bend Ventures, LLC v. Van Hook*, 554 F. Supp. 3d 808, 817-18 (E.D. La. 2020), the court found that an

---

[19] Borden's other official sources, including FINCEN and the Department of Justice, do not discuss the appropriate tax treatment of XRP or virtual currencies.

experienced tax attorney could offer opinion testimony in a legal malpractice case about why a tax defense failed, based on his review of the trial record.  Here, Borden is proposing to testify that XRP is treated for tax purposes as a convertible virtual currency, after reviewing IRS guidance that does not mention XRP, with no prior experience in the tax treatment of virtual currencies.  So the Court has every reason to conclude that Borden's methodological analysis lacks the rigor required of an expert and his opinions are grounded on nothing more than his own assertions.

### C.      Borden is Not Qualified to Testify about the Tax Treatment of XRP.

The SEC does not dispute that Borden is an accomplished tax professional, professor, and has testified as an expert in other cases.  But that does not automatically mean that he should be permitted to testify in this case.  Defendants claim that Borden's opinions in this case, that XRP should be taxed as a virtual currency, "fits comfortably within his extensive experience."  (D.E. 596 at 75.)  This is unpersuasive because Borden's opinions in this case have little or nothing to do with any of his prior professional work, studies, or experience.

In *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995), the court noted that the challenged expert "had both the practical experience and necessary academic training" to offer the testimony at issue.  In other words, he had experience that was directly relevant to issues about which he was testifying.  Before this engagement, Borden had not studied, written, taught or advised clients about the federal taxation of virtual currencies.  So he has no specialized or practical experience relating to digital assets.  Defendants suggest that a person who is qualified as an expert in one broadly-defined area should be allowed to offer opinions an *as an expert* regarding any new development, product, or hazard within that subject matter, regardless of whether that new development, product, or hazard is unfamiliar to him.  But that is not the law.  *See In re Rezulin Products Liab. Litig.,* 309 F. Supp. 2d at 549 (excluding experts who lacked knowledge of the FDA

regulations at issue).  Defendants have offered no valid reason why the Court should find Borden

qualified to testify as an expert witness on this esoteric subject.

## V.        Easton's Testimony Should Be Excluded in Its Entirety.

Easton's opinions should be excluded because:  (1) his analysis of XRP from the perspective

of Generally Accepted Accounting Principles ("GAAP") is irrelevant to the legal issues in this

matter, which center on whether Ripple's offering and sales of XRP constitute investment contracts;

and (2) his rebuttal report does not address the subject matter of ███████ and ███████ opinions,

which did not address the accounting treatment of XRP.

### A.        XRP Accounting under GAAP Is Not Relevant under *Howey.*

Defendants offer a number of arguments in attempting to establish the relevance of Easton's

opinions (*see* D.E. 596 at 64-69); but ultimately, none are persuasive.  The legal question presented

by *Howey* is whether a defendant has engaged in any transaction, contract, or scheme that constitutes

(1) an investment of money, (2) into a common enterprise, (3) with a reasonable expectation of

profit from the efforts of others.  Courts apply the *Howey* test by looking to objective facts, including

the marketing of the asset, the reasonable expectations of purchasers, and the economic reality of

the investment.  The evidence considered by the courts includes the totality of an issuer's

representations, statements, and promises, whether written or oral, rather than the current

accounting classification of the asset offered or sold.

First, Defendants claim that Easton's opinions support their contention that XRP lacks the

"essential characteristics of a security and would not ordinarily and commonly be considered a

security in the commercial world" because "GAAP requires that a company record a transaction

based on the economic substance of the arrangement between the relevant parties."   (D.E. 596 at

65 (citation omitted).)  In their view, Easton's testimony will help determine XRP's character in

commerce, because accounting "reflects the nature" of commercial transactions.  (*Id.*)  However,

Defendants have not identified a single case where the testimony of an accounting expert was deemed admissible in order to determine the character of an asset, or the nature of a commercial transaction, under *Howey*. Not only are Defendants' affirmative defenses silent on XRP's GAAP treatment, Ripple's answer makes clear that XRP's treatment under accounting and tax regimes is not relevant in a securities law case such as this. (*See* D.E. 51 ¶ 400 ("Ripple avers that the scope of the memorandum was expressly limited to certain income tax accounting issues, and that the audit firm that drafted the memorandum stated that it 'provide[d] no analysis on non-income tax issues, such as corporate law or securities matters.'").)

Unable to cite any case where GAAP treatment was relevant to a *Howey* determination, Defendants instead invoke *Glen-Arden* and *Marine Bank* for the proposition that the Court must examine XRP's characteristics in ordinary commerce. (*See* D.E. 596 at 65.) Neither of these cases looks to the accounting treatment of the assets in question to determine whether the defendants offered and sold investment contracts. In *Glen-Arden*, the court found that casks of Scotch whiskey were sold as investment contracts. 493 F.2d at 1032. The evidence before the court actually included certain accounting records, such as sales receipts, confirmations, warehouse records, transfer certificates, and proof of insurance. *Id.* However, the court did not view those records as dispositive, and examined other evidence showing the "economic reality" of the parties' relationship because the character the instrument in commerce was revealed "by the terms of the offer, the plan of distribution and the economic inducements held out to the prospect." *Id.* at 1034. In *Marine Bank*, the Supreme Court found that a privately-negotiated agreement to share in the profits of a slaughterhouse, which gave the depositors certain rights in and control over aspects of the business, was *not* a security under the Exchange Act. 455 U.S. at 558-60. The Court observed that, in determining whether an instrument was offered and sold as a security, "[e]ach transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes

intended to be served and the factual setting as a whole." *Id.* at 560 n.11.  In analyzing whether the transaction at issue entailed the sale of a security, the Court neither examined the transaction's treatment under relevant accounting standards nor relied on any accounting evidence.  *Id.* at 559-60.

Defendants also claim that Easton's opinions are relevant to their fair notice defense.  (D.E. 596 at 66.)  More specifically, they want Easton to testify that, for years, individuals and businesses have been purchasing and selling XRP—and they looked to GAAP and other accounting guidance to account for those transactions.  (*Id.*)  Easton would also testify that the SEC's delegation of authority for accounting standards, and the SEC's acceptance of audited financial statements which treat XRP as an intangible asset (rather than a security), should be viewed as evidence that XRP is not a security.  (*Id.* at 67.)

As stated at IV.A *supra*, to sustain their fair notice defense, Defendants must show that that Section 5 of the Securities Act provided *constitutionally* insufficient notice that its XRP distributions were prohibited absent registration.  Defendants do not allege XRP's accounting treatment as a fact supporting their fair notice defenses.  (D.E. 51 at 97; D.E. 462 at 97; D.E. 463 at 103.)  Moreover, Defendants cite no case where a court has held that any topic of Easton's proffered testimony is relevant to a fair notice defense.  Likewise, Ripple itself disavows the notion that accounting treatment controls securities laws determinations.  (*See* D.E. 51 ¶ 400.)

Even under Defendants' theory of the case, it is unclear how Easton's opinions about GAAP accounting could be relevant to the question of whether Ripple's offering and sales of XRP constitute investment contracts under *Howey*.  Defendants have not articulated how Easton's opinions about GAAP could assist the Court, or the jury, in deciding any disputed question relevant to *Howey*.

Neither the Court nor the trier of fact needs to decide whether XRP transactions create a specific expectation of an investment return akin to an equity or debt security.  The operative

question is whether Defendants offered and sold XRP as an investment contract, and GAAP accounting does not (and cannot) provide an answer.  Defendants' citation (*see* D.E. 596 at 68) to *Intern'l Broth. of Teamsters v. Daniel*, 439 U.S. 551, 559-60 (1979), is inapposite.[20]  Nothing in that decision suggests that expert testimony about accounting standards would assist the Court in deciding whether Ripple's sales of XRP were sales of an investment contract.

**B.     Easton's Rebuttal Opinions Are Not Responsive to ████████ and ████████ Opinions.**

Neither ████████ nor ████████ has offered an opinion in this matter about GAAP accounting or the economic substance of XRP transactions under accounting standards.  And their analyses of Ripple's XRP escrow, lock-up provisions, and payments to MoneyGram or third-party service providers did not mention or touch on GAAP accounting.  Nevertheless, Easton purports to "rebut" their opinions by arguing that their opinions (on other subjects) disregarded or were inconsistent with GAAP accounting and his view of the appropriate treatment of equity and debt securities under GAAP.  Essentially, Easton's rebuttal argues that no matter the different ways that Ripple used XRP, none of those uses can constitute investment contracts because, under GAAP, the economic substance of those transactions was not a sale of debt or equity securities.  This is not appropriate expert rebuttal.

The fact that Rule 26 permits experts to offer rebuttal opinions does not negate the separate requirements of Rule 702, i.e., that all expert opinions must be based on reliable data and methodology, and must be relevant.  *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 28 (S.D.N.Y. 2020).   If an expert's opinion does not relate to an issue in the case, it is not relevant and

---

[20] In *Teamsters*, the Supreme Court's inquiry focused on whether the plaintiff-employee had given anything of value (described as "tangible and definable consideration") in exchange for participating in a defined benefit pension plan.  439 U.S. 559-60.  The Court found that the employee's individual contribution to the success of the pension plan was impossible to measure, and in reality the employee was working at his job in order to receive compensation, not to invest in his retirement. *Id.* at 560.  Here, there is no question that XRP purchasers gave value in exchange for XRP.

therefore cannot be helpful to the trier of fact. *Id.* In addition, "expert testimony should be excluded if it is speculative or conjectural," or "if it is based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples to oranges comparison.'" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21-22 (2d Cir. 1996) (abuse of discretion to admit expert opinion about future earnings based on unrealistic and speculative assumptions).

Here, Defendants claim that Easton has offered "archetypal rebuttal testimony" because he purportedly identified a flawed premise that shows the weakness of an expert's conclusions or the expert's qualifications. (D.E. 596 at 70 (citation omitted).) But Easton's assumption that it was impossible for ███ and ███ to offer opinions about Ripple's use of XRP—without considering the economic substance of those transactions under GAAP accounting—is neither rational nor helpful to the trier of fact. ███ and ███ were not asked to address, or required to consider, GAAP accounting when analyzing Ripple's use of XRP.[21] Allowing Easton to recap portions of his initial opinions, under the guise of offering rebuttal opinions which do not relate to the substance of ███ and ███ opinions, is also improper. *See Liddle v. Cirrus Design Corp.*, 2009 WL 4907201, at *4-5 (S.D.N.Y. Dec. 18, 2009). Nor is it an apples-to-apples comparison of Easton's views to those of the SEC's experts. Accordingly, Easton's rebuttal opinions will not assist the trier of fact and should be excluded.

## VI.   Yadav's Testimony Should Be Excluded in Its Entirety.

Yadav's entire report should be excluded because it offers an impermissible legal opinion, i.e., a *sui generis* legal test to answer the question of where offers and sales of securities under Section 5 of the Securities Act occur for purposes of determining whether those offers and sales were made in the United States. Defendants thus seek to supplant the Court's ruling on this topic with Yadav's

---

[21] If Easton were correct, then all of *Ripple's* other expert witnesses who opined about Ripple's use of XRP could be attacked by Easton on the same grounds.

opinions, which do not address the facts that this Court has already held to be relevant to the analysis.  Yadav's Opinion 3 should be excluded for the additional reasons that it is based on a flawed methodology—invented by Yadav for purposes of this litigation and applied inconsistently—and is not relevant because it does not answer the fundamental question it purports to answer.

### A.    Yadav Offers Improper and Incorrect Legal Opinions.

Defendants offer Yadav's testimony to advance their preferred legal standards governing the domesticity of "offers" and "sales" under the Securities Act.  Not only do Yadav's opinions "usurp … the role of the trial judge in instructing the jury as to the applicable law,"[22] they also directly contradict this Court's ruling as to the applicable legal standards governing the domesticity of Defendants' offers and sales of XRP.  (*See* D.E. 441 at 20-28.)

As to Defendants' *sales* of XRP, the Court held that "the transactional domesticity test set out in *Morrison*, and clarified by *Absolute Activist*, governs this analysis."  (D.E. 441 at 24 (citing *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 269-70 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69-70 (2d Cir. 2012).)  Relying on *Absolute Activist*, the Court explained that a domestic transaction may be demonstrated with "facts that suggest that irrevocable liability attached or title was transferred in the United States," and those facts "may include those 'concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money.'"  (D.E. 441 at 23 (quoting *Absolute Activist*, 677 F.3d at 70).)

As to Defendants' *offers* of XRP, the Court adopted the test articulated in *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147 (S.D.N.Y. 2011), holding that, "for an 'offer' to be domestic, a person or entity must (1) attempt to offer, in the United States, to dispose of securities … or (2) solicit, in the United States, an offer to buy securities…."  (D.E. 441 at 26 (quoting *Goldman Sachs*, 790 F. Supp. 2d at 165 (quoting 15 U.S.C. §§ 77q(a), 77b(a)(3)) (cleaned up).)

---

[22] (D.E. 596 at 87 (quoting *U.S. v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (citation omitted)).)

Yadav opines "that *sales* and *offers* to sell on [a digital asset] exchange must occur on the exchange itself in accordance with the exchange's specific rules and processes."[23]  (D.E. 596 at 88 (emphasis added).)  She then determines the location of "the exchange itself" by applying the four criteria she created for this engagement: (i) an exchange's place of business/registered office/domicile; (ii) location referenced in its terms of use or service; and (iii) market participants' and (iv) regulators' beliefs about the exchange's location.  (D.E. 596 at 92; Yadav Rep. (D.E. 548, Ex. 20) ¶ 103.)  These opinions contravene, not merely the "SEC's interpretation of the law" (D.E. 596 at 87), but this Court's prior ruling.

To determine where a *sale* occurred under *Absolute Activist*, courts ask where "irrevocable liability attached or title was transferred."  (D.E. 441 at 23.)  To be sure, Yadav opines *how* and *when* a digital asset sale becomes "final and binding," which is, according to Yadav, "as soon as offers to buy and sell cryptocurrencies are posted on and matched by an exchange in accordance with its rules."  (Yadav Rep. ¶ 22.)  But she makes no attempt to grapple with *where* in the world that occurs, merely jumping to the conclusion that it takes place at the exchange's geographical location, which she determines by applying her four criteria.  (*Id.* ¶¶ 22, 103, 107-08 & Table A.)  The Court should not accept this logical leap.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").  (*See also* D.E. 536 at 48-50.)

Instead, Yadav offers her own legal test—a sale of digital assets becomes final wherever an exchange is located, according to her criteria.  But this test has nothing to do with the one outlined

---

[23] Defendants protest that Yadav's use of "offer" and "sale" as "industry terms" do not render her opinions "testimony stating ultimate legal conclusions."  (D.E. 596 at 87 n.52 (citation omitted).)  But this claim is belied by Defendants' assertion that Yadav's opinion "demonstrates that Defendants' sales and offers of XRP on foreign cryptocurrency exchanges…were not within the territorial scope of the U.S. securities laws."  (*Id.* at 86.)

in *Absolute Activist*.  In addition, contrary to Defendants' assertions (D.E. 596 at 87-91), Yadav's opinions do not encompass the *facts* that the Court identified as relevant to the legal test of where a transaction occurred, *i.e.*, facts relating to "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money."  (D.E. 441 at 23 (quoting *Absolute Activist*, 677 F.3d at 70).)  Defendants assert that Yadav considered "the processes of order placement and matching," citing portions of her report where she discusses various exchange rules.  (D.E. 596 at 90.)  But those rules do not address "where orders were placed" and "where contracts were formed."  (*Id.*)  Yadav expressly did not consider "where title is passed" or "the geographic location in which payment was exchanged" as relevant to her opinions.  (*See* Yadav Tr. (D.E. 548, Ex. 19) 191:5-19.)  To answer the question of *where*, Yadav relies solely on her four criteria (Yadav Rep. ¶¶ 103, 107-08 & Table A), none of which address any of the facts this Court has found relevant to the analysis of where a sale occurred.  (D.E. 441 at 23.)

Yadav's opinion as to where "offers" of digital assets occur fares no better.  Yadav opines that "offers to buy or sell digital assets on exchanges are made in the physical location of the exchange" (D.E. 596 at 86), which, again, is determined by application of her criteria.  (Yadav Rep. ¶¶ 103, 107-08 & Table A.)  Again, this standard has nothing to do with this Court's ruling that an "offer" occurs when a person or entity, while "in the United States," either "attempts or offers …to dispose of securities" or "solicits … an offer to buy securities."  (D.E. 441 at 26 (quoting *Goldman Sachs*, 790 F. Supp. 2d at 165 (cleaned up).)  As the Court observed, "[w]hen assessing offers …, the focus 'is on the person or entity offering securities.'"  (*Id.* at 27 (quoting *Goldman Sachs*, 790 F. Supp. 2d at 165) (cleaned up).)

Yadav's location of "offer" test wholly rejects that principle.  Contrary to Defendants' assertion (D.E. 596 at 90), Yadav's analysis entirely ignores the location of the seller.  When asked a hypothetical question as to whether the "physical location" of someone "sitting in" New York City

or London when placing an order on a digital asset exchange had "any relevance whatsoever to [her] opinion about where an order takes place," Yadav answered:  "No."  (Yadav Tr. 189:1-11.)

Yadav further opines that "there is no actual offer" when a client conveys instructions to an agent to buy or sell a digital asset on an exchange.  (D.E. 596 at 90-91; *see also id.* at 87 (asserting that Yadav's testimony as to "how generalized instructions to agents must be translated into specific orders to trade on an exchange" will be "helpful in evaluating" where offers occurred).)  Again, this is contrary to the Court's legal ruling that Individual Defendants made domestic "offers" when they made "offers through the 'Market Maker,' a global digital asset trading firm with an office in the United States.'"  (D.E. 441 at 28 (quoting Amended Compl. (D.E. 42 ¶ 96).)

Yadav also makes no efforts to determine any *facts* (D.E. 596 at 87) as to Defendants' solicitation of offers to buy XRP from the United States, which are relevant under the *Goldman Sachs* standard this Court adopted.  (D.E. 441 at 26.)  Had she done so, she would have encountered numerous facts relevant to Defendants' U.S.-based solicitations, including Ripple's provision of instructions on how to buy XRP on its website, Ripple's publicity campaigns surrounding the listing of XRP on digital asset exchanges, and Garlinghouse's public statements touting XRP's value.  (*E.g.* ▆▆▆▆ Rebuttal ¶¶ 101-16.)  These pre-sale communications "soliciting" offers to buy XRP constitute "offers" under *Goldman Sachs* and a long line of cases.  *See, e.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (Section 5 "offer" goes "beyond the common law contract concept of an offer" and covers pre-sale negotiations); *SEC v. Arvida Corp.*, 169 F. Supp. 211, 215 (S.D.N.Y. 1958) ("public distribution" of information about securities via "news media" was a Section 5 "offer").

In an attempt to preserve Yadav's "offer" opinion, Defendants assert it will be "useful to the factfinder in applying the law of offers in the context of exchanges," where, according to Defendants, courts consider that traders have "figuratively traveled to [a] foreign exchange through a foreign broker."  (D.E. 596 at 91.)  Not only is this inconsistent with the Court's ruling regarding

Defendants' offers made through market makers (D.E. 441 at 28), it is also entirely unsupported by the cases Defendants cite.  (*See* D.E. 596 at 91 (citing *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010); *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 626 (S.D.N.Y. 2010); *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 179 (S.D.N.Y. 2010).)  These cases each involve a private action brought under Section 10(b) of the Exchange Act—none consider whether an "offer" occurred, much less break ground on a new "law of offers in the context of exchanges."  (*See id.*)

### B.  Yadav's Opinion 3 Is Based on an Unreliable Methodology.

Defendants do not dispute that Yadav created her four indicia for exchange location for this engagement, without reliance on any academic literature or input from any other researcher in her field.  (D.E. 536 at 48.)  Defendants attempt to defend Yadav's selection of criteria as "grounded in [her] experience and academic work," but do not articulate any link between the two, merely repeating the four criteria set forth in her opinion.[24]  (D.E. 596 at 91-92 (citation omitted).)  Even that recitation demonstrates that Yadav's opinions are inadmissible *ipse dixit*.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  For example, Defendants do not explain *why* Yadav concluded that an exchange's "place of business, registered office, and domicile"—which she acknowledges may be in *different* geographical locations (Yadav Rep., Table A)—constitute "the location of operations for the exchange on which offers are made and trades finalized," or how her "experience" led her to that conclusion.  (D.E. 596 at 92.)  Defendants also offer no response to the SEC's assertion that

---

[24] Contrary to Defendants' assertion (D.E. 596 at 92-93), the SEC lodges a methodological objection—Yadav identified what *she* considered a relevant indicator of where a digital asset transaction occurred, i.e., server location, but then disregarded it.  (*See* Yadav Rep. ¶ 102 (recognizing server location as among "potential indicia of [exchange] location").)  Defendants offer in defense Yadav's "strong" conclusion that server location has "no significance" to "where an *exchange or firm* is located," but they do not address why she brushed aside the relevance of server location to where a *sale* becomes final.  (D.E. 596 at 93 (emphasis added).)

the last two indicia—the subjective beliefs of market participants or regulators—are inherently

unreliable indicators of where an exchange actually exists, let alone where a digital asset transaction

occurs.  (D.E. 536 at 50.)

Finally, Yadav applied two additional criteria only to those exchanges where, in her view,

there were "indicia that a trade may occur within the United States," stating that a "case-by-case"

analysis was required to determine whether any particular transaction became final in the United

States because these domestic exchanges also have foreign affiliates.  (D.E. 536 at 50-51 (quoting

Yadav Rep. ¶ 111).)  Defendants assert that she made this "observation… for completeness."  (D.E.

596 at 94.)  Defendants do not dispute that Yadav did not apply a similar, case-by-case analysis for

the exchanges that she determined were foreign-based under her indicia and did not consider

whether those purportedly foreign-based exchanges have U.S.-based affiliates.  (D.E. 536 at 50-51.)

"Completeness," and an unbiased application of her methodology, would have required Yadav to

apply the same methodology to each of the exchanges she assessed.

## VII.   Ferrell's Testimony Should Be Excluded in Its Entirety.

Ferrell's testimony should be excluded in its entirety because he: (1) offers impermissible

legal opinions (including whether certain facts are relevant to *Howey*, whether others tend to show an

element of the *Howey* test, and how the Court and jury should interpret contractual provisions); (2)

opines that Ripple's actions, including its public statements, had no effect on the price of XRP

without analyzing a single such public statement; and (3) offers irrelevant opinions premised on an

incorrect legal question (such as the status of XRP as a "currency" or that it has "use").

### A.     Ferrell's Legal Opinions Should Be Excluded as Improper and Irrelevant.

Defendants do not dispute that Ferrell offers opinions as to what an "investment contract"

is (*e.g.*, Ferrell Rep. (D.E. 548, Ex. 21) ¶¶ 11-13, 15, 33-81; Ferrell Rebuttal (D.E. 548, Ex. 22) ¶ 11),

what its "economic substance" entails (*e.g.*, Ferrell Rep. ¶¶ 12, 34, 82, 89; Ferrell Rebuttal ¶¶ 8, 11,

41

14, 31, 41, 47, 61, 63, 65, 66), whether there existed a "common enterprise" (*e.g.*, Ferrell Rep. ¶¶ 15, 140-45), or whether particular evidence is relevant to these inquiries (*e.g.*, Ferrell Rep. ¶¶ 15, 83-89; Ferrell Rebuttal ¶¶ 8, 11, 14, 31, 33, 47, 48, 62, 65).  They also do not dispute that Ferrell conceded that "investment contract," the "economic substance" of an investment contract, and "common enterprise" are all legal—*not* economic—concepts.  (*See* Ferrell Tr. (D.E. 548, Ex. 24) 14:4-8, 16:24-17:7, 17:10-16, 23:15-22, 295:2-6.)

Instead, Defendants defend Ferrell's opinions by asserting (incorrectly) that the SEC's argument in support of excluding these opinions consisted of a "single sentence," presented "without any analysis or discussion."  (D.E. 596 at 39.)  This is unsupported by a review of the SEC's brief, which explained that permitting Ferrell to testify regarding the relevance of evidence, or whether a prong of the *Howey* test is satisfied, "would plainly usurp the Court and the jury's roles," and accordingly would be "fundamentally contrary to *Daubert* and the Federal Rules of Evidence."[25] (*See* D.E. 536 at 53-55 (citing case law and record facts supporting argument that Ferrell's legal opinions should be excluded); *id.* at 2 (explaining that "[t]he *Howey* test is not confined to a contract law analysis of written sales contracts (if any written contracts even exist) but instead looks to the totality of representations made by an issuer")).)

Defendants' next tactic is to avoid using the words "investment contract"—notwithstanding

---

[25] Defendants assert in several places that the SEC's arguments are undeveloped and suggest the Court should therefore disregard them. (*E.g.*, D.E. 596 at 37, 40, 80 n.48.) The only Second Circuit case Defendants cite in support of this argument, *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001), is inapposite, as it pertains to an appellate rule governing an appellee's "statement of the issues presented for review," which obviously does not govern the instant motion.  Moreover, the SEC's arguments were plainly sufficiently developed to permit Defendants to respond, as they responded to all such arguments they critique on this basis.

Ferrell's use of the term throughout his reports—and attempt to cast Ferrell's opinions as "purely economic," relying on the SEC's allegation that XRP has the "economic reality" of a security.[26]  (*See* D.E. 596 at 40-41 & n.29.)

First, simply "[i]nserting the word 'economically' …does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (notwithstanding an expert's testimony that he was "not offering a 'legal' opinion," excluding expert testimony that "all 'economically material' information" had been disclosed on the grounds that it constituted impermissible legal opinion and would "suggest to the jury that their job is done" as "they have been told the answer to an ultimate question").

Second, it is true that, in analyzing whether an instrument was offered or sold as an investment contract, "form should be disregarded for substance and the emphasis should be on economic reality."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).  There is, however, a single, well-settled method to determine the "economic reality" of an offer or sale:  the *Howey* test.  *See, e.g.*, *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) ("[c]onsidering the economic realities under the *Howey* test" to find resale of digital assets into secondary public market was part of distribution of securities without registration); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985) (noting that the *Forman* Court "[a]ppli[ed] the *Howey* test" to draw conclusions about "the economic realities of the transaction"); *Scottsdale Ins. Co. v. McGrath*, 506 F. Supp. 3d 216, 225 (S.D.N.Y. 2020) ("The so-called '*Howey* test' is whether 'looking at the economic realities, the

---

[26] Defendants' citation to *Aluminum Warehousing*, 336 F.R.D. at 29-30 (D.E. 596 at 40) is inapposite, as Defendants do not identify any "economic analysis" that Ferrell conducted to reach his conclusions about the nature of "investment contracts," their "economic substance," or the existence of a "common enterprise."  Indeed, Ferrell could not have conducted any such economic analysis because, as he conceded, these are legal, rather than economic, concepts. (Ferrell Tr. 14:4-8, 16:24-17:7, 17:10-16, 23:15-22, 295:2-6.)

transaction involved an investment of money in a common enterprise with profits to come solely from the efforts of others.'" (citation omitted)).

Ferrell's opinions thus are either (i) impermissible opinions as to whether elements of the *Howey* test are satisfied, or (ii) a ploy to supplant the *Howey* test with his own opinions regarding the economic reality of XRP transactions (D.E. 596 at 40 & n.29). If they are the former, they should be excluded because whether the elements of the *Howey* test are satisfied is unquestionably "the ultimate conclusion the jury will be asked to make" if this case proceeds to trial. (*See* D.E. 596 at 39-40 (quoting *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482, 505 (S.D.N.Y. 2009).). If they are the latter, they should be excluded as irrelevant under governing law.

Ferrell's opinions that "Ripple's contracts do not provide XRP purchasers with certain rights traditionally associated with common stock such as dividends or voting rights" are no more relevant. (D.E. 596 at 40-41 (citation omitted).) First, absence of entitlement to dividends is no defense to a finding that XRP was offered and sold as an "investment contract" because an expected increase in the value of an instrument is sufficient to satisfy "profit" in *Howey*'s "reasonable expectation of profit" element. *See Telegram*, 448 F. Supp. 3d at 371 ("profit" as used in *Howey* includes "the increased value of the investment" (quoting *Edwards*, 540 U.S. at 394)). Second, no court has concluded that an instrument was not offered or sold as an investment contract because of an absence of voting rights. Defendants' cited cases are not to the contrary. (D.E. 596 at 40-41.) *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551 (1979), did not address whether the instrument in question supplied voting rights. *Landreth* did not apply the *Howey* test, simply concluding that an asset that was both labeled a "stock" and bore the "usual characteristics" of a stock was a "stock" within the meaning of the Securities Act. *See* 471 U.S. at 694, 697. And in *Tcherepnin v. Knight*, 389 U.S. 332 (1967), the Court did not rely on the fact that holders of the instruments at issue were entitled to

dividends and voting rights to determine that those instruments were investment contracts; instead, it applied the *Howey* test. *See id.* at 338-39.

**B.** **Ferrell's Opinion that Ripple Did Not Affect the Price of XRP Should Be Excluded as Unreliable.**

**1.** **Ferrell's Opinion Is Predicated on a Single Statistical Observation That Neither Courts Nor Academic Literature Recognize as Supporting the Conclusion He Draws.**

In defending Ferrell's opinion that Ripple's actions did not affect XRP's prices, Defendants improperly conflate the *methodology* Ferrell employed with the *conclusions* he drew from that methodology.  (D.E. 596 at 28-34.)  To be admissible, Ferrell's conclusions must be supported by his methodology, and they are not.  *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248 (S.D.N.Y. 2010) ("In assessing the reliability of expert testimony, the trial court must decide not only whether an expert's methodology is reliable for some purposes, but whether it is a reliable way 'to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant.'" (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 154 (1999))).

Ferrell's methodology was a "factor model," which he employed "to identify the factors that explain [XRP]'s price changes over time."  (D.E. 596 at 28.)  Ferrell then interpreted the results of his factor model, concluding that Ripple's actions did not impact XRP's prices based on his observation of a single data point generated by his model, the absence of a statistically significant non-zero alpha.  (D.E. 596 at 28-32.)  In Defendants' view, this observation means that his model demonstrates that "all of XRP's statistically significant price variation over seven years is *fully explained* by the movement of the cryptocurrency market" and therefore, there is "no room" for Ripple to have impacted XRP price returns.  (D.E. 596 at 29-30 (emphasis added); *see also id.* at 32 ("Ferrell properly interpreted his results as showing that there is no room for *any* other factors that have a statistically significant effect on XRP's long-run prices." (emphasis in original)).)

In response to the SEC's critique that Ferrell's methodology here is novel and unsupported,

Defendants cite a handful of academic articles in support of their assertion that the "factor model"

is an accepted methodology to "assess the factors explaining price returns for a variety of asset

types, including cryptocurrencies" and note that Ferrell has used factor models in previous expert

work.[27] (D.E. 596 at 27-32 & nn. 20-22.)  None of the articles cited by Defendants, however,

supports the use of a factor model to draw the conclusion that Ferrell draws here.[28]  Indeed, Ferrell

conceded that this statistical measure cannot be used to draw this conclusion. (*See* Ferrell Tr.

222:19-23 ("Q. Professor, are you offering the opinion that because alpha is statistically

insignificant, there is no room for any other factors to explain the price returns of XRP? A. Well,

no, I'm not saying that.").)  Defendants attempt to rehabilitate Ferrell by drawing a distinction

between *any* price movements caused by factors other than those explained by his model and

"*statistically significant* long-term price impacts."  (D.E. 596 at 32 n.23.)  But this is not Ferrell's

opinion—he did not draw

---

[27] The SEC inadvertently misstated Ferrell's use of factor models in his prior expert work.  The transcript pages cited by both the SEC and Defendants (D.E. 536 at 56; D.E. 596 at 27 & n.17) demonstrate that Ferrell could not identify any specific expert engagement in which he had "used a factor model to opine on the question of whether a specific factor or event influenced price returns."  (Ferrell Tr. 79:14-80:17.)  Defendants also do not identify any such engagement.

[28] In each of the articles Defendants cite (D.E. 596 at 31-32 & nn. 20-22), the authors develop an index that provides a measure of a firm characteristic, such as quality of corporate governance. They then use the Jensen-alpha approach to estimate the effect of changes in the firm characteristic, as measured by a change in the index, either across firms or over time, on the asset's returns *subsequent* to the change of that characteristic.  Paul A. Gompers, et al., "Corporate Governance and Equity Prices," The Quarterly Journal of Economics (2003), at 108-109, 121-125; L. Bebchuk, A. Cohen & A. Ferrell, "What Matters in Corporate Governance?," 22 Rev. Fin. Stud. 783 (2009), at 785-86; L. Bebchuk, A. Cohen & C. Wang, "Learning and the Disappearing Association Between Governance and Returns," 108 J. Fin. Econ. 323 (2013), at 326. *See also* S.P. Kothari & Jerold B. Warner, "Econometrics of Event Studies," Handbook of Empirical Corporate Finance (2007) at 24-26 (explaining that, in a long-run event study, alpha is calculated only from post-event abnormal returns).  These papers do not support Ferrell's work here because he does not employ the same or an analogous methodology. Ferrell does not identify any characteristic of Ripple that changes over time and he does not estimate the effect of any such changes on subsequent XRP returns.  Moreover, none of these papers draws any meaning from, much less predicates conclusions on, observation of the absence of a statistically significant non-zero alpha.  (D.E. 596 at 29.)

that distinction at deposition and does not use that language in his Report.  (*See* Ferrell Rep. ¶ 102 (opining there are "no remaining average 'excess' XRP price returns that are unexplained by [his] model"); *id.* ¶ 103 ("the variation in long-run XRP price return can be explained by non-XRP cryptocurrency market factors that are outside of Ripple's control").

To be sure, the law does not require Ferrell to employ the well-accepted "event study" method to assess the impact of Ripple's actions on XRP's price, but if he opts for an alternative, as he did here, that method must be "reasonable and recognized in the relevant scientific community." *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 310352, at *6-8 (S.D.N.Y. Mar. 24, 2000). Defendants did not cite a single academic article in support of the proposition that the absence of a statistically significant non-zero alpha is sufficient to rule out the possibility that other factors outside those modeled influenced an asset's price.  Moreover, no court has ever found Ferrell's methodology sufficient to draw the conclusion that Ferrell draws here (i.e., that his factor model results leave "no room" for any other factors to affect XRP's price), and his opinion accordingly should be excluded as unreliable.[29]  *See In re the Bear Stearns Cos., Inc. Secs.*, 2016 WL 4098385, at *9 (S.D.N.Y. July 25, 2016) (excluding plaintiff's expert opinion where methodology had "not achieved 'general acceptance' within the relevant scientific community or 'been subjected to peer review and publication'"; concluding that the cases and academic literature cited by plaintiff on the topic of the expert's analysis did not actually endorse the methodology the expert employed).

## 2.   Ferrell's Own Factor Model Demonstrates That There Is "Room" for Other Factors to Influence XRP's Price.

Defendants do not dispute that the two measures the SEC cites—adjusted R-squared and root mean square error (RMSE)—assess how well Ferrell's model "fits" the variation in XRP price

---

[29] If Ferrell's observation of alpha had the meaning he attaches to it, one would have to embrace the absurd conclusion that the prices of stocks with an alpha statistically indistinguishable from zero, e.g., 26 of 27 stocks in the Dow Jones Industrial Average, are not affected by company-specific news.  (*See* ██████ Rebuttal (D.E. 548, Ex. 5) ¶¶ 21-24 & Figure 2.)

data that it examines.  (*See* D.E. 596 at 33 n.24, 34 n.25.)  Instead, they urge the Court not to rely on these results in assessing his conclusions, citing cases where courts "treat[ed] attacks on a regression's R-squared as bearing on weight, not admissibility."  (D.E. 596 at 33.)  But none of these cases involved an expert making a claim that his model so perfectly explained price movements that there was no room for any other factor to influence price, as Ferrell does here.  (*See* D.E. 596 at 27-32.)  Ferrell puts the ability of his model to explain price variation at issue by opining his results demonstrate there was "no room" for Ripple to affect price.[30]  (D.E. 596 at 32.)  And he expressly relies on his factor model's adjusted R-squared values as establishing "the explanatory power of [his] model in explaining XRP price movements."  (Ferrell Supp. Report (D.E. 548, Ex. 23) ¶ 16; *see also* Ferrell Rep. ¶¶ 98 & n.174, 99, 101, 117.)

The adjusted R-squared values for Ferrell's factor model show that his model explains only approximately 54% of XRP's price fluctuations for 2013-2020, and approximately 92% for a sub-period, 2015-2020.  (Ferrell Rep. ¶ 98.)  Neither of these figures is 100%, as Ferrell's conclusions would suggest, and Ferrell could not explain why the same factor models estimated over two largely overlapping periods have such dramatically different explanatory power. (Ferrell Tr. 173:24-176:3.)

Defendants challenge the validity of comparing adjusted R-squared values because the inputs differ (in part) between Ferrell's two estimation periods.  (D.E. 596 at 34.)  This critique is contrary to their own expert's views, as Ferrell compared the adjusted R-squared values of his own and ▮▮▮▮ models (which used different inputs), acknowledging the validity of this exercise. (Ferrell Supp. Report ¶ 20 n.31.)  Defendants next offer that the explanatory values differ widely because "dependent-variable data (XRP returns)" in the first and second periods were different.  (D.E. 596 at

---

[30] It is no defense to say that "no econometricians use RMSE in the way the SEC seeks to employ it here."  (D.E. 596 at 34 n.25.)  The authorities cited by Defendants do not address application of RMSE to test the claim, as Ferrell made here, that a model so thoroughly explains the variation in an asset's price that it is safe to conclude that no other factors affected its price.  (*See id.*)

34.)  But because the second period is a sub-sample of the first period, they are not "different samples" of XRP price data (D.E. 596 at 34 (citation omitted))—approximately three-quarters of XRP price data was *identical* between the two periods.  Defendants next offer that the results differ because Ferrell used different sets of digital assets to construct his "independent variables" in the two periods, asserting that comparing the two periods is therefore "apples to oranges."  (*Id.*)  Again, the independent variables overlap, as Ferrell used all 9 digital assets from first estimation period in his second estimation period.  But even the *same* independent variable does not generate the same results in the two overlapping time periods.  In Ferrell's first estimation period, Bitcoin is not statistically significantly correlated with XRP's price.  (Ferrell Rep. ¶ 99 & Exhibit 5.)  In his second estimation period, Bitcoin is statistically significantly inversely correlated with XRP's price.  (*Id.*)  Ferrell's results for the two models are thus inconsistent across the two periods even for the *same* independent variable.

The RMSE values for Ferrell's factor model shows that the magnitude of the *typical* monthly XRP price return left unexplained by his factor model was approximately 53.2% for his first period and approximately 34.2% for his second period. (*See* Ferrell Tr. 241:8-243:19.) Defendants do not dispute this, but again urge the Court to find this "goes to weight, not admissibility." (D.E. 596 at 34 & n.25.)  Although that may be true of a typical case, where an expert makes the kind of claim Ferrell does here—opining that his results excludes the possibility that other factors (including Ripple) affected XRP's price—that so much of typical monthly XRP price returns is left *unexplained* by the model supports exclusion of Ferrell's opinion as unreliable and unhelpful to the jury.

### 3. Ferrell's Opinion that Ripple's XRP's Distributions Did Not Affect XRP's Price Is Irrelevant and Unreliable.

Ferrell's opinion that Ripple's XRP distributions did not impact XRP's price should be excluded as irrelevant and unreliable.[31]

Defendants' relevance argument relies on a tortured reading of the Complaint and the SEC's discovery responses, both of which appropriately focus on Defendants' "public promises" to engage in efforts to increase XRP's price. (D.E. 35-36 & n.26 (citing D.E. 46 ¶¶ 263-69).) Such "public promises" are indeed relevant to the reasonable expectations created by the promoter. *See Joiner*, 320 U.S. at 352-53 (courts look to "the terms of the offer, the plan of distribution, and the economic inducements *held out* to the prospect" (emphasis added)). But despite the SEC's invitation in its opening brief (D.E. 536 at 59), Defendants cite no authority suggesting that the relationship between the act of selling the instrument at issue and changes to its price has any relevance to any part of the *Howey* test. Even if Ferrell's opinion as to Ripple's XRP distributions was reliable (and it is not), it is entirely irrelevant to whether Defendants offered and sold XRP as a security.

Ferrell's opinion is unreliable because his methodology was not constructed to assess the effects of Ripple's XRP distributions. Such distributions could only impact XRP's price if (a) such XRP actually entered the market, or at least (b) market participants were aware of Ripple's distributions. (D.E. 536 at 59.) Defendants do not dispute this. Nor do they dispute that Ferrell's model did not actually examine whether or when either of these occurred. (*Id.*) Defendants attempt to defend this methodological flaw by citing the Complaint. (D.E. 596 at 36.) But the SEC's allegations could not—and did not—supply the data necessary for Ferrell to run a regression analysis that accounted for the dates and times that Ripple's distributed XRP actually entered the

---

[31] Perhaps recognizing that, if Ferrell's factor model perfectly explained XRP's price movements, his analysis of the impact of Ripple's distributions on XRP's price would be entirely superfluous, Defendants assert for the first time that this analysis was a "robustness check" on Ferrell's factor model (D.E. 596 at 35), but Ferrell never describes it as such. (*See* Ferrell Rep. ¶¶ 107-23.)

market, or market participants became aware of such entry, both of which Defendants implicitly

concede were necessary to measure any actual XRP price effect.  Indeed, it would be unreasonable

to expect Ripple's distributions to affect XRP price at the point they were moved to another

account—the date that Ferrell uses for matching distributions to XRP returns (Ferrell Rep. C-6,

C-7)—if these distributions actually entered the market, or market participants learned about them,

several months or even years later.  Because Ferrell does not examine these data points, his

methodology is unreliable and his opinion should be excluded.  (*See* Ferrell Tr. 247:8-14, 249:9-17.)

      Defendants' remaining arguments fare no better.  Defendants do not dispute that if Ripple

bought XRP to increase XRP's price in response to a price decline at the beginning of his 28-day

period, and the price rebounded in response to Ripple's actions, Ferrell's model would not detect

this relationship.  (D.E. 536 at 59-60.)  Instead, Defendants assert that "[i]f XRP's price does not

change between the first and last day of an analysis period, then, by definition, no longer-term price

change has occurred."  (D.E. 596 at 36-37.)  But this is not true—if Ripple's purchases of XRP

caused a rebound in XRP price within Ferrell's 28-day period, then that price increase would be

"baked into" XRP's price going forward in the long term.

      Finally, Ferrell's conversion of his data from number of XRP distributed to dollar value

distributed unnecessarily introduced XRP price variation into his analysis.  (D.E. 536 at 60.)  Thus,

the same number of XRP issued in 2013 and 2017 would have very different impacts in Ferrell's

model because, when multiplied by the contemporaneous price, as Ferrell did, the value of the

same distributions in 2013 would be 100 times lower than the value of distributions in 2017 simply

because XRP price was 100 times higher in 2017 than in 2013.  Thus, what Ferrell actually tests in

his analysis is the impact of XRP price (rather than distributions) on XRP returns.  Defendants

assert in response only that Ferrell testified that he had also run his model using number of XRP

(D.E. 596 at 37), an analysis that he inexplicably failed to include in his expert report and thus could not be appropriately tested at deposition.

### C. Ferrell's Opinion that XRP Is a Virtual Currency Should Be Excluded as Irrelevant.

Defendants argue Ferrell's opinion that XRP is a virtual currency is relevant for two reasons, both of which are meritless.

First, Defendants argue that Ferrell's virtual currency opinion is relevant to whether it is "ordinarily and commonly considered a security in the commercial world," citing *Marine Bank*. (D.E. 596 at 38 (cleaned up).)  As explained at I.C *supra*, *Marine Bank* endorsed the same criteria articulated in *Joiner* for determining an instrument's "character in commerce," all of which focus on the promoter's statements and actions, and none of which are addressed in Ferrell's virtual currency opinion.  *See Marine Bank*, 455 U.S. at 556, 559 (contrasting the private agreement at issue with the solicitations in *Joiner* to over 1,000 persons and sales in *Howey* to 42 persons).

Second, Defendants argue that Ferrell's opinion that XRP is a "virtual currency" is relevant because the securities laws exempt "currencies" from the definition of security.  (D.E. 596 at 39.) Ferrell's opinion supplies no evidence that XRP is a "currency" such that Defendants' offers and sales of XRP need not be registered—Ferrell does not opine that XRP is a "currency," at all or within the meaning of the securities laws (and the latter would be an impermissible legal opinion). (Ferrell Rep. ¶¶ 146-52.)  Defendants' attempt to shoehorn Ferrell's "virtual currency" opinion into the statutory exemption for "currencies" is another endeavor to substitute their "theory" of the case as the standard for admissibility, instead of governing law.

### D. Ferrell's Opinions Related to ODL Should Be Excluded as Irrelevant.

Ferrell's opinions related to ODL—that it "could be more cost-efficient than traditional remittance methods" or "would represent a viable alternative to traditional remittance methods" under certain assumed conditions (D.E. 596 at 37)—are not relevant to any claim or defense.  As set

forth at I.B *supra*, the relevant question to the "investment contract" analysis is not whether an asset

has a "use" but whether it was offered and sold primarily for use or potential for profit.

Defendants claim that Ferrell's opinions are admissible to rebut the SEC's "theory" that

ODL "has no viable economic use," citing the SEC's Amended Complaint.  (D.E. 596 at 37-38

(citing D.E. 46 ¶ 365).)  But Ferrell's opinions do not address, much less rebut, the SEC's allegations

that ODL use was subsidized by Ripple, that Ripple touted ODL as a cheaper alternative to cross-

border money transfers, and that at least one money transmitter found it to be significantly more

expensive.  (D.E. 46 ¶ 365.)  Nor does Ferrell's "empirical conclusion" regarding a hypothetical

scenario in which ODL "could" or "would" be cost-effective without Ripple subsidies address the

"20 paragraphs" of the Amended Complaint pleading facts demonstrating the reality that,

historically, it was not.[32]  (D.E. 596 at 37; *see also id.* at 5-6 (citing D.E. 46 ¶¶ 358-78).)

Ferrell's opinion that "Ripple's business efforts (including paying rebates to remitters)

represent rational methods of seeking to increase the 'use cases' for ODL" (D.E. 596 at 37-38) is

equally irrelevant.  The *Howey* test does not require this Court to determine whether Ripple's

business methods were "rational," and any evidence to that effect is wholly irrelevant and would

create a confusing and unnecessary side show at any trial.  *See* Fed. R. Evid. 401, 403.

### E.     Ferrell's Additional Rebuttal and Supplemental Opinions Should Be Excluded.

Defendants' remaining arguments for the admissibility of Ferrell's opinions should be

rejected.

First, as to Ferrell's rebuttal of ███████ Defendants do not dispute that ███████ did not opine

on the reasonable expectations of XRP purchasers, and all of Ferrell's opinions on this topic are

accordingly beyond the scope of ███████ opinions.  (D.E. 536 at 64.)  Defendants do not address

---

[32] ███████ identifies methodological flaws undermining the reliability of Ferrell's conclusion that
ODL "could" or "would" be economically viable.  (███████ Rebuttal ¶¶ 33-39.)

the SEC's argument that Ferrell's critique of ███ does not actually go to the opinions ███

offered, i.e., short-term effects of Defendants' trading on XRP's price.  (*Id.*)

Second, Defendants misleadingly claim that a judge in this District endorsed Ferrell's "exact

critique" of an expert who "adjusted his estimate of a stock's value on days the expert designated as

non-news days."  (D.E. 596 at 41-42 (quoting *In re Bear Stearns Cos. Sec.*, 2016 WL 4098385, at *10

(S.D.N.Y. July 25, 2016).)  The *Bear Stearns* court excluded an expert, not because of the method he

employed to calculate but-for prices on non-news days, but because his opinions lacked the evidence

necessary to support his conclusion that abnormal returns were caused by the news in question.  *See*

*id.* at *14 (rejecting expert's theory that abnormal returns on certain days without observable news

were the result of "leaked" disclosures).  In contrast, the only abnormal returns that ███ subtracts

in his but-for price analysis are those that are statistically significantly correlated with Ripple news.[33]

Third, Defendants do not dispute any of the ways in which the SEC pointed out Ferrell's

misreads ███ opinions, including Ferrell's incorrect assertion that ███ was "silent on the issue of

market efficiency."[34]  (D.E. 536 at 65.)  Defendants inaccurately assert that the SEC

mischaracterized Ferrell's testimony on this point of market inefficiency (Ferrell Tr. 70:8-11), and,

citing nothing but Ferrell, assert that it is impossible to "use an event study to *draw conclusions* about

---

[33] Defendants do not explain the distinction they attempt to draw between "actual" and "adjusted" pricing data in Marais's report and Ferrell's 2007 paper.  (D.E. 596 at 42 & n.30.)  Like ███ Marais compounds percentage returns to examine the "consequence" to an XRP purchaser of investing on days with and without Ripple news.  (*See* Marais Rebuttal (D.E. 548, Ex. 38) ¶ 21.)  Similarly, like ███ Ferrell calculated price inflation resulting from undisclosed information by adjusting actual returns for the but-for (or predicted) returns.  *See* Allen Ferrell & Atanu Saha, "The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implication of *Dura Pharmaceuticals, Inc. v. Broudo*," The Business Lawyer, Vol. 63, No. 1 (Nov. 2007), at 163-86.

[34] Defendants also continue to misinterpret the statistical components at issue here, asserting that "[a]ny 'leftover,' unexplained XRP return after accounting for movement in the general digital asset markets, is reflected in 'alpha,' the regression 'constant.'"  (D.E. 596 at 29.)  Defendants cite nothing in support of this statement, and it is wrong.  The "leftover, unexplained" XRP returns from a factor model are found in epsilon (the regression residual), not in alpha (the regression constant).  (D.E. 536 at 65.)

the relationship between events and asset prices in an inefficient market." (D.E. 596 at 42-43.)  But

Ferrell did not offer this opinion, either in the Supplemental Report paragraphs or transcript pages

cited by Defendants.  (*See* D.E. 596 at 43.)  Such an opinion, had Ferrell offered it, would stand in

sharp contrast to peer-reviewed, academic research reflecting event studies conducted on digital

asset markets (including XRP) and drawing conclusions from those studies that certain events

caused subsequent price changes.  (*See* ███ Rep. (D.E. 548, Ex. 4) ¶¶ 34-38.)  Indeed, market

efficiency is not the binary concept Defendants claim it is, where event studies can be conducted in

"efficient" markets and not "inefficient" markets.  *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573

U.S. 258, 272 (2014) ("market efficiency is a matter of degree").  (*Cf.* Fischel Tr. (D.E. 548, Ex. 34)

224:13-17 (testifying he did *not* "believe that the XRP market was completely inefficient, meaning

there's no relationship between announcements and price movements").)  As Ferrell recognizes, a

less efficient market presents methodological design challenges (*see* Ferrell Tr. 98:4-14), which ███

appropriately addressed.  (███ Report ¶¶ 35-38 & Appendix F.)

Fourth, Magistrate Judge Netburn denied Defendants' motion to strike ███

supplemental report and permitted Defendants to submit supplemental reports responding to

███ supplement.[35]  (D.E. 469.)  Ferrell's attempts to use his Supplemental Report to bolster his

original opinions, by including references to his analysis and materials that he could and should

have included in his Report, should be rejected. (*See* D.E. 536 at 63-64.)

---

[35] Defendants misinterpret the Order (D.E. 596 at 43), which noted that ███ "supplemental
report was prepared explicitly in response to the reports of two of Defendant Ripple's rebuttal
experts."  (D.E. 469 at 2.) The "two" experts were Marais and Fischel—Ferrell did not submit any
rebuttal to ███ opening report.

Finally, Defendants assert that Ferrell casts doubt on the credibility of ███ but-for counterfactual prices because they "mathematically imply an average excess 28-day return" attributable to Ripple, and if such return existed, the "alpha" in Ferrell's factor model "would have been enormous," but it was "statistically indistinguishable from zero."[36]  (D.E. 596 at 44.)  Ferrell has not identified a flaw in ███ methodology, but in his own.  As calculated by Ferrell using ███ model, the 28-day excess XRP returns attributable to Ripple vary between 11.03% and 23.2%.  (Ferrell Supp. Report ¶ 15.)  As Ferrell acknowledged, the RMSE values for his factor model reveal that the magnitude of the *typical monthly* XRP price return left *unexplained* by his factor model was approximately 53.2% for his first period and approximately 34.2% for his second period.  (Ferrell Tr. 241:8-243:19.)  These Ferrell-calculated 28-day excess returns attributable to Ripple (between 11.03% and 23.2%) fall well under the typical monthly returns left unexplained by Ferrell's model.  (*Id.*)  Ferrell's supplemental calculation thus "casts significant doubt" on the credibility of his *own* conclusion that his factor model so perfectly explains XRP returns that there is "no room" for Ripple's influence.  (D.E. 596 at 29, 32, 44.)

## VIII.   Osler's Initial Opinions Should Be Excluded in Their Entirety.

Osler's initial opinions should be excluded because:  (1) whether XRP functions as, and has the attributes of, a currency, and whether XRP has a valid use in Ripple's ODL product, is not relevant to the question of whether Ripple may be liable for offering and selling XRP as an investment contract (D.E. 536 at 71-72); (2) Osler's opinions do not meet the reliability requirements of *Daubert* because her currency opinions involved little or no analysis and her ODL opinions almost exclusively repeated factual statements by Ripple employees (*id.* at 72-76); and (3) Osler is not qualified to offer her opinions in this matter because she has demonstrated no expertise

---

[36] Defendants misleadingly assert that "███ offered no criticisms of Ferrell's arithmetic" (D.E. 596 at 44), ignoring the many aspects of Ferrell's methodology that ███ critiqued in his rebuttal.  (*E.g.*, ███ Rebuttal ¶¶ 37-57.)

in analyzing cryptocurrencies, and she has no training or practical experience with ODL or the

business strategy of disruptive innovation (*id.* at 76-77).

### A.    Osler Is Not an Expert on XRP, ODL, or Disruptive Innovation.

Defendants have failed to establish that Osler has the necessary specialized training or

experience to testify as expert in the only two subjects of her initial report.  Defendants argue that

because Osler is qualified to testify generally about currencies, she needs no additional expertise to

offer an opinion that XRP functions as a currency.  (D.E. 596 at 78-79.)  Defendants fail to

acknowledge that Osler is not merely offering general opinions about the functions and attributes of

currencies; she also is opining *specifically* that Ripple's digital asset XRP has the attributes and

functions of a currency despite lacking expertise in digital assets or XRP.  Similarly, Osler has

demonstrated expertise in cross-border payment systems and currency trading, but she is not merely

describing the subject of cross-border money transfers.  The essence of her opinion is that ODL is a

superior product which is disrupting the payments industry (*e.g.*, Osler Rep. (D.E. 548, Ex. 29) ¶ 7),

offered without any experience or expertise in ODL or the strategy of disruptive innovation.

In *Lion Oil Trading & Transp., Inc. v. Statoil Marketing and Trading Inc.*, 2011 WL 855876

(S.D.N.Y. Feb. 28, 2011), the court noted that an expert does not need to have "experience tailored

to the precise product or process *that is the subject matter of the dispute.*"  *Id.* at *1 (emphasis added).  But

the court *also* noted that an expert's "general experience" may be "insufficient ... to testify about the

[particular] *issue* in the case at hand."  *Id.* (emphasis supplied).  Nothing in Osler's background

suggests that she is qualified to offer expert opinions about the specific issues of XRP's features,

ODL's benefits, or whether Ripple is actually pursuing a strategy of disruptive innovation.  *See Arista*

*Records,* LLC, 2011 WL 1674796 at *5 (excluding computer science expert's opinions about

statistics).  Osler has cited no academic studies about ODL (or XRP or disruptive innovation), and a

lack of citation to other studies is one of the factors under *Daubert* that, along with her lack of

experience with the particular issues she was asked to address, tends to show that her opinions will not be helpful to the trier of fact.  *See* 509 U.S. at 594.

### B.      Osler's Opinions about XRP and ODL Are Not Relevant.

Defendants contend that Osler's opinions are relevant because they tend to show that XRP has an "actual or potential use" in ODL, and that XRP is a "virtual currency" under another federal regulatory regime.  (*See* D.E. 596 at 5-7, 79-80.)  However, Osler has not opined that XRP is a currency for purposes of the Securities Act, or even a "virtual currency" under another regulatory regime.  (*See* Osler Rep. ¶¶ 7, 13-14, 18.)  Osler merely opines that XRP *functions* like a currency, and has some common *attribute*s of a currency.  (*Id.*)  This opinion is not helpful to the trier of fact because Defendants do not dispute that currencies can be offered and sold as investment contracts (D.E. 596 at 6-7), and she offers no opinion or analysis on whether XRP purchasers reasonably expect to use their XRP as currency, or hold them as investments with the expectation of making a profit.  (*See* Osler Rep. ¶¶ 7, 13-14, 18.)  In short, Osler's opinions will not help the jury determine whether Defendants offered and sold XRP as a security.

Similarly, Osler's opinions that XRP has an "economically" viable use or potential use to provide liquidity in cross-border transactions is merely an assumption.  (*See id.* ¶¶ 44, 53.)  Osler knew that Ripple had partnered with MoneyGram but was unaware that Ripple needed to provide financial subsidies to MoneyGram because MoneyGram had incurred a variety of additional exchange fees and significant new costs after incorporating ODL into its money transfer business; and, in fact, MoneyGram's only financial benefits from using ODL were the substantial subsidy payments received from Ripple.  (*See* D.E. 536 at 67-68, 70-71.)  Accordingly, Osler's assumptions about XRP having an economically viable use in the money transfer business represent a "complete break" with the real-world experience of ODL.  *See Boucher*, 738 F.3d at 22 (excluding opinion of expert whose assumptions about future employment disregarded plaintiff's actual work experience).

Defendants attempt to defend the reliability of Osler's analysis of ODL in several ways. First, they argue that disagreements about basic facts are matters for cross examination rather than exclusion.  (D.E. 596 at 80.)  They also claim that Osler's ODL opinions are *not* a repetition of factual information obtained from Ripple, that in any event she is permitted to rely on facts from Ripple sources, and that Osler never claimed that ODL was cost-effective for MoneyGram.  (*Id.* at 80-81.)  Each of these attempts fails.

Osler opined that ODL is an "economically sound option" for "cross-border and cross-currency payments," but she did not perform any testing, review any studies of XRP or ODL, cite the conclusions of any other economists, or compare ODL to any similar payment system.  (D.E. 536 at 74; Osler Rep. ¶¶ 7, 19-74.)  In evaluating the potential success of ODL, Osler chose to rely on Ripple's own statements about ODL, as well as data and documents about ODL produced by Ripple, news articles which described Ripple's goals for ODL, or other unidentified sources.  (D.E. 536 at 75; Osler Rep. ¶¶ 36, 41-44, 45, 53-55, 57-60, 62-64.)  And in describing Ripple's likelihood of success with ODL, Osler's limited sources included a Ripple executive and a CNBC article touting Ripple.  (D.E. 536 at 75; Osler Report ¶¶ 65-74.)

The foregoing facts are sufficient to demonstrate that Osler's "opinions" about ODL consist mostly of factual information about Ripple—sourced from Ripple—which could be offered by Ripple employees or through Ripple documents.  (*See* D.E. 536 at 75.)  And to the extent that Osler referred to MoneyGram merely as an example of Ripple's attempt to build a network, without disclosing that Ripple paid MoneyGram more than $50 million to use ODL, and MoneyGram did not realize any cost savings from ODL, those facts are inconsistent with Osler's opinion that ODL is less costly than traditional payment platforms.  (*Id.* at 76-76.)  The Court can only allow Osler to offer expert opinions if her opinions are reliable.  Because Osler has either mischaracterized or

misunderstood the basic facts upon which her ODL opinion rests, her opinion is not reliable. *See Amorgianos*, 303 F.3d at 268-69 (affirming exclusion of experts whose analysis and conclusions were inconsistent with the data and literature on which they claimed to rely); *Arista Recs.*, 608 F. Supp. 2d at 429 (excluding expert testimony that "simply repeats" statements of the expert's client, "without any independent investigation or analysis").

Second, Defendants argue that Osler was not required to adhere to the *Dauber*t standards regarding testing and peer review, required for the admission of "scientific" evidence, because the standards for admitting her economic opinions are more relaxed and do not require testing and experimentation. (D.E. 596 at 82.) Defendants further explain that Osler's opinions were offered as matters of economic *theory*, not fact, and courts frequently allow economists to offer expert testimony without testing or quantitative measurement. (*Id.* at 83.) According to Defendants, Osler's opinions about the functions and attributes of currency are a matter of academic consensus. (*Id.*)

This is misleading. Osler has opined that, like a currency, *XRP* actually functioned as a medium of exchange, a means of payment, a unit of account and a store of value. (*See* Osler Rep. ¶ 7.) The Court must ensure that Osler "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Finally, Defendants argue that the SEC cannot use ▮▮▮▮▮▮ opinions to challenge the admissibility of Osler's opinions. (D.E. 596 at 84.) Defendants misperceive the SEC's argument. In arguing that Osler's opinions that XRP functioned as a currency were unreliable, the SEC argued that Osler did not test her theory, consider the work of other economists or academics, consider the possibility of error, or compare XRP to other currencies or digital assets. (*See* D.E. 536 at 73; Osler Rep. ¶¶ 13-15.) In opining that XRP had the attributes of a currency, Osler did not perform any

significant analysis and cited only the Ripple website and a *Forbes* article.  (D.E. 536 at 73-74; Osler

Rep. at ¶ 18.)

The SEC then compared and contrasted Osler's lack of objectivity and rigor to ███████

attempt to test and disprove Osler's assertions.  (D.E. 536 at 74.)  Among other things, ███████

identified an accepted definition of the term "currency," checked whether XRP had been used in the

U.S. for purchases at major retailers, noted XRP's historic price volatility, observed that XRP did not

appear to be used as a unit of account, to price goods and services, or as a method of payment.  (*See*

D.E. 536 at 74; ██████ Rebuttal (D.E. 548, Ex. 32) ¶¶ 10, 11-14, 19-20, 22, 24-26, 30.)  The SEC did

*not* ask the Court to "choose sides" by accepting ██████ opinions (and data) over Osler's.  The SEC

merely used ██████ rebuttal analysis and conclusions to demonstrate that Osler had done essentially

nothing to ensure the reliability of her opinion that XRP functions as a currency.  The Court need

not accept ██████ opinions, or factual conclusions, as true.  However, the Court can and should

take notice that Osler has offered no way to determine whether her opinions are reliable.  *See*

*Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 380-81 (S.D.N.Y. 2014) (expert's opinion about

recordkeeping was unreliable because he had not actually reviewed evidentiary record).

Defendants are correct that, if Osler is allowed to offer her initial opinions at trial, the jury

will decide between the competing opinions of the parties' experts.[37]  But the question before the

Court now is whether Osler's initial opinions are sufficiently reliable to be admissible, and they are

---

[37] Defendants claim that ██████ does not understand the terms "general acceptance" and "medium
of exchange" as applied to currency.  (D.E. 596 at 84-85.)  This is incorrect.  ██████ is a professor of
finance and has properly distinguished between the terms "medium of exchange" and "common
acceptance"—which helps define how often an asset is used as a means of payment.  The Euro,
New Zealand Dollar, and Thai Bhat (*see id.* at 85) all are fiat currencies and are both a medium and
exchange and regularly accepted for purchases in Europe, New Zealand, and Thailand, respectively.
Cigarettes are not a fiat currency anywhere, although they once were regularly accepted in trade at
POW camps. (*Id.*)  And XRP is not a fiat currency, and does not appear to be regularly accepted as a
means of payment, within the U.S. or anywhere else.

not because Defendants, who bear the burden as proponents of her testimony, have not demonstrated her opinions are "scientifically valid."  *See Daubert*, 509 U.S. at 592-93.

## IX.    Fischel's First and Fourth Purported Rebuttal Opinions Should Be Excluded.

Fischel's first and fourth opinions (the "*Howey* opinions") expressly purport to answer whether *Howey* elements are satisfied—*Howey*'s "expectation of profits" and "common enterprise" prongs.  These two opinions should be excluded because they do not rebut any of █████ opinions and because they are improper and incorrect legal conclusions.  In addition, Fischel's fourth opinion, relating to *Howey*'s "common enterprise" element, should be excluded as unreliable.

### A.    Fischel's *Howey* Opinions Are Impermissible Legal Conclusions.

Fischel's first and fourth opinions, on their face, are legal opinions as to whether certain evidence satisfies or, at minimum, is relevant to two elements of the *Howey* test.  Fischel's first opinion addresses the "reasonable expectation of profits" element, opining that ████ event study "do[es] not demonstrate that XRP holders profit solely or primarily from the efforts of Ripple." (Fischel Rebuttal (D.E. 548, Ex. 33) ¶ 18.)  Fischel's fourth opinion goes on to address the "common enterprise" element, opining that █████ event study "does not establish whether XRP holders are engaged in a 'common enterprise' with Ripple."  (*Id.* ¶ 31.)

Defendants' protest that these opinions "do not say anything about how the Court or jury should interpret or apply the *Howey* test" cannot be squared with Fischel's reports.  (D.E. 596 at 50.) Fischel's *Howey* opinions both improperly (a) tell the jury what law to apply to the key legal question in this case, i.e., whether Defendants offered and sold XRP as an investment contract under *Howey*; and (b) instruct the jury how to answer this question as to two of *Howey*'s elements.  An opinion that evidence does not satisfy, or is not relevant to, a legal test is quintessential legal opinion, not a

"factual analysis."[37]

Defendants miscast Fischel's *Howey* opinions as merely "discussing the deficiencies in ▇ methodology."[39] (D.E. 596 at 50.) On the contrary, Fischel offers these opinions assuming that ▇ event study accurately reveals that Ripple's actions impact XRP prices. (*E.g.*, Fischel Rebuttal ¶ 34 ("[E]ven if Dr. ▇ analysis demonstrates that XRP prices reacted around the time of certain announcements made by Ripple, such a finding cannot and does not establish whether XRP holders are engaged in a 'common enterprise' to share profits or returns generated solely or primarily by the entrepreneurial or managerial efforts of Ripple." (footnote omitted).) Fischel's first opinion directly addresses the legal test—which, in Fischel's view, is whether "XRP holders profit solely or primarily from the efforts of Ripple"—and not ▇ opinion that "XRP prices rise in response to Ripple's actions." (Fischel Rebuttal ¶ 20; D.E. 596 at 50-51.) As for Fischel's fourth opinion, it tells the jury how to resolve an ultimate question at issue in this case, which a case Defendants cite holds is improper. (D.E. 596 at 51 (Fischel opines "the results of ▇ event study do not shed any light on whether XRP is a security"); *id.* at 50 (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp. 2d 482, 505 (S.D.N.Y. 2009) ("[A]n expert may not draw the final inference between relevant evidence and the ultimate conclusion the jury will be asked to make.")).)

Fischel also did not conduct any "economic analysis" to reach his *Howey* opinions. (*See* D.E. 596 at 52 (quoting *In re Aluminum Warehousing*, 336 F.R.D. at 32).) Unlike the expert in *Aluminum Warehousing*, Fischel did not perform any testing or empirical analysis, or utilize any accepted

---

[38] Defendants assert that it is "telling[]" that the SEC did not address the relevance of ▇ testimony in its motion to exclude Fischel, nor did ▇ in his report. (D.E. 596 at 49.) But *Defendants* assert ▇ opinion is relevant (*id.* at 47), and ▇ is an expert witness, not the SEC's lawyer. The SEC did not employ Defendants' strategy of hiring expert witnesses to make legal arguments. (*See* D.E. 536 at 17, 47, 53, 80.)

[39] Fischel discusses such purported "deficiencies" in his second and third opinions, with which the SEC disagrees, but has not moved to exclude. Fischel's first and fourth opinions, on the other hand, are impermissible and incorrect legal opinions.

economic definition or methodology capable of being tested, to reach these opinions.  *See* 336

F.R.D. at 26, 31-32 (expert collected and analyzed sales data, assessed the "economic incentives and

rationales" of various market participants, performed an "empirical and economic analysis," and

applied "accepted economic principles and statistical analysis" to reach conclusion that economic

interests of proposed class members conflicted).  Also, unlike the expert in *Aluminum Warehousing*,

Fischel's opinions, as discussed above, offer legal conclusions and advise the jury on how to resolve

the key issues in the case.  *Id.* at 32.  Moreover, Fischel concedes there is no accepted *economic*

definition of an "investment contract" or "common enterprise."  (Fischel Tr. 101:4-7, 105:2-7,

143:6-144:3.)  Accordingly, his opinions that two elements of an "investment contract" are not

satisfied by ▮▮▮ event study are purely legal, and should be excluded.  *See Highland Cap. Mgmt.,*

*L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005). (*See also* D.E. 536 at 80-81 (collecting

cases).)

### B.       Fischel's *Howey* Opinions Misstate the Law.

Fischel's *Howey* opinions should likewise be excluded because they misstate the law.  Contrary to

Defendants' assertion (D.E. 596 at 53), the SEC's objections to Fischel's articulation of the *Howey*

elements are no mere "quibble" with his wording.  (D.E. 536 at 80 (Fischel's first and fourth

opinions were "based on an incorrect recitation of *Howey*'s elements and do not accurately reflect the

current state of the '*Howey* Test,' as developed by subsequent courts").)  And the SEC does not

complain that Fischel "mentions *Howey*" (D.E. 596 at 49)—the problem is that he mischaracterizes

it.

Defendants do not dispute that *Howey* does not use the phrase "engaged in" when describing

the *Howey* test's "common enterprise" component.  (D.E. 596 at 53.)  Thus, Fischel does not

"merely recite[] the *Howey* factors," as Defendants claim.  (*Id.* at 50.)  Defendants do not explain why

Fischel elected to use different language from *Howey* and the legion of cases repeating the *Howey* test,

other than citing a single case in which a court used the word "engaged."[40]  (*Id.* at 53.)  Neither the "common enterprise" nor the "reasonable expectation of profits" prong—the two of which Fischel appears to conflate in his "common enterprise analysis"—requires that investors be "engaged" in anything (D.E. 536 at 82-83) and Fischel's use of this term incorrectly suggests otherwise.  In addition, as to Fischel's opinion regarding "reasonable expectation of profits," Defendants are silent on Fischel's concession that this opinion does not reflect the current formulation of the *Howey* test, as developed by subsequent courts.  (D.E. 536 at 80, 84; *see also* Fischel Tr. 111:7-13 (testifying that he did not "consider whether XRP purchasers had a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of Ripple" because that was "not relevant").)

Moreover, because Fischel's opinions involve incorrect articulations of law, the SEC cannot address those deficiencies through cross-examination, the typical method of attacking expert testimony at trial.  This would require the SEC to engage in the inappropriate exercise of cross-examining Fischel, not through documents or prior inconsistent statements, but using the judicial opinions that demonstrate that Fischel's opinions are legally incorrect.  While Defendants propose curing defects in Fischel's testimony through an instruction from the Court, D.E. 596 at 53 n.36, the curative instruction would need to advise that Fischel misstates the law.  But if the Court agrees with the SEC that Fischel does misstate *Howey* and its progeny, then for the reasons discussed above and in the SEC's opening brief, exclusion is the proper remedy, as his opinions would only serve to confuse the jury.  *See also* Fed. R. Evid. 403 (allowing for exclusion of evidence that "confus[es] the issues" or "mislead[s] the jury.")

---

[40] This case, *Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 618 F. Supp. 436, 439 (S.D.N.Y. 1985), is inapposite here, since it speaks of "plaintiff be[ing] engaged in a common enterprise" and the SEC is plaintiff here.  *Silverstein* also initially correctly cites the *Howey* test, and uses the word "engaged" without citing any other case using that term.  *Id.*  Fischel did not consider *Silverstein* in forming his opinions. (Fischel Tr. 104:2-12.)

**C.    Fischel's *Howey* Opinions Are Improper Rebuttal.**

Defendants do not dispute that "███ makes no mention of *Howey* or any of *Howey*'s elements for determining the existence of offers or sales of investment contracts."  (D.E. 596 at 47 (cleaned up).) That Fischel opines on whether ███ event study satisfies two *Howey* elements—a claim that ███ never made—is sufficient to conclude Fischel's *Howey* opinions are improper rebuttal.  *See Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 18 (D.D.C. 2013) (excluding rebuttal expert where the opinions he purported to rebut were "not, in fact, those reached by its experts or identified in their reports").

Defendants do not even attempt to argue that ███ opinions address the "common enterprise" element of *Howey* in any way.  Because ███ reached no conclusion regarding "common enterprise," and thus did not employ any supporting methodology, Fischel's fourth opinion cannot constitute a critique of that methodology.  (D.E. 596 at 47.)  Similarly, contrary to Defendants' assertion (*id.* at 48, 50-51), ███ never opined that "XRP holders profit solely or primarily from the efforts of Ripple," and in any event, this is not a "*Howey* requirement."[41]  (*Id.* at 47.)  *See, e.g.*, *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered *based on what the purchasers were 'led to expect.'*") (emphasis added)). (*See also* D.E. 536 at 83-84 (collecting cases).)

**D.    Fischel's "Common Enterprise" Opinion Is Unsupported and Unreliable.**

In their defense of Fischel's "common enterprise" opinion, Defendants attack a straw man, asserting that Fischel need not "offer a competing methodology in support of his fourth opinion."

---

[41] Defendants assert that Fischel's opinion is premised on ███ purportedly "ignor[ing] evidence generated by his own models that directly contradicts his conclusion that XRP prices rise in response to Ripple actions."  (D.E. 596 at 50; *id.* at 48.)   Defendants ignore that Fischel conceded that XRP's price did in fact rise in response to certain Ripple news identified by ███ (Fischel Tr. 83:14-85:19, 86:6-88:16, 89:13-90:1; 166:23-167:15.)

(D.E. 596 at 54-56.)  Indeed, it would have been impossible for Fischel to offer a "competing methodology," as ██████ methodology had nothing to do with the "common enterprise" element.

The SEC's critique is founded upon Fischel's inability to employ any *economic* theory or technique because, as Fischel recognized, "common enterprise" is a legal concept.  (Fischel Tr. 139:2-14 (agreeing "common enterprise is, in part, a legal term")).)  Although Fischel (like Ferrell) attempts to immunize his legal conclusions by preceding them with the words "economic" or "economics" (*e.g.*, Fischel Rebuttal ¶ 16), Fischel did not—and could not—supply any accepted *economic* definition of "common enterprise," either in his reports or testimony.  (Fischel Tr. 143:6-144:3; *see* Fischel Rebuttal; Fischel Supp. Report (D.E. 548, Ex. 36).)  Defendants assert that Fischel's "common enterprise" opinion is founded upon "economic theory," but Fischel did not identify any such theory.  (D.E. 596 at 54.)  Because Fischel did not have any accepted economic definition to evaluate a "common enterprise," and did not perform any testing or analysis on whatever standard he employed, his opinion is nothing more than his own *ipse dixit* and must be excluded.  *See CFTC v. Wilson*, 2016 WL 7229056, at *9 (S.D.N.Y. Sept. 30, 2016).

## X.     Marais's Testimony Should Be Excluded in Its Entirety.

Marais's testimony, which purports to rebut ██████ conclusion that certain Ripple news affected XRP's prices, should be excluded in its entirety because his opinions are unreliable, as they are not grounded in economics or statistics, because they are unsupported by his own methodology and internally inconsistent, and because they are improper rebuttal.

### A.     Marais's Rebuttal Opinions Are Unreliable Because They Have No Basis in Economics or Statistics.

In his Rebuttal, Marais opined that ██████ analysis does not "support the contention that, in economic substance, movements in XRP prices solely or predominantly reflect responses to disclosures about Ripple's actions" because they account for "no more than a modest, far from



preponderant portion" of XRP's abnormal price returns since 2014.[42]  (Marais Rebuttal (D.E. 548, Ex. 38) ¶¶ 5, 30.)  In an attempt to preserve his testimony, Defendants walk Marais's second opinion out on a limb, asserting now that Marais opines that ▬ "methodology established that there are unknown, confounding factors that were correlated with XRP returns on non-Ripple-news days."  (D.E. 596 at 59-60; *see also id.* at 60 (claiming Marais "highlight[ed] confounding factors that ▬ ignored" and addressed "confounding factors ▬ *himself identified*").)  This is facially inaccurate, without any basis in economics or statistics, and contradicted by XRP return data.

First, Defendants do not identify any "confounding factors," and neither does Marais.[43]  (D.E. 596 at 59-60.)  Defendants' entire argument that Marais's opinion establishes (i) the *existence* of "unknown" factors that drive abnormal XRP returns and that (ii) such "unknown" factors "undermine" ▬ conclusions is premised upon two paragraphs of Marais's Rebuttal.  (*Id.*; Marais Rebuttal ¶¶ 19-20.)  In those paragraphs, discussing ▬ key milestone news events category, Marais observes that ▬ does not study what drove abnormal XRP returns on days other than those with Ripple's key milestone news, and that "[n]othing in Dr. ▬ analysis rules out that the unaccounted-for factors driving the 179 *non*-coincident Unusual returns—rather than the Ripple news event—*may* also have operated during the four *coincident* trading days, and *may* thus have driven

---

[42] Marais also opined that ▬ statistical analysis "cannot prove a causal relationship between Ripple's actions and XRP price movements" (Marais Rebuttal ¶ 30), but Defendants do not challenge that Marais concedes that event studies are commonly used in litigation to address the question of whether specific news caused a price reaction.  (D.E. 536 at 88 n.26.)

[43] ▬ designed his event study to exclude the possibility that confounding factors were driving abnormal XRP returns on Ripple news days.  ▬ Tr. (D.E. 548, Ex. 35) 194:18-197:20, 200:8-20, 203:12-204:12, 206:4-207:2; 208:5-210:3.)

the Unusual returns on those days as well." (Marais Rebuttal ¶¶ 19-20 (emphasis added).)  Marais

also did not study what drove abnormal positive XRP returns on days without Ripple news.  (*Id.*)  He

accordingly could not, and did not, identify *any* factor affecting XRP's price on such days, nor does

he point to ███ identification of any such factor.[44]  (*Id.*)  Defendants' cited cases, where rebuttal

experts actually "identif[ied] 'other factors' that an expert 'should have considered,'" are therefore

inapposite.  (D.E. 596 at 60 (citation omitted).)

Marais only speculates that some "unknown" mystery factors affected XRP's price on non-

news days, and those same mystery factors "may" also have affected XRP's price on days with

Ripple news (in other words, the mystery factors "may" be "confounding" factors on Ripple news

days).  (Marais Rebuttal ¶ 20.)  Such speculation is insufficient grounds for expert testimony.  *See, e.g.*,

*Dora Homes, Inc. v. Epperson*, 344 F. Supp. 2d 875, 889 (E.D.N.Y. 2004) (excluding expert whose

opinion "rest[ed] upon nothing more than subjective belief and unsupported speculation").

Second, Marais did not cite any economics or statistics literature suggesting that a properly

conducted event study must account for what factors "may" have driven abnormal returns on days

other than the event days that are the subject of the study.  (*See* D.E. 536 at 89.)  And Defendants do

not cite a *single* academic paper endorsing the view that Marais's critique of ███ event study is

generally accepted by the relevant scientific community.  Nor do they cite a *single* case in which a

court found fault with an expert's event study because it did not address the cause(s) of abnormal

returns on days other than the days on which the "events" at issue occurred.

Defendants rely only on Marais's qualifications to defend his opinion.  (D.E. 596 at 57, 60.)

Qualifications are necessary, but not alone sufficient, to permit expert testimony.  *E.g.*, *Estate of

Jaquez v. City of New York*, 104 F. Supp. 3d 414, 426 (S.D.N.Y. 2015) ("[E]ven otherwise qualified

---

[44] ███ did identify, and designed his event study to control for, market factors that may have
affected XRP's price, including, e.g., the prices of other digital assets.  (*E.g.* ███ Rep. ¶ 39.)

experts may not simply offer conclusory opinions.").  Defendants do not contend—nor could they —that rebuttal experts are exempt from the requirements of *Daubert*.  And *Daubert* requires that experts show that their testimony is "scientifically valid."  *See Daubert*, 509 U.S. at 590, 592-93 (courts must undertake "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid" and assess whether testimony is "scientifically valid" by assessing whether it "rest[s] on good grounds, based on what is known" (citation omitted)).

Not only have Defendants offered no reason to believe that Marais's views are "scientifically valid," they do not dispute that (i) in a chapter addressing the proper use of event studies in litigation, *authored by Marais*, there is no suggestion that an expert must check for "unknown, confounding factors" that may be driving abnormal returns on non-event days, and (ii) Marais could not identify any occasion where, in conducting an event study, he had performed this task.[45]  (D.E. 536 at 89 & n.27.)  It is axiomatic that a "court must 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level intellectual rigor that characterizes the practice of an expert in the relevant field."  *Amorgianos*, 303 F.3d at 265-66 (quoting *Kumho Tire*, 526 U.S. at 152).  And it is plain that Marais did not employ that same "intellectual rigor" here.  *See Rypkema v. Time Mfg. Co.*, 263 F. Supp. 2d 687, 692-93 (S.D.N.Y. 2003) (excluding expert because "guesswork, even educated hunches by qualified experts is not enough" and testimony offered "must be 'genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist'" (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996))).

Finally, if Defendants' new contention—that there was some "unknown" mystery factor driving abnormal XRP returns, indiscriminately on days with and without Ripple news (D.E. 596 at

---

[45] Indeed, properly conducted event studies—like the one ███ employed here—scientifically test the hypothesis that unknown, random factors could account for the price returns in question.  (*E.g.*, ███ Rep. ¶¶ 52-64.)

59-60)—were correct, the actual XRP return data set forth in Marais's report would look quite different.  Taking ███ Model 5 as an example, ███ identifies abnormal XRP returns on approximately 9% of the days within his study period (183 abnormal return days / 2,007 total days). (Marais Rebuttal, Table 2.) ███ further identifies 105 days with Ripple news within the same period.  (*Id.*)  If a mystery factor was actually driving up returns on Ripple news days, one would expect about 9% of Ripple news days (approximately 10) to coincide with abnormal positive XRP returns.  But there were *24 days* with Ripple news and abnormal positive XRP returns (*id.*), making an abnormal positive XRP return approximately 2.5 times more likely on day *with* Ripple news than on days without Ripple news.  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 430 (S.D.N.Y. 2014) ("If the stock price is significantly more likely to change on News Days than on Non–News Days, that suggests a causal relationship between material news and the stock price.").

### B.  Marais's Rebuttal Opinions Are Unreliable Because They Are Unsupported by His Own Methodology and Internally Inconsistent.

Marais opines that "the 'overwhelming preponderance' of compounded XRP returns occurred on non-Ripple-news days," relying on his calculation of a hypothetical investor's cumulative returns investing in significant abnormal return days with Ripple news and without Ripple news.[46]  (D.E. 596 at 58 (citing Marais Rebuttal ¶¶ 27-29).)  But his concession at deposition fatally undercuts this opinion.  Marais agreed that for ███ key milestone category, without the *five* Ripple news event days of the *2,007 day* trading period, his hypothetical investor's returns would drop by 50%, from $92.55 to $45.06. (Marais Tr. (D.E. 548, Ex. 37) 228:24-229:9.)  Applying the

---

[46] Defendants misstate Marais's analysis.  Marais did not "observ[e] that an XRP purchaser would have made *more money* by buying on non-Ripple-news days than by buying XRP on ███ identified Ripple news days."  (D.E. 596 at 61.)  Marais only examines days with statistically significant abnormal XRP returns, comparing a hypothetical investor's compounded returns when investing on such days (i) with Ripple news and (ii) without such news.  (Marais Rebuttal ¶¶ 21, 28.)  The more meaningful exercise—comparing compounded returns of a hypothetical investor who purchased XRP on Ripple news days versus no-news days (D.E. 596 at 61)—is precisely the one ███ undertook in his Supplemental Report.  (███ Supp. Report (D.E. 548, Ex. 6) ¶¶ 9, 20-24.)

same exercise to ████ combined categories of Ripple news (not just key milestone news events),

without Ripple news days, Marais's hypothetical XRP investor's return for all trading days drops

from $92.55 to 66 cents.  (D.E. 536 at 90-91.)  Defendants neither dispute these calculations nor

defend Marais's opinion beyond stating that "alleged agreement [with ████ is not the proper

subject of a *Daubert* motion."  (D.E. 596 at 62.)  But exclusion of opinions that are wholly

unsupported by an expert's methodology—as Marais's are here—is unquestionably required by

*Daubert*.  *See Amorgianos*, 303 F.3d at 266.

Marais also opines that "████ analysis identified approximately 40 times as many days

with '[u]nusual' XRP returns *without* Ripple actions as days with unusual XRP returns *with* Ripple

actions."[47]  (D.E. 596 at 58 (citing Marais Rebuttal ¶¶ 19, 25-26).)  Notwithstanding the SEC's

invitation (D.E. 536 at 89), Defendants do not supply any citations to academic literature—or case

law—suggesting that simply counting days with abnormal returns (with and without news events),

and then observing that one set is larger than the other, is a scientifically grounded critique of event

study methodology.  *See Daubert*, 509 U.S. at 590, 592-93.

Defendants also do not explain why, in his Supplemental Report, Marais adopted a position

opposite the one he took in his Rebuttal, opining that ████ results—establishing the substantial

cumulative effect of Ripple's actions on XRP's price—were "not surprising" because removal of

any

---

[47] This statement relies on Marais's incorrect calculation, which assumes the number of Ripple news event days was 4, when in reality the total number was 24.  (*See* Marais Rebuttal ¶¶ 19, 25-26 & Tables 2 & 3.)  When corrected, the "disparity between Unusual returns without an apparent association with Ripple news identified by Dr. ████ and those that *do* coincide with such news" (*id.* ¶ 25) drops from "approximately 40 times" (D.E. 596 at 58) to approximately 7 times.

abnormal returns "is expected to reduce the would-have been prices."  (D.E. 536 at 91 (quoting

Marais Supp. ¶¶ 8, 12, 17).)

> ### C.  Marais's Supplemental Rebuttal Opinions Are Unreliable Because They Have No Basis in Economics or Statistics.

Defendants do not dispute that Marais cited no academic literature suggesting that to

construct a counterfactual price analysis, ███ must rely on one particular model.[48]  (D.E. 536 at 91-

92.)  Defendants also do not supply any such supporting literature or case law, relying solely on

Marais's qualifications.  (D.E. 596 at 62-63.)  Again, qualifications alone are insufficient to permit

Marais's testimony, where Defendants have failed to demonstrate his opinion is "scientifically valid."

*Daubert*, 509 U.S. at 590, 592-93.

> ### D.  Marais's Rebuttal Opinion Goes Beyond the Scope of ███ Opening Report.

To rebut ███ opening expert report, Marais offers the opinion that ███ analysis does

not "support the contention that, in economic substance, movements in XRP prices solely or

predominantly reflect responses to disclosures about Ripple's actions."  (Marais Rebuttal ¶ 5.)

Defendants do not dispute that ███ opening report does not opine that "XRP prices solely or

predominantly reflect responses to disclosures about Ripple's actions."  (D.E. 536 at 88.)

Instead, Defendants mischaracterize Marais's testimony to defend his opinions as addressing

"solely" those set forth in ███ opening report.  (D.E. 596 at 59.)  When asked if his rebuttal

opinion "pertain[ed] solely to opinions set forth in Dr. ███ expert report," Marais first responded

affirmatively, and then amended his answer to clarify that his rebuttal addressed what "Dr. ███

findings do… and do not convey and imply about what I understand are issues in this case. And in

that sense, my opinions go beyond Dr. ███ (Marais Tr. 116:5-18.)  When asked to identify which

---

[48] In fact, ███ relied on all 20 of his models to conclude that, absent the abnormal XRP returns
following Ripple news events, more than 90% of XRP prices are below 2 cents.  (D.E. 536 at 92.)

portions of his report went beyond ██████ opening report, Marais identified his assignment from counsel to determine "whether, based on [Marais's] expertise, ██████ opinions support the contention that, in economic substance, movements in XRP prices solely or predominantly reflect responses to disclosures about Ripple's actions." (*Id.* at 116:25-117:17; Marais Rebuttal ¶ 5.)

## XI.    Shampanier's Purported Rebuttal Testimony Should Be Excluded in Its Entirety.

Shampanier's rebuttal opinions should be excluded for several reasons.  First, Shampanier does not actually rebut or counter the substance of ██████ opinions, which were based on a combination of Ripple's statements, actions, and economic reality, and her critiques of ██████ methodology go well beyond the scope of his report.  Second, Shampanier has offered improper speculation about the implications of ██████ opinions.  And finally, Shampanier is an academic with no experience studying digital assets investors, and therefore is not qualified to rebut ██████ opinions regarding the perspective of a reasonable XRP purchaser.

### A.    Shampanier's Rebuttal Does Not Address the Substance of ██████ Opinions.

Defendants do not seriously dispute that Shampanier's rebuttal report is not limited to the same subject matter identified by ████  Although Shampanier criticizes ██████ analysis, she does not actually disagree with any of ██████ conclusions, including:  that a reasonable purchaser of XRP would have had an expectation of profit derived from the actions of Ripple; and, that the features of XRP are more likely to appeal to an investor than an institution interested in cross-border asset transfers.  (*E.g.,* ████ Rep. (D.E. 548, Ex. 2) ¶¶ 8-9.)

Further, Defendants do not dispute that ████ accurately described XRP's economic features, Ripple's sales, distributions, escrows, and buybacks of XRP, and Ripple's public communications and promotional statements about XRP on its own website, social media, finance and digital assets news sites, and investor forums.  Nor do Defendants dispute that the SEC is not required to submit survey evidence for the Court to find that reasonable XRP purchasers would

have had an expectation of profits based on Ripple's efforts to develop the market for XRP.  *See, e.g.*, *SEC v. Telegram*, 448 F. Supp. 3d 375-82 (entering preliminary injunction based on, among other things, defendant's offering materials, promotional efforts, financial incentives to users, and economic reality of defendants' offers and sales of Grams).

Instead, Shampanier's rebuttal opinions focus almost exclusively on describing the survey methodology that ███ *could have used* to determine whether the perceptions of XRP purchasers were affected by particular public statements by Ripple.  (*See* D.E. 536 at 95-97.)  She does not, and cannot, conclude that following her preferred survey methodology would have yielded results that differed from ███ conclusions.  Accordingly, the differences between ███ opinions and Shampanier's opinions are simply too great to justify the admission of her opinions as a rebuttal.  *See McBeth v. Porges*, 2018 WL 5997918, at *7 (S.D.N.Y. Nov. 15, 2018) ("connection between proper accounting and auditing and tax treatment [was] too attenuated to justify admission" of rebuttal expert's testimony).

## B.        Shampanier's Opinions about Causation Are Not Appropriate Rebuttal.

Instead, Defendants claim that ███ conclusions that the perceptions of XRP purchasers were created, formed, or affected by the actions of Ripple amount "in substance" to opinions about causation.  (D.E. 596 at 110-114.)  But none of the cases cited by Defendants (D.E. 596 at 110-112) on the definition of "causation" stand for the proposition that an opinion regarding alternative

survey methodology is a relevant or reliable rebuttal to an expert's opinion regarding reasonable

investor beliefs based on the evidentiary record.[49]

Accordingly, even if the Court were to conclude that ███ offered opinions about

causation, which the SEC does not concede, the Court should not allow Shampanier to offer her

opinions about survey methodology and design.  The fact remains that ███ opinions are *not*

based on survey evidence.  ███ opinions are based on his personal experience with crypto

investments, his familiarity with XRP's economics, Ripple's distributions and escrows of XRP, and

Ripple's public statements about XRP.  So Shampanier's testimony about the principles and

methods of survey design is simply not a relevant or reliable rebuttal to ███ testimony.

Moreover, Shampanier could have conducted her own survey regarding which of Ripple's

public statements about XRP have impacted the perceptions of XRP holders.  But she failed to do

so.  And Shampanier offers no disagreement with ███ conclusions, which are based upon his

experience as a digital asset investor, XRP's economics, or on Ripple's distributions and escrows of

XRP.  Accordingly, Shampanier's theoretical observations about survey design would not provide

any more assistance to the trier of fact than a vigorous cross examination by Defendants' counsel.

### C.    Shampanier's Speculation about ███ Knowledge or Opinions Is Improper.

Next, Defendants do not deny that Shampanier cannot speculate about what ███ knows,

or intends to establish through his testimony.  (*See* D.E. 596 at 114.)  And Defendants do not deny

that Shampanier intends to offer testimony about what is implicit in, or implied by, ███

---

[49] Defendants' citation to *Wells Fargo & Co. v. WhenU.com, Inc.,* 293 F. Supp. 2d 734, 754 (E.D. Mich. 2003) is inapposite.  (*See* D.E. 596 at 111 n.68.)  In that case, plaintiffs actually offered survey evidence which the defendants' expert criticized.  293 F. Supp. 3d at 750.  The court agreed with defendants' expert that the surveys used by the plaintiffs' expert were not properly designed.  *Id.* at 751-754.  However, in this case ███ did not conduct a survey, but rather offered opinions based on his personal experience investing in digital assets and his understanding of blockchain technology.  So Shampanier's opinions about conducting surveys are not a criticism of ███ analysis.

opinions.  Instead, Defendants argue that such testimony would not be speculative, but rather it is merely another form of Shanpanier's opinions about causation.  (*Id.*)  This argument is wrong. Shampanier's rebuttal opinions and testimony do address what ███ meant or implied in support of his opinions regarding ODL, as well as what ███ meant regarding Ripple's statements, actions, and product offerings.  (*See* Shampanier Tr. (D.E. 548, Ex. 43) 115:12-116:9; 118:15-119:18; 125:10-24; 129:8-25; 138:1-141:11.)  Such testimony should not be permitted.  *See Scentsational*, 2018 WL 1889763, at *3 ("expert testimony should be excluded if it is speculative or conjectural"); *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

### D.  Shampanier Is Not Qualified to Testify about the Perceptions of XRP Holders.

Finally, Defendants claim that any argument about Shampanier's lack of experience with digital assets is contrary to Second Circuit precedent.  (D.E. 596 at 115.)  However, none of the cases cited by Defendants justify her testimony in this case.  In *McCullock*, 61 F.3d at 1043-44, the court noted that the challenged expert "had both the practical experience and necessary academic training" to offer the testimony at issue.  In *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997), the court found that a mechanical engineer was qualified to testify about interactions between people and machines.  And in *Lion Oil,* 2011 WL 855876, at *1-2, the court found that two experts with extensive experience in the oil and gas industry could testify about trading crude oil.  Each of the challenged experts in those cases had extensive, practical experience with the subject matter on which they were proposed to testify, so any lack of education or training on the narrower, more specialized issues in dispute was not disqualifying.

Shampanier stands in a very different position.  The SEC has not argued that Shampanier lacks knowledge about the empirical methods for measuring perceptions in trademark infringement, false advertising, consumer products, online retail, or entertainment.  Nor has the SEC argued that

Shampanier lacks expertise measuring the perceptions of market participants.  The SEC has simply argued that Shampanier has not *used* her education and empirical training to measure perceptions about XRP in this case, and that she has no other experience with Ripple, ODL, XRP, or digital assets that would qualify her to rebut ███ opinions about the perceptions of XRP holders.  *See Fin. Guar.*, 2020 WL 4251229, at *2.

Finally, to the extent Defendants suggest that it is the SEC's responsibility to show that Shampanier's work in other fields "do[es] not apply" when measuring perceptions of XRP purchasers (D.E. 596 at 115), they are wrong.  Having offered Shampanier as a rebuttal expert, it is *Defendants* who bear the burden of showing that her testimony is admissible on the issues for which they offer it.  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  Like the unsuccessful expert in *Wells Fargo,* 293 F. Supp. 2d at 750, Shampanier has not attempted to measure the perceptions of any XRP investors about Ripple's actions and public statements promoting XRP.  And she has no personal experience with digital assets that might allow her to testify about her own perceptions.  So any opinion testimony offered by Shampanier about what ███ could have done, had he attempted to conduct a survey of XRP holders, or about the best way for someone to conduct such a survey, cannot assist the trier of fact in deciding any issue in this case.

## CONCLUSION

For the foregoing reasons and those set forth in the SEC's opening brief, the Court should exclude the testimony of Defendants' proffered expert witnesses as set forth above.

Dated:  New York, New York

August 30, 2022

/s/ Mark R. Sylvester
Mark R. Sylvester
Pascale Guerrier
Ladan F. Stewart
Jorge G. Tenreiro
Daphna A. Waxman
Attorneys for Plaintiff

SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-0159 (Sylvester)
sylvesterm@sec.gov

Benjamin J. Hanauer
Robert M. Moye
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, IL 60604