UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION, :
:
                             Plaintiff, :     20 Civ. 10832 (AT) (SN)
:
     - against - :     ECF Case
:
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE, :
and CHRISTIAN A. LARSEN, :
:
                             Defendants. :
:
-----------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
BRIEF IN OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF** ■■■■■■■■■■■

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................................... 1

BACKGROUND ................................................................................................................................ 2

    I.      ▉ Qualifications .................................................................................................... 2

    II.     ▉ Opinions ........................................................................................................... 3

LEGAL STANDARD ......................................................................................................................... 6

ARGUMENT ....................................................................................................................................... 7

    I.      ▉ Is Qualified to Offer Opinions Regarding the Perspective of a Reasonable Investor in Digital Assets ....................................................................................... 7

    II.     ▉ Opinions Are Based on a Clear and Reliable Methodology that ▉ Developed Based on His Experience .................................................................. 11

    III.    ▉ Opinions Are Useful to the Trier of Fact ....................................................... 13

    IV.    ▉ Rebuttal Opinions Should Not Be Excluded .................................................. 14

CONCLUSION .................................................................................................................................. 15

# TABLE OF AUTHORITIES

**Cases**

*Alto v. Sun Pharm. Indus., Inc.*,
  No. 19 Civ. 9758 (GHW), 2021 WL 4803582 (S.D.N.Y. Oct. 13, 2021) .......................... 8

*CFTC v. Wilson*,
  No. 13 Civ. 7884 (AT), 2016 WL 7229056 (S.D.N.Y. Sep. 30, 2016) ............................. 7

*Crown Cork & Seal Co. v. Credit Suisse First Boston*,
  Nos. 12 Civ. 5803 (JLG) et al., 2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) ................ 14

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
  No. 12 Civ. 7372 (AT), 2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ............................. 6

*Guardino v. Alutiiq Diversified Servs., LLC*,
  457 F. Supp. 3d 158 (N.D.N.Y. 2020) ............................................................................ 13

*In re Blech Sec. Litig.*,
  No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ...................... 13

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
  MDL No. 1358 (SAS), 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ........................ 11–12

*Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*,
  Nos. 08 Civ. 11315 (WHP) et al., 2011 WL 855876 (S.D.N.Y. Feb. 28, 2011) .............. 9

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ........................................................................................... 10

*Morrison v. Nat'l Australia Bank Ltd.*,
  561 U.S. 247 (2010) ....................................................................................................... 15

*Packard v. City of N.Y.*,
  No. 15 Civ. 7130 (AT), 2020 WL 1479016 (S.D.N.Y. Mar. 25, 2020) ....................... 6–7

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*,
  716 F. Supp. 2d 220 (S.D.N.Y. 2010) ............................................................................ 10

*Sandler v. Montefiore Health Sys., Inc.*,
  No. 16 Civ. 2258 (JPO), 2018 WL 4636835 (S.D.N.Y. Sep. 27, 2018) ........................ 14

████████████████████████████████████████████████████████████████████ 1, 3, 9, 14

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ......................................................................... 12 n.3

*United States v. Litvak,*
  808 F.3d 160 (2d Cir. 2015) ................................................................................................. 8, 12

*United States v. Romano,*
  794 F.3d 317 (2d Cir. 2015) ................................................................................................ 12–13

**Rules and Regulations**

Fed. R. Evid. 702 .............................................................................................................................. 8

Plaintiff Securities and Exchange Commission ("SEC") respectfully opposes Defendants' Motion to Exclude the Expert Testimony of ▒▒▒▒▒▒▒ (D.E. 543, 544). For the reasons that follow, the Court should deny Defendants' motion.

## PRELIMINARY STATEMENT

▒▒▒ an experienced and active participant in the digital asset trading market with significant expertise in blockchains and digital assets, has provided a number of opinions based on his experience that will assist the trier of fact. Specifically, after analyzing Ripple's public statements and certain features of XRP's design, ▒▒▒ opines that a reasonable XRP purchaser would have had an expectation of future profit derived from Ripple's efforts. The relevance and helpfulness of this analysis has already been recognized in a similar context. ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

Defendants' motion to exclude ▒▒▒ testimony is a series of misguided attempts to minimize his expertise and methodology. Defendants cast him as a mere electrical engineer, ignoring his broad and significant experience with blockchains and digital assets. They argue that his lengthy investment expertise is irrelevant because he has not provided investment advice to other investors or managed money for them, ignoring that no such requirement exists in the law. They dismiss his methodology because he does not employ an empirical analysis, ignoring that experts may provide opinions based on their experience. They claim that he simply parrots Ripple's public statements, ignoring that he uses his expertise to actually analyze what a reasonable digital asset purchaser would understand from Ripple's public statements, and also analyzes XRP, the XRP ecosystem, and Ripple's sale and distribution strategy. They claim that he does not have the

requisite pedigree to rebut the series of tenured professors Defendants have hired, ignoring that he, unlike those defense experts, has relevant practical experience with the offer and sale of digital assets, as well as "use cases" identified by promoters of such assets. Defendants' arguments should be rejected, and their motion should be denied.

## BACKGROUND

### I. ▇▇▇ Qualifications

As part of his work with a forensic data analytics and economic consulting firm, ▇▇▇ who holds a Master's degree in engineering, has "provided expert consulting in blockchain, digital assets, and forensic data analytics for private companies, federal agencies, and foreign securities regulators." (▇▇▇ Report (D.E. 548-2) ¶¶ 3–4.) He has "assist[ed] various government agencies with investigating possible securities violations and financial fraud in the digital assets space…includ[ing] analyzing fraudulent blockchain investment schemes, tracking money laundering on the blockchain, and discovering and proving manipulative trading activity related to digital assets." (*Id.* ¶ 3.) His work has ranged from "examining documents and representations related to initial coin offerings to providing detailed analysis of blockchain data, including flows of funds on the blockchain, smart contract activity, on-blockchain trading data, and decentralized finance platforms." (*Id.*) ▇▇▇ has also "developed and managed the development of scripts and algorithms to process and analyze large collections of blockchain data." (*Id.*)

In addition, as part of his work as founder and managing director of the investment partnership ▇▇▇ has "profitably allocated capital to many digital asset investments," "analyz[ed] hundreds of companies, projects, coins and tokens in the digital asset space," and "developed and executed successful cryptocurrency arbitrage strategies." (*Id.* ¶ 4.) He has "practical firsthand experience with using blockchains as well as the trading platforms, software platforms, and institutional products built on top of them." (*Id.*) More broadly,

▇▇▇ has 19 years of experience "evaluating and investing in companies, public equities, commodities, real estate, bonds, currencies, and derivatives of those asset classes." (*Id.*) He has "managed automated quantitative strategies as well as discretionary investment strategies" and analyzed "the relative risks and rewards of an investment and the circumstances in which the investment makes the most sense – for hundreds of investments, including digital assets." (*Id.*)

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

II. ▇▇▇ **Opinions**

▇▇▇ opening report concerns the perspective of a hypothetical, reasonable market participant presented with Ripple's statements, actions, and product offerings. ▇▇▇ opines that, based on statements made by Ripple, as well as certain XRP design features, a reasonable XRP purchaser would have had an expectation of future profit derived from Ripple's efforts. (▇▇▇ Report ¶ 8.) ▇▇▇ opines, based on his many years of experience as an investor and close observer of the digital asset space, that "the statements, actions, background, and competence of the founders and companies that create and support a blockchain project are extremely important to the decision-making process of purchasers of digital assets." (*Id.*) ▇▇▇ offers a "not exhaustive" list of "promotional factors" that a reasonable investment-oriented purchaser of XRP would consider:

> 1) an explanation of the investment bull case for the digital asset, i.e. an explanation of the company's own view about why its digital asset will increase in value over time; 2) announcements of any important strategic partnerships; 3) descriptions of the qualifications of the team members who will develop and manage the project; 4)

3

the target addressable market for the platform or product; 5) plans for the use of funds being raised; and 6) plans to provide a liquid trading market for the digital asset.

(Id. ¶ 50 & n.48.) ▬ then analyzes Ripple's public statements and concludes that "Ripple communicated about each of these topics extensively in public venues, which in my opinion had the effect of generating significant investor interest in purchasing XRP." (Id.; see also id. ¶¶ 51–84 (collecting examples of Ripple's public statements on its website, social media platforms, news sites, and investor forums).)

Specifically, ▬ points to Ripple's "promotional activity" that "created a well-understood bullish thesis for the price of XRP and encouraged speculative investment flows into the digital asset," including "advertising new partnerships with financial institutions, highlighting the experience and expertise of Ripple's team members, making public statements about why XRP was poised to increase in price, publishing positive commentary about the future growth trajectory of Ripple's products, and describing the plans for developing the XRP ecosystem." (Id. ¶ 8.) ▬ concludes that "Ripple's extensive public comments and reports about these topics likely served to inform and persuade investment-oriented purchasers about the potential reward of purchasing XRP for the purposes of generating a profit." (Id. ¶ 85.)

▬ also analyzes a number of features of the design of XRP and the XRP Ledger (the blockchain on which XRP exists), Ripple's design of its On-Demand Liquidity ("ODL") product,[1] and Ripple's ongoing sales, distribution, escrow, and buybacks of XRP. (Id. ¶¶ 9, 17–49.) Based on this analysis, ▬ opines that "certain elements in Ripple's and its founders' design of XRP, the XRP Ledger, and a variety of software products [] appealed more to a purchaser of XRP interested

---

[1] ODL is software developed by Ripple that enables a Ripple customer to make two exchanges of XRP: the first from fiat currency (like U.S. Dollars) to XRP and the second from XRP to another fiat currency (like Mexican Pesos). (▬ Report ¶ 17.)

4

in making a profit than to financial institutions seeking to embrace Ripple's stated vision of utilizing XRP as a bridge asset for cross-border asset transfers." (*Id.* ¶ 9.)

For example, because "XRP was deliberately created with a maximum fixed-supply cap of 100 billion coins along with a variable price dictated by market forces" and due to "Ripple's efforts to promote the growth of the XRP ecosystem and to develop financial products that use XRP to conduct transactions," ▇ opines that a "reasonable purchaser of XRP would understand that if Ripple's ambitious cross-border payment business were successful, the ensuing demand for XRP would tremendously increase the price of XRP." (*Id.* ¶¶ 23–24.) ▇ also opines that "[p]otential purchasers of XRP would have understood the simple economics behind the message being promoted by Ripple…: XRP, as designed, provided a mechanism for passive XRP owners to benefit financially from Ripple's success as a provider of financial service products built on the XRP Ledger, as a developer of the XRP ecosystem, and as a driver of demand for XRP." (*Id.* ¶ 26.) Similarly, ▇ opines that "[t]he manner and mechanism of Ripple's ongoing sales, distribution, escrow, and buybacks of XRP would have been extremely important to a potential investment-oriented purchaser of XRP," whereas "a reasonable purchaser of XRP that is exclusively considering the utility of the coin would be less concerned with some of these heavily promoted sales and distribution mechanisms." (*Id.* ¶¶ 48–49.)

▇ also offers rebuttals to the opinions of three defense experts as they relate to Ripple's ODL product: (1) Ferrell's opinion that ODL transaction volume was growing and ODL transaction costs were decreasing over time; (2) Osler's opinion that ODL was a less costly substitute for traditional, fiat currency cross-border payments and was a viable option for cross-border currency payments; and (3) Adriaens's and Ferrell's opinions that Ripple's payment of rebates and incentives to ODL customers was consistent with strategies employed by technology companies to grow their customer base. (▇ Rebuttal ¶ 6.) ▇ concludes that each of these opinions is

5

incorrect because (1) ODL volume fell and ODL transaction costs increased in 2020; (2) it was not economical to use ODL absent significant financial subsidies provided by Ripple; and (3) ODL's growth was not sustainable because ODL lacked "an economically compelling value proposition" for cross-border payments. (*Id.* ¶¶ 7–10; *see also id.* ¶¶ 11–49.) ▮ also rebuts Adriaens's opinion that equity investments in certain businesses demonstrates a "use case" for XRP by pointing to flaws in Adriaens's methodology, including Adriaens's failure to assess whether the equity investment in those businesses actually related to their purported "use" of XRP or the XRP Ledger. (*Id.* ¶¶ 50–89.) Finally, ▮ offers a rebuttal to the opinion of defense expert Yadav that, for the majority of the digital asset platforms she considers, there is no indication that offers to sell digital assets on those platforms were made or became final in the United States. (*Id.* ¶ 90.) ▮ points to a number of shortcomings in Yadav's opinion, including that she ignores Ripple's sales of XRP on the XRP Ledger (*id.* ¶¶ 134–36), Ripple's programmatic sales of XRP including through U.S.-based market makers (*id.* ¶¶ 117–20), as well as Ripple's over-the-counter sales to U.S.-based institutions and individuals (*id.* ¶¶ 137–39), and that she applies her methodology inconsistently (*id.* ¶¶ 126–33).

## LEGAL STANDARD

In evaluating the admissibility of expert testimony, "[c]ourts first address 'the threshold question of whether a witness is qualified as an expert by knowledge, skill, experience, training, or education to render his or her opinions.'" *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, at *2 (S.D.N.Y. Feb. 19, 2020) (Torres, J.) (citation omitted). "After considering the expert's qualifications, courts determine whether the expert testimony is reliable." *Id.* at *2. Finally, "courts ask 'whether the expert's testimony (as to a particular matter) will assist the trier of fact.'" *Id.* at *3 (citation omitted). "Exclusion of expert testimony is 'the exception rather than the rule.'" *Packard v. City of N.Y.*, 2020 WL 1479016, at *2 (S.D.N.Y. Mar. 25, 2020) (Torres, J.) (citation omitted). As long as there are "good grounds" underlying an expert's testimony, "'it should be

tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny.'" *CFTC v. Wilson*, 2016 WL 7229056, at *7 (S.D.N.Y. Sep. 30, 2016) (Torres, J.) (citation omitted). Disputes regarding "'the strength of [an expert's] credentials, faults in his…methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony.'" *Packard*, 2020 WL 1479016, at *3 (citation omitted).

## ARGUMENT

I. ▮▮▮ **Is Qualified to Offer Opinions Regarding the Perspective of a Reasonable Investor in Digital Assets.**

▮▮▮ is qualified to opine on the perspective of a reasonable digital asset investor. He has years of experience with digital assets, both as a consultant for private companies, federal agencies, and foreign securities regulators, and as an investor personally and through ▮▮▮ an investment partnership he founded in 2016. (▮▮▮ Report ¶¶ 3–4.) Since early 2015, ▮▮▮ has analyzed hundreds of companies, projects, coins, and tokens in the digital asset space, and developed and executed successful cryptocurrency arbitrage strategies. (*Id.* ¶ 4; ▮▮▮ Tr. (D.E. 548-44) 32.) He has purchased approximately 100 digital assets and used multiple digital asset trading platforms. (▮▮▮ Tr. 34, 60, 64–66.) ▮▮▮ has enjoyed approximately ▮▮▮ cumulative returns on its investments over a 5.5-year period. (*Id.* at 101.) ▮▮▮ has also assisted government agencies with investigating fraud and other violations in the digital asset space, including by conducting detailed analyses of blockchain data to identify fraudulent blockchain investment schemes and track money laundering on the blockchain, and discovering and proving manipulative trading activity relating to digital assets. (*Id.* ¶ 3.) In addition, through his academic and professional training as an engineer, ▮▮▮ has developed expertise with software technology and algorithms similar to the technology underlying blockchains. (*Id.* at 141–42.)

Defendants ignore all of this and seek to exclude ▮▮▮ because he is "an electrical engineer with no education, certifications, or formal training in economics, finance, investment, cross-border

7

remittances, or any related field." (D.E. 544 ("Br.") at 1.) But there is no requirement that an expert opining on the perspective of a reasonable investor be a tenured finance professor or an economist. To the contrary, even without "formal training" in finance or economics, ▓ has the "practical experience" and "specialized knowledge" with blockchains and digital assets to qualify him as an expert. *Alto v. Sun Pharm. Indus., Inc.*, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021) ("Even if a proposed expert lacks formal training in a given area, he may still have 'practical experience' or 'specialized knowledge' qualifying him to give opinion testimony under Rule 702.") (quoting Fed. R. Evid. 702); *see also United States v. Litvak*, 808 F.3d 160, 180–82 (2d Cir. 2015) (appropriate for former RMBS investor to testify about reasonable expectations of investors in RMBS market).

Defendants also argue ▓ is not qualified because he has not provided investment advice to clients and has instead invested on behalf of himself and ▓ (Br. at 1, 4–5.) But there is no requirement that an expert opining on the perspective of a reasonable investor be an investment adviser or manage money for clients. The cases Defendants cite (*id.* at 5) are inapposite because the proposed experts in those cases did not rely on *any* investment experience and instead sought to opine on whether certain information would be pertinent to reasonable investors based on their professional training as engineers, accountants, or lawyers—*not* as investors. Here, by contrast, ▓ uses his "background in the [digital asset] space, [his] experience trading digital assets, [and his] experience as a user of digital assets, in understanding how blockchains and blockchain companies and blockchain projects work, to identify the key factors that…pertain[] to a reasonable purchaser." (▓ Tr. 217.)

In addition to his extensive investment experience, ▓ has had numerous interactions with other participants in the digital asset market, further allowing him to opine on the perspective of a reasonable investor in that market. (*Id.* at 108 ("I've spoken to purchasers who purchase for utility reasons, purchasers who bought digital assets for investment purposes, people who purchased

8

because they were interested in a particular industry, people who purchased because they were executing a specific trading strategy.").) Defendants dismiss this additional practical experience because ▇ was unable to recall at his deposition specific conversations with market participants. But, as ▇ testified, he has "had conversations with so many people about digital assets across so many different topics that it's impossible for [him] to relate a specific… characterization of a specific conversation that would come anywhere close to being representative of all those interactions." (*Id.* at 104.) That ▇ could not recount the details of numerous conversations he has had over many years is unsurprising, and says nothing about his ability to provide relevant, helpful testimony on the perspective of a reasonable investor in the digital asset market based on his years as an active participant in that market.

Similarly, ▇ is qualified to offer his opinion that "certain elements in Ripple's and its founders' design of XRP, the XRP Ledger, and a variety of software products [] appealed more to a purchaser of XRP interested in making a profit than to financial institutions seeking to embrace Ripple's stated vision of utilizing XRP as a bridge asset for cross-border asset transfers." (▇ Report ¶ 9.) This opinion is based on ▇ analysis of a number of features of the design of XRP and the XRP Ledger, ODL, and Ripple's ongoing sales, distribution, escrow, and buybacks of XRP (*id.* ¶¶ 9, 17–49)—which ▇ is qualified to do based on his expertise with blockchains and digital assets, including his experience executing arbitrage strategies with respect to digital asset investments. ▇

Defendants' argument that ▇ "has never worked in the cross-border payment industry" (Br. at 7), applies equally to the defense experts who opine on ODL and ignores the expertise ▇ *does* have in the digital asset market (which the defense experts lack). *See Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 2011 WL 855876, at *1 (S.D.N.Y. Feb. 28, 2011) (rejecting

9

argument that experts with experience in oil and gas industry were unqualified because neither had specific experience trading crude oil, reasoning "[a]n expert need not be disqualified 'merely because he or she does not possess experience tailored to the precise product or process'" at issue).

Defendants' argument that ▉ investment experience should be disregarded because he "improperly failed to answer questions about ▉ based on a non-disclosure agreement (Br. at 5), is disingenuous and should be rejected. ▉ answered numerous question about ▉ investment history, investment activities, and investment strategy. (*See, e.g.,* ▉ Tr. 98–102 ( ▉ investment returns); 66–70, 113–15 ( ▉ evaluation of regulatory risk); 65–66, 171–74 ( ▉ purchases of digital assets); 35–45 ( ▉ arbitrage strategy).) He declined to answer *a single question* relating to ▉ assets under management. (*Id.* at 100.) Defendants cannot credibly claim that ▉ qualifications turn on the answer to that one question.[2]

In sum, ▉ has extensive practical experience that qualifies him to opine on the reasonable expectations of investors in the digital asset market. Defendants' "quibble" with ▉ "academic training…and his other alleged shortcomings" are "properly explored on cross-examination" and go "to his testimony's weight and credibility—not its admissibility." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (expert qualified where matter was within his general expertise even though he lacked qualifications as to certain technical matters in that field); *see also Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, 716 F. Supp. 2d 220, 227 (S.D.N.Y. 2010) (concerns about areas of expert's experience being "less robust" go to weight and credibility, not admissibility).

---

[2] Defendants also fail to mention that, after obtaining the required release, ▉ agreed to answer this question, in writing, after the deposition concluded. Defendants declined, insisting he answer a litany of questions they failed to ask at deposition. (*See* Ex. 1 to Declaration of Ladan F. Stewart.) Defendants' argument is especially disingenuous since Defendants' own expert also declined to answer a question based on a similar non-disclosure agreement. (Ferrell Tr. (D.E. 548-24) 47–49.)

II. ▮▮▮▮▮ Opinions Are Based on a Clear and Reliable Methodology that ▮▮▮▮ Developed Based on His Experience.

Based on his experience as a user and trader of digital assets and his expertise with blockchain companies and blockchain projects, ▮▮▮ employs a clear methodology consisting of six key "promotional factors" that a reasonable investment-oriented purchaser of XRP would consider in purchasing XRP. (▮▮▮ Report ¶ 50; ▮▮▮ Tr. 217.) ▮▮▮ then reviews and analyzes Ripple's public statements to determine to what extent those statements fall within the six promotional factors in his methodology. (▮▮▮ Report ¶¶ 50–51.) Based on his analysis, ▮▮▮ concludes that "a reasonable purchaser of XRP would have had an expectation of generating profit based on the efforts of Ripple and its management to accomplish the growth strategies that Ripple advertised to the public as being already achieved or planned for the future." (*Id.* ¶ 89.) Similarly, based on his experience and expertise, ▮▮▮ analyzes the design of XRP and the XRP Ledger, ODL, and Ripple's ongoing sales, distribution, escrow, and buybacks of XRP. (*Id.* ¶¶ 17–49.) Based on this analysis, ▮▮▮ opines that "certain elements in Ripple's and its founders' design of XRP, the XRP Ledger, and a variety of software products [] appealed more to a purchaser of XRP interested in making a profit than to financial institutions seeking to embrace Ripple's stated vision of utilizing XRP as a bridge asset for cross-border asset transfers." (*Id.* ¶ 9.)

Defendants seek to exclude these opinions based on a number of attacks inapplicable to expert testimony grounded in experience, as ▮▮▮ is here. Defendants first argue that ▮▮▮ did not employ a proper methodology because he did not use an empirical analysis. But the law is clear that where, as here, an expert's "method is the application of experience to facts," his opinion is reliable if it is "'properly grounded, well-reasoned, and not speculative'; and the expert must 'show how his or her experience…led to his conclusion.'" *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008) (citations omitted). ▮▮▮ opinions

11

as to the reasonable expectations of an XRP purchaser are grounded in his years of experience as an investor "analyz[ing] hundreds of companies, projects, coins and tokens in the digital asset space." (███ Report ¶ 4.) ███ uses his experience to develop a methodology for evaluating investor expectations and then applies those factors to the facts of this case.[3] Nothing more is required. *See Litvak*, 808 F.3d at 180 n.25 (appropriate for former RMBS investor to testify about reasonable expectations of investors in RMBS market based on his "personal knowledge and experience").

Defendants next complain that ███ methodology is unreliable because it is not based on any academic publication. Again, this argument ignores the law governing expert testimony based on experience. ███ uses his "extensive experience" with digital assets and blockchains "to analyze an array of facts," including Ripple's public statements and the design of XRP and the XRP ecosystem. *MTBE*, 2008 WL 1971538, at *7.[4] Defendants also suggest that ███ testimony is inadmissible because it is not fully replicable. (Br. at 11.) But expert testimony is admissible even where the expert's "methods are not entirely replicable because they are based in part on his personal experience," as ███ are here. *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015). Defendants' final argument, that ███ methodology is unreliable because he first reached his conclusion and then looked for evidence to support it, is contradicted by the record. (Br. at 10.) ███ testified that he first "set forth a list of important factors that are considered by reasonable purchasers, and those important factors are based on [his] understanding of the space and [his]

---

[3] None of the cases cited by Defendants (Br. at 8) hold otherwise. For example, in *SEC v. Tourre*, the court rejected the defense expert's testimony not, as Defendants suggest, because the proposed expert had not conducted a survey of market participants (Br. at 8 & n.9), but because he was unqualified and his testimony would improperly invade the province of the judge and jury. 950 F. Supp. 2d 666, 677–78 (S.D.N.Y. 2013).

[4] Defendants are wrong to suggest that ███ considers a different set of factors for his own investment decisions (Br. at 10). Those factors relate specifically to arbitrage trading strategies employed by ███ (███ Tr. 37, 43) and are not "promotional factors" related to digital asset investment decisions.

involvement in the space, both as a user of blockchains and investor in the space." (███ Tr. 156.) He then analyzed Ripple's public statements. (*Id.* at 157.) And despite Defendants' accusation that ███ failed to look for any statements that "cut against his theory" (Br. at 11), ███ testified that he considered statements that "speak to noninvestment-use cases as well." (███ Tr. 155–56.)

Moreover, these types of criticisms of an expert's methodology go "to the weight of the evidence, not to its admissibility" and are "matters for cross-examination and argument to the jury." *Romano*, 794 F.3d at 333; *see also Guardino v. Alutiiq Diversified Servs., LLC*, 457 F. Supp. 3d 158, 162 (N.D.N.Y. 2020) (disputes concerning "an expert's use or application of her methodology… go to the weight, not the admissibility of her testimony"); *In re: Blech Sec. Litig.*, 2003 WL 1610775, at *25 (S.D.N.Y. Mar. 26, 2003) ("'[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attack'… 'rather than wholesale exclusion.'") (citation omitted).

### III.  ███ Opinions Are Useful to the Trier of Fact.

Defendants also seek to exclude ███ testimony on the ground that he simply parrots Ripple's public statements and "a jury can interpret these statements on its own." (Br. at 12.) Defendants ignore that ███ does far more than just read Ripple's public statements. He analyzes those statements using his broad expertise in areas unfamiliar to the public and even to most investors. He can explain to the fact finder both what the statements mean to a reasonable investor in the digital asset market and how those investors would react to those statements. And ███ analysis is not limited to Ripple's statements—he also analyzes elements of XRP, the XRP Ledger, ODL, and Ripple's sale and distribution mechanisms for XRP. As ███ explained, Ripple's statements "have specific meaning to someone who is in the blockchain space"; for example, a reasonable digital asset purchaser would understand that Ripple's decision to "escrow" a large amount of its XRP relates to "controlling the circulating supply of XRP at a given moment,"

whereas an investor unfamiliar with digital assets may not have the same understanding of the term "escrow." (███ Tr. 227.) A thorough, considered analysis of Ripple's public statements is only enhanced by the expertise in blockchains and digital assets that ███ offers, and ███ testimony will therefore assist the trier of fact. *See Sandler v. Montefiore Health Sys., Inc.*, 2018 WL 4636835 (S.D.N.Y. Sep. 27, 2018) (expert testimony based on experience will help trier of fact understand "particular context and circumstances" of conduct at issue). ███

███

IV. ███ **Rebuttal Opinions Should Not Be Excluded.**

Defendants focus their attacks on ███ rebuttal opinions on the claim that ███ does not have the pedigree to rebut the opinions of the tenured professors Defendants have hired. But, unlike the defense experts he rebuts, ███ has real-world practical experience transacting in digital assets. "[A]n expert 'should not be required to satisfy an overly narrow test of his own qualifications,' and the court's focus should be on 'whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth.'" *Crown Cork & Seal Co. v. Credit Suisse First Boston*, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) (citation omitted).

███ uses his experience to analyze Ripple's ODL product and to rebut certain defense expert opinions regarding ODL, which Ripple has made the centerpiece of its claim that XRP has real-world "use case." ███ offers three opinions to rebut Ferrell, Osler, and Adriaens, including that although Ripple's extensive use of subsidies helped to grow the base of ODL users in the short-term, that growth was not sustainable because ODL lacked "an economically compelling value proposition" absent subsidies. (███ Rebuttal ¶¶ 8–10; *see supra* at 5–6.) ███ expertise with blockchains and digital assets qualifies him to render these opinions. Defendants claim that ███ is unqualified to rebut Ferrell because Ferrell conducted a "statistical analysis" and ███ has no

14

training in statistical analysis. (Br. at 14). But Defendants overstate the qualifications necessary to perform Ferrell's work on ODL (*see* D.E. 548-21 at Section IV), which did not involve the statistical analysis Ferrell employed elsewhere in his report where Ferrell tested for "statistically significant" relationships (*id.* at Sections III.C and III.D). Ferrell merely conducted a *cost analysis* for a money transmitter using ODL to move funds across digital asset platforms—an analysis ▆ is well-qualified to perform based on his investment expertise including transacting across digital asset platforms. ▆ is similarly qualified to rebut Adriaens's "use case" opinion based on his experience evaluating digital assets for both utility and investment uses. (▆ Tr. 80; ▆ Report ¶ 3.) And despite Defendants' claim that he "uses no reliable methodology" (Br. at 13), ▆ methodology is consistent with Ferrell's: ▆ analyzes ODL volume and cost data, including the digital asset platform fees paid to ODL users. (▆ Rebuttal ¶¶ 11–49.)[5]

Finally, with respect to his rebuttal of Yadav's opinions, ▆ expertise with digital asset investments (including trading on some of the very platforms Yadav analyzed (▆ Tr. 34, 58, 62)) renders him well-qualified to point out shortcomings in Yadav's opinion that are directly relevant to the territoriality analysis under *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), as applied by this Court. *See* D.E. 441 at 27–28. For example, Yadav overlooks Ripple's sales of XRP on the XRP Ledger (▆ Rebuttal ¶¶ 134–36), Ripple's programmatic sales of XRP including through U.S.-based market makers (*id.* ¶¶ 117–20), as well as Ripple's over-the-counter sales to U.S.-based institutions and individuals (*id.* ¶¶ 137–39).

## CONCLUSION

The Court should deny Defendants' motion to exclude ▆ testimony.

---

[5] Defendants claim that ▆ "admits that [whether ODL is viable as a matter of economic theory] is 'outside the scope of what [he] was asked to do'" (Br. at 13), but the quoted portion of ▆ testimony is merely a clarification that he was offering an opinion based on data available in the relevant time period (2013 to the filing of the SEC's complaint). (▆ Tr. 266–67.)

15

Dated: New York, New York
       August 9, 2022

Respectfully submitted,

/s Ladan F. Stewart
Ladan F. Stewart
Pascale Guerrier
Mark R. Sylvester
Jorge G. Tenreiro
Daphna A. Waxman
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
(212) 336-0153 (Stewart)
stewartla@sec.gov

Benjamin J. Hanauer
Robert M. Moye
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, IL 60604