UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,  :
                                                     Plaintiff,     :      20 Civ. 10832 (AT) (SN)
                                                              :
              - against -                                        :      ECF Case
                                                             :
RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,  :
and CHRISTIAN A. LARSEN,                             :
                                                            :
                                     Defendants.     :
                                                                 :
------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
BRIEF IN OPPOSITION TO DEFENDANTS' MOTION
TO EXCLUDE THE TESTIMONY OF** ████████

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iii
**PRELIMINARY STATEMENT** ............................................................................................... 1
**BACKGROUND** ........................................................................................................................ 2
    I.    [REDACTED] Experience ................................................................................................ 2
    II.   [REDACTED] Opinions .................................................................................................. 3
**ARGUMENT** ............................................................................................................................. 5
    I.    Experts, Including [REDACTED] Himself, Routinely Testify About Securities Industry Custom and Practices. ............................................................................. 5
    II.   [REDACTED] Testimony is Highly Relevant. .............................................................. 7
    III.  [REDACTED] Has the Requisite Expertise. ................................................................ 11
    IV.  [REDACTED] Employed Reliable Methodology. ...................................................... 13
    V.   [REDACTED] Should be Permitted to Testify on Issues Relevant to Defendants' Affirmative Defenses, Including Industry Custom and Practice. ............................... 14
**CONCLUSION** ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Berckeley Inv. Grp., Ltd. v. Colkitt,*
  455 F.3d 195 (3d Cir. 2006) ...................................................................................... 8-9, 15 fn.4

*Bocoum v. Daimler Trucks N. Am. LLC,*
  No. 17 Civ. 7636 (JPC)(BCM), 2022 WL 902465 (S.D.N.Y. Mar. 28, 2022) ..................... 9

*Highland Cap. Mgmt., L.P. v. Schneider,*
  551 F. Supp. 2d 173 (S.D.N.Y. 2008) ............................................................. 5, 7-8, 10, 12

*In re Blech Sec. Litig.,*
  No. 94 Civ. 7696 (RWS), 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ............... 5-6, 8, 15

*Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.,*
  No. 08 Civ. 11315 (WHP), 2011 WL 855876 (S.D.N.Y. Feb. 28, 2011) ........................ 12

*Marx & Co. v. Diners' Club, Inc.,*
  550 F.2d 505 (2d Cir. 1977) ........................................................................................... 6, 8

[REDACTED] ............................................................................................................................ 6

[REDACTED] ............................................................................................................................ 7

*SEC v. Mudd,*
  2016 WL 2593980 (S.D.N.Y. May 4, 2016) .................................................................... 10

[REDACTED] ......................................................................................................................... 7, 9

[REDACTED] ........................................................................................................... 7, 10, 12, 14

*SEC v. U.S. Envtl., Inc.,*
  No. 94 Civ. 6608 (PKL) (AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ......... 5, 6, 13

*SEC v. W.J. Howey Co.,*
  328 U.S. 293 (1946) ......................................................................................................... 14

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC,*
  467 F.3d 107 (2d Cir. 2006) ........................................................................................ 11-12

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991) ................................................................................5, 6, 7, 8, 12

██████████████████████████████████ ........................................................................................6

*United States v. Offill,*
  666 F.3d 168 (4th Cir. 2011) ................................................................................................15 fn.4

*United States v. Russo,*
  74 F.3d 1383 (2d Cir. 1996) ................................................................................................6

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,*
  571 F.3d 206 (2d Cir. 2009) ................................................................................................9

**Statutes**

15 U.S.C. § 77e ................................................................................................1, 6, 7, 8, 14

Plaintiff Securities and Exchange Commission ("SEC") respectfully opposes Defendants' Motion to Exclude the Expert Testimony of ▮▮▮▮▮▮ (D.E. 532, 533). For the reasons that follow, the Court should deny Defendants' motion.

## PRELIMINARY STATEMENT

The SEC claims that Defendants failed to register their offers and sales of XRP, in violation of Section 5 of the Securities Act of 1933 and that Defendants Christian Larsen and Bradley Garlinghouse aided and abetted Ripple's violations of Section 5. (Am. Compl., ECF 46, ¶ 1). The SEC's core allegation is that by not registering, Defendants raised more than $1.4 billion without providing the important disclosures investors otherwise receive when a company raises funds from the public. (*Id.*, ¶¶ 1-2, 5). By not filing a registration statement, Ripple "never provided investors with the material information that every year hundreds of other issuers include in such statements when soliciting public investment." (*Id.*, ¶ 2). The information Defendants never disclosed due to their lack of registration included "the type of financial and managerial information typically provided in registration statements and subsequent periodic and current filings." (*Id.*, ¶ 5).

▮▮▮▮▮ opinions are highly relevant to this case. They provide context for the SEC's charges, including the *scienter*-based aiding and abetting claims, explain the customary steps companies normally take to publicly raise capital, and help the jury understand the type of information Defendants withheld from investors. ▮▮▮▮ is an experienced securities regulator with decades of experience overseeing securities offerings. His proposed testimony – about general securities industry background, regulations relevant to the dispute at hand, and industry custom and practice – is the type of expert testimony routinely allowed in securities cases such as this. In fact, Defendants have raised industry custom and practice as part of their affirmative defenses.

Defendants also assert they are transparent actors with respect to XRP markets, yet concede they withheld key financial information from the public. (*See* D.E. 562 at 2-3). ▮▮▮▮

testimony exposes the gaps between the information Defendants self-selected for disclosure, and the regulatory disclosure requirements imposed by Congress and the SEC. Many courts have accepted ▇▇▇ testimony on precisely these subjects, finding it helpful to the jury. Likewise, the Second Circuit has affirmed the specific expert testimony ▇▇▇ offers here: explanations about SEC filing requirements and the process of registering a securities offering.

Against this backdrop, Defendants' challenges to ▇▇▇ qualifications and the relevance of his testimony ring hollow. His long career as a high-ranking securities regulator makes him overwhelmingly qualified to discuss the intricacies of the capital-raising process. ▇▇▇ lack of digital asset experience, which Defendants claim to be disqualifying, should not preclude him from testifying about the *securities* industry in a case limited to violations of the federal *securities* laws.

## BACKGROUND

### I. ▇▇▇ Experience

▇▇▇ has more than 49 years of regulatory and consulting experience in the securities industry. (▇▇▇ Report, D.E. 534-1, at 5). His areas of expertise include various public securities markets, and "the rules, regulations, customs, and best practices that govern those markets." (*Id.*). From 1972 to 2004, ▇▇▇ worked at NASD, the predecessor to the Financial Industry Regulatory Authority ("FINRA"), and at NASDAQ. He rose from a field examiner to various high-level managerial positions including ▇▇▇ ▇▇▇. (*Id.*, at 5-7). In these positions, ▇▇▇ had overall responsibilities for NASDAQ's regulatory policies and was in charge of "regulatory oversight for both the [Over the Counter] securities markets and the NASDAQ Stock Market." (*Id.* at 5-6). In those roles, he has investigated and managed cases involving unregistered securities distributions. (*Id.* at 6). He was also responsible for reviewing thousands of public statements and press releases to make "the final determination as to what information NASDAQ listed companies were required to disclose." (*Id.*)

> Throughout his career, ███ routinely worked on or supervised regulatory endeavors that dealt with and analyzed both public and private offerings and the disclosures that customarily accompany both primary market and secondary market trading. This includes working with NASDAQ issuers on a regular basis on issues regarding ongoing material disclosures and investigative matters related to initial and ongoing disclosure by [public] companies.

(*Id.* at 7). He also had substantial and routine experience working with a common method for raising capital: initial public offerings ("IPOs"). (D.E. 534-2, ███ Dep. Tr., 227:23-228:23). Indeed, he worked on "every [IPO] that traded on NASDAQ" by enforcing NASD's "regulatory interest," monitoring compliance with SEC and NASD rules, and "polic[ing] all those IPOs." (*Id.*).

Since 2004, ███ has worked as a securities consultant on matters involving regulation, compliance, and technology. (D.E. 534-1, at. 5-6). He has also testified in many securities cases, on topics including industry background and practices, regulatory issues, and unregistered securities offerings. (*Id.* at. 7-8). As to the subject of this case: "A lot of [his previous] testimony and opinions relate to the space that relates to unregistered distributions." (D.E. 534-2, 80:16-19).

II. ███ Opinions

Based on his lengthy securities industry career, ███ offers helpful opinions to assist the jury. First, ███ provides context for the violations at issue and a background on the country's capital markets. He explains how companies raise capital, as Ripple did by selling XRP, and the common method by which they solicit funds from public investors. (D.E. 534-1, at 7-11).

Next, ███ details how companies that solicit public investments typically provide important disclosures and information to investors and the markets. (*Id.* at 9-11). ███ explains that the typical form of initial disclosure is a registration statement, which includes a prospectus. (*Id.*). ███ describes the types of information routinely disclosed in a prospectus, including audited financial statements, the identity of the seller of the securities, and how the

3

company intends to use the proceeds of its offering. (*Id.* at 13-14). ▆ then notes how companies that register provide ongoing periodic disclosure of important information about the company, its operations, and its finances. (*Id.* at 14-17). While he (correctly) references certain SEC regulations as the bases for his opinions, ▆ *never* opines that any violation occurred.

▆ also provides insights into specific types of information that Ripple would have customarily disclosed had it registered its XRP offerings. (*Id.* at 30-31). Such disclosures include the amount of Ripple's revenues from selling XRP, how Ripple used the proceeds of its XRP sales, sales by insiders (such as Garlinghouse and Larsen), and Ripple's use of promotions, incentives, and payments to facilitate trading in XRP and the use of Ripple's products. (*Id.*). Defendants do not dispute the accuracy of ▆ opinions about the disclosures typically provided in public securities offerings. Simply put, ▆ explains the type of public disclosures that Defendants avoided by not registering their offers and sales of XRP.

Next, ▆ discusses the significant costs and resources that companies typically expend when publicly raising funds. (*Id.* at 22-23). These include substantial legal, accounting, compliance, and underwriting expenses. (*Id.*). ▆ likewise details how a company publicly raising capital also exposes itself to legal and regulatory scrutiny. (*Id.*). These opinions are relevant to the aiding and abetting claims against Garlinghouse and Larsen, which contain a *scienter* element. For these and the strict liability claims, the opinions offer context for Defendants' decisions not to register their XRP offerings.

▆ then offers opinions directly relevant to Defendants' "fair notice" affirmative defense, which Defendants expressly premise on industry custom and practice. He describes how the SEC has historically brought actions where a wide range of novel or innovative investment products are found to be "investment contracts," including the large number of cases the SEC brought in the digital asset space before bringing this lawsuit. (*Id.* at 25-26, 29-30). ▆

4

further describes how companies and individuals that become subject to an SEC enforcement investigation, as Defendants were well in advance of this lawsuit, should be on "heightened awareness" that their conduct could violate the securities laws. (*Id.* at 29). He also describes a variety of resources available to those raising funds from public investors who, like Defendants, claim to be "confused" whether their conduct complies with the federal securities laws. (*Id.* at 26-29). While the SEC will move for summary judgment on Defendants' fair notice defense, should the defense proceed to trial, ▇▇▇ opinions will help the jury evaluate the defense.

## ARGUMENT

The testimony ▇▇▇ proffers is commonplace in securities cases, he has repeatedly been allowed to offer similar testimony in such cases, and Defendants' specific objections are misplaced.

**I.  Experts, Including ▇▇▇ Himself, Routinely Testify About Securities Industry Custom and Practices.**

In cases "involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). Accordingly, Courts routinely allow the type of opinions proffered by ▇▇▇ regarding background, customs, and practices in the securities industry. *See, e.g., SEC v. U.S. Envtl., Inc.*, 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) ("In securities cases, federal courts have admitted expert testimony to assist the trier of fact in understanding…securities industry regulations and complicated terms and concepts inherent in the practice of the securities industry.") (citations omitted); *see also Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008) ("As with Duval's testimony on [securities] industry custom and practice, Guild…may testify as to the customs and practices of the industry. It is relevant…and may prove helpful to the jury.").

Thus, an expert may properly testify "that particular practices deviate from the norm, what effects they may have on the market, and whether [defendants] would have been aware of these effects." *In re Blech Sec. Litig.*, 2003 WL 1610775, at *19-22 (S.D.N.Y. Mar. 26, 2003) (allowing

experts to testify "as to what ordinary broker activity entails and as to the customs and practices of the industry"); *see also U.S. Envtl.*, 2002 WL 31323832, at *3 (allowing testimony regarding securities industry "practices and usages").

The Second Circuit has affirmed testimony about SEC filing requirements similar to that proffered by ▇▇▇ *Bilzerian* approved testimony about "general background on federal securities regulation and the filing requirements" of a SEC disclosure document. 926 F.2d at 1294. Similarly, the court has affirmed testimony on a central topic of ▇▇▇ report: "the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508-09 (2d Cir. 1977). Such testimony is helpful in securities cases as long as it does not state that defendants violated the law, and provides "the groundwork…to enable the jury to make its own informed determination." *United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996) (citation omitted).

Employing these standards, courts have repeatedly allowed ▇▇▇ himself to testify, including over objections similar to those advanced by Defendants. In a case involving a Section 5 violation, Judge Cote similarly allowed a report by ▇▇▇ into evidence, ▇▇▇ which offered opinions ▇▇▇ ▇▇▇ (D.E. 534-1, at 7). ▇▇▇ has also been permitted to testify at trial ▇▇▇ ▇▇▇ (D.E. 534-1, at 7).

Recently, another court in a Section 5 case issued an opinion rejecting challenges against ▇▇▇ similar to those Defendants assert. ▇▇▇ ▇▇▇ Qualifying ▇▇▇ the court noted his 40-plus-year securities industry career, including his high-ranking role ▇▇▇ the markets and investigating the central issue in *this* case: ▇▇▇ *Id.* at *3-4. Because the securities industry is ▇▇▇ ▇▇▇



6

██████ *Id.* at *7 (citing *Bilzerian*, 926 F.2d at 1294-95, and *Highland Cap.*, 551 F. Supp. 2d at 183). ██ also rejected an argument Defendants raise here: that ██ was offering legal opinions by citing SEC and industry regulations that formed the bases of his opinions. *Id.*

██████████ (citing *Bilzerian* at 1294-95).

More generally, in ██████ another case alleging Section 5 violations, Judge Cote found ██████

Likewise, in ██████, the court accepted ██████ There, he provided general background testimony that ██████ *Id.* The court found ██ "credible," *id.* at 475, and relied on his opinions regarding regulatory requirements, *id.* at 507-508.

II.     ██ Testimony is Highly Relevant.

Defendants first argue that ██ testimony about the securities registration process and its disclosure regime are irrelevant to the issue of whether Defendants' unregistered XRP offers and sales were part of "investment contracts," and thus violated Section 5. (D.E. 533, at 9). As Defendants recognize, ██ expressly takes no position on that question. (*Id.*). Nor does ██ offer an opinion on how the jury should decide any element of the SEC's claims.

Instead, ██ provides context for the SEC's charges by helping the jury understand the customary practices of companies seeking to raise funds from public investors: registration and its

attendant disclosure obligations. *Highland Cap.*, 551 F. Supp. 2d at 186 ("industry customs and practices testimony may include a discussion of regulatory rules and other guidelines" and the expert "can provide context that is helpful to the jury without making impermissible legal conclusions"). As discussed above, expert testimony on the securities industry's background, customs, and practices is routine. *See, e.g., id.*; *Marx*, 550 F.2d at 508-509; *Bilzerian*, 926 F.2d at 1294.

▇▇▇▇ explains the importance of the SEC's charges, why registration matters, and the impact of Defendants' failure to register their XRP distributions: investors were deprived of important disclosures customarily provided by companies selling investments to the public. This type of testimony will be helpful to a lay jury, which likely has little experience with the customary practices and technical requirements of the registration and disclosure regime governing public offerings. *See, e.g., Blech*, 2003 WL 1610775, at *19 ("proper testimony is for an expert familiar with the market to explain terms and practices that a lay jury would not understand"). ▇▇▇▇ testimony is also proper because it explains how Defendants' practices – failure to register and the resulting nondisclosure of key information – "deviate from the norm [and] what effects they may have on the market." *Id.*; *see also Marx*, 550 F.2d at 512 ("The expert, for example, may tell the jury whether he thinks the method of trading was normal.").

▇▇▇▇ testimony is also highly relevant because it rebuts one of Defendants' core defenses, namely their allegation the SEC "mischaracteriz[e]s the record" and "fails to identify any material information asymmetries" resulting from Defendants' nonregistration. (*See, e.g.*, D.E. 51 at 7 ¶¶ 15, 15(b)). His testimony about the effects of non-registration are also relevant to the aiding-and-abetting claims against Garlinghouse and Larsen. They will help the jury consider the issue of *scienter*, by explaining the industry norms so that the jury can properly assess Defendants Larsen's and Garlinghouse's knowledge or reckless disregard of "the facts that made Ripple's scheme illegal." *See* D.E. 441 at 15; *see also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) (in case

8

alleging *scienter*-based Section 5 violations: "The customs and business practices in the securities industry… provide[] an important context which will aid the jury in determining whether Berckeley had the requisite scienter at the time to evade the registration requirements.").

Defendants demand ▮▮▮▮ exclusion because certain of his opinions (about what types of disclosures Ripple would customarily have made and when it would have provided them to the public) assume that Defendants' XRP distributions involved securities. (D.E. 533 at 9-10.) But that is not disqualifying, since challenges to an expert's assumptions "go to the weight, not the admissibility, of the testimony." *Bocoum v. Daimler Trucks N. Am. LLC*, 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). Indeed, ▮▮▮▮ has previously been allowed to provide testimony ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Nor would ▮▮▮▮ testimony about registration or disclosure practices "confuse the jury," as Defendants argue. (D.E. 533 at 10-11). Despite listing examples of ▮▮▮▮ purportedly confusing opinions, Defendants notably do not contend that any of these opinions are incorrect. (*Id.*) To the contrary, Defendants "do not dispute that registration and disclosure requirements would apply in some form if their XRP distributions were determined to be investment contracts." (*Id.* at 10). In fact, Defendants recently conceded the accuracy of ▮▮▮▮ opinions, by confirming that, by not registering, Ripple was able to keep its financial statements hidden from the public eye and thus deprive XRP purchasers of "detailed information about Ripple's financial condition, long term business plans, revenue streams, and expense structures." (D.E. 562 at 2).

Moreover, ▮▮▮▮ discussion of registration and disclosure requirements is proper because it forms the bases of his opinions about industry custom and practices. (D.E. 534-1, at 3 ("industry custom and practice [] is informed by federal securities law"); *id.* at 10 ("securities law

9

governs the process, and guides industry custom and practice, when companies seek investment by the public"); *id.* at 11-12 (custom and practice "is influenced strongly by the relevant statutes, rules, and their interpretation by the SEC and the courts"); (D.E. 534-2, at 76:23-77:23). He never opines that any violation occurred. (*Id.* at 28:2-5, 73:14-23). This renders his opinions about the existence and terms of regulatory requirements permissible. *Highland Cap.*, 551 F. Supp. 2d at 186 ("Stupay's industry customs and practices testimony may include a discussion of regulatory rules and other guidelines, however, he may not opine as to whether such rules and guidelines were violated");

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

     Defendants next argue that ████████ testimony about customary disclosures in a public securities offering would be prejudicial, arguing that such testimony "insinuates" Defendants engaged in fraud. (D.E. 533 at 14-15). But the lone case Defendants cite for this proposition, *SEC v. Mudd*, 2016 WL 2593980 (S.D.N.Y. May 4, 2016), is inapposite. *Mudd* excluded testimony from an SEC expert about a hypothetical definition of the term "subprime" that the SEC did *not* contend should have applied. *Mudd*, at *3-4. Because the SEC did not allege that the expert's "subprime" definition applied, the court held that testimony about that hypothetical definition had the "potential to confuse jury members." *Id.* at *4.

     Here, ████████ testimony is entirely consistent with the SEC's theory of the case and core allegations. The SEC alleges that Ripple "never provided investors with the material information that every year hundreds of other issuers include in such statements when soliciting public investment" including "the type of financial and managerial information typically provided in registration statements and subsequent periodic and current filings." (D.E. 46, ¶¶ 2, 5). Given the

consistency between ▬▬▬ testimony, the SEC's allegations, and Ripple's admission that by not registering it kept its financial statements private (D.E. 562, at 2), there is no risk of jury confusion.

### III. ▬▬▬ Has the Requisite Expertise.

Defendants' argument, that ▬▬▬ lacks sufficient expertise and methodology to opine on the type of disclosures that are customarily present when a company raises capital from public investors, is similarly misguided. To begin with, Defendants ignore the varied cases cited above in which courts have qualified ▬▬▬ to testify about securities industry background, custom, practices, and regulations. Defendants also ignore that ▬▬▬ has overwhelming experience on the primary topic of his report, the requirements attendant to raising capital. Indeed, over the course of his lengthy regulatory career, he worked on "every [IPO] that traded on NASDAQ" by enforcing NASD's "regulatory interest," monitoring compliance with SEC and NASD rules, and "polic[ing] all those IPOs." (D.E. 534-2, at 227:23-228:23).[1]

Defendants also overlook ▬▬▬ long career reviewing thousands of SEC filings to assess whether prescribed information was being disclosed, making "the final determination as to what information NASDAQ listed companies were required to disclose." (D.E. 534-1, at 6; *see also* 534-2, at 48:25-51:7, 118:16-119:9). ▬▬▬ made these determinations despite being a "generalist" high-ranking official at NASD, as opposed to being a company- or industry-specific specialist that Defendants suggest is required to opine on whether a disclosure is required. (D.E.

---

[1] Despite ▬▬▬ extensive work on IPOs while at NASD, Defendants incorrectly claim he "has no professional experience working on IPOs." (D.E. 533 at 19). To the contrary, he is qualified to opine that public offerings are an expensive and resource-intensive process involving lawyers, accountants, underwriters, and compliance professionals. (D.E. 534-1, at 22-23). ▬▬▬ utilized a tool offered by the auditing firm PWC to estimate the costs Ripple would have incurred had it raised capital through registered as opposed to unregistered XRP distributions. (*Id.* at 23). Even if the Court accepts Defendants' argument that ▬▬▬ should not be able to provide a precise cost figure (D.E. 533 at 19), he should still be allowed to generally describe the use of expensive professionals in the capital-raising process, to provide the jury background and context to consider Defendants' choice not to register their XRP distributions.

533 at 12). This extensive experience, on the precise topics of his opinions, shows that ▮ is more than qualified. *See, e.g., SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132-33 (2d Cir. 2006) (expert with "over 30 years of experience in the insurance industry" who was "familiar with practices in the industry" was qualified); ▮

▮

Defendants recognize that experts may properly testify as to securities industry custom and practice. They show this by citing *Bilzerian*, 926 F.2d at 1294 (which allowed expert testimony on "general background on federal securities regulation and [SEC] filing requirements") and *Highland Cap.*, 551 F. Supp. 2d at 186 ("industry customs and practices testimony may include a discussion of regulatory rules and other guidelines"). (D.E. 533 at 14).

Even though the experts allowed to testify in those cases were securities "generalists," Defendants seek to evade those cases' holdings by arguing that ▮ lack of experience in the *digital asset* industry leaves him unqualified to opine on industry custom and practice in the *securities* industry. D.E. 533 at 14. But this argument "rest[s] on a constricted view of expert qualifications," since an expert "need not be disqualified 'merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, No. 08 Civ. 11315 (WHP), 2011 WL 855876, at *1 (S.D.N.Y. Feb. 28, 2011) (citations omitted and collecting cases). Indeed, ▮ rejected a similar attempt to improperly narrow the scope of ▮ expertise. ▮

▮

Defendants' arguments about ▮ lack of digital asset expertise ignore that his opinions address custom and practice in the *securities* industry, particularly when companies raise capital from investors in our public markets. The relevant qualification in this context is the *securities*

industry, as its registration requirements apply generally to securities offers and sales, regardless of the particular industry to which those securities relate. Here, ▮▮▮▮ career as a securities regulator and routine work evaluating IPOs renders him more than qualified. Indeed, most of Defendants' proffered experts lack any crypto experience. *See* D.E. 536 at 26, 47, 51, 78-79, 106 (defense experts Schwartz, Borden, Easton, Osler, and Shampanier have no digital assets expertise); D.E. 548-34 (Fischel Dep. Tr.) at 33:15-20; D.E. 548-37 (Marais Dep. Tr.) at 81:13-82:12.

IV. ▮▮▮▮ **Employed Reliable Methodology.**

Defendants also incorrectly assert that ▮▮▮▮ opinions are not grounded in sufficient facts or methodology. (D.E. 533 at 12-13). But ▮▮▮▮ describes the types of information customarily disclosed in a registration filing, including audited financial statements, the identity of the seller of the securities, and how the company intends to use offering proceeds. (D.E. 534-1, at 13-14). When asked to provide the bases for these opinions, he cited SEC regulations that mandate such disclosures (Form S-1 and Regulations S-K and S-X). (D.E. 534-2, 112:2-21, 125:6-12, 127:10-128:11).[2] ▮▮▮▮ also details the regulations supporting his opinions about the types of ongoing disclosures companies customarily make after filing a registration statement. (D.E. 534-1, at 16-17 (citing Forms 10-K, 10-Q, and 8-K)). Indeed, many of the missing disclosures ▮▮▮▮ identifies – such as a full accounting of Ripple's XRP sales revenues, use of proceeds, and audited financial statements (*id.* at 30-31) – are expressly required by SEC Forms S-1 and 10-K (at 9-11 (Parts II-IV), available at https://www.sec.gov/files/form10-k.pdf), which Ripple should have filed with the SEC.

▮▮▮▮ citation to the regulations forming the basis of his testimony establishes the reliability of his methodology. *See, e.g., U.S. Envtl.*, 2002 WL 31323832, at *3 (methodology reliable where expert identified "the sources and nature of [his opinions] in his deposition, identifying the

---

[2] A review of Form S-1 (at 4-5 ("Item 11")) and Regulations S-K and S-X confirms the accuracy of ▮▮▮▮ testimony. *See* https://www.sec.gov/files/forms-1.pdf; 17 C.F.R. §§ 210 and 229.

13

case law and statutes from which many of the standards arose…the reliability of his testimony can be sufficiently evaluated by inquiring into Lowry's thirty years of experience as a regulator, compliance director, and securities consultant");

Defendants also claim ▮ "tell[s] the jury what role to reach," by purportedly opining on the materiality of information that Ripple did not disclose. (D.E. 533 at 13-14). Even if ▮ were offering a materiality opinion (he is not), that could not conceivably infringe on any jury function. Materiality is not an element of any claim or defense at issue in this case.

V. ▮ **Should be Permitted to Testify on Issues Relevant to Defendants' Affirmative Defenses, Including Industry Custom and Practice.**

Defendants argue that the SEC failed to provide "fair notice to the market that transactions in XRP violated the law." (D.E. 51, at 97; D.E. 462, at 97-98). Defendants later argued that the SEC created "ambiguity and confusion" in its outward facing actions regarding digital assets. (D.E. 172, at 28-29). By the express terms of this affirmative defense, the SEC created this alleged confusion by "treating XRP as a digital currency that was not subject to the federal securities laws…consistent with the *industry standard, custom, and practice.*" (D.E. 51, at 99; D.E. 462, at 99) (emphasis added).

With Defendants explicitly raising securities industry custom and practice as defenses, ▮ report counters that charge by explaining that Defendants failed to comply with industry norms despite their alleged "confusion." (D.E. 534-1, at 25-30). He thus opines that, based on industry custom and practice, a market participant claiming to be confused whether their conduct comports with the securities laws takes affirmative steps including: (a) looking for guidance from the decades of judicial decisions applying *Howey* to "non-traditional investment products"; (b) consulting with the SEC staff, including seeking a "No-Action" letter; (c) reviewing the dozens of SEC actions involving digital assets, including large numbers of Section 5 cases; and (d) being on

14

"heightened awareness," should a firm become subject to a SEC Enforcement investigation (as Ripple became in 2018). (*Id.*).  ████ bases this opinion on his regulatory career, which provided him "personal experience of interaction between NASD and the SEC and how to regulate…new products." (D.E. 534-2, 152:11-153:4, 159:18-160:15, 165:25-167:21, 171:20-24, 172:21-25).

While the SEC will show that the fair notice defense should not survive summary judgment, should that defense nevertheless go to a jury, the SEC should be allowed to rebut the industry custom and practice allegations Defendants invoke to support their defense. While Defendants myopically argue that ████ lacks sufficient experience with digital assets (D.E. 533, at 15-19), his report makes clear that his opinions apply generally to the *securities industry*, in which courts routinely find that he is qualified to testify. Nor does ████ usurp the role of the jury, since he does not opine whether the defense succeeds. Rather, he provides insight on whether "particular practices deviate from the norm," *Blech*, 2003 WL 1610775, at *19, which will allow the jury to make an informed decision should it evaluate any industry custom and practice defense.[3]

## CONCLUSION

The Court should deny Defendants' motion to exclude ████ testimony.

---

[3] Defendants also argue ████ cannot testify about exemptions from the securities laws' registration requirements (D.E. 533, at 15), yet assert affirmative defenses alleging their XRP distributions were exempt from registration. (D.E. 51 at 99; D.E 462 at 101). Thus, ████ opinions providing background for and principles underpinning exemptions (D.E. 534-1, at 18-22) are appropriate and will assist the jury. *See, e.g.*, *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (affirming testimony on "complex concepts involving securities registration, registration exemptions, and specific regulatory practices…we find it difficult to imagine how the government could have presented its case against Offill without the assistance of expert testimony to explain the intricate regulatory landscape and how securities practitioners function within it"); *Berckeley*, 455 F.3d at 218 (same result for "securities industry custom" testimony about registration exemptions).

15

Dated: New York, New York  
       August 09, 2022

Respectfully submitted,

/s/ Pascale Guerrier
Pascale Guerrier
Ladan F. Stewart
Mark R. Sylvester
Jorge G. Tenreiro
Daphna A. Waxman
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004
guerrierp@sec.gov

Benjamin J. Hanauer
Robert M. Moye
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
175 W. Jackson Boulevard, Suite 1450
Chicago, IL 60604