**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>        v.<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>                    Defendants. | Case No. 20-CV-10832 (AT) (SN) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF** ███████████

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

LEGAL STANDARD ............................................................................................................. 4

ARGUMENT ......................................................................................................................... 4

I.   ███████ IS UNQUALIFIED TO OFFER HIS OPINIONS .................................................. 4

II.  ███████ HAS NO RELIABLE METHODOLOGY TO SUPPORT HIS OPINIONS .......... 7

   A.  ███████ Made No Effort To Measure The Perceptions Of XRP Purchasers ....................... 8

   B.  ███████ Opinions Have No Reliable Methodology Behind Them. .................................. 8

      1.  ███████ Opinions Are Unreliable *Ipse Dixit* ............................................................ 9

      2.  ███████ Search for Supporting Information Was Unreliable Because It Was
          One-Sided And Incapable of Replication. ................................................................... 10

III. ███████ TESTIMONY WILL NOT HELP THE JURY ............................................. 12

IV.  ███████ REBUTTAL OPINIONS SHOULD BE EXCLUDED ................................ 13

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**                                                                     **Page(s)**

*523 IP LLC v. CureMD.Com,*
   48 F. Supp. 3d 600 (S.D.N.Y. 2014) ........................................................... 4

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
   677 F.3d 60 (2d Cir. 2012) ........................................................................ 15

*Amorgianos v. Nat'l R.R. Passenger Corp.,*
   303 F.3d 256 (2d Cir. 2002) ........................................................................ 7

*Anderson v. Binance,*
   2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ............................................ 15

*Aubrey v. Barlin,*
   2015 WL 6002260 (W.D. Tex. Oct. 14, 2015) ........................................... 5

*Barton v. Hai Feng 1710 Designated,*
   2021 WL 704320 (S.D. Ga. Feb. 23, 2021) ............................................... 4

*BMC Software, Inc. v. Servicenow, Inc.,*
   2016 WL 379620 (E.D. Tex. Feb. 1, 2016) ............................................... 9

*Boucher v. U.S. Suzuki Motor Corp.,*
   73 F.3d 18 (2d Cir. 1996) ........................................................................... 9

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.,*
   627 F. Supp. 2d 384 (D.N.J. 2009) .......................................................... 12

*Buckley v. Deloitte & Touche USA LLP,*
   888 F. Supp. 2d 404 (S.D.N.Y. 2012) ....................................................... 8

*ChromaDex, Inc. v. Elysium Health, Inc.,*
   2020 WL 1279236 (C.D. Cal. Jan. 16, 2020) ............................................ 9

*Darby v. Carnival Corp.,*
   2021 WL 6428039 (S.D. Fla. Nov. 23, 2021) ............................................ 4

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993) .................................................................... 3, 4, 9, 12

*Earley Info. Sci., Inc. v. Omega Eng'g, Inc.,*
   2021 WL 5868249 (D. Mass. Dec. 10, 2021) ........................................... 9

*Gen. Elec. Co. v. Joiner,*
   522 U.S. 136 (1997) ................................................................................... 9

*Goldberg v. 401 N. Wabash Venture LLC,*
   2013 WL 212912 (N.D. Ill. Jan. 18, 2013) ............................................................... 8

*Graves v. Mazda Motor Corp.,*
   405 F. App'x 296 (10th Cir. 2010) ........................................................................... 9

*Hancox v. Cottrell, Inc.,*
   2007 WL 9718029 (W.D. Mo. June 13, 2007) ......................................................... 5

*Hilaire v. DeWalt Indus. Tool Co.,*
   54 F. Supp. 3d 223 (E.D.N.Y. 2014) ........................................................................ 7

*Innis Arden Golf Club v. Pitney Bowes, Inc.,*
   629 F. Supp. 2d 175 (D. Conn. 2009) ..................................................................... 12

*Jinro Am. Inc. v. Secure Inv., Inc.,*
   266 F.3d 993 (9th Cir. 2001) ................................................................................ 6, 7

*Johnson v. Breg, Inc.,*
   2011 WL 13143351 (E.D.N.C. Dec. 13, 2011) ........................................................ 5

*Jones v. ConAgra Foods, Inc.,*
   2014 WL 2702726 (N.D. Cal. June 13, 2014) ......................................................... 10

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999) ................................................................................................. 7

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,*
   209 F. Supp. 3d 612 (S.D.N.Y. 2016) ................................................................. 8, 11

*MTV Cap. Ltd. P'ship v. Quvis, Inc.,*
   2008 WL 5516517 (W.D. Okla. Nov. 12, 2008) ...................................................... 5

*Patsy's Italian Rest., Inc. v. Banas,*
   531 F. Supp. 2d 483 (E.D.N.Y. 2008) ...................................................................... 9

*Pearlstein v. Blackberry Ltd.,*
   2021 WL 4131646 (S.D.N.Y. Sept. 10, 2021) ............................................... 7, 10, 12

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon,*
   2020 WL 1322856 (S.D.N.Y. Mar. 20, 2020) .......................................................... 9

*Piambino v. Bailey,*
   610 F.2d 1306 (5th Cir. 1980) ............................................................................... 12

*In re Rezulin Prods. Liab. Litig.,*
   309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................................... 10-11

*Sassafras Enters., Inc. v. Roshco, Inc.*,
   915 F. Supp. 1 (N.D. Ill. 1996) ........................................................................... 6

*SEC v. Am. Growth Funding II, LLC*,
   2019 WL 1772509 (S.D.N.Y. Apr. 23, 2019) ...................................................... 12

*SEC v. Mapp*,
   2017 WL 5466660 (E.D. Tex. Nov. 14, 2017) ................................................... 5, 6

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................. 8

*United States v. Cruz*,
   363 F.3d 187 (2d Cir. 2004) .............................................................................. 13

*United States v. Ray*,
   2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ........................................................ 14

*United States v. Sayre*,
   434 F. App'x 622 (9th Cir. 2011) ...................................................................... 12

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007) ............................................................................... 4

## RULES AND REGULATIONS

Federal Rule of Evidence 702 .................................................................................. 4, 12

## INTRODUCTION

██████████ is an electrical engineer with no education, certifications, or formal training in economics, finance, investment, cross-border remittances, or any related field.  His supposed expertise comes primarily from an investment partnership he founded that has never had any clients.  He seeks to offer an opinion on what factors would have led a reasonable purchaser of XRP to expect to receive profits based on Ripple's efforts, despite not having spoken to a single person who purchased XRP and admitting that he himself would rely on different factors as an investor.  He also seeks to offer an opinion that cross-border remittance service providers would not be interested in using XRP as a bridge asset, despite having no experience in institutional cross-border remittances and not having spoken to a single cross-border remittance provider about using XRP as a bridge asset.  These opinions should be excluded entirely for three reasons.

First, ██████ is unqualified to offer them.  He has no education or training in any investment-related field.  He has spent the vast majority of his fifteen-year career (all but two years) in non-investing jobs—mainly focused on building radar systems.  His only investment-focused job is with a two-person investing LLC he founded that has never had a client.  He claims to have "intimate familiarity with many different participants in the digital asset space" based on interactions with those market participants, but cannot recall even one of those supposed interactions.  And he has never spoken to anyone who works for a cross-border money transmitter.

Second, ██████ used *no* methodology to assess what a reasonable purchaser would believe.  He came up with a list of factors that he thinks would be important to investment-oriented purchasers, without any supporting authority, academic research, or empirical evidence to support the list.  ██████ himself, moreover, undermines his own list:  he admitted in his deposition that the factors he considers when investing are *different* from those he identified in his report.  And to the

extent it could be said that █████ applied any methodology, he did not do so in a reliable manner. After making up his list of factors, █████ then searched for Ripple statements and actions that he thought would lead purchasers to expect profits based on Ripple's efforts while simply ignoring any statements or actions that would not have led to that expectation. His speculation on the usefulness of XRP in cross-border remittances is similarly ungrounded.

Third, allowing █████ to testify would not help the jury. At bottom, he does no more than interpret Ripple's public statements and then conclude that an ordinary investor would reach the same interpretation. A jury is just as equipped as █████ is to do that. Likewise for his cross-border remittances opinion, which is derived solely from reading public documents and testimony.

█████ also offers several rebuttal opinions, responding to *four* different experts—all of them tenured professors with areas of expertise as diverse as market microstructure, the economic theory of cross-border remittance transfers, and economic cost modeling. That █████, an electrical engineer, purports to rebut *all* of these experts is on its face evidence that he is not testifying based on meaningful qualifications or any reliable methodology. His rebuttal opinions should be excluded in their entirety for similar reasons as his affirmative opinions.

## BACKGROUND

█████ is an electrical engineer. He received a B.S. in electrical engineering from Rice University in 2006 and an M.S. in electrical engineering from the University of Texas in 2010. *See* Ex. A, Expert Report of █████ (Oct. 4, 2021) ("█████ Rep."), App'x A ("█████ CV").[1] He has no degrees or certifications in any investment-focused field. *See* Ex. B, Dep. Tr. of █████ ("Tr.") 142:5-13. From 2007 to 2016, █████ held several non-

---

[1] Citations to "Ex. __" reference exhibits attached to the accompanying Declaration of Bradley E. Oppenheimer.

investment-focused jobs.  He spent about two years working at a Texas electricity grid operator until 2009; he bought and leased solar water heaters on the side during the same period; then from 2010 to 2016 he worked a series of jobs focused on designing radar systems.  *Id.* 22:18-24:20, 91:24-92:7, 95:8-96:18.  In September 2016, he quit his job and for a brief spell (just over two years) worked full time on starting a two-person investment partnership, █████ Capital LLC, which he majority owns.  *Id.* 96:19-98:7.  █████ has never had any clients; it invests only its founders' money and does not provide investing advice to anyone else.  *Id.* 100:25-101:6, 110:24-111:3.  It attempts to employ "arbitrage" strategies to profit off inefficiencies in digital asset markets.  *Id.* 36:9-12, 151:18-152:20.  In January 2019, █████ stopped trying to invest full time and joined █████, where he assists with forensic fraud investigations.  █████ CV.  Although the SEC has retained him as an expert in other cases (no other party in federal or state court litigation ever has), he has never testified at trial in any court proceeding, Tr. 124:24-125:20, and has never been subject to a *Daubert* motion before this one.[2]

█████ opening report concludes that Ripple's public statements and actions would cause a "reasonable purchaser" of XRP to have "an expectation of future profit derived from the efforts of Ripple." █████ Rep. ¶ 8.  He bases this opinion solely on his "experience as an investor and close observer of the digital asset space."  *Id*.  He also purports to opine that various institutions involved in the cross-border payments industry would not find XRP or Ripple's cross-border payments product, ODL, to be an attractive option to facilitate such payments.[3]  *E.g., id.* ¶¶ 27-29.

---

[2] The SEC relied on a report from █████ in its motion for a preliminary injunction in *SEC v.* █████, 19-cv-9439 (PKC) (S.D.N.Y.), but █████ was not subject to a *Daubert* motion in that action, and no court to our knowledge has qualified him as an expert.

[3] ODL ("On-Demand Liquidity") is a feature of Ripple's software as a service product, RippleNet.  ODL uses XRP as a bridge currency to settle in near real-time cross-border payments with transparent pricing.  It offers a revolutionary alternative to traditional cross-border payment systems that are costly, slow (potentially taking several days to settle), and opaque.

███ has never worked for—or interviewed anyone who works for—any company that works in the cross-border remittance industry.  Tr. 244:11-25, 247:25-248:8.

## LEGAL STANDARD

The SEC must show by a preponderance of the evidence that ███ testimony satisfies Federal Rule of Evidence 702.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).  The Rule 702 "inquiry . . . focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony . . . will assist the trier of fact."  *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

## ARGUMENT

## I.     ███ IS UNQUALIFIED TO OFFER HIS OPINIONS

███ purports to opine on the "likely" beliefs of "reasonable [XRP] purchasers," and sometimes of two particular subsets: "investment-oriented purchasers" and "utility-oriented" institutional purchasers (principally remittance service providers).  ███ Rep. ¶¶ 31, 85-90.  He is unqualified to offer that testimony.  ███ has no degrees, certifications, or formal training in any fields related to economics, finance, or investing.  Tr. 29:13-24, 142:11-13.[4]  He has no credentials in psychology, marketing, or any other discipline that surveys how people interpret

---

[4] ███ did testify that he took some accounting or economics courses in college, and that he has watched some online lectures, but could not "remember, like, names of them" or the subjects that they covered.  Tr. 28:16-17.  He also claimed to have expertise due to having "read[ ] blog posts" and listened to "podcasts."  *Id.* 29:10, 234:19.  None of that comes remotely close to establishing expert credentials.  *Cf. Darby v. Carnival Corp.*, 2021 WL 6428039, at *8 (S.D. Fla. Nov. 23, 2021) ("[T]he qualification prong is not flexible enough to permit a person who merely passes an online course and does not have substantial experience to clear the qualification hurdle."); *Barton v. Hai Feng 1710 Designated*, 2021 WL 704320, at *3 (S.D. Ga. Feb. 23, 2021) (excluding expert whose expertise was based on "informational videos he watched on YouTube").

statements or actions. *Id.* 226:3-4; ██ CV.  He has never worked as an investment advisor,[5]

managed money for a client, or held a job providing investment advice to clients.  *Id.* 13:17-19,

94:25-96:18, 101:4-6, 110:24-111:3.  This lack of qualifications is fatal to ██ opinions.  *See*

*SEC v. Mapp*, 2017 WL 5466660, at *2-3 (E.D. Tex. Nov. 14, 2017) (excluding SEC's expert, a

former electrical engineer, from opining on what would affect a "reasonable investor's decision"

to invest because putative expert lacked "experience in advising investors or recommending

particular investments to the average person"); *Aubrey v. Barlin*, 2015 WL 6002260, at *9 (W.D.

Tex. Oct. 14, 2015) (same for witness with forty years' experience as forensic fraud investigator

but none providing investment advice); *MTV Cap. Ltd. P'ship v. Quvis, Inc.*, 2008 WL 5516517,

at *2 (W.D. Okla. Nov. 12, 2008) (same for securities lawyer with substantial experience advising

clients on regulatory risks of investments but none advising them on merits of investments).

Given this lack of relevant credentials, ██ instead cites his "experience as an investor

and close observer of the digital asset space," relying principally on his majority ownership of and

around two years' full-time experience working at ██—the only full-time investment-

focused job he has ever held.  ██ Rep. ¶ 8.  That does not establish any expertise.  There is no

evidence that ██ gained relevant experience through ██, because he improperly refused

to answer questions about ██ based on a supposed NDA *with his own majority-owned*

*company*.  *See* Tr. 36:7-19, 100:21-24; *Hancox v. Cottrell, Inc.*, 2007 WL 9718029, at *1 (W.D.

Mo. June 13, 2007) (barring expert who refused to answer questions about consulting work

referenced in report due to NDA); *Johnson v. Breg, Inc.*, 2011 WL 13143351, at *1 (E.D.N.C.

---

[5] At his deposition, ██ testified that he had advised certain government agencies about "investment" decisions, but he clarified that he was using the term "investment" to mean "purchasing assets" such as "a purchase of hardware" or other "technology."  Tr. 19:24-21:6. Working on government procurement does not provide experience as an investment advisor.

Dec. 13, 2011) (improper for expert to refuse on confidentiality grounds to testify about purported experience).[6]  The Court should not let ███ use ███ as the supposed basis of his expertise while refusing to discuss it based on what is effectively an NDA with himself; that would be a roadmap to abuse by future experts seeking to hide their (lack of) qualifications from scrutiny.

But even putting that deliberate lack of transparency aside, ███ experience with ███ ███ is not a sufficient basis for his opinions.  ███ has never had any clients; it invests only its founders' money.  Tr. 100:25-101:6.  It did not give him experience providing investment advice to others.  *Id*. 101:4-6, 110:24-111:3 ("Q. . . . Can a person . . . pay ███ to get advice about digital asset trading?  A. No.").[7]  Accordingly, ███ has no experience from which to opine about what other people would have considered important in deciding to buy XRP.  *See*, *e.g.*, *Mapp*, 2017 WL 5466660, at \*2-3; *see also Sassafras Enters., Inc. v. Roshco, Inc.*, 915 F. Supp. 1, 8 (N.D. Ill. 1996) ("Michalek's business experience might perhaps qualify him as an 'expert' . . . on some matters having to do with [his business] . . . but there is surely nothing to suggest his qualifications as a mindreader.  Simply put, he has not been shown to be capable of testifying as to the mental reactions that *other* persons would have on seeing [defendant's] product.").[8]

---

[6] At his deposition, ███ claimed not to recall who signed the purported NDA on behalf of ███, even though there are only two options and one is himself.  Tr. 36:16-37:4.

[7] ███ also points to personal investing he has done since he was in college as a basis for his supposed expertise.  ███ Rep. ¶ 4 (claiming to have "19 years of experience" trading); Tr. 9:11-24 (admitting that this "experience" started when ███ was an eighteen-year-old college freshman); *id.* 12:19-22 (failing to recall whether he ever spent more than ten hours a week investing during this period).  That also is not a basis to testify as an expert.  *Cf. Jinro Am. Inc. v. Secure Inv., Inc.*, 266 F.3d 993, 1001, 1006 (9th Cir. 2001) (excluding witness who based purported expertise on knowledge gained through a "hobby").  If it were, anyone with a brokerage or retirement account would be qualified as an "expert" in investing.

[8] ███ claims that he has "intimate familiarity with many different participants in the digital asset space including retail users and traders, institutional investors, cryptocurrency miners, software developers, entrepreneurs, and venture capital investors," based on supposed conversations he had with them.  ███ Rep. ¶ 4; Tr. 118:8-119:9.  But when asked, he could not recall a single conversation with even one person in any of these categories.  Tr. 116:8-117:22.

This lack of experience is equally fatal to ▮▮▮▮ other opinion, concerning how institutional entities in the cross-border payment industry would view Ripple's statements, actions, and product offerings, including its ODL product.  *E.g.*, ▮▮▮▮ Rep. ¶¶ 27-31, 85-90.  He has never worked in the cross-border payment industry and has not spoken to anyone who has.  Tr. 244:11-25, 247:25-248:8.  He admitted that the sole basis for his "expertise" to offer this opinion is the fact that he read public statements and deposition transcripts from money transmitters.  *Id.* 245:12-22 ("[Q.] What expertise do you have to identify what money transmitters were likely to care deeply about?  A. As I said, I read, you know, many statements by money transmitters about the type of issues they care about, about their business model, about their business strategy.  In addition, you know, read their -- details about their finances.").  That is not expertise.  *See Jinro Am. Inc.*, 266 F.3d at 1001, 1003-06 (excluding expert who learned about subject through newspaper articles); *Pearlstein v. Blackberry Ltd.*, 2021 WL 4131646, at *4 (S.D.N.Y. Sept. 10, 2021) (excluding expert who opined on "the thinking of" a board of directors based only on reading and interpreting company's documents).  All of ▮▮▮▮ opinions fail at this threshold step.

## II.     ▮▮▮▮ HAS NO RELIABLE METHODOLOGY TO SUPPORT HIS OPINIONS

All experts, including those testifying from experience, must use a reliable process.  *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 243 (E.D.N.Y. 2014); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-66 (2d Cir. 2002) (expert testifying from "personal experience" must still use "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999))).  Even if ▮▮▮▮ had the qualifications to testify as an expert (he does not), he employed *no* coherent methodology, let alone a reliable one.  This flaw is independently fatal to his opinions.

A.   ██████   **Made No Effort To Measure The Perceptions Of XRP Purchasers.**

██████ opines on what ordinary purchasers of XRP believed. *E.g.*, ██████ Rep. ¶ 87.  There are empirical ways to measure such beliefs, such as well-designed surveys, focus groups, interviews, or certain statistical analyses.  *See* Ex. C, Expert Rebuttal Report of Kristina Shampanier ¶¶ 18-31 (Nov. 12, 2021) ("Shampanier Rebuttal") (describing survey, interview, and focus-group methodologies); Ex. D, Expert Report of Allen Ferrell (Oct. 4, 2021) ("Ferrell Rep.") (using statistical analysis to determine what factors influenced XRP price).  ██████ admitted he did not use any of those methods.  Tr. 219:10-220:9, 224:21-226:4.  That is fatal to his opinions: questions focused on a "mental association in buyer[s'] minds" are "primarily . . . empirical" and best assessed through empirical methods like surveys, by experts with "training or experience" in using such methods.  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638-39 (S.D.N.Y. 2016) (citation omitted).[9]  ██████ did not do any empirical analysis and is not qualified to do one in any event.  *See, e.g.*, Shampanier Rebuttal ¶¶ 9, 16.

B.   ██████   **Opinions Have No Reliable Methodology Behind Them.**

Instead of an empirical analysis, ██████ opinion proceeds in two steps:  First, he set out a list of six "factors" he thinks would "likely" have been important to a reasonable purchaser of XRP.  *See, e.g.*, ██████ Rep. ¶ 50.  Second, he searched for public statements by Ripple that would support those factors (but apparently not for evidence that would undermine them).  *See infra* at 10-12.  Neither step amounts to a reliable methodology.

---

[9] *See also Goldberg v. 401 N. Wabash Venture LLC*, 2013 WL 212912, at *2, *6 (N.D. Ill. Jan. 18, 2013) (excluding expert opining on how a "reasonably prudent buyer" would interpret marketing materials without conducting any surveys, interviews, or focus groups); *SEC v. Tourre*, 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013) (excluding expert in securities case opining on expectations of a "CDO market participant[]" without conducting survey of such participants); *Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 414 (S.D.N.Y. 2012) (excluding expert opining on how lenders would have reacted to audit disclosures based on "generalized experience alone" rather than by using empirical methods).

1.   ████   **Opinions Are Unreliable *Ipse Dixit*.**

████ first step is a classic example of inadmissible *ipse dixit*.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural."); *Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, 2021 WL 5868249, at *3-5 (D. Mass. Dec. 10, 2021) (barring expert who used methodology with "no basis" other than "[g]eneric appeals to [his] experience").

████ came up with a list of factors that he says are likely important to reasonable XRP purchasers, based on nothing more than his say-so.  He provides no authority for that list—there is no academic paper, industry journal, book, or publication that supports it, *see* Tr. 250:14-251:21, nor does he offer any other valid basis in lieu of those sources to opine about what others believe. He did nothing to test whether actual purchasers of XRP ever considered the factors he identified. *Id.* 242:2-14.  And he never spoke to a single person who purchased XRP when coming up with his factors.  *Id.* 196:20-24.  It is solely a list of "the factors *[████] thought* were important to digital asset purchasers."  *Id.* 242:2-14 (emphasis added).  That is not a reliable methodology that can satisfy *Daubert*.  *See, e.g.*, *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2020 WL 1322856, at *7-8 (S.D.N.Y. Mar. 20, 2020) (excluding "*ipse dixit*" opinion about what "investors and other market participants" would find "important" based solely on anecdotal familiarity with market).[10]

---

[10] *See also*, *e.g.*, *Patsy's Italian Rest., Inc. v. Banas*, 531 F. Supp. 2d 483, 485-86 (E.D.N.Y. 2008) (reliance on "personal knowledge and expertise" rather than surveys or other empirical methods in opining on consumers' beliefs rendered methodology unreliable); *Graves v. Mazda Motor Corp.*, 405 F. App'x 296, 299 (10th Cir. 2010) (affirming exclusion of expert who relied "on no more than his [own] say so" to opine on how an "ordinary consumer would expect" a car part to operate); *ChromaDex, Inc. v. Elysium Health, Inc.*, 2020 WL 1279236, at *8 (C.D. Cal. Jan. 16, 2020) (rejecting expert's opinion that "present[ed] no reliable business principle or method to suggest . . . how consumers would have gone about their purchasing decisions . . . and instead applie[d] [only] his purported knowledge and experience.  This is not a reliable method[.]"); *BMC Software, Inc. v. Servicenow, Inc.*, 2016 WL 379620, at *2 (E.D. Tex. Feb. 1, 2016) (same).

Further undermining ▇▇▇ *ipse dixit* about what reasonable purchasers would consider are his own admissions that reasonable purchasers do *not* necessarily consider the factors he identified. Most starkly, ▇▇▇ himself considers a different set of factors when he makes his own digital asset investment decisions. *See* Tr. 37:9-45:10 (▇▇▇ considerations included "the price of an asset," "technological considerations about [its] blockchain[ ]," and its arbitrage opportunities, none of which are among the six factors set out in ▇▇▇ report, *see* ▇▇▇ Rep. ¶ 50).[11] *Cf. Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (declining to rely on expert who made purchasing decisions without considering information that she claimed other consumers would consider). He also admitted that reasonable investors may consider "completely different factors" than ▇▇▇ advances and that he had no "way to validate" what they actually consider. Tr. 213:9-20. In other words, not only did ▇▇▇ simply make up the list of factors he says are important to reasonable purchasers, but his own conduct and express admissions show that the factors he listed are *not* necessarily important to reasonable purchasers. That is not a methodology at all, and certainly not a reliable one; it mandates exclusion. These same points also render ▇▇▇ opinion regarding money remitters' views of ODL unreliable.[12]

**2.      ▇▇▇ Search For Supporting Information Was Unreliable Because It Was One-Sided And Incapable Of Replication.**

The second step of ▇▇▇ "methodology" is also unreliable. It is improper for an expert to first reach a conclusion and only then look for evidence that supports it. *In re Rezulin Prods.*

---

[11] ▇▇▇ spoke only at a high level of generality, refusing to provide specific details on his trading approach, again on the basis of his supposed NDA. *See* Tr. 37:11-16 ("I can't discuss [the factors ▇▇▇ considers] at length."); *id.* 36:8-12. These refusals prevent a full evaluation of ▇▇▇ purported qualifications. *See supra* at 5-6.

[12] *See Pearlstein*, 2021 WL 4131646, at *10 (barring expert from opining on beliefs of market participants that he "pulled out of thin air"; it went "well beyond expert *ipse dixit*" for him to opine on "apparent belief[s]" of companies he was not familiar with); *cf.*, *e.g.*, ▇▇▇ Rep. ¶ 86 (listing "specific topics" that "a money transmitter likely cares deeply about," citing nothing).

*Liab. Litig.*, 309 F. Supp. 2d 531, 550 (S.D.N.Y. 2004).  But ███ appears to have done just that.  After making up his list of factors, he then "looked to see if there were Ripple statements regarding those factors," ultimately citing roughly 40 statements in his report.  Tr. 157:9-16.

████ evidently failed to look for any public statements that cut against his theory.  Every single statement he considered supports the supposed investment case for XRP (at least in his view).  ████ Rep. ¶¶ 50-87.  But he conceded that Ripple made many statements that would not support his theories, Tr. 155:5-156:3 ("there are [Ripple statements about] noninvestment cases that show up outside of those quotes [cited in the report]"), and that he does not know how many public statements Ripple made that he did not consider, *id.* 158:12-159:2.  He simply did not consider the statements that would cut against his theory.  *See id.* 154:16-18 (affirming that every statement he considered is cited in his report).  ████ provided no meaningful detail on how he found those statements that he did consider.  *Id.*; *see also id.* 155:10-12 (admitting that he found "many statements by Ripple" and "[s]ome . . . ended up in the report" while "some . . . didn't").  He admitted that he used no standardized approach; he just "generally searched through Ripple's public statements" for any he "could find" that fit the factors he picked.  *Id.* 153:16-24.

In other words, ████ supposed methodology was to look only for statements neatly fitting his ultimate opinions, even though he admits that plenty of other statements would not have supported them.  *See id.* 159:20-160:12.  This non-replicable and facially cherry-picked "search" for evidence requires exclusion.[13]  *See Malletier*, 209 F. Supp. 3d at 644-45 (excluding witness

---

[13] Other aspects of ████ opinions also appear to have been predetermined, which also makes them unreliable.  For instance, he testified that his opinion would not change even if XRP purchasers testified they *did not* rely on Ripple's statements, reasoning that they *subconsciously* rely on Ripple because (████ incorrectly believes) Ripple created XRP.  *See* Tr. 209:22-210:20 ("I think *whether [XRP purchasers] realize it or not*, they -- you know, Ripple -- there are certain, kind of, facts I know about what happened in the development of the XRP Ledger.  One of them is that Ripple aided in the development, so without Ripple, they wouldn't have been able to even

who opined about reasonable purchaser expectations based on social media and news coverage from Google searches because he failed to "preserve, much less produce," the vast majority of the websites he considered and did not keep a list of search terms or hits, making it "impossible to reconstruct [his] searches," which "alone[ ]" made "exclusion . . . mandatory under *Daubert*").

**III.     ████████       TESTIMONY WILL NOT HELP THE JURY**

In the final step of his opinion, after (arbitrarily) selecting a handful of Ripple's public statements, ████ puts his spin on them and concludes—without explanation—that "reasonable purchasers" would share his interpretation of each.  *E.g.*, ████ Rep. ¶¶ 85-87.  That does not satisfy the requirements of *Daubert* and Rule 702, because a jury can interpret these statements on its own.  *See United States v. Sayre*, 434 F. App'x 622, 624 (9th Cir. 2011) ("The term 'reasonable investor' is a concept within the jury's ordinary experience and understanding."); *Piambino v. Bailey*, 610 F.2d 1306, 1319-20 (5th Cir. 1980) ("What a 'reasonable investor' would . . . expect is for determination by the trier of fact[.]").[14]

---

make that purchase.  *Whether they know that they relied on those development efforts or not*, if those . . . development efforts didn't exist, they couldn't have even made that purchase.") (emphasis added).  A "methodology" like this one that is designed to lead to a specific result is unreliable.  *Cf. Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 190 (D. Conn. 2009) (expert opinion "with a preordained conclusion" is not "legally reliable").

[14] *See also SEC v. Am. Growth Funding II, LLC*, 2019 WL 1772509, at *2 (S.D.N.Y. Apr. 23, 2019) ("Chase attempts to tell the jury how to interpret the plain language of the PPMs and instructs the jury that his favored interpretation is not materially misleading to a reasonable investor.  These topics are not appropriate for expert testimony. . . .  [T]he jury is capable of interpreting the plain language of the PPMs without the aid of an expert."); *Pearlstein*, 2021 WL 4131646, at *4 ("[T]he jury does not need Professor Lys to interpret these documents for them. . . .  Having an expert offer an 'opinion' about what they mean – or what they might mean to someone he has never met – imbues Plaintiffs' argument with an impermissible gloss of correctness."); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 442 (D.N.J. 2009) ("[As to the expert's] summary of, and spin on, [documents in the record], the Court finds that such testimony is unhelpful to . . . the trier of fact and excludes [it].  This is because the documents speak for themselves and do not require expert testimony to discern what they mean.").

**IV.**    ▮▮▮▮▮▮▮   **REBUTTAL OPINIONS SHOULD BE EXCLUDED**

▮▮▮▮ also submitted a 148-page rebuttal report purporting to rebut the opinions of four experts, all of whom are leading academics with decades of experience in their respective fields, which range from econometrics, to cross-border remittances, to market microstructure, to financial technology innovation. ▮▮▮▮, an electrical engineer whose claim to expertise is through his own digital asset trading experience, is unqualified to opine on any of those topics, let alone *all* of them. *Cf. United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("[D]istrict courts . . . must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise."). Moreover, ▮▮▮▮ uses no reliable methodology in his attempts to rebut these four various experts, and his unreliable comments will not help the jury. His rebuttal opinions should be excluded.

**Osler Rebuttal.** Prof. Carol Osler is a Ph.D. economist who studies currencies and cross-border remittances; she has published dozens of articles and taught courses on those topics for decades. Prof. Osler opines on the viability of the ODL product for cross-border transactions as a matter of economic theory. *See* Ex. E, Expert Report of Carol Osler ¶¶ 1-7 & Ex. A (Oct. 4, 2021). In contrast, ▮▮▮▮ only exposure to cross-border trading comes from currency trades he has made in his personal capacity. Tr. 275:14-21. Yet his rebuttal explicitly limits its focus to whether ODL makes sense for "financial institutions such as MoneyGram." *See* Ex. F, Rebuttal Report of ▮▮▮▮▮▮▮ ¶ 16 (Nov. 12, 2021) ("▮▮▮▮ Rebuttal"). ▮▮▮▮ has no credentials to opine on those institutions' views. Tr. 244:11-25. He also does not actually address Prof. Osler's opinion, which concerns whether ODL is viable as a matter of economic theory; indeed, he admits that such an analysis is "outside of the scope of what [he] was asked to do." *Id.* 266:22-267:18.

**Ferrell Rebuttal.** ▮▮▮▮ is just as unqualified to rebut Prof. Ferrell's ODL-related opinions. Prof. Ferrell holds a Ph.D. from MIT and a J.D. from Harvard. He is a tenured professor

13

at Harvard Business School and Harvard Law School with more than 30 years' experience in econometrics and finance.  He employed statistical models to forecast whether ODL could become cost-efficient in the future under certain market conditions.  Ferrell Rep. ¶¶ 1, 153-61 & Exs. 17-22.  ████ has *no* training in statistical analysis.  *See* Tr. 224:21-22.  He fails to explain how he is qualified to rebut Prof. Ferrell's calculations.  He articulates no basis for the "methodology" he attempts to use in this attempted rebuttal, and he misapplies that "methodology" in any event.[15]

**Adriaens Rebuttal.**  The same flaws apply to ████ rebuttal of Prof. Adriaens's opinions.  Prof. Adriaens is a tenured Ph.D. professor at the University of Michigan and has taught finance and entrepreneurship courses since 2006; since 2015, his research has focused on financial technology innovation.  *See* Ex. H, Expert Report of Peter Adriaens ¶¶ 1-11 (Oct. 4, 2021).  ████ never even tries to explain how he is qualified to rebut Prof. Adriaens's opinions; he merely refers vaguely to his supposed "expertise in digital asset markets and digital[ asset technologies." ████ Rebuttal ¶ 64.  "Even '[i]f the witness is relying solely or primarily on experience, [he still] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'"  *United States v. Ray*, 2022 WL 101911, at *2 (S.D.N.Y. Jan. 11, 2022) (citation omitted).  ████ never does.

**Yadav Rebuttal.**  Prof. Yadav is a law professor and Associate Dean at Vanderbilt Law School, where she researches and teaches courses on, among other things, the role of exchanges

---

[15] ████ admitted that his attempt at rebutting Prof. Ferrell contained at least one meaningful error that overstated ████ purported conclusions:  he inflated the exchange-rate fees for one exchange by 100% when purporting to calculate the costs of an ODL transaction.  Tr. 292:8-16; *compare* ████ Rebuttal ¶ 41 (describing a "26 basis point[ ]" fee "for Bitso"), *with* Ex. G, Second Am. Rebuttal Report of ████ ¶ 41 (Feb. 24, 2022) (listing this fee at "13 basis points" in an amended rebuttal report).  While that error casts doubt upon ████ opinions in its own right, it is also symptomatic of a broader problem:  ████ attempts to opine on topics for which he has no meaningful qualifications.  No amount of amending can fix that.

14

in a technologically changing marketplace and in cross-border transactions.  She opines on where digital asset transactions take place, based on characteristics of the exchanges facilitating them. Ex. I, Expert Report of Yesha Yadav ¶¶ 1-3, 7-9, 19-22 (Oct. 4, 2021).  ██████ purported rebuttal is inadmissible for at least three reasons.  *First*, unlike Prof. Yadav, ██████ has no experience from which to opine on the market microstructure of digital asset exchanges.  Even qualified experts (and ██████ is not one) may not offer roving opinions beyond their experience, for the reasons explained above.  *Second*, ██████ employs no reliable methodology.  For example, he purports (at ¶¶ 109-12) to do a "search-engine optimization" (SEO) analysis but identifies no SEO-related training or experience.  *Third*, ██████ rebuttal of Prof. Yadav is legally irrelevant and thus unhelpful to the jury.  This Court has already rejected the SEC's argument that it "should evaluate the 'entire selling process' to determine if . . . offers occurred in the United States."  Mem. Op. at 25 (ECF No. 441) ("MTD Op.") (citation omitted).  ██████ analysis, however, is expressly focused on the "entire offering process."  ██████ Rebuttal ¶¶ 92 (opining that an "offer" includes the "entire process whereby a digital asset is offered for sale"), 100, 104-06.[16]  This error infects ██████ opinion throughout; he uses this incorrect premise to offer opinions about topics as irrelevant and varied as Ripple's bank account and Twitter feed.  *Id.* ¶¶ 115, 124-25.

## CONCLUSION

For the reasons above, the Court should exclude ██████ opinions in their entirety.

---

[16] Many of ██████ other points are also irrelevant as a matter of law.  For example, he argues (at ¶¶ 117-20) that whether U.S. citizens trade on foreign exchanges is relevant to whether transactions were domestic.  That is wrong as a matter of law.  *See Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012) ("[A] party's residency or citizenship is irrelevant to the location of a given transaction."); MTD Op. at 23 (similar).  ██████ also says (at ¶¶ 131-33) that the location of an exchange's servers is relevant to determining the location of transactions on that exchange, but this too is wrong.  *Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (title passing over servers located in California was insufficient to establish domesticity).

Dated:  July 12, 2022                   Respectfully submitted,

*/s/ Bradley E. Oppenheimer*         
Bradley E. Oppenheimer

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
boppenheimer@kellogghansen.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Counsel for Defendant Ripple Labs Inc.*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

*Counsel for Defendant Bradley
Garlinghouse*

PAUL, WEISS, WHARTON, RIFKIND &
GARRISON LLP

*Counsel for Defendant Christian A. Larsen*