**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>      v.<br><br>RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,<br><br>                              Defendants. | Case No. 20-CV-10832 (AT) (SN) |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S OMNIBUS MOTION TO EXCLUDE THE TESTIMONY OF
<u>DEFENDANTS' EXPERT WITNESSES</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

I.    **THE SEC IMPROPERLY SEEKS TO EXCLUDE TESTIMONY THAT GOES TO THE CORE ISSUES IN THIS CASE**....................................................1

     A.    Relevance of Affirmative Testimony .........................................................1

          1.    Contracts ............................................................................................3

          2.    Uses for XRP and the XRP Ledger...................................................5

          3.    Other Legal Regimes and Economic Characteristics of XRP...........6

     B.    Scope of Rebuttal Testimony......................................................................8

     C.    Expert Qualifications................................................................................10

II.    **THE SEC'S INDIVIDUAL *DAUBERT* MOTIONS SHOULD BE DENIED** ..............12

     A.    Alan Schwartz..........................................................................................12

          1.    Schwartz's Background and Opinions..............................................12

          2.    The SEC's Challenges to Schwartz's Opinions Are Without Merit................13

     B.    Allen Ferrell.............................................................................................27

          1.    Ferrell's Background and Opinions .................................................27

          2.    Ferrell's Factor Model Is Reliable and Admissible .........................28

          3.    Ferrell's Consideration of Ripple's XRP Distributions Was Relevant and Reliable................................................................................35

          4.    Ferrell's ODL Opinion Is Relevant and Admissible........................37

          5.    Ferrell's Opinion That XRP Functions as Currency Is Relevant and Admissible................................................................................38

          6.    Ferrell's Remaining Opinions Are Admissible................................39

     C.    Daniel Fischel .........................................................................................45

          1.    Fischel's Background and Opinions .................................................45

          2.    Fischel's First and Fourth Opinions Are Admissible........................46

     D.    M. Laurentius Marais................................................................................57

          1.    Marais's Background and Opinions..................................................57

          2.    Marais's Rebuttal Opinions Are Procedurally Proper, Reliable, and Consistent with His Supplemental Report ................................57

i

3.      Marais's Supplemental Report Challenging ███ Counterfactual
        Price Methodology Is Reliable ........................................................62

E.   Peter Easton .........................................................................................64

     1.      Easton's Background and Opinion ...............................................64

     2.      Easton's Testimony Concerning the Proper Accounting Treatment for
             Transactions Involving XRP Is Relevant and Reliable......................64

     3.      Easton's Opinions Are Proper Rebuttal Testimony to Opinions Offered
             by ██████ and ██████ .........................................................69

F.   Bradley Borden ....................................................................................73

     1.      Borden's Background and Opinion................................................73

     2.      Borden's Opinion Concerning the Proper Tax Classification of XRP Is
             Relevant ..................................................................................73

     3.      Borden Is Well-Qualified ...........................................................75

     4.      Borden's Methodology Is Reliable ...............................................75

G.   Carol Osler ..........................................................................................77

     1.      Osler's Background and Opinions ...............................................77

     2.      Osler Is Qualified .....................................................................78

     3.      Osler's Opinions Are Relevant ...................................................79

     4.      Osler's Analysis Is Reliable .......................................................80

H.   Yesha Yadav ........................................................................................86

     1.      Yadav's Background and Opinions ..............................................86

     2.      Yadav Does Not Offer Any Inadmissible Legal Conclusion.............87

     3.      Yadav's "Opinion 3" Is Based on a Reliable Methodology, and the
             SEC's Criticisms Are Issues of Weight, Not Admissibility .............91

I.   Peter Adriaens ......................................................................................96

     1.      Adriaens's Background and Opinions ..........................................96

     2.      The Opinions Expressed in Adriaens's Report Are His Own.............98

     3.      Adriaens's Opinions About the XRP Ledger's Innovations and Ripple's
             Business Model Are Relevant and Proper Expert Testimony.......................102

     4.      Adriaens's Use Case Opinion Reliably Applies His Expertise.......................104

     5.      Adriaens's Rebuttal Opinion Is Admissible .................................107

J.  Kristina Shampanier ...................................................................................109

    1.  Shampanier's Background and Opinions..........................................109

    2.  Shampanier's Opinions Are Admissible..........................................110

**CONCLUSION** ...........................................................................................**116**

## TABLE OF AUTHORITIES

**CASES**                                                                    **Page(s)**

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012)................................................................... 86

*In re Aluminum Warehousing Antitrust Litig.*,
    336 F.R.D. 5 (S.D.N.Y. 2020), *appeal pending*, No. 21-954 (2d Cir.) ..... 9, 20, 40, 47, 50, 52,
        55, 59, 63, 70, 88, 114

*Amica Mut. Ins. Co. v. Willard*,
    2009 WL 2982902 (E.D. Mo. Sept. 14, 2009)................................... 110

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)................................................................. 91

*Anderson v. Binance*,
    2022 WL 976824 (S.D.N.Y. Mar. 31, 2022), *appeal pending*, No. 22-972 (2d Cir.) ........... 94

*Arista Recs. LLC v. Usenet.com, Inc.*,
    608 F. Supp. 2d 409 (S.D.N.Y. 2009).................................................. 100

*In re Arris Cable Modem Consumer Litig.*,
    327 F.R.D. 334 (N.D. Cal. 2018)......................................................... 24

*Ass'n of Am. R.Rs. v. United States*,
    603 F.2d 953 (D.C. Cir. 1979)............................................................. 68

*Assoc. Elec. Gas Ins. Servs. v. Babcock & WilcoxPower Generation Grp., Inc.*,
    2013 WL 5771166 (D. Conn. Oct. 24, 2013) .................................... 8, 44

*Bamert v. Pulte Home Corp.*,
    445 F. App'x 256 (11th Cir. 2011) ...................................................... 18

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)............................................................................ 45

*In re Bear Stearns Cos., Inc. Sec.*,
    2016 WL 4098385 (S.D.N.Y. July 25, 2016) ..................................... 42

*Beastie Boys v. Monster Energy Co.*,
    983 F. Supp. 2d 354 (S.D.N.Y. 2014).................................................. 105

*In re Blech Sec. Litig.*,
    2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ........................... 47, 88, 93

*Borgognoni v. City of Hattiesburg*,
    2016 WL 6088593 (S.D. Miss. June 10, 2016) .......................... 42, 110

*Boykin v. W. Express, Inc.*,
    2015 WL 539423 (S.D.N.Y. Feb. 6, 2015)........................................... 81

*Broadspring, Inc. v. Congoo, LLC*,
    2014 WL 4100615 (S.D.N.Y. Aug. 20, 2014) .................................... 20

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001) ................................................................ 106

*Can't Live Without It, LLC v. ETS Express, Inc.*,
  373 F. Supp. 3d 434 (S.D.N.Y. 2018) .................................................. 18

*Capri Sun GmbH v. Am. Beverage Corp.*,
  2022 WL 976270 (S.D.N.Y. Mar. 31, 2022) ................................ 20, 89, 113, 114

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................ 45

*Cedar Petrochemicals, Inc. v. Dongbu Hannog Chem. Co.*,
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) .................................................. 103

*CFTC v. Moncada*,
  2014 WL 2945793 (S.D.N.Y. June 30, 2014) ...................................... 56

*CFTC v. Wilson*,
  2016 WL 7229056 (S.D.N.Y. Sept. 30, 2016) ..................................... 55

*Chem. Mfrs. Ass'n, v. U.S. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................... 33

*Chen-Oster v. Goldman, Sachs & Co.*,
  2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) .............................. 55, 89, 105

*Choi v. Tower Research Cap. LLC*,
  2 F.4th 10 (2d Cir. 2021) .................................................................... 52

*CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*,
  815 F. Supp. 2d 673 (S.D.N.Y. 2011) .................................................. 22

*Clarke v. Dutton Harris & Co.*,
  2022 WL 717611 (D. Nev. Mar. 10, 2022) .......................................... 75

*Clayton v. Katz*,
  2015 WL 1500248 (S.D.N.Y. Mar. 31, 2015) ...................................... 10

*Coquina Invs. v. Rothstein*,
  2011 WL 4949191 (S.D. Fla. Oct. 18, 2011)................................... 48, 69

*Cornwell v. Credit Suisse Grp.*,
  729 F. Supp. 2d 620 (S.D.N.Y. 2010).................................................. 91

*Counts v. Gen. Motors, LLC*,
  2022 WL 2078023 (E.D. Mich. June 9, 2022)...................................... 59

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) ..................................................... 99

*Cumberland Packing Corp. v. Monsanto Co.*,
  32 F. Supp. 2d 561 (E.D.N.Y. 1999) ................................................... 111

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)................................................................... 65, 91, 93

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  2022 WL 199274 (N.D. Ill. Jan. 21, 2022) ......................................................... 103

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016) ................................................................... 95

*In re Digital Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ........................................................................... 55

*Dollar Rent A Car Sys., Inc. v. P.R.P. Enters., Inc.*,
  242 F. App'x 584 (10th Cir. 2007) ...................................................................... 49

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
  2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019) ..................................................... 33

*Edmondson v. RCI Hosp. Holdings, Inc.*,
  2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ................................................... 111

*EEOC v. DHL Express (USA), Inc.*,
  2016 WL 5796890 (N.D. Ill. Sept. 30, 2016) ..................................................... 33

*In re Elysium Health-ChromaDex Litig.*,
  2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ........................................................ 88

*F.H. Krear & Co. v. Nineteen Named Trs.*,
  810 F.2d 1250 (2d Cir. 1987) .............................................................................. 23

*Fiataruolo v. United States*,
  8 F.3d 930 (2d Cir. 1993) ................................................................. 50, 51, 87, 89

*Fin. Guar. Ins. Co. v. Putnam Advisory Co.*,
  2020 WL 4251229 (S.D.N.Y. Feb. 19, 2020) ..................................................... 23

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
  388 F. Supp. 3d 145 (E.D.N.Y. 2019) ................................................................ 36

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) ........................................................... 23, 75

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ........................................................................... 4, 39

*Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.*,
  2012 WL 1372150 (S.D.N.Y. Apr. 18, 2012) ..................................................... 20

*Glen-Arden Commodities, Inc. v. Costantino*,
  493 F.2d 1027 (2d Cir. 1974) ....................................................... 4, 7, 65, 73, 103

*Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*,
  2022 WL 2122655 (M.D. Fla. June 14, 2022) ............................................. 99, 102

*Gucci Am., Inc. v. Guess?, Inc.*,
  831 F. Supp. 2d 723 (S.D.N.Y. Nov. 16, 2011) ................................................ 111

*Gussack Realty Co. v. Xerox Corp.*,
  224 F.3d 85 (2d Cir. 2000) ...................................................................... 36, 79, 80

*GWTP Invs., L.P. v. SES Americom, Inc.*,
   2007 WL 7630459 (N.D. Tex. Aug. 3, 2007) ....................................................... 102

*Harris v. Koenig*,
   815 F. Supp. 2d 6 (D.D.C. 2011) .................................................................... 2, 16

*Hatala v. Port Auth. of NY & NJ*,
   2017 WL 9832293 (S.D.N.Y. Oct. 30, 2017) ........................................................ 23

*HBC Ventures, LLC v. Holt MD Consulting, Inc.*,
   2012 WL 4483625 (E.D.N.C. Sept. 27, 2012) ....................................................... 21

*Henkel v. Wagner*,
   2016 WL 1271062 (S.D.N.Y. Mar. 29, 2016) .................................................. 55, 60

*Highland Cap. Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................... 52

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ................................ 18, 81

*Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*,
   439 U.S. 551 (1979) ........................................................................ 41, 65, 68

*Isom v. Howmedica, Inc.*,
   2002 WL 1052030 (N.D. Ill. May 22, 2002) ......................................................... 98

*Joffe v. King & Spalding LLP*,
   2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) ........................................................ 55

*In re Joint E&S Dist. Asbestos Litig.*,
   52 F.3d 1124 (2d Cir. 1995) .......................................................................... 84

*Keystone Mfg. Co. v. Jaccard Corp.*,
   394 F. Supp. 2d 543 (W.D.N.Y. 2005) ................................................................ 98

*Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*,
   392 F. Supp. 3d 382 (S.D.N.Y. 2019) ................................................................ 23

*Kristensen ex rel. Kristensen v. Spotnitz*,
   2011 WL 4380893 (W.D. Va. Sept. 21, 2011) ..................................................... 112

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 .................................................................................... 54, 82

*Landreth Timber Co. v. Landreth*,
   471 U.S. 681 (1985) ................................................................................. 41

*Legier & Materne v. Great Plains Software, Inc.*,
   2005 WL 2037346 (E.D. La. Aug. 3, 2005) ......................................................... 102

*Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*,
   2007 WL 2265199 (S.D. Ind. Aug. 6, 2007) ......................................................... 99

*Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*,
   2011 WL 855876 (S.D.N.Y. Feb. 28, 2011) ........................................ 10, 11, 64, 79, 115

*Longoria v. Million Dollar Corp.*,
    2021 WL 791505 (D. Colo. Mar. 2, 2021) .................................................... 111, 112, 113

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015).............................................................. 20, 21, 106

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
    2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015).................................................. 49, 63, 69, 72

*Luizzi v. Pro Transp., Inc.*,
    2011 WL 1655567 (E.D.N.Y. May 2, 2011) ........................................................ 23

*Lyman v. St. Jude Med. S.C., Inc.*,
    580 F. Supp. 2d 719 (E.D. Wis. 2008).............................................................. 33

*Lyondell Chem. Co. v. Albemarle Corp.*,
    2007 WL 9711337 (E.D. Tex. Feb. 26, 2007) ...................................................... 50

*Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)............................................................ 30, 84, 102

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)............................................. 7, 17, 38, 65, 66, 68, 73

*Maritan v. Birmingham Props.*,
    875 F.2d 1451 (10th Cir. 1989) ...................................................................... 17

*Marvel Characters Inc. v. Kirby*,
    726 F.3d 119 (2d Cir. 2013).......................................................................... 38

*Marx & Co. v. Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977).......................................................................... 23

*Mason Capital, Ltd. v. Kaman Corp.*,
    2005 WL 2850083 (D. Conn. Oct. 31, 2005) ...................................................... 23

*McCullock v. H.B. Fuller Co.*,
    61 F.3d 1038 (2d Cir. 1995).............................................................. 10, 75, 79, 115

*Media Glow Digit., LLC v. Panasonic Corp. of N. Am.*,
    2019 WL 1055527 (S.D.N.Y. Mar. 6, 2019) ...................................................... 93

*Medidata Sols., Inc. v. Veeva Sys., Inc.*,
    2022 WL 576089 (S.D.N.Y. Feb. 25, 2022)...................................................... 40, 60

*Medisim Ltd. v. BestMed LLC*,
    861 F. Supp. 2d 158 (S.D.N.Y. 2012).............................................................. 76

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*:
    2008 WL 1971538 (S.D.N.Y. May 7, 2008) ...................................................... 50, 87

    643 F. Supp. 2d 482 (S.D.N.Y. 2009).............................................................. 40

*Miller v. Holzmann*,
    563 F. Supp. 2d 54 (D.D.C. 2008) .............................................................. 82, 83

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016)...................................................... 82, 83, 90, 92

*Monroe Cnty. Emps. Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019).............................................................................. 33

*Morrison v. Nat'l Australia Bank Ltd.*,
   561 U.S. 247 (2010).................................................................................................. 86

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   2021 WL 2403727 (S.D.N.Y. June 11, 2021) ........................................................ 93

*Olin Corp. v. Lamorak Ins. Co.*:

   332 F. Supp. 3d 818 (S.D.N.Y. 2018)...................................................................... 20

   2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018) ........................................... 2, 16, 41, 67

*Outley v. City of N.Y.*,
   837 F.2d 587 (2d Cir.1988)........................................................................................ 9

*Pac. Life Ins. Co. v. Bank of New York Mellon*,
   571 F. Supp. 3d 106 (S.D.N.Y. 2021)...................................................................... 99

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
   2011 WL 2295269 (S.D. Fla. June 8, 2011) .......................................................... 60

*Park Yield LLC v. Brown*,
   2019 WL 6684127 (S.D.N.Y. Dec. 6, 2019) .......................................................... 17

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016)................................................................................. 2, 41

*Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*,
   2021 WL 5770871 (S.D.N.Y. Dec. 6, 2021) .......................................................... 62

*Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*,
   753 F. Supp. 2d 166 (S.D.N.Y. 2010)...................................................................... 91

*In re Processed Egg Prods. Antitrust Litig.*,
   312 F.R.D. 171 (E.D. Pa. 2015)............................................................................... 34

*Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*,
   988 F. Supp. 2d 395 (S.D.N.Y. 2013)...................................................................... 38

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014)................................................................. 94, 114

*Restivo v. Hessemann*,
   846 F.3d 547 (2d Cir. 2017)..................................................................................... 93

*In re Rezulin Prods. Liab. Litig.*,
   309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................................................... 115

*Riegel v. Medtronic, Inc.*,
   451 F.3d 104 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008)....................................... 90

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*,
2000 WL 310352 (S.D.N.Y. Mar. 24, 2000) ........................................................ 31

*Rodriguez v. Banco Cent. Corp.*,
990 F.2d 7 (1st Cir. 1993) ................................................................................. 68

*Rosario v. City of New York*,
2021 WL 1930293 (S.D.N.Y. May 13, 2021) ........................................ 18, 80, 81

*Scentsational Techs., LLC v. Pepsi, Inc.*,
2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018)..................................................... 115

*Schneider ex rel. Est. of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003)................................................................................ 79

*Sci. Components Corp. v. Sirenza Microdevices, Inc.*,
2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008)................................. 8, 43-44, 70, 72

*Scott v. Chipotle Mexican Grill, Inc.*,
315 F.R.D. 33 (S.D.N.Y. 2016) ......................................... 20, 46, 47, 48, 55, 58

*SEC v. Ahmed*,
308 F. Supp. 3d 628 (D. Conn. 2018) ............................................................... 95

*SEC v. C. M. Joiner Leasing Corp.*,
320 U.S. 344 (1943).......................................................................... 7, 17, 103

*SEC v. Das*,
2011 WL 4375787 (D. Neb. Sept. 20, 2011) ...................................................... 21

*SEC v. Edwards*,
540 U.S. 389 (2004)............................................................................................. 3

*SEC v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013)................................................................. 52

*SEC v. U.S. Env't, Inc.*,
2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) .................................................. 51

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946)......................................................... 3, 4, 16, 19, 50, 65, 113

*Sentinel Ins. Co. v. VLM Foods, Inc.*,
2021 WL 4513595 (E.D. Va. Oct. 1, 2021).......................................................... 24

*Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
618 F. Supp. 436 (S.D.N.Y. 1985)...................................................................... 53

*Sitts v. Dairy Farmers of Am., Inc.*,
2020 WL 3467993 (D. Vt. June 24, 2020) .......................................................... 22

*Skydive Ariz., Inc. v. Quattrocchi*,
2009 WL 2515616 (D. Ariz. Aug. 13, 2009)....................................................... 83

*SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*,
2014 WL 6603951 (S.D.N.Y. Nov. 20, 2014)..................................................... 39

*SourceOne Dental, Inc. v. Patterson Cos.*,
2018 WL 2172667 (E.D.N.Y. May 10, 2018) ................................................ 82, 83

*In re Specialist & Other Vessel Owner Limitation Actions*,
2020 WL 8665287 (S.D.N.Y. June 30, 2020) ...................................................... 9

*Stackhouse v. Toyota Motor Co.*,
2010 WL 3377409 (C.D. Cal. July 16, 2010) ...................................................... 91

*Stagl v. Delta Air Lines, Inc.*,
117 F.3d 76 (2d Cir. 1997) ................................................................... 10, 115

*StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*,
2015 WL 3824170 (M.D. Fla. June 19, 2015) ..................................................... 99

*Sunbeam Prods., Inc. v. Homedics, Inc.*,
670 F. Supp. 2d 873 (W.D. Wis. 2009) ........................................................... 102

*TC Sys. Inc. v. Town of Colonie*,
213 F. Supp. 2d 171 (N.D.N.Y. 2002) ............................................................. 70

*Tcherepnin v. Knight*,
389 U.S. 332 (1967) ............................................................................... 41

*In re Term Commodities Cotton Futures Litig.*,
2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ................................................. 84, 89

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
2003 WL 25781900 (C.D. Cal. Jan. 27, 2003) .................................................... 82

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) ...................................................................... 37, 80

*U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*,
112 F. Supp. 3d 122 (S.D.N.Y. 2015) ........................................................... 102

*United Hous. Found., Inc. v. Forman*,
421 U.S. 837 (1975) .............................................................................. 105

*United States v. Asare*,
2019 WL 5693477 (S.D.N.Y. Nov. 4, 2019) ..................................................... 103

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ............................................................... 21, 51, 87

*United States v. Coyle*,
1993 WL 378332 (S.D.N.Y. Sept. 17, 1993) ....................................................... 53

*United States v. Duncan*,
42 F.3d 97 (2d Cir. 1994) .................................................................. 21, 50, 89

*United States v. Feliciano*,
223 F.3d 102 (2d Cir. 2000) ...................................................................... 21

*United States v. Jones*,
2018 WL 1115778 (S.D.N.Y. Feb. 27, 2018) ...................................................... 65

*United States v. Lumpkin*,
  192 F.3d 280 (2d Cir. 1999)........................................................................ 87

*United States v. Ray*,
  2022 WL 101911 (S.D.N.Y. Jan. 11, 2022) ................................... 103-04

*United States v. Romano*,
  794 F.3d 317 (2d Cir. 2015)........................................................................ 92

*United States v. Ruggiero*,
  928 F.2d 1289 (2d Cir. 1991) ..................................................................... 51

*United States v. Scop*,
  846 F.2d 135 (2d Cir. 1988)........................................................................ 52

*United States v. Univar USA Inc.*,
  294 F. Supp. 3d 1314 (Ct. Int'l Trade Mar. 2, 2018) ................................ 82

*In re Vitamin C Antitrust Litig.*,
  2012 WL 6675117 (E.D.N.Y. Dec. 21, 2012) .......................................... 31

*Vysyaraju v. Mgmt. Health Sols., Inc.*,
  2013 WL 4437236 (S.D.N.Y. Aug. 19, 2013) .......................................... 64

*Wechsler v. Hunt Health Sys., Ltd.*,
  381 F. Supp. 2d 135 (S.D.N.Y. 2003)...................................................... 107

*Wells Fargo & Co. v. WhenU.com, Inc.*,
  293 F. Supp. 2d 734 (E.D. Mich. 2003)........................................... 111, 114

*WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*,
  25 F.3d 422 (7th Cir. 1994) ........................................................................ 22

*Willow Bend Ventures, LLC v. Van Hook*,
  554 F. Supp. 3d 808 (E.D. La. 2020) ......................................................... 76

*Wills v. Amerada Hess Corp.*,
  379 F.3d 32 (2d Cir. 2004).......................................................................... 54

*In re Zimmer M/L Taper Hip Prosthesis Prods. Liab. Litig.*,
  2021 WL 1405185 (S.D.N.Y. Apr. 14, 2021)............................................. 9

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ....................................................... 55

**STATUTES**

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ................................ 13, 14, 39, 68, 87

  § 2, 15 U.S.C. § 77b.................................................................................... 87

  § 19(b)(B), 15 U.S.C. § 77s(b)(B) .............................................................. 68

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ........................................ 39

  15 U.S.C. § 78c(a)(10)................................................................................. 39

15 U.S.C. § 7218(c) ...................................................................................................... 68

## RULES AND REGULATIONS

17 C.F.R. § 230.152 ........................................................................................................ 19

31 C.F.R. § 1010.100(ff)(8)(ii) ........................................................................................ 6

Fed. R. Civ. P.:

    Rule 26 ............................................................... 69, 70, 71, 98, 106, 107

        advisory committee's note to 2010 amendment ................................ 98

    Rule 26(a)(2)(B) .................................................................... 98, 103, 106

    Rule 26(a)(2)(C)(ii) ...................................................................... 70

    Rule 26(a)(2)(D)(ii) ................................................................. 46, 69

    Rule 26(b)(4)(B) ............................................................................. 99

Fed. R. Evid.:

    Rule 401 .................................................................................... 18

    Rule 401(a) ............................................................................. 19, 38

    Rule 702 .................................................................................... 2, 30

        advisory committee's notes to 1972 proposed rules ....................... 92

        advisory committee's note to 2000 amendments ................... 30, 81

    Rule 703 .............................................................................. 97, 107

    Rule 704 advisory committee's note to 1972 proposed rules ......... 52, 88

    Rule 704(a) .......................................................................... 51, 88

    Rule 1006 ................................................................................. 20

## LEGISLATIVE MATERIALS

H.R. Rep. No. 73-85 (1933) ......................................................................... 17-18

Testimony Concerning the Roles of the SEC and the FASB in Establishing GAAP by
    Robert K. Herdman Chief Accountant, SEC, Before the House Subcomm. on Capital
    Markets, Insurance, and Gov't Sponsored Enterprises of the Comm. on Financial
    Services, 2002 WL 1046983 (May 14, 2002),
    https://www.sec.gov/news/testimony/051402tsrkh.htm .................................... 68-69

## ADMINISTRATIVE MATERIALS

P. Munter, SEC Acting Chief Accountant, Statement on OCA's Continued Focus on
    High Quality Financial Reporting in a Complex Environment (Dec. 6, 2021),
    https://www.sec.gov/news/statement/munter-oca-2021-12-06 .............................. 69

Proposed Interpretation, Retail Commodity Transactions Involving Virtual Currency,
    82 Fed. Reg. 60,335 (Dec. 20, 2017) ............................................................... 6

SEC, *Policy Statement:  Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter*, SEC Rel. Nos. 33-8221; 34-47743; IC-26028; FR-70 (last modified Apr. 25, 2003), https://www.sec.gov/rules/policy/33-8221.htm .................... 66

**OTHER AUTHORITIES**

*American Heritage Dictionary* (5th ed. 2011) .................................................... 59, 112

J. Armstrong, *Principles of Forecasting:  A Handbook for Researchers and Practitioners* (2001) ............................................................................................ 35

J. Armstrong & F. Collopy, *Error Measures for Generalizing About Forecasting Methods:  Empirical Comparisons*, 8 Int'l J. Forecasting 69 (1992) .................... 35

L. Bebchuk, A. Cohen & A. Ferrell, *What Matters in Corporate Governance?*, 22 Rev. Fin. Stud. 783 (2009) ....................................................................... 31, 32

L. Bebchuk, A. Cohen & C. Wang, *Learning and the Disappearing Association Between Governance and Returns*, 108 J. Fin. Econ. 323 (2013) .................... 32, 43

*Black's Law Dictionary* (4th ed. 1968) .................................................................. 68

Blockchain Council, *What is Decentralization in Blockchain?*, https://www.blockchain-council.org/blockchain/what-is-decentralization-in-blockchain/ ................................................................................................ 100

Brief for the SEC, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (No. 843), 1946 WL 50582 (Apr. 17, 1946) ...................................................................... 4

D. Chicco, M. Warrens & G. Jurman, *The Coefficient of Determination R-Squared Is More Informative Than SMAPE, MAE, MAPE, MSE and RMSE in Regression Analysis Evaluation*, Peer J. Computer Science, July 2021 .................... 34

Compl., *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181, ECF No. 1 (S.D.N.Y. Sept. 21, 2017) ...................................... 6

Compl., *CFTC v. Gemini Tr. Co.*, No. 1:22-cv-04563, ECF No. 1 (S.D.N.Y. June 2, 2022) ...................................... 6

A. Datta, *18733:  Applied Cryptography*, Spring 2017, https://course.ece.cmu.edu/~ece733/lectures/22-bitcoin.pdf ............................. 101

S. Diamond, *Reference Guide on Survey Research*, *in* Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) .................................... 111

A. Ferrell & A. Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implication of Dura Pharmaceuticals, Inc. v. Broudo*, 63 Bus. Law. 163 (2007) .............................................................................. 42

D. Fischel:

*Efficient Capital Markets, The Crash, and the Fraud on the Market Theory*,
74 Cornell L. Rev. 907 (1989) ............................................................... 45

*Use of Modern Finance Theory in Securities Fraud Cases Involving Actively
Traded Securities*, 38 Bus. Lawyer 1 (1982) ......................................... 45

P. Gompers, J. Ishii & A. Metrick, *Corporate Governance and Equity Prices*,
118 Q. J. Econ. 107 (2003) ..................................................................... 32

C. Harvey, Y. Liu & H. Zhu, *. . . and the Cross-Section of Expected Returns*,
29 Rev. Fin. Stud. 5 (2016) ..................................................................... 31

R. Hemaltha, D. Akila, D. Balaganesh & A. Paul, *The Internet of Medical Things
(IoMT):  Healthcare Transformation* Sec. (2022),
https://www.google.com/books/edition/The_Internet_of_Medical_Things_IoMT/
crZeEAAAQBAJ?hl=en&gbpv=1 ........................................................... 100

P. Kennedy, *A Guide to Econometrics* (5th ed. 2003) ................................ 34

Y. Liu & A. Tsyvinski, *Risks and Returns of Cryptocurrency*,
34 Rev. Fin. Stud. 2689 (2021) .............................................................. 31

1 *McCormick on Evid.* (8th ed.) ................................................................. 18

*New Century Dictionary* (1933) ............................................................... 39

*Oxford English Dictionary:  A New English Dictionary on Historical Principles* (1933) ........... 39

Ripple, *University Blockchain Research Initiative*, https://ubri.ripple.com/ ............... 96

D. Rubinfeld, *Reference Guide on Multiple Regression in Reference Manual on
Scientific Evidence* (2d ed. 2000) ...................................................... 33, 34

*Webster's II New College Dictionary* (1999) ..................................... 59, 112

*Webster's Third New International Dictionary* (2002) ............................. 112

Wikipedia, *Bitcoin network*,
https://en.wikipedia.org/w/index.php?title=Bitcoin_network&oldid=1046993712 ............. 101

C. Willmott & K. Matsuura, *Advantages of the Mean Absolute Error (MAE) Over
the Root Mean Square Error (RMSE) in Assessing Average Model Performance*,
30 Climate Rsch. 79 (2005) ................................................................... 35

## I.    THE SEC IMPROPERLY SEEKS TO EXCLUDE TESTIMONY THAT GOES TO THE CORE ISSUES IN THIS CASE

The SEC seeks to exclude, in whole or in part, all ten expert witnesses proffered by Defendants, despite their obvious qualifications and the importance of their testimony to a fair resolution of this case.  For almost every expert witness offering an affirmative opinion, the SEC argues that their opinions are irrelevant.  For all of the rebuttal opinions it challenges, the SEC argues that the rebuttals are beyond the scope of the opinions offered by the SEC's experts.  And for several of Defendants' experts, the SEC argues that, despite their credentials as leaders in their respective fields, they are nonetheless unqualified to offer expert opinions as to the specific issues they address.

These are not legitimate objections.  Rather, the SEC is using the *Daubert* process to try to cover serious defects in its case and preclude Defendants from mounting a robust defense.  The opinions by Defendants' experts are not irrelevant; they are just damaging to the SEC's claims.  The rebuttal opinions are not beyond the scope of the opinions offered by the SEC's experts; they just demonstrate embarrassing shortcomings in those opinions.  And Defendants' experts are not unqualified; they just bring their qualifications to bear in a way that threatens to undermine the SEC's case.

We will confront the SEC's criticisms of each expert in turn.  But it is worth dealing at the outset with the SEC's objections by category to show its misuse of the *Daubert* process.

### A.    Relevance of Affirmative Testimony

The SEC's principal argument for excluding the affirmative opinions of at least six experts is its claim that their testimony is "irrelevant" or "not relevant."  The SEC uses those terms at least 70 times in its brief.  But a close reading shows that all the SEC means by "irrelevant" is that the

testimony is inconsistent with the SEC's theory of the case.[1]  That is not a basis for exclusion under Federal Rule of Evidence 702.  Defendants are entitled to present their own theory of the case.

The SEC cites (at 19) *Olin Corp. v. Lamorak Insurance Co*., 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018), for the proposition that "[e]xpert testimony . . . should be excluded when it applies the wrong legal standard."  But the very next sentence of that decision (which the SEC omits) cautions that "the testimony of a party's expert must be evaluated within the context of *that party's own* theory of the case."  *Id.* (emphasis added).  "As a result," the Court explained, "where the legal or factual sustainability of a party's theory has not yet been decided, the possibility that such theory 'may be legally or factually deficient' is 'not justification[ ] for concluding that, in the context of [that party's] theory, [the expert's] testimony is unreliable or unhelpful.' "  *Id.* (quoting *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016) (brackets in *Olin*)).

*Pfizer* held that it was reversible error to exclude the testimony of the plaintiffs' expert Daniel Fischel simply because the issues he addressed were irrelevant under the defendants' theory of the case.  Fischel is an expert witness for Defendants in this case, and the SEC seeks to exclude his opinions as irrelevant for reasons practically identical to those raised in *Pfizer*.  In reversing Fischel's exclusion, the Second Circuit found it unnecessary to "decide in this appeal that Plaintiffs' theory is either legally or factually sustainable."  819 F.3d at 661; *see also Harris v. Koenig*, 815 F. Supp. 2d 6, 10 (D.D.C. 2011) (denying *Daubert* motion because expert's opinion was appropriate as long as it "comports with Plaintiffs' theory of the case" and explaining that,

---

[1] To be clear, the testimony is not irrelevant even under the SEC's own theory.  The SEC mistakes testimony that *undermines* its position for testimony that is *irrelevant* to its position.

"[w]hile Defendants may disagree with that legal theory, resolution of this disagreement will occur at the merits stage of the litigation and not pursuant to a Rule 702 motion").

Contrary to that guidance, the SEC repeatedly and incorrectly argues that opinions inconsistent with its theory of the case should be excluded as irrelevant.  Three examples follow.

### 1.    Contracts

The SEC seeks to exclude a range of opinions relating to the contents of Defendants' contracts for the distribution of XRP.  Specifically, it argues that "[t]he *Howey* test is not confined to a contract law analysis of written sales contracts," and so the contents of those contracts are "irrelevant to the *Howey* analysis."  Pl.'s Memo. of Law in Supp. of Its Omnibus Mot. To Exclude the Test. of Defs.' Expert Witnesses ("Motion" or "Mot.") at 2 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)).

Even on its own terms, that is a staggering *non sequitur*.  That *Howey* allows consideration of facts *in addition to* the contents of contracts does not make the contents of the contracts "irrelevant."  Judge Netburn already rejected that precise argument when she held (in a decision that the SEC did not appeal) that Ripple's interrogatory concerning contract terms was "relevant" and ordered the SEC to supplement its interrogatory response on that basis.  ECF No. 397 at 3 (explaining that the "SEC's legal theory is not an excuse to avoid responding to Defendants' factual inquiry").

As the Supreme Court has cautioned, in applying *Howey*, courts "are considering investment *contracts*."  *SEC v. Edwards*, 540 U.S. 389, 397 (2004).  The terms of Defendants' contracts therefore matter.  Whether they impose post-contractual obligations matters; whether they have integration clauses matters; or whether they give XRP holders any right to share in the profits of Ripple matters.  All these things matter to whether XRP was offered and distributed

pursuant to an investment contract.  In arguing the contrary, the SEC ignores the language of *Howey* as well as its own framing of the question presented in that case.[2]

*Howey* teaches that a court determining whether there is an investment contract can look *both* to the four corners of each individual contract *and* to the broader context in which the written instrument is grounded.  That is how *Howey* reached its central holding that a land sale contract coupled with a services contract formed an investment contract, even if neither document standing alone would have done so.  *See* 328 U.S. at 297-98.  That is also the basis for the Second Circuit's decisions applying *Howey.  See, e.g.*, *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1031-32 (2d Cir. 1974) (considering both the contract for investment and the "canned sales pitch" that accompanied it in finding an investment contract); *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 232 (2d Cir. 1985) (considering both the contract for investment and promotional material targeted to investors).  And that is why *Howey* itself and every single post-*Howey* case starts (and often ends) with a close discussion of the contracts.  Neither the *Howey* Court, nor the Second Circuit cases following *Howey*, have ever held (or even suggested) that courts should ignore operative contracts.  The terms of the contracts are relevant under *Howey* and its progeny; accordingly, Defendants' experts' opinions relating to Defendants' contracts are also relevant.

The reason the SEC urges the Court to disregard what Defendants' contracts actually say is that the contracts are devastating to its case, as Defendants' forthcoming summary judgment

---

[2] "Whether, under the undisputed facts, respondents are offering an 'investment contract,' as the term is included in the definition of a 'security' in Section 2 (1) of the Securities Act of 1933, when the offering consists of units of a citrus grove development *coupled with a contract* for cultivating, marketing and remitting the net proceeds to the investor."  Brief for the SEC at 2, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (No. 843), 1946 WL 50582 (Apr. 17, 1946) (emphasis added).

motion will show.  The SEC is free to argue on summary judgment (wrongly, we think) that contract language is not dispositive because there were "representations made to investors, beyond the four corners of written contracts."  Mot. at 20.  But a merits dispute should not be resolved in a *Daubert* challenge.  The SEC's desire to prove the existence of "investment contracts" without regard to what any "contracts" say is no basis for excluding any discussion of contract language. If anything, it is a red flag about the weakness of the agency's case.

### 2.    Uses for XRP and the XRP Ledger

In a similar vein, the SEC moves to preclude as irrelevant the opinions of three experts about Ripple's business plans generally, and in particular its cross-border remittance product—known as On Demand Liquidity ("ODL")—which leverages XRP as a bridge asset.  The SEC contends that, because "items that have an actual or potential 'use' nevertheless *can be sold* as part of investment contracts," evidence of such use "does not advance the *Howey* inquiry" and should therefore be excluded.  Mot. at 2.

Again, this is an obvious *non sequitur*.  That items with "actual or potential use" *can* be sold as part of an investment contract does not mean that evidence of those actual or potential uses is *irrelevant* to whether those items are sold as an investment contract.  Indeed, in the very same paragraph, the SEC admits that use is a "relevant inquiry," *id.*, and proffers its own expert, █████ █████ to opine on the viability of Ripple's cross-border remittance product (though he lacks genuine credentials and applies no credible methodology to do so).[3]  The SEC's Amended Complaint spends more than 20 paragraphs trying to allege that ODL does not present a genuine "use" for XRP.  *See* ECF No. 46 ("Am. Compl.") ¶¶ 358-378.  Now that Defendants have proffered evidence to rebut those allegations, the SEC seeks to dismiss the issue as irrelevant.  The Court

---

[3] We have separately explained the shortcomings in █████ credentials and his "methodology."  *See* ECF No. 544 at 7-12.

should give no credence to that strategic about-face.  *Cf.* ECF No. 531 at 6 ("The hypocrisy . . . suggests that the SEC is adopting its litigation positions to further its desired goal, and not out of a faithful allegiance to the law.").

### 3.    Other Legal Regimes and Economic Characteristics of XRP

The SEC also seeks to exclude as irrelevant expert testimony about how XRP is treated under other legal and industry regimes based on its economic characteristics:  as a virtual currency regulated by the Treasury's Financial Crimes Enforcement Network ("FinCEN");[4] as a commodity regulated by the Commodity Futures Trading Commission ("CFTC");[5] as "property" under federal tax law; as an "intangible asset" under Generally Accepted Accounting Principles ("GAAP"); and as a "security" under none of those regimes.

The SEC's argument on all four issues is essentially the same:  The opinions should be excluded because, "[e]ven if XRP were a virtual currency [or commodity, or non-security under tax law or GAAP]," the expert "does not take the position that it is impossible for [XRP] to be offered and sold as an investment contract."  Mot. at 62 (Allen Ferrell); *see also id.* at 29-32 (Peter Adriaens), 41-42 (Peter Easton), 71-72 (Carol Osler).  That is a third *non sequitur*.  Even if XRP's treatment under these other regulatory regimes as something other than a security does not make

---

[4] In 2015, Ripple settled an unrelated case with the U.S. Department of Justice and FinCEN, both of which determined that XRP is a "virtual currency" *and* required a Ripple subsidiary that sells XRP to register as a "money services business," which is inconsistent with it being a securities dealer.  *See* 31 C.F.R. § 1010.100(ff)(8)(ii).

[5] In a recent enforcement action, the CFTC characterized "[d]igital assets such as bitcoin and other virtual currencies" as "encompassed by the definition of 'commodity.'"  *CFTC v. Gemini Tr. Co.*, No. 1:22-cv-04563, ECF No. 1, ¶ 14 (S.D.N.Y. June 2, 2022).  The CFTC has taken similar positions on several other occasions.  *See, e.g.*, *CFTC v. Gelfman Blueprint, Inc.*, No. 1:17-cv-07181, ECF No. 1, ¶ 12 (S.D.N.Y. Sept. 21, 2017); Proposed Interpretation, Retail Commodity Transactions Involving Virtual Currency, 82 Fed. Reg. 60,335, 60,337 (Dec. 20, 2017) (to be codified at 17 C.F.R. pt. 1) ("[T]he Commission established that virtual currency is a commodity as that term is defined by [the Commodity Exchange Act, 7 U.S.C. §] 1a(9).").

it "impossible" for XRP to be offered and sold as an investment contract, those other regimes are relevant to whether XRP would "ordinarily and commonly [be] considered . . . securities in the commercial world."  *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982).  Both the Supreme Court and the Second Circuit have expressly held that an asset's "character . . . in commerce" is relevant to whether it is an investment contract.  *E.g.*, *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943); *Glen-Arden*, 493 F.2d at 1029, 1034.  This evidence goes to that inquiry.

Moreover, the treatment of XRP under other legal regimes is also relevant to the "objective" inquiry "whether Ripple had fair notice that the term 'investment contract' covered its distribution of XRP."  ECF No. 440 at 8, 10 n.5.  The SEC completely ignores this defense even though its motion to strike Ripple's fair-notice defense was denied by the Court.  *Id.* at 10.  Even if "security" can mean one thing under federal securities law and another thing under Treasury regulations, CFTC regulations, federal tax law, and GAAP, the practical treatment of XRP under these other laws and regulations—and the SEC's long silence about that treatment—is highly relevant to whether an objective person had fair notice that the SEC would suddenly, many years later, claim that XRP is a security.  This point is especially strong with respect to GAAP because the SEC itself has regulatory authority over GAAP.  Evidence that XRP is not a security under GAAP shows that even a framework under the SEC's own supervision contradicts the SEC's litigating position in this case.

Yet again, the problem for the SEC is not that this mountain of evidence is "irrelevant"; there is no way it could be, given the Supreme Court's and the Second Circuit's directives to consider an asset's "character . . . in commerce."  *E.g.*, *Joiner*, 320 U.S. at 352-53; *Glen-Arden*, 493 F.2d at 1029, 1034.  Rather, the SEC's problem is, yet again, that the evidence is detrimental to its claims on the merits.  That is not a basis to exclude expert testimony.

### B.      Scope of Rebuttal Testimony

As we have separately explained, *see* ECF Nos. 533, 538, 541, 544, 547, the SEC's experts' opinions are riddled with problems.  Ripple's rebuttal experts demonstrate many of those flaws.  The SEC would have the Court exclude most of that rebuttal testimony based on the astonishing argument that, if its own expert failed to do or consider certain things, it would be "outside the scope" of the initial opinions for a rebuttal expert to point out that flaw.  Mot. at 43.  To take just one example, the SEC's putative expert ██████ opined on the supposed beliefs of XRP purchasers but failed to speak to even a single XRP purchaser in doing so.  Defendants' rebuttal expert Kristina Shampanier, an expert in empirical survey methods, pointed out in rebuttal that ██████ could have conducted (but failed to do so) a survey or other well-designed empirical study to determine what XRP purchasers believed, and that this would have been a reliable method that Defendants and this Court could test, as opposed to ██████ actual approach of simply imagining a hypothetical person and guessing her views.  The SEC bizarrely argues that this rebuttal testimony should be excluded precisely *because* ██████ failed to implement these more reliable methods initially, so they are "beyond the scope" of ██████ report.  It makes a comparable argument with respect to multiple other rebuttal witnesses, who likewise pointed out flaws in the opening reports of the experts they were tasked with rebutting.

That is not the law.  Rebuttal testimony points out flaws in an expert's initial report, including problems with the expert's analysis and analyses the expert left out.  "This is archetypal rebuttal testimony:  it identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise." *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008); *see also Assoc. Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Grp., Inc.*, 2013 WL 5771166, at *3 (D. Conn. Oct. 24, 2013) (rebuttal expert may even "offer new analysis and calculations" so long as they "were

undertaken in an effort to rebut and/or contradict the theory posited by" the opposition expert).

And even if the SEC were right that any of the defense rebuttal experts went "beyond the scope"

of the SEC's experts, that would not justify their wholesale exclusion in any event.[6]

On this point, too, the SEC's arguments conflict with one another.  While claiming that

some of Defendants' rebuttal experts go "beyond the scope," the SEC also argues that others did

not go far enough and should have done their own, independent studies.  For example, the SEC's

expert ██████████ performed an "event study" to try to correlate XRP prices to Ripple's

actions.  Multiple defense experts rebutted his opinion from various perspectives.  The SEC objects

that "none . . . offer their own event studies."  Mot. at 3.  But "[a] rebuttal expert, by nature,

criticizes the methodology and/or opinions of another.  There is no requirement that a rebuttal

expert himself offer a competing analysis." *In re Aluminum Warehousing Antitrust Litig.*, 336

F.R.D. 5, 29-30 (S.D.N.Y. 2020), *appeal pending*, No. 21-954 (2d Cir.).

The SEC's own rebuttal experts illustrate the point.  For example, Defendants' expert,

Dr. Allen Ferrell, performed a "factor analysis" that found no long-run excess return of XRP above

the broader cryptocurrency market—leaving no room to argue that Ripple's actions affected XRP

prices in the long run.  The SEC's experts ████, ████, and ████████ each try to rebut

portions of Ferrell's opinion.  But none performed a factor analysis; each instead raises points that

they (wrongly) claim Ferrell failed to consider.  On the SEC's reasoning, their rebuttals to Ferrell

---

[6] *See, e.g.*, *In re Specialist & Other Vessel Owner Limitation Actions*, 2020 WL 8665287, at *2 (S.D.N.Y. June 30, 2020) (wholesale exclusion of rebuttal testimony based on scope is a "'drastic remedy' which is 'inconsistent' with the judicial preference for 'determination of issues on the merits,'" and the preferred remedy is simply "the opportunity to serve surrebuttal reports." (alteration and citation omitted)); *In re Zimmer M/L Taper Hip Prosthesis Prods. Liab. Litig.*, 2021 WL 1405185, at *5 (S.D.N.Y. Apr. 14, 2021) ("[B]efore the extreme sanction of preclusion may be used by the district court, a judge . . . must consider less drastic responses.") (quoting *Outley v. City of N.Y.*, 837 F.2d 587, 591 (2d Cir. 1988)).  The SEC has never claimed prejudice from Defendants' rebuttal reports and never sought leave for sur-rebuttals.

would also be inadmissible.  Does the SEC really believe that all its own rebuttal experts proffered improper rebuttal testimony?  Presumably not.

## C.      Expert Qualifications

Perhaps the strangest argument the SEC raises is that some of Defendants' experts, whom it concedes are eminently qualified in their fields, cannot bring those qualifications to bear on this case without separate expertise specific to XRP.  For example, Professor Carol Osler is one of the world's foremost authorities on currencies and cross-border remittances; the SEC concedes, as it must, that she "clearly would be qualified to testify generally about the functions and attributes of a currency" and about "the differing methods of cross-border payments."  Mot. at 76.  Yet it argues that she cannot opine about whether XRP has the function and attributes of a currency, or how ODL can facilitate cross-border payments, because "she does not have any special training or experience in evaluating cryptocurrencies" or "in evaluating Ripple's ODL product."  *Id.*

The SEC is not the first litigant to try to dodge opposing expert testimony by demanding overly specific qualifications, and courts have long rejected that gambit.  *See, e.g.*, *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) (rejecting argument that ear, nose, and throat doctor was unqualified to opine that glue fumes caused plaintiff's throat polyps for lack of specialized knowledge of glue fumes); *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997) (holding that the district court erred by excluding an engineer with expertise in designing machines for human use from opining on the design of an airline baggage carousel for lack of experience with baggage carousels, because this "degree of specificity" was improper).[7]  Osler and the other

---

[7] *See also Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 2011 WL 855876, at *1-2, *7 (S.D.N.Y. Feb. 28, 2011) (declining to exclude experts with extensive experience in oil and gas industry on basis that they lacked experience with precise crude oil product or agreement at issue in case; argument "rest[ed] on a constricted view of expert qualifications"); *Clayton v. Katz*, 2015 WL 1500248, at *7-8 (S.D.N.Y. Mar. 31, 2015) (rejecting

defense experts for whom the SEC raises this challenge are preeminent experts in their respective fields, and they bring that expertise to bear on questions involving XRP.  That is sufficient to reject the SEC's argument.  *See Lion Oil*, 2011 WL 855876, at *1-2 (improper to exclude expert "merely because he or she does not possess experience tailored to [a] precise product or process . . . [in] dispute").

       Once more, the SEC's own experts could not pass its proposed test.  Two of its own experts ██████████████ and ██████ also have no experience evaluating cryptocurrencies.  A third ██████ claims expertise in digital assets on the basis of having written a single paper on the topic—the same number as Osler.  If the SEC's argument had merit, it would call for the exclusion of three of the agency's own five experts.  But it has none; it is one more legally ungrounded effort to keep from the factfinder testimony that will hurt the agency's case.

---

argument that doctor was unqualified to testify about liposuction system because he had never applied it to precise type of procedure performed on plaintiff).

## II.      THE SEC'S INDIVIDUAL *DAUBERT* MOTIONS SHOULD BE DENIED

### A.      Alan Schwartz

#### 1.      Schwartz's Background and Opinions

The SEC first moves to exclude the testimony of Professor Alan Schwartz—Sterling Professor of Law at Yale Law School and a Professor of Management at the Yale School of Management, among numerous other notable appointments.  Ex. 1, Expert Report of Alan Schwartz ¶ 1 (Oct. 4, 2021) ("Schwartz Rep.").[8]  Schwartz is an expert in contracts and commercial law, and a widely cited law professor.  *Id.* ¶ 2.  As set forth below, Schwartz offers testimony about a central component of Defendants' case:  a summary of the provisions (and absence thereof) in more than 1,700 contracts by which Ripple transferred XRP to third parties between 2013 and 2020.  Schwartz reviewed and organized these contracts, applied his expertise, and developed a framework that will enable the jury to understand certain critical facts about them.

As part of their defense, Defendants will seek to admit these 1,700 different contracts at trial.  These are the specific agreements by which Ripple, over the course of eight years, transferred XRP to hundreds of contractual counterparties in a wide variety of commercial transactions.  These contracts are powerful evidence that demonstrates that neither XRP, nor Ripple's contracts transferring XRP, are investment contracts within the meaning of the Securities Act of 1933.  They also help establish that, under *Howey*, Defendants did not offer or sell XRP as part of any common enterprise; that Ripple did not agree to any relevant post-contractual obligations to recipients of XRP; and that no recipient of XRP had—and as a matter of law could not have had—any reasonable expectation that Ripple would engage in efforts to generate profits for the recipients of XRP or to increase the market price of XRP.

---

[8] Citations to "Ex. __" refer to exhibits attached to the accompanying Declaration of Kylie Chiseul Kim.

The presentation of the relevant details for each of these 1,700 contracts poses an enormous logistical challenge at trial.  To address this problem, Schwartz supervised a process by which he reviewed, organized, and cataloged each of these 1,700 contracts and then divided them into useful categories.  He then described the commercial purpose of the contracts he placed in each category and, most importantly for this Motion, he helpfully summarized whether the contemporaneous agreements between Ripple and its counterparties included, or did not include, certain standard contractual provisions.  He does not reach any opinion on any ultimate legal issues.

### 2.    The SEC's Challenges to Schwartz's Opinions Are Without Merit

The SEC's arguments to exclude Schwartz's testimony defy credulity.  It suggests (at 18) that Schwartz's testimony is unnecessary because the Court itself "is well positioned to interpret Ripple's contracts"—of which, again, there are 1,700—"and the written contracts in *Howey* – and, if necessary, explain them to the jury."  It further argues that the written *contracts* memorializing Ripple's transfers of XRP are not relevant to answering the question whether Ripple offered and sold *investment contracts*, as Congress used that term in the Securities Act of 1933.  And it contends that, because Schwartz refers to the two contracts at issue in *Howey*, he is offering improper and misleading legal opinions.

Each of the SEC's challenges is without merit.  The contracts are plainly relevant to disputed issues in this case:  among other things, they support Defendants' position on the correct application of *Howey* and undermine the SEC's allegation that Defendants engaged in a single eight-year distribution of XRP.  Defendants are entitled to call a summary expert to describe the relevant provisions of these contracts, to identify which of Ripple's contracts include post-contractual obligations (none), and to explain their economic and commercial significance to the jury.  Schwartz is indisputably qualified to offer this testimony.

Finally, contrary to the SEC's claims, Schwartz's testimony contains no legal conclusions. Schwartz does not offer any legal analysis of the contracts in *Howey* or those at issue in this case—much less an opinion about whether these contracts are *investment contracts*. He instead develops a framework, based on his expert knowledge of contracts and contractual provisions, from which he can describe for the jury the various types of contracts Ripple entered into, and the presence or absence of provisions that are commonly used in commercial transactions.

### a.    Schwartz Offers Expert Testimony About Defendants' Transfers of XRP Through 1,700 Contracts

At trial, Defendants intend to offer these written contracts into evidence. These are the contracts by which Defendants allegedly offered and sold billions of units of XRP as an "investment contract" in a single, integrated, public "offering" that spanned more than eight years. *See* Am. Compl. ¶¶ 1, 3. Defendants will argue to the jury that nearly all of these contracts expressly state that Ripple has no post-sale obligation to the counterparty; that none includes any promise to undertake efforts to return profits or to increase the price of XRP; and that—far from selling XRP as part of an integrated, uniform offering of investment contracts—Ripple transferred XRP over eight years as part of its ordinary business operations pursuant to different types of contracts that included different provisions depending on their commercial purpose.

Effectively describing the terms of these contracts at trial presents an enormous logistical challenge—as shown by the SEC's claim during discovery that its attorneys did not have time to review and understand them.[9] Defendants retained Schwartz to help overcome this challenge. The

---

[9] During discovery, Defendants served an extensive and detailed set of requests for admission ("RFAs"), in which it asked the SEC to admit—on a contract-by-contract basis—that Ripple's XRP contracts did not include "any promises by Ripple to increase the price of XRP, to develop the XRP ecosystem, to improve the XRP Ledger, or to share in any of Ripple's profits." ECF No. 376 at 3. The SEC refused to respond to a single such RFA, claiming that it "would . . . require more than 4,800 hours" to respond to that set of RFAs. ECF No. 367 at 5. Judge Netburn

SEC does not dispute that Schwartz is qualified to describe "the use, purpose, and meaning of contractual provisions" from a commercial point of view. *See* Schwartz Rep. ¶ 3. He has taught contract law at Yale for more than 25 years, is a prolific author of articles and book chapters on issues that bear on contracts, and has served on the boards of three publicly traded companies, *see id.* ¶ 2.

Drawing on that expertise, Schwartz organized Ripple's 1,700 XRP contracts into four primary categories: (1) contracts whereby Ripple transferred XRP directly to a counterparty ("Sales Contracts"); (2) contracts whereby the counterparties agreed to sell XRP on behalf of Ripple over trading platforms ("Programmatic Contracts"); (3) contracts whereby Ripple paid for various services in XRP ("Services Contracts"); and (4) miscellaneous contracts that do not fall into the first three categories ("Other Contracts"). *Id.* ¶ 18. In the balance of his report, Schwartz explains the commercial purpose of these categories of contracts and identifies specific provisions that are included or omitted from these contracts.

Based on this analysis, Schwartz offers the opinion that he could not find, in any of the contracts, any contractual provision by which Ripple committed to perform any post-sale actions "that could affect the value of XRP or return profits to any person." *Id.* ¶ 11. He also identifies specific provisions inconsistent with such an obligation. *See, e.g.*, *id.* ¶ 29 (noting that Ripple's

---

sustained the SEC's objection to these RFAs, finding that responding to the RFAs would be unduly burdensome for the SEC. ECF No. 397 at 8.

Defendants also served an interrogatory asking the SEC to identify the terms of XRP contracts that it "contend[s] created an 'expectation of profits'" under *Howey* "by the purchaser of XRP." *See* ECF No. 326 at 2. The SEC objected, claiming that, "under *Howey*'s progeny, the contours of the investment contract may come not just from 'contracts' but also from statements made in commerce and the very nature or character of the instruments." ECF No. 345 at 3. Judge Netburn directed the SEC to "supplement its response to Interrogatory No. 2 to identify any specific contractual terms" on which it would rely for that purpose. ECF No. 397 at 3. Judge Netburn underscored these contractual terms "are central to this action" and are not "irrelevant because it is inconsistent with the SEC's interpretation of the law." *Id.* at 2.

Sales Contracts typically contain, among other things, "an acknowledgment that the purchased units of XRP do not grant the purchaser any right to make any demand on Ripple").

### b. Schwartz's Testimony About Ripple's 1,700 XRP Contracts Is Relevant

The SEC suggests (at 18-22) that Schwartz's testimony is inadmissible because Ripple's contracts with XRP purchasers are *irrelevant*. That claim is baseless: as Judge Netburn previously found, the terms of those contracts "are central to this action." ECF No. 397 at 2.

### i. Schwartz's Testimony About Ripple's 1,700 XRP Contracts Is Relevant to Both Sides' "Investment Contract" Theories

The SEC's argument that Schwartz's testimony about Ripple's contracts is irrelevant fails based on well-established precedent that an expert's testimony "must be evaluated within the context of [Defendants'] own theory of the case." *Olin*, 2018 WL 1901634, at \*21. As explained above, under Defendants' legal theory, Ripple's contracts are dispositive. The Supreme Court explained in *Howey* that the meaning of the statutory term "investment contract," as used by Congress in 1933, was "crystallized" by a series of state cases interpreting state "blue sky" laws. *Howey*, 328 U.S. at 298. Those cases make clear that "the essential ingredients of an investment contract," *id.* at 301, include features not present here: a written contract between a promoter and an investor that imposed post-contractual obligations on the promoter to take specific actions for the benefit of the investor and that granted a right to demand and receive part of the profits generated by the promoter's activities. Schwartz's testimony supports these conclusions. While the SEC "may disagree with" Defendants' "legal theory, resolution of this disagreement will occur at the merits stage of the litigation and not pursuant to a Rule 702 motion." *Harris*, 815 F. Supp. 2d at 6, 10 (denying *Daubert* motion).

Indeed, the contracts are relevant even under the SEC's own reading of *Howey*. The agency claims that Ripple entered into a common enterprise with XRP purchasers, who reasonably

expected profits from Ripple based on Ripple's prospective obligations to those purchasers.  Am. Compl. ¶ 238.  Whatever other evidence the SEC may claim is the source of these "expectations," the contemporaneous memorialization of at least *some* of those expectations in written agreements is obviously relevant to that issue.

The SEC suggests (at 20) that Schwartz's testimony should be excluded "because the *Howey* inquiry is not limited to the terms of written contracts (if any) between the promoter and the investor."  That argument tacitly admits that the SEC cannot prove Defendants offered "investment contracts" based on the parties' written contracts, which alone establishes the relevance of these contracts.  But even if the *Howey* inquiry is not *limited to* the terms of written contracts, that hardly makes the contracts irrelevant.  As the SEC itself acknowledges, the Court and the jury must "look to 'the terms of the offer'" and "the economic inducements held out to the prospect."  Mot. at 20 (quoting *Joiner*, 320 U.S. at 352-53).  The contracts are an obvious source of relevant evidence on those issues.  And the observation that courts have considered evidence beyond the four corners of an operative contract in finding those "terms" and "inducements," *see id.*, hardly renders the "terms" and "inducements" in the parties' written agreements *irrelevant* to whether an instrument is offered as an "investment contract."  No court has ever suggested that written contracts are irrelevant in a case about an alleged investment contract.  On the contrary, courts routinely analyze contractual provisions in deciding whether an instrument is an investment contract.[10]

---

[10] *See, e.g.*, *Park Yield LLC v. Brown*, 2019 WL 6684127, at *5 (S.D.N.Y. Dec. 6, 2019) (defendants' "insistence that this Court simply ignore the express terms of the Agreements [wa]s unavailing" where they identified the agreements as securities); *see also Maritan v. Birmingham Props.*, 875 F.2d 1451, 1459 (10th Cir. 1989) (considering both the terms of agreement and the party's conduct to conclude that the relevant "agreement" was "not the type of instrument that comes to mind when the term 'security' is used and does not fall within 'the ordinary concept of a security'") (quoting *Marine Bank*, 455 U.S. at 559, quoting in turn H.R. Rep. No. 73-85, at 11

The SEC's argument is also flatly inconsistent with the basic tenet of evidence law that "[a] brick is not a wall."  1 *McCormick on Evid.* § 185 (8th ed.) *see* Fed. R. Evid. 401 (relevant evidence need only have some "tendency to make . . . more or less probable" a "fact" that "is of consequence in determining the action").  As contemporaneous written expressions of the parties' expectations about future performance, the contracts are plainly relevant even if not dispositive.  *See also Can't Live Without It, LLC v. ETS Express, Inc.*, 373 F. Supp. 3d 434, 440 (S.D.N.Y. 2018) ("[F]ailure to prove the defendant's whole case does not mean that [evidence is] irrelevant and should be excluded.").  Perhaps the SEC will persuade a jury to ignore Ripple's 1,700 XRP contracts in favor of a handful of tweets that most XRP purchasers likely never saw, but that is an argument for trial—not a basis for exclusion.[11]

The SEC argues (at 16) that Schwartz conceded that "the representations that led the *Howey* investors to expect substantial profits came from the sales talk, *not* the two written contracts."  The Court (not the experts) will interpret and apply *Howey*.  In any event, the SEC mischaracterizes Schwartz's observations about *Howey*:  he testified he did not "know what led investors to expect whatever the investors expected," Ex. 2, Dep. Tr. of Alan Schwartz ("Schwartz Tr.") 62:18-23, and that the sales pitch associated with the contracts in *Howey* was offered to address the

---

(1933)); *Bamert v. Pulte Home Corp.*, 445 F. App'x 256, 267-68 (11th Cir. 2011) (per curiam) ("We disagree with Plaintiffs' contention that the purchase agreements were not central to their claims.  Without considering the agreements, it would be impossible for the District Court to evaluate properly how much control Plaintiffs exercised over their investments, which turns out to be a crucial issue in this case.").

[11] *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010) ("[I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony. . . .  Questions about what facts are most relevant or reliable . . . are for the jury."), *aff'd*, 564 U.S. 91 (2011); *Rosario v. City of New York*, 2021 WL 1930293, at *3 (S.D.N.Y. May 13, 2021) ("Plaintiff's dispute with the reliability of [the expert's] opinion ultimately rests on the sufficiency of the underlying facts and evidence.  Such disputes are appropriate for resolution through '[v]igorous cross-examination [and] presentation of contrary evidence' before the jury." (citation omitted)).

enterprise's historical and expected future profits, *id.* 64:9-25.  He did not testify that the *Howey* contracts were irrelevant to investor expectations, which would make no sense.  The service contract in *Howey*—in which the promoter agreed "to pay over to" the purchaser "the net proceeds of the fruit produced," *see* Ex. 3, Schwartz Dep. Ex. AS-5 at 17—plainly was relevant to whether investors would "*share in the profits of*" *the* "*enterprise*."  *Howey*, 328 U.S. at 299 (emphasis added); *see id.* at 300 (noting that the investors' "shares in this enterprise [we]re evidenced by land sales contracts and warranty deeds").

### ii.   Schwartz's Testimony About the Differences Among Ripple's 1,700 XRP Contracts Is Relevant To Rebut the SEC's "Distribution" Allegation

Finally, the 1,700 contracts are relevant for another reason:  they contradict the SEC's allegations that the Defendants' transactions in XRP were made as part of a single, integrated, eight-year-long "distribution" of XRP.  Am. Compl. ¶ 1.  Evidence about the wide variety of contracts and varying contractual provisions, executed with different counterparties, on different dates, with different economic terms, and so on, is all relevant to refuting the allegation that Defendants engaged in a single distribution of XRP and supports the defense that Ripple transferred XRP for routine and varied business purposes.  *Cf.* 17 C.F.R. § 230.152 (SEC rule discussing when two or more offerings are considered a single offering).  Schwartz's description of the variety of types of commercial contracts will assist the jury in evaluating the SEC's contention that every transfer of XRP was part of a single integrated offering of securities.  This point independently warrants admission of Schwartz's testimony, as it undermines a critical factual allegation in the SEC's Complaint.  *See* Fed. R. Evid. 401(a).  The SEC ignores it entirely.

c. **Schwartz's Testimony Regarding Ripple's Contracts Is Admissible Expert Testimony**

i. **Schwartz's Opinions Will Assist the Jury and Promote Effective Case Management**

Contrary to the SEC's claims that Schwartz's testimony is unnecessary (at 18), Schwartz's expert testimony will be critical to effective case management. As set forth above, Schwartz has drawn on his "specialized knowledge in the field of [contract analysis] to synthesize information from" Ripple's 1,700 XRP contracts, *Broadspring, Inc. v. Congoo, LLC*, 2014 WL 4100615, at *16 (S.D.N.Y. Aug. 20, 2014), and to offer it to the jury in an efficient and comprehensible manner. In this respect, Schwartz provides trial efficiencies similar to a summary witness, but also provides additional testimony that a custodian of records cannot, *cf.* Fed. R. Evid. 1006 (permitting summary witness to catalog "voluminous writings . . . that cannot be conveniently examined in court"). That is a proper purpose for expert testimony, as many cases recognize.[12]

The SEC suggests (at 18) that the Court and the jury can easily review these contracts on their own, but it offers no practical or efficient way this could be achieved. As Judge Netburn recognized, *see supra* at 14-15 n.9, discussing the terms of each of the 1,700 contracts at issue in this case is burdensome even for the parties. The burden would be even greater—if not

---

[12] *See also Capri Sun GmbH v. Am. Beverage Corp.*, 2022 WL 976270, at *21 (S.D.N.Y. Mar. 31, 2022) ("'[E]xpert testimony [can] . . . "synthesize[]" or "summarize[]" data in a manner that 'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'") (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016)); *Aluminum Warehousing*, 336 F.R.D. at 31 (allowing expert opinion "based on an empirical review and analysis of record evidence"); *Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 837 (S.D.N.Y. 2018) ("a party can use an expert report to synthesize and digest reams of otherwise admissible evidence"); *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 504 (S.D.N.Y. 2015) (the expert adds value by "comb[ing] through [voluminous data], compil[ing] and aggregat[ing] the data . . . , and present[ing] it in a more readily understandable format"); *Genon Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 2012 WL 1372150, at *3 (S.D.N.Y. Apr. 18, 2012) (denying motion to strike expert's declaration where expert had "summarize[d] the relevant provisions of [a contract]").

impossible—for a jury.  There is no reason to waste the Court's resources in that way:  even if "a juror may be able to understand" individual pieces of data, an expert adds value by "comb[ing] through voluminous [data], compil[ing] and aggregat[ing] the data . . . [,] and present[ing] it in a more readily understandable format."  *Louis Vuitton*, 97 F. Supp. 3d at 504.  Schwartz's testimony fills that role with a helpful description of the 1,700 contracts, as well as a framework by which to evaluate their terms and commercial purpose, it will be more than helpful to the jury:  it is essential to sound trial management.

### ii.   Schwartz's Description of the Contracts Does Not Constitute a Legal Opinion

The SEC argues (at 21-22) that Schwartz's opinions are inadmissible legal conclusions. But expert testimony is not inadmissible simply because it draws on legal source material or offers a factual conclusion that bears on an ultimate issue of law.[13]  Courts regularly distinguish testimony that usurps the role of the court in setting forth legal standards applicable to the ultimate question from testimony that properly describes commercial practices informed by legal standards.  *See, e.g.*, *SEC v. Das*, 2011 WL 4375787, at *9 (D. Neb. Sept. 20, 2011) (granting in part and denying in part SEC motion to exclude testimony of a lawyer and an expert for the defense, distinguishing admissible testimony about "practices and procedures generally used in corporate governance" from inadmissible legal testimony); *see also HBC Ventures, LLC v. Holt MD Consulting, Inc.*, 2012 WL 4483625, at *8-9 (E.D.N.C. Sept. 27, 2012) (distinguishing opinions that "not only track

---

[13] *See United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000) ("Testimony by Rovelli and Bair about narcotics trafficking by Los Solidos was not objectionable merely because of its pertinence to the issue of whether Los Solidos engaged in racketeering activity."); *United States v. Duncan*, 42 F.3d 97, 102-03 (2d Cir. 1994) (testimony using term "money laundering" and characterizing tax returns as "false" not inadmissible expert testimony because the witness "posited factual conclusions" and "did not comment as to whether [the defendant] was guilty of . . . the crimes with which [he] was charged"); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294-95 (2d Cir. 1991) (declining to reverse admission of expert testimony giving "general background on" related substantive law).

the language of the legal principle at issue, but also use terminology having a specialized legal meaning," from admissible testimony that does not "utilize terms with specialized legal meaning" and that concerns "corporate norms and governance and whether an entity's actions diverged from the corporate norms").  In particular, "expert witness testimony may explain how a contract operates in the marketplace."  *Sitts v. Dairy Farmers of Am., Inc.*, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020) (law professor and economist allowed to "opine as to how a contract or contractual term operates in the marketplace"); *see also WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (expert testimony "about the customary and usual meaning given to" certain language in a contract and "the customary formats for calculating percentage rent in the commercial real estate industry" admissible in contract case); *CIT Grp./Bus. Credit, Inc. v. Graco Fishing & Rental Tools, Inc.*, 815 F. Supp. 2d 673, 678 (S.D.N.Y. 2011) (holding that, although expert testimony about "whether certain events constituted a material breach of" a relevant contract was inadmissible, testimony regarding industry custom and practice was admissible).

Schwartz's testimony is admissible because he is not offering testimony about the meaning of any disputed provisions in Ripple's contracts.  Schwartz's testimony will help the jury evaluate how commercial parties induce or extinguish prospective obligations in their written agreements. He describes, based on his expertise in *the commercial use of contracts*, the categories of contracts that Ripple executed with counterparties and identifies as a factual matter which standard provisions were and were not included in those contracts to assist the jury in evaluating how those contracts and contractual provisions are generally understood in the commercial world.  Although the underlying facts are embodied in documents that have legal significance, the opinions themselves are not legal opinions:  they are opinions about "how" Ripple's XRP "contract[s] . . . operate[] in the marketplace," *Sitts*, 2020 WL 3467993, at *7, and are therefore admissible.

The SEC acknowledges (at 15 n.5) that Schwartz will not opine on the significance of these contracts to the ultimate, "investment contract" issue. Indeed, the agency goes so far as to complain (at 16) that Schwartz did not include in his contractual analysis "Ripple's representations on its website and social media posts." Exactly so. His testimony is limited to describing a document-intensive portion of the evidence supporting the defense. As a result, his testimony is different from the testimony addressed in the cases the SEC cites (at 17-18):[14] Schwartz is not offering testimony "about the applicable law *that governs the case*." *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 n.16 (S.D.N.Y. 2009) (emphasis added) (collecting cases) (in state-law case, admitting expert testimony on federal regulatory compliance). The SEC's legal-conclusion objection is therefore misplaced.[15]

---

[14] *See F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1258 (2d Cir. 1987) (in case that turned on contract law, expert could not testify "that the [key c]ontracts were unenforceable for lack of essential terms"); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir. 1977) (in dispute over whether defendant breached its contractual obligation to use best efforts, overruling admission of expert's interpretation of the meaning of best efforts within the contract); *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 401 (S.D.N.Y. 2019) (excluding the interpretation of a contract in breach-of-contract action); *Luizzi v. Pro Transp., Inc.*, 2011 WL 1655567, at *3 (E.D.N.Y. May 2, 2011) (excluding expert testimony about "the scope of the obligations created by" an insurance policy in a case about a party's obligations under the insurance policy).

This Court's cases respect the same distinction. In *Financial Guaranty*, this Court barred an industry expert from testifying that parties to a contract had particular rights—a disputed issue in the case. *See Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 2020 WL 4251229, at *7 (S.D.N.Y. Feb. 19, 2020). But this Court has declined to exclude testimony where the expert offered custom-and-practice testimony about the meaning of certain contract terms in an industry. *See Hatala v. Port Auth. of NY & NJ*, 2017 WL 9832293, at *5 (S.D.N.Y. Oct. 30, 2017).

[15] *Mason Capital, Ltd. v. Kaman Corp.*, 2005 WL 2850083 (D. Conn. Oct. 31, 2005), has little to do with this case. There, the court "disregarded" the testimony of experts, including Schwartz, "to the" (unidentified) "extent that the experts provided testimony on what they believed is the meaning of" a statute. *Id.* at *6 n.2. But the court went on to decline to exclude "the valuable testimony provided by [Schwartz and another expert] on the way in which those in" the relevant "industry construe[d] various" important facts, on the ground that "[t]hat testimony [wa]s clearly relevant to the proper interpretation of a statute regulating a specialized area of law." *Id.* None of this has any relevance to Schwartz's testimony in this case.

### iii. Schwartz's Testimony Is Based on an Appropriate Level of Review of Ripple's Contracts

The SEC also challenges (at 13-14) the process by which Schwartz reviewed the contracts, primarily on the basis (at 13) that he did not read each of the 1,700 contracts in detail before his report was served. But nothing required him to do so, and the SEC cites no authority to support this challenge. *See Sentinel Ins. Co. v. VLM Foods, Inc.*, 2021 WL 4513595, at \*13 (E.D. Va. Oct. 1, 2021) (denying motion to exclude expert opining on reasonableness of attorneys' fees even though he "did not review every single piece of paper" in "the underlying case files," because "he reviewed sufficient records to be able to opine on the reasonableness of the fees"); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018) ("Defendant cites no authority for the proposition that an expert must independently sort through all of the discovery in a case in order to determine the relevant evidence."). On the contrary, as a world-renowned scholar who has spent his career studying contracts and contract law, Schwartz possesses ample expertise to review standard commercial contracts, identify sensible categories for them, and design and oversee a process by which the contracts were placed into those categories, without doing so himself in the first instance.

That is what Schwartz did here. After reviewing sample contracts, Schwartz identified certain initial standard contractual provisions to use for categorizing the agreements, including but not limited to "the nature of the sale or distribution of XRP, as well as the presence or absence of: risk factors, disclaimers of third-party beneficiary rights, disclaimers of warranties, integration clauses, and post-contractual obligations Ripple owed to XRP purchasers." Schwartz Rep. ¶ 6 n.4. All 1,700 contracts were then organized based on the presence or absence of these provisions. *Id.* ¶ 6. Schwartz personally examined a sample of the contracts in these various categories "to confirm the presence or absence of the specific contractual provisions [he] identified." *Id.* ¶ 7. He

then supervised a review process by which, in cooperation with counsel, he arrived at the four final categories supplied in his reports:  Sales Contracts, Programmatic Contracts, Services Contracts, and Other Contracts.  *Id.* ¶¶ 7, 18 & Exs. C-F.  Before finalizing his report, Schwartz "personally reviewed more than 140 contracts that were exemplars of" these four categories and their subcategories.  *Id.* ¶ 5.

The SEC criticizes (at 13) Schwartz for not reviewing the work of counsel in sorting the contracts, but that criticism misstates his methodology.  He directed and controlled the review process, asking counsel to sort the 1,700 contracts based on criteria that he specified.  *See* Schwartz Rep. ¶¶ 6-7.  This included a review of the contracts for specific provisions he identified—*e.g.*, "risk factors, disclaimers of third-party beneficiary rights, disclaimers of warranties, integration clauses, and post-contractual obligations."  *Id.* ¶ 6 n.4.  He thereafter "examined" (which is to say, verified) the sorted contracts "to confirm the presence or absence of the specific contractual provisions."  *Id.* ¶ 7.  Moreover, after he submitted his report, he reviewed more than 1,000 specific contracts, confirming they were properly sorted and that none undermined his opinions.  *See* Schwartz Tr. 21:9-23:19.[16]  Personal review of all 1,700 contracts was unnecessary because most of the contracts at issue (some 1,200 of them) are form contracts, of which more than 600 were boilerplate (generally, one-page) subsidiary purchase agreements relating back to master XRP purchase agreements, and more than 600 were boilerplate "wholesale sales orders."  Schwartz Rep. ¶ 5 n.3.  For "form contracts," it was not necessary for him to "review[] every page[] of each contract," Schwartz Tr. 43:22-44:8, "to make sure that Contract 47, for example, was like Contract 46," *id.* 42:3-18.

---

[16] The SEC's deposition-by-pop-quiz approach to Schwartz's memory on the specifics of individual contracts, *see* Mot. at 13-14, does not undermine the reliability of Schwartz's methodology and is no basis for exclusion.

The SEC does not suggest that Schwartz's descriptions of the contracts are inaccurate or misleading.  Nor does it dispute Schwartz's opinion that none of these contracts includes any post-contractual obligation for Ripple or any promise to undertake efforts to return profits or to increase the price of XRP.  Nor does the SEC claim that it is aware of any specific contract that would change Schwartz's opinions.  Although the SEC is free to cross-examine Schwartz at trial about his level of diligence, its suggestion that the process he used warrants exclusion is meritless.

**B.      Allen Ferrell**

**1.      Ferrell's Background and Opinions**

Dr. Allen Ferrell is an economist and is, among other notable appointments:  the Greenfield

Professor of Securities Law at Harvard Law School; a faculty associate at the Kennedy School of

Government at Harvard; a fellow at Columbia University's Program on the Law and Economics

of Capital Markets; and a member of the editorial board of the Journal of Financial Perspectives.

Ex. 4, Expert Report of Allen Ferrell ¶¶ 1-2 (Oct. 4, 2021) ("Ferrell Rep."); *id*. App. A.   He

completed a Ph.D. in economics from MIT in 2005, specializing in the fields of econometrics and

finance.  *Id*. ¶ 1.  His dissertation focused on the relationship between stock prices and financial

disclosures.  *Id.*  He was previously a member of the Board of Economic Advisors to the Financial

Industry Regulatory Authority ("FINRA").  *Id*. ¶ 2.

Ferrell has published at least 30 articles in leading law and finance journals, including a

number of articles applying event studies and "factor models" to assess whether firm-specific

action or information impacts an asset's price.  Ferrell has served as an expert witness in more than

100 cases, and has performed (or critiqued) event studies in over 50 of those engagements.  Ex. 5,

Dep. Tr. of Allen Ferrell ("Ferrell Tr.") 62:7-15.  He deployed multiple factor models as an expert,

contrary to the SEC's misrepresentation in its Motion (at 56).  *Id.* 79:8-80:13.[17]

---

[17] The SEC falsely asserts (at 56) that Ferrell has "never [used] a factor model" in prior
expert engagements.  Ferrell testified just the opposite.  Ferrell Tr. 79:14-21 ("Q.  Prior to this
engagement, how many times have you used a factor model to opine on the question of whether a
specific factor or event influenced price returns? . . .  A.  I don't have a specific recollection.  *I
have used it in the past*, but I don't have a number.") (emphasis added); *see also id.* 80:1-17
(describing specific engagement in which "I do remember using a factor model"); *id*. 79:2-13
("Q.  In your prior expert engagements when you have been called upon to opine as to whether a
specific factor or event influenced price returns, . . . you conducted . . . an event study, is that right?
A.  That's not quite right. . . .  I've also used factor model[s]. . . .  So it depends on the facts and
circumstances of the case, including the efficiency of the market.").

Ferrell offers several opinions that identify economic flaws in the SEC's theory of the case. Using a factor model, he determines that Ripple's efforts did not impact long-term XRP price returns above and beyond the impact caused by the broader cryptocurrency market.  He also concludes that:  (1) Ripple's XRP contracts lack the economic substance of its equity contracts; (2) Ripple and XRP holders do not, as an economic matter, participate in a common enterprise; (3) speculative demand is not unique to assets deemed "investment contracts" or "securities"; (4) XRP has the economic characteristics of a virtual currency; and (5) Ripple's ODL product is an economically viable alternative to traditional remittance payment methods.  In rebuttal and supplemental reports, Ferrell critiques the SEC's experts, ███ and ███.

The SEC does not seriously dispute that Ferrell is qualified to offer these opinions.  But the SEC seeks to exclude Ferrell's testimony for allegedly:  failing to sufficiently analyze the effect of Ripple actions on the price of XRP, offering legal conclusions, and offering opinions "irrelevant" to the legal question at issue.  All three characterizations are wrong, and provide no basis for excluding his testimony.

## 2. Ferrell's Factor Model Is Reliable and Admissible

According to the SEC, between 2013 and 2020, Ripple "engaged in efforts" to influence the price of XRP, leading "XRP purchasers to reasonably expect profit based on Ripple's efforts." Ex. 6, Pl.'s Resps. & Objs. to Ripple's First Set of Interrogs. at 28 (July 1, 2021) (Interrog. No. 11) ("SEC Interrog. Resps."); *see also* Am. Compl. ¶¶ 61-62, 90, 241, 244, 284, 315-357.  Ferrell tested this hypothesis with a factor model—a statistical analysis designed to identify the factors that explain an asset's price changes over time.  Ferrell Rep. ¶ 91.  A factor model can disaggregate the effect on XRP's price of market-wide factors (*i.e.*, the same factors that cause price changes in other digital assets like Bitcoin and Ether) from the effect on XRP's price of all other factors (which would include, among other things, any returns attributable to Ripple's efforts, if any such

returns existed).  Any "leftover," unexplained XRP return after accounting for movement in the general digital asset markets, is reflected in "alpha," the regression "constant."  As Ferrell explained, if the market harbored (and thus priced in) expectations of profit based on *Ripple-specific* factors, that would show up in a statistically significant, non-zero alpha—reflecting some level of XRP price returns left unexplained by general market forces.  Conversely, if there is no statistically significant non-zero alpha, then the entire price return is explained by broader market forces, leaving no room for any expectation of Ripple-specific factors to explain XRP price returns. *Id.* ¶ 102.  This approach—looking for alpha to test whether the market expects profit from firm-specific actions—is rooted in a well-established body of finance and econometric literature.  *See infra* at 32 n.22 (citing sources, including a publication co-authored by Ferrell).

To run the factor model, Ferrell first constructed factors (called "principal components") reflecting broader digital asset market price movements during two periods:  2013-2020 (XRP's full trading history) and 2015-2020 (a more mature period of digital asset markets, in which more digital assets existed and digital assets generally traded with greater liquidity).  The first period relied on the nine non-XRP digital assets with available price information during the full seven-year span; the second period relied on data from the 91 non-XRP digital assets fitting that criterion from 2015 to 2020.[18]  Ferrell Rep. ¶¶ 93, 95 & n.162; Ferrell Tr. 169:20-170:7.  Ferrell then ran a regression to compare the monthly price returns of the market-wide factors to those of XRP during the two estimation periods.  The regression revealed that the principal components in both estimation periods had statistically significant relationships with XRP price returns.  Ferrell Rep.

---

[18] For the second period, Ferrell included only digital assets with market caps of at least $100,000 in the first or last months of the period, to avoid using smaller digital assets with less informative price information.  Ferrell Rep. ¶ 95 n.162.  The SEC does not challenge this methodological decision.

¶ 98.   After controlling for those principal components, Ferrell determined that the remaining return (alpha) was statistically insignificant—that is, indistinguishable from zero.  In other words, all of XRP's statistically significant price variation over seven years is fully explained by the movement of the cryptocurrency market, not Ripple's actions.  *Id*. ¶ 102 & n.178.

Ferrell also looked at other possible explanatory variables—including the S&P 500, MCSI World Index, Bloomberg Commodity Index, Gold, Yen, U.S. Dollar Index, and Euro as factors. None had a statistically significant relationship with XRP price returns.  *Id.* ¶ 101.  He also examined whether Ripple's monthly distributions of XRP (net outflow; *i.e.*, sales minus purchases) could explain XRP price returns; they, too, had no statistically significant relationship.  *Id.* ¶¶ 113-115 & Ex. 11.A.

The SEC attacks Ferrell's factor model on three grounds:  (1) it disagrees with Ferrell's choice to apply a factor model instead of an event study; (2) it claims that Ferrell failed to adequately study the impact of specific Ripple efforts on XRP price; and (3) it exaggerates the importance of two statistical indicia (R-squared and Root Mean Square Error ("RMSE")) to suggest that Ferrell's model is unreliable.  All three arguments are baseless.

### a.   The SEC's Disagreement with Ferrell's Choice of Test Goes to Weight

Most of the SEC's criticism (at 54-57) of Ferrell's work amounts to a disagreement with his decision to use a factor model instead of an event study.  But a disagreement with an opposing expert's choice among valid scientific methodologies is not grounds for exclusion under Rule 702. *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 648 (S.D.N.Y. 2007) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance." (citation omitted)); Fed. R. Evid. 702 advisory committee's note to 2000 amendments (Rule 702 "is broad enough to permit testimony that is the product of competing

principles or methods in the same field of expertise.").[19]  At most, this sort of disagreement goes to weight, not admissibility.

Even if the SEC's methodology complaint could go to admissibility, it is still wrong, because its argument depends entirely on ignoring and misrepresenting both Ferrell's own experience and the vast body of academic literature supporting it.  *First*, the SEC wrongly claims (at 56) that Ferrell's selection of a factor model is "novel and unsupported."  That is false.  Even putting aside Ferrell's own experience applying factor models as an expert witness (which the SEC flatly misrepresents, *see supra* at 27 & n.17), and in leading academic publications[20] (which the SEC simply ignores), factor models are supported by a deep body of academic literature spanning 50 years.  *See* Ferrell Rep. ¶ 91 & nn.153-154 (citing sources).[21]  Economists have applied them to assess the factors explaining price returns for a variety of asset types, including cryptocurrencies.  *Id.* ¶ 91 n.154; *see* Y. Liu & A. Tsyvinski, *Risks and Returns of Cryptocurrency*, 34 Rev. Fin. Stud. 2689 (2021) (using factor model to assess factors affecting digital-asset prices).  *Second*, the SEC also suggests (at 56) that it is "novel" to apply a factor model to "assess whether

---

[19] *See also RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2000 WL 310352, at *6-7 (S.D.N.Y. Mar. 24, 2000) (declining to exclude expert for failure to apply event study where expert applied a "reasonable and generally accepted alternative"); *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *9 (E.D.N.Y. Dec. 21, 2012) ("It is for the jury to determine whether the methodological decisions that Dr. Wu made render his analysis either more or less persuasive than Professor Bernheim's model.").

[20] *See* L. Bebchuk, A. Cohen & A. Ferrell, *What Matters in Corporate Governance?*, 22 Rev. Fin. Stud. 783, 797, 812-823 (2009).

[21] *See also, e.g.*, C. Harvey, Y. Liu & H. Zhu, . . . *and the Cross-Section of Expected Returns*, 29 Rev. Fin. Stud. 5, 6, 8 (2016) (describing review of 313 articles from "top journals" and "top conferences" that have applied factor models in asset-pricing context, adding that this collection is "underrepresent[ative]" because "we generally only consider top journals").

a company action . . . affect[s] an asset's price." But that too is wrong; academic work by Ferrell and by many others does just that.[22]

b.   **The Alpha in Ferrell's Model Explains That Ripple Actions Did Not Affect XRP Price**

The SEC claims (at 55-58) that Ferrell's factor-model analysis is faulty because it "jumps to the conclusion" that Ripple actions did not influence XRP price without specifically examining the impact of Ripple's actions. But that claim, too, is incorrect; the SEC's argument reflects its own misunderstanding of factor models, not any error in Ferrell's analysis.

As explained above, *see supra* at 28-29, the alpha in Ferrell's factor model represents *any* remaining XRP price returns after accounting for market-wide factors. Ferrell Tr. 126:5-23. Thus, if *anything* (including Ripple actions) resulted in long-term XRP-specific price increase "above and beyond" price variation resulting from trends in the digital asset market generally, the factor model would yield a positive alpha. As even the SEC's own expert agrees, it did not. *See* Ex. 7, Feb. 18, 2022 Dep. Tr. of ▇▇▇▇ ("▇ Tr.") 294:10-18 (agreeing that Ferrell "quite correctly" found alpha to be statistically indistinguishable from zero).[23] Ferrell properly interpreted his results as showing that there is no room for *any* other factors that have a statistically significant effect on XRP's long-run prices.

---

[22] *E.g.*, P. Gompers, J. Ishii & A. Metrick, *Corporate Governance and Equity Prices*, 118 Q. J. Econ. 107, 122 (2003) (applying factor model to test if corporate governance impacts price return above/beyond other market factors); Ferrell et al., *What Matters in Corporate Governance?* at 812-13 (same); L. Bebchuk, A. Cohen & C. Wang, *Learning and the Disappearing Association Between Governance and Returns*, 108 J. Fin. Econ. 323 (2013) (same).

[23] The SEC attacks a strawman when it claims (at 58) that "Ferrell cites nothing in support of his novel proposition that he can conclude, from his observation of statistically insignificant 'alpha,' that there are no other price-moving factors (like Ripple's actions) that might impact XRP returns." Ferrell does not claim that his alpha finding means that no other factors might ever move price. Rather, he concludes that there are no *statistically significant* long-term price impacts left unexplained by the factors he studies, and thus that Ripple's actions did not have a statistically significant effect on XRP's long-term returns.

### c.      Ferrell's Model Is Reliable

The SEC claims (at 58) that based on a different statistical metric ("R-squared"),[24] Ferrell's model "explains only approximately 54% of XRP's price fluctuations" in its first period and is thus unreliable.  It also claims that Ferrell's higher R-squared (92%) for the second period shows "inconsistent results" and therefore requires exclusion.  Both of these attacks would go to weight rather than admissibility even if they were correct, but they are incorrect in any event because they misunderstand R-squared.

"As a general rule, courts should be reluctant to rely solely on a statistic such as $R^2$ to choose one model over another."  D. Rubinfeld, *Reference Guide on Multiple Regression in Reference Manual on Scientific Evidence* 216-17 (2d ed. 2000).  That is because "a low $R^2$ does not necessarily imply a poor model (and vice versa)."  *Id.* at 188 n.24; *see also Monroe Cnty. Emps. Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 389 & n.22 (N.D. Ga. 2019) (recognizing same, citing several econometrics texts).  Accordingly, courts routinely treat attacks on a regression's R-squared as bearing on weight, not admissibility.  *See, e.g.*, *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *10 (E.D.N.Y. Feb. 21, 2019) (argument that opposing expert's "R-squared figures are low" presented question for jury); *EEOC v. DHL Express (USA), Inc.*, 2016 WL 5796890, at *4 (N.D. Ill. Sept. 30, 2016) (same); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 725 (E.D. Wis. 2008) (same for report with 15.4% R-squared value but other, "better measure" of statistical significance); *cf. Chem. Mfrs. Ass'n v. U.S. EPA*, 870 F.2d 177, 215-16 (5th Cir. 1989) (rejecting argument that agency analysis was unreliable when it relied on regression with 52% R-squared).

---

[24] In general terms, R-squared explains how well a regression model "fits" the variation in the data it examines.

Furthermore, the SEC misunderstands R-squared when it argues (at 58) that the different R-squared values in Ferrell's first period (54%) and second period (92%) somehow warrant the exclusion of his testimony.  It is "misleading" to "[c]ompar[e] R-squared values" when "the dependent variables differ."  *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 171, 194 (E.D. Pa. 2015).  The dependent-variable data (XRP returns) in Ferrell's first and second periods differ.  Because "$R^2$ is also sensitive to the range of variation of the independent variable," P. Kennedy, *A Guide to Econometrics* 30 (5th ed. 2003), it is also misleading to compare R-squared values when independent variables differ.  They do here; the first period (2013 to 2020) included data from nine digital assets; the second period (2015 to 2020) included data from 91.  In equating two different time periods yielding different "fits" for different data sets, the SEC compares apples to oranges.  And, in doing so, it flouts textbook econometrics principles.  *See id.* ("[I]t makes no sense to compare $R^2$ across different samples.").

All of these flaws also apply to the SEC's almost completely unexplained claim (at 58-59) that Ferrell's model is unreliable because his model purportedly produced RMSE values of 53.2 and 34.2 in the first and second periods, respectively.  Even if that argument was adequately developed (it wasn't), it would go at most to weight; like R-squared, RMSE values presented in a vacuum say little about overall quality of a regression.[25]

---

[25] RMSE is a "measure of fit" metric similar to R-squared; for the same reasons as above, this critique also goes to weight, not admissibility.  *See* Rubinfeld, *Reference Guide on Multiple Regression* 215 & nn.74 & 76 (R-squared and RMSE "provide similar information"); *id.* at 216-17 (courts should not rely solely on statistics "such as $R^2$").  The SEC cites no cases excluding an expert based on a purportedly poor RMSE score—nor any academic authority applying this metric to assess whether a finding like Ferrell's is reliable.  That is because no econometricians use RMSE in the way the SEC seeks to employ it here.  And like R-squared, several scholars have recognized that RMSE, on its own, is not a reliable metric through which to assess the reliability of a regression.  *See, e.g.*, D. Chicco, M. Warrens & G. Jurman, *The Coefficient of Determination R-Squared Is More Informative Than SMAPE, MAE, MAPE, MSE and RMSE in Regression Analysis Evaluation*, Peer J. Computer Science, July 2021 at 16 (it is "impossible to detect the quality of a

### 3.     Ferrell's Consideration of Ripple's XRP Distributions Was Relevant and Reliable

As a robustness check for his factor model, Ferrell examined Ripple's distributions of XRP and found that they had no statistically significant relationship with monthly XRP price returns. The SEC raises several baseless attacks on this portion of Ferrell's analysis.

*First*, the SEC disingenuously claims (at 55) that Ferrell studied *only* Ripple distributions and cannot opine on any other Ripple actions.   As explained above, any analysis of alpha necessarily includes an analysis of the impact of *all* Ripple actions.

*Second*, the SEC oddly claims (at 59) that consideration of Ripple's distributions is "irrelevant."   But the SEC itself has sought to prove—in its Amended Complaint, discovery materials, and expert reports—that Ripple's distributions have generated a Ripple-specific expectation of profits and (by increasing liquidity and XRP adoption) have led to increased XRP prices.   *E.g.*, Am. Compl. ¶¶ 79, 82 (claiming that "Ripple's planned distribution of XRP succeeded" and that "[t]he market price for XRP" rose "137,000%" from 2014 to 2017); *id.* ¶¶ 263-269 (claiming that Defendants made public promises to distribute XRP in a way that would increase XRP price and "engaged in many of these publicly-promised efforts").[26]   The SEC cannot credibly declare facts relevant when it alleges them and irrelevant when its allegations prove false.

---

regression from a single" RMSE score alone); J. Armstrong & F. Collopy, *Error Measures for Generalizing About Forecasting Methods:  Empirical Comparisons*, 8 Int'l J. Forecasting 69, 78 (1992) ("RMSE should not be used for generalizing about the level of accuracy of . . . forecasting methods because of its low reliability."); J. Armstrong, *Principles of Forecasting: A Handbook for Researchers and Practitioners* 459 (2001) ("Research findings since the early 1980s have effectively ruled out the RMSE as a measure for comparing methods.  Given that it is based on squaring forecast errors, it is unreliable[.]"); C. Willmott & K. Matsuura, *Advantages of the Mean Absolute Error (MAE) Over the Root Mean Square Error (RMSE) in Assessing Average Model Performance*, 30 Climate Rsch. 79, 81 (2005) ("RMSE . . . should not be used to compare the average performance of 2 or more models").

[26] *See also* SEC Interrog. Resps. at 20 (Interrog. No. 8) (listing "Ripple's institutional and market sales of XRP" and "other distributions of XRP" among actions forming expectation of

*Third*, the SEC baselessly argues (at 59) that Ferrell's analysis is unreliable because he did not personally examine whether any distributed XRP actually entered the market, or whether market participants were aware of the distributions.  But the Amended Complaint repeatedly alleges both of those things.  *E.g.*, Am. Compl. ¶ 69 ("Ripple sold XRP widely into the market"); *id.* ¶¶ 264-269 (describing Ripple's public communications regarding distributions).  Experts need not find facts themselves, *see Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000), and "may rely on factual assumptions as they prepare their reports," *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 171 n.20 (E.D.N.Y. 2019).[27]

*Fourth*, the SEC criticizes Ferrell's decision to design his model using 28-day periods.  It claims that if XRP price on the first and last day of a period was the same—but fluctuated in between—the model would not capture that short-term price movement, and that Ferrell's 28-day windows are thus unreliable.  That is all speculation; no SEC expert introduced any competing factor model with shorter windows to show whether any such short-term price movements occurred.  And even if the SEC were right, that would not help its case; it would be bizarre to say that investors expected profits based on Ripple's actions when Ripple's actions failed to produce any lasting price changes.  In any event, this criticism simply amounts to a disagreement with using monthly windows instead of shorter-term windows.  Ferrell focused on long-term price effects.  If XRP's price does not change between the first and last day of an analysis period, then, by

---

profits); Ex. 8, Expert Report of ████████ ¶ 9 (Oct. 13, 2021) ("████ Rep.") (claiming that "Ripple and its executives . . . took steps to influence the price of XRP," in part through distribution practices); Ex. 9, Expert Rebuttal Report of ████████ ¶ 56(b) (Nov. 12, 2021) ("████ Rebuttal Rep.") ("Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price."); Ex. 10, Expert Report of ████████ ¶ 48 (Oct. 4, 2021) ("████ Rep.") (claiming that the "manner . . . of Ripple's ongoing . . . distribution" of XRP "supported the bull case, and price, of XRP").

[27] To the extent the SEC's position is that Ferrell lacks a factual basis for his opinion because the SEC's own factual allegations are unsupported, that is another red flag about its case.

definition, no longer-term price change has occurred.  *See* Ferrell Tr. 97:10-19.  That sort of disagreement goes to weight, not admissibility.  *See supra* at 30-31.

Finally, the SEC (in an unexplained argument, at 60) disagrees with Ferrell's decision to denominate Ripple's distributions in terms of USD, as opposed to units of XRP.  That undeveloped assertion is not enough to preserve the argument.  *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001).  Regardless, the SEC presents no evidence that using USD would change the results— because it knows it would not.  As Ferrell testified at his deposition, prior to filing his report, he ran his analysis both ways and saw no change.  Ferrell Tr. 31:1-19.

### 4.      Ferrell's ODL Opinion Is Relevant and Admissible

The SEC claims that Ferrell's ODL opinion is irrelevant and that it consists solely of factual narrative.  The first point is legally wrong and the second misrepresents Ferrell's report.

Testimony that XRP is useful is clearly relevant.  *See supra* at 5-6.  The SEC devoted more than 20 paragraphs in its Amended Complaint, and extensive "expert" testimony, to an argument that ODL is not commercially viable and not a "significant non-investment 'use' for XRP."  *See id.*  Defendants should be permitted to muster evidence to rebut this theory.

To rebut the SEC's claim that ODL has no viable economic use, *see* Am. Compl. ¶ 365, Ferrell created a statistical price model to determine whether ODL could be more cost-efficient than traditional remittance methods under various scenarios involving differing levels of market liquidity.  Ferrell Rep. ¶¶ 154-162.  He concludes that over time ODL failure rates and cost-efficiencies improved as XRP markets became more liquid, *id.* ¶¶ 154-159 & Exs. 17-20, and that at certain levels of liquidity, ODL would represent a viable alternative to traditional remittance methods for transactions of certain sizes, *id.* ¶¶ 160-161.  He then uses that empirical conclusion to explain that Ripple's business efforts (including paying rebates to remitters) represent rational methods of seeking to increase the "use case" for ODL, similar to that of other now well-

established companies.  *Id.* ¶¶ 162-166.  All of these opinions are within Ferrell's expertise and are relevant to the SEC's allegation that ODL is not commercially viable as a use case.

Without any development (or acknowledgment of the cost-modeling analysis Ferrell performs), the SEC claims (at 62) that Ferrell's conclusions are "not the product of meaningful analysis but largely consist[] of a recitation of record facts, sometimes in summary form."  But Ferrell's entire ODL opinion relies on detailed expert analysis and opinion, and every fact he mentions provides helpful context to support and understand his analysis.  It is well-settled that an expert is free to provide context for his opinions, and Ferrell permissibly does so here.  *Reach Music Publ'g, Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013).[28]

### 5.    Ferrell's Opinion That XRP Functions as Currency Is Relevant and Admissible

The SEC attacks as inadmissible (at 60-62) Ferrell's opinion that XRP functions as a currency; that argument is misplaced, for the reasons explained above.  XRP's functioning as a currency is plainly relevant to whether it is "ordinarily and commonly considered [a] securit[y] in the commercial world," whether it is a "currency" exempt from the federal securities laws, and whether Defendants had fair notice that their conduct could have violated the securities laws.  *See Marine Bank*, 455 U.S. at 559; *see also supra* at 6-7.  The SEC's further assertion (at 62) that Ferrell's conclusion does not render it "impossible" for XRP to be a security confuses whether the opinion is dispositive for whether it is relevant.  *See* Fed. R. Evid. 401(a).

---

[28] The SEC also distorts Ferrell's report by claiming (at 62) that his cost-modeling analysis of MoneyGram data simply "summariz[es] MoneyGram's XRP transfers related to ODL, relying on voluminous MoneyGram transaction data."  That is not true (Ferrell analyzes that data to draw conclusions); but even if it were, it would not be a basis for exclusion.  An expert may help the jury by "synthesiz[ing] dense or voluminous" data.  *Marvel Characters Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013).

The SEC's argument that Ferrell's currency opinion is irrelevant is also misplaced because the federal securities laws expressly exclude "currencies" from the definition of "security"—so if XRP is a currency, then as a matter of law, it is not a security.  *See* 15 U.S.C. § 78c(a)(10) (Securities Exchange Act of 1934 excluding "currency" from definition of "security"); *Gary Plastic Packaging*, 756 F.2d at 238  (scope of 1934 and 1933 Acts is "the same").  The SEC tries (at 61) to avoid that conclusion by pointing to a single dictionary from 1933 that defined "currency" as government-backed, but this issue of statutory interpretation does not turn on what the SEC can pull out of a lone dictionary, and the SEC's preferred definition is by no means the only one from that era.  *See Oxford English Dictionary:  A New English Dictionary on Historical Principles*, vol. II.C, 1270 (1933) ("Of money:  The fact or quality of being current or passing from man to man as a medium of exchange; circulation."); *New Century Dictionary* 364 (1933) ("circulation, as of coin; also, that which is current as a medium of exchange").  In any event, the question goes to the parties' competing legal theories, and so should not be resolved on a *Daubert* motion.  *See supra* at 1-2.

### 6.      Ferrell's Remaining Opinions Are Admissible

### a.      Ferrell's Opinions Are Permissible Economic Testimony

The SEC's remaining critiques of Ferrell's testimony are baseless, and rooted in willful misunderstandings of his testimony.  In a single sentence (at 53-54), the SEC cites—without any analysis or discussion—dozens of paragraphs where Ferrell allegedly offers "legal opinion[s]."  Generally speaking, "a 'single, conclusory, one-sentence argument' is insufficient to raise an issue in the first instance."  *SOHC, Inc. v. Zentis Food Sols. N. Am., LLC*, 2014 WL 6603951, at *1 (S.D.N.Y. Nov. 20, 2014) (citation omitted).  Regardless, nothing in the paragraphs that the SEC points to are legal opinions.  "The crucial distinction" between impermissible "legal opinions" and permitted expert testimony "is that an expert may not draw the final inference between relevant

evidence and the ultimate conclusion the jury will be asked to make. . . .  Within the courts of the

Second Circuit, an expert may lead a jury to the precipice of a verdict, but she may not instruct

them to leap."  *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 482,

505 (S.D.N.Y. 2009).  Thus, it is generally accepted that an expert is permitted to "reach[] factual

conclusions accompanied by economic analysis on mixed questions of law and fact that bear on

issues relevant to" the case.  *Aluminum Warehousing*, 336 F.R.D. at 32.  Ferrell presents a purely

economic retort to the SEC's mischaracterization of XRP as having the "economic reality" of a

security in the Amended Complaint, *e.g.*, Am. Compl. ¶¶ 237, 241, 282-289; he never crosses the

line into offering legal opinions.[29]

The SEC also argues (at 54) that "at least some of [Ferrell's] improper legal opinions are

also irrelevant."  This bare assertion is even less developed than the last one; the SEC does not

even say which paragraph(s) in Ferrell's report it believes to be irrelevant.  The one example it

gives, without citation (at 54), is that Ferrell opines that Ripple's contracts "do not provide XRP

purchasers with certain rights traditionally associated with common stock such as dividends or

---

[29] Though the SEC did not develop this argument, we will detail why it is wrong.  The SEC
points to 71 paragraphs of Ferrell's report as supposedly offering legal opinions.  Some of those
explicitly disclaim offering legal opinions.  *E.g.*, Ferrell Rep. ¶ 11.  Others describe the economic
relationship in Ripple's contracts with XRP purchasers, *e.g.*, *id.* ¶¶ 15, 33-81, and compare them
with Ripple's private equity ownership contracts, *id.* ¶¶ 82-83, demonstrating that there are
important differences between XRP and Ripple stock; and the economic independence of XRP
purchasers, *id.* ¶¶ 140-145.  The SEC also says that Ferrell offers a legal opinion in rebutting the
SEC's expert, ███.  Ex. 11, Expert Rebuttal Report of Allen Ferrell ¶¶ 11, 14 (Nov. 12, 2021)
("Ferrell Rebuttal Rep.").  Those citations, too, yield no legal opinions.  Ferrell simply notes that
███ fixation on how Defendants executed offers and sales of XRP is *economically* irrelevant
to an analysis of XRP's character in commerce because none of the behaviors ███ identified is
unique to securities markets.  *Id.* ¶¶ 11, 33, 42, 47-48, 62, 65; *see also* Ferrell Rep. ¶¶ 84-89.
Ferrell also critiques ███ review of Ripple trading days and explains how that analysis proves
nothing about the impact of Ripple efforts on XRP's long-term price variation.  Ferrell Rebuttal
Rep. ¶¶ 14, 31, 42, 47.  "A rebuttal expert, by nature, criticizes the methodology and/or opinions
of another."  *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 2022 WL 576089, at *2 (S.D.N.Y. Feb. 25,
2022).

voting rights."  But that fact is relevant to determining whether XRP has "the characteristics of a security," *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 559 (1979), and to the economic substance of the transactions, *see Landreth Timber Co. v. Landreth*, 471 U.S. 681, 688 (1985).  Indeed, in *Tcherepnin v. Knight*, which the SEC cites (at 54), the Supreme Court emphasized that the withdrawable capital shares at issue, which it concluded were securities, entitled holders to both dividends and precisely defined voting rights.  389 U.S. 332, 343-44 (1967).  That the absence of any such rights is unhelpful to the *SEC's* theory of the case is no basis to exclude Ripple's expert testimony.  *See Olin*, 2018 WL 1901634, at *21; *Pfizer*, 819 F.3d at 659; *see also supra* at 1-5.

### b.   Ferrell's Rebuttal and Supplemental Reports Are Substantively and Procedurally Proper

The bulk of the SEC's remaining criticisms improperly attempt to narrow the scope of how Ferrell can rebut ████ and ████.  They rely primarily on mischaracterizing Ferrell's testimony and misreading the applicable law.

*First*, the SEC is wrong to characterize (at 64) Ferrell's rebuttal to ████ as outside the scope of ████ opinion.  While ████ claims that Defendants "took steps to influence the price of XRP" and that "XRP prices generally moved upward or stopped declining" as a result, ████ Rep. ¶ 9; *see also* Ex. 12, Dep. Tr. of ████ 103:19-104:4 (XRP "moved in a manner consistent with" Ripple actions), Ferrell concludes that this is empirically wrong, and based on no methodology, Ferrell Rebuttal Rep. ¶¶ 7-11.  Critiques of this sort are squarely within the realm of acceptable expert rebuttal and are not excludable as "beyond the scope."  *See supra* at 8-10.

*Second*, Ferrell's critique that ████ improperly adjusts XRP prices on days ████ identified as "non-news days" is not, as the SEC claims (at 64-65), "scientifically unsound."  A judge in this District endorsed the exact critique (also authored by Ferrell) in excluding another expert who,

like ▮▮▮▮, "adjust[ed] his estimate" of a stock's value "on days [the expert] designate[d] as" non-news days.  *In re Bear Stearns Cos. Sec.*, 2016 WL 4098385, at *10 (S.D.N.Y. July 25, 2016).

Nor did either Dr. M. Laurentius Marais or Ferrell ever endorse ▮▮▮▮ methodology, as the SEC claims; the SEC misleadingly cites to a chart in Marais's report that describes cumulative investment returns based on actual (not adjusted) pricing data, and a 2007 paper Ferrell co-authored that forward-casts actual (not adjusted) price inflation.[30]

*Third*, the SEC launches (at 65) a volley of allegations that Ferrell misreads ▮▮▮▮ Criticisms of that sort "can be properly addressed through cross-examination," and go to weight, not admissibility.  *Borgognoni v. City of Hattiesburg*, 2016 WL 6088593, at *1 (S.D. Miss. June 10, 2016) (refusing to exclude an expert for allegedly "misreading" plaintiff's expert report).  They are also wrong:  the SEC's criticism turns on its misunderstanding of alpha, *see supra* at 28-29, 32, and quoting Ferrell out of context.  The SEC asserts (at 65) that Ferrell "testified that it is not impossible to perform an event study when the market is not efficient."  That is not what Ferrell actually said, and misses the point.  An expert can *perform* an event study in an inefficient market (that is, in fact, a way to test whether a market is efficient).  But he cannot use an event study to *draw conclusions* about the relationship between events and asset prices in an inefficient market—

---

[30] In their paper about stock-drop misrepresentation cases, Ferrell and Saha calculated the impact of a misrepresentation on a stock's price over time by:  noting the stock's actual price, subtracting the but-for price, determining the difference (the "inflation"), and adding that inflation to prices on subsequent days.  *See* A. Ferrell & A. Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action:  The Implication of Dura Pharmaceuticals, Inc. v. Broudo*, 63 Bus. Law. 163, 185 (2007).  In contrast, ▮▮▮▮ took his but-for price from a "Ripple news" day, carried it over to the following "non-news" day, and then calculated a *new* but-for price based on actual market returns.  An example is illustrative:  if Ferrell found the actual price of stock X on a Monday (an event day) was $100, but should have been $70, he concludes the inflation was $30.  On Tuesday (a non-event day), if the price of stock X moves to $200, Ferrell again subtracts the $30 of inflation—yielding $170.  ▮▮▮▮ on the other hand, would say that if on Monday the price of XRP was $100, but should have been $70, on Tuesday when the price of XRP doubled, the but-for price is $140.

precisely the defect in ███ report that Ferrell identified.  *See* Ex. 13, Suppl. Expert Report of Allen Ferrell ¶¶ 4-5 (May 13, 2022) ("Ferrell Suppl. Rep."); Ferrell Tr. 75:20-76:13, 94:17-95:9, 98:4-12; *see also* ECF No. 547 at 3-6.  Factor models, on the other hand, *need not* be conducted in efficient markets—contrary to the SEC's assertion (at 65), which notably lacks any supporting citation.  *See* Ferrell Suppl. Rep. ¶ 16 & n.23.[31]

*Fourth*, and finally, the SEC seeks (at 63) to exclude opinions Ferrell offered in response to ███ improperly submitted "supplemental" expert report by arguing that the report merely bolsters Ferrell's original report.  This is a stunning attempt by the SEC to take advantage of misconduct for which the Court has already ordered sanctions.  Long after the deadlines for expert reports had passed, ███ filed a report providing "a new empirical analysis" prepared "explicitly in response to" Ferrell's report.  ECF No. 469 at 2.  The Court sanctioned the SEC, finding that the agency "ha[d] conducted itself improperly by serving an unauthorized supplemental report on the last day of discovery," and provided Defendants the opportunity to file additional reports responding to ███ "new analysis."  *Id.* at 1, 4.  Ferrell did so:  he explained why ███ new analysis was deficient.  Because ███ belated analysis responded to Ferrell's report, that supplemental report necessarily referred to Ferrell's statistical analyses of alpha.

The SEC tries to recast that Court-authorized supplement as an attempt to "bolster" Ferrell's original conclusions, but it has no basis to do so.  Ferrell's supplemental report "is archetypal rebuttal testimony:  it identifies a flawed premise in [███ supplemental] report that casts doubt on both that report's conclusions and its author's expertise."  *Sci. Components*, 2008

---

[31] *See, e.g.*, Bebchuk et al., *Learning and the Disappearing Association Between Governance and Returns* at 323-48 (using factor models to measure alpha over multiple years when the market, according to the authors, does not quickly price public information concerning corporate governance—*i.e.*, is not efficient).

WL 4911440, at *2.  Here, the "flawed premise" is that ███ claims that "virtually the entire price of XRP as of October 28, 2020 was a function of" Ripple news.  Ferrell Suppl. Rep. ¶ 3; Ex. 14, Suppl. Expert Report of ████████ ¶ 9 (Feb. 28, 2022) ("███ Suppl. Rep.").  "████ but-for counterfactual XRP prices mathematically imply an average excess 28-day return associated with news about Ripple."  Ferrell Suppl. Rep. ¶ 15.  If such an excessive return existed, the alpha in Ferrell's factor model would have been enormous.   But it was not—it was statistically indistinguishable from zero.  Ferrell Rep. ¶¶ 16-21.  Given that ███ offered no criticism of Ferrell's arithmetic, that rebuttal casts significant doubt on whether ███ findings are credible.[32] The SEC's attempt to cast Ferrell's direct responses to ███ as improper bolstering of his original report lacks any genuine basis in Ferrell's actual opinions.

The SEC also claims (at 63) that Ferrell's supplemental report improperly references analyses and sources not cited in Ferrell's original report.  But it is entirely permissible for a rebuttal expert to "offer new analysis and calculations" in a rebuttal report so long as they were undertaken "for the purpose of rebutting or critiquing the opinions of" the opposition experts. *Assoc. Elec.*, 2013 WL 5771166, at *3.   ███ improperly filed a report responding to Ferrell's explicit critiques of his work; Ferrell's responses, to the extent they involved citing additional academic work in support of his argument or referencing analyses on which he did not previously rely, properly rebut ███ new conclusions.

---

[32] Indeed, despite ███ assertion that he tested various "holding period[s]" for investors to prove that it was somehow possible to predict Ripple events and invest in XRP before they occurred, ███ Suppl. Rep. ¶¶ 2-22, Ferrell proved that alpha remains statistically insignificant regardless of the window he used to test the existence of ███ alleged excess returns.

### C.     Daniel Fischel

#### 1.     Fischel's Background and Opinions

Professor Daniel Fischel is a rebuttal expert who provides critical expert testimony challenging the opinions of ████, the SEC's primary economic expert.  Fischel's opinions support Defendants' argument that ████ event study—which ████ asserts proves that "XRP prices react to news about Ripple's actions"[33]—is methodologically flawed and triggers this Court's gatekeeping responsibility to exclude unreliable opinion testimony.

Fischel is one of the nation's leading experts on the proper use of event study methodology in securities law cases and is uniquely qualified to rebut ████ opinions.  *See* Ex. 15, Expert Rebuttal Report of Daniel R. Fischel ¶¶ 27, 32 (Nov. 12, 2021) ("Fischel Rebuttal Rep.").  Fischel has written extensively about event studies, including a seminal article cited favorably by this Court.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 n.24 (1988) (citing D. Fischel, *Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities*, 38 Bus. Lawyer 1 (1982)); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 77-78 (S.D.N.Y. 2015) (citing D. Fischel, *Efficient Capital Markets, The Crash, and the Fraud on the Market Theory*, 74 Cornell L. Rev. 907, 910-11 (1989)).  He has published two books and approximately 50 articles addressing the economics of corporate law and financial markets, testified as an expert in hundreds of cases, and been cited by courts at all levels, including the U.S. Supreme Court.  *See* Fischel Rebuttal Rep. ¶ 2 & App. A.  The SEC frequently retains him as an advisor on economic issues.  *Id.*

████ event study purports to show that Ripple's actions "coincide[d] with" XRP price increases "more frequently than random chance could explain."  *See* ████ Rep. ¶¶ 47, 52.  From

---

[33] Ex. 14, Amended Expert Report of ████████ ¶ 12(a) (Oct. 6, 2021) ("████ Rep.").

this, ▓ concludes that "the most likely explanation . . . is that the [Ripple] news caused the price." ▓ Tr. 252:17-19; *see also* ▓ Rep. ¶ 12 ("XRP prices react to . . . Ripple's actions").

Fischel offers four opinions rebutting ▓:  (1) that ▓ event study fails to show that Ripple's actions were a primary cause of XRP price increases; (2) that ▓ methodology fails to control for confounding factors; (3) that ▓ methodology is unreliable because XRP trades in an inefficient market; and (4) that, even in a properly conducted event study, identification of a relationship between abnormal price movements for an asset and news announcements made by a company does not indicate whether the asset is a security.  *See* ECF No. 547 at 3-6, 8-10.

### 2.    Fischel's First and Fourth Opinions Are Admissible

The SEC does not dispute Fischel's qualifications to offer these opinions, nor does it challenge his second and third opinions.  Instead, the SEC seeks to exclude only Fischel's first and fourth opinions, for four reasons.  *First*, the SEC argues that these opinions are improper rebuttal testimony because Fischel references the *Howey* test in explaining his opinions, while ▓ does not.  The SEC thus claims Fischel is rebutting an argument that ▓ did not make.  *Second*, the SEC argues the opinions must be excluded because they are legal conclusions about *Howey*.  *Third*, the SEC argues that Fischel misstates the *Howey* test.  *Fourth*, the SEC argues that Fischel's fourth opinion is unsupported by any testing or accepted economics standard.  None of these arguments has merit for the reasons set forth below.

#### a.    Fischel's First and Fourth Opinions Are Proper Rebuttal Testimony

Proper expert rebuttal testimony is intended to "contradict or rebut evidence on the same subject matter" in the opposing party's expert report.  Fed. R. Civ. P. 26(a)(2)(D)(ii).  The phrase "same subject matter" is broadly construed.  *See Scott*, 315 F.R.D. at 44 (citation omitted).  "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the

evidence of the adverse party." *Id.* (citation omitted); *see also Aluminum Warehousing*, 336 F.R.D. at 29-30 ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." (citation omitted)); *In re Blech Sec. Litig.*, 2003 WL 1610775, at *20 (S.D.N.Y. Mar. 26, 2003) (qualifying Fischel as an expert and holding that "[c]ourts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party").

The SEC offers no argument that remotely suggests Fischel's rebuttal opinions are improper. Fischel identifies serious methodological errors in ███ event study and challenges ███ resulting opinions based on those errors. Fischel properly references *Howey* to provide context for his explanation of why ███ methodology cannot establish whether an asset is a security or provide reliable results, and, therefore, would not be helpful to the jury.

The SEC asks this Court (at 78) to exclude Fischel's criticisms of ███ opinions because ███ "make[s] no mention of *Howey* or any of *Howey*'s elements for determining the existence of offers or sales of investment contracts." But the SEC misinterprets Fischel's rebuttal. Fischel is not rebutting ███ because of anything ███ said about *Howey*. Rather, he is rebutting ███ opinion about the extent to which Ripple's actions affected the price of XRP, which bears directly on whether "XRP holders profit solely or primarily from the efforts of Ripple"—one of *Howey*'s requirements. Fischel Rebuttal Rep. ¶ 20. Fischel references the *Howey* test—which the SEC has repeatedly argued governs this case—to provide context for his rebuttal. Fischel's opinion is on squarely the "same subject matter" as ███ opinions and therefore is admissible rebuttal testimony.

      **i.**      **Fischel Properly Opines That ▮▮▮ Failed To Show Ripple's Actions Were a Primary Cause of XRP Price Increases**

In Fischel's first opinion, he explains why ▮▮▮ event study could not show that Ripple's actions were a primary cause of XRP price increases. As Fischel explains, contrary to the conclusions ▮▮▮ and the SEC try to draw from it, ▮▮▮ event study in fact shows (1) that the majority of days with significantly positive XRP returns did *not* coincide with any Ripple actions, and (2) that the majority of days with Ripple actions did *not* coincide with days with significantly positive XRP returns. *See* Fischel Rebuttal Rep. ¶ 20. Fischel explains why ▮▮▮ event study thus does not support ▮▮▮ opinion "that XRP holders profit solely or primarily from the efforts of Ripple." *Id.*

Fischel's opinion properly rebuts "the soundness of [▮▮▮] conclusion[]," *see Scott*, 315 F.R.D. at 47, by demonstrating that the data generated by ▮▮▮ own study actually support the opposite conclusion: that "76.3% to 89.5% of days with significantly positive XRP returns had no news about Ripple's efforts," and that "70.5% to 84.8% of days with news about Ripple's efforts . . . did not have significantly positive XRP returns." Fischel Rebuttal Rep. ¶ 20. That is proper rebuttal testimony. *See Coquina Invs. v. Rothstein*, 2011 WL 4949191, at *3 (S.D. Fla. Oct. 18, 2011) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts.").

      **ii.**      **Fischel Properly Explains the Inherent Limitations in ▮▮▮ Event Study**

In Fischel's fourth opinion, he relies on his extensive expertise with the event study methodology to explain why that methodology cannot yield economic information that distinguishes whether an asset is a security. *See* Fischel Rebuttal Rep. ¶¶ 31-34. Fischel explains that, in an efficient market, an event study identifies abnormal movements in "asset prices" that correspond to "publicly available information about the asset—regardless of whether or not the

asset is a security." *Id.* ¶¶ 32, 33.  Thus, even if "XRP prices reacted around the time of certain announcements made by Ripple," that finding "cannot and does not establish whether XRP holders are engaged in a 'common enterprise' to share profits or returns generated solely or primarily by the entrepreneurial or managerial efforts of Ripple." *Id.* ¶ 34.  Fischel explains that ███ event study will identify abnormal price movements regardless of whether an asset is a security, and therefore does not yield meaningful evidence that supports the SEC's argument that XRP is an investment contract under *Howey*.  *See id.* ¶ 32.  This critique is also proper rebuttal testimony. *See Dollar Rent A Car Sys., Inc. v. P.R.P. Enters., Inc.*, 242 F. App'x 584, 589 (10th Cir. 2007) (a rebuttal expert can testify about the "limits of [another expert's] methodology"); *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *12-13 (S.D.N.Y. Sept. 16, 2015) (a rebuttal expert "[p]oint[s] out alleged errors or inconsistencies that another expert relies on" and "proffers opinions as to methodological errors").

Fischel offers proper rebuttal testimony explaining why ███ event study methodology does not generate useful information about whether an asset is a security.  Given that the SEC has repeatedly argued that *Howey* sets forth the exclusive legal standard governing this case, *see, e.g.*, Mot. at 5-7, there is nothing inappropriate about Fischel explaining his opinions by reference to the *Howey* framework.  Nor is there any basis to exclude Fischel's opinions merely because he mentions *Howey* and ███ does not.  Tellingly, the SEC's Motion does not explain what ███ analysis *is* relevant to or probative of—nor does ███ in his report.  If ███ testimony is not relevant to any prong of the *Howey* test, then it is unclear why the SEC has proffered it at all.

### b.      Fischel's First and Fourth Opinions Are Not Legal Conclusions

The SEC next argues that, by referencing the *Howey* test in his first and fourth opinions, Fischel is offering "impermissible legal conclusions about 'governing law,' 'technical legal terms,'

and 'legal requirements.'" Mot. at 81. But the SEC misconstrues Fischel's opinions and mischaracterizes his references to *Howey*.

An expert opinion constitutes an inadmissible legal conclusion "if it will 'usurp . . . the role of the trial judge in instructing the jury as to the applicable law.'" *Duncan*, 42 F.3d at 101 (citation omitted). Fischel's opinions do not do this, because they do not say anything about how the Court or jury should interpret or apply the *Howey* test. *See Fiataruolo v. United States*, 8 F.3d 930, 942 (2d Cir. 1993) (rejecting "simple bald assertion[s] of the law"); *see also* Ex. 17, Dep. Tr. of Daniel Fischel 34:8-35:3, 101:14-102:8, 103:15-104:8, 145:8-148:16. He merely recites the *Howey* factors, *see* 328 U.S. at 298-99, and uses them as a framework for his economic analysis discussing the deficiencies in ████ methodology, *see, e.g.*, Fischel Rebuttal Rep. ¶¶ 18, 20, 31, 34. This is entirely permissible. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 WL 1971538, at *14 (S.D.N.Y. May 7, 2008) (admitting expert testimony where the expert did not "testify as to the legal meaning" of a term but instead "permissibly state[d] a factual conclusion supporting a legal argument); *Aluminum Warehousing*, 336 F.R.D. at 32 (expert who did "not conclusorily declare that class certification would be inappropriate, or provide an unadorned [legal] conclusion" was offering "economic, not legal, conclusions"). Courts have routinely held that "mere reference to legal standards . . . does not mean that an expert has intruded upon the domain of the court." *Lyondell Chem. Co. v. Albemarle Corp.*, 2007 WL 9711337, at *2 (E.D. Tex. Feb. 26, 2007).

Fischel's first opinion is not that the SEC has or has not satisfied *Howey*: it is that ████ ignores evidence generated by his own models that directly contradicts his conclusion that XRP prices rise in response to Ripple actions. This is critical evidence for a jury to consider when deciding whether, as ████ suggests, "XRP holders profit solely or primarily from the efforts of

Ripple."  Fischel Rebuttal Rep. ¶ 20.  And Fischel's fourth opinion is not that XRP is or is not a

security.  It is that ████ event study was bound to capture a certain degree of XRP price

movement in response to public information and would do so whether XRP was a security or not,

and thus the results of the event study do not shed any light on whether XRP is a security.  *Id.*

¶¶ 32-34.  This critique will also aid the jury in evaluating whether XRP is an investment contract

under *Howey*.  *See id.* ¶ 31.

The SEC conflates two separate things:  an opinion about factual issues relevant to a legal

test, and an opinion about whether the legal test is satisfied.  It is well-established that an expert

opinion "is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), and

the Second Circuit instructs district courts to "distinguish between factual conclusions that may be

included in an expert's testimony—though they embrace an ultimate issue to be decided by the

jury," and "testimony stating ultimate legal conclusions based on those facts," *Bilzerian*, 926 F.2d

at 1294; *see also Fiataruolo*, 8 F.3d at 942 (permitting expert testimony that defendant violated

established accounting principles where expert "gave the jury helpful information beyond a simple

statement on how its verdict should read [and] couched his opinion specifically 'on the evidence

[he] looked at and the work that he did'"); *SEC v. U.S. Env't, Inc.*, 2002 WL 31323832, at *5

(S.D.N.Y. Oct. 16, 2002) ("conclusion that [defendant] was an 'essential participant' in the effort

to increase the price of USE stock is a factual one," not a legal one, "arrived at by studying the

trading records of that stock and concluding that the increase in price could not have occurred

without [defendant's] participation").  Fischel's critiques fall squarely in the first category, as

"factual conclusions that are dispositive of particular issues if believed" by the jury.  *United States

v. Ruggiero*, 928 F.2d 1289, 1305 (2d Cir. 1991) (citation omitted).[34]

---

[34] The SEC even goes so far as to argue (at 81) that "Fischel should not be allowed to offer
opinions which use language from *Howey*."  It is entirely proper for an expert to reference or situate

Because the SEC mischaracterizes Fischel's opinions, none of the cases the SEC cites provides a basis to exclude his testimony.  In each case, the excluded expert sought to offer opinions "tell[ing] the jury what result to reach" using the language of the governing legal standard, without weighing in on dispositive factual issues.[35]  *See* Fed. R. Evid. 704 advisory committee's note to 1972 proposed rules.  The SEC has not identified any case in which a court excluded an expert's testimony that addressed the limits of another expert's opinion by reference to the legal standard.  *Compare* Mot. at 80-81 (citing cases) *with Aluminum Warehousing*, 336 F.R.D. at 32 (denying motion to exclude where expert opinion "usefully examined issues relevant to whether the[] requirements of [the governing legal standard] were met" and "reache[d] factual conclusions accompanied by economic analysis on mixed questions of law and fact").

---

his analysis in the context of what the SEC argues is the governing legal standard.  *See Aluminum Warehousing*, 336 F.R.D. at 32 ("contrary to the FLPs' contentions, [the expert's] use of the terms 'individualized inquiry' and 'conflicts' in his report do not transform his empirical and economic analysis into 'testimony stating ultimate legal conclusions'" (citation omitted)).

[35] *See United States v. Scop*, 846 F.2d 135, 138, 140 (2d Cir. 1988) (expert opined "that the stock . . . was manipulated and that certain individuals were active participants and material participants in the manipulation of that stock"; the court excluded the opinion because the expert did not even "attempt to couch the opinion testimony at issue in even conclusory factual statements"); *Choi v. Tower Research Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021) (expert "identifie[d] a handful of [governing] rules," "cite[d] several cases and [] documents that [the expert] claim[ed] support[ed] his interpretation of those rules," "advance[d] policy arguments," "'offer[ed] scant input' on the issues," and was "little more than a legal brief that parrot[ed] plaintiffs' arguments" (citation omitted)); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 470-71 (S.D.N.Y. 2005) (expert opined "that the actions of certain parties . . . constituted a purchase or sale of a security," that certain information constituted "material, non-public information," that individuals "acted to manipulate the market price for . . . stock" and "'violated' a 'direct fiduciary duty . . .' by failing to keep '[i]nside [i]nformation' . . . 'confidential,'" and that "the conduct of certain defendants and non-parties 'was wrongful and violative of the criminal law'" (citations omitted)); *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (expert opined that "all 'economically material' information has been disclosed").

c.        **Fischel's First and Fourth Opinions Do Not Misstate the Law**

The SEC claims (at 81-84) that Fischel's opinions should be excluded because they misstate the law.  But the SEC does not argue that Fischel has considered the wrong legal test or misquoted that test.  Instead, as the SEC's chart (at 82) reveals, the SEC merely quibbles with the words Fischel uses to paraphrase *Howey*.  Nothing Fischel says about *Howey* is incorrect or misleading.  The SEC takes issue with two variations in his description of the legal standard.

*First*, the SEC observes (at 82-83) that Fischel uses the phrase "engaged in" when stating that ███ event study cannot support the SEC's claim that "XRP holders are engaged in a 'common enterprise' with Ripple."  The SEC argues (at 82) that Fischel's formulation somehow suggests a purchaser of XRP must be "actively engaged" in Ripple's business (even though Fischel never used the word "actively.")  Regardless, paraphrasing rather than quoting the *Howey* test hardly justifies excluding Fischel's opinion, especially as courts use the same phrasing when describing the *Howey* test.  *See, e.g.*, *Silverstein v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 618 F. Supp. 436, 439 (S.D.N.Y. 1985) ("no interpretation of the facts in the instant action would meet the *Howey* criterion that plaintiff be *engaged in a 'common enterprise'*" (emphasis added)).  And nothing in Fischel's opinions states that the SEC must prove that a purchaser of XRP be "actively engaged" in Ripple's business, nor do any of his opinions even remotely suggest as much.[36]

*Second*, the SEC argues (at 82-84) that Fischel's criticism of ███ opinions improperly focuses on the "actual impact of Ripple's efforts, as opposed to what Ripple led investors to expect," because Fischel's report did not repeat verbatim the phrase "led to expect" from *Howey*.

_____

[36] If there is a risk of jury confusion on this issue—and it is not clear why there would be— the Court can address it with an instruction.  *See United States v. Coyle*, 1993 WL 378332, at *7 (S.D.N.Y. Sept. 17, 1993) (where "there could be juror confusion" on an issue, "the jury instructions will clarify [it]").

That is facially incorrect:  Fischel's rebuttal report uses the phrase "led to expect" three times (at ¶¶ 7, 26 n.60, and 31).  To the extent Fischel omitted the phrase, it was only because ███ event study methodology focused on the "actual impact" of Ripple's efforts—not what Ripple "led [purchasers of XRP] to expect," Mot. at 83—and that is the opinion Fischel is rebutting.

In any event, Fischel's report *does* use the phrase "led to expect" in appropriate places.  For example, he states that "the event study methodology used by [███] cannot and does not establish whether XRP holders . . . *were led to expect profits or returns* generated solely or primarily from the entrepreneurial or managerial efforts of Ripple." Fischel Rebuttal Rep. ¶ 31 (emphasis added).  It is not a basis to exclude his opinion that he (like *Howey* itself) does not repeat the exact same phrasing every time he discusses the standard.[37]

### d.      Fischel's Fourth Opinion Is Reliable

Finally, the SEC argues (at 85) that Fischel's fourth critique of ███ is unreliable because of a "lack of testing" and because he did not rely on an "accepted standard."  But that argument misses the mark.  Whether an expert's methodology "has been or can be tested" or "has gained general acceptance in the relevant scientific community," *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 48 (2d Cir. 2004), may be useful considerations where an expert advances scientific testimony.  But they are a poor fit where the expert offers opinions based on economic theory.  *See infra* at 82-83; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 ("the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case").  More fundamentally, Fischel does not offer a competing methodology

---

[37] The SEC also claims (at 84) that Fischel "ignore[s] that 'the word "solely" should not be construed as a literal limitation,'" but never explains how Fischel is construing "solely" as a literal limitation.  In fact, Fischel repeatedly uses the phrase "solely or primarily."  *See, e.g.*, Fischel Rebuttal Rep. ¶ 20; Ex. 18, Suppl. Expert Report of Daniel R. Fischel ¶ 11 (May 13, 2022).

in support of his fourth opinion.  Rather, he criticizes ████ methodology because it does not and cannot produce any economic information about whether XRP is a security.

It is black-letter law that "a rebuttal witness . . . [i]s under no obligation to create models or methods of his own." *Scott*, 315 F.R.D. at 51; *see also Henkel v. Wagner*, 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (a rebuttal expert "does not need a 'model or theory' to identify purported flaws in [an expert's] testimony. . . .  Rather, she needs only her expertise and the 'method' identified at the beginning of her report—namely, reviewing the documents in this case, along with [the opposing expert's] report, and arriving at an opinion as to [the opposing expert's] analysis"); *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 78 (S.D.N.Y. 2017) ("[r]ebuttal experts . . . have a 'less demanding task' because 'they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' expert'" (quoting *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007))).  Nor must a rebuttal expert "identify alternative or better methodologies," *Joffe v. King & Spalding LLP*, 2019 WL 4673554, at *14 (S.D.N.Y. Sept. 24, 2019), or "offer a competing analysis," *Aluminum Warehousing*, 336 F.R.D. at 29-30 (citation omitted).  Rather, it is sufficient that a rebuttal expert's opinions "concern criticizing [the analysis] presented by another party."  *Id.* at 29 (citation omitted).

The cases on which the SEC relies do not support its position.  In each, an expert was affirmatively offering a particular methodology with which the court found flaws; none excluded a rebuttal opinion merely because it critiqued another expert's methodology without employing one of its own.  *See Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *6 (S.D.N.Y. Mar. 17, 2022) (excluding a rebuttal expert's *independent study* and an *opening* expert's opinions due to methodological flaws in both); *CFTC v. Wilson*, 2016 WL 7229056, at *11 (S.D.N.Y. Sept. 30, 2016) (excluding portions of an *opening* expert's opinions because the expert's methodology was

not generally accepted); *CFTC v. Moncada*, 2014 WL 2945793, at *3 (S.D.N.Y. June 30, 2014) (excluding an *opening* expert who drew conclusions about market data without disclosing any methodology or actually looking at most of that data).

Fischel is one of the nation's leading experts on the proper use of event study methodology in securities law cases.  He is uniquely qualified to offer rebuttal opinions addressing the weaknesses in ▮▮▮ event study, and on the methodological flaws that are inherent in an event study that uses pricing data obtained from an inefficient market.  The SEC has offered no support for excluding these opinions merely because Fischel did not offer a competing methodology in support of his critiques of ▮▮▮.[38]

---

[38] The SEC's passing mentions (at 77, 80) of Fischel's failure to conduct his own event study fall flat for similar reasons.  Given Fischel's opinion that it is inappropriate to use an event study in an inefficient market, it would be illogical for Fischel to have conducted an event study of his own.  There is certainly no requirement that he do so.

**D.      M. Laurentius Marais**

**1.      Marais's Background and Opinions**

Dr. M. Laurentius Marais filed two reports in this case:  a rebuttal report and a supplemental rebuttal.  Both discuss the methodological flaws in ▮▮▮ event study and counterfactual price calculation, and describe how ▮▮▮ work does not support his opinion that Ripple's actions impact XRP's price.  The SEC seeks to exclude both reports:  the rebuttal report because it is supposedly beyond the scope of ▮▮▮ opening report and because it is supposedly unreliable and contradicted by Marais's supplemental report; and the supplemental report because it is supposedly unreliable.  Each of these arguments is baseless and reflects fundamental misunderstandings of Marais's testimony and the role of a rebuttal expert.

Marais holds three degrees in mathematics and statistics from Stanford University, including a Ph.D. in Business Administration and Mathematics.  Ex. 19, Expert Rebuttal Report of M. Laurentius Marais ¶ 1 (Nov. 12, 2021) ("Marais Rebuttal Rep.").  He has served on the faculties of the University of Chicago and Stanford University, is a fellow of the Royal Statistical Society, and is a member of the American Statistical Association, the Society for Industrial and Applied Mathematics, and the American Economic Association.  *Id.*  Marais has extensive experience performing and evaluating event studies.  *See* Ex. 20, Dep. Tr. of M. Laurentius Marais ("Marais Tr.") 25:25-26:5.  And, as the SEC acknowledges (at 86), Marais has authored several papers about the use of event studies in litigation.  *Id*. 45:12-46:24.

**2.      Marais's Rebuttal Opinions Are Procedurally Proper, Reliable, and Consistent with His Supplemental Report**

**a.      Marais's Rebuttal Opinions Are Proper**

In his rebuttal report, Marais explains why ▮▮▮ opinion that Ripple's actions affected the price of XRP was methodologically unsound.  Marais observes that "▮▮▮ event study *rebuts*

rather than *supports* the conclusion that the price of XRP is primarily a function of disclosures about Ripple's actions."  Marais Rebuttal Rep. ¶ 7 (emphases added).  This is for two principal reasons:  *First*, Marais shows that ▮▮▮ analysis identified approximately 40 times as many days with "[u]nusual" XRP returns[39] *without* Ripple actions as days with unusual XRP returns *with* Ripple actions.  *Id.* ¶¶ 19, 25-26.  *Second*, Marais explains, again using the data generated by ▮▮▮ model, that the "overwhelming preponderance" of compounded XRP returns occurred on non-Ripple-news days. *Id.* ¶¶ 27-29.  Taken together, Marais explains that ▮▮▮ model does not account for most of the days on which there was an unusual XRP price movement, and in fact actually establishes that the economic magnitude of the abnormal returns ostensibly associated with Ripple actions pales in comparison to the magnitude of abnormal returns *not* associated with Ripple actions.  *Id.* ¶¶ 21, 29.  In other words, ▮▮▮ methodology cannot establish that Ripple's actions affect XRP price.  *Id.* ¶ 29.

The SEC argues (at 88) that Marais's criticism of ▮▮▮ "[g]oes [b]eyond the [s]cope" of ▮▮▮ opening report.  The SEC is wrong.  There is no serious dispute that Marais's opinion addresses "the same subject matter encompassed in the opposing party's expert report," and that alone establishes that it is a permissible, in-scope rebuttal.  *Scott*, 315 F.R.D. at 44; *see also supra* at Part I.B.  And Marais repeatedly affirmed, both in his report and at his deposition, that his "rebuttal opinion pertain[s] solely to opinions set forth in ▮▮▮ [opening] expert report."  Marais Tr. 116:5-9.

---

[39] ▮▮▮ refers to certain days as having "significantly positive" XRP returns if any of the following three days had a "statistically significantly positive" return but no "statistically significantly negative" returns.  Marais Rebuttal Rep. ¶ 13 n.14.  Marais rejects this terminology because it presumes that ▮▮▮ appropriately applied "a straightforward textbook determination of statistical significance," when in fact ▮▮▮ did not do so.  *See id.* ¶ 13 n.13.  Marais therefore uses the phrase "[u]nusual" to refer to the returns on these days.

The SEC bases this argument on a single exchange at Marais's deposition where—in the SEC's telling (at 88)—Marais supposedly "conceded" that his opinion "go[es] beyond" ███. But the SEC omits the beginning of the exchange, in which Marais testified that his rebuttal opinion "solely" addresses the "opinions set forth in ███ expert report." Marais Tr. 116:5-9.  Marais explained that any portion of his testimony "go[ing] beyond" ███ report identified limitations that ███ *failed to address*.  Specifically, Marais explained that ███ opening report "careless[ly]" failed to disclose the "extreme limitations" of his analysis and that, "in discussing what ███ conclusions mean and what their significance is," Marais necessarily addresses those limitations that ███ failed to disclose himself. *Id.* 116:5-24, 117:18-118:20.  "[C]riticizing th[e opinion] presented by another party" by pointing out its limitations is the quintessential task of the rebuttal expert.  *Aluminum Warehousing*, 336 F.R.D. at 29 (citation omitted); *see also Counts v. Gen. Motors, LLC*, 2022 WL 2078023, at *27 (E.D. Mich. June 9, 2022) ("highlighting the flaws in and limitations of" an opposition expert's "work . . . [is] crucial to the jury's ability to assess the weight" appropriate to give the opposing expert's opinions); *supra* at Part I.B.[40]

      **b.**      **Marais Properly Criticizes ███ Analysis**

In his opening report, ███ claims that his event study methodology proved "that XRP prices react to the news of actions by Ripple Labs." ███ Rep. ¶ 12.  Marais explains why this is not necessarily true, much less uniformly so:  ███ fails to acknowledge the fact that his methodology established that there are unknown, confounding factors that were correlated with

---

[40] Marais's opinion addresses the same subject matter as ███ report because ███ offers the opinion that Ripple's actions "impact" the price of XRP. ███ Rep. ¶ 10.  "Impact" is obviously a synonym for "cause."  *Compare, e.g.*, *Impact*, American Heritage Dictionary 880 (5th ed. 2011) ("The effect . . . of one . . . thing on another"), *and Impact*, *Webster's II New College Dictionary* 553 (1999) (same), *with Cause*, *American Heritage Dictionary* 295 ("[t]he producer of an effect"); *see also infra* at 112 & n.69.  So is "react to."  *See* ███ Rep. ¶ 12.  Marais opines on the limitations of ███ causal conclusion:  ███ cannot say that Ripple actions *primarily* drove XRP price change.

XRP returns on non-Ripple-news days.  Marais Rebuttal Rep. ¶¶ 16-20; *see also* ECF No. 547 at 8-9.  Those factors could equally affect XRP's price on what ███ calls "Ripple news days." *Id.* ¶ 19.  Indeed, Marais describes how ███ own data identified 179 "[u]nusual" XRP price returns on *non*-Ripple-news days—far more than occurred on Ripple news days.

The SEC claims (at 88-89) that Marais incorrectly injects a "novel, unrecognized step" into the event study methodology by highlighting confounding factors that ███ ignored.  This is wrong.  Marais comments on ███ misinterpretation of his own results:  namely, ███ own study cannot support the conclusion that Ripple impacted XRP price.  Rebuttal experts routinely identify "other factors" that an expert "should have considered" that undermine their conclusions. *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269, at *5-6 (S.D. Fla. June 8, 2011); *see also Medidata,* 2022 WL 576089, at *2 (permitting a rebuttal expert to testify about "qualitative evidence that" the other side's opening report "allegedly did not consider"). Marais's opinion addressed ███ failure to account for confounding factors ███ *himself identified* that undermine his conclusion that Ripple actions impacted XRP's price.

The SEC is wrong when it argues (at 91-92) that Marais's rebuttal opinion is improper because he failed to support it with academic literature.  The law imposes no such requirement. A rebuttal expert "needs only her expertise and the 'method' identified at the beginning of her report—namely, reviewing the documents in this case, along with [the opposing expert's] report, and arriving at an opinion as to [the opposing expert's] analysis."  *Henkel*, 2016 WL 1271062, at *12.  Marais is a highly skilled statistician with decades of experience analyzing event studies. *See generally* Marais Rebuttal Rep., Attach. A.  Even the SEC agrees (at 86) that Marais is "familiar with the use of event studies in litigation" and an author of "articles on the topic." Marais properly applied his extensive expertise in reviewing ███ interpretation of the results of his event study.

c. **Marais's Rebuttal and Supplemental Opinions Properly Criticize ███ Opinions That XRP Prices "React" to Ripple Actions**

The SEC also insists (at 89-91) that Marais's rebuttal and supplemental opinions are contradictory. Again, the SEC mischaracterizes what Marais actually did and said.

In his supplemental report, Marais reviews the improper supplemental report ███ filed on the last day of discovery. ECF No. 469 at 2 (sanctioning the SEC and authorizing Marais's supplemental response). ███ claimed in his supplemental report that he could quantify the aggregate impact of Ripple actions on XRP prices. Ex. 21, Suppl. Expert Report of M. Laurentius Marais ¶ 12 (May 13, 2022) ("Marais Suppl. Rep."). ███ identified days with "[u]nusual" XRP returns coinciding with Ripple news days, removed the amount of "abnormal" return purportedly caused by Ripple's actions for each of those days, and generated a "but-for" price. *Id*. ¶ 14. Based on this methodology, ███ opined that, but for Ripple's actions, the price of XRP would never have exceeded $0.02. *Id*.

To demonstrate the flaws in this methodology, Marais repeated ███ calculations on Wednesdays rather than Ripple news days. Specifically: instead of removing the "abnormal" returns on "[u]nusual" XRP return days coinciding with Ripple news days, he removed "abnormal" returns from "[u]nusual" XRP return days coinciding with Wednesdays. *Id*. This yielded a nearly identical, and equally nonsensical, result: a significantly lower XRP price between 2014 and 2020. *Id*. This analysis is fully consistent with Marais's rebuttal report, in which Marais opines that ███ methodology could not prove that *Ripple's actions* caused XRP's price to increase. In fact, Marais, using ███ data, challenges ███ opinion by observing that an XRP purchaser would have made *more money* by buying XRP on non-Ripple-news days than by buying XRP on ███ identified Ripple news days. Marais Rebuttal Rep. ¶¶ 23-26 & tbl. 2.

The SEC contends (at 90) that Marais's testimony "actually supports ███ findings" because "it demonstrates that Ripple's actions were of overwhelming importance to XRP's price." The SEC completely mischaracterizes Marais's opinions.  Marais's first report explains why ███ methodology does not support the conclusions he attempted to reach, and the second explains why an unreliable supplemental methodology ███ invented to try to plug that gap is insufficient to do so.[41]  Regardless, alleged agreement is not the proper subject of a *Daubert* motion.  *See Phoenix Light SF Ltd. v. Wells Fargo Bank, N.A.*, 2021 WL 5770871, at *2 (S.D.N.Y. Dec. 6, 2021) ("[E]xclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning or methodology.'" (citation omitted)).  If the SEC really thinks Marais's testimony helps its case, it should make that argument to the jury.

### 3. Marais's Supplemental Report Challenging ███ Counterfactual Price Methodology Is Reliable

In his supplemental report, Marais describes how ███ multiple different regression models routinely produce inconsistent results as to the magnitude, statistical significance, and even the *directionality* of the purported effect Ripple news days had on XRP price.  Marais Suppl. Rep. ¶ 20.  For example, on May 16, 2017—a day ███ discussed at length in his supplemental report as having unusually positive XRP returns, *see* ███ Suppl. Rep. ¶ 11—half of ███ models do not even identify an "[u]nusual" XRP return.  Some even identify *negative* XRP returns.  *Id.* ¶ 20.

---

[41] Marais's rebuttal report demonstrates, among other things, that *cumulative* XRP returns on non-Ripple-news days are larger than *cumulative* XRP returns on Ripple news days.  *See* Marais Rebuttal Rep. ¶¶ 21-22 ("[T]he overwhelming preponderance of compounded investment returns associated with [u]nusual trading days occurred on days that did not coincide with Ripple news events identified by ███.  He then provides additional nuance in his supplemental report, observing that, while the *average* XRP return on Ripple news days is larger than the average return on other days, the *cumulative* return on non-news days still vastly outweighs returns on news days. *Id.* ¶¶ 8, 10.

█████ failure to address this and other contradictions in his models undermines the reliability of his opinions. *Id.* ¶¶ 19, 21.

The SEC argues (at 91-92) that this rebuttal opinion is unreliable because it does not cite any "economic literature that suggests that" "█████ must rely on one particular model" rather than selectively choosing from among 20 mutually contradictory ones.  But, as previously discussed, *supra* at Part I.B, that is not the law.  A rebuttal expert is permitted to "[p]oint[] out alleged errors or inconsistencies that another expert relies on."  *Luitpold*, 2015 WL 5459662, at *12.   And, a rebuttal expert need only rely on their expertise in doing so.  *See Aluminum Warehousing*, 336 F.R.D. at 29-30.   The SEC has not alleged that Marais is unqualified to critique event study methodologies—nor could it; the agency concedes (at 86) that Marais is an expert in the field.

E.      **Peter Easton**

1.      **Easton's Background and Opinion**

The SEC asks this Court to exclude the testimony of Professor Peter Easton, who offers an opinion on the proper accounting treatment for commercial transactions involving XRP under applicable accounting guidance.  Specifically, Easton opines that Ripple, and other companies holding XRP, properly "account for those holdings as indefinite-lived intangible assets," Ex. 22, Expert Report of Peter Easton ¶ 10 (Oct. 4, 2021) ("Easton Rep."), and that, under GAAP, "an objective purchaser or recipient of XRP would understand that he or she had acquired an Intangible Asset, and not . . . a security," *id*. ¶ 90.  Easton is an accounting professor with more than 40 years of experience.  *Id*. ¶¶ 1, 3-4.  His academic research has focused on the role of accounting information in securities valuation and investors' decision-making.  *Id.* ¶ 4.

2.      **Easton's Testimony Concerning the Proper Accounting Treatment for Transactions Involving XRP Is Relevant and Reliable**

The SEC does not challenge Easton's qualifications to opine on the proper accounting treatment for commercial transactions, including those involving XRP.[42]  Nor does the SEC contest the methodology Easton used to reach his conclusions, and it offered no rebuttal to his opinions.[43]  Instead, the SEC focuses on relevance.  According to the SEC, Easton's opinion "has no bearing on whether Defendants' offers and sales of XRP were investment contracts and

---

[42] The SEC remarks in passing (at 38) that Easton "does not consider himself an expert in the accounting of digital assets," but it does not claim that this is a basis to exclude his testimony. Nor could it.  The application of GAAP to an asset like XRP fits well within the bounds of Easton's expertise.  An expert need not "possess experience tailored to the precise product or process that is the subject matter of the dispute." *Lion Oil*, 2011 WL 855876, at *1-2 (citation omitted).

[43] The SEC also does not dispute that Easton's opinion concerns a proper subject for expert testimony, and the case law makes clear that the proper classification of assets like XRP under GAAP "requires accounting expertise." *Vysyaraju v. Mgmt. Health Sols., Inc*., 2013 WL 4437236, at *6 (S.D.N.Y. Aug. 19, 2013) (noting the "unremarkable proposition that it requires accounting expertise to apply GAAP").

therefore securities under the federal securities laws." Mot. at 38. The SEC is wrong. Easton's opinion is relevant and supports a central component of Defendants' case: that XRP does not have the essential characteristics of a security and would not "ordinarily and commonly [be] considered [a] securit[y] in the commercial world." *Marine Bank*, 455 U.S. at 559.

Expert testimony is relevant and admissible when it helps the jury "to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). The bar for relevance is "low," and Easton's opinion easily meets it. *United States v. Jones*, 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018). Easton's testimony is directly relevant to the disputed issue of "what character [XRP] is given in commerce," *Glen-Arden*, 493 F.2d at 1034 (citation omitted), and whether XRP holders were acquiring "a separable financial interest with the characteristics of a security"—something the Supreme Court has found "[i]n every decision . . . recognizing the presence of a 'security' under the Securities Acts," *Daniel*, 439 U.S. at 559-60.

Moreover, *Howey* instructs courts to consider the "economic reality" of the transaction. 328 U.S. at 298. "Accounting reflects the nature of the transaction," Ex. 23, Dep. Tr. of Peter Easton ("Easton Tr.") 200:22-24, and "GAAP requires that a company record a transaction based on the economic substance of the arrangement between the relevant parties," Ex. 24, Expert Rebuttal Report of Peter Easton ¶ 12 (Nov. 12, 2021) ("Easton Rebuttal Rep."). Easton's opinion regarding the proper application of GAAP to transactions in XRP—which turns on an analysis of the economic and commercial realities of those transactions—is therefore highly relevant to the application of *Howey*.

Based on the economic substance of Defendants' XRP transactions, Easton concluded that "accounting for XRP as a security is inconsistent with U.S. GAAP," Easton Rep. ¶ 11, because,

"unlike the case for issuances of equity and debt securities, Ripple has no future obligation to the holder of XRP . . . [,] nor does the purchase of XRP provide the holder with 'an ownership interest in' Ripple," *id*. ¶ 88 (citation omitted). Easton's testimony supports the defense in important ways. *First*, his testimony addresses a particular aspect of the economic realities of Defendants' transactions in XRP and provides an analysis under GAAP—"the language of finance," Easton Tr. 183:13-17—that an objective purchaser in commerce would not consider XRP to be a security. *Second*, his opinion will help the jury evaluate an issue critical to the defense of this case, which is whether Ripple's counterparties in transactions involving XRP obtained an asset with the essential characteristics of a security in the "commercial world." *Marine Bank*, 455 U.S. at 559.

Easton's opinion also is relevant to Defendants' fair-notice defense, which the SEC does not address in its *Daubert* motion. "GAAP is the mechanism by which security sales are recorded in the United States." Easton Tr. 191:5-7. Years before the SEC brought this case, individuals and businesses buying and selling XRP needed to determine whether to account for transactions in XRP under the accounting rules applicable to securities or in some other manner. To answer that question, market participants looked to GAAP and, in more recent years, industry guidance concerning cryptocurrencies specifically. The SEC has delegated its authority to set U.S. accounting standards to the Financial Accounting Standards Board ("FASB") (which promulgates GAAP), Easton Rep. ¶ 16 & n.8, but still retains ultimate control over those standards.[44] In addition, publicly traded companies have, for years, filed audited financial statements with the

---

[44] *See* SEC, *Policy Statement:  Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter*, SEC Rel. Nos. 33-8221; 34-47743; IC-26028; FR-70 (last modified Apr. 25, 2003) (noting the "federal securities laws set forth the Commission's broad authority and responsibility to prescribe the methods to be followed in the preparation of accounts and the form and content of financial statements to be filed under those laws" and its determination that "FASB has the capacity to assist the Commission in fulfilling th[ose] requirements"), https://www.sec.gov/rules/policy/33-8221.htm.

SEC treating XRP as an intangible asset, not a security.  *Id.* ¶¶ 78-79.  The SEC's Division of Corporate Finance is in charge of reviewing those financial statements to ensure their accounting and disclosures do not mislead investors.  The SEC's long-standing silence in the face of such disclosures, and accounting rules for which it is responsible, is relevant evidence that an objective person would not have considered XRP a security.

The SEC's argument (at 41-42) that Easton's testimony is not relevant to a disputed issue in this case may be swiftly dismissed.  The SEC argues (at 42) that "whether something constitutes an 'investment contract' under the Securities Act is governed exclusively by Supreme Court and Second Circuit precedent—*Howey* and its progeny," and that Easton's opinion supposedly does not bear on that question.  The SEC is doubly wrong.  The relevance of Easton's opinion must be measured against *Defendants'* theory of the case, not the SEC's, *see Olin*, 2018 WL 1901634, at *21; and it is clearly relevant on that basis alone.  But it is relevant even adopting the SEC's theory that "*Howey* and its progeny" are the exclusive sources of relevance for the reasons noted above.  As the SEC itself represented to the Court in its Motion (at 1, 5-7), *Howey* and its progeny require objective evaluation of the "economic reality of the investment."  Easton's opinion is directly relevant to the economic reality of the XRP transactions at issue based on the "economic reality" of Ripple's relationship with the XRP holder.

The SEC misses the point in arguing (at 42) that Easton's testimony is irrelevant because he "focus[es] on the accounting treatment of 'equity' (such as stock) or 'debt' securities," whereas the SEC alleges that XRP is an "investment contract."  Easton's testimony is relevant precisely because GAAP disregards the label of the transaction and looks at the transaction's economic substance based on "the arrangement between the relevant parties."  Easton Rebuttal Rep. ¶ 12.  A debt security gives the holder a fixed return; an equity security gives the holder a share in an

entity's future profits (if any).  *See* Easton Rep. ¶¶ 39-40.  XRP gives the holder neither, and that is why XRP lacks what GAAP recognizes as the economic substance of a security.  *See id.* ¶ 88.

An investment contract—although a distinct type of instrument identified in the Securities Act's definition of "security"—still involves the offer or sale of "a separable financial interest with the characteristics of a security."  *Daniel*, 439 U.S. at 559-60 (collecting cases); *see also Black's Law Dictionary* 1522 (4th ed. 1968) (defining "securities" as "[e]vidences of obligations to pay money or of rights to participate in earnings and distribution of corporate, trust, and other property").  The point of *Howey* is not to expand the "instruments [Congress in 1933] ordinarily and commonly considered to be securities in the commercial world."  *Marine Bank*, 455 U.S. at 559.  It is to identify offerings that have the economic substance of such instruments, but lack their form.  Thus, as the D.C. Circuit has explained, once "'an investment of money in a common enterprise . . .' is shown, the 'evidence of interest in or indebtedness of the [holder]' would be substantially similar to the stocks and bonds expressly mentioned in section 20a."  *Ass'n of Am. R.Rs. v. United States*, 603 F.2d 953, 971-72 (D.C. Cir. 1979) (citation omitted); *see Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) ("[T]he substance of an investment contract [must be] a security-like interest in a 'common enterprise'" (citation omitted)).

The SEC's argument that Easton's opinion is not relevant is particularly misplaced because the SEC is the federal agency charged with policing the capital markets and establishing accounting principles to enforce the federal securities laws.  *See* 15 U.S.C. §§ 77s(b)(B), 7218(c).  The SEC oversees FASB and has "ultimate responsibility to ensure that the FASB deals with issues referred to it by the SEC."[45]  And it often stresses the importance of GAAP to investor decision-

---

[45] Testimony Concerning the Roles of the SEC and the FASB in Establishing GAAP by Robert K. Herdman Chief Accountant, SEC, Before the House Subcomm. on Capital Markets, Insurance, and Gov't Sponsored Enterprises of the Comm. on Financial Services, 2002 WL

making and the functioning of liquid markets.[46]  This Court should reject the SEC's suggestion

that the accounting treatment applicable to transactions in XRP—and an expert opinion that, under

GAAP, those transactions involved the transfer of an intangible asset—is irrelevant in this case.

### 3. Easton's Opinions Are Proper Rebuttal Testimony to Opinions Offered by ▇▇▇ and ▇▇▇

The SEC also asks this Court (at 43-44) to preclude Easton from offering rebuttal opinions

in response to two of the SEC's experts, ▇▇▇ and ▇▇▇.  In his rebuttal report, Easton explains

that those experts ignore and conflate the economic reality of Defendants' XRP transactions as a

matter of GAAP.  Rule 26 allows rebuttal testimony "intended solely to contradict or rebut

evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).

A rebuttal expert may "testify as to the flaws that she believe[s] are inherent in another expert's

report that implicitly assumes or ignores certain facts," *Coquina*, 2011 WL 4949191, at *3 (citation

omitted), and "[p]oint[] out alleged errors or inconsistencies that another expert relies on,"

*Luitpold*, 2015 WL 5459662, at *12.  Easton's rebuttal opinions do exactly that.

The SEC's request to exclude Easton's rebuttal of ▇▇▇ is baseless. ▇▇▇ claims that

"Ripple used XRP in a similar manner as companies use stock," ▇▇▇ Rep. ¶ 53; in support, he

points to Ripple's sales of XRP to partly fund its operations, and its award of XRP as compensation

to its employees, *see also id.* ¶ 54 ("Ripple used XRP in an extremely similar capacity as firms use

---

1046983, at *1, *7 (May 14, 2002) (addressing "questions . . . with respect to the relevancy of generally accepted accounting principles in today's business environment" and attributing the "liquid capital markets" in the U.S. to "the high quality of our financial reporting system" and GAAP), https://www.sec.gov/news/testimony/051402tsrkh.htm.

[46] *See, e.g.*, P. Munter, SEC Acting Chief Accountant, Statement on OCA's Continued Focus on High Quality Financial Reporting in a Complex Environment (Dec. 6, 2021) ("Fundamental to the functioning of [our capital market] is that the information companies provide to investors be of high quality, including financial statements that are . . . prepared in accordance with [GAAP]"), https://www.sec.gov/news/statement/munter-oca-2021-12-06.

publicly traded equity."). ███ also claims that, by including lock-up provisions in certain of its sales contracts to third parties, Ripple's sales and transfers of XRP were equivalent to transactions in common stock. *See id.* ¶ 53.

Easton offers rebuttal testimony that, from an accounting perspective, exposes critical flaws in ███ opinions. According to Easton, ███ "incorrectly conflates the economic substance of the sales of XRP with Ripple's subsequent use of the proceeds from those sales," Easton Rebuttal Rep. ¶ 3, and he explains why ███ characterizations are "inconsistent with fundamental accounting principles," *id.* ¶ 12. Easton explains that, because "Ripple's sales of XRP do not grant the recipient the rights (or Ripple, the obligations) associated with the issuance of a debt or equity security," the economic substance of Defendants' XRP transactions are fundamentally different from transactions involving a security. *Id.* ¶ 13. For similar reasons, he explains that the lock-up provisions in certain of Ripple's contracts fail to support ███ opinion that Ripple's sales of XRP are like sales of stock. *See id.* ¶ 24.

Easton's testimony is "archetypal rebuttal testimony" under Rule 26 because "it identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise." *Sci. Components*, 2008 WL 4911440, at *2. The SEC's suggestion (at 43) that Easton should not be permitted to offer this criticism because ███ himself did not consider the application of GAAP misstates the law. *See Aluminum Warehousing*, 336 F.R.D. at 29 ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." (citation omitted)). Precisely the opposite is true. *See, e.g.*, *TC Sys. Inc. v. Town of Colonie*, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002) (interpreting "same subject matter" in Rule 26(a)(2)(C)(ii) as allowing rebuttal experts to use a different methodology to analyze the same facts considered by the expert in chief); *see also*

*supra* at Part I.B.  ███████ is a professor of finance at the ██████████████ and purports to be an expert in finance.  His opinions about transactions in XRP should (at least) have taken account of the economic substance of those transactions.  Easton's opinion—based on fundamental accounting principles that require consideration of the economic substance of a transaction— appropriately exposes this fundamental error in ████████ opinion.

The SEC's request to prevent Easton from rebutting ████████ opinions is equally baseless. ████████ opines that Ripple took certain actions to provide price support for XRP and that it paid incentives to business partners using XRP.  *See* ████████ Rep. ¶¶ 38-47.  The SEC seeks to rely on ████████ opinions to support its contention that "XRP was an investment contract" with Ripple, "and therefore a security . . . [under] the federal securities laws."  Am. Compl. ¶ 231.  Easton explains the flaws in that approach from an accounting perspective, which ████████ failed to consider in his report.  He concludes that, even if "Ripple used mechanisms to limit the supply or otherwise support the market price of XRP," that does not, from an accounting perspective, support the argument that "the economic substance of those transactions were sales of equity or debt securities."  Easton Rebuttal Rep. ¶ 3.  Rather, Easton explains that "what matters in determining the appropriate accounting for a transaction is the economic substance of the contractual arrangement between the buyer and seller."  *Id.* ¶ 24.  He further opines that "[t]he fact that Ripple may have paid business partners and vendors for services in XRP rather than fiat currency[ ] does not mean that, under U.S. GAAP, the economic substance of those transactions were sales of equity or debt securities."  *Id*. ¶ 3.

Easton's opinions fall squarely within the bounds of Rule 26 and are important to explain why, from the perspective of fundamental accounting principles, ████████ opinions are flawed and unreliable.  Easton's opinions are rooted in GAAP, which in turn is squarely rooted in the

"economic reality" of the transactions at issue.  *Id.* ¶ 12.  ███████ failure to consider that aspect of the transactions on which he opines is a clear shortcoming in his analysis and is a more than fair subject for rebuttal testimony.  *See Sci. Components*, 2008 WL 4911440, at *2; *Luitpold*, 2015 WL 5459662, at *12.

## F.    Bradley Borden

### 1.    Borden's Background and Opinion

Prof. Bradley Borden is a tax law professor at Brooklyn Law School and an active tax law practitioner.  He has more than 20 years of experience in academic and professional work relating to the tax classification of property and the tax consequences of property transactions.  He has authored several books and more than 100 articles on the subject.  Borden opines that based on well-established principles of U.S. taxation, "[a] reasonable buyer or seller of . . . XRP would not expect it to be classified as a security for federal income tax purposes or qualify for federal income tax treatment specific to securities."  Ex. 25, Expert Report of Bradley Borden ¶ 9 (Oct. 4, 2021) ("Borden Rep.").  The SEC offered no rebuttal expert to challenge Borden's opinion.

### 2.    Borden's Opinion Concerning the Proper Tax Classification of XRP Is Relevant

The SEC (at 35-36) challenges the relevance of Borden's opinion, but that challenge fails on the same grounds as its challenge to Easton.  While the SEC may regard Borden's opinions as irrelevant to *its theory*, Borden's opinions unquestionably are relevant to "what character [XRP] is given in commerce," *Glen-Arden*, 493 F.2d at 1029, and to Defendants' fair-notice defense. Borden's testimony easily meets the low relevance bar.

*First*, Borden's testimony is directly relevant to whether XRP would "ordinarily and commonly [be] considered . . . securities in the commercial world."  *Marine Bank*, 455 U.S. at 559.  As Borden explains, under authoritative IRS guidance in effect since 2014, virtual currency such as XRP is not a security for tax purposes.  Borden Rep. ¶¶ 18, 21.  Federal income tax law has instead treated virtual currency such as XRP as "property" subject to general taxation rules for property, *not* subject to any exceptions applicable to "securities."  *Id.* ¶¶ 21, 23-26, 28-33.

The tax classification of XRP has practical, real-world importance. Businesses and individuals often take the tax treatment of transactions into account when making commercial decisions to buy or sell property, as Borden explains based on his decades of experience as a tax professional. *Id*. ¶¶ 21-22. Reasonable individuals and businesses would have known that XRP was not a security for tax purposes and would have understood that "[t]he characteristics of typical assets that come within the federal income tax definition of securities . . . are significantly different from the characteristics of virtual currency such as XRP." *Id*. ¶ 13. This distinction matters in the real world: for example, key provisions of the tax code, like the wash sale rule (which precludes deductions for sales of securities if the seller reacquires the securities within 30 days), do not apply to XRP because it is classified as property rather than as a security. *Id.* ¶¶ 34-35.

Borden's opinion is also relevant to Defendants' fair-notice defense. Consistent with the applicable IRS guidance, thousands of taxpayers operating in good faith to file accurate returns have, for years, filed federal tax returns treating their XRP transactions as property that was not a security. The SEC said nothing to the contrary, and its silence (like its silence in the face of GAAP's treatment of XRP) is again directly relevant to whether an objective person would have believed XRP would be considered a security under the federal securities laws.

Further, Borden's opinion explains that XRP is not considered a security under other regulatory and legal regimes, including that of the FinCEN and the U.S. Department of Justice. *Id*. ¶ 12. Borden's testimony will help a jury understand how the IRS's treatment of XRP as a non-security relates to, and is consistent with, FinCEN's and the U.S. Department of Justice's treatment of XRP as a virtual currency rather than a security. *See id*. ¶ 18 & n.21. That XRP is not considered a security under a number of other regulatory regimes both supports Defendants' fair-notice defense and highlights the extent of the SEC's overreach.

### 3.     Borden Is Well-Qualified

The SEC's half-hearted attempt to attack Borden's qualifications should likewise be rejected.  His tax-related qualifications, described in part above, are impeccable; he has been a tax professional for more than 20 years and a professor of tax law since 2004; he is widely published on federal income tax issues; and his work has been widely cited by federal courts, including the Fifth and Ninth Circuits.  Borden Rep. ¶¶ 1-3.  Borden's opinion, which explains how a specific type of property is classified under federal tax law, fits comfortably within his extensive experience as a professional and an academic.  The SEC's claim that Borden is unqualified because he never wrote an article or gave a speech specifically about virtual currency or XRP is meritless, as explained above.  *See supra* at Part I.C.  Borden's expertise in tax issues is more than sufficient to qualify him to opine on the tax treatment of XRP; as a matter of law, he does not also need expertise in digital assets.  *See, e.g.*, *McCulloch*, 61 F.3d at 1043 (ear, nose, and throat doctor was qualified to opine on whether glue fumes caused plaintiff's throat condition and did not need additional expertise specifically relating to glue fumes).  At best, the SEC's argument regarding Borden's qualifications would go to weight, not admissibility.  *See, e.g.*, *Fosamax*, 645 F. Supp. 2d at 202.

### 4.     Borden's Methodology Is Reliable

To reach his conclusions regarding the appropriate tax treatment for transactions involving XRP, Borden carefully considered the U.S. tax code, case law, Treasury regulations, IRS published guidance, legislative history, and private IRS rulings based on his 20 years of expertise as a tax law practitioner.  *See* Borden Rep. ¶ 20.  Forming an expert opinion based on expertise in an industry is a well-accepted and reliable methodology.  *See, e.g.*, *Clarke v. Dutton Harris & Co.*, 2022 WL 717611, at *2 (D. Nev. Mar. 10, 2022) (finding expert's analysis based on "his expertise as a CPA, his 40 years of experience, and the relevant tax principles" reliable).

The SEC accuses (at 36) Borden's methodology of being "[i]mproper *[i]pse [d]ixit*" without citing any basis for that assertion.  Far from "*ipse dixit*," Borden's methodology for answering the questions posed to him is the same methodology that capable tax professionals across the country use every day.  He reliably applied his expertise in federal income tax classification to determine the appropriate tax classification of virtual currency such as XRP under the authoritative body of federal tax law.  *See, e.g.*, *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 174 (S.D.N.Y. 2012) (rejecting argument that expert opinion was "ipse dixit" where expert's conclusion was "an application of his expertise" to the claim terms at issue); *Willow Bend Ventures, LLC v. Van Hook*, 554 F. Supp. 3d 808, 817-18 (E.D. La. 2020) (rejecting challenge to tax-law expert's opinions that were "well within the ambit of her expertise" and "relevant and reliable as they [were] placed within the context of the record of that proceeding").

### G.     Carol Osler

#### 1.     Osler's Background and Opinions

Professor Carol Osler holds a Ph.D. in economics from Princeton University and is presently the Martin and Ahuva Gross Professor of Financial Markets and Institutions at Brandeis University International Business School.  Ex. 26, Expert Report of Carol Osler ¶¶ 1-2 (Oct. 4, 2021) ("Osler Rep.").  She has focused on currencies and foreign exchange trading throughout her 30-year career in academia.  *Id*., Ex. A.  She has previously held faculty appointments at Columbia University, Northwestern University's Kellogg School of Management, and Dartmouth College, and she served as a senior research economist at the Federal Reserve Bank of New York for a decade.  *Id*.  Osler has published over 30 papers, including roughly 20 on currency markets and exchange rates—her primary area of research.  *Id.* ¶ 4, Ex. A.  She has taught a course at Brandeis focused largely on currency markets since 2002.  *Id.* ¶ 3, Ex. A.  She has served as an expert in 11 prior cases.  *Id.*, Ex. A.

Osler's opening report offers two opinions.  *First*, she identifies the functions and attributes of currency as a matter of economic theory, and concludes that XRP possesses all of these characteristics.  *Id*. ¶¶ 8-18.  Osler bases this opinion on her three-decade career researching and teaching about currency markets, as well as her familiarity with the "mountains of research" and "rich" literature on the "exact nature of money and currency" that she has studied throughout her career.  Ex. 27, Dep. Tr. of Carol Osler ("Osler Tr.") 69:9-13.  *Second*, Osler opines that as a matter of economic theory, Ripple's cross-border payment product, ODL, represents a viable alternative to traditional cross-border remittance payment channels.  Osler Rep. ¶¶ 19-74.

Osler also offers a rebuttal opinion responding to the SEC's purported expert, ████. ████, who has no relevant academic credentials and no meaningful experience in cross-border payments, and has never worked for—or spoken to anyone who works for—any cross-border

remitter, has purported to opine on the reasons why ODL would be poorly suited for use in cross-border transactions.  *See* ECF No. 544 at 7.  Osler's rebuttal shows that ███ ODL-related opinion failed to adhere "with basic economic principles" and "display[ed] a lack of understanding of the current operations of the foreign exchange markets."  Ex. 28, Expert Rebuttal Report of Carol Osler ¶ 7 (Nov. 12, 2021).  For example, Osler's rebuttal points out several basic mistakes that ███ makes, including that he (1) relies on a "non-existent distinction between . . . 'fixed' or 'variable'[-supply]" fiat currencies that "can only be described as mystifying" and has no support in any academic literature; and (2) argues that traditional cross-border remittances involve only a "single foreign exchange transaction" while ODL involves two, an outright misunderstanding of traditional remittance processes that fails to recognize that the vast majority of traditional remittance payments also involve two steps.  *Id.* ¶¶ 7, 17-18, 21-22.  Osler highlights a host of other mistakes, ultimately concluding that his opinions "lack a sound foundation in economics or logic."  *Id.* ¶ 34.

The SEC has not challenged Osler's rebuttal opinion.  But it seeks to exclude her opening opinions on the bases that:  (1) Osler is not qualified to offer her opinions; (2) her opinions are not relevant; and (3) her currency and ODL opinions are unreliable because she relies on disputed facts and has not subjected them to rigid scientific testing.  All three bases lack merit.

### 2.  Osler Is Qualified

Dr. Osler is eminently qualified to offer all of her opinions.  The SEC does not (and cannot) contest her qualifications; it concedes (at 76) that she is "clearly . . . qualified to testify generally about the functions and attributes of a currency" and is "qualified to offer opinions about the trends, costs and benefits of currency remittances between the official currencies of nations, foreign exchange transactions, and the differing methods of cross-border payments."  Yet the SEC claims that she is somehow unqualified because she lacks "special training or experience in evaluating

cryptocurrencies." *Id*.  As noted above, that argument ignores the black-letter principle that an expert need "not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Lion Oil*, 2011 WL 855876, at *1 (citation omitted).

The SEC similarly complains (at 66) that Osler fails to base her opinion on any "studies, academic articles or other publications considering" whether XRP is a currency—or, even more strangely (at 74), that she did not review "any academic or professional studies of . . . ODL."  None of the SEC's experts cited any such study either—as is unsurprising, because XRP and ODL are innovative products in a rapidly developing industry.  In any event, just as an expert need not have personal expertise about the particular product or process at issue, an expert also need not point to publications that specifically address that product or process.  *See McCullock*, 61 F.3d at 1043-44 (rejecting defendant's argument that an expert was unqualified because he failed to cite medical literature specifically dealing with glue fumes); *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 405-06 (3d Cir. 2003) (reversing district court's exclusion of medical expert who did not cite literature "address[ing] the specific" medical procedure at issue; "an expert opinion should not be excluded simply because there is no literature on point.").  Those settled principles foreclose the SEC's argument.[47]

### 3.      Osler's Opinions Are Relevant

The SEC also argues (at 71) that Osler's opinions that XRP has the functions and attributes of a currency, and that ODL is a viable solution for cross-border payments as a matter of economic theory, are irrelevant; in support of that position, it simply repeats arguments it makes elsewhere on the same topics.  The argument fails for the same reasons explained above.  *See supra* at 5-7,

---

[47] The SEC (at 76-77) also claims Osler is unqualified because she lacks "special[ized] knowledge" about facts she relies on.  That is not an attack on qualifications at all.  In any event, "an expert may rely on data that she did not personally collect," *Gussack Realty*, 224 F.3d at 94-95, so this attack fails regardless of its misplaced framing.

37-38.  The SEC's argument that Osler's currency opinion is irrelevant is particularly odd because

an entire section of its Amended Complaint alleges that "XRP Are [sic] Not 'Currency' Under the

Federal Securities Laws."  Am. Compl. ¶¶ 379-391.  Once again, though the SEC apparently

wishes otherwise, facts that the SEC proclaims to be relevant when the agency thinks it can prove

them do not become irrelevant when it finds it cannot.

### 4.       Osler's Analysis Is Reliable

Finally, the SEC argues (at 72-76) that Osler's opinions are "unreliable" and "[r]estate

Ripple's [f]actual [a]rguments."  The SEC is wrong for at least three reasons.

**A.**  The SEC's position is largely based on a disagreement with the facts that Osler relies

on.[48]  That is not a basis for excluding her testimony.  *See Rosario*, 2021 WL 1930293, at *3

("Plaintiff's dispute with the reliability of [the expert's] opinion ultimately rests on the sufficiency

of the underlying facts and evidence.  Such disputes are appropriate for resolution through

'[v]igorous cross-examination . . . .'" (citation omitted)).

For example, the SEC (at 66, 68 n.17, 73-74) errs in criticizing Osler for not personally

finding the facts she relied on, or for relying on facts from Ripple sources.  Experts need not find

facts on their own.  *Compare* Mot. at 74 (criticizing Osler for not "testing" certain facts) *with*

*Gussack Realty*, 224 F.3d at 94-95 ("[An] expert . . . need not have conducted her own tests.").

The SEC (at 73) also critiques Osler for relying on "facts that are in dispute," but experts can do

---

[48] The SEC makes (at 75) a bare assertion, with no argument or development, that Osler's
ODL opinion is "mostly a repetition of factual information obtained from Ripple."  It fails to cite
a single paragraph in her report that it contends is "repetition" of this sort.  To the extent this is
intended to be an argument for exclusion, it is waived.  *Tolbert*, 242 F.3d at 75 ("[I]ssues adverted
to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are
deemed waived." (citation omitted)).  In any event, the SEC is wrong: Osler applies her expertise
in economic principles relating to cross-border payments to opine that ODL is viable as a matter
of economic theory, relying on her expert analysis (not just a recitation of facts) at each step.  Osler
Rep. ¶¶ 19-74.  That is neither "a repetition of factual information" nor "from Ripple."

that too.  *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendments ("When facts are

in dispute, experts sometimes reach different conclusions based on competing versions of the facts.

The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial

court to exclude an expert's testimony" on that basis.).

For similar reasons, the SEC errs in suggesting (at 68, 75) that Osler's ODL opinion is

unreliable because it "misrepresents" facts about Ripple's relationship with MoneyGram.  Such a

purported factual error—particularly where, as here, the fact is irrelevant to the expert's opinion—

would not warrant exclusion even if Osler had made one.  *See i4i Ltd.*, 598 F.3d at 856 ("[I]t is not

the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's

testimony.  Questions about what facts are most relevant or reliable . . . are for the jury."); *Rosario*,

2021 WL 1930293, at *3 (disputes over expert's facts go to weight, not admissibility); *Boykin v.*

*W. Express, Inc.*, 2015 WL 539423, at *9 n.9 (S.D.N.Y. Feb. 6, 2015) (an alleged "factual error

that is largely irrelevant to the ultimate opinion does not render an expert's testimony

inadmissible").

The SEC's accusation is wrong in any event.  Osler does not "misrepresent" anything.

Aside from an unrelated sentence in a background discussion, MoneyGram comes up only once in

Osler's opening report—in a brief reference, *see* Osler Rep. ¶ 71, where she mentioned it as an

example of Ripple's rational strategic efforts to build up a network and overcome network effects

and "massive barriers to entry."  *See id.* ¶¶ 69, 71-74.  The SEC argues that Osler should have

spent *more* time discussing the relationship, and particularly should have examined whether

MoneyGram found Ripple's ODL product cost-effective.  But that is irrelevant to her opinion.  She

never claimed that ODL was cost-effective for MoneyGram, which is at best a factual question for

the jury to decide.  Osler's opinion concerns whether ODL is viable as a matter of economic theory,

not whether it worked for a specific customer at a specific point in the past.  If the SEC wants to argue to the jury that it should give Osler's opinion less weight because of MoneyGram's experience, the agency can do so, and Defendants will respond.  But that is not a *Daubert* issue.

**B.**  The SEC also (at 73-74) criticizes Osler for failing to adhere to the four *Daubert* factors governing quantitative, scientific opinions.  Those criticisms are misplaced.  Because the *Daubert* factors for scientific opinions do not invariably apply to all expert opinions, *Kumho Tire*, 526 U.S. at 151, courts reject efforts to apply rigid "testing" or "rate of error" requirements to opinions that are not are not susceptible to objective testing.  *E.g., In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 480 (S.D.N.Y. 2016) ("Defendants . . . attempt to force [the expert]'s opinions into the four-factor mold set forth by *Daubert* . . . [but] [n]one of the four factors listed in *Daubert* apply to [the expert], which makes sense because she is not purporting to be a scientist giving a scientific opinion.").  Osler offers her opinions as a matter of *economic theory*, and the scientific *Daubert* factors do not apply to such opinions.  *See Ticketmaster Corp. v. Tickets.Com, Inc.*, 2003 WL 25781900, at *1 (C.D. Cal. Jan. 27, 2003) ("It is obvious" that opinions based on "economic theories" "cannot be held to the rigid standards that expert scientific testimony must meet.").[49]

Beyond that general principle (which itself suffices to reject the SEC's argument), courts have held that expert economists' opinions comparable to Osler's (which concern the generally accepted economic theory of currencies and the concepts of network effects and barriers to entry as applied to ODL) are admissible.  *See Miller v. Holzmann*, 563 F. Supp. 2d 54, 96 (D.D.C. 2008)

---

[49] *See also, e.g.*, *United States v. Univar USA Inc.*, 294 F. Supp. 3d 1314, 1332 (Ct. Int'l Trade Mar. 2, 2018) ("[I]t is usually impossible to subject nonscientific theories, such as the economic theories relevant here, to experimentation."); *SourceOne Dental, Inc. v. Patterson Cos.*, 2018 WL 2172667, at *2 (E.D.N.Y. May 10, 2018) ("Expert testimony on 'soft sciences' like economics is less likely to be excluded 'because these disciplines require the use of professional judgment[.]' " (citation omitted)).

(economics professor opining on "general economic theory" did not need to satisfy scientific "testability" or "margin-of-error" factors, and satisfied *Daubert* by applying "basic principles taught in undergraduate economics courses, which indicates the theories . . . [were] generally accepted in the field of economics"); *Skydive Ariz., Inc. v. Quattrocchi*, 2009 WL 2515616, at *2 (D. Ariz. Aug. 13, 2009) ("The principles and methodologies discussed by Mr. Durkin are general economic principles on networks and network effects.  Therefore, the Court is satisfied that Mr. Durkin's testimony rests on a reliable foundation."); *SourceOne Dental*, 2018 WL 2172667, at *7 (permitting testimony on why entity "was a potentially disruptive market entrant").  Osler offers no quantitative opinion, and the SEC's efforts to suggest otherwise by faulting her for not running "tests" or calculating margins of "error" are inapposite.[50]  *See Mirena*, 169 F. Supp. 3d at 480.

The SEC also complains (at 73) that Osler delivers her currency opinion "without defining the term 'currency,'" but that is a matter of semantics, not substance.  Osler explained at her deposition that there are arcane academic debates over the precise contours of how to define currency but that there is "a consensus within" the field of academics who study currency as to the "functions" and "attributes" that currencies possess, and she evaluated whether XRP had those functions and attributes.  Osler Tr. 69:4-13, 72:21-73:6.  The SEC agrees that the "functions and attributes of a currency" are "clearly" within her expertise.  Mot. at 76.  Applying concepts based on broad academic consensus is precisely what an expert should do.  *E.g., Miller*, 563 F. Supp. 2d at 98.

---

[50] The SEC (at 73 n.19) goes so far as to criticize Osler for failing to include what the SEC believes to be a sufficient number of "chart[s], graph[s], or table[s]" in her report, citing no authority.  There is, of course, no requirement for an expert to include any minimum number of demonstratives in her report in order to offer admissible opinions.

**C.**  Finally, the SEC (at 74) relies extensively on the rebuttal report of its expert, ████,

to argue that Osler's currency opinion is wrong.  But it simply lists the ways he disagrees with

her—setting up the kind of "battle of the experts" that goes to weight, not admissibility.[51]  *In re*

*Joint E&S Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) ("Trial courts should not

arrogate the jury's role in 'evaluating the evidence and the credibility of expert witnesses' by

'simply cho[o]s[ing] sides in [the] battle of the experts." (citation omitted)); *In re Term*

*Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *21 (S.D.N.Y. Sept. 30, 2020) ("[T]he

Parties present a classic battle of the experts . . . [a]nd the Court cannot choose, as a matter of law,

which [side is] more convincing.").

Although the SEC argues (at 74) that ████ "actually tested" whether XRP is a currency,

his report shows that all he did was take a different view of the importance of "general

acceptance"—a potential consideration relating to whether an asset is a "medium of exchange,"

one of the three core functions of currencies.  Even if ████ competing view on this point were

right, that would not warrant exclusion.  *Malletier*, 525 F. Supp. 2d at 648 (it is for juries, not

judges, to choose between two "competing" expert theories).

In any event, if the SEC seeks a battle of the experts on this issue, it is on the losing side.

████ lacks the qualifications to rebut Osler:  he is not a macroeconomist and has no experience

studying currencies.  His purported rebuttal of Osler sorely misapplies the economic concepts at

issue.  For example, ████ argues that XRP lacks "general acceptance" (and therefore is not a

"medium of exchange") because companies like Home Depot or Walmart do not accept it for retail

purchases.  ████ Rebuttal Rep. ¶ 19.  But that is not how economists define "general acceptance"

---

[51]  Defendants have separately moved to exclude ████ opinions, for reasons independent of his debate with Osler.  *See* ECF No. 538.

or "medium of exchange."  If it were, then the Euro, New Zealand Dollar, and Thai Baht (to name just a few), which also are not accepted for retail purchases at Home Depot and Walmart, would not count as "currencies."  Rather, as Osler explained at her deposition, the "threshold [of 'common acceptance'] is extremely low," as demonstrated by (among other things) a seminal academic paper characterizing cigarettes in POW camps as currency, which she noted is accepted by the "vast majority of economists" and is "almost universally known" and taught to students.  Osler Tr. 93:15-94:8.  And ████ simply ignores the retailers worldwide that do accept XRP as payment. *See, e.g.*, Osler Rep. ¶ 13 (identifying two examples); *see also* Ex. 29, Expert Report of Peter Adriaens ¶¶ 119-134 & App. C (Oct. 4, 2021) ("Adriaens Rep.") (identifying other businesses that accepted or used XRP).  In any event, those factual disputes are for a jury to resolve; ████ disagreement with Osler falls far short of justifying her exclusion.

### H.     Yesha Yadav

#### 1.     Yadav's Background and Opinions

Professor Yesha Yadav is a tenured professor at Vanderbilt University, is a leading academic in the field of market structure, financial innovation, and financial markets.  Her research covers the design and operations of both traditional and cryptocurrency exchanges; the dynamics of market trading, clearing, and settlement on exchanges; and how exchanges act as "critical actors" in private industry self-governance.  Ex. 30, Expert Report of Yesha Yadav ¶¶ 1-10 (Oct. 4, 2021) ("Yadav Rep.").  Her expert opinion provides background on the operation and core functions of exchanges; examines the importance and operation of the rules and processes by which trades are matched, become final, are settled, and disputes are resolved on exchanges; explains that these rules and processes are necessary to fulfill the exchanges' central economic purpose as places where participants can transfer value reliably and predictably, and with finality; and explains how her background and research support her opinions.  *See id.* ¶ 22.  She concludes that:  (1) as a matter of market structure, offers to buy or sell digital assets on exchanges are made in the physical location of the exchanges; and (2) based on her research and experience relating to how exchanges finalize trades, there is no indication that trades on the majority of the exchanges on which Defendants traded became binding in the United States.  *See id.* ¶¶ 19, 63, 71.  Her opinion demonstrates that Defendants' sales and offers of XRP on foreign cryptocurrency exchanges—a unique transactional environment—were not within the territorial scope of the U.S. securities laws.  *See Morrison v. Nat'l Australia Bank Ltd*., 561 U.S. 247, 251 (2010); *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67-69 (2d Cir. 2012).

The SEC does not dispute that Yadav is qualified to offer the opinions in her report.  Nor could it.  It also does not challenge the relevance of her opinions and does not challenge the reasoning that Yadav employed to opine that offers and sales on cryptocurrency exchanges are

made at the location of the exchange.  Instead, the SEC makes two narrow arguments:  It claims

that (1) Yadav is offering "*a legal opinion* on a *legal issue*," Mot. at 45, and that all of her opinions

are "wrong" because they do not embrace the SEC's interpretation of the law, *id.* at 47-48; and (2)

one specific aspect of her testimony—her opinion on the locations of trades on cryptocurrency

exchanges—should be excluded as "unreliable and internally inconsistent." *id.* at 48-51.  Neither

of these arguments warrants exclusion, in full or in part.

### 2.      Yadav Does Not Offer Any Inadmissible Legal Conclusion

The SEC's "legal opinion" argument (at 46-47) misstates the proper scope of expert

testimony.  An opinion is inadmissible on this ground only "if it will 'usurp either the role of the

trial judge in instructing the jury as to the applicable law or the role of the jury in applying that

law to the facts before it.'"  *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (citation

omitted); *see also Bilzerian*, 926 F.2d at 1294-95.  Yadav's opinion does neither.

*First*, Yadav does not usurp the role of the trial judge because she does not purport to set

forth her "*own legal test*."  Mot. at 47.  Tellingly, the SEC does not point to any specific portion

of Yadav's report that opines on the applicable legal test, because Yadav never once makes any

"simple bald assertion of the law."  *Fiataruolo*, 8 F.3d at 942; *see also MTBE*, 2008 WL 1971538,

at *14 (admitting expert testimony where expert did not "testify as to the legal meaning" of a term

but instead "permissibly state[d] a factual conclusion supporting a legal argument").  Instead,

Yadav offers a market microstructural opinion about the location of sales and offers to sell based

on *facts* and academic research concerning the rules and processes governing orderly operation

and rules of cryptocurrency exchanges.[52]  She explains the key features that enable exchanges to

---

[52] The fact that the terms "sale" and "offer to sell" are also defined in Section 2 of the
Securities Act of 1933 is of no import; Yadav employs those terms as they are commonly used in
her field of market microstructure, and the use of industry terms that have another meaning in a

operationally transform an intention to trade into an actionable offer that, once matched with another offer, becomes a consummated and binding trade on the exchange.  These microstructural processes—involving, as she describes, the exchange rules, logistics, matching conventions, dispute-resolution processes, and more—are essential to how exchanges fulfill their central economic purpose by constructing a marketplace that can deliver the trust, certainty, and finality that traders count on when structuring their economic decisions.  She applies her knowledge and experience from academic research and market practice to opine that sales and offers to sell on the exchange must occur on the exchange itself in accordance with the exchange's specific rules and processes.  *See generally* Yadav Rep. ¶¶ 26-98.  All of that testimony concerns market-structural concepts central to how trading on cryptocurrency exchanges takes place—concepts with which the jury may be unfamiliar.  None of it is even close to an "opin[ion] on any of the ultimate legal issues in the case."  *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at \*25-26 (S.D.N.Y. Feb. 11, 2022) (allowing testimony on regulatory matters where expert did not offer opinions that advertising was misleading as a matter of law); *see also Blech*, 2003 WL 1610775, at \*19 ("expert testimony is especially appropriate" "to explain terms and practices that a lay jury would not understand").

    *Second*, Yadav's opinions do not usurp the role of the factfinder.  Mot. at 46.  "An opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a).  Rather, expert testimony may permissibly supply essential ingredients to assist a factfinder in arriving at the ultimate conclusion.  *See* Fed. R. Evid. 704 advisory committee's note to 1972 proposed rules.  Such testimony is helpful.  *See Elysium*, 2022 WL 421135, at \*26.  Nowhere does Yadav purport

---

legal context does "not transform . . . empirical and economic analysis into 'testimony stating ultimate legal conclusions.' "  *Aluminum Warehousing*, 336 F.R.D. at 32 (citation omitted).

to tell the factfinder "what result to reach" by offering "a simple statement on how its verdict should read." *Fiataruolo*, 8 F.3d at 941-42.  Instead, she analyzes facts and renders an opinion on how sales and offers to sell on cryptocurrency exchanges work.  These include facts that are important for a factfinder to evaluate extraterritoriality—such as facts "concerning the formation of the contracts" and "the placement of purchase orders."  ECF No. 441 at 23; *see Term Commodities*, 2020 WL 5849142, at *13 (denying motion to exclude expert testimony that provides "commentary on a factual issue" and "market observations" regarding how behavior impacts the market, as opposed to whether the defendant violated the law).  For example, Yadav analyzes market practice to detail how instructions given to agents differ from actual actionable offers made on an exchange.  She describes how generalized instructions to agents must be translated into specific orders to trade on an exchange in accordance with the exchange's specific rules and processes in order to be viewed and accepted by counterparties.  Yadav Rep. ¶¶ 71-83. This is squarely the kind of evidence that will be helpful in evaluating whether offers occurred domestically or abroad.  *See* ECF No. 441 at 25-26.  And Yadav's testimony regarding when and where trades on cryptocurrency exchanges become final, Yadav Rep. ¶¶ 84-114, will be helpful in evaluating whether sales occurred domestically or abroad.  *See* ECF No. 441 at 23-24; *Duncan*, 42 F.3d at 101 (expert testimony admissible where, rather than "tell[ing] the [trier of fact] what result to reach," it provided "the groundwork" "to enable the [trier of fact] to make its own informed determination"); *Capri Sun*, 2022 WL 976270, at *21 (declining to exclude testimony where "report does not force the facts into a legal mold that would deprive the average juror of her ability to make factual determinations"); *Chen-Oster*, 2022 WL 814074, at *5 (distinguishing between "a legal brief that parrots" parties' arguments and those that "provide context to the [trier of fact] to aid its understanding of the facts").

Finally, the SEC claims (at 47) that Yadav's opinions are not compatible with *Morrison* as applied by the Court in its Order on the Individual Defendants' Motions To Dismiss. But the Court has not had occasion to apply the law under *Morrison* to facts adduced in discovery regarding the operation of offers and sales that Defendants made on *foreign cryptocurrency exchanges*, including through a *foreign trading firm*.[53] The SEC's ultimate contention that Yadav's opinions are "wrong," Mot. at 47, is no basis for exclusion. *See Mirena*, 169 F. Supp. 3d at 419 ("Although Plaintiffs and their experts may disagree with [the expert's] conclusions, these disagreements are best explored on cross-examination.").

The SEC also mischaracterizes Yadav's opinions. The SEC says that Yadav concluded that "facts regarding where contracts were formed, where orders were placed, or where title was passed" "are not relevant." Mot. at 47-48. That is simply not true. Yadav expressly *considers* the processes of order placement and matching—including "where orders were placed" and "where contracts were formed"—in her analysis of the "rules of the road" that exchanges put in place in order to ensure trust, liquidity, and finality. *E.g.*, Yadav Rep. ¶¶ 22, 30, 37-39 (explaining why exchanges set rules to "establish market expectations" regarding "when trades become binding"); *id.* ¶¶ 64-70 (opining that, based on a review of exchange rules and practices, orders, once matched, become automatically binding on parties in the exchange's trading system). Similarly, Yadav does not reject the location of the seller as "*entirely irrelevant*," Mot. at 47-48; instead, she explains that, in the context of a trade executed on an exchange, "[a]n executable offer to trade does not materialize when and where a client instructs their agent to buy/sell certain assets at a future date

---

[53] The Court's decision on the motion to dismiss was necessarily confined to consideration of the SEC's allegations in its Amended Complaint. The SEC's Amended Complaint conspicuously omitted an explanation of the offering or selling process on foreign exchanges, or anything but the barest of allegations concerning the operations of the foreign trading firm that placed offers and sales on Defendants' behalf. *See* Am. Compl. ¶¶ 174-178, 183-187.

and time" because, "[a]t that stage, there is no actual offer to trade on an exchange," Yadav Rep. ¶ 72.  These opinions will be useful to the factfinder in applying the law of offers in the context of exchanges, where courts consider that the trader "has figuratively traveled to that foreign exchange" through a foreign broker to complete the transaction.  *Stackhouse v. Toyota Motor Co.*, 2010 WL 3377409, at *1 (C.D. Cal. July 16, 2010); *see also Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 626 (S.D.N.Y. 2010) (citing *Stackhouse*); *Plumbers' Union Loc. No. 12 Pension Fund v. Swiss Reinsurance Co.*, 753 F. Supp. 2d 166, 179 (S.D.N.Y. 2010) ("the country in which an investor happened to be located at the time that it placed its purchase order is immaterial" because the purchaser "figuratively traveled" to the exchange).

### 3.    Yadav's "Opinion 3" Is Based on a Reliable Methodology, and the SEC's Criticisms Are Issues of Weight, Not Admissibility

The SEC's final criticism of Yadav's report focuses only on the last of her opinions.  Yadav examined 25 cryptocurrency exchanges and determined that, for 21 of them, "there is no indication that offers are made on the exchanges in the U.S., or that trades on these exchanges become final in the U.S."  Yadav Rep. ¶¶ 99-114.

The SEC claims (at 48) that the indicia Yadav examined for whether offers and sales on cryptocurrency exchanges are made in the United States "are not generally accepted in her field." As an initial point, the SEC's objection has no foundation:  the SEC cites no authority for that proposition, and the rebuttal "expert" it offered, ███, has no background or expertise in this area at all.  *See* ECF No. 544 at 14-15.  But, in any event, the SEC is wrong on the law; a "well-grounded" theory can be admissible even if it has not "been published."  *Daubert*, 509 U.S. at 593; *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (rejecting proposition that an expert "must back his or her opinion with published studies that unequivocally support his or her conclusions").  This is particularly true in this novel field.  What matters is not

publication history, but rather whether the opinion is strongly "grounded in" an expert's "experience" and academic work. *Mirena*, 169 F. Supp. 3d at 422 (admitting expert testimony where opinions were "grounded in his experience and in the literature, as is appropriate under *Daubert*"); *see also United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (*Daubert* factors are not a "checklist").

The SEC also claims (at 49) that Yadav did not explain "how she arrived" at her indicia. That is false. Yadav applies her knowledge and experience in exchange design and operation to detail at length why she consulted certain specific indicia to determine where an exchange is located. Yadav Rep. ¶¶ 103-105. For example, an exchange's "place of business, registered office and domicile" identify "the location of operations for the exchange on which offers are made and trades finalized," *id.* ¶ 103, and thus the potential location of their books and records, including those detailing finalized trades. The location mentioned in the exchange's terms of service provides the "jurisdiction to cover dispute resolution" and governing law, *id.*, which affect the finality of trades. The location where regulators and market participants believe an exchange is located is also important: the expectations of users about location should be informed by their regular commercial interactions with the exchange, including those concerning applicable laws and avenues for redress; those of regulators can reasonably be assumed to be supported by informed investigation and dialogue with foreign peer regulators. *See id.* ¶¶ 103-105. Combined with Yadav's extensive experience, these explanations more than adequately show "how the conclusion is . . . grounded" in Yadav's expertise. Fed. R. Evid. 702 advisory committee's notes to 1972 proposed rules.

The SEC next argues (at 49-50) that Yadav should have considered certain of the SEC's preferred factors and placed less emphasis on others. This challenge amounts to nothing more

than simple disagreement with Yadav's conclusions—axiomatically inappropriate grounds for exclusion.  *See Daubert*, 509 U.S. at 595 (court's focus "must be solely on principles and methodology, not on the conclusions that they generate"); *Blech*, 2003 WL 1610775, at *25 (rejecting challenge to expert where argument was "a simple disagreement of opinion").[54]  If the SEC thinks an expert failed "to consider alternative scenarios or additional facts," it can introduce additional evidence at trial if it chooses.  *Media Glow Digit., LLC v. Panasonic Corp. of N. Am.*, 2019 WL 1055527, at *5 (S.D.N.Y. Mar. 6, 2019); *see Restivo v. Hessemann*, 846 F.3d 547, 577 (2d Cir. 2017) (contentions that "assumptions are unfounded" or that there are "gaps or inconsistencies in the reasoning leading to" the opinion "go to the weight of the evidence, not to its admissibility").

In any event, the SEC's quibbles with Yadav's indicia fall apart on close examination.  For example, it claims that she failed to consider the location of an exchange's computer servers.  But Yadav *does* consider whether servers should be consulted as an indicia of location for cryptocurrency exchanges, and she dismisses the idea as uninformative, given how digital and automated global financial markets work in practice.  *See* Yadav Rep. ¶¶ 103-105; Ex. 31, Dep. Tr. of Yesha Yadav ("Yadav Tr.") 243:18-25 ("Based on my research and experience, based on my understanding of market structure and trading, I conclude strongly that servers in today's modern digital global electronic marketplace really have no significance whatsoever in providing definitive and credible indicia of where an exchange or firm is located.").  As she explains,

---

[54] The SEC's criticisms of Yadav's indicia appear to be a repackaging of the contrary opinions of its putative rebuttal expert, ████. ████ is unqualified to offer those opinions and has no methodology to support them.  *See* ECF No. 544 at 14-15.  But even if his opinions were admissible (they are not), mere "disagreements between experts rarely if ever justify *Daubert* exclusions."  *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *13 (S.D.N.Y. June 11, 2021).

exchanges and firms commonly locate servers around the world in order to enable cross-border trading to occur.  That the London Stock Exchange locates servers in Virginia does not change the location of the London Stock Exchange to Virginia.  Rather, orders are matched on the order books of the London Stock Exchange, and the London Stock Exchange is clearly located in the United Kingdom.  *See* Yadav Rep. ¶¶ 41-42, 102, 105; *see also Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (plaintiffs needed to "allege more" for domesticity than saying that "title 'passed in whole or in part over servers located in California that host Binance's website.'" (citation omitted)), *appeal pending*, No. 22-972 (2d Cir.).  Likewise, it claims (at 50) that Yadav offers no "credible" explanation for why she considered the perceptions of regulators and market participants about where exchanges are located.  Yadav *does* explain clearly why she considers these indicia.  Yadav Rep. ¶ 105.  The word "credible" speaks volumes here; the SEC's complaint is not that she did not explain her reasoning, but that the SEC disagrees with that reasoning as not "credible."  Such a challenge does not pass muster:  courts "must not determine the credibility of the expert's proffered testimony" on a *Daubert* motion.  *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 399 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).[55]

Finally, the SEC claims (at 50-51) that Yadav applied her indicia inconsistently because she observed that four U.S.-based exchanges had foreign affiliates but allegedly did not examine whether any of the 21 exchanges without indicia of a U.S. presence had U.S.-based affiliates.  But Yadav's observation that some U.S.-based exchanges have foreign affiliates is not a methodological issue; it is an observation Yadav made for completeness.  Yadav Tr. 235:7-236:19. As she explained, if a trade was made on a U.S. affiliate, the four indicia would then have to be

---

[55] The SEC also claims, falsely, that Yadav "ignore[d]" on-ledger or over-the-counter trades.  Mot. at 45 n.9.  Not so.  Those issues are beyond the scope of Yadav's opinions, which were limited to trades made on cryptocurrency exchanges.  Yadav Rep. ¶ 19.

applied to *that affiliate exchange* to determine where the affiliate was located and thus where the offer and sale were made. *Id.* 237:5-14. But there is absolutely no evidence in this case that any such trade occurred. Critically, the SEC—not Yadav—has the burden to prove the domesticity of each trade. *See SEC v. Ahmed*, 308 F. Supp. 3d 628, 660 (D. Conn. 2018). At bottom, this too is an objection to the conclusions in Yadav's report, not a methodological challenge requiring exclusion. *See Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40 (S.D.N.Y. 2016) (alleged "inconsisten[cies]" in expert's prior testimony and disputes about contrary facts were "matters for cross-examination at trial").

I.      Peter Adriaens

    1.      Adriaens's Background and Opinions

Peter Adriaens is a Professor of Entrepreneurship and Strategy at the University of Michigan's Ross School of Business.  Adriaens is an engineer, a scientist, and an entrepreneur, with extensive practical and classroom experience and a substantial publication record in all of those disciplines.  *See* Adriaens Rep. ¶¶ 1, 3, 5 & App. A at 1.  His academic interests and experience include FinTech (*i.e.*, the application of computer technology to support banking and other financial services).  Among other things, since 2016, he has directed the University's Center for Smart Infrastructure Finance, in which he co-founded the University's "FinTech Collaboratory," a cross-disciplinary program studying cryptocurrency.  *Id.* ¶¶ 4-9.  He became familiar with Ripple through this work.  *See id.* ¶¶ 12-15.[56]  Further, he is personally a co-founder of and investor in startups, and he serves on boards for FinTech organizations, such as Detroit FinTech Bay and Blockchain Triangle.  *Id.* ¶¶ 10-11.

Adriaens will not offer the jury opinions on the technical aspects of any particular blockchain technology.  *See* Ex. 32, Dep. Tr. of Peter Adriaens ("Adriaens Tr.") 295:4-10.  His opening report, instead, catalogs common background facts he considered about the blockchain industry and the XRP Ledger and Ripple in particular as context for his opinions—often relying, as the SEC notes, on Ripple's words, rather than paraphrasing the underlying sources.  *See* Adriaens Rep. ¶¶ 26-78; *see also id.* ¶ 41 n.26 (explaining that the sources he is "relying on" "[i]n describing the XRP Ledger, XRP, and Ripple throughout this report" include (among other things) certain sections of Ripple's website or that of the XRP Ledger Foundation).  Defendants will not

---

[56]   The FinTech Collaboratory is funded in part by Ripple's University Blockchain Research Initiative (UBRI), which supports programs at dozens of universities that research matters related to blockchain and payments technologies.  *See* Ripple, *University Blockchain Research Initiative*, https://ubri.ripple.com/.

offer his affirmative testimony at trial to establish those facts:  he does not have (and does not need, *see* Fed. R. Evid. 703) personal knowledge of the development of the XRP Ledger, and he is not a computer scientist.  Defendants will instead prove those facts through other sources.

As the SEC notes (at 23), Adriaens will instead offer three opinions, *see* Adriaens Rep. ¶¶ 19-21:   (i) that the XRP Ledger's functional improvements over other blockchains in the application of blockchain technology to payment systems—its (much) faster transaction speed and (much) reduced environmental impact—are important in encouraging the adoption of blockchain technology; (ii) that it is consistent with how innovative high-tech startups develop for Ripple to have taken years and several iterations to find the right commercial application for its use of the open-sourced XRP Ledger; and (iii) that marketplace validation of the technology's commercial promise can be found in the fact that scalable firms with a diverse array of offerings have found use cases for XRP and the XRP Ledger.  *See* Adriaens Tr. 295:16-22 (identifying these paragraphs as "summariz[ing] the opinions that [he] offered in this case").  None of those opinions requires "expertise in the technical details of how XRP Ledger validation works."  *Id.* 295:4-10.

Adriaens's testimony will end there if the Court, as it should, excludes the opinion of the SEC's computer science expert, ▮▮▮▮▮▮▮, that the XRP Ledger is not decentralized.  *See* ECF No. 541.  If ▮▮▮ does testify, Adriaens will offer a rebuttal.  Although as a matter of industry shorthand, Adriaens believes the XRP Ledger is decentralized and said so in his opening report, Adriaens Rep. 59, he will offer no *opinion* establishing whether the XRP Ledger is in fact centralized or decentralized as the term is used in the computer science field.  *E.g.*, Adriaens Tr. 295:4-15 (stating that his "background is in the business analytics, business development, and business applications of the blockchain and digital currencies" and not in the operational details of blockchain).  He instead addresses ▮▮▮▮▮ opinions as a FinTech expert familiar with industry

practice and academic literature regarding blockchain decentralization. *See, e.g.*, *id*. On rebuttal, he will explain that the "methodology" ███ created for this litigation to assess that question is not accepted; that it is indefensible on its own terms; and that ███ application of it is unreliable. *See* Ex. 33, Expert Rebuttal Report of Peter Adriaens ¶ 4 (Nov. 12, 2021) ("Adriaens Rebuttal Rep.").

### 2. The Opinions Expressed in Adriaens's Report Are His Own

The SEC primarily attacks not Adriaens's methodology or opinions, but his drafting process. Mot. at 23-27. It fails to show that the drafting of the report is a basis for the exclusion of his opinions.

Rule 26 requires an expert to disclose "the facts or data considered by the witness in forming" the expert's opinions in a report to be "prepared and signed by the witness." Fed. R. Civ. P. 26(a)(2)(B). But the Federal Rules do not dictate either the drafting process or the attribution norms the witness is to use. As to the drafting process, many cases—including those decided before the modern rule that the attorney work product doctrine bars discovery into the details of the drafting process, *see* Fed. R. Civ. P. 26 advisory committee's note to 2010 amendment—have recognized that as long as the witness is "substantially involved" in preparing the report and the report reflects the expert's opinions, the mechanics of its drafting are not a basis for exclusion. *See Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005) (denying disqualification motion when counsel assisted expert in drafting report; expert "was actively and substantively involved in the preparation and content of his report[,] thoroughly read it prior to affixing his signature," and "ratified and confirmed that the opinions set forth in the report are his own expert opinions").[57] That is especially appropriate where (as with Adriaens) an expert is not

---

[57] *See also Isom v. Howmedica, Inc.*, 2002 WL 1052030, at *1 (N.D. Ill. May 22, 2002) ("reject[ing] a formalistic approach which would require that the expert be the person who actually

a professional witness.  *See StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc.*, 2015 WL 3824170, at

*7 (M.D. Fla. June 19, 2015) (rejecting *Daubert* challenge where inexperienced expert "asked

Defendants' counsel to prepare a draft of his opinion, to which [he] provided extensive corrections

to ensure that his opinion was conveyed").[58]

The record shows that Adriaens was substantially involved in preparing his report; in fact

he drafted his report through multiple iterations with counsel and with the assistance of one of his

students.  *See* Adriaens Tr. 15:8-16:16.[59]  The SEC cannot show that Adriaens does not himself

hold the three opinions identified above:  this is not a case like *Riegel v. Medtronic, Inc.*, 451 F.3d

104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008); Mot. at 24, because Adriaens did not "back[]

away from" his core opinions "in his deposition."   Adriaens did not expound on technical

computer-science details on the XRP Ledger that lie outside his expertise, *e.g.*, Adriaens Tr.

134:13-136:21; 167:25-168:14, but he made clear that his three core opinions were his own and

fully embraced them.  *Id*. 295:23-296:1 (agreeing that he did not need "expertise in the technical

---

puts pen to paper (or fingers to keyboard)"; similar result); *Lehman Bros. Holdings, Inc. v. Laureate Realty Servs., Inc.*, 2007 WL 2265199, at *2 (S.D. Ind. Aug. 6, 2007) ("[T]he determinative question with respect to whether there has been compliance with respect to the 'preparation' of a Rule 26(a)(2) report is not who actually penned an expert's report, but whose opinions and analysis the report contains."); *see also Crowley v. Chait*, 322 F. Supp. 2d 530, 544 (D.N.J. 2004) (similar).

[58] The SEC mentions counsel's instructions not to disclose details of the drafting of individual sentences in the report.  But such questioning improperly invades attorney work product, *see* Fed. R. Civ. P. 26(b)(4)(B), and the SEC never sought further information on the ground that any specific instruction was improper and that the potential answer was material.

[59] This case thus differs from the SEC's "ghostwriting" cases (at 26).  *Gov't Emps. Ins. Co. v. Right Spinal Clinic, Inc.*, 2022 WL 2122655, at *3-5 (M.D. Fla. June 14, 2022) (expert "did not contribute a single word to the Report" or "participate in the drafting process with" lawyers, and was "so far removed from the drafting process that he does not know who wrote the Report"); *Pac. Life Ins. Co. v. Bank of New York Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021) (expert "unable to describe what any of" those "with whom he had worked . . . did in connection with the preparation of the report," "could not recall how much time he spent editing the report or any details of directions he gave for its preparation[,]" and "could not identify which [staff] performed what tasks or even [seriously] describe the supervision he purportedly provided").

details of how XRP Ledger validation works" to offer the three opinions set forth in paragraphs 19-21 of his report).

The SEC does not and cannot claim it is improper for Adriaens to rely on Ripple for facts. That is different from "restat[ing]" a client's "views" as his opinion, which he did not do. *Cf. Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 428 (S.D.N.Y. 2009); Mot. at 26. Instead, the SEC criticizes Adriaens because his opening report recites background facts in language found in other sources, at times without attribution. Such citation failures are fair game for cross-examination, but do not present a *Daubert* issue. The SEC fails to show otherwise.

*First*, the SEC does not contend that any background fact Adriaens recites is controversial. For example, the SEC cites (at 25) language it found on an "Amazon web page" that states the meaning of "decentralization" in the blockchain context, and implies that Adriaens parroted that language without attribution. That argument misconstrues the record; Adriaens confirmed during a deposition break, *see* Adriaens Tr. 293:3-294:5, virtually identical language is used in other sources as well.[60]   But in any event, the SEC does not claim that this description of "decentralization" is incorrect; only that it appears without attribution in the report. The fact that the language is so widespread simply reinforces the point that it is uncontroversial background information for Adriaens's opinions—not the opinions themselves.

The SEC's own expert, ███, supplied inline citations only "[w]here appropriate," *see* Ex. 34, Amended Expert Report of ███████ at 5 (Jan. 25, 2022) ("███ Rep."), and

---

[60] *See, e.g.*, Blockchain Council, *What is Decentralization in Blockchain?* (similar language used without attribution), https://www.blockchain-council.org/blockchain/what-is-decentralization-in-blockchain/. Indeed, it is so common that it has since been used in a book published after the deposition. *See* R. Hemaltha, D. Akila, D. Balaganesh & A. Paul, *The Internet of Medical Things (IoMT): Healthcare Transformation* Sec. 14.3.1 (2022), *available at* https://www.google.com/books/edition/The_Internet_of_Medical_Things_IoMT/crZeEAAAQBAJ?hl=en&gbpv=1.

appears to have himself used language found elsewhere in his own report without attribution.  As one example, his description of bitcoin consensus validation tracks Wikipedia's in important ways.[61]  As another, he explains a bitcoin transaction in terms strikingly similar to those used in a course presentation from Carnegie Mellon University.[62]  Defendants do not contend that those resemblances make ▮▮▮▮▮▮ opinions inadmissible, though it is inadmissible for other reasons.  But it does show that uncontroversial background facts are familiar and accessible to those that work and teach in the blockchain field, and that elegant variation is not at a premium in it.  And it is another example of the SEC proposing a test its own experts could not pass.

*Second*, the SEC does not contend that the specific language to which it objects is material.  Take the SEC's example (at 24-25) of Ripple blog posts regarding the environmental advantages of the XRP Ledger over bitcoin, and the company's vision to speed up the settlement of international payments.  If Adriaens had paraphrased these sources or put quotation marks around the language he used, that would have made no difference to the opinions he is offering, as his opinions are about what follows from those facts.

*Third*, and finally, the SEC points to no evidence that Adriaens bore any dishonest intention in assembling his report.  He explained that it was "never [his] intention to not cite if [the text] was identical to something that we find somewhere else."  Adriaens Tr. 294:6-11.  The SEC does not

---

[61]    *Compare* ▮▮▮▮▮ Rep. 14-15 (setting forth six) *with* https://en.wikipedia.org/w/index.php?title=Bitcoin_network&oldid=1046993712 (version of Wikipedia page about the bitcoin network contemporaneous with ▮▮▮▮▮ opening report containing, under Section 2.3, text nearly identical to those steps' topic sentences).

[62] *Compare* ▮▮▮▮▮ Rep. 12 (describing how a bitcoin "user Alice wishing to send 1 BTC to another user Bob" would do so, then how to mitigate so-called "double-spend" difficulties) *with* A. Datta, *18733:  Applied Cryptography* at 14-15, Spring 2017 (lecture slides from Carnegie Mellon course; one explains how, if "Alice wants to send 1 BTC to Bob," she would do so, and the next explains how the system would prevent double-spending), https://course.ece.cmu.edu/~ece733/lectures/22-bitcoin.pdf.

and cannot accuse Adriaens of merely repeating opinions reached by another expert.[63]  Under these

circumstances, the SEC is free to characterize the issue of copying background facts as one of

"credibility," but the SEC "has not shown that it impacts the reliability of" his "opinions."  *GWTP*

*Invs., L.P. v. SES Americom, Inc.*, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007).[64]

### 3.    Adriaens's Opinions About the XRP Ledger's Innovations and Ripple's Business Model Are Relevant and Proper Expert Testimony

The SEC cannot mean what it says (at 27) in dismissing as "irrelevant" Adriaens's first

two opinions:  that the XRP Ledger's innovations were commercially important and that Ripple's

product evolution is typical of high-tech startups.  The SEC alleges that "No Significant Non-

Investment 'Use' for XRP Exists."  Am. Compl. at 63; *see also id.* ¶¶ 358-378 (dismissing ODL).

Further, the SEC's own proffered expert, █████, also states baselessly, *see* ECF No. 544 at 7, that

Ripple's ODL product is not commercially viable.  The notion that evidence refuting contentions

the SEC itself has put at issue is "irrelevant" is not serious.  Adriaens's testimony about XRP and

the XRP Ledger generally and about Ripple's ODL product in particular is relevant to rebut the

---

[63] This case is thus unlike the SEC's other cases (at 23, 26).  *E.g.*, *Gov't Emps. Ins.*, 2022 WL 2122655, at *3-5 (expert's report was demonstrably copied from one the party had presented in a different case and drawn without attribution from a book written by party's counsel); *see also Malletier*, 525 F. Supp. 2d at 666 (excluding expert on mouthpiece theory); *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015) (declining to exclude expert on mouthpiece theory).  Although the SEC plucks out instances (at 25-26) where Adriaens was unable to elaborate on particular facts, the SEC makes no attempt to show that those facts matter, and even moments of "painful[] confus[ion]" about a report during deposition do not warrant exclusion.  *Sunbeam Prods., Inc. v. Homedics, Inc.*, 670 F. Supp. 2d 873, 883 (W.D. Wis. 2009).

[64] Even taking the SEC's argument in its most extreme form as an accusation of plagiarism in a report, that is merely a subject for cross-examination, absent proof of an intention to testify falsely or to pass off another expert's opinions as one's own (which are not present here); it does not warrant outright exclusion.  *See GWTP Invs.*, 2007 WL 7630459, at *5 ("While the alleged plagiarism may be germane to the issue of Shaw's credibility, however, SES has not shown that it impacts the reliability of Shaw's opinions."); *Legier & Materne v. Great Plains Software, Inc.*, 2005 WL 2037346, at *4 (E.D. La. Aug. 3, 2005) (expert accused of plagiarism; court holds credibility issues are "better left to the trier of fact").

SEC's allegations and expert testimony.  Further, even independent of those reasons, it also provides important context in assessing XRP's "character in commerce," which is relevant under binding Supreme Court and Second Circuit precedent.  *Joiner*, 320 U.S. at 352-53; *Glen-Arden*, 493 F.2d at 1029, 1034.

The SEC is also incorrect in arguing (at 32) that Adriaens's business-model opinion simply offers a "factual narrative recounting Ripple's history of developing and funding projects related to XRP or the XRP Ledger."  This argument again ignores the distinction between background facts and expert opinions based on them.  The "factual narrative" that the SEC complains of is simply the set of facts that Adriaens considered in forming his opinions refuting the SEC's caricatures of the XRP Ledger and Ripple—which he not only properly disclosed but was required to disclose in his report, *see* Fed. R. Civ. P. 26(a)(2)(B).  *E.g.*, *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2022 WL 199274, at *26 (N.D. Ill. Jan. 21, 2022) (refusing to exclude what movants called "three hundred pages of 'factual' advocacy" in a report because "it was appropriate—and indeed necessary—for [the expert] to disclose the factual basis for her opinions").  The SEC is free to attempt to undermine Adriaens's opinions at trial by disproving the facts he relies on; but it cannot exclude his opinions at the *Daubert* stage simply because they are based on facts the agency does not like.  *See United States v. Asare*, 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019) (Torres, J.) (noting that argument taking issue with expert's factual premises was for the fact-finder).  Additionally, any qualms the SEC has with the reliability or number of facts Adriaens relies on go to weight, not admissibility.  *See Cedar Petrochemicals, Inc. v. Dongbu Hannog Chem. Co.*, 769 F. Supp. 2d 269, 284 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony 'may go to weight, not admissibility.'" (citation omitted)); *United States*

*v. Ray*, 2022 WL 101911, at *6-7 (S.D.N.Y. Jan. 11, 2022) (dismissing concerns about the accuracy of underlying data of an expert report as going to weight, not admissibility).

### 4.    Adriaens's Use Case Opinion Reliably Applies His Expertise

Adriaens identifies third-party use cases for XRP that supply commercial validation of its potential.  He explains Ripple's own products using the XRP Ledger (such as ODL).  *See* Adriaens Rep. ¶¶ 119-122.  He then identifies firms across an array of industries that have (i) also developed use cases for XRP and the XRP Ledger and (ii) received equity financing after Ripple was founded. *Id.* ¶ 124; Adriaens Tr. 40:15-43:6 (clarifying part of this analysis).

The SEC enlisted ███ in rebuttal.  The substance of his criticism of Adriaens is less that he used an improper methodology, and more that he asked the wrong question:  In ███ view, Adriaens should have assessed whether and to what extent these businesses *actually* use XRP and the XRP Ledger.  ███ Rep. ¶ 52.  ███ qualifications to critique the views of a professor of entrepreneurship on the point are a mystery.  *See* ECF No. 544 at 14.

Contrary to the SEC's claim (at 29-33), Adriaens's opinions about use cases for XRP and the XRP Ledger are relevant and based on a reliable application of his expertise.

*First*, the SEC's relevance argument attacks a straw man.  Contrary to the SEC's claim, Defendants do not contend that if XRP and the XRP Ledger have a use, that alone "preclude[s] offers or sales of that instrument from meeting *Howey*'s expectation of profits prong."  Mot. at 30. Evidence about XRP's uses is nevertheless relevant.  Even (incorrectly) taking "the relevant question" as the SEC poses it (at 30), a fact-finder cannot assess whether XRP "*was offered and sold primarily for use* or instead primarily for its potential for profit" without knowing what the uses for XRP are in the first place.  The SEC's own example (at 31) proves the point: the Supreme Court could never have "looked at the *totality* of the offers and sales of the stocks in the condominium" at issue in *Forman* without knowing for what purpose people would use the

apartments.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 853 (1975) ("In the present case[,] there can be no doubt that investors were attracted solely by the prospect of acquiring a place to live, and not by financial returns on their investments.").  The corresponding information in this case—what XRP can be used for—is thus relevant and helpful to lay jurors.

*Second*, the SEC's criticisms of Adriaens's methodology for identifying use cases go to weight, not admissibility.  Echoing ███, the SEC complains that Adriaens failed to investigate whether and to what extent businesses actually use XRP and the XRP Ledger.  But this reduces to a disagreement about how to assess marketplace validation of XRP or the XRP Ledger's promise.  As the Court has recognized, in circumstances where a qualified "expert must make a judgment call based on methodological considerations," the question is whether the expert supplies "a valid, reasonable explanation" for the choice made.  *Chen-Oster*, 2022 WL 814074, at *7 (rejecting challenge to design of regression analysis).  Adriaens is qualified to assess the marketplace's validation of XRP and the XRP Ledger, and he has supplied such an explanation.

There is no reasonable dispute that Adriaens is qualified to opine about whether the marketplace has validated a technology's potential.  Marketplace reactions to financial technology are squarely within Adriaens's expertise.  A professor at a premier research university, he studies and regularly teaches entrepreneurship with a particular focus on FinTech, and he heads a research initiative focused on FinTech.  Adriaens Rep. ¶¶ 4-9.  And his expertise extends outside the classroom—he sits on the boards of startups, and is himself a startup co-founder.  *Id*. ¶¶ 10-11.  Admittedly, like "marketing or plumbing," this field "does not readily lend itself to a formal or quantitative methodology," but that simply makes his qualifications a necessary focus—and on that score, he is unassailable.  *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364 (S.D.N.Y. 2014) (expert testimony admissible in relevant part where the "analysis" and

"reasoning" were "based principally upon his experience and research in" the relevant field); *see also Louis Vuitton*, 97 F. Supp. 3d at 505 (rejecting challenge that expert analysis related to marketing and brand value was speculative, where expert was clearly qualified and methodology required application of professional judgment).

Adriaens's explanation for his methodological design was eminently reasonable.  The question he addressed was:  "can you identify high-growth companies or companies that are viewed to be high growth with a market presence in different industry sectors that use XRP or XRPL?"  Adriaens Tr. 227:17-228:10; *see also id.* 229:10-230:11 (explaining that even if a company "used 15 or 20 other currencies and one of them happens to be XRP, it doesn't matter" because "[i]t is a high-growth company and, therefore, becomes a validation of the use of XRP in the market").  That ████ thought it was better to focus on depth of use does nothing to make unreliable Adriaens's focus on breadth of users.  A difference of opinion between a professor of entrepreneurship and the SEC's catch-all expert ████ "go[es] to the weight of the evidence, not to its admissibility." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

The SEC also criticizes the inputs Adriaens used.  *First*, the SEC observes (at 32) that early in his work, Adriaens asked counsel whether they had assembled information about potential use cases that he could use as a starting point, and counsel provided what they had compiled.  Adriaens Tr. 37:18-38:19.  Adriaens disclosed those use cases, as Rule 26 requires, *see* Fed. R. Civ. P. 26(a)(2)(B) (expert must disclose "facts or data considered"), in an appendix to his report.  But the SEC mischaracterizes the role of the use cases identified in the appendix in his analysis:  the use cases listed in the appendix did not define the relevant universe, but served as a starting point for

further research.  His conclusions do not depend on the contents of the appendix; disclosing it was simply a matter of good order under Rule 26.

The SEC also notes in passing (at 32) that Adriaens relies for this analysis on "hearsay" Crunchbase data.  But there are reasons that it buries this critique in a parenthetical:  experts may rely on hearsay, *Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 145 (S.D.N.Y. 2003) (rejecting contrary position under Federal Rule of Evidence 703, "because" the expert "reasonably relied on" that hearsay); even ███ never criticizes the use of Crunchbase; and another SEC expert relies on Crunchbase data, too.  *See* ███ Rep. ¶ 48 n.67.

### 5.    Adriaens's Rebuttal Opinion Is Admissible

The SEC's attack on Adriaens's rebuttal (at 27) mischaracterizes it.  The SEC first claims (at 27-28) to find a contradiction between Adriaens's opening report, where he describes his view that the XRP Ledger is decentralized, *see* Adriaens Rep. ¶ 21, and his rebuttal report, where he explains why ███ contrary opinion does not rest on a reliable application of a reliable methodology, *see* Adriaens Rebuttal Rep. ¶ 4.  The SEC's claim that there is a necessary contradiction between those two different opinions is mystifying:  "decentralization" has multiple senses, and different contexts call for different uses of the term.  It has no established meaning among computer scientists, which is one of several reasons why ███ opinion is fatally flawed, *see* ECF No. 541 at 4-8; but that does not make it equally ambiguous in "the venture capital investment context, in the business context, business literature context, and in other academic lenses," which Adriaens addressed in his opening report.  Adriaens Tr. 104:4-14.[65]

---

[65] Indeed, the SEC's own allegations show that the word "decentralized" has different meanings depending on context.  Compare ███ claim that the XRP Ledger is centralized with the SEC's own Amended Complaint, where it described Ripple's network as "decentralized." Am. Compl. ¶ 382 (referring to "Ripple's decentralized network of blockchain technology").  If the SEC does not intend to contradict its own expert, it must acknowledge that the word "decentralized" means different things in its Amended Complaint and in his report.

The SEC also makes much of the fact that Adriaens is not a computer scientist.  Mot. at 29.
But that has never been in dispute.  *See supra* at 97, citing Adriaens Tr. 295:4-15.  The point of
Adriaens's rebuttal is instead that ███████ work does not use any accepted methodology to
address the decentralization question.   This opinion is based on Adriaens's expertise in the
blockchain industry and a review of relevant literature; it does not require a computer science
degree.  Indeed, as Defendants have explained in their own *Daubert* motion, ██████ made up his
"methodology" for this case; he then conceded during his deposition that three of his four factors
for supposedly evaluating "decentralization" are not even required for decentralization; and, to the
extent he did not abandon it during his deposition, he applied it in ways that are biased to favor
bitcoin, which he owns, over XRP.  *See* ECF No.  541.

J.      **Kristina Shampanier**

1.      **Shampanier's Background and Opinions**

Dr. Kristina Shampanier holds a Ph.D. from the MIT Sloan School of Management.  Her Ph.D. is in Business and Management Science, with specialization in Marketing.  Ex. 35, Expert Rebuttal Report of Kristina Shampanier ¶ 1 (Nov. 12, 2021) ("Shampanier Rebuttal Rep.").  Her academic research at MIT focused on judgment, decision-making, and consumer behavior.  *Id.* She has extensive experience in designing and conducting surveys, has taught classes on survey design, and has published on that topic in both academic and industry publications.  *Id.* ¶ 2; *id.* App. A at 39-40.  She has served as an expert regarding issues of consumer perceptions and survey design in at least seven prior cases.  *Id.* App. A at 36.

Shampanier's opinions in this case are exclusively rebuttals to the opinions of the SEC's putative catch-all expert, ██████████.  ██████, an electrical engineer with no training in how to measure consumer perceptions, seeks to opine about how "reasonable purchasers" of XRP (a group he sometimes divides into "investment-oriented purchasers" and "utility-oriented purchasers") would have perceived certain of Ripple's "statements, actions, and product offerings."  ████ Rep. ¶¶ 31, 85-90; ECF No. 544 at 4.  To reach that opinion, ████ came up with a list of "the factors [he] thought were important to digital asset purchasers," and then stated his view of how such purchasers would have interpreted various Ripple statements in light of those factors he thought were important—all without talking to a single person who purchased XRP.  Ex. 36, Dep. Tr. of ████████████ 242:2-14; ████ Rep. ¶¶ 85-87.

In her rebuttal opinion, Shampanier explains that ████ opinions are unreliable because they effectively amount to a "survey of a single respondent—himself."  Shampanier Rebuttal Rep. ¶ 9(a).  She further explains that there are reliable empirical methods available for testing the perceptions of XRP purchasers, including the "gold standard" of a well-designed experimental

survey and other options such as interviews and focus groups; but ███ failed to employ any of those reliable methods.  *Id.* ¶¶ 18-28 & n.36.  She also points to a host of other flaws in ███ reasoning.[66]  If the Court grants Defendants' pending motion to exclude ███ testimony, *see* ECF No. 544, the SEC's motion to exclude Shampanier's rebuttal testimony would be moot.

### 2.   Shampanier's Opinions Are Admissible

The SEC seeks to exclude Shampanier's testimony on three grounds.  All three are meritless.

**A.**  The SEC first argues (at 97-99) that Shampanier's opinions do not respond to ███ opinions because she opined that controlled experiments (including experimental-form surveys) are the best way to test causal propositions, but (the SEC says) ███ offered no causal opinions. Even if the SEC were correct (and it is not), that would not warrant exclusion, because an expert's "purported misreading of [an opposing] expert report[] can be properly addressed through cross-examination."  *Borgognoni*, 2016 WL 6088593, at *1; *see also Amica Mut. Ins. Co. v. Willard*, 2009 WL 2982902, at *4 (E.D. Mo. Sept. 14, 2009) ("Whether or not Mr. Moyer misread Mr. Schield's report may be a matter for cross-examination at trial.").

But the SEC is wrong in any event.  Its argument misconstrues both experts' testimony. As to ███, the SEC's argument that he offers no opinions about causation is mere wordplay.  It touts (at 96) the fact that "the word 'cause' does not appear in ███ description of his assignment."  That formalism (the failure to use magic words in one paragraph of a report) does

---

[66] Those additional flaws include that:  (i) ███ never established that any XRP purchasers actually saw the Ripple statements he credited with shaping their perceptions; (ii) he did not (and could not) distinguish between purchasers' beliefs attributable to Ripple's statements and their beliefs attributable to other sources; (iii) he offered no analysis to support his attempted distinction between "investment-oriented" and "utility-oriented" purchasers; and (iv) he did not explain why he selected the particular Ripple statements that he "evaluated" as the potential basis of purchasers' beliefs.  Shampanier Rebuttal Rep. ¶¶ 9, 26 & n.43, 36-39, 43, 48.

not matter.  *See, e.g.*, *Longoria v. Million Dollar Corp.*, 2021 WL 791505, at *7 (D. Colo. Mar. 2, 2021) (expert's use of words other "than 'caused' . . . does not transform" an opinion "from a causal" to non-causal one).  Rather, a proposition is "causal" if it seeks "to determine the source of [purchasers'] attitudes or beliefs."  S. Diamond, *Reference Guide on Survey Research*, *in* Federal Judicial Center, *Reference Manual on Scientific Evidence* 359, 397 (3d ed. 2011).  That is what ███ purports to do.  *See, e.g.*, ███ Rep. ¶ 50 (claiming that various types of public statements "*had the effect of* generating significant investor interest in purchasing XRP" (emphasis added)).[67] Courts routinely reject efforts to describe opinions like ███ as non-causal.  *See, e.g.*, *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) (reasoning that plaintiff's expert offered a "causal" opinion when assessing whether defendants' public advertisements formed basis for consumer perspectives).[68]

The SEC ties itself in knots trying to avoid using the word "cause" when describing ███ opinions.  It insists (at 98) that ███ did not opine that XRP purchasers' beliefs were "caused by" Ripple's statements and actions, but rather that those beliefs were "formed by" or

---

[67] *See also, e.g.*, ███ Rep. ¶ 85 (speculating that "Ripple's extensive public comments . . . likely served to . . . persuade investment-oriented purchasers" to buy XRP); *id.* ¶ 43 (speculating that Ripple announcements "would have greatly encouraged potential [XRP purchasers] to earn a speculative investment profit with their purchase"); *id.* ¶ 47 (speculating that Ripple's buybacks would "instill confidence in other purchasers").  In each example, the claimed causal relationship is clear:  an alleged Ripple statement or action allegedly led to a certain state of mind.

[68] *See also Longoria*, 2021 WL 791505, at *7 (rejecting expert's argument that his opinion about the beliefs of consumers who encountered defendant's advertising messages was not "causal"); *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 n.96 (S.D.N.Y. Nov. 16, 2011) (describing as "causal" the question whether a particular product design was the basis for consumer state of mind—there, the belief that two products were the same); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 574 (E.D.N.Y. 1999) (expert addressing similar question "[t]ested[ ] . . . a causal proposition"); *cf. Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 754 (E.D. Mich. 2003) (excluding expert whose opinion on similar topic failed to "establish[ ] causation," favorably citing rebuttal survey expert who, like Shampanier did here, pointed out the "kind of survey design that could have been employed to establish causation").

"exist[] based on" statements and actions.  But saying that perspectives were "formed by" or "exist based on" statements and actions is just another way of saying that those statements and actions caused those perspectives; that is, in fact, the dictionary definition of "cause."[69]  Likewise, it says (at 94) that "███ opined that Ripple *generated* significant interest in purchasing XRP" (emphasis added); again, that is just another way of saying that Ripple "caused" that interest.  *See Generate*, *Webster's Third New International Dictionary* 945 (2002) ("*Webster's Third*") ("to cause to be:  bring into existence").  ███ use of a synonym for "cause" does not change the substance of his analysis.

Further, in accusing Shampanier of rebutting a causal opinion that (the SEC says) ███ did not offer, the SEC misleadingly omits language from Shampanier's report quoting the exact opinion she rebuts, in which ███ said that Ripple's actions "create[d]" expectations among investors—another synonym for "caused."[70]  *See, e.g.*, *Longoria*, 2021 WL 791505, at *7 (expert's "use of [the word] 'created,' rather than 'caused,'" "does not transform [his opinion] from a causal . . . to a descriptive one"); *Create*, *Webster's Third* 532 ("to cause to be or produce").  Whether an expert is offering an opinion on causation does not turn on such "semantic[]" games.  *Kristensen ex rel. Kristensen v. Spotnitz*, 2011 WL 4380893, at *18 (W.D. Va. Sept. 21, 2011) (rejecting a similar wordplay-based attempt to disclaim a causation opinion and thereby "exempt [the expert's]

---

[69] *Compare* Mot. at 98 (perspective "that exists . . . based on" Ripple statements) *with Cause*, *American Heritage Dictionary* 295 ("A basis for a[] . . . response"), *and Cause*, *Webster's II New College Dictionary* 177 (1999) ("A basis for an action"); *compare also* Mot. at 98 (perspectives "formed by" Ripple's statements) *with Cause*, *Webster's Third* 356 (something "that brings about an effect"), *and Cause*, *American Heritage Dictionary* 295 ("[t]he producer of an effect").

[70] Specifically, the SEC omits from its quotation (at 98) of Shampanier's Appendix C the portion quoting ███ statement that Ripple's actions "would create the hope that a purchaser could passively earn profits by owning XRP."  Shampanier Rebuttal Rep., App. C at 43.

opinion testimony from the [standards] meant to ensure the reliability of such testimony"); *Longoria*, 2021 WL 791505, at *7.

But the SEC's "causal" objection is misplaced in any event. Even if the SEC were right that ███████ use of synonyms meant he was not offering an opinion about causation (it isn't), and even if ██████ opinions somehow remained relevant in that case (they wouldn't),[71] Shampanier's rebuttal would still be proper, because she explains that there are several empirical methods he could have used to measure XRP purchasers' perceptions that are far more reliable than the approach he employed, regardless of whether he made any causal claims. *See, e.g.*, Shampanier Rebuttal Rep. ¶¶ 28-29 ("Other, non-experimental options are also available to evaluate perceptions. . . . For example, someone interested in how reasonable purchasers understand certain information could conduct a simple survey, without a control group, or carry out a qualitative study such as focus groups or qualitative phone interviews."); Ex. 37, Dep. Tr. of Kristina Shampanier ("Shampanier Tr.") 211:12-23 ("If we're not going after a causal proposition and [an expert is] evaluating perceptions, the most direct way of doing that would be a survey. . . . From a scientific perspective, the . . . most direct way to establish what a [hypothetical XRP purchaser] is thinking is to ask about people who are similar to that imaginary hypothesized person."). That is, even if the SEC were right that ██████ offers no opinions about what caused investors to hold beliefs, Shampanier still provides a powerful critique of ██████ failure to use any reliable methodology. That quintessential rebuttal testimony should not be excluded. *See Capri Sun*, 2022 WL 976270, at *23-26 (rebuttal expert who identified other methodologies for

---

[71] If the SEC were right that ██████ opinions say nothing about whether Ripple caused investors to hold certain beliefs, then his testimony would be irrelevant under the third *Howey* prong, which concerns whether investors were "*led to* expect profits" based on the promoter's efforts—not whether they had beliefs about profits regardless of the source of those beliefs. 328 U.S. at 298-99 (emphasis added).

assessing consumer perception that opposing expert did not employ "carri[ed] out precisely the charge of a rebuttal expert"); *cf. Wells Fargo* 293 F. Supp. 2d at 754 (favorably citing rebuttal survey expert pointing out the "kind of survey design that could have been"—but never was—employed in opposing expert's report).[72]

**B.**   The SEC also accuses Shampanier (at 99) of "improper speculation" because she stated at her deposition that ██████ used language that implies causal relationships.   That is merely a repackaging of the "causal" argument.   It is just as wrong (██████ clearly offers causal opinions, as explained above), and is just as much of a red herring (Shampanier's testimony would still be admissible even if ██████ did not offer a causal opinion).   *See Capri Sun*, 2022 WL 976270, at *23-26.

In any event, Shampanier was not speculating about whether ██████ was offering a causal opinion.   Rather, whether an assertion involves a testable causal proposition is an important part of her own expertise.   As she testified, experts in testing consumer perceptions are trained to identify when someone is making a causal assertion in order to test that assertion, and she brought her expertise to bear on ██████ statements.   *See* Shampanier Tr. 157:19-158:1; 64:13-65:17; 56:4-8.   Her criticism of ██████ (baseless) report is proper expert testimony.   *See Aluminum Warehousing*, 336 F.R.D. at 29-30 ("A rebuttal expert, by nature, criticizes the methodology and/or opinions of another." (citation omitted)).

Shampanier's rebuttal is not at all like the opinions excluded in the cases the SEC cites (at 99), where experts attempted to usurp the jury's role by speculating on the parties' state of mind.

---

[72]   The SEC also tries to challenge Shampanier's credibility (which is improper on a *Daubert* motion in any event, *see Reed Constr.*, 49 F. Supp. 3d at 399), by asserting (at 96) that she previously "supported experts who have evaluated the perception of a hypothetical consumer without conducting any scientific analysis."   This completely misrepresents Shampanier's testimony, which was precisely the opposite:   "I have supported several experts *rebutting* such opinions."   Shampanier Tr. 209:14-15 & Ex. 38, Shampanier Errata Sheet at 7 (emphasis added).

*See In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004) (improper for expert witnesses to opine on the "motive, intent and state of mind" of corporations in case); *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *13-14 (S.D.N.Y. Apr. 18, 2018) (same).  Her criticism went to the objective merits of ███ reasoning and analysis, not his subjective thoughts or beliefs.  If anything, the SEC's cases only reinforce why ███ opinion should be excluded, since its entire purpose is to speculate about XRP purchasers' states of mind. *See, e.g.,* ███ Rep. ¶¶ 2, 8-9, 85-90.

    **C.**  Finally, the SEC argues (at 99-100) that Shampanier is unqualified to offer her opinions because she does not have experience specific to digital assets.  As explained above, *supra* at 10-11, that argument is foreclosed by Second Circuit law.  *See McCullock*, 61 F.3d at 1043-44; *Stagl*, 117 F.3d at 82; *Lion Oil*, 2011 WL 855876, at *1-2, 7.  Shampanier is an expert in using scientifically accepted empirical methods for measuring perceptions—and she has personally applied those methods in fields ranging from trademark infringement, to false advertising, to employment, to healthcare, to antitrust, involving industries and product offerings such as consumer products, banking, auto, tech, online retail, and entertainment.  *See* Shampanier Rebuttal Rep. ¶ 3; *id*. App. A at 35.  The SEC cannot seriously contend (and indeed does not attempt to show) that the methods that work in all of those other fields somehow do not apply when it comes to measuring the perceptions of XRP purchasers.  Its invocation (at 99) of ███ supposed credentials relating to digital assets is both mistaken, *see* ECF No. 544, and irrelevant to whether Shampanier is qualified to offer her rebuttal opinions.  Even assuming *arguendo* that ███ could qualify as an expert, that would not diminish Shampanier's deep expertise in measuring market participants' perceptions—precisely the topic she criticizes ███ for failing to address competently using reliable methods.

**CONCLUSION**

For the foregoing reasons, the SEC's Motion should be denied in its entirety.

Date:  August 9, 2022                              Respectfully submitted,

*/s/ Michael K. Kellogg*
Michael K. Kellogg

KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
mkellogg@kellogghansen.com

*/s/ Lisa Zornberg*
Lisa Zornberg

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000
lzornberg@debevoise.com

*Counsel for Defendant Ripple Labs Inc.*

*/s/ Matthew C. Solomon*
Matthew C. Solomon

CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
+1 (202) 974-1680
msolomon@cgsh.com

*Counsel for Defendant Bradley Garlinghouse*

*/s/ Martin Flumenbaum*
Martin Flumenbaum

PAUL, WEISS, WHARTON, RIFKIND &
   GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000
mflumenbaum@paulweiss.com

*Counsel for Defendant Christian A. Larsen*