# Exhibit 2

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE            )
    COMMISSION,                        )
5                                      )
                    Plaintiff,         )
6                                      ) Case No.
            vs.                        ) 20-civ-10832(AT)(SN)
7                                      )
    RIPPLE LABS, INC., BRADLEY         )
8   GARLINGHOUSE, and CHRISTIAN A.     )
    LARSEN,                            )
9                                      )
                    Defendants.        )
10  _____)

11

12            VIDEOTAPED DEPOSITION OF

13                 ALAN SCHWARTZ

14           Friday, February 11, 2022

15

16

17

18

19

20

21

22

23
    Reported by:
24  JEFFREY BENZ, RMR, CRR
    STENOGRAPHIC REPORTER
25  JOB No. 220211JBE

                                                    1

1

2

3

4        VIDEOTAPED DEPOSITION of ALAN SCHWARTZ, taken by

5    Plaintiff, at the offices of Debevoise & Plimpton, 919

6    Third Avenue, New York, New York, on February 11, 2022

7    commencing at 9:13 a.m., before Jeffrey Benz, a

8    Certified Realtime Reporter, Registered Merit Reporter

9    and Notary Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              2

```
 1    A P P E A R A N C E S:

 2

 3    FOR THE PLAINTIFF:

 4         SECURITIES AND EXCHANGE COMMISSION
           200 Vesey Street, Suite 400
 5         New York, New York  10281-1022
                BENJAMIN HANAUER, ESQ
 6              DAPHNA WAXMAN, ESQ.
           Telephone: 212.336.0153
 7         Email: hanauer@sec.gov
                  waxmand@sec.gov

 8

 9    FOR DEFENDANT RIPPLE LABS:

10         KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
           1615 M Street, N.W.
11         Washington, D.C.  20036
           BY:   REID M. FIGEL, ESQ.
12               GAVAN GIDEON, ESQ.
                 ROBERT L. MOORE, ESQ. (Remotely)
13               ELIANA M. PFEFFER, ESQ. (Remotely)
                 JUSTIN B. BERG, ESQ. (Remotely)
14         Telephone: 202.326.7918
           Email: rfigel@kellogghansen.com
15                ggideon@kellogghansen.com
                  rmoore@kellogghansen.com
16                epfeffer@kellogghansen.com
                  jberg@kellogghansen.com

17                    -and-

18
           DEBEVOISE & PLIMPTON LLP
19         919 Third Avenue
           New York, New York   10022
20         BY:   BENJAMIN LEB, ESQ. (Remotely)
           Telephone: 212.909.6089
21         Email: bjleb@debevoise.com

22

23

24

25
                                                         3
```

```
 1   A P P E A R A N C E S: (Ctd.)

 2

 3   FOR DEFENDANT BRADLEY GARLINGHOUSE:

 4        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          2112 Pennsylvania Avenue, NW
 5        Washington, D.C.  20037
          BY:   JORGE A. BONILLA LOPEZ, ESQ. (Remotely)
 6        Telephone: 202.974.1517
          Email: jbonillalopez@cgsh.com
 7

 8   FOR DEFENDANT CHRISTIAN A. LARSEN:

 9        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          1285 Avenue of the Americas
10        New York, New York   10019-6064
          BY:   SARAH J. PROSTKO, ESQ.  (Remotely)
11             CONNOR J. RITSCHARD, ESQ. (Remotely)
          Telephone: 212.373.2491
12        Email: sprostko@paulweiss.com
                 critschard@paulweiss.com
13

14   ALSO PRESENT:

15        ANA GUARDADO, Ripple Labs, Inc. (Remotely)

16        KYLE E. CHERMAK, Debevoise & Plimpton (Remotely)

17        JIM BAKER, Videographer

18

19

20

21

22

23

24

25
                                                            4
```

```
 1                          INDEX

 2   ALAN SCHWARTZ

 3        Examination by:                    Page

 4             MR. HANAUER                      6

 5

 6                        EXHIBITS

 7   NUMBER           DESCRIPTION            PAGE

 8   Exhibit 1   Expert Report of Alan        16
                 Schwartz, dated October 4,
 9               2021

10   Exhibit 4   Supreme Court's Decision in  63
                 Securities and Exchange
11               Commission v. W.J. Howey
                 Co., et al.
12
     Exhibit 5   Transcript of Howey          55
13               litigation

14   Exhibit 8   XRP Purchase Summary        120

15   Exhibit 9   ███████ Wholesale Order     125

16   Exhibit 10 Agreement between Ripple and 131
                 GSR Holdings Limited
17
     Exhibit 11 GSS Agreement               142
18
     Exhibit 12 Copy of Azimo Agreement     148
19
     Exhibit 15 MoneyGram Agreement         156
20
     Exhibit 16 Loan Agreement              158
21
     Exhibit 17 BF Custody Agreement        161
22
     Exhibit 18 Copy of Custody Agreement   166
23
     Exhibit 20 Joint Venture Agreement     177
24               Between Ripple and SBI

25   Exhibit 21 ████ Contract               178
```

5

09:12  1           THE VIDEOGRAPHER:  Good morning.  We're now
09:12  2  on the record.  Today's date is February 11, 2022.
09:12  3  The time is 9:13 a.m.  This is Disk 1 of the video
09:12  4  deposition of Alan Schwartz, in the matter of SEC
09:12  5  versus Ripple Labs, et al.
09:12  6           My name is Jim Brady.  I'm the
09:12  7  videographer.  Today's court reporter is Jeff Benz.
09:12  8  We're both with Gradillas Reporting.
09:12  9           Today's deposition is taking place at
09:12 10  Debevoise & Plimpton, 919 Third Avenue, New York,
09:12 11  New York.
09:12 12           The attorneys' appearances will appear on
09:12 13  the transcript.  May I ask now that the court
09:12 14  reporter please swear in the witness.
09:13 15  ALAN SCHWARTZ,
09:13 16      called as a witness, having been first
09:13 17      duly sworn by Jeffrey Benz, a Notary
09:13 18      Public within and for the State of New
09:13 19      York, was examined and testified as
09:13 20      follows:
09:10 21  EXAMINATION BY MR. HANAUER:
09:13 22      Q.  Good morning, sir.  My name's Ben Hanauer.
09:13 23  I represent the SEC, who's the plaintiff in this
09:13 24  lawsuit.
09:13 25           Can you please state your name for the

6

09:13 1    record.

09:13 2         A.    Alan Schwartz.

09:13 3         Q.    And, Professor Schwartz, is there any

09:13 4    reason why you cannot give accurate testimony today?

09:13 5         A.    No.

09:13 6         Q.    How many preparation sessions did you do

09:13 7    for today's deposition?

09:13 8         A.    Four, I think.  Three or four.

09:13 9         Q.    And when were they?

09:13 10        A.    Yesterday and Wednesday, and then a couple

09:13 11   of weeks ago we did a couple.

09:13 12        Q.    And when you say "we," who was present for

09:13 13   those preparation sessions?

09:13 14        A.    Mr. Figel, Mr. Gideon, and a gentleman

09:14 15   whose name I -- I never got Robert's last name.

09:14 16   There's another person, an employee of the firm, the

09:14 17   Kellogg Hansen firm.

09:14 18        Q.    And how long total did you spend preparing

09:14 19   for today's deposition?

09:14 20        A.    I would -- between 15 and 20 hours.

09:14 21        Q.    And in your preparation, did you review any

09:14 22   documents other than the ones cited in your

09:14 23   October 4, 2021, report?

09:14 24        A.    Yes, I did.

09:14 25              MR. FIGEL:  Start -- say yes -- answer yes

7

09:14  1    or no.  Give me a chance -- there may be some

09:14  2    privilege issues, so if you just give a pause after

09:14  3    Mr. Hanauer's question, please.

09:14  4        Q.   And what did you review other than the

09:14  5    documents cited in your report?

09:14  6             MR. FIGEL:  I direct you not to answer that

09:14  7    question based on attorney work product.

09:14  8        Q.   Did you review any deposition transcripts?

09:14  9        A.   No.

09:14 10             MR. FIGEL:  Again, let me -- let me give

09:14 11    you the instruction --

09:14 12             THE WITNESS:  Okay.

09:14 13             MR. FIGEL:  -- but fine, start by answering

09:15 14    yes or no.

09:15 15        Q.   Have you ever been deposed or given

09:15 16    testimony in a lawsuit before?

09:15 17             MR. FIGEL:  You can answer.

09:15 18        A.   Yes.

09:15 19        Q.   How many times?

09:15 20        A.   Over the years -- hard to remember over the

09:15 21    years.  More than ten.

09:15 22        Q.   And I guess I should probably split that

09:15 23    up.  How many times have you been deposed in

09:15 24    connection with a lawsuit?

09:15 25        A.   Same answer.

8

09:15 1       Q.    Around 10?

09:15 2       A.    Or more, 10, 12, something like that.

09:15 3       Q.    And beyond those depositions, how many

09:15 4  times have you given testimony in a lawsuit?

09:15 5       A.    Does that include an arbitration?

09:15 6       Q.    Yes.

09:15 7       A.    Four or five.

09:15 8       Q.    Generally speaking, what were the cases

09:15 9  about that you've testified in?

09:16 10      A.    They were in a variety of areas.  I've been

09:16 11 an expert in bankruptcy, corporate governance,

09:16 12 contracts, sales.

09:16 13      Q.    Have you ever offered expert testimony in a

09:16 14 case involving allegations of federal securities law

09:16 15 violations?

09:16 16      A.    No.

09:16 17      Q.    Have you ever testified as a fact witness?

09:16 18      A.    No.

09:16 19      Q.    How much of your professional time do you

09:16 20 spend working as a litigation expert or consultant on

09:16 21 one hand, as opposed to working as a law professor?

09:16 22      A.    Less than 5 percent, maybe less than

09:16 23 3 percent.

09:16 24      Q.    Has your expert testimony ever been

09:16 25 excluded for any reason?

9

09:17  1          A.    Yes.

09:17  2          Q.    Can you tell me about that, please.

09:17  3          A.    It was -- it's hard to -- once I was an

09:17  4    expert in a dispute between oil companies, and a part

09:17  5    of my report was excluded on the ground that there

09:17  6    was economic analysis in it and I hadn't qualified as

09:17  7    an economic expert.

09:17  8          Q.    And what case was that?

09:17  9          A.    Well, I can't remember the name, but it was

09:17 10    between two big oil companies, involving oil leases

09:17 11    in Prudhomme Bay.

09:17 12          Q.    Do you know what court that case was in?

09:17 13          A.    What case.

09:17 14                I think that was in Washington, D.C.

09:17 15          Q.    District -- federal court?

09:17 16          A.    District court in Washington, D.C.

09:17 17          Q.    Federal district court?

09:18 18          A.    Yes.

09:18 19          Q.    Has -- besides that occasion, has your

09:18 20    expert testimony ever been excluded for any other

09:18 21    reason?

09:18 22          A.    Not that I can recall.

09:18 23          Q.    Were you retained as an expert in a case

09:18 24    called Mason Capital versus Cayman Corp., in the

09:18 25    District of Connecticut?

                                                              10

09:18 1    A.   Yes.

09:18 2    Q.   And you testified at a trial that took

09:18 3  place in that case in October 2005?

09:18 4    A.   I don't remember the date, but I did

09:18 5  testify in a trial.

09:18 6    Q.   And one of the subjects of your testimony

09:18 7  in that case was about your beliefs about the meaning

09:18 8  of Connecticut's Business Combination Act?

09:18 9    A.   I don't specifically recall, but I wouldn't

09:18 10  object to that characterization.

09:18 11    Q.   And in that case, did the court grant the

09:18 12  opposing side's motion in limine to preclude that

09:18 13  portion of your testimony?

09:18 14    A.   I think it did.

09:19 15    Q.   And the reason the court excluded that

09:19 16  portion of your testimony was because the court found

09:19 17  the constructions of statutes is a judicial task and

09:19 18  not a proper subject of expert testimony?

09:19 19    A.   I don't particularly recall why the court

09:19 20  excluded my re-- that part of my report.  I don't

09:19 21  recall what the judge said or whether the judge wrote

09:19 22  something down.

09:19 23    Q.   Any other instances where your testimony

09:19 24  was excluded?

09:19 25    A.   Not that I can recall.

11

09:19  1       Q.   Has a court ever expressed disagreement

09:19  2  with an opinion you expressed?

09:19  3       A.   I -- I'm not exactly sure how to answer

09:20  4  that question because I -- I expressed -- when I

09:20  5  testified, the court didn't always come out on the

09:20  6  side for which I was an expert.

09:20  7       Q.   So there are cases where you testified

09:20  8  where ultimately the other side prevailed in the

09:20  9  lawsuit?

09:20 10       A.   I think so.

09:20 11       Q.   You're a professor at the Yale Law School?

09:20 12       A.   That's correct.

09:20 13       Q.   Since when?

09:20 14       A.   1987.

09:20 15       Q.   And have you held any other employment

09:20 16  since 1987?

09:20 17       A.   I'm also a professor in the Yale School of

09:20 18  Management.

09:20 19       Q.   Any other employment over the past

09:20 20  30 years?

09:20 21       A.   No.

09:20 22       Q.   Are you a member -- sit on any corporate

09:20 23  boards?

09:20 24       A.   I have sat on corporate boards.

09:20 25       Q.   Which ones?

                                                              12

```
09:20  1        A.   Rhone Industries.  Cliffs Natural
09:20  2   Resources, and Furniture Brands.
09:21  3        Q.   Are you still on any of those boards?
09:21  4        A.   No.
09:21  5        Q.   Why did you leave?
09:21  6        A.   I aged out.
09:21  7             Well, actually I ages out of Cliffs Natural
09:21  8   Resources and Furniture Brands.  We sold Rhone
09:21  9   Industries.
09:21 10        Q.   Understood.
09:21 11             And what's your date of birth, sir?
09:21 12        A.   ████████, 1940.
09:21 13        Q.   Are you licensed to practice law?
09:21 14        A.   Not currently.
09:21 15        Q.   When were you last licensed to practice
09:21 16   law?
09:21 17        A.   Actually, I -- I'm going to give a little
09:21 18   bit of a complicated answer to that question.  I was
09:21 19   a member of the New York Bar.  I think that I let my
09:21 20   membership lapse.
09:21 21             I think if you're a professor at an
09:21 22   accredited Connecticut law school for a certain
09:21 23   period of time, you become a member of the
09:21 24   Connecticut Bar.
09:22 25        Q.   So when did your New York law license
```

13

09:22 1    lapse?

09:22 2         A.   I don't recall how long it takes for a

09:22 3    license to lapse, but I have not practiced law in

09:22 4    New York for a very long time.

09:22 5         Q.   Have you practiced law anywhere else?

09:22 6         A.   No.

09:22 7         Q.   Have you ever represented clients in court?

09:22 8         A.   No.

09:22 9              Well, I have when I was a practicing

09:22 10   attorney.

09:22 11        Q.   And when you say "a long time ago," is

09:22 12   there any way we can --

09:22 13        A.   I left the -- yes, I left practice in 1969.

09:22 14        Q.   And when you did practice, did you have

09:22 15   areas of expertise or specialization?

09:22 16        A.   I was a litigator.

09:22 17        Q.   You are an expert in contract law?

09:22 18        A.   I think so, yes.

09:22 19        Q.   Do you consider yourself an expert in the

09:22 20   federal securities laws?

09:22 21        A.   No.

09:23 22        Q.   Are you qualified to offer expert testimony

09:23 23   on how courts interpret the term, "investment

09:23 24   contract," in cases applying the federal securities

09:23 25   laws?

14

09:23  1              MR. FIGEL:  Objection.  You can answer.

09:23  2       A.    No, I'm not an expert in the federal

09:23  3  securities laws.

09:23  4       Q.    And will you be offering any such opinions

09:23  5  in this case about how courts interpret the term,

09:23  6  "investment contract," under the federal securities

09:23  7  laws?

09:23  8       A.    No.

09:23  9       Q.    Are you offering an opinion that under the

09:23 10  federal securities laws, investment contracts are

09:23 11  limited to common law contracts?

09:23 12              MR. FIGEL:  Objection.

09:23 13       A.    No.

09:23 14       Q.    Are you offering an opinion that investment

09:23 15  contracts under the federal securities laws cannot

09:23 16  contain representations beyond the four corners of

09:23 17  any common law contract?

09:23 18       A.    No, I'm not offering an opinion.

09:24 19       Q.    Are you offering an opinion whether any of

09:24 20  Ripple's offers or sales of XRP qualify for an

09:24 21  exemption from registration under the federal

09:24 22  securities laws?

09:24 23       A.    No.

09:24 24       Q.    Are you an expert in the field of

09:24 25  blockchain technologies?

                                                              15

09:24  1       A.   No.

09:24  2       Q.   Are you an expert in the field of digital

09:24  3  assets or cryptocurrencies?

09:24  4       A.   No.

09:24  5       Q.   Before this case, have you ever worked on a

09:24  6  case involving digital assets or cryptocurrencies?

09:24  7       A.   No.

09:24  8       Q.   And I believe I tendered Exhibit 1.  It

09:24  9  should be sitting right in front of you.

09:24 10       A.   Yes.

09:24 11            MR. HANAUER:  Do you want to share with --

09:25 12  oh, you did.  Good.  Thank you.

09:25 13       Q.   And Exhibit 1, that's the expert report you

09:25 14  submitted in this case, on October 4, 2021?

09:25 15       A.   Yes.

09:25 16            (Expert Report of Alan Schwartz, dated

09:25 17            October 4, 2021, was marked Exhibit AS-1 for

09:25 18            identification, as of this date.)

09:25 19       Q.   And on page 65 of the report, is that your

09:25 20  signature?

09:25 21       A.   Yes, it is.

09:25 22       Q.   Did anyone assist you in the preparation of

09:25 23  your report?

09:25 24            MR. FIGEL:  Answer that question yes or no.

09:25 25       A.   Yes.

16

```
09:25  1          Q.    Who?

09:25  2          A.    Mr. Figel.

09:25  3          Q.    Anyone else?

09:25  4          A.    No.

09:25  5          Q.    Did you write the whole report?

09:25  6          A.    Yes.

09:25  7          Q.    Was anything in the report written by

09:25  8    Ripple's attorneys?

09:25  9          A.    No.

09:25 10          Q.    Did Ripple's attorneys direct you to write

09:25 11    anything?

09:26 12          A.    No.

09:26 13          Q.    Who prepared Exhibits C through F to your

09:26 14    report?

09:26 15          A.    I think employees of Mr. Figel's firm.

09:26 16          Q.    Do you know who?

09:26 17          A.    I think it was -- I think it is Robert --

09:26 18          Q.    Well, I don't want you to speculate.  Just

09:26 19    to the best of your knowledge, do you know who

09:26 20    prepared Exhibits C to F of your report?

09:26 21          A.    No.

09:26 22          MR. FIGEL:  Just so you know, it's not a

09:26 23    mystery, but I'm not allowed to testify.

09:26 24          Q.    Is there -- and -- just so I have that,

09:26 25    Mr. Figel is the only attorney who assisted you in
```

17

| | | |
|---|---|---|
| 09:26 | 1 | the preparation of your report? |
| 09:26 | 2 | A.   There were other attorneys on phone calls, |
| 09:26 | 3 | but Mr. Figel played the largest role. |
| 09:26 | 4 | Q.   Can you name any of the other attorneys? |
| 09:26 | 5 | A.   Gavan Gideon. |
| 09:26 | 6 | Q.   Anyone else? |
| 09:26 | 7 | A.   No. |
| 09:27 | 8 | Q.   Is there anything in your report that is |
| 09:27 | 9 | inaccurate? |
| 09:27 | 10 | A.   Not to my knowledge. |
| 09:27 | 11 | Q.   Just so we're clear for the record, when I |
| 09:27 | 12 | say "report," I'm referring to Exhibit 1. |
| 09:27 | 13 | A.   Yes. |
| 09:27 | 14 | Q.   Is there anything in your report that you |
| 09:27 | 15 | need to correct or supplement? |
| 09:27 | 16 | A.   Not -- not now. |
| 09:27 | 17 | Q.   Does your report contain -- well, do you |
| 09:27 | 18 | intend to supplement your report in the future? |
| 09:27 | 19 | A.   That would depend on events yet to occur. |
| 09:27 | 20 | Q.   Do you have any intention to at this time? |
| 09:27 | 21 | A.   No. |
| 09:27 | 22 | Q.   Does your report contain a complete |
| 09:27 | 23 | statement of all the opinions you will express in |
| 09:27 | 24 | this case? |
| 09:27 | 25 | A.   Yes. |

18

| 09:27 | 1 | MR. FIGEL:  Objection. |
|---|---|---|

09:27  1          MR. FIGEL:  Objection.

09:27  2          You can answer.

09:27  3      A.   Yes.

09:27  4      Q.   Does your report contain all the bases and

09:27  5  reasons for the opinions you are offering?

09:27  6          MR. FIGEL:  Objection.

09:28  7      A.   Yes.

09:28  8      Q.   Does your report identify all the facts and

09:28  9  data you considered in forming the opinions expressed

09:28 10  in your report?

09:28 11      A.   Yes.

09:28 12          Well, let me clarify.

09:28 13          I've had conversations about the nature of

09:28 14  crypto markets with various people, and I assume that

09:28 15  they -- they were informative for me, but they --

09:28 16  those conversations aren't in this report.

09:28 17      Q.   Did you rely on any of those conversations,

09:28 18  in forming -- well, strike that.

09:28 19          Did you consider any of those

09:28 20  conversations, in forming the opinions you're

09:28 21  expressing in this case?

09:28 22      A.   No.

09:28 23      Q.   Besides the contracts which you

09:29 24  specifically refer to in the report, are all of the

09:29 25  facts and data that you relied on listed in Exhibit B

19

09:29  1    to your report?

09:29  2         A.   Let me look at Exhibit B.

09:29  3              Yeah, that's the materials I considered.

09:29  4         Q.   And from Exhibit B, it looks like the only

09:29  5    document prepared by an attorney in this case that

09:29  6    you considered, was the SEC's amended complaint.

09:29  7         A.   That's correct.

09:29  8         Q.   Did you consider any of the SEC's

09:29  9    interrogatory responses?

09:30 10         A.   I considered them after this report was

09:30 11    written.

09:30 12         Q.   Which ones?

09:30 13         A.   I can't exactly remember.  I visited --

09:30 14    what's the name of the document that the SEC

09:30 15    submitted in response?  I read one document the SEC

09:30 16    prepared after I prepared this report.

09:30 17         Q.   So a single interrogatory response?

09:30 18         A.   Yeah, it was response to interrogatories.

09:30 19    That's -- I think it was.

09:30 20         Q.   Do those -- after reviewing those

09:30 21    interrogatory responses, does that in any way impact

09:30 22    the opinions you're offering in this case?

09:30 23         A.   No.

09:30 24         Q.   You considered the amended complaint in

09:30 25    this case in forming your opinions?

20

09:30  1        A.    The SEC's amended complaint?

09:30  2        Q.    Yes, sir.

09:30  3        A.    Yes.

09:30  4        Q.    Did you read the whole thing?

09:31  5        A.    Yes.

09:31  6        Q.    Are you offering the opinion that any

09:31  7    allegation in the complaint is untrue?

09:31  8        A.    No.

09:31  9        Q.    Do -- so -- you said that after you wrote

09:31 10    your report, you reviewed one of the SEC's

09:31 11    interrogatory responses.  After you signed your

09:31 12    report, have you reviewed any other documents or

09:31 13    information that are relevant to the opinions

09:31 14    expressed in your report?

09:31 15            MR. FIGEL:  You can answer if you

09:31 16    understand the question.

09:31 17            And don't identify what they are yet.

09:31 18        A.    Yes.

09:31 19        Q.    And what documents are those?

09:31 20            MR. FIGEL:  You can answer, but don't

09:31 21    reveal any documents that you were shown in

09:31 22    connection with your preparation for your testimony.

09:32 23        A.    I looked at additional contracts of Ripple.

09:32 24        Q.    How many?

09:32 25        A.    Hundreds.

                                                              21

09:32  1      Q.   And how would I be able to tell which

09:32  2  contracts you reviewed after signing your report?

09:32  3      A.   They wouldn't be -- they wouldn't be

09:32  4  referred to in my report.

09:32  5      Q.   Does your review -- are those documents

09:32  6  that you reviewed after signing your report in any

09:32  7  way relevant to your report?

09:32  8      A.   In any way, it's very broad.  I reviewed

09:32  9  them to see whether there were any inconsistencies

09:32 10  between the -- those contracts and my report.

09:33 11      Q.   And how many -- you said there are hundreds

09:33 12  that you reviewed?

09:33 13      A.   Yeah.  I think there were 1700 in total.

09:33 14      Q.   Well, there are 1700 listed in your report.

09:33 15  How many did you review after your report was signed?

09:33 16      A.   I can't remember.  A lot.

09:33 17      Q.   More than a hundred?

09:33 18      A.   Yes.

09:33 19      Q.   More than 200?

09:33 20      A.   Probably.

09:33 21      Q.   More than 500?

09:33 22      A.   Yes.  I -- yeah, more than -- yes.

09:33 23      Q.   And you reviewed the entirety of those

09:33 24  500-plus contracts?

09:33 25      A.   Yes.

22

09:33  1      Q.   Did you review more than 700 contracts?

09:33  2      A.   I -- I basically went through all of them,

09:33  3   in the binders that were submitted, that I had.

09:33  4      Q.   Who submitted binders to you?

09:33  5      A.   The Kellogg firm gave me binders and

09:33  6   informed me that those binders had Ripple contracts

09:34  7   in them, which they did.

09:34  8      Q.   Did they -- those binders have all 1700

09:34  9   contracts?

09:34 10      A.   I didn't -- I didn't count them.

09:34 11      Q.   What's your best approximation of the

09:34 12   number of contracts you reviewed after signing your

09:34 13   report?

09:34 14      A.   Over a thousand.

09:34 15      Q.   All 1700 contracts cited in your report?

09:34 16      A.   It would be hard, honestly, to say every

09:34 17   one, but a very large proportion.

09:34 18      Q.   Do you still have those contracts?

09:34 19      A.   I do.

09:34 20      Q.   Do the opinions in your report rely on any

09:34 21   assumptions?

09:34 22           MR. FIGEL:  Objection.

09:34 23      A.   I would have to review my report, but I

09:34 24   don't think I made very many assumptions in it.

09:35 25      Q.   Did anyone ask you to make any assumptions,

                                                              23

09:35  1    in preparing your report?

09:35  2            MR. FIGEL:  Start with answering yes or no.

09:35  3            THE WITNESS:  What?

09:35  4            MR. FIGEL:  Start by answering yes or no.

09:35  5        A.   No.

09:35  6        Q.   Will you be offering any opinions in this

09:35  7    case that are not contained in your report?

09:35  8        A.   No.

09:35  9        Q.   Will you be offering any opinions related

09:35 10    to the conduct of either of the individual defendants

09:35 11    in this case?

09:35 12        A.   No.

09:35 13        Q.   Will you be offering any opinion related to

09:35 14    industry custom or practice?

09:35 15        A.   No.

09:35 16            MR. FIGEL:  Objection.  You can answer.

09:35 17        Q.   Will you be offering an opinion related to

09:35 18    any of the defendants' affirmative defenses?

09:35 19        A.   No.

09:35 20        Q.   Will you be offering rebuttal testimony to

09:35 21    any of the SEC's experts?

09:35 22        A.   No.

09:36 23        Q.   Have you read any of the other expert

09:36 24    reports in this case?

09:36 25        A.   No.

                                                        24

09:36  1        Q.    How many hours did you work on this

09:36  2   engagement prior to completing your report?

09:36  3              So from the time you got -- you signed your

09:36  4   engagement to the time you signed your report.

09:36  5        A.    35 to 40 hours.

09:36  6        Q.    And that includes preparing your report?

09:36  7        A.    Yes.

09:36  8        Q.    And it includes reviewing all the contracts

09:36  9   cited in your report?

09:36 10              MR. FIGEL:  Objection.

09:36 11        Q.    The answer is yes?  I'm sorry.  You need to

09:36 12   give a verbal answer.

09:36 13        A.    Yes.

09:36 14        Q.    How much time did you spend reviewing the

09:37 15   contracts that you received after you signed the

09:37 16   report?

09:37 17        A.    Maybe eight to ten hours.

09:37 18        Q.    How much money have you billed so far for

09:37 19   this case?

09:37 20        A.    Approximately $50,000.

09:37 21        Q.    Your rate is $1,200 an hour?

09:37 22        A.    Yes.

09:37 23        Q.    Is that your standard billing rate?

09:37 24        A.    Yes.

09:37 25        Q.    Since when?

25

09:37  1          A.    Since the last two or three years.

09:37  2          Q.    Have you ever charged that much per hour in

09:37  3     another case?

09:37  4          A.    Yes.

09:37  5          Q.    Have you ever billed more as an expert

09:38  6     witness than in this case?

09:38  7          A.    No.

09:38  8          Q.    So in preparing your report, how many

09:38  9     contracts did you personally review?

09:38 10          A.    I think about 140 to 150.

09:38 11          Q.    And how long did that review and analysis

09:38 12     take?

09:38 13          A.    I can't really recall what proportion of

09:38 14     the time I spent was spent writing or thinking or

09:38 15     reading or -- I just can't really break it down.

09:38 16          Q.    So, the 35- to 40-hour number you gave me a

09:38 17     couple minutes ago, that included both reviewing and

09:39 18     analyzing contracts and drafting your report?

09:39 19          A.    Yes.

09:39 20          Q.    Does your report identify the specific

09:39 21     140 contracts that you reviewed?

09:39 22          A.    I think my report refers to 17 in specific

09:39 23     contracts.

09:39 24          Q.    And if I wanted to know the remaining

09:39 25     120-plus contracts that you personally reviewed in

                                                                    26

09:39 1    preparing your report, how would I figure that out?

09:39 2        A.   Well, the -- the difficulty is all these

09:39 3    contracts are very much like each other, so a way to

09:39 4    go about that would be to see what was supplied to me

09:39 5    before the date of my report.

09:40 6        Q.   Okay.  And unfortunately, I don't have that

09:40 7    information.  So what I'm trying to get at is, is

09:40 8    there any record of the 17 or so contracts that you

09:40 9    personally -- or -- I'm sorry.

09:40 10           Is there any record of the 140 contracts

09:40 11   you reviewed to prepare your report?

09:40 12       A.   I think if you did email discovery, you

09:40 13   would see that there were emails which would say

09:40 14   things like, We're sending you X, or we're sending

09:40 15   you Y.

09:40 16           MR. FIGEL:  I'm -- I'm sorry to interrupt.

09:40 17           I'm -- I'm allowing you to answer these

09:40 18   questions because he's interested, but be careful not

09:40 19   to reveal communications --

09:40 20           THE WITNESS:  No.

09:40 21           MR. FIGEL:  -- the substance of

09:40 22   communications with our firm and -- and you.

09:40 23           THE WITNESS:  Okay.

09:40 24       Q.   So, I -- I just want to make sure I have

09:41 25   this right.  So the 140 contracts you reviewed in

27

09:41  1    preparing your report, were those all emailed to you

09:41  2    by Ripple's counsel?

09:41  3            MR. FIGEL:  You can answer yes or no.

09:41  4        A.   No.

09:41  5        Q.   Okay.  So again, I'm just trying to figure

09:41  6    out which 140 contracts you -- you reviewed.

09:41  7        A.   Well, I -- I'm not trying to be evasive.

09:41  8    They sent me boxes with things in them that -- so

09:41  9    they weren't emailed.

09:41 10        Q.   So the 140 contracts you reviewed, were

09:41 11    those the only 140 contracts you got, or were they --

09:41 12    from Ripple's counsel, or were they part of a larger

09:41 13    set?

09:41 14            MR. FIGEL:  Objection.

09:41 15            You can answer if you understand.

09:41 16        A.   They were obviously part of a larger set

09:41 17    because we have the full set.

09:42 18        Q.   Are you aware of any record showing the

09:42 19    specific 100 -- strike that.

09:42 20            Are you aware of any record that documents

09:42 21    the specific 140 contracts you personally reviewed

09:42 22    before signing your report?

09:42 23        A.   No.

09:42 24        Q.   Is there a way to figure that out?

09:42 25        A.   Yes.

28

09:42 1      Q.   How?

09:42 2      A.   Well, I could go through my office in

09:42 3  New Haven and see what I had there.  And I would

09:42 4  check when I got what, because there were, as I said,

09:42 5  messages.

09:42 6           And ultimately, I could come up with the

09:42 7  ones I looked at before October 4 and the ones I

09:42 8  looked at after.

09:42 9      Q.   You have to -- is there -- did you take

09:42 10 notes of any of that, or would you have to go

09:42 11 basically on memory, I reviewed this before signing

09:42 12 my report, or I reviewed it after signing my report?

09:42 13     A.   Well, as I said, I'm not trying to be

09:43 14 evasive.  I have two offices, one in New Haven and

09:43 15 one in New York.  I did most of the work on the

09:43 16 report in New Haven, but -- but since then, I've been

09:43 17 mainly working in New York.

09:43 18          So I could go through my -- my New Haven

09:43 19 office would probably have a lot of the stuff I did

09:43 20 before the report, and my New York office would have

09:43 21 a lot of other stuff.

09:43 22     Q.   Do you have any records reflecting which

09:43 23 140 contracts you reviewed prior to signing your

09:43 24 report?

09:43 25     A.   No.

29

| | | |
|---|---|---|
| 09:43 | 1 | Q.   Now, prior to signing your report, who |
| 09:43 | 2 | reviewed the other 1500-plus contracts cited in your |
| 09:43 | 3 | report? |
| 09:43 | 4 | A.   I don't know. |
| 09:43 | 5 | Q.   And prior to -- did you -- signing your |
| 09:44 | 6 | report, did you have any firsthand knowledge of the |
| 09:44 | 7 | contents of the contracts you did not review? |
| 09:44 | 8 | A.   No. |
| 09:44 | 9 | Q.   Did you give direction to anybody regarding |
| 09:44 | 10 | the 1500 plus contracts that you did not review? |
| 09:44 | 11 | A.   Yes. |
| 09:44 | 12 | Q.   Who did -- first of all, who did you give |
| 09:44 | 13 | direction to? |
| 09:44 | 14 | A.   By who -- |
| 09:44 | 15 | MR. FIGEL:  You can answer.  Give names. |
| 09:44 | 16 | A.   To Mr. Figel, to Mr. Gideon, and to -- |
| 09:44 | 17 | what's Robert's last name? |
| 09:44 | 18 | MR. FIGEL:  Can I answer? |
| 09:44 | 19 | Moore, M-O-O-R-E. |
| 09:44 | 20 | A.   Right.  To Mr. Moore. |
| 09:44 | 21 | Q.   And do you know if they were the ones |
| 09:44 | 22 | reviewing the contracts? |
| 09:44 | 23 | A.   Do I personally know?  No. |
| 09:44 | 24 | Q.   And what direction did you give them? |
| 09:45 | 25 | A.   I directed -- I directed them to look for |

30

09:45 1    representative contracts in the categories that I

09:45 2    thought were germane.

09:45 3         Q.    And are those the categories identified in

09:45 4    your report?

09:45 5         A.    They are.

09:45 6         Q.    And did this occur -- this direction you

09:45 7    gave to counsel to categorize the contracts, was this

09:45 8    before or after you had reviewed the 140 contracts?

09:45 9         A.    Before.

09:45 10        Q.    Had you reviewed any contracts at the time

09:45 11   you gave counsel that direction?

09:45 12        A.    I think I re-- I reviewed a small number.

09:45 13        Q.    Like how many?

09:45 14        A.    I -- I can't recall how many.

09:46 15        Q.    Who came up with the categories?

09:46 16        A.    Me.

09:46 17        Q.    And how did you come up with those

09:46 18   categories before you had finished reviewing the

09:46 19   140 contracts?

09:46 20        A.    I had some understanding of Ripple's

09:46 21   business model, which led me to think that they had

09:46 22   contracts in these various categories.

09:46 23              And I wanted to see whether those contracts

09:46 24   would be relevant to any opinions that I was retained

09:46 25   to give.  And so essentially the process was I had a

                                                                    31

09:46  1    small sample, and I wanted a bigger sample.

09:46  2        Q.    And how did you gain an understanding of

09:46  3    Ripple's business model?

09:46  4        A.    I -- as a general matter, I had a sense of

09:47  5    what cryptocurrency companies do, and I think I

09:47  6    had -- without revealing any substance, I had

09:47  7    conversations with counsel about, So what kind of

09:47  8    company is this, and so on.

09:47  9        Q.    So you learned about Ripple's business

09:47 10    model through communicating with counsel?

09:47 11        A.    I learned -- I learned about -- generally

09:47 12    learned about what cryptocurrencies do just because,

09:47 13    if you're interested in commerce and you were in

09:47 14    a -- a lead institution, you talk about these things

09:47 15    with people who know them.

09:47 16            And I wanted to confirm the general view I

09:47 17    had of this kind of industry with -- I wanted to see

09:47 18    whether this company was sort of like the others

09:47 19    that -- or basically a typical cryptocurrency

09:47 20    company.

09:48 21        Q.    What did you do to supervise the work of

09:48 22    the attorneys acting at your direction?

09:48 23        A.    I didn't directly supervise the attorneys.

09:48 24        Q.    What did you do to verify the accuracy of

09:48 25    their work?

32

09:48 1       A.   Well, if -- if I wanted to see direct sales

09:48 2   contracts, and I had seen a couple before the

09:48 3   attorneys were going to get me more of them, I

09:48 4   essentially internally reviewed to see whether what I

09:48 5   was being shown were direct sales contracts, in that

09:48 6   category.

09:48 7       Q.   So for the contracts listed on Exhibits C

09:48 8   through F to your report, what did you do to verify

09:48 9   that those exhibits accurately categorized the

09:49 10  contracts?

09:49 11      A.   I'm not sure --

09:49 12           MR. FIGEL:  Objection.

09:49 13           You can answer.

09:49 14      A.   Also I'm not sure I understand that

09:49 15  question.

09:49 16      Q.   What did you do to make sure Exhibit -- to

09:49 17  verify that Exhibits C to F to your report -- well,

09:49 18  let me back up.

09:49 19           You -- you testified you did not prepare

09:49 20  Exhibits C to F to your report, correct?

09:49 21      A.   That's correct.

09:49 22      Q.   And you also testified you don't know who

09:49 23  prepared them?

09:49 24      A.   I don't have -- no -- I mean, I have a

09:49 25  suspicion, but I wouldn't want to testify that I

33

09:49  1    actually know.

09:49  2         Q.   So, what did you do to verify that these

09:49  3    Exhibits C to F are accurate?

09:49  4         A.   I'm not sure what you mean by "accurate."

09:49  5         Q.   Well, so, for instance, Exhibit C lists

09:49  6    hundreds of sales contracts.

09:49  7         A.   Yes.

09:49  8         Q.   What did you do to verify that each

09:50  9    contract listed on Exhibit C appropriately belongs to

09:50 10    be listed along with the other sales contracts?

09:50 11              MR. FIGEL:   Objection.

09:50 12         A.   I looked at a lot of them to see whether

09:50 13    they were sales contracts or not.

09:50 14         Q.   And that was the work you did after signing

09:50 15    your report?

09:50 16         A.   Some before, some after.

09:50 17         Q.   So, how many -- how many hours did you

09:50 18    spend -- well, let -- you -- just to take a step

09:50 19    back.

09:50 20              You said before you signed your report, you

09:50 21    had only looked at 140 contracts.  Right?

09:50 22         A.   Yes.

09:50 23         Q.   And then --

09:50 24         A.   Approximately 140.

09:50 25         Q.   What did you do at the time you signed your

                                                              34

09:50 1   report to verify that the other 1500 contracts listed

09:50 2   on the exhibits to your report were accurately

09:50 3   categorized?

09:51 4          MR. FIGEL:  Objection.

09:51 5      A.   I didn't do -- the only way to verify --

09:51 6   let me back up.

09:51 7          I asked the attorneys for a representative

09:51 8   sample of contracts in each of the categories that I

09:51 9   thought would be relevant, and I relied on the

09:51 10  attorneys to pick contracts in those categories that

09:51 11  would, when I looked at the entire universe,

09:51 12  accurately represent the entire universe.

09:51 13     Q.   And the result of that direction was the

09:51 14  Exhibits C to F to your report?

09:51 15     A.   Yes.

09:51 16     Q.   And before you signed your report, what did

09:51 17  you do to verify that Exhibits C through F were

09:51 18  accurate?

09:52 19     A.   I think I've answered this question, but if

09:52 20  you want me to try again, I'll try again.

09:52 21         Exhibits C through F are -- are the

09:52 22  universe.  When I wrote my report, I didn't see the

09:52 23  entire universe.

09:52 24         I relied on the attorneys to give me

09:52 25  contracts in these categories that would be accurate

35

09:52  1    samples of the entire universe.

09:52  2        Q.   And did you do anything prior to signing

09:52  3    your report to verify the attorneys' work?

09:52  4        A.   No.

09:52  5        Q.   Is it your understanding that the

09:52  6    1700 contracts listed on Exhibits C to F of your

09:52  7    report reflect all of Ripple's offers and sales of

09:52  8    XRP at issue in this lawsuit?

09:53  9        A.   No.

09:53 10        Q.   How many offers and sales of XRP by Ripple

09:53 11    that are at issue in this lawsuit are not reflected

09:53 12    on Exhibits C to F of your report?

09:53 13             MR. FIGEL:  Objection.

09:53 14        A.   I don't --

09:53 15             MR. FIGEL:  You can answer.

09:53 16        A.   I don't know.

09:53 17        Q.   Do you know how many offers and sales of

09:53 18    XRP Ripple made between February 2013 and

09:53 19    December 2020 that are not reflected on Exhibit --

09:53 20    not reflected by one of the contracts on Exhibits C

09:53 21    to F of your report?

09:53 22             MR. FIGEL:  Objection.

09:53 23        A.   No.

09:53 24        Q.   Do you know whether Ripple made offers or

09:53 25    sales of XRP that were not reflected by written

36

09:53  1   agreement?

09:53  2           MR. FIGEL:  Objection.

09:53  3       A.   No.

09:54  4       Q.   If Ripple had offered or sold XRP but did

09:54  5   not document those offers or sales in a written

09:54  6   agreement, did you consider those offers or sales in

09:54  7   forming your opinions?

09:54  8           MR. FIGEL:  Objection.

09:54  9       A.   No.

09:54 10       Q.   Are you offering an opinion on any offer or

09:54 11   sale or transfer of XRP not reflected by one of the

09:54 12   contracts listed in your report?

09:54 13       A.   No.

09:54 14       Q.   Are you offering -- are you offering an

09:54 15   opinion on whether any computer code deployed on a

09:54 16   blockchain represents an enforceable contract?

09:54 17           MR. FIGEL:  Objection.

09:54 18       A.   No.

09:54 19       Q.   Are you offering an opinion on any of the

09:54 20   statements or representations made on Ripple's

09:54 21   website?

09:54 22       A.   No.

09:55 23       Q.   Did you consider any such statements or

09:55 24   representations in forming your opinions?

09:55 25       A.   The only ones that I considered were in

37

09:55  1    your complaint and response to interrogatories.

09:55  2         Q.   Are you offering an opinion on any press

09:55  3    release or social media posting made by Ripple or its

09:55  4    personnel?

09:55  5         A.   No.

09:55  6         Q.   Have you spoken with any purchaser of XRP?

09:55  7         A.   No.

09:55  8         Q.   And do you own any XRP?

09:55  9         A.   No.

09:55  10        Q.   Do you own any digital asset or

09:55  11   cryptocurrency?

09:55  12        A.   No.

09:55  13        Q.   Have you ever?

09:55  14        A.   No.

09:55  15        Q.   Are you offering an opinion on any

09:55  16   purchaser or holder of XRP's motives or intentions?

09:55  17        A.   No.

09:56  18        Q.   And then in your report, you refer to

09:56  19   the -- the various -- let's just go to your report.

09:56  20   Can you go, please, to paragraph 5 on page 4 of your

09:56  21   report.

09:56  22             And I want to direct you just to the last

09:56  23   sentence of paragraph 4 -- I'm sorry -- paragraph 5,

09:56  24   the one that reads, Of those contracts, I have

09:56  25   personally reviewed more than 140 contracts that were

                                                              38

09:56  1   exemplars of the categories and subcategories set

09:56  2   forth in this declaration.

09:56  3        A.   Yes.

09:56  4        Q.   And who determined the -- those 140

09:57  5   contracts were exemplars?

09:57  6        A.   The attorneys.

09:57  7        Q.   And who selected the 140 contracts that you

09:57  8   would review?

09:57  9        A.   The attorneys.

09:57 10        Q.   What direction, if any, did you give to the

09:57 11   attorneys who selected those 140 contracts for you?

09:57 12        A.   I -- I think I've answered this question,

09:57 13   but -- to say again, I created the categories.  And

09:57 14   so, for example, I said, I would like to see direct

09:57 15   sales contracts that were representative of the

09:57 16   direct sales contracts that Ripple sold XRP under.

09:58 17        Q.   And just so I'm clear, you came up with

09:58 18   those categories before you started reviewing

09:58 19   contracts?

09:58 20        A.   Well, I saw -- I had saw a few contracts at

09:58 21   the start, just to see what was going on.  But the

09:58 22   very bulk of the contracts that I reviewed, I

09:58 23   reviewed after I communicated the categories to the

09:58 24   attorneys and had them do a search.

09:58 25        Q.   And then following your initial review of

39

09:58  1   the 140 contracts, you were provided with access to

09:58  2   all 1700-plus contracts listed in Exhibits C

09:58  3   through F?

09:58  4        A.   I guess I could see whatever I wanted to

09:58  5   see.

09:58  6        Q.   Well, you said you were -- in your report,

09:58  7   it says you were given access to those 1700.

09:58  8        A.   Yes.

09:58  9        Q.   If you just describe the access you were

09:58 10   given.

09:59 11        A.   I could ask the attorneys for contracts,

09:59 12   and they would provide them.

09:59 13        Q.   Were all of the contracts that you had --

09:59 14   were all the contracts that were provided to you,

09:59 15   were they provided to you in paper form or electronic

09:59 16   form?

09:59 17             MR. FIGEL:  Objection.

09:59 18        A.   The contracts were provided in paper form.

09:59 19        Q.   Were you given access to any sort of

09:59 20   database containing the contracts?

09:59 21        A.   No.  I was given the contracts.

09:59 22        Q.   In hard-copy form.

09:59 23        A.   Yes.

09:59 24        Q.   Were any contracts emailed to you?

09:59 25        A.   No.

40

09:59   1         Q.   And the contracts that you were physically

09:59   2   given copies of, was -- were they all the 1700

09:59   3   contracts?

09:59   4         A.   I have all of them now.

10:00   5         Q.   Did you have all 1700 contracts before you

10:00   6   signed your report?

10:00   7         A.   No.

10:00   8         Q.   Just the 140?

10:00   9         A.   I don't recall how many I had.  But I

10:00  10   didn't have the full universe of 1700.

10:00  11         Q.   And when did you actually get the full

10:00  12   universe?

10:00  13         A.   I think it was in -- sometime after I

10:00  14   signed my report and when there was, I think the

10:00  15   earliest schedule depositions.  I recall the

10:00  16   depositions were scheduled for early January and then

10:00  17   were moved, and sometime before then and after my

10:00  18   report.

10:00  19         Q.   How many of the 1700 contracts did you

10:00  20   personally review?

10:00  21              MR. FIGEL:  Objection.

10:00  22              You can answer.

10:00  23         A.   I reviewed most of them.

10:00  24              I would say a very large percentage.

10:00  25         Q.   And in the course of that review, did you

                                                                    41

10:00  1    review all of those -- the entirety of each contract?

10:01  2         A.   No.

10:01  3         Q.   How many of the 1700 contracts did you not

10:01  4    read the entirety of?

10:01  5              MR. FIGEL:  Objection.

10:01  6         A.   I didn't -- I was looking for particular

10:01  7    things in those contracts.  So either they were there

10:01  8    or they weren't, so I didn't feel that I had to read

10:01  9    the entire document.

10:01  10             So I didn't.

10:01  11        Q.   And that's the case with all 1700

10:01  12   contracts.

10:01  13        A.   Some I read the -- there were some that I

10:01  14   had to read the entire document to get a sense of

10:01  15   what it was about.  There were others when, because

10:01  16   they were form contracts that were -- each one was

10:01  17   very much like the other, I just checked to make sure

10:01  18   that Contract 47, for example, was like Contract 46.

10:01  19        Q.   And again, you said that there were some of

10:01  20   the 1700 contracts you didn't review at all.

10:02  21   Correct?

10:02  22        A.   Well, that would be a pretty small

10:02  23   fraction.

10:02  24        Q.   But there are some.

10:02  25        A.   Well, to be exact, there were these big

                                                                   42

10:02  1   binders.  I went through them.  It could be that I

10:02  2   turned pages inaccurately or my attention flagged for

10:02  3   a moment, but essentially my object was to go through

10:02  4   everything in the binder.

10:02  5        Q.   But not word for word.

10:02  6        A.   Well, I was looking for particular words.

10:02  7   If I saw them, I would read them.  If they were

10:02  8   absent, then I didn't have to read them.

10:02  9        Q.   So if a contract had a provision in it that

10:02 10   you weren't necessarily looking for, you may not have

10:02 11   reviewed that provision.

10:02 12        A.   Yes.

10:02 13        Q.   Of the contracts -- well, why didn't you

10:02 14   read all -- the entirety of all 1700 contracts?

10:03 15        A.   Because I was interested in whether Ripple

10:03 16   assumed any -- or whether there were words in any of

10:03 17   these contracts that would support an inference that

10:03 18   Ripple assumed post-sale obligations toward a buyer

10:03 19   of XRP.  And there was a question whether such words

10:03 20   were in any of these contracts or not, and I looked

10:03 21   to see whether they were.

10:03 22        Q.   So does that mean you reviewed every page

10:03 23   of each contract to make sure that those provisions

10:03 24   were not there?

10:03 25             MR. FIGEL:  Objection.

43

10:03  1      A.    No.  I didn't have to do that because, as I

10:03  2   said, they were form contracts.  So if in Contract 37

10:03  3   these words would appear or not appear in a relevant

10:04  4   part of the contract, I would look at that.  For

10:04  5   example, I was interested in whether there were

10:04  6   disclaimers, so I would look for those.

10:04  7            Essentially, I searched these contracts

10:04  8   consistent with what I said in my report.

10:04  9      Q.    Of the contracts you reviewed, did any

10:04 10   contain a provision that you considered to be vague

10:04 11   or ambiguous?

10:04 12      A.    Not the -- not the words that I read.

10:04 13      Q.    And of the components of the contracts that

10:04 14   you did not review, how would you know whether they

10:04 15   contained terms that are vague or ambiguous?

10:04 16      A.    I wouldn't know that if I didn't read them.

10:05 17      Q.    So going back to -- you said you reviewed

10:05 18   a -- a relatively small amount -- you initially

10:05 19   reviewed a relatively small amount of contracts and

10:05 20   then came up with the categories described in your

10:05 21   report?

10:05 22      A.    Yeah.

10:05 23      Q.    Were Ripple's lawyers involved in coming up

10:05 24   with those categories?

10:05 25            MR. FIGEL:  You can answer yes or no.

44

10:05  1        A.    No.  They were my categories.

10:05  2        Q.    Are the categories you selected the only

10:05  3   reasonable way to categorize the contracts identified

10:05  4   in your report?

10:05  5            MR. FIGEL:  Objection.

10:05  6        A.    I can't say they were the only reasonable

10:05  7   way.  They were the way I thought would be

10:06  8   illuminating with respect to the questions that I was

10:06  9   trying to answer.

10:06  10       Q.    So I take it, then, that certain of the

10:06  11  contracts could fall into a category that you did not

10:06  12  identify in your report?

10:06  13           MR. FIGEL:  Objection.

10:06  14       A.    Well, it's certainly possible.  But if you

10:06  15  look at my report, they were forming categories and

10:06  16  then a whole bunch of miscellaneous contracts.  So I

10:06  17  would not imagine that there would be much that would

10:06  18  be missing, but I can't say that there would be

10:06  19  nothing missing.

10:06  20       Q.    Could another expert in the field of

10:06  21  contract law reasonably come up with different

10:06  22  categories?

10:06  23           MR. FIGEL:  Objection.

10:06  24       A.    You know, of course, there's that

10:06  25  possibility.  But if you were a contracts expert and

45

10:06  1    interested in the questions that I was interested in,

10:06  2    it would be difficult for me to think that you would

10:06  3    come up with anything very differently from what I

10:07  4    came up with.

10:07  5         Q.   Could Judge Torres come up with different

10:07  6    reasonable ways to categorize the contracts?

10:07  7              MR. FIGEL:  Objection.

10:07  8         A.   I don't know.

10:07  9         Q.   Do you know who Judge Torres is?

10:07 10         A.   Not offhand.

10:07 11         Q.   The Article III judge in this lawsuit.

10:07 12         A.   I don't know what Judge Torres did.

10:07 13         Q.   Is there any reason why Judge Torres is not

10:07 14    qualified to interpret the contracts cited in your

10:07 15    report?

10:07 16              MR. FIGEL:  Objection.

10:07 17         A.   I don't know anything in particular about

10:07 18    Judge Torres.

10:07 19         Q.   What was your methodology for selecting the

10:07 20    categories and the criteria?

10:07 21         A.   As I said before, I was interested in

10:07 22    whether Ripple had obligated itself to perform

10:08 23    services post sale for the buyers of XRP, so I looked

10:08 24    for contracts in which such obligations might appear.

10:08 25              So, for example, they would or would not

                                                              46

10:08  1   appear in a direct sales contract, and certain of the

10:08  2   contracts in which Ripple was a buyer of services

10:08  3   with another company, there might be a possibility

10:08  4   that there was a term in a contract like that that

10:08  5   would make an XRP buyer a third-party beneficiary, so

10:08  6   I looked at the service contracts to see whether such

10:08  7   a -- there were language that might support such an

10:08  8   inference.

10:08  9          I looked -- there were -- Ripple sold -- I

10:08 10   mean, there's a question I had, was whether Ripple

10:09 11   made only discrete sales of particular things or

10:09 12   whether they sold them in a way that is sometimes

10:09 13   customary where you make an agreement with a buyer

10:09 14   that from time to time, the buyer will submit orders,

10:09 15   and the terms of those orders will be the ones of the

10:09 16   master agreement.  So I was interested in whether

10:09 17   there were any contracts like that.

10:09 18     Q.   And -- and I'm sorry, because I'm -- I'm

10:09 19   not sure we're on the same page for -- for this

10:09 20   question.

10:09 21          I'm not talking about the different

10:09 22   features of the contracts, like a -- post obligations

10:09 23   or anything like that.  Just the -- basically the

10:09 24   categories you cite in your report, direct sales

10:09 25   contract, wholesale contract, programmatic contract,

47

10:09 1    loans, employee compensation, those categories.  What

10:09 2    was your --

10:09 3            MR. FIGEL:  Objection.  Can I have just a

10:09 4    moment, Mr. Hanauer?

10:09 5            MR. HANAUER:  I just want to make sure I'm

10:09 6    seeing the question.

10:09 7            MR. FIGEL:  Well, you interrupted an answer

10:10 8    to the question, What was your methodology for

10:10 9    selecting the categories in, and the criteria.  And

10:10 10   he was giving an answer as to his -- the methodology

10:10 11   that he was giving.

10:10 12           And then you interrupted him and said what

10:10 13   you just said, which is, I'm not talking about the

10:10 14   different features of the contracts.  So I don't -- I

10:10 15   just want to make sure the witness has had an

10:10 16   opportunity to finish his answer with respect to the

10:10 17   methodology, which was the question that you posed.

10:10 18       A.   I was -- I thought I had answered that.  I

10:10 19   was looking for contract types which might contain

10:10 20   terms that would create a contractual expectation on

10:10 21   the part of a buyer of XRP.  Those provisions could

10:11 22   appear in various kinds of contracts, so I was

10:11 23   interested in what kinds of contracts there were.

10:11 24       Q.   I guess my question was -- or my question

10:11 25   now is, the categories you've identified, direct

48

```
10:11  1  sales, programmatic, wholesale, employee
10:11  2  compensation, what was your methodology for coming up
10:11  3  with those general categories, selecting those
10:11  4  general categories?
10:11  5       A.   I think I've answered that question.  I
10:11  6  didn't have -- because I'm not sure what -- what you
10:11  7  mean in your question by a methodology.
10:11  8            I -- the overarching question that I was
10:11  9  trying to address was whether there was language in
10:11 10  contracts that Ripple used that would sustain the
10:11 11  particular inference, and I was interested in the
10:11 12  various kinds of contracts that might contain such
10:12 13  language.
10:12 14       Q.   And you split up those various kinds of
10:12 15  contracts into categories such as direct sales,
10:12 16  programmatic sales, loans?
10:12 17       A.   Right.  Yeah, there were -- yeah, there
10:12 18  were -- I think that's right.
10:12 19       Q.   So I guess what I'm trying to get at is,
10:12 20  you testified that you came up with the categories
10:12 21  after only reviewing a small amount of contracts, and
10:12 22  I guess, what was the methodology of deciding those
10:12 23  categories that you relayed to counsel and instructed
10:12 24  them on how to list in the appendix?  What was your
10:12 25  methodology, you know, of coming up with these
```

49

10:12  1    categories before you started your more thorough

10:12  2    review of the contracts?

10:12  3              MR. FIGEL:  Objection.

10:12  4         A.   Well, it would be were there contracts of

10:13  5    Type A, were there contracts of Type B, were there

10:13  6    contracts of Type C.

10:13  7         Q.   And what was your methodology in coming up

10:13  8    with Type A, Type B, Type C?

10:13  9         A.   Well, for example, although I think I've

10:13 10    answered this, if Type A is a direct sales contract,

10:13 11    then I wanted to see a direct sales contract because

10:13 12    you might find a commitment to buyers in a direct

10:13 13    sales contract.

10:13 14              If it was a service contract, you might

10:13 15    find third-party beneficiary language in a service

10:13 16    contract.

10:13 17              The overarching question I was trying to

10:13 18    answer was whether there was -- there were terms or

10:13 19    phrases in any of these contracts that can sus--

10:13 20    could sustain an inference that Ripple assumed

10:14 21    post-sale obligations toward buyers.

10:14 22              I really don't have anything else to say to

10:14 23    that, because I just asked for what -- is there a

10:14 24    contract like this, is there a contract like that.

10:14 25         Q.   And -- and I guess that's what I'm getting

50

10:14  1    at.   When you -- when you relayed to counsel, said,

10:14  2    Are there direct sales contracts, are there service

10:14  3    contracts, are there loan contracts, what was your

10:14  4    methodology in choosing those various categories that

10:14  5    you asked counsel to find for you?

10:14  6                MR. FIGEL:   Objection.

10:14  7        A.    Because the -- contracts of that type might

10:14  8    or might not contain the language that I was

10:14  9    interested in.

10:14 10        Q.    How did you go about choosing those

10:14 11    specific types?

10:14 12        A.    I'm not sure I have more to say about that.

10:14 13    I mean, it might be -- I mean, there was some

10:14 14    back-and-forth in the sense of -- in the course of

10:14 15    discussions in which I said I wanted to see contracts

10:14 16    in various categories, I don't have a direct

10:15 17    recollection, but it wouldn't surprise me if somebody

10:15 18    said, Well, you know they were loans.   If anybody

10:15 19    said that to me, I'd say, Well, let me see those.

10:15 20        Q.    Did you ask to review any representations

10:15 21    beyond the four corners of a contract?

10:15 22        A.    No.

10:15 23        Q.    Why not?

10:15 24        A.    Because the question that was addressed --

10:15 25    the question that was -- that I was retained to

51

| | | |
|---|---|---|
| 10:15 | 1 | answer was whether there were contractual obligations |
| 10:15 | 2 | created, which I sought to answer by looking at the |
| 10:15 | 3 | contracts. |
| 10:15 | 4 | Q.   Was any documentation provided to you |
| 10:15 | 5 | showing the work that went into the preparation of |
| 10:15 | 6 | Exhibits C to F of your report? |
| 10:16 | 7 | A.   No. |
| 10:16 | 8 | MR. FIGEL:  Objection. |
| 10:16 | 9 | A.   No. |
| 10:16 | 10 | Q.   How are you doing on time?  We've been |
| 10:16 | 11 | going a little bit more than an hour and may be |
| 10:16 | 12 | logical. |
| 10:16 | 13 | A.   Maybe another half hour, and then I'll want |
| 10:16 | 14 | to do pushups. |
| 10:16 | 15 | MR. HANAUER:  That's fine. |
| 10:16 | 16 | MR. FIGEL:  That was not the answer I was |
| 10:16 | 17 | hoping for.  Does anybody else need a break? |
| 10:16 | 18 | THE WITNESS:  Well, we can do a break now. |
| 10:16 | 19 | It's okay, I don't care. |
| 10:16 | 20 | MR. FIGEL:  It's up -- it's up to you. |
| 10:16 | 21 | THE WITNESS:  I don't mind going for a |
| 10:16 | 22 | little while longer. |
| 10:16 | 23 | MR. FIGEL:  All right.  Well, you're the |
| 10:16 | 24 | guy that matters, so we're going to keep going. |
| 10:16 | 25 | Okay.  But whenever you -- whenever you need one, |

52

10:16  1    just let me know, okay?

10:16  2            THE WITNESS:  Well -- yeah, we've been

10:16  3    doing an hour.  Maybe a little bit more.

10:16  4        Q.   Okay.  So in your report you reference the

10:16  5    Supreme Court's decision in SEC versus

10:16  6    W.J. Howey Company?

10:16  7        A.   Yes.

10:16  8        Q.   You reviewed the Supreme Court's decision

10:16  9    in Howey before preparing your report?

10:16 10        A.   Yes.

10:16 11        Q.   Do you consider yourself an expert on how

10:16 12    courts have applied that decision?

10:17 13        A.   I don't know that anyone would be an expert

10:17 14    in how a court applied a particular decision.  I have

10:17 15    read some post Howey cases.

10:17 16        Q.   Did you consider any of the post Howey

10:17 17    cases in preparing your report?

10:17 18        A.   No, I did not.

10:17 19        Q.   Have courts provided more recent guidance

10:17 20    since the Supreme Court's Howey decision on how to

10:17 21    determine if transactions involve the offer or sale

10:17 22    of an investment contract?

10:17 23            MR. FIGEL:  Objection.

10:17 24        A.   I've read some cases, but I haven't --

10:17 25    there -- I am told that there are hundreds of cases

53

10:17  1    that apply Howey.  I have not read hundreds of cases.

10:18  2        Q.   In forming your opinions, did you consider

10:18  3    any court cases applying Howey?

10:18  4        A.   In forming my report, no.

10:18  5        Q.   And in forming your opinions, did you

10:18  6    consider the features of any contracts in cases

10:18  7    applying Howey to see how the court analyzed those

10:18  8    contracts to see if the financial instruments were

10:18  9    investment contracts?

10:18  10            MR. FIGEL:  Objection.

10:18  11       A.   Not in preparing my report.

10:18  12       Q.   In addition to reviewing the Supreme

10:18  13   Court's Howey decision, you also reviewed the lower

10:18  14   courts' opinions in the Howey litigation?

10:19  15       A.   Yes.

10:19  16       Q.   And you also read the transcript of record

10:19  17   before the Supreme Court?

10:19  18       A.   Yes.

10:19  19       Q.   Did you review all 134 pages of that

10:19  20   transcript of record?

10:19  21       A.   Yes.

10:19  22       Q.   How did you obtain it?

10:19  23       A.   I don't recall.  I -- I either got it from

10:19  24   my library, or the lawyers gave it to me.  I don't

10:19  25   recall how I came about getting it.

                                                              54

10:19  1      Q.   And when I say Howey, I'm going to refer to

10:19  2  the Supreme Court's decision.

10:19  3      A.   Right.

10:19  4      Q.   Okay.

10:19  5           Howey involved two common law contracts.

10:19  6      A.   Howey just involved two contracts.  I don't

10:19  7  know what common law adds to that description.

10:19  8      Q.   That's fair.  Howey involved a land sale

10:19  9  contract and a service contract?

10:19 10      A.   Yes.

10:19 11      Q.   And you reviewed both of those contracts?

10:20 12      A.   Yes.  They were in the record, so I...

10:20 13           MR. HANAUER:  Exhibit 5.

10:20 14           MS. WAXMAN:  Sorry.

10:20 15           THE WITNESS:  A lot of paper in this case.

10:20 16           MR. FIGEL:  Do you want me to give him --

10:20 17           MR. HANAUER:  Yeah, the witness should have

10:20 18  one.

10:20 19           MR. FIGEL:  Okay, that's fine.  He should

10:20 20  have one, yes, I was just not sure about which one.

10:20 21           (Transcript of Howey litigation was marked

10:20 22       Exhibit AS-5 for identification, as of this

10:20 23       date.)

10:20 24      Q.   So I just tendered you Exhibit 5.  Is

10:20 25  Exhibit 5 a copy of the Howey transcript of record

                                                              55

10:21 1   that you reviewed?

10:21 2       A.   It seems to be.

10:21 3       Q.   And the two contracts at issue in Howey

10:21 4   that you reviewed, those are reflected on pages 11 to

10:21 5   20 of Exhibit 5?

10:21 6       A.   Yes.

10:21 7         (Witness reviewing document.)

10:21 8       A.   Yes.

10:21 9       Q.   And Exhibit 5 also contains stipulated

10:21 10   facts that the Supreme Court considered in deciding

10:21 11   Howey?

10:21 12       A.   Yes.

10:21 13       Q.   And that's on pages 5 to 11?

10:22 14       A.   Yes.

10:22 15       Q.   And you reviewed those stipulated facts?

10:22 16       A.   Once.

10:22 17       Q.   Is it your understanding that in addition

10:22 18   to -- so let me take a step back.

10:22 19         So the two contracts at issue in Howey were

10:22 20   a land sale contract and a services contract?

10:22 21       A.   Yes.

10:22 22       Q.   In addition to receiving the land sales

10:22 23   contract and the services contract, the investors in

10:22 24   the Howey case, they also received a sales talk from

10:22 25   representatives of the companies selling those

56

10:22  1    contracts?

10:22  2              MR. FIGEL:  Objection.

10:22  3         A.   I think they did.  I think this is in the

10:22  4    record.

10:22  5         Q.   And that sales talk is included on pages 20

10:22  6    to 28 of Exhibit 5?

10:22  7         A.   I don't recall the pages, but --

10:23  8              (Witness reviewing document.)

10:23  9         A.   That seems to be correct.

10:23 10         Q.   Just for your reference, on pages 8 to 9 of

10:23 11    Exhibit 5, in paragraph 12 it says, Attached hereto

10:23 12    in a part hereof, as Exhibit B 1, is a typical sales

10:23 13    talk employed by representatives as acting for the

10:23 14    two companies in effectuating sales.

10:23 15         A.   Yes.

10:23 16         Q.   And that's the same sales talk I just asked

10:23 17    you about?

10:23 18         A.   It seems to be, yes.

10:23 19         Q.   And you reviewed the sales talk in

10:23 20    preparing your report?

10:23 21         A.   I read everything here.

10:24 22         Q.   In Exhibit 5?

10:24 23         A.   Yes.

10:24 24         Q.   In determining whether an investment

10:24 25    contract existed in Howey, did the Supreme Court look

57

10:24  1  at the two contracts, the land sales contract and the

10:24  2  services contract, in isolation; or did the Supreme

10:24  3  Court consider them together?

10:24  4      MR. FIGEL:  Objection.

10:24  5      A.    I think the court collapsed the two into

10:24  6  one.

10:24  7      Q.    And is that one of the lessons from Howey,

10:24  8  that if multiple contracts govern a commercial

10:24  9  relationship, those multiple contracts should be

10:24 10  considered together to determine if an investment

10:24 11  contract exists under the federal securities laws?

10:24 12      MR. FIGEL:  Objection.

10:24 13      A.    I'm not offering an opinion on whether

10:24 14  something is or isn't an investment contract.

10:24 15      Q.    And when you say "investment contract," do

10:24 16  you mean investment contract as that term is

10:25 17  construed under the federal securities laws?

10:25 18      A.    Yes.

10:25 19      Q.    And going forward, if I use the term

10:25 20  "investment contract," will you understand that I'm

10:25 21  referencing that term as it's used under the federal

10:25 22  securities laws?

10:25 23      A.    Yes, so long as you understand that I'm not

10:25 24  giving an opinion on that issue.

10:25 25      Q.    That should make our time here a lot of

58

10:25   1   shorter.

10:25   2        A.   Good.

10:25   3        Q.   Are you offering an opinion on whether or

10:25   4   not the sales talk the investors received was a

10:25   5   component of the investment contract the Court in

10:25   6   Howey found exists?

10:25   7             MR. FIGEL:  Objection.

10:25   8        A.   The contracts speak for themselves; that

10:25   9   is, the contracts create obligations and duties.

10:25  10        Q.   But my question is, when determining

10:26  11   whether an investment contract exists, was the Court

10:26  12   just looking at the land sales and services contract

10:26  13   or was it looking also at the sales talk?

10:26  14             MR. FIGEL:  Objection.

10:26  15        A.   I assume the Court read the record.

10:26  16        Q.   Can I refer you now to your report, page 7,

10:26  17   paragraph 10.

10:26  18             I want to refer you to the first full

10:26  19   sentence on paragraph 7.

10:26  20        A.   Uh-huh.

10:27  21        Q.   Do you see -- what do you mean when you

10:27  22   write, In the commercial circumstances?

10:27  23             MR. FIGEL:  Objection.

10:27  24             That's not what it says.

10:27  25        A.   Yes.

59

10:27 1          It's -- it says what it says, if you have a

10:27 2  question about it.

10:27 3      Q.   That's what I tried to ask.  What did

10:27 4  you -- what did you mean when you write, In the

10:27 5  commercial circumstances?

10:27 6      A.   I didn't.  I wrote, The commercial context,

10:27 7  or -- in paren, or economic substance, closed paren.

10:27 8      Q.   I just want to make sure we're on -- this

10:27 9  is the top of page 7.

10:27 10      A.   Oh.

10:27 11          Well, I am -- you said paragraph 10.  Are

10:27 12  you referring to anything --

10:27 13      Q.   Yeah.  Paragraph 10 spills over from page 6

10:27 14  into page 7.  I apologize for not trying to get you

10:28 15  there.

10:28 16          Top of page 7, the first full sentence.

10:28 17      A.   Well, the first full sentence begins, The

10:28 18  two contracts in Howey considered together.

10:28 19          Is that the sentence you're --

10:28 20      Q.   Yes.  Yes, sir.  I'm asking you, when you

10:28 21  write, Considered together in the commercial

10:28 22  circumstances, what do you mean by "commercial

10:28 23  circumstances"?

10:28 24      A.   That they were selling orange groves.

10:28 25      Q.   Were the two contracts in Howey the only

60

10:28  1    factual basis for providing the investors the

10:28  2    prospect of an investment return?

10:28  3              MR. FIGEL:  Objection.

10:28  4        A.   If you're asking me what the investors were

10:28  5    thinking or what they relied upon, that's beyond the

10:28  6    scope of my report.

10:28  7        Q.   I'm asking you what they were told.

10:29  8              MR. FIGEL:  Objection.

10:29  9        A.   What they were told is in the record.

10:29 10        Q.   Right.  So my question is, is the only

10:29 11    factual -- so in Howey, the investors were led to

10:29 12    expect returns on their investment.  Correct?

10:29 13        A.   Yeah.  Everybody who makes an investment

10:29 14    anticipates a return.

10:29 15              I mean, they weren't doing it for nothing.

10:29 16        Q.   And what I'm asking is, the only factual

10:29 17    basis that the investors received to expect that

10:29 18    return, was it just the two contracts?

10:29 19              MR. FIGEL:  Objection.

10:29 20        A.   No.  The investors thought they were making

10:29 21    an investment in orange groves.  Whatever went into

10:29 22    that determination on the part of the investors is

10:29 23    what they considered.

10:29 24        Q.   But what was told them that would create an

10:30 25    expectation that they would profit?

                                                              61

10:30  1             MR. FIGEL:  Objection.

10:30  2        A.   I don't know what was told them.  But I

10:30  3   assume that they received a sales talk which would be

10:30  4   similar to the one in the record.

10:30  5        Q.   And in that sales talk, the investors were

10:30  6   told to expect profits from their investment?

10:30  7        A.   I think the investors were told that this

10:30  8   would be a good investment, which is what sellers

10:30  9   tell buyers.

10:31 10        Q.   Is it your understanding of Howey that one

10:31 11   requisite element to find an investment contract is

10:31 12   an expectation of profit by the investor?

10:31 13             MR. FIGEL:  Objection.

10:31 14        A.   If by "investment contract," you mean

10:31 15   something under the securities laws, I'm not

10:31 16   testifying to what elements add up to what a

10:31 17   securities law conclusion would be.

10:31 18        Q.   What provision of the land sales contract

10:31 19   or the services contract in Howey led investors to

10:31 20   expect substantial profits?

10:31 21             MR. FIGEL:  Objection.

10:31 22        A.   I don't know what led investors to expect

10:31 23   whatever the investors expected.

10:31 24        Q.   What from the land sales or the services

10:31 25   contract did the Supreme Court find gave investors an

                                                          62

10:32   1    expectation of substantial profit?

10:32   2        A.   I don't think the Supreme Court said that.

10:32   3    I think the Supreme Court said that the return

10:32   4    that -- that the inventors could not realize a return

10:32   5    except for -- or at least importantly, for the

10:32   6    efforts of the Howey Company.

10:32   7            MR. HANAUER:  Daphna, could we do

10:32   8    Exhibit 4.

10:32   9            THE WITNESS:  If we're going to talk about

10:32  10    this, I -- this would be good time for me to take a

10:32  11    break, if that would be okay.

10:32  12            MR. HANAUER:  Perfect.

10:32  13            THE VIDEOGRAPHER:  Going off the record.

10:32  14    The time is 10:34.

10:33  15            (A recess was taken from 10:34 to 10:48.)

10:47  16            THE VIDEOGRAPHER:  Going back on the

10:47  17    record.  The time is 10:48.

10:47  18        Q.   Professor Schwartz, do you have Exhibit 4

10:47  19    in front of you?

10:47  20        A.   I do.

10:47  21            (Supreme Court's Decision in Securities and

10:47  22        Exchange Commission v. W.J. Howey Co., et al.,

10:47  23        was marked Exhibit AS-4 for identification, as

10:47  24        of this date.)

10:47  25        Q.   And Exhibit 4, that's a copy of the Supreme

                                                              63

10:47  1    Court's decision in Howey that you reviewed?

10:47  2        A.   Yes.

10:47  3        Q.   I would like to refer you to the -- page 3

10:47  4    of the exhibit, the paragraph that starts with, 7

10:47  5    after 4 stars.

10:47  6             The one that begins, The purchasers, for

10:47  7    the most part, are nonresidents of Florida.

10:47  8        A.   Yes.

10:47  9        Q.   And then do you see a little bit further in

10:47 10    the paragraph, it says, they are attracted by the

10:47 11    expectation of substantial profits.  It was

10:47 12    represented, for example, that profits during the

10:47 13    1943-1944 season amounted to 20 percent and that even

10:48 14    greater profits might be expected during the 1944 to

10:48 15    1945 season?

10:48 16        A.   I do.

10:48 17        Q.   Were those representations about

10:48 18    substantial profits, were those contained in the land

10:48 19    sales contract?

10:48 20        A.   No.

10:48 21        Q.   Were they contained in the services

10:48 22    contract?

10:48 23        A.   No.

10:48 24        Q.   They were in the sales talk, though.

10:48 25        A.   Yes.

64

10:48  1        Q.    Did any of the contracts in Howey give the

10:48  2   buyer a right to share in the profits of any company?

10:48  3            MR. FIGEL:  Objection.

10:48  4        A.    Yeah.   I think they were entitled to share

10:48  5   in the profits from the sale of oranges.

10:49  6        Q.    Did any of the contracts give the buyer a

10:49  7   right to share in the profits of W.J. Howey Co. --

10:49  8   Company?

10:49  9        A.    No.

10:49 10        Q.    What about Howey-in-the-Hills Service,

10:49 11   Inc.?

10:49 12        A.    I don't think so.

10:49 13        Q.    Did any of the contracts in Howey give the

10:49 14   buyer voting rights in any company?

10:49 15        A.    No.

10:49 16        Q.    Did any of the contracts in Howey give the

10:49 17   buyer the rights to dividends for any company?

10:49 18            MR. FIGEL:  Objection.

10:49 19        A.    "Dividend" is a term of art.  If by

10:49 20   "dividends" you mean payouts a corporation makes to

10:49 21   shareholders, the answer would be no.

10:49 22        Q.    Are you offering an opinion on whether any

10:49 23   of Ripple's actions affected the value of XRP or

10:49 24   resulted in profits to XRP purchasers?

10:50 25        A.    No.

                                                                65

10:50  1        Q.    Are you offering any opinion whether

10:50  2   something affected or impacted the price of XRP?

10:50  3              MR. FIGEL:   Objection.

10:50  4        A.    No.

10:50  5        Q.    I'd like you to look at your report,

10:50  6   paragraph 11.

10:50  7        A.    Okay.

10:50  8        Q.    And do you see the sentence that says, I

10:50  9   was not able to identify a single contract that

10:50 10   included an express provision that obligated Ripple

10:50 11   to perform post-sale duties that could affect the

10:50 12   value of XRP or return profits to any person?

10:51 13        A.    Yes.

10:51 14        Q.    In your opinion, is an express provision

10:51 15   that obligates Ripple to perform post-sale duties

10:51 16   that could affect the value of XRP or return profits

10:51 17   to any person required to establish the existence of

10:51 18   an investment contract under the federal securities

10:51 19   laws?

10:51 20        A.    I have --

10:51 21              MR. FIGEL:   Objection.

10:51 22        A.    -- no opinion on what would or would not

10:51 23   constitute an investment contract under the

10:51 24   securities laws.

10:51 25        Q.    And I'm just -- if you bear with me, I'm

                                                          66

10:51  1   going to ask you a series of fairly similar questions

10:51  2   that hopefully will save us a very significant amount

10:51  3   of time.

10:51  4              Are you offering the opinion that the

10:51  5   presence of any contractual provision or type of

10:51  6   contractual provision is required to establish the

10:51  7   existence of an investment contract under the federal

10:52  8   securities laws?

10:52  9        A.   No.

10:52 10              MR. FIGEL:  Objection.

10:52 11        Q.   Are you offering the opinion that the

10:52 12   absence of any contractual provision or type of

10:52 13   contractual provision is required to establish the

10:52 14   existence of an investment contract under the federal

10:52 15   securities laws?

10:52 16              MR. FIGEL:  Objection.

10:52 17        A.   No.

10:52 18        Q.   Are you offering the opinion that the

10:52 19   presence of any combination of contractual provisions

10:52 20   is required to establish the existence of an

10:52 21   investment contract?

10:52 22              MR. FIGEL:  Objection.

10:52 23        A.   No.

10:52 24        Q.   Are you offering the opinion that the

10:52 25   presence of any combination of contractual provisions

                                                              67

10:52  1    precludes the existence of an investment contract?

10:52  2            MR. FIGEL:  Objection.

10:52  3        A.   No.

10:52  4        Q.   Are you offering the opinion that the

10:52  5    presence of any contractual provision or type of

10:52  6    contractual provision precludes the existence of an

10:52  7    investment contract?

10:52  8            MR. FIGEL:  Objection.

10:52  9        A.   No.

10:52 10        Q.   Are you offering the opinion that the

10:52 11    absence of any contractual provision or type of

10:53 12    contractual provision precludes the existence of an

10:53 13    investment contract under the federal securities

10:53 14    laws?

10:53 15        A.   No.

10:53 16        Q.   Did Ripple sell XRP only to people who

10:53 17    intended to use XRP for non-investment purposes?

10:53 18            MR. FIGEL:  Objection.

10:53 19        A.   I don't know the answer to that question.

10:53 20            That is, I'm -- I'm saying that I don't

10:53 21    know what any particular buyers intended.

10:54 22        Q.   Did the contracts in Howey suggest an

10:54 23    intention to convey third-party rights?

10:54 24        A.   I don't recall any language in those

10:54 25    contracts that would support that conclusion.

                                                          68

10:54  1      Q.   In your report, you talk about Ripple's

10:54  2  business model.

10:54  3           Is that accurate?

10:54  4      A.   I don't recall where in my report I said

10:54  5  that, but if I --

10:54  6      Q.   Page 8.  The last full paragraph of -- the

10:54  7  last full sen -- I'm sorry.  Page 8, the last full

10:54  8  paragraph of paragraph 12.

10:54  9      A.   I see that.

10:54 10      Q.   So what is Ripple's business model?

10:54 11      A.   That they create and sell cryptocurrency to

10:55 12  buyers and -- that's the story.  They create it and

10:55 13  sell it.

10:55 14      Q.   So Ripple created XRP.

10:55 15      A.   Yeah, and they sell it.

10:55 16      Q.   Are you aware that the vast majority of

10:55 17  Ripple's revenues come from selling XRP?

10:55 18      A.   I don't know where their revenues come

10:55 19  from.

10:55 20      Q.   Well, you just said their business model

10:55 21  was selling XRP.

10:55 22      A.   What I said was that their business model

10:55 23  doesn't require them to be a member of a network.  In

10:55 24  a variety of industries, networks are requisite to

10:55 25  how the industry functions.  Ripple essentially

69

10:56  1    functions on its own.

10:56  2        Q.    You write in your report that, Ripple's

10:56  3    return does not depend on or confer any rights in a

10:56  4    third party.

10:56  5              Do you see that?

10:56  6        A.    I see it.

10:56  7        Q.    What do you mean by that?

10:56  8        A.    What I mean by that is so far as I can

10:56  9    tell, their return comes -- primarily comes from

10:56 10    selling XRP.

10:56 11        Q.    So when you say a third party, is someone

10:56 12    who purchases Ripple -- or is someone that purchases

10:56 13    XRP from Ripple a third party?

10:56 14        A.    No.

10:57 15        Q.    So, when you mean a third party, you mean

10:57 16    someone other than Ripple or the person or entity

10:57 17    that purchases XRP?

10:57 18        A.    There are industries in which there are

10:57 19    people in a network, or several parties get together

10:57 20    in a joint or common venture.  All I meant here was

10:57 21    that Ripple is just the maker and seller of a

10:57 22    product.

10:57 23        Q.    Are you offering an opinion whether

10:57 24    Ripple's products affected the price of XRP?

10:57 25        A.    No.

                                                              70

10:57 1        MS. PROSTKO:  Objection.

10:57 2     Q.   Are you offering an opinion on how the

10:57 3  liquidity of XRP affects its price?

10:57 4        MR. FIGEL:  Objection.

10:57 5     A.   I'm not offering an opinion on that.

10:58 6        MS. PROSTKO:  Sorry to interrupt,

10:58 7  interject.  I had an objection at the same time the

10:58 8  answer was being given to the question about the --

10:58 9  are you offering an opinion about whether Ripple's

10:58 10 efforts affected the price of XRP, and I don't see

10:58 11 that noted on the rough transcript.

10:58 12       MR. FIGEL:  57:52.

10:58 13    Q.   Are you offering an opinion on whether uses

10:58 14 other than trading for investment purposes existed

10:58 15 for XRP?

10:58 16       MR. FIGEL:  Objection.

10:58 17    A.   No, I don't think so.

10:58 18       If it's not in my report, I don't -- I'm

10:58 19 not offering an opinion on it.

10:58 20    Q.   Does your report rest on the assumption

10:58 21 that there were uses for XRP, other than trading for

10:59 22 investment purposes?

10:59 23       MR. FIGEL:  Objection.

10:59 24    A.   No.

10:59 25    Q.   Can you please look at paragraph 13 of your

                                                        71

| | | |
|---|---|---|
| 10:59 | 1 | report. |
| 10:59 | 2 | And then I want to refer you to the first |
| 10:59 | 3 | full sentence on page 9. |
| 10:59 | 4 | A.   Uh-huh. |
| 10:59 | 5 | Q.   It says, Rather, Ripple's promotional |
| 10:59 | 6 | actions are typical of the actions of most merchants |
| 10:59 | 7 | who are concerned with the aftermarket for the |
| 10:59 | 8 | products they sell? |
| 10:59 | 9 | A.   Yes. |
| 10:59 | 10 | Q.   What are Ripple's promotional actions that |
| 10:59 | 11 | you described? |
| 11:00 | 12 | A.   The ones I observed in the SI-- SEC's |
| 11:00 | 13 | complaint. |
| 11:00 | 14 | Q.   Anything else? |
| 11:00 | 15 | A.   No. |
| 11:00 | 16 | Q.   In forming your opinions, did you consider |
| 11:00 | 17 | how Ripple's promotional actions compare to the |
| 11:00 | 18 | promotional actions of firms offering and selling |
| 11:00 | 19 | securities to investors? |
| 11:00 | 20 | A.   No. |
| 11:00 | 21 | Q.   Do you see how, on page 9 of your report, |
| 11:01 | 22 | you reference De Beers, Rolex, and BMW? |
| 11:01 | 23 | A.   Yes. |
| 11:01 | 24 | Q.   Where did those examples come from? |
| 11:01 | 25 | A.   My knowledge of the world. |

72

11:01  1        Q.   Did --

11:01  2        A.   Well, also, I own a Rolex and a BMW.

11:01  3             But I don't own any diamonds.

11:01  4        Q.   Did you come up with the De Beers example

11:01  5   on your own?

11:01  6        A.   Yes.

11:01  7        Q.   And if I told you that the example of

11:01  8   De Beers was listed in another expert report, would

11:01  9   you have any knowledge of that?

11:01 10        A.   No.

11:01 11        Q.   Does De Beers own and control the majority

11:01 12   of diamonds in existence?

11:01 13             MR. FIGEL:  Objection.

11:01 14        A.   I don't know De Beers' market share.

11:01 15        Q.   Do you have any reason to believe that

11:01 16   De Beers owns and controls the majority of diamonds

11:02 17   in existence?

11:02 18        A.   As I said, I don't know their market share.

11:02 19   I know that they control a lot of diamonds.

11:02 20        Q.   Does Rolex own and control the majority of

11:02 21   Rolex watches in existence?

11:02 22             MR. FIGEL:  Objection.

11:02 23        A.   Well, they don't control the aftermarket in

11:02 24   them.

11:02 25        Q.   And I guess that's my question, are there

73

11:02  1   more -- for using the Rolex example, are there more

11:02  2   Rolex sitting in Rolex's inventory or sitting in the

11:02  3   collection with people that purchase Rolexes?

11:02  4          MR. FIGEL:  Objection.

11:02  5      A.   I don't know the answer to that question.

11:02  6      Q.   And -- and it's the same question for

11:02  7   De Beers; who has more diamonds, De Beers in its

11:02  8   inventory, or all the other people in the world who

11:02  9   own diamonds put together?

11:02 10          MR. FIGEL:  Objection.

11:02 11      A.   As a matter of fact, I don't know the

11:03 12   relevant proportions.  People have been buying

11:03 13   diamonds for hundreds of years, so I would assume, if

11:03 14   I'm going to assume anything, that there are probably

11:03 15   more diamonds out there than the ones that De Beers

11:03 16   owns, but if you're asking me for a fact answer, I

11:03 17   don't know for a fact what any proportions are.

11:03 18      Q.   What -- what about for BMW?  Does BMW own

11:03 19   the majority of BMW cars in existence?

11:03 20          MR. FIGEL:  Objection.

11:03 21      A.   No.

11:03 22      Q.   Does Ripple own and control the majority of

11:03 23   XRP in existence?

11:03 24          MR. FIGEL:  Objection.

11:03 25      A.   I don't know the answer to that.

74

11:03  1      Q.   Are you familiar with the concept of

11:03  2  fiduciary duties owed by a company's management to

11:03  3  its owners?

11:03  4      A.   Yes.

11:03  5      Q.   Okay.  What does that concept mean to you?

11:03  6      A.   Well, if the owners are shareholders, the

11:03  7  manager's own duties of loyalty, care, and good faith

11:04  8  to the shareholders.

11:04  9           And those are fiduciary duties.

11:04 10      Q.   Did Ripple owe fiduciary duties to its

11:04 11  equity shareholders?

11:04 12           MR. FIGEL:  Objection.

11:04 13      A.   I don't know Ripple's corporate setup.  If

11:04 14  it was a corp-- a typical corporate setup, then the

11:04 15  answer would be yes, but I don't know for a fact what

11:04 16  their corporate setup is.

11:04 17      Q.   Do you know if Ripple has equity

11:04 18  shareholders?

11:04 19      A.   No.

11:04 20      Q.   Let's assume that Ripple did have or does

11:04 21  have equity shareholders.

11:04 22           If -- assuming that's the case, would

11:04 23  Ripple owe fiduciary duties to its equity

11:04 24  shareholders to increase the value of Ripple's

11:04 25  shares?

75

11:04  1            MR. FIGEL:  Objection.

11:04  2       A.   No.

11:05  3       Q.   Why do you say that?

11:05  4       A.   Well, you're asking me about fiduciary

11:05  5   duties.  The fiduciary duties are to manage

11:05  6   carefully, to avoid conflicts of interest, to make

11:05  7   appropriate disclosures.

11:05  8            Companies don't promise shareholders --

11:05  9   usually don't promise shareholders returns.

11:05 10       Q.   I'm not asking about the promise of

11:05 11   returns.  But does management have a fiduciary duty

11:05 12   to make good-faith efforts to increase the value of

11:05 13   the company?

11:05 14            MR. FIGEL:  Objection.

11:05 15       A.   No, they don't have a fiduciary duty as

11:05 16   fiduciary duties are technically defined in corporate

11:05 17   law.  They have a contractual obligation, implicit in

11:05 18   the share contract, to manage in the best interest of

11:06 19   their shareholders.

11:06 20            THE WITNESS:  Did anybody else hear that?

11:06 21   I hope so.

11:06 22       Q.   And the obligation of management to act in

11:06 23   the best interests of a company's shareholders, does

11:06 24   that include the obligation to increase the value of

11:06 25   the company's shares?

76

11:06  1            MR. FIGEL:  Objection.

11:06  2       A.    Managers want to maximize share value.

11:06  3       Q.    Does that include an obligation to use

11:06  4  good-faith efforts to grow the value of the company's

11:06  5  assets?

11:06  6            MR. FIGEL:  Objection.

11:06  7       A.    Those are legal terms.  I -- there's --

11:07  8  shareholder of a company doesn't have a right to any

11:07  9  particular level of effort on behalf of the managers.

11:07 10  That's why you write contracts with managers to

11:07 11  incentivize them.

11:07 12       Q.    And again, are you offering an opinion

11:07 13  about the expectations of any purchaser or holder of

11:07 14  XRP?

11:07 15       A.    No.

11:07 16       Q.    So going back to your report, paragraph 9,

11:08 17  do you see the sentence two-thirds of the way down

11:08 18  that begins, Ripple presumably also seeks to protect

11:08 19  the after-sale value of XRP for its own benefit?

11:08 20       A.    Paragraph?

11:08 21       Q.    Page 9.

11:08 22       A.    Oh, page 9.

11:08 23            MR. FIGEL:  Do you mind if I point it out

11:08 24  to him?

11:08 25            MR. HANAUER:  Yeah, of course.

77

11:08  1          MR. FIGEL:  Beginning with "Ripple."

11:08  2          THE WITNESS:  Yeah.

11:08  3          (Witness reviewing document.)

11:08  4     Q.   Did you have a chance to review that

11:08  5   sentence?

11:08  6     A.   Yes, I have.

11:08  7     Q.   What do you mean by, Protect the after-sale

11:08  8   value of XRP?

11:09  9     A.   That XRP would not fall materially in

11:09 10   value.

11:09 11     Q.   What steps did Ripple take to protect the

11:09 12   after-sale value of XRP?

11:09 13          MR. FIGEL:  Objection.

11:09 14     A.   I don't know.

11:09 15     Q.   You don't know?

11:09 16     A.   Well, other than what I read in the SEC

11:09 17   report, my language in -- my expert report uses the

11:09 18   word "presumably."

11:09 19     Q.   And why would Ripple take steps to protect

11:09 20   the after-sale value of XRP?

11:09 21          MR. FIGEL:  Objection.

11:09 22     A.   You could be asking me one of two

11:09 23   questions.  One question you can be asking me is,

11:09 24   What is the subjective intention of the people who

11:09 25   run Ripple?

78

| | | |
|---|---|---|
| 11:09 | 1 | I have no idea what that would be. |
| 11:10 | 2 | If you're asking me whether someone who |
| 11:10 | 3 | sells a product that has an aftermarket wants to |
| 11:10 | 4 | protect the aftermarket, the answer would be yes. |
| 11:10 | 5 | Q.   Why would Ripple presumably want to |
| 11:10 | 6 | protect -- strike that. |
| 11:10 | 7 | Why would Ripple want to prevent the price |
| 11:10 | 8 | of XRP from declining materially? |
| 11:10 | 9 | MR. FIGEL:  Objection. |
| 11:10 | 10 | A.   XRP -- because XRP is a cryptocurrency.  If |
| 11:10 | 11 | you have a currency, you don't want a currency to |
| 11:10 | 12 | fall in value. |
| 11:10 | 13 | Q.   What do you mean by, If you have a |
| 11:10 | 14 | currency? |
| 11:10 | 15 | MR. FIGEL:  Objection. |
| 11:10 | 16 | A.   If I'm selling someone a unit of currency, |
| 11:11 | 17 | which they may later use in transactions, I would |
| 11:11 | 18 | like, as the seller of the -- the initial seller, |
| 11:11 | 19 | to -- to see whether a buyer of XRP could actually |
| 11:11 | 20 | transact in it for the buyer's benefit. |
| 11:11 | 21 | Q.   And I believe you testified earlier that |
| 11:11 | 22 | Ripple's business model was selling XRP, right? |
| 11:11 | 23 | A.   Yes. |
| 11:11 | 24 | MR. FIGEL:  Objection. |
| 11:11 | 25 | Q.   And that's another reason why Ripple |

79

11:11  1    doesn't want the price of XRP to decline materially,

11:11  2    is because Ripple generates revenues from selling

11:11  3    XRP.

11:11  4              MR. FIGEL:  Objection.

11:11  5         A.   No.  It's -- if my revenue depends on

11:11  6    selling apples, I don't really care what the

11:11  7    post-sale value of an apple is.

11:12  8              Ripple is selling a currency.  A currency

11:12  9    is something that people use to exchange for

11:12 10    something else.  So Ripple would have an interest in

11:12 11    having people buy their currency; that is, people

11:12 12    would only buy Ripple's currency if they thought that

11:12 13    they could use it as a currency.

11:12 14         Q.   Are you offering the opinion that XRP is a

11:12 15    currency?

11:12 16              MR. FIGEL:  Objection.

11:12 17         A.   No.  I'm offering -- what am I offering an

11:12 18    opinion on, if anything?

11:12 19              No.  I -- what I know is that Ripple sells

11:12 20    XRP and that XRP is used as a currency.

11:12 21         Q.   Are you offering any opinion as to whether

11:13 22    XRP should be legally classified as a currency?

11:13 23         A.   No.

11:13 24         Q.   Could a third party benefit from Ripple's

11:13 25    conduct even if that third party was not made a

                                                              80

11:13  1    beneficiary by virtue of a provision in any of

11:13  2    Ripple's contracts?

11:13  3              MR. FIGEL:  Objection.

11:13  4        A.   I think you'd have to make that question

11:13  5    more concrete.

11:13  6              I mean, I don't know what type of third

11:13  7    party you're talking about or what you mean by a

11:13  8    "benefit."

11:13  9        Q.   Well, you say in your report that you

11:13  10   couldn't find any provisions that would make a third

11:13  11   party a beneficiary of any of Ripple's contracts.

11:13  12   Right?

11:14  13       A.   I -- yes.

11:14  14       Q.   Are there ways that a third party could

11:14  15   benefit from Ripple's conduct, even if they weren't

11:14  16   described as a third-party beneficiary in any of

11:14  17   Ripple's contracts?

11:14  18             MR. FIGEL:  Objection.

11:14  19       A.   Well, if someone came to own Ripple and

11:14  20   Ripple increased in value, through any efforts of --

11:14  21   of -- if someone came to own XRP and XRP increased in

11:14  22   value, they would be happy about that.

11:14  23       Q.   Right.  So --

11:15  24       A.   They could own it through buying it, having

11:15  25   it be willed to them, giving it to them as a gift.

                                                                    81

11:15  1          Q.   So hypothetical here:  Ripple sells XRP to

11:15  2     Party B.  There's nothing in the contract about any

11:15  3     other third party.  And then Ripple -- and then

11:15  4     Party B sells that same XRP to Party C.

11:15  5               If Ripple does something to create -- to

11:15  6     increase the value of XRP, does Party C benefit?

11:15  7               MR. FIGEL:  Objection.

11:15  8          A.   Yes.

11:15  9          Q.   Your report mentions the restatement of

11:15 10     contracts.

11:15 11          A.   Yes.

11:15 12          Q.   Does the restatement of contracts define

11:16 13     "investment contract" the same way as that term is

11:16 14     defined under the federal securities laws?

11:16 15          A.   I don't think the restatement mentions the

11:16 16     word "investment contract" or the concept.

11:16 17          Q.   Does the restatement of contracts govern

11:16 18     the determination of whether something is an

11:16 19     investment contract under the federal securities

11:16 20     laws?

11:16 21               MR. FIGEL:  Objection.

11:16 22          A.   No.

11:16 23          Q.   Did Ripple sell XRP to purchasers who

11:16 24     acquired it for investment purposes?

11:16 25               MR. FIGEL:  Objection.

82

11:17  1        A.    I don't know to whom Ripple sold XRP.

11:17  2        Q.    Well, you talk about it in your report.

11:17  3        A.    Well, I mean, they -- I know they sold XRP.

11:17  4   But if you're asking me what the purpose was of any

11:17  5   particular buyer, I don't know what that purpose

11:17  6   would have been.

11:17  7        Q.    Did any of the contracts you reviewed say

11:17  8   what the purpose of the -- of the XRP purchases were?

11:17  9        A.    Not that I recall.  But I do recall some

11:17 10   contracts explicitly saying that the buyer wasn't

11:17 11   purchasing XRP for an investment purpose.

11:17 12        Q.    When an issuer of securities sells

11:17 13   securities to an investor, does the title and risk of

11:17 14   loss typically pass to the investor?

11:17 15             MR. FIGEL:  Objection.

11:18 16        A.    I -- I don't think that would be a standard

11:18 17   term in a contract of the type you described.

11:18 18        Q.    I'm not -- independent of any contract, in

11:18 19   an IPO -- do you know what an IPO is?

11:18 20        A.    Yes.

11:18 21        Q.    When someone buys a company's securities in

11:18 22   an IPO, who assumes the title and risk of loss

11:18 23   associated with those securities?

11:18 24             MR. FIGEL:  Objection.

11:18 25        A.    The buyer.

                                                            83

11:18  1        Q.   Under what circumstances did the -- does

11:18  2    the seller of securities retain title and risk of

11:18  3    loss after the security has been sold to an investor?

11:18  4             MR. FIGEL:  Objection.

11:18  5        A.   I don't think there are any such

11:18  6    circumstances; but if there are any, I don't have

11:18  7    them in mind.

11:19  8        Q.   Can I ask you to look at paragraph 14 of

11:19  9    your report.

11:19 10             Do you see the sentence that says -- near

11:19 11    the middle, Rather than assume any post-sale

11:19 12    obligation to promote and increase the value of XRP,

11:20 13    the typical Ripple sales contract warns the customer

11:20 14    that the future value of XRP depends on the continued

11:20 15    willingness of market participants to engage fiat

11:20 16    currency for virtual currency?

11:20 17        A.   Yes.

11:20 18        Q.   How many contracts did you review that

11:20 19    contain that disclaimer?

11:20 20        A.   I don't know exactly, but I would say that

11:20 21    that's a standard term in just about all of the

11:20 22    direct sales contracts that I looked at.

11:20 23        Q.   How many of those did you look at?

11:20 24        A.   I think I've said before that I don't have

11:20 25    a precise number of the contracts I reviewed in each

84

11:20  1    category.

11:20  2        Q.   Then the next sentence, you write, The

11:21  3    service contracts in Howey set forth specific

11:21  4    contractually required value-affecting actions that

11:21  5    Howey had the unilateral ability to perform and that

11:21  6    were essential to enable the land purchaser to earn a

11:21  7    profit.

11:21  8            Why do you say that the Howey -- that the

11:21  9    Howey Company had the unilateral ability to harvest

11:21 10    and sell the oranges?

11:21 11        A.   Because the Supreme Court in the Howey case

11:21 12    said that a future of an investment contract was that

11:21 13    the investors' return depended -- and the

11:21 14    Supreme Court used the word "solely" -- on the

11:21 15    efforts of others.

11:21 16            And I wanted to -- so I -- that is my

11:21 17    interpretation of what the Supreme Court meant by

11:21 18    that, was that Howey had the ability to affect the

11:22 19    return in the way that the Supreme Court was

11:22 20    referring to.

11:22 21        Q.   Did the Howey Company have the unilateral

11:22 22    ability to harvest and sell the oranges?

11:22 23        A.   Under the service contract, I think they

11:22 24    were the only ones that could, because the buyers of

11:22 25    orange groves were precluded from entering onto the

85

11:22 1   land to harvest oranges themselves.

11:22 2       Q.   So it's your read of Howey that the

11:22 3   purchasers of the land sale contract were not

11:22 4   required to -- or did not have the ability to harvest

11:22 5   their own oranges?

11:22 6       A.   I don't think they had the ability to

11:22 7   harvest their own oranges.  I think they were

11:22 8   entitled to a share of the return from the oranges

11:22 9   that the Howey Company picked.

11:23 10      Q.   But I thought the Howey companies told the

11:23 11  investors that they were under no obligation to use

11:23 12  Howey's services.

11:23 13      A.   Howey told investors -- Howey -- well, let

11:23 14  me back up.

11:23 15           Howey sold investors orange groves.  They

11:23 16  offered the investors a service contract that would

11:23 17  go along with the orange groves.  It's my

11:23 18  recollection that about 85 percent of the buyers

11:23 19  purchased service contracts from Howey, and

11:23 20  15 percent of the buyers did not.

11:23 21      Q.   And is it your understanding that the

11:23 22  15 percent of the investors in Howey who didn't

11:23 23  purchase the service contracts were not allowed to

11:23 24  enter the orange groves they purchased or harvest the

11:23 25  crop?

86

11:24  1        A.   I think I recall language -- but I can't be

11:24  2   very precise about this -- that the service contracts

11:24  3   Howey offered were typical of service contracts

11:24  4   offered in the industry.

11:24  5        Q.   Were there factors in Howey, beyond the

11:24  6   unilateral control of the Howey companies, that could

11:24  7   have affected the investors' actual profits or

11:24  8   expectations of profits?

11:24  9             MR. FIGEL:  Objection.

11:24 10        A.   I don't know anything that the Howey

11:24 11   Company did with respect to the value of oranges.

11:24 12        Q.   Well, we know, from the Supreme Court's

11:24 13   decision, that Howey led the investors to expect

11:24 14   profits.  Right?

11:25 15             MR. FIGEL:  Objection.

11:25 16        A.   We know that Howey said that if the future

11:25 17   was like the past, you would make money.

11:25 18        Q.   And part of the expectation of profits in

11:25 19   Howey came from the efforts of the Howey companies.

11:25 20   Right?

11:25 21        A.   Well, if the Howey Company didn't expend

11:25 22   any efforts under the service contracts, there

11:25 23   wouldn't have been any profits because there wouldn't

11:25 24   have been any oranges.

11:25 25        Q.   Were there factors other than the actions

87

11:25   1   of the Howey companies that could have affected the

11:25   2   investors' profits?

11:25   3           MR. FIGEL:  Objection.

11:25   4       A.   Yeah, there's a market in oranges.

11:25   5       Q.   So like if there's a deep freeze in

11:25   6   Florida, that could affect the investor's profits.

11:25   7       A.   Yeah.

11:25   8           Yeah, as I said, there's a market in

11:25   9   oranges.  That price of oranges is, I think, set by

11:26  10   supply and demand.

11:26  11       Q.   And so the factors affecting supply and

11:26  12   demand could affect the price -- or could affect the

11:26  13   Howey's investors' returns independent of the efforts

11:26  14   of the Howey companies?

11:26  15           MR. FIGEL:  Objection.

11:26  16       A.   I would put it this way:  The efforts of

11:26  17   the Howey companies were necessary for the investors

11:26  18   to receive a return but not sufficient.

11:26  19       Q.   And even if the Howey companies took all

11:26  20   the necessary steps to generate profits for the

11:26  21   investors, there were things outside Howey's control

11:26  22   that could have affected the -- the return to the

11:26  23   investors?

11:27  24           MR. FIGEL:  Objection.

11:27  25       A.   I mean, I'm not an expert in the oranges

                                                                88

11:27  1    industry so I'm -- I can't really be -- you know,

11:27  2    give any testimony about how that industry works.

11:27  3              I do know that there's a market in oranges

11:27  4    and that the price is set by supply and demand, and

11:27  5    so any one buyer or seller probably couldn't affect

11:27  6    the price by anything it did, but -- but I don't have

11:27  7    personal knowledge of that industry, so it wouldn't

11:27  8    shock me if some industry expert contradicted what I

11:27  9    just said.

11:27 10        Q.   Is it a -- a common feature of commercial

11:27 11    enterprises that external factors beyond the control

11:27 12    of management can affect the profits of the

11:27 13    enterprise and its investors?

11:27 14        A.   It depends on the enterprise.

11:27 15        Q.   What enter-- commercial enterprises are

11:28 16    immune from external factors beyond the control of

11:28 17    management affecting the company's profits?

11:28 18              MR. FIGEL:  Objection.

11:28 19        A.   No one's immune from the world, but you

11:28 20    have a lot more control over what goes on if you're a

11:28 21    monopolist than if you're working in a competitive

11:28 22    market.  So as I said, it would depend on industry

11:28 23    structure and other things.

11:28 24        Q.   Your report talks about how New York or

11:28 25    Delaware law governs many of the Ripple contracts?

89

11:28  1          A.   Yes.

11:28  2          Q.   How many of the contracts described in

11:28  3     your -- documented in your report are governed by

11:29  4     New York and Delaware law?

11:29  5          A.   I don't know the precise number, but I

11:29  6     think a majority of them are.

11:29  7          Q.   How many of the contracts are governed by

11:29  8     California law?

11:29  9          A.   There are some, but it's my recollection

11:29 10     that that would be a relatively small fraction of the

11:29 11     full universe.

11:29 12          Q.   How many of the 1700 contracts identified

11:29 13     in your report are governed by a jurisdiction that

11:29 14     takes a different approach to the Four Corners Rule?

11:29 15               MR. FIGEL:  Objection.

11:29 16          A.   I don't know the number, but the California

11:29 17     contracts would definitely be one of those

11:29 18     jurisdictions.

11:30 19          Q.   What is the California approach to the

11:30 20     interpretation of integration clauses?

11:30 21               MR. FIGEL:  Objection.

11:30 22          A.   The California approach is that an

11:30 23     integration clause is evidence of the parties'

11:30 24     intention to make the contract the complete statement

11:30 25     of the rights and duties of the parties, but because

                                                              90

11:30  1   it is just evidence, it could be rebutted by other

11:30  2   evidence.

11:30  3        Q.   In this case, does the presence of an

11:30  4   integration clause in any of Ripple's contracts

11:30  5   preclude the court from considering representations

11:31  6   made outside the four corners of Ripple's contracts?

11:31  7        A.   If there is a merger or integration clause,

11:31  8   and you are in a jurisdiction such as New York or

11:31  9   jurisdictions that follow New York, a court would not

11:31 10   consider extracontractual representations when the

11:31 11   court is engaged on deciding what the contract --

11:31 12   what obligations the contract creates.

11:31 13        Q.   What about in an SEC enforcement action

11:31 14   alleging violations of the federal securities laws?

11:31 15        A.   I have --

11:31 16             MR. FIGEL:  Objection.

11:31 17        A.   I have no opinion on what a court would do

11:31 18   in that circumstance.

11:32 19        Q.   You write in your report that statutory

11:32 20   interpretation is within your field of expertise?

11:32 21        A.   Yes.

11:32 22        Q.   Is that the case?

11:32 23        A.   Well, I'm claiming it.

11:32 24        Q.   Is the interpretation of a statute

11:32 25   typically a legal question for the court to decide?

                                                          91

11:32  1          A.    Yes.

11:32  2          Q.    Are you opining that any statute at issue

11:32  3  in this case is ambiguous?

11:32  4                MR. FIGEL:  Objection.

11:32  5          A.    No.

11:33  6          Q.    Could you go to paragraph 16 of your

11:33  7  report.

11:33  8                So I want to refer you to the last word on

11:33  9  page 11, and then that sentence continuing on to

11:33 10  page 12.

11:33 11          A.    Uh-huh.

11:33 12          Q.    You write, Thus, under the standard

11:33 13  interpretive canon, the meaning of the word

11:33 14  "contract" in the statutory phrase "investment

11:33 15  contract" would be its common law meaning?

11:33 16          A.    Yes.

11:33 17          Q.    Does the Supreme Court say that in Howey?

11:33 18          A.    No.  The Supreme Court says that the

11:33 19  statute did not define the phrase "investment

11:33 20  contract," but it did not reach the question that I'm

11:34 21  talking about in my report.

11:34 22          Q.    Can an investment contract be established

11:34 23  by a scheme or transaction?

11:34 24                MR. FIGEL:  Objection.

11:34 25          A.    I -- I'm not a securities law expert.

                                                                    92

11:34  1      Q.   The determination of whether Ripple's

11:34  2  offers and sales of XRP, whether those offers and

11:34  3  sales violate the federal securities laws, is that

11:34  4  determination governed by the common law of contracts

11:34  5  or the federal securities laws?

11:34  6           MR. FIGEL:  Objection.

11:34  7      A.   That would be determined by the federal

11:34  8  securities laws.

11:35  9      Q.   So do you see paragraph 17 of your report,

11:35 10  the last sentence.

11:35 11           It says, It would follow that the contracts

11:35 12  Ripple uses to market XRP are distinguishable from

11:35 13  the contracts Howey used to market citrus groves?

11:35 14      A.   Yes.

11:35 15      Q.   In forming your opinions, did you consider

11:35 16  whether Ripple's representations on its website and

11:35 17  its social media posts are distinguishable or similar

11:36 18  to the sales talk from Howey?

11:36 19           MR. FIGEL:  Objection.

11:36 20      A.   No.

11:36 21      Q.   Will you be offering any such opinion?

11:36 22      A.   No.

11:36 23      Q.   Will you be offering an opinion on whether

11:36 24  any of Ripple's contracts are distinguishable from

11:36 25  any contract in any court case applying the Howey

                                                              93

11:36   1   decision?

11:36   2        A.   If I'm -- if I'm shown such a case and

11:36   3   asked for my views, I would give them.

11:36   4             But in the absence of being shown such a

11:36   5   case, I have no intention of giving any such opinion.

11:36   6        Q.   So when you considered a particular

11:37   7   contract, a particular Ripple contract, did you

11:37   8   examine all of the contracts between Ripple and its

11:37   9   counterparty that governed their commercial

11:37  10   relationship?

11:37  11             MR. FIGEL:  Objection.

11:37  12        A.   I'm not sure I understand that question.

11:37  13   If -- if -- if it -- if the question is did I read

11:37  14   every word in each of these contracts, I've testified

11:37  15   to that before.

11:37  16        Q.   And the answer's no?

11:37  17        A.   And the answer would be no.

11:37  18             Is there -- if you're asking me a different

11:37  19   question, I'm not quite sure I understand what that

11:37  20   would be.

11:37  21        Q.   And I'm sorry, because it is a different

11:37  22   question.

11:37  23             So when you were considering any specific

11:37  24   contract or -- that you discuss in your report, did

11:37  25   you examine all of the contracts between Ripple and

94

11:37  1    its counterparty governing their commercial

11:37  2    relationship or just the specific contract you

11:37  3    discussed in your report?

11:38  4        A.   Once again, I'm a little bit confused.

11:38  5    When I -- when I looked at the contracts referred to

11:38  6    in my report, or other ones, I was asking what the

11:38  7    legal relationship -- what the relationship was that

11:38  8    the contract created.

11:38  9        Q.   Right.  So -- well, let's assume that

11:38 10    Ripple -- well, so let's use the example of the

11:38 11    direct sales contract.

11:38 12            For a direct sales contract between Ripple

11:38 13    and its counterparty, how do you know that that sales

11:38 14    contract was the only contract governing the

11:38 15    commercial relationship between Ripple and its

11:38 16    counterparty?

11:38 17        A.   I don't know that.

11:39 18        Q.   So talking about the direct sales

11:39 19    contracts, are you offering an opinion on how

11:39 20    Ripple's direct sales of XRP were similar or

11:39 21    different than an IPO?

11:39 22        A.   No.

11:39 23        Q.   What about a secondary offering?

11:39 24        A.   In an IPO, you're selling securities.  A

11:39 25    security is a contract between the holder and the

95

11:40  1    firm.

11:40  2            Ripple is selling a thing; that is, an item

11:40  3    of cryptocurrency, not a contract.

11:40  4            So there would be a major difference, if

11:40  5    I'm -- between selling a contract and selling a

11:40  6    thing.

11:40  7        Q.   Isn't that the ultimate legal dispute in

11:40  8    this case?

11:40  9            MR. FIGEL:  Objection.

11:40 10        A.   No, I don't think so.  You asked me whether

11:40 11    there was a similarity.  I said Ripple was selling an

11:40 12    item of currency.  In an IPO, you're selling

11:40 13    something different.

11:40 14        Q.   So you're opining that what Ripple sold was

11:40 15    not a security?

11:40 16            MR. FIGEL:  Objection.

11:40 17        A.   No.

11:40 18            No, I'm not opining that at all.

11:40 19        Q.   I think just said in an IPO, they sell

11:40 20    securities; in Ripple's case, they sell something

11:40 21    else.

11:40 22        A.   No.  In an IPO, you're selling a contract,

11:41 23    like a share of stock.  If you're selling an item of

11:41 24    cryptocurrency, that's sold under a contract.  It

11:41 25    isn't a contract.

96

11:41  1          Q.   In an IPO, can the issuer sell securities

11:41  2    directly to a counterparty for the counterparty's own

11:41  3    use?

11:41  4               MR. FIGEL:  Objection.

11:41  5          A.   I'm not an expert in that.

11:41  6          Q.   In a public or private securities offering,

11:41  7    can the issuer and its counterparty execute a single

11:41  8    master agreement containing the terms that would

11:41  9    apply to all subsequent sales of the issuer's

11:41  10   securities to the counterparty?

11:41  11              MR. FIGEL:  Objection.

11:42  12         A.   I'm not an expert in securities.  I do know

11:42  13   that companies that issue stock hold back stock that

11:42  14   they may later issue.  And if they later issue stock,

11:42  15   it would be under the same terms as the earlier

11:42  16   issue.

11:42  17              But I don't have an opinion on anything

11:42  18   else about that.

11:42  19         Q.   Can the issuer of securities agree to

11:42  20   exchange a defined quantity of securities with a

11:42  21   counterparty for a defined quantity of U.S. dollars?

11:42  22              MR. FIGEL:  Objection.

11:42  23         A.   I don't have an opinion on that.

11:42  24         Q.   Are you familiar with the term

11:43  25   "underwriter"?

97

11:43  1      A.   Yes.

11:43  2      Q.   And what's your understanding of the term

11:43  3  "underwriter"?

11:43  4      A.   Underwriter is an intermediary between the

11:43  5  company and an ultimate purchaser.

11:43  6      Q.   Are you offering an opinion -- I want to

11:43  7  ask you about the wholesale sales contracts you talk

11:43  8  about in your report.

11:43  9           Are you offering an opinion on whether the

11:43 10  wholesale sales contracts are different or similar

11:43 11  than underwriter contracts in a securities offering?

11:43 12           MR. FIGEL:  Objection.

11:43 13      A.   No, I'm not offering an opinion on that.

11:43 14      Q.   In a securities offering, can the issuer of

11:43 15  the securities sell securities to an underwriter

11:43 16  whose stated intent is to sell those securities to an

11:43 17  ultimate third-party purchaser in a transaction to

11:44 18  which the issuer is not a party?

11:44 19           MR. FIGEL:  Objection.

11:44 20      A.   I think the answer is "yes" to that.

11:44 21      Q.   Are you offering an opinion on whether the

11:44 22  wholesale sales contracts are different or similar

11:44 23  than broker-dealer contracts in a securities

11:44 24  offering?

11:44 25           MR. FIGEL:  Objection.

98

11:44  1        A.    No.

11:44  2              THE COURT REPORTER:  If you answered, I'm

11:44  3    sorry; I didn't hear it.

11:44  4        A.    No.

11:45  5        Q.    Can you look at paragraph 27, please, of

11:45  6    your report.

11:45  7              And you write about -- in the second full

11:45  8    sentence, you write about the wholesale sales orders.

11:45  9              The counterparty would expressly represent

11:45 10    and warrant that it was not purchasing XRP for any

11:45 11    investment purpose.

11:45 12              Do you see that?

11:45 13        A.    Yes.

11:45 14        Q.    Did the direct sales contracts have a

11:45 15    similar representation on the part of the purchaser?

11:45 16        A.    I don't think so.

11:46 17              But I have to check.

11:46 18              (Witness reviewing document.)

11:47 19        Q.    Can I continue?

11:47 20        A.    What?

11:47 21        Q.    May I continue?

11:47 22        A.    Yes.

11:47 23        Q.    I'm sorry.  I thought you were still --

11:47 24        A.    No, no.

11:47 25        Q.    Do you know whether or not the wholesale

99

| | | |
|---|---|---|
| 11:47 | 1 | contract counterparties marketed their XRP to third |
| 11:47 | 2 | parties for investment purposes? |
| 11:47 | 3 | A.   No. |
| 11:47 | 4 | Q.   Do you have any understanding of how the |
| 11:47 | 5 | wholesale contract counterparties marketed the XRP |
| 11:47 | 6 | they sold to third parties? |
| 11:47 | 7 | MR. FIGEL:  Objection. |
| 11:47 | 8 | A.   I have no direct knowledge of that. |
| 11:48 | 9 | Q.   You write in your report that the wholesale |
| 11:48 | 10 | sales contracts were only executed between |
| 11:48 | 11 | February 2013 and March 2016. |
| 11:48 | 12 | A.   Yes. |
| 11:48 | 13 | Q.   During that period of time, what uses |
| 11:48 | 14 | beyond investment purposes existed for XRP? |
| 11:48 | 15 | MR. FIGEL:  Objection. |
| 11:48 | 16 | A.   I don't know. |
| 11:48 | 17 | Q.   Do you know when Ripple's cross-border |
| 11:48 | 18 | payment software became commercially functional? |
| 11:48 | 19 | MR. FIGEL:  Objection. |
| 11:48 | 20 | A.   I don't know the date of that. |
| 11:49 | 21 | Q.   For the wholesale contracts, does it make |
| 11:49 | 22 | commercial sense for Ripple's counterparty to |
| 11:49 | 23 | purchase the XRP from Ripple if the counterparty does |
| 11:49 | 24 | not believe it can sell that XRP to a third party for |
| 11:49 | 25 | a higher price? |

100

11:49  1          MR. FIGEL:  Objection.

11:49  2     A.   It's a wholesale contract in which the

11:49  3  buyer pays.  It would be irrational for the buyer to

11:49  4  believe that they couldn't resell for more than they

11:49  5  bought it for.

11:49  6     Q.   And in paragraph 28 of your report, do you

11:50  7  see how you discuss purchase letters of intent, where

11:50  8  Ripple would pay the counterparty a commission of

11:50  9  ▮ to ▮ percent of the XRP the counterparty sold?

11:50 10     A.   Yes.

11:50 11     Q.   By earning that commission, is Ripple's

11:50 12  counterparty -- is Ripple's counterparty profiting

11:50 13  off its XRP purchases?

11:50 14          MR. FIGEL:  Objection.

11:50 15     A.   I think that's a -- that's an ambiguous

11:50 16  question.

11:50 17          The counterparty is providing a service,

11:50 18  and its being paid a commission.  Whether the

11:50 19  counterparty's business is profitable or not, I have

11:50 20  no idea.

11:51 21     Q.   The counterparty's generating revenues

11:51 22  based on that commission, correct?

11:51 23          MR. FIGEL:  Objection.

11:51 24     A.   Well, yeah, the counterparty gets a

11:51 25  commission on sales, so it has to have sales.

                                                      101

11:51  1          Q.   And by paying those commissions, are

11:51  2   Ripple's efforts a cause of the counterparty's

11:51  3   revenues?

11:51  4               MR. FIGEL:  Objection.

11:51  5          A.   No.  The counterparty's revenues depend on

11:51  6   the market for XRP, which is a function of a whole

11:51  7   variety of factors that would affect price and

11:51  8   demand.  Ripple is just, as I said, buying services

11:51  9   and paying a commission.

11:52 10          Q.   Do you see how you discuss the -- the

11:52 11   contracts described in paragraph 28 required Ripple's

11:52 12   counterparty to sell XRP to third parties at or above

11:52 13   market price?

11:52 14               MR. FIGEL:  Objection.

11:52 15          A.   Yes, I see that.

11:52 16          Q.   Are you offering an opinion on whether that

11:52 17   requirement impacts the price of XRP?

11:52 18          A.   No.

11:52 19          Q.   Paragraph 29, you talk about the UCC.

11:52 20               Is that right?

11:52 21          A.   Yes.

11:53 22          Q.   Are you offering an opinion in this case

11:53 23   whether UCC Article 2 applies to the sales of XRP?

11:53 24          A.   No.

11:53 25          Q.   Are you offering an opinion whether any

                                                            102

11:53  1    part of the UCC applies to sales of XRP?

11:53  2            MR. FIGEL:  Objection.

11:53  3        A.   No.

11:53  4        Q.   Does the UCC -- the UCC, that's the Uniform

11:53  5    Commercial Code?

11:53  6        A.   Yes.

11:53  7        Q.   Does the UCC contain a provision regarding

11:53  8    the sales of securities?

11:53  9        A.   I think Article 8 contains -- regulates

11:53 10    security transactions.

11:53 11        Q.   Is the UCC's definition of "securities" the

11:53 12    same as the definition of "securities" under the

11:53 13    federal securities laws?

11:53 14        A.   I don't recall what Article 8 provides.

11:53 15        Q.   In a lawsuit alleging violations of the

11:53 16    federal securities laws, if there's a dispute between

11:53 17    the UCC and the federal securities laws, which one

11:54 18    controls?

11:54 19            MR. FIGEL:  Objection.

11:54 20        A.   The federal securities laws.

11:54 21        Q.   In this lawsuit, does the Court look to the

11:54 22    UCC or the federal securities laws to determine if

11:54 23    Ripple's XRP offers and sales involve securities?

11:54 24            MR. FIGEL:  Objection.

11:54 25        A.   The Court is going to look to whatever it

                                                              103

11:54  1    thinks is relevant.

11:54  2         Q.   Are you offering an opinion whether the

11:54  3    Court should look to the UCC or the federal

11:54  4    securities laws?

11:54  5         A.   No.

11:54  6         Q.   Is it a legal defense to an SEC enforcement

11:54  7    action that the financial instrument at issue does

11:54  8    not meet the UCC definition of a security?

11:54  9              MR. FIGEL:  Objection.

11:55 10         A.   I don't know the precise answer to that

11:55 11    question, but I would doubt it.

11:55 12         Q.   And do you see on paragraph 29, you list a

11:55 13    variety of terms that the Ripple sales contracts

11:55 14    typically contain?

11:55 15         A.   Yes.

11:55 16         Q.   Are you offering an opinion whether these

11:55 17    terms are also present in contracts for the sales of

11:55 18    securities in public or private offerings?

11:55 19              MR. FIGEL:  Objection.

11:55 20         A.   No.

11:56 21         Q.   And then do you see, in paragraph 30, there

11:56 22    are a list of bullet points, that -- of types of

11:56 23    provisions that you say that the sales contracts

11:56 24    don't have?

11:56 25         A.   Yes.

                                                              104

11:56  1      Q.   All things being equal, would the presence

11:56  2  of any of these provisions make a contract more or

11:56  3  less likely to be an investment contract under the

11:56  4  federal securities laws?

11:56  5           MR. FIGEL:  Objection.

11:56  6      A.   I don't have an opinion on that.

11:56  7      Q.   You see in paragraph 32, you talk about

11:56  8  programmatic sales contracts?

11:56  9      A.   Yes.

11:56 10      Q.   Are you offering an opinion on how the

11:57 11  programmatic contracts are similar or different to

11:57 12  underwriter contracts in a securities offering?

11:57 13      A.   No.

11:57 14           MR. FIGEL:  Objection.

11:57 15      A.   No, I'm not.

11:57 16      Q.   Are you offering an opinion on how the

11:57 17  programmatic contracts are similar or different to

11:57 18  broker-dealer contracts in a securities offering?

11:57 19           MR. FIGEL:  Objection.

11:57 20      A.   No.

11:57 21      Q.   For the programmatic sales contracts, does

11:57 22  it make commercial sense for Ripple's counterparty to

11:57 23  purchase XRP from Ripple if it does not believe it

11:57 24  can sell that XRP to a third party for a higher

11:57 25  price?

                                                      105

```
11:57  1            MR. FIGEL:  Objection.
11:57  2       A.   I think there's a problem with your
11:57  3  question because in these agreements, they're not
11:58  4  selling XRP, they're just transferring it.
11:58  5       Q.   Do you see, in paragraph 33, how you say
11:58  6  that the programmatic sales contracts are consignment
11:58  7  contracts?
11:58  8       A.   I said in substance they're consignment
11:58  9  contracts.  Consignment agreements.
11:58 10       Q.   Are you offering an opinion on whether an
11:58 11  underwriter contract in a securities offering is a
11:58 12  consignment contract?
11:58 13       A.   No.
11:58 14            MR. FIGEL:  Objection.
11:58 15       Q.   Do you have an opinion on that?
11:58 16       A.   No.
11:58 17       Q.   Are you offering an opinion on whether a
11:59 18  broker-dealer contract in a securities offering is a
11:59 19  consignment contract?
11:59 20       A.   No.
11:59 21            MR. FIGEL:  Objection.
11:59 22            MR. HANAUER:  We're at noon, and we've been
11:59 23  going an hour and 15, I think.  I just want to check
11:59 24  to make sure you're okay.
11:59 25            THE WITNESS:  I could take a break.  When
```

106

| | | |
|---|---|---|
| 11:59 | 1 | will we break for lunch? |
| 11:59 | 2 | MR. HANAUER:  Let's go off the record. |
| 11:59 | 3 | THE VIDEOGRAPHER:  We're off the record. |
| 11:59 | 4 | The time is 12:00 p.m. |
| 11:59 | 5 | (Discussion off the record.) |
| 12:00 | 6 | (A recess was taken from 12:00 noon to |
| 12:00 | 7 | 12:13.) |
| 12:11 | 8 | THE VIDEOGRAPHER:  Going back on the |
| 12:11 | 9 | record, the time is 12:13. |
| 12:11 | 10 | MR. FIGEL:  Mr. Hanauer, before you begin, |
| 12:11 | 11 | could I just memorialize a -- an agreement we just |
| 12:11 | 12 | reached, which is that the normal practice, which is |
| 12:11 | 13 | an objection by one counsel, can serve to preserve |
| 12:12 | 14 | the objections of all parties? |
| 12:12 | 15 | MR. HANAUER:  So stipulated. |
| 12:12 | 16 | MR. FIGEL:  Thank you. |
| 12:12 | 17 | Q.   So, Professor Schwartz, your report talks |
| 12:12 | 18 | about various market maker contracts. |
| 12:12 | 19 | A.   Let me -- |
| 12:12 | 20 | Q.   In paragraph 38 of your report. |
| 12:12 | 21 | A.   Yes. |
| 12:12 | 22 | Q.   Are you offering an opinion whether or not |
| 12:12 | 23 | the securities -- strike that. |
| 12:12 | 24 | Are you offering an opinion whether the |
| 12:12 | 25 | issuer of securities is permitted to offer |

107

12:12  1    consideration to a market maker in exchange for the

12:13  2    market maker making a market in the issuer's

12:13  3    securities?

12:13  4        A.    No.

12:13  5        Q.    Are you offering an opinion whether the

12:13  6    issuer of securities is allowed to contract with a

12:13  7    market maker in a way that allows the issuer to set

12:13  8    terms for the market maker's sales of the issuer's

12:13  9    securities?

12:13 10        A.    No.

12:13 11        Q.    Do you see, in paragraph 39, you talk about

12:13 12    the product incentive contracts?

12:13 13        A.    Uh-huh.  Yes.

12:14 14        Q.    And I believe you talk about -- or are you

12:14 15    familiar with Ripple's On-Demand Liquidity product or

12:14 16    xRapid product?

12:14 17        A.    I know what it is.

12:14 18        Q.    And I believe that you classified contracts

12:14 19    related to that product as both product incentive

12:14 20    contract and master-hosted services contracts?

12:14 21        A.    Yes.

12:14 22        Q.    Are you aware that Ripple's On-Demand

12:14 23    Liquidity and xRapid contracts provided that Ripple

12:14 24    would pay incentives and rebates to the counterparty

12:14 25    for using On-Demand Liquidity or xRapid?

                                                            108

```
12:14   1              MR. FIGEL:  Objection.

12:14   2       A.   I am aware of contracts in which Ripple

12:14   3  made such agreements.

12:15   4       Q.   Are you aware that On-Demand Liquidity or

12:15   5  xRapid required Ripple's counterparty to purchase XRP

12:15   6  in order to transfer currency using Ripple's

12:15   7  software?

12:15   8              MR. FIGEL:  Objection.

12:15   9       A.   Will you repeat that question, please?  I'm

12:15  10  not sure I -- I followed the entire question.

12:15  11              (The record was read back.)

12:15  12       A.   I'm not aware of that.

12:15  13       Q.   And do you -- going to paragraph 46.

12:16  14              I think -- do you see how you talk about

12:16  15  the last sentence, Ripple also agreed to pay

12:16  16  MoneyGram certain market development fees and bonuses

12:16  17  in XRP if the transactions executed on Ripple's

12:16  18  platform exceeded specified volume thresholds?

12:16  19       A.   Yes.

12:16  20       Q.   Did those bonus provisions incentivize

12:17  21  MoneyGram to increase the volume of its XRP

12:17  22  transactions using Ripple's software product?

12:17  23              MR. FIGEL:  Objection.

12:17  24       A.   I don't know what "incentivize

12:17  25  MoneyGram" -- I mean, but those payments essentially
```

109

12:17  1   were linked to volume so the more the -- the larger

12:17  2   the dollar volume of transactions MoneyGram made

12:17  3   through the ODL platform, the greater the bonus

12:17  4   payment.

12:17  5        Q.   Do you have an opinion on how MoneyGram

12:17  6   increasing the volume of its XRP transactions would

12:17  7   impact XRP's price?

12:17  8             MR. FIGEL:  Objection.

12:17  9        A.   No.

12:17 10        Q.   Are you offering an opinion whether ODL or

12:17 11   xRapid would be commercially viable for its users if

12:17 12   not for the rebates and incentives paid by Ripple?

12:18 13        A.   I have no opinion on that.

12:18 14        Q.   Can you go to -- so do you see on

12:18 15   paragraph 35 of your report.

12:18 16             You list five bullet points for the type of

12:18 17   provisions you say are absent from the programmatic

12:18 18   contracts?

12:18 19        A.   Yes.

12:18 20        Q.   And then compare that with paragraph 42.

12:19 21             There are three bullet points for

12:19 22   provisions you say are absent from the service

12:19 23   contracts.

12:19 24             Do you see that?

12:19 25        A.   Yup.

110

12:19  1      Q.   And so one of the bullet points that's in

12:19  2  paragraph 35, but not paragraph 42, is a provision

12:19  3  that creates an ongoing obligation owed by Ripple to

12:19  4  the counterparty with respect to any tran-- XRP

12:19  5  transfer pursuant to the contract?

12:19  6      A.   Yes.

12:19  7      Q.   So I take it from the absence of a bullet

12:19  8  point like that in paragraph 42, did you find such

12:20  9  provisions in the services contracts?

12:20 10      A.   I did not.

12:20 11      Q.   Then -- if that's the case, then why did

12:20 12  you not include that bullet point in paragraph 42?

12:20 13      A.   The -- they were different kinds of

12:20 14  contracts.  In the programmatic contracts, you're --

12:20 15  XRP was transferred, so -- so it could be -- it could

12:20 16  conceivably be possible if there would be some

12:20 17  obligation with respect to what was transferred.

12:20 18  But -- essentially transferred for resale.  So I

12:20 19  found no such provisions, so I said so.

12:20 20           Services contracts were a different kind of

12:21 21  agreement.

12:21 22      Q.   What about the bullet point from

12:21 23  paragraph 35, you -- provisions that impose on Ripple

12:21 24  any fiduciary or similar duty owed to the

12:21 25  counterparty?

111

12:21  1              Were there provisions like that in the

12:21  2    services contract?

12:21  3         A.   No.

12:21  4         Q.   So if -- in paragraph 35, and in other

12:21  5    paragraphs of your report, you're listing all these

12:21  6    types of provisions that are not in the contracts.

12:21  7    Right?

12:21  8         A.   Right.

12:21  9         Q.   And you're doing the same thing with

12:21 10    paragraph 42.  Right?  The same type of exercise,

12:21 11    listing provisions that are not in the contract?

12:21 12         A.   Yes.

12:21 13         Q.   So what should we infer from the fact that

12:21 14    for some types of contracts, there are only -- you

12:22 15    only identify three types of provisions missing, but

12:22 16    for other types, of contracts, you identify four or

12:22 17    five types of provisions missing?

12:22 18         A.   It's a question of the --

12:22 19              MR. FIGEL:  Objection.

12:22 20              You can answer.

12:22 21              THE WITNESS:  Should I --

12:22 22              MR. FIGEL:  Yes, yeah, I just made the

12:22 23    record.

12:22 24         A.   It's a function of the kind of contract it

12:22 25    is.  So, for example, if I'm buying services, I can't

                                                              112

```
12:22  1    possibly own a fiduciary obligation to the seller so

12:22  2    it's pointless to say there's no fiduciary

12:22  3    obligation.

12:22  4            But if I'm selling something, then a

12:22  5    fiduciary obligation may be attached to it.

12:22  6            So, I think the things that I said are a

12:22  7    function of the kind of contracts that there were.

12:23  8       Q.   Let's go to paragraph 56, please.

12:23  9            And you describe the Rosemoor agreement as

12:23 10    a representative example of an XRP direct sales

12:23 11    contract?

12:23 12       A.   Yes.

12:23 13       Q.   What percentage of the direct sales

12:23 14    contracts did you personally review?

12:23 15            MR. FIGEL:  Objection.

12:23 16       A.   I can't recall what percentage.  I can only

12:23 17    recall that I reviewed a lot of them.

12:24 18       Q.   Did you review all the direct sales

12:24 19    contracts?

12:24 20       A.   I reviewed most of them because I reviewed,

12:24 21    as I previously testified, almost all of the

12:24 22    1700 contracts.  But if you're going to ask me what

12:24 23    percentage fell in each category, I would have

12:24 24    trouble recalling that.

12:24 25       Q.   And you didn't document that in any way.
```

113

12:24  1    Correct?

12:24  2        A.    No.

12:24  3        Q.    Did you -- just so I have a better record,

12:24  4    did you document in any way which contracts you

12:24  5    reviewed and which ones you didn't review?

12:24  6        A.    Not in a systematic way.  I made notes

12:24  7    about some of the contracts to refresh my

12:24  8    recollection when I was writing a report.

12:24  9        Q.    Did you document in any way which contracts

12:24 10    you reviewed and which contracts you didn't review?

12:25 11        A.    Up to the date of -- up to the date of --

12:25 12    no, I didn't -- I'm trying to -- trying to actually

12:25 13    answer your question truthfully.

12:25 14              I just was looking at what -- at

12:25 15    representative samples of the various kinds of

12:25 16    contracts.  I didn't document the formal search

12:25 17    process on my part because I didn't do a formal

12:25 18    search process.

12:25 19        Q.    When you looked at the direct sales

12:25 20    contracts, what did you do to determine that the

12:25 21    contracts you reviewed were the only contracts

12:25 22    governing the commercial relationship between Ripple

12:25 23    and its counterparty?

12:25 24        A.    I don't know if they were the only

12:25 25    contracts that constituted a commercial relationship.

114

12:25  1      Q.   What is Rosemoor Capital?

12:25  2      A.   It's a -- I don't know very much about

12:26  3  them.  They buy and trade.

12:26  4      Q.   Are you aware that Rosemoor Capital is a

12:26  5  venture capital and private equity firm?

12:26  6      A.   No.

12:26  7      Q.   Are you aware that ███████████ is an

12:26  8  investor in Ripple?

12:26  9      A.   I don't know anything about ███████

12:26 10  ███████ business.

12:26 11      Q.   When you determined that the ███████

12:26 12  agreement is a representative example of an XRP

12:26 13  direct sales contract, did you consider that ███████

12:26 14  ███████ is an equity shareholder of Ripple?

12:26 15      A.   No.

12:26 16      Q.   How many direct sales contracts did you

12:27 17  personally review that did not involve an investor in

12:27 18  Ripple?

12:27 19           MR. FIGEL:  Objection.

12:27 20      A.   I have no idea.

12:27 21      Q.   Did you consider how the Rosemoor contract

12:27 22  is in any way different from a contract in which the

12:27 23  issuer of securities agrees to sell its securities

12:27 24  directly to an institutional investor?

12:27 25           MR. FIGEL:  Objection.

                                                           115

| | | |
|---|---|---|
| 12:27 | 1 | A.    No. |
| 12:27 | 2 | Q.    Are you offering an opinion that the |

12:27  3  Rosemoor contract is different from a contract in

12:27  4  which the issuer of securities agrees to sell its

12:27  5  securities directly to an institutional investor?

12:27  6           MR. FIGEL:  Objection.

12:28  7      A.    Well, you would only say that under the

12:28  8  Rosemoor agreement, they're selling XRP, which itself

12:28  9  isn't a security.

12:28 10      Q.    You're offering that opinion in this case?

12:28 11      A.    Well, XRP is a thing, not -- I mean, you

12:28 12  asked me whether the contracts under which XRP is

12:28 13  sold are investment contracts.  I have no opinion

12:28 14  about that.

12:28 15           I just know that XRP is like a widget.

12:28 16      Q.    Are you offering the opinion that XRP is

12:28 17  not a security?

12:28 18           MR. FIGEL:  Objection.

12:28 19      A.    No.

12:28 20      Q.    Can a widget be a security?

12:28 21           MR. FIGEL:  Objection.

12:28 22      A.    I don't see -- I don't see how.

12:29 23      Q.    No matter the commercial circumstances?

12:29 24           MR. FIGEL:  Objection.

12:29 25      A.    I think there's a difference between a

                                                              116

12:29  1    contract and a thing.

12:29  2        Q.   Can an orange grove be a security?

12:29  3        A.   Orange grove is a thing.

12:29  4        Q.   Can an orange grove be a security?

12:29  5        A.   Itself?  No.

12:29  6             I guess I would add that a car isn't a

12:29  7    security.  A TV isn't a security.

12:29  8        Q.   Can offers or sales of orange groves

12:29  9    constitute the offer and sale of securities?

12:29 10             MR. FIGEL:  Objection.

12:29 11        A.   I don't have an opinion on that.

12:30 12        Q.   Do you have an opinion on whether the offer

12:30 13    or sale of anything can constitute the offer or sale

12:30 14    of a security?

12:30 15             MR. FIGEL:  Objection.

12:30 16        A.   It would depend on -- it would depend on

12:30 17    the terms.

12:30 18        Q.   But are you offering an opinion in this

12:30 19    case?

12:30 20        A.   No.

12:30 21             MR. FIGEL:  Can I just add an objection?  I

12:30 22    mean the last question.

12:30 23             Thanks.

12:30 24        Q.   Can you look at paragraph 68, please.

12:31 25             And do you see that you said that the

117

12:31   1    Rosemoor agreement contains terms related to

12:31   2    restrictions on transfer of XRP by Rosemoor?

12:31   3          A.   I recall saying that.  Is there a paragraph

12:31   4    that you are particularly referring to?

12:31   5          Q.   I'm --

12:31   6          A.   Oh, yeah.

12:31   7          Q.   Of your report, 68.  I'm sorry.

12:31   8          A.   Yes, okay.

12:31   9               (Witness reviewing document.)

12:31  10          Q.   Does the Rosemoor contract allow the

12:31  11    parties to set a period of time in which Rosemoor

12:31  12    cannot resell or otherwise distribute the XRP it

12:31  13    purchased from Ripple?

12:31  14          A.   Yeah, I recall that.

12:31  15          Q.   Does the Rosemoor contract allow the

12:32  16    parties to set a limitation on the amount of XRP

12:32  17    that -- or purchase from Ripple that Rosemoor can

12:32  18    sell on a daily basis?

12:32  19               MR. FIGEL:  Objection.

12:32  20          A.   I think there were sales restrictions.

12:32  21          Q.   And how many contracts did you review

12:32  22    containing restrictions on what Ripple's counterparty

12:32  23    could do with the XRP they obtained from Ripple?

12:32  24          A.   I don't have a number, but there were some

12:32  25    that had such wholesale restrictions.

118

12:32  1      Q.   How many contracts did you review that
12:32  2  contained restrictions limiting the quantity of XRP
12:32  3  the purchaser could obtain to the amount needed for
12:32  4  the purchaser's non-investment purposes?
12:33  5           MR. FIGEL:  Objection.
12:33  6      A.   I don't recall.
12:33  7      Q.   How many contracts did you review
12:33  8  containing restrictions limiting Ripple's
12:33  9  counterparty from selling the XRP they purchased from
12:33 10  Ripple only to parties outside the United States?
12:33 11           MR. FIGEL:  Objection.
12:33 12      A.   I only recall reading a couple of contracts
12:33 13  like that.
12:33 14      Q.   How many contracts did you review limiting
12:33 15  Ripple's counterparty from selling the XRP they
12:33 16  obtained from Ripple only to accredited investors?
12:33 17      A.   I don't recall any such restrictions.
12:33 18      Q.   How many contracts did you review that
12:33 19  contained restrictions allowing Ripple's counterparty
12:34 20  to sell the XRP they obtained from Ripple only to
12:34 21  those third parties that would use XRP for
12:34 22  non-investment purposes?
12:34 23           MR. FIGEL:  Objection.
12:34 24      A.   I recall that there was such contracts.  I
12:34 25  don't recall the number.

119

12:34  1           MR. HANAUER:  Can you send Exhibit 8,

12:34  2  please.

12:34  3           (XRP Purchase Summary was marked

12:34  4      Exhibit AS-8 for identification, as of this

12:34  5      date.)

12:34  6           MR. HANAUER:  One for the court reporter,

12:34  7  please.

12:35  8      Q.   Is Exhibit 8 a copy of the XRP purchase

12:35  9  summary you reference in paragraph 69 of your report?

12:35 10      A.   Yes.

12:35 11      Q.   So do you see how there's a line for

12:35 12  lock-up period and daily sales limitations, on

12:35 13  Exhibit 8?

12:35 14      A.   Yes.

12:35 15      Q.   And are those the sales restrictions we

12:35 16  were just talking about or resale restrictions?

12:36 17      A.   Yes.

12:36 18      Q.   Did you review any documents, including

12:36 19  other summary of XRP purchases, that actually imposed

12:36 20  a lock-up period or daily sale limitation?

12:36 21      A.   Yes.

12:36 22      Q.   How many did you review?

12:36 23      A.   You know, I -- this may short-circuit it,

12:36 24  but I didn't really count.  So.  I -- if the answer

12:36 25  is, did I review a contract of a certain type or -- a

                                                        120

12:36  1    few contracts or some contracts, the answer would be

12:36  2    yes.  If you're asking me whether it's 11 or 34, I

12:36  3    don't have an answer to that.

12:36  4         Q.   By setting a lock-up period or volume

12:36  5    restriction, could one of these XRP purchase

12:36  6    summaries add a substantive term to a direct sales

12:37  7    contract?

12:37  8              MR. FIGEL:  Objection.

12:37  9         A.   I would have to review the contract.  There

12:37 10    would be a question whether this was a modification

12:37 11    or not.  Modifications are not enforceable unless

12:37 12    they're supported by a separate consideration.

12:37 13              On the other hand, this document says it's

12:37 14    governed by the master agreement, and it could just

12:37 15    be filling in the blanks.  If it's filling in the

12:37 16    blanks, then it would be enforceable.

12:38 17         Q.   Are you -- sitting here today, are you

12:38 18    aware of the length of any lock-up period or daily

12:38 19    sales limitation governing any of Ripple's XRP sales

12:38 20    to Rosemoor?

12:38 21         A.   No.  I'm not aware -- I have a recollection

12:38 22    that they went through ███████████████, but I don't

12:38 23    have any particular recollection.

12:38 24         Q.   And are you offering any opinion on how the

12:38 25    lock-up periods or daily volume limitations could

                                                              121

12:38  1   affect the price of XRP?

12:38  2        A.   No.

12:39  3        Q.   So in paragraph 71 of your report, you say

12:39  4   that each of the direct sales contracts is in

12:39  5   substance similar to the relevant part of the

12:39  6   Rosemoor agreement?

12:39  7        A.   Uh-huh.  Yes.

12:39  8        Q.   What was your basis for saying that for the

12:39  9   sales contracts you did not personally review?

12:39 10        A.   I think the answer to that question is in

12:39 11   the first sentence of paragraph 71.

12:40 12             I don't have anything to add to my -- to

12:40 13   what the first sentence of paragraph 71 says.

12:40 14        Q.   So is the answer that for the contracts,

12:40 15   you didn't personally review your basis for

12:40 16   concluding that those contracts were in substance

12:40 17   similar to the Rosemoor agreement; the basis of that

12:40 18   was the work done by counsel?

12:40 19        A.   It was a combination of my work and work

12:40 20   done from counsel, acting at my direction.  I asked

12:40 21   counsel in particular, whether those contracts were

12:40 22   relevantly different.  I assume that my counsel knew

12:40 23   how to read a contract, too.

12:40 24        Q.   Are there any written communications on

12:41 25   that subject between you and counsel?

122

12:41  1      A.    I don't recall any.

12:41  2      Q.    Do you see the list of bullet points, on

12:41  3  paragraph 71 of provisions you say that the direct

12:41  4  sales contracts typically contain?

12:41  5      A.    Yes.

12:41  6      Q.    Are there direct sales contracts listed on

12:41  7  Exhibit C that do not contain all those terms?

12:41  8      A.    Well, yeah, because some of the direct

12:41  9  sales contracts just were an exchange of a certain

12:41 10  number of XRP in return for price, but this contract

12:42 11  contemplates a series of sales.

12:42 12      Q.    Were there direct sales contracts that had

12:42 13  terms that created an ongoing obligation owed by

12:42 14  Ripple after delivery of the purchased units of XRP?

12:42 15      A.    I don't recall any such language that would

12:42 16  sustain an inference like that.

12:42 17      Q.    Then why is that bullet point missing from

12:42 18  paragraph 72?

12:42 19          MR. FIGEL:  Objection.

12:43 20      A.    I don't recall why it's missing, but I

12:43 21  would -- it is my recollection that you couldn't find

12:43 22  any such language in that contract.

12:43 23      Q.    Okay.  Let's go to paragraph 75, please,

12:43 24  where you talk about the wholesale sales contracts.

12:43 25          For the wholesale sales contracts, what did

                                                        123

```
12:43  1    you do to determine that the contracts you reviewed
12:43  2    were the only contracts governing the relationship
12:43  3    between Ripple and its counterparty?
12:43  4        A.   I didn't do anything.
12:44  5        Q.   What is ██████?
12:44  6        A.   I don't know very much about the
12:44  7    business -- businesses of any of the buyers or a lot
12:44  8    of the buyers to these contracts because that was
12:44  9    beyond the scope of my report to know that.
12:44  10       Q.   Are you aware that ██████ is a digital
12:44  11   asset exchange?
12:44  12       A.   I think I knew that.  But as I said, I
12:44  13   wasn't asked to investigate or learn about the
12:44  14   business buyers; that is, what their businesses were.
12:44  15       Q.   Could the business of Ripple's counterparty
12:44  16   inform what they intended to do with the XRP they
12:45  17   obtained from Ripple?
12:45  18            MR. FIGEL:  Objection.
12:45  19       A.   Well, there were contractual restrictions
12:45  20   on what they could do.  I don't have direct knowledge
12:45  21   as to whether they adhered to those restrictions or
12:45  22   not.
12:45  23       Q.   But beyond the four corners of the
12:45  24   contract, if someone wanted to know what the
12:45  25   purchaser of XRP wanted to do with that XRP that they
```

124

12:45  1    purchased, would they want to know what the business

12:45  2    is of the person or entity that purchased the XRP?

12:45  3              MR. FIGEL:  Objection.

12:45  4         A.   Well, you're describing a -- a search.  If

12:45  5    I -- I want to know what Bitstamp was doing, I would

12:45  6    assume that someone would search in a rational way to

12:45  7    find out what Bitstamp was doing.

12:45  8         Q.   Did you perform any such searches?

12:46  9         A.   No.

12:46 10              MR. HANAUER:  Exhibit 9, please.

12:46 11              (Bitstamp Wholesale Order was marked

12:46 12         Exhibit AS-9 for identification, as of this

12:46 13         date.)

12:46 14         Q.   Is Exhibit 9 a copy of the ██████████

12:46 15    wholesale order referenced in paragraph 75 of your

12:46 16    report?

12:47 17         A.   I think it is.

12:47 18         Q.   Do you see the second paragraph of

12:47 19    Exhibit 9?  It says, This agreement governs the

12:47 20    purchase and sale of the purchased Ripple currency

12:47 21    specified below.

12:47 22         A.   Yes.

12:47 23         Q.   Why does it refer to whatever Ripple is

12:47 24    selling as purchased Ripple currency?

12:47 25              MR. FIGEL:  Objection.

125

```
12:47  1              (Witness reviewing document.)

12:48  2       A.   Can you repeat that question?  I just

12:48  3  was --

12:48  4              THE WITNESS:  Mr. Reporter, could you

12:48  5  please repeat that question.

12:48  6              (The record was read back.)

12:48  7       A.   I don't know.

12:48  8       Q.   And then, do you see on Exhibit 9 -- if we

12:48  9  go to Section 1.4 of that contract, which I believe

12:48 10  is on page 2 of Exhibit 9.

12:48 11       A.   Yes.

12:49 12       Q.   And one of the terms of the sale is that

12:49 13  Bitstamp represents that it will not resell or

12:49 14  otherwise distribute the Ripple currency to any party

12:49 15  if Bitstamp has actual or reasonable knowledge that

12:49 16  such other party intends to purchase or acquire the

12:49 17  Ripple currency as an investment.

12:49 18       A.   Yes, I looked at this section.

12:49 19       Q.   What is the purpose of such a provision?

12:49 20              MR. FIGEL:  Objection.

12:49 21       A.   I can only infer purpose from the words.  I

12:50 22  don't have any independent knowledge of what the

12:50 23  purpose is -- of the parties were in adopting

12:50 24  Section 1.4.

12:50 25       Q.   I'll take your reasonable inference.
```

126

12:50   1   What's that?

12:50   2       A.   Well, it -- my reasonable inference is that

12:50   3   they -- that Ripple wanted XRP to be used in commerce

12:50   4   rather than held.

12:50   5       Q.   And what do you mean by "used in commerce"?

12:50   6       A.   Used in transactions.

12:50   7       Q.   You mean used to facility cross-border

12:50   8   payments?

12:50   9            MR. FIGEL:  Objection.

12:50  10       A.   I don't know anything in -- as I said, I

12:50  11   don't have any independent knowledge, but the point

12:51  12   of a restriction like this would be that you want the

12:51  13   product to be used in various kinds of transactions.

12:51  14   I don't know whether they would be cross border or

12:51  15   not cross border.

12:51  16       Q.   When someone purchases digital currency off

12:51  17   a digital currency exchange, does the exchange have

12:51  18   any knowledge whether the purchaser intends to use

12:51  19   the digital currency for investment purposes?

12:51  20            MR. FIGEL:  Objection.

12:51  21       A.   I -- I don't know what particular people

12:51  22   from particular exchanges know, but that's not the

12:51  23   point of an exchange is to know what people use

12:52  24   what's being traded -- what purpose they have.  The

12:52  25   point of an exchange is to facilitate deals.

127

12:52  1      Q.   And the Bitstamp wholesale order, that's

12:52  2  back from 2000-- or Exhibit 9, that's back from 2013?

12:52  3  That's when it was executed?

12:52  4      A.   That's the effective date.

12:52  5      Q.   And back in 2013, what noninvestment uses

12:52  6  existed for XRP?

12:52  7      A.   I don't know.

12:52  8      Q.   Were -- back in 2013, were any of Ripple's

12:52  9  products that used XRP in commercial operation?

12:52 10           MR. FIGEL:  Objection.

12:52 11      A.   I don't know that.

12:52 12      Q.   Are you offering an opinion that the

12:52 13  Bitstamp contract in Exhibit 9 is different from a

12:52 14  contract in which the issuer of securities agrees to

12:52 15  sell its securities directly to an exchange?

12:53 16           MR. FIGEL:  Objection.

12:53 17      A.   No.

12:53 18      Q.   And then, do you see on paragraph -- excuse

12:53 19  me, on Section 9.3 of Exhibit 9, the no third-party

12:53 20  beneficiaries?

12:53 21      A.   Yes.

12:53 22      Q.   Are you offering an opinion whether the

12:53 23  federal securities laws allow parties to an

12:53 24  investment contract to waive away the requirements of

12:53 25  the Securities Act of 1933?

                                                           128

12:53  1                 MR. FIGEL:  Objection.

12:53  2        A.    No.

12:53  3        Q.    Do you have an opinion on that subject?

12:53  4        A.    No.

12:53  5        Q.    Can you look at paragraph 85 of your

12:54  6   report, please.

12:54  7                 And you list a bunch of bullet points after

12:54  8   writing, Specifically, the wholesale contracts

12:54  9   typically contain.  And then you list various types

12:54 10   of provisions.

12:54 11                 Do you see that?

12:54 12        A.    Yes.

12:54 13        Q.    Are there wholesale sales contracts listed

12:54 14   on Exhibit C to report that do not contain any of the

12:54 15   terms listed in those bullet points?

12:55 16        A.    I don't recall reading any such contract.

12:55 17        Q.    Then why are you using the word "typical,"

12:55 18   or "typically"?

12:55 19        A.    I'm using the word "typical" as a hedge

12:55 20   because at that point, I hadn't read every single

12:55 21   one.

12:55 22        Q.    And then in paragraph 86, where you say

12:55 23   that Each of the wholesale sales contracts listed in

12:55 24   Exhibit C lacks any express provision or

12:55 25   representation, you were relying on counsel to tell

                                                            129

12:55  1  you that for the contracts you didn't review?

12:55  2       A.   Yes.

12:56  3       Q.   Did any of the wholesale sales contracts

12:56  4  you reviewed, or have counsel review, contain a

12:56  5  provision restricting what someone who purchased XRP

12:56  6  from Ripple's counterparty could do with the XRP they

12:56  7  purchased?

12:56  8            MR. FIGEL:  Objection.

12:56  9       A.   I don't recall any such restriction.

12:56  10           MR. HANAUER:  Ready for lunch?

12:56  11           THE WITNESS:  Yes.

12:56  12           THE VIDEOGRAPHER:  Off the record.  The

12:56  13  time is 12:57.

12:56  14           (Luncheon recess at 12:57)

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

                                                            130

```
12:56   1        A F T E R N O O N   S E S S I O N

12:56   2        (1:52)

12:56   3   ALAN SCHWARTZ

12:56   4        resumed, having been previously duly

12:56   5        sworn by a Notary Public, was

12:56   6        examined and testified further

12:56   7        as follows:

01:50   8             THE VIDEOGRAPHER:  We are going back on the

01:50   9   record.  The time is 1:52.

01:50  10   CONTINUED EXAMINATION BY MR. HANAUER:

01:50  11        Q.   Professor Schwartz, can you please look at

01:50  12   paragraph 89 of your report, where you talk about the

01:51  13   programmatic contracts.

01:51  14             And you reference an agreement between

01:51  15   Ripple and GSR Holdings Limited?

01:51  16        A.   Yes.

01:51  17        Q.   And is Exhibit 10, which I -- which should

01:51  18   be in front of you, is that a copy of the GSR

01:51  19   agreement referenced in paragraph 89 of your report?

01:51  20             (Agreement between Ripple and GSR Holdings

01:51  21        Limited was marked Exhibit AS-10 for

01:51  22        identification, as of this date.)

01:51  23        A.   I'm afraid I don't have Exhibit 10.

01:51  24             Oh, okay.  Now I have Exhibit 10.

01:51  25             Yes.
```

                                                              131

01:51  1        Q.   And when you looked at the programmatic

01:52  2   contracts, what did you do, if anything, to determine

01:52  3   that the contracts you reviewed were the only

01:52  4   contracts governing the commercial relationship

01:52  5   between Ripple and its counterparty?

01:52  6        A.   I didn't do anything.

01:52  7        Q.   What is GSR Holdings Limited?

01:52  8        A.   GSR -- I think it's a digital asset

01:52  9   exchange.

01:52 10        Q.   And did all of the programmatic contracts

01:52 11   you reviewed or had reviewed for you by counsel have

01:52 12   a digital asset exchange as the counterparty?

01:52 13             MR. FIGEL:  Objection.

01:53 14        A.   I think the answer is yes.

01:53 15        Q.   And do you see, on Exhibit 10, Section 2,

01:53 16   it says, GSR agrees to transact in XRP according to

01:53 17   the then current programmatic schedule provided by

01:53 18   Ripple, (programmatic market activity) subject to the

01:53 19   terms of this agreement?

01:53 20        A.   Yes.

01:53 21        Q.   And did you review any of the program --

01:53 22   programmatic market activity schedules?

01:53 23        A.   I think I reviewed the one attached to the

01:53 24   GSR agreement.

01:53 25        Q.   Is that the only one?

                                                              132

01:53  1        A.    I don't recall -- I -- I probably reviewed

01:54  2   one or two others, but I mainly focused on that one.

01:54  3        Q.    And which one was the one -- which schedule

01:54  4   was attached to the programmatic -- the GSR

01:54  5   agreement?

01:54  6        A.    Whichever the one was attached was the one

01:54  7   I looked at.

01:54  8        Q.    And that's where I'm getting at, I'm not

01:54  9   sure there is one attached to the agreement, and I

01:54 10   don't see any listed in your report.

01:54 11        A.    No, I think this is about -- I have a

01:54 12   recollection, but it may be in error, in one of the

01:54 13   large binders that I was given, I saw such a thing,

01:55 14   but -- but I can't right now reconstruct it.

01:55 15        Q.    And you think you may have looked at one?

01:55 16   Just one?

01:55 17        A.    I haven't looked at a lot of them.

01:55 18        Q.    Do you know how many exist?

01:55 19        A.    No.

01:55 20        Q.    Do you know what they say, the program--

01:55 21   the programmatic market activity schedules?

01:55 22        A.    I think they -- they control the -- the

01:55 23   timing and distribution of Ripple.

01:55 24              I'm sorry.

01:55 25        Q.    Do you need to take that?

                                                              133

01:55  1        A.   I don't have to take it, I just wanted to

01:55  2   not take it.

01:55  3        Q.   And I think your answer was -- when I asked

01:55  4   you about what the programmatic market activity

01:55  5   schedules say, I think you responded, They control

01:55  6   the timing and distribution of Ripple?

01:55  7        A.   Of -- I mean of XRP.

01:56  8        Q.   And could your opinions about the

01:56  9   programmatic contracts change based on what's in the

01:56 10   schedules that you did not review?

01:56 11        MR. FIGEL:  Objection.

01:56 12        A.   Yeah, if there's anything inconsistent with

01:56 13   anything I said, that would -- and it was materially

01:56 14   inconsistent, my views would change.

01:56 15        Q.   And do you see, on Exhibit 10, I want to

01:56 16   refer you to Section 3.

01:56 17        The remittance of proceeds to Ripple.

01:57 18        A.   Yes.

01:57 19        Q.   So what is your understanding of how that

01:57 20   works?

01:57 21        MR. FIGEL:  Objection.

01:57 22        Q.   Of how GSR makes money off this contract.

01:57 23        MR. FIGEL:  Objection.

01:57 24        A.   What I infer from the contract is the

01:57 25   percent is a commission.

                                                          134

01:57  1        Q.   Did you review any other programmatic

01:57  2  contracts that allowed Ripple's counterparty to

01:57  3  retain a portion of the proceeds from distributing

01:57  4  the XRP obtained from Ripple?

01:57  5             MR. FIGEL:  Objection.

01:57  6        A.   I think I did, but I don't have a direct

01:57  7  recollection of that.

01:57  8        Q.   If I asked you to assume that Ripple's

01:58  9  efforts caused the price of XRP to increase, would

01:58 10  Exhibit 10 lead GSR to expect profits based on

01:58 11  Riffle -- Ripple's efforts?

01:58 12             MR. FIGEL:  Objection.

01:58 13        A.   As I recall, your question was efforts to

01:58 14  increase the price.  Was that -- was that what you

01:58 15  said?

01:58 16        Q.   Yeah.  Assume -- and I know it's disputed

01:58 17  in this case.  But just assume that Ripple's efforts,

01:58 18  in fact, caused the price of XRP to increase.

01:58 19             Okay?

01:58 20        A.   Yeah.

01:58 21             And the question is, would that affect

01:58 22  GSR's return?

01:58 23        Q.   If that's the case, can GSR expect profits

01:58 24  off this contract in Exhibit 10 based on Ripple's

01:59 25  efforts?

                                                                135

01:59  1          MR. FIGEL:  Objection.

01:59  2      A.   I can't answer that question without

01:59  3  knowing what -- what you -- what Ripple would be

01:59  4  doing.

01:59  5          For example, increasing the price is

01:59  6  consistent with reducing the supply.  Since GSR gets

01:59  7  compensated on the basis of the sales it makes, if

01:59  8  supply shrunk, they would lose money rather than gain

01:59  9  it so that there would be a question as to what

01:59 10  Ripple was doing.

01:59 11      Q.   Could reducing the supply of XRP increase

01:59 12  its price?

01:59 13          MR. FIGEL:  Objection.

01:59 14      A.   Reducing -- this is an "other things equal"

01:59 15  question?

01:59 16      Q.   Correct.

01:59 17      A.   Other things equal, if the supply curve

01:59 18  shifts in, the price goes up, assuming demand is

01:59 19  unchanged.

01:59 20      Q.   So assuming demand is unchanged, if the

02:00 21  supply of XRP drops, the price of XRP goes up?

02:00 22          MR. FIGEL:  Objection.

02:00 23      A.   I mean, I can't say that as a matter of

02:00 24  fact.  It's a matter of theory.  If demand is

02:00 25  unchanged and the supply of an asset falls, the price

136

02:00  1    of the asset should rise.

02:00  2         Q.   Are you aware of any efforts by Ripple, to

02:00  3    decrease the supply of XRP available to the

02:00  4    marketplace?

02:00  5              MR. FIGEL:  Objection.

02:00  6         A.   No.

02:00  7              MS. PROSTKO:  Objection.

02:00  8         Q.   Are you aware of Ripple's escrow program?

02:00  9         A.   Excuse me?

02:00 10         Q.   Are you aware of Ripple's escrow program?

02:00 11         A.   Yes, I think so.

02:00 12         Q.   What do you know about that?

02:00 13              MR. FIGEL:  Objection.

02:00 14         A.   I think it's an orderly market provision.

02:00 15         Q.   Can you elaborate, please.

02:00 16         A.   I don't have much more to say than that,

02:00 17    that it's -- it's an interest of any seller to insure

02:01 18    that -- essentially to reduce volatility.

02:01 19         Q.   Is that in the contracts, the escrow

02:01 20    program?

02:01 21              MR. FIGEL:  Objection.

02:01 22         A.   No.  It's what I infer from -- it's what --

02:01 23    what I would infer, but it is not so far as I can

02:01 24    tell in the contract.

02:01 25         Q.   Can you look at paragraph 101 of your

                                                                137

02:01  1    report, please.

02:01  2         And you -- just picking up halfway through

02:01  3    that first sentence, you write, I conclude that each

02:01  4    of the programmatic contracts is in substance similar

02:01  5    to the GSR agreement.

02:02  6         A.   Yes.

02:02  7         Q.   And at the time you wrote that, you were

02:02  8    relying on Ripple's attorneys to tell you about the

02:02  9    contracts that you did not personally review?

02:02 10         A.   Yeah.  I think I've testified to that.

02:02 11         Q.   And would that be the case for any contract

02:02 12    that you didn't personally review, you relied on

02:02 13    Ripple's attorneys to tell you whether they were

02:02 14    similar to the contracts you did review?

02:02 15         MR. FIGEL:  Objection.

02:02 16         A.   That's partly right.  I also asked whether

02:02 17    there were material differences.

02:02 18         Q.   So for any contract that you did not

02:02 19    personally review, you relied on Ripple's counsel to

02:02 20    tell you whether there were material similarities or

02:02 21    differences to the contracts that you had reviewed?

02:03 22         A.   That's correct.

02:03 23         Q.   And then, in staying with paragraph 1,

02:03 24    you're saying, after you -- strike that.  Going back

02:03 25    to paragraph 101, after you write that the

                                                              138

```
02:03  1   programmatic contracts are similar to the GSR
02:03  2   agreement, you write, Specifically, each of these
02:03  3   contracts contains a provision stating that the
02:03  4   agreement in any related documents constitute the
02:03  5   entire agreement between the parties?
02:03  6       A.   Yes.
02:03  7       Q.   Is that type of provision, that's an
02:03  8   integration clause?
02:03  9       A.   Yes, it is.
02:03 10       Q.   And why is it that an integration clause
02:03 11   makes all the programmatic contracts similar in
02:03 12   substance?
02:03 13            MR. FIGEL:  Objection.
02:04 14       A.   I didn't say that.
02:04 15       Q.   Well, you write -- the first sentence says
02:04 16   they're all similar in substance.  Paragraph 101.
02:04 17   Right?
02:04 18       A.   Yes.
02:04 19       Q.   And then the second sentence is,
02:04 20   Specifically these contracts all have integration
02:04 21   clauses?
02:04 22       A.   Yeah, that's an example of similarity.
02:04 23   Other examples of similarity are in paragraph 102.
02:04 24       Q.   So I guess the -- the presence of
02:04 25   integration clauses is not what makes all of these
```

139

02:04  1    programmatic contracts the same; they just all happen

02:04  2    have to integration clauses?

02:04  3          A.   Well, they can't be the same because

02:04  4    they're different, logically speaking.

02:04  5               The contracts, I thought, were similar in

02:05  6    important respects, of which the presence of an

02:05  7    integration clause is one.

02:05  8          Q.   Do most commercial contracts between

02:05  9    sophisticated parties contain integration clauses?

02:05 10          A.   I can't answer that.

02:05 11          Q.   Well, you're an expert on contracts, right?

02:05 12          A.   There are maybe 20 million commercial

02:05 13    contracts a year.  If you're asking me whether

02:05 14    2,417,312 have an integration clause, I'd say I don't

02:05 15    know the answer to that.

02:05 16          Q.   But, I mean, you studied contracts for a

02:05 17    long time, right?

02:05 18          A.   I have.

02:05 19          Q.   For most of the contracts you personally

02:05 20    reviewed between sophisticated parties, do those

02:05 21    contracts typically contain integration clauses?

02:05 22          A.   It would depend on the industry.  I don't

02:05 23    think they're in M&A contracts.  But they're in other

02:05 24    kinds of -- they're also not in a usual sales

02:05 25    contract.  But they tend to be in complicated

                                                                 140

02:05  1    agreements, such as construction contracts or the

02:06  2    agreements to construct a shopping center contract.

02:06  3              So it would depend on the context.

02:06  4    Sometimes you have one, and sometimes you don't.

02:06  5         Q.   Did any of the 1700 contracts you reviewed

02:06  6    or had counsel review in this case not contain

02:06  7    integration clauses?

02:06  8         A.   I think -- yes, I think I've seen some that

02:06  9    didn't.

02:06 10         Q.   What percentage generally of the contracts?

02:06 11         A.   I can't say without going over that sample

02:06 12    again.

02:06 13         Q.   Did any of the programmatic sales contracts

02:06 14    identified in your report contain a provision

02:07 15    restricting what someone who purchased XRP from

02:07 16    Ripple's counterparty could do with the XRP they

02:07 17    purchased?

02:07 18              MR. FIGEL:  Objection.

02:07 19         A.   No, I don't think so.

02:07 20              No.

02:07 21         Q.   Did you review any contracts between Ripple

02:07 22    and GSR where Ripple contracted with GSR to purchase

02:07 23    XRP in the secondary market?

02:07 24         A.   I don't recall that.

02:07 25         Q.   Did you consider any such contract in

                                                                    141

02:07 1    forming your opinions?

02:07 2         A.   I don't think so.

02:08 3         Q.   Okay.  Paragraph 105 discusses the

02:08 4    market-making contracts.

02:08 5              MR. HANAUER:  Can you send around 11,

02:08 6         please.

02:08 7              (█████ Agreement was marked Exhibit AS-11 for

02:08 8         identification, as of this date.)

02:08 9         A.   I think I have -- okay.

02:08 10        Q.   Is Exhibit 11 a copy of the ████ agreement

02:08 11   referenced in paragraph 105 of your report?

02:09 12        A.   I think so.

02:09 13        Q.   Any reason why you would say Exhibit 11 is

02:09 14   not a copy of the ████ agreement referenced in

02:09 15   paragraph 105 of your report?

02:09 16        A.   No.

02:09 17        Q.   When you looked at the market-making

02:09 18   contracts, did you do anything to determine that the

02:10 19   contracts you reviewed were the only contracts

02:10 20   governing the commercial relationship between Ripple

02:10 21   and its counterparty?

02:10 22        A.   No.

02:10 23        Q.   Independent of this case, have you reviewed

02:10 24   any contracts involving a market maker?

02:10 25              MR. FIGEL:  Objection.

                                                              142

02:10  1        A.    In my life?

02:10  2        Q.    Yeah.

02:10  3        A.    I can't remember.  Probably, but I can't

02:10  4   remember for sure.

02:10  5        Q.    Can you name any today as you sit here

02:10  6   today?

02:10  7        A.    No.

02:10  8        Q.    Are you offering any opinion on how

02:10  9   Exhibit 11 is different or similar than any other

02:10 10   contract involving a securities market maker?

02:10 11              MR. FIGEL:  Objection.

02:10 12        A.    No, I'm not.

02:11 13        Q.    By contracting with market makers, did

02:11 14   Ripple help facilitate the trading of XRP?

02:11 15              MR. FIGEL:  Objection.

02:11 16        A.    I can infer such an intention from the

02:11 17   agreement.

02:11 18              Other than that, I don't have an answer.

02:11 19        Q.    What is the job of a market maker?

02:11 20        A.    To make a market.

02:11 21        Q.    And does making that market help facilitate

02:11 22   trading in whatever is being sold?

02:11 23        A.    Yes.

02:11 24        Q.    By contracting with market makers, did

02:11 25   Ripple help provide investors with a mechanism to

                                                          143

02:11  1   sell XRP at a profit?

02:11  2          MR. FIGEL:  Objection.

02:11  3          MS. PROSTKO:  Objection.

02:11  4      A.   I'm going to resist the last part of your

02:11  5   question.  They -- it provided an opportunity to

02:12  6   trade XRP.  Whether at a profit or not, I have no

02:12  7   idea.

02:12  8      Q.   So by contracting with market makers,

02:12  9   Ripple provided an opportunity for traders to trade

02:12 10   in XRP?

02:12 11          MR. FIGEL:  Objection.

02:12 12      A.   That is the purpose of -- of these

02:12 13   agreements.

02:12 14      Q.   And do you see on Exhibit 11 how the

02:12 15   agreement talks about a defined spread and a

02:12 16   deployment amount?

02:12 17      A.   Yes.

02:13 18      Q.   Did the other market-making contracts you

02:13 19   reviewed contain similar provisions?

02:13 20      A.   I can't recall right now.

02:13 21      Q.   In paragraph 108 of your report, you say

02:13 22   that the market-making contract provides that Ripple

02:13 23   will deliver ████████████ --

02:13 24      A.   Yes.

02:13 25      Q.   -- to GSS?

                                                            144

02:13  1          A.    Yes.

02:13  2          Q.    Is that ████████████, is that

02:13  3    compensation to ██, or is that for ██ to use in its

02:13  4    market-making activities?

02:13  5               MR. FIGEL:  Objection.

02:14  6          A.    The contract defines it as compensation.

02:14  7          Q.    Is there any restrictions in the ██

02:14  8    agreement on what ███ can do with the ████████████

02:14  9    it obtained from Ripple?

02:14 10          A.    I don't recall any such restrictions.

02:14 11          Q.    And since ███ is obtaining ████████████

02:14 12    as compensation, does that incentivize ███ to make a

02:14 13    market for XRP at a higher price?

02:14 14               MR. FIGEL:  Objection.

02:15 15          A.    That's payment for GSR to make a market,

02:15 16    which is to say it's payment for GSR to do what they

02:15 17    do.

02:15 18          Q.    GSS?

02:15 19          A.    GSS, that is.

02:15 20          Q.    So -- but now -- once ███ -- once ████

02:15 21    obtains that ██████████████ --

02:15 22          A.    Right.

02:15 23          Q.    -- it's in GSS's interest for that XRP to

02:15 24    be worth more.

02:15 25               MR. FIGEL:  Objection.

                                                              145

02:15  1          A.   Not necessarily.

02:15  2          Q.   Why do you say that?

02:15  3          A.   Because if their intention is to convert it

02:15  4   immediately into dollars, they only care about the

02:15  5   price at the time they get it.

02:16  6          Q.   Do you know what ███'s intentions were to

02:16  7   do with the ███████████ it obtained from -- or

02:16  8   ███████████ XRP it obtained from Ripple?

02:16  9          A.   No.

02:16 10          Q.   So can you look at paragraph 111 of your

02:16 11   report.

02:16 12              Again, I'd ask you to compare that with

02:16 13   paragraph 102.

02:16 14              And it looks like paragraph 102 contains a

02:16 15   bullet point that paragraph 111 does not, that

02:16 16   says -- discusses provisions that create an ongoing

02:17 17   obligation owed by Ripple to the counterparty?

02:17 18          A.   Yes.

02:17 19          Q.   Did you find any such provisions in the GSS

02:17 20   contract or market maker contracts?

02:17 21          A.   No.

02:17 22          Q.   So, again, why were you listing five bullet

02:17 23   points in paragraph 102 but only four bullet points

02:17 24   in paragraph 111?

02:17 25          A.   I can't recall why I did that, but I do

                                                            146

02:17  1   know that there's no such language in Exhibit 10.

02:17  2        Q.   What about Exhibit 11?

02:17  3        A.   Which one is -- oh, Exhibit 11?

02:17  4             I don't -- I have -- 5, 4 -- oh.  This

02:18  5   is -- this is Exhibit 10.

02:18  6             MR. FIGEL:  Is that --

02:18  7        A.   You referred to Exhibit 11, I don't think I

02:18  8   have an Exhibit 11.

02:18  9             MR. FIGEL:  I think it's in front of right

02:18 10   there.

02:18 11        A.   There's Exhibit 10.

02:18 12             Oh, this is Exhibit -- no, I didn't see

02:18 13   anything in that agreement either.

02:18 14             MR. FIGEL:  Just so the record's clear, do

02:18 15   you have Exhibit 11?

02:18 16             THE WITNESS:  I do.  It's right here.

02:18 17             MR. HANAUER:  Mr. Court Reporter, was I

02:18 18   asking a question about -- an authentication question

02:18 19   on Exhibit 11?  Just to make sure I have it.

02:18 20             (The record was read back.)

02:19 21        Q.   Okay.  Sorry about that, sir.

02:19 22             Just so I have this in the record, is

02:19 23   Exhibit 11 an accurate copy of the GSS agreement

02:19 24   referenced in paragraph 105 of your report?

02:19 25        A.   Yes.

147

02:19  1        Q.    Thank you.

02:19  2              Did any of the market maker contracts you

02:19  3   reviewed contain a provision restricting what someone

02:19  4   who purchased XRP from the market maker could do with

02:19  5   the XRP they purchased?

02:20  6              MR. FIGEL:  Objection.

02:20  7        A.    No.

02:20  8              MR. HANAUER:  Exhibit 12.

02:20  9              (Copy of Azimo Agreement was marked Exhibit

02:20 10        AS-12 for identification, as of this date.)

02:20 11        Q.    While we're passing out exhibits, I will

02:20 12   ask you to refer to paragraph 116 of your report.

02:20 13              And once you've had a chance to review

02:20 14   Exhibit 12 I'll ask you, is Exhibit 12 a copy of the

02:20 15   Azimo agreement referenced in paragraph 116 of your

02:20 16   report?

02:20 17        A.    Yes.

02:20 18        Q.    And when you looked at the product

02:21 19   incentive contracts, did you do anything to determine

02:21 20   that the contracts you reviewed were the only

02:21 21   contracts governing the commercial relationship

02:21 22   between Ripple and its counterparty?

02:21 23        A.    No.

02:21 24        Q.    What is Azimo?

02:21 25              (Witness reviewing document.)

                                                              148

02:21  1      A.    Azimo is a company that -- well, I must

02:21  2  say, I don't know very much about Azimo, but it

02:21  3  essentially does transactions in cryptocurrency in

02:22  4  various markets.

02:22  5      Q.    Do you know what type -- type or -- of

02:22  6  transactions or the purpose of the transactions?

02:22  7      A.    No.

02:22  8      Q.    And do you see how the preamble to

02:22  9  Exhibit 12 references a master-hosted services

02:22 10  agreement between Ripple and Azimo?

02:22 11      A.    Are you referring to my report or to

02:22 12  Exhibit 12?

02:22 13      Q.    Exhibit 12.  The preamble to Exhibit 12.

02:22 14      A.    Yes.

02:22 15      Q.    Did you review the master-hosted services

02:22 16  agreement between Ripple and Azimo?

02:22 17      A.    I don't recall doing so.

02:22 18      Q.    Do you know if Azimo was a user of Ripple's

02:23 19  ODL product?

02:23 20      A.    I don't know whether it was or wasn't.

02:23 21      Q.    Are you offering an opinion whether --

02:23 22  okay.  Let me try and help you out with this.  Let's

02:23 23  look at paragraph 117.

02:23 24           Can you just read that to yourself.

02:23 25      A.    Yes.

149

02:23  1              Oh, yes.  Yeah.  It -- that's -- I now --
02:23  2      it has refreshed my recollection.
02:23  3          Q.    Okay.  So I'll ask you again, was Azimo a
02:23  4      user of Ripple's ODL product?
02:23  5          A.    Yes.
02:23  6          Q.    And you say that -- in paragraph 117, you
02:24  7      say, Ripple purchases services from Azimo in exchange
02:24  8      for payment.
02:24  9          A.    Yes.
02:24 10          Q.    Does Azimo also purchase services from
02:24 11      Ripple?
02:24 12          A.    Well, if it's using the ODL product, it
02:24 13      must purchase services, but I was referring to the
02:24 14      particular contract in Exhibit 12.
02:24 15          Q.    And you reference, in paragraph 117, how
02:24 16      the ███ agreement obligates Ripple to pay █ million
02:24 17      in XRP -- $█ million worth of XRP --
02:24 18          A.    Yes.
02:24 19          Q.    -- in exchange for Azimo meeting certain
02:24 20      milestones?
02:24 21          A.    Not milestones.  Well, yes, incentive
02:24 22      milestones, but then it's later defined in particular
02:25 23      as a number of transactions.
02:25 24          Q.    Are you offering an opinion whether it
02:25 25      would be commercially viable for Azimo to use ODL

                                                                    150

```
02:25  1    absent the incentives paid by Ripple?

02:25  2              MR. FIGEL:  Objection.

02:25  3         A.   No.

02:25  4         Q.   Can you look at paragraph -- or Section 4,

02:25  5    Exhibit A to Exhibit 12.

02:26  6              It's part of Exhibit 12 with a Bates number

02:26  7    ending in 182.

02:26  8         A.   Yes, I'm looking at that now.

02:26  9         Q.   And do you see that Azimo acknowledges that

02:26 10    virtual currency, including XRP, is not legal tender?

02:26 11         A.   Yes.

02:26 12         Q.   Did any of the contracts you reviewed treat

02:26 13    XRP as either fiat currency or legal tender?

02:26 14              MR. FIGEL:  Objection.

02:26 15         A.   No, I don't recall seeing any such

02:26 16    provisions.

02:26 17         Q.   Do you have an opinion whether XRP is

02:26 18    either legal tender or fiat currency?

02:27 19              MR. FIGEL:  Objection.

02:27 20         A.   I don't think it's either one.

02:27 21         Q.   So paragraph 124 of your report references

02:27 22    an agreement with -- references the ████████████

02:27 23    pilot agreement.

02:28 24              Do you see that?

02:28 25         A.   Uh-huh.
```

151

02:28  1      Q.   And you conclude paragraph 124 by writing,

02:28  2  Ripple agrees to pay ██████, on a monthly basis,

02:28  3  ████████████ of the aggregate value of XRP purchased or

02:28  4  sold by ██████ on Bitstamp using its algorithm?

02:28  5      A.   Yes.

02:28  6      Q.   By contracting with ██████, did Ripple help

02:28  7  facilitate the trading of XRP?

02:28  8           MR. FIGEL:  Objection.

02:28  9      A.   I don't know.  That's a question of fact as

02:28 10  to the effect of the agreement.  I don't have any

02:28 11  opinion on the effect of any of these agreements.

02:29 12      Q.   Going back to Azimo, what purchases -- or

02:29 13  what services did Ripple purchase from Azimo?

02:29 14           MR. FIGEL:  Objection.

02:29 15      A.   To use Ripple in -- to use XRP in

02:29 16  transactions in the specified markets.  Specified

02:29 17  countries, actually.

02:29 18      Q.   Did Ripple pay Azimo to buy and sell XRP in

02:29 19  the market?

02:29 20           MR. FIGEL:  Objection.

02:29 21      A.   I don't recall any contract provisions to

02:29 22  that effect.

02:29 23      Q.   And again, you did not review the master

02:29 24  services agreement between Ripple and Azimo?

02:30 25      A.   I don't recall reviewing that particular

                                                            152

02:30  1    one.

02:30  2        Q.    Can you look at paragraph 131, please.

02:30  3             And do you see how you write, the --

02:30  4    Specifically the product incentive contracts

02:30  5    typically contain, and then there are two bullet

02:31  6    points?

02:31  7        A.    Uh-huh.

02:31  8        Q.    So, similar question to what I was asking

02:31  9    you earlier about the integration clause.  Is it

02:31 10    the -- are you -- are you saying that all of the

02:31 11    products incentive contracts had the two provisions

02:31 12    listed in the bullet points on paragraph 31, or are

02:31 13    you saying that those two provisions are what make

02:31 14    the product incentive contracts similar in substance?

02:31 15             MR. FIGEL:  Objection.

02:31 16        A.    What makes the contracts similar are the

02:31 17    clauses they have in common and the clauses that they

02:31 18    in common lack.  So I'm not basing similarity on any

02:31 19    particular term.

02:31 20        Q.    Would you be able to find provision -- are

02:32 21    the two provisions listed in -- on the bullet points

02:32 22    in paragraph 131, are those common provisions in

02:32 23    contracts in a whole variety of industries?

02:32 24        A.    I guess I would answer it in this way.

02:32 25             With a lot of contracts, there is -- there

153

02:32  1    are few or no precontractual communications between

02:32  2    parties.  Example, in a typical sales contract, if

02:32  3    you want to ship TVs to a retailer, they're sold

02:32  4    under a standard contract, then retailer takes the

02:32  5    contract or it doesn't.

02:32  6              In other areas, there are discussions prior

02:32  7    to the making of a contract.  And that -- it's --

02:33  8    that creates an incentive to use a merger clause in

02:33  9    order to ensure that the enforceable promises people

02:33 10    make are in their written contract.

02:33 11    Q.   Did any of the product incentive contracts

02:33 12    identified in your report contain a provision

02:33 13    restricting what someone who purchased XRP from

02:33 14    Ripple's counterparty could do with the XRP they

02:33 15    purchased?

02:33 16              MR. FIGEL:  Objection.

02:33 17    A.   No.

02:33 18    Q.   Did any contract identified in your report

02:33 19    contain a provision restricting what someone who

02:33 20    purchased XRP from Ripple's counterparty could do

02:33 21    with the XRP they purchased?

02:33 22              MR. FIGEL:  Objection.

02:33 23    A.   No.  Maybe this is volunteering, but you

02:34 24    couldn't bind a party who wasn't -- an agent who

02:34 25    wasn't a party to a contract to do or not do things.

                                                              154

02:34  1      Q.   So, it would have been impossible for
02:34  2  Ripple to put restrictions on what the purchaser of
02:34  3  XRP from one of Ripple's counterparties could do with
02:34  4  the XRP purchased from the counterparty?
02:34  5           MR. FIGEL:  Objection.
02:34  6      A.   Well, Ripple could do what it did do.  It
02:34  7  could require the buyer of XRP to restrict the use by
02:34  8  parties down in the distribution chain.
02:34  9           And I think I recall provisions saying that
02:34 10  the buyer wouldn't sell to anyone who had an
02:34 11  investment purpose or the like.
02:35 12           But the most you could do is -- is to have
02:35 13  your -- is to require your counterparty to make
02:35 14  transactions with nonparties under certain terms so
02:35 15  that if the counterparty didn't do that, you could
02:35 16  sue the counterparty.
02:35 17      Q.   Did any of Ripple's contracts identified in
02:35 18  your report bind third parties that were not Ripple's
02:35 19  counterparties?
02:35 20           MR. FIGEL:  Objection.
02:35 21      A.   No.
02:35 22      Q.   Can we go to paragraph 135 where you talk
02:35 23  about the employee and executive compensation
02:36 24  contract.
02:36 25      A.   Yes.

155

02:36  1            MR. HANAUER:  Bless you.

02:36  2       Q.   Did any of the employee and executive

02:36  3  compensation contracts contain a restriction on what

02:36  4  the Ripple employee or executive could do with the

02:36  5  XRP they obtained from Ripple?

02:36  6            MR. FIGEL:  Objection.

02:36  7       A.   I don't think so.

02:36  8       Q.   Did you review any of Defendant

02:37  9  Garlinghouse's employee executive compensation

02:37 10  contracts with Ripple?

02:37 11       A.   No.

02:37 12       Q.   Did you review any of Defendant

02:37 13  Garlinghouse's contracts between him and Ripple?

02:37 14       A.   No.

02:37 15       Q.   Did you consider any of Defendant

02:37 16  Garlinghouse's contracts in forming your opinions?

02:37 17       A.   No.

02:38 18       Q.   Could you go to paragraph 144 of your

02:38 19  report, please.

02:38 20            (MoneyGram Agreement was marked Exhibit

02:38 21       AS-15 for identification, as of this date.)

02:38 22       Q.   Is Exhibit 15 a copy of the MoneyGram

02:38 23  agreement referenced in paragraph 144 of your report.

02:38 24       A.   Yes.

02:38 25       Q.   And when you looked at the master-hosted

                                                            156

02:39  1    services agreements, did you do anything to determine

02:39  2    that the contracts you reviewed were the only

02:39  3    contracts governing the commercial relationship

02:39  4    between Ripple and its counterparty?

02:39  5         A.   No.

02:39  6         Q.   Why was Ripple contracting with MoneyGram?

02:39  7              MR. FIGEL:  Objection.

02:39  8         A.   I don't know why, as a matter of fact, they

02:39  9    were contracting with MoneyGram.

02:39 10         Q.   And do you see how -- or can I refer you to

02:39 11    paragraph 147 of your report.

02:39 12         A.   Uh-huh.

02:40 13         Q.   Do you see how that discusses Ripple paying

02:40 14    rebates to MoneyGram?

02:40 15         A.   Yes.

02:40 16         Q.   Are you offering an opinion whether it

02:40 17    would be commercially viable for MoneyGram to use

02:40 18    Ripple's products, if not for the rebates and

02:40 19    incentives Ripple offered?

02:40 20              MR. FIGEL:  Objection.

02:40 21         A.   No.

02:41 22         Q.   Can I refer you to paragraph 160 of your

02:41 23    report, please.

02:41 24              (Loan Agreement was marked Exhibit AS-16

02:41 25         for identification, as of this date.)

                                                                157

02:41  1      Q.   Before I ask you about the loan agreements,

02:41  2  we just looked at the Azimo agreement and the

02:41  3  MoneyGram agreement.

02:41  4      A.   Yes.

02:41  5      Q.   Why did you put them in different

02:41  6  categories?

02:41  7      A.   Because the loan is a different transaction

02:41  8  from --

02:41  9      Q.   I'm sorry.  And I'm not trying to be

02:41 10  confusing or anything like that.

02:41 11      A.   No.

02:41 12      Q.   Before we get to the loan agreements, I

02:41 13  want to refer back to the last two sets of agreements

02:41 14  we looked at, the MoneyGram agreement and the Azimo

02:41 15  agreement.

02:41 16           And my question is, why did you put them

02:42 17  into different categories?

02:42 18      A.   The -- because they had different

02:42 19  commercial purposes.

02:42 20           The Azimo agreement, at least as I infer

02:42 21  from the words, was an agreement in which Azimo is

02:42 22  being paid to conduct certain transactions.

02:42 23           In the MoneyGram agreement, MoneyGram was

02:42 24  using a service that Ripple provided.  So they were

02:42 25  different deals.

                                                          158

02:42 1  Q. Do you know if Azimo used a service that

02:42 2 Ripple provided?

02:42 3  A. I don't know any more than what the

02:42 4 contract says.

02:42 5  Q. The contract that you reviewed says?

02:42 6  A. Yes.

02:43 7  Q. So do you see Exhibit 16 in front of you?

02:43 8  A. I do.

02:43 9  Q. Is Exhibit 16 a copy of the loan agreement

02:43 10 referenced in paragraph 160 of your report?

02:43 11  A. Yes.

02:43 12  Q. What is ██████ or ████████?

02:44 13  A. I'm not sure what ██████ is.

02:44 14  Q. Do you know what their -- what ████████

02:44 15 business is?

02:44 16  A. Not right now, no.

02:44 17  Q. Do you know what the businesses of the

02:44 18 other counterparties to the loan agreements

02:44 19 identified in your report are?

02:44 20  A. I don't recall.

02:44 21  Q. Do you know what the purpose of the loans

02:44 22 identified in your report were?

02:44 23  A. I think ██████ -- ██████ is a financial

02:44 24 services company, which is about all I know about it.

02:45 25   I would infer from looking at the agreement

159

02:45  1    that the goal was to have ███████ use XRP, but I

02:45  2    don't know that as a matter of fact.

02:45  3        Q.   Was the loan agreement with ███████

02:45  4    related to a broader commercial relationship between

02:45  5    Ripple and ███████?

02:45  6             MR. FIGEL:  Objection.

02:45  7        A.   I don't know that.

02:45  8        Q.   Were -- do you know if any of the other

02:45  9    loan agreements identified in your report were part

02:45 10    of larger commercial relationships between Ripple and

02:45 11    the counterparty?

02:45 12        A.   I don't know that.

02:45 13        Q.   Do you know if Ripple paid ███████

02:45 14    incentives, bonuses, or rebates as part of a broader

02:45 15    commercial relationship?

02:45 16             MR. FIGEL:  Objection.

02:46 17        A.   No.

02:46 18        Q.   Do you know if Ripple paid the other loan

02:46 19    and promissory note counterparties bonuses,

02:46 20    incentives, or rebates as part of a larger commercial

02:46 21    relationship?

02:46 22        A.   No.

02:46 23        Q.   Did Ripple reimburse ███████ for the --

02:46 24    for the interest Ripple charged on the loan?

02:46 25             MR. FIGEL:  Objection.

160

```
02:46  1        A.   Well, there's no contractual obligation for
02:46  2   Ripple to do that.  If -- at least no contractual
02:47  3   obligation under the digital asset loan agreement.
02:47  4        Q.   Do you know if Ripple reimbursed ██████
02:47  5   for the interest it charged on the loan?
02:47  6        A.   No.
02:47  7        Q.   Do you know if Ripple reimbursed any other
02:47  8   of the loan or promissory note counterparties for the
02:47  9   interest it charged?
02:47 10        A.   No.
02:47 11        Q.   Did the loan -- the ██████ loan agreement
02:47 12   contain a provision restricting what ██████ could
02:47 13   do with the XRP Ripple loaned it?
02:47 14        A.   Such a restriction would -- is not in the
02:47 15   contract.
02:47 16        Q.   Did any other of the loans or promissory
02:47 17   notes identified in your report contain restrictions
02:47 18   on what Ripple's counterparty could do with the XRP?
02:48 19        A.   I don't recall seeing any of them in this
02:48 20   type of agreement.
02:48 21        Q.   May I direct your attention to
02:48 22   paragraph 170, please.
02:48 23             (█ Custody Agreement was marked Exhibit
02:48 24        AS-17 for identification, as of this date.)
02:48 25        Q.   And Exhibit 17, is that a copy of the ██
```

161

02:49  1  custody agreement referenced in paragraph 170 of your

02:49  2  report?

02:49  3      A.   Yes.

02:49  4      Q.   When you looked at the custody agreements

02:49  5  referenced in your report, did you do anything to

02:49  6  determine that those agreements that you reviewed

02:49  7  were the only contracts governing the commercial

02:49  8  relationship between Ripple and its counterparty?

02:49  9      A.   No.

02:49 10      Q.   So the counterparty to the ▮ custody

02:49 11  agreement is an entity called ███████████

02:49 12      A.   Yes.

02:49 13      Q.   What is their business?

02:49 14      A.   I don't know.

02:50 15      Q.   Do you know the businesses of any of the

02:50 16  other parties to the custody agreements identified in

02:50 17  your report?

02:50 18      A.   I don't recall.

02:50 19      Q.   And do you know what the purpose was of the

02:50 20  ▮ custody agreement?

02:50 21           MR. FIGEL:  Objection.

02:50 22      A.   The customer had purchased XRP.  And it

02:50 23  wanted Ripple to essentially hold it for them, to be

02:50 24  the custodian of it for them rather than take

02:50 25  possession themselves.

162

02:50  1        Q.    And do you know what ███████████.

02:50  2   intended to do with the XRP Ripple loaned it?

02:51  3              MR. FIGEL:  Objection.

02:51  4        A.    No.

02:51  5              I think -- no, I don't.

02:51  6        Q.    And was the ██ custody agreement

02:51  7   substantially similar to the other custody agreements

02:51  8   you reviewed?

02:51  9        A.    Yes.

02:51 10        Q.    So the ██ custody agreement lays out the

02:51 11   terms for Ripple to custody XRP that ██████████ had

02:51 12   previously purchased from Ripple?

02:51 13        A.    That is my understanding.

02:52 14        Q.    And why did ████████████ originally buy XRP

02:52 15   from Ripple?

02:52 16              MR. FIGEL:  Objection.

02:52 17        A.    I don't know.

02:52 18        Q.    Can I ask you to look at paragraph 8 of

02:52 19   Exhibit 17.

02:52 20        A.    Uh-huh.

02:52 21        Q.    And after that first romanette, is ██████

02:52 22   ██████ representing that its holding the XRP for

02:52 23   investment purposes?

02:53 24        A.    It's representing it has the authority to

02:53 25   hold XRP for investment purposes.

                                                              163

02:53 1    Q.    And do you know whether or not █████████

02:53 2    was, in fact, holding XRP for investment purposes?

02:53 3    A.    No.

02:53 4    Q.    How many of the other custody agreements

02:53 5    contained a similar provision where the counterparty

02:53 6    represented that it is authorized to hold XRP for

02:53 7    investment purposes?

02:53 8    A.    I think they all did.

02:53 9    Q.    Was the ██ custody agreement related to a

02:53 10   broader commercial relationship between Ripple and

02:53 11   ████████?

02:53 12   A.    I don't know that.

02:53 13   Q.    Were the other custody agreements

02:53 14   identified in your report part of -- strike that.

02:54 15         Did you review any other contracts,

02:54 16   reflecting a broader commercial relationship between

02:54 17   Ripple and the counterparties to the other custody

02:54 18   agreements identified in your report?

02:54 19         MR. FIGEL:  Objection.

02:54 20   A.    No.

02:54 21   Q.    Do you know if Ripple paid ███████

02:54 22   incentives, bonuses, or rebates?

02:54 23         MR. FIGEL:  Objection.

02:54 24   A.    No, I don't know whether they did or not.

02:54 25   Q.    Do you know if Ripple paid incentives,

                                                              164

02:54 1   bonuses, or rebates to the other counterparties of

02:54 2   the custody agreements?

02:54 3              MR. FIGEL:  Objection.

02:54 4        A.   No.

02:54 5        Q.   Did the █ custody agreement contain a

02:54 6   provision restricting what ████████ could do with

02:55 7   the XRP that Ripple custodied?

02:55 8        A.   No.

02:55 9        Q.   Did the other custody agreements identified

02:55 10  in your report contain provisions restricting what

02:55 11  Ripple's counterparty could do with the XRP?

02:55 12       A.   Not to my knowledge.

02:55 13       Q.   How are you doing on breaks?

02:55 14       A.   Doing okay.

02:55 15       Q.   Doing okay.  All right.  Let's keep going.

02:55 16            Can I ask you to look at page -- I'm sorry,

02:55 17  paragraph 178 of your report.

02:56 18            And you reference that Rippleworks is a

02:56 19  charitable organization that provides grants and

02:56 20  other funding to Social Impact Ventures?

02:56 21       A.   Yes.

02:56 22       Q.   What is your basis for saying that?

02:56 23       A.   I think that -- that they were identified

02:56 24  as such in the contract.

02:56 25            MR. HANAUER:  Let's do Exhibit 18.

                                                              165

02:56  1             (Copy of Custody Agreement was marked

02:56  2         Exhibit AS-18 for identification, as of this

02:56  3         date.)

02:57  4         Q.   Is Exhibit 18 a custody -- a copy of the

02:57  5    custody agreement identified in paragraph 178 of your

02:57  6    report?

02:57  7         A.   Yes.

02:57  8         Q.   I'll -- I'll return to my question, and --

02:57  9    and what is your basis for saying that Rippleworks is

02:57 10    a charitable organization that provides grants and

02:57 11    funding to Social Impact Ventures?

02:57 12         A.   It's described as a foundation.  Foundation

02:58 13    is not a profit-making company.  So foundation's

02:58 14    usually charitable companies, which essentially make

02:58 15    grants.

02:58 16             I might have learned, in conversation about

02:58 17    this case, about Social Impact Ventures.  But it

02:58 18    was -- and I don't recall where I heard that, but it

02:58 19    was clear to me that -- just from reading the

02:58 20    agreement that we were not talking about a

02:58 21    profit-making enterprise as a counterparty.

02:58 22         Q.   Did you write the words, "A charitable

02:58 23    organization that provides grants and other funding

02:58 24    to Social Impact Ventures"?

02:58 25         A.   Yes, I did.

                                                          166

02:58  1      Q.   Are you aware that the amended complaint in

02:58  2  this case alleges that Ripple and the individual

02:58  3  defendants used Rippleworks as a mechanism to achieve

02:59  4  Ripple's goal of distributing XRP into the public

02:59  5  trading market and increase trading in XRP?

02:59  6      A.   I'm not aware of that.

02:59  7      Q.   Are you offering any opinion that

02:59  8  challenges those allegations?

02:59  9      A.   I don't have an opinion one way or the

02:59 10  other.

02:59 11      Q.   Are you offering any opinion challenging

02:59 12  the amended complaint's -- strike that.

02:59 13           Are you offering any opinion challenging

02:59 14  any of the amended complaint's allegations relating

02:59 15  to Rippleworks?

02:59 16           MR. FIGEL:  Objection.

02:59 17      A.   I would have to know what they were.

02:59 18      Q.   Well, you did review the complaint, the

02:59 19  amended complaint, correct?

02:59 20      A.   Yes.

02:59 21      Q.   And as you sit here today, are you refuting

03:00 22  any of the allegations about Rippleworks?

03:00 23      A.   No, that's not in my report.  I don't have

03:00 24  any -- any expert opinion on what Ripple and

03:00 25  Rippleworks did.

                                                           167

03:00  1        Q.    Did the Rippleworks cus-- did Exhibit 18,

03:00  2  did that contain a -- does that contain a provision

03:00  3  restricting what Rippleworks can do with the XRP

03:00  4  Ripple custody?

03:00  5        A.    No.

03:00  6        Q.    Can you look at your report, paragraph 188,

03:00  7  please.

03:00  8              So do you see how paragraph 188 references

03:01  9  settlement agreements involving Ripple on one hand,

03:01 10  and on the other hand, R3 HoldCo, Jed McCabe [sic],

03:01 11  Arthur Britto, Greg Kidd, and Matthew Mellon?

03:01 12        A.    Yes.

03:01 13        Q.    Were those the only parties to settlement

03:01 14  agreements that you reviewed?

03:01 15        A.    I think so.

03:02 16        Q.    So in Exhibit 5 to your report, it looks

03:02 17  like there could be more than a hundred settlement

03:02 18  agreements.

03:02 19        A.    I don't know how many there were.

03:02 20        Q.    Well, you can look at Exhibit F to your

03:02 21  report.

03:02 22        A.    Yeah, I -- there were a lot of them.  I

03:02 23  don't -- you asked me, once again, about a specific

03:02 24  number.  I don't have a specific number.

03:02 25        Q.    And did the -- the settlement agreements

                                                              168

03:02  1    on -- identified in Exhibit F to your report, did all

03:02  2    of those settlement agreements involve either

03:02  3    R3 HoldCo, Jed McCabe, Arthur Britto, Greg Kidd or

03:02  4    Matthew Mellon?

03:03  5        A.   I think so.

03:03  6             I don't recall any other parties.

03:03  7        Q.   Why were there so many settlement

03:03  8    agreements for only a handful of counterparties?

03:03  9             MR. FIGEL:  Objection.

03:03  10       A.   I don't know.

03:03  11       Q.   Did you review all the settlement

03:03  12   agreements contained on Exhibit F to your report?

03:03  13       A.   If they were an exhibit to my report, I

03:03  14   looked at them, or most of them, or almost all of

03:03  15   them.

03:03  16       Q.   After you signed your report.

03:03  17       A.   Some before, more after.

03:04  18       Q.   For R3 HoldCo, what is that company's

03:04  19   business?

03:04  20       A.   I'm not sure.

03:04  21       Q.   And do you know what the purpose was of

03:04  22   R3 HoldCo's original contractual relationship with

03:04  23   Ripple?

03:04  24       A.   No.

03:04  25       Q.   Do you know what Arthur Britto or Greg

                                                            169

03:04   1    Kidd's relationship was with Ripple?

03:04   2         A.    No.

03:05   3         Q.    What about Matthew Mellon?

03:05   4         A.    I know that Matthew Mellon was supposed to

03:05   5    provide certain services to Ripple.

03:05   6         Q.    What services were those?

03:05   7         A.    The contract describes them as ambassador

03:05   8    services.

03:05   9         Q.    Are you able to fill in any more details on

03:05  10    what those ambassador services entailed?

03:05  11         A.    No.

03:05  12         Q.    Did any of the settlement agreements

03:05  13    identified in your report contain a provision

03:05  14    restricting what Ripple's counterparty could do with

03:05  15    the XRP Ripple provided?

03:05  16              MR. FIGEL:  Objection.

03:05  17         A.    I don't think so.

03:06  18         Q.    So in paragraph 191, you say that the R3

03:06  19    option sets out terms pursuant to which XRP2 grants

03:06  20    R3 HoldCo the right to purchase up 5 billion units of

03:06  21    XRP at a per-unit price of .8 -- of .85 cents.

03:06  22              Is that correct?

03:06  23         A.    Yeah.

03:06  24         Q.    And you understood XRP2 to be a subsidiary

03:06  25    of Ripple?

                                                              170

03:06  1      A.   Yes.

03:06  2      Q.   Is the option to purchase point -- XRP at

03:06  3  .85 cents per unit, is that a significant discount to

03:07  4  Ripple's market price?

03:07  5          MR. FIGEL:  Objection.

03:07  6      A.   I don't know the answer to that.

03:07  7      Q.   If you were to assume that .85 cents per

03:07  8  unit was a significant discount to market price, did

03:07  9  the R3 option allow R3 HoldCo to profit from the XRP

03:07 10  it obtain-- purchased from Ripple if it immediately

03:07 11  sold that XRP into the market?

03:07 12          MR. FIGEL:  Objection.

03:07 13      A.   That's a two -- maybe you could break that

03:07 14  question down into two, because that was a pretty

03:07 15  long question.

03:07 16      Q.   Okay.  So the first part is the -- I asked

03:08 17  you if the -- the option price was a significant

03:08 18  discount to market price.

03:08 19      A.   I said I didn't know the answer to that.

03:08 20      Q.   Fair enough.

03:08 21          Now I'm asking you to assume that it was a

03:08 22  significant discount to market price.

03:08 23      A.   Yes.

03:08 24      Q.   If that's the case, does the R3 option

03:08 25  allow Ripple's counterparty to profit off the XRP it

                                                              171

03:08  1   purchased from Ripple if it turns around and sells

03:08  2   that XRP at market price?

03:08  3            MR. FIGEL:  Objection.

03:08  4        A.   Well, I mean, if -- if I could sell

03:08  5   something at $10 a unit in the market and you're

03:08  6   charging me $2 for it, I'm going to make $8 if I

03:08  7   resell it.  That seems to be -- so it's certainly --

03:08  8   what you say is a possibility.

03:08  9            But in other words, this -- so far as I can

03:08 10   tell, these were -- this is another way to make a --

03:09 11   to make a payment pursuant to a settlement agreement.

03:09 12            So instead of giving you a hundred dollars,

03:09 13   I give you the right to buy an asset for 50 you can

03:09 14   sell at a hundred dollars.  It seems as if that

03:09 15   was -- that there was just a settlement and that's

03:09 16   the way that R3 HoldCo is partially compensated.  But

03:09 17   that's all I know about it.

03:09 18        Q.   Would it make commercial sense for

03:09 19   R3 HoldCo to exercise the R3 option if the market

03:09 20   price of XRP was below .85 cents per unit?

03:09 21            MR. FIGEL:  Objection.

03:09 22        A.   No.

03:10 23        Q.   Did you review -- so can I refer you to

03:10 24   paragraph 204 of your report, please.

03:10 25        A.   Yes.

                                                              172

03:10  1        Q.   And do you see how you say, In addition to

03:10  2   the R3 HoldCo settlement, I also reviewed the Britto

03:10  3   settlement agreement?

03:10  4        A.   Yes.

03:10  5        Q.   Did you review any other settlement

03:10  6   agreements other than the ones between RC HoldCo and

03:11  7   Ripple and Arthur Britto and Ripple?

03:11  8        A.   I don't recall doing that.

03:11  9        Q.   Did you review any settlement agreement

03:11 10   between Ripple and Mr. McCaleb?

03:11 11        A.   I don't recall reading that.

03:11 12        Q.   Did the Britto settlement agreement allow

03:11 13   Mr. Britto to purchase XRP at a discount to market

03:11 14   price?

03:11 15             MR. FIGEL:  Objection.

03:11 16        A.   The contract does not give Mr. Britto any

03:11 17   such rights.  If there are any extracontractual

03:11 18   rights, I don't know about them.

03:12 19             MR. HANAUER:  How are you doing?

03:12 20             THE WITNESS:  I'm okay.  Well, it's -- we

03:12 21   could take a break for a little while.

03:12 22             MR. FIGEL:  I think we should.

03:12 23             MR. HANAUER:  Go off the record, please.

03:12 24             THE VIDEOGRAPHER:  Off the record, the time

03:12 25   is 3:13.

                                                            173

03:12  1              (A recess was taken from 3:13 to 3:39.)

03:37  2              THE VIDEOGRAPHER:  Back on the record.  The

03:37  3    time is 3:39.  And, Reid, just put your microphone

03:37  4    on.

03:38  5              MR. FIGEL:  Thank you.

03:38  6       Q.    Professor Schwartz, can I direct you to

03:38  7    paragraph 209 of your report where you're talking

03:38  8    about the Xpring contracts?

03:38  9       A.    Yes.

03:38 10       Q.    What was the Xpring program?

03:38 11       A.    Excuse me?

03:38 12       Q.    What was the -- and I'm not sure if I'm

03:38 13    saying this right.  What was the Xpring program?

03:38 14       A.    It's a program under which Ripple made

03:38 15    investments in other companies and which they

03:38 16    exchanged either cash or XRP for equity or services.

03:38 17       Q.    And what's your basis for saying that?

03:38 18       A.    The contract -- that's what the contracts

03:38 19    provided.

03:39 20       Q.    And do you know what the Xpring

03:39 21    counterparties intended to do with the XRP Ripple

03:39 22    provided them?

03:39 23       A.    Do I -- no, I don't know what they intended

03:39 24    to do.

03:39 25       Q.    Are you aware that the amended complaint in

                                                                    174

```
03:39  1    this case alleges that Ripple used Xpring as a

03:39  2    mechanism to achieve Ripple's goal of distributing

03:39  3    XRP into the public trading market and increase

03:39  4    trading in XRP?

03:39  5         A.   Yes, I'm aware of that.

03:39  6              I want to amend what I said in the ███

03:39  7    contract.

03:39  8              THE COURT REPORTER:  I'm sorry.  In the

03:39  9    what?

03:39 10              THE WITNESS:  ███████

03:39 11              THE COURT REPORTER:  Thank you.

03:39 12         A.   ██████  promised to -- to develop and

03:40 13    integrate XRP, and to essentially, you know, get X--

03:40 14    increase XRP's use.  So...

03:40 15         Q.   That was the purpose of ██████ contract

03:40 16    with Ripple?

03:40 17         A.   That's what they promised to use best

03:40 18    efforts to do.

03:40 19         Q.   So going -- is there anything else you need

03:40 20    to amend or correct?

03:40 21         A.   No.

03:40 22         Q.   So, I believe you said that you were aware

03:40 23    of the allegations in the amended complaint regarding

03:40 24    Xpring?

03:40 25         A.   Yes.  I read the amended complaint.
```

175

03:40  1      Q.    Are you offering any opinion that

03:40  2  challenges the amended complaint's allegations

03:40  3  regarding Xpring?

03:40  4      A.    No.

03:40  5            MR. FIGEL:  Objection.

03:41  6      Q.    Did the Xpring contracts contain a

03:41  7  provision restricting what Ripple's counterparty

03:41  8  could do with the XRP Ripple provided?

03:41  9      A.    Not to my recollection.

03:41 10      Q.    Did Ripple take any steps to restrict the

03:41 11  Xpring counterparties from reselling the XRP Ripple

03:41 12  provided them to the public?

03:41 13            MR. FIGEL:  Objection.

03:41 14      A.    No.

03:41 15            Not that -- no.

03:42 16      Q.    Can I refer you to paragraph 216 of your

03:42 17  report, please.

03:42 18            So you reference various joint venture

03:42 19  contracts?

03:42 20      A.    Yes.

03:42 21      Q.    And what did you do to determine that the

03:42 22  joint venture contracts you reviewed were the only

03:42 23  contracts governing the commercial relationship

03:42 24  between Ripple and its counterparty?

03:42 25      A.    I didn't do anything.

                                                              176

03:43  1              (Joint Venture Agreement Between Ripple and

03:43  2         SBI was marked Exhibit AS-20 for identification,

03:43  3         as of this date.)

03:43  4         Q.   Do you see how Exhibit-- I'm sorry.

03:43  5              Do you see on paragraph 216 of your report

03:43  6    references a joint venture agreement between Ripple

03:43  7    and SBI?

03:43  8         A.   Yes.

03:43  9         Q.   Is Exhibit 20 a copy of that joint venture

03:43 10    agreement?

03:44 11         A.   Yes.

03:44 12         Q.   What was the business purpose of the SBI

03:44 13    joint venture?

03:44 14         A.   Essentially to distribute or increase

03:44 15    distribution of Ripple, in the territory defined

03:44 16    under agreement.

03:44 17         Q.   When you say "increase the distribution of

03:44 18    Ripple," do you mean the distribution of XRP?

03:44 19         A.   Yes, the distribution of XRP in Japan,

03:44 20    specifically.

03:44 21         Q.   By entering into the joint venture

03:45 22    agreement, did Ripple help facilitate the trading of

03:45 23    XRP?

03:45 24              MR. FIGEL:  Objection.

03:45 25         A.   The object was to have SBIH, I think it's

177

03:45  1    SBIH's clients and future clients use XRP.

03:45  2        Q.   For what?

03:45  3        A.   For whatever purpose that they wanted to

03:45  4    use it.

03:45  5        Q.   Are you offering any opinion on what

03:45  6    anybody who obtained XRP from the joint venture

03:45  7    intended to do with it?

03:45  8             MR. FIGEL:  Objection.

03:45  9        A.   No.

03:45 10        Q.   Did the joint venture -- any of the joint

03:45 11    venture agreements contain a provision restricting

03:46 12    what could be done with any of the XRP Ripple

03:46 13    provided?

03:46 14        A.   No.

03:46 15        Q.   Can you look at paragraph 219 of your

03:46 16    report.

03:47 17             Do see how paragraph 219 of your report

03:47 18    references an entity called ████?

03:47 19        A.   Yes.

03:47 20        Q.   And do you have Exhibit 21 in front of you?

03:47 21        A.   Yes.

03:47 22             (████ Contract was marked Exhibit AS-21 for

03:47 23        identification, as of this date.)

03:47 24        Q.   Is Exhibit 21 one of the ████ contracts

03:47 25    referenced in paragraph 219?

                                                            178

03:47  1          A.    Yes.

03:47  2          Q.    And what was the purpose of the

03:48  3    contemplated arrangement between Ripple and ███?

03:48  4          A.    ███ was supposed to create a -- a fund and

03:48  5    sell shares in it to investors.

03:48  6                And the fund was going to hold as an asset

03:48  7    XRP.

03:48  8          Q.    Is it your understanding that the potential

03:48  9    investors in the XRP fund would seek to profit off

03:48 10    their investment?

03:48 11                MR. FIGEL:  Objection.

03:48 12          A.    I think everybody seeks to profit off their

03:48 13    investment.

03:48 14          Q.    And you write in paragraph 219 that the

03:48 15    parties contemplated that interest in the fund would

03:49 16    be offered and sold in the United States pursuant to

03:49 17    an exemption from registration under the Securities

03:49 18    Act?

03:49 19          A.    Yes.

03:49 20          Q.    Would the interests in the ███ fund sold

03:49 21    to investors, would those have been securities under

03:49 22    the federal securities laws?

03:49 23                MR. FIGEL:  Objection.

03:49 24          A.    I don't have an opinion about that.

03:49 25          Q.    Do you know why the ███ fund was never

                                                              179

| 03:49 | 1 | established? |
| 03:49 | 2 | A.    No. |
| 03:49 | 3 | MR. HANAUER:  Can I take one minute to |
| 03:49 | 4 | confer with counsel. |
| 03:49 | 5 | THE VIDEOGRAPHER:  Going off the record. |
| 03:49 | 6 | The time is 3:51. |
| 03:50 | 7 | (Discussion off the record.). |
| 03:50 | 8 | THE VIDEOGRAPHER:  Back on the record.  The |
| 03:50 | 9 | time is 3:51. |
| 03:50 | 10 | MR. HANAUER:  Thank you very much, |
| 03:50 | 11 | Professor Schwartz.  We have no further questions at |
| 03:50 | 12 | this time. |
| 03:50 | 13 | THE WITNESS:  Okay. |
| 03:50 | 14 | MR. FIGEL:  And on behalf of Ripple, we |
| 03:50 | 15 | have no questions. |
| 03:50 | 16 | I'm not sure if anyone else on -- do |
| 03:50 | 17 | counsel for the other parties have any questions for |
| 03:50 | 18 | Professor Schwartz? |
| 03:50 | 19 | MS. PROSTKO:  No.  On behalf of Larsen |
| 03:50 | 20 | defendant, we have no questions, but we thank you |
| 03:50 | 21 | very much for your time today. |
| 03:50 | 22 | MR. BONILLA:  I have no questions, for |
| 03:50 | 23 | Defendant Garlinghouse. |
| 03:50 | 24 | MR. HANAUER:  Do you do the reserving |
| 03:50 | 25 | signature on the record here in New York? |

180

```
03:50   1              MR. FIGEL:  Yes.

03:50   2              We will just assume it.

03:51   3              MR. HANAUER:  Okay.  Thank you.

03:51   4              THE VIDEOGRAPHER:  That concludes today's

03:51   5   deposition.  The time is 3:52.

        6              (Time noted: 3:52 p.m.)

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25
```

181

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4         I, ALAN SCHWARTZ, do hereby declare under

 5         penalty of perjury that I have read the entire

 6         foregoing transcript of my deposition testimony,

 7         or the same has been read to me, and certify that

 8         it is a true, correct and complete transcript of

 9         my testimony given on February 11, 2022, save and

10         except for changes and/or corrections, if any, as

11         indicated by me on the attached Errata Sheet, with

12         the understanding that I offer these changes and/or

13         corrections as if still under oath.

14           _____ I have made corrections to my deposition.

15           _____ I have NOT made any changes to my deposition.

16

17  Signed: _____
                ALAN SCHWARTZ
18

19  Dated this _____ day of _____ of 20____.

20

21

22

23

24

25
                                                          182
```

```
 1                C E R T I F I C A T E

 2

 3   STATE OF NEW YORK     )
                           )  Ss.:
 4   COUNTY OF NEW YORK    )

 5

 6        I JEFFREY BENZ, a Certified Realtime Reporter,

 7   Registered Merit Reporter and Notary Public within and

 8   for the State of New York, do hereby certify:

 9        That the witness whose examination is hereinbefore

10   set forth was duly sworn by me and that this transcript

11   of such examination is a true record of the testimony

12   given by such witness.

13        I further certify that I am not related to any of

14   the parties to this action by blood or marriage and that

15   I am in no way interested in the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17   this  14th  of  February  , 2022

18

19   _____

20   JEFFREY BENZ, CRR, RMR

21

22

23

24

25
```

```
1                          ERRATA SHEET

2       Deposition of: ALAN SCHWARTZ
        Date taken:  FEBRUARY 11, 2022
3       Case:  SEC v. RIPPLE LABS, INC., et al.

4       PAGE  LINE
        _____ _____    CHANGE:  _____
5                      REASON:  _____

6       _____ _____    CHANGE:  _____
                       REASON:  _____
7
        _____ _____    CHANGE:  _____
8                      REASON:  _____

9       _____ _____    CHANGE:  _____
                       REASON:  _____
10
        _____ _____    CHANGE:  _____
11                     REASON:  _____

12      _____ _____    CHANGE:  _____
                       REASON:  _____
13
        _____ _____    CHANGE:  _____
14                     REASON:  _____

15      _____ _____    CHANGE:  _____
                       REASON:  _____
16
        _____ _____    CHANGE:  _____
17                     REASON:  _____

18      _____ _____    CHANGE:  _____
                       REASON:  _____
19
        _____ _____    CHANGE:  _____
20                     REASON:  _____

21      _____ _____    CHANGE:  _____
                       REASON:  _____
22
        _____ _____    CHANGE:  _____
23                     REASON:  _____

24
        Signed_____
25      Dated_____

                                                              184
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**