# Exhibit 3

## FILED UNDER SEAL

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/23   Page 2 of 135

SEC v Ripple
EXHIBIT

**AS-5**

A. Schwartz  2.11.2022

**EXHIBIT**

AS-5

# TRANSCRIPT OF RECORD

## SUPREME COURT OF THE UNITED STATES

### OCTOBER TERM, 19**720**

No. 843

## SECURITIES AND EXCHANGE COMMISSION, PETITIONER

vs.

## W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC.

ON WRIT OF CERTIORARI TO THE UNITED STATES CIRCUIT COURT
OF APPEALS FOR THE FIFTH CIRCUIT

# INDEX

PAGE

Complaint ........................................ 1
Answer of Defendants to Complaint .............. 4

Stipulation of Facts ............................ 5
    Exhibit "A"—Form of Contract ............... 11
    Exhibit "B"—Form of Agreement ............. 15
    Exhibit "B-1"—Typical Sales Talk ............ 20
    Exhibit "C"—Photostat of Circular entitled "Play
        in Florida at Howey-in-the-Hills" ...... 29
    Exhibit "D"—Schedule Reflecting Sales of Land
        by the Howey Company and Correspond-
        ing caretaking Contracts of the Service
        Company during Three Year Period ended
        May 31, 1943 ......................... 31
    Exhibits "E" to "H" inclusive—Photostat of
        Pictures ............................. 35

Motion of Plaintiff for Summary Judgment ....... 39
Petition of Plaintiff and Order to withdraw motion
    for Summary Judgment .................. 39

TRANSCRIPT OF PROCEEDINGS ............... 41
    Colloquy between Court and Counsel ........ 43

Evidence for Plaintiff:
    Testimony of William A. McClain ......... 43

Evidence for Defendants:
    Testimony of Dodge Taylor .............. 58

Statement made by the Court ............... 75
Statement made by Mr. Bedell, Counsel for
    Defendants ........................... 77

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/08/23  Page 4 of 135

## INDEX—Continued.

PAGE

Transcript of Proceedings—(Continued):
    Statement made by Mr. McClain, Counsel for
        Plaintiff .............................    78

    Colloquy between Court and Counsel ........    79

Motion of Plaintiff to adopt the Proposed Findings
    of Fact .................................    80
    Plaintiff's Proposed Findings of Fact .........    81

Defendants Proposed Findings of Fact and Con-
    clusions of Law ...................:...........    90
Findings of Fact and Conclusions of Law by the
    Court, dated 4/18/45 ......................    94
Memorandum Opinion, entered 4/17/45 ..........   103
Final Judgment, entered 4/18/45 ...............   108
Notice of Appeal ..............................   109
Appellant's Statement of Points on Appeal ........   110
Appellant's Designation of Contents of Record on
    Appeal ...................................   111

Appellees' Additional Designation of Contents of
    Record on Appeal .........................   113
    Exhibit Defendant #1—Excerpt from the U. S.
        Census of 1940 ......................   114
    Exhibit Defendant #2—Large Map (Omitted
        from Printed Record) Original on File
    Exhibit Plaintiff's "J"—Form of Agreement ....   117

Order transmitting Original Exhibit—Map to C. C. A.   120
Order dated 6/25/45 directing filing of Plaintiff's and
    Defendants' Proposed Findings of Fact ......   120
Clerk's Certificate ..............................   122

**PETITION FOR CERTIORARI FILED FEBRUARY 12, 1946
CERTIORARI GRANTED MARCH 25, 1946**

Proceedings in U. S. C. C. A., Fifth Circuit_____ 123
    Minute entry of argument and submission_____ 123
    Opinion, Hutcheson, J_____ 123
    Judgment _____ 128
    Clerk's certificate_____ 128
Order allowing certiorari_____ 129

Case No. 220 Orlando Civil.

S. E. C. Attorneys:
  Roger Foster, Solicitor,
     Philadelphia, 3, Pa.
  Wm. A. McClain, Attorney,
     415 Palmer Bldg.,
       Atlanta, 3, Ga.

Defts. Attorneys:
  C. E. Duncan,
     Tavares, Fla.
  George C. Bedell,
     Bisbee Bldg.,
       Jacksonville, 2, Fla.

---

3              **COMPLAINT.**

Filed May 16, 1944.

UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF FLORIDA.

Civil Action, File No. 220 Orl. Civ.

SECURITIES AND EXCHANGE COMMISSION,
                          Plaintiff,

v.

W. J. HOWEY COMPANY, and HOWEY-IN-THE-HILLS
SERVICE, INC.,
                          Defendants.

**2**

1. It appears to the plaintiff that the defendants are engaged and are about to engage in acts and practices which constitute and will constitute violations of Section 5 (a) of the Securities Act of 1933, 15 U. S. C. 77 (e) (a); and plaintiff, pursuant to Section 20 (b) of the Act, 15 U. S. C. 77 t (b), brings this action to enjoin such acts and practices.

2. This action arises under Section 22 (a) of the Securities Act of 1933, 15 U. S. C. 77 v (a).

3. Since on and prior to January 1, 1936, the defendants have been and are now selling securities evidenced in part by warranty deeds and development contracts in connection with the sale of land planted to citrus trees in Lake County, Florida, and in the sale of such securities have been and are now directly and indirectly using the mails and means and instruments of transportation and communication in interstate commerce and have been and are now directly and indirectly carrying such securities and causing them to be carried through the mails and in interstate commerce, by means and instruments of transportation, for the purpose of sale and for delivery after sale.

4. No registration statement with respect to such securities has been or is now in effect with the Securities and Exchange Commission.

5. The defendants will, unless enjoined, continue to engage in the acts and practices set forth in this complaint.

Wherefore, the plaintiff demands a preliminary and final injunction enjoining the defendants, their officers, servants, agents, employees, successors and assigns, and each of them, from:

**3**

(a) Directly or indirectly

(1) Making use of any means or instrument of transportation or communication in interstate commerce, or of the mails, to offer or sell securities evidenced in part by warranty deeds and development contracts in connection with the sale of land planted to citrus trees in Lake County, Florida, or any other security related to the sale and cultivation of citrus groves, through the use or medium of any prospectus or otherwise;

(2) Carrying such securities or causing them to be carried through the mails or in interstate commerce, by any means or instrument of transportation, for the purpose of sale or for delivery after sale; unless and until a registration statement is in effect with the Securities and Exchange Commission as to such securities; provided that the foregoing shall not apply to any security or transaction which is exempt from the registration provisions of Section 5 of the Securities Act of 1933.

> EDWARD H. CASHION,
> (Edward H. Cashion)
> Counsel.
> WILLIAM GREEN,
> (William Green)
> Regional Administrator.
> WILLIAM A. McCLAIN,
> (William A. McClain)
> Attorney.
> SECURITIES AND EXCHANGE
> COMMISSION.

415 Palmer Building,
Atlanta, Georgia.

State of Florida,
County of Duval.

I, William A. McClain, one of the attorneys for the plaintiff, make oath that the facts alleged in this Complaint

are true to the best of my knowledge and belief.

WILLIAM A. McCLAIN.

(William A. McClain)

Sworn and subscribed to before me this 16th day of May, 1944.

EDWIN R. WILLIAMS,

(Seal)　　　　　Clerk, U. S. District Court, Jacksonville, Florida.

By OCTAVIA MOORE,

Deputy Clerk.

————

THE ANSWER OF W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC., TO THE COMPLAINT OF SECURITIES AND EXCHANGE COMMISSION.

5　　　　　　Filed May 20, 1944.

(Title Omitted.)

The defendants are without knowledge that the plaintiff has ever determined that defendants are engaged or about to engage in acts and practices which constitute or will constitute violations of any provision of the Securities Act of 1933, and on the contrary allege the fact to be that the plaintiff and defendants have agreed to submit for determination of this Court the question as to whether the business conducted by the defendants is subject to the said Act upon a Stipulation, which Stipulation has been entered into between plaintiff and defendants, and is ready to be filed with this Answer. And these defendants say that they are advised and believe and upon information and belief allege the fact to be that their business is not

subject to the said Act. And these defendants say it is untrue that on or prior to January 1, 1936, or at any other time, defendants have been selling securities as in Paragraph "3" of the Complaint alleged, and it is untrue that in the sale of securities defendants have been or are now directly or indirectly using the mails or means or instruments of transportation or communication, or directly or indirectly carrying or causing to be carried securities for the purpose of sale or delivery after sale, as in said paragraph "3" alleged. And it is untrue that these defendants, or either of them, has any purpose so to do.

C. E. DUNCAN,
Per   GEORGE C. BEDELL,

Tavares, Florida.

GEORGE C. BEDELL,
(George C. Bedell)
Attorneys for defendants.

703 Bisbee Building,
    Jacksonville, Florida.

---

6                      STIPULATION.

Filed May 20, 1944,

(Title Omitted.)

1. It is Hereby stipulated and agreed by and between the Securities and Exchange Commission, Plaintiff, by its undersigned attorney, J. Cecil Penland, and W. J. Howey Company and Howey in the Hills Service, Inc., defendants, by their undersigned attorney, George C. Bedell, as follows:

2. The W. J. Howey Company, hereinafter referred to as the Howey Company, is a corporation organized under

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/08/23 Page 11 of 135

the laws of the State of Florida in 1922 with its principal place of business at Howey-in-the-Hills, Florida.

3. Howey-in-the-Hills Service Inc., hereinafter referred to as the Service Company, is a corporation organized under the laws of the State of Florida, in 1932, with its principal place of business at Howey-in-the-Hills, Florida.

4. The officers and directors of the Howey Company and the Service Company are the same, namely:

C. V. Griffin, President and Treasurer and Director.

Dodge Taylor, Vice President and Director.

R. W. Holsclaw, Secretary and Director.

5. The stockholders of the Howey Company and the Service Company are substantially the same, namely:

|  | Howey Company | Service Company |
|---|---|---|
| C. V. Griffin ............... | 510 shares | 510 shares |
| Dodge Taylor ............... | 228 shares | 229 shares |
| R. W. Holsclaw ............. | 1 shares | 0 shares |
| C. M. Pinkerton ............ | 1 shares | 1 shares |
| Howey-in-the-Hills Investment Corp. ....... | 260 shares | 260 shares |
|  | 1000 | 1000 |

6. The Howey Company and the Service Company share the same offices and utilize the same facilities and personnel.

7. The Howey Company and the Service Company are under direct common control.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/22 Page 12 of 135

8. The Howey Company is the owner of large tracts of land in Lake County, Florida, which it is now and for more than twenty years has been planting to citrus trees and selling to various purchasers for development into citrus groves as hereinafter described. Form of contract, Exhibit A, made a part hereof, has been the standard form of land sales contract used by the Howey Company since 1935. In occasional instances modifications are used to meet the requirements of the individual purchaser.

9. The prices charged for the land, which vary according to the number of years it has been planted to citrus trees before it is sold, are as follows:

One year old groves $675 per acre.

Two year old groves $750 per acre.

Upon full payment of the purchase price the land is conveyed to the purchaser by a warranty deed. If the purchaser fails to pay the required installments, the Howey Company may foreclose the contract in the same manner as it would foreclose a mortgage under Florida laws.

10. The Service Company is now and since its organization has been engaged in the business of cultivating and developing citrus groves on land in Lake County, Florida. A copy of Form 1-B, the form of agreement used in said cultivation and development of citrus groves, is attached hereto as Exhibit B and made a part hereof. This form of contract has been the standard form of service contract used by the Service Company since 1935. In occasional instances modifications are used to suit the requirement of the owner.

8

11. By such service contract the Service Company undertakes to properly maintain, fertilize, spray and cultivate and otherwise care for the citrus groves growing on the land for a specified period for the following service fees:

For the first five years $40 per acre, per year.

For bearing groves $30 per acre, per year.

In addition to the stipulated fees, the owner of the land agrees to pay taxes as and when they become due, the market price delivered at the described property of pruning, dusting material, spraying, spraying material, special treatment, seed for cover crop, sowing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of the Service Company, all as set forth in Exhibit B; and as set forth in said Exhibit B, the purchaser grants full and complete possession of the premises to the Service Company which agrees to pay the purchaser a nominal rental and marketing of the fruit by the Service Company is therein provided for.

12. The Howey Company maintains the Floridan Country Club, a resort hotel owned by the Howey Company. While tourists and vacationists who patronize the Club are being escorted around the golf course, through the bridle paths and over the lakes, their attention is directed to the citrus groves adjoining these attractions. They are informed that young groves are for sale and if they show an interest in purchasing a grove the respective operations of the Howey Company and the Service Company are explained. Attached hereto and made part hereof as

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 14 of 135

Exhibit B-1 is a typical sales talk employed by representatives acting for the two companies in effectuating sales. A circular describing the entertainment offered by the Club, entitled "Play in Florida at Howey-in-the-Hills" is attached as Exhibit C and made a part hereof.

13. The acreage sold by the Howey Company and groves cared for by the Service Company are within a radius of eight to ten miles of Howey-in-the-Hills, Florida. About 90% of all transactions are closed at the office of the two companies, at Howey-in-the-Hills, Florida. Generally, where the Howey Company is selling the acreage and the Service Company is entering into a contract for its care, the agreements on Forms 1 and 1-B, Exhibits A and B, are executed simultaneously.

14. The customers are for the most part residents of states other than Florida. They do not possess the knowledge, skill and equipment necessary for the care and cultivation of citrus groves. In numerous instances the purchasers have acquired homes in the vicinity, or spend a portion of each year in the vicinity, and rely on the Service Company or some other service concern to care for the grove and market the fruit, frequently inquiring and making suggestions both with respect to care of the grove and marketing of the fruit.

15. The Howey Company will sell acreage to persons who do not intend to use the Service Company as their caretaker. Moreover, the Service Company will develop groves on land not purchased from the Howey Company and solicits service contracts from others than purchasers from the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/22 Page 15 of 135

and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company.

16.   Prospective customers have an opportunity to learn that six to eight competing service companies operate in the same vicinity of Howey-in-the-Hills, Florida.   In the first place, said competitors post signs by the groves serviced by them which are visible from the highways, and in the second place, they send advertisements to grove owners.   Moreover, the officers of the Howey Company and the Service Company acquaint prospective purchasers with the existence of competitors.

17.   The agreement to purchase land planted to young citrus trees and the development agreement are customarily offered to prospective customers at the same time. The purchaser is encouraged to enter into a caretaking agreement with the Service Company.   He is, of course, informed that the Service Company's competency and efficiency in caring for citrus groves exceed those of its competitors.

18.   During the year ended May 31, 1941, the Howey Company sold 10 groves involving 14.51 acres; and the Service Company is caring for 8 of these groves involving 12.69 acres.   During the year ended May 31, 1942, the Howey Company sold 21 groves, involving 117.78 acres; and the Service Company is caring for 16 of these groves involving 99.31 acres.   During the year ended May 31, 1943, the Howey Company sold 20 groves involving 62.97 acres; and the Service Company is caring for 18 of these groves involving 54.54 acres.   Thus, of the 195.26 acres sold by the Howey Company during the three year period, 166.54 acres are being cared for by the Service Company, or 85%.   A schedule showing the sales made by the Howey Company during the three year period

ended May 31, 1943, together with a brief description of the service agreement entered into by the Service Company, where applicable, is attached as Exhibit D and made a part herof. Of a total of 2487.36 acres of groves under cultivation by the Service Company in March, 1944, more than 1400 acres are of groves more than ten years old.

19. The mails and instruments of transportation and communication in interstate commerce are now and for sometime have been used in the sale of said agreements, Forms 1 and 1-B, and they are and for sometime have been, carried through the mails and in interstate commerce by means and instruments of transportation for the purpose of sale and for the delivery after sale.

20. At no time has a registration statement been in effect with this Commission under the Securities Act of 1933 with respect to these agreements, Form 1 and Form 1-B.

21. Photographs, Exhibits E, F, G, and H, show respectively a grove 1 year from planting, a grove 3 years from planting, a grove 7 years from planting, and a grove 20 years from planting.

> C. E. DUNCAN,
> GEORGE C. BEDELL,
>   Attorneys for Defendants.
> WM. A. McCLAIN,
>   Attorney Sec. & Exchange
>   Comm., Plaintiff.

11                    EXHIBIT "A".

Articles of Agreement.

............... 19 ....

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 17 of 135

Amount paid at time of purchase $.........

W. J. Howey Company,
    Howey-in-the-Hills, Florida.

Gentlemen: I hereby apply for the purchase of the following described property, to-wit: ...................
............................................ ............
Section .... Township .... South, Range .... East, in Lake County, Florida, containing .... acres, more or less, subject to Government survey and subject to twenty (20) feet for roadways on two sides of each forty acres, as well as to all roadways now vested in the County of Lake or in the State of Florida. The price of the land as now developed is $......... All payments other than cash or its equivalent to be evidenced by promissory notes of even date herewith, bearing interest from date thereon at six per cent. per annum, interest payable annually.

Summary of all payments follows:

1. Cash ......................... $......
2. Note due .. months after date .. $......
3. Note due .. months after date .. $......
4. Note due .. months after date .. $......
5. Note due .. months after date .. $......
      Total ................... $...... $......

Upon the full payment of the total consideration hereinabove set forth, said W. J. Howey Company agrees to deliver, or cause to be delivered, a warranty deed conveying merchantable title. W. J. Howey Company further agrees to pay all taxes due to the date of this contract, purchaser to pay all subsequent taxes; provided, however that the W. J. Howey Company shall have the right to pay all subsequent taxes on behalf of the purchaser, and in

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 18 of 135

such event the taxes so paid shall be charged to the purchaser, together with interest at six per cent. per annum thereon from date of payments, and the said warranty deed embracing the said land, as aforesaid, shall not be delivered until such taxes and interest are paid.

The purchaser his heirs or assigns, agrees to purchase said property upon the terms and conditions herein set forth, and make all payments promptly when and as the same severally fall due.

It is understood that, from the date of the acceptance of this application by W. J. Howey Company, the purchaser shall have the right to use and occupy the foregoing premises and shall have full title to all rents and profits therefrom, excepting the fruit crop for the citrus marketing season of 19.. to 19...

The purchaser, however, promises and hereby agrees that the W. J. Howey Company does have a lien for money due hereunder upon all rents and profits, including returns from the sale of any fruit, from said premises from the date of the acceptance of this application until all sums due hereunder have been paid to W. J. Howey Company, and it is further agreed that such sums accruing by reason of such rents and profits from said premises shall be paid to W. J. Howey company and applied first on interest and then on principal sums last falling due under the terms hereof. This contract, upon its acceptance, shall constitute a notice and direction to any third party, whether an individual or corporation, having in its possession any money accruing from such rents and profits from the premises to pay the same to W. J. Howey Company to be applied according to the terms hereof whenever accompanied by presentation to such third party of a statement of the monies due hereunder, sworn to by an officer of the W. J. Howey Company.

**14**

If any of the said sums of money referred to be not promptly and fully paid within thirty days next after the same severally becomes due and payable, or if each and every the stipulations, agreements, conditions and covenants to be performed by the purchaser as set forth in said primossory notes and this contract, or either, are not duly performed, complied with and abided by, the said aggregate sum mentioned in this contract, remaining unpaid, either evidenced by promissory notes herein or otherwise, shall become due and payable forthwith or thereafter at the option of the W. J. Howey Company, its successors or assigns, as fully and completely as if the total consideration was originally stipulated to be paid on such day, anything in said promissory notes or in this agreement to the contrary notwithstanding; in which event the W. J. Howey Company shall have the option to foreclose this contract upon the premises hereinabove described and upon any citrus crop growing or to be grown upon the said premises, or either of them, in the same manner as the foreclosure of a mortgage or lien under the laws of the State of Florida, and in case of foreclosure the purchaser covenants and agrees to pay all Court costs, including a reasonable attorney's fee, for the foreclosure thereof. Provided further that, in the event the purchaser shall fail to pay any of said sums of money in this contract referred to within thirty days next after the same become severally due and payable, or if each and every the stipulations, agreements, conditions and covenants to be performed by the purchaser as set forth in said promissory notes and this contract, or either, are not duly performed, complied with and abided by, all sums of money then paid shall at any time after such default, at the option of said W. J. Howey Company, be forfeited to it as rent and liquidated damages, and all rights and interest in and to said described lands and appurtenances thereunto belonging as acquired by the purchaser herein shall

**15**

be forfeited as rents and liquidated damages to the said
W. J. Howey Company, and this purchase agreement
canceled; and in the event this latter option is exercised
by the W. J. Howey Company, it shall return to the pur-
chaser all unpaid notes, duly canceled. Time being the
essence of this contract. All remittances must be made
payable to the order of W. J. Howey Company.

This application shall not become a contract of pur-
chase until accepted by said W. J. Howey Company at its
office at Howey-in-the-Hills, Florida.

Name and address of purchaser's bank ..............
.....................................................
Address.

....................
Purchaser.

....................
Purchaser.

....................
Address.

Accepted at Howey-in-the-Hills, Florida ...........
19.....

W. J. HOWEY COMPANY,
By ....................

14                    EXHIBIT "B".

This Indenture, Made and Entered into this .... day
of ..........., A. D. 19... Between ...................
hereinafter called party of the first part, and Howey-in-
the-Hills Service, Inc., a corporation organized and exist-
ing under the laws of the State of Florida, hereinafter
called party of the second part.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 21 of 135

Whereas, First party now owns the land hereinafter more particularly described and second party is and has been for some time engaged in the business of cultivating and building citrus groves and is properly equipped for such purpose, Witnesseth,

That for and in consideration of the mutual and dependent covenants hereinafter made, the parties to this indenture have agreed and do agree as follows:

First: (a) First party does hereby grant full and complete possession to second party for a period of .... years (from the date hereof) (from the date of the planting to citrus) of the following described property, to-wit: .................................................... Section ...., Twp. .... South, Range .... East, in Lake County, Florida, containing .... acres, more or less.

(b) First party does hereby agree to pay to second party the following sums:

(1) The sum of $...... per acre per year, said yearly payment to the divided into twelve (12) equal monthly installments, the first of which shall be payable on the first day of the month succeeding the date on which this indenture begins to operate.

(2) The market price delivered at the above described property of pruning, dusting, dusting material, spraying, spraying material, special treatment, seed for cover crop, sowing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of second party, such sums to be payable upon demand.

(3) First party shall pay taxes when and as they become due and, in the event first party fails to pay the

Case 1:20-cv-10832-AT-SN Document 598-3 Filed 08/09/23 Page 22 of 135

taxes as aforesaid, second party shall have the right to pay same and charge the amount so paid to first party, which shall then be considered part of the sums due under this indenture, and shall be payable upon demand.

Second: (a) Second party does this day pay unto the first party the sum of $...... as rental, the receipt of which is hereby acknowledged.

(b) Second party does hereby covenant that it will properly maintain, fertilize, spray, cultivate and otherwise care for the above described property and the citrus grove located and growing thereon for the full term hereof, according to its best judgment.

(c) Second party further covenants and agrees to pay over to said first party the net proceeds of the fruit produced upon the above described lands after deducting therefrom any cost or charge incurred by second party in the gathering, packing, marketing and selling of each crop of fruit during the life of this indenture, as well as any of the sums which may be accrued to second party under the terms of paragraph First: (b) (1) through (b) (3) hereinabove set forth, regardless of whether or not the same may then be due. Such processes of harvesting and sale shall be performed by second party at the time and in the manner which in its judgment seem best. It is further mutually agreed upon and understood that second party may at its discretion market the fruit upon the property above described in pools with other fruit of like variety and grade controlled or owned by second party and, if marketed in a pool, the proceeds of any and all shipments shall be pooled with the proceeds of other fruit of like variety and grade so marketed by second party as aforesaid and then the net proceeds of each pool shall be proportioned equally and paid to each member of such

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 23 of 135

pool, in accordance with the number of standard boxes contributed by each member of such pool. The pooling provision of this section shall not apply to fruit sold on the tree.

(d)  In the event it is mutually agreed upon in writing between the parties hereto and provided there are no moneys accrued under the terms of this indenture from first party to second party at the time any specific crop is harvested, the first party shall thereupon own said specific crop of fruit and shall have the right of entry in the above described premises to dispose of the same in any manner whatsoever he may desire.

Third:  It is fully understood and agreed by the parties hereto that the consideration for this lease and agreement herein entered into by second party to maintain the grove and to pay over to first party the net proceeds from the sale of fruit therefrom based upon the nominal terms hereinabove set forth, and first party therefore enters into this present agreement to pay the sums above specified in paragraphs First:  (b) (1), (2) and (3).

Fourth:  The first party hereby assumes the risk of natural conditions and governmental rules and regulations, as well as market conditions, which may operate to prevent the production of a crop or the realization of net proceeds therefrom.

Fifth:  In the event second party shall extend the time of payment of any of the sums due or to become due from first party under the terms of paragraphs First:  (b), (1), (2) and (3) above by the acceptance of a note or other evidence of indebtedness, such instrument shall not be construed as payment, but shall be merely the evidence of

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/09/23  Page 24 of 135

the indebtedness, and shall be secured by this contract as though originally incorporated herein.

Sixth:  (a) It is further agreed that first party, his heirs and assigns, does hereby grant to second party whatever title or interest first party, his heirs or assigns, now owns, or shall hereafter acquire, in the premises hereinabove described, and the crops grown or to be grown thereon, and either of them to hold the same as security for all payments due from first party to second party under the terms of this indenture, and that in the event first party, his heirs or assigns, shall be in default for a period of thirty days in the payment of any of the sums so falling due, then second party shall immediately have the option to foreclose the lien hereby granted upon the premises and crops above described for the amounts then due under this indenture.  In the event it shall become necessary to place said claim or lien in the hands of an attorney for collection, then first party hereby covenants to pay a reasonable attorney's fee for the collection thereof, together with all costs and in addition thereto covenants and agrees to pay second party, its successors or assigns, all sums falling due according to the terms of this indenture from the date of such default to the time that final decree may be entered for the amount due.

(b)  It is undertsood that all payments falling due under the terms of this indenture from first party to second party shall be based upon the fiscal year as described in paragraph First:  (b) (1) and that these payments shall not be allocated in any manner whatsoever so as to apply to any particular crop; it being the intention of this instrument that all of the covenants herein contained are mutual and dependent during the life of this indenture and are not to operate independently or severally.

20

(c)  The exercising of the option to foreclose shall not operate as a breach or rescission of this indenture, or any of the terms hereof, on the part of second party, but in the event that final decree is secured by said second party, then this indenture shall terminate in all respects.

Seventh:  This agreement is executed in duplicate and is binding upon the parties hereto, their heirs, successors and assigns, and it expressly agreed upon that the covenants and conditions of this indenture shall run with the land and with the reversion.

Executed at Howey-in-the-Hills, Lake County, Florida, on the day and year first above written.

(Seal) .....................

Party of the First Part.

(Seal) .....................

Party of the First Part.

HOWEY-IN-THE-HILLS SERV-ICE, INC.,

By ....................

Vice-President, Party of the Second Part.

Signed, sealed and delivered in the presence of:

.....................

.....................

.....................

.....................

18              EXHIBIT B-1.

The development of what is known as "Howey-in-the-Hills" was started by Mr. W. J. Howey in 1915 when he purchased a large tract of land, approximately 100,000

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/08/23 Page 26 of 135

acres in extent. Of this area, about 40,000 acres is water
and waste land, and the balance is good citrus land. There
has been developed about 10,000 acres of grove which is
now in bearing and about 2,000 acres of young groves
which will be bearing in another four or five years.

Mr. Howey died in 1938 and Mr. Griffin and I bought
the stock in the operating companies in 1940. We have
been trying to build up the property as a tourist resort,
and have renovated the hotel building, and made various
improvements in it, such as the bathing beach, the stables,
and the golf course. We are also developing as rapidly as
we can the remaining citrus acreage, and during the last
three years we have planted about 500 acres of grove
annually. We are both primarily in the citrus business and
expect to continue to be all our lives. Each year we set
aside half or more of the newly planted groves to keep,
and these are not for sale. The balance of the newly
planted groves we do offer for sale to help us finance
additional development.

The Howey tract is one of the most favored citrus areas.
It lies imemdiately south of several large lakes, such as
Lake Harris, Lake Griffin, Lake Eustis, and Lake Yale.
There are between two and three hundred smaller lakes
interspersed through the property. These lakes, coupled
with the rolling topography of the land, give the area re-
markable resistance to frost, as the lakes tend to warm
any cold air which may descend on us from the north. In
addition, cold air tends to drain down the hillsides into
the valleys. In the history of this property the principal
damage to the trees from cold has come in the pockets
from which there is no air drainage, and we have re-
moved all the trees from such areas.

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/22   Page 27 of 135

The entire area is also underlaid with a red clay sub-soil, such as you see on these roads. A citrus tree has a long tap root through which it absorbs its moisture. This tap root customarily grows until it reaches moisture, which in this country is this clay sub-soil. Because this clay holds moisture just like a blotter, we have here a remarkable resistance to drought. In case of dry weather, trees here will show no signs of distress long after trees on the low lands show wilt.

In choosing the varieties of fruit which we are going to grow, we are guided entirely by commercial consider-ations. For that reason we don't propagate nor grow any varieties except those with a ready market acceptance. It takes two or three years in the nursery and another five years in the grove to get a tree ready to bear, and so we want to know that we're going to have fruit we can sell before we begin to grow a tree.

In some of the earlier plantings, there are Duncan grape-fruit and Pineapple oranges. These are fine varieties of fruit, but they have the market disadvantage of being seeded fruit and of coming on the market in mid-season, when the great bulk of the citrus crop moves. Plantings in later years were almost exclusively Marsh seedless grape-fruit and Valencia oranges. These are both late vari-eties, coming on the market in March, April, and May, or, in some cases, as late as June. Because they move after the larger volume of citrus is off the market and because they are seedless, they have ready market acceptance, and almost always bring preferred prices. In fact, these two varieties have for some years been the money crops of Florida citrus. Yet they do have certain disadvantages. All grapefruit varieties are fast growing, heavy bearing trees, but there have been some seasons, particularly dur-ing the depression, when grapefruit was hard to sell

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/22 Page 28 of 135

Valencias, while they almost always bring good prices, are a relatively slow growing tree and relatively light bearers. The fruit on both varieties, because they mature late in the season, must be carried on the tree through the winter, which means that there is some element of frost risk in them.

It is to overcome these disadvantages that we have largely confined our plantings in the last three years to the Hamlin orange. This tree and the fruit seemingly possess every essential advantage for citrus. It is a fast growing, prolific bearing tree. The fruit, properly grown, is of exceptionally fine quality. It has smooth texture, thin skin, and is practically seedless. It matures in October or early November and is the first Florida fruit on the market. Because it comes on the market by itself, it always brings a preferred price. The price may not be quite as high as Valencias bring later in the season, but because the production is greater the revenue from each tree is more than from a Valencia. The early maturity practically eliminates the frost risk, and also any loss from a fall drought which we quite often have. Because the fruit is off the trees early, the trees can be cultivated and fertilized in the fall and winter with no other idea than to produce the next crop of fruit, and without having to safeguard the quality of the crop on the trees, as we must do with Valencias. While we have groves planted to all the standard varieties, we think the Hamlin orange is the finest of all of them, and if anyone wanted a small grove of one variety, we think this is the one he should choose.

Our cultural practices on young groves are intensive cultivation and fertilization for nine months of the year. The tree rows are worked every ten days or two weeks during that period and the trees are fertilized every sixty days. In December, January and February we keep the

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/23   Page 29 of 135

trees as dormant as we can, because it is in those three months we will get cold weather if we're going to have any. Pruning on young trees is mainly confined to cutting off lemon sprouts coming out below the bud. There is practically no spraying on young trees, although this fall we did give all the one and two-year-old trees a nutritional spray to kill scale, which seemed to be generally present in minor quantities.

It costs about $50 per acre per year on an average to take care of a young grove in this manner. It could be done cheaper, but our methods produce a heavy, lush growth and get a bearing tree quicker than the cheaper methods. And that is what we're after—to get a bearing tree as quickly as we can. We continue with these methods until the tree is about five years old, when we let it bear its first crop. Then we radically change our cultural methods to produce fruit rather than tree growth.

In a bearing grove, we fertilize rather heavily twice a year, once in May and again in December or January. A Grapefruit tree the size of most of our bearing trees gets 20 to 25 pounds in each application, and an orange tree, 15 to 20 pounds. The trees are also sprayed several times a year. Early in the spring we put on a strong lime sulphur solution, or what is called a "dormant spray" to protect the bloom from thrips. Then about May we use a "Bordeaux" spray, which is a mixture of copper and lime to control melanose. In the summer and fall we use an oil emulsion spray for scale, or a lime sulphur spray for rust mite as the groves may need them. We try to produce good, clean fruit, free from blemishes, and to do this we have to fertilize and spray in the quantities and at the time we should.

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/09/22  Page 30 of 135

We aren't particularly interested in what it costs to take care of an acre of grove, but we are very much interested in what it costs to produce a box of fruit. Last year, costs on bearing groves averaged about $75 per acre. We produced grapefruit for about 20 cents per box and oranges for about 40 cents per box. This year labor costs are considerably higher, and consequently production costs will be somewhat increased.

Bearing groves are only cultivated during the winter. In the summer we allow either leguminous cover crops or the natural grasses to grow in the middles. In the fall we disc or plow these middles, and break the grass into the soil. This adds a certain amount of humus or organic matter to the soil.

There is some necessity for pruning. After the crop is taken from the trees, some dead wood shows up, but we don't do nearly as much pruning as we used to. It is an expensive operation to remove all this fine dead wood, and we have found that it gradually falls off anyway. So now we confine most of our pruning to large dead limbs.

We never prune off any live wood nor attempt to direct the growth of a bearing tree through pruning. Our object in growing these trees is to get a large tree with plenty of bearing surface. The inside as well as the outside of the tree bears fruit, and we want all that good wood in there to get the largest possible crops. The larger crops we can produce, the greater the return and the lower the production costs, and consequently the more profitable the grove. We're trying to produce this fruit at a low enough cost, so there is a good profit in it, even when prices are lower than they are now.

In fertilizing a grove, the principal constituents of a fertilizer mixture are ammonia, phosphoric acid and potash. We want at least 25% of the mixture to be organic substances which are slow feeding. In addition, we must

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/08/22   Page 31 of 135

give attention to the so-called minor elements, magnesium, manganese, copper, and zinc. The U. S. Department of Agriculture has conducted experiments over the years, which show that trees obtaining all of these minor elements produce larger and better quality of crops, are more resistant to disease and the natural hazards of frost and drought. We apply these minor elements both in fertilizer and in spray solutions.

All of these trees here are budded trees, as opposed to trees grown direct from the seed. We bud the variety of citrus fruit we want on a rough lemon seedling about two years old. There are two common root stocks in Florida the sour orange and the rough lemon. The sour orange is a slow growing stock and is somewhat more resistant to cold damage than the rough lemon. It is particularly suited to low lands with a heavy soil, where it is apt to be colder than in this section, and where there is a good deal of nutriment in the soil. In these sand hills, however, it would take nearly fifteen years to get a tree on sour orange stock, and, with out natural protection against cold, we don't need the hardier stock. Trees on a rough lemon root system are, therefore, the only practical ones for this locality. We are doing some work now with trees on Cleopatra Mandarin stock, which is a trifle slower growing and somewhat hardier than the rough lemon.

As in any other thing in which nature is a factor, the production of citrus trees varies somewhat from season to season. In general we expect the range of production on grapefruit trees, the age of these bearing trees we have here, to be from 8 to 10 boxes per tree and on orange trees around 4 or 5 boxes per tree. On the Hamlin orange we will be able to get larger production than on Valencias, and on Hamlin trees of comparable age the production should be 6 or 7 boxes per tree. The trees are planted on 30-foot centers, which makes 48 trees per acre.

Case 1:20-cv-10832-AT-SN  Document 898-3  Filed 08/08/23  Page 32 of 135

Prices for fruit also vary from season to season. We usually sell our fruit on-the-tree to outside buyers, who do the picking and packing and pay us for each day's picking as it is completed. We like this method of sale, because it relieves us of all responsibility except checking the amount of fruit picked, and enables us to settle with our growers within about two weeks from the time the fruit is picked. We keep a checker with each picking crew, and a separate count is made of the fruit belonging to each individual grower.

This year we have already sold all our Hamlins for $2.00 per box on-the-tree. All of our Pineapples for $1.85 per box on-the-tree and some of our Duncan grapefruit for $1.00 per box on-the-tree. These prices now are pretty well established by the ceiling price, and are about as much as the grower can get under the ceiling. These prices aren't unusually high due to the war, because the ceiling price was based on the average price over the several years immediately preceding the war. I have seen several seasons in which prices were as high or higher than those we are now getting.

Last season most groves made profits after production costs of about $200 per acre, although many groves did better than that. This year, based on our estimated crops and the prices we are getting, the general level of profits will probably be a little higher. However, I wouldn't want anyone who bought a grove to expect to average over the next ten years, or over the first ten years of bearing if they bought a young grove, much more than $100 per acre profit. There are going to be bad years with the good, and the productivity of a grove should be judged over a period of years.

The citrus industry has been the basic industry of this section of Florida since its settlement right after the Civil War. There are trees in this immediate vicinity that were

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/09/22  Page 33 of 135

planted around 1865 which are still producing large crops of fruit. I am told that there are trees in Spain and Italy which are 200 and 300 years old.

During the twenty years I have been here, I have seen the production of citrus fruit in Florida increase from about 25,000,000 boxes to about 60,000,000 boxes last season. Demand and consumption for that greatly increased volume has been built up and sustained and the fruit is still being sold at good prices. There will, of course, be further increases in production, but the area still remaining in the State which is good citrus land is limited. Meanwhile, improved methods of canning and the new dehydration processes being worked out by the Government to ship fruit juices to the armed forces abroad will undoubtedly lead to still further increases in demand and consumption. Such processes will, too, probably result in economies in handling, so that fruit or fruit juices can be sold very reasonably and still leave the grower about the same price that he is now getting.

Don't buy a grove unless you are prepared to take good care of it. Nothing responds so quickly to care or lack of care as a citrus tree, and a grove will be of no value to you unless you look after it. If you do buy a grove, you buy a specific piece of land to which you hold title, and it is yours to do with as you like.

The growing of citrus fruit is an old established business in Florida in which a large number of people are engaged, and we don't claim to be the only people who know how to do it right. Naturally, if you buy a grove we would like to look after it for you, and we think we could satisfy you as we have hundreds of others. But, if you don't want our care, you are at liberty to employ anyone you wish, or to look after it yourself.



EXHIBIT C

# EXHIBIT D.

Schedule Reflecting Sales of Land by the Howey Company and Corresponding Caretaking Contracts of the Service Company during Three Year Period Ended May 31, 1943.

Purchasers have been assigned identifying numbers to avoid making public their names addresses.

## Fiscal year ended May 31, 1941.

| Date 1941 | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 2/12 | 1 | 1. | $ 700.00 | Ten-year service contract. |
| 2/12 | 2 | .91 | 910.00 | No service contract in force. |
| 2/18 | 3 | .91 | 910.00 | No service contract in force. |
| 2/19 | 4 | 1.25 | 1,250.00 | Ten-year service contract. |
| 2/22 | 5 | 1.12 | 1,120.00 | Ten-year service contract. |
| 2/25 | 6 | 4. | 2,800.00 | Ten-year service contract. |
| 2/26 | 7 | .83 | 830.00 | Ten-year service contract. |
| 4/25 | 8 | 1.66 | 1,660.00 | Ten-year service contract. |
| 5/ 2 | 9 | .83 | 830.00 | Ten-year service contract. |
| 5/29 | 10 | 2. | 2,000.00 | Ten-year service contract. |
| | | 14.51 | 13,010.00 | |

## Fiscal year ended May 31, 1942.

| Date | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 1941 | | | | |
| 10/21 | 8 | 5. | $ 5,000.00 | Ten-year service contract. |
| 1942 | | | | |
| 1/23 | 8 | .83 | 830.00 | Ten-year service contract. |
| 2/10 | 11 | 2. | 2,000.00 | Ten-year service contract. |
| 2/24 | 12 | 2. | 2,000.00 | Ten-year service contract. |
| 2/27 | 13 | 1. | 1,000.00 | Ten-year service contract. |
| 2/28 | 14 | .91 | 910.00 | Ten-year service contract. |
| 3/ 7 | 15 | 1.35 | 1,350.00 | Ten-year service contract. |
| 3/18 | 16 | 68.6 | 52,805.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 3/20 | 17 | .73 | 730.00 | Ten-year service contract. |
| 3/27 | 18 | 5.81 | 5,810.00 | Ten-year service contract. |
| 3/27 | 18 | 1.39 | 1,390.00 | No service contract in force. |
| 4/ 7 | 19 | .73 | 730.00 | No service contract in force. |
| 4/ 7 | 20 | .73 | 730.00 | Ten-year service contract. |
| 4/17 | 21 | 2.64 | 2,640.00 | Ten-year service contract. |
| 4/20 | 22 | 1.39 | 1,390.00 | Ten-year service contract. |
| 4/22 | 23 | 1.35 | 1,350.00 | No service contract in force. |

| | | | | |
|---|---|---|---|---|
| 4/24 | 24 | 1.35 | 1,350.00 | Ten-year service contract. |
| 4/24 | 25 | 1.35 | 1,350.00 | Ten-year service contract. |
| 4/28 | 26 | 10. | 10,600.00 | No service contract in force. |
| 4/28 | 27 | 5. | 5,000.00 | No service contract in force. |
| 4/ 9 | 28 | 3.62 | 1,629.00 | Ten-year service contract. |
| | | 117.78 | 100,594.00 | |

## Fiscal year ended May 31, 1943.

| Date | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 1942 | | | | |
| 6/ 9 | 29 | 2.66 | $ 2,660.00 | Ten-year service contract. |
| 6/12 | 26 | 7.68 | 3,072.00 | No service contract in force. |
| 6/16 | 30 | 1.8 | 1,800.00 | Ten-year service contract. |
| 7/ 1 | 8 | 2.5 | 2,500.00 | Ten-year service contract. |
| 10/20 | 22 | .73 | 730.00 | Ten-year service contract. |
| 1943 | | | | |
| 1/12 | 31 | 11.49 | 8,617.50 | Ten-year service contract. |
| 2/17 | 28 | 1.68 | 840.00 | Ten-year service contract. |
| 2/14 | 16 | 2.5 | 2,500.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 2/26 | 32 | .7 | 840.00 | Ten-year service contract. |

33

| Date | Purchaser Number | Number of Acres | Purchase Price | Description of Service Contract |
|---|---|---|---|---|
| 3/ 2 | 33 | 2.79 | 3,348.00 | Ten-year service contract. |
| 3/ 3 | 34 | 8.89 | 8,769.00 | Ten-year service contract with privilege of annual cancellation to either party. |
| 3/ 5 | 35 | 5.67 | 2,550.00 | Ten-year service contract. |
| 3/15 | 36 | .91 | 1,092.00 | Ten-year service contract. |
| 3/16 | 37 | 1.35 | 1,620.00 | Ten-year service contract. |
| 3/20 | 38 | .75 | 900.00 | No service contract in force. |
| 3/26 | 39 | 1. | 1,200.00 | Ten-year service contract. |
| 4/ 5 | 40 | .91 | 1,092.00 | Ten-year service contract. |
| 5/21 | 41 | .65 | 780.00 | Ten-year service contract. |
| 5/21 | 29 | 3.17 | 3,804.00 | Ten-year service contract. |
| 5/25 | 42 | 5.14 | 3,469.50 | Ten-year service contract. |
| | | 62.97 | $52,184.00 | |
| Totals | | 195.26 | $165,788.00 | |

34

Case 1:20-cv-10832-AT-SN Document 896-3 Filed 08/09/23 Page 40 of 135



EXHIBIT E

Case 1:20-cv-10832-AT-SN   Document 896-3   Filed 08/89/23   Page 41 of 135



Case 1:20-cv-10832-AT-SN   Document 896-3   Filed 08/09/23   Page 42 of 135

37

EXHIBIT G



EXHIBIT H



39

## MOTION FOR SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF.

Filed May 31, 1944.

(Title Omitted.)

Plaintiff, Securities and Exchange Commission, moves the Court as follows: That a summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, be entered in its favor for the relief demanded in the Bill of Complaint on the ground that there is no genuine issue as to any material fact to be presented to this Court, the facts being stipulated, and that the plaintiff is entitled to a final judgment as a matter of law.

EDWARD H. CASHION,
(Edward H. Cashion).
Counsel.
WILLIAM GREEN,
(William Green)
Regional Administrator.
WILLIAM A. McCLAIN,
(William A. McClain)
Attorney.
SECURITIES AND EXCHANGE
COMMISSION.

415 Palmer Building,
Atlanta, Georgia.

---

33      PETITION AND ORDER.

Filed Jan. 3, 1945.

(Title Omitted.)

1. The plaintiff, Securities and Exchange Commission, filed with this Court on June 10, 1944, a motion for sum-

mary judgment pursuant to rule 56 of the Federal Rules of Civil Procedure, upon the assumption that there was no genuine issue of material fact presented to this Court.

2. It now appears that the stipulation of facts previously filed should be amended or in lieu thereof additional evidence submitted to this Court.

Wherefore, plaintiff moves the Court that the motion for summary judgment previously filed be withdrawn and that it be permitted to submit additional evidence through stipulation or otherwise.

> EDWARD H. CASHION,
>     (Edward H. Cashion)
>         Counsel.
> WILLIAM GREEN,
>     (William Green)
>         Regional Administrator.
> WILLIAM A. McCLAIN,
>     (William A. McClain)
>         Attorney.
> SECURITIES AND EXCHANGE
>     COMMISSION.

415 Palmer Building,
    Atlanta, Georgia.

---

## ORDER.

### Orl. C. O. B. 3-112.

The foregoing motion read and considered, it is ordered that the motion for summary judgment previously filed by the plaintiff in this matter be and the same is hereby withdrawn and the parties hereto are authorized to sub-

41

mit to the Court additional evidence which in their judg-
ment they deem relevant to the issues herein.

This 2 day of January, 1945.

DOZIER A. DeVANE,
U. S. D. C. Judge, Sou. D.
of Fla.

———

34          TRANSCRIPT OF PROCEEDINGS.

Received Feb. 3, 1945.

Filed Jun. 22, 1945.

Received Feb. 7, 1945, Lit. Docket Unit, Sec. & Exch.
Comm.

Testimony and Proceedings.

(Title Omitted.)

Before his Honor, Dozier A. DeVane, Judge of the above
Court, sitting in chambers, upon the petition of the plain-
tiff, commencing at ten o'clock in the forenoon, Tuesday,
January 30, 1945.

Appearances:
  William A. McClain, Esquire, appearing on behalf of
      the Plaintiff.
  George C. Bedell, Esquire, and C. E. Duncan, Esquire,
      appearing on behalf of the Defendants.

Reporter:  V. F. Halter.

42

The Court:

Proceed, gentlemen.

Mr. McClain:

If your Honor please, I think this hearing was called after several conferences in which we were unable to get together on a specific stipulation. Both of us had some ideas as to what evidence should be submitted to the Court, and we feel it would be advisable to offer just the oral testimony and see if that would not be, possibly, the quickest solution.

Mr. Bedell:

Now, do we mutually understand that the stipulation that has been filed here, is in evidence in this case?

Mr. McClain:

That is correct. This is supplemental to the stipulation already offered.

If your Honor please, I would like to be sworn and make a statement in this case. We have been extremely shorthanded in personnel with the result that I have made, personally—although being an attorney on the case —an inspection down at Howey-in-the-Hills, and I obtained certain facts, firsthand, which I would like to make a statement on, to that effect, and offer myself as a witness, if there be any question. I think there is probably a little dispute about the facts which I will testify to, but they are mainly the facts which I feel should go into the stipulation from the standpoint of the government.

The Court:

All right, just be sworn.

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/08/23   Page 48 of 135

MR. WILLIAM A. McCLAIN, having been produced and first duly sworn as a witness on behalf of the plaintiff, testified as follows:

37                    Direct Statement.

By Mr. McClain:

I am an attorney, employed by the Securities and Exchange Commission, and directed to handle the legal affairs of this present proceedings.

On two occasions, I went to Howey-in-the-Hills, Florida, for the purpose of obtaining information concerning the operation of the company and the development and so forth, and there I talked with Mr. Taylor, and with his attorney, Mr. Duncan, who were kind enough to show me every detail that I thought was necessary and that would be helpful in arriving at a solution of this problem.

We discussed the activities of both the Howey Company and its subsidiary, Howey-in-the-Hills Service Company. I was shown certain records and maps and taken over the properties and shown the development of the Howey Company the activities of the Service Company and explained the present management and the previous management,—that is, prior to a change when Mr. Taylor and his partner, Mr. Griffin, took over the affairs of the present W. J. Howey Company.

According to the information I received, there have been about 55 sales of the lands to about 45 persons during the past two or three years. Believe that is since February 1, 1941. The Howey Company maintains also an up-to-date, modern hotel, which I likewise had the pleasure of visiting. At this hotel, a great number of persons come and spend vacations—

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/09/23  Page 49 of 135

Mr. Bedell:

One moment.  Are you testifying of your own knowledge now, as to these people that come and go?

A.  Well, except for what I was told by Mr. Taylor, who was one of the officers of the defendant.

The Court:

That would not be hearsay, if Mr. Taylor told you.

A.  This is, every bit—I have, very carefully, as far as possible, confined what I shall say to what I saw, and my conversation with Mr. Taylor.  Now, at any point where there is any dispute as to that, I would be glad to change it.

During the year, persons come to the hotel and a bus is operated for a portion of the year between Howey and Orlando.  These persons are taken, from time to time, on tours of the properties; that is, they are shown the developments of the citrus industry, and the development, and I believe the original stipulation is, as near as can be said, a typical sales talk, which was stipulated to, and is exactly what is generally told these people during the course of the tour, or, to prospective purchasers.

At various intervals, these persons are given an opportunity, some of them, at least, to purchase land, and all of this land that has been sold, with the exception of a few sales, is sold at approximately $1000.00 an acre.  That is, in the past, and that is all, the $1000.00 acre land, producing citrus trees.  That is, trees which are more than five years old, it being my understanding that the policy of the Howey Company and the Service Company is not to permit the citrus trees to bear under a five-year period. I understand that is true, and that it is done so that it may not be injurious to the trees.

The Service Company, being a subsidiary of the Howey Company, has at this time approximately 215 contracts for the care of the groves, and about 42 or 43 relate to the acreage I mention above, which has been sold since the first of February, 1941. These purchasers reside in various states, 23 in number, including the District of Columbia, and I believe, maybe one or two from Canada.

The Howey Company maintains, or, rather, I suppose that would be the Service Company, a substantial amount of equipment, including 75 tractors, sprayer wagons, fertilizer trucks, and other machinery used in cultivating citrus trees. The work of the Service Company has been substantial, and it is necessary, in order to care for the properties, to maintain a substantial amount of equipment, which is more than a pittance, I mean, the Service Company is not a fly-by-night company. It is a substantial service company.

There is also maintained, which is in use at times, a a cannery and a packing plant. It was explained to me that the cannery, while not operating in the last two years, is there in case they wish to use it, and it is sort of an insurance against a very low price in citrus fruits.

Fertilizer is purchased at various intervals in the year, in substantial quantities, and the customers are billed, along with their services, for fertilizer consumed during the year, and most of these contracts, by the way, as I understand, are on sort of a monthly basis. That is, the customer is billed for the service and he is billed for the amount of fertilizer or for the amount of spraying, whatever that may be, as it develops, although, in a few instances, it may accumulate. The company bills them, but the charges are accumulated, perhaps, until the harvesting season, in some instances. All the planting which is done by the defendant is done in 40-acre tracts, these tracts being approximately 1320 feet square. They are approximately—allowing, of course, for low spots or what

Case 1:20-cv-10832-AT-SN Document 898-3 Filed 08/09/22 Page 51 of 135

we call cold spots and lakes and so forth—done in rows; the trees are planted in rows of approximately 48 to the acre. On two sides of the 40-acres tracts, are usually 20-foot spaces or areaways whereby the tracts may be more accessible for the purpose of gathering fruit or caring for the trees.

Insofar as possible, these tracts are laid out and sold on sort of a row basis; that is, if it is possible to do so, an acre would include a row of trees or 48 feet, I mean, 48 trees, and in so far as is possible, the person, of course, owning one row of 48 trees, or one acre, thereby would have a plat approximately 30 feet in frontage, because these trees are planted, as I understand it, on a 30-foot center. Is that a correct statement, Mr. Taylor?

Mr. Taylor:

That is correct, yes, sir.

Mr. McLain:

Very few of these tracts are in fact fenced, but they are identified by stakes which are facing on an areaway, and, on both sides of the cross bar they have printed on them letters and numerals. For example, it may have on it, number 40, A B and C, 10 rows. That is then recorded back into a plat book. That refers, then, to number 40 in the plat book, and to the investor or to the purchaser, A B and C who own ten rows of trees. That is, A may own two rows and B four rows, and C four rows. It would not mean that A B and C own the entire tract or an undivided portion of that tract. They would own specific rows themselves. And, that was also the purpose in servicing, because right next to that may be another tract of several rows of trees which would not necessarily be serviced by the service company but by some others, Fosgate, or Plymouth, I believe is another one.

That may be shown also from the pictures which are attached to the original stipulation.

This development covers a substantial area of land, as you look across over this developed area, you may see citrus trees as far as the eye will carry. I mean, it is no small project. It is one of substantial size, and, over a period of years. For example, I was shown some trees as much as 95 years old, which are still in excellent production, and, as I understand it, it is properly accepted that there is no known age of a citrus tree, as long as they are properly taken care of. Is that correct, Mr. Taylor?

Mr. Taylor:
That is correct.

Mr. McClain:
It was also expalined to me that generally, the fruit from the groves is marketed in two ways. One, the crops are sold, or the fruit is sold on the trees, to buyers who enter into a contract with the company to buy all the fruit of a certain variety on certain trees, owned by or under the care of the defendant. That is, that plan is what is known as the sale of the fruit on the tree itself, and the buyer, of course, has the expense of picking it and taking it away, and the defendants send into that area where picking is going on, what is known as a checker, and that checker counts the number of baskets or boxes, whatever it may be, and reports back to the Howey Company, or to the office, the number of baskets taken from each particular owner's trees. As I understand it, that is what is known as tree sales. Is that correct, Mr. Taylor?

Mr. Taylor:
That is correct.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 53 of 135

Mr. McClain:

At this time, I should like to offer I believe it would be
exhibit J—a copy of the usual agreement entered into for
the sale of fruit. (Tending counsel paper.)

Said contract is one which was given to me by the de-
fendants.

Mr. Bedell:

We have no objection.

The Court:

Let it be received as *defendant's* exhibit J.

. . . The instrument last above referred to was received
and filed in evidence and marked plaintiff's exhibit J.

Mr. McClain:

When settlement is made by the buyer, it is made on a
specific number of boxes picked, whereas the contract is,
of necessity, on an estimated basis. That is, they estimate
the number of baskets of fruit that will come from a par-
ticular tract, and then that is, of course, subject to the
figures of the checker. And, when settlement is made by
the buyer with the defendants, which I understand is by
settlement of all of the fruit covered by the contract, a
check is sent in at various intervals, that is, weekly, or
even monthly. That check in turn is distributed or divid-
ed among the various persons who have service contracts
with the defendants.

Now, the second method employed is one which is pro-
vided by the contract itself, and that is simply a plan un-
der which all of the fruit is picked and taken to the can-
nery or packing house where it is processed and packed.
The fruit is then sold by the defendants in what the con-
tract speaks of as pools. I won't attempt to elaborate on
that, because I am not sure, myself, except as to the use

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/22 Page 54 of 135

of the term in the contract of service. The fruit is then sold by the defendant in pools with other fruit of like variety and grade which is under the control, or is owned by the defendants, and the net proceeds of each pool is proportioned equally and paid to each member of the pool in accordance with the number of boxes contributed by each member.

Now, I will be glad to read in the exact contract provision, if you think it would clarify it any. I have it here before me.

The Court:

I do not believe that would be necessary. I think I understand that procedure whereby the fruit is pooled.

Mr. McClain:

The Howey Company owns at this time approximately 400 acres of bearing citrus trees. About 1000 acres of trees which are less than five years old, or what we call non-bearing, in addition to a substantial amount, purportedly, twelve or fifteen thousand acres of undeveloped land, much of which would be suitable for citrus planting.

The area developed by the defendants is generally served by, I believe, one or two main highways, as well as some graded roads. Some of the areaways, of course, are a little bit more than graded paths, but are accessible from the standpoint of servicing the various tracts on the contract.

The Court:

Right at this point: Are these 45 sales that you have already referred to, all sales of bearing acreage?

A. Most of them are. There are a few. I think not more than two or three are trees less than three or five years old. Is that correct, Mr. Taylor?

Mr. Taylor:

I haven't looked that up from that standpoint, Mac. I can tell very easily from the stipulation. (Examining stipulation.)

Mr. McClain:

There appear to be about six or seven, according to my count.

Mr. Taylor:

I counted nine, and it would be a larger proportion of that in dollar volume of sales.

The Court:

State that again. You can stipulate as to that fact if you are on agreement on it. What are the facts with reference to that?

Mr. Taylor:

Well, let us find out.

The Court:

With respect to the ages of the trees that are sold.

Mr. McClain:

According to exhibit D, which includes all of the sales up to the filing of the original stipulation—I beg your pardon; up until May 31st, 1943; and there have been some sales since, the totals of which I do not have the information on, but there were eight sales of non-producing trees, or, 103.21 acres, which were sold for $73,933.00. That is, of the non-producing.

The Court:

And how many were there of producing properties? Do you have your total sales? And your total acreage?

Mr. McClain:

I don't believe we have the number of the sales.

Mr. Taylor:

I believe it is summarized in the stipulation. Paragraph 18 of the stipulation.

Mr. McClain:

There were about 43 sales which were producing trees. According to the stipulation, there were 51 sales altogether, eight of which were non-producing.

The Court:

· And the acreage of the eight is what?

A. The acreage of the eight is 103.21.

The Court:

What was the acreage of the 43 sales?

A. 195.26 less 103.21, which leaves 92.05 for the number of acres of producing. That would be $91,855.00.

The Court:

Ninety-one thousand dollars?

Mr. Bedell:

Dollars, are you talking about?

Mr. McClain:

I was talking about dollars, there, yes.

The Court:

You are talking about dollars, now, for the 92.05 acres?

A. Wait. What's wrong? That is wrong somewhere.

. . . Discussion was had off the record.

The Court:

Can you determine that?

A. Yes, the non-bearing groves were approximately $73,933.00 and the bearing groves were approximately $91,855.00.

The Court:

Now, is there any way that we can determine the age of the groves, the non-bearing groves, at the time of the sales? The approximate age?

A. Your Honor, I frankly did not ask that question. I more or less broke it down into bearing and non-bearing. Now, anything that I would say would be more or less of a recollection and I suppose Mr. Taylor's statement on that matter would be better than mine.

The Court:

All right. We will have Mr. Taylor sworn and let him make that statement. What I am interested in is whether or not these trees,—that the land is cleared and the trees are planted and they have a year or two growth before they are sold?

A. Your Honor, I believe that the land is cleared and the trees planted before they are sold. It occurs to me that Mr. Taylor said that that was the general rule. If there was any difference there, I just don't recall it.

The Court:

We will come to that later. Now, go ahead with your statement.

A. I think, your Honor, that about concludes my statement. I would be glad to answer any questions that Mr. Bedell would care to ask.

## Cross Examination.

By Mr. Bedell:

Q. I wish you would state again the manner and mode of distribution of proceeds where the sale is made directly of fruit on the trees. Either I misunderstood you, or I think you stated it not clearly. Will you just state it again as you know it to be?

A. My understanding is that when the fruit is sold on the tree, a buyer enters into the contract, most of the time, similar to the one that has been introduced in evidence, exhibit J. The fruit is estimated, and, he agrees to pay at a certain rate per basket or box, whatever that may be. When he starts to pick the fruit, on which he bears all the expense, the defendants put in a man called a checker who checks the number of baskets or boxes on the trees of each customer or purchaser.

Q. Now, when you say each purchaser or customer, do you mean each individual owner?

A. Correct.

Q. All right. That is good enough.

A. And then that is reported back to the offices of the company.

The Court:

A strict count is kept of the fruit purchased from each owner's land?

A. I presume that, as far as possible, that is true, yes. Because, he reports back, You see, all of these tracts which are under service agreement, are referred back to by numbers in a large plat book, a record book in the

office. It is cared for as a number. But, that number relates back to the plat book where the original owner's or purchaser's name appears. They also maintain a couple of accounts for each individual purchaser, showing the amount paid to him and the amounts he owes. It's an individual accounting process.

Now, after the fruit is marketed, or after it is picked, a check is sent in weekly by the buyer of the fruit to the defendants. Just one check. It may be a thousand, or it may be ten thousand dollars, and then they have got to go back and check their records to determine who is entitled to what part of that, and that is then credited to the account of each individual purchaser, and he is sent a check for the amount of the fruit, less, of course, any amount which he may owe. In the majority of the cases they may or may not owe some on the servicing agreement. In a few instances the servicing agreement had not been taken care of for several months or a year, in which event that amount would be taken from the check, and he would be sent a check for the difference. In many other instances, the individual owner would pay servicing charges on the fertilizing and spraying on a monthly basis or tri-monthly basis or semi-annually.

The Court:

But, so far as your investigation is concerned, you became satisfied that both in the care of the property and the spraying and the fertilizing operations and the marketing of the fruit, that the defendant and the service company would make an individual accounting as far as each owner is concerned?

A. So far as I could find out, I think that is correct.

The Court:

Are there any further questions of this witness?

Mr. Bedell:

Q. Mr. McClain, when you went to Howey, you made known to these gentlemen your official connection with Securities and Exchange Commission?

A. That is correct, sir.

Q. They opened up to you any records that were there and facilitated your examination as best they could, do you think?

A. They were very cooperative.

Mr. Bedell:

That is all.

The Court:

All right, Mr. McClain, you may come down.

(Witness excused.)

The Court:

Have you any other witness?

Mr. McClain:

I think that that concludes, at this time,—I might possibly have a rebuttal witness, but, on the direct testimony I think that is all, because that covers, I think, the points which I had felt pertinent to a further amendment of the stipulation.

The Court:

Have you any witnesses, Mr. Bedell?

Mr. Bedell:

Yes, I think we want to go into some little matters.

I wish to read in evidence from the 16th census of the United States, of 1940, title, "Annual, Volume 1, Part 3; Page 782", a statement entitled "Citrus Production in Lake County."

Now, your Honor, to read over these figures, I think, would perhaps only tend to confusion, but I have here an excerpt that was taken from the Official record in the Public Library in Jacksonville, and it was carefully checked, and I have furnished Mr. McClain with a copy, but, the reporter need not take this down.  I am going to turn over a typewritten duplicate of this one.  I want to call your Honor's attention to this fact.

On the farms reporting citrus fruit trees, there were 1721 in Lake County.

And, of the oranges, which included satsumas, tangerines, and mandarines, there were 1681.

Of the trees planted but not of bearing age, there were 367,222 reported.

Of the trees of bearing age, there were 1,017,203 trees.

Now, I will not go into these—

Mr. McClain:

Your Honor, may I interrupt at this point?

The Court:

Yes.

Mr. McClain:

I have seen a copy of this purported summary and I make no objection that it is not correct, in so far as the document is concerned, and I have no objection to using this summary which Mr. Bedell says that he took it from and can state that it is correct, but what I do object to is the particular relevancy of this information.  I mean, the record just becomes further cluttered up.  And I attempted to find out, as far as I could, that it is a citrus bearing area.  There is no dispute of that.  That they are raising citrus trees; that they are in the citrus business also.  I think there is really one issue here, and that is whether or not . the particular instruments, the contracts which

are sold, are securities. Now, I am wondering what the relevancy is, or how that would, in any way, assist the Court in coming to a conclusion as to whether or not the two documents—you have a service agreement and deed coupled together, which, according to the government, constitutes a security—whether or not it is a security.

The Court:

Since your objection merely goes to the relevancy, we will let it come in as part of the record. Mr. Bedell thinks it is relevant and the Court will determine its relevancy in connection with the entire case. Proceed, Mr. Bedell.

Mr. McClain:

I have one more further objection, and that is the same objection to the statement, on the last page, a little paragraph entitled, "Trees, Fruits, Nuts and Grapes", which appear to relate, as I read it, to the individual farm where fruit trees are only incidental parts. I think there is no evidence here whatsoever that it is anything other than a citrus planting and that the complete area and the complete acreage sold is covered with citrus trees or planted in citrus trees, and it seems to me that is likewise both irrelevant and an immaterial issue, completely, and disassociated from the statistical question.

The Court:

Your objection goes to its relevancy and your first objection relates to that as well as the other, and it will be received subject to its relevancy. Treat it as an exhibit, either way you want to, but, let it be received as an exhibit and the objections to it are overruled.

Mr. Bedell:

The only relevancy, I understand, in its introduction,

is that it shows how this thing is made up. It is very short. It reads:

"On many farms there are a few fruit or planted nut trees, or grape vines, which are not a part of a well-defined orchard or vineyard. In many cases such reports were secured for the number of trees, with or without production, but no acreage was shown. An acreage was supplied when there was enough trees or plants, at normal planting distances, to make two acres."

It just shows how they went about putting up the information that they had there.

Now, will your Honor excuse me a moment? I would like to confer with Mr. Duncan and Mr. Taylor on this matter.

The Court:

Yes, we will take a short recess.

. . . And thereupon an informal recess was had, thereafter the following further proceedings were had:

MR. DODGE TAYLOR, having been produced and first duly sworn as a witness on behalf of the defendant testified as follows:

53                         Direct Examination.

By Mr. Duncan:

Q. Mr. Taylor, will you please state your name and connection with the defendants?

A. My name is Dodge Taylor and I am Vice-President of the two defendant companies.

Q. How long have you been associated with the two defendant companies?

A. Since 1923.

Q. Mr. Taylor, are you thoroughly familiar with all of the lands which have been cleared and planted by the defendant, W. J. Howey Company—?

A. Yes.

Q. —and their present status?

A. I am.

Q. Mr. Taylor, I show you a paper which purports to be a map. Will you explain what that is?

A. That is a map which I prepared, of the lands which are now owned and which have been heretofore developed by the Howey Company and I prepared it from the records of the company and my personal knowledge of the land. It shows the lands covered by the stipulation in the present case, the lands owned by other people and under care of the defendants, which are not covered by the stipulation. The lands planted by the defendants, now owned by other people and under care by other operators. The citrus groves owned by the defendants and the unimproved citrus lands owned by the defendants.

Q. Under what circumstances was this map prepared?

A. It was prepared at Mr. McClain's request.

Q. Was that map prepared in his presence?

A. It was, yes, sir.

Mr. Duncan:

The defendant offers this map in evidence to indicate the properties included in the stipulation as well as properties owned by others and cared for by others.

The Court:

Any objection, Mr. McClain?

Mr. McClain:

Yes. I have no objection to the map in so far as it relates to the properties covered by the stipulation, but I do object to it, in so far as it relates to properties which have

been developed and which may have, from time to time, been cared for by the defendants, but which are not cared for at this time. It seems to me that that would inject into this case, the activities and operations of the defendant companies in previous years and for all of the lands which have not been covered by the stipulation, and, further more, that the map relates to lands which were serviced by the defendant companies under an entirely separate and distinct service agreement and not the service agreement which we have here. I mean, that I think it covers a period for lands which is immaterial to this case, and irrelevant, and I think that the map as it now stands and is constituted is misleading to one reading it without a further knowledge of previous activities of the old company.

In so far as the lands covered,—the green lands covered by the stipulation—I have no objection to the map on that score, as to that land, but I do think it injects a different issue.

The Court:

Have you a map prepared that contains just the information that you want shown on it?

Mr. McClain:

I have not one that shows just the green, because there was a difference of opinion when we got through with this, as to what the map would show, but the trouble is, we haven't another map. We had only one copy.

The Court:

Does that map show the property, the acreage, that is set to groves, owned by the defendant company?

Mr. Taylor:

It does.

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/22   Page 66 of 135

Mr. Duncan:
Yes, it does.

The Court:
And does it show the acreage that is set to groves that the defendant company has sold since they have been involved in this litigation?

Mr. Taylor:
It does.

The Court:
Then, that is information that I indicated at the first hearing that I desired, myself. I am going to permit the map to be introduced in evidence. That map, or that part of it has no relevancy in the case, will be disregarded in disposing of the matter. The rest of the information I think I can get off of the map. Any information that is not relevant, it will not cause me any trouble, I do not think.

Mr. McClain:
What I had in mind, I don't want to inject into it, the map, as it related to property covered by the blue pencil.

The Court:
We won't inject that into it. We will receive it and hold as pertinent, only that matter shown on the map that relates to the litigation. You can mark it as an exhibit.

. . . The instrument last above referred to, being the map, was received and filed in evidence and marked defendants exhibit number 2.

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/23   Page 67 of 135

The Court:

Are you through with it?  Do you want to ask some more questions about it?

Mr. Duncan:

I want to ask some questions about it, but he can do that without the map.

The Court:

All right.

Mr. Duncan:

Q. Mr. Taylor, do you own any of those properties in that area, personally?

A. I, personally, yes, sir.

Q. Will you state the approximate acreage?

A. About 100 acres.

Mr. Bedell:

Q. Bearing groves?

A. Yes, sir.

Mr. Duncan:

Q. Mr. Griffin is also connected with the company, and he is also a property owner in the area, is he not?

A. Correct, yes, sir.

Q. Does he own any bearing citrus in that area?

A. Yes, sir, he does.

Q. Can you state approximately the number of bearing citrus trees or acres that he owns?

A. Around 350.

Q. How long have you owned—what is the oldest grove that you own in that area?

A. It is 22 years old.

Mr. Duncan:

That is all. You may inquire, Mr. McClain.

By the Court:

Will you come around here and point out to me on this map, the citrus land, the sales that are involved in this litigation?

Mr. Duncan:

That is in green. Right here. (Indicating on the map.)

The Court:

The part in green?

Mr. Duncan:

The part in green. See, there are some here and down here there in an area, and, right here and right here.

The Court:

All right.

Mr. McClain:

May I proceed?

The Court:

You may proceed.

Cross Examination.

By Mr. McClain:

Q. Mr. Taylor, the area that is colored green refers to the property covered by the stipulation in this case, does it not?

A. That is correct, yes, sir.

Q. And the property colored blue relates to property, all of which was planted by these companies in various years?

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 69 of 135

A. It relates to that, but it is further defined as land owned by or owned and under care by other operators.

Q. It was planted by—

A. It was planted originally by the defendants, yes, sir.

Q. And that property, parts of it, has been in and out, under service agreements?

A. That is correct. New service contracts every year.

Q. Now, at the time of this organization, Mrs. Howey owner or was granted a substantial amount of acreage, was she not?

A. She owned approximately a thousand acres, personally, at that time.

Q. And her present acreage is covered by the blue?

A. That is correct.

Q. The hotel which is operated by the defendant, is in the town of Howey-in-the-Hills, is it not?

A. Yes.

Q. And that hotel has been there for some years?

A. It was built in the winter of 1923–1924.

Q. It was started out, was it not, only as a winter resort?

A. Mr. Howey's original idea of it was to use it to house prospects for the purchase of land. Since 1940 we have operated it only as a tourist hotel. We have done general tourist advertising and attracted the general public, which was a departure from the plan under which Mr. Howey operated.

Q. Is that hotel operated as a year-around project?

A. Yes, sir, that is correct.

Q. You have guests at various seasons of the year, do you not?

A. Every month.

Q. Now, do you still maintain a bus schedule into St. Petersburg as well as Orlando?

A. No, sir.

Q. Only to Orlando?

A. We do not maintain any bus schedule into Orlando. The Orlando Transit Company runs a regular bus, one of its regular scheduled buses, back and forth, but we have no buses of our own that operate to Orlando.

Q. Is there any way that you can estimate the number of persons who visit the hotel during the twelve months period, or, a year?

A. The account I have kept, we opened in the winter of 1940-41 and I believe there have been approximately six thousand people stayed at the hotel since the fall of 1940 when it was opened on its present basis.

Q. And has your patronage increased or decreased during the past year?

A. It has increased.

Q. How long have you been in this business, Mr. Taylor?

A. Since May 15, 1923.

Q. And your business is also to keep familiarized with the care of citrus trees and the development trees, is it not?

A. My personal work has been more along that line than any other, yes, sir.

Q. Has your care and fertilization, in the spraying, and that sort of thing, in citrus trees, changed materially in the last ten or fifteen years?

A. Now, you are asking for a dissertation on citrus culture?

Q. I don't want to get into that.

A. Well, it has been backwards and forwards. I think most of it, in recent years, has come back to the old practices which probably Judge DeVane knew as a child when he was raised around Plant City. We have had a lot of so called scientific and new notions during the depression, but most of us have come back to the fact of good fertilization, good spraying, and good cultivation.

66

Q. In order to maintain the groves which you have under care, as well as your own property, how many men do you employ in that, normally?

A. Our standard is one man to each 100 acres, Mr. McClain.

Q. One man to each 100 acres?

A. Yes. That is, for actual field operations. Of course, we run a machine shop and keep mechanics. It is particularly important, now, that we can't get the repair parts and new machinery.

Q. Do you fertilize these trees several times a year?

A. Bearing trees, we fertilize twice a year and younger ones, every 60 days for nine months of the year.

Q. And what about spraying?

A. Well, your spray program on bearing trees was include treatment at times, and in making a lime sulphur spray during the summer and fall, just as necessary.

Q. Is there any more cost, for example, in fertilizing and caring for a tree five years old and a tree 50 years old?

A. The converse would be true. There is more cost to a tree 50 years old than to a tree 5 years old.

Q. As the trees grow older, the actual cost of servicing is a little bit more expensive?

A. It increases. It takes more fertilizer per tree to sustain it. The heavier costs. We have considerable more foliage to keep clean with the spray program. Costs certainly tend to increase with increased age and size of the tree.

Q. Now, in addition to the facts that you have mentioned, I suppose you have a certain amount of pruning to do, or not?

A. We do very little pruning now. The only pruning we would do would be in case of something that would cause heavy dead wood.

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/23   Page 72 of 135

Q.  You try to keep out the dead wood?

A.  We do no pruning of good wood, and very little pruning of dead wood that appears in the center of the tree.  That's an expensive operation and in our opinion does very little good to get it off.

Q.  Is it necessary to water during a drouth or anything of that kind at any time?

A.  We are exceptionally well located.  There is a clay sub-soil which underlies that area and we have a remarkable resistance to the drouth.  We haven't found it necessary to water trees over one year old in a great many years.

Q.  Do you know, personally, a great many of the persons who own trees that you take care of?

A.  Yes, sir.  I see pretty nearly all of them once a year.

Q.  They come around to look over their property?

A.  Yes, sir, they do.

Q.  Are most of these persons business men and women?

A.  Yes, sir.

Q.  Do you know the types of business they are engaged in? Any of them?

A.  Lawyers, bankers, doctors, manufacturers.  You can name any kind of business you want, and we possibly have one.

Q.  When you get ready to enter into your contracts for the sale of fruit, or sell the fruit, do you use your discretion in determining where you can get the most, or a more advantageous contract?

A.  I don't know as I understand your question, Mr. McClain.

Q.  When you get ready to sell the fruits, do you contract or communicate with more than one person with respect to the sale of it, or is it usually sold to only one?  I mean, using your own discretion?

A.  The large volume of fruit we have, we couldn't sell it on the tree to one purchaser and get any advantageous picking dates.  If we decide we are going to sell a certain variety of fruit on the tree, we divide that up among the eligible purchasers.  We naturally try to do business with people of reputable and financial means to avoid a credit risk, and we deal, so far as possible, with people whose agreement on picking dates is satisfactory.

Q.  Would you say that maintenance of the service company is a direct benefit to these persons who belong?

A.  Well, that calls for an opinion on which I am probably prejudiced.

The Court:

I think he is right about that, Mr. McClain.  I think it calls for his opinion.

Mr. McClain:

I will withdraw it.

The Court:

If you will put it this way.  The services have to be rendered.  There is no question about that.

Mr. McClain:

That is right.

The Court:

And it is a question of whether or not his company is of more benefit to the owners than the Fosgate Company or the Plymouth Association, for example.  Is that the object of your question?

Mr. McClain:

Well, it was in a way.  From my observation, I am pretty well satisfied with the answer, generally, to that ques-

tion, but what I had in mind was the fact that the advantage was to a small purchaser in having his land serviced rather than to have to do it himself. It seems to me it is a virtual impossibility—

The Court:

Oh, well, I suppose there will be no controversy between you gentlemen that is necessary for the small purchaser to have the land serviced. He can't own the equipment to service his own property. You do not deny that.

Mr. McClain:

No, sir, I should think that would be so, from my observation.

The Court:

I may be talking on a fact I know too much about, that we ought to have in the record.

Mr. McClain:

It seems to me it would be foolish for a man to buy a grove and not have it serviced.

The Court:

Is it, or is it not, essential for a small owner to have a service company take care of his grove?

A. Yes, sir.

The Court:

It is essential?

A. Yes, sir.

The Court:

In the servicing of these groves, there are numerous

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/22 Page 75 of 135

companies of high standing in or near Lake County, is that correct?

A. That is correct, yes, sir. There are at least a dozen that operate in this immediate area.

The Court:
Q. And the owners of a property, grove property, in that vicinity are not limited to your company to service that property?
A. No, sir, they are not.

The Court:
Q. You have the Plymouth Citrus Association; you have the Fosgate Association. You have Bill Peters and his association, and the Roper Brothers and their association. I could go along with a long list of them.
A. Yes, sir, that is correct.

The Court:
Q. Those are all well recognized companies?
A. Yes, sir.

The Court:
Q. As to whether or not you are better than they are, that is just a matter of personal opinion?
A. Yes, sir.

The Court:
Is there anything further, Mr. McClain?

Mr. McClain:
I was just going to refresh my recollection. If you will give me just a moment. Yes, there is one more question.

By Mr. McClain:

Q. Mr. Taylor, over the past four or five years, what percentage, would you say, of persons who buy land, enter into service agreements with the service company?

A. I think we concluded it,—or, it is computed in the stipulation as being 85%. Paragraph 18.

Mr. McClain:

I believe that is all.

The Court:

Mr. Taylor, it has already been agreed to on this record, that eight sales were made during the period covered by this suit, representing a total of 103.21 acres of land on which the trees were non-bearing. Had this land been cleared and all of the trees been planted to the land before the sales were made?

A. Yes, sir.

Q. Can you give us any idea as to the age of those trees at the time of sale?

A. They were one year old or older, Judge. I think most of them were about two years old at the time they were sold.

Q. They were one year old or older?

A. Yes, sir.

Q. And your opinion is that the majority were two years old?

A. Yes, sir.

Q. Does your company engage in the sale of land itself, out there, for citrus development under this same plan?

A. I don't know as I understand your question, Judge.

Q. Do you engage in the sale of raw land out there for development by your companies, under this same plan?

A. We have made an occasional contract of that nature, yes, sir.

Q. Where you would sell a small acreage of land?

A. No, that would be a large acreage. An extremely large acreage. This sale would be 50 40 acres or more in area. D. A. D.

Q. Now, are those involved in this case?

A. None come within the period of time covered by this litigation.

The Court:

That is all.

Mr. McClain:

That is all I have.

Mr. Duncan:

I have three or four more questions.

Re-Direct Examination.

By Mr. Duncan:

Q. Mr. Taylor, has your company at any time ever sold any grove property in undivided interests to two or more persons?

A. No, sir.

Q. Has a sale been made, each sale been made individually to each purchaser?

A. Well, there has probably been some time during the time we have been in business that two people came in together and said they wanted to buy a ten-acre grove together. That was a partnership which they themselves created.

Q. You have never offered any property in undivided interests?

A. No, sir.

Mr. McClain:

Now, I think we ought to have a little explanation of what we are talking about. Is that an undivided interest as used by the Federal law, or a term used by this industry?

The Court:

I think so, too. I think what the Court would be interested in is whether or not you sell an undivided interest in any acreage in which the company retains an undivided interest.

A.   No, sir.

Q.   You are in partnership with none of these people to whom sales are made?

A.   That is correct, yes, sir.

Q.   It is an outright 100% sale in each case?

A.   The sale of a specific tract of land.

The Court:

That is the only partnership that it seems to me would be pertinent here.

Mr. Duncan:

Q.   Is it your practice to sell any of this land to persons unless they have inspected it?

A.   No, sir, we have never done that.

Q.   You are willing to state, then, that in every case the purchaser has personally inspected the property?

A.   That is correct.

Mr. Duncan:

That is all.

Re-Cross Examination.

By Mr. McClain:

Q.   You say that there is no contractual or partnership agreement, Mr. Taylor, between yourself and the companies or the purchasers?

Case 1:20-cv-10832-AT-SN  Document 998-3  Filed 08/09/23  Page 79 of 135

A.  I didn't say any contractual arrangement.  I said no partnership arrangement.

Q.  That would be subject, however, to some interpretation of the service agreement, would it not?

Mr. Bedell:

Well, your Honor, it seems to me that the Court is probably capable of determining that question without Mr. Taylor's expert advice.

Mr. McClain:

Well, what I am leading up to is to show under the terms of the service agreement—it is a legal conclusion, I agree.  We have heard testimony here that there is not such, when, as a matter of fact, the contract might make it such.  Let the records show that I am not subscribing to any legal principle here or attempting to interpret the service agreement.

The Court:

The only thing the Court attempted to develop from the witness was whether or not in the actual sale of the property, as a sale, there were any sales made in which the purchaser acquired only a part interest in the land and the company retained a part interest in the land.  Any legal deduction that might be made as between the owner of the land and the service company is a result of the service contract, and is an entirely different question.

Mr. McClain:

I just wanted to make that point, because the service contract to me, is the crux of this matter.

The Court:

The question did not go to the effect of the legal prin-

ciples of the service contract, and I do not think Mr. Taylor could answer that question.

Mr. McClain:

I agree.

The Court:

There is, however, no controversy, and you do not dispute in any way Mr. Taylor's statement to the effect that in the actual sales, that they do not sell only a partial interest in the land to the purchasers and the company retains title to—?

Mr. McClain:

Subject to any legal interpretation which may be drawn from the service contract. There are several legal interpretations, I think, that might be drawn from that.

The Court:

Then, that is all the testimony you have?

Mr. Bedell:

Yes, that is all.

Mr. McClain:

That is all.

(Witness excused.)

The Court:

Gentlemen, I do not consider that it is necessary for you to file briefs in this matter or for you to argue the case. I have carefully considered the stipulation that you entered into and filed in the case at first hearing and the testimony that you have submitted this morning merely goes to the clarification of certain aspects of the stipulation, of the facts covered by the original stipulation filed in the case.

In deciding this case, I desire to let the record in this case show that I adhere to the legal principles and interpretations of the Securities Act as announced by Judge Strum in Securities Exchange Commission vs. Bailey et al., 41 Federal Supplement, Page 647. I find from the testimony introduced in this case, that this case does not fall within the same category as that case, and that under the facts as shown by the record of this case, the defendants are not selling securities as that word is defined in the Securities Act, and that the government is not entitled to receive the relief sought in this particular suit.

The difficult question that confronts me in the case, is what should be done with the case despite that conclusion. While I find and now hold that the defendants are not violating the Securities Act, and the government is not entitled to the relief sought in this suit, that does not mean that the defendants could not begin, tomorrow, to expand their activities in such a way as to come within the Securities Act and fall within the precise principles announced by Judge Strum in the Securities Exchange Commission vs. Bailey referred to above.

Now, the question is, what should we do with this case? I would like to hear your statement on that, Mr. McClain. Shall we retain jurisdiction of this case, or, will the Securities Exchange Commission continue its watchful observation of this company to see that it does not violate the act? Of course, you are interested only primarily in the companies that are subject to the act—.

Mr. McClain:
That is right.

The Court:
And you are supposed not to have anything to do with companies that are not subject to the act.

Mr. McClain:

I suppose that is correct.

The Court:

The Court has not the machinery to see that this company continues to conduct its business in such a manner as not to violate the act, and I assume that it would be a duty and obligation upon the Securities and Exchange Commission under the Securities Act, to come into this Court again in case they ever find this company violating the act.

Mr. Bedell:

May I say a word on this thing, your Honor?

The Court:

Yes, sir.

Mr. Bedell:

My acquaintance with the Howey enterprise is a pretty old one. I would have to go back through my books to see when it started. I have no hesitation in just saying on my own responsibility that the records of that company are an open book, and, whenever the Securities and Exchange Commission wants to inform itself as to what is going on in that company, I think they will be treated just like they were treated here. Courteously, and a full disclosure will be made.

Now, my thought in this case is that there was an application here for a restraint. The Securities Exchange Commission has certainly made out no case of fraud. They have made out no case of selling shares. They have made out no case against securities offered for sale. I submit the proper decree here is a dismissal of this

bill, and, of course, the Securities Exchange Commission isn't abolished by a decree dismissing this bill, but the record here is a clear record, and I think we are entitled to a dismissal of the bill on that record.

Mr. McClain:

If your Honor please, I think that the case, as it now stands, as Mr. Bedell says, is on application for injunction. If that injunction is denied and the matter dismissed, then it occurs to me that we would like the necessary findings of fact and conclusions of law which would permit an appeal to the Circuit Court. I think it is a matter we would have to consider very carefully before we would appeal. I think that is indicated in counsel for the Commission's advice, from Philadelphia. We have a job to do that is an over all proposition. If it were one individual case, that would be one thing, but, you have to coordinate your opinions on your interpretations, and if that case merits it, I think that we would like to consider the right of appeal, and it seems to me the best way would be for your Honor to make whatever findings of fact and conclusions of law your Honor feels should be drawn in the case, and deny the injunction dismissing the case, giving the right hereafter to appeal.

The Court:

All right. I will endeavor to, in my findings of fact and conclusions of law, reserve to the Securities and Exchange Commission the right to bring another suit, should they ever find that this compnay is guilty of the practices shown in this Bailey case or in any other similar situation, but the thing that I had in mind was this: In case that fall into this class, the Court sometimes gets itself into technical trouble when it dismisses a bill, even though the government fails to prevail in the

particular issue that is raised and tried in the case, and I just wondered if this happened to be one of those cases. I suppose it is not.

Mr. Bedell:

It could hardly be res adjudicata because the bill would be based on the circumstances of the particular case that is presented by the bill.

Mr. McClain:

As I understand it, this is a hearing on a temporary injunction rather than a final injunction.

The Court:

No, sir, my understanding was that it went to trial on both.

Mr. McClain:

On both?

The Court:

On both. That was what you gentlemen announced to me at the outset.

Mr. McClain:

That is all right. I just wanted to have the record clear.

The Court:

Will you, Mr. Bedell, and your associates there, draw findings of fact and conclusions of law and let me have it, and let Mr. McClain have a copy of it so he can suggest anything he might want incorporated in there, and, from the two suggestions, I will endeavor to prepare my own findings of fact and conclusions of law in the case, and will you also prepare a draft of final decree or order to be entered?

Mr. Bedell:

Of course, the findings of fact are very greatly simplified by this twenty-one paragraph stipulation that we have here. And, if the government decides to go to the Court of Appeals on it, it would make a very short record anyway.

The Court:

You have in mind the provisions of this rule with reference to the injunction suit?

Mr. Bedell:

Yes, sir.

The Court:

Well, let me have those matters, gentlemen.

....And thereupon the proceedings having been concluded, the hearing adjourned.

———

77      PROPOSED FINDINGS OF FACT.

Filed Feb. 27, 1945.

(Title Omitted.)

To The Honorable Dozier A. DeVane, Judge, United States District Court For The Southern District of Florida:

The plaintiff, Securities and Exchange Commission, by its attorneys moves the Court that it adopt the proposed findings of fact attached hereto.

**81**

This 23rd day of February, 1945.

EDWARD H. CASHION,
(Edward H. Cashion).
Counsel.

WILLIAM GREEN,
(William Green).
Attorney.

WILLIAM A. McCLAIN,
(William A. McClain).
Attorney.

SECURITIES AND EX-
CHANGE COMMISSION,

415 Palmer Building,
Atlanta, Georgia.

78          FINDINGS OF FACT.

1. The W. J. Howey Company and the Howey-In-The-Hills Service, Inc., hereinafter referred to as the Howey Company and the Service Company, respectively, are corporations organized under the laws of the State of Florida.   S-2&3

2. The officers and directors of the Howey Company and the Service Company are the same, namely:

C. V. Griffin, President, Treasurer and Director.

Dodge Taylor, Vice President and Director.

R. W. Holsclaw, Secertary and Director.   S-4.

3. The stockholders of the Howey Company and the Service Company are substantially the same, namely:

|                              | Howey Company | Service Company |
|------------------------------|---------------|-----------------|
| C. V. Griffin ..........     | 510 shares    | 510 shares      |
| Dodge Taylor ..........      | 228 shares    | 229 shares      |
| R. W. Holsclaw ........      | 1 shares      | 0 shares        |
| C. M. Pinkerton .......      | 1 shares      | 1 shares        |
| Howey-In-The-Hills In-<br>vestment Corp. ....  | 260 shares    | 260 shares      |
|                              | 1000          | 1000     S-5    |

4. The Howey Company and the Service Company have been under direct common control at least since 1940 when C. V. Griffin and Dodge Taylor purchased the stock set forth in paragraph 3. S-7, ST-2.

5. The Howey Company and the Service Company share the same offices and utilize the same facilities and personnel, their principal place of business being located at Howey-In-The-Hills, Florida. S-6, 2 & 3.

-6. The Howey Company is the owner of large tracts of land in Lake County, Florida, and since prior to 1940 has been and is now engaged in the business of selling such land planted to citrus trees. S-3, ST-1.

7. The Service Company since prior to 1940 has been engaged in the business of cultivating and developing citrus groves in Lake County, Florida.

8. The Howey Company owns and operates at Howey-In-The-Hills, Florida, a resort hotel known as the Floridan Country Club, The following statements appear in one of the advertising circulars used by the Howey Company to attract patronage to the hotel:

A. "Almost any form of outdoor recreation is available to club members and their guests in a background of beautiful hills and lakes and the world's finest citrus groves."

B. "Here you may break a round of golf by picking tempting tree-ripened oranges and tangerines from groves adjoining the golf course."

Since the Fall of 1940 approximately 6,000 people have stayed at the hotel. There is a regular bus service by the Orlando Transit Company between Howey-In-The-Hills and the City of Orlando, Florida. No bus service is maintained by the defendants. S-12, EX-C, R-26.

9. While tourists and vacationists who patronize the club are being escorted around the golf course, through the bridle paths and over the lakes, their attention is directed to citrus groves adjoining these attractions. When vacationists evince an interest in the groves, they are informed that some of the acreage is for sale. They are told that they can purchase a grove and that the Service Company will undertake to develop the grove and harvest and market the crops. S-12, 13.

10. Vacationists are informed that profits during the 1943-1944 season amounted to about 20 per cent, although in some instances the return was greater; that based upon the estimated crop and the prices being secured for the season 1944-1945, the general level of proftis would probably be a little higher than 20 per cent for the 1944-1945 season. They are told, however, that if they purchase groves and have the Service Company service the groves for them, they should not expect to receive more than 10 percent profit per year over the next ten years on a grove already in bearing

at the time of purchase, or over the first ten years of bearing if they buy a young grove, since there will be bad years with the good. ST-8.

11. It is a matter of common knowledge that a citrus tree properly cared for continues in bearing for many years, reputedly approaching the century mark. Vaca-tionists are informed that there are trees in the vicinity of Howey-In-The-Hills, Florida which were planted around 1865 and are still producing large crops of fruit. R-8, ST-3.

12. Potential customers are for the most part resi-dents of states other than Florida and the actual pur-chasers reside in various states, 23 in number, includ-ing the District of Columbia, and one or two reside in Canada. Purchasers are predominately professional and business people, such as lawyers, bankers, doctors, manu-facturers, etc. S-14, R-5, 29.

13. The purchasers do not possess the knowledge, skill or equipment necessary for the care and cultivation of citrus trees. It would be completely unfeasible and un-economical for a small owner to take care of his property and therefore he must rely on a service company to do this work. S-14, R-31.

14. The purchaser is encouraged to enter into a caretaking agreement with the Service Company and he is told that its competency and efficiency in caring for citrus trees exceed that of its competitors. A land sales contract and the service contract are customarily offered to investors simultaneously. S-13 & 17.

15. Between the period February 1, 1941 and May 31, 1943, 85% of the investors who purchased citrus acre-

·age from the Howey Company simultaneously entered into service contracts with the Service Company. S-18.

16. Between February 1, 1941 and May 31, 1943, the Howey Company made 51 sales to 42 persons involving a total of 195.26 acres for $165,783. Eight of these sales were of non-bearing trees totaling 103.21 acres and 43 were sales of bearing trees totaling 92.05 acres. Of the 42 persons, 31 purchased tracts less than 5 acres. The average holding of these persons is 1.33 acres. All but one of these small purchasers made only a single purchase, whereas the 11 purchasers of more than 5 acres purchased their holdings in 19 transactions. Sales of as little as .65 of an acre, .7 of an acre, .73 of an acre were made by the Howey Company. Of the acreage sold, 166.54 acres (85%) are being cared for by the Service Company. R-11 & 12.

17. The Standard service contract used by the Service Company grants full and complete possession of the premises to the Service Company which agrees to pay a nominal rental to the owner of the land therefor. In its usual service contract, the Service Company undertakes properly to maintain, fertilize, spray and cultivate and otherwise care for the citrus trees growing on the land for a specified period. Ex-B.

18. The standard service contract provides that the Service Company shall market the crop and pay over to the owner the net proceeds of the fruit produced after deducting therefrom any charge incurred in the gathering, packing, marketing and selling of such fruit. Ex-B.

19. Under the standard service contract the owner of the land does not own a specific crop of fruit or have the right of entry to his property to dispose of the crop

86

unless it is mutually agreed upon in writing by the owner and the Service Company, and provided there are no monies owing to the latter. Ex-B.

20. The fruit is marketed by the Service Company in two ways. One, the fruit is sold on the trees to buyers who enter into a contract with the Service Company to buy all of the fruit of a certain variety on certain trees, owned by or under the care of the defendants. The fruit of each individual owner as picked is checked and accounted for by the Servce Company to that individual owner. The second method employed is where all of the fruit is packed and taken to the cannery or packing house where it is processed or packed. The fruti of the individual owner is then pooled with fruit of like variety and grade and the net proceeds of the sale thereof are apportioned equally and paid to each individual owner in accordance with the number of boxes of fruit contributed by him. R-8, 9, 10.

21. In its usual service contract, the Service Company charges the following service fees:

For non-bearing trees $40 per acre per year.
For bearng trees $30 per acre per year.

In addition to the stipulated fees, the owner of the land agrees to pay taxes as and when they become due, the market price delivered at the described property, of pruning, dusting, dusting material, spraying, spraying material, special treatment, need for cover crop, sewing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of the Service Company. The term of the usual service contract covers a ten-year period; in some in-

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 92 of 135

stances there is a privilege of annual cancellation by either party. S-11, Ex-B.

22. The lands of the Howey Company are planted in 40-acre tracts approximately 1320 feet square and the trees are planted in rows of approximately 48 to an acre, set on 30-foot centers. Insofar as possible plats are laid out and sold on a row basis. A person purchasing one acre would thus ordinarily acquire a single row of 48 trees with a 30 foot frontage. On two sides of the 40-acre tracts are open ways, approximately 20 feet wide. The tracts are not fenced but are staked with marks referring to a plat book record whereby the owners of the specific rows of trees in the tract may be definitely identified. For example: a single plat located in a 40-acre tract might contain 10 rows of trees comprising 10 acres, being identified by a stake bearing the symbols "Number 40. A, B and C. 10 rows." This refers to a number 40 in the plat book, which shows that investor A owns two rows, investor B owns 4 rows, and investor C owns 4 rows. R-6, 7.

23. The prices charged for the land, which vary according to the number of years it has been planted with citrus trees, are as follows:

One year old trees $675 per acre.
Two year old trees $750 per acre.
Bearing trees (five years old or older) approximately $1000 per acre. S-9.

24. Upon full payment of the purchase price the land is conveyed to the purchaser by a warranty deed. If the purchaser fails to pay the installments required by the contract, the Howey Company may foreclose the contract in the same manner as it would foreclose a mortgage under Florida laws. S-9.

Case 1:20-cv-10832-AT-SN   Document 898-3   Filed 08/09/22   Page 93 of 135

25. All sales have been an outright sale of a definitely identified tract of land. In no instance has there been a sale of a right to share with others in the profits of land held in common with the defendant Companies or others. R-34, 35.

26. No sales have been made by the Howey Company to any purchaser who has not personally inspected the property. In numerous instances the purchasers have acquired homes in the vicinity or spend a portion of each year in the vicinity, frequently inquiring and making suggestions with respect to care of their land and marketing of the fruit. The standard service agreement provides that the developing of the property and the harvesting and sale of the crop shall be done in accordance with the best judgment of the Service Company. A considerable number of the purchasers visit their property at least once a year. R-35, S-14, Ex. B, R-29.

27. The Howey Company will sell acreage to persons who do not intend to use the Service Company as their caretaker. The Service Company will service trees on land not purchased from the Howey Company and solicits service contracts from others than purchasers of the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company, and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company. Prospective customers have an opportunity to learn that there are numerous competing service companies of high standing operating in the vicinity of Howey-In-The-Hills whose business is to service property owned by others. Such competitors post signs by the land serviced by them which are visible from the highways, and they send advertisements to land owners. Moreover, officers of the Howey

Company and the Service Company acquaint prospective purchasers with the existence of competitors. Of course, prospective customers are informed by them that the Service Company's competency and efficiency exceed that of its competitors, with the success indicated in paragraph 15 above. S-15, 16, R-31, 32.

28. The defendant Service Company maintains 75 tractors, sprayer wagons, fertilizer trucks, and other machinery used in cultivating citrus trees, a machine shop and force of mechanics. The company maintains a cannery and packing plant and a force of about one man to each 100 acres of land. R-5, R-27, 28.

29. In the care of the grove, as in the yield of the fruit, the cost of the care and the proceeds of the fruit may be, and are, definitely and distinctly accounted for with respect to the specific row or rows owned by the individual. R-7, 8, 9, R-10, 14.

30. Of the defendants, the W. J. Howey Company owns approximately 400 acres of bearing citrus trees. The Vice President of the two Companies, associated with them since 1923, is the owner of approximately 100 acres of bearing groves, the oldest of which is 22 years old. Mr. Griffin, connected with the Company, owns approximately 350 acres of bearing groves. R-10, 20, R-23 24.

31. The citrus industry is an established industry in Lake County, Florida, and according to the United States Census of 1940 there were of farms reporting two acres or more of citrus trees, 1721, with more than a million trees of bearing age. R-16.

32. The mails and instruments of transportation and communication in interstate commerce are now and for

some time have been used in the sale of said land and
service contracts, and land sales contracts, warranty deeds,
and service contracts are now being and for some time
have been carried through the mails and in interstate com-
merce by means and instruments of transportation for the
purpose of sale and for delivery after sale.  S-19.

33.  At no time has a registration statement been in
effect with this Commission under the Securities Act of
1933 with respect to these contracts.  S-20.

————

FINDINGS OF FACT AND CONCLUSIONS OF LAW.

Filed Jul. 14, 1945 as of Feb. 27, 1945.

85                         (Title Omitted.)

There is no controversy with respect to the facts in
this case.  The parties by written stipulation in twenty-
one numbered paragraphs filed May 20, 1944, with nu-
merous exhibits therein referred to, have agreed on the
principal facts, and that stipulation with the above men-
tioned exhibits will be taken as part of these Findings of
Fact.

(1)  At the trial of the cause the parties offered oral
and documentary evidence which was admitted and con-
sidered by the Court, and supplemental to the agreed facts
set forth in the above mentioned stipulation and exhibits,
the Court finds that there have been about 55 sales of
lands to about 45 persons since about February 1, 1941,
at a price with few exceptions of approximately $1,000.00
an acre for groves containing citrus trees more than 5
years old and the Service Company has at this time ap-
proximately 215 contracts for care of groves of which ap-

proximately 42 or 43 cover acreage sold since the 1st of February, 1941. These purchasers reside in various states, 23 in number, including the District of Columbia and one or two in Canada. (R. 3, 5.) Of the eight sales representing a total of one hundred three and a fraction acres of non-bearing trees, the trees were all one year old or older, and in a few instances where there was sale of undeveloped land the average would be 40 acres or more, but there were none during the period of time covered by this litigation. (R. 33, 34.) No sales have been made to any purchaser who has not personally inspected the property. (R. 3, 5, 35.) The purchasers, or a considerable number of them, visit their property at least once a year (R. 29), and the purchasers are made up principally of business and professional people (R. 29). The Company operates a tourist hotel (The Floridan Country Club, mentioned in the stipulation) as a year-round project and there is a regular bus service by the Orlando Transit Company between Howey-In-The-Hills and the City of Orlando. No bus service is maintained by defendants. (R. 26.) Since the present management took over the Company (winter of 1940-41) approximately 6000 people have stayed at the hotel (R. 26).

(2) The lands are planted in forty-acre tracts approximately 1320 feet square, and the trees are planted in rows of approximately 48 to an acre. On two sides of the forty-acre tracts are open ways, approximately 20 feet wide, and each acre would ordinary include a row of 48 trees and the owner would have approximately 30 feet of frontage. The tracts are not fenced but staked with marks referring to a plat book record whereby the owner of the specific property, whether it contained 1, 2 or more rows may be definitely identified. (R. 7.) In the care of the grove, as in the yield of fruit, the cost of the care and the proceeds of the fruit may be, and are, definitely and dis-

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/22   Page 97 of 135

tinctly accounted for with respect to the specific row or rows owned by the individual.   (R. 7, 8, 9, 10, 14.)

(3)   All sales have been an out-right sale of a definitely identified tract of land.   In no instance has there been a sale of a right to share with others in the profits of land held in common with the defendant Companies or others. (R. 34, 35.)

(4)   Where fruit is sold on the tree the fruit of each individual owner as picked is checked and accounted for by defendant Service Company to that individual owner, and where the fruit is processed or canned the fruit of the individual owner is pooled with fruit of like variety and grade and the net proceeds apportioned equally and paid to each individual owner in accordance with the number of boxes of fruit contributed by him.   (R. 9, 10.)

(5)   The citrus industry is an established industry in Lake County, Florida, and according to the United States Census of 1940 there were of farms reporting two acres or more of citrus trees, 1721, with more than a million trees of bearing age.   (R. 16.)

(6)   It is a matter of common knowledge that a citrus tree properly cared for continued in bearing for many years, reputedly approaching the century mark.   (R. 8.) Of the defendants, The W. J. Howey Company owns approximately 400 acres of bearing citrus trees (R. 10).   The Vice-president of the two companies, associated with them since 1923 is the owner of approximately 100 acres of bearing groves, the oldest of which is 22 years old.   (R. 20, 23, 24.)   Mr. Griffin, connected with the company, owns approximately 350 acres of bearing groves.   (R. 23, 24.)

(7) It is matter of common knowledge and a matter not in dispute (R. 31) that the care of a grove requires equipment and force beyond the means of the owner of a small tract (R. 31), and there are numerous companies of good standing whose business it is to service groves owned by others. (R. 31, 32.) Approximately 85% of the purchasers within recent years have arrangements with the defendant Service Company for care, but many of the purchasers during past years are now having their groves cared for by others than the defendant Service Company (see map).

(8) The defendant Service Company maintains some 75 tractors, sprayer wagons, fertilizer trucks, and other machinery used in cultivating citrus trees, and a machine shop and force of mechanics. (R. 28.) The Company maintains a cannery and packing plant (R. 5) and a force of about one man to each 100 acres of grove (R. 27).

### Conclusions of Law.

In deciding this case, I desire to let the record in this case show that I adhere to the legal principles and interpretations of the Securities Act as announced by Judge Strum in Securities Exchange Commission v. Bailey, et al., 41 Fed. Supp., 647. I find from the testimony introduced in this case, that this case does not fall within the same category as that case, and that under the facts as shown by the record of this case, the defendants are not selling securities as that word is defined in the Securities Act, and that the government is not entitled to receive the relief sought in this particular suit.

And the Clerk of the Court is hereby directed to enter in the records of the Court its judgment entitled in the above styled cause and in these words: "This cause com-

ing on to be heard upon final hearing, and the parties having submitted their proofs, and the Court having heard counsel for the respective parties, it is now upon consideration thereof, Ordered, Adjudged, and Decreed by the Court that the injunction prayed for be denied and that the complaint be and the same is hereby dismissed.

Done and Ordered this .... day of ........... 1945.

. . . . . . . . . . . . . . . . . . . .
Judge.

———

FINDINGS OF FACT AND CONCLUSIONS OF LAW.

89                    Filed Apr. 18, 1945.

(Title Omitted.)

The above entitled cause coming on to be heard upon the complaint filed herein, the answer thereto, the stipulation of the parties as to the facts, the oral and documentary evidence offered at the hearing and the Court having considered the pleadings, the stipulation of the parties as to the Facts, the oral and documentary evidence submitted, and heard arguments of counsel for the respective parties and being fully advised in the premises makes the following findings of fact and conclusions of law.

1. The W. J. Howey Company and the Howey-in-the-Hills Service, Inc., hereinafter referred to as the Howey Company and the Service Company, respectively, are corporations organized under the laws of the State of Florida. The Howey Company was organized in 1922 and the Service Company was organized in 1932.

Case 1:20-cv-10832-AT-SN Document 898-3 Filed 08/09/23 Page 100 of 135

2.  The officers and directors of the Howey Company and the Service Company are the same, namely:

C. V. Griffin, President, Treasurer & Director.

Dodge Taylor, Vice-President and Director.

R. W. Holsclaw, Secretary and Director.

3.  The stockholders of the Howey Company and the Service Company are substantially the same, namely:

|  | Howey Company | Service Company |
|---|---|---|
| C. V. Griffin ................ | 510 shares | 510 shares |
| Dodge Taylor ................ | 228 shares | 229 shares |
| R. W. Holsclaw .............. | 1 share | 0 shares |
| C. M. Pinkerton ............. | 1 share | 1 share |
| Howey-in-the-Hills Investment Corp. ........ | 260 shares | 260 shares |

4.  The Howey Company and the Service Company share the same offices and both companies are under direct common control, utilizing the same facilities and personnel, their principal place of business being located at Howey-in-the-Hills, Florida.

5.  The Howey Company is the owner of large tracts of land in Lake County, Florida and for more than twenty years has been and is now engaged in the business of selling such land planted to citrus trees.

6.  The Service Company, since its organization in 1932, has been engaged in the business of cultivating and developing citrus groves in Lake County, Florida.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/08/23 Page 101 of 135

7.   The Howey Company owns and operates at Howey-in-the-Hills, Florida, a resort hotel known as the Floridan Country Club.   Since the Fall of 1940 approximately 6,000 people have stayed at the hotel.   There is a regular bus service by the Orlando Transit Company between Howey-in-the-Hills and the City of Orlando, Florida.   No bus service is maintained by the defendants.

8.   While tourists and vacationists who patronize the club are being escorted around the golf course, through the bridle paths and over the lakes, their attention is directed to citrus groves adjoining these attractions.   When vacationists evince an interest in the groves, they are informed that some of the acreage is for sale.

9.   Vacationists are informed that profits during the 1943-1944 season amounted to about 20 percent, although in some instances the return was greater; that based upon the estimated crop and the prices being secured for the season 1943-1944, the general level of profits would probably be a little higher than 20 percent for the 1944-1945 season.   They are told, however, that if they purchase groves and have the Service Company service the groves for them, they should not expect to receive more than 10 percent profit per year over the next ten years on a grove already in bearing at the time of purchase, or over the first ten years of bearing if they buy a young grove, since there will be bad years with the good.

10.   It is a matter of common knowledge that a citrus tree properly cared for continues in bearing for many years, reputedly approaching the century mark.   Vacationists are informed of the fact that there are trees in the vicinity of Howey-in-the-Hills, Florida which were planted around 1865 and are still producing large crops of fruit.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 102 of 135

11. Potential customers are for the most part residents of states other than the State of Florida and the actual purchasers reside in various states, 23 in number, including the District of Columbia, and one or two reside in Canada. Purchasers are predominately professional and business people, such as lawyers, bankers, doctors, manufacturers, etc.

12. The purchasers do not possess the knowledge, skill or equipment necessary for the care and cultivation of citrus trees. It would be completely unfeasible and uneconomical for a small owner to take care of his property and therefore he must rely on a service company to do this work. A land sales contract and the service contract therefore are customarily offered to potential customers simultaneously.

13. Between the period of February 1941 and May 31, 1943, 85% of the investors who purchased citrus acreage from the Howey Company simultaneously entered into service contracts with the Service Company.

14. Between February 1, 1941 and May 31, 1943, the Howey Company made 51 sales to 42 persons involving a total of 195.26 acres for $165,788. Eight of these sales were of non-bearing trees totaling 103.21 acres and 43 were sales of bearing trees totaling 92.05 acres. Of the 42 persons, 31 purchased tracts less than 5 acres. The average holding of these persons is 1.33 acres. All but one of these small purchasers made only a single purchase, whereas the 11 purchasers of more than 5 acres purchased their holdings in 19 transactions. Sales of as little as .65 acre, .7 acre, .73 acre were made by the Howey Company. Of the acreage sold 166.54 acres (85%) are being cared for by the Service Company.

98

- 15.  In its usual service contract, the Service Company undertakes properly to maintain, fertilize, spray and cultivate and otherwise care for the citrus trees growing on the land for a specified period.  The Service Company also agrees to market the crop and pay over to the owner the net proceeds of the fruit produced after deducting therefrom any charge incurred in the gathering, packing, marketing and selling of such fruit.

16.  The fruit is marketed by the Service Company in two ways.  One, the fruit is sold on the trees to buyers who enter into a contract with the Service Company to buy all of the fruit of a certain variety on certain trees, owned by or under the care of the defendants.  The fruit of each individual owner as picked is checked and accounted for by the Service Company to that individual owner.  The second method employed is where all of the fruit is picked and taken to the cannery or packing house where it is processed or packed.  The fruit of the individual owner is then pooled with fruit of like variety and grade and the net proceeds of the sale thereof are apportioned equally and paid to each individual owner in accordance with the number of boxes of fruit contributed by him.

17.  In its usual service contract, the Service Company charges the following service fees:

For non-bearing trees $40 per acre per year.

For bearing trees $30 per acre per year.

In addition to the stipulated fees, the owner of the land agrees to pay taxes as and when they become due, the market price delivered at the described property, of pruning, dusting, dusting material, spraying, spray material,

99

special treatment, seed for cover crop, sowing of same, fertilizer, replacement of any trees which may die, and watering trees when and as performed or applied in accordance with the best judgment of the Service Company. The term of the usual service contract covers a ten-year period; in some instances there is a privilege of annual cancellation by either party.

18. The lands of the Howey Company are planted in 40-acre tracts approximately 1320 feet square and the trees are planted in rows of approximately 48 to an acre, set on 30-foot centers. Insofar as possible plats are laid out and sold on a row basis. A person purchasing one acre would thus ordinarily acquire a single row of 48 trees with a 30-foot frontage. On two sides of the 40-acre tracts are open ways, approximately 20 feet wide. The tracts are not fenced but are staked with marks referring to a plat book record whereby the owners of the specific rows of trees in the tract may be definitely identified. For example: a single plat located in a 40-acre tract might contain 10 rows of trees comprising 10 acres, being identified by a stake bearing the symbols "Number 40. A, B, and C. 10 rows." This refers to a number 40 in the plat book, which shows that investor A owns two rows, investor B owns 4 rows and investor C owns 4 rows.

19. The prices charged for the land, which vary according to the number of years it has been planted with citrus trees, are as follows:

One year old trees $675 per acre.

Two year old trees $750 per acre.

Bearing trees (five years old or older) approximately $1000 per acre.

20. Upon full payment of the purchase price the land is conveyed to the purchaser by warranty deed. If the purchaser fails to pay the installments required by the Contract, the Howey Company may foreclose the contract in the same manner as it would foreclose a mortgage under Florida laws.

21. All sales have been an out-right sale of a definitely identified tract of land. In no instance has there been a sale of a right to share with others in the profits of land held in common with the defendant Companies or others.

22. No sales have been made by the Howey Company to any purchaser who has not personally inspected the property. In numerous instances the purchasers have acquired homes in the vicinity or spend a portion of each year in the vicinity, frequently inquiring and making suggestions with respect to care of their land and marketing of the fruit. The standard service agreement provides that the development of the property and the harvesting and sale of the crop shall be done in accordance with the best judgment of the Service Company. A considerable number of the purchasers visit their property at least once a year.

23. The Howey Company sells acreage to persons who do not use the Service Company as their caretaker. The Service Company services trees on land not purchased from the Howey Company and solicits service contracts from others than purchasers of the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company, and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company. Prospective customers have an opportunity to learn that there are numerous

competing service companies of high standing operating
in the vicinity of Howey-in-the-Hills whose business is to
service property owned by others. Such competitors post
signs by the land serviced by them which are visible from
the highways, and they send advertisements to land own-
ers. Moreover, officers of the Howey Company and the
Service Company acquaint prospective purchasers with
the existence of competitors. Of course, prospective cus-
tomers are informed by them that the Service Company's
competency and efficiency exceed that of its competitors.

24. The defendant Service Company was servicing 2,-
487.36 acres of citrus groves in March, 1944 and maintains
75 tractors, sprayer wagons, fertilizer trucks, and other
machinery used in cultivating these citrus groves, a ma-
chine shop and force of mechanics. The company also
maintains a cannery and packing plant and a force of
about one man to each 100 acres of land.

25. In the care of each grove, as in the yield of the
fruit, the cost of the care and the proceeds of the fruit
may be, and are, definitely and distinctly accounted for
with respect to the specific property owned by the indi-
vidual.

26. Of the defendants, the W. J. Howey Company owns
approximately 400 acres of bearing citrus trees. The Vice-
President of the two Companies, associated with them
since 1923, is the owner of approximately 100 acres of
bearing groves, the oldest of which is 22 years old. Mr.
Griffin, connected with the Company, owns approximately
350 acres of bearing groves.

27. The citrus industry is an established industry in
Lake County, Florida, and according to the United States
Census of 1940 there were of the farms reporting two acres

or more of citrus trees, 1721, with more than a million trees of bearing age.

28.  The mails and instruments of transportation and communication in interstate commerce are now and for some time have been used in the sale of said land and service contracts, and land sales contracts, warranty deeds, and service contracts are now being and for some time have been carried through the mails and in interstate commerce by means and instruments of transportation for the purpose of sale and for delivery after sale.

29.  At no time has a registration statement been in effect with Securities and Exchange Commission under the Securities Act 1933, with respect to these contracts.

### Conclusions of Law.

1.  The Court has jurisdiction of the parties and of the subject matter of this suit.

2.  Under the facts as shown by the record of this case the defendants are not selling securities as that word is defined in the Securities Act and the Government is not entitled to the relief sought in this suit.

3.  An Order will be entered denying the injunction prayed for and dismissing the Complaint.

Dated at Orlando, Florida, this 18th day of April, 1945.

DOZIER A. DeVANE,

United States District Judge.

96                    MEMORANDUM OPINION.

Filed Apr. 18, 1945.

(Title Omitted.)

There is no controversy with respect to the facts in this
case. The parties, by written stipulation filed May 20,
1944, have agreed upon the principal facts. In addition,
the parties offered oral and documentary evidence at a
Hearing subsequently held at the direction of the Court
for the purpose of supplying certain additional information
desired by the Court.

The record shows that the W. J. Howey Company, here-
after referred to as the Howey Company, is a corporation,
organized under the laws of the State of Florida in 1922,
with its principal place of business at Howey-in-the-
Hills, Florida. Howey-in-the-Hills Service, Inc., hereafter
referred to as the Service Company, is a corporation or-
ganized under the laws of the State of Florida in 1932,
with its principal place of business at Howey-in-the-Hills,
Florida. G. W. Griffin is President and Dodge Taylor is
Vice-President of both companies. The Howey Company
and the Service Company share the same offices and
utilize the same personnel and both companies are under
direct common control.

The Howey Company is the owner of large tracts of
land in Lake County, Florida, which it is now and for
more than twenty-years has been planting to citrus trees
and selling at various stages of development, after the
trees have reached one year old or older. The prices
charged vary according to the number of years the land
has been planted to citrus trees. The price generally re-
ceived for land where the trees are one year old is $675.00
per acre; for two year old trees, $750.00 per acre; and bear-
ing trees, five years or older, approximately $1,000.00 per
acre.

The Service Company is now and since its organiza-
tion has been engaged in the business of cultivating and
caring for citrus groves sold by the Howey Company to
others where its services were desired by the purchaser.
It has, since 1935, used a standard form of Service Con-
tract. In occasional instances modification of this Con-
tract is made to suit the requirements of a particular own-
er. By such Service Contract the Service Company un-
dertakes to properly maintain, fertilize, spray, cultivate,
and otherwise care for the citrus groves, for a specified
service charge of $40.00 per acre per year for trees under
five years old, and $30.00 per acre, per year, for bear-
ing groves more than five years old.

In addition to the service charge the owner of the land
agrees to pay for pruning, dusting and dusting material,
spraying and spray material, special treatment, seed for
cover crop, sowing of same, fertilizer, replacement of any
trees which may die, and watering of trees when neces-
sary. The Service Company acts as the Agent of the ·
owner of the property for the purpose of marketing the
fruit, if that service is desired.

During the three year period ended May 31, 1943—being
the period involved in this case—The Howey Company
sold fifty-one (51) parcels of land comprising 195.26 acres
of grove property. Of the fifty-one purchasers forty-two
entered into the Service Contract with the Service Com-
pany for the care of their properties. The contracts cov-
ered 166.54 acres, or 85% of the acreage sold by the Howey
Company during that period.

The Service Company is also engaged in the general
business of servicing citrus groves and services many grove
properties. It maintains 75 tractors, spray wagons, fer-
tilizer trucks and other machinery used in the cultivation
of citrus trees; a machine shop with mechanics and a force
of about one man to each 100 acres of grove property.
The record does not disclose the total acreage being cared

Case 1:20-cv-10832-AT-SN Document 898-3 Filed 08/09/23 Page 110 of 135

for by the Service Company on May 31, 1943, but it does disclose that in March, 1944, it was servicing 2,487.36 acres of citrus grove. The 166.54 acres covered by the contracts mentioned above, constitutes less than 7% of the total acreage under service agreements with the Service Company.

The citrus industry is an established industry in central and southern Florida and according to United States Census of 1940 there were 1721 farms reporting two (2) acres or more of citrus trees in Lake County, with more than one million trees of bearing age. It is a matter of common knowledge in the citrus section of Florida, and the record discloses, that the care of citrus groves requires equipment and a force beyond the means of the owner of a small tract of citrus property and there are numerous companies of good standing in the State, whose business is to service groves owned by others. There are at least seven such companies operating in the area in which the Service Company operates.

Plaintiff contends that the activities of the Howey Company and the Service Company in the sale of grove properties and in the care of same, constitute a violation of Section 5(a) of the Securities Act of 1933—15 U. S. C. 77 (a) (e), and by this suit seeks to enjoin such acts and practices. The specific charge is that the entry into service contracts by the Service Company, with purchasers of land from the Howey Company constitutes the sale of securities and as no registration statement, with respect to such activities has been or is now in effect with the Securities and Exchange Commission, that the defendants should be enjoined from continuation of their present practices until registration statements have been filed and approved according to the requirements of the Securities Act of 1933.

In deciding this case I desire to let the record show that I adhere to the legal principle and interpretation of the

Securities Act, as announced by Judge Strum, in Securi-
ties and Exchange Commission vs. Vailey, et al., 41 Fed.
Supp. 647. I find from the testimony introduced in this
case that this case does not fall within the same category
as that case and under facts shown by the record in this
case, the defendants are not selling securities as that
word is defined in the Securities Act and that the Gov-
ernment is not entitled to the relief sought in this particu-
lar suit.

In Securities and Exchange Commission vs. Bailey, et
al., Supra, the two companies there involved were the
owners of large tracts of land in Marion County, Florida,
said to be peculiarly adapted for growing tung trees.
These companies were engaged in selling these lands to
the public in small tracts for development and cultivation
of tung oil producing trees. Currently with or shortly af-
ter execution of a "sales" contract, a separate "develop-
ment" contract was executed between the purchaser and
development company, or an individual identified with
the companies owning the land. An extensive advertising
campaign was carried on and the raw land was sold, sight
unseen, to the purchaser. The tung oil industry was a
new untried and undeveloped industry in Florida. Little
was known about it, but glowing pictures were painted
of the prospects. The fact that the Securities Act reaches
out to stop such activities is a blessing to our gullible and
unsuspecting public.

As pointed out above, the citrus industry is an estab-
lished industry in Florida. Its beginning ante-dates the
building of railroads in the State and its progress has
been such that it is the largest single farming activity in
the State today. Moreover, the record in this case shows
that not a single sale of citrus grove property was made by
the Howey Company during the period involved in this
suit, except to purchasers who actually inspected the prop-
erty before purchasing the same. The record further dis-

closes that no purchaser is required to engage the Service Company to care for his property and that of the fifty-one purchasers acquiring citrus property during this period, only forty-two entered into contracts with the Service Company for the care of the property. The competition between service companies is keen. The services offered by the Howey Company through the Service Company to the purchasers of citrus properties from the Howey Company is more in the nature of a guarantee to such purchasers that their properties will be well cared for, than anything else. The Service Company could not long exist if it depended altogether upon the business secured from the sales made by the Howey Company. Moreover, the purchasers of these small tracts of citrus property could not safely acquire same unless they did, at the same time, secure the services of some reliable service company to care for their properties. The employment of the Service Company by the purchasers of property from the Howey Company in no way constitutes a violation of the Securities Act of 1933.

Findings of Fact and Conclusions of Law will be prepared in conformity with this Memorandum Opinion.

Dated at Orlando, Florida, this 17th day of April, 1945.

DOZIER A. DeVANE,

United States District Judge.

100            FINAL JUDGMENT.

Filed Apr. 18, 1945.

In the United States District Court in and for the South-
ern District of Florida, Orlando Division.

Securities and Exchange Commission, Plaintiff
vs.
W. J. Howey Company and Howey-in-the-Hills Service,
Inc., Defendants.

Case No. 220 Orl. Civ.

Orl. C. O. B. 3-251.

This cause coming on to be heard upon final hearing
and the parties having submitted their proof and the Court
having heard counsel for the respective parties and hav-
ing prepared and filed a Memorandum Opinion and Find-
ings of Fact and Conclusions of Law herein, it is now upon
consideration thereof,

Ordered And Adjudged by the Court that the Injunction
prayed for by the Plaintiff be denied and that the Com-
plaint be and the same is hereby dismissed.

Done And Ordered in Chambers at Orlando, Florida, this
18th day of April, 1945.

                    DOZIER A. DeVANE,
                    United States District Judge.

Case 1:20-cv-10832-AT-SN Document 998-3 Filed 08/09/23 Page 114 of 135

**101**         **NOTICE OF APPEAL.**

Filed May 14, 1945.

In the United States District Court for the Southern District of Florida, Orlando Division.

Securities and Exchange Commission, Plaintiff,

vs.

W. J. Howey Company and Howey-in-the-Hills Service, Inc., Defendants.

Civil Action (Orlando) No. 220.

Notice Is Given That The Securities And Exchange Commission, plaintiff above named, hereby appeals to the United States Circuit Court of Appeals for the Fifth Circuit from the final judgment entered in this action on the 18th day of April, 1945.

Dated this 12th day of May 1945.

> ROGER S. FOSTER,
>> (Roger S. Foster)
>> Solicitor.
>
> EDWARD H. CASHION,
>> (Edward H. Cashion)
>> Counsel.

18th and Locust Sts.,
     Philadelphia, 3, Pa.

> WILLIAM GREEN,
>> (William Green)
>> Regional Administrator.
>
> WILLIAM A. McLAIN,
>> (William A. McLain)
>>> (Attorneys for Plaintiff, Securities a n d Exchange Commission.

415 Palmer Bldg.,
     Forsyth and Marietta Sts.,
       Atlanta 3, Ga.

110

102            STATEMENT OF POINTS.

Filed Jun. 22, 1945, Orlando, Fla.

(Title Omitted.)

In its appeal, appellant Securities and Exchange Commission, plaintiff in the above-entitled action, intends to rely solely upon the point that the District Court erred in concluding that the defendants were not engaged in the sale and in the offering for sale of a "security" within the meaning of Section 2(1) of the Securities Act of 1933, as amended (15 U. S. C. § 77 b (1)).

Dated, June 21, 1945.

                    ROGER S. FOSTER,
                      (Roger S. Foster)
                      Solicitor.
                    EDWARD H. CASHION,
                      (Edward H. Cashion)
                      Counsel.
18th and Locust Streets,
    Philadelphia 3, Pennsylvania.
                    WILLIAM GREEN,
                      (William Green)
                      Regional Administrator.
                    WILLIAM A. McCLAIN,
                      (William A. McClain)
                        Attorneys for Plaintiff, Securities and Exchange Commission.
415 Palmer Building,
    Forsyth and Marietta Streets,
        Atlanta 3, Georgia.

111.

Copy served upon George C. Bedell and Carl E. Duncan, attorneys for defendants, W. J. Howey Company and Howey-in-the-Hills Service, Inc., June 21, 1945.

WILLIAM A. McCLAIN.

---

103       DESIGNATION OF RECORD.

Filed June 22, 1945.

(Title Omitted.)

Appellant Securities and Exchange Commission, plaintiff in the above-entitled action, designates the following portions of the record, proceedings and evidence to be contained in the record on appeal in the above-entitled action:

1.   Complaint for preliminary and final injunction, filed on May 16, 1944.

2.   Answer of defendants, filed on May 20, 1944.

3.   Stipulation of the parties, filed on May 20, 1944.

4.   Motion for summary judgment, filed on June 1, 1944.

5.   Petition and order to withdraw motion for summary judgment, filed on January 3, 1945.

6.   Transcript of proceedings dated January 30, 1945.

7.   Plaintiff's proposed findings of fact, submitted February 27, 1945, and filed June ...., 1945.

**112**

8.  Defendants' proposed findings of fact, submitted February 27, 1945, and filed June ...., 1945.

9.  Findings of Fact and Conclusions of Law, dated April 18, 1945.

10.  Memorandum opinion, dated April 17, 1945.

11.  Final Judgment, dated April 18, 1945.

12.  Notice of Appeal, filed May 14, 1945.

13.  Statement of points to be relied upon by plaintiff in its appeal.

14.  This designation of record.

Dated:  June 21, 1945.

> ROGER S. FOSTER,
>     (Roger S. Foster)
>     Solicitor.
> EDWARD H. CASHION,
>     (Edward H. Cashion)
>     Counsel.

18th and Locust Streets,
    Philadelphia 3, Pennsylvania.

> WILLIAM GREEN,
>     (William Green)
>         Regional Administrator.
> WILLIAM A. McCLAIN,
>     (William A. McClain)
>         Attorneys for Plaintiff, Securities a n d Exchange Commission.

415 Palmer Building,
    Forsyth and Marietta Streets,
        Atlanta 3, Georgia.

**113**

Copy served upon George C. Bedell and Carl E. Duncan, attorneys for defendants, W. J. Howey Company and Howey-in-the-Hills Service, Inc., June 21, 1945.

WM. A. McCLAIN.

—————

105          DESIGNATION OF RECORD.

Filed Jun. 25, 1945.

(Title Omitted.)

The defendants in the above styled cause designate additional portions of the record, proceedings and evidence to be included in the transcript upon the appeal taken by plaintiff in the above styled cause, as follows:

Each and every of the Exhibits admitted in evidence at the trial of the cause, including: The several Exhibits to the Stipulation of the Parties filed in the cause, and the several other Exhibits filed in evidence at the trial of the cause, including: Form of Agreement, Exhibit J (referred to on Page 9 of the transcript of proceedings); Excerpt from the United States Census of 1940 (referred to on Page 18 of the transcript of proceedings); and the map (referred to on Page 22 of the transcript of proceedings).

C. E. DUNCAN,
GEORGE C. BEDELL,
Attorneys for Defendants.

45 West Forsyth Street,
Jacksonville (2), Florida.

106

# DEF. EXHIBIT 1.

## S. E. C. vs Howey.

### Filed in Evidence 1-30, 1945.

### Citrus Production in Lake County.

Citrus fruit trees, 1940, and production, Season
    1939-40 (from bloom of 1939) .......... Farms reporting ............... 1,721
Oranges (satsumas, tangerines, mandarins, etc.) Farms reporting ............... 1,681
Trees not of bearing age .................... Number ...................... 367,222
Trees of bearing age ...................... Number ...................... 1,417,203
Quantity harvested ......................... Farms reporting ............... 1,349
                                        Field boxes ...................... 2,839,002

Satsumas ...................................... Farms reporting ............... 69
Trees of bearing age ...................... Number ...................... 653
Quantity harvested ......................... Number ...................... 9,443
Trees not of bearing age .................... Field boxes ...................... 27,776

Tangerines and mandarines ................. Farms reporting ............... 722
Trees not of bearing age .................... Number ...................... 7,743
Trees of bearing age ...................... Number ...................... 130,443
Quantity harvested ......................... Field boxes ...................... 234,584

114

| | | |
|---|---|---:|
| Other early and mid-season oranges ........ | Farms reporting ................ | 1,516 |
| Trees not of bearing age .................... | Number ........................ | 232,640 |
| Trees of bearing age ...................... | Number ........................ | 826,048 |
| Quantity harvested ......................... | Field boxes ..................... | 1,890,496 |
| Valencia and other late oranges ............ | Farms reporting ................ | 1,055 |
| Trees not of bearing age .................... | Number ........................ | 126,186 |
| Trees of bearing age ...................... | Number ........................ | 451,269 |
| Quantity harvested ......................... | Field boxes ..................... | 686,146 |
| Grapefruit (all varieties) .................. | Farms reporting ................ | 1,166 |
| Trees not of bearing age .................... | Number ........................ | 34,462 |
| Trees of bearing age ...................... | Number ........................ | 469,519 |
| Quantity harvested ......................... | Field boxes ..................... | 1,144,855 |
| Seedless ................................... | Farms reporting ................ | 666 |
| Trees not of bearing age .................... | Number ........................ | 20,503 |
| Trees of bearing age ...................... | Number ........................ | 256,931 |
| Quantity harvested ......................... | Field boxes ..................... | 626,664 |
| All other ................................. | Farms reporting ................ | 827 |
| Trees not of bearing age .................... | Number ........................ | 13,959 |
| Trees of bearing age ...................... | Number ........................ | 212,588 |
| Quantity harvested ......................... | Field boxes ..................... | 518,191 |

115

| | | |
|---|---|---|
| Lemons ..................................... | Farms reporting ................. | 73 |
| Trees not of bearing age .................... | Number ........................ | 276 |
| Trees of bearing age ....................... | Number ........................ | 560 |
| Quantity harvested ......................... | Farms reporting ................ | 27 |
| | Field boxes ..................... | 348 |
| | | |
| Limes ....................................... | Farms reporting ................. | 58 |
| Trees not of bearing age .................... | Number ........................ | 3,581 |
| Trees of bearing age ....................... | Number ........................ | 1,525 |
| Quantity harvested ......................... | Farms reporting ................ | 12 |
| | Pounds ......................... | 33,598 |
| | | |
| Kumquats .................................... | Farms reporting ................. | 16 |
| Trees not of bearing age .................... | Number ........................ | 58 |
| Trees of bearing age ....................... | Number ........................ | 555 |
| Quantity harvested ......................... | Farms reporting ................ | 4 |
| | Pounds ......................... | 1,515 |
| | | |
| Tangeloes ................................... | Farms reporting ................. | 4 |
| Trees not of bearing age .................... | Number ........................ | 100 |
| Trees of bearing age ....................... | Number ........................ | 2,034 |
| Quantity harvested ......................... | Farms reporting ................ | 2 |
| | Field boxes ..................... | 10,347 |

Sixteenth Census of the United States, 1940.   Agriculture, Vol. 1, Part 3, p. 782.

From Introduction Page XIV.

## "Trees, Fruits, Nuts and Grapes.

On many farms there are a few fruit or planted nut trees, or grapevines, which are not a part of a well-defined orchard or vineyard. In many such cases reports were secured for the number of trees, with or without production, but no acreage was shown. An acreage was supplied when there were enough trees or plants, at normal planting distances, to make two acres."

106-B             PLTF. EXHIBIT J.

#220 Orl. Civ. S. E. C. vs. Howey. Filed in Evidence 1/30/1945. Edwin R. Williams, Clerk.

### Original.

This Agreement made and entered into this .... day of ............ A. D. 19...., between W. J. Howey Company, a Florida corporation, hereinafter called the seller and ................,... of ................. hereinafter called the buyer.

Witnesseth, that for and in consideration of the mutual covenants hereinafter set forth the seller agrees to sell and the buyer agrees to buy approximately:

............ boxes of ....,..............

..........,... boxes of ...................

being all of the crop of citrus fruit of said varieties of the season 19....-19...., now on the trees in the groves

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/08/23   Page 123 of 135

under control of the seller, and known and designated by
the seller as groves numbered: ..........................
.............................................................,
said groves being located near Howey-in-the-Hills, Lake
County, Florida, on the following terms and conditions:

(1)  It is agreed that the price for said citrus fruit on-
the-tree shall be as hereafter specified per standard field
box, and that the buyer shall have up to and including the
dates hereafter specified within which to remove said
fruit:

$........ per standard field box of ...................
to be removed by ...............................

$........ per standard field box of ...................
to be removed by ...............................

(2)  The buyer agrees to pay herewith the sum of
$........ on account of said sale of fruit, the receipt of
which is hereby acknowledged, as part of the purchase
price above specified, and to pay to the seller at the close
of each day of picking the full consideration for the num-
ber of boxes picked during that day, the deposit to apply
on the fruit last moved.

(3)  It is agreed that the buyers shall pay the state
advertising tax as assessed by the state of Florida on all
citrus fruits and any other State or Federal government
charges or taxes whatsoever, and the buyer shall and does
hereby relieve the seller of all liability therefor.

(4)  The seller warrants that it has full right and au-
thority to sell the fruit covered by this contract. It is,
however, understood and agreed that the seller controls a
portion of said fruit by virtue of certain contracts and

**119**

agreements with the legal owners of said lands; that in the event the seller's authority to sell said crops of fruit, or any part thereof, is terminated by virtue of agreement, exercise of option, or authority of law, or by reason of said fruit having been removed from said land by means beyond the control of the seller, buyer does hereby agree that the seller will be relieved of all obligation to deliver such fruit.

(5.) It is further agreed by the parties hereto that in the event buyer fails to comply with any of the terms hereof in the manner and at the time prescribed hereby, and that such default shall continue for a period of three days, the seller shall and does hereby have the right immediately to cancel this agreement and to treat same as null and void; that upon such default the seller shall have immediate right to dispose of the balance of the fruit covered by this contract in such reasonable manner as to the seller may seem best; that thereupon the buyer will immediately pay to seller the difference between the consideration for such fruit named by this contract and the price secured by the seller after such defualt. Time shall be the essence of this contract.

Executed and delivered in the county of Lake and state of Florida by the parties hereto on the day and year first above written.

W. J. HOWEY COMPANY,

By ....................

....................

By ....................

120

107                          ORDER.

Filed Jun. 25, 1945.

(Title Omitted.)

Orl. C. O. B. 3-307.

It appearing to the Court that the large colored map admitted in evidence at the trial and referred to on Page 61 of the Transcript of Proceedings should be inspected by the Appellate Court, it it now,

Ordered that the said map be transmitted to the United States Circuit Court of Appeals for the Fifth Circuit along with the record on appeal.

Done And Ordered at Orlando, Florida, this 25th day of June, 1945.

                         DOZIER A. DeVANE,
                         Judge.

                    ————————

ORDER DIRECTING FILING OF PLAINTIFF'S AND DEFENDANTS' PROPOSED FINDINGS OF FACT.

108                    Filed June 25, 1945.

(Title Omitted.)

Orl. C. O. B. 3-307.

In Consideration of plaintiff's Motion for an Order by this Court directing that its Proposed Findings be made a part of the record in the appeal from the final judgment in this cause entered on April 18, 1945;

**121**

It Is Ordered And Directed by this Court that plaintiff's and defendants' proposed Findings of Fact, heretofore submitted to this Court in Chambers on February 27, 1945, be filed of record in the office of the Clerk of this Court as of the original date of submission.

Done And Ordered in Chambers at Orlando, Florida, this 25th day of June, 1945.

DOZIER A. DeVANE,
United States District Judge.

**122**

United States of America,
Southern District of Florida, ss.

I, EDWIN R. WILLIAMS, Clerk of the United States District Court in and for the Southern District of Florida, do hereby certify that the annexed and foregoing is a true and correct copy of the original instruments filed in the case of Securities and Exchange Commission, plaintiff, vs. W. J. Howey Company and Howey-in-the-Hills Service Company, defendants, No. 220 Orlando Civil, which is set forth as items 1 through 14 inclusive in plaintiffs designation and exhibits required in defendants designation of Contents and being pages numbered 1 to 106 herein inclusive, prepared according to the directions of the attorneys and now remaining among the records of the said Court in my office.

In testimony whereof, I have hereunto subscribed my name and affixed the seal of the aforesaid Court at Orlando, Florida, this 17th day of July, 1945, A. D.

EDWIN R. WILLIAMS,

(Seal)                              Clerk.

By  EDNA P. HARMON,
Deputy  Clerk.

That thereafter the following proceedings were had in said cause, in the United States Circuit Court of Appeals for the Fifth Circuit, viz:

## ARGUMENT AND SUBMISSION

### Extract from the Minutes of October 17, 1945

#### No. 11421

##### SECURITIES AND EXCHANGE COMMISSION

*vs.*

### W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC.

On this day this cause was called, and, after argument by Milton V. Freeman, Esq., Assistant Solicitor, Securities & Exchange Commission, for appellant, and C. E. Duncan, Esq., and George C. Bedell, Esq., for appellees, was submitted to the Court.

### Opinion of the Court Filed—November 13, 1945

## UNITED STATES CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT

### No. 11421

#### SECURITIES AND EXCHANGE COMMISSION, APPELLANT

*vs.*

### W. J. HOWEY COMPANY AND HOWEY-IN-THE-HILLS SERVICE, INC., APPELLEES

#### Appeal from the District Court of the United States for the Southern District of Florida

### (November 13, 1945)

#### Before HUTCHESON, WALLER, and LEE, *Circuit Judges*

HUTCHESON, *Circuit Judge:* The suit against W. J. Howey Company [1] and Howey-In-The-Hills Service, Inc.[2] was for an in-

---

[1] This company is the owner of large tracts of land in Lake County, Florida. For more than 20 years it has been planting citrus trees and, after the trees have reached one year or older, selling to various purchasers various size groves at various stages of development, the price varying according to the number of years the land has been planted to citrus trees. It also owns and operates the Floridan Country Club at Howey-In-The-Hills, a resort hotel frequented by tourists and vacationists. These are shown citrus groves owned by the company, are informed that young groves are for sale, and, if any interest is shown, this is followed up with an effort to make sales.

[2] This company has since its organization in 1932 been engaged in cultivating and developing citrus groves for their owners, generally under a standard form of service contract used by it since 1935, with occasional modifications to suit particular requirements of particular owners.

junction under Section 20 (b) of the Securities Act of 1933.[3] The
claim in general was that the defendants, without filing with the
Securities and Exchange Commission a registration statement
with respect thereto have been, and are now, using the mails and
interstate commerce to sell securities, to-wit, investment contracts,[4]
evidenced by warranty deeds and development contracts given in
connection with, and as a part of, the sale of citrus groves in
violation of Section 5 (a) Securities Act of 1933, Sec. 77 (e),
15 U. S. C.

Particularized, the claim was: that the two companies under
the same common control, with the same officers, facilities, and
personnel, and substantially the same stockholders, were engaged
in carrying on an investment business, to-wit, the growth and
cultivation of citrus trees and the marketing and sale of fruit
therefrom; that by the device of deeds from the Howey Company
to the groves, and cultivation and management contracts from
the Service Company, they were in substance and effect selling
investment contracts to customers in that, though the purchasers
of groves paid their money in form as purchasers of specific tracts
of land, they were in fact investors with the Howey Companies in
a citrus growing and marketing enterprise, the profits from their
purchases to be derived not from their own skill and efforts but
from the skill and efforts of others.

The defendants denied the charges of the complaint that they
were jointly selling investment contracts. As to the Howey Com-
pany, they insisted that it was selling specific groves and exe-
cuting deeds carrying full title to them, that its contract was com-
plete when the terms of sale were agreed on, and the sale was
completed when the deed was delivered. As to the Service Com-
pany, the insistence was that it was engaged not in selling securi-
ties or investment contracts but in selling its services in caring
for, cultivating and managing groves. Finally, pointing out that
there was no requirement on the part of the Howey Company that
its purchasers would have their groves served by the Service Com-
pany, and no obligation on the part of such purchasers to have
this done, they insisted that it could not reasonably be claimed
that a purchaser of a grove from the Howey Company was not
purchasing merely a grove and looking to its growth and fruiting
for a return on, and an increase in, value of his investment, but

---

[3] 15 U. S. C. Sec. 77t (b).

[4] "The term 'security' means any note, stock, treasury stock, bond, debenture, evi-
dence of indebtedness, certificate of interest or participation in any profit-sharing
agreement, collateral-trust certificate, pre-organization certificate or subscription,
transferable share, investment contract, voting-trust certificate, certificate of deposit
for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in
general, any interest or instrument commonly known as a 'security' or any certificate
of interest or participation in, temporary or interim certificate for, receipt for, guar-
antee of, or warrant, or right to subscribe to or purchase any of the foregoing."
Sec. 2 (1) Securities Act 1933, 15 U. S. C. Sec. 77 (b) (1).

was in reality purchasing an interest in an investment enterprise being carried on by the two Howey Companies, looking to their work and efforts for a return on this investment and an increase in its value.

The district judge, upon facts [5] stipulated and testified to without conflict, found with the defendants that they were not, as charged, selling securities, to-wit, investment contracts, but that the Howey Company was selling groves, and the Service Company was contracting for a cultivating, managing and marketing

---

[5] The citrus industry is an established industry in central and southern Florida. Its beginning antedates the building of railroads into the state, and its progress has been such that it is the largest single farming industry in the State. According to United States Census of 1940 there were 1,721 farms reporting two (2) acres or more of citrus trees in Lake County, with more than one million trees of bearing age. It is a matter of common knowledge in the citrus section of Florida, and the record discloses, that the care of citrus groves requires equipment and a force beyond the means of the owner of a small tract of citrus property and there are numerous companies of good standing in the State, whose business is to service groves owned by others. There are at least seven such companies operating in the area in which the Service Company operates.

The prices charged for the land, which vary according to the number of years it has been planted with citrus trees, are as follows:

One year old trees $675 per acre;
Two year old trees $750 per acre;
Bearing trees (five years old or older) approximately $1,000 per acre.

Upon full payment of the purchase price the land is conveyed to the purchaser by warranty deed. If the purchaser fails to pay the installments required by the Contract, the Howey Company may foreclosure the contract in the same manner as it would foreclose a mortgage under Florida laws.

All sales have been an out-right sale of a definitely identified tract of land. In no instance has there been a sale of a right to share with others in the profits of land held in common with the defendant Companies or others.

No sales have been made by the Howey Company to any purchaser who has not personally inspected the property. In numerous instances the purchasers have acquired homes in the vicinity or spend a portion of each year in the vicinity, frequently inquiring and making suggestions with respect to care of their land and marketing of the fruit. The standard service agreement provides that the development of the property and the harvesting and sale of the crop shall be done in accordance with the best judgment of the Service Company. A considerable number of the purchasers visit their property at least once a year.

The Howey Company sells acreage to persons who do not use the Service Company as their caretaker. The Service-Company services trees on land not purchased from the Howey Company and solicits service contracts from others than purchasers of the Howey Company. Sales of acreage by the Howey Company are not conditioned upon the purchasers entering into service agreements with the Service Company, and the caretaking agreements are not conditioned upon the purchase of acreage from the Howey Company. Prospective customers have an opportunity to learn that there are numerous competing service companies of high standing operating in the vicinity of Howey-In-The-Hills whose business is to service property owned by others. Such competitors post signs by the land serviced by them which are visible from the highways, and they send advertisements to land owners. Moreover, officers of the Howey Company and the Service Company acquaint prospective purchasers with the existence of competitors. Of course, prospective customers are informed by them that the Service Company's competency and efficiency exceed that of its competitors.

The defendant Service Company was servicing 2,487.36 acres of citrus groves in March, 1944, including therein 166.40 acres purchased from Howey Company since 1941, and maintains 75 tractors, sprayer wagons, fertilizer trucks, and other machinery used in cultivating these citrus groves, a machine shop and force of mechanics. The company also maintains a cannery and packing plant and a force of about one man to each 100 acres of land.

In the care of each grove, as in the yield of the fruit, the cost of the care and the proceeds of the fruit may be, and are, definitely and distinctly accounted for with respect to the specific property owned by the individual.

The purchasers do not possess the knowledge, skill or equipment necessary for the care and cultivation of citrus trees. It would be completely unfensible and uneconomical for a small owner to take care of his property and therefore he must rely on a service company to do this work. A land sales contract and the service contract therefore are customarily offered to potential customers simultaneously.

Between the period of February 1941 and May 31, 1943, 85% of the investors who purchased citrus acreage from the Howey Company simultaneously entered into service contracts with the Service Company.

Between February 1, 1941 and May 31, 1943, the Howey Company made 51 sales to 42 persons involving a total of 195.26 acres for $185,788. Eight of these sales were

## 126

service.  Pointing out that the Joiner case,[e] so strongly relied on by plaintiff, as well as those dealing with rabbit, fox, and tung tree culture, had to do with speculative promotions where the thing sold was valueless except as the prospect of a successful promotion gave it value, while here the transactions were not at all promotional but were sales of specific orange groves having an established value and specific contracts for their servicing, he concluded, we think, correctly, that those cases were not at all in point.

He thought, as we do, that the facts that orange groves need cultivating and servicing and that individual owners of small groves are not equipped to do this for themselves but must contract with service companies or others for its being done, were without significance in making the primary determination here. This is whether what Howey sold was a particular grove and what the Service Company sold was a particular service contract, or whether what was done, the sale of the grove and the issuance of the contract, was in effect one transaction, the sale of an interest in a general enterprise of grove cultivation and marketing.  He, therefore, correctly concluded that the facts so strongly relied on by the plaintiff: that nearly all of the purchasers were residents of other states who did not expect to, and could not, personally cultivate their groves; that some of the groves were very small in extent; and that the Howey Company in connection with the sale of a grove did emphasize the advantage to the purchaser of contracting with its subsidiary, the Service Company, for its servicing; could not convert what it was in law and in fact the purchase in fee simple of a designated and described grove, and the making of a separate contract for servicing it, into the purchase of a security, to-wit, an investment contract under which the purchaser acquired not a grove with a separate contract to service it, but an interest in Howey & Company's business of developing, selling and servicing orange groves.

We, of course, agree with plaintiff that the protection of the invoked statute and the jurisdiction of the commission extend equally to securities of established businesses as to those of new businesses, to non-speculative as well as to speculative investments, and that the fact that an activity or pursuit has passed out of the promotional or experimental stage does not at all exempt it from the Act.  But it may not be doubted that in close

of non-bearing trees totaling 103.21 acres and 43 were sales of bearing trees totaling 92.05 acres.  Of the 42 persons, 31 purchased tracts less than 5 acres.  The average holding of these persons is 1.33 acres.  All but one of these small purchasers made only a single purchase, whereas the 11 purchasers of more than 5 acres purchased their holdings in 19 transactions.  Sales of as little as .65 acre, .7 acre, .73 acre were made by the Howey Company.  Of the acreage sold 166.54 acres (85%) are being cared for by the Service Company.
[e] S. E. C. v. Joiner, 320 U. S. 344.

cases, like Joiner's was, the fact that an activity is purely promotional and speculative does have weight in answering the critical question, whether in fact the purchase was of a specific thing having specific value in itself or was of a thing having no value unless the enterprise as a whole should succeed. Where, in short, the seller is not conducting a speculative enterprise, and the thing sold has a specific and definite value apart from the success of the activity which sells it, it is exceedingly difficult to make out such a *nexus* between the sale and the enterprise sufficient to make the purchase not one of a specific thing but of an interest in the enterprise. On the other hand, when the enterprise is speculative and promotional in character and the thing sold has value only if the enterprise as a whole succeeds, the *nexus* between purchase and enterprise, which makes them one in the sense that the purchase is really not of a specific thing but of an interest in the enterprise, at once meets the eye of the judge and informs his judgment in the case.

We cannot agree, therefore, with appellant that the line of demarcation between the purchase of a specific thing and of an interest in an enterprise is to be drawn according to whether the purchaser manages the thing purchased or contracts with others for its management. Such a test would make every purchase of a thing, the management of which was to be conducted through agents, the purchase not of a thing but of an investment contract. Such a test, in the light of the established fact that a great number of properties, especially agricultural properties, are now run not by, but for, their owners under service contracts, is a completely unreal one. Here it is quite clear that each purchaser looked for the income from his investment to the fruitage of his own grove and not to the fruitage of the groves as a whole. It is quite clear, too, that each purchaser's income was in no sense dependent upon the purchase or development of other tracts than his own except in the sense that as grove owners generally prospered, each owner of a grove would. To say that because a purchaser of a farm or a building, at the time and in connection with the purchase, secured the services of another, whether the seller, someone connected with him, or someone entirely independent of him, to manage it, he became a purchaser not of property but of a security, an investment contract, is to stretch beyond the breaking point the analogy of the Joiner case. It is, indeed, to run a good principle into the ground. The judgment was right. It is

*Affirmed.*

**128**

*Judgment*

Extract from the Minutes of November 13, 1945
No. 11421

SECURITIES AND EXCHANGE COMMISSION

*vs.*

W. J. HOWEY COMPANY, AND HOWEY-IN-THE-HILLS SERVICE, INC.

This cause came on to be heard on the transcript of the record from the District Court of the United States for the Southern District of Florida, and was argued by counsel;

On consideration whereof, It is now here ordered, adjudged and decreed by this Court that the judgment of the said District Court in this cause be, and the same is hereby, affirmed.

*Clerk's certificate*

UNITED STATES OF AMERICA,
    *United States Circuit Court of Appeals, Fifth Circuit.*

I, Oakley F. Dodd, Clerk of the United States Circuit Court of Appeals for the Fifth Circuit, do hereby certify that the pages numbered from 123 to 131 next preceding this certificate contain full, true and complete copies of all the pleadings, record entries and proceedings, including the opinion of the United States Circuit Court of Appeals for the Fifth Circuit, in a certain cause in said Court, numbered 11421, wherein Securities and Exchange Commission is appellant, and W. J. Howey Company, and Howey-In-The-Hills Service, Inc., are appellees, as full, true and complete as the originals of the same now remain in my office.

I further certify that the pages of the printed record numbered from 1 to 122 are identical with the printed record upon which said cause was heard and decided in the said Circuit Court of Appeals.

In testimony whereof, I hereunto subscribe my name and affix the seal of the said United States Circuit Court of Appeals, at my office in the City of New Orleans, Louisiana, in the Fifth Circuit, this 2nd day of February, A. D. 1946.

[SEAL]                         (S)  OAKLEY F. DODD,
                          *Clerk of the United States Circuit
                          Court of Appeals, Fifth Circuit.*

Case 1:20-cv-10832-AT-SN   Document 998-3   Filed 08/09/22   Page 134 of 135

Supreme Court of the United States

*Order allowing certiorari*

Filed March 25, 1946

The petition herein for a writ of certiorari to the United States Circuit Court of Appeals for the Fifth Circuit is granted.

And it is further ordered that the duly certified copy of the transcript of the proceedings below which accompanied the petition shall be treated as though filed in response to such writ.

Mr. Justice JACKSON took no part in the consideration or decision of this application.

Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293 (1946). Transcript of Record. 20 May 1944. The Making of Modern Law: U.S. Supreme Court Records and Briefs, 1832–1978, link.gale.com/apps/doc/DW0108423063/SCRB?u=usscl&sid= bookmark-SCRB&xid=51c97a1c&pg=1. Accessed 14 Oct. 2021.