# Exhibit 5

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE        )
    COMMISSION,                    )
5                                  )
                   Plaintiff,      )
6                                  ) Case No.
            v.                     ) 20-Civ-10832(AT)(SN)
7                                  )
    RIPPLE LABS, INC., BRADLEY     )
8   GARLINGHOUSE, and CHRISTIAN    )
    LARSEN,                        )
9                                  )
                   Defendants.     )
10  _____)

11

12      **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14              VIDEOTAPED DEPOSITION OF

15          FRANK ALLEN FERRELL, III, Ph.D.

16          Wednesday, February 23, 2022

17

18

19

20

21

22

23

    Reported by:
24  BRIDGET LOMBARDOZZI
    CSR, RMR, CRR, CLR
25  Job No. 2202232BLO

                                              1

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1                 UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF NEW YORK

 3

 4    SECURITIES AND EXCHANGE          )
      COMMISSION,                      )
 5                                     )
                      Plaintiff,       )
 6                                     ) Case No.
                 v.                    ) 20-Civ-10832(AT)(SN)
 7                                     )
      RIPPLE LABS, INC., BRADLEY       )
 8    GARLINGHOUSE, and CHRISTIAN      )
      LARSEN,                          )
 9                                     )
                      Defendants.      )
10    _____)

11

12

13

14

15           Videotaped deposition of FRANK ALLEN FERRELL,

16    III, taken on behalf of Plaintiff, held at the offices of

17    Debevoise & Plimpton, 919 Third Avenue, New York, New

18    York, commencing at 9:27 a.m. and ending at 6:49 p.m., on

19    Wednesday, February 23, 2021, before Bridget Lombardozzi,

20    CCR, RMR, CRR, CLR, and Notary Public of the States of

21    New York and New Jersey, pursuant to notice.

22

23

24

25
                                                              2
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S (Via Remote where indicated):

 2

 3

 4   For the Plaintiff:

 5

 6

 7        UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 8        NEW YORK REGIONAL OFFICE

 9        BY:  MARK SYLVESTER, ESQUIRE

10             ARTUR MINKIN, ESQUIRE

11             JON DANIELS, ESQUIRE

12        200 Vesey Street

13        Suite 400

14        New York, New York  10281-1022

15        Telephone:  212.336.1060

16        Email:   sylvesterm@sec.gov

17                 minkina@sec.gov

18                 jdaniels@sec.gov

19

20

21

22

23

24

25
```

3

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1  A P P E A R A N C E S (Continued):
 2  For Defendant Ripple Labs Inc.:
 3          DEBEVOISE & PLIMPTON LLP
 4          BY:  SCOTT CARAVELLO, ESQUIRE (Remote)
 5          919 Third Avenue
 6          New York, New York  10022
 7          Telephone:  212.909.6000
 8          E-Mail:  Scaravello@debevoise.com
 9                      -and-
10          KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
11          BY:  MICHAEL KELLOGG, ESQUIRE
12              REID FIGEL, ESQUIRE
13              JUSTIN BERG, ESQUIRE
14              ELIANA PFEFFER, ESQUIRE (Remote)
15              COLLIN WHITE, ESQUIRE (Remote)
16          Sumner Square
17          1615 M Street, N.W.
18          Suite 400
19          Washington, D.C.  20036
20          Telephone:  202.326.7999
21          E-mail:  Mkellogg@kellogghansen.com
22                   rfigel@kellogghansen.com
23                   jberg@kellogghansen.com
24                   epfeffer@kellogghansen.com
25                   cwhite@kellogghansen.com
```

4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S (Continued):

 2

 3   For Defendant Bradley Garlinghouse:

 4

 5            CLEARY GOTTLIEB STEEN & HAMILTON

 6            BY:  NICOLE TATZ, ESQUIRE (Remote)

 7            2112 Pennsylvania Avenue, NW

 8            Washington, D.C.  20037

 9            Telephone:  202.974.1500

10            E-mail:  Ntatz@cgsh.com

11

12

13   For Defendant Christian A. Larsen:

14

15            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

16            By:  SARAH PROSTKO, ESQUIRE (Remote)

17                 MICHAEL GERTZMAN, ESQUIRE (Remote)

18            1285 Avenue of the Americas

19            New York, New York  10019-6064

20            Telephone:  212.373.2491

21            E-mail:  sprostko@paulweiss.com

22                     mgertzman@paulweiss.com

23

24

25
```

5

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
1   ALSO PRESENT:

2

3           DEBORAH McCRIMMON, Ripple (Remote)

4           STELLA UVAYDOVA, SEC (Remote)

5           THOMAS DEVINE, Videographer
            Shereck Video Service
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                        INDEX

 2   WITNESS                          EXAMINATION

 3

 4   FRANK ALLEN FERRELL, III, Ph.D.

 5       BY MR. SYLVESTER                      11

 6

 7

 8

 9                      EXHIBITS

10   SEC - AF
     NUMBER             DESCRIPTION           PAGE
11

12   Exhibit AF-1 Expert Report of            18

13                Allen Ferrell, Ph.D.

14                October 4, 2021

15                NO BATES, 133 pages

16

17   Exhibit AF-2 Rebuttal Expert Report of   23

18                Allen Ferrell, Ph.D.

19                November 12, 2021

20                NO BATES, 52 pages

21

22   Exhibit AF-6 Expert Rebuttal Report of   106

23                ███████ █████ Ph.D.

24                November 12, 2021

25                NO BATES, 31 pages
```

7

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1                          EXHIBITS

2    SEC - AF
     NUMBER                 DESCRIPTION              PAGE
3

4    Exhibit AF-21 Stata Program Linear              239

5                  Regression Runs for Exhibit 3

6                  NO BATES, 1 page

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        8

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
1                    DEPOSITION SUPPORT INDEX

2

3      DIRECTION TO WITNESS NOT TO ANSWER

4         Page    Line

5          58        9

6          60        9

7

8

9

10     STIPULATIONS

11        Page    Line

12         11       15

13

14

15     PORTION MARKED HIGHLY CONFIDENTIAL

16        Page    Line

17        - -none- -

18

19

20     REQUEST FOR DOCUMENTS

21        Page    Line

22        - -none- -

23

24

25
```

9

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                    -  -  -

 2                 9:27 a.m.

 3            February 23, 2022

 4                    -  -  -

 5            THE VIDEOGRAPHER:  Good

 6       morning.  We're going on the record at

 7       9:27 a.m. on February 23rd, 2022.

 8       This is the videotaped deposition of

 9       Allen Ferrell in the matter of

09:27:29 10   Securities and Ex -- Securities and

11       Exchange Commission v. Ripple Labs,

12       Inc., Bradley Garlinghouse and

13       Christian Larsen, Case Number

14       20-cv-10832 (AT)(SN).

09:27:56 15        This deposition is being held

16       at the offices of Debevoise &

17       Plimpton, 919 Third Avenue, New York,

18       New York.

19            My name is Thomas Devine,

09:28:06 20   certified legal video specialist with

21       Gradillas Court Reporters located at

22       400 N. Brand Boulevard, Suite 950,

23       Glendale, California.

24            Appearances will be noted on

09:28:21 25   the stenographic record.
```

10

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
09:28:23   1              Will the court reporter
           2        please swear in the witness and we may
           3        proceed.
           4              F R A N K   A L L E N
09:28:28   5        F E R R E L L, III, Ph.D., having been
           6        duly sworn, was examined and testified
           7        as follows:
           8                  THE REPORTER:  Thank you.
           9                  You may proceed.
09:28:39  10                  MR. SYLVESTER:  Good morning
          11        --
          12                  MR. KELLOGG:  Before we
          13        begin, Mark --
          14                  MR. SYLVESTER:  Sorry.
09:28:40  15                  MR. KELLOGG:  -- I'd like to
          16        put one thing on the record.  Per
          17        prior practice, any objection by one
          18        defendant is considered an objection
          19        by all defendants.
09:28:49  20                  MR. SYLVESTER:  Sounds good.
          21   DIRECT-EXAMINATION
          22   BY MR. SYLVESTER:
          23        Q.   Good morning, Professor.
          24        A.   Good morning.
09:28:52  25        Q.   Could you please state your name for the
```

11

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:28:53 1    record?

2         A.   My full name is Frank Allen Ferrell,

3    III.

4         Q.   I'm Mark Sylvester.  I'm an attorney

09:28:58 5    with the SEC.  I'm here with my colleagues from

6    the SEC, Artur Minkin and Jon Daniels.  A few of

7    my colleagues are joining by Zoom as well.

8              You've had your deposition taken before,

9    correct?

09:29:08 10        A.   Yes.

11        Q.   Okay.  Is there anything that would

12   prevent you from testifying fully and truthfully

13   here today?

14        A.   No.

09:29:14 15        Q.   Were you retained to provide expert

16   services in this case?

17        A.   Yes.

18        Q.   Who retained you?

19        A.   I -- I was -- I worked with Kellogg

09:29:22 20   Huber -- Kellogg and Debevoise.  I believe the

21   engagement letter's with them.  I did the

22   engagement letter through Compass Lexecon, so I

23   would -- I would have to -- I would refer back to

24   that engagement letter.

09:29:37 25        Q.   Are you also retained by the individual

12

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:29:38 1    defendants in this case?

2        A.    Again, I don't remember the engagement

3    letters with the law firms or with the underlying

4    clients.  I would have to look at the engagement

09:29:49 5    letter.  My understanding is I'm on the engagement

6    letter with Compass Lexecon pursuant to which I

7    performed my work.

8        Q.    Do you know whether Paul Weiss or Cleary

9    are parties to that letter as well?

09:30:02 10        A.    I don't remember.

11        Q.    Okay.  Are you familiar with the term

12    "XRP"?

13        A.    Yes.

14        Q.    Are you familiar with the term "digital

09:30:06 15    asset"?

16        A.    Yes.

17        Q.    Are you familiar with the term

18    "investment contract"?

19        A.    Yes.

09:30:10 20        Q.    Does "investment contract" have a

21    generally accepted meaning in the field of

22    economics?

23                MR. KELLOGG:  Objection.

24        Calls for a legal conclusion.

09:30:18 25                MR. SYLVESTER:  Actually,

13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:30:19   1          Counselor, I'm asking him to narrow
          2          his answer to the field of economics.
          3   BY MR. SYLVESTER:
          4      Q.   So my question is, does "investment
09:30:25   5   contract" have a generally accepted meaning in the
          6   field of economics?
          7      A.   My understanding of the phrase
          8   "investment contract" is it's a legal term.
          9      Q.   Okay.
09:30:33  10      A.   It has a legal component to it.
         11      Q.   Again, focusing on the field of
         12   economics, is there any authoritative economics
         13   text that defines investment contract to your
         14   knowledge?
09:30:43  15      A.   Same answer as before.  That is the
         16   invest -- the phrase "investment contract" has a
         17   legal component to it.  And just to be clear, I'm
         18   not providing an opinion on whether anything's an
         19   investment contract or not.
09:31:00  20      Q.   Whether or not the term has a legal
         21   component to it, are you aware of any
         22   authoritative economics text that defines
         23   investment contract?
         24      A.   None occurs to me sitting here.  That
09:31:11  25   is, the phrase "investment contract" -- and,

                                                          14

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:31:15  1  again, as used in this litigation and the

2  complaint -- has a legal component to it.

3      Q.  Okay.  Does it also have an economics

4  component?

09:31:25  5      A.  Well, I don't want -- there is --

6  obviously "investment contract" is a reference to

7  contracts, but it has a legal component to it and

8  so I'm not opining on whether anything is an

9  investment contract or not.

09:31:38  10     Q.  Okay.

11           MR. KELLOGG:  I'm sorry to

12        interrupt, but the people on Zoom said

13        they can't see the witness.

14           MR. SYLVESTER:  Let's go off

09:31:51  15      the record if this takes more than a

16        second.

17           MR. KELLOGG:  A little more.

18           THE VIDEOGRAPHER:  What

19        should I do?  Go off the record?

09:31:58  20      MR. SYLVESTER:  No, if you

21        just need to tilt the camera, that's

22        fine.  I just didn't know if it was

23        going to be a longer correction.

24           MR. KELLOGG:  That's good.

09:32:04  25      Thank you.

15

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:32:06  1    BY MR. SYLVESTER:

2          Q.   In preparation of your expert opinions

3    in this case, did you review any economics

4    literature that discussed the economic

09:32:14  5    characteristics of an investment contract?

6          A.   No.

7          Q.   Are you aware of any economics

8    literature that sets forth how to assess whether

9    the economic substance of an asset or a

09:32:26 10    transaction constitutes an investment contract?

11          A.   No.  That's -- that would constitute in

12    part a legal opinion.

13          Q.   Okay.  When you say "that would

14    constitute in part a legal opinion," can you

09:32:37 15    explain what you mean?

16          A.   As I said before, the phrase "investment

17    contract" is obviously a phrase that's used in --

18    in the case law and in legal texts.  And so my

19    understanding of the phrase "investment contract"

09:32:55 20    is that it has a legal -- it's a legal construct

21    or a legal meaning to it.  And I'm not opining on

22    that question given it would involve a legal

23    opinion.

24          Q.   Okay.  So fair to say that the economics

09:33:07 25    literature doesn't address the question of -- of

16

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:33:10  1   how to figure out what the economic substance of

2   an investment contract is?

3                    MR. KELLOGG:  Objection.

4        A.   Phrased in that way, I agree with that

09:33:18  5   statement.  That is, "investment contract," as I

6   understand that phrase, is a phrase that's used in

7   case law and in legal argumentation.  So that

8   would involve a legal opinion and I'm not

9   providing that.

09:33:33 10       Q.   Does the term "commonality" have a

11   generally accepted meaning in the field of

12   economics?

13       A.   I'm sure the phrase "commonality" is

14   used in economics, but I -- I -- I'm not aware

09:33:45 15   of -- offhand, I don't have a citation for the

16   usage of the word "commonality."

17       Q.   When you used the word "commonality" in

18   your expert report, are you referring to an

19   economics term or to one of the elements of the

09:34:00 20   Howey test?

21       A.   You would have to -- you would have to

22   refer me to my expert report to answer that

23   question fully.  But if we're talking about

24   commonality as part of providing an opinion on

09:34:11 25   investment contract status, I'm not providing that

17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:34:13  1  opinion.

2      Q.   Let's -- let me hand you what's been

3  marked AF-1.  Let me try to hand that to you.

4          (Whereupon, exhibit is received and

09:34:21  5  marked SEC Ferrell Exhibit AF-1 for

6  identification.)

7  BY MR. SYLVESTER:

8      Q.   There you go.

9      A.   Thank you.

09:34:29 10             MR. SYLVESTER:  Michael, I'll

11             just ask you to pass these out if

12             that's all right.

13             MR. KELLOGG:  Thank you.

14             THE WITNESS:  Oh, she --

09:34:29 15             the -- the court reporter wants a

16             copy, too.

17             THE REPORTER:  Thank you.

18  BY MR. SYLVESTER:

19      Q.   If I could just direct you, Professor,

09:34:50 20  to the -- well, let me start with authentication.

21          Do you recognize AF-1?

22      A.   I do.

23      Q.   Okay.  And is this the expert report

24  that you prepared in this case, or one of them?

09:35:05 25      A.   Yes.

                                                        18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:35:05  1       Q.   Okay.  Let me turn you to romanette III

2   of the table of contents of AF-1.

3       A.   Romanette III?

4       Q.   Yes.  Near the bottom -- bottom of the

09:35:18  5   page, there's a Section F, "Economic Assertions

6   for Commonality are Fundamentally Flawed."

7       Do you see that?

8       A.   I don't see where you're looking at.

9   Can you -- what -- can you repeat where you're --

09:35:27  10  what part you're looking at?

11      Q.   Sure.

12      Are you on Romanette III?

13      A.   Yes.

14      Q.   Okay.  Do you see the bolded "XRP is a

09:35:35  15  Virtual Currency" at the very bottom of the page?

16      A.   Yes, I do.

17      Q.   Immediately above that there's a

18   subsection title, Section F, "Economic Assertions

19   for Commonality are Fundamentally Flawed."

09:35:49  20      A.   Yes.

21      Q.   Okay.  So my question is, when you used

22   "commonality" in that title, were you referencing

23   an economic concept or were you referencing an

24   element of the Howey test?

09:35:58  25            MR. KELLOGG:  Objection.

19

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:35:59 1      A.   I'm referencing my discussion on pages

2  67, 68, 69 and 70.  So that's what I'm referencing

3  there.  And just give me one second here.

4           Yeah.  And in that discussion that's

09:36:15 5  being referenced in that bullet or in that table

6  of contents, I, in part, reference back to my

7  analysis in Section II where I get into the

8  economic substance of the -- of the contracts.

9           So I would just reference the actual

09:36:32 10  content of that discussion on pages 67 through

11  page 70.

12      Q.   What is the definition of commonality as

13  used in the -- as used in Subsection F of your

14  opening report?

09:36:47 15               MR. KELLOGG:   Objection.

16      A.   It's really the discussion I have in

17  that section of the report in terms of what I'm

18  talking about.  So, for example, in paragraph 141,

19  I mention there's no pooling of the funds.

09:37:07 20  Paragraph 142, I talk about the contracts.  I also

21  talk about my factor model.

22           So it's really a reference to these

23  economic points that I'm making in that section.

24      Q.   Returning to my question about the

09:37:20 25  economics literature, as used in your Subsection

20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:37:22   1    F, is "commonality" a generally accepted term in

2    economics literature?

3                       MR. KELLOGG:   Objection.

4         A.   So what I'm referencing here in the

09:37:34   5    beginning of paragraph 140 is -- and I cite to the

6    complaint -- is the economic theory by the SEC as

7    articulated in the complaint.   So the first

8    sentence in this Section F is I am citing to the

9    complaint and then I'm discussing thereafter, as I

09:37:52  10    explained at the end of paragraph 140, the

11    economic analysis.

12                       So, again, Subsection F is the economic

13    theory articulated in the complaint and then the

14    economic analysis that I reference and discuss in

09:38:10  15    paragraphs 141 through paragraph 145.

16         Q.   Okay.   I think you've answered, as far

17    as I understand it, how you're using commonality

18    for purposes of AF-1, is that right?

19                       MR. KELLOGG:   Objection.

09:38:32  20         A.   I -- I -- I just discuss what I'm

21    actually doing in paragraph F -- I'm sorry, in

22    Section F.   So Section F is called "Economic

23    Assertions for Commonality are Fundamentally

24    Flawed."   And it is correct that in paragraph 140,

09:38:44  25    I cite to the complaint for the articulation of

21

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:38:46  1  the economic theory by the SEC in the complaint.

2  So I am working off of that.

3         As you see at the end of paragraph 140,

4  I then say "As I explain below, the SEC's claims"

09:39:02  5  -- that is the claims about the economic theory --

6  "are flawed as a matter of economic substance."

7         So that -- that's what this section is

8  doing.  That's what I'm referring to when I say

9  "Economic Assertions for Commonality are

09:39:14 10  Fundamentally Flawed."

11     Q.   And did you cite any economics

12  literature in your report for the definition of

13  commonality?

14               MR. KELLOGG:  Objection.

09:39:27 15     A.   I -- all the citations I use are in the

16  report.  We can talk about the citations.  But for

17  purposes of this section, I am focused in the

18  beginning, in paragraph 140, for the economic

19  theory as articulated by the SEC in its complaint.

09:39:44 20     Q.   Sitting here today, can you think of any

21  economics literature that defines the term

22  "commonality"?

23               MR. KELLOGG:  Objection.

24     A.   I don't -- I don't have a view on that.

09:39:53 25  When I'm discussing in this section the economic

22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:39:57  1  assertions for commonality, I'm talking about the

2  economic assertions in the complaint.

3      Q.   Is --

4      A.   I'm sorry.  Just to -- just to elaborate

09:40:08  5  one second.  I didn't mean to interrupt.

6      Q.   Please.

7      A.   So just to be a little more specific,

8  the first three footnotes in Subsection F that

9  we've been discussing -- Footnotes 243, Footnotes

09:40:25 10  244, Footnotes -- Footnote 245 -- are all

11  citations to the complaint.  Again, apropos of my

12  earlier answer that I'm dealing here with the

13  economic assertions for commonality as articulated

14  in the SEC complaint.

09:40:42 15      Q.   And as used in the SEC complaint,

16  commonality is one of the elements of Howey,

17  right?

18               MR. KELLOGG:  Objection.

19      A.   That calls for a legal conclusion.  I --

09:40:50 20  I have read the complaint and it is certainly the

21  case that the complaint does talk about

22  commonality.

23          (Whereupon, exhibit is received and

24  marked SEC Ferrell Exhibit AF-2 for

09:41:00 25  identification.)

23

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:41:09  1  BY MR. SYLVESTER:

2      Q.   Let me hand you what's been marked AF-2.

3  There we go.

4      A.   Thank you.

09:41:22  5      Q.   Professor, is AF-2 the expert rebuttal

6  report you submitted in this case?

7      A.   Yes.

8      Q.   Okay.  Are all of the expert opinions

9  that you intend to offer in this case included

09:41:39 10  within either AF-1 or AF-2?

11      A.   I don't know what counsel's going to ask

12  me to opine on.  I will say in addition to the

13  rebuttal report and the opening report, I have

14  reviewed the rebuttal reports by Dr. ▉▉▉▉ and

09:41:59 15  by Dr. ▉▉▉ and Mr. ▉▉▉  And I certainly have

16  views on that.  So I would include in my answer,

17  in terms of my work, my review and assessment as

18  it relates to me of those opposing expert reports.

19      Q.   Do you intend to submit a supplemental

09:42:23 20  expert report in this case?

21      A.   Sitting here today, I have not been

22  asked to do that.

23      Q.   Other than the rebuttal reports of

24  Dr. ▉▉▉▉ Dr. ▉▉▉ and Mr. ▉▉▉ have you read

09:42:37 25  any other expert reports in this case?

24

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:42:43   1        A.   I did review -- I did read, albeit
           2   not -- albeit it's not a focal point, I did read
           3   the initial report of Dr. ████    Obviously I
           4   did because I -- I discuss that in my rebuttal.  I
09:42:56   5   also read the initial report of Dr. ████
           6        Q.   Okay.  And you did not provide a
           7   rebuttal opinion to Dr. ████ opening report,
           8   correct?
           9        A.   That is correct.
09:43:18  10        Q.   Why not?
          11                  MR. KELLOGG:  Objection.
          12        A.   It wasn't my assignment.  It was not
          13   work that I was asked to do.
          14        Q.   Did you review Dr. ████ work papers
09:43:26  15   related to the analysis he performed in connection
          16   with his opening report?
          17        A.   I don't have a recollection of that.
          18   I -- I focused -- again, just to be clear on the
          19   record, I did read Dr. ████ opening report, but
09:43:40  20   I focused on his rebuttal.
          21        Q.   And sitting here today, you can't
          22   remember one way or the other whether you reviewed
          23   Dr. ████ work papers that he prepared in
          24   connection with his opening report?
09:43:50  25        A.   I believe the answer to that is no.
```

25

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:43:52  1    Q.   Okay.  Did you perform any analysis of

2    Dr. █████ analysis that he set forth in his

3    opening report?

4    A.   No.  It's not -- it was not a focal

09:44:02  5    point.  I focused on -- in terms of Dr. ████ and

6    what he says, I focused on his rebuttal.

7    Q.   Did you review Dr. Metz's work papers

8    that he prepared in connection with his rebuttal

9    report?

09:44:18 10    A.   Yes.

11    Q.   Okay.  Did you perform any analysis of

12    Dr. █████ analysis that he performed in

13    connection with his rebuttal report?

14    A.   Yes.

09:44:26 15    Q.   What analysis did you perform?

16    A.   So one of the things I did with respect

17    to the rebuttal report of Dr. ████ is -- two

18    things.  One is, he critiques me for using one

19    return for THC -- I forget the exact date -- the

09:44:48 20    THC crypto.  So this is one out of approximately

21    6,700 returns, roughly speaking, that I used in

22    the PCA analysis.  He critiques the usage of that

23    one return.

24         And so I simply reran the model not

09:45:05 25    using that particular return and not using THC to

26

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:45:09   1   see if my conclusions are robust to that and I
           2   found that they were.  It doesn't affect anything.
           3            The second thing I did with respect to
           4   Dr. █████ in addition to obviously carefully
09:45:21   5   reviewing what he says, is I calculated the
           6   alphas -- not the change in alpha, but the
           7   alphas -- in his Figure 17, that last page of his
           8   report, and whether or not they were statistically
           9   significant at the 5 percent level.
09:45:38  10            So I believe those are the two
          11   additional things that I did in addition to just
          12   carefully reading what he had to say with respect
          13   to Dr. █████
          14       Q.   And -- and just for the record, you
09:45:52  15   don't intend to submit any supplemental report
          16   reflecting any analysis that you conducted
          17   regarding Dr. █████ analysis in his rebuttal
          18   report, correct?
          19       A.   I have not been asked by counsel to
09:46:03  20   submit a supplemental report --
          21       Q.   Okay.
          22       A.   -- sitting here today.
          23       Q.   Other than the deposition transcripts
          24   that are listed in your AF-1, have you reviewed
09:46:13  25   any other deposition testimony in this case?
```

27

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:46:15  1       A.    No.  All the deposition testimony is

       2   listed in the materials I listed in the report.

       3       Q.    Okay.  Other than the rebuttal of

       4   Dr. ████████ opening report that is set forth in

09:46:30  5   your AF-2, are there any other expert opinions

       6   that you're rebutting in this case?

       7       A.    Yes.  Doc -- just to be clear, I did

       8   review Dr. ██████ -- Mr. ██████ critique of my

       9   opening report.  And so I obviously reviewed that

09:46:49 10   discussion by Mr. ██████ as well.

      11       Q.    Okay.  With respect to your critiques of

      12   Mr. ██████ sitting here today, you don't intend to

      13   crystallize those into a supplemental report that

      14   you'll be submitting, correct?

09:47:04 15       A.    Same answer as before.  I've not --

      16   sitting here today, I have not been asked by

      17   counsel to prepare a supplemental report.

      18       Q.    Okay.  Have you performed any additional

      19   analysis pertaining to any of the opinions that

09:47:29 20   you offered in Exhibit 1 since October 4th of 2021

      21   other than anything that might have been

      22   encompassed by your previous answers here today?

      23                 MR. KELLOGG:   Objection.

      24       A.    Exhibit 1, is that my opening report?

09:47:43 25       Q.    It is.

                                                          28

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:47:43 | 1 | A.   Okay.   So could you repeat the question? |
| | 2 | Q.   Sure. |
| | 3 | Other than any analysis we've already |
| | 4 | discussed today, have you performed any additional |
| 09:47:50 | 5 | analysis regarding the opinions that you've set |
| | 6 | forth in AF-1? |
| | 7 | MR. KELLOGG:   Objection. |
| | 8 | A.   So I did -- so we talked about Dr. █████ |
| | 9 | We talked -- and my analyses there of his |
| 09:48:04 | 10 | rebuttal.  I did -- as I did with Dr. █████ in his |
| | 11 | rebuttal -- take a careful look at Dr. ███████ |
| | 12 | critique of my work, as well as Dr. ██████ |
| | 13 | So I would encompass in my answer my |
| | 14 | review and assessment not just of Dr. ██████ |
| 09:48:26 | 15 | rebuttal, but those additional rebuttal reports |
| | 16 | which obviously speak to and concern the issues |
| | 17 | that I discuss in AF-1. |
| | 18 | Q.   Did you do any additional analysis |
| | 19 | outside of what you just described in your last |
| 09:48:39 | 20 | answer? |
| | 21 | A.   Yes. |
| | 22 | Q.   What? |
| | 23 | A.   So just -- just to be clear.  So earlier |
| | 24 | we discussed my work in discussing Dr. ██████ |
| 09:48:47 | 25 | rebuttal. |

29

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:48:47  1          With respect to Dr. -- or Mr. ██████ the

2   one addition -- besides obviously reading and

3   carefully considering what he had to say, the

4   additional work I did with respect to that

09:49:00  5   rebuttal report, or his critique of my opening

6   report, is I did look at non-MoneyGram remittance

7   data for 2020 in connection with reviewing

8   Dr. ██████ -- Mr. ██████ critique of my work.

9          With respect to Dr. ██████ and his

09:49:28 10   critique, I did a couple additional analyses.  One

11   is, my understanding is that he critiques me for

12   including -- as a distribution to a non-Ripple

13   party, he critiques my inclusion in that type of

14   distribution the distribution of XRP to custody

09:49:54 15   accounts.

16          I don't agree with that critique, but,

17   nevertheless, I also analyzed whether any of my

18   results, the results I report in my opening

19   report, were changed if you just look at

09:50:08 20   distributions that are programmatic, market maker,

21   or -- or sales on to exchanges to see if it's

22   robust to confining the distribution analysis to

23   those distributions.  And I found that it doesn't

24   make any difference to my conclusions.  So that's

09:50:25 25   one thing that I did with Dr. Griffin.

30

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:50:28   1          I should say, also, with Dr. ███████

2    before the filing of my report, the report in

3    AF-1, I had run the -- the -- I had run the

4    distributions both in U.S. dollars and in XRP

09:50:47   5    units.  Obviously I went with U.S. dollars in my

6    denomination, but I'd already known prior to the

7    filing of my report, the report in AF-1, that that

8    doesn't make a difference.  It's obviously one of

9    his critiques.

09:51:01  10          Another comment along these lines is

11   before the filing of my report as -- you know, the

12   report in AF-1, I had also run the factor model on

13   weekly returns, on 30-day fixed -- you know,

14   30-day fixed period returns, and on the calendar

09:51:17  15   monthly returns.

16          Now, as I explain in my report, I felt,

17   and still feel, that 28 days is the best level of

18   frequency for the factor model, but prior to the

19   filing of the report, I knew that it was robust.

09:51:33  20   It was -- the results of the factor model, the

21   results of whether the alpha is statistically

22   significant, were robust to weekly, 30-day, or

23   calendar.  So I know that's something that

24   Dr. ████████ mentions in his rebuttal and so I

09:51:52  25   mention it -- mention that fact here.

31

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:52:00   1            One other thing I wanted to say.  So

           2   Dr. ████████ distribution analysis; his critique

           3   of the frequency of the data.  Let me just think

           4   here, make sure I give a complete answer.

09:52:22   5            Oh, one other thing I should mention as

           6   long as we're having this conversation about all

           7   of the work I've done, including prior to the

           8   filing, is prior to the filing of the report in

           9   AF-1, I had also ran the factor model just on the

09:52:34  10   CoinMarket return data.  And that -- that

          11   didn't -- I -- I used CryptoCompare for the

          12   reasons I describe in the report, and I think

          13   that's the right choice, but I had run the model

          14   on just the CoinMarket price return data and that

09:52:52  15   didn't change anything.

          16            Let me just think.  Anything else in

          17   Dr. ████████?

          18            So I know that Dr. ████████ critiques the

          19   use of this -- the square root price impact model.

09:53:08  20   And, you know, I -- I do have comments on that.

          21   Obviously that's something I didn't discuss beyond

          22   the footnote with the academic citations that I

          23   have for that, but I certainly have reactions to

          24   his critique of the use of that -- that square

09:53:25  25   root price impact model.
```

32

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:53:29   1            Just give me one more second to think
           2   here if there's anything else.  I think that's a
           3   pretty complete list.  Let me just think if
           4   there's anything else.  Give me a moment if you
09:53:39   5   could.
           6        Q.   Sure.
           7        A.   It might be helpful to see Dr. ████████
           8   rebuttal.  I'm just trying to think if there's
           9   anything else in Dr. ██████.
09:54:11  10            Oh, I remember now.  I was searching for
          11   it and now I remembered.
          12            The other thing that I did after -- this
          13   is after the filing of his rebuttal report, just
          14   to be clear.  The last thing that I did in terms
09:54:23  15   of that work is I recalculated the 1.6 percent
          16   price impact number -- let me be a little clearer.
          17   The potential price impact number of 1.6 percent,
          18   I recalculated that using just top-tier exchanges
          19   as identified by CryptoCompare and using just that
09:54:49  20   volume.  And it changes the number using that
          21   formula from 1.6 to 2 percent.
          22            I believe that's a complete answer to
          23   your -- your question.
          24        Q.   Returning to the portion of your answer
09:55:04  25   where you described running your factor model on
```

33

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:55:06  1   weekly returns and 30-day fixed returns, did you

2   perform that analysis prior to submitting AF-1?

3       A.   Yes.

4       Q.   Is that analysis described anywhere in

09:55:14  5   AF-1?

6       A.   No.  I -- and the reason being -- maybe

7   I'm going beyond your question -- is I felt,

8   and -- and feel -- my opinion is that 28 days is

9   the -- is the best definition, the best return

09:55:31 10   series to use.

11          So I would rely on the 28-day period

12   that I use for the reasons given in my report.

13   I'm just noting that the criticism by, I believe,

14   Dr. ████████ of I should have used different

09:55:49 15   frequency data -- again, a criticism I don't agree

16   with -- but it doesn't make a difference.

17       Q.   And did you include within the backup

18   materials that you provided for production to the

19   SEC any of your analysis regarding your -- running

09:56:08 20   your factor model on weekly returns and 30-day

21   fixed returns in connection with your opening

22   report?

23              MR. KELLOGG:  Objection.

24       A.   I don't know offhand.  What I relied

09:56:17 25   upon in AF-1 is -- is the -- and what I report is

34

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:56:21  1  the 28-day returns.  I don't -- but going directly

          2  to your question, I don't know offhand.

          3      Q.   Okay.  You also mentioned, if I

          4  understood your testimony correctly, that you also

09:56:36  5  ran your factor model using just CoinMarketCap

          6  data prior to submitting AF-1, is that right?

          7      A.   That's correct.  So when I say

          8  "CoinMarketCap data," I mean the prices in

          9  CoinMarket, yes.

09:56:48 10      Q.   Okay.  When you say "CoinMarket" and I'm

         11  saying "CoinMarketCap," are we talking about the

         12  same thing or no?

         13      A.   I believe we are.

         14      Q.   Okay.  And does AF-1 mention anywhere

09:57:01 15  that you ran your factor model using only

         16  CoinMarketCap data?

         17              MR. KELLOGG:  Objection.

         18      A.   I do not believe it does because the

         19  return series that I used was the best return

09:57:15 20  series, in my opinion, which was the combination

         21  of CoinMarketCap and CryptoCompare.  That's

         22  consistent with the academic literature in my

         23  view.

         24      Q.   And sitting here today, do you know

09:57:27 25  whether the backup materials that you prepared in

                                                           35

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:57:30 | 1 | connection with your opening report, AF-1, |
| | 2 | contains your analysis in which you ran your |
| | 3 | factor model on CoinMarketCap data only? |
| | 4 | MR. KELLOGG:  Objection. |
| 09:57:39 | 5 | A.   Same answer as before.  I don't know |
| | 6 | offhand.  Obviously what I relied upon in my AF-1 |
| | 7 | report is -- is the return series that's described |
| | 8 | in that report. |
| | 9 | Q.   Focusing just on your preparation of |
| 09:57:56 | 10 | AF-1, is there any other category of analysis that |
| | 11 | you performed in connection with forming your |
| | 12 | opinions that are set forth in AF-1 that is not |
| | 13 | described in AF-1? |
| | 14 | MR. KELLOGG:  Objection. |
| 09:58:07 | 15 | A.   I believe I've -- I've -- I've |
| | 16 | mentioned -- I think our earlier discussion |
| | 17 | encapsulates that -- that other work. |
| | 18 | Q.   Okay.  When were you retained to provide |
| | 19 | expert services in this case? |
| 09:58:34 | 20 | A.   I don't have an exact date.  I know |
| | 21 | that -- I believe that I started work early last |
| | 22 | year.  I believe February of last year is when I |
| | 23 | started doing work.  I don't know the exact date |
| | 24 | of the engagement letter, but that's my best |
| 09:58:52 | 25 | recollection. |

36

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:58:56  1      Q.   Were you retained to provide expert

2    services related to this case prior to your

3    retention as an expert witness in this case?

4                   MR. KELLOGG:  Objection.

09:59:03  5      A.   Could you repeat the question?

6      Q.   Sure.

7                   Were you retained to provide expert

8    services in this case prior to your retention as

9    an expert witness in this case?

09:59:11 10      A.   My -- my understanding from the

11   beginning was I was going to be an expert.  I have

12   no memory of it changing in any way.  So my

13   understanding was from -- from the beginning is I

14   would be hired as an expert.

09:59:29 15      Q.   When you say the word "expert" in that

16   answer, do you mean a testifying expert?

17      A.   Yes.

18      Q.   Okay.

19      A.   That was my understanding.

09:59:38 20      Q.   Prior to your retention as an expert

21   witness in this case, did you know anything about

22   Ripple?

23      A.   I had read about it in general market

24   commentary.

09:59:49 25      Q.   What did you know about Ripple prior to

37

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:59:50 1  your retention?

2      A.   Well, at a high level, it's a crypto

3  asset.  It involves blockchain.  It was one of the

4  larger cryptocurrencies earlier in time.  I do

10:00:06 5  remember reading about the filing of the SEC

6  lawsuit that's at issue here.  So at that level of

7  generality.

8      Q.   Prior to your retention as an expert in

9  this case, had you ever met Mr. Garlinghouse?

10:00:18 10     A.   No.

11     Q.   Prior to your retention, had you ever

12  met Mr. Larsen?

13     A.   No.

14     Q.   Prior to your retention, had you ever

10:00:24 15  met anyone who worked at Ripple to your knowledge?

16     A.   No.

17     Q.   Prior to your retention, had you ever

18  met any of the lawyers representing defendants in

19  this case?

10:00:32 20          MR. KELLOGG:  Objection.

21          You can answer yes or no.

22     A.   I have a bad memory for this sort of

23  thing.  It's entirely -- entirely possible, but I

24  don't have a recollection.

10:00:45 25     Q.   Did -- go ahead.  Sorry.

38

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:00:47  1        A.   I do want to be clear that I'm really

2   terrible at mem -- at remembering this sort of

3   thing.  I don't want to offend anybody.  I don't

4   have a recollection.

10:01:06  5        Q.   Prior to your retention in this case,

6   had you ever been retained as an expert witness by

7   Kellogg?

8        A.   I don't believe so.  I don't have a

9   memory of that.  I am involved in cases where

10:01:17 10   there's a number of firms.  It's possible that

11   Kellogg was, you know, involved because that often

12   happens.  But I don't -- answering your question,

13   I don't have a memory sitting here right now of

14   being retained by Kellogg in other matters.  It's

10:01:34 15   possible, but I don't have a recollection sitting

16   here.

17        Q.   Prior to your retention, had you ever

18   been retained as an expert witness by Debevoise &

19   Plimpton?

10:01:45 20        A.   Yes.

21        Q.   How many times?

22        A.   Again, I'm going to be very cautious

23   here.  I -- I don't have a clear recollection.

24   I -- I believe it's several times prior to this

10:01:53 25   engagement that I've been retained by Debevoise.

39

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:01:56  1    I want to say two, but it could easily be more

2    than that.  But I want to say something like one

3    or two times is my best recollection sitting here.

4    Again, with the very important caveat that, you

10:02:10  5    know, I've -- I work with a lot of law firms and,

6    you know, I don't have a list in my mind of the

7    number of times I've worked with this or that

8    firm.

9            But the answer to your question is, yes,

10:02:23  10   I have been retained by Debevoise before.

11       Q.   When was your most recent retention as

12   an expert witness by Debevoise?

13       A.   Putting aside this matter, I do remember

14   doing a 10b-5 matter with Debevoise.  I believe

10:02:38  15   this is a few years ago.  That's my best

16   recollection.  It's possible that I've done a case

17   since then.  I would have to double-check.  I know

18   I've worked with Debevoise in the past.

19                    MR. KELLOGG:  I'd like to

10:02:50  20           direct the witness not to discuss the

21           nature of any prior representation.

22                    THE WITNESS:  Okay.

23   BY MR. SYLVESTER:

24       Q.   Okay.  Prior to your retention in this

10:03:03  25   case, had you read the SEC's complaint against

40

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:03:06  1    Ripple?

2        A.   I read it around the time of my

3    engagement.  I might have read it contemporaneous

4    with -- with the engagement.  I don't know the

10:03:17  5    exact timing of that.

6        Q.   Prior to your engagement, I believe you

7    testified that you had read about the SEC's case

8    against Ripple, is that right?

9        A.   Yeah, as we -- sorry, I didn't mean to

10:03:30 10    interrupt.

11        Q.   Go ahead.

12        A.   Yeah.  So I -- I -- I have a

13    recollection of it being reported upon in the

14    press.  I don't have a -- I don't -- don't have a

10:03:38 15    recollection of -- of -- I don't have a

16    recollection of reading it -- I believe that's in

17    December of 2020.  I think that I read it after

18    that point.  So my memory is the complaint was

19    filed in December of 2020 and I read it -- I don't

10:03:58 20    think I read it in December, you know.

21            I guess I want to leave this open.  I --

22    I read it somewhere in the December-February time

23    frame, if I -- if my memory of the -- of the

24    timing is correct.

10:04:09 25        Q.   And just so the record is clear, are we

41

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:04:11 | 1 | talking about the complaint or about press |
| | 2 | articles about the lawsuit? |
| | 3 | A. Well, we -- we have two different |
| | 4 | questions now lingering. One question is, when |
| 10:04:20 | 5 | did I read the complaint? And with respect to |
| | 6 | that question, it's somewhere in the |
| | 7 | December-February time frame. I don't have a |
| | 8 | specific recollection of exactly when I read the |
| | 9 | complaint. |
| 10:04:35 | 10 | The second question that's out there is, |
| | 11 | when did I read about the SEC filing a complaint? |
| | 12 | My memory, my best recollection, is I do recall |
| | 13 | reading in the press that the SEC had filed a |
| | 14 | lawsuit, is my best recollection. |
| 10:04:52 | 15 | Q. And with respect to reading in the press |
| | 16 | about the SEC's lawsuit against Ripple, when did |
| | 17 | that occur? |
| | 18 | A. Same time period. Somewhere in the |
| | 19 | December-February time period. If I'm remembering |
| 10:05:02 | 20 | correctly when this all transpired, which I |
| | 21 | believe was December of 2020. That's -- that's my |
| | 22 | best recollection. |
| | 23 | Q. It -- it's fair to say, Professor, that |
| | 24 | you were familiar with the Howey case prior to |
| 10:05:16 | 25 | your engagement in this case? |

42

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:05:17 1       MR. KELLOGG:  Objection.

2   A. That's a fair statement.

3   Q. Okay.  Again in the period prior to your

4 retention, what was your opinion, if you had one,

10:05:34 5 about whether the SEC's allegations, if proved,

6 would demonstrate a violation of its securities

7 laws?

8       MR. KELLOGG:  Objection;

9     calls for a legal conclusion.

10:05:45 10   A. Yeah, that calls for a legal conclusion.

11 I'm not providing an opinion on that.

12   Q. Perfectly understood.  But I think we've

13 established that you understood the Howey test

14 prior to your retention and that you at least may

10:05:57 15 have read the complaint or a press article about

16 the complaint prior to your retention.

17     So I'm asking if you formed any opinion

18 based on what you'd read --

19       MR. KELLOGG:  Objection;

10:06:05 20     calls for a legal conclusion.

21       MR. SYLVESTER:  I haven't

22     finished my question, Counselor.

23 BY MR. SYLVESTER:

24   Q. I'm focusing just on the period prior to

10:06:13 25 your retention.

43

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:06:14 | 1 | Based on anything that you read about |
| | 2 | the case or the complaint, did you form an opinion |
| | 3 | about whether or not the SEC's allegations, if |
| | 4 | proved, constitute a violation of securities laws? |
| 10:06:25 | 5 | MR. KELLOGG:  Objection. |
| | 6 | A.   Well, I would not form a legal |
| | 7 | conclusion without having read the actual |
| | 8 | complaint.  So the answer to that question is |
| | 9 | certainly no.  And, you know, in terms of reading |
| 10:06:40 | 10 | the complaint, obviously I have views about the |
| | 11 | economic theory and assertions in the complaint, |
| | 12 | but I have not formed a legal opinion as to how |
| | 13 | the judge should rule here.  So I'm not -- not |
| | 14 | providing that opinion. |
| 10:06:54 | 15 | Q.   Again, I'm just focusing on the period |
| | 16 | prior to your retention in this case. |
| | 17 | Did you have any views about the |
| | 18 | economic theories or assertions in the complaint |
| | 19 | prior to your retention as an expert? |
| 10:07:04 | 20 | MR. KELLOGG:  Objection. |
| | 21 | A.   So, again, my memory reading the |
| | 22 | complaint is -- is in that time frame.  So I don't |
| | 23 | remember whether it is at the same time as the |
| | 24 | engagement or it was a month, you know, a week |
| 10:07:15 | 25 | earlier, but it's in that time frame that I read |

44

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:07:17  1    the complaint.

       2           As I said before, I did read general

       3    descriptions in the press of the SEC's theory, but

       4    I -- you know, quite frankly, I would not form a

10:07:28  5    legal conclusion, even if I was asked to do so,

       6    based on secondhand reporting on legal matters.

       7       Q.   When you read the complaint, did you

       8    form an opinion about whether the facts alleged,

       9    if proved, would demonstrate a violation of the

10:07:49 10    securities laws?

      11               MR. KELLOGG:   Objection;

      12           calls for a legal conclusion.

      13       A.   I don't have a view on that.

      14       Q.   I'm not sure what that answer means.

10:08:01 15           Does that mean no or you don't recall or

      16    something else?

      17       A.   I don't have a -- okay.  I -- I am

      18    not -- I'm not providing and I don't have a legal

      19    analysis of all the legal issues that relate to

10:08:15 20    this dispute; that is, whether, in fact, this

      21    constitutes a security as defined by the

      22    securities laws.  That's -- obviously very capable

      23    counsel and -- and the judge and -- and the legal

      24    system will decide that.  I'm not providing an

10:08:32 25    opinion and I haven't formed a legal opinion on

                                                           45

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:08:36   1   that.

  2       Q.   What was it that you read in the press

  3   about the SEC's case against Ripple prior to your

  4   retention?

10:08:56   5       A.   I don't -- I don't have a specific

  6   recollection.  I -- I -- I read a lot of press and

  7   I don't -- I don't -- I do have a generalized

  8   recollection of reading about it, but I'm not

  9   going to be able to give you more particulars.

10:09:12 10       Q.   Do you own XRP?

11       A.   No.

12       Q.   Have you ever owned XRP?

13       A.   No.

14       Q.   Sitting here today, do you have any

10:09:16 15   plans to acquire XRP?

16       A.   No.

17       Q.   Are you charging a fee for your expert

18   services in this case?

19       A.   Yes.

10:09:22 20       Q.   How much is your fee?

21       A.   So my expert fee is 1,250 at the time

22   that I was retained.  So that part of my

23   compensation is my hourly rate.  Just to have a

24   complete answer for the record, another component

10:09:38 25   of my compensation is I get a percentage of junior

46

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:09:41  1  people at Compass Lexecon that work pursuant to my
        2  instructions and supervision.
        3          So an example of that would be somebody
        4  put -- puts together binders and sends that to me.
10:09:52  5  So junior people at Compass Lexecon working in
        6  this matter under my instructions and supervision,
        7  I do get compensation based on that as well as my
        8  hourly rate.
        9      Q.   Is the compensation that you just
10:10:10 10  referenced a percentage of your billables?
       11      A.   Yes, but with the important
       12  qualification that it's not the billables at
       13  large.  It's junior staff at Compass Lexecon for
       14  which this would apply.
10:10:23 15      Q.   What's that percentage?
       16      A.   So I do have a confidential contract
       17  with Compass Lexecon.  I -- it's -- I just want to
       18  make sure I'm not violating any confidentiality.
       19              MR. FIGEL:  Give us just a
10:10:45 20          second.
       21              (Pause)
       22              MR. KELLOGG:  So if your
       23          agreement with Compass is that it's
       24          confidential, then you should not
10:10:56 25          reveal it.

                                                        47

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:10:56 | 1 | THE WITNESS:  Okay. |
| | 2 | BY MR. SYLVESTER: |
| | 3 | Q.  Okay.  So just for purposes of the |
| | 4 | record, you're declining to answer my question |
| 10:11:05 | 5 | based on a preexisting confidentiality agreement |
| | 6 | with a private party? |
| | 7 | A.  So my understanding, sitting here today, |
| | 8 | is that my agreement with Compass Lexecon is |
| | 9 | confidential.  That's my understanding sitting |
| 10:11:13 | 10 | here today.  And so the answer to your question |
| | 11 | would be yes.  But I do, to reiterate, get a |
| | 12 | percentage of the junior staff working pursuant to |
| | 13 | my instruction and supervision in this matter. |
| | 14 | MR. KELLOGG:  To make it |
| 10:11:29 | 15 | clear, we do not represent Compass |
| | 16 | Lexecon so we're not forming a legal |
| | 17 | opinion about the nature of the |
| | 18 | contract. |
| | 19 | MR. SYLVESTER:  Understood. |
| 10:11:37 | 20 | THE WITNESS:  And I -- |
| | 21 | maybe -- so I want to make clear |
| | 22 | that's my understanding of the nature |
| | 23 | of the agreement sitting here today, |
| | 24 | that it's confidential.  I -- I can |
| 10:11:48 | 25 | certainly confirm or disconfirm that |

48

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:11:51  1            my understanding is correct or

        2            incorrect.

        3  BY MR. SYLVESTER:

        4      Q.   How much have you billed for your

10:11:58  5  services in this matter so far?

        6      A.   So I haven't added up the number of

        7  hours, but it is substantial.  So it's several

        8  hundred hours over this period since I've been

        9  engaged, so -- but I had not added up the hours.

10:12:12 10      Q.   Is the seven -- strike that.

       11            Is the several hundred hours just your

       12  time or you plus any staff assisting you?

       13      A.   So my answer to your earlier question is

       14  just my time.

10:12:23 15      Q.   Okay.

       16      A.   So it would be multiple of, you know,

       17  several -- I know "several" has a lack of -- you

       18  know, it's -- it's not a specific number, but it

       19  is a significant amount of time, my personal

10:12:33 20  time.

       21      Q.   And do you have a sense of how many

       22  hours any staff working with you in connection

       23  with this matter have billed?

       24      A.   I do not, no.

10:12:43 25      Q.   Okay.  Would Compass Lexecon have those

                                                              49

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:12:44  1   records?

2        A.   I would assume so.

3        Q.   Okay.  And would Compass Lexecon have

4   precise records of how many hours you've billed in

10:12:52  5   this matter?

6        A.   I'm not privy to their recordkeeping

7   system.  I would assume so but that -- that's just

8   an assumption.

9        Q.   Have you received any compensation for

10:13:03 10   your work in this case in XRP?

11        A.   No.

12        Q.   Do you have any plans to receive XRP as

13   compensation for your expert services in this

14   case?

10:13:09 15        A.   No.

16        Q.   Did others assist you with providing

17   your expert services in this case?

18        A.   Yes.

19        Q.   Who?

10:13:17 20        A.   So I interacted with -- I'm just going

21   to spell her name -- A-N-D-R-I-A, Andria,

22   van der Merwe.  And she is the senior person at

23   Compass Lexecon with whom I interfaced.

24        Q.   What's her title?

10:13:40 25        A.   Executive vice president or senior --

50

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

10:13:42  1   I -- I forget her exact title, but she's a -- a

2   senior person at Compass Lexecon with whom I've

3   worked in the past with.

4        Q.   Is there anyone --

10:13:51  5              THE VIDEOGRAPHER:  Excuse me,

6           Counsel.  Your -- your mic is sort of

7           rubbing against your shirt.  Sorry for

8           the interruption.

9              MR. SYLVESTER:  No problem.

10:13:58 10  BY MR. SYLVESTER:

11        Q.   Is there anyone else who assisted you

12   with providing your expert services in this case?

13              MR. KELLOGG:  Objection on

14           work product grounds.

10:14:06 15           Do not discuss any

16           conversations with attorneys.

17              THE WITNESS:  Okay.

18        A.   So my understanding is that she --

19   this is the person at Compass Lexecon -- did have

10:14:17 20  assistance from Compass Lexecon staff in terms of

21   work product or analysis.  But my interactions

22   were through her, or with her, in terms of -- of

23   my instructions and supervision and so forth.

24        Q.   Who are the assistants that

10:14:40 25  Ms. van der Merwe interacted with in connection

51

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:14:45  1    with the preparation of your expert report?

2         A.   So I don't have a list off the top of my

3    head.  So I know there was junior staff that were

4    doing different tasks, but I interfaced with her.

10:14:59  5         Q.   Did you ever directly communicate with

6    any of the junior staff that were doing different

7    tasks in connection with preparation of your

8    expert opinion?

9         A.   So my memory sitting here today is just

10:15:10 10   -- my best recollection in terms of Compass

11   Lexecon staff is one other person as -- as best I

12   can remember.  Ron -- I'm going to mispronounce

13   his last name -- Lewon -- Lewinski, Lewonski.

14   Ronald Lewonski.  Some -- something along those

10:15:30 15   lines.

16             So in addition with -- to interfacing

17   with her, that's the one other person that I can

18   recall sitting here today.

19        Q.   What is Mr. Lewonski's role at Compass

10:15:45 20   Lexecon?

21        A.   So he's a -- was a statistician.

22        Q.   He's no longer with the company?

23        A.   My memory is that he moved to another

24   company to do something -- some statistical stuff

10:16:02 25   with another company.  I -- was it Amazon or -- I

52

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:16:06  1    forget which company.

2         Q.    What assistance did Mr. Lewonski provide

3    with your expert opinions?

4         A.    So, again, I interfaced with that --

10:16:16  5    that one person at Lexecon.  He did join in a

6    conversation about the factor model.  So it was

7    that one conversation where I do remember he -- he

8    talked.

9         Q.    Did he have any assistance in designing

10:16:37 10    your factor model?

11        A.    Well, the factor model was my -- my

12    instructions and I'm the one that provided

13    instructions on exactly what I wanted done and

14    how -- how it was to be done.

10:16:50 15        Q.    How did Ms. van der Merwe assist in your

16    expert services in this case?

17                      MR. KELLOGG:  Objection.

18        A.    So she helped -- you know, a couple

19    different buckets.  She helped put together

10:17:08 20    binders of materials for me; kept the flow of

21    materials organized.  She -- through her,

22    interfacing with her, there was a lot of data

23    work, merging of data and so forth.  And I used

24    Compass Lexecon pursuant to my instructions for

10:17:26 25    that.

53

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:17:34  1          So, yeah, it was really -- I worked

2    closely with her in preparing the analyses and the

3    end result of my reports reflected in AF-1 and

4    AF-2.

10:17:49  5      Q.   What was the role of the junior

6    assistants at Compass Lexecon with whom you did

7    not directly communicate in preparation of your

8    expert opinions in this case?

9               MR. KELLOGG:   Objection.

10:18:02 10      A.   So -- so I don't have a breakdown of who

11   did what.  I interfaced with this person.  I know

12   that she had assistants.  But, again, it was

13   pursuant to my instructions and -- and supervision

14   about the ultimate work product.

10:18:21 15      Q.   Was Ms. van der Merwe responsible for

16   the merging of price data between CoinMarketCap

17   and CryptoCompare?

18              MR. KELLOGG:   Objection.

19      A.   So you used the word "responsible."  At

10:18:32 20   the end of the day, I'm responsible.  She did

21   assist in the merging of the data pursuant to my

22   instructions and supervision.

23      Q.   Do you know how much -- strike that.

24          Are Ms. van der Merwe and Mr. Lowanski

10:18:58 25   also charging, through Compass Lexecon, defendants

54

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:19:01   1   for their services?

2        A.   I have no personal knowledge of that.  I

3   assume so, but I have no personal knowledge.

4        Q.   Do you know what their billing rates

10:19:10   5   are?

6        A.   No.

7        Q.   Did anyone at Compass Lexecon provide

8   any comments to drafts of AF-1?

9                 MR. KELLOGG:   Objection.

10:19:27  10        A.   The comments or the -- the interactions

11   were -- I certainly discussed with Compass Lexecon

12   what I wanted done.  I certainly had their

13   assistance.  In terms of the draft itself, my

14   memory of the draft was really reflecting the work

10:19:48  15   product.  So I think the discussions, the

16   thinking, the analysis, occurred before the final

17   production of the report.  So I certainly had

18   those conversations.

19        Q.   Who wrote the first draft of AF-1?

10:20:03  20        A.   I did.

21        Q.   Okay.

22        A.   But I -- I did have the assistance of

23   Compass Lexecon.  So, for example, some -- the

24   exhibits were produced pursuant to my instructions

10:20:16  25   and supervision by Compass Lexecon primarily

55

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:20:19  1   because we would still be waiting -- waiting for

2   the report if I were to do these exhibits in a --

3   in a clean and, you know, properly formatted way.

4           So I did have the assistance of Compass

10:20:32  5   Lexecon, but the first draft was mine.

6       Q.   Okay.  Who are all the individuals at

7   Compass Lexecon who contributed in any way to the

8   drafting of your report?

9               MR. KELLOGG:  Objection;

10:20:43 10          mischaracterizes the testimony.

11      A.   So -- so my interactions with Compass

12   Lexecon in terms of the draft is -- is what I

13   described earlier.  I did the first draft.  I did

14   have the assistance of Compass Lexecon; they

10:20:57 15   helped put together the exhibits pursuant to my

16   instructions and supervision.  And obviously, you

17   know, that was, you know, something that, as I

18   worked on the draft, I continued to have the

19   assistance of Compass Lexecon.

10:21:14 20      Q.   Who were the people that provided the

21   assistance in -- as described in your last

22   answer?

23               MR. KELLOGG:  Objection;

24          asked and answered.

10:21:20 25      A.   It's the same answer as before.  I

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

10:21:25  1  interfaced, with that one exception that I can

2  recall, with -- with -- with that one person at

3  Compass Lexecon.

4      Q.   With Ms. van der Merwe?

10:21:32  5      A.   Yes.

6      Q.   Did any attorneys provide comments to

7  drafts of Exhibit 1?

8              MR. KELLOGG:  Objection.

9              Direct the witness not to

10:21:43  10          answer.  You can answer yes or no, but

11          that's it.

12      A.   What's the pending question?

13      Q.   Did any attorneys provide comments on

14  drafts of Exhibit 1?

10:21:56  15      A.   I don't recall ever receiving comments

16  from counsel on the draft.  I certainly talked

17  about -- well --

18              MR. KELLOGG:  Objection.

19              Don't -- don't go into detail.

10:22:05  20      A.   So I -- I don't recall ever receiving

21  comments on the draft from -- from counsel, is my

22  best recollection.

23      Q.   Okay.

24      A.   So, in other words, you know, for -- for

10:22:18  25  example, I did a draft and then there's a markup

57

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:22:20 | 1 | of the draft by counsel.  I don't recall ever |
| | 2 | that -- I never recall that happening. |
| | 3 | Q.  Just a yes or no:  Did you ever receive |
| | 4 | comments orally from counsel on the draft? |
| 10:22:29 | 5 | MR. KELLOGG:  You can answer |
| | 6 | yes or no. |
| | 7 | A.  It depends on what you mean by |
| | 8 | "comments."  So I did describe to counsel -- |
| | 9 | MR. KELLOGG:  I'm going to |
| 10:22:43 | 10 | direct the witness not to answer that |
| | 11 | question. |
| | 12 | MR. SYLVESTER:  Not to answer |
| | 13 | whether or not he received comments |
| | 14 | orally from counsel? |
| 10:22:49 | 15 | MR. KELLOGG:  Yes. |
| | 16 | MR. SYLVESTER:  I believe -- |
| | 17 | do you want to strike it from the |
| | 18 | record?  Because he already answered. |
| | 19 | MR. KELLOGG:  Yes. |
| 10:22:54 | 20 | MR. SYLVESTER:  Okay.  So |
| | 21 | just so the record is clear, you would |
| | 22 | permit Professor Ferrell to answer the |
| | 23 | question whether or not he received |
| | 24 | written comments to his draft, but |
| 10:23:05 | 25 | you object and instruct him not to |

58

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:23:07   1            answer as to whether or not

           2            he received oral --

           3                    MR. KELLOGG:  I object to --

           4                    MR. SYLVESTER:  Please let me

10:23:10   5            finish just for the record.

           6                    You would object -- object

           7            and instruct him not to answer as to

           8            whether or not he received oral

           9            comments from counsel on his draft

10:23:17  10            expert report.

          11                    THE WITNESS:  Would this be a

          12            good time to take a five-minute break?

          13            We've been --

          14                    MR. SYLVESTER:  That's fine

10:23:30  15            by me.  Let's go off the record.

          16                    MR. FIGEL:  Why don't we

          17            finish this --

          18                    THE VIDEOGRAPHER:  Okay.

          19            Thank you.  The time is approx --

10:23:34  20            approximately 10:24.  We're going off

          21            the record.

          22                    (Whereupon, a recess is

          23            taken.)

          24                    THE VIDEOGRAPHER:  The time

10:44:25  25            is approximately 10:44.  We're back on
```

                                                        59

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:44:27 | 1 | the record.  This is the beginning of |
| | 2 | Media 2. |
| | 3 | MR. SYLVESTER:  Okay.  When |
| | 4 | we went off the record, we were having |
| 10:44:34 | 5 | a colloquy about Ripple's counsel's |
| | 6 | instruction not to answer. |
| | 7 | Have you come to a position |
| | 8 | on whether or not he is -- |
| | 9 | MR. KELLOGG:  Correct.  I |
| 10:44:41 | 10 | will direct the witness not to answer |
| | 11 | any questions about conversations or |
| | 12 | other interactions with counsel about |
| | 13 | the drafting process of the report. |
| | 14 | MR. SYLVESTER:  And just for |
| 10:44:53 | 15 | clarity, that includes whether or not |
| | 16 | such conversations occurred? |
| | 17 | MR. KELLOGG:  Correct. |
| | 18 | MR. SYLVESTER:  Okay. |
| | 19 | BY MR. SYLVESTER: |
| 10:45:02 | 20 | Q.   And are you, Professor, going to follow |
| | 21 | counsel's instruction not to answer any questions |
| | 22 | regarding any conversations you had with counsel |
| | 23 | about the drafting process of your report |
| | 24 | including whether or not such conversations |
| 10:45:15 | 25 | occurred? |

60

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:45:16   1       A.   I'm going to follow the instruction of

2   counsel.

3       Q.   Okay.

4               MR. SYLVESTER:  Before we get

10:45:20   5          back to questioning -- questioning, I

6          also want to put a reservation of

7          rights on the record.

8               To the extent that Professor

9          Ferrell testifies here today about any

10:45:30  10          analysis that he has performed that

11          the SEC has not received or any

12          opinions he has formed that are not

13          set forth in his expert reports, AF-1

14          or AF-2, we reserve all rights to

10:45:43  15          preclude any such analysis or any such

16          testimony at a later date.

17   BY MR. SYLVESTER:

18       Q.   Moving on, have you served as an expert

19   witness prior to this case?

10:45:56  20       A.   Yes.

21       Q.   Approximately how many times have you

22   been retained as an expert witness?

23       A.   I don't have an answer for that.  I

24   don't have a number.

10:46:06  25       Q.   General terms is fine.

61

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:46:11 1        A.    I've been retained over the years in a

2    number of securities and capital market cases, but

3    I don't have a number.

4        Q.    Is it north of 50, would you estimate?

10:46:20 5        A.    If the question is north of 50 in my

6    lifetime, yes.

7        Q.    Okay.  Is it north of 100, would you

8    estimate?

9        A.    In my lifetime, yes, it would be north

10:46:30 10   of 100.  I do want to note that I have been on

11   occasion retained as an expert and the case

12   settled and I effectively do very little or --

13   if -- if anything.

14            So north of 100 with that understanding

10:46:46 15   of what an engagement might entail.

16       Q.    Okay.  Is it north of 200?

17       A.    I don't believe so, but I -- I don't --

18   I don't have a specific recollection sitting here.

19   If you're talking about my entire life, I don't --

10:47:07 20   I don't know sitting here.

21       Q.    Okay.  In the entirety of your expert

22   engagements, have you ever been retained by the

23   plaintiff's counsel?

24       A.    Yes.

10:47:13 25       Q.    Okay.  Sitting here today, just an

62

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:47:15  1   approximate number, what percentage of the time

2   have you been retained by plaintiff's counsel over

3   the history of your engagements?

4       A.   I don't have a specific recollection.  A

10:47:24  5   majority is on the defense side.  I have on

6   occasion been retained by plaintiffs.

7       Q.   Okay.  Prior to this case, have you been

8   retained in a case where a governmental entity was

9   a party?

10:47:35 10       A.   Yes.

11       Q.   How many times has that occurred?

12       A.   So I want to be clear.  Is the question

13   that I'd been retained by the government or the

14   government's been involved?

10:47:43 15       Q.   My first question was, is the

16   government -- let me just ask it again.

17            Have you been retained in a case where a

18   governmental entity was a party regardless of who

19   retained you?

10:47:51 20       A.   Yes.

21       Q.   Okay.  Have you ever been retained by

22   the government in any such case?

23       A.   Yes.

24       Q.   Okay.  How many times have you been

10:47:57 25   retained by the government as an expert witness?

63

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:48:00  1      A.   So, you know, just sitting here, the one

2    memory that comes to mind is I was retained by the

3    U.S. Attorney -- U.S. Attorney in the Southern

4    District in a criminal securities case is -- you

10:48:16  5    know, just sitting here today, is the -- is the

6    one case that comes to mind.  That was a couple

7    years ago.

8      Q.   Okay.  And now backing up to the

9    entirety of cases in which the government was a

10:48:25 10    party and you were an expert witness,

11    approximately how many of those exist?

12      A.   I don't know.  It's -- it has happened

13    on occasion, but it's -- it's -- it's relatively

14    infrequent.  Relatively infre -- it does happen,

10:48:40 15    but relatively infrequently.

16      Q.   Would you say that number is as high as

17    ten?

18      A.   It's possible.  I don't -- I don't have

19    a specific number.

10:48:51 20      Q.   Okay.  Would you say it's as high as 50?

21      A.   No.

22      Q.   Okay.  Have you ever served as an expert

23    witness in a case in which the SEC was a party?

24      A.   Yes.

10:49:04 25      Q.   How many such cases?

64

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:49:06  1  A. I don't have a specific number.  It's a

2 small number of cases, is my best recollection,

3 but I don't have a specific number.

4  Q. Has the SEC ever retained you as an

10:49:13  5 expert witness?

6  A. No.

7  Q. So in each of the cases that you've been

8 retained as an expert witness in which the SEC was

9 a party, you've been a witness for the defense?

10:49:23 10  A. Yes.  The handful of times I can recall

11 that happening, yes.

12  Q. Has your expert opinion ever been

13 excluded by a court?

14  A. No.

10:49:33 15  Q. Let me reask a better question related

16 to that.

17   Has there ever -- has your expert

18 opinion ever been excluded in whole or in part by

19 a court?

10:49:41 20  A. No.

21  Q. Okay.  Have you ever held any

22 professional licenses?

23  A. I was a member of the bar for, like, a

24 year in the '90s.  So that's -- no other

10:49:56 25 professional licenses.

65

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:49:57 | 1 | Q. Okay. Was your bar license ever revoked |
| | 2 | or suspended? |
| | 3 | A. I -- I stopped being a member of the bar |
| | 4 | because I wasn't practicing law, so... |
| 10:50:11 | 5 | Q. Have you ever -- |
| | 6 | A. I let it lapse. |
| | 7 | Q. I'm sorry. You said it lapsed? |
| | 8 | A. I believe so. |
| | 9 | Q. Okay. Have you ever been the subject of |
| 10:50:18 | 10 | any disciplinary action related to your |
| | 11 | professional activities? |
| | 12 | A. No. |
| | 13 | Q. Are you familiar with the term "event |
| | 14 | study"? |
| 10:50:24 | 15 | A. Yes. |
| | 16 | Q. Okay. Have you conducted event studies |
| | 17 | in the past as part of your expert witness work? |
| | 18 | A. Yes. |
| | 19 | Q. Approximately how many times? |
| 10:50:32 | 20 | A. How many -- is the question how many |
| | 21 | times have I done an event study? |
| | 22 | Q. As a part of your expert witness work in |
| | 23 | the past. |
| | 24 | A. A large number of times. |
| 10:50:41 | 25 | Q. North of 50? |

66

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:50:41  1       A.    Possibly.

          2       Q.    North of 100?

          3       A.    I don't have a specific recollection.  I

          4   don't know.

10:50:50  5       Q.    Have you ever submitted a rebuttal

          6   expert opinion critiquing an event study conducted

          7   by another expert witness?

          8       A.    Yes.

          9       Q.    How many times have you done that?

10:51:01 10       A.    A fair number of times.  I don't have a

         11   specific number, but I -- I have definitely done

         12   that.

         13       Q.    Okay.  Would you estimate that as north

         14   of 50?

10:51:07 15       A.    I don't have a specific number.  I'm not

         16   sure if it's north of 50.  I don't know.

         17       Q.    How about north of 20?

         18       A.    My best -- I don't have a specific

         19   number.  The answer is probably yes.

10:51:19 20       Q.    Okay.  Have you conducted event studies

         21   in contexts other than engagements as an expert

         22   witness?

         23       A.    Yes.

         24       Q.    Okay.  What context?

10:51:30 25       A.    Academic writing and I also teach event

                                                              67

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:51:32   1    studies.

           2         Q.    Are the academic publications in which

           3    you've addressed the topic of event studies listed

           4    among your publications in AF-1?

10:51:46   5         A.    All my current publications are -- are

           6    listed there.  Let me just take a quick look.  I

           7    am -- yes.  So my most recent paper is listed in

           8    the rebuttal.  So I believe this is a complete

           9    list of my academic writings.

10:52:01  10         Q.    Okay.  Before performing an event study,

          11    do you always check whether the market for the

          12    considered security is efficient?

          13         A.    My best recollection is in the context

          14    where I've done an event study, it's been assumed

10:52:15  15    that the market's efficient is my best

          16    recollection.

          17         Q.    When you say "it's been assumed," is

          18    that you doing the assuming or someone else?

          19         A.    It's an assumption -- you know, if we're

10:52:29  20    talking about my expert work, it's an assumption

          21    of the litigation under -- under Basic versus

          22    Levinson or under the -- let me -- let me restate.

          23              That typically when I do an event study

          24    in my -- is in a situation where it's been assumed

10:52:43  25    for purposes of litigation that the market is

                                                              68

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:52:46  1   efficient.

2        Q.   Now moving to your -- strike that.

3             For event -- event studies that you've

4   conducted in academic contexts, for those event

10:52:56  5   studies, do you always check whether the market

6   for the considered security is efficient?

7        A.   I believe the event studies that I do in

8   my -- in my work is for large publicly traded

9   companies.  So I don't -- I didn't run the legal

10:53:11 10   test for efficiency there, but we're talking

11   about, my best recollection is, large publicly

12   traded companies such as listed in the New York

13   Stock Exchange where I don't think there would be

14   a dispute as to efficiency is -- is my sense.

10:53:28 15        Q.   And there are other tests for market

16   efficiency setting aside legal tests, correct?

17             MR. KELLOGG:  Objection.

18        A.   There's certainly academic literature on

19   efficiency going back to Gene Fama's work in the

10:53:40 20   1960s for sure.

21        Q.   And focusing only on economic tests for

22   market efficiency, before performing an event

23   study in an academic context, do you check whether

24   the market is considered efficient in economic

10:53:56 25   terms?

69

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:53:56  1    A.   The same answer as before.  So my best

2    recollection of kind of the event study factor

3    type analysis I've done academic work for involves

4    publicly traded securities; New York Stock

10:54:08  5    Exchange listed securities, for example.

6          So, you know, I received it on that

7    basis.

8    Q.   Have you ever performed an event study

9    where the market in your view was not efficient?

10:54:26  10    A.   I don't recall offhand doing that.  I'm

11    not saying it's impossible.  I don't have a

12    recollection sitting here today of doing that.

13    Q.   When you perform an event study, do you

14    always check for statistically significant

10:54:37  15    abnormal returns on days without any relevant news

16    during the period you're examining?

17          MR. KELLOGG:   Objection.

18    A.   You know, when I run an event study such

19    as, you know, as an expert, the question's always

10:54:55  20    what is the point of the event study and that

21    informs what I look for and what's relevant.  So

22    it really depends on the purpose that I'm using

23    the event study for or the purpose that, for

24    example, an opposing expert's using the event

10:55:08  25    study and that informs the questions that I think

70

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:55:10   1   are relevant.
           2       Q.   If you're conducting an event study in
           3   which you're testing the impact of a news event on
           4   the price of a security, in that -- in an event
10:55:24   5   study that addresses that question, do you always
           6   check for statistically significant abnormal
           7   returns on days without any relevant news?
           8              MR. KELLOGG:  Objection.
           9       A.   Again, it depends on the event study
10:55:38  10   that I'm assessing or conducting.  I'd just want
          11   to know more context about the purposes of the
          12   event study and the facts and circumstances.
          13       Q.   Can you recall conducting an event study
          14   in which you took steps to determine whether or
10:55:53  15   not there were statistically significant abnormal
          16   returns on days other than days on which the
          17   relevant news was released?
          18              MR. KELLOGG:  Objection.
          19       A.   That's at a high level of generality.
10:56:09  20   It's certainly possible, but it would depend on
          21   what the relevant economic questions were given
          22   the facts and circumstances of the case and given,
          23   if we're talking about expert work, what the
          24   opposing expert's doing and the purpose for which
10:56:22  25   they're offering the event study.  So it would
```

71

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:56:24  1   really depend on the context and the facts and

2   circumstances.

3       Q.   That makes sense, but I'm asking about

4   your recollection of your prior work.

10:56:35  5       Can you recall taking the steps to

6   determine whether or not there were statistically

7   significant abnormal returns on no news days when

8   conducting an event study?

9               MR. KELLOGG:  Objection.

10:56:45 10      A.   It's possible.  I don't have a specific

11  recollection.

12      Q.   Okay.  Let's assume that you conduct an

13  event study -- now we're in hypothetical land.

14      Let's assume that you conduct an event

10:56:56 15  study and you observe a statistically significant

16  abnormal price return following a news event.

17  Let's also say that you observe a number of days

18  without news that also have statistically

19  significant abnormal price returns.

10:57:09 20      How would your analysis or conclusions

21  about the price reaction to news events change, if

22  it would?

23              MR. KELLOGG:  Objection.

24      A.   I don't have a view.  I would have to

10:57:18 25  think about it.

72

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:57:26   1          Q.   Did you conduct an event study as part

           2    of your work in this case?

           3          A.   No.

           4          Q.   Have you ever conducted an event study

10:57:32   5    that pertained to digital asset prices?

           6          A.   No.

           7          Q.   Okay.  Are you offering any opinion in

           8    this case regarding the suitability of event study

           9    methodology and assessing whether there exists a

10:57:44  10    link between Ripple news and the price of XRP?

          11                    MR. KELLOGG:  Objection.

          12          A.   I am certainly providing an opinion that

          13    the factor model is the appropriate statistical

          14    model given the facts and circumstances of this

10:57:57  15    case.  So I do have a -- a view as to whether,

          16    given the economic theory in the complaint,

          17    that -- I do have a view as to whether the event

          18    study methodology or the factor model methodology

          19    is more appropriate.  So that level of generality

10:58:14  20    I do have an opinion.

          21          Q.   Are you providing the opinion that the

          22    factor model that you employed is the only

          23    appropriate statistical model to employ to

          24    determine whether there is a link between Ripple

10:58:26  25    news and the price of XRP?

                                                                    73

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:58:27   1                        MR. KELLOGG:  Objection.

         2        A.   I'm providing the opinion that the

         3    factor model is -- is the correct statistical

         4    model, correct statistical technique, to assess

10:58:38   5    the economic theory as articulated in the

         6    complaint.

         7        Q.   And what I'm just focusing in on is, is

         8    it the only correct statistical technique in your

         9    view?

10:58:48 10                        MR. KELLOGG:  Objection.

       11        A.   Well, you know, there's a panoply of

       12    academically peer-reviewed statistical techniques.

       13    The question here is, which one of those

       14    statistical techniques is appropriate given the

10:59:04 15    facts and circumstances of this case?  And my

       16    opinion is that the factor model is the correct

       17    way, not the event study approach.

       18        Q.   Is there any part of your expert opinion

       19    that states expressly that the event study

10:59:27 20    approach is the incorrect way to study whether

       21    there exists a link between Ripple news and the

       22    price of XRP?

       23                      MR. KELLOGG:  Objection.

       24        A.   Sure.  So I try to, you know, explain

10:59:39 25    this in detail in my opening report.  That is, the

74

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:59:43 1   SEC's economic theory articulated in the complaint

2   is -- there's a whole series of events:

3   Statements, distributions, et cetera.  There's a

4   whole series of events -- activities; conduct, if

11:00:01 5   you will -- that occurred over this seven-year

6   period, 2013 to 2020, that in aggregate is

7   associated with the price of XRP going up.

8         So, for example, paragraph 79 to 82 of

9   the complaint.  Paragraph 9 of the complaint

11:00:19 10   refers to all the conduct referenced in the

11   complaint as the basis for the legal conclusion.

12         And so given the facts and circumstances

13   of this case, I felt it was appropriate that one

14   analyze the cumulative effect of the conduct

11:00:38 15   identified in the complaint and whether it is, in

16   fact, associated with excess returns.  That is to

17   say, returns that are specific to XRP and are not

18   otherwise explainable by general movements in

19   the -- in the cryptocurrency markets.

11:00:55 20         I would also say, to give a complete

21   answer, that for the event -- that another virtue

22   of this approach -- that is, the factor model

23   approach -- is one can analyze the entire time

24   period.  I also analyzed, obviously, 2015 to 2020,

11:01:10 25   as well, separately.  That has the virtue of

75

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:01:16  1    capturing the entirety of the price return series

2    versus a situation where even if you observe a

3    short-term correlation between a news event and an

4    XRP change in price, even assuming that were true,

11:01:33  5    there's still the further question of whether that

6    gets reversed later.

7              Again, this -- this sort of speaks to

8    market efficiency and the need to know and the

9    impact that the efficiency of the market has on

11:01:47 10    how one -- whether you can meaningfully interpret

11    the results of an event study given that, you

12    know, you're not -- you may not be able to

13    identify the appropriate event window.

14              So, again, for those reasons, the

11:02:01 15    reasons articulated in my report, I believe the

16    factor model is the appropriate statistical test

17    in the facts and circumstances of this case.

18         Q.   When was the last time you read the

19    SEC's complaint in this matter?

11:02:14 20         A.   Last night.

21         Q.   How many times have you read the

22    complaint?

23         A.   Many times.

24         Q.   More than ten?

11:02:22 25         A.   Probably.

76

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:02:25  1      Q.   More than 20?

        2      A.   Probably not.

        3      Q.   Okay.  And just for the record, you read

        4  the complaint approximately more than ten times in

11:02:36  5  connection with preparing your expert report in

        6  this case?

        7      A.   Yes.

        8      Q.   Okay.  As part of -- part of forming

        9  your opinion in this case, you conducted a

11:02:43 10  principal components analysis, is that right?

       11      A.   Yes.

       12      Q.   Okay.  As I understand it, the purpose

       13  of conducting the principal components analysis

       14  was to describe the main drivers of general

11:02:54 15  cryptocurrency markets, is that right?

       16              MR. KELLOGG:  Objection.

       17      A.   It's a way of capturing the information

       18  in the non-XRP cryptocurrency markets that I then

       19  use in the factor model.

11:03:08 20      Q.   When you say "capturing the

       21  information," what information do you mean?

       22      A.   Well, there's the 91 tokens that I use

       23  for the 2015 to 2020 period.  There's the 9 crypto

       24  assets that I use for the full period.  And so

11:03:22 25  there's a covariance matrix associated with that.

                                                      77

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:03:24   1   And the PCA analysis is a way to extract

2   information embedded in the covariance matrix of

3   the cryptocurrency assets that I'm using, extract

4   into the principal components that I then use in

11:03:42   5   the regression analysis or in the factor model

6   analysis.

7       Q.   As part of your previous engagements as

8   an expert witness, have you ever conducted a

9   principal components analysis?

11:03:57  10       A.   I don't recall either way.

11       Q.   Setting aside whether or not you

12   conducted a PCA -- strike that.

13            If I say "PCA" throughout the day, I

14   mean principal components analysis.  Okay?

11:04:13  15       A.   Understood.

16       Q.   Okay.  Setting aside whether or not you

17   conducted a PCA in your prior engagements, have

18   you ever been called upon to opine as to whether

19   a specific factor or event influenced price

11:04:27  20   returns?

21            MR. KELLOGG:  Objection.

22       A.   I -- I mean, going back to our earlier

23   questions, I have done event study analyses in the

24   past.

11:04:37  25       Q.   And so that I understand your answer,

78

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:04:41  1    I -- strike that.

2                In your prior expert engagements when

3    you have been called upon to opine as to whether a

4    specific factor or event influenced price returns,

11:04:50  5    the expert analysis that you conducted was an

6    event study, is that right?

7                     MR. KELLOGG:  Objection.

8         A.   That's not quite right.  So I have used

9    event studies in -- in the context of thinking

11:05:05  10   about prices.  I've also used factor model as well

11   in other contexts.  So it depends on the facts and

12   circumstances of the case, including the

13   efficiency of the market.

14        Q.   Prior to this engagement, how many times

11:05:21  15   have you used a factor model to opine on the

16   question of whether a specific factor or event

17   influenced price returns?

18                     MR. KELLOGG:  Objection.

19        A.   I don't have a specific recollection.  I

11:05:30  20   have used it in the past, but I don't have a

21   number.

22        Q.   Under ten?

23        A.   Yes.

24        Q.   Under five?

11:05:38  25   A.   Probably.  I'm not sure.

79

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

11:05:41   1        Q.   Can you recall sitting here today any of

         2   the matters in which you've used a factor model to

         3   opine as to whether a specific factor or event

         4   influenced price returns?

11:05:51   5        A.   So I do remember -- I'm not going to

         6   remember cases.  I do remember there's been

         7   matters where the claim is that there's been

         8   leakage of information into the marketplace that

         9   affected the returns over a period of time.  And I

11:06:12  10   do remember using a factor model in that context.

        11             So, again, a claim concerning events

        12   spanned over a period of time where the claim is

        13   that it's impacting the price return series.

        14        Q.   Do you recall the security at issue in

11:06:30  15   the case you just described?

        16        A.   I believe it was a publicly traded

        17   security, is my memory.  A publicly traded stock.

        18        Q.   Prior to this case, have you ever

        19   offered an expert opinion that an asset was or was

11:06:50  20   not a currency?

        21        A.   No.

        22        Q.   Prior to this case, have you ever

        23   offered an expert opinion that an asset was or was

        24   not a virtual currency?

11:06:59  25        A.   No.

                                                              80

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:06:59  1      Q.    Prior to this case, have you ever

2    offered an expert opinion that an asset did or did

3    not function as a store of value?

4      A.    No.

11:07:06  5      Q.    Prior to this case, have you ever

6    offered an expert opinion that an asset did or did

7    not function as a unit of account?

8      A.    No.

9      Q.    Prior to this -- prior to this case,

11:07:16  10    have you ever offered an expert opinion that an

11    asset did or did not function as a medium of

12    exchange?

13      A.    I don't believe so.

14      Q.    Okay.  Have you ever --

11:07:26  15      A.    So these are -- just to be clear on the

16    record, this is my best recollection sitting here

17    today.

18      Q.    Have you authored any academic articles

19    that addressed the topic of whether an asset is or

11:07:37  20    is not a currency?

21      A.    No.

22      Q.    Have you authored any academic articles

23    that address the topic of whether an asset is or

24    is not a virtual currency?

11:07:45  25      A.    No.

81

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:07:45 1      Q.   Have you authored any academic articles

2  that address the topic of whether or not an asset

3  functions as a medium of exchange?

4      A.   I don't believe so.

11:07:56 5      Q.   Have you authored any academic articles

6  that address the topic of whether an asset

7  functions as a store of value?

8      A.   I don't believe so.

9      Q.   Have you authored any academic articles

11:08:05 10 that address the topic of whether an asset

11 functions as a unit of account?

12     A.   I don't believe so.

13     Q.   Have you written any publications

14 pertaining to digital assets?

11:08:14 15     A.   I don't believe so.

16     Q.   Have you taught any classes that cover

17 the topic of digital assets?

18     A.   Yes.

19     Q.   What classes?

11:08:22 20     A.   I cover it in corporate finance and I

21 cover it in my securities regulation class.  Oh,

22 and it also comes up in my law and finance class

23 on start-ups.

24     Q.   What topics do you cover related to

11:08:42 25 digital assets in your securities regulation

82

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:08:44  1  courses?

2      A.   So I -- so the securities regulation

3  class is a -- is a class at the law school

4  although I incorporate economics and finance into

11:08:57  5  that.  And so the securities regulation class, I

6  do cover different issues relating to the

7  application of securities laws and -- and digital

8  assets have come up in that context, such as ICOs

9  or, you know, tokens, where, for example, there's

11:09:17 10  some right associated to -- with profits or

11  earnings of the entity that's issuing them to --

12  to raise capital.

13          So that would be the securities

14  regulation class.  It comes up in that context.

11:09:31 15  Kind of the panoply of instruments that you

16  observe in the marketplace.

17          In corporate finance, I talk about it as

18  sort of a new -- new-ish, I should say, financial

19  asset.  So just sort of the characteristics of

11:09:49 20  this -- of this space of crypto assets.

21          And then the law of finance seminar, we

22  do talk about start-ups including start-ups in

23  the -- in the block up -- in the blockchain space.

24          So it comes up in different ways in --

11:10:03 25  in -- in these different courses.

83

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:10:09  1          Q.   Have you ever taught -- strike that.

       2               Have you -- strike that.

       3               When you teach your securities

       4     regulation class, do you teach case law?

11:10:24  5          A.   Yes.

       6          Q.   Have you, as part of your securities

       7     regulation class, ever taught any cases in which

       8     the SEC has brought any claims against a digital

       9     asset issuer?

11:10:35 10          A.   I don't believe so.  Now, the case book

      11     that I use I do think mentions -- might -- I'd

      12     have to look back.  It's possible the case book

      13     mentions those cases in passing, but I don't have

      14     a recollection of specifically assigning those

11:10:48 15     cases.

      16          Q.   Have you ever taught a class in which

      17     you address the topic of the SEC's case against

      18     Ripple?

      19          A.   No.  No.  I have mentioned in the

11:10:56 20     context of securities regulation crypto assets.  I

      21     don't remember ever assigning a case or a

      22     complaint to the class.  So I do mention the issue

      23     in class, but, again, I don't have a recollection

      24     of ever assigning an SEC complaint or -- or a

11:11:16 25     case.  So it's really at that level of generality.

                                                          84

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:11:21  1     Q.   Setting aside the SEC's case against

2    Ripple, have you ever taught any class in which

3    you discussed Ripple or XRP?

4     A.   I don't think I've ever gotten into the

11:11:32  5    allegations in this case, no.  I do mention -- I

6    have mentioned securities regulations.  It's

7    mentioned in the case book as well, I believe.

8    You know, the -- the policy issues around crypto

9    assets and how they interact with the securities

11:11:47 10    laws.  So at that level of generality, yes.

11     Q.   Prior to this case, had you been

12    retained as an expert in any case involving

13    digital assets?

14     A.   I don't believe so.

11:11:59 15     Q.   Prior to this case, had you ever

16    conducted any analysis of price movement of

17    digital assets?

18     A.   I don't believe so.

19     Q.   Are you offering any opinion in this

11:12:10 20    case on the informational efficiency of the XRP

21    market?

22     A.   No.

23     Q.   Okay.

24     A.   I'm not providing an opinion on that

11:12:19 25    except to say -- except referencing my earlier

85

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:12:22  1   comments about the event study approach versus the

2   factor model.

3        Q.   Turning to Appendix B of your opening

4   report, AF-1.

11:12:43  5        A.   Appendix B?

6        Q.   That's right.

7        A.   Yes.

8        Q.   Labeled "Materials Considered."

9             Do you see that?

11:12:47 10        A.   I do.

11        Q.   Did you personally review each of the

12   materials listed in Appendix B?

13        A.   I did.

14        Q.   You know what a Wells submission is, is

11:12:55 15   that right?

16        A.   Yes, I do.

17        Q.   Okay.  Did you review any of defendants'

18   Wells submissions in this case?

19        A.   I don't believe I reviewed the Wells

11:13:03 20   submission is my best recollection.  That's my

21   best recollection sitting here.

22        Q.   Okay.  Let's turn to paragraph 90 of

23   AF-1 on page 39.

24        A.   Page 39?

11:13:33 25        Q.   Yes.

86

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 11:13:33 | 1 | A.   Paragraph 90? |
| | 2 | Q.   That's right. |
| | 3 | A.   Okay. |
| | 4 | Q.   The second sentence, you refer to "the |
| 11:13:38 | 5 | economic reality that Ripple's efforts do not |
| | 6 | impact XRP prices." |
| | 7 | A.   I don't -- I don't see that.  Page 39? |
| | 8 | Q.   39, paragraph 90. |
| | 9 | A.   Yes. |
| 11:13:47 | 10 | Q.   Sentence 2.  I'm quoting the latter |
| | 11 | portion of sentence 2.  Your reference is to "the |
| | 12 | economic reality that Ripple's efforts do not |
| | 13 | impact XRP prices." |
| | 14 | A.   I do.  Okay.  I didn't realize you were |
| 11:14:00 | 15 | reading a portion of the sentence.  Okay. |
| | 16 | MR. KELLOGG:  Sorry.  Mark, |
| | 17 | where are we? |
| | 18 | MR. SYLVESTER:  The second |
| | 19 | sentence of paragraph 90, latter |
| 11:14:08 | 20 | portion. |
| | 21 | BY MR. SYLVESTER: |
| | 22 | Q.   Okay.  Is your view, Professor, that the |
| | 23 | economic reality described in this sentence -- |
| | 24 | sorry.  Strike that. |
| 11:14:21 | 25 | Is your view that the economic reality |

87

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:14:23  1   that Ripple's efforts do not impact XRP prices

 2   based on your analysis that you describe in

 3   Section III of your report?

 4                 MR. KELLOGG:  Objection.

11:14:40  5       A.   Well, it does reflect the -- the

 6   analysis in Section III, but I -- you know, I

 7   would also, you know, reference all the work in

 8   the report, including my review of the contracts.

 9   You know, the contracts are also referenced in the

11:14:55 10   complaint as well.

11           But I am including as a basis here the

12   factor model, that's true.

13       Q.   Okay.  And can we shorthand the -- the

14   analysis performed in Section III.C of your report

11:15:12 15   as your factor model?  Is that fair?

16       A.   Well, I -- I have a factor model in

17   III.D as well.

18       Q.   Okay.

19       A.   So I -- I wouldn't confine the factor

11:15:27 20   model just to III.C if what you're interested in

21   is the factor model.

22       Q.   Maybe it's easier if I just distinguish

23   throughout the day your two analyses by referring

24   to the analysis that you performed with respect to

11:15:40 25   Sections III.D and III.C of your report.  Would

88

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:15:43  1   that work?

2        A.   If you want to refer to the analysis in

3   III.C, I have no problem with that.

4        Q.   Okay.  All right.  And in III.C you

11:15:55  5   describe the statistical analysis you performed?

6        A.   One of the statistical analyses, yes.

7        Q.   Right.

8             Did you design the analysis that's

9   described in Section III.C to answer the question

11:16:03 10   of whether Ripple's efforts impact XRP prices?

11                  MR. KELLOGG:  Objection.

12        A.   Well, a full answer to that is it's

13   designed to assess the economic theory articulated

14   in the SEC complaint; i.e., there's a whole series

11:16:19 15   of events, including distributions, but not

16   limited to distributions, that had the effect or

17   associated with XRP price increases over that time

18   period, the time period being 2013 to 2020.

19             So the factor model is the appropriate

11:16:37 20   statistical test to assess that economic theory.

21        Q.   In your last answer you referenced a

22   whole series of events including, but not limited

23   to, distributions.

24             What other events are part of that

11:16:53 25   series of events?

89

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:16:54  1      A.   I would just reference the complaint.

2   So the complaint identifies various statements,

3   tweets, I believe, distributions, that in the

4   SEC's view over this time period are -- is

11:17:12  5   associated with XRP prices increasing.  And,

6   again, I would reference the complaint for the

7   full list of the various events, distributions,

8   news -- statements that the SEC believes in

9   aggregate is associated and helps explain XRP

11:17:41 10   price increases over this time period, the 2013 to

11   20 -- 2020 period.

12        And, again, my view is the factor model

13   is the appropriate way to test whether that's

14   accurate or not.

11:17:59 15      Q.   In your view the factor model is the

16   appropriate way to test whether all of the items

17   that you just listed had an impact on XRP's price,

18   is that right?

19            MR. KELLOGG:  Objection.

11:18:08 20      A.   It's the appropriate way to assess

21   whether over this time period the events -- events

22   defined as the conduct identified by the

23   complaint -- had or are associated with excess

24   returns of XRP; i.e., returns of XRP that are not

11:18:27 25   explained by general movements in the non-XRP

90

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:18:33  1    cryptocurrency markets.

2        Q.   Let's look back to paragraph 90.  At the

3    very bottom of page 39 --

4        A.   Yes.

11:19:07  5        Q.   -- you reference your "empirical

6    analysis of long-run XRP price return."

7             Do you see that?

8        A.   I do see that portion of the sentence at

9    the bottom of page 39.

11:19:17 10        Q.   Okay.  And is that phrase that I just

11   read a reference to the analysis that you

12   performed that's described in Section III.C?

13             MR. KELLOGG:  Objection.

14        A.   I am referencing the analysis in III.C,

11:19:37 15   but I -- I would note that I also have a factor

16   model that is relevant to my opinion here in

17   III.D.

18        Q.   Okay.  The top bullet, still on

19   paragraph 90, but on page 40 now, says "Variation

11:19:53 20   in long-run XRP price return can be explained by

21   exogenous cryptocurrency market factors that are

22   outside Ripple's control."

23             Do you see that?

24        A.   I do.

11:20:01 25        Q.   Okay.  What does the term "long-run"

91

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:20:06  1  mean in this sentence?

2  A.   It -- it's a reference to the estimation

3  periods that I -- I looked at.

4  THE REPORTER:  What period?

11:20:15  5  A.   It's a reference to the estimation

6  periods that I used and there's two:  The 2013 to

7  2020 period, and then my Estimation Period 2,

8  which is 2015 to 2020.

9  Q.   Did you perform any analysis to evaluate

11:20:30 10  the question of whether Ripple's efforts impact

11  XRP prices in the short run?

12  MR. KELLOGG:  Objection.

13  A.   The answer to that is yes in the sense

14  that if there were news events -- I'm going to --

11:20:43 15  I'm going to use the phrase "events" to reference

16  the complaint's identification of what the SEC

17  feels or believes is impacting, is relevant to

18  the -- to the XRP pricing.

19  So, again, I just want to be clear.

11:20:59 20  When we're talking about events, I'm assuming that

21  we're talking about the events deemed relevant by

22  the complaint, but you can tell me if I'm

23  misunderstanding.

24  Q.   I think it's fair to make sure we're

11:21:12 25  talking about the same thing.

92

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:21:13   1           So the complaint makes a number of

           2    allegations about Ripple's actions.  Fair to say?

           3           A.   Yes.

           4           Q.   Okay.  So when you use the word

11:21:19   5    "events," are you talking about the various types

           6    of Ripple's actions that are alleged in the

           7    complaint?

           8           A.   Yes.

           9           Q.   Okay.

11:21:25  10           A.   The distributions, the statements, the

          11    various events so identified by the complaint.

          12    And I -- and I do analyze, you know, the short

          13    term in the sense that if these events had an

          14    immediate -- for example, had an impact on XRP

11:21:44  15    pricing that was permanent, didn't get reversed

          16    because the market is inefficient, then that would

          17    be picked up in the -- in the factor model.

          18           So events that have permanent price

          19    effects that don't get reversed, for example,

11:22:00  20    would -- would show up in the XRP return and it

          21    would show up in whether the excess returns, the

          22    returns specific to XRP, are statistically

          23    significant or not.

          24           Q.   Other than the one set forth in

11:22:40  25    Dr. ████ opening report, are you aware of any

                                                                93

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:22:42  1    event study that evaluates the question of whether

2    news of Ripple's actions had any correlation with

3    XRP price returns?

4                    MR. KELLOGG:  Objection.

11:22:52  5        A.   Not sitting here.  Nothing that I -- I

6    recall.

7        Q.   Okay.  Focusing just on your analysis

8    set forth in III.C, did counsel ask you to make

9    any assumptions in connection with the analysis

11:23:01 10    you performed as described in III.C?

11                    MR. KELLOGG:  Objection.

12                    You can answer yes or no.

13        A.   No.

14        Q.   Okay.  Are you expressing any opinion in

11:23:10 15    this case about whether or not Ripple's efforts

16    affect daily or intraday XRP prices?

17        A.   I am in the sense that I described

18    earlier, which -- which is to say, if Ripple news,

19    the various things that the SEC identifies in the

11:23:31 20    complaint, if those events had an immediate --

21    let's say a same-day price effect, just

22    hypothetically, and that price effect was

23    permanent, it didn't get reversed because the

24    market's inefficient.  So it doesn't get reversed

11:23:48 25    11 days later.  It's a permanent price effect,

94

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:23:51  1    whether it be intraday or at the end of -- end of

2    the closing day, whatever your time interval is.

3    Those permanent pricing effects would show up in

4    the returns that I analyzed and would show up if

11:24:04  5    it's -- if it's XRP specific in the excess returns

6    that I'm analyzing in the factor model.

7            So in that way I am analyzing that

8    question, again in the context of the time series,

9    over my estimation period.

11:24:25  10   Q.   Setting aside that analysis that you

11   just described, did you perform any other analysis

12   pertaining to the question of whether or not

13   Ripple's efforts affect daily or intraday XRP

14   prices?

11:24:34  15           MR. KELLOGG:   Objection.

16   A.   That would be my answer to the question.

17   Q.   Okay.

18   A.   Which is, the short term can matter to

19   the long term if the short term is permanent and,

11:24:44  20   therefore, would show up in the re -- the price

21   series.

22           If the -- if one -- you know, just to

23   take the opposite hypothetical, if, for example,

24   there's a correlation between a news event and a

11:24:59  25   change in XRP price, as a hypothetical, and that

95

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:25:02  1  gets reversed, hypothetically, nine days later,

2  then that would not -- and -- and all that's

3  occurring within my 28-day window, that would not

4  show up in the return by definition.  It might

11:25:16  5  show up in the weekly, but not in the -- the

6  28-day period.

7           So, again, I am -- I would be picking up

8  in my factor analysis events that -- that affect

9  the -- the return versus, you know, some news

11:25:34  10  event that might be reversed by the market.

11     Q.   Sitting here today, do you know whether

12  the hypothetical that you just described occurred?

13  Meaning there was a news event, there was a Ripple

14  news event, there was a change in XRP price, there

11:25:50  15  was a reversion, and it wasn't picked up in your

16  factoring analysis?

17           MR. KELLOGG:  Objection.

18     A.   No.  So the prob -- one problem in my

19  view and one reason why the factor model is a

11:26:00  20  better approach is I have not seen any -- I'm not

21  aware of, I should say, Dr. ███ addressing how

22  his event study can -- can -- can adjust for that.

23           So, again, it goes back to my reason for

24  why the factor model is better.  We're talking

11:26:18  25  about XRP in 2013 and -- and going forward.  We're

96

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:26:22  1    talking about the long-term price series given the

2    allegations in the complaint.  And so I just view

3    that as this is the better way to go.

4        Q.   Is it possible in your view that there

11:26:37  5    was a Ripple news event and a resulting change in

6    XRP price, the XRP price then reverted within your

7    28-day window, and that did not show up in your

8    factor model?

9                MR. KELLOGG:  Objection.

11:26:55 10        A.   So in your hypo, if the price increased

11    and decreased within the 28-day period, I think it

12    follows that it would not be in the -- the 28-day

13    period.  It may -- it might be in the week period,

14    depending on the timing of those events, but a

11:27:12 15    complete price reversal within that time interval

16    by definition would not be -- wouldn't be, A, a

17    permanent price effect; and, B, wouldn't be in the

18    time series; and, C, wouldn't explain why XRP

19    price is going up over time.

11:27:34 20        Q.   Okay.  You've mentioned in your

21    testimony a few times, I think, the phrase

22    "because the market is inefficient."  And I just

23    want to clarify for the record.  Are you offering

24    any opinion in this case about the efficiency of

11:27:49 25    the XRP market?

97

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:27:50   1                     MR. KELLOGG:  Objection.

  2     A.   I am not.

  3     Q.   Okay.

  4     A.   I -- I -- I'm saying that if the market

11:27:56   5  is in -- inefficient, the market for XRP, for

  6  example, in 2013 or some time period, then in that

  7  scenario the event study is going to have this

  8  problem of what the appropriate event window is.

  9  That is to say, how do you control for or adjust,

11:28:19 10  when thinking about price impacts, for reversals

 11  or whatever it is that renders the market

 12  inefficient?

 13       So I was really talking in terms of that

 14  scenario.

11:28:29 15     Q.   And you haven't done any analysis to

 16  determine one way or the other whether the XRP

 17  market is or is not inefficient?

 18              MR. KELLOGG:  Objection.

 19     A.   Correct.

11:28:39 20     Q.   Okay.  Are you expressing the opinion in

 21  this case that XRP would have performed as it

 22  historically did irrespective of Ripple's actions?

 23              MR. KELLOGG:  Objection.

 24     A.   That's not -- that's not quite the way I

11:28:52 25  would frame it.  The way I would frame it is

98

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:28:55  1    there's no excess returns.  There's no XRP

2    specific price returns -- there's no price returns

3    specific to XRP that -- above and beyond the

4    general cryptocurrency market movements.

11:29:18  5         Q.   And does that mean in your view -- in

6    your view that XRP would have performed as it did

7    irrespective of Ripple's actions?

8         A.   It -- well, the -- that test and that

9    finding is -- does directly speak to the SEC's

11:29:34 10    claim in its complaint that Ripple's efforts

11    caused the price to increase or is associated with

12    a price increase, you know, over this time period.

13              So it -- it's really addressing the

14    economic theory articulated in the complaint; that

11:29:49 15    is to say, there's Ripple-specific efforts that

16    help explain or are associated with an XRP price

17    rise.  And it's really that proposition that I'm

18    testing.

19         Q.   Who collected the data that you used for

11:30:22 20    your factor analysis?

21         A.   Compass Lexecon.

22         Q.   Do you know who personally conducted the

23    data pull?

24         A.   We're -- we're going to just go back to

11:30:29 25    our earlier conversation.  I interfaced with

99

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:30:34   1   Ms. van der Merwe at Compass Lexecon.  I gave
           2   instructions on the type of analysis I wanted to
           3   do, including the data pull and where to pull the
           4   data.  And so I would just reference our earlier
11:30:48   5   discussion in that regard.
           6        Q.   Did you personally do anything to check
           7   the quality of the data that you used in
           8   performing your factor analysis?
           9        A.   You said "personally."  Sure.  I went
11:30:58  10   over the data with Compass Lexecon.  I talked
          11   about where I wanted the data to be pulled.  So,
          12   yes, a lot of work went into that including myself
          13   personally.
          14        Q.   What data quality checks, if any, did
11:31:13  15   you perform?
          16        A.   Well, so, I reviewed the academic
          17   literature about where the academic peer-reviewed
          18   finance literature pools return data.  The
          19   academic literature is quite clear that
11:31:26  20   CoinMarketCap and CryptoCompare are widely used in
          21   the peer-reviewed academic research.  And so I
          22   guess I began my data collection by grounding
          23   myself in the accepted approach in the academic
          24   literature.  So I guess that's the main starting
11:31:49  25   point.
```

100

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:31:49  1         As I said earlier today, I also ran

2  before the filing of the report all the time

3  series on CoinMarketCap just as a robustness

4  check.  I think the data sources that I use in the

11:32:01  5  report are the correct ones.  But it was really, I

6  guess answering your questions, following the

7  academic literature on this.

8         Q.   Returning to the data sources that you

9  used underlying your opinions in the report, in

11:32:11 10  addition to referencing the academic literature,

11  are there any other data quality checks that you

12  performed?

13         A.   Well, sure.  I mean, I went over the

14  data collection process, how they're pulling the

11:32:22 15  data, I looked at the data.  So, yes, this was a

16  process that unfolded over time.  So it wasn't

17  simply, you know -- you know, just reading

18  academic finance papers but, rather, making sure

19  that that was properly implemented in how the data

11:32:46 20  here was put together.

21         Q.   Why did you -- excuse me.

22         Why did you opt to use price data from

23  two sources?

24         A.   Well, if you look at the academic

11:32:55 25  peer-reviewed literature, CryptoCompare is widely

101

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:33:00  1  used in the peer-reviewed academic research --

          2  academic peer-reviewed literature as a source

          3  of -- of price return data.

          4         Now, you do run into the following

11:33:09  5  issue, which is CryptoCompare does not go back to

          6  2013.  So another source that is also used in the

          7  academic literature is CoinMarket.  So

          8  CoinMarket -- CryptoCompare doesn't go back to the

          9  beginning and, therefore, I relied, consistent

11:33:28 10  with the academic literature, on -- on CoinMarket

        11  for that time period.

        12     Q.   Does CoinMarket cover the entire period

        13  from 2013 to 2020?

        14     A.   I believe so.  And that's why I was able

11:33:39 15  to run it, as I discussed earlier, just on

        16  CoinMarket.  But I felt the better way to go is to

        17  use CryptoCompare because that is used as a data

        18  source in peer-reviewed academic research.

        19     Q.   For clarity, for the opinions underlying

11:34:02 20  your report, you used both data sources, is that

        21  right?

        22     A.   Yes.

        23     Q.   Okay.  Is there any academic literature

        24  you can think of sitting here today that uses two

11:34:10 25  sets of data sources for pricing?

102

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

11:34:16 1     A.   I haven't looked at that specifically.

2   I mean, not sitting here today.  I can say that

3   the academic peer-reviewed literature uses both

4   and uses CryptoCompare for later time periods.

11:34:28 5   That's simply not possible to use for the earlier

6   period because it doesn't exist in CryptoCompare.

7       So, you know, sitting here today, both

8   are used in the academic research literature.  As

9   I said earlier, even if you just run it on

11:34:43 10   CoinMarket, it doesn't make a difference.

11     Q.   What's the advantage of using two sets

12   of data versus just using CoinMarket data?

13     A.   Well, at the end of the day, it doesn't

14   matter.  The results are the same.  The excess

11:34:57 15   returns are not statistically significant at the 5

16   percent level.

17       That being said, if you review the

18   academic peer-reviewed literature, you do observe

19   papers using CryptoCompare for their analysis.

11:35:26 20     Q.   Right.  My question, though, goes to

21   your -- the methodology that you selected for your

22   report.

23       Was there an advantage in your mind to

24   using two data sources versus just using the

11:35:35 25   CoinMarket data?

103

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:35:36  1        A.   Again, it doesn't make a difference,

2   but, yes, there is an advantage in the sense that

3   when you read the peer-reviewed academic research

4   literature, and the literature is analyzing a

11:35:47  5   later time period, a period for which there is

6   CryptoCompare data, you do observe the

7   peer-reviewed academic literature using that data

8   source.  Not that it means CoinMarket is bad data,

9   but, rather, you do observe papers using

11:36:01 10   CryptoCompare.

11        So the Liu paper in the Journal of

12   Finance, or coming out in the Journal of Finance,

13   uses CryptoCompare, I believe if I'm citing the

14   paper correctly, but let -- let me restate that.

11:36:14 15        There are peer-reviewed academic papers

16   that are using CryptoCompare.  Obviously you can't

17   use that in the earlier period here because it

18   doesn't exist in the data set.

19        Q.   Did you do anything to verify

11:36:28 20   compatibility of price data from the two data sets

21   that you used?

22        A.   Yes.  So I did CoinMarketCap and I ran

23   it on that, as I said, as well as reviewing the

24   data.  And as we discussed earlier today, I know

11:36:41 25   that Dr. ████ has -- I'm going to put aside the

104

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:36:44  1   fact that he identifies three date -- three

2   returns that I don't use, where he claims I didn't

3   do due diligence on data that I didn't use.  I'm

4   going to put that aside.

11:36:55  5        He does identify one return out of the

6   6,700 I used that looks, I think, abnormally

7   large.  And so I did rerun it dropping that and it

8   doesn't -- doesn't affect anything.

9        Q.   Let me limit my question to any steps

11:37:13 10  that you took prior to submitting your expert

11  report in AF-1.

12       A.   Okay.

13       Q.   Prior to submitting AF-1, did you do

14  anything to verify the compatibility of the price

11:37:22 15  data in the two data sets?

16       A.   I would go back to my earlier answer.

17  I -- I ran everything on CoinMarket; didn't make a

18  difference.  I visually inspected the data.  I

19  instructed Lexecon where to pull the data from

11:37:35 20  based on the academic research.  You know, went

21  over the data with them -- or with her in

22  conversation and on looking at the data.

23       So, again, it was a process that I

24  undertook in constructing the factor model and the

11:37:51 25  data inputs to it.

105

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:37:55  1        Q.   You've referenced a few times Dr. █████

      2   reference to the token THC in your data set,

      3   correct?

      4        A.   Yes.

11:38:04  5        Q.   Prior to reading Dr. █████ rebuttal

      6   report, were you aware of those unusual price

      7   spikes of THC within your data set?

      8        A.   So you just used the word "spikes,"

      9   plural, in your statement.  My understanding --

11:38:18 10   but we could look at his report -- is that he

     11   identified one out of the -- I'm approximating

     12   now -- one out of the 6,700 crypto returns that I

     13   used as, in his judgment, being too large.  So it

     14   wasn't plural, it was one, if we're talking about

11:38:35 15   the same thing.  And, again, it's -- it affects

     16   nothing.

     17        Q.   Be that as it may, were you aware of the

     18   price of the one -- strike that.

     19             Let's look at Dr. █████ rebuttal

11:38:52 20   report.  Can we look at --

     21        A.   I don't have his report.

     22        Q.   I will get it for you.

     23        A.   I'm sorry.  I didn't mean to jump ahead.

     24        Q.   Let's look at -- at AF-6, please.

11:39:02 25             (Whereupon, exhibit is

                                                        106

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:39:02   1              received and marked SEC Ferrell
           2              Exhibit AF-6 for identification.)
           3                     MR. SYLVESTER:  Thank you
           4              very much.  Okay.  Here we go.
11:39:13   5                     THE WITNESS:  I want to give
           6              one to her.
           7    BY MR. SYLVESTER:
           8         Q.   I'm handing you what's been marked AF-6.
           9    This is the expert rebuttal report of Dr. ████
11:39:26  10              Professor Ferrell, this is the ████
          11    rebuttal report we've been discussing?
          12         A.   Yes.
          13         Q.   Okay.  Let's turn to page 19 of that
          14    report, Figure 10.
11:39:44  15         A.   Figure 10?
          16         Q.   Yes, please.
          17         A.   Okay.  Oh, we were -- I'm sorry.  You
          18    ask your question and I'll make -- go ahead.
          19         Q.   So my question was, were you aware of
11:39:53  20    the prices of the THC token that Dr. ████
          21    identifies as outliers prior to submitting your
          22    expert report, AF-1?
          23                     MR. KELLOGG:  Objection.
          24         A.   Okay.  So I'm going to read from
11:40:08  25    paragraph 38 of his report where he's referencing
```

107

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:40:12   1   Figure 10.

2                "As shown in Figure 10, most prices for

3   THC are fractions of a cent, but there are three

4   dates (August 21, 22 and 23, 2017) when THC prices

11:40:26   5   are reported to reach values of over 10 million

6   U.S. dollars per token in the CryptoCompare data."

7   Okay.  And then he has Figure 10.

8                Okay.  So my comment on this is this is

9   a little silly because I don't use August 21st,

11:40:45  10   22nd or 23rd.  It's not used in my factor model.

11   I use, as I say, the 28-day period which I believe

12   runs from -- I'm not going to get the exact dates,

13   but it runs from early August to early September.

14                So he's pointing to data that is not

11:41:00  15   used in my analysis.  So, you know, this is --

16   this is really completely irrelevant.

17       Q.   Commentary aside, were you aware of

18   these -- what Dr. ███ characterizes as "outlier

19   prices" on the three dates listed in Figure 10

11:41:16  20   prior to submitting your expert report in AF-1?

21       A.   I --

22                MR. KELLOGG:  Objection.

23       A.   I don't recall seeing that.  Again,

24   completely irrelevant.  It's not used in my data

11:41:24  25   analysis.  I do appreciate being accused of not

108

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:41:27  1    doing due diligence when the data being identified

2    is not actually used by myself.

3        Q.    Were there any outlier price data with

4    respect to the THC returns that did get

11:41:39  5    incorporated into your analysis?

6        A.    I believe -- and we can look at the

7    report.  Let me just -- give me one second here.

8            Yeah.  So he -- in addition to these

9    three that we've been talking about in Figure 10,

11:42:09 10    he identifies -- and this is what I was

11    referencing earlier -- a THC return date in

12    paragraph 41.

13        Q.    Okay.  So in your view there was one

14    inaccurate price data point for THC that was

11:42:25 15    incorporated into your analysis.  Is that fair?

16        A.    I agree that 8,916 percent is a very

17    large return.  So this is one return out of

18    approximately 6,700 returns that I used that was

19    in the original data, not the -- not in the -- you

11:42:44 20    know.  So this -- this wouldn't be affected by my

21    CoinMarketCap running of the model.  But there is

22    one return out of the 6,700 that is this return.

23    And as I said earlier, it makes no difference to

24    the outcome, as one would expect.

11:43:08 25        Q.    So the record is clear, THC is one of

109

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:43:10  1  the tokens that's used in your principal

 2  components analysis as reflected in AF-1, correct?

 3      A.   That's right.  It's one of the 9 --

 4  well, let's -- just to be clear, it's one of the

11:43:20  5  91 tokens that are used in Estimation Period 2,

 6  the 2015 to 2020 period.  I don't believe THC is

 7  in the 9 tokens that's used for the full time

 8  period.

 9          So his discussion here is about -- I

11:43:34 10  believe, is focused on the Estimation Period 2

11  where this is one -- this token or this crypto is

12  one of the 91.

13      Q.   In your report in AF-1, you report the

14  results of your analysis using a 28-day return

11:44:07 15  period, is that right?

16      A.   Yes.

17      Q.   Why did you opt to use a 28-day return

18  period in your expert report?

19      A.   Well, I have a footnote explaining why I

11:44:22 20  think this is the best specification, and that is

21  I'm running it essentially on a Tuesday to a

22  Tuesday.  So you avoid national holidays on

23  Mondays.  You avoid mixing different days of the

24  week if you were, for example, to run it on a

11:44:38 25  calendar basis.  You're running it from a Tuesday

110

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:44:42  1   to a Tuesday and you're avoiding weekend effects.

2            So, you know, for those reasons that I

3   reference in the footnote, I felt a 28-day was the

4   best specification.  And, again, I explain all of

11:44:59  5   this in the report.

6       Q.   Is there any advantage in your mind to

7   starting your analysis and ending your analysis on

8   a Tuesday versus a Wednesday, a Thursday or a

9   Friday?

11:45:07 10       A.   So Tuesday is the first day -- I forget

11   exactly when the data starts, but it's after that

12   weekend and Monday.  Obviously, you know, I tried

13   to run the model as early as I could with these

14   considerations in mind for that same time period.

11:45:22 15            But, you know, all the permutations that

16   Dr. ███ presents in his report, whether it be

17   running it on a Wednesday or a Thursday or what

18   have you, does not change the result.  The result

19   being there's no statistically significant alpha

11:45:38 20   at the 5 percent level.

21       Q.   Prior to submitting your report in AF-1,

22   had you run your factor model starting and ending

23   on a Wednesday?

24       A.   I don't recall the answer to that.  I --

11:45:51 25   what I did do, which is related to your question,

111

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:45:55  1   is, as I said earlier, I did run it on weekly and

2   on -- on 30-day and on calendar month.  So I don't

3   know whether the calendar month would -- how that

4   would end in terms of days of the week, but I did

11:46:09  5   run those alternative specifications.  Didn't

6   change the results.  But, again, for the reasons I

7   describe in my report, I felt 28 days was the best

8   specification.

9        Q.   And, again, you ran those weekly, 30-day

11:46:22 10   and calendar month factor models prior to

11   submitting your expert report in AF-1?

12        A.   I did.

13        Q.   Okay.  Are there any academic articles

14   that explain any benefits to using CryptoCompare

11:46:37 15   data versus CoinMarket data?

16        A.   So you have to direct me to that, you

17   know, if you have a particular paper in mind.  But

18   it is the case that folks -- you know,

19   peer-reviewed literature does use CryptoCompare

11:46:51 20   data for later time periods, although, you know,

21   as I said before, it doesn't actually affect --

22   that choice of the data set doesn't actually

23   affect the results.

24        Q.   Turning back to a previous question,

11:47:06 25   prior to submitting your report in AF-1, it's true

112

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:47:09    1    that you did not use a -- a Wednesday start and
            2    end date to run your factor model, correct?
            3                    MR. KELLOGG:  Objection.
            4        A.   I -- as I said before, I would just
11:47:18    5    reference my earlier answer.  I forget the start
            6    dates for the -- you know, whether -- you know,
            7    for example, I forget whether the calendar mixes a
            8    Wednesday with -- I just don't remember.  I did
            9    run it on weekly, 30, and calendar.  Again, it
11:47:29   10    doesn't make a difference, as does the
           11    permutations, the specifications in Dr. ████.
           12    None of it changes the result that the alpha is
           13    statistically insignificant at the 5 percent
           14    level.
11:47:43   15        Q.   But sitting here today, you don't
           16    recall having run your analysis using a Wednesday
           17    or a Thursday start date prior to AF-1, is that
           18    right?
           19                    MR. KELLOGG:  Objection;
11:47:51   20              asked and answered.
           21        A.   Same answer as before.
           22        Q.   I believe you testified earlier that THC
           23    was part of your principal components for your
           24    Estimation Period 2, is that right?
11:48:16   25        A.   I believe that's correct.
```

113

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:48:18   1      Q.   Was it part of PC 2?

          2      A.   Well, the principal component analysis

          3  is extracting information from the entire

          4  covariance matrix.  So I do believe it appears --

11:48:31   5  you know, it is being weighted or reflected in PCA

          6  2.  So I think that is -- at that level of

          7  generality, I think that's a fair statement.

          8      Q.   Okay.  Do you recall what were the other

          9  tokens in Principal Component Number 2?

11:48:47 10      A.   Oh, I don't.  I mean, I have -- you

        11  know, all the 91 is extracting all of the

        12  information from the covariance matrix.  I'm happy

        13  to look at -- if what you're referring to is page

        14  22, I'm happy to take a look at that.

11:48:58 15      Q.   Are you referring to page 22 of AF-1?

        16      A.   Oh, I thought you were -- I thought we

        17  were discussing Figure 13 of ███ where he's

        18  talking about PCA 2.

        19      Q.   We can look at Figure 13 of ███  I was

11:49:12 20  just asking if you -- if you know one way or the

        21  other what other tokens in Principal Component 2

        22  there were in addition to THC.

        23      A.   Well, the P -- just to be clear, the PCA

        24  is extracting all the information from the

11:49:22 25  covariance matrix for all 91.  Now, the -- what

                                                 114

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:49:25  1    that translates into in terms of how different

2    coins get weighted, you know -- yeah, that's a

3    separate question.  But, you know, the PCA

4    analysis is extracting, in constructing the PCA

11:49:40  5    components, all the information for the entire

6    covariance matrix of the 91 tokens.

7         Q.   Can we --

8         A.   Or the 91 -- I keep saying "tokens."

9    Ninety-one tokens.  I'm using that interchangeably

11:49:49  10   with crypto assets.

11        Q.   Can we look at Exhibit 3 of your AF-1?

12        A.   AF-1?

13        Q.   Yes, please.  Exhibit 3.

14             Exhibit 3 is labeled "Regression of XRP

11:50:14  15   price return on principal components of other

16   cryptocurrencies."

17             Do you see that?

18        A.   I do.

19        Q.   Okay.  Can you explain to me what the

11:50:22  20   difference is between Principal Component 1 and

21   Principal Component 2 on your Exhibit 3?

22        A.   I just explained it.  I would reference

23   the PCA analysis, which is extracting -- it's a

24   projection of the covariance matrix into a lower

11:50:36  25   dimension of data.  So it's extracting, in the

115

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:50:39  1  Principal Component 1, the most information from
        2  the covariance matrix to construct PCA 1, which is
        3  going to be a weighting across tokens based on
        4  where the information resides in the covariance
11:50:51  5  matrix to construct PCA 1 and -- and then so forth
        6  and so on.
        7      Q.   What was the weight of THC in Principal
        8  Component 2?
        9      A.   I don't have that memorized.  So it is
11:51:07 10  extracting information from the entire covariance
       11  matrix.  So the 91 by 91 covariance matrix -- you
       12  know, I have not memorized, you know, the implied
       13  weighting of the PCA 2 across the 91 tokens.
       14      Q.   Is the use of a 28-day, Tuesday to
11:51:33 15  Tuesday, return a generally accepted methodology
       16  in -- in economics literature studying price
       17  returns?
       18      A.   I think it is consistent or a reflect of
       19  the academic literature for the reasons I state in
11:51:44 20  my footnote.
       21          So, for example, it's established that
       22  there's weekend effects with crypto assets.  There
       23  are -- and so given these concerns about
       24  day-of-the-week effects for crypto, in the
11:52:02 25  literature I think it's consistent to do the

116

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:52:05  1   28-day as the best specification.

2       Q.   Sitting here today, can you think of any

3   academic literature that uses a 28-day return

4   period?

11:52:11  5              MR. KELLOGG:  Objection.

6       A.   So I believe there's a paper by Chain,

7   C-H-A-I- -- C-H-A-I-N, that uses a 28-day window.

8   That's one that might be most on point with your

9   question.  But, again, I would reference the

11:52:33 10   academic literature on day-of-the-week effects for

11   crypto as the reason why I thought Tuesday to

12   Tuesday was the best specification.  As I said

13   before, the other specifications have the same

14   result.

11:52:50 15       Q.   Did you cite that Chain paper in your

16   expert report?

17       A.   I don't believe I did.

18       Q.   Did you review the Chain paper prior to

19   preparing your expert report?

11:52:59 20       A.   Yes.  Yes, I -- I reviewed a lot of

21   papers.  I feel -- felt like it was sufficient, I

22   still feel like it's sufficient, that there are

23   day-of-the-week effects for crypto.  And the best

24   specification would incorporate that fact into

11:53:17 25   defining the appropriate window or the appropriate

117

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:53:23  1    time period; i.e., the 28 days.

2         Q.   What other papers besides the Chain

3    paper did you review in preparation of your expert

4    report but not cite in your expert report?

11:53:34  5         A.   Well, I've read over the years many

6    crypto papers.  I'm not going to have a -- a list

7    off the top of my head.

8         Q.   And I just -- I -- I don't want to

9    interrupt you, but I just want to limit my

11:53:48 10    question to in preparation of your expert report.

11    Just that time period.

12                   MR. KELLOGG:  Objection.

13         A.   Again, I'm bringing to bear my knowledge

14    as -- as -- as an academic economist, the

11:54:02 15    literature.  I do cite papers for specific reasons

16    in my report, but I am invoking my experience as

17    an academic economist in how I thought and

18    prepared my analyses.

19         Q.   In your view, does your PCA identify the

11:54:21 20    most important economic factors in the crypto

21    market?

22                   MR. KELLOGG:  Objection.

23         A.   I don't think that's -- I -- I think

24    that's too broad and too -- I guess I don't agree

11:54:35 25    with that framing.  Really, what information that

                                                        118

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:54:37   1   -- what information are you interested in is a

2   function of what the analysis is that you're

3   doing.

4           For my analysis, the PCA is extracting

11:54:49   5   in an efficient way the information in the

6   covariance matrix of the 91 or the 9 tokens given

7   what I'm interested in, which is exploring the

8   price movements of XRP in relation to the other

9   cryptocurrency markets.  So, again, for my

11:55:08   10   purposes I think it does capture the right

11   information.

12           I guess I'm hesitant to speak to any --

13   you know, other potential research questions I

14   would have to -- I would have to think about.

11:55:25   15       Q.   In your view, is the information that's

16   captured from the covariance matrix of the 91

17   tokens econo -- information about important

18   economic factors in the crypto market?

19               MR. KELLOGG:  Objection.

11:55:37   20       A.   It is extracting information about

21   the -- the times -- the pricing time series in the

22   non-XRP cryptocurrency markets in a very

23   established way.  I think the PCA analysis has

24   been around, I think, over a hundred years.  So it

11:55:51   25   is a well-grounded, academically peer-reviewed

119

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:55:57  1    technique widely used to capture information that

       2    might be relevant to a research question or an

       3    analysis.

       4        Q.   Is there other information about the

11:56:12  5    cryptocurrency market other than price and time

       6    series and non-XRP cryptocurrency markets that the

       7    PCA provides?

       8                MR. KELLOGG:  Objection.

       9        A.   I'm not sure what the question's asking.

11:56:26 10        Q.   I'm asking whether or not the PCA

      11    provides any other information about relevant

      12    factors in the cryptocurrency market other than

      13    just the time and price series of the data -- of

      14    the underlying data.

11:56:36 15        A.   Well, it --

      16                MR. KELLOGG:  Objection.

      17        A.   I mean, I guess we have to talk a little

      18    bit about what a PCA does.  It's projecting higher

      19    dimensional data using, you know, the -- the

11:56:45 20    covariance matrix into a lower dimension.  So it

      21    is extracting in an efficient manner information

      22    in -- in the -- in the other non-XRP crypto market

      23    return price series.

      24        Q.   When you say "information" in that

11:57:03 25    answer, what is that information that's being

                                                          120

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:57:04 | 1 | extracted? |
| | 2 | A.    The covariance matrix. |
| | 3 | Q.    And -- |
| | 4 | A.    So -- |
| 11:57:08 | 5 | Q.    Sorry.  Go ahead. |
| | 6 | A.    Yeah.  So it's a well-established |
| | 7 | technique to extract information reflected in the |
| | 8 | time series of the 91 or the other 9 tokens. |
| | 9 | Q.    What information does it extract? |
| 11:57:29 | 10 | A.    It extracts -- we have lots of time |
| | 11 | series for 91 or 9.  It's extracting the time |
| | 12 | series along the dimensions that have the most |
| | 13 | information about what the -- what the |
| | 14 | cryptocurrency markets are doing.  So typically |
| 11:57:44 | 15 | the PCA is going to work off the eigenvalue of the |
| | 16 | matrix to project from a higher dimension to a |
| | 17 | lower dimension the informational content of the |
| | 18 | data. |
| | 19 | So, again, completely standard.  It's |
| 11:57:58 | 20 | used in asset pricing models.  It's used for other |
| | 21 | purposes all the time.  It's nothing surprising or |
| | 22 | novel in any way about using a PCA to extract |
| | 23 | information from -- from -- you know, from a data |
| | 24 | set. |
| 11:58:17 | 25 | Q.    Did you use -- |

121

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:58:17  1              MR. KELLOGG:  Mark, is now a

        2         good time for a break?

        3              MR. SYLVESTER:  Sure.  Fine

        4         by me.

11:58:22  5              THE VIDEOGRAPHER:  Okay.

        6         Thank you.  The time is approximately

        7         11:58.  We're going off the record.

        8              (Whereupon, a recess is

        9         taken.)

11:58:28 10              THE VIDEOGRAPHER:  And the

       11         time is approximately 12:15 p.m.

       12         We're back on the record.  This is the

       13         beginning of Media 3.

       14    BY MR. SYLVESTER:

12:15:39 15         Q.   Professor, did you use the Fama-French

       16    factors in your analysis?

       17         A.   No.

       18         Q.   It's true that at no point you conducted

       19    your factor model using daily price data, is that

12:15:57 20    right?

       21         A.   Correct.

       22         Q.   Okay.  This is a hypothetical question.

       23    Let's assume the only change to your analysis is

       24    that you analyzed the price return data at a daily

12:16:09 25    interval versus your 28-day interval.  Let's

                                                           122

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:16:12   1   assume that other digital assets explain a very
           2   small --
           3                       THE REPORTER:  You're going
           4             to have to slow down, Mark.
12:16:15   5        Q.   Let's assume that other digital assets
           6   explain a very small portion of XRP price return
           7   variation.  Say less than 50 percent.
           8             Would that change your opinion in this
           9   case?
12:16:24  10                       MR. KELLOGG:  Objection.
          11        A.   If I understand the question correctly,
          12   the question is would I reject the model purely as
          13   a function of adjusted R-squared?  Again, I guess
          14   I would want to see the model and what's going on
12:16:44  15   with the model.  Obviously different models can
          16   have different adjusted R-squares in terms of the
          17   explanatory power of the model.
          18             So I guess in your hypothetical, I would
          19   want to do the work to understand the model and --
12:16:57  20   and see and make -- and make an assessment from
          21   there.  Given my purposes and what I was testing,
          22   you know, I -- I had the specification, I think,
          23   that best captures it.
          24        Q.   Is your opinion in this case based in
12:17:11  25   part on the adjusted R-squares that your model
```

123

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:17:15  1  produced?

2       A.   Not per se.  So the adjusted R-squared

3  for -- for Estimation Period 1, the 90 percent

4  plus, I mean, that is a feature of the model that

12:17:30  5  I use.  So in that sense it is part of my analysis

6  because it is the associated adjusted R-squared.

7          So, yes, going back to my earlier

8  answer, I would say the adjusted R-squared for the

9  model or the models that I'm running is a feature

12:17:45 10  of the model.  It's an output of the model.  So

11  obviously in that sense it's part of my analysis.

12  It's a function of the model.

13          But I would also say that, you know, you

14  can obviously not ascertain the statistical

12:18:03 15  significance of the alpha, which is what I'm

16  primarily focused on, by -- you know, by just

17  referencing what the adjusted R-squared is.  So

18  I'm more interested in the model's assessment of

19  the statistical significance of the alpha.  But

12:18:19 20  that being said, the adjusted R-squared is

21  obviously part of -- it's reflecting what the

22  model is doing in practice.

23       Q.   When you say you're primarily focused on

24  the statistical significance of the alpha, can you

12:18:36 25  explain the relationship between that and your

124

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:18:38  1   expert opinion that -- I'm quoting from paragraph

2   100 -- "variation in long-run price return of XRP

3   can be explained by exogenous, non-XRP,

4   cryptocurrency price returns or, put differently,

12:18:49  5   by factors outside Ripple's control"?

6          A.   Can you remind me what page that is?

7          Q.   Sure, 47.

8          A.   Can you remind me of what you were just

9   reading?

12:19:05 10          Q.   Sure, it's paragraph 100.  It starts "In

11   summary..."  It's just one sentence.

12          A.   Okay.  And what was -- I see the

13   language.  Which -- now, what was the question?

14          Q.   The question was you -- your -- a few

12:19:18 15   answers back, I believe that you said that you're

16   primarily focused on the statistical significance

17   of the alpha, is that right?

18          A.   Yes.

19          Q.   Okay.

12:19:27 20          A.   In the context, to be clear, of having a

21   model that appropriately accounts for non-XRP

22   crypto price movements and so forth.

23          Q.   Right.  And what I'm trying to do is

24   ask -- strike that.

12:19:38 25               What's the relationship between the

125

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:19:40  1   statistical significance of the alpha and your

2   conclusions that you reached in paragraph 100, if

3   there is one?

4              MR. KELLOGG:  Objection.

12:19:51  5        A.   Right.  So obviously I do further

6   analysis after paragraph 100, so I don't want to

7   create the misimpression that my analysis of the

8   price returns ends at paragraph 100.  And so I

9   would incorporate the further analysis that I do.

12:20:08  10             But I am saying that if the SEC's

11   economic theory as articulated in the complaint is

12   true, one would expect to observe excess returns

13   of XRP and that's the alpha.  That is to say,

14   there's returns that are specific to XRP, specific

12:20:30  15   to XRP, that are positive, because the SEC is

16   alleging that on the whole these news and

17   activities of Ripple were helping to drive the

18   price up.  So that theory would indicate that the

19   XRP specific price return is positive and

12:20:50  20   statistically significant; i.e., it's -- the

21   return is above and beyond what you would just

22   expect based on general cryptocurrency market

23   movements.

24        Q.   Okay.  Returning to my hypothetical

12:21:09  25   about running your factor model with daily

126

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:21:14   1   interval data, if your factor mod -- if you had

2   done that and under the assumption that other

3   digital assets, non-XRP assets, explain a very

4   small portion of XRP price return variation, would

12:21:24   5   that affect your opinion at all?

6                   MR. KELLOGG:  Objection.

7        A.   So your question is some hypothetical

8   analysis that I didn't do, would that affect my

9   opinion?  I would have to see what the analysis

12:21:34   10   is.  Some hypothetical model using daily prices

11   for a asset pricing model.  I mean, I -- one other

12   thing I would say is I do describe in my report

13   the frequency of data that is used for these

14   factor models.

12:21:53   15           So, anyway, your hypothetical's about a

16   hypothetical analysis.  I would need to take a

17   look and think about it.

18        Q.   Would it be possible to run your factor

19   model as described in your report using daily

12:22:06   20   pricing data?

21                   MR. KELLOGG:  Objection.

22        A.   Yes, you could do that, I assume.

23   Again, I would be worried about the consistency of

24   such approach with the academic literature that I

12:22:18   25   cite about the frequency of the data used in these

                                                         127

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:22:21   1   factor models.  The monthly or the weekly is

2   basically what you see.  So I cite to those asset

3   pricing model papers about the frequency of the

4   data.

12:22:30   5          But, again, for some hypothetical

6   analysis that I haven't done, what do I think

7   about it?  I guess I would want to see it.

8       Q.   Are there academic papers that you cite

9   in your report that do -- sorry, strike that.

12:22:46  10          Are there academic papers that you cite

11   in your report regarding cryptocurrency returns

12   that do use daily pricing data?

13       A.   Yes.  I mean, I think, you know, I cite

14   to one of Dr. ███████ papers where he uses

12:23:01  15   higher frequency data, I think for different

16   purposes than what I'm concerned with.  You know,

17   I'm concerned with the long-run time series for

18   the returns.  I believe in that particular paper

19   he was more motivated by looking at trading types.

12:23:20  20          So, yes, some of the academic papers use

21   a different frequency of data, you know, given the

22   research question that they were interested in.

23       Q.   Why did you elect not to run your model

24   on daily price data for purposes of your opinion?

12:23:32  25       A.   Because --

128

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:23:32  1              MR. KELLOGG:  Objection.

2        A.    -- the academic papers I cite -- and

3   this is when I've done my own academic work with

4   factor models -- is -- is -- is monthly return

12:23:44  5   data is what you see.  I know that, you know, some

6   of the papers I cite also use weekly, but I'm

7   looking over a seven-year period.

8              So my view is that the monthly -- I'm

9   rounding here from the 28 days -- is consistent

12:23:59 10   with the asset pricing model literature.

11        Q.    When you've used factor models in your

12   own academic work, have you also used a 28-day

13   interval?

14        A.    No, because I've never -- I've never run

12:24:11 15   a factor model in my academic work on -- on

16   crypto, which has these unique features; you know,

17   this -- this feature in the data that you have

18   these day -- these strong day-of-the-week effects.

19        Q.    Let's turn to paragraph 20 -- sorry,

12:24:32 20   strike that.

21              Let's turn to paragraph 92 of your

22   opening report, page 41.

23        A.    Okay.

24        Q.    The first sentence of paragraph 92 is

12:24:46 25   "There is no consensus in the literature on the

                                                      129

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:24:48 | 1 | nature or the number of factors that should be |
| | 2 | used." |
| | 3 | Do you see that? |
| | 4 | A.   I do. |
| 12:24:53 | 5 | Q.   Is it fair to say, then, that it was |
| | 6 | your own judgment as to which factors would be |
| | 7 | appropriate to determine the factors that you used |
| | 8 | in your analysis? |
| | 9 | MR. KELLOGG:  Objection. |
| 12:25:02 | 10 | A.   No, I don't agree with that -- that -- |
| | 11 | that characterization.  I use an absolutely |
| | 12 | standard technique, a technique that's been used |
| | 13 | in asset pricing model literature to construct the |
| | 14 | factors.  So it wasn't a subjective decision.  I'm |
| 12:25:19 | 15 | using well-established techniques -- |
| | 16 | well-established techniques used in the asset |
| | 17 | pricing model literature to construct the factors. |
| | 18 | Q.   What academic articles did you rely on |
| | 19 | in support of your selection of factors for your |
| 12:25:34 | 20 | factor model? |
| | 21 | A.   Well, I -- I have a number of academic |
| | 22 | citations in my -- in my report, including |
| | 23 | academic citations where the PCA analysis is used. |
| | 24 | As I said before, I'm also drawing on my |
| 12:25:52 | 25 | general experience as an academic economist and my |

130

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:25:55 | 1 | general knowledge of the asset pricing model |
| | 2 | literature, as well as the academic cites that I |
| | 3 | provide. |
| | 4 | Q.   How is it -- |
| 12:26:01 | 5 | THE WITNESS:  Am I speaking |
| | 6 | too quickly? |
| | 7 | THE REPORTER:  Yes. |
| | 8 | THE WITNESS:  I'll -- I'll |
| | 9 | slow down. |
| 12:26:15 | 10 | THE REPORTER:  Thank you. |
| | 11 | BY MR. SYLVESTER: |
| | 12 | Q.   How is it that you were able to draw |
| | 13 | from the literature for assistance with selecting |
| | 14 | factors given that there's no consensus as to the |
| 12:26:25 | 15 | nature or number of factors in the literature? |
| | 16 | MR. KELLOGG:  Objection. |
| | 17 | A.   I think you're mischaracterizing that |
| | 18 | sentence because what -- the sentences that follow |
| | 19 | in that paragraph, paragraph 92, you know, are |
| 12:26:38 | 20 | referencing sort of off-the-shelf factors.  So for |
| | 21 | CAPM you have a market index.  Often people use |
| | 22 | the S&P 500.  For Fama-French you can go to Ken |
| | 23 | French's website, you can pull the Fama-French |
| | 24 | factors.  So these are established indices in that |
| 12:26:58 | 25 | space. |

131

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:26:59  1       So what the sentence is really saying is

2  there's -- there's no such established indices in

3  the sense that you have it for CAPM and for

4  Fama-French in the equity space.  That's not to

12:27:14  5  say that there isn't a relevant academic

6  literature.  That relevant academic literature is

7  both the use of the PCA as a -- as a well-known

8  statistical technique, the use of PCA in the

9  context of asset pricing models, and the use of

12:27:32  10  factor models more generally in this space.

11      Q.   Okay.  So even though, according to your

12  report, there's no consensus in the literature on

13  the nature and number of factors that should be

14  used, you would say, nevertheless, the methodology

12:27:45  15  that you applied here is informed by that academic

16  literature?

17          MR. KELLOGG:  Objection.

18      A.   Don't agree with that.  I -- I'm drawing

19  from the academic literature.  It's grounded in

12:27:55  20  the academic literature.  It reflects the academic

21  literature:  The academic literature on the PCA,

22  the -- the academic literature where PCAs are used

23  in asset pricing models, the academic literature

24  on factor models.

12:28:13  25      Q.   Why did you use a PCA for determining

132

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:28:14  1   factors that affect digital asset returns instead

2   of constructing a market index?

3                     MR. KELLOGG:  Objection.

4        A.  Well, again, I mean, you could -- I

12:28:30  5   mean, I guess I'd just go back to my report, which

6   is there's no established market index for crypto

7   over this time period; that is to say, 2013 to

8   2020.  There is a well-established technique in

9   the academic literature for constructing factors

12:28:50 10   and that is -- that is the PCA.  And that's

11   consistent and reflective and grounded in the

12   academic literature.

13        Q.  If you had wanted to construct a market

14   index for digital assets, could you have done so?

12:29:02 15                     MR. KELLOGG:  Objection.

16        A.  So I'm not aware -- I guess I would just

17   stick with what I say in my report, that my -- my

18   view of the literature is there's no consensus as

19   there is in the CAPM or Fama-French of an

12:29:18 20   off-the-shelf factor to use.  There is a consensus

21   that the PCA is -- is an appropriate technique to

22   construct factors and -- and that's what I do.

23        Q.  Setting aside consensus, which I

24   understand, just from a layperson's perspective,

12:29:32 25   if you had wanted to construct a market index as

133

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:29:36  1  an economist for these other digital assets, is

2  that something you would have been capable of

3  doing?

4              MR. KELLOGG:  Objection.

12:29:41  5      A.  I don't even know what a market index

6  would mean in that context.  So we're talking

7  about 2013, where we have the very beginning of

8  crypto assets.  We have a lot of coins added

9  later.  Again, I don't know what the point of that

12:29:56 10  exercise would be if there's -- you know, if that

11  exercise that you're contemplating is not grounded

12  in the academic literature.

13      Q.  Are you aware of any academic literature

14  in which the authors construct a market index for

12:30:12 15  cryptocurrencies?

16      A.  So there are papers that I talk about

17  that do construct factors for later time periods

18  in various ways including using PCA.  I'm not

19  aware of a consensus in the literature for a

12:30:26 20  market index over this time period in the way that

21  you do for CAPM and Fama-French.

22      Q.  Setting aside whether there's a

23  consensus, are you aware of any academic papers in

24  which the authors construct a market index for

12:30:39 25  cryptocurrencies?

                                                    134

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:30:39  1                    MR. KELLOGG:  Objection.

        2        A.   You would have to direct me to the

        3   paper.  I'm sure that folks have looked at the

        4   market generally for crypto.  I'm not aware of an

12:30:47  5   established market index for this time period in

        6   the way that you do for CAPM and Fama-French.  So

        7   that's my view of the literature.

        8        Q.   Okay.  So just for clarity of the

        9   record, sitting here today, you can't think of any

12:31:01 10   academic articles in which the authors construct a

       11   market index for cryptocurrencies?

       12                    MR. KELLOGG:  Objection.

       13        A.   I'm not saying that.  So I'm sure that

       14   there's papers that look at market effects of

12:31:10 15   crypto.  You know, I have some citations here in

       16   my -- I'm trying to find it now.

       17             So, yeah, that's not a fair

       18   characterization.  There's certainly papers that

       19   look at the general market for crypto assets.  If

12:31:27 20   you want to call that a market index or not, I

       21   don't know.  But, again, I would just revert to my

       22   earlier characterization of the literature.

       23        Q.   What is the -- strike that.

       24             Is the PCA a commonly accepted

12:31:54 25   methodology for identifying factors for an asset

                                                              135

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:31:56  1  pricing model?

2      A.   Yes.

3      Q.   Did you cite any sources in your report

4  that use a PCA to identify factors for an asset

12:32:04  5  pricing model?

6      A.   So I know this is not a memory test.  I

7  believe I do cite such papers.  I believe the Hu

8  paper, is my best memory, does a PCA in the asset

9  pricing model.  But I do believe I do cite studies

12:32:18 10  and -- let me just see here.

11          And I will also say, drawing on my

12  general experience as an academic economist, that

13  PCAs are used in the asset pricing model

14  literature.  There's nothing unusual or novel or

12:32:33 15  surprising about that.

16      Q.   Is it true that when conducting a PCA, a

17  researcher typically tries to understand what the

18  components mean?

19              MR. KELLOGG:  Objection.

12:32:49 20      A.   Well, I discuss this in my report.  I

21  mean, the components -- the meaning of the

22  component is -- is informed by what the PCA

23  analysis is doing.  So I guess I would reference

24  our earlier discussion about what the PCA

12:33:00 25  component is reflecting.

136

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:33:07 1     Q.   Does your report provide any economic

2  interpretation between any particular principal

3  component and the cryptocurrency market?

4     A.   Well, the -- the PCA is extracting the

12:33:19 5  information from the general non-XRP

6  cryptocurrency markets and -- and their price

7  movements and price properties.

8     Let me just pause here and see if

9  there's anything I want to add to that.

12:33:46 10     Yeah, and I would also reference

11  paragraph 93 where I talked about this in a little

12  more detail.

13     Oh, and then paragraph 94 I mention the

14  Hu paper that uses PCA.  I mention the Liu paper.

12:34:00 15     So, again, I think I would go back to my

16  report and answer some of these questions.

17     Q.   Is it fair to say that in your analysis

18  you observed the relationship between Principal

19  Component 1 and XRP?

12:34:16 20     A.   No.  I -- in my analysis I believe for

21  the -- if we can just turn to my Exhibit 3, I have

22  four principal components using the BIC criteria

23  for Estimation Period 1 and I have 11 for the

24  second period.

12:34:42 25     Q.   Okay.  Can you tell me what the BIC

137

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:34:44  1   criteria is?

2        A.   Well, I have the formula in the

3   footnote.  I don't have the formula memorized.

4   But it's the Bayesian information criteria.  So

12:34:54  5   it's a well-established criteria for how many

6   variables, independent variables, that you add to

7   the model.  And then it tells you whether you

8   should -- you know, in my situation, whether you

9   should have three or four or five or -- or so

12:35:07 10   forth.

11        So it's a criteria that penalizes you

12   for adding a variable, but also you get the

13   benefit of more explanatory power, generally

14   speaking.  So the formula for the BIC -- and I'm

12:35:21 15   just going to take a moment to find it in my

16   report because I do have a footnote on it.  Give

17   me a second here.  It's Footnote 171.

18        Q.   I see.

19        So Footnote 171 sets forth the Bayesian

12:36:24 20   information criterion equation, is that right?

21        A.   Yes.

22        Q.   Okay.  And the -- that's referred to in

23   Footnote 4 of your Exhibit 3 as the BIC criteria?

24        A.   Let me just confirm that -- the

12:36:35 25   footnote.  Just give me one second.  Yes, that is

138

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:36:37  1  correct.

2     Q.   Why did you use the BIC criteria in

3  selecting your number of principal components as

4  reflected on Exhibit 3?

12:36:48  5     A.   Well, the BIC is an objective criteria

6  for how many components you're going to have.  So

7  do you include one?  Do you include three?  Do you

8  include seven?  I don't want to have a subjective

9  judgment as to the number of BIC princ -- the

12:37:08 10  number of principal components.  The BIC is a

11  well-established criteria for answering that

12  question that's been used in the academic

13  literature.

14          So, for example, at the end of

12:37:19 15  paragraph -- I'm sorry, at the end of Footnote

16  171, you know, I cite to a Journal of Financial

17  Economics paper that uses BIC for their P -- PCA.

18     Q.   Is it -- is it in your view important to

19  use objective criteria for determining how many

12:37:42 20  components you need to have?

21               MR. KELLOGG:   Objection.

22     A.   Well, my view is -- I would -- I would

23  have my view be more granular than that; is that

24  the BIC is a well-established criteria for

12:37:53 25  deciding the number of components to use.

139

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:37:58  1      Q.   And for your purposes in forming your

       2   expert opinion, was it important to you to use a

       3   methodology that employed objective criteria in

       4   determining your -- the number of components to

12:38:09  5   use?

       6                   MR. KELLOGG:   Objection.

       7      A.   Again, the way I would frame it is this

       8   is a well-established criteria in the literature

       9   that I'm using.  So I wanted to ground my

12:38:20 10   selection criteria in the academic literature,

      11   which is what this does.  So that -- I would

      12   describe the motivation in those terms.

      13      Q.   Okay.  Can we turn to Exhibit 5 of your

      14   AF-1?

12:38:37 15      A.   Exhibit 5?

      16      Q.   Yes.

      17      A.   Give me one second here.

      18      Q.   Exhibit 5 is labeled "Regression of XRP

      19   Returns on Returns of Largest Market-Cap Coins."

12:38:52 20              Do you see that?

      21      A.   Yes.

      22      Q.   I don't see in the footnotes any

      23   reference to the BIC criteria.

      24              Did you employ the BIC criteria in

12:39:01 25   making your selections for the components of

                                                          140

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:39:03   1    Exhibit 5?
           2         A.    No, the --
           3                    MR. KELLOGG:  Objection.
           4         A.    The selection criteria here is largest
12:39:08   5    market cap coins.  And, again, as I explain in my
           6    report, the purpose of Exhibit 5 is just as a
           7    robustness check on the PCA and -- and, also,
           8    unlike a PCA principal components analysis, you
           9    know, which is this implied weighting across
12:39:29  10    crypto assets, you know, Exhibit 5 enables the
          11    reader to actually see individual crypto assets.
          12                    So, again, it's by way of another, you
          13    know -- by way of, you know, moving from the PCA
          14    just so that you have individual crypto assets on
12:39:47  15    the right-hand side.  But the selection criteria
          16    was the largest as, again, as a robustness check
          17    on my -- you know, as a -- one additional analysis
          18    to my principal analysis that uses the PCA.
          19         Q.    Did -- did you attempt to use the BIC
12:40:04  20    criteria to engage in your selection process with
          21    respect to Exhibit 5?
          22                    MR. KELLOGG:  Objection.
          23         A.    I've already answered the question.
          24         Q.    That's a no then?
12:40:14  25         A.    I told you the selection criteria for
```

141

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:40:16  1  Exhibit 5.
          2      Q.   And that did not include the BIC
          3  criteria, is that right?
          4      A.   That's correct.  I chose -- the
12:40:22  5  selection criteria is the largest market cap
          6  coins.  The coins that were the largest in this
          7  time period.  So that was the selection criteria
          8  for Exhibit 5 and -- and the results -- and the
          9  results have been reported there.
12:40:41 10      Q.   Turning back to your Exhibit 3.
         11      A.   Yes.
         12      Q.   As I understand your analysis, you did
         13  observe some relationship between the principal
         14  components in your model and XRP, is that right?
12:40:56 15      A.   For some of the principal components.
         16      Q.   Okay.  For the principal components for
         17  which you observed the relationship between those
         18  principal components and XRP, what's the -- what's
         19  the economic intuition behind that relationship in
12:41:09 20  your view?
         21              MR. KELLOGG:  Objection.
         22      A.   What I would say is there's a
         23  statistical association between the information
         24  impounded in that -- that principal component and
12:41:23 25  XRP price returns.
```

                                                              142

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:41:26   1        Q.   Do you provide any economic

           2   interpretation of that statistical association?

           3                  MR. KELLOGG:   Objection.

           4        A.   Sure.   That's what I talk about in my

12:41:35   5   report.

           6        Q.   Can you point to me in your report where

           7   you provide an economic interpretation for the

           8   statistical association between certain of your

           9   PCs and XRP price returns?

12:41:50  10                  MR. KELLOGG:   Objection.

          11        A.   Well, I would just refer to my

          12   discussion in part 3 where I talk about movements

          13   in the noncryptocurrency markets, so the non-XRP

          14   cryptocurrency markets, and the relationship to

12:42:05  15   XRP price return data and the meaning of the

          16   excess returns.

          17             So, again, that is reflected in this

          18   full discussion in Part III.

          19        Q.   You say Part III.

12:42:22  20             Do you have a specific section that

          21   you're looking at when you refer me to Part III?

          22        A.   Well, I would refer you to III.C and

          23   III.D, where I talk about the factor model and

          24   what it's doing and what the meaning is.   So I

12:42:34  25   would just reference my report for that

                                                        143

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:42:42  1    discussion.

2         Q.   Let me try to put the question in

3    plainer English that I might understand better.

4              In your report do you express any

12:42:48  5    opinion or explanation as to why there's a

6    statistically significant correlation between some

7    of your PCs and XRP price returns?

8                        MR. KELLOGG:  Objection.

9         A.   So, again, the -- what I'm focused on --

12:43:00 10    I mean, obviously, I'm building this model -- is,

11    is there excess returns for XRP?  Is there

12    positive excess returns for XRP above and beyond

13    what -- the general price movements in the non-XRP

14    cryptocurrency markets?  That information in those

12:43:22 15    markets is embedded into the PCA -- or into the

16    principal components that are used on the

17    right-hand side of the equation.

18         Q.   If I'm understanding your answer

19    correctly, it wasn't part of your project to

12:43:37 20    examine the question of why there was any

21    relationship between certain of your principal

22    components and XRP price returns, is that right?

23                        MR. KELLOGG:  Objection.

24         A.   I don't agree with that.  I mean, I'm --

12:43:48 25    I'm -- I'm addressing the empirical question of

144

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:43:54  1    what is the relationship between XRP and the more

2    general cryptocurrency markets?  That's the

3    empirical question that I'm addressing.  I

4    didn't know the answer to that before doing the

12:44:06  5    analysis, it's an empirical question, but that

6    is -- that is the question that in part is being

7    addressed here.

8         Q.   And it's fair to say as a result of your

9    analysis, you -- you did observe a relationship

12:44:17 10    between XRP price returns and the returns of other

11    digital assets?

12              MR. KELLOGG:  Objection.

13         A.   Well, again, I would reference Exhibit

14    3 -- Exhibit 4 -- I'm sorry, Exhibit 3 is just

12:44:28 15    the -- Exhibit 4 is just the list.  But, yeah, I

16    would go back -- if we're talking about the factor

17    model, I would go back to, you know, the exhibits

18    that report the outcome of that -- of that

19    analysis.

12:44:41 20         Q.   And did you make any attempt in your

21    report to explain why you observed the

22    relationship that you observed between XRP price

23    returns and the returns of other digital assets?

24              MR. KELLOGG:  Objection;

12:44:56 25              asked and answered.

145

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:44:56  1        A.    Yeah, I would just frame my inquiry the

          2   way I did before, which is it's an empirical

          3   question about the relationship between XRP and

          4   the broader market of crypto assets and I'm

12:45:07  5   observing that empirical relationship in the way

          6   that you would do in any asset pricing model.  So

          7   it's a very standard type of analysis that you

          8   would do when you're thinking about that sort of

          9   empirical question.

12:45:25 10        Q.    In economics literature, if a -- if an

         11   author observes a price correlation, is it typical

         12   that the author provide some possible economic

         13   explanation for that correlation?

         14              MR. KELLOGG:  Objection.

12:45:40 15        A.    You're speaking at a very high level.  I

         16   would want to look at the paper, what the research

         17   question is, in order to answer that.

         18        Q.    It is a high-level question and it's

         19   broad, but I'm asking you as someone who knows the

12:46:06 20   economics literature.  In the economics

         21   literature -- instead of typical, let's say

         22   common.

         23              In the economics literature, is it

         24   common if an author observes a price correlation

12:46:15 25   that the author provide some possible explanation

                                                              146

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:46:17  1    for that correlation?

         2                    MR. KELLOGG:  Objection.

         3         A.   Again, it really depends on what the

         4    research question is.  You know, in an asset

12:46:25  5    pricing model, typically what you're interested in

         6    is the empirics:  What are the relationships?

         7                    But, again, what questions are going to

         8    be answered in an academic paper obviously is a

         9    function of what is the research question at

12:46:40 10    issue.

        11         Q.   Let's look at Exhibit 7 to your report,

        12    AF-1.  So exhibit 7 is labeled "Regression of XRP

        13    Returns on Principal Components of Other

        14    Cryptocurrencies and Returns of Other Assets."

12:47:03 15                    Do you see that?

        16         A.   I do.

        17         Q.   Okay.  There's a column on Exhibit 7

        18    that says "Cryptocurrency and S&P 500."

        19                    Do you see that?

12:47:14 20         A.   Yes.

        21         Q.   The third entry down in that column is

        22    negative 0.001 asterisk.

        23                    Do you see that?

        24         A.   I do.

12:47:22 25         Q.   Okay.  What does negative 0.001 asterisk

                                                          147

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:47:27  1    tell us in this chart?

2         A.    It tells us that there's a statistically

3    significant relationship between Principal

4    Component 1 and XRP price returns.

12:47:44  5         Q.    Okay.  Going down that same column,

6    cryptocurrency and S&P 500, if you go down to the

7    row that says "S&P 500 Return," I see an entry of

8    0.398.

9              Do you see that?

12:47:56  10        A.    I do.

11             Q.    Okay.  What does the 0.398 tell us?

12             A.    Well, this -- this is telling us that

13   there's not a statistically significant

14   relationship in this specification between the S&P

12:48:07  15   500 and the returns of XRP.

16             Q.    Can you interpret Exhibit 7 to say that

17   if the S&P 500 changes by 1 percent, then the XRP

18   return would change by .398 percent?

19                   MR. KELLOGG:   Objection.

12:48:24  20        A.    I would not say that because that point

21   estimate is not statistically significant.

22             Q.    When you say "that point estimate,"

23   which number are you referring to?

24             A.    I'm referring to 0.398.

12:48:42  25        Q.    Do you agree with the general maxim that

                                                          148

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:48:45  1    correlation does not equal causation?

2                        MR. KELLOGG:  Objection.

3         A.   Yes.

4         Q.   Do you interpret the results of your

12:48:51  5    analysis, as set forth in Section III.C of your

6    report, to establish correlation between XRP price

7    returns and the price returns of certain other

8    digital assets?

9                        MR. KELLOGG:  Objection.

12:49:02 10        A.   The way I would frame it is XRP moves in

11    relation to the general cryptocurrency market as

12    reflected in -- in my statistical analysis.

13        Q.   Is there a distinction between the

14    answer that you just provided and correlation

12:49:19 15    conceptually?

16                        MR. KELLOGG:  Objection.

17        A.   You know, maybe this is a nitpick, but

18    the betas typically are, you know -- correlate,

19    you know -- you know, it's a correlation divided

12:49:32 20    by some form of volatility in the market.  But I

21    agree with the proposition that what I'm showing

22    consistent with the asset pricing model literature

23    is the XRP returns do move in relation to the

24    general cryptocurrency markets.  There is a

12:49:45 25    statistically significant association.

                                                          149

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:49:52  1        Q.   Okay.  Do you interpret the results of

2    your analysis set forth in III.C to establish any

3    causal relationship between XRP price returns and

4    the price returns of certain other digital assets?

12:50:05  5        A.   What I would say is what I say in my

6    report, which is the price returns -- that there's

7    no XRP specific price returns above and beyond the

8    statistically significant associations with

9    generalized cryptocurrency market price movements.

12:50:33 10        Q.   Let's go back to paragraph 100 of your

11   report, which is on page 47.

12        A.   Yes.

13        Q.   What does the word -- I'll just read it

14   for the record so we're clear.

12:50:51 15             "In summary, my empirical analyses show

16   that the variation in long-run price return of XRP

17   can be explained by exogenous, non-XRP,

18   cryptocurrency price returns or, put differently,

19   by factors outside Ripple's control."

12:51:05 20             Do you see that?

21        A.   I do.

22        Q.   Okay.  What does the word "exogenous"

23   mean in that sentence?

24        A.   It means I'm looking at crypto assets

12:51:16 25   other than XRP.

                                                         150

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:51:22  1          Q.   Okay.  What steps did you take, if any,

       2    to verify that non-XRP cryptocurrency returns

       3    were, in fact, exogenous of XRP returns?

       4          A.   Well, I --

12:51:31  5                    MR. KELLOGG:  Objection.

       6          A.   Again, I just told you the definition

       7    that I'm using here, which is I'm looking at

       8    non-XRP price returns in the data.  I'm looking at

       9    the general movements, whether it be the 9 or the

12:51:43 10    91, the general movements as captured by the

      11    principal component analysis in those markets.

      12    The markets excluding XRP.

      13          Q.   Did you perform any analysis to check

      14    whether the non-XRP cryptocurrency returns that

12:52:03 15    you examined were affected by changes in XRP price

      16    returns?

      17                    MR. KELLOGG:  Objection.

      18          A.   The analysis I did is reflected in the

      19    report, which is, are there statistical

12:52:14 20    associations over this time period, the seven

      21    years or the five years, between generalized

      22    non-XRP crypto market price return behavior and

      23    XRP?  That's -- that's the analysis that I did.

      24          Q.   Is it possible that there is a

12:52:29 25    statistically significant association between XRP

                                                            151

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:52:32 1  returns and the other digital asset returns that

2  you looked at because XRP affects the prices of

3  those other digital assets?

4              MR. KELLOGG:  Objection.

12:52:42 5    A.   I have not seen any theory or --

6  economic theory articulated to that effect in this

7  litigation, so I'm not aware of such a claim.

8  But, again, all I can do is reiterate, you know,

9  in response to your question, what I did, which is

12:52:57 10 statistical associations between generalized

11 movements in the cryptocurrency markets, you know,

12 across these 91 tokens or across the 9 tokens and

13 movements in XRP.

14    Q.   Did you undertake any analysis to rule

12:53:13 15 out the possibility that XRP price -- price

16 movements affect the price movements of the other

17 digital assets that you looked at?

18              MR. KELLOGG:  Objection;

19              asked and answered.

12:53:25 20    A.   Yeah.  So I'll just repeat what I did in

21 my analysis, which is, what are the statistical

22 associations between generalized non-XRP crypto

23 markets and movements in the XRP price; and,

24 furthermore, are there XRP price returns above and

12:53:45 25 beyond what -- what the statistical associations

152

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:53:50  1    would indicate in terms of the movement of XRP

2    price?

3         Q.   So is it fair to say, sitting here

4    today, that you don't have an opinion about

12:53:59  5    whether XRP moved the prices of other digital

6    assets or other digital assets moved the price of

7    XRP?

8              MR. KELLOGG:   Objection.

9         A.   So, again, I'll just reiterate the

12:54:09 10    analysis I did do, which is the statistical

11    associations between generalized market movements

12    and XRP in just the same way that academics have

13    done it in all sorts of contexts, including public

14    equities.

12:54:25 15         Q.   Are you offering an opinion in this case

16    that the price movements in other digital assets

17    caused the price movements in XRP?

18         A.   I wouldn't frame it that way.  I would

19    say there's a statistically significant

12:54:38 20    association between these generalized price

21    movements and price movements in XRP consistent

22    with the asset pricing model literature.

23         Q.   Are you offering an opinion in this case

24    that the price movements in XRP caused the price

12:54:58 25    movements in other digital assets?

153

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:55:01 1      A.   I never say that in my report.  Again, I

2    can reiterate what I did, which is, you know, I

3    did an asset pricing model, which is an exercise

4    that's commonly done in the academic literature,

12:55:17 5    looking at the statistical associations between

6    this particular asset, XRP, and more generalized

7    market movements as represented by the 91 tokens

8    or crypto assets and the 9 -- or the 9 for the --

9    for the longer time period.

12:55:34 10      Q.   Was it part of your assignment in this

11   case to determine whether, or if, XRP price

12   movements moved the prices of other digital

13   assets?

14           MR. KELLOGG:  Objection.

12:55:46 15      A.   So, again, the work that I did and the

16   analysis I did is contained in my reports.  And,

17   again, I'm happy to reiterate what I did in the

18   factor model, which is to test whether there's an

19   XRP specific price movement above and beyond what

12:56:02 20   you would otherwise expect given the statistical

21   associations in terms of generalized non-XRP

22   crypto market price movements.

23      Q.   So I think that means you were not asked

24   to determine whether or not there was a causal

12:56:19 25   relationship between the movements in XRP prices

154

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:56:21  1  on the one hand and the movements in digital asset

2  prices on the other hand?

3                    MR. KELLOGG:  Objection;

4            asked and answered.

12:56:27  5      A.   So that's not -- those words are not in

6  my assignment.  My assignment and what I did is

7  what I just described.  So, again, I would be

8  happy to state what I did, but, you know, just

9  sort of the way I would summarize it is I used,

12:56:43  10  consistent or reflective of the asset pricing

11  model literature, an asset pricing model here to

12  explore as whether, as a statistical matter,

13  there's XRP price returns above and beyond what

14  these statistical associations would tend to

12:57:01  15  indicate would happen or would, you know -- or the

16  statistical associations reflecting this --

17  reflecting the results of the factor model.

18      Q.   Let's look at paragraph 102 of your

19  report, which is on page 48.

12:57:29  20      A.   Page 48?

21      Q.   Yes.

22            The first sentence of 102 states "The

23  factor models and the corresponding results I

24  present in Exhibits 3 through 7 allow me to

12:57:45  25  examine whether, on average, there are additional

                                                     155

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:57:48   1   XRP price returns after controlling for other

2   non-XRP cryptocurrency market factors."

3         Do you see that?

4    A.   I do.

12:57:55   5    Q.   Okay.   When you refer to "controlling

6   for other non-XRP cryptocurrency market factors,"

7   do you mean the use of your PCA?

8    A.   Well, I believe some of those exhibits

9   is just running it on the individual crypto assets

12:58:08 10   that we discussed earlier, but I'm definitely

11   referring to including here the factor models:

12   That is to say, Estimation Period 1, Estimation

13   Period 2., the factor models supplemented by these

14   additional indices such as the S&P 500, as well

12:58:26 15   as -- you know, obviously I also had the

16   distributions analysis, too, although I don't --

17   let me just -- give me one moment here.   Let me

18   just refresh my recollection.

19         So Exhibit 3 is the PCA; exhibit 6 is

12:58:48 20   for the full time period; and Exhibit 7 is -- is

21   for the five-year period.   Let me just -- give me

22   a second here.

23         Yeah.   So the -- the distribution

24   analysis is not in Exhibits 3 through 7.   That

12:59:07 25   comes later.

156

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:59:10 1      Q.   Okay.  Did you check to see if your
2    principal components explain the price returns of
3    other digital assets other than XRP?
4           A.   No.  That was not -- that was not
12:59:20 5    relevant to the asset pricing model inquiry.  I'm
6    constructing an asset pricing model for XRP.
7           Q.   Why did you not include other factors
8    besides other digital assets in your construction
9    of your PCA?
12:59:35 10      A.   Well, I explored that possibility, so I
11   have these exhibits.  I'll turn to Exhibit 7.  I
12   do explore other factors, sort of standard indices
13   that we were talking about earlier:  The S&P 500,
14   the MSC -- MCSI World Index, the Emerging Market
12:59:59 15   Index, the Commodity Index, the gold return, the
16   U.S. dollar, the Japanese yen.
17           So I -- I do explore some standard
18   indices as well, and consistent with the academic
19   literature, these are not statistically
13:00:16 20  significant.
21           Q.   Did you include, for instance, the S&P
22   500 in the construction of your principal
23   components?
24           A.   Well, I view Exhibit 7 as part of the
13:00:26 25  work that I did here.

157

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:00:28   1        Q.   Understood, but I'm asking a specific

         2   question about how you constructed your principal

         3   components.

         4             Did you include the S&P 500 return

13:00:35   5   within your construction of the principal

         6   components?

         7        A.   Oh, I misunderstood your question.

         8             No, the principal components, whether

         9   it's one, two, three or four, whatever the

13:00:43  10   principal component is, is -- is capturing the

        11   information from other crypto assets.

        12        Q.   And -- and why was it that you opted not

        13   to include, for example, the S&P 500 in your

        14   principal components construction?

13:01:01  15        A.   Well, because I -- what I wanted to

        16   do -- there's a couple of different questions.

        17   One question in my asset pricing model is, do --

        18   the -- the first logical question is, do other

        19   crypto assets, like bitcoin, like Ether and so

13:01:19  20   forth -- whether other crypto assets have an

        21   association, a statistical association, with XRP

        22   returns.  And for that, given the lack of a

        23   market -- an academic consensus on market indices

        24   over this time period, I used the PCA.

13:01:38  25             So the first logical question is to --

                                                                  158

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:01:43  1    to address that relationship.  For the S&P 500,

2    there's an index that we all know that's used

3    commonly in the literature.  And I just entered

4    that into the equation on the right-hand side once

13:01:55  5    I had captured the information in the non-XRP

6    cryptocurrencies.

7        Q.   If in constructing your principal

8    components you're attempting to find the best

9    factors to explain XRP price returns, why not

13:02:15 10    include the S&P 500 returns?

11             MR. KELLOGG:  Objection.

12        A.   Okay.  So that's a little bit of a

13    misstatement of my approach.  My approach was,

14    obviously, in exploring XRP returns, one needs to

13:02:28 15    incorporate what's happening in the general

16    cryptocurrency markets.  Just as a -- that's

17    obvious.  And so the PCA analysis is the way,

18    consistent with the asset pricing model

19    literature, that I do that.

13:02:43 20             With the S&P 500, there's an index that

21    we -- we don't have to do a PCA.  There's an index

22    that's readily available, widely used.  And, so,

23    once I captured the non-XRP cryptocurrency

24    markets, I then entered the S&P 500.

13:03:02 25             So the PCA is about constructing

159

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:03:05  1   components for the non-XRP cryptocurrency markets.

2   That's the point of the exercise.

3       Q.   So in your view in constructing your

4   principal components, there were not any other

13:03:18  5   factors that would be of relevance other than the

6   prices of certain other digital assets?

7                MR. KELLOGG:   Objection.

8       A.   So certainly it could be the case the

9   S&P 500 matters.  That's why I test it.  Again,

13:03:30  10   consistent with the academic literature, it's not

11   statistically significant.  But, again, I needed

12   to be able to test the relationship between XRP

13   and these crypto -- more general non-XRP crypto

14   markets.  And so consistent with the academic

13:03:47  15   literature, I used PCA for that question.

16       Q.   Did you perform any sensitivity checks

17   for your PCA results using different sets of

18   digital assets?

19       A.   I used -- well, I used two different

13:04:00  20   sets of digital assets:  The 9 for the full period

21   and the 91 for the second period.

22                The -- so I used all the tokens that I

23   could subject to the selection criteria that I --

24   I have in my report; you know, i.e., for -- or,

13:04:19  25   for example, I have price return data for those

160

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:04:23  1    tokens.  And then I allowed the PCA to tell me

2    what's important and what's not.

3         Q.   And -- sorry.

4         A.   So, again, the way I view my exercise is

13:04:31  5    I looked at the tokens that -- for which I had the

6    available data for the seven-year period and then

7    allowed the PCA to tell me what's important in

8    that -- in that universe.

9         Q.   Other than what you just described, did

13:04:48  10   you perform any additional sensitivity checks for

11   your PCA results using different sets of digital

12   assets?

13        A.   I used all the digital assets that I

14   could for the first estimation period and for the

13:04:59  15   second.

16             Now, I do want to add for the second I

17   did have a minimum market cap criteria.  I think

18   it's reflected in the report.  But I allowed the

19   PCA to tell me what was important in the universe

13:05:13  20   of tokens that I had available to me.

21        Q.   Let me turn your attention to Footnote

22   162 on page 42.

23        A.   Give me one second.  162?

24        Q.   Yes.

13:05:39  25        A.   Yes.

161

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:05:40 1       Q.   This is the market cap criteria that you

2   just referenced?

3       A.   Correct.

4       Q.   Okay.  Is it possible that at some point

13:05:48 5   during your period the market cap for an included

6   digital asset could have dipped lower than

7   $100,000?

8              MR. KELLOGG:  Objection.

9       A.   It's possible.

13:05:58 10      Q.   Okay.

11      A.   I don't know if that happened, but it's

12   possible.  I don't know offhand -- let me take

13   another -- I don't know offhand that that

14   happened.  The criteria here, in Footnote 162, is

13:06:10 15   at least 100,000 in either August or December.

16      Q.   Do you know -- strike that.

17           In Footnote 4 to your Exhibit 4 --

18      A.   Wait.  Wait one second.

19      Q.   Sure.

13:06:26 20      A.   Exhibit 4?

21      Q.   Yes.

22      A.   Exhibit 4.  Okay.

23      Q.   You state "XRP market cap on August

24   11th, 2015 was $274 million."

13:06:37 25           Do you see that?

162

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
13:06:38    1         A.    I do.
            2         Q.    Okay.  And do you know offhand what
            3    XRP's market cap was by December 2020?
            4         A.    I don't know offhand.
13:06:47    5         Q.    I think it is in --
            6         A.    I think it's in the complaint, but I
            7    don't remember offhand.
            8         Q.    Let's go to page C-3 of your Appendix C.
            9         A.    Where should I go?
13:07:24   10         Q.    Paragraph 6.
           11         A.    Of Appendix?
           12         Q.    Let me make sure I have the label right.
           13               Yeah, Appendix C, page C-3, paragraph 6
           14    of that appendix.
13:07:37   15         A.    Let me just take a look.
           16                    MR. KELLOGG:  Mark, can you
           17             clarify where we are?
           18                    MR. SYLVESTER:  Sure.
           19         Q.    Professor, do you see where we are?
13:08:01   20         A.    I'm at paragraph 6 at C-3.
           21         Q.    Okay.  I just want to make sure the
           22    copies are right.
           23                    MR. SYLVESTER:  Yeah, we're
           24             at page -- page C-3 of Appendix C.
13:08:11   25                    MR. KELLOGG:  Okay.  Got it.
```

163

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 13:08:12 | 1 | MR. SYLVESTER:  Okay. |
| | 2 | BY MR. SYLVESTER: |
| | 3 | Q.   So paragraph 6, the -- the last sentence |
| | 4 | on page C-3 says "For comparison, on those two |
| 13:08:20 | 5 | days, XRP market capitalization far exceeded that |
| | 6 | cutoff and was $260 million and $23 billion, |
| | 7 | respectively." |
| | 8 | Do you see that? |
| | 9 | A.   I do. |
| 13:08:30 | 10 | Q.   And I read that $23 billion figure to |
| | 11 | correspond to December 21st, 2020. |
| | 12 | Do you read that the same way? |
| | 13 | A.   Yes. |
| | 14 | Q.   Okay.  Was it important to your analysis |
| 13:08:40 | 15 | of the relationship between XRP price returns and |
| | 16 | other digital asset price returns to understand |
| | 17 | the market caps of XRP and those other digital |
| | 18 | assets? |
| | 19 | MR. KELLOGG:  Objection. |
| 13:08:50 | 20 | A.   Well, I certainly report the market cap. |
| | 21 | I certainly report regressions on the highest |
| | 22 | market cap coins in Exhibit 5.  So I certainly do |
| | 23 | work on that. |
| | 24 | For purposes of the PCA, the PCA will |
| 13:09:06 | 25 | extract the information in the most efficient way |

164

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:09:09  1   from the entire universe of -- of the tokens

2   regardless of their -- you know, regardless of

3   whether it's 100 million or 300 million or what

4   have you.

13:09:20  5       Q.   In your view, is it -- is it at all

6   likely that a digital asset with a market cap of

7   $100,000 would have an impact on the price of XRP

8   when it has a market cap in the hundreds of

9   millions of dollars?

13:09:31 10              MR. KELLOGG:   Objection.

11       A.   I don't think that's a -- I don't

12   think that -- I think you're miss -- I think your

13   question misunderstands the point of an asset

14   pricing model, which is we have movements, price

13:09:43 15   movements, in the general market.  Maybe they're

16   small cap; maybe they're large cap.  And the

17   question is, is there a statistically significant

18   association with those movements?  And in this

19   instance, XRP.

13:09:57 20              So I don't think there's anything in the

21   asset pricing model methodology that would exclude

22   the possibility that smaller cap coins have some

23   informational content.  Obviously, I employed

24   100,000 as sort of the minimum, but I don't -- I

13:10:18 25   would not for the purposes of the PCA rank them in

165

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:10:25  1    terms of whether they have 200 million or 400

       2    million or something else.

       3              Now, obviously, in Exhibit 5, I do

       4    run -- I do run the regression on the largest

13:10:36  5    market cap coins, but that's -- that's not the

       6    factor model.

       7       Q.   Is there any academic literature that

       8    you can think of with respect to cryptocurrency

       9    asset prices that uses a minimum $100,000 market

13:10:54 10    cap for inclusion in the model?

      11              MR. KELLOGG:  Objection.

      12       A.   So I cite in the footnote -- not

      13    100,000, it's a -- it's a different time period

      14    for different coins -- that a threshold is being

13:11:09 15    used in their analysis.

      16       Q.   What footnote are you looking at,

      17    Professor?

      18       A.   So Footnote 8.

      19       Q.   On C-3?

13:11:17 20       A.   On C-3.  So I say "My decision to

      21    restrict the sample based on market cap is also

      22    supported by the academic literature.  See, for

      23    example, Liu, 2021, who restricts the coins in

      24    their sample to those with a market cap over a

13:11:33 25    million."  Journal of Finance.

                                                              166

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:11:35  1      Q.   Why was it that you decided to use

       2  $100,000 instead of a million dollars for your

       3  model?

       4      A.   Right.  I wanted to be -- I wanted to

13:11:43  5  make sure that I allowed the PCA to -- to

       6  potentially incorporate information on a wide

       7  range of coins.  It's not that -- and those

       8  coins -- you know, the crypto assets' price

       9  movements might have a statistical relationship

13:12:03 10  even if they're 200,000 or 500,000 with -- with

      11  XRP price returns.

      12           So I used the lower threshold and,

      13  hence -- hence, used a larger universe of coins

      14  than would otherwise be the case, particularly in

13:12:20 15  -- anyway, particularly in these earlier periods.

      16      Q.   And what was the advantage in your view

      17  of using that lower threshold?

      18              MR. KELLOGG:  Objection.

      19      A.   Well, I wanted to allow the PCA to tell

13:12:37 20  me for universal coins for which I had pricing

      21  data, you know, to extract that information

      22  from -- from the covariance matrix.  And then it's

      23  an empirical question whether the information so

      24  extracted has a statistically significant

13:12:55 25  association.

                                                              167

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:12:55  1    So if the coins, if the crypto assets

2 that are being analyzed by the PCA, are

3 uninformative about XRP price returns, they're

4 uninformative because I used $100,000 threshold,

13:13:13  5 for instance, then the statistical analysis would

6 tell us that, you know.

7    So as I report from my Estimation Period

8 1 -- and I'll go back to Exhibit 3 -- in fact, you

9 know, I have a 91 percent -- a 92 percent adjusted

13:13:33 10 R-squared and I'm finding statistically

11 significant association.

12    So the information from the token so

13 defined does have informational content in the

14 asset pricing model about movements of XRP.

13:13:46 15 Q. When you say it has -- strike that.

16    You just said the information in --

17 strike that.

18    I think you just said that the

19 information in the token model -- sorry.  Let me

13:13:59 20 start again.  Withdrawn.

21    What information about XRP price returns

22 is provided by your model as reflected on Exhibit

23 3?

24 A. I would just go back to our conversation

13:14:12 25 this morning, our conversation about what a PCA

168

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:14:15  1  does.  So the P -- the principal component

2  analysis is using this universe of tokens, however

3  that's being defined.  By "tokens" I mean crypto

4  assets.  Extracting the information from that and

13:14:31  5  seeing -- testing the empirical question about

6  what is the statistical association?  And, more

7  specifically, are there excess returns to XRP that

8  are not otherwise explained or accounted for by

9  these statistical associations?

13:14:54  10       Q.   Why was it that you decided to construct

11  two separate estimation periods?

12       A.   I know that Ether is an important -- it

13  was a judgment about Ether that started to be

14  traded at this point.  Let me just go to my report

13:15:10  15  here.  Give me one second.

16            Yeah.  So Exhibit 4 has the largest

17  coins as of August 11th, 2015.  Ether is there.

18  It's the third largest, you know, after bitcoin

19  and Litecoin.

13:15:43  20            So, again, Ether is an important crypto,

21  not -- I'm not saying for purposes of this

22  litigation, but Ether is well known.  That's when

23  it began to trade.  Also, starting in 2015, it

24  enables one to use a lot more coins or a lot more

13:16:01  25  crypto assets than 2013.

169

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:16:03  1              So the virtue of -- of 2015 is I also

2     have more tokens.  And so it's just a robustness

3     check on this 2015 to 2020 period, in particular,

4     utilizing through the PCA more tokens than were

13:16:17  5     available as of 2013.  So we move from 9 tokens, 9

6     crypto assets, to 91, I believe, as of August

7     2015.

8                    MR. KELLOGG:  Mark, is this a

9              good time for a lunch break?

13:16:33 10                    MR. SYLVESTER:  I think it

11              is, yes.  Let's go off the record.

12                    THE VIDEOGRAPHER:  Okay.

13              Thank you.  The time is approximately

14              1:16.  We're going off the record.

13:16:41 15                    (Whereupon, a luncheon recess

16              is taken.)

17

18

19

20

21

22

23

24

25

170

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
13:16:41  1              A F T E R N O O N    S E S S I O N
          2                    THE VIDEOGRAPHER:  And the
          3              time is approximately 1 -- excuse me,
          4              2:04 p.m.  We're back on the record.
14:04:11  5                    MR. KELLOGG:  Mark, before
          6              you start, can I put one thing on the
          7              record?
          8                    MR. SYLVESTER:  Sure.
          9                    MR. KELLOGG:  Re our
14:04:16 10              discussion earlier about Allen's
         11              compensation agreement with Compass
         12              Lexecon.
         13                    MR. SYLVESTER:  Mm-hmm.
         14                    MR. KELLOGG:  We've reached
14:04:21 15              out to Compass Lexecon and they would
         16              not agree to allow Allen to testify on
         17              that.  But we're happy to continue
         18              working with you to get whatever
         19              information about that you -- you
14:04:31 20              need.
         21                    MR. SYLVESTER:  Okay.  Thank
         22              you.
         23      BY MR. SYLVESTER:
         24         Q.   Professor, let's turn back to Exhibit 5
14:04:37 25      of your opening report.  This is your "Regression
                                                            171
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:04:55  1   of XRP Returns on Returns" --

2   A.   Yeah.  I just -- I just want to find the

3   part in my report where I discuss the exhibit.  So

4   just --

14:05:02  5   Q.   Sure.  Take your time.

6   A.   -- give me a moment here.

7   Q.   And just for the record, I'll read the

8   title again.  Exhibit 5 is the "Regression of XRP

9   Returns on Returns of Largest Market-Cap Coins."

14:05:48 10   A.   Just -- I need a second here.

11        Okay.  I'm there.

12   Q.   Okay.  Great.

13        So turning to Exhibit 5, do you have any

14   explanation as to why some of the coins on Exhibit

14:06:22 15   5 have a statistically significant positive

16   coefficient and others have a statistically

17   significant negative coefficient?  I'm looking at

18   Estimation Period 2.

19   A.   So you want me to look at Estimation

14:06:34 20   Period 2.

21   Q.   Mm-hmm.

22   A.   Well, just -- just to be clear, the

23   coefficient on the bitcoin, the negative 0.661,

24   for instance, is conditional on all the other

14:06:48 25   returns in the right-hand side.  So it's not the

172

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:06:53  1  coefficient on bitcoin as an independent variable

2  by itself, but conditional on the other returns

3  being included, it's a negative 0.661.  So I just

4  wanted to be clear about what the coefficient

14:07:07  5  represents, and it represents that coefficient in

6  conjunction with the other coefficients in the

7  specification.

8          I'm sorry, could you repeat your

9  question?

14:07:19 10      Q.   Sure.

11          Again, focusing just on Estimation

12  Period 2, do you have any explanation for why

13  there's a statistically significant positive

14  coefficient for some coins and a statistically

14:07:32 15  significant negative coefficient for other

16  coins?

17      A.   Not beyond what I just said, which is

18  it's conditional or a function of the full

19  specification.  And this is just empirically

14:07:45 20  what the model indicates or the regression

21  indicates.

22          So beyond that I don't have any really

23  further commentary on it.

24      Q.   Okay.  Turning to your Exhibit 3 of

14:08:08 25  AF-1, why is it in your view that Estimation

173

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:08:09  1   Period 1 and Estimation Period 2 produce such

2   different results as to adjusted R-squared?

3       A.   I don't have a specific reason.  I

4   don't -- I could speculate as to why the adjusted

14:08:34  5   R-squares are different, the -- the .94 and the

6   .92, but that's the output of the model.  The

7   model -- Estimation Period 1 in the model using

8   just 9 tokens, whereas Estimation Period 2 is

9   using 91.  That's the -- that's what the

14:08:53 10   statistics tell us.

11       Q.   Okay.  As part of your analysis and

12   steps that you took to prepare your expert

13   opinion, did you take any steps to examine the

14   question of why there was such a divergence

14:09:06 15   between the adjusted R-squared in Periods 1 and

16   Period 2?

17               MR. KELLOGG:  Objection.

18       A.   I think we discussed earlier today the

19   additional work that I did in response to the

14:09:15 20   rebuttal report.  So all the analyses that I have

21   done is -- is in -- is covered in these reports

22   and in our morning conversation.

23       Q.   Turn with me to paragraph 98 of your

24   report.

14:09:34 25       A.   Wait one second while I get there.

174

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:09:37  1      Q.   Yeah.  And it's going to be the end of

2  paragraph 98 on page 46.  I'm looking at the

3  sentence that says "The adjusted R-squared in

4  Estimation Period 1, which includes a period when

14:09:57  5  the cryptocurrency markets were arguably less

6  mature, exceeds 50 percent."  And then "The

7  adjusted R-squared in Estimation Period 2 exceeds

8  90 percent."

9         Do you see that?

14:10:07 10      A.   I do.

11      Q.   Is there say relationship between your

12  adjusted R-squared finding for Period 1 and your

13  statement that the cryptocurrency markets were

14  arguably less mature during Period 1?

14:10:16 15            MR. KELLOGG:  Objection.

16      A.   I think I would just leave it as it is

17  in the report, which is just the simple

18  observation that in this additional -- you know,

19  the -- the extended period of Estimation Period 1,

14:10:33 20  which begins in 2013, that the crypto markets were

21  arguably less mature, and then I have the

22  citations for that in Footnote 175.

23         So I think -- I -- I'm comfortable with

24  the way that that is framed in this paragraph.

14:10:51 25      Q.   How would the market's lack of maturity

175

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:10:54  1  during Period 1 impact XRP price during that

2  period, if it would?

3        A.   I don't have a view on that.  My view is

4  informed by what the statistics show, whether it

14:11:07  5  be for the full period or for the Estimation

6  Period 2.

7        Q.   Does the lower adjusted R-squared for

8  Estimation Period 1 mean that pre-2015 XRP prices

9  were driven by other factors unrelated to

14:11:32 10  cryptocurrency market factors?

11              MR. KELLOGG:  Objection.

12        A.   So I -- again, I just wouldn't compare

13  Estimation Period 1 to Estimation Period 2 just on

14  terms of adjusted R-squared, which I think is an

14:11:47 15  embedded assumption in your question.  You would

16  want to look at what the full model is doing in

17  the two periods, including in the PCAs that are

18  being used.

19              So I would not just simply compare the

14:12:00 20  adjusted R-squares and -- squared and make some

21  sweeping conclusion about that earlier period.

22        Q.   Setting aside the comparison point, what

23  does the adjusted R-squared figure for Period 1

24  mean?  What does that reflect in --

14:12:16 25        A.   Well, I have a footnote where I cite to

176

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:12:18  1  this, so I'm just going to take a moment and flip

2  through my report to find -- to find that.

3  　　Q.　174 talks about R-squared.  I'm not sure

4  if that's what you're looking for.  Footnote 174 I

14:12:32  5  mean.

6  　　A.　Yes.  So that's what I was looking for

7  and it's, again, Footnote 174.

8  　　Q.　Can you explain to me in layman's terms

9  what an adjusted R-squared figure means and what

14:12:48 10  it tells you?

11  　　A.　Well, I mean, it's one metric, not the

12  only metric, but one metric for the goodness of

13  fit in terms of explaining the variation of the

14  dependent variable.  Here, the dependent variable

14:13:04 15  being the returns of XRP.

16  　　　　Again, adjusted R-squared, whether it's

17  high or low or -- or somewhere in between, is a

18  separate question as to whether there's

19  statistically identifiable excess returns for XRP.

14:13:23 20  　　Q.　Okay.  So what does -- focusing just on

21  Period 1 and the actual value of adjusted

22  R-squared, 0.541, what does that tell you about

23  the model's power to explain for Period 1?

24  　　　　　　MR. KELLOGG:  Objection.

14:13:41 25  　　A.　The power to explain.  I mean, it -- the

177

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:13:42  1  adjusted R-squared is the percentage of the

2  variation in the dependent variable for that

3  period.  That's what's reflected in the adjusted

4  R-squared.  That's a separate question, as I

14:13:55  5  indicated earlier, as to whether there's a

6  statistical association between excess returns for

7  XRP and relative to the non-XRP cryptocurrency

8  markets.

9       Q.   What's the dependent variable for Period

14:14:10 10  1?

11       A.   If we go to Exhibit 3, period -- Exhibit

12  3 says in the title "Regression of XRP Price

13  Return on Principal Components of Other

14  Cryptocurrencies."

14:14:31 15       Q.   I think your answer means the dependent

16  variable is XRP price return, is that right?

17       A.   Yes.

18       Q.   Okay.  So the adjusted R-squared figure

19  for Period 1 tells us that for Period 1 only, your

14:14:45 20  model explains approximately 54 percent of the

21  variation in XRP price returns?

22       A.   Yes.

23                 MR. KELLOGG:  Objection.

24       A.   Yeah.  So that -- that is -- the 54

14:14:53 25  percent is the adjusted R-squared and it is the

178

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:14:57   1   percentage of the variation in the dependent

2   variable for that model for that period.

3       Q.   Okay.  Given that, as I understand it,

4   the adjusted R-squared figure for Period 1 tells

14:15:15   5   us that your model explains 54 percent of the

6   variation in XRP price return, did you take any

7   steps to check to see if any other factors

8   contributed to XRP price return changes during

9   Period 1?

14:15:29  10              MR. KELLOGG:  Objection.

11       A.   Well, I -- I did do the work that we

12   discussed earlier.  I mean, I did the regressions

13   in Exhibit 5, which is just the crypto -- the

14   cryptos themselves.  I do the work in Exhibit 7,

14:15:43  15   where I explore -- well, this is for the later

16   period.  I explore different returns -- actually,

17   I wanted to reference Exhibit 6, where I do

18   additional work for other potential explanatory

19   factors:  The S&P 500, the emerging market,

14:16:03  20   commodities, gold, U.S. dollars, yen, euro.

21              So I do do a -- further explore -- you

22   know, further work to think about factors that

23   might be affecting XRP.  And, again, these

24   results, the results reflected in Exhibit 6, are

14:16:21  25   consistent with the econom -- academic literature.

179

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:16:26  1        Q.   And as I'm reading the results in

2    Exhibit 6, the model doesn't predict any more than

3    the approximately 54 percent of XRP return

4    variations than the model reflected in Exhibit 3,

14:16:43  5    is that right?

6        A.   Yes.  The adjusted R-squares at the

7    bottom of Exhibit 6 range from 53 to 54 percent.

8    I'm rounding here.  But, you know, what's

9    important really in this exhibit is whether or not

14:17:02 10    the S&P 500 return, the emerging market, the

11    commodities, and so forth, whether they enter into

12    the equation with statistically significant or

13    not.

14            So my conclusion that the S&P 500

14:17:19 15    return, for example, you know, doesn't have the

16    statistical relationship with XRP price return is

17    not a function of the adjusted R-squared; rather,

18    it's a function of the fact that the point

19    estimate, which is negative 0.629, is not

14:17:37 20    statistically significant.

21        Q.   Given that for Period 1, your model

22    explains approximately 54 percent of the variation

23    of XRP's price return, did you take any steps to

24    determine whether or not Ripple's actions

14:18:08 25    explained any of the remaining unexplained

180

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:18:11    1    variation in XRP price return?

2                    MR. KELLOGG:  Objection.

3         A.    Yes, I did.

4         Q.    And what were those steps?

14:18:19    5         A.    The alpha.  The constant term.  So I

6    want to be very clear about this.  The -- the

7    constant -- I'm also referring to that as alpha.

8    They're -- they're used interchangeably.  So in

9    Exhibit 6 it says "constant."  That's the same

14:18:32   10    thing as alpha.

11                    Alpha represents whether or not relative

12    to -- now here I'm looking at the first column,

13    the "cryptocurrency factors" column -- whether

14    relative to the cryptocurrency markets there is an

14:18:54   15    XRP specific price return above and beyond what

16    the statistical associations would lead you to

17    expect.  So that alpha is not statistically

18    significant in all these permutations or

19    specifications.

14:19:10   20                    And, again, the theory in the complaint

21    is that Ripple took various efforts,

22    distributions, and statements and so forth -- I'm

23    not going to reproduce the complaint here -- that

24    over this time period, this seven-year period,

14:19:28   25    resulted or was associated with XRP price

181

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:19:32  1  increasing.

2         And that's a testable proposition and

3  that would be reflected in the alpha.  The alpha

4  represents excess XRP returns.  Excess relative to

14:19:46  5  the cryptocurrency market.  And, again, there's no

6  statistical association.

7     Q.   Are you aware that in 2017 XRP prices

8  increased dramatically?

9              MR. KELLOGG:  Objection.

14:20:09 10     A.   That -- that might well be right.  I

11  don't have a specific recollection.

12     Q.   Okay.  Did you consider constructing

13  estimation periods before and after 2017 when XRP

14  prices were very different?

14:20:19 15              MR. KELLOGG:  Objection.

16     A.   Well, you know, turning to Dr. █████ as

17  we discussed this morning, he has a great point, I

18  believe -- just give me one second here.  I'm

19  going to need a second.

14:20:46 20              Well, my understanding of Dr. █████ in

21  his Figure 17 is that he uses as a break point not

22  2017 as your -- as your question poses, but,

23  rather, he uses the bit -- the BitLicense, which I

24  believe, given his Footnote 47 on page 27 of his

14:21:06 25  rebuttal report, occurred in 2016.

182

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:21:15   1         And as I mentioned earlier today, all

        2   his alphas -- not the change in alpha, but all his

        3   alphas -- using that as a break point, all the

        4   post-BitLicense alphas -- which, again, is the

14:21:30   5   middle of 2016 -- are statistically insignificant.

        6         So that would be the most direct

        7   response to your question.

        8         Q.   Let me ask this question:  Did you

        9   consider constructing any additional estimation

14:21:42  10   periods beyond the two that you constructed?

       11         A.   No.  I felt that was adequate given the

       12   theory in the complaint which is alleging and

       13   identifying events over this seven-year period.

       14   As I -- as we discussed this morning, I also

14:21:56  15   looked at Dr. ███████ specifications which includes

       16   alphas for the -- not post-2017, but for the

       17   post-2016 period.

       18         Q.   Did you conduct your analysis for Period

       19   1 and then conduct your analysis for Period 2 or

14:22:16  20   did you conduct them at the same time or in the

       21   reverse order?

       22         A.   I don't have a memory of that.  I -- I

       23   do have a memory very early on of wanting to do

       24   the full time period.  That was obvious from the

14:22:30  25   beginning.  And I also have a memory of wanting to

                                                      183

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:22:32  1   include Ether as one of the tokens given its

2   prominence.

3           So my memory is that was my thoughts

4   right from the beginning.  I don't remember the

14:22:44  5   exact order.

6       Q.   Why was it that you wanted to include

7   Ether as a token given its prominence?

8       A.   Well, the trading only occurred in 2015,

9   and so I just thought that was another natural

14:22:55 10   break point.  Also, as I discuss in my opening

11   report, this is a developing market.  It's

12   developing over time.  There's more tokens

13   available in 2015.  And so I thought that time

14   period would be a useful robustness check on the

14:23:14 15   full seven-year period.  So I thought that was

16   helpful to include for those reasons.

17       Q.   Do you know whether your model for

18   Period 2 would produce a similar adjusted

19   R-squared if you excluded or added a few more

14:23:25 20   monthly observations?

21                 MR. KELLOGG:  Objection.

22       A.   I'm not -- I'm not sure what you're

23   referring to by -- what -- I don't -- I guess I

24   don't understand the question.  What -- what

14:23:36 25   observations are you talking about?

184

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:23:37   1          Q.   Let me ask a broader question.

           2               Did you check to see how sensitive the

           3     adjusted R-squared result was for Period 2 to all

           4     of the data inputs that you used?

14:23:50   5          A.   How sensitive the -- I mean, the

           6     adjusted R-squared is a measure of the model and

           7     the fitness of the model for that time period.

           8     So, you know -- and that's the standard statistic

           9     to report in tables like this.  So -- so I felt

14:24:10  10     that that was consistent with standard academic

          11     practice.

          12               If you're referencing -- and I don't

          13     know if you are -- Dr. ████ discussion in his

          14     Figure 3, I'm happy to talk about that.  But in

14:24:24  15     terms of my reporting adjusted R-squares, I felt

          16     this was -- I -- it is the standard academic

          17     practice to do it this way.

          18          Q.   Let's look at paragraph 96 of your

          19     opening report.

14:24:46  20          A.   Yes.

          21          Q.   On page 44 there's a continuation of

          22     paragraph 96.

          23          A.   I'm sorry, can you say that again?

          24          Q.   Sure.  Let me rephrase.

14:24:55  25               If you turn to page 44 --

                                                              185

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:24:57  1        A.    Forty-four.

          2        Q.    -- paragraph 96 concludes on page 44,

          3   but my question is about the regression equation.

          4              Do you see that?

14:25:05  5        A.    All right.  Let me just read the full

          6   paragraph.  Okay?

          7              Okay.  I've reviewed that.

          8        Q.    Okay.  Is the re -- strike that.

          9              Is the regression equation in paragraph

14:25:39 10   96 the equation that you used to perform your

         11   analysis that's described in Section III.C of your

         12   report?

         13        A.    Well, it is used in Section III.  I do

         14   other regressions in Section III as well.  So it's

14:26:20 15   in Section III, but there's other regressions in

         16   Section III as well.

         17        Q.    Fair enough.

         18              Is -- does the equation in paragraph 96

         19   correspond to the regressions that -- the results

14:26:34 20   of which are in Exhibit 3?

         21        A.    Yes.

         22        Q.    Okay.  Looking back at paragraph 96 and

         23   looking at the equation in particular, on the

         24   right side of the equation there's a lower case

14:26:53 25   "a."

                                                                186

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:26:54  1           Do you see that?

        2      A.    Yes.

        3      Q.    That "a" is the alpha, correct?

        4      A.    Yes.

14:26:58  5      Q.    Okay.  Okay.  And reading from the very

        6  end of paragraph 96, the alpha is the "remaining

        7  average return, after accounting for the exposure

        8  to the non-XRP cryptocurrency market factors," is

        9  that right?

14:27:24 10      A.    Well, the alpha plus the error term.

       11  But the -- you know, so just looking at that

       12  equation in paragraph 96, but the error term has a

       13  mean zero.  But -- but, yes.  So that -- the alpha

       14  is on the right-hand side of that equation on page

14:27:39 15  44.

       16      Q.    Okay.  After the alpha term in the

       17  equation on -- in paragraph 96, there's an epsilon

       18  "t."

       19           Do you see that?

14:27:49 20      A.    Yes.

       21      Q.    What is the epsilon "t" on the right

       22  side of the equation?

       23      A.    That is the error term.

       24           THE REPORTER:  I'm sorry,

14:27:57 25           that is the?

                                                       187

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:27:57  1                    THE WITNESS:  The error term.

       2        Q.   Okay.  And does that epsilon "t"

       3   represent the residual return?

       4        A.   No.  I mean, the residual ter -- I mean,

14:28:08  5   if the -- if you include in the full model the

       6   estimated coefficient with alpha, then the epsilon

       7   would be -- well, you just -- I guess -- let me

       8   restart.

       9             The epsilon would be defined by just

14:28:21 10   moving the alpha to the left-hand side in that

       11   equation.

       12        Q.   Okay.  Let me reask my question in part

       13   because I don't understand statistics as well as

       14   you.

14:28:32 15             Is it correct to say that the epsilon

       16   "t" is the residual return in the equation?

       17        A.   I don't want to use that -- I don't want

       18   to -- in terms of the definition of residual, if

       19   you include in your calculation of the residual

14:28:55 20   the alpha, the alpha estimate, then definitionally

       21   you'll be right.  Sometimes people use -- I just

       22   want to be clear.

       23             Sometimes people use the phrase

       24   "residual return" to not include the alpha.  So I

14:29:10 25   think there's a -- semantically people use, in my

                                                          188

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:29:13  1   experience, the phrase "residual return" in

2   different ways.  So I just want to be clear on

3   that.

4           But the alpha is the excess return on

14:29:23  5   average in the return series.  The error term is

6   the error term that you would have in any, you

7   know, kind of a regression.

8       Q.   And when you say "error term," we're

9   talking about epsilon "t," is that right?

14:29:36 10       A.   Yes.

11       Q.   Okay.  Do you address the error term

12   anywhere in your report?

13       A.   Well, the error term is just a standard

14   part of any regression.  So all the results that I

14:29:49 15   have include, you know, a regression with an error

16   term by definition.  You could think about the

17   error term as this bouncing up and down, this

18   volatility of -- that the regression generates

19   when it's generating the coefficients in the

14:30:07 20   model.

21       Q.   What does the error term tell us about

22   the model, if anything?

23       A.   What does it tell us?  I mean, it's just

24   part of the -- you know, if we're talking about

14:30:20 25   OLS regression, ordinary least squares regression,

189

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:30:25   1   it's part of the model that there's going to be an

2   error term in any given period just by func --

3   just by function of the fact that you're trying to

4   fit the data into a line or a slope.

14:30:45   5       Q.   Okay.  I'm looking for an English

6   translation, if there is one, of -- you know

7   how -- we already discussed the adjusted

8   R-squared.  It tells you the percentage in

9   variation of XRP returns that's -- that are

14:30:58  10   explained by the model, right?

11       A.   I do remember that.

12       Q.   Okay.  Is there some -- is there some

13   plain English way to explain to me what an -- what

14   this error term tells us about the model?

14:31:09  15                 MR. KELLOGG:  Objection;

16                 asked and answered.

17       A.   I mean, I don't know what you mean by

18   "tells us about the model."  It's part -- like in

19   an ordinary least squares regression, OLS

14:31:16  20   regression, you're going to have an error term

21   associate -- you know, as part of the model.  An

22   error term left over, so to speak, after the

23   coefficients.  Whether you -- you know, you

24   conclude the alpha in that or not.

14:31:32  25       Q.   Is there any relationship between the

190

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:31:34   1   error term and actual XRP returns?

           2        A.   I mean, the XRP returns are being

           3   regressed on the model that has an error term in

           4   it.  So the actual XRP price returns are on the

14:31:54   5   left-hand side of the equation.  The error term in

           6   the regression's on the right-hand side.

           7        Q.   Is there any -- other than paragraph 96,

           8   is there any paragraph in your report that

           9   addresses the error term in your equation?

14:32:20  10        A.   I'm not sure what you mean by

          11   "addresses."  Everything that I report, whether

          12   it's Exhibit 3, any regression that I use and --

          13   and the regression anybody's using, as far as I

          14   know, in this case, has an error term in it.  So,

14:32:37  15   yes, it is addressed in all my regressions because

          16   that's part of the model.

          17        Q.   Okay.  Let's go to paragraph 102,

          18   please.

          19        A.   I'm sorry, what was that?

14:32:54  20        Q.   Paragraph 102 on page 48.

          21             So the last sentence in paragraph 102

          22   says "As I explain above, a zero regression

          23   constant is consistent with the average monthly

          24   Ripple price returns (less the risk-free rate)

14:33:25  25   being explained by the non-XRP cryptocurrency

                                                              191

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:33:29 1  factors and no remaining average 'excess' XRP

2  price returns that are unexplained by the model."

3          Do you see that?

4     A.   I do.

14:33:36 5     Q.   Okay.  Is the model in that sentence

6  the -- strike that.

7          What are you referring to when you say

8  "the model" in that sentence?

9     A.   The regression that we were talking --

14:33:52 10 well, I'm sorry.  You know, I would -- the models

11 are -- are what's being referred to in the first

12 sentence of that paragraph.  So the first sentence

13 of the paragraph 102 states "The factor models and

14 the corresponding results I present in Exhibits 3

14:34:07 15 through 7" -- I won't read the full sentence.  So

16 that -- that is what is being referenced at the

17 end of that paragraph.

18    Q.   Okay.  And I take it from reading

19 paragraph 102 that your conclusion that there are

14:34:29 20 no remaining average excess XRP price returns that

21 are unexplained by the model is based in part on

22 the zero regression constant that's referenced in

23 the last sentence of paragraph 102?  Is that

24 right?

14:34:43 25                MR. KELLOGG:  Objection.

192

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:34:48  1      A.    Zero -- no.  That's -- the model -- the

2    regression is what we were talking about earlier

3    in the factor model.  The regression that we were

4    talking -- let me just get the actual paragraph.

14:34:58  5          The regression that we were talking

6    about -- well, one of the regressions being

7    referenced here is the regression in paragraph 96,

8    which does have an error term on the right-hand

9    side, which any OLS -- any regression is going to

14:35:14 10    have.  You know, it's going to have this error

11    term in it.

12          You know, my reference to a zero

13    regression constant is just simply a reference to

14    the fact that the constant, or alpha, if you will,

14:35:28 15    is statistically indistinguishable from zero.  I'm

16    not saying that the point estimate in the model is

17    zero.  It's, rather, the point estimate for alpha

18    or the constant, it's statistically

19    indistinguishable from zero.

14:35:44 20      Q.    Okay.  And the -- just to go back to

21    your Exhibit 3, the point estimate in your models

22    for the alpha for Estimation Period 1 is 0.058 and

23    for Estimation Period 2, negative 0.022, is that

24    right?

14:36:07 25      A.    Yes.

193

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:36:13  1      Q.   Okay.  So when -- when you use the
        2  phrase "zero regression constant" in the final
        3  sentence of paragraph 102 --
        4      A.   Let me just get back to that spot.
14:36:23  5      Q.   Sure.
        6      A.   Okay.
        7      Q.   When you use the phrase "zero regression
        8  constant" in the final sentence of paragraph 102,
        9  you are referring, I believe, to your conclusion
14:36:36 10  that the alpha is statistically indistinguishable
       11  from zero, is that right?
       12      A.   Correct.  And I would point you to the
       13  immediately prior sentence to that statement.  "In
       14  other words, one cannot reject the null hypothesis
14:36:52 15  that the constant - the observed average monthly
       16  XRP price return after subtracting the risk-free
       17  rate - is zero (controlling for non-XRP
       18  cryptocurrency market factors)."
       19      Q.   Okay.  And -- and you reached the
14:37:08 20  conclusion, as expressed at the very end of
       21  paragraph 102, that there are "no remaining
       22  average 'excess' XRP price returns that are
       23  unexplained by the model," correct?
       24      A.   Yes.  That is to say, there's no excess
14:37:22 25  returns statistically distinguishable from zero.

                                                        194

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:37:24  1    That is to say, we don't -- one does not observe

2    an extra return that's XRP specific on average for

3    this time period.  That is to say, what shows up

4    as statistically significant in the model are the

14:37:41  5    principal components that reflect what's going on

6    in the non-XRP cryptocurrency markets.

7        Q.   Does your conclusion that no remaining

8    average excess XRP price returns remain that are

9    unexplained by the model depend on anything else

14:38:05 10    other than your conclusion that the alpha in your

11    model is statistically indistinguishable from

12    zero?

13             MR. KELLOGG:  Objection.

14        A.   I am working off of the alpha being

14:38:18 15    statistically indistinguishable from zero.  But,

16    obviously, to reach that conclusion requires a

17    model; requires, you know, all the work that I

18    did.  So I would -- would reference all the work,

19    including Exhibits 3 through 7 that are referenced

14:38:33 20    in the beginning of this paragraph, in -- in

21    thinking about that conclusion.

22        Q.   Is there another result other than --

23    strike that.

24             Is there another result obtained from

14:38:47 25    running your model other than the conclusion that

195

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:38:50  1  the alpha is statistically indistinguishable from

2  zero that informs your conclusion that there's no

3  remaining average excess XRP price returns

4  unexplained by the model?

14:39:01  5          MR. KELLOGG:  Objection.

6      A.   Well, I have a number of exhibits, not

7  just Exhibit 3, that are -- that generate the same

8  conclusion.  That is, there's no statistically --

9  there's no alpha, there's no constant, that's

14:39:18 10  statistically indistinguishable from zero in those

11  other models.  And as we discussed earlier today,

12  Dr. ████████ alternative specifications also

13  generate the same result.

14      Q.   Just for the record, we've talked about

14:39:34 15  the constant in Exhibit 3.  I don't see a constant

16  in Exhibit 4.

17      A.   Well, Exhibit -- Exhibit 4 --

18              MR. KELLOGG:  Objection.  Is

19          that a question?

14:39:46 20              MR. SYLVESTER:  I wasn't

21          done, but --

22              THE WITNESS:  Oh, I'm sorry.

23  BY MR. SYLVESTER:

24      Q.   I'll tell you what.  I just -- what I'd

14:39:50 25  like to see -- we were just discussing the concept

196

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:39:53 1  that you've concluded that the alpha is

2  statistically insignificant -- lost it.

3         Can you say it for me again?  The alpha

4  is statistically indistinguishable from zero.

14:40:07 5      A.   (Indicating.)

6      Q.   Okay.  Great.  Which exhibits does that

7  concept show up in appended to your Exhibit 1?

8      A.   Appended to what?  Exhibit?

9      Q.   Exhibit 1, yeah.

14:40:17 10     A.   Oh.  Well, I mean, you can see that in

11  Exhibit 3.  Exhibit 4 is not a regression.  It's

12  just a listing of the 20 largest cryptocurrencies.

13  So this is descriptive of that.  It's not a

14  regression.

14:40:28 15        Exhibit 5, this is my regression on the

16  largest MarketCap coins.  You see that the alpha

17  or the constant is statistically indistinguishable

18  from zero.

19        You go to my Exhibit 6 and all the

14:40:43 20  different specifications, that's when I'm adding

21  gold and fiat currencies and what have you, all

22  the constant are, likewise, statistically

23  indistinguishable from zero.

24        We go to Exhibit 7.  Now we're in that

14:40:59 25  second estimation period.  And, again, all these

197

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
14:41:03   1   different specifications have the same result;
           2   that is to say, the constant -- the alpha is
           3   statistically indistinguishable from zero.
           4           Exhibit 10.
14:41:16   5           Okay.  Now we're into Exhibit 11A, which
           6   is on page 92.  Once again, in this -- I won't
           7   walk through it now, but the three specifications
           8   I have here, the -- the alpha is statistically
           9   indistinguishable from zero.
14:41:39  10           You go to Exhibit 11B, which is on page
          11   93, that's the second estimation period.  Same
          12   results:  Statistically indistinguishable from
          13   zero.
          14           Exhibit 12A, same result.
14:42:02  15           Exhibit 12B, this is the "Regression of
          16   XRP Returns on Ripple XRP distributions -
          17   Accounting for Volatility, Estimation Period 2."
          18   Statistically indistinguishable from zero.
          19           Exhibit 3 is just -- we're getting into
14:42:23  20   different -- different issues here.
          21           Exhibits 17, 18, 19, 20 are -- and 21
          22   and 22 are the MoneyGram ODL issues.
          23           So I tried to be comprehensive in my
          24   answer, but, you know, those are the exhibits that
14:42:41  25   come to mind in terms of answering your question.
```

198

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:42:47   1        Q.   Okay.  Let's look back at Exhibit 3.

       2             Do you agree, looking at Exhibit 3, that

       3   for Period 1 the average monthly return of XRP was

       4   5.8 percent higher than the average monthly return

14:43:10   5   predicted by the principal components in the

       6   regression during this period?

       7        A.   I don't agree with that in a statistical

       8   sense.  It's -- there is a point estimate that's

       9   positive, but it's statistically indistinguishable

14:43:25 10   from zero.  So as a statistician, as an economet

      11   -- as a financial economist, and this is -- this

      12   would be reflected in standard academic practice,

      13   you would view this constant as statistically

      14   indistinguishable from zero.

14:43:41 15        Q.   You started your answer with "I don't

      16   agree with that in a statistical sense."

      17             Is there any sense in which the answer

      18   is different?

      19                  MR. KELLOGG:  Objection.

14:43:50 20        A.   Well, I agree that there's a point

      21   estimate here, which is positive, it's negative in

      22   the second period, but you just don't take point

      23   estimates.  The point of doing statistical

      24   analysis is whether this is statistically in the

14:44:05 25   data or not.  And as we've been discussing, this

                                                         199

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:44:08   1   point estimate, as is true for the point estimate

2   in Estimation Period 2, the negative 0.022, is

3   statistically indistinguishable from zero.

4       Q.   Given the regression for Period 1, isn't

14:44:25   5   5.8 percent the most likely value of alpha?

6                    MR. KELLOGG:  Objection.

7       A.   I don't think that follows from the

8   regression at all.  So the regression -- the point

9   of doing statistical analysis is whether we can

14:44:40  10   identify on a reliable basis the -- you know,

11   whether a point estimate is statistically

12   distinguishable.  Here, we're testing it against

13   the null being zero.

14            So, again, you know, using -- the point

14:44:55  15   of the statistical analysis is to identify whether

16   an estimate is statistically reliable or

17   statistically present in the data.

18       Q.   Do you base your conclusion that the

19   constant is not statistically distinguishable on

14:45:16  20   the "t" statistics?

21       A.   Well, I ran it on the Huber-White, so

22   there is -- you know, obviously I'm working off of

23   the standard errors to calculate the statistical

24   significance at the 5 percent level.

14:45:30  25       Q.   Do you know how standard errors are

200

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:45:32  1  calculated?

2      A.   Yes, but I'm not going to be able to

3  recall off the top of my head.

4      Q.   Okay.  Would you agree that, all else

14:45:41  5  equal, if the residuals in the regression were

6  smaller, the estimated standard errors would also

7  be --

8                THE REPORTER:  Repeat.

9      Q.   Would you agree that, all else equal, if

14:45:49 10  the residuals in the regression were smaller, the

11  estimated standard errors would also be smaller?

12                MR. KELLOGG:  Objection.

13      A.   I don't know what you mean by

14  "residuals" in your question.

14:46:07 15      Q.   If -- let me reask that question using

16  the phrase "error term."

17                Would you agree, all else equal, if the

18  error term in the regression were smaller, the

19  estimated standard errors would also be smaller?

14:46:20 20                MR. KELLOGG:  Objection.

21      A.   Are you -- you're talking about the

22  error term and not the constant in your question?

23      Q.   That's right.

24      A.   Can you repeat the question?

14:46:31 25                MR. SYLVESTER:  Bridget,

                                                        201

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:46:31  1           would you mind reading that one back?

       2                    (Whereupon, the record was

       3           read back.)

       4                    MR. KELLOGG:  Objection.

14:46:55  5      A.    Yeah, I -- I -- I don't want to answer

       6    that off the top of my head.  I would want to

       7    think about that and go back to the formula.

       8           So what I can say is based on the

       9    standard errors that I actually calculate, this

14:47:10 10    is -- this is what one finds statistically.

      11      Q.    Would you agree that, all else equal, if

      12    the error terms in the regression were all zero,

      13    the estimated standard errors would also be zero?

      14                    MR. KELLOGG:  Objection.

14:47:26 15      A.    I want to be careful.  I want to think

      16    about that.  I don't want to answer the

      17    application of the standard error formula off the

      18    top of my head.

      19           What I can say is based on the standard

14:47:36 20    errors that I actually calculate for this model,

      21    it's not statistically significant.

      22      Q.    What's the "it" in that sentence?

      23      A.    The constant.  The alpha.  So just to be

      24    clear, I calculate the standard errors, the

14:47:53 25    statistical significance, for these various

                                                    202

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:47:55  1    models, these various specifications that I'm

2    running.  And based on those standard errors, the

3    alpha, the constant, is not statistically

4    significant.  Not statistically distinguishable

14:48:08  5    from the -- from zero, which is the null

6    hypothesis.

7        Q.   Are you familiar with the concept

8    economically significant?

9        A.   I've heard that phrase.

14:48:21  10        Q.   Okay.  What is the difference between

11    something that's economically significant and

12    statistically significant?

13                    MR. KELLOGG:  Objection.

14        A.   So the context where I've seen this is

14:48:34  15    somebody finds a statistically significant

16    result -- so they have a point estimate, they find

17    a statistically significant result, and then the

18    question becomes, how big a deal is this?

19            So we find an effect of X on Y or a

14:48:53  20    statistical association of X on Y.  And then

21    the -- and then -- so the person reports the

22    results of their statistical analysis.  There is a

23    statistical relationship.

24            And then the question that one might

14:49:10  25    ask, and sometimes is asked, is, okay, there's an

203

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:49:14  1    association here, but is this economically

2    meaningful?  Is this something that we should care

3    about or how much should we care about it?  So it

4    really goes to the question of magnitude once we

14:49:23  5    are assured that there is a statistical

6    relationship in the data.

7        Q.   Is it possible for a result to be

8    statistically insignificant but economically

9    significant?

14:49:34 10                    MR. KELLOGG:  Objection.

11        A.   That is not -- not -- I would need to

12    see the context of where that claim is being made.

13        Q.   What context would you need to answer

14    that question?

14:49:55 15        A.   I'm really not sure what you're talk --

16    what your question is asking, I guess is what I'm

17    saying.

18        Q.   I'm just talking about the, sort of,

19    conceptual level in economics literature.  If

14:50:05 20    there's a difference between economically

21    significant and statistically significant, is

22    there a possible situation where a result is

23    statistically insignificant but economically

24    significant?

14:50:16 25                    MR. KELLOGG:  Objection.

204

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:50:17  1        A.   I mean, that's a very broad statement

       2   about all of economics.  Again, I would just

       3   repeat my earlier answer.  The context that occurs

       4   to me sitting here about economic significance is

14:50:27  5   really your -- you do data analysis.  You find

       6   that there's a statistical association, so it's in

       7   the data in that sense.  And then you can ask, is

       8   this economically meaningful or how economically

       9   meaningful?

14:50:40 10        So, again, that's the context that comes

      11   to mind, you know, in this -- with regard to this

      12   issue.

      13        Q.   Let's look back at your Exhibit 3.  If

      14   you replaced the insignificant .058 constant with

14:51:06 15   zero, would your model still predict XRP returns

      16   equally well?

      17             MR. KELLOGG:  Objection.

      18        A.   So if I ran a different model, what

      19   would be the outcome?  I would have to run the

14:51:18 20   model.  So if -- so as I understand, your question

      21   is you -- your question is if I put an a priori

      22   restriction on a model, that the intercept term,

      23   the constant term, has to be zero, would it do a

      24   better or worse job?  I don't -- I'd have to think

14:51:35 25   about it.  I don't have a view.

                                                         205

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:51:37  1        Q.   Whether it would be better or worse,

       2    would it be different than what we're looking at

       3    in Exhibit 3?

       4                    MR. KELLOGG:  Objection.

14:51:42  5        A.   Well, if I understand your question

       6    correctly, it would be different in a trivial

       7    sense in that, again, if I understand your

       8    question correctly, your -- in your hypothetical,

       9    you, as an a priori matter, are setting the

14:51:55 10    intercept term, the constant term, to zero.

      11             So that is -- that is different than

      12    what I'm doing, which is I'm interested in whether

      13    there's alpha to begin with.

      14        Q.   Okay.  Let -- let's consider a

14:52:06 15    hypothetical.  So during a given month, a company

      16    announces a new product and, following that

      17    announcement, its share price increases by 50

      18    percent that day.  Later that month the same

      19    company announces it will recall an existing

14:52:20 20    product and, following the announcement, its share

      21    price drops by 50 percent that day.

      22             In that circumstance, the average

      23    monthly return and the alpha are zero, correct?

      24                    MR. KELLOGG:  Objection.

14:52:30 25        A.   That's not actually right.  So I'm going

                                                              206

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:52:32    1   to nitpick here.  In your hypo -- let's call the

         2   price 100.  It goes up 50 percent.  That's 150.

         3   If it falls 50 percent, that's 75.  So the price

         4   doesn't remain the same.

14:52:43    5       Q.   Let's use absolute price terms.  Let's

         6   say -- let's adjust the hypothetical to say that

         7   the price goes from 100 to 120 and then falls from

         8   120 to 100.

         9           In that circumstance, where it's 100 at

14:52:55   10   the start and 100 at the end, would the average

        11   monthly return in alpha be zero?

        12               MR. KELLOGG:  Objection.

        13       A.   Not necessarily.  So in your hypo it's

        14   100 and 100.  I agree with you that in that hypo

14:53:10   15   that's a zero return.  I think we can all -- you

        16   know, I think we can agree on that.  Whether

        17   that's a -- that's related to a negative or a

        18   positive alpha or -- or -- or an alpha that's

        19   statistically indistinguishable from zero is an

14:53:24   20   entirely separate question.

        21           So what if the al -- the -- the

        22   instrument that we're talking about that goes from

        23   100 and stays at 100 at the end of the day is

        24   underperforming the market and it has a beta of 1?

14:53:44   25   So in that situation staying constant would

                                                          207

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:53:48  1    actually result in a negative alpha.

        2             So, again, in response to your question,

        3    whether something has a positive or negative alpha

        4    is a function not just of the price returns of

14:53:57  5    that instrument, but how is it doing relative to

        6    the factors that you have found to be

        7    statistically associated with -- with price return

        8    behavior?

        9        Q.   Let's look back at your paragraph 102

14:54:33 10    again.

       11             MR. KELLOGG:   Sorry, which

       12             paragraph?

       13             MR. SYLVESTER:   102 on page

       14             48.

14:54:43 15        A.   Just give me a second here.

       16        Q.   Sure.

       17        A.   Okay.  I'm there.

       18        Q.   Okay.  Great.

       19             Looking again at the last sentence, that

14:54:51 20    we've now read through a few times together, is

       21    the standard way to measure excess price return

       22    with a constant or -- or is it with the error term

       23    that's left unexplained by the model?

       24             MR. KELLOGG:   Objection.

14:55:11 25        A.   Well, I mean, the error term is going to

                                                              208

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:55:12  1  be, you know -- it's going to be bouncing around,

2  up and down, depending on what the returns are

3  doing that month and what the other factors are

4  doing.

14:55:23  5  The alpha, the constant, is going to

6  give you that average excess return per month.  So

7  it's absolutely standard in the academic

8  literature to look at the alpha.  I think Mike

9  Jensen at HBS, Harvard Business School, had a very

14:55:36 10  famous paper in the 1960s on alpha and there's a

11  long literature on the meaning of alpha since

12  then. I've done some work myself on -- on alpha as

13  a measure of excess returns.

14  So I would say that the academic

14:55:56 15  literature very much supports my focus on alpha in

16  these regressions as a measure of excess returns.

17  Q.  What are the academic papers that you

18  cite in your report that use alpha to measure

19  excess returns?

14:56:17 20  A.  That I would have to go through and take

21  a look at the papers that are cited.  But there's

22  many papers that look at alpha as excess returns.

23  I would mention Gomphers, Ishii, Metrick had a

24  paper in the Quarterly Journal of Economics in

14:56:30 25  2003.  The whole point of their paper is alpha, is

209

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:56:33   1   their excess returns associated with good

2   corporate governance?

3           I've done a paper in Review of Financial

4   Studies where we look at alpha as well.  So

14:56:46   5   there's -- that's just an example on the

6   literature on alpha.

7           Again, alpha as a measure of whether or

8   not you're observing not just bouncing up and

9   down, but is there positive or negative excess

14:57:00  10   returns above and beyond what you would expect

11   based on your factor model that you're deploying?

12       Q.   The two papers that you just cited, did

13   you review them in connection with preparing your

14   expert report in this case?

14:57:15  15       A.   I mean, not particularly.  I mean,

16   this -- these are papers that I've known for --

17   well, the Gomphers, Ishii, Metrick, I knew it as a

18   working paper back in -- these are papers -- and

19   one of which I wrote.  So these are papers that

14:57:28  20   I've known for, you know, a decade or two decades.

21       Q.   Looking back at your --

22       A.   But I do want to just --

23       Q.   Go ahead.

24       A.   -- put a little closure on this.

14:57:40  25           It's absolutely standard in the academic

210

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:57:43  1    literature to view the alpha, to view the

2    constant, as a measure of excess returns, returns

3    above and beyond -- it could be negative or

4    positive -- relative to the factor model that you

14:57:55  5    happen to be deploying.

6        Q.   And other than your article and the

7    Gomphers article, can you think of any other

8    academic literature sitting here today that

9    supports that view?

14:58:05 10        A.   Oh, I mean, there's many papers that do

11    that.  I mean, I just mentioned Mike Jensen's

12    paper in the 1960s that started this whole thing

13    off.  I would have to think more to come up with

14    citations off -- off the top of my head, but, you

14:58:19 15    know, those -- those two papers would all be good

16    starting points.

17            And it's inherent in the model, which

18    is -- right?  You have, in the regression model --

19    going back to paragraph 96, if we go look at the

14:58:32 20    regression model itself, you just think about what

21    the alpha represents.  It represents, you know,

22    this sort of constant effect, if any, above and

23    beyond the -- you know, what's in your factor

24    model.

14:58:54 25        Q.   Let's look again to your Exhibit 3 at

211

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
14:58:57   1    the point estimate of your constant for Period 1.
           2         A.   Yes.
           3         Q.   Okay.  Can we conclude, looking at your
           4    Exhibit 3, with 95 percent confidence that the
14:59:11   5    true constant is in the range of approximately two
           6    standard deviations of .058 in either direction
           7    for Period 1?
           8         A.   I don't want to agree to a specific
           9    confidence interval.  I will say the confidence
14:59:29  10    interval includes the zero.  That is to say
          11    statistically indistinguishable from zero with --
          12    you know, using the 5 percent level of confidence.
          13         Q.   Isn't two standard deviations the
          14    generally accepted method for determining the
14:59:44  15    confidence interval?
          16         A.   Given --
          17              MR. KELLOGG:  Objection.
          18         A.   Depending on your confidence level, yes.
          19         Q.   What's the confidence level expressed in
14:59:51  20    your work in this case?
          21         A.   Five percent.
          22         Q.   Okay.  So is it fair to say, then, that
          23    the 95 percent confidence interval with respect to
          24    the true constant range for .058 would be two
15:00:02  25    standard deviations in either direction?
```

212

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:00:03  1                    MR. KELLOGG:  Objection.

        2        A.   Sitting here today, I believe that's

        3   accurate.  I would want to double-check, but I

        4   believe that's accurate.

15:00:11  5        Q.   What is it that you would want to

        6   double-check?

        7        A.   Well, I would want to make sure, you

        8   know, sitting here, that I'm not misrepresenting

        9   the exact confidence interval.  You know, based on

15:00:22 10   the standard error, you know, this is

       11   statistically indistinguishable from zero; i.e.,

       12   the confidence level includes zero.

       13        Q.   Right.  I guess if I look at -- I'm

       14   trying to figure out -- strike all that.

15:00:37 15             Footnote 2 of your Exhibit 3 says

       16   "asterisk indicates statistical significance at

       17   the 5 percent level."

       18             Do you see that?

       19        A.   I do.

15:00:45 20        Q.   Does that mean that for your results

       21   displayed in Exhibit 3, you used a 95 percent

       22   confidence level?

       23        A.   Yes.

       24        Q.   Okay.  So why is it that you can't say

15:00:58 25   with certainty that the 95 percent confidence

                                                            213

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:01:03   1   interval for the true constant value for your

2   Estimation Period 1 is within two standard

3   deviations on either side of .058?

4               MR. KELLOGG:  Objection.

15:01:14   5       A.   So I believe that's accurate.  All I'm

6   saying is that I would want to double-check that

7   it's two standard deviations.  That's consistent

8   with my memory sitting here, but, you know, I just

9   want to be, you know -- yeah.  So I guess I'll

15:01:27  10   leave my answer at that.

11       Q.   What would you check?

12       A.   Well, I would just want to make sure --

13   you know, I would want to calculate the

14   standard -- the confidence interval, so...

15:01:37  15       Q.   How would you calculate the confidence

16   interval?

17       A.    Well, the confidence interval is a

18   function of the standard error.  The standard

19   error is going to tell you how many standard

15:01:45  20   deviations you have for the confidence interval.

21   If you're asking me to perform the calculation

22   sitting here, I'm not prepared to do that.

23       Q.   Why is it that you're not prepared to do

24   that?

15:01:53  25               MR. KELLOGG:  Objection.

                                                            214

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:01:54  1        A.    Because my report has the standard
        2   error.  It reports the constant.  It reports
        3   whether it's statistically indistinguishable.  I
        4   have all the information in this exhibit that's
15:02:09  5   necessary for the conclusions I draw.
        6             I agree with you that the point estimate
        7   will have an associated confidence interval
        8   associated with it.
        9        Q.    And sitting here today, do you know how
15:02:24 10   to calculate the associated confidence interval
       11   for the constant for Period 1?
       12                  MR. KELLOGG:  Objection.
       13        A.    So I believe it's two standard
       14   deviations.  I believe that's accurate.  But,
15:02:34 15   again, I'm not going to do new work sitting here
       16   in the middle of a deposition.
       17        Q.    Assuming that it is two standard
       18   deviations, what's the calculation that you would
       19   perform to determine what the range of values for
15:02:54 20   the true constant are for Period 1?
       21                  MR. KELLOGG:  Objection.
       22        A.    So I'm not going to do new calculations
       23   sitting here.  So I agree it's two standard
       24   deviations, is my best memory.  I agree that
15:03:05 25   there's a confidence interval, but I'm not going

                                                              215

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:03:08  1    to do a calculation sitting in the middle of -- a

2    new calculation sitting in the middle of a

3    deposition.

4         Q.   Okay.  Setting aside doing the math of a

15:03:16  5    new calculation, just conceptually, can you tell

6    me how you would go about, with words, figuring

7    out what the confidence interval is for the range

8    of true constant values for Estimation Period 1?

9                   MR. KELLOGG:  Objection.

15:03:28 10         A.   I -- I -- I'm going to leave the work

11    that I've done as reflected in the exhibit.

12         Q.   Is that because you don't know how to do

13    it?

14                   MR. KELLOGG:  Objection.

15:03:37 15         A.   I don't want to, you know, off the top

16    of my head say something that's inaccurate.  So

17    I'm not going to do new work in the middle of the

18    deposition.  I'm going to rely on the work that I

19    carefully did over many months.  And so -- and

15:03:52 20    that is what forms the basis for my opinion.

21              Now, I agree with you that my best

22    memory is it's two standard deviations associated

23    with a 95 percent confidence level, or interval,

24    but, again, I'm not going to do new math sitting

15:04:07 25    here.

216

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:04:14  1         Q.   Understanding that you refuse to, could

       2   you?

       3                    MR. KELLOGG:  Objection.

       4         A.   I'm just going to repeat my earlier

15:04:18  5   answer.

       6         Q.   Do you know -- assuming the standard

       7   deviation is -- assuming that you would use two

       8   standard deviations, do you know how to perform

       9   the calculation that would give you the range of

15:04:33 10   values for the true constant for Period 1?

      11                    MR. KELLOGG:  Objection.

      12         A.   I -- I would want to think about it.

      13         Q.   Okay.  You would agree with me that

      14   there -- there is a range of values for the true

15:04:45 15   constant for Period 1, is that right?

      16         A.   Of course.

      17         Q.   Okay.

      18         A.   And that confidence interval, as we

      19   discussed, includes zero.  That's what it means to

15:04:53 20   say that something's statistically

      21   indistinguishable from zero.

      22         Q.   Could the true value of the constant for

      23   Period 1 be as high as 14 percent?

      24                    MR. KELLOGG:  Objection.

15:05:08 25         A.   I don't know offhand.  There will be a

                                                          217

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

15:05:10   1   confidence interval on both sides of the point

2   estimate.  So I agree with that.  So there would

3   be in the confidence interval a number above

4   0.058.  I don't have the exact number.

15:05:25   5        Q.   Okay.

6        A.   But I agree with you directionally that

7   in the confidence interval, there would be a range

8   around the point estimate.

9        Q.   Let's assume -- I'll ask you to assume

15:05:37  10   for the sake of my question that 14 percent is

11   within the range of the true constant for Period

12   1.

13        A.   Sure.

14        Q.   Do you have any more reason to exclude

15:05:47  15   14 percent than you do to exclude zero as the true

16   constant?

17                  MR. KELLOGG:  Objection.

18        A.   So whenever you do statistical testing,

19   you always need -- you always go into the

15:06:01  20   hypothesis.  You don't come up with a hypothesis

21   after the fact.  So the null hypothesis, which is

22   the necessary first step before doing any

23   statistical analysis, is, is it statistically

24   indistinguishable from zero or is the true

15:06:17  25   value -- or conversely, is it statistically

218

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:06:21  1    distinguishable from zero?

2                So that's the null hypothesis that I'm

3    testing for the reasons that we discussed earlier

4    today.  And it -- you know, it turns out to be

15:06:32  5    statistically indistinguishable from zero.

6                Again, there's obviously always going to

7    be a confidence interval associated with any point

8    estimate.

9        Q.   Okay.  Assuming, again, that 14 percent

15:06:45 10    is within the range of values for the true

11    constant for Period 1, is there any statistical

12    reason to think that it's more likely that zero is

13    the true constant than 14 percent is the true

14    constant?

15:06:57 15                MR. KELLOGG:  Objection.

16                MR. SYLVESTER:  Please let me

17            finish.

18        A.   I don't -- I don't agree with that

19    approach at all.  In statistical testing, you have

15:07:05 20    to go into the null hypothesis.  You don't create

21    your altern -- you know, a different hypothesis

22    after the fact.  So the hypothesis being tested

23    here, the reason for the statistical analysis

24    going in, is whether or not the alpha is

15:07:24 25    statistically distinguishable from zero.  That's

219

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:07:26  1    the question that's being answered.  You don't

2    genie up or create a new hypothesis -- i.e., it's

3    14 percent -- after the fact.  I don't think

4    that's a valid approach.  It kind of invalidates

15:07:39  5    the statistical methodology which is you're

6    testing a hypothesis.

7                So I -- I guess I strongly disagree with

8    what I understand your question to be proposing.

9        Q.   I don't think I'm suggesting that you

15:07:54 10    take this approach.  I'm just asking your opinion

11    as an economist and somebody who understands

12    statistics, that if we assume that 14 percent is

13    within the true constant range for Estimation

14    Period 1, can you tell me if it's statistically

15:08:08 15    likelier that the true constant is zero than 14

16    percent?

17                MR. KELLOGG:  Objection;

18                asked and answered.

19        A.   I just don't agree with that approach.

15:08:18 20    That is, the statistics are designed to answer a

21    hypothesis that you have going in.  It does have a

22    confidence interval associated with it, but what

23    I'm testing here, the null hypothesis, sets up the

24    regression analysis that we're doing.  That is to

15:08:32 25    say, can we, at a certain confidence interval,

220

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:08:36  1  reject the hypothesis that the true alpha is zero?

2  So, again, in statistical testing, you

3  have to have a hypothesis going in.  You don't say

4  after the fact, well, now I think it's -- you

15:08:46  5  know, that's -- that's what I'm testing.  I'm not

6  going to change the hypothesis, you know, after

7  the fact.

8  Q.  I totally understand you don't agree

9  with my approach.

15:08:58  10  Are you capable of answering my

11  question?

12  MR. KELLOGG:  Objection.

13  A.  I've answered it the best way I can.

14  Q.  So am I to understand that you're not

15:09:08  15  capable of telling me whether or not it's likelier

16  that the true constant is zero than 14 percent

17  given the parameters of my hypothetical?

18  MR. KELLOGG:  Objection;

19  asked and answered.

15:09:18  20  A.  I agree with you that there's a

21  confidence interval, but the -- but the

22  statistical model is in service of testing the

23  hypothesis.

24  Q.  Okay.  Let's look at Dr. ██████ rebuttal

15:09:44  25  again, Exhibit 6.

221

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
15:09:45   1                    THE WITNESS:  So we've been
           2          going about an hour.  Does it make
           3          sense to take a quick break?
           4                    MR. SYLVESTER:  That's fine
15:09:51   5          by me if it's okay --
           6                    THE WITNESS:  Thanks.
           7                    MR. KELLOGG:  Sure.
           8                    THE VIDEOGRAPHER:  Okay.
           9          Thank you.  The time is approximately
15:09:53  10          3:09 p.m.  We're going off the record.
          11          It's the end of Media 4.
          12                    (Whereupon, a recess is
          13          taken.)
          14                    THE VIDEOGRAPHER:  And the
15:26:55  15          time is approximately 3:26.  We're
          16          back on the record.  This is the
          17          beginning of Media 5.
          18    BY MR. SYLVESTER:
          19        Q.   Professor, are you offering the opinion
15:27:02  20    that because alpha is statistically insignificant,
          21    there is no room for any other factors to explain
          22    the price returns of XRP?
          23        A.   Well, no, I'm not saying that.  So if we
          24    go to my Exhibit 7, for example, you know, I do
15:27:28  25    add other market factors, potential market
```

222

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:27:34  1  factors, after I had my PCA components, to explore

2  whether those additional market factors, such as

3  the S&P 500, have, you know, a statistical

4  association.

15:27:52  5        So -- so, you know, I -- I do leave open

6  the possibility, you know, as reflected in this

7  work, that there's other factors that could have a

8  statistical association which I then explore, you

9  know, in the context of looking at these different

15:28:07 10  factors.

11        Q.   Are there any additional market factors

12  that explain XRP returns?

13        A.   Well, I can only report on the work that

14  I've done.  And so I would reference the factors

15:28:19 15  that I do look at in my report, which obviously is

16  the non-XRP crypto market factors, the S&P 500,

17  the World Index Return, the Emerging Market, the

18  Bloomberg Commodity, gold, dollar, yen, euro.

19        Q.   And as to any other additional market

15:28:47 20  factors beyond the ones that you just mentioned,

21  you didn't examine them, so you can't say one way

22  or another whether they affected XRP price

23  returns, is that fair?

24             MR. KELLOGG:  Objection.

15:28:56 25        A.   The work that I did, the factors I

223

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:28:59   1   looked at are in my report.  What I can say is

2   conditional -- conditional in the pricing effect

3   or association of those factors, there is no

4   excess return so it's statistically

15:29:15   5   distinguishable from zero.

6        Q.   Okay.  But it's -- it's possible -- if I

7   understand your testimony, it's possible to have

8   an alpha that's statistically indistinguishly --

9   indistinguishable from zero and then also have

15:29:35  10   other market factors explain price returns of XRP,

11   is that correct?

12             MR. KELLOGG:  Objection.

13        A.   Well, I mean, I show that in my work,

14   which is there's no excess returns and there's a

15:29:46  15   statistical association between some of these

16   market factors and XRP price return behavior.

17        Q.   Are any of the additional market factors

18   that you identify in Exhibit 7 statistically

19   significant?

15:30:09  20        A.   No.  So once we move beyond the -- the

21   non-XRP cryptocurrency factors, again, consistent

22   with the academic literature, these additional

23   factors, such as commodities, has no

24   statistically significant association.

15:30:37  25        Q.   I think you testified that in your work

224

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:30:38  1   you show there's no excess returns.  I thought

2   what you demonstrated was that there was no

3   average excess returns, is that right?

4              MR. KELLOGG:  Objection.

15:30:48  5      A.   I think you're drawing a distinction

6   that I wasn't making in your -- in your comment.

7   So I would just go back to the report.  The alpha

8   is the excess returns over this time period.

9      Q.   Can you show me where you're reading

15:31:05 10   from, please?

11      A.   Okay.  I haven't found the spot, so give

12   me one second.

13           Okay.  So I would just point to my third

14   bullet point on page 40, as the way I characterize

15:31:46 15   it in the report, where I say "On average, XRP

16   price returns are not statistically different than

17   zero, controlling for cryptocurrency market

18   factors, over which Ripple has no control."

19      Q.   And is that conclusion the same or

15:32:06 20   different from the conclusion that you articulate

21   in paragraph 102, where you say "In each of the

22   Exhibits, 3 to 7, in all columns, none of the

23   constants - which are estimates of the average

24   monthly XRP price" --

15:32:24 25      A.   I'm sorry, I don't -- I don't know where

225

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
15:32:25   1   you're reading from.
           2        Q.   Paragraph 102.
           3        A.   Okay.
           4        Q.   About mid paragraph it starts "In
15:32:29   5   each..."
           6        A.   Yeah.
           7        Q.   Okay.  "In each of the Exhibits, 3 to 7,
           8   in all columns, none of the constants - which are
           9   estimates of the average monthly XRP return after
15:32:39  10   subtracting the risk free rate and controlling
          11   from non-XRP cryptocurrency factors - is
          12   statistically significant at the 5 percent level."
          13        So I guess my question is, is there a
          14   distinction between excess returns and average
15:32:51  15   monthly excess returns?
          16        A.   I'm not drawing that distinction in my
          17   report.
          18        Q.   Why not?
          19        A.   Because I'm referring to the same thing.
15:32:59  20   I'm referring to the constant in my exhibit.  So
          21   the discussions that we've been having is
          22   referring to exactly the same regression.  So
          23   obviously they're referring to the same thing,
          24   which is the alpha, the constant term in these
15:33:15  25   exhibits, such as Exhibit 3.
```

226

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:33:19 1      Q.   Okay.  So let's turn back to the bullet

2   you pointed me to.  I think that was page 40, is

3   that right?

4      A.   I have to find it again.  Yes.

15:33:30 5      Q.   So when you say in the third bullet on

6   page 40 that you read to me that begins with "On

7   average," that's a different way of saying what

8   you're saying in paragraph 102, is that right?

9      A.   I don't know what -- what you mean by

15:33:42 10  "different way."  I -- I am using different words.

11  It's not exactly the exact phrase that I use on

12  page 40.  It's explain -- it's referring to the

13  same alpha estimates in my exhibits.  It's

14  referring to the same thing, which is it's monthly

15:34:02 15  returns -- ergo, the excess return, if any, is

16  going to be a monthly return -- that's going to be

17  reflected in that alpha term in the exhibits.

18      Q.   And would an excess return include the

19  error term in addition to alpha?

15:34:27 20      A.   The excess return that I'm referring to

21  here is the alpha -- is the -- is the alpha in the

22  equation that we looked at earlier.  So let me

23  just go back.

24           So the alpha that's being estimated is

15:34:37 25  the alpha in the regression term on page 43,

227

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 15:34:40 | 1 | paragraph 96. |
| | 2 | Q.   Okay.  Okay.  Let's look at Dr. ███ |
| | 3 | rebuttal report again. |
| | 4 | A.   Okay. |
| 15:35:10 | 5 | Q.   AF-6.  Let's turn to page 14, please. |
| | 6 | Page 14 has a Figure 6 labeled "XRP 28-Day Net |
| | 7 | Return Unexplained by Dr. Ferrell's Model |
| | 8 | (Estimation Period 1)." |
| | 9 | Do you see that? |
| 15:35:41 | 10 | A.   Yeah, I see the Figure 6 heading. |
| | 11 | Q.   Okay.  And then on the next page, |
| | 12 | there's a Figure 7 and that heading is "XRP 28-Day |
| | 13 | Net Return Unexplained by Dr. Ferrell's Model |
| | 14 | (Estimation Period 2)." |
| 15:35:54 | 15 | Do you see that? |
| | 16 | A.   I do. |
| | 17 | Q.   Okay.  Do Dr. ███ Figures 6 and 7 |
| | 18 | show the error term unexplained by your model? |
| | 19 | A.   So the way I'm reading this and the way |
| 15:36:08 | 20 | I understand it is that he's using the predicted |
| | 21 | XRP return.  So I'm interpreting him as using the |
| | 22 | point estimate for the alpha, is my interpretation |
| | 23 | of that second sentence in paragraph 32.  And that |
| | 24 | he's subtracting the predicted XRP return, which I |
| 15:36:26 | 25 | understand him to be using -- I believe he's using |

228

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

15:36:32  1  the point estimate and subtracting the actual

2  return.  And then he's plotting the delta over

3  time.

4       Q.   Okay.  So in your view, do Dr. ████

15:36:43  5  figures have any relationship to the error term in

6  your equation expressed in paragraph 96 of your

7  report?

8             MR. KELLOGG:  Objection.

9       A.   So -- so if he's using, in his predicted

15:36:52 10  XRP return that's referenced in paragraph 32, the

11  point estimate on the alpha, then, yes.  Under

12  that equation in -- on page -- you know, on page

13  44, if I understand what he's do -- what I

14  understand him saying is he's subtracting -- he's

15:37:18 15  moving that alpha over to the left-hand side

16  and -- and, therefore, what remains is the error

17  term.

18        If he's not using the point estimate for

19  the alpha, then it would obviously be the

15:37:28 20  conjunction of the two or the combination of the

21  two.

22       Q.   Did you take any steps to determine

23  whether or not it was possible that unexplained

24  XRP returns -- actual unexplained XRP returns

15:37:43 25  reflected on Figures 6 and 7 were the result of

229

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:37:47   1   Ripple's actions?

2                     MR. KELLOGG:  Objection.

3          A.   Well, I did, in the sense that the model

4   and the various specifications of the model are

15:37:56   5   asking a question:  Is there a monthly excess

6   return over this time period?  Not just bouncing

7   up and down, but is there an average excess return

8   associated with XRP over the -- over the

9   seven-year period or five-year period?

15:38:15  10            So I do think the work that I did in the

11   opening report does address that question.

12   Whether or not the error term is bouncing up and

13   down, you know, that's part of -- any regression

14   model is going to have a error term.  The

15:38:29  15   regression model is identifying this excess return

16   if it exists.

17          Q.   Is the -- strike that.

18            Is the phenomenon of the error term

19   "bouncing up and down," to use your words,

15:38:53  20   reflected in Figures 6 and 7 of Dr. ████

21   rebuttal report?

22                     MR. KELLOGG:  Objection.

23          A.   Well, again, I would go back to my

24   earlier answer and I just don't remember offhand.

15:39:01  25   But if in his predicted XRP return in paragraph 32

                                                        230

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:39:07  1    incorporates the point estimate of the alpha, then

2    under equation -- the equation on page 44 of my

3    report, that would be the error term under that

4    assumption.

15:39:21  5        Q.    Okay.   The last sentence of paragraph 33

6    of Dr. ████ rebuttal report on page 15 --

7        A.    Thirty-three?

8        Q.    Thirty-three.

9              -- says "He" -- that's a reference to

15:39:41 10    you, Professor -- "did not perform any testing to

11    see whether Ripple news or actions coincided with

12    any of these unexplained returns," referring to

13    the returns reflected in Figures 6 and 7.

14              So my question with you is, do you agree

15:39:54 15    or disagree with that statement?

16        A.    I disagree with that statement because

17    the hypothesis that I was testing is the SEC's

18    theory, economic theory, that Ripple took various

19    efforts over the seven-year period -- and also the

15:40:09 20    five-year period -- over the seven-year period

21    that is associated with XRP price going up.   So

22    that is the economic theory that I'm testing,

23    that's the hypothesis that I'm testing, and so I

24    did test for that.

15:40:26 25              The "Ripple news or actions" that he's

231

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:40:29  1    referring to in paragraph 33, you know, I assume

2    that's a reference to the SEC's theory in this

3    case that there's actions and news that Ripple

4    undertook that's affecting the XRP price.  So I

15:40:43  5    most definitely did test that in my factor model.

6         Q.   What in your view explains the

7    phenomenon of "bouncing up and down" -- again, to

8    use your words -- that we see in Figures 6 and 7

9    of Dr. ██████ rebuttal?

15:41:00 10              MR. KELLOGG:  Objection.

11         A.   So in any model, there's going to be a

12    error term.  There's going to -- you're never

13    going to get a perfect fit in a model.  That's not

14    the nature of statistical testing.  But the model

15:41:11 15    can test whether, on average, there's this excess

16    return, whether it be negative or positive,

17    associated with XRP.

18              So that's what the model is identifying,

19    whether there's excess returns associated with XRP

15:41:25 20    over time.  The model does have explanatory power,

21    the adjusted R-squared, if you want to use that

22    metric, but it's never going to be 100 percent.

23         Q.   Professor, a few answers ago you said "I

24    was testing" -- "what I was testing was the SEC's

15:41:58 25    theory, economic theory, that Ripple took various

232

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:42:01  1    efforts over the seven-year period -- and also the

2    five-year period -- that is associated with XRP

3    price going up."

4            Can you point me to the place in your

15:42:11  5    report where you identify the SEC expressing that

6    economic theory?

7        A.   Well, it's the whole basis for why I'm

8    analyzing excess returns, which is the SEC's

9    theory.  So I'm happy to flip through my report,

15:42:31 10    but I talk about the complaint in a number of

11    points.

12            Okay.  So I'm just going to walk through

13    my initial report to give a full responsive answer

14    to this.

15:42:56 15            So in paragraph 7, which is under the

16    title back -- "Brief Background on Litigation," I

17    state in the second sentence "The alleged spec" --

18    well, I should read the full paragraph.  "The

19    SEC's affirmative theory in its complaint for why

15:43:13 20    XRP should be deemed" --

21                    THE REPORTER:  One second.

22            Go ahead.

23        A.   -- "should be deemed an investment

24    contract extensively relies upon its

15:43:23 25    characterization of XRP as a 'speculative

233

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:43:27  1    investment.'"

2            This is -- the next part is the one I

3    wanted to focus on.  "The alleged speculation is

4    supposedly driven by the hope that Ripple's

15:43:34  5    efforts would somehow find a 'use' for XRP at some

6    point in the future, and that XRP's price would

7    rise as a result of those efforts."

8            I have various citations and quotes in

9    the complaint here.  Let me just keep on going

15:43:57 10    through my report.

11            Paragraph 13 in my report, I state "In

12    Section III, I will address the SEC's assertion

13    that 'profit' from 'speculating' on XRP's price

14    increasing would primarily follow as a matter of

15:44:24 15    'economic reality' from Ripple's efforts to manage

16    and develop its business and promoting XRP."

17            So, again, referencing this theory of

18    the SEC that there's actions, events, that is

19    resulting in -- that's associated with Ripple and

15:44:42 20    its -- and its price.

21            Let me just keep going forward.  I'm

22    going to skip over the contract section.

23            Paragraph 83 on page 36:  "The SEC's

24    claim that the economic reality establishes that

15:45:23 25    XRP is an investment contract because market

234

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:45:26   1   actors speculated on XRP's price and, moreover,

2   that Ripple's efforts impacted XRP's price is

3   equally mistaken."  Skipping a sentence.  "Rather,

4   as I will show in Sections III.C and D" -- that's

15:45:43   5   the sections that include the factor model -- "the

6   economic reality is that" -- "is that XRP's

7   long-run price returns are, in fact, associated

8   with factors outside Ripple's control, namely,

9   price returns of non-XRP cryptocurrencies, and

15:45:59  10   that the XRP returns are unrelated to factors

11   under Ripple's control, including the various

12   distributions of XRP mentioned in the SEC's

13   complaint."

14          Paragraph 84.  I'm not going to read the

15:46:14  15   whole thing, but it talks about speculative demand

16   according to the SEC causing XRP prices to rise.

17   I quote from the complaint extensively in Footnote

18   141.

19          Paragraph 90.  I think this -- this is

15:46:34  20   the beginning of my factor analysis, the very

21   first sentence.  "The SEC alleges that Ripple

22   distributed XRP to create profits for themselves

23   and the purchasers in the form of increased

24   prices" -- I italicize that -- "for XRP." I'm

15:46:54  25   citing to the complaint here.

235

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:47:29  1           Paragraph 107 on page 50:  "The SEC also

2  points to various efforts by Ripple that

3  purchasers of XRP allegedly relied upon for an

4  expectation of profit (in the form of increasing

15:47:48  5  XRP's price)."

6           Second sentence of paragraph 108:  "The

7  SEC then points to the increase in the market

8  price of XRP as evidence that Ripple's planned

9  distributions of XRP succeeded."  I quote -- I

15:48:13  10  cite to the complaint.

11           I think at this point in -- in Section

12  E, I'm talking about the -- some -- a different

13  set of issues, aren't related issues, but let me

14  just take a quick look.

15:49:01  15           Paragraph 140, page 67:  "The SEC argues

16  that the fortunes of XRP purchasers depend on

17  Ripple successfully executing their XRP strategy."

18  Citation to the complaint.  "According to the SEC,

19  the success or failure of Ripple's XRP strategy

15:49:22  20  was contingent on Ripple propelling trading of XRP

21  that drives demand for XRP, which will dictate

22  investors' profits (recognized in increased prices

23  at which they could sell XRP) or losses."

24           So just flipping through my report,

15:50:01  25  those are the sections I was able to readily

236

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:50:03  1  identify.

2          Q.   Okay.  Let's turn back to Dr. ███

3  rebuttal report, Figures 6 and 7.

4              Can you exclude the possibility that the

15:50:20  5  bouncing up and down in XRP returns as observed in

6  Figures 6 and 7 occurred because of Ripple's

7  actions?

8                   MR. KELLOGG:  Objection.

9          A.   I can exclude or I can -- I -- I test

15:50:39 10  whether Ripple's actions as identified by the SEC

11  over this time period generated excess returns for

12  XRP.  So that's what I tested.  So I can --

13  that -- that's a question I addressed.

14         Q.   As to any actual XRP price returns

15:51:05 15  unexplained by your model, can you exclude the

16  possibility that those actual returns were because

17  of Ripple's actions?

18                   MR. KELLOGG:  Objection.

19         A.   Again, if the claim is that Ripple's

15:51:20 20  actions caused Ripple's -- caused XRP price to

21  increase over this time period by virtue of the

22  actions and the expectations that those actions

23  caused in the marketplace, I do -- I do address

24  that issue.

15:51:41 25         Q.   Let's assume that all of the unexplained

237

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:51:43  1   XRP returns reflected in Figures 6 and 7 of

2   Dr. ████ rebuttal report were, in fact, the

3   result of Ripple's actions.

4             Would that affect your expert opinion at

15:51:53  5   all?

6                       MR. KELLOGG:  Objection.

7        A.   That's such a -- a fanciful hypothetical

8   I'm having trouble with it.  You know, if that was

9   somehow shown, I -- I would need to think about

15:52:06 10  it, but it strikes me as a -- I'm having a hard

11  time answering the question given the

12  hypothetical.

13            I mean, I would go back to my earlier

14  observation that any regression model is going to

15:52:24 15  have an error term in it; that it's never the case

16  that data fits perfectly along a -- a slope if

17  we're talking about an OLS regression, for

18  example.

19       Q.   If Ripple had affected the long-term

15:52:36 20  price of XRP, is it your view that you would have

21  expected to find a statistically significant

22  alpha?

23                      MR. KELLOGG:  Objection.

24       A.   I think that that view would lead to the

15:52:48 25  hypothesis that there would be a statist -- that

238

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:52:51  1  there would be a alpha.  And the test for that is

2  the statistical test that I undertook.  That is

3  the reliable methodology in the academic

4  peer-reviewed literature for testing a hypothesis

15:53:15  5  that there is alpha.

6      Q.   Okay.  Professor, I want to show you

7  what's been marked AF-21.

8          (Whereupon, exhibit is received and

9  marked SEC Ferrell Exhibit AF-21 for

15:53:37  10  identification.)

11      A.   Should I put this aside?

12      Q.   For now, yeah.  I'll just pass them all

13  to you so you can distribute.

14          So, Professor, I'm going to represent to

15:54:14  15  you that AF-21 are two tables of data obtained

16  from running the Stata programs that create the

17  results of your Exhibit 3 and that you provided as

18  part of your work papers for your ex -- for your

19  expert report.

15:54:27  20      A.   Okay.

21              MR. KELLOGG:  I object to the

22          use of this exhibit.

23              MR. SYLVESTER:  Why?

24              MR. KELLOGG:  Because it's

15:54:34  25          something that you've created separate

239

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
15:54:38   1              and apart from any of the expert
           2              reports.
           3                      MR. SYLVESTER:  That's not
           4              true.  I just represented to Professor
15:54:44   5              Ferrell that this exhibit was created
           6              by running the programs that he
           7              produced as part of -- or that counsel
           8              produced as part of his backup to his
           9              expert report.  This is part of --
15:54:56  10              this is the output of the analysis he
          11              produced to us.
          12                      MR. KELLOGG:  But there's no
          13              way for him to check that in looking
          14              at this sheet of paper.
15:55:03  15                      MR. SYLVESTER:  Well, there
          16              is one way for him to check it.  Let's
          17              see if he's seen the data before.
          18                      May I ask him a question?
          19     BY MR. SYLVESTER:
15:55:09  20         Q.   Professor, I understand you haven't
          21     physically seen AF-21 before today.  Be that as it
          22     may, have you seen the data that's displayed in
          23     AF-21 before today?
          24         A.   Well, I'm looking at the first linear
15:55:26  25     regression and it is the -- you know, I'm just
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:55:28  1    lining it up with the Estimation Period 1.  And,

2    you know, it is the results in that Estimation

3    Period 1, the coefficients and the constant return

4    in that linear regression.

15:55:43  5            I can -- and let me just check the

6    second linear regression here.

7            Same answer.

8        Q.   Okay.  So it's fair to say that you

9    recognize the data displayed in AF-21, the top

15:56:16 10    panel, as the regression output for Period 1 and

11    the bottom panel as the regression output for

12    Period 2?

13                    MR. KELLOGG:  Objection.

14        A.   That -- that appears to be correct.

15:56:26 15        Q.   Okay.

16        A.   Without reproducing it on the spot for

17    myself.

18        Q.   Understood.  We don't have the computer

19    program here with us today.

15:56:38 20            Do you understand -- okay.

21            So turning to Panel 1 first, the top

22    panel, do you see on the right-hand side where it

23    says "Root MSE"?

24        A.   Yes.

15:56:49 25        Q.   Okay.  Do you understand that to be Root

241

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:56:51  1   Mean Square Error?

2        A.    Yes.

3                    MR. KELLOGG:   Objection.

4        Q.    Okay.   Are you familiar with the concept

15:56:56  5   of Root Mean Square Error?

6        A.    Yes.

7        Q.    Okay.   You can see for Period 1 that the

8   Root Mean Square Error --

9        A.    So are we -- are we still looking at the

15:57:06 10   first linear regression?

11        Q.    Yes.

12        A.    Okay.

13        Q.    And I understand the first linear

14   regression to correspond with your Period 1

15:57:12 15   regression, is that right?

16        A.    Yes.

17        Q.    Okay.   So looking at the first linear

18   regression that corresponds with Period 1, the

19   Root Mean Square Error is .53246.

15:57:24 20             Do you see that?

21        A.    I do.

22        Q.    Okay.   That Root Mean Square Error

23   figure means that the typical monthly unexplained

24   XRP price return in the regression for Period 1 is

15:57:34 25   approximately 53.2 percent, is that right?

242

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:57:37  1                    MR. KELLOGG:  Objection.

       2         A.    I think that's correct.

       3         Q.    Okay.

       4         A.    And that -- this is going to, you know,

15:57:44  5  be a function of running the regression and

       6  fitting these values on the -- the PCAs and the

       7  constant term.

       8         Q.    Okay.  Turning now to the bottom panel,

       9  which I understand to be the linear regression

15:57:58 10  employed for Period 2, do you see that the Root

      11  Mean Square Error value is .34178?

      12         A.    I do.

      13         Q.    Okay.  And that means -- that Root Mean

      14  Square Error figure means that the typical monthly

15:58:10 15  unexplained XRP price return in the regression for

      16  Period 2 is approximately 34.2 percent, is that

      17  right?

      18                    MR. KELLOGG:  Objection.

      19         A.    I believe that's correct.

15:58:19 20         Q.    Okay.

      21         A.    Or that would be one -- yes, I believe

      22  that's correct.

      23         Q.    Okay.  Let's turn -- actually, before we

      24  turn to anything else, let me just ask you a

15:58:35 25  question.

                                                                243

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:58:35  1          Do you agree that Ripple's distributions

2  could have an impact on XRP price only if those

3  distributions actually entered the market through

4  trading?

15:58:42  5                    MR. KELLOGG:  Objection.

6      A.    Not necessarily.  So it depends on, you

7  know, the market views about when distributions

8  are -- I mean, it depends -- I would want to know

9  more about market expectations.

15:59:01 10          So certainly one mechanism for

11  distribution to have an effect is -- is the sale

12  of those distributions into the marketplace, but

13  also the effect -- the fact that there is

14  distributions occurring, even if they end up, say,

15:59:17 15  for instance, in a custody account, could

16  potentially affect market pricing as well.  As I

17  explain in my report, you know, increasing supply,

18  all else being equal, could lead to an

19  equilibrium, a lower price.

15:59:32 20      Q.    So if I understand your answer, another

21  mechanism for a distribution to have an impact on

22  prices in addition to trading is if there is

23  market awareness of that distribution, is that

24  right?

15:59:44 25                    MR. KELLOGG:  Objection.

244

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:59:45  1      A.   Right.  So the market views supplies

2  increasing over time, that could affect market

3  pricing, too.  So, you know, you would want to

4  think about expectations.  You would want to think

15:59:56  5  about supply in the marketplace.  So all these

6  things obviously are going to be part of the

7  overall picture in thinking about distributions

8  and the increase of supply that the sales or the

9  distributions can represent.

16:00:14 10      Q.   In your analysis of Ripple's

11  distributions that's set forth in -- in Section

12  III.D of your report, did you check to see if the

13  distributions that you considered were actually

14  used for trades?

16:00:24 15                  MR. KELLOGG:  Objection.

16      A.   I'd have to see what you're referring to

17  in my report.  So should I go to III.D?

18      Q.   Sure.  I don't -- I don't have a

19  specific paragraph citation for you.  I'm just

16:00:37 20  asking a general methodological question.

21      A.   Let me just make sure I have the

22  right -- let me just make sure I have the right

23  section that you're referring to.

24      Q.   Absolutely.  Yeah.  I'm talking about

16:00:45 25  the analysis that you performed that you summarize

245

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:00:47  1    in III.D.

2         A.    Yeah.  So in III.D, as I explain -- let

3    me just get the exact place where I talk about

4    this.  Well, let me go to the exhibits.

16:01:08  5         So in Exhibit -- Exhibit 11A, there's

6    the distributions and lag distributions.  So for

7    the specification where there's distribution or

8    lag distribution, I believe that would encompass

9    56 days.

16:01:32 10         Q.    Okay.  And how does your answer that you

11   just provided relate to my question of whether or

12   not you checked to see whether or not the

13   distributions you analyzed were actually traded in

14   the market?

16:01:42 15         A.    Well, that's not how I'm defining

16   distribution here.  So I define distribution, as I

17   say in my report -- let me just go to the -- is --

18   let me -- I think it's in the appendix actually.

19         So on page C-7 of Appendix C, I define

16:02:36 20   the data distribution and the data.  So I'm now

21   reading the third sentence:  "For transfers

22   involving a reserved or custody account, the date

23   on which the transfer first occurred is used.  I

24   understand this is also consistent with how Ripple

16:02:55 25   reports its data."

246

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:02:56  1                So, anyway, there's a lot more

2    discussion about how the distribution data was put

3    together, but that is one of the definitions of a

4    distribution that I use.  That is to say, moving

16:03:10  5    from Ripple, if Ripple's what we're talking about,

6    to a non-Ripple account, an account under the

7    control of a party other than Ripple.

8         Q.   Mm-hmm.

9              And after that XRP moved from Ripple to

16:03:23 10    a non-Ripple party, did you do anything to -- to

11    determine whether at that point the XRP entered

12    the market?

13                   MR. KELLOGG:  Objection.

14         A.   No, I did not.  In terms of the

16:03:32 15    definition of distribution, whether it's lagged or

16    not, in my analysis, that's how I'm defining

17    distribution.

18              Now, as I said this morning, given

19    Dr. ███████ criticism, which I don't agree with,

16:03:46 20    but I also ran the distribution analysis, as we

21    discussed this morning, using just programmatic

22    and market maker and exchange sales and it doesn't

23    affect the results of my analysis.  So, anyway,

24    that's something that we discussed this morning

16:04:02 25    and I, you know, would raise it again here.

247

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:04:06  1         Q.   Turning to the next sentence after the

       2    one you just read --

       3         A.   Oh, I just closed it.  Okay.

       4         Q.   It's C-7, paragraph 13.

16:04:21  5         A.   Okay.

       6         Q.   You wrote "For example, Ripple may set

       7    up and transfer to a custody account one million

       8    XRP on January 1st, 2015.  The funds may stay in

       9    that account until the relevant non-Ripple entity

16:04:32 10    directs Ripple to withdraw the XRP funds from the

      11    custody account on May 1st, 2015."

      12              Do you see that?

      13         A.   I do.

      14         Q.   As far as you know, are there any market

16:04:43 15    participants except for Ripple and the relevant

      16    non-Ripple party that would be aware of the funds

      17    being transferred to the custody account on

      18    January 21st --

      19                   MR. KELLOGG:  Objection.

16:04:54 20                   THE REPORTER:  You're going

      21         to have to slow down.

      22                   MR. SYLVESTER:  Okay.

      23                   THE REPORTER:  Repeat.

      24    BY MR. SYLVESTER:

16:04:55 25         Q.   As far as you know, are there any market

                                                                    248

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:04:57   1   participants besides Ripple and the non-Ripple

2   party aware of the funds being transferred to a

3   custody account on January 1st, 2015?

4                    MR. KELLOGG:  Objection.

16:05:07   5        A.   Well, this is a -- this is a

6   hypothetical.  Are you assuming -- so if this

7   hypothetical held true, is that -- I'm not quite

8   understanding the question.

9        Q.   Let me reask a different question but

16:05:18  10   same topic.

11                    Did you take any steps to determine, in

12   the circumstances where Ripple transferred XRP to

13   a non-Ripple party, to determine whether or not

14   market participants were aware of the transfer on

16:05:36  15   the date of the transfer?

16                    MR. KELLOGG:  Objection.

17        A.   No.  I don't have a view on that.  I --

18   I do have a view that it's a distribution in the

19   sense that it's going from Ripple to a non-Ripple

16:05:46  20   party, albeit in a custody account, but it's under

21   the control of the non-Ripple party.  And that --

22   that's how I'm defining a distribution; that is to

23   say, the movement of XRP from Ripple to a

24   non-Ripple party.

16:06:13  25        Q.   In paragraph 14 on the next page, C-8,

                                                         249

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:06:17 1    you write "Last, in calculating net distributions

2    for use in the analyses, the record level data

3    were adjusted by:  One, converting values in fiat

4    currencies to XRP (for a small set of the data)."

16:06:31 5    I just want to pause there.

6         What was the small set of the data

7    you're referencing?

8         A.    Let me just read this full paragraph.

9         Q.    Sure.

16:06:54 10        A.    I would have to go back to the data to

11   review it.  I don't recall offhand.

12        Q.    Okay.  Can your model distinguish

13   between the following two possible scenarios of

14   zero monthly net distributions:  Scenario 1, no

16:07:14 15   Ripple distributions of XRP at all during the

16   month; Scenario 2, Ripple bought a lot of XRP at

17   the beginning of the month and then sold back the

18   same number of XRP at the end of the month?

19             MR. KELLOGG:  Objection.

16:07:29 20        A.    So -- let me just go back to my report.

21   I think this goes back to the question of net

22   distributions or net outflows, but I want to get

23   the relevant part of the report.

24        Q.    And if you wouldn't mind when you get

16:07:42 25   there directing me to where you're looking.

250

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:07:44  1      A.    Sure.

       2            All right.  So I'm looking at paragraph

       3    113, page 53.  And I state, in -- in terms of my

       4    analysis, my factor analysis, "First" -- so I'm

16:08:41  5    looking at the second sentence.  "First, I include

       6    Ripple's monthly distribution of XRP, which is the

       7    net outflows of XRP from Ripple over the last 28

       8    days, and, second, I include the one-month lagged

       9    XRP distributions to account for timing

16:08:57 10    differences in XRP distributions."

      11            So the answer to your question is I'm

      12    looking at net outflows --

      13      Q.    Okay.

      14      A.    -- for the 28-day period.

16:09:10 15      Q.    Let me reask my question more precisely

      16    in reference to paragraph 113.

      17            When looking at net outflows of XRP from

      18    Ripple over the last 28 days, does your model

      19    distinguish from a 28-day period where Ripple made

16:09:25 20    no distributions of XRP from a period where Ripple

      21    bought and sold back the same amount of XRP during

      22    the 28-day period?

      23                  MR. KELLOGG:  Objection.

      24      A.    In your hypothetical, the net outflow,

16:09:38 25    if I understand your hypothetical, would be zero.

                                                          251

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:09:41  1      Q.   Okay.  And could your model pick up the

2    difference between those two factual scenarios or

3    would it just be zero in those two cases?

4      A.   So in your hypothetical, the net outflow

16:09:49  5    from Ripple would be zero.  So on net, the supply

6    of XRP in both of your hypos, hypotheticals,

7    didn't increase at the end of the day.

8      Q.   Okay.  So applying your model to both

9    those scenarios, the net monthly outflow would be

16:10:03 10    zero for Scenario 1 and zero for --

11                    THE REPORTER:  You're going

12             to have to slow down.

13      Q.   Applying your model to that

14    hypothetical, the net monthly outflows would be

16:10:12 15    zero for my first scenario and zero for my second

16    scenario?

17                    MR. KELLOGG:  Objection.

18      A.   Correct, because -- well, because the

19    net is zero.  So the net supply of XRP in your two

16:10:27 20    hypotheticals, you know, results in a net increase

21    in supply at the end of the 28-day period of zero.

22      Q.   Okay.  I have another two possible

23    scenarios for you.  Again, hypothetically.  The

24    first scenario is XRP's price does not change at

16:10:45 25    all during the 28-day period, and the second

252

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

16:10:48  1   scenario is that XRP's price declined at the

2   beginning of the 28-day period and rebounded to

3   the same price toward the ends of the 28-day

4   period.

16:10:57  5        Can your model distinguish between those

6   two factual scenarios?

7                MR. KELLOGG:  Objection.

8        A.   So -- okay.  I just want to make sure.

9   We're not talking about distributions now, we're

16:11:05 10   talking about prices?

11        Q.   Yes.

12        A.   Okay.  So in the 28-day window, it's

13   looking at price returns over the 28 days.  So in

14   your situation, if it's 100 in the beginning --

16:11:15 15   just to normalize the price to 100 -- and it's 100

16   at the end, that would be a return of zero for

17   that 28-day increment.

18        So it is correct -- and I'll point to

19   the footnote on this just to be crystal clear.  It

16:11:29 20   will take a second.

21             (Pause)

22        Footnote 163 on page 43.  So that's the

23   specifics about how the 28-day price return's

24   being calculated.  And, again, to answer your

16:12:42 25   question, if the price in the beginning of that

253

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:12:45  1   period, the 28-day period, is the same as the end,
2   that would be a price return of zero.
3       Q.   Okay.  And I just want to make sure I
4   understand.  So there's -- let me pose two
16:12:57  5   different factual scenarios.  One 28-day period
6   using XRP is $100.  It's $100 the entirety of the
7   28-day period.  It's a flat line.
8       A.   Okay.
9       Q.   Second factual scenario, XRP starts at
16:13:10 10   100, it goes up to 120 sometime during the month,
11   it goes back to 100 sometime later in the month,
12   end of the month it's 100.
13          Does your model distinguish at all
14   between the changes -- between those two factual
16:13:23 15   scenarios?
16       A.   The return is the same.  So it is 28-day
17   returns.  So, yes, I am -- you know, as you can
18   see in the formula in Footnote 163, I'm using
19   price Day T plus 28 and I'm using price in the
16:13:42 20   denominator of Day T -- of Day T.  So it is
21   working off of those two prices.  To reiterate,
22   price of Day T plus 28 and price on Day T.  And
23   that's the return that's being used in that 20-day
24   period.
16:13:56 25          So in your hypothetical, as I understand

254

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:14:00  1    it, in both of those hypotheticals, you're setting

2    price Day T plus 28 equal the price Day T in both

3    scenarios and, ergo, it would have the same

4    return.

16:14:17  5        Q.   The -- the return would be zero for both

6    factual scenarios, correct?

7        A.   Yes.

8        Q.   Okay.  Did you have access --

9        A.   Just -- just to comment.

16:14:25 10        Q.   Go ahead.

11        A.   You know, we're talking about returns

12    and then we're -- I just -- the formula in

13    Footnote 163 is in prices that converts it into

14    returns.  So I just want to make sure we're clear

16:14:35 15    that in the hypo we're using prices in our

16    hypothetical and then converting them into

17    returns.

18        Q.   Okay.  Did you have access to daily

19    disaggregated XRP distributions data, meaning

16:14:48 20    inflows and outflows?

21        A.   So the data that we had was

22    multifaceted.  Some of it was on a monthly basis.

23    I would just refer back to the data appendix in

24    all of this and the different data sources because

16:15:03 25    there's a number of different data sources with

255

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:15:05  1  different levels of frequency.  So give me a

2  second here.

3         Yeah.  So, I mean, this gets pretty

4  complicated in terms of the different data sources

16:15:24  5  that were used to construct the -- the -- the

6  flows, the distribution flows, whether they -- you

7  know, at different points in time.

8         And so paragraph -- Section F of my

9  Appendix C, starting on page C-6, walks through

16:15:44 10  some of the -- some of the data sources.  So there

11  is record -- record level data for some of the --

12  the distributions or some of the flows.  There is

13  monthly account balances.

14             THE VIDEOGRAPHER:  Counsel,

16:15:57 15         I'm sorry, I'm getting some

16         interference with your microphone

17         rubbing against your jacket.  Sorry

18         for the interruption.  Thank you.

19      A.   And there's monthly changes in balances

16:16:09 20  that supplement the record level data.

21         So some of the distribution data is

22  monthly and all those data sources were -- were

23  utilized, not just the record level data.

24      Q.   Why was it that you chose to perform

16:16:26 25  your distributions analysis using monthly net

                                                      256

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:16:28   1    data?

2         A.   Well, I mean, there's -- there's two

3    answers to that question.  One is my

4    specification, as we've been discussing, is using

16:16:37   5    a 28-day period.  So the factor model that we've

6    been talking about is using these 28-day periods.

7    So if I'm to incorporate the distributions into

8    the factor model, it's natural to also have it be

9    the same increment of time.

16:16:54  10         The second answer is, and I won't read

11    the de -- the details, but constructing the

12    distribution data was a nontrivial exercise.  And

13    using, in addition to the record level data, the

14    monthly account balances, monthly changes in the

16:17:12  15    balances, was part of the process as well as the

16    record level data.

17         So the data sources have different

18    levels of frequency associated with it.  And --

19    and so that -- that's -- that's, you know, how the

16:17:32  20    data was put together.

21         Q.   Okay.  Are you aware of any academic

22    literature that uses dollar value of net

23    distributions to measure the impact of

24    distributions on a stock price?

16:17:43  25                   MR. KELLOGG:  Objection.

257

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:17:48  1       A.   I don't recall either way.  I would have
        2  to take a look.  I -- yeah.  I just don't have a
        3  specific recollection sitting here.
        4       Q.   Okay.  Was your original distributions
16:18:03  5  data in number of XRP or in dollars?
        6       A.   So I believe a lot of the data was in
        7  XRP.  So we have reserved accounts that are set in
        8  XRP funds.  There is another data source that we
        9  used, you know, in constructing the data.
16:18:20 10            I just want to get the exact language
       11  here.  I know it's here somewhere.  I just can't
       12  find it right away.  Give me a second.
       13            So maybe I'll just point you to the
       14  exhibit where the data's reflected.
16:19:16 15       Q.   Perhaps Exhibit 8?
       16       A.   What's that?
       17       Q.   Perhaps Exhibit 8?
       18       A.   Not quite.  Yeah, so that's not exactly
       19  what I was thinking about.
16:19:25 20            Exhibit 10.  So CoinMarketCap has data
       21  on -- on -- on what they label a circulating
       22  supply.  And so another -- another data source,
       23  going to your question for this, which is
       24  denominated or in -- in XRP, you can see the Y
16:19:53 25  axis here, is CoinMarketCap circulating supply and

                                                            258

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:19:58   1   then we obviously have the XRP distributions in

           2   XRP here.

           3              So I guess two points here.  One is,

           4   it's -- it is in XRP units and it's yet another

16:20:10   5   data source in addition to what I was describing

           6   later that was utilized to make sure that what we

           7   were seeing in the XRP distributions was

           8   consistent with this other source of data; that is

           9   to say, the CoinMarketCap circulating supply.

16:20:28  10   Again, going to your question, that is in XRP.

          11       Q.   Okay.  And to convert the number of XRP

          12   to dollars for purposes of -- of your analysis, I

          13   believe, according to Exhibit 9, Footnote 2 --

          14       A.   Just give me one second.

16:20:47  15       Q.   Sure.

          16       A.   Let me just familiar -- we're skipping

          17   around a lot so let me just take a moment to look

          18   at what you're looking at.

          19       Q.   Sure.  And just to orient us, I'm at

16:20:58  20   Exhibit 9, Footnote 2.

          21       A.   Okay.

          22       Q.   So I read Footnote 2 to mean that for

          23   your distributions analysis to convert the number

          24   of XRP to dollar values, you used, depending on

16:21:29  25   the period of time, CryptoCompare and

                                                              259

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:21:34   1    CoinMarketCap prices, is that right?

2         A.   Yes.

3         Q.   Okay.  In your view, could this

4    conversion from number of XRP distributed into

16:21:44   5    dollar values have introduced inaccuracies in the

6    data since you didn't use actual prices at which

7    the XRP were distributed?

8                   MR. KELLOGG:  Objection.

9         A.   No.  I view this as the market price of

16:21:56  10    the XRP in question.  So I don't view it as

11    inaccurate.

12         Q.   And the -- the price of XRP varied

13    substantially in the period from 2013 to 2020,

14    correct?

16:22:18  15                   MR. KELLOGG:  Objection.

16         A.   Well, it depends on -- you know, are you

17    talking about over a long period of time or are

18    you talking about on a daily basis?

19         Q.   I meant over the -- the entire period,

16:22:30  20    it sort of increased substantially, right?

21         A.   It -- it definitely changes over time.

22         Q.   And -- and fair to say that change in

23    the 2013 to 2020 period is an increase in price,

24    right?

16:22:42  25         A.   Yes.

260

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:22:43  1         Q.   Okay.

        2         A.   And I think we saw earlier the market

        3    cap of -- of XRP, which is not only about price,

        4    but about, you know, the -- the XRP units out

16:22:54  5    there.  But, yes, it did increase in price.

        6         Q.   Okay.

        7         A.   Oh.

        8         Q.   Go ahead.

        9         A.   Let me just -- let me take another crack

16:23:10 10    at my earlier answer, which is the price is

       11    increasing and the supply in the marketplace of

       12    XRP is increasing, too, as we can see in Exhibit

       13    10.  That's -- that's what I was trying to say

       14    with my earlier answer.

16:23:24 15         Q.   Okay.  So -- so that I understand your

       16    distributions analysis, let me introduce another

       17    hypothetical.  And let's use completely

       18    hypothetical price numbers to make the math easier

       19    on me.

16:23:38 20              So let's say in 2015, XRP was trading at

       21    a dollar and Ripple distributed one million XRP.

       22    Using your distributions calculations, you would

       23    convert that to $1 million, correct?

       24         A.   Yes, if that's the price in

16:23:56 25    CryptoCompare or CoinMarketCap, depending on

                                                          261

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:24:00  1   exactly when in 2015 you're talking about.

2        Q.    Okay.  So let's say again, totally

3   hypothetically, in 2018, XRP's price --

4        A.    2018 now?

16:24:07  5   Q.    Yes.

6        A.    Okay.

7        Q.    Totally hypothetically.  XRP's price is

8   $5.  Ripple distributes again one million XRP.  In

9   that case, your distributions figure would be $5

16:24:18 10   million, correct?

11        A.    Yes.  So the -- just to be clear, it's

12   converting to dollars on the date of distribution

13   and it's using the average of the opening and

14   closing price as reported in CryptoCompare.

16:24:31 15   Q.    Okay.  And for both of those

16   circumstances in my hypothetical, Ripple was

17   distributing the same amount of XRP, one million

18   XRP, right?

19        A.    Yes.  I think that's right.

16:24:43 20   Q.    Okay.  Would you agree that the

21   conversion of distributions into dollar values

22   introduces additional variation into the net

23   distributions data that makes it more difficult to

24   detect the relationship between XRP returns and

16:24:53 25   Ripple's actions?

262

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:24:53  1                    MR. KELLOGG:  Objection.

        2        A.   No, I don't agree with that.  I'm --

        3   I'm -- I'm using the market value of the XRP

        4   distribution based on the pricing.  And so I view

16:25:07  5   that as an accurate way to track the -- the

        6   outflows or the net outflows.

        7             But as we discussed earlier today in

        8   response to Dr. ███████ criticism on this score,

        9   not that I agree with it, is I reran the

16:25:29 10   distribution analysis and the -- and the -- and

       11   the -- and how it's measured using XRP units

       12   rather than converting it into the -- into dollars

       13   using market values and it doesn't change the

       14   results.

16:25:58 15        Q.   Is it fair to say that in no place in

       16   your report are you providing an expert opinion as

       17   to Ripple's motivations with respect to any of its

       18   actions?

       19                    MR. KELLOGG:  Objection.

16:26:08 20        A.   Agreed.

       21        Q.   Okay.

       22        A.   I am not, as an economist, opining on

       23   what somebody was thinking, what somebody was

       24   feeling, what somebody thought.  I'm not a fact

16:26:18 25   witness.

                                                          263

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:26:18  1        Q.   Okay.  Let's turn to paragraph 119,

        2   please.

        3        A.   Let me just familiar my -- familiarize

        4   myself with the paragraph --

16:26:39  5        Q.   Sure.

        6        A.   -- for a moment.

        7             Okay.

        8        Q.   The last sentence of 119 says "The cap

        9   on XRP distributions introduced by the escrow is

16:27:25 10   therefore not a binding constraint on the amount

       11   that Ripple can distribute per month."

       12             Do you see that?

       13        A.   I do.

       14        Q.   Can you explain in what way the escrow

16:27:33 15   is not a binding constraint on the amount of XRP

       16   that Ripple can distribute per month?

       17        A.   Well, I'll just refer to the discussion

       18   earlier in that paragraph.  So my understanding of

       19   the escrow is that they can distribute up to one

16:27:47 20   billion per month in XRP.  So that is -- that is

       21   the -- the limit, as I understand it, on the

       22   escrow.  So they can do up to a billion.  They

       23   don't have to do a billion, but they can do up to

       24   a billion as I understand it.

16:28:03 25             And so, you know, in the sentence that

                                                        264

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:28:07  1    begins "I analyzed" on page 55, I'm just simply

2    observing that the monthly ratio, you know,

3    ranged, you know, up to 55.8 percent.  And then

4    for the next time period, it ranged up to 55.9

16:28:27  5    percent.

6             So I'm just making the observation that

7    in the distribution data that monthly limit of one

8    billion wasn't binding because they're doing less

9    than -- less than 100 percent.

16:28:41  10        Q.   Did you calculate the monthly ratio for

11    the years ending 2019 and 2020?

12        A.   I don't recall that offhand.  I do have

13    the distribution net outflows in dollar numbers of

14    Exhibit 9.  I have the monthly net outflows in XRP

16:29:09  15    on Exhibit 8.  So I would reference that for the

16    2019/2020 period.  But, again, this is in XRP

17    units.

18             You see here in that Y axis of Exhibit

19    8?

16:29:24  20        Q.   Mm-hmm.

21        A.   There is a one billion XRP.  And you can

22    just take a look at the net outflows in XRP in

23    Exhibit 8 for 2019 and 2020.  I believe that it's

24    all below that monthly cap of a billion.

16:29:46  25        Q.   Okay.  Let's go back to paragraph 1 --

265

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:29:48   1                    THE WITNESS:  How long have
           2            we been going?  I don't want to take a
           3            break too often.
           4                    MR. SYLVESTER:  It's been
16:29:53   5            about an hour.
           6                    MR. KELLOGG:  A little over
           7            an hour.  Do you want to take a break?
           8                    THE WITNESS:  Yeah.  Maybe --
           9            I hate keeping people here in the
16:29:59  10            evening, but maybe a break.
          11                    MR. SYLVESTER:  It's fine by
          12            me.
          13                    THE VIDEOGRAPHER:  Okay.
          14            Thank you.  The time is approximately
16:30:02  15            4:20 -- make that 4:30.  We're going
          16            off the record.
          17                    (Whereupon, a recess is taken)
          18                    THE VIDEOGRAPHER:  And the
          19            time is 4:50 p.m.  We're back on the
16:51:00  20            record.
          21    BY MR. SYLVESTER:
          22        Q.   Professor, are you familiar with the
          23    term "liquidity premium"?
          24        A.   I believe so in the sense of a
16:51:15  25    premium -- a potential premium for liquidity.  So

                                                                  266

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:51:18  1    in that general sense, yes.

2         Q.   Okay.  What is your understanding of the

3    term "liquidity premium"?

4         A.   So the way I just defined it is the idea

16:51:29  5    that, all else being equal, a more liquid asset

6    can have more value than an illiquid asset, all

7    else being equal.

8         Q.   Okay.  Are you aware of any economics

9    literature that suggests that digital assets are

16:51:41 10    not subject to a liquidity premium?

11        A.   No.

12        Q.   Okay.  Did you do any testing in this

13    case to determine whether XRP's listing on any new

14    digital asset platform had any impact on XRP's

16:51:55 15    price?

16        A.   Yes, in -- in -- in the sense that I --

17    I framed the hypothesis that I tested earlier,

18    which is the net effect of the actions that the

19    SEC identifies, which includes listing on

16:52:11 20    exchanges, did not have a statistically

21    significant excess return.

22        Q.   Other than the testing that you just

23    mentioned, did you do any additional testing to

24    determine whether XRP's listing on any particular

16:52:25 25    digital asset platform had any impact on XRP's

267

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:52:27 1    price?

2                     MR. KELLOGG:  Objection.

3         A.   So the work I did is reflected in -- in

4    those regressions.

16:52:41 5         Q.   Okay.  Over the period of 2013 to 2020,

6    has Ripple sold XRP every year?

7                     MR. KELLOGG:  Objection.

8         A.   So in your question you used the word

9    "sold."  What I can talk about is distributions in

16:53:04 10   the way that I defined it, and we were discussing

11   earlier.  So I think the most responsive answer to

12   your question would be Exhibit 8, which is the net

13   outflows from Ripple.  And this is denominated in

14   XRP and -- anyway, you can see the -- the net

16:53:29 15   outflows over time.

16        Q.   You also reviewed Ripple's financial

17   statements from 2014 to 2020, is that correct?

18        A.   Yes.

19        Q.   Okay.  Do you recall from that review

16:53:43 20   whether Ripple sold XRP each of those years?

21        A.   I don't have a specific recollection.

22   You know, I do track -- I do track outflows from

23   Ripple and that's reflected in Exhibit 8 and

24   Exhibit 9, as well as Exhibit 10.  So that's --

16:54:03 25   that's the work I did, again, in the context of

268

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:54:06   1    distributions based on the data sources that we

           2    discussed earlier.

           3         Q.   Okay.  Let's -- so -- strike that.

           4              Do you have any sense, let's say just

16:54:24   5    for 2020, how frequently Ripple sold XRP?  Daily?

           6    Weekly?  Monthly?

           7         A.   You keep -- you keep using the word

           8    "sold."  So I'm -- I'm looking at distributions,

           9    which obviously include sales, and Exhibit 8 does

16:54:40  10    have data for 2020.

          11              So, again, in terms of net outflows, you

          12    know, I would again go back to my Exhibits 8 and

          13    9.

          14         Q.   Okay.  And remind me, Professor, how you

16:54:59  15    define outflows for purposes of Exhibit 8.

          16         A.   It's exactly the net outflow -- net

          17    distribution outflows that we were talking about

          18    earlier.

          19         Q.   Okay.

16:55:11  20         A.   So there's various data sources that

          21    went into that, including monthly account data,

          22    record level -- record level data, checked against

          23    CoinMarket circulating supply.  So rather involved

          24    construction.  "Involved" in the sense of multiple

16:55:31  25    data sources to construct what's reflected in

                                                              269

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:55:36  1    Exhibit 8 and Exhibit 9.

2         Q.   Okay.  Let -- let's go to paragraph 141

3    of your report, please.

4         A.   Let me just -- give me a minute to get

16:56:07  5    the context of the paragraph.

6         Q.   Sure.

7              (Pause)

8         A.   Okay.  I've -- I've reviewed that

9    section.

16:56:46 10         Q.   Okay.  The first sentence, you'll see it

11   says "There was no pooling of the funds."

12              Do you see that?

13         A.   I do.

14         Q.   By "funds," do you mean XRP or dollars

16:56:54 15   or something else?

16         A.   I'm referring to pooling of funds by

17   investors that are then going to be used for the

18   purposes of increasing profits or earnings that

19   then are -- the benefits of which are then going

16:57:14 20   to be shared for the contributors to the pool.

21         Q.   Okay.  And the -- the sentence "There

22   was no pooling of the funds" is in passive voice.

23              Who was it that was not doing the

24   pooling in your view?

16:57:29 25         A.   Well, again, in part, this is a

270

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:57:32  1   reference to the earlier discussion of the

2   contracts and was there pooling of funds in an

3   enterprise with then some kind of claim on those

4   funds and some kind of promise, increased profits

16:57:46  5   or earnings.

6       Q.   Okay.  And I want to go back to your

7   previous answer where you said you were referring

8   to pooling of funds by investors.

9            Are you talking about sales of XRP?

16:58:00 10   Like, I want to locate this in the facts of this

11   case.  When you say there was no pooling of the

12   funds, do you mean funds that XRP purchasers paid

13   to receive the XRP?

14                MR. KELLOGG:  Objection.

16:58:16 15       A.   No.  I mean -- again, you know, maybe

16   it's helpful to go to the -- the next paragraph.

17   142 I think helps elucidate what I'm -- I'm

18   talking about here, which is that there's not a

19   pooling of funds by investors who receive the XRP

16:58:33 20   where those investors now have some sort of right

21   to enjoy the benefits of that pooling as a result

22   of -- of that relationship.

23            So, again, I think what I'm talking

24   about 141 is elucidated by -- you know, is clar --

16:58:54 25   you know, elaborated upon in paragraph 142.

                                                    271

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:58:59  1          Q.   Are you expressing an opinion in this

       2     case that Ripple did not pool funds it received

       3     from its sale of XRP?

       4          A.   I'm not providing that opinion.

16:59:10  5          Q.   Okay.  Turning back to paragraph 141,

       6     you'll note, Professor, there's not a citation.

       7               Can you tell me where you --

       8          A.   I'm sorry, I -- what paragraph are we

       9     on?

16:59:29 10          Q.   141.

      11          A.   Okay.

      12          Q.   There's not a citation in that

      13     paragraph.

      14               Can you tell me how -- how or where you

16:59:34 15     obtained the information for -- in paragraph 141?

      16          A.   Well, 141, as I explained, is elaborated

      17     upon in 142.  So it referenced back -- it

      18     references back to my economic analysis of the

      19     substance of the contracts we viewed in Section II

16:59:52 20     and then it also references the factor model in

      21     Section III.  So, again, it's referencing that

      22     earlier work that I did in separate sections of

      23     the report.

      24          Q.   Okay.  So let me just ask specific to

17:00:11 25     the sentences.  You write "Specifically, Chris

                                                          272

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:00:14  1   Larsen, Jed McCaleb and Arthur Britto collectively

2   held the remaining 20 billion XRP units and gave

3   80 billion XRP units to Ripple."

4            Where did you get that information?

17:00:26  5       A.   The 20 billion and 80 billion?

6       Q.   The contents of that sentence.

7       A.   So that's my understanding.  I believe

8   it's in the distribution data, this 20 billion/80

9   billion.  That's -- that sentence, that second

17:00:35 10  sentence, is my understanding of the -- of the

11  basic facts of this case; that there's a total of

12  100 billion XRP units, 80 billion with Ripple and

13  then later obviously there's an escrow account

14  for -- involving XRP.

17:00:56 15          So that second sentence is -- you know,

16  is my understanding of sort of the basic

17  background facts of the case, but the analysis

18  is -- you know, I would point to paragraph 142,

19  which invokes work that I did in earlier sections

17:01:13 20  of the report.

21       Q.   Turning to the last sentence of 141, you

22  write "Furthermore, Chris Larsen, Jed McCaleb, and

23  Arthur Britto did not pool their XRP holdings and

24  were free to behave independently from each other

17:01:24 25  and independently from Ripple."

273

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:01:26   1          Do you see that?

          2      A.   I do.

          3      Q.   What is your basis for that sentence

          4    that I just read?

17:01:30   5      A.   So when you look at the distribution

          6    data and the exhibit, Appendix C, you know, the --

          7    the distribution data from Ripple, the outflows

          8    from Ripple, it is not incorporating these

          9    individuals and what they decide to do with

17:01:48  10    their -- their XRP.

         11          And there might be something -- just

         12    give me one second here.

         13          (Pause)

         14          And I would also reference in the

17:02:23  15    context of this discussion Footnote 54 on page 15

         16    in my report, where I say -- and now I'm just

         17    reading from the report -- "I was informed by

         18    counsel that distributions by Founders and the

         19    bounty program identified in the complaint are

17:02:41  20    outside the scope of my assignment."

         21          So I would -- and then there's a

         22    citation to the complaint referencing the -- you

         23    know, the -- with a reference.  So, anyway, you

         24    know, I would also point to that -- that

17:03:05  25    definition of my assignment.

                                                              274

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:03:06  1        Q.   Did you have distributions data for

2    Mr. McCaleb or Mr. Britto?

3        A.   It was just something I wasn't focused

4    on.  I -- I don't recall offhand if that's in the

17:03:18  5    distribution data or not.  I mean, the

6    distribution data that I was using is reflected in

7    the appendix.  So I'll just go back to that.  Give

8    me one moment.

9             So, you know, for the distribution

17:03:31 10    data -- and now I'm on page C-6 of my appendix.

11    And, you know, I'm talking about the monthly

12    account balances for Ripple's accounts and sort of

13    how -- and, also, I'm looking at the financial

14    statements of Ripple.

17:03:53 15             So those data sources are about Ripple's

16    distributions.  My understanding of that is that

17    doesn't include what these individuals

18    independently might be doing.

19        Q.   So how is it that you formed the

17:04:06 20    conclusion that they did not pool their XRP

21    holdings and were free to behave independently

22    from each other and independently from Ripple?

23        A.   So that's my understanding of the

24    background, which is the individuals are separate

17:04:18 25    entities, so to speak, from Ripple.  They're in --

275

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:04:22  1    I mean, I don't -- that Ripple's distribution data

2    and how it dealt with its XRP, how it dealt with

3    the escrow account, were issues for Ripple.

4    There's nothing in the Ripple distribution data

17:04:39  5    that has anything, in my memory, about, well,

6    we're going to tell this or that individual what

7    to do with their own separately owned XRP.

8          So the distribution data that I had

9    about Ripple was about their XRP.  I don't recall

17:04:55 10    offhand that Ripple was treating their holdings as

11    part of their holdings for purposes of these

12    different data sources such as Ripple's monthly

13    account balances.

14    Q.    Other than whatever access to Ripple's

17:05:12 15    distribution data that you had, do you have any

16    other basis for the statements you make in the

17    third sentence of paragraph 141?

18    A.    Well, as I said, the -- the -- that

19    first sentence in paragraph 141 -- you know, 141

17:05:37 20    more generally, is elaborated upon in 142, which

21    is invoking earlier work with the academic and

22    data sources that I use there.

23          The fact that XRP had 80 billion and

24    these individuals had 20 billion is just a basic

17:05:56 25    understanding of the facts of the case.  I didn't

276

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:05:58  1    understand that to be at issue.  It is my basic

2    understanding.  And of course the 80 billion is

3    reflected in that Ripple data that I did use for

4    the construction of -- of the distribution data.

17:06:13  5        Q.    And my question is, how did you obtain

6    the understanding that Mr. Larsen, Mr. McCaleb and

7    Mr. Britto did not pool their XRP holdings and

8    were free to behave independently from each other

9    and independently from Ripple?

17:06:26 10        A.    I gave you the -- the answer, the basis

11   for that, which is the Ripple -- how Ripple

12   treated its XRP.  My recollection is that the

13   private holdings of these individuals was not

14   treated as Ripple XRP for those purposes, for the

17:06:45 15   distribution purposes.

16             My understanding is that they had 20 and

17   Ripple had 80.  That's a basic background

18   understanding of the facts of the case.  And

19   that -- I guess the last thing I would add is that

17:07:02 20   they're individuals who own the XRP and, you know,

21   didn't have -- my understanding, and I haven't

22   seen anything to the contrary, that Ripple somehow

23   owned or controlled the 20 billion that they had.

24             So, again, part of this is just sort of

17:07:21 25   basic background to the case; that is, the 80 and

277

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:07:24  1  20 billion division.  I would also reference the

2  Ripple treatment of XRP and its internal data and

3  the data sources that are used.  And then,

4  obviously, the work that is referenced in

17:07:37  5  paragraph 142.

6      Q.   I'm struggling to see how any of the

7  data sources you just named would inform you as to

8  what Mr. Larsen, Mr. McCaleb and Mr. Britto

9  actually did with their XRP holdings or were free

17:07:53 10  to do with their XRP holdings.

11          Can you identify any data sources that

12  you have with respect to Mr. Larsen, Mr. McCaleb

13  or Mr. Britto's combined actions with respect to

14  their XRP holdings?

17:08:04 15                MR. KELLOGG:  Objection.

16      A.   So as I mentioned before, I explicitly

17  state in Footnote 54 that the distribution by the

18  founders identified in the complaint are outside

19  the scope of my assignment.  So it is true that I

17:08:26 20  did not analyze the distributions of these

21  individuals; rather, I was focused on the

22  distributions of Ripple.

23          So part of this has to do with the scope

24  of my assignment.

17:08:40 25          Now, I -- I do want to add -- obviously

278

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:08:45  1   I do, in my rebuttal to Mr. ███████ I do talk

2   about some hop analysis and that does get into a

3   set of issues there.  But here, in this initial

4   report, I don't claim to be doing a distribution

17:09:00  5   analysis by -- let me just go back to the relevant

6   paragraph -- by Mr. Larsen, McCaleb or Britto.

7       Q.   Okay.  Let's move to paragraph 143,

8   further down on the page.  The second-to-last

9   sentence is "In fact, a majority of XRP are not

17:09:22 10   purchased directly from Ripple but are traded

11   anonymously at the cryptocurrency exchanges."

12           Do you see that?

13       A.   I do.

14       Q.   Is that statement true for the entire

17:09:34 15   period of 2013 to 2020?

16       A.   Give me one moment.  I just want to

17   check one more thing and I'll get back to you to

18   get to the relevant -- we're skipping around in

19   the report a little bit.

17:10:40 20           So, yeah, as I discuss in my report, I

21   do agree that the trading volume was definitely

22   lower earlier in the time period, you know.  And I

23   would reference here Exhibit 14 on page 97 where I

24   talk about the number of exchanges.  You know,

17:10:58 25   there's a little bit of a bump in 2015 and then it

279

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:11:03  1    starts, you know, to visually -- 2017 it starts to

2    go up at a -- at a -- at a decent pace.

3              You know, if you look at, you know,

4    trading volume, which is reflected in velocity on

17:11:25  5    Exhibit 15 -- so, again, velocity is being defined

6    as trading volume divided by the circulating

7    supply.

8              It is true in the early period it is low

9    in that Exhibit 15 and picks up around, you know,

17:11:39 10    starting at 2016 or so.  Yeah, so I definitely

11    agree earlier in the period the trading volume is

12    lower, significantly lower.  The -- listing on

13    exchanges or exchange trading is -- is definitely

14    lower.

17:11:58 15        Q.   And was it true earlier in the period

16    that a majority of XRP were not purchased directly

17    from Ripple?

18        A.   What paragraph are we on again?

19        Q.   143, the second-to-last sentence.

17:12:16 20        A.   Yes.  So this is -- this is -- this is a

21    statement about looking at it over the entire

22    period.  And, obviously, in the last sentence of

23    143, in particular the later period.  So I'm not

24    making that representation about trading

17:12:32 25    anonymously for cryptocurrency exchanges confined

                                                          280

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:12:36  1   to 2013 or 2014.

2       Q.   Okay.  Let's go back to the pooling of

3   funds in 141.

4       A.   Yes.

17:12:45  5       Q.   I want to make sure I understand your

6   testimony.

7            When you say there was no pooling of the

8   funds, are you referring to people's holdings of

9   XRP?

17:12:53  10      A.   Well, again, 141 is talking about the

11  pooling of funds.  And then the next, you know,

12  two sentences in that paragraph are talking about

13  these three individuals that own 20 billion XRP,

14  20 percent of the total supply, and that their --

17:13:14  15  their holdings of XRP are separate from that of

16  Ripple.  So that's point one.

17           And then point two would be the other

18  issues that I reference in paragraph 142 that is,

19  again, referencing work that I had done earlier.

17:13:38  20      Q.   Okay.  So with respect to the reference

21  to pooling of funds in 141, you're referring to

22  Mr. Larsen, Mr. McCaleb and Mr. Britto's funds, is

23  that right?

24      A.   Well, as -- as the sentence says, they

17:13:53  25  have 20 billion of XRP.  My understanding is that

281

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:13:57  1   was not treated as part of Ripple's XRP.  That is,

2   it was treated, at least in the data that I saw in

3   the distribution sources, that these are treated

4   as private holdings by these individuals.

17:14:12  5          So in that sense, there's no pooling in

6   the sense that they have XRP and are -- are

7   independent of -- of XR -- are independent of --

8   forgive me, what was the question again?  I got a

9   little distracted.

17:14:33  10       Q.   It's okay.

11          Let me reask it because -- strike that.

12          When you write "There was no pooling of

13   the funds" in your first sentence of 141, are you

14   referring to Mr. Larsen's, Mr. McCaleb's and

17:14:54  15   Mr. Britto's XRP?

16       A.   Yes, in part, but I also then talk about

17   the issues in one -- in paragraph 142.

18       Q.   And -- and will you explain to me, if

19   there is another meaning of "there was no pooling

17:15:10  20   of the funds," other than reference to

21   Mr. Larsen's, Mr. McCaleb's and Mr. Britto's XRP,

22   what is that other meaning?

23       A.   Well, there's a broader discussion now

24   in paragraph 142 about, you know, the operation of

17:15:25  25   Ripple and whether any XRP, any XRP purchases,

282

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:15:30  1   create a pooling of funds where there's been a

2   contractual obligation on the part of Ripple to

3   expend efforts, a contractual obligation on the

4   part of Ripple to increase XRP's price, a

17:15:44  5   contractual obligation to share in any profits

6   from the management of the enterprise.

7       Q.   Okay.  Let's move to paragraph 144 on

8   the next page.

9       A.   So just give me a moment to situate

17:16:04 10   myself.

11       Q.   Sure.

12           (Pause)

13       A.   Okay.

14       Q.   Okay.  The first sentence of paragraph

17:17:17 15   144 says "Some parties that received XRP directly

16   from Ripple sell rather than hold XRP."  And the

17   second sentence, "For example, market makers use

18   their XRP to quote bids and offers, and improve

19   market liquidity," and it goes on to talk about

17:17:33 20   ODL customers.

21           My question is, isn't it true that

22   Ripple employs market makers to sell XRP

23   programmatically on its behalf?

24       A.   There -- there is programmatic sales on

17:17:47 25   behalf of Ripple, is my understanding.  And I

283

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:17:52  1   would reference back to my discussion of various

2   contracts, including the section on programmatic

3   sales.  Let me just get the exact section here.

4           So I would reference you back to --

17:18:12  5   well --

6       Q.   One place --

7       A.   Well, paragraph 42, page 18, I state

8   "Ripple also entered into contracts with

9   programmatic sellers," and then I -- I have some

17:18:26 10  discussion of that, including GSR.  I also, in

11  paragraph 46, on page 20, talk about market

12  makers.

13          So, yes, there is programmatic --

14  contracts governing programmatic sales.

17:18:44 15      Q.   Okay.  And in those contracts governing

16  programmatic sales, Ripple is employing, for

17  instance, GSR to sell XRP on its behalf, correct?

18      A.   That's my understanding.  And, you know,

19  I would reference paragraphs 43 through 45 where I

17:19:01 20  believe I talk about that particular issue.

21      Q.   And do you have a sense over what period

22  of time Ripple employed GSR to sell XRP

23  programmatically on its behalf?

24      A.   I do -- I do -- we -- I did -- I'm

17:19:16 25  trying to remember the dates.  You know, I know

284

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
17:19:19   1   that in 2017 -- and, obviously, Dr. ███████

           2   report is focused on programmatic sales by GSR.

           3           Give me one second here.

           4           So I'm returning to my rebuttal report

17:19:36   5   where I discuss -- I think I have that data there.

           6   It's in the latter period, I think, including

           7   2017, but let me give you a specific answer.  This

           8   may take a moment.

           9           Yeah.  So back -- yeah, in 2016 and 2017

17:20:06  10   there's GSR activity.  Let me just make sure

          11   there's nothing else I want to say on this.

          12           (Pause)

          13           Yeah.  So just to elaborate on my

          14   earlier answer.  So that -- was the question is

17:20:40  15   Ripple using GSR?

          16       Q.   Do you have a sense over what period of

          17   time Ripple employed GSR to sell XRP

          18   programmatically on its behalf?

          19       A.   Okay.  So in terms of GSR when it was

17:21:18  20   active, you know, I would reference Exhibit 6B in

          21   my rebuttal.  Now, this includes acting for

          22   non-Ripple entities, including Mr. Larsen.  So I

          23   believe it's 2017 is my best recollection.  The

          24   contract that I reference between Ripple and GSR

17:21:38  25   in my report is dated June 2nd, 2017.
```

285

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:21:45   1          Q.   Do you know if Ripple ever stopped
           2   employing GSR to sell XRP on its behalf?
           3          A.   Stopped employing GSR.  I know there's a
           4   termination provision with the GSR programmatic
17:22:00   5   contract that I talk about in the report,
           6   paragraph 44, but I don't know if that was, in
           7   fact, terminated or not.
           8          Q.   Okay.  Let's move to the first sentence
           9   of paragraph 145 in the same section.
17:22:13  10          A.   Oh, I'm sorry.  Just to give a complete
          11   answer, there's also a contract in 2019 with GSR
          12   and Ripple that I reference in paragraph 49
          13   actually dated July 1st, 2019.  And this is using
          14   GSR as a -- as a market maker.
17:22:33  15          Q.   Okay.  Let's turn to paragraph 145.  The
          16   first sentence says "In contrast, Ripple holds XRP
          17   over a long-term horizon."
          18               Do you see that?
          19          A.   I do.
17:22:44  20          Q.   What do you mean by "long-time horizon"?
          21          A.   I would reference here the net outflows
          22   from Ripple reflected in Exhibit 8.  And we look
          23   at this later time period, you know, we see
          24   distributions far less than a billion in a month.
17:23:15  25   We looked at the net outflows in dollar amounts

                                                                286

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:23:19   1   reflected in Exhibit 9.

2           So I would reference that data for the

3   proposition that -- that Ripple is holding XRP for

4   long periods of time, multiple years.  It is,

17:23:34   5   obviously, engaged in net outflows, but it's

6   far -- it's just a fraction in any given month of

7   the total holdings.

8       Q.   Okay.  But at least according to your

9   Exhibit 9, it is engaged in net outflows at least

17:23:50  10   from late 2013 to late 2020, is that fair?

11                MR. KELLOGG:  Objection.

12       A.   That is fair.  So the monthly net

13   outflows from Ripple, there is a little bit of

14   blue early on denominated in U.S. dollars.  And

17:24:11  15   the net outflows in Exhibit 9 are -- at least when

16   denominated in dollars, is larger in the later

17   period.

18           Now, when we look at the XRP units, you

19   don't see that spike in the later period looking

17:24:29  20   at Exhibit 8.

21       Q.   And turning back to paragraph 145, the

22   same sentence, "In contrast, Ripple" --

23       A.   One second.  Let me just get there.

24       Q.   Sure.

17:24:41  25   A.   Okay.

287

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:24:41  1     Q.   Same sentence.  "In contrast, Ripple

        2  holds XRP over a long-term horizon."

        3          When you write "In contrast," are you

        4  contrasting Ripple with other market participants

17:24:52  5  who hold XRP?

        6     A.   The contrast is with the velocity

        7  calculation that I discuss in the prior paragraph,

        8  paragraph 144, and is reflected in Exhibit 15.

        9     Q.   Are Ripple's programmatic sales included

17:25:06 10  within your velocity calculation in paragraph 144?

       11     A.   So the Exhibit 15 -- so this would be

       12  all trading volume.  So as reported by -- with the

       13  top tier or with the CryptoCompare volume data.

       14  The actual distributions by Ripple we know from

17:25:33 15  those earlier exhibits.

       16     Q.   What steps, if any, did you take to

       17  disaggregate Ripple's trading from the rest of the

       18  market's trading to compare velocity?

       19     A.   Well, I did disaggregate it in the sense

17:25:48 20  that I identified, both in dollars and XRP,

       21  exactly the quantum of distributions by Ripple

       22  whether it's via GSR or some other entity.  So I

       23  do have that disaggregation.

       24          The trading volume here is going to be

17:26:08 25  all the -- the entire trading volume for the

                                                    288

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:26:12  1   market as reported by CryptoCompare or as reported

2   by these top-tier exchanges.

3        Q.   So your trading volume figure described

4   in 144 would include any Ripple trading that took

17:26:22  5   place on digital asset platforms, is that fair?

6        A.   If -- if there were sales by -- by

7   Ripple that enter the trading volumes, it would be

8   reflected in the calculation of the velocity, you

9   know, just by -- you know, in terms of the trading

17:26:40 10   volume if it's being reported into the -- into

11   the -- into these figures.

12        Now, again, the point of comparison is

13   we know exactly how much distributions are

14   actually happening in total and that's reflected

17:26:55 15   in Exhibits 8 and 9.

16        Q.   Does your velocity figure tell us

17   anything about how many non-Ripple XRP holders are

18   holding their XRP over a long term?

19        A.   Exhibit 15 is not about on a per-person

17:27:09 20   basis.  It's on a per-XRP basis.  So that is

21   consistent with how velocity is normally defined.

22        Q.   Okay.  If I understand your answer, I

23   think that means that your velocity analysis does

24   not exclude the possibility that some XRP

17:27:32 25   purchasers hold their XRP over a long-time

289

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:27:35  1   horizon?

2                      MR. KELLOGG:  Objection.

3        A.   That's correct.  So paragraph 144 says

4   "a higher velocity means that the asset is traded,

17:27:44  5   (turned over) or used more often."

6            So it's not at the individual trader

7   level, I don't -- I'm not aware of data that would

8   enable one to do that.  It's, rather, how often

9   does the asset -- here XRP -- get turned over?  So

17:28:00 10   very standard traditional method of looking at,

11   you know, turnover in the market.

12        Q.   Can we flip back to the heading on page

13   67?  This is Section F.  We talked about this

14   briefly earlier in the day.

17:28:16 15        A.   Page 67?

16        Q.   Yes.  Section F, the heading is

17   "Economic Assertions for Commonality are

18   Fundamentally Flawed."

19        A.   Yes.

17:28:25 20        Q.   Do you see that?

21            And "commonality" as used in the heading

22   for Subsection F is referring to the commonality

23   element of the Howey test, is that right?

24                      MR. KELLOGG:  Objection;

17:28:34 25            calls for a legal conclusion.

                                                              290

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:28:37  1             MR. SYLVESTER:  Let me finish

2         my question, but okay.

3         Q.   Go ahead.

4         A.   Calls for -- I'm not providing a legal

17:28:43  5   opinion.  So the answer to your question is, no,

6    I'm not opining on "commonality" as that phrase is

7    used in the Howey decision, but rather the SEC's

8    economic assertions in this portion of their

9    complaint.

17:29:06 10        Q.   Okay.  Are you opining on the SEC's

11   economic assertions in the commonality portion of

12   the SEC's complaint?

13        A.   Well, we should turn to the complaint.

14   I do have citations here to paragraph 291 of the

17:29:17 15   complaint, paragraph 317 of the complaint, 291,

16   293 of the complaint.  Yeah.  So I would just at

17   least point to the portions of the complaint that

18   I actually cite here in this particular section.

19        Q.   Okay.  And at least in your quoted

17:29:41 20   citations, I don't see the word "commonality."

21             So am I to assume that the word

22   "commonality" is drawn from the SEC's complaint?

23        A.   We would have to -- I mean, I would like

24   to see the complaint to refresh my recollection on

17:29:54 25   that.  But it is these particular paragraphs that

291

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:30:04  1    I'm referencing here in terms of the subject

        2    matter of this section.

        3        Q.   Particular paragraphs of the complaint

        4    you mean?

17:30:13  5        A.   Yes.  So I identify different portions

        6    of the complaint in the context of the first

        7    paragraph in this section and what I'm going to

        8    discuss.

        9             In other words, the economic assertions

17:30:35 10    by the SEC is reflected not just in the citations

       11    to the complaint, but in that first paragraph

       12    where I lay it out, lay out in quotations what the

       13    S -- SEC is saying here.

       14        Q.   Let's turn back to paragraph 145.  The

17:30:58 15    second sentence of paragraph 145 says "Because of

       16    the differences in both the timing and the

       17    duration of holding periods between Ripple and

       18    direct and indirect purchasers of XRP, their

       19    exposure to XRP price volatility and therefore to

17:31:11 20    risk is different."

       21             Do you see that?

       22        A.   I do.

       23        Q.   Okay.  Does that sentence that I just

       24    read bear on the question of whether the SEC's

17:31:24 25    economic assertions for commonality are

                                                              292

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:31:26  1   fundamentally flawed?

        2              MR. KELLOGG:  Objection.

        3     A.   I think it is part of my analysis of the

        4   economic assertions by the SEC.

17:31:36  5     Q.   Can you explain how in your view, if I

        6   understand you correctly, the statements in that

        7   sentence undercut the SEC's economic assertions?

        8     A.   Well, I would go to the third sentence

        9   in paragraph 140 on page 67.  And now I'm just

17:31:59 10   reading from my report.  "The SEC also argues that

       11   the 'fortunes' of XRP purchasers were aligned with

       12   each other and with Ripple because Ripple 'pooled

       13   the funds it raised in the offering.'"

       14              So there's this assertion, economic

17:32:17 15   assertion, that XRP purchasers at large are

       16   aligned with Ripple.  And the point here is that,

       17   you know, if your holding periods for a volatile

       18   asset are different, you're differently situated,

       19   you know, in that respect.

17:32:36 20     Q.   In your view, are Microsoft shareholders

       21   in a common enterprise with Microsoft?

       22              MR. KELLOGG:  Objection.

       23     A.   Calls for a legal conclusion if what you

       24   mean by "common enterprise" is you're invoking the

17:32:53 25   Howey test.

                                                      293

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:32:56   1      Q.   Okay.  I mean, I didn't hear an

2      instruction not to answer.  So in your view, are

3      Microsoft shareholders in a common enterprise with

4      Microsoft?

17:33:05   5                     MR. KELLOGG:  Objection;

6                calls for a legal conclusion.

7      A.   If you're asking me for my legal

8      conclusion as to whether Microsoft stock is stock,

9      I believe the answer is yes.  I'm not here to

17:33:21  10      opine on that.  The word "stock" appears in the

11      definition of security in the '33 Act, so I'm not

12      here to provide that legal opinion, but I do agree

13      that it's stock if you're asking me the question

14      and want -- want my view on it.

17:33:41  15      Q.   From an economic perspective, are

16      Microsoft shareholders in a common enterprise with

17      Microsoft?

18      A.   Well, I would -- common -- well, I

19      would -- I guess I would want to explore exactly

17:33:54  20      what you mean in your question about common

21      enterprise.  My earlier response was simply

22      agreeing that it is stock, for what it's worth.

23      But in terms of the economic substance of that

24      relationship, I guess I would want to know more

17:34:10  25      about how you're defining common enterprise in

294

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:34:13   1   your question.

2        Q.   Is there a generally accepted definition

3   in the economics literature of the term "common

4   enterprise"?

17:34:21   5              MR. KELLOGG:  Objection.

6        A.   Not as such, no.  I mean, there are

7   academic economic literature on velocity, on

8   different time horizons, but I would not say

9   commonality or common enterprise is a -- you know,

17:34:39  10   is a -- is a phrase that's used in a way like

11   asset pricing models are.  It does have a strong

12   legal connotation.

13              That's not to say you can't talk about

14   economic assertions that underpin the claim of

17:34:54  15   commonality.

16        Q.   Okay.  And, again from an economic

17   perspective, are Microsoft shareholders in a

18   common enterprise with Microsoft regardless of

19   whether they're day trading or long-term holders

17:35:10  20   of the stock?

21              MR. KELLOGG:  Objection.

22        A.   So, again, what I'm doing in this

23   section is the economic assertions by the SEC.  If

24   you're asking me -- I guess in your question, I

17:35:23  25   would want to know how you're defining "common

295

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:35:26  1   enterprise" for -- you know, in your question.

2           I don't need to -- you know, the

3   commonality that I'm dealing with in my report is

4   really working off of the economic assertions that

17:35:38  5   the SEC makes in the context of commonality.  I'm

6   not directly opining on commonality as such.

7       Q.   Okay.  Let's move to --

8                   THE WITNESS:  May I ask how

9           much time we have on the record?  Just

17:36:00 10           kind of pace -- pace myself.  I'm

11           sorry to interrupt.

12                   THE VIDEOGRAPHER:  We have

13           about 57 minutes left.

14   BY MR. SYLVESTER:

17:36:04 15       Q.   Okay.  Let's move to your rebuttal

16   report, AF-2.

17       A.   Rebuttal?  Oh, okay.  AF-2?

18       Q.   Yes.

19       A.   So I might take one last break just so I

17:36:20 20   don't fade.

21       Q.   Do you want to take it now?  That's

22   fine.

23       A.   It sounds like we're at a natural break

24   point.

17:36:25 25       Q.   Fine by me.

                                                        296

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:36:27  1          A.   Does that make sense?   So, yeah, maybe

        2   take a break just to stretch my legs.

        3                  THE VIDEOGRAPHER:   Okay.

        4                  Thank you.   The time is 5:36.   We're

17:36:33  5                  going off the record.

        6                      (Whereupon, a recess is taken.)

        7                  THE VIDEOGRAPHER:   And the

        8                  time is approximately 5:55 p.m.   We're

        9                  back on the record.

17:55:26 10   BY MR. SYLVESTER:

       11          Q.   Professor, when you address the pooling

       12   of funds in Subsection F of your opening report,

       13   is there any portion of that section that

       14   addresses whether Ripple pooled funds it received

17:55:43 15   in its sales of XRP?

       16          A.   So paragraph 141, that first statement,

       17   is referring to, A, the fact that there's

       18   individuals that own XRP that are not Ripple, that

       19   owned the 20 billion XRP units.   So there's these

17:56:12 20   separate holdings of XRP.   Again, this is a basic

       21   background assumption of the case as I understand

       22   it.   That is to say, these individuals held 20

       23   billion, whereas Ripple had 80 billion.

       24                  And the second point on the pooling is

17:56:27 25   really what I referred to in 142.   There's not

                                                              297

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:56:30  1    pooling and sharing of the benefits of that

       2    pooling with the XRP purchasers in the sense of a

       3    contractual relationship or obligation or

       4    distribution of the profits thereby generated.

17:56:46  5         Q.   Okay.  Focusing just on dollars Ripple

       6    received from its sales of XRP, does any part of

       7    Subsection F discuss whether or not Ripple pooled

       8    the dollars it received from sales of XRP?

       9         A.   No.

17:57:06 10         Q.   Okay.

      11         A.   Again, with the caveat that -- I mean,

      12    there's a couple -- I want to be clear on the

      13    record about this.  I think there's a couple

      14    different senses of pooling floating around here

17:57:18 15    that might create a lack of clarity in the record.

      16              I am addressing whether this pooling by

      17    Ripple of the funds that it receives in the sense

      18    of it's pooling these funds received and the XRP

      19    purchasers then get the benefit in the form of a

17:57:36 20    distribution, the benefit in the form of a claim,

      21    on whatever profits, if any, are generated by that

      22    pooling.

      23              So if we're defining pooling in that

      24    way, I most certainly do talk about it, as

17:57:48 25    paragraph 142 indicates.  So I just want to be

                                                              298

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:57:55 1   clear on the record about -- you know, to be clear

2   on what is meant and what is not meant by

3   "pooling."

4        Q.   I don't quite understand your answer.

17:58:21 5   You're opining, I think, if I understand it

6   correctly, on whether or not Ripple pools funds

7   and that pooling results in certain rights in XRP

8   purchasers that you identify in paragraph 142, is

9   that correct?

17:58:38 10                  MR. KELLOGG:  Objection.

11        A.   Well, to be clear, I'll just read the

12   relevant portion of paragraph 142.  "That these

13   contracts" -- such as the programmatic sales

14   contract.  "That these contracts do not have any

17:58:53 15   contractual rights entitling these counterparties

16   to a share of Ripple's profits if Ripple is

17   successful in its ongoing efforts to manage and

18   develop its business operations.  There are no

19   such contractual rights and no ongoing obligations

17:59:07 20   for Ripple to expend efforts to increase XRP's

21   price."  The first part of that sentence is I -- I

22   reference the work that I did in Section II.

23                  So, again, if that's what is meant by

24   "pooling" -- that is, funds are put together and

17:59:23 25   then there's these rights in the pooled -- in the

                                                              299

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:59:27  1   profits, if any, that are generated by the pool --

2   then that is addressed and I do have an opinion on

3   that and that's reflected in paragraph 142.

4        Q.   Okay.  Let's use a hypothetical.

17:59:39  5   Same -- same pooling concept.  Let's say Ripple

6   sells $10 worth of XRP on Tuesday and then sells

7   $10 worth of XRP on Wednesday.

8             Is your opinion expressing any view as

9   to whether or not Ripple pools that $20 of XRP --

17:59:54 10   $20 of proceeds from its XRP sales?

11        A.   If what you mean by "pooling" is

12   ignore -- you know, is just putting the money

13   together or not putting the money together in an

14   account or accounts, I'm not providing an opinion

18:00:11 15   on that.  If what is meant by "pooling" is that

16   those relationships, those contractual

17   relationships, pursuant to which Ripple gets those

18   funds, the $20 in your example, whether those

19   contractual relationships create a right to a

18:00:31 20   portion of the profits if Ripple's successful in

21   its ongoing efforts, then I do have an opinion on

22   it.

23        Q.   Does the company have a fiduciary

24   obligation to its shareholders to maximize the

18:00:44 25   value of its assets?

300

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:00:45   1                 MR. KELLOGG:  Objection;

            2         calls for a legal conclusion.

            3     A.     Yeah, that's a legal opinion.

            4     Q.     Be that as it may, do you know?

18:00:56   5     A.     So under Delaware corporate law, there

            6 are fiduciary obligations of the directors that

            7 run to the corporation, as I understand it, which

            8 would, you know, involve acting in the best

            9 interests of the corporation.

18:01:16 10     Q.     And in your view as an economist, would

        11 acting in the best interests of a corporation

        12 include maximizing the value of its assets?

        13                 MR. KELLOGG:  Objection.

        14     A.     So as a policy matter, if you're asking

18:01:27 15 my personal view on this as an economist, that is

        16 a -- assuming that we're talking about a

        17 for-profit organization, sure, maximizing assets

        18 would be certainly something that you would want

        19 to think about in terms of a fiduciary obligation

18:01:45 20 by a corporation to its shareholders.  So I'm --

        21 or to its claims on the firm's assets.

        22         So, you know, again, obviously what

        23 fiduciary obligations a corporate board has is

        24 ultimately a question of Delaware corporate law

18:02:08 25 assuming it's incorporated in Delaware.

                                                  301

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:02:10  1      Q.   Okay.  Let's turn now to your -- AF-2,

2    your rebuttal report.  I want to start with

3    paragraph 7, please.

4                    MR. KELLOGG:  I'm sorry,

18:02:21  5            where are we?

6                    MR. SYLVESTER:  Paragraph 7.

7                    MR. KELLOGG:  Of the main

8            report?

9                    MR. SYLVESTER:  Of the

18:02:29 10            rebuttal report.

11                    THE WITNESS:  Do you have a

12            copy?

13                    MR. KELLOGG:  Of the

14            rebuttal?

18:02:32 15                    MR. SYLVESTER:  You should

16            have it.

17                    MR. KELLOGG:  Yeah.

18                    THE WITNESS:  I'm at

19            paragraph 7.

18:02:41 20    BY MR. SYLVESTER:

21      Q.   Okay.  Great.  The first sentence of

22    paragraph 7 is "I have been asked by counsel for

23    Ripple to assess the claims, summarized above,

24    made in the ██████ report."

18:02:50 25            Do you see that?

                                                    302

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 18:02:50 | 1 | A.    Yes. |
| | 2 | Q.    Okay.  So my first question is, was your |
| | 3 | assignment with respect to your rebuttal opinion |
| | 4 | limited to assessing the claims made in the |
| 18:03:00 | 5 | ███████  report? |
| | 6 | MR. KELLOGG:  Objection. |
| | 7 | A.    Yes.  So this rebuttal report is a |
| | 8 | rebuttal to his -- his report, so it is assessing |
| | 9 | the opinions reflected in paragraph 6. |
| 18:03:19 | 10 | Q.    Okay.  Can -- |
| | 11 | A.    I would also note that, you know, |
| | 12 | obviously I read the entire report and, as we |
| | 13 | discussed this morning, I did consider his -- this |
| | 14 | isn't -- I'm sorry. |
| 18:03:37 | 15 | I was just going to note that |
| | 16 | Dr. ███████  has a rebuttal report, you know, a |
| | 17 | report where he criticizes me.  Obviously I have |
| | 18 | views on that.  But here, in this -- so -- but in |
| | 19 | this rebuttal report, I was asked to assess these |
| 18:03:50 | 20 | opinions in his initial report. |
| | 21 | Q.    Okay.  Turning to paragraph 8 on the |
| | 22 | next page. |
| | 23 | A.    Just give me a second to read it. |
| | 24 | Q.    Sure.  It's probably worth reading the |
| 18:04:05 | 25 | entire thing because most of it is just one |

303

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:04:07  1    sentence.

2                    (Pause)

3         A.    Okay.

4         Q.    So my question is, did Dr. ███████ opine

18:04:45  5    that any of the XRP price movements he observed

6    resulted in any sustained impact on the market

7    price of XRP?

8         A.    So it was -- reading his report, it was

9    unclear about whether he thought it was -- his --

18:05:05 10    it is fair to say that his report -- and I think I

11    mention this later -- just give me one second

12    here.  He does reference short term -- let me just

13    get the language here.  Just give me one more

14    second.

18:05:54 15                    (Pause)

16              So the way he characterizes his

17    findings I think I, in part, summarize in

18    paragraph 10, where he uses language like it's

19    "consistent" with Ripple attempting to influence

18:06:10 20    prices or the actions "coincided" with price

21    changes.

22              As I understand from his deposition,

23    he -- he -- and it's consistent with this summary

24    or this -- these statements that I make in

18:06:27 25    paragraph 10, quoting him, is that he's making no

                                                              304

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

18:06:31  1  claim of causation.  That is to say, as I

2  understand his position -- and, again, it's

3  consistent with this language here -- he's not

4  making any claim that the actions that he

18:06:45  5  analyzes, in fact, caused an XRP price change, let

6  alone an XRP price change that's permanent.

7            So that's my best understanding of -- of

8  what his position is.

9       Q.   Did -- did you read Dr. ███████

18:07:03 10  deposition transcript?

11       A.   I did not.

12       Q.   Let's go to paragraph 9 of your report.

13  I'm looking at the second sentence.  That says "As

14  an initial matter, Dr. ██████ does not (and

18:07:34 15  cannot) explain why a handful of trades on just a

16  few cherry-picked dates would have resulted in any

17  long-term impact on the market price of XRP, much

18  less caused purchasers of XRP to have any

19  reasonable expectation of profits from Ripple's

18:07:48 20  conduct."

21            Do you see that?

22       A.   I do.

23       Q.   Did Dr. ██████ opine on the reasonable

24  expectations of XRP purchasers?

18:08:00 25       A.   He opined -- I don't think he uses that

305

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:08:02   1   phrase.  He opined -- you know, he's discussing

2   XRP price changes, which obviously XRP price

3   changes do reflect the expectations of the

4   marketplace.  But I don't believe he used that

18:08:15   5   particular phrase.

6       Q.   Can you explain what you mean by "XRP

7   price changes do reflect the expectations of the

8   marketplace"?

9       A.   Well, XRP has a market price, right?  It

18:08:28  10   trades in the markets and has a market price that

11   changes over time.  And the market is going to

12   have a -- a view, a consensus view, as to the

13   market value of that asset, just like it does for

14   any asset.

18:08:43  15           So the market value is going to reflect

16   the market consensus at that point.

17       Q.   As part of your assignment for your

18   rebuttal report, did counsel ask you to examine

19   the relationship, if any, between Dr. ████████

18:08:57  20   opinions and the reasonable expectations of XRP

21   purchasers?

22       A.   What counsel asked me to do was -- is

23   reflected in paragraph 7.

24       Q.   Okay.  I don't see any reference to the

18:09:16  25   reasonable expectations of XRP purchasers in

306

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:09:19  1    paragraph 7., is that right?

2         A.    That's correct.  So, again, the

3    expectations of the market, you know, is going to

4    be reflected in the price of XRP; that it's going

18:09:38  5    to reflect the consensus view as to the market

6    value of this particular asset, XRP, and he does

7    analyze or discuss XRP prices.

8              So it's only in that sense that, you

9    know, this -- that it intersects with

18:09:58 10    Dr. ██████████  analysis.

11         Q.    Okay.  So when you refer in your report

12    to "reasonable expectations of profits from

13    Ripple's conduct," are you talking about -- strike

14    that.

18:10:08 15              When you refer to "reasonable

16    expectations of profits from Ripple's conduct," is

17    that limited to any such expectations that might

18    show up in XRP's market price?

19         A.    Yes.

18:10:20 20                   MR. KELLOGG:  Objection.

21         A.    So any reference to "reasonable

22    expectations of profit" -- and we can certainly

23    look at other parts of my rebuttal where that

24    phrase might be used -- is solely focused on

18:10:34 25    conducting the assignment in paragraph 7.  That

307

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:10:39  1   is, his actual analysis.

2        Q.   Okay.  Let's turn to paragraph 11 on

3   page 6.  And there are some dark bullets and some

4   clear bullets.  I want to look at the first clear

18:10:57  5   bullet.  The last sentence of the first clear

6   bullet is "The fact that market actors attempt to

7   minimize the price impact associated" --

8        A.   Oh, I'm sorry.  I'm in the wrong place.

9   Where -- where should I be?

18:11:17 10        Q.   Paragraph 11, page 6.  Do you see how

11   the first two bullets are filled in and the

12   remaining three are clear?

13        A.   Yes.

14        Q.   So the first clear bullet.

18:11:26 15        A.   Oh, I see.  Okay.

16        Q.   And the last sentence of that first

17   clear bullet is "The fact that market actors

18   attempt to minimize the price impact associated

19   with their sales is hardly surprising or novel,

18:11:38 20   and does not support an opinion that XRP is a

21   security."

22             Do you see that?

23        A.   I do.

24        Q.   Did Dr. ████████ offer any opinion as to

18:11:47 25   whether or not XRP is a security?

                                                    308

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:11:48  1          A.   I think he avoided opining directly on

2    that, as -- as I am -- as I am.  I'm only -- the

3    reference in this bullet is just to the -- the

4    idea that best ex, best execution, is something

18:12:07  5    that occurs in many different markets, many

6    different asset classes.

7               I am not opining anywhere, whether it be

8    in the rebuttal or my initial report, on whether

9    or not XRP is a security.  It's a legal question.

18:12:20 10    Nothing that I've written should be construed as

11    providing an opinion on that ultimate legal

12    question.

13          Q.   Let's look at the next page.  We're

14    still on paragraph 11.  There's the first full

18:12:39 15    bullet on paragraph -- sorry, on page 7, that says

16    "As the factor analysis presented in my opening

17    report shows, the long-run prices of XRP were

18    influenced not by the efforts of Ripple, but by

19    the changes in the value of cryptocurrencies

18:12:56 20    generally; focusing, instead, on a handful of

21    select days does not constitute a reliable

22    scientific methodology."

23               Do you see that?

24          A.   I do.

18:13:04 25          Q.   Okay.  So when you say "not by the

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:13:06  1   efforts of Ripple," are you expressing an opinion

      2   here that Ripple's efforts in no way influence the

      3   long-run prices of XRP?

      4                     THE REPORTER:  You're going

18:13:12  5         to have to slow down.

      6                     MR. KELLOGG:  Objection.

      7       A.   So I need to hear the question again

      8   now.

      9       Q.   Sure.

18:13:21 10         When you say "not by the efforts of

     11   Ripple" in the sentence I just read, are you

     12   expressing the opinion here that Ripple's

     13   efforts in no way influence the long-run prices of

     14   XRP?

18:13:33 15                     MR. KELLOGG:  Objection.

     16       A.   What I'm referencing here, in this

     17   particular sentence, is the various -- the factor

     18   model and its various specifications that we

     19   discussed that are contained in my initial report.

18:13:46 20   That is to say, there's no statistically

     21   significant excess return associated --

     22   associated -- associated with XRP above and beyond

     23   or separate and apart from general movements in

     24   cryptocurrency.

18:14:01 25         So I want to be very clear on the

                                                        310

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:14:04  1    record.  The hypothesis that I was testing is the

        2    null hypothesis:  Is the alpha statistically

        3    distinguishable from zero or is it -- or is it, in

        4    fact, the same as zero, you know, in a statistical

18:14:17  5    sense?

        6         So that -- that's the analysis that I

        7    was referencing in this particular bullet.

        8         Q.   Okay.  Is it possible in your view for

        9    someone to take steps consistent with an attempt

18:14:36 10    to influence the price of an asset and yet be

        11   unsuccessful in influencing the price?

        12              MR. KELLOGG:  Objection.

        13        A.   Stated at that level of generality, yes.

        14        Q.   Okay.  Separate and apart from whether

18:14:48 15    or not it may have been successful, are you

        16   offering any opinion that Ripple did not take

        17   steps to influence the price of XRP?

        18              MR. KELLOGG:  Objection.

        19        A.   As I understand your question, you're

18:15:00 20    asking me -- or the question is asking me the

        21   motivations of Ripple, the motivations of Ripple

        22   with respect to the trading activity that

        23   Dr. ████ focuses on.  And the answer to the

        24   question is no.  I'm not going to opine on the

18:15:18 25    motivations, feelings, personal thoughts of

                                                           311

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:15:23   1    individuals.
           2        Q.   Okay.  Slightly different question.
           3             Again, separate and apart from whether
           4    or not Ripple may have been successful in any
18:15:32   5    efforts, are you offering any opinion here that
           6    Ripple did not take steps consistent with
           7    influencing the price of XRP?
           8                      MR. KELLOGG:  Objection.
           9        A.   Same answer.  So as I understand the
18:15:45  10    question, the question is ask -- is saying -- is
          11    asking, am I going to opine on the motivations of
          12    individuals, such as individuals at Ripple, and
          13    what their thought processes were?  And the answer
          14    to the question is no.
18:16:06  15        Q.   Do you disagree with any of the
          16    Dr. ██████ conclusions -- strike that.
          17             Separate and apart from Dr. ████████
          18    analysis of any impact on XRP's price, do you
          19    disagree with Ripple -- with Dr. ██████
18:16:23  20    conclusions that on certain occasions Ripple
          21    employees took steps consistent with influencing
          22    the price of XRP?
          23                      MR. KELLOGG:  Objection.
          24        A.   So I want to be careful here.  So
18:16:39  25    insofar as you're asking me about these emails and
```

312

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:16:42   1   Dr. ████ citing emails to -- and any use of
           2   emails to opine on motivations or purposes, I'm
           3   not providing an opinion on that.  That -- that's
           4   not my role as an economist.
18:16:58   5            I obviously do analyze the particular
           6   days that he chooses, but that's using market
           7   data, not opining on personal motivations of
           8   individuals, whether it be at Ripple or elsewhere.
           9        Q.   Okay.  You may have anticipated my next
18:17:21  10   question.
          11            Separate and apart from whether or not
          12   they may have been successful, are you offering
          13   any opinion that Mr. Larsen or Mr. Garlinghouse
          14   did or did not take steps to influence the price
18:17:31  15   of XRP?
          16                 MR. KELLOGG:  Objection.
          17        A.   So, again, my understanding of your
          18   question is, am I going to opine on the
          19   motivations, beliefs, feelings, opinions of those
18:17:42  20   individuals?  And the answer to -- answer to that
          21   question is no.
          22        Q.   Okay.  Let's look at -- let's look at
          23   Exhibit 1 to your AF-2.
          24        A.   Exhibit 1?
18:18:13  25        Q.   Yes.
```

313

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:18:14  1          A.    Just give me a moment to situate myself.

        2          Q.    Sure.

        3          A.    Okay.

        4          Q.    The right-hand panel of Exhibit 1 to

18:18:36  5    AF-2 displays data for cryptocurrency exchanges.

        6                Do you see that?

        7          A.    I do.

        8          Q.    Do you know whether or not any GSR

        9    trading is within the volume reflected in the

18:18:47 10    right-hand panel for cryptocurrency exchanges?

       11          A.    So this is the crypto -- cryptocurrency

       12    exchanges being reported by CryptoCompare.  Beyond

       13    the -- the net outflows that we were talking about

       14    earlier that's reflected in my exhibits and my

18:19:03 15    initial report, I have the same answer that --

       16    that -- from previously when you asked me about

       17    trading volume.  So I -- I don't disaggregate

       18    here, you know, GSR trading -- well, I'm using the

       19    full trading volume on the cryptocurrency

18:19:26 20    exchanges.  Obviously, I have the GSR XRP Ledger

       21    trading on the left-hand side.

       22          Q.    Mm-hmm.  But to the extent that GSR

       23    trading is included -- strike that.

       24                To the extent GSR was trading on

18:19:39 25    cryptocurrency exchanges during this time period,

                                                              314

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:19:41  1    that trading would be included in the volume on

        2    the right-hand side?

        3        A.   Yes, I would assume so.  Whether, you

        4    know, in that -- you know, that would include GSR

18:19:57  5    trading for -- hypothetically would include GSR

        6    trading for clients other than -- than Ripple.

        7    I'm not saying that happened.  I'm just saying it

        8    would -- this trading, as I understand the

        9    CryptoCompare data, would be reflected in the

18:20:13 10    cryptocurrency exchange volume.

       11        Q.   Okay.  Let's turn back to paragraph 18

       12    of your rebuttal report.

       13        A.   Paragraph O18?

       14        Q.   Eighteen.

18:20:27 15        A.   Just give me a moment.

       16        Q.   Sure.

       17        A.   Yes.

       18        Q.   Okay.  In paragraph 18 you describe

       19    using a square root model.

18:20:52 20             Do you see that?

       21        A.   Yes.

       22        Q.   Okay.  My question is, did you use the

       23    square root impact model that -- you'll have to

       24    excuse my pronunciation -- Donier and Bonart used

18:21:06 25    in 2015 referenced in Footnote 33?

                                                        315

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:21:11  1       A.   There's a formula that I used.  It, you

2   know, involves the square root of the volume of

3   the trade or the order -- I think it's called the

4   meta order -- over the volume, the trading volume.

18:21:22  5   And there's a parameter that's estimated at 0.9.

6       Q.   And did you --

7       A.   And there's a volatility -- there's a

8   price volatility term there, too.

9       Q.   Did you obtain that 0.9 figure that you

18:21:36  10   just testified about from the Donier and Bonart

11   paper referenced in Footnote 33?

12       A.   Yes.  I believe that's from the Bitcoin

13   paper, if that's what you're referring to.

14       Q.   Did you perform any calculations using

18:21:52  15   XRP prices to determine any components of the

16   square root model that you used as described in

17   paragraph 18?

18       A.   I don't understand the question.  Is the

19   question is am I using -- am I calculating inputs

18:22:09  20   into the -- into the formula?

21       Q.   Yes.

22            Did you perform any calculations using

23   XRP prices to determine any inputs that you then

24   used to put into the formula that you found from

18:22:17  25   the paper we've been discussing?

316

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:22:19  1                    MR. KELLOGG:  Objection.

        2         A.    Yes.

        3         Q.    What -- what calculations do you recall?

        4         A.    Well, there's -- in the formula there's

18:22:25  5    the order size.  There's the volat -- the price

        6    volatility.  There's the trading volume.  So those

        7    are all inputs into the square root calculation.

        8         Q.    And you reference the 0.9 figure.  What

        9    does that refer to?

18:22:40 10         A.    It's a parameterization in the formula.

       11    I think it's the Y term in the formula.  So that's

       12    another component of the formula, which I did get

       13    from the Bitcoin paper.

       14              And I want to be very clear on the

18:22:52 15    record.  The point of this square root calculation

       16    is simply illustrative of the point that I make in

       17    the second sentence of Footnote 33, that "total

       18    trading volume and price volatility are important

       19    when assessing the price impact of a trade."  That

18:23:14 20    is to say, these are important factors.  I'm using

       21    this as an illustrative example of how it could be

       22    important.

       23              I'm not saying -- I'm not saying that

       24    the price impact is 1.6 percent or 2 percent.

18:23:25 25    It's illustrative of this point that these factors

                                                                317

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:23:30   1   can be important if one is interested in assessing

2   price impact of a trade.  It's illustrative of

3   that general point.  It's not a calculation of the

4   actual price impact of any particular trade on any

18:23:44   5   particular -- you know, on this day.  And the same

6   comment would hold for the square root estimates

7   that I utilize in the exhibit at a later point.

8        Q.   Okay.  I want to make sure I understand

9   your testimony.

18:24:03  10        You're saying with respect to the

11   concluding sentence of paragraph 18 that you're

12   not opining that the price impact in this

13   particular case is 1.6 percent, is that right?

14             MR. KELLOGG:  Objection.

18:24:15  15        A.   So what I say in paragraph 18 is the

16   potential XRP price impact using the square root

17   model is approximately 1.6 percent.  So it's --

18   and this point, the 1.6 percent, is in service of

19   the general point that total trading volume and

18:24:36  20   price volatility can be important in assessing the

21   price impact.  So it's just illustrative of that

22   general point.

23        I'm not saying for this trade or these

24   trades it is, in fact, 1.6 percent.  It's a

18:24:51  25   potential price impact.  It's illustrative of the

318

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:24:54  1  general point that you would want to think about

       2  these factors in assessing price impact.

       3         And the same comment would hold for the

       4  illustrative calculations using the square root

18:25:08  5  model that are provided later in the report as

       6  well.

       7     Q.   Looking at paragraph 20 -- I'll give you

       8  a second to read that and then I'll ask my

       9  question.

18:25:22  10     A.   Okay.  Thank you.

      11         (Pause)

      12         Yes.

      13     Q.   Are you offering the opinion that GSR's

      14  purchases during the one-hour period described in

18:25:35  15  paragraph 20 were inconsistent with implementation

      16  of a price floor as directed by Ripple?

      17     A.   Can you repeat the question?

      18             MR. SYLVESTER:  Bridget,

      19         would you mind reading that one back.

18:25:52  20         Thanks.

      21             (Whereupon, the record was

      22         read back.)

      23     A.   I guess what I would say is I would

      24  reference my paragraph 21.  So this notion of a

18:26:17  25  price floor doesn't seem to hold up in the data if

                                                           319

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:26:24  1    you look at pre-November 1st and post-November

       2    1st.

       3            So, you know, in your question, you were

       4    referencing the price floor and that seems

18:26:33  5    inconsistent with the fact that prices were more

       6    often below that price floor -- now I'm reading

       7    from my report -- in November and December than

       8    they were before.  So I guess I do view the data

       9    as inconsistent or Dr. ██████ ignores this when

18:26:54 10   he talks about a price floor.

      11        Q.   Okay.  Again, sort of reverting to our

      12    principles.  Setting aside whether or not GSR was

      13    or was not effective in implementing a price

      14    floor, are you opining as to whether GSR's

18:27:10 15   purchases during that one-hour period referenced

      16    in paragraph 20 are or are not consistent with the

      17    implementation of a price floor?

      18            MR. KELLOGG:  Objection.

      19        A.   Well, again, I -- just to go to what

18:27:24 20   Dr. ██████ says, and I quote it in paragraph 21,

      21    he says "GSR seems to have succeeded" in this

      22    price floor.  So, again, I would reference that

      23    data.

      24            I'm sorry, what -- what's the question?

18:27:42 25       Q.   I think you answered it.  Let -- let's

                                                        320

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:27:44  1   go to the data.  Let's go to Exhibit 2, please.

2       A.   Okay.

3       Q.   My question on Exhibit 2 is, did you

4   examine intraday price data for XRP to prepare

18:28:03  5   this exhibit?

6       A.   These are the daily low price.

7       Q.   Okay.  So I think that means, yes, you

8   did examine intraday data, is that right?

9       A.   Yes.  My understanding of daily low

18:28:13  10   prices is it would include intraday in that -- in

11   that way, in identifying the low price.

12       Q.   Okay.  For each of the day that's

13   included within the blue bars shown in your

14   Exhibit 2, did you conduct any analysis of what

18:28:29  15   percentage of the day XRP's price was below .008

16   dollars?

17           MR. KELLOGG:  Objection.

18       A.   No.  So I believe the -- the data has

19   the close -- the -- the open, the close, and the

18:28:43  20   daily low.  Maybe the daily high.  I can't

21   remember.  So the answer to your question is, no,

22   this is just reporting the number of days where

23   this -- where the low price breached the so-called

24   price maintenance floor.

18:28:58  25       Q.   Okay.  Let's go back to paragraph 45 of

321

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:29:07  1   AF-2.

2          A.    Forty-five?

3          Q.    Yes.

4          A.    Paragraph 45?

18:29:08  5          Q.    Paragraph 45, page 23.  And my question

6    is about the concluding sentence, so it's probably

7    worth you reading the whole paragraph.

8          A.    Yeah.

9               (Pause)

18:29:55 10         A.    Okay.  I've read the paragraph.

11         Q.    Okay.  The last sentence says "In order

12   for this claim to be true, the regression

13   coefficient on the prior returns must be

14   statistically significant, and my return

18:30:08 15   regression specification demonstrates that this is

16   not the case."

17              My question is, why is it that the

18   regression coefficient on the prior returns needs

19   to be statistically significant in order for

18:30:18 20   Dr. ███████ claim that these sellers on behalf

21   of Ripple sold more XRP when the price of XRP was

22   increasing and relatively less when the price was

23   decreasing on the previous day?  Why -- why does

24   your regression coefficient need to be

18:30:36 25   statistically significant in order for that to be

322

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:30:38   1   true?
           2                MR. KELLOGG:  Objection.
           3        A.   Yeah, that's -- that's -- that's a long
           4   question.  Let me make sure I -- I want to make
18:30:43   5   sure I'm answering it.
           6             So Dr. ███████ in his report says
           7   that -- well, I have the quote here.  That "These
           8   sellers, on behalf of Ripple, sold more XRP when
           9   the price was increasing and relatively less when
18:31:03  10   the price was decreasing the previous day."  No,
          11   that's not the quote I wanted.
          12             So in his report -- Dr. ████████
          13   report, that is -- my understanding of what he was
          14   saying is that this selling activity, the selling
18:31:34  15   of more XRP, is associated with increasing returns
          16   on -- contemporaneously increasing returns.  That
          17   is, his claim is not just confined to the previous
          18   day's returns, but I read him in his report to be
          19   making a claim about selling more XRP when the
18:31:57  20   price is contemporaneously rising.
          21             What his regression is about -- and we
          22   can talk about his regression -- is he's using lag
          23   returns.  So I'm making the observation that a lag
          24   return coefficient is not going to address the
18:32:15  25   question of whether there was contemporaneous
```

323

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:32:21  1    increases in the prices during the sale activity.

2            Now, this leads directly into the last

3    sentence of that paragraph, which is "If there was

4    a statistical association in return..."  So if

18:32:33  5    returns are falling today, returns are falling on

6    average statistically, then there would be a

7    relationship between that previous return that

8    Dr. ▆▆▆▆ is using and contemporaneous return.

9    So there might be a -- a basis for an inference

18:32:46 10    there, but there is no statistical association

11    between contemporaneous returns and prior returns.

12            And, therefore, a lag regression, a

13    regression that's using lag returns, is not going

14    to be able to ascertain whether, in fact, Ripple

18:33:01 15    was selling more when prices contemporaneously

16    were increasing.

17        Q.    Okay.  Let's move to Exhibit 8 of AF-2.

18        A.    Exhibit 8?

19        Q.    Yes.  This is labeled, for the record,

18:33:22 20    "Examples of Alleged Indirect Transfers of XRP

21    from Mr. Larsen and Mr. Garlinghouse to GSR Traced

22    by Dr. ▆▆▆▆▆▆

23            You'll see, Professor, that a number of

24    addresses are noted as belonging to "another

18:33:43 25    party."

324

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:33:45  1            Do you see that?

       2       A.   Are you looking -- I'm sorry.  Oh, okay.

       3   So you're looking at the second column.  Yes, I

       4   do.

18:33:58  5       Q.   Okay.  And you say in your note, the

       6   last sentence, "When the address I.D. has not been

       7   provided, another party is indicated above."

       8            Did you see that?

       9       A.   Yes.

18:34:14 10       Q.   Did you ask counsel to supply you with

      11   any documents that might answer the question of

      12   who controlled these destination addresses?

      13                 MR. KELLOGG:  Objection.

      14                 THE REPORTER:  I'm sorry.

18:34:19 15       Repeat.

      16                 MR. SYLVESTER:  Sure.

      17   BY MR. SYLVESTER:

      18       Q.   Did you ask counsel to supply you with

      19   any documents that might answer the question of

18:34:25 20   who controlled these destination addresses?

      21       A.   No.  I want to be clear here.  In this

      22   exhibit, Exhibit 8, I'm using -- I'm assessing

      23   Dr. ██████ work.  And the address I.D., that

      24   second column that we were discussing, is drawn

18:34:45 25   from the identification of the wallets, or the

                                                            325

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
18:34:49   1   addresses, from Dr. ████████ work.

           2           So this is a product of his backup

           3   materials that he produced in terms of his

           4   identification of the address I.D.  And so I'm

18:35:03   5   assessing the work that he did including what's

           6   reflected in this table.

           7           So this table is really drawn very

           8   directly from his backup.  Obviously, I calculated

           9   the cumulative number of days from Larsen or

18:35:19  10   Garlinghouse wallet transfer, which is a trivial

          11   calculation, but this is a reflection of his --

          12   his work, his backup, and his identification.

          13       Q.   Okay.  Looking just at the first example

          14   regarding Mr. Larsen, the way I read the first row

18:35:36  15   is that Mr. Larsen transferred 20 million units of

          16   XRP to the destination address in the first row

          17   starting with "████████

          18           Do you agree?

          19       A.   Yes.

18:35:55  20       Q.   Okay.  And then the next transfer is

          21   from ██████ of 2,083,313 XRP to the following

          22   destination address of R -- well, no.  Strike

          23   that.

          24           This is what I'm having trouble

18:36:16  25   understanding.  It looks like, if I'm reading your
```

326

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:36:21   1    chart correctly, the units of XRP traced by

           2    Dr. ██████  goes from 20 million to 2,083,313 and

           3    then back up, in the next row, to 2,083,333.

           4             Do you see that?

18:36:37   5        A.   I -- I'm not following you.

           6        Q.   Okay.  Do you see "Units of XRP

           7    transferred, 20 million"?

           8        A.   Yes.

           9        Q.   Okay.  If you go all the way to the

18:36:45  10    right on that same row, do you see "Units of XRP

          11    traced by Dr. ██████

          12        A.   Yes.

          13        Q.   Okay.  And that value is 2,083,313?

          14        A.   Yes.

18:36:55  15        Q.   Okay.  So the next entry under "Units of

          16    XRP transferred" is 2,083,333.

          17             Do you see that?

          18        A.   So I'm supposed to be looking at the

          19    second row now?

18:37:08  20        Q.   Yes.

          21        A.   Okay.

          22        Q.   So my question is, it appears that this

          23    chart is suggesting that 20 million XRP were

          24    transferred, 2,083,313 were traced, but then the

18:37:33  25    number of XRP units transferred goes back up to
```

327

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:37:36   1   2,083,333.

           2            Can you explain how -- how that works?

           3                 MR. KELLOGG:  Objection.

           4        A.   I think you're make --

18:37:45   5                 MS. PROSTKO:  Objection.

           6        A.   I think you're mis -- I think you're

           7   misreading the chart a little bit, or the -- or

           8   the figure or the exhibit, I should say.

           9        Q.   Yeah.  Please explain.

18:37:54  10        A.   So Dr. ███████ is -- is tracing for --

          11   first, let me note that I was not provided with

          12   his hop program pursuant to which he's doing this

          13   hop analysis.  So that was a black box that I was

          14   not able to access.

18:38:11  15            According to his tracing algorithm,

          16   which I don't have access to, he ultimately traces

          17   for this first hop -- the hop -- the first hop

          18   consisting of three hops, ultimately traces the

          19   2,083,313.  So that's why that number in the

18:38:33  20   second-to-last column is the same because that's

          21   what he ultimately ascribes in terms of the hop

          22   analysis from Larsen to the final destination,

          23   which is GSR.

          24            But as you're pointing out, the units of

18:38:49  25   XRP transferred per hop or per -- or per
```

328

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:38:53   1   transaction does vary.  But, really, the question
           2   is -- well, what's reflected in that
           3   second-to-last column is what Dr. ████ ascribes
           4   to Dr. -- or Mr. Larsen in terms of the ultimate
18:39:08   5   destination of GSR.
           6            But you are right that the individual
           7   hops -- one, two and three -- would -- you know,
           8   they're not all the same.
           9        Q.   Okay.
18:39:23  10                  MR. SYLVESTER:  Can we take
          11            five minutes off the record before we
          12            end for the day?  Is that all right
          13            with you?
          14                  THE WITNESS:  Sure.
18:39:28  15                  MR. KELLOGG:  Sure.
          16                  MR. SYLVESTER:  Great.  Thank
          17            you very much.
          18                  THE VIDEOGRAPHER:  Okay.
          19            Thank you.  The time is approximately
18:39:33  20            6:39.  We're going off the record.
          21                  (Whereupon, a recess is
          22            taken.)
          23                  THE VIDEOGRAPHER:  The time
          24            is approximately 6:47 p.m.  We're back
18:47:09  25            on the record.
```

329

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:47:10    1   BY MR. SYLVESTER:
            2       Q.   Okay.  Professor, are you expressing the
            3   opinion in this case that defined that an
            4   instrument was offered and sold as an investment
18:47:19    5   contract, that instrument must entitle its holder
            6   to a share of the profits of the company that sold
            7   the instrument?
            8                MR. KELLOGG:  Objection.
            9       A.   So as I understood, if I heard your
18:47:31   10   question that -- the first part was it -- was in
           11   order to be defined as a security, am I correct?
           12                MR. SYLVESTER:  Do you want
           13             to read it back, Bridget?  No, you
           14             don't want to.  You want me to say it.
18:47:36   15             Okay.  I'll say it again.
           16   BY MR. SYLVESTER:
           17       Q.   I said investment contract, but let me
           18   just restate the question.
           19             Are you expressing the opinion in this
18:47:44   20   case that defined that an instrument was offered
           21   and sold as an investment contract, that
           22   instrument must entitle its holder to a share of
           23   the profits of the company that sold the
           24   instrument?
18:47:56   25                MR. KELLOGG:  Objection.
```

330

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:47:57   1        A.   That calls for a legal opinion.   The
           2   answer to that question is no.
           3        Q.   Okay.   Are you expressing the opinion in
           4   this case that defined that an instrument was
18:48:03   5   offered and sold as an investment contract, that
           6   instrument must require the company that sold the
           7   instrument to expend efforts in some way?
           8                  MR. KELLOGG:   Objection;
           9             calls for a legal conclusion.
18:48:13  10        A.   As I understand the question, it calls
          11   for a legal conclusion.   I'm not providing that
          12   opinion.
          13        Q.   Okay.   Are you providing the opinion in
          14   this case that it is not possible for a virtual
18:48:24  15   currency to be offered and sold as an investment
          16   contract?
          17                  MR. KELLOGG:   Objection.
          18        A.   As I understand the question, it calls
          19   for a legal opinion, so I'm not providing that
18:48:34  20   opinion.
          21                  MR. SYLVESTER:   Okay.   That
          22             is all the questions I have for you,
          23             Professor Ferrell.
          24                  I just want to again -- you
18:48:40  25             know, we've -- this is to Ripple's
```

                                                          331

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:48:43   1          counsel.

           2                  We've heard today about

           3          analysis that Professor Ferrell

           4          conducted that was not disclosed in

18:48:48   5          his opening expert report.  We've also

           6          heard about analysis that he conducted

           7          subsequent to reviewing Dr. ███████

           8          work.  I just want to put on the

           9          record that we reserve all rights

18:48:59  10          depending on what defendants do or

          11          don't do with that information.  That

          12          could include calling Dr. -- Professor

          13          Ferrell back.  That's our reservation

          14          of rights.

18:49:06  15                  I have nothing further for

          16          you.  Thank you very much.  I

          17          appreciate your time, Professor.

          18                  THE WITNESS:  Thank you.

          19                  THE VIDEOGRAPHER:  May I

18:49:12  20          close out the deposition for today?

          21                  MR. KELLOGG:  You may.

          22                  THE VIDEOGRAPHER:  Thank you.

          23          We are off the record at 6:49 p.m. and

          24          this concludes today's testimony by

18:49:21  25          Dr. Allen Ferrell.  The total number

                                                            332

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:49:24   1           of media units used was seven and will

2           be retained by the court reporting

3           agency.  Thank you.

4                   THE WITNESS:  Thank you.

5                   (Whereupon, the deposition

6           concluded at 6:49 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

333

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   STATE OF NEW YORK        )

 2                            ) ss:

 3   COUNTY OF NEW YORK       )

 4            I hereby certify that the witness in the

 5   foregoing deposition, FRANK ALLEN FERRELL, III, Ph.D.,

 6   was by me duly sworn to testify to the truth, the whole

 7   truth and nothing but the truth, in the within-entitled

 8   cause; that said deposition was taken at the time and

 9   place herein named; and that the deposition is a true

10   record of the witness's testimony as reported by me, a

11   duly certified shorthand reporter and a disinterested

12   person, and was thereafter transcribed into typewriting

13   by computer.

14            I further certify that I am not interested in

15   the outcome of the said action, nor connected with nor

16   related to any of the parties in said action, nor to

17   their respective counsel.

18            IN WITNESS WHEREOF, I have hereunto set my hand

19   this 25th day of February 2022.

20            Reading and Signing was:

21   ___ requested    ___ waived   _X_ not requested.

22

23

24

25       BRIDGET LOMBARDOZZI, CSR, RMR, CRR

                                                         334
```