# Exhibit 17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
5                                 )
                 Plaintiff,       )
6                                 ) Case No.
       vs.                        ) 20-Civ-10832(AT)(SN)
7                                 )
     RIPPLE LABS, INC., BRADLEY   )
8    GARLINGHOUSE, and            )
     CHRISTIAN A. LARSEN,         )
9                                 )
                 Defendants.      )
10   _____)

11

12

13

14          CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15               REMOTE VIDEO DEPOSITION OF

16                    DANIEL R. FISCHEL

17               Monday, February 28, 2021

18

19

20

21

22

23

     STENOGRAPHICALLY REPORTED BY:
24   CHERYL L. SANDECKI, CSR, RPR
     LICENSE NO. 084-03710
25   JOB NO. 220228LAK

                                                        1

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
               Plaintiff,         )
 6                                ) Case No.
       vs.                        ) 20-Civ-10832(AT)(SN)
 7                                )
     RIPPLE LABS, INC., BRADLEY   )
 8   GARLINGHOUSE, and            )
     CHRISTIAN A. LARSEN,         )
 9                                )
               Defendants.        )
10   _____)
11
12
13        The videotaped deposition of
14   DANIEL R. FISCHEL, called for examination
15   pursuant to the Rules of Civil Procedure for the
16   United States District Courts pertaining to the
17   taking of depositions, taken before
18   CHERYL L. SANDECKI, Certified Shorthand Reporter
19   for the State of Illinois, at 110 North Wacker
20   Drive, Chicago, Illinois, on February 28, 2022,
21   at the hour of 9:15 a.m.
22
23
24
25
```

2

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S:

 2

 3   FOR THE PLAINTIFF:

 4   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 5   CHICAGO REGIONAL OFFICE

 6   BY:   BENJAMIN J. HANAUER, ESQUIRE

 7   175 West Jackson Boulevard

 8   Suite 900

 9   Chicago, Illinois 60604

10   Telephone:  312.353.8642

11   E-mail: hanauerb@sec.gov

12     - and -

13   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

14   NEW YORK REGIONAL OFFICE

15   BY:   MARK SYLVESTER, ESQUIRE

16   New York Regional Office

17   200 Vesey Street

18   Suite 400

19   New York, New York 10281-1022

20   Telephone:  212.336.1060

21   Email:  sylvesterm@sec.gov

22

23

24

25
```

3

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  A P P E A R A N C E S (Continued)
 2  FOR DEFENDANT RIPPLE LABS INC.:
 3  DEBEVOISE & PLIMPTON LLP
 4  BY:   SCOTT CARAVELLO, ESQUIRE (Remote)
 5  919 Third Avenue
 6  New York, New York 10022
 7  Telephone:  212.909.6000
 8  E-Mail:  scaravello@debevoise.com
 9        -and-
10  KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
11  BY:   REID M. FIGEL, ESQUIRE
12        GAVAN GIDEON, ESQUIRE
13        KYLIE CHISEUL KIM, ESQUIRE (Remote)
14        ELIANA PFEFFER, ESQUIRE (Remote)
15        COLLIN R. WHITE, ESQUIRE (Remote)
16  Sumner Square
17  1615 M Street, N.W.
18  Suite 400
19  Washington, D.C. 20036
20  Telephone:  202.326.7999
21  E-mail: rfigel@kellogghansen.com
22          ggideon@kellogghansen.com
23          kkim@kellogghansen.com
24          epfeffer@kellogghansen.com
25          cwhite@kellogghansen.com
```

4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  A P P E A R A N C E S (Continued)

2  FOR DEFENDANT BRADLEY GARLINGHOUSE:

3  CLEARY GOTTLIEB STEEN & HAMILTON

4  BY:   MICHAEL SCHULMAN, ESQUIRE (Remote)

5  2112 Pennsylvania Avenue, NW

6  Washington, D.C. 20037

7  Telephone:  202.974.1500

8  E-mail: mschulman@cgsh.com

9

10  FOR DEFENDANT CHRISTIAN A. LARSEN:

11  PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

12  BY:   MARTIN FLUMENBAUM (Remote)

13        KRISTINA A. BUNTING (Remote)

14        EMILY M. GLAVIN (Remote)

15  1285 Avenue of the Americas

16  New York, New York  10019

17  Telephone:  212.373.3191

18  E-mail:  mflumenbaum@paulweiss.com

19         kbunting@paulweiss.com

20         eglavin@paulweiss.com

21

22

23

24

25

5

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S  (Continued):

 2

 3   ALSO PRESENT:

 4   EUGENE CANJELS, Ph.D, SEC

 5   MAXWELL CLARKE, SEC

 6   MARINA MARTYNOVA, SEC

 7   ARTUR MINKIN, SEC

 8   ANA GUARDADO, Ripple Labs

 9   STELLA UVAYDOVA, SEC

10   DEREK LETELLIER, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                       INDEX

 2   WITNESS                         EXAMINATION

 3
      DANIEL FISCHEL
 4
      EXAMINATION BY MR. HANAUER          9
 5

 6
                        EXHIBITS
 7

 8   NUMBER                      MARKED FOR ID

 9   Fischel Deposition Exhibit

10   Exhibit DF-1    Expert Rebuttal Report      19
                     of Daniel R. Fischel
11                   Dated November 12, 2021

12   Exhibit DF-2    Amended Expert Report of     63
                     ███████████, Ph.D. dated
13                   October 6, 2021

14   Exhibit DF-3    Article:  Announcement      73
                     Effects in the
15                   Cryptocurrency Market by
                     Mohammad Hashemi Joo
16
     Exhibit DF-19   Model Calculations         126
17
     Exhibit DF-12   Declaration of Daniel R.    217
18                   Fischel In Re:  Shah, et
                     al., v. Zimmer Biomet
19                   Holdings, Inc., et al.

20

21         *** EXHIBITS BOUND SEPARATELY ***

22

23

24

25
                                                    7
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1        THE VIDEOGRAPHER:  This is media unit one.
 2   We are now on the video record.
 3             This is the videotaped deposition of
 4   Daniel Fischel being taken on February 28, 2022.
 5   The time is now 9:17 a.m. as indicated on the
 6   video screen.  We are located at 110 North
 7   Wacker Drive, Suite 3800, Chicago, Illinois.
 8             This deposition is being taken on
 9   behalf of the plaintiff and video recorded on
10   behalf of the plaintiff in the matter of
11   Securities and Exchange Commission versus Ripple
12   Labs, Inc., et al.  The case number is
13   20-Civ-10832, filed in the United States
14   District Court, Southern District of New York.
15             My name is Derek Letellier, certified
16   legal videographer representing Gradillas Court
17   Reporters with offices in Glendale, California.
18   The court reporter today is Cheryl Sandecki also
19   of Gradillas Court Reporters.
20             Counsel, please identify yourselves for
21   the video record and state the parties that you
22   represent.
23        MR. HANAUER:  I think we usually just type
24   them in.
25        THE VIDEOGRAPHER:  Okay, that's fine.  If the
```

09:17 appears at lines 5, 10, 15, 20, 25

8

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  court reporter could please swear in the

2  witness.

3                     (Witness administered an oath.)

4                     DANIEL FISCHEL,

5  having been first administered an oath, was

6  examined and testified as follows:

7                     EXAMINATION

8  BY MR. HANAUER:

9       Q.   Could you please state and spell your

09:18 10  name for the record please?

11       A.   Daniel Robert Fischel, F-i-s-c-h-e-l.

12       Q.   And good morning, Mr. -- or Professor

13  Fischel.  My name is Ben Hanauer.  I represent

14  the plaintiff, the SEC in this case.

09:18 15            Is there any reason why you cannot give

16  accurate testimony today?

17       A.   No.

18       Q.   And how many preparation sessions did

19  you have for today's deposition?

09:18 20       A.   Well, I had many, many discussions with

21  people that I work with at Compass Lexecon and

22  then I had one Zoom call with several counsel.

23       Q.   Counsel for Ripple in this case?

24       A.   Yes.  I assume counsel for Ripple or

09:19 25  whoever else.

9

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    Q.    Which counsel was it?  Who was it?

2    A.    For -- well, certainly for Ripple, but

3  I don't know if Ripple is the only -- you know,

4  in other words, the defendant -- there is more

09:19 5  than one defendant.

6    Q.    So who were the attorneys on the Zoom

7  call you just referenced?

8    A.    Well, Mr. Figel was on.  Mr. Flumenbaum

9  was on.  I believe there was an attorney from

09:19 10  Cleary on.  There might have been some others.

11    Q.    And that was the only preparation

12  session you had with counsel to prepare for

13  today's deposition?

14    A.    That's right.

09:19 15    Q.    And did you review -- in preparing for

16  today's deposition, did you review any documents

17  other than the ones cited in your report that

18  you have considered in forming any opinion that

19  you will express in this case?

09:20 20    A.    I looked at some of the studies on

21  studying whether cryptocurrencies trade in an

22  efficient market, some of the ones cited in my

23  report but also some others.  I can't think of

24  anything else that I reviewed.

09:20 25    Q.    And the ones you didn't cite in your

10

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1  report, will you be disclosing those?

         2      A.   I have no objection to it.  But it's

         3  certainly not up to me.

         4      Q.   What are they?

09:20    5      A.   I don't know the titles, but the --

         6  there have been other articles written in

         7  addition to the ones cited by Dr. ███.  And we

         8  just did a more complete literature search.

         9      Q.   And who is "we"?

09:21   10      A.   My firm, Compass Lexecon.

        11      Q.   And you considered those studies?

        12      MR. FIGEL:  Objection.

        13      THE WITNESS:  Well, considered, yes, in the

        14  sense that I looked at them.

09:21   15  BY MR. HANAUER:

        16      Q.   And did those -- did you consider those

        17  studies in forming any opinion you will be

        18  expressing in this case?

        19      A.   I would say for the most part, they

09:21   20  were consistent with the opinions that I did

        21  express in my report.

        22      MR. HANAUER:  Well, in that case, Counsel,

        23  we're just going to put on the record that we

        24  request that you disclose those studies pursuant

09:21   25  to Rule 26.

                                                          11

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1        MR. FIGEL:  Your request is noted.  We will
 2   take it under advisement.
 3   BY MR. HANAUER:
 4        Q.   Professor Fischel, how many times have
09:21 5   you had your deposition taken as an expert
 6   witness?
 7        A.   I haven't counted, but I would say a
 8   significant number of times.
 9        Q.   More than 200?
09:22 10        A.   I don't think more than 200.  Probably
11   more than 100, but I don't think more than 200.
12        Q.   And if -- for the depositions you've --
13   the depositions that were taken of you as an
14   expert witness, those are listed on Appendix A
09:22 15   to your report?
16        A.   Yes, they should be.
17        Q.   How many times have you testified at
18   trial as an expert witness?
19        A.   Also I haven't counted, but a
09:22 20   significant number of times as well.
21        Q.   More than 50?
22        A.   Probably more than 50.
23        Q.   In this case, this lawsuit, were you
24   ever retained in a nontestifying or consulting
09:23 25   capacity?
```

12

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1     MR. FIGEL:  Objection.

2         You can answer.

3     THE WITNESS:  My understanding is that we are

4  always retained in a nontestifying capacity

09:23  5  until a decision is made to disclose, so in this

6  case, me as an expert.

7  BY MR. HANAUER:

8     Q.   How many of your testifying expert

9  witness cases were you engaged by the

09:23 10  government?

11     A.   I don't know the exact number.  But,

12  you know, a number of times.

13     Q.   Would you say it's a large or a small

14  percentage of your engagements?

09:23 15     A.   Well, as a percentage of the total, you

16  know, probably pretty small but, you know, in

17  some very important cases.

18     Q.   When was the last time you provided us

19  expert testimony on behalf of the government?

09:24 20     A.   I testified in a case, it was a couple

21  years ago, in connection with the Chrysler

22  bankruptcy.  I'm sure it's on my CV and it's a

23  long-reported decision that came out of that

24  case.

09:24 25     Q.   And who did you represent -- who

13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  retained you in that case?

2      A.   The justice department.

3      Q.   Was that a criminal matter?

4      A.   No.

09:24  5      Q.   When was the last time you were

6  retained as an expert witness by the government

7  in a prosecution or enforcement matter?

8      A.   In the last couple weeks.

9      Q.   And what case was that?

09:24  10      A.   It's -- it hasn't been disclosed yet,

11  so I'm not going to disclose it.

12      Q.   You were engaged to be a testifying

13  expert?

14      A.   You know, again, usually the

09:25  15  understanding, even if it's not explicit, is we

16  are retained to provide expert services and a

17  decision is made at a subsequent point in time

18  as to who is going to -- if anyone, is going to

19  be a testifying expert.

09:25  20      Q.   Do you have any employment other than

21  being a law professor and your work at Compass

22  Lexecon?

23      A.   Well, I would say right now my formal

24  sole employment is with Compass Lexecon, even

09:25  25  though I still have very close connections to

14

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    the University of Chicago, not just the law

2    school.

3        Q.    So are you still a professor at the

4    University of Chicago?

09:26  5        A.    I still have my title.  I haven't

6    actively taught in the last couple of years.  I

7    keep trying to fit it in because I'm always

8    asked.  But the last couple of years I've just

9    gotten too busy to do it.

09:26 10        Q.    Do you still receive a salary or

11   compensation from the University of Chicago?

12        A.    No.  But even when I was an active

13   faculty member, I donated all my compensation

14   back.  So that really hasn't changed.

09:26 15              But as I said, I'm still very much

16   involved with the university.

17        Q.    How much of your professional time do

18   you spend working as an expert witness as

19   opposed to being involved as a professor?

09:26 20        MR. FIGEL:  Objection.

21              You can answer.

22        THE WITNESS:  You know, I would say now and

23   in the recent past really a hundred percent of

24   my professional time is associated with my work

09:27 25   and role at Compass Lexecon.

15

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   BY MR. HANAUER:

2      Q.   In your role as a testifying expert,

3   has your expert testimony ever been excluded for

4   any reason?

09:27 5      A.   For any reason?  I guess I would have

6   to say yes to that.

7      Q.   How many times?

8      A.   You know, not very many and for, you

9   know, a series of different kind of reasons,

09:27 10  too.  But I would say not on substance or

11   credentials, rather on other disclosed too late

12   or in one well-known case, the defendant's

13   disclosure was deemed by the District Court to

14   be inadequate and that led to a long series of

09:28 15  follow-up appellate and on bond-cum litigation

16   all involving the justification for the -- by

17   the District Court to allow me to testify as a

18   summary witness but not as an expert witness.

19        So -- and I guess there was one --

09:28 20     Q.   What case was that, sir?

21      A.   The criminal case, the United States

22   versus Nacchio.  And then there was --

23      Q.   In the Nacchio case, you performed an

24   event study in that case?

09:29 25     A.   I don't remember.  Very possibly, but I

16

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    don't remember.

2        Q.    And I'm sorry, you were mentioning

3    another case when you spoke?

4        A.    I just don't want my answer to be

09:29 5    incomplete and, therefore, misleading.

6            There was another case, the Pfizer

7    Securities Fraud Case in the Second Circuit

8    where a District Court did exclude my testimony.

9    Again, it's a complicated story behind that.

09:29 10    But then the Court of Appeals reversed the

11    District Court.  Let me just finish, just to

12    give a complete answer.

13            The Court of Appeals ruled that -- if I

14    remember correctly, that the District Court did

09:29 15    not abuse its discretion in not allowing one

16    minor calculation to be admitted into evidence.

17    But the -- that was a very small part of my

18    testimony.  The Court of Appeals said the rest

19    of my -- the District Court was reversed in not

09:30 20    allowing the rest of my testimony to be

21    presented to the jury.

22        Q.    And that was the Pfizer securities

23    litigation?

24        A.    That's right.

09:30 25    Q.    And you performed an event study in

17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  that case?

2      A.   I'm sure I performed an event study.  I

3  mean, I performed hundreds of event studies.

4  And in any kind of securities fraud case, I'm

09:30  5  sure I performed an event study.

6      Q.   And the Second Circuit in the Pfizer

7  case affirmed the District Court's finding that

8  a portion of your testimony was unreliable?

9      A.   One calculation -- small calculation, I

09:30 10  think as the Court of Appeals stated or, more

11  accurately, that the District Court did not

12  abuse its discretion in that finding.

13      Q.   Any other cases where your testimony

14  was excluded?

09:31 15      A.   Let's see.  There was a case many years

16  ago where one opinion out of three of my

17  opinions -- it was actually a jointly-authored

18  report and the District Court ruled that one out

19  of three opinions, I think the court said,

09:31 20  wasn't relevant, if I remember correctly.

21      Q.   What case was that?

22      A.   You know, if I looked at my CV, I could

23  find it.  But I don't remember the name of the

24  case.  It was a long time ago.

09:31 25      Q.   And --

18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1        A.    I don't remember any others.

         2        Q.    You beat me to my question.

         3        A.    Yeah.

         4        Q.    So speaking of CV, probably a good time

09:32    5   as any, I put in front of you exhibit that's

         6   been marked as DF-1.  Do you see that?

         7        A.    Yes.

         8                   (Whereupon, Deposition

         9                   Exhibit DF-1 was marked for

09:32   10                   identification.)

        11   BY MR. HANAUER:

        12        Q.    And DF-1, that's a copy of the expert

        13   rebuttal report you submitted in this case?

        14        A.    Yes.

09:32   15        Q.    And I would like to ask you some

        16   questions about your CV, which I believe is

        17   Appendix A to Exhibit DF-1.

        18        A.    Okay.

        19        Q.    How many times has a court refused to

09:32   20   credit or to follow your expert opinion?

        21        MR. FIGEL:  Objection.

        22        THE WITNESS:  You know, I can't possibly

        23   answer that question.  You know, if you mean a

        24   court did not rule in the way that -- or didn't

09:33   25   base a ruling on my expert testimony or

                                                         19

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1    disagreed with my expert testimony, I can't

         2    possibly answer that question.

         3    BY MR. HANAUER:

         4        Q.   Okay.  Has it been many times?

09:33    5        MR. FIGEL:  Objection.

         6        THE WITNESS:  Well, I've testified a lot.  I

         7    would say the overwhelming majority of times

         8    courts have -- where courts have commented on my

         9    testimony have credited, agreed with it, cited

09:33   10    it, relied on it.  And certainly there have been

        11    a few times where the opposite occurred, where a

        12    court disagreed with my testimony.

        13    BY MR. HANAUER:

        14        Q.   So I would like to ask you, referring

09:33   15    to page 4 of the appendix, the United States v.

        16    Bases and Pacilio case.  You testified in that

        17    matter?

        18        A.   I did.

        19        Q.   Here in Chicago?

09:34   20        A.   I did.

        21        Q.   And what was your -- that was only this

        22    past summer, correct?

        23        A.   That's right.

        24        Q.   And what was your opinion in that case?

09:34   25        A.   That the economic evidence that I

                                                        20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    reviewed did not support, it was really

2    inconsistent with the government's allegations

3    about spoofing.

4        Q.    And the jury convicted the defendants

09:34  5    in that case?

6        A.    It was actually a mixed verdict.  The

7    jury acquitted on the spoofing count, which was

8    the count that I testified about; and convicted

9    on, I think, mail or wire-fraud counts, if I

09:34 10    remember correctly.

11        Q.    And I want to ask you about turning to

12    page 9 of your CV.  The Commodities Futures

13    Trading Commission versus Oystacher case.  It's

14    the third one on page 9.

09:35 15        A.    Yes, I see that.

16        Q.    And you provided expert testimony at a

17    preliminary injunction hearing in that case?

18        A.    That's right.

19        Q.    And you critiqued the opinion of the

09:35 20    CFTC's expert witness?

21        A.    That's correct.

22        Q.    And Judge St. Eve in that case found

23    that your critiques did not undermine the CFTC's

24    expert's opinions?

09:35 25        MR. FIGEL:  Objection.

21

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1        THE WITNESS:  You know, I would want to see
        2   the opinion.  I basically remember the court --
        3   well, I don't want to -- I don't want to
        4   speculate.  I would rather see the opinion.
09:35   5   BY MR. HANAUER:
        6        Q.   And on the next page of your CV,
        7   page 10, you referenced SEC versus Wiley case.
        8        A.   Yes, I remember that case.
        9        Q.   And you provided trial testimony for
09:36  10   the defendant?
       11        A.   I can't remember if it was a trial or
       12   some kind of preliminary injunction hearing or
       13   something.  But I certainly testified for the
       14   defendant.
09:36  15        Q.   What was your opinion in that case?
       16        A.   You know, as you go farther back in
       17   time, I just need to see.  If you have a copy,
       18   show it to me and I'll -- it will refresh my
       19   recollection.
09:36  20        Q.   You don't remember as we sit here
       21   today?
       22        A.   I don't remember it well; well enough
       23   to describe.
       24        Q.   If you go to page 14 of your case --
09:37  25   I'm sorry, of your CV.  And do you see the case
```

22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

          1   near the middle of the page SEC versus Carl

          2   Jasper?

          3        A.   I do.

          4        Q.   In that case you performed an event

09:37     5   study on behalf of the defendant?

          6        A.   Actually, you know, that's over ten

          7   years ago.  I have no recollection what that

          8   case was about.

          9        Q.   And going to page 17 of your CV, the

09:37    10   second case is a case called United States

         11   versus Sanjay Kumar?

         12        A.   Yes, I remember that case.

         13        Q.   And in that case you provided an

         14   opinion that challenged the government's expert

09:38    15   witness's event study?

         16        MR. FIGEL:  Objection.

         17        THE WITNESS:  I don't know if that's really a

         18   fair characterization of what I did.  I remember

         19   I challenged the government's calculation of

09:38    20   economic loss, if I remember correctly, in a

         21   sentencing hearing.

         22   BY MR. HANAUER:

         23        Q.   And in that case the court accepted the

         24   government's expert opinion and did not accept

09:38    25   yours?

                                                                  23

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      MR. FIGEL:  Objection.

2      THE WITNESS:  Yeah, that's correct, to the

3 best of my recollection.

4 BY MR. HANAUER:

09:38 5      Q.   Then going to page 29 of your CV, in

6 the middle of the page, do you see a case called

7 SEC versus First City Finance Corporation?

8      A.   Yes, I see that.

9      Q.   I know it's going a little bit back.

09:39 10 But do you --

11      A.   That's 25 years ago.

12      Q.   Did you provide expert testimony for

13 the defendant in that case?

14      A.   Yeah, I was going to say I think it was

09:39 15 an affidavit, but it says it's testimony, so it

16 was probably testimony.

17      Q.   Do you remember anything about that

18 testimony?

19      A.   Believe it or not, I do.

09:39 20      I think it was about the economic

21 consequences of a 13(d) filing, if I remember

22 correctly.

23      Q.   And in that case the court determined

24 that your opinion relied on purely speculative

09:39 25 hypothetical figures?

24

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          MR. FIGEL:  Objection.

2          THE WITNESS:  You know, again, something that

3    specific I would have to look.

4    BY MR. HANAUER:

09:39  5          Q.   When was the last time that you

6    provided expert testimony against the government

7    and the defendant was found not guilty or not

8    liable?

9          MR. FIGEL:  Objection.

09:40  10         THE WITNESS:  So it can't be the times I've

11   testified for the government and the courts have

12   relied and cited extensively my testimony,

13   you're not including that in your question?

14   BY MR. HANAUER:

09:40  15         Q.   That's not part of my question.

16         A.   I don't remember.

17         Q.   Who retained you in this case?

18         A.   I think I was originally retained by

19   the -- at least in terms of who contacted me,

09:40  20   the Kellogg Hansen firm.

21         Q.   And is -- did you sign like an

22   engagement letter or something like that?

23         A.   I don't know because sometimes we have

24   engagement letters, sometimes we don't depending

09:41  25   on typically whether the client that's retaining

25

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1  us wants an engagement letter.

         2      Q.    Who is the client that's retaining you

         3  in this case?

         4      A.    Well, as I said, I believe it's all the

09:41    5  defendants, but I'm not a hundred percent sure

         6  of that.

         7           I know the company Ripple is retaining

         8  us and possibly the other defendants as well.

         9      Q.    Are you providing testimony on behalf

09:41   10  of either of the individual defendants in this

        11  case?

        12      MR. FIGEL:  Objection.

        13      THE WITNESS:  The testimony that I'm giving

        14  is what's contained in my report and whatever --

09:41   15  and my answers to questions.  As I said, I -- I

        16  know that I'm being retained by Ripple.  I

        17  assume I'm being retained by the other

        18  defendants, but I'm not a hundred percent sure.

        19  BY MR. HANAUER:

09:42   20      Q.    Your hourly rate on this engagement is

        21  $1,750?

        22      A.    That's right.

        23      Q.    Is that your standard rate?

        24      A.    Yes.

09:42   25      Q.    When did you last raise rates?

                                                        26

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1        A.    Maybe a couple years ago.

2        Q.    When were you first retained in this

3   case?

4        A.    Well, the -- I don't remember exactly,

09:42  5   but, you know, probably sometime in 2021.

6        Q.    Were you and Compass Lexecon retained

7   at the same time?

8        A.    Compass Lexecon would be the party that

9   was retained.  I'm not typically, or to the best

09:43  10   of my recollection, ever separately retained

11   from Compass Lexecon.

12       Q.    You're the chairman and president of

13   Compass Lexecon?

14       A.    I am.

09:43  15       Q.    Are you also the founder?

16       A.    No.

17       Q.    How long have you been with Compass

18   Lexecon?

19       MR. FIGEL:  Objection.

09:43  20       THE WITNESS:  Well, Compass Lexecon is the

21   successor firm to Lexecon.  If you count the

22   times when it was just Lexecon, I think I

23   affiliated with Lexecon the first time, I think,

24   in 1981, if I remember correctly.

25

27

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   BY MR. HANAUER:

 2       Q.    Did you found Lexecon?

 3       A.    No.

 4       Q.    How many Compass Lexecon experts have

 5   been retained in this case?

 6       MR. FIGEL:  Objection.

 7       THE WITNESS:  Well, if you mean formal

 8   employees of Compass Lexecon, I think I'm the

 9   only one, as far as I know.

10           Although I'm not exactly sure whether

11   Laurentius Morais is an employee or

12   an independent contractor.  I believe Allen

13   Ferrell is an independent contractor.

14           Those are the experts that I'm aware of

15   that, you know, we have some relationship with.

16   BY MR. HANAUER:

17       Q.    Anyone else?

18       A.    Not that I know of or not that I can

19   think of.  But it's possible that there are

20   other experts that I'm just not aware of.

21       Q.    How many other engagements have you

22   done for Ripple?

23       A.    None as far as I'm aware.

24       Q.    And when I say "Ripple," do you

25   understand that I'm referring to the defendant
```

09:44  5
09:44  10
09:44  15
09:45  20
09:45  25

28

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    in this case?

2        A.   Yes, I understand that.

3        MR. FIGEL:  Objection, Mr. Hanauer.  I assume

4    when you talk about defendant, you're going to

09:45 5   distinguish among Ripple and the individual

6    defendants?

7        MR. HANAUER:  Thank you, Counsel.

8    BY MR. HANAUER:

9        Q.   I'll clare -- when I talk about

09:45 10  Ripple -- or when I say "Ripple," you understand

11   that to mean the defendant Ripple Labs in this

12   case?

13       A.   Yes, that's what I understand.

14       Q.   How many engagements have you done for

09:45 15  the Kellogg Hansen firm?

16       MR. FIGEL:  You can answer it with a number

17   to start with.

18       THE WITNESS:  You know, again, I -- a

19   nontrivial number, but I -- over a long period

09:46 20  of time.  I don't know the exact number.

21   BY MR. HANAUER:

22       Q.   More than ten?

23       A.   It might be more than ten.  Maybe right

24   around ten, just as a rough -- just as a rough

09:46 25  guess.

29

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    Q.   How many engagements have you done for

2    the Debevoise law firm?

3        MR. FIGEL:  Again, why don't you start with a

4    number, if you know.

09:46  5    THE WITNESS:  Yeah, I want some clarification.

6    Do you want me personally or the firm?

7    BY MR. HANAUER:

8    Q.   Well, let's start with you.

9    A.   Because if these questions are for the

09:46  10   firm, I really don't know.  I can only speak

11   about the times I've -- I personally can

12   remember being involved in a case with the

13   Debevoise law firm only.

14        You know, again, a nontrivial number.

09:46  15   I don't know the exact number.

16   Q.   Around the same as the Kellogg firm?

17       MR. FIGEL:  Objection.

18       THE WITNESS:  Maybe a little less, but, you

19   know, again, it's over a lot of years, so I'm

09:47  20   not a hundred percent sure.

21   BY MR. HANAUER:

22   Q.   On this case, did the other testifying

23   Compass Lexecon experts and their support teams

24   coordinate any of their analysis or opinions?

09:47  25       MR. FIGEL:  Objection.

30

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    THE WITNESS:  Well, I can't speak for others.

2    I can only speak for myself.

3        I did not coordinate with anyone.

4    BY MR. HANAUER:

09:47  5    Q.  And does Compass Lexecon have any

6    processes or checks installed in place to ensure

7    that teams work independently and do not overlap

8    or coordinate?

9    MR. FIGEL:  Objection.

09:47  10    THE WITNESS:  I think that would be a

11    case-by-case determination on whether those

12    kinds of separations, structural separations,

13    are required.

14    BY MR. HANAUER:

09:48  15    Q.  Were any employed in this case?

16    MR. FIGEL:  Objection.

17    THE WITNESS:  In terms of formal directions

18    that -- of the teams would be completely

19    separate, I would say no.

09:48  20    BY MR. HANAUER:

21    Q.  How many hours did you work on this

22    engagement between the time you were engaged and

23    the completion of your report?

24    A.  I don't remember exactly.  You know, as

09:48  25    a rough guess, I would say somewhere between 25

31

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   and 50 but -- hours, but I'm not sure.  I would

2   have to check.

3       Q.   And how many hours have you billed

4   since completing your report?

09:49   5       MR. FIGEL:  Objection.

6       THE WITNESS:  You know, again, in terms of

7   the -- not all the time has been recorded yet,

8   so, you know, I'll just give the same rough --

9   excuse me, the same rough guess, you know, maybe

09:49  10   somewhere between 25 and 50.

11   BY MR. HANAUER:

12       Q.   How much money has Compass billed to

13   Ripple on this case in total?

14       MR. FIGEL:  Objection.

09:49  15       THE WITNESS:  I don't know.

16   BY MR. HANAUER:

17       Q.   How are you compensated by Compass?

18       MR. FIGEL:  Objection.

19       THE WITNESS:  I get a hundred percent of my

09:49  20   hourly rate.  And then I also get some share of

21   the overall profits of Compass Lexecon.

22   BY MR. HANAUER:

23       Q.   Do you receive a portion of the rates

24   charged by other experts and staff working on

09:50  25   this litigation?

32

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1        A.    No.

        2        Q.    But the full 1,750 an hour, that goes

        3   to you?

        4        A.    Yes.

09:50   5        Q.    You've been on emeritus status at the

        6   University of Chicago since 2006?

        7        A.    I don't know the exact year, but

        8   approximately that's right.

        9        Q.    When was the last article or

09:50  10   publication that you authored?

       11        A.    It's on my CV, so whatever that is.

       12        Q.    Why don't we just take a look so we

       13   have it in the record.

       14        A.    Okay.  It looks like 2006.

09:51  15        Q.    Do you consider yourself an expert in

       16   the field of blockchain technologies?

       17        A.    No.

       18        Q.    Do you consider yourself an expert in

       19   the field of digital assets or cryptocurrencies?

09:51  20        A.    No.

       21        Q.    Have you ever owned any digital assets

       22   or cryptocurrencies?

       23        A.    No.

       24        Q.    Are you an expert on the issue of

09:51  25   whether digital assets are securities under the
```

33

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1   federal securities laws?

 2        MR. FIGEL:  Objection.

 3        THE WITNESS:  Well, first of all, that's a

 4   legal question, so I'm not offering any legal

09:52  5   testimony.  But apart from that, the answer is

 6   no.

 7   BY MR. HANAUER:

 8        Q.   Are you offering an opinion on how

 9   courts interpret the term "investment contract"

09:52 10   as it relates to the federal securities laws?

11        A.   That's the same answer as I just gave.

12   It's a legal question.  I'm not offering any

13   legal opinions.  And in addition to that, the

14   answer is no.

09:52 15        Q.   Will you be offering an opinion whether

16   any XRP transaction constituted or involved

17   sales or offers of investment contracts?

18        MR. FIGEL:  Objection.

19        THE WITNESS:  Again, that's a legal opinion.

09:52 20   I will not be offering any opinion like that.

21   BY MR. HANAUER:

22        Q.   Are you offering or will you be

23   offering any opinion on whether any transaction

24   qualifies for an exemption from registration

09:53 25   under the federal securities laws?

                                                   34

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1        A.    That's the same answer as my last

2    several answers.  That's a legal question.  I'm

3    not offering any legal opinions.

4             And apart from that, I'm not going to

09:53  5    -- I don't have expertise on that issue.

6        Q.    How many times have you provided an

7    expert opinion related to an event study?

8        MR. FIGEL:  Objection.

9             You can answer.

09:53 10    THE WITNESS:  Countless numbers of times.

11    BY MR. HANAUER:

12        Q.    How many times have you performed an

13    event study as an expert witness?

14        MR. FIGEL:  Objection.

09:53 15    THE WITNESS:  Hundreds, if not thousands of

16    times.

17    BY MR. HANAUER:

18        Q.    Have you ever performed an event study

19    related to a digital asset or cryptocurrency?

09:54 20        A.    No, not that I can think of.

21        Q.    Are you offering any opinion whether

22    there are specific adjustments that should be

23    made to an event study for digital assets as

24    compared to an event study for stocks?

09:54 25        MR. FIGEL:  Objection.

35

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    THE WITNESS:  Well, I don't know if I would

2    say adjustments is the right word.  I do think

3    one of the issues that always comes up with

4    event studies is the relationship between event

09:54 5    studies and the existence of efficient markets.

6    I'm extremely familiar with that issue.

7         And I do think there is a fundamental

8    difference between the use or the appropriate

9    use of event studies in connection with

09:55 10   cryptocurrencies as compared with, for example,

11   event studies in connection with publicly-traded

12   stocks on the New York Stock Exchange or NASDAQ

13   or any organized exchange, assuming that those

14   stocks on those exchanges satisfy the criteria

09:55 15   for an efficient market.

16   BY MR. HANAUER:

17   Q.   So I understand that, but I guess my

18   question is:  Are you offering an opinion about

19   any specific adjustments that should be made to

09:55 20   an event study for digital assets as compared to

21   an event study for stocks?

22   MR. FIGEL:  Objection.

23   THE WITNESS:  I guess the specific adjustment

24   is whether it's appropriate to use an event

09:55 25   study other than as a test for whether or not

36

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    cryptocurrencies trade in an efficient market.

2    BY MR. HANAUER:

3        Q.    And I would -- what's your answer to

4    whether an event study is an appropriate test

09:56  5    for whether -- actually, strike that.

6              Again, I understand you're that saying

7    that there are differences between crypto

8    markets and stock markets.  But are you going to

9    give the opinion that an adjustment needs to be

09:56 10    made to an event study for crypto assets as

11    opposed to an event study for stocks?

12        MR. FIGEL:  Objection.

13        THE WITNESS:  I've answered that question

14    several times.  I think there is no event study

09:56 15    in the academic literature that finds that

16    cryptocurrencies trade in an efficient market.

17    And that raises the question, given that

18    finding -- and I discussed this in my report --

19    as to whether it's appropriate to use an event

09:57 20    study to reach conclusions about the

21    relationship between information and price

22    movements in the cryptocurrency context as

23    compared with the context where stocks trade in

24    an efficient market, such as the situations that

09:57 25    I've just described.

37

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    When you perform an event study for

3    expert testimony, does your expert report

4    typically include a description of the important

09:57  5    steps in your methodology?

6        MR. FIGEL:  Objection.

7        THE WITNESS:  Well, that's a pretty vague

8    question.

9            You know, I guess I frequently discuss

09:58 10    what's generally referred to as the Cammer

11    factors, which are criteria which are frequently

12    recognized as criteria for determining whether

13    stocks or bonds or, I guess, any financial asset

14    trade in a financial -- trade in an efficient

09:58 15    market.

16            So I guess in that sense, I would say

17    yes.

18    BY MR. HANAUER:

19        Q.    When you perform an event study, do you

09:58 20    first start with identifying all significant

21    price changes and then check to see if those

22    changes can be linked to news, or do you start

23    by identifying news and then check to see if

24    there was a price reaction to the news

09:58 25    announcement?

38

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1       MR. FIGEL:  Objection.

2       THE WITNESS:  Well, you know, first of all, I

3    would say every case depends on the relevant

4    facts and circumstances depending on the

09:59  5    question being analyzed.

6           But, generally speaking, in event

7    studies, you have particular periods of time

8    that you're analyzing, and you analyze the

9    relationship between price movements and what

09:59 10    happened in connection with events or the lack

11   of events on particular days.

12   BY MR. HANAUER:

13       Q.   But do you first look for price changes

14   of an asset and then see if those price changes

09:59 15   can be linked to news, or do you start with news

16   and then look to see if the news is linked to

17   price changes?

18       MR. FIGEL:  Objection.

19       THE WITNESS:  As I said, every case is

09:59 20   different.  So it depends on the relevant facts

21   and circumstances, but I would say most

22   typically neither of the alternatives that you

23   just posited.

24           Most typically you look at days.  If

10:00 25   you're looking at -- and whatever the relevant

39

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    period of time is in connection with the inquiry

2    that you're providing, you look at all the days

3    and you look at the -- you have a -- you form a

4    statistical model and you perform a -- one or

10:00  5    more regressions to analyze, as I said, the

6    relationship between price movements, or the

7    lack of price movements, on a set of days that

8    you are analyzing.

9    BY MR. HANAUER:

10:00 10    Q.   In event studies that involve repeated

11   public announcements or repeated the news

12   announcements, do you typically only use the

13   date of the earliest news release, or do you

14   include all event days when that same news is

10:01 15   repeated?

16       MR. FIGEL:  Objection.

17       THE WITNESS:  There's a difference between

18   what you look at and how you interpret what you

19   look at.

10:01 20          In terms of what you look at, generally

21   speaking, you don't make subjective judgments as

22   to which days you look at.  You look at all the

23   days.  And then how you interpret the results

24   depends on, you know, again, the particular

10:01 25   facts and circumstances that you're analyzing.

40

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1            So that if you see that there is a

2    series of days that have similar information or

3    identical information being disclosed, you take

4    that into account in how you interpret the

10:02   5    results.

6    BY MR. HANAUER:

7        Q.   If the same news is announced on

8    multiple days, do you treat each day where there

9    is the same announcement as an event day?

10:02  10        MR. FIGEL:  Objection.

11        THE WITNESS:  Again, it just doesn't really

12    capture the typical way that event studies are

13    performed.  You look at all the days.

14            Again, speaking at a high level of

10:02  15    generality, because as I said, every case is

16    different and you always have to take into

17    account the relevant facts and circumstances,

18    but you don't make subjective judgments about

19    what's an event day.

10:02  20            You look at all the days, and then you

21    see what happens on each day, if anything, and

22    what price reaction occurred on each day, if

23    anything.  And you interpret the data as

24    appropriate depending on the relevant facts and

10:03  25    circumstances.

41

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.   Before you perform an event study as an

3    expert witness, do you always check whether the

4    market for the financial product at issue is

10:03  5    sufficiently efficient?

6        MR. FIGEL:  Objection.

7        THE WITNESS:  I would say either explicitly

8    or implicitly, yes, I think you do.

9    BY MR. HANAUER:

10:03 10        Q.   And what's the difference about how you

11    go about checking efficiency explicitly or

12    implicitly?

13        MR. FIGEL:  Objection.

14        THE WITNESS:  Well, many of my expert reports

10:03 15    go through the various Cammer factors, as I

16    stated, so I would say that's an explicit

17    treatment.

18            Sometimes there's no dispute and it's

19    just obvious.  So if you take a very actively

10:04 20    traded stock on the New York Stock Exchange, for

21    example, it might just be assumed by everyone

22    that that stock trades in an efficient market so

23    there's no need to demonstrate what's obvious.

24    So, you know, that's also possible.

25

42

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  BY MR. HANAUER:
 2       Q.   So for certain of your event studies,
 3  you don't start by performing a Cammer analysis --
 4       MR. FIGEL:  Objection.
 5  BY MR. HANAUER:
 6       Q.   -- C-A-M-M-E-R?
 7       A.   Yes, I'm sure that's true.
 8       Q.   Did anyone -- referring to your report
 9  in this case, Exhibit DF-1, did anyone assist
10  you in preparing the report?
11       A.   Yes.
12       Q.   And who was that?
13       A.   I would say three people particularly.
14  David Gross, Eddie Grgeta, and Constance Kelly.
15       Q.   And those three individuals, they are
16  all affiliated with Compass?
17       A.   They're all employees of Compass
18  Lexecon, correct.
19       Q.   Did you write the entirety of your
20  report?
21       A.   You mean did I draft every word, no.
22       Q.   Who did?  Or who else did?
23       A.   You know, probably -- probably the
24  latter two names that I mentioned were involved
25  in the drafting, working under my supervision.
```

10:04  5
10:04 10
10:05 15
10:05 20
10:05 25

43

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      Q.   Going through your report, are you able

2    to discern what portions you wrote and what

3    portions other people wrote?

4      A.   No.  Well, first of all, it's a very

10:06  5    interactive process.

6           Secondly, there were multiple drafts

7    that were written.  And everyone was involved to

8    some extent.

9           But as I said, I would say primarily

10:06 10   the other people that did most of the drafting,

11   initial drafting, under my supervision were

12   Eddie Grgeta and Constance Kelly.

13     Q.   And did those two folks, did they do

14   most -- did they draft most of your report?

10:06 15     MR. FIGEL:  Objection.

16     THE WITNESS:  I would say they -- they were

17   the most involved in implementing the opinions

18   that I wanted to give.

19           And, again, the report is a product of

10:07 20   multiple drafts.  As I stated, it was very much

21   of a cooperative project in terms of talking

22   about it, thinking about it, organizing it,

23   obviously, all done under my supervision and

24   direction.

25

44

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  BY MR. HANAUER:
 2      Q.   Was anything in your report written by
 3  Ripple's attorneys?
 4      MR. FIGEL:  Objection.
 5          You can answer yes or no.
 6      THE WITNESS:  No.
 7  BY MR. HANAUER:
 8      Q.   Did Ripple's attorneys direct you to
 9  write anything?
10      MR. FIGEL:  Objection.  Give me just a
11  second, Mr. Hanauer.
12          Start with, you can answer yes or no.
13      THE WITNESS:  No.
14  BY MR. HANAUER:
15      Q.   Did you -- does your report incorporate
16  comments from Ripple's attorneys?
17      MR. FIGEL:  Objection.
18          You can answer yes or no.
19      THE WITNESS:  I don't think so, no.
20  BY MR. HANAUER:
21      Q.   And you testified that there were three
22  Compass team members who primarily assisted in
23  preparing your report; is that correct?
24      A.   Yes.  In thinking about the case,
25  conceptualizing the case, discussing ideas about
```

10:07  5

10:07 10

10:07 15

10:08 20

10:08 25

45

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      the case, which ultimately led to the

2      preparation of the report and continued work

3      subsequently to the preparation of the work.

4      Those three that I mentioned.

10:08  5      Q.   And how many other Compass Lexecon

6      personnel affiliated -- or assisted the three

7      people you mentioned?

8           MR. FIGEL:  Objection.

9           THE WITNESS:  There were certainly some

10:08 10    others.  I don't know how many.  I mean, I can

11     think of a couple names, and I'm sure there were

12     research assistants and others as well.

13     BY MR. HANAUER:

14          Q.   How many Compass personnel billed time

10:09 15    in relation to your report?

16          A.   I don't know.

17          Q.   Who prepared Exhibits 1 and 2 to your

18     report?

19          A.   Well, they were prepared after going

10:09 20    through Dr. ████ backup.  I'm actually not

21     sure who actually, at least originally, went

22     through Dr. ████ backup to get the data to

23     prepare Exhibits 1 and 2.

24          Q.   So understanding that you don't know

10:10 25    who went through Dr. ████ backup data, do you

46

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
    1   know who was the person that prepared Exhibits 1
    2   and 2 to your report?
    3       MR. FIGEL:  Objection.
    4       THE WITNESS:  Physically prepared the
10:10 5   reports -- the exhibits, excuse me?  No, I would
    6   say I went over the backup with the three people
    7   that I mentioned.  But how that backup got
    8   physically translated into the exhibits, which,
    9   as I said I went over, specifically went over
10:10 10  with the three people that I mentioned, I'm not
    11  sure.
    12  BY MR. HANAUER:
    13      Q.   Is there anything in your report that
    14  is inaccurate?
10:10 15      A.   Not that I know of.
    16      Q.   And when I say "your report," do you
    17  understand that I'm referring to Exhibit DF-1?
    18      A.   Yes, I understand that.
    19      Q.   Is there anything in your report that
10:11 20  you need to correct?
    21      A.   Not that I'm aware of.
    22      Q.   Does your report contain a complete
    23  statement of all the opinions you will express
    24  in this case?
10:11 25      MR. FIGEL:  Objection.
```

47

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1      THE WITNESS:  Well, certainly, the opinions

         2    that I was aware of at the time of my report.

         3    I'm not aware of any other opinions as of now

         4    that I would express if asked.  But, obviously,

10:11    5    in cases of this complexity and magnitude,

         6    things might come up.

         7          I haven't, you know, reviewed the

         8    testimony of Dr. ███, for example, or any other

         9    expert, you know, so I don't know what I could

10:12   10    be asked, what additional work could be

        11    performed.

        12          But as of now, I don't have any

        13    additional opinions to the ones that are

        14    expressed in my report.

10:12   15    BY MR. HANAUER:

        16      Q.   So, I take it, you will not be

        17    offering -- as you sit here today, are you aware

        18    of any opinions that you will offer in this case

        19    that are not contained in your report?

10:12   20      MR. FIGEL:  Objection.

        21      THE WITNESS:  As I sit here today, I am not

        22    aware of any other opinions.  But, as I said, in

        23    cases of this complexity and magnitude, it's my

        24    experience that things tend to come up, you keep

10:12   25    working, you keep thinking of new things, you're

                                                              48

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  told about new things, you're aware of positions
 2  that are being taken in the case.  So things
 3  could come up.
 4          But as of now, I'm not aware of any
10:12 5  additional opinions to the ones that are
 6  contained in my report.
 7  BY MR. HANAUER:
 8      Q.   Have you been asked to prepare either a
 9  supplemental report or an additional report in
10:13 10 this case?
11      MR. FIGEL:  Start by answering yes or no.
12      THE WITNESS:  No.
13  BY MR. HANAUER:
14      Q.   Does your report contain all of the
10:13 15 bases and reasons for the opinions you're
16  offering?
17      MR. FIGEL:  Objection.
18      THE WITNESS:  I would say yes, combined with
19  my experience and expertise.
10:13 20 BY MR. HANAUER:
21      Q.   Does appendix -- why don't we just look
22  at it.  Can you pull up Appendix B to your
23  report, please.
24          Does Appendix B to your report identify
10:14 25 all the facts and data you considered in forming
```

49

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    the opinions expressed in your report?

2        A.    That I relied on in my report, it

3    should.

4        Q.    Different question.  Not relied on.

10:14  5    Considered.

6        MR. FIGEL:  Objection.

7        THE WITNESS:  Well, "considered" is such a

8    broad term.  Anything that I came in contact

9    with.

10:14 10   BY MR. HANAUER:

11       Q.    "Considered" is the words from the

12   federal rules, so that's why I'm using that

13   word.

14       MR. FIGEL:  Objection.

10:14 15       THE WITNESS:  I would say considered in the

16   way that I used the material for purposes of my

17   report, I would say yes.  But it's not all the

18   material that I've ever seen in connection with

19   this case.  That's what I -- that's the

10:14 20   distinction that I would draw.

21   BY MR. HANAUER:

22       Q.    Just so the record is clear on this,

23   does Appendix B to your report identify all the

24   facts and data you considered in forming the

10:15 25   opinions expressed in your report?

                                                    50

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1        MR. FIGEL:  Objection.

 2        THE WITNESS:  Considered in the way that you

 3   described, yes.

 4   BY MR. HANAUER:

 5        Q.   Does Appendix B list all of the

 6   academic literature and textbooks you considered

 7   in forming the opinions expressed in your

 8   report?

 9        A.   Yes, with the caveat that I mentioned

10   in my earlier answer, that I'm aware of other

11   articles that analyze the efficiency of

12   cryptocurrency markets, other than those cited

13   by Dr. ████ that I looked at in connection with

14   the preparation of my report.

15        Q.   And can you name any of those?

16        A.   Not from memory, as I said earlier.

17        Q.   Aside from those articles you just

18   mentioned, are there any facts or data that you

19   considered but did not rely upon for this

20   engagement?

21        MR. FIGEL:  Objection.

22        THE WITNESS:  Well, that's really the

23   distinction that I was drawing before.  I'm sure

24   I saw a lot of paper in this case that I'm not

25   relying on.  I don't know if that comes within
```

10:15   5
10:15   10
10:16   15
10:16   20
10:16   25

51

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   your definition of "considered."

2   BY MR. HANAUER:

3       Q.   Did the articles you just mentioned

4   that you said you reviewed but can't remember

10:17 5   the names of them, were any of them published in

6   peer-reviewed journals?

7       A.   I believe so, yes.

8       Q.   All of them?

9       A.   I don't know.

10:17 10   MR. HANAUER:  And, again, Counsel, I'll just

11   repeat my request on the record for disclosure

12   of those materials considered by Professor

13   Fischel.

14       MR. FIGEL:  We understand your request and we

10:17 15   will take it under advisement.

16   BY MR. HANAUER:

17       Q.   Apart from the information contained in

18   the documents either identified in your report

19   or in Appendix B to your report, did you

10:17 20   consider any other facts or data in forming the

21   opinions stated in your report?

22       MR. FIGEL:  Objection.

23       THE WITNESS:  I don't have anything to add to

24   what I've already said.  I don't recall anything

10:17 25   that I considered in connection with forming my

52

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    opinions, but I don't want to say that I didn't

2    see anything else in connection with my work in

3    this case.

4    BY MR. HANAUER:

10:18  5        Q.   Did you consider any of the SEC's

6    interrogatory responses?

7        A.   I think I -- didn't I cite some

8    interrogatory responses by the SEC in my report?

9    I think I did.  Maybe I'm confusing that with --

10:18 10       Q.   And I don't want to --

11       A.   Footnote was what I was thinking of.

12       Q.   Yeah.  And I don't want to trip you up,

13   Professor.  It looks like under Legal Documents

14   and Expert Reports, the only discovery response

10:19 15  you have listed is the SEC's Answers to the

16   First Set of Requests for Admission.

17       A.   Yeah, that's what --

18       MR. FIGEL:  Objection.

19       THE WITNESS:  That's what I was just thinking

10:19 20  of in footnote 33.

21   BY MR. HANAUER:

22       Q.   Okay.  So I'll repeat my question.

23           Did you consider any SEC interrogatory

24   responses?

10:19 25       MR. FIGEL:  Objection.

53

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1        THE WITNESS:  Not in forming my opinions.  I
 2   don't remember if I ever saw any.
 3   BY MR. HANAUER:
 4        Q.   Did you consider any request for
 5   admission responses other than the SEC's
 6   response to Defendant's First Set of Requests
 7   for Admissions?
 8        MR. FIGEL:  Objection.
 9        THE WITNESS:  Same answer.  I don't recall
10   one way or the other.
11   BY MR. HANAUER:
12        Q.   Have you reviewed any deposition
13   transcripts in this case?
14        A.   I don't believe so.  I certainly plan
15   to look at Dr. █████ deposition at some point,
16   but I haven't as of yet.
17        Q.   Have you read any other deposition
18   transcripts from this case?
19        A.   No.
20        Q.   You read the entirety of the amended
21   complaint in this case?
22        A.   Well, when you say "the entirety," if
23   you mean every word, probably not.
24        Q.   Are you offering the opinion that any
25   factual allegation in the complaint is untrue?
```

54

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          MR. FIGEL:  Objection.

2          THE WITNESS:  It's very hard to answer that

3     question.  I'm certainly not generally offering

4     opinions about factual testimony one way or the

10:21  5     other.  But what comes within your definition of

6     a "factual allegation," whether there is any

7     overlap between whatever your definition is and

8     the economic evidence and analysis that I

9     discussed in my report, I don't know.

10:21  10          So I think you'd have to be a little

11     bit more specific as to what you're including as

12     a factual allegation.

13     BY MR. HANAUER:

14          Q.   Do you have first-hand knowledge of any

10:21  15     fact alleged in the complaint?

16          A.   First-hand knowledge, no.

17          Q.   In forming your opinions in this case,

18     did you consider any of the statements Ripple

19     made on its website?

10:22  20          MR. FIGEL:  Objection.

21          THE WITNESS:  I don't believe so, no.

22     BY MR. HANAUER:

23          Q.   Did you consider any social media posts

24     by Ripple or its personnel?

10:22  25          MR. FIGEL:  Objection.

55

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          THE WITNESS:  No.

2     BY MR. HANAUER:

3          Q.   Did you consider any Ripple promotional

4     materials?

10:22  5          MR. FIGEL:  Objection.

6          THE WITNESS:  No.

7     BY MR. HANAUER:

8          Q.   Did you speak with any purchasers or

9     holders of XRP?

10:22 10          A.   No, not to the best of my knowledge.

11          Q.   Did you review any documents to

12     determine any purchaser or holder, their intent

13     for obtaining XRP?

14          MR. FIGEL:  Objection.

10:22 15          THE WITNESS:  No.

16     BY MR. HANAUER:

17          Q.   Did you do anything to determine

18     whether any purchaser intended to sell their XRP

19     for a profit?

10:22 20          A.   No.

21          Q.   Did you do anything to determine

22     whether any particular purchaser or holder

23     intended to profit based on Ripple's efforts?

24          MR. FIGEL:  Objection.

10:23 25          THE WITNESS:  No.

56

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.   Are you offering any opinion about the

3    intent or expectation of any XRP purchaser or

4    holder?

10:23  5        MR. FIGEL:  Objection.

6        THE WITNESS:  No.

7    BY MR. HANAUER:

8        Q.   So we've been going a little bit more

9    than an hour.  I just want to check with you how

10:23 10    you're doing on time and breaks.

11        A.   I'm fine either taking a break or not

12    taking a break, whatever your preference is or

13    other people's preference.

14        MR. FIGEL:  Why don't we take a break.

10:23 15             Before we go off the record, just a

16    couple things.  One, I assume we can have the

17    standard understanding that an objection by one

18    party constitutes an objection by all parties.

19        MR. HANAUER:  So stipulated.

10:23 20        MR. FIGEL:  And just since we are all dating

21    ourselves, I believe the Belzberg case was 35

22    years ago, not 25 years ago.

23        MR. HANAUER:  Let's go off the record.

24        THE VIDEOGRAPHER:  We are going off the

10:24 25    record.  The time is 10:24 a.m.

57

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1              (Whereupon, a recess was had at
 2              10:24 a.m., after which the
 3              deposition was resumed at
 4              10:44 a.m. as follows:)
10:44  5    THE VIDEOGRAPHER:  We are back on the record.
 6  The time is 10:44 a.m.
 7          You may proceed.
 8  BY MR. HANAUER:
 9     Q.   Professor Fischel, have you read
10:44 10  Ripple's well submission that it submitted in
11  this matter?
12     A.   No.
13     Q.   In preparing your report, did you
14  consider any academic research or digital assets
10:44 15  or cryptocurrencies?
16     A.   The articles on cryptocurrencies and
17  efficient markets that I mentioned.  I can't
18  think of anything else, but let me just check to
19  make sure.
10:45 20          No.  Other than that general category,
21  I would say no.
22     Q.   So with the exception of the two papers
23  cited on Appendix B to your report, the Joo
24  paper and the Feng paper, in preparing your
10:45 25  report did you consider any other academic
```

58

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1    literature relating to digital assets for
         2    cryptocurrencies?
         3         MR. FIGEL:  Objection.
         4         THE WITNESS:  I'm getting the -- the sequence
10:45    5    of when I saw articles a little bit fuzzy in my
         6    mind.  I can't remember if Dr. ███ cited more
         7    than those two.  I think he did.  But I
         8    certainly looked at every article that he cited
         9    on cryptocurrencies and efficient markets.
10:46   10         And as I said, I have looked at other
        11    articles besides those two, but I can't remember
        12    before or after.  I know some after.  But I
        13    can't remember if there were also some before
        14    other than those two.
10:46   15         MR. FIGEL:  Excuse me, Mr. Hanauer, I'm not
        16    sure if the -- I had an objection to the last
        17    question.  I'm not sure if that was the "chk."
        18         THE COURT REPORTER:  That was a check.  I
        19    didn't hear.  Speak a little louder.
10:46   20         MR. FIGEL:  Okay.  Will do.
        21    BY MR. HANAUER:
        22         Q.   Are you disputing the conclusions of
        23    any academic paper cited by Mr. ███?
        24         A.   Again, it's a pretty open-ended
10:47   25    question.  You'd have to show me which

                                                              59

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   conclusion or which paper you're referring to

2   before I could answer one way or the other.

3       Q.   Maybe we'll get to that in a little

4   bit.

10:47   5       Do any of the opinions in your report

6   rely on any assumptions?

7       MR. FIGEL:  Objection.

8       THE WITNESS:  Again, that's such a broad

9   open-ended question.

10:47  10       You know, the term "assumptions" is

11   pretty open-ended.  But I think in terms of any

12   of the opinions formally being based on any

13   particular assumptions, I think the answer to

14   that is no.

10:47  15   BY MR. HANAUER:

16       Q.   Did Ripple's -- did Ripple or its

17   attorneys ask you to make any assumptions in

18   this case?

19       MR. FIGEL:  Objection.

10:48  20       You can answer yes or no.  Don't reveal

21   any communications with Ripple's counsel.

22       THE WITNESS:  No.

23   BY MR. HANAUER:

24       Q.   Are you offering any opinions related

10:48  25   to the conduct of the individual defendants in

60

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1  this case, Mr. Garlinghouse or Mr. Larsen?
         2      MR. FIGEL:  Objection.
         3      THE WITNESS:  I don't believe so, no.
         4  BY MR. HANAUER:
10:48    5      Q.   Will you be offering any opinion
         6  related to industry custom and practice?
         7      A.   No.
         8      Q.   Will you be offering an opinion related
         9  to any of the defendants' affirmative defenses?
10:48   10      MR. FIGEL:  Objection.
        11      THE WITNESS:  You have to tell me what they
        12  are.
        13  BY MR. HANAUER:
        14      Q.   As you sit here today, can you think of
10:48   15  any opinion you're offering related to any of
        16  the defendants' affirmative defenses?
        17      A.   I don't know because I don't know what
        18  the affirmative defenses are from memory.
        19      Q.   Are you offering -- will you be
10:49   20  offering any opinion related to Ripple's fair
        21  notice defense?
        22      MR. FIGEL:  Objection.
        23      THE WITNESS:  No.
        24  BY MR. HANAUER:
10:49   25      Q.   Will you be offering an opinion related
```

61

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   to either of the individual defendants' scienter

 2   defenses?

 3        MR. FIGEL:  Objection.

 4        THE WITNESS:  No.  I mean, obviously the

10:49 5   opinions I'm offering are the ones in my report.

 6   So if there is any overlap between any of my

 7   opinions in my report and any of your questions,

 8   you know, obviously my -- I'm expected to

 9   testify if asked about my report.

10:49 10       But in connection with all the

11   questions that you're asking me, I don't expect

12   to, at least as of now, offer any additional

13   opinions beyond what's in my report on those

14   subjects.

10:49 15  BY MR. HANAUER:

16        Q.   The opinions you offer in this case are

17   rebuttals to opinions offered by Dr. ████ in his

18   amended report dated October 6, 2021?

19        A.   Again, I'm not sure of the date.  But

10:50 20  they are rebuttal opinions to the opinions of

21   Dr. ████.  That's correct.

22        Q.   And just so it's in the record, a copy

23   of Dr. ████ report, that's Exhibit DF-2?

24        A.   Yes, I see that.  I wasn't aware of it.

10:50 25  I see the date as well.
```

                                                    62

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
              1                    (Whereupon, Deposition
              2                    Exhibit DF-2 was marked for
              3                    identification.)
              4      BY MR. HANAUER:
    10:50    5          Q.   Do your opinions in this case pertain
              6      solely to the opinions set forth in Dr. ████
              7      report?
              8          MR. FIGEL:  Objection.
              9          THE WITNESS:  It's really an ambiguous
    10:50   10      question.  Some of the opinions are based on
             11      economic theory or literature that's not based
             12      on Dr. ████ more general.
             13               But the opinions I'm offering in the
             14      case are rebuttal opinions to the opinions of
    10:51   15      Dr. ████.
             16      BY MR. HANAUER:
             17          Q.   Are you offering any rebuttal opinions
             18      to Dr. ████ rebuttal to Dr. Ferrell's report?
             19          A.   Same answer as I gave a minute ago.
    10:51   20      Not specifically, except to the extent that
             21      something in my report can be characterized as
             22      also relevant to a criticism of -- in responding
             23      to a criticism of Dr. Ferrell's report --
             24      Professor Ferrell's report.
    10:52   25          Q.   Have you read Dr. ████ rebuttal
```

63

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1   report?
        2        A.   You mean this exhibit, whatever it is,
        3   Exhibit 2?
        4        Q.   No.   The rebuttal expert report that
10:52   5   Dr. ███ has submitted in this case.
        6        A.   I don't believe so, no.
        7        Q.   Will you be offering opinions regarding
        8   any of the SEC's experts other than Dr. ███?
        9        MR. FIGEL:  Objection.
10:52  10        THE WITNESS:  Same answer.  Again, not
       11   specifically as far as I know, other than to the
       12   extent that the opinions in my report have some
       13   relevance, if they do, to responding to claims
       14   by other experts as well.
10:53  15   BY MR. HANAUER:
       16        Q.   And if I refer to Dr. ███ report, do
       17   you understand that I'm referring to Exhibit
       18   DF-2?
       19        A.   That is what I understand, correct.
10:53  20        Q.   Have you reviewed any of the SEC's
       21   expert reports in this case other than
       22   Dr. ███ report?
       23        A.   No.
       24        Q.   So I want to ask you some questions
10:53  25   about event studies.
```

                                                            64

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
           1          If you had been asked to conduct an
           2    event study that assessed the claim -- I'm
           3    sorry, let me start over.
           4          If you had been asked to conduct an
10:53      5    event study that assessed claims of any link
           6    between Ripple announcements and XRP prices,
           7    would you have been able to do that?
           8       MR. FIGEL:  Objection.
           9       THE WITNESS:  It's very hard to answer that
10:53     10    question.  Would I be given a purpose for why
          11    I'm doing it, the context of why I'm doing it?
          12          I'm not sure I can answer the question
          13    without an answer to those questions.
          14    BY MR. HANAUER:
10:54     15       Q.  Well, Dr. ███, he did an event study
          16    that looked at the impact of Ripple public
          17    announcements and XRP prices, right?
          18       MR. FIGEL:  Objection.
          19       THE WITNESS:  Yes, he did that.
10:54     20    BY MR. HANAUER:
          21       Q.  If you wanted to conduct a similar
          22    event study, could you do that?
          23       MR. FIGEL:  Objection.
          24       THE WITNESS:  Again, it's hard to answer that
10:54     25    question because if you just mean the actual act
```

65

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    of conducting an event study, you can conduct an

2    event study of the relationship between any

3    event and any price.  It has nothing -- there's

4    nothing unique about cryptocurrencies.

10:55  5         The only issue is whether it's

6    appropriate to do it, what it shows you, what

7    you can infer from it.  And that's why context

8    is important.

9         If you asked me to conduct an event

10:55 10   study between announcements by Kellogg's and the

11   price of Corn Flakes, you can do that.

12        In other words, an event study is just

13   a statistical technique to analyze the

14   relationship between what occurs on particular

10:55 15   days or events on particular days and price

16   movements.

17        It might not be valid for any purpose,

18   it might not tell you anything, but you could

19   physically conduct that statistical analysis for

10:56 20   anything.

21        But that's not really meaningful

22   outside the issue of for what purpose, whether

23   it's appropriate, and what it tells you.  And,

24   again, that's one of the really fundamental

10:56 25   flaws, in my opinion, in Dr. ███████ report and

66

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  why his methodology is so defective.

2  BY MR. HANAUER:

3     Q.   Would you be able to conduct an event

4  study that validly or accurately determined a

10:56  5  link between Ripple public announcements and XRP

6  prices?

7     MR. FIGEL:  Objection.

8     THE WITNESS:  You know, again, it depends for

9  what purpose and it depends by what you mean by

10:57  10  "validly."

11        In other words, there are a series of

12  academic studies that have attempted to use

13  event studies to analyze whether cryptocurrencies

14  trade in an efficient market.  If that's the

10:57  15  question that's being analyzed, then, yes, I

16  could -- if I were interested in analyzing that

17  question independently from the academic studies

18  that have analyzed that question, I could an --

19  I could do that, in the same way that academic

10:57  20  studies have already done that.

21        That's -- excuse me.  That's why the

22  purpose of conducting an event study has to be

23  considered anytime you're asking the question of

24  what you can validly do or not do.

25

67

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.   So I think you said you could conduct

3    an event study to determine the efficiency of

4    the market for XRP?

10:58  5        MR. FIGEL:  Objection.

6        THE WITNESS:  That's right.

7    BY MR. HANAUER:

8        Q.   Could you conduct an event study for

9    another purpose such as accurately determining

10:58 10   the impact of public announcements on XRP

11   prices?

12       MR. FIGEL:  Objection.

13       THE WITNESS:  Well, that gets a lot more

14   complicated because one of the findings in the

10:58 15   academic literature is -- one of the purposes of

16   determining whether it's possible to draw

17   meaningful conclusions about the relationships

18   between events and prices is the existence of an

19   efficient market because the definition of a

10:59 20   semi-strong efficient market is prices that

21   reflect publicly-available information quickly

22   and without bias.

23            And in the absence of a finding of an

24   efficient market, you don't have a -- those

10:59 25   criteria are not satisfied or may not be

68

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1    satisfied or one or both may not be satisfied.

 2             And that immediately is something that

 3    has to be taken into account at the very least

 4    and may call into question any conclusions that

 5    are drawn in the absence of an efficient market.

 6             But, again, you need to provide a

 7    little more context and definition to answer

 8    beyond that general answer.

 9    BY MR. HANAUER:

10       Q.    Did you conduct an event study in this

11    case?

12       A.    No, other than -- not independently,

13    other than reviewing the academic literature and

14    reviewing the work by Dr. ███.

15       Q.    Did anyone at Compass conduct an event

16    study related to this case?

17       A.    Not to the best of my knowledge.

18       Q.    Are you offering an opinion in this

19    case on the informational efficiency of the XRP

20    market?

21       MR. FIGEL:  Objection.

22       THE WITNESS:  Well, I think Dr. ███, for all

23    practical purposes, concedes that the XRP market

24    is not informationally efficient.

25             And apart from that, a number of the
```

10:59   (line 5)
11:00   (line 10)
11:00   (line 15)
11:00   (line 20)
11:01   (line 25)

69

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    academic studies concede the same thing.  In

2    fact, the Joo article that he cites, if I

3    remember correctly, concludes that the XRP

4    market is one of the least efficient

11:01  5    cryptocurrency market, although he doesn't cite

6    that.

7    BY MR. HANAUER:

8        Q.    What article is that?

9        A.    The Joo article that he cites.

11:01 10       Q.    J-O-O?

11       A.    J-O-N, I think it is.  Or maybe I'm

12    getting the name wrong.

13             Yeah, I'm sorry, J-O-O, you're right.

14       Q.    Did you do any independent analysis to

11:01 15    test the efficiency of the XRP market?

16       A.    No, other than what I just described of

17    reviewing the academic literature and looking at

18    the findings of Dr. ███.

19       Q.    Did anyone at Compass do any

11:02 20    independent analysis to test the efficiency of

21    the XRP market?

22       A.    Not to the best of my knowledge.

23       Q.    As an expert witness, have you ever

24    performed an event study where you tried to

11:02 25    assess whether there was a link between a news

70

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    event and a price reaction, and you concluded

2    that there was no such link based on the

3    observation of abnormal reactions in price on

4    days with no news events?

11:02  5        MR. FIGEL:  Objection.

6        THE WITNESS:  You know, I've conducted a lot

7    of event studies in a lot of different contexts.

8    You know, I just don't know.  I don't recall one

9    way or the other whether that situation has ever

11:03 10    occurred.

11    BY MR. HANAUER:

12        Q.   Can you name any case, as you sit here

13    today, where you applied such an analysis?

14        MR. FIGEL:  Objection.

11:03 15        THE WITNESS:  Well, it's reached a particular

16    conclusion if I understood your -- based on an

17    assumed set of facts, if I understood your

18    question correctly.

19             I can't name any event study in the

11:03 20    hundreds or thousands that I've done where --

21    because there's so many different permutations

22    in so many event studies over so many years.  I

23    just can't tell you one way or the other.

24    BY MR. HANAUER:

11:04 25        Q.   So I want to ask you about the Joo

71

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    article, Announcement of Facts in the

2    Cryptocurrency Markets.

3        A.    Okay.

4        Q.    You read that article in connection

11:04 5    with your report?

6        A.    Yes, that's correct.

7        Q.    Do you dispute any of the findings in

8    the Joo article?

9        A.    Well, again, you have to show me the

11:04 10   article and show me which finding you're

11   referring to.

12       Q.    As you sit here today, can you name any

13   findings that you're able to dispute?

14       MR. FIGEL:  Objection.

11:04 15       THE WITNESS:  As I sit here, I don't remember

16   all the findings, so I don't know if there's any

17   that I disagree with without looking at the

18   findings themselves.

19   BY MR. HANAUER:

11:05 20       Q.    Are you aware of any scholarly article

21   disputing any findings from the Joo article?

22       MR. FIGEL:  Objection.

23       THE WITNESS:  I'd have to look.

24   BY MR. HANAUER:

11:05 25       Q.    As you sit here today?

72

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1      A.   I don't have the articles in front of

         2   me.  As I sit here today, I just don't know one

         3   way or the other.

         4      Q.   Do you have any critiques of the design

11:05    5   of the event studies described in the Joo

         6   article?

         7      MR. FIGEL:  Objection.

         8      THE WITNESS:  Again, I don't have the article

         9   in front of me so I don't know.

11:05   10                  (Whereupon, Deposition

        11                   Exhibit DF-3 was marked for

        12                   identification.)

        13   BY MR. HANAUER:

        14      Q.   Is Exhibit DF-3 a copy of the Joo

11:06   15   article we've just been discussing?

        16      A.   It is.

        17           What do you want me to look at?

        18      Q.   Well, I asked you some questions and

        19   you said you'd need to have the report in front

11:06   20   of you so --

        21      A.   I thought you asked me some questions

        22   about particular aspects of the Joo article.

        23      Q.   Okay.  Do you have any critique of the

        24   author's design of the event studies described?

11:08   25      A.   You know, I haven't studied the design

                                                              73

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

        1  of the empirical test in any detail.  But just
        2  looking over the article, I don't have any
        3  particular specific criticisms.
        4      Q.   Did you -- in preparing your report,
11:08   5  did you consider the Feng article, Informed
        6  Trading in the Bitcoin Market?
        7      A.   I think I considered it and discussed
        8  it in -- I think it was a footnote in my report
        9  if I remember correctly.
11:09  10      Q.   Are you offering an opinion that
       11  disputes any of the findings in that paper?
       12      MR. FIGEL:  Objection.
       13      THE WITNESS:  The same answer that I just
       14  gave about this.
11:09  15          First of all -- this Joo article, first
       16  of all, I don't have the article in front of me.
       17          Secondly, even if I do have the article
       18  in front of me, I'm not really trying to
       19  duplicate the results and the kinds of things
11:09  20  you would really need to do to be able to know
       21  if I had any disagreement with any of the
       22  findings or the structure of the empirical
       23  tests.
       24          I did think the particular finding that
11:10  25  I put in the footnote of my report was

                                                        74

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    significant and, again, very similar to the

2    finding in the Joo report.

3    BY MR. HANAUER:

4        Q.   And what finding is that?

11:10   5        A.   The finding of inefficiencies in the

6    market creating arbitrage opportunities because

7    of the deviations from market efficiency that

8    exists in other contexts.

9        Q.   Did you review the design of the event

11:10  10    study in the Feng article?

11        MR. FIGEL:  Objection.

12        THE WITNESS:  You know, as I would say -- I

13    would say the same thing as I said about the Joo

14    article.  Not in any detail.

11:11  15            I certainly reviewed the article and

16    the findings and the conclusions.  If there was

17    anything specific, you'd have to show me the

18    article.

19            But, as I said, even if you showed it

11:11  20    to me, I couldn't say definitively because that

21    wasn't really my intention in reviewing the

22    articles and I didn't try and duplicate the

23    results to see if I got the same answers as the

24    authors themselves got.

25

                                                           75

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
     1  BY MR. HANAUER:
     2      Q.    Did you try and duplicate the results
     3  of either the Gerritsen article or the Schaub
     4  article cited in Mr. ███████ report?
11:11 5      A.    No.
     6      Q.    So the Gerritsen report, Can Bitcoin
     7  Investors Profit From Predictions by Crypto
     8  Experts, you did not cite that report in
     9  Appendix B to your own report, you did not cite
11:12 10 that paper.
     11          Did you consider the Gerritsen paper in
     12 preparing your report in this case?
     13     MR. FIGEL:  Objection.
     14     THE WITNESS:  Yes, I looked at all the
11:12 15 reports cited by Dr. ████.
     16 BY MR. HANAUER:
     17     Q.    Before you signed your report?
     18     A.    That's what I'm just a little bit
     19 confused about in terms of timing.  I'm not sure
11:12 20 if it was before or after.
     21     Q.    And as you sit here today, are you
     22 offering any opinion disputing any of the
     23 findings in the Gerritsen article?
     24     MR. FIGEL:  Objection.
11:13 25     THE WITNESS:  The exact same answers that I
```

76

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1  gave about the other two articles.

         2          I don't have the article in front of

         3  me, so I don't know which finding you're

         4  referring to.  But even if I did have the

11:13    5  article in front of me, I would give the same

         6  answer, that I didn't really read the article

         7  with the intention of trying to duplicate the

         8  results to see if I agreed with everything that

         9  was done and the results that were reported in

11:13   10  the article.

        11          I was trying to survey the academic

        12  literature to see what it revealed about certain

        13  issues that were discussed in Dr. ████ report.

        14  BY MR. HANAUER:

11:13   15      Q.  Would your answer be the same for the

        16  Mark Schaub article cited by Dr. ████?

        17      A.  Yes --

        18      MR. FIGEL:  Objection.

        19      THE WITNESS:  Yes, it would.

11:14   20  BY MR. HANAUER:

        21      Q.  For Dr. ████ report, did you read the

        22  entirety of it?

        23      A.  Yes.

        24      Q.  Are you offering any opinion whether

11:14   25  Dr. ████ is qualified to offer the opinions

                                                        77

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    expressed in his report?

2        A.   No, I'm not.  I'm not offering any

3    opinion on whether he is or he isn't.

4        Q.   Do you have any reason to dispute his

11:14  5    qualifications?

6        A.   No, I don't.

7        Q.   Did you review Dr. ███ work for

8    errors?

9        MR. FIGEL:  Objection.

11:15  10       THE WITNESS:  I'm not sure what you mean by

11   "errors."  Like computational errors or -- what

12   kind of errors are you talking about?

13   BY MR. HANAUER:

14       Q.   Did you review his report for

11:15  15   computational errors?

16       A.   No.

17       Q.   Did anyone at Compass review Dr. ███

18   work to see if there were computational errors?

19       A.   I don't believe so, no.

11:15  20       Q.   Did you review the data Dr. ███ used

21   to conduct his event study?

22       MR. FIGEL:  Objection.

23       THE WITNESS:  I mean, I reviewed the report

24   so I saw the data that Dr. ███ used in his

11:15  25   report.  That's what I would say.

78

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    Did you review the backup data from

3    Dr. ██████ report that the SEC produced to

4    Ripple?

11:16  5        A.    Yes.  I mean, as I said before, that's

6    where my Exhibits 1 and 2 came from, his backup

7    data.

8        Q.    And did you review that data?

9        A.    Well, again, I'm not sure what you mean

11:16 10   by "review that data."  I reviewed the data in

11   his backup in order to create Exhibits 1 and 2.

12       Q.    Did you or anyone at Compass find any

13   errors in Dr. ██████ data?

14       MR. FIGEL:  Objection.

11:16 15       THE WITNESS:  We didn't really look for

16   errors.  I don't know if anybody saw anything

17   that they thought was an error, if you mean like

18   a mechanical error or computational error.

19   BY MR. HANAUER:

11:16 20       Q.    Did you or anyone working at your

21   direction attempt to replicate Dr. ██████

22   calculations?

23       A.    No, as far as I know.

24       Q.    And I believe that you testified that

11:17 25   neither you nor anyone at Compass conducted an

79

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    event study related to XRP?

2        A.   I said that's certainly true of me.

3    And to the best of my knowledge, it's true of

4    others as well.

11:17 5        Q.   Why didn't you or anyone at Compass try

6    and conduct an event study, excuse me, related

7    to XRP?

8        A.   Because I thought the use of event

9    studies by Dr. ███ in his opinion was

11:18 10   methodologically flawed for a number of

11   different reasons in ways that could not be

12   corrected by performing another event study.

13       Q.   Did you or anyone at Compass conduct an

14   event study related to any other digital assets?

11:18 15       MR. FIGEL:  Objection.

16       THE WITNESS:  No, to the best of my

17   knowledge.

18   BY MR. HANAUER:

19       Q.   Did you conduct any study to test the

11:18 20   efficiency of the XRP market?

21       A.   I think I've answered that already.

22       I think Dr. ███, I think in his

23   report, concedes that the XRP market is not

24   efficient.  And apart from that, there is a

11:19 25   series of academic articles that conclude the

80

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1  same thing.

 2      Q.   Did you attempt to apply the Cammer

 3  factors to XRP?

 4      A.   I actually thought about that and I

11:19  5  thought about the Cammer factors.  And, again,

 6  it was obvious that XRP would not meet the

 7  Cammer factors -- would not meet the

 8  requirements for the finding of an efficient

 9  market listed in the Cammer factors.

11:20 10      Q.   Did you -- is there any written work or

 11  analysis applying the Cammer factors to XRP?

 12      MR. FIGEL:  Objection.

 13      THE WITNESS:  I actually don't know the

 14  answer to that because I specifically raised

11:20 15  that issue with people that I was working with,

 16  and I didn't really follow up on it because the

 17  answer is obvious.

 18         But I don't know whether the people I

 19  was working with actually implemented that

11:20 20  request in a -- or that idea in a formal way by

 21  creating written work product.  I just don't

 22  know.

 23  BY MR. HANAUER:

 24      Q.   Have you reviewed any event studies

11:21 25  related to XRP other than Dr. ████?

                                                    81

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1     A.   And other than what's in the academic

2  articles, no.

3     Q.   Okay.  So what academic articles

4  performing an event study related to XRP have

11:21  5  you reviewed?

6     MR. FIGEL:  Objection.

7     THE WITNESS:  Whatever articles that I

8  reviewed discuss the efficiency of the market in

9  XRPs by looking, you know, for example, at the

11:21 10  speed of price adjustment, the existence of

11  serial correlation, the existence of arbitrage

12  opportunities.  That's what I would say.

13  BY MR. HANAUER:

14     Q.   And I'm just looking for which articles

11:22 15  actually discuss that for XRP.

16        So that's in the Joo article, right?

17     A.   Yes, I think that's in a number of the

18  articles.  But, again, I can't recite that from

19  memory without looking at all the articles.

11:22 20     Q.   You can't name an article other than

21  the Joo article that performed an event study

22  related to XRP?

23     MR. FIGEL:  Objection.

24     THE WITNESS:  I can't name them from memory

11:22 25  without having the articles in front of me,

82

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    correct.

2    BY MR. HANAUER:

3        Q.   Are you offering an opinion in this

4    case regarding Dr. ███ conclusions about the

11:22  5    link between XRP prices and the prices of other

6    digital assets?

7        MR. FIGEL:  Objection.

8        THE WITNESS:  I would say I didn't -- I

9    certainly saw Dr. ███ discussion of that

11:23 10    issue in numerous places, but I did not conduct

11    any separate analysis of that one way or the

12    other.

13    BY MR. HANAUER:

14        Q.   Are you offering the opinion whether or

11:23 15    not Ripple's actions or public announcements

16    cause XRP price movements?

17        A.   Well, first of all, you're using the

18    word "cause."  That has a particular meaning in

19    event study analysis.

11:24 20        You know, what an event study can show

21    is correlation.  I think that's what even -- if

22    I -- I don't remember exactly Dr. ███

23    phraseology, but that's the right statistical

24    answer to what an event study shows.  And then

11:24 25    by interpretation you might be able to reach a

83

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    conclusion about the causation.

2            So I don't really think Dr. ███ shows

3    that or even claims that.  But I wouldn't rule

4    out that certain events -- certain announcements

11:25  5    by XRP resulted in price changes in the sense

6    that, in the absence of those announcements, the

7    exact same price changes would not have

8    occurred.

9        Q.   And when you say announcements by XRP,

11:25 10    do you mean --

11        A.   I'm sorry.

12        Q.   -- announcements by Ripple?

13        A.   I meant announcements by Ripple.  Thank

14    you.

11:25 15        Q.   So using the correlation language that

16    you just referenced, are you opining in this

17    case whether or not there's a correlation

18    between Ripple's actions or public announcements

19    and XRP price movements?

11:26 20        A.   Again, it's very hard to answer that

21    question at the level of generality of your

22    question.

23            I think Dr. ███ study is

24    fundamentally flawed in a variety of different

11:26 25    ways, but I still would not rule out the

84

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  possibility that there were times when

2  announcements by Ripple were correlated at some

3  point in time with price movements by XRP.

4          I think that's a fair interpretation of

11:26  5  the data.

6      Q.   And did you perform any work or

7  analysis to determine if there was a correlation

8  between Ripple's actions or public announcements

9  and XRP price movements?

11:27 10     MR. FIGEL:  Objection.

11     THE WITNESS:  You know, I guess I would say

12  some in the sense that as a result of background

13  and experience, if you pick certain events that

14  you can anticipate would have a big price

11:27 15  effects or see the price effects first and then

16  look backwards towards the events, I believe you

17  could imagine -- not just imagine, conclude that

18  there was a correlation between certain

19  announcements and certain price movements.

11:27 20         But, again, that might be true for my

21  Kellogg's and Corn Flakes example.  Or maybe a

22  more relevant example would be De Beers

23  announcements.

24         In other words, for any price movement

11:28 25  that's related to a product, if you look over a

85

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
      1  multi-year period, you can find announcements
      2  that are likely going to be correlated with
      3  price movements.  And that's really all that
      4  Dr. ████ did.
11:28 5  BY MR. HANAUER:
      6      Q.   And I don't want to talk about the
      7  theoretical.  I just want to talk about like
      8  what you actually did.
      9           And did you perform any analysis to
11:28 10 actually determine if there is a statistically
      11 significant association between Ripple's actions
      12 or public announcements and XRP's price
      13 movements?
      14     MR. FIGEL:  Objection.
11:29 15     THE WITNESS:  I will say not in a formal
      16 statistical sense.  I think we looked at some of
      17 the biggest price movements and the events that
      18 occurred around those price movements or the
      19 announcements that occurred around those price
11:29 20 movements.
      21           And as I said, I think it would be fair
      22 to conclude that there was a correlation between
      23 the biggest price movements and certain
      24 announcements, even to the point of going beyond
11:29 25 what an event study can tell you itself and
```

86

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
          1   conclude for certain isolated price movements.
          2   Those were at a minimum correlated, possibly
          3   even caused by those announcements, but, again,
          4   in ways that you can find throughout the
11:30     5   different -- all the myriad of different
          6   relationships between products and price
          7   movements.
          8   BY MR. HANAUER:
          9       Q.   How many Ripple announcements did you
11:30    10   find were correlated with statistically
         11   significant XRP price movements?
         12       MR. FIGEL:  Objection.
         13       THE WITNESS:  Well, I didn't quite say that.
         14            What I said was, what we did do was
11:31    15   look at some of the biggest price movements that
         16   Dr. ████ found and then looked at certain
         17   announcements that occurred around the time of
         18   those price movements and concluded that, you
         19   know, just based on a fair interpretation of the
11:31    20   data that there would -- there would likely be a
         21   correlation between the announcements and the
         22   price movements, and possibly even a stronger
         23   relationship for that handful of announcements
         24   and that handful of price movements.
         25
```

87

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  BY MR. HANAUER:
 2      Q.   And how many such announcements did you
 3  find?
 4      A.   I don't remember the exact number.  But
 5  I think we tried to find the biggest price
 6  movements.  I'm not sure how we -- exactly how
 7  we defined the biggest price movements but --
 8  what the cutoff was, but some relatively small
 9  number just really to illustrate that if you
10  start with 500 announcements over a seven-year
11  period or whatever it was, you can find a
12  handful that there are big price movements where
13  there is a relationship with -- that there
14  appears to be a relationship with a handful of
15  really big price movements and particular
16  announcements.
17      Q.   Do you agree that Dr. ██████ procedures
18  flagged days with large positive price
19  reactions?
20      MR. FIGEL:  Objection.
21      THE WITNESS:  I'm not sure what you mean by
22  "flagged days."  You can look at price reactions
23  on every single day if you have the data to do
24  it.  And then you can create a model to tell you
25  what a large price movement -- to define what a
```

88

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    large price movement is.

2         So I don't know if that's what you mean

3    by flagging days.  But, you know, that's

4    certainly what you can do with a series of price

11:33    5    movements.

6    BY MR. HANAUER:

7         Q.   Did Dr. ██████ miss any days with large

8    positive price reactions?

9         MR. FIGEL:  Objection.

11:33    10         THE WITNESS:  I don't know because I didn't

11    attempt to replicate his study.

12    BY MR. HANAUER:

13         Q.   Do you dispute Dr. ██████ conclusion

14    that he finds statistically significant evidence

11:34    15    that XRP prices react to news about Ripple's

16    actions?

17         A.   That's a hard question to answer.

18    Because I -- I find that the study is so

19    methodologically flawed for numerous reasons.

11:34    20         But notwithstanding those

21    methodological flaws, I do not disagree for the

22    reasons that I just said, that you could

23    identify certain large price movements that are

24    associated with -- in terms of correlation,

11:35    25    possibly even causation, with certain

89

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   announcements by Ripple.  But I don't believe

 2   that supports any of the conclusions that -- or

 3   any of the opinions that Dr. ████ reached

 4   because his analysis is so methodologically

 5   flawed.

 6       Q.   So you discuss confounding news in your

 7   report?

 8       A.   Among other things, that's right.

 9       Q.   Did you do any analysis to determine

10   whether Dr. ████ results were actually

11   confounded by confounding information?

12       MR. FIGEL:  Objection.

13       THE WITNESS:  You mean other than what I said

14   in the report?  I'm not sure I understand the

15   question.

16   BY MR. HANAUER:

17       Q.   Well, your report identifies various

18   events that you claim could be confounding news,

19   right?

20       A.   Or were confounded, correct.

21       Q.   Did you do any testing or analysis to

22   determine the effect on XRP's price of the

23   announcements you claim to be confounding news?

24       MR. FIGEL:  Objection.

25       THE WITNESS:  Well, sometimes I think there
```

11:35 (line 5)
11:35 (line 10)
11:35 (line 15)
11:36 (line 20)
11:36 (line 25)

90

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    is some qualitative things that you can say, as

2    I did in the report, and as Dr. ███ himself

3    said in his report in terms of certain

4    concessions that he made.

11:36    5    But a lot of times you can't

6    disentangle confounding information.  And when

7    that happens -- this is a very well-known

8    problem in event studies -- you can't draw --

9    you can't reach conclusions about the -- in this

11:37   10    case I'll use the word "cause" -- causes of the

11    price movement.

12    You know, so for an example, in more

13    conventional event studies, it's frequently the

14    case that on a particular day you have two

11:37   15    events that occur, let's say, at the same time

16    and you don't have a basis for distinguishing

17    which one was responsible for the price

18    movement.

19    So in that situation, when that occurs,

11:37   20    it would be a mistake to conclude that one of

21    the two confounding events was responsible for a

22    price movement if you can't distinguish between

23    them.

24    And there is a similar problem that

11:38   25    exists with the confounding events in Dr. ███

91

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
  1   event study, although with respect to certain of

  2   the events you can go beyond that and make

  3   qualitative statements, as Dr. ████ himself does

  4   in his report.

11:38  5   BY MR. HANAUER:

  6       Q.   Did you make any attempt to, in your

  7   words, disentangle the announcements you

  8   identified as confounding?

  9       MR. FIGEL:  Objection.

11:38 10      THE WITNESS:  Some qualitative effort, yes.

 11   But a lot of times you can't disentangle, that's

 12   the whole point, and that's one of the

 13   criticisms of the inferences that Dr. ████ draws

 14   to the extent that his event study is meant to

11:39 15   demonstrate a relationship between Ripple's

 16   actions that reflect Ripple's, I'll use the

 17   word, "entrepreneurial efforts" and other causes

 18   of particular price movements.

 19   BY MR. HANAUER:

11:39 20      Q.   Did you look at intraday price

 21   movements to see the effect of multiple

 22   announcements on the same day?

 23       MR. FIGEL:  Objection.

 24       THE WITNESS:  That's not really the big

11:39 25   problem with confounding information in
```

92

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   Dr. ███████ event study.

 2          But as I said, a lot of times you can't

 3   disentangle and that causes you to not be able

 4   to reach conclusions about the causes of price

 5   movements.  But I certainly did make some

 6   qualitative assessments, as Dr. █████ does

 7   himself.

 8          In other words, there is a basic

 9   distinction between creating information and

10   reporting information.  If you take an example

11   outside of event studies and, for example, a

12   newscaster, a newscaster can report an event

13   which has a big effect -- it could even have a

14   big effect on prices -- but the newscaster is

15   reporting an event that the newscaster didn't

16   have anything to do with or the newscaster is

17   just reporting an event that is the product of

18   actions by others.

19          But if you looked at the price reaction

20   to what the newscaster said, sometimes markets

21   can move based on what the newscaster said, even

22   though the newscaster had nothing to do with

23   creating the event.

24          And so if you drew the inference that

25   it was the newscaster's efforts that created the
```

93

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1   price movement, you would be making a
        2   fundamental mistake because you would be
        3   ignoring the difference between creating
        4   information and reporting information.
11:41   5           And so in the case of cryptocurrencies,
        6   for example, in XRP and Dr. ███ report, when
        7   he uses things like decisions by other platforms
        8   to allow XRP to be traded on a different
        9   platform and calls that a significant event by
11:42  10   XRP, an XRP announcement that results in a
       11   significant price movement, forgetting any other
       12   problems with that analysis, in many ways that's
       13   like the newscaster example.  That's ignoring
       14   the distinction between creating information and
11:42  15   reporting information.
       16           And there are a number of other
       17   illustrations like that in Dr. ███ list of, I
       18   guess what he calls, "event days" that have
       19   significant price reactions.  And that's really
11:43  20   what I discuss in my report.  And actually it's
       21   Dr. ███ himself acknowledges in his report
       22   because he has one footnote -- I don't remember
       23   exactly what the subject was -- and I'm sure I
       24   could find it -- where he reports significant
11:43  25   results and I think he has a footnote saying
```

94

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   it's not clear whether Ripple had anything to do

2   with the underlying events which caused the

3   price movement, even though the announcement was

4   made by Ripple but the announcement was

11:43   5   announcing something that was done by others.

6           If you are trying -- if what you are

7   trying to test for is whether entrepreneurial

8   efforts by Ripple are correlated with price

9   movements, then you can't ignore the distinction

11:44  10  between creating information and reporting

11  information.  And that's a basic confounding

12  problem that really permeates all of Dr. ███████

13  analysis, one of many really fundamental

14  methodological flaws.

11:44  15  BY MR. HANAUER:

16       Q.   Did you look at any intraday price data

17  on this assignment?

18       MR. FIGEL:  Objection.

19       THE WITNESS:  I think I said no because

11:44  20  that's not the principal reason why I'm -- at

21  least this particular methodological flaw in

22  Dr. ███████ study occurred.

23  BY MR. HANAUER:

24       Q.   And you said you made a variety of

11:44  25  qualitative assessments about the effect of

95

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  confounding announcements.  Did you perform any

2  quantitative assessments about the effect of

3  confounding announcements?

4      MR. FIGEL:  Objection.

11:45  5      THE WITNESS:  No.  But, again, as I said, one

6  of the problems with confounding announcements

7  is frequently they can't be disentangled and

8  that occurs all the time in standard event study

9  analysis.  And when that occurs, it has to be

11:45 10  recognized as a limitation of what you can infer

11  from the data.  And that's exactly what Dr. ████

12  did not do.  That's another, as I said, basic

13  methodological flaw.

14  BY MR. HANAUER:

11:45 15      Q.  Are you offering any opinions about the

16  appropriateness of how Dr. ████ decided to

17  categorize the various types of Ripple news

18  discussed in his report?

19      MR. FIGEL:  Objection.

11:45 20      THE WITNESS:  I think to some extent, yes.

21  It's totally subjective.  He picked certain days

22  to analyze, ignores the vast majority of days.

23  He also analyzes public events but not negative

24  events.

11:46 25          I'm not aware of any event study in any

96

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  academic journal that describes as proper

2  methodology only analyzing the price reaction to

3  positive events as opposed to negative events or

4  positive price reactions as opposed to negative

11:46  5  price reactions.

6          I'm not saying that none exists.  But

7  it seems so fundamentally inconsistent with

8  basic statistical analysis and basic event study

9  methodology.  I'm just not aware of any support

11:47 10  in peer-reviewed journals or anywhere else for

11  that kind of approach.

12  BY MR. HANAUER:

13      Q.   Did Ripple make any public

14  announcements that categorized XRP in a negative

11:47 15  light?

16      MR. FIGEL:  Objection.

17      THE WITNESS:  I don't know whether they did

18  or they didn't.  But it's not only how Ripple

19  characterized the event; it's what the price

11:47 20  reaction is to the event.

21          And typically event studies analyzing

22  the relationship between events and price

23  movements don't limit themselves to positive

24  price movements.  As I said, that's a departure

11:47 25  from any recognized event study methodology that

97

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   I've ever seen --
 2   BY MR. HANAUER:
 3       Q.   Are you --
 4       A.   -- in any peer-reviewed journals that
 5   I'm familiar with.
 6       Q.   Are you offering any opinions regarding
 7   the appropriateness of Dr. ████    index modeling
 8   in this case?
 9       MR. FIGEL:  Objection.
10       THE WITNESS:  You know, that's -- he's got
11   all those 20 different regressions.  I haven't
12   really thought about whether there were any that
13   could have been added or subtracted.  So I guess
14   no, I don't have any specific criticisms of that
15   one issue.
16   BY MR. HANAUER:
17       Q.   Can you please look at your report,
18   paragraph 14.
19       A.   Okay, I have it.
20       Q.   And do you see you say [as read]:
21   Based on my review of the economic evidence?
22       A.   Yes, I see that.
23       Q.   What do you mean by "economic
24   evidence"?  What are you referring to?
25       A.   The things that are referred to
```

11:48  5

11:48 10

11:48 15

11:49 20

11:49 25

98

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

 1  immediately after.

 2      Q.   Well, what's immediately after are your

 3  conclusions, right?

 4      A.   About economic evidence.

11:49 5     Q.   So when you say "economic evidence," is

 6  that the -- mean the same thing as the facts and

 7  data you reviewed?

 8      MR. FIGEL:  Objection.

 9      THE WITNESS:  Well, I mean, if you look at

11:50 10 the sentence, it says [as read]:  Based on my

 11 review of the economic evidence, I have

 12 concluded that Dr. ███ analysis is

 13 fundamentally flawed for multiple reasons and

 14 provides no support for the SEC's claim that XRP

11:50 15 is a security.

 16          And then it lists the areas that I gave

 17 as reasons based on economic evidence that

 18 Dr. ███ analysis, in my opinion, is

 19 fundamentally flawed.

11:50 20 BY MR. HANAUER:

 21     Q.   And the four romanettes in paragraph

 22 14, those are the four general critiques you

 23 have about Dr. ███ opinions?

 24     A.   Yes, that's right.

11:50 25     Q.   And beyond the reasons cited in

                                                99

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1   paragraph 14, are you offering any other reasons

        2   why you believe Dr. ███████ analysis is

        3   fundamentally flawed?

        4       MR. FIGEL:  Objection.

11:51   5       THE WITNESS:  Well, you know, I think the

        6   report speaks for itself.  It's organized I

        7   think consistently with these four areas.  So

        8   that's what I would say.

        9   BY MR. HANAUER:

11:51  10       Q.   I guess, though, is there an area

       11   beyond the four identified in paragraph 14 that

       12   you think makes Dr. ██████ analysis

       13   fundamentally flawed?

       14       MR. FIGEL:  Objection.

11:51  15       THE WITNESS:  Really just what's contained in

       16   my report.

       17   BY MR. HANAUER:

       18       Q.   Can you look at paragraph 16, please.

       19       A.   Sixteen.  Okay.

11:52  20       Q.   And referring to the first paragraph --

       21   or the first sentence of paragraph 16, is there

       22   an accepted economics definition of security --

       23   of a security?

       24       A.   I don't know if I would call it an

11:52  25   accepted economic definition.  But what's stated
```

100

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  in the first sentence of paragraph 16 is a

2  general statement about the economic meaning of

3  a security.

4      Q.   Is there an accepted economics

11:52  5  definition of an investment contract?

6      A.   Again, I'm not sure whether something

7  is understood as an accepted definition.  But at

8  least my understanding of the common economic

9  meaning of an investment contract is an

11:53 10  investment, the success of which varies based on

11  the success or lack of success or -- of whatever

12  the firm or venture that the economic actor is

13  investing in.

14      Q.   In this lawsuit does the court decide

11:53 15  whether Ripple's XRP distributions violated the

16  federal securities laws using the economics

17  definition of investment contract or the

18  definition of investment contract as commonly

19  used under the federal securities laws?

11:54 20      MR. FIGEL:  Objection.

21      THE WITNESS:  I don't have an opinion on what

22  the court should rely on.  That's obviously up

23  to the court.

24  BY MR. HANAUER:

11:54 25      Q.   Are you offering the opinion that in

101

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
       1  order for an investment product to be considered

       2  a security under the federal securities laws the

       3  holder of that investment product must have a

       4  claim on the cash flows or some other asset of

11:54  5  the investment products issuer?

       6      MR. FIGEL:  Objection.

       7      THE WITNESS:  That's a legal opinion.  I'm

       8  not offering any legal opinions.

       9  BY MR. HANAUER:

11:54 10      Q.   So you cite the Supreme Court's

      11  decision in SEC versus W.J. Howey Company?

      12      A.   That's right.

      13      Q.   And you refer to the Howey test?

      14      A.   Correct.

11:55 15      Q.   And that's in paragraph seven of your

      16  report?

      17      A.   That's right.

      18      Q.   Does Dr. ████ offer the opinion that

      19  XRP is a security under the Howey test?

11:55 20      MR. FIGEL:  Objection.

      21      THE WITNESS:  Well, you'd have to ask him.  I

      22  didn't see that particular opinion phrased that

      23  way in his report.

      24  BY MR. HANAUER:

11:55 25      Q.   Does Dr. ████ report offer an opinion
```

102

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  whether any aspect of the Howey test is

2  satisfied?

3      MR. FIGEL:  Objection.

4      THE WITNESS:  If you mean does he literally

11:56  5  offer an opinion that says this element is

6  satisfied or not satisfied, again, you'd have to

7  ask him.  But not that I recall.

8  BY MR. HANAUER:

9      Q.   Does Dr. ████  opine whether any XRP

11:56 10  transactions constitute the offer of sale of

11  securities?

12      MR. FIGEL:  Objection.

13      THE WITNESS:  Same answer.

14  BY MR. HANAUER:

11:56 15      Q.   And are you offering an opinion on

16  whether any of Ripple's XRP transactions

17  satisfied the Howey test?

18      A.   Again, that's a legal opinion.  So, no,

19  I'm not; I'm not offering any legal opinions.

11:56 20      Q.   Did you consider yourself an expert on

21  how courts have applied the Supreme Court's

22  Howey decision?

23      MR. FIGEL:  Objection.

24      THE WITNESS:  That's another legal opinion.

11:56 25  And I'm not offering any legal opinions.

103

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   BY MR. HANAUER:

2       Q.   Did you have -- have courts provided

3   more recent guidance since Howey on how to

4   determine if transactions involve the offer or

11:57  5   sales of securities?

6       MR. FIGEL:  Objection.

7       THE WITNESS:  That's another legal opinion.

8   I'm not offering any legal opinions.

9   BY MR. HANAUER:

11:57  10      Q.   Did you review any such decisions in

11   preparing your report?

12      A.   No.

13      MR. HANAUER:  Let's go off the record.

14      THE VIDEOGRAPHER:  This is the end of media

11:57  15   unit one.  We are going off the record.  The

16   time is 11:57 a.m.

17                    (Whereupon, a recess was had at

18                     11:57 a.m., after which the

19                     deposition was resumed at

12:18  20                     12:19 p.m. as follows:)

21      THE VIDEOGRAPHER:  We are back on the record.

22   This is the start of media unit two, the

23   deposition of Daniel Fischel.  The time is

24   12:19 p.m.

12:18  25          You may proceed.

104

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    Professor Fischel, before we went on

3    break, you provided an economics definition of

4    investment contract.

12:19  5            Do you remember that?

6        A.    I think I said I'm not sure there is

7    such a thing as an accepted definition, but

8    that's, I think, a general economic

9    understanding of what an investment contract is.

12:19 10       Q.    I actually want to clarify that point.

11   Whatever definition you gave, does that come

12   from any academic textbook or scholarly article?

13       A.    It very well might as a description.  I

14   didn't search to see if that, I would say,

12:19 15   general understanding is contained in some type

16   of finance or business text.  I would expect

17   that it would appear somewhere.  But I didn't

18   check.

19       Q.    Can you name one as you sit here today?

12:20 20       A.    No, I can't because I didn't

21   investigate that question.

22       Q.    Can I ask you to look at paragraph --

23   or page 10 of your report, please.

24       A.    Sure.  Okay.

12:20 25       Q.    And do you see a heading A says [as

105

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    read]:  The findings of Dr. ▇▇▇ event study

2    methodology do not demonstrate that XRP holders

3    profit solely or primarily from the efforts of

4    Ripple?

12:20 5          A.    Yes, I see that.

6          Q.    Does Dr. ▇▇▇ report offer the

7    opinion that XRP holders profit solely or

8    primarily from the efforts of Ripple?

9          MR. FIGEL:  Objection.

12:20 10         THE WITNESS:  Again, he doesn't use those

11   words.  But in my opinion he reports his results

12   in a very misleading way because what he does

13   is, you know, for a series of the announcements

14   that he subjectively picks, he has a series of

12:21 15   exhibits where he just shows check marks to show

16   that there is, in his opinion, a statistical

17   relationship between the events out of the 500

18   that he picks and price reactions.

19            But if you look at his backup, and

12:21 20   that's the purpose of my Exhibit 1, you get a

21   very different reaction, a very different

22   understanding of what that relationship is,

23   meaning that on the overwhelming majority of

24   days where he says there are events, there is no

12:22 25   statistically significant price reaction.  And

106

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  on a significant number of days where there is

2  no events, there is a statistically significant

3  price reaction.  And you would never get that

4  understanding from his exhibits with checks.

12:22  5      And so I thought the way he reported

6  his results were very misleading, apart from the

7  other fundamental methodological flaws that I

8  discuss in my report, a few of which I referred

9  to already.  And that's really the purpose of

12:22 10  this section.

11  BY MR. HANAUER:

12      Q.   Did you perform any work or analysis to

13  test whether XRP holders profits solely or

14  primarily from the efforts of Ripple?

12:23 15      MR. FIGEL:  Objection.

16      THE WITNESS:  I think Dr. ███  own results

17  taken at face value, even apart from the

18  methodological flaws which exist, demonstrate

19  that XRP price changes are not, and therefore,

12:23 20  XRP's holders profits from price changes are not

21  solely or primarily attributable to Ripple's

22  efforts.

23  BY MR. HANAUER:

24      Q.   I'm not asking what Dr. ███ did.  I'm

12:23 25  asking what you did.

107

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1            Did you do any work or analysis to test
         2   whether XRP holders profit solely or primarily
         3   from Ripple's efforts?
         4       MR. FIGEL:  Objection.
12:23    5       THE WITNESS:  As I said, I didn't think it
         6   was necessary to do any tests because Dr. ████
         7   own results demonstrate what I just said, which
         8   is also included in this particular section of
         9   my report and in Exhibit 1.
12:24   10   BY MR. HANAUER:
        11       Q.   Can the SEC satisfy the expectation of
        12   profits prong of the Howey test by establishing
        13   that under the circumstances Ripple promoted XRP
        14   primarily as an investment?
12:24   15       MR. FIGEL:  Objection.
        16       THE WITNESS:  That sounds like a legal
        17   question.  I don't have any opinion on that one
        18   way or the other.
        19   BY MR. HANAUER:
12:24   20       Q.   Are you offering an opinion whether,
        21   under all the circumstances, Ripple ever
        22   promoted XRP primarily as an investment?
        23       MR. FIGEL:  Objection.
        24       THE WITNESS:  No, I'm not offering an opinion
12:24   25   on that.
```

108

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.   Did you consider whether Ripple ever

3    promoted XRP primarily as an investment?

4        A.   No, I didn't.  For purposes of the

12:25  5    analysis in my report, I did not.

6        Q.   Are you offering an opinion on whether,

7    under all the circumstances, Ripple promoted XRP

8    as a means whereby XRP purchasers could pool

9    their own activities, their money, and Ripple's

12:25 10    contribution in a meaningful way?

11        MR. FIGEL:  Objection.

12        THE WITNESS:  I'm not offering an opinion

13    about that.

14    BY MR. HANAUER:

12:25 15        Q.   Did you consider whether Ripple ever

16    promoted XRP as a means whereby Ripple

17    purchasers could pool their own activities,

18    their money, and Ripple's contributions in a

19    meaningful way?

12:25 20        MR. FIGEL:  Objection.

21        THE WITNESS:  No.  As with the previous

22    questions, it's not really.  I didn't consider

23    it and it's not relevant for the purposes of my

24    analysis.

25

109

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    Well, why is it relevant for you to

3    consider whether XRP holders profits solely or

4    primarily from the efforts of Ripple but not

12:26  5    whether Ripple promoted XRP as an investment?

6        MR. FIGEL:  Objection.

7        THE WITNESS:  For the reason that I just

8    said, that Dr. ███ has exhibit after exhibit

9    where he reports the existence of relationships

12:26 10    with check marks.  But if you look at his

11    backup, you get a very different impression of

12    what's behind those check marks.  And it's only

13    as a result of his subjective choice of dates to

14    look at and how he interprets price reactions in

12:27 15    connection with those dates that he can even get

16    the check marks that he shows.

17            But as I said, even apart from the

18    methodological flaws, which are pervasive in

19    Dr. ███ report, even taken at face value, I

12:27 20    think it's fair to say that he reports his

21    results in a very misleading way.  And if you

22    look at his backup, you can see that the

23    relationships which he purports to find are

24    actually much weaker and look very different

12:27 25    than the way that he reports them.

110

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
      1   BY MR. HANAUER:
      2       Q.   Are you offering an opinion as to
      3   whether XRP purchasers had a reasonable
      4   expectation of profits to be derived from the
12:27 5   entrepreneurial or managerial efforts of Ripple?
      6       A.   I'm not offering an opinion about that.
      7       Q.   Did you consider whether XRP purchasers
      8   had a reasonable expectation of profits to be
      9   derived from the entrepreneurial or managerial
12:28 10  efforts of Ripple?
      11      A.   I didn't consider that in connection
      12  with forming any of my opinions because it's not
      13  relevant.
      14      Q.   Can you look please at page -- or
12:28 15  paragraph 18 of your report.
      16      A.   Okay.
      17      Q.   And I want to refer you to the second
      18  sentence.  And you write [as read]:  In fact,
      19  taken at face value, Dr. ████ analysis finds
12:28 20  that, (i), most days were significantly
      21  positive, XRP returns had no news about Ripple's
      22  efforts; and, (ii), most days with news about
      23  Ripple's efforts did not have significantly
      24  positive XRP returns.
12:28 25           Do you see that?
```

111

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1        A.    Yes, I see that.
        2        Q.    Are you offering the opinion that
        3   either of those metrics identified in the two
        4   romanettes, are you offering the opinion that
12:29   5   either of those are the determinative metrics
        6   for event studies?
        7        MR. FIGEL:  Objection.
        8        THE WITNESS:  I don't understand that
        9   question.
12:29  10   BY MR. HANAUER:
       11        Q.    Well, have you -- are you offering the
       12   opinion that an event study gauges price
       13   reaction by looking at the days where there is
       14   significant returns but no -- no news
12:29  15   announcements?
       16        MR. FIGEL:  Objection.
       17        THE WITNESS:  I mean, an event study can show
       18   you that.  How relevant that is in a particular
       19   case depends on the -- obviously the relevant
12:29  20   facts and circumstances of the case.
       21   BY MR. HANAUER:
       22        Q.    Have you ever performed an event study
       23   for litigation that based your finding on the
       24   comparison of days with significantly positive
12:30  25   returns compared to the days without news
```

                                                            112

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  announcements?

2      MR. FIGEL:  Objection.

3      THE WITNESS:  Yeah, I think probably the

4  answer to that would be yes, I think.

12:30  5  BY MR. HANAUER:

6      Q.  Can you name one, please?

7      A.  I think there was some insider trading

8  cases that I have been involved in where that

9  kind of presentation was part of what we did,

12:30 10  showing basically the relationship between

11  trading days and events and showing -- and price

12  movements, and showing that a lot of days when

13  there were events, there was no trading in

14  advance of the events.  And a lot of the days

12:31 15  when there were big price movements, there was

16  no trading or no events, something of that

17  nature.  So I think the answer to your question

18  would be yes.

19      Q.  Can you name one of the those cases, as

12:31 20  you sit here today?

21      A.  For some reason the name Billy Bob

22  Harris sticks in my mind.  I don't know if

23  that's a real person or I'm just imagining that

24  name.  But I think there was a case involving

12:31 25  Billy Bob Harris.  But I know there were others,

113

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1    too.
        2           But as I sit here, I don't remember the
        3    exact names of the cases.
        4       Q.   Did you ever perform an event study for
12:32   5    litigation where the determining metric you
        6    looked at was days with events not having
        7    significantly positive returns?
        8       MR. FIGEL:  Objection.
        9       THE WITNESS:  What did you say?  "The
12:32  10    determining metric"?  You know, other than what
       11    I just said, I can't think of any others, as I
       12    sit here.  But, again, I've done so many event
       13    studies and so many different contexts over so
       14    many years, it's very hard to generalize of what
12:32  15    I did or didn't do that would fit every single
       16    example.
       17    BY MR. HANAUER:
       18       Q.   Can I ask you to look at paragraph 20,
       19    please --
12:33  20       A.   Okay.
       21       Q.   -- of your report.
       22           What is the significance of 76.3 to
       23    89.5 percent of days with significantly positive
       24    XRP returns having no news about Ripple's
12:33  25    efforts?
```

114

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
       1       MR. FIGEL:  Objection.
       2       THE WITNESS:  It's what I just said.  It
       3   demonstrates from Dr. ████ own backup exactly
       4   what the relationship was between statistically
12:33  5   significant days with statistically significant
       6   returns and whether or not there was news,
       7   again, taking Dr. ████ study at face value,
       8   including his subjective analysis of which of
       9   the 500 days should be analyzed, which shouldn't
12:34 10   be analyzed, which are -- tell you something
      11   that is probative in terms of the hypothesis
      12   that he's testing.
      13           But even just taking exactly what he
      14   did at face value and forgetting all the
12:34 15   methodological criticisms that exist, this is
      16   what his results show, which is very different
      17   from the way he reports his results with checks.
      18       MR. HANAUER:  One second.
      19               (Short pause in proceedings.)
12:34 20   BY MR. HANAUER:
      21       Q.   In order to determine whether Ripple
      22   news announcements contribute to XRP prices,
      23   should one check the magnitude of the price
      24   reaction on news days?
12:35 25       MR. FIGEL:  Objection.
```

115

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| | 1 | THE WITNESS:  Well, again, your question |
| | 2 | presumes that there is a basis for looking at an |
| | 3 | inefficient market, a price reaction on days |
| | 4 | where there are announcements. |
| 12:35 | 5 | And one of the whole significant |
| | 6 | findings of the lack of an efficient market is |
| | 7 | there is not really a theoretical or empirical |
| | 8 | basis to do that. |
| | 9 | But putting that fundamental criticism |
| 12:36 | 10 | to one side, as a matter of statistics, it's |
| | 11 | generally accepted that there are well-accepted |
| | 12 | methodological techniques to answer questions of |
| | 13 | which price movements are large enough or which |
| | 14 | returns, to be more precise, are large enough |
| 12:36 | 15 | that they are unlikely to be attributable to |
| | 16 | chance alone. |
| | 17 | BY MR. HANAUER: |
| | 18 | Q.   Did you perform any analysis in this |
| | 19 | case to check the magnitude of price reaction of |
| 12:36 | 20 | XRP to Ripple announcements? |
| | 21 | MR. FIGEL:  Objection. |
| | 22 | THE WITNESS:  Not other than reviewing |
| | 23 | Dr. ███ analysis and, again, with the |
| | 24 | background of the relevant academic literature |
| 12:37 | 25 | that I've referred to several times. |

116

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  BY MR. HANAUER:

2     Q.   Is it informative in event studies to

3  compare price reaction on news days to price

4  reaction on no news days?

12:37 5     MR. FIGEL:  Objection.

6     THE WITNESS:  Can be.  I mean, I think it's a

7  function of what it is you're trying to test

8  under the relevant facts and circumstances at

9  the time.

12:37 10  BY MR. HANAUER:

11     Q.   Did you perform any such analysis in

12  this case?

13     MR. FIGEL:  Objection.

14     THE WITNESS:  No, other than looking at the

12:37 15  results that Dr. ███ reported.

16  BY MR. HANAUER:

17     Q.   Have you performed such analysis before

18  on other event studies for litigation?

19     MR. FIGEL:  Objection.

12:38 20     THE WITNESS:  Probably.  I mean, comparing

21  the returns on news days with the returns on

22  non-news days, yeah.  I think so, yes, for the

23  magnitude of returns, the volatility of returns.

24  Yes, I'm sure I have.

25

117

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
      1  BY MR. HANAUER:

      2      Q.   Did you do any work or analysis on this

      3  case to determine whether there was a difference

      4  between significant returns on news days and no

12:38 5  news days?

      6      MR. FIGEL:  Objection.

      7      THE WITNESS:  In terms of the magnitude of

      8  returns, I don't think so, but I'm not a hundred

      9  percent sure.

12:39 10 BY MR. HANAUER:

      11     Q.   Did you do any work or analysis to

      12 determine how much XRP returns on the news days

      13 contributed to the total XRP returns during the

      14 relevant periods -- relevant period?

12:39 15     A.   You know, that's really, I think, the

      16 same question you just asked me.

      17          I don't think so in terms of that very

      18 specific comparison, but I'm not a hundred

      19 percent sure.

12:39 20     Q.   Did you test the magnitude of abnormal

      21 returns estimated by Dr. ███ on news days

      22 compared to no news days?

      23     THE COURT REPORTER:  You said abnormal,

      24 right?  Okay.

12:40 25     MR. FIGEL:  Objection.
```

118

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1       THE WITNESS:  Yeah, as I've said a number of

2   times, I just analyzed Dr. ███ backup to look

3   at what he himself found, as opposed to

4   performing any completely independent event

12:40  5   studies.

6           What I'm not sure of is -- in response

7   to a couple of your questions is whether we took

8   his results and sliced them and diced them in

9   the ways that you're suggesting, as opposed to

12:40 10   the ways that are reported in my Exhibit 1.

11   BY MR. HANAUER:

12       Q.   In your words, did you slice and dice

13   Dr. ███ results in a way that's not reflected

14   on Exhibit 1?

12:41 15       A.   You know, as I said, I don't think so

16   in any systematic way, but I'm not a hundred

17   percent sure.

18       Q.   Are you offering the opinion that

19   Dr. ███ event study is flawed based on the

12:41 20   number of no news days with significant returns?

21       A.   You know, again, I think, you know,

22   that presumes, you know, among other things, the

23   efficiency of the market.  And so I'm ignoring

24   some of the methodological criticisms that I

12:42 25   believe characterize Dr. ███ report.

                                                        119

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
          1              But in specific answer to your
          2    question, again, that's, if I understand the
          3    question correctly, different from the way I
          4    reported Dr. ████ backup in Exhibit 1.  And so
12:43     5    I don't believe we did exactly what you just
          6    said, but I'm not sure.
          7    BY MR. HANAUER:
          8         Q.   Are you offering the opinion that
          9    Mr. ████ event study is flawed based on the
12:43    10    number of news days without significant returns?
         11         A.   As I said, I think Dr. ████ reports his
         12    results in a fundamentally misleading way, and I
         13    think there are other methodological flaws that
         14    undermine his event study.
12:43    15              And that's basically what I said in my
         16    report and that's what I think.
         17         Q.   So in paragraph 20, the percentages in
         18    romanettes (i) and (ii), does that come from
         19    Exhibit 1 --
12:44    20         A.   Yes.
         21         Q.   -- to your report?
         22         A.   Yes, it does.
         23         Q.   And do the metrics in those two
         24    romanettes establish that XRP holders do not
12:44    25    profit solely or primarily from the efforts of
```

                                                          120

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    Ripple?

2        A.    I think they are inconsistent with the

3    claim that XRP holders primarily -- that profit

4    primarily or solely from the profits of Ripple.

12:44  5        Q.    So for Exhibit 1 to your report, can

6    you remind me who prepared that?

7        A.    I'll just adopt all my previous answers

8    to that question.  I'm not sure who actually

9    physically prepared the exhibit.

12:45  10            The exhibits are taken straight from

11   Dr. ██████ backup, which we analyzed to try and

12   get behind the way he reported his results in

13   his report.

14       Q.    So whoever -- whoever it is that

12:45  15   prepared Exhibit 1 to your report, what did you

16   do to verify their work?

17       A.    Again, we just took the exhibit

18   directly from Dr. ██████ backup to his report.

19   It wasn't an independent test that we did.  It

12:45  20   was just reporting what Dr. ██████ himself found

21   but didn't include in his report.

22       Q.    But you didn't prepare Exhibit 1,

23   right, to your report?

24       A.    You mean personally did I create the

12:46  25   exhibit physically, as opposed to the idea of

121

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    showing that his own backup looks very different

2    from the way he reported his results in the

3    report?  If that's what you're asking, yes, I

4    did not physically prepare the exhibit.

12:46  5        Q.    So if you didn't prepare the exhibit,

6    what did you do, if anything, to verify the work

7    of whoever did prepare Exhibit 1 to your report?

8        A.    Because the work, again, is taken

9    directly from Dr. ███████ backup.

12:46 10        I mean, did I check whether every

11   number is transcribed correctly?  No, I didn't.

12   I assume we usually have some internal checking

13   process, so I assume that was done.

14        But this is -- again, these are not a

12:47 15   matter of any independent analysis that we did

16   other than looking at what Dr. ███████ found as

17   revealed in his backup and just moving those

18   findings from the backup to the exhibit.

19        Q.    So referring to the second romanette on

12:47 20   Exhibit 20 where you cite the 70.5 to

21   84.8 percent figure, where on Exhibit M do those

22   numbers come from?  Or, I'm sorry, where on

23   Exhibit 1 to your report do those numbers come

24   from?

12:47 25        A.    Just one second, please.

122

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1           All right.  If you look at Exhibit 1,

2    and you look at the first page of Exhibit 1, and

3    you look at the top two lines going across for

4    the very last vertical entry, percentage of

12:48  5    event days with significant returns and without

6    significant returns, okay, you see the two

7    numbers, 70.5 percent and 84.8 percent.

8         Q.   So column M?

9         A.   Column M, which are itself -- just one

12:49 10    second, please.

11           If you look at the pages behind the

12    first page and you look at all the entries under

13    exhibit -- under letter M, if everything is

14    working correctly, you should find a low number

12:50 15    of 70.5 and a high number of 84.8.

16           So, let's see.  I see the 84.8 and I

17    see the 70.5.

18         Q.   And the 84.8 number, that comes from

19    the two-sided nonparametric specification of

12:50 20    model one?

21         A.   That's correct.

22         Q.   And how did you calculate the numbers

23    in column M?

24         A.   You know, frankly, I can't remember if

12:51 25    those calculations were by us to sort of -- to

                                                    123

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
     1  take Dr. ████  numbers and just translate them

     2  to percentages or whether they were in the

     3  backup themselves.  I just don't remember.

     4      Q.   So is the number M the function of

12:51 5  comparing any two other columns on Exhibit 1?

     6      A.   You know, again, I would have to check

     7  myself if the -- you know, I just have to check.

     8      Q.   Okay.

     9      A.   I'm not sure.

12:53 10     Q.   I think I figured it out how to do it,

     11 but I'm going to ask you to verify it for me.

     12 Okay?

     13     A.   Okay.

     14     MR. HANAUER:  Would you mind passing this

12:53 15 down.

     16     THE WITNESS:  Yeah, I'm not going to use your

     17 little calculator or computer or whatever this

     18 is.  I mean, you can represent whatever numbers

     19 you want to me based on your usage of this

12:53 20 instrument.  And if I can agree, I will, or if I

     21 can't agree, I'll say I need to independently

     22 verify it.

     23 BY MR. HANAUER:

     24     Q.   So if I ask you to type something into

12:53 25 a calculator, you won't do that?
```

124

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1        A.   I will do it, I'm just not going to do
 2   anything more than type the numbers into the
 3   calculator.
 4        Q.   Okay.  And I won't ask you to.  Okay?
 5        A.   Okay.
 6        Q.   So I think that the way you got to
 7   column M is to divide column F by column D.
 8             Can you try doing that for model 1,
 9   two-sided nonparametric?
10        A.   Yeah, you know, for --
11        MR. FIGEL:  I object to this.
12             Mr. Hanauer, you obviously have a
13   calculator.  You could have done it before this.
14   You can represent to him what the arithmetic is.
15   I don't think it's an appropriate use of
16   deposition time to have him go through a
17   rhetorical exercise of using a calculator.
18        THE WITNESS:  Well, you know, for whatever
19   it's worth, I do think that is what it is.  I
20   was just looking at the -- eyeballing the data.
21             But I can't perform the calculation in
22   my head, and I don't want to use your
23   calculator.  But that is the way it looks to
24   me.
25
```

12:53 5
12:54 10
12:54 15
12:54 20
12:55 25

125

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
          1              (Whereupon, Deposition
          2              Exhibit DF-19 was marked for
          3              identification.)
          4         MR. FIGEL:  As I suspected, you've already
12:55     5    done the math, so we'll take your
          6    representations about the arithmetic.
          7         MR. HANAUER:  I've been told you may not want
          8    the witness using a calculator.
          9    BY MR. HANAUER:
12:55    10         Q.   So, again, if I'm trying to figure out
         11    how you arrived at column M, is it safe to say
         12    that you divided, at least for the two-sided
         13    nonparametric portion of model 1, did you divide
         14    column F by column D?
12:56    15         A.   You know, as I said, I think so.  I
         16    mean, that's what I thought so before you gave
         17    me this sheet.  I didn't perform these
         18    calculations so it looks right to me.  But, you
         19    know, obviously, I want to have a chance to
12:56    20    check it myself.
         21         Q.   And that's why I put a calculator in
         22    front of you.
         23         A.   Yeah, but I don't want to use your
         24    calculator and I don't want to do these
12:56    25    calculations on the fly.
```

126

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1            That's the way it looks to me.  I'm
 2   willing to say that much.  That's what I think.
 3            But to be a hundred percent sure, I'd
 4   want to check myself.
12:56  5   Q.  Okay.  Well, maybe if we're -- when we
 6   have a break and you can use whatever instrument
 7   you feel is appropriate, if you think my math is
 8   wrong, please let me know.
 9       MR. FIGEL:  I have a proposal, Mr. Hanauer.
12:56 10   We'll take your representation that you've done
11   the math correctly.  I will do a parallel check.
12   If I see something, I will bring that to your
13   attention.
14            I just don't think it's fair to ask the
12:57 15   witness to use an unfamiliar calculator and do
16   mathematical calculations on the record.
17       MR. HANAUER:  Okay.
18       THE WITNESS:  And just to be clear, I'm not
19   suggesting that I think your math is wrong.  I
12:57 20   didn't say that.
21   BY MR. HANAUER:
22   Q.  Well, there's a good chance it could
23   be, but that's neither here nor there.
24            So column M, it looks like that
12:57 25   calculates the frequency of event days without
```

127

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    significant returns among all event days.

2         Is that accurate?

3    A.   That's the way it looks.

4    Q.   And are you offering the opinion

12:57 5    that --

6    A.   Actually, can you just hold on for one

7    second.  There may be a simpler answer to this.

8         And I apologize for not thinking of

9    this right away.  If you look at the last page

12:58 10    of Exhibit 1, there is a legend that tells you

11    how every column is calculated.

12         And column M is column F divided by

13    column D.

14    Q.   There we go.

12:58 15         So having that --

16    A.   It's on -- in other words, it's on the

17    exhibit.

18    Q.   Exhibit 1 to your report?

19    A.   Correct.

12:58 20    Q.   So on Exhibit 1 to your report, does

21    column M calculate the frequency of event days

22    without significant returns among all event

23    days?

24    A.   I mean, column M calculates whatever is

12:58 25    that's reflected on column M, which is what's

128

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    stated.

2        Q.    So that would be significant -- the

3    frequency of significant returns, that's column

4    F, right?  I'm sorry.

12:59  5        So column F is event days without

6    significant returns?

7        A.    That's right.

8        Q.    And column D is event days total?

9        MR. FIGEL:  Objection.

12:59 10    THE WITNESS:  Again, this is -- just to be

11   clear, this is Dr. ███████ backup.  It's not our

12   calculation.  This is reporting what he found --

13   what he did based on his determination as to

14   what days counted and what days didn't count and

01:00 15   how you separate the days in different

16   categories in his subjective opinion.

17        But column D is -- again, the number of

18   the event days varies depending on which

19   specification you're looking at.  Because for

01:00 20   some specifications, there were more trading

21   days -- or more days and therefore more event

22   days than others.  He discusses that in his

23   report.

24        But with respect to the first

01:00 25   regression specification on page 2 of 6, there

129

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  are 105 -- according to Dr. ████, 105 total

 2  event days; 16 of them have significant returns,

 3  according to Dr. ████; 89 of them do not have

 4  significant returns.

 5          Again, I'm just going to say, again,

 6  this is accepting Dr. ████ conclusions and

 7  analysis at face value and ignoring the

 8  methodological flaws that exist.  But these are

 9  his reports -- these are his results, rather, as

10  reported in his backup.

11  BY MR. HANAUER:

12      Q.  Have you ever prepared an event study

13  as a testifying expert that relies on the metric

14  frequency of event days without significant

15  returns among all -- among all event days that

16  relies on that metric to establish or disprove

17  the relationship between public announcements

18  and the price of a security?

19      A.  Well, that was sort of a compound

20  question.

21          The closest thing that I can think of

22  is what I've said we've done in a number of

23  different insider trading cases, which I do

24  recall, of looking at some total set of days

25  that were at issue in the case and looking at
```

01:01  5
01:01 10
01:01 15
01:02 20
01:02 25

130

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    the days when there were price movements or were

2    not price movements and were trades -- was

3    trading around those days, there was not trading

4    around those days, and the various comparisons

01:02  5    that you get performing that analysis.

6        Q.   And that was -- and if I were to ask

7    you to name a case --

8        A.   The only name that came to me was Billy

9    Bob Harris.  But I do think there are other

01:03 10    cases as well.

11        Q.   Are you aware of any academic or

12    scholarly literature that supports using that

13    metric to support an event study?

14        MR. FIGEL:  Objection.

01:03 15        THE WITNESS:  I don't know what you mean,

16    "support an event study."  These are the --

17    these are Dr. ███ results of his event study.

18    They neither support or don't support.  It's

19    just what the event study shows, according to

01:03 20    Dr. ███.

21    BY MR. HANAUER:

22        Q.   Are you aware of any academic or

23    scholarly literature that supports using that

24    metric as a way to criticize an event -- the

01:03 25    results of an event study?

131

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1     A.    I'm not criticizing the results of an

2     event study.   The results are what the results

3     are.

4              Again, putting aside the methodological

01:03  5     criticisms that I have, these are the results

6     that are reported.   What I have said is the way

7     that Dr. ███ reported these results, his own

8     results, with just checks and not showing how

9     weak the relationships are even if under his

01:04 10     test choosing the days that he wants to look at,

11     ignoring the vast majority of days, you know,

12     defining his own test of statistical

13     significance, these are just all his results

14     just taken at face value.

01:04 15              And I do think both because of the

16     subjectivity, the fact that there was an

17     inefficient market, the fact that he's only

18     looking at one-sided events, he's not looking at

19     negative events, as well as some other

01:05 20     methodological criticisms that are even more

21     fundamental, for the most part, I'm ignoring all

22     of those right now.

23              I'm just looking at, this is what he

24     found.   But he didn't report this is what he

01:05 25     found.   What he reported was a series of check

132

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1    marks.  And I think the check marks are

         2    misleading in light of the actual results of the

         3    event studies that he himself performed.

         4        Q.   Let me ask you about column L on

01:05    5    Exhibit 1 to your report.

         6        A.   Okay.

         7        Q.   And that represents the frequency of

         8    event days that had significant returns?

         9        A.   That's right.

01:05   10        Q.   And it looks like -- does Exhibit 1

        11    have -- contain the data you would need to

        12    calculate the frequency of nonevent days with

        13    significant returns?

        14        MR. FIGEL:  Objection.

01:06   15        THE WITNESS:  Well, if you look at columns G,

        16    H, and I, if I understand the question

        17    correctly, they deal with the number of nonevent

        18    days and the number of significant returns and

        19    the number of nonsignificant returns, according

01:06   20    to Dr. ███████ in his own event study in all these

        21    -- in all these different specifications.

        22    BY MR. HANAUER:

        23        Q.   So if I wanted to find the frequency of

        24    nonevent days with significant returns using

01:07   25    Dr. ███████ data, would I divide column H by

                                                              133

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    column G?

2        A.    The number of nonevent days with

3    significant returns, that's the question?  Yes,

4    I think that's what you would do.

01:07 5        Q.    So I'd like to refer you to model 1,

6    two-sided nonparametric specification.

7        A.    Okay.

8        Q.    So if I wanted to divide H by G for

9    that model, would it be 104 divided by 2,264?

01:08 10        A.    I believe so, yes, that's what it would

11    be.

12        Q.    And if we look at exhibit -- my Exhibit

13    DF-19, it says 104 divided by 2,264 equals

14    4.6 percent?

01:08 15        A.    That's what it looks like.

16        Q.    Do you have any reason to doubt that

17    calculation?

18        A.    No, I don't.

19        Q.    Are you familiar with the concept of

01:08 20    false positives in statistical tests?

21        A.    Yes.

22        Q.    What is the typical expectation for

23    false positives in a statistical test?

24        MR. FIGEL:  Objection.

01:08 25        THE WITNESS:  At the level of generality of

                                                        134

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   your question, I'm not sure there is an

2   expectation.

3   BY MR. HANAUER:

4       Q.   Isn't the level of -- you would

01:09  5   typically expect false positives in statistical

6   tests between five and ten percent?

7       A.   Those are conventional levels of

8   statistical significance.

9            In event studies, I'm not sure they

01:09 10   would apply always, no matter what the test was.

11   But generally you would expect to find,

12   depending if you had a one-tailed test or a

13   two-tailed test, a price reaction that's

14   statistically significant randomly, even if not

01:09 15   attributable to, not correlated with or caused

16   by a particular event.  Solely by chance, in

17   other words.

18       Q.   So if we think about that 4.6 percent

19   number of the nonevent days with significant

01:10 20   returns, is it possible that some of those

21   significant nonevent observations with

22   significant returns could be false positives?

23       MR. FIGEL:  Objection.

24       THE WITNESS:  I'm not sure I'd call them

01:10 25   false positives.  I mean, they are what they

135

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
        1   are.
        2       MR. HANAUER:  Now a good time for a break?
        3       MR. FIGEL:  Sure.
        4       THE VIDEOGRAPHER:  We are going off the
01:10   5   record.  The time is 1:11 p.m.
        6                     (Whereupon, a recess was had at
        7                     1:11 p.m., after which the
        8                     deposition was resumed at
        9                     2:22 p.m. as follows:)
02:21  10       THE VIDEOGRAPHER:  We are back on the record.
       11   The time is 2:22 p.m.
       12           You may proceed.
       13   BY MR. HANAUER:
       14       Q.   Professor Fischel, could I ask you to
02:21  15   please look at page 18 of your report.
       16           And do you see a heading D in between
       17   paragraphs 30 and 31?
       18       A.   Yes, I do.
       19       Q.   Does Dr. ████ report offer the
02:22  20   opinion that XRP holders are engaged in a common
       21   enterprise with Ripple?
       22       A.   He doesn't say those words, as far as I
       23   can recall.
       24       Q.   Did you perform any work or analysis to
02:22  25   determine whether or not XRP holders are engaged
```

136

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    in a common enterprise with Ripple?

2        A.    Well, I would say one of my

3    methodological criticisms of Dr. ███ is his

4    entire event study proves nothing about any of

02:23  5    the competing claims in this case.  Not only it

6    doesn't prove anything, it doesn't shed any

7    light on any of the competing claims in this

8    case.

9             And to the extent that one of the

02:23 10    claims in this case related to whether or not

11    XRP is a security, which is clearly a legal

12    question, according to what Dr. ███ has done,

13    his whole approach, even the way he sets up his

14    hypothesis that he's testing in paragraph 30,

02:24 15    has nothing to do with anything in terms of the

16    disputed issues in the case.

17             And so that's a really basic criticism,

18    but it's really a basic methodological

19    criticism.  In other words, if you wanted to

02:24 20    show that this event study that Dr. ███ did

21    sheds some light on any of the issues in the

22    case, you would want to say that these results

23    that he finds, apart from some of the other

24    methodological criticisms, show something of

02:25 25    consequence in terms of the relationship between

137

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1   XRP and Ripple that does not exist in multiple
         2   other contexts.
         3           So just to give one example, if you --
         4   I think I mentioned this earlier.  If you took
02:25    5   De Beers and you took seven years of price --
         6   seven years of announcements and seven years of
         7   analysis of the prices of diamonds, I haven't
         8   done the analysis, but I have no doubt that if
         9   you took hundreds of announcements over seven
02:26   10   years, you would find some announcements that
        11   had a price effect on diamonds.
        12           And that would be true about oil.  I
        13   even mentioned earlier about a less direct
        14   example, but, nevertheless, the same point about
02:26   15   a food -- a food manufacturer like Kellogg's and
        16   a product like, you know, the price of Corn
        17   Flakes.
        18           And so to the extent that the event
        19   study doesn't have any claim -- doesn't have any
02:26   20   relationship, doesn't even purport to have any
        21   relationship to any of the issues that are
        22   relevant in an economic or legal sense to what's
        23   disputed in the case, including the issue of
        24   whether Ripple and XRP are in a common
02:27   25   enterprise, I think that's a really major

                                                        138

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  methodological flaw.

2      Q.   Okay.  And I understand that your --

3  you disagree with Dr. ███ conclusion -- well,

4  you disagree with a contention that there's a

02:27  5  common enterprise, right?

6      MR. FIGEL:  Objection.

7      THE WITNESS:  Well, common enterprise is, in

8  part, a legal term.  But, you know, whatever it

9  means as a matter of economics, Dr. ███ does

02:27 10  not show that the relationship between Ripple

11  and XRP is any different than the relationship

12  between De Beers and diamonds or oil companies

13  and oil or food manufacturers and food prices,

14  and doesn't even purport to.

02:28 15      He never even states what he's testing

16  in ways that distinguish the relationship

17  between De Beers -- excuse me, the relationship

18  between Ripple and XRP from all of these other

19  examples.

02:28 20      You know what, when I looked at

21  paragraph 30 of his report -- and I remember the

22  number -- I think all you have to do is look at

23  that paragraph and realize that the entire

24  exercise that Dr. ███ is conducting is really

02:28 25  fundamentally flawed from a methodological point

139

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   of view.

2           Because, for example, he doesn't have

3   any control group.  If you wanted to do this in

4   some kind of an academic way, you would want to

02:28   5   try and show that the relationship -- forgetting

6   all the subjectivity and the lack of efficient

7   markets, you'd want to show that the

8   relationship between Ripple and XRP, for

9   example, is different than the relationship

02:29  10   between other cryptocurrencies, between their

11   founders' companies and price movements.

12           You'd want to show that it's different

13   from commodities, such as diamonds.

14   BY MR. HANAUER:

02:29  15       Q.   And excuse me, Professor, I think

16   you're steering a little from my question, so if

17   you don't mind, I'm going to try and rephrase.

18       MR. FIGEL:  Objection.  I'd like the witness

19   to be able to finish his answer.  You

02:29  20   interrupted him.

21       MR. HANAUER:  Well, I move to strike his

22   answer as nonresponsive.

23       MR. FIGEL:  Well, I'd like to have him finish

24   it and then you can make whatever motion you'd

02:29  25   like.

                                                        140

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    Is there anything else you'd like to

3    add to the question of:  You disagree with the

4    contention that there's a common enterprise?

02:29  5        A.    I think for the reasons that I just

6    stated, and the lack of a control group, a lack

7    of a comparison.

8            Again, that's just a basic and

9    fundamental methodological flaw because it sheds

02:30 10   no light on this relationship, has any different

11   characteristics than an infinite number of other

12   relationships that have nothing to do with

13   securities or cryptocurrency.

14           And so in terms of what it has to do

02:30 15   with common enterprise, to the extent that

16   there's some intended relationship between what

17   Dr. ███ has done and the -- to shed any light

18   on the relevant issues that need to be decided

19   in this case, including the issue of common

02:30 20   enterprise, he hasn't done that.  He doesn't

21   purport to do that.

22           And, again, that just fails all basic

23   recognized standards for proper methodological

24   approaches.  And that's a fundamental defect.

02:31 25       Q.    So I understand that you disagree with

141

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    Dr. ████ methodology.

2             What I'm asking you, though, is:  Did

3    you perform any affirmative work or testing or

4    analysis to try and test whether XRP holders are

02:31  5    engaged in a common enterprise with Ripple?

6        MR. FIGEL:  Objection.

7        THE WITNESS:  You know, as I've indicated

8    multiple times, my report is a rebuttal report

9    to Dr. ████.

02:31 10             The conclusion that I've reached is for

11    reasons that I've just stated and other reasons

12    that I've previously stated or are contained in

13    my reports, I don't believe that Dr. ████

14    entire analysis, because it is so methodologically

02:32 15    flawed and violates all standards of appropriate

16    methodology and peer-tested -- and peer-reviewed

17    journals, sheds any light on the question of

18    whether or not the relationship between Ripple

19    and XRP is one that you could call a common

02:32 20    enterprise.

21    BY MR. HANAUER:

22        Q.   But did you do any testing on your own

23    to answer that question?

24        MR. FIGEL:  Objection, asked and answered two

02:32 25    or three times now.

142

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    THE WITNESS:  Yeah, I don't have anything to

2  add.  The analysis that I did on my own was my

3  analysis and critique of Dr. ████.  That's what

4  I did.

02:32  5  BY MR. HANAUER:

6    Q.   Is there an accepted economics

7  definition of common enterprise?

8    A.   Again, you've asked me this question in

9  connection with other terms.  I don't know if

02:32 10  I'd say there's an accepted definition.  There's

11  frequently an understanding of what a common

12  enterprise is.

13    Q.   In the economics literature?

14    A.   As a matter of economics.

02:33 15    Q.   So if I wanted to test, from an

16  economic perspective, whether a common

17  enterprise exists or not, what would I do?

18    MR. FIGEL:  Objection.

19    THE WITNESS:  Well, it depends a little bit

02:33 20  on the context.  But one thing you would want to

21  do is you'd want to see if the relationship

22  between the parties creates some commonality in

23  terms of what's good news for one is good news

24  for the other and what's bad news for one is bad

02:33 25  news for the other.

143

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          Again, I don't know if I'd call that an

2    accepted definition, but that's a usual economic

3    understanding of the term common enterprise.

4    BY MR. HANAUER:

02:34  5      Q.   And are you offering the opinion that

6    XRP holders are not engaged in the common

7    enterprise with Ripple?

8          MR. FIGEL:  Objection.

9          THE WITNESS:  The opinions that I'm offering

02:34 10   are exactly what I've said and what's contained

11    in my report.

12    BY MR. HANAUER:

13        Q.   I'm asking a yes or no question.

14        MR. FIGEL:  Objection.

02:34 15      THE WITNESS:  You know, you told me -- you

16    cut me off before, so I don't want to repeat

17    what I just said.  But if you want me to repeat

18    it again, I will.

19          I'm offering the opinion that the

02:34 20   analysis that Dr. ████ has performed is

21    fundamentally flawed, violates various basic

22    requirements of standard methodology established

23    in peer-reviewed journal after peer-reviewed

24    journal.

02:34 25          And for all those reasons, including

                                                     144

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

          1    ones that I've stated in my previous answers and

          2    the ones contained in my report, I believe his

          3    report sheds no light whatsoever on the issue of

          4    whether or not Ripple and XRP are engaged in a

02:35     5    common enterprise, however common enterprise is

          6    defined.

          7    BY MR. HANAUER:

          8       Q.   So the question you just identified

          9    "engaged in a common enterprise," why is that

02:35    10    question even relevant to this case?

         11       MR. FIGEL:  Objection.

         12       THE WITNESS:  Well, whether it's legally

         13    relevant or not is a question for the court to

         14    decide, not for me to decide.

02:35    15          I mean, I think those words are used in

         16    the Howey test itself, you know.  But, you know,

         17    again, I'm not offering any legal opinions.

         18          The basic opinion I'm offering is that

         19    if you look at the test that Dr. ███ claims he

02:35    20    is performing, look at paragraph 30 -- I'm happy

         21    to read it into the record if you want me to

         22    read it into the record -- it's a generic

         23    question that has nothing to do with the

         24    relationship between Ripple and XRP in a way

02:36    25    that's any different from the relation of

                                                         145

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   countless other firms and products of firms or

 2   investments in firms, however you want to phrase

 3   it.

 4   BY MR. HANAUER:

 5       Q.   So you cite to Howey.  Does Howey use

 6   the terms "engaged in a common enterprise"?

 7       MR. FIGEL:  Objection.

 8       THE WITNESS:  Well, you know that better than

 9   I do.  But let's see what -- I quoted it, so I

10   don't want to paraphrase it.

11   BY MR. HANAUER:

12       Q.   I want to make sure we're right on the

13   terminology here.

14       A.   The words "common enterprise" appear in

15   paragraph seven.

16       Q.   I asked you engaged in a common

17   enterprise.  Is that language anywhere in Howey?

18       MR. FIGEL:  Objection.

19       THE WITNESS:  I don't see those exact words

20   in Howey.

21   BY MR. HANAUER:

22       Q.   And, in fact, Howey --

23       A.   At least not in this quote that I have.

24       Q.   And, instead, Howey uses the words

25   "invests money in a common enterprise," correct?
```

02:36 (line 5)
02:36 (line 10)
02:37 (line 15)
02:37 (line 20)
02:37 (line 25)

146

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      A.    That's what it says.

2      Q.    Are you offering an opinion whether or

3  not XRP purchasers invested money in a common

4  enterprise?

02:37  5      A.    Well, I think if you're asking whether

6  I'm expressing an opinion whether holders of XRP

7  invested in Ripple, you know, there is certainly

8  not a one-for-one correlation there.

9      Q.    That wasn't my question.

02:38 10      Are you offering an opinion whether or

11  not holders of XRP invested money in a common

12  enterprise?

13      A.    Your question doesn't really make any

14  sense.  Ripple is the common -- I don't

02:38 15  understand.  What is your definition of what the

16  common enterprise is in your definition -- in

17  your question?

18      Q.    Unfortunately, I'm the one that asks

19  the questions.

02:38 20      A.    Then I don't understand the question.

21      Q.    What I'm trying to determine is why are

22  you using the term "engaged in a common

23  enterprise" when the test is "invested money in

24  a common enterprise"?

02:38 25      MR. FIGEL:  Objection.

147

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1      THE WITNESS:  You know, as I said, I'm not
         2  offering any legal opinions.  The judge can
         3  decide if what I said about a criticism -- a
         4  fundamental criticism in Dr. ██████ methodology
02:39    5  because he doesn't distinguish -- among the
         6  other fundamental methodological criticisms
         7  because he doesn't distinguish in any way the
         8  relationship between Ripple and XRP from the
         9  relationship between De Beers and diamonds, oil
02:39   10  companies and oil, and countless other examples,
        11  and he doesn't even claim to.
        12      And if you look at his paragraph 30,
        13  it's generic.  It applies to every single one of
        14  the examples that I just mentioned.  The judge
02:39   15  can decide if that's a valid criticism or not a
        16  valid criticism, but that's my opinion.
        17  BY MR. HANAUER:
        18      Q.  Did Ripple pool the money it received
        19  from selling XRP to different purchasers?
02:39   20      MR. FIGEL:  Objection.
        21      THE WITNESS:  I don't know.  I don't have an
        22  opinion on that one way or the other.
        23  BY MR. HANAUER:
        24      Q.  Did Ripple deposit the funds it
02:40   25  received from selling XRP into a single bank
```

148

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    account?

2         MR. FIGEL:  Objection.

3         THE WITNESS:  I don't know.  I have no

4    opinion on that one way or the other.

02:40  5    BY MR. HANAUER:

6         Q.   Did Ripple separately manage the funds

7    it received from different XRP purchasers?

8         MR. FIGEL:  Objection.

9         THE WITNESS:  I don't know.  I have no

02:40 10    opinion on that one way or the other.

11    BY MR. HANAUER:

12         Q.   Did Ripple use the money it received

13    from selling XRP to fund its operations?

14         MR. FIGEL:  Objection.

02:40 15         THE WITNESS:  You know, at one point I think

16    I've seen some data on that, on the sources of

17    funds that Ripple had.  You know, I guess all I

18    can say is I've seen some funds -- I've seen

19    some data on that, but I haven't really

02:40 20    conducted any study of it.

21    BY MR. HANAUER:

22         Q.   Did Ripple use the money it received

23    from selling XRP to fund the construction of the

24    Ripple ecosystem?

02:41 25         MR. FIGEL:  Objection.

149

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          THE WITNESS:  It really would be the same

2    answer.  I think I've seen some data on that,

3    but I haven't really studied that question.

4    BY MR. HANAUER:

02:41 5      Q.   Did Ripple endeavor to increase the

6    range of goods and services that holders of XRP

7    would find beneficial to buy and sell using XRP?

8          MR. FIGEL:  Objection.

9          THE WITNESS:  Same answer.

02:41 10   BY MR. HANAUER:

11         Q.   Did the success of the digital asset

12   ecosystem that Ripple built drive demand for

13   XRP?

14         MR. FIGEL:  Objection.

02:41 15        THE WITNESS:  The phrase "drive demand" is

16   too vague, so I'm not sure how to answer the

17   question.

18   BY MR. HANAUER:

19         Q.   Well, if Ripple creates a product that

02:42 20   uses XRP to make the product work, is Ripple

21   driving demand for XRP by increasing the use of

22   that product?

23         MR. FIGEL:  Objection.

24         THE WITNESS:  You know, I guess you could say

02:42 25   that.  But that's exactly the same generic point

150

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  that doesn't distinguish the relationship

2  between Ripple and XRP from countless other

3  relationships that have nothing to do with

4  securities or allegations about securities.

02:42  5  It's just -- presumably when a firm creates a

6  product, it's frequently the case or typically

7  the case that by creating the product the firm

8  is taking steps to increase the demand for the

9  product.  So by definition -- because if the

02:43  10  product didn't exist, there wouldn't be demand

11  for it.

12      But that's exactly the criticism I'm

13  making of Professor Metz.  He has this

14  completely generic test that has nothing to do

02:43  15  with anything that distinguishes this

16  relationship from countless other relationships,

17  and he doesn't even claim that it does.

18      And your question is, you know, subject

19  to exactly the same response, that, yes, Ripple,

02:43  20  by creating XRP increases the demand for XRP by

21  definition because XRP didn't otherwise exist.

22  And that's true for every single -- maybe

23  overstating slightly -- but as a general matter,

24  that is true for every single creator of a

02:43  25  product where the success of the product is

151

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

          1   based in some way on market acceptance of the

          2   product.

          3   BY MR. HANAUER:

          4       Q.   Are you offering any opinion on what

02:44     5   drove demand for XRP?

          6       MR. FIGEL:  Objection.

          7       THE WITNESS:  Not a separate opinion.  But I

          8   discuss a lot of different examples of different

          9   ways, I guess you could say, in which demand for

02:44    10   XRP existed.

         11   BY MR. HANAUER:

         12       Q.   Does Dr. ███████ report offer the

         13   opinion that an event study can establish

         14   whether or not offers or sales of securities

02:44    15   took place?

         16       MR. FIGEL:  Objection.

         17       THE WITNESS:  Again, I don't think he uses

         18   those words.  But as I've tried to indicate,

         19   presumably, he didn't go to all this effort to

02:45    20   conduct a study that has no relationship to the

         21   issues in the case.  And one of my fundamental

         22   criticisms is exactly that; that his study in no

         23   way distinguishes the relationship between

         24   Ripple and XRP from countless other

02:45    25   relationships that have nothing to do with the

                                                          152

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1    facts and circumstances of this case, let alone

 2    have nothing to do with the issue whether

 3    something is a security.

 4    BY MR. HANAUER:

02:45  5        Q.   And I guess you used the example of an

 6    oil company, right?

 7        A.   As one example, that's right.

 8        Q.   Does any oil company own the majority

 9    of all the oil in existence?

02:45 10       MR. FIGEL:  Objection.

 11       THE WITNESS:  Not that I know of.

 12    BY MR. HANAUER:

 13       Q.   Did any oil company or its founders

 14    create oil?

02:46 15       A.   You mean discover oil or you mean

 16    chemically create?  I'm not sure exactly what

 17    you mean.

 18       Q.   The latter.

 19       A.   Did they chemically create oil?  Not to

02:46 20    the best of my knowledge, but I don't really

 21    know for certain.

 22       Q.   Does oil have use independent of

 23    trading or speculation?

 24       A.   Trading or speculation?  Yes, it does.

02:46 25       Q.   Are you offering an opinion in this

                                                   153

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
          1   case whether uses of XRP exist other than for

          2   trading or speculation?

          3       MR. FIGEL:  Objection.

          4       THE WITNESS:  I'm not -- you know, I assume
02:46     5   you're not suggesting any of these questions

          6   have anything to do with Dr. ████ study.  I

          7   mean, that's what I'm responding to.  So I just

          8   want to make sure the context of my answers is

          9   clear.
02:47    10   BY MR. HANAUER:

         11       Q.   Okay.  Can you answer my question?

         12       A.   I did answer it.

         13       Q.   Are you offering an opinion in this

         14   case on any use of XRP other than for trading or
02:47    15   speculation?

         16       MR. FIGEL:  Objection.

         17       THE WITNESS:  I would say I have some

         18   background familiarity with that issue, but I am

         19   not expressing any separate opinion on that
02:47    20   issue.

         21   BY MR. HANAUER:

         22       Q.   Are you offering an opinion about the

         23   date by which any of Ripple's products that use

         24   XRP became commercially operational?
02:47    25       MR. FIGEL:  Objection.
```

154

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1      THE WITNESS:  No, I'm not.
         2   BY MR. HANAUER:
         3      Q.   Are you offering the opinion that XRP
         4   cannot be offered or sold as an investment
02:48    5   contract -- let me rephrase.
         6           Are you offering the opinion that XRP
         7   cannot be offered or sold as an investment
         8   contract under any circumstances?
         9      MR. FIGEL:  Objection.
02:48   10      THE WITNESS:  That sounds like a legal
        11   opinion.  I'm not offering any legal opinions on
        12   any subject.
        13   BY MR. HANAUER:
        14      Q.   Can I ask you to look at page 12 of
02:48   15   your report.
        16      A.   Okay.
        17      Q.   So you talk about in paragraph -- in
        18   section B of your report, you talk about
        19   confounding news or confounding information.
02:49   20      A.   That's right.
        21      Q.   And I'm trying to figure out what you
        22   mean by "confounding news."
        23           Are you talking about public
        24   announcements that Dr. ███ identified but
02:49   25   didn't place on one of the 105 event days, or
```

155

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   are you talking about announcements from those

2   105 event days that weren't really -- that, in

3   your opinion, weren't really announcements about

4   Ripple's efforts?

02:49   5        MR. FIGEL:  Objection.

6        THE WITNESS:  I don't think either one of

7   those alternatives fairly describes the content

8   of this particular section of my report.

9   BY MR. HANAUER:

02:50   10        Q.    Okay.  Well, then why don't you tell me

11   what you mean by "confounding information" as it

12   pertains to opinion B on page 2 of your report.

13        A.    All right.  Opinion B has a discussion

14   of two different types of confounding

02:50   15   information.

16             One type is a fundamental problem that

17   I described earlier of -- many of Dr. ████

18   announcements are not -- to the extent there is

19   a claim of a price reaction that's correlated

02:50   20   with those announcements are not solely a

21   product of Ripple's entrepreneurial efforts, but

22   rather are a combination of Ripple's efforts and

23   new information about supply and demand in the

24   marketplace.

02:51   25             And as I said earlier, there is

156

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    basically a continuum from situations where both

2    effects are occurring and it's really difficult

3    or really impossible to disentangle them.

4            In other situations where Professor --

02:51 5    excuse me, Dr. █████ himself recognizes the

6    problem and just states as a matter of fact that

7    it's not clear in some of his examples whether

8    Ripple is even involved in the event itself that

9    Ripple is announcing.  That's closer to the

02:52 10   example that I gave about the difference between

11   creator of information and reporter of

12   information.  So that's one type of confounding

13   information.

14           And the other type really relates to

02:52 15   the fact that XRPs are not traded in an

16   efficient market.  And when you have information

17   that's not traded in an efficient market, you

18   don't really have a definitive theory of when

19   prices are going to react to that information,

02:52 20   whether they're going to react to that

21   information without bias.

22           And, therefore, when you have

23   confounding events, other I should say

24   compounding news because I don't mean to limit

02:52 25   myself to Dr. █████ 105 event days.  But when

157

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
      1    you have other news, even news that's contained

      2    in Dr. ████ -- I think it's Exhibit C with his

      3    500-plus announcements -- within a window -- and

      4    I describe different windows around the

02:53 5    so-called event day -- because you're in a world

      6    of inefficient markets, you can't really

      7    attribute, even as a correlation, the price

      8    reaction to the event that Professor ████ --

      9    excuse me, Dr. ████ is claiming that there is a

02:53 10   correlation because you can't exclude the

     11    possibility in an inefficient market.

     12         The other news announcements in the

     13    different windows of time that I describe in

     14    Exhibit 2 also are responsible, at least in

02:54 15   part, as well as other announcements in --

     16    outside even of the windows that I identified

     17    that could have had an effect on the prices that

     18    Dr. ████ claims are correlated with particular

     19    announcements -- with announcements on

02:54 20   particular event days.

     21    Q.   Did you perform any work or analysis to

     22    quantify the impact of confounding news on XRP

     23    prices?

     24         MR. FIGEL:  Objection.

02:54 25        THE WITNESS:  Again, I think the whole point
```

158

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  of an inefficient market is you can't quantify
 2  it because you don't have a theory of how
 3  quickly prices react to information.  That's one
 4  of the characteristics of an inefficient market.
02:55  5          So what you can do, what I did do is
 6  identify other news that occurred in the same
 7  time period in the different windows that I
 8  describe in Exhibit 2 at the same time as the
 9  information that Dr. ████ claims as an event day
02:55 10  that's correlated with a particular price
11  reaction.
12          And that, as I stated in my report,
13  really underestimates the significance of the
14  fact that XRPs do not trade in an efficient
02:55 15  market.  Because in an inefficient market, there
16  is no way to say, there is no way to conclude
17  that those confounding announcements also didn't
18  have an effect on the price that Dr. ████ claims
19  is correlated with a particular announcement on
02:56 20  a particular event day.
21  BY MR. HANAUER:
22      Q.   If you had wanted, could you have been
23  capable of checking for the -- if you had
24  wanted, could you have been capable of trying to
02:56 25  quantify the effect of confounding news?
```

159

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1        MR. FIGEL:  Objection.

2        THE WITNESS:  I think under the facts and

3   circumstances of this case, given the fact that

4   XRP is trading in an inefficient market, I think

02:56 5   it would be very difficult.  I'm not sure how

6   you do it.

7   BY MR. HANAUER:

8        Q.   Did you perform any work or analysis to

9   determine whether Dr. ███████ results would

02:56 10  change if he excluded confounding news days?

11       A.   No, I didn't perform any such analysis

12  since I think -- if you look at the two

13  different types of confounding information, I'm

14  not even sure how you would decide what to

02:57 15  exclude.

16       Q.   So going back to I think the first of

17  the two definitions you talked about in

18  describing confounding, the one where you said

19  the Ripple news announcement, it's more about

02:57 20  supply and demand than Ripple's efforts -- do

21  you understand what I'm talking about or

22  referring to?

23       A.   I understand what you're talking about,

24  but that's not an accurate paraphrase of what I

02:57 25  said.

160

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

      1          Q.    Okay.  You understand which of the

      2    versions of confounding I'm referring to?

      3          A.    Yes, I do understand that.

      4          Q.    Okay.  So for those events, how did you

02:58 5    determine whether a Ripple announcement related

      6    to, on one hand, Ripple's efforts, or the other

      7    information about the supply, demand, or

      8    expectation of market participants other than

      9    Ripple?

02:58 10         MR. FIGEL:  Objection.

     11          THE WITNESS:  Again, that's a

     12    mischaracterization of what I said.  It's not a

     13    matter of one or the other; it's both are

     14    occurring simultaneously, in effect.  Because an

02:58 15   announcement can reveal an effort by Ripple and

     16    it can also reveal information about supply and

     17    demand in the marketplace.  So they can both be

     18    occurring at the same time.

     19               And, again, it is like the problem of

02:59 20   confounding information in more traditional

     21    event studies where, when you have confounding

     22    information, when you can't disentangle, it

     23    makes it impossible to reach a conclusion about

     24    the -- what part of the price reaction is

02:59 25   attributable to one aspect, one part of the

                                                       161

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1     confounding information versus another part.

2          Sometimes there is external sources of

3     information that you can look to to, you know,

4     possibly reach some judgments depending, you

02:59  5     know, obviously on the relevant facts and

6     circumstances.  But sometimes it's just

7     impossible.  And you have to recognize that, and

8     that's something that Dr. ███ doesn't do.

9          But, again, I want to emphasize,

03:00 10     sometimes it's possible to say something

11     stronger than that.  And I keep coming back to,

12     you know, the example of an event which produces

13     news that's announced by a third party.  And the

14     announcement by a third party can be what causes

03:00 15     the price reaction, but it's just disclosing

16     events that are not caused by the party

17     disclosing the information.

18          In a situation like the example that I

19     used before of third parties deciding to allow

03:01 20     XRP to trade on their platforms, it's similar to

21     that.  Ripple is announcing that other parties

22     are now allowing XRP to trade on their

23     platforms.  And Dr. ███ somewhere has a

24     footnote where it's either that example or some

03:01 25     other example where he says it's not even clear

162

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    that Ripple had any involvement in any of the

2    events that it's announcing.

3         And those type of situations, which are

4    part of Dr. Ripple's [sic] 105 days, the days

03:01  5   that he considers relevant as opposed to the 400

6    or so that he, for all practical purposes,

7    ignores, that really highlights the problem,

8    those type of situations.  Because those

9    situations are not only compounded, but they

03:02 10  really highlight the distinction between, as I

11   said, creating information and reporting

12   information, which professor -- excuse me,

13   Dr. ███ ignores.  And that's the problem.

14   BY MR. HANAUER:

03:02 15     Q.   So in Exhibit C -- or I'm sorry,

16   Appendix C to Dr. ███ report, he actually

17   lists all the news announcements he covered in

18   his event study?

19      A.   That's my understanding.

03:02 20     Q.   And did you read the contents of all

21   those news announcements?

22      A.   No, I did not.

23      Q.   Did you read the contents of any of

24   those news announcements?

03:03 25     A.   You know, at least parts that Dr. ███

163

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1  quoted in his report.

 2       Q.   Only the ones he quoted in his report?

 3       A.   I think so.  I don't remember doing any

 4  kind of systematic investigation of the ones

03:03  5  that he either ignored entirely or even the ones

 6  that he used as part of event days.

 7            I guess I read what he considered

 8  relevant.

 9       Q.   Well, do you know whether Dr. ███ read

03:03 10  the entirety of all those reports?

11       MR. FIGEL:  Objection.

12       THE WITNESS:  No.  You would have to ask him.

13  BY MR. HANAUER:

14       Q.   Are you offering any opinions on the

03:03 15  efforts Ripple took to increase demand for XRP?

16       MR. FIGEL:  Objection.

17       THE WITNESS:  Not in isolation, no, I'm not.

18  BY MR. HANAUER:

19       Q.   Are you offering any opinions on

03:04 20  whether Ripple's efforts affected demand for

21  XRP?

22       MR. FIGEL:  Objection.

23       THE WITNESS:  I'm not offering a separate

24  opinion on that subject.

25
```

164

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  BY MR. HANAUER:

2       Q.   Could Ripple take efforts that would

3  increase demand for XRP?

4       A.   Yes, obviously.

03:04  5       Q.   Are you offering any opinions on the

6  efforts Ripple took to impact supply of XRP?

7       MR. FIGEL:  Objection.

8       THE WITNESS:  Again, I have, you know, some

9  background in my report on what Ripple did with

03:04 10  respect to supply of XRP.  That's like some of

11  the other questions that you asked, part of

12  background, part of the facts and circumstances

13  of the case.  But I'm not offering a separate

14  opinion about it.

03:05 15  BY MR. HANAUER:

16       Q.   Are you offering any opinions on

17  whether Ripple -- Ripple's efforts actually did

18  affect the supply of XRP?

19       MR. FIGEL:  Objection.

03:05 20       THE WITNESS:  Again, I'm not offering any

21  separate opinions about that.  I have discussion

22  of that in the background section of my report,

23  but it's not a separate opinion.

24  BY MR. HANAUER:

03:05 25       Q.   And all things being equal, from an

165

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1   economics perspective, if demand for an asset

 2   stays flat and the supply of that asset goes

 3   down, should we expect the price of that asset

 4   to go up?

03:05  5       MR. FIGEL:  Objection.

 6       THE WITNESS:  Well, it would depend on the

 7   shape of the supply curve.  But, you know,

 8   that's certainly a reasonable assumption that

 9   that would happen frequently, I guess.  I don't

03:06 10   know what else to say.

 11           But in any particular situation,

 12   obviously you'd have to analyze the relevant

 13   facts and circumstances and look at the data to

 14   form a conclusion.

03:06 15   BY MR. HANAUER:

 16       Q.   Are you offering any opinions on the

 17   efforts Ripple took to increase the price of

 18   XRP?

 19       MR. FIGEL:  Objection.

03:06 20       THE WITNESS:  No, I'm not, not as a separate

 21   opinion.

 22   BY MR. HANAUER:

 23       Q.   Are you offering any opinions on

 24   whether any of Ripple's efforts actually did

03:06 25   affect XRP's price?

166

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    A.   I think I said earlier that we did try

2  and look at the biggest price reactions of XRP

3  and look at certain disclosures by Ripple at

4  very -- at the same period as the price

03:07  5  reactions or very close to the price reactions.

6         And I think I said it seemed

7  reasonable, with respect to that handful set of

8  price reactions, to conclude that there was at

9  least a correlation between the announcements

03:07 10  and -- with respect to those few announcements,

11  those announcements and price reactions and

12  even, you know, be stronger than that and, you

13  know, at least as a working hypothesis, you

14  know, conclude that there was likely a causal

03:08 15  relationship.

16    Q.   Are you offering any opinions on

17  whether Ripple's efforts, independent of public

18  news announcements, affected XRP's price?

19    MR. FIGEL:  Objection.

03:08 20    THE WITNESS:  I'm not offering any separate

21  opinions on that subject.

22  BY MR. HANAUER:

23    Q.   Are you offering any opinions on the

24  efforts Ripple took to increase the liquidity of

03:08 25  XRP?

167

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

           1       MR. FIGEL:  Objection.

           2       THE WITNESS:  Same answer.

           3   BY MR. HANAUER:

           4       Q.   Are you offering any opinions on how

03:08      5   liquidity of XRP affects its price?

           6       MR. FIGEL:  Objection.

           7       THE WITNESS:  No, I'm not.

           8   BY MR. HANAUER:

           9       Q.   Can I ask you to look at paragraph 22

03:09     10   of your report.

          11       A.   Okay.

          12       Q.   And what do you mean when you say that

          13   [as read]:  Statistically significant XRP

          14   returns are correlated with announcements

03:09     15   related to the expected supply and demand for

          16   XRP or other market conditions?

          17       A.   Well, I mean, there's a whole paragraph

          18   that describes it.  I mean, there's a -- there's

          19   a couple of points.

03:10     20           One, just like all the questions that

          21   you just asked me, the company's associated

          22   products want those profits to be successful in

          23   terms of whatever it is, increasing demand,

          24   increasing liquidity, increasing price,

03:10     25   affecting supply.

                                                                    168

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          So, again, there's no distinction

2    between any of those outcomes or intentions by

3    companies that in any way is linked to whether

4    or not something is a security.

03:10  5          That's like the other things that I've

6    already described, which are completely generic

7    that have nothing to do with whether something

8    is a security.  And that's just a continual

9    methodological flaw in Dr. ███████ analysis.

03:11 10   Q.   I apologize because I think we're --

11   you may not have understood the question or I

12   did a bad job of asking it.

13          Can I just ask you:  What did you mean

14   when you were referring to statistically

03:11 15   significant XRP returns?

16   A.   Okay.  That's a completely different

17   question.

18   Q.   Yeah, and I'm sorry.  That's the one I

19   would like for you to discuss.

03:11 20   A.   That's fine.

21          I meant returns that, in Dr. ███████

22   event study, he found to be statistically

23   significant in either a parametric or a

24   nonparametric test in either a one- or a

03:11 25   two-tailed test.

169

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      Q.   And are you -- did you do any work or

2    analysis that disputes that finding of

3    statistical significance?

4      A.   You mean whether Dr. ███ calculated

03:11  5    statistical significance correctly using the

6    model that he used?

7      Q.   Yes.

8      A.   And the days that he chose?  No, other

9    than, you know, describing the extreme

03:12 10   subjectivity of what he did and looking at

11   positive results, not negative results.

12          I mean, there's a lot of criticisms,

13   but the actual calculation that he did of what's

14   a statistically significant return based on the

03:12 15   model that he used, I didn't do any work to see

16   whether his regression -- his regression result,

17   given the regression that he used and the data

18   that he used for the regression, that the data

19   that he reported was an accurate description of

03:12 20   the data resulting from the regression.

21     Q.   And what was your methodology for

22   trying to determine if an announcement related

23   to supply, demand, or expectations of market

24   participants on one hand or Ripple's efforts on

03:13 25   the other?

170

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1     A.   The methodology was to highlight how

2  various announcements have both effects going on

3  simultaneously.  And some of the announcements,

4  as I've said several times, and as Dr. ████

03:13  5  himself concedes, are announcements about

6  actions by third parties that have very little,

7  if anything, to do with actions by Ripple

8  itself.

9     Q.   For Ripple's own announcements, what

03:13  10  was your methodology for determining whether the

11  announcement related to supply or demand, as

12  opposed to Ripple's efforts?

13     A.   It's basically what I've already said.

14     Q.   Can you elaborate?

03:14  15     A.   Yeah.  I just highlighted how various

16  announcements contain information about Ripple's

17  efforts, as well as new information about supply

18  and demand conditions in the marketplace where

19  it's very hard, if not impossible, to

03:14  20  disentangle those two.

21     But also, there are certain events that

22  Dr. ████ includes in his event days where he

23  himself concedes that there's no obvious

24  relationship or any relationship between

03:14  25  Ripple's actions and the effect of the

171

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  announcement that Ripple itself makes.

2      Q.   For the announcements that you didn't

3  actually read, what was your basis for

4  determining whether those announcements related

03:15  5  to supply or demand as opposed to Ripple's

6  efforts?

7      MR. FIGEL:  Objection.

8      THE WITNESS:  Because I read how Dr. ███ in

9  his report characterized them, his justification

03:15 10  for why he included them, and how he described

11  them, and was able to reach the conclusions that

12  I reached as described in my report.

13  BY MR. HANAUER:

14      Q.   Could another expert reasonably reach

03:15 15  the conclusion that the announcements Dr. ███

16  analyzed did, in fact, relate to Ripple's

17  efforts as opposed to supply and demand?

18      MR. FIGEL:  Objection.

19      THE WITNESS:  That's, again, a

03:15 20  mischaracterization of my opinion and what I've

21  said.  As to what another expert could conclude,

22  you'd have to ask them.

23  BY MR. HANAUER:

24      Q.   You talk about how some of the

03:16 25  announcements Dr. ███ looked at related to the

172

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    expectations of market participants as opposed

2    to Ripple's efforts; is that right?

3        A.    You know, I think there is some

4    sentences to that effect, if I remember

03:16  5    correctly.  But why don't you point me to

6    whatever it is that you're referring to so I can

7    respond directly.

8        Q.    So in paragraph 21 of your report.

9        A.    Okay.

03:16 10    Q.    I think in the third sentence you say

11   how information about Ripple's efforts could be

12   confounded about information about the

13   expectations of market participants.

14        MR. FIGEL:  Mr. Hanauer, just so the record

03:17 15   is clear, would you mind reading the sentence

16   you're referring to?

17   BY MR. HANAUER:

18        Q.    The third sentence of paragraph 21 of

19   your report.  Do you see that?

03:17 20    A.    Beginning "Such confounding

21   information"?

22        Q.    Correct.

23        A.    Okay, I've read it.

24        Q.    So the expectations of market

03:18 25   participants, is that one of the factors of the

173

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   Howey test?

2       MR. FIGEL:  Objection.

3       THE WITNESS:  That's a legal question.  I

4   don't have any legal opinions that I'm offering

03:18  5   in this case.

6   BY MR. HANAUER:

7       Q.   Well, you state in your report a

8   section of Howey and then you say it's referred

9   to as the Howey test.

03:18 10      MR. FIGEL:  Objection.

11  BY MR. HANAUER:

12      Q.   Paragraph seven.

13      A.   I say my understanding is that's a

14  description of the Howey test, correct.

03:18 15      Q.   And one of the factors that you

16  describe the Howey test involves the expectation

17  of market participants?

18      A.   Are you saying -- is that contained in

19  what I quoted in paragraph seven?  I'm not sure

03:18 20  what you're asking me.

21      Q.   So I'm guessing -- or I'm asking:  Why

22  is it proper to consider Ripple announcements

23  that discuss the expectation of market

24  participants a confounding event if that is one

03:19 25  of the factors of a Howey test?

174

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1        MR. FIGEL:  Objection.

2        THE WITNESS:  Again, that sounds like partly

3   a -- or entirely a legal -- asking for a legal

4   opinion, which I'm not giving.

03:19  5            But you're also not focusing or looking

6   at the whole sentence which describes what's

7   meant not in terms of a legal opinion, but in

8   terms of how to interpret price movements.

9   BY MR. HANAUER:

03:19  10   Q.   Did you do anything to determine

11   whether the expectation of market participants

12   was impacted by their expectation of Ripple's

13   efforts?

14        MR. FIGEL:  Objection.

03:20  15        THE WITNESS:  You know, again, that's too

16   vague a question.

17            But it also, again, is a kind of

18   generic question that does not in any way

19   distinguish the relationship between Ripple and

03:20  20   XRP and countless other examples of exactly the

21   same thing that have nothing to do with any of

22   the issues relating to what's -- what is a

23   security, if what you're asking me is, is there

24   any relationship between Ripple's efforts and

03:20  25   investors' expectations about XRP.  If that --

175

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   that's the way I understood the question.

2   BY MR. HANAUER:

3     Q.   That's not my question.

4     My question is --

03:20 5     A.   Okay.  Then maybe I misunderstood the

6   question.

7     Q.   -- is whether you did anything to

8   determine whether the expectation of any market

9   participant was impacted by that participant's

03:21 10   expectation of Ripple's efforts?

11     MR. FIGEL:  Objection.

12     THE WITNESS:  All right.  Well, at least to

13   me that's the same question.

14     I didn't do any independent analysis.

03:21 15   I don't have any independent opinion on that

16   subject other than to the extent that

17   relationship exists; it is a generic

18   relationship having nothing to do with anything

19   that's specific to the relationship between

03:21 20   Ripple and XRP but has to do with the

21   relationship between efforts of firms or

22   companies or founders, whatever the relevant

23   issue that's being -- or situation that's being

24   analyzed, and whatever the firm or product --

03:21 25   firm or founder or, again, whatever the

176

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

          1   situation is that's being analyzed, what they

          2   are doing and how that affects expectations of

          3   whatever, whether it's a product or an

          4   investment, whatever it is.

03:22     5          It's a completely generic question

          6   that, no matter how it's resolved, has nothing

          7   to do with anything specific about the

          8   relationship between Ripple and XRP.

          9   BY MR. HANAUER:

03:22    10      Q.   Did you do anything to determine the

         11   expectation of any particular market

         12   participant?

         13      A.   No, I did not.

         14      MR. HANAUER:  What do you say we take a break

03:22    15   right now.

         16      THE VIDEOGRAPHER:  We are going off the

         17   record.  The time is 3:23 p.m.

         18              (Whereupon, a recess was had at

         19              3:23 p.m., after which the

03:22    20              deposition was resumed at

         21              3:23 p.m. as follows:)

         22      THE VIDEOGRAPHER:  This is the end of media

         23   unit two.  We are going off the record.  The

         24   time is 3:23 p.m.

         25

                                                          177

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
                          1                    (Whereupon, a recess was had at
                          2                     3:23 p.m., after which the
                          3                     deposition was resumed at
                          4                     3:42 p.m. as follows:)
             03:42        5        THE VIDEOGRAPHER:  We are --
                          6        MR. FIGEL:  Before we -- could we just get a
                          7    time check?
                          8        THE VIDEOGRAPHER:  Oh, I'm sorry.  Yeah,
                          9    we've been on the record for 4 hours and
             03:42       10    14 minutes.
                         11        MR. FIGEL:  And not holding you to anything
                         12    Ben, but do you think we're going to go the full
                         13    whole seven?
                         14        MR. HANAUER:  I hope not.
             03:42       15        MR. FIGEL:  Okay, good.
                         16        THE VIDEOGRAPHER:  All right.  We are back on
                         17    the record.  This is the start of media unit
                         18    three, the deposition of Daniel Fischel.  The
                         19    time is 3:42 p.m.
             03:42       20            You may proceed.
                         21    BY MR. HANAUER:
                         22        Q.   Professor Fischel, can I please refer
                         23    you to paragraph 23 of your report.
                         24        A.   Okay.
             03:42       25        Q.   And do you see in romanette (i) you
```

178

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  talk about how announcements about Ripple's

2  equity financing provide information about the

3  state of the market for XRP?

4      A.   Yes, I see that.

03:43  5      Q.   What information do Ripple's financing

6  amount -- I mean financing announcements provide

7  about the state of the market of XRP?

8      A.   Well, as the paragraph describes,

9  Ripple has different sources of -- different

03:43 10  sources of funds.  Equity issuances and selling

11  XRP units are two different sources of funds.

12          So the more Ripple relies on one source

13  of funds, all else equal can communicate

14  information to market participants about their

03:44 15  need to use alternative sources of funds, such

16  as selling units of XRP.

17          So I would say that's an example of

18  what -- as the section describes, as a compound

19  announcement.  The announcement itself is about

03:44 20  an equity issuance by Ripple.

21          But one of the reasons it has a price

22  effect is not because of just the equity

23  issuance by Ripple itself, which does not

24  directly involve XRP, but rather information

03:45 25  that it communicates about XRP.

179

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
              1          And that's, again, an example of what I
              2   refer to as a compound announcement because it's
              3   an announcement about one thing that has nothing
              4   to do with XRP but it communicates information
03:45         5   about market conditions for XRP, and, therefore,
              6   it's a compound announcement.
              7      Q.   Did you do anything to determine
              8   whether obtaining equity financing actually
              9   decreased the supply of XRP?
03:45        10      MR. FIGEL:  Objection.
             11      THE WITNESS:  Well, first of all, that's not
             12   what the paragraph says.  But the answer, did I
             13   actually investigate that question, no, I
             14   didn't.
03:46        15   BY MR. HANAUER:
             16      Q.   Could Ripple increase its capital
             17   expenditures and research and development
             18   spending using the newly-obtained equity
             19   financing while keeping its XRP sales at the
03:46        20   same level?
             21      MR. FIGEL:  Objection.
             22      THE WITNESS:  Is that possible?  Yes, it's
             23   possible.
             24   BY MR. HANAUER:
03:46        25      Q.   Do you know whether or not Ripple did
```

180

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  that?

2      A.  No, I don't.  I didn't investigate that

3  question.

4          But, again, that's not the point of the

03:46  5  paragraph.

6      Q.  If Ripple ceased to exist as a company,

7  how would that impact the market for XRP?

8      MR. FIGEL:  Objection.

9      THE WITNESS:  I don't know.  One would have

03:46 10  to speculate about the future, which is not so

11  easy.

12          And I don't know if it would be

13  possible to give a definitive answer because one

14  doesn't know what could happen in the future.

03:46 15  BY MR. HANAUER:

16      Q.  Do you have an opinion one way or the

17  other?

18      MR. FIGEL:  Objection.

19      THE WITNESS:  I don't.

03:47 20  BY MR. HANAUER:

21      Q.  Does Ripple going out and obtaining

22  equity financing, does that involve efforts by

23  Ripple?

24      A.  Well, it's a decision made by Ripple

03:47 25  for sure.  And what's done to the method for

181

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    what Ripple -- the steps that Ripple takes to

2    raise equity funds, you just have to investigate

3    that.  I can't answer that in the abstract.

4        Q.   Do you know how much money Ripple spent

03:47  5    to obtain equity financing?

6        A.   No, I don't, not from memory.

7        Q.   Did you review any documents that would

8    have shed light on how much money Ripple spent

9    to obtain equity financing?

03:48 10    MR. FIGEL:  Objection.

11    THE WITNESS:  Not that I recall.

12        But, again, I wasn't looking for that

13    information, so it's possible that it was in

14    some document that I saw, but I don't recall any

03:48 15    discussion of that in any document that I

16    remember reviewing.

17    BY MR. HANAUER:

18        Q.   And do you have any understanding of

19    whether the parties that provided equity

03:48 20    financing to Ripple, whether those parties

21    sought out Ripple on their own or were they

22    solicited by Ripple?

23        A.   I don't know.

24        Q.   And in paragraph 23, romanette (i), you

03:48 25    mention Ripple's decision to escrow 55 billion

182

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

           1   XRP tokens?

           2       MR. FIGEL:  Objection.

           3       THE WITNESS:  Yes, that's right.

           4   BY MR. HANAUER:

03:49      5       Q.   Was that an effort of Ripple to escrow

           6   the 55 billion XRP?

           7       A.   Well, it was a decision by Ripple, yes,

           8   it was.

           9       Q.   Could that escrowing have occurred

03:49     10   without Ripple's efforts?

          11       MR. FIGEL:  Objection.

          12       THE WITNESS:  Well, by definition, no, it

          13   couldn't.

          14   BY MR. HANAUER:

03:49     15       Q.   And in paragraph 23 (i), you also --

          16   or, I'm sorry, paragraph 23 romanette (i), you

          17   talk about Ripple receiving New York's first

          18   BitLicense.

          19       A.   Yes, that's right.

03:50     20       Q.   And did Ripple have to undertake

          21   efforts to obtain that license?

          22       A.   I don't know.

          23       Q.   Do you know how much money Ripple spent

          24   associated with applying for the BitLicense?

03:50     25       A.   No, I don't.

                                                              183

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      Q.   In the next paragraph, paragraph 23,

2  romanette (ii), you talk about the trading

3  platforms.

4      A.   Yes, I see that.

03:50  5      Q.   Do you know what efforts Ripple

6  undertook to get listed on any particular

7  exchange?

8      MR. FIGEL:  Objection.

9      THE WITNESS:  No, I haven't studied that

03:51 10  either.

11  BY MR. HANAUER:

12      Q.   Do you know whether Ripple paid money

13  to get listed on any exchange?

14      MR. FIGEL:  Objection.

03:51 15      THE WITNESS:  No, I don't.

16  BY MR. HANAUER:

17      Q.   Do you know any particular exchange's

18  reasons for listing XRP?

19      A.   No, I don't.

03:51 20      Q.   If Ripple paid an exchange to list XRP,

21  would that exchange listing of XRP involve

22  Ripple's efforts?

23      A.   It would -- yes.  If I make that

24  assumption, it would involve Ripple's efforts,

03:51 25  but that's not the same as saying that the

184

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1  information communicated would be solely as a
         2  result of Ripple's efforts.
         3          And even with respect to Ripple's
         4  efforts, what I've referred to several times,
03:52    5  but I didn't have Dr. ███████ report in front of
         6  me, is paragraph 49 -- I'm sorry, footnote 49,
         7  where he states -- or at least it's -- or
         8  there's a reference to his report Figure 16,
         9  where on page 34 of Dr. ████████ report where he
03:52   10  acknowledges that the majority of the 11
        11  announcements involve Ripple's actions.
        12      Q.   But did Dr. ██████ actually look to --
        13  did Dr. ██████ do anything to determine why any
        14  particular exchange listed XRP?
03:52   15      MR. FIGEL:  Objection.
        16      THE WITNESS:  You'll have to ask him.  I
        17  don't know what he did.  I know what he
        18  acknowledged.
        19  BY MR. HANAUER:
03:53   20      Q.   In that same paragraph 23, romanette
        21  (ii), you talk about how other cryptocurrencies
        22  such as Bitcoin are listed on platforms without
        23  the effort of a company like Ripple.
        24      A.   Yes, I see that.
03:53   25      Q.   Do you know what cryptocurrencies other
```

185

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    than Bitcoin have been listed on exchanges

2    without the effort of a sponsoring company?

3        MR. FIGEL:  Objection.

4        THE WITNESS:  No, I don't.

03:54  5    BY MR. HANAUER:

6        Q.    At the time the first exchange listed

7    Bitcoin, was there a company that owned the

8    majority of Bitcoin in existence?

9        A.    I don't believe so.

03:54 10    Q.    Has there ever been a company that

11    owned the majority of Bitcoin in existence?

12        A.    Not as far as I know.

13        Q.    So I want to refer you now to the next

14    two subparagraphs, paragraph 23, romanette (iii)

03:54 15    and (iv).

16            Do you see those?

17        A.    Yes, I see that.

18        Q.    Do you know what efforts Ripple

19    undertook to get users to use its products?

03:55 20        MR. FIGEL:  Objection.

21        THE WITNESS:  No, I haven't studied that

22    question.

23            Again, it's like so many questions, one

24    of his completely generic questions having

03:55 25    nothing to do with any particular relationship

186

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  between Ripple and XRP.

2  BY MR. HANAUER:

3      Q.   Do you know whether Ripple paid

4  rebates, incentives, bonuses, or other

03:55  5  compensation in order to get users to use

6  Ripple's products and software?

7      MR. FIGEL:  Objection.

8      THE WITNESS:  No, I don't.

9  BY MR. HANAUER:

03:55  10      Q.   Do you know any particular user's

11  reasons for using Ripple's products?

12      A.   Other than they made a decision it was

13  in their interests to do so, no, I don't.

14      Q.   If Ripple paid someone to use its

03:55  15  products, would that person's decision to use

16  the product involve Ripple's efforts?

17      MR. FIGEL:  Objection.

18      THE WITNESS:  Yes.  But --

19      MR. FLUMENBAUM:  Objection.

03:56  20      THE COURT REPORTER:  He said objection.  Got

21  it.

22      MR. FLUMENBAUM:  Thank you.  I didn't hear

23  Reid.

24      MR. FIGEL:  I did object, Marty.

03:56  25      MR. FLUMENBAUM:  Good.

187

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

1       THE WITNESS:  I just wanted to finish my

2   answer.

3            The point is not that all these actions

4   had no involvement by Ripple, although some of

03:56  5   them apparently did not have any, at least

6   according to Dr. ███.

7            But the point is that the information

8   content of the announcement was not solely a

9   product of Ripple's actions.

03:56 10            And one of the ways that you can tell

11   that is that the actions frequently don't even

12   involve XRP.  They involve use of Ripple's

13   software, use of Ripple's equity issuances.  But

14   they have a price effect on XRP.

03:57 15            Now, why is that?  Again, taking

16   Dr. ███ findings and his analysis at face

17   value, the reason is that the information

18   content of an announcement that has nothing to

19   do with XRP communicates information to market

03:57 20   participants about market conditions for XRP

21   and, therefore, there is a price reaction for

22   XRP, at least according to Dr. ███, a

23   correlation with the price reaction for XRP in

24   connection with an announcement that on its face

03:57 25   has nothing to do with XRP.

                                                        188

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

                   1          And that's, again, a simple and clear

                   2     example of why these announcements are compound

                   3     announcements with respect to explanations of

                   4     price movements of XRP, even taking Dr. ████

      03:58        5     findings at face value.

                   6     BY MR. HANAUER:

                   7          Q.   So which of Dr. -- the announcements

                   8     analyzed by Dr. ████, which of those

                   9     announcements had nothing to do with XRP?

      03:58       10          MR. FIGEL:  Objection.

                  11          THE WITNESS:  Announcements that don't refer

                  12     to XRP but at least what I'm just referring to,

                  13     announcements that refer to actions by Ripple

                  14     independent of actions about XRP, such as

      03:59       15     Ripple's equity issuances and use by customers

                  16     of Ripple's software.

                  17     BY MR. HANAUER:

                  18          Q.   Can you name any of the announcements

                  19     Ripple made about its software that involved

      03:59       20     software that did not require the use of XRP?

                  21          MR. FIGEL:  Objection.

                  22          THE WITNESS:  It's not whether the software

                  23     could be used for XRP.  That is one of the

                  24     factors that explains -- or that communicates

      03:59       25     information about potential increase in demand

                                                                      189

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    for XRP.

2            But the point is the announcement is

3    itself -- the announcement itself is about

4    decisions by third parties to use Ripple's

04:00  5    software.  And that, notwithstanding the fact

6    that the announcement itself is about a decision

7    to use Ripple's software, again, as the

8    paragraph states, that also communicates

9    information about the expected supply and demand

04:00 10    for XRP from users of the XRP ledger.

11    BY MR. HANAUER:

12        Q.   Do you know which of Ripple's products

13    required the use of XRP?

14        A.   No, not without studying the issue.

04:00 15    But I don't have any opinion on that.

16        Q.   Are you aware that some of Ripple's

17    products and software required XRP to work?

18        A.    I think Ripple had a number of

19    different products, some related to XRP, some

04:00 20    not, some payment system products not related to

21    XRP.

22            But beyond that, I haven't studied the

23    issue and I certainly don't have an opinion

24    about it.

04:01 25        Q.   Can we look at Exhibit 2 to your

190

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    report, please.

2         A.    Okay.

3         Q.    Who prepared Exhibit 2 to your report?

4         A.    This is just like Exhibit 1.  We looked

04:01  5    at Dr. █████ backup.  He has a series of

6    columns, as I recall, about other announcements

7    in his Exhibit C within certain periods of his

8    event days.  And we just took that data that he

9    himself reports and just transferred it to

04:02 10    Exhibit 2.

11         Q.    I asked who prepared it.

12         A.    You mean who -- again, I'm sorry the

13    same question who physically prepared Exhibit 2?

14         Q.    Yes.

04:02 15         A.    I don't know who physically prepared

16    Exhibit 2.  It might have been a research

17    assistant.

18         Q.    Did you do anything to verify the

19    accuracy of Exhibit 2?

04:02 20         A.    Well, something.  I mean, I looked at

21    the various documents in Dr. █████ event study

22    to see how the numbers on Exhibit 2 were

23    created.  You know, I guess that's what we did.

24         Q.    Does Exhibit 2 to your report, does it

04:03 25    only identify news announcements that Dr. █████

191

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1   identified that were not included in his 105

        2   news days?

        3       MR. FIGEL:  Objection.

        4       THE WITNESS:  It refers to other

04:03   5   announcements on Dr. ████ Exhibit C

        6   surrounding one or more of Dr. ████ event

        7   days.  But, frankly, I'm not sure from memory

        8   without checking whether any of the confounding

        9   announcements were also themselves event days.

04:04  10   I would have to check to make sure.

       11   BY MR. HANAUER:

       12       Q.   Did Dr. ████ determine that the

       13   announcements that were not in his five select

       14   categories would not be expected to move XRP

04:05  15   prices?

       16       MR. FIGEL:  Objection.

       17       THE WITNESS:  I think that's what he said in

       18   his report.

       19   BY MR. HANAUER:

04:05  20       Q.   And did you do any work or analysis to

       21   determine whether the excluded events actually

       22   did affect Ripple -- or XRP's price?

       23       MR. FIGEL:  Objection.

       24       THE WITNESS:  I didn't.  But the point is

04:05  25   there is kind of a selection bias, a
```

192

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   subjectivity that produces a selection bias.

2           If you want to test the effective

3   announcements on prices, if you start by picking

4   your subjective judgment of the events that have

04:06   5   -- are the most likely to have an effect on

6   prices, it's no big surprise that your

7   subjective judgment, if you do it competently,

8   is more likely to produce events that are

9   correlated with price movements because that's

04:06  10   your selection criteria.

11           If you select important events, you're

12   going to get a result that reflects your

13   selection bias, that you're starting with

14   important events that you subjectively identify

04:06  15   and your results are going to reflect that.

16           It's different than analyzing the

17   number of -- the percentage of statistically

18   significant results and not statistically

19   significant results.  If you don't use that

04:07  20   selection bias, then you start with all 500

21   days, for example, you would get different

22   results.

23   BY MR. HANAUER:

24       Q.   Of the approximately 400 events that

04:07  25   Dr. ███ excluded from his analysis, how many of

193

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1  those news announcements did you read the
         2  contents of in their entirety?
         3       MR. FIGEL:  Objection.
         4       THE WITNESS:  You know, I would say, unless
04:07    5  their results were quoted somewhere, probably
         6  none.  In terms of the description of them, I
         7  certainly read the description provided by
         8  Dr. ███ of them and why he, in his opinion,
         9  decided not to include them in his results.
04:08   10  BY MR. HANAUER:
        11       Q.   Are you offering the opinion that any
        12  particular of the announcements that Dr. ███
        13  excluded from his analysis actually confounded
        14  or otherwise affected Dr. ███ analysis?
04:08   15       MR. FIGEL:  Objection.
        16       THE WITNESS:  Well, clearly it affected his
        17  analysis because he ignored 400 out of the 500
        18  days, rounding.  Yes, that affects your
        19  analysis.
04:08   20       If you have a percentage of days with
        21  significant results and a percentage of days
        22  without significant results, even if you're just
        23  talking about correlations, forgetting all the
        24  other methodological flaws that I've identified,
04:08   25  obviously it affects your results if you throw
```

194

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
         1   out 400 days and don't consider them and only

         2   look at 100 and of those 100 only look at a

         3   small subset of those days when there are

         4   statistically -- you find a correlation with

04:09    5   statistically significant results.  Obviously

         6   that affects your results and your analysis.

         7   BY MR. HANAUER:

         8       Q.   Did you perform any work or testing to

         9   see how ██████ analysis would have changed if

04:09   10   any of the excluded events had, in fact, been

        11   included?

        12       MR. FIGEL:  Objection.

        13       THE WITNESS:  I think the point is obvious

        14   from what I said.  Assuming that there was some

04:09   15   principal reason for choosing -- selecting the

        16   100 events to test and excluding the 400, if you

        17   used 500 events, you would get a much lower

        18   percentage of statistically significant days

        19   relative to 500 days than you do relative to 100

04:10   20   days, rounding.  I think it's 105 days, but it's

        21   the same point.

        22   BY MR. HANAUER:

        23       Q.   But did you actually do any testing

        24   that included the events that Dr. ████ excluded?

04:10   25       A.   I didn't do any testing.  But Dr. ████
```

195

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    himself states that in his report as the reason

2    why he excluded the 400 other events or the

3    400 -- you know, events have sort of a double

4    meaning in this case.  So why he excluded the

04:10  5    400 other announcements is probably more

6    accurate.

7        Q.   And if I wanted to see how the results

8    would change by including events that Dr. █████

9    excluded, would that require doing another

04:11 10   iteration of the event study with additional

11   events in it?

12       MR. FIGEL:  Objection.

13       THE WITNESS:  Well, additional announcements

14   -- and, again, in answering these questions, I'm

04:11 15   just accepting Professor -- Dr. █████ analysis

16   at face value, meaning I'm not focused on the

17   deficiency caused -- deficiencies caused by the

18   fact that you're interpreting -- or Dr. █████ is

19   interpreting price reactions in relation to

04:11 20   announcements in an inefficient market, which,

21   you know, creates serious problems of its own.

22           But putting that all to one side, it

23   would be possible to duplicate what Dr. █████

24   did, accepting all of his conditions, selection

04:12 25   criteria, and putting to one side all the

196

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  methodological flaws associated with doing that,

2  and do the exact same announcements with -- the

3  exact same analysis with 500 announcements as he

4  does with 100 announcements, again rounding the

04:12  5  500 and the 100.

6  BY MR. HANAUER:

7      Q.   It would be possible to do that

8  testing?

9      A.   Yes, absolutely it would be possible.

04:12  10      Q.   Did you or Compass, in fact, do that

11  testing?

12      A.   No, for the reason that I stated.  And

13  it's also described by Dr. ███ himself as part

14  of his methodology and the reasons why he used

04:12  15  that methodology.

16      Q.   I would ask you to assume that Dr. ███

17  was correct, that the excluded events should not

18  be included in his testing.

19           If we were to accept that assumption,

04:13  20  would Exhibit 2 still support the opinion that

21  the announcements Dr. Metz analyzed may be

22  confounded by other contemporaneous

23  announcements?

24      MR. FIGEL:  Objection.

04:13  25      THE WITNESS:  Yes.  The point would still

197

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    apply.

2    BY MR. HANAUER:

3        Q.    And why is that?

4        A.    Because you don't have to have a

04:13  5    statistically significant price reaction to have

6    an effect on prices.  And particularly in an

7    inefficient market, you cannot confidently, even

8    as a matter of correlation, associate particular

9    price movements with particular announcements.

04:14  10    And if you have multiple announcements, you

11    can't tell if the, for example, the announcement

12    that you are calling statistically significant

13    is only statistically significant because it's

14    partly reflecting the effects of another

04:14  15    announcement in the same window, you know, just

16    as an example.

17            It's just another illustration of --

18    about Dr. ███ recognizing that he's dealing

19    with an inefficient market but not appreciating

04:14  20    the significance and the consequence and the

21    implications of that admission.

22        Q.    Did you look at any news announcements

23    beyond the 504 -- 514 identified by Dr. ███?

24        A.    Not that I recall.

04:15  25    Q.    Do you consider repetitive news as

198

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
    1  value relevant news that should be considered
    2  separately for measuring price impact?
    3      MR. FIGEL:  Objection.
    4      THE WITNESS:  Again, it depends entirely on
04:15 5  the relevant facts and circumstances.  It is
    6  certainly possible that information that would
    7  generally be referred to as stale, the price
    8  reaction to that would have to be interpreted in
    9  light of the fact that the information is stale.
04:15 10      On the other hand, sometimes repetition
   11  of the same information makes the information
   12  more important, not less important.  It just
   13  depends on the relevant facts and circumstances.
   14  BY MR. HANAUER:
04:16 15      Q.  Did you do any work or analysis to
   16  determine whether any of the events identified
   17  by Dr. ███ were stale or were repetitive?
   18      MR. FIGEL:  Objection.
   19      THE WITNESS:  No, I didn't.  I saw what
04:16 20  Dr. ███ did as a justification for excluding
   21  certain announcements.  As I said, there is a
   22  lot of subjective decision making by Dr. ███ as
   23  to which announcements counted, which
   24  announcements don't count.
04:16 25      It's one thing to interpret results in
```

199

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

           1   a particular way.  It's another thing to
           2   subjectively decide which observations need to
           3   be included in terms of analyzing what the
           4   results of a particular study show.
04:16      5        And I think one always needs to be
           6   careful, again, as a lot of support for this in
           7   the academic literature about subjectively
           8   including or excluding which announcements or
           9   which events you include in a particular
04:17     10   analysis absent a principal basis for doing so.
          11   BY MR. HANAUER:
          12        Q.   Is there an objective way to determine
          13   which news should be included in Dr. ██████
          14   analysis?
04:17     15        MR. FIGEL:  Objection.
          16        THE WITNESS:  Well, you know, I guess one
          17   starting point is you could report results for
          18   all 514 announcements.  That would be a good way
          19   to start.
04:18     20   BY MR. HANAUER:
          21        Q.   Do the figures on your table in
          22   Exhibit 2 to your report, do those figures
          23   include repetitive or stale news?
          24        A.   I don't know without looking.  But,
04:18     25   again, to say something is repetitive is not the

                                                            200

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    same thing as saying that it's stale.

2              And, again, that's a function of

3    interpretation depending on the relevant facts

4    and circumstances.  Sometimes the repetition of

04:18  5    an announcement can have a smaller or no effect

6    because the effect of the announcement was

7    earlier.

8              Other times you can have exactly the

9    reverse, that a particular announcement, when

04:19 10   it's made the first time, has a very small or no

11   effect, but when it's made the second time has a

12   big effect precisely because it's being

13   repeated.

14             And, therefore, to arbitrarily exclude

04:19 15   announcements because they've been in one's

16   subjective judgment made at an earlier or

17   something similar has been made at an earlier

18   point in time is really an error.  Because the

19   fact that information is repeated doesn't tell

04:19 20   you by itself whether that -- whether the

21   repetition makes the information more important

22   or less important.

23             That's just another methodological flaw

24   in what Dr. ████ did.

04:20 25        Q.   Can you please pull out Dr. ████

201

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
         1   report.

         2         A.    Okay.  I have it.

         3         Q.    And look at page 29.

         4         A.    Okay, I have it.

04:20    5         Q.    Look at footnote 67, please.

         6         A.    Okay.  Just give me a second to look at

         7   it.

         8               Okay, I've looked at it.

         9         Q.    And do you see how Dr. ████ writes [as

04:20   10   read]:  On May 16, 2017, Ripple announces its

        11   plan to escrow 55 billion XRP tokens.  A

        12   newsroom article from May 26, 2017, again

        13   reports Ripple's plan to escrow 55 billion XRP

        14   tokens.  I exclude the May 26, 2017, event from

04:21   15   my analysis as stale?

        16         A.    Yes, I see that.

        17         Q.    Should the May 26, 2017, event

        18   referenced in that footnote, should that be

        19   considered as confounding news for the May 16th

04:21   20   announcement?

        21         A.    Confounding news?  I wouldn't call it

        22   confounding news.

        23         Q.    Would the May 26, 2017, announcement

        24   show up within the ten -- plus or minus ten-day

04:22   25   window on Exhibit 2 to your report?
```

                                                              202

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1        MR. FIGEL:  Objection.

        2        THE WITNESS:  It might and it should.

        3   BY MR. HANAUER:

        4        Q.   Why is that when you just said that the

04:22   5   May 26th announcement would not be confounding

        6   news?

        7        MR. FIGEL:  Objection.

        8        THE WITNESS:  Because previously we were

        9   using the term to be situations where

04:22  10   confounding news was information either -- in my

       11   report, either information that communicated

       12   information about Ripple's efforts, if there

       13   were efforts, and new information about supply

       14   and demand conditions, as well as multiple

04:23  15   announcements within a particular event window

       16   and different event windows that you cannot

       17   exclude the possibility, have an effect on

       18   price, particularly because of the

       19   acknowledgement that XRP is trading in an

04:23  20   efficient market.

       21            So let's take this particular example

       22   of excluding 5/26.  One of the things that I've

       23   written about in my own articles about event

       24   studies is the need to avoid "I know it when I

04:23  25   see it" tests to decide what's important or not
```

203

1    important just based on your own subjective

2    judgment, as opposed to doing the analysis

3    yourself, looking at the price reaction and

4    deciding whether or not the price reaction

04:24  5    demonstrates that the announcement, in this

6    case, the second announcement, relative to the

7    first announcement is bigger, smaller, what --

8    or the same.

9         That's the proper methodology to use.

04:24 10    You don't know without looking based on an "I

11    know it when I see it" test what the

12    relationship is between the price effects of

13    these two different announcements.  And because

14    what's involved is an inefficient market, there

04:24 15    is no theory for when information is reflected

16    in prices in an information market.

17         So it may be that some of the price

18    reaction on the one announcement, either one of

19    them, is a product of other information from the

04:25 20    other announcement just not being reflected in

21    prices on that day but on the other day or

22    they're combined in some way.  There is no way

23    to know without actually doing the analysis and

24    actually looking at the effect on prices or the

04:25 25    correlation, to be more precise, using

204

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    Dr. ███████ term, as opposed to making a

2    subjective judgment and arbitrarily including

3    some announcements but not other announcements.

4           Again, I just think that's a basic

04:25  5    methodological error.

6    BY MR. HANAUER:

7        Q.   On Exhibit 2 you say that the events

8    Dr. Metz included may have been confounded

9    without actually doing any analysis to determine

04:26 10    the impact of potentially confounding

11    announcements?

12        MR. FIGEL:  Objection.

13        THE WITNESS:  I wouldn't say there is no

14    analysis.  The announcement is the proximity in

04:26 15    time and the significance of the proximity in

16    time, particularly in a situation where you're

17    dealing with an inefficient market when there is

18    no theory for what time period information is

19    reflected in prices, when that occurs and

04:26 20    whether it occurs without bias, and if there is

21    bias when the bias disappears.

22           That's the point of Exhibit 2.

23    BY MR. HANAUER:

24        Q.   Did you do any analysis or testing to

04:26 25    make a quantitative determination on the impact

205

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    of any particular piece of potentially

2    confounding news?

3        MR. FIGEL:  Objection.

4        THE WITNESS:  You know, again, I've tried to

04:27  5    make this point several times.  It's very hard

6    to do really and sometimes impossible to do in

7    an inefficient market because you don't know

8    when the price effects of any particular

9    announcement, when they are reflected in prices

04:27 10    or when they're fully reflected in prices, when

11    they're reflected in prices without bias.

12        If you have an efficient market, you

13    have a premise for stating that for certain

14    types of information there is empirical support

04:27 15    for those types of announcements in an efficient

16    market, what the speed of price adjustment is to

17    new information.

18        In fact, that is one of the key

19    provisions in the Cammer factors that we

04:28 20    discussed earlier.

21        But with an inefficient market you

22    don't have a theory of the speed of price

23    adjustment to new information.  And that's why

24    the existence of multiple announcements in a

04:28 25    particular window is particularly important in

206

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   creating, at a minimum, caution in attributing a

2   correlation between a price -- between a

3   particular announcement and a price movement

4   when there are other announcements in the same

04:28  5   window as the announcement that, in this case,

6   Dr. ███ is attributing correlation to.  And

7   that's what Exhibit 2 is meant to illustrate.

8   BY MR. HANAUER:

9       Q.   Are you offering any opinion as to the

04:29 10   quantitative impact of any potentially

11   confounding news?

12       MR. FIGEL:  Objection.

13       THE WITNESS:  I would say no for the reasons

14   that I just described.

04:29 15   BY MR. HANAUER:

16       Q.   How many -- besides the May 26, 2017,

17   example, how many other news repetitions are

18   included in your analysis on Exhibit 2 to your

19   report?

04:29 20       MR. FIGEL:  Objection.

21       THE WITNESS:  Well, first of all, I'm not

22   sure about the premise of your question.

23           When you said that the May 26th

24   announcement is included -- it might be -- but I

04:30 25   don't have a way of knowing that for sure as I

207

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   sit here --
 2   BY MR. HANAUER:
 3       Q.   Well, you included all of Dr. ████
 4   514 announcements, right?
 5       MR. FIGEL:  Just to -- just so the record is
 6   clear, Dr. Fischel, Professor Fischel, did you
 7   finish your answer before Mr. Hanauer asked a
 8   clarifying question?
 9       THE WITNESS:  No.  I was trying to finish my
10   answer.
11       MR. FIGEL:  Do you want the court reporter to
12   read back the question on where you were?
13       THE WITNESS:  No, I remember the question.
14           What I was about to say is, as I said,
15   you might be right in what you said about the
16   May 26th announcement.  But I don't have the --
17   I have the number of other announcements within
18   the same windows as what's reflected in
19   Exhibit 2, but I don't have the list of
20   announcements themselves in front of me.
21           So I can tell you what Exhibit 2 says,
22   but I cannot say with certainty which specific
23   announcements are included because I don't have
24   them in front of me.
25
```

04:30 appears at lines 5, 10, 15, 20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.   Do you know how many repetitive or

3    stale announcements are included on Exhibit 2?

4        A.   That's what I was trying to answer.

04:31  5             I don't -- first of all, a repetitive

6    announcement is not the same as a stale

7    announcement for reasons that I've said several

8    times.  A repetitive announcement may have a

9    much bigger effect than the initial

04:31 10   announcement.

11            So to assume that they're stale and

12   they have no effect and you can ignore them,

13   that's a fundamental error in an event study

14   analysis.

04:31 15            So let me just start there.

16            Apart from that, I don't know which

17   announcements you're considering to be

18   repetitive or stale; so, therefore, I do not

19   know how many of whatever you're considering to

04:32 20   be repetitive or stale, even for the moment

21   ignoring the error in equating repetitive with

22   stale, how many of what you are defining in a

23   particular category, how many of those

24   announcements are included in Exhibit 2.

04:32 25       Q.   Did you do any work to determine

                                                    209

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   whether -- strike that.
 2          Did you do any work to determine the
 3   amount, if any, of repetitive or stale events
 4   included in Exhibit 2?
 5       MR. FIGEL:  Objection.
 6       THE WITNESS:  I would say no because that
 7   would not be relevant for purposes of the
 8   analysis that I did in Exhibit 2.
 9   BY MR. HANAUER:
10       Q.   So the title of Exhibit 2 is [as read]:
11   Event days analyzed in Dr. ██████ select
12   categories test may be confounded by other
13   announcements on or near the event day.
14       A.   That's right.
15       Q.   And that's your opinion?
16       A.   That's right, particularly in the
17   context of identifying characteristics of
18   inefficient markets and the implications of what
19   an inefficient market means.
20       Q.   Are you offering an opinion that goes a
21   step further than that, that the events analyzed
22   in Dr. ██████ select categories' test are
23   confounded by other announcements?
24       MR. FIGEL:  Objection.
25       THE WITNESS:  I think what I've said multiple
```

04:32 (line 5)
04:33 (line 10)
04:33 (line 15)
04:33 (line 20)
04:34 (line 25)

210

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    times is in inefficient markets when there's no

2    theory of when information is reflected in

3    price, it is impossible to know, if you have

4    multiple announcements in a particular time

04:34  5    period, what price reactions can be confidently

6    attributed to one announcement as compared to

7    both announcements or even compared to neither

8    announcement.  That's the point.

9    BY MR. HANAUER:

04:35 10    Q.   So do you have any specific examples of

11    news events from Dr. ████ analysis that were

12    confounded on the same day with other news?

13    A.   I'd have to check.  That's a good

14    question.  I'd have to check to be sure.

04:35 15    I don't know --

16    Q.   You don't know --

17    A.   I don't know without checking.

18    I mean, it's in the data, but I -- from

19    memory, I don't remember.

04:35 20    Q.   So on Exhibit 2 to your report, can we

21    look at row number one.

22    A.   I'm sorry, this is ████.

23    Okay, I have it.

24    Q.   And how many days are in the windows

04:36 25    reflected in row number one?

211

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1       A.    Ten days, plus or minus, from the event

        2   day.

        3       Q.    So is that 21 days total?

        4       A.    Yes, that would be 21 days total.

04:36   5       Q.    And what is the fourth row, the row

        6   titled Average?  What does that represent?

        7       A.    That means if you look at all of the

        8   event days and look at all of the other

        9   announcements within that event window and you

04:37  10   average them all from, again, a minimum of zero

       11   to a maximum of 14 with a median of 4, you get

       12   an average of 5.

       13       Q.    And from Exhibit 2, can we tell if

       14   those average of five other announcements are in

04:37  15   the first ten days of the 21-day window?

       16       A.    No, you can't.

       17       Q.    Do you know -- can you tell how many of

       18   the average of five events are on the last ten

       19   days of the 21-day window?

04:38  20       A.    I mean, you could by checking, but you

       21   can't tell just looking at this exhibit.

       22       Q.    Is it fair to say that to reach the

       23   conclusion from Exhibit 2 to your report, that

       24   event days analyzed in Dr. █████ category may

04:38  25   be confounded by other announcements, that to
```

212

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

1    reach that conclusion, it doesn't matter if the

2    other announcements are before, on, or after the

3    event day analyzed by Dr. ███?

4         MR. FIGEL:  Objection.

04:38 5       THE WITNESS:  I don't know if I'd say it

6    doesn't matter.  Although, one of the articles,

7    I actually discuss it in my report, on the

8    existence or lack of existence of an efficient

9    market, does exactly what is in this exhibit of

04:39 10   looking at arbitrage opportunities both before

11   and after particular events.

12         So there's support in the academic

13   literature for analyzing the issue the way I

14   did.  But you -- on the exhibit itself, you

04:39 15   cannot tell whether the announcements are before

16   or after, or most before or most after.

17   BY MR. HANAUER:

18        Q.   Does it affect your analysis?

19        A.   For this purpose, no, it does not

04:39 20   affect my analysis.

21        Q.   Does Exhibit 2 to your report

22   distinguish between announcements in Dr. ███

23   select categories on one hand and announcements

24   in Dr. ███ other categories on the other?

04:40 25       MR. FIGEL:  Objection.

213

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
         1      THE WITNESS:  You know, you asked me that
         2   before, and I said I'd have to check.
         3           I think most of the -- if I remember
         4   correctly, most of the other announcements
04:40    5   around the event day are not in Dr. ████
         6   select categories, but I don't remember if all
         7   of them are.
         8   BY MR. HANAUER:
         9      Q.   Does it matter for your analysis?
04:40   10      A.   No.
        11      Q.   Did you test if any of the news
        12   announcements outside of the five categories
        13   analyzed by Dr. ████ were associated with
        14   statistically significant price returns?
04:41   15      MR. FIGEL:  Objection.
        16      THE WITNESS:  Did I specifically test that?
        17   No, I don't think I did.
        18   BY MR. HANAUER:
        19      Q.   Did you test how quickly the effect of
04:41   20   news announcements were incorporated into XRP's
        21   price?
        22      MR. FIGEL:  Objection.
        23      THE WITNESS:  I mean, that's -- one of the
        24   characteristics of an inefficient market is you
04:41   25   don't really have a theoretical basis for
```

214

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1   analyzing that question.

 2   BY MR. HANAUER:

 3       Q.   So the answer is no?

 4       A.   There's no test that you can conduct

04:41  5   that can definitively answer that question if

 6   it's an inefficient market.

 7            You can have shorter event windows,

 8   larger event windows, there's tradeoffs with

 9   respect to both of those strategies.  And the

04:42 10   reason why you have different event windows is

11   because you can't answer the question

12   definitively and there's no theoretical basis

13   for doing so.

14            That's the reason to have different

04:42 15   event windows.

16       Q.   When you perform an event study, do you

17   always look for confounding news and make

18   adjustments to account for confounding news?

19       MR. FIGEL:  Objection.

04:42 20       THE WITNESS:  Again, every case depends on

21   the relevant facts and circumstances.  But when

22   you're dealing with an efficient market, again,

23   one of the definitions of an efficient market is

24   publicly available information is reflected

04:43 25   quickly and without bias in prices.  And there

215

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      has been a number of studies of how quick that

2      is, whether or not there's bias.

3              So there is a framework in the academic

4      literature for what the logical length of time

04:43  5      to look at to determine the effect of a piece of

6      publicly available information, whether from an

7      announcement or otherwise.

8              And that doesn't exist in inefficient

9      markets.  And that's why there are these

04:43 10      different trading windows -- trading event

11      windows in the study that is -- I discuss in my

12      report about arbitrage opportunities before and

13      after particular events demonstrating market

14      insufficiently with cryptocurrencies.

04:44 15   BY MR. HANAUER:

16          Q.    That's the Joo paper?

17          A.    No.  I think that's the -- I just want

18      to look just to make sure that what I just said

19      is accurate.  But it's not the Joo paper, I

04:44 20      don't believe.

21          Q.    Would it be the Feng paper then?

22          A.    Yeah, it's footnote 71.

23          MR. HANAUER:  Do you mind if we take a quick

24      break?

04:44 25          MR. FIGEL:  Not at all.

                                                    216

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1      MR. HANAUER:  Off the record, please.

 2      THE VIDEOGRAPHER:  We are going off the

 3 record.  The time is 4:45 p.m.

 4                      (Whereupon, a recess was had at

 5                      4:45 p.m., after which the

 6                      deposition was resumed at

 7                      5:11 p.m. as follows:)

 8      THE VIDEOGRAPHER:  We are back on the record.

 9 The time is 5:12 p.m.

10          You may proceed.

11 BY MR. HANAUER:

12      Q.   Professor Fischel, in other of your

13 testifying expert engagements, have you prepared

14 reports that test the market efficiency for a

15 specific security?

16      A.   Certainly I analyzed that question.

17 I'm trying to remember if any of my reports on

18 that issue were ever filed.

19      MR. HANAUER:  Exhibit 12.

20      THE WITNESS:  And I'd have to check.

21 Certainly, I filed a number of reports concluding

22 that markets were efficient.

23                      (Whereupon, Deposition

24                      Exhibit DF-12 was marked for

25                      identification.)
```

05:11  5
05:11 10
05:11 15
05:12 20
05:12 25

217

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    BY MR. HANAUER:

2        Q.    Is Exhibit DF-12 a copy of the expert

3    report you submitted in a case called Shah

4    versus Zimmer Biomet Holdings, Inc., in the

05:13 5  Northern District of Indiana?

6        A.    Yes, it appears to be.

7        Q.    And in the Shah case, did you test the

8    market efficiency of a specific security?

9        A.    You know, I actually don't remember

05:13 10 very well, but let me just look and I can answer

11   that question.

12           Yes, I did.

13       Q.    And was one of the ways you tested for

14   market efficiency in the Shah case was by

05:14 15 performing an event study?

16       A.    Yes.

17       Q.    In this case did you perform an event

18   study to test the efficiency of the XRP trading

19   markets?

05:14 20     A.    No, for the reasons that I've stated.

21       Q.    Did you perform any work or analysis to

22   assess XRP price movement independent of

23   Bitcoin?

24       MR. FIGEL:  Objection.

05:15 25     THE WITNESS:  I would say no unless one of

218

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
        1   Dr. ██████ different 20 regression
        2   specifications, you might be able to draw
        3   inferences about that question by looking at his
        4   different regressions and the explanatory power
05:15   5   of different independent variables.
        6           But in terms of any independent
        7   analysis, no, I didn't.
        8   BY MR. HANAUER:
        9       Q.   Did you perform any work or analysis to
05:16  10   assess XRP price movement independent of any
       11   other digital asset other than Bitcoin?
       12       MR. FIGEL:  Objection.
       13       THE WITNESS:  Really, the same answer as I
       14   just gave.
05:16  15   BY MR. HANAUER:
       16       Q.   When you're defining market efficiency,
       17   is it a black-and-white issue where markets can
       18   only be efficient or not efficient?
       19       MR. FIGEL:  Objection.
05:16  20       THE WITNESS:  I think it depends.  Define for
       21   what purpose.  For purposes of interpreting
       22   price movements in an event study, I think
       23   market efficiency and satisfying the conditions
       24   for semi-strong market efficiency, I think
05:17  25   that's quite important.
```

219

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1          I would say more generally market

2    efficiency in a pure economic sense without

3    consideration of the context of how market

4    efficiency is either being used or not used,

05:17  5    it's probably more accurate to say that markets,

6    depending on which market you're talking about,

7    it's probably more accurate to talk about a

8    continuum of market efficiency to complete

9    inefficiency to somewhere in between.

05:17 10    BY MR. HANAUER:

11         Q.   So that continuum you just discussed,

12    does that apply to market efficiency as it

13    relates to event studies?

14         A.   Not so much.  I mean, that -- that's

05:17 15    what I was describing a second ago, that if you

16    want to attribute correlation, let alone

17    causation, between a particular event and a

18    particular price movement, you need some

19    empirical basis, some theoretical and empirical

05:18 20    basis generally from existing academic

21    literature, but also tests that you yourself can

22    perform, that gives you a basis for concluding

23    that particular events or announcements can be

24    confidently associated with or correlated with

05:19 25    particular price movements.

220

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  Q.  For -- as they relate to -- as it

2 relates to event studies, what's the difference,

3 if any, between a market being less efficient

4 and a market being not efficient?

05:19 5  A.  Not very much in terms of the way event

6 studies are usually used for purposes of

7 analyzing the relationship between public

8 announcements or events and price movements.

9  Q.  So are you saying that -- can an event

05:19 10 study be performed to accurately test the impact

11 between news announcements and prices when the

12 market is less efficient but not not efficient?

13  MR. FIGEL:  Objection.

14  THE WITNESS:  Well, again, I'm trying to

05:20 15 distinguish between how event studies can be

16 used in ways that you have confidence about the

17 results versus how they could potentially be

18 used.

19  So, for example, if you try and do an

05:20 20 event study with an asset that's never traded,

21 then it would be -- that's really one end of the

22 spectrum of inefficiency, but then you get all

23 kinds of intermediate cases that can exist where

24 you still cannot confidently establish

05:21 25 correlation between particular events and

221

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    particular price movements, again, depending on

2    the event and depending on the price movement

3    because there may be things that you know from

4    other sources that allow you to -- in

05:21  5    particular, the situations reach inferences

6    whether or not the market is efficient.

7         And that's -- that's the logic in these

8    academic studies of having all kinds of

9    different windows, short windows, medium

05:21 10   windows, long windows.  But, again, there's

11   tradeoffs because let's say with a market that

12   is not efficient but it's not like the market

13   where nothing ever trades, and so you don't

14   really have a basis for knowing how quickly

05:22 15   prices react to new publicly available

16   information.

17        And the way you deal with that, the way

18   a number of academic studies do, is you extend

19   the event window.  So instead of one day, you

05:22 20   look at ten days or seven days.

21        And that's a way to try and compensate

22   for the fact that you don't really have a basis

23   or a theory for why the effect should be

24   immediate.  But the problem when you do that is

05:22 25   you introduce the possibility that other things

222

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    are occurring in the seven days or the ten days

2    that are also having an effect other than what

3    it is that you're measuring.

4            And it's very hard to basically solve

05:23  5    both things at the same time, to expand event

6    windows before and after to try and capture the

7    fact that you don't know how quickly information

8    is being reflected in prices and at the same

9    time not introduce the possibility that you're

05:23 10    also taking -- now taking into account -- or

11    possibly taking into account the effect of other

12    events that may have an influence on price but

13    are not the events that you're trying to

14    measure.

05:23 15            So that's the basic reality.  And

16    that -- lengthening those event windows might be

17    the best you can do, but then you have to

18    interpret the results in the context of the

19    tradeoffs that exist and the limitations that

05:24 20    occur when you're in that position, something

21    that Dr. ████ did not do.

22            So, you know, I guess that's what I

23    would say.

24    BY MR. HANAUER:

05:24 25        Q.    So is it Dr. █████ opinion that the

223

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   XRP markets are less efficient than the stock

2   market or is it that they're not efficient at

3   all?

4      MR. FIGEL:  Objection.

05:24  5      THE WITNESS:  Well, you have to ask him.  I

6   assume he would not say that they're not

7   efficient at all; because if they were not

8   efficient at all, then price movements would

9   just be completely random in relation to

05:25 10  announcements or events.  And I assume he

11   doesn't believe that.  So if --

12  BY MR. HANAUER:

13      Q.   Do you believe that?

14      A.   Do I believe that the XRP market was

05:25 15  completely inefficient, meaning there's no

16   relationship between announcements and price

17   movements?  No, I don't believe that.

18      Q.   Did you do any work in this case to

19   determine whether the XRP trading markets were

05:25 20  less efficient as opposed to not efficient?

21      MR. FIGEL:  Objection.

22      THE WITNESS:  You know, I reviewed a lot of

23   academic literature, peer-reviewed literature on

24   this question, as well as looking at Dr. █████

05:26 25  own analysis.  You know, you're coming up with

224

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
      1  categories that are not really typical.

      2         But I wouldn't say that I have an

      3  opinion or there's a finding in the academic

      4  literature that there's no connection of any

05:26 5  kind between announcements and price movements,

      6  no correlation ever.  I wouldn't say that no

      7  correlation ever exists because that would be

      8  too strong.

      9  BY MR. HANAUER:

05:26 10    Q.   Are you offering the opinion that the

     11  XRP trading markets are not sufficiently

     12  efficient to perform an event study that

     13  accurately measures the impact of news

     14  announcements on price?

05:26 15    MR. FIGEL:  Objection.

     16    THE WITNESS:  Yes.  I'm saying one of the

     17  characteristics of an inefficient market, which

     18  is what the academic literature finds and what

     19  Dr. ███ concedes, is it has implications for

05:27 20  how confident you can be, that you're accurately

     21  measuring the effect or the correlation between

     22  particular events or announcements and

     23  particular price movements.  That's the meaning

     24  of an inefficient market.

     25
```

225

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   BY MR. HANAUER:

2       Q.    Does Dr. ████ concede that XRP does not

3   trade in an efficient market?

4       MR. FIGEL:  Objection.

05:27  5       THE WITNESS:  Well, you'd have to ask him.

6   But when he reports the findings of academic

7   studies which conclude that when he talks about

8   the existence of serial correlation and comes up

9   with attempted statistical tests to try and

05:27 10   correct for the existence of serial correlation,

11   which is itself a violation of a random walk and

12   even weak form of efficient markets, so I would

13   say, yes, he does, by the literature that he

14   cites and the tests that he performs, and his

05:28 15   analysis of the nature of price movements in

16   cryptocurrency markets.

17           So yes, I would say he does acknowledge

18   the general finding, as far as I'm aware, in

19   every academic study that considers the question

05:28 20   that cryptocurrency markets, in general, and

21   XRP, in particular, do not exhibit the

22   characteristics of an efficient market.

23   BY MR. HANAUER:

24       Q.    Does he -- does Dr. ████ say anywhere

05:28 25   in his report that XRP does not trade in an

226

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  efficient market?

2      A.    Does he use those words?  I'd have to

3  look but the characteristics of price movements

4  that he describes and the empirical tests that

05:29  5  he does and the literature that he cites all

6  demonstrate a recognition on his part that, from

7  his own analysis of price movements as well as

8  the academic literature that he relies on, that

9  cryptocurrency markets, in general, and XRP, in

05:29 10  particular, do not -- that neither of those --

11  or XRP as an example of cryptocurrency markets

12  trade in efficient market.

13          In fact, as I mentioned, the Joo

14  article, if I remember correctly concludes that

05:29 15  XRP is one of the least efficient cryptocurrency

16  markets.

17  BY MR. HANAUER:

18      Q.    Does the Joo article say that the XRP

19  markets are insufficiently efficient such that

05:30 20  you can't accurately measure the impact of news

21  announcements on XRP prices?

22      MR. FIGEL:  Objection.

23      THE WITNESS:  Well, again, I don't recall

24  exactly what they say.  But what the -- the

05:30 25  purpose of the article is to do a test of market

227

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

efficiency, to conclude one way or the other
whether cryptocurrency markets, and XRP in
particular, trades in an efficient market.  And
the conclusion of the article is that they
05:30  don't.  Crypto markets generally don't trade in
an efficient market, and crypto -- and XRP
specifically does not trade in an efficient
market.

     In fact, it's farther away from an
05:30 efficient market than other cryptocurrencies.
BY MR. HANAUER:
    Q.  In an efficient market are stock price
increases associated with positive relevant news
announcements?
05:31     MR. FIGEL:  Objection.
    THE WITNESS:  Not necessarily.
BY MR. HANAUER:
    Q.  When an -- when the market is
efficient, when are stock price increases
05:31 generally -- strike that.
    In an efficient market, are stock price
increases generally associated with positive
relevant news announcements?
    MR. FIGEL:  Objection.
05:31     THE WITNESS:  Well, statistically significant

228

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
          1  price increases are, by definition, positive.
          2  Whether they are associated with positive
          3  announcements generally is too vague of a
          4  question.  You need a definition of what a
05:31     5  positive announcement is.  Is it the language is
          6  positive?  That certainly is not the case.
          7  There are many positive-sounding announcements
          8  that have big negative stock price consequences.
          9          So it just depends.  You have to look
05:32    10  at the actual data.  And as I said in my answers
         11  a few minutes ago, you can't just rely on a "I
         12  know it when I see it" test.
         13          You have to actually look at what
         14  happens with a particular announcement and what
05:32    15  the price reaction is in relation to that
         16  announcement.
         17  BY MR. HANAUER:
         18    Q.   In an efficient market, does the price
         19  of a security react to news that is not
05:32    20  material?
         21    MR. FIGEL:  Objection.
         22    THE WITNESS:  The price reflects all publicly
         23  available information.  So in that sense, the
         24  answer is yes.
05:33    25          Whether that reaction is statistically
```

229

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
      1    significant, that's a different question, and
      2    whether you can exclude the possibility that the
      3    price reaction is attributable to chance alone,
      4    that's also a different question.
05:33 5            But the definition of a semi-strong
      6    efficient market is that prices react to all
      7    publicly available information, whether material
      8    or not, it's just you can't tell whether the
      9    movement also is random and, therefore,
05:33 10   something that you can't reject the hypothesis
     11    that the movement is attributable to chance
     12    alone.
     13    BY MR. HANAUER:
     14        Q.   When did securities markets become
05:33 15   sufficiently efficient for event studies to
     16    accurately measure the impact of news
     17    announcements on stock prices?
     18        MR. FIGEL:  Objection.
     19        THE WITNESS:  Well, that's a pretty broad
05:34 20   question.  You know, I'm not sure there is a
     21    clear answer to it in terms of a dividing line
     22    chronologically.
     23            You know, a lot of the famous articles
     24    about market efficiency I think started
05:34 25   appearing in the '70s and then, you know,
```

230

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

 1    continued since then.

 2    BY MR. HANAUER:

 3        Q.   Were securities markets sufficiently

 4    efficient for event studies to accurately

05:34 5    measure the impact of news announcements on

 6    stock prices before the advent of the internet?

 7        MR. FIGEL:  Objection.

 8        THE WITNESS:  I think many of the main

 9    studies of market efficiency on which event

05:35 10    studies relied occurred before the advent of the

 11    internet.

 12    BY MR. HANAUER:

 13        Q.   Same question but instead of internet,

 14    what if I were to -- well, I'll just ask the

05:35 15    question.

 16            Were securities markets sufficiently

 17    efficient for event studies to measure the

 18    impact of news announcements on stock prices

 19    before CNBC or Bloomberg were widely available?

05:35 20        MR. FIGEL:  Objection.

 21        THE WITNESS:  Well, part of my problem is I

 22    don't know when CNBC and Bloomberg were widely

 23    available.  But in terms of the academic

 24    literature on the efficiency of prices, I

05:35 25    don't -- I haven't reviewed them recently with

231

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    that -- or ever with that question in mind, you

2    know.  So I -- I would think the answer to that

3    is yes, but I would have to investigate it a

4    little bit further to -- I don't know if

05:36  5    Bloomberg was available in -- well, I guess

6    Bloomberg is because of Bloomberg.  I don't

7    know.  He's -- I don't know how old he is, so I

8    don't know the answer to your question.

9         I would say probably, but I'd want to

05:36 10   investigate more, for sure.

11   BY MR. HANAUER:

12      Q.   Are the cryptocurrency markets more or

13   less efficient over the past five years than the

14   stock market was in the 1980s?

05:37 15      MR. FIGEL:  Objection.

16      THE WITNESS:  You know, it's an odd

17   comparison.

18      MR. FLUMENBAUM:  It's way beyond the scope,

19   too.  I mean, I don't understand this line of

05:37 20   questioning.  It has nothing to do with his

21   report.

22      MR. HANAUER:  Anything else, Counsel?

23      MR. FLUMENBAUM:  No.

24      THE WITNESS:  I started to say, it's sort of

05:37 25   a very odd question of comparing one against the

232

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   other in different markets with different types

2   of claims.  I don't know if that specific

3   question has ever been studied.

4   BY MR. HANAUER:

05:38   5        Q.   Have you ever studied that question?

6        MR. FIGEL:  Objection.

7        THE WITNESS:  No.  I would say the one thing

8   that I have done is used event studies using

9   data from the 1980s based on literature,

05:38  10   academic literature on the efficiency of markets

11   at that time.  And I don't think there's a

12   similar academic literature about

13   cryptocurrencies in the last five years.  So I

14   haven't studied that question.  I don't want to

05:38  15   express an opinion about that question.

16        But to the extent I have a reaction to

17   the question, it's what I just said.

18   BY MR. HANAUER:

19        Q.   Going back to the Cammer factors that

05:39  20   you referenced earlier today, what's the

21   methodology for determining whether a market is

22   efficient or not when certain of the Cammer

23   factors support efficiency but certain don't?

24        MR. FIGEL:  Objection.

05:39  25        THE WITNESS:  Well, that's partly a legal

233

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  question again, and I'm not expressing a legal

2  opinion.  But I think there is a general

3  understanding that certain factors are more

4  important than others.

05:39  5  BY MR. HANAUER:

6      Q.   And which are the most important

7  factors?

8      A.   Well, again, it might, you know, depend

9  on the relevant facts and circumstances that are

05:39  10  at issue.  But, generally, it's the extent that

11  one can say that the -- that price reactions to

12  particular events occur quickly and without

13  bias.  I think that's generally regarded as

14  probably the most important factor; certainly

05:40  15  the most important economic factor.  And I -- so

16  that's what I would say.

17      Q.   So beyond the Cammer factors to

18  determine the efficiency of a market for a

19  digital -- or I'm sorry.

05:40  20          To determine the efficiency of a market

21  for a particular asset, can you also

22  appropriately consider a company's

23  capitalization?

24      MR. FIGEL:  Objection.

05:40  25      THE WITNESS:  Yes, I think you can

234

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

         1    appropriately consider a company's

         2    capitalization.

         3    BY MR. HANAUER:

         4        Q.   What about bid/ask spread?

05:41    5        A.   That's another factor that has

         6    sometimes been considered certainly by courts.

         7        Q.   What about percentage --

         8        A.   And bid/ask spread is a measure of

         9    liquidity, and liquidity can be correlated with

05:41   10    the speed of price adjustment to new

        11    information.

        12        Q.   Are you offering any opinion as to the

        13    liquidity of the XRP markets?

        14        A.   No, I'm not.

05:41   15        Q.   Did you perform any work or analysis to

        16    determine the period of time by which

        17    information is fully incorporated into XRP

        18    prices without bias?

        19        A.   Well, that's part of the problem; you

05:42   20    don't know that.  That's, again, one of the

        21    characteristics of the inefficient market.  I'm

        22    just going to repeat again what I just said.

        23    That's the logic of using different event

        24    windows because you don't know, so you increase

05:42   25    the event window hoping that the effect of a

                                                              235

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    particular or a -- that a particular event is

2    correlated with a price movement within a

3    certain period of time, so you have short event

4    windows and then longer event windows.

05:42  5          But, first of all, you don't even know

6    with the longer event window that that fully

7    captures the -- what the price reaction that's

8    correlated with a particular event.

9          But, again, even if you could solve

05:43 10   that problem, you introduce another problem,

11   which is you start introducing unrelated events.

12   And, again, that just creates another problem in

13   figuring out how much of a price reaction is

14   correlated with a particular disclosure or

05:43 15   event.

16      Q.   Did you perform a Cammer analysis in

17   this case?

18      A.   I think I answered that question a

19   number of hours ago.  I suggested that it would

05:43 20   be interesting to do, in some sense knowing the

21   answer, but I'm not sure whether the people that

22   I was working with actually implemented the

23   analysis as opposed to just something we

24   discussed.

05:44 25      Q.   Are you offering the opinion then on

236

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
       1  the outcome of any Cammer analysis as it relates
       2  to XRP?
       3      A.   I do not --
       4      MR. FLUMENBAUM:  Objection.
05:44  5      THE WITNESS:  I wouldn't say I'm offering an
       6  opinion about it.  I haven't offered an opinion
       7  about it.  But I think the implication of the
       8  conclusion and all of the academic studies as
       9  well as in Dr. ███████ report that XRP does not
05:44 10  trade in an inefficient market means that XRP
      11  would not satisfy the Cammer factors.
      12  BY MR. HANAUER:
      13      Q.   How does XRP's daily trading volume
      14  compare to that of smaller stocks on the S&P 500
05:45 15  index?
      16      MR. FIGEL:  Objection.
      17      MR. FLUMENBAUM:  Objection.
      18      THE WITNESS:  I don't know.  I would have to
      19  look.
05:45 20  BY MR. HANAUER:
      21      Q.   Is XRP covered by investment
      22  professionals?
      23      MR. FIGEL:  Objection.
      24      MR. FLUMENBAUM:  Objection.
05:45 25      THE WITNESS:  I'm sure there are some
```

237

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  investment professionals who try and follow

2  price movements of XRP.

3  BY MR. HANAUER:

4      Q.   Do you know the extent of coverage of

05:45  5  XRP by investment professionals?

6      MR. FIGEL:  Objection.

7      THE WITNESS:  I haven't specifically studied

8  that question.

9  BY MR. HANAUER:

05:45 10    Q.   Are there market makers that make a

11  market in XRP?

12     MR. FLUMENBAUM:  Objection.

13     THE WITNESS:  I haven't specifically studied

14  that question either.

05:46 15  BY MR. HANAUER:

16     Q.   Are you aware of the allegation in the

17  amended complaint that Ripple paid market makers

18  to make a market in XRP?

19     MR. FLUMENBAUM:  Objection.

05:46 20    THE WITNESS:  You'd have to show it to me.

21  BY MR. HANAUER:

22     Q.   How does Ripple's capitalization

23  compare to smaller stocks on the -- smaller

24  companies included in the S&P 500 index?

05:47 25    MR. FIGEL:  Objection.

238

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1      MR. FLUMENBAUM:  Objection.

2      THE WITNESS:  I haven't studied that

3 question.

4 BY MR. HANAUER:

05:47  5      Q.   Have you studied the bid/ask spread in

6 the XRP markets?

7      MR. FIGEL:  Objection.

8      THE WITNESS:  No, I haven't.

9 BY MR. HANAUER:

05:47 10      Q.   Have you studied the percentage of XRP

11 tokens held by the public?

12      MR. FIGEL:  Objection.

13      THE WITNESS:  No, I haven't.

14 BY MR. HANAUER:

05:48 15      Q.   Are you able to provide specific

16 examples of Ripple news announcements that you

17 think were not fully incorporated into XRP's

18 price within three days?

19      MR. FIGEL:  Objection.

05:48 20      MR. FLUMENBAUM:  Objection.

21      THE WITNESS:  You know, it's the same problem

22 because the stock -- not the stock, excuse me --

23 because XRP does not trade in an efficient

24 market.  There is no way to know whether the

05:48 25 price effect is fully incorporated within three

239

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1    days or any other time period.

2         And by the way, that is why the price

3    reaction test is generally considered to be the

4    most important test that determines whether a

05:49  5    stock trades in an efficient market and the

6    Cammer factors as well.

7    BY MR. HANAUER:

8         Q.   Isn't that sort of circular, that

9    you're saying you need to establish in the

05:49 10   Cammer factors a cause-effect relationship

11   between news announcements and stock price

12   movement, but that you can't make that

13   determination until you establish the Cammer

14   factors?

05:49 15        MR. FIGEL:  Objection.

16        THE WITNESS:  It's not circular because one

17   of the things that the academic studies do is,

18   you know, for example, look for serial

19   correlation, look for arbitrage opportunities,

05:50 20   things that would not exist if prices fully

21   reflected the effects of particular

22   announcements or other types of publicly

23   available information.  If that were true, then

24   there would be no arbitrage opportunities, there

05:50 25   wouldn't be serial correlation, you wouldn't

                                                    240

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   need to have these different studies looking at

 2   different event windows, et cetera.

 3           So, you know, that's why the Cammer

 4   factors are a way to look at a series of

 5   different factors to determine whether, in the

 6   case of the Cammer factors, a stock or other

 7   security trades in an efficient market.

 8           But with respect to cryptocurrencies

 9   and XRP, based on the academic literature, based

10   on Dr. ██████ own findings, you already know it

11   doesn't trade -- XRP doesn't trade in an

12   efficient market and, therefore, you know it

13   wouldn't satisfy the Cammer factors, which are

14   intended to be a test of whether a particular

15   security or financial asset trades in an

16   efficient market.

17   BY MR. HANAUER:

18       Q.   Did Ripple have policies that

19   contemplated the public announcements about

20   Ripple or the XRP protocol could affect the

21   decision to buy or sell XRP?

22       MR. FIGEL:  Objection.

23       THE WITNESS:  I don't know.

24   BY MR. HANAUER:

25       Q.   Did Ripple have policies that
```

241

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

           1   contemplated that certain announcements by

           2   Ripple could significantly affect the trading

           3   price of XRP?

           4       MR. FIGEL:  Objection.

05:52      5       MR. FLUMENBAUM:  Objection.  He's not a fact

           6   witness.  He's not testifying --

           7       MR. HANAUER:  Speaking objection, Counsel.

           8       MR. FLUMENBAUM:  You're way beyond what

           9   you're allowed to ask him --

05:52     10       MR. HANAUER:  Speaking objection, Counsel.

          11       MR. FLUMENBAUM:  -- as an expert.

          12       MR. HANAUER:  Can you reread the question,

          13   please?

          14                 (Whereupon, the record was read

02:04     15                  as requested.)

          16       MR. HANAUER:  I'll restate it.

          17   BY MR. HANAUER:

          18       Q.   Did Ripple have policies that

          19   contemplated that certain announcements by

05:53     20   Ripple could significantly affect the trading

          21   price of XRP?

          22       MR. FIGEL:  Objection.

          23       MR. FLUMENBAUM:  Objection.

          24       THE WITNESS:  I don't know.

          25

                                                              242

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1   BY MR. HANAUER:

2       Q.   Did Ripple advise its employees that

3   Ripple's news announcements become generally

4   known two days following an announcement?

05:53   5       MR. FIGEL:  Objection.

6       MR. FLUMENBAUM:  Objection, improper

7   question.

8       THE WITNESS:  I don't know.

9   BY MR. HANAUER:

05:53  10      Q.   Have you reviewed any of Ripple's

11  internal codes of conduct?

12      A.   No.

13      Q.   Have you reviewed any of Ripple's

14  insider trading policies?

05:54  15      A.   No.

16      Q.   Are you aware whether or not Ripple has

17  insider trading policies or ever did?

18      MR. FLUMENBAUM:  Objection.

19      THE WITNESS:  I don't recall one way or the

05:54  20  other.

21      MR. HANAUER:  One moment please while I

22  confirm with counsel.

23      MR. FIGEL:  Could we also get a time check?

24      THE VIDEOGRAPHER:  Yeah, we've been on the

05:54  25  record a little over six hours.

243

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
        1      MR. FIGEL:  So we have one hour left to get
        2  to seven?
        3      THE VIDEOGRAPHER:  I believe so, yeah.  A
        4  little over six hours.
05:54   5      MR. HANAUER:  Let's go off the record and
        6  take a very short break, please.
        7      THE VIDEOGRAPHER:  We are going off the
        8  record.  The time is 5:55 p.m.
        9                  (Whereupon, a recess was had at
05:58  10                   5:55 p.m., after which the
       11                   deposition was resumed at
       12                   5:58 p.m. as follows:)
       13      THE VIDEOGRAPHER:  We are back on the record.
       14  The time is 5:58 p.m.
05:58  15          You may proceed.
       16      MR. HANAUER:  Thank you, Professor Fischel.
       17  The SEC has no further questions at this time.
       18      MR. FIGEL:  No question from Ripple Labs.
       19      THE COURT REPORTER:  Anybody on the phone?
05:58  20      MR. FIGEL:  Mr. Flumenbaum?
       21      THE VIDEOGRAPHER:  Are we on mute?
       22      THE COURT REPORTER:  No.
       23      MR. FLUMENBAUM:  No questions.
       24      THE COURT REPORTER:  I think we have standing
05:58  25  orders for you guys on this case?
```

244

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

1    MR. HANAUER:  In terms of delivery and all

2  that?

3    THE COURT REPORTER:  Yeah.

4    MR. HANAUER:  We can go off the record.

05:58   5    THE VIDEOGRAPHER:  This is end of media unit

6  three.  This concludes the deposition of Daniel

7  Fischel.  The video will be retained by

8  Gradillas Court Reporters.

9         We are going off the record.  The time

05:59  10  is 5:59 p.m.

11                    (Whereupon, the witness was

12                     excused.)

13                    (The proceedings concluded at

14                     5:59 p.m.)

15

16

17

18

19

20

21

22

23

24

25

245

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4       I, DANIEL R. FISCHEL, do hereby declare under

 5       penalty of perjury that I have read the entire

 6       foregoing transcript of my deposition testimony,

 7       or the same has been read to me, and certify that

 8       it is a true, correct and complete transcript of

 9       my testimony given on February 28, 2022, save and

10       except for changes and/or corrections, if any, as

11       indicated by me on the attached Errata Sheet, with

12       the understanding that I offer these changes and/or

13       corrections as if still under oath.

14          _____ I have made corrections to my deposition.

15          _____ I have NOT made any changes to my deposition.

16

17   Signed: _____
                DANIEL R. FISCHEL
18

19   Dated this _____ day of _____ of 20____.

20

21   Sworn to and Subscribed before me,

22   this_____day of_____, 20____.

23   _____
     Notary Public       My commission expires:_____

24

25
                                                         246
```

Page 247

1  STATE OF ILLINOIS

2  COUNTY OF COOK

3

4       I, CHERYL L. SANDECKI, a Certified

5  Shorthand Reporter within and for the State of

6  Illinois, do hereby certify that heretofore,

7  to-wit, on February 28, 2022, personally

8  appeared before me, at 110 North Wacker Drive,

9  Chicago, Illinois, DANIEL R. FISCHEL, in a cause

10  now pending and undetermined in the United

11  States District Court, Southern District of New

12  York, wherein Securities and Exchange

13  Commission is the plaintiff and RIPPLE LABS,

14  INC., BRADLEY GARLINGHOUSE, and CHRISTIAN LARSEN

15  are the Defendants.

16       I further certify that the said

17  DANIEL R. FISCHEL was first administered an oath

18  to testify the truth, the whole truth and

19  nothing but the truth in the cause aforesaid;

20  that the testimony then given by said witness

21  was reported stenographically by me in the

22  presence of the said witness, and afterwards

23  reduced to typewriting by Computer-Aided

24  Transcription, and the foregoing is a true and

25  correct transcript of the testimony so given by

Page 248

1    said witness as aforesaid.

2            I further certify that the signature to

3    the foregoing deposition was reserved by counsel

4    for the respective parties and that there were

5    present at the deposition the attorneys

6    hereinbefore mentioned.

7            I further certify that I am not counsel

8    for nor in any way related to the parties to

9    this suit, nor am I in any way interested in the

10   outcome thereof.

11           IN TESTIMONY WHEREOF:  I certify to the

12   above facts this 1st day of March, 2022.

13

14

15

16

17
                 _____
18               CHERYL L. SANDECKI, RPR, CLR
                 CERTIFIED SHORTHAND REPORTER
19               IL CSR NO.:  084-03710
                 ID NO.:  SRL-1145
20               NJ CCR NO.:  30XI00241500
                 TN NO.: 823
21               WA CCR NO.:  22001795

22

23

24

25

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
1                        ERRATA SHEET
2      Deposition of:  DANIEL R. FISCHEL
       Date taken:  FEBRUARY 28, 2022
3      Case:  SEC v. RIPPLE LABS, INC., et al.
4      PAGE  LINE
       _____ _____    CHANGE: _____
5                     REASON: _____
6      _____ _____    CHANGE: _____
                      REASON: _____
7
                      CHANGE: _____
8      _____ _____    REASON: _____
9      _____ _____    CHANGE: _____
                      REASON: _____
10
       _____ _____    CHANGE: _____
11                    REASON: _____
12     _____ _____    CHANGE: _____
                      REASON: _____
13
       _____ _____    CHANGE: _____
14                    REASON: _____
15     _____ _____    CHANGE: _____
                      REASON: _____
16
       _____ _____    CHANGE: _____
17                    REASON: _____
18     _____ _____    CHANGE: _____
                      REASON: _____
19
       _____ _____    CHANGE: _____
20                    REASON: _____
21     _____ _____    CHANGE: _____
                      REASON: _____
22
       _____ _____    CHANGE: _____
23                    REASON: _____
24     Signed_____
25     Dated_____
                                                          249
```