# Exhibit 20

**HIGHLY CONFIDENTIAL**

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4  SECURITIES AND EXCHANGE        )
   COMMISSION,                    )
5                                 )
                   Plaintiff,     )
6                                 )
         vs.                      ) Case No.
7                                 ) 20-Civ-10832(AT)(SN)
   RIPPLE LABS, INC., BRADLEY     )
8  GARLINGHOUSE, and CHRISTIAN    )
   A. LARSEN,                     )
9                                 )
                   Defendants.    )
10 _____)

11

12

13

14              HIGHLY CONFIDENTIAL

15          VIDEO-RECORDED DEPOSITION OF

16              M. LAURENTIUS MARAIS

17              New York, New York

18          Tuesday, December 21, 2021

19

20

21

22

23  Reported Stenographically By:
    PATRICIA A. BIDONDE
24  Registered Professional Reporter
    Realtime Certified Reporter
25  JOB No. 211220PBI

1

HIGHLY CONFIDENTIAL

1

2

3                               December 21, 2021
                                9:17 a.m.
4

5

6                     HIGHLY CONFIDENTIAL

7          Video-Recorded Deposition of M.

8          LAURENTIUS MARAIS, held at the offices

9          of Debevoise & Plimpton, 919 Third

10         Avenue, New York, New York, before

11         Patricia A. Bidonde, Stenographer,

12         Registered Professional Reporter,

13         Realtime Certified Reporter, Certified

14         eDepoze Court Reporter, Notary Public of

15         the States of New York, New Jersey, and

16         Connecticut.

17

18

19

20

21

22

23

24

25

                                                      2

HIGHLY CONFIDENTIAL

```
 1              A P P E A R A N C E S

 2

 3   UNITED STATES SECURITIES AND EXCHANGE

 4   COMMISSION

 5   Attorneys for Plaintiff

 6         200 Vesey Street

 7         Suite 400

 8         New York, New York 10281

 9   BY:   MARK R. SYLVESTER, ESQ.

10         212-336-0159

11         sylvesterm@sec.gov

12   BY:   PASCALE GUERRIER, ESQ.

13         212-336-5473

14         guerrierp@sec.gov

15         (Via Videoconference)

16

17         100 F Street, Northeast

18         Washington, D.C. 20549

19   BY:   EUGENE P. CANJELS, ESQ.

20         202-551-8515

21         canjelse@sec.gov

22   BY:   ARTUR MINKIN, ESQ.

23         (Via Videoconference)

24   BY:   NICOLE FORBES, ESQ.

25         (Via Videoconference)
```

3

**HIGHLY CONFIDENTIAL**

```
 1        A P P E A R A N C E S (Continued)
 2   DEBEVOISE & PLIMPTON LLP
 3   Attorneys for Defendant Ripple Labs, Inc.
 4        919 Third Avenue
 5        New York, New York  10022
 6   BY:   DANIEL J. MARCUS, ESQ.
 7        212-909-6564
 8        djmarcus@debevoise.com
 9        (Via Videoconference)
10   BY:   MICHAEL BRENNER, ESQ.
11        212-909-6921
12        mabrenne@debevoise.com
13        (Via Videoconference)
14
15   KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
16   Sumner Square
17        1615 M Street, Northwest
18        Suite 400
19        Washington, D.C. 20036
20   BY:   REID M. FIGEL, ESQ.
21        202-326-7918
22        rfigel@kellogghansen.com
23   BY:   GAVAN GIDEON, ESQ.
24        202-326-7958
25        ggideon@kellogghansen.com
```

4

**HIGHLY CONFIDENTIAL**

```
 1          A P P E A R A N C E S   (CONTINUED)
 2    CLEARY GOTTLIEB STEEN & HAMILTON
 3    Attorneys for Defendant Bradley Garlinghouse
 4          2112 Pennsylvania Avenue, Northwest
 5          Washington, D.C. 20037
 6    BY:   JORGE BONILLA LOPEZ, ESQ.
 7          202-974-1517
 8          jbonillalopez@cgsh.com
 9
10    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
11    Attorneys for Defendant Christian A. Larsen
12          1285 Avenue of the Americas
13          New York, New York 10019-6064
14    BY:   JUSTIN D. WARD, ESQ.
15          212-373-3446
16          jward@paulweiss.com
17          (Via Videoconference)
18    BY:   EMILY M. GLAVIN, ESQ.
19          212-373-3912
20          eglavin@paulweiss.com
21          (Via Videoconference)
22
23    ALSO PRESENT:
24    CHRISTIAN BIDONDE, Videographer
25                        - - -
```

5

**HIGHLY CONFIDENTIAL**

```
 1                    E R R A T A

 2    EXAMINATION                        PAGE    LINE
      BY MR. SYLVESTER                    9       21
 3
                      E X H I B I T S
 4    LM                                 PAGE    LINE

 5    Exhibit LM-1     Rebuttal Expert Report of

 6                     M. Laurentius Marais.......11      18

 7    Exhibit LM-10    Applied Economics article

 8                     by Mohammad Hashemi Joo....87     1

 9    Exhibit LM- 2    Amended expert report of

10                     Dr. ██████████..........155      12

11    Exhibit LM-3     Copy of Table 2 from

12                     report LM-1................185     6

13    Exhibit LM-4     Enlarged copy of Table 3

14                     from M. Laurentius

15                     Marais' expert report......208     17

16    Exhibit LM-5     Summary table of data

17                     provided by M. Laurentius

18                     Marais....................224      18

19    Exhibit LM-6     Summary table referencing

20                     data provided by M.

21                     Laurentius Marais for the

22                     same 2,007 day trading

23                     period in ██████ Model

24                     Number 5..................229      12

25
```

6

**HIGHLY CONFIDENTIAL**

1          IT IS HEREBY STIPULATED AND

2     AGREED, by and between the attorneys for

3     the respective parties, that all

4     objections, except as to the form of the

5     questions, shall be reserved to the time

6     of the trial.

7          IT IS FURTHER STIPULATED AND

8     AGREED that the within examination may

9     be signed and sworn to before any Notary

10    Public with the same force and effect as

11    if signed and sworn to before the court.

12         IT IS FURTHER STIPULATED AND

13    AGREED that the filing of the original

14    transcript of the examination is waived.

15

16

17

18

19

20

21

22

23

24

25

7

HIGHLY CONFIDENTIAL

```
 1                     - - -

 2            P R O C E E D I N G S

 3                     - - -

 4            THE VIDEOGRAPHER:  This is the

 5    video-recorded deposition of M. Laurentius

 6    Marais, in the matter of Securities and

 7    Exchange Commission versus Ripple Labs, Inc.,

 8    Bradley Garlinghouse, and Christian A.

 9    Larsen, Case Number 20 Civ. 10832 (AT)(SN).

10            This deposition is being held at

11    the offices of Debevoise & Plimpton, 919

12    Third Avenue, New York, New York.  Today's

13    date is December 21, 2021.  The time on the

14    video monitor is 9:16 a.m.

15            My name is Christian Bidonde, I am

16    the Legal Video Specialist with Gradillas

17    Court Reporters, located at 400 North Brand

18    Boulevard, Suite 950, Glendale, California.

19            Would counsel and all present

20    please voice identify themselves.

21            MR. SYLVESTER:  My name is Mark

22    Sylvester.  I am for the plaintiff, the SEC.

23    I'm here with my colleague Eugene Canjels.

24            MR. FIGEL:  Reid Figel from Kellogg

25    Hansen with Gavan Gideon representing Ripple
```

8

HIGHLY CONFIDENTIAL

```
 1        Labs.
 2                MR. SYLVESTER:  Justin Ward from
 3        Paul, Weiss, Rifkind, Wharton & Garrison on
 4        behalf of Christian Larsen and joined by my
 5        colleague Emily Glavin.
 6                MR. LOPEZ:  Jorge Bonilla Lopez
 7        from Cleary Gottlieb on behalf of defendant
 8        Bradley Garlinghouse.
 9                MR. SYLVESTER:  There may be other
10        of our colleagues.  Sometimes we just put the
11        names on the record so that we don't have to
12        work through everyone if that's agreeable.
13        Okay.
14                THE VIDEOGRAPHER:  Would the
15        certified stenographer please swear in the
16        deponent.
17   M.   L A U R E N T I U S   M A R A I S, called
18            as a witness, having been duly sworn by
19            a Notary Public, was examined and
20            testified as follows:
21   EXAMINATION BY
22   MR. SYLVESTER:
23        Q.    Could you please state your name
24   for the record.
25                A.    M. Laurentius Marais.  The spelling
```

09:18:53
09:18:53
09:18:55
09:18:55

                                                          9

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 09:19:13 | 1 | is L-a-u-r-e-n-t-i-u-s.  Marais is M-a-r-a-i-s. |
| 09:19:13 | 2 |          Q.    And, again, I'm Mark Sylvester. |
| 09:19:13 | 3 | I'm here with the plaintiff in this case, the SEC, |
| 09:19:13 | 4 | with my colleague Eugene in the room.  Other of my |
| 09:19:18 | 5 | SEC colleagues are joining us remotely. |
| 09:19:22 | 6 |          You've had your deposition taken |
| 09:19:23 | 7 | before.  Is that right, Mr. Marais? |
| 09:19:26 | 8 |          A.    Yes. |
| 09:19:26 | 9 |          Q.    Is there anything that would |
| 09:19:27 | 10 | prevent you from testifying fully and truthfully |
| 09:19:30 | 11 | here today? |
| 09:19:30 | 12 |          A.    Nothing that I'm aware of. |
| 09:19:32 | 13 |          Q.    Were you retained to provide expert |
| 09:19:34 | 14 | services in this case? |
| 09:19:35 | 15 |          A.    Yes. |
| 09:19:35 | 16 |          Q.    Who retained you? |
| 09:19:37 | 17 |          A.    I understand that my retention is |
| 09:19:41 | 18 | on behalf of Ripple Labs. |
| 09:19:47 | 19 |          Q.    Did any other defendant in this |
| 09:19:49 | 20 | case retain you? |
| 09:19:50 | 21 |          A.    I can't absolutely rule it out, but |
| 09:19:53 | 22 | I've had no contact with any other defendant. |
| 09:19:57 | 23 | And, to the best of my knowledge, my retention is |
| 09:19:58 | 24 | by Ripple Labs. |
| 09:20:00 | 25 |          Q.    Okay.  On occasion today, when I |

10

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:20:02 | 1 | use the word "Ripple," I'll be referring to Ripple |
| 09:20:06 | 2 | Labs, the defendant in this case.  Okay? |
| 09:20:08 | 3 | A.    I'll try to keep that in mind. |
| 09:20:10 | 4 | Q.    Are you familiar with the term XRP? |
| 09:20:12 | 5 | A.    Yes. |
| 09:20:13 | 6 | Q.    What is XRP? |
| 09:20:17 | 7 | A.    XRP is a kind of cryptocurrency. |
| 09:20:21 | 8 | Q.    Are you familiar with the term |
| 09:20:23 | 9 | "digital asset"? |
| 09:20:25 | 10 | A.    I've come across the term.  I'm not |
| 09:20:32 | 11 | sure I can define it for you in a comprehensive |
| 09:20:44 | 12 | way. |
| 09:20:45 | 13 | Q.    To the best of your knowledge, is |
| 09:20:45 | 14 | XRP a digital asset? |
| 09:20:45 | 15 | A.    In my layperson's interpretation of |
| 09:20:48 | 16 | that term -- in other words, not as an expert term |
| 09:20:50 | 17 | of art -- I would consider it a digital asset. |
| 09:21:05 | 18 | (Exhibit LM-1, Rebuttal Expert |
| 09:21:05 | 19 | Report of M. Laurentius Marais, marked for |
| 09:21:06 | 20 | identification, as of this date.) |
| 09:21:06 | 21 | Q.    Dr. Marais, I'm going to hand you |
| 09:21:08 | 22 | what's been marked -- premarked LM-1. |
| 09:21:19 | 23 | Dr. Marais, is exhibit LM-1 the |
| 09:21:23 | 24 | expert rebuttal report that you submitted in this |
| 09:21:27 | 25 | case? |

11

**HIGHLY CONFIDENTIAL**

```
09:21:27  1              A.    It appears to be, yes.
09:21:28  2              Q.    Does your signature appear on page
09:21:32  3    17 of LM-1?
09:21:34  4              A.    It does.  I see it there.
09:21:36  5              Q.    Okay.  In LM-1, you are offering
09:21:39  6    opinions on the opinions offered by Dr. ████
09:21:42  7    ████  in his expert report in this case.  Is that
09:21:47  8    right?
09:21:48  9              A.    That's fair.
09:21:49 10              Q.    Is Attachment A to LM-1 your CV?
09:21:52 11              A.    Yes.
09:21:54 12              Q.    Looking at your CV now, do you see
09:21:57 13    any inaccuracies?
09:22:09 14              A.    (Document review.)
09:22:09 15              MR. FIGEL:  Objection to form.
09:22:11 16              A.    I don't see any.  And I was -- I'm
09:22:13 17    not aware of any.
09:22:18 18              Q.    Does the education section of your
09:22:22 19    CV accurately list the degrees you earned?
09:22:30 20              A.    Yes.
09:22:31 21              Q.    Have you had any formal education
09:22:35 22    after 1985 that is not listed here?
09:22:41 23              A.    Other than traffic school, no.
09:22:43 24              Q.    Your CV lists your membership in a
09:22:52 25    number of associations.  Is that right?
```

                                                        12

**HIGHLY CONFIDENTIAL**

```
09:22:55  1          A.    Yes.
09:22:55  2          Q.    Do any of the associations of which
09:22:58  3    you're a member have any relationship with any
09:23:00  4    defendant in this case?
09:23:05  5          A.    None that I'm aware of, but these
09:23:12  6    associations are so broad in their range of
09:23:17  7    activity and interest that I can't rule it out.
09:23:19  8                They are membership associations,
09:23:22  9    and it's entirely possible that people with an
09:23:26 10    interest in this litigation in some manner are
09:23:28 11    members of these organizations.  So I suppose that
09:23:31 12    would be a kind of association, which I'm not
09:23:36 13    aware of but can't rule out.
09:23:44 14          Q.    Have you ever held any professional
09:23:47 15    licenses?
09:23:48 16          A.    No.
09:23:48 17          Q.    Have you ever been the subject of
09:23:49 18    any disciplinary action related to your
09:23:54 19    professional activities?
09:23:54 20          A.    None that ever came to my
09:23:56 21    attention.
09:23:57 22          Q.    Dr. Marais, you've served as an
09:24:03 23    expert witness prior to this case.  Is that right?
09:24:06 24          A.    I have.
09:24:06 25          Q.    When was the very first occasion
```

13

**HIGHLY CONFIDENTIAL**

09:24:08  1    you were retained as an expert witness?

09:24:10  2                    MR. FIGEL:  Objection.

09:24:10  3                    You can answer.

09:24:11  4           A.    I'm not able to answer that without

09:24:18  5    delving into dusty archive at this point.  It

09:24:23  6    would have been in the -- roughly, though -- in

09:24:28  7    the mid-1990s when I was retained as a designated

09:24:32  8    expert.  I did some expert work as a confidential

09:24:37  9    consultant on other occasions prior to that.

09:24:41  10          Q.    When you say a "designated expert,"

09:24:45  11   do you mean a testifying expert witness?

09:24:48  12          A.    I mean -- that's really what I

09:24:50  13   mean, somebody who provided live testimony.

09:24:52  14          Q.    So between the mid-'90s and now,

09:24:55  15   approximately how many times have you been

09:24:56  16   retained as an expert witness to testify?

09:24:58  17          A.    That's a number I've never

09:25:03  18   calculated and don't have any need in the ordinary

09:25:07  19   course of business to keep a record of.

09:25:10  20                 So at best, I can give you my

09:25:13  21   impressionistic estimate, which is at least 200

09:25:21  22   times and possibly -- possibly, depending on how

09:25:27  23   one counts, 400 times.

09:25:34  24                 I say "depending on how one counts"

09:25:37  25   because I have been retained on numerous occasions

                                                                    14

**HIGHLY CONFIDENTIAL**

09:25:40  1   when the retention did not lead to any actual

09:25:44  2   work.  But I was asked if I was available to do

09:25:46  3   something.

09:25:48  4                So does that mean I was retained to

09:25:51  5   provide expert testimony?  Who knows.  I'm not

09:25:56  6   sure I could even distinguish those occasions.

09:25:59  7                The easiest part of that is how

09:26:03  8   many times have I actually provided expert

09:26:05  9   testimony.  And that's somewhere in the 1 to 200

09:26:10 10   range.

09:26:11 11        Q.    On those occasions when you

09:26:13 12   provided expert testimony, did you also prepare an

09:26:16 13   expert report?

09:26:16 14                MR. FIGEL:  Objection.

09:26:24 15        A.    Sometimes yes and sometimes no.

09:26:28 16        Q.    Would you say in those 100 to 200

09:26:31 17   occasions, the majority of the time you prepared

09:26:33 18   an expert report?

09:26:34 19        A.    Yes.  That -- I think

09:26:38 20   that -- that's pretty secure impressionistic

09:26:42 21   estimate without having a tally.

09:26:43 22        Q.    You're currently an executive vice

09:26:46 23   president at Compass Lexecon?

09:26:48 24        A.    Yes, that is correct.

09:26:49 25        Q.    What work do you do in that role?

15

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:26:53 | 1 | A.    I provide consulting services in |
| 09:26:57 | 2 | the areas of my own expertise to clients who |
| 09:27:02 | 3 | approach me or who approach Compass Lexecon |
| 09:27:08 | 4 | insiders, other than me, who identify me as a |
| 09:27:11 | 5 | suitable candidate for providing certain -- for |
| 09:27:16 | 6 | providing the kind -- the kinds of services that |
| 09:27:22 | 7 | I -- that fall within my areas of expertise. |
| 09:27:23 | 8 | Q.    What are your areas of expertise? |
| 09:27:25 | 9 | A.    Generally, applied mathematics, |
| 09:27:32 | 10 | applied statistics including econometrics.  And I |
| 09:27:40 | 11 | have some expertise in the area that, at the |
| 09:27:43 | 12 | University of Chicago, used to be called |
| 09:27:46 | 13 | managerial accounting, which is a kind of applied |
| 09:27:50 | 14 | mathematics for managers for the analysis of |
| 09:27:53 | 15 | processes inside firms. |
| 09:28:00 | 16 | Q.    Approximately how much of your |
| 09:28:02 | 17 | professional time at Compass Lexecon is spent in |
| 09:28:05 | 18 | connection with duties as a retained expert |
| 09:28:07 | 19 | witness? |
| 09:28:07 | 20 | MR. FIGEL:  Objection. |
| 09:28:07 | 21 | A.    Approximately 100 percent. |
| 09:28:20 | 22 | Q.    Has that been true throughout the |
| 09:28:23 | 23 | time that you've been an executive vice president |
| 09:28:25 | 24 | at Compass Lexecon? |
| 09:28:27 | 25 | MR. FIGEL:  Same objection. |

16

**HIGHLY CONFIDENTIAL**

09:28:28 1          A.    Yes.  I should probably clarify my
09:28:31 2   previous answer by saying, since expert analysis
09:28:38 3   is the one thing that I do in my work -- that's
09:28:40 4   why I give you, say, the answer is approximately
09:28:43 5   100 percent -- if you meant -- when you said
09:28:46 6   "retained expert" in that previous question, if
09:28:49 7   you meant retained expert in the sense of an
09:28:52 8   expert involved in litigation, that's not
09:28:54 9   100 percent.
09:28:57 10          But -- so my answer was accurate as
09:28:59 11  stated.  I'm just expanding on it a little bit.
09:29:03 12          Q.    Sure.  If I use the term "expert
09:29:05 13  witness" for purposes of this deposition, I'll
09:29:09 14  mean a retained testifying expert.  Is that fair?
09:29:11 15          A.    I will try and keep that in mind.
09:29:13 16  That's how I understood -- that's what I
09:29:15 17  understood you to be referring to
09:29:17 18  pre- -- actually, that's not what I understood you
09:29:20 19  to be referring to previously.
09:29:21 20          So the answer would be
09:29:23 21  approximate -- my revised answer, in light of what
09:29:26 22  you've just explained, would be approximately
09:29:30 23  90 percent.
09:29:33 24          Q.    Prior to Compass Lexecon, you
09:29:37 25  worked for William E. Wecker Associates.  Is that

                                                      17

| | | |
|---|---|---|
| 09:29:40 | 1 | right? |
| 09:29:40 | 2 | A. Yes. |
| 09:29:41 | 3 | Q. What sort of work did you do in |
| 09:29:43 | 4 | that role? |
| 09:29:43 | 5 | A. Exactly the same sort of work that |
| 09:29:45 | 6 | I have just described in connection with Compass |
| 09:29:48 | 7 | Lexecon. |
| 09:29:48 | 8 | Q. And approximately how much of your |
| 09:29:50 | 9 | professional time at William E. Wecker was spent |
| 09:29:56 | 10 | as an expert witness? |
| 09:29:59 | 11 | MR. FIGEL: Objection. Withdrawn |
| 09:30:00 | 12 | with your definition. |
| 09:30:01 | 13 | A. The -- over the entire time I was |
| 09:30:07 | 14 | with Wecker Associates, probably 60 or 65 percent |
| 09:30:15 | 15 | of my time. |
| 09:30:22 | 16 | Q. Okay. And prior to William |
| 09:30:25 | 17 | E. Wecker Associates, you were a consulting |
| 09:30:27 | 18 | professor at Stanford University School of Law. |
| 09:30:29 | 19 | Is that right? |
| 09:30:29 | 20 | A. Yes. |
| 09:30:30 | 21 | Q. And did you serve as a retained |
| 09:30:34 | 22 | expert witness at all during your time at |
| 09:30:38 | 23 | Stanford? |
| 09:30:38 | 24 | A. Yes. And I should clarify my |
| 09:30:41 | 25 | previous answer, because the premise of your |

18

**HIGHLY CONFIDENTIAL**

```
09:30:45  1   question was mistaken, actually.
09:30:46  2             You said prior to my time at
09:30:49  3   William E. Wecker Associates.  Actually, that
09:30:57  4   happened during my time at William E. Wecker
09:31:00  5   Associates.  My appointment at Stanford was not a
09:31:02  6   full-time position.  It was something that I did
09:31:04  7   even while I was working at William E. Wecker
09:31:13  8   Associates.
09:31:13  9        Q.    Understood.  Thank you for that
09:31:15 10   clarification.
09:31:17 11             Prior to joining William E. Wecker
09:31:19 12   Associates in 1992, you had a variety of roles at
09:31:22 13   the University of Chicago graduate school of
09:31:24 14   business.  Is that right?
09:31:25 15        A.    Correct.
09:31:25 16        Q.    And during the time that you were
09:31:26 17   at the University of Chicago, did you ever serve
09:31:28 18   as an expert witness?
09:31:30 19        A.    No.
09:31:48 20        Q.    Do you advertise your services as
09:31:51 21   an expert witness?
09:31:52 22        A.    I do not.  I know that there is a
09:31:59 23   profile of me on the Compass Lexecon website.
09:32:04 24   There may be -- may still be a profile on the
09:32:12 25   William E. Wecker Associates website.  I did not
```

19

**HIGHLY CONFIDENTIAL**

09:32:15  1  personally post those profiles.  So I think it's

09:32:21  2  fair to say I do not advertise myself as an expert

09:32:28  3  witness.

09:32:29  4        Q.    Do you know what kinds of

09:32:30  5  information those profiles you just described

09:32:34  6  contain?

09:32:34  7        A.    I have looked at them from time to

09:32:36  8  time.  So I think I know that they very briefly

09:32:44  9  describe something about my background.  And they

09:32:47 10  have a photograph -- a now somewhat outdated

09:32:50 11  photograph.  And that they offer a link to contact

09:32:54 12  the organization or to get a copy of my CV.

09:33:00 13        Q.    Is it your understanding that the

09:33:02 14  purpose of those profiles is to advertise your

09:33:06 15  services as an expert witness?

09:33:09 16              MR. FIGEL:  Objection.

09:33:10 17        A.    That's not how I would characterize

09:33:18 18  them, no.

09:33:19 19        Q.    Have you ever been retained as an

09:33:21 20  expert witness by a plaintiff?

09:33:23 21        A.    Yes.

09:33:23 22        Q.    Prior to this case, have you ever

09:33:25 23  been retained as an expert witness by a defendant?

09:33:28 24        A.    Yes.

09:33:28 25        Q.    In all of your prior engagements as

20

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:33:30 | 1 | an expert witness, approximately what percentage |
| 09:33:32 | 2 | of those cases were you retained by the plaintiff? |
| 09:33:35 | 3 | A.   I can only give you an |
| 09:33:43 | 4 | impressionistic estimate of that.  I would say |
| 09:33:46 | 5 | that it is a low percentage, probably in single |
| 09:33:50 | 6 | digits. |
| 09:33:54 | 7 | If not -- if we took the trouble to |
| 09:33:57 | 8 | research it, if it were not in single digits, I |
| 09:34:01 | 9 | would be amazed if it were much above 10 percent. |
| 09:34:04 | 10 | Q.   Prior to this case, have you ever |
| 09:34:06 | 11 | been retained in a case where a governmental |
| 09:34:08 | 12 | entity was a party? |
| 09:34:12 | 13 | A.   I'm pausing to think about that. |
| 09:34:34 | 14 | Yes. |
| 09:34:34 | 15 | Q.   How many times? |
| 09:34:36 | 16 | A.   At least half a dozen times.  But I |
| 09:34:43 | 17 | suspect the true -- the accurate answer is |
| 09:34:47 | 18 | substantially more than half a dozen.  It's just |
| 09:34:50 | 19 | that half a dozen occasions come easily to mind. |
| 09:34:53 | 20 | But you've -- you -- the level of |
| 09:34:58 | 21 | specificity of what you're asking me now is such |
| 09:35:00 | 22 | that, to even give you a reasonably accurate |
| 09:35:06 | 23 | answer for even the past five years, I would have |
| 09:35:09 | 24 | to consult my list of testimony attached to my |
| 09:35:11 | 25 | report. |

21

**HIGHLY CONFIDENTIAL**

09:35:14  1          Q.    In any of the cases that you can
09:35:16  2    recall, were you retained as an expert witness by
09:35:19  3    the government?
09:35:25  4          A.    Only one case comes to mind.  I
09:35:35  5    can't -- I'm not certain.  As you know, I've been
09:35:37  6    doing this for 30 years.  So I'm not being coy
09:35:44  7    here.
09:35:44  8                Only one case comes to mind.  I
09:35:47  9    can't absolutely rule out that there weren't other
09:35:49 10    examples, but one case comes to mind.
09:35:51 11          Q.    Which is the case in which you were
09:35:53 12    retained by a governmental entity which you can
09:35:56 13    recall today?
09:35:59 14          A.    Even though it was a really long
09:36:00 15    time ago, I am not sure that I was ever actually
09:36:04 16    disclosed in that case.  And so I would need to
09:36:13 17    look into that, I believe, as a -- out of respect
09:36:15 18    to that client, to learn whether it's okay to
09:36:21 19    disclose that.
09:36:34 20          Q.    Looking at Attachment B to LM-1,
09:36:38 21    which is your expert report, is it fair to say
09:36:43 22    that you were not retained by any governmental
09:36:45 23    entity listed in any of these 45 cases?
09:36:53 24          A.    I'm looking at the list briefly
09:36:54 25    just to remind myself.  I think the answer is

                                                            22

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:36:57 | 1 | going to be yes, but just to be sure, I'm taking a |
| 09:37:02 | 2 | look at it. |
| 09:37:26 | 3 | (Document review.) |
| 09:37:26 | 4 | The one questionable case -- the |
| 09:37:29 | 5 | one question mark for me, out of the 45, is |
| 09:37:32 | 6 | Item 19 where I was retained by the California |
| 09:37:38 | 7 | Insurance Guarantee Association, which I |
| 09:37:41 | 8 | understand to be a, at least some kind of |
| 09:37:48 | 9 | quasi-governmental entity.  It is -- has some |
| 09:37:52 | 10 | affiliation with or connection to the state |
| 09:37:54 | 11 | government of California. |
| 09:37:55 | 12 | Q.    Has your expert opinion ever been |
| 09:37:59 | 13 | excluded in any case? |
| 09:38:01 | 14 | MR. FIGEL:  Objection. |
| 09:38:01 | 15 | A.    It has. |
| 09:38:06 | 16 | Q.    How many times has that happened? |
| 09:38:07 | 17 | A.    There are two occasions I can think |
| 09:38:17 | 18 | of that -- where my opinion was -- was excluded to |
| 09:38:24 | 19 | the extent that I was not permitted to testify at |
| 09:38:27 | 20 | all. |
| 09:38:27 | 21 | Q.    Which cases were those? |
| 09:38:29 | 22 | A.    One of the those is in the State of |
| 09:38:36 | 23 | Washington.  It is called Ngethpharat.  I know |
| 09:38:46 | 24 | you're going to ask me for spelling on that. |
| 09:38:52 | 25 | N-g-e-t-h-p-h-a-r-a-t versus State Farm.  It's |

23

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:39:05 | 1 | closely associated with a case called Jama, |
| 09:39:08 | 2 | J-a-m-a, versus State Farm.  I believe that was |
| 09:39:11 | 3 | in -- that is in federal court in the State of |
| 09:39:17 | 4 | Washington. |
| 09:39:20 | 5 | The other instance that I'm aware |
| 09:39:22 | 6 | of is from seven or so years ago in a case called |
| 09:39:25 | 7 | Walden v. Chrysler in state court in Georgia. |
| 09:39:38 | 8 | Q.    In the State Farm case in |
| 09:39:41 | 9 | Washington federal court, for what reason was your |
| 09:39:47 | 10 | expert opinion excluded? |
| 09:39:47 | 11 | MR. FIGEL:  Objection. |
| 09:39:47 | 12 | A.    I understand that the reasons were |
| 09:39:49 | 13 | two-fold.  One was that in a determination of |
| 09:39:57 | 14 | damages, the Court was persuaded that the opinion |
| 09:40:02 | 15 | I was providing on the definition -- the proper |
| 09:40:10 | 16 | definition of damages, of economic damages, was |
| 09:40:12 | 17 | not -- was actually a legal opinion and, |
| 09:40:17 | 18 | therefore, outside my area of expertise. |
| 09:40:29 | 19 | The rest of my opinion pertained to |
| 09:40:31 | 20 | whether certain calculations were -- involved |
| 09:40:34 | 21 | multiplication or division and why that |
| 09:40:42 | 22 | distinction was material to issues in the case. |
| 09:40:45 | 23 | And I understand that the Court |
| 09:40:46 | 24 | held that it did not need to be instructed on the |
| 09:40:49 | 25 | definition between -- the difference between |

24

HIGHLY CONFIDENTIAL

09:40:55  1    multiplication and division.

09:40:57  2         Q.    How about the Walden case.  Why was

09:41:00  3    your opinion excluded in the Walden case?

09:41:02  4         A.    In the Walden case, my -- I had the

09:41:05  5    assignment of examining the federal NASS

09:41:12  6    database -- that's the -- that's all caps N-A-S-S,

09:41:15  7    the National Accident Sampling System, in order to

09:41:23  8    determine whether certain events had or had not

09:41:25  9    been recorded in that database.

09:41:35  10        The Court determined that the

09:41:36  11   accidents that I was looking at in the NASS

09:41:39  12   database were not substantially similar to the

09:41:41  13   accident that gave rise to the litigation.  I

09:41:48  14   believe that was the -- the Court's primary ground

09:41:57  15   for excluding my testimony, that there was a

09:42:01  16   requirement in that jurisdiction for substantial

09:42:03  17   similarity.

09:42:03  18        Q.    To the best of your knowledge, is

09:42:05  19   your expert report that you submitted in the State

09:42:08  20   Farm case publicly available?

09:42:10  21        A.    I have no idea.

09:42:13  22        Q.    Same answer for the Walden case?

09:42:16  23        MR. FIGEL:  Objection.

09:42:17  24        A.    Correct.

09:42:18  25        Q.    Are you familiar with the term

                                                            25

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:42:19 | 1 | "event study"? |
| 09:42:23 | 2 | A.    Yes. |
| 09:42:23 | 3 | Q.    Have you conducted event studies as |
| 09:42:25 | 4 | part of your expert witness work in the past? |
| 09:42:27 | 5 | A.    Yes. |
| 09:42:30 | 6 | Q.    Was an event study any part of any |
| 09:42:32 | 7 | of your excluded expert opinions? |
| 09:42:34 | 8 | A.    No. |
| 09:42:35 | 9 | Q.    Approximately how many times have |
| 09:42:37 | 10 | you conducted an event study in connection with |
| 09:42:42 | 11 | your expert witness work? |
| 09:42:46 | 12 | A.    We are now talking about an era |
| 09:42:50 | 13 | from the late 1990s into the early 2000s.  So it's |
| 09:43:00 | 14 | particularly hard for me to be precise.  But my |
| 09:43:03 | 15 | best estimate sitting here is half a dozen |
| 09:43:06 | 16 | occasions. |
| 09:43:11 | 17 | Q.    So the total number of event |
| 09:43:13 | 18 | studies that you've conducted in connection with |
| 09:43:15 | 19 | your expert witness work or your best |
| 09:43:18 | 20 | approximation is approximately six? |
| 09:43:20 | 21 | MR. FIGEL:  Objection. |
| 09:43:20 | 22 | A.    Yes. |
| 09:43:20 | 23 | Q.    Is it fair to say that you're |
| 09:43:22 | 24 | familiar with the requirement that expert |
| 09:43:24 | 25 | witnesses set forth the basis and reasons for |

26

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:43:26 | 1 | their opinions in their expert reports? |
| 09:43:32 | 2 | A.    I certainly do not have a lawyer's |
| 09:43:37 | 3 | expert knowledge of the procedural rules that |
| 09:43:45 | 4 | govern those questions.  But I have been |
| 09:43:47 | 5 | instructed over the years by lawyers on elements |
| 09:43:50 | 6 | that need to be in my reports, and I generally try |
| 09:43:52 | 7 | to put them there. |
| 09:43:53 | 8 | Q.    Is it fair to say that it's your |
| 09:43:55 | 9 | practice to include a description of your |
| 09:43:57 | 10 | methodology in your expert reports? |
| 09:44:00 | 11 | MR. FIGEL:  Objection. |
| 09:44:01 | 12 | A.    As a very general characterization, |
| 09:44:10 | 13 | I think it's a fair characterization.  What that |
| 09:44:12 | 14 | actually means in different instances depends on |
| 09:44:15 | 15 | the circumstances. |
| 09:44:16 | 16 | Q.    When you describe your methodology |
| 09:44:18 | 17 | in your expert reports, do you include all steps |
| 09:44:21 | 18 | that you consider material to reach your opinion? |
| 09:44:24 | 19 | MR. FIGEL:  Objection. |
| 09:44:31 | 20 | A.    I do.  Sometimes they're visible in |
| 09:44:34 | 21 | the body of the report.  Sometimes they are |
| 09:44:36 | 22 | visible in the backup materials that I produce in |
| 09:44:42 | 23 | conjunction with a report which I deem to be part |
| 09:44:46 | 24 | of the report. |
| 09:44:47 | 25 | Q.    Limiting this question only to |

27

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:44:53 | 1 | event studies that you've conducted as an expert |
| 09:44:56 | 2 | witness, are there any steps that you routinely |
| 09:44:58 | 3 | take as part of conducting an event study but do |
| 09:45:03 | 4 | not include in your expert report? |
| 09:45:05 | 5 | MR. FIGEL: Objection. |
| 09:45:09 | 6 | A. As I indicated in a previous |
| 09:45:12 | 7 | answer, it has been a long time since I last |
| 09:45:14 | 8 | actually conducted an event study as opposed to |
| 09:45:19 | 9 | replicating an event study, which is what I did in |
| 09:45:22 | 10 | the present case. |
| 09:45:28 | 11 | And so it would be, at best, |
| 09:45:31 | 12 | leading for me to try to vaguely characterize what |
| 09:45:38 | 13 | are my standard practices when I perform an event |
| 09:45:42 | 14 | study. |
| 09:45:42 | 15 | It may well be that if I were |
| 09:45:44 | 16 | called upon to resume performing event studies, |
| 09:45:47 | 17 | that I would look at reports from long ago and |
| 09:45:54 | 18 | look at literature, scholarly and professional |
| 09:45:58 | 19 | literature, that has appeared since then, and I |
| 09:46:01 | 20 | may -- my standard practices may, in future, not |
| 09:46:04 | 21 | be what they were 20 years ago. |
| 09:46:06 | 22 | So I -- that was a long-winded way |
| 09:46:10 | 23 | of saying I don't think I can give you a fair |
| 09:46:13 | 24 | answer or a fair catalog of what are my standard |
| 09:46:17 | 25 | practices, because I -- performing event studies |

28

**HIGHLY CONFIDENTIAL**

```
09:46:20   1   is not a standard practice of mine.
09:46:22   2            Q.    Limiting ourselves to the time when
09:46:25   3   you were performing event studies in the past,
09:46:27   4   were there any steps that you routinely took then
09:46:29   5   as part of conducting those event studies but did
09:46:32   6   not include in your expert reports?
09:46:34   7            MR. FIGEL:  Objection.
09:46:39   8            A.    I would have to look at the expert
09:46:42   9   reports from that era to be able to answer that
09:46:45  10   question.  I would doubt it, subject to the
09:46:55  11   qualification I stated a moment ago of providing
09:46:58  12   electronic backup along with the event study,
09:47:01  13   given -- interpreting my report as the -- as
09:47:04  14   including the electronic backup, I doubt that
09:47:06  15   there was any step that I took that I did not
09:47:10  16   document in my expert report.
09:47:18  17            But I can't speak to that with
09:47:21  18   specificity today.  I simply don't have a clear
09:47:25  19   enough and fresh enough recollection of the work
09:47:28  20   that I did on event studies 20 years ago.
09:47:33  21            Q.    How did you come to be retained as
09:47:36  22   an expert witness in this case?
09:47:38  23            A.    I received either a telephone call
09:47:47  24   or an e-mail from counsel for Ripple asking me
09:47:53  25   whether I was available to discuss some issues
```

29

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:47:56 | 1 | concerning this litigation. |
| 09:48:00 | 2 | Q.    Which attorney contacted you? |
| 09:48:01 | 3 | A.    Mr. Figel to my left. |
| 09:48:06 | 4 | Q.    When did you receive this contact |
| 09:48:08 | 5 | from Mr. Figel? |
| 09:48:16 | 6 | A.    Not very long before I delivered my |
| 09:48:19 | 7 | report.  I would say -- I don't have a precise |
| 09:48:27 | 8 | recall of the date of that, but whatever the date |
| 09:48:30 | 9 | is on which I signed the report is -- I -- I would |
| 09:48:35 | 10 | say, again, impressionistically, it was no more |
| 09:48:38 | 11 | than three weeks after when Mr. Figel called me. |
| 09:48:43 | 12 | Q.    Prior to your retention as an |
| 09:48:45 | 13 | expert witness in this case, did you know anything |
| 09:48:47 | 14 | about Ripple? |
| 09:48:48 | 15 | A.    Yes. |
| 09:48:51 | 16 | Q.    What did you know? |
| 09:48:52 | 17 | MR. FIGEL:  Objection. |
| 09:48:52 | 18 | A.    I knew that Ripple was, in some |
| 09:48:58 | 19 | way, entirely, vaguely defined in my own mind, |
| 09:49:05 | 20 | associated with XRP, with the cryptocurrency |
| 09:49:11 | 21 | called XRP.  And when I say "associated with," |
| 09:49:15 | 22 | what I mean by that is just when I looked up |
| 09:49:18 | 23 | articles on XRP, I would tend to find the name |
| 09:49:24 | 24 | Ripple showing up somewhere in the article. |
| 09:49:29 | 25 | Q.    Did you look up articles about XRP |

30

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:49:33 | 1 | prior to your retention as an expert witness in |
| 09:49:35 | 2 | this case? |
| 09:49:35 | 3 | A. Yes. |
| 09:49:36 | 4 | Q. Why? |
| 09:49:36 | 5 | A. As part of learning how to acquire |
| 09:49:45 | 6 | and use XRP. |
| 09:49:46 | 7 | Q. Why were you interested in learning |
| 09:49:55 | 8 | how to acquire and use XRP? |
| 09:49:57 | 9 | A. I retained some supporting services |
| 09:50:00 | 10 | for family members in another country where the |
| 09:50:08 | 11 | vendor of those services had a preference for |
| 09:50:15 | 12 | being paid in XRP. |
| 09:50:20 | 13 | Q. What vendor is that? |
| 09:50:24 | 14 | A. An IT consultant and a general |
| 09:50:24 | 15 | personal assistant in -- as well as providing IT |
| 09:50:43 | 16 | consulting services. |
| 09:50:43 | 17 | Q. Is this an individual or a company? |
| 09:50:45 | 18 | A. An individual. |
| 09:50:46 | 19 | Q. Did that person tell you why they |
| 09:50:50 | 20 | preferred to receive payment in XRP? |
| 09:50:51 | 21 | A. Partly yes, partly no. |
| 09:51:01 | 22 | Q. Can you explain your answer? |
| 09:51:02 | 23 | A. Since the person was in another |
| 09:51:05 | 24 | country, being paid in cryptocurrency avoided the |
| 09:51:13 | 25 | complications of wire transfers and currency |

31

**HIGHLY CONFIDENTIAL**

09:51:16  1  conversions from one -- from US dollars to a

09:51:20  2  different currency.  I understood why that was a

09:51:27  3  convenience.  That's the partly yes part.

09:51:33  4              Why specifically XRP as opposed to

09:51:36  5  something -- some other kind of cryptocurrency, I

09:51:40  6  do not know.  That's the partly no part of my

09:51:43  7  answer.

09:51:46  8         Q.    Setting aside your interaction with

09:51:49  9  this person, prior to your retention in this case,

09:51:51 10  did you know anything else about XRP?

09:51:53 11              MR. FIGEL:  Objection.

09:51:56 12         A.    No.

09:51:57 13         Q.    Do you own XRP?

09:51:58 14         A.    Yes.

09:51:59 15         Q.    How did you acquire it?

09:52:01 16         A.    On a cryptocurrency exchange.

09:52:06 17         Q.    How much XRP do you own?

09:52:12 18         A.    At present I think about $5 worth.

09:52:18 19         Q.    Why did you purchase it?

09:52:19 20         A.    I purchased it in the course of

09:52:21 21  making payments to the vendor I described in a

09:52:25 22  previous answer.  So I have a small remaining

09:52:27 23  balance of XRP from that transaction.

09:52:31 24         Q.    Other than your payments to the

09:52:35 25  vendor that we've discussed, are there any other

32

**HIGHLY CONFIDENTIAL**

09:52:38  1    occasions -- strike that.

09:52:40  2                    Other than for purposes of paying

09:52:44  3    the vendor we just discussed, are there any other

09:52:47  4    reasons why you've purchased XRP?

09:52:54  5                    MR. FIGEL:  Objection to form.

09:52:55  6         A.    Yes.

09:52:55  7         Q.    What are those reasons?

09:53:03  8         A.    Curiosity about how cryptocurrency

09:53:07  9    purchases and transactions work.  In other words,

09:53:20 10    before the -- having been made aware of XRP by my

09:53:25 11    interaction -- by my early conversations with the

09:53:28 12    person who I knew might later be interested in

09:53:30 13    pursuing the conversation, I went ahead and

09:53:33 14    purchased some XRP and set up an account on an

09:53:39 15    exchange just to gain some experience at how

09:53:41 16    transactions like that can be conducted and what

09:53:45 17    unexpected holdups might occur.

09:53:54 18         Q.    Other than XRP, have you purchased

09:53:57 19    any other digital assets?

09:53:59 20         A.    No.

09:53:59 21         Q.    Sitting here today, do you have any

09:54:01 22    plans to acquire more XRP in the future?

09:54:07 23         A.    I have no specific plan as I sit

09:54:10 24    here.  It may be that I may need to make such

09:54:15 25    plans in order to continue paying my vendor in the

                                                                    33

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:54:23 | 1 | other country that I talked about. |
| 09:54:27 | 2 | Q.    Prior to your retention as an |
| 09:54:30 | 3 | expert witness in this case, did you know anything |
| 09:54:32 | 4 | about the SEC's case against Ripple? |
| 09:54:37 | 5 | A.    Yes. |
| 09:54:38 | 6 | Q.    What did you know? |
| 09:54:43 | 7 | A.    Essentially only that there was a |
| 09:54:44 | 8 | case and that it -- I -- I had some inkling of |
| 09:54:50 | 9 | what the case was about, but certainly no detailed |
| 09:54:59 | 10 | knowledge. |
| 09:54:59 | 11 | Q.    Prior to your retention in this |
| 09:55:01 | 12 | case, had you ever met Brad Garlinghouse? |
| 09:55:05 | 13 | A.    Not knowingly. |
| 09:55:09 | 14 | Q.    Prior to your retention in this |
| 09:55:11 | 15 | case, had you ever met Chris Larsen? |
| 09:55:14 | 16 | A.    Not knowingly. |
| 09:55:15 | 17 | Q.    Prior to your retention in this |
| 09:55:17 | 18 | case, had you ever knowingly met anyone who worked |
| 09:55:19 | 19 | at Ripple? |
| 09:55:22 | 20 | A.    No. |
| 09:55:22 | 21 | Q.    Prior to your retention in this |
| 09:55:23 | 22 | case, had you ever knowingly met any of the |
| 09:55:26 | 23 | lawyers representing defendants in this case? |
| 09:55:33 | 24 | A.    No. |
| 09:55:34 | 25 | Q.    Prior to retention, had you ever |

34

**HIGHLY CONFIDENTIAL**

```
09:55:36  1  been retained by Debevoise & Plimpton?
09:55:40  2          A.    Not that I recall.  I should
09:55:45  3  qualify that answer by saying that I have from
09:55:51  4  time to time been involved in complex cases with
09:55:55  5  multiple counsel for different parties, and
09:55:58  6  sometimes there are joint defense arrangements.
09:56:04  7          And so even though my direct
09:56:07  8  contact may be with law firm A, I can't always
09:56:11  9  know that law firm B and law firm C are involved.
09:56:14 10  But with that qualification, I have no
09:56:16 11  recollection, as I sit here, of ever being
09:56:22 12  retained by Debevoise & Plimpton.
09:56:26 13          Q.    Prior to your retention here, had
09:56:30 14  you ever been retained by Kellogg Hansen?
09:56:33 15          A.    Yes.
09:56:33 16          Q.    How many times?
09:56:34 17          A.    Once.
09:56:46 18          Q.    When?
09:56:47 19          A.    Approximately three months ago.
09:56:55 20          Q.    Prior to your retention, to your
09:57:04 21  knowledge, had Compass Lexecon ever been retained
09:57:08 22  by Debevoise & Plimpton?
09:57:10 23          A.    It would not surprise me, but I
09:57:12 24  have no specific knowledge of it.
09:57:18 25          Q.    Prior to your retention, and
```

35

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:57:20 | 1 | setting aside the retention we just talked about |
| 09:57:23 | 2 | three months ago, to your knowledge, had Compass |
| 09:57:28 | 3 | Lexecon ever been retained by Kellogg Hansen? |
| 09:57:31 | 4 | A.   Yes. |
| 09:57:31 | 5 | Q.   How many times? |
| 09:57:32 | 6 | A.   I have no idea.  I have no way of |
| 09:57:33 | 7 | knowing.  It's not within my area of |
| 09:57:35 | 8 | responsibility to know such things. |
| 09:57:41 | 9 | Q.   Are you charging defendants a fee |
| 09:57:44 | 10 | for your expert services in this case? |
| 09:57:47 | 11 | A.   Broadly, yes, in the sense that I |
| 09:57:51 | 12 | am here as an employee of Compass Lexecon.  And |
| 09:57:55 | 13 | Compass Lexecon does charge for my time. |
| 09:57:57 | 14 | Q.   How much does Compass Lexecon |
| 09:58:01 | 15 | charge for your time? |
| 09:58:02 | 16 | A.   I think the number is stated in my |
| 09:58:04 | 17 | expert report in this case.  It is $1,040 per |
| 09:58:12 | 18 | hour. |
| 09:58:12 | 19 | Q.   Is this your standard hourly fee |
| 09:58:14 | 20 | for expert services? |
| 09:58:18 | 21 | A.   Yes. |
| 09:58:18 | 22 | Q.   How long has $1,040 per hour been |
| 09:58:24 | 23 | your standard fee for expert services? |
| 09:58:26 | 24 | A.   Since approximately January 1 of |
| 09:58:30 | 25 | 2021. |

36

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 09:58:30 | 1 | Q. What was it before then? |
| 09:58:32 | 2 | A. $1,000 per hour. |
| 09:58:37 | 3 | Q. How much have -- strike that. |
| 09:58:40 | 4 | How much has Compass Lexecon billed |
| 09:58:42 | 5 | for your services in this case so far? |
| 09:58:43 | 6 | A. I do not know the answer to that. |
| 09:58:48 | 7 | Obviously somebody does. I'm not suggesting that |
| 09:58:50 | 8 | it's not a knowable thing, but it's not a thing |
| 09:58:56 | 9 | that I happen to know. |
| 09:58:58 | 10 | Q. Approximately how many hours have |
| 09:58:59 | 11 | you worked on this case so far? |
| 09:59:01 | 12 | A. That will have to be one of my now |
| 09:59:06 | 13 | famous impressionistic estimates. I would |
| 09:59:15 | 14 | estimate that at somewhere in the range of 30 to |
| 09:59:19 | 15 | 45 hours. |
| 09:59:20 | 16 | Q. Have you received any compensation |
| 09:59:29 | 17 | in connection with this case in XRP? |
| 09:59:31 | 18 | A. No. |
| 09:59:31 | 19 | Q. Do you have any plans to receive |
| 09:59:35 | 20 | XRP as compensation in connection with this case? |
| 09:59:37 | 21 | A. I'm hoping not. |
| 09:59:38 | 22 | Q. To your knowledge, is Compass |
| 09:59:40 | 23 | Lexecon planning to receive any payment in XRP in |
| 09:59:43 | 24 | connection with your services provided in this |
| 09:59:53 | 25 | case? |

37

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 09:59:53 | 1 | A.    I'm not aware of it, but I can't |
| 09:59:55 | 2 | rule it out.  I'm -- but as I say, I'm not aware |
| 10:00:01 | 3 | of it. |
| 10:00:01 | 4 | Q.    Do you -- |
| 10:00:01 | 5 | A.    It hadn't occurred -- in fact, |
| 10:00:02 | 6 | before you asked, it hadn't occurred to me as a |
| 10:00:05 | 7 | possibility. |
| 10:00:05 | 8 | Q.    In your position at Compass |
| 10:00:06 | 9 | Lexecon, is your compensation tied to the amount |
| 10:00:10 | 10 | that you bill to clients? |
| 10:00:12 | 11 | MR. FIGEL:  Objection. |
| 10:00:12 | 12 | A.    Yes. |
| 10:00:13 | 13 | Q.    How so? |
| 10:00:19 | 14 | A.    My compensation is tied to what -- |
| 10:00:25 | 15 | to the hourly billings of Compass Lexecon for time |
| 10:00:28 | 16 | that I devote to client engagements. |
| 10:00:35 | 17 | Q.    Is your compensation at Compass |
| 10:00:37 | 18 | Lexecon also tied to the total amount that Compass |
| 10:00:40 | 19 | Lexecon bills to clients? |
| 10:00:41 | 20 | A.    Yes. |
| 10:00:42 | 21 | Q.    How so? |
| 10:00:42 | 22 | A.    There is an -- I get some so-called |
| 10:00:49 | 23 | attribution, a portion of billings, hourly |
| 10:00:52 | 24 | billings for staff working under my direction. |
| 10:00:57 | 25 | Q.    Did others assist you with |

38

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:01:00 | 1 | providing your expert services in this case? |
| 10:01:01 | 2 | A.    Yes. |
| 10:01:01 | 3 | Q.    Who? |
| 10:01:02 | 4 | A.    Principally Dr. Dzmitry Asinski. |
| 10:01:13 | 5 | That is D-z-m-i-t-r-y.  Asinski is A-s-i-n-s-k-i. |
| 10:01:27 | 6 | Q.    What is Dr. Asinski's role at |
| 10:01:31 | 7 | Compass Lexecon? |
| 10:01:32 | 8 | A.    He is a senior vice president or |
| 10:01:39 | 9 | something -- he has a -- a three-word title, |
| 10:01:43 | 10 | something like senior vice president.  Maybe -- |
| 10:01:47 | 11 | Q.    How did Dr. -- sorry.  Were you -- |
| 10:01:49 | 12 | A.    Maybe some hyphens in there. |
| 10:01:53 | 13 | Q.    How did Dr. Asinski assist you with |
| 10:01:56 | 14 | your -- providing your expert services in this |
| 10:01:57 | 15 | case? |
| 10:01:57 | 16 | A.    When computers needed to be |
| 10:01:59 | 17 | programmed, when data needed to be reformatted in |
| 10:02:10 | 18 | order to become accessible to the kind of software |
| 10:02:12 | 19 | that we used, when analyses had to be performed |
| 10:02:21 | 20 | and audited, all of that was done under my |
| 10:02:27 | 21 | direction but done, actually implemented by -- on |
| 10:02:31 | 22 | my behalf by Dr. Asinski, assisted as needed by |
| 10:02:40 | 23 | additional staff. |
| 10:02:44 | 24 | Q.    Other than Dr. Asinski, is there |
| 10:02:46 | 25 | anyone else that assisted in -- assisted with |

39

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:02:51 | 1 | providing your expert services in this case? |
| 10:02:54 | 2 | MR. FIGEL:  Objection. |
| 10:02:54 | 3 | A.    Yes. |
| 10:02:54 | 4 | Q.    Who? |
| 10:02:59 | 5 | A.    Narsid Golic.  N-a-r-s-i-d |
| 10:03:10 | 6 | G-o-l-i-c. |
| 10:03:10 | 7 | Q.    And how did Narsid Golic assist you |
| 10:03:17 | 8 | with providing your expert services in this case? |
| 10:03:18 | 9 | A.    Narsid Golic is a -- is junior |
| 10:03:22 | 10 | relative to Dr. Asinski but assisted Dr. Asinski |
| 10:03:32 | 11 | with the practical implementation of the work that |
| 10:03:35 | 12 | I had directed -- that I had directed be done. |
| 10:03:43 | 13 | Q.    When you say "assisted with the |
| 10:03:44 | 14 | practical implementation," what does that mean? |
| 10:03:46 | 15 | A.    Program computers. |
| 10:03:50 | 16 | Q.    Other than the two individuals we |
| 10:03:51 | 17 | just discussed, is there anyone else at Compass |
| 10:03:54 | 18 | Lexecon that assisted you with providing your |
| 10:03:56 | 19 | expert services in this case? |
| 10:03:57 | 20 | MR. FIGEL:  Objection. |
| 10:03:58 | 21 | A.    No one else comes to mind, but I |
| 10:04:01 | 22 | can't absolutely rule out that Dr. Asinski or |
| 10:04:06 | 23 | Mr. Golic at some point may not -- may have |
| 10:04:11 | 24 | brought in additional help.  But it's my |
| 10:04:18 | 25 | understanding and it's my belief, as I sit here, |

40

HIGHLY CONFIDENTIAL

10:04:21  1   that virtually all of the work that I did not do

10:04:23  2   myself was done by them.

10:04:29  3        Q.    How much, if anything, have

10:04:32  4   Dr. Asinski and Mr. Golic billed defendants in

10:04:41  5   this case?

10:04:41  6        A.    That was a little too muffled.  I

10:04:44  7   think you asked how much they billed?

10:04:46  8        Q.    That's right.

10:04:46  9        A.    I don't know the answer to that.

10:04:48 10   As I indicated previously, I'm certainly not

10:04:50 11   suggesting and -- it's unknowable.  I just don't

10:04:56 12   happen to know it.

10:04:57 13        Q.    Those billing records would be with

10:05:00 14   Compass Lexecon.  Is that right?

10:05:00 15        A.    Correct.

10:05:01 16        Q.    Do you know what their billing

10:05:03 17   rates are?

10:05:03 18        A.    Only within ranges.

10:05:10 19        Q.    What's the range for Dr. Asinski?

10:05:12 20        A.    I believe his range, his billing

10:05:18 21   rate is somewhere within the 800s.

10:05:21 22        Q.    How about Mr. Golic?

10:05:22 23        A.    Five to 600 is what I believe

10:05:28 24   the -- where his range sits.

10:05:30 25        Q.    Do you know approximately how many

41

**HIGHLY CONFIDENTIAL**

10:05:31  1    hours each of them have billed to this matter?

10:05:33  2           A.    I do not.

10:05:40  3           Q.    Did you do anything to prepare for

10:05:41  4    your deposition today?

10:05:42  5           A.    Yes.

10:05:42  6           Q.    What did you do?

10:05:43  7           A.    I reread my own report.  I actually

10:05:50  8    first reread Dr. ████ report.  Then I reread my

10:05:55  9    own report.  I glanced at the complaint in this

10:05:57  10   matter, the first amended complaint.

10:06:04  11          I looked briefly at the materials

10:06:12  12   that I cite as materials considered.  I looked

10:06:15  13   briefly at the electronic disclosure -- disclosure

10:06:23  14   package that Mr. -- that Dr. Asinski produced

10:06:27  15   under my direction and at my request in support of

10:06:31  16   and in conjunction with my report in this matter.

10:06:48  17   I met with counsel.

10:06:51  18          Those are the things that occur to

10:06:52  19   me.  If something else occurs to me that I should

10:07:00  20   have mentioned and I'm -- it's simply not coming

10:07:02  21   to mind right now.  But if I -- if I have a flash

10:07:07  22   of insight or recollection, I will certainly

10:07:10  23   volunteer it if it happens in the course of this

10:07:12  24   depo.

10:07:12  25          Q.    Thank you, Doctor.  How many times

42

**HIGHLY CONFIDENTIAL**

```
10:07:16   1   did you meet with counsel in preparation for your
10:07:18   2   deposition?
10:07:21   3           A.    Once.
10:07:21   4           Q.    Who did you meet with?
10:07:28   5           A.    Mr. Figel and his colleague,
10:07:32   6   Mr. Gideon.  Mr. Gideon has so many names.  I'm
10:07:37   7   hoping I'm getting his last name.
10:07:43   8               MR. GIDEON:  You got it.
10:07:44   9           Q.    Anyone else?
10:07:46  10           A.    No.
10:07:49  11           Q.    Other than counsel, did anyone
10:07:51  12   assist you with preparation for your deposition
10:07:53  13   today?
10:07:54  14           A.    Yes.
10:07:54  15           Q.    Who?
10:07:58  16           A.    Dr. Asinski.
10:08:01  17           Q.    How did he assist you with
10:08:02  18   preparation?
10:08:07  19           A.    He reminded me where to look for
10:08:10  20   copies of my backup materials.  He reminded me how
10:08:22  21   we had performed certain calculations at my
10:08:26  22   request.  He reminded me at my request.  I think
10:08:30  23   that's about it.
10:08:34  24           Q.    Going back to your meeting with
10:08:36  25   counsel, how long did you meet with counsel?
```

43

**HIGHLY CONFIDENTIAL**

10:08:37  1          A.    Three and a half -- I think it was
10:08:49  2    three and a half hours, thereabouts.
10:08:51  3                MR. FIGEL:  Mr. Sylvester, I don't
10:08:55  4       mean to interrupt your questioning.  But
10:08:57  5       there is a point that I think Dr. Marais may
10:09:00  6       have overlooked that I just would like to
10:09:00  7       refresh his recollection about so the record
10:09:02  8       is clear.
10:09:03  9                MR. SYLVESTER:  Absolutely.  Go
10:09:04 10       ahead.
10:09:04 11                MR. FIGEL:  Can I just -- literally
10:09:05 12       five seconds.
10:09:05 13                MR. SYLVESTER:  Feel free.
10:09:12 14                (Witness confers with counsel.)
10:09:12 15    BY MR. SYLVESTER:
10:09:12 16          Q.    Any answers that you'd like to
10:09:15 17    clarify, Dr. Marais?
10:09:17 18          A.    A flash of recollection has
10:09:19 19    occurred to me.  There was a Zoom screen in the
10:09:21 20    meeting yesterday.  And I could not tell you with
10:09:29 21    precision who was on that screen.  They were
10:09:36 22    mostly represented by black rectangles with small
10:09:41 23    names.
10:09:41 24                But I do understand that other
10:09:43 25    couns- -- that counsel for other defendants in

                                                          44

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 10:09:48 | 1 | this case were on.  That's what occurs to me to |
| 10:09:58 | 2 | add. |
| 10:09:59 | 3 | Q.    Focusing just on yesterday's Zoom |
| 10:10:02 | 4 | call with counsel, were there any others that |
| 10:10:05 | 5 | weren't counsel on that call? |
| 10:10:06 | 6 | A.    Yes. |
| 10:10:06 | 7 | Q.    Who? |
| 10:10:07 | 8 | A.    Dr. Asinski was on that call via |
| 10:10:11 | 9 | Zoom.  I think I saw Mr. Golic's name.  And beyond |
| 10:10:23 | 10 | that, I can't think of -- I cannot think, as I sit |
| 10:10:30 | 11 | here, of anyone else I recognized as not counsel. |
| 10:10:36 | 12 | Q.    Have you written any publications |
| 10:10:38 | 13 | pertaining to event studies? |
| 10:10:41 | 14 | A.    Yes. |
| 10:10:41 | 15 | Q.    How many? |
| 10:10:48 | 16 | A.    A relative handful, maybe as many |
| 10:10:54 | 17 | as five or six. |
| 10:10:55 | 18 | Q.    When was the most recent of such |
| 10:10:57 | 19 | publications? |
| 10:10:58 | 20 | A.    The best way for me to answer that |
| 10:11:02 | 21 | is to turn to my CV. |
| 10:11:04 | 22 | Q.    Please do. |
| 10:11:28 | 23 | A.    (Document review.) |
| 10:11:29 | 24 | 2005. |
| 10:11:30 | 25 | Q.    Which article are you referring to, |

45

**HIGHLY CONFIDENTIAL**

10:11:32   1   Dr. Marais?

10:11:32   2          A.    It's the fifth from the end on page

10:11:37   3   3 of my CV.  It's called "Event study methods:

10:11:42   4   detecting and measuring the security price effects

10:11:46   5   of disclosures and interventions (with Katherine

10:11:49   6   Schipper)."

10:11:52   7          Q.    The paper you just described, that

10:11:54   8   paper explains how event studies can be used in

10:11:58   9   litigation.  Is that right?

10:11:59  10          A.    Yes.

10:11:59  11          Q.    Is that topic, how event studies

10:12:06  12   can be used in litigation, also the topics of your

10:12:08  13   other five or so papers that you've written

10:12:12  14   regarding event studies?

10:12:13  15          MR. FIGEL:  Objection.

10:12:14  16          A.    I'm sorry, somehow the middle part

10:12:20  17   of that question just dropped out.  Would you --

10:12:23  18   would you repeat it, please.

10:12:24  19          Q.    I'll ask a better question.

10:12:28  20          Setting aside the paper that we

10:12:30  21   just discussed, what was the topic of the other

10:12:33  22   papers that you wrote that pertain to event

10:12:35  23   studies?

10:12:35  24          A.    I would say various.

10:12:37  25          Q.    Were any of the other papers that

46

HIGHLY CONFIDENTIAL

10:12:39   1   you wrote pertaining to event studies also about

10:12:42   2   the topic of how event studies are used in

10:12:44   3   litigation?

10:12:44   4                 MR. FIGEL:  Objection.

10:12:45   5        A.    Yes.  In a certain sense.  And

10:12:52   6   let -- I'll -- assuming you were about to ask me

10:12:55   7   what sense is that.

10:12:56   8        Q.    Please go ahead.

10:12:57   9        A.    The event study article with

10:13:00  10   Katherine Schipper that I described appeared in

10:13:03  11   several editions of this publication.  And I

10:13:07  12   revised it on each of those occasions.

10:13:09  13                 So even though not visible on my

10:13:16  14   CV, since I list only the most current version of

10:13:19  15   it, there were more versions having -- and they

10:13:22  16   all had to do with the use of event studies in

10:13:25  17   litigation.

10:13:25  18                 But other writings of mine on event

10:13:28  19   studies did not have to do with litigation.

10:13:33  20        Q.    Have you taught any classes that

10:13:37  21   cover the topic of event studies?

10:13:41  22        A.    Yes, I would say so.

10:13:49  23        Q.    When was the most recent such

10:13:51  24   class?

10:13:56  25        A.    Probably 199- -- around 1998.

                                                                  47

**HIGHLY CONFIDENTIAL**

```
10:14:08   1            Q.    Am I recalling your testimony
10:14:10   2    correctly that the last time you performed an
10:14:12   3    event study as an expert witness was in the early
10:14:15   4    2000s?
10:14:16   5                  MR. FIGEL:   Objection.
10:14:16   6            A.    Yes.
10:14:22   7            Q.    Prior to your retention in this
10:14:25   8    case, have you submitted an expert rebuttal report
10:14:31   9    commenting on an event study conducted by another
10:14:31  10    expert witness?
10:14:32  11            A.    That is possible although I don't
10:14:33  12    remember it specifically.  And if it happened, it
10:14:35  13    would have been in that era.
10:14:37  14            Q.    And by "that era," do you mean the
10:14:39  15    late 1990s to the early 2000s?
10:14:42  16            A.    Yes, I do.  I can't absolutely rule
10:14:50  17    out that it hasn't happened in the interim as
10:14:55  18    well.  I'm fairly sure I have not created an event
10:14:59  19    study and sponsored it as part of an expert report
10:15:04  20    since the early 2000s.
10:15:09  21                  But I can't absolutely rule out
10:15:10  22    that I haven't responded to an event study.  It
10:15:13  23    was not very recent because, if it had happened
10:15:16  24    very recently, I would remember it.
10:15:18  25            Q.    So is it fair to say that, of the
```

48

HIGHLY CONFIDENTIAL

10:15:28   1   cases that appear on your Attachment B, none of

10:15:34   2   these cases involved event studies?

10:15:36   3               MR. FIGEL:   Objection.

10:15:44   4         A.    I think the answer is going to be

10:15:46   5   yes, but I'm going to look very quickly.

10:15:49   6               (Document review.)

10:17:03   7               The reason I took the time is that

10:17:07   8   I do recall that there have been occasions when I

10:17:10   9   recognized something I was doing as a direct

10:17:13   10  analogue of an event study, even though it was not

10:17:18   11  in the conventional securities litigation format.

10:17:21   12  And I was trying to remind myself of when that

10:17:25   13  might have occurred.

10:17:28   14              It is fair to say that I have

10:17:35   15  not -- in the list of engagements that I just

10:17:38   16  looked at, there is nothing that I would call a

10:17:41   17  conventional event study in the context of a

10:17:44   18  securities litigation.

10:17:45   19              There are instances in work that I

10:17:49   20  performed in some of those cases where I did

10:17:51   21  recognize and may even have mentioned in a report

10:17:53   22  that this is the analogue of an event study as

10:17:57   23  applied in the securities litigation format.

10:18:07   24        Q.    Which cases fall into that latter

10:18:10   25  analogous category, I'll call it?

49

**HIGHLY CONFIDENTIAL**

```
10:18:13  1              MR. FIGEL:  Objection.
10:18:13  2        A.    The one that is easiest to recall
10:18:20  3   is one in which I -- is one that is so recent that
10:18:23  4   it is not on that list.  It is a critical case,
10:18:31  5   United States versus Tyson Rhame, et al.  Tyson is
10:18:39  6   T-y-s-o-n.  Rhame is R-h-a-m-e.
10:18:48  7        Q.    Are there any other retentions as
10:18:56  8   an expert witness or -- strike that.
10:18:58  9              Are there any other occasions on
10:19:00 10   which you've offered deposition or trial testimony
10:19:02 11   in the last four years that are not listed in
10:19:04 12   Attachment B?
10:19:15 13        A.    I know that there is at least one
10:19:18 14   more.
10:19:31 15              (Document review.)
10:19:31 16              I was -- yes, so there was Rhame,
10:19:36 17   and there was -- I've also been deposed since I
10:19:37 18   created this list.
10:19:38 19        Q.    You're referencing a case other
10:19:45 20   than Rhame.  Is that right?
10:19:45 21        A.    Correct.
10:19:46 22        Q.    What's that case?
10:19:49 23        A.    It is entitled, I think, Greenway
10:19:54 24   of West Palm Beach versus Kia Motors of America,
10:20:01 25   Kia being K-i-a.
```

**HIGHLY CONFIDENTIAL**

```
10:20:06   1          Q.    Going back to the Rhame case, at a
10:20:13   2   very high level, what was the expert opinion that
10:20:15   3   you offered in that case?
10:20:16   4          A.    At a very high level, that the
10:20:19   5   government's calculation of the so-called actual
10:20:26   6   loss amount in that case was unfounded.
10:20:40   7          Q.    How would you define the term
10:20:47   8   "event study"?
10:20:54   9          A.    In much the same way as the
10:20:57  10   definition stated in -- I think I gave some -- a
10:21:04  11   terse definition in my report.  And Dr. ███ also
10:21:09  12   defines an event study and refers to literature
10:21:12  13   that defines event studies such as Craig
10:21:17  14   MacKinlay's article and Binder's review article.
10:21:25  15   So I would give you a perfectly conventional
10:21:28  16   definition.
10:21:36  17          Now, I've -- now that I described
10:21:40  18   how -- described the manner in which I would
10:21:41  19   define it, if you want the actual definition, I
10:21:44  20   could give you that too.
10:21:45  21          Q.    Let me ask it -- this question:  Is
10:21:48  22   it fair to say that event studies are used to
10:21:49  23   provide answer to two questions:  Did an
10:21:50  24   announcement cause a price reaction, and what was
10:21:54  25   the price reaction to the announcement alone?
```

51

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:21:55 | 1 | MR. FIGEL:  Objection. |
| 10:22:03 | 2 | A.   I think what you're asking me about |
| 10:22:05 | 3 | from a statistician's perspective is statistical |
| 10:22:10 | 4 | significance and point estimate of an announcement |
| 10:22:12 | 5 | effect. |
| 10:22:14 | 6 | And your question does seem to |
| 10:22:16 | 7 | focus on litigation -- the way you say that seems |
| 10:22:20 | 8 | to focus on litigation applications as opposed to |
| 10:22:23 | 9 | how event studies are really and widely and mostly |
| 10:22:29 | 10 | used in academic research. |
| 10:22:32 | 11 | So with that qualification, I -- I |
| 10:22:36 | 12 | agree that those are key kinds of questions that |
| 10:22:43 | 13 | are addressed using event studies. |
| 10:22:50 | 14 | Those are not the only questions |
| 10:22:51 | 15 | that can be addressed by event studies, and I'm |
| 10:22:57 | 16 | sure they are not the only questions that have |
| 10:23:00 | 17 | been addressed, even in litig- -- even in |
| 10:23:01 | 18 | litigation settings alone.  But I'll grant you |
| 10:23:07 | 19 | that those are two things that one could approach |
| 10:23:10 | 20 | via an event study. |
| 10:23:13 | 21 | Q.   Are those two questions the |
| 10:23:14 | 22 | questions that are typically addressed by event |
| 10:23:18 | 23 | studies in litigation? |
| 10:23:19 | 24 | MR. FIGEL:  Objection. |
| 10:23:19 | 25 | A.   Being a statistician and not a |

52

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:23:26 | 1 | diviner, I would need data on -- I would need to |
| 10:23:36 | 2 | go out and collect instances of event studies used |
| 10:23:42 | 3 | in litigation and then code them up in a |
| 10:23:43 | 4 | systematic way. |
| 10:23:44 | 5 | It wouldn't -- so the fair answer |
| 10:23:47 | 6 | to your question is I -- I couldn't possibly say. |
| 10:23:52 | 7 | But I can be a little bit more helpful and say it |
| 10:23:55 | 8 | would not surprise me to discover that those are |
| 10:24:02 | 9 | the most frequently asked questions. |
| 10:24:05 | 10 | Q.    Limiting event studies to their use |
| 10:24:08 | 11 | in litigation, how does an event study answer the |
| 10:24:11 | 12 | question of whether an announcement caused a price |
| 10:24:14 | 13 | reaction? |
| 10:24:14 | 14 | MR. FIGEL:  Objection. |
| 10:24:23 | 15 | A.    So that I understand what you're |
| 10:24:24 | 16 | asking me, you're asking about the actual process |
| 10:24:28 | 17 | of using an event study.  Is that right?  You |
| 10:24:32 | 18 | would like me to describe the steps of the method? |
| 10:24:39 | 19 | In other words, your -- your |
| 10:24:40 | 20 | question is a little bit ambiguous.  Possible |
| 10:24:43 | 21 | answer might be, they do it very well or they |
| 10:24:47 | 22 | don't do it very well.  But I think you're not |
| 10:24:49 | 23 | asking -- you ask how -- how do they do it. |
| 10:24:52 | 24 | Q.    Let me ask a better question. |
| 10:24:54 | 25 | Would you agree with the statement:  The |

53

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:24:55 | 1 | statistical significance of the event parameter |
| 10:25:00 | 2 | shows that we can conclude with 95 percent |
| 10:25:03 | 3 | confidence that the value of a specific security |
| 10:25:05 | 4 | being examined declined or increased as a result |
| 10:25:08 | 5 | of the information event? |
| 10:25:12 | 6 | MR. FIGEL:  Objection. |
| 10:25:13 | 7 | A.    Would I agree or -- your question |
| 10:25:14 | 8 | is would I agree or disagree with that statement? |
| 10:25:16 | 9 | Q.    That's right. |
| 10:25:17 | 10 | A.    I couldn't possibly agree or |
| 10:25:19 | 11 | disagree with that statement without knowing the |
| 10:25:23 | 12 | context, what had -- the calculations that had |
| 10:25:26 | 13 | been performed, whether they'd been performed |
| 10:25:30 | 14 | correctly. |
| 10:25:31 | 15 | When you're -- you seem -- with due |
| 10:25:33 | 16 | respect, sir, you seem to be reading the |
| 10:25:35 | 17 | conclusion of an elaborate calculation and -- that |
| 10:25:40 | 18 | you have not specified and then asking me whether |
| 10:25:43 | 19 | I agree with the conclusion.  Sorry.  I'm unable |
| 10:25:52 | 20 | to say without more information. |
| 10:25:53 | 21 | Q.    In your experience, is a 95 percent |
| 10:25:55 | 22 | confidence level sufficient for an expert to opine |
| 10:25:59 | 23 | that a given news event caused a price impact? |
| 10:26:02 | 24 | MR. FIGEL:  Objection. |
| 10:26:02 | 25 | A.    I will answer that -- I think the |

54

**HIGHLY CONFIDENTIAL**

```
10:26:17  1   only fair way to answer that is in two parts, one
10:26:23  2   of which is yes and the other of which is no.  And
10:26:27  3   I will have to make that a fair and informative
10:26:31  4   answer, which was certainly my intention.  I will
10:26:34  5   have to explain the yes and the no.
10:26:36  6            Q.    Please do.
10:26:39  7            A.    The confidence level at which
10:26:42  8   statistical inferences of all kinds are performed,
10:26:48  9   the confidence level, and in particular an event
10:27:00 10   study type of analysis, that is a choice.  It --
10:27:01 11   the data does not -- neither the question nor the
10:27:04 12   data dictates that 95 percent be the confidence
10:27:08 13   level.
10:27:08 14            It is a choice that the researcher
10:27:10 15   makes, how certain do I want to be that I -- that
10:27:15 16   the conclusions that I arrive at do correspond to
10:27:20 17   a real -- a real effect, an empirical effect.
10:27:24 18            And one can prespecify a confidence
10:27:26 19   level of 99 percent or of 95 percent or of
10:27:32 20   90 percent.  It's a choice.  So it's not the data
10:27:35 21   speaking.  It's the researcher speaking.
10:27:40 22            I generally counsel against picking
10:27:44 23   any of those as a prespecified threshold.  But if,
10:27:48 24   nevertheless, a researcher was going to go --
10:27:54 25   plunge ahead and follow that path, it is -- I
```

55

HIGHLY CONFIDENTIAL

```
10:27:57   1   would agree with the proposition -- this is the
10:27:59   2   yes part of my answer -- I would agree with the
10:28:01   3   proposition that 95 percent is the overwhelmingly
10:28:08   4   predominant choice of a level of confidence for a
10:28:13   5   statistical analysis.  It's not the only choice.
10:28:14   6   And there's no genuinely principled reason why
10:28:19   7   that has to be the level of confidence.
10:28:25   8            But in reality, across the entire
10:28:32   9   domain of applied statistics, including
10:28:32  10   econometrics and other areas of application, that
10:28:35  11   is the level of confidence that researchers pick.
10:28:37  12   So that -- so, yes, that's the yes part.
10:28:40  13            The no part is that event studies
10:28:49  14   are, by their nature, studies of observational
10:28:52  15   data.  And one cannot infer causation solely from
10:29:10  16   observing an apparently statistically significant
10:29:17  17   finding.
10:29:19  18            So your question, which we've all
10:29:21  19   forgotten by now, involved whether 95 percent
10:29:27  20   confidence is sufficient to infer that one thing
10:29:36  21   had caused another thing.  And in observational
10:29:40  22   data, you can never really get to causation merely
10:29:43  23   by observing a statistically significant outcome
10:29:48  24   from a calculation.
10:30:03  25            MR. SYLVESTER:  We've been going
```

56

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:30:05 | 1 | for about an hour 15.  Can we take a quick |
| 10:30:07 | 2 | break?  Is that all right? |
| 10:30:07 | 3 | THE WITNESS:  Works for me. |
| 10:30:09 | 4 | THE VIDEOGRAPHER:  The time is |
| 10:30:09 | 5 | 10:29 a.m. This concludes Media 1.  Off the |
| 10:30:09 | 6 | record. |
| 10:48:18 | 7 | (Recess taken from 10:29 a.m. to |
| 10:51:11 | 8 | 10:50 a.m.) |
| 10:51:11 | 9 | THE VIDEOGRAPHER:  The time now is |
| 10:51:11 | 10 | 10:50 a.m.  This begins Media 2.  On the |
| 10:51:11 | 11 | record. |
| 10:51:11 | 12 | BY MR. SYLVESTER: |
| 10:51:18 | 13 | Q.    Dr. Marais, other than the State |
| 10:51:20 | 14 | Farm and Walden cases that we discussed earlier, |
| 10:51:24 | 15 | has there been any occasion in which a portion of |
| 10:51:27 | 16 | any of your expert report has been excluded? |
| 10:51:30 | 17 | MR. FIGEL:  Objection. |
| 10:51:30 | 18 | A.    Yes. |
| 10:51:31 | 19 | Q.    How many times has that happened? |
| 10:51:34 | 20 | A.    There are two occasions I'm aware |
| 10:51:50 | 21 | of. |
| 10:51:50 | 22 | Q.    What were those two cases? |
| 10:51:53 | 23 | A.    One of them was a case called |
| 10:52:00 | 24 | Hernandez versus Crown Corporation.  The other was |
| 10:52:07 | 25 | a case called Tuf Racing, T-u-f Racing, versus |

57

HIGHLY CONFIDENTIAL

10:52:15  1    Suzuki.

10:52:17  2           Q.    Why was a portion of your expert

10:52:20  3    report excluded in the Hernandez case?

10:52:26  4           A.    In one portion of my report, I

10:52:28  5    compared the rate of injuries of the subject type

10:52:35  6    of forklift truck to every -- to the rate of

10:52:43  7    injuries from the tools of the trade in every

10:52:46  8    other private sector occupation in the United

10:52:52  9    States.

10:52:53 10           And the Court held that that was a

10:52:55 11    form of comparative risk testimony and that, in

10:53:00 12    that jurisdiction, comparative risk was not

10:53:05 13    admissible as a defense against whatever it was

10:53:08 14    that was being alleged.

10:53:12 15           And so that was only a portion of

10:53:14 16    my work.  I had -- it was a small portion of my

10:53:16 17    work.  And that portion was excluded.

10:53:18 18           Q.    What jurisdiction was the Hernandez

10:53:20 19    case?

10:53:21 20           A.    I don't recall.  It was somewhere

10:53:24 21    on the east coast.

10:53:25 22           Q.    For what reason was a portion of

10:53:31 23    your expert report excluded in the Tuf Racing

10:53:35 24    case?

10:53:36 25           MR. FIGEL:  Objection.

58

**HIGHLY CONFIDENTIAL**

10:53:36 1          A.    In Tuf Racing, I was responding to
10:53:43 2   an opposing expert on damages allegedly suffered
10:53:46 3   by the Tuf Racing enterprise.
10:53:52 4          Among my multiple opinions in that
10:53:53 5   case, I had opined that the -- that first
10:54:01 6   principles dictated that the proper target date
10:54:04 7   for discounting allegedly lost earnings to a
10:54:10 8   present value was the date on which the harm
10:54:13 9   occurred, the breach.
10:54:16 10         And so the present value should be
10:54:19 11  calculated as of the breach date and then carried
10:54:23 12  forward maybe at a pretrial or posttrial interest
10:54:29 13  rate from that date, but that that was the target
10:54:31 14  date.
10:54:31 15         The Court held that in Cook County,
10:54:34 16  Illinois, it was not first principles that
10:54:37 17  mattered, it was legal precedence and that that
10:54:40 18  was -- the choice of target date was not a topic
10:54:47 19  for expert testimony.
10:54:48 20         I was allowed, however, to testify
10:54:51 21  on every other aspect of my work, and we -- the
10:54:57 22  side that retained me prevailed in that case
10:55:01 23  based, in part, on my testimony.
10:55:05 24         Q.   Do you recall testifying earlier
10:55:07 25  today that you've performed approximately six

59

**HIGHLY CONFIDENTIAL**

10:55:11  1   event studies in connection with prior expert

10:55:15  2   witness retentions?

10:55:15  3        A.   I did.  I also recall qualifying

10:55:18  4   that answer because all of that was a very long

10:55:22  5   time ago.

10:55:23  6        Q.   Which of those six cases can you

10:55:29  7   recall sitting here today?

10:55:29  8        A.   I recall a case in which I was

10:55:40  9   retained by a pension fund for firemen and a

10:55:49 10   pension fund for nurses.

10:55:53 11        It was a securities litigation, and

10:56:00 12   the union pension funds were suing somebody in

10:56:05 13   connection with inadequate disclosure or something

10:56:07 14   of the kind.  And I recall my work as involving an

10:56:12 15   event study.

10:56:19 16        Q.   Do you remember the somebody who

10:56:20 17   was being sued in that case?

10:56:22 18        A.   I do not.

10:56:23 19        Q.   Do you remember which -- what the

10:56:25 20   name was of the pension fund you referenced?

10:56:29 21        A.   No, it's -- as I've testified, it's

10:56:31 22   20 years ago.  I don't recall.

10:56:33 23        Q.   Do you remember what court that was

10:56:34 24   in?

10:56:34 25        A.   I have a vague sense that it was in

60

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 10:56:39 | 1 | California, that the case was venued in |
| 10:56:44 | 2 | California.  But whether it was in state court or |
| 10:56:47 | 3 | federal court, I don't recall. |
| 10:56:48 | 4 | Q.    What other cases, if any, can you |
| 10:56:51 | 5 | recall, sitting here today, where you provided an |
| 10:56:53 | 6 | expert report that contained an event study? |
| 10:56:55 | 7 | MR. FIGEL:  Objection. |
| 10:56:56 | 8 | A.    The name Time Warner comes to mind |
| 10:57:03 | 9 | as a defendant in one such case.  I can't be sure |
| 10:57:11 | 10 | that's not the widows and the -- not widows, the |
| 10:57:16 | 11 | nurses and firemen case. |
| 10:57:21 | 12 | But I -- I vaguely recall that |
| 10:57:24 | 13 | there was such a -- such a case -- such an |
| 10:57:28 | 14 | instance.  Those are the two that I remember, even |
| 10:57:33 | 15 | though only partially and vaguely. |
| 10:57:36 | 16 | Q.    So just for the record, those are |
| 10:57:41 | 17 | the only two cases in which you performed an event |
| 10:57:44 | 18 | study in connection with your expert witness work |
| 10:57:48 | 19 | that you can recall sitting here today? |
| 10:57:50 | 20 | MR. FIGEL:  Objection. |
| 10:57:51 | 21 | A.    That I -- that I think I recall |
| 10:57:54 | 22 | involving an event study, yes. |
| 10:58:01 | 23 | Q.    Do you recall what jurisdiction the |
| 10:58:02 | 24 | Time Warner case was in? |
| 10:58:03 | 25 | A.    No.  I'm -- as I indicated in a |

61

**HIGHLY CONFIDENTIAL**

10:58:09  1   previous answer, I'm not even sure that is not the

10:58:12  2   same case as the one that I referred to.  But

10:58:15  3   other than that, I don't remember.

10:58:21  4        Q.   Have you ever made any profits or

10:58:23  5   losses from trading XRP?

10:58:27  6        A.   In -- yes, although only

10:58:33  7   incidentally.

10:58:33  8        Q.   Can you explain what you mean by

10:58:40  9   "only incidentally."

10:58:41  10        A.   I purchased some XRP to pay my

10:58:44  11   vendor in the matter I referred to earlier.  I

10:58:53  12   held those XRP for some time, for a few weeks.  By

10:59:02  13   the time I was making the payments, the value of

10:59:05  14   XRP had dropped.

10:59:06  15            And so in that sense I, incidental

10:59:12  16   to a transaction, I suffered a tiny loss by

10:59:16  17   holding XRP for some period of time.

10:59:21  18        Q.   Other than the loss that you just

10:59:23  19   described, were there any other occasions where

10:59:25  20   you either made a profit or suffered a loss on XRP

10:59:28  21   trading?

10:59:30  22            MR. FIGEL:  Objection.

10:59:30  23        A.   No.  I -- I should revise that

10:59:41  24   answer.  I've testified already that I have a

10:59:43  25   balance that's probably about $5 in XRP.  So I may

                                                                    62

HIGHLY CONFIDENTIAL

10:59:47 1  be making a profit or a loss as we sit here.  But

10:59:50 2  it's not on a large scale.

10:59:55 3          Q.   Is it fair to say that on some

10:59:57 4  occasions, event studies establish that prices

11:00:02 5  react to news?

11:00:03 6          A.   That's broadly what event studies

11:00:06 7  are used for.  So on some occasions, that does

11:00:10 8  seem to be the case, yes.

11:00:18 9          Q.   In performing an event study, an

11:00:21 10 expert has to undertake a number of steps.  Is

11:00:25 11 that fair?

11:00:25 12              MR. FIGEL:  Objection.

11:00:25 13         A.   An expert would have to do some

11:00:32 14 work, and work can often be divided up into steps.

11:00:35 15         Q.   In conducting an event study, the

11:00:38 16 expert must identify the announcement or

11:00:40 17 announcements whose potential effect on the

11:00:44 18 security price is in question.  Is that right?

11:00:46 19         A.   Hard to disagree with that the

11:00:50 20 expert has to do something like that.

11:00:53 21         Q.   At some point in conducting an

11:00:55 22 event study, the expert will have to determine

11:00:58 23 which trading days he's examining.  Is that right?

11:01:01 24              MR. FIGEL:  Objection.

11:01:01 25         A.   Explicitly or implicitly, yes.

63

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:01:08 | 1 | Q.   And at some point, the expert would |
| 11:01:11 | 2 | have to determine which days within the period he |
| 11:01:13 | 3 | observes an abnormal price reaction for the |
| 11:01:17 | 4 | security at issue.  Correct? |
| 11:01:18 | 5 | MR. FIGEL:  Objection. |
| 11:01:19 | 6 | A.   Event studies typically involve |
| 11:01:21 | 7 | something along those lines. |
| 11:01:25 | 8 | Q.   When performing an event study, |
| 11:01:32 | 9 | would an expert typically start with identifying |
| 11:01:37 | 10 | all significant price changes and then check to |
| 11:01:40 | 11 | see if any of these changes could be linked to the |
| 11:01:43 | 12 | news events, or does the expert start with the |
| 11:01:46 | 13 | news events and see if there were significant |
| 11:01:49 | 14 | price changes on the news event days? |
| 11:01:52 | 15 | MR. FIGEL:  Objection. |
| 11:01:53 | 16 | A.   Event studies are performed in |
| 11:01:56 | 17 | multiple different ways.  I've already indicated |
| 11:02:04 | 18 | in my testimony earlier today, there are things |
| 11:02:06 | 19 | that don't even look like conventional event |
| 11:02:09 | 20 | studies that can be considered event studies.  So |
| 11:02:13 | 21 | the best answer I can give you is:  It depends. |
| 11:02:17 | 22 | There is an event study at issue in |
| 11:02:23 | 23 | this case, as I think we all know, in which |
| 11:02:27 | 24 | Dr. ▮▮▮ performed a distinctly nonstandard kind |
| 11:02:32 | 25 | of analysis that -- for which he doesn't provide a |

64

**HIGHLY CONFIDENTIAL**

```
11:02:36  1   specific citation, and that may be because no
11:02:40  2   citation exists.
11:02:41  3              So I mention that to point out that
11:02:45  4   it is an event study of a kind.  And it has
11:02:51  5   features that are pretty much unique to it, in my
11:02:55  6   experience.  Although I can't rule out that there
11:03:00  7   might not be some precedence for it.
11:03:02  8              So it would be misleading to
11:03:09  9   generalize that an event study always has feature
11:03:16 10   X and never has feature Y.  Because Dr. ████
11:03:20 11   surprises us with a nonstandard kind of event
11:03:24 12   study formulation, which I would not have -- you
11:03:29 13   might have asked me about yesterday and I would
11:03:32 14   have said that I had never seen such a thing.
11:03:34 15   Well, not yesterday, but the day before Mr. Figel
11:03:39 16   called me.
11:03:40 17      Q.    On the occasions on which you've
11:03:48 18   conducted event studies, have you typically
11:03:50 19   investigated abnormal price reactions on all
11:03:56 20   no-news days before and after the news event days
11:03:59 21   in question?
11:04:00 22              MR. FIGEL:  Objection.
11:04:00 23      A.    I would have to go back both to the
11:04:03 24   event studies that I performed in litigation more
11:04:06 25   than 20 years ago and the event studies with which
```

65

**HIGHLY CONFIDENTIAL**

```
11:04:10   1   I was involved in as an academic researcher before
11:04:24   2   I became a private consultant to -- and refresh my
11:04:27   3   recollection of what I did on those occasions --
11:04:29   4   I'm -- to really give you an accurate answer to
11:04:31   5   that question.
11:04:36   6            But I'm sorry, what -- maybe I
11:04:39   7   misheard, I -- could we just go back.  Could you
           8   restate the question so I'm sure I'm answering the
           9   right thing.
          10            Q.   Sure.  On the occasions on which
          11   you've conducted event studies, have you typically
          12   investigated abnormal price reactions on all
          13   no-news days -- strike that.
          14            Yeah.  Okay.  On the occasions on
          15   which you've conducted event studies in the past,
          16   have you typically investigated abnormal price
          17   reactions on all no-news days in addition to
          18   investigating price reactions on the news event
11:05:28  19   days within the period you're examining?
11:05:30  20            MR. FIGEL:  Objection.
11:05:30  21            A.   I don't think I can -- I'm able --
11:05:34  22   for the reasons that I've testified about, I don't
11:05:38  23   think I'm able to characterize what I have
11:05:41  24   typically done at this point without refreshing my
11:05:45  25   recollection on -- I'm fairly sure that there were
```

66

HIGHLY CONFIDENTIAL

11:05:48  1   occasions where I did something that seems to

11:05:50  2   resemble what you're asking about, and on other

11:05:54  3   occasions, I did nothing that resembles what

11:05:57  4   you're asking me about.

11:05:58  5               But to apply the characterization

11:06:00  6   of "typically," I'm not able to do that at

11:06:06  7   this -- at a 20-year distance in time.

11:06:09  8        Q.    Can you recall an occasion where,

11:06:12  9   as part of conducting an event study, you

11:06:19 10   investigated abnormal price reactions on days on

11:06:21 11   which there was not a news event in question?

11:06:26 12        A.    Not as I sit here today for the

11:06:29 13   simple reason that I've testified about,

11:06:31 14   repeatedly, of the 20-year remove.

11:06:41 15               I -- as a -- as a -- I will add

11:06:45 16   that as a -- as an academic, I performed many more

11:06:51 17   event studies than I ever did once I left

11:06:59 18   academia.  And so it was one of my research areas.

11:07:01 19               So I applied a wide range of

11:07:06 20   methodologies and -- to a wide range of questions

11:07:11 21   in a wide range of ways, none of which I can

11:07:17 22   testify about as fresh recollections, sitting here

11:07:22 23   today.

11:07:22 24        Q.    And just for the record, when I

11:07:24 25   asked that last question about event studies, were

67

**HIGHLY CONFIDENTIAL**

11:07:28   1   you answering for all event studies you've ever

11:07:31   2   conducted, or event studies limited to your work

11:07:35   3   as an expert witness?

11:07:37   4       A.    When I understood your question to

11:07:40   5   be about work as an expert witness, I answered

11:07:43   6   about those event studies.  And when you did not

11:07:47   7   qualify the event studies you were asking me

11:07:49   8   about, I was asking about event studies throughout

11:07:51   9   my life.

11:07:55  10       Q.    Thank you.  Is it fair to say that,

11:08:05  11   if you had investigated abnormal price reactions

11:08:09  12   that occurred on days other than news event days,

11:08:15  13   and you prepared an expert report in connection

11:08:20  14   with the event study, you would have documented

11:08:22  15   those investigative steps in your invest- -- in

11:08:25  16   your expert report?

11:08:26  17               MR. FIGEL:  Objection.

11:08:40  18       A.    If those investigative steps,

11:08:46  19   whatever they may have been, fitting somewhere

11:08:52  20   under the -- in the category you're asking about,

11:08:55  21   if they had been a material part of the basis of

11:08:59  22   my opinions, I would have described them as such.

11:09:06  23               And if they had been -- not been a

11:09:11  24   material part of the basis of opinions, expert

11:09:13  25   opinions I was rendering, I may not necessarily

68

| | | |
|---|---|---|
| 11:09:18 | 1 | have, although I may still have referred to them |
| 11:09:21 | 2 | in passing. |
| 11:09:31 | 3 | Q.    Can you recall any of your previous |
| 11:09:33 | 4 | expert reports in which you did document any steps |
| 11:09:35 | 5 | you took to investigate abnormal price reactions |
| 11:09:39 | 6 | that occurred on days other than news event days? |
| 11:09:41 | 7 | MR. FIGEL:  Objection. |
| 11:10:00 | 8 | A.    If we -- I cannot recall such an |
| 11:10:18 | 9 | instance for the reason that I have testified |
| 11:10:20 | 10 | about repeatedly. |
| 11:10:22 | 11 | Although, if you -- if we drop the |
| 11:10:25 | 12 | word "price" and just refer to reactions, I can |
| 11:10:28 | 13 | recall an instance. |
| 11:10:30 | 14 | Q.    Can you tell me what steps you took |
| 11:10:35 | 15 | in the instance you just referenced? |
| 11:10:37 | 16 | MR. FIGEL:  Objection. |
| 11:10:37 | 17 | A.    I am thinking of an analysis, not |
| 11:10:45 | 18 | of price, but in effect, of trading volume and in |
| 11:10:58 | 19 | a matter with a set of news days and announcement |
| 11:11:03 | 20 | days and a number of extremely prominent changes |
| 11:11:16 | 21 | in trading volume. |
| 11:11:23 | 22 | And the step that I took -- I took |
| 11:11:30 | 23 | multiple steps, not all of which I remember, but |
| 11:11:33 | 24 | one step that I took is to make a time series |
| 11:11:36 | 25 | graph showing trading volumes overlaid on a set of |

69

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:11:47 | 1 | timelines showing announcement dates and onset |
| 11:11:53 | 2 | dates of various key events and key announcements, |
| 11:11:58 | 3 | key disclosures in the case, whose -- so I created |
| 11:12:07 | 4 | such a -- such a picture and then wrote text |
| 11:12:13 | 5 | surrounding it, describing what the graphical |
| 11:12:20 | 6 | illustration showed and what it did not show and |
| 11:12:24 | 7 | what conclusion I drew from it. |
| 11:12:32 | 8 | Q.   What case is it that you are |
| 11:12:35 | 9 | discussing in connection with which you performed |
| 11:12:38 | 10 | the work you just discussed? |
| 11:12:40 | 11 | A.   It is the United States versus |
| 11:12:42 | 12 | Rhame matter. |
| 11:12:51 | 13 | Q.   So this is a rather recent |
| 11:12:53 | 14 | engagement.  Is that right? |
| 11:12:54 | 15 | A.   Yes. |
| 11:13:00 | 16 | Q.   What question were you |
| 11:13:01 | 17 | investigating in the Rhame matter? |
| 11:13:07 | 18 | A.   Whether there was evidence in one |
| 11:13:12 | 19 | kind of volume data versus a different kind of |
| 11:13:17 | 20 | volume data of -- that would support the -- the |
| 11:13:28 | 21 | hypothesis of a causal link from the announcement |
| 11:13:35 | 22 | or the disclosure or the event -- there were some |
| 11:13:42 | 23 | of each of those in the case -- with changes in |
| 11:13:48 | 24 | volume, in trading volumes. |
| 11:13:52 | 25 | Q.   Did you find such a link? |

70

HIGHLY CONFIDENTIAL

11:13:56   1        A.     I found what appeared to be the

11:13:59   2   absence of such a link.

11:14:03   3        Q.     Was part of the basis for your

11:14:06   4   finding of an absence of such a link your

11:14:10   5   identification of abnormal reactions in trading

11:14:17   6   volume on days other than the news event days in

11:14:23   7   question in that case?

11:14:24   8        A.     I'd say so, yes. I think that

11:14:31   9   fairly describes what I did.

11:14:35 10        Q.     Is your reasoning -- strike that.

11:14:40 11        Have you disclosed your expert

11:14:43 12   report in that case?

11:14:49 13        A.     I have -- I submitted a report in

11:14:51 14   that case. I am not -- if that -- yeah. It was

11:14:56 15   disclosed to the government in that case. I don't

11:15:01 16   know what other sense of disclosure you might have

11:15:04 17   in mind.

11:15:13 18        Q.     Is there any other

11:15:13 19   expert's -- strike that.

11:15:17 20        Is there any other event study that

11:15:18 21   you performed, in connection with your expert work

11:15:22 22   or otherwise, in which you have reached a

11:15:25 23   conclusion that there was no link between the

11:15:30 24   event or events in question and an effect on price

11:15:41 25   or volume on the basis of abnormal movements in

71

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 11:15:45 | 1 | price or volume on non-news event days? |
| 11:15:48 | 2 | MR. FIGEL: Objection. |
| 11:16:03 | 3 | A. Could I hear the question read |
| 11:16:05 | 4 | back. |
| 11:16:05 | 5 | MR. SYLVESTER: I'm going to ask |
| 11:16:06 | 6 | the court reporter to read that one back, |
| 11:16:08 | 7 | please. |
| 11:16:12 | 8 | (Record read by the certified |
| | 9 | stenographer as follows: |
| | 10 | "QUESTION: Is there any other |
| | 11 | event study that you performed, in connection |
| | 12 | with your expert work or otherwise, in which |
| | 13 | you have reached a conclusion that there was |
| | 14 | no link between the event or events in |
| | 15 | question and an effect on price or volume on |
| | 16 | the basis of abnormal movements in price or |
| 11:16:46 | 17 | volume on non-news event days?") |
| 11:16:46 | 18 | A. The question begins with a |
| 11:16:49 | 19 | premise -- or begins "is there any other event |
| 11:16:53 | 20 | study." It's not clear to me what other events -- |
| 11:17:02 | 21 | when you say "other," other than what? |
| 11:17:07 | 22 | The Rhame analysis was not, per se, |
| 11:17:11 | 23 | an event study, as I testified earlier and |
| 11:17:14 | 24 | explained earlier. It -- one could recognize an |
| 11:17:17 | 25 | analogue in there, but it wasn't really an event |

72

HIGHLY CONFIDENTIAL

11:17:20  1   study.  So when you say "any other," do you mean

11:17:23  2   any other than Rhame?

11:17:29  3     BY MR. SYLVESTER:

11:17:29  4         Q.    If we amend my question to include

11:17:32  5   any expert work you've performed, can you answer

11:17:35  6   the question amended to any expert work you

11:17:38  7   performed?

11:17:38  8         A.    Okay.  Let me make sure I've got

11:17:41  9   the question straight then.

11:17:42  10        Q.    Sure.

11:17:43  11        A.    In any expert work, where by

11:17:48  12  "expert" we mean potentially testifying expert,

11:17:51  13  not just that I was an expert as an academic on a

11:17:55  14  certain topic, so test- -- in any work as a

11:18:01  15  retained testifying expert.

11:18:03  16        Q.    Let's expand it to any work you've

11:18:07  17  performed as a statistician examining the impact

11:18:10  18  of a news event on something like price or volume.

11:18:20  19        A.    Okay.  So I'm a statistician for

11:18:22  20  this hype- -- this setup.  Any work I have

11:18:29  21  performed that relates to identifying the effect

11:18:33  22  of an event on price or volume, that's the

11:18:44  23  situation.

11:18:45  24              And in such a situation, have I

11:18:47  25  ever reached the conclusion that there was no

73

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 11:18:53 | 1 | impact by investigating ab- -- statistically |
| 11:19:08 | 2 | significant abnormal somethings not coinciding |
| 11:19:15 | 3 | with a news event or with the event that is the |
| 11:19:19 | 4 | subject.  Was -- have I got that -- was that |
| 11:19:22 | 5 | right? |
| 11:19:22 | 6 | Q.    Yes. |
| 11:19:26 | 7 | A.    Okay.  I don't recall such an |
| 11:19:27 | 8 | instance, and I don't even think that fairly |
| 11:19:33 | 9 | describes my work in this case.  So sitting here, |
| 11:19:36 | 10 | I can't recall any such instance. |
| 11:19:38 | 11 | Q.    Does that describe your work in |
| 11:19:41 | 12 | Rhame? |
| 11:19:43 | 13 | MR. FIGEL:  Objection. |
| 11:19:51 | 14 | A.    I think -- understanding that it |
| 11:19:52 | 15 | was not an event study in the normal sense of that |
| 11:19:56 | 16 | term, yes, I think that fairly -- that's -- it's |
| 11:20:04 | 17 | not how I did or would describe my work in Rhame. |
| 11:20:09 | 18 | But you -- obviously, you get to ask |
| 11:20:14 | 19 | the -- formulate the question.  I've -- I think I |
| 11:20:18 | 20 | can agree that that sounds a lot like what I did |
| 11:20:21 | 21 | in Rhame. |
| 11:20:22 | 22 | Q.    In the papers that you've written |
| 11:20:45 | 23 | about event studies, Dr. Marais, have you ever |
| 11:20:49 | 24 | mentioned that the investigation of abnormal price |
| 11:20:54 | 25 | reactions on non-news event days is a step that |

74

HIGHLY CONFIDENTIAL

11:20:58  1  someone performing an event study should take?

11:21:02  2              MR. FIGEL:  Objection.

11:21:15  3          A.   If I did it, there would have been

11:21:17  4  a context for it that I don't recall sitting here

11:21:22  5  today.  I will frankly admit, I have not reread my

11:21:27  6  papers on event studies in many years, at least,

11:21:33  7  multiple years.

11:21:34  8              So I -- I am -- you know, it's

11:21:36  9  either there or not.  And I don't recall -- I

11:21:43 10  can't testify to that with any definite

11:21:49 11  recollection sitting here today.

11:21:50 12          Q.   Is it fair to say that when you

11:21:51 13  wrote your papers regarding event studies, that

11:21:58 14  you included within those papers the procedures

11:22:02 15  that you considered necessary to perform a proper

11:22:05 16  event study?

11:22:08 17          A.   Certainly the procedures that I

11:22:15 18  considered necessary to perform a proper event

11:22:17 19  study for the purposes for which those event --

11:22:22 20  the event studies I was writing about were being

11:22:25 21  conducted.

11:22:25 22          Q.   You've also written at least one

11:22:31 23  paper that addresses the topic, in general terms,

11:22:36 24  of how event studies can be used in litigation.

11:22:40 25  Is that right?

75

HIGHLY CONFIDENTIAL

```
11:22:40  1        A.    Yes.
11:22:41  2        Q.    And in those -- strike that.
11:22:44  3              In that paper, you describe the
11:22:46  4  procedures that one undertakes to use an event
11:22:51  5  study in litigation.  Is that right?
11:22:53  6        A.    That, as a general, high-level
11:22:58  7  characterization, that's fair enough.
11:23:00  8        Q.    And when describing in that paper
11:23:04  9  the procedures that one undertakes to use an event
11:23:08 10  study in litigation, did you include within that
11:23:10 11  description all steps that you would consider
11:23:12 12  necessary to undertake a proper event study for
11:23:15 13  the purposes of litigation?
11:23:16 14        A.    The purposes of litigation is a
11:23:18 15  pretty broad category.  I described how event
11:23:25 16  studies are -- how single-firm event studies are
11:23:30 17  typically employed in securities litigation, but
11:23:36 18  your phrase "for purposes of litigation" is
11:23:40 19  pretty -- it covers a lot of ground.
11:23:44 20              So I wouldn't want to -- I
11:23:45 21  certainly wouldn't want to say that I included in
11:23:48 22  that writing a -- any -- every way an event study
11:23:53 23  could meaningfully and validly be used for
11:23:56 24  purposes of litigation.
11:24:00 25              Depending -- how an event study is
```

76

**HIGHLY CONFIDENTIAL**

```
11:24:02  1   used depends on exactly what is at issue.  And I
11:24:08  2   was writing about a particular context, which I
11:24:12  3   believe I set forth in -- when I was writing about
11:24:17  4   single-firm event studies in securities cases, for
11:24:22  5   measuring the effect, say, of a -- for quantifying
11:24:31  6   the effect of a particular disclosure.
11:24:38  7              For -- I mention that because that
11:24:39  8   is an example that distinguishes the event studies
11:24:46  9   that I was writing about in litigation, for
11:24:48 10   example, from the event study that -- and this is
11:24:50 11   just as an example -- distinguishes it from the
11:24:54 12   event study that Dr. ███ performed in this case
11:24:57 13   in which he nowhere quantifies the effect on price
11:25:04 14   of any event.  He doesn't report such a thing.
11:25:11 15              That just goes to the point -- just
11:25:14 16   to be clear on what I'm answering, that goes to my
11:25:16 17   point that different event studies are conducted
11:25:20 18   in different ways for answering different
11:25:22 19   questions.
11:25:26 20         Q.   Let me pose a hypothetical.  Let's
11:25:32 21   say you've conducted an event study and you
11:25:33 22   observe an abnormal price reaction on each of the
11:25:37 23   news days in question.  And let's further say that
11:25:39 24   you also observe abnormal price reactions on days
11:25:42 25   on which there was no news event in question.
```

77

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:25:44 | 1 | Does the existence of abnormal |
| 11:25:48 | 2 | price reactions on the no-news days change your |
| 11:25:50 | 3 | opinion about the observed price reactions on the |
| 11:25:53 | 4 | news days? |
| 11:25:54 | 5 | MR. FIGEL: Objection. |
| 11:25:54 | 6 | A.    That would depend on what opinion I |
| 11:25:59 | 7 | was expressing. |
| 11:26:04 | 8 | Q.    Let's say you were asked to |
| 11:26:06 | 9 | determine whether there was any effect of the |
| 11:26:11 | 10 | news -- whether there was any |
| 11:26:13 | 11 | statistically-significant relationship between the |
| 11:26:13 | 12 | no-news days and price movement -- sorry.  Strike |
| 11:26:13 | 13 | that. |
| 11:26:19 | 14 | Let's say you were asked to |
| 11:26:20 | 15 | determine whether there was a price effect caused |
| 11:26:25 | 16 | by the news event. |
| 11:26:26 | 17 | MR. FIGEL: Objection. |
| 11:26:39 | 18 | A.    The -- okay.  So that sounds very |
| 11:26:45 | 19 | much like a standard litigation format event study |
| 11:26:56 | 20 | which, as I've testified, is a little different |
| 11:26:57 | 21 | from what Dr. ███ did in the present case, which |
| 11:27:00 | 22 | I understand is what all of this is about. |
| 11:27:03 | 23 | That's a question that can be |
| 11:27:05 | 24 | answered, narrowly formulated as it -- as you have |
| 11:27:14 | 25 | formulated it, by computing a cumulative abnormal |

78

**HIGHLY CONFIDENTIAL**

```
11:27:20  1  return and a T statistic for a cumulative abnormal
11:27:24  2  return over the -- for the event days.  And one
11:27:33  3  could stop there.
11:27:34  4        Q.   When you say "one could stop
11:27:37  5  there," does that mean that you would not need to
11:27:39  6  take the step of investigating abnormal price
11:27:45  7  reactions on no-news days?
11:27:48  8             MR. FIGEL:  Objection.
11:27:49  9        A.   The -- one could answer, if given
11:27:55 10  the narrow assignment that your question asks me
11:28:00 11  to assume as part of a hypothetical, if that were
11:28:03 12  the narrow assignment, you could answer it without
11:28:09 13  reference to test to the statistical significance
11:28:15 14  of abnormal returns on days other than the news
11:28:21 15  days.
11:28:24 16             And that typically is what
11:28:26 17  litigation-style event studies look like, the ones
11:28:33 18  that I have encountered, in any case.
11:28:53 19        Q.   Dr. Marais, did you conduct an
11:28:56 20  event study in this case?
11:29:07 21        A.   I would say no.  There is a, kind
11:29:14 22  of, an event study in this case that is at the
11:29:22 23  core of my work in this case.  But it's not my
11:29:24 24  event study, it's somebody else's event study.
11:29:27 25  It's Dr. ████ event study.
```

79

HIGHLY CONFIDENTIAL

11:29:30  1          Q.    If you had been asked to conduct an

11:29:32  2  event study that assessed claims of any link

11:29:36  3  between Ripple news and XRP prices, would you have

11:29:42  4  been able to do so?

11:29:43  5                  MR. FIGEL:  Objection.

11:29:47  6          A.    I can't think of a reason why I

11:29:49  7  would not have been able to do so.  I never was

11:29:53  8  asked that assignment.  And as you know, it's

11:30:05  9  unwise to give off-the-cuff answers to questions

11:30:09 10  like -- to large assignment questions like that

11:30:11 11  while sitting at the deposition table.

11:30:13 12                  But I can't -- I would have needed

11:30:14 13  to know more than is in your question, obviously,

11:30:18 14  to determine ultimately if I could do that.  But I

11:30:22 15  can't think of a reason why I would not be able to

11:30:24 16  do it.

11:30:36 17          Q.    Have you -- strike that.

11:30:38 18                  Do you have any expertise with

11:30:40 19  regard to digital assets?

11:30:42 20          A.    "Digital assets" is a fuzzy

11:30:54 21  concept.  It doesn't have bright line boundaries.

11:30:58 22  I am not, for example, a skilled trader with a

11:31:02 23  track record of earning large profits in digital

11:31:07 24  assets.  So I have no -- I don't have that kind of

11:31:09 25  expertise.

                                                                80

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 11:31:10 | 1 | But there are many -- what I'm |
| 11:31:12 | 2 | trying to say is, there are many aspects to |
| 11:31:16 | 3 | digital assets, and one aspect of digital assets |
| 11:31:19 | 4 | is scholars in financial economics studying |
| 11:31:24 | 5 | digital assets.  And they, as I'm sure you know, |
| 11:31:28 | 6 | they use statistical and, more specifically, |
| 11:31:32 | 7 | econometric methods. |
| 11:31:34 | 8 | And so to the extent that they use |
| 11:31:36 | 9 | methods that were inside my area of expertise, |
| 11:31:39 | 10 | that is the kind of expertise that I have.  It's a |
| 11:31:42 | 11 | generalized expertise, but it does relate in |
| 11:31:45 | 12 | particular to certain studies of digital assets. |
| 11:31:55 | 13 | But with that qualification and |
| 11:31:58 | 14 | background, no, I would not -- I have never and I |
| 11:32:00 | 15 | would not describe myself as an expert in the area |
| 11:32:03 | 16 | of digital assets.  All that I have just said is |
| 11:32:09 | 17 | that I have -- there are no bright lines that |
| 11:32:12 | 18 | divide digital assets from my areas.  And in those |
| 11:32:15 | 19 | frontier regions, I do have expertise. |
| 11:32:18 | 20 | Q.    Have you authored any publications |
| 11:32:22 | 21 | pertaining to digital assets? |
| 11:32:24 | 22 | A.    No, I have not. |
| 11:32:25 | 23 | Q.    Have you taught any courses that |
| 11:32:27 | 24 | cover the topic of digital assets? |
| 11:32:29 | 25 | A.    No. |

81

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:32:30 | 1 | Q.    Have you taken any courses that |
| 11:32:31 | 2 | have covered the topic of digital assets? |
| 11:32:35 | 3 | A.    I have not done that. |
| 11:32:36 | 4 | Q.    Prior to this case, have you been |
| 11:32:38 | 5 | retained as an expert in any case involving |
| 11:32:40 | 6 | digital assets in any way? |
| 11:32:41 | 7 | A.    No, I have not. |
| 11:32:48 | 8 | Q.    Other than your work in this case, |
| 11:32:49 | 9 | have you ever conducted an event study involving |
| 11:32:51 | 10 | digital assets? |
| 11:32:55 | 11 | A.    Even including my work in this |
| 11:32:56 | 12 | case, I have never conducted an event study. |
| 11:33:06 | 13 | Q.    Are you offering any opinion on the |
| 11:33:07 | 14 | suitability of event study methodology to evaluate |
| 11:33:13 | 15 | the effects of disclosures on digital asset |
| 11:33:16 | 16 | prices? |
| 11:33:17 | 17 | MR. FIGEL:  Objection. |
| 11:33:24 | 18 | A.    I am offering no expert opinion in |
| 11:33:28 | 19 | this matter on that specific area.  I have |
| 11:33:35 | 20 | questions.  I have come to understand that it's |
| 11:33:38 | 21 | no -- there's no slam dunk simple answer. |
| 11:33:43 | 22 | But that -- that is an -- that |
| 11:33:45 | 23 | doesn't rise to the level of an expert opinion |
| 11:33:48 | 24 | that I'm offering in this case.  And I express no |
| 11:33:50 | 25 | such opinion in my report. |

82

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:33:55 | 1 | Q. Are you offering any opinion in |
| 11:33:57 | 2 | this case on the informational efficiency of the |
| 11:34:02 | 3 | XRP market? |
| 11:34:03 | 4 | A. Actually, no. |
| 11:34:07 | 5 | Q. Are you offering any opinion in |
| 11:34:09 | 6 | this case on the informational efficiency of the |
| 11:34:13 | 7 | market for any digital asset? |
| 11:34:15 | 8 | A. Again, no, I am not. |
| 11:34:16 | 9 | Q. Turning to Attachment C of LM-1, |
| 11:34:21 | 10 | your expert report. Is Attachment C to your |
| 11:34:43 | 11 | report a list of materials you considered in |
| 11:34:45 | 12 | preparing your report? |
| 11:34:46 | 13 | A. Yes. |
| 11:34:46 | 14 | Q. Did you personally review each of |
| 11:34:51 | 15 | the materials listed at Numbers 1 through 5 of |
| 11:34:53 | 16 | Attachment C? |
| 11:34:54 | 17 | A. Yes. |
| 11:34:54 | 18 | Q. Did defense counsel supply you with |
| 11:34:57 | 19 | the items listed in Attachment C? |
| 11:35:00 | 20 | MR. FIGEL: Start by answering yes |
| 11:35:14 | 21 | or no. |
| 11:35:14 | 22 | A. Some yes, some no. |
| 11:35:15 | 23 | Q. Which of the items listed on |
| 11:35:20 | 24 | Attachment C did defense counsel supply you with? |
| 11:35:23 | 25 | MR. FIGEL: Just identify by number |

83

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 11:35:26 | 1 | on your Exhibit C, please. |
| 11:35:27 | 2 | A.    1, 3, and 5. |
| 11:35:42 | 3 | Q.    You reviewed the Gerritsen paper |
| 11:35:51 | 4 | listed at Number 3.  Is that right? |
| 11:35:51 | 5 | A.    Yes. |
| 11:35:51 | 6 | Q.    What, if anything, did you learn |
| 11:35:55 | 7 | from reading the Gerritsen paper? |
| 11:35:57 | 8 | A.    That there's no precedent in it for |
| 11:36:01 | 9 | the kind of analysis that -- for the specific kind |
| 11:36:06 | 10 | of analysis that Dr. ███ performed in the course |
| 11:36:10 | 11 | of his purported event study in this matter. |
| 11:36:16 | 12 | There are precedents for portions of it, but not |
| 11:36:20 | 13 | for the core method. |
| 11:36:25 | 14 | MR. FIGEL:  Mr. Sylvester, I |
| 11:36:27 | 15 | just -- I mean, maybe to avoid you asking |
| 11:36:29 | 16 | questions, can I just clarify whether he |
| 11:36:32 | 17 | meant to say Number 3 as opposed to Number 2 |
| 11:36:37 | 18 | with respect to the information that was |
| 11:36:37 | 19 | provided by counsel? |
| 11:36:38 | 20 | MR. SYLVESTER:  Oh, sure.  That's |
| 11:36:39 | 21 | fine. |
| 11:36:39 | 22 | Q.    Do you recall, Dr. Marais, if it |
| 11:36:42 | 23 | was, in fact, Number 2 that was provided by |
| 11:36:44 | 24 | counsel and not Number 3? |
| 11:36:45 | 25 | A.    I recall clearly that what I meant |

84

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:36:47 | 1 | to say when asked that question was 1, 2, and 5. |
| 11:36:52 | 2 | And if I said 1, 3, and 5, I misspoke. |
| 11:36:55 | 3 | Q.    Going back to your reading of the |
| 11:36:59 | 4 | Gerritsen paper, is it your testimony that the |
| 11:37:07 | 5 | Gerritsen paper provides some precedent for |
| 11:37:14 | 6 | Dr. ████ work in this case? |
| 11:37:15 | 7 | A.    Yes. |
| 11:37:15 | 8 | Q.    What precedent does the Gerritsen |
| 11:37:19 | 9 | paper provide for Dr. ████ work in this case? |
| 11:37:28 | 10 | A.    To be crisp about that, I'd |
| 11:37:31 | 11 | probably have to look at a copy of the Gerritsen |
| 11:37:34 | 12 | paper, which I did not commit to memory.  So I |
| 11:37:38 | 13 | don't have a verbatim recall. |
| 11:37:39 | 14 | The measurement of profiting from |
| 11:37:47 | 15 | predictions requires I -- some benchmark modeling |
| 11:37:50 | 16 | for how profits were measured.  And it may be -- I |
| 11:37:57 | 17 | believe that one or -- one or the other of these |
| 11:37:59 | 18 | articles -- it may be the Gerritsen article -- did |
| 11:38:02 | 19 | use the most basic form of index model, the |
| 11:38:09 | 20 | constant mean return model from -- that Dr. ████ |
| 11:38:13 | 21 | also used. |
| 11:38:19 | 22 | It did not, however, use in any |
| 11:38:22 | 23 | way, shape, or form the hypergeometric |
| 11:38:27 | 24 | distribution analysis that Dr. ████ also relies |
| 11:38:36 | 25 | on.  In fact, that -- the analysis that Dr. ████ |

85

HIGHLY CONFIDENTIAL

```
11:38:38  1   relies on for his ultimate conclusions.
11:38:47  2           Q.    How did your reading of the
11:38:48  3   Gerritsen paper inform your opinions here, if it
11:38:52  4   did?
11:38:55  5           A.    Only as background.  I'm not -- I'm
11:38:58  6   not relying on anything in Gerritsen as a basis
11:39:03  7   for any opinion that I express in my report.
11:39:09  8           Q.    What, if anything, did you learn
11:39:11  9   from reading the Joo, J-o-o, et al., paper listed
11:39:15 10   in Number 4?
11:39:16 11           A.    I found a description of it in the
11:39:29 12   generalized rank test that to which Dr. ███
11:39:32 13   refers.  I also found in it some degree of
11:39:45 14   precedent for using index models, using an index
11:39:45 15   model.
11:39:54 16           And I don't recall if Joo, et al.,
11:39:58 17   may, in fact, be the source where I found a
11:40:01 18   precedent for the constant mean return model,
11:40:04 19   which is Dr. ███ Model 1.  But in particular,
11:40:10 20   Dr. ███ cites Joo in at least one -- I think he
11:40:15 21   cites -- has multiple citations to Joo.
11:40:19 22           But one topic for which he cites
11:40:22 23   Joo is the generalized rank test that he applies.
11:40:26 24   And so I was interested in the nature of that
11:40:30 25   particular generalized rank test.
```

86

**HIGHLY CONFIDENTIAL**

11:41:01  1                    (Exhibit LM-10, Applied Economics
11:41:01  2            article by Mohammad Hashemi Joo, marked for
11:41:04  3            identification, as of this date.)
11:41:04  4            Q.    I'm going to hand you, Dr. Marais,
11:41:06  5    what's been marked as LM-10.  Once you've had a
11:41:21  6    chance to look at it, my question is just:  Is
11:41:24  7    LM-10 a copy of the Joo article that you cite in
11:41:28  8    your report?
11:41:30  9            A.    (Document review.)
11:41:45 10                  Yes.
11:41:48 11            Q.    And this article in LM-10 appeared
11:41:51 12    in Applied Economics.  Is that right?
11:41:53 13            A.    Yes.
11:41:53 14            Q.    Do you have any views on the
11:41:55 15    reputation of Applied Economics in the economics
11:41:58 16    community?
11:41:58 17            A.    I do not.
11:41:59 18            Q.    Do you know if the Joo article was
11:42:01 19    peer reviewed?
11:42:02 20            A.    I assume so but I don't know that
11:42:05 21    to be a fact.
11:42:08 22            Q.    In part, the Joo paper discusses
11:42:11 23    event studies conducted with the respect
11:42:15 24    of -- strike that.
11:42:16 25                  In part, Joo's paper describes

87

**HIGHLY CONFIDENTIAL**

```
11:42:19  1   event studies conducted with respect to the effect
11:42:21  2   of certain announcements on the price of three
11:42:26  3   digital assets.  Is that right?
11:42:29  4           A.   I have to remind myself if there
11:42:33  5   are really three digital assets.
11:42:35  6           Q.   If it's helpful, I'm looking at
11:42:38  7   page -4796 under the subhead "Data and methodology
11:42:47  8   sample."
11:42:52  9           A.   Got it.
11:42:54 10              (Document review.)
11:43:09 11              I'm also looking at Table 2 on page
11:43:12 12   -4800 where some results are -- some summary
11:43:16 13   statistics are reported for the same three
11:43:25 14   cryptocurrencies and also the tables around major
11:43:30 15   events that I see on pages -4802, and all of which
11:43:40 16   refer to Bitcoin, Ripple, and Ethereum.
11:43:49 17              So I think by now I've satisfied
11:43:51 18   myself that the answer to your question is yes.
11:43:54 19           Q.   Do you understand the reference in
11:43:57 20   the JOO article to Ripple to be a reference to
11:44:02 21   XRP?
11:44:02 22           A.   That's how I read it when I saw it.
11:44:04 23           Q.   What was the basis for your
11:44:09 24   understanding that Joo's reference to Ripple was a
11:44:14 25   reference to XRP when you read the article?
```

88

**HIGHLY CONFIDENTIAL**

11:44:14   1          A.    Initially and primar- -- and

11:44:22   2    primarily, it was that by the time I saw this

11:44:24   3    article, I was familiar with seeing references to

11:44:30   4    Ripple and XRP occurring together.

11:44:33   5               As I testified earlier today, I do

11:44:36   6    not have a fresh recall as I sit here of whether

11:44:42   7    the article actually confirmed that expressly.

11:44:46   8    But I don't recall learning anything from it that

11:44:48   9    changed my understanding.

11:44:53  10          Q.    Did you first read the Joo article

11:44:56  11    after your retention in this case?

11:44:58  12          A.    Yes.

11:45:02  13          Q.    In reading this Joo article, did

11:45:05  14    you have any critique of the author's design of

11:45:10  15    the event studies described?

11:45:12  16               MR. FIGEL:  Objection.

11:45:16  17          A.    The test statistics that these

11:45:20  18    authors used are part of the design of their event

11:45:23  19    study.  And I have some -- I do have some

11:45:26  20    questions about that.  But because I didn't need

11:45:36  21    to go to delve into the background of this article

11:45:42  22    and read yet other articles, I never fully

11:45:45  23    resolved those questions.

11:45:46  24               For the purposes of my assignment

11:45:48  25    in this case and for the opinions that I actually

89

**HIGHLY CONFIDENTIAL**

```
11:45:51  1  express in my report, I didn't need to -- to delve
11:45:56  2  behind the questions.  So criticism, potential
11:46:02  3  criticism, depending on the questions that
11:46:04  4  occurred to me.
11:46:09  5          Q.    Did you review the portion of the
11:46:11  6  Joo paper regarding selection of major events,
11:46:14  7  starting on page -4797?
11:46:31  8          A.    Only in a cursory way.
11:46:34  9          Q.    Do you recall having any critique
11:46:37 10  of the Joo paper's authors' design of their
11:46:41 11  selection of major events for their event study?
11:46:44 12                MR. FIGEL:   Objection.
11:46:45 13          A.    I don't recall focusing enough on
11:46:54 14  the section -- their section on the selection of
11:46:59 15  their events, since that isn't what Dr. ███ cited
11:47:02 16  this article for, to develop a basis for
11:47:09 17  endorsement or criticism.
11:47:18 18          Q.    Have you finished all of the work
11:47:21 19  you were assigned to do in this case?
11:47:23 20          A.    Yes, in the sense that I have no
11:47:26 21  pending projects or outstanding assignments, so
11:47:37 22  that it's fair to say I have no plans to do
11:47:39 23  additional work as I sit here today.
11:47:42 24                If I am asked to do anything
11:47:45 25  additional, I would certainly entertain such a
```

90

**HIGHLY CONFIDENTIAL**

```
11:47:47  1    request if it came to me.
11:47:49  2           Q.    Have you come to learn any
11:47:50  3    information since you signed the report at LM-1
11:47:55  4    that in any way affects the opinions set forth in
11:48:00  5    your report?
11:48:00  6           A.    No.  None that I can think of at
11:48:09  7    least.
11:48:09  8           Q.    Who wrote the text of your report
11:48:12  9    at LM-1?
11:48:23 10           A.    It was a collaborative writing
11:48:26 11    effort in which Dr. Asinski provided portions of
11:48:39 12    the -- of a draft text which I then, in most
11:48:45 13    cases, thoroughly and extensively rewrote so that
11:48:52 14    the collaboration ended with a document that is
11:48:55 15    entirely my own.
11:48:59 16           Q.    Do you recall any portions of your
11:49:01 17    report that you did not, as you describe it,
11:49:05 18    thoroughly and extensively rewrite?
11:49:06 19           A.    No.
11:49:07 20           Q.    Is there anyone else who assisted
11:49:10 21    with the drafting of your report other than
11:49:13 22    Dr. Asinski?
11:49:14 23           A.    I've already mentioned Mr. Narsid
11:49:23 24    Golic, who performed various tasks in support of
11:49:28 25    Dr. Asinski.  I can't know -- I don't know whether
```

91

HIGHLY CONFIDENTIAL

11:49:32  1    Mr. Golic had a role in creating material

11:49:36  2    delivered to me by Dr. Asinski.  But except for

11:49:41  3    that, I can't think of anybody.

11:49:43  4            Q.    Is there any portion of your report

11:49:45  5    where you wrote the first draft?

11:49:55  6            A.    I can't answer that from memory,

11:49:58  7    but I would be happy to page through the report

11:50:00  8    and tell you if I recognize such a section.

11:50:05  9            Q.    Sure.  Why don't you go ahead.

11:50:12  10           A.    (Document review.)

11:50:13  11                 Much of the boilerplate on

11:50:15  12   introduction and background, I certainly wrote the

11:50:17  13   first draft.  And I didn't write it for this

11:50:21  14   engagement.  I've used similar language elsewhere.

11:50:40  15   It seems to me Section 2 is mostly my writing, as

11:50:46  16   a first draft, I mean.  All of it is entirely my

11:50:49  17   writing but I drafted that.

11:51:07  18                 Paragraph 11, I wrote the first

11:51:08  19   draft.  Paragraph 13 looks to me like something

11:51:24  20   that I drafted.  Paragraph 17 looks to me like

11:51:31  21   something that I drafted.  Paragraph 20 and 21

11:52:05  22   were likely my work as in creating the initial

11:52:08  23   draft.

11:52:20  24                 I am -- I created the first draft

11:52:28  25   of tables, like Tables 2 and 3, but certainly the

92

**HIGHLY CONFIDENTIAL**

```
11:52:43   1   insertion of the bulk of the numbers into those
11:52:46   2   tables, that was done -- I didn't do that from the
11:52:52   3   source computer outputs that we used for those.
11:53:08   4            Paragraph 25 looks like something I
11:53:10   5   drafted.  Paragraph 30 looks like something I
11:53:18   6   wrote the first draft of.
11:53:20   7            So I -- while Dr. Asinski and
11:53:23   8   others assisting me had a substantial role, it
11:53:29   9   looks like I -- and helped with comments -- it
11:53:32  10   looks like to me as if the -- much of the
11:53:36  11   substance of this document I drafted.
11:53:41  12       Q.    You mentioned that you likely
11:53:42  13   prepared the first draft of Tables 2 and 3 and
11:53:45  14   others input the numbers.  Is that right?
11:53:49  15       A.    With a few numbers but that the
11:53:52  16   bulk of the numbers, I testified, were not
11:53:55  17   inserted by me.
11:54:01  18       Q.    Right.  Are you nevertheless
11:54:03  19   familiar with the numbers that appear in Tables 2
11:54:05  20   and 3?
11:54:05  21       A.    Yes, I am.
11:54:05  22       Q.    Other than Dr. Asinski and possibly
11:54:08  23   Mr. Golic, was there anyone else who assisted with
11:54:11  24   the drafting of your report?
11:54:12  25       A.    No.
```

93

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:54:12 | 1 | Q.   Did counsel provide comments on |
| 11:54:15 | 2 | your report? |
| 11:54:16 | 3 | A.   Yes. |
| 11:54:16 | 4 | Q.   Which counsel? |
| 11:54:18 | 5 | A.   Mr. Figel and possibly, for all I |
| 11:54:26 | 6 | know, anybody working with him. |
| 11:54:30 | 7 | Q.   Did counsel draft any part of your |
| 11:54:33 | 8 | report? |
| 11:54:34 | 9 | MR. FIGEL: You can answer yes or |
| 11:54:35 | 10 | no. |
| 11:54:35 | 11 | A.   No. |
| 11:54:38 | 12 | Q.   Did you incorporate counsel's |
| 11:54:40 | 13 | comments into the final version of your report? |
| 11:54:46 | 14 | A.   Where counsel's comments seemed to |
| 11:54:49 | 15 | me to be useful and/or to suggest useful ideas or |
| 11:54:58 | 16 | changes, I made improvements to the language |
| 11:55:02 | 17 | prompted by counsel's comments, and where they did |
| 11:55:04 | 18 | not, I did not. |
| 11:55:15 | 19 | Q.   Item 5 of Attachment C to your |
| 11:55:19 | 20 | report is ▇▇▇ electronic backup.  Is that right? |
| 11:55:28 | 21 | A.   Yes. |
| 11:55:28 | 22 | Q.   Did you personally review the ▇▇▇ |
| 11:55:36 | 23 | electronic backup? |
| 11:55:37 | 24 | A.   I reviewed at least portions of it. |
| 11:55:41 | 25 | I had access to the whole of it, but I won't say |

94

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**HIGHLY CONFIDENTIAL**

11:55:44 1    that I personally scrutinized every part of it.

11:55:51 2           Q.    In your review of the portions of

11:55:54 3    Dr. ███ electronic backup that you reviewed, did

11:55:59 4    you find any errors?

11:56:04 5           A.    None that I can recall.  I'm fairly

11:56:11 6    sure I would remember since all of this is quite

11:56:14 7    recent.  I did not find errors.

11:56:16 8           Q.    Did you instruct others to review

11:56:20 9    Dr. ███ electronic backup?

11:56:23 10          A.    Yes.

11:56:23 11          Q.    What instructions, if any, did you

11:56:27 12   provide them as to their review?

11:56:34 13          A.    To explore the backup material in

11:56:43 14   order to report back to me its nature, to

11:56:51 15   replicate the calculations performed by Dr. ███

11:56:56 16   and verify that when using the inputs, the input

11:57:00 17   data provided by him, that the calculations

11:57:07 18   described by him actually produced the outputs

11:57:10 19   reported by him.

11:57:14 20                So that would be a routine process

11:57:16 21   of replication, of auditing the work, to confirm

11:57:22 22   that the inputs -- to confirm at least by checking

11:57:33 23   a number of individual input data items that the

11:57:37 24   inputs actually did appear to come from the, I

11:57:44 25   think, coin-based source, whatever the name of the

95

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:57:48 | 1 | source is that Dr. ███ reports, and that we could |
| 11:57:55 | 2 | see the same numbers looking at those sources; and |
| 11:58:02 | 3 | then to report back to me that -- whether or not |
| 11:58:10 | 4 | we were able replicate and thereby fully |
| 11:58:18 | 5 | understand what it is that Dr. ███ had done. |
| 11:58:20 | 6 | Q.    Were you able to replicate |
| 11:58:25 | 7 | Dr. ███ calculations? |
| 11:58:25 | 8 | A.    Yes. |
| 11:58:26 | 9 | Q.    From the review that you just |
| 11:58:28 | 10 | described, did anyone on your team discover any |
| 11:58:30 | 11 | errors in Dr. ███ backup files? |
| 11:58:34 | 12 | MR. FIGEL:  Objection. |
| 11:58:34 | 13 | A.    I recall none. |
| 11:58:35 | 14 | Q.    Are you aware that defense counsel |
| 11:58:40 | 15 | in this case produced a set of files entitled |
| 11:58:45 | 16 | "Marais Backup" to the SEC? |
| 11:58:47 | 17 | A.    Yes. |
| 11:58:47 | 18 | Q.    Did you prepare the materials |
| 11:58:49 | 19 | contained within Marais Backup? |
| 11:58:52 | 20 | A.    Yes, at least in the sense that the |
| 11:58:56 | 21 | files were created under my direction by the |
| 11:59:00 | 22 | Compass Lexecon staff whose names I have already |
| 11:59:02 | 23 | testified about. |
| 11:59:03 | 24 | Q.    What do the Marais Backup files |
| 11:59:05 | 25 | contain? |

96

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 11:59:05 | 1 | A.    They contain computer code used to |
| 11:59:15 | 2 | produce the results reported in my own report |
| 11:59:26 | 3 | that -- that is two flavors of computer code. |
| 11:59:30 | 4 | They contain input files which are |
| 11:59:34 | 5 | very largely derived and may, in fact, come |
| 11:59:37 | 6 | straight from Dr. ███   own production in this |
| 11:59:43 | 7 | case. |
| 11:59:43 | 8 | They contain intermediate files |
| 11:59:48 | 9 | that were produced as -- in the course of |
| 11:59:54 | 10 | executing the computer code produced in that |
| 11:59:58 | 11 | backup, they contain output files.  Some of those |
| 12:00:04 | 12 | outputs, if I remember correctly, are in |
| 12:00:08 | 13 | relatively unfriendly computer output-like format. |
| 12:00:14 | 14 | Other outputs are in the form of |
| 12:00:17 | 15 | Excel spreadsheets, which were the basis of |
| 12:00:21 | 16 | exhibits to my report. |
| 12:00:28 | 17 | So I think that fairly fully |
| 12:00:30 | 18 | describes what is in those backup materials.  And |
| 12:00:37 | 19 | they -- in the form I believe they were delivered, |
| 12:00:40 | 20 | they -- the components are labeled.  They're in |
| 12:00:44 | 21 | file folders.  And those folders are labeled to |
| 12:00:47 | 22 | make it fairly easy to understand the relation of |
| 12:00:55 | 23 | the computer files we produced to the description |
| 12:00:57 | 24 | that I've just given. |
| 12:00:58 | 25 | Q.    Did you do anything to check the |

97

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 12:01:00 | 1 | accuracy of the materials contained within your |
| 12:01:02 | 2 | backup files? |
| 12:01:03 | 3 | MR. FIGEL:  Objection. |
| 12:01:03 | 4 | A.    I routinely -- I followed my |
| 12:01:12 | 5 | routine practice of asking about whether the |
| 12:01:19 | 6 | materials in the backup files tied to the exhibits |
| 12:01:28 | 7 | where there was -- in my report and whether we had |
| 12:01:35 | 8 | reason to think that the calculations that we had |
| 12:01:39 | 9 | performed were performed accurately. |
| 12:01:45 | 10 | And in part, we verified -- I had |
| 12:01:50 | 11 | that verified by confirming that we were able to |
| 12:01:57 | 12 | produce -- to reconcile to numbers reported by |
| 12:02:02 | 13 | Dr. ▮▮▮ or appearing in Dr. ▮▮▮ backup |
| 12:02:05 | 14 | materials, even though the chain of computer steps |
| 12:02:15 | 15 | that we were using were not identical to the set |
| 12:02:19 | 16 | of steps used by Dr. ▮▮▮.  So yes. |
| 12:02:31 | 17 | Q.    You said in part that you followed |
| 12:02:32 | 18 | your routine practice of asking about whether the |
| 12:02:35 | 19 | materials in the backup files tied to the exhibits |
| 12:02:40 | 20 | in your report. |
| 12:02:41 | 21 | Who did you ask? |
| 12:02:41 | 22 | A.    Dr. Asinski. |
| 12:02:42 | 23 | Q.    Okay. |
| 12:02:56 | 24 | THE WITNESS:  I would like to take |
| 12:02:58 | 25 | a break at some point soon.  It doesn't have |

98

**HIGHLY CONFIDENTIAL**

```
12:03:01   1        to be at this exact moment.
12:03:03   2                  MR. FIGEL:  Now is fine by me.
12:03:06   3                  Let's go off the record.
12:03:10   4                  THE VIDEOGRAPHER:  The time is
           5        12:02 p.m.  This concludes Media 2.  Off the
           6        record.
           7                  (Lunch recess taken from 12:02 p.m.
           8        to 12:58 p.m.)
           9                            - - -
          10          A F T E R N O O N   S E S S I O N
          11                            - - -
          12                  (Time noted:  12:58 p.m.)
          13                            - - -
          14                  THE VIDEOGRAPHER:  The time now is
          15        12:58 p.m.  This begins Media 3.  On the
          16        record.
          17      M.  L A U R E N T I U S   M A R A I S,
          18            resumed and testified further as
          19            follows:
          20      CONTINUED EXAMINATION
          21      BY MR. SYLVESTER:
12:59:18  22            Q.   Dr. Marais, earlier today you
12:59:20  23      testified that, prior to your retention as an
12:59:24  24      expert witness in this case, you had been retained
12:59:25  25      about three months ago by Kellogg Hansen.  Is that
```

99

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 12:59:32 | 1 | right? |
| 12:59:32 | 2 | A.    Yes. |
| 12:59:32 | 3 | Q.    Did that retention have anything to |
| 12:59:34 | 4 | do with this case? |
| 12:59:35 | 5 | A.    No. |
| 12:59:37 | 6 | Q.    Earlier today I believe you |
| 12:59:38 | 7 | testified that Dr. ████ study as expressed in his |
| 12:59:43 | 8 | expert report is a nonstandard analysis.  Is that |
| 12:59:47 | 9 | right? |
| 12:59:47 | 10 | A.    Yes. |
| 12:59:47 | 11 | Q.    And I believe that you also |
| 12:59:49 | 12 | testified that you could not rule out that there |
| 12:59:51 | 13 | was precedent for that nonstandard analysis.  Is |
| 12:59:56 | 14 | that right? |
| 12:59:56 | 15 | A.    Correct. |
| 12:59:57 | 16 | Q.    Did you look for any such |
| 12:59:58 | 17 | precedent? |
| 01:00:06 | 18 | A.    Yes. |
| 01:00:06 | 19 | Q.    What did you find, if anything? |
| 01:00:07 | 20 | A.    Nothing. |
| 01:00:08 | 21 | Q.    I believe you testified earlier |
| 01:00:09 | 22 | that the Joo and Gerritsen papers might provide |
| 01:00:14 | 23 | some precedent for some portions of Dr. ████ |
| 01:00:18 | 24 | study.  Is that right? |
| 01:00:18 | 25 | A.    Yes. |

100

**HIGHLY CONFIDENTIAL**

```
01:00:19   1          Q.    And what precedent do either of
01:00:21   2   those two papers provide for Dr. ██ study?
01:00:28   3          A.    The use of some kind of index
01:00:31   4   model, even if it is the -- the no index model
01:00:34   5   that Dr. ██ calls the constant mean returns
01:00:38   6   model.  But at least the use of some kind of index
01:00:41   7   model for estimating a normal return on a
01:00:49   8   cryptocurrency in some test period.
01:01:00   9          Q.    Is there any other precedent that
01:01:02  10   either of those two papers provide for Dr. ██
01:01:09  11   study?
01:01:09  12          A.    Not in a methodological sense.
01:01:11  13   They both have superficial characteristics but --
01:01:15  14   that don't go to the method that resembled
01:01:22  15   Dr. ██.  They both -- they both have to do with
01:01:24  16   cryptocurrencies of a -- for instance.
01:01:26  17              But that's what I call superficial.
01:01:28  18   That doesn't -- that's not enough to make them
01:01:30  19   precedent, a methodological precedent.
01:01:37  20          Q.    When were you retained in the Rhame
01:01:40  21   case we discussed earlier?
01:01:46  22          A.    In the -- at some point in the
01:01:48  23   first half of 2020, maybe around the end of the
01:01:51  24   first quarter of 2020.
01:01:57  25          Q.    And when was it that your expert
```

101

**HIGHLY CONFIDENTIAL**

01:02:00  1    report was provided to the other side in Rhame?

01:02:03  2            A.    In either late October or early

01:02:11  3    November of 2021.

01:02:22  4            Q.    Who retained you in the Rhame

01:02:26  5    matter?

01:02:26  6            A.    I was retained through counsel,

01:02:28  7    counsel being Alston & Bird, on behalf of

01:02:33  8    defendant Tyson Rhame.

01:02:38  9            Q.    In your professional career, and

01:02:41 10    setting aside Rhame, was there any occasion in

01:02:43 11    which you endeavored to assess whether there was a

01:02:47 12    link between a news event and a reaction in volume

01:02:51 13    and you concluded there was no such link, based in

01:02:55 14    whole or in part, on your observation of abnormal

01:02:59 15    reactions in volume on days with no-news events?

01:03:01 16            MR. FIGEL:  Objection.

01:03:02 17            A.    I testified at some length this

01:03:19 18    morning about the passage of time since I

01:03:23 19    performed event studies as a routine part of my

01:03:36 20    consulting practice.  And I testified that,

01:03:40 21    because really 20 or more years have passed, I

01:03:43 22    can't today testify with fresh recollection or

01:03:46 23    specificity about the content of those event

01:03:51 24    studies.

01:03:51 25            So I can only say I don't -- I do

102

**HIGHLY CONFIDENTIAL**

```
01:04:00   1    not recall the nature of everything that I did
01:04:02   2    when I last did this kind of -- most recently did
01:04:08   3    work that seems to be covered by your question.
01:04:19   4         Q.   So fair to say, other than Rhame,
01:04:22   5    sitting here today, you cannot think of any other
01:04:24   6    occasion that would be responsive to my previous
01:04:28   7    question?
01:04:28   8              MR. FIGEL:  Objection.
01:04:28   9         A.   I can think of many occasions that
01:04:37  10    could be covered by your previous question, but
01:04:39  11    none where my -- none that I would have thought to
01:04:45  12    describe in that way.
01:04:53  13              But your question is broad enough
01:04:55  14    that there are matters that I would describe
01:04:57  15    differently if asked to describe what they were
01:04:59  16    about, but upon reflection might well recognize as
01:05:04  17    fitting into the category you are asking me about.
01:05:08  18         Q.   Can you describe, setting aside
01:05:13  19    Rhame, another occasion in which you endeavored to
01:05:16  20    assess whether there was a link between a news
01:05:18  21    event and a reaction in volume and you concluded
01:05:22  22    there was no such link, based in whole or in part,
01:05:25  23    on your observation of abnormal reactions in
01:05:30  24    volume on days with no-news events?
01:05:33  25              MR. FIGEL:  Objection.
```

103

HIGHLY CONFIDENTIAL

01:05:33  1          A.    I've already testified that I
01:05:42  2   can't -- that concerning my work on event studies
01:05:44  3   per se, it's too long ago.  I don't -- I don't
01:05:47  4   have that recollection.
01:05:48  5               I've also given you -- I've also
01:05:51  6   pointed out that your characterization is broad
01:05:54  7   enough to cover situations that wouldn't -- that
01:05:58  8   might not have been labeled event studies per se.
01:06:08  9               And because they were not labeled
01:06:10 10   event studies per se, I would need to remind
01:06:14 11   myself, however briefly, of the nature of what the
01:06:17 12   work was.
01:06:21 13               And so with that in mind, I've
01:06:23 14   picked up my report, and I've turned to Attachment
01:06:26 15   B.  And I would like to run my finger down these
01:06:35 16   matters and just think about what they involved
01:06:38 17   and whether they fit under the heading of what you
01:06:40 18   were asking me about.
01:06:42 19          Q.    Please go ahead.
01:06:43 20          A.    (Document review.)
01:08:55 21               The -- Item 14 on my -- on the list
01:08:57 22   is called Cotromano v United Technologies and
01:09:03 23   Adinolfe versus United Technologies.  That seems
01:09:08 24   to me to be an example of the second kind of case
01:09:15 25   that I mentioned.

                                                          104

HIGHLY CONFIDENTIAL

01:09:17  1          I -- I identified two categories.

01:09:21  2   One was work that I had done on event studies,

01:09:23  3   which is now too long ago for me to recall clearly

01:09:26  4   what it was.

01:09:29  5          Cotromano is also some time ago.

01:09:32  6   But my recollection of Cotromano is that it falls

01:09:35  7   into the second category, where there is something

01:09:37  8   that one can recognize as a kind of event study,

01:09:41  9   even though not called that in the context.

01:09:46 10          And that fits the rest of the

01:09:47 11   characterization that you provided.  And I -- as

01:09:53 12   it's now coming back to mind, I think that's not

01:09:58 13   the only one.

01:10:04 14          I think Pinares versus United

01:10:13 15   Technologies in Item 17 had something of that same

01:10:14 16   character.

01:10:23 17          (Document review.)

01:10:33 18          The -- there are aspects of the

01:10:38 19   opiate litigation identified in Item 22 that fit

01:10:42 20   that character.  The same would hold in 23, also

01:11:01 21   26, also 34, also 38, also 40, also 44.

01:12:12 22          And, of course, this list begins in

01:12:16 23   January of 2017 because it's meant to cover only a

01:12:22 24   full four-year period.  And so were we looking at

01:12:29 25   older versions of this list, there might well be

105

**HIGHLY CONFIDENTIAL**

01:12:33   1   others that are even better candidates than what

01:12:40   2   I've identified for you on this list.

01:12:43   3           Q.     In any of the cases that you just

01:12:45   4   identified, was it your assignment to evaluate the

01:12:49   5   link between a news event and the price of a

01:12:53   6   security?

01:12:56   7           MR. FIGEL:   Objection.

01:12:56   8           A.     No.

01:13:02   9           Q.     In any of the cases that you just

01:13:04   10   identified, was it your assignment to evaluate the

01:13:07   11   link between a news event and the volume of a

01:13:10   12   securities trading?

01:13:12   13           MR. FIGEL:   Objection.

01:13:12   14           A.     Certainly the volume of something,

01:13:16   15   but not the volume of securities necessarily.

01:13:20   16           Q.     Was your assignment for any of the

01:13:32   17   cases you just identified substantially identical

01:13:38   18   for any of them?

01:13:39   19           MR. FIGEL:   Objection.

01:13:39   20           A.     Identical to what?

01:13:44   21           Q.     That's a fair point.   I'll give you

01:13:46   22   an example so you know what I mean.

01:13:48   23           Assignments 34 and 44 both appear

01:13:52   24   to involve the client JUUL Labs.   Were you

01:13:55   25   retained by JUUL Labs?

106

**HIGHLY CONFIDENTIAL**

01:13:57  1          A.    Yes.

01:13:57  2          Q.    Was your assignment in 34 and 44

01:14:00  3   substantially identical?

01:14:14  4                MR. FIGEL:  Objection.

01:14:14  5          A.    (Document review.)

01:14:21  6                There was certainly an overlap

01:14:25  7   between 30 -- 33, 34, and 44.  To the best of my

01:14:33  8   recollection, sitting here, though, the

01:14:35  9   differences were so substantial that I would not

01:14:37 10   call the assignments substantially identical.

01:14:43 11          Q.    Let's start with 14.  What opinion

01:14:45 12   did you offer in the Cotromano case?

01:15:13 13          A.    The opinion that I offered in

01:15:15 14   Cotromano had to do with the statistics

01:15:19 15   surrounding a putative -- a putative cancer

01:15:32 16   cluster in an area of Florida -- in a subdivision

01:15:41 17   of Florida that was near a -- somewhat near a

01:15:48 18   Pratt & Whitney jet engine production and research

01:15:53 19   facility.

01:16:02 20                My opinion was about the

01:16:04 21   investigation that had been performed by the State

01:16:07 22   of Florida and the federal EPA on the causation,

01:16:17 23   or lack thereof, of the pediatric brain cancers

01:16:26 24   that had been observed in the acreage subdivision

01:16:29 25   and the presence of the plant.

                                                              107

**HIGHLY CONFIDENTIAL**

01:16:40  1          Q.    Did you provide any opinion related

01:16:43  2    to causation that you just described?

01:16:45  3          A.    Yes.

01:16:45  4          Q.    What was your opinion?

01:16:46  5          A.    That it had -- that it had not been

01:16:53  6    established and that despite a -- and a fairly

01:17:02  7    intensive investigation, no link had ever been --

01:17:07  8    no actual link had ever been documented.

01:17:11  9          Q.    What is it about the work that you

01:17:13  10   performed in the Cotromano case that you believe

01:17:18  11   may be responsive to my question as to whether in

01:17:23  12   your professional career there was any occasion in

01:17:25  13   which you endeavored to assess whether there was a

01:17:28  14   link between a news event and a reaction in volume

01:17:32  15   and you concluded there was no such link, based in

01:17:36  16   whole or in part, on your observation of abnormal

01:17:41  17   returns in volume on days with no-news events?

01:17:46  18                MR. FIGEL:  Objection.

01:17:46  19         A.    My -- I -- my answer to that

01:17:47  20   question was that this case involved such a thing.

01:17:49  21   As it turns out, the opinions I ultimately

01:17:52  22   expressed did not involve my work on that

01:17:58  23   question.

01:17:59  24                But that question did arise in that

01:18:06  25   case in the form of the disclosure of the

                                                          108

**HIGHLY CONFIDENTIAL**

01:18:10  1    investigation itself, various disclosures

01:18:22  2    concerning the discovery of the cluster, various

01:18:29  3    disclosures concerning the outcome of the

01:18:32  4    investigation by the various state and federal

01:18:34  5    authorities, and the prices of housing.  And I --

01:18:44  6    there may even have been a volume question in

01:18:49  7    terms of turnover.

01:18:50  8              So there were news releases

01:18:52  9    concerning this event in the vicinity of the area.

01:18:56  10   And there were questions about the price of

01:18:58  11   housing.

01:19:01  12             Q.    Did your expert work address those

01:19:03  13   questions regarding price of housing?

01:19:05  14             A.    I did initially, yes.

01:19:07  15             Q.    And -- but you didn't ultimately

01:19:09  16   end up offering an opinion about any questions

01:19:11  17   related to price of housing.  Is that right?

01:19:13  18             A.    That is correct.

01:19:15  19             Q.    Okay.  Limiting your answers only

01:19:25  20   to work that you did that was ultimately presented

01:19:28  21   in an expert report, and setting aside Cotromano,

01:19:34  22   which we just discussed, which of Items 17, 22,

01:19:40  23   23, 26, 34, 38, 40, and 44 do you view as

01:19:45  24   responsive to my question as to whether there was

01:19:46  25   any occasion in which you endeavored to assess

                                                          109

**HIGHLY CONFIDENTIAL**

```
01:19:50  1   whether there was a link between a news event and
01:19:52  2   a reaction in volume and you concluded there was
01:19:54  3   no such link, based in whole or in part, on your
01:19:57  4   observation of abnormal returns in volume on days
01:20:03  5   with no-news events?
01:20:04  6            MR. FIGEL:  Objection.
01:20:05  7         A.    (Document review.)
01:20:44  8            In work that was -- that I
01:20:45  9   ultimately did include in what I produced, there
01:20:52 10   is -- there's some question on my mind as to
01:20:54 11   whether the declaration of an epidemic of opioid
01:21:01 12   abuse is a news event or not.
01:21:08 13            It's -- it is a news event.  It is
01:21:10 14   also a very substantive event.  But it is at least
01:21:15 15   news that the administration, the national
01:21:18 16   administration has declared it to be an epidemic.
01:21:26 17   There was an element of that in Item 22.
01:21:28 18         Q.    What opinion did you provide in
01:21:34 19   connection with Item 22?
01:21:35 20         A.    That none of the events on the
01:21:38 21   timeline of that case, including the disclosure
01:21:44 22   and announcement of -- that the problems
01:21:51 23   associated with opioids are now viewed as an
01:21:56 24   epidemic and a crisis, a national emergency,
01:22:00 25   public health emergency, appear to be related in a
```

110

HIGHLY CONFIDENTIAL

01:22:08   1   documentable way to the trajectory of sales of

01:22:13   2   Johnson & Johnson products or of opioids

01:22:19   3   generally.

01:22:24   4         Q.    What abnormal reactions did you

01:22:29   5   observe in connection with your work in Item 22

01:22:35   6   that impacted your opinion in that case?

01:22:37   7               MR. FIGEL:  Objection.

01:22:42   8         A.    Movements in the trajectory that

01:22:48   9   were statistically large increases or changes,

01:22:55  10   turning points that did not appear to coincide

01:22:59  11   with events on the timeline to which changes had

01:23:09  12   been attributed or linked in purported causal

01:23:22  13   claims by various experts in the matter.

01:23:25  14         Q.    When you used the word "trajectory"

01:23:28  15   in your previous response, trajectory of what?

01:23:30  16         A.    Sales.

01:23:31  17         Q.    Sales of Johnson & Johnson

01:23:32  18   products?

01:23:32  19         A.    Yes.  So volumes, in other words.

01:23:45  20         Q.    Is there any other item among the

01:23:50  21   items you identified, and setting aside Cotromano

01:23:54  22   and the case we just discussed, in which you

01:24:01  23   offered an opinion in an expert report that you

01:24:04  24   believed to be responsive to my question as to

01:24:08  25   whether there was any occasion in which you

111

HIGHLY CONFIDENTIAL

```
01:24:10   1   endeavored to assess whether there was a link
01:24:13   2   between a news event and a reaction in volume and
01:24:16   3   you concluded there was no such link, based in
01:24:18   4   whole or in part, on your observation of abnormal
01:24:24   5   reactions in volume on days with no news-events?
01:24:27   6              MR. FIGEL:  Objection.
01:24:27   7        A.    Setting aside the character and
01:24:32   8   similar analyses with different details to the one
01:24:37   9   that I have just described, there are -- in the
01:24:47  10   JUUL matter, one or more JUUL matters,
01:24:51  11   JUUL-related matters, there is a similar -- I -- I
01:24:59  12   take it back.
01:25:00  13              The -- I suppose youth usage can be
01:25:05  14   described as volume.  So it's not a price effect.
01:25:13  15   But there is a volume effect, and there are
01:25:15  16   disclosures along -- arranged along a timeline,
01:25:19  17   and there are marked changes in volume.
01:25:21  18              And there is a question of whether
01:25:22  19   the marked changes in volume are -- can be related
01:25:30  20   in a statistically reliable way to disclosures.
01:25:36  21              Now, again, as in the opioid
01:25:40  22   matter, there is a question in my mind about
01:25:42  23   whether the disclosure is just a disclosure, a
01:25:46  24   news event or, whether, as a news event, it is
01:25:54  25   describing some underlying real event that may be
```

112

**HIGHLY CONFIDENTIAL**

01:25:56  1   the driver of any consequence.

01:26:02  2            I suppose there is always a real

01:26:03  3   event that is described in news unless it's fake

01:26:06  4   news.

01:26:06  5            But the analysis that I have

01:26:10  6   performed of -- of youth usage in relation to

01:26:19  7   timeline markers are of that character where there

01:26:26  8   are marked statistical changes, statistically

01:26:31  9   large changes in youth usage that do not coincide

01:26:37 10   with the disclosed events that are held to be or

01:26:45 11   hypothesized to be possibly causal.

01:26:49 12       Q.   And was the existence of those

01:26:51 13   marked statistical changes that you just described

01:26:55 14   influential on your opinion that you presented in

01:26:59 15   the JUUL matter?

01:27:00 16       A.   Yes.

01:27:00 17            MR. FIGEL:  Objection.

01:27:02 18            Sorry.

01:27:02 19       Q.   In what way?

01:27:03 20       A.   The fact that they were held to be,

01:27:09 21   by some opinions in the case, causally related but

01:27:16 22   were, in fact, not -- did not coincide in a

01:27:25 23   rationally recognizable way with the changes that

01:27:29 24   they are supposed to have caused was part of my

01:27:32 25   support for the opinion that the causation -- that

113

HIGHLY CONFIDENTIAL

```
01:27:40   1    certain causation claims had simply not been
01:27:43   2    established on a statistically reliable basis.
01:27:47   3            Q.   I've asked a series of questions
01:27:55   4    relating to reactions in volume.  I'll ask for
01:27:59   5    your patience.  I'm going to ask the same question
01:28:02   6    with price to make sure we covered the whole
01:28:04   7    ground here.
01:28:04   8            In your professional career, was
01:28:06   9    there any occasion in which you endeavored to
01:28:08  10    assess whether there was a link between a news
01:28:10  11    event and a reaction in price and you concluded
01:28:13  12    there was no such link, based in whole or in part,
01:28:15  13    on your observation of abnormal reactions in price
01:28:20  14    on days with no-news events?
01:28:22  15            MR. FIGEL:  Objection.
01:28:22  16            A.   If I heard the preamble correctly,
01:28:24  17    you asked in my professional career, which goes
01:28:28  18    back to about 1982 at the University of Chicago.
01:28:36  19            I've already testified at some
01:28:40  20    length about the fact -- I hope understandable
01:28:45  21    fact -- that I simply cannot testify about the
01:28:50  22    content of event study related or event study
01:28:58  23    analogous work that I did 20 years ago, and
01:29:02  24    certainly 40 years ago is not any easier.
01:29:16  25            So I would have to say
```

114

**HIGHLY CONFIDENTIAL**

```
01:29:18   1   almost -- almost certainly yes, there have been
01:29:22   2   such occasions, but I cannot recall sitting --
01:29:31   3   that sitting here today.  I can't identify a
01:29:34   4   specific instance for you today.
01:29:39   5               It is most likely that that
01:29:41   6   occurred while I was still doing academic
01:29:44   7   research.
01:29:48   8          Q.    When was that?
01:29:49   9          A.    That was a period that spanned
01:29:53  10   approximately 40 years ago to 30 years ago.
01:29:57  11          Q.    Why is it most likely that it
01:30:03  12   occurred when you were doing your academic
01:30:05  13   research?
01:30:05  14          A.    Because I was looking at many more
01:30:08  15   event study-type analyses then and at a much
01:30:12  16   greater variety of -- in the main, much more
01:30:14  17   interesting questions than the ones that arise in
01:30:17  18   narrow litigation assignments.
01:30:21  19          Q.    In this case, you are offering
01:30:26  20   solely an expert rebuttal opinion.  Is that right?
01:30:31  21          A.    It is right to the extent that I am
01:30:34  22   responding in a focused way to the report of
01:30:43  23   Dr. ████ in this case.  That said, if Dr. ████
01:30:46  24   were, God forbid, to vanish off the face of the
01:30:50  25   earth and somebody else presented opinions that
```

115

**HIGHLY CONFIDENTIAL**

```
01:30:53  1   overlap with the ███ issues that I address, my
01:30:59  2   opinions would be pertinent, more broadly because
01:31:03  3   I address issues.  I don't address the person,
01:31:08  4   Dr. -- Dr. ███.
01:31:11  5          Q.   As it stands today, does your
01:31:13  6   rebuttal opinion pertain solely to opinions set
01:31:17  7   forth in Dr. ███ expert report?
01:31:20  8          A.   Yes.  I think that is a fair
01:31:21  9   characterization.
01:31:23 10          Q.   Are all of the opinions --
01:31:24 11          A.   It -- sorry.  Can I just add?
01:31:26 12          Q.   Please.
01:31:26 13          A.   It refers to the -- to what
01:31:32 14   those -- what the Dr. ███ findings do and not --
01:31:37 15   and do not convey and imply about what I
01:31:46 16   understand are issues in this case.  And in that
01:31:52 17   sense, my opinions go beyond Dr. ███, because
01:31:56 18   Dr. ███ is not very explicit on that point.
01:31:58 19          But it is certainly the case
01:32:00 20   that -- and I view my work as rebuttal to
01:32:03 21   Dr. ███.  It just happens that in discussing what
01:32:07 22   Dr. ███ conclusions mean and what their
01:32:11 23   significance is, I end up going a little bit
01:32:13 24   beyond what Dr. ███ himself says.
01:32:15 25          Q.   Can you identify for me the
```

116

**HIGHLY CONFIDENTIAL**

```
01:32:16  1   occasions on which you go a little bit beyond what
01:32:19  2   Dr. ███  says?
01:32:20  3            A.    I'm not sure I will get all of them
01:32:31  4   from memory, but I can give you an illustration.
01:32:33  5            Q.    Please.
01:32:34  6            A.    (Document review.)
01:32:53  7            I'm looking, for instance, at
01:32:58  8   paragraph 5 of my report.  And I'm going to skip
01:33:02  9   the first part of -- it's a single-sentence
01:33:10 10   paragraph, which is remarkable in itself.
01:33:20 11            I will skip over the first half of
01:33:21 12   it and say that I was asked to address:
01:33:23 13                "Whether, based on my expertise,
01:33:26 14       his opinions support the contention that, in
01:33:28 15       economic substance, movements in XRP prices
01:33:32 16       solely or predominantly reflect responses to
01:33:36 17       disclosures about Ripple's actions."
01:33:42 18            Now, I don't know that I can -- it
01:33:43 19   may be that I can, but I'm not sure that I can
01:33:47 20   find in Dr. ███ report a claim or an opinion
01:33:57 21   that movements in XRP prices solely or
01:33:59 22   predominantly reflect responses to disclosures
01:34:01 23   about Ripple's actions.
01:34:03 24            So in that sense, my addressing
01:34:07 25   that question does go beyond what Dr. ███ seems
```

117

**HIGHLY CONFIDENTIAL**

01:34:13  1   to assert directly in his own conclusions and go

01:34:18  2   to exactly what I just explained as what do these

01:34:21  3   conclusions say or not about what an issue -- a

01:34:28  4   question that I understand to be important in this

01:34:30  5   case.

01:34:30  6              Q.   Do you believe from your reading of

01:34:32  7   Dr. ███ report that he's contending:

01:34:35  8                  "In economic substance, movements

01:34:36  9       in XRP prices solely or predominantly reflect

01:34:47 10       responses to disclosures about Ripple's

01:34:49 11       actions"?

01:34:50 12              A.   I think he does not, to the best of

01:34:54 13   my recollection.  Without actually paging through

01:34:56 14   it, I think -- I doubt that I can find a place

01:34:58 15   where Dr. ███ states a proposition that I would

01:35:01 16   say amounts to this.

01:35:03 17                  But I would say that Dr. ███ is

01:35:05 18   careless about not alerting the reader of his

01:35:14 19   report to the rather extreme limitations of what

01:35:18 20   his findings really show.

01:35:20 21                  And in that sense, he rather

01:35:28 22   invites a reader of his report to fill in the

01:35:34 23   missing piece that gets you to these words in

01:35:36 24   paragraph 5.  And he does nothing to -- to -- he

01:35:41 25   doesn't put in any railing or fencing to keep the

118

HIGHLY CONFIDENTIAL

01:35:43  1    reader of his report away from drawing that

01:35:46  2    inference.

01:35:49  3                   That's what I mean in paragraph 7,

01:35:51  4    what the words in paragraph 7 of my report.

01:35:53  5         Q.    Which words are you referring to,

01:35:57  6    Dr. Marais?

01:35:57  7         A.    Where I say, I quote -- in

01:35:59  8    paragraph 6, I quote him in his expansive

01:36:04  9    conclusion:

01:36:05 10                   "Statistically significant evidence

01:36:07 11         XRP prices react to news about Ripple's

01:36:10 12         actions ... the results hold for nearly all

01:36:13 13         statistical models ...  taken together, this

01:36:16 14         indicates" -- bottom line conclusion -- "XRP

01:36:18 15         prices react to the news of actions by Ripple

01:36:23 16         Labs."

01:36:24 17                   Now, for somebody who has in mind

01:36:26 18    what I understand to be the question in this

01:36:28 19    case -- Do XRP purchasers purchase XRP looking for

01:36:34 20    value from Ripple Labs? -- that statement doesn't

01:36:39 21    contain any user warnings about the limitations of

01:36:46 22    Dr. ███ work.  And that's why I say this

01:36:49 23    language -- your question to me was what language

01:36:52 24    am I referring to in my own paragraph.  And the

01:36:54 25    language I'm -- I was referring to is where I say:

119

**HIGHLY CONFIDENTIAL**

01:36:57  1          "This language invites a reader of

01:37:00  2      the ██ report to conclude that Dr. ██ has

01:37:04  3      identified statistical evidence showing that

01:37:06  4      XRP price movements are driven largely -- and

01:37:09  5      causally" -- which he certainly has not

01:37:14  6      done -- "by actions taken by Ripple."

01:37:18  7          Q.    So is it fair to say that your view

01:37:23  8  is not that Dr. ██ contends that, in economic

01:37:30  9  substance, movements in XRP prices solely or

01:37:34 10  predominantly reflect responses to disclosures

01:37:39 11  about Ripple actions, but that a reader could draw

01:37:43 12  that inference from reading his report?

01:37:45 13          MR. FIGEL:   Objection.

01:37:45 14          A.    I think that is so close to fair

01:37:48 15  that it's almost not possible to see the daylight

01:37:52 16  between it and fairness, but I do see some

01:37:58 17  daylight there.

01:37:58 18          I would not testify that Dr. ██

01:38:02 19  does not test- -- contend that.  I have testified

01:38:06 20  that he does not ex- -- I can't point to express

01:38:08 21  language in Dr. ██.  But Dr. ██ is a little

01:38:16 22  unclear in his restatements of his assignments.

01:38:20 23          The assignments can be read as

01:38:22 24  being fairly broad.  And Dr. ██ conclusion is

01:38:26 25  so strongly positive on discovering what he says

                                                      120

**HIGHLY CONFIDENTIAL**

```
01:38:33   1   he was asked to look for, as quoted here, that
01:38:43   2   it's almost a contention.  That's why I say there
01:38:47   3   is little daylight between what I actually am
01:38:49   4   testifying to and your characterization of it.
01:38:53   5            Of course, if Dr. ███ were here
01:38:55   6   and simply disavowed these opinions, I would say,
01:39:02   7   "Sorry, I stand corrected.  You are not saying
01:39:05   8   anything causal and you are not saying that."
01:39:09   9            But since I have only his report to
01:39:10  10   work with, this is where I end up.
01:39:19  11        Q.   Is it possible that XRP prices
01:39:22  12   could react to the news of actions by Ripple Labs
01:39:25  13   and also, at the same time, that XRP prices do not
01:39:31  14   solely or predominantly reflect responses to
01:39:33  15   disclosures about Ripple's actions?
01:39:36  16            MR. FIGEL:  Objection.
01:39:47  17        A.   I think that that is not only
01:39:49  18   possible, but as far as I can tell, that is -- I
01:39:56  19   can't say the -- I will disavow any causal
01:40:02  20   conclusion, because I'm not sure -- I don't see
01:40:04  21   any simple -- any sufficient basis for genuine
01:40:08  22   causal conclusions.
01:40:11  23            So I'll stick with "associate"
01:40:13  24   rather than "caused by."  With that qualification,
01:40:20  25   I think what you've -- the possibility you've
```

121

**HIGHLY CONFIDENTIAL**

```
01:40:23  1    asked me about is the pos- -- is where we are.
01:40:25  2                 Dr. ████ does document that
01:40:32  3    a -- what I will characterize as a sliver of the
01:40:36  4    large abnormal returns on XRP do coincide
01:40:46  5    with -- different from causation -- do coincide
01:40:50  6    with Ripple news events.  Most of the large price
01:40:54  7    movements that he identifies do not coincide with
01:40:57  8    Ripple news events.
01:41:01  9                 So the nature of the coincidence
01:41:03 10    that he finds is a statistically significant
01:41:05 11    association.  It is an association with a sliver
01:41:12 12    of the large price movements in XRP, and I
01:41:21 13    would -- that -- that's my basis for saying yes,
01:41:24 14    with my caveat.  I do -- I think that it's not
01:41:30 15    only possible, I think that's what the evidence
01:41:32 16    that I'm aware of shows.
01:41:33 17         Q.    Do you think that the evidence that
01:41:37 18    you just described that Dr. ████ identified in his
01:41:41 19    report is sufficient to support the sentence:
01:41:46 20    "This evidence indicates that XRP prices react to
01:41:52 21    the news of actions by Ripple Labs"?
01:41:54 22                 MR. FIGEL:  Objection.
01:41:54 23         A.    Properly understood, the problem --
01:42:01 24    and I'm happy -- I realize I've been giving rather
01:42:05 25    long answers.  I'll stop there.
```

                                                                    122

**HIGHLY CONFIDENTIAL**

```
01:42:07   1              Properly -- properly understood,
01:42:09   2   yes, and I'm -- if you would like, I would be
01:42:12   3   happy to explain what I mean by that.
01:42:14   4          Q.   I think -- let's return to this
01:42:17   5   line of questioning.
01:42:26   6              Other than Dr. ████ report, have
01:42:28   7   you read any other expert reports in this case?
01:42:34   8          A.   I have -- "read" is perhaps too
01:42:39   9   strong.  I have reviewed -- I've reviewed one
01:42:40  10   report, one other report.
01:42:46  11          Q.   Which one?
01:42:47  12          A.   The report of Dr. or Professor
01:42:52  13   Allen Ferrell.
01:42:52  14          Q.   You characterized your review as
01:42:54  15   "'read' is too strong."  Why is that?
01:43:03  16          A.   I paged through it, paused on the
01:43:06  17   most rivetingly interesting pages, which are the
01:43:09  18   ones that have statistics on them, long enough to
01:43:14  19   understand what is being done there and read
01:43:28  20   with -- and perused, reviewed with very little
01:43:31  21   attention the substantial discussion in that
01:43:33  22   report of things that I think, if I remember
01:43:40  23   right, are called the Howey factors.  The Howey
01:43:48  24   factor, H-o-w-i-e, I think.  Or is it e-y?  I'm
01:43:51  25   not sure.
```

123

**HIGHLY CONFIDENTIAL**

```
01:43:55  1              MR. FIGEL:  Mr. Sylvester and I
01:43:57  2       both know but we're not testifying.  Can I
01:44:02  3       spare the court reporter?
01:44:03  4              MR. SYLVESTER:  Go ahead.
01:44:04  5              MR. FIGEL:  It's e-y.
01:44:08  6          Q.   Okay.  Other than Dr. Ferrell's
01:44:11  7   report, have you read any other expert reports in
01:44:15  8   this case?
01:44:15  9          A.   Other than Dr. Ferrell's report and
01:44:20 10   Dr. ████ report?
01:44:21 11          Q.   I stand corrected.  Other than
01:44:23 12   those two.
01:44:23 13          A.   No, I've read no other reports.
01:44:25 14          Q.   Okay.  Are you offering any
01:44:27 15   opinions in this case about the contents of any
01:44:29 16   expert reports other than Dr. ████ expert report?
01:44:34 17          A.   Not as I sit here today.  I've
01:44:36 18   already indicated that if asked -- I've already
01:44:39 19   testified that I have no pending projects or
01:44:43 20   requests.  I've also testified that if asked, I
01:44:46 21   would consider a request within reason.
01:44:53 22          Q.   Do you know Dr. ████?
01:45:01 23          A.   I thought about that when I read
01:45:04 24   that he was at the ███████████████.  But we
01:45:06 25   did not overlap, I believe, at the ███████████
```

                                                          124

**HIGHLY CONFIDENTIAL**

01:45:10  1   █████████.

01:45:11  2                    So the -- so I didn't remember him,

01:45:15  3   and then I looked at his CV, and I still did not

01:45:19  4   remember him.

01:45:19  5         Q.    Other than any information that you

01:45:21  6   obtained from Dr. █████ CV, do you know anything

01:45:25  7   about him?

01:45:26  8         A.    No.

01:45:26  9         Q.    Did you review the portions of

01:45:31  10  Dr. █████ report that sets forth his

01:45:34  11  qualifications?

01:45:38  12        A.    Yes.  So I suppose I should have

01:45:41  13  said yes, do I know anything else?  Anything that

01:45:44  14  it says in his report about him that is not also

01:45:47  15  in his CV, I learned from that source.

01:45:50  16        Q.    Is it your view that Dr. █████ is

01:45:53  17  qualified to offer the opinions he offered in his

01:45:57  18  expert report?

01:45:57  19                    MR. FIGEL:  Objection.

01:45:58  20        A.    Based on his description of his

01:46:01  21  background and what his CV says about him, I have

01:46:12  22  no basis to question Dr. █████ technical

01:46:15  23  qualifications.

01:46:15  24        Q.    Do you know Dr. Ferrell?

01:46:18  25        A.    No.

                                                                125

**HIGHLY CONFIDENTIAL**

```
01:46:18   1            Q.    Do you know anything about
01:46:21   2    Dr. Ferrell?
01:46:26   3            A.    Yes.
01:46:26   4            Q.    What do you know?
01:46:27   5            A.    The things that I learned from his
01:46:31   6    CV and from his description of his qualifications
01:46:36   7    in his -- in the report that I looked at briefly.
01:46:40   8            Q.    Are you aware that defendants
01:46:45   9    submitted an expert report by Daniel Fischel?
01:46:50  10            A.    Yes, I am.
01:46:50  11            Q.    Did you read his report?
01:46:51  12            A.    No.
01:46:51  13            Q.    Did you communicate with him about
01:46:53  14    his report?
01:46:54  15            A.    No.
01:46:55  16            Q.    Did you communicate with him about
01:46:57  17    your report?
01:46:57  18            A.    No.
01:46:57  19            Q.    Have you communicated with
01:47:02  20    Mr. Fischel at all about the topic of this case?
01:47:05  21            A.    No.
01:47:06  22            Q.    You do know Mr. Fischel though?
01:47:13  23            A.    Yes.
01:47:13  24            Q.    You work together?
01:47:15  25            A.    Yes.
```

126

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 01:47:15 | 1 | Q.    Do you work closely with him? |
| 01:47:20 | 2 | A.    That would overstate it.  I've |
| 01:47:23 | 3 | known Mr. Fischel for much longer than I've been |
| 01:47:27 | 4 | at Compass Lexecon.  So I say that to explain that |
| 01:47:31 | 5 | I know Mr. Fischel, but I don't work closely with |
| 01:47:37 | 6 | him. |
| 01:47:37 | 7 | Q.    Outside of Dr. ███ report, has |
| 01:47:42 | 8 | defense counsel provided you with any other event |
| 01:47:46 | 9 | study regarding XRP's price? |
| 01:47:49 | 10 | MR. FIGEL:  Why don't you start by |
| 01:47:51 | 11 | answering yes or no. |
| 01:47:52 | 12 | A.    No. |
| 01:47:52 | 13 | Q.    Outside of Dr. ███ report and the |
| 01:47:55 | 14 | Joo paper that we discussed earlier, are you aware |
| 01:47:58 | 15 | of any other event study conducted regarding XRP's |
| 01:48:04 | 16 | price? |
| 01:48:05 | 17 | A.    I have no specific knowledge of any |
| 01:48:07 | 18 | other event study. |
| 01:48:16 | 19 | Q.    Okay.  Turning to paragraph 4 of |
| 01:48:17 | 20 | your report.  Fair to say that paragraph 4, among |
| 01:48:33 | 21 | other things, summarizes certain of Dr. ███ |
| 01:48:38 | 22 | conclusions? |
| 01:48:39 | 23 | A.    (Document review.) |
| 01:48:55 | 24 | Yes. |
| 01:48:55 | 25 | Q.    In addition to the conclusions that |

127

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 01:48:58 | 1 | you summarize in your paragraph 4, Dr. ██ also |
| 01:49:01 | 2 | reached certain conclusions regarding the |
| 01:49:03 | 3 | relationship between XRP returns and the returns |
| 01:49:05 | 4 | of other digital assets.  Correct? |
| 01:49:09 | 5 | A.    Yes. |
| 01:49:09 | 6 | Q.    Are you offering any opinion in |
| 01:49:13 | 7 | this case regarding Dr. ██ conclusions |
| 01:49:15 | 8 | regarding the link between XRP prices and the |
| 01:49:17 | 9 | prices of other digital assets? |
| 01:49:20 | 10 | A.    I am not unless there is some way |
| 01:49:26 | 11 | in which that topic is implicated in the topics |
| 01:49:30 | 12 | that I do address that I'm not recognizing at the |
| 01:49:33 | 13 | moment. |
| 01:49:39 | 14 | Q.    I think we covered this earlier, |
| 01:49:40 | 15 | but for the record, the concluding part of |
| 01:49:43 | 16 | paragraph 5, the -- that, as I understand |
| 01:49:47 | 17 | it -- let me -- strike that. |
| 01:49:48 | 18 | Paragraph 5 describes your |
| 01:49:49 | 19 | assignment.  Is that right? |
| 01:49:50 | 20 | A.    Yes. |
| 01:49:57 | 21 | Q.    Okay.  And the concluding part of |
| 01:49:58 | 22 | paragraph 5 in which -- which ends: |
| 01:50:00 | 23 | "His opinions support the |
| 01:50:01 | 24 | contention that, in economic substance, |
| 01:50:03 | 25 | movements in XRP prices solely or |

128

**HIGHLY CONFIDENTIAL**

01:50:06  1          predominantly reflect responses to

01:50:09  2          disclosures about Ripple's actions."

01:50:11  3                  That assignment was given to you by

01:50:13  4   counsel.  Is that right?

01:50:19  5          A.    As I say in that paragraph, the

01:50:21  6   whole paragraph is my assignment from counsel.  It

01:50:25  7   begins:  "Counsel for Ripple has asked me to

01:50:32  8   assess."

01:50:33  9          Q.    Does Dr. ███ use the phrase

01:50:36 10   "economic substance" anywhere in his report?

01:50:51 11          A.    I would have to use Acrobat tools

01:50:55 12   like the search function to tell that.  I don't

01:50:58 13   have a verbatim recall.

01:51:00 14          Q.    Do you recall whether Dr. ███ used

01:51:02 15   the words "solely or predominantly" in his report?

01:51:13 16          A.    Again, I can't be certain of that,

01:51:17 17   but I have no reason to think that he did.  I

01:51:21 18   believe that is the

01:51:22 19   characterize- -- characterization of my

01:51:23 20   assignment, not a characterization of -- not a

01:51:26 21   quote from Dr. ███.

01:51:28 22                  And you did ask me earlier, as you

01:51:31 23   know, and I did testify earlier about this entire

01:51:42 24   half paragraph, and I did indicate at some length

01:51:44 25   its relation, in my mind, to what Dr. ███ does

                                                              129

**HIGHLY CONFIDENTIAL**

```
01:51:47   1   conclude expressly.
01:51:53   2            Q.    Taking a look at paragraph 30 of
01:51:56   3   your report.
01:52:05   4            A.    I'm there.
01:52:06   5            Q.    Do you summarize your opinions in
01:52:10   6   paragraph 30, starting with this phrase "in sum"?
01:52:15   7            A.    Yes.
01:52:22   8            Q.    Okay.  You first write:
01:52:23   9                  "It would be wrong to interpret
01:52:25  10       Dr. ███ event study as establishing that
01:52:28  11       XRP price movements are essentially a
01:52:30  12       function of Ripple's actions."
01:52:34  13                  Do you see that?
01:52:34  14            A.    Yes.
01:52:34  15            Q.    Okay.  Are you opining in this case
01:52:36  16   as to whether or not XRP price movements are
01:52:39  17   essentially a function of Ripple's actions?
01:52:42  18            A.    I am opining that there is nothing
01:52:48  19   in Dr. ███ work that supports that conclusion
01:52:50  20   and, rather, that Dr. ███ work seems to refute
01:52:54  21   rather than support that conclusion.
01:53:00  22            Q.    Have you performed any analysis to
01:53:02  23   determine whether or not XRP price movements are
01:53:04  24   essentially a function of Ripple's actions?
01:53:07  25            A.    I have performed such an analysis
```

130

**HIGHLY CONFIDENTIAL**

```
01:53:09  1   only in my review and assessment of Dr. ▮▮▮ work
01:53:14  2   in this case.  I have not undertaken that
01:53:21  3   assignment from scratch.
01:53:28  4            Q.   You next write:
01:53:30  5                 "Instead, the ▮▮▮ event study
01:53:36  6       cannot prove a causal relationship between
01:53:38  7       Ripple's actions and XRP price movements."
01:53:41  8                 Do you see that?
01:53:41  9            A.   Yes.
01:53:42 10            Q.   Are you -- setting aside your
01:53:45 11   critique of Dr. ▮▮▮ report, are you offering any
01:53:49 12   other opinions in this case as to whether or not
01:53:51 13   there is a causal relationship between Ripple's
01:53:55 14   actions and XRP price movements?
01:53:57 15                 MR. FIGEL:  Objection.
01:53:57 16            A.   So to be clear, we're setting aside
01:53:59 17   entirely Dr. ▮▮▮ work and my response to
01:54:01 18   Dr. ▮▮▮ work.  Outside of my response to
01:54:08 19   Dr. ▮▮▮ work, I am not offering any other
01:54:11 20   opinion independently of my review of Dr. ▮▮▮ on
01:54:18 21   a causal relation of this kind.
01:54:23 22            Q.   Other than your review of Dr. ▮▮▮
01:54:24 23   work, have you performed any analysis to determine
01:54:27 24   whether or not there's a causal relationship
01:54:30 25   between Ripple's actions and XRP price movements?
```

131

**HIGHLY CONFIDENTIAL**

01:54:33  1            MR. FIGEL:  Objection.

01:54:34  2       A.    I have not.  Doing such a thing was

01:54:37  3   not part -- has never been part of my assignment,

01:54:40  4   as I understood it, in this case.

01:54:42  5       Q.    In the next sentence, Dr. Marais,

01:54:45  6   do you see the phrase "and, even if it could do

01:54:49  7   so"?

01:54:49  8       A.    Yes.

01:54:53  9       Q.    Does that phrase "even if it could

01:54:55 10   do so" reference, essentially, even if the ████

01:55:01 11   event study could prove a causal relationship

01:55:02 12   between Ripple's actions and XRP price movements?

01:55:06 13       A.    Yes.

01:55:07 14       Q.    Okay.  The sentence continues:

01:55:13 15            "The ████ event study documents at

01:55:20 16       best that any dependence of XRP price

01:55:22 17       movements on Ripple-related news accounts for

01:55:25 18       no more than a modest, far-from-preponderant

01:55:28 19       portion of XRP's unusual price movements

01:55:30 20       since 2014."

01:55:31 21            Do you see that?

01:55:31 22       A.    Yes.

01:55:32 23       Q.    When you say "XRP's unusual price

01:55:34 24   movements since 2014," what is it that you are

01:55:36 25   referring to?

                                                              132

HIGHLY CONFIDENTIAL

01:55:36  1          A.    "Unusual" is written with a capital

01:55:39  2     U, and that is because it's a defined term that I

01:55:43  3     define early on in my report.

01:55:46  4               I'm happy to recount the -- that

01:55:48  5     definition that I give earlier.  But if you are

01:55:52  6     going to be taking me through that portion of my

01:55:55  7     report anyway, we might as well just go there and

01:55:58  8     not do it twice.

01:56:04  9          Q.    Sure.  Why not.  Do you want to

01:56:07 10     point me to the paragraph that you're identifying,

01:56:11 11     Dr. Marais?

01:56:11 12          A.    Yes.  Page 6, Footnote 13, which

01:56:35 13     ties to the first full sentence on that page.

01:56:45 14          Q.    In Footnote 13, you define your use

01:56:47 15     of the term "unusual"?

01:56:49 16          A.    Yes.  Actually, not only

01:56:52 17     Footnote 13, but paragraph 13 that -- near the

01:56:55 18     foot of the previous page.

01:56:57 19          Q.    What is your definition for

01:57:00 20     "unusual" for the purposes of your report?

01:57:02 21          A.    Well, I use, as I define the term

01:57:04 22     here, having noted that Dr. ███ has several

01:57:12 23     different ways of identifying what he calls

01:57:14 24     significantly positive trading days or event days,

01:57:19 25     any one of those, whichever one happens to be

                                                              133

**HIGHLY CONFIDENTIAL**

```
01:57:22   1    pertinent at any given point in the discussion is
01:57:25   2    what I call capital U "Unusual" trading days.
01:57:32   3              Q.    Are unusual trading days the days
01:57:36   4    on which Dr. ███ observed abnormal returns in
01:57:42   5    XRP?
01:57:42   6                    MR. FIGEL:  Objection.
01:57:49   7              A.    No.
01:57:49   8              Q.    Why not?
01:57:52   9                    MR. FIGEL:  Objection.
01:57:53  10              A.    Because there is an abnormal return
01:58:03  11    in XRP every -- on every single trading day.  In
01:58:08  12    fact, there are abnormal returns of various
01:58:11  13    flavors on every single trading day, and they are
01:58:16  14    not all unusual returns, that's why not.
01:58:19  15              Q.    And can you, once again, just
01:58:27  16    define for me what an unusual return is for
01:58:29  17    purposes of your report?
01:58:30  18              A.    Yes, it is a -- it is an abnormal
01:58:35  19    return of the kind that Dr. ███ labels as
01:58:42  20    significantly positive by either a parametric or a
01:58:49  21    nonparametric procedure applied in either a
01:58:55  22    two-sided or a one-sided way and with the, sort
01:59:06  23    of, small, local data mining exercise that he
01:59:09  24    performs at each trading day.
01:59:14  25              Q.    Are unusual days days in which
```

134

NULL**HIGHLY CONFIDENTIAL**

01:59:16   1    there is a statistically significant abnormal XRP

01:59:20   2    return?

01:59:20   3                    MR. FIGEL:  Objection.

01:59:24   4          A.    No, that is -- that's not -- that's

01:59:27   5    moving in the right direction but it's not --

01:59:35   6    doesn't quite get there yet.

01:59:37   7          Q.    Is it fair to say that you take

01:59:43   8    issue with Dr. ████ calling specific trading days,

01:59:47   9    quote, "significantly positive"?

01:59:56  10          A.    I -- "taking issue" is stronger.

01:59:57  11    This is just a small difference of opinion in what

02:00:07  12    is a fair -- a reasonably informative term to use.

02:00:12  13    I don't particularly take issue with him.

02:00:14  14                    But statistically significantly

02:00:20  15    positive has a meaning from a textbook.  And what

02:00:26  16    Dr. ████ actually does doesn't quite conform to

02:00:30  17    any standard textbook definition.  That's why I

02:00:33  18    introduced the term "unusual" rather than using

02:00:35  19    a -- rather than misusing a term of art.

02:00:40  20          Q.    Is there any component to your

02:00:42  21    definition of "unusual" that involves statistical

02:00:47  22    significance?

02:00:49  23          A.    Yes.

02:00:49  24          Q.    What is that component?

02:00:50  25          A.    It is the -- what I call the small

                                                                       135

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 02:00:53 | 1 | local data mining exercise of picking a target |
| 02:00:58 | 2 | day, picking one of the four approaches -- the |
| 02:01:03 | 3 | parametric, nonparametric, one-sided, two-sided, |
| 02:01:10 | 4 | whatever, pick the approach.  Then that approach |
| 02:01:13 | 5 | gives you a means of determining textbook-type |
| 02:01:20 | 6 | statistical significance. |
| 02:01:22 | 7 | But what you then do is you look |
| 02:01:26 | 8 | for the target -- the single target day with which |
| 02:01:31 | 9 | you began alone, and separately for the single |
| 02:01:35 | 10 | target day as well as the day following it, and |
| 02:01:39 | 11 | separately again for the target day, the day |
| 02:01:42 | 12 | following it, and day plus two following it. |
| 02:01:50 | 13 | You apply the more or less standard |
| 02:01:52 | 14 | textbook notion of statistical significance to all |
| 02:01:58 | 15 | three of those, and you pick the best of three, as |
| 02:02:03 | 16 | it were, if -- meaning, if any of them crosses the |
| 02:02:09 | 17 | threshold for statistical significance, now your |
| 02:02:14 | 18 | day -- your single target day with which you began |
| 02:02:17 | 19 | is, at least, a candidate for being labeled what |
| 02:02:20 | 20 | Dr. ███ calls significantly positive. |
| 02:02:25 | 21 | But now there's more.  You now do |
| 02:02:27 | 22 | the same thing in the opposite direction.  You |
| 02:02:29 | 23 | look at the target day, the target day plus the |
| 02:02:31 | 24 | next day, and finally, the target day plus the |
| 02:02:34 | 25 | next two days, and you look for a significantly |

136

**HIGHLY CONFIDENTIAL**

02:02:42  1   negative indication by the usual textbook version

02:02:46  2   of what that means.

02:02:48  3                    In each of those three cases, you

02:02:51  4   look for the most significant of the three and

02:02:53  5   check to see that that most significantly negative

02:02:59  6   outcome does not actually reach significance.

02:03:05  7                    And only if you have done all of

02:03:09  8   those steps do you finally -- and reach the

02:03:19  9   judgments, the conclusions that I have outlined

02:03:21 10   here -- only then do you call the day, label that

02:03:24 11   trading day with which you began, as significantly

02:03:29 12   positive.

02:03:31 13                    So there are many pieces involved

02:03:34 14   there, many more than in a standard textbook

02:03:40 15   definition or procedure for determining

02:03:44 16   statistical significance.

02:03:46 17                    That whole -- that's what I call

02:03:47 18   the small local data mining exercise.  And if you

02:03:51 19   pass -- if a -- the day with which you began

02:03:55 20   passes that threshold, that's what I call

02:03:59 21   "unusual," an unusual day, as a defined term.

02:04:03 22            Q.    Let's return to your paragraph 7.

02:04:30 23                    Before I ask a question on 7, do

02:04:31 24   you agree that Dr. ████ procedure flags days with

02:04:34 25   large positive price reactions?

137

**HIGHLY CONFIDENTIAL**

```
02:04:36   1                    MR. FIGEL:  Objection.
02:04:36   2            A.      Broadly, yes.  It's a screen
02:04:45   3    that -- of course, it has all of the texture in it
02:04:49   4    that -- or all of the details that I just
02:04:51   5    testified about.
02:04:52   6                    So just saying "large positive,"
02:04:54   7    well, there will be some positive -- there may be
02:04:57   8    some large positive price react- -- price
02:05:03   9    movements, not reactions, but price movements,
02:05:07  10    that it may be that there are some that somebody
02:05:10  11    would think is large, but that don't get flagged
02:05:15  12    by this procedure.
02:05:15  13                    But it's broadly a fair description
02:05:17  14    that it -- it sifts out larger from smaller upward
02:05:22  15    price movements, in the sense I testified about.
02:05:36  16            Q.      We discussed briefly earlier the
02:05:39  17    start of paragraph 7 where you write that
02:05:45  18    Dr. █████:
02:05:46  19                    "Language invites a reader of the
02:05:50  20       █████ report to conclude that Dr. █████ has
02:05:53  21       identified statistical evidence showing that
02:05:55  22       XRP price movements are driven largely and
02:05:58  23       causally by actions taken by Ripple."
02:06:01  24                    Do you remember that conversation
02:06:02  25    earlier?
```

138

HIGHLY CONFIDENTIAL

02:06:02  1          A.    I can bring it back to mind.

02:06:04  2          Q.    Other than the portion of Dr. ███

02:06:06  3   report that you quote in paragraph 6 of your

02:06:13  4   report, is there other language in Dr. ███

02:06:16  5   report that extends the invitation you describe

02:06:20  6   here?

02:06:20  7                MR. FIGEL:  Objection.

02:06:43  8          A.    There may be.  I have not committed

02:06:46  9   Dr. ███ report to memory.  If you want a more

02:06:55  10  definite answer to that, I would have to have you

02:06:58  11  provide me a copy of Dr. ███ report.

02:07:04  12          I could -- I could answer the

02:07:06  13  question fairly quickly with his report in hand

02:07:10  14  because I know where to look if -- for any

02:07:13  15  additional language of that kind, if there is any.

02:07:19  16          Q.    Let's return to that a bit later.

02:07:22  17          Are you offering any opinion in

02:07:24  18  this case as to whether or not XRP prices are

02:07:26  19  driven largely by Ripple's actions?

02:07:32  20          A.    I am of -- as to -- yes, I am

02:07:36  21  offering the opinion that nothing in Dr. ███

02:07:39  22  work establishes that proposition and that

02:07:48  23  Dr. ███ work, rather than support that

02:07:50  24  proposition, tends, instead, to refute it.

02:07:59  25          Q.    And what you just described, is

                                                              139

**HIGHLY CONFIDENTIAL**

02:08:02  1   that the entirety of any opinion you're offering
02:08:07  2   with respect to whether XRP prices are driven
02:08:09  3   largely by Ripple's actions?
02:08:11  4        A.   I hesitate to say yes because I say
02:08:16  5   a lot in my report, all of which goes to that
02:08:19  6   proposition.  But -- so to say that that's the
02:08:22  7   entirety of what I have to say about that subject
02:08:25  8   is -- would not be accurate.
02:08:31  9             But I think, as a summary statement
02:08:33 10   of what I conclude from it all, I think it's fair.
02:08:40 11        Q.   Returning back to paragraph 7, you
02:08:46 12   write in your second sentence:
02:08:50 13             "As I explained below, Dr. ████
02:08:55 14        event study is not designed to investigate
02:08:57 15        this proposition and does not, in fact,
02:08:59 16        support such a conclusion."
02:09:01 17             Do you see that?
02:09:01 18        A.   Yes.
02:09:01 19        Q.   Is the "this proposition" in that
02:09:03 20   sentence that XRP price movements are driven
02:09:08 21   largely and causally by actions taken by Ripple?
02:09:10 22        A.   Yes.
02:09:10 23        Q.   Do you believe that Dr. ████
02:09:12 24   assignment was to investigate whether XRP price
02:09:15 25   movements were driven largely and causally by

140

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

HIGHLY CONFIDENTIAL

02:09:18  1   actions taken by Ripple?

02:09:19  2           A.   I can't rule it out, but it's not

02:09:30  3   clearly -- it's not clearly enough stated for me

02:09:31  4   to rule it in either.  Specifically, Dr. ███ --

02:09:40  5   Dr. ███ provides more than one statement of what

02:09:43  6   he was asked to do.

02:09:45  7           And one of them begins with, the

02:09:48  8   SEC asked him to perform statistical analyses.

02:09:53  9   Oh, good, well, now we know what it's about.  So

02:09:56 10   that doesn't help us very much.

02:09:58 11           And then it goes on to say,

02:10:05 12   concerning the relationship, as I -- I'm

02:10:09 13   paraphrasing at this point, I would have to go

02:10:13 14   back to Dr. ███ report to get the wording

02:10:16 15   right -- the formulation of concern -- statistical

02:10:21 16   analyses concerning the relationship is broad

02:10:24 17   enough to include this proposition or not.

02:10:33 18           So I -- I will say this:  Dr. ███

02:10:41 19   does not expressly say that this proposition, or

02:10:47 20   words very like it, captures his assignment.  But

02:10:50 21   I can't -- I'm left, after reading the ███

02:10:54 22   report, not entirely clear on where the bright

02:10:57 23   lines were.  And given the apparent breadth of his

02:11:00 24   conclusions, it seems like he may think that he

02:11:04 25   was asked to opine on causation, for example.

141

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:11:09 | 1 | Q.    And that -- strike that. |
| 02:11:10 | 2 | Is your basis for believing that |
| 02:11:12 | 3 | there's some possibility that Dr. ███ assignment |
| 02:11:17 | 4 | included investigating whether XRP price movements |
| 02:11:22 | 5 | are driven largely and causally by actions taken |
| 02:11:27 | 6 | by Ripple the breadth of Dr. ███ conclusions? |
| 02:11:31 | 7 | MR. FIGEL:  Objection. |
| 02:11:31 | 8 | A.    It's not a basis for believing this |
| 02:11:37 | 9 | to be the case.  It's just a basis for being |
| 02:11:40 | 10 | unable to rule this out. |
| 02:11:46 | 11 | Again, if Dr. ███ were here and |
| 02:11:51 | 12 | were willing to stipulate that he's not trying to |
| 02:11:52 | 13 | say anything about causation and -- or about |
| 02:11:56 | 14 | substantial causation of XRP price movements, |
| 02:12:00 | 15 | if -- which I can't rule out, he may -- maybe he |
| 02:12:03 | 16 | would say that, and in that case, presumably, we |
| 02:12:05 | 17 | would be done. |
| 02:12:06 | 18 | Q.    So is it fair to say that sitting |
| 02:12:08 | 19 | here today, you don't believe one way or the other |
| 02:12:09 | 20 | that Dr. ███ assignment was to investigate |
| 02:12:12 | 21 | whether XRP price movements are driven largely and |
| 02:12:15 | 22 | causally by actions taken by Ripple? |
| 02:12:19 | 23 | A.    I don't -- |
| 02:12:19 | 24 | MR. FIGEL:  Objection. |
| 02:12:20 | 25 | THE WITNESS:  I'm sorry. |

142

HIGHLY CONFIDENTIAL

02:12:21   1          A.    I don't have an opinion or belief

02:12:24   2   about that one way or another, other than that

02:12:27   3   Dr. ███ does not entirely rule it out either in

02:12:31   4   his statement of his assignment or in his -- in

02:12:35   5   the manner in which he states his conclusions.

02:12:36   6          I don't need to have an opinion

02:12:39   7   about that to reach my opinion, which is simply

02:12:42   8   that his work does not support that conclusion.

02:12:45   9          Q.    You don't need to understand the

02:12:47  10   scope of his assignment to reach your opinion?

02:12:50  11          MR. FIGEL:   Objection.

02:12:53  12          A.    I don't need to resolve whether

02:12:55  13   this language is or is not, in his mind, part of

02:13:00  14   his assignment to be able to say that regard- --

02:13:08  15   that either way, the work that he performed and

02:13:11  16   presents in his report does not support this

02:13:15  17   proposition.

02:13:17  18          That opinion stands if Dr. -- the

02:13:23  19   hypothetical Dr. ███ I've referred to a time or

02:13:25  20   two, the ███ avatar came into the room and said,

02:13:33  21   "But that's not what I was trying to prove," then

02:13:36  22   I would say in response, "Well, great.   Then we

02:13:43  23   agree that that's not even what you were trying

02:13:43  24   to, but you certainly didn't prove it."

02:13:45  25          And if Dr. ███ avatar came in and

143

**HIGHLY CONFIDENTIAL**

02:13:49  1  said that he was trying to prove it, I would say

02:13:51  2  the same, "Your work does not prove it."

02:13:54  3              That's why -- that is why it

02:13:55  4  doesn't matter, to my opinion, ultimately, what a

02:14:03  5  completely clear statement of his assignment was.

02:14:28  6              THE WITNESS:  I'm noticing that

02:14:29  7       we've been going for about an hour and a

02:14:31  8       quarter --

02:14:31  9              MR. SYLVESTER:  Would you like the

02:14:33 10       take a break?

02:14:33 11              THE WITNESS:  Yes.  It doesn't have

02:14:33 12       to be at this moment.

02:14:33 13              MR. SYLVESTER:  Now's great.  Let's

02:14:33 14       take a break.

02:14:35 15              THE WITNESS:  Thank you,

02:14:36 16       Mr. -- you're Mr. Sylvester?

02:14:37 17              MR. SYLVESTER:  I am.

02:14:37 18              THE WITNESS:  Mr. Sylvester, thank

02:14:37 19       you.

02:14:37 20              MR. SYLVESTER:  Sure.

02:14:37 21              THE VIDEOGRAPHER:  The time is

02:14:37 22       2:13 p.m.  This concludes Media 3.  Off the

02:14:37 23       record.

02:37:11 24              (Recess taken from 2:13 p.m. to

02:37:11 25       2:36 p.m.)

                                                              144

**HIGHLY CONFIDENTIAL**

02:37:11  1              THE VIDEOGRAPHER:  The time now is
02:37:11  2      2:36 p.m.  This begins Media 4.  On the
02:37:11  3      record.
02:37:11  4   BY MR. SYLVESTER:
02:37:20  5          Q.    Dr. Marais, turning back to
02:37:21  6   paragraph 5 of your report.
02:37:30  7          A.    I am there.
02:37:30  8          Q.    Okay.  Thank you.  I believe that
02:37:31  9   you testified earlier that the question of whether
02:37:34 10   movements in XRP prices solely or predominantly
02:37:38 11   reflect responses to disclosures about Ripple's
02:37:42 12   actions was a central issue in this case.  Is that
02:37:47 13   right?
02:37:51 14          A.    I qual- -- as qualified by my
02:37:54 15   saying "I understand."
02:37:55 16          Q.    What is the basis for your
02:37:56 17   understanding?
02:37:58 18              MR. FIGEL:  You can answer it but
02:37:59 19      don't reveal communications with counsel.
02:38:11 20          A.    The basis of my understanding is my
02:38:16 21   nonexpert paraphrase of what I understand the
02:38:27 22   expressions "investors in" or "purchasers of XRP
02:38:35 23   look to Ripple to create value."
02:38:41 24              Now, even though that may not be a
02:38:45 25   direct quote from anybody, the "create value"

145

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:38:49 | 1 | idea, that phrase, I think, comes straight from |
| 02:38:53 | 2 | Dr. ███ report.  And I understand as a |
| 02:38:59 | 3 | layperson -- and, again, I need to be completely |
| 02:39:02 | 4 | clear, I'm confident that there is shelves full of |
| 02:39:10 | 5 | case law and legal understanding of this point, |
| 02:39:13 | 6 | and I'm not purporting to summarize any of that. |
| 02:39:17 | 7 | I'm just describing my layperson's understanding. |
| 02:39:20 | 8 | But looking to Ripple for creating |
| 02:39:23 | 9 | value as an investor in XRP, to me, does not |
| 02:39:26 | 10 | convey very occasionally looking to Ripple for a |
| 02:39:31 | 11 | sliver of the value creation or the sliver of the |
| 02:39:35 | 12 | value that might be created by my position in XRP. |
| 02:39:43 | 13 | But it strongly suggests to me |
| 02:39:45 | 14 | the -- - what I par- -- what I paraphrase in my |
| 02:39:52 | 15 | own statement that I gave you about what I -- my |
| 02:39:55 | 16 | understanding that that is a central issue in the |
| 02:39:59 | 17 | case. |
| 02:39:59 | 18 | So I do recall from the first |
| 02:40:02 | 19 | amended complaint in this case repeated references |
| 02:40:04 | 20 | by the SEC itself to -- to the economic substance |
| 02:40:11 | 21 | in -- and the actual phrase "in economic" -- "in |
| 02:40:15 | 22 | economic reality" I think actually is the phrase, |
| 02:40:19 | 23 | "economic reality dictates" or "in economic |
| 02:40:22 | 24 | reality." |
| 02:40:23 | 25 | Now, putting together, as an |

146

**HIGHLY CONFIDENTIAL**

02:40:25  1  educated layperson, the idea of economic -- in

02:40:30  2  economic reality investors in XRP look to Ripple

02:40:39  3  for value creation, without any qualification that

02:40:42  4  says for some infinitesimal portion of that value

02:40:49  5  creation or some sliver, that, to me, suggests

02:40:57  6  this, what I've characterized here as the

02:41:00  7  contention that in economic substance, read

02:41:07  8  economic reality, movements in XRP prices solely,

02:41:08  9  or, if solely is too strong, predominantly reflect

02:41:16  10  responses to disclosures about Ripple's actions.

02:41:19  11          So I -- that was a longer answer

02:41:24  12  than I realized I was embarking on, but the -- you

02:41:34  13  were asking for my basis, and I did describe my

02:41:36  14  basis.

02:41:36  15          Q.   Okay.  Let's move on to paragraph

02:41:38  16  17 of your report, please.

02:41:42  17          A.   That suggests to me, at this rate,

02:41:48  18  we'll be done in ten minutes.

02:41:56  19          Q.   Why would we want to cut our time

02:41:59  20  short, Dr. Marais?

02:42:00  21          So paragraph 17, among other

02:42:03  22  things, contains your Table 1.  Is that right?

02:42:05  23          A.   Yes.

02:42:06  24          Q.   And as I understand your Table 1,

02:42:09  25  it displays, among other information, tallies of

147

**HIGHLY CONFIDENTIAL**

02:42:13  1   numbers of days related to Dr. ███ Model 5, key

02:42:20  2   milestone news events model.  Is that correct?

02:42:22  3          A.    Yes.  But for the statement to be

02:42:29  4   entirely correct, you also have to include

02:42:33  5   one -- you also have to include one-sided

02:42:34  6   parametric approach.

02:42:35  7          Q.    Okay.  Thank you.  So looking at

02:42:37  8   the table, the top row is labeled -- or rather, I

02:42:43  9   should say the columns are labeled "Daily XRP

02:42:48  10  Return."

02:42:49  11         Do you see that?

02:42:49  12         A.    Yes.

02:42:49  13         Q.    And the Daily XRP Return columns

02:42:52  14  are split into "unusual" and "regular."

02:42:55  15         Do you see that?

02:42:56  16         A.    Yes.

02:42:56  17         Q.    And "unusual" there, is that the

02:42:58  18  same meaning of unusual that you explained to us

02:43:00  19  earlier today?

02:43:00  20         A.    Yes.

02:43:01  21         Q.    Okay.

02:43:01  22         A.    Throughout my report, there's only

02:43:06  23  one meaning.

02:43:07  24         Q.    And "regular" essentially means not

02:43:09  25  unusual.  Is that right?

148

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:43:09 | 1 | A.   That's exactly correct. |
| 02:43:11 | 2 | Q.   Okay.  And on the left side of the |
| 02:43:13 | 3 | table, addressing the rows, there's "News Event?" |
| 02:43:17 | 4 | question mark. |
| 02:43:17 | 5 | Do you see that? |
| 02:43:19 | 6 | A.   Yes. |
| 02:43:20 | 7 | Q.   And for "News Event?" question |
| 02:43:23 | 8 | mark, there are two values, "Yes" and "No." |
| 02:43:26 | 9 | Do you see that? |
| 02:43:26 | 10 | A.   Yes. |
| 02:43:26 | 11 | Q.   Does "Yes" indicate those days on |
| 02:43:29 | 12 | which Dr. ███ identified a Ripple key milestone |
| 02:43:33 | 13 | news event? |
| 02:43:33 | 14 | A.   Yes. |
| 02:43:34 | 15 | Q.   And "No" indicates any of the days |
| 02:43:37 | 16 | within this period in which Dr. ███ did not |
| 02:43:40 | 17 | identify a key milestone news event? |
| 02:43:43 | 18 | A.   Yes. |
| 02:43:43 | 19 | Q.   Okay.  And the total number of days |
| 02:43:45 | 20 | in the entire Model 5, using a one-sided |
| 02:43:52 | 21 | parametric approach, is 2,007? |
| 02:43:57 | 22 | A.   Yes. |
| 02:43:59 | 23 | Q.   Okay.  And -- go ahead. |
| 02:43:59 | 24 | A.   Actually 2,008 but ... |
| 02:44:05 | 25 | Q.   Do you want to elaborate on why -- |

149

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:44:08 | 1 | the difference between 2,007 and 2,008? |
| 02:44:09 | 2 | A.    Well, to get returns, you have to |
| 02:44:12 | 3 | have one extra day -- right? -- it takes two days |
| 02:44:16 | 4 | to calculate one return.  Then you can reuse the |
| 02:44:19 | 5 | second of those days for the second return. |
| 02:44:21 | 6 | So the number of day -- your |
| 02:44:24 | 7 | question was about the number of days involved, |
| 02:44:28 | 8 | and the days and the returns are not identical. |
| 02:44:30 | 9 | Q.    I see.  Okay.  So the -- but the |
| 02:44:35 | 10 | number of days -- the Number 2,007 in this chart |
| 02:44:41 | 11 | does refer to days.  Is that right? |
| 02:44:44 | 12 | A.    It refer- -- it does refer to days, |
| 02:44:52 | 13 | but it does not count all of the days that are |
| 02:44:56 | 14 | involved in creating this little chart.  There's |
| 02:45:00 | 15 | one more day involved.  That's all I meant to |
| 02:45:03 | 16 | point out.  And it's only because of the way you |
| 02:45:06 | 17 | framed your question. |
| 02:45:07 | 18 | Q.    Okay.  Turning to the "News Event? |
| 02:45:10 | 19 | Yes" row. |
| 02:45:10 | 20 | Do you see that? |
| 02:45:11 | 21 | A.    Yes. |
| 02:45:11 | 22 | Q.    And on "News Event?  Yes," it |
| 02:45:13 | 23 | appears that Dr. ▉ has identified four days on |
| 02:45:16 | 24 | which there was a Ripple key milestone news event |
| 02:45:19 | 25 | and also unusual daily XRP returns.  Is that |

150

**HIGHLY CONFIDENTIAL**

```
02:45:23  1    right?
02:45:23  2              A.    Yes.
02:45:25  3              Q.    Okay.   And the Number 1 is one day
02:45:30  4    on which Dr. ███ has identified a Ripple key
02:45:33  5    milestone news event, and that day there were
02:45:36  6    regular daily XRP returns.  Is that right?
02:45:41  7              A.    Correct.
02:45:42  8              Q.    Okay.  And the total number of days
02:45:43  9    on which Dr. ███ observed a Ripple key milestone
02:45:47 10    news event in this period is five.  Is that right?
02:45:51 11              A.    Yes.
02:45:52 12              Q.    Okay.  Do you agree that there is a
02:45:59 13    statistically significant correlation between the
02:46:02 14    Ripple key milestone news events identified by
02:46:07 15    Dr. ███ and the categorization of trading days
02:46:12 16    into unusual and regular?
02:46:13 17              MR. FIGEL:  Objection.
02:46:19 18              A.    Despite my coffee, I do need -- I
02:46:23 19    apologize, I do need to hear the question again.
02:46:25 20              Q.    Of course.  Do you agree that there
02:46:28 21    is a statistically significant correlation between
02:46:32 22    Ripple key news event- -- strike that.
02:46:34 23              Do you agree that there is a
02:46:35 24    statistically significant correlation between
02:46:37 25    Ripple key milestone news events, identified by
```

151

**HIGHLY CONFIDENTIAL**

02:46:40  1   Dr. ████, and the categorization of trading days

02:46:46  2   into the categories "Unusual" and "Regular"?

02:46:48  3            MR. FIGEL:  Objection.

02:46:55  4            A.    Measured in terms of the

02:46:57  5   hyp- -- the nonstandard hypergeometric

02:47:00  6   distributional analysis that Dr. ████ introduces

02:47:06  7   for his work in this case, I do agree that there

02:47:14  8   is a p-value that is significant in relation to

02:47:19  9   the 95 percent confidence level.

02:47:25 10            Measured in terms of a standard

02:47:27 11   event study, I don't know because Dr. ████ doesn't

02:47:32 12   tell us.

02:47:33 13            Q.    What is it that's missing from

02:47:44 14   Dr. ████ analysis that leads you to say that,

02:47:48 15   measured in terms of a standard event study, you

02:47:51 16   don't know?

02:47:51 17            MR. FIGEL:  Objection.

02:47:51 18            A.    Well, one completely standard

02:47:59 19   approach would be to have a pooled regression

02:48:04 20   analysis that encompasses all of the event dates

02:48:10 21   of the particular kind he's interested in here

02:48:14 22   with an indicator variable that turns on for

02:48:23 23   events of that kind included in the regression.

02:48:26 24            That's a zero-one variable that

02:48:30 25   turns -- that exists, is populated for all of the

152

**HIGHLY CONFIDENTIAL**

02:48:32  1   dates in the analysis, but is mostly equal to zero

02:48:40  2   and equal to 1 just on the event dates.  That

02:48:43  3   variable would have a coefficient.  That

02:48:46  4   coefficient would have a corresponding T

02:48:52  5   statistic.

02:48:53  6          And although it is likely that,

02:48:55  7   based on what I'm seeing here, that the -- that

02:49:02  8   that approach would yield -- it may well yield a

02:49:06  9   statistically significant result, we don't

02:49:09  10  actually know, because Dr. ██████ analysis doesn't

02:49:13  11  actually produce that result.

02:49:14  12         So that's what I mean when I say I

02:49:20  13  can't really tell what a stand- -- what a standard

02:49:27  14  event study using indicator -- an indicator

02:49:28  15  variable would tell us.

02:49:29  16         But in terms of Dr. ██████ somewhat

02:49:39  17  peculiar hypergeometric analysis, yes, I agree,

02:49:44  18  there's -- he gets a p-value that is less than

02:49:47  19  .05.

02:49:48  20     Q.   It looks like, at least in part,

02:49:50  21  your paragraph 18 summarizes Dr. ██████ analysis

02:49:56  22  with respect to these four unusual days that are

02:49:59  23  displayed in Table 1.  Is that fair?

02:50:05  24     A.   I need to read it.

02:50:06  25     Q.   Sure.

153

**HIGHLY CONFIDENTIAL**

02:50:21  1          A.     (Document review.)

02:50:22  2                 Yes, it's intended to be an

02:50:23  3     explanation of Dr. ███████ finding.

02:50:27  4          Q.     And is it fair to say that, as

02:50:29  5     described in your paragraph 18, you do not dispute

02:50:32  6     Dr. ███████ finding with respect to his

02:50:35  7     characterization of these four unusual days?

02:50:38  8                 MR. FIGEL:  Objection.

02:50:43  9          A.     I certainly strongly stand by my

02:50:46  10    paragraph 18.  So I -- if that's what -- if you're

02:50:56  11    asking me whether I agree with what I say in my

02:50:59  12    paragraph 18, unambiguously, yes.

02:51:03  13         Q.     Okay.  And to make sure I'm reading

02:51:05  14    your paragraph 18 correctly --

02:51:07  15         A.     Yes.

02:51:07  16         Q.     -- at least with respect to

02:51:13  17    Dr. ███████ conclusions based on his analysis of the

02:51:16  18    four unusual daily XRP return days that correspond

02:51:22  19    with the Ripple key milestone news events, you

02:51:25  20    don't dispute his conclusion of statistical

02:51:30  21    significance?

02:51:31  22         A.     Within -- yes, with the important

02:51:34  23    proviso that we are talking about this framework

02:51:42  24    of performing the analysis within a hypergeometric

02:51:45  25    distribution looking for what he calls a

                                                          154

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:51:50 | 1 | correlation, but in -- again, not in the sense in |
| 02:51:58 | 2 | which that term is usually used. |
| 02:52:00 | 3 | It's not a correlation coefficient. |
| 02:52:03 | 4 | It's not a nonparametric correlation coefficient. |
| 02:52:08 | 5 | It -- it measures the English language concept of |
| 02:52:10 | 6 | correlation, not the statistical concept, and it |
| 02:52:16 | 7 | is a statistically significant finding within that |
| 02:52:19 | 8 | framework.  I do agree with that. |
| 02:52:21 | 9 | Q.    Do you believe -- actually, strike |
| 02:52:21 | 10 | that. |
| 02:52:27 | 11 | Let me hand you Exhibit 2. |
| 02:52:28 | 12 | (Exhibit LM-2, Amended expert |
| 02:52:28 | 13 | report of Dr. ███████, marked for |
| 02:52:41 | 14 | identification, as of this date.) |
| 02:52:41 | 15 | Q.    Dr. Marais, I'm handing you |
| 02:52:43 | 16 | Exhibit 2.  Is LM-2 Dr. █████ amended expert |
| 02:53:00 | 17 | report submitted in this case? |
| 02:53:01 | 18 | A.    I recognize it as being that. |
| 02:53:03 | 19 | Q.    Okay.  Let's turn to paragraph 12a |
| 02:53:09 | 20 | of Exhibit 2, please. |
| 02:53:22 | 21 | A.    I'm there. |
| 02:53:23 | 22 | Q.    Okay.  The first bolded sentence in |
| 02:53:26 | 23 | 12a of Dr. █████ report says: |
| 02:53:29 | 24 | "XRP prices react to certain news |
| 02:53:31 | 25 | and public statements about Ripple's |

155

HIGHLY CONFIDENTIAL

```
02:53:33  1        actions."
02:53:34  2                    Do you see that?
02:53:35  3        A.    Yes.
02:53:35  4        Q.    Do you dispute Dr. ███ conclusion
02:53:39  5   that I just read?
02:53:41  6        A.    I would say, at best, unproven.
02:53:53  7        Q.    Okay.  Let's move on to the next
02:53:55  8   sentence:
02:53:56  9             "Using a well-accepted event study
02:53:57 10        methodology, I find statistically significant
02:53:59 11        evidence that XRP prices react to news about
02:54:02 12        Ripple's actions."
02:54:04 13                    Do you see that?
02:54:04 14        A.    I see.  I do see it.
02:54:06 15        Q.    Okay.  Do you dispute that
02:54:07 16   sentence?
02:54:12 17        A.    Properly read and interpreted in
02:54:15 18   the context of his report, I understand what the
02:54:18 19   sentence means.  The sentence is misleading.
02:54:22 20        Q.    Please tell me why.
02:54:26 21        A.    The statistically significant
02:54:27 22   evidence that he finds is the correlation, the
02:54:34 23   coincidence between certain days that he's labeled
02:54:36 24   news days and certain days that he has labeled, in
02:54:40 25   my terminology, unusual returns days.
```

156

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 02:54:50 | 1 | Now, there is the well-known |
| 02:54:52 | 2 | truism -- which doesn't mean it is false, it is |
| 02:54:55 | 3 | true -- that association is not causation.  And |
| 02:54:59 | 4 | correlation is association. |
| 02:55:04 | 5 | So the statistical significance of |
| 02:55:07 | 6 | the finding is suggestive of correlation and |
| 02:55:17 | 7 | causes us, if we accept the evidence of the |
| 02:55:19 | 8 | p-value of the statistical significance, causes me |
| 02:55:24 | 9 | to agree that this is -- this is evidence that has |
| 02:55:28 | 10 | passed the usual thresholds for association. |
| 02:55:37 | 11 | It is a large step from there to |
| 02:55:42 | 12 | causation.  And p-values don't tell you causation. |
| 02:55:46 | 13 | And observational studies have great difficulty in |
| 02:55:51 | 14 | telling you causation.  And event studies are |
| 02:55:54 | 15 | observational studies. |
| 02:55:55 | 16 | And where event studies are used in |
| 02:55:59 | 17 | scholarly research, they have a property that is |
| 02:56:04 | 18 | simply absent from Dr. ███ work in this case |
| 02:56:11 | 19 | that goes to the issue of causation. |
| 02:56:20 | 20 | Q.   What property is absent from |
| 02:56:22 | 21 | Dr. ███ work in this case that goes to the issue |
| 02:56:23 | 22 | of causation? |
| 02:56:28 | 23 | MR. FIGEL:  Objection. |
| 02:56:29 | 24 | A.   Event studies including the event |
| 02:56:31 | 25 | studies that are referred to by Dr. ███ Joo |

157

**HIGHLY CONFIDENTIAL**

02:56:39   1   reference to an article by a pair of Scandinavians
02:56:49   2   with unpronounceable names for the generalized
02:56:53   3   rank test, that Dr. ███ ultimately imports into
02:56:57   4   his own work, are typically, in academic research,
02:57:06   5   performed for groups of firms.
02:57:08   6          For example, do financial firms'
02:57:12   7   stock prices respond to their earnings
02:57:14   8   announcements?  What that means is that there are
02:57:21   9   large cross sections, and ideally in those large
02:57:26   10   cross sections, the event dates don't coincide for
02:57:30   11   different firms.  So different firm announcements
02:57:33   12   on different dates.
02:57:34   13          That adds a dimension that helps --
02:57:39   14   it doesn't fully distinguish between correlation
02:57:42   15   and causation, but it adds a dimension that is
02:57:47   16   helpful in moving towards a causal conclusion.
02:57:51   17          In the case of Dr. ███ work in
02:57:53   18   this case, as is often the case in
02:57:57   19   litigation-related event studies -- so this is --
02:58:01   20   this is not -- I'm not criticizing Dr. ███
02:58:04   21   personally for this -- but the problem here is
02:58:07   22   that this is a single price series.
02:58:09   23          It's like a single firm event
02:58:11   24   study, which is not the same thing as a portfolio
02:58:14   25   event study.  That makes it particularly difficult

158

**HIGHLY CONFIDENTIAL**

02:58:20  1   to move from association to causation, as Dr. ███

02:58:29  2   himself expressly acknowledges in his report.  And

02:58:36  3   I don't see Dr. ███ bridging that gap in this

02:58:40  4   report.

02:58:40  5            Q.    Can you point me to the place in

02:58:46  6   your report where you set forth the critique that

02:58:51  7   you just articulated?

02:58:52  8            A.    We've been there already.  But we

02:59:00  9   can go back.  Let's see.  In my conclusion, where

02:59:04 10   you asked me whether these are my conclusions, I

02:59:06 11   note that:

02:59:08 12            "Instead, the ███ event study

02:59:11 13        cannot prove a causal relationship between

02:59:15 14        Ripple's actions and XRP price movements."

02:59:16 15            That's in the middle of paragraph

02:59:17 16   30.  And you spent some time asking me about that

02:59:20 17   earlier, I recall.

02:59:29 18            You -- I remember -- I recall you

02:59:30 19   asking me what I meant when I said "even if it

02:59:34 20   could do so," and I said that refers to the

02:59:37 21   proposition that the ███ event study cannot prove

02:59:42 22   a causal relationship.

02:59:44 23            Now, that's just the summary

02:59:45 24   statement.  I say it back in paragraph 7 where we

02:59:53 25   just were, I think.  Paragraph 7 is not the right

159

**HIGHLY CONFIDENTIAL**

03:00:13  1   paragraph reference.

03:00:17  2                    (Document review.)

03:00:18  3                    Oh, in paragraph 7, I -- yes, "this

03:00:25  4   language invites a reader ... 'evidence' showing

03:00:26  5   that" it's -- blah, et cetera:

03:00:27  6                    "'Evidence' showing that XRP price

03:00:29  7          movements are driven largely" -- and then set

03:00:31  8          apart in between em dashes:

03:00:38  9                    "And causally -- by actions taken

03:00:40 10          by Ripple.  As I explain below, Dr. ███

03:00:46 11          event study is not designed to investigate

03:00:48 12          this proposition."

03:00:50 13                    So that's where I am setting it up.

03:00:57 14   I -- so I book-ended it.  There are 12 pages in

03:01:01 15   between that I would need to go through to point

03:01:03 16   to where else I reach this point.

03:01:13 17          Q.   I would be particularly interested

03:01:14 18   in any places where you could point to that --

03:01:17 19   where you explain why, in your view, the ███

03:01:20 20   event study cannot prove a causal relationship

03:01:24 21   between Ripple's actions and XRP prices?

03:01:43 22          A.   I take it you mean apart from the

03:01:48 23   virtually universally known limitation of

03:01:53 24   observational studies which I've referred to.

03:02:05 25          Q.   Where are you reading from, Doctor?

                                                              160

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 03:02:06 | 1 | A.    I'm not reading. |
| 03:02:13 | 2 | Q.    Oh. |
| 03:02:14 | 3 | A.    I was thinking about what kind of |
| 03:02:16 | 4 | statement I'm looking for. |
| 03:03:18 | 5 | (Document review.) |
| 03:03:18 | 6 | In paragraph 20, I bring up, |
| 03:03:23 | 7 | without using the term "confounding," the |
| 03:03:33 | 8 | confounding hypothesis of the -- the point being |
| 03:03:46 | 9 | the apparent absence of any attempt by Dr. ██ to |
| 03:03:52 | 10 | rule out, even by searching for news events |
| 03:03:57 | 11 | related to cryptocurrency other than going to |
| 03:04:04 | 12 | Ripple's repository of news releases and links, I |
| 03:04:11 | 13 | mean, there's no indication that I find that |
| 03:04:17 | 14 | Dr. ██ has searched widely for answers to the |
| 03:04:20 | 15 | question, Well, what else happened on those days? |
| 03:04:23 | 16 | That's called confounding.  And if |
| 03:04:28 | 17 | there is a confounding factor operating, you |
| 03:04:34 | 18 | really can't say what the association is with or |
| 03:04:36 | 19 | what the potential cause is. |
| 03:04:42 | 20 | So I'm noting confounding as a |
| 03:04:44 | 21 | discussion in paragraph 20.  In sum, I say "the |
| 03:04:48 | 22 | association," and that's a carefully chosen word: |
| 03:04:56 | 23 | "Between Dr. ██ subjectively |
| 03:04:59 | 24 | selected days with Ripple news events and |
| 03:05:02 | 25 | un-" -- "as a matter of fundamental |

161

**HIGHLY CONFIDENTIAL**

03:05:07  1          statistical principles," in which I'm

03:05:09  2          referring to the confounding idea that I just

03:05:11  3          brought up.

03:05:14  4                    But the princ- -- when I say

03:05:17  5     "fundamental statistical principle," I've already

03:05:19  6     said -- quoted here the fundamental principle of

03:05:22  7     association is not causation.  That is so

03:05:25  8     well-known that most middle schoolers can quote

03:05:28  9     it.

03:05:28  10                   So the fact that I'm referring to

03:05:30  11    the association that he has documented here, "as a

03:05:34  12    matter of fundamental statistical principles, does

03:05:38  13    not per se, establish that the key milestones news

03:05:41  14    caused" -- in italics -- the abnormal XRP

03:05:49  15    coincident returns.

03:05:50  16                   So he overreaches in his apparent

03:05:57  17    causal claim, I say.  That -- I would concede that

03:06:00  18    that is terse, which is unlike me.  But it is an

03:06:04  19    explanation of confounding, and the -- a reference

03:06:08  20    to the extreme limitations of observational data.

03:06:19  21    Now, there's probably more.  I just paused on

03:06:24  22    paragraph 20.

03:06:25  23         Q.   May I ask, in paragraph 20, why you

03:06:28  24    did not use the word "confounding"?

03:06:30  25         A.   Because I explained the concept.

                                                            162

```
03:06:32   1            Q.    No reason not to use the word?
03:06:34   2                  MR. FIGEL:  Objection.
03:06:34   3            A.    There is no -- there is no specific
03:06:35   4    reason not to use the word.  I'm not writing for a
03:06:39   5    technical audience in this report.  And I could
03:06:45   6    have said "confounding," but then I would have had
03:06:50   7    to explain it anyway.
03:06:51   8            Q.    Are single firm event studies used
03:06:54   9    in securities litigation to establish causation
03:06:57  10    from correlation?
03:06:58  11                  MR. FIGEL:  Objection.
03:06:59  12            A.    They are used to find evidence that
03:07:12  13    may then be interpreted based on other
03:07:21  14    considerations as possibly causal or not.
03:07:27  15                  They -- the event study per se is
03:07:35  16    incapable of establishing causation for all -- for
03:07:40  17    all of the reasons and more that I've been -- that
03:07:44  18    I've just alluded to.
03:07:51  19                  May I ask respectfully, are we done
03:07:53  20    with the previous question, or should I continue
03:07:56  21    finding references to where I flesh out what I am
03:08:01  22    saying about association is not causation and
03:08:04  23    there is a potential for confounding?
03:08:08  24            Q.    I think I understand those two
03:08:14  25    principles that you've identified.
```

163

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 03:08:16 | 1 | Did you, in your work on this case, |
| 03:08:20 | 2 | check for whether there was confounding |
| 03:08:22 | 3 | information on, for instance, the four unusual |
| 03:08:28 | 4 | news days identified in Dr. ███ Model 5? |
| 03:08:31 | 5 | MR. FIGEL:  Objection. |
| 03:08:32 | 6 | A.    I did not.  I did not need to to |
| 03:08:38 | 7 | arrive at the conclusions that I have arrived at. |
| 03:08:43 | 8 | It was enough for me to -- since that's not a -- |
| 03:08:47 | 9 | that's not really front and center in -- in my own |
| 03:08:51 | 10 | opinions, it's enough for me to note that -- it |
| 03:08:56 | 11 | seemed enough for me to note that Dr. ███ does |
| 03:09:00 | 12 | not seem to have done anything to rule out other |
| 03:09:03 | 13 | factors. |
| 03:09:03 | 14 | Q.    And just so the record is clear |
| 03:09:05 | 15 | because I limited my last question, did you check |
| 03:09:07 | 16 | for any confounding information at all as part of |
| 03:09:13 | 17 | your work in this case? |
| 03:09:14 | 18 | A.    No, I've -- I -- to be clear, and |
| 03:09:16 | 19 | this may save us some time, I did not change or |
| 03:09:23 | 20 | add to -- except in presentation of some results |
| 03:09:26 | 21 | that Dr. ███ chose not to highlight -- to |
| 03:09:34 | 22 | Dr. ███ work, I'm not endorsing his modeling, |
| 03:09:37 | 23 | his index modeling, and I'm not endorsing his news |
| 03:09:41 | 24 | search.  But I do accept both as the premise of my |
| 03:09:46 | 25 | work in this case. |

164

HIGHLY CONFIDENTIAL

03:09:48  1          Q.    Do you have any objection to
03:09:56  2   Dr. ████ index modeling in this case?
03:09:58  3                MR. FIGEL:  Objection.
03:10:15  4          A.    I question aspects of his index
03:10:18  5   modeling.  It seems to me perfect -- it seems to
03:10:26  6   me fairly reasonable as, sort of, the first
03:10:31  7   preliminary thing that one would try.
03:10:35  8                But then there are -- there are
03:10:43  9   other kinds of things that I would think one would
03:10:46 10   want to do that Dr. ████ does not seem to give any
03:10:50 11   indication that he did as the -- as a, kind of, an
03:10:56 12   obvious refinement of his work.
03:10:59 13          Q.    Did you undertake any such
03:11:02 14   refinements to determine whether Dr. ████ results
03:11:05 15   would change if he had taken the approach that you
03:11:09 16   would prefer?
03:11:11 17                MR. FIGEL:  Objection.
03:11:11 18          A.    No, I didn't do -- I did not
03:11:13 19   attempt to do what Dr. ████ seems to have failed
03:11:17 20   to do.  And I really didn't need to do anything of
03:11:20 21   the kind to arrive at my key opinions in this
03:11:24 22   case.
03:11:24 23          Q.    Turning back to Dr. ████ paragraph
03:11:32 24   12a.  Just want to focus on a portion of a
03:11:49 25   sentence that we've already looked at to make sure

                                                          165

**HIGHLY CONFIDENTIAL**

```
03:11:52   1   I understand your views.  And that's -- Dr. ████
03:11:56   2   writes -- this is the first sentence, the second
03:12:01   3   half:
03:12:02   4               "I find statistically significant
03:12:03   5        evidence that XRP prices react to news about
03:12:06   6        Ripple's actions."
03:12:08   7               Is it true, Dr. Marais, that,
03:12:09   8   typically, event studies provide statistically
03:12:12   9   significant evidence of a price reaction to a
03:12:14  10   particular piece of news?
03:12:15  11               MR. FIGEL:  Objection.
03:12:15  12        A.    Event studies typically measure an
03:12:25  13   association.  There is then a question of whether
03:12:33  14   that association represents a reaction.  Reaction
03:12:40  15   implies a causal effect that -- in other words,
03:12:45  16   that if the news had not happened, the price
03:12:50  17   movement that is documented would not have
03:12:52  18   happened.
03:12:53  19               That part is sort of an extra
03:13:00  20   statistical meaning and be outside of the strict
03:13:04  21   p-value calculation, regression calculation
03:13:14  22   inference.  And that is almost always true with
03:13:18  23   observational data, that you can't just look at
03:13:19  24   what the -- comes out of a statistical calculation
03:13:21  25   and call it a causal effect.
```

166

**HIGHLY CONFIDENTIAL**

03:13:24  1                    Dr. ██████ recognizes that expressly
03:13:27  2   and writes as much in his own report.  Now, he
03:13:31  3   says there are things that you have to do to reach
03:13:39  4   a causal -- causal conclusion, and then he doesn't
03:13:42  5   appear to do them.
03:13:43  6                    And yet, here at the beginning, he
03:13:44  7   states that he has evidence of a price reaction,
03:13:46  8   meaning causation.  That's kind of a gap in -- a
03:13:55  9   logical gap in ██████.
03:13:59 10            Q.    Let me make sure I understand your
03:14:02 11   answer.  There's one set of circumstances in which
03:14:04 12   an event study could per se prove causation, and
03:14:06 13   there's another set of circumstances in which an
03:14:13 14   event study could provide evidence of causation.
03:14:14 15                    Are you with me so far?
03:14:16 16            A.    No, I'm not.
03:14:16 17            Q.    Okay.  I'm just trying to
03:14:17 18   understand your answer.  I think it's your view,
03:14:18 19   correct me if I'm wrong, that -- backing up from
03:14:20 20   Dr. ██████ report -- in general, the results of an
03:14:25 21   event study do not per se prove causation.
03:14:28 22            A.    I think that's fair.
03:14:29 23            Q.    Okay.  Again, at a level of
03:14:30 24   generality, I'm asking, are event studies
03:14:34 25   typically used to provide evidence toward or

                                                              167

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 03:14:38 | 1 | against a conclusion of causation? |
| 03:14:40 | 2 | A.    Yes. |
| 03:14:44 | 3 | Q.    Okay. |
| 03:14:44 | 4 | A.    That's fair as a very general |
| 03:14:48 | 5 | characterization. |
| 03:14:49 | 6 | Q.    Okay.  And is it your view in this |
| 03:14:51 | 7 | case that Dr. ███ study fails to provide |
| 03:14:56 | 8 | statistically significant evidence that XRP prices |
| 03:14:59 | 9 | react to news about Ripple's actions? |
| 03:15:02 | 10 | A.    No, that's not my view. |
| 03:15:09 | 11 | Q.    Okay.  What evidence does Dr. ███ |
| 03:15:15 | 12 | study -- let me rephrase. |
| 03:15:16 | 13 | What statistically significant |
| 03:15:18 | 14 | evidence does Dr. ███ study provide that XRP |
| 03:15:24 | 15 | prices react to news about Ripple's actions? |
| 03:15:28 | 16 | MR. FIGEL:  Objection. |
| 03:15:28 | 17 | A.    We have already discussed in the |
| 03:15:29 | 18 | context of one -- a paragraph in my report, my |
| 03:15:38 | 19 | explication of Table 1, that is Table 1 from my |
| 03:15:50 | 20 | report.  So I have Table 1 on page 7, and then I |
| 03:15:53 | 21 | have paragraph 18.  And you asked me whether |
| 03:15:54 | 22 | paragraph 18 describes what I understand to be |
| 03:15:58 | 23 | Dr. ███ process of logic. |
| 03:16:04 | 24 | And I -- I agree that that is his |
| 03:16:07 | 25 | process of logic, which leads to a finding of |

168

HIGHLY CONFIDENTIAL

```
03:16:11  1   statistical significance.  But it is a
03:16:14  2   statistically significant correlation, a
03:16:21  3   statistically significant association in a certain
03:16:23  4   way.  I test -- well.
03:16:28  5            Q.    So is it your view that -- I'm now
03:16:30  6   looking at your Table 1.
03:16:31  7            A.    I'm there.
03:16:32  8            Q.    Okay.  Is it your view that
03:16:33  9   Dr. ██████ conclusion that there was a
03:16:39 10   statistically significant correlation between --
03:16:47 11   in Model 5 news events and unusual daily XRP
03:16:54 12   returns, is that, in your view, evidence, that at
03:17:00 13   least for this set of occasions, Ripple's actions
03:17:03 14   affected XRP's prices?
03:17:05 15            MR. FIGEL:  Objection.
03:17:06 16            A.    It is evidence.  It is a -- it's
03:17:20 17   small, but it documents -- it's a little patch of
03:17:24 18   evidence that documents the idea of association
03:17:28 19   between a category of Ripple news events and
03:17:33 20   unusual trading days for XRP.
03:17:39 21            It's an association.  That -- that
03:17:45 22   is evidence that weighs in favor but does not
03:17:49 23   establish causation.  It's just -- it's one --
03:17:57 24   it's one tiny weight on a scale.  It is that.  But
03:18:06 25   you need some more stuff as Dr. ██████ himself
```

169

HIGHLY CONFIDENTIAL

```
03:18:14   1    explains.
03:18:14   2            Q.    What is the "more stuff" that is
03:18:16   3    needed -- strike that.
03:18:19   4            Well, let me ask the question.
03:18:20   5    I'll use your terminology.
03:18:21   6            What is the "more stuff" that is
03:18:23   7    needed in your view?
03:18:25   8            MR. FIGEL:  Objection.
03:18:25   9        A.    Well, it is generally accepted by
03:18:37  10    people in my field that you can never get exactly
03:18:44  11    all the way by pure deductive logic.  There will
03:18:55  12    remain a leap at the end.  But you can search hard
03:18:59  13    for confounding factors and rule them out.
03:19:06  14            You can construct explanations for
03:19:27  15    the plausibility of the effect that -- for
03:19:29  16    example, discussions by analysts or market
03:19:35  17    commemorators on the crypto space or on XRP, in
03:19:41  18    particular, saying at about the same time or the
03:19:49  19    day after that this was a really important move
03:19:53  20    for XRP, and speaking to the plausibility of the
03:20:03  21    causal linkage.
03:20:07  22            I think Dr. ███, where he refers
03:20:10  23    to this, mentions three things, and I'm forgetting
03:20:14  24    his third thing.  But there is -- he refers to,
03:20:18  25    under certain conditions, an event study finding
```

170

HIGHLY CONFIDENTIAL

03:20:22  1   can point to causation.

03:20:26  2              And I've mentioned two kinds of

03:20:28  3   factors which look kind of like Bradford Hill

03:20:33  4   criteria for the case of inferring causation from

03:20:35  5   an event study.

03:20:37  6         Q.   When you say you've mentioned two

03:20:39  7   kinds of factors, is one of those factors

03:20:43  8   confounding news?

03:20:45  9         A.   The search for confounding factors.

03:20:49 10         Q.   Okay.  That I understand.  And I

03:20:51 11   understand is embodied perhaps in other places,

03:20:55 12   but you've identified as embodied in paragraph 20

03:20:58 13   of your report?

03:20:59 14         A.   Yes.

03:20:59 15         Q.   Okay.  The second factor I don't

03:21:02 16   understand -- I think you just articulated it.  I

03:21:05 17   didn't follow it.  Can you point it to me in your

03:21:07 18   report?

03:21:07 19         A.   No, my report doesn't -- my report

03:21:16 20   has -- my report makes the point association is

03:21:18 21   not causation.  And we are now well beyond the

03:21:20 22   level of detail that I get into in my report.

03:21:23 23         Q.   I see.

03:21:23 24         A.   On the theme, prompted I hope by

03:21:28 25   your questions, I hope I'm not just on a riff

                                                        171

**HIGHLY CONFIDENTIAL**

```
03:21:32  1   here.  But I thought that you were asking me
03:21:36  2   about, well, what's necessary to get from
03:21:41  3   association to causation.  So I did not mean to be
03:21:44  4   pointing to something that is in my report.
03:21:46  5            These are very, completely general
03:21:48  6   statistical precepts that do apply to event
03:21:53  7   studies, but this is not event study stuff I'm
03:21:55  8   talking about now.  This is general analysis of
03:22:00  9   observational data as opposed to experimental
03:22:03 10   data.
03:22:03 11            Q.    Okay.  You've mentioned that
03:22:05 12   confounding news is a factor that can break the
03:22:09 13   link between correlation and causation.  Is that
03:22:14 14   fair?
03:22:16 15            A.    That can -- what was the verb in
03:22:18 16   that sentence?
03:22:19 17            Q.    Break the link.
03:22:20 18            A.    Break.  No, well, that's not really
03:22:24 19   what I meant to convey.  It's a -- I think I can
03:22:27 20   sign on to that statement, but it's not what I was
03:22:30 21   testifying about.  I was -- the -- I should wait
03:22:36 22   for a question.
03:22:37 23            Q.    Other than -- I want to return to
03:22:51 24   Table 1.
03:22:51 25            A.    Whose Table 1?
```

172

HIGHLY CONFIDENTIAL

```
03:22:53  1          Q.    I'm sorry.  Your Table 1, Doctor.
03:23:03  2   Other than Ripple key milestone events -- strike
03:23:03  3   that.
03:23:07  4          I think it's fair to characterize
03:23:09  5   Dr. ████ conclusions in his report that Ripple
03:23:12  6   key milestone events are the cause of the unusual
03:23:19  7   daily XRP returns on the four days identified in
03:23:22  8   your Table 1.
03:23:25  9          Would you agree with that?
03:23:26 10          A.    I don't know from memory alone
03:23:37 11   whether he actually says that.  I do agree that
03:23:42 12   he -- where he is summarizing in his summary of
03:23:45 13   opinions he has landed on XRP prices react.
03:23:49 14          But whether -- when he is
03:23:51 15   specifically talking about the milestone events,
03:23:53 16   whether he has language in there that suggests
03:23:56 17   there that he concludes that, I don't recall.  The
03:23:59 18   report is right in front of me.  I can find it.
03:24:01 19          Q.    That's okay, Doctor.  It's a fair
03:24:03 20   point.  I may have overstated it.  Let me put it
03:24:06 21   this way:  One of the things -- just looking at
03:24:09 22   Dr. ████ results as summarized in your Table 1,
03:24:13 23   one of the things that may have caused the unusual
03:24:19 24   daily XRP return on the four days reported in this
03:24:23 25   chart is the Ripple key milestone news events.
```

173

**HIGHLY CONFIDENTIAL**

```
03:24:27  1                  That's one possibility, right?
03:24:27  2          A.     That is a hypothesis, yes.
03:24:30  3          Q.     And there's also a possibility that
03:24:32  4   there were confounding news events that caused
03:24:35  5   XRP's price to be unusual, the daily XRP returns
03:24:40  6   to be unusual on that day.  Is that right?
03:24:42  7          A.     That is also possible.
03:24:44  8          MR. FIGEL:  Objection.
03:24:45  9          Q.     Okay.  Is there anything else that
03:24:46 10   you can think of besides Ripple key milestone news
03:24:50 11   events or confounding news events that might have
03:24:53 12   caused the unusual daily XRP return on those four
03:24:56 13   unusual days in your Table 1?
03:24:58 14          A.     I can't think of anything else that
03:25:09 15   is a, as Dr. ████ puts it, a nonrandom systematic
03:25:15 16   cause.  As long as one defines confounding news
03:25:20 17   events broadly enough.  And what I mean by that is
03:25:28 18   there could be, you know, here's a hypothetical:
03:25:31 19                  So the European Central Bank takes
03:25:35 20   some action to either outlaw or to authorize the
03:25:37 21   use of XRP for paying taxes in European countries.
03:25:44 22   I suppose -- we get back to the point of, you
03:25:49 23   know, is it news or is it the action or is it --
03:25:52 24   are those distinguishable at all, because how
03:25:55 25   would you know about the action if the news didn't
```

174

**HIGHLY CONFIDENTIAL**

```
03:25:59  1   get to you?
03:26:01  2              Well, maybe you would know about
03:26:03  3   the action because the action was taken but not
03:26:05  4   reported, but somebody traded an enormous chunk
03:26:10  5   of -- I can think of stories that don't quite
03:26:14  6   involve news, but that -- so events more in a
03:26:16  7   broader category than just news disclosures.  But
03:26:24  8   something happened, some confounding thing.
03:26:29  9              Whether or not it's the sort of
03:26:30 10   thing that you would pick up in a news index
03:26:33 11   looking for XRP-related news on that day.
03:26:38 12        Q.   Can we take a look at -- let's go
03:26:48 13   back to your report, please, paragraphs 13 and 15.
03:26:56 14        A.   13 and 15.
03:26:57 15        Q.   Yes.
03:27:07 16        A.   I'm there.
03:27:09 17        Q.   Okay.  Is it fair to say that in
03:27:10 18   paragraphs 13 and 15, you summarize certain
03:27:12 19   aspects of Dr. ███ methodological design?
03:27:15 20        A.   Give me just a moment to ...
03:27:33 21              (Document review.)
03:27:34 22              That seems like a fair
03:27:35 23   characterization to me.
03:27:36 24        Q.   Do you have any critique of
03:27:41 25   Dr. ███ methodological design as set forth in
```

175

HIGHLY CONFIDENTIAL

```
03:27:44  1   your paragraphs 13 and 15?
03:27:46  2              MR. FIGEL:  Objection.
03:27:46  3         A.    Well, paragraphs 13 and 15 are
03:27:49  4   really just a tabulation of how in the world is it
03:27:51  5   that he comes up with 400 alternative ways of
03:27:55  6   doing the thing.
03:27:59  7              The methodological design isn't
03:28:02  8   really set forth in paragraphs 13 and 15.  I do
03:28:05  9   have some critiques.  You asked me earlier and I
03:28:09  10  said I do.  But they aren't identified or easily
03:28:14  11  linked to paragraphs 13 and 15 for the reason that
03:28:18  12  I just testified about.
03:28:19  13        Q.    And -- understood.  Thank you.
03:28:22  14  What -- to make sure we have a clear record, what
03:28:27  15  are your critiques -- -- strike that.
03:28:30  16             Setting aside the confounding news
03:28:35  17  issue, which we've discussed, what are your other
03:28:38  18  critiques of Dr. ████ methodological design, if
03:28:43  19  any?
03:28:43  20        A.    I want to clarify first.  I said
03:28:53  21  critiques.  And I was actually more accurate in
03:28:55  22  characterizing what I am talking about here in a
03:28:58  23  previous answer when I explained that we are --
03:29:04  24  we've reached issues that I did not need to go
03:29:06  25  into for my opinions in this case.
```

176

**HIGHLY CONFIDENTIAL**

03:29:10 1          And so they are questions in my

03:29:11 2    mind about what is this?  This is fine for the

03:29:19 3    first thing you would think of doing, but what is

03:29:23 4    the second thing you would think of doing and what

03:29:23 5    might you learn from that?

03:29:28 6          So these are questions that might

03:29:29 7    very well lead to critiques.  But I did not

03:29:33 8    develop a detailed critique.  I didn't need to.

03:29:35 9          But given that qualification, it is

03:29:43 10   striking to me that Dr. ████ analysis is

03:29:49 11   concerned with distinguishing nonsystematic,

03:29:54 12   nonrandom systematic effects as he calls them in

03:29:57 13   his technical appendix from everyday price

03:30:07 14   movement, and yet he allows days of putative

03:30:14 15   nonrandom systemic price movements into his

03:30:18 16   estimation -- his rolling estimation periods.

03:30:24 17          So when he is analyzing, for

03:30:27 18   example, the five milestone event days, he has --

03:30:35 19   as he explains this, he calls them rolling -- I

03:30:43 20   think they're actually sliding, not rolling -- he

03:30:46 21   has this sliding 180-day window that follows along

03:30:49 22   each analysis day.

03:30:50 23          But when he comes to his other

03:30:53 24   analysis, he has different event days.  And he

03:30:56 25   simply ignores the fact that he is allowing to

177

**HIGHLY CONFIDENTIAL**

03:30:58  1   creep into his estimation days the same days that

03:31:02  2   a moment ago he was treating as event days with

03:31:06  3   potential nonrandom systematic effects.

03:31:12  4           And I -- I note that there are as

03:31:17  5   many as 500 days of potential nonrandom systematic

03:31:20  6   effects during the 2,000 or so days of his event

03:31:27  7   period, of his analysis period.

03:31:30  8           And because of the way he does his

03:31:32  9   analysis, every time he switches gears to a new

03:31:35  10  category of news events, it's as if he forgets

03:31:38  11  about the fact that he just a moment ago was

03:31:41  12  talking about days with nonrandom systematic

03:31:44  13  effects, and he now includes them in the

03:31:46  14  estimation period, the baseline estimation period.

03:31:52  15  So I -- I question that element of his -- of his

03:32:01  16  work.

03:32:09  17          But I -- so let me be clear, that

03:32:10  18  is not a detailed critique, and it -- I don't know

03:32:13  19  what one would learn from exploring that point.

03:32:17  20  But there would be a logical coherence to

03:32:20  21  excluding all of the event -- the potential event

03:32:23  22  days from estimating the index model.

03:32:25  23          Q.   Is the critique that you just

03:32:27  24  described one of the bases for the opinions that

03:32:30  25  you're providing in this case?

178

**HIGHLY CONFIDENTIAL**

03:32:32  1          A.    No.  I don't need to get into this.
03:32:35  2     As I've already testified, I think expressly just
03:32:37  3     a minute ago, I don't need to get into that
03:32:40  4     territory to arrive at my opinions in this case.
03:32:43  5          Q.    Other than your -- strike that.
03:32:55  6               Other than confounding news, which
03:32:57  7     we've discussed, are there other critiques of
03:33:01  8     Dr. ████ methodology in this case that underlie
03:33:05  9     your opinions set forth in your report?
03:33:08 10          A.    I'm sorry, but your question as you
03:33:11 11     frame it seems to say something about my testimony
03:33:15 12     that I don't think I meant to convey in the way
03:33:19 13     that your question characterizes it.
03:33:24 14          Q.    Do you think that Dr. ████, in
03:33:27 15     your -- it's your view that Dr. ████ failed to
03:33:32 16     look for confounding news.  Is that correct?
03:33:34 17          A.    Yes.
03:33:35 18          Q.    Is this a methodological flaw in
03:33:39 19     your view?
03:33:39 20          A.    It's a question I would raise, and
03:33:45 21     it has a strong potential to be a methodological
03:33:48 22     flaw.  It certainly means that he can't rule out
03:33:51 23     confounding.
03:33:52 24          Q.    Is the failure to look
03:33:57 25     for -- strike that.

                                                              179

03:33:58  1          Does Dr. ███ failure to look for

03:34:00  2     confounding news render his opinions about

03:34:04  3     statistical significance unreliable?

03:34:09  4          A.    No.   I don't see how it does quite

03:34:18  5     that, for the -- within the narrow scope of what

03:34:23  6     his opinions about statistical significance are

03:34:26  7     about and what they convey, I don't think that

03:34:33  8     they are rendered unreliable by that oversight per

03:34:46  9     se period.

03:34:46  10         Q.    Is there anything about Dr. ███

03:34:48  11    methodological design that, in your view, renders

03:34:51  12    his results unreliable?

03:34:53  13         A.    With an appropriate understanding

03:35:04  14    of what I mean, and what we mean about his

03:35:11  15    results, I don't -- I've replicated his

03:35:16  16    hypergeometric probability calculations, and I

03:35:20  17    believe they were correctly performed.   Those are

03:35:24  18    results.

03:35:26  19          From there on, things get more

03:35:30  20    complicated.   What do these results mean?   What do

03:35:34  21    they convey?   But as far as those results are

03:35:38  22    concerned; in other words, p-values attached to

03:35:42  23    certain two-by-two tables like my table,

03:35:45  24    illustrative Table 1, his calculations are not --

03:35:49  25    are neither unreliable nor wrong.

180

**HIGHLY CONFIDENTIAL**

03:35:56  1          Q.    In paragraph 14 of your report, you

03:35:58  2    discuss Dr. ███ categorization of Ripple news.

03:36:05  3    Is that right?

03:36:05  4          A.    Yes.

03:36:06  5          Q.    Is there anything about Dr. ███

03:36:14  6    categorization of Ripple news that renders his

03:36:19  7    results unreliable here?

03:36:20  8          A.    There's nothing beyond what I say

03:36:22  9    in paragraph 14 that comes to mind that I would

03:36:33  10   point to sitting here this afternoon.  That is not

03:36:35  11   the same as an endorsement.  I don't have an

03:36:38  12   opinion -- I really am not expressing an opinion

03:36:43  13   one way or another to begin with about what it

03:36:45  14   would even mean for a categorization of news to be

03:36:50  15   unreliable and then whether this is such an

03:36:52  16   unreliable categorization.

03:36:56  17          I note that there's a certain

03:36:58  18   subjectivity in it.  I have no quibble, I have no

03:37:02  19   fight with Dr. ███ about that.  He says himself

03:37:05  20   that it's subjective.

03:37:08  21          There may be other things that, if

03:37:10  22   I had reason to delve into what he did that I

03:37:14  23   might find at least questionable, but I don't have

03:37:18  24   such a thing in mind as I sit here this afternoon.

03:37:21  25   That's just not an area I needed to go into for

181

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 03:37:25 | 1 | the opinions I have in this -- arrived at in this |
| 03:37:29 | 2 | case. |
| 03:37:29 | 3 | Q.   Okay.  Is there a generally |
| 03:37:34 | 4 | accepted statistical or economic methodology to |
| 03:37:36 | 5 | identify relevant news days? |
| 03:37:39 | 6 | MR. FIGEL:  Objection. |
| 03:37:45 | 7 | A.   There are informal professional |
| 03:37:55 | 8 | standards that have emerged in scholarly work and |
| 03:38:02 | 9 | separately in litigation settings informed by |
| 03:38:07 | 10 | different imperatives in those two cases.  But |
| 03:38:11 | 11 | I -- I wouldn't say there's a set of bright-line |
| 03:38:16 | 12 | standards. |
| 03:38:23 | 13 | Q.   Do you have an opinion as to |
| 03:38:26 | 14 | whether Dr. ███ did or did not follow those |
| 03:38:29 | 15 | standards that you just described in selecting |
| 03:38:32 | 16 | news events? |
| 03:38:33 | 17 | A.   I don't -- I don't have -- I'm not |
| 03:38:36 | 18 | proffering an expert opinion on that subject in |
| 03:38:42 | 19 | this matter.  I have noted in my report the |
| 03:38:46 | 20 | confounding issue.  And I have noted in my |
| 03:38:51 | 21 | testimony here the fact that I find no indication |
| 03:38:54 | 22 | that he's looked for any kind of news other than |
| 03:38:58 | 23 | really the most -- the path of least resistance |
| 03:39:04 | 24 | and effort, which is to go to Ripple's website. |
| 03:39:07 | 25 | Q.   Do you -- |

182

**HIGHLY CONFIDENTIAL**

```
03:39:14  1        A.   But that doesn't rise to the level
03:39:17  2   of an expert -- a distinct expert opinion that I'm
03:39:21  3   proffering.
03:39:27  4        Q.   Do you believe that Dr. ███
03:39:29  5   omitted any important news events from his
03:39:32  6   analysis?
03:39:39  7        A.   As far as I know, he includes no
03:39:40  8   news event that isn't -- doesn't happen to be
03:39:43  9   listed in some form on Ripple's website.  I don't
03:39:47 10   have any reason to think that everything that is
03:39:49 11   important in the world of cryptocurrency price
03:39:55 12   movements generally is listed on Ripple's website.
03:39:57 13   So I don't have a -- I'm not offering an expert
03:40:03 14   opinion.
03:40:03 15        I don't have a fully established
03:40:07 16   and supported belief, but it seems likely to me
03:40:11 17   there -- that things must have happened.  It can't
03:40:14 18   be that the only cryptocurrency pricing-related
03:40:19 19   events in the world in these 2,000 days all happen
03:40:23 20   to have to be related to Ripple and XRP.
03:40:27 21        Q.   But you did not identify any such
03:40:36 22   events.  Is that right?
03:40:37 23        A.   That's -- I have not done any
03:40:39 24   independent work on searching for news events that
03:40:43 25   Dr. ███ omitted.
```

183

**HIGHLY CONFIDENTIAL**

```
03:40:46  1          Q.    In some of Dr. █████ regression
03:40:50  2   models, he constructs a returns index of multiple
03:40:54  3   digital assets.
03:40:54  4              Do you have any critiques of that
03:40:59  5   index that Dr. █████ used in his work in this case?
03:41:05  6          A.    I have questions.  It raises
03:41:07  7   questions for me that, if I were engaged in work
03:41:10  8   like what Dr. █████ is doing, I would attempt to
03:41:14  9   answer, and I would write up as part of my work if
03:41:19  10  I ended up propounding anything like what Dr. █████
03:41:24  11  propounds.
03:41:26  12         Q.    And is it your view that his
03:41:28  13  failure to take those steps renders his results
03:41:31  14  unreliable?
03:41:33  15         A.    That's -- I haven't reached that
03:41:37  16  opinion as an independent expert opinion.  And I
03:41:48  17  didn't need to go there for purposes of my work in
03:42:02  18  this case.
03:42:02  19              MR. SYLVESTER:  I think it would be
03:42:03  20      useful to take a brief break if that's all
03:42:10  21      right, Dr. Marais.
03:42:10  22              THE WITNESS:  Certainly.
03:42:11  23              THE VIDEOGRAPHER:  The time is 3:41
03:42:11  24      p.m.  This concludes Media 4.  Off the
03:42:11  25      record.
```

184

**HIGHLY CONFIDENTIAL**

```
04:05:57   1              (Recess taken from 3:41 p.m. to
04:05:57   2       4:04 p.m.)
04:05:57   3              THE VIDEOGRAPHER:  The time is
04:05:57   4       4:04 p.m.  This begins Media 5.  On the
04:06:14   5       record.
04:06:14   6              (Exhibit LM-3, Copy of Table 2
04:06:14   7       from report LM-1, marked for
04:06:14   8       identification, as of this date.)
04:06:15   9   BY MR. SYLVESTER:
04:06:15  10          Q.    Dr. Marais, I'm going to hand you
04:06:17  11   what's been marked LM-3.  And I will represent to
04:06:20  12   you that LM-3 is just a larger copy of the Table 2
04:06:24  13   that appears in your report, LM-1.  So if you
04:06:28  14   prefer to look at your report, that's fine.  I
04:06:34  15   just figured that this might be a little easier.
04:06:54  16              Okay.  Taking a look at your
04:06:58  17   Table 2, other than the column where it says "██████
04:07:02  18   Model Number," are all of the numbers in your
04:07:05  19   Table 2 numbers of days?
04:07:13  20          A.    Yes.
04:07:19  21          Q.    Okay.  And the "Notes" section at
04:07:22  22   the bottom of Table 2 supplies information
04:07:25  23   regarding the ratio of non-coincident unusual days
04:07:30  24   to the number of coincident unusual days.  Is that
04:07:35  25   right?
```

185

**HIGHLY CONFIDENTIAL**

04:07:35  1           A.    Yes.

04:07:47  2           Q.    Okay.  Turning back to paragraphs

04:07:49  3   25 and 26 of your report.

04:07:57  4           A.    I am there.

04:07:58  5           Q.    Okay.  Do those paragraphs also

04:08:00  6   discuss the ratio between no Ripple news unusual

04:08:02  7   days and Ripple news unusual days?

04:08:05  8           A.    Yes.

04:08:07  9           Q.    In paragraph 26 --

04:08:17 10           A.    I'm sorry, can I --

04:08:18 11           Q.    Sure.

04:08:19 12           A.       -- define that.  Paragraph 25

04:08:22 13   obviously speaks to that ratio.  It begins with

04:08:24 14   the words "The ratio."

04:08:27 15              Paragraph 26 is a summary paragraph

04:08:29 16   that does not address ratios per se.  It's just a

04:08:29 17   summary of what I would call the upshot of the

04:08:39 18   discussion before, including but not limited to

04:08:44 19   paragraph 25.

04:08:45 20           Q.    In addition to the contents of

04:08:53 21   paragraph 25, what are the other bases for your

04:08:57 22   statements in paragraph 26?

04:09:06 23           A.    Okay.  Well, let me read it

04:09:09 24   carefully.

04:09:09 25              (Document review.)

                                                        186

**HIGHLY CONFIDENTIAL**

04:09:30  1          I would say the actual counts are
04:09:32  2   as important as the -- the ratios are just a way
04:09:36  3   of summarizing disparities.  That's all they are.
04:09:43  4   The ratios are not an object in and of themselves.
04:09:44  5          And the only reason I get into
04:09:47  6   ratios at all is that when I was discussing
04:09:50  7   Table 1, I pointed to a disparity in which I ended
04:09:56  8   up saying that -- just to make the point about the
04:10:00  9   disparity, that there was a ratio of -- I thought
04:10:09 10   I had mentioned a ratio in connection with -- I'm
04:10:20 11   not sure if it's there or not.  I'm not seeing it
04:10:22 12   right now.
04:10:23 13          But my point is that the discussion
04:10:25 14   is a discussion of disparities in numbers, and the
04:10:30 15   ratios is secondary.  It's just illustrative.
04:10:33 16          Q.    In that sentence that you just
04:10:35 17   said, disparities of numbers --
04:10:38 18          A.    Yes.
04:10:39 19          Q.    -- in the case of 26, paragraph 26,
04:10:42 20   do you mean numbers of days?
04:10:45 21          A.    Yes.
04:10:56 22          Q.    Okay.  Looking at Table 2 again,
04:10:58 23   ███  Model Number 5, there are 2,007 -- strike
04:10:58 24   that.
04:11:08 25          On Table 2, there's a column that

                                                          187

**HIGHLY CONFIDENTIAL**

```
04:11:12  1   says: "All Trading Days and Analysis Period."
04:11:13  2              Do you see that?
04:11:13  3        A.   Yes.
04:11:14  4        Q.   Under ████ -- the corresponding
04:11:18  5   entry for ██████████ Number 5 is 2,007.  Correct?
04:11:21  6        A.   Yes.
04:11:21  7        Q.   Okay.  And is that 2,007 the same
04:11:25  8   2,007 that is displayed in the bottom-right corner
04:11:33  9   of your Table 1?
04:11:37 10        A.   Yes.
04:11:37 11        Q.   Okay.  Turning back to Table 2,
04:11:39 12   there's a column labeled:  "'Unusual' trading days
04:11:42 13   in analysis period."
04:11:44 14              Do you see that?
04:11:44 15        A.   Yes.
04:11:45 16        Q.   And for Model Number 5, that's a
04:11:47 17   total of 183.  Is that right?
04:11:48 18        A.   Yes.  Yes, it is.
04:11:54 19        Q.   Okay.  And that corresponds to the
04:11:57 20   183 total unusual days in the first column of
04:12:01 21   Table 1.  Is that right?
04:12:12 22        A.   Yes.
04:12:12 23        Q.   Okay.  Similarly, the four unusual
04:12:14 24   yes news event days in Table 1 correspond to the
04:12:19 25   entry of 4 under unusual trading days coincident
```

188

**HIGHLY CONFIDENTIAL**

04:12:23  1    with Ripple news in Table 2.  Correct?

04:12:26  2            A.    Yes.

04:12:27  3            Q.    Okay.  And the entry of one in

04:12:29  4    regular trading days in Table 2 corresponds to the

04:12:36  5    entry of one in the news event yes regular daily

04:12:38  6    XRP return cell in Table 1.  Correct?

04:12:42  7            A.    Yes.

04:12:43  8            Q.    Okay.  And just for the record,

04:12:51  9    the -- starting -- on Table 2 again, there's two

04:12:55 10    categories of unusual trading days, the first

04:12:59 11    coincident with Ripple news, that column

04:13:03 12    identifies days with unusual returns on which

04:13:05 13    there was also a Ripple news event.  Correct?

04:13:08 14            A.    Yes.

04:13:08 15            Q.    Okay.  And the next column,

04:13:10 16    no-coincident Ripple news, that identifies days

04:13:14 17    with unusual returns in which there was not a

04:13:16 18    Ripple news event.  Correct?

04:13:17 19            A.    Yes.

04:13:17 20            Q.    Okay.  And finally, the third

04:13:19 21    column -- or the column immediately to the right

04:13:21 22    of no-coincident Ripple news -- is regular trading

04:13:23 23    days, and that identifies days in which there was

04:13:28 24    a Ripple news event but no unusual returns.

04:13:32 25    Correct?

189

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:13:32 | 1 | A.    Again, correct. |
| 04:13:33 | 2 | Q.    Okay.  Great.  For Model Number 5, |
| 04:13:35 | 3 | how many days did Dr. ██ identify as days with |
| 04:13:40 | 4 | unusual returns on which there was a Ripple news |
| 04:13:42 | 5 | event, any Ripple news event? |
| 04:13:48 | 6 | A.    In other words, not limited to key |
| 04:13:50 | 7 | milestones? |
| 04:13:51 | 8 | Q.    That's exactly right. |
| 04:14:04 | 9 | A.    I don't know that with precision, |
| 04:14:06 | 10 | sitting here, other than to say that the ██ |
| 04:14:09 | 11 | select categories over near the right-hand end of |
| 04:14:18 | 12 | this table refer to just as the -- just as the 4 |
| 04:14:29 | 13 | plus 1 on -- are -- I'm sorry. |
| 04:14:39 | 14 | How many days did he identify with |
| 04:14:40 | 15 | news events?  And the answer is the maximum in the |
| 04:14:44 | 16 | select categories, which is the same as the first |
| 04:14:53 | 17 | four categories on this page.  It's the union of |
| 04:14:58 | 18 | those with some acquisition dates thrown in, as he |
| 04:15:02 | 19 | describes it.  There are 100 and -- a maximum of |
| 04:15:09 | 20 | 105, but in the case of Model 5, actually, an |
| 04:15:17 | 21 | actual total of only 90. |
| 04:15:24 | 22 | Q.    Can you show me where you're seeing |
| 04:15:26 | 23 | 90? |
| 04:15:38 | 24 | A.    (Document review.) |
| 04:15:39 | 25 | Coincident? |

190

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

HIGHLY CONFIDENTIAL

04:15:39  1          Q.    Let me --

04:15:40  2          A.    Yes, I can show you where I'm

04:15:42  3   seeing 90.  I am seeing 90 -- the trading days in

04:15:52  4   those three columns are -- the ones with news in

04:16:02  5   the select category are the 24 plus the 66.

04:16:14  6          Q.    I see.  And that adds up 90?

04:16:19  7          A.    That sums to 90.  In every other

04:16:21  8   case, you will notice the -- actually what I was

04:16:26  9   about to say is not quite correct.  So I'll just

04:16:30 10   stop there.

04:16:31 11          Q.    Okay.  And just for the record, the

04:16:34 12   right-hand three columns of Table 2 report unusual

04:16:44 13   trading days coincident with Ripple news, unusual

04:16:47 14   trading days not coincident with Ripple news, and

04:16:52 15   regular trading days coincident with Ripple news

04:16:58 16   for all of Dr. ██████ news categories combined.  Is

04:17:03 17   that right?

04:17:03 18          A.    It's almost right.

04:17:05 19          Q.    Go ahead.  I'm sorry.  Will you

04:17:05 20   explain why it's almost right?

04:17:08 21          A.    There are -- these are the ████ --

04:17:10 22   these are the news categories that Dr. ████ chose

04:17:13 23   to include in Figure 1 of his report.

04:17:18 24              So I think it's fair to say these

04:17:20 25   are the news categories on which Dr. ████ -- to

                                                         191

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**HIGHLY CONFIDENTIAL**

04:17:31 1 which Dr. ███ directs the attention of his reader

04:17:34 2 as the basis for -- the key basis for whatever

04:17:38 3 opinions that he arrives at.

04:17:41 4          When one reads the news-gathering

04:17:45 5 section of Dr. ███ report, he doesn't have only

04:17:50 6 four or maybe five categories in there.  He has a

04:17:55 7 total of 14 categories of news events, some of

04:18:00 8 which I gather he just sets aside a priori as not

04:18:06 9 of interest, one of which he tests expressly as a,

04:18:11 10 sort of, a -- from his perspective, internal test

04:18:19 11 of validity.  And that is staffing decisions and

04:18:24 12 appointments.

04:18:24 13          And that doesn't show up in his

04:18:26 14 Figure 1.  And it doesn't show up as generating

04:18:30 15 significant correlations or associated with

04:18:35 16 significant correlations.

04:18:36 17          So your question was all of -- no,

04:18:40 18 there's a more textured story.  I've given you

04:18:43 19 some out -- some elements of it, but it's in

04:18:48 20 Dr. ███ report anyway.  That -- he's the author

04:18:51 21 of it.  I'm not the author.  I'm just the Cliff's

04:18:54 22 Notes version.

04:18:55 23          Q.   In choosing the categories of

04:18:58 24 Dr. ███ news categorizations to include in

04:19:02 25 Table 2, how did you go about choosing those to

                                                      192

**HIGHLY CONFIDENTIAL**

04:19:06  1  include?

04:19:06  2          A.    I just explained, in substance, how

04:19:11  3  I went about it.  Dr. ███ has a Figure 1 in his

04:19:19  4  report.  I excerpt, in paragraph 8 of my report,

04:19:29  5  Dr. ███ Figure 1 from his report which is around

04:19:33  6  page 9 -- no.  Page 3.  So that's Figure 1 of the

04:19:41  7  ███ report.

04:19:43  8          Dr. ███ never, as I read his

04:19:45  9  report, never fully explains the transition from

04:19:51 10  the 14 news categories to what he ends up

04:19:54 11  reporting as the basis of his opinion.

04:20:04 12          But whatever that story is, I go to

04:20:07 13  his Figure 1 for my guidance in -- and you will

04:20:09 14  see that my headings of milestones, trading

04:20:17 15  platforms, customers, commercialization, and

04:20:21 16  select categories track the headings of Dr. ███

04:20:25 17  Figure 1.

04:20:25 18          Q.    Understood.  Thank you.  Turning

04:20:28 19  back to your Table 2, for Model 5, how many days

04:20:36 20  did Dr. ███ identify as days with unusual returns

04:20:40 21  on which there was a Ripple news event, any Ripple

04:20:45 22  news event?

04:20:45 23          A.    Table 2 shows for that number

04:20:48 24  exactly what Table 1 showed for that number, which

04:20:54 25  is four.

193

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:20:54 | 1 | Q.    And what about the select category |
| 04:20:58 | 2 | that combines all the different news category that |
| 04:21:02 | 3 | Dr. ███ looked at? |
| 04:21:04 | 4 | MR. FIGEL:  Objection. |
| 04:21:04 | 5 | A.    In the case of Model 5, the answer |
| 04:21:07 | 6 | is 24. |
| 04:21:08 | 7 | Q.    Okay.  Turning to paragraph 19 of |
| 04:21:12 | 8 | your report, you write: |
| 04:21:17 | 9 | "One striking feature of Dr. ███ |
| 04:21:19 | 10 | analysis of the tallies shown in Table 1 |
| 04:21:23 | 11 | above -- not highlighted by Dr. ███ -- is |
| 04:21:25 | 12 | that it offers no account of what factors or |
| 04:21:28 | 13 | events caused the remaining 179 (equals 183 - |
| 04:21:33 | 14 | 4) unusual trading days to have unusual XRP |
| 04:21:37 | 15 | returns." |
| 04:21:38 | 16 | If we look at Table 2, isn't it |
| 04:21:42 | 17 | true that Dr. ███ actually offers an opinion as |
| 04:21:45 | 18 | to 20 additional days as being coincident with |
| 04:21:50 | 19 | Ripple news? |
| 04:21:51 | 20 | A.    That would be a fair statement if |
| 04:22:08 | 21 | Dr. ███ did not point to Model 5 and key |
| 04:22:14 | 22 | milestones as an element of evidence in itself. |
| 04:22:21 | 23 | It is -- it ought to be clear to the reader of my |
| 04:22:28 | 24 | paragraph 19 that paragraph 19 is a discussion of |
| 04:22:34 | 25 | Table 1. |

194

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 04:22:37 | 1 | And Table 1 is a discussion of a |
| 04:22:48 | 2 | cell from Dr. ██████ Figure 1, which like so many |
| 04:22:53 | 3 | other cells, is shaded in green with a check mark |
| 04:23:00 | 4 | and is discussed all on its own in an entire |
| 04:23:04 | 5 | section of Dr. ██████ report being Section 6(a), |
| 04:23:16 | 6 | ranging from page 29 to 34. |
| 04:23:20 | 7 | In all of those places, |
| 04:23:22 | 8 | table -- Model 5, in conjunction with milestone |
| 04:23:25 | 9 | events, is presented as a piece of evidence that |
| 04:23:31 | 10 | stands on its own. |
| 04:23:44 | 11 | So against that background, it's an |
| 04:23:47 | 12 | entirely reasonable space statement that he |
| 04:23:49 | 13 | presents no account in the context of this |
| 04:23:56 | 14 | purported independent autonomous piece of evidence |
| 04:24:00 | 15 | of what happened on the remaining 179 days. |
| 04:24:11 | 16 | I'll pause there because that, I |
| 04:24:14 | 17 | think, is a fair answer to your question.  But I |
| 04:24:17 | 18 | have a whole lot more to say about it. |
| 04:24:19 | 19 | Q.   I appreciate the answer to the |
| 04:24:21 | 20 | question.  Is it also true that Dr. ██████ presents |
| 04:24:26 | 21 | in his report the results of his various news |
| 04:24:32 | 22 | categories combined in a select category? |
| 04:24:36 | 23 | A.   Yes. |
| 04:24:37 | 24 | Q.   Okay.  You note in paragraph 21 |
| 04:24:44 | 25 | that -- |

195

HIGHLY CONFIDENTIAL

04:24:45  1          A.    Whose paragraph 21?

04:24:49  2          Q.    Great point, Doctor.  In your

04:24:52  3    paragraph 21 of your report, you note that for

04:25:06  4    the -- let me just quote it.  That will be easier.

04:25:08  5              In about the middle of the

04:25:10  6    paragraph, you note:

04:25:13  7                "In striking contrast, the same

04:25:14  8          dollar invested and reinvested for the 179

04:25:20  9          non-coincident unusual trading days (plus the

04:25:23  10         two days following each non-coincident day)

04:25:26  11         would have compounded to a total value of

04:25:29  12         $4,198,673, more than 2.1 million times

04:25:35  13         $1.99."

04:25:36  14             Do you know what portion of the

04:25:37  15   approximately $4.2 million in cumulative proceeds

04:25:41  16   you identify as associated with the 179 days was,

04:25:45  17   in fact, associated with the 20 additional news

04:25:47  18   days identified by Dr. ███?

04:25:51  19             MR. FIGEL:  Objection.

04:25:55  20         A.    I don't know that offhand as I sit

04:26:05  21   here, but I do know one can get some sense of it

04:26:08  22   from Table 3 of my report, which may not answer

04:26:18  23   precisely that question, but comes close and

04:26:31  24   teaches that in the same spot where the $1.99 that

04:26:40  25   is tailored to Dr. ███ Model 5 and key

                                                              196

**HIGHLY CONFIDENTIAL**

```
04:26:46  1   milestones appears, adding the additional 20 days,
04:26:52  2   to which you have drawn my attention, gets us to
04:26:55  3   $482.20 in comparison to $7,776 with an additional
04:27:13  4   number for the regular trading days.
04:27:19  5               So, yes, one can tell from the way
04:27:22  6   that I have laid out Table 3 that the disparity is
04:27:29  7   different in magnitude but the disparity
04:27:35  8   continues.
04:27:35  9         Q.    The disparity laid out in your
04:27:38 10   paragraph 19 is 2.1 million times.  Is that right?
04:27:51 11         A.    I think you must be referring to
04:27:58 12   paragraph 21?
04:27:59 13         Q.    I am.  Thank you for the
04:28:02 14   correction.
04:28:02 15         A.    Yes.
04:28:02 16         Q.    And the disparity between 7,776 and
04:28:09 17   $482.20, roughly what's that disparity?
04:28:33 18         A.    It is roughly -- sorry.  I'm still
04:28:36 19   making my way there.
04:28:38 20               (Document review.)
04:28:38 21               It's -- in very rough, round
04:28:40 22   numbers, it's a 15-fold disparity.
04:28:42 23         Q.    So the disparity drops from
04:28:44 24   2.1 million X to approximately 15X?
04:28:47 25         A.    That's correct.
```

197

**HIGHLY CONFIDENTIAL**

```
04:28:48   1            Q.    Turning to paragraph 21 of your
04:28:58   2    report -- actually 21 this time -- you discuss
04:29:06   3    consideration of magnitudes of returns.
04:29:09   4                  Do you see that?
04:29:12   5            A.    I'm sorry.  We're in paragraph 21
04:29:19   6    of my report?
04:29:21   7            Q.    That's right.  And the first
04:29:22   8    sentence says:
04:29:25   9                  "Simple tallies of news event
04:29:27  10        occurrences with and without coincidences
04:29:31  11        with unusual XRP returns, lacking any
04:29:33  12        consideration of the magnitudes of these
04:29:36  13        returns, provide no indication of the
04:29:37  14        economic magnitude of the disparity between
04:29:40  15        the four coincident and 179
04:29:42  16        non-coincident trading days."
04:29:44  17                  Do you see that?
04:29:46  18            A.    Yes, I do.
04:29:46  19            Q.    Okay.  What do you mean by
04:29:48  20    magnitude of returns and/or magnitude of disparity
04:29:52  21    in that sentence?
04:30:02  22            A.    I mean that contrary to what I
04:30:04  23    would expect to find in a standard event study
04:30:06  24    where there are concepts like end-point metrics,
04:30:13  25    like cumulative abnormal returns, possibly turned
```

198

**HIGHLY CONFIDENTIAL**

```
04:30:18  1   into total amounts of dollar value changes so
04:30:30  2   frequently expressed in dollar magnitudes.
04:30:32  3                  There's nothing in Dr. ████ dry
04:30:39  4   abstraction of colored marbles in
04:30:41  5   a -- hypothetical colored marbles in -- and
04:30:44  6   p-values that he analogizes to, draws from an urn
04:30:53  7   full of marbles, that measures the magnitude of
04:31:02  8   what he purports to identify or measures the
04:31:05  9   magnitude of what he does not explain, which is
04:31:14  10  the -- in the case of each discrete analysis that
04:31:21  11  he performs, such as the milestones or the select
04:31:25  12  category, each of which he rep- -- he presents as
04:31:26  13  yet another application of the same results.  See,
04:31:30  14  here's another of the same -- of the same general
04:31:31  15  result.
04:31:32  16                  They all look like just a check
04:31:34  17  mark against a green background in Dr. ████ work.
04:31:37  18  That gives no indication of the economic magnitude
04:31:42  19  which -- you know, which is sometimes called
04:31:43  20  practical significance or clinical significance of
04:31:51  21  the result that he arrives at.
04:31:52  22                  Now, what I show is in the case
04:31:54  23  looking only at the milestones, there is a
04:32:02  24  2.1 million fold discrepancy as -- I have no
04:32:08  25  trouble calling the piece of the total abnormal
```

199

HIGHLY CONFIDENTIAL

```
04:32:10  1   day unusual return that is associated with the

04:32:16  2   effect that he documents under milestones a sliver

04:32:20  3   at 1.21 millionth.

04:32:25  4                And if you go to the other end of

04:32:27  5   his table, where he has flung all of his

04:32:31  6   categories -- his key four categories plus

04:32:35  7   acquisitions into the hopper -- I have no problem

04:32:38  8   calling, 1 -- in my own mental arithmetic of a

04:32:43  9   moment ago, I have no trouble calling 1/15 a

04:32:48  10  sliver.

04:32:49  11               That's what I mean by the tallies.

04:33:00  12  Four out of one or four out of five or four out of

04:33:02  13  183 don't tell you anything about the magnitude in

04:33:10  14  the sense -- in the same manner that an ordinary

04:33:12  15  standard event study would do.

04:33:14  16               It doesn't reveal to you the

04:33:22  17  slivery nature of what Dr. ██████ has related to

04:33:33  18  purportedly associated with -- not related to in

04:33:34  19  any causal sense -- associated with Ripple news

04:33:38  20  events.

04:33:44  21        Q.    What is the result that an ordinary

04:33:49  22  standard event study would typically provide that

04:33:53  23  is, in your view, missing from Dr. ██████ report?

04:33:56  24        A.    I have -- it is typically a result,

04:33:57  25  especially in a litigation setting, that has some
```

200

HIGHLY CONFIDENTIAL

```
04:34:02   1    dollar magnitudes associated with the purportedly
04:34:07   2    statistically significant effects.
04:34:22   3            Q.    Let's turn to paragraph 7 of your
04:34:23   4    report.
04:34:43   5            A.    I'm there.
04:34:44   6            Q.    Is this issue of the -- strike
04:34:44   7    that.
04:34:52   8                  You just responded that, in a
04:34:53   9    litigation setting, an event study typically
04:34:56  10    prevents -- strike that.
04:34:57  11                  I believe you just testified in a
04:34:59  12    litigation setting, an event study typically
04:35:03  13    presents some dollar magnitudes associated with a
04:35:06  14    purportedly statistically significant effect.  Is
04:35:10  15    that right?
04:35:10  16            A.    Yes.
04:35:11  17            Q.    Okay.  Is that concept that you
04:35:16  18    just testified related in any way to the
04:35:18  19    conclusions you reach in paragraph 7?
04:35:19  20                  MR. FIGEL:  Objection.
04:35:25  21            A.    I need to read the paragraph.
04:35:27  22            Q.    Please.
04:35:29  23            A.    (Document review.)
04:35:53  24                  Yes.
04:35:54  25            Q.    How are those, the concept that you
```

201

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:35:56 | 1 | just testified about and your conclusions in |
| 04:35:58 | 2 | paragraph 7, related? |
| 04:36:01 | 3 | A.    Paragraph 7 covers several patches |
| 04:36:06 | 4 | of territory.  But I am thinking of the final |
| 04:36:14 | 5 | sentence: |
| 04:36:15 | 6 | "Properly interpreted, Dr. ████ |
| 04:36:18 | 7 | event study rebuts rather than supports the |
| 04:36:20 | 8 | conclusion that the price of XRP is primarily |
| 04:36:23 | 9 | a function of disclosures about Ripple's |
| 04:36:25 | 10 | actions." |
| 04:36:34 | 11 | Now, understanding that I am not at |
| 04:36:36 | 12 | all implying that, if I were asked that question |
| 04:36:39 | 13 | de novo, that this is how I would approach -- |
| 04:36:46 | 14 | Dr. ████ analysis is how I would approach that |
| 04:36:46 | 15 | question. |
| 04:36:51 | 16 | Nevertheless, having been asked to |
| 04:36:55 | 17 | assess Dr. ████ work, I note that in terms of |
| 04:36:57 | 18 | these unusual returns that are a fundamental |
| 04:37:01 | 19 | ingredient of his analysis, most of the pricing -- |
| 04:37:11 | 20 | price change action that is captured by the |
| 04:37:13 | 21 | unusual returns happens on days that he does not |
| 04:37:16 | 22 | relate to Ripple news, so that is my basis. |
| 04:37:26 | 23 | That plus the counting of days, but |
| 04:37:31 | 24 | the dollar value as even more than the counting of |
| 04:37:36 | 25 | days, although those two are mutually |

202

**HIGHLY CONFIDENTIAL**

```
04:37:39   1   corroborative, go -- stands for the proposition
04:37:41   2   that these events that he rebuts rather than
04:37:44   3   supports the conclusion that the price of XRP is
04:37:46   4   primarily a function of disclosures about Ripple
04:37:50   5   actions.
04:38:03   6            Q.   So in your view, it's fair to say
04:38:08   7   the magnitude of returns is important to examine
04:38:11   8   in the context of determining whether or not
04:38:16   9   there's a price reaction?
04:38:20  10            MR. FIGEL:   Objection.
04:38:21  11            A.   As general as that statement is,
04:38:22  12   it's easy to agree with.
04:38:33  13            Q.   Let's go back to paragraph 21,
04:38:37  14   please.
04:38:42  15            A.   Paragraph --
04:38:43  16            Q.   Back to 21, please.
04:38:55  17            A.   I'm there.
04:38:55  18            Q.   Okay.   In paragraph 21 you supply
04:38:58  19   an accumulated total value figure of $1.99 for the
04:39:03  20   four days reflected in Table 1.   Is that right?
04:39:06  21            A.   Yes.
04:39:06  22            Q.   Okay.   Those four days are the days
04:39:09  23   in which there was a key milestone news event and
04:39:11  24   an unusual daily XRP return.   Is that right?
04:39:14  25            A.   Correct.
```

203

HIGHLY CONFIDENTIAL

```
04:39:15   1          Q.    Okay.  Can you please explain how
04:39:17   2    you arrived at the $1.99 figure?
04:39:22   3          A.    Yes.  The -- as I disclose in
04:39:38   4    Footnote 19, in performing this calculation,
04:39:40   5    although I refer to it as "the days," the
04:39:45   6    co- -- four representing the coincident days, I
04:39:50   7    follow in Dr. ████████ footsteps, in that, when he
04:39:56   8    calls a day -- when he labels it as coinciding
04:40:03   9    with -- when he labels it as an unusual return
04:40:06  10    day, that is actually based as, I explained much
04:40:09  11    earlier today, on a small data-mining exercise
04:40:13  12    over the up to three-day window.
04:40:20  13          The -- so while I say these are
04:40:27  14    returns measured over four certain days, as I say
04:40:32  15    in Footnote 19, I use three-day windows.  That
04:40:36  16    gives rise to a small complication in that what if
04:40:42  17    a three-day window overlaps with a successor day
04:40:50  18    that is also of the same kind?  We wouldn't want
04:40:56  19    to double count the return.
04:40:58  20          So I'm supposing, for
04:41:00  21    example -- and I have not committed these data to
04:41:02  22    memory, so I don't know whether this happens for
04:41:07  23    the milestone events, but it does happen
04:41:11  24    elsewhere, if not for the milestone events.
04:41:14  25          So the  -- to be really explicit,
```

204

**HIGHLY CONFIDENTIAL**

04:41:18  1   the complication that I am pointing to is what if

04:41:21  2   day two of the first milestone event day of the

04:41:25  3   window, of the three-day window -- day three of

04:41:30  4   the window coincides with another milestone event

04:41:34  5   day?  I wouldn't want to double count that day.

04:41:43  6            So the -- the, I guess, economical

04:41:48  7   explanation is:  Take a calendar, color in all of

04:41:53  8   the coincident return days -- "coincident" meaning

04:41:57  9   coincident with news -- and color in the two

04:42:02  10  following days.

04:42:05  11           It may be that in that process of

04:42:08  12  coloring some cells get colored more than once.

04:42:13  13  They get colored because of a preceding coincident

04:42:18  14  day and they also overlap with another coincident

04:42:21  15  day.  But ignore the fact that you've

04:42:26  16  double-colored some days.  They're still -- if the

04:42:27  17  color is blue, they're still blue.

04:42:29  18           Now, invest $1 -- now that we've

04:42:33  19  got that part laid out on the calendar, invest $1

04:42:38  20  at the closing price of midnight of the day before

04:42:46  21  the first blue streak on the calendar and hold

04:42:49  22  that investment until the end of that blue streak.

04:42:54  23  Whether it's three days later or five days later,

04:42:59  24  whenever that blue streak ends, hold that $1.

04:43:03  25           Cash-out at the -- so you're

205

**HIGHLY CONFIDENTIAL**

04:43:05  1    starting at midnight, universal time, on the day

04:43:12  2    before the first blue color day, and you are

04:43:15  3    cashing out at the price of midnight of the last

04:43:19  4    day colored in blue.  Take those proceeds and

04:43:26  5    reinvest at the beginning midnight of the day

04:43:28  6    before the beginning of the next blue streak on

04:43:31  7    the calendar.  And hold until that blue streak

04:43:35  8    ends.  Cash-out at midnight.  Take those proceeds

04:43:41  9    and reinvest until you run -- continue that

04:43:43 10    process until you run out of blue streaks.

04:43:45 11              So this is assuming that you really

04:43:49 12    can -- it's a hypothetical in that it assumes that

04:43:54 13    you can -- you can actually execute your

04:43:57 14    transaction at the recorded closing price of both

04:44:04 15    the day before you invest and the last day of your

04:44:06 16    investment.  That's exactly how you'd calculate

04:44:09 17    the $1.99 or the 2.1 -- the 4.199 million.

04:44:20 18              Q.   And is that the methodology that

04:44:22 19    you set forth in Footnote 20 of your report?

04:44:27 20              A.   Yes.  Footnote 20 doesn't provide

04:44:41 21    all of the detail that I just did about how to

04:44:44 22    handle overlaps.  But in substance, that is what

04:44:50 23    Footnote 20 was meant to convey.

04:44:52 24              Q.   Is there any part of your report

04:44:54 25    that addresses your methodology when overlaps, as

206

**HIGHLY CONFIDENTIAL**

04:44:58  1   you just described, occur?

04:45:00  2        A.    The answer is certainly yes,

04:45:12  3   although I don't know without paging through the

04:45:16  4   report whether it's visible on the face of the

04:45:24  5   report.  But what I mean by that "yes" is that, as

04:45:27  6   I testified earlier, I provided electronic

04:45:31  7   supporting materials for all of these

04:45:34  8   calculations; and in my view, the electronic

04:45:37  9   supporting materials produced along with the

04:45:41 10   report are part of the report.

04:45:43 11             So far better and far more precise

04:45:48 12   than a verbal description is the fact that the

04:45:52 13   actual calculation including the computer code

04:45:56 14   that performs the calculation are part of what I

04:45:59 15   produced in this case.

04:46:02 16        Q.    Was there ever any overlap in

04:46:05 17   three-day windows where one window contained a

04:46:08 18   news day with regular returns and one window

04:46:11 19   contained a no-news day with unusual returns?

04:46:14 20        A.    There were some mixed overlaps of

04:46:21 21   that kind which required that I define a way of

04:46:37 22   breaking the tie between -- in a mixed overlap of

04:46:42 23   that kind.

04:46:43 24             In other words, would I include the

04:46:49 25   day in -- would I label it -- would I tag it as

207

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:46:56 | 1 | a -- the extended -- with it falling within the |
| 04:47:04 | 2 | extended span of a coincident unusual return day |
| 04:47:07 | 3 | or something else. |
| 04:47:10 | 4 | And the answer is -- well, there is |
| 04:47:18 | 5 | an answer.  And there were such days and there is |
| 04:47:21 | 6 | an answer to what I did. |
| 04:47:23 | 7 | Q.    And is that answer set forth in the |
| 04:47:28 | 8 | face of your expert report, or in your backup |
| 04:47:32 | 9 | materials, or elsewhere? |
| 04:47:33 | 10 | A.    It is certainly set forth in my |
| 04:47:39 | 11 | backup materials.  I do not recall whether I make |
| 04:47:42 | 12 | reference to that complication in the body of the |
| 04:47:46 | 13 | report. |
| 04:48:04 | 14 | Q.    Okay.  Let's take a look |
| 04:48:06 | 15 | at -- handing you LM-4, which is just an enlarged |
| 04:48:11 | 16 | copy of your Table 3 in your report. |
| 04:48:14 | 17 | (Exhibit LM-4, Enlarged copy of |
| 04:48:14 | 18 | Table 3 from M. Laurentius Marais' expert |
| 04:48:14 | 19 | report, marked for identification, as of |
| 04:48:24 | 20 | this date.) |
| 04:48:24 | 21 | Q.    In your Table 3, Dr. Marais, are |
| 04:48:30 | 22 | the values displayed calculated using actual XRP |
| 04:48:37 | 23 | daily returns? |
| 04:48:39 | 24 | A.    In mathematical substance, yes.  I |
| 04:48:51 | 25 | don't recall whether they are actually calculated |

208

04:48:54  1   in terms of recorded prices on -- at discrete

04:49:06  2   end-points.  The same calculation could be

04:49:09  3   performed with returns by adding up -- by summing

04:49:10  4   log returns and taking the exponential function or

04:49:14  5   simply taking the ratio of prices at discrete

04:49:20  6   days.  And I could tell with a code in front of,

04:49:24  7   me but I don't recall offhand.

04:49:26  8            What I'm explaining here is that

04:49:28  9   the mathematical -- the same mathematical

04:49:34 10   calculation can be performed via different

04:49:36 11   pathways.  And I don't recall whether the express

04:49:39 12   pathway expressly used daily XRP returns or

04:49:45 13   whether it jumped to without going via -- without

04:49:51 14   involving returns.

04:49:54 15            Q.    The numbers that are displayed in

04:50:04 16   Table 3 of your report are rounded.  Correct?

04:50:06 17            A.    Well, yes.

04:50:08 18            Q.    If I were to examine your backup

04:50:12 19   materials and click on the Excel spreadsheet that

04:50:14 20   you produced for Table 3, I would see digits up to

04:50:18 21   several places.  Correct?

04:50:20 22            A.    If you clicked -- if you

04:50:25 23   interrogated my backup materials at the

04:50:28 24   appropriate point in the chain of calculation, you

04:50:34 25   would -- you could certainly achieve the result --

209

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:50:38 | 1 | get the information you are asking about. |
| 04:50:40 | 2 | What I don't know anymore as I sit |
| 04:50:48 | 3 | here, whether that point extends all the way down |
| 04:50:51 | 4 | to the Excel tables or whether the information was |
| 04:50:53 | 5 | rounded by the time it reached the Excel tables. |
| 04:50:57 | 6 | But if that turns out to be the |
| 04:50:59 | 7 | case, then going upstream in the materials that I |
| 04:51:04 | 8 | have produced would allow you to get the full |
| 04:51:12 | 9 | precision of the number.  So they are there.  I |
| 04:51:14 | 10 | just am not testifying that they are in the Excel |
| 04:51:17 | 11 | spreadsheet, although they may be. |
| 04:51:19 | 12 | Q.    Understood.  Okay.  For -- looking |
| 04:51:22 | 13 | at Table 3 for the Model 5 row, the entry under |
| 04:51:33 | 14 | "'unusual' trading days coincident with Ripple |
| 04:51:34 | 15 | news" is $1.99. |
| 04:51:37 | 16 | Do you see that? |
| 04:51:37 | 17 | A.    Yes, I do. |
| 04:51:38 | 18 | Q.    And is that the total accumulated |
| 04:51:41 | 19 | proceeds for the four Ripple key milestone news |
| 04:51:45 | 20 | unusual return days that you reference in |
| 04:51:49 | 21 | paragraph 21 of your report? |
| 04:51:57 | 22 | A.    Yes.  The $1.99 from paragraph 21 |
| 04:52:01 | 23 | is the same as the $1.99 that I think you are |
| 04:52:06 | 24 | directing my attention to. |
| 04:52:08 | 25 | Q.    Okay.  For the Model 5 row in |

210

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 04:52:15 | 1 | Table 3, is the $4,198,673 figure under |
| 04:52:21 | 2 | no-coincident Ripple news the total accumulated |
| 04:52:26 | 3 | proceeds for the 179 Ripple news -- no Ripple |
| 04:52:33 | 4 | news -- strike that. |
| 04:52:33 | 5 | It's important to get this right. |
| 04:52:34 | 6 | For the Model 5 row of your |
| 04:52:39 | 7 | Table 3, is the $4,198,673 figure under |
| 04:52:47 | 8 | no-coincident Ripple news the total accumulated |
| 04:52:53 | 9 | proceeds for the 179 no-news unusual return days |
| 04:52:57 | 10 | that is referenced in your paragraph 21? |
| 04:53:04 | 11 | A.    Yes. |
| 04:53:04 | 12 | Q.    Okay.  If I -- looking at Table 3 |
| 04:53:07 | 13 | again.  If I multiply the $1.99 in the unusual |
| 04:53:13 | 14 | trading days coincident with Ripple news column |
| 04:53:19 | 15 | with the approximately 4.2 million in the unusual |
| 04:53:24 | 16 | trading days no-coincident Ripple news column, |
| 04:53:30 | 17 | will I get, at least in rough terms, the |
| 04:53:32 | 18 | approximately 8.3 million figure in the unusual |
| 04:53:36 | 19 | trading days in ▇▇▇ analysis period, third |
| 04:53:42 | 20 | column in Table 3? |
| 04:53:47 | 21 | A.    With your qualification of "at |
| 04:53:52 | 22 | least in rough terms," which I take to mean |
| 04:53:56 | 23 | approximately in the same ballpark, you will get a |
| 04:53:59 | 24 | number that is close but not mathematically -- I |
| 04:54:06 | 25 | actually don't know about the particular case of |

211

**HIGHLY CONFIDENTIAL**

```
04:54:10  1   Model 5.
04:54:11  2              But there are some instances where
04:54:13  3   that multiplication will not get you an exact, a
04:54:17  4   mathematically exact reconciliation for reasons
04:54:23  5   that have to do with testimony I've already given.
04:54:27  6         Q.   Okay.  And setting aside the issue
04:54:30  7   of whether or not there's an exact mathematical
04:54:34  8   reconciliation.  What's the principle behind the
04:54:42  9   phenomenon that if you multiply the $1.99 for the
04:54:50 10   unusual trading days coincident with Ripple news
04:54:53 11   with the approximately 4.2 million for the unusual
04:54:56 12   trading days no-coincident Ripple news, you will
04:54:58 13   get approximately the 8.3 million and the unusual
04:55:01 14   trading days in ███████ analysis period?
04:55:06 15              MR. FIGEL:  Objection.
04:55:06 16         A.   Well, the principle behind that is
04:55:10 17   the principle of commutativity of multiplication.
04:55:19 18         Q.   Okay.  And how does that principle
04:55:22 19   apply to multiplying together the coincident with
04:55:27 20   Ripple news unusual trading day returns and the
04:55:31 21   no-coincident Ripple news unusual trading day
04:55:36 22   returns to get the total unusual trading days in
04:55:38 23   ███████ analysis period figure?
04:55:40 24         A.   In the following way:  The -- one
04:55:49 25   can take that same calendar with the blue streaks
```

212

**HIGHLY CONFIDENTIAL**

04:55:53  1   that I referred to earlier and write into every

04:56:02  2   cell of that hypothetical calendar, hanging in

04:56:03  3   midair here between us, the total return for that

04:56:07  4   day of un-Ripple.

04:56:14  5            Now, things get a little bit

04:56:16  6   complicated because what I -- because of the

04:56:22  7   overlapping of the streaks and the fact that you

04:56:29  8   have already asked me about that, there is more

04:56:31  9   than one classification of the kinds of days that

04:56:34 10   we are talking about here.

04:56:38 11            So now we have to have in mind that

04:56:42 12   there are red -- there are blue streaks but also

04:56:45 13   yellow streaks and green streaks and there may

04:56:47 14   be -- those streaks may collide.  And to make an

04:56:52 15   overall coherent table, I had to impose some

04:56:59 16   priority rules on what do I do in the cases where

04:57:01 17   the streaks overlap to some extent.

04:57:11 18            But for answering your pending

04:57:15 19   question, I'm going to assume away that

04:57:17 20   complication, so there are no overlaps to be

04:57:18 21   concerned about.  And there's only one color

04:57:21 22   involved here.

04:57:27 23            Well, one way of describing the

04:57:29 24   calculation of the -- that we're talking about

04:57:33 25   here is to start at the far left-hand end of the

213

HIGHLY CONFIDENTIAL

04:57:37  1   blue streaks with $1 and to multiply it by the

04:57:47  2   total return -- one -- 100 percent, plus the total

04:57:50  3   return for that first day, and then multiply the

04:57:53  4   result of that by 100 percent, plus the total

04:57:56  5   return for the second color of the streaked -- the

04:57:58  6   "streaky" day, and so on.

04:58:01  7               And then skip to the next

04:58:04  8   place -- over the white space, to the next space

04:58:07  9   where a blue streak has been colored in on this

04:58:10 10   chart.

04:58:10 11               Now some of those event days are --

04:58:14 12   some of those blue streaky days are of the

04:58:18 13   coincident kind, and -- but we are now talking

04:58:22 14   about combining them with the not-coincident kind.

04:58:26 15   And so I've added in some more blue streaks for

04:58:30 16   the not-coincident kind.

04:58:34 17               Now the commutative law of

04:58:35 18   multiplication says that if I do a whole bunch of

04:58:39 19   multiplications, it doesn't really matter whether

04:58:43 20   I multiply the second or the third things first

04:58:47 21   and then multiply by the first, the order of the

04:58:51 22   multiplications doesn't matter.

04:58:53 23               And since the total return over

04:58:55 24   unusual trading days is simply the

04:59:03 25   multi- -- consists of the multiplication of all of

214

**HIGHLY CONFIDENTIAL**

04:59:06  1    the days that I have colored in blue, and the two

04:59:13  2    components that are reported separately under the

04:59:16  3    milestones day is simply the multiplication of

04:59:21  4    some of them, those are the coincident ones.

04:59:25  5                    And the no confounding Ripple news

04:59:30  6    are -- represents the multiplication of others of

04:59:33  7    them.  It's easy to see that if I multiply all of

04:59:37  8    them together, I must get the result from

04:59:39  9    multiplying them together in groups.

04:59:41  10                    So that is why my testimony was

04:59:43  11   that the -- yes, there is a principle behind it,

04:59:46  12   and it is the principle of the commutativity of

04:59:50  13   multiplication, the commutative law.

04:59:54  14             Q.    Thank you, Doctor.  For -- going

04:59:56  15   back to your Table 3, for the Model 5 row, what

05:00:05  16   does the entry for -- of $1.03 under the regular

05:00:13  17   trading days heading for key milestones reflect?

05:00:27  18             A.    That over all of the regular

05:00:31  19   trading days that -- so those are trading days

05:00:37  20   that are not individually labeled as unusual and

05:00:51  21   that do not coincide with news.  Let me see.

05:00:58  22                    So if you refer back to Table 2,

05:01:07  23   and you look in the same spot, you would see that

05:01:09  24   there is a count of one.

05:01:13  25             Q.    Yes.

215

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:01:13 | 1 | A. And this $1.03 is really just what |
| 05:01:18 | 2 | the proceeds of trading over a three-day -- for |
| 05:01:29 | 3 | consistency, over a three-day window holding a $1 |
| 05:01:34 | 4 | investment starting on that one day. So no |
| 05:01:38 | 5 | multiplication is involved. |
| 05:01:39 | 6 | Q. And the regular trading days column |
| 05:01:42 | 7 | on both your Table 2 and your Table 3 corresponds |
| 05:01:45 | 8 | to days in which there was a Ripple news event but |
| 05:01:50 | 9 | there was not an unusual daily XRP return. Is |
| 05:01:54 | 10 | that right? |
| 05:01:54 | 11 | A. Correct. |
| 05:01:55 | 12 | Q. Okay. If I wanted to know -- going |
| 05:02:01 | 13 | back to Table 3, if I wanted to know the total |
| 05:02:04 | 14 | cumulative proceeds for the five days of Ripple |
| 05:02:08 | 15 | news events in the key milestones data set, would |
| 05:02:11 | 16 | I multiply $1.99 and $1.03? |
| 05:02:17 | 17 | A. Yes. Subject only to the |
| 05:02:30 | 18 | complications about which I have already testified |
| 05:02:33 | 19 | about the possibility of overlapping streaks and |
| 05:02:41 | 20 | how those are dealt with and my testimony about |
| 05:02:45 | 21 | how one -- about what I had to do to make for an |
| 05:02:50 | 22 | overall coherence and how that can be found in |
| 05:02:56 | 23 | precise detail in my backup materials. |
| 05:03:04 | 24 | Q. Okay. The product of $1.99 and |
| 05:03:06 | 25 | $1.03 is approximately $2.05. Correct? |

216

**HIGHLY CONFIDENTIAL**

```
05:03:10   1          A.    That seems about right.
05:03:16   2          Q.    Okay.  And what is the -- strike
05:03:16   3   that.
05:03:34   4          Okay.  Returning to Table 3 of your
05:03:36   5   report, again, sticking with Model number 5, is
05:03:42   6   the $92.55 figure the total compounded proceeds
05:03:46   7   for all trading days in the ███ analysis period
05:03:53   8   for Dr. ███ Model Number 5?
05:03:55   9          MR. FIGEL:  Objection.
05:03:56  10          A.    Yes.
05:03:56  11          Q.    Okay.  Now, I'm going to move to
05:03:58  12   the right-hand side of Table 3 and look at the
05:03:58  13   ███ select categories columns.
05:04:05  14          Is $482.20 the total compounded
05:04:09  15   proceeds for unusual trading days coincident with
05:04:13  16   Ripple news in Dr. ███ Model 5?
05:04:16  17          A.    Yes.
05:04:17  18          Q.    And is $7,776 the total compounded
05:04:17  19   proceeds for unusual trading days not coincident
05:04:17  20   with Ripple news in Dr. ███ Model 5?
05:04:17  21          A.    Yes.
05:04:31  22          Q.    Okay.  Now, I'm going to look at
05:04:33  23   Tables 2 and 3 together.  Is the $482.20 figure in
05:04:39  24   Table 3 the total compounded proceeds for the 24
05:04:44  25   days of unusual returns coincident with Ripple
```

217

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:04:46 | 1 | news displayed in Table 2? |
| 05:04:49 | 2 | A.    Yes.  Subject to all of the minor |
| 05:04:54 | 3 | complications that I testified about earlier in |
| 05:05:02 | 4 | response to questions from you. |
| 05:05:03 | 5 | Q.    Setting aside those same minor |
| 05:05:08 | 6 | complications, is the $7776 figure in Table 3 the |
| 05:05:12 | 7 | total compounded proceeds for the 159 unusual |
| 05:05:16 | 8 | trading days no-coincident Ripple news displayed |
| 05:05:21 | 9 | in Table 2? |
| 05:05:22 | 10 | A.    Yes. |
| 05:05:22 | 11 | Q.    Okay.  If we compare all 24 Ripple |
| 05:05:33 | 12 | news events unusual return days within the Model 5 |
| 05:05:38 | 13 | trading period -- strike that. |
| 05:06:14 | 14 | Okay.  Going back to Table 3.  The |
| 05:06:17 | 15 | unusual trading days in Dr. ███ analysis period |
| 05:06:20 | 16 | for Model 5 is the approximately $8.3 million |
| 05:06:25 | 17 | figure.  Right? |
| 05:06:27 | 18 | A.    Yes. |
| 05:06:35 | 19 | Q.    And is that approximately |
| 05:06:38 | 20 | $8.3 million figure the total compounded proceeds |
| 05:06:41 | 21 | for all unusual return days in Model 5? |
| 05:06:44 | 22 | A.    Yes.  Again, subject to everything |
| 05:06:47 | 23 | I've testified about here.  With details that can |
| 05:06:53 | 24 | be found in my electronic backup materials. |
| 05:06:56 | 25 | Q.    Okay.  Okay.  Going back to the |

218

**HIGHLY CONFIDENTIAL**

05:07:12  1    Ripple news days within Model 5, is it fair to say

05:07:16  2    that if one undertook an investment strategy where

05:07:20  3    $1 is invested in all five of the key milestone

05:07:24  4    news days plus the two days as described in your

05:07:29  5    Footnote 20, the proceeds would be an accumulated

05:07:34  6    total value of $2.05?

05:07:37  7            A.    Something close to that.  I don't

05:07:41  8    know whether this is one of the instances where a

05:07:44  9    simple multiplication yields exactly the right

05:07:48 10    number.  I've -- for reasons I've already

05:07:52 11    testified about.

05:07:53 12            Q.    Okay.  And looking now at Tables 2

05:07:55 13    and 3 together, would you agree that the total

05:08:00 14    compounded proceeds for all trading days in ▮▮▮▮

05:08:04 15    analysis period is $92.55?

05:08:13 16            A.    I'm sorry.  Looking at both tables

05:08:16 17    together --

05:08:17 18            Q.    Yeah.  Strike that.  Let me ask

05:08:20 19    another question.

05:08:21 20            A.    You're asking me about a dollar

05:08:24 21    figure which only appears in one.

05:08:26 22            Q.    You're right.  Let me not do that.

05:08:28 23    Withdrawn.

05:08:28 24            Does the $92.55 figure displayed in

05:08:33 25    all trading days in ▮▮▮ analysis period

219

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:08:36 | 1 | correspond with the 2,007 all trading days in |
| 05:08:40 | 2 | analysis period identified in Table 2? |
| 05:08:42 | 3 | A.    Yes. |
| 05:08:48 | 4 | Q.    Okay.  So it's fair to say that we |
| 05:08:51 | 5 | know that the total compounded proceeds for all |
| 05:08:52 | 6 | 2,007 days in ███████ Model 5 is $92.55? |
| 05:08:57 | 7 | A.    That's what this number means. |
| 05:08:59 | 8 | Q.    Okay.  And we know that the total |
| 05:09:01 | 9 | compounded proceeds for the five Ripple news days |
| 05:09:05 | 10 | in the ██████ Model Number 5 is $2.05 |
| 05:09:10 | 11 | approximately? |
| 05:09:10 | 12 | A.    Again -- again, that is correct. |
| 05:09:11 | 13 | Q.    So if we wanted to determine the |
| 05:09:13 | 14 | compounded total proceeds for the remaining 2,002 |
| 05:09:18 | 15 | days in Dr. ██████ Model Number 5, we can divide |
| 05:09:24 | 16 | 92.55 by 205.  Is that right? |
| 05:09:30 | 17 | A.    I have to think about that. |
| 05:09:33 | 18 | Q.    Okay. |
| 05:09:47 | 19 | A.    Yes.  The compounded return over |
| 05:09:51 | 20 | the five days alone is $2.05.  And over the entire |
| 05:09:58 | 21 | period, all 2,007 is 92.55.  And those should -- |
| 05:10:04 | 22 | subject to the same complications that I described |
| 05:10:06 | 23 | earlier, those should multiply. |
| 05:10:13 | 24 | Q.    The $2.05 for the five days should |
| 05:10:16 | 25 | multiply by some number assigned to the 2,002 days |

220

**HIGHLY CONFIDENTIAL**

05:10:25  1  to get us the total 92.55 for the 2,007 days.  Is

05:10:26  2  that right?

05:10:26  3       A.   Yes.  I hesitate just in case there

05:10:28  4  is some complication arising from different

05:10:31  5  numbers of total days in these calculations, but I

05:10:39  6  -- as I sit here, I can't think of a reason why

05:10:42  7  the days covered in the various columns here would

05:10:45  8  change from group to group.

05:10:48  9       Q.   Okay.  And if we divide $92.55 by

05:10:52 10  $2.05 to try to reach an approximation for the

05:10:58 11  cumulative total proceeds for the 2,002 days,

05:11:01 12  that's approximately $45.06.  Is that right?

05:11:08 13       A.   That seems about right.

05:11:10 14       Q.   Okay.  So is it fair to say that if

05:11:10 15  one undertook an investment strategy where $1 is

05:11:14 16  invested on all of the 2,002 no Ripple news days

05:11:20 17  plus the additional days described in your

05:11:24 18  methodology in Footnote 20, the proceeds of that

05:11:28 19  investment strategy would be an accumulated total

05:11:31 20  value of $45.06 approximately?

05:11:37 21       A.   I'm sorry.  The -- I need to hear

05:11:41 22  the premise of the question again.  I heard the

05:11:43 23  trailing end, but what is the premise again?

05:11:45 24       Q.   Sure.  So the premise is someone is

05:11:48 25  undertaking an investment strategy where they

221

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:11:50 | 1 | invest $1 on the 2,002 no Ripple news days in |
| 05:11:58 | 2 | ████ Model 5. |
| 05:11:59 | 3 | And my question is:  Is the |
| 05:12:03 | 4 | cumulative proceeds of that strategy approximately |
| 05:12:10 | 5 | $45.06? |
| 05:12:10 | 6 | A.   Yes.  With -- that sounds right |
| 05:12:11 | 7 | with one adjustment to the series of questions to |
| 05:12:18 | 8 | which -- of which this is a part.  There was a |
| 05:12:26 | 9 | point in which you mentioned 2,002 days. |
| 05:12:26 | 10 | Q.   Yes. |
| 05:12:30 | 11 | A.   Recall that the returns that I am |
| 05:12:32 | 12 | measuring here are measured over three-day |
| 05:12:43 | 13 | periods.  That is -- I explained that in part |
| 05:12:47 | 14 | using the concept of the blue streaks drawn onto |
| 05:12:50 | 15 | the calendar.  I think you got to 2,002 by |
| 05:12:53 | 16 | subtracting five from 2,007. |
| 05:12:58 | 17 | The $90 that we are seeing on row |
| 05:13:04 | 18 | five is for the entire run of the calendar, and |
| 05:13:10 | 19 | the $2.05 that you have calculated and that I've |
| 05:13:17 | 20 | broadly agreed to is for five days. |
| 05:13:23 | 21 | But each of those five days, if |
| 05:13:25 | 22 | they're widely separated so that there are no |
| 05:13:28 | 23 | overlaps, each of those five days could account |
| 05:13:32 | 24 | for three trading days because of the way this |
| 05:13:36 | 25 | calculation is performed. |

222

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 05:13:38 | 1 | So what I won't agree to -- or |
| 05:13:41 | 2 | can't agree to -- is that it's, in fact, exactly |
| 05:13:47 | 3 | 2,002 trading days because there are complications |
| 05:13:51 | 4 | resulting from the extent of the blue streaks. |
| 05:13:57 | 5 | Q.    I see.  So would it be fair to say |
| 05:14:00 | 6 | that the proceeds for -- the cumulative total |
| 05:14:11 | 7 | proceeds for the days coded as no news days within |
| 05:14:17 | 8 | the 2,007 is approximately $45.06? |
| 05:14:23 | 9 | MR. FIGEL:  Objection. |
| 05:14:23 | 10 | A.    That's -- that is a -- that seems |
| 05:14:27 | 11 | to me to be fair. |
| 05:14:28 | 12 | Q.    Okay. |
| 05:14:31 | 13 | A.    When -- when it works for you, |
| 05:14:34 | 14 | could we take another break?  It's getting late |
| 05:14:37 | 15 | and I need to get some blood flow. |
| 05:14:40 | 16 | MR. SYLVESTER:  Sure.  We can take |
| 05:14:41 | 17 | a quick break.  Thanks.  Off the record. |
| 05:14:46 | 18 | THE VIDEOGRAPHER:  The time is |
| 05:14:46 | 19 | 5:13 p.m.  This concludes Media 5.  Off the |
| 05:14:46 | 20 | record. |
| 05:37:02 | 21 | (Recess taken from 5:14 p.m. to |
| 05:37:02 | 22 | 5:35 p.m.) |
| 05:37:02 | 23 | THE VIDEOGRAPHER:  The time is 5:35 |
| 05:37:02 | 24 | p.m.  This begins Media 6.  On the record. |
| 05:37:02 | 25 | BY MR. SYLVESTER: |

223

**HIGHLY CONFIDENTIAL**

05:37:18  1          Q.    Okay.  Now, Dr. Marais, turning to

05:37:19  2     Table 3, I believe that you testified earlier that

05:37:25  3     in applying your methodology for calculating the

05:37:28  4     cumulative proceeds, you applied a method such

05:36:32  5     that a single day would not be counted in both the

05:36:35  6     unusual trading days coincident with Ripple news

05:36:38  7     column and also the unusual trading days

05:36:43  8     no-coincident Ripple news column.  Is that right?

05:36:46  9          A.    Yes.

05:36:47 10          Q.    Okay.  Is it also true that you

05:36:48 11     applied a methodology such that if a day were

05:36:50 12     counted in the regular trading day's column, it

05:36:55 13     was then not counted in either of the two unusual

05:36:58 14     trading days columns?

05:37:00 15          A.    Yes.

05:37:11 16          Q.    Okay.  I would like to show you

05:37:13 17     what I have marked LM-5.

05:37:15 18                (Exhibit LM-5, Summary table of

05:37:15 19          data provided by M. Laurentius Marais,

05:37:15 20          marked for identification, as of this

05:37:18 21          date.)

05:37:18 22          Q.    LM-5 is a summary table of data

05:37:21 23     that you provided displaying many of the numbers

05:37:23 24     that we were just discussing before the break.

05:37:28 25     And it's formatted in the same format as the

                                                              224

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:37:30 | 1 | Table 1 of your report, which is to say that the |
| 05:37:35 | 2 | columns are cumulative XRP return and categorized |
| 05:37:40 | 3 | in unusual daily XRP return days and regular XRP |
| 05:37:48 | 4 | return days. |
| 05:37:49 | 5 | And the news events are categorized |
| 05:37:51 | 6 | by milestones again into, yes, there was a Ripple |
| 05:37:55 | 7 | milestone news day or, no, there was not a Ripple |
| 05:37:59 | 8 | milestones news day. |
| 05:38:03 | 9 | But instead of the number of days, |
| 05:38:04 | 10 | what I've inserted into this chart is largely |
| 05:38:08 | 11 | numbers drawn from your Table 3.  So if we start |
| 05:38:11 | 12 | at the top-left cell of LM-5, you'll see $1.99. |
| 05:38:18 | 13 | And $1.99 is the cumulative return for the four |
| 05:38:22 | 14 | unusual return days with Ripple milestone news |
| 05:38:33 | 15 | according to your Table 3.  Correct? |
| 05:38:33 | 16 | A.    Yes. |
| 05:38:33 | 17 | Q.    Okay.  And the top middle cell is |
| 05:38:34 | 18 | $1.03.  And $1.03 is the total cumulative return |
| 05:38:38 | 19 | for the one regular return day with Ripple |
| 05:38:41 | 20 | milestone news according to your Table 3. |
| 05:38:50 | 21 | Correct? |
| 05:38:50 | 22 | A.    That's correct.  As you indicated |
| 05:38:52 | 23 | yourself, a rounded number, but -- |
| 05:38:56 | 24 | Q.    Approximately. |
| 05:38:57 | 25 | A.    -- yes, that is the number that is |

225

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:39:01 | 1 | reported in my Table 3. |
| 05:39:02 | 2 |        Q.    Okay.  And turning to the middle |
| 05:39:04 | 3 | left cell, 4,198,673 is the cumulative return for |
| 05:39:12 | 4 | the 179 unusual return days with no Ripple news in |
| 05:39:19 | 5 | ████ Model Number 5.  Correct? |
| 05:39:23 | 6 |        A.    I'm just checking that out. |
| 05:39:25 | 7 |        Q.    Yes. |
| 05:39:26 | 8 |        A.    673 unusual trading days, key |
| 05:39:40 | 9 | milestone.  Yes, that -- that is correct. |
| 05:39:44 | 10 |        Q.    Okay.  The bottom left cell is |
| 05:39:50 | 11 | labeled "all."  And you can see it's 8,352,186. |
| 05:39:57 | 12 | And that is the total cumulative return for all |
| 05:40:05 | 13 | 183 unusual return days in ████ Model Number 5. |
| 05:40:09 | 14 | Correct? |
| 05:40:09 | 15 |        A.    Yes. |
| 05:40:10 | 16 |        Q.    Okay.  Now, moving to the |
| 05:40:14 | 17 | right-most cells on LM-5, $2.05 is the approximate |
| 05:40:23 | 18 | total cumulative return for all five Ripple |
| 05:40:29 | 19 | milestone news days in Dr. ████ Model Number 5. |
| 05:40:32 | 20 | Correct? |
| 05:40:32 | 21 |        A.    That's correct. |
| 05:40:33 | 22 |        Q.    Okay.  And the bottom-right cell, |
| 05:40:37 | 23 | the $92.55, that's the total cumulative return for |
| 05:40:41 | 24 | the entire period in ████ Model Number 5. |
| 05:40:52 | 25 | Correct? |

226

**HIGHLY CONFIDENTIAL**

05:40:52  1        A.    Yes.

05:40:52  2        Q.    Okay.  And before the break, we

05:40:54  3   determined that the total return for all trading

05:41:00  4   days in ███ Model Number 5 period, taking out

05:41:05  5   the days associated with the five Ripple milestone

05:41:12  6   days, is approximately $45.06.  Is that correct?

05:41:18  7        A.    Correct.

05:41:19  8        Q.    Okay.  Looking at this table, is it

05:41:30  9   correct that to reach the missing values that we

05:41:32  10  haven't discussed, the way you would fill in those

05:41:34  11  numbers is to reach the total that's in the "all"

05:41:36  12  column, you would multiply across the rows.

05:41:39  13             So for instance, for the yes news

05:41:41  14  event it's $1.99 times $1.03 equals approximately

05:41:53  15  $2.05?

05:41:54  16       A.    Oh, yes.  Yes.

05:41:54  17       Q.    Okay.  And then when you're

05:41:55  18  examining just no-news event days, to reach the

05:41:59  19  $45.06 in the "all" column, you would have to

05:42:03  20  multiply the approximately 4.1 million times a

05:42:05  21  very small number.  Is that right?

05:42:07  22       A.    Right.  The $45.06 itself comes

05:42:12  23  from -- I mean, I see a $45.06 there, but ...

05:42:16  24       Q.    That was if we wanted to determine

05:42:18  25  the compounded total proceeds for the remaining

227

**HIGHLY CONFIDENTIAL**

05:42:25  1    days in ███ Model Number 5.  I initially had

05:42:32  2    called that 2,002, but you pointed out that you

05:42:32  3    can't really just take 2,007 minus five.

05:42:35  4            A.    Mm-hmm.

05:42:35  5            Q.    So I think we'd agreed before the

05:42:37  6    break that one way to put it is that if you take

05:42:39  7    the total 2,007 ███ Model 5 trading day period

05:42:43  8    and you subtract out the returns associated with

05:42:46  9    the Ripple key milestone days, the way to reach

05:42:50 10    that is to divide the total returns for the entire

05:42:55 11    period on all days, $92.55, by the returns

05:43:03 12    associated with the yes Ripple milestones days

05:43:06 13    which is $2.05.

05:43:09 14            Is that right?

05:43:09 15            A.    Yes.  I testified that you could do

05:43:13 16    that calculation, but it would be subject to the

05:43:16 17    various qualifications in my prior testimony and

05:43:25 18    -- which may be -- have unusual mag- -- relative

05:43:30 19    magnitudes because of the small number of news

05:43:33 20    days we're talking about here.

05:43:35 21            Q.    When you say --

05:43:36 22            A.    But broadly -- broadly, that is

05:43:39 23    what I testified to.

05:43:40 24            Q.    Okay.  So if we look, Dr. Marais,

05:43:47 25    just at the "all" column in LM-5, is it fair to

                                                          228

**HIGHLY CONFIDENTIAL**

05:43:51  1   conclude that without the five days of cumulative

05:43:54  2   returns from days with Ripple key milestone

05:43:59  3   announcements, the total compounded proceeds for

05:44:02  4   the entire 2,007 day trading period are about cut

05:44:07  5   in half?

05:44:08  6          A.    Subject to gain to the

05:44:10  7   qualifications in my previous testimony, I would

05:44:14  8   have to agree that dividing anything by two about

05:44:22  9   cuts it in half.

05:44:23  10         Q.    Okay.  All right.  I'd like to show

05:44:32  11  you another exhibit.  This one is labeled LM-6.

05:44:44  12              (Exhibit LM-6, Summary table

05:44:44  13         referencing data provided by M. Laurentius

05:44:44  14         Marais for the same 2,007 day trading

05:44:44  15         period in ███ Model Number 5, marked for

05:44:47  16         identification, as of this date.)

05:44:47  17         Q.    So LM-6 is also a summary table

05:44:57  18  referencing data you provided.  And this is for

05:44:59  19  the same 2,007 day trading period in ███ Model

05:45:04  20  Number 5.  The difference is that this, instead of

05:45:07  21  the key milestone period, is the select event

05:45:09  22  period.

05:45:10  23         A.    Got it.

05:45:11  24         Q.    Okay.  So looking at the numbers on

05:45:16  25  this table, is the $482.20 in the top-left cell,

229

**HIGHLY CONFIDENTIAL**

05:45:26  1    is that the total compounded proceeds on unusual

05:45:31  2    return days coincident with Ripple news from your

05:45:34  3    Table 3?

05:45:41  4            A.    That is the number from Table 3 for

05:45:48  5    Model 5.

05:45:49  6            Q.    Okay.  And just for the record, the

05:45:50  7    way this is displayed in LM-6 is that the $482.20

05:45:56  8    is in the cell reflecting yes news event and

05:46:01  9    unusual return for daily XRP return.

05:46:07 10            All right.  Looking at the top

05:46:12 11    middle cell, the 29 cents figure, is that the 29

05:46:20 12    cents figure that appears in the regular trading

05:46:27 13    days column for the select category in your

05:46:29 14    Table 3?

05:46:30 15            A.    That is indeed that figure.

05:46:36 16            Q.    Okay.  And if we wanted to know

05:46:44 17    for -- I'm turning to the "all" category.  If we

05:46:47 18    wanted to know the total cumulative proceeds for

05:46:51 19    all news event days, the way we would reach that

05:46:54 20    is we would multiply 482.20 by .29.  Is that

05:46:54 21    right?

05:47:05 22            A.    Yes.  Subject to all of the

05:47:07 23    qualifications in my previous testimony on such

05:47:16 24    multiplications.

05:47:17 25            Q.    And 48 -- sorry.  Strike that.

230

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:47:18 | 1 | 482.20 times .29 is approximately |
| 05:47:29 | 2 | 139.95.  Would you agree? |
| 05:47:31 | 3 | A.    That's a level of precision and a |
| 05:47:32 | 4 | kind of mental arithmetic that I don't do anymore. |
| 05:47:40 | 5 | But it's certainly the ballpark -- the right |
| 05:47:42 | 6 | ballpark.  It's about .3 times 480. |
| 05:47:49 | 7 | Q.    Looking at the middle left cell in |
| 05:47:51 | 8 | LM-6, that 7,776, that corresponds with the |
| 05:48:00 | 9 | unusual trading days, no-coincident Ripple news in |
| 05:48:06 | 10 | your Table 3.  Correct? |
| 05:48:07 | 11 | A.    I'm sorry.  It's the seven thousand |
| 05:48:17 | 12 | seven hundred and -- yes, I do see that number. |
| 05:48:25 | 13 | Q.    Okay.  And the bottom-right cell, |
| 05:48:27 | 14 | "all," "all," that's still $92.55 because this is |
| 05:48:32 | 15 | the same total compounded proceeds figure for the |
| 05:48:34 | 16 | 2,007 trading days.  Correct? |
| 05:48:36 | 17 | A.    Yes, that is correct. |
| 05:48:37 | 18 | Q.    Okay.  Now, if we want to get the |
| 05:48:39 | 19 | figure -- so we've established the 139.95 in |
| 05:48:49 | 20 | approximate terms.  We've established the 92.55 |
| 05:48:52 | 21 | from your chart.  If we want to get the figure for |
| 05:48:54 | 22 | the cumulative returns for all no Ripple news |
| 05:48:57 | 23 | days, would we do that by dividing 92.55 by |
| 05:49:06 | 24 | 139.95? |
| 05:49:07 | 25 | A.    If there were no peculiarities that |

231

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 05:49:18 | 1 | of the kind that I alluded to in my earlier |
| 05:49:21 | 2 | testimony, the qualifications about these |
| 05:49:24 | 3 | multiplications, that would be a way of getting a |
| 05:49:27 | 4 | number for that cell. |
| 05:49:28 | 5 | Q.   And what -- just to make sure we're |
| 05:49:31 | 6 | on the same page, what peculiarities are you |
| 05:49:36 | 7 | referring to in your last answer? |
| 05:49:44 | 8 | A.   I'm referring to the peculiarities |
| 05:49:46 | 9 | that arise from classifying potentially |
| 05:49:54 | 10 | indeterminate cells in my hypothetical image that |
| 05:50:04 | 11 | I drew in the air, as it were, of streaks of |
| 05:50:07 | 12 | different colors overlapping and making a |
| 05:50:10 | 13 | calculation involving or completing filling out a |
| 05:50:20 | 14 | table involving categories of events that might |
| 05:50:22 | 15 | have overlaps. |
| 05:50:27 | 16 | Q.   Mm-hmm.  Is it fair to say that |
| 05:50:28 | 17 | applying the sort of, methodological selections |
| 05:50:33 | 18 | you made in the event, that there were these |
| 05:50:35 | 19 | overlaps, the way you would reach the total |
| 05:50:43 | 20 | cumulative proceeds for no-news events in |
| 05:50:47 | 21 | Exhibit 6 would be to divide 92.55 by 139.95? |
| 05:50:53 | 22 | A.   I'm sorry.  Say -- say that again. |
| 05:50:57 | 23 | The -- |
| 05:50:57 | 24 | Q.   Sure.  I want to -- I want to say, |
| 05:50:59 | 25 | like, assuming that we apply the methodological |

232

**HIGHLY CONFIDENTIAL**

05:51:03   1    choices that you made with respect to overlapping

05:51:06   2    windows, taking those as a given, as a

05:51:08   3    construction of how to determine the returns, the

05:51:11   4    total cumulative proceeds associated with all of

05:51:15   5    the days in which there were no Ripple news

05:51:18   6    events, the way we would approach that is to

05:51:21   7    divide the returns for all trading days in the

05:51:25   8    period, 92.55, by the returns for the yes Ripple

05:51:31   9    news event trading days in the period, 139.95.

05:51:37   10           A.    The -- your question refers to

05:51:47   11    my -- what I've -- the qualification that I've

05:51:54   12    been stating, and then appears to make an abrupt

05:51:59   13    U-turn and to simply ignore that qualification.

05:52:02   14           I have been -- I've consistently

05:52:06   15    testified that the multiplic- -- ones ability to

05:52:11   16    multiply numbers in tables like this is qualified

05:52:22   17    by, limited by anomalies that arise from the

05:52:28   18    classification -- the hierarchical classification

05:52:32   19    that I provided that I needed to implement.  And

05:52:37   20    that does not yield perfect multiplications.

05:52:43   21           And then you -- your question

05:52:44   22    appears to recognize that and then to immediately

05:52:47   23    deny it.  The -- one's ability -- the correctness

05:52:56   24    of multiplying cell entries in these tables to get

05:52:59   25    to the margins, so dividing the margins by cell

233

HIGHLY CONFIDENTIAL

05:53:01  1   entries to get other cell entries, is all limited

05:53:09  2   by the effect of the classifications I needed to

05:53:15  3   make and the fact that those classifications do

05:53:20  4   not affect different columns in this table in the

05:53:34  5   same way.

05:53:34  6              So the answer -- the long answer

05:53:40  7   I'm giving you here is really the same as the

05:53:43  8   answer I gave you -- I have just given you about

05:53:44  9   five times in a row.  If those complications did

05:53:49  10  not exist then we could multiply and divide as you

05:53:51  11  suggest.

05:53:51  12             The complications do exist, and so

05:53:54  13  I have no reason to expect that you can replicate

05:53:56  14  calculations that can be done with the actual

05:53:58  15  returns by multiplying round and dividing rounded

05:54:07  16  numbers from my Table 3 in the format of tables

05:54:12  17  like the LM-6 and whatever the previous, LM-5.

05:54:19  18        Q.    Turning to LM-6, I want to make

05:54:24  19  sure I understand your methodology with respect to

05:54:27  20  overlapping days.

05:54:29  21             The value represented, the

05:54:35  22  480 -- maybe it's easier to point to your chart,

05:54:37  23  to your Table 3.  The $482.20 that's reported as

05:54:43  24  coincident with Ripple news -- do you see that?

05:54:48  25        A.    Yes.

234

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:54:48 | 1 | Q. Is it true that for that period, |
| 05:54:55 | 2 | whatever days make up the total proceeds of |
| 05:54:58 | 3 | $482.20, none of those days overlap with either |
| 05:55:03 | 4 | the no-coincident Ripple news period or the |
| 05:55:08 | 5 | regular trading days period? |
| 05:55:09 | 6 | A. I'm not certain whether that is |
| 05:55:11 | 7 | true because of the way the hierarchy of rules |
| 05:55:17 | 8 | that I applied affects the calculation behind |
| 05:55:21 | 9 | different cells in this table. But the way to |
| 05:55:24 | 10 | know that is to look at the actual computer code |
| 05:55:27 | 11 | that created the actual calculations without |
| 05:55:31 | 12 | rounding and without truncation, and with no |
| 05:55:34 | 13 | ambiguity about potentially overlapping colored |
| 05:55:40 | 14 | streaks in the hypothetical calendar that I have |
| 05:55:44 | 15 | referred to. |
| 05:55:48 | 16 | Q. The methodology that you applied to |
| 05:55:51 | 17 | reach the figures in your Table 3 for $482.20 for |
| 05:56:01 | 18 | unusual trading days coincident with Ripple news, |
| 05:56:05 | 19 | $7,776 associated with -- or rather, cumulative |
| 05:56:11 | 20 | proceeds for unusual trading days no-coincident |
| 05:56:14 | 21 | Ripple news, do you believe that you applied that |
| 05:56:16 | 22 | correctly? |
| 05:56:18 | 23 | A. I do. |
| 05:56:19 | 24 | Q. Okay. And is the same true with |
| 05:56:22 | 25 | the methodology that you applied with respect to |

235

**HIGHLY CONFIDENTIAL**

05:56:27 1    determining that 29 cents total cumulative

05:56:30 2    proceeds associated with the regular trading days

05:56:34 3    in your Table 3?

05:56:35 4         A.    "The same" meaning I believe that I

05:56:45 5    applied the methodology that I applied correctly?

05:56:49 6         Q.    I guess I'm asking more for your

05:56:52 7    own value judgment on your methodology.  It seems

05:56:56 8    that you are confronted with a situation where you

05:57:00 9    had overlapping windows between several

05:57:06 10   categories.  Is that fair?

05:57:07 11        A.    That is fair.

05:57:08 12        Q.    And you also decided that the right

05:57:11 13   thing to do was to implement a strategy so that

05:57:14 14   you didn't double count any day in any of those

05:57:17 15   categories, notwithstanding the overlapping

05:57:20 16   windows.

05:57:20 17        A.    That was my intention.

05:57:21 18        Q.    And is that -- do you think that

05:57:25 19   was the appropriate methodology to apply to this

05:57:28 20   exercise set forth in Table 3?

05:57:30 21        A.    I think that there is no -- because

05:57:33 22   of the nature of the data and the nature of the

05:57:36 23   issue that we're discussing, I think that there is

05:57:40 24   no uniquely correct way of dealing with the issue.

05:57:46 25             But I believe that what I -- I

236

HIGHLY CONFIDENTIAL

05:57:50   1   certainly think that what I applied, the method

05:57:55   2   that I did apply and the hierarchy of

05:57:59   3   classification that I did apply was an entirely

05:58:02   4   reasonable and appropriate method for illustrating

05:58:06   5   the point that I am -- that I intended to

05:58:10   6   illustrate.

05:58:11   7        Q.    So given your familiarity with your

05:58:23   8   data and your methodology, sitting here today, if

05:58:26   9   you look at LM-6, are these returns for, say, the

05:58:29  10   news event yes category of 139.95 in the ballpark

05:58:36  11   of what you'd expect?

05:58:41  12        A.    I have no particular expectation.

05:58:45  13   I don't have a preformed expectation.  If I were

05:58:49  14   attempting to make tables like LM-5 and LM-6

05:58:58  15   entirely consistently with my previous testimony,

05:59:00  16   I would not be attempting to multiply and divide

05:59:05  17   numbers from Table 3 of my report.

05:59:05  18              I would turn instead to the

05:59:08  19   electronic supporting materials for my report,

05:59:11  20   which not only set forth the full precision

05:59:14  21   numbers so that they're not subject to rounding,

05:59:16  22   but also reveal exactly what was multiplied to get

05:59:20  23   to the dollar figure reported in a truncated or a

05:59:27  24   rounded form in each cell of Table 3.

05:59:30  25              So if I had an interest in

237

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 05:59:35 | 1 | calculating, in filling in a table like Table LM-6 |
| 05:59:39 | 2 | or Table LM-7, I've just described the method that |
| 05:59:45 | 3 | I would follow which is not the method -- |
| 05:59:51 | 4 | certainly not relying on somebody else's |
| 05:59:54 | 5 | arithmetic and isn't even based on starting from |
| 05:59:58 | 6 | the numbers that are reported on the visible face |
| 06:00:01 | 7 | of Table 3. |
| 06:00:05 | 8 | Q.    You would not start with such |
| 06:00:07 | 9 | numbers? |
| 06:00:12 | 10 | MR. FIGEL:  Objection. |
| 06:00:13 | 11 | Q.    I wanted to make sure I heard you |
| 06:00:15 | 12 | correctly. |
| 06:00:16 | 13 | A.    For filling in the cells of tables |
| 06:00:19 | 14 | like LM-6 and LM-5, I would not start with the |
| 06:00:28 | 15 | rounded numbers that I have just -- as I just |
| 06:00:31 | 16 | explained. |
| 06:00:31 | 17 | I would go to the source material |
| 06:00:34 | 18 | for Table 3 where I would have the benefit of full |
| 06:00:40 | 19 | precision and full understanding of how potential |
| 06:00:45 | 20 | overlaps had been dealt with. |
| 06:00:46 | 21 | Q.    If you had the -- your Table 3 |
| 06:00:51 | 22 | Excel spreadsheet in front of you, and you wanted |
| 06:00:57 | 23 | to undertake the exercise set forth in the yes |
| 06:01:00 | 24 | news event row in LM-6, would you do that by |
| 06:01:06 | 25 | multiplying the cell that corresponds with $482.20 |

238

HIGHLY CONFIDENTIAL

06:01:13  1  on LM-4 with the cell that corresponds with 29

06:01:19  2  cents on LM-4?

06:01:22  3        A.    No.

06:01:29  4        Q.    Why not?

06:01:29  5        A.    Because, first, as I've testified

06:01:31  6  already, I do not know, sitting here, whether

06:01:36  7  there is a level of rounding that occurred before

06:01:39  8  the numbers got into the spreadsheets like the one

06:01:42  9  that created Table 3.

06:01:44  10        You may recall that I explained

06:01:48  11  that I would go upstream from that table as far as

06:01:51  12  was necessary to get full precision.

06:02:00  13        But I would also, in order to avoid

06:02:03  14  any possibility of misunderstanding due to

06:02:08  15  overlapping cell products, I would go upstream far

06:02:16  16  enough not only to get the full precision, but

06:02:21  17  upstream far enough to be completely clear about

06:02:29  18  what were the -- which cells in the hypothetical

06:02:34  19  calendar that I have referred to a number of

06:02:38  20  times, contributed to each of the products

06:02:49  21  reported in Table 3, in order to understand

06:02:54  22  whether I should expect a multiplicative

06:02:56  23  relationship like the ones in Tables LM-5 and

06:03:01  24  LM-6, and if not, to apply suitable footnotes to

06:03:08  25  account for whatever it was that I discovered.

**HIGHLY CONFIDENTIAL**

```
06:03:13   1          Q.    If one wanted to undertake the
06:03:16   2   exercise that you just described, could one do so
06:03:18   3   with the data that you supplied in Marais backup?
06:03:23   4          A.    Yes.  That's -- in fact, those
06:03:29   5   materials are exactly what I have meant to refer
06:03:31   6   to -- what I did -- was, in fact referring to as
06:03:34   7   my electronic backup for every -- in every answer
06:03:41   8   in the past ten minutes or so.
06:03:48   9          Q.    When you undertook your assignment
06:03:50  10   in this case, did you investigate to what
06:03:55  11   extent -- strike that.
06:03:55  12              Let's assume, as a hypothetical,
06:03:58  13   that the numbers on LM-6 are roughly correct.
06:04:02  14              Would it change your opinion at all
06:04:05  15   with respect to your rebuttal of Dr. ██████ report
06:04:19  16   in this case, if, in fact, Ripple news events were
06:04:22  17   responsible for returns of 139.95 and all news
06:04:26  18   events were 92.55?
06:04:27  19          MR. FIGEL:  Objection.
06:04:28  20          A.    I would turn instead to Table 3 and
06:04:36  21   assume that the numbers on Table 3 were
06:04:40  22   approximately correct, where the -- I'm using the
06:04:47  23   word "approximate" only to refer to the
06:04:51  24   complications resulting from the overlapping
06:04:54  25   phenomena that I have testified about.  And I
```

240

HIGHLY CONFIDENTIAL

06:04:58 1  would continue to base my opinions and conclusions

06:05:04 2  on the Table 3 numbers on that assumption.

06:05:10 3  Q.   Okay.  The Table 3 numbers, though,

06:05:17 4  are the -- I think we established the Table 3

06:05:19 5  numbers for 482.20 for unusual trading days

06:05:24 6  coincident with Ripple news and 29 cents for

06:05:30 7  regular trading days are from your Table 3.  Is

06:05:37 8  that right?

06:05:37 9  MR. FIGEL:  Objection.

06:05:37 10  A.   There are certain inputs in

06:05:41 11  table -- I'm sorry, I may have missed the gist of

06:05:44 12  that question.  But I think you were asking me,

06:05:48 13  did certain input numbers on LM-6 and/or LM-5 come

06:05:53 14  from Table 3?

06:05:57 15  Q.   I was, but I was -- I thought your

06:06:00 16  answer to my hypothetical was, I wouldn't look at

06:06:06 17  LM-6, I would look at LM-4, which is your Table 3.

06:06:10 18  And I was just pointing out that it seems that to

06:06:13 19  supply at least certain of the numbers in LM-6,

06:06:16 20  you can look at LM-4 and identify those numbers.

06:06:21 21  MR. FIGEL:  Objection.

06:06:27 22  A.   The fact that someone else had

06:06:29 23  transcribed some numbers from my Table 3 into

06:06:32 24  their table and done some arithmetic with them is

06:06:38 25  immaterial to me.  Any number of people can do any

241

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 06:06:46 | 1 | number of things with numbers from Table 3. |
| 06:06:48 | 2 | Table 3 is organized the way I |
| 06:06:51 | 3 | would organize these data.  And I don't really |
| 06:06:58 | 4 | care what somebody else might -- how they might |
| 06:07:00 | 5 | rearrange the numbers.  I would continue to base |
| 06:07:04 | 6 | my conclusions and opinion in this matter on |
| 06:07:11 | 7 | Table 3. |
| 06:07:11 | 8 | Q.    Okay.  Understood.  But backing up |
| 06:07:18 | 9 | from what tables are in front of you, let's assume |
| 06:07:22 | 10 | the hypothetical case where, for a given period, |
| 06:07:28 | 11 | this 2,007-day period, the total returns for all |
| 06:07:33 | 12 | days are 92.55, and the total returns attributed |
| 06:07:38 | 13 | just to Ripple news events days are 139.95. |
| 06:07:44 | 14 | That's the hypothetical. |
| 06:07:45 | 15 | Does that affect your opinion at |
| 06:07:47 | 16 | all in this case? |
| 06:07:48 | 17 | MR. FIGEL:  Objection. |
| 06:07:49 | 18 | A.    No. |
| 06:07:58 | 19 | Q.    Why not? |
| 06:08:00 | 20 | A.    Because the total return for all |
| 06:08:09 | 21 | trading days of 92.95 -- 92.55 or whatever the |
| 06:08:19 | 22 | $92 -- 92.55, describes a -- obscures a |
| 06:08:32 | 23 | complicated history of ups and downs, including an |
| 06:08:38 | 24 | up that went all the way to $3.50 and then came |
| 06:08:45 | 25 | down again. |

242

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 06:08:52 | 1 | Dr. ███ purports to draw |
| 06:08:54 | 2 | conclusions from a two-part procedure, one of |
| 06:08:59 | 3 | which involves three-day trading |
| 06:09:05 | 4 | windows -- trading day windows in which he |
| 06:09:07 | 5 | identifies a certain number of those snippets of |
| 06:09:12 | 6 | time as being unusual in the sense in which I have |
| 06:09:18 | 7 | identified that term with a -- defined that term |
| 06:09:22 | 8 | with a capital U. |
| 06:09:24 | 9 | And he labels certain other days as |
| 06:09:30 | 10 | being categorized as having -- being associated |
| 06:09:36 | 11 | with Ripple news events.  He finds highly |
| 06:09:40 | 12 | statistically significant coincidences between the |
| 06:09:48 | 13 | trading day snippets and the news days. |
| 06:09:53 | 14 | $95 versus $136 are two average |
| 06:09:59 | 15 | statements about -- two statements about certain |
| 06:10:05 | 16 | averages that really have very -- have nothing to |
| 06:10:10 | 17 | do, that I recognize as I sit here, with the |
| 06:10:18 | 18 | substance of my commentary and set of conclusions |
| 06:10:24 | 19 | on Dr. ███ work, which is that he has identified |
| 06:10:32 | 20 | a highly statistically significant correlation of |
| 06:10:37 | 21 | Ripple news with a sliver of the days -- of the |
| 06:10:49 | 22 | trading day snippets that he has also identified |
| 06:10:52 | 23 | as ones potentially containing nonrandom |
| 06:10:57 | 24 | systematic effects of something. |
| 06:11:04 | 25 | The averages that you were asking |

243

**HIGHLY CONFIDENTIAL**

06:11:06  1  me about just have next to nothing -- they have

06:11:11  2  nothing to do, that I recognize, with Dr. ███

06:11:15  3  analysis in the first place.

06:11:21  4          With due respect, Mr. Sylvester,

06:11:23  5  you're off on a tangent, and on a very slender

06:11:26  6  limb of that tangent.  And it has nothing to do,

06:11:31  7  that I recognize, with Dr. ███ purported

06:11:35  8  analysis or with my opinion that Dr. ███

06:11:41  9  analysis, although it has identified a seemingly

06:11:46  10  highly statistically significant correlation, has

06:11:52  11  identified a correlation with only a sliver of the

06:11:58  12  event, the trading day snippets that he, that he

06:12:03  13  himself has identified as the candidates for

06:12:06  14  nonrandom systemic price effects.

06:12:10  15          Q.    Is there any place in your report,

06:12:24  16  Dr. Marais, where you set forth the total

06:12:26  17  cumulative proceeds for the 2,007-day period in

06:12:32  18  ███  Model Number 5?

06:12:34  19          A.    For the 2,007 days?

06:12:56  20          (Document review.)

06:12:56  21          I see that in -- I believe that

06:12:58  22  spot is visible in the counterpart of the

06:13:06  23  2,007-day number, if you just go to that same cell

06:13:09  24  in Table 3.

06:13:20  25          Q.    I see.  Is there any part of your

                                                                244

**HIGHLY CONFIDENTIAL**

06:13:22  1    expert report where you compare the total

06:13:25  2    cumulative proceeds attributable to Ripple news

06:13:32  3    days with the total cumulative proceeds for the

06:13:35  4    entire period?

06:13:36  5         A.   I do not -- I could flip through my

06:13:51  6    report and see if I'm reminded of something.

06:13:55  7    Sitting here, without doing that, I don't recall

06:13:59  8    any place where I do that, because that is simply

06:14:03  9    not a comparison that is pertinent to what I do,

06:14:13 10    in fact, do, which I set forth again in a -- in a

06:14:18 11    longish answer about two minutes ago.

06:14:23 12              MR. SYLVESTER:  I think we're very

06:14:24 13         close to the end.  Can we just take five

06:14:26 14         minutes off the record to wrap up?

06:14:30 15              MR. FIGEL:  Gladly.

06:14:34 16              MR. SYLVESTER:  Off the record.

06:14:34 17              THE VIDEOGRAPHER:  The time is

06:14:34 18         6:14 p.m.  This concludes Media 6.  Off the

06:14:34 19         record.

06:29:05 20              (Recess taken from 6:14 p.m. to

06:29:05 21         6:28 p.m.)

06:29:05 22              THE VIDEOGRAPHER:  The time is now

06:29:05 23         6:28 p.m.  This begins Media 7.  On the

06:29:05 24         record.

06:29:05 25    BY MR. SYLVESTER:

                                                        245

**HIGHLY CONFIDENTIAL**

```
06:29:19   1          Q.    Dr. Marais, turning to your Table 1
06:29:20   2    again in your expert report.
06:29:21   3          A.    I'm there.
06:29:23   4          Q.    Okay.  There are 179 days that
06:29:24   5    correspond with unusual daily XRP returns and no
06:29:27   6    Ripple news events.  Is that right?
06:29:29   7          A.    Yes.
06:29:35   8          Q.    Did you undertake any analysis to
06:29:38   9    determine what unaccounted for factors might have
06:29:41  10    driven unusual returns on those 179 days?
06:29:43  11          A.    I did not.  I did not need to do
06:29:48  12    that to arrive at the opinions I have in this
06:29:50  13    case.
06:29:50  14          Q.    Did you undertake any analysis to
06:29:53  15    determine what unaccounted for factors might have
06:29:58  16    driven unusual returns on any days that were not
06:30:00  17    coincident with Ripple news days?
06:30:07  18                MR. FIGEL:  Objection.
06:30:08  19          A.    I -- as I have testified earlier
06:30:11  20    today, I did not undertake any brand new work
06:30:16  21    outside of what Dr. ████ reported and delivered.
06:30:21  22    Dr. ███, as far as I can tell, undertook no such
06:30:25  23    analysis.  And I do point that out, but I did not
06:30:29  24    attempt to fill in that gap.
06:30:33  25          Q.    Are you familiar with the concept
```

                                                              246

**HIGHLY CONFIDENTIAL**

| | | |
|---|---|---|
| 06:30:35 | 1 | of false positives in statistical tests? |
| 06:30:41 | 2 | A.    Yes. |
| 06:30:42 | 3 | Q.    Turning again to the 179 days, is |
| 06:30:44 | 4 | it possible that some of those days could be false |
| 06:30:47 | 5 | positives? |
| 06:30:48 | 6 | MR. FIGEL:  Objection. |
| 06:30:48 | 7 | A.    It is -- it is certainly possible |
| 06:30:55 | 8 | as it is possible that some of the four days |
| 06:30:59 | 9 | identified by Dr. ███ are false positives. |
| 06:31:05 | 10 | Q.    What is a typical expectation, if |
| 06:31:08 | 11 | any, for false positive observations? |
| 06:31:11 | 12 | MR. FIGEL:  Objection. |
| 06:31:11 | 13 | A.    That they are flagged by a |
| 06:31:21 | 14 | statistical procedure as being significant such as |
| 06:31:36 | 15 | Dr. ███ procedure in this case. |
| 06:31:40 | 16 | Q.    As the percentage -- |
| 06:31:43 | 17 | A.    And -- |
| 06:31:45 | 18 | Q.    Go ahead. |
| 06:31:46 | 19 | A.    I'm sorry.  But that, in reality, |
| 06:31:49 | 20 | they do not correspond to a nonrandom, systematic |
| 06:31:59 | 21 | effect of the kind that Dr. ███ refers to when he |
| 06:32:05 | 22 | describes his procedure for identifying them. |
| 06:32:12 | 23 | Q.    Is the typical expectation in |
| 06:32:16 | 24 | percentage terms for false positives around 5 or |
| 06:32:21 | 25 | 10 percent? |

247

**HIGHLY CONFIDENTIAL**

```
06:32:21   1            A.     It depends on the nature of the
06:32:25   2    data and on the nature of the procedure for
06:32:27   3    identifying them.  I -- I would not say there is
06:32:31   4    such a thing as a typical rate of -- for -- that
06:32:38   5    fits all situations.
06:32:40   6            Q.     I want to turn now to page 4 of
06:32:44   7    your report in which Dr. ███    Figure 1 is
06:32:50   8    reproduced.
06:33:06   9            A.     I see it sitting right there.
06:33:09  10            Q.     Okay.  Is it fair to say that the
06:33:14  11    check-marks in Dr. ███    Figure 1 are intended to
06:33:20  12    indicate significance at the 5 percent level
06:33:24  13    according to Dr. ███?
06:33:26  14            A.     Yes.
06:33:27  15            Q.     Okay.  Do you dispute any of
06:33:30  16    Dr. ███ conclusions regarding statistical
06:33:33  17    significance as is indicated in his Figure 1?
06:33:36  18            A.     I agree that the arithmetic that
06:33:45  19    Dr. ███ arrive -- performed to arrive at the
06:33:49  20    coloring of the cells and the check-marks in the
06:33:53  21    cells appears to me to be correct.  In fact, I've
06:33:58  22    replicated it and I think he got the arithmetic
06:34:02  23    correct.
06:34:02  24            Q.     And that includes his conclusions
06:34:07  25    regarding significance at the 5 percent level
```

248

HIGHLY CONFIDENTIAL

| | | |
|---|---|---|
| 06:34:09 | 1 | displayed in Figure 1? |
| 06:34:12 | 2 | A.   Within the framework of |
| 06:34:18 | 3 | Mr. -- Dr. ███ analysis, I do agree that his |
| 06:34:28 | 4 | hypergeometric calculation, probability |
| 06:34:32 | 5 | calculations produced p-values below 5 percent -- |
| 06:34:37 | 6 | actually, below 5 percent wherever he indicates |
| 06:34:38 | 7 | that he got such an outcome. |
| 06:34:40 | 8 | MR. SYLVESTER:  I have nothing |
| 06:34:41 | 9 | further.  Thank you very much for your time. |
| 06:34:41 | 10 | Reid? |
| 06:34:48 | 11 | MR. FIGEL:  We don't have any |
| 06:34:51 | 12 | follow-up, obviously reserving all our rights |
| 06:34:53 | 13 | to check the transcript and to have him |
| 06:34:55 | 14 | consider some of the questions you asked. |
| 06:34:57 | 15 | But I think we need to ask the |
| 06:34:59 | 16 | Cleary folks and the Paul Weiss folks if they |
| 06:35:03 | 17 | have questions. |
| 06:35:03 | 18 | MR. SYLVESTER:  Sure.  Are they on? |
| 06:35:06 | 19 | Cleary?  Paul Weiss? |
| 06:35:06 | 20 | MR. BONILLA LOPEZ:  Nothing on my |
| 06:35:09 | 21 | end from Cleary. |
| 06:35:11 | 22 | MR. WARD:  Nothing from Paul Weiss. |
| | 23 | Thank you. |
| | 24 | MR. SYLVESTER:  Okay.  Great. |
| | 25 | Thank you very much, Dr. Marais. |

249

**HIGHLY CONFIDENTIAL**

```
 1          Appreciate your time.
 2                    THE WITNESS:  Thank you.
 3                    CERTIFIED STENOGRAPHER:  So would
 4          counsel please state your orders for the
 5          transcript on the record, please; if you
 6          would like a rough draft and when you would
 7          like the final.
06:35:26  8                    I have SEC's order already.
06:35:33  9                    MR. FIGEL:  What are our choices?
06:35:35 10          Expedited.
06:35:37 11                    CERTIFIED STENOGRAPHER:  If you
06:35:37 12          would like a rough and when you would like
06:35:37 13          the final.
06:35:42 14                    MR. FIGEL:  How soon can we get the
06:35:42 15          final?
06:35:42 16                    CERTIFIED STENOGRAPHER:  Tomorrow?
06:35:42 17                    (Continued on the next page.)
        18
        19
        20
        21
        22
        23
        24
        25
```

250

**HIGHLY CONFIDENTIAL**

```
06:35:42   1            MR. FIGEL:  That's fine.  We'll
06:35:44   2       just do that.  You can skip the rough.  Just
06:35:47   3       give us the final tomorrow.  Thank you.
06:35:49   4            And I assume this is highly
06:35:51   5       confidential?
06:35:54   6            MR. SYLVESTER:  It's up to you.
06:35:57   7            MR. FIGEL:  Yeah, I think we should
06:35:57   8       keep it highly confidential.  That's how his
06:35:59   9       report was designated and we agreed to that.
06:36:00  10       So let's keep the deposition consistent with
06:36:03  11       the report.
06:36:13  12            That's it for us.
06:36:13  13            THE VIDEOGRAPHER:  The time is 6:35
          14       p.m.  This concludes Media 7 of 7 of today's
          15       deposition.  Off the record.
          16            (Time noted:  6:35 p.m.)
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

251

**HIGHLY CONFIDENTIAL**

```
 1                CERTIFICATE OF WITNESS

 2

 3

 4       I, M. LAURENTIUS MARAIS, do hereby declare under

 5       penalty of perjury that I have read the entire

 6       foregoing transcript of my deposition testimony,

 7       or the same has been read to me, and certify that

 8       it is a true, correct and complete transcript of

 9       my testimony given on December 21, 2021, save and

10       except for changes and/or corrections, if any, as

11       indicated by me on the attached Errata Sheet, with

12       the understanding that I offer these changes and/or

13       corrections as if still under oath.

14          _____ I have made corrections to my deposition.

15          _____ I have NOT made any changes to my deposition.

16

17   Signed: _____
                M. LAURENTIUS MARAIS
18

19   Dated this _____ day of _____ of 20____.

20

21

22

23

24

25
                                                    252
```

1

2                C E R T I F I C A T E

3    STATE OF NEW YORK    )

4                          : ss.

5    COUNTY OF NASSAU     )

6

7               I, PATRICIA A. BIDONDE, a Notary

8          Public within and for the State of New

9          York, do hereby certify:

10              That M. LAURENTIUS MARAIS, the

11         witness whose deposition is hereinbefore

12         set forth, was duly sworn by me, and

13         that such deposition is a true record of

14         the testimony given by the witness.

15              I further certify that I am not

16         related to any of the parties to this

17         action by blood or marriage, and that I

18         am in no way interested in the outcome

19         of this matter.

20              IN WITNESS WHEREOF, I have

21         hereunto set my hand this day,

22         December 22, 2021.

23         _____Patricia Bidonde_____
           PATRICIA A. BIDONDE
24         Stenographer
           Registered Professional Reporter
25         Realtime Certified Reporter

                                                253

**HIGHLY CONFIDENTIAL**

1                    E R R A T A

2   ERRATA SHEET FOR THE TRANSCRIPT OF:

3   Case Name:      SEC v Ripple

4   Dep Date:       December 21, 2021

5   Deponent:    M. Laurentius Marais

6   Pg. Ln.  Now Reads        Should Read          Reason

7   ___ ____ _____ _____ _____

8   ___ ____ _____ _____ _____

9   ___ ____ _____ _____ _____

10  ___ ____ _____ _____ _____

11  ___ ____ _____ _____ _____

12  ___ ____ _____ _____ _____

13  ___ ____ _____ _____ _____

14  ___ ____ _____ _____ _____

15  ___ ____ _____ _____ _____

16  ___ ____ _____ _____ _____

17  ___ ____ _____ _____ _____

18  ___ ____ _____ _____ _____

19  ___ ____ _____ _____ _____

20  ___ ____ _____ _____ _____

21  ___ ____ _____ _____ _____

22  ___ ____ _____ _____ _____

23  ___ ____ _____ _____ _____

24  ___ ____ _____ _____ _____

25  ___ ____ _____ _____ _____

**HIGHLY CONFIDENTIAL**

```
1              E R R A T A (Continued)

2     Pg. Ln.  Now Reads          Should Read             Reason

3     ___ ____ _____  _____   _____

4     ___ ____ _____  _____   _____

5     ___ ____ _____  _____   _____

6     ___ ____ _____  _____   _____

7     ___ ____ _____  _____   _____

8     ___ ____ _____  _____   _____

9     ___ ____ _____  _____   _____

10    ___ ____ _____  _____   _____

11    ___ ____ _____  _____   _____

12    ___ ____ _____  _____   _____

13    ___ ____ _____  _____   _____

14    ___ ____ _____  _____   _____

15    ___ ____ _____  _____   _____

16    ___ ____ _____  _____   _____

17    ___ ____ _____  _____   _____

18

19    _____   _____

20    Date                        M. Laurentius Marais

21

22

23

24

25
                                                            255
```