# Exhibit 32

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
                     Plaintiff,       )
 6                                    ) Case No.
               v.                     ) 20-Civ-10832(AT)(SN)
 7                                    )
     RIPPLE LABS, INC., BRADLEY       )
 8   GARLINGHOUSE, and CHRISTIAN      )
     LARSEN,                          )
 9                                    )
                     Defendants.      )
10   _____)

11

12        **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14               VIDEOTAPED DEPOSITION OF

15                 DR. PETER ADRIAENS

16              Tuesday, February 8, 2022

17

18

19

20

21

22

23

24   Reported by:
     BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 220208BLO
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                UNITED STATES DISTRICT COURT

 2               SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
 5                                    )
                    Plaintiff,        )
 6                                    ) Case No.
          v.                          ) 20-Civ-10832(AT)(SN)
 7                                    )
     RIPPLE LABS, INC., BRADLEY       )
 8   GARLINGHOUSE, and CHRISTIAN      )
     LARSEN,                          )
 9                                    )
                    Defendants.       )
10   _____)

11

12

13

14

15        Videotaped deposition of DR. PETER ADRIAENS

16   taken on behalf of Plaintiff at the offices of Debevoise

17   & Plimpton, 919 Third Avenue, New York, New York,

18   commencing at 9:07 a.m. and ending at 6:21 p.m., on

19   Tuesday, February 8, 2022, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States of

21   New York and New Jersey, pursuant to notice.

22

23

24

25
                                                            2
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
1  A P P E A R A N C E S (All appearing remotely):

2

3

4  For the Plaintiff:

5

6

7          UNITED STATES SECURITIES AND EXCHANGE COMMISSION

8          NEW YORK REGIONAL OFFICE

9          BY:  MARK R. SYLVESTER, ESQUIRE

10              DAPHNA A. WAXMAN, ESQUIRE

11              JON A. DANIELS, ESQUIRE

12         New York Regional Office

13         200 Vesey Street

14         Suite 400

15         New York, New York  10281-1022

16         Telephone:  212.336-0159

17         Email:   sylvesterm@sec.gov

18                  waxmand@sec.gov

19                  danielsj@sec.gov

20

21

22

23

24

25
```

3

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S (Continued):

 2

 3   For Defendant Ripple Labs Inc. and the Witness:

 4

 5

 6           DEBEVOISE & PLIMPTON LLP

 7           BY:  LISA ZORNBERG, ESQUIRE

 8                CHRISTOPHER S. FORD, ESQUIRE

 9                ANNA GRESSEL, ESQUIRE (Remote)

10                ASHLEY HAHN, ESQUIRE (Remote)

11                SCOTT M. CARAVELLO, ESQUIRE (Remote)

12           919 Third Avenue

13           New York, New York  10022

14           Telephone:  212.909.6000

15           E-Mail:  Lzornberg@debevoise.com

16                    cford@debevoise.com

17                    agressel@debevoise.com

18                    ahahn@debevoise.com

19                    scaravello@debevoise.com

20

21                    -and-

22

23

24

25
```

4

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1  A P P E A R A N C E S (Continued):

 2

 3  For Defendant Ripple Labs Inc. and the Witness:

 4

 5          KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

 6          BY:  COLLIN R. WHITE, ESQUIRE

 7              MICHAEL KELLOGG, ESQUIRE (Remote)

 8          Sumner Square

 9          1615 M Street, N.W.

10          Suite 400

11          Washington, D.C.  20036

12          Telephone:  202.326.7999

13          E-mail:  Cwhitekellogghansen.com

14                   mkellogg@kellogghansen.com

15

16  For Defendant Bradley Garlinghouse:

17

18          CLEARY GOTTLIEB STEEN & HAMILTON

19          BY:  NICOLE TATZ, ESQUIRE (Remote)

20          2112 Pennsylvania Avenue, NW

21          Washington, D.C.  20037

22          Telephone:  202.974.1500

23          E-mail:  ntatz@cgsh.com

24

25
```

5

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   A P P E A R A N C E S (Continued):

 2

 3   For Defendant Christian A. Larsen:

 4

 5           PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

 6           BY:  CARLY M. LAGROTTERIA, ESQUIRE

 7                JUSTIN WARD, ESQUIRE (Remote)

 8           1285 Avenue of the Americas

 9           New York, New York  10019-6064

10           Telephone:  212.373.2491

11           E-mail:  Clagrotteria@paulweiss.com

12                    jward@paulweiss.com

13

14   ALSO PRESENT:

15

16           REBECCA MATSUMARA, Ripple

17           STELLA UVAYDOVAS, SEC

18           JAMES BRADY, Videographer
             Shereck Video Service
19

20

21

22

23

24

25
```
6

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                        INDEX

 2   WITNESS                       EXAMINATION

 3   DR. PETER ADRIAENS

 4       BY MR. SYLVESTER               11

 5       BY MR. WHITE                  293

 6

 7

 8

 9

10                      EXHIBITS

11   SEC PA
     NUMBER          DESCRIPTION         PAGE
12

13   Exhibit 1    Expert Report of Dr. Peter    13

14                Adriaens dated 10-4-21

15                NO BATES, 137 pages

16

17   Exhibit 2    Rebuttal Report of Dr. Peter   14

18                Adriaens dated 11-12-21

19                NO BATES, 34 pages

20

21   Exhibit 3    Expert Report of Dr. ███    202

22                ████  dated 10-4-21

23                NO BATES, 46 pages

24

25
```

7

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                        EXHIBITS

 2   SEC PA
     NUMBER               DESCRIPTION              PAGE
 3

 4   Exhibit 22   Printout from XRPL.org            171

 5                Consensus Protections Against

 6                Attacks and Failure Modes

 7                NO BATES, 3 pages

 8

 9   Exhibit 23   11-10-21 Status of Analysis       131

10                of Halt on 11-3-21

11                NO BATES, 2 pages

12

13   Exhibit 24   Printout from amazon.com          154

14                "What is Decentralization in

15                Blockchain/"

16                NO BATES, 7 pages

17

18

19

20

21

22

23

24

25
                                                      8
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                 DEPOSITION SUPPORT INDEX

 2

 3    DIRECTION TO WITNESS NOT TO ANSWER

 4       Page   Line

 5        16     19

 6        18     25

 7       149     14

 8       171     10

 9       276     12

10

11    STIPULATIONS

12       Page   Line

13        - -none- -

14

15

16    PORTION MARKED HIGHLY CONFIDENTIAL

17       Page   Line

18        - -none- -

19

20

21   REQUEST FOR DOCUMENTS

22       Page   Line

23        - -none- -

24

25
```

9

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
                        1                    -  -  -

                        2                  9:07 a.m.

                        3             February 8, 2022

                        4                    -  -  -

09:06:23                5             THE VIDEOGRAPHER:  We're on

                        6        the record.  The time is 9:07 a.m.

                        7        Today's date is February 8th, 2022.

                        8        This is Disk 1 of the video deposition

                        9        of Peter Adriaens in the matter of the

09:06:35               10        SEC versus Ripple Labs.

                       11             My name is Jim Brady.  I'm

                       12        the videographer with Gradillas Court

                       13        Reporting.  Today's court reporter is

                       14        Bridget Lombardozzi, also with

09:06:44               15        Gradillas Court Reporting.  We're here

                       16        today at the office of Debevoise &

                       17        Plimpton, 919 Third Avenue, New York,

                       18        New York.

                       19             All attorney appearances will

09:06:55               20        appear on the transcript.

                       21             I ask now that the court

                       22        reporter please swear in the witness.

                       23             P E T E R   A D R I A E N S,

                       24        having been duly sworn, was examined

09:06:59               25        and testified as follows:
```

10

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:07:13 | 1 | THE REPORTER:  Thank you. |
| | 2 | You may proceed. |
| | 3 | DIRECT-EXAMINATION |
| | 4 | BY MR. SYLVESTER: |
| 09:07:15 | 5 | Q.   Good morning, Professor. |
| | 6 | Could you please state your name for the |
| | 7 | record. |
| | 8 | A.   Peter Adriaens. |
| | 9 | Q.   And I'm Mark Sylvester.  I'm an attorney |
| 09:07:22 | 10 | with the SEC, the plaintiff in this okay.  I'm |
| | 11 | here with my colleagues, Daphna Waxman and Jon |
| | 12 | Daniels.  There are other of my colleagues joining |
| | 13 | us on Zoom today. |
| | 14 | Are you represented by counsel here |
| 09:07:32 | 15 | today? |
| | 16 | A.   No, I'm not. |
| | 17 | Q.   Have you had your deposition taken |
| | 18 | before, Professor? |
| | 19 | A.   Can you repeat the question? |
| 09:07:39 | 20 | Q.   Sure. |
| | 21 | Have you had your deposition taken |
| | 22 | before? |
| | 23 | A.   My deposition or a deposition? |
| | 24 | Q.   Your deposition.  Have you been deposed? |
| 09:07:48 | 25 | A.   I have been deposed, yes. |

11

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:07:50 | 1 | Q.   How many times? |
| | 2 | A.   Three or four times. |
| | 3 | Q.   Okay.  Is there anything that would |
| | 4 | prevent you from testifying fully and truthfully |
| 09:07:57 | 5 | here today? |
| | 6 | A.   No. |
| | 7 | Q.   Were you retained to provide expert |
| | 8 | services in this case? |
| | 9 | A.   Yes, I was. |
| 09:08:06 | 10 | Q.   Who retained you? |
| | 11 | A.   Debevoise & Plimpton and Kellogg Hansen. |
| | 12 | Q.   Were you retained on behalf of Ripple |
| | 13 | Labs only or all defendants? |
| | 14 | A.   It was on behalf of all defendants. |
| 09:08:19 | 15 | Q.   Okay.  If I say "Ripple" today, I mean |
| | 16 | Ripple Labs, the defendant in this case.  Okay? |
| | 17 | A.   Okay. |
| | 18 | Q.   Are you familiar with the term "XRP"? |
| | 19 | A.   Yes, I am. |
| 09:08:28 | 20 | Q.   Are you familiar with the term "digital |
| | 21 | asset"? |
| | 22 | A.   Yes, I am. |
| | 23 | Q.   Are you familiar with the term "XRP |
| | 24 | Ledger"? |
| 09:08:35 | 25 | A.   Yes, I am. |

12

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:08:36  1       Q.   What is the XRP Ledger?

       2       A.   It is an open permissionless blockchain.

       3                 THE REPORTER:  Permissless?

       4                 THE WITNESS:  Permissionless

09:08:47  5          blockchain.

       6                 THE REPORTER:  Thank you.

       7  BY MR. SYLVESTER:

       8       Q.   Is there only one XRP Ledger or are

       9  there multiple ledgers?

09:09:01 10       A.   As far as I know, there's one XRP

      11  Ledger.

      12       Q.   Professor, let me hand you what's been

      13  marked Exhibit 1.

      14                 (Whereupon, exhibit is

09:09:10 15          received and marked SEC Adriaens

      16          Exhibit 1 for identification.)

      17  BY MR. SYLVESTER:

      18       Q.   I'm going to hand you a copy and ask

      19  counsel to pass it down.  There we go.

09:09:23 20            And, Professor, is Exhibit 1 your expert

      21  report of October 4th, 2021?

      22       A.   Yes, it is.

      23       Q.   Okay.  Turning to the page following

      24  page 70, is that your signature on that page?

09:09:49 25       A.   Yes, it is.

                                                            13

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:09:50   1          Q.   Okay.

           2                    (Whereupon, exhibit is

           3               received and marked SEC Adriaens

           4               Exhibit 2 for identification.)

09:09:52   5   BY MR. SYLVESTER:

           6          Q.   Let me hand you what's been marked PA-2.

           7               Is PA-2 your expert rebuttal report of

           8   November 12th, 2021?

           9          A.   Yes, it is.

09:10:12  10          Q.   And turning to the page following page

          11   31 of Exhibit 2, is that your signature on that

          12   page?

          13          A.   Yes, it is.

          14          Q.   Have you finished all of the work that

09:10:27  15   you were assigned to do in this case?

          16          A.   I did.

          17          Q.   Are you planning on providing any

          18   supplemental reports?

          19          A.   No, I'm not.

09:10:38  20          Q.   Okay.  Who wrote Exhibit 1?

          21                    MR. WHITE:  Objection.

          22                    I'm going to instruct you not

          23               to answer --

          24                    THE REPORTER:  I can't hear

09:10:44  25               you, sir.

                                                          14

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:10:45  1                    MR. WHITE:  Exhibit 1?
          2                    MR. SYLVESTER:  Yeah.  His
          3           expert report.
          4                    MR. WHITE:  You can answer
09:10:50  5           that question.  We'll take this one at
          6           a time.
          7      A.   I wrote the expert report.
          8      Q.   Okay.  Did anyone help you draft Exhibit
          9  1?
09:10:58 10                    MR. WHITE:  You can answer
         11           that yes or no.
         12      A.   Yes.
         13      Q.   Okay.  Who provided help in drafting
         14  Exhibit 1?
09:11:12 15      A.   I went through multiple iterations with
         16  counsel.
         17      Q.   Which attorneys?
         18      A.   Are you asking for specific names?
         19      Q.   Yes.
09:11:24 20      A.   It was multiple.
         21      Q.   Can you recall any of the names sitting
         22  here today?
         23      A.   Collin White.  Chris.
         24      Q.   Chris Ford?
09:11:37 25      A.   Yes.
```

15

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:11:38   1              Lisa.
           2       Q.   Lisa Zornberg?
           3       A.   Lisa Zornberg.  And others that were
           4   on -- in various discussions.
09:11:47   5       Q.   Apart from counsel, did anyone else help
           6   you prepare your report?
           7       A.   I had one of my students or staff in the
           8   Center for Smart Infrastructure Finance at the
           9   University of Michigan help.
09:12:02  10       Q.   Who is that?
          11       A.   The name of the student?
          12       Q.   Yes.
          13       A.   Kenneth Chung.
          14       Q.   Apart from Mr. Chung and counsel, did
09:12:16  15   anyone else help you prepare your report?
          16       A.   No.
          17       Q.   Okay.  Other than yourself, did anyone
          18   draft any part of Exhibit 1?
          19                MR. WHITE:  I'm going to
09:12:31  20           instruct not to answer.  That gets
          21           into attorney work product, so we're
          22           not going to go into those details.
          23                MS. SMITH:  Okay.  So your
          24           position is that if counsel drafted a
09:12:39  25           portion of this expert report, that's
```

16

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:12:40   1              privileged?
           2                     MR. WHITE:  Our position is
           3              that work product protects the
           4              drafting process and you're asking a
09:12:47   5              question that goes to that.  So the
           6              answer to that question is yes.
           7   BY MR. SYLVESTER:
           8      Q.   Okay.  Did anyone provide comments to
           9   Exhibit 1?
09:12:59  10                     MR. WHITE:  You can answer
          11              that question yes or no.
          12      A.   Yes.
          13      Q.   Was it all the same people that we've
          14   already discussed:  Ms. Zornberg, Mr. White,
09:13:06  15   Mr. Ford, and your student?
          16      A.   It was part of the same discussions,
          17   yes.
          18      Q.   Okay.  Did you incorporate counsel's
          19   comments into the final version of Exhibit 1?
09:13:15  20                     MR. WHITE:  You can -- you
          21              can answer that question yes or no.
          22      A.   Is your question did I incorporate or
          23   did I consider them?
          24      Q.   Did you incorporate counsel's comments
09:13:28  25   into the final version of Exhibit 1?
```

17

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:13:31  1          A.   You'll have to be more specific

        2   regarding which comments.  I considered all

        3   comments that I received.

        4          Q.   I see.

09:13:39  5               Were there some comments that you

        6   incorporated?

        7          A.   There may have been.

        8          Q.   Who wrote Exhibit 2?

        9                    MR. WHITE:  Same instruction,

09:13:48 10          please.  You can answer that question.

       11          A.   I did.

       12          Q.   Okay.  Did anyone help you draft Exhibit

       13   2?

       14          A.   The same people I referred to earlier.

09:14:00 15          Q.   The same people you referred to that

       16   helped you draft Exhibit 1, is that right?

       17          A.   Yes, sir.

       18          Q.   Okay.

       19          A.   Except for the student.  He was not

09:14:09 20   involved in that one.

       21          Q.   I see.  So counsel only.

       22          A.   Yes.

       23          Q.   Okay.  Did any of your -- did any of

       24   Ripple's counsel draft any part of Exhibit 2?

09:14:17 25                    MR. WHITE:  I'm going to

                                                              18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:14:18  1              instruct not to answer that question,

       2              again on the same basis.

       3      Q.   Did counsel provide comments to Exhibit

       4   2?

09:14:24  5                   MR. WHITE:  You can answer

       6              that question yes or no.

       7      A.   Yes.

       8      Q.   Did you incorporate counsel's comments

       9   into the final version of Exhibit 2?

09:14:32 10      A.   I considered them.

       11      Q.   Did you incorporate any of counsel's

       12   comments into the final version of Exhibit 2?

       13      A.   I can't be specific unless we go to a

       14   specific section.

09:14:43 15      Q.   And sitting here today, do you recall

       16   incorporating any of counsel's comments into

       17   Exhibit 2?

       18                   MR. WHITE:  You can answer

       19              that yes or no.

09:14:50 20      A.   Yes.

       21      Q.   Okay.  Are all of the opinions that you

       22   are offering in this case set forth either in

       23   Exhibit 1 or Exhibit 2?

       24      A.   Yes.

09:15:04 25      Q.   And sitting here today, do you have any

                                                              19

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:15:05  1    plans to offer any additional opinions that are

       2    not in Exhibit 1 or 2?

       3        A.   I am not planning on offering any

       4    additional opinions.  However, I would like to

09:15:15  5    make a clarification to some of the language in

       6    Exhibit 1.

       7        Q.   Okay.  Is there an error in Exhibit 1?

       8        A.   There's unclear description -- unclear

       9    language in the description of the methodology

09:15:31 10    that I used to arrive at Exhibit D.

      11        Q.   I see.

      12             What paragraph is that?

      13        A.   That would be page -- page 64, paragraph

      14    124, and page 65, paragraph 125.

09:15:58 15        Q.   Okay.  Thank you.

      16             Is Appendix A to Exhibit 1 your CV,

      17    Professor?

      18        A.   Yes, it is.

      19        Q.   And it's obviously quite lengthy, so I

09:16:14 20    won't ask you to review it right now.

      21             So just sitting here today, are you

      22    aware of any inaccuracies in your CV?

      23        A.   As far as I know, it was updated as of

      24    October 4th, 2021.

09:16:31 25        Q.   Okay.  And is your -- strike that.

                                                              20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:16:33   1              Does the education section of your CV
           2   accurately list the degrees that you earned?
           3        A.   Apologies.  What was the question?
           4        Q.   Does the education section --
09:16:44   5        A.   Oh.
           6        Q.   -- of your CV accurately list the
           7   degrees that you earned?
           8        A.   Yes.
           9        Q.   Okay.  Have you had any formal education
09:16:52  10   after 1992?
          11        A.   As in degree?  No additional degree.
          12        Q.   Okay.  Have you taken any computer
          13   science courses?
          14        A.   Yes.
09:17:08  15        Q.   Okay.  When did you take -- when did you
          16   last take a computer science course?
          17        A.   Fifteen years -- I'm not exactly sure.
          18   Maybe 15 years ago when I switched my career.
          19        Q.   Have you ever taken any course specific
09:17:29  20   to blockchain technology?
          21        A.   I teach a course on blockchain
          22   technology.
          23        Q.   Prior to your teaching engagement, did
          24   you ever take any course regarding blockchain
09:17:38  25   technology?
```

21

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:17:38   1        A.    There were at that time no courses
           2   available in blockchain technology.
           3        Q.    At the time of your formal education you
           4   mean?
09:17:44   5        A.    At the time of formal education.  At the
           6   time when I switched to the Business School at the
           7   University of Michigan in 2006.
           8        Q.    Have you ever held any professional
           9   licenses?
09:18:06  10        A.    I have a professional engineering
          11   license.
          12        Q.    Has that license ever been revoked or
          13   suspended?
          14        A.    No, it has not.
09:18:12  15        Q.    Have you ever been the subject of any
          16   disciplinary action related to your professional
          17   activities?
          18        A.    No.
          19        Q.    Okay.  You've been a professor at the
09:18:21  20   University of Michigan since 1992?
          21        A.    Yes.
          22        Q.    Apart from the course that you just told
          23   me about blockchain technology, have you ever
          24   taught a computer science course at the University
09:18:33  25   of Michigan?

                                                                22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:18:34 1  A. I have not taught a computer science

2 course.

3  Q. Okay.  And when did you first teach a

4 blockchain technology course?

09:18:49 5  A. 2016.

6  Q. Okay.

7  A. I started teaching finance and financial

8 technology and blockchain courses in 2016.

9  Q. Have you ever taught a course

09:19:00 10 exclusively devoted to blockchain?

11  A. No.  There's no such course available

12 currently at the University of Michigan.

13  Q. You've served as an expert witness prior

14 to this case, is that right?

09:19:15 15  A. I currently serve, yes.

16  Q. And prior to your engagement in the case

17 against Ripple Labs, you've served as an expert

18 witness in other cases?

19  A. I have, yes.

09:19:25 20  Q. Okay.  Page 35 of your CV lists your

21 litigation expert witness work, is that right?

22  A. Yes.

23  Q. Are these seven engagements the totality

24 of your litigation expert witness work or were

09:19:54 25 there any other engagements?

23

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:19:55  1              MR. WHITE:  Objection to the
          2        form of that last question.
          3     A.   These were -- these were the
          4  engagements, yes.
09:20:18  5     Q.   These were all of your expert witness
          6  engagements?
          7     A.   Yes.
          8     Q.   Okay.  Taking a look at page 35, what
          9  were the names of the cases that these engagements
09:20:34 10  involved for these seven assignments?
         11     A.   I do not exactly recall.
         12     Q.   You don't recall any of the names of any
         13  of the seven cases?
         14     A.   Not of the cases, no.
09:20:50 15     Q.   In each of these cases, did you provide
         16  an expert report?
         17     A.   Yes.
         18     Q.   In any of these cases, did your expert
         19  report involve blockchain technology?
09:21:03 20     A.   No.
         21     Q.   Have you ever been qualified by a court
         22  as an expert in blockchain technology?
         23     A.   By a court?  No.
         24     Q.   Prior to this case, had you been
09:21:17 25  retained as an expert in any case involving
```

                                                        24

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:21:20 | 1 | digital assets? |
| | 2 | A.   No. |
| | 3 | Q.   In any of these seven cases, were you |
| | 4 | retained by the plaintiff? |
| 09:21:31 | 5 | A.   I was not. |
| | 6 | Q.   In any of these seven cases, was any |
| | 7 | governmental entity a party? |
| | 8 | A.   I don't believe so. |
| | 9 | Q.   Has your expert testimony ever been |
| 09:22:11 | 10 | excluded in whole or in part? |
| | 11 | A.   No. |
| | 12 | Q.   Has any portion of an expert report you |
| | 13 | submitted ever been excluded in whole or in part? |
| | 14 | A.   Sorry.  Can you repeat that question? |
| 09:22:25 | 15 | Q.   Sure. |
| | 16 | Has any expert report that you submitted |
| | 17 | ever been excluded in whole or in part? |
| | 18 | A.   No. |
| | 19 | Q.   Has any expert affidavit that you |
| 09:22:43 | 20 | submitted as part of a case ever been excluded in |
| | 21 | whole or in part? |
| | 22 | A.   Not that I recall. |
| | 23 | Q.   What are you an expert in, Professor? |
| | 24 | A.   I'm an expert in finance, |
| 09:22:58 | 25 | entrepreneurial business development, and |

25

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:23:01  1    financial technology.

2         Q.    What --

3         A.    Particularly focused on applications in

4    various different digital industries.

09:23:17  5         Q.    Do you consider yourself an expert in

6    blockchain technology?

7         A.    Yes.

8         Q.    When did you first learn of the

9    existence of blockchain technology?

09:23:31 10         A.    I don't exactly recall, but it was at

11   least between five and ten years ago.

12         Q.    Have you off -- strike that.

13              Have you authored any academic papers on

14   the topic of blockchain technology?

09:23:50 15         A.    Yes.

16         Q.    How many?

17         A.    I'm going to have to look at my risumi.

18         Q.    That's fine.  Also feel free to

19   approximate.  I don't need an exact number.

09:24:12 20         A.    Probably a half dozen.

21         Q.    When did you first publish a paper on

22   the topic of blockchain technology?

23         A.    When you refer to "the topic of

24   blockchain technology," that is very broad.

09:24:25 25              Is there a specific aspect of that that

26

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:24:29 1    you want to refer to?

2         Q.   Well, of the six that you just

3    mentioned, when was the first of those six

4    published?

09:24:47 5         A.   I think 2018, I believe.

6         Q.   Were any of the six that you just

7    mentioned peer reviewed?

8         A.   Yes.

9         Q.   All six of them?

09:24:57 10         A.   I'm going to have to take a look at --

11         Q.   Sure.

12         A.   -- the six that I referred to.

13         Q.   When you find the items that you're

14    looking for, Professor, will you just call them

09:25:43 15    out?

16         A.   Yes, I will.

17         Q.   Thanks.

18         A.   On page 14, under "Journal Publications

19    (Published)," 4, 5, and 6.  And on page 19, under

09:26:53 20    "Refereed Conference Papers," 3 and 4.  And the

21    rest were book chapters or -- which are typically

22    not refereed, and nonrefereed abstracts.

23         Q.   Were the five papers that you just

24    identified all peer reviewed?

09:27:34 25         A.   Yes.

27

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:27:35  1      Q.   Do any of your publications address the

       2   topic of decentralization of blockchains?

       3      A.   What do you mean with addressing it?

       4      Q.   Is that the topic of the paper?

09:27:53  5      A.   It is not the topic of the paper, but I

       6   do bring up the concept of decentralization in

       7   these papers.

       8      Q.   Are you familiar with the term

       9   "consensus theory"?

09:28:03 10      A.   I'm familiar with consensus.

      11      Q.   Okay.  Do -- do any of your publications

      12   address the topic of consensus?

      13      A.   Again, it's not the topic of the paper,

      14   but it is part of the descriptions within the

09:28:19 15   paper.

      16      Q.   Okay.  Are you familiar with the

      17   Byzantine generals problem?

      18      A.   At the high level?  Yes.

      19      Q.   Okay.  Do any of your publications

09:28:29 20   address the topic of the Byzantine generals

      21   problem?

      22      A.   They do not.

      23      Q.   Okay.  Do any of your publications

      24   compare the relative decentralization of two or

09:28:41 25   more blockchains?

28

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:28:46   1          A.   Relative?  Sorry.  Can you repeat that

         2     question?

         3          Q.   Sure.

         4               Do any of your publications compare the

09:28:51   5     relative decentralization of two or more

         6     blockchains?

         7          A.   I am not sure what the question means.

         8          Q.   Do any of your publications examine

         9     whether one blockchain is more decentralized than

09:29:08  10     another blockchain?

        11          A.   No, they do not.

        12          Q.   Have you ever designed a blockchain

        13     yourself?

        14                    THE REPORTER:  Repeat.

09:29:14  15                    MR. SYLVESTER:  Sure.

        16          Q.   Have you ever designed a blockchain

        17     yourself?

        18          A.   I have not.

        19          Q.   Have you ever contributed code to a

09:29:24  20     blockchain in development?

        21          A.   My students have.  I have not.

        22          Q.   Thank you.

        23               Have you contributed a proposed

        24     improvement to an existing blockchain?

09:29:39  25          A.   I have not.

                                                                29

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:29:39  1        Q.   Okay.  Is it fair to say that you began
          2   to focus your professional efforts on blockchain
          3   in 2015?
          4        A.   It became part of the teachings and
09:29:50  5   research, yes.
          6        Q.   You supervise a research group at the
          7   University of Michigan?
          8        A.   Yes, I do.
          9        Q.   Does that group conduct any research on
09:30:03 10   consensus?
         11        A.   "Consensus" is a very broad question, so
         12   if we could narrow -- narrow it down further.
         13        Q.   Sure.
         14             Does your -- does your re -- the
09:30:22 15   research group that you supervise conduct any
         16   research on the Byzantine generals problem?
         17        A.   No, they do not.
         18        Q.   How long has the Journal of Blockchain
         19   Research been published?
09:30:34 20             MR. WHITE:  Objection to
         21        form.
         22             You can answer if you
         23        understand.
         24        A.   Do you mean when was it founded?  When
09:30:49 25   was it started?
```

                                                                    30

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:30:50  1          Q.   Yes, I do.

          2          A.   I'm not exactly sure, but I believe it

          3   is on the order of two to three years.

          4          Q.   It was founded two to three years ago?

09:31:01  5          A.   I believe so, yes.

          6          Q.   Okay.  Are you on the Journal of

          7   Blockchain Research's advisory board or its

          8   editorial board?

          9          A.   Advisory board.

09:31:10 10          Q.   Okay.  How long have you served in that

         11   capacity?

         12          A.   I'm not exactly sure.  I'm going to have

         13   to think.  COVID has sort of changed our -- warped

         14   our time.  Since before COVID, so it must have

09:31:39 15   been 2019.

         16          Q.   How were you selected to serve on the

         17   advisory board of that journal?

         18          A.   I was a participant in a mathematical

         19   conference on financial tech -- in a self-funded

09:31:53 20   mathematical conference on financial technology

         21   that was held in Blockchain Triangle in University

         22   of North Carolina, I believe.  And so some of the

         23   other members of that journal were present there

         24   and they asked, based on my presentation, whether

09:32:13 25   I wanted to become a member of the advisory board.

                                                                  31

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:32:19  1        Q.   In paragraph 11 of your report, you

       2   describe founding two start-up firms, is that

       3   right?

       4        A.   Yes.

09:32:31  5        Q.   Do either of the firms that you founded

       6   employ blockchain technology?

       7        A.   They currently do not, but we're

       8   exploring it in one of them.

       9        Q.   For the one that you're exploring, are

09:32:44 10   you exploring use of either XRP or the XRP Ledger?

      11        A.   No.  This time not.  No.

      12        Q.   In paragraph 8 of Exhibit 1, your

      13   opening report, you write that you are on --

      14   you're an advisory board member of two funds, is

09:33:10 15   that right?

      16        A.   Yes, until 2017.  Yes.

      17        Q.   I see.  You're not currently a -- a

      18   member?

      19        A.   No longer, no.

09:33:18 20        Q.   I see.

      21             When you were on the advisory board of

      22   those two funds, did you have any role in funding

      23   a company that had created its own blockchain?

      24        A.   Apologies.  Which paragraph are you

09:33:28 25   referring to?

                                                          32

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:33:31  1        Q.    Paragraph 8.

       2        A.    Could you repeat the question, please?

       3        Q.    Sure.

       4              When you were on the boards of those

09:33:38  5   funds in that capacity, did you have any role in

       6   funding a company that had created its own

       7   blockchain?

       8        A.    I'm on the advisory board of the funds

       9   and the funds -- I'm going to have to go back over

09:33:54 10   which portfolio companies at that time were

      11   actually financed by the fund.  So I'm not exactly

      12   clear on that question.

      13        Q.    You're not sure sitting here today?

      14        A.    I'm not sure sitting here today.

09:34:06 15        Q.    Okay.

      16        A.    We have received many applications,

      17   including from blockchain companies, of companies

      18   that seek financing.

      19        Q.    Okay.  When was bitcoin created?

09:34:23 20        A.    Well, paper was published in 2008.

      21        Q.    When did you first learn of Ripple's

      22   existence?

      23        A.    I'm not exactly sure.  It was around the

      24   time that I was serving -- during the period I was

09:34:52 25   serving on the fund and -- on the funds and we

                                                              33

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:34:57 1    received applications of blockchain companies and

2    start looking for blockchain companies that were

3    currently active in the market.  I would say about

4    maybe a decade ago.  Between five years and a

09:35:15 5    decade ago.  Something like that.

6         Q.   Was there any funding relationship

7    between either of the funds on which -- strike

8    that.

9              Was there any funding relationship

09:35:24 10   between the Wolverine Venture Fund and Lurie

11   Commercial -- Commercialization Fund and Ripple?

12        A.   No.

13        Q.   Okay.  Do you own XRP?

14        A.   I do not.

09:35:38 15        Q.   Have you ever owned XRP?

16        A.   No.

17        Q.   Sitting here today, do you have any

18   plans to acquire XRP?

19        A.   No.

09:35:55 20        Q.   Prior to your retention in this case,

21   did you know anything about the SEC's case against

22   Ripple?

23        A.   I was aware through media, media

24   disclosures and writeups and financial review and

09:36:18 25   sort of articles like that.  Forbes.  So I knew

34

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:36:22   1    about it, yes.
           2         Q.   Prior to your retention, had you ever
           3    discussed this case with any Ripple employee?
           4         A.   Can you repeat that question?
09:36:30   5         Q.   Sure.
           6              Prior to your retention as an expert
           7    witness in this case, had you ever discussed the
           8    SEC's case against Ripple with any Ripple
           9    employee?
09:36:37  10         A.   No, I have not.
          11         Q.   Prior to your retention in this case,
          12    had you ever met any of the lawyers representing
          13    defendants in this case?
          14         A.   I have not.
09:36:47  15         Q.   Okay.  Are you charging defendants a fee
          16    for your expert services in this case?
          17         A.   Yes.
          18         Q.   How much is your fee?
          19         A.   It's 750 an hour for preparation of
09:37:02  20    reports and 950 an hour for depositions.
          21         Q.   Is this your standard hourly fee for
          22    expert services?
          23         A.   Yes.
          24         Q.   How much have you billed for your
09:37:12  25    services so far?
```

35

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:37:22  1        A.   I have to check the exact numbers, but I

        2   believe it's around 250,000.

        3        Q.   Have you received any of your

        4   compensation in XRP?

09:37:36  5        A.   I have not.

        6        Q.   Do you have any plans to receive XRP as

        7   compensation for your expert services in this

        8   case?

        9        A.   No.

09:37:53 10        Q.   Turning back to Exhibit 1, is Appendix B

       11   to your report a list of materials you considered

       12   in preparing your report in addition to those that

       13   are cited in the body of your report?

       14        A.   Yes, it is.

09:38:10 15        Q.   Did you personally review each of the

       16   materials listed in Appendix B?

       17        A.   I did over the time of preparing for the

       18   case, yes.

       19        Q.   Did defense counsel provide you with all

09:38:25 20   of the documents listed in Appendix B?

       21        A.   Not all the documents.

       22        Q.   Which were the documents that were --

       23   that you obtained other than from defense counsel?

       24        A.   I'm not exactly sure, but there were

09:39:26 25   some documents that I pulled myself because they

                                                              36

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:39:29 | 1 | were publicly available after reading some of the |
| | 2 | reports, such as, for example, the Wells report. |
| | 3 | I looked at some of those footnotes and pulled |
| | 4 | those myself, but they're listed here as well. |
| 09:39:42 | 5 | Q.   When you say "the Wells report," do you |
| | 6 | mean the "In Re:  Ripple Labs Inc. Wells |
| | 7 | Submission on behalf of Ripple Labs Inc."? |
| | 8 | A.   I believe so. |
| | 9 | Q.   Which documents did you procure after |
| 09:40:09 | 10 | reading Ripple's Wells submission? |
| | 11 | A.   I cannot be certain of that. |
| | 12 | Q.   Do you recall any sitting here today? |
| | 13 | A.   It was one of the litigation materials, |
| | 14 | but I do not recall. |
| 09:40:27 | 15 | Q.   Okay.  Turning to -- |
| | 16 | A.   All that were requested by me from |
| | 17 | counsel. |
| | 18 | Q.   Okay.  Turning to Appendix C, you |
| | 19 | received Appendix C, the list of XRP use cases, |
| 09:40:48 | 20 | from defense counsel, is that right? |
| | 21 | A.   I requested this list from counsel after |
| | 22 | having seen reference to a comprehensive list of |
| | 23 | use cases in some of the filings, including the |
| | 24 | Wells filing, I believe.  And I was aware of a |
| 09:41:09 | 25 | number of cases myself.  So then I, yes, did |

37

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:41:12   1   request from counsel whether they had this list

2   available or a list available that I could take a

3   look at.

4        Q.   Okay.

09:41:23   5        A.   And that's this list, Appendix C.

6        Q.   That's Appendix C.  Okay.

7             Did you make any changes to the XRP use

8   cases list that you received from defense counsel

9   before appending it to your report as Appendix C?

09:41:43  10        A.   Is the question did I make changes to

11   Appendix C before I appended it to the report?

12        Q.   Close.

13             You received at your request a list of

14   use cases from defense counsel.

09:41:54  15        A.   Yes.  Yes.

16        Q.   After receiving that list but before

17   appending it to your report, did you make any

18   changes to the list?

19        A.   I did not make changes to the list, no.

09:42:03  20        Q.   Okay.  What, if anything, did you do to

21   confirm the accuracy of the information supplied

22   on Appendix C?

23        A.   This was part of my work and methodology

24   listed in Appendix D.  So I looked at the

09:42:20  25   websites.  I looked at -- double-checked what

38

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:42:28  1    industries these companies -- what does it say? --

2    category, I guess, that these various different

3    companies were assigned to.  So I just did spot

4    checks on those.

09:42:39  5        Q.   Did you look at the websites for each of

6    the entity names listed on Appendix C?

7        A.   That was the work that I delegated to

8    the student I referred to earlier.

9        Q.   Okay.  What work did the student that

09:42:58 10    you referred to earlier do with respect to each of

11    the entries on Appendix C?

12        A.   Well, the student was really involved in

13    the methodology to extracting from this list a

14    subset that is my Appendix D.  So as part of

09:43:15 15    arriving at Appendix D, we had to actually do a

16    review of appendix -- and an analysis of Appendix

17    C.

18        Q.   And what did that student's review and

19    analysis entail?

09:43:27 20        A.   So that goes to the methodology that I

21    describe on page 64.  So the student looked for

22    each of these companies, first at which of these

23    companies had received venture rounds.  So we

24    checked each of the companies as to the

09:43:44 25    availability of information on each of these

39

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:43:47  1    companies in Crunchbase.  Crunchbase is a public

2    database where one can search companies for

3    financing, type of financing and who finances the

4    company.  We also get information there on

09:44:03  5    founding date.

6                I used founding date in my methodology

7    as a proxy for when venture investment was

8    received by these companies relative to when XRP

9    and XRPL technology was available.

09:44:22  10              So that's the kind of work that he did.

11   Looked at the websites, looked at the founding

12   dates, looked at the amount of the -- capital was

13   received by these companies.  And that's where I

14   need to offer a correction on my page 64.

09:44:35  15        Q.   How does the description of the

16   methodology that you just explained differ, if at

17   all, from your description on page 64?

18        A.   So I want it to be clear.  The

19   methodology has not changed.  It's the description

09:44:53  20   of the methodology that is unclear.  So --

21        Q.   Can you explain to me what's unclear?

22        A.   So -- yes.  So the methodology

23   essentially went through three steps.  The first

24   step was to go to Crunchbase and look for all the

09:45:10  25   equity investment that each of the companies on

40

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:45:12  1    the list of 660 had received and we used it as a

2    proxy for high-growth companies among that list of

3    660.  And it's bullet number 1.

4          So bullet number 2 then, out of that

09:45:27  5    full list, I looked at when these companies were

6    founded, and that's what I state here, to see

7    whether the companies were founded before or after

8    Ripple was founded.  But as you will see, my

9    methodology, and the result of my methodology is

09:45:44 10    Appendix D, I included companies that were founded

11    before Ripple was founded but actually received

12    their equity capital after Ripple was founded, and

13    that piece of information is not included in

14    bullet number 2.  So when I talk about the

09:46:02 15    founding, to look at the before and after, it's

16    really about the financing after the founding of

17    Ripple.

18          And the third bullet is as is.  It's

19    really only bullet number 2 in Appendix 4.

09:46:18 20          And, just to be clear, the methodology

21    is what the methodology is.  It resulted in my

22    Appendix D as a result of analysis of Appendix C.

23    It's just that the description was not very clear.

24          Q.   Okay.  So the -- the piece of your

09:46:40 25    methodology that in your view wasn't clearly

41

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:46:42  1   described in your existing report, Exhibit 1, is

2   that on some occasions you included companies

3   within Appendix D that were founded prior to

4   Ripple's founding?

09:46:54  5        A.   Yes.

6        Q.   Okay.

7        A.   But received equity capital after

8   Ripple's founding.  And that is part of the title

9   of Appendix D.

09:47:11 10        Q.   Who prepared Appendix D?

11        A.   I did together with my student.

12        Q.   Other than your student, did anyone else

13   assist you with preparing Appendix D?

14        A.   No.  I -- regarding Appendix D, I'd like

09:47:36 15   to make a correction there as well --

16        Q.   Sure.  Go ahead.

17        A.   -- in light of the correction on page

18   64, paragraph 124.  And the -- the title is really

19   about use cases receiving venture capital after

09:47:58 20   Ripple founding.  So this "and founded" is not

21   necessary in this title.

22        Q.   And in some cases it's inaccurate?

23                  MR. WHITE:  Objection to

24             form.

09:48:06 25                  You can answer.

42

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:48:10  1      A.   It does not reflect the actual list of

2   companies that I extracted from the larger

3   database --

4      Q.   Right.

09:48:16  5      A.   -- which were founded before.  So that's

6   why "and founded" is incorrect.

7      Q.   I see.

8           How many of the companies listed on

9   Appendix D were founded before Ripple's founding?

09:48:35 10      A.   I believe it was eight companies and

11   these are all with the founding date, which is the

12   last column in -- in this Appendix, in Appendix D.

13   Last column is the founding date of those

14   companies.

09:48:47 15      Q.   I see.

16      A.   So those that have founding dates before

17   2012.  About eight companies.

18      Q.   What's the meaning of the number to the

19   left of the date?

09:49:03 20      A.   That's the aggregate equity capital that

21   these companies have received.

22      Q.   In millions?

23      A.   In millions.  Sorry.  Yes.

24      Q.   What, if anything, did you do to confirm

09:49:14 25   the accuracy of the information in Appendix D?

43

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:49:25  1          A.   Appendix D was the result of my

2     analysis.   So it was all based on the information

3     that was found on Crunchbase.   However, I was

4     notified later on in Mr. ███████ report that one

09:49:43  5     of the companies in here had -- we referred to the

6     wrong website and, so, therefore there was

7     confusion on the name.

8               So the correction to the list really

9     came after taking a look at Mr. ███████ report and

09:50:02 10     when he referred to one company, namely STYRA

11     Technologies.   It's on page -- I guess these pages

12     are not numbered.   It's page 3 of Appendix D, sort

13     of in the upper half.   STYRA Technologies is not

14     the correct company.   It is not the correct

09:50:22 15     website and that is not the correct equity capital

16     to be used.

17               So this is -- this was an erroneous

18     inclusion in that list.

19          Q.   And prior to including STYRA in your

09:50:35 20     Appendix D, did you visit STYRA's website as

21     listed in Appendix D?

22          A.   As I mentioned earlier, I worked with my

23     student to look at these websites, yes.

24          Q.   How many of the websites listed in

09:50:47 25     Appendix D did you personally visit, if any?

44

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:50:59   1          A.    As I said, this was a back-and-forth
           2     between student and myself.
           3          Q.    Sitting here today, do you recall
           4     visiting any of the websites that are listed on
09:51:07   5     Appendix D?
           6          A.    I did double-check after the STYRA issue
           7     was pointed out.  Double-checked again all the
           8     websites of these companies.
           9          Q.    After you read Mr. ███████ rebuttal
09:51:20  10     report?
          11          A.    I double-checked at that time, yes.
          12          Q.    Prior to submitting the -- the report in
          13     the October of last year, which websites listed in
          14     Appendix D did you visit personally, if any?
09:51:34  15          A.    I did them together with my student.
          16          Q.    Does that mean that you -- you sat with
          17     your student and looked at them together?
          18                    MR. WHITE:  Objection; form.
          19                    You can answer.
09:51:47  20          A.    We did not sit together.  I asked him
          21     to -- after he did all the Crunchbase analysis,
          22     I -- I walked with him over the Crunchbase
          23     analysis and how to do this.  And then he came
          24     back with a short list and then we started looking
09:52:00  25     at -- we con -- we double-checked the websites and

                                                                    45

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:52:06  1  the information of that short list and --

          2      Q.    When you say "short list" -- sorry.  Go

          3  ahead.

          4      A.    The short list being the 91 companies

09:52:15  5  that resulted from the method -- from the

          6  methodology I applied to the 660.

          7      Q.    So the short list is now Appendix D?

          8      A.    Yes.  Appendix D is the list of equity

          9  invested companies that have -- either founded

09:52:28 10  after or before Ripple, that have received equity

         11  capital after the founding of Ripple.

         12      Q.    Okay.  Setting apart anything --

         13      A.    Except for STYRA, of course.

         14      Q.    Thank you.

09:52:38 15          Setting apart anything that your student

         16  may have done, what did you do to review any of

         17  the websites that are listed on Appendix D?

         18      A.    I looked at the websites.  Looked at

         19  when -- how they used XRP and XRPL or XRPL; what

09:52:57 20  these companies did; what industry they were in;

         21  how they were categorized.  So generally what kind

         22  of information was available on these companies.

         23          I looked at media releases of these

         24  companies.  I cross-referenced all these companies

09:53:13 25  again with XRP and XRPL and see if there was any

                                                              46

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:53:18   1    release that would either confirm or not confirm,

           2    but in this case it all confirmed the use, the use

           3    of XRP and XRPL.

           4         Q.    And you personally did that for all 91?

09:53:31   5         A.    I personally did that for all 91.

           6         Q.    How did you locate media releases with

           7    respect to the XRP or the XRP Ledger for all 91

           8         A.    There's sort of two parts to your

           9    question.  How do you check media releases?  Many

09:53:47  10    of these companies actually have media buttons

          11    that I can check.

          12              And as far as the cross --

          13    cross-referencing to XRP and XRPL, I did a search.

          14         Q.    A Google search?

09:54:02  15         A.    A keyword search, yes.

          16         Q.    Okay.

          17         A.    And then looked at whatever business

          18    websites or other credible websites came up.

          19         Q.    Okay.  Turning to --

09:54:14  20         A.    CoinDesk and as such.

          21         Q.    I'm sorry?  What was that?

          22         A.    It's a list of -- these are references

          23    such as Fortune and CoinDesk and crypto.com and,

          24    you know, professional sites that would have

09:54:31  25    information on the use of XRP or XRPL by these

                                                                47

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:54:34  1   companies.

2        Q.   Turning to Appendix E, was Appendix E

3   supplied by defense counsel?

4        A.   Appendix E was requested by me.  I was

09:54:57  5   aware, since I had been aware and was familiar

6   with Ripple or knew about Ripple, as I said, about

7   between five and ten years ago.  I knew what they

8   were doing.  I had seen media releases of this

9   company.

09:55:19 10        I was able to, as part of my report,

11   looking at equity investment in these companies

12   and I at one point requested whether my

13   knowledge -- I wanted to cross-reference whether

14   my knowledge and what was available about the

09:55:38 15   company was correct.  So I requested this list and

16   then this list was provided by counsel.

17        Q.   After you received the list that appears

18   at Appendix E to your report but before you

19   appended it to your report, did you make any

09:55:54 20   changes?

21        A.   Can you repeat the question?

22        Q.   Sure.

23        You received the materials that now

24   appear as Appendix E from --

09:56:20 25        A.   Mm-hmm.

48

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:56:20   1          Q.   -- defense counsel, correct?

           2          A.   Yes.

           3          Q.   Okay.   Before you appended those

           4   materials as Appendix E to your report -- your

09:56:26   5   report, did you make any changes?

           6                    MR. WHITE:   Objection to

           7             form.

           8                    You can answer.

           9          A.   I don't think I did, no.

09:56:35  10          Q.   What, if anything, did you do to confirm

          11   the accuracy of the information in Appendix E?

          12          A.   I -- so Appendix E has a lot of

          13   information.   The subtitle of Appendix E is "Brief

          14   Timeline of Products, Fundraising Rounds, and

09:56:54  15   Accolades."   So the three elements of that.

          16             Regarding everything that related to any

          17   of these three, I had other sources of information

          18   available as well, but in here I looked at all the

          19   websites or all these web links that were

09:57:12  20   provided.

          21          Q.   And, again, you personally visited each

          22   of these websites?

          23          A.   I personally visited each of these

          24   websites.

09:57:28  25          Q.   Did you take any other steps other than

                                                            49

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:57:29  1    visiting these websites to confirm the accuracy of

2    the information?

3        A.   Yes.  For example, fundraising rounds I

4    requested from counsel that I could see the

09:57:46  5    consolidated financial statements to

6    cross-reference the amount of equity capital that

7    was received, et cetera.  Why it was received, any

8    other information.

9            So I did a lot of cross-referencing

09:58:01  10   between this and other sources of information

11   available to me.  I went just also to Ripple's

12   site.  I went to all the other media sites that

13   are footnoted in the -- in the document to make

14   sure that the information contained in here was

09:58:19  15   correct.

16           And, again, the intent was not, as I

17   stated in my report, where I take someone's

18   information and put it in a few charts, Chart 6

19   and Chart 7, to be illustrative of products and

09:58:37  20   accolades.  Not a full and complete list.

21       Q.   Which years of Ripple's consolidated

22   financial statements did you review?

23       A.   I think we have to go back to materials

24   provided in Appendix B.  I believe the first

09:59:13  25   Bates-identified documents are the consolidated

50

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:59:17  1    statements, but also -- let me refer to my report,

2    the table where I aggregate this information.

3    There's a footnote in the report that I also want

4    to refer to so...

09:59:46  5            Yeah.  Table 3 on page 50 has the

6    footnote to -- to the links in Appendix E, I

7    guess.  Appendix -- yeah, in Appendix E, and the

8    data came from the consolidated statements which I

9    think are all the Bates-numbered documents.

10:00:11 10        Q.   I see.

11        A.   So I seen every year, I believe.  Yep.

12    2014, '15, '16, '17, through -- through 2020.

13        Q.   Did you review the entirety of the

14    financial statements for the years listed in

10:00:26 15    Footnote 77?

16        A.   I did, yes.

17        Q.   Okay.  Other than the materials that

18    we've already discussed in the appendices, did

19    defense counsel supply you with any other facts or

10:00:37 20    data that appears in your report?

21        A.   Other than the footnotes and Appendix B,

22    no.

23        Q.   When you say "other than the footnotes,"

24    do you mean that defense counsel supplied you with

10:00:51 25    the citations that appear in the footnotes in your

51

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:00:54   1   report?
           2                  MR. WHITE:  Objection.
           3          Calls --
           4     A.   Can you restate that question?
10:00:57   5     Q.   Sure.
           6          Can you identify me -- for me what facts
           7   or data defense counsel supplied that we haven't
           8   yet discussed today?
           9     A.   No, these were all mine.
10:01:08  10     Q.   So to be clear, other than the
          11   appendices that we've discussed --
          12     A.   Mm-hmm.
          13     Q.   -- there's nothing else in your report
          14   in terms of facts or data that was supplied by
10:01:18  15   defense counsel?
          16     A.   No.
          17     Q.   In your report you cite press releases
          18   by Ripple on occasion, correct?
          19     A.   In the report?
10:01:38  20     Q.   Yes.
          21     A.   Yes.  Where in the report are you
          22   referring?
          23     Q.   I don't have a citation for you at the
          24   ready.
10:01:48  25          Do you recall sitting here today whether
```

                                                              52

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:01:49 | 1 | or not you cited Ripple press releases in the |
| | 2 | report? |
| | 3 | A.   I do, yes. |
| | 4 | Q.   Okay.  And did you? |
| 10:02:00 | 5 | A.   Yes.  Yes, I did.  I'm sorry.  Yes. |
| | 6 | Q.   And on occasion you referred to Ripple's |
| | 7 | website as a source for your report, is that |
| | 8 | correct? |
| | 9 | A.   Yes, I did. |
| 10:02:11 | 10 | Q.   Okay.  For any of these Ripple sources, |
| | 11 | what, if anything, did you do to confirm the |
| | 12 | accuracy of the information supplied in those |
| | 13 | sources? |
| | 14 | MR. WHITE:  Objection. |
| 10:02:27 | 15 | A.   Is your question specific to the Ripple |
| | 16 | website? |
| | 17 | Q.   Specific to Ripple website or Ripple |
| | 18 | press releases or any other Ripple-authored |
| | 19 | source. |
| 10:02:39 | 20 | MR. WHITE:  Same objection. |
| | 21 | A.   So I've been familiar with Ripple for a |
| | 22 | long time and I'm also -- through the University |
| | 23 | of Michigan we're a member of UBRI, Ripple's |
| | 24 | University Blockchain Research Initiative, that |
| 10:02:57 | 25 | results in meetings.  There was one in-person |

53

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:03:00  1    meeting in Berkeley, UC Berkeley, and there have

2    been two online meetings.  And so there's a lot of

3    information that comes out there that jives with

4    the information that is released on the website.

10:03:14  5    So it becomes sort of a cross-referencing between

6    multiple sources.

7        Q.   Okay.  Other than what you just

8    mentioned, did you take any affirmative steps to

9    confirm the accuracy of information authored by

10:03:26 10    Ripple that's cited in your report?

11                  MR. WHITE:  Objection; form.

12        A.   Depends on which specific information

13    and reference you're referring to.

14        Q.   Sitting here today, can you recall any

10:03:43 15    steps you took to confirm the accuracy of any

16    particular Ripple source cited in your report?

17                  MR. WHITE:  Objection; form.

18        A.   Any Ripple source?

19        Q.   Yes.

10:03:57 20        A.   I cannot answer that question.  Some I

21    did; some I did not further verify.  There's many

22    pages on the websites.  There's many documents

23    related to XRP and XRPL.  There's many other

24    crypto sites that refer to it.  And in some cases

10:04:19 25    I did cross-reference.  We have to go to a

54

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:04:21  1  specific citation or footnote.

2       Q.   Okay.  Did you talk to any Ripple

3  employees in connection with the preparation of

4  your report?

10:04:27  5       A.   No.

6       Q.   Okay.  Was there ever any occasion where

7  you copied language from a Ripple source directly

8  into your expert report?

9       A.   What do you mean with "a Ripple source"?

10:04:45 10       Q.   For instance, there's a -- say there's a

11  Ripple press release.

12            Did you ever copy language directly from

13  that press release into your report?

14       A.   If and when I did, it would have been in

10:04:52 15  quotations.

16       Q.   Okay.  Setting aside Ripple sources, did

17  you ever copy language from any other source

18  directly into your report without quotations?

19                 MR. WHITE:  Objection to

10:05:00 20            form.

21       A.   Not that I'm aware of, no.

22       Q.   Okay.  In preparing your opinion that's

23  set forth in Exhibit 1, did you consider any

24  sources that aren't cited in Exhibit 1?

10:05:24 25       A.   Could you repeat that question?

55

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:05:25   1          Q.    Sure.

           2                In preparing your expert opinion that's

           3   set forth in Exhibit 1, did you consider any

           4   sources that are not cited in Exhibit 1?

10:05:41   5          A.    No.

           6          Q.    Okay.

           7          A.    Besides my overall knowledge in the

           8   space and that helped me structure the report, but

           9   I cited to any statement that was relevant in this

10:05:53  10   report.

          11          Q.    Okay.  I'll just ask a narrowing

          12   opinion.

          13                In preparing your opinion set forth in

          14   Exhibit 1, did you consider any websites where you

10:06:02  15   didn't cite the website in Exhibit 1?

          16          A.    I did not.

          17          Q.    Okay.  Moving to Exhibit 2, your

          18   rebuttal report, in preparing your opinions set

          19   forth in Exhibit 2, did you consider any materials

10:06:12  20   that are not listed within Exhibit 2?

          21          A.    I only see the footnotes here.  Are

          22   there any other...?

          23          Q.    Right.

          24                Were there any other sources that you

10:06:33  25   considered in preparing Exhibit 2 that are not

                                                               56

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:06:36  1   cited in any way in Exhibit 2?

2        A.   No.

3        Q.   No.

4             You cite a number of academic articles

10:06:46  5   in Exhibit 2?

6                  MR. WHITE:  Objection.  Is

7             there a question?

8        A.   Can you repeat the question?

9        Q.   Sure.

10:06:55 10             You -- did you cite a number of academic

11   articles in Exhibit 2?

12       A.   I do.

13       Q.   Okay.  Did defense counsel supply you

14   with any of the academic articles that you cite in

10:07:04 15   Exhibit 2?

16                  MR. WHITE:  You can answer

17             that yes or no.

18       A.   No.

19       Q.   Okay.  Other than your own reports, have

10:07:12 20   you read any other expert reports in this case?

21       A.   Yes.

22       Q.   Which ones?

23       A.   I have read Dr. ███████ report and

24   then the rebuttal reports inasmuch as they cover

10:07:30 25   your question.

57

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:07:31  1          Q.   Have you read all of the rebuttal
          2  reports from the SEC?
          3                    MR. WHITE:   Objection.
          4          A.   I have read the rebuttal report from
10:07:40  5  Mr. ████   that is relevant to my original report.
          6          Q.   Did you read Mr. █████ opening report?
          7          A.   I did not.
          8          Q.   Okay.  Did you read the entirety of
          9  Mr. ██████ rebuttal report?
10:07:55 10          A.   I did.
         11          Q.   Are there any other expert reports that
         12  you read that we haven't discussed yet?
         13          A.   There was an updated report by
         14  Dr. ██████  that I also read.
10:08:13 15          Q.   Have you also reviewed Dr. ████████
         16  deposition testimony in this case?
         17          A.   I have not.
         18          Q.   Other than the deposition testimony
         19  that's listed in Appendix B to your Exhibit 1,
10:08:28 20  have you reviewed any other deposition testimony
         21  in this case?
         22          A.   Sorry.  I have to go and refer.
         23          Q.   Sure.
         24          A.   No, just David Schwartz and Asheesh
10:09:01 25  Birla.
```

58

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:09:03   1       Q.   Okay.  Going back to Exhibit 2 for a
         2   moment, did you read all of the academic papers
         3   that you cited in Exhibit 2?
         4       A.   Exhibit -- what do you refer -- what is
10:09:18   5   Exhibit 2?
         6       Q.   Your rebuttal report is Exhibit 2.
         7       A.   Ah, yes.  Okay.
         8       Q.   So the question is:  Did you read all of
         9   the academic papers that you cited in your
10:09:25  10   rebuttal report?
        11       A.   I did.
        12       Q.   Let's see.  Let's turn back to Exhibit
        13   1, paragraph 41, and Footnote 26.
        14            Are you there, Professor?
10:09:53  15       A.   Page 41?
        16       Q.   Paragraph 41.
        17       A.   Oh, paragraph 41.
        18       Q.   Page 19.
        19       A.   And you're referring to?
10:10:09  20       Q.   Footnote 26.
        21       A.   Yes.
        22       Q.   In Footnote 26, you cite a number of
        23   items on which you rely in addition to the sources
        24   cited in your report, is that correct?
10:10:18  25            MR. WHITE:  Objection.

                                                        59

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:10:24  1        A.   These are cited in my report.

        2        Q.   Right.  Let me just read it.  Footnote

        3   26 states "In describing the XRP Ledger, XRP, and

        4   Ripple throughout this report, in addition to the

10:10:34  5   cited sources, I am relying on..." and then the

        6   sentence continues, correct?

        7        A.   Oh, yes.

        8        Q.   Okay.  What of your "personal dealings

        9   with Ripple in connection with UBRI and developing

10:10:44 10   the gift to the University of Michigan" did you --

       11                     THE REPORTER:  Repeat.

       12                     MR. SYLVESTER:  Sure.

       13        Q.   What of your "personal dealings with

       14   Ripple in connection with UBRI and developing the

10:10:57 15   gift to the University of Michigan" did you rely

       16   on in forming the opinions set forth in your

       17   report?

       18        A.   Specific which knowledge?

       19        Q.   Yeah.

10:11:10 20             How did it inform your report?

       21                     MR. WHITE:  Objection.

       22        A.   Well, I'm broadly familiar with the

       23   company.  I'm familiar with its arc of products

       24   over time.  I'm familiar with the application use

10:11:27 25   cases even before we started doing this report

                                                            60

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:11:30   1   that used XRP -- some use cases that used XRP or

           2   XRPL.

           3            I'm familiar with Xpring and RippleX,

           4   again, through my engagements on UBRI.

10:11:50   5            I'm familiar with, of course,

           6   conversations that I had with other UBRI members

           7   from the 27 global universities that come together

           8   at these conferences.  So that sort of generally

           9   informs the broad understanding of -- of -- of

10:12:12  10   technology, technology limitations, uses, business

          11   models.

          12            And then, of course, I cite specifically

          13   to a case, a business case, Ripple -- the business

          14   of crypto, which is one of the business cases that

10:12:30  15   I use in an entrepreneurial business development

          16   course that I teach at the University of Michigan

          17   to engineers and MBAs.

          18       Q.   What use cases for XRP or the XRP Ledger

          19   were you familiar with prior to your engagement

10:12:44  20   with this case?

          21       A.   Are you asking for the names of the

          22   companies?

          23       Q.   Whatever you would consider to be a use

          24   case.

10:13:00  25                      MR. WHITE:  Objection.  No

                                                                    61

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:13:02  1           question.

       2      A.    So I was familiar with Ripple Net and

       3  xCurrent and the xRapid, ODL, even though it all

       4  went through iterations.  I was familiar with, of

10:13:23  5  course, the exchanges, decentralized exchanges as

       6  well as other exchanges that use XRP.

       7           I am --

       8      Q.    Can you give me an example of

       9  decentralized and other exchanges that use XRP?

10:13:42 10      A.    Both buyers and sellers of XRP on

      11  exchanges.  On a -- not a specific exchange, but

      12  Binance and others, Kraken and those.

      13      Q.    Okay.  Turning back to Footnote 26, one

      14  of the other items on which you relied in your

10:14:04 15  expert report is your experience as an expert in

      16  blockchain technology, is that correct?

      17      A.    Yes.

      18      Q.    How did your experience as an expert in

      19  blockchain technology inform your report?

10:14:22 20      A.    Well, my expertise is mainly focused

      21  around different application domains, the

      22  disruptive potential of blockchain, blockchain

      23  business -- the blockchain business case, business

      24  cases.  How different kinds of companies have

10:14:40 25  deployed blockchain, not just start-ups, but also

                                                        62

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:14:45  1   larger corporations such as IBM and others.  How

2   they use blockchains as really more from on the

3   applied side rather than on the underlying

4   technical features side specifically.

10:15:04  5         So that sort of broad information is how

6   disruptive the technology is in the market.  And

7   with "disruptive," I mean how disruptive the

8   future opportunities for growth are for blockchain

9   in the industry.

10:15:24 10   Q.   Another item on which you relied

11   according to Footnote 26 is Ripple's Wells

12   submission.

13         Do you see that?

14   A.   Yes.

10:15:32 15   Q.   Do you have an understanding of what a

16   Wells submission is, what its purpose is?

17   A.   I do not.

18   Q.   Okay.  What portion of Ripple's Wells

19   submission did you rely on in preparing your

10:15:47 20   report?

21   A.   I read the entire submission to get a

22   sense of context, to get a sense of arguments, to

23   get a sense of kind of information that is

24   being -- that was in the early days of my

10:16:01 25   engagement in this case where I wanted to

63

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:16:05  1   basically look at all types of reports that were

2   out there, filings, as well as depositions, to

3   inform myself as to what the context and various

4   different arguments were related to this case.

10:16:26  5       Q.   When you say you wanted to get a sense

6   of the arguments related to this case, arguments

7   about what?

8       A.   Well, I don't mean the -- the legal

9   arguments.  I just want to see what are the

10:16:38 10  different positions, I guess, that -- that these

11  different reports, you know, display.

12      Q.   The position of Ripple?

13              MR. WHITE:  Objection.  No

14              question.

10:16:54 15      A.   The position of whomever the author was

16  of -- and authors were of the report.

17      Q.   Do you know who authored Ripple's Wells

18  submission?

19      A.   As I sit here, I cannot be sure, but I

10:17:12 20  believe it was on behalf of Ripple.  I just --

21  that was immaterial to my review.  My review was

22  what is the information that is out there relating

23  to this SEC case?  Because all I knew at that time

24  was essentially all the media disclosures.  So

10:17:29 25  very high level.  I didn't know anything else

64

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:17:33   1   related to -- of course related to the specific

2   case.  I wanted to read more about it.

3       Q.   Did you do anything to verify the

4   accuracy of any information you learned from

10:17:42   5   reviewing Ripple's Wells submission?

6       A.   I did not.  I read it, again, to gain

7   insights.

8       Q.   You mentioned earlier -- turning again

9   to Footnote 26, you mentioned earlier the business

10:18:10  10   case that you teach in your class.

11           Is that Ripple, the business of crypto?

12       A.   Yes, it is.

13       Q.   Okay.  What information did you draw

14   from Ripple, the business of crypto, in forming

10:18:22  15   your opinions?

16       A.   Well, this is one of a few FinTech or

17   financial technology cases that is available on --

18   in the Harvard Business School site, cases that I

19   use in my classes, that really talks about and --

10:18:40  20   and explains to the students sort of how digital

21   companies and early technology companies develop

22   their product strategy, their market strategy,

23   their market adoption.  It's really more from that

24   perspective.

10:18:54  25           So I wanted to understand what was the

65

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:18:57  1   value proposition that -- I wanted to understand.

2   I mean I teach what's the value proposition that

3   Ripple put out there and how -- sort of what is

4   the arc of different products that result in sort

10:19:12  5   of moving towards that market.

6        Q.   Do you know whether anyone at Ripple

7   contributed content to that business case?

8        A.   I will have to check the business case,

9   but I would not be surprised, given my knowledge

10:19:33  10   of how business cases are written, that there

11   would be interviews with people from Ripple.

12        Q.   Do you know whether anyone at Ripple

13   approved the statements in the business case?

14        A.   I do not know what -- as I'm sitting

10:19:52  15   here now.

16        Q.   Okay.  Would that sort of review and

17   approval by a company that was the subject of a

18   business case be standard operating procedure?

19              MR. WHITE:  Objection; form

10:20:06  20        and foundation.

21        A.   I'm not sure what the Harvard Business

22   School's rules are regarding the degree of

23   affirmation or confirmation or sign-off.

24        Q.   Did you ever learn -- go ahead.  Sorry.

10:20:23  25        A.   So the case is exemplary of many other

66

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:20:27  1   digital finance cases that I teach in that class

         2   and they all follow that same arc in business

         3   development iterations and product iterations over

         4   time.  So as the students become more interested

10:20:38  5   in financial technology and blockchain, I wanted

         6   to bring in financial technology cases to sort of

         7   illustrate that this is generally how digital

         8   industries develop.

         9       Q.   Did you at any point ever learn that any

10:20:53 10   of the information included within that case study

      11   was inaccurate?

      12                      MR. WHITE:  Objection; form.

      13       A.   Sorry.  Could you repeat that question,

      14   please?

10:21:12 15       Q.   Sure.

      16           Have you ever learned that any of the

      17   information included within the case study

      18   referenced in Footnote 26 was inaccurate?

      19                      MR. WHITE:  Objection; form.

10:21:30 20       A.   So did I verify that or did I learn

      21   about it?  So what was your question?

      22       Q.   The latter.

      23           Just have you ever discovered or learned

      24   at any point in time that there's any information

10:21:42 25   that's within that case study that turned out to

                   67

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:21:44  1  be inaccurate?

2              MR. WHITE:  Objection; form.

3      A.   The only thing I can speak to is that

4  they highlight the MoneyGram collaboration,

10:21:52  5  partnership in the business case --

6      Q.   Mm-hmm.

7      A.   -- as written up.  And I learned after

8  that the MoneyGram partnership I believe was

9  either on hiatus or discontinued.  I'm not sure

10:22:07 10  exactly what was -- what was happening there.  But

11  that wouldn't make it inaccurate.  It's just that

12  one partner that adopted the product may have made

13  a decision as to whether or not they liked it or

14  didn't like it.

10:22:21 15          This is, again, part of the overall

16  adoption process.  You test out the market.  So I

17  don't think the question is about accurate or

18  inaccurate necessarily.  It's about does the -- do

19  the conditions change?

10:22:43 20      Q.   Right.  But just setting aside changed

21  market conditions --

22      A.   Mm-hmm.

23      Q.   -- is there anything else in the report

24  that sitting here today you think is inaccurate?

10:22:53 25      A.   I would have to go back over that report

                                                            68

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:22:55 | 1 | in the context of what I know now since being |
| | 2 | engaged whether or not anything that I read in |
| | 3 | that case I would deem to be inaccurate.  I don't |
| | 4 | know. |
| 10:23:16 | 5 | Q.   Turning back to Exhibit 2, paragraph 2, |
| | 6 | it says that you've been asked to evaluate the |
| | 7 | methodology and conclusions set forth in that |
| | 8 | report, referencing Dr. ███████ report, is that |
| | 9 | right? |
| 10:23:34 | 10 | A.   Yes, that's what it states in this |
| | 11 | paragraph. |
| | 12 | Q.   Okay.  Are you rebutting any expert's |
| | 13 | opinion in this case other than Dr. ██████ |
| | 14 | opinion? |
| 10:23:46 | 15 | A.   My focus was on Dr. ██████ report. |
| | 16 | Q.   Regardless of your focus, is there any |
| | 17 | other expert opinion that you're rebutting in this |
| | 18 | case other than Dr. ██████ opinion? |
| | 19 | A.   No. |
| 10:24:02 | 20 | Q.   Okay.  Do you know Dr. ██████ |
| | 21 | A.   Personally?  No, I do not. |
| | 22 | Q.   Prior to this case, had you ever heard |
| | 23 | of him? |
| | 24 | A.   I had not. |
| 10:24:17 | 25 | Q.   Prior to your retention in this case, |

69

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:24:19  1   did you have any familiarity with his work?
          2        A.   Prior to retention in this case?
          3        Q.   Mm-hmm.
          4        A.   No.
10:24:30  5        Q.   Okay.  Did you review the portions of
          6   Dr. ███████ report that set forth his
          7   qualifications in his CV?
          8        A.   Yes, I did.
          9        Q.   Do you believe that Dr. ██████ is
10:24:39 10   qualified to offer an expert opinion on the topic
         11   of decentralization?
         12             MR. WHITE:  Objection; form
         13        and calls for a legal conclusion.
         14        A.   When you refer to the "topic," what do
10:24:52 15   you mean specifically?
         16        Q.   Well, in Dr. ██████ report, he sets
         17   forth his opinion on the decentralization of the
         18   XRP Ledger, correct?
         19        A.   Yes.
10:25:04 20             MR. WHITE:  Objection; form.
         21        Q.   And he also in his report compares the
         22   decentralization of the XRP Ledger with the
         23   bitcoin and Ethereum ledgers, correct?
         24             THE REPORTER:  Slow down,
10:25:11 25        please.  "He also in is report..."?
```

70

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:25:12 | 1 | Q.   Compares the decentralization of the XRP |
| | 2 | Ledger with the bitcoin and Ethereum ledgers, |
| | 3 | correct? |
| | 4 | MR. WHITE:  Objection; form. |
| 10:25:21 | 5 | A.   That is what his opinion -- his opinion |
| | 6 | is based on that compare -- his methodology is -- |
| | 7 | he uses a methodology to make that comparison, |
| | 8 | yes. |
| | 9 | Q.   And in so doing, he's offering an |
| 10:25:34 | 10 | opinion broadly on the topic of decentralization, |
| | 11 | correct? |
| | 12 | MR. WHITE:  Objection; form. |
| | 13 | A.   He is offering an opinion on that, |
| | 14 | that's correct. |
| 10:25:41 | 15 | Q.   Okay.  So based on your review of |
| | 16 | Dr. ████████ qualifications and his CV, do you |
| | 17 | believe that he's qualified to offer an opinion on |
| | 18 | the topic of decentralization? |
| | 19 | MR. WHITE:  Objection; form, |
| 10:25:53 | 20 | calls for a legal conclusion. |
| | 21 | Q.   You can answer. |
| | 22 | A.   He is qualified.  I agree he is |
| | 23 | qualified to form an opinion.  The question is |
| | 24 | whether the approach and the methodology that he |
| 10:26:07 | 25 | uses is one that is established in the literature. |

71

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:26:16   1        Q.   Prior to your retention as an expert

           2   witness in this case, had you ever met anyone who

           3   worked at Ripple?

           4        A.   Prior to my retention?  Yes.

10:26:25   5        Q.   Who?

           6        A.   Asheesh Birla.

           7        Q.   Anyone else?

           8        A.   And then Lauren Weymouth.

           9        Q.   Anyone else?

10:26:44  10             MR. WHITE:  Objection; form.

          11        A.   There are people that speak at these

          12   UBRI conferences and I meet them from far away,

          13   but I don't really have a one-on-one conversation

          14   with them.

10:27:00  15        Q.   Who falls within that category?

          16        A.   Example, David Schwartz and Chris

          17   Larsen.  He opens the conference.  He opened one

          18   of the conferences.

          19        Q.   How about Mr. Garlinghouse?

10:27:21  20             MR. WHITE:  Objection; form.

          21        A.   I don't know him.

          22        Q.   Have you ever heard him speak?

          23        A.   No.

          24        Q.   And you've never had a one-on-one

10:27:42  25   conversation with either Mr. Schwartz or
```

72

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:27:46   1   Mr. Larsen?
           2                   MR. WHITE:  Objection; form.
           3        A.   I have not.
           4        Q.   Okay.  When did you meet Mr. Birla?
10:27:58   5   Approximately is fine.
           6        A.   I believe that must have been 2018
           7   sometime.
           8        Q.   How did you meet him?
           9        A.   He was -- I was introduced to him
10:28:13  10   through the Business Engagement Office of the
          11   University of Michigan.  Companies such as Ripple
          12   that have alumni of the University of Michigan
          13   will reach out to the Business Engagement Office
          14   to set up partnerships or gift agreements or
10:28:31  15   things like that.
          16             And through the initial context that
          17   Mr. Birla made with the Business Engagement
          18   Office, I received a call to say that Ripple was
          19   interested in finding out what the University of
10:28:45  20   Michigan was doing with respect to blockchain and
          21   cryptocurrencies and that resulted in a first --
          22   first a call and then a meeting at one of the --
          23   during one of the football games, I believe.
          24        Q.   Why did the Business Engagement Office
10:29:07  25   of the University of Michigan reach out to you?
```

73

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:29:10  1          MR. WHITE:  Objection;

       2      foundation.

       3    A.   I had at that time -- so this was --

       4  we're talking 2018.  In 2016, '16/'17, I started

10:29:25  5  the Center for Infrastructure Finance at the

       6  University of Michigan.  And some of the people at

       7  the Business Engagement Office that I know knew

       8  that I was interested in decentralized

       9  technologies and blockchain as part of that

10:29:37 10  center.  So they reached out to several people

      11  across the university.

      12          MR. WHITE:  Ms. Sylvester,

      13      sorry, we've been going for about an

      14      hour and twenty.  Would now be a good

10:29:52 15      time for a break?

      16          MR. SYLVESTER:  Sure.  Fine

      17      by me.

      18          MR. WHITE:  Okay.

      19          THE VIDEOGRAPHER:  We'll go

10:29:56 20      off the record.  The time is 10:31.

      21          (Whereupon, a recess is

      22      taken.)

      23          THE VIDEOGRAPHER:  We'll go

      24      back on the record.  The time is

10:47:33 25      10:48.

                                                    74

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:47:35  1  BY MR. SYLVESTER:

2       Q.   Professor, when was the last time that

3  you spoke with Mr. Birla?

4       A.   I don't recall exactly.  Since

10:47:50  5  Ms. Weymouth took over from him in her role as

6  director of UBRI.  I believe I refer to that in my

7  expert report, when she took over.  She took over

8  in August 2018.

9       Q.   And what is her role at UBRI?

10:48:14  10      A.   She is the Director of University

11  Partnerships.

12      Q.   And what's the nature of your

13  communications with her in that role?

14      A.   She will -- she will contact all the

10:48:45  15  UBRI leads on occasion and then it's usually about

16  an update on their software or an invitation to

17  participate in meetings or in hackathons or things

18  like -- things of the like.

19      Q.   What exactly is UBRI?

10:49:10  20      A.   UBRI is a name, University Research

21  Partnership, that is intended to -- intended to

22  sort of expand the knowledge in blockchains and

23  financial technology and to prepare the next

24  generation of, sort of, employees in the FinTech

10:49:35  25  space at various different universities.

75

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:49:39  1          So it really is a gifting program to

2    stimulate innovation -- sorry, to stimulate

3    innovation at universities.

4          Q.   UBRI is a gifting program, is that

10:49:51  5    right?

6                    MR. WHITE:  Objection; form.

7          A.   It is a partnership program and the way

8    they work with universities is through gifts.

9          Q.   UBRI gives gifts to universities.

10:50:01 10                    MR. WHITE:  Objection.  No

11              question.

12         A.   That I'm going to have to double-check

13    how the gift arrangement, as in the legal gift

14    arrangement, is structured, which I do not get

10:50:14 15    involved in.  But it is a -- it is designated as

16    being a gift under a corporate gifting of the

17    university.  So, therefore, it's not a contract.

18         Q.   When you said "the gift" in your answer,

19    do you mean the gift given to the University of

10:50:33 20    Michigan?

21         A.   Yes.

22         Q.   Okay.  And Ripple funds UBRI, is that

23    right?

24         A.   Actually, I am not privy to that

10:50:47 25    information, on how UBRI is funded.

76

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:50:51 | 1 | Q.   Okay.  Can you look -- |
| | 2 | A.   But it being a partnership program -- |
| | 3 | MR. WHITE:  Let the witness |
| | 4 | finish his answer -- sorry, finish his |
| 10:50:55 | 5 | answer. |
| | 6 | MR. SYLVESTER:  Please do. |
| | 7 | A.   No, that's okay. |
| | 8 | I don't know how it is funded. |
| | 9 | Q.   Okay.  Can we look at paragraph 12 of |
| 10:51:02 | 10 | your report? |
| | 11 | A.   Yes. |
| | 12 | Q.   So the first sentence says "Ripple Labs |
| | 13 | Inc. (Ripple) funds what is known as the |
| | 14 | University Blockchain Research Initiatve (UBRI)"? |
| 10:51:21 | 15 | A.   Yes. |
| | 16 | Q.   What's the basis for that statement? |
| | 17 | A.   When I say it funds it, it's actually |
| | 18 | operated out of Ripple.  It's part of Ripple, but |
| | 19 | I -- it does not refer to the actual sourcing of |
| 10:51:36 | 20 | the funding, which I do not know and I'm not |
| | 21 | familiar with. |
| | 22 | Q.   Why did you choose the word "funds"? |
| | 23 | A.   I mainly did it based on assumption |
| | 24 | because it's part of Ripple and, therefore, I |
| 10:51:55 | 25 | would assume it is Ripple-backed. |

77

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:51:59 1     Q.  Sitting here today, do you know whether

2  or not it's Ripple-backed?

3             MR. WHITE:  Objection to

4       form.

10:52:08 5     A.  As I answered earlier, I am not familiar

6  with the actual agreements between Ripple and

7  UBRI, the UBRI program.

8     Q.  What was your --

9     A.  The corp -- corporate agreements, that

10:52:20 10  is.

11     Q.  Sure.

12       What was your involvement with the

13  University of Michigan's participation in UBRI, if

14  any?

10:52:35 15     A.  I am one of the three university leads

16  to operationalize the gift.

17       Was that your question?

18     Q.  Can you explain what you mean by

19  "operationalize the gift"?

10:52:53 20     A.  Yeah.  So when a -- a corporate funder

21  engages with the university, the university,

22  through its Business Engagement Office, will reach

23  out to who they think are relevant faculty

24  members/professors at the university and they

10:53:10 25  identified three key members.  Over time.  This

78

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:53:13  1    was iterative.  One in engineering, that is

       2    myself.  Then a person in the business -- the Ross

       3    School of Business and a person in the Ford School

       4    for Public Policy.

10:53:26  5           And they then leave it up to the three

       6    of us to develop a program that would meet the

       7    spirit of the gift, but we do not have any

       8    contractual obligations to -- Ripple cannot

       9    interfere in what it is that we actually do with

10:53:46 10    the funding once it releases UBRI and comes to the

      11    university.

      12        Q.   And, Professor, we've been speaking of

      13    "the gift."

      14           Is this the gift referenced in paragraph

10:53:56 15    13 of your expert report?

      16        A.   Yes, it is.

      17        Q.   Okay.  You're the director of the Center

      18    for Smart Infrastructure Finance?

      19        A.   That's correct, yes.

10:54:08 20        Q.   And that center co-founded the

      21    University of Michigan FinTech Collaboratory?

      22                    MR. WHITE:  Objection.  No --

      23           no question.

      24        Q.   Go ahead.

10:54:18 25        A.   Okay.  Yes, the center is one of the

                                                          79

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:54:25  1    three co-founders of the FinTech Collaboratory.

2        Q.   And according to paragraph 12, the

3    FinTech Collaboratory -- strike that.

4             According to paragraph 12, the FinTech

10:54:37  5    Collaboratory is funded in part by a gift from

6    UBRI, is that right?

7        A.   Yes.  Which statement are you referring

8    to?

9        Q.   Paragraph 12, the third sentence.

10:54:49 10    A.   Yes.  Yes.

11       Q.   Okay.  What portion of the FinTech

12   Collaboratory's budget is -- constitutes that gift

13   from UBRI?

14                 MR. WHITE:  Objection; form.

10:55:02 15    A.   So the FinTech Collaboratory isn't

16   really an entity.  It's an integration of three

17   centers.  And these -- the Ripple gift comes in to

18   these three centers, each of whom have plenty of

19   other funding from other sources.

10:55:20 20    Q.   Okay.  Does -- does the FinTech

21   Collaboratory have a budget?

22       A.   That would be the Ripple gift.

23       Q.   The Ripple gift is the FinTech

24   Collaboratory's budget?

10:55:36 25    A.   That then trickles down into the three

80

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:55:38 1  partners:  In engineering, in the business school,

2  and in Ford School for Public Policy.  And these

3  three partners actually have to find -- or

4  actually are funded otherwise as well.  So

10:55:48 5  basically it's part of the funding of the three

6  core members of the FinTech Collaboratory.

7      Q.   And who are the three core members of

8  the FinTech Collaboratory?

9      A.   So it is the Center for Infrastructure

10:55:59 10  Finance; it is the Ford School for Public Policy

11  Center on Finance, Law, and Policy; and it is the

12  FinTech Initiative at the Ross School of Business.

13      Q.   Have you seen the original gift

14  agreement referenced in paragraph 13?

10:56:19 15      A.   I have seen it, yes.

16      Q.   Do you have it?

17              MR. WHITE:  Objection to

18          form.

19      Q.   Is it within your files?

10:56:33 20      A.   It's probably somewhere on my computer.

21      Q.   Did you review that in connection with

22  preparing your report?

23      A.   No.

24      Q.   Was there a second gift agreement for

10:56:57 25  the gift extended in April of 2021 as referenced

81

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:57:01  1   in paragraph 13?

2         A.   Yes.

3         Q.   And do you have access to that gift

4   agreement as well?

10:57:15  5                  MR. WHITE:  Objection; form.

6         A.   I have access to the check.

7         Q.   Are the funds from the gift extension

8   referenced in paragraph 13 allocated in the same

9   way as the initial gift?

10:57:36 10                  MR. WHITE:  Objection; form.

11        A.   No.  So it depends on the needs and the

12   needs of the individual partners of the center.

13        Q.   How is -- sorry.  Go ahead.

14                  MR. WHITE:  Please finish

10:57:48 15         your answer.

16        A.   It depends on the needs, the

17   programmatic needs, I guess, of the different

18   members of the Collaboratory.

19        Q.   The gift extension that started in April

10:58:00 20   of 2021 is ongoing for two years from April 2021?

21   Am I reading that correctly?

22        A.   Yes, but I am not sure when the gift was

23   actually committed to the university.  It was sort

24   of -- there was an agreement and then there was a

10:58:22 25   commitment of the gift as in when it's actually

82

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:58:26  1   coming to the university.  So I don't know when

2   it's coming to the -- or when -- when it came to

3   the university.

4       Q.   Do you know how the funds as part of the

10:58:36  5   gift extension have been allocated to date?

6       A.   To date?  I would have to take a look.

7       Q.   Have part of -- strike that.

8            Has any part of the gift extension been

9   allocated to the FinTech Collaboratory?

10:58:56 10       A.   It all went to the FinTech

11   Collaboratory, but the allocation as to the three

12   parties of the FinTech Collaboratory changes.  And

13   from my recollection, the gift extension was

14   mainly allocated to the business school and the

10:59:14 15   School for Public Policy.

16       Q.   As -- as part of your role at the

17   University of Michigan, do you conduct research?

18       A.   Yes.  I lead a research group, yes.

19       Q.   And is any of that research group's

10:59:39 20   funding funded by the UBRI gifts we've been

21   discussing?

22       A.   Some of it.

23       Q.   What percentage?

24       A.   When you refer to "percentage," do you

10:59:57 25   refer to the percentage of the center's budget,

83

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:00:00  1   how much of that is Ripple, how much of that is

2   UBRI funds?

3       Q.   I'm focusing just on the research group

4   that you supervised.

11:00:09  5       A.   Okay.

6       Q.   How much of that research group's

7   funding comes from the UBRI gifts we've been

8   discussing?

9       A.   Maybe about 10 or 15 percent.

11:00:22 10      Q.   Has there been any change or update to

11   Ripple's gift to the University of Michigan since

12   you submitted your report in October of 2021?

13                   MR. WHITE:  Objection; form.

14      A.   Can you restate that question?

11:00:41 15      Q.   Sure.

16               Has there been any change or update to

17   Ripple's gift to the University of Michigan since

18   your report was submitted in October of 2021?

19      A.   You're referring to Exhibit 1?

11:00:50 20      Q.   Yes.

21                   MR. WHITE:  Objection.

22               Objection to form of the last

23               question.

24                   THE WITNESS:  Okay.  Sorry.

11:00:53 25                   MR. WHITE:  You can answer.

84

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:00:55   1        A.    No.

           2        Q.    Are you familiar with the concept of a

           3   validator node that runs on the XRP Ledger?

           4        A.    Yes.

11:01:08   5        Q.    Okay.  Does the University of Michigan

           6   run a validator node on the XRP Ledger?

           7        A.    It does not.

           8        Q.    Has it ever?

           9        A.    Not that I know of.  It's part of the

11:01:36  10   restrictions of the gift agreement.

          11        Q.    I see.

          12              Can we turn to the end of paragraph 12?

          13   The last sentence of paragraph 12 says "As part of

          14   UBRI, the University of Michigan maintains a

11:01:55  15   validator node on the XRP Ledger (which I describe

          16   in greater detail below), but the University of

          17   Michigan has not actively participated in voting

          18   on the XRP Ledger because of university policies

          19   governing services under corporate gift

11:02:10  20   agreements."

          21              Do you see that?

          22        A.    Yes.

          23        Q.    Okay.  What does "maintains a node" --

          24   sorry.  Strike that.

11:02:17  25              What does "maintains a validator node on

                                                              85

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:02:20  1   the XRP Ledger" mean?

2      A.   I would say we have the nodes or we are

3   a node, but we're -- it's inactive.  We don't get

4   involved in any verification of transactions or

11:02:31  5   anything.  It's not active.

6      Q.   So the -- the node maintained by the

7   University of Michigan on the XRP Ledger does not

8   validate transactions?

9           MR. WHITE:  Objection.  No

11:02:43 10      question.

11      Q.   Go ahead.

12      A.   It -- it does not validate transactions.

13      Q.   Okay.

14      A.   And the maintenance part relates to that

11:02:52 15   we do get the updates on the protocols and

16   whatnot, that we get things to download, but we

17   actually do not validate.

18      Q.   Did anyone at Ripple ever ask anyone at

19   the University of Michigan to run a validator node

11:03:09 20   on the XRP Ledger?

21           MR. WHITE:  Objection;

22      foundation.

23      A.   As part of the negotiations around the

24   gift agreement, Ripple stated that they would like

11:03:25 25   the University of Michigan to become an active

86

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:03:29   1   validator node on the network.  And the university

2   said that that could not be part of the agreement.

3   However -- because of policies that I cite to

4   later, standard practice policies and gift

11:03:42   5   acceptance; however, if researches would choose to

6   maintain it or -- out of their -- out of their

7   funds, they could, but it's -- so Ripple only

8   asked at the time that we negotiated the gift

9   agreement.

11:04:12  10       Q.   What was the policy that prohibited the

11   University of Michigan from being able to run a

12   validator node on the XRP Ledger?

13       A.   So I refer to page 7 in my report where

14   I refer to that standard practice guide and

11:04:41  15   policies.  And this is the way I understand it,

16   but I did not get involved in the negotiations

17   between the university and UBRI.  That the

18   expectation of running a validator node under a

19   gift agreement would constitute a contractual

11:05:00  20   expectation which cannot be done under a gift

21   agreement.

22       Q.   A contractual expectation between what

23   parties?

24       A.   Between -- between Ripple and -- and the

11:05:15  25   University of Michigan.

87

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:05:20  1          Q.   Who was involved, if you know, in the

2    negotiations between Ripple and the University of

3    Michigan around the gift arrangement?

4                         MR. WHITE:  Objection; form.

11:05:33  5          A.   I do not know the names, but this goes

6    to the Office of the Vice President for Research.

7          Q.   Do you know who was involved on the

8    Ripple end?

9                         MR. WHITE:  Objection; form.

11:05:51 10          A.   I do not know who was involved on the

11   Ripple end in the negotiations.  I know who my

12   contact person is, but I don't know if that person

13   is involved in the actual negotiations of gift

14   agreements.

11:06:03 15          Q.   That's Ms. Weymouth?

16                         MR. WHITE:  Objection.  No

17              question.

18          Q.   You can answer.

19          A.   After August 2018, yes.

11:06:11 20          Q.   And what -- you state in paragraph 15

21   that your "communications with Ms. Weymouth have

22   pertained to the use of the gift funds at the

23   University of Michigan and our participation in

24   the annual UBRI conference."

11:06:35 25          A.   Yes.

88

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:06:40  1        Q.   Why were you speaking with Ms. Weymouth

       2    about the use of the gift funds at the University

       3    of Michigan?

       4        A.   Because she is the administrator and

11:06:53  5    director of university relationships.  And she

       6    will occasionally check in with the universities

       7    that have received gifts.  And she said, "So how

       8    are you doing?  What are you doing with this?"

       9    It's sort of a -- part of a regular check-in to

11:07:16 10    maintain the relationship.

      11        Q.   So as part of the check-in, you explain

      12    to her how the university is using the gift funds.

      13                   MR. WHITE:  Objection.  No

      14             question.

11:07:23 15        A.   Yes.

      16        Q.   Have you ever spoken at any of the UBRI

      17    conferences?

      18        A.   Yes.

      19        Q.   Which ones?

11:07:34 20        A.   I spoke at the -- the 2020 conference

      21    and --

      22        Q.   What was the top -- sorry.  Go ahead.

      23        A.   And that was on tokenization of

      24    infrastructure finance.  And my students, some of

11:07:55 25    my students, have spoken at the 2019 in-person

                                                            89

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:07:58  1    conference at UC Berkeley.

2              Q.   What was the topic of your students'

3    presentation at the 2019 UBRI conference?

4              A.   The development of a blockchain

11:08:12  5    application for -- to track opioid prescriptions.

6              Q.   Did that blockchain application involve

7    the use of the XRP Ledger?

8              A.   It did not.

9              Q.   Did the topic of your speech involve the

11:08:43 10    use of XRP or the XRP Ledger.

11             A.   It referred to the opportunity, future

12   opportunity, of the XRP Ledger.  The topic is

13   really about tokenization of infrastructure, of

14   debt and equity financing of infrastructure.  And

11:09:08 15    we talked about the globalization of financing of

16   infrastructure and, then, therefore, where the

17   opportunity might be for a Ripple -- for an XRP

18   application.

19             Q.   Is the tokenization of financing

11:09:22 20    infrastructure a topic that you researched?

21             A.   Yes.

22             Q.   And is it a topic that you research as

23   part of the FinTech Collaboratory group?

24             A.   In part, yes.

11:09:45 25             Q.   Have you developed any applications

90

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:09:46  1    regarding -- strike that.

2             Have you developed any applications on

3    the XRP Ledger as part of your research at the

4    University of Michigan?

11:09:58  5        A.    Not to date.

6        Q.    Have you developed any applications

7    using XRP as part of your research at the

8    University of Michigan?

9        A.    Not to date.

11:10:09 10       Q.    Are you working on any -- strike that.

11            Are you researching any projects in

12   which either the XRP Ledger or XRP will be used

13   currently?

14       A.    Personally, I am not, but

11:10:24 15   Blockchain@Michigan, which is a computer science

16   business student hub that focuses on decentralized

17   applications on the blockchain, is -- one of the

18   ledgers that they're exploring is XRPL.

19       Q.    Is Blockchain@Michigan funded at all by

11:10:46 20   UBRI?

21       A.    Their administrative structure has some

22   funding through UBRI as part of the Collaboratory.

23       Q.    Are you personal friends with any

24   current or former Ripple employee?

11:11:10 25       A.    No.

91

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:11:10 | 1 | Q. Do you have a professional relationship |
| | 2 | with any current or former Ripple employee? |
| | 3 | A. I would say that Asheesh Birla and |
| | 4 | Lauren Weymouth are the two people I have |
| 11:11:23 | 5 | professional -- professional relationships with. |
| | 6 | Q. Do you have any role with respect to the |
| | 7 | University of Michigan's running -- sorry. Strike |
| | 8 | that. |
| | 9 | Do you have any role with respect to the |
| 11:11:34 | 10 | University of Michigan's maintenance of the node |
| | 11 | on the XRP Ledger? |
| | 12 | A. Sorry. Can you repeat that question? |
| | 13 | Q. Sure. |
| | 14 | Do you personally have any role with |
| 11:11:46 | 15 | respect to the University of Michigan's |
| | 16 | maintenance of the node on the XRP Ledger? |
| | 17 | A. Depends how you define "personally." |
| | 18 | One of the staff members in the department |
| | 19 | receives the pings from Ripple and updates on the |
| 11:12:06 | 20 | software required, but that's it. It's basically |
| | 21 | just to keep it up-to-date, but I don't personally |
| | 22 | get involved in that. |
| | 23 | Q. Can we turn to page 7 of your Appendix |
| | 24 | A? |
| 11:12:41 | 25 | A. I have it. |

92

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:12:42 | 1 | Q.   Okay.  So under the "Research Grants and |
| | 2 | Contracts" section, the last entry is "Ripple." |
| | 3 |      Do you see that? |
| | 4 | A.   Yes. |
| 11:12:49 | 5 | Q.   Is this the $1 million gift that we've |
| | 6 | been discussing that's set forth in your report |
| | 7 | around paragraph 12 or 13? |
| | 8 | A.   Yes. |
| | 9 | Q.   Okay.  Can you explain what PI and 2 |
| 11:13:03 | 10 | co-PIs mean? |
| | 11 | A.   Oh, it's the -- "PI" stands for |
| | 12 | principal investigator and co-PI, co-principal |
| | 13 | investigators, but essentially the three of us are |
| | 14 | at the same level.  So it's one person designated |
| 11:13:17 | 15 | in engineering, myself; one person designated in |
| | 16 | the business school; and one person designated in |
| | 17 | the School for Public Policy. |
| | 18 | Q.   And what does that term "principal |
| | 19 | investigator" mean? |
| 11:13:31 | 20 | A.   Sort of the lead.  The lead.  In the |
| | 21 | context of a research grant, say from the National |
| | 22 | Science Foundation or -- or anything like that, in |
| | 23 | that context you're the one that's actually |
| | 24 | leading and directing the research.  In this case |
| 11:13:46 | 25 | it's basically the three of us that are |

93

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:13:48  1    collaborating in the Collaboratory.

2        Q.   Okay.  Do you have the same status with

3    respect to the subsequent $250,000 gift from UBRI?

4        A.   We have maintained that relationship

11:14:01  5    among the three co-PIs.  That's right.

6        Q.   Do you have an understanding of why it

7    was that Ripple wanted the University of Michigan

8    to run a validator node on the XRP Ledger?

9        A.   Why they wanted that to be part of the

11:14:52 10    gift?

11       Q.   Yes.

12       A.   No, I'm not sure.

13       Q.   Have you ever had any discussions with

14    anyone at the University of Michigan with respect

11:15:07 15    to Ripple's request that the University of

16    Michigan run a validator node on the XRP Ledger?

17       A.   No.  So once the decision was made

18    higher up that we couldn't do it as part of the

19    gift, that discussion was stopped.  But every

11:15:29 20    university has their own policy around that.

21       Q.   Setting aside the University of

22    Michigan's maintenance of a node on the XRP

23    Ledger, have you ever run any kind of node on the

24    XRP Ledger?

11:15:44 25       A.   I have not.

94

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:15:45  1     Q.   Okay.  Have you ever run any kind of

2  node for any blockchain?

3     A.   Personally I have not, no.

4     Q.   Okay.  Let's turn to paragraph 19 of

11:16:01  5  your Exhibit 1, which was Opinion 1.

6     A.   Page 19 of Exhibit 1?

7     Q.   Sorry.  Page 8, paragraph 19 of Exhibit

8  1.

9     A.   Okay.  Yes.

11:16:22 10     Q.   Okay.  And your first opinion is listed

11  here as "The XRP Ledger and its native currency,

12  XRP, represented an important innovation in

13  blockchain technology."

14        Do you see that?

11:16:30 15     A.   Yes, I do.

16     Q.   What criteria did you use to determine

17  whether XRP and the XRP Ledger represented an

18  important innovation in blockchain technology?

19     A.   Going back to my background as a advisor

11:16:52 20  for venture capital firms where we look at new

21  technologies that come to market, we look at

22  innovation from the perspective of is -- is this

23  technology an improvement over, and a significant

24  improvement over, existing technologies and in

11:17:15 25  what capacity?

95

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:17:17  1            And my aspects that I looked at were

2      speed, cost, environmental costs, security.

3      Issues like that.

4            And I referred to the incumbent

11:17:35  5      technology or compared to the incumbent

6      technology.

7                        THE REPORTER:  Income?

8                        THE WITNESS:  Incumbent.

9                        THE REPORTER:  Thank you.

11:17:42 10                        THE WITNESS:  Existing.

11      Q.   And is it your opinion that the XRP

12      Ledger is superior on the metrics of speed, cost,

13      environmental costs, and security to preexisting

14      blockchains?

11:17:56 15                        MR. WHITE:  Objection to

16            form.

17      A.   There was a lot of information packed in

18      that question.  Can you be more specific?

19      Q.   Sure.

11:18:08 20            You -- my understanding of your previous

21      response when I asked what criteria you used to

22      determine whether something was an important

23      innovation with respect to XRP and the XRP Ledger,

24      the metrics that you mentioned were speed, costs,

11:18:26 25      environmental costs, and security, is that right?

96

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:18:28  1    Did I understand you correctly?

2         A.    Those are among the ones that I looked

3    at, yes.

4         Q.    Okay.  So I'm asking if it's your

11:18:35  5    opinion that the XRP Ledger is superior to

6    preexisting blockchains with respect to the

7    metrics of speed, cost, environmental costs, and

8    security.

9                      MR. WHITE:  Objection to

11:18:41 10              form.

11        A.    The transaction speed is faster than the

12    incumbent technology at that time when it came up,

13    which was bitcoin.  The cost of a transaction was

14    lower.  Again, in the proposition.  The

11:19:07 15    environmental cost was lower just because of the

16    type of consensus mechanism that they were using.

17    And then the security features were different from

18    what they were for the incumbent technology that

19    led me to conclude security -- improved security.

11:19:31 20        Q.    What were the features of the XRP Ledger

21    versus incumbent technology that in your view led

22    to improved security?

23        A.    I'm mainly referring to the different

24    consensus mechanisms that the XRPL was use -- uses

11:20:06 25    to validate transactions.

97

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:20:07  1      Q.   Okay.  Does that mean that it's your

         2  view that the XRP Ledger's consensus -- consen --

         3  strike that.

         4           Is it your view that the XRP Ledger's

11:20:15  5  consensus mechanism is more secure than bitcoin's

         6  consensus mechanism?

         7                    MR. WHITE:  Objection; form.

         8      A.   It's not necessarily kind of a binary

         9  decision.  It's -- it's a different kind of

11:20:32 10  security mechanism and validation mechanism that

         11  would avoid 51 percent of tax, for example.  And,

         12  so, I was looking from that perspective.

         13      Q.   Okay.  Let's turn to the next page,

         14  paragraph 20, your Opinion 2.

11:21:07 15      A.   Paragraph or page?

         16      Q.   Page 9, paragraph 20.

         17      A.   Okay.

         18      Q.   Opinion 2 reads "Ripple's iterative

         19  development of its business model and products is

11:21:17 20  consistent with start-up practices in

         21  high-technology industries."

         22           Do you see that?

         23      A.   Yes.

         24      Q.   Okay.  And then at the very last

11:21:24 25  sentence of that paragraph, you reference "market

                                                              98

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:21:28  1    demand."

2                    Do you see that sentence?

3         A.    The last sentence of that -- yes.

4    Market demand, yes.

11:21:39  5         Q.    What steps, if any, did you take to

6    ascertain what market demand for Ripple products

7    existed over the years?

8                         MR. WHITE:  Objection to

9              form.

11:21:51 10        A.    That was not the analysis that I did.

11    The analysis I -- I mean, what I opined on in

12    this -- in Opinion 2 is that Ripple, like other

13    digital companies, develops different products,

14    improvements on technology, to ultimately --

11:22:18 15    develops marketing -- marketing strategies to

16    actually position its technologies for broad

17    adoption by the market.

18                    But I -- this statement does not say

19    whether they actually satisfy market demand.  That

11:22:32 20    is not what I intended with this sentence here.

21        Q.    And it wasn't part of your, sort of,

22    methodology to examine whether there was, in fact,

23    any market demand for any Ripple product.

24                         MR. WHITE:  Objection; form

11:22:50 25              and no question.

99

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:22:53   1       A.   Ripple had a value proposition and part

           2   of its value proposition was to make international

           3   settlements easier, faster, and cheaper.  And it's

           4   sort of a -- a business hypothesis or a market

11:23:09   5   that they're going to.  The question is, what is

           6   the path to market to go from where you are with

           7   your technology to servicing that ultimate market

           8   that you want to -- or one of these markets that

           9   you want to serve?

11:23:24  10          In fact, most of these technology

          11   start-up companies don't really even know

          12   necessarily what ultimately will become the

          13   beachhead market or the growth market that their

          14   technology will be -- will be deployed in nor what

11:23:36  15   the ultimate product will be.

          16          So it's very hard to actually do that

          17   analysis as -- as you're inquiring about.

          18       Q.   You just said most of the start-up

          19   companies don't even necessarily know what

11:23:52  20   ultimately will become their beachhead market --

          21       A.   Mm-hmm.

          22       Q.   -- or -- I'm paraphrasing now -- what

          23   product will ultimately be successful, is that

          24   right?

11:24:01  25       A.   Or which products, yes.

                                                              100

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:24:01    1                     MR. WHITE:  Objection; form.

            2          Q.   Is that true with Ripple as well?

            3                     MR. WHITE:  Objection; form.

            4          A.   Well, if you look over the -- the arc of

11:24:13    5    products that Ripple has developed since its

            6    inception and tested with different market

            7    participants from the Ripple corridor all way

            8    through to now Ripple Net, it is essentially a

            9    trial and error kind of process.  And you'll find

11:24:32   10    out over time if one has an open source ledger in

           11    which applications can be built, then what the

           12    ultimate use cases will become.

           13               So that -- I would argue that they're

           14    still moving in that direction where they

11:24:44   15    originally intended to move, but the diversity of

           16    use cases, as I outline later on, are examples of

           17    how third parties just use it for uses that are

           18    originally not intended by -- by Ripple.

           19          Q.   Let's go to same page, paragraph 21.

11:25:15   20    Opinion 3 says "The XRP Ledger and its native

           21    currency, XRP, have commercial utility that third

           22    parties have leveraged in the creation or

           23    advancement of their business models,

           24    demonstrating the decentralized nature of the XRP

11:25:30   25    Ledger."
```

101

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:25:31   1            Do you see that?

          2       A.   Yes, I see that.

          3       Q.   How in your view does third-party

          4   leveraging of XRP demonstrate the decentralized

11:25:39   5   nature of the XRP Ledger?

          6       A.   Well, the way in the context of my

          7   experience, again, of -- of advising companies,

          8   including blockchain companies, is when one has an

          9   open source platform on which applications can be

11:26:03 10   built without a centralized authority to approve

        11   transactions, that in the sort of -- the current

        12   vernacular of both the academic and the business

        13   use of the word "decentralized," it constitutes as

        14   being a decentralized application.

11:26:37 15       Q.   Let me ask a clarifying question.  You

        16   concluded that answer by referencing a

        17   decentralized application.

        18       Are you talking about the XRP Ledger

        19   when you use the word "application" or something

11:26:46 20   else?

        21       A.   I'm sorry.  I didn't mean to say

        22   application.  The decentralized nature of the

        23   Ledger.

        24       Q.   Okay.  So when you say "the

11:26:54 25   decentralized nature" of the XRP Ledger, are you

                                                     102

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:26:57  1  offering an opinion that the XRP Ledger is, in

2  fact, decentralized?

3       A.   In the context of how currently the word

4  "decentralized" is used in the business literature

11:27:13  5  and actually even in the academic literature --

6  look at the MIT Digital Asset Lab -- it's still

7  not even clear what the actual definition is of

8  decentralized.

9            So in the way we're using it in that

11:27:28 10  vernacular, yes.

11       Q.   What is the definition of

12  decentralized -- decentralization used in that

13  vernacular?

14       A.   There is no definition.  It is really

11:27:41 15  more of an understanding and an expectation.

16       Q.   Can you describe the understanding and

17  expectation that is called forth by the use of the

18  word "decentralization"?

19                 MR. WHITE:  Objection; form.

11:28:06 20       A.   Well, again, in that same context, from

21  the perspective of the blockchain being

22  permissionless, being open source and, therefore,

23  accessible to third-party developers, having no

24  central authority that verifies transactions, that

11:28:31 25  validates transactions, sort of constitutes that.

103

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:28:35 | 1 | It is not a definition.  It is a -- a working |
| | 2 | understanding of decentralization as used in these |
| | 3 | contexts. |
| | 4 | Q.   When you say "as used in these |
| 11:28:50 | 5 | contexts," which contexts are you referring to? |
| | 6 | A.   I mean in the venture capital investment |
| | 7 | context, in the business context, business |
| | 8 | literature context, and in other academic lenses |
| | 9 | on, for example, as I said, just MIT digital |
| 11:29:13 | 10 | currency initiative.  They say, look, we don't |
| | 11 | really even know, we have to contextualize what we |
| | 12 | mean by decentralization, so, therefore, we can't |
| | 13 | adopt a definition of what it is.  So we'll use a |
| | 14 | working knowledge of what we think it is. |
| 11:29:30 | 15 | Q.   Mm-hmm. |
| | 16 | Is -- so the general understanding of |
| | 17 | what decentralization means in your view, in the |
| | 18 | context you just described, is a blockchain that's |
| | 19 | permissionless, open source, accessible to |
| 11:29:45 | 20 | third-party developers, and has no central |
| | 21 | authority that verifies transactions? |
| | 22 | MR. WHITE:  Objection.  No |
| | 23 | question. |
| | 24 | A.   These are some broad characteristics |
| 11:29:57 | 25 | that we use in sort of the -- the business |

104

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:30:02 1   vernacular, yes.

2       Q.   And are those the characteristics that

3   you're referring to when you use the words

4   "decentralized nature of the XRP Ledger" in

11:30:10 5   paragraph 21?

6       A.   In that nondefinitional descriptive

7   understanding, that's what I did there, yes.

8       Q.   Are there any academic publications that

9   endorse the general understanding of

11:30:33 10   decentralization as you just described it?

11       A.   Well, in recent years, the scientific

12   literature has sort of moved into a direction of

13   trying to understand how decentralization should

14   be understood, how it should be measured, how it

11:30:53 15   should be defined.  There's lots of working

16   definitions out there, but there's no governing

17   definitions -- governing definition at this point.

18            So there is no academic -- if that's

19   what you're asking -- paper that states this

11:31:04 20   working definition is the going definition.  It

21   is -- it is an understanding.  It's not a

22   definition.

23       Q.   What's the distinction in your mind

24   between an understanding and a definition?

11:31:18 25       A.   It is a -- sort of a working knowledge

105

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:31:22 | 1 | of how people in general talk about a topic versus |
| | 2 | how academicians in the scientific literature |
| | 3 | would try to define a term and develop metrics and |
| | 4 | tools to measure those metrics.  So that's sort of |
| 11:31:44 | 5 | the difference.  So the working level |
| | 6 | understanding versus the academic definitional |
| | 7 | approach. |
| | 8 | Q.   How is the existence of third-party |
| | 9 | applications on a blockchain related to the |
| 11:32:06 | 10 | concept of decentralization of that blockchain, if |
| | 11 | it is? |
| | 12 | A.   Well, again, sort of referring back to |
| | 13 | my earlier answer, it goes to it being broadly |
| | 14 | available to a large community of developers and |
| 11:32:27 | 15 | their users.  That becomes an element of a |
| | 16 | decentralized system in this nondefinitional |
| | 17 | fashion, nondefinitional nature. |
| | 18 | Q.   In paragraph -- both paragraphs 21 and |
| | 19 | 22, you reference "Ripple's vision."  Do you see |
| 11:33:10 | 20 | that?  It's the second sentence of paragraph 21 |
| | 21 | and also the second sentence of paragraph 22. |
| | 22 | A.   Yes. |
| | 23 | Q.   How do you know what Ripple's vision is |
| | 24 | or was? |
| 11:33:21 | 25 | MR. WHITE:  Objection; form. |

106

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:33:29 | 1 | A.   There's no firsthand knowledge, but I |
| | 2 | used it from my working knowledge of Ripple, as |
| | 3 | well as reading the business cases, as well as all |
| | 4 | the publications in the business literature, |
| 11:33:47 | 5 | financial magazines, crypto magazines, of what the |
| | 6 | aspirations were of what they sought to achieve. |
| | 7 | So that was the vision. |
| | 8 | Q.   Are all those publications that you just |
| | 9 | referenced cited in your report? |
| 11:34:00 | 10 | A.   Yes, they are. |
| | 11 | Q.   Okay.  You mentioned earlier that you |
| | 12 | reviewed Ripple's financial statements for, I |
| | 13 | believe, the years 2014 through 2020, is that |
| | 14 | correct? |
| 11:34:26 | 15 | A.   Yes, I did. |
| | 16 | Q.   You're aware that the vast majority of |
| | 17 | Ripple's revenues over the years have come from |
| | 18 | sales of XRP? |
| | 19 | MR. WHITE:  Objection; form. |
| 11:34:36 | 20 | A.   I have seen the P & L statement, profit |
| | 21 | and loss statements, within that, yes. |
| | 22 | Q.   Okay. |
| | 23 | A.   I'm referring to that. |
| | 24 | Q.   So you would agree with me that the vast |
| 11:34:49 | 25 | majority of Ripple's revenues have come from XRP |

107

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:34:52  1  sales over the years?

2                MR. WHITE:  Objection; form,

3           foundation.

4      A.   I'm going to have to look at a specific

11:34:59  5  financial statement to actually verify my answer

6  to your question.

7      Q.   Okay.  Sitting here today, you can't

8  recall?

9                MR. WHITE:  Objection; form.

11:35:08 10     A.   It's been a while since I've read them

11  and it depends on what year you're talking about.

12  I don't recall.

13     Q.   Okay.  Professor, we talked a little

14  earlier about consensus.

11:35:22 15          What is consensus?  What does that term

16  mean?

17     A.   Consensus is a -- a set -- is a set of

18  different mechanisms where different validators on

19  a -- on a network decide as to whether or not to

11:35:42 20  move the Ledger forward and add a block to the

21  chain.  And so there's different kinds of

22  consensus mechanisms where proof of work and proof

23  of stake and federated consensus mechanism that

24  Ripple has to actually make that final encrypted

11:36:03 25  decision to move the Ledger forward.

                                                    108

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:36:06  1        Q.   Do you consider yourself an expert in

        2   consensus?

        3        A.   Good enough working knowledge of it,

        4   yes.

11:36:15  5        Q.   That wasn't quite my question.

        6             Do you consider yourself an expert in

        7   consensus?

        8        A.   How do you define "expert"?

        9        Q.   I'm asking what you consider yourself,

11:36:26 10   sir.  So do you consider yourself an expert in

       11   consensus?

       12        A.   Yes.

       13        Q.   What is the relationship, if any,

       14   between consensus and the question of the extent

11:36:37 15   to which a blockchain is decentralized?

       16                  MR. WHITE:  Objection; form.

       17        A.   Can you repeat that question, please?

       18        Q.   Sure.

       19             What is the relationship, if any,

11:36:55 20   between consensus and the question of the extent

       21   to which a blockchain is decentralized?

       22                  MR. WHITE:  Objection; form.

       23        A.   It's -- the way I understand it, it's

       24   all about sufficient number of validators agreeing

11:37:09 25   on moving the blockchain forward.  And that's part

                                                          109

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:37:15  1   of consensus mechanism.  It's a consensus among

2   validators.

3        Q.   And how is that related to the concept

4   of decentralization?

11:37:32  5        A.   In that there is no single central

6   authority making that decision, but independent

7   nodes that do not -- validator nodes that do not

8   trust each other achieving a path forward on the

9   blockchain.

11:37:52 10        Q.   Have you reviewed the paper entitled

11   "The Ripple Protocol Consensus Algorithm" authored

12   by David Schwartz, Noah Youngs, and Arthur Britto?

13        A.   It sounds familiar, but I would have to

14   take a look at that.

11:38:08 15        Q.   Are you familiar with the term "Sybil

16   attack"?

17        A.   I've read about Sybil attack.

18        Q.   What is Sybil attack?

19        A.   As I'm sitting here, I cannot define it

11:38:24 20   for you.

21        Q.   Let me pose a hypothetical regarding the

22   application of consensus using an example of

23   something other than a blockchain.  Okay?

24        A.   So what's the hypothetical?

11:38:45 25        Q.   The hypothetical is let's suppose

110

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:38:47  1   there's a rocket and the rocket's direction is

2   controlled by a navigation system.  Okay?

3                    MR. WHITE:  Objection; form.

4        A.   Mm-hmm.

11:38:53  5        Q.   Okay.  Let's say the rocket has a single

6   navigation system to control its navigation.

7        A.   Mm-hmm.

8                    MR. WHITE:  Objection, form,

9             to that last question.

11:39:02 10        Q.   Is this a centralized system?

11                    MR. WHITE:  Objection; form.

12        A.   I find the analogy hard to reconcile

13   with my notion of decentralized.

14        Q.   I'm sorry.  I didn't quite understand

11:39:26 15   your answer.

16             Would you say that is a centralized

17   system?

18                    MR. WHITE:  Same form

19             objection.

11:39:31 20        A.   What I say is that I have a hard time

21   reconciling your example, your hypothetical, with

22   the decision as to whether or not centralized, not

23   centralized.

24        Q.   Are you saying that my hypothetical

11:39:43 25   doesn't provide enough information for you to know

111

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:39:45 | 1 | whether or not the system is centralized or |
| | 2 | decentralized? |
| | 3 | MR. WHITE:  Objection; |
| | 4 | mischaracterizes testimony. |
| 11:39:49 | 5 | A.   That is not what I said.  I was not |
| | 6 | looking for more information.  I was just trying |
| | 7 | to find the context of your hypothetical to |
| | 8 | actually try to answer my question -- to answer |
| | 9 | your question. |
| 11:40:01 | 10 | Q.   Okay.  So can you answer the question as |
| | 11 | to whether or not that's a centralized system? |
| | 12 | MR. WHITE:  Objection; form. |
| | 13 | A.   Can you repeat your system? |
| | 14 | Q.   Sure. |
| 11:40:12 | 15 | So there's a rocket. |
| | 16 | A.   Mm-hmm. |
| | 17 | Q.   It has a navigation system.  It's |
| | 18 | controlled by one single navigation system. |
| | 19 | A.   Mm-hmm. |
| 11:40:18 | 20 | MR. WHITE:  Objection to form |
| | 21 | to this -- continue. |
| | 22 | MR. SYLVESTER:  I have to |
| | 23 | finish.  Thank you. |
| | 24 | MR. WHITE:  I understand. |
| 11:40:23 | 25 | MR. SYLVESTER:  Thank you. |

112

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:40:23 1     Q.   Is this a centralized system?

2                 MR. WHITE:  Objection to

3       form.

4     A.   Given the narrowness of the information,

11:40:34 5 the limited information that you're providing me,

6 I would say there's a single point of failure.

7     Q.   So does that mean the system is

8 centralized?

9     A.   I've never thought about centralization

11:40:49 10 in that context so I can't answer your question.

11     Q.   Okay.  Generally, if there's a single

12 point of failure in a system, does that mean the

13 system is centralized?

14                 MR. WHITE:  Objection; form.

11:41:01 15     A.   In a nondefinitional way, I mean, I

16 would say yes.

17     Q.   Let's say -- we're still with the

18 rocket.  Let's say instead of having one

19 navigation system, it has two:  A primary

11:41:19 20 navigation system and a secondary navigation

21 system.

22     A.   Mm-hmm.

23                 MR. WHITE:  Objection to --

24       sorry.

11:41:23 25     Q.   Is that a centralized system?

113

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:41:24  1                      MR. WHITE:  Objection to
        2          form.
        3      A.   It depends how these two navigation
        4  systems come to a decision.
11:41:38  5      Q.   How does it depend?  Can you explain
        6  your answer?
        7                      MR. WHITE:  Objection to
        8          form.
        9      A.   I was saying -- oh, yes.  Do the two --
11:41:52 10  you said guidance systems?  What did you call
       11  them?
       12      Q.   Navigation systems.
       13      A.   Navigation systems.
       14          -- whether they depend on one another or
11:42:00 15  not.
       16      Q.   Okay.  Let's say the system is
       17  designed -- two navigation systems.  It's -- it's
       18  designed -- the navigation systems are designed to
       19  take the navigation data from the primary and, if
11:42:10 20  that one fails, then the secondary system.
       21          Is that -- is that system centralized?
       22                      MR. WHITE:  Objection; form.
       23      A.   I don't think there was enough of a
       24  decision to actually -- enough of a definition
11:42:25 25  around centralization as to whether or not that

                                                           114

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:42:28 | 1 | would be centralized or not. |
| | 2 | Q.   I just want to make sure I understand |
| | 3 | your answer. |
| | 4 | It's not that the hypothetical doesn't |
| 11:42:34 | 5 | have enough information.  It's that the concept of |
| | 6 | centralization isn't sufficiently defined to |
| | 7 | answer, correct? |
| | 8 | A.   To be able to answer that question, yes. |
| | 9 | MR. WHITE:  Objection; form. |
| 11:42:45 | 10 | Q.   Let's say instead a rocket has three |
| | 11 | navigation systems and its navigation is |
| | 12 | controlled by majority voting. |
| | 13 | Are you familiar with the majority |
| | 14 | voting system? |
| 11:42:56 | 15 | A.   Yes. |
| | 16 | MR. WHITE:  Objection to |
| | 17 | form. |
| | 18 | Q.   Let's say in this hypothetical with |
| | 19 | three navigation systems one of those systems |
| 11:43:05 | 20 | fails.  It just simply ceases to operate. |
| | 21 | What impact would that have on the |
| | 22 | rocket? |
| | 23 | MR. WHITE:  Objection; form, |
| | 24 | and relevance of a rocket analogy to |
| 11:43:15 | 25 | blockchain. |

115

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:43:26  1        A.   So you have three navigation systems and

2   there's majority voting in these navigation

3   systems and one navigation system falls out or

4   fails.  And then the question is?

11:43:48  5        Q.   How would that affect the system's

6   ability to operate?

7                    MR. WHITE:  Objection; form.

8        A.   Again, given the limiting parameters of

9   this hypothetical, those two remaining guidance

11:44:10 10   systems are still -- I'm not sure how you're

11   drawing the analogy there, but -- to centralized

12   operation.  So there is no longer -- if there's

13   only two left, there is no longer a majority in

14   your hypothetical.  And if there's no longer a

11:44:54 15   majority, then those decisions can't be -- the

16   system fails, I guess.

17        Q.   Okay.  Let's say we have the three --

18   three navigation systems, majority voting.  Let's

19   say two of the navigation systems simply fail.

11:45:10 20             Is that system centralized?

21                    MR. WHITE:  Objection; form.

22        A.   If they have no fail-safes, no backup

23   mechanisms?  I think I -- there's just not enough

24   information to actually make a decision on

11:45:26 25   centralization.

116

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:45:28   1       Q.   Okay.  Let's say instead of -- same --
           2   same rocket, same three navigation systems, same
           3   majority voting.  Let's say instead of two of the
           4   systems simply failing they're taken over by the
11:45:39   5   enemy, by a malicious actor.
           6                 MR. WHITE:  No -- sorry.
           7       Q.   Is that system centralized?
           8                 MR. WHITE:  Objection; form.
           9       A.   I have -- so what are the parameters
11:45:54  10   again?
          11       Q.   The rocket has three navigation systems;
          12   they majority vote on navigation; a malicious
          13   actor takes over two of the voting systems.
          14            Is that system centralized?
11:46:06  15                 MR. WHITE:   Objection; form.
          16       A.   Based on the information you're giving
          17   me and the analogy you're making or the -- the
          18   hypothetical you're providing me, it was still
          19   decentralized -- is it centralized?  Is that your
11:46:31  20   question?
          21       Q.   Yes.
          22       A.   No.
          23       Q.   Why not?
          24       A.   Because the original design was still
11:46:39  25   three.

                                                            117

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:46:45  1      Q.   Is the system in my hypothetical

2      controlled by one authority?

3                     MR. WHITE:  Objection to

4            form.

11:46:58  5      A.   After two are hijacked, or whatever you

6      said --

7                     MR. WHITE:  Objection to

8            form.

9      A.   -- there's one left, but the rule of the

11:47:07 10      system was majority -- I don't know.  I'm kind of

11      getting lost in the -- in the analogy here.

12      Q.   Okay.  Did you want me to repeat the

13      question or -- would that be helpful?

14      A.   Were the same conditions still the same

11:47:29 15      in that analogy as in majority voting?

16      Q.   Three navigation systems, majority

17      voting, malicious actor takes over two.

18            Is that a centralized system?

19                     MR. WHITE:  Objection to

11:47:38 20            form.

21      A.   It would violate the majority protocol.

22      Q.   Is it -- understanding your -- your

23      response, is that -- is that meant to be a

24      response to the question of whether or not it's a

11:48:02 25      centralized system?

                                                      118

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:48:04 1      A.   I can't answer whether that's a

2    centralized system.

3      Q.   Okay.  How might -- so we have a rocket

4    with three navigation systems.  How might we make

11:48:13 5    the rocket --

6                THE REPORTER:  Repeat.

7                MR. SYLVESTER:  Yes.

8      Q.   We have a knock -- a rocket with three

9    navigation systems, majority voting.

11:48:20 10           How might we make the rocket's

11    navigation system more resilient from attack?

12                MR. WHITE:  Objection to

13           form; calls for speculation.

14      A.   Not being a rocket scientist, I mean, I

11:48:34 15    wouldn't -- I wouldn't know.

16      Q.   Let's switch to a blockchain on that

17    analogy then.  Let's take a --

18      A.   Before you go there, can I go to the

19    restroom, please?

11:48:42 20      Q.   Yeah.  Absolutely.  Let's take a break.

21                THE VIDEOGRAPHER:  Going off

22           the record.  The time is 11:50.

23                (Whereupon, a recess is taken.)

24                THE VIDEOGRAPHER:  We'll go

12:04:17 25           back on the record.  The time is

                                                        119

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:04:19   1              12:05.
           2   BY MR. SYLVESTER:
           3       Q.   Professor, before I believe that you
           4   testified that you're familiar with the Byzantine
12:04:27   5   generals problem, is that right?
           6       A.   As a -- at a high level, yes.
           7       Q.   Can you describe what that is?
           8       A.   It's basically where multiple -- I guess
           9   we can put it in the context of nodes, in the
12:04:47  10   context of generals, that have to make a decision
          11   as to whether or not to take a certain action.  In
          12   this case, for example, the action would be for
          13   the blockchain to move forward, but not all of
          14   the -- all of the generals actually have the same
12:05:04  15   opinion of what they should be doing.
          16           And then the -- the -- the problem is
          17   then how does one arrive at a consensus to move
          18   forward even independent of what -- of the
          19   majority to move forward independent of the ones
12:05:21  20   that are not part of the majority will be doing.
          21           So the Byzantine problem is often put in
          22   the context of -- of fault tolerance of a
          23   blockchain where, since all the nodes of the
          24   validators are untrusting of one another, the
12:05:41  25   question then is when transactions need to be
```

120

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:05:46  1    validated, we need to sort of get to a majority

2    vote or arrive at a consensus.  That's what a

3    Byzantine problem is.  And how do we communicate,

4    I guess, how we move forward with a majority of

12:06:03  5    generals or a majority of nodes.

6        Q.    Professor, do you know how the XRP

7    Ledger consensus mechanism works?

8        A.    Yes.

9        Q.    Can you describe how the XRP Ledger

12:06:19  10   consensus mechanism works?

11       A.    The Ledger -- and, again, I'm not going

12   to go too deep into this, but the Ledger has

13   unique node lists of multiple validators that will

14   ultimately -- will decide on whether or not a

12:06:48  15   transaction will -- well, first, there's the

16   verification of the transaction, then there's the

17   communication of the verification of the

18   transactions, and then there is the majority vote

19   on the -- any of the unique node lists that makes

12:07:05  20   then a decision as to whether or not there is

21   liveness on the blockchain as the transactions

22   move forward.

23       Q.    What's the role of the unique node list

24   in validation on the XRP Ledger?

12:07:23  25       A.    Ultimately they make the decision as to

121

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:07:27 | 1 | whether or not the transaction was -- the Ledger |
| | 2 | moves forward. |
| | 3 | Q.   The validators on the unique node list |
| | 4 | ultimately make that decision? |
| 12:07:38 | 5 | MR. WHITE:  Objection.  No |
| | 6 | question. |
| | 7 | A.   Unique node list make that -- makes that |
| | 8 | decision, yes. |
| | 9 | Q.   Yeah.  What I'm trying to draw the |
| 12:07:50 | 10 | distinction is, is it the list itself making the |
| | 11 | decision or is it the validators on the list |
| | 12 | making the decision? |
| | 13 | A.   I'm going to have to think about that. |
| | 14 | So for consensus to -- to achieve |
| 12:08:12 | 15 | consensus, the validators in the unique node lists |
| | 16 | have to agree, or 80 percent of them have to |
| | 17 | agree, as to whether to move the transaction |
| | 18 | forward. |
| | 19 | Q.   You testified earlier that one of the |
| 12:08:33 | 20 | improvements of the XRP Ledger is speed, is that |
| | 21 | correct? |
| | 22 | A.   Yes. |
| | 23 | Q.   Is there any relationship between the |
| | 24 | XRP Ledger's consensus mechanism and its speed? |
| 12:08:43 | 25 | MR. WHITE:  Objection; form. |

122

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:08:50 1      A.   That is the information that I've taken

2      from what is provided on the various citations

3      that I've cited in my report, yes.

4      Q.   Okay.  So I think what you're saying is

12:09:02 5      it's not your expert opinion that the XRP Ledger

6      is faster, but you've gathered from the sources

7      you've reviewed that the XRP Ledger is, in fact,

8      faster?

9      A.   It is my --

12:09:11 10                   MR. WHITE:  Objection to

11           form.

12      A.   -- expert opinion in the comparison of

13      the XRP Ledger and bitcoin, Ethereum, that the

14      information that is available based on the type of

12:09:24 15      consensus mechanism that is being used, proof of

16      work or federate consensus, that the federate

17      consensus mechanism is, in fact, faster than the

18      two other ones.

19      Q.   Do you know why it's faster than the two

12:09:37 20      other ones?

21      A.   We --

22                   MR. WHITE:  Objection to

23           form.

24                   Go ahead.

12:09:46 25      A.   In the context of bitcoin, for example,

123

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:09:50  1    because there is no mining mechanism involved as

2    in their consensus program, there is no

3    requirement for six -- for agreement, I guess,

4    among the -- for establishment, I guess, for one

12:10:08  5    miner to be the fastest one to actually move a

6    transaction forward.  So the mining mechanism

7    takes longer to allow a transaction to move

8    forward, whereas the voting mechanism on this dUNL

9    is a faster mechanism.

12:10:27  10        Q.    What about the speed of the XRP Ledger

11    compared to the Ethereum blockchain?

12                  MR. WHITE:  Same objection.

13        A.    Again, I'm going to refer to my report

14    where the information, I guess, in the comparison

12:10:43  15    of the speed and time, and Ethereum is also a

16    proof of work mechanism, though it's moving

17    towards proof of stake, that the time it takes to

18    ultimately validate and move a transaction forward

19    takes longer than -- than XRP.  It's not a voting

12:11:01  20    mechanism.  It's a mining mechanism.

21        Q.    Is the XRP Ledger's consensus mechanism

22    faster than a proof of stake consensus mechanism?

23                  MR. WHITE:  Objection; form.

24        A.    I have not made that comparison.

12:11:17  25        Q.    Do you know?

124

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:11:17    1                          MR. WHITE:  Objection to
            2             form.
            3        A.   I do not know.  And when I -- the
            4    opinion in my report on the innovation of the XRP
12:11:29    5    Ledger over what existed at that time in the
            6    industry, that there was no Ethereum or proof of
            7    stake mechanism out there at that time.  Was the
            8    second Ledger and so I could only compare it to
            9    blockchain -- only compare it to bitcoin.  But I
12:11:49   10    know from the literature, and I've cited to it,
           11    that the Ethereum transactions are slower, but I
           12    don't know about proof of stake.
           13        Q.   Okay.  When was the XRP Ledger launched?
           14                          MR. WHITE:  Objection; form.
12:12:09   15        A.   What do you mean with the word
           16    "launched"?
           17        Q.   When did it come into existence?
           18        A.   So that is also ambiguous.  When was it
           19    developed or when was it made public?
12:12:26   20        Q.   Let's start with when was it developed?
           21        A.   I don't know the exact time of that, but
           22    it was obviously developed before it was publicly
           23    released.
           24        Q.   Who developed it?
12:12:36   25        A.   The names of the people that developed
```

125

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:12:46    1   it?
            2         Q.   Sure, if you know.
            3         A.   I believe it was in the CoinBase.  Not
            4   CoinBase.  What am I saying?  OpenCoin.  Sorry.
12:12:59    5         Q.   Yeah, I meant the people who actually
            6   coded the XRP Ledger.
            7              Do you know?
            8         A.   Oh, you mean the people.  I believe
            9   David Schwartz was involved.  Arthur Britto was
12:13:15   10   involved.  And I forgot who the third person was.
           11         Q.   Okay.
           12         A.   Jim.  I forgot his last name.
           13         Q.   And when was the XRP Ledger made
           14   available to the public?
12:13:33   15         A.   I don't know what the actual time was or
           16   date was when it was released to the public, but
           17   it was clearly after the development in -- maybe
           18   2013, in that order, based on my reading of the --
           19   of David Schwartz's deposition.  I believe he
12:13:53   20   makes reference to that date, late 2012/early
           21   2013.
           22         Q.   Who controlled the validators on the UNL
           23   at the time of XRP Ledger's public launch?
           24              MR. WHITE:  Objection; form.
12:14:21   25         A.   I'm going to need to refer to other
```

126

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:14:23   1   documents that would have that information in it.

2       Q.   You're not sure sitting here today?

3               MR. WHITE:  Same objection.

4       A.   Ripple definitely controlled some

12:14:37   5   validators, but I don't know who controlled which

6   validator.

7       Q.   I'm talking, just to be clear, at the --

8   at the start when the XRP Ledger was made public.

9           At that point in time, do you know who

12:14:47   10  controlled the validators?

11              MR. WHITE:  Objection; form.

12      A.   Again, I'm going to have to refer to a

13  document that refers to that date and that

14  information.

12:14:56   15      Q.   And -- and that's because you don't

16  know.

17              MR. WHITE:  Objection to form

18          and no question.

19      A.   I'm not sure, but from what I've read,

12:15:06   20  again, from David Schwartz's deposition, that

21  Ripple controlled some of the validators.

22      Q.   Did Ripple control all of the validators

23  at that time?

24              MR. WHITE:  Objection; form.

12:15:18   25      A.   I do not recall.  I'm going to have to

127

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:15:20   1   refer to that deposition or other reports.

2       Q.   Assuming that at the public launch of

3   the XRP Ledger, Ripple controlled all of the

4   validators on the UNL, would that make the XRP

12:15:38   5   Ledger at that point in time centralized?

6                   MR. WHITE:   Objection; form.

7       A.   Well, you're calling for my analysis of

8   what is centralized and I am -- there's too many

9   complexities, as I mentioned earlier, involved in

12:15:57   10   what the definition is of centralized and

11   decentralized.

12       Q.   Right.   Well, I'll ask you just to apply

13   the general understanding that you described for

14   us earlier.

12:16:04   15                   MR. WHITE:   Objection.   No

16            question.

17       Q.   Do you understand what I mean or no?

18       A.   Can you repeat that question?

19       Q.   Sure.

12:16:15   20            Earlier, when we were discussing

21   paragraph 21 of your report where you describe the

22   decentralized nature of the XRP Ledger, you gave

23   me your general understanding of what

24   decentralized meant.

12:16:24   25            Do you recall that?

128

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:16:26  1         A.    In that context, yes.

          2         Q.    In that context.

          3               So I'm asking you to apply that general

          4    understanding as you articulated it to this

12:16:32  5    context that I am asking you about, which is a

          6    circumstance in which Ripple controls all of the

          7    validators on the UNL.

          8               In that circumstance, applying your

          9    general understanding, would that make the XRP

12:16:44 10    Ledger centralized?

         11                    MR. WHITE:  Objection; form.

         12         A.    Well, again, calls for between us a

         13    common understanding of what the definition is of

         14    decentralized.  So at that time -- or when I used

12:17:01 15    "decentralized," I'm not defining centralized to

         16    decentralized.  But the way I stated my

         17    understanding of -- the business level

         18    understanding of centralized and decentralized was

         19    that there were more aspects, I guess, to the XRPL

12:17:24 20    when it was released to the public in that it was

         21    open.  It -- it -- it allowed for third-party

         22    contracts.

         23               And then this question of, well, if

         24    there was central authority that authorizes all

12:17:46 25    transactions.

                                                              129

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:17:47  1      Q.   Right.

2           So even if there was a central authority

3      that was required to authorize all transactions,

4      in your view such a system could still be

12:17:55  5      decentralized?

6                     MR. WHITE:  Objection; form

7                and no question.

8      A.   It could be because there are many

9      layers to the structure of a blockchain or there

12:18:07 10      are many layers to the structure of a blockchain.

11      There's the validation layers, there's the

12      governance layers, there's the network layers of a

13      blockchain.  And, therefore, whether one decides

14      whether something is centralized or not depends on

12:18:23 15      how you query the entire structure of the

16      blockchain and not just the -- in your narrow

17      example in 2013, when it was first released,

18      making the assumptions that you are making is just

19      one aspect of the centralization question and

12:18:41 20      discussion.

21      Q.   Okay.  Can every block in every

22      transaction that ever occurred on the XRP Ledger

23      be viewed by anyone today?

24                     MR. WHITE:  Objection; form.

12:19:01 25      A.   If you're referring to permissionless

130

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:19:05  1  blockchains, that's the intent.  As a node on the

2  blockchain, as the University of Michigan is, we

3  have a -- a shadow ledger and I can see all

4  transactions in the blockchain.

12:19:23  5      Q.  And are you -- is the University of

6  Michigan able to view through its node all

7  transactions on the XRP Ledger from its public

8  launch until the present time?

9                  MR. WHITE:  Objection to

12:19:33  10          form.

11      A.  It is my understanding that if we wanted

12  to, we would be able to.

13      Q.  Are you aware that the XRP Ledger halted

14  in November of 2021?

12:20:04  15                  MR. WHITE:  Objection; form.

16      A.  No.

17      Q.  Okay.  Let's look at Exhibit 23.

18                  (Whereupon, exhibit is

19          received and marked SEC Adriaens

12:20:13  20          Exhibit 23 for identification.)

21  BY MR. SYLVESTER:

22      Q.  So Exhibit 23, Professor, is the

23  printout from the website -- I won't read the

24  entire URL as it appears at the bottom of the

12:20:36  25  document, but it's from xrplf.org.

131

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:20:41 | 1 | Are you familiar with xrplf.org? |
| | 2 | A.   I've seen it, yes. |
| | 3 | Q.   Okay. |
| | 4 | A.   Seen reference to it. |
| 12:20:49 | 5 | Q.   Is xrplf.org among the sources that you |
| | 6 | cite in your expert report? |
| | 7 | A.   I'm going to have to check that.   I |
| | 8 | don't recall. |
| | 9 | Q.   Okay.  So I take it -- let me ask the |
| 12:21:10 | 10 | question. |
| | 11 | Have you seen this document before |
| | 12 | today? |
| | 13 | A.   I have not. |
| | 14 | Q.   Okay.  Take a minute to review it and |
| 12:21:15 | 15 | then I'll ask questions.  Let me know when you're |
| | 16 | ready. |
| | 17 | (Pause) |
| | 18 | A.   I've had a chance to look through this |
| | 19 | document. |
| 12:22:28 | 20 | Q.   Okay.  Great. |
| | 21 | As you can see, the document describes a |
| | 22 | network halt on November 3rd, 2021.  And one of |
| | 23 | the items, number 3, says "In the wake of quorum |
| | 24 | loss, the system behaved as expected, valuing |
| 12:22:46 | 25 | safety over liveness.  The halt was the correct |

132

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:22:48  1    response."

          2             Do you see that?

          3        A.   I see that.

          4        Q.   What does the phrase "quorum loss" mean

12:22:53  5    there?

          6                  MR. WHITE:   Objection;

          7             foundation.

          8        A.   I would have to speculate because I

          9    don't know, but the general use of the word

12:23:07 10    "quorum" means that it is a majority.

         11        Q.   And does that have any relationship with

         12    the way in which the XRP Ledger -- the way in

         13    which the XRP Ledger's consensus mechanism works?

         14                  MR. WHITE:   Objection; form

12:23:28 15             and foundation.

         16        A.   I don't have enough information

         17    regarding this halt.  I haven't done any analysis

         18    on this to try to understand, a better

         19    understanding of underlying theories behind these

12:23:45 20    top line statements.

         21        Q.   Okay.  Do you understand the phrase "the

         22    system behaved as expected, valuing safety over

         23    liveness"?

         24        A.   Yes.

12:23:54 25        Q.   What does that mean?

                                                            133

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:23:54    1                    MR. WHITE:  Objection.

2          A.   So liveness means good things happen,

3    forward -- forward movement of the -- of the

4    blockchain.  And safety is -- bad things can

12:24:16    5    happen.  And so basically it says the system

6    behaved in a valued -- sort of protecting against

7    bad things that could happen rather than moving

8    the server forward.

9                    But, again, that's just my analysis of

12:24:34   10    the language, the statement as -- as -- as

11    presented here.  I really don't know more than

12    that.

13          Q.   Okay.  Do you know if the XRP Ledger is

14    designed to halt if a certain number of validators

12:24:45   15    on Ripple's UNL stop validating transactions?

16                    MR. WHITE:  Objection; form.

17          A.   I would have to speculate and go back to

18    the workings of the XRPL on that.

19          Q.   So you're not sure sitting here today,

12:25:09   20    is that right?

21                    MR. WHITE:  Same objection.

22          A.   So what is the question again?

23          Q.   Is the XRP Ledger designed to halt if a

24    certain number of validators on Ripple's UNL

12:25:21   25    stopped validating transactions?

134

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:25:23   1                 MR. WHITE:  Objection.

          2      A.   I would have to look at the information

          3   that I provided in my report, if at all, regarding

          4   that issue.

12:25:37   5      Q.   Okay.  So I just -- is your answer that

          6   the answer is in your report, but you don't know

          7   right now or --

          8                 MR. WHITE:  Objection.

          9      A.   I cannot be certain, so I would have to

12:25:46 10   refer to my report.

        11      Q.   Okay.  And do you believe the answer to

        12   that question is in your report?

        13      A.   I have a discussion around safety and

        14   liveness and I'm going to have to look back at

12:26:00 15   that section around safety and liveness in my

        16   report.

        17      Q.   Okay.

        18      (Pause)

        19      A.   Sir, what was your question again?

12:27:19 20      Q.   Sure.

        21      Is the XRP Ledger designed to halt if a

        22   certain number of validators on Ripple's UNL stop

        23   validating transactions?

        24                MR. WHITE:  Objection.

12:27:30 25      A.   Is it designed to halt?  I can answer

                                         135

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:27:43   1   this more broadly that if validation protocol is

2   violated, that a blockchain would not move

3   forward.

4        Q.   Right.   And I'm asking a specific

12:27:51   5   question about the XRP Ledger's validation

6   protocol.

7        A.   Mm-hmm.

8        Q.   So is the XRP Ledger's validation

9   protocol designed such that the XRP Ledger will

12:28:04  10   halt if a certain number of validators on Ripple's

11   UNL stop validating transaction?

12             MR. WHITE:   Objection.

13        A.   I'll have to verify what the conditions

14   are under which the Ledger will halt.

12:28:15  15        Q.   Okay.   So you don't know either way

16   sitting here today?

17        A.   Yes.   No.   Sorry.   I -- I do not -- that

18   was a double negation there.

19        Q.   Yes.

12:28:23  20        A.   I do not know.   I'll have to verify

21   that.

22        Q.   Okay.   Let's turn to page 12 of your

23   report, your Exhibit 1, paragraph 27.   And I'm

24   looking at the top, point 1.

12:28:41  25        A.   Uh-huh.

136

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:28:41  1        Q.   Do you see where it says "Distributed

       2   (Decentralized) Database"?

       3        A.   Yes.

       4        Q.   And that heading is followed by three

12:28:50  5   sentences.

       6             Do you see that?

       7        A.   Yes.

       8        Q.   Do those three sentences describe a

       9   database that is both distributed and

12:28:52 10   decentralized?

      11                  THE REPORTER:  Repeat.

      12                  MR. SYLVESTER:  Sure.

      13        Q.   Do those three sentences describe a

      14   database that is both distributed and

12:29:01 15   decentralized?

      16        A.   The description here is pretty limited

      17   when it comes to distributed and decentralized.

      18   But, yes, each party in a blockchain has access to

      19   the entire database that is part of being

12:29:32 20   distributed.  There's no single party that

      21   controls the data.  That is one of the metrics

      22   related to decentralization as to the validation

      23   layer, but if you're asking does that describe

      24   distributed and decentralized, if -- at a very

12:30:03 25   high level it talks to the elements of distributed

                                                               137

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:30:04 1   and decentralized.

2          Q.   Okay.  And did you -- strike that.

3               Did you create this description of

4    distributed or decentralized database or did you

12:30:20 5   draw it from another source?

6          A.   Well, there's no citation here so this

7    would be from the working knowledge around

8    distributed and decentralized.  My working

9    knowledge based on my experience on the -- the

12:30:45 10  boards of the venture funds.

11         Q.   Okay.  In general, in your report, when

12   you drew a definition or a description from

13   another source, was it your practice to cite that

14   source?

12:31:05 15        A.   Yes.

16         Q.   Okay.  One of the aspects of

17   decentralization described here is no single party

18   controls the data or information.

19               Do you see that?

12:31:26 20        A.   Yes.

21         Q.   In your view, is a system centralized if

22   a single party does control the data or

23   information?

24               MR. WHITE:  Objection; form.

12:31:41 25        A.   Depends how you -- how one defines the

138

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:31:42 1   system.  Because a -- a blockchain system has

2   multiple layers and each of these layers have to

3   be queried for centralized or decentralized.

4        Q.   Okay.  Narrowing just to the blockchain

12:31:55 5   context and the consensus mechanism, if a single

6   party controls the consensus mechanism, is the

7   blockchain decentralized?

8                     MR. WHITE:  Objection to

9             form.

12:32:07 10       A.   The consensus mechanism or the protocol,

11   the validation protocol?

12        Q.   Either.  We can answer them one at a

13   time if you want.  Let's start with consensus

14   mechanism.

12:32:25 15             If a single party controls the consensus

16   mechanism in a blockchain, is the blockchain

17   decentralized?

18                     MR. WHITE:  Objection to

19             form.

12:32:35 20       A.   I cannot answer that question.

21        Q.   Why is that?

22        A.   Because the blockchain has more than

23   just a consensus mechanism associated with it.

24        Q.   Okay.  I'm going to ask the same

12:32:45 25   question the other way you put it.

                                                    139

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:32:48  1              In -- in the context of a blockchain, if

        2    a single party controls the validation protocol,

        3    is the blockchain decentralized?

        4                    MR. WHITE:  Objection to

12:32:56  5              form.

        6         A.    The same answer because a blockchain is

        7    more than a consensus mechanism.

        8         Q.    Okay.  Have you read the -- strike that.

        9              Let's go to paragraph 32, which is on

12:33:17 10    page 15.

       11              Have you read the white paper under

       12    the -- published under the pseudonym Satoshi

       13    Nakamoto referenced in paragraph 32?

       14         A.    At some point in time I have, yes.

12:33:42 15         Q.    When did you first read it?

       16         A.    I don't exactly know, but this was

       17    between five and ten years ago, when I first got

       18    into blockchain.

       19         Q.    Have you read it more recently?

12:34:04 20         A.    I have not.

       21         Q.    Okay.  The first sentence of paragraph

       22    32, you describe -- strike that.

       23              The first sentence of paragraph 32 is

       24    "Blockchain technology enables (among other

12:34:17 25    things) a novel medium of exchange known as

                                                            140

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:34:20  1    cryptocurrency."

2                       Do you see that?

3              A.    I see that.

4              Q.    Are you offering any opinions in this

12:34:24  5    case as to whether or not any cryptocurrency is a

6    generally accepted medium of exchange?

7              A.    Can you repeat that question?

8              Q.    Sure.

9                       Are you offering any opinions in this

12:34:40 10    case as to whether any cryptocurrency is a

11    generally accepted medium of exchange?

12                       MR. WHITE:   Objection to

13                       form.

14             A.    I don't think that is explicit in my

12:34:48 15    opinions here, no.

16             Q.    Okay.  Let's go to the first sentence of

17    paragraph 33.  "The primary purpose of bitcoin was

18    to securely store value in a public,

19    decentralized, and self-sustained system."

12:35:03 20                       Do you see that?

21             A.    Yes.

22             Q.    What's your -- what's your basis for

23    that statement?

24             A.    Just drawing on the general knowledge of

12:35:15 25    what the purpose and the objective was of bitcoin.

                                                                    141

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:35:19  1     Q.   And how did you obtain that general

       2  knowledge?

       3     A.   Conversational discussions, working

       4  knowledge in the financial technology space.  No

12:35:31  5  specific reference.

       6     Q.   Okay.  Further down in the paragraph, do

       7  you see where it says "When a user sends bitcoin,

       8  the transaction is bundled in a block with 1,000

       9  to 2,500 other transactions and published to the

12:35:44 10  network"?

      11     A.   I see that.

      12     Q.   What's your basis for that statement?

      13     A.   This is something I read probably on the

      14  specifics of how transactions were bundled.

12:36:03 15     Q.   Is there any reason why there's not a

      16  source cited for that statement?

      17                    MR. WHITE:  Objection to

      18           form.

      19     A.   It may have been not specific to this

12:36:14 20  sentence, but around bitcoin I have a number of

      21  citations.  So, no, I didn't specifically cite

      22  this, but this information is available in other

      23  references.  It's in my report -- I mean it's in

      24  the citations in my report, but I wouldn't be able

12:36:32 25  to point to the specific citation that actually

                                                        142

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:36:34  1    says this.

2         Q.    Okay.  Let's go to paragraph 38.  The

3    bottom of -- the bottom of paragraph 38, so it's

4    actually on page 18.  The last sentence says

12:36:52  5    "Ether follows the same principles as bitcoin in

6    that its rewards and distribution are regulated on

7    a yearly basis."

8              Do you see that?

9         A.    Right above paragraph 39?

12:37:04 10         Q.    That's right, yes.

11         A.    Yes.

12         Q.    What's your basis for that statement?

13         A.    Again, information from the literature

14    on Ethereum.

12:37:11 15         Q.    And which literature on Ethereum?

16         A.    I don't know if it was from bitcoin.com.

17    One of the citations that I have in -- in my

18    report referred to that on a comparison of

19    different -- I think it had to do with the

12:37:27 20    different consensus mechanisms and the rewards of

21    the different consensus mechanisms.

22         Q.    And do you recall which -- which article

23    you cited in your report has this proposition?

24         A.    I do not, but as I indicated, I think it

12:37:54 25    is related to the different consensus methods that

143

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:38:01  1   at one point I describe.  I'd have to go back and

2   see which of the cited references, cited

3   footnotes, actually gets -- has this information.

4        Q.   Is -- is there any reason that you

12:38:15  5   didn't drop a footnote after this sentence here at

6   the end of paragraph 38?

7                    MR. WHITE:  Objection to

8            form.

9        A.   I assume it to be common knowledge in

12:38:24 10   the industry and I didn't -- it was not material

11   to my opinion.

12        Q.   Did you only include in your citations

13   sources that were material to your expert opinion?

14                    MR. WHITE:  Objection; form.

12:38:53 15        A.   I would say that I provided citations

16   when the -- when I relied further on that

17   information to come to an opinion.  And if I did

18   not rely on those -- that specific statement, then

19   I didn't include the reference even if that

12:39:13 20   reference was readily obtained from other

21   references that I cited.

22        Q.   Okay.  Viewing your report as a whole,

23   divorced from this paragraph 38, are there sources

24   that you reviewed but that you didn't cite in your

12:39:24 25   report because you did not rely on them?

                                                    144

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:39:26  1                    MR. WHITE:  Objection; form.

2        A.   Not that I recall, no.

3        Q.   Okay.  In paragraph 39, the next

4   paragraph, there's a number of statements about

12:39:38  5   energy consumption.

6        A.   Yes.

7        Q.   There's -- just to take one as an

8   example, this -- "This is roughly equivalent to

9   the annual energy draw of countries like

12:39:50 10   Bangladesh and Chile."

11            Do you see that?

12        A.   Yes, I see that.

13        Q.   Where -- what are your bases for the

14   statements that you make in paragraph 39 regarding

12:40:00 15   the energy consumption of various countries?

16                    MR. WHITE:  Objection; form.

17        A.   It's illustrative of the differences in

18   energy use between different currencies.

19        Q.   Sure, but what was your source of that

12:40:19 20   information?

21                    MR. WHITE:  Objection; form.

22        A.   I know that on the energy -- let's see.

23   Twenty-three.  So you're specifically referring to

24   the specific sentence regarding Bangladesh and

12:40:42 25   Chile?

145

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:40:44  1        Q.   There -- there's that sentence.  The
       2   next sentence refers to consumption of American
       3   and Nigerian citizens.  There's a sentence after
       4   that about the average U.S. household's energy
12:40:54  5   consumption.
       6             Just for any of these assertions, what
       7   was your source?
       8                  MR. WHITE:  Objection; form.
       9        A.   I'm going to have to look back at that.
12:41:11 10   And during the drafting of the report, later on in
      11   the report, I also again talk about the energy
      12   aspects of blockchains and there are citations
      13   there.  So they may have been there instead of
      14   over here.  I mean, I'm not entirely sure.
12:41:25 15             But even using this information is
      16   not -- it's illustrative and it's not salient to
      17   the opinion.  What is salient to the opinion is
      18   how much energy is being used, not whether or
      19   not -- how it compares to energy consumption of
12:41:43 20   Bangladesh and Chile.
      21        Q.   Mm-hmm.
      22             But sitting here today, you're not sure
      23   from what source you drew that information
      24   regarding energy consumption in paragraph 39, is
12:41:51 25   that right?

                                                       146

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:41:52  1                    MR. WHITE:  Objection to

          2          form.

          3      A.    I'm going to have to -- sorry.

          4          I'm going to have to go back over the

12:41:57  5    later citations and see if it was in there.

          6      Q.    Okay.  Turning -- I'd like you to take a

          7    look at, as a whole, paragraphs 41, 42, 43, 44,

          8    45, 46, 47.  It's just a few pages of your report.

          9      A.    Mm-hmm.

12:42:26 10      Q.    I see a citation after the first

         11    sentence of paragraph 41, and then I see another

         12    one at the very end of paragraph 48, but I don't

         13    see any intermediate citations.

         14          So my question for you is just why did

12:42:46 15    you opt not to specifically cite the sources of

         16    the information in those intermediate paragraphs

         17    between 41 and 48?

         18                    MR. WHITE:  Objection; form.

         19      A.    If you're asking was there a conscious

12:43:01 20    decision to not cite this?  No, there was not.

         21      Q.    Okay.  So why was it that you opted not

         22    to provide citations to the individual

         23    propositions within those paragraphs?

         24      A.    A lot of this information that is

12:43:21 25    presented in these paragraphs actually draws on

                                                          147

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:43:32  1   both my own knowledge of the Ledger, engagement

2   with Ripple, as well as references on the bottom,

3   whatever citations on the bottom of page 19 that

4   sort of state -- or refer to the text that I'm

12:43:54  5   writing here.

6            I -- also, again, if you recall, I do

7   talk about the product arc later on and some of

8   the aspects that may refer to that and then come

9   back over here.

12:44:09 10           So it's -- it's, I mean, overall

11   knowledge that I've gained from my -- essentially

12   my ten years of working in the blockchain space,

13   financial technology companies, familiarity with

14   Ripple.  So there was no conscious decisions to

12:44:27 15   opt to cite to or not cite to.

16       Q.   Okay.  Let's -- let's focus on paragraph

17   43, "Decentralized Validation."

18           Do you see that?

19       A.   Yes.

12:44:40 20       Q.   For the statements in that paragraph,

21   what were your sources, if any, that informed the

22   statements in paragraph 43?

23                    MR. WHITE:   Objection to

24                    form.

12:44:52 25       A.   Well, if you look at these statements,

148

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:44:55  1   they're really very high-level statements about

2   essentially what -- how decentralized validation

3   is used in the context of -- as I referred to

4   earlier, of both the business literature, the

12:45:15  5   investor conversations, and even the academic

6   literature, not necessarily being clear.

7          So I just sort of provide high-level

8   statements here, not definitional statements.  And

9   because they were not definitional statements, I

12:45:29 10  guess I must not have cited to them.  They're just

11  high-level elements.

12      Q.   Okay.  Did you draft paragraph 43?

13              MR. WHITE:  Objection.

14              I'm going to instruct you not

12:45:41 15          to answer on the same basis discussed

16          earlier today.

17      Q.   What is the difference, if any, between

18  your description of decentralization in paragraph

19  43 and the definition of decentralization that

12:46:06 20  requires that no single authority is fully trusted

21  by all?

22      A.   So you're referring to paragraph 43 and

23  what?

24      Q.   There's a -- I want you to assume that

12:46:28 25  one definition of decentralization requires that

149

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:46:30  1    no single authority is trusted by all.  That's one

2    possible definition.

3              And what I'm asking is, sir, what's the

4    difference between that definition and your

12:46:37  5    description of decentralization in paragraph 43,

6    if there is one?

7                        MR. WHITE:  Objection; form.

8        A.   This is in the same high-level con --

9    used in the same high-level context.

12:46:52 10        Q.   I'm -- can you say more?  What do you

11    mean by "used in the same high-level context"?

12                        MR. WHITE:  Objection; form.

13        A.   So you're asking me to compare what I

14    say in paragraph 43 to what?  To another

12:47:06 15    definition?

16        Q.   Yes.

17        A.   So where did you get that other -- where

18    does the other definition come from?

19        Q.   Well, I mean, it comes from Troncoso,

12:47:13 20    but it kind of doesn't matter.  Assume it's a

21    definition.

22                        MR. WHITE:  Objection.  No

23              question.

24        A.   I -- I was not aware --

12:47:20 25        Q.   Okay.  So --

150

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:47:20  1      A.   -- where you were citing.

2      Q.   Okay.  So there's a definition that

3  something is decentralized if no single authority

4  is fully trusted by all.  Let's just assume that's

12:47:32  5  the definition.

6      A.   It's a definition.

7      Q.   Yes, exactly.

8           Is there any difference between that

9  definition and the description you set forth of

12:47:39 10  decentralized validation in paragraph 43?

11                MR. WHITE:  Objection to

12           form.

13      A.   I have not done that analysis and that

14  was not the intent of this opinion to define

12:47:56 15  decentralization.

16      Q.   Okay.  In the middle of paragraph 43,

17  you write "Decentralized networks strive to reduce

18  the level of trust (and thus dependence) that

19  participants must place in each other and deter

12:48:08 20  their ability to exert authority or control over

21  one another in ways that degrade the functionality

22  of the network."

23           Do you see that?

24      A.   I see that.

12:48:16 25      Q.   Okay.  You write "decentralized networks

151

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:48:20 | 1 | strive to." |
| | 2 | Who or what is doing the striving? |
| | 3 | MR. WHITE:  Objection; form. |
| | 4 | A.   Who or what is doing the striving? |
| 12:48:35 | 5 | Q.   Mm-hmm.  Yes. |
| | 6 | MR. WHITE:  Same objection. |
| | 7 | A.   I think here I referred to the design of |
| | 8 | decentralized networks and any design tries to |
| | 9 | achieve a certain objective. |
| 12:48:50 | 10 | Q.   Okay.  Let me ask a question about the |
| | 11 | last sentence of paragraph 43.  You write "In |
| | 12 | other words, the purpose of decentralized |
| | 13 | validation is to avoid one party having outsized |
| | 14 | control over one another to make a network |
| 12:49:26 | 15 | decision (to validate a transaction)." |
| | 16 | Do you see that? |
| | 17 | A.   I see that. |
| | 18 | Q.   Okay.  If one party must be trusted to |
| | 19 | validate a transaction, is it fair to say that |
| 12:49:36 | 20 | that party has outsized control over others to |
| | 21 | validate the transaction? |
| | 22 | MR. WHITE:  Objection; form. |
| | 23 | A.   Can you rephrase that question, please? |
| | 24 | Q.   Sure.  Or I'll try to. |
| 12:49:54 | 25 | Let's assume that one party is in |

152

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:49:58  1    control of transaction validation.

          2           My question is, is it fair to say that

          3    that party has outsized control over other parties

          4    in making a network decision; i.e., validating

12:50:14  5    transactions?

          6                   MR. WHITE:  Object to form;

          7           incomplete hypothetical.

          8      A.   Sorry.  I'm going to ask you to read --

          9    I'm going to ask you to repeat it again because

12:50:42 10    I'm trying to read it in this sentence.

         11      Q.   Sure.

         12           So the way I understand the sentence

         13    is -- well, let me just read it again.  You write

         14    "The purpose of decentralized validation is to

12:50:56 15    avoid one party having outsized control over one

         16    another to make a network decision (to validate a

         17    transaction)."

         18           And so my question is, if one party has

         19    the authority or must be trusted to validate a

12:51:06 20    transaction, does that party have outsized control

         21    over others?

         22                   MR. WHITE:  Objection to

         23           form; incomplete hypothetical.

         24      A.   In a generic sense, just like this is a

12:51:17 25    generic statement, that would be the implication,

                                                              153

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:51:19  1    yes.

          2         Q.    Okay.   I want to show you what's been

          3    marked PA 24.

          4                        (Whereupon, exhibit is

12:51:26  5                 received and marked SEC Adriaens

          6                 Exhibit 24 for identification.)

          7    BY MR. SYLVESTER:

          8         Q.    Here you go.

          9               So PA 24 has a URL at the bottom, but I

12:51:44 10    can tell you that it's from Amazon.com.   And I'd

         11    like you to read the first two sentences under the

         12    first question "What is decentralization?"

         13               Do you see that?

         14         A.    Yes.

12:52:04 15         Q.    Okay.   Can you read those aloud, please?

         16         A.    "In blockchain, decentralization refers

         17    to the transfer of control and decision-making

         18    from a centralized authority (individual,

         19    organization, or group thereof) to a distributed

12:52:24 20    network.   Decentralized networks strive to reduce

         21    the level of trust that participants must place in

         22    one another, and deter their ability to exert

         23    authority or control over one another in ways that

         24    degrade the functionality of the network."

12:52:41 25         Q.    Okay.   So have you seen this document

                                                              154

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

| | | |
|---|---|---|
| 12:52:42 | 1 | before, this Amazon page? |
| | 2 | A.   No. |
| | 3 | Q.   Okay.  Can you explain why the first two |
| | 4 | sentences of your paragraph 43 are almost word for |
| 12:52:55 | 5 | word the text of this Amazon page? |
| | 6 | THE REPORTER:  The last part. |
| | 7 | Are almost word for word...? |
| | 8 | MR. SYLVESTER:  The text of |
| | 9 | this Amazon page. |
| 12:53:12 | 10 | A.   Well, I am -- I don't know where -- as I |
| | 11 | said, I've never seen this document.  I don't know |
| | 12 | where the language in this document was taken |
| | 13 | from, whether that is originally from Amazon or |
| | 14 | came from another reference.  And I do not recall |
| 12:53:36 | 15 | at this point where and how through the literature |
| | 16 | I arrived at the structure of the sentence. |
| | 17 | Q.   Did you copy the first two sentences -- |
| | 18 | sorry.  Strike that. |
| | 19 | Did you copy the text from this page in |
| 12:53:57 | 20 | Exhibit 24 into the first two sentences of your |
| | 21 | expert report? |
| | 22 | A.   I did not. |
| | 23 | Q.   Did anyone else? |
| | 24 | MR. WHITE:  Objection. |
| 12:54:08 | 25 | I'm instructing you to |

155

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
12:54:10  1              exclude from your answer any
          2              communications with counsel.
          3      A.   Sorry.  What was your question?
          4      Q.   Did anyone else copy the text from the
12:54:20  5  Amazon web page at Exhibit 24 into your report at
          6  paragraph 43?
          7              MR. WHITE:  Same objection
          8              and instruction.
          9      A.   That is outside of my knowledge.  I
12:54:29 10  wouldn't know.
         11      Q.   You wouldn't know.
         12              MR. WHITE:  Same objection
         13              and instruction.
         14      A.   I didn't -- how we arrived -- how I
12:54:39 15  arrived at the sentence structure and where it
         16  came from relative to the other documents that I
         17  cited.  It's not clear what the reference or the
         18  relationship is between the Amazon document and
         19  the two sentences there and where this was derived
12:54:54 20  from, from other sources that I did cite.
         21      Q.   You would agree with me, though, that
         22  it's an almost word-for-word recreation of the
         23  Amazon document in your expert report?
         24      A.   It is very close, yes.
12:55:09 25      Q.   And sitting here today, you're not sure
```

156

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:55:11  1   why?

2        A.   That's correct.  I don't know.

3        Q.   Okay.  Let's move on to paragraph 44.

4   The first sentence is "Since there is no central

12:55:24  5   authority present to validate and verify the

6   transactions, and every transaction in a

7   blockchain is considered completely secured and

8   verified, consensus protocols are a core part of

9   any blockchain network."

12:55:33 10        A.   Yes.

11        Q.   What's your source for that statement?

12        A.   That is sort of a general statement

13   around how blockchains are designed.

14        Q.   Okay.  You say "considered completely

12:55:57 15   secured and verified."

16             Do you see that?

17        A.   Yes.

18        Q.   Considered by what or by whom?

19        A.   It would be through the validation

12:56:14 20   mech -- the consensus mechanism.

21        Q.   Okay.  And -- and you go on to define

22   consensus mechanism in the next sentence, is that

23   right?

24        A.   There are four consensus protocols or a

12:56:26 25   core part, right.

157

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:56:27  1        Q.   Okay.  And you go on to define consensus

2   mechanism in the next sentence, is that right?

3        A.   Yes.

4        Q.   What source did you rely on, if any, for

12:56:41  5   your definition of consensus mechanism?

6        A.   Again, I'm going to have to refer to

7   some of my earlier citations from which I referred

8   for many aspects or components of my report.  I --

9   I don't know.

12:57:02  10        Q.   Okay.  This isn't -- strike that.

11             You did not create the definition of

12   consensus mechanism described in paragraph 44, is

13   that right?

14        A.   It's a description, a description that's

12:57:17  15   out there.

16        Q.   Okay.  Paragraph 45 you write that

17   the -- second sentence.  "The Ledger is

18   standardized with regard to protocols (objectives

19   in the consensus algorithm) and acceptance of

12:57:31  20   validators on to the network, and it is

21   decentralized with respect to how transactions are

22   validated."

23             Do you see that?

24        A.   Yes.

12:57:40  25        Q.   Okay.  What does "standardized with

                                                              158

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:57:41  1    regard to protocols (objectives in the consensus

          2    algorithm)" mean?

          3         A.   Well, every consensus mechanism on a

          4    blockchain has a consensus -- has a protocol that

12:58:01  5    is the standard how the blockchain is supposed to

          6    operate and how it's supposed to validate

          7    transactions.

          8         Q.   What does the word "standardized" mean

          9    in describing that -- those protocols?

12:58:23 10         A.   The protocol is essentially the

         11    governing document of how the blockchain operates.

         12         Q.   Is that the underlying code of the XRP

         13    Ledger?

         14                   MR. WHITE:   Objection to

12:58:29 15              form.

         16         A.   You could refer to it as that, yes.

         17         Q.   Okay.  You describe Ripple's release of

         18    a recommended UNL in paragraph 45.

         19              Do you see that?

12:58:55 20         A.   In 45?

         21         Q.   Yes.

         22         A.   Okay.

         23         Q.   What is the process for the placement of

         24    validators onto Ripple's UNL, if you know?

12:59:12 25         A.   Well, if validator nodes are active,

                                                              159

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

12:59:19   1   they can be added to a UNL pending approval of the

2   other validators within that UNL.

3           We're talking in general about UNLs?

4       Q.   No, just Ripple's UNL.

12:59:33   5           What's the process for the selection of

6   validators that are placed onto Ripple's UNL?

7       A.   It is my understanding that Ripple has

8   to approve of those validators.

9       Q.   And do you know what metrics, if any,

12:59:50  10   Ripple applies to its approval process for

11   validators to be placed on its UNL?

12       A.   I don't know specifically.  I know more

13   generally that a validator has to be trusted; has

14   to be active and online; has to be -- has to have

13:00:11  15   participated on the Ledger.  So sort of a -- a

16   history, I guess, of that particular node or --

17   but I don't know exactly what the criteria are.

18   These are just some features, I guess, associated

19   with those nodes.

13:00:39  20       Q.   When you say -- I'm repeating your

21   testimony as I understand it.  "I don't know

22   specifically.  I know more generally that a

23   validator has to be trusted; has to be active and

24   online; has to be -- has to have participated on

13:00:51  25   the Ledger."

160

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:00:53  1          In that sentence is it trusted by

2    Ripple?

3          A.   I'm sorry.  I misstated.  It doesn't

4    have to be trusted.  It has to be -- there has to

13:01:01  5    be historical evidence of that particular

6    validator to be an active validator, have -- is

7    online a lot of the time, has participated in

8    prior transactions.  So some history of that.

9          That would make it into the -- you're

13:01:21 10    specifically referring to a dUNL.  But I don't

11    know about the actual protocol and how they select

12    them.  I just know some of the characteristics

13    because they referred to that in the Schwartz

14    document.

13:01:32 15          Q.   Is it fair to say that if Ripple selects

16    validators for inclusion on Ripple's UNL, that

17    Ripple trusts those validators?

18          A.   I did not opine on that.

19          Q.   What -- let me ask you this.

13:01:48 20          In paragraph 45 you say "In addition,

21    Ripple releases a recommended unique node list

22    (UNL) of trusted and verified" validate --

23    "validators."

24          A.   Mm-hmm.

13:01:57 25          Q.   Do you see that?

161

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:01:58 1     A.   Yes.

2     Q.   Trusted by whom?

3     A.   I would assume that would be by the

4  other validators on the UNL as well as by Ripple

13:02:14 5  because they published that dUNL.

6     Q.   Okay.

7     A.   In fact, I'm speculating there.  I don't

8  know what the actual process is.

9     Q.   I'm not sure I understand.

13:02:33 10     When you use the word "trusted" in this

11  sentence in your report, who was doing the

12  trusting?

13     A.   The intent of the sentence was not to be

14  that specific around who is doing the trusting.

13:02:50 15  It's basically reliable validators.  That's really

16  the intent of the statement.

17     Q.   Okay.  So fair to say that in Ripple's

18  view, Ripple includes validators on its list that

19  Ripple views as reliable?

13:03:04 20          MR. WHITE:  Objection; form,

21        foundation.

22     A.   That would be the intent of the

23  sentence, but, as I said, I don't really know the

24  actual protocol that Ripple used to select the

13:03:18 25  validator -- validators.

162

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:03:21  1        Q.   Okay.  The last couple of sentences of

        2   paragraph 45, "XRP Ledger users are not required

        3   to use these validators for transactions."  I'll

        4   stop there.

13:03:32  5             Do you see that?

        6        A.   Yes.

        7        Q.   With -- is the reference -- strike that.

        8             Is the phrase "these validators" a

        9   reference to the validators that are listed on

13:03:45 10   Ripple's UNL?

       11        A.   You know, that's a little confusing

       12   here.

       13             Sorry, what was your question?

       14        Q.   Is the phrase "these validators" that

13:04:14 15   appears in the second-to-last sentence of

       16   paragraph 45 a reference to the validators that

       17   are listed on Ripple's UNL?

       18        A.   Yes.  It says essentially that the XRP

       19   Ledger users are not required to use the dUNL for

13:04:31 20   transactions --

       21        Q.   Okay.

       22        A.   -- to validate transactions.  That was

       23   the intent of the sentence.

       24        Q.   Okay.  If nodes do not use the

13:04:50 25   validators on Ripple's UNL, are there any risks to

                                                            163

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:04:57  1    the nodes who opt not to use that UNL?

2                        MR. WHITE:  Objection; form.

3         A.   It is my understanding there are other

4    UNLs available and other UNLs in the future that

13:05:11  5    could be created.

6         Q.   Focusing just on the present, what's

7    your understanding about the degree of overlap in

8    the lists among the various UNLs that Ripple

9    publishes?

13:05:28 10                        MR. WHITE:  Objection to

11              form.

12        A.   It seems like there were multiple

13   questions in that question.  Part of it is, are

14   there other UNLs?

13:05:47 15        Q.   That's a fair point.

16              Ripple publishes its own UNL, correct?

17        A.   Yes.

18        Q.   Okay.  In the current iteration of the

19   Ripple code, is Ripple's UNL the only Ripple UNL

13:05:59 20   available?

21        A.   No.

22        Q.   Okay.

23                        THE REPORTER:  I'm sorry?

24                        THE WITNESS:  No.  Sorry.

13:06:04 25                        THE REPORTER:  Thank you.

                                                        164

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:06:04   1        Q.   There are other UNLs that are currently

        2   listed in the Ripple-D code, is that right?

        3        A.   There's other UNLs available, yes.

        4        Q.   Okay.  Focusing just on the UNLs that

13:06:17   5   are listed in the Ripple-D code, are you aware of

        6   the extent of the overlap of the validator lists

        7   among those UNLs with Ripple's UNL?

        8        A.   Am I aware there's overlap?

        9        Q.   I'm asking if you know whether or not

13:06:32  10   there's overlap.

        11        A.   By reading some of the documents that

        12   I'm citing to, I'm aware that there is some

        13   overlap.

        14        Q.   But is it a perfect overlap between the

13:06:47  15   lists?

        16                MR. WHITE:  Objection to

        17            form.

        18        A.   I do not have that information here as

        19   I'm sitting here.

13:06:53  20        Q.   Okay.

        21                MR. SYLVESTER:  Should we

        22            break for lunch?  We're right about

        23            one.  Does that work for you?

        24                MS. ZORNBERG:  Sure.

13:07:04  25                MR. WHITE:  Yes.

                                                        165

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:07:04    1                    MR. SYLVESTER:  Okay.

            2                    THE VIDEOGRAPHER:  Going off

            3           the record.  The time is 1:08.

            4                    (Whereupon, a luncheon recess

13:07:09    5           is taken.)

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

                                                              166

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

13:07:09   1              A F T E R N O O N   S E S S I O N

           2                    THE VIDEOGRAPHER:  We'll go

           3              back on the record.  The time is 2:11.

           4   BY MR. SYLVESTER:

14:09:54   5        Q.    Professor, I'd like to start with

           6   paragraph 46 on page 21 of your Exhibit 1.

           7        A.    Okay.

           8        Q.    The first sentence of that paragraph is

           9   "The XRP Ledger's consensus protocol breaks up the

14:10:12  10   common notion of a shared set of validator nodes."

          11              Do you see that?

          12        A.    Yes.

          13        Q.    What do you mean here by "a shared set

          14   of validator nodes"?

14:10:48  15        A.    As I understand in my writing, I

          16   intended that to mean that every node can choose

          17   who they -- can choose the UNL that they work

          18   with.

          19        Q.    And that's reflected in the next

14:11:02  20   sentence, "Rather, it lets every node declare

          21   other nodes it subjectively trusts in a UNL"?

          22        A.    Yes.

          23                    MR. WHITE:  Objection.  No

          24              question.

14:11:14  25        Q.    Okay.  If a node departs from the Ripple

                                                              167

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:11:16  1    UNL and instead creates its own list of validators

2    it subjectively trusts, what, if anything, will

3    ensure that it remains on the XRP Ledger and does

4    not fork?

14:11:28  5              MR. WHITE:  Objection; form.

6       A.   I don't think I'm prepared to answer

7    that question.  As I indicated this morning, my

8    knowledge on blockchain and consensus and the

9    features are at the business implementation and

14:11:57 10    business development level.  And some of the

11    technical aspects and underlying code and

12    protocol, issues like what you're referring to

13    right now, I cannot -- I cannot directly answer.

14    I do not have that level of expertise.

14:12:17 15       Q.   Okay.  And when you say you cannot

16    answer, is it because you don't know?

17              MR. WHITE:  Objection; form.

18       A.   I do not have that expertise.

19       Q.   Okay.  Let's look at paragraph 47 of

14:12:33 20    your report.  The first two sentences say "Not all

21    XRP Ledger validators participate in the consensus

22    process all the time.  In fact, a smaller subset

23    of validators consistently is responsible for

24    approval of transactions, and serves three

14:12:47 25    functions," and the sentence continues, but my

168

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:12:51   1    question is about the approval of transactions.

2         Is the smaller subset of validators that

3    is consistently responsible for approving

4    transactions the validators that are listed on

14:13:01   5    Ripple's UNL?

6                   MR. WHITE:  Objection; form.

7    A.   I don't think there's anything in this

8    paragraph that refers to Ripple's UNL.

9    Q.   Right.  I understand that, sir.  I

14:13:20  10    meant -- I'm asking if that's -- if that's an

11    accurate statement.

12         So you write "a smaller subset of

13    validators consistently is responsible for

14    approval of transactions."

14:13:30  15    A.   Uh-huh.

16    Q.   What is that "smaller subset"?

17    A.   Again, I think that asks to a level of

18    technical knowledge that I cannot respond to.

19    Q.   But you wrote this, right?

14:13:45  20    A.   Yes.

21    Q.   So what was your basis at the time of

22    writing for your understanding that a smaller

23    subset of validators consistently is responsible

24    for approval of transactions?

14:13:56  25    A.   As a matter of -- the intent was to

169

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:14:00   1   write these paragraphs, as I indicate at the

2   beginning in paragraph 41, as sort of an overview

3   of the XRP Ledger based on the references cited in

4   26 and it states sort of as a matter of knowledge

14:14:21   5   that is out there rather than as an analysis.  It

6   was also not materially analysis to -- material to

7   my analysis and opinions.

8       Q.   Sitting here today, do you know whether

9   or not it's true that a smaller subset of

14:14:34   10   validators consistently is responsible for

11   approval of transactions?

12       A.   I have no reason to disagree with that.

13       Q.   I'm asking if you affirmatively agree.

14           Do -- do you -- do you have a basis to

14:14:57   15   believe it's true?

16               MR. WHITE:   Objection to

17               form.

18       A.   Not beyond the information that I've

19   gathered, but not from my own practical knowledge.

14:15:07   20       Q.   Okay.  And -- and what is the -- what is

21   the source for this sentence in paragraph 47?

22       A.   Again, I refer you back to the citation

23   26 which is for present purposes going forward.

24   And a lot of this actually refers to various

14:15:26   25   different sources consulted in 26, which was a lot

170

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

14:15:28　1　of sources including a lot of Ripple -- Ripple

　　　　　2　sources, Ripple website information.

　　　　　3　　　　Q.　Do you know which of those sources cited

　　　　　4　in 26 support the proposition that a smaller

14:15:42　5　subset of validators consistently is responsible

　　　　　6　for approval of transactions?

　　　　　7　　　　A.　I don't know and I will have to review

　　　　　8　some of these websites.

　　　　　9　　　　Q.　Did you write paragraph 47?

14:16:20　10　　　　　　　MR. WHITE:　Objection.　I'm

　　　　　11　　　　　going to instruct the witness not to

　　　　　12　　　　　answer for the reasons previously

　　　　　13　　　　　stated.

　　　　　14　　　　　　　MR. SYLVESTER:　And what are

14:16:28　15　　　　　the reasons previously stated?

　　　　　16　　　　　　　MR. WHITE:　That the drafting

　　　　　17　　　　　process is protected by the work

　　　　　18　　　　　product privilege.

　　　　　19　　　　　　　MR. SYLVESTER:　Okay.

14:16:37　20　BY MR. SYLVESTER:

　　　　　21　　　　Q.　I want to show you what's been marked

　　　　　22　Exhibit 22, please.

　　　　　23　　　　　　　(Whereupon, exhibit is received

　　　　　24　　　　　and marked SEC Adriaens Exhibit 22

14:17:05　25　　　　　for identification.)

171

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 14:17:19 | 1 | MR. SYLVESTER:  Great.  So |
| | 2 | here you go. |
| | 3 | BY MR. SYLVESTER: |
| | 4 | Q.   So Exhibit 22 is a printout from a |
| 14:17:29 | 5 | website, that appears at the bottom of the |
| | 6 | document, from xrpl.org. |
| | 7 | A.   Uh-huh. |
| | 8 | Q.   Professor, you did cite xrpl.org as one |
| | 9 | of your sources in -- in your report, correct? |
| 14:17:45 | 10 | A.   I do cite that in Footnote 26, yes. |
| | 11 | Q.   Okay.  The portion of this -- well, let |
| | 12 | me ask you this:  Have you seen this -- this |
| | 13 | publication on xrpl.org prior to today? |
| | 14 | A.   As I mentioned, I did look at xrpl.org. |
| 14:18:05 | 15 | Q.   Mm-hmm. |
| | 16 | A.   And this may or may not have been, I |
| | 17 | guess, the information that -- that I've seen. |
| | 18 | Q.   Okay.  Let me ask a better question. |
| | 19 | If you turn to the second page, do you |
| 14:18:19 | 20 | see where it says "Validator Overlap |
| | 21 | Requirements"? |
| | 22 | A.   Yes. |
| | 23 | Q.   Have you -- have you read this section |
| | 24 | about validator overlap requirements on xrpl.org? |
| 14:18:45 | 25 | A.   If this is what was the link, xrpl.org, |

172

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:18:48  1    then I have read it.

2         Q.    Does it look familiar to you sitting

3    here today?

4         A.    I cannot be certain.

14:18:58  5    Q.    Okay.  If you wouldn't mind taking a

6    moment just to review those few paragraphs under

7    "Validator Overlap Requirements," I just have a

8    few questions.

9              (Pause)

14:20:17 10    A.    I've read it.

11        Q.    Okay.  Let's start here.

12             Did you disagree with anything that you

13   read in the three paragraphs under "Validator

14   Overlap Requirements"?

14:20:24 15                   MR. WHITE:  Object to form.

16        A.    I do not have the technical background

17   to either agree or disagree.  It's just stated

18   as -- as written.

19        Q.    Okay.  Do you see where it says --

14:20:51 20   strike that.

21             If a validator selects a UNL that

22   overlaps less than 90 percent with other UNLs,

23   what risk does that pose?

24                   MR. WHITE:  Objection; form,

14:21:03 25        calls for speculation.

173

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

14:21:12   1      A.   You're asking me to do a technical

2  analysis that I am not qualified to do based on

3  this information.

4      Q.   Okay.  Separate and apart from this

14:21:23   5  document -- I just want to make sure I understand

6  your answer -- you're not able to answer the

7  question if a validator selects a UNL that is --

8  that overlaps less than 90 percent with other

9  UNLs, what risk that poses, is that right?

14:21:37  10               MR. WHITE:  Objection; form.

11      A.   I don't have the background to answer

12  that question.

13      Q.   Okay.  Do you have -- do you see the

14  reference in Exhibit 22, at the bottom of that

14:21:52  15  section where it says "If your chosen set of

16  validators does not have enough overlap with

17  others, your server may diverge from the rest of

18  the network and you could lose money by taking

19  action based on your server's divergent state."

14:22:07  20          Do you see that?

21      A.   No.

22      Q.   No?  Okay.

23      A.   Are -- are you referring to this?

24      Q.   Yes.

14:22:11  25      A.   Okay.

174

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:22:11  1      Q.   So Exhibit 22.

         2      A.   Yes.

         3      Q.   The third paragraph under "Validator

         4  Overlap Requirements."

14:22:15  5      A.   Yes.

         6      Q.   And then the last sentence of that third

         7  paragraph.

         8      A.   A chosen set of validators.

         9      Q.   That's right.

14:22:27 10      A.   Okay.  I'm sorry, your question was?

        11      Q.   My question is, do you know how it is

        12  that one could lose money by taking action based

        13  on one server's divergent state?

        14              MR. WHITE:  Objection; form.

14:22:52 15      A.   I do not have enough information to

        16  actually make that -- to explain that.

        17      Q.   Okay.  Let's go back to your report,

        18  Exhibit 1, paragraph 48, which is on page 22.

        19      A.   Yes.

14:23:16 20      Q.   The first sentence of that paragraph is

        21  "The features of decentralized validation and the

        22  XRP Ledger's consensus protocol enabled an

        23  increase in the speed with which it can validity

        24  transactions, and make settlement of the

14:23:30 25  transaction faster than traditional payment

                                                        175

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:23:32  1    rails."

2              What's the basis for that statement?

3        A.    This is information that is based on the

4    citation, I believe Citation Number 27 and, again,

14:23:54  5    was part of my providing -- providing background

6    on the XRP and XRPL.

7        Q.    Do you --

8        A.    Not an analysis.

9        Q.    I see.

14:24:03 10              Do you know how fast transactions

11    settled via traditional payment rails?

12        A.    Depends which payment rails we consider.

13        Q.    Okay.  I'm trying to determine the basis

14    for your statement that the speed of the XRP

14:24:23 15    Ledger is faster than traditional payment rails.

16    So I'd like to know, what -- what are the

17    traditional payment rails that you're referring to

18    here?  How fast do they settle transactions?

19                   MR. WHITE:  Objection; form.

14:24:41 20        A.    I don't have information on how many

21    seconds or microseconds or whatever time it would

22    take.

23        Q.    Is -- is this statement, the first

24    sentence of paragraph 48, something that you drew

14:24:52 25    from a source that you read in preparing your

176

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:24:55 1  report?

2      A.   I believe so, yes.  Either it's going to

3  be based on Footnote 26 or on the difference

4  between XRP and other cryptocurrencies, 27, which

14:25:14 5  makes reference to the speed of transactions.

6      Q.   Okay.  Paragraph 49 on page 23, about

7  four lines down, there's a sentence that says --

8  that starts "To prevent malicious activity..."

9          Do you see that?

14:25:42 10     A.   Yes.

11     Q.   Okay.  So my question is, does a

12  validator on the XRP Ledger have to take any

13  affirmative steps to create a Unique Node List?

14                  MR. WHITE:  Objection to

14:25:54 15         form.

16     A.   I am not prepared to respond to the

17  technical requirements of a validator and the

18  Unique Node List.

19     Q.   And, so, it's fair to say you don't know

14:26:11 20  sitting here today?

21                  MR. WHITE:  Objection; form.

22     A.   I don't know beyond the information

23  that's available publicly.

24     Q.   I'm sorry, what do you mean by the

14:26:24 25  information "available publicly"?

                                                        177

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:26:26    1          A.    That's available based on the citations

            2    I've used earlier.  It's descriptive of the

            3    process, not an analysis of the process.

            4          Q.    Okay.  Do you see where it says, in the

14:26:44    5    same paragraph, 49, "Each XRP Ledger validator

            6    must maintain and have approved a list of trusted

            7    servers"?

            8          A.    I'm not sure where you are.

            9          Q.    Oh, it's the same sentence that starts

14:26:58   10    with "To prevent malicious activity..."

           11          A.    Yes.

           12          Q.    Do you know if bitcoin also has the same

           13    requirement, that nodes must have a list of

           14    trusted servers?

14:27:25   15          A.    Bitcoin works through miners, as far as

           16    I understand.

           17          Q.    And does that process entail having a

           18    list of trusted servers?

           19          A.    They're competing servers.

14:27:37   20          Q.    So is that a no, it does not?

           21                    MR. WHITE:  Objection; form.

           22          A.    I am not sure in terms of the use of

           23    this language, but I understand that process to be

           24    a mining process as opposed to a federated

14:27:52   25    consensus process.

                                                                      178

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:28:08  1      Q.   Going down to paragraph 50, the first

2   sentence, second clause, says that "the system

3   only makes forward progress when a super-majority

4   of the validators each node trusts agree on the

14:28:21  5   state of the Ledger."

6            Do you see that?

7      A.   Yes.

8      Q.   What is this super-majority?  What --

9   what percentage must agree?

14:28:41 10      A.   Based on the information that I have

11   read, I believe it's on the order of 80 percent.

12      Q.   Can 20 percent of faulty nodes on

13   Ripple's UNL halt the XRP Ledger?

14                 MR. WHITE:  Objection; form.

14:29:03 15      A.   Are you specifically asking about the

16   dUNL?

17      Q.   Yes.  I'll repeat it, but, yes.

18            Can -- can 20 percent of faulty nodes on

19   Ripple's dUNL halt the XRP Ledger?

14:29:15 20                 MR. WHITE:  Same objection.

21      A.   I would need more information.  I think

22   that is unclear since there are multiple UNLs

23   available and we don't know who actually uses the

24   dUNL, so...

14:29:42 25            Technically, in the protocol, the

179

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:29:45  1   implications of the 20 percent that you're

2   mentioning, I cannot do an analysis on that based

3   on where I'm sitting right now.

4        Q.   When you say "in the protocol," what do

14:29:58  5   you mean by "protocol"?

6        A.   The consensus protocol.  The code.

7        Q.   Okay.  Skipping back to paragraph 49,

8   right after the sentence that we were just looking

9   at that starts with "To prevent malicious

14:30:24 10   activity," there's a sentence that says "The

11   network is designed to rely on trusted validator

12   parties that grow organically, while pushing out

13   dishonest nodes."

14        Do you see that?

14:30:35 15        A.   I see that.

16        Q.   Okay.  How does the group of trusted

17   validators on the XRP Ledger grow organically?

18        A.   Because new validators become part of

19   the network.  How do new validators become part of

14:30:54 20   the network?  Is that part of what you're asking?

21        Q.   I'm asking what you meant when you wrote

22   that trusted validator parties grow organically.

23        A.   Again, I used it in the context of the

24   information that I reviewed on the XRP Ledger.

14:31:09 25        Q.   Okay.  But do you have a meaning of what

                                                        180

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:31:11 1     the phrase grow -- I'm confused because I don't

2     know what the meaning of "grow organically" is.

3     So what did you mean by "grow organically"?

4          A.    That new parties -- individuals,

14:31:23 5     universities, companies, whatever it might be --

6     become validators in the network.

7          Q.    And --

8          A.    That's organically.

9          Q.    How is that organic?

14:31:37 10         A.    Organic as opposed to -- in the commonly

11    used meaning of the term "organic" as opposed to

12    sort of directed new validators.  So these sort of

13    pop out independent of Ripple, independent of some

14    of the other validators.  So organic growth of a

14:32:03 15    network.

16         Q.    And how about the concluding part,

17    "While pushing out dishonest nodes"?  How are

18    dishonest nodes pushed out of the XRP network?

19         A.    Again, this kind of goes to technical

14:32:20 20    aspects of the operation of the ledger.  I believe

21    there was a voting process involved and I can't

22    comment beyond that.

23         Q.    Okay.  So this sentence is -- is

24    something that you obtained from reviewing from

14:32:34 25    another source?

181

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
14:32:36  1        A.   Yeah.

          2        Q.   That's fair?

          3        A.   To -- to provide general context and

          4   overview, yes.

14:32:42  5        Q.   Okay.  Can you -- sorry, strike that.

          6             The last sentence of paragraph -- strike

          7   that.

          8             The second-to-last sentence of paragraph

          9   49 that starts with "However," do you see that?

14:33:21 10        A.   Yes.

         11        Q.   I read the sentence to mean that one of

         12   the vulnerabilities of the XRP Ledger is that it

         13   requires an a priori agreement on common trusted

         14   nodes with the UNL, is that correct?

14:33:38 15                  MR. WHITE:  Objection; form.

         16        A.   That's what the sentence says.

         17        Q.   Okay.  Is that "a priori agreement on

         18   common trusted nodes" a reference to a UNL?

         19        A.   Sorry.  What is your question again?

14:34:10 20        Q.   Is your reference to an "a priori

         21   agreement on trusted nodes" a reference to a UNL?

         22        A.   Let me reread that sentence to remind me

         23   of the intent.

         24             (Pause)

14:34:50 25        A.   This actually goes to a very technical
```

182

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:34:52  1    aspect of the protocol conditions --

2         Q.   Mm-hmm.

3         A.   -- that I'm not prepared to discuss or

4    analyze or interpret.

14:35:03  5        Q.   Is it a technical aspect that you

6    understand?

7         A.   At a level of -- high level of

8    understanding, yes.

9         Q.   Okay.  But at your high level of

14:35:19 10  understanding, why is an a priori agreement on

11   common trusted nodes a vulnerability of the XRP

12   Ledger?

13                   MR. WHITE:  Objection; form.

14        A.   I'll have to take a look at the context

14:35:42 15  of the reference from which I pulled this

16   information.

17        Q.   And what's that reference?

18        A.   I believe it was one of the references

19   cited in 26 on XRP, XRPL.

14:35:53 20       Q.   Sitting here today, do you know which of

21   the references in 26 is the source from which you

22   drew this sentence in paragraph 49?

23        A.   Given the context of the paragraph, it's

24   probably one of the latter ones, XRPL overview.

14:36:21 25  It's all securities so I'm going to have to go

183

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:36:24  1    back to that reference.

2         Q.   I'm sorry, what was the last thing you

3    said, the last sentence?

4         A.   You said 49, right?  In 49 -- paragraph

14:36:38  5    49, the sentence that you're referring to, what

6    makes XRP Ledger attractive for speed, et cetera,

7    is under the improved security subset on page 22.

8    So I'll have to go back to the reference that

9    discusses improved security to get that context

14:36:57 10    again.

11         Q.   I see.

12              And just to be clear, this whole section

13    of improved security, this is not your expert

14    opinion.  This is information that you drew from

14:37:10 15    sources you reviewed, is that right?

16         A.   Information I drew from resources I

17    reviewed and were used in the context of

18    formulating the opinion on whether XRPL and XRP

19    aren't innovation of the existing blockchains.

14:37:32 20         Q.   Okay.

21         A.   Blockchain.  There was only one at that

22    time.

23         Q.   And to the extent the sources of

24    information you reviewed were Ripple or Ripple

14:37:44 25    affiliates, did you take any steps to verify the

184

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:37:46  1    veracity of that information that you then

2    included in your report?

3                   MR. WHITE:  Objection to

4            form.

14:38:02  5        A.   Are you referring specifically to

6    this -- to this statement in paragraph 49?

7        Q.   Let's start with that statement in

8    paragraph 49, sure.

9        A.   I did not verify it independently.

14:38:17 10        Q.   Okay.  Now, backing up from paragraph

11   49, to the extent that there are any statements in

12   your report where -- that don't represent your

13   expert opinion and are, rather, just drawn from

14   sources of information from Ripple or Ripple

14:38:31 15   affiliates, did you take any steps to verify the

16   veracity of that information before including it

17   in your report?

18        A.   Well, I didn't only look at 26.  There's

19   other references that refer to comparison of

14:38:47 20   ledgers or statements, statements on CoinDesk and

21   whatnot that I've referenced earlier that speak to

22   this, but I did not specifically cite to here.  To

23   see whether those same statements are made in

24   those same documents.

14:39:08 25        Q.   Right.  I'm asking more of a

185

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:39:10   1   methodological question.

2           A.   Oh, okay.

3           Q.   So, for instance, let's use this

4   improved security paragraph as an example.  So

14:39:16   5   from the improved security paragraph, my

6   understanding of what you've told us is that this

7   is not your expert opinion.  This is a -- a

8   summary or a recitation of information that you've

9   reviewed --

14:39:26  10           A.   Background.

11           Q.   -- from other sources.

12           A.   Yes, background information.

13                     MR. WHITE:  Objection; form.

14           Q.   To the extent that at any point in your

14:39:33  15   report, paragraph 49 or elsewhere, to the extent

16   that the information that you incorporated in your

17   report was coming straight from a Ripple source,

18   did you take any steps to verify from an

19   independent source that that information was true?

14:39:54  20           A.   Well, as I mentioned, there are other

21   sources that refer -- now you specifically talk

22   about security.  But those statements that came

23   from Ripple, if these statements also were

24   amplified elsewhere, I kept them in.  If there was

14:40:07  25   a contradiction, I may have highlighted that

                                                        186

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:40:13  1    contradiction.

2        Q.   Okay.  So, again, I just want to get to

3    a methodological question.  One approach that you

4    might have taken would be to just accept as true

14:40:22  5    whatever is stated in Ripple sources.  Another

6    approach you might have taken is to not accept as

7    true anything that was stated in Ripple sources.

8    A third approach you might take is taking Ripple

9    sources and, if it's a Ripple-only source for that

14:40:35 10    information, trying to find an independent source

11    to verify the veracity of the Ripple source.

12            Do you understand the three scenarios

13    I'm setting out?

14        A.   Sort of.

14:40:43 15        Q.   Okay.  Did -- did you do the third

16    thing?  If -- if you were -- for instance, with --

17    going back to 49, when you're making a statement

18    in your report about improved security, did you --

19    did you search for any other independent source of

14:40:59 20    information about improved security of the XRP

21    Ledger independent of Ripple?

22                MR. WHITE:  Objection; form.

23        A.   In the context of this opinion, I was

24    not asked to render an opinion on the security of

14:41:11 25    the XRP Ledger.  I basically took the information

187

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:41:16  1  that was available and in aggregate used it in my

2  opinion on the innovation of Ripple -- of -- of

3  XRP and XRPL over the existing blockchain.

4      Q.   I hear you, but I -- I'm not sure

14:41:31  5  you're -- with all due respect, I'm just not sure

6  you're answering my question.  And -- and, again,

7  I'm just asking a question as to your method.

8  Let's keep it to paragraph 49.

9          For paragraph 49, you make a series of

14:41:44 10  statements about improved security.  I understand

11  from what you've said that you've drawn these

12  statements from other sources.  They're not your

13  expert opinion.  Correct?

14      A.   Mm-hmm.

14:41:53 15      Q.   Okay.  When you drew -- if you -- with

16  respect to 49, if any of the facts in 49 come from

17  Ripple sources, did you make any efforts to verify

18  the veracity of those facts in 49 from sources

19  independent of Ripple?

14:42:10 20      A.   I did not.

21      Q.   Okay.  Were there other occasions in

22  your report where you drew from -- strike that.

23          Were there other occasions in your

24  report where you set out in your report facts that

14:42:25 25  you obtained from your review of Ripple sources

188

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:42:27  1  and did not take any steps to independ --

2  independently verify the veracity of those facts?

3      A.   Is your question were there other places

4  where I did not do that?

14:42:39  5      Q.   Yes, exactly.

6      A.   You'd have to go to very specific

7  places.  So my -- what I was -- what I set to do

8  is to compare what was available about Ripple,

9  whether disclosed by Ripple or other parties,

14:42:56 10  relative to what the incumbent technology is.

11  That was actually the -- the objective of my -- of

12  my opinion, is to compare new versus incumbent and

13  take whatever aggregate information that I had to

14  actually compare these two.

14:43:13 15      Q.   Okay.  So from your perspective, you

16  didn't draw a distinction between whether or not

17  you learned information from a Ripple source or

18  from a non-Ripple source?

19              MR. WHITE:  Objection; form.

14:43:22 20      A.   Not necessarily, no.

21      Q.   Okay.  How -- how is a reader of your

22  report able to ascertain what portions of your

23  report are recitations of facts drawn from other

24  sources versus what portions of your report are

14:43:45 25  your expert opinion?

189

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:43:45  1                        MR. WHITE:  Objection; form.

2        A.   Well, when I have citations to sources,

3   then that is not my own original, I guess,

4   opinion.  It's just, using those sources, I have

14:44:14  5   to come to a conclusion:  How did the aggregate of

6   these sources and of that information gained from

7   these sources stack up against what the incumbent

8   technology is?  Which is kind of how we do,

9   generally, a business analysis for innovative

14:44:32 10  companies relative to companies that are already

11  in the market.

12        Q.   Right.

13             I -- I guess what I'm trying to

14  determine is for something like -- focusing on the

14:44:43 15  example of 49, improved -- improved security --

16        A.   Mm-hmm.

17        Q.   -- how can the reader of your report

18  tell whether or not you, as an expert, are opining

19  that the XRP Ledger constitutes a ledger with

14:44:56 20  improved security over preexisting technology

21  versus your adopting others' views that that's the

22  case?

23                        MR. WHITE:  Objection; form.

24        A.   Because the information is presented

14:45:17 25  regarding what the incumbent technology, bitcoin,

190

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

14:45:21  1   does or has or its speeds or its energy use or its

2   cost relative to what we know about the XRPL.

3            Now, when I cite, for example, that it

4   takes three to five seconds or four seconds on

14:45:40  5   average to, you know, validate a transaction, that

6   isn't only based on the Ripple source.  If I've

7   seen it elsewhere, then, you know, I'm comfortable

8   with that information.

9        Q.   Okay.  I hear you, but I'm -- I'm still

14:45:58  10   struggling with how is a reader of your report

11   able to differentiate between when you, an expert

12   retained to provide expert witness services, are

13   expressing your expert opinion versus when you're

14   reciting the fact -- facts or information as

14:46:18  15   stated from other sources?  Is there a way to do

16   that reading your opinion?

17            MR. WHITE:   Objection; form.

18        A.   What the reader will read is how the

19   XRPL compares to bitcoin.  And that is the level

14:46:44  20   of information that is necessary in my expert

21   opinion as long as the information is derived from

22   credible sources.

23        Q.   And how do we know that the information

24   is derived from credible sources without specific

14:47:00  25   citations, say, within paragraph 49?

191

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
14:47:03   1                    MR. WHITE:  Objection to
           2        form.
           3        A.   This paragraph 49 is really a
           4   descriptive overview of the security features.  It
14:47:22   5   is not an independent validation of the security
           6   features.
           7        Q.   It's not your independent expert --
           8        A.   It is not my --
           9                    (Indiscernible cross talk;
14:47:32  10        reporter requests one speaker.)
          11                    THE WITNESS:  Sorry.
          12        Q.   Shall I finish?  Is that okay?
          13        A.   Yeah.  I think you were paraphrasing me,
          14   but I don't know who was...
14:47:45  15        Q.   Actually, strike that.
          16             Did you have an answer you wanted to
          17   provide me?  I don't want to cut you off.
          18        A.   I provided aggregated information that
          19   was available, whether from Ripple sources or from
14:48:00  20   other sources, brought it together in this section
          21   where I was -- where I was asked to provide an
          22   opinion on whether XRP or XRPL was an innovation
          23   over bitcoin.  And is -- or a better bitcoin.
          24             And I used a number of features, looked
14:48:24  25   at a number of features.  I looked at speed.  Did
```

192

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:48:27  1   I independently verify the speed?  I did not

2   independently verify the speed.  I looked at

3   environmental -- environment -- energy use.  I

4   looked at cost.  At least cost as reported.  And I

14:48:45  5   looked at the security aspects.  But I did not --

6   as being four sort of aspects that XR -- that

7   Ripple with XRP and XRPL brought to the table.

8   And that's how I did the comparison.  But I didn't

9   do an independent analysis of that.  I just

14:49:13 10   aggregated the information in a different way to

11   allow us to compare between two blockchains.

12          And some of that is done in Table 1,

13   looking at features and attributes.  It's

14   different ways of presenting information that is

14:49:30 15   already out there to compare.  Is blockchain --

16   from a business perspective analysis.  This is not

17   a technical analysis.  It's an evaluation as a

18   business.  With the technology and products, did

19   the company present -- was XRPL an improvement

14:49:58 20   over existing blockchains?

21       Q.   Okay.  Prior to your engagement in this

22   case, had you ever made any statement regarding

23   the topic of decentralization as applied to the

24   XRP Ledger?

14:50:29 25       A.   No.

193

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:50:29   1        Q.   Okay.  Prior to your engagement in this

           2   case, had you ever considered the question of

           3   whether and to what extent the XRP Ledger was

           4   decentralized?

14:50:45   5        A.   No.  It was more about whether

           6   blockchains were decentralized.

           7        Q.   Prior to your engagement in this case,

           8   had you ever compared the relative

           9   decentralization of the XRP Ledger and bitcoin?

14:50:58  10        A.   Sorry, can you repeat that question?

          11        Q.   Sure.

          12             Prior to your engagement in this case,

          13   had you ever compared the relative

          14   decentralization of the XRP Ledger and bitcoin?

14:51:09  15        A.   No.  And I didn't do it in my engagement

          16   either.

          17        Q.   Okay.  Prior to your engagement in this

          18   case, had you ever compared the decentralization

          19   of the XRP Ledger to any other blockchain?

14:51:25  20        A.   I had not and there was also not

          21   directly a way to do that.

          22        Q.   Is it your view that there's no way to

          23   compare the decentralization of the XRP Ledger to

          24   any blockchain?

14:51:45  25        A.   That is my position in my rebuttal

                                                            194

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
14:51:50   1   report.
           2       Q.   Prior to your engagement in this case,
           3   had you ever read any statement about the
           4   centralization or decentralization of the XRP
14:52:06   5   Ledger?
           6       A.   I probably read it on websites, as in
           7   crypto websites.
           8       Q.   And what was it that you read?
           9       A.   Well, there's all sorts of discussion
14:52:24  10   forums on CoinDesk and, you know, crypto.com sites
          11   and whatnot on decentralization.  So that's sort
          12   of the level of, you know, knowledge and
          13   information that I looked at.
          14       Q.   Did you read any articles specific to
14:52:41  15   the topic of the decentralization of the XRP
          16   Ledger?
          17       A.   Articles?  Do you mean any information
          18   that is available online?
          19       Q.   I do.
14:52:57  20       A.   I probably did, yes.
          21       Q.   And what was -- what was the -- strike
          22   that.
          23            Did the articles that you read take the
          24   position that the XRP Ledger was or was not
14:53:10  25   decentralized?
```

195

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:53:13  1      A.   Before this case, at that time I wasn't

2    looking at this from that perspective.  I was

3    looking from the perspective of being on the

4    advisory board of a fund and having to evaluate a

14:53:23  5    bunch of different FinTech companies and looking

6    at, you know, what do we know about FinTech

7    companies, the blockchains they operate on.  You

8    know, what's being said about centralization and

9    decentralization.  More at that level, not

14:53:38 10    specific to XRP or specific to...

11           So I didn't really take a position.

12      Q.   Prior to your engagement in this case,

13    were you aware of any statements by Ripple about

14    the centralization or decentralization of the XRP

14:53:56 15    Ledger?

16      A.   Prior to the case?

17      Q.   Prior to your engagement in this case.

18      A.   I didn't follow that level of detail,

19    no.

14:54:26 20      Q.   Let's go to your rebuttal report,

21    Exhibit 2, please.  Going to paragraph 36, which

22    is on page 20 and 21.  And I'm looking just at the

23    last sentence of paragraph 36, which says "Each of

24    these features of the XRP Ledger offer

14:55:18 25    incentives - for example, to payment processors

196

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:55:20  1  who want to ensure their transactions clear more

2  quickly and cheaply than on the bitcoin or

3  Ethereum blockchains and therefore have an

4  incentive to ensure the XRP Ledger continues to

14:55:28  5  exist."

6          Do you see that?

7      A.   I see that.

8      Q.   Is this sentence an example of

9  information that you sourced from elsewhere or is

14:55:35 10  this your expert opinion?

11              MR. WHITE:   Objection; form.

12      A.   So we have to go back to the purpose of

13  the rebuttal report, in which case I wear my

14  academic hat because this is a discussion in the

14:56:07 15  scientific literature as to what the meaning of

16  decentralization -- what the definition is, how

17  you measure it, or what the metrics are that would

18  describe it.  How you measure it.  How -- what the

19  purpose is or what the role is of incentives,

14:56:30 20  whether incentives need to be economic incentives

21  or not economic incentives.

22          And I read all the papers that I

23  sourced, all the papers that are cited on that and

24  understood from, I believe in this case, the --

14:56:45 25  starting with the -- was that the side paper?

197

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:56:50   1   Let's see.  I'll have to reread this paragraph, by

2   the way.

3              Even when you look at the Troncoso

4   papers, some of the other papers for discussion,

14:57:30   5   there was discussion around -- this was specific

6   around incentives, right.  This paragraph that

7   you're referring to is a paragraph around

8   incentives.  And my opinion on Dr. ███████

9   report as to whether these incentives and protocol

14:57:52  10   incentives are necessary to build a successful

11   decentralized system.

12              So I set out to test that assertion by

13   reading papers in the academic literature.  And

14   based on these papers in the academic literature

14:58:07  15   that say it doesn't have to be one in protocol

16   incentive and it doesn't necessarily need to be an

17   economic incentive.  The -- so that's a big part

18   that led into this sentence.

19              Second, practically, I'm advisor to a

14:58:27  20   blockchain company called Blockchain Triangle that

21   operates on a -- on a blockchain.  And working

22   with them, the question is, also, do participants

23   need to be economically incentivized, as I said?

24   Now it's all about risk management.  So they want

14:58:43  25   to keep a blockchain live for risk management or

198

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:58:50 1    reputational reasons.

2            The University of Michigan, as I

3    mentioned to you earlier, we actively -- we do not

4    actively run a node.  We're not paid to run a

14:59:01 5    node.  We're not compensated to run a node.  We're

6    actually not running it.  But the research that is

7    happening on the XRP and XRPL might incentivize

8    some of the researchers that are working in the

9    space to actually fund and be active on the

14:59:18 10   operations of the validator node.  So that's what

11   I'm saying.  It doesn't have to be a strictly

12   protocol economic incentive.

13       Q.   Do you -- sorry, go ahead.

14       A.   Yeah.  Sorry.

14:59:32 15      Q.   You said the University of Michigan is

16   no longer running a node on the XRP Ledger, is

17   that right?

18       A.   We maintain the node.  We do not

19   actively participate in the validation process.

14:59:45 20      Q.   I see.

21            And that's true today?

22       A.   That is true today.

23       Q.   Okay.  I want to focus you back on the

24   last sentence of paragraph 36.

14:59:55 25      A.   Mm-hmm.

199

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

14:59:55  1      Q.   Do you know whether payment processors

2   clear transactions on the XRP Ledger?

3      A.   I think you'll have to be more specific

4   as in which payment processor.

15:00:17  5      Q.   Well, that's actually my question to

6   you, Professor.  So I'm trying to find the basis

7   for this assertion that "for example, to payment

8   processors who want to ensure their transactions

9   clear more quickly and cheaply than on the bitcoin

15:00:31 10   or Ethereum blockchains."

11           What payment processors are you

12   referring to in your rebuttal report?

13      A.   It's more of a general statement here.

14      Q.   What's the basis for -- I'm sorry.  Go

15:00:45 15   ahead.

16      A.   I was done.

17      Q.   Oh, okay.

18           What's the basis for the statement that

19   "payment processors who want to ensure their

15:00:57 20   transactions clear more quickly and cheaply than

21   on bitcoin or Ethereum" have an incentive to use

22   the XRP Ledger?

23      A.   I believe it's in the context of the

24   fact that they need XRP to clear their

15:01:44 25   transactions.

200

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:01:46  1       Q.   Okay.  But how do you know that?

       2       A.   Based on some of the examples that I

       3    looked at at -- at the end of my first report.

       4       Q.   If you look at the paragraph 36 of your

15:02:00  5    rebuttal report, you can see there's -- there's

       6    not a footnote to that sentence and -- and that's

       7    why I'm inquiring.

       8            What's -- what's the source of that

       9    information?

15:02:38 10       A.   You're right, there is no source cited

      11    here and that's sloppy.  I didn't refer back to my

      12    first report where I identified some of the use

      13    cases, some of whom were payment processors.

      14       Q.   I see.

15:02:58 15       A.   And I did not carry that over.

      16       Q.   And which -- which payment processors

      17    from your first report are you referring back to

      18    at the end of paragraph 36 of your rebuttal

      19    report?

15:03:13 20       A.   I did not refer back to a specific

      21    payment processor, but just payment processor as

      22    an exemplar on a use case.

      23       Q.   I see.

      24            Do you know whether payment processors

15:03:22 25    use the -- the XRP Ledger to clear their

                                                      201

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
15:03:23   1    transactions today?
           2         A.    If they accept XRP?
           3         Q.    Okay.  But do you -- I'm sorry, maybe --
           4         A.    Are you looking for names or --
15:03:51   5         Q.    Yeah.  Let's just start with yes or no.
           6               Do you know whether payment processors
           7    use the Ledger, the XRP Ledger, to clear their
           8    transactions today?
           9         A.    I'm going to have to check into that.
15:04:05  10         Q.    Okay.  So that means you're not sure one
          11    way or the other sitting here today?
          12         A.    I'm clearly not certain --
          13         Q.    Okay.
          14         A.    -- whether they use the XRP or the XRPL,
15:04:16  15    yeah.
          16         Q.    Can we look at Exhibit 3, please?
          17                    (Whereupon, exhibit is
          18               received and marked SEC Adriaens
          19               Exhibit 3 for identification.)
15:04:32  20                    MR. SYLVESTER:  Thank you
          21               very much.
          22    BY MR. SYLVESTER:
          23         Q.    Exhibit 3, Professor, is Dr. ███████
          24    report dated October 4th, 2021.  And my question
15:04:48  25    for you is going to be on page 26 of his report.
```

202

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:04:54  1        A.    Page 26?

          2        Q.    Yes.

          3              On page 26, do you see that Figure 1,

          4    which is entitled "Ripple validators and

15:05:12  5    validators operated by entities funded by Ripple,

          6    given as a fraction of the dUNL membership over

          7    time"?

          8        A.    I see that.

          9        Q.    I believe you -- you did not comment on

15:05:26 10    this figure in your rebuttal report, is that

         11    correct?

         12        A.    I would have to check.

         13              (Pause)

         14        A.    I finally found the link here.  Sorry.

15:07:17 15              I believe I did not specifically cite

         16    Figure 1 in my rebuttal report.

         17        Q.    Okay.  And sitting here today, do you

         18    have any reason to dispute the data that's

         19    displayed in Figure 1?

15:07:28 20                        MR. WHITE:  Objection; form.

         21        A.    I have not verified these data, so I

         22    wouldn't know.

         23        Q.    Right.  I'm not asking you to

         24    affirmatively agree with the data.  I'm asking if

15:07:46 25    you have any reason to dispute the data displayed

                                                              203

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

15:07:48  1    in Figure 1.

2                        MR. WHITE:  Objection; asked

3                and answered.

4        A.   I don't really have the technical

15:07:58  5    background to assess whether or not this is

6    correct or not.

7        Q.   Okay.  If -- let me pose a hypothetical

8    then.

9                Let's say there was a period where

15:08:14 10    Ripple controlled 100 percent of the validators

11    that were on Ripple's UNL.

12                Did Ripple then, as a practical matter,

13    control the validation of the transactions on the

14    XRP Ledger?

15:08:24 15                        MR. WHITE:  Objection; form.

16        A.   It's a hypothetical, of course, so one

17    would have to speculate.

18        Q.   You're permitted to speculate.

19        A.   Under those conditions and not knowing

15:08:45 20    anything else, they would control -- what was the

21    question again?  Do they --

22        Q.   I -- sorry.  Go ahead.  Did you want me

23    to reask it?

24        A.   Oh, yeah, if you could reask it.

15:09:03 25        Q.   Of course.

                                                         204

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:09:03  1         The hypothetical is, let's say there was

2    a period where Ripple controlled 100 percent of

3    the validators that were on Ripple's UNL.

4         Did Ripple, then, as a practical matter,

15:09:11  5    control the validation of the transactions on the

6    XRP Ledger?

7         A.   I don't know what the meaning of

8    "control" is in this hypothetical and how that

9    would be impacted by the protocol, the validation

15:09:29 10    protocol, so it would be hard for me to give a

11    yes-or-no answer to that.

12         Q.   Let's assume that the XRP Ledger for

13    this hypothetical works the way it works as you

14    described earlier, that it's 80 percent majority

15:09:46 15    voting.

16         A.   Mm-hmm.

17         Q.   And Ripple controls 100 percent of the

18    validators.

19         So under those circumstances, does

15:09:53 20    Ripple, as a practical matter, control the

21    validation of transactions on the XRP Ledger?

22              MR. WHITE:  Objection; form,

23         calls for speculation.

24         A.   Do you also assume -- I mean, what are

15:10:05 25    the other assumptions in that?  Are there other

205

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:10:08   1   UNLs?

2        Q.   Let's say that's the UNL that the nodes

3   are -- have selected as the UNL they use.

4                  MR. WHITE:   Objection.

15:10:25   5        A.   So you're assuming there's only one UNL

6   and Ripple controls 100 percent of all the

7   validators in the UNL?

8        Q.   That's exactly right.

9        A.   As a hypothetical.

15:10:35  10        Q.   That's -- that's correct.   That's my

11   hypo.

12                  Under those circumstances, does Ripple,

13   as a practical matter, control the validation of

14   transactions on the XRP Ledger?

15:10:43  15                  MR. WHITE:   Objection to

16              form; calls for speculation.

17        A.   Of course my answer would be

18   speculative, but it would appear yes, while

19   knowing that that is not the case.

15:11:02  20        Q.   What do you mean, "while knowing that is

21   not the case"?

22        A.   You're referring to 100 percent control

23   and there being only one UNL.

24        Q.   Those are the terms of my hypothetical,

15:11:12  25   that's right.

                                                        206

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:11:14    1        A.    Those are the terms of your

            2    hypothetical.   Okay.

            3        Q.    Let's go to your original report again.

            4    Let's start with Appendix C.

15:11:57    5                      MR. WHITE:   If we're moving,

            6              going to a new topic, would now be a

            7              good time for a break?

            8                      MR. SYLVESTER:   Sure.   That's

            9              fine.

15:12:03   10                      MR. WHITE:   All right.

           11                      THE VIDEOGRAPHER:   Off the

           12              record.   The time is 3:13.

           13                      (Whereupon, a recess is taken.)

           14                      THE VIDEOGRAPHER:   We'll go

15:36:43   15              back on the record.   The time is 3:38.

           16    BY MR. SYLVESTER:

           17        Q.    Professor, let's turn to page 8 of your

           18    expert report, Exhibit 1.

           19        A.    Page 8?

15:37:02   20        Q.    Yes.

           21        A.    Okay.

           22        Q.    Paragraph 19 where it says "Opinion 1."

           23              Do you see that?

           24        A.    Yes.

15:37:07   25        Q.    And your opinion here is "The XRP Ledger

                                                                207

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:37:10  1    and its native currency, XRP, represented an

2    important innovation in blockchain technology."

3         Do you see that?

4         A.   Yes.

15:37:17  5    Q.   Before the break we were talking about

6    various aspects of the XRP Ledger as to which you

7    gathered information from sources --

8         A.   Mm-hmm.

9         Q.   -- such as speed, cost, environmental

15:37:32 10    impact, security.

11        Do you recall that conversation?

12        A.   Yes, I do.

13        Q.   Okay.  My question is, are those the

14   factors that you considered when you concluded for

15:37:43 15   your Opinion 1 that the XRP Ledger in its nature

16   currency, XRP, represented an important innovation

17   in blockchain technology?

18        A.   These were factors I considered, yes.

19        Q.   Okay.  And as to -- strike that.

15:38:05 20        As to those factors -- the speed of the

21   Ledger, the cost of transactions, the

22   environmental impact of the Ledger and the

23   relative -- the security of the Ledger, of the XRP

24   Ledger, versus other blockchains -- those are all

15:38:17 25   topics on which you don't have your own

208

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:38:22  1    independent expert opinion but, rather, read the

2    sources cited in your report and have recited what

3    you read, is that right?

4                    MR. WHITE:  Objection; form.

15:38:34  5        A.   Yes.  I aggregated information that was

6    available on the XRPL, yeah.

7        Q.   As to any of those factors -- speed,

8    cost, environmental impact, security of the XRP

9    Ledger -- was there ever any dispute in the

15:38:50 10    sources that you reviewed?  For instance, was

11    there any article that said, well, actually, the

12    XRP Ledger is less secure than bitcoin?

13                    MR. WHITE:  Objection; form.

14        A.   Oh, okay.  Was there any -- sorry, what

15:39:07 15    was the question?

16        Q.   Was there any dispute among the sources

17    as to any of these factors?  And my example was --

18    was, did you ever look at a source that said,

19    well, the XRP Ledger is actually less secure than

15:39:18 20    bitcoin?

21                    MR. WHITE:  Objection; form.

22        A.   Specifically on security, I believe

23    there is the paper of Chase and MacBrough,

24    nonpeer-reviewed paper, I believe, that refers to

15:39:36 25    that.  But, again, I did not do an independent

                                                         209

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:39:39   1    analysis as to which assertion was the correct

2    assertion.  When I look at important innovations,

3    we look at a new product that comes in the market,

4    in what extent and in what characteristics is it

15:39:57   5    superior to existing products.

6              So from a -- a VC/business analyst, you

7    very often look at a -- sort of a commonly used,

8    how should I say, metric in discussions among

9    venture capitalists is, oh, can we achieve a 5 or

15:40:14   10   a 10x improvement?

11             I do not cite a 5 or 10x.  It's just

12   sort of a common way of looking at this.  Is it

13   five times faster? ten times faster?  Order of

14   magnitude is always an important sort of metric in

15:40:28   15   the business community, in the venture community,

16   and I looked at it more from that perspective.

17             Of course on securities, we can't talk

18   about order of magnitude.  It's not a -- can't be

19   metricized.  In fact, it can't even -- can't even

15:40:40   20   be well measured.

21             And, so, yes, I was aware of Chase and

22   MacBrough paper.

23        Q.   And the Chase MacBrough paper expresses

24   the opinion that the XRP Ledger is actually less

15:40:54   25   secure than bitcoin, is that right?

210

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:40:57  1      A.   To my recollection -- and, again, I'm

2   not a technical expert in analyzing security

3   issues on blockchains -- it was that there are

4   conditions under which there might be problems

15:41:12  5   with the server -- with the -- with the

6   blockchain.  Sorry.

7      Q.   So in -- in reaching the conclusion

8   within your paragraph 49 that the XRP Ledger

9   represented improved security, how was it that you

15:41:28 10   chose to disregard the concerns set forth in the

11   Chase MacBrough paper?

12           MR. WHITE:  Objection; form.

13      A.   Well, at the time when the XRP Ledger

14   was introduced in the market, there was only

15:41:49 15   bitcoin and there had been some issues with

16   exchanges, with an exchange Mt. Gox, I believe, or

17   around that time.  There had been issues with 51

18   percent of tax.  And the argument was, at least in

19   some of the readings that I did, that the

15:42:06 20   federated consensus mechanism that Ripple

21   deployed -- that -- sorry, that XRP uses is less,

22   I guess, vulnerable to that type of attack.  And I

23   used that.

24           And the other one, Chase and MacBrough

15:42:36 25   paper, I used a little more as context to know

211

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:42:44  1    about it.

          2                    THE REPORTER:  I used the?

          3                    THE WITNESS:  Sorry.

          4         A.   The Chase and MacBrough paper, I used

15:42:44  5    that more as background to know about the

          6    concerns.

          7              I, actually, want to go back to the

          8    discussion we had before our break.  One of the

          9    lines that you asked, where you asked me what's

15:42:54 10    the citation to that regarding the a priori

         11    agreements --

         12         Q.   Mm-hmm.

         13         A.   -- in the security, I did not

         14    double-check it, but thinking about it, that might

15:43:07 15    have been the Chase and MacBrough or related to

         16    that paper.

         17         Q.   Okay.

         18         A.   So I did take it into account in my

         19    considerations.

15:43:17 20         Q.   And -- and how -- do I understand

         21    correctly that the Chase MacBrough paper outlined

         22    weaknesses in security of the XRP Ledger?

         23                    MR. WHITE:  Objection to

         24              form.

15:43:34 25         A.   Again, I'm not a -- it's a very highly

                                                               212

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:43:36  1    technical paper and I -- I do not have that level

2    of technical background to do that kind of

3    analysis. But reading the conclusions of that

4    paper, they argued that under certain conditions,

15:43:45  5    there might be security issues or problems with

6    the Ledger. But I cannot independently verify

7    that, so I decided to look at what most sites and

8    most reports around the XRPL we're talking about,

9    which was that it did appear to not have that

15:44:06  10   vulnerability, that 51 percent tax as sort of an

11   added security as a different consensus metric.

12   Different consensus method.

13          But, again, we have to look at not each

14   of them separately. It's really the aggregate.

15:44:24  15   Again, when we discuss where the innovations are,

16   we write reports where innovations are with new

17   companies, digital companies, FinTech or

18   otherwise. We discuss what is -- what the current

19   baseline is in the market and what these new

15:44:40  20   companies are capable of achieving relative to

21   that and, therefore, what their potential market

22   opportunity is.

23          And I looked at a subset of features

24   that have come up in these discussions like the

15:44:53  25   ones you just iterated.

213

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:44:54  1      Q.   Was your -- was the Chase MacBrough

       2  paper part of that baseline of the market views on

       3  how secure the XRP Ledger was vis-a-vis other

       4  blockchains?

15:45:10  5      A.   Well, the Chase and MacBrough, I forgot

       6  where that is published -- was published.  I'm

       7  going to have to look that up relative to the

       8  innovation that existed at the time when the XRP

       9  Ledger was introduced to the market.  So probably

15:45:25 10  I did not take it explicitly into consideration.

      11  As I said, it isn't just about security.  It's

      12  about all -- the aggregate of all of these

      13  benefits.

      14      Q.   Setting aside the Chase MacBrough paper,

15:45:38 15  were there other instances where a source that you

      16  read expressed the view that on any of the factors

      17  you listed -- speed, cost, environmental impact or

      18  security -- the XRP Ledger was actually inferior

      19  to other blockchains?

15:46:06 20      A.   You mean on speed, cost, and energy

      21  benefits?  It was inferior to other blockchains?

      22      Q.   Yes.

      23      A.   I have not come across a reference that

      24  would state that.

15:46:17 25      Q.   How did you select the sources that you

                                                          214

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

15:46:19  1  reviewed to inform your views about what the

2  market opinion was about the speed, cost,

3  environmental impact, or security of the XRP

4  Ledger?

15:46:35  5      A.   Keyword searches.  Use cases I looked at

6  that selected the XRP or XRPL, for example,

7  because of their environmental -- its

8  environmental benefits or costs.  So we have -- I

9  mean, there were -- it's not academic literature.

15:46:58  10  In that case it is information that is out there

11  in the cryptosphere.  And overwhelmingly what I

12  came across were these benefits.

13      Q.   When you say "keyword searches," do you

14  mean Google searches?

15:47:13  15      A.   Yes, among others.  Google searches,

16  Ripple reports, Insights, crypto.com.  You know,

17  those types of websites that evaluate and look at

18  cryptocurrencies and blockchains.  CoinDesk,

19  Medium.

15:47:34  20      Q.   Did you make any attempt to seek out

21  sources on these topics that might have been

22  skeptical of Ripple or XRP Ledger?

23                  MR. WHITE:  Objection to

24           form.

15:47:49  25      A.   I would have assumed that negative

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:47:53 1    reports would have come out with the same

2    searches.

3         Q.   With the keyword searches?

4         A.   Yes.

15:47:59 5         Q.   Okay.  Understood.

6              But just to make sure I understand the

7    answer to my question, did you -- did you take any

8    affirmative steps to try to seek out sources that

9    might have been skeptical about these features

15:48:10 10   about the XRP Ledger?

11                  MR. WHITE:  Objection; form.

12        A.   I wouldn't know how to go about doing

13   that.  When I look at sources that say how this

14   XRPL compared to other blockchains -- I mean, in

15:48:24 15  this case, it would have been just bitcoin, right,

16   because that was the only one that was antecedent.

17             There was nothing that came -- that came

18   up, I guess, that would refer to that negative

19   effect.

15:48:41 20        Q.   Okay.  Let's go to your Appendix C,

21   please.

22             Professor, do you know who created this

23   list that appears as Appendix C?

24        A.   It was -- I requested the lists, as I

15:49:13 25  mentioned earlier, that was referred to in the

216

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:49:16  1   Wells report that I referred earlier.  I had

2   information myself of radio news cases and I

3   requested from counsel whether there is a list,

4   either the list that was referred to in the Wells

15:49:31  5   report or otherwise, available for me to take a

6   look at.

7       Q.   Okay.  But do you know who -- who

8   actually drafted this list?

9       A.   No.

15:49:46 10       Q.   Column 2 on the list says "Category."

11           Do you see that?

12       A.   Yes.

13       Q.   Is that the category of company that's

14   listed under the "Entity Name" column?

15:50:00 15       A.   Yes.  Sometimes we call category primary

16   use case.  That's how I refer to it in -- in -- in

17   my report.  It's sort of the industry or the use

18   case that gets that.

19       Q.   That -- that was my question about

15:50:15 20   actually the distinction between the category of

21   company and the use case.  And why this brings to

22   mind is on the very top of the second page of

23   Appendix C --

24       A.   Mm-hmm.

15:50:27 25       Q.   -- I'm sorry, I don't know how to

217

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:50:28   1   pronounce the name.  It looks like Beliani.

2          Do you see that?

3      A.   I'm sorry, where?

4      Q.   The very top of the second page of

15:50:37   5   Appendix C.

6      A.   Beliani, yeah.

7      Q.   Okay.  And do you see how the category

8   listed is "Furniture"?

9      A.   Yes.

15:50:46   10      Q.   So, clearly, I think we can agree that

11   XRP can't be used as furniture?

12          MR. WHITE:  Objection; form.

13      A.   Of course not.

14      Q.   The Ledger can't be used as furniture?

15:50:54   15      A.   No.

16      Q.   Okay.  So --

17      A.   It's the market.  It's -- essentially

18   the category is the market.  What is the market

19   you're trying to attract, that the use case tries

15:51:05   20   to address?

21      Q.   Okay.  So I -- what should I take from

22   the designation of furniture for the Beliani

23   entry?

24      A.   Purchasing.  It's an e-commerce company,

15:51:19   25   I believe.  I haven't looked at this one recently,

218

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:51:21  1   but what -- what I would take away -- I'm going to

2   have to look at it again -- is that one could

3   purchase furniture with XRP in the context of this

4   use case.

15:51:34  5        Q.   Okay.  And is it -- is that connection

6   that you just made, that one could purchase

7   furniture from Beliani using XRP, is that set out

8   anywhere in your report?

9        A.   No, that is based on going on to the

15:51:56 10   website of those -- of that company.

11        Q.   Okay.  I have one question about the

12   relationship between Appendix C and Appendix D.

13        A.   Yes.

14        Q.   So if you look at Appendix D, there's a

15:52:13 15   second column that's unlabeled.

16             Do you see that?

17        A.   Yes.

18        Q.   It just starts with "uConektPAY," the

19   first entry.

15:52:21 20             Is that second column in Appendix D a

21   copy of the category listed in Appendix C?

22        A.   That would be the category or the -- the

23   market, yeah.

24        Q.   Okay.

15:52:30 25        A.   Yeah.

219

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:52:30  1      Q.   But I guess what I'm trying to say is
         2   did -- did you copy over the category listed in
         3   Appendix C into the second column of Appendix D?
         4      A.   I believe so, but I first did go to the
15:52:54  5   website of that company to see whether they were
         6   actually in that industry or in that category.
         7      Q.   Okay.  Going back to Appendix C -- and
         8   we'll get to your work that Appendix D represents,
         9   but I just want to focus on C.
15:53:21 10           In order for a company to be included on
        11   this list of use cases, does there have to be a
        12   use for XRP or the XRP Ledger that actually exists
        13   in the world or is it possible that some of these
        14   use cases are theoretical or in development?
15:53:39 15      A.   For this list?
        16      Q.   For Appendix C.
        17      A.   I went in with the assumption when I
        18   initially received it that they were use cases,
        19   either current or may have had or -- or
15:53:56 20   potentially they're exchanges; had XRP -- use of
        21   XRP or XRPL.  But my analysis was done then on
        22   analyzing these use cases.
        23      Q.   Okay.
        24      A.   Assuming this to be true, then let's go
15:54:12 25   validate and verify that in my own analysis.

                                                        220

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:54:18  1        Q.   Did counsel ask you to assume that this

       2   list of use cases in Appendix C was a list of

       3   genuine use cases for XRP or the XRP Ledger?

       4        A.   They didn't have me assume anything.

15:54:34  5        Q.   Okay.  When you say "I went in with the

       6   assumption when I initially received it that they

       7   were use cases, current or potentially if they're

       8   exchanges," that was just an assumption you

       9   generated on your own?

15:54:45 10        A.   A starting -- that's right.  Starting

      11   assumption.  Starting hypothesis I was going to be

      12   testing, yes.

      13        Q.   Okay.  And then some subset of Appendix

      14   C is also listed in Appendix D, is that right?

15:55:01 15        A.   Sorry, a subset of?

      16        Q.   Of C.

      17        A.   Is in D.

      18        Q.   Okay.

      19        A.   Yes.

15:55:08 20        Q.   So if we just focus on the Appendix C

      21   and we carve out anything that's listed on

      22   Appendix D, did you take any steps to verify

      23   whether those use cases that appear only on

      24   Appendix C actually were genuine use cases for XRP

15:55:27 25   or the XRP Ledger?

                                                             221

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:55:34   1      A.   So your question is, did I look at the

2   use cases that remained after I extracted Appendix

3   D from Appendix C?

4      Q.   Right.   I think I understood your

15:55:44   5   testimony earlier to be that you took a number of

6   steps to --

7      A.   Yes.

8      Q.   -- examine the use cases with respect to

9   D.

15:55:50  10      A.   Mm-hmm.

11      Q.   So I'm saying if you take out the -- the

12   companies listed on D from C, did you do any

13   independent analysis of the remaining companies on

14   C?

15:56:02  15      A.   I did not.

16      Q.   Okay.

17      A.   Which meant that either -- that they

18   could still -- that they could also be use cases

19   that were nonequity investment use cases.

15:56:18  20      Q.   Sure.   You just don't know one way or --

21   sorry.

22      A.   Yes.

23      Q.   You just don't know one way or the other

24   because you didn't look into it, is that right?

15:56:25  25      A.   I didn't validate or verify each of the

                                                     222

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:56:28  1    companies with respect to the use, XRP or XRPL.

2         Q.   Okay.  Let's turn to paragraph 124 of

3    your Exhibit 1.  That's page 64.

4         A.   Sorry, where are we looking?

15:56:59  5         Q.   Page 64 of your opening report.

6         A.   Yes.

7         Q.   Okay.  So in paragraph 124, the first

8    bullet, the last sentence, you say "I rely on

9    Crunchbase because it is a leading firm that, in

15:57:18 10    my experience as an expert in this space, is a

11    reliable source of information regarding whether

12    particularly innovative firms received equity

13    funding."

14         A.   Right.

15:57:26 15         Q.   Do you see that?

16         A.   Yes.

17         Q.   Okay.  Is it a generally accepted view

18    in your field that Crunchbase is a reliable source

19    of information regarding whether particularly

15:57:36 20    innovative firms received equity funding?

21              MR. WHITE:  Objection; form.

22         A.   Crunchbase is a reliable database to

23    find equity funding on companies and the implicit

24    assumption for equity financing of companies is

15:58:02 25    that they're reviewed and, sort of, verified in

223

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:58:07  1    the market to have innovative value propositions.

2    So that's why I conflated these two concepts.

3           Crunchbase probably doesn't say

4    particularly innovative firms receive equity

15:58:19  5    funding, define that here.  They probably don't

6    say it like that.  This is my own wording.

7           Q.   In your last answer when you say you

8    conflated the two concepts, you mean you conflated

9    the concepts of particularly innovative firms with

15:58:31 10    firms that received equity funding?

11           A.   Right.  So companies that receive equity

12    funding often are viewed as being companies with

13    substantial growth potential and market traction

14    in the industry or in the markets that they're

15:58:46 15    trying to address.

16           Q.   Okay.  So let's move on to the second

17    bullet.

18           So will you walk me through, again, what

19    steps exactly you took with respect to any dates

15:58:59 20    to arrive at the subset of companies on Appendix

21    C?

22           A.   Right.  So, again, going back over Step

23    Number 1, having been given a list of 660, I --

24    and not having had the time to look at each of the

15:59:16 25    660 separately, I said let's look at those that

224

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

15:59:20  1    are considered by the industry with sort of a

2    market validation of equity financing.  So at

3    least I have a subset of those.

4              So then I looked at that subset.  And I

15:59:34  5    said, okay, now the question is, did that subset

6    of growth companies with at least market indices

7    that they are growth companies, what -- did they

8    have access or when would they have access to XRP

9    or XRPL?  And they couldn't have had access to XRP

15:59:56 10    or XRPL -- XRPL until after 2013, roughly.

11             And that's why I used the founding date

12    of Ripple as a cutoff.  I said, okay, let's look

13    first at all the companies founded after 20 --

14    2013 and having received equity financing.

16:00:21 15    Because in those equity comp -- those

16    equity-financed companies had access to -- or let

17    me -- at that time XRP and XRPL were in the

18    market.

19             The second step, then, was -- because

16:00:38 20    that filters out a subset of companies.  Actually

21    filters out -- let's see.  153 companies were

22    founded after -- so 153 companies were founded

23    after Ripple, Ripple's incorporation.  I guess

24    they used 2012, not 2013.  Of those founded after

16:00:58 25    Ripple's incorporation, instead of 91 use cases,

225

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:01:02  1   it's actually 83.  I think that was the other

2   modification we talked about this morning.  It's

3   83 use cases had equity investment data of those

4   companies founded after 2012.

16:01:16  5        Then I looked at all the remaining

6   companies that had equity financing that were

7   older than Ripple, incorporated before Ripple, but

8   where the equity financing didn't happen until

9   after the founding date of Ripple.  So only --

16:01:33 10   that's -- and that's about eight companies.

11        So basically now we have 83 plus 8 is 91

12   use cases.  91 use cases are 83 companies with

13   equity -- that were founded after Ripple's

14   founding and received equity financing, and the

16:01:52 15   additional eight are companies founded before

16   Ripple that received equity financing after

17   Ripple's founding.

18        And that's the total -- the list

19   total -- that's the methodology I applied and

16:02:05 20   that's the list that is in Appendix D.

21        Q.   Okay.  I think I followed that.

22        Whenever you used the phrase "equity

23   funding" in that answer, you're referring to your

24   use of Crunchbase to see which companies received

16:02:22 25   equity funding, that's correct?

226

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:02:24  1    A.   That's correct, yes.

2    Q.   Okay.  Did you -- as to any of the 91

3    companies, did you make any attempt to ascertain

4    whether or not the equity funding the companies

16:02:42  5    received had anything to do with the company's

6    engagement with XRP or the XRP Ledger?

7    A.   No, that was not material to my

8    analysis.  I wanted to find high-growth companies

9    that are after 2012, of being the cutoff date,

16:03:08  10   using either XRP or XRPL.  But it is not material

11   whether they got the financing because of XRP or

12   XRPL.  What I want to find is fast-growing

13   companies in the market that are using XRP or

14   XRPL, which even by itself is a validation of XRP

16:03:28  15   and XRPL as a useful currency in the market and

16   technology in the market.

17   Q.   So in your view, it would not be more

18   persuasive to demonstrate that the company

19   received funding because of some use of XRP or the

16:03:48  20   XRP Ledger?

21            MR. WHITE:  Objection; form.

22        No question.  Mischaracterizes

23        testimony.

24   A.   It -- it is impossible to ascertain that

16:04:02  25   relationship or correlation, but also was not

227

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:04:05  1    material to my analysis.  So my analysis was, can

2    you identify high-growth companies or companies

3    that are viewed to be high growth with a market

4    presence in different industry sectors that use

16:04:20  5    XRP or XRPL?

6              And the fact that they continued to get

7    equity funding after the founding o Ripple and,

8    therefore, and the availability of XRP and XRPL in

9    the market, is an indicator of broad market

16:04:40 10    adoption.

11         Q.   Okay.  You said it's impossible to

12    ascertain any relationship or correlation between

13    the funding received by these companies and their

14    engagement with XRP or the XRP Ledger, is that

16:05:02 15    right?

16         A.   The problem is that we would be looking

17    at a causality which is -- yes, based on my

18    experience, venture funds looking at equity

19    finance companies, very difficult to ascertain.

16:05:23 20         Q.   Okay.  I understand you said it's very

21    difficult, but did you try?

22         A.   It was not material to my analysis.

23         Q.   And so because it was not material to

24    your analysis, you didn't take any steps to try to

16:05:46 25    find any link between the funding and the

228

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:05:48  1    company's use of XRP or the XRP Ledger, is that

2    fair?

3          A.    That's fair.

4          Q.    Okay.  Would you agree that if companies

16:06:05  5    were funded prior to any engagement with XRP or

6    the XRP Ledger, that engagement could not have

7    been a factor in receipt of the funding?

8          A.    Can you rephrase that?  I'm not sure I

9    understand.

16:06:22 10          Q.    Sure.

11                Let's use a hypothetical.  Let's say a

12    company was -- received equity funding in 2014 and

13    that company didn't have anything to do with XRP

14    or the XRP Ledger until 2018.

16:06:36 15                I think under your rubric, that company

16    would be included within Appendix D, is that

17    right?

18                      MR. WHITE:  Objection; form.

19          A.    It would -- sorry.

16:06:46 20                      MR. WHITE:  Go ahead.

21          A.    It would be.

22          Q.    Okay.  And so I'm just saying in that

23    circumstance, in that hypothetical, there's no

24    basis to conclude that the funding in 2014 had

16:06:56 25    anything to do what -- whatsoever with the

229

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:06:58    1    company's use of XRP or XRP Ledger in 2018?

2                        MR. WHITE:  Objection to

3            form.

4        A.   Again, which is -- which is not material

16:07:06    5    to my analysis.  The analysis, do high-growth

6    companies use XRP as part of -- do they leverage

7    XRP or XRPL as part of their business model?  Even

8    if they used 15 or 20 other currencies and one of

9    them happens to be XRP, it doesn't matter.  It is

16:07:28   10    a high-growth company and, therefore, becomes a

11    validation of the use of XRP in the market.

12        Q.   Okay.  So the --

13        A.   The funding time point in the --

14    adoption time point of that company of XRP or XRPL

16:07:42   15    are not material to this -- to this process.

16        Q.   I -- I'm sorry.  Go ahead.

17        A.   Yes.

18        Q.   I totally hear you that it's not

19    material, but I just want to see if you agree with

16:07:56   20    my hypothetical.

21                   So the company's funded in 2014, nothing

22    to do with the XRP Ledger or XRP until 2018.  We

23    can both agree that the funding itself had nothing

24    to do with any connection between the company and

16:08:10   25    XRP and the XRP Ledger?

                                                              230

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:08:11  1                          MR. WHITE:  Objection to

2              form.

3         A.    The funding of that company had nothing

4    to do with the XRP or XRPL Ledger.

16:08:25  5         Q.    Okay.

6         A.    However, that company did decide to use

7    the XRP or XRPL Ledger and, therefore, it did

8    become relevant.

9         Q.    If you're just looking at the

16:08:36 10   high-growth company measure, not tied to the

11   timing of any use of XRP or the XRP Ledger, then

12   why did you exclude the pre-2013 companies?

13        A.    I did not exclude the pre-2013

14   companies.

16:09:00 15        Q.    I see.  I -- I thought that was a step

16   that we discussed.  Maybe I misunderstood --

17        A.    No, that was the -- that was the

18   inaccuracy in bullet number 2.

19        Q.    I see.

16:09:13 20        A.    So it's the companies founded after 2013

21   that received equity financing -- really the

22   operational variable is, when did companies that

23   have equity financing have access to XRP and XRPL?

24              So, basically, I looked also at

16:09:29 25   companies that were founded before 2013 that

                                                          231

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:09:33 1    received their equity finance, their growth

2    financing, after 2013.  So I have both before and

3    after.

4              And, again, this was just -- this --

16:09:43 5    this whole equity financing piece, this step

6    number 1, was really just to come up with an

7    illustrative spectrum of companies that, based on

8    my experience in the industry, would be viewed as

9    being a relevant subset of companies.  I didn't

16:10:02 10   look at IBM, for example.  Didn't look at -- there

11   are lots of big corporates that use blockchain and

12   potentially use XRP.  So I just used the subset --

13   used this subset to come up with an illustrative

14   use case -- set of use cases.

16:10:25 15        Q.   This method where you observed equity

16   financing of specific high-growth companies on

17   Crunchbase to evaluate the use case of a digital

18   asset, which you did in your report, have you ever

19   employed that methodology anyplace else other than

16:10:48 20   in your expert report in this case?

21        A.   Yes.  We do these on the funds as well,

22   the Lurie Venture Fund, the Lurie

23   Commercialization Fund.  FinTech group funds which

24   I am involved in but did not talk about in this --

16:11:03 25   this report.

232

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:11:06   1          There's always lots of applications of

          2   companies wanting to, of course, get equity

          3   financing.  And one of the triaging that we do is

          4   look at what do we know about these companies?

16:11:18   5   What do we know about similar companies in this

          6   space?  How are they funded?  How were they

          7   financed?  To sort of figure out is there a

          8   similar company like the company we're looking at

          9   on Crunchbase that is equity financed.

16:11:32  10          So, yes, we look at that as a triaging

         11   mechanism.

         12      Q.   That -- that makes sense to me, but I'm

         13   asking a little bit of a different question.

         14          When evaluating in terms of the

16:11:41  15   viability of a digital asset --

         16      A.   Mm-hmm.

         17      Q.   -- which it seems the -- strike that.

         18          Have you ever in your -- outside of the

         19   context of the report of this case, evaluated the

16:11:52  20   viability of a digital asset or a blockchain by

         21   observing equity investment in companies unrelated

         22   to that digital asset or to that blockchain?

         23              MR. WHITE:  Objection; form.

         24      A.   That's a specific hypothetical that I

16:12:13  25   have not -- that specific structuring, I guess, of

                                                              233

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:12:16  1    the question.  I have not.

         2         Q.    Okay.  When you -- when you composed the

         3    list that -- of 91 companies that appears in

         4    Exhibit -- Appendix D, did you take into account

16:12:31  5    whether any of those companies received funding

         6    from Ripple?

         7         A.    Did I take it into account?  I did for

         8    those where I had that information available.

         9         Q.    And are there any -- any companies on

16:13:02 10    your list of 91 in Appendix D that did, in fact,

        11    receive funding from Ripple?

        12         A.    I believe there are.  These are --

        13    definitely Coil is definitely one of them.  I

        14    don't know if STYRA is on here.  Yes, where was --

16:13:38 15    yes, Coil is here.

        16              So, actually, Crunchbase does provide

        17    information when you search who the financiers are

        18    behind each round.  And so I would know that.

        19         Q.    Okay.  Can we turn to page 9 of your

16:14:00 20    report, Exhibit 1?

        21         A.    I'm sorry, page 9?

        22         Q.    Page 9, paragraph 21.

        23         A.    Oh, okay.

        24         Q.    Do you see where it says "Opinion 3"?

16:14:19 25         A.    Yes.

                                                                  234

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:14:19  1      Q.   Okay.  So I just want to focus on the

2  first clause of Opinion 3.  "The XRP Ledger and

3  its native currency, XRP, have commercial utility

4  that third parties have leveraged in the creation

16:14:33  5  or advancement of their business models."

6           Do you see that?

7      A.   Yes.

8      Q.   Is your work as described on Appendix

9  D -- strike that.

16:14:43 10           Does your work encapsulated by Appendix

11  D have any relationship to this Opinion 3 that I

12  just read?

13                MR. WHITE:  Objection; form.

14      A.   Yes.

16:15:03 15      Q.   Okay.  Can you explain to me how the

16  methodology that you described demonstrates that

17  any of the companies listed in Appendix D

18  leveraged XRP or the XRP Ledger in the creation or

19  advancement of their business models?

16:15:22 20      A.   If they use it as a payment mechanism.

21  If they use it as a way to conduct e --

22  e-commerce.  If they list XRP in their exchange.

23  If they -- any of the activities that any of the

24  companies in Appendix D undertake that uses XRP or

16:15:45 25  XRPL, in my view, leverages or uses XRP or XRPL in

235

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:15:51  1   their business model.

2   Q.   Okay.  So if a retail online seller

3   accepts 100 different digital assets for payment,

4   one of them is XRP, in your view, that would be a

16:16:07  5   good example of a business that leveraged XRP in

6   the creation or advancement of that company's

7   business model?

8                    MR. WHITE:  Objection; form.

9   A.   Yes.  They use it as part of their

16:16:24 10   business.  And business model is not necessarily

11   the same as revenue model.  There's a lot of

12   discussion around that, but the business model is

13   how they conduct their business.

14   Q.   Okay.  So the -- the sort of phrase --

16:16:40 15   strike that.

16                    The phrase "creation or advancement of

17   their business models" in your Opinion 3

18   encompasses any contact whatsoever between XRP or

19   the XRP Ledger and the company's businesses listed

16:16:59 20   in Appendix D.

21                    Is that fair?

22   A.   That's fair.  And it kind of ties back

23   to a statement that I make earlier in my report on

24   what constitutes successful currency.  And it is a

16:17:23 25   currency that is viewed to be one that is

236

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:17:25  1   broadly -- I'm going to have to check where --

2   where that is.

3              All right.  On page 26, paragraph 57.

4   So for currencies to be useful and be successful,

16:17:46  5   the usability and breadth of applicability of that

6   particular cryptocurrency in any market so that

7   people feel comfortable using it anywhere is --

8   becomes a very important driver for the market

9   access and the utility of that currency.  And,

16:18:03 10   therefore, if a Korean supermarket uses, in your

11   example, 50 cryptocurrencies, one of which is XRP,

12   then that is a validation of the currency and is

13   a -- it's part of the business model of that

14   Korean supermarket.

16:18:29 15      Q.   Okay.  Are you offering any opinion in

16   this case about whether XRP is or is not a

17   currency?

18      A.   No, I'm not.

19      Q.   Okay.  The paragraph 57 that you pointed

16:18:46 20   me to, that doesn't have any citations that I can

21   see, at least not on page 26.  I do see one at the

22   very end on page 27.

23              Are the -- the bullets -- the first four

24   bullets on page 26 -- value proposition, usability

16:19:06 25   and breadth of applicability, design, and

237

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
16:19:09   1   liquidity -- are those your expert opinion or is
           2   this a case of sort of information aggregation
           3   from other sources?
           4        A.   It's information aggregation from other
16:19:22   5   sources.
           6        Q.   Okay.
           7        A.   Including -- including many of the ones
           8   that are cited on the bottom of page 27.
           9        Q.   Okay.  Going back to the discussion we
16:19:43  10   were just having about your Opinion 3 --
          11        A.   What page?
          12        Q.   Let's see.
          13        A.   Nine?
          14        Q.   Page 9.
16:19:55  15             If a company accepts XRP, but no one
          16   ever actually pays for anything with XRP, in your
          17   view, is that company's business model -- strike
          18   that.
          19             If a company accepts XRP, but no one
16:20:13  20   actually ever pays for anything in XRP, does XRP
          21   advance the -- have any involvement in the
          22   creation or advancement of that company's business
          23   model?
          24                  MR. WHITE:  Objection to
16:20:23  25             form.
```

                                                              238

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:20:27  1          A.   In the context of my analysis, if the

         2   company offers it, even if the customers don't use

         3   it, it's still -- or initially don't use it, it is

         4   still part of the business model of that company

16:20:39  5   that offers it.

         6          Q.   Okay.  With respect to the companies

         7   that are listed on Appendix D, did you take any

         8   steps to determine whether or not for companies

         9   that accept XRP as payment anyone actually pays

16:20:56 10   for goods and services with XRP?

        11          A.   So is your question did I check the

        12   revenue, essentially, of each of these companies

        13   to see if they -- whether -- to see if there were

        14   any transactions in XRP?

16:21:22 15          Q.   My question's a bit broader in that it's

        16   did you take any steps at all to determine whether

        17   or not any company listed on Appendix D as

        18   accepting XRP actually in the course of its

        19   business receives payment in XRP?

16:21:36 20                        MR. WHITE:   Objection; form.

        21          A.   Not as part of this analysis, no.

        22          Q.   When you say "this analysis," do you

        23   mean your expert report?

        24          A.   Not as part -- yes, not as part of the

16:21:52 25   expert report.

                                                                   239

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:22:02  1      Q.   Okay.

        2      A.   It also includes, say, a company that

        3  used to use XRP and, for example, no longer uses

        4  XRP because of, for example, the -- you know, the

16:22:13  5  current litigation that's underway.  It still was

        6  an XRP use case.  But if a company that was equity

        7  financed but -- in 2013, let's say, went bankrupt

        8  in 2018, but during that time used XRP, it's also

        9  a use case.

16:22:37 10      Q.   Okay.  I think what you're saying --

       11  strike that.

       12      So Appendix D is not intended to be a

       13  snapshot of the current ways XRP or the XRP Ledger

       14  are actually used in the world.

16:22:48 15                  MR. WHITE:  Objection.  No

       16           question.

       17      A.   Is your question it's not a snapshot?

       18      Q.   That's right.

       19      A.   Or it is a snapshot?

16:22:58 20      Q.   It's not.  I'm ask -- let me ask it

       21  again.

       22      A.   Okay.

       23      Q.   Was it -- was it your intention with

       24  Appendix D to create a snapshot of the current

16:23:07 25  ways XRP or the XRP Ledger are actually used in

                                                    240

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:23:10  1   the world as of the time of your report?

2        A.   As a proxy for "being used in the

3   world," it means do these companies in Appendix D

4   either use XRP or XRPL?  It was a snapshot.  Just

16:23:26  5   that the companies offer the opportunity is not

6   necessarily whether the users use it.

7        Q.   Okay.

8        A.   That's, I think, where you're making the

9   distinction.

16:23:41 10        Q.   And there was one other distinction I

11   think you drew which is that there could be cases

12   or maybe there -- strike that.

13             There are cases, if I understand your

14   testimony correctly, on Appendix D, where the

16:23:54 15   company once had some connection to XRP or the XRP

16   Ledger but no longer does.

17                      MR. WHITE:  Objection.  No

18             question.

19        A.   Right.  But, again, it really doesn't

16:24:07 20   change the opinion.  The diversity of use cases

21   where XRP or XRPL is being used as part of the

22   business model of these companies, whether it's

23   91, 90, 89, or even let's take off -- you want to

24   take off all the ones from before 2013, 83 is

16:24:31 25   still a substantial set of use cases.

                                                    241

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:24:33  1            And I didn't -- it's, again, just

        2   illustrative of the equity financed use cases.

        3   And to your earlier point, all the other companies

        4   that are currently on the -- that are on that list

16:24:44  5   of 660, even though I did not analyze these

        6   companies, it might very well be there's a lot of

        7   use cases on there as well.

        8            And, in fact, since I submitted the

        9   report in October, just because of, you know, the

16:25:02 10   way I follow the industry, there's at least a half

       11   dozen more use cases that I've become aware of

       12   that use XRP or XRPL.

       13            So it's a constantly evolving industry

       14   with new use cases being built that cannot be

16:25:17 15   anticipated at any given point in time.  So it is

       16   a snapshot in time.

       17   Q.    I guess with my question I was trying to

       18   draw the distinction between a use case and a use

       19   that exists in the world at the time of your

16:25:28 20   report.

       21            So, for instance, using something you

       22   testified about, if a company once accepted XRP as

       23   payment but no longer does, that's, in your view,

       24   still a use case that's -- that's included in

16:25:42 25   Appendix D, is that right?

                                                        242

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:25:42  1               MR. WHITE:  Objection; asked

       2         and answered.

       3     A.   Of course, that particular use case that

       4   I brought up, I think I -- I don't know where I

16:25:54  5   included it.  Maybe I didn't include it yet.

       6         The change happened later.  So that's --

       7   that's why I did the snapshot in time.  You have

       8   to keep looking at are these companies still

       9   accepting?

16:26:08 10         But as -- as of the time, 20 --

      11   whatever, October 4th, I believe?  Yes, October

      12   4th, or the last time I checked the list before we

      13   submitted the report, these companies were still

      14   using XRP or XRPL.

16:26:24 15         Some companies were acquired.  I

      16   think it was -- I forgot what the names of that

      17   company now.  Harbor, I believe.  So Wallet was

      18   acquired by another company.  And that's fine.  I

      19   mean, it's -- it's part of the evolving industry

16:26:47 20   over time.  There was acquisitions.  There was

      21   bankruptcies.  There are different use cases that

      22   evolve and develop.  And I just wanted to

      23   illustrate that using a subset of companies from

      24   the list of 660.

16:27:01 25     Q.   Okay.  Let's go to page 64, paragraph

                                                      243

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:27:03  1    124.

2         A.    Yes.

3         Q.    The last bullet says "Third, I examined

4    the applications for the remaining use cases."

16:27:16  5              What does the word "applications" mean

6    in that sentence?

7         A.    "Applications"?  Seems like an odd word

8    here.

9              Basically this is I examined all the

16:28:07 10   remaining use cases after Step 1 and Step 2.

11        Q.    Okay.  Is that --

12        A.    I'm not sure what -- how the word

13   "applications" and why the word "applications" is

14   in here.

16:28:19 15        Q.    Did -- did you put the word

16   "applications" in your report?

17        A.    It may have been a carryover on one of

18   the iterations.

19                   MR. WHITE:  Objection.

16:28:28 20                   I'm going to instruct you not

21              to disclose the substance of

22              communications with counsel.

23        A.    But Bullet Number 3 is clearly about the

24   91 companies that resulted from Step 1 and Step 2.

16:28:47 25        Q.    Okay.  So setting aside the word

                                                    244

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:28:53  1    "applications," taking the sentence in total, "I
          2    examined the applications for the remaining use
          3    cases," what -- what exactly did that entail?
          4    What steps did you take?
16:29:14  5         A.   Well, I went on the website of each of
          6    these companies and I looked at, one, what kind of
          7    company it was, how they were using XRP or XRPL,
          8    and essentially what they were doing.  So -- so
          9    what markets were they serving?
16:29:37 10         Q.   Okay.  For each of the 91 companies
         11    listed in your Appendix D, were you able to
         12    determine from your review of the company's
         13    website how the company was using XRP or XRPL?
         14         A.   In terms of availability and in terms of
16:29:53 15    media statements that the company made or in terms
         16    of keyword searches between XRP, XRPL, and the
         17    name of the company, I wanted to verify whether
         18    they were still using and whether they were using
         19    and how they were using XRP or XRPL.
16:30:15 20         Q.   Okay.  I think I understand your answer
         21    to mean that to determine how the companies listed
         22    on Appendix D were using XRP or XRPL, you went to
         23    the company's website and then, at least on some
         24    occasions, also did Google searches.
16:30:31 25              Does that sound right?

                                                                245

16:30:32   1       A.   As well as media releases on these
           2   company sites, yes.
           3       Q.   When you say the "media releases on the
           4   company sites," you mean that company's website,
16:30:41   5   right?
           6       A.   That company's websites, yes.
           7       Q.   Okay.  Other than Google searches and
           8   review of the company's websites, did you take any
           9   other steps to examine the applications for the
16:30:53  10   remaining use cases?
          11       A.   I -- other than that, no.
          12       Q.   Okay.
          13       A.   So then I developed descriptions of how
          14   these companies were using the XRP or XRPL.
16:31:03  15       Q.   And when you say you "developed
          16   descriptions of how the companies were using XRP
          17   or XRPL," where are those descriptions?
          18       A.   They start at paragraph 126 -- no, 128.
          19   So I just illustrated a few of these companies,
16:31:25  20   not all 91 of them, but a few of these companies,
          21   how they were using it just to illustrate the
          22   spectrum.
          23       Q.   It looks like, if I'm counting
          24   correctly, this is a description of six companies,
16:31:45  25   is that right?

                                                              246

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:31:48  1       A.   Six companies representing 91 companies

       2   or 90 companies if you take STYRA out.

       3       Q.   Okay.  Sorry.

       4            Is there any part of your report,

16:32:01  5   setting aside the six companies that are discussed

       6   in paragraphs 128 through 133, that describes the

       7   use of XRP or the XRP Ledger by the remaining

       8   companies on Appendix D?

       9       A.   No.  I just illustrated a subset of

16:32:25 10   companies in each industry.

      11       Q.   Okay.

      12       A.   In each market.

      13       Q.   Are there any other steps that you took

      14   with respect to your preparation of Appendix D or

16:32:42 15   your examination of the use cases reflected in

      16   Appendix D that we have not already discussed?

      17       A.   I don't think so.  Except for, of

      18   course, assembling all of the information on the

      19   capital invested and aggregating the information

16:33:18 20   of what industries these 91 -- or 90 companies

      21   represented.  And, again, it was just meant to be

      22   an illustrative set of use cases.

      23       Q.   How did you select the illustrative set

      24   of use cases in paragraphs 128 to 133?

16:34:05 25       A.   Based on more -- the level of detail of

                                                            247

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:34:08  1  information that I could find on that company's

2  use of XRP or XRPL.

3  Q.   Okay.  So fair to say that these six

4  companies are the companies that you were able to

16:34:20  5  find the most detail about their use of XRP or XRP

6  Ledger?

7  A.   I think that's a mis -- that's not what

8  I said, "the most" information.  Actually, I want

9  to double-check something here.

16:34:40 10  I believe one of the other pieces of

11  information that I considered is the value of the

12  company if they had their own coin and we knew

13  something about their coin market cap or whether

14  they were -- had large financing rounds just to

16:35:28 15  illustrate some of the bigger companies or the

16  companies with more -- higher financing rounds.

17  Q.   Your answer reflects other factors that

18  you took into consideration when selecting the six

19  to highlight in paragraphs 128 to 133, is that

16:35:45 20  right?

21  A.   Yes.

22  Q.   Okay.  Can we look at 132, paragraph

23  132, page 68?  The last two lines on the page have

24  a single full sentence.  It says "Data443 chose to

16:36:09 25  work with Ripple's technology because the XRP

248

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 16:36:12 | 1 | Ledger is enterprise-focused with a level of |
| | 2 | maturity and capability in the blockchain realm." |
| | 3 |      Do you see that? |
| | 4 | A.   Yes. |
| 16:36:20 | 5 | Q.   How do you know why Data443 chose to |
| | 6 | work with Ripple's technology? |
| | 7 | A.   That was based on Data443's own media |
| | 8 | disclosure as cited below. |
| | 9 | Q.   Okay.  The phrase "Ripple's technology" |
| 16:36:41 | 10 | in that sentence, what is it that you're referring |
| | 11 | to? |
| | 12 | A.   Actually, I mean here the -- it's a |
| | 13 | misstatement.  The XRP Ledger. |
| | 14 | Q.   So for the purposes of this sentence, |
| 16:36:50 | 15 | "Ripple's technology," the reference is to the XRP |
| | 16 | Ledger? |
| | 17 | A.   It is the XRP Ledger, yes. |
| | 18 | Q.   Okay.  Going back to Appendix D, we |
| | 19 | discussed that the second column is a carryover |
| 16:37:18 | 20 | from Appendix C. |
| | 21 |      Do you recall that? |
| | 22 | A.   Yes. |
| | 23 | Q.   Did you -- did you rely on the category |
| | 24 | in Appendix D that counsel provided in Appendix C? |
| 16:37:42 | 25 | A.   If it is a carryover, yes, it came from |

249

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
16:37:45   1   that table.
           2       Q.   Okay.
           3       A.   And I do recall making some adjustments
           4   with some of these companies, but -- after looking
16:38:00   5   at their websites, but I don't recall which ones.
           6   I'm going to have to cross-reference that.
           7       Q.   You recall making adjustments to the
           8   second column of Appendix D, is that right?
           9       A.   For some of the companies, yes, but I
16:38:10  10   forgot which ones.
          11       Q.   Okay.
          12       A.   The challenge with categorization is
          13   that there is no standard.  Different exchanges
          14   use different methods.  And -- and Consensus
16:38:25  15   itself and other management consulting groups,
          16   they all have different categorizations, so...
          17       Q.   Okay.
          18       A.   I tried to cross-verify.
          19       Q.   Let's look back at paragraph 57.
16:38:50  20       A.   Paragraph 57?
          21       Q.   Mm-hmm.  I'd like to focus on the "Value
          22   Proposition" bullet.
          23       A.   Yes.
          24       Q.   Can you read the "Value Proposition"
16:39:11  25   bullet into the record, please?
```

                                                        250

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:39:14  1      A.   "A cryptocurrency is more likely to

          2  achieve wide adoption if it solves a

          3  well-understood problem and is coupled to a

          4  transparent business model, so the marketplace

16:39:25  5  understands how the cryptocurrency is used and how

          6  it creates value."

          7      Q.   In the context of that sentence, what's

          8  a "transparent business model"?

          9      A.   When it's -- transparent business model

16:39:47 10  is business model that is well understood by

         11  outsiders how a company generates revenue and how

         12  it sets up partnerships.

         13      Q.   In your view, if a company was touting

         14  acceptance of a product, but was not disclosing to

16:40:01 15  the market that it was also heavily subsidizing

         16  users to use that product, is that a transparent

         17  business model?

         18           MR. WHITE:   Objection; form.

         19      A.   Can you restate that question?

16:40:17 20      Q.   Sure.

         21           MR. SYLVESTER:   Actually,

         22           Bridget, would you mind reading that

         23           back?

         24           (Whereupon, the record was

16:40:22 25           read back.)

                                                              251

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:40:40   1                    MR. WHITE:   Same objection.

           2        A.    This is a hypothetical.  I would need to

           3   know more information about that.

           4        Q.    What would --

16:40:49   5        A.    More context.

           6        Q.    What would you need to know?

           7        A.    Well, transparency, there's no binary in

           8   transparency of a business model.  It's a -- it's

           9   a spectrum, I guess, of what is being disclosed to

16:41:09  10   the market.  Public companies disclose their

          11   business model; private companies, you know, are

          12   less open about their business model.  Sometimes

          13   it's obvious; sometimes it's not obvious.

          14               So I would need to know what is the

16:41:28  15   company?  What were they disclosing?  What were

          16   they holding back?  Did they call it transparent

          17   themselves, what they were doing, or were they --

          18   was the media telling -- telling the world that

          19   this was a transparent business model?

16:41:46  20               So it's hard to assess that.

          21        Q.    Why is it that private companies are

          22   less open about their business model?

          23                    MR. WHITE:   Objection; form.

          24        A.    Excuse me.

16:42:09  25               So private companies, particularly

                                                              252

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:42:11  1  equity investable companies -- and I'm wearing my

2  hat as a -- as an investor in venture funds --

3  initially are, one, not even clear -- they know

4  what -- potentially what their value proposition

16:42:24  5  is, but they're not clear how they're going to be

6  making money, how they're going to be generating

7  revenue.

8          And so the transparency of a business

9  model can only be so transparent as to even what

16:42:38  10  the company knows itself.  It doesn't want to get

11  pinned down out -- on the outside, I guess, as in

12  this is your business model or this is not part of

13  your business model.

14          It maintains flexibility as the

16:42:51  15  investors, the private investors, negotiate the

16  growth and the change and the product development

17  within that company.

18          So that's why it's -- usually or often

19  the business model isn't -- it's only partially

16:43:08  20  known.

21                  MR. WHITE:  Mark, would now

22          be an okay time for a break?

23                  MR. SYLVESTER:  Yeah, fine.

24          Sure.

16:43:12  25                  MR. WHITE:  Okay.

                                                        253

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

16:43:13  1                    THE VIDEOGRAPHER:  Off the

2            record.  The time is 4:44.

3                    (Whereupon, a recess is taken.)

4                    THE VIDEOGRAPHER:  We'll go

17:02:56  5            back on the record.  The time is 5:04.

6       BY MR. SYLVESTER:

7            Q.   Professor, I want to make sure I

8       understand your rubric for inclusion of companies

9       on Appendix D, so I'm going to go back to a hypo.

17:03:12 10            Let's assume there's a company that

11      accepts XRP as payment for its goods, but, in

12      fact, no one has ever paid for any of that

13      company's goods in XRP.

14            Would that company, using your

17:03:29 15      methodology, be included on Appendix D?

16                    MR. WHITE:  Objection; form.

17            A.   So XRP is available, but it's -- or it's

18      possible to pay in XRP, but nobody actually pays

19      in XRP?  Is that --

17:03:47 20            Q.   Exactly right.

21            A.   Well, from -- again, from the business

22      analysis perspective, it is still part of -- it is

23      still a use case.

24            Q.   Okay.

17:03:59 25            A.   Because, again, we're taking a snapshot

254

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:04:02  1    in time and we have to figure out has it never

2    used XRP -- I'm sorry, have people never paid in

3    XRP?  Is it at an inception point?  So everything

4    is a snapshot in time in use and growth.

17:04:19  5        Q.   Okay.  So I think I understand your

6    answer to be that hypothetical company would be

7    included on Appendix B -- sorry, Appendix D, as in

8    dog, using your rubric?

9        A.   It would be.

17:04:30 10              MR. WHITE:  Objection.

11              THE WITNESS:  I'm sorry.

12              MR. WHITE:  You can proceed.

13        Q.   So going back to page 9 of your expert

14    report, paragraph 21, could you explain to me --

17:04:47 15    again, sticking with the hypo that I just used --

16    how XRP in that case could arguably be part of the

17    creation or advancement of the business model of

18    that company?

19              MR. WHITE:  Objection;

17:05:02 20          incomplete hypothetical.

21        A.   Well, of course, you're asking me to

22    speculate on a hypothetical use case --

23        Q.   Yes.

24        A.   -- that is an extreme, you know, tail of

17:05:22 25    a spectrum of use.  In that case the argument

255

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:05:27  1   would be harder to make, but, regardless, it is

2   still -- the company still made the decision to

3   allow payment in XRP; i.e., the company actually

4   trusts XRP and payments in XRP enough for them to

17:05:45  5   include it in their business model.

6        Q.   Would you say the -- in that

7   circumstance of the hypothetical that I described

8   that the company's acceptance of XRP advances that

9   company's business model?

17:06:24 10        A.   Well, from the company's expect -- we

11   can't -- of course, it's a hypothetical, so we

12   can't really know why that company decided that

13   they were going to include XRP as a possible

14   payment mechanism.  But, clearly, the company must

17:06:40 15   have made some decision that we're not privy to as

16   to why they decided to allow payment in a certain

17   set of currencies that would advance their

18   business model and access in the market.

19        Q.   Are there any companies on your Appendix

17:06:57 20   D that accept XRP as payment but as to which

21   nobody has ever paid in XRP?

22        A.   I did not do that analysis.  And, one,

23   it would be very difficult to do that kind of

24   analysis, if not impossible.

17:07:27 25        Q.   I want to return to the issue of

256

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

17:07:30    1    Ripple's UNL.

2              If a hacker hacked into Ripple's website

3    and replaced Ripple's genuine UNL with a list of

4    50 malicious nodes, what would be the effect on

17:07:49    5    the XRP Ledger?

6                        MR. WHITE:  Objection; calls

7              for speculation.

8        A.    That is speculative and I don't know if

9    Ripple or the Ledger protocol has ever considered

17:08:08   10    such a case, so I cannot comment or opine on what

11    the implications of that would be.

12        Q.    Let's turn to paragraph 58 of your

13    report, which is page 27.

14              Do you see Table 1 there on page 27?

17:08:46   15        A.    Yes, I do.

16        Q.    And Table 1's labeled "Comparison of

17    Features/Attributes of Top Successful

18    Cryptocurrencies."

19              Do you see that?

17:08:55   20        A.    Yes, I did.  Yes, I do.

21        Q.    Is this table your expert opinion as to

22    these features of these cryptocurrencies or is

23    this an occasion of an aggregation of information

24    from sources you reviewed in preparing your

17:09:10   25    report?

257

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:09:15  1       A.   This table is a result of a combination

2    of both.  I, first, on page 26, laid out some of

3    these characteristics that are brought up in the

4    industry as features, as possible features.

17:09:31  5    There's no absolute comparison, but what are

6    example features.  So those are the attributes

7    that was aggregated from the literature.

8            Then I decided to apply these to

9    bitcoin, Ethereum or bitcoin, Ether and XRP.  And

17:09:52 10    for that I ended up using the references that are

11    cited on the bottom of that page to fill in what

12    is where.

13       Q.   Okay.  With respect to security risk for

14    XRP Ledger/XRP, what's written there is "potential

17:10:15 15    vulnerability from attacks on specific nodes due

16    to openness and liquidity of system."

17            Do you see that?

18       A.   Yes.

19       Q.   What does that -- what -- sorry.  Strike

17:10:24 20    that.

21            What does "potential vulnerability from

22    attacks on specific nodes due to openness and

23    liquidity of system" mean?

24       A.   I did not do an independent analysis of

17:10:37 25    what that meant.  It's -- it's information that I

258

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:10:38  1    took from MIT Technology review when I looked for

2    where the potential risks were that are being

3    talked about, I guess, on the various, you know,

4    networks and in the cryptosphere and did it each

17:10:58  5    for, again, not complete, but examples of security

6    risks for the three currencies.

7        Q.    Sitting here today, do -- do you have an

8    understanding of -- of the potential vulnerability

9    being described in that cell of Table 1?

17:11:23 10        A.    I have no technical understanding of

11    what that would mean in the context of the Ledger

12    protocol.

13        Q.    Do you know what kind of security risk

14    it describes?

17:11:45 15        A.    Malicious impacts on specific nodes.

16        Q.    How --

17        A.    Attacks -- I guess attacks on specific

18    nodes.

19        Q.    How about the portion "due to openness

17:11:59 20    and liquidity of system"?  Do you know what that

21    means?

22        A.    Not on a technical level, no.

23        Q.    Do you know at a nontechnical level?

24        A.    I'm not going to comment to that until

17:12:26 25    or unless I've had a chance to review the MIT

259

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:12:28  1    Technology review paper to, again, look at the

2    context in which they use that particular

3    statement.

4        Q.   Okay.  The category of liquidity under

17:12:46  5    "Attributes," do you see that?

6        A.   Yes.

7        Q.   What does liquidity mean in this

8    context?

9        A.   A high -- sorry.  High-trading volumes

17:13:02 10    and, therefore, availability on the market.

11        Q.   And how did you determine that all three

12    of these digital assets have high-trading volumes?

13        A.   Based on information that's available on

14    various different sites and how much is being

17:13:27 15    traded on a daily basis and -- for all three of

16    these currencies, in addition to others, as I list

17    in other -- where is it? -- in Chart 4 gives us

18    information on liquidity.  But "high" is not a

19    numeric designation, of course.

17:13:59 20        Q.   Let's look at paragraph 60 on the next

21    page.  Looking at the third sentence, it says

22    "Much like bitcoin became the digital peer-to-peer

23    money transfer standard, XRP became the digital

24    standard for currency exchange, asset settlement

17:14:18 25    and remittances."

260

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
17:14:20    1                        Do you see that?
            2                        MR. WHITE:  Objection;
            3               misstates the document.
            4                        MR. SYLVESTER:  Does it?
17:14:23    5                        MR. WHITE:  Yes.
            6                        THE WITNESS:  Actually, I
            7               state "a digital standard."
            8                        MR. SYLVESTER:  Thank you for
            9               the correction, both of you.
17:14:28   10   BY MR. SYLVESTER:
           11        Q.   My question is whether or not that
           12   sentence, with the correction from counsel and
           13   from yourself, is that your expert opinion or is
           14   that something that you drew from one of the
17:14:43   15   sources that you reviewed in preparation of your
           16   report?
           17        A.   It is drawn from sources in my report.
           18        Q.   Okay.  And I see that there's not a
           19   footnote here.
17:14:56   20                        Sitting here today, do you know where
           21   you drew that information that we just read
           22   together?
           23        A.   I'm going to have to look that up.  I
           24   don't know right off --
17:15:24   25        Q.   Okay.
```

261

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:15:24  1          A.    -- as I'm sitting here.

       2          Q.    The next sentence that begins "Usability

       3   and standardization," do you see that?

       4          A.    Yes.

17:15:38  5          Q.    Take your time to read it, obviously,

       6   but is that also a case of -- strike that.

       7                Is that sentence your expert opinion or

       8   is that an example of information that you drew

       9   from other sources in preparation of your report?

17:15:55 10          A.    The information that we need, custodial

      11   and noncustodial actors, or specifically this

      12   sentence?

      13          Q.    The entire sentence.

      14          A.    Okay.  That's how I understand -- what I

17:16:07 15   understand custodial actors to be.  So it was my

      16   own kind of statement.

      17          Q.    Okay.  Do all cryptocurrencies in your

      18   view need to have institutional investors such as

      19   hedge funds regardless of their use cases?

17:16:33 20                    MR. WHITE:  Objection; form,

      21          calls for speculation.

      22          A.    Can you repeat the question, please?

      23          Q.    Sure.

      24                Do all cryptocurrencies need to have

17:16:50 25   institutional investors such as hedge funds

                                                            262

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

17:16:53  1    regardless of their use cases?

2    A.   It is -- it is speculative.  I will turn

3    it around in that having institutional investors

4    that move a lot of assets on exchanges creates

17:17:11  5    liquidity.  So it's sort of the other way around,

6    so...

7    Q.   Let me read the sentence and -- and see

8    if we can come to a common understanding.  So it

9    says -- your sentence says "Usability and

17:17:31 10    standardization require the cryptocurrency to have

11    well-functioning custodial actors, including

12    exchanges, institutional investors such as hedge

13    funds, and e-commerce with viable scalable use

14    cases."

17:17:41 15    A.   Uh-huh.

16    Q.   So I'm just picking out the requirement

17    of "institutional investors such as hedge funds"

18    and asking is it the case that all

19    cryptocurrencies need to have institutional

17:17:51 20    investors such as hedge funds in order to be

21    usable?

22    A.   It would help in creating liquidity

23    depending on what the cryptocurrency --

24    cryptocurrency's use case is.  AND you're asking

17:18:08 25    about all.  There's now nine -- twelve thousand

263

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:18:13  1  cryptocurrencies, so I am not sure which

2  cryptocurrencies would benefit from that.

3      Q.   Okay.  Let's go to 63, please, on the

4  next page.  Paragraph 63.  This paragraph states

17:18:39  5  "The importance of liquidity and trading volume on

6  exchanges cannot be overstated.  Liquidity

7  attracts users and is a key underpinning of the

8  value of a cryptocurrency."

9          Do you see that?

17:18:50 10      A.   I see that.

11      Q.   Okay.  Is that your expert opinion or is

12  that information that you drew from other sources

13  in the course of preparing your report?

14      A.   That is my opinion or information that

17:19:08 15  I've -- sorry.  How did you differentiate?  Is it

16  your opinion or is it -- would you repeat that?

17      Q.   Absolutely.

18          Is paragraph 63 your expert opinion in

19  this case that you applied your expertise to and

17:19:22 20  your methodology as set forth in the report?

21  That's one option.  The other option is, or is it

22  information that you drew from any of the sources

23  that you reviewed in preparing your report?

24      A.   This is what I applied my expert opinion

17:19:36 25  to.

264

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:19:38  1      Q.   Okay.  Can you explain to me what -- how

2   you applied your expertise to generate the opinion

3   set forth in paragraph 63?

4      A.   It sort of goes back to the statements

17:19:57  5   that I made earlier in the report regarding --

6   regarding some of the characteristics of

7   successful currencies, successful

8   cryptocurrencies, and including the table that we

9   discussed, Table 1 that we discussed.

17:20:12 10                That broad availability and

11   liquidity of a currency, of a cryptocurrency, in

12   an ecosystem that can readily access this -- this

13   currency for all sorts of applications is -- sort

14   of a more high-level statement, is important to

17:20:36 15   attract users of the cryptocurrency.  It's really

16   a high-level statement more so than and derives

17   from my earlier statements in my report.

18      Q.   You say in 63 that liquidity "is a key

19   underpinning of the value of a cryptocurrency," is

17:20:57 20   that right?

21      A.   Yes.

22      Q.   Is price one way to measure a

23   cryptocurrency's value?

24                MR. WHITE:  Objection.

17:21:09 25      A.   It is, but what -- what I intended here

265

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:21:12  1   with "value of a cryptocurrency" is the utility of

          2   the cryptocurrency.  Value as in utility.

          3       Q.   In general, all other things equal, if

          4   an asset becomes more liquid, what effect does

17:21:32  5   that have on the asset's price?

          6              MR. WHITE:  Objection; calls

          7         for speculation.

          8       A.   I think I would have to speculate.  I

          9   don't think there is a unique answer to that of

17:21:53 10   how liquidity is directly correlated to price.

         11       Q.   Okay.  You write that "The importance of

         12   liquidity and trading volume on exchanges cannot

         13   be overstated."

         14              Do you see that?

17:22:11 15       A.   Yes.

         16       Q.   Given the importance of listing on

         17   exchanges to the value of a cryptocurrency, in

         18   your view would the holders of a cryptocurrency

         19   find it important if a company said they were

17:22:25 20   trying to obtain listings for that

         21   cryptocurrency?

         22              MR. WHITE:  Objection; calls

         23         for speculation.

         24       A.   Was your question users?  Sorry, can you

17:22:36 25   repeat -- repeat the question?

                                                              266

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:22:40   1      Q.   It was holders, but I'll repeat the

  2   whole thing.

  3      A.   Holders.  Okay.

  4      Q.   Given the importance of listing on

17:22:48   5   exchanges to the value of cryptocurrency -- as set

  6   forth in your paragraph 63 -- in your view would

  7   the holders of a cryptocurrency find it important

  8   if a company said they were trying to obtain

  9   listings for that cryptocurrency?

17:22:58 10            MR. WHITE:  Same objection.

11      A.   From an investment perspective that may

12   be important, but I wouldn't speculate on that.  I

13   don't know.

14      Q.   What do you mean by "from an investment

17:23:19 15   perspective that may be important"?

16            MR. WHITE:  Objection --

17      A.   What do you mean with holders of

18   cryptocurrencies?  Owners in their wallets, or

19   what do you mean by "holders"?

17:23:37 20       Q.   By holder I meant owner, right.

21            MR. WHITE:  Same objection to

22        this line of questioning.

23      Q.   The question was what do you mean by

24   your testimony "from an investment perspective

17:23:47 25   that may be important"?

267

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:23:50  1       A.   I'm going to rephrase that.  It depends

2    on what --

3                      MS. ZORNBERG:  Hold on.

4                      THE WITNESS:  Sorry.

17:23:53  5                      MR. WHITE:  I believe the

6              court reporter only read back part of

7              the statement, so if we could

8              please -- let's go -- let's go back.

9              Let's see.

17:24:14 10                      Please reread your full

11             question as fully stated.

12                      MR. SYLVESTER:  You want me

13             to reread my entire full question?  I

14             was asking him about his testimony.

17:24:23 15                      MR. WHITE:  Yes.

16                      THE WITNESS:  And I want to

17             strike my answer, if that is possible,

18             or modify my answer.

19   BY MR. SYLVESTER:

17:24:31 20       Q.   You can always modify your answer.

21       A.   Okay.  I want to modify my answer.

22       Q.   You're welcome to.  Please, go ahead.

23       A.   That it depends on what the objective is

24   of the holder of a crypto asset.

17:24:43 25       Q.   Okay.  If the holder of a crypto asset

268

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:24:45  1    has an investment objective, then in that case

2    would that cryptocurrency holder find it important

3    if the company said they were trying to obtain

4    listings for that cryptocurrency?

17:24:55  5                    MR. WHITE:  Objection; calls

6              for speculation.

7         A.   Again, I would need more context, and I

8    cannot answer that question with a yes or no.

9         Q.   Okay.  Let's turn to page 31, paragraph

17:25:20 10    69.

11         A.   Yes, I have it.

12         Q.   Okay.  My -- my question on that is just

13    what source you used to -- strike that.

14                    What's the basis for the facts set forth

17:25:45 15    in paragraph 69?

16         A.   That was a follow-up on the citations

17    that I cited in -- in 68 on how the crypto space

18    is developing, institutional -- is developing,

19    institutional investors are getting involved.  So

17:26:14 20    within these documents they provided more

21    information on the breadth of the investment space

22    in cryptocurrency.

23         Q.   When you say "these documents," which

24    documents are you referring to?

17:26:22 25         A.   I'm sorry.  I meant the citations.

                                                      269

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:26:26  1    Citation 41.  Citation 41 and 42, which I cited in

2    the previous paragraph.  It was from those same

3    citations.

4         Q.   Okay.  The very last sentence of

17:26:43  5    paragraph 70 says "Although individual purchasers

6    made up just 36 percent of the exchange's volume

7    during the quarter ending December 31, more than

8    90 percent of CoinBase's revenue came from retail

9    trades."

17:26:56 10         Do you see that?

11         A.   I see that.

12         Q.   Was that fact drawn from the article

13    referenced at Footnote 43?

14         A.   I believe so, yes.

17:27:09 15         Q.   Okay.  Other than the reference at

16    Footnote 43, do you have any other basis to

17    believe that that 36 percent or 90 percent figure

18    are accurate?

19         A.   I didn't do any independent analysis of

17:27:22 20    that.

21         Q.   Okay.

22         A.   Again, it's a snapshot in time.

23         Q.   In paragraph 71, in the first sentence,

24    you write "In summary, increased involvement of

17:27:32 25    institutional and retail users benefits the

270

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:27:34  1   liquidity of cryptocurrencies on exchanges and, in

2   turn, increases business opportunities for new

3   start-ups and corporate use cases."

4        Do you see that?

17:27:41  5   A.   Yes.

6   Q.   Okay.  In the context of benefiting

7   liquidity of cryptocurrencies on exchanges, does

8   "involvement" in your first sentence mean trading?

9            MR. WHITE:  Objection; form.

17:28:07  10  A.   I'm going to have to reread the previous

11  paragraphs because this is a summary of the

12  previous paragraphs, but trading definitely is

13  part of it.

14       I don't think there was any -- looking

17:28:41  15  back at these paragraphs, a specific meaning to

16  "involvement" or "engagement" in.

17  Q.   But you said trading is part of it, is

18  that right?

19  A.   Yes.  I think, again, it refers to

17:28:58  20  Footnote 41, talking about institutional investors

21  getting -- are getting involved.  So the use of

22  "involve" includes trading.

23  Q.   Okay.  How does trading -- strike that.

24       How does increased trading by

17:29:19  25  institutional or retail investors increase

                                                        271

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:29:22  1  business opportunities for new start-ups and

2  corporate use cases?

3      A.   The more -- the more liquid and

4  available a cryptocurrency is in the market, the

17:29:42  5  more likely businesses might use that currency,

6  for example, as a payment mechanism for their

7  businesses.  That's really what it means.

8      Q.   In the second paragraph of -- strike

9  that.

17:30:10  10      In the second sentence of paragraph 71,

11  you write "It is important to a given

12  cryptocurrency that both institutional and retail

13  market participants can take advantage of the

14  benefit of liquidity, which is one of the key

17:30:22  15  value propositions of integrating such a

16  cryptocurrency in current and new use case

17  applications."

18      Do you see that?

19      A.   I see that.

17:30:30  20      Q.   How is it that a retail market

21  participant can take advantage of the benefit of

22  liquidity?

23      A.   Well, increasingly retail market

24  participants are participating in various

17:30:52  25  exchanges, as I noted in paragraph 70.  Buy-sell

272

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 17:31:03 | 1 | opportunities.  I don't know if I need to say |
| | 2 | anything beyond that. |
| | 3 | Q.   When you say "retail market participants |
| | 4 | are participating in various exchanges," you mean |
| 17:31:17 | 5 | trading on those exchanges, is that right? |
| | 6 | MR. WHITE:  Objection; form. |
| | 7 | A.   In the context of this sentence, |
| | 8 | "institutional and retail market participants" is |
| | 9 | not only the institutional retail -- I mean going |
| 17:31:37 | 10 | to the previous sentence.  And not only |
| | 11 | institutional and retail investors but, also, |
| | 12 | large and small companies. |
| | 13 | So "market participants" is a pretty |
| | 14 | broad umbrella or participant in the market. |
| 17:32:01 | 15 | Q.   Okay.  Let's go to paragraph 101, |
| | 16 | please.  That is on page 46. |
| | 17 | A.   Okay. |
| | 18 | Q.   Okay.  So near the bottom of the |
| | 19 | paragraph, you write "Ripple sought to reduce |
| 17:32:28 | 20 | these friction costs by enabling participants to |
| | 21 | message, clear, and settle transactions at low |
| | 22 | cost and high speed." |
| | 23 | Do you see that? |
| | 24 | A.   I see that. |
| 17:32:39 | 25 | Q.   What steps did Ripple take to accomplish |

273

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:32:42   1   the ends you describe in this paragraph?

2                        MR. WHITE:   Objection; form.

3        A.   Well, it goes back to the vision of the

4   company and the products that it would release on

17:33:18   5   the market to -- it says "sought to reduce."   So

6   it is really working towards that process if you

7   look at the product arc of -- of Ripple, where it

8   seeks to develop software that allows -- that

9   would allow banks to reduce or to message, clear,

17:33:47  10   and settle transactions at low cost and high

11   speed.   It goes back to the products that Ripple

12   develops.

13        Q.   The last sentence of paragraph 101 says

14   "With the Internet of Value, a value transaction

17:34:03  15   such as a foreign currency payment can happen

16   instantly, just as how people have been sharing

17   words, images, and videos online for decades."

18             Do you see that?

19        A.   Yes.

17:34:13  20        Q.   Is that sentence your expert opinion?

21        A.   That sentence has been used very

22   colloquially in the -- in the crypto industry and

23   at meetings, my UBRI meetings, and other

24   conversations that we've had in the context of --

17:34:41  25   of the FinTech Collaboratory.

274

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:34:44  1          Q.   When you say "it's been used

          2   colloquially at UBRI meetings," who is it that has

          3   used this -- this sentence in the past?

          4          A.   I don't know specifically about a -- a

17:34:58  5   "who," but it was -- I'm not sure who initially

          6   promoted it, but it became sort of a, I guess, a

          7   statement or a value proposition or a vision that

          8   people in the industry were starting to use, but I

          9   forgot who actually originally made the statement

17:35:24 10   of Internet of Value.  It's become a verbiage, a

         11   term, of the blockchain era.

         12          Q.   If this is a statement from someone else

         13   in the marketplace, is there a reason why you

         14   didn't cite it?

17:35:38 15                    MR. WHITE:  Objection.

         16          A.   It would have been -- there's no reason

         17   why it was not cited.  I mean, it's sort of a

         18   general statement around this whole Internet of

         19   Value.  It would have been a personal

17:36:17 20   communication or...

         21          Q.   What do you mean by "a personal

         22   communication"?

         23          A.   Well, I mean, I spend my life day in and

         24   day out in this industry.  So there's a lot of

17:36:35 25   terms in the context of expert opinion that aren't

                                                              275

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:36:38  1  necessarily cited to a specific citation, but are

2  sort of part of the vernacular in the industry.

3  But it has come up at these UBRI meetings, as I

4  mentioned, when the group of 27 universities meet

17:36:51  5  and then I don't know how -- how it came about.

6       And I apologize that there's no specific

7  citation, but I -- I wouldn't know which one to

8  cite.

9       Q.   Did you write that last sentence of

17:37:11 10  paragraph 101?

11                 MR. WHITE:  Objection.

12                 I'm going to instruct you not

13  to answer on the basis of the work product

14  privilege.

17:37:20 15       Q.   Okay.  Paragraph 102 -- actually, let's

16  move -- let's move to paragraph 110, please.  That

17  is on page 51.  The first sentence of paragraph

18  110 is "Separate from its equity investment, I

19  understand that Ripple distributed XRP to an array

17:37:46 20  of counterparties with the goal of increasing

21  liquidity in the market."

22       Do you see that?

23       A.   Yes.

24       Q.   Okay.  My first question is, does the

17:37:54 25  word "distributed" encompass Ripple's sale of XRP?

276

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
17:38:07   1          A.    Excuse me.

           2                Does it encompass sales?

           3          Q.    Yes.

           4          A.    Yes.

17:38:18   5          Q.    The citation for that first sentence is

           6    the -- is Ripple's Wells submission.

           7                Do you see that, Footnote 79?

           8          A.    Yes.

           9          Q.    What was it about the Wells submission

17:38:28  10    that you relied on for the text of that sentence?

          11          A.    Sorry, what is the -- can you rephrase

          12    that question?

          13          Q.    Sure.

          14                What -- what was it that you learned

17:38:52  15    from or drew from the Wells submission that

          16    informed the text of the first sentence of

          17    paragraph 110?

          18                      MR. WHITE:  Objection.  You

          19                can show him the Wells.

17:39:01  20          A.    It -- from my reading of the Wells.  I

          21    mean, I guess that's where I got the information.

          22          Q.    Separate from your review of the Wells

          23    submission, did you have an understanding that

          24    Ripple sold XRP?

17:39:23  25          A.    Yes.
```

277

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:39:24  1      Q.   How did you acquire that understanding?

2      A.   I looked at the consolidated financial

3  statements of Ripple.

4      Q.   And those demonstrated that Ripple sold

17:39:33  5  XRP?

6      A.   Yes.  Those are the XRP information on

7  the sales of XRP.

8      Q.   You write in the second sentence of 110,

9  "Such distributions are fully consistent with the

17:40:07 10  methods of product adoption of high-technology

11  companies identified above and the milestone

12  expectations of Ripple's equity investments."

13           Do you see that?

14      A.   Yes.

17:40:19 15      Q.   How was it in your view that Ripple's

16  sales of XRP were consistent with the methods of

17  product adoption of high-technology companies?

18      A.   Well, digital companies and other

19  companies, but companies like Ripple, that sell

17:40:39 20  software on the market that depends on, in this

21  case, XRP to function is consistent with what

22  these start-up companies do or start-up companies

23  try to do with new products that they sell in the

24  market.  They drive -- they try to drive market

17:41:06 25  adoption.  They try to get more people to use

278

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:41:08   1    these products.  But the product cannot be used

2    without the availability of liquidity in this case

3    in the market.

4           So, therefore, what Ripple did is they

17:41:25   5    undertook a -- what we call a penetration pricing

6    strategy to sell part of its technology, often at

7    a discount, as I talk about later on, in the

8    market to various different parties to allow the

9    markets to better use the software, the different

17:41:50  10    products that Ripple was releasing in the market.

11        Q.   What software does Ripple sell that

12    requires XRP to function?

13        A.   Well, ODL, On-Demand Liquidity, which I

14    guess was the former, I guess, xRapid.  But

17:42:15  15    essentially any transactions that need to happen

16    on exchanges require the fee that is paid in -- in

17    XRP as well.  There's multiple products that

18    existed out in the market that require the

19    availability of XRP for market participants to use

17:42:42  20    those products.  So payment processors, yeah.

21        Q.   Focusing on ODL, does -- does ODL

22    require the availability of liquidity in the

23    market to function?

24                MR. WHITE:  Objection; form.

17:43:04  25        A.   Well, specific, you know, payment rails,

279

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:43:07  1    I guess, between different countries.  I mean,

2    yes, they require that.

3        Q.   What -- what do you know about how

4    Ripple's ODL product works?

17:43:19  5                    MR. WHITE:  Objection; vague.

6        A.   XRP functions at the level -- that I

7    understand it, XRP functions as a bridge currency

8    between one fiat currency and another fiat

9    currency.

17:43:36 10        Q.   Do you know who Ripple's customers are

11    that purchase the ODL product from Ripple?

12        A.   Who the current buyers are, what the

13    current -- yeah, current market is?

14        Q.   Yes.

17:44:07 15        A.   I believe it's mainly payment

16    processors.

17        Q.   What's an example --

18        A.   Large industrials.  Some banks, I

19    believe.  But, anyhow, I don't have the full list.

17:44:19 20    I have to check.  I have to look that up.

21        Q.   To your knowledge, do individual retail

22    users use Ripple's ODL product?

23        A.   Not to my knowledge.

24        Q.   Would Ripple's sales to individual --

17:44:45 25    strike that.

280

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:44:45  1           Would Ripple's sales of XRP to
        2   individual users promote the adoption of ODL as a
        3   successful product?
        4                   MR. WHITE:  Objection; calls
17:44:56  5           for speculation.
        6       A.   I mean, there's too much -- too many
        7   uncertainties and context missing to be able to
        8   respond to that with a yes or no.
        9       Q.   Given what you know about the ODL
17:45:22 10   product, is it safe to say that Ripple's sales of
       11   XRP to individual users were not in connection
       12   with promoting adoption of the ODL product?
       13                   MR. WHITE:  Objection; form.
       14       A.   I'm not sure I understand your question.
17:45:42 15   Could you rephrase that, please?
       16       Q.   Sure.
       17           I think we've established that
       18   individuals do not use ODL, is that right?
       19       A.   That's not my understanding, sir.
17:45:55 20       Q.   Okay.  So if an individual purchases
       21   XRP, it's not for the purpose of using ODL, right?
       22                   MR. WHITE:  Objection; form.
       23       A.   That's not my understanding.
       24       Q.   I can't tell if you're agreeing or
17:46:05 25   disagreeing.  I'm sorry.

                                                        281

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:46:06  1      A.   That's not my understanding.  Sorry.

        2  No.

        3      Q.   It's probably because I'm asking the

        4  question poorly.

17:46:15  5           You would agree that if an individual

        6  purchases XRP, that individual is not purchasing

        7  the XRP for the purpose of using ODL, is that

        8  right?

        9           MR. WHITE:  Objection.

17:46:29 10      A.   It's my understanding that it's only

       11  large corporates and institutionals, but I would

       12  have to review that.

       13      Q.   Okay.  Let's move to paragraph 120,

       14  please.  That's on page 59.  The first sentence of

17:47:00 15  120 says "During its product development, Ripple

       16  has enabled several important use cases related to

       17  payment services, cross-currency settlements, and

       18  FX (foreign exchange) solutions."

       19           Do you see that?

17:47:12 20      A.   Yes.

       21      Q.   In the context of this sentence, does

       22  "enabled" mean that Ripple developed these use

       23  cases?

       24           MR. WHITE:  Objection; form.

17:47:37 25      A.   Based on the ones that I list below, I

                                                        282

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:47:45  1    guess ripple designed these products.

2         Q.   Moving to the bullet that starts "ODL"

3    on page 60, do you see that?

4         A.   Yes.

17:48:03  5    Q.   It says "ODL, formerly known as xRapid,

6    is a liquidity solution for banks that uses XRP as

7    a bridge currency," and then continues.

8              Do you see that?

9         A.   Yes.

17:48:15 10    Q.   Do any banks currently use ODL today?

11                   MR. WHITE:   Objection;

12              foundation.

13        A.   I have to defer to -- or refer to the

14   deposition by Dr. Birla -- or Mr. Birla, I'm not

17:48:42 15   sure -- who said that -- I think he indicated that

16   ODL was currently not used by banks.

17        Q.   Okay.   Moving to the last bullet on page

18   60, you write "Ripple products also make use of

19   ILP, an open protocol suite for sending payments

17:48:57 20   across different ledgers, most often cited by

21   third-party developers as a key differentiator for

22   adopting XRP or use of the XRP Ledger."

23             Do you see that?

24        A.   I see that.

17:49:08 25   Q.   Okay.   Who are the third-party

283

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:49:12  1  developers that you're referencing in this

2  sentence?

3       A.   Third-party use case developers.

4       Q.   And who are they?  Who are you

17:49:28  5  describing in this sentence?

6              MR. WHITE:   Objection; form.

7       A.   These are not individuals.  These are

8  companies that have adopted XRP or used the XRP

9  Ledger because ILP allows them to cross over

17:49:51 10  between multiple different ledgers and even

11  between regular bank accounts and ledgers.

12       Q.   Right.  I'm trying to get at which

13  third-party developers have made the claim --

14       A.   Oh.

17:50:03 15       Q.   -- as expressed in your first sentence.

16       A.   I am going to have to check my Footnote

17  92 and 93 to make reference to that statement.

18       Q.   Sitting here today, do you know whether

19  or not the references cited in Footnotes 92 or 93

17:50:48 20  support the statement that "ILP is most often

21  cited by third-party developers as a key

22  differentiator for adopting XRP or the use of the

23  XRP Ledger"?

24       A.   I do not know which of these two

17:51:02 25  references would have that specific statement in

284

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
17:51:05   1   it.
           2        Q.   Are you certain that one of them does?
           3        A.   I would have to --
           4                  MR. WHITE:  Objection.
17:51:12   5        A.   I would have to look back at these
           6   footnotes to -- to check that.
           7        Q.   Let's turn to paragraph 123 on page 63.
           8   The second sentence starts with "Aside from
           9   multiple e-commerce companies using the XRP Ledger
17:51:41  10   because of its speed and cost benefits..."
          11             Do you see that?
          12        A.   Yes.
          13        Q.   Which e-commerce companies use the XRP
          14   Ledger?
17:52:04  15        A.   Well, many of the e-commerce companies
          16   are listed on the -- both Appendix C and Appendix
          17   D., and any company that accepts XRP for its, you
          18   know, product sales.
          19        Q.   Okay.  So to make sure I understand the
17:52:27  20   sentence, when you say "multiple e-commerce
          21   companies use the XRP Ledger because of its speed
          22   and cost benefits," you're referring to e-commerce
          23   companies that accept XRP as payment, is that
          24   right?
17:52:46  25        A.   Yes.  This is -- 120 -- paragraph 123 is
```

285

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:52:48  1    a setup for paragraph 124, which refers to "these

2    use cases."  So it's connected between two -- for

3    example, the example of furniture that you brought

4    up earlier would be an example.

17:53:07  5        Q.   Going back to paragraph 123, how do you

6    know that these e-commerce companies are using the

7    XRP Ledger because of its speed and cost benefits?

8        A.   This goes back to some of the previous

9    citations related to some of the companies I

17:53:56 10    listed before, as well as other readings on

11    companies where there are specific quotations from

12    business owners saying "I like it because of

13    speed."

14        Q.   Which companies are you --

17:54:09 15        A.   For example, TapJets mentioned that

16    because of speed, but I did not cite specifically

17    to the statement of the business owner of TapJets

18    who actually said that.  That's an omission on my

19    behalf.  I apologize.

17:54:25 20        Q.   Aside from the TapJets statement that

21    you just described, were there other occasions

22    where you were able to determine that e-commerce

23    companies had elected to use the XRP Ledger

24    because of its speed and cost benefits?

17:54:42 25        A.   There are other quotes that I've come

286

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:54:44   1    across in my research, yes.

2         Q.   Are those incorporated in your report

3    anywhere?

4         A.   I'm going to have to check which of

17:54:58   5    these use cases those were.  I apologize that I

6    did not cite specifically those, to those

7    companies and those business owners who explicitly

8    stated that.

9         Q.   Okay.  Let's turn to paragraph 33,

17:55:23  10    please.

11         A.   Sorry, paragraph?

12         Q.   Thirty-three on page 16.

13              The sentence near the end of the

14    paragraph starts "When a user sends bitcoin, the

17:55:49  15    transaction is bundled in a block with 1,000" to

16    20 -- strike that.

17              Let's move to paragraph 35.  The last

18    sentence of paragraph 35 says "Current estimates

19    suggest there are over 700,000 blocks on the

17:56:03  20    bitcoin blockchain."

21              Do you see that?

22         A.   I see that.

23         Q.   What's your source for that statement?

24         A.   It's probably one of the ones that was

17:56:19  25    cited earlier such as 20, but I did not

287

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:56:23  1   specifically cite to that.

2   Q.   Do you know sitting here today what

3   source you used to come up with that sentence in

4   paragraph 35?

17:56:37  5   A.   I am not sure.

6   Q.   Okay.

7   A.   But I'm assuming that where it came from

8   was cited in one of the earliest -- earlier

9   references when I described bitcoin.

17:56:49 10   Q.   Okay.   The same question for paragraph

11   38 on page 18.   About the center of that paragraph

12   it reads "By design, the rewards halves after

13   210,000 new blocks, or about every four years,

14   until reaching the maximum supply of 21 million

17:57:15 15   coins.   In May 2020, the block reward was halved

16   for a third time to 6.25 BTC."

17           Do you see that?

18   A.   I see that.

19   Q.   What was your source for that

17:57:25 20   information?

21   A.   I'm going to have to look back at where

22   that came from.

23   Q.   Sitting here today, you're not sure what

24   source you used?

17:57:43 25   A.   Which source are the ones that I -- that

288

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

17:57:45  1    I cited, I don't know.  Don't know, no.

       2          Q.   Let's look at paragraph 46 on page 22.

       3    This is in reference to the XRP Ledger.  The last

       4    sentence says "The number of validators has grown

17:58:09  5    to 150 around the world, including clients, users,

       6    and company servers; notable validators include

       7    Microsoft and Massachusetts Institute of

       8    Technology."

       9              Do you see that?

17:58:22 10          A.   On the top of 22?

      11          Q.   Yes.

      12          A.   Yes.

      13          Q.   What is your source for that

      14    information?

17:58:36 15          A.   I believe it's both information based on

      16    the -- my Reference 26, information that's

      17    available on Ripple sites.  And since MIT is one

      18    of the -- one of the UBRI universities, it's one

      19    of -- one of our colleagues in the partnership.

17:58:59 20    So I knew -- I knew about that one.

      21          Q.   Okay.

      22                    MR. SYLVESTER:  I would like

      23              to take a brief break and then we can

      24              wrap this up if that sounds all right.

17:59:09 25                    THE VIDEOGRAPHER:  Going off

                                                          289

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
17:59:09   1              the record.  The time is 6 p.m.
           2                      (Whereupon, a recess is
           3              taken.)
           4                      THE VIDEOGRAPHER:  We'll go
18:12:31   5              back on the record.  The time is 6:13.
           6    BY MR. SYLVESTER:
           7       Q.   Professor, how did you come to be
           8    retained as an expert in this case?
           9       A.   I initially received a call from
18:12:44  10    counsel.  I --
          11                      MR. WHITE:  I caution you not
          12              to disclose the substance of
          13              conversations with counsel.
          14                      THE WITNESS:  All right.
18:12:57  15       A.   I received a -- a call; we had a
          16    discussion.  They disappeared and came back at one
          17    point and said "We'd like to retain you."
          18       Q.   Which counsel reached out to you?
          19       A.   I believe it was Michael Kellogg.
18:13:17  20       Q.   When was that initial -- sorry.  Go
          21    ahead.
          22       A.   At least the firm, but I don't know who
          23    it was within the firm.
          24       Q.   When was that initial call?
18:13:30  25       A.   Would have been April 2021.
```

290

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:13:32  1       Q.   Okay.  Did you do anything today to

2    prepare for your deposition?  Strike that.  Taking

3    out "today."

4            Did you do anything to prepare for your

18:13:43  5    deposition today?

6       A.   Oh.  Yes.

7       Q.   What did you do?

8       A.   I reread all the reports, my reports,

9    rebuttal reports, filings, depositions.  So did a

18:14:00  10   reread of all of the materials and we had a couple

11   preparation sessions.

12      Q.   Who participated in your preparation

13   sessions?

14      A.   It was counsel at Debevoise, Kellogg

18:14:20  15   Hansen.  And I forgot the other counsel.

16      Q.   About how long did you spend in

17   preparation with counsel prior to your

18   deposition?

19      A.   As in hours?

18:14:38  20      Q.   Yes.

21      A.   In total, probably two days.

22      Q.   Two eight-hour days?

23      A.   Two half days and one full day.  So

24   three separate meetings.

18:14:52  25      Q.   Other than counsel, did anyone else

291

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:14:54  1    assist with your preparation for your deposition

       2    today?

       3        A.   No.

       4                 MR. SYLVESTER:  That's all

18:15:00  5        the questions I have.

       6        Thank you.

       7                 THE WITNESS:  Thank you.

       8                 MR. WHITE:  So we will have

       9        some redirect and we can go now if you

18:15:08 10        want.

      11                 MR. SYLVESTER:  Go ahead.

      12                 MR. WHITE:  Do we want to

      13        switch?

      14                 MR. SYLVESTER:  I'm

18:15:14 15        comfortable here, but if you'd like to

      16        switch, that's fine by me.

      17                 MS. ZORNBERG:  I think you

      18        should switch because it's video.

      19                 MR. WHITE:  Because of video,

18:15:20 20        yeah.  Go off the video.

      21                 THE VIDEOGRAPHER:  Going off

      22        the record.  The time is 6:16.

      23                 (Pause)

      24                 THE VIDEOGRAPHER:  We'll go

18:16:28 25        back on the record.  The time is 6:17.

                                                         292

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:16:31  1    CROSS-EXAMINATION

      2    BY MR. WHITE:

      3        Q.    Dr. Adriaens, earlier today you were

      4    asked about some language in paragraph 43 of your

18:16:39  5    report that is similar to language in another

      6    source that was marked as Exhibit PA 24.

      7              Do you recall that line of testimony?

      8        A.    Yes, I do.

      9        Q.    Would you focus with me on the two

18:16:53 10    sentences you were asked about in that paragraph,

     11    which is the first two sentences of paragraph 43?

     12    Do you view the statements made in those sentences

     13    to be in any way controversial?

     14                    MR. SYLVESTER:   Object to

18:17:09 15              form.

     16        A.    No, I do not.   I think they're very

     17    high-level descriptions.

     18        Q.    Since reviewing Exhibit PA 24 earlier

     19    today, have you looked into whether -- into

18:17:21 20    whether Exhibit PA 24 is the only source that uses

     21    that language?

     22        A.    Yes.   After I was asked by SEC counsel

     23    regarding these two sentences, I decided to take

     24    advantage of one of our breaks to do a search on

18:17:42 25    the exact statements, a basic Google search.   And

                                                       293

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:17:51   1   I found that these exact sentences -- or these

2   sentence -- these sentences, give or take one word

3   or two, did actually appear in a lot of crypto

4   sites, such as Medium, in book chapters, and

18:18:10   5   other -- other places.

6       Q.   Was it ever your intention to take

7   language from some particular source and not

8   provide a citation?

9       A.   No, it was never my intention to not

18:18:26  10   cite if this was identical to something that we

11   find somewhere else.

12       Q.   Let me shift to another topic.

13           You recall that Mr. Sylvester spent

14   quite some time today questioning you about

18:18:41  15   back -- background factors set forth in Part 2 of

16   your report.

17           Do you recall that testimony?

18               MR. SYLVESTER:  Object to

19           form.

18:18:46  20       A.   Yes.

21       Q.   Look with me at paragraph 23 of your

22   report.  Let me know when you're there.

23       A.   I'm there.

24       Q.   Do you see there that you characterize

18:18:58  25   Part 2 as "background"?

                                                        294

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
18:19:04    1                    MR. SYLVESTER:  Object to
            2         form.
            3         A.    Yes.
            4         Q.    Are you a technical expert in the
18:19:07    5    operational details of how the XRP Ledger or other
            6    blockchains work?
            7    No.  As I stated or testified earlier in the -- today's
            8    deposition, my background is in the business analytics,
            9    business development, and business applications of the
18:19:28   10    blockchain and digital currencies.
           11         Q.    And that's the expertise you brought to
           12    bear in this case, correct?
           13                    MR. SYLVESTER:  Object to
           14         form.
18:19:36   15         A.    That's the expertise I brought to bear.
           16         Q.    Look with me now at paragraphs 19
           17    through 21.  Let me know when you've had a chance
           18    to review them.
           19         A.    Yes.
18:19:51   20         Q.    Those paragraphs summarize the opinions
           21    that you've offered in this case, correct?
           22         A.    Yes, they do.
           23         Q.    Is expertise in the technical details of
           24    how XRP Ledger validation works necessary for any
18:20:07   25    of the opinions that you've offered?
```

295

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

18:20:09    1         A.    No, it isn't.

            2                   MR. WHITE:   That's all the

            3         questioning I have subject to any

            4         further questioning.   I will request

18:20:16    5         to read and sign and designate the

            6         transcript confidential.

            7                   MR. SYLVESTER:   I don't have

            8         anything.   Thanks.

            9                   THE VIDEOGRAPHER:   That

18:20:21   10         concludes today's deposition.   The

           11         time is 6:21.

           12                   (Whereupon, the deposition

           13         was concluded at 6:21 p.m.)

           14

16:56:00   15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

                                                          296

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

1  STATE OF NEW YORK        )

2                           ) ss:

3  COUNTY OF NEW YORK       )

4         I hereby certify that the witness in the

5  foregoing deposition, DR. PETER ADRIAENS was by me duly

6  sworn to testify to the truth, the whole truth and

7  nothing but the truth, in the within-entitled cause; that

8  said deposition was taken at the time and place herein

9  named; and that the deposition is a true record of the

10 witness's testimony as reported by me, a duly certified

11 shorthand reporter and a disinterested person, and was

12 thereafter transcribed into typewriting by computer.

13        I further certify that I am not interested in

14 the outcome of the said action, nor connected with nor

15 related to any of the parties in said action, nor to

16 their respective counsel.

17        IN WITNESS WHEREOF, I have hereunto set my hand

18 this 10th day of February 2022.

19        Reading and Signing was:

20  _x__ requested    ___ waived   __ not requested.

21

22

23        *Bridget Lombardozzi*

24        BRIDGET LOMBARDOZZI, CSR, RMR, CRR

25

                                                    297

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4        I, PETER ADRIAENS, do hereby declare under

 5        penalty of perjury that I have read the entire

 6        foregoing transcript of my deposition testimony,

 7        or the same has been read to me, and certify that

 8        it is a true, correct and complete transcript of

 9        my testimony given on February 8, 2022, save and

10        except for changes and/or corrections, if any, as

11        indicated by me on the attached Errata Sheet, with

12        the understanding that I offer these changes and/or

13        corrections as if still under oath.

14           _____ I have made corrections to my deposition.

15           _____ I have NOT made any changes to my deposition.

16

17   Signed: _____
                PETER ADRIAENS
18

19   Dated this _____ day of _____ of 20____.

20

21

22

23

24

25
                                                        298
```

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
1                        ERRATA SHEET
2       Deposition of:  PETER ADRIAENS
        Date taken: FEBRUARY 8, 2022
3       Case:  SEC v. RIPPLE LABS, INC., et al.
4       PAGE  LINE
        _____ _____     CHANGE: _____
5                       REASON: _____
6       _____ _____     CHANGE: _____
                        REASON: _____
7
                        CHANGE: _____
8       _____ _____     REASON: _____
9       _____ _____     CHANGE: _____
                        REASON: _____
10
                        CHANGE: _____
11      _____ _____     REASON: _____
12      _____ _____     CHANGE: _____
                        REASON: _____
13
                        CHANGE: _____
14      _____ _____     REASON: _____
15      _____ _____     CHANGE: _____
                        REASON: _____
16
                        CHANGE: _____
17      _____ _____     REASON: _____
18      _____ _____     CHANGE: _____
                        REASON: _____
19
                        CHANGE: _____
20      _____ _____     REASON: _____
21      _____ _____     CHANGE: _____
                        REASON: _____
22
                        CHANGE: _____
23      _____ _____     REASON: _____
24
        Signed_____
25      Dated_____
                                                        299
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**