# Exhibit 37

1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
                      Plaintiff,    ) Case No.:
6          v.                       ) 20-Civ-10832(AT)(SN)
                                    )
7    RIPPLE LABS, INC., BRADLEY     )
     GARLINGHOUSE, and CHRISTIAN    )
8    LARSEN,                        )
                                    )
9                     Defendants.   )
     _____)

10

11

12

13

14

15               VIDEOTAPED DEPOSITION OF

16             KRISTINA S. SHAMPANIER, Ph.D.

17              Monday, December 20, 2021

18

19

20

21

22

23

24   Reported by:
     BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 211220BLO

                                                        1

1              IN THE UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                    Plaintiff,        )  Case No.:
6            v.                       )  20.Civ.10832(AT)(SN)
                                      )
7    RIPPLE LABS, INC., BRADLEY       )
     GARLINGHOUSE, and CHRISTIAN      )
8    LARSEN,                          )
                                      )
9                    Defendants.      )
     _____ )

10

11

12

13

14

15           Videotaped Deposition of KRISTINA S. SHAMPANIER,

16   Ph.D. taken on behalf of Plaintiff, held at the offices

17   of Debevoise & Plimpton, 919 Third Avenue, New York, New

18   York, commencing at 9:01 a.m. and ending at 4:41 p.m., on

19   Monday, December 20, 2021, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States of

21   New York and New Jersey, pursuant to notice.

22

23

24

25
                                                          2

```
 1    A P P E A R A N C E S (Via Remote where indicated):

 2

 3

 4    For the Plaintiff:

 5

 6

 7         UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 8         NEW YORK REGIONAL OFFICE

 9         BY:  PASCALE GUERRIER, ESQUIRE

10              MARK SYLVESTER, ESQUIRE

11         New York Regional Office

12         200 Vesey Street

13         Suite 400

14         New York, New York  10281-1022

15         Telephone:  212.336.0153

16         Email:   guerrierp@sec.gov

17                  sylvesterm@sec.gov

18

19

20

21

22

23

24

25
```

3

```
 1   A P P E A R A N C E S (Continued):

 2   For Defendant Ripple Labs Inc.:

 3            DEBEVOISE & PLIMPTON LLP

 4            BY:  PETER URMSTON, ESQUIRE (Remote)

 5                 LISA ZORNBERG, ESQUIRE (Remote)

 6                 ASHLEY HAHN, ESQUIRE (Remote)

 7            919 Third Avenue

 8            New York, New York  10022

 9            Telephone:  212.909.6000

10            E-Mail:  pcurmston@debevoise.com

11                     lzornberg@debevoise.com

12                     ahahn@debevoise.com

13                         -and-

14   For Defendant Ripple Labs Inc. and the Witness:

15

16            KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

17            BY:  BRADLEY E. OPPENHEIMER, ESQUIRE

18                 JUSTIN BERG, ESQUIRE (Remote)

19            Sumner Square

20            1615 M Street, N.W.

21            Suite 400

22            Washington, D.C.  20036

23            Telephone:  202.326.7999

24            E-mail:  Boppenheimer@kellogghansen.com

25                     jberg@kellogghansen.com
```

4

```
 1    A P P E A R A N C E S  (Continued):

 2

 3    For Defendant Bradley Garlinghouse:

 4

 5            CLEARY GOTTLIEB STEEN & HAMILTON

 6            BY:  JACKIE M. BRUNE, ESQUIRE (Remote)

 7            One Liberty Plaza

 8            New York, New York  10006

 9            Telephone:  212.225.2951

10            E-mail:  jabrune@cgsh.com

11

12    For Defendant Christian A. Larsen:

13

14            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

15            BY:  SARAH PROSTKO, ESQUIRE (Remote)

16            1285 Avenue of the Americas

17            New York, New York  10019-6064

18            Telephone:  212.373.3067

19            E-mail:  sprostko@paulweiss.com

20

21    ALSO PRESENT:

22

23            NICOLE FORBES, Paralegal, SEC

24            DAVID SHERECK, Videographer
              Shereck Video Service
25
```

5

```
1                          INDEX

2    WITNESS                        EXAMINATION

3    KRISTINA S. SHAMPANIER, Ph.D.

4        BY MS. GUERRIER                  10

5        BY MR. OPPENHEIMER             219

6

7

8                        EXHIBITS

9    SEC
     NUMBER            DESCRIPTION          PAGE
10

11   Exhibit 1    Curriculum Vitae of ███        97

12                 ███, Undated

13                 NO BATES, 3 pages

14

15   Exhibit 4    Expert Rebuttal Report of    24

16                 Kristina Shampanier, Ph.D.

17                 dated November 12, 2021

18                 NO BATES, 45 pages

19

20   Exhibit 5    Thesis Dissertation "Essays   64

21                 in Behavioral Decision-

22                 Making" dated May 2007 by

23                 Dr. Shampanier

24                 NO BATES, 159 pages

25
```

6



1                          EXHIBITS

2    SEC
     NUMBER              DESCRIPTION              PAGE
3

4    Exhibit 7    Expert Report of ▮▮▮▮▮        96

5                 ▮▮▮▮▮▮, dated October 4,

6                 2021

7                 NO BATES, 50 pages

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      7

```
 1                    DEPOSITION SUPPORT INDEX

 2

 3       DIRECTION TO WITNESS NOT TO ANSWER

 4          Page     Line

 5           16        6

 6           17       22

 7           33        9

 8           34       18

 9           34       21

10

11

12       STIPULATIONS

13          Page     Line

14           12        1

15

16

17       PORTION MARKED HIGHLY CONFIDENTIAL

18          Page     Line

19           - -none- -

20

21

22       REQUEST FOR DOCUMENTS

23          Page     Line

24           - -none- -

25
```

8

```
 1                    -  -  -

 2                  9:01 a.m.

 3              December 20, 2021

 4                    -  -  -

 5              THE VIDEOGRAPHER:  Okay.  We

 6       are on the record.  The time is

 7       approximately 9:01 a.m.  Today's date

 8       is Monday, December 20th, 2021.  This

 9       is the video deposition of Kristina

10       Shampanier in the matter of the

11       Securities and Exchange Commission

12       versus Ripple Labs, et al.  Index

13       number is 20-Civ-10832 in the United

14       States District Court, Southern

15       District of New York.

16              My name is David Shereck,

17       certified legal videographer with Shereck

18       Video, in association with Gradillas

19       Reporting of Glendale, California.

20              We're located today at the

21       offices of Debevoise & Plimpton located

22       at 919 Third Avenue, New York, New York.

23              All counsel that are present

24       will be noted on the stenographic record.

25              And the court reporter today is
```

9

09:02:28   1              Bridget Lombardozzi, also with Gradillas,

           2         and will you please swear in the witness.

           3                   K R I S T I N A

           4         S H A M P A N I E R, Ph.D., having been

09:02:32   5         duly sworn, was examined and testified as

           6         follows:

           7                        THE REPORTER:  Thank you.

           8                   You may proceed.

           9    DIRECT-EXAMINATION

09:02:45  10    BY MS. GUERRIER:

          11         Q.    Good morning.  I'm Pascal Guerrier with

          12    the SEC.  I'll be asking you questions today.

          13    With me is my -- is also counsel, Mark Sylvester.

          14              If you could please state your name for

09:02:58  15    the record.

          16         A.    Kristina Shampanier.

          17         Q.    Are you represented by counsel today?

          18         A.    Yes.

          19         Q.    Who's your counsel?

09:03:05  20         A.    Brad Oppenheimer.

          21         Q.    And who is Brad Oppenheimer with?

          22         A.    Kellogg Hansen.

          23         Q.    Before we get started, I want to just

          24    give you some of the rules that are going to

09:03:18  25    govern the deposition today so that the deposition

                                                                    10

09:03:20 can go smoothly.

You understand that you're giving testimony under oath?

A. Yes.

09:03:28 Q. And do you understand that your answers today to my questions have the same force and effect as if we were in a courtroom?

A. Yes.

Q. Is there anything that will prevent you

09:03:39 from testifying truthfully and accurately today?

A. No.

Q. If you don't understand any question that I ask, I -- please let me know and I'll rephrase it.

09:03:51 Please allow me to finish my question before you start answering so that the court reporter can have a clear record of your testimony and my questions.

And if you could please respond verbally

09:04:06 because the court reporter cannot transcribe nods and other nonverbal actions.

Do you have any questions about any of the rules that I've just described to you?

A. No questions.

09:04:20 Q. Okay. Have you had --

```
09:04:22   1                      MR. OPPENHEIMER:  Could I

           2              just put on the record here we'd like

           3              to continue our prior practice of

           4              having an objection by one defendant

09:04:29   5              count as an objection by all.

           6                      MS. GUERRIER:  Sure.

           7                      MR. OPPENHEIMER:  Thank you.

           8      BY MS. GUERRIER:

           9         Q.   Have you had your deposition taken

09:04:35  10      before today?

          11         A.   Yes.

          12         Q.   Okay.  Do you recall when you had your

          13      deposition taken?

          14         A.   2016.

09:04:47  15         Q.   Any other time?

          16         A.   No.

          17         Q.   Do you recall the case where you had

          18      your deposition taken in 2016?

          19         A.   It was several cases combined.  One of

09:05:04  20      them was United States versus Florida.

          21         Q.   Do you recall what the case was about?

          22         A.   Was a health care case.

          23         Q.   When you say "it was several cases

          24      combined," can you elaborate on that?

09:05:26  25         A.   Why don't we open my report and it's
```

12

```
09:05:27   1    listed in my CV.
           2        Q.   Why don't you answer my questions,
           3    please.
           4                MR. OPPENHEIMER:  Objection.
09:05:35   5        A.   There were several cases combined
           6    together.  One of them had a very long name that I
           7    cannot recollect from memory.  The other one was
           8    United States versus Florida.
           9        Q.   Okay.  Were they all health care cases?
09:05:55  10        A.   Yes.
          11        Q.   Did you do anything to prepare for your
          12    deposition today?
          13        A.   Yes.
          14        Q.   What did you do to prepare for your
09:06:07  15    deposition?
          16        A.   I reviewed my report, Mr. ███████
          17    report, the complaint, materials considered in my
          18    report, Ripple's answer.  I had several meetings
          19    with my colleagues and with counsel.
09:06:42  20        Q.   Which colleagues did you have meetings
          21    with in preparation for your deposition?
          22        A.   Niall MacMenamin and Vendela Fehrm.
          23        Q.   And Vendela?  I'm sorry?
          24        A.   Fehrm.
09:06:57  25        Q.   Who is Niall MacMenamin?
```

13

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
09:07:00   1          A.   He's a -- and I apologize in advance to

           2     any of my colleagues whose names I mispronounce.

           3     Same for counsel.  Niall is my colleague at

           4     Compass Lexecon.

09:07:28   5          Q.   Does Mr. Niall MacMenamin work with you

           6     at Con Lexecon?

           7          A.   Niall works with me at Compass Lexecon.

           8          Q.   Compass Lexecon.

           9          So do you supervise Mr. Mc -- am I

09:07:42  10     saying his name correctly?  Mc -- MacMenamin?

          11          A.   MacMenamin.

          12          Q.   MacMenamin.

          13          Do you supervise Mr. MacMenamin?

          14               MR. OPPENHEIMER:  Objection.

09:07:53  15               You can answer.

          16          A.   No.

          17          Q.   Okay.  So what is his role at Con

          18     Lexecon?

          19          A.   His role at Compass Lexecon -- his

09:08:01  20     position at Compass Lexecon is senior vice

          21     president.

          22          Q.   Were any attorneys present when you met

          23     with Mr. MacMenamin?

          24          A.   Sometimes yes, sometimes no.

09:08:27  25          Q.   Okay.  Do you recall the times when the
```

                                                                  14

09:08:28  1    attorneys were not present when you met with

       2    Mr. MacMenamin?

       3              MR. OPPENHEIMER:  You can

       4         answer that yes or no if you recall.

09:08:38  5    A.   Yes.

       6    Q.   So can you tell me which times you met

       7    with Mr. MacMenamin without your attorneys

       8    present?

       9    A.   This would --

09:08:46 10              MR. OPPENHEIMER:  Objection

      11         to the form.

      12              You can answer as to which

      13         times you met with him if you understand

      14         that.

09:08:57 15    A.   This would be in the past two weeks or

      16    so.

      17    Q.   Was Mr. MacMenamin involved in preparing

      18    the report that you submitted in this case?

      19    A.   He assisted me.

09:09:15 20    Q.   How did he assist you?

      21    A.   We had discussions about the report.

      22    Q.   Did he help you write the report?

      23    A.   He reviewed the report and gave me

      24    feedback.

09:09:39 25    Q.   Is Mr. MacMenamin your supervisor?

                                                          15

09:09:40  1      A.   No.

2      Q.   When you met with Mr. MacMenamin without

3  your attorneys present, did -- what did you

4  discuss?

09:09:55  5               MR. OPPENHEIMER:  Objection.

6               I'll instruct you not to answer

7         that.  That calls for privileged

8         information.

9      Q.   Okay.  Is Mr. -- was Mr. MacMenamin

09:10:06  10  retained by your counsel to assist you in this

11  case?

12               MR. OPPENHEIMER:  Objection.

13               You can answer if you know.

14      A.   I'm not sure about the technicalities.

09:10:23  15  I understand he was retained to assist me.

16      Q.   You also mentioned Mr. -- I'm sorry,

17  Vendela Fehrm?

18      A.   Vendela Fehrm.  It's a she.

19      Q.   Vendela Fehrm.

09:10:45  20         And who is Vendela Fehrm?

21      A.   She's my colleague -- colleague at

22  Compass Lexecon.

23      Q.   What is her title at Compass Lexecon?

24      A.   Vice president.

09:11:13  25      Q.   Does Ms. La Fehrm assist you with

16

```
09:11:16   1    preparing the report you submitted in this case?
           2                    MR. OPPENHEIMER:  Objection.
           3                    You can answer.
           4          A.   Ms. Fehrm assisted me with the report.
09:11:27   5          Q.   How did Ms. La Fehrm assist you with the
           6    report?
           7          A.   She helped finding certain citations.
           8                    THE REPORTER:  Repeat.
           9          A.   She helped finding certain citations.
09:11:54  10          Q.   Are those citations report -- included
          11    in the report you submitted?
          12          A.   That's correct.
          13          Q.   Do you recall which citations she helped
          14    find for you?
09:12:03  15                    MR. OPPENHEIMER:  Objection.
          16                    You can answer that yes or no
          17            if you recall.
          18          A.   To a degree.
          19          Q.   What do you recall regarding the
09:12:13  20    citations that she assisted you with?
          21                    MR. OPPENHEIMER:  Objection.
          22                    I instruct you not to answer
          23            that.
          24                    MS. GUERRIER:  What is the
09:12:18  25            basis for your objection?
```

17

```
09:12:19   1              MR. OPPENHEIMER:  You're
           2          asking -- as I understand it, you're
           3          asking about the substance of the
           4          discussions that she had with her own
09:12:32   5          support team who are Compass Lexecon
           6          employees retained by and acting at
           7          the direction of counsel.  I think
           8          that's attorney work product and it's
           9          privileged from discovery.
09:12:43  10              MS. GUERRIER:  Okay.
          11   BY MS. GUERRIER:
          12       Q.   You also stated you met with attorneys
          13   in this case, is that correct?
          14       A.   That's correct.
09:12:58  15       Q.   Who did you meet with?
          16       A.   Bradley Oppenheimer, Justin Berg, Andrew
          17   whose last name I don't remember, Sarah Prostko.
          18       Q.   Do you recall how many times you met
          19   with the attorneys in this case?
09:13:24  20       A.   I haven't finished answering.
          21       Q.   I'm sorry.
          22       A.   And Jackie Brune, I believe.
          23       Q.   Can you repeat that, please?
          24       A.   Jackie Brune.
09:13:41  25       Q.   Jackie Brune?
```

18

09:13:42   1      A.   Yes.

       2      Q.   Okay.   Okay.   Did you meet with the

       3   individuals that you've identified all together at

       4   once?

09:14:01   5      A.   I had several meetings.   Some of them

       6   were at all the meetings; some of them were at

       7   only some of the meetings.

       8      Q.   Do you recall how many sessions you had

       9   with the attorneys that you identified to prepare

09:14:11 10   for your deposition?

      11      A.   I do.

      12      Q.   How many sessions did you have?

      13      A.   Three.

      14      Q.   When was the first session?

09:14:23 15      A.   Within the past two weeks.

      16      Q.   Do you recall the date?

      17      A.   No.

      18      Q.   When was the second session?

      19      A.   Within the past two weeks.

09:14:34 20      Q.   Do you recall the date?

      21      A.   No.

      22      Q.   When was the third session?

      23      A.   Yesterday.

      24      Q.   Were all of the attorneys that you've

09:14:43 25   identified present at yesterday's session to

19

```
09:14:47   1   prepare you for your deposition?
           2        A.   No.
           3        Q.   Who was present?
           4        A.   Bradley Oppenheimer and Justin Berg.
09:15:00   5        Q.   Do you recall how long the session
           6   lasted?
           7        A.   About two hours.
           8        Q.   And the session -- the first session
           9   that you had with the attorneys in the past two
09:15:14  10   weeks, do you recall how long the first session
          11   lasted?
          12        A.   Yes.
          13        Q.   How long did the first session last?
          14        A.   Four hours.
09:15:24  15        Q.   Do you recall how long the second
          16   session that you had in the past two weeks with
          17   your attorneys lasted?
          18        A.   Yes.
          19        Q.   How long did the first session last?
09:15:38  20   I'm sorry, the second session that you had with
          21   your attorneys in the past two weeks last.
          22        A.   Three hours.
          23        Q.   Was anyone who was not an attorney
          24   present during any of the sessions that you had
09:15:56  25   with your attorneys?
```

20

```
09:16:00   1          A.   Yes.

           2          Q.   Who was present during the sessions that

           3     you had with your attorney?

           4          A.   In the first two sessions, Niall

09:16:10   5     MacMenamin and Vendela Fehrm were also present.

           6          Q.   Anyone else?

           7          A.   No.

           8          Q.   Other than counsel, did you speak

           9     with -- and -- other than counsel and the

09:16:35  10     individuals at Compass Lexecon that you described,

          11     did you speak with anyone else about your

          12     deposition?

          13          A.   My family knows I'm at a deposition.

          14          Q.   Who did you speak with in your family

09:16:54  15     about the deposition?

          16          A.   My husband and my parents know I'm in a

          17     deposition.

          18          Q.   When did you speak with your husband

          19     about the deposition?

09:17:08  20          A.   I don't recall.

          21          Q.   Do you recall what you told your husband

          22     about th█ deposition?

          23               MR. OPPENHEIMER:  You can

          24               answer yes or no.

09:17:14  25          A.   Yes.
```

                                                                    21

```
09:17:14   1        Q.   What did you tell your husband about the
           2   deposition?
           3        A.   That I would be --
           4                  MR. OPPENHEIMER:  Objection.
09:17:28   5                  I don't think you are obligated
           6            to disclose the substance of your
           7            communications with your husband.
           8                  Counsel, maybe we can try
           9            laying some foundation as to whether she
09:17:40  10            discussed any --
          11                  MS. GUERRIER:  Well --
          12                  MR. OPPENHEIMER:   --
          13            substance relating to the deposition
          14            with him before --
09:17:43  15                  MS. GUERRIER:  -- I'm
          16            getting there, but I don't think
          17            that's a proper objection.  Your
          18            objections are to form.  I don't know
          19            what privilege you're preserve --
09:17:51  20            preserving here.
          21                  MR. OPPENHEIMER:  I believe
          22            there's a marital communications
          23            privilege between husbands and wives.
          24                  MS. GUERRIER:  Are you
09:17:56  25            claiming the marital priv --
```

22

```
09:18:00   1                    privilege here?
           2                         MR. OPPENHEIMER:  I think
           3              the witness may choose to claim that
           4              if she wishes.
09:18:06   5                         MS. GUERRIER:  Do you
           6              represent her personally?
           7                         MR. OPPENHEIMER:  I'm here
           8              representing Ripple Labs.
           9                         MS. GUERRIER:  Right.  So
09:18:09  10              how are you -- okay.  So you -- you
          11              cannot object to her own marital
          12              privilege if she does choose to claim
          13              it or not.
          14      BY MS. GUERRIER:
09:18:20  15           Q.   So what did you talk to your husband
          16      about regarding the deposition?
          17           A.   I told him I would be deposed.
          18           Q.   Did you talk to him about the substance
          19      of this case?
09:18:31  20           A.   No.
          21           Q.   You also said you spoke with your
          22      parents about the case?
          23           A.   That's correct.
          24           Q.   What did you tell your parents about the
09:18:39  25      case?
```

23

```
09:18:40   1          A.   That I would be deposed.

           2          Q.   Did you speak about any substantive

           3     aspect of the case?

           4          A.   No.

09:18:46   5          Q.   Did you tell them what the case was

           6     about?

           7          A.   No.

           8          Q.   Did you speak with anyone else other

           9     than your family about the case?

09:18:55  10          A.   No.

          11                    MS. GUERRIER:  I'm going

          12               to -- if you could also pass it down

          13               to the court reporter.

          14                    THE REPORTER:  Exhibit 4?

09:19:38  15                    MS. GUERRIER:  Yes.

          16                    (Whereupon, exhibit is received

          17               and marked SEC Shampanier Deposition

          18               Exhibit 4 for identification.)

          19                    THE REPORTER:  Exhibit 4 for

09:19:41  20               identification.

          21     BY MS. GUERRIER:

          22          Q.   I've handed you what's been premarked as

          23     Exhibit 4.

          24               Do you recognize the document that I've

09:19:47  25     handed you that's been premarked as Exhibit 4?
```

24

09:20:24  1            (Pause)

        2        A.   Yes.

        3        Q.   What is the document that's been

        4   premarked as Exhibit 4?

09:20:29  5        A.   This appears to be a copy of my report

        6   in this case.

        7        Q.   Okay.  If you could turn to page 34 of

        8   the report.

        9            Is that your signature on page 34 of the

09:20:54 10   report?

       11        A.   Yes.

       12        Q.   Do you recall when you finalized the

       13   report?

       14        A.   November 12th.

09:21:06 15        Q.   Do you recall when you started drafting

       16   the report?

       17        A.   Yes.

       18        Q.   When did you start drafting the report?

       19        A.   October.

09:21:15 20        Q.   Do you recall what date?

       21        A.   No.

       22        Q.   Is this the -- Exhibit 4 the only draft

       23   of the report?

       24        A.   No.

09:21:30 25        Q.   Okay.  How many drafts are there of the

                                                              25

09:21:31  1    report?

2         A.    I don't know.

3         Q.    Where are the drafts of the report?

4         A.    On the Compass Lexecon network.

09:21:52  5    Q.    Is the report that you submitted today

6    final?

7         A.    It is final but if new information comes

8    in, I reserve the right to change my opinions.

9         Q.    Okay.  Has any information since you

09:22:08 10   signed this report affected or altered the

11   opinions that are set forth in the report?

12        A.    No.

13        Q.    Are you ready to testify about the

14   opinions that you're offering in this case?

09:22:25 15   A.    Yes.

16        Q.    Do you recall when you were retained to

17   provide your expert services in this case?

18        A.    Yes.

19        Q.    When were you retained?

09:22:51 20   A.    October.

21        Q.    What year?

22        A.    October 2021.

23        Q.    Okay.  Do you recall who retained you to

24   provide expert services in this case?

09:23:07 25   A.    Counsel for Ripple.

26

```
09:23:14   1          Q.   Do you recall what firm?

           2          A.   Kellogg Hansen.

           3          Q.   Okay.  Are you just representing -- I'm

           4     sorry.

09:23:23   5               Are -- did you submit the report on

           6     behalf of Ripple only?

           7                    MR. OPPENHEIMER:  Objection.

           8                    You can answer.

           9          A.   That's correct.

09:23:46  10          Q.   Did you come to any arrangements with

          11     Ripple regarding your fees in this case?

          12                    MR. OPPENHEIMER:  Objection

          13               to the form.

          14                    You can answer.

09:23:57  15          A.   I didn't personally discuss my fees with

          16     counsel.

          17          Q.   Well, do you know how much you're

          18     charging for your services in this case?

          19          A.   Compass Lexecon is charging $975 per

09:24:17  20     hour for my work.

          21          Q.   Okay.  Do you know if you're expected to

          22     provide any additional expert services other than

          23     the report that you submitted in this case?

          24                    MR. OPPENHEIMER:  Objection

09:24:35  25               to the form.
```

27

09:24:42   1          A.   I don't know that -- that for sure.   I
            2    understand that I may testify at trial.
            3          Q.   Mm-hmm.
            4               Do you know if your -- the rate that's
09:25:00   5     being charged for your services will change if
            6     you testify at trial?
            7          A.   I know that.
            8          Q.   I'm sorry?
            9          A.   I know whether it will change or not.
09:25:12  10          Q.   So what is the answer?   Will it change
           11    or not?
           12          A.   It -- it will not change.
           13          Q.   Do you -- do you know how many billable
           14    hours you've spent on this case thus far?
09:25:30  15          A.   No.
           16          Q.   How do you keep your time on this case?
           17          A.   I enter time usually daily in the system
           18    in Compass Lexecon.
           19          Q.   Do you know what specific work that you
09:25:58  20    billed for in the case?
           21          A.   Yes, generally.
           22          Q.   So what -- what specific work have you
           23    billed for in this case?
           24                    MR. OPPENHEIMER:   Objection.
09:26:06  25                    You can answer as to the types

                                                                    28

```
09:26:09    1              of work you've performed.  You should not
            2              reveal the substance of any discussions
            3              with counsel.
            4         A.   Reviewing case materials, meetings,
09:26:24    5    drafting report, preparation to deposition.  These
            6    are the major ones.
            7         Q.   What are the -- are -- are there other
            8    types of work that you've done in the case other
            9    than the ones that you just described?
09:26:52   10         A.   Not that I recall.
           11         Q.   Do you have any --
           12              THE VIDEOGRAPHER:  Go ahead.
           13         Q.   Do you have any personal relationship
           14    with any of -- with the defendants in this case?
09:27:18   15         A.   No.
           16         Q.   Okay.  Do you have any financial
           17    relationships with the defendants in this case?
           18              MR. OPPENHEIMER:  Objection.
           19              You can answer.
09:27:35   20         A.   Compass Lexecon is compensated for my
           21    work in this case.
           22         Q.   Are you familiar with XRP?
           23         A.   Yes.
           24         Q.   What is XRP?
09:27:51   25         A.   It is --
```

29

09:27:51  1                    MR. OPPENHEIMER:  Objection.

          2                    You can answer.

          3          A.   XRP is the digital asset at issue in

          4     this case.

09:28:00  5          Q.   Do you own any XRP?

          6          A.   No.

          7          Q.   Does anyone in your family own any XRP?

          8          A.   No.

          9          Q.   Have you bought any XRP?

09:28:17 10          A.   No.

         11          Q.   Have you sold any XRP?

         12          A.   No.

         13          Q.   Do you know if Compass Lexecon has

         14     received any compensation in XRP?

09:28:40 15          A.   I don't know the full extent of Compass

         16     Lexecon's compensation, but I would be very

         17     surprised if they received any compensation in

         18     XRP.

         19          Q.   Why?

09:28:54 20          A.   I've been in economic consulting for 15

         21     years and I've never seen anyone being compensated

         22     in anything but U.S. dollars or other traditional

         23     currencies.

         24          Q.   Do you recall when you were first

09:29:26 25     contacted to render your expert services in this

                                                              30

09:29:28  1    case?

2        A.   October.

3        Q.   Do you know how the defendant knew how

4    to contact you in this case?

09:29:43  5        A.   No.

6        Q.   Was anyone present during this initial

7    contact from the defendant in this case?

8        A.   Yes.

9        Q.   Who was present at your initial contact

09:30:07 10    with the defendant in this case?

11        A.   Just to clarify, by "defendant" I assume

12    you mean counsel.  And the person present was

13    Niall MacMenamin.

14        Q.   Were you provided with any assignment

09:30:32 15    during the first contact that you had with the

16    defendant in this case?

17        A.   Yes.

18        Q.   Do you recall what your assignment was

19    in your first contact in this case?

09:30:45 20        A.   Yes.

21        Q.   What was the assignment?

22        A.   To evaluate the expert report of ███████

23    ████.

24        Q.   Were you asked to render an opinion on

09:31:00 25    this initial contact?

                                                              31

09:31:02  1              MR. OPPENHEIMER:  Objection.

2        I think the substance of individual

3        conversations is -- is privileged.  I

4        think if you want to ask her what her

09:31:15  5        assignment was, you're welcome to do

6        that; but if you want to ask her the

7        substance of any particular

8        conversation, I'll instruct you not

9        to answer.

09:31:25 10              MS. GUERRIER:  First of all,

11       I asked her whether she was asked to

12       render any opinion on the initial

13       contact.  Number two, you shouldn't

14       be having any speaking objections.

09:31:35 15       I'm not sure what your objection is,

16       frankly.

17              MR. OPPENHEIMER:  It's a

18       privilege objection.  I just

19       explained the basis for it.  If you'd

09:31:42 20       like me to elaborate, I can.

21              MS. GUERRIER:  She can

22       answer yes or no.

23              MR. OPPENHEIMER:  Hang on.

24              MS. GUERRIER:  So I'll

09:31:58 25       repeat my question unless you have

32

```
09:32:00    1                    anything else to add.

            2                           MR. OPPENHEIMER:  Go ahead.

            3                    Why don't you ask your question.

            4         BY MS. GUERRIER:

09:32:05    5              Q.   Were you asked to render any opinion on

            6         the initial contact?

            7                           MR. OPPENHEIMER:  Objection.

            8                           I'm going to instruct you not

            9                    to answer that.

09:32:18   10                           MS. GUERRIER:  What's the

           11                    basis for your objection?

           12                           MR. OPPENHEIMER:  It's

           13                    privileged.  You're -- you're asking

           14                    her -- in substance that question

09:32:24   15                    asks what the lawyers discussed with

           16                    her in the initial conversation and,

           17                    in particular, whether this

           18                    particular sentence, essentially

           19                    "Please render an opinion" came up.

09:32:36   20                           You're not allowed to ask

           21                    questions that go --

           22                           MS. GUERRIER:  You don't

           23                    have to tell me what I'm not allowed

           24                    to do.  Your objection is noted.

09:32:42   25                    We'll have that on the record and we
```

                                                                    33

```
09:32:43   1                    can deal with that later.
           2                         MR. OPPENHEIMER:  Counsel,
           3                    you asked me the basis for the
           4                    objection.  I'm giving you the basis
09:32:47   5                    for the objection.  It -- it is
           6                    within the scope of attorney work
           7                    product to inquire as to the
           8                    particular conversations the witness
           9                    had with counsel.  I'm not going to
09:32:57  10                    allow her to answer that.
          11                         MS. GUERRIER:  Okay.  Your
          12                    objection is noted.
          13          BY MS. GUERRIER:
          14               Q.   Were you provided with any facts about
09:33:02  15          the case at the initial consultation?
          16                         MR. OPPENHEIMER:  Same
          17                    objection.
          18                         I instruct you not to answer.
          19               Q.   Were you provided with any documents
09:33:13  20          about the case at the initial consultation?
          21                         MR. OPPENHEIMER:  Same
          22                    objection.  Same instruction.
          23               Q.   Did you receive any records for this
          24          case when you were retained as an expert?
09:33:31  25                         MR. OPPENHEIMER:  You can
```

34

```
09:33:36   1              answer.
           2        A.    What do you mean by "records"?
           3        Q.    Do you have an understanding what the
           4  term "records" means?
09:33:44   5                    MR. OPPENHEIMER:  Objection.
           6              She -- objection to the form.
           7                    You can answer if you
           8         understand.
           9        A.    It has several meanings.
09:33:51  10        Q.    Did you get any documents when you were
          11  retained in this case?
          12        A.    Yes.
          13        Q.    When did you receive the documents for
          14  this case?
09:34:06  15        A.    October.
          16        Q.    From whom did you receive the documents?
          17        A.    From Niall MacMenamin.
          18        Q.    Were there any facts that were provided
          19  to you by your attorneys that you considered in
09:34:29  20  forming your opinion in this case?
          21        A.    Can you repeat that, please?
          22        Q.    Sure.
          23              Were there any facts that were provided
          24  to you by your attorneys that you considered in
09:34:50  25  forming your opinion in this case?
```

35

```
09:34:59   1        A.   No.

           2        Q.   Okay.   Were there any documents that

           3   were provided by your attorneys that you

           4   considered in forming your opinion in this case?

09:35:17   5        A.   I under -- under -- I understand that

           6   the documents I received from Niall were provided

           7   to him by counsel.

           8        Q.   Did you consider any of the documents

           9   that were provided to you by counsel in forming

09:35:30  10   your opinions?

          11                  MR. OPPENHEIMER:   Objection.

          12                  You can answer if you know.

          13        A.   Not directly received.

          14        Q.   What do you mean by "not directly

09:35:41  15   received"?

          16        A.   Niall received documents from counsel.

          17   I received documents from Niall.

          18        Q.   Okay.   So the documents that ended up in

          19   front of you, did you consider any of them in

09:35:53  20   forming your opinion?

          21        A.   Yes.

          22        Q.   What documents did you consider in

          23   forming your opinions in this case?

          24        A.   The complaint, Ripple's response to the

09:36:09  25   complaint, Mr. ███████ report, the Howey case.
```

                                                                36

```
09:36:29   1          Q.    Anything else?

           2          A.    Nothing else.

           3          Q.    Were there any assumptions that you

           4    relied on in formulating your opinions in this

09:37:00   5    case that were provided to you by counsel?

           6          A.    No.

           7          Q.    Did you personally do all the work in

           8    support of the report that you submitted in this

           9    case?

09:37:25  10                     MR. OPPENHEIMER:  Objection.

          11          A.    I had assistance from my team.

          12          Q.    Who makes up the "team" that you're

          13    referring to?

          14          A.    Niall MacMenamin, Vendela Fehrm.  And

09:37:49  15    there might have been -- there was another person

          16    who worked directly with Vendela.

          17          Q.    Who is this other person who worked

          18    directly with Vendela Fehrm?

          19          A.    I don't remember the name.

09:38:03  20          Q.    Did you supervise this other person who

          21    worked directly with Vendela Fehrm?

          22          A.    Vendela supervised this other person.

          23          Q.    Do you recall this other person's title?

          24          A.    No.

09:38:19  25          Q.    Do you know what role this other person
```

                                                              37

09:38:21  1    played in form -- helping you formulate your

2    opinions in this case?

3        A.   Yes.

4        Q.   What role did this person play?

09:38:28  5        A.   He verified citations.

6        Q.   Do you recall which citations he

7    verified?

8        A.   All of them or the majority.

9        Q.   What did Vendela Fehrm do in support of

09:38:54 10   you -- your work in this case?

11       A.   She helped finding certain citations.

12       Q.   Did she do anything else?

13       A.   She supervised this other person who

14   checked the citations.

09:39:23 15       Q.   Is this other person that you're

16   referring to an employee of Compass Lexington --

17   Lexecon?

18       A.   He's an employee of Compass Lex --

19   Lexecon.

09:39:38 20       Q.   Other than finding certain citations and

21   supervising the person that you can't recall, what

22   else did Vendela Fehrm do?

23       A.   Nothing else as I recall.

24       Q.   Did you supervise Vendela Fehrm's work?

09:40:03 25       A.   Yes.

38

09:40:04  1         Q.   How did you supervise Vendela Fehrm's

2    work?

3                       MR. OPPENHEIMER:  Objection.

4                       You can answer.

09:40:15  5         A.   I asked her to look for citations and I

6    asked her to find someone to verify the cita --

7    citations and oversee them.

8         Q.   Anything else?

9         A.   Not that I recall.

09:40:45 10         Q.   What exactly did Niall MacMenamin do in

11    support of your work in this case?

12                       MR. OPPENHEIMER:  Objection.

13         A.   He reviewed the draft and provided me

14    with feedback.

09:41:13 15         Q.   Anything else?

16         A.   Not that I recall.

17         Q.   Were you present when -- at all times

18    when Vendela Fehrm was performing the work that

19    you described in support of your report?

09:41:30 20         A.   Present for?

21         Q.   Well, where was Vendela Fehrm performing

22    the work that she -- you described that she

23    performed in support of your report?

24         A.   These days everybody works from home, so

09:41:43 25    I assume she was working from home.  I was working

39

09:41:47  1    from home.

2         Q.   Okay.  Well, how did you supervise her

3    work while she was working from home?

4                   MR. OPPENHEIMER:  Objection.

09:41:59  5    A.   We had periodic Zoom calls.

6         Q.   Did you have any Zoom calls with the

7    person that you cannot recall who helped your --

8    write your report?

9                   MR. OPPENHEIMER:  Objection

09:42:16 10         to the form.

11         A.   The person whose name I cannot recall

12    did not help write the report.  That person

13    verified footnotes and citations.  I did not have

14    a Zoom call with that person.

09:42:33 15         Q.   Other than Niall MacMen -- MacMenamin,

16    Vernon La Fehrm -- I'm sorry.  Let -- Vendela

17    Fehrm and the person that you cannot recall, did

18    anyone else assist you with your report?

19         A.   Not that I recall.

09:43:03 20         Q.   Did any attorney help you draft your

21    report?

22                   MR. OPPENHEIMER:  Objection.

23                   You can answer.

24         A.   Counsel provided feedback.

09:43:21 25         Q.   Which counsel provided feedback?

                                                      40

09:43:36   1          A.   I don't recall.

        2          Q.   Is there any part of the report that

        3   counsel drafted?

        4          A.   No.

09:43:45   5          Q.   Is there any language in your report

        6   that is not yours?

        7          A.   No.

        8          Q.   Did anyone check your work other than

        9   the people that -- Niall MacMenamin and counsel?

09:44:01  10                    MR. OPPENHEIMER:   Objection.

       11                    You can answer.

       12          A.   The person whose last name or first name

       13   I cannot recall verified citations.

       14          Q.   Did anyone verify any statements that

09:44:24  15   you made in the body of the report?

       16                    MR. OPPENHEIMER:   Objection.

       17          A.   Can you clarify what you mean?

       18          Q.   Did anyone review any of the statements

       19   that you made in the body of your report?

09:44:40  20                    MR. OPPENHEIMER:   Objection

       21               to the form.

       22                    You can answer.

       23          A.   Niall reviewed my report and counsel

       24   reviewed my report.

09:44:57  25          Q.   Are all the records that you considered

                                                            41

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:44:59  1    in formulating your opinion listed in your report?

        2         A.   What do you mean by "records"?

        3         Q.   Everything that you've considered in

        4    formulating your opinion, did you list that

09:45:16  5    information in your report?

        6                   MR. OPPENHEIMER:   Objection

        7              to form.

        8         A.   Materials considered are in my Appendix

        9    B.

09:45:25 10         Q.   Does that include all of the materials

       11    that you've considered in formulating your

       12    opinion?

       13         A.   Yes.

       14         Q.   Okay.  Are there materials that you

09:45:40 15    reviewed that were not listed in your report?

       16         A.   No.

       17         Q.   Were there any documents that you wanted

       18    to review but could not obtain?

       19         A.   No.

09:46:43 20         Q.   What is the Appendix A that you've

       21    attached to your report?

       22         A.   Appendix A is my CV.

       23         Q.   Okay.  Is your CV complete?

       24                   MR. OPPENHEIMER:   Objection.

09:47:03 25         A.   Can you clarify what you mean by

                                                              42

09:47:04 1    "complete"?

2        Q.   Does -- does your CV contain all of the

3    information that's current regarding your

4    professional position?

09:47:14 5              MR. OPPENHEIMER:   Objection

6         to form.

7        A.   I have been in economic consulting for

8    over 15 years and prior to that I obtained three

9    degrees.  So in this document, which is under ten

09:47:39 10   pages, it would be impossible to list everything

11   that I ever did in my professional career and in

12   my time at school.

13       Q.   Okay.  Is there any education that

14   you -- that is not listed on your Appendix A?

09:47:58 15             MR. OPPENHEIMER:   Objection;

16        form.

17       A.   My secondary education is not listed

18   here.

19       Q.   What do you mean by "secondary

09:48:08 20   education"?

21       A.   High school, middle school, primary

22   school, --

23       Q.   Okay.

24       A.   -- kindergarten.

09:48:16 25        Q.   Any education after high school that's

43

09:48:18  1    not listed on your CV?

        2                    MR. OPPENHEIMER:  Objection

        3            to the form.

        4        A.    The big ones are listed.  There could

09:48:32  5    have been seminars, web -- webinars, lectures that

        6    I'm not including, conferences.

        7        Q.    When was this Appendix A created?

        8        A.    Sometime between October and November.

        9        Q.    Did you have another CV prior to the one

09:49:01 10    that's attached to your report as Appendix A?

       11        A.    I first created a CV in the early 2000s

       12    and it's been evolving since.

       13        Q.    Have you removed anything from the prior

       14    CVs that's not included in the CV that you have

09:49:33 15    attached as Appendix A to your report?

       16                    MR. OPPENHEIMER:  Objection

       17            to form.

       18        A.    As I said, my CV is evolving.  Some

       19    items become more -- I include new items and

09:49:50 20    sometimes I retire something that's irrelevant or

       21    just for space or old.

       22        Q.    What are some of the things that you

       23    retired from your CV?

       24        A.    I had a brief internship back in Russia.

09:50:22 25    Probably prior to 2000.  That's no longer in my

                                                              44

09:50:25  1   CV.

2   Q.   Where was the internship?

3   A.   At -- at a company selling consumer

4   goods.  They were participating in an exhibition.

09:50:40  5   I worked at the exhibition.

6   Q.   What did you do at the exhibition?

7   A.   I presented the products.  I sold some

8   products.

9   Q.   Anything else that's been retired from

09:50:59 10   your CV?

11   A.   There's probably a lot of things as my

12   CV has evolved in the past 20 years.

13   Q.   So what else has been retired from your

14   CV?

09:51:15 15   A.   I'm sure I would not be able to recall

16   all of them.  There was a paper in mathematics

17   that at one point was accepted to a journal that I

18   listed for several years, but as I moved to the

19   United States I had different priorities so I

09:51:39 20   never finished the final touches on the paper and

21   it's never been published.

22   Q.   Do you recall the -- the name of the

23   paper in mathematics?

24   A.   It had to do with free nonassociative

09:51:53 25   algebras.

45

09:51:56  1        Q.   Is this a paper that you were working

          2    on?

          3        A.   I was working on this paper.

          4        Q.   Were you employed by a company when you

09:52:05  5    were working on this paper?

          6        A.   No.

          7                 MR. OPPENHEIMER:   Objection

          8             to form.

          9        Q.   Were you in school when you were working

09:52:14 10    on this paper?

         11        A.   Yes.

         12        Q.   What school?

         13        A.   Moscow State University, and then I

         14    might have continued working on it when I was

09:52:23 15    already at the New Economic School.  And I might

         16    have brought it with me at MIT, but I don't think

         17    I worked on that at MIT.

         18        Q.   Okay.  Anything else?

         19        A.   I wouldn't be able to recall all the

09:52:40 20    changes I've made to my CV within the past 20

         21    years.

         22        Q.   How about within the past ten years?

         23        A.   Same.  I wouldn't be able to recall.

         24        Q.   Okay.  Have you made any changes within

09:52:49 25    the past five years to your CV?

                                                               46

09:52:55  1        A.    Yes.  It's constantly evolving.

        2        Q.    So do you recall what changes you've

        3  made in the past five years to your CV?

        4        A.    I can recall examples.

09:53:04  5        Q.    Okay.  Can you provide the examples?

        6        A.    Well, one example, I changed jobs this

        7  past summer, so I added Compass Lexecon to my CV

        8  and changed how I describe my prior employment.

        9        Q.    How did you change how you describe your

09:53:25 10  prior employment?

       11        A.    Well, I put a final date to it.  Until

       12  then it said "2005 to present."

       13        Q.    Other than those three schools that you

       14  listed on your CV, is there anything -- other

09:54:04 15  school missing?

       16                    MR. OPPENHEIMER:  Objection.

       17        A.    These are my three degrees.  While I was

       18  at MIT and Sloan School of Management, I also took

       19  classes at MIT Economic Department and Harvard

09:54:24 20  Business School and Harvard Psychology Department.

       21  Since I started my career, I've gone to several

       22  conferences, some of which have educational

       23  aspects; webinars, seminars.  I don't think those

       24  are listed.

09:54:50 25        Q.    Anything else that's missing from your

                                                                  47

09:54:51  1    CV?

2                        MR. OPPENHEIMER:  Objection

3               to form.

4          A.    Nothing is missing from my CV.

09:54:59  5    Q.    Well, anything else that you did not

6    list on your CV?

7          A.    I did not list a lot of things that I've

8    done in the past 20 years or so.

9          Q.    Other than what we discussed, is there

09:55:09 10    anything else that you did not list on your CV?

11                       MR. OPPENHEIMER:  Objection.

12                       You can answer.

13         A.    Well, I could give you more examples.

14         Q.    That would be good.

09:55:23 15    A.    The section of my CV that's titled

16    "Selective Consulting Experience" lists cases

17    where I supported other experts.  And the list

18    here is short relative to all the cases I've done.

19    The majority of them are not listed here.

09:55:54 20    Q.    Anything else that's not listed on your

21    CV?

22                       MR. OPPENHEIMER:  Objection.

23         A.    I'm sure there are plenty of other

24    things I've done in the past 20 years that are not

09:56:13 25    listed on my CV.  The point of a CV is not to have

                                                                    48

09:56:17  1     an exhaustive list of every single little thing

2     I've done.

3          Q.   Okay.  Well, for the purpose of this

4     deposition, do you recall anything else that's not

09:56:26  5     listed on your CV other than what you just

6     discussed?

7                    MR. OPPENHEIMER:  Objection

8            to form.

9          A.   I'll give you one more example.  While I

09:57:00 10     was at the Analysis Group for many years, I

11     participated in teaching a Stata class and --

12                    THE REPORTER:  Repeat.

13                    THE WITNESS:  Stata class.

14          A.   And for several years I was also the

09:57:17 15     head of the Stata teaching group.

16          Q.   You testified that you took classes at

17     the Harvard Business School.

18               Do you recall when you took those

19     classes?

09:58:09 20          A.   Yes.

21          Q.   When did you take the classes at the

22     Harvard Business School?

23          A.   One class I took in 2002 and there might

24     have been one other class, but I don't recall

09:58:24 25     precisely.  But all of that would be during my

49

09:58:29  1    time at MIT.

2         Q.   Okay.  Do you recall what the subject of

3    the course you took at -- in 2002 at Harvard

4    Business School was?

09:58:40  5         A.   Experimental economics.

6         Q.   Do you recall the subject of the course

7    in 2004?

8                        MR. OPPENHEIMER:   Objection

9              to the form.

09:58:52 10         A.   I don't think I mentioned anything about

11    2004.

12         Q.   Well, let me read back.  You said there

13    may have been another class.

14              Do you recall what year you took that

09:59:14 15    other class?

16         A.   I'm not sure --

17         Q.   Well --

18         A.   -- the year or whether there even was

19    another class.  I might have taken it without

09:59:22 20    credit.  I don't recall the details.

21         Q.   You also testified that you took a class

22    at the Harvard Psychology Department, is that

23    correct?

24         A.   That's correct.

09:59:39 25         Q.   Do you recall what year you took the

50

09:59:40 1  class at the Harvard Psychology Department?

2       A.   I took several classes in Harvard

3  Psychology Department, at least three for credit

4  and some without credit.  And that would be

10:00:02 5  probably starting in 2003 and until I graduated

6  from MIT.

7       Q.   You testified that you participated in

8  teaching a statistics tass -- teaching a class

9  when you were at the Analysis Group, is that

10:00:39 10  correct?

11            MR. OPPENHEIMER:  Objection

12            to the form.  Mischaracterizes

13            testimony.

14       A.   I didn't say that.

10:00:44 15       Q.   So what did -- what did you teach when

16  you were at Analysis Group?

17       A.   Among other things, Stata.

18       Q.   Stata?

19       A.   Yes.

10:01:00 20       Q.   Can you spell that?

21       A.   S-T-A-T-A.

22       Q.   What is Stata?

23       A.   It's a statistical package to analyze

24  data.

10:01:18 25       Q.   Okay.  Is there anything else that you

51

10:01:21  1    taught when you were at Analysis Group?

2         A.   Yes.

3         Q.   What else?

4         A.   Survey and experimental design.

10:01:30  5                   THE REPORTER:  Repeat.

6         A.   Survey and experimental design.

7         Q.   Anything else?

8         A.   That's possible.  I was there for over

9    15 years, but I don't recall anything other big.

10:02:10 10       Q.   When did you graduate from the Moscow

11   State University?

12        A.   2001.

13        Q.   What degree did you obtain from Moscow

14   State University?

10:02:28 15       A.   MS in mathematics.

16        Q.   When did you graduate from the New

17   Economic School in Russia?

18        A.   2002.

19        Q.   What degree did you obtain from the New

10:02:45 20   Economic School in Russia?

21        A.   MA in economics.

22        Q.   When did you start attending MIT Sloan

23   School of Management?

24        A.   2002.

10:03:03 25       Q.   And when did you obtain your degree from

52

| | | |
|---|---|---|
| 10:03:06 | 1 | MIT Sloan School of Management? |
| | 2 | A.   2007. |
| | 3 | Q.   What did you obtain your degree in? |
| | 4 | A.   My diploma says management science, but |
| 10:03:15 | 5 | effectively it's a degree in marketing as I spent |
| | 6 | over five years in the marketing group. |
| | 7 | Q.   What year did you -- I'm sorry.  You did |
| | 8 | answer that. |
| | 9 | Were there any breaks between 2002 and |
| 10:03:31 | 10 | 2007 that you took in your schooling? |
| | 11 | MR. OPPENHEIMER:  Objection. |
| | 12 | You can answer. |
| | 13 | A.   No. |
| | 14 | Q.   Are you a member of any professional |
| 10:04:12 | 15 | organization? |
| | 16 | A.   I'm a member of American Marketing |
| | 17 | Association. |
| | 18 | Q.   How long have you been a member of |
| | 19 | American Marketing Association? |
| 10:04:31 | 20 | A.   Several years. |
| | 21 | Q.   Do you -- do you have a number for the |
| | 22 | several years? |
| | 23 | A.   No. |
| | 24 | Q.   Is it less than five years? |
| 10:04:41 | 25 | A.   I'm not sure. |

53

10:04:53  1          Q.    What is the American Marketing

         2     Association?

         3          A.    It's an association of economics and

         4     practitioners doing marketing.

10:05:07  5          Q.    Is your membership current in the

         6     American Marketing Association?

         7          A.    I believe so.

         8          Q.    Any other professional associations or

         9     organizations that you're a member of?

10:05:31 10          A.    No.

        11          Q.    Have you taken any marketing courses

        12     regarding digital assets?

        13          A.    No.

        14          Q.    Have you taken any courses regarding

10:06:17 15     digital assets?

        16          A.    No.

        17          Q.    Have you received any training in the

        18     area of digital assets?

        19          A.    No.

10:06:43 20          Q.    Have you conducted any marketing work in

        21     the area of digital assets?

        22          A.    No.

        23          Q.    Have you ever taught a class about

        24     digital assets?

10:07:02 25          A.    No.

                                                              54

10:07:09  1          Q.   Have you ever conducted any experiments

        2     regarding digital assets?

        3          A.   No.

        4          Q.   Have you ever conducted any surveys

10:07:21  5     regarding digital assets?

        6          A.   No.

        7          Q.   How long have you been employed at

        8     Compass Lexecon?

        9          A.   I've been employed at Compass Lexecon

10:08:09 10     since this past summer.

       11          Q.   What is your role at Compass Lexecon?

       12          A.   Senior vice president.

       13          Q.   Where did you work prior to this last

       14     summer?

10:08:29 15          A.   Analysis Group.

       16          Q.   I'm sorry?

       17          A.   Analysis Group.

       18          Q.   Did you start working at Compass Lexecon

       19     while you were still working at Analysis Group?

10:08:43 20          A.   No.

       21          Q.   Okay.  So in your CV, you listed your

       22     experience at Compass Lexecon from 2005 to 2021,

       23     is that correct?

       24          A.   That's a typo.  That should be 2021 to

10:09:01 25     present as it says next to "Senior Vice

                                                                    55

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:09:03 1    President."

2    Q.   Okay.  What are your job duties at

3    Compass Lexecon?

4    A.   I focus on causal inference, designing

10:09:19 5    and conducting experiments, surveys, analyzing and

6    evaluating experiments and surveys conducted by

7    others, assisting experts or serving myself in an

8    expert role, among other things.

9    Q.   What are some of the other things that

10:09:53 10   you do at Compass Lexecon?

11   A.   One example is hiring.

12   Q.   Anything else?

13   A.   Overseeing the work of junior colleagues

14   or more junior colleagues.

10:10:22 15   Q.   Anything else?

16   A.   It's an economic consulting environment,

17   so the standard economic consulting experience.

18   Q.   What's the "standard economic consulting

19   experience"?

10:11:10 20   A.   Communicating with clients,

21   communicating with experts, reviewing materials.

22   Q.   Anything else?

23                MR. OPPENHEIMER:  Objection

24        to the form.

10:11:39 25   A.   I'm sure there are other more nuanced

56

```
10:11:43   1    tasks that I carry out and it's probably a very

           2    long list.  Similar as with the CV, I can only

           3    give you examples.

           4         Q.   So can you give some of the examples of

10:11:55   5    the other tasks that you conduct at Compass

           6    Lexecon?

           7         A.   Review of academic literature.

           8                   THE REPORTER:  Repeat.

           9         A.   Review of academic literature.

10:12:20  10         Q.   Anything else?

          11                   MR. OPPENHEIMER:  Objection

          12         to form.

          13         A.   Another example would be review of data.

          14         Q.   Anything else?

10:12:45  15         A.   Another example would be review of

          16    documents.

          17         Q.   Is there anything else?

          18         A.   There probably is a lot of else.

          19         Q.   Do you recall what else?

10:13:23  20         A.   Assisting lawyers with preparation for

          21    depositions, assisting experts with preparation

          22    for a deposition, preparing for my own deposition.

          23         Q.   Any other job duties that you have at

          24    Compass Lexecon?

10:14:06  25         A.   Drafting my report or assisting others
```

57

```
10:14:09   1    with drafting their reports.
           2         Q.    Have you discussed all the job duties
           3    that you have at Compass Lexecon?
           4         A.    I'm sure the list is very long and I'm
10:14:23   5    probably missing something, but I've given you
           6    plenty of examples.
           7         Q.    Is there anything that you recall that
           8    you have not stated?
           9                   MR. OPPENHEIMER:   Objection
10:14:29  10             to form.
          11         A.    Zoom calls.
          12         Q.    Is that a job duty?
          13         A.    What do you mean by a "duty"?
          14         Q.    Well, what are you hired to do at
10:15:00  15    Compass Lexecon?   That's what I mean by "duty."
          16         A.    All of those things that I listed and
          17    probably more things.
          18         Q.    Okay.   Other than everything that we've
          19    discussed including the Zoom calls, is there
10:15:11  20    anything else that you recall and have not stated?
          21                   MR. OPPENHEIMER:   Objection
          22             to form.
          23         A.    I can recall more if you'd like.
          24         Q.    If you can recall your job duties, if
10:15:32  25    you could state what they are for the record other
```

58

```
10:15:37  1    than what you've already described.
          2         A.    Reviewing case documents.
          3         Q.    Have you described all of your job
          4    duties at Compass Lexecon?
10:16:15  5                        MR. OPPENHEIMER:  Objection
          6         to form.
          7         A.    I don't think it's feasible to describe
          8    all the duties because it's a very long list and
          9    not specifically defined.
10:16:29 10         Q.    Well, what else have you not told us
         11    about today?
         12                        MR. OPPENHEIMER:  Objection
         13         to form.
         14         A.    I believe I've given you the major
10:16:43 15    things but if you'd like I can try to remember
         16    more nuanced details.
         17         Q.    Well, if you can recall.
         18         A.    Well, I'm relatively new at Compass
         19    Lexecon, so I haven't done all of these -- all of
10:17:13 20    the calling, but I'm pretty sure it will happen
         21    soon.
         22         Q.    Can I --
         23         A.    For example, being present at someone
         24    else's deposition --
10:17:22 25         Q.    Can I stop you right there?  If you have
```

59

10:17:24  1    not -- I'm asking you for the duties that you

2    currently have.

3         A.   Right.

4         Q.   I -- I -- I'm not asking you about what

10:17:30  5    could happen in the future or not.

6         A.   Right.  So it is part of my job, but it

7    maybe hasn't happened yet, but I'm sure I'll be

8    present at someone else's deposition eventually.

9    For this case I will be reviewing the transcript

10:17:48 10   for the errata sheet.  I will probably do this for

11   other people's depositions in the future.  I

12   communicate with survey panels and other vendors

13   who help carrying out surveys and experiments.

14        Q.   Okay.  Where did you work prior to

10:18:25 15   Compass Lexecon?

16        A.   Analysis Group.

17        Q.   How long did you work at Analysis Group?

18        A.   Be -- between 2005 and 2021.  In 2005, I

19   was an intern associate for a summer, and then in

10:18:47 20   2007, I started full time.

21        Q.   Okay.  Were you an associate between

22   2007 and 2009?

23        A.   Yes.

24        Q.   Okay.  What were your duties as an

10:19:04 25   associate at Analysis Group, Inc.?

60

```
10:19:21   1          A.    I did a lot of data analysis.  I
           2    assisted with drafting reports.  I taught the
           3    Stata class.  I probably assisted with depositions
           4    or were present at depositions, but I cannot say
10:19:47   5    for sure whether it was while I was still an
           6    associate or once I became manager.
           7                In many respects the job definition is
           8    the same throughout the career in economic
           9    consulting.  It's the level of responsibility that
10:20:08  10    shifts.
          11          Q.    Okay.  So you became a manager in 2009?
          12          A.    Yes.
          13          Q.    How long were you a manager at Analysis
          14    Group?
10:20:19  15          A.    Until 2015.
          16          Q.    Did your responsibilities change from
          17    the time you were an associate until when you
          18    became a manager in 2009?
          19          A.    The way things work at Analysis Group is
10:20:33  20    that there is really no dramatic shift.  Once a
          21    person is promoted, they say there that you should
          22    already be working at a manager level for a year
          23    before you are promoted to a manager.
          24                But, generally, as one grows there in
10:20:56  25    their career, that means more responsibility, less
```

61

10:21:02  1    day-to-day activities such as programming and data

2    analysis, more communication with clients and

3    experts and possibly starting as an expert

4    yourself.

10:21:16  5         Q.   Okay.  You became a vice president at

6    Analysis Group?

7         A.   That's correct.

8         Q.   When did you become a vice president at

9    Analysis Group?

10:21:25 10        A.   2016.

11        Q.   And how long were you a vice president?

12        A.   Until 2020.

13        Q.   What did you do at Analysis Group after

14    2020?

10:21:36 15        A.   I was a consultant.

16        Q.   What were your duties as a consultant?

17        A.   Largely similar to my duties as vice

18    president.  The structure of my compensation

19    changed.

10:22:01 20                  THE REPORTER:  The structure

21             of the organization?

22                  THE WITNESS:  Compensation.

23             Of my compensation.

24        Q.   Can you describe your duties as a

10:22:06 25    consultant?

62

10:22:14  1          A.   I was an expert on one case.   I

          2     supported other experts on other cases, assisted

          3     with data analysis, drafting reports, with

          4     developing rebuttals.   In the case where I was the

10:22:34  5     expert, I conducted a conjoined analysis survey

          6     and market simulations.

          7          Q.   Okay.   And how long were you a

          8     consultant at Analysis Group?

          9          A.   Until 2021.

10:23:03 10          Q.   Did you have any jobs between the time

         11     you left Analysis Group and started at Compass

         12     Lexecon?

         13          A.   No.

         14          Q.   Okay.   Going back to your Ph.D. at MIT

10:23:15 15     Sloan School of Management, what was the topic of

         16     your dissertation?

         17          A.   Essays in behavioral decision-making.

         18          Q.   Okay.   Can you describe what your

         19     dissertation was about at MIT Sloan School?

10:23:34 20          A.   It consisted of three chapters that were

         21     largely unrelated streams of research.   One stream

         22     of research had to do with consumers overvaluing

         23     products that are -- that they can get for free

         24     and wanting them more than they should from a

10:24:04 25     standard economics perspective.

                                                                  63

10:24:10  1          Another stream of research was related

       2     to mood regulation.  For example, what kind of

       3     movie would you see in a good mood or in a bad

       4     mood?

10:24:24  5          And the third stream of research had to

       6     do with whether wanting and liking are aligned.

       7               (Whereupon, exhibit is received

       8          and marked SEC Shampanier Deposition

       9          Exhibit 5 for identification.)

10:25:23 10               THE REPORTER:  Exhibit 5 for

      11          identification.

      12     BY MS. GUERRIER:

      13     Q.    Okay.  I've handed you what's been

      14     marked as Exhibit 5.

10:25:28 15          Do you recognize the document that's

      16     been marked as Exhibit 5?

      17     A.    This appears to be a copy of my

      18     dissertation.

      19     Q.    Okay.  Were you examining causal

10:26:19 20     relationships in the subject matter of your

      21     dissertation?

      22     A.    Yes.

      23     Q.    Can you explain the type of causal

      24     relationships you were examining?

10:26:41 25     A.    I'll need to refresh my memory.

                                                        64

10:27:23  1              For example, the first essay in my

2      dissertation is entitled "Zero as a Special Price:

3      The True Value of Free Products."

4              The main causal proposition tested in

10:27:36  5      this chapter in my dissertation is whether when

6      consumers are exposed to a free product they

7      reacted in a way that is essentially rational.

8          Q.   Are you done?

9          A.   This is a very short summary of the

10:28:04 10      first chapter of my dissertation.

11          Q.   Were you evaluating perceptions of

12      consumers in your dissertation?

13          A.   Can you repeat the question, please?

14          Q.   Sure.

10:29:16 15              Were you evaluating perceptions of

16      consumers in your dissertation?

17          A.   Yes.

18          Q.   Okay.  Can you summarize what

19      perceptions you were evaluating in your

10:29:35 20      dissertation with respect to consumers?

21                      MR. OPPENHEIMER:   Objection

22              to form.

23          A.   Participants in the experiment were

24      asked to evaluate how attractive they found

10:30:16 25      certain offers.

65

10:30:17  1          Q.   Okay.  So was there a cause-and-effect
       2    connection with the perception that you were
       3    evaluating?
       4          A.   Yes.
10:30:25  5          Q.   What was the cause-and-effect
       6    connection?
       7          A.   The cause was the presence of a free
       8    product.
       9          Q.   And what was the effect?
10:30:39 10          A.   Attitude.  Attitude.
      11          Q.   How did you connect the cause and effect
      12    of the perception of the consumer?
      13          A.   Using an experiment.
      14          Q.   What type of experiment?
10:31:01 15          A.   Randomized control experiments.
      16                    THE REPORTER:  Randomized?
      17                    THE WITNESS:  Control.
      18          Q.   What's a randomized control experiment?
      19          A.   In a randomized control experiment, a
10:31:19 20    group of participants is randomly split into two
      21    groups.  We can call them a test group and a
      22    control group.  And they go through a similar
      23    procedure, but there is a difference and that
      24    difference is the cause that we're testing.
10:31:40 25              Then we measure those participants which

                                                              66

10:31:45   1    is a measure of interest to us.  And if there is a

           2    difference in the outcome between the two groups

           3    which is statistically significant, we can

           4    conclude -- or at least we cannot reject the

10:32:00   5    hypothesis that there is no impact.  So usually --

           6                    THE REPORTER:  There is no?

           7                    THE WITNESS:  Impact.

           8        A.    So in lay terms that means we conclude

           9    that there is a cause and effect.

10:32:20  10        Q.    Okay.  Would it be possible to evaluate

          11    the perception of these consumers without

          12    conducting a randomized control experiment?

          13                    MR. OPPENHEIMER:  Objection

          14        to form.

10:32:35  15        A.    If you simply want to record perceptions

          16    without investigating the cause of those

          17    perceptions, then we can conduct other studies.

          18        Q.    What types of other studies can you

          19    conduct if you just want to look at perception and

10:32:49  20    not cause and effect?

          21        A.    For example, a survey.

          22        Q.    Anything else?

          23        A.    At the preliminary stage of research,

          24    when we want to simply hypothesize of what the

10:33:09  25    perceptions are, we can conduct qualitative

                                                                    67

10:33:14  1    studies such as focus groups or phone interviews.

       2        Q.   Can you explain what qualitative studies

       3    are?

       4        A.   Qualitative studies are studies from

10:33:33  5    which we don't make numeric conclusions such as X

       6    percent of people think Y.

       7        Q.   Is this different from quantitative

       8    studies?

       9        A.   That's correct.

10:33:48 10        Q.   What's a quantitative study?

      11        A.   In quantitative studies, we make

      12    quantitative conclusions.

      13        Q.   What are quantitative conclusions?

      14        A.   An example would be X percent of

10:34:01 15    purchasers of this yogurt believe that this yogurt

      16    is very tasty.

      17        Q.   Do you need to rely on data to conduct

      18    quantitative studies?

      19        A.   Yes.

10:34:36 20        Q.   We'll get back to that.

      21             So going back to your CV, did you have

      22    any other professional employment that's not

      23    listed on your risumi or your CV?

      24                 MR. OPPENHEIMER:   Objection

10:34:46 25             to form.

                                                          68

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:35:13    1            A.    Not anything major.

            2            Q.    Do you recall what else you didn't list

            3    with regards to your professional employment?

            4                       MR. OPPENHEIMER:  Objection.

10:35:24    5            A.    Can you repeat the question, please?

            6            Q.    I had asked you whether you had any

            7    other professional employment that's not listed on

            8    your risumi or CV.  And you responded "not

            9    anything major."

10:35:42   10            So my question is, do you recall what

           11    else you didn't list with regard to your

           12    professional employment?

           13                       MR. OPPENHEIMER:  Same

           14            objection.

10:35:50   15            A.    I did not list my minor and very old

           16    engagements like the internship and the exhibition

           17    I described previously.

           18                       MS. GUERRIER:  Do you want

           19            to take a --

10:36:17   20                       MR. OPPENHEIMER:  Sure.

           21                       MS. GUERRIER:    --

           22            ten-minute break?

           23                       MR. OPPENHEIMER:  That's

           24            fine.

10:36:20   25                       MS. GUERRIER:  Okay.

                                                                    69

10:36:21  1                    THE VIDEOGRAPHER:  Okay.

        2              Going off the record at 10:36.

        3                    (Whereupon, a recess is taken.)

        4                    THE VIDEOGRAPHER:  Okay.

10:51:56  5              Back on the record at 10:52.

        6    BY MS. GUERRIER:

        7         Q.   Okay.  Did you testify that you have

        8    experience conducting quantitative studies?

        9         A.   I don't know if I testified to that, but

10:52:34 10    I do have experience.

       11         Q.   Is it, yes, you have experience

       12    conducting quantitative studies?

       13         A.   I have experience conducting

       14    quantitative studies.

10:52:55 15         Q.   When you've conducted those studies, on

       16    occasion, have you observed a statistically

       17    significant correlation between two variables?

       18                    MR. OPPENHEIMER:  Objection

       19              to form.

10:53:06 20                    You can answer.

       21         A.   I've observed statistically significant

       22    effects.  I'm not sure specifically if I ever

       23    looked at correlations.  Most likely I have.

       24         Q.   So is it most likely you have observed

10:53:35 25    statistically significant correlations?

                                                                70

10:53:37  1                    MR. OPPENHEIMER:  Objection

2           to form.

3        A.   I have observed statistically

4    significant effects.  Those could have been

10:53:47  5    correlations, but usually I don't look at

6    correlations.

7        Q.   Okay.  If you observe a statistically

8    significant correlation, what, if anything,

9    does -- does that observation permit you to

10:54:03 10    conclude regarding cause and effect?

11                    MR. OPPENHEIMER:  Objection

12           to form.

13        A.   There could be a causal relationship or

14    there could be no causal relationship.

10:54:42 15        Q.   Can you please elaborate on what you

16    mean by "there could be a causal relationship or

17    there could be no causal relationship"?

18        A.   If there is a statistically significant

19    correlation between two variables, it could be

10:54:57 20    because one of them causes the other or it could

21    -- it could be that none of them causes that.

22        Q.   I believe you testified that you have

23    observed statistically significant effects, is

24    that correct?

10:55:26 25        A.   That's correct.

71

10:55:27  1       Q.   So in such studies, are you able to

       2   observe a statistically significant effect between

       3   two variables?

       4                MR. OPPENHEIMER:   Objection

10:55:39  5        to form.

       6       A.   In an experiment, a statistically

       7   significant effect is usually the difference,

       8   statistically significant difference, between the

       9   outcomes of the test group and the control group.

10:56:04 10       Q.   If you observe a statistically

      11   significant effect, does that observation permit

      12   you to conclude -- make any conclusions regarding

      13   cause and effect?

      14                MR. OPPENHEIMER:   Objection

10:56:16 15        to form.

      16       A.   If I conduct a randomized controlled

      17   experiment and there's a statistically significant

      18   difference between the outcomes in the test group

      19   and the control group, I can conclude in lay terms

10:56:35 20   that there is a causal effect between the

      21   manipulated variable and the outcome.

      22       Q.   Okay.  Do you have an area of expertise?

      23                MR. OPPENHEIMER:   Objection

      24        to form.

10:57:14 25       A.   I'm an expert in several areas.

                                                          72

10:57:16   1          Q.   What are your areas of expertise?

           2          A.   Experimental design, survey design,

           3     consumer behavior, judgment and decision-making.

           4          Q.   Do you consider yourself an expert with

10:58:10   5     regards to surveys of digital asset holders?

           6                    MR. OPPENHEIMER:   Objection

           7               to form.

           8          A.   I consider myself an expert in surveys

           9     done with -- if I am provided background on

10:58:33  10     digital assets or another product, I can design a

          11     reliable survey on that topic.  In fact, I have

          12     designed numerous surveys or assisted others in

          13     designing them and oftentimes the subject matter

          14     or the exact product in those cases was relatively

10:59:02  15     new to me or entirely new to me.

          16          Q.   Have you designed a survey concerning

          17     digital assets?

          18          A.   No.

          19          Q.   Have you assisted anyone in designing a

10:59:17  20     survey concerning digital assets?

          21          A.   I believe that's covered by an NDA.

          22          Q.   Well, I don't need to know the substance

          23     of what you've done.  I'm asking you if you've

          24     actually designed -- assisted anyone in conducting

10:59:37  25     a survey regarding digital assets.

                                                                  73

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
10:59:41  1          A.   That's covered by an NDA.

          2          Q.   You need to answer the question yes or

          3     no.

          4          A.   Can I consult counsel?

10:59:48  5                    MR. OPPENHEIMER:  Why don't

          6               you start with a yes or a no to just

          7               whether you've assisted anyone in

          8               designing a survey concerning digital

          9               assets.  We can take each question as

11:00:00 10               we go.

         11          A.   Yes.

         12          Q.   Do you recall when you assisted in

         13     conducting a survey in -- regarding digital

         14     assets?

11:00:15 15          A.   Within the last couple of years.

         16          Q.   Was the survey done in connection with

         17     this case?

         18          A.   No.

         19          Q.   Was the survey that you assisted with

11:00:58 20     with regard to the digital assets in connection

         21     with litigation?

         22          A.   That's covered by an NDA.

         23          Q.   You need to answer yes or no.

         24          A.   Can I consult counsel?

11:01:11 25                    MR. OPPENHEIMER:  Why don't
```

74

11:01:21  1            we go off the record for a minute.

        2                 MS. GUERRIER:  No.  The

        3            question is still pending.  I'm

        4            sorry.

11:01:26  5                 MR. OPPENHEIMER:  Counsel,

        6            if she believes she's subject to an

        7            NDA, then I'm not sure she can

        8            answer.  If we go off the record, we

        9            can try to sort this out.  That's --

11:01:40 10                 MS. GUERRIER:  Well, I'm not

       11            asking her about names.  I'm asking

       12            her a general question.  Was her

       13            survey that she assisted with in

       14            connection with litigation?

11:01:53 15                 MR. OPPENHEIMER:  Without

       16            the opportunity to discuss that with

       17            her, I don't know whether that would

       18            be covered by the NDA.

       19                 MS. GUERRIER:  Well, you

11:01:59 20            don't represent her in that capacity

       21            so you wouldn't have a role in

       22            determining whether or not it's

       23            covered by anything.

       24                 MR. OPPENHEIMER:  I'm not

11:02:09 25            sure that's accurate.

                                                        75

11:02:13   1                        But if you -- if you understand

2                        the question and you think you can answer

3                        it as asked, you can go ahead.  I think

4                        you can answer yes or no.

11:02:18   5                        THE WITNESS:  Can you repeat

6                        the question, please?

7        BY MS. GUERRIER:

8             Q.   Was the survey that you assisted with

9        with regard to the digital assets in connection

11:02:27  10        with litigation?

11             A.   To the best of my recollection, yes.

12             Q.   Did you submit an expert report in

13        connection with the survey that you assisted with

14        with regard to the digital assets?

11:02:45  15             A.   If I'm assisting another expert, I do

16        not submit reports.

17                        THE REPORTER:  I'm sorry,

18                        repeat.

19             A.   If I assist other experts, I do not

11:02:57  20        submit reports.

21             Q.   So is the answer no?

22             A.   The answer is no.

23             Q.   Did the person you assisted submit an

24        expert report in connection with the survey that

11:03:14  25        was done regarding the digital assets?

76

11:03:28  1        A.    No.

          2        Q.    Have you listed all of the publications

          3   that you have made in the last ten years in your

          4   report?

11:04:19  5        A.    That's correct.

          6        Q.    Okay.  Do any of the publications that

          7   you've listed in your report concern digital

          8   assets?

          9        A.    No.

11:05:03 10        Q.    Have you listed all of the cases where

         11   you testified at trial in the past four years in

         12   your report?

         13                    MR. OPPENHEIMER:  Objection

         14            to form.

11:05:13 15        A.    Can you repeat the question, please?

         16        Q.    Have you listed all of the cases where

         17   you testified at trial in the past four years in

         18   your report?

         19                    MR. OPPENHEIMER:  Same

11:05:19 20            objection.

         21        A.    I have not testified at trial in the

         22   past four years.

         23        Q.    Okay.  Does your report identify all

         24   deposition testimony that you gave in the last

11:05:32 25   four years?

                                                              77

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

11:05:33  1              MR. OPPENHEIMER:  Objection

        2         to form.

        3         A.   I did not testify at deposition in the

        4    past four years.

11:05:43  5         Q.   Did you testify at trial prior to the

        6    last four years?

        7         A.   No.

        8         Q.   Did you testify at a deposition prior to

        9    the last four years?

11:05:52 10         A.   Yes.

       11         Q.   Okay.  Is that -- what -- is that what

       12    you described earlier in your deposition today?

       13         A.   Yes, I did.

       14         Q.   Okay.  Any other time that you testified

11:06:07 15    at a deposition prior to the last four years?

       16         A.   No.

       17         Q.   Turning to page 36 of your report, what

       18    is the "Selected Expert Casework" that you've

       19    listed?

11:06:51 20         A.   This section of my CV, these cases where

       21    I was retained as an expert.

       22         Q.   In the household chemical advertising

       23    class action, were you evaluating causation in

       24    that case?

11:07:31 25         A.   Yes.

                                                              78

11:07:54   1        Q.   Okay.  Do you know if your -- the expert
           2   declaration that you submitted in the household
           3   chemicals false advertising class action was
           4   submitted to the court?
11:08:09   5        A.   There are two declarations here and I
           6   believe they were submitted just like any other
           7   declaration.
           8        Q.   What do you mean?
           9        A.   I submitted it to counsel.  Counsel must
11:08:27  10   have done what counsel usually does with
          11   declarations.
          12        Q.   Do you know for a fact whether this
          13   declaration was submitted to the court?
          14                   MR. OPPENHEIMER:  Objection
11:08:36  15        to form.
          16        A.   I haven't verified, but I believe they
          17   did submit it -- them.
          18        Q.   Did the court in that case accept you as
          19   an expert?
11:08:49  20                   MR. OPPENHEIMER:  Objection
          21        to form.
          22        A.   Could you clarify on that?
          23        Q.   Do you know if the court accepted your
          24   expert declaration in that case?
11:09:02  25                   MR. OPPENHEIMER:  Objection

79

11:09:02  1             to form.

        2        A.   So regarding the first case, the case

        3   settled so I don't know what kind of opinion the

        4   court had.

11:09:22  5        Q.   Okay.

        6        A.   And regarding the second case, I believe

        7   it's ongoing.

        8        Q.   When you say "the second case," are you

        9   referring to the last sentence where you state

11:09:32 10   that you "conducted similar analysis for a related

       11   case..."?

       12        A.   Yes.

       13        Q.   Okay.  Did that case also involve

       14   causation?

11:09:42 15        A.   Yes.

       16        Q.   Okay.  So the second item listed under

       17   your "Selected Expert Casework," do you recall

       18   when you filed an expert report in the beauty

       19   products trademark infringement case?

11:10:13 20        A.   That was a few years ago.

       21        Q.   Do you know if the call -- the court

       22   accepted the report that you filed in that case?

       23                    MR. OPPENHEIMER:  Objection

       24             to form.

11:10:30 25        A.   This was a case before the Trademark

                                                              80

|           |    |                                                    |
|-----------|----|----------------------------------------------------|
| 11:10:33  | 1  | Trial and Appeal Board of the U.S. Patent and      |
|           | 2  | Trademark Office.  I don't know if the court was   |
|           | 3  | involved.                                          |
|           | 4  | Q.   Okay.  In the banking false advertising       |
| 11:10:51  | 5  | class action, did you prepare an expert report?    |
|           | 6  | A.   No.                                           |
|           | 7  | Q.   Did you prepare an expert report in the       |
|           | 8  | fast food employment litigation?                   |
|           | 9  | A.   No.                                           |
| 11:11:21  | 10 | Q.   In the Next of Friend Susan Root -- and       |
|           | 11 | I'm paraphrasing -- case that's listed, you        |
|           | 12 | submitted a rebuttal report?                       |
|           | 13 | A.   That's correct.                               |
|           | 14 | Q.   Did your rebuttal report involve              |
| 11:11:39  | 15 | causation?                                         |
|           | 16 |                  MR. OPPENHEIMER:  Objection        |
|           | 17 |          to form.                                  |
|           | 18 | A.   Yes.                                           |
|           | 19 | Q.   And you -- were you deposed in that           |
| 11:11:57  | 20 | case, the Susan Root case?                         |
|           | 21 | A.   Yes.                                           |
|           | 22 | Q.   Do you recall when you were deposed in        |
|           | 23 | the Susan Root case?                               |
|           | 24 | A.   2016.                                         |
| 11:12:09  | 25 | Q.   Okay.  Is that the deposition that you        |

81

11:12:11  1    described earlier?

       2        A.   Yes.

       3        Q.   Do you know if the court accepted your

       4    rebuttal report?

11:12:19  5                  MR. OPPENHEIMER:   Objection

       6         to form.

       7        A.   To the best of my recollection, the

       8    client won the case in court and the court never

       9    ruled on the Daubert motion.  So I assume that

11:12:38 10    means that the court accepted it.

      11        Q.   Well, do you know for a fact if the

      12    court accepted your report for this --

      13                  MR. OPPENHEIMER:   Objection

      14         to form.

11:12:48 15        A.   What specifically do you mean by

      16    "accepted"?  I know how a court can reject an

      17    expert report by Dauberting it.  I'm not sure what

      18    means "accepting."

      19        Q.   So was your report subject to a Daubert

11:13:04 20    motion?

      21        A.   I believe there was a Daubert motion.

      22    And to the best of my recollection, the court

      23    never ruled on it and ruled on the overall matters

      24    in the case in favor of my client.

11:13:15 25        Q.   Okay.  So there was no ruling on your

                                                          82

11:13:17  1    report?

2         A.    To the best of my recollection last time

3    I checked.

4         Q.    Okay.  Did you submit an expert report

11:13:28  5    in the hospitality business trademark infringement

6    case?

7         A.    No.

8         Q.    Did -- so you submitted three reports in

9    the electronics false advertising case?

11:13:53 10        A.    That's correct.

11        Q.    What types of reports did you submit in

12   the electronic false advertising case?

13        A.    I opined on the merits of the design of

14   the consumer electronics product test conducted

11:14:08 15   for advertising claims.

16        Q.    So was it three reports on the same

17   subject matter?

18        A.    Yes.

19        Q.    Do you know if your report, any of your

11:14:23 20   reports, that you submitted in the electronics

21   false advertising case were accepted?

22                    MR. OPPENHEIMER:  Objection

23        to form.

24        A.    Accepted by who?

11:14:33 25        Q.    Well, was this a litigation?

83

11:14:37   1          A.    This was a case in front of the National

           2    Advertising Division of the Council of Better

           3    Business Bureaus.

           4          Q.    Well, do you -- you know if the National

11:14:49   5    Advertising Division of the Council of Better

           6    Business Bureaus accepted your report?

           7                    MR. OPPENHEIMER:   Objection

           8          to form.

           9          A.    To the best of my knowledge.

11:15:00  10          Q.    So what is the answer?

          11          A.    I'm not sure what you mean by

          12    "accepted."  It wasn't rejected.

          13          Q.    How do you know it wasn't rejected?

          14          A.    Because I would have been informed.

11:15:12  15    I -- this is to the best of my knowledge, and no

          16    one ever informed me that it was rejected, so I

          17    have no reason to believe that it was rejected.

          18          Q.    Did anyone inform you that your report

          19    was accepted?

11:15:25  20                    MR. OPPENHEIMER:   Objection

          21          to form.

          22          A.    I never heard anyone say to anyone that

          23    their report was accepted.  I understand in -- in

          24    a court setting, which I'm not sure this is

11:15:36  25    considered a court setting, there can be a Daubert

                                                                    84

11:15:41  1    motion and the court can reject a -- a report.

2            In this particular case, for example, I

3       don't think there was a Daubert motion.

4       Q.   Okay.  Did anybody tell you anything

11:15:57  5    about the report that you submitted with regard to

6       whether or not the accountant -- the report that

7       you submitted to the Council of Better Business

8       Bureaus was accepted by the Council of Business

9       Bureaus?

11:16:11  10           MR. OPPENHEIMER:  Objection

11           to form.

12      A.   I don't think anyone used those specific

13      words with me, but my general understanding is

14      this report was not rejected in any form.

11:16:27  15   Q.   Did someone tell you that the report was

16      not rejected?

17           MR. OPPENHEIMER:  Objection

18           to form.

19      A.   I don't recall specifics.

11:16:59  20   Q.   Other than the case that you described

21      where your report was -- your rebuttal was subject

22      to a Daubert challenge and you don't know -- that

23      the court did not rule on, have you ever submitted

24      a -- an expert report in any litigation that was

11:17:12  25   subject to a Daubert motion?

85

11:17:14  1                    MR. OPPENHEIMER:  Objection

         2          to form.

         3      A.   Regarding the case where there was a

         4  Daubert motion, my understanding is that the court

11:17:27  5  did not rule on the motion and ruled on the

         6  overall case in favor of my client.  There were no

         7  other Daubert motions against me as far as I know.

         8      Q.   Have you ever qualified as an expert in

         9  any court?

11:17:48 10                    MR. OPPENHEIMER:  Objection

        11          to form.

        12      A.   That sounds like a legal statement.

        13      Q.   Do you know if your report ever -- have

        14  you ever submitted a report in any case that was

11:18:08 15  accepted by the court?

        16                    MR. OPPENHEIMER:  Objection

        17          to form.

        18      A.   As I explained, I'm not sure what you

        19  mean by "accepted."  I know that none of my

11:18:21 20  reports were explicitly rejected by a court.

        21      Q.   Has a court ruled on any report that

        22  you've ever submitted in a litigation?

        23                    MR. OPPENHEIMER:  Objection

        24          to form.

11:18:33 25      A.   I'm not sure what you mean by the "court

                                                            86

11:18:36 1    ruled" other than in the Daubert motion situation.

2    And in one Daubert motion, I know the court did

3    not rule on that and ruled on the overall case in

4    favor of my client.

11:18:51 5        Q.    Do you know if any expert report that

6    you've submitted in any litigation was subject to

7    a motion to strike the report?

8        A.    I don't know the difference between

9    Daubert motion and motion to strike.

11:19:07 10       Q.    Okay.  Have you ever testified as an

11   expert in court?

12              MR. OPPENHEIMER:  Objection;

13         asked and answered.

14       A.    No.

11:19:16 15       Q.    Is the answer no?

16       A.    The answer is no.

17       Q.    Okay.  Moving on to page 37 of your

18   report, the trademark and trade dress infringement

19   matter, did that involve determining causation?

11:19:52 20       A.    Yes.

21       Q.    Were you testing consumer perception in

22   that case?

23       A.    These are numerous cases and all of them

24   involved testing causation and consumer

11:20:11 25   perception.

87

11:20:13  1        Q.   Okay.  Did any of these cases in the

        2  trademark and trade dress infringement matters

        3  involve testing perception only?

        4        A.   What do you mean by "only"?

11:20:27  5        Q.   Without cause and effect.

        6             MR. OPPENHEIMER:  Objection

        7        to form.

        8        A.   In trademark and trade dress cases, we

        9  would want to understand how the trademark at

11:21:01 10  issue impacts consumer perception.  So there is

       11  always a causal link of interest.  I don't recall

       12  all the cases, whether one of the experts said --

       13  was on the other side maybe did not test the

       14  causal link.  I don't recall.

11:21:29 15        Q.   Is it poss -- I'm sorry.  Were you done?

       16        A.   Standard trademark/trade dress cases all

       17  are interested in causal effect of the trademark

       18  on consumer perception.

       19        Q.   Okay.  Is it possible to test consumer

11:22:23 20  perception without conducting a quantitative

       21  analysis?

       22             MR. OPPENHEIMER:  Objection

       23        to form.

       24        A.   What do you mean by "test consumer

11:22:39 25  perception"?

                                                              88

11:22:42  1        Q.   Can you evaluate consumer perception
        2   without conducting a cause-and-effect analysis?
        3                  MR. OPPENHEIMER:   Objection
        4          to form.
11:23:00  5        A.   If one is interested in consumer
        6   perception as -- as it exists currently without
        7   any interest in to what caused those perceptions,
        8   one can evaluate those perceptions without
        9   conducting an experiment.
11:23:43 10        Q.   Have you ever evaluated a consumer
       11   perception without conducting a causal-and-effect
       12   analysis?
       13                  MR. OPPENHEIMER:   Objection
       14          to the form.
11:23:56 15        A.   Can you rephrase, please?
       16        Q.   Have you ever evaluated a consumer
       17   perception without conducting a causal-and-effect
       18   analysis?
       19                  MR. OPPENHEIMER:   Objection
11:24:15 20          to the form.
       21        A.   Do you mean cause-and-effect analysis?
       22        Q.   Yes.
       23        A.   I don't recall specifically.  I might
       24   have evaluated others' work of this type.
11:25:10 25        Q.   In your -- the page 38 of your report

                                                           89

11:25:17  1    where you list the "False Advertising" heading --

2    A.   Yes.

3    Q.   -- did you conduct a survey in the

4    Kenneth Hobbs v. Brother International Corp. case?

11:25:29  5                    MR. OPPENHEIMER:   Objection

6         to form.

7    A.   Can you repeat the question?

8    Q.   On page 38 of your report where you list

9    the "False Advertising" heading, did you conduct a

11:25:49 10    survey in the Kenneth Hobbs v. Brother

11    International Corp. case?

12                    MR. OPPENHEIMER:   Same

13         objection.

14    A.   I supported Professor Joel Steckel.

11:26:03 15    Q.   Did he conduct a survey in that case?

16    A.   He conducted two surveys.

17    Q.   Were those surveys -- did those surveys

18    have to do with cause and effect?

19    A.   One of them.

11:26:25 20    Q.   I'm sorry?

21    A.   One of them.

22    Q.   Which one?

23    A.   There is a sentence that starts with

24    "The other, a survey/experiment, addressed the

11:26:39 25    materiality of this limitation to consumers.   In

90

11:26:43 1    its order denying class certification, the court

2    cited the experiment involving more than 450

3    people who had purchased or planned to purchase a

4    printer close to the time of the survey, which

11:26:52 5    found that 'consumers chose the Brother printer

6    with nearly identical frequency regardless of

7    whether they were made aware of the unscannable

8    margin at the time of their selection.'"

9        Q.   What was the second survey about?

11:27:08 10              MR. OPPENHEIMER:  Objection

11        to form.

12        A.   The survey that's listed here as the

13    first is described as "One survey evaluated

14    consumer awareness of a printer's alleged

11:27:27 15    malfunctioning."

16        Q.   Okay.  So did that survey that evaluated

17    the consumer awareness of printer's alleged

18    malfunctioning involve cause and effect?

19        A.   No.

11:27:44 20        Q.   So what was being evaluated in that

21    survey?

22        A.   Awareness.

23        Q.   Was this a quantitative survey or a

24    qualitative survey?

11:27:57 25        A.   What is a qualitative survey?

91

11:28:00  1          Q.   I don't know.  Is there such a thing as

          2   a qualitative survey?

          3          A.   If there is, it's an obscure term.

          4          Q.   Can you explain what you mean?

11:28:11  5          A.   Normally --

          6                    MR. OPPENHEIMER:  Objection.

          7          A.   -- when one speaks about surveys, it's a

          8   quantitative matter.

          9          Q.   Okay.  So was there a qualitative

11:28:20 10   analysis with regards to the first survey?

         11          A.   There was no qualitative analysis.

         12          Q.   So what type of analysis was conducted?

         13          A.   Quantitative.

         14          Q.   With regards to the E-Retailor false

11:28:44 15   advertising matter, did that case involve

         16   cause-and-effect relationships?

         17          A.   Yes.

         18          Q.   Okay.  And the online services false

         19   advertising matter, did that case involve

11:29:01 20   cause-and-effect relationships?

         21          A.   Yes.

         22          Q.   In the cigarette false advertising

         23   matter, did that case involve cause-and-effect

         24   relationships?

11:29:38 25          A.   This was a rebuttal.  I believe the

                                                              92

11:29:39   1    subject matter involved the causal relationship,

2    but the method proposed by the opposing counsel

3    did not address it properly.

4              THE REPORTER:  Address it?

11:29:53   5              THE WITNESS:  Properly.

6         Q.   Who submitted the rebuttal in the case?

7              MR. OPPENHEIMER:  Objection

8         to form.

9         A.   The expert is not listed in my CV, which

11:30:06  10    means that information is not public or was not

11    public when I drafted this portion of my CV.

12         Q.   Did you submit a rebuttal in that case?

13         A.   No.  I supported an expert.

14         Q.   Do you know whether the rebuttal was the

11:30:30  15    subject of a Daubert motion?

16         A.   I don't recall.

17         Q.   Under your "Corporate Acquisitions"

18    heading, did the AT&T case involve a causal --

19    cause-and-effect analysis?

11:30:49  20         A.   Yes.

21         Q.   Okay.  And on page 39, the cases you

22    listed under the "Antitrust" heading, did they all

23    involve cause-and-effect relationships?

24         A.   Not to the best of my recollection.

11:31:19  25         Q.   Okay.

93

11:31:21  1       A.   The cases themselves might -- might have

       2   involved causal relationships, but not the parts I

       3   worked on.

       4       Q.   Okay.  So which case -- did you perform

11:31:34  5   any cause-and-effect work in the Microsoft

       6   antitrust matters?

       7                   MR. OPPENHEIMER:  Objection

       8        to form.

       9       A.   I don't recall the specifics.

11:32:12 10       Q.   Did you perform any cause-and-effect

      11   work in the credit cards antitrust matter?

      12                   MR. OPPENHEIMER:  Objection

      13        to form.

      14       A.   The opposing expert developed a survey

11:32:40 15   in an experimental form to test causal

      16   propositions.  The expert I assisted with revised

      17   that survey to expose its drawbacks.

      18                   THE REPORTER:  Its?

      19                   THE WITNESS:  Drawbacks.

11:33:02 20       Q.   So was your deposition taken in the

      21   high-tech antitrust matter?

      22       A.   I was not an expert in this case and my

      23   deposition was not taken.

      24       Q.   Do you recall what your assignment was

11:34:02 25   in this case?

94

11:34:03  1          A.   Could you repeat that, please?

       2          Q.   Do you recall what your assignment was

       3     in this case?

       4          A.   Yes.

11:34:13  5          Q.   What was your assignment?

       6          A.   To evaluate the expert report of

       7     Mr. ███.

       8          Q.   Is there a specific subject matter that

       9     you were evaluating with regard to Mr. ███

11:34:31 10     report?

      11                    MR. OPPENHEIMER:   Objection

      12              to form.

      13          A.   I am evaluating the entire report.

      14          Q.   What specifically were you evaluating?

11:34:40 15                    MR. OPPENHEIMER:   Objection.

      16          A.   The entire report.

      17          Q.   Do you recall what subject matter you

      18     evaluated in the ███ report?

      19                    MR. OPPENHEIMER:   Objection;

11:35:16 20              asked and answered.

      21                    Answer again.

      22          A.   The entire report.

      23          Q.   Well, let's go through the report.  Let

      24     me hand you...

11:35:55 25                    THE WITNESS:  Can I have one

                                                              95

```
11:35:55   1                    more?
           2                    MR. OPPENHEIMER:  There's
           3          two there.
           4                    THE WITNESS:  Oh.
11:36:00   5                    (Whereupon, exhibit is received
           6          and marked SEC Shampanier Deposition
           7          Exhibit 7 for identification.)
           8                    THE REPORTER:  Exhibit 7 for
           9          identification.
11:36:03  10    BY MS. GUERRIER:
          11          Q.   I've handed you what's been marked as
          12    Exhibit 7.
          13               Do you recognize the document that's
          14    been premarked as Exhibit 7?
11:36:32  15          A.   Yes.  This appears to be Mr. █████
          16    report but without the appendices.
          17                    MS. GUERRIER:  I'm going to
          18          mark this as an exhibit.  This is the
          19          appendix to Mr. █████ report.
11:37:29  20                    MR. OPPENHEIMER:  Do you
          21          have additional copies?
          22                    MS. GUERRIER:  I don't.  I
          23          don't know why this wasn't included
          24          in the report.
11:37:55  25                    THE REPORTER:  What did you
```

96

```
11:37:57   1              want to mark this?

           2                        MS. GUERRIER:  That could be

           3              1, Exhibit 1.

           4                        (Whereupon, exhibit is received

11:38:27   5              and marked SEC Shampanier Deposition

           6              Exhibit 1 for identification.)

           7                        THE REPORTER:  Exhibit 1 for

           8              identification.

           9   BY MS. GUERRIER:

11:38:30  10        Q.    Okay.  Are you providing any rebuttal

          11   regarding the summary of findings in ████████

          12   report which starts on page 6 of the report?

          13        A.    Just for the record, we still don't have

          14   the full report.  Exhibit 1 is some of the

11:39:23  15   appendices, I believe.

          16        Q.    Okay.  Right now I'm looking at Exhibit

          17   7.  That -- the last page where he signed on page

          18   49, that's -- I'm looking at that document, not

          19   the document marked Exhibit 1.  I don't have any

11:39:42  20   questions about Exhibit 1.

          21        A.    Okay.  Exhibit 7 is a partial report of

          22   ████████████████.

          23        Q.    Okay.  Is there a signature page on

          24   Exhibit 7?

11:40:07  25        A.    There is a signature page.
```

97

```
11:40:09   1          Q.   Okay.  Who -- who signed it as far as

           2   you can see on page 49 of the report?

           3          A.   ███████████.

           4          Q.   Okay.  So going back to page 6 of the

11:40:22   5   report, are you providing any rebuttal regarding

           6   the summary of findings outlined in Mr. ████████

           7   report on page 6 --

           8                         MR. OPPENHEIMER:  Objection

           9          to form.

11:40:51  10          Q.   -- to 8?

          11          A.   I provide rebuttal to Mr. ███████ entire

          12   report.

          13          Q.   Okay.  So what specifically on the

          14   summary of findings are you rebutting?

11:41:09  15          A.   The entire summary of findings.

          16          Q.   So what in -- what exactly are you

          17   rebutting?

          18                         MR. OPPENHEIMER:  Objection;

          19          asked and answered.

11:41:19  20          A.   Mr. ██████ report.

          21          Q.   Are there any facts under the summary of

          22   findings that you're rebutting?

          23                         MR. OPPENHEIMER:  Objection

          24          to form.

11:41:43  25          A.   I'm rebutting the entire summary of
```

                                                                98

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:41:45   1    findings.
           2        Q.   Okay.  So what -- can you show -- can
           3    you let me know exactly in paragraph 8 what you
           4    are rebutting?
11:41:52   5                  MR. OPPENHEIMER:  Objection
           6             to form.
           7        A.   I'm rebutting entire summary of
           8    findings, including all of paragraph 8 and 7 and
           9    9.
11:42:10  10        Q.   Okay.  So in paragraph 8, the first
          11    sentence, "The design of XRP as a fixed-supply..."
          12             You see that sentence?
          13        A.   I see that sentence.
          14        Q.   What exactly are you rebutting?
11:42:21  15                  MR. OPPENHEIMER:  Objection
          16             to form.
          17        A.   This sentence, as well as Mr. ████████
          18    general conclusion in this report, is causal.
          19        Q.   Okay.
11:42:44  20        A.   It says that "Statements made by Ripple
          21    were consistent with promoting an investment use
          22    case for XRP as well as the design of XRP as a
          23    fixed-supply coin."  So he is saying that those
          24    two items caused investment use case for XRP.
11:43:15  25        Q.   So you stated that you're rebutting the
```

99

11:43:18   1    first sentence.

           2            What -- what are you rebutting in the

           3    first sentence?

           4                    MR. OPPENHEIMER:  Objection

11:43:22   5            to form.

           6    A.   The entire first sentence.

           7    Q.   So what specifically?

           8                    MR. OPPENHEIMER:  Objection

           9            to form; asked and answered.

11:43:28  10    A.   The entire first sentence.

          11    Q.   What -- can you explain what you mean by

          12    that?

          13                    MR. OPPENHEIMER:  Objection.

          14            You can answer.

11:43:38  15    A.   I rebut the entire first sentence.

          16    Q.   What are you presenting to contradict

          17    that sentence?

          18    A.   This is a causal statement and Mr. ████

          19    did not use any reliable methodology to test it.

11:43:52  20    Q.   Are you rebutting Mr. ████

          21    methodology or are you rebutting the facts that he

          22    used in this paragraph --

          23                    MR. OPPENHEIMER:  Objection

          24            to form.

11:44:04  25    Q.   -- 8?

                                                                100

11:44:05  1        A.   I'm rebutting Mr. ███ methodology

2   and, as a result, I also rebut his conclusions.

3        Q.   So are you rebutting any facts that are

4   stated in this paragraph?

11:44:14  5                     MR. OPPENHEIMER:   Objection

6             to form.

7        A.   Which specific facts are you referring

8   to?

9        Q.   I'm asking you.

11:44:23 10                     MR. OPPENHEIMER:   Objection

11             to form.

12        A.   I'm rebutting the entirety of the

13   sentence.

14        Q.   Okay.  So what -- what critique do you

11:44:30 15   have with the first sentence?

16                     MR. OPPENHEIMER:   Objection;

17             asked and answered.

18        A.   It's a causal statement and Mr. ███

19   did not use any reliable methodology to test that

11:44:41 20   causal proposition.

21        Q.   What facts are you relying on in support

22   of your rebuttal of the first sentence in

23   paragraph 8?

24                     MR. OPPENHEIMER:   Objection.

11:44:57 25        A.   I rely on the materials listed as

101

11:44:59  1    materials considered --

2        Q.   Can you list the --

3        A.   -- in my report.

4        Q.   Can you list the specific materials that

11:45:04  5    you're relying on that rebut this first sentence

6    in paragraph 8?

7                    MR. OPPENHEIMER:  Objection

8              to form.

9        A.   Appendix B of my report lists materials

11:45:34 10    I considered.  I rely on all of them.

11        Q.   Can you point to the materials that

12    you're specifically relying on for your rebuttal

13    of paragraph 8?

14                    MR. OPPENHEIMER:  Were you

11:45:48 15              done with that last answer?

16                    THE WITNESS:  Sorry, I

17              didn't hear you.

18                    MR. OPPENHEIMER:  Were you

19              done with that last answer?

11:45:56 20                    THE WITNESS:  I was done,

21              yes.

22                    MR. OPPENHEIMER:  Okay.

23        A.   I rely on all of my materials

24    considered.

11:46:01 25        Q.   Can you name the materials that you

102

| | | |
|---|---|---|
| 11:46:02 | 1 | considered in support of your rebuttal of |
| | 2 | paragraph 8? |
| | 3 | MR. OPPENHEIMER:  Objection; |
| | 4 | asked and answered. |
| 11:46:14 | 5 | A.   I rely on court documents for background |
| | 6 | and I rely on the remainder of my materials |
| | 7 | considered to support the appropriate methodology |
| | 8 | for testing causal proposition. |
| | 9 | Q.   Can you -- I'm sorry, were you done? |
| 11:46:29 | 10 | A.   Mr. ▆▆▆▆ did not use a reliable |
| | 11 | methodology to test his causal propositions. |
| | 12 | Q.   Can you identify by name the specific |
| | 13 | documents that you're relying on in support of |
| | 14 | paragraph 8? |
| 11:46:41 | 15 | MR. OPPENHEIMER:  Objection; |
| | 16 | asked and answered for probably the |
| | 17 | eighth time now. |
| | 18 | A.   As I said, it's the entirety of my |
| | 19 | materials considered, but I can give you examples. |
| 11:46:57 | 20 | Q.   Go ahead, please. |
| | 21 | A.   For example, third item from bottom on |
| | 22 | page 41 discusses "Experimental and |
| | 23 | Quasi-Experimental Designs for Generalized Causal |
| | 24 | Inference."  And this book discusses specifically |
| 11:47:31 | 25 | the gold standard of testing causal propositions |

103

```
11:47:38  1    is an experiment.

          2           And I'll actually read what it says.

          3    Paragraph -- paragraph 18 on page 10 of my report

          4    cites the book of Shadish, Cook and Campbell, the

11:48:17  5    sentence that adds in Footnote 22, and it reads:

          6    "Shadish, et al, (2002) also state that

          7    'experiments are well-suited to studying causal

          8    relationships.  No other scientific method

          9    regularly matches the characteristics of causal

11:48:41 10    relationships so well.'"

         11           Q.   Can you turn to page 3 of Mr. ████

         12    report?

         13           A.   Yes, I'm there.

         14           Q.   Can you please read the first sentence

11:49:10 15    of paragraph 2 of Mr. ████ assignment?

         16           A.   Mr. ████ states "The SEC retained me to

         17    independently analyze and render opinions on the

         18    perspective of a reasonable purchaser of XRP on

         19    Ripple's statements, actions, and product

11:49:29 20    offerings."  Footnote 1.  I will -- Footnote 1

         21    says "I also was retained to provide analysis

         22    and/or rebuttal to defendants' expert reports, if

         23    and as needed."

         24           Q.   Does Mr. ████ state that he was

11:49:51 25    retained to evaluate cause-and-effect
```

                                                        104

11:49:53  1    relationships between Ripple's statements,

          2    actions, and specific outcomes or behaviors?

          3                    MR. OPPENHEIMER:  Objection

          4         to form.

11:50:06  5         A.   Yes.

          6         Q.   Does he state that he was retained to

          7    evaluate cause and effect?

          8                    MR. OPPENHEIMER:  Objection.

          9         A.   He's evaluating the perspective of a

11:50:21 10    reasonable purchaser of XRP on Ripple's

         11    statements, actions, and product offerings.  In

         12    other words, he evaluates the impact of

         13    statements, actions, and product offerings of

         14    Ripple on the perspective of a reasonable

11:50:39 15    purchaser of XRP.

         16         Q.   Is that your interpretation of this

         17    sentence that you -- you read?

         18                    MR. OPPENHEIMER:  Objection

         19         to form.

11:50:55 20         A.   That is what the sentence states.

         21         Q.   Does the sentence use the term "cause

         22    and effect"?

         23         A.   The sentence does not use those two

         24    words.

11:51:02 25         Q.   So where did you come up with the cause

                                                            105

11:51:04  1    and effect in the sentence that you just read?

          2                    MR. OPPENHEIMER:  Objection

          3            to form.

          4        A.   That's the content of the sentence.

11:51:13  5        Q.   Is that your interpretation of the

          6    sentence?

          7                    MR. OPPENHEIMER:  Objection.

          8        A.   This is what the sentence states.

          9        Q.   Is the word "cause" used anywhere in

11:51:32 10    this sentence?

         11                    MR. OPPENHEIMER:  Objection;

         12            asked and answered.

         13        A.   The word "cause" is not used in the

         14    sentence.

11:51:38 15        Q.   Is the word "effect" used anywhere in

         16    this sentence?

         17                    MR. OPPENHEIMER:  Objection;

         18            asked and answered.

         19        A.   The word "effect" is not used in the

11:51:46 20    sentence.

         21        Q.   Do you have an understanding what the

         22    term "perspective" means?

         23        A.   Yes.

         24        Q.   What does the term "perspective" mean?

11:51:59 25        A.   Perception and behavior.

                                                        106

11:52:07  1          Q.    Do you have an understanding of the term

        2     "cause"?

        3          A.    Yes.

        4          Q.    What does cause mean?

11:52:18  5          A.    Impact a fact.

        6          Q.    I'm sorry?

        7          A.    Impact a fact.

        8          Q.    Does the term "perspective" mean the

        9     same thing as the term "cause"?

11:52:32 10          A.    Perspective is the outcome here.

       11          Q.    My question is, does the term

       12     "perspective" mean the same thing as the term

       13     "cause"?

       14          A.    No.

11:53:11 15          Q.    Is the rebuttal that you provided in

       16     this case based on applying cause and effect to

       17     Ripple's statements and actions?

       18                      MR. OPPENHEIMER:  Objection

       19               to form.

11:53:27 20          A.    I'm not sure what the sentence means.

       21          Q.    Did you conduct a cause-and-effect

       22     analysis in your rebuttal report?

       23                      MR. OPPENHEIMER:  Objection.

       24          A.    I evaluated Mr. ███████ "analysis."  I

11:53:45 25     did not conduct my own analysis.

                                                              107

```
11:53:47   1          Q.   And when you describe the methodology

           2     that you reviewed in your report, are you using a

           3     cause-and-effect methodology?

           4                    MR. OPPENHEIMER:   Objection.

11:53:59   5

           6          A.   I'm using the literature on cause and

           7     effect to evaluate Mr. ███████ report which, in

           8     paragraph 2, states that he was retained to

           9     evaluate the causal proposition.

11:54:22  10          Q.   Where does it say that he was retained

          11     to evaluate the causal proposition in paragraph 2?

          12                    MR. OPPENHEIMER:   Objection;

          13                asked and answered.

          14          A.   Paragraph 2 has a cause and an effect.

11:54:34  15     The cause is the statement, actions, and product

          16     offerings of Ripple; and the effect is the

          17     perspective of a reasonable purchaser of XRP.

          18          Q.   Is that an opinion that you're rendering

          19     regarding what paragraph 2 means?

11:54:48  20                    MR. OPPENHEIMER:   Objection

          21                to form.

          22          A.   That's what the paragraph states.

          23          Q.   Can you point to the word "cause" in

          24     paragraph 2?

11:54:57  25                    MR. OPPENHEIMER:   Objection;
```

108

11:54:58  1                    asked and answered.

        2       A.    There is no word "cause" in paragraph 2.

        3       Q.    Okay.  Turning to page 8 of Mr. █████

        4  report, "Background," is there anything in the

11:55:52  5  background section that you're providing a

        6  rebuttal to?

        7                    MR. OPPENHEIMER:  Objection

        8            to form.

        9                    (Pause)

11:57:49 10       A.    Section 3 is called "Background."  It's

       11  provided in Mr. █████ report for background.

       12  And I rebut his entire report.

       13       Q.    So what are the facts that you're

       14  providing a rebuttal to in paragraph 10?

11:58:10 15                    MR. OPPENHEIMER:  Objection

       16            to form.

       17       A.    I take the background of this case as

       18  given as provided in Mr. █████ report and the

       19  complaint and the answer to the complaint.  My

11:58:35 20  opinions are regarding Mr. █████ conclusions and

       21  the unreliable methodology which he reached them

       22  with.

       23       Q.    Okay.  I want -- I just want to clarify

       24  because you stated earlier that you are rebutting

11:58:49 25  the entire report.

                                                                  109

11:58:50  1          So are you rebutting the conclusions and

       2   methodology that Mr. ███████ provided or is there

       3   anything in addition to the conclusions and

       4   methodology that you're rebutting?

11:59:00  5                    MR. OPPENHEIMER:  Objection

       6            to form.

       7       A.   I'm rebutting the entire report.

       8       Q.   Okay.  So with regard to the background,

       9   did you state that you're -- let me -- that you're

11:59:16 10   taking the background as a given?

      11                    MR. OPPENHEIMER:  Objection.

      12       A.   I don't recall anymore that I stated.

      13   What is it that I said?

      14                    MS. GUERRIER:  Could you --

11:59:34 15                    THE WITNESS:  Could you read

      16            my answer, please?

      17                    MS. GUERRIER:  Could you

      18            read her answer to the question "So

      19            what are the facts that are you

11:59:40 20            providing a rebuttal to in paragraph

      21            10?"  I think it starts at line 34,

      22            10.  Her answer starts at line 34,

      23            13.

      24                    (Whereupon, the record was read

12:00:20 25            back.)

                                                    110

```
12:00:21   1     BY MS. GUERRIER:
           2         Q.   So can you clarify whether you're
           3     rebutting any facts in the background section?
           4                    MR. OPPENHEIMER:   Objection
12:00:27   5         to form.
           6         A.   I am taking the background as given and
           7     I'm rebutting the entire report.
           8         Q.   Okay.  Is there anything in paragraph 10
           9     that you disagree with?
12:01:01  10                    MR. OPPENHEIMER:   Objection
          11         to form.
          12                    (Pause)
          13         A.   I take this paragraph as given.
          14         Q.   Is there anything in paragraph 11 that
12:01:48  15     you disagree with?
          16                    MR. OPPENHEIMER:   Objection
          17         to form.
          18         A.   I take paragraph 11 as given.
          19         Q.   Is there anything in paragraph 12 that
12:02:35  20     you disagree with?
          21                    MR. OPPENHEIMER:   Objection
          22         to form.
          23         A.   I take paragraph 12 as given.
          24         Q.   Is there anything in paragraph 13 that
12:03:06  25     you disagree with?
```

                                                            111

```
12:03:07   1                    MR. OPPENHEIMER:  Objection

           2         to form.

           3         A.   I take paragraph 13 as given.

           4         Q.   Moving on to Section 4 of Mr. ██████

12:03:51   5    report titled "Ripple Platform Overview," is there

           6    anything under Section 4, including the

           7    subsections 4.1, 4.2, that you disagree with?

           8                    MR. OPPENHEIMER:  Objection

           9         to form.

12:05:44  10                    (Pause)

          11         A.   Can you repeat the question, please?

          12         Q.   The question was "Moving on to Section 4

          13    of Mr. ██████   report titled 'Ripple" Plat --

          14                    THE REPORTER:  Platform.

12:08:06  15         Q.   -- "'Ripple Platform Overview,' is there

          16    anything under Section 4, including the

          17    subsections 4.1 and 4.2, that you disagree with?"

          18                    MR. OPPENHEIMER:  Objection

          19         to form.

12:08:28  20         A.   To the extent that this section

          21    describes background facts and history, I take it

          22    as given.  To the extent that this section

          23    describes or implies perspective of a reasonable

          24    purchaser of XRP on Ripple's statement, action,

12:08:46  25    product offering, those conclusions are not
```

112

12:08:50   1     supported by any valid methodology and, thus, are

           2     unreliable.

           3         Q.   Is there any statement in paragraph 14

           4     of Mr. ▇▇▇ report where he implies the

12:09:11   5     perspective of a reasonable purchaser of XRP on

           6     Ripple's statements, actions, product offerings?

           7              (Pause)

           8         A.   All of these sentences describe Ripple's

           9     actions.  If there is any implications about how

12:09:56  10     those actions affected prospective purchasers or

          11     purchasers, Mr. ▇▇▇ did not provide reliable

          12     methodology for those implications if they exist

          13     here.

          14         Q.   So were you able to identify

12:10:14  15     specifically where Mr. ▇▇▇ makes those

          16     implications in paragraph 14?

          17              MR. OPPENHEIMER:  Objection

          18         to form.

          19         A.   I don't see anything explicit, but if

12:10:33  20     Mr. ▇▇▇ implies something, then he has no

          21     support for such implications.

          22         Q.   Well, when you say "if" he implies

          23     something, did he, in fact, imply any of the

          24     perspective that you describe --

12:10:53  25              MR. OPPENHEIMER:  Objection

                                                              113

```
12:10:53   1              to form.

           2        Q.   -- in paragraph 14?

           3        A.   If Mr. ███ implies here that any of

           4   the actions of Ripple that he lists caused certain

12:11:19   5   perspective -- for example, he mentions the

           6   public; he implies the public cause and

           7   perspective of the actions of Ripple -- then those

           8   implications are not supported by a valid

           9   methodology.

12:11:35  10        Q.   What were you just reading?

          11        A.   Second sentence of paragraph 14 mentions

          12   the public.

          13        Q.   So what -- what do you take issue with

          14   in the second sentence of paragraph 14?

12:11:51  15                   MR. OPPENHEIMER:   Objection

          16              to form.

          17        A.   If this sentence is used by Mr. ███ to

          18   imply any perspective of the public, even though

          19   such a perspective is not stated here explicitly,

12:12:16  20   but if there is such an implication, that

          21   implication is not based on any methodology.

          22        Q.   Can you identify anywhere in the report

          23   where there's an implication regarding perspective

          24   of XRP purchasers with regard to the second

12:12:29  25   sentence in paragraph 14?
```

114

```
12:12:31   1                    MR. OPPENHEIMER:  Objection

           2          to form.

           3      A.    Throughout his report, Mr. █████

           4  discusses numerous cases of the public

12:12:44   5  perspective; specifically, the perspective of the

           6  purchasers or prospective purchasers of XRP.

           7      Q.    Okay.  Is there any statement about

           8  perspective in the second sentence of paragraph

           9  14?

12:13:00  10      A.    The word "perspective" is not in the

          11  second paragraph.

          12      Q.    Do you disagree with the statement that

          13  "In 2012, the XRP blockchain was released to the

          14  public and went live for the first time with a

12:13:11  15  maximum supply of 100 billion XRP created"?

          16                    MR. OPPENHEIMER:  Objection

          17          to form.

          18      A.    I take it as given.

          19      Q.    Okay.

12:13:23  20      A.    I'm not opining here on the history or

          21  mechanics of XRP or Ripple.

          22      Q.    Is there anything in paragraph 15 that

          23  you disagree with?

          24                    MR. OPPENHEIMER:  Objection,

12:13:36  25          form.
```

115

12:13:45   1           A.    The first sentence says "In the early

           2   years, Ripple released products geared towards

           3   prospective individual users and traders."

           4           If there is an implication here of how

12:13:58   5   the prospective purchasers end up -- what they

           6   ended up doing with XRP or this other products

           7   that Ripple released, if there is such an

           8   implication here, then it's not supported by any

           9   reliable methodology.

12:14:16  10           Q.    Is there such an implication, in fact,

          11   in paragraph 15?

          12                  MR. OPPENHEIMER:   Objection

          13           to form.

          14           A.    To the extent that they reach such an

12:14:46  15   implication and if there is such an implication,

          16   it's not supported by any reliable methodology.

          17           Q.    Well, what do you mean "to the extent"

          18   that there is such ampli -- implication?

          19           A.    If Mr. ████   implies here that

12:15:07  20   prospective purchasers of Ripple products engaged

          21   in certain activities with those products after

          22   the purchase, there is no systematic analysis of

          23   what those individuals did.

          24           Q.    Do you disagree with the -- the

12:15:33  25   statement that "Ripple released products geared

                                                                116

| | | |
|---|---|---|
| 12:15:37 | 1 | towards prospective individual users and traders"? |
| | 2 |         MR. OPPENHEIMER:  Objection |
| | 3 |     to form. |
| | 4 |     A.   To the extent that it describes |
| 12:15:55 | 5 | historical -- history of XRP and Ripple, I take it |

12:15:37  1   towards prospective individual users and traders"?

2          MR. OPPENHEIMER:  Objection

3      to form.

4      A.   To the extent that it describes

12:15:55  5   historical -- history of XRP and Ripple, I take it

6   as given.  If there is any implication about the

7   perspective of purchasers and how it was caused by

8   actions, statements, and offerings of Ripple,

9   Mr. ████ did not provide a reliable methodology

12:16:18 10   to support such statements.

11      Q.   Do you disagree with the second -- the

12   facts in the second sentence in paragraph 15?

13          MR. OPPENHEIMER:  Objection

14      to form.

12:16:52 15   A.   To the extent this sentence describes

16   the history of XRP and Ripple, I take it as given.

17   To the extent there is an implication of what

18   individuals did with this app, there is no

19   systematic analysis.

12:17:13 20   Q.   Do you disagree with the next

21   sentence -- the facts contained in the next

22   sentence following the third sentence in paragraph

23   15?

24          MR. OPPENHEIMER:  Objection

12:17:22 25   to form.

117

12:17:38    1          A.   I'm not offering any opinions on the

            2      history or mechanics of XRP or Ripple's other

            3      products.   To the extent that the statements --

            4      any statements in this report imply a causal

12:17:56    5      relationship between XRP -- between Ripple's

            6      statements, actions, and offerings and perspective

            7      of purchasers and potential purchasers, Mr. █████

            8      did not offer a reliable methodology to evaluate

            9      such a causal relationship.

12:18:18   10                     THE REPORTER:  Did not offer

           11              a reliable?

           12                     THE WITNESS:  Methodology to

           13              evaluate such a causal relationship.

           14          Q.   Can you -- I'm sorry.

12:18:33   15          Can you identify any statement in

           16      paragraph 15 that implies a causal relationship

           17      between XRP, Ripple's statements, actions, and

           18      offerings and the perspective of purchasers and

           19      potential purchasers of XRP?

12:18:45   20                     MR. OPPENHEIMER:  Objection

           21              to form.

           22          A.   There may be an implied relationship

           23      here between the upgrades and the branding on the

           24      one hand and trading becoming number one use case.

12:19:33   25                     THE REPORTER:  Number one?

                                                                      118

12:19:35  1                    THE WITNESS:  Use case.

        2        Q.   How is there an implied relationship

        3   between the upgrades and the branding and on --

        4   and the trading becoming number one --

12:19:44  5                    MR. OPPENHEIMER:  Objection

        6         to form.

        7        Q.   -- on use case of Ripple?

        8        A.   The sentence read -- reads "After

        9   several upgrades, Ripple Client was rebranded in

12:19:59 10   2014 as Ripple Trade, with Ripple recognizing that

       11   'Trading has rapidly become the number one use

       12   case of Ripple.'"

       13        Q.   Okay.  So where is the implication of

       14   the relationship between the upgrade and the

12:20:16 15   branding?

       16                    MR. OPPENHEIMER:  Objection;

       17         asked and answered.

       18        A.   The implication is in the sentence.

       19        Q.   Okay.  So do you disagree that Ripple

12:20:37 20   Client was rebranded in 2014 as Ripple Trade?

       21                    MR. OPPENHEIMER:  Objection

       22         to form.

       23        A.   I'll answer the question, but maybe we

       24   can take a break soon.

12:20:56 25        Q.   Yeah, you can -- yes.  I'll finish with

                                                            119

12:20:58   1    this section and we can take a break.

          2       A.   Can you repeat the last question,

          3    please?

          4       Q.   Do you disagree that Ripple Client was

12:21:12   5    rebranded in 2014 as Ripple Trade?

          6               MR. OPPENHEIMER:  Objection;

          7         form.

          8       A.   I don't offer any opinions about the

          9    history or mechanics of XRP or Ripple and its

12:21:24 10    other products.

       11       Q.   Okay.  Do you disagree with the

       12    quotation that "Trading has rapidly become the

       13    number one use case of Ripple," which includes the

       14    footnote citation in Footnote 8?

12:21:40 15               MR. OPPENHEIMER:  Objection

       16         to form.

       17       A.   I don't offer any opinions regarding the

       18    history of Ripple or the veracity of statements

       19    cited in -- cited -- cited in the report of

12:22:00 20    Mr. ██████.

       21       Q.   Okay.  So is this your position with

       22    regard to the last sentence in paragraph 15?

       23               MR. OPPENHEIMER:  Objection

       24         to form.

12:22:32 25       A.   I'm not offering any opinions about the

                                            120

12:22:34    1     history of Ripple or XRP.

            2           Q.    Okay.   Thank you.

            3                      MS. GUERRIER:   I think this

            4                is a good time for a break.   We can

12:22:45    5                go off the record.

            6                      THE VIDEOGRAPHER:   Okay.

            7                Going off the record at 12:22.

            8                      (Whereupon, a luncheon recess

            9                is taken.)

12:22:51   10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

                                                              121

```
12:22:51  1              A F T E R N O O N   S E S S I O N

          2                    (Record notes the appearance of

          3              Attorney Lisa Zornberg and Attorney

          4              Justin Berg at this time.)

13:06:56  5                    THE VIDEOGRAPHER:  Okay.

          6              Back on the record at 1:07.

          7    BY MS. GUERRIER:

          8        Q.   Okay.  Doctor, if you could turn to page

          9    11 of Mr. ███████ report.

13:07:28 10              Are you providing any rebuttal to any of

         11    the statements in paragraph 16 of Mr. ██████

         12    report?

         13                    MR. OPPENHEIMER:  Objection

         14              to the form.

13:08:22 15        A.   I don't offer any opinions with respect

         16    to the history of Ripple.  To the extent any of

         17    the statements have other implications, Mr. █████

         18    has not supported them with a reliable

         19    methodology.

13:08:40 20        Q.   Can you identify any statements in

         21    paragraph 16 that have causal implications?

         22                    MR. OPPENHEIMER:  Objection

         23              to form.

         24        A.   The sentence that states "Next, the

13:09:09 25    RippleNet Committee was announced, laying the
```

                                                            122

13:09:12 1    foundation for various products geared towards

2    global payment problems," this sentence might have

3    an implication of how the announcement of

4    RippleNet Committee impacted perceptions of

13:09:30 5    potential Ripple clients and Ripple clients.

6         Q.   Is that your interpretation of this

7    sentence that you just read?

8                   MR. OPPENHEIMER:   Objection;

9         form.

13:09:48 10        A.   This is what the state -- this is what

11   the sentence says.

12        Q.   Did you check Footnote 12 to determine

13   whether or not that sentence could be verified?

14        A.   Did I specifically click on the URL in

13:10:11 15   Footnote 12?  I don't recall.

16        Q.   So how does this sentence have an

17   implication of how the announcement of RippleNet

18   Committee impacted perceptions of potential Ripple

19   clients and Ripple -- Ripple clients?

13:10:35 20                  MR. OPPENHEIMER:   Objection

21        to form.

22        A.   The statement -- the sentence mentions

23   that the committee was announced and then it says

24   that that laid a "foundation for various products

13:11:02 25   geared toward global payments problems."  The

                                                        123

13:11:05  1   impli -- possible implication here is that the

2   future users of RippleNet Committee or any

3   associated products took something away from the

4   announcement as relating to the global payment

13:11:26  5   problem.

6       Q.   Does Mr. ████, in his report, state --

7   make the implication that the users of RippleNet

8   Committee or any associated products took

9   something away from the announce -- announcement,

13:11:42 10   announcement as relating to the global payments

11   problem?

12             MR. OPPENHEIMER:   Objection

13        to form.

14       A.   That's a possible implication.   There

13:11:51 15   are numerous places in Mr. ████ report where he

16   makes a specific connection between statements and

17   perceptions.   I'm looking for an example.

18             For example, in my report, in Appendix

19   C, in the row of the table that starts with number

13:12:33 20   85, which is a reference to Mr. ████ report

21   paragraph, the last sentence says "Indeed, the use

22   of terms such as 'traction,' 'market fit,' 'total

23   addressable market,' and even 'investors' when

24   describing Ripple's progress and growth" -- "and

13:12:50 25   growth potential are words typically understood by

124

13:12:53 1   market participants to mean that they should be

2   buying XRP as a potentially profitable

3   investment."

4        So this specifically discusses that

13:13:03 5   certain words used by Ripple are predicted by

6   Mr. ███ to have an effect on market partic --

7   market participants and, in particular, on the

8   understanding or perception of the market

9   participants.

13:13:26 10       Q.   Well, can you identify where Mr. ███

11   connects the RippleNet Committee that was

12   announced laying a foundation for various products

13   geared towards global payments problems to the

14   perception of XRP purchases?

13:13:45 15             MR. OPPENHEIMER:  Objection

16      to form.

17       A.   I don't say that he connected to the

18   perception of XRP purchasers, but he mentions the

19   announcement and he stated that it's laid a

13:14:02 20   foundation for various products geared towards

21   global payment problems.

22        Laying a foundation is potentially a

23   causal proposition.  There might be a causal

24   inference implied here by Mr. ███.

13:14:26 25             THE REPORTER:  By?

125

13:14:26  1                    THE WITNESS:  Mr. ███.

2        Q.   Do you know whether Ripple, in the

3   Footnote 12, the URL, made the statement that

4   Mr. ███ included in his report in the sentence

13:14:38  5   that we're discussing?

6                    MR. OPPENHEIMER:  Objection

7             to form.

8        A.   Mr. ███ does not use direct quotes.

9   Whether the substance of the sentence feeds the

13:14:50 10   source, I don't recall if I checked.

11        Q.   So you -- do you recall -- I'm sorry,

12   did you testify you don't recall if you checked to

13   see if the sentence is included in the URL that's

14   on -- in Footnote 12?

13:15:09 15        A.   I --

16                    MR. OPPENHEIMER:  Objection.

17        A.   It's unlikely that this exact sentence

18   is included in the source because Mr. ███ does

19   not use quotation marks.  I did not check -- or I

13:15:19 20   don't recall whether I checked whether the

21   substance of the sentence reflects the source.

22        Q.   So assume that the statement is included

23   in "Our Story" link at Footnote 12, would that

24   change your opinion regarding the so-called

13:15:45 25   implications that you claim Mr. ███ made with

                                                    126

13:15:49   1    respect to this sentence?

          2                    MR. OPPENHEIMER:  Objection

          3            to form.

          4        A.   You're saying Mr. ███ quoted the

13:16:03   5    sentence without using quotation --

          6        Q.   Assuming that --

          7        A.   -- without using a quotation mark?

          8        Q.   Yeah.  Assuming that he did, does that

          9    change your statement that Mr. ███ is making an

13:16:13  10    implication here?

         11                    MR. OPPENHEIMER:  Objection.

         12        A.   If Mr. ███ quoting directly someone

         13    else, then he's just quoting someone else.

         14        Q.   So how does that affect your opinion

13:16:28  15    regarding the connection that you testified

         16    Mr. ███ made between this statement and the

         17    perspective of XRP purchasers?

         18                    MR. OPPENHEIMER:  Objection;

         19            mischaracterizes testimony.

13:16:50  20        A.   Can you repeat the question, please?

         21        Q.   So I'll start with your answer.  You

         22    stated "If Mr. ███'s quoting directly someone

         23    else, then he's just quoting someone else."

         24            And I asked "So how does that affect

13:17:11  25    your opinion regarding the connection that you

                                                              127

13:17:13  1    testified Mr. ███ made between this statement

2    and the perspective of XRP purchasers?"

3                    MR. OPPENHEIMER:  Same

4          objection.

13:17:23  5        A.   If Mr. ███ did not write this

6    sentence, then Mr. ███ is just using someone

7    else's sentence.

8        Q.   How does this affect your opinion

9    regarding the connection between this statement

13:17:40 10    and the perspective of XRP purchasers?

11                    MR. OPPENHEIMER:  Objection

12          to form.

13        A.   If Mr. ███ quotes without quotation

14    marks someone else's statement, then he is quoting

13:18:06 15    that statement.  Whether he put in some additional

16    meaning into it, that you'll have to ask

17    Mr. ███.  But if it's just someone else's

18    statement quoted here without quotation marks,

19    then that's someone else's statement.

13:18:28 20        Q.   Is there anything you're rebutting in

21    paragraph 17 of Mr. ███ report?

22                    MR. OPPENHEIMER:  Objection

23          to form.

24              (Pause)

13:19:33 25        A.   I don't offer any opinion with respect

128

```
13:19:35   1    to the history of XRP or Ripple or ODL.  To the

           2    extent that Mr. ████ implies here any causal

           3    relationships between action, statements, and

           4    offerings of Ripple and perspective -- perspective

13:19:59   5    of a reasonable purchaser or potential purchaser,

           6    such implications are unsupported by any valid

           7    methodology.

           8        Q.    Can you identify any statement in

           9    paragraph 17 where Mr. ████ implies a causal

13:20:23  10    relationship between action, statements, and

          11    offerings of Ripple and the perspective of a

          12    reasonable purchaser of XRP?

          13                    MR. OPPENHEIMER:  Objection

          14        to form.

13:20:44  15        A.    The state -- the sentence starts by

          16    saying "ODL was intended to facilitate

          17    cross-border transactions between money

          18    transmitters' domestic and foreign accounts," and

          19    then it lists three steps.

13:21:03  20            If there is a potential implication here

          21    that the presence of ODL indeed facilitated

          22    cross-border transactions and that the purchasers

          23    or clients perceived it in that way, that

          24    statement has not been tested by Mr. ████.  That

13:21:30  25    implication has not been tested by Mr. ████.
```

129

13:21:38  1        Q.   Is there, in fact, the implication that

          2   the presence of ODL facilitated cross-border

          3   transactions and that the purchasers of ODL

          4   proceeded "in that way"?

13:21:54  5                     MR. OPPENHEIMER:   Objection

          6             to form.

          7        A.   Can you please repeat the question?

          8        Q.   Is there, in fact, the implication that

          9   the presence of ODL facilitated cross-border

13:22:05 10   transactions and that the purchasers of ODL

         11   proceeded "in that way" --

         12                     MR. OPPENHEIMER:   Objection.

         13        Q.   -- in paragraph 17 of Mr. ██████

         14   report?

13:22:16 15        A.   I don't think that's what I said.

         16                     MS. GUERRIER:   Could you

         17             please read her answer which starts

         18             at 7, 10 please.

         19                     (Whereupon, the record was read

13:23:15 20             back.)

         21                     THE WITNESS:   I believe the

         22             word was perceived, not proceeded.

         23   BY MS. GUERRIER:

         24        Q.   So are you prepared to answer the

13:24:15 25   question or would you like me to repeat the

                                                              130

13:24:16 1    question again?

2                        MR. OPPENHEIMER:  Objection.

3         A.   Can you repeat the question again?

4         Q.   Yeah.

13:24:20 5              Is there, in fact, the implication that

6    the presence of ODL facilitated cross-border

7    transactions and that the purchasers of ODL

8    perceived it in that way?

9                        MR. OPPENHEIMER:  Objection

13:24:33 10        to form; asked and answered.

11        A.   If there is such an implication, Mr.

12    █████  did not --

13                        THE REPORTER:  Repeat.

14        A.   If there is such an implication,

13:24:50 15   Mr. █████ did not test it.

16        Q.   Is there such an implication?

17                        MR. OPPENHEIMER:  Objection

18        to form.

19        A.   I'm reading what the sentence states.

13:25:08 20   Q.   So is this your interpretation of the

21    sentence that Mr. █████ wrote in his report in

22    paragraph 17?

23                        MR. OPPENHEIMER:  Objection.

24        A.   There may have been an implication here.

13:25:22 25   Q.   Is there -- are you offering any

131

13:25:24  1    rebuttal to any statement in paragraph 18 of

          2    Mr. ███████ report?

          3                    MR. OPPENHEIMER:   Objection

          4            to form.

13:25:57  5        A.   I don't define the mechanics of ODL.

          6        Q.   Are you providing any -- any rebuttal to

          7    paragraph 19 of Mr. ███████ report?

          8                    MR. OPPENHEIMER:   Objection

          9            to form.

13:26:45 10        A.   He, Mr. █████, mentions the promotion of

         11    the growth of ODL and he specifically mentions an

         12    excerpt from an announcement on the Ripple

         13    website.  In general, in his report, he eventually

         14    links actions and announcements of Ripple with

13:27:16 15    pro -- with the perspective of the purchaser of

         16    XRP.

         17                To the extent that he plans to do -- or

         18    does this elsewhere in the report with this

         19    particular statement and this particular

13:27:34 20    promoted -- promotion of the growth, he's -- the

         21    causal link has not been established by Mr. ██████

         22    with a reliable methodology.

         23        Q.   Do you disagree with the statement that

         24    Ripple promoted the growth of ODL users and

13:28:09 25    transaction volume?

                                                              132

```
13:28:10   1                    MR. OPPENHEIMER:  Objection

           2          to form.

           3       A.   I don't opine on what Ripple did or --

           4                    THE REPORTER:  I'm sorry.  I

13:28:19   5          don't what on what Ripple did?

           6                    THE WITNESS:  I don't opine

           7          on what Ripple did.

           8       Q.   Are you providing any opinion on Figure

           9   3 referenced in paragraph 19?

13:28:30  10                    MR. OPPENHEIMER:  Objection

          11          to form.

          12       A.   I don't opine on the mechanics of ODL or

          13   Ripple.

          14       Q.   Are you providing any rebuttal to

13:28:48  15   paragraph 20 of Mr. █████s report?

          16                    MR. OPPENHEIMER:  Objection

          17          to form.

          18       A.   I don't opine on the history of Ripple

          19   or MoneyGram.

13:29:51  20       Q.   Are you providing any rebuttal to

          21   paragraph 21 of Mr. █████ report?

          22                    MR. OPPENHEIMER:  Objection

          23          to form.

          24       A.   I don't offer any opinions with respect

13:30:30  25   to the history of ODL or MoneyGram.
```

133

13:30:39  1          Q.    Turning to your report, does paragraph 9

       2     contain all of the opinions that you formulated in

       3     this case?

       4                    MR. OPPENHEIMER:   Objection

13:30:58  5          to form.

       6          A.    My opinions are my entire report.   This

       7     is a summary.

       8          Q.    Does -- does the summary that you've

       9     included in paragraph 9.a through f include

13:31:18 10     summaries of all the opinions that you formulated

      11     in this case?

      12                    MR. OPPENHEIMER:   Objection;

      13          form.

      14          A.    All my opinions are my entire report.

13:31:28 15     This is a summary.

      16          Q.    Well, my question is whether the summary

      17     that you've included -- the summaries that you've

      18     included in paragraphs 9.a through f include

      19     summaries of all the opinions that you formulated

13:31:47 20     in this case.

      21                    MR. OPPENHEIMER:   Objection;

      22          asked and answered.

      23          A.    All my opinions are my entire report.

      24     Paragraph 9 is a summary.

13:32:13 25          Q.    Are you providing any opinion of whether

                                                                    134

```
13:32:15   1    or not XRP is a security for federal securities

           2    laws purposes?

           3         A.   I'm not offering any legal opinions.

           4         Q.   So is the question -- I'm sorry.

13:32:32   5         Is the answer no?

           6         A.   I'm not offering --

           7                   MR. OPPENHEIMER:  Objection

           8         to form.

           9         A.   -- any legal opinions.

13:32:52  10         Q.   Okay.  Are you offering any factual

          11    opinion regarding whether or not XRP is a

          12    security?

          13                   MR. OPPENHEIMER:  Objection

          14         to the form.

13:33:05  15         A.   Could you clarify what you mean by

          16    "factual opinion"?

          17         Q.   Is XRP a security in fact?

          18                   MR. OPPENHEIMER:  Objection

          19         to form.

13:33:17  20         A.   I'm not offering any legal opinions.

          21         Q.   Okay.  Can you turn to paragraph 15 of

          22    your report?  And if you could please read

          23    paragraph 15 into the record.

          24         A.   "Mr. ███████ opinions concern the

13:33:42  25    effects that Ripple's 'statements, actions, and
```

                                                                135

13:33:47  1    product offerings' supposedly had on the

2    'perspectives' of reasonable purchasers of XRP.

3    For example, he opines that actions by Ripple

4    'would create' certain expectations for 'a

13:34:05  5    reasonable purchaser.'"  Footnote 20 refers to

6    ███ report, paragraph 8.  "Conclusions of this

7    sort are considered 'causal,' in the sense that he

8    implies that Ripple's 'statements, actions, and

9    product offerings' caused changes in the

13:34:23 10    'perspective of a reasonable purchaser.'"

11        Q.   What do you mean by "conclusions of this

12    sort"?

13        A.   Conclusions that have a cause and an

14    effect.

13:34:53 15        Q.   And you stated that the so-called

16    conclusions are considered causal.

17             Are considered causal by whom?

18                  MR. OPPENHEIMER:  Objection.

19        A.   I did not say "so-called conclusions."

13:35:09 20        Q.   That's my term.

21             So the question is:  You stated that the

22    so-called conclusions are considered causal.

23                  MR. OPPENHEIMER:  Objection.

24        Q.   So going back to your statement about

13:35:23 25    the conclusions are considered causal, who are

136

13:35:26  1    they considered causal by?

2                         MR. OPPENHEIMER:  Objection

3              to form.

4         A.   My sentence states "Conclusions of this

13:35:35  5    sort are considered 'causal' in the sense that he

6    implies that Ripple's 'statements, actions, and

7    product offerings caused changes in the

8    'perspective of a reasonable purchaser.'"

9              I might have missed a closing quotation

13:35:52 10    mark after "offerings."

11              So conclusions that have a cause and an

12    effect are causal conclusions.  And who considers

13    them causal?  That's the academic world and the

14    economic consulting world, the literature in

13:36:20 15    social sciences.

16         Q.   So are you providing a legal opinion

17    here in your paragraph 15 about what is considered

18    causal or not?

19                         MR. OPPENHEIMER:  Objection.

13:36:34 20    A.   I'm not offering any legal opinions.

21         Q.   Why isn't your statement analyzing

22    Mr. ██████ sentence a legal opinion?

23                         MR. OPPENHEIMER:  Objection

24              to form.

13:36:53 25    A.   I'm not offering any legal opinions.

137

```
13:37:24    1          Q.   What is your basis for the statement
            2    that Mr. ████ implies that Ripple's statements,
            3    actions, and product offerings cause changes in
            4    the perspective of a reasonable purchaser?
13:37:37    5                         MR. OPPENHEIMER:   Objection
            6          to form.
            7          A.   So in paragraph 8 of his report,
            8    Mr. ████ makes numerous causal statements of this
            9    sort.  For example, he says, in the second
13:38:40   10    sentence, "I conclude that a reasonable purchaser
           11    would have had an expectation of future profit
           12    derived from the efforts of Ripple."  Efforts of
           13    Ripple falls under statements, actions, and
           14    product offerings.  And execution falls under
13:39:01   15    perspective.  And reasonable purchaser -- let me
           16    restate.  Expectations of reasonable purchaser
           17    falls under perspective of reasonable purchaser.
           18                    Next, he says "Specifically, purchasers
           19    would have expected or hoped to profit by later
13:39:22   20    reselling their" XIP -- "XRP at a higher price on
           21    a secondary market after XRP substantially
           22    increased in value."  Here he expands on what that
           23    perspective or that expectation would be.
           24                    Later in the paragraph he says "Ripple
13:40:00   25    also promoted a variety of its achievements,
```

138

13:40:06   1     initiatives, and strategy that created a

           2     well-understood bullish thesis for the price of

           3     XRP and encouraged speculative investment flows

           4     into the digital asset."  Here, Ripple's promotion

13:40:19   5     of a variety of its achievements, initiatives, and

           6     strategy is an example of statements, actions, and

           7     product offerings.

           8              And then the "speculative investment

           9     flows into digital assets," that's a perspective.

13:40:43  10     That's the characterization of Mr. ████ of the

          11     perspective of the purchasers because it implies

          12     here that they purchased to invest.

          13              Next, he states "This promotional

          14     activity included advertising new partnerships

13:41:15  15     with financial institutions, highlighting the

          16     experience and expertise of Ripple's team members,

          17     making public statements about why XRP was poised

          18     to increase in price, publishing positive

          19     commentary about the future growth trajectory of

13:41:30  20     Ripple's products, and describing the plans for

          21     developing the XRP ecosystem."  Here Mr. ████

          22     expands on what statements, actions, and product

          23     offerings were.

          24              Next, he says "Although Ripple's

13:42:02  25     development of the blockchain and broader XRP

                                                              139

13:42:05  1   ecosystem, along with its promotion of the bull

2   case for buying XRP, would not guarantee a profit,

3   it would create the hope that a purchaser could

4   passively earn profits by owning XRP while Ripple

13:42:19  5   took steps to increase the value of the coin."

6   Here the statements, actions, and product

7   offerings are Ripple's development of the

8   blockchain and broader XRP ecosystem along with

9   its promotion of the bull case for buying XRP.

13:42:44 10   And the perspective is the hope that the purchaser

11   could possibly earn profit by owning XRP while

12   Ripple took steps to increase the value of the

13   coin.

14             Next, he says "In my experience as an

13:43:12 15   investor and close observer of the digital asset

16   space, the statements, actions, background, and

17   competence of the founders and companies that

18   create and support a blockchain project are

19   extremely important to the decision-making

13:43:26 20   process of purchasers of digital assets."  Here

21   he expands his causal proposition outside of

22   Ripple and XRP to founders and companies that

23   create and support blockchain projects.  And here

24   he refers to that statements, actions, and

13:43:50 25   product offerings of such companies and their

140

13:43:53  1    founders, and that's the cause.  And the effect

2    is the decision-making process of purchasers of

3    digital assets.

4         So pretty much every word in this

13:44:10  5    paragraph is either a -- as -- a discussion of

6    the statements, actions, and product offerings of

7    Ripple and in one case of a broad category of

8    founders and companies.  And then -- or it is a

9    discussion of a perspective of a reasonable

13:44:35 10    purchaser or it's a statement that connects the

11    two in a causal statement -- in a causal form.

12         Q.   So going back to your statement in the

13    second sentence where you quote Mr. ███████

14    statement, "I conclude that a reasonable purchaser

13:45:01 15    would have had an expectation of future profit

16    derived from the efforts of Ripple," you stated

17    that "an expectation falls under perspective" --

18    I'm sorry, I think you stated -- "expectations of

19    reasonable purchaser falls under perspective of

13:45:20 20    reasonable purchaser."

21         What do you mean by that?

22              MR. OPPENHEIMER:  Objection

23    to form.

24         A.   Expectation is the type of a

13:45:31 25    perspective.

141

13:45:34 1     Q.   Is perspective causation?

2                     MR. OPPENHEIMER:  Objection.

3          A.   No.  A perspective can be caused by

4     something.

13:45:57 5     Q.   Next you say "Specifically, purchasers

6     would have expected or hoped to profit by later

7     reselling their XRP at a higher price on a" second

8     -- "secondary market after XRP substantially

9     increased in value," and then you state "he

13:46:14 10   expands on what that perspective or that

11    expectation would be."

12                    Can you explain what you mean here?

13                    MR. OPPENHEIMER:  Objection

14             to form.

13:46:23 15   A.   Mr. ████ talks about what purchasers

16    would expect when he describes the purchaser's

17    expectations or purchaser's perspective.

18         Q.   So the next sentence you highlighted in

19    the paragraph, you state Ripple also promoted a

13:46:54 20   variety of its achievements, initiatives, and

21    strategy that created a well understood bullish

22    thesis for the price of XRP.  It encouraged

23    speculative investment into the digital asset.

24    I'm paraphrasing.  And you state that Ripple's

13:47:10 25   promotion of a variety of its achievements,

                                                    142

13:47:13  1   initiatives, and strategy is an example of

        2   statements, actions, and product offerings.

        3            Could you please explain what you mean?

        4                 MR. OPPENHEIMER:  Objection

13:47:21  5            to form.

        6       A.   Where we initially started the

        7   discussion or where you initially started your

        8   questioning, this last line of questioning, was

        9   the last sentence of my paragraph 15 where I

13:47:44 10   mention Mr. ███s causal -- causal --

       11   Mr. ███s -- let me restart.

       12            This line of questioning started when

       13   you directed me to the last sentence of my

       14   paragraph 15.  Here I state that Mr. ███

13:48:09 15   conclusions are causal because he links what he

       16   calls statements, actions, and product offerings

       17   of Ripple in a causal manner with what he calls

       18   perspective of a reasonable purchaser.

       19            I don't remember the exact question you

13:48:27 20   asked me about paragraph 8, but my long answer was

       21   to point out which of the pieces in paragraph 8

       22   reflect statements, actions, and product

       23   offerings, which ones reflect the perspective of

       24   reasonable purchasers, and where Mr. ███ makes a

13:48:51 25   causal link.

                                                         143

13:48:56  1           Q.   Okay.  So with respect to this statement

       2      where you stated that he -- you read into -- from

       3      his report that Ripple also promoted a variety of

       4      its achievements, initiatives, and strategies.  So

13:49:27  5      that -- that would be the last -- before the last

       6      sentence in paragraph 8 on page 6.

       7           Can you identify the cause and effect in

       8      this statement?

       9                MR. OPPENHEIMER:  Objection

13:49:42 10      to form.

      11           A.   Ripple's promotion of a variety of its

      12      achievements, initiatives, and strategy here

      13      serves as a cause.  The bullish thesis may be an

      14      effect, but more generally the effect is at the

13:50:32 15      end of this paragraph where Mr. ███ makes a more

      16      general conclusion not just about Ripple, but

      17      generally about founders and companies.  And he

      18      says that statements and actions and background

      19      and competence of the founders impact or create an

13:51:04 20      -- impact decision-making process of purchasers of

      21      digital assets.  So the decision-making process of

      22      purchasers of digital assets is the outcome.

      23           Q.   Okay.  So going back to the sentence

      24      before the last on page 6, is there no effect in

13:51:24 25      that sentence?

                                                              144

13:51:24  1               MR. OPPENHEIMER:  Objection

       2          to form.

       3      A.    The well-understood bullish thesis may

       4      be an effect in this particular sentence, but the

13:51:44  5      general purpose of this sentence is to list all

       6      the actions and statements and product offerings

       7      of Ripple that eventually culminated in the end of

       8      this paragraph, led to the decision-making

       9      process -- or impacted the decision-making process

13:52:00 10      -- process of purchasers of digital assets.

      11      Q.    How do you know what the general purpose

      12      of this single statement is?

      13               MR. OPPENHEIMER:  Objection.

      14      A.    I'm taking this paragraph in this report

13:52:18 15      as a whole.

      16      Q.    So is this your interpretation of the

      17      sentence before the last in paragraph 8 of

      18      Mr. ██████  report?

      19      A.    This is what the paragraph states.

13:52:28 20      Q.    According to your interpretation --

      21               MR. OPPENHEIMER:  Objection

      22          to form.

      23      Q.    -- of the paragraph?

      24               MR. OPPENHEIMER:  Objection

13:52:32 25          to form.

                                                        145

13:52:33 1          A.    This is what the paragraph states.

2          Q.    Are you equating expectation with

3    causation?

4                    MR. OPPENHEIMER:  Objection;

13:53:26 5          asked and answered.

6          A.    Expectations can be caused by something;

7    but, generally speaking, the word "expectation"

8    and "causation" mean different things.

9          Q.    Okay.  Are you opining about Mr. ████

13:53:43 10   state of mind?

11         A.    I'm not offering any psychological

12   evaluation.

13         Q.    So how do you know what he implied?

14                   MR. OPPENHEIMER:   Objection

13:53:56 15         to form.

16         A.    I'm reading the text and, in certain

17   places, there appears to be an implication, but

18   generally based on the totality of his report.

19         Q.    Were you done with your answer?

13:54:36 20         A.    Yes.

21         Q.    So if you turn to paragraph 16 of --

22   of -- of your report where you discuss the

23   scientific grounded methodology to assess whether

24   causal relationships "of this sort exist."

13:55:32 25              Can you give us some examples of the

                                                          146

13:55:34  1   scientifically grounded methodology?

2       A.   The sentence reads "There are

3   scientifically grounded and reliable methodologies

4   to assess whether causal relationships of this

13:55:46  5   sort exist."

6            My next section is titled "The

7   established, reliable, and supportable method for

8   evaluating causal propositions is the experimental

9   method."  And that section describes experiments.

13:56:08  10            THE REPORTER:  Describes?

11            THE WITNESS:  Experiments.

12       Q.   Can you give us some examples of these

13   types of experiments that are used to evaluate

14   causal relationships?

13:56:27  15       A.   Well, for example, the 2019 -- and I'm

16   reading from paragraph 18.  "The 2019 Sveriges

17   Riksbank Prize in Economic Sciences in Memory of

18   Alfred Nobel (commonly referred to as the 'Nobel

19   Prize' in economics) was awarded to Abhijit

13:56:50  20   Banerjee, Esther Duflo, and Michael Kremer for

21   their use of experiments in the field of

22   developmental economics and, similarly, in 2021,

23   Nobel Prize in Economics was awarded to do David

24   Card, Joshua Angrist, and Guido Imbens for their

13:57:09  25   work related to experiments and

147

13:57:10    1    quasi-experiments."

2         Q.   Is an experiment and survey the same

3    thing scientifically?

4         A.   An experiment can be conducted in the

13:57:33    5    survey form, but not necessarily.  A survey can be

6    conducted in experimental form, but not

7    necessarily.

8         Q.   Are the methodologies described in your

9    report applicable to determining causal

13:57:57   10    relationships?

11              MR. OPPENHEIMER:  Objection

12         to form.

13         A.   Which methodologies are you referring

14    to?

13:58:04   15         Q.   The methodologies you described in your

16    report.

17              MR. OPPENHEIMER:  Objection;

18         vague.

19         A.   Well, the first sentence in paragraph 18

13:58:14   20    says "The gold standard for testing a causal

21    hypothesis is an experiment."  That's the gold

22    standard.  Then I discuss experiments.

23              Then in paragraph 28 I say "Other,

24    non-experimental options are also available to

13:58:59   25    evaluate perceptions and expected behavior,

148

13:59:01   1      although they are less effective in isolating

2      causal effects than the gold standard methodology

3      of conducting an experiment."

4           And then I discuss examples.

13:59:24   5      Q.    Does paragraph 26 of your report contain

6      the steps that would be used, in your opinion, to

7      evaluate the perception of a reasonable XRP

8      purchaser?

9                MR. OPPENHEIMER:   Objection

13:59:37  10           to form.

11      A.    Paragraph 26 describes some elements of

12      how a causal hypothesis that certain statements,

13      actions, and offerings caused perception and

14      perspective of -- or generally the perspective of

14:00:09  15      purchasers and potential purchasers of XRP can be

16      tested.

17      Q.    Did you conduct any test in the manner

18      described in paragraph 26 with regard to this

19      case?

14:00:33  20      A.    No.

21      Q.    Are you providing a rebuttal to

22      Mr. ███████ analysis of the perceptions of XRP

23      purchasers?

24                MR. OPPENHEIMER:   Objection

14:00:58  25           to form.

149

14:01:06  1        A.   I don't believe what Mr. ███ provided

       2   is an appropriate or reliable analysis.  I do

       3   provide rebuttal for his entire report.

       4        Q.   If you did not conduct any tests in this

14:01:25  5   case, how are you able to rebut Mr. ███

       6   analysis of XR -- the reasonable expectations of

       7   XRP purchasers' perception?

       8             I'm sorry, let me repeat the sentence.

       9             If you did not conduct any tests in this

14:01:42 10   case, how are you able to rebut Mr. ███

      11   analysis of the perception of a reasonable XRP

      12   purchaser?

      13                       MR. OPPENHEIMER:  Objection

      14             to form.

14:02:00 15        A.   If you are quoting anything I said

      16   previously, I believe I've been using the word

      17   "perspective" over "perception" words to an

      18   extent.

      19             I also wouldn't call what Mr. ███ did

14:02:14 20   an analysis.  Mr. ███ makes causal conclusions

      21   and he did not use a methodology, a reliable

      22   methodology, that would allow him to make such

      23   conclusions and, as such, his conclusions are

      24   invalid.

14:02:48 25        Q.   Is the methodology that you described

                                                            150

14:02:49  1    the only manner of evaluating the perception of a

2    reasonable purchaser of XRP?

3                        MR. OPPENHEIMER:  Objection

4          to form.

14:03:07  5        A.    An experiment is a gold standard of

6    evaluating a causal relationship between the

7    actions, statements, and offerings of Ripple and

8    the perspective of purchasers or potential

9    purchasers, including perceptions.

14:03:33 10        Q.    Assuming that -- I'm sorry, were you

11   done?

12        A.    No.

13        Q.    Well, go ahead.  You can finish your

14   sentence.

14:03:44 15        A.    I'm figuring out my thoughts because I

16   was interrupted.

17                There are, as I discuss in paragraph 28,

18   "Other, nonexperimental options also available to

19   evaluate perceptions and expected behavior" --

14:04:11 20   which is perspective -- "although they're less

21   effective in isolating causal effects than the

22   gold standard methodology of conducting an

23   experiment."

24                I'm done with my answer.

14:04:33 25        Q.    Assume that you -- Mr. ███ is only

151

14:04:37   1      evaluating perception without cause and effect.

2      Are you familiar with the type of analysis that

3      could be conducted to evaluate perception without

4      cause and effect?

14:04:50   5                          MR. OPPENHEIMER:  Objection.

6                          You can answer.

7           A.   With respect to perceptions or beliefs,

8      in paragraph 22 of my report, I explain that the

9      most direct outcome -- the most direct way of

14:05:27  10      measuring such an outcome is through a survey.

11                And then, in paragraph 23, I describe

12      surveys that can be appropriate when the goal is

13      to learn about prevalent opinions -- again,

14      perceptions -- or preferences rather than causal

14:06:01  15      relationships.  And there are examples in

16      parentheses.

17           Q.   Is the survey the only means of

18      determining perception when you're not looking at

19      cause and effect?

14:06:20  20           A.   Surveys are the most direct ways.  There

21      are indirect ways of measuring perception.

22           Q.   What are the indirect ways of measuring

23      perception?

24           A.   For example, a conjoined analysis survey

14:06:43  25      or any other choice experiment can establish the

                                                                 152

14:06:52  1    impact of a certain feature of a product on

       2    consumer choices.  And to the extent that we

       3    establish that the feature impacts the choices or

       4    doesn't impact the choices, we often can make

14:07:14  5    inference about the underlying perceptions.

       6        Q.   Can an expert in your field rely on his

       7    or her experience to evaluate perception when

       8    cause and effect is not at issue?

       9             MR. OPPENHEIMER:  Objection

14:07:39 10        to form.

      11        A.   In my field, perceptions are an

      12    empirical question.

      13        Q.   What do you mean by "perceptions are an

      14    empirical question"?

14:08:02 15        A.   Researchers in my field would want some

      16    data or would conduct a study to obtain such data

      17    in order to evaluate perceptions.

      18        Q.   Are you aware of any percept -- consumer

      19    perception evaluations that are conducted without

14:08:28 20    scientific data?

      21             MR. OPPENHEIMER:  Objection

      22        to form.

      23        A.   I've assisted others and, in fact, in

      24    rebutting other experts -- and, in fact, I

14:08:57 25    rebutted one such expert other than Mr. ██████ --

                                                              153

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:09:00  1    where nonscientific matters or pure introspection

2    is used.  And in all those cases they -- either

3    the expert I supported or myself as the expert

4    held the opinion that that approach is

14:09:22  5    unscientific and meritless and unreliable.

6         Q.   Would it surprise you to know that

7    courts in this district that govern this case

8    allow experts to testify about consumer perception

9    without presenting scientific information?

14:09:40 10              MR. OPPENHEIMER:  Objection

11         to form.

12         A.   I'm not offering any legal opinions.

13         Q.   Have you ever heard of experts

14    testifying about consumer perception without

14:09:52 15    offering scientific analysis?

16              MR. OPPENHEIMER:  Objection

17         to form.

18         A.   I already answered that question.

19         Q.   I don't think I asked you if you've ever

14:10:02 20    heard of experts testifying about consumer

21    perception without offering scientific analysis.

22              So can you please answer the question?

23         A.   I'll repeat.

24              MR. OPPENHEIMER:  Objection.

14:10:12 25              You can answer.

                                                        154

```
14:10:16   1        A.   I rebutted an expert who was offering

           2   nonscientific testimony and I supported several

           3   experts in rebutting nonscientific testimony with

           4   respect to consumer perceptions.

14:10:39   5        Q.   In all the cases where you rebutted

           6   experts who were providing nonscientific testimony

           7   with respect to consumer perception, did you

           8   submit a report?

           9                  MR. OPPENHEIMER:  Objection.

14:10:54  10                  You can answer.

          11        A.   I was an expert in one such case.  In

          12   that case, the expert I rebutted did a little bit

          13   more than Mr. ████ and actually conducted a

          14   study.  However, she herself admitted it was not

14:11:12  15   scientific.  And I submitted a rebuttal report in

          16   that case.

          17             And in other cases where I supported

          18   experts, I did not submit reports, but the experts

          19   I supported submitted their own reports.

14:11:31  20        Q.   In the case where you submitted a

          21   rebuttal report, was your rebuttal report subject

          22   to a Daubert challenge?

          23                  MR. OPPENHEIMER:  Objection;

          24                  asked and answered.

14:11:41  25        A.   We discussed the case previously where
```

                                                            155

14:11:46  1    the court chose not to rule on the Daubert motion

       2    and rule on the merits of the case and rule in

       3    favor of my client.

       4        Q.    So is it fair to say you've never

14:11:57  5    presented your expert opinion about the

       6    methodology to test consumer perception to a

       7    court?

       8                    MR. OPPENHEIMER:   Objection

       9            to form.

14:12:10 10        A.    Can you repeat the question?

      11        Q.    Is it fair to say that you've never

      12    presented your expert opinion about the mailed --

      13    methodology to test consumer perception to a

      14    court?

14:12:21 15                    MR. OPPENHEIMER:   Same

      16            objection.

      17        A.    I don't think it's fair to say this.

      18        Q.    So have you ever presented your -- an

      19    expert opinion about the methodology to test

14:12:36 20    consumer perception to a judge?

      21                    MR. OPPENHEIMER:   Objection

      22            to form.

      23        A.    I have never testified in court.  I have

      24    submitted reports.

14:13:24 25        Q.    Have you conducted any surveys in a case

                                                           156

14:13:26  1    similar to the case before the court?

          2              MR. OPPENHEIMER:   Objection

          3         to form.

          4    A.    What do you mean, "before the court"?

14:13:40  5    Q.    Did you review the complaint in this

          6    case?

          7    A.    I reviewed the complaint in this case.

          8    Q.    Do you recall the claims against Ripple

          9    in this case?

14:14:06 10    A.    I cannot restate the entire complaint,

         11    but the background section of my report offers a

         12    summary of the claims.

         13    Q.    Okay.  So have you conducted a survey

         14    with regard to expectation of a reasonable

14:14:23 15    purchaser in a case that's similar to the case

         16    that you were asked to submit a report?

         17              MR. OPPENHEIMER:   Objection

         18         to form.

         19    A.    I have conducted surveys in cases where

14:14:45 20    the subject matter was the impact of certain

         21    stimuli on consumer perceptions and behavior,

         22    which is similar to this report in this -- and to

         23    this case in the sense that Mr. ████ makes causal

         24    propositions about how stimuli impacted the

14:15:13 25    perspective of the purchasers and potential

                                                            157

14:15:15   1      purchasers.

           2          Q.    Have you submitted a survey in a case

           3      where the SEC was the plaintiff in a case?

           4                      MR. OPPENHEIMER:   Objection

14:15:22   5              to form.

           6          A.    No.

           7          Q.    I believe you testified that you

           8      reviewed the Howey case, is that correct?

           9          A.    That is correct.

14:15:54  10          Q.    Did the Howey case inform your opinions

          11      in your -- in the report that you submitted?

          12          A.    I reviewed it for background.

          13          Q.    If you could please turn to Appendix C

          14      of your report.

14:17:08  15                      Could you describe Appendix C to your

          16      report?

          17                      MR. OPPENHEIMER:   Objection

          18              to the form.

          19                      You can answer.

14:17:13  20          A.    These are examples of Mr. ██████

          21      unsupported causal propositions.

          22          Q.    How are the statements that you

          23      highlighted of Mr. ██████ unsupported?

          24          A.    These are causal propositions and they

14:17:37  25      are not supported by any reliable methodology that

                                                                      158

```
14:17:42   1        would allow Mr. ███ to test a causal
           2        proposition.
           3            Q.   Okay.  To clarify, when you say "they
           4        are not supported," are you limiting your critique
14:17:54   5        to methodology?
           6                    MR. OPPENHEIMER:  Objection
           7            to form.
           8            A.   If you are asking me whether the
           9        outcomes of Mr. -- if Mr. ███ conclusions
14:18:09  10        themselves of the methodology match reality, that
          11        could happen by total coincidence, just like a
          12        broken clock shows correct time twice a day.
          13                    But all Mr. ███ causal propositions,
          14        all his conclusions, are not supported by any
14:18:33  15        reliable methodology.  So any match between his
          16        conclusions and reality would be purely
          17        coincidental.
          18            Q.   Going to the para -- I guess paragraph
          19        31 on -- that you've listed on Appendix C, can you
14:18:55  20        identify the cause in this statement?
          21            A.   Look at the last sentence here.  It says
          22        "From the perspective of a utility-oriented
          23        purchaser, as discussed above, the fixed-supply
          24        and variable price model of XRP presents
14:20:10  25        significant disadvantages."
```

<div align="right">159</div>

14:20:14  1                  The cause here is the fixed-supply

        2    variable price model of XRP and the effect is the

        3    perspective of a utility-oriented purchaser if

        4    such purchaser indeed exists.

14:20:33  5                  The previous sentence is more

        6    complicated.

        7          Q.   How so?

        8          A.   It has multiple causes.

        9          Q.   Can you identify the causes in the

14:20:53 10    previous sentence?

       11          A.   Well, it also lists the perspective and

       12    that perspective is the effect.

       13                      THE REPORTER:  Is?

       14                      THE WITNESS:  The effect.

14:21:04 15          A.   And that perspective is all the

       16    investment-oriented purchaser -- purchasers -- it

       17    says purchasers -- indeed exist, and the cause is

       18    the fixed-supply and variable price models

       19    provide -- and variable price models.

14:21:40 20          Q.   What is the effect in that sentence?

       21                      MR. OPPENHEIMER:  Objection

       22          to form.

       23          A.   The fact that the perspective of "a

       24    reasonable investment-oriented purchasers."

14:21:57 25          Q.   And if you go to paragraph 47, that's on

                                                                    160

14:22:03   1   the next page of Appendix C, page 44.

           2         Can you identify the cause in this

           3   statement?

           4         A.   The cause is the buyback activity.  And

14:22:32   5   the effect -- there are two effects:  One is the

           6   perspective of utility-oriented purchasers if

           7   those exist, as stated by Mr. ████; and the other

           8   is the perception of the investment-oriented

           9   purchasers if those exist.

14:22:54  10         Q.   The same question for paragraph 48:

          11   What is the cause and what is the effect?

          12         A.   The cause is the manner and mechanism of

          13   Ripple's ongoing sales, distribution, escrow, and

          14   buybacks of XRP, and the effect is the perspective

14:23:21  15   of the potential investment-oriented purchaser of

          16   XRP if said purchaser exists.

          17         Q.   Same question for paragraph 49:  What is

          18   the cause and the effect?

          19         A.   The cause is these heavily promoted

14:23:55  20   sales and distribution mechanisms.  The effect is

          21   the perspective of the reasonable purchaser of XRP

          22   that is exclusively considering the utility use of

          23   the coin if such a reasonable purchaser exists.

          24         Q.   Paragraph 86, can you identify the cause

14:24:22  25   and effect?

                                                              161

14:24:47   1         A.   There are several causes here.  They're

          2    all combined into specific topics.  Examples are

          3    the liquidity of the digital asset trading

          4    platforms it needs to rely on to complete the ODL

14:25:19   5    transaction.  And another example is

          6    communications about the bull case for the price

          7    of XRP.  And the effect is the perspective of

          8    purchasers of XRP for cross-border payments.  I

          9    also referred to, I believe, as a money

14:25:44  10    transmitter.

         11         Q.   Anything else?

         12                   MR. OPPENHEIMER:  Objection

         13         to form.

         14         A.   The causes are also called some of these

14:26:16  15    topics.

         16         Q.   I'm sorry, what do you mean "the causes

         17    are also called some of these topics"?

         18         A.   Some of these topics is a cause from

         19    this paragraph.  Mr. ████ refers to the causes in

14:26:40  20    different ways.  He uses the term "some of these

         21    topics," and then for some of these topics, he

         22    says "specific topics" and he leaves those

         23    specific topics and then he has another example

         24    about communications.

14:27:37  25         Q.   Turning to -- staying with paragraph 86

                                                                     162

14:27:41  1   that you -- did Ripple's communications cause a

2   money transmitter to be interested of some of

3   these topics --

4                    MR. OPPENHEIMER:  Objection.

14:27:49  5       Q.   -- or does the interest in certain

6   aspects or lack of interest in other aspects exist

7   prior to the Ripple communication?

8                    MR. OPPENHEIMER:  Objection

9           to form.

14:28:33 10       A.   So Mr. ████ is saying here that a money

11   transmitter is less interested in Ripple's

12   communications about the bull case for the price

13   of XRP.  If there are no such communications, then

14   we cannot measure the interest of -- of the money

14:28:58 15   transmitter in such communications.  So it's the

16   communication that causes or doesn't cause or

17   causes less interest on the part of the money

18   transmitter.

19       Q.   So assume that a company is a

14:29:28 20   money-transmitting institution and its executives'

21   perspective is that, you know, they like economic

22   incentives such as rebates and volumes -- and

23   volume bonuses.

24                    If Ripple announced that it would

14:29:45 25   provide economic incentives in the form of rebates

163

14:29:48  1    and volume bonuses, would that cause its

2    executives to have a perspective to like the

3    economic incentive or would that perspective have

4    already existed prior to the announcement?

14:30:06  5                        MR. OPPENHEIMER:  Objection

6              to form.

7         A.    While taking this incomplete

8    hypothetical, a company can have a preference for

9    higher profits or smaller costs and high revenues,

14:30:37 10    its actions can be impacted by announcements and

11    other stimuli.

12                        THE REPORTER:  Other?

13                        THE WITNESS:  Stimuli.

14         Q.    Are you done?

14:30:55 15         A.    Yes.

16         Q.    Why is the hypothetical incomplete?

17         A.    Because it's missing the majority of

18    information that we could potentially have in --

19    in the marketplace.

14:31:22 20         Q.    Such as?

21         A.    Such as what is the company?  What is

22    the product?  What is the company that sells the

23    product?

24         Q.    Why does that matter?

14:31:39 25         A.    What?

164

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:31:40  1        Q.   Why does that matter?

        2        A.   Because perspective is an empirical

        3    matter.  We can hypothesize about it from

        4    theoretical perspective and from incomplete

14:32:04  5    hypothetical, but ultimately such hypotheses need

        6    to be tested empirically.

        7        Q.   So assume a digital asset investor views

        8    it favorably when a wealthy businessperson

        9    announces that they will buy a digital asset such

14:32:23 10    as bitcoin.  So if a wealthy investor announces

       11    that he's buying bitcoin, would the invest -- the

       12    hypothetical investor view bitcoin more favorably

       13    because of the announcement?

       14              MR. OPPENHEIMER:  Objection

14:32:42 15        to form.

       16        A.   It's an incomplete hypothesis.

       17        Q.   Well, this is the hypothetical.  So

       18    can -- would the perspective change after the

       19    announcement that the wealthy investor will be

14:33:11 20    buying bitcoin?

       21              MR. OPPENHEIMER:  Objection

       22        to form.

       23        A.   It may change; it may not change.  Both

       24    cases are possible.

14:33:20 25        Q.   Okay.

                                                        165

```
14:33:20   1        A.   It's an empirical question.

           2                    THE WITNESS:  Can we take a

           3        break?  Should we take break?

           4                    MS. GUERRIER:  Okay.  You

14:34:07   5        can take a break.

           6                    THE VIDEOGRAPHER:  Okay.

           7        Going off the record at 2:34.

           8                    (Whereupon, a recess is taken.)

           9                    THE VIDEOGRAPHER:  Okay.

14:49:51  10        Back on the record at 2:49.

          11   BY MS. GUERRIER:

          12        Q.   Are you aware of any survey results

          13   related to the perspect -- perspective of a

          14   reasonable purchaser on which the SEC -- in which

14:50:18  15   the SEC was a plaintiff?

          16                    MR. OPPENHEIMER:  Objection;

          17        form.

          18        A.   That's covered by NDA.

          19        Q.   Well, the answer -- you can answer yes

14:50:40  20   or no.

          21        A.   Yes.

          22        Q.   Did you review any of those reports in

          23   writing the report that you submitted in this

          24   case?

14:51:00  25                    MR. OPPENHEIMER:  Objection
```

166

14:51:00  1              to form.

          2                   You can answer.

          3      A.   I believe your previous question was not

          4   about the report.  If it was, I will need to

14:51:15  5   answer differently.

          6      Q.   I'm sorry, what was that answer?

          7      A.   In your previous question, I believe you

          8   didn't ask about the report.  So in your current

          9   question, there is no logical link, but maybe I

14:51:39 10   misheard.  And if so, I'll change -- I'll respond.

         11   Maybe you can go back to the previous question.

         12      Q.   You want me to ask the question again?

         13      A.   The --

         14                   MR. OPPENHEIMER:  Counsel,

14:51:49 15              she stated her answer.

         16                   MS. GUERRIER:  I'm -- I'm

         17              not -- let me fin -- you know, let

         18              her answer the question.

         19                   MS. JONES:  She has answered

14:51:55 20              the question repeatedly.

         21                   MS. GUERRIER:  I'm asking

         22              her if she -- you're interrupting for

         23              no reason.  I'm asking her if she

         24              wants me to ask the question again.

14:52:05 25      A.   I would like the previous question to be

                                                              167

```
14:52:06   1    read back.
           2         Q.   Are you aware of any survey results
           3    relating to the perspective of a reasonable
           4    purchaser on which the SEC -- in which the SEC was
14:52:17   5    the plaintiff?
           6         A.   Now you can ask your current question.
           7         Q.   No, you -- let me finish.
           8              You answered "That's covered by an NDA."
           9              And I said, "Well, you can answer yes or
14:52:29  10    no."
          11              And you answered "Yes."
          12              And I asked, "Did you review any of
          13    those reports in writing the report that you
          14    submitted in this case?"
14:52:41  15         A.   What --
          16                   MR. OPPENHEIMER:   Objection.
          17                   You can answer.
          18         A.   What reports are you referring to?
          19         Q.   How are the survey results provided?
14:52:54  20         A.   That's covered by NDA.
          21         Q.   Well, were they provided in a document?
          22         A.   That's covered by NDA.
          23         Q.   What's covered by an NDA?
          24         A.   Everything I learned in that case.
14:53:16  25         Q.   I'm not asking you what you learned in
```

168

```
14:53:17   1    the case.  I'm asking you how those survey results
           2    were provided.
           3                      MR. OPPENHEIMER:  Objection
           4              to the form.
14:53:23   5                      You can answer if you believe
           6              you're able to.
           7    A.    That's covered by NDA.
           8    Q.    Did you rely on any of the survey
           9    results relating to the perspective of a
14:53:44  10    reasonable purchaser in which the SEC was a
          11    plaintiff in formulating your opinion in this
          12    case?
          13                      MR. OPPENHEIMER:  Objection
          14              to form.
14:53:57  15    A.    No.
          16    Q.    If you could turn to paragraph 26 of
          17    your report.
          18              Looking at Footnote 39 to paragraph 26,
          19    the first sentence refers to "Mr. ███████ claims
14:55:23  20    that in a certain passage in an interview with
          21    Bloomberg Technology, Ripple's CEO, Brad
          22    Garlinghouse, contributed to certain underrating
          23    of XRP potential purchasers about XRP."
          24              Is that -- did you mean understanding?
14:56:57  25    A.    I mean understanding.
```

169

14:56:58  1          Q.   Is that a typo?

       2          A.   That's a typo.

       3          Q.   Going to the second paragraph, you

       4     state, I believe the third sentence, "Mr. ███

14:57:12  5     believes that because of" his statement -- "this

       6     statement, 'potential purchasers of XRP would have

       7     understood XRP, as designed, provided a mechanism

       8     for passive XRP owners to benefit financially from

       9     Ripple's success as a provider of financial

14:57:34 10     service products built on the XRP ledger, as a

      11     developer of the XRP ecosystem, and as a driver of

      12     demand for XRP.'"

      13               What is the basis for the claim that

      14     Mr. ███ believed that because of the statement

14:58:00 15     that I read from Footnote 39, that potential

      16     purchasers of XRP would have understood that XRP

      17     as designed provided mechanisms for passive XRP

      18     owners, et cetera?

      19                    MR. OPPENHEIMER:   Objection

14:58:21 20               to form.

      21          A.   Well, setting aside that this may not be

      22     a perfect rendering of the footnote, looking at

      23     paragraph 25 and 26 of Mr. ███ report, that's

      24     what he says.

14:58:41 25          Q.   What specifically does he say in

                                                           170

14:58:43  1    paragraph 26 of his report that supports your

2    claim that because of the statement read into the

3    record that, "Potential purchasers of XRP would

4    have understood that XRP, as designed, provided a

14:59:07  5    mechanism for passive XRP owners to benefit

6    financially from Ripple's success as a provider of

7    financial service products built on the XRP

8    ledger, as a developer of the XRP ecosystem, and

9    as a driver of demand for XRP"?

14:59:24 10                    MR. OPPENHEIMER:  Objection

11          to form.

12          A.    Paragraph 26 of Mr. ████████ report

13    states "Potential purchasers of XRP would have

14    understood the simple economics behind the message

14:59:37 15    being promoted by Ripple on this subject:  XRP, as

16    designed, provided a mechanism for passive XRP

17    owners to benefit financially from Ripple's

18    success as a provider of financial service

19    products built on the XRP ledger" -- Footnote 25,

14:59:57 20    which I'll read later -- "as a developer of the

21    XRP ecosystem and as a driver of demand for XRP."

22                    And Footnote 25 states "Although some

23    Ripple products did not use XRP, this report

24    focuses on what Ripple communicated publicly,

15:00:14 25    including its assertions that usage of its

171

15:00:18   1    products by financial institutions would

           2    ultimately lead to greater demand for XRP.  This

           3    is further discussed in Section 7."

           4         Q.   Is Mr. ███ describing perception or

15:00:31   5    causation in paragraph 26?

           6                   MR. OPPENHEIMER:  Objection

           7              to form.

           8         A.   He's describing perception that's caused

           9    by Ripple's statements.

15:00:47  10                   THE REPORTER:  Ripple?

          11                   THE WITNESS:  Ripple's

          12              statements, among possibly other

          13              things.

          14         A.   To quote from his paragraph, he is

15:01:02  15    describing the understanding that's caused by

          16    the -- the message being promoted by Ripple.

          17         Q.   Is he describing the effect on the

          18    reasonable purchaser of XRP as opposed to whether

          19    or not the messaging caused the reaction?

15:01:20  20         A.   He's describing --

          21                   MR. OPPENHEIMER:  Object to

          22              form.

          23         A.   He is describing both the cause and the

          24    effect and, in particular, one example of the

15:01:33  25    cause is described in paragraph 25.

                                                              172

15:01:42  1        Q.   Can you describe specifically what

        2   you're referring to in paragraph 25?

        3        A.   It states "Ripple directly and publicly

        4   made the case for this relationship between

15:01:54  5   increased demand for XRP and the future price of

        6   XRP.  In an interview with Bloomberg Technology,

        7   for example, Garlinghouse ties Ripple's efforts to

        8   provide payment solutions with increased demand

        9   and higher prices, all enabled by XRP's fixed

15:02:11 10   supply model," colon, and that's followed by the

       11   quote "When Ripple uses XRP, we're solving a

       12   payments problem.  I believe that the more utility

       13   you draw, the more demand you're going to drive.

       14   And for most of these digital assets, you have

15:02:28 15   fixed supply.  If you have fixed supply and

       16   increasing demand, it's going to drive price up."

       17             And footnote "YouTube.  Ripple CEO

       18   Garlinghouse sees real value in bitcoin at 2:06."

       19   And a URL to a YouTube video and year, in

15:02:51 20   parentheses, 2017.

       21        Q.   Can you describe the cause and effect in

       22   paragraph 25?

       23             MR. OPPENHEIMER:  Objection

       24        to form.

15:03:03 25        A.   This mainly discusses the cause.  The

                                                        173

15:03:06  1    effects are discussed in paragraph 26.  They made

2    some implications here about the effect when it

3    says "the case for this relationship between

4    increased demand for XRP and the future price of

15:03:19  5    XRP."  There is an implication here that that was

6    the perception of purchasers or potential

7    purchasers.  And it also states the effect, but

8    mostly it focuses on the cause.

9         Q.    How did you determine the implication

15:03:52 10    that you just described?

11                   MR. OPPENHEIMER:  Objection

12              to form.

13         A.    That's what the sentence states.

14         Q.    Does the sentence use the term

15:04:07 15    "implications"?

16         A.    The sentence does not use the word

17    "implications."

18         Q.    Okay.  Going back to Footnote 39 where

19    you're describing what Mr. ███ believed.

15:04:38 20              How do you know what Mr. ███ believes?

21                   MR. OPPENHEIMER:  Objection;

22              asked and answered.

23         A.    I'm describing what he states in his

24    report.

15:04:55 25         Q.    Are you providing any opinion about

                                                        174

15:04:57  1    Mr. ███ state of mind?

2         A.   I'm not offering a psychological

3    evaluation of Mr. ███.

4         Q.   In Footnote 39 you also refer, in the

15:05:11  5    third paragraph, to the Garlinghouse's message

6    being replaced by a placebo, is that correct?

7         A.   I state "In the experiment, respondents

8    in the test group could be exposed to the

9    interview the way it occurred, while the control

15:05:29 10    group respondents could be exposed to the same

11    interview but where the passage identified by

12    Mr. ███ would be removed or replaced by a

13    'placebo.'"

14         Q.   What do you mean by a "placebo?"

15:05:45 15         A.   A placebo would be a different statement

16    that does not cause concern to SEC.

17         Q.   I'm sorry, can you repeat your answer,

18    please?

19         A.   A placebo would be a statement that does

15:06:12 20    not cause concern to SEC or to Mr. ███.

21         Q.   So what -- what is the placebo that

22    would be used that would not cause concern to the

23    SEC or to Mr. ███?

24              MR. OPPENHEIMER:   Objection

15:06:34 25         to form.

175

15:06:39  1                          You can answer.

          2            A.    That would be part of developing the

          3      survey/experiment.  I outlined in my report some

          4      elements at the very high level of a potential

15:06:57  5      survey/experiment.  One of the decisions that

          6      would need to be made while developing, designing,

          7      such a study and possibly even after pretesting or

          8      through the help of pretesting is whether the

          9      statement can be removed entirely, whether it

15:07:19 10      needs to be replaced with placebo, and what's the

         11      appropriate placebo.

         12            Q.    How would you phrase the survey question

         13      to understand the perspective of a reasonable

         14      purchaser of XRP in this context?

15:07:35 15                          MR. OPPENHEIMER:  Objection

         16                    to form.

         17            A.    On page 17, paragraph h. of my report, I

         18      say "Both groups will then be evaluated on a

         19      'dependent measure' which would aim at gaining the

15:08:04 20      unbiased 'perspective of a reasonable purchaser.'

         21      For example, respondents could be asked in

         22      open-ended and closed-ended formats about their

         23      perception of the digital asset described to them,

         24      whether they would expect its price to grow

15:08:19 25      because of the efforts of the company discussed in

                                                              176

15:08:22 1    the study, whether they would expect the digital

2    asset to be usable in transactions, including

3    cross-border transactions, and what their own

4    intentions would be with respect to the asset

15:08:39 5    discussed (e.g., whether they would consider

6    purchasing it, and what they would potentially do

7    with it afterwards)."

8        Q.    Would there be a focus group?

9                MR. OPPENHEIMER:  Objection

15:08:54 10        to form.

11        A.    One potential stage of designing a

12    survey/experiment is to conduct focus groups.

13        Q.    So in the context of Footnote 35, who

14    would be -- I'm sorry, Footnote 39, who would be

15:09:19 15    part of the focus group?

16                MR. OPPENHEIMER:  Objection.

17                You can answer.

18        A.    In Footnote 39, I don't think I

19    mentioned focus groups.

15:09:29 20        Q.    I'll repeat the question.

21                In the context of Footnote 39, who would

22    be part of the focus group?

23                MR. OPPENHEIMER:  Objection.

24                You can answer again.

15:09:41 25        A.    Paragraph 39 describes an experiment not

177

15:09:45 1    a focus group.

2        Q.   Do you use focus groups for experiments?

3        A.   Some --

4                  MR. OPPENHEIMER:  Objection.

15:09:54 5                  You can answer.

6        A.   Sometimes focus groups are used as part

7    of the -- of designing of an experiment or a

8    survey.

9        Q.   With regard to paragraph h. of your

15:10:15 10   report, page 17, paragraph h., would you use a

11   focus group?

12                  MR. OPPENHEIMER:  Objection.

13       A.   Paragraph h. discusses potential

14   questions or other dependent measures that can be

15:10:27 15   measured in a survey or experiment.  It does not

16   discuss specifically a focus group.

17       Q.   I'm asking you, would you use a focus

18   group?

19                  MR. OPPENHEIMER:  Objection

15:10:41 20       to form.

21       A.   In designing a survey or an experiment,

22   focus groups is a potential step.  Sitting here

23   today, I cannot tell you whether, in this

24   particular study, a focus group would be used as

15:10:59 25   part of designing a study.  And I would need much

                                                    178

15:11:03  1    more time than this deposition to design a study.

2        Q.   Okay.  Other than designing a study,

3    which I don't think I asked about, how would you

4    recruit a focus group to participate in a survey

15:11:18  5    in the context of your paragraph h.?

6                    MR. OPPENHEIMER:  Objection

7            to form.

8        A.   Would you read back the question,

9    please?

15:11:29 10                    (Whereupon, the record was read

11            back.)

12        A.   You asked about focus groups which are

13    used as part of designing a survey or an

14    experiment.  That's why I answered about focus

15:11:55 15    groups.

16        Q.   How would you recruit members of a focus

17    group in the context of conducting a survey?

18                    MR. OPPENHEIMER:  Objection

19            to form.

15:12:12 20        A.   Focus groups would be carried out in the

21    context of designing a survey if they need to be

22    conducted.

23        Q.   Assume you're conducting a survey to

24    determine the effect of Mr. Garlinghouse's

15:12:32 25    statements with respect to XRP.  How would you

179

15:12:41  1    recruit a focus group for that survey?

          2                    MR. OPPENHEIMER:   Objection

          3          to form.

          4          A.   I don't understand what it means to

15:12:51  5    "recruit" a focus group for a survey.

          6          Q.   Well, how do you get people to

          7    participate in a focus group?

          8          A.   Usually you target the same population

          9    as you would eventually target in your survey or

15:13:12 10    experiment unless the focus groups or some

         11    intermediate step changes that design decision.

         12          Q.   In paragraph -- in Footnote 39 of your

         13    report, you refer to the "test group."

         14          Does "test group" mean something

15:13:33 15     different than "focus group"?

         16          A.   Yes.

         17          Q.   What is a test group?

         18          A.   On page 16, paragraph d., I say

         19    "Respondents who qualify would be randomly

15:13:57 20    assigned to a test group or a control group."

         21          Q.   What is a test group?

         22          A.   I then say in paragraph e., "Test group

         23    respondents would be exposed to a set of tested

         24    statements and actions by Ripple:   Specifically,

15:14:16 25    the 'statements, actions, and product offerings'

                                                              180

15:14:19   1   that Mr. ██████ describes in his report.  These

          2   could be presented in a form of a vignette

          3   accompanied by news articles, video interviews, or

          4   other stimuli approximating the marketplace

15:14:34   5   realities."  Footnote 38, which I'll read

          6   afterward.

          7            "The" name "Ripple and XRP" -- sorry.

          8   "The names Ripple and XRP could be an anonymized

          9   to control for prior knowledge."

15:14:47  10            And Footnote 38 describes the importance

         11   of realism in experiments.

         12                    THE REPORTER:  The

         13            importance of?

         14                    THE WITNESS:  Realism.

15:15:01  15    Q.    What kind of people would be members of

         16   the test group?

         17                    MR. OPPENHEIMER:  Objection

         18            to form.

         19    A.    On page 15, paragraph d., I state

15:15:24  20   "Actual and potential purchasers of XRP (the

         21   target population) would be recruited to

         22   participate in a survey.  Those could be drawn,

         23   for example, from the three types of purchasers

         24   that Mr. ██████ highlighted:  'individuals,

15:15:37  25   institutional investors, and financial services

                                                              181

15:15:40  1    companies.'"

2         Q.    What do you mean by "control group" in

3    Footnote 39 of your report?

4         A.    Control group is the other group that is

15:15:57  5    not a test group.

6         Q.    Is that the scientific definition for

7    control group?

8                   MR. OPPENHEIMER:  Objection;

9         form.

15:16:12 10         A.    Yes, in part.  If you'd like more

11   details, the control group is the group that's not

12   exposed to the tested stimulus and is exposed to

13   something else, usually with placebo elements.

14        Q.    Does control group mean the same thing

15:16:33 15   as focus group?

16        A.    No.

17        Q.    How are the two terms different?

18        A.    Test group and control group, in terms

19   for splitting the sample in a survey or experiment

15:16:49 20   into two subsamples which have a different

21   experience within that experiment and whose

22   outcomes are eventually measured as a part of the

23   experiment.

24             A focus group is a separate study that

15:17:07 25   may or may not be conducted prior to the

182

15:17:10  1    experiment as part of designing the experiment or

2    surveys.

3                        THE REPORTER:  The last

4                part?

15:17:22  5                        THE WITNESS:  Or surveys.

6                        THE REPORTER:  Thank you.

7        Q.    Going back to your paragraph 9 of your

8    rebuttal, you state -- could you please read

9    paragraph 9.d into the record?

15:18:13 10        A.    "Mr. ████ does not evaluate whether and

11   to what degree XRP purchasers were exposed to

12   Ripple's statement that he 'reviews and analyzes.'

13   A proper analysis of the impact of such statements

14   on potential purchasers would include such an

15:18:14 15   evaluation.

16        Q.    What is the basis of your statement that

17   Mr. ████ does not evaluate whether and to what

18   degree XRP purchasers were exposed to Ripple's

19   statements that he -- and I'm -- in your quotes

15:18:47 20   "reviews and analyzes"?

21        A.    Such an evaluation would often result in

22   a conclusion that a certain percentage of relevant

23   population was exposed to the relevant statements.

24   I did not see such a conclusion in Mr. ████

15:19:20 25   report.

183

15:19:23  1          Q.   Well, if -- can you turn to paragraph 56

2     of Mr. ▓▓▓▓ report on page 32?

3               Can you read the last sentence on page

4     32 starting with "In a public statement..." and

15:20:22  5     going on to page 33 up to the Footnote 66?

6          A.   Do you want me to read the sentence that

7     starts with "In a public statement..."?

8          Q.   Yes.

9          A.   "In a public statement on CoinDesk, one

15:20:41 10     of the leading digital asset news sites,

11     Garlinghouse commented, 'We have had a significant

12     rally in XRP prices, but it is reflective of a lot

13     of work we have done to make Ripple a very

14     compelling solution.'"

15:20:58 15               Footnote 66.  "CoinDesk.  Use or

16      speculation:  What's driving Ripple's price to"

17      all high -- "to all-time highs?"  2017, and there

18      is a URL.

19          Q.   So is the statement that you just read a

15:21:24 20     statement that's made by Mr. Garlinghouse

21     according to Mr. ▓▓▓▓ report?

22                    MR. OPPENHEIMER:  Objection

23          to form.

24               You can answer.

15:21:34 25          A.   According to Mr. ▓▓▓▓ report,

184

15:21:36  1        Mr. Garlinghouse made this statement.

2            Q.   If you could please look at paragraph 57

3        of Mr. ███ report, does Mr. ███ include

4        another statement by Mr. Garlinghouse in paragraph

15:21:57  5        57 of his report?

6            A.   Paragraph 57 contains another statement

7        by Mr. Garlinghouse.

8            Q.   If you could go to paragraph 58 of

9        Mr. ███ report, does Mr. ███ quote another

15:22:36 10        statement by Mr. Garlinghouse?

11            A.   Paragraph 58 lists another statement by

12        Mr. Garlinghouse.  However, for all of the

13        statements we just discussed in paragraph 56, 57

14        and 58, there is no analysis of exposure.

15:23:34 15            Q.   Is it possible that XRP purchasers might

16        have been exposed to the statements that Mr. ███

17        includes in paragraphs 56, 57 and 58 of his

18        report?

19                      MR. OPPENHEIMER:  Objection;

15:23:49 20            calls for speculation.

21                      You can answer.

22            A.   It's a testable hypothesis.

23                      THE REPORTER:  It's a what

24            hypothesis?

15:23:57 25                      THE WITNESS:  Testable.

185

15:23:58  1          A.   It is possible that some purchasers were

2     exposed; however, how many and what percent of

3     relative population, whether it's zero or more

4     than zero but still negligible or whether it's

15:24:09  5     substantial, that's all testable hypothesis.  And

6     Mr. ████ does not offer any analysis to evaluate

7     to what degree purchasers or potential purchasers

8     of XRP were exposed to any of these statements.

9          Q.   Was that -- was Mr. ████ assigned with

15:24:32 10     evaluating whether and to what degree XRP

11     purchasers were exposed to Ripple's statements?

12               MR. OPPENHEIMER:   Objection

13          to form.

14          A.   Mr. ████ was asked to evaluate a causal

15:25:01 15     relationship between the statement, actions, and

16     product offering on the one hand and the

17     perspective of a reasonable purchaser on the other

18     hand.  And in order to evaluate whether certain

19     statements had an effect on the perspective of a

15:25:17 20     reasonable purchaser, we first need to establish

21     whether the reasonable purchaser was ever exposed

22     to those statements and to what degree.

23          Q.   Can you point to where in Mr. ████

24     report, where he states that he was asked to

15:25:33 25     evaluate a causal relationship between the

186

```
15:25:37   1        statements, actions, and product offering on the

           2        one hand and the perspective of a reasonable

           3        purchaser on the other hand?

           4                    MR. OPPENHEIMER:   Objection

15:25:47   5            to the form.

           6        A.    In paragraph 2, Mr. Ripple -- Mr. ████

           7        states "The SEC retained me to independently

           8        analyze and render opinions on the perspective of

           9        a reasonable purchaser of XRP on Ripple's

15:26:02  10        statements, actions, and product offerings."

          11        Q.    Is there any word that -- let me

          12        rephrase this.

          13                    Does the sentence include the word

          14        "cause"?

15:26:20  15        A.    The sentence does not involve -- include

          16        the word "cause."

          17        Q.    And going back to your opinion in

          18        paragraph 9.c, can you read for the record

          19        paragraph 9.c?

15:27:03  20        A.    "Mr. ████    'analysis' does not allow

          21        him to separate the supposed impact of Ripple's

          22        conduct on the purchaser's 'perspective' from

          23        other potential influences, such as preexisting

          24        beliefs or general principles of economics."

15:27:28  25        Q.    Can you explain what you mean by this
```

187

```
15:27:29   1      sentence?
           2          A.   The reason that experiments are gold
           3      standard of testing causal propositions is because
           4      they can separate the impact of what's
15:27:45   5      hypothesized to be the cause on the outcome from
           6      the impact of all other potential inferences.
           7      Because Mr. ████ did not conduct an experiment or
           8      any other reliable -- he did not use any other
           9      reliable approach to test a causal proposition, he
15:28:07  10      cannot separate the impact of the specific alleged
          11      conduct from the impact of all other inferences
          12      such as preexisting beliefs or general economic
          13      principles.
          14          Q.   Assuming that Mr. ████ is not testing
15:28:31  15      any causal proposition, would your opinion in
          16      paragraph 9.c change?
          17                     MR. OPPENHEIMER:   Objection
          18           to form.
          19                     You can answer.
15:28:48  20          A.   If Mr. ████ is not testing any causal
          21      proposition, then his report does not exist, so I
          22      wouldn't need -- I would not need to rebut it.
          23          Q.   Can you explain what you mean by your
          24      statement that his report does not exist if he's
15:29:05  25      not causing -- if -- I'm sorry, if he's not
```

188

```
15:29:08    1      testing causal proposition?

            2          A.   Well, to start with, he's not testing

            3      causal propositions, but he is making causal

            4      conclusions.  And he cannot make those conclusions

15:29:23    5      and not make them at the same time.

            6          Q.   And the determination that Mr. ████ is

            7      making causal conclusions, is that an opinion that

            8      you're providing in this case?

            9                    MR. OPPENHEIMER:  Objection

15:29:38   10            to form.

           11          A.   If I look at Mr. ████ summary of

           12      findings, for example, I think I've gone in great

           13      detail for paragraph 8 where almost every -- every

           14      word is either a part of the cause or an effect;

15:30:07   15      every sentence either -- almost every sentence

           16      either describes a cause or an effect or a causal

           17      combined proposition.

           18          Q.   Is that an expert opinion that you're

           19      providing?

15:30:20   20                    MR. OPPENHEIMER:  Objection

           21            to form.

           22          A.   That is what paragraph 8 states.

           23          Q.   I'm sorry?

           24          A.   That is what paragraph 8 states.

15:30:44   25          Q.   Is that your interpretation of paragraph
```

189

15:30:45  1    8?

        2                      MR. OPPENHEIMER:  Objection

        3              to form.  Asked and answered

        4              repeatedly.

15:30:49  5                      You can answer again.

        6         A.    That's what the paragraph states.

        7         Q.    Okay.  In paragraph 9.d of your report,

        8    you state that "███████ does not explain how he

        9    selected Ripple's statements that he 'reviews and

15:31:05 10   analyzes.'"

       11                      What is the basis for this statement?

       12         A.    "That Mr. ███████ does not explain how he

       13   selected Ripple's statements that he 'reviews and

       14   analyzes.'"

15:31:28 15        Q.    In your expert opinion, how is he

       16   supposed to explain how he selected Ripple's

       17   statements that he reviews and analyzes?

       18                      MR. OPPENHEIMER:  Objection

       19              to form.

15:31:46 20        A.    There are multiple ways to do it.  For

       21   example, Mr. ██████ could have a section in his

       22   report where he could list all the statements that

       23   he reviews and analyzes and say, for example, all

       24   the statements come from the complaint; which

15:32:06 25   would not be the case here, but if it were the

                                                                190

15:32:10  1    case, he could say I have read the complaint.  The

2    complaint makes me think I should be testing these

3    statements and I'm going to test them.  None of

4    this is happening in Mr. ███████ report.

15:32:31  5         Another example is that SEC could have

6    instructed him to test specific statements and he

7    could have described that in his report.  That

8    also doesn't happen.

9         Q.   Can you turn to paragraph 68 of

15:32:46  10   Mr. ██████ report?

11        The sentence in quotations that's

12   included in paragraph 68, the first quotation, is

13   that a sentence that Mr. ██████ included in his

14   report?  Is that -- I'm sorry.  Is that a

15:33:41  15   statement that Mr. ██████ reported in his report?

16              MR. OPPENHEIMER:  Objection

17        to form.

18              You can answer.

19        A.   Mr. ██████ states that this sentence

15:34:28  20   comes -- this quote comes from a Ripple --

21   Ripple's post on its blog.

22        Q.   Does Mr. ██████ state who is the author

23   of the statement?

24        A.   If by "who" you refer to a particular

15:35:12  25   person, then I don't see it here.

191

15:35:13  1          Q.   Okay.  If you turn to page 38, does

        2     the -- is there a reference to Miguel Vias in

        3     paragraph 68?

        4          A.   He does mention Miguel Vias.

15:35:32  5          Q.   And who is Miguel Vias according to

        6     Mr. █████?

        7          A.   According to Mr. █████, Miguel Vias is

        8     the head of Ripple's XRP markets team, or was

        9     at -- at that time.

15:35:46 10          Q.   Okay.  Does Mr. █████ cite in his report

       11     to -- I'm sorry.

       12               Does Mr. █████ provide a cite in his

       13     report with regard to that statement?

       14          A.   I'm not sure what you mean.

15:36:09 15          Q.   Does -- what does Footnote 90 refer to?

       16          A.   Footnote 90 refers to presumably the

       17     source of this, where Mr. █████ found this

       18     statement.

       19          Q.   Okay.  So if you look at paragraph 39 --

15:36:32 20     I'm sorry, 69 of Mr. █████ report, does

       21     paragraph 30 -- 69 include a statement?

       22                    MR. OPPENHEIMER:  Objection

       23          to form.

       24          A.   Paragraph 69 of Mr. █████ report

15:37:25 25     quotes a statement on Ripple's Insights blog

                                                              192

15:37:31 1   supposedly made by Garlinghouse.

2        Q.   Is there a citation to the statement in

3   paragraph 69?

4                  MR. OPPENHEIMER:  Objection.

15:37:39 5                  You can answer.

6        A.   There is a Footnote 93, which is

7   cross-referencing Footnote 92.

8        Q.   And what -- what is Footnote 92?

9        A.   It says "Ripple.  Zoe Cruz Joins

15:37:59 10   Ripple's Board of Directors (2017)" and the URL.

11        Q.   If you turn to paragraph 73 of

12   Mr. ██████ report, does paragraph 73 include a

13   statement?

14                  MR. OPPENHEIMER:  Objection

15:38:37 15        to form.

16        A.   Paragraph 73 includes a portion of an

17   interview which was a part of the Cryptocurrency

18   Investor Forum.

19        Q.   According to Mr. ██████, whose statement

15:39:19 20   is included in paragraph 73?

21        A.   According to Mr. ██████, the statement

22   was made by Breanne Magidan, Ripple's former head

23   of Global Institutional Markets.

24        Q.   Going back to your report, in paragraph

15:40:04 25   9.e, can you explain what you mean by "market

193

15:40:11  1    segmentation"?

2         A.    Market segmentation is an analysis that

3    allows to split one's addressable markets into

4    segments.

15:40:29  5                   THE REPORTER:  Allows what

6              markets?

7                   THE WITNESS:  Addressable.

8         Q.    Why would market segmentation be

9    applic -- applicable in evaluating the perception

15:41:04 10    of reasonable XRP purchasers?

11                   MR. OPPENHEIMER:  Objection

12              to form.

13                   You can answer.

14         A.    Mr. ████ throughout his report

15:41:19 15    describes two types of perspectives or two

16    different perspectives:  One of investor-oriented

17    purchasers and the other cross-border

18    transfer-oriented purchase -- purchasers.  Nowhere

19    in his report does Mr. ████ offer any empirical

15:41:39 20    evidence that would support the existence of these

21    two types of purchasers or that those are the only

22    two types of purchasers.

23                   One way to establish whether purchasers

24    of a particular product are, indeed -- indeed

15:41:56 25    belong to two separate segments is to conduct

194

15:42:01  1    market segmentation.

2        Q.    Does Mr. ████ state anywhere in his

3    report that investment-oriented purchasers and

4    cross-border transfer-oriented purchasers are the

15:42:20  5    only two types of XRP purchasers?

6        A.    He evaluates only those two types.  And

7    in particular, he seems to suggest that

8    investment-oriented purchasers are predominant,

9    but he offers no empirical support for that.

15:42:44 10        Q.    But does he state that these are the

11    only two types of XRP purchasers anywhere in the

12    report?

13                    MR. OPPENHEIMER:  Objection

14            to form.

15:43:12 15        A.    His assignment is to "analyze and render

16    opinions on the perspective of a reasonable

17    purchaser of XRP on Ripple's statements, actions,

18    and product offerings."  So "reasonable purchaser"

19    is very general here.

15:43:30 20            Then further in his report, he offers

21    two perspectives:  One of investment-oriented

22    purchaser and one of a cross-border

23    transfer-oriented purchaser.  He doesn't mention

24    any other type.  For his report to be exhaustive,

15:43:45 25    if there -- if he believes there are other types,

195

15:43:47  1    he would need to mention them.

2         Q.   Is that an opinion?

3                   MR. OPPENHEIMER:   Objection

4         to form.

15:44:14  5    A.   My entire report is that of my opinions

6    in this case.

7         Q.   And so the answer is yes?

8                   MR. OPPENHEIMER:   Objection.

9         A.   Everything I state in my report is my

15:44:25 10   opinion in this case.

11        Q.   Have you provided any expert opinion

12   about the qualifications or experience of an

13   expert in your professional capacity?

14                  MR. OPPENHEIMER:   Objection

15:45:00 15   to form.

16        A.   In paragraph f on page 5, I state

17   "Mr. ███ does not appear to possess the

18   qualifications or experience needed to address

19   certain aspects of the 'perspective of a

15:45:20 20   reasonable purchaser' or the effect of Ripple's

21   'statements, actions, and product offerings' on

22   those aspects of the purchaser's perspective, such

23   as purchasers' perceptions of Ripple's at-issue

24   statements."

15:45:38 25        I might have missed a closing quotation

196

15:45:41   1   mark after "reasonable purchaser."

2        Q.   Other than paragraph f in this case,

3   have you provided any expert opinion about the

4   qualifications or experience of an expert in your

15:46:01   5   professional capacity?

6                    MR. OPPENHEIMER:  Objection

7            to form.

8        A.   I might have in the United States versus

9   Florida case.  I don't remem -- I don't recall the

15:46:23  10   specifics.

11        Q.   Has an expert report ever been rejected

12   based on your expert opinion about that expert's

13   qualifications or experience?

14                    MR. OPPENHEIMER:  Objection

15:46:40  15            to form.

16        A.   To the best of my recollection, in the

17   United States versus Florida case, the court chose

18   not to opine on any Daubert motions and instead

19   opined on the case's merits and ruled in favor of

15:47:09  20   my client.

21                    MR. OPPENHEIMER:  Counsel, I

22            don't know if you're planning on

23            starting a new topic, but if we could

24            take a break sometime soon.

15:47:30  25                    MS. GUERRIER:  Sure.  Why

197

15:47:30  1                    don't we take a break now.   Ten

          2          minutes?

          3                         THE VIDEOGRAPHER:   Okay.

          4          Going off the record, 3:47.

15:47:36  5                    (Whereupon, a recess is taken.)

          6                         THE VIDEOGRAPHER:   Okay.

          7          Back on the record at 4:01.

          8  BY MS. GUERRIER:

          9     Q.    In Section --

16:01:19 10                         THE VIDEOGRAPHER:   Your mic.

         11                         MS. GUERRIER:   Oh, yes,

         12          that's important.

         13  BY MS. GUERRIER:

         14     Q.    Okay.   In Section B to your report on

16:01:32 15  page 21, you state that "Mr. ████ does not

         16  evaluate whether and to what degree XRP purchasers

         17  were exposed to the at-issue communications and

         18  does not attempt to empirically evaluate the

         19  causal effect, if any, of Ripple's public

16:01:50 20  communications on perceptions or purchase

         21  decisions of actual or potential purchasers of

         22  XRP."

         23                    Was this part of Mr. ████ assignment?

         24                         MR. OPPENHEIMER:   Objection

16:02:10 25          to form.

                                                                 198

16:02:10  1          A.    Going back to paragraph 2 of Mr. ███████

        2    report, the SEC retained him "to independently

        3    analyze and render opinions on the perspective of

        4    a reasonable purchaser of XRP on Ripple's

16:02:22  5    statements, actions" -- "statements, actions, and

        6    product offerings."

        7              And then throughout his report, he lists

        8    numerous communications by Ripple and arrives at

        9    causal conclusions regarding what effect those

16:02:39 10    communications had on perceptions or purchase

       11    decisions of actual or potential purchasers of

       12    XRP.

       13              So that's part of his assignment and his

       14    report.

16:02:52 15          Q.    Is that your interpretation of

       16    Mr. ██████ assign -- assignment?

       17                    MR. OPPENHEIMER:   Objection

       18              to form.

       19          A.    That's what's in his report.

16:03:06 20          Q.    Is this an opinion that you're providing

       21    concerning whether or not Mr. █████ was asked to

       22    do what I've described in Section B on page 21 of

       23    your report?

       24                    MR. OPPENHEIMER:   Objection

16:03:17 25              to form.

                                                              199

16:03:25  1          A.    My entire report is my opinions.

       2          Q.    Do you have a criticism of Section 5 of

       3     Mr. ███ expert report which starts on page 15

       4     of his report and goes through page 19 of the

16:03:50  5     report?

       6          A.    One of the sections in my report

       7     specifically addresses Section 5 of Mr. ████

       8     report.

       9          Q.    What is the specific rebuttal that

16:04:28 10     you're providing with respect to Section 5 of

      11     Mr. ███ report?

      12                    MR. OPPENHEIMER:  Objection;

      13          form.

      14          A.    Section -- Section VI.B.a. of my report

16:04:54 15     is called "███ Report Section 5" featured --

      16     "Features of XRP Coin Economics and Suitability as

      17     a Bridge Asset."

      18                In that section I specifically address

      19     Section 5 of Mr. ████ report.

16:05:14 20          Q.    So what is the specific criticism that

      21     you have of Section 5 of Mr. ████ report?

      22                    MR. OPPENHEIMER:  Objection

      23          to form.

      24          A.    That's my entire Section VI.B.a.

16:05:38 25          Q.    I'm sorry?

                                                           200

16:05:42   1          A.    That's my entire Section VI.B.a.

           2          Q.    Can you verbalize what your rebuttal is

           3   on Section 5 of Mr. ██████ report?

           4                      MR. OPPENHEIMER:   Objection

16:05:54   5          to form.

           6          A.    I can read to you examples from my

           7   Section VI.B.a.  For example, in paragraph 39, I

           8   state "In Section 5.3 of his report, Mr. ██████

           9   summarizes the 'Perspective of a reasonable

16:06:27  10   purchaser with respect to XRP's fixed-supply

          11   model,' again splitting the purchasers into

          12   'investment-oriented purchasers of XRP' and

          13   'purchasers who are exclusively interested in the

          14   utility use of the cross-border payment product.'

16:06:46  15   Again, he does not explain whether these two types

          16   of purchasers were exposed or paid attention to

          17   the specific Ripple statements, whether the

          18   perspectives (perceptions and purchase behaviors)

          19   of these two types of potential purchasers were

16:07:03  20   affected by those statements or by general

          21   economic logic, why these two types of customers

          22   represent a relevant market segmentation, and

          23   whether there is any basis to say these two are

          24   the only types of potential purchasers that should

16:07:19  25   be considered."

                                                              201

16:07:29  1          Q.   Turning to Section 6 of Mr. ███████

        2     report, which starts on page 19 of his report and

        3     ends on page 26, are you providing any rebuttal to

        4     Section 6 of Mr. ███████ report?

16:07:48  5                      MR. OPPENHEIMER:   Objection

        6          to form.

        7          A.   Well, as I stated before, all of my

        8     report is my opinions and my rebuttal of

        9     Mr. ███████ entire report.  With respect to

16:08:11 10     Section 6 of his report, there is a section in my

       11     report, that's Section VI.B.b, called "███████

       12     Report Section 6 'XRP Sale and Escrow'" mechanism

       13     -- 'Mechanics.'"

       14          Q.   Can you verbalize the rebuttal that

16:08:41 15     you're providing to Section 6 of Mr. ███████

       16     report?

       17                      MR. OPPENHEIMER:   Objection

       18          to form.

       19          A.   I can read to you excerpts from my

16:08:57 20     Section B.b, but my entire Section VI.B.b is the

       21     rebuttal.  It's the one that specifically

       22     addresses Mr. ███████ Section 6.  It's only one

       23     paragraph, so I'll read it in its entirety.

       24          "In Sections 6.1-6.5" in -- "of his

16:09:31 25     report, Mr. ███████ discusses 'XRP Sale and Escrow

                                                                202

16:09:35  1    Mechanics,' again intermingling theoretical logic,

2    statements made by Ripple, and actions taken by

3    Ripple."

4              Footnote 55, which I'll -- which reads

16:09:49  5    "█████ Report, paragraphs 32 to 47.

6    Occasionally, Mr. █████ would interject these

7    descriptions with what appears to be his take on

8    purchaser 'perspective.'  For example, he states

9    that various aspects of institutional purchasing

16:10:05 10    of XRP, 'repeatedly communicated by Ripple in the

11    XRP markets reports,' 'would appeal to an

12    individual purchaser with a long-term investment

13    mindset.'  █████ report, paragraph 37.  He does

14    not identify any basis for distinguishing between

16:10:26 15    subsets of potential XRP purchasers (for example,

16    his 'individual purchaser with a long-term

17    investment mindset' versus an individual

18    purchaser with a short-term investment mindset,

19    or an individual purchaser with no investment

16:10:41 20    mindset, or an entity purchaser, but also makes

21    no attempt to argue that his conclusions hold as

22    to all subsets of potential XRP purchasers."

23              Continuing with the paragraph:  "This

24    intermingling is flawed for the reason I explain

16:11:01 25    above.  Then, in Section 6.6, Mr. █████ describes

                                                          203

16:11:04  1    the supposed 'perspective of a reasonable

2    purchaser with regards to Ripple's XRP sales and

3    escrow,' again discussing separately the

4    perspective of 'a potential investment-oriented

16:11:18  5    purchaser of XRP' and 'a reasonable purchaser of

6    XRP that is exclusively considering the utility

7    use of the coin.'"

8            Footnote 56, "██████ report, paragraphs

9    48 to 49."

16:11:37  10           "Again, he does not explain why his

11   segmentation into these two types of purchasers is

12   valid, or whether these two types of purchasers

13   were exposed or paid attention to the specific

14   Ripple statements, whether they interpreted the

16:11:50  15   statements the same way as Mr. ██████, or whether

16   the perspectives (perceptions and purchase

17   behaviors) of these two types of potential

18   purchasers are affected by those statements or by

19   general economic logic.  Each of these omissions

16:12:06  20   is" critic -- "is a critical flaw in Mr. ██████

21   reasoning."

22           So both for Section 5 and Section 6 of

23   Mr. ██████ report, the general rebuttal that I

24   offer -- and there is more detail in my report,

16:12:23  25   but at a high level is that the statements that

16:12:27  1      Mr. ███ highlights in those sections, it

2      doesn't test whether the perspective of the

3      purchaser was affected by these statements.

4           He doesn't -- he also doesn't analyze

16:12:41  5      whether purchasers or potential purchasers were

6      even exposed to those statements.  And he

7      repeatedly made separate conclusions for two types

8      of potential purchasers, but he offers no

9      explanation -- or let me rephrase -- no reliable

16:13:02 10      methodology that would allow one to conclude that

11      these two types of potential purchasers or

12      purchasers exist and those are the only two types.

13      Q.   Okay.  Did you conduct any of the tests

14      that you described in paragraph 40 of your report?

16:13:21 15                MR. OPPENHEIMER:  Objection

16           to form.

17      Q.   In this case.

18      A.   I don't know if I used the word "test"

19      here specifically.

16:13:45 20      Q.   Well, did you do any of the things that

21      you've described in paragraph 40 of your report in

22      this case?

23                MR. OPPENHEIMER:  Objection

24           to form.

16:13:55 25      A.   My assignment in this case is to

205

16:13:56  1     evaluate Mr. ████ report.  In order to do that,

          2     I do not need to conduct an empirical study.

          3         Q.   So is the answer no?

          4         A.   The answer is I did not conduct

16:14:14  5     empirical studies because I didn't need to.

          6         Q.   Okay.  Looking at Section 7 of

          7     Mr. ████s report, which starts at page 26 of the

          8     report and ends at page 49, are you -- what

          9     rebuttal are you providing to Section 7 of

16:14:56 10     Mr. ████ report?

         11                    MR. OPPENHEIMER:   Objection

         12              to form.

         13         A.   If you're referring to Section 7 of

         14     Mr. ████ report, it ends on page 47 of his

16:15:08 15     report.

         16         Q.   Yes, I'm sorry.  Page 47.

         17              What rebuttal are you providing to

         18     Section 7 of Mr. Ripple's -- I'm sorry,

         19     Mr. ████ report?

16:15:39 20         A.   Section VI.B.c. of my report is called

         21     "████ Report Section 7 'Ripple Communications and

         22     Promotional Statements.'"  And that section of my

         23     report specifically addresses Section 7 of

         24     Mr. ████ report.

16:15:59 25         Q.   Can you verbalize the rebuttal that

                                                              206

```
16:16:01   1    you're providing to Section 7 of Mr. ████
           2    report?
           3                    MR. OPPENHEIMER:   Objection
           4          to form.
16:16:21   5          A.   My entire opinion is in my report.   The
           6    general, the main highlights of it is that, again,
           7    Mr. ████ lists numerous statements and makes
           8    causal conclusions about how those statements
           9    affected the perspective of purchasers and
16:16:46  10    potential purchasers of XRP, but he doesn't
          11    evaluate that causal proposition with any reliable
          12    methodology.   He doesn't evaluate whether a
          13    relevant population was even exposed or to what
          14    degree to those statements.
16:17:07  15                He, again, offers two separate
          16    perspectives for the two types of purchasers he
          17    defines without offering any empirical evidence
          18    that those two types exist or that no other types
          19    exist.
16:17:26  20                I have not finished.
          21                Another criticism of Section 7, as well
          22    as 5 and 6, is that with respect to the statements
          23    of Mr. ████ -- it's not all -- he doesn't
          24    evaluate to what degree potential and actual
16:18:20  25    purchasers were exposed to this statement.   He
```

                                                              207

16:18:23   1     doesn't evaluate whether they paid any attention

2     to the statement or whether they recall them at

3     the time of the potential purchase.

4               In Section 7, on my Sections V and VI,

16:18:53   5     he has an incremental section that is called

6     Section 7.1 and it's called -- it starts on page

7     26 of his report and it's called "Promotional

8     Factors Considered by an Investment-Oriented

9     Purchaser."

16:19:24  10               Mr. ████ does not have a parallel

11     subsection for the other type of purchaser he

12     claims exist and that suggests that Mr. ████

13     believes that the promotional -- that the

14     investment-oriented purchaser is the predominant

16:19:44  15     purchaser type or he's not interested or less

16     interested than the other type for some reason.

17               I'm done with my answer.

18          Q.    Could you go to page 29, your header

19     paragraph C.  You state that "Mr. ████s 'review

16:20:33  20     and analysis' does not evaluate any actual or

21     potential XRP purchaser's perspective except for

22     his own."

23               Is -- is it possible to evaluate

24     perception of a consumer based upon the expert's

16:20:56  25     experience alone?

208

16:20:59  1                    MR. OPPENHEIMER:  Objection

          2         to form.

          3         A.   From a scientific point of view, if you

          4    are interested in the perceptions of purchasers or

16:21:14  5    perspective purchasers, we should measure those

          6    perceptions empirically or evaluate them in some

          7    indirect way empirically.

          8         Q.   Do you know whether any experts have

          9    evaluated the perception of a hypothetical

16:21:34 10    consumer without conducting any scientific

         11    analysis but relying on this expert's experience?

         12                    MR. OPPENHEIMER:  Objection

         13         to form.

         14         A.   I have supported several experts

16:21:48 15    providing such opinions.

         16         Q.   Were the cases that you supported in

         17    rebutting an expert that may have evaluated the

         18    perception of a hypothetical purchaser based on

         19    that expert's experience, were those cases

16:22:35 20    litigation cases?

         21                    MR. OPPENHEIMER:  Objection;

         22         form.

         23         A.   Yes.  And I think I should clarify that

         24    the cases, or at least one case I'm referring to,

16:23:01 25    the expert on the other side did not present an

                                                              209

16:23:06  1    opinion of his own introspections as a potential

2    consumer but, rather, what he believed the

3    consumers would think based on literature.

4        Q.   Is it possible that an expert can

16:23:33  5    evaluate the perception of a hypothetical consumer

6    without the need to conduct an experiment?

7                    MR. OPPENHEIMER:  Objection;

8            form.

9        A.   From a scientific perspective, we have a

16:23:52  10   hypothesis about the impact of stimulus on

11   perceptions.

12                    THE REPORTER:  I'm sorry,

13           repeat.

14       A.   From a scientific perspective, we have

16:24:00  15   an hypothesis about the impact of a stimulus on

16   perceptions or perspectives.  The gold standard is

17   to conduct a sur -- an experiment.

18       Q.   So my question is, is it possible that

19   an expert can evaluate the perception of a

16:24:25  20   hypothetical consumer without the need to conduct

21   any experiment?

22                    MR. OPPENHEIMER:  Objection

23           to form.

24       A.   There are some other methods that are

16:24:41  25   less effective in establishing causation but

210

16:24:44   1    nevertheless can establish causation to some

           2    degree.  Mr. ███ did not use any of those

           3    methods.

           4         Q.    Assuming that we're not trying to

16:24:55   5    establish causation and we're just looking at the

           6    perception of a hypothetical consumer, is it

           7    possible that an expert can evaluate the

           8    perception of that hypothetical consumer without

           9    the need to conduct an experiment?

16:25:13  10                     MR. OPPENHEIMER:  Objection

          11         to form.

          12         A.    If we're not going after a causal

          13    proposition and they're evaluating perceptions,

          14    the most direct way of doing that would be a

16:25:27  15    survey.

          16              If we are looking at some hypothetical

          17    imaginary person, then the question is:  Who is to

          18    decide what that person's thinking?  From a

          19    scientific perspective, the best way -- or the

16:25:46  20    most direct way.  The most direct way to establish

          21    what a person is thinking is to ask about people

          22    who are similar to that imaginary hypothesized

          23    person.

          24         Q.    Can an expert evaluate the perception of

16:26:02  25    a hypothetical consumer based on specialized

                                                                211

16:26:06  1    experience alone, without talking about cause and

        2    effect?

        3                    MR. OPPENHEIMER:   Objection

        4            to form.

16:26:16  5         A.    If we're evaluating perceptions of

        6    consumers -- was it consumers in your question?

        7         Q.    I'll repeat the question.

        8                Can an expert evaluate the perception of

        9    a hypothetical consumer based on specialized

16:26:32 10    experience alone, without talking about cause and

       11    effect?

       12                    MR. OPPENHEIMER:   Same

       13            objection.

       14         A.    From a scientific perspective, that way

16:26:49 15    to -- one way, a direct way, to identify what a

       16    hypothetical consumer thinks is to ask actual

       17    consumers what they think.  Otherwise, it's not

       18    clear how we're going to figure out what this

       19    imaginary person imaginary thoughts -- imaginary

16:27:12 20    person's imaginary thoughts are.

       21         Q.    Is it your testimony that no expert has

       22    evaluated the perception of a hypothetical

       23    consumer based on specialized knowledge alone?

       24                    MR. OPPENHEIMER:   Objection

16:27:29 25            to form.

                                                              212

16:27:43  1        A.   I am not offering any legal opinions in

2    this case.  There might have been experts who did

3    something.  That's not scientifically valid.

4        Q.   What is the basis for your statement

16:27:59  5    that analyze -- evaluating consumer perception

6    based on specialized knowledge alone, without

7    trying to determine cause and effect, is not

8    scientifically valid?

9              MR. OPPENHEIMER:  Objection

16:28:11 10         to form.

11        A.   So the base case scenario of this

12    methodology, quote/unquote, is that we're getting

13    the perception of a single person, a person who

14    knows the hypothesis in the current case, knows

16:28:38 15    the sponsor of this, quote/unquote, study and is

16    just one person.  That does not allow us to

17    evaluate what a representative consumer believes.

18        Q.   Are you aware that experts have been

19    accepted in courts in this jurisdiction based on

16:29:09 20    their specialized knowledge alone with respect to

21    evaluating the perspective of a hypothetical

22    consumer?

23              MR. OPPENHEIMER:  Objection

24         to form.

16:29:21 25        A.   If you represent that to me, I believe

                                                          213

16:29:23  1    you, and I'm not offering any legal opinions.

2    From a scientific perspective, introspecting will

3    give us perception of one person, not of a

4    representative consumer.  And that one person is

16:29:51  5    not even necessarily the consumer of the product

6    of interest.

7                    THE REPORTER:  The consumer

8              of --

9                    THE WITNESS:  Of the product

16:30:02 10              of interest.  Or a potential consumer

11              of the product of interest.

12         Q.   Could the expert look at online -- for

13    example, online reviews by consumers to determine

14    the perception of hypothetical consumers without

16:30:27 15    trying to determine cause and effect but just

16    perception?

17                    MR. OPPENHEIMER:  Objection

18              to form.

19         A.   There is a scientific methodology called

16:30:41 20    content analysis as discussed in Footnote 67 of my

21    report.  "Content analysis is a method of

22    collecting social data through carefully

23    specifying and counting social artifacts such as

24    books, songs, speeches, and paintings.  Without

16:31:02 25    making any personal contact with people, you can

214

| | |
|---|---|
| 16:31:04 | 1 |

16:31:04  1    use this method to examine a wide variety of

2    social phenomena.  Content analysis is the study

3    of recorded human communications.  Among the forms

4    suitable for study are books, magazines, web

16:31:16  5    pages, poems, newspapers, songs, paintings,

6    speeches, letters, email messages, bulletin board

7    postings on the internet, laws, and constitutions,

8    as well as any components or collections thereof.

9    Content analysis is particularly well suited to

16:31:34 10    the study of communications and to answering the

11    classic question of communications research:  'Who

12    says what, to whom, why, how, and with what

13    effect?'  Common units of analysis in content

14    analysis include elements of communications -

16:31:51 15    words, paragraphs, books and so forth.  Standard

16    probability-sampling techniques are sometimes

17    appropriate in content analysis."

18         If an expert wanted to conduct content

19    analysis of product reviews, that would, if

16:32:09 20    properly conducted, be a reliable methodology.

21    Q.   So is scientific -- I'm sorry.

22         Is a -- is a scientific analysis

23    mandatory for determining the perspective of a

24    reasonable purchaser if all you're doing is

16:32:48 25    determining the perspective of a reasonable

215

16:32:51  1    purchaser?

          2              MR. OPPENHEIMER:  Objection

          3         to form.

          4         A.    From a scientific perspective, the

16:33:03  5    perspective of a reasonable purchaser can be

          6    measured as the perspective of -- on average, of a

          7    sample of relevant purchasers.

          8              There could be also indirect methods but

          9    also empirical methods.  Introspecting into what I

16:33:25 10    think about this product will, at best, only tell

         11    you what I think about it, not what consumers of

         12    this product think.  And even if I am a consumer

         13    of this product or a potential consumer of this

         14    product, I'm only one person.  That could be an

16:33:43 15    outlier.

         16              And obviously the same applies to

         17    Mr. ████.  His introspections into what he

         18    believes, what his perspective is in this case,

         19    it's only his perspective.  Even if he's a

16:34:08 20    relevant purchaser or potential purchaser of XRP,

         21    that's only his belief and his belief may be

         22    biased because he knows the sponsor of -- of his,

         23    quote/unquote, analysis.

         24         Q.    So can Mr. ████ provide a nonscientific

16:34:33 25    opinion regarding the perspective of a reasonable

                                                              216

16:34:39  1    XRP purchaser based on his specialized experience

          2    in digital assets?

          3                        MR. OPPENHEIMER:   Objection

          4              to form.

16:34:53  5         A.    From the scientific perspect -- from a

          6    scientific point of view, the reasonable

          7    purchaser -- until -- unless we're talking about

          8    imaginary people and their imaginary thoughts, a

          9    reasonable purchaser is a representation of an

16:35:12 10    average -- of average across actual purchasers.

         11              Usually it's infeasible to reach every

         12    single purchaser, so a sample of the purchasers is

         13    evaluated.  That becomes a survey.  If we're also

         14    interested in a causal proposition with respect to

16:35:36 15    the perspective, that would be a survey with a

         16    control group or some other experiment.

         17         Q.    So if we're not talking about a

         18    cause-and-effect situation and we're just speaking

         19    about evaluating how XRP purchasers viewed certain

16:35:59 20    statements and actions by Ripple, is your

         21    testimony that there's no nonscientific method of

         22    doing this?

         23                        MR. OPPENHEIMER:   Objection;

         24              asked and answered.

16:36:11 25              You can answer again.

                                                              217

16:36:17  1      A.   When you say that consumers viewed

       2  certain statements, that's the impact of those

       3  statements on consumers' perception.  So that's a

       4  causal proposition.

16:36:28  5      Q.   Isn't that a separate theory from

       6  viewing -- from having a perspect -- a perception

       7  about a statement and whether the statement caused

       8  a certain perception?

       9           MR. OPPENHEIMER:   Objection

16:36:41 10      to form.

      11      A.   If a person has a perception of a

      12  statement and wouldn't have the same perception

      13  without that statement, then the statement causes

      14  that perception.

16:37:02 15      Q.   Is there any way that the perception

      16  could exist prior to the person even hearing the

      17  statement?

      18      A.   If a perception exists prior to the

      19  person hearing the statement, then that perception

16:37:14 20  is not caused by the statement.

      21      Q.   Okay.

      22      A.   And if such a perception exists, that's

      23  what's called a preexisting belief and that's what

      24  an experiment controls for.

16:37:40 25      Q.   You would do the experiment if you're

                                                          218

16:37:42 1    trying to determine cause and effect?

2                      MR. OPPENHEIMER:  Objection

3              to form.

4         A.   An experiment is a gold standard of

16:37:51 5    evaluating causal propositions.

6         Q.   Okay.

7                      MS. GUERRIER:  Okay.  I

8              don't have any other questions.

9                      MR. OPPENHEIMER:  Okay.  Can

16:37:57 10            we go off the record for just a

11            minute for me to circle my notes?

12                      THE VIDEOGRAPHER:  Okay.

13            Going off the record at 4:38.

14                      (Whereupon, a recess is taken.)

16:40:55 15            THE VIDEOGRAPHER:  Okay.

16            Back on the record, 4:41.

17    CROSS-EXAMINATION

18    BY MR. OPPENHEIMER:

19        Q.   You were asked some questions earlier

16:41:00 20   about the meaning of the term "placebo."

21            Can you clarify what the scientific

22    definition of a placebo is?

23        A.   A placebo is a stimulus that's the same

24    as a test stimulus except for the aspect that's

16:41:16 25   being tested.

                                                        219

16:41:19  1      Q.  You were also asked some questions about

2  whether certain causal statements in Mr. ████

3  report used the word "cause."

4       Is it possible to state a causal

16:41:28  5  inference or a causal conclusion without using the

6  word "cause"?

7      A.  Yes, it's possible.

8          MR. OPPENHEIMER:  No further

9        questions.

16:41:37 10         MS. GUERRIER:  I don't have

11        anything.

12         THE VIDEOGRAPHER:  Okay.

13        This concludes the video deposition

14        of Kristina Shampanier.  I said it

16:41:46 15        right.  The time is 4:41.  Going off

16        the record.

17         (Whereupon, the deposition

18        concluded at 4:41 p.m.)

19

20

21

22

23

24

25

220

```
 1    STATE OF NEW YORK        )

 2                             ) ss:

 3    COUNTY OF NEW YORK       )

 4             I hereby certify that the witness in the

 5    foregoing deposition, KRISTINA SHAMPANIER, Ph.D. was by

 6    me duly sworn to testify to the truth, the whole truth

 7    and nothing but the truth, in the within-entitled cause;

 8    that said deposition was taken at the time and place

 9    herein named; and that the deposition is a true record of

10    the witness's testimony as reported by me, a duly

11    certified shorthand reporter and a disinterested person,

12    and was thereafter transcribed into typewriting by

13    computer.

14             I further certify that I am not interested in

15    the outcome of the said action, nor connected with nor

16    related to any of the parties in said action, nor to

17    their respective counsel.

18             IN WITNESS WHEREOF, I have hereunto set my hand

19    this 22nd day of December, 2021.

20             Reading and Signing was:

21    ___ requested    ___ waived    _X_ not requested.

22

23

24

25             BRIDGET LOMBARDOZZI, CSR, RMR, CRR
```

221