# Exhibit K

1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        HONORABLE VALERIE BAKER FAIRBANK

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    – – –

6   United States of America,      )
                    PLAINTIFF,   )
7                                  )
    VS.                            )   NO. CR05–198VBF
8                                  )
    Stephen C. Sayre,             )
9                    DEFENDANT,   )
    _____)

10

11

12

13        REPORTER'S TRANSCRIPT OF PROCEEDINGS

14            LOS ANGELES, CALIFORNIA

15           WEDNESDAY, JULY 16, 2008

16            JURY TRIAL – DAY EIGHT

17

18

19

20    _____

21          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
22          312 North Spring Street, #436
            Los Angeles, California 90012

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF,

4    UNITED STATES OF AMERICA:      U.S. DEPARTMENT OF JUSTICE
                                     U.S. ATTORNEY'S OFFICE
5                                    BY:  RICHARD ROBINSON, AUSA
                                     312 NORTH SPRING STREET
6                                    TWELFTH FLOOR
                                     LOS ANGELES, CA  90012
7

8

9    FOR THE DEFENDANT:
          STEPHEN C. SAYRE
10         DEFENDANT PRO SE

11

12   ADVISORY COUNSEL TO DEFENDANT:
          DAVID REED
13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, JULY 16, 2008

2                              8:30 A.M.

3                              - - - -

4

5

6          (The following proceedings were held in open court

7           outside the presence of the jury:)

8

9          THE COURT:  Good morning.  It is 9:05.  We can get

10   started on jury instructions pertaining to the securities

11   fraud charges.

12          Last night at the request of defendant and his

13   advisory counsel, I concentrated on reviewing and

14   arriving at a tentative on the jury instructions

15   pertaining to the securities fraud charges.

16          After carefully reviewing the matter last

17   night, I fail to see how and why the defense needed some

18   resolution in the jury instructions before presenting

19   their expert, but I did nevertheless prepare a two-page

20   written tentative which I will go over with you now.  Of

21   course, this is just a tentative.  The court will not

22   finally resolve jury instructions until after all the

23   evidence has been presented.

24          I had my staff give each side a copy of the

25   tentative rulings.  I will go through them, and I will

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    invite argument by both sides as appropriate on the jury

2    instructions.

3           Looking at the government's jury instructions

4    first, beginning with instruction -- proposed instruction

5    number 35, the court's tentative is to give that

6    instruction.

7           Next, with respect to the government's

8    proposed instruction 36, which is similar to the

9    defendant's proposed instruction 32, as stated yesterday,

10   the court's instruction is -- the court's tentative is to

11   give a modified version of both instructions consistent

12   with Ninth Circuit model instruction 9.7.

13          In other words, the court, looking at the

14   government's proposed instruction 36, would give the

15   government's proposed instruction 36 as presented.

16          Then, looking at the defendant's proposed

17   instruction 32, the court would give certain of the

18   additional paragraphs requested by the defendant which

19   are taken from 9.7.

20          Looking at the defendant's proposed

21   instruction number 32, lines 22 through 26, this is on

22   page 35 of the defendant's submission, the court would

23   give that instruction.

24          With respect to page 36, lines 1 through 3,

25   the court questions whether that is necessary in light of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    other parts of the instruction on page 35, lines 16 to

2    17, and other instructions, but I will give lines 1

3    through 3.  I will consider giving it.  And I would give

4    on page 36 lines 5 and 6.

5           So essentially, the tentative is to give the

6    government's and then -- proposed instruction 36 and then

7    give the portion of defendant's proposed instruction 32,

8    which adds to the government's.  In other words, merge

9    the two.

10          Next, continuing with the government's

11   proposed instruction, the court's tentative is to give

12   the government's proposed instructions 37, 38, 39, 40.  I

13   would hear argument on 41, but the tentative is to give

14   it as requested.  42, tentative to give.

15          Government's 43, the tentative is to give the

16   second paragraph, lines 9 through 12.  I would ask for

17   argument on whether the court should give the first

18   paragraph.  There is a question in my mind as to whether

19   the first paragraph in the government's proposed 43 is

20   necessary in light of the fact that the court is

21   essentially giving model -- Ninth Circuit model jury

22   instruction 9.7, which is contained in the blended

23   version of the government's 46 and the defendant's 33.

24          The court would give government's proposed 44,

25   45, and then we get to the government's proposed 46 which

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    pertains to the definition of material.

2            MR. REED:  And this is the big area, Your Honor.

3            THE COURT:  And I realize that from looking at the

4    papers, but, again, in considering the matter, I feel

5    that the argument that the court needed to decide these

6    and recess early and decide these before the expert

7    testimony continued lacked credibility, but,

8    nevertheless, out of an abundance of caution, I took a

9    break yesterday, and I am reviewing these now.

10           So looking at the government's proposed 46 and

11   the defendant's proposed 33 as set forth in the court's

12   tentative, the court would give the government's proposed

13   46 with a possible modification of paragraph 3 of the

14   government's 46.

15           The instruction, government's proposed 46,

16   particularly paragraphs 1 and 2 of the instruction, finds

17   support in the case law, including TSC Industries, U.S.

18   versus Brooks, U.S. versus Tarrallo, T-A-R-R-A-L-L-O.

19           And I would also refer to the Zweig case,

20   Z-W-E-I-G, 594 F2nd 1261 at 1266.  In that case, the

21   Ninth Circuit stated:  "The appropriate test for

22   materiality of an admitted fact is whether there is a

23   substantial likelihood that a reasonable investor would

24   consider the fact important in making his or her

25   decision."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          The government's proposed 46 is more

2    consistent with model instruction 9.7 than the

3    defendant's proposed 33.  The court would tentatively

4    reject the defendant's proposed 33 as not necessary.  The

5    concept set forth in defendant's 33 relating to the

6    definition of materiality are more appropriately covered

7    by the government's and more accurately covered by the

8    government's proposed instruction 46.

9          So the tentative would be to grant the

10   government's proposed 46, though I have a question as to

11   the third and last paragraph, and deny the defendant's

12   proposed 33 as unnecessary and adequately covered and

13   more appropriately covered by the other instructions.

14          Of course, however, the defendant can argue

15   total mix to the jury and can make that -- can make an

16   argument relating to total mix, but it is not necessary

17   to have this in an instruction.

18          Then, with respect to the government's 47, the

19   tentative is to give.

20          With respect to the government's 48 regarding

21   the term willfully, the court's tentative is to give the

22   government's proposed 48 and to refuse the

23   defendant's 40.

24          The government's instruction accurately states

25   the law and is supported by the case law cited, including

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the Tarrallo case, 379 F.3d 1174.  The defendant's

2    proposed instruction number 40 lacks support and, in

3    fact, is misleading in certain respects, for example, to

4    the extent it implies that knowingly is required.

5          Then, looking at the rest of the government's

6    instructions as to the substantive issues, the court's

7    tentative is to give 49, 50.  The court would give 51 but

8    questions whether it is applicable.  I assume it is, and

9    it is based upon Ninth Circuit model instruction 5.9.  So

10   I would give it as requested tentatively.  Same with

11   respect to -- the court would give 52.

12         With respect to the government's proposed

13   instruction 53, which is based on the Ninth Circuit model

14   instruction 4.17, the court would give this instruction,

15   53.

16         MR. ROBINSON:  Your Honor --

17         THE COURT:  But it seems to be a duplicate of 50.

18         MR. ROBINSON:  I'm sorry, Your Honor.  I was going

19   to point that out.  It was a mistake.  We duplicated it.

20   It wouldn't apply.

21         THE COURT:  All right.  So 53 is withdrawn.

22         Then, 54 I would give.  There was an extra

23   page 58, so that would be disregarded.  55, the

24   government's proposed 55, I would give, and this seems to

25   be the same as the defendant's 28.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        Then turning to the defendant's proposed

2   substantive instructions, the court would -- has already

3   addressed 32 and 33.  I would give part of 32 as stated.

4        I would tentatively reject defendant's 33.

5        With respect to the defendant's 34, the

6   court's tentative is to refuse.  I find the lack of

7   support -- legal support for this instruction, having

8   read the cases cited.

9        With respect to 35 and 36 of the defendant's

10  proposed instructions, the court's tentative is also to

11  refuse, finding these are essentially redundant, they are

12  not necessary, and that they duplicate other instructions

13  that the court is giving.

14       With respect to the defendant's 37, the

15  court's tentative is to refuse.  There is a lack of

16  support for this instruction.  Furthermore, the

17  instruction is unnecessary especially in light of the

18  other instructions which the court intends to give, and I

19  would refer to the Ninth Circuit case of SEC versus Rana

20  Research, 8 F.3d 1358 at 1362.

21        With respect to instruction 38, the

22  tentative is to refuse this instruction as worded.  The

23  last sentence of the instruction, for example, is

24  over-inclusive and inaccurate and inappropriate to the

25  extent it tells the jury how to look at certain evidence.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   The last sentence reads:  "Thus, for example, statements

2   that are optimistic predictions for a company's

3   performance are not misstatements of material facts about

4   a company or its stock."  That is not accurate.  It is

5   over-inclusive, and it is instructing the jury on how

6   they should consider the evidence.  And those kinds of

7   instructions are not proper.

8          I would also refer to the case of U.S. versus

9   Smith and the Tarrallo case, U.S. versus Smith at page

10  1051 in particular.

11         With respect to the defendant's proposed 39,

12  the court's tentative is to refuse.  There is a lack of

13  support for giving this instruction to the jury in this

14  case.  The cases cited do not support giving this

15  instruction.

16         With respect to 40, the court would --

17  defendant's proposed 40, the court would also deny.

18         With respect to 41, the court would deny.

19  This instruction is not necessary.  It is more

20  appropriately addressed in plaintiff's proposed 51 which

21  is based upon model jury instruction 5.9.

22         With respect to 42, I would hear argument from

23  both sides.  I don't have a tentative on defendant's 42.

24         With respect to 43, the court would refuse as

25  worded, noting that the instruction appears incomplete

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    and inaccurate.  In any event, I would not advise the

2    jury the Ninth Circuit has held.  But I will hear

3    argument as to 43.

4              With respect to 44, I would also hear

5    argument.  I question whether there is sufficient legal

6    support for giving this instruction, and I question

7    whether there is a factual basis for the instruction, in

8    any event.  So I would hear argument on 44.

9              On 45, I would refuse as unnecessary.  It is

10   repetitive and covered adequately by the other

11   instructions.

12             These appear to be the only disputed

13   instructions.  As to the introductory instructions, both

14   sides essentially proposed the same instructions.

15             Mr. Robinson, before I turn to the defense,

16   I would ask you if the government has any questions or

17   clarification.

18        MR. ROBINSON:  May I have a moment just to review

19   my notes, Your Honor?

20        THE COURT:  Sure.  I will take a couple minute

21   break, if you like, both sides.  We will start at 9:30 as

22   soon as the jury is here.

23        MR. SAYRE:  Your Honor.

24        THE COURT:  Yes.

25        MR. SAYRE:  If I could address the issue

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    regarding -- regarding jury instruction 33 because the

2    evidence is overwhelming --

3          THE COURT:  Why don't I take a couple of minute

4    break, and then we will get to that.  I will make sure

5    that we have at least five minutes before we start.

6          THE CLERK:  This court is in recess.

7               (Brief recess.)

8          THE COURT:  Mr. Robinson -- I am noting that both

9    sides are here -- any questions regarding the court's

10   tentative -- and I would state it is just a tentative --

11   or any clarification?

12         MR. ROBINSON:  No, Your Honor.  I think that, if I

13   may, I could just respond to the court's position.

14              With respect to government's instruction 36 as

15   modified, the government has no objection to the court's

16   modification but agrees with the court that the second

17   paragraph from defendant's instruction that refers to

18   whether the false statement went through the mail is

19   probably not necessary under the facts of this case and

20   in light of other instructions we have.  And so I would

21   suggest that we don't use that second paragraph of

22   defendant's 42, but we use the first and the third

23   paragraphs which the court wanted used.

24              I would just note, Your Honor, that lack of

25   reliance was covered in a different government

1   instruction, but if the court prefers to consolidate it

2   into one, we have no objection to that.  So we are fine

3   with that, Your Honor.

4          With respect to government's 43, the court, I

5   believe, indicated that the first paragraph seemed to be

6   redundant with other instructions, but the second

7   paragraph is okay.  That is fine with the government,

8   Your Honor.

9          THE COURT:  All right.

10          MR. ROBINSON:  And then with respect to

11   government's instruction number 46, the third paragraph,

12   Your Honor was not convinced that the case law clearly

13   supported that third paragraph.  And, frankly, Your

14   Honor, I have only quickly read the cases that we cited,

15   but I would invite the court's attention to a passage in

16   the Supreme court's decision in TSC Industries, which is

17   one of the cases we cited.

18          THE COURT:  All right.

19          MR. ROBINSON:  And, Your Honor, at page 2130 of

20   that opinion, next to headnote 1, the court says:  "The

21   question of materiality, it is universally agreed is an

22   objective one involving the significance of an admitted

23   or misrepresented fact to a reasonable investor.

24   Variations in the formulation of a general test of

25   materiality occur in the articulation of just how

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    significant a fact must be, or, put another way, how

2    certain it must be that the fact would affect a

3    reasonable investor's judgment."

4         And so, Your Honor, I think that that does

5    support the third paragraph where it says the question is

6    whether it had a capacity or potential to influence the

7    person's decision.

8         The first part which says the test is not

9    whether somebody actually made a decision or lost money

10   based on the act, I think is well supported in the law,

11   including the Ninth Circuit instruction on securities

12   fraud.  So mainly, this latter portion of the paragraph I

13   assume the court is concerned about --

14        THE COURT:  Right.

15        MR. ROBINSON:  -- about whether it had a capacity

16   or potential to influence a person's decision.  And I

17   think that is supported by TSC Industries, in particular

18   the passage I just quoted before.

19        THE COURT:  All right.  Thank you.

20        Mr. Sayre, as to the court's tentative, I

21   would invite your response as appropriate.

22        MR. SAYRE:  Yes, Your Honor.  As you heard,

23   Mr. Robinson redundantly cited TSC Industries.  That is

24   exactly where the quote from our jury instruction 33

25   comes from.  It is replete throughout every district

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    court --

2          THE COURT:  I read that case, and I found that

3    quote.  The question in my mind is simply because there

4    is a statement in a case, does that support giving the

5    instruction, quoting that statement?  I found not in this

6    instance.

7          MR. SAYRE:  Your Honor, this involves a news

8    release.  How could it be more appropriate, the total mix

9    instruction?  If I could just please make the statements

10   here and go through this.

11         THE COURT:  Sure.

12         MR. SAYRE:  The following quotation is from 15

13   USCS --

14         THE COURT:  Please, Mr. Sayre --

15         MR. SAYRE:  Yes.

16         THE COURT:  -- if you want a record, slow down.

17   The court reporter can't follow that, you reading

18   quickly.

19         MR. SAYRE:  I just wanted to make sure I could get

20   the information in, but I will slow down.  The following

21   quotation is from 15 USCS, Section 78(j), commentary

22   section of the United States Code Service 2007.

23           "To assert a viable section 10(b) claim,"

24   which is exactly what we are dealing with here, "the

25   plaintiff must establish a number of elements.  First,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  any misstatement or omission must be material.  Whether a

2  particular misstatement or omission is material involves

3  a factual inquiry into whether there is a substantial

4  likelihood that an accurate disclosure would have been

5  viewed by a reasonable investor as having significantly

6  altered the total mix of information."  Couldn't be much

7  more clear, that comes directly from the --

8         THE COURT:  Correct.  And you elaborate on this in

9  your proposed jury instructions, the argument with

10 respect to defendant's proposed jury instruction 33

11 contained in the defendant's filing at pages 37 through

12 40.

13        MR. SAYRE:  Yes, Your Honor.  And the key issue,

14 as I mentioned previously, is that this is clearly and

15 unequivocally a total mix case.  If there is another case

16 that would be a total mix case above and beyond this one,

17 I would like to know about it because I don't know of

18 one --

19        THE COURT:  As I stated in my tentative, your

20 witnesses can refer to total mix, you can argue total

21 mix, but it is not necessary or appropriate to instruct

22 the jury on total mix.  A jury instruction using the

23 language total mix is not necessary or appropriate.

24 Materiality is adequately covered and more appropriately

25 covered by the government's proposed instruction 46.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1       MR. SAYRE:  May I answer that?

2       THE COURT:  In -- for example, in argument,

3   counsel for both sides could tell the jury, in deciding

4   materiality, you can consider all the facts and

5   circumstances presented by the evidence.  That is what I

6   mean by total mix.

7           But please continue, Mr. Sayre, and then I

8   will give Mr. Robinson an opportunity to respond.

9       MR. SAYRE:  What Mr. Robinson is clearly doing,

10  and it is unequivocal, he is citing half the materiality

11  definition of the case law being used.  I see no logical

12  reason why that should be done just to prejudice the

13  defendant.  That is clearly what is being done.  Why

14  would we cite half of a quotation from a Supreme court

15  case law?  That seems absurd and outrageous.

16          Now, it goes on -- and if you are questioning

17  whether or not it is in civil case law Ninth Circuit, it

18  clearly is because there is a long list.  You cited U.S.

19  versus Smith.  They cite TSC and Basic, and they quote

20  exactly the same quote that I quoted from the U.S. Code

21  Service.

22          And then we go on to the other case law which

23  is cited in the jury instruction itself, and I will turn

24  to that page.  This is the government's exhibit.  We have

25  U.S. versus Reyes, District court in the Ninth Circuit;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   U.S. versus Smith, Ninth Circuit; U.S. versus Bringham,

2   Ninth Circuit; U.S. versus Margala, Ninth Circuit; U.S.

3   versus DiIanni.  And those are the criminal case laws

4   that cite TSC and/or Basic, which is identical as far as

5   the issue of materiality.

6           My question is, why should we simply cut off

7   half the definition of materiality to support the

8   prosecution?  It seems a bit outrageous because this is a

9   total mix case.

10      THE COURT:  Thank you.  Mr. Robinson.

11      MR. ROBINSON:  Your Honor, this may take more than

12  a couple of minutes.

13      THE COURT:  I am going to ask my clerk to check on

14  the jurors.  A few minutes ago, I was advised that we

15  still had two jurors missing.  I do not want to keep them

16  waiting.  It is not necessary.  So as soon as the jurors

17  are here, let me know, and we will start, Ms. Bradshaw.

18          Mr. Robinson.

19      MR. ROBINSON:  Thank you, Your Honor.  I just

20  wanted to say that in case I get cut off, I would like to

21  pick up later, if I have an opportunity.

22          Your Honor, the government made this point in

23  its motion in limine, and I would stress it again here.

24  The language that references total mix which appears in

25  numerous securities fraud cases is not disputed by the

1    government.  We are not saying that that phrase does not

2    appear in the cases, Your Honor.

3            What we are saying, first of all, is that in

4    the context of the securities fraud charged in this case

5    which concerns a scheme to defraud involving false and

6    misleading investment opinions in which the information

7    which is false and misleading does not concern the

8    company being touted, namely, e-Connect, but instead

9    concerns the independence, objectivity, lack of conflict

10   or interest of the person, or in this case the

11   corporation that the person controls touting the stock,

12   that that presents a different context.

13           So the total mix analysis which the defendant

14   wants to use here which does not focus on whether or not

15   the omission or misleading statements in that -- in those

16   opinions about the defendant's objectivity, honesty and

17   lack of conflict of interest, if there is any total mix,

18   it goes to that information, Your Honor.  It does not go

19   to all the other news releases that may have been out on

20   the Internet concerning e-Connect.

21           The problem with the defendant's analysis is

22   they take it so far as to say it is in the total mix,

23   begging the question, the total mix as to what?  The

24   government submits that the only total mix that matters

25   here is the total mix of information which would reveal

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   whether or not defendant's opinions were misleading and

2   whether they were important and whether the misleading

3   information would have been important to an investor or a

4   potential investor reading those opinions.

5          The problem with defendant's analysis is

6   essentially he is claiming that if -- he can cite

7   thousands.  He cited less than a hundred.  But if he

8   could cite thousands and thousands and thousands of

9   articles on the Internet about e-connect as the total

10  mix, somehow that drowns out his fraudulent conduct in

11  presenting those investment opinions.

12         And I defy him to cite a single case in which

13  the court has ever recognized a defense to the kind of

14  securities fraud claim that we have here about a

15  fraudulent representation relating to the capacity and

16  the lack of conflict of interest of somebody touting the

17  stock, where any court has ever said, oh, you can defend

18  on materiality in a case like that by just talking about

19  how many other people are discussing, not you, but the

20  company.

21         So, Your Honor, not only do we think that a

22  jury instruction on total mix that would contemplate

23  allowing the defendant to argue that his fraud is drowned

24  out by the fact that other people wrote not about him,

25  not about IFR, but about e-Connect, misstates the law and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    would mislead the jury.

2           And the absurd practical consequences of that

3    standard would be, how would you prove securities fraud

4    if you were dealing with Microsoft or Apple, a company in

5    which there is countless things on the Internet or in

6    publications at any given time?  Would that be the total

7    mix in deciding whether a defendant charged with

8    securities fraud had engaged in a scheme to defraud by

9    giving investment opinions, simultaneously trading

10   against those investment opinions and not revealing what

11   he was doing?  I would say no, Your Honor.  That defies

12   common sense.

13          So the government has a fundamental objection

14   to the use of the total mix to contemplate information

15   that relates not to defendant and the IFR opinions and

16   whether or not they are false and misleading or

17   important, but instead to just what people are saying

18   about e-Connect.

19          There is no support that I have seen in the

20   thousands of pages I have read of those cases that he has

21   cited where a defense was ever raised and approved by any

22   court that allowed the total mix analysis to be applied

23   in that fashion.  So that is our problem with total mix,

24   Your Honor.

25          THE COURT:  Thank you.  Mr. Sayre.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    And I would ask -- I understand we still have

2  one juror missing; is that correct?

3    THE CLERK:  Yes, Your Honor.

4    THE COURT:  Yes, Mr. Sayre.

5    MR. SAYRE:  Your Honor, his argument is totally

6  erroneous.  First of all, the definition of materiality

7  is what we are dealing with here.  Not his definition,

8  but TSC's definition by his own insistence.  He is

9  cutting the definition in half, and he is justifying it

10  because he wants to call the fact that I omitted an

11  irrelevant fact a fraud.  And since I committed

12  Mr. Robinson's fraud, I have no right to defend myself.

13  This is clearly what is being said.  It is ludicrous.

14    Now, in regard to there being no precedent,

15  there is no precedent for a case like this.  I challenge

16  Mr. Robinson to even find a case that vaguely represents

17  somebody who omitted a fact, who managed a company, had

18  an investment in the company he is writing about.  It

19  doesn't exist because I read all the case law.

20    MR. ROBINSON:  The court has already ruled to the

21  contrary, Your Honor, as the court may recall on his

22  motion about materiality.

23    MR. SAYRE:  If I could speak to this issue?

24    THE COURT:  Yes, Mr. Sayre.

25    MR. SAYRE:  And then in regard to the materiality

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   issue, we have Apple Computers, he was asking how can

2   Apple Computers determine total mix in the case law, and

3   he says it doesn't exist.  It is right here in Ninth

4   Circuit.  They determined that clearly false and

5   misleading statements about the CEO and president were

6   not misleading because of the total mix of information on

7   the market, so that is clearly another false statement.

8   It is clearly here.  It is Apple Computers, 672 F.Supp at

9   1561.  It was dismissed by a motion to dismiss it.  It --

10        THE COURT:  I'm sorry.  Would you state that cite

11   again?

12        MR. SAYRE:  It was 672 F.Supp at 1561.

13        THE COURT:  All right.

14        MR. SAYRE:  And this case law is specifically what

15   he is saying does not exist.  And it clearly does exist.

16            And in regard to the issues related to this

17   case, the total mix is the entirety of the case because

18   the defendant in any case such as this couldn't possibly

19   have the intent unless the omission was material, because

20   if it wasn't a material omission, he couldn't have had

21   the intent to influence the market.  This is the whole

22   purpose of total mix.

23            He is trying to clearly misconstrue the law,

24   and he is trying to quote half of the total mix

25   definition, TSC and Basic, which are the two Supreme

1    court decisions that every district court and every Ninth

2    Circuit court uses as a definition of materiality in

3    cases where there were press releases released.

4         THE COURT:  Thank you.

5         MR. ROBINSON:  Your Honor, I could just respond to

6    Apple, and that is all I will say.  Your Honor, I have

7    read the Apple case.  The Apple case was a puffing case.

8    It was a case in which the securities fraud had to do

9    with vague and overly optimistic projections about how

10   certain Apple products would work.

11        And in that context, which is completely

12   different than the context we have here, the court looked

13   at whether the total mix of information that the market

14   knew about Apple's products would make them false and

15   misleading.

16        And so I would grant that if the question is

17   somebody has puffed up a description about a company's

18   product and in the total mix of the marketplace there is

19   ample information that is just puffing and would not

20   mislead anybody, then the total mix can apply.  But that

21   is not the context which we are addressing in this case.

22   Apple provides no help to the defendant.

23        MR. SAYRE:  Your Honor, if I could just make

24   one last statement in regard to this same issue.

25   Clearly, it still goes to intent.  He is trying to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  whitewash the Apple Computer situation.  They stated very

2  clearly, "Lisa is going to be phenomenally successful in

3  the first year out of the chute."

4         THE COURT:  Wait.  Please slow down when you read

5  from a document for the reporter.

6         MR. SAYRE:  Mr. Jobs, the CEO and president, and

7  the other principle executive for Apple Computers, made

8  the following two statements which they knew to be false:

9  "Lisa is going to be phenomenally successful in the first

10 year out of the chute."  They knew that they couldn't get

11 even get this system operating at this point, and they

12 didn't even know if there was any possibility of

13 marketing this product.  And this is in the case law.

14         Then the other statement that was made and

15 quoted in the Wall Street Journal, not some unknown

16 article, omitting a fact that somebody managed the

17 company and whatever remote theory that Mr. Robinson has

18 devised, "This division that developed Lisa is going to

19 make Apple's growth before this look small."  They said

20 this knowing that it was not likely that they could even

21 successfully market this product.  It was a clear and

22 intentional lie.  It had nothing to do with puffing.

23         THE COURT:  The court's tentative remains.  The

24 court will give the government's proposed jury

25 instruction 46 and refuse the defendant's proposed jury

1   instruction 33 for reasons set forth in the court's

2   tentative and as further articulated by the prosecutor,

3   Mr. Robinson, this morning.  I find his points are all

4   well taken and supported by the law.

5           The tentative will be filed and served as a

6   tentative along with a more thorough minute order

7   explaining the court's tentative on these issues.

8           We are still waiting for one juror.  That

9   juror's family has confirmed that he should be here soon,

10  so it should be a couple of minutes.  We will take a

11  break and then start as soon as that juror is here.

12  Thank you very much.

13          MR. ROBINSON:  Thank you, Your Honor.

14          THE CLERK:  This court is in recess.

15              (Brief recess.)

16          THE COURT:  The jurors are all here, and we will

17  get started.

18

19      (The following proceedings were held in open court

20       in the presence of the jury.)

21

22          THE COURT:  Good morning, ladies and gentlemen.  I

23  note the presence of the jurors, counsel and parties for

24  both sides, and the witness has returned to the witness

25  stand.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Sir, I would remind you that you were

2    previously sworn and you are still under oath.  Would you

3    state your name again for the record?

4          THE WITNESS:  Carl R. Knudson.

5          THE COURT:  Thank you, Mr. Knudson.

6          Mr. Sayre, please continue.

7

8          DIRECT EXAMINATION (Res'd)

9    BY MR. SAYRE:

10   Q    We left off with a few questions regarding your

11   experience and such.  In addition to your work with the

12   IRS and the U.S. Treasury Department as a special agent,

13   you worked with the CIA and Naval Intelligence as well,

14   did you not?

15   A    Yes, I did.

16         MR. SAYRE:  I think if the reporter might be able

17   to indicate where we left off, I am having trouble --

18         THE COURT:  No, that is not appropriate, but I

19   believe yesterday when we adjourned, the witness had been

20   asked questions regarding 2291, Exhibit 2291.

21         MR. SAYRE:  Oh, yes.

22         THE COURT:  And he was discussing how 2291 was

23   prepared, the number of releases before the first IFR,

24   referring to page 3, 2291, and a redacted version of 2291

25   was admitted into evidence and permission was given to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    publish it to the jury.

2        MR. SAYRE:  Okay.  Well, I am going to try to

3    figure it out because 2291 is several pages.

4    Q    I will just start and you tell me if you have

5    answered these questions.  Does your Exhibit 2291 list

6    other press releases issued by e-Connect and Prima

7    Capital during the same time period?

8    A    Yes, they do.

9    Q    And does your analysis indicate whether Silver

10   Screen Industries purchased or sold e-Connect stock

11   immediately before or after its second release?

12   A    The second release from IFR occurred on March 1st,

13   2000, 6:03 a.m. in the morning, and the closest purchase

14   of Silver Screen stock occurred on the 28th,

15   February 28th, at 9:43 in the morning.  So when you ask

16   immediate, I would say no.

17   Q    And does your Exhibit 2291 show that Silver Screen

18   Industries subsequently sold their stock in e-Connect?

19   A    Yes, they did.  Look at page 3 of Exhibit 2291, and

20   the green shaded area indicates a sell of Silver Screen

21   stock on March 2nd.  All of their holdings were sold

22   within about 30 minutes, between 11:00 o'clock --

23   11:00 o'clock on March 2nd.

24   Q    Does your Exhibit 22291 show the price that the

25   stock was being sold at?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    Yes, it does.

2    Q    Does your Exhibit 2291 show that the price of

3    e-Connect was falling from $4.43 per share to

4    approximately $3.5 per share during that same time

5    period?

6    A    Yes, it does.

7    Q    So after IFR released the March 1st, 2000 release,

8    did the price ultimately fall on March 2, 2000?

9    A    Yes, it did.

10   Q    Did Silver Screen make a profit from their sale of

11   e-Connect?

12   A    Yes, they did.

13   Q    Does your profit calculation coincide with the

14   profit number provided by Mr. Loveman?

15   A    Yes.  If you'd look at Exhibit 2291 and you look at

16   the last row colored in green, you will see in the

17   running proceeds without fees, because there is a profit

18   calculation of $246,679.92.

19   Q    And drawing your attention to 2291 at page 3, the

20   last row, does this row show a purchase of e-Connect

21   stock by Silver Screen?

22   A    Yes, it does.  The last two rows show that there

23   were approximately 80,000 shares of Silver Screen -- of

24   e-Connect purchased by Silver Screen.

25   Q    And so would it be fair to say that Silver Screen

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    purchased e-Connect stock back -- I'm sorry, let me

2    restate that.

3           Would it be fair to say that Silver Screen

4    purchased the e-Connect stock back the day after it had

5    sold the e-Connect stock?

6           MR. ROBINSON:  Objection.  Leading.

7           THE COURT:  Sustained.

8    Q    BY MR. SAYRE: What occurred in the trading in those

9    two days, the March 2nd and the March 3rd trades1

10   A    March 2nd, Silver Screen sold their complete

11   holding in e-Connect stock, and then March 3rd -- let me

12   clarify that.  They sold 96,100 shares on March 2nd.  And

13   on March 3rd, they purchased 80,000 shares of e-Connect

14   stock.

15   Q    Was Silver Screen purchasing stock that was

16   increasing in value?

17   A    The purchase on the 3rd shows that the stock was

18   selling at -- or was purchased at $4.6562 per share, and

19   the second purchase of 56,900 shares was purchased at

20   $4.6875, so the stock was rising at that point.

21   Q    So the difference between the shares was 96,100

22   shares were sold, 80,000 shares were purchased.  What was

23   the total sell and buy amounts?  What was the total

24   amount of the sale, and what was the total amount of the

25   buy-back on the 3rd?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      Well, the difference between 96,180, just as a

2    point of clarification, there were additional purchases

3    of e-Connect stock a few days later which brought the

4    total holding up to 81,200.

5            I have done a rough calculation, and I think

6    the difference is 14,900 shares that was the difference

7    between when they sold it at 96,100 and when they

8    purchased it back at 81,200.

9    Q      So the difference in purchase price and sale price

10   in total, is that calculated on the chart?  In other

11   words, the sale on March 2nd was for what total gross

12   amount?

13   A      It was 246,000.  Those were the sells.

14   Q      And what was the repurchase total?

15   A      The repurchase totals were 266,000 plus 7000.

16   About 273.

17   Q      So significantly higher to buy less stock?

18   A      Yes.

19   Q      And what was the dollar amount per share that

20   Silver Screen purchased e-Connect stock for on March 6,

21   2000?

22   A      If you go to it page 4 --

23   Q      Page 4, yes?

24   A      -- of Exhibit 2291, you will see color coded purple

25   right in the middle of the chart.  And there are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  two purchases on March 6th for 500 shares and 700 shares,

2  and they were purchased at $7.10 per share.

3  Q     Therefore, Silver Screen was continuing to purchase

4  e-Connect stock despite the fact that the market on the

5  stock was rising?

6        MR. ROBINSON:  Objection, Your Honor.  Leading.

7        THE COURT:  Sustained.

8  Q   BY MR. SAYRE: What was Silver Screen doing under

9  these circumstances when it was purchasing stock for a

10 greater value?  Can you simply describe what was

11 happening at that time in regard to the pricing and the

12 increase in pricing and what Silver Screen Industries

13 was doing regarding its trading activity?

14 A     Well, the -- Exhibit 2291 shows that Silver Screen

15 was continuing to purchase a small amount at a higher

16 rate.

17 Q     The total buy-back was significantly greater than

18 the sale previously?

19       MR. ROBINSON:  Objection.  Leading.

20       THE COURT:  Sustained.

21 Q   BY MR. SAYRE: All right.  Was the sale on March 2nd

22 significantly less than the purchase price on March 3rd?

23 A     Yes.  If you look at the colored shaded green on

24 page 3, you can see that the sales of Silver Screen were

25 at the top of $4.4 per share, and the last entry is 3.5

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   for 33,700 shares.  So they are -- Silver Screen is

2   selling stock in a declining market or at least at a

3   declining profit.

4           And when they then start repurchasing the

5   following day, they are buying it back at $4.06, or 60

6   cents per share, which is an indication that the market

7   is on the upswing again and they are paying more.

8   Q    So this -- was this sell on March 2nd and there is

9   a buy-back on March 3rd strategically or mathematically

10  practical?

11       MR. ROBINSON:  Objection.  Leading, vague and

12  ambiguous.  Calls for speculation as to strategy.

13       THE COURT:  Sustained.

14  Q  BY MR. SAYRE: Would this have led to a loss of

15  potential profit in the future?

16  A    Yes.

17       MR. ROBINSON:  Objection.  Ambiguous.

18       THE COURT:  Sustained.  Lack of foundation as

19  well.

20  Q  BY MR. SAYRE: When was the next IFR release,

21  according to your Exhibit 2291?

22  A    The next release after March 1st was on March 3rd.

23  That is at the top of page 4 on Exhibit 2291.

24  Q    According to this exhibit, where were the other

25  press releases -- were there other press releases issued

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  during that same period of time?

2  A    Well, there was the press release we just talked

3  about on March 1st.

4  Q    Oh, no.  I am referring to other companies' press

5  releases.

6  A    Oh, yes.  Yes, there were.  I mean, there were --

7  Q    Where would we find that information?

8  A    On March 3rd, if you just look at the date and you

9  look at the press releases associated with that date, you

10 will see that there are a number of businesses issuing

11 releases with respect to the e-Connect stock.

12 Q    Could you read those press releases for the jury,

13 which ones were released on that same day?

14 A    I -- I can read you the headline, but I --

15 Q    Yes, that would be preferable.

16      MR. ROBINSON:  Your Honor, I would object that the

17 underlying press releases haven't been offered into

18 evidence or were admitted.

19      THE COURT:  Sustained.  And Exhibit 2291 has been

20 admitted into evidence and speaks for itself.

21 Q    BY MR. SAYRE: We will continue while we are putting

22 together the appropriate information for the exhibit.

23 What was the --

24      MR. SAYRE:  We are going to have the same issue on

25 this question, then.  Actually, almost all these next

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    questions pertain to that exhibit.  So we will -- I think

2    in just a few minutes we will have this --

3           Your Honor, I would like to ask the court to

4    introduce Exhibit 2001.

5           THE COURT:  2001 will be marked for

6    identification.

7           MR. SAYRE:  Thank you, Your Honor.

8    Q      And, Mr. Knudson, you are reviewing the total mix

9    at this time; is that correct?  Do you have a copy of

10   it --

11   A      Yes.  I am reviewing the press releases that are

12   marked under Exhibit 2001.

13   Q      And have you previously reviewed those press

14   releases?

15   A      Yes, I have.

16   Q      And those press releases you currently have in

17   front of you are accurate representations of the previous

18   press releases you had reviewed?

19   A      Yes.  These are the press releases that are

20   evidenced by the Bates number on Exhibit 2291.

21   Q      Government discovery?

22   A      Yes.  And also the press releases that I recovered

23   from the Internet that I previously talked about.

24   Q      That have been stipulated to, I believe.

25           And the charts, these charts represent a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  synopsis of the press releases that you have currently as

2  Exhibit 2001; is that correct?

3  A    Yes.

4       MR. SAYRE:  Your Honor, I would like permission to

5  introduce Exhibit 2001 into evidence.

6       THE COURT:  Any objection?

7       MR. ROBINSON:  No objection, Your Honor.

8       THE COURT:  Admitted.

9  Q    BY MR. SAYRE: Mr. Knudson, were we going to

10 reference the first bar chart on February 29, or which

11 exhibit were we referring to?

12 A    I believe if you look on page 4 of 2291, we are

13 talking about a bar chart release with Bates number 3085.

14 Q    Okay.  3085.  All right.  We are locating that.

15       Could we continue without the actual article,

16 possibly?  What is the headline for barchart.com on that

17 particular date?

18 A    Historical opinion for e-Connect.  I recall this

19 release if you wish to ask questions about it.

20 Q    It is the March 3rd bar chart that you were

21 referring to in the chart?

22 A    Yes.  I have a copy of it if you would like.

23 Q    Possibly that would be best.  We will have to get

24 it for you.

25       MR. SAYRE:  Your Honor, if I could ask the clerk

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to bring the copy.

2          THE COURT:  Yes.

3          MR. SAYRE:  We seem to have -- this is March 6.

4    This is actually the Wall Street Directory on March 3rd,

5    so I will project that.  There must have been some type

6    of cross-reference.

7          MR. REED:  Returning this to the clerk, Your

8    Honor, to give to the witness.

9          THE COURT:  Okay.  Thank you.

10   Q   BY MR. SAYRE: All right.  Then in regard to the

11   March 3rd release, the Wall Street Directory, which is

12   the parent company for barchart.com, so there is no

13   confusion in that regard --

14         MR. ROBINSON:  Objection.  The question just

15   stated facts not in evidence.

16         THE COURT:  Sustained.  And the jury should

17   disregar4d the question.

18              Please, Mr. Sayre, simply ask a question

19   without testifying.

20   Q   BY MR. SAYRE: In regard to this opinion from the

21   Wall Street Directory, could you describe what this

22   opinion states and what the statistics represent?

23         MR. ROBINSON:  Objection.  Document speaks for

24   itself, lack of foundation.

25         THE COURT:  Sustained on both grounds.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q   BY MR. SAYRE: All right.  Does this Wall Street

2    Directory of March 3rd exhibit list buy recommendations

3    for e-Connect stock?

4            MR. ROBINSON:  Same objection.  The document

5    speaks for itself.

6            THE COURT:  Sustained.

7            MR. SAYRE:  There must be something that

8    Mr. Knudson can say about the chart?

9            MR. ROBINSON:  If he provides the proper

10   foundation, Your Honor, I won't object.

11           THE COURT:  Noted.

12   Q   BY MR. SAYRE: We already did that, but I will do

13   that again.

14           Was this taken from the government's exhibit?

15   A    Yes, it was.

16   Q    And this is something that has been stipulated to

17   by the government?

18   A    I understand --

19           MR. ROBINSON:  Objection.  Ambiguous as to what

20   the stipulation encompassed.  The court has the

21   stipulation.

22           THE COURT:  Sustained.

23           And the jury should disregard the question,

24   and the answer is stricken.

25   Q   BY MR. SAYRE: is this document taken from

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Exhibit 2001?

2    A    Yes.

3    Q    What does it say?

4         MR. ROBINSON:  Objection.  The document speaks for

5    itself, Your Honor.

6         THE COURT:  Sustained.

7         MR. SAYRE:  Your Honor, can I ask the jury to read

8    it, and we will just sit quietly while the --

9         THE COURT:  The jury will have the exhibits that

10   have been admitted into evidence to read and review

11   during deliberations.

12        MR. SAYRE:  Your Honor --

13        THE COURT:  Please move on.

14   Q   BY MR. SAYRE: All right.  In Exhibit 2291, there is

15   a reference to Prima Capital on March 3rd.  Does that

16   document have a Bates number?

17   A    Yes, it does.

18   Q    You may want to -- on each of these, it may be more

19   efficient if we just take your exhibits, Mr. Knudson,

20   because the number of articles are so time-consuming.

21        MR. SAYRE:  Your Honor, could I ask the clerk on

22   all these issues, it would just expedite things

23   considerably.

24        THE COURT:  What do you want the clerk to do?

25        MR. SAYRE:  To bring all of Mr. Knudsen's exhibits

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   up because we are having such a hard time locating them.

2       THE COURT:  Sure.  As Mr. Knudson hands the clerk

3   the exhibits, she will bring them up to you as directed.

4       MR. SAYRE:  Oh.  All of them?  We have all of

5   them.  We are just having trouble locating the reference.

6       THE COURT:  Do you want her to bring all the --

7       MR. SAYRE:  No, just the individual references.

8       THE WITNESS:  Well, these are in order.

9       MR. SAYRE:  These are in order as well.  I could

10   take a second copy and try to locate them at the same

11   time.  But I think you maybe have more familiarity with

12   the exhibits.  I don't know.

13       THE WITNESS:  Well, I have Exhibits 2531.

14   Q   BY MR. SAYRE: Okay.  Whatever you have would be

15   great.

16   A    It is two pages.

17   Q    Now, this document is part of government's

18   evidence, is it not?

19   A    Yes, it is.

20   Q    It has previously been provided to the government

21   in support of our Exhibit 2291?

22   A    Yes.

23   Q    Does the March 3rd -- I seem to have a lot of --

24   this is -- there is a lot of disorganization here.  Now,

25   we are referring to a March 2nd release.  I think we are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   lost.  I know.  That is the problem.

2   A      No.  The release says March 3rd at the top.

3   Q      Yes, it does.  So let's -- does this document, what

4   does this document reflect?  What is the title of this

5   document?

6   A      This is the e-Connect to Pilot Island Establish

7   Unique.  So if you look at the headline at the top of the

8   page, March 3rd, the headline appears on my Exhibit 2291

9   and if you look at the second page of that exhibit, you

10  will see that that press release was issued by Prima

11  Capital for e-Connect at the bottom of the page.

12  Q      So the titles at the left side of the chart reflect

13  the media that was extant at that particular date related

14  to e-Connect; is that correct?

15  A      Yes.

16  Q      Could you please look at Exhibit 2291 and tell the

17  jury when Silver Screen Industries began purchasing

18  e-Connect stock on March 3rd?

19          MR. ROBINSON:  Objection to the form of the

20  question, Your Honor, as ambiguous.  He used the phrase

21  "began purchasing."  Does that mean execution of an order

22  or placement of an order?  And the timing is important.

23          THE COURT:  Sustained.

24  Q   BY MR. SAYRE: All right.  Mr. Knudson, could you

25  please look at Exhibit 2291 and tell the jury at what

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  point in time on that particular day the trading in

2  e-Connect began for Silver Screen Industries?

3  A    Yes.  If you look at the bottom of page 3, color

4  coded purple, you will see that the first purchase of

5  e-Connect stock on the 3rd was right around 1:00 o'clock.

6  Q    Was this after the other releases or before the IFR

7  release?

8  A    Well, it was after the March 1st release, and it

9  was before the March 3rd release.

10      MR. REED:  Your Honor, I wanted to just return

11  this original exhibit to the witness so we don't lose it.

12  That was the press release, March 3rd.

13  Q    BY MR. SAYRE: So what time did the March 3rd release

14  actually get released?  What time was that, according to

15  the chart?

16  A    On page 4, the first row at the top of page 4,

17  there is an IFR release on March 3rd at 1458 hours, which

18  is right around just before 3:00 o'clock.

19  Q    Would this time difference make any difference to

20  your analysis?

21  A    No.

22  Q    So if Silver Screen sold all 96,100 shares of

23  e-Connect on March 2nd, it had maximized its profit

24  potential that it would have gained had it held onto the

25  stock?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. ROBINSON:  Objection.  Lack of foundation.

2  Calls for speculation.

3    THE COURT:  Sustained.  Lack of foundation,

4  speculation.

5  Q   BY MR. SAYRE: If Silver Screen Industries had not

6  made this sale on March 2nd and had sold all the

7  e-Connect stock on March 9th and 10th, would it have

8  made considerably more money?

9    MR. ROBINSON:  Objection.  Lack of foundation.

10  Calls for speculation.

11    THE COURT:  Overruled.

12    THE WITNESS:  The answer is yes, the e-Connect

13  stock, all 96,100 shares, were sold in a declining market

14  on March 2nd.  Had they kept the 96,100 shares, they

15  would have had 96,100 shares to sell on March 9th and

16  10th.  At that price, they would have sold them at

17  $19.75.  So clearly, there is a loss of potential profit

18  by them selling all their shares on March 2nd.  The

19  profit was roughly $290,000 that they lost by selling

20  their shares on the 2nd.

21  Q   BY MR. SAYRE: Exhibit 2291 shows that after March 6,

22  there was a purchase of 1200 shares of e-Connect, the

23  total holdings are 81,200; is that correct?

24  A    That's correct.

25  Q    Did Silver Screen release an opinion immediately

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  before or after they purchased these 1200 shares?

2  A    No, they didn't.

3       MR. ROBINSON:  Objection.  The question said

4  Silver Screen.

5       THE COURT:  Sustained.

6  Q  BY MR. SAYRE: Did I purchase shares for Silver

7  Screen made before or after they purchased -- or I

8  purchased the shares for Silver Screen -- all right.  I

9  am going to have to make a moment to get this the way --

10       The shares purchased for Silver Screen on

11  March 6th -- did I purchase Silver Screen industry shares

12  for Silver Screen -- I don't know.

13       This is -- these little word puzzles are

14  getting a little silly.

15       MR. ROBINSON:  Objection, Your Honor.

16       THE COURT:  Sustained.

17  Q  BY MR. SAYRE: Did IFR issue an opinion immediately

18  before or after the 1200 shares were purchased for

19  Silver Screen Industries?

20  A    No.

21  Q    So when was the next IFR opinion released?  And

22  would you point that out on the Exhibit 2291.

23  A    Page 4, near the bottom, color coded in a darker

24  purple, I would say maybe call it blue, there is --

25  releasing firm is called IFR, and the date is March 8th

1    at 6:15 in the morning.

2    Q     Okay.  Thank you.  Were other releases listed on

3    Exhibit 2291 on or near the same day that IFR released

4    their opinion?

5    A     Yes.

6    Q     Did barchart.com and Prima Capital issue releases

7    during the period before and after the release by IFR?

8    A     Yes, they did.

9    Q     And was barchart.com on their March 7th release

10   shown on Bates number 3084 again indicating a 100 percent

11   buy recommendation for short, medium and long-term

12   investment?

13         MR. ROBINSON:  Your Honor, objection.  The

14   document speaks for itself.  He is just asking the

15   witness to adopt his characterization of it.

16         THE COURT:  Sustained.

17   Q   BY MR. SAYRE: Mr. Knudson, could you read the

18   document for the jury?

19         THE COURT:  The objection has been sustained.  The

20   document, Exhibit 2291, has been admitted into

21   evidence --

22         MR. SAYRE:  I am going to briefly consult --

23         THE COURT:  -- and the jury can read the document

24   in the jury room during deliberations if they choose to.

25   Q   BY MR. SAYRE:Did you ultimately render an opinion

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   in this case based on the total mix of information of

2   these press releases?

3   A    Yes.

4   Q    And after the fourth opinion from IFR, based on

5   your analysis as shown on Exhibit 2290 and 2291, did

6   Silver Screen immediately buy or sell shares of

7   e-Connect, according to the two charts?

8   A    Immediately?  No.

9   Q    After March 8th, did barchart.com continue to

10  release 100 percent buy recommendations on March 8th and

11  9th?

12       MR. ROBINSON:  Objection.  Document speaks for

13  itself.

14       THE COURT:  Sustained.

15  Q  BY MR. SAYRE: Did the barchart.com releases -- all

16  right.

17       Did the barchart.com releases from the 8th and

18  9th of March indicate that e-Connect prices were still

19  rising?

20       MR. ROBINSON:  Objection.  Compound.  The

21  documents will speak for themselves.

22       THE COURT:  Sustained on both grounds.

23  Q  BY MR. SAYRE: Are there samples of press releases

24  that you designate in your chart which you used to

25  render your opinion?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A     Yes.

2    Q     Which ones?

3    A     Well, all of them that are listed on 2291, but in

4    particular, the references to Bates number 3084 and 3085

5    are examples of releases known as bar chart.

6    Q     And one of those on March 3rd, I believe, was that

7    Wall Street Directory?

8    A     No.  The bar charts are dated March 8th and

9    March 7th.

10   Q     And could you read the samples of the press

11   releases in your chart that allowed you to render this

12   final opinion?

13         MR. ROBINSON:  Objection, Your Honor.  First, they

14   speak for themselves, and if he is talking about all the

15   releases that rendered his opinion, there is 70 or

16   something of them there, so I would object on 403

17   grounds.

18         THE COURT:  Sustained on both grounds.  Also,

19   asked and answered.  He did -- he previously responded to

20   the question, which press releases did you use in

21   arriving at your opinion?  He answered that question.

22         MR. SAYRE:  All right.

23   Q   BY MR. SAYRE:  Exhibit 3086 indicated that e-Connect

24   opened on March 9th at $20.88 and closed at $14.50; is

25   that correct?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. ROBINSON:  Objection, Your Honor.  The

2  document speaks for itself, and it is a leading question.

3        THE COURT:  Sustained on both grounds.

4  Q    BY MR. SAYRE: Did Silver Screen at some point sell

5  their holdings in e-Connect?

6  A    Yes, they did.

7  Q    And on what dates?

8  A    On March 9th, they sold all of their holdings

9  except for 1200 shares.  On March 10th, they sold their

10 remaining shares of 1200.

11 Q    On page 5, there is -- actually, there is a Pacific

12 Equity release regarding e-Connect dated March 10th.

13 Does this release reference Bates numbers?

14 A    Yes.

15 Q    And what Bates numbers would those be?

16 A    It is 2344 and 2345.

17       MR. SAYRE:  Your Honor, permission to publish?

18       MR. ROBINSON:  Your Honor, may I have a moment?  I

19 am not sure we have that in the defense exhibit that we

20 received.

21       THE COURT:

22       MR. ROBINSON:  Have an opportunity to check it

23 before we take a position.

24       THE COURT:  Yes, Mr. Chavez.

25       THE WITNESS:  Can we take a five-minute break?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  Absolutely.  We will take a ten-minute

2  break now until 10:50.  The jurors should remember not to

3  discuss this case or anything related to this case.

4  Thank you.

5         All right.  Thank you.  We will take a

6  ten-minute break as well.  Thanks.

7

8    (The following proceedings were held in open court

9     outside the presence of the jury:)

10

11    THE COURT:  In the trial, both sides are present,

12  and we will call in the jury.

13    MR. ROBINSON:  Your Honor, may I just --

14    THE COURT:  Yes.

15    MR. ROBINSON:  I think we are getting to the point

16  where I would expect the defendant to ask Mr. Knudson for

17  his opinion.  And we had orders yesterday about certain

18  areas where Mr. Knudson could not render an opinion, and

19  I would like to avoid a situation where I am jumping up

20  and objecting.

21         So perhaps the defendant could let us know

22  what the opinion is -- or what the question will be about

23  the opinion so we can deal with that before the jury

24  comes out.

25    THE COURT:  Your point is well taken.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      Mr. Sayre, could you summarize the opinions

2  that you would ask --

3      MR. SAYRE:  Yes, Your Honor.

4      THE COURT:  -- the witness for?

5      MR. SAYRE:  Yes.  I would just like to refer to

6  Rule 704A which states," Expert's opinion is reliable and

7  helpful" --

8      THE COURT:  Please slow down when you read.  I

9  have 704 in front of me, so it is not necessary to read

10 it.  Just respond to my question at this time.  What

11 opinions will your expert be giving?

12     MR. SAYRE:  Well, the first opinion is, did you

13 see any patterns of fraud that resembled a market

14 manipulation scheme by Silver Screen?

15     MR. ROBINSON:  Can I address these one at a time,

16 Your Honor?  Or we can list them.

17     THE COURT:  I would like to have a list of the

18 opinions.

19         Did you see any patterns of fraud that showed

20 that Silver Screen engaged in market manipulation; is

21 that correct?

22     MR. SAYRE:  Yes, Your Honor.

23     THE COURT:  Then, what is the second opinion?

24         Mr. Knudson, you can have a seat if you wish.

25 You don't need to remain in the witness stand.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      MR. SAYRE:  Then there, was there a pattern of

2  withdrawals from Silver Screen Industries' account at

3  that would be considered an indication of fraud?  That

4  would be the second opinion.

5      THE COURT:  Okay.  Any other opinions, Mr. Sayre?

6      MR. SAYRE:  I believe there is one other.

7      THE COURT:  Okay.  That is from Mr. Knudson.

8      MR. SAYRE:  And then the other would be, after

9  reviewing all the discovery evidence in this case, what

10 have you concluded?

11     THE COURT:  And what is he going to say?

12     MR. SAYRE:  What are you going to say?

13     THE WITNESS:  That Silver Screen was following the

14 market in their trading activity.

15     THE COURT:  Any other opinions?

16     MR. SAYRE:  I believe that's it, Your Honor.

17     THE COURT:  All right.  What is the government's

18 response or position?

19     MR. ROBINSON:  Your Honor, some of this was the

20 subject of the government's motion in limine, so I will

21 refer to that and also make an additional argument.

22          With respect to trading patterns on the

23 issue -- on the opinion, did you see patterns of fraud

24 that show that Silver Screen engaged in market

25 manipulation, if the -- first of all, we had a Rule 16

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  objection in that the disclosure letter for Mr. -- with

2  respect to Mr. Knudson stated that conclusion but never

3  described what patterns he would be referring to so that

4  we would have an opportunity to analyze them and decide

5  whether that testimony was consistent with the pattern,

6  had a proper foundation, or could otherwise be

7  challenged.

8          And if the court looks at the Knudson letter,

9  there is no disclosure of any particular patterns.  And

10 in the charts that he has given us, I don't think there

11 is anything on those charts which would, you know, circle

12 something or and highlight something that said there is a

13 pattern.  So first we have a Rule 16 objection.

14         Secondly, the issue in this case is securities

15 fraud with respect to the investment opinions issued by

16 Mr. Sayre in the name of IFR.  It is not that his trading

17 in the sense of buying and selling e-Connect stock in the

18 Silver Screen account itself caused a market

19 manipulation.  For example, if he owned 50 million shares

20 and bought and sold it and manipulated the market, that

21 would be something else.

22         But we have never claimed, it is not in the

23 indictment, we have never claimed that his purchase and

24 sales of shares separate and apart from the opinions

25 caused a market manipulation.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          So I would say that that just doesn't go to a

2    relevant issue or it is outweighed under 403, and it

3    would be confusing to the jury.

4          I have a similar objection to the second

5    opinion, which was, was there a pattern of -- I think it

6    was transactions in the account that would be indicative

7    of fraud?  Here, I think he is talking about Silver

8    Screen's bank account.

9          And we made a Rule 16 objection in our motion

10   in limine that the Knudson Rule 16 letter failed to

11   identify any bank account patterns or explain how they

12   would support that conclusion, so we have a rule 16

13   objection.

14         Secondly, Your Honor, we haven't contended in

15   this case that something that he did with his bank

16   account itself constituted fraud, plus it would be very

17   confusing and ambiguous as to what is meant by fraud.

18   Are we talking about check kiting?  What are we -- loan

19   fraud?  I mean, the only real relevance of the bank

20   accounts here is that the money to purchase and sell the

21   stock flows through the bank account, and the

22   government's position is Mr. Sayre controls the bank

23   account.

24         Beyond that, I don't see how an expert opinion

25   on an indicia of fraud or lack thereof in the bank

1   account is helpful to the jury in deciding any of the

2   issues in this case.

3        THE COURT:  Evidence has been introduced as to

4   withdrawals from bank accounts and transfers to the Bank

5   of Montreal.  From the government's perspective, what is

6   the relevance of that evidence?

7        MR. ROBINSON:  Because I don't know what pattern

8   Mr. Knudson is going to refer to, it is hard for me to

9   address that.  If the Rule 16 --

10        THE COURT:  Independent of Mr. Knudson from the

11   government's perspective.

12        MR. ROBINSON:  From the government's perspective,

13   the transfer of funds offshore was indicative of

14   defendant's scheme and that he wanted to profit from his

15   securities fraud and then make the proceeds less

16   available to be pursued by the SEC or law enforcement and

17   also make it more difficult to trace his relationship

18   with those proceeds.

19            So if Mr. Knudson is going to specifically

20   talk about those issues, I suppose that would be okay.

21   But I simply can't tell from the Rule 16 disclosure

22   whether that is the focus of his analysis or not, and I

23   don't know -- I don't know how he renders an opinion on

24   that either, but that is a separate issue.

25        THE COURT:  All right.  And what about the third

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   opinion where Mr. Sayre indicated that he would ask

2   Mr. Knudson, after reviewing all of the discovery, what

3   have you concluded, and the response would essentially be

4   that Silver Screen was following the market in its

5   trading?

6          MR. ROBINSON:  First of all, I am not sure what

7   following the market means.  If it means that they bought

8   and sold at market prices, I don't see how that is

9   helpful to the jury or particularly relevant to the case.

10  So the opinion itself to me is simply unclear what that

11  is and how it has any probative value in this case.

12         THE COURT:  All right.  Perhaps we can begin with

13  the third -- the defendant's response to the government's

14  objection to the third opinion that Mr. Knudson concluded

15  that Silver Screen was following the market in their

16  trading.

17            What does he mean by that, and how is it

18  relevant to issues in this case.

19         MR. SAYRE:  Right, Your Honor.  It is in

20  contradiction to the statement that Silver Screen

21  Industries' trades were based on IFR's opinions.  It was

22  based on the market at the time, the press releases being

23  released by e-Connect and all the other press releases

24  being released concurrently.  It wasn't based on IFR's

25  releases, which I believe is the government's theory.  If

1   it is not, I don't understand this case at all.

2        MR. ROBINSON:  There was no Rule 16 disclosure

3   showing how that conclusion is based on any reasons.  And

4   first, I don't -- I don't follow.  But there certainly

5   was no Rule 16 disclosure explaining how he was going to

6   arrive at that opinion following the market and how that

7   somehow negates that the defendant was taking profits in

8   the rise in the market after he issued those opinions.

9        I don't know how he arrives at that

10  conclusion, Your Honor, because it has never been

11  explained what the basis for that conclusion is.

12       MR. SAYRE:  Your Honor, it is not a contention

13  that we weren't taking profits.  I think that is pretty

14  self-evident.  It is the contention that Mr. Robinson

15  says that I omitted I managed the company in order to

16  pump up the stock and sell it at increased value,

17  artificially raising the price of the stock.  Again, I am

18  assuming this is his theory.  It may be something else.

19       THE COURT:  And you are presenting this evidence

20  to rebut an argument of intent to deceive?

21       MR. SAYRE:  Yes, Your Honor, entirely.

22       THE COURT:  Was this disclosed in the Rule 16

23  expert witness summary, this opinion?

24       MR. SAYRE:  I don't have --

25       MR. ROBINSON:  I have attached the letter -- Your

1    Honor, I have attached the Rule 16 letter to my motion in

2    limine.

3        THE COURT:  With respect to this Exhibit 1 to the

4    government's motion, the second full paragraph refers to

5    an opinion, but it is unclear because it doesn't identify

6    the chart.  And it merely says Mr. Knudson will explain

7    the chart and what it shows.  The chart includes the time

8    line of dissemination of total mix documents.  Well, the

9    witness has done that with 2291.

10       Then, the second opinion as set forth in the

11   third paragraph that Mr. Knudson will discuss common

12   stock frauds, yesterday I indicated my ruling that that

13   would not be relevant or admissible.

14       But the third paragraph goes on to state that

15   Mr. Knudson will testify of about trading patterns of

16   Silver Screen based on the charts vis-a-vis IFR releases;

17   namely, that the pattern is not consistent with the pump

18   and dump scheme, a scalping scheme or a market

19   manipulation scheme.  The last scheme being the relevant

20   scheme, market manipulation.

21       He will testify about the implications of

22   trading of stock in what is known as the long position,

23   etcetera.  He will testify that the positions Mr. Sayre

24   took in e-Connect were long positions and why the fact

25   patterns of trades are in ways inconsistent with a person

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  who is committing a stock scheme.

2      MR. ROBINSON:  That, Your Honor, does not tell us

3  what the patterns are or what the reasons are that they

4  support his conclusion.  It tells when he is going to

5  testify about, but it doesn't tell us how he arrives at

6  that.  And that is what a Rule 16 disclosure is supposed

7  to do.

8      THE COURT:  It is supposed to disclose in at least

9  summary form the reasons or the basis of the opinion?

10     MR. ROBINSON:  Yes, Your Honor.

11     THE COURT:  What is the remedy for failure to

12  fully comply with Rule 16?  Is it exclusion?

13     MR. ROBINSON:  Well, the court has discretion to

14  fashion the remedy, obviously.  And the remedy can vary

15  from exclusion, and I have cases supporting that, to

16  requiring the defense to make full and proper disclosure

17  under Rule 16 and giving the opportunity for the

18  government to have that information and evaluate it

19  before it has to commence its cross-examination of the

20  witness.

21         In this case, Your Honor, we have made a big

22  deal about Rule 16, and the court was very clear that she

23  wanted Rule 16 compliance.  This is what we have, and

24  they have never supplemented it.  I made my motion in

25  limine pointing out these problems.  I filed the motion

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  in limine on Monday, and there has been no effort by the

2  defense to address the shortcomings in the Rule 16 letter

3  by giving us a description of those patterns and the

4  bases and the opinions that the witness would rely on.

5       So now, here we are, soon, I'm presumably

6  going to begin my cross, and I don't have that

7  information.  I don't think that is what Rule 16

8  contemplates.

9     THE COURT:  The Rule 16 letter, Exhibit 1 to the

10  government's motion, is a letter by advisory counsel

11  dated June 24th of 2008.  After receiving this letter,

12  did the government object to the defense that this

13  June 24th letter was inadequate and did the government

14  seek, Mr. Robinson, a more full disclosure?

15     MR. ROBINSON:  I did not at that time, Your Honor.

16  I raised it in my motion in limine on Monday, which I

17  thought was sufficiently in advance.  And there would

18  have been sufficient time for the defense to provide me

19  with that information before these witnesses testified.

20     THE COURT:  Let's continue down the letter.

21       The last paragraph on page 1 refers -- states

22  Mr. Knudson will testify that Exhibit blank is called the

23  total mix analysis.  And Mr. Knudson will testify

24  regarding the timing of trading patterns exhibited by the

25  data.  And then Mr. Knudson will testify that in light of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    his experience, it is not statistically possible or

2    possible in any other way taking into consideration the

3    total mix of information about e-Connect released on the

4    world market to determine or forensically measure the

5    impact of the inclusion or exclusion of Silver Screen in

6    the safe harbor, et cetera.

7            I already addressed this yesterday, and I

8    excluded this opinion.

9            Then, continuing on the second page, the first

10   full paragraph, it states Mr. Knudson will also testify

11   about his analysis of the Silver Screen corporate bank

12   account and will testify about the pattern of deposits

13   and disbursements from Silver Screen account.  And

14   finally, Mr. Knudson will testify as to the use of

15   offshore accounts.

16           Mr. Sayre, what is your response to the

17   government's objection to the opinions on grounds that

18   the Rule 16 disclosures were insufficient, they merely

19   indicated a conclusion or an opinion without stating the

20   basis, and, furthermore, as to the first and second

21   opinions that you have identified, that they are not

22   relevant, or if they have some relevance, it is minimal

23   and substantially outweighed by other factors in 403?

24        MR. SAYRE:  Well, Your Honor, I assume, at least

25   from my understanding of Rule 16 disclosures, that it is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   supposed to be a summary of the information being

2   provided.  If he wanted the entire line of questions and

3   answers, we certainly didn't get that from the

4   government.

5           It is very clearly stated, it is very clearly

6   synopsized, and it definitely gives a summary of the

7   basis that this information will be -- and the charts

8   also which have all the information relevant to the

9   summary.  So it has a substantial amount of supporting

10  information.

11      THE COURT:  The charts may give the basis, and the

12  letter may indicate the area of the opinion, but the

13  letter doesn't state the opinion.  As Mr. Robinson

14  pointed out, neither the court nor the government knows

15  what opinion your expert will state regarding patterns of

16  fraud or that he didn't see any patterns of fraud to

17  indicate market manipulation.  That statement doesn't

18  tell the court anything or, more importantly the

19  prosecution.

20          And the charts, when considered with that

21  statement, don't advise the prosecution of what the

22  witness is going to say in this regard.  Same thing with

23  patterns of withdrawals from bank accounts.

24          But what is your response to the relevancy

25  objection?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. SAYRE:  I don't -- I don't see how it could be

2    any more relevant.  It is discussing the issue -- all

3    this goes to the issue of intent.  If I intended to

4    manipulate the market, I would had to have made a

5    statement that could have moved the market.  All this

6    information proves that these statements or the omission

7    of or even the IFR articles in their entirety did not

8    show any pattern that this information being omitted

9    would have in any way manipulated the market.  It is

10   simply a statement that, namely, the pattern is not

11   consistent with a pump and dump scheme, a scalping

12   scheme, or a market manipulation scheme even by the

13   trading patterns themselves, which are presented in the

14   charts.

15         And then, of course, this whole case is

16   intent, and, of course, the entire case based on

17   character.  But intent is a key issue here.  And if we

18   can't prove anything related to intent, we have no

19   defense, and I think that is exactly what Mr. Robinson is

20   looking for.

21   THE COURT:  That is your response with respect to

22   the relevancy of all three opinions, that they all relate

23   to intent?

24   MR. SAYRE:  Yes, Your Honor.  It is entirely based

25   on intent, proving these facts that the market

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   manipulation scheme that Mr. Robinson alleges simply did

2   not exist.  So there couldn't have been intent to defraud

3   if there was no scheme to defraud.

4       MR. ROBINSON:  I don't really see how Mr. Knudson

5   is in a position to voice that opinion, but I can only

6   guess because I don't know what the bases are for that,

7   Your Honor.

8       THE COURT:  Well, perhaps to make the record

9   clear, Mr. Knudson is here, I should ask him for the

10  information that really should have been provided in the

11  letter, and I would ask the clerk to tell the jury that

12  they can take a break for 15 more minutes.  Thank you.

13       Yes.  Mr. Knudson, when you state that you do

14  not see any pattern of fraud showing market manipulation

15  by Silver Screen, what do you mean?  What is your -- what

16  will you testify to?

17       THE WITNESS:  I believe I was -- I was possibly

18  addressing this in my testimony when I made the

19  observation that there was no immediate purchase or sale

20  of e-Connect stock before or after a release of an IFR

21  opinion.

22       THE COURT:  You have made that statement to the

23  jury, and you certainly can.  The question is whether you

24  can state the opinion that this shows there was no fraud

25  or market manipulation.  And that is a legal question for

1    the court, is this a proper subject for expert testimony.

2         THE WITNESS:  Well, I believe --

3         THE COURT:  Looking at the patterns like you have,

4    highlighting the significance of the patterns, as you

5    have, that the defendant, for example, sold at a loss at

6    one point when if he held onto March 9th rather than

7    selling on March 2nd, he would have made more money.  You

8    have made that point to the jury.

9         The question is, whether as an expert -- and I

10   am not going to argue with an expert as to admissibility

11   of evidence.  My argument is to Mr. Sayre.

12        THE WITNESS:  If I may, Your Honor.

13        THE COURT:  So the question is whether, Mr. Sayre,

14   your witness, your expert witness, can say, looking at

15   these patterns, there is no fraud.  Is that a proper

16   subject of an expert's opinion, or is that something

17   better saved for closing argument?

18        Certainly, the evidence has been presented to

19   the jury through Mr. Knudsen's expert testimony.  He

20   did -- for example, referring to 2291, Exhibit 2291 in

21   his testimony this morning, stated that -- or pointed

22   out, essentially, in his testimony that Silver Screen

23   continued to purchase stock at a higher price.  The total

24   buy-back was significantly greater than the sale.  This

25   is all evidence that has been presented to the jury

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    through your expert.

2         MR. SAYRE:  Yes, Your Honor.

3         THE COURT:  And I guess it could be referred to as

4    pattern evidence.  And in your closing argument you can

5    certainly argue that this -- that there is no pattern of

6    fraud or there is no showing of market manipulation here.

7    You can assert, I would suggest tentatively, that this

8    tends to disprove the government's allegation that you

9    had a scheme or used a scheme to defraud or engaged in a

10   transaction practice or course of business which operated

11   as a fraud.  You can argue this.

12        The question is, can you have your expert

13   opine that the pattern does not reveal market

14   manipulation or is not a pattern of fraud.

15        That would seem to be a legal conclusion or an

16   argument that should be made to the jury and not be

17   highlighted by an expert.

18        MR. SAYRE:  Your Honor, may I answer that?

19        THE COURT:  Yes.

20        MR. SAYRE:  Okay.  In regard to that, he will be

21   testifying to an ultimate issue in this case as an

22   expert, but if I testify to it, I am not an expert.

23        THE COURT:  I am talking about closing arguments

24   based upon the evidence presented.

25        MR. SAYRE:  That is what I mean, Your Honor.  Our

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    experts are being refused the right to make an expert

2    opinion, which I believe is allowed by 704A.  If he

3    doesn't make an opinion, the entire purpose of an expert

4    has been excluded from the trial.  Because he is just

5    stating facts.  He is a summary witness, not an expert.

6    He is no longer being allowed to present himself to the

7    jury as an expert witness.

8         THE COURT:  I would pose the same question with

9    respect to the pattern of withdrawals.  Presumably,

10   Mr. Knudson is going to have a chart examining the

11   pattern of withdrawals or bank transactions by Silver

12   Screen.  That evidence can be presented to the jury.

13        But for the conclusion that this isn't -- that

14   this pattern is not fraudulent, that would seem to be

15   something for the jury to decide.

16        MR. SAYRE:  Well, but they are not experts, Your

17   Honor, and neither am I.  So he is determining this

18   information from decades of experience as a forensic

19   accountant, an IRS investigator, and all his other

20   qualifications.

21        THE COURT:  In that regard, the summary of his

22   testimony doesn't tell us anything about the pattern he

23   is going to identify or what the basis -- what his

24   opinion is in this regard other than there is no pattern

25   of withdrawals that would be an indication of fraud.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   That is the idea indicated in Exhibit 1.

2         MR. SAYRE:  Well --

3         THE COURT:  But what is the witness going to say?

4   What is his reasoning?  Mr. Knudson.

5         THE WITNESS:  Well, basically, I would point out

6   that on the -- my exhibit, it doesn't have any

7   significant withdrawals or payments to Mr. Sayre.  So

8   when we have a million or so dollars going through the

9   account, the jury can obviously see for themselves that

10  there aren't a significant amount of monies that are

11  going out to Mr. Sayre.

12          And it goes to the lifestyle evidence that the

13  government has put on with respect to the Ferrari and the

14  lavish lifestyle that he was living up in Hollywood

15  Hills.  It goes to the fact that he was not really

16  profiting from his scheme, his market manipulation

17  scheme.

18          And so I think it does fairly present the

19  evidence in this case to the jury with respect to him and

20  the profitability of his scheme and how he used those

21  profits.

22        THE COURT:  Mr. Robinson, what is your response to

23  this offer?

24        MR. ROBINSON:  Well, at least now I have some idea

25  of what Mr. Knudson wants to testify about.  That is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   helpful.

2           But I would also say, Your Honor, and I

3   believe that we laid out the law in our motion in limine,

4   it is improper to have an expert witness opine about the

5   law; and even though 704A allows expert testimony to be

6   admitted that may embrace an ultimate issue, it is

7   improper to have an expert rendering legal opinions or

8   directing the jury to draw legal conclusions about the

9   evidence based on that opinion.

10          And the way Mr. Sayre, at least, is framing

11  how he expects this opinion to come out, it is that

12  Mr. Sayre didn't commit fraud, as would be the conclusion

13  of the witness based on his review of the pattern

14  evidence that he has described.  I think that is

15  improper.

16          If Mr. Sayre wants to have him highlight and

17  explain the transactions that the witness has just

18  described here, I don't have a problem or an objection to

19  that now that I know what they are.  I agree that, in

20  closing argument, Mr. Sayre can -- with the benefit of

21  the instructions that the court will be giving the jury,

22  not Mr. Knudson or me or Dr. Cornew, he can argue the

23  proper inferences to be drawn.

24          But I don't think that Mr. Knudson should be

25  framing opinions in terms of whether or not fraud exists

1   here for Mr. Sayre based on this type of information.

2          THE COURT:  I agree.  The evidence of what the

3   transfers or withdrawals were from the Silver Screen

4   accounts can be introduced and highlighted by the expert,

5   but the expert can't testify as to the ultimate

6   conclusion of whether this is an indication of fraud or

7   not.

8          That can be argued by Mr. Sayre to the jury in

9   his closing arguments, and the government can make an

10  argument and the defendant but -- as to how the jury

11  should decide the legal issues, but experts -- expert

12  opinion on this would not be appropriate, in my view.

13          Mr. Sayre, anything further by way of

14  response?

15         MR. SAYRE:  Yes, Your Honor.  In that respect, I

16  understand the concept of fraud being a legal issue.

17  Could Mr. Knudson simply refer to these issues as being

18  generally accepted practice or in regard to being

19  permissible as to the rules that he understands them as

20  an accountant and as a forensic accountant as an

21  investigator, rather that making a legal determination.

22  And I understand the point that fraud would be a legal

23  determination.  So if he uses the appropriate terminology

24  that would be relevant to his expertise, that may be

25  appropriate.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  All right.  What about the third

2    opinion that, after reviewing all the evidence,

3    Mr. Knudson reached the opinion that Silver Screen was

4    following the market in their trading?  The third opinion

5    seems to have some relation to the first opinion, but

6    what is the basis?  What is the reasoning behind this

7    conclusion, Mr. Knudson?

8    MR. ROBINSON:  The conclusion or the basis for the

9    conclusion would be just looking at the evidence that is

10   contained in Exhibits 290, 291 and that the patterns of

11   his trading, the purchasing and selling, are very similar

12   to what Garrett Sayre was talking about was that Mr. --

13   Mr. Sayre is a student of the market, and he looks for

14   trends.

15   And when you look at the trends that exist in

16   the trading of Silver Screen, by Silver Screen of

17   e-Connect, you can quite clearly see that many of these

18   trades occur between 10:00 and 11:00 or in a certain

19   period of time.  He is not an early morning trader.  He

20   is a mid morning trader.  And I think that is very

21   relevant in explaining that his trading activity does not

22   follow, as Mr. Loveman indicated in his testimony,

23   immediately after or before the release of an IFR

24   opinion.

25   So I do think that it should be explained to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   the jury that this pattern of trading that was used by

2   Mr. Sayre is not consistent with the releases of the IFR

3   opinions.

4          I think it is very clear from the exhibits

5   that we have placed into evidence, and maybe the argument

6   could be, again, it is argument, that Mr. Sayre could

7   point this out in his closing and just refer to the

8   exhibits and show them the obvious times of trading by

9   Mr. Sayre.

10         THE COURT:  All right.  Government have anything

11  to add?

12         MR. ROBINSON:  Well, Your Honor, first of all, I

13  hope I didn't misunderstand Mr. Knudson on this.  I take

14  it he is not going to be testifying about the defendant's

15  state of mind, that he infers that Mr. Sayre is -- as his

16  brother described him, has a certain frame of mind,

17  because that would not be proper expert testimony here.

18         MR. SAYRE:  No, I will not.

19         MR. ROBINSON:  If he wants to say that Mr. Sayre's

20  trading is consistent with the way people sometimes

21  described as day traders trade, which I think is kind of

22  what Mr. Knudson is saying, and I don't think day trader

23  has the kind of legal conclusion or issues that we are --

24  that I am concerned about in this case.  So if he wants

25  to say that his pattern is consistent with somebody who

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  is just day trading in the market and leaves it at that

2  and then Mr. Sayre wants to argue that that somehow

3  negates his intent or refutes the government's evidence

4  on his intent, that is fine with the government.

5          THE COURT:  I would agree.  Mr. Sayre.

6          MR. SAYRE:  Yes, Your Honor.  What I would like to

7  do is I have two questions here that I think maybe would

8  clarify a few issues in regard to that.

9              That one question that was just discussed by

10  Mr. Robinson I was thinking might be best phrased as, is

11  the trading activity consistent with what would be

12  expected of a day trader in the market.  And then another

13  question would be --

14          THE COURT:  That would be fine.

15          MR. SAYRE:  And then the other, do the trades and

16  publications appear to indicate that Silver Screen

17  Industries' trades were following the timing of IFR

18  releases or following the general market.

19          THE COURT:  I don't believe there would be a basis

20  for that opinion in light of the government's objections

21  so far.  Mr. Robinson?

22          MR. ROBINSON:  Yes.  I think that's crossing the

23  line towards talking about his intent, Your Honor.

24          THE COURT:  All right.  I am just going to take

25  about a five-minute break to consider your positions.  I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    stood up and reached for -- when Mr. Knudson referred to

2    Mr. Loveman's testimony, I reached for my notes of

3    Mr. Loveman's testimony on July 8 to confirm that he

4    didn't cross the line into opinions or open any doors.

5    And from glancing at my notes of his testimony, I find

6    that he did not, that he stayed away from improper

7    opinions.  All right, I'll -- yes.

8         MR. SAYRE:  One suggestion from Mr. Knudson, I

9    will just read it quickly, he said, "Based on your

10   analysis, do the trades and publications appear to

11   indicate that Silver Screen Industries' trades were

12   following the general market" and leave out the other

13   issue related to this.  So this would be his expert

14   opinion related to the patterns and such.

15        MR. ROBINSON:  I don't know what following the

16   market means, Your Honor.

17        MR. SAYRE:  Well, the general market, the total

18   mix of information on the market.  That would be what --

19        MR. ROBINSON:  I believe that is confusing to the

20   jury.

21        THE COURT:  I would sustain the objection to that

22   question.

23        THE WITNESS:  Your Honor, perhaps --

24        THE COURT:  I have heard argument from counsel,

25   proffer on both sides.  Thank you.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE CLERK:  This court is in recess.

2               (Brief recess.)

3          THE COURT:  In the trial, both sides are present.

4    We are outside the jury's presence.  Considering the

5    issues raised in the government's motion in limine and

6    the parties' arguments today, the court will grant the

7    government's motion on grounds that the opinions are not

8    relevant and admissible.

9               The ultimate opinion that the -- that no

10   patterns of fraud or market manipulation are seen and

11   that the pattern of withdrawal is not an indication of

12   fraud, these opinions are not relevant or admissible,

13   referring to 702 and 704 of the evidence code, and I

14   would refer to the brief filed by the government on this

15   issue.

16              Essentially, if I allowed those opinions, the

17   role of the jury would be usurped improperly.  Although,

18   in certain circumstances experts can testify to the

19   ultimate issues to be decided by the trier of fact, in

20   this case testimony on those ultimate issues is not

21   relevant or admissible.  The jury can decide whether the

22   patterns set forth, for example, in 2291 and the

23   witness's testimony are indicative of fraud or not.

24              Similarly, the jury can decide whether the

25   patterns of withdrawals, which the expert is free to

1   testify about, those facts, the jury can decide whether

2   the facts highlighted -- introduced and highlighted by

3   the expert are indicative of fraud.

4          The -- however, as discussed before the break,

5   the witness, of course, can state facts regarding the

6   defendant's trading, and, for example, he can state that

7   in his opinion, the defendant's trading is consistent

8   with the trading of a day trader, but he can't give the

9   ultimate conclusion as to whether or not the trading is

10  indicative of fraud or not indicative of fraud.  Neither

11  expert can do that, neither the plaintiff's expert nor

12  the defendant's experts.

13         The Rule 16 objection was also made.  It is

14  true that the summary is inadequate and does not comply

15  with Rule 16, but I don't believe the remedy of exclusion

16  would be appropriate.  So my decision is not based upon

17  the Rule 16 objection.

18         And we will bring in the jury, and Mr. Knudson

19  can take the witness stand again.

20

21     (The following proceedings were held in open court

22      in the presence of the jury.)

23

24     THE COURT:  Good afternoon.  In the trial I note

25  the presence of both sides and all of the jurors.  Thank

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    you very much.  Please be seated.

2              The witness is present, and he is reminded

3    that he was previously sworn and is still under oath.

4              Would you state your name again for the

5    record?

6         THE WITNESS:  Carl Knudson.

7         THE COURT:  Thank you Mr. Knudson.

8         Mr. Sayre, please continue.

9         MR. SAYRE:  Yes, and I apologize for all the

10   delays in exhibit issues.

11        THE COURT:  Your apology isn't necessary.  I

12   would -- as I have explained to the jury, sometimes it

13   takes the court longer to address and resolve issues

14   outside the jury's presence than anticipated.  I can

15   assure you that we are all working hard while you have a

16   recess, and we appreciate your patience.  Usually our

17   breaks and discussions outside your presence serve to

18   expedite the proceedings.

19             Thank you.  Mr. Sayre, please continue.

20   Q   BY MR. SAYRE: Yes.  Mr. Knudson, based upon your

21   analysis of the discovery as listed in Defense Exhibits

22   2290 and 2291, did you see whether the trading of

23   e-Connect stock occurred immediately after or before the

24   release of the IFR opinions at issue in this case?

25        MR. ROBINSON:  Objection.  Asked and answered.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Sustained.

2   Q   BY MR. SAYRE: Is Silver Screen Industries' trading

3   activity consistent with what would be expected of a day

4   trader in the market?

5   A     Yes.

6   Q     Could you explain why?

7   A     Day traders follow the market publications, chat

8   sites, and have a consistent pattern of when they trade

9   and don't trade.  And generally, based on the pattern of

10  trading here, I see that this is rather consistent

11  trading -- you know, a constant trading pattern.

12          If I might expand a little bit further on

13  that.

14  Q     Yes, I think if we could just have a description of

15  exactly how the trades indicate day trading, is the

16  timing of the trades and this sort of thing.

17  A     I believe we previously discussed that the trading

18  pattern was consistent with a market that was going up.

19  You buy when the market is going up, hopefully, or just

20  before the market goes up.  And traders are looking at

21  how the market reacts, and they will sell when the market

22  starts going down.

23          So when we see the trades that occurred by

24  Silver Screen, you can see that they were selling when

25  the market was going down and they were buying,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  hopefully, in a market that was going up.

2  Q     And in the trades, however, there were clearly

3  times when the trades were made at approximately the same

4  times of the day; is that correct?

5  A     Yes.

6  Q     Did you analyze the Prima Capital press releases in

7  this case?

8  A     Yes, I did.

9  Q     What are they?

10       MR. ROBINSON:  Objection.  Compound.  Lack of

11 foundation.

12       THE COURT:  Sustained.

13 Q   BY MR. SAYRE: Who was the source of these releases,

14 which company?

15 A     The source of all the releases?

16 Q     No.  Prima Capital.

17       MR. ROBINSON:  Objection.  Compound.  Lack of

18 foundation.

19       THE COURT:  Sustained.  Are you referring to a

20 specific exhibit or Bates stamp within an exhibit?

21       MR. SAYRE:  I am referring to the 2001 exhibit

22 which exhibits all the total mix of information on the

23 market and Prima Capital releases, just the individual

24 Prima Capital releases, in that exhibit.

25       THE COURT:  Which -- in light of the objection,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    which Prima Capital release?  You can refer to each of

2    them, but you have to refer to them specifically.

3         MR. SAYRE:  Oh, I see.

4    Q   BY MR. SAYRE: If you could review those releases on

5    your chart, we are looking for them here as well.  If

6    you see them, you could indicate the various different

7    releases, I suppose, and that might facilitate things.

8    Yes, the ones on the chart are what we are referring to.

9    Those Prima Capital releases, who was responsible for

10   having those releases disseminated?

11        MR. ROBINSON:  Objection.  Lack of foundation.

12        THE COURT:  Sustained.

13   Q   BY MR. SAYRE: Did you determine who released the

14   Prima Capital releases on your chart?

15        MR. ROBINSON:  Objection.  Lack of foundation.

16        THE COURT:  Sustained.

17   Q   BY MR. SAYRE: Did you do an investigation to

18   determine who released the Prima Capital press releases

19   on your chart?

20   A    Well, I merely looked at the releasing party on the

21   release which indicates the person who is releasing the

22   information.

23   Q    Correct.  Who was that?

24   A    I am going to --

25        MR. ROBINSON:  Objection, Your Honor.  The

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  document speaks for itself, if his conclusion is based

2  merely on reading the document.

3      THE COURT:  Sustained.

4  Q  BY MR. SAYRE: All right.  Well, let's turn to

5  Exhibit 2291A.  Could you explain this exhibit to the

6  jury?

7      THE COURT:  2291A will be marked for

8  identification.

9      MR. SAYRE:  Thank you.

10     THE WITNESS:  2291A is an Excel spreadsheet of all

11 the banking activity in the Silver Screen bank account at

12 Bank of America covering the period October 1999 to

13 March 5th, 2000.  This exhibit was prepared from the bank

14 statements, deposit items, withdrawal items provided by

15 the government, and they are referenced on the chart to a

16 particular Bates number where you would find that

17 information.

18 Q  BY MR. SAYRE: And then preparing these exhibits,

19 what information did you draw?

20 A     In constructing a bank analysis, you always start

21 with the bank statements.  That provides a foundation of

22 all the information that is going to be on your

23 spreadsheet.  That ensures that every nickel that went

24 through the bank account is accounted for.  So you would

25 look at the bank statement first.

1       Then you would look at the supporting
2  documents such as the deposit tickets, deposit items,
3  incoming wire transfers.
4       Then, from the other side of the ledger, you
5  would look at withdrawals, which would be evidenced
6  perhaps by outgoing wire transfer orders or cancelled
7  checks.
8       And you put all of that information in its
9  appropriate designation on each row which would allow the
10 jury to look at the document and determine the source of
11 the funds that came into the account and the disposition
12 of the funds going out.
13 Q    And is this an accurate reconstruction of all the
14 banking activity within the Silver Screen account?
15 A    Yes, it is.
16      MR. SAYRE:  Your Honor, may I have permission to
17 publish Exhibit 2291A?
18      THE COURT:  Any objection?
19      MR. ROBINSON:  Could I voir dire the witness on
20 just one issue, Your Honor?
21      THE COURT:  Yes.
22
23                    VOIR-DIRE EXAMINATION
24 BY MR. ROBINSON:
25 Q    Mr. Knudson, on the far right-hand side of this

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  Exhibit 2291A for identification, there is a column that

2  says comments?

3  A    Yes.

4  Q    Could you explain what was the basis for your

5  preparing the comments section?

6  A    This is the information that came off the check.

7  Q    Verbatim off the check?

8  A    Pretty much, yes.

9       MR. ROBINSON:  Thank you, Your Honor.

10      THE COURT:  Thank you.  2291A is admitted and may

11  be published to the jury.

12      MR. SAYRE:  Thank you.

13

14              DIRECT EXAMINATION (Res'd)

15  BY MR. SAYRE:

16  Q    Mr. Knudson, can you summarize your findings with

17  respect to Exhibit 2291A?

18      MR. ROBINSON:  Objection.  Vague and ambiguous as

19  to the scope of findings.

20      THE COURT:  Sustained.

21  Q   BY MR. SAYRE: Could you explain to the jury what

22  Exhibit 2291A represents in --

23  A    Yes.  2291 represents all the funds that went into

24  Silver Screen Industries, and the -- as you can see on

25  line 1, the beginning balance in this account was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

$15,488.

You can then see monies that are coming in to the account in the deposit column, and you can see that there was a 95,000 amount that came in. And this, although not perfect evidence, would indicate that this $95,000 came from DAI. And I think you heard testimony about DAI and its relationship.

The other monies that came in -- substantially came in from E-trade Securities, if you go down to February 18th, you will see a deposit for $131,000. This is a wire transfer credit from E-trade Securities, and you can see that this money came in. And there were then subsequent monies that went out right after that to E-trade Securities and a person by the name of Jane Sayre.

There was a deposit after that of $4680, and that came from something called Cinema Arts Entertainment.

And it appears that right after that, there were wire transfer orders from E-trade Securities, and after that, Dean Witter Reynolds.

From the deposit side, the total amount that went into the account was $1,693,000 and change, and this same amount of money went out -- or a little bit more when you include the amount that was already in there.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          From the withdrawal side, I think the

2    comments section were designed to put in the payee of the

3    check or information that was on the check or on the wire

4    transfer order, which would tell you who the person was

5    receiving the money.

6    Q    Based on your charts, what is your summary of the

7    information regarding Silver Screen Industries' trades?

8          MR. ROBINSON:  Objection.  Your Honor.  Vague and

9    ambiguous.

10         THE COURT:  Sustained.

11   Q   BY MR. SAYRE: Having reviewed all the information,

12   what do the trading patterns of Silver Screen indicate?

13         MR. ROBINSON:  Your Honor, objection.  This chart

14   deals with a bank account, not with a trading account, so

15   the question is unclear as to what he is referring to.

16         THE COURT:  Sustained.

17         MR. SAYRE:  I would be referring back to chart

18   2290 and chart 2291.

19         THE COURT:  Can you state the question?

20         MR. SAYRE:  Yes.

21   Q   BY MR. SAYRE: Based on these two charts, 2290 and

22   2291, what does the trading activity of Silver Screen

23   Industries indicate?

24   A    Well, it indicates that the pattern of trades was

25   similar to a day trader, that the trading was consistent

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    with the market in -- that was going up or a market was

2    going up, very consistent with what traders do is that

3    they try to get in when the market is going up, and they

4    try to get rid of their stock than the market is going

5    down.

6         MR. SAYRE:  All right.  Then no further questions,

7    Your Honor.

8         THE COURT:  Thank you.  Mr. Robinson, any

9    cross-examination?

10        MR. ROBINSON:  Yes, Your Honor.

11

12                   CROSS-EXAMINATION

13   BY MR. ROBINSON:

14   Q    Mr. Knudson, in your work as an IRS agent, did you

15   actually investigate securities fraud?

16   A    No.  We didn't actually investigate securities

17   fraud.  We investigated in parallel -- normally with the

18   FBI on security fraud matters.

19   Q    You investigated tax offenses, money laundering

20   offenses with the IRS; correct?

21   A    Yes.  Including that, yes.

22   Q    And when you were working in private practice with

23   KPMG and Price Waterhouse, you talked about being

24   involved in SEC compliance matters?

25   A    Yes.

1  Q    Did you investigate securities fraud?

2  A    Yes.

3  Q    All right.  Now, with respect to the charts that

4  Stephen Loveman, the government's witness, forensic

5  auditor, provided, he provided some charts.  I assume you

6  have reviewed those previously?

7  A    Briefly, yes.

8  Q    With respect to the chart that he had listing the

9  purchases and sales of e-Connect stock in the Silver

10 Screen account, did you have any -- did you find any

11 mistakes in that chart with regard to how much stock was

12 bought or sold and when it was bought or sold?

13 A    No.  Quite frankly, I didn't focus on Mr. Loveman's

14 work product.  I didn't really have much of an opinion on

15 it.

16 Q    Okay.  So you don't dispute the accuracy of his

17 chart showing the buys and sells in the Silver Screen

18 account with respect to E-trade; correct?

19 A    Well, it is just my impression.  I didn't review

20 them in extensive detail.  But I believe they are

21 reasonable.

22 Q    And with respect to the determinations reflected on

23 those charts about the profit that was made from, for

24 example, the purchase and sale of the first 96,100

25 shares, you come up with the same profit figure that

1    Mr. Loveman had; correct?

2    A    Yes.

3    Q    And then with respect to the subsequent purchase

4    and sale of e-Connect shares in the Silver Screen

5    account, the 80,000 plus a bit, you come up with the same

6    profit that Mr. Loveman came up with, didn't you?

7    A    Yes, I did.

8    Q    Now, with respect to the charts that you prepared,

9    you prepared -- just a moment and I will have it.  You

10   prepared the chart that indicated when -- this is Defense

11   Exhibit 2291.  Do you have that before you?

12   A    Yes.

13   Q    Now, this is the chart that you prepared that

14   listed what you described as releases?

15   A    Yes.

16   Q    And chronologically, along with purchases and sales

17   of e-Connect stock in the Silver Screen account; correct?

18   A    Yes.

19   Q    Now, when you were referring to the documents that

20   you described as releases --

21   A    Yes.

22   Q    -- you correlated those with items that you were

23   able to locate either because they had been produced by

24   the government for the defendant --

25   A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q       -- as instances of items which were publicly

2    disseminated over the Internet concerning e-Connect;

3    correct?

4    A       Yes.

5    Q       And some additional items that you located through

6    your investigation; correct?

7    A       Yes.

8    Q       Now, with respect to these items, when you listed

9    them on your chart, you listed them by what you referred

10   to in the second column as a release title?

11   A       Yes.

12   Q       So you have Exhibit 2291 before you?

13   A       Yes, I do.

14   Q       So that would be what the headline was on the

15   release; correct?

16   A       Yes.

17   Q       All right.  And the headline on the release may or

18   may not describe what it discussed about e-Connect in the

19   release; correct?

20   A       Yes.

21   Q       So, for example, you had opinions from something

22   called the subway.com; right?

23   A       Yes, I did.

24   Q       And on your chart where you list opinions for the

25   subway.com, let's take an example, the one that appears

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    on the third page of your chart for the subway.com on

2    March 2nd, 2000.

3    A    Yes.

4    Q    And you describe as subway.com announces investment

5    opinion on stereoscope.com?

6    A    Yes.

7    Q    And then you correspond that to a document in the

8    Bates number D with a lot of zeros and then 62-64?

9    A    Yes.

10   Q    Okay.  That opinion was not an investment opinion

11   about e-Connect, was it?

12   A    I will have to refer to it.

13   Q    Could you look at it.  You have the underlying

14   document?

15   A    Yes.

16        The reference is to e-Connect at the bottom of

17   the document, and I think there is four pages.

18        MR. ROBINSON:  Your Honor, may I display this --

19   this is an underlying document supporting that exhibit.

20   It is marked as D000062.

21        MR. SAYRE:  It speaks for itself, Your Honor.

22        THE COURT:  And it is in Exhibit 2001?

23        MR. ROBINSON:  Yes.  It is the basis for 2001.

24        THE COURT:  Overruled.

25   Q  BY MR. ROBINSON: So, Mr. Knudson, I have placed on

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   the screen so the jury and the court can see, this is

2   the document that you referred to in your chart as the

3   subway opinion; correct?

4   A    What Bates date?

5   Q    March 2nd, 2002.

6   A    What Bates number do you have there?

7   Q    0000062.

8   A    Okay.

9   Q    And on your chart, how do you describe this

10   document?

11   A    Announces investment opinion on stereoscape.com

12   headline with e-Connect.

13   Q    And on this document, it discusses, does it not,

14   numerous companies?

15   A    Yes, it does.

16   Q    Where does it discuss e-Connect?

17   A    It discusses e-Connect at the bottom of the page.

18   Q    And isn't it correct that the only thing it says

19   about e-Connect is under the heading, market's largest

20   dollar volume leaders, dot, dot, dot, it lists e-Connect

21   OTC BB, colon, e-Connect, which is the trading symbol for

22   e-Connect, and then a bunch of other companies?

23   A    Yes.

24   Q    So the only information this provides, it is not an

25   investment opinion about e-Connect, is it?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    A     I am not quite sure that it is an investment

2    opinion, but it does have information regarding

3    e-Connect.

4    Q     The only information it has is that e-Connect,

5    along with another -- the other companies listed here --

6    and now I will display the second page of this exhibit,

7    which continues on -- e-Connect and all those other

8    companies listed, starting on the bottom of that first

9    page and continuing to the top of the second page, are

10   just described as the market's largest dollar value

11   leaders?

12   A     Yes.

13   Q     So for purposes of your total mix analysis, all

14   this type of release contributes is that it tells the

15   public there is a lot of trading going on in dollar

16   volume in e-Connect, along with a bunch of other stocks;

17   correct?

18   A     Yes.  At the bottom of 61, it talks about when

19   e-Connect was established and the technology and a short

20   little description of what they were doing.

21   Q     This is 62, though.

22   A     Understand, but I think this is related to that as

23   well.  Maybe not.  Never mind.

24   Q     Is it fair to say that that is an example of a

25   release which is not an investment opinion about

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   e-Connect?

2   A     Yes.

3   Q     Rather, it -- is it fair to say it is simply a

4   description of trading activity in e-Connect?

5   A     Yes.  It is information out on the market about

6   e-Connect.

7   Q     And it does not recommend that anybody buy

8   e-Connect, does it?  No recommendation appears in that?

9   A     No.

10  Q     And there is no projection in it or prediction that

11  e-Connect will reach a certain dollar volume or a certain

12  price in the future, is there?

13  A     No.

14  Q     Now, Mr. Knudson, I would like you to continue on

15  with your chart.  We will look at some other examples of

16  what you have cited as releases.

17          Could you please look at -- at the

18  equityalert.com announces investment opinion number 8 of

19  8, which I believe is on your chart as a release on

20  January 7th of 2000.

21  A     Okay.

22   MR. SAYRE:  Your Honor, could we have the exhibit

23  published so we know what Mr. Robinson is referring to?

24   MR. ROBINSON:  Your Honor, I am referring to

25  Defense Exhibit 2291 for the reference to the listing

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that Mr. Knudson has.

2          THE COURT:  All right.  It is Defense Exhibit

3    2291.

4          MR. ROBINSON:  Right.  And then I have referred

5    him to a particular entry which is on this exhibit, which

6    is the one that is described in the far left column as

7    releasing firm, equityalert.com, release --

8    equityalert.com announces investment opinion number 8 of

9    8.

10         THE COURT:  And is this opinion included in

11   Exhibit 2001?

12         MR. ROBINSON:  I believe it is, Your Honor, as

13   Bates number D0000003 through 4 as the underlying

14   document.

15         THE COURT:  Thank you.  Do you have a question?

16         MR. ROBINSON:  Yes.  I want to refer him to that.

17   Q   BY MR. ROBINSON: Now, with respect to that document,

18   do you have that before you?

19   A     Yes, I do.

20   Q     Okay.  Now, the title of that document is what?

21   A     Equityalert.com announces investment opinion number

22   8 of 8.

23   Q     Now, that is not the title that you used for the

24   release title, is it?

25   A     No.  It is the third line down.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q     Okay.  So sometimes you used the title of the

2    article and sometimes you didn't when you described it in

3    this exhibit; is that correct?

4    A     Yes.

5    Q     All right.  So, now, referring to this article,

6    what in this article did you find that was relevant to

7    e-Connect that's reflected on your chart?

8          MR. ROBINSON:  Your Honor, may I publish this?

9          THE COURT:  Yes.

10   Q  BY MR. ROBINSON: What in this exhibit did you find

11   relevant about e-Connect that caused you to list it on

12   your chart?

13   A     The statement E-connects gains 53.06 percent after

14   taking first quarter order.

15   Q     So there is a reference to the increase in the

16   stock price of e-Connect?

17   A     Yes.

18   Q     Anything else?

19   A     No.

20   Q     So it is fair to say that this is not an investment

21   opinion recommending e-Connect, is it?

22   A     That is true.

23   Q     And it doesn't project any -- give any opinion

24   projecting any increase in E-connect's price, stock price

25   in the future, does it?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A      Well, actually, if you read it, I think you could

2   conclude that this talking about a gain of 53 percent, I

3   think --

4   Q      Does it say it is going to gain in the future to a

5   certain price per share level?

6   A      I think you could conclude that, yes.

7   Q      Where -- that is an inference you are drawing,

8   isn't it?

9   A      That is true.

10  Q      What does it say in this document about any

11  prediction of future stock price?  Does it specify a

12  price, it is going to go up to a certain amount?

13  A      No, it doesn't.

14  Q      And so, it is fair to say that this reflects

15  historical information about where e-Connect stock is

16  trading at that point in time, and that is all it does?

17  A      That is true.

18  Q      Now, with respect to e-Connect itself, it put out

19  releases; correct?

20  A      Yes.

21  Q      The company itself issued releases.  And you have

22  included those on your exhibit, Defense Exhibit 2291;

23  correct?

24  A      Yes.

25  Q      Is it fair to say that in the company's own press

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  releases, it did not predict a particular stock price in

2  the future?

3  A    I think that would be fair to say that that is

4  probably accurate.

5  Q    And it wouldn't be fair to characterize the

6  company -- E-connect's own press releases as investment

7  opinions, would it?

8  A    I don't know.  I don't know that you -- I think

9  that's an opinion that I couldn't advance.

10  Q    Is it fair to say that the company's own releases

11  about itself are not presented as being independent from

12  the company?

13  A    That is probably true.

14  Q    Now, on your Exhibit 2291, there were also

15  releases, weren't there, from companies other than

16  e-Connect which made reference to e-Connect, and you

17  included those; right?

18  A    Yes.

19  Q    So, for example, if we could look at the release

20  you have listed on here for e-Connect -- well, just a

21  moment, I'm sorry.

22       MR. ROBINSON:  May I have just one moment, Your

23  Honor?  I need to clarify something about this exhibit.

24          I apologize for the delay.

25  Q    Mr. Knudson, if you would look on the Defense

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Exhibit 2291, you have an entry for releasing firm E

2   funds for January 28th, 2000?

3   A    Yes.

4   Q    See that.  And then you have the underlying

5   document that supports that, which is D0000011?

6   A    Yes.

7   Q    And could you turn to that document, please.  Do

8   you have that before you?

9   A    I am looking.  I don't have that in my exhibit

10  package, I don't believe.  Let me look again.

11  Q    You don't have that, sir?

12  A    I don't have that here in my package, no.

13       MR. ROBINSON:  Your Honor, I could approach him

14  and give him my copy?

15       THE COURT:  Yes.

16  Q  BY MR. ROBINSON: You now have before you Defense

17  Exhibit 0000011?

18  A    Yes, I do.

19  Q    And this is the release that you cite in support of

20  the entry on your chart, Exhibit 2291, with respect to

21  E funds on January 28th, 2000; correct?

22  A    Yes.

23  Q    Now, this, a news release, is from -- not from

24  e-Connect; correct?

25  A    That's correct.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      You attribute on your chart to E funds; correct?

2    A      Yes.

3    Q      And in this release, is -- let me strike that.

4           Is this release an investment opinion on

5    e-Connect?  It is not, is it?

6    A      No.

7    Q      And this release doesn't predict any particular

8    future price for e-Connect, does it?

9    A      No, it doesn't.

10   Q      And it doesn't recommend that people buy e-Connect,

11   does it?

12   A      Not specifically, no.

13   Q      And it doesn't purport to be from any independent

14   investment analyst, does it?

15   A      Well, it has a safe harbor statement at the bottom

16   of the page, so I am not sure how to answer that

17   question.

18   Q      Well, is there anything in this document where the

19   company releasing it says they're independent investment

20   analysts with regard to e-Connect?

21   A      It doesn't say that, no.

22   Q      Isn't this a case of another company that does

23   business with e-Connect talking about their business

24   relationship?

25   A      I don't know.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q      Now, I would like you to look on your -- excuse me,

2   I keep saying your.  I apologize.  This is Defense

3   Exhibit 2291 which you have prepared.  Please turn to the

4   second page, and you have an entry there for something

5   released by freedomstocks.com?

6   A      Yes.

7   Q      And that is for February 7th, 2000?

8   A      Yes.

9   Q      And do you have the underlying documents supporting

10  that, 2550 and 2521?

11          MR. SAYRE:  Your Honor, I would like to object

12  under Rule 403.  We are not even in the relevant time

13  period.  This is a waste of time.

14          MR. ROBINSON:  This is a defense chart, Your

15  Honor.

16          THE COURT:  Overruled.

17  Q   BY MR. ROBINSON: Do you have that before you,

18  Mr. Knudson?

19  A      Say those again, please.

20  Q      I believe on your chart it is 2508 and 2509.

21          THE COURT:  I believe you just referred to earlier

22  Bates stamp 2550 and 2521.

23          MR. ROBINSON:  Your Honor, I apologize.  I

24  misspoke about that.  It is 2550 and 2521.  I apologize.

25          THE COURT:  Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      THE WITNESS:  Okay.

2    Q   BY MR. ROBINSON: And on your -- excuse me.  I

3    apologize.  On Defense Exhibit 2291, this entry that you

4    have for Freedom Stocks for February 7, 2000, how is

5    that described under release title?

6    A    Freedomstock.com announces investment opinions for

7    week of February 7th, 2000.

8      MR. ROBINSON:  May I publish it, Your Honor?

9      THE COURT:  Yes.

10     MR. SAYRE:  Your Honor, I would like to also

11   object that, for whatever reason, we couldn't read from

12   these documents.  I object to the fact the prosecution is

13   doing the same.

14     THE COURT:  Overruled.  The argument lacks merit

15   or basis.

16   Q   BY MR. ROBINSON: Mr. Knudson, so in this particular

17   instance on Defense Exhibit 2291, you used the same

18   title as appears at the top of this release, correct,

19   Freedomstocks.com announces investment opinion for week

20   of February 7th, 2000?

21   A    Yes.

22   Q    Where in this document did you find information

23   that related to e-Connect?

24   A    Give me a moment, please.  On 2550, there -- seems

25   to be related to another document, which is 2521.  It is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    listed on 2521.

2    Q    Well, you have it listed for 2550, don't you, on

3    your chart?

4    A    Yes, I do.

5    Q    So let's, if it we can, for the moment stick with

6    2550, because that is the document that matches the title

7    that you have for this entry; correct?

8    A    That is true.  I was interrelating these two on the

9    same date.

10   Q    Okay.  Well, on this document, 2550, isn't it the

11   case that the only thing in this document that even --

12   that mentions e-Connect is where it says "Recently

13   profiled U.S. companies include," a number of companies

14   are listed, and at one point it says e-Connect?

15   A    Right.

16   Q    Is there anything else about e-Connect on this

17   document?

18   A    No.

19   Q    And so, it is fair to say that this is not an

20   investment opinion itself concerning e-Connect; correct?

21   A    That is true.

22   Q    It makes no prediction of future price for the

23   company; correct?

24   A    That's correct.

25   Q    And it doesn't recommend that people buy the stock,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    does it?

2    A    No, it doesn't.

3    Q    On Defense Exhibit 2291, you also included, did you

4    not, news service articles that referred to e-Connect;

5    correct?

6    A    Yes.

7    Q    For example, you had a news service article

8    regarding e-Connect that appears from something called

9    Asia Pulse PTE, and that is on page 4 of 2291 for a

10   release date of March 8th, 2000; correct?

11   A    Yes.

12   Q    And the underlying document that you had that

13   supported that is marked as D00000074; correct?

14   A    Yes.

15   Q    And that is not -- let me rephrase.

16        That's Asia Pulse PTE sending out a release on

17   repeating IFR; correct?

18       MR. ROBINSON:  Your Honor, may I check with the

19   agent about one thing?

20       THE COURT:  Yes.

21   Q   BY MR. ROBINSON: I'm sorry for the interruption.

22        This is D0000074; correct?

23   A    Yes.

24   Q    Okay.  And you put this on your -- on Defense

25   Exhibit 2291 described as asia.net summary for Wednesday,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    March 8, 2000; correct?

2    A     Yes.

3         MR. ROBINSON:  Your Honor, may I display this?

4         THE COURT:  Yes.

5         MR. ROBINSON:  I am displaying D0000074.

6    Q   BY MR. ROBINSON: At the top of it, it says asia.net

7    summary for Wednesday, March 8, 2000, which is the title

8    you used for the release title on your chart?

9    A     Yes.

10   Q     What on this document relates to e-Connect that

11   caused you to include it in your exhibit?

12   A     At the bottom of the page.

13   Q     And that is the part where it talks about the part

14   of what e-Connect said today concerning integration of

15   its systems?

16   A     Yes.

17   Q     Now, it is fair to say that this is not an

18   investment opinion, is it?

19   A     No, it is not.

20   Q     It doesn't make any predicted about the future

21   price of e-Connect?

22   A     That is true.

23   Q     Doesn't recommend that anyone buy e-Connect, does

24   it?

25   A     No, it doesn't.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q    And it doesn't purport to come from an independent

2    investment analyst who doesn't have any interest in the

3    stock, does it?

4    A    I don't believe so.

5    Q    You also have on Exhibit 2291 release that comes

6    from something called Linux Stock News.  This appears on

7    March 7th, 2000.  It is on the first page of 2291.

8    A    Yes.

9    Q    And that is supported by Exhibit D00000072 and 73?

10    A    Yes.

11    Q    Could you turn to those supporting documents?  Do

12    you have them before you?

13    A    Yes, I do.

14         MR. ROBINSON:  Your Honor, may I publish?

15         THE COURT:  Yes.

16    Q  BY MR. ROBINSON: Now, the title that you have on

17    Exhibit 2291 for this is Linux Stock News announces

18    investment opinion; correct?

19    A    Yes.

20    Q    And that comes from the top of this page; right?

21    That is where you got it?

22    A    Yes.

23    Q    Now, where on this document is there material

24    concerning e-Connect that caused you to include it as

25    part of Exhibit 2291?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    I don't have the first page.  Oh, yes, I do.  Here

2    it is.  The very, very bottom of the page.

3    Q    The very, very bottom of the first page?

4    A    Yes.  And then beginning at the top of the second

5    page.

6    Q    Is that the part that says, "This week we revisit

7    e-Connect," starting on the bottom of that page 72?

8    A    Yes.

9    Q    And then, it continues onto the next page; correct?

10   A    Yes, it does.

11   Q    And on the next page, it appears to be cut off.

12            Do you see any other information about

13   e-Connect that appears on this defense exhibit?

14   A    Just the reference to the information at the bottom

15   of the page and the references to Palm IPO and that kind

16   of connection.

17   Q    Now, on your chart, this is described as Linux

18   Stock News announces investment opinion, but it is

19   correct, is it not, that this is not an investment

20   opinion about e-Connect, is it?

21   A    That is true.

22   Q    It does not recommend that anyone buy e-Connect;

23   correct?

24   A    That's correct.

25   Q    Doesn't project any future pricing levels for

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   e-Connect; correct?

2   A     That's correct.

3   Q     And it doesn't say that Linux Stock News is

4   independent and objective and has no position in

5   e-Connect, does it?

6   A     No, it doesn't.

7   Q     On Exhibit 2291, you include what could be

8   described as releases from something called Wall Street

9   Directory.  And I invite your attention to page 4 of

10  2291, an entry for the date, March 3rd, 2000, that you

11  have listed the releasing firm Wall Street Directory?

12  A     Yes.

13  Q     And then beneath that you put barchart.com reprint.

14  A     Yes.

15  Q     And the corresponding supporting document is Bates

16  3082?

17  A     Yes.

18  Q     First, Mr. Knudson, you describe this in the

19  releasing firm column of 2291 as barchart.com reprint.

20  What investigation did you conduct to determine that Wall

21  Street Directory was a barchart.com reprint?

22  A     I didn't.

23  Q     So what -- why did you put something on your chart

24  that you didn't investigate?  Was there a reason that you

25  put barchart.com reprint?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    That is in parentheses, so it may have been that

2    that is what I was believing that it was and failed to

3    take it out after -- after I couldn't find whether it was

4    or not.

5    Q    So you don't really know where the Wall Street

6    Directory comes from or what its affiliation is with

7    barchart, do you?

8    A    This came out of the government's exhibits.

9    Q    But you don't have any knowledge because you didn't

10   investigate it; correct?

11   A    That is true.

12   Q    Now --

13        MR. ROBINSON:  Your Honor, may I publish this?

14        THE COURT:  Yes.

15   Q    BY MR. ROBINSON: So is it fair to say that you don't

16   know who or what is Wall Street Directory?

17   A    That is fair to say.

18   Q    Now, on this document what information concerning

19   e-Connect did you find relevant that caused you to put it

20   on 2291?

21   A    It was providing market information on e-Connect.

22   Q    So, for example, it appears to indicate for the

23   date March 3rd of 2000, there is open, high, low, last,

24   change in volume numbers relating to e-Connect?

25   A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q     And that is historical stock information?

2   A     Yes.

3   Q     And then there are some additional items on here

4   called the composite indicator trend spotter.  Do you

5   know what the composite indicator trend spotter is?

6   A     It is an analysis performed by this company.

7   Q     Are you speculating, or do you know that for a

8   fact?

9   A     Well, I am speculating.

10  Q     And you don't know how this company performs a

11  composite indicator trend spotter analysis, do you?

12  A     No.  I can only say that this is very similar to

13  what Bar Charts was doing.

14  Q     And on this document, the word "buy" appears

15  multiple times; correct?

16  A     Yes.

17  Q     Now, it doesn't indicate, does it, any prediction

18  about future stock price for e-Connect, does it?

19  A     It doesn't say it specifically, no.

20  Q     So from this, you can't tell, can you, whether you

21  should buy e-Connect, according to this, when it is at

22  $5-and-a-half or $6 or $9 or $10 or $20?  You can't tell

23  from this, can you?

24  A     That is true.

25  Q     The buy is not in relation to any particular price?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    Only as it relates to that date.

2    Q    And this does not indicate a time of day, does it,

3    when it came out?

4    A    I don't see it listed here.

5    Q    And, in fact, since it shows the open, high, low,

6    last, it would have to come out after trading closed that

7    day, wouldn't it?

8    A    Yes, I believe I have indicated that.

9    Q    So this wouldn't be a buy recommendation that came

10   out on the 3rd of March for trading that day because

11   trading that day is done; correct?

12   A    Well, I don't know that that is actually true.

13   Q    It shows last $4.63?

14   A    That is true, but --

15   Q    Does that indicate a closing price that day for the

16   stock?

17   A    Close of market is what that price is, but that

18   doesn't mean that trading couldn't have occurred after

19   close of market.

20   Q    Now, this document doesn't purport to be from an

21   independent investment analyst who doesn't own any stock

22   in e-Connect, does it?  There is nothing on here that

23   says that?

24   A    That is true.

25   Q    And then, Mr. Knudson, you also talked about

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    several times barchart.com as among the releases that you

2    put in Exhibit 2291; correct?

3    A     Yes.

4    Q     And so now, if I invite your attention to the entry

5    that you listed on 2291, by a release from barchart.com

6    for March 6th, 2000.

7    A     Okay.

8    Q     And so for that entry, the underlying pages for

9    that, do you have those well as well?

10   A     Yes, I do.

11   Q     And that is 3083?

12   A     Yes.

13        MR. ROBINSON:  May I publish it, Your Honor?

14        THE COURT:  Yes.

15   Q   BY MR. ROBINSON: Mr. Knudson, this is one of several

16   barchart.com releases that you have included in Exhibit

17   2291; correct?

18   A     Yes.

19   Q     This one is for -- it is described as historical

20   opinion as of 3/6/2000?

21   A     Yes.

22   Q     Does that indicate that this was printed out

23   sometime after 3/6/2000, since it is an as of date and it

24   says historical?

25   A     I suppose so.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q      Now, on this chart, there is a listing of

2   historical stock price information for e-Connect on

3   March 6, 2000; correct?

4   A      Yes.

5   Q      With the open, high, low, last change, volume, et

6   cetera; correct?

7   A      Yes.

8   Q      And then there is some information that refers to,

9   for example, the 20-50 day MACD oscillator, 20-day

10  Bollinger bands, et cetera.  And across from that, there

11  is the word "buy" that appears a number of times;

12  correct?

13  A      Yes.

14  Q      Now, is it fair to say that on this exhibit, there

15  is no recommendation -- strike that.

16          There is no prediction of future price for

17  e-Connect stock, is there?

18  A      Well, there actually are predictions and

19  recommendations.

20  Q      What price level does it say e-Connect stock is

21  going to be in the future, and where does it say that on

22  the chart?

23  A      Well, it talks about short-term indicators,

24  seven-day directional indicator, ten to eight moving

25  average, and it is talking about a buy recommendation

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   over time.  It doesn't say what the price would be.

2   Q     Right.  So a person reading this is not provided

3   with information as to a particular price or price range?

4   A reasonable investor looking at this is not given

5   information --

6          MR. SAYRE:  Calls for speculation and conclusion.

7          MR. ROBINSON:  I will rephrase it, Your Honor.

8          THE COURT:  All right.

9   Q   BY MR. ROBINSON: A person reading this document who

10  is considering investing in e-Connect is not provided

11  information about any specific or particular stock price

12  range; correct?

13  A     Well, it actually does.  I mean, it is telling you

14  the high and the low, and it is telling you what the

15  current price is and --

16  Q     Let me -- excuse me.  Let me rephrase that.  I am

17  talking about future stock price.  It does list

18  historical stock price as of March 6, but it does not

19  provide information as to specific stock price in the

20  future, does it?

21  A     It doesn't tell you a specific stock price.  Nobody

22  could ever predict that.

23          MR. ROBINSON:  Your Honor, move to strike after he

24  answered the question "it does not provide specific stock

25  price."

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Granted.  Stricken.

2    Q   BY MR. ROBINSON: Nor does it tell you a specific

3    dollar range of stock price in the future, does it?

4    A     No.

5    Q     So it doesn't tell you, for example, whether you

6    should buy the stock in e-Connect if it was at $9 or $10

7    or $15 or $20, does it?

8    A     It doesn't give you a specific price, that's

9    correct.

10   Q     And it doesn't purport to be provided by someone

11   who is independent and has no position or ownership of

12   e-Connect stock, does it?  There is no disclaimer here in

13   that regard, is there?

14   A     Not on this, no.

15   Q     Now, I would like to you look at the IFR opinion,

16   independent financial reports's opinion, that is

17   referenced on Defendant's 2291 that appeared on March 8th

18   of 2000.

19   A     Okay.

20         MR. ROBINSON:  Your Honor, may I publish the first

21   page of this?

22         THE COURT:  Yes.

23   Q   BY MR. ROBINSON: Now, the copy I have, Mr. Knudson,

24   is from a copy that has been used previously in

25   evidence.  But if you could look at the screen and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   satisfy yourself that what I am displaying is the same

2   thing that you have for the March 8th Independent

3   Financial Report's opinion.  Is that the one you are

4   familiar with?

5   A     Hold on just a second.  I have referred to it as a

6   different number.  I recognize this one, but I also have

7   one that is referenced on my chart.

8   Q     They appear to be the same document?

9   A     Well, no.  They are not the same document.

10  Q     The same text?

11  A     It is from Business Wire, so I would assume that it

12  is.

13  Q     Would you be confused if I use this copy that I

14  have displaced?  Because if you would in any way, I will

15  make sure I am using the same one you are using if you

16  think they are materially different.

17  A     Go ahead.

18  Q     Now, this is the March 8th Independent Financial

19  Report's opinion that -- that you have been referring to

20  in your testimony; correct?

21  A     Yes.

22  Q     And isn't it the case that, unlike all the other

23  releases that we have been talking about that I have

24  reviewed with you, this purports to be an independent

25  investment opinion?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. SAYRE:  Your Honor, the document speaks for

2   itself, and it is argumentative.

3        THE COURT:  Overruled.

4        THE WITNESS:  Well, I don't think we reviewed all

5   of the information on my chart.

6   Q    BY MR. ROBINSON: Of the ones I reviewed with you --

7   A    But the ones you have, I would agree.

8   Q    Right.  And unlike the ones I have reviewed with

9   you that are on your chart, this does give predictions

10  and projections about specific prices that e-Connect

11  stock will reach in the future; correct?

12  A    Yes.

13  Q    And that is unlike any of the other releases on

14  your chart that we have discussed so far; correct?

15  A    That is true.

16  Q    And this includes a disclaimer at the bottom where

17  it says, "IFR holds no stock in e-Connect and is not and

18  will not be compensated for its opinion in regard to

19  e-Connect."  That type of -- that disclaimer language,

20  the substance of that, doesn't appear on any of the

21  releases that we have reviewed so far; correct?

22  A    That is true.

23  Q    So of the releases that we have looked at so far,

24  the release by Independent Financial Reports is not a

25  press release, is it?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    No, it is not.

2    Q    It is an investment opinion; correct?  That is what

3    it calls itself; correct?

4    A    Yes.

5    Q    And each of the Independent Financial Reports

6    investment opinions are investment opinions and not press

7    releases; correct?

8    A    Yes.

9    Q    And each of these purports to be independent and

10   objective and coming from a company that has no interest

11   in the stock it is recommending; correct?

12   A    That's correct.

13   Q    And particularly the last one that I showed you

14   recommends purchase of the stock and talks about specific

15   future higher prices and growth in the prices of the

16   stock; correct?

17   A    Yes.

18   Q    Which of the other releases that you put into

19   Exhibit 2291 do that?

20   A    Do you want me to review all of them?

21   Q    If you can review them and find some that have

22   those same features, I would like you to identify them.

23   A    I think the purpose of this exhibit is to show

24   press releases in context with all the information that

25   was out in the public.  My --

1    MR. ROBINSON:  Your Honor.  Objection.  Move to

2  strike as nonresponsive.

3    THE COURT:  Sustained.  Granted.  Stricken.

4  Q   BY MR. ROBINSON: Can you identify any releases that

5  you have listed on Defendant's Exhibit 2291 that have

6  one or more of the features that I just described to you

7  and you acknowledge are present in the Independent

8  Financial Reports investment opinions?

9  A    No, I can't.

10    MR. ROBINSON:  May I have a moment, Your Honor?

11    THE COURT:  Yes.

12    MR. ROBINSON:  No further questions, Your Honor.

13    THE COURT:  Thank you.  Any redirect, Mr. Sayre?

14    MR. SAYRE:  Yes, Your Honor.

15

16                  REDIRECT EXAMINATION

17  BY MR. SAYRE:

18  Q    Mr. Knudson, did you say Equity Alert or subway.com

19  were opinions about e-Connect?

20  A    No, I did not.

21  Q    Did you state that -- in your exhibit that

22  E-connect's press releases were opinions?

23  A    No, I didn't.

24  Q    And did you state that E funds was an investment

25  opinion on your charts?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A     No.

2        MR. ROBINSON:  Your Honor, object to the form of

3   the question.  He is just asking the witness what his

4   prior testimony was.

5        THE COURT:  Overruled.

6   Q   BY MR. SAYRE: Are the overwhelming majority of

7   articles in Exhibit 2001 entirely about e-Connect?

8        MR. ROBINSON:  Objection.  Vague and ambiguous as

9   to "overwhelming."

10       THE COURT:  Sustained.

11  Q   BY MR. SAYRE: Would it be fair to say that

12  approximately 90 percent of the articles in Exhibit 2001

13  are entirely about the e-Connect company?

14  A     Yes.

15  Q     Is it fair to say that the IFR opinions didn't give

16  100 percent buy ratings?

17  A     That is true.

18  Q     Is it fair to say that Wall Street Directory did

19  give 100 percent buy ratings?

20  A     Yes.

21  Q     Is it fair to say at the bottom of the IFR articles

22  that there was a considerable warning given regarding the

23  risks involving the stock market?

24       MR. ROBINSON:  Okay.  Irrelevant.

25       THE COURT:  Sustained.  And those exhibits that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  have been admitted speak for themselves.

2  Q    BY MR. SAYRE: Is it fair to say that the Wall Street

3  Directory 100 percent buy rating had no warning of any

4  kind?

5  A     That is true.

6  Q     Would it be fair to say that all articles tend to

7  produce different forms of information?

8       MR. ROBINSON:  Objection.  Vague and ambiguous.

9  Lack of foundation.  Relevance.

10      THE COURT:  Sustained.

11 Q    BY MR. SAYRE: Did you find any two articles that

12 were identical in the 60-something articles that you

13 presented in Exhibit 2001?

14      MR. ROBINSON:  Objection to the meaning of

15 identical.

16      THE COURT:  Sustained under 402, 403, 702.

17 Q    BY MR. SAYRE: Did any of the other articles in

18 Exhibit 2001 give 100 percent buy ratings in e-Connect?

19      MR. ROBINSON:  Objection, Your Honor.  Unclear as

20 to whether he is referring to the exact words,

21 100 percent buy rating, or that they recommended a buy

22 without any reservations.  The question is ambiguous.

23      THE COURT:  Sustained.

24 Q    BY MR. SAYRE: Precisely, did any of the articles in

25 the Exhibit 2001 use the term 100 percent buy ratings

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    other than barchart.com and the Wall Street Directory?

2    A      That is quite a big question.  I am not sure.  I

3    don't have all of the information in my head at this

4    moment.  But there were some that were very positive.  I

5    can't say that they used 100 percent buy rating.

6    Q      And IFR articles did not use that term, did they?

7    A      I don't believe so.

8    Q      Did IFR own any stock in e-Connect?

9           MR. ROBINSON:  Objection.  Lack of foundation.

10          THE COURT:  Sustained.

11   Q   BY MR. SAYRE: Did you purport to investigate the

12   Wall Street Directory opinions?

13   A      No.

14   Q      Did you create the Wall Street Directory opinions?

15   A      No, I didn't.

16   Q      How many opinions did -- in combination of

17   barchart.com and Wall Street Directory produce on

18   e-Connect between the dates February 29th and March 8th

19   in the year 2000?  I should say that are included in your

20   Exhibit 2001.

21   A      Between February 28th and --

22          THE COURT:  The question was February 29th and

23   March 8th in the year 2000.

24          THE WITNESS:  Would you say it again, please?

25   Q   BY MR. SAYRE: Just how many opinions were there

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    between February 29th and March 8th that are included in

2    Exhibit 2001?

3    A    Are we talking about IFR opinions?

4    Q    No.  Wall Street Directory and barchart.com.

5    A    Well, again, I don't believe they were opinions.  I

6    think they were news releases.

7    Q    In respect to the historical opinions in Wall

8    Street Directory and barchart.com, could you tell me on

9    the barchart.com and the Wall Street Directory, the

10   historical opinion for e-Connect, how many are there in

11   the 2001 exhibit?

12   A    (No response.)

13   Q    All right.  Possibly that is not so important.

14        MR. SAYRE:  I would like to broadcast eight of the

15   opinions, Your Honor.

16        THE COURT:  Which of the documents?  Can you

17   identify them?

18        MR. SAYRE:  Yes.  This is January 29th.

19        THE COURT:  And you are referring to writings

20   listed in Exhibit 2291?

21        MR. SAYRE:  Yes.  Well, they are documents that

22   are -- yes, that are mentioned.

23        THE COURT:  All right.  Which documents?

24        MR. SAYRE:  They are in Exhibit 2001, but I don't

25   know the specific identification.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  If you could give me the name and the
2    date and the Bates stamp identifying number.
3        MR. SAYRE:  Yes.  Well, the first one would be
4    2/29/2000.
5        THE COURT:  2/29/2000.  And which releasing firm?
6        MR. SAYRE:  That would be barchart.com.
7        THE COURT:  Barchart.com.  All right.  And that is
8    Bates stamped 3079?
9        MR. SAYRE:  Actually, unfortunately, it is missing
10   from the exhibits I have here, but I would assume that it
11   is preceding --
12       THE COURT:  I am referring to Defense Exhibit
13   2291.  That is what I am reading from.
14       THE WITNESS:  I have it in front of me.
15       MR. SAYRE:  I think possibly we will just simplify
16   this.
17   Q   BY MR. SAYRE: Could you just briefly describe to the
18   jury the concept of beneficial ownership for -- a
19   nominee beneficial ownership in offshore corporations?
20       MR. ROBINSON:  Objection.  Calls for a legal
21   conclusion and relevance and lack of foundation.
22       THE COURT:  Sustained.  Also beyond the scope of
23   cross.
24       MR. SAYRE:  No further questions.  Thank you.
25       THE COURT:  Any further questions redirect -- or

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  recross, Mr. Robinson?

2       MR. ROBINSON:  Just briefly, Your Honor. ^rce.

3

4                    RECROSS-EXAMINATION

5  BY MR. ROBINSON:

6  Q    Mr. Knudson, when you were asked about 100 percent

7  buy ratings --

8  A    Yes.

9  Q    -- your response was simply that the words

10 100 percent buy rating don't appear in the IFR opinions

11 anywhere; correct?

12 A    I didn't -- I don't recall seeing those.

13 Q    Okay.  But there is no question that the IFR,

14 Independent Financial Reports, investment opinions

15 recommended that people invest in that stock of

16 e-Connect?

17 A    That is true.

18 Q    And with respect to 100 percent buy rating, of all

19 the other articles that are in Exhibit 2291, it is only

20 the ones that were put out under the name barchart and

21 Wall Street that used the words 100 percent buy rating;

22 correct?

23 A    I believe that's correct.

24 Q    And if you set aside those handful from barchart

25 and Wall Street along with the Independent Financial

1  Reports investment opinions, there is no other releases

2  in that exhibit where there is an investment opinion

3  recommending buying e-Connect?

4  A    I don't think I could say that with any clarity.

5  Q    It is the exhibit you prepared.

6  A    That is true, but as I sit here right now, I can't

7  go through each one.

8  Q    You don't remember any of them, do you?

9  A    Not right now, I don't.

10       MR. ROBINSON:  Nothing further.

11       THE COURT:  Mr. Sayre --

12       MR. SAYRE:  Yes, Your Honor.

13       THE COURT:  -- any redirect?

14  Q  BY MR. SAYRE: Mr. Knudson, in your experience as an

15  IRS agent and investigator for the U.S. Treasury, is it

16  impermissible to publish opinions?

17       MR. ROBINSON:  Objection.  Beyond the scope of the

18  direct, the redirect and the cross, lack of foundation,

19  and relevance.

20       THE COURT:  Sustained on those grounds.

21       MR. SAYRE:  No further questions, Your Honor.

22       MR. ROBINSON:  Nothing further, Your Honor.

23       THE COURT:  Can Mr. Knudson be excused as a

24  witness, Mr. Sayre?

25       MR. SAYRE:  Yes, Your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. ROBINSON:  Yes.

2        THE COURT:  All right.  Thank you very much.  You

3   are excused.

4            And, Mr. Sayre, you may call your next

5   witness.

6        MR. SAYRE:  Your Honor, would it be permissible to

7   take a short break?

8        THE COURT:  We can get started, and then we will

9   take a break.  Thank you.

10           The witness can approach the witness stand to

11  my right.

12       THE WITNESS:  Thank you, Your Honor.

13       THE CLERK:  Sir, can you please raise your right

14  hand?

15       THE WITNESS:  Certainly.

16      (The wit was sworn.)

17       THE CLERK:  Thank you.  Please take a seat, and

18  can you please state and spell your full name for the

19  record.

20       THE WITNESS:  Yes.  My name is Ronald W. Cornew,

21  and that is spelled C-O-R-N-E-W.

22       THE CLERK:  Thank you.

23       THE COURT:  Mr. Sayre.

24

25                    DIRECT EXAMINATION

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. SAYRE:

2    Q    Yes.  Mr. Cornew -- I'm sorry.  Dr. Cornew.  How

3    are you employed?

4    A    I am the president of Market Consulting Corporation

5    and have been so for approximately 20 years.

6    Q    Can you describe your educational background?

7    A    Yes, I have both a undergraduate and a graduate

8    degree from the Massachusetts Institute of Technology.

9    Q    Can you describe your employment over the past 20

10   years?

11   A    Yes.  Over the last 20 years, I have been employed

12   as a consultant in the securities industry.  We have --

13   over that time period, we have consulted for a large

14   number of different organizations, including the New York

15   Stock Exchange, Teachers Insurance and Annuity

16   Association, which is the insurance company and the

17   pension plan insurer and, for that matter, investment

18   manager of the pension plans of approximately 2000

19   colleges and universities in the United States.  I have

20   also been involved with, as I mentioned, any number of

21   other organizations.

22            I also have been a professor at Ford

23   International University where I have taught courses

24   relating to investment management stocks and various

25   things of that type.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      As a result of your background and experience, do

2    you have expertise in the field of how the United States

3    stock market operates?

4    A      Yes, I do.  I do.

5    Q      What is that experience?

6    A      Well, again, as I mentioned, I have been employed

7    for the last 20 years as a consultant in this area.  But

8    also, prior to that time, I was the -- a founder and a

9    vice president of a company which created and sold

10   securities.

11          And in that connection, I did due diligence

12   work.  I was involved in the generation of press

13   releases.  I was involved, for that matter, in the

14   trading of the company.  And just general, different

15   kinds of tasks that relate to a lot of the issues in this

16   case, including -- I think the thing I was trying to

17   think of and say, perhaps if I have already said it,

18   excuse me for me repeating myself, but I think I also

19   wanted to point out that I had done due diligence work in

20   connection with that.

21   Q      And as a result of your education and experience,

22   do you have expertise in the fields of securities and

23   marketing?

24   A      Yes, I do.

25          THE COURT:  Would this be a good time to take our

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    break?

2         MR. SAYRE:  Yes.

3         THE COURT:  We will take a ten-minute break until

4    1:30.  The jurors should remember not to discuss this

5    case or anything related to the case.  Thank you.

6

7         (The following proceedings were held in open court

8          outside the presence of the jury:)

9

10        THE COURT:  The jurors are out of the room

11   Dr. Cornew, you can step down from the witness stand.  We

12   will take a break in a couple of minutes, but until we

13   do -- before we take a break, are there any issues to

14   address at this time?

15        MR. ROBINSON:  Your Honor, the government's motion

16   in limine which the court has addressed with respect to

17   Mr. Knudson also extended to the opinions of Dr. Cornew,

18   and we have the same concerns as reflected in our motion

19   in limine.  And to the extent the court would like to

20   address that before we get into those areas or perhaps

21   Mr. Sayre could work around those areas, we would avoid

22   having a lot of objections in front of the jury.

23        THE COURT:  All right.  How would you suggest we

24   proceed?  I would ask -- I could ask Mr. Sayre what

25   opinions Dr. Cornew will state, will be asked to state.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1       MR. ROBINSON:  Very well, Your Honor.

2       THE COURT:  Does that sufficiently address your

3   motion at this time?

4       MR. ROBINSON:  Yes, Your Honor.

5       THE COURT:  Mr. Sayre, what opinions will you be

6   asking Dr. Cornew to give to the jury?

7       MR. SAYRE:  I will look through the documents

8   here.

9       THE COURT:  Why don't we take a five-minute break

10  for my staff, and then I will ask Mr. -- and the parties,

11  then I will ask Mr. Sayre to list the opinions that

12  Dr. Cornew will state.

13              (Brief recess.)

14      (The following proceedings were held in open court

15       outside the presence of the jury:)

16

17      THE COURT:  We are outside the jurors' presence.

18  Both sides are here.  With respect to Dr. Cornew's

19  testimony, reviewing the government's motion to dismiss

20  and Exhibit 2 to the government's motion to dismiss,

21  which contains -- which consists of a letter dated

22  June 24th, 2008 summarizing Dr. Cornew's testimony, I

23  would tentatively rule as follows:

24          Looking at the first -- the second paragraph

25  on page 1 beginning, he will testify about the stock

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  market for tech stocks, tentative grant motion to exclude

2  not relevant or admissible expert opinion.

3          With respect to the remaining paragraphs on

4  page 1, the third, fourth, fifth and sixth, the court's

5  tentative is to grant the motion to exclude as well for

6  reasons set forth in the government's motion.  With

7  respect to the third paragraph, the testimony is not

8  relevant, describing -- for example, insider trading

9  frauds is not relevant.

10          With respect to the remaining opinions in the

11  fourth, fifth and sixth paragraphs in Exhibit 2, this is

12  not admissible expert opinion.  Essentially, what the

13  expert -- what defendant seeks to do is have his expert

14  instruct the jury unnecessarily on the law.

15          With respect to the -- page 2 of Exhibit 2,

16  there are five opinions listed in five separate

17  paragraphs.

18          With respect to the first four paragraphs, the

19  court would also tentatively grant the government's

20  motion to exclude.  Again, this is impermissible,

21  inadmissible testimony by an expert and should be

22  excluded for all of the reasons set forth in the

23  government's brief.  Again, the jury -- the witness seeks

24  to instruct the jury on how they should interpret the

25  law, how they should decide the case.  Same ruling with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    respect to the last paragraph on -- and the last opinion

2    on page 2.

3            In addition, when the defendant refers to

4    methodology, there is no foundation for the kind of

5    methodology the expert would use.  Moreover, again, the

6    defense seeks to have the expert impermissibly tell the

7    jury how they should decide what is material or is not

8    material in this case.

9            With respect to the last page of Exhibit 2,

10   the first paragraph states that the witness will testify

11   about e-Connect, the company, its history.  The question

12   I have is, is this a proper subject of expert testimony?

13   In this case, is there a sufficient foundation for his

14   knowledge?  Wouldn't the appropriate witness to testify

15   about e-Connect be Thomas Hughes, who has already

16   testified?

17           Then continuing on the third page, the second

18   paragraph, the expert's opinion about the indictment and

19   the criminal statutes is not relevant or admissible.

20   This paragraph states that he has prepared charts.  I

21   need to learn more about those charts to see if they are

22   admissible and would be concerned as to whether or not

23   they are unduly cumulative of Mr. Knudsen's charts.  But

24   I would invite more information from the defendant as to

25   what kind of charts the doctor has prepared.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Then, with respect to the third paragraph on

2  page 3, the court's tentative would be to exclude that as

3  well, though I would entertain argument to the contrary.

4  And I would exclude it for reasons set forth in the

5  government's brief.

6    With respect to the fourth paragraph on

7  page 3, the court's tentative would be to exclude

8  pursuant to grounds set forth in the government's papers.

9    With respect to the fifth paragraph on page 3,

10  the court's tentative would be to exclude as well for

11  reasons set forth in the government's brief.

12    And with respect to the final opinion, the

13  final paragraph on page 3, the court would also exclude

14  pursuant to the grounds set forth in the government's

15  brief.

16    Before I turn to the defendant, does --

17  Mr. Robinson, does the government have any argument they

18  wish to highlight or correct?

19    MR. ROBINSON:  No, Your Honor.  I think that there

20  were some Rule 16 arguments that we made as well, but I

21  would approach those the same way we approached the other

22  ones.  It is within the court's discretion.  We wouldn't

23  ask that he be prohibited from testifying, but if there

24  are areas of opinion that the court will allow him to

25  testify to which were not -- for which the bases and the

1    reasons were not spelled out in the Cornew Rule 16

2    letter, we would ask that they at least be spelled out

3    before the government is required to cross-examine him.

4         THE COURT:  That is a valid request.  In sum, as

5    the government asserts in their papers, the expert should

6    not be permitted to testify about how securities laws of

7    the United States operate.  He shouldn't be allowed to

8    testify generally as to common fraud schemes.  His

9    testimony regarding materiality is also objectionable for

10   the reasons highlighted in the government's brief.  The

11   government's objection to testimony regarding the impact

12   of Silver Screen trading on the stock price also has

13   merit and would be sustained.

14         Mr. Sayre, do you wish to be heard in

15   response?

16        MR. SAYRE:  Your Honor.  Just that, clearly, it

17   appears that we will be entirely eliminating all expert

18   opinion; is that correct?

19        THE COURT:  That is not what I stated.  First of

20   all, Exhibit 2, to the government's motion is rather --

21   is general, and it doesn't purport to be exhaustive.

22   Furthermore, as I stated, there may be areas where expert

23   testimony by Dr. Cornew is appropriate.

24         For example, as I stated on page 3,

25   Paragraph 2, you refer to the expert's charts.  Well, the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  summary is so vague, I can't tell what you are referring

2  to.  The charts may be admissible.  That is one of the

3  areas I identified as potentially a proper area for

4  expert opinion.

5         So I would like to hear from you now, or

6  since it is 1:45, if there is some areas of his testimony

7  that you could elicit now in the next 15 minutes, why

8  don't we do that rather than keeping jury waiting?  And

9  then once the jury leaves, I can ask for a more detailed

10 recitation by the defense as to what opinions they do

11 seek to elicit from the doctor.

12    MR. SAYRE:  All right.  And then, Your Honor, in

13 respect to the charts, pretty much what the chart do is

14 simply add more information to the government's charts.

15 That is all they --

16    THE COURT:  All right.  And you provided a copy of

17 the charts to the court this morning.  I have them before

18 me, Exhibits 2340 through 2363; is that right?

19    MR. SAYRE:  Yes, Your Honor.  And in regard to the

20 time, again, it would be best, of course, as far as me

21 being able to return and prepare for tomorrow, the

22 earlier we break, the better.

23    THE COURT:  You have had more than ample time to

24 prepare for trial.  That is why I continued the trial in

25 this case multiple times.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. SAYRE:  Yes.

2    THE COURT:  I find that additional delays can't be

3  justified.  I am trying to accommodate your schedule, but

4  you also want to be heard on certain points.

5    MR. SAYRE:  Yes.

6    THE COURT:  So I would suggest we stop today at

7  2:00, and you will be heard on these issues before we

8  recess.

9         Are there any areas of Dr. Cornew's

10  testimony that can be elicited now in the next 15

11  minutes?

12    MR. SAYRE:  Yes.  Yes, there is.

13    THE COURT:  And I direct our attention to his

14  charts.

15    MR. SAYRE:  All right.  Are we referring to the

16  testimony before the jury, Your Honor?

17    THE COURT:  Correct.

18    MR. SAYRE:  Yes.  We can continue with his

19  background, and that would probably easily take the next

20  12 minutes, I would imagine.

21    THE COURT:  That doesn't really seem to be -- you

22  know, I am not placing time limits on you, but you have

23  got a jury here.  If you waste time in front of the jury,

24  I don't think it is beneficial to your case.  Are

25  there -- it appeared to me that you asked a lot about his

1   background before we broke.  Maybe you need a little more

2   time.  But after that, is there any agreement as to which

3   of the charts he can testify about?

4        MR. SAYRE:  Oh, the charts after that.  I would

5   have to ask Dr. Cornew.  We have been doing quite a bit

6   of changes, and it looks like we will have to do quite a

7   bit of additional changes to suit the motion in limine.

8            So which chart would come first, Dr. Cornew?

9        THE WITNESS:  May I approach Mr. Sayre?

10       THE COURT:  Sure.  Well, perhaps I can shortcut

11  things.  Does the government have any objection to

12  inquiry regarding 2340?

13       MR. ROBINSON:  Your Honor, I think the government

14  is at a disadvantage in that we have what we understand

15  to be the charts, but we don't have exhibit numbers on

16  them.

17       THE COURT:  I apologize.  You can --

18       MS. TABET:  I placed a set of copies on your table

19  this morning with the exhibit numbers in front of them.

20       MR. ROBINSON:  Oh, no.  If you put them here, it

21  might be under something.  We do --

22       THE COURT:  Maybe we can expedite things --

23  Mr. Robinson, any of these exhibits as to which the

24  government has no objection at this time?

25       MR. ROBINSON:  Your Honor, if -- I don't know

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    which exhibits relate to which area of the witness's

2    testimony.  I would have to speculate.  A lot of them

3    appear to relate to areas which the court has tentatively

4    ruled she would exclude.

5           So perhaps the defendant could identify with

6    Dr. Cornew which chart he thinks is an area that the

7    court has not excluded, and I would address that.

8           THE COURT:  All right.  Thank you.

9           Mr. Sayre or Mr. Cornew?

10   MR. SAYRE:  Yes, Your Honor.  Did you want me to

11   list the charts?

12   THE COURT:  Yes.  Which charts?  After conferring

13   with your expert, which charts do you believe could be

14   identified and discussed?

15   MR. SAYRE:  Okay.  Then, there would be

16   Exhibit 2340, which is Nasdaq market overall trading

17   activity 1998 to 2002.

18   THE COURT:  Any objection to that exhibit by the

19   government?

20   MR. ROBINSON:  I think Your Honor ruled that he

21   should not testify about the stock market for technology

22   stocks in the late 90's and early 2000 because it is not

23   relevant.

24   THE COURT:  I need further argument to convince me

25   this is relevant.  So putting aside 2340 and 2341 --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    MR. SAYRE:  Yes.

2    THE COURT:  -- are there any other exhibits or

3    groups of exhibits?

4    MR. SAYRE:  Did we just pass by 2341?  I see.  And

5    then this next one is Exhibit -- it is a government,

6    Exhibit 104.  What we have is an overlay which points out

7    the omissions on that chart.  And the overlay is

8    Exhibit 2342.

9    THE COURT:  Well, exhibits shouldn't be

10   characterized as a correction of omissions.  That would

11   be argumentative.

12   MR. ROBINSON:  Your Honor, I don't believe that we

13   offered into evidence 104.

14   THE COURT:  All right.  That's correct.  I will

15   have my clerk check.

16        Mrs. Sanchez, has 104 been admitted?

17   THE CLERK:  No.  Identified only.

18   MR. ROBINSON:  I haven't offered it.  I may use a

19   version of it in closing, but it is not admitted.

20   MR. SAYRE:  Wouldn't it have to be admitted to be

21   used in closing, Your Honor?

22   THE COURT:  I am not addressing the admissibility

23   now.  You have got 15 jurors in the jury room that are

24   starting to get really hot, so --

25   MR. SAYRE:  Exhibit 101, Your Honor, would be --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Government Exhibit 101, I believe, has been entered into

2   evidence.  And then the overlay for that exhibit would be

3   Exhibit Number 2343, which is the omissions in the

4   government chart.  It is just adding the information that

5   is missing from the chart.

6           THE COURT:  All right.

7           MR. SAYRE:  Press releases --

8           THE COURT:  The clerk should confirm that 101 has

9   been admitted.

10          THE CLERK:  Yes, Your Honor.

11          MR. ROBINSON:  Your Honor, I don't believe it was

12  admitted in this version.

13          THE COURT:  All right.  I have two pages.  I would

14  have to go back and check my notes.

15          MR. ROBINSON:  Yes.  I think -- I think they

16  altered an earlier draft, but they did not alter the

17  one that we offered into evidence.  So it would be

18  confusing if it was presented.

19          THE COURT:  Can we move along right now?  We will

20  have to address that.

21          MR. SAYRE:  Then it would be on the exhibit --

22  whatever exhibit they have that is replacing this

23  exhibit, the overlay would be the same, Your Honor.

24          THE COURT:  We can address that tomorrow.

25          MR. SAYRE:  All right.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1       THE COURT:  Any other exhibits or areas of

2  testimony?

3       MR. SAYRE:  I think, Your Honor, that at this

4  point, it would be confusing, the jury wouldn't know what

5  we were really discussing if we jumped forward that far,

6  if we weren't able to at least produce that Exhibit 101

7  which is now evidently --

8       THE COURT:  All right.  Do you want to call the

9  jury in and finish the foundation as to his

10 qualifications and --

11      MR. SAYRE:  Yes, Your Honor.

12      THE COURT:  -- the information he has reviewed to

13 prepare for his testimony?  Thank you.

14           And then after that, we will spend as much

15 time as needed reviewing his testimony outside the

16 presence of the jury so we have no delays tomorrow.

17           And if we don't finish today, I can start with

18 both sides tomorrow at 8:00.  It is my intention to start

19 at 8:00 tomorrow anyway because after finishing issues

20 relating to Dr. Cornew, I think would be it would be

21 appropriate to continue our discussion of jury

22 instructions and get as much resolved as we can.

23           I don't want to burden either side, but we

24 also have an obligation to see as much as possible that

25 the case is tried within the time estimate given to the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  jury.  And since we are stopping at 2:00 or 2:30, we can

2  start at 8:00, if that is not going to be impossible for

3  counsel and the parties.

4          (The following proceedings were held in open court

5           in the presence of the jury.)

6

7          THE COURT:  In the trial, I note the presence of

8  both sides, all the jurors.  Please be seated.  Ladies

9  and gentlemen of the jury, I'm sorry to have kept you

10  waiting.

11          Dr. Cornew can take the witness stand again.

12  I would simply advise him that he was previously sworn

13  and he is still under oath.  Could he please state his

14  name again for the record?

15          THE WITNESS:  Yes, Your Honor.  My name is Ronald

16  Cornew.

17          THE COURT:  Thank you, Dr. Cornew.

18          Please continue, Mr. Sayre.

19  Q   BY MR. SAYRE: Yes.  Dr. Cornew, as a result of your

20  education and experience, do you have an expertise in

21  the field of securities law -- I'm sorry -- securities

22  violations at the criminal and civil level?

23  A     Yes, I do.  I have previously testified for the

24  United States Attorney in a white collar crime case.  I

25  also have been involved in a fair number of matters

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  involving civil violations or alleged civil violations of

2  securities law.

3          I am also a member of the compliance and legal

4  division of the Securities Industry Association.  And I,

5  for that matter, have served as a member of the board of

6  arbitrators on the New York Stock Exchange and of Nasdaq,

7  including as chairperson.

8  Q    As a result of your education and experience, do

9  you have an expertise with the securities industry rules

10 and the standards of practice within the industry?

11 A    Yes, I do.  And that includes the rules of the

12 various so-called self-regulatory agencies, which again

13 are the New York Stock Exchange and Nasdaq.  It also

14 includes both federal and state securities laws.  And,

15 for that matter, there are other issues of industry

16 practice and custom and so forth that come into play.

17 Q    As a result of your education and experience, do

18 you have an expertise in the field of forensic accounting

19 relating to the trading of various kinds of securities?

20 A    Yes, I do.  I have been involved in analyzing

21 situations where embezzlement has occurred and other

22 forms of white collar crime.  I have also done damage

23 calculations in connection with that kind of work and

24 have prepared charts and graphs and things of that type.

25 Q    Do you have an expertise in the area of what

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  constitutes due diligence related to the financial

2  reporting industry?

3  A     Yes.  As I mentioned, back in the early part of my

4  career, I was involved in a company that created and sold

5  securities, and in that connection, I became familiar and

6  was engaged in due diligence work in generating various

7  forms of financial information that were released in

8  connection with that.

9         I also have been a consultant to different

10  brokerage firms where that kind of issue that you are

11  speaking of comes up.  For example, disputes between

12  customers and brokers, there is often an allegation that

13  a broker did not properly, you know, do the work that was

14  necessary to present an investment to a client.

15         It is a similar kind of issue.  There are a

16  number of different areas where that kind of thing comes

17  up.

18  Q     Do you have an expertise in the area of forensic

19  analysis regarding the stock market such that you can

20  render opinions which would produce information that

21  would be relevant to company releases, news sources, and

22  other material related to this?

23  A     Yes.

24  Q     What is this field referred to as?

25  A     Well, the -- what we are dealing with here

1   generally is the issue of what is material, and material

2   is -- sorry for the double use --

3       THE COURT:  Answer is nonresponsive and is

4   stricken.  The court would also refer to its prior

5   orders.  Not relevant.

6       MR. SAYRE:  Yes, Your Honor.

7   Q   BY MR. SAYRE: What is this form of analysis of news

8   releases and press releases referred to?  Is there a

9   particular name or particular type of reference for that

10  particular field of study?

11  A   Yes.  There is an area that has developed in

12  securities in the last 10 years or so that deals with --

13  it is something called an event analysis.  And it deals

14  with what it is that really moves stock prices.  And,

15  basically, things like earnings releases are dealt with

16  as well as new product releases and revenue increases.

17  Those are the things that event analysis shows moves the

18  market.

19  Q   Do you have an expertise in analyzing the kinds of

20  offenses charged against a defendant and the code of

21  regulations related thereto?

22  A   I'm sorry.  I did not hear your question,

23  Mr. Sayre.

24  Q   Do you have an expertise in analyzing the types of

25  offenses that are related to the issue in this case?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      THE COURT:  Objection.  Sustained in light of the
2  court's rulings.  402, 403.
3  Q   BY MR. SAYRE: Do you have an expertise in the area
4  that constitutes due diligence related to the financial
5  reporting industry?
6  A    Yes.
7  Q    Do you have an expertise in the area of forensic
8  analysis regarding the stock market such that you can
9  render opinions of whether the information released by
10  companies and news services have had a -- I don't know if
11  this word is impermissible, but material effect?
12      MR. ROBINSON:  Objection, Your Honor.
13      THE COURT:  Sustained.  Irrelevant.  402, 403.
14  Referring to the court's rulings.
15  Q   BY MR. SAYRE: Do you have an expertise analyzing the
16  kinds of offenses charged in the indictment against the
17  defendant and the code of federal regulations related
18  thereto?
19  A    Yes.
20  Q    Do you have an expertise in the field of stock
21  frauds in their various forms?
22  A    Yes.
23  Q    Have you been qualified as an expert in respect to
24  the fields mentioned above?
25  A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. ROBINSON:  Objection.  Compound.

2          THE COURT:  Sustained.

3   Q   BY MR. SAYRE: Do you have an expertise in the field

4   of stock fraud litigation?

5   A     Yes.

6   Q     Are you an international lecturer and professor

7   regarding stock frauds and the litigation related to

8   stock frauds?

9   A     I have lectured on that.  I have lectured on that

10  outside of this country, so the answer is yes.

11  Q     Have you testified in court as an expert witness in

12  either or all of the above areas in which you have an

13  expertise?

14         MR. ROBINSON:  Objection.  Compound.

15         THE COURT:  Sustained.

16  Q   BY MR. SAYRE: Have you testified as an expert

17  witness as a forensic analyst regarding stock issues?

18  A     Yes.  I think I answered that.  I have done that

19  kind of work, presented charts and damage calculations

20  and things of that type.

21         MR. SAYRE:  Your Honor, I would like to request --

22         THE COURT:  Have you finished questioning the

23  witness about his background and qualifications,

24  Mr. Sayre?

25         MR. SAYRE:  Yes, I have.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  All right.  Then the jury would be

2    excused until tomorrow at 8:30.  Please remember not to

3    discuss this case or anything related to this case with

4    anyone.  Thank you very much.  We will see you tomorrow

5    at 8:30.

6

7        (The following proceedings were held in open court

8         outside the presence of the jury:)

9

10       THE COURT:  Thank you very much.  The witness can

11   step down.

12            We are outside the jury's presence, so we can

13   continue our discussion of the government's motion in

14   limine regarding the expert testimony of the doctor.  I

15   would refer to the government's brief commencing on

16   page 7.  Their objection number 1, as I have indicated,

17   is -- should be sustained.  Testimony regarding

18   applicable securities laws would usurp the role of the

19   court in instructing the jury on the applicable law.

20            With respect to objection number 2 relating to

21   testimony about common fraud schemes, the government's

22   objection also has merit.  This is on page 7 commencing

23   on line 24.  The testimony would not be relevant and

24   would not be helpful to the jury and, therefore, not

25   admissible.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    With respect to the objection on page 8

2  commencing on line 4 regarding Cornew's testimony

3  regarding materiality, that is also objectionable, and

4  the government's objection has merit and will be

5  sustained.  The testimony first would improperly tell the

6  jury how it should decide the issue of materiality.  It

7  would usurp the jury's function.

8    And the total mix testimony contemplated does

9  not have support in the law, given the facts of this

10  case.  And I would refer to the legal discussions set

11  forth in the government's brief, page 9, and the cases

12  cited in particular at the bottom of page 9, including

13  the Zweig case, Z-W-E-I-G.

14    With respect to the fourth item objected to on

15  page 10, commencing on line 1, testimony regarding

16  e-Connect, the company, its history and purported

17  activities, as indicated, the court would sustain that

18  objection on lack of foundation.  Dr. Cornew is not a

19  percipient witness, and while an expert can rely on

20  hearsay facts to support his opinion, he cannot be called

21  simply to introduce otherwise inadmissible hearsay to the

22  jury.  There is no foundation for expert opinion

23  testimony as to e-Connect and Hughes.  And Cornew's

24  testimony would not be helpful to the jury.  Therefore,

25  not admissible.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    The final area objected to is item number 5

2  in the government's brief, impact of Silver Screen

3  trading on stock price.  The government contends this is

4  not relevant or lacks probative value and therefore

5  should be excluded under 403.  I would invite further

6  argument on this and further argument on the charts

7  prepared by Dr. Cornew that Mr. Sayre wishes to

8  introduce.

9    Mr. Sayre.

10    MR. SAYRE:  Yes.  Well, in regard to -- from what

11  I understand, I am trying to make notes, but I understand

12  that item 5 is an issue that you would like to hear

13  further argument.  Was there other items?

14    THE COURT:  It is up to you.  I gave you my

15  tentative, and I am giving you time to respond.

16    MR. SAYRE:  With regard to the impact on Silver

17  Screen trading on stock prices, it is just a general

18  overall presentation of the prosecution's charts that

19  seem to indicate that the stock prices were affected by

20  the sales and the purchases of Silver Screen Industries'

21  stock.

22    So if they are not refuted by implication -- I

23  realize the government's case is just implying that IFR's

24  releases -- well, I am not sure if it is implying that,

25  but my understanding is that he says that IFR's releases

1    or the omissions of Silver Screen Industries from IFR's

2    releases have caused the stock to increase.

3            We need to somehow refute that, and if we are

4    not allowed to refute it by proving, at least on a

5    technical level, that this did not occur both in the buys

6    and sells which are an issue of the case and also the

7    press releases themselves and the impact that the

8    omission of Silver Screen Industries had on the stock

9    price of e-Connect, Your Honor.

10           THE COURT:  All right.  What is the government's

11   response to Mr. Sayre's assertion that this evidence

12   regarding the impact of Silver Screen trading on the

13   stock price is relevant and needed to respond to the

14   evidence introduced by the government in its case in

15   chief?

16           MR. ROBINSON:  Your Honor, neither the indictment

17   nor opening statement from the government nor the

18   evidence from Loveman or any of the other witnesses, I

19   believe, was submitted in support of a theory that simply

20   the trading, the purchasing and selling of stock in the

21   Silver Screen account caused a manipulation of the

22   market.  There are cases that can be brought on that kind

23   of a theory, but this is not one of them.

24           So the reason we argued that under 403, that

25   this would be -- result in confusion of the issues and

1    undue delay is because it would be putting in what

2    appears to be a complicated analysis with a number of

3    parts to address what has not been an issue in dispute in

4    this case.

5            We have never said and I don't believe Loveman

6    or anybody else has said that because the defendant

7    caused a certain amount of stock to be sold or purchased

8    on a certain day, that conduct caused a change in the

9    price of e-Connect.

10           Our focus has always been on him putting out

11   the IFR releases and whether or not they were misleading

12   to the public and done with intent to defraud.  We didn't

13   even have -- and I think we were careful, we didn't have

14   Loveman say that a particular release caused a particular

15   increase in the price of the stock.  Frankly, I think

16   that's a very difficult issue to argue, and if we ever

17   argue it, it would be at a later point in these

18   proceedings.  But we have been careful to avoid that, and

19   so we have not invited it.  We have not alleged it.  We

20   have not tried to prove it.

21           And so I don't think that injecting that into

22   the trial would serve to do anything other than confuse

23   the jury and result in an undue consumption of time on

24   matters that are not at issue.

25           THE COURT:  It would be easier to address the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   government's objection if the court knew more about what

2   Dr. Cornew is going to testify to pertaining to the

3   impact of Silver Screen trading on stock price.

4          Perhaps you can explain, Mr. Sayre.  In the

5   disclosure to the government on June 24th, which is

6   Exhibit 2 to the government's motion, it is stated on

7   page 3 that the expert will testify about charts he has

8   prepared and will testify as to the impact of Silver

9   Screen orders on the market and activity of the market.

10  Perhaps you can be more specific because here -- the

11  government's objection that there was insufficient

12  disclosure has merit.

13      MR. SAYRE:  Yes, Your Honor.  The government

14  charts inferred by indicating that the purchases occurred

15  at certain times, and then they have the bars of the

16  price of e-Connect rising, and they infer that the IFR

17  releases caused the increase in value by only isolating

18  the IFR reports as well as the Silver Screen Industries'

19  purchases.

20          So clearly, the charts speak for themselves,

21  as Mr. Robinson has said so many times today.  And that

22  is going to speak to the jury just as loudly as any

23  testimony would.  And we need to contradict the

24  implications of the charts.

25          And what we will be doing in that regard is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    simply adding the information that has been left out by

2    the government.  And that is really the intention of the

3    charts that we have in regard to the charts that will be

4    presented by Dr. Cornew.

5         THE COURT:  And what opinions will he be asked to

6    give regarding these charts?  What conclusions?

7         MR. SAYRE:  The conclusions will be entirely

8    statistical in regard to the buys and sells of the

9    e-Connect stock by Silver Screen Industries.  So it will

10   show the impact on the market that these buys and sells

11   had by statistical analysis of the actual fluctuation

12   price before, during, and after these trades occurred.

13         And it would be very brief.  We don't intend

14   to take more than 15, minutes I don't believe.  It is

15   just showing the documentation of the statistics to prove

16   that the market did not move and was not subject to any

17   type of influence by these trades.

18         MR. REED:  Your Honor, Dr. Cornew indicated that

19   he can give you more details if you wish them.

20         THE WITNESS:  If it would help the court.

21         THE COURT:  All right.  If there is no objection.

22         THE WITNESS:  Your Honor, I have not been in here

23   to hear all the back and forth, but I understand that the

24   issue of the mix of information as it relates to this

25   case, that the court has indicated that that testimony

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   can be received on it, but that it would not be --

2       THE COURT:  It would perhaps be more appropriate

3   if, instead of making an argument to me, which would

4   really not be permissible, if you would just outline the

5   testimony that you plan to give in this area.  This would

6   serve several purposes.  I could assess the defendant's

7   position that it is admissible, and it would also give

8   the government the Rule 16 disclosure they are entitled

9   to.

10      THE WITNESS:  Yes.  The purpose of the charts is

11  to show that a reasonable investor would not have been

12  persuaded at all by the evidence that appears there

13  relating to Mr. Sayre's IFR press releases, that he

14  should consider or would purchase shares in that

15  particular stock.

16      THE COURT:  And which charts are you referring to?

17      THE WITNESS:  Well, it depends somewhat on what

18  Mr. Robinson has in.  But we are clearly referring to

19  chart number 101 and perhaps another one that I do not

20  know the number of, but it is the one that has the

21  two marks on it that look like bolts of lightning

22  striking.

23      MR. ROBINSON:  Neither of those are in evidence,

24  Your Honor.

25      THE WITNESS:  Have they been shown to the jury?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MR. ROBINSON:  If they are not in evidence, they

2   don't get shown to the jury.

3        THE COURT:  I am asking the questions here,

4   Dr. Cornew.  So what charts would you seek to introduce?

5        THE WITNESS:  101 and an overlay to it.  I don't

6   have the charts in front of me, but -- I have the charts

7   in front of me now.

8            Exhibit 101 and an overlay to it.

9        THE COURT:  What do you mean, what overlay?  Is it

10  one of your exhibits?

11       THE WITNESS:  There is an acetate overlay that

12  will go on top of this particular chart.

13       THE COURT:  All right.

14       THE WITNESS:  That would be one thing we would

15  seek to introduce.

16       THE COURT:  And for what purpose?

17       THE WITNESS:  For indicating the insignificance of

18  Mr. Sayre's press releases in view of the actions of

19  ECNC.

20       THE COURT:  What do you mean by insignificance?

21       THE WITNESS:  Well, Your Honor, there are

22  something in excess of 25 other press releases at the

23  same time, and our view is that his release of those

24  press releases would not have had an impact on a

25  reasonable investor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  So that the -- in other words, the

2    press releases were not material?

3    THE WITNESS:  Yes.  But I am not going to say

4    anything about law, Your Honor.  You are the expert of

5    law here.  I am just going to say what the facts are and

6    then the legal interpretation.

7    THE COURT:  Any other charts?

8    THE WITNESS:  Yes.  There is another set of

9    exhibits -- again, I am hampered by lacking the numbers

10   on these, but they are these charts right here which show

11   relevant --

12   THE COURT:  I can't see.  If you could give me an

13   exhibit number.  Whose exhibit are you referring to, a

14   government exhibit?

15   THE WITNESS:  No.  This now is an exhibit that has

16   been prepared under my direction.  And it shows that for

17   the ten days from February 28th through March 10th, the

18   market went up every morning.  So any inference from

19   previous testimony that the four press releases of

20   Mr. Sayre caused those rises has no basis.  That is the

21   nature of that charge.

22   THE COURT:  And looking at the exhibits before me,

23   just for the record, it seems like you're referring to

24   2352.

25   THE WITNESS:  2351, Your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        THE COURT:  2351.  Okay.  Thanks.  All right.

2   Please continue.

3        THE WITNESS:  Yes.  And then there is another

4   exhibit --

5        MR. ROBINSON:  Your Honor, if I may --

6        THE COURT:  Yes.

7        MR. ROBINSON:  -- he has not given the reasons for

8   that conclusion.  He has just stated the conclusion and

9   said here is a chart.

10       THE COURT:  Well taken.  What is the reason for

11  this conclusion that -- as you assert, that the IFR

12  reports did not --

13       THE WITNESS:  The answer is that what a reasonable

14  investor relies upon, based upon the event analysis work

15  that I told you about before, is information relating to

16  earnings increases or revenue increases or new products,

17  there is an unending series of releases from ECNC in this

18  period relating to those subjects.  That, we believe, is

19  the reason why the price rose.

20       THE COURT:  So this relates to the materiality

21  issue?

22       THE WITNESS:  Well, yes, but I am not going to

23  introduce any -- we will be introducing evidence but not

24  making any decision on that issue.

25       THE COURT:  Mr. Robinson.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1       MR. ROBINSON:  I would like to know what is the

2   premise for that conclusion, that a so-called reasonable

3   investor pays attention to one thing and not another.  I

4   mean, there is no empirical data that has been supplied

5   in any Daubert sense to show a reliable methodology.  He

6   reached that conclusion, but he hasn't provided any

7   reasons why that conclusion has any validity.

8       THE COURT:  Dr. Cornew, what is the basis for that

9   conclusion?

10      THE WITNESS:  The basis of it is my experience as

11  a teacher and as someone working in this field as to what

12  it is that makes prices rise.

13      THE COURT:  Are you relying upon any empirical

14  data or any methodology in arriving at this decision?

15      THE WITNESS:  I am relying on my knowledge and

16  experience.

17      MR. ROBINSON:  Your Honor, that makes it.  I would

18  have a whole slew of Daubert objections on an expert who

19  just says, based on my experience, I am a litmus test for

20  what a reasonable investor would do.

21      THE COURT:  I would agree.  The defense would have

22  to make a better showing of the basis for the decision

23  to -- the basis for the opinion to have it admissible,

24  more than it is based upon my experience.

25          But please continue.  I would like to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    hear --

2        THE WITNESS:  There is another exhibit here, 2363

3    is written at the bottom of it, Your Honor.

4            It shows what really happened to poor

5    Mrs. Cattani.  It is an exhibit that shows her buy of 75

6    shares, and immediately afterward it, there is a very

7    large volume of short selling that is the reason she lost

8    the money that she did.  That plus the fact that the

9    prices were elevated through the press releases of ECNC.

10       MR. ROBINSON:  Your Honor, we would to object to

11   that because, first of all, the issue wasn't why she lost

12   money.  She just testified that she read the opinion and

13   it was important to her, and she explained why it was

14   important to her in her purchase.  This is not a civil

15   class action where she was claiming damages and we are

16   trying to show what was the causality of her loss.  She

17   was called simply to testify about what she read and why

18   it was important to her as an investor.  And she

19   testified about what was in the IFR releases that was

20   important to her.

21           So on 403 grounds, I would object that some

22   after the fact postmortem of what loss she sustained

23   isn't important.  I mean, if it is just for impeachment

24   purposes, he could have impeached her at the time, asking

25   about her loss and whether it caused any bias in her

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  testimony.  But I don't see what the relevance, or, given

2  the 403 considerations, what the justification is for

3  this complex analysis about what happened to her trading

4  after she made her decision to purchase e-Connect stock

5  after reading the IFR opinion that she testified to.

6        THE WITNESS:  May I respond?

7        THE COURT:  You are not an advocate in this case.

8  I will hear from Mr. Sayre.

9        MR. SAYRE:  Yes, Your Honor.  In that regard, I am

10  fairly certain Mr. Robinson is likely to refer to

11  Mrs. Cattani having suffered a loss because of the IFR

12  opinion she read.  And certainly, the inference is

13  already there.  The inferences are there in regard to

14  everything that the government has stated in their

15  charts.

16        And the inferences and the implications of

17  what they are saying is clearly that the omission of

18  Silver Screen Industries caused the stock to rise and

19  caused to confuse people so terribly that they bought the

20  stock by some -- I don't know, generally speaking, he is

21  saying that the omission of Silver Screen Industries

22  caused all the problems with e-Connect.  That was what

23  the implications on those charts clearly indicate.  And

24  we need to somehow contradict that through common sense

25  and logic.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  I would sustain the objection under

2    Evidence Code Section 403.

3        Reviewing Ms. Cattani's testimony given on

4    July 3rd, 2008 and commencing at 1:38 in the afternoon,

5    the focus of her testimony was essentially that she saw

6    the IFR opinions regarding e-Connect and she relied on

7    them in purchasing the stock and she placed weight on the

8    representation in the IFR opinions that the opinions were

9    independent and that the author of the opinion, IFR, did

10   not hold stock in e-Connect.

11       I don't believe the -- although there was

12   evidence as to the price she paid and the trading, I

13   understand that the government will not be arguing that

14   she suffered a loss.

15   MR. ROBINSON:  That is not an element of the

16   offense, Your Honor, and we are not going to argue it as

17   to her.  I will go back and look at the transcript, but I

18   don't think we got into -- she ultimately sold her

19   shares, but we didn't even have much testimony on what

20   happened in that regard.

21   THE COURT:  She did testify that she wasn't paying

22   attention to price and she placed a limit order and the

23   price was going up quickly past her limit order.  She

24   placed another limit order.  It was cancelled.  She

25   finally put in a market order because the stock kept

1    going up.  She was influenced by the IFR opinion that

2    said 20 to $25.  And on March 8th, she paid $19.75 higher

3    than she expected to.

4            If you can -- my ruling is to sustain the

5    objection under 403, finding that the probative value as

6    to Ms.  Cattani is quite limited and outweighed by the

7    dangers set forth in 403, including confusion of issues

8    and wasting time -- confusion, unfairly so.

9            Please continue, Dr. Cornew, to list the

10   charts you wish to introduce and your opinions.  Then I

11   will hear argument from the government and the defendant.

12   And we will start at 8:00 tomorrow if there is anything

13   in addition counsel or the government or -- or the

14   defendant wishes to add, I will hear that at

15   8:00 o'clock.

16           Yes.

17       THE WITNESS:  Let me say that with regard to the

18   exhibits, the final conclusion is going to be based on

19   all the factors in the charts, especially the total mix

20   of information, but even without it --

21       THE COURT:  Can you -- can you -- since they are

22   not listed in any disclosure to the government, can you

23   list the charts that you intend to introduce and the

24   opinions that you intend to state based on those charts?

25   Is that --

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        THE WITNESS:  I think that would be fair if we

2    could do that tomorrow morning.

3        THE COURT:  No.  Now is the time.

4           Does that address the government's Rule 16?

5        MR. ROBINSON:  Yes, Your Honor.  Because then we

6    will have an opportunity to prepare --

7        THE COURT:  And also, I will be better able to

8    assess the government's arguments and the defendant's

9    arguments on the admissibility of the expert's testimony.

10       THE WITNESS:  Your Honor, if I heard correctly,

11   you have ruled every exhibit to be inadmissible.

12       THE COURT:  That is not correct.  And I was going

13   to call you counsel.  You are behaving like an advocate.

14       THE WITNESS:  I am trying not to.

15       THE COURT:  With all due respect, I need to know

16   what opinions the defendant intends to elicit from you

17   and the basis of those opinions.  And it would be of

18   great assistance if you, Dr. Cornew, or the defendant

19   would list the opinions and the bases of the opinions and

20   also, to the extent possible, cross-reference to the

21   exhibits you have provided the court so I can appreciate

22   the significance of the exhibits and properly consider

23   the defendant's arguments that the exhibits are relevant

24   and admissible.

25       THE WITNESS:  All right.  It has been pointed out

1    to me that there were some charts that were excluded when

2    I went through this.  Let me try to respond directly to

3    your request.

4         THE COURT:  I was handed -- another was a group of

5    exhibits this morning entitled Dr. Cornew's exhibits,

6    Exhibit 2340 through 2363.  In addition to your opinions,

7    the bases of the opinions, it would help if you would

8    also address the significance of these exhibits to your

9    opinions.

10        THE WITNESS:  There are a group of charts under

11   Exhibit Number 2346, I believe --

12        THE COURT:  All right.

13        THE WITNESS:  -- which -- there is one of them for

14   each day that Mr. Sayre made an order.  They show that

15   his order had no impact on market price.  And these are

16   intended to be a defense against the argument that there

17   was manipulation here.

18              Again, it is fundamental that evidence showing

19   that his actions did not move the market, whether it was

20   his purchases, as they were, his sales, or beyond that,

21   that his press releases moved the market.  If none of

22   those things are true, and I believe we are in a position

23   to show them, then it substantially enhances his defense,

24   I believe.

25        THE COURT:  All right.  With respect to 2346, how

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   was it prepared?

2       THE WITNESS:  It was prepared under my direction

3   from data that was made available from FINRA, which is

4   the new name for Nasdaq.  They maintain a database in

5   which it is possible to get a disk with all the prices of

6   ECNC and also the changes in price of market maker,

7   changes in their bid ask price.  We have charts on those

8   things.

9       THE COURT:  So I fully appreciate this chart, can

10  you exhibit -- with respect to this chart, can you go

11  through just across the chart what is lined, what is

12  date, what is our time, what is EX time, what is the

13  control number, ST, volume, price, et cetera?

14      THE WITNESS:  I would be glad to do that, Your

15  Honor.

16          This again is a chart for January 31, 2000.

17  It shows prices from that data source I just mentioned of

18  Silver Screen -- sorry -- of ECNC both before and after

19  the 10,000 share purchase.  The line number on the left

20  indicates the transaction number and the sequence for

21  that day.  I do not know if it begins with one, but every

22  number, every line has a unique number.

23      THE COURT:  All right.

24      THE WITNESS:  The date, of course, is all the date

25  of January 31, 2000.  The R time refers to when the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   transaction is actually being reported.  The transaction

2   is going to be on that line.  The X time refers to when

3   the transaction was actually executed.  Those times are

4   typically very close, but sometimes they are not.

5   Sometimes a trade will be an out trade.  It won't be

6   matched perhaps until the end of the day.  Then you will

7   have a recording of something that happened much earlier.

8          The control number is a number that I do not

9   know the nature of, but it is obviously important to NASD

10  to pin down this particular transaction.

11         Now, the ST code that appears there, there is

12  a so-called regular way in which the transactions occur,

13  and that is what the R is and, in most cases, that is

14  what you are going to find in that column.

15         The M, frankly, I have forgotten what it is

16  because it is really the R'S that are were going to be.

17  I say that, but I see I am wrong.  I see on that line

18  that the M is there.  And frankly, at this moment, Your

19  Honor, it is not in my head what that is.

20         The volume is 10,000, indicating that the size

21  of the transaction occurring at that instant of time,

22  which happens to be, if you go back over to the line,

23  9:34 and 43 seconds in the morning.  That is Eastern

24  Standard Time.  So at 9:34 -- sorry -- 9:34:46 a.m.,

25  10,000 shares were traded.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  I understand.  I still don't
2    understand what the ST is.  I haven't heard any
3    information as to the ST code, what R or M is.  But I
4    understand your point.
5        THE WITNESS:  It shows that there is no change in
6    the price at that moment.  That is what it shows.
7        THE COURT:  All right.  And you have that --
8        THE WITNESS:  For each one of these days.
9        THE COURT:  Okay.  I see that on Exhibit --
10       THE WITNESS:  Each day, there was an order from
11   Silver Screen.
12       THE COURT:  2347, 2348 --
13       THE WITNESS:  Yes.
14       THE COURT:  -- 2349 through 2350.
15       THE WITNESS:  Yes.
16       THE COURT:  Okay.  I understand that point.  What
17   about -- and I will consider the government's objection
18   on grounds of relevancy and 403 and Mr. Sayre's argument
19   to the contrary that this is, in fact, correct,
20   Mr. Sayre, in rebutting the assertion that you engaged in
21   a scheme to defraud.  It is also responsive to
22   Mr. Loveman's testimony and the exhibits introduced
23   through Loveman; is that correct?
24       MR. SAYRE:  That's correct, Your Honor.
25       THE COURT:  Continue, please.  I will reserve

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   ruling on this.

2          THE WITNESS:  2344 -- 2344 is a similar one, but

3   this deals with the sale on March 9th.

4          THE COURT:  All right.  I think that's fairly

5   clear.

6          THE WITNESS:  It's a similar thing, yes, that his

7   sale did not drive the market down.

8          THE COURT:  You have explained 2346 through 2350.

9   Any other charts you intend to introduce?

10         THE WITNESS:  Yes.  There is one here that's

11  called 2361 where you see all the bid ask prices of the

12  various market makers on March the 3rd, which is the

13  one day where one of Mr. Sayre's press releases is

14  released during the trading day.  We have an opportunity

15  there to see what the impact of that press release was on

16  the market makers.

17         And once again, after this is presented, I am

18  sure someone will argue that it shows that there was no

19  impact on the market makers.  And that is particularly

20  important because those people make a living following

21  the market and paying attention to any news that matters.

22         THE COURT:  Thank you.  What is the government's

23  position on Exhibit 2361 and anticipated testimony by the

24  expert on 2361?

25         MR. ROBINSON:  Same position as we had before

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    under 403, Your Honor.  We think it would just confuse

2    the issues.  We have never claimed that the buying and

3    selling of stock by Mr. Sayre caused a change in the

4    price of the stock.

5             The focus of the case is on whether or not

6    the Independent Financial Reports releases are

7    misleading.  And to the extent that we had a chart that

8    showed that there was an increase in the price of the

9    stock during the period, it was just a way of

10   illustrating that he would buy and sell and gain as the

11   price of the stock went up.

12       MR. SAYRE:  Your Honor, I believe the chart also

13   shows, and Dr. Cornew can correct me if I am wrong, that

14   the IFR releases also had no effect on the market makers

15   or the price that they were quoting for the stock.

16             I believe those charts were used for the

17   same --

18       THE COURT:  What about the government's

19   position --

20       THE WITNESS:  I just explained that --

21       THE COURT:  Excuse me.  I am addressing the

22   defendant, Dr. Cornew.

23             Mr. Sayre, what about the government's

24   position that they are not contending that you had an

25   impact on the market, the stock prices are only admitted

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   and only relevant to show that you bought when the stock

2   price went up?

3        MR. SAYRE:  All right.  So I --

4        THE COURT:  Not to show that you caused

5   fluctuation in the stock prices or caused an increase in

6   the stock price.

7        MR. SAYRE:  All right.  And the government is

8   contending that the IFR reports did not cause any

9   fluctuation in the stock price?  Am I understanding that

10  correctly?

11       MR. ROBINSON:  We are taking the position that we

12  don't have to prove that as an element of the offense,

13  and I think that's consistent with the court's jury

14  instructions.

15       THE COURT:  Is the government going to argue that

16  the IFR reports caused the stock prices to go up?

17       MR. ROBINSON:  No, Your Honor.  We have never

18  argued that it was a cause.  We have said it coincided

19  with the increase in price and he profited as the price

20  went up.  We have argued that -- and we will argue that a

21  reasonable investor would find that information material,

22  but we haven't tried to establish through any empirical

23  evidence a causal link that a certain press release or a

24  certain opinion caused a certain price change in the

25  stock.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    So -- and frankly, this other thing about

2  somehow market makers are the litmus test for a

3  reasonable investor, I have never seen any case law that

4  held that to be the case.

5    THE COURT:  Mr. Sayre.

6    MR. SAYRE:  I suppose if the government isn't

7  contending that the IFR release is causing the increase

8  in stock price, if that could be stipulated, then, there

9  would be no need to disprove it.

10    Again, if the government is going to just

11  remain moot on the subject and show the charts which

12  clearly imply, in fact, not only imply, their charts

13  misleadingly indicate that the IFR reports caused every

14  singular increase in e-Connect stock price, because they

15  don't even include any of the other materials that were

16  out on the market at the time.

17    THE COURT:  All right.  With respect to 2361, the

18  court would sustain the government's objection under 403,

19  considering the content of 2361.  And the reference to

20  the market makers and the market maker identifiers, I

21  find limited probative value in any event and that it is

22  substantially outweighed by the danger, particularly of

23  undue delay and waste of time, and also substantially

24  outweighed by the danger of unfair prejudice.  The

25  objection is sustained to 2361.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        Doctor, do you have any other exhibits or

2   charts or other opinions that we haven't addressed?

3        THE WITNESS:  Did we cover Exhibit 109, Your

4   Honor?

5        THE COURT:  Government's Exhibit 109?  Is that in

6   evidence, Mrs. Sanchez?

7        THE CLERK:  I don't show it, Your Honor.

8        MR. SAYRE:  Your Honor, there was one question I

9   had.  I believe the prosecution had mentioned that there

10  was a change to chart 101.  We could cover that chart now

11  if we a copy of the changes to chart 101.

12       THE COURT:  I will review the evidence as to 101.

13  But 109 isn't in evidence.

14       So please move on, Dr. Cornew.  Any other

15  opinions you intend to state, and please cross-reference

16  to the exhibits?

17       THE WITNESS:  Yes.  Did you make a decision with

18  regard to 2363?  This is the one that shows that Steven

19  Sayre, through trading at Silver Screen, did not cause

20  the losses.

21       THE COURT:  I don't believe you have mentioned

22  2363 yet.

23       THE WITNESS:  Let me do that.  It shows her 75

24  share buy.  Perhaps we could put this on the graph.

25       MR. ROBINSON:  I believe, Your Honor, this was the

1   Cattani-related exhibits.

2          THE COURT:  I apologize, yes.  I did exclude that,

3   I'm sorry, under Evidence Code 403.

4          MR. ROBINSON:  Your Honor, I think that 2362 is

5   still left.  And perhaps we could learn whether or not

6   that would be at issue.

7          THE COURT:  Thank you.

8                Doctor, will you be seeking to introduce --

9   to refer to and testify about 2362 and draw conclusions

10  from 2362?  If so, can you explain what it is?

11         THE WITNESS:  Yes.  2362, every one of those bars

12  is another press release that was issued at the time of

13  Mr. Sayre's press releases and shows the total set of

14  things that a reasonable investor would be considering at

15  that point in time in determining whether or not he or

16  she would be likely to buy the shares of e-Connect.

17         THE COURT:  And what opinions will you be

18  rendering in connection with 2362?  What additional

19  opinions?

20         THE WITNESS:  That a reasonable investor under

21  these circumstances would not have been influenced at all

22  by the press release or three press releases of Mr. Sayre

23  that had the offensive language, let alone by that

24  language in those press releases, for reasons that I

25  have -- that I need to testify to before Your Honor would

1    understand why that is relevant.

2         THE COURT:  And what reasons?

3         THE WITNESS:  Well, the reason again goes back to

4    what I was telling you about event analysis, it being the

5    fact that you have earning surprises, revenue surprises,

6    and the release of information relating to new products

7    being the things that move market makers and markets.

8    Those are coming out in an unending succession from

9    ECNYC, as an analysis of that would show.

10        THE COURT: Excuse me.  Doctor, if you see me

11   looking to my right, I am looking at real time, the

12   reporter's printout of what you are saying.  So I am not

13   disregarding you.  I am just listening to and reading

14   what you are saying.

15             Thank you, please continue.

16        THE WITNESS:  Mr. Sayre has felt it is vital to

17   his defense to be able to show this environment and from

18   that, be able to infer, even under the Tarrallo standard,

19   that a reasonable investor would not be purchasing based

20   upon his press release.

21        THE COURT:  All right.  What is the government's

22   position?

23        MR. ROBINSON:  Your Honor, I believe that the

24   court has previously ruled in its law of the case that in

25   order for the government to establish the offense ––

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  offenses charged here, it is not necessary to show that

2  the price of the stock was affected, that anybody was

3  injured, or that there was a gain taken.

4          And in connection with the materiality motion

5  that the defendant made that the court denied, I believe

6  that the court ruled on that basis.  It seems to me that

7  the ultimate conclusion which the witness wants to derive

8  is that if he can show that the market didn't change,

9  therefore, it is impossible for what Mr. Sayre did to be

10  material, and I think that's absolutely improper.

11      THE WITNESS:  Your Honor, we are talking about

12  press release --

13      THE COURT:  Wait.  Wait.  Doctor, I am not

14  addressing you.  You are not an advocate.  I would like

15  to hear from Mr. Robinson, and then I'd like to hear from

16  Mr. Sayre.

17      THE WITNESS:  He is misunderstanding what I said.

18      THE COURT:  You may be seated, sir.

19          Mr. Robinson, please continue.

20      MR. ROBINSON:  Your Honor, it seems to me what the

21  premise of the testimony is and why it would in effect be

22  a misstatement of the applicable law is that the witness

23  wants to give an opinion that ultimately tells the jury

24  you cannot find that what Mr. Sayre did here with regard

25  to the IFR opinions was material because my opinion is,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   based on my experience, that no empirical analysis that I
2   have given to the government to assess, based on my
3   experience, I can tell you that anything he said didn't
4   affect the price of the stock.
5          And that is simply not a legal requirement for
6   establishing the elements of the offense in this case,
7   and it would invade the province of the jury by saying
8   that this expert has concluded that what Mr. Sayre said
9   did not matter as an empirical matter because of some
10   analysis which I have yet to hear explained other than it
11   has been labeled "my experience."
12          THE COURT:  So the government's objections include
13   irrelevant and --
14          MR. ROBINSON:  Improper opinion evidence.
15          THE COURT:  -- improper opinion evidence?
16          MR. ROBINSON:  And I would say one thing, Your
17   Honor, also.  If we had received the Rule 16 disclosure
18   which would have indicated that there was going to be
19   this kind of testimony on this kind of basis, we might
20   have considered hiring our own expert who has a different
21   litmus test for materiality and a different methodology.
22   But we didn't get that disclosure.  Now we are hearing
23   about these things for the first time with real -- with
24   no real articulation that I think would satisfy Daubert
25   as to the reliability of this.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Also, under Daubert, I am sure the court knows

2     that an expert's opinion which doesn't take into account

3     all of the facts is not reliable.  And I have heard

4     nothing about his opinion that takes into account many of

5     the facts in this case, including that we have had a

6     witness who testified that she certainly found it

7     material.

8          But setting that aside, I just don't

9     understand this analysis.  There is no empirical basis

10    for offering it.  It is just a summary conclusion that,

11    based on his experience and looking at an event analysis,

12    he has decided there was no event here resulting from

13    Mr. Sayre's opinions that is material.

14          I just think under 702, 403, the fact that he

15    is invading the province of the jury on a legal

16    conclusion, it is entirely improper.  He needs to lay a

17    foundation for that kind of opinion, and he hasn't done

18    it.

19          THE COURT:  Mr. Sayre.

20          MR. SAYRE:  Yes, Your Honor.  I don't believe that

21    Dr. Cornew intends to speak to the issue of materiality.

22    What he wants to -- and he would exclude that from his

23    language.  But what he wants to do is simply show what

24    effect the IFR opinion this had on the market by

25    empirical research and statistics, because clearly,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   despite what Mr. Robinson says that he is not going to
2   claim that it caused injury or loss or gain or any of
3   these issues, the whole concept of materiality becomes
4   irrelevant.  If it didn't cause anything, then why is it
5   material?  Obviously, a material fact has to have some
6   form of causation.
7       THE COURT:  Looking at 2362 and considering the
8   Exhibit 2 to the government's motion and your argument
9   and the doctor's statements, the court will sustain the
10  objection to 2362, defendant's exhibit, and testimony
11  regarding it.
12          I find that it is not relevant or its
13  probative value is minimal and outweighed by -- or de
14  minimus and outweighed by factors set forth in 403.
15          Moreover, the testimony is not admissible
16  under Evidence Code 702.  It is improper opinion
17  testimony not shown to be reliable, invades the province
18  of the jury, and there is a serious Rule 16 issue as
19  well.
20          It is ten to 3:00.  I know you need to get
21  back.  I have hearings commencing at 3:00 in other
22  criminal cases.  We will continue at 8:30 o'clock
23  tomorrow if there is no objection.  And I would order
24  Dr. Cornew to be here and continue to list his opinions,
25  the bases of his opinions, and cross-reference the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    exhibits he intends to introduce.  And I will hear brief

2    argument on that tomorrow.  Thank you very much.

3          (The proceedings were concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          I N D E X

 2

 3    WITNESS NAME                              PAGE

 4    CARL KNUDSON
          Direct Examination by Mr. Sayre        27
 5        Voir-Dire Examination by Mr. Robinson  81
          Cross-examination                      85
 6        Redirect Examination                  117
          Recross-Examination                   122
 7        Redirect Examination                  125

 8    RONALD CORNEW
          Direct Examination by Mr. Sayre       125
 9

                                                 IN
10    EXHIBIT                   I.D.          EVIDENCE

11    2001 - Press releases       35
      2291A - Spreadsheet         80               82
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28,

United States Code, the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.

Date:  August 18, 2008

_____

Katie E. Thibodeaux, CSR No. 9858

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA