UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

   Plaintiff,

   v.

RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN,

   Defendants.

Case No. 20-cv-10832 (AT)

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE THE TESTIMONY OF** ███████

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 2

    I.    ▮▮▮▮ Cherry-Picking of Time Periods and Exclusion of Data Renders His Opinion on Ripple and Larsen's XRP Purchases Unreliable. ........................................ 2

    II.    The Critical Gaps in ▮▮▮▮ Regression Analysis Render His Opinion on Ripple's XRP Sales Inadmissible. .................................................................................. 7

    III.    ▮▮▮▮ Purported Qualifications Do Not Alone Warrant Admission of His Other Opinions. ................................................................................................................ 8

    IV.    ▮▮▮▮ Opinions are Not Relevant, Not Useful, and Highly Prejudicial. ................... 10

CONCLUSION ........................................................................................................................... 11

## TABLE OF AUTHORITIES

**Cases**

*Aventis Env't Sci. USA LP v. Scotts Co.*,
   383 F. Supp. 2d 488 (S.D.N.Y. 2005)..................................................................................2

*Barber v. United Airlines, Inc.*,
   17 F. App'x 433 (7th Cir. 2001) ............................................................................................2

*Daubert v. Merrell Down Pharm. Inc.*,
   509 U.S. 579 (1993)..................................................................................................... *passim*

*Highland Cap. Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................................................................................9

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)..................................................................................6

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*,
   2008 WL 1971538 (S.D.N.Y. May 7, 2008) .......................................................................8

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. (No. II)*,
   341 F. Supp. 213 (S.D.N.Y. 2018) ...................................................................................5, 6

*Sandler v. Montefiore Health Sys.*,
   2018 WL 4636835 (S.D.N.Y. Sept. 27, 2018).....................................................................8

*State v. Deutsche Telekom AG*,
   419 F. Supp. 3d 783 (S.D.N.Y. 2019)..................................................................................4

*United States v. Tuzman*,
   2017 WL 6527261 (S.D.N.Y. Dec. 18, 2017) .....................................................................7

**Other Authorities**

Fed. R. Civ. P. 26.............................................................................................................................3

Fed. R. Evid. 702 ........................................................................................................................8, 9

Ferrell, Allen and Atanu Saha, *The Loss Causation Requirement for Rule 10b-5
   Causes of Action: The Implications of Dura Pharmaceuticals, Inc. v. Broudo*,
   The Business Lawyer (2007) ................................................................................................6

Defendants Ripple Labs Inc. ("Ripple"), Christian A. Larsen ("Larsen"), and Bradley Garlinghouse ("Garlinghouse"), submit this reply memorandum of law in further support of their motion to exclude the expert report and testimony of ▮▮▮▮▮▮ ("▮▮▮▮") from this action.

## INTRODUCTION

The SEC does not dispute the fundamental flaws which render ▮▮▮▮ testimony inadmissible, including, among other things, cherry-picking data to support his XRP purchases analysis and omitting critical steps from the published article he cites in support of his XRP sales regression analysis methodology. Instead, the SEC argues that those flaws go to the weight of ▮▮▮▮ opinions, not admissibility. The SEC is wrong—these flaws render ▮▮▮▮ testimony excludable under *Daubert*.

*First*, the SEC concedes that ▮▮▮▮ analysis of five short periods of Ripple and Larsen's XRP purchases in 2016 and 2017 was extremely limited, and instead attempts to justify ▮▮▮▮ exclusion of substantial and highly relevant data from his analysis by pointing to the narrow goals of the analysis, as well as the unavailability and unreliability of other data. But the data ▮▮▮▮ reviewed is so narrow, and the data he didn't review so potentially important, as to render unreliable his opinions regarding Ripple and Larsen's XRP purchases in those narrow periods, much less a broader period. And the SEC's assertion that ▮▮▮▮ analysis "is limited to '*specific times*' and specific episodes" (Pl.'s Br. in Opp. to Defs.' Mot. to Exclude the Testimony of ▮▮▮▮▮▮ (ECF No. 597) ("Opp.") at 5) only further reinforces that ▮▮▮▮ opinions are completely unhelpful to jurors and utterly irrelevant to the *Howey* analysis's consideration of reasonable expectations of XRP purchasers.

*Second*, the SEC admits that ▮▮▮▮ regression analysis of Ripple's XRP sales deviated from the article on which he based his analysis by neither analyzing contemporaneous returns, nor examining price return as a dependent variable, each of which would have been contrary to

1

his opinion. That sort of deviation from the stated methodology for his analysis renders the opinion unreliable and excludable.

*Third*, the SEC admits that ▬ applied no methodology to reach his other opinions aside from his "experience" and "qualifications"—essentially conceding that those opinions reflect nothing more than ▬ inadmissible *ipse dixit*.

In short, the SEC's drastic minimization of the scope of ▬ opinions further reinforces that these opinions should be excluded, as they are so narrow as to be irrelevant and unhelpful to the jury, and could cause significant prejudice to Defendants.

## ARGUMENT

I.     ▬ **Cherry-Picking of Time Periods and Exclusion of Data Renders His Opinion on Ripple and Larsen's XRP Purchases Unreliable.**

The SEC does not deny that ▬ ignored immense amounts of trading data in offering an opinion about Ripple and Larsen's XRP purchases. But the SEC wrongly asserts that this critical flaw goes to weight, not admissibility. Courts routinely exclude expert testimony that cherry-picks data, "because such a selective use of facts fails to satisfy the scientific method and *Daubert*." *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) (affirming district court's exclusion of cherry-picked expert testimony, and noting the expert "did not adequately explain why he ignored certain facts and data, while accepting others").[1]

The SEC concedes (Opp. at 4-5) that ▬ analyzed only four instances of Ripple's XRP purchases on portions of seven non-consecutive days in a case involving an alleged eight-

---

[1] The SEC's reliance on *Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005) is not to the contrary. *Aventis* does not even consider cherry-picked data, and instead addressed an expert's reliance upon one set of facts and data in their original report and another data set in their rebuttal. *Aventis* acknowledged that "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 513 (citation omitted). That is exactly the issue with ▬ opinion.

2

year unregistered securities offering (or approximately 2,912 days), yet argues that ▓▓▓▓ dataset is appropriate given that he only opines as to the four "specific times" addressed in his report.[2]  Setting aside that this concession demonstrates that ▓▓▓▓ opinion is useless (as at best, his opinion addresses 0.2% of days in the alleged offering), ▓▓▓▓ methodology is completely unreliable.  It is also prejudicial because the outcome-driven nature of his analysis all but guarantees that his conclusions, however limited, will be misleading to the jury.

The SEC claims (Opp. at 7), for example, that ▓▓▓▓ selected his extremely limited time period for analysis in Figures 1-4 "based on a review of 30 email chains, each of which contains discussions between Ripple and GSR employees regarding buying or selling XRP."  As an initial point, the SEC's explanation contradicts ▓▓▓▓ report, which cited only five unique email chains in connection with this section of his report and did not list the SEC's newfound list of 30 email chains as among the materials considered.  See Rep. Figures 1-4; cf. Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring expert reports to include "the facts or data considered by the witness").  But even putting aside that fundamental flaw, the SEC's argument only reinforces that ▓▓▓▓ analysis of the "directives" purportedly given by Defendants to GSR to purchase XRP, and the conclusions drawn therefrom, are based on an extremely limited data set that appears to have been selected to reinforce ▓▓▓▓ hypothesis.  This is the opposite of scientific analysis.

▓▓▓▓ does not even bother to address whether these 30 emails encompass the full universe of "directives" to GSR, and in fact, the record shows that there are an enormous number of

---

[2]   The SEC also inexplicably argues that "▓▓▓▓ does in fact examine Ripple purchases after 2016: his regression model examines Ripple-directed trading activity from 2015 to 2019." Opp. at 12.  But in fact, ▓▓▓▓ Figures 1-4 are used in support of his opinions about Ripple's XRP *purchases*, whereas the regression analysis is used to support his opinions about Ripple's XRP *sales*.  See Amended Expert Report of ▓▓▓▓ (Oct. 13, 2021) ECF No. 539-1 ("Rep.") Figures 1-4; ¶ 34.  The regression analysis provides no analysis or opinions related to Ripple's XRP purchases, and therefore, the fact remains that ▓▓▓▓ expert report provides no analysis of Ripple's XRP purchases outside of seven non-consecutive days examined in Figures 1-4.

communications between Ripple and GSR that ▇▇ simply ignored. For example, just on the seven days covered by ▇▇ analysis in Figures 1-4, GSR alone produced 93 unique emails between itself and Ripple. Looking to the broader time period in which GSR made purchases and sales on behalf of Defendants (around 1,600 days),[3] there were more than 3,600 unique emails between GSR and Defendants produced in discovery. Neither ▇▇ nor the SEC makes any attempt to explain why ▇▇ failed to review any of those other communications to see what "directives" they contained, nor why reviewing less than one percent of the communications is a reliable method by which to draw conclusions about Defendants' trading activity. These severe limitations preclude ▇▇ from making any inferences that his purported XRP price observations apply for even the narrower period, let alone that they would have been sustained over any longer period of time. *See State v. Deutsche Telekom AG*, 419 F. Supp. 3d 783, 789-90 (S.D.N.Y. 2019) (excluding analysis that extrapolated conclusions based on five to seven events over the course of a year).

▇▇ did not just exclude thousands of communications from his analysis; he also excluded substantial amounts of trading data even from within the narrow windows of time analyzed. By analyzing only XRP purchases (i) by identifiable GSR addresses; (ii) on the XRP Ledger; and (iii) in the XRP/USD pair, ▇▇ excluded trading by GSR (i) undertaken through other addresses associated with GSR; (ii) on centralized exchanges off the XRP Ledger (companies like Coinbase or Poloniex); and (iii) in currency pairs other than XRP/USD. Nor did ▇▇ consider other trading in the virtual currency market which might help explain XRP price movements. These limitations render ▇▇ opinions wholly unreliable because he ignored

---

[3]   *See* Rep. ¶ 32 ("Ripple enlisted GSR to provide programmatic sales on behalf of Ripple from November 2014 to January 2017 and from June 2017 to at least September 2019.")

4

data within his trading windows that may have ultimately contradicted even the correlations he purportedly observed.

The SEC does not dispute these limitations on ▇▇▇ analysis or that there was significant trading during the analyzed periods on centralized exchanges and in currency pairs other than XRP/USD. Instead, the SEC points (Opp. at 7) to purported issues with the integrity of the excluded data, explaining, for instance, that ▇▇▇ excluded off-ledger trading due to concerns of "potential errors that could be driven by wash trading on centralized exchanges." But ▇▇▇ did not actually follow this directive. When analyzing Larsen's XRP purchases, Rep. Figure 5, ▇▇▇ *only* considered trades made on a centralized exchange, Poloniex; moreover, he also included exchange-based trades in his regression analysis.

▇▇▇ also misreads the communications from which he bases his opinion. For example, one of the communications ▇▇▇ relies upon for his opinions on Larsen described a purchase strategy *prior* to June 11, 2017. ▇▇▇ nonetheless uses this communication to analyze trades three days <u>after</u> the June 11 message.[4]  Rep. ¶¶ 27-28. The communication references purchases through GSR, but ▇▇▇ only looks for trades *on Poloniex*. *Id.*

At bottom, however, the fundamental problem with ▇▇▇ report is that it is biased by his own selections of communications from which to start his analysis. He begins by (mis)reading Defendants' "specific statements" in cherry-picked communications that allegedly support his hypothesis that Defendants traded in a "manner consistent" with affecting XRP price (Opp. at 4, 8), and then analyzes trades to show that XRP price was affected. He does not consider counter-examples, or analyze time periods that undermine his conclusion. This outcome-driven analysis is the antithesis of the scientific method. *See In re Mirena Ius*

---

[4]   The SEC also incorrectly describes (Opp. at 8) the "weekend" as between June 10-12, 2017. However, June 12, 2017 was a Monday, so the weekend only lasted through June 11.

5

*Levonorgestrel-Related Prod. Liab. Litig.* (No. II), 341 F. Supp. 3d 213, 261 (S.D.N.Y. 2018), (excluding expert where, among other flaws, ignoring contrary data was suggestive "of an outcome-driven approach, not a search for truth"), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020).

Finally, the SEC fails in its attempt (Opp. at 8) to distinguish *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 483-84 (S.D.N.Y. 2018), on the grounds that ▮ based his analysis on "available trading data." That is not true; as discussed above, and as the SEC concedes elsewhere (*e.g.*, Opp. at 6-7), ▮ excluded a significant amount of available data from his analysis. But in any event, the SEC's excuse for why ▮ cherry-picked his data is exactly what the court in *LIBOR* rejected. In that case, the plaintiffs defended the opinions of one of the experts—as the SEC does here—on the basis that "'the lack of reliable . . . data limit[ed] [his] ability' to conduct" an analysis. *Id*. at 503. But the court excluded that expert's opinion, finding that "[w]hile incomplete data may, understandably, impair an expert's ability to fully conduct the analysis that he proposes, it does not excuse the failure to construct an analytical framework under which the data is to be analyzed." *Id*. at 504. ▮ similar failures also justify exclusion of his opinions.[5]

---

[5] The SEC claims (Opp. at 5 & n.4) that ▮ methodology of graphically presenting evidence of returns or volume over short periods of time follows the same methodology used in numerous academic papers. But that argument misses the point. The issue with ▮ opinion is not how he displayed his results, but rather, the limited data he uses in his analysis and the conclusions he draws from that limited data. None of the academic papers the SEC cites considered and drew conclusions of price effects from cherry-picked non-public information bearing on trading activity of an individual trader, like Ripple. For example, in the paper the SEC cites authored by Defendants' expert Allen Ferrell, Ferrell charted the stock price of a publicly-traded company over the course of a day and noted events that occurred at certain points in time. Ferrell, Allen, and Atanu Saha, *The Loss Causation Requirement for Rule 10b-5 Causes of Action: The Implications of Dura Pharmaceuticals, Inc. v. Broudo*, The Business Lawyer (2007) at 163-86 [Figure 2]. That is quite different from what ▮ did—cherry-picking GSR's trading on-ledger in XRP/USD pairs over seven non-consecutive days to opine that

**II.     The Critical Gaps in ▬▬▬ Regression Analysis Render His Opinion on Ripple's XRP Sales Inadmissible.**

The SEC does not deny that ▬▬▬ skipped two key steps in performing his regression analysis of Ripple's XRP sales that were used in the article on which he based his methodology, and which would undermine his conclusion. This sort of failure renders ▬▬▬ regression analysis inadmissible. *See United States v. Tuzman*, 2017 WL 6527261, at *17 (S.D.N.Y. Dec. 18, 2017) (excluding opinions where an expert's "failure to follow the methodology set forth in the two research papers on which he purports to rely render[ed] his testimony unreliable").

*First*, there is no dispute that ▬▬▬ regression analysis considered lagged returns but not contemporaneous returns, contrary to the methodology he purported to rely on (which included contemporaneous returns). The SEC offers no defense of that decision. Instead, it asserts (Opp. at 10-11) that ▬▬▬ analysis of lagged returns was reliable and statistically significant. That is not responsive to the criticism of the flaw. The SEC neither explains why ▬▬▬ selectively abandoned contemporaneous returns as a variable, nor acknowledges the significance of the fact that including it (in accordance with the methodology he purported to follow) would have undermined his conclusions.

*Second*, there is also no dispute that ▬▬▬ excluded price return as a dependent variable (Opp. at 10), which would have indicated whether prices were impacted by Ripple's trading activity. Had ▬▬▬ followed this step, his regression would have shown that Ripple's trading activity had no statistically significant impact on XRP price returns, thereby rendering the regression analysis based on lagged returns meaningless. *See* ECF No. 538 at 8. If Ripple's trading had no impact on the price of XRP, then Ripple's intent has no arguable relevance.

---

GSR's trades on behalf of Ripple "appear[] successful as the price increased dramatically," Rep. ¶ 18, while ignoring GSR's other trading off-ledger, and in other pairs, as well as other digital assets' trading, on those seven days.

The SEC's rationalization (Opp. at 11) that ▉ is now trying to answer a different question than the 2003 article on which he purportedly based his methodology signals even deeper flaws with ▉ opinions. ▉ apparently selected a methodology that was unsuited to answer the question he was presented, and then had to selectively manipulate that methodology, without explanation, to perform an analysis he deemed appropriate.

In a last-ditch effort (Opp. at 12), the SEC baselessly implies that there is a "battle of the experts" as to this issue that is best left to a jury to decide. That is simply not the case. The question is not whether Professor Ferrell's rebuttal opinion is better than ▉ opening opinion. It is whether ▉ methodology can be considered reliable given his significant, unexplained, and now undefended, departures from the methodology he purports to invoke. It cannot.

### III. ▉ Purported Qualifications Do Not Alone Warrant Admission of His Other Opinions.

The SEC does not explicitly deny that ▉ applied no methodology at all to draw his opinions regarding Defendants' purported incentives and sales practices, contending instead (Opp. at 13) that his experience alone is a sufficient basis for admitting his opinions. It is not.[6] Rule 702 makes clear that an expert must not only have "scientific, technical, or other

---

[6] *Sandler v. Montefiore Health Sys.*, 2018 WL 4636835, at *1 (S.D.N.Y. Sept. 27, 2018), which the SEC cites, is based on a completely different set of circumstances. There, the expert had directly relevant experience having worked nearly three decades for an organization that accredited Montefiore's resident program. *Id*. at *1, *18. *That* experience was deemed directly pertinent to the facts of the case. *Id*. at *18-19. Here, by contrast, ▉ generalized experience in the broad fields of economics and finance is of dubious application, and is no substitute for a reliable methodology. And while it is true that "an expert testifying on the basis of experience may form his conclusions by applying his extensive experience to the facts of the case," *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liab. Litig.*, 2008 WL 1971538, at *10 (S.D.N.Y. May 7, 2008), an expert must also "apply his experience to the facts *using the same intellectual rigor*" as a professional in his field. *Id*. (emphasis added). This ▉ does not do. ▉ instead only provides a vague recitation of data from Ripple's financial statements without further analysis.

specialized knowledge," *but also* offer testimony that is "based on sufficient facts or data," and "the product of reliable principles and methods" that are "reliably applied" to the facts of the case. Fed. R. Evid. 702. Even assuming *arguendo* that ▬ could satisfy the "specialized knowledge" factor, his opinions fall far short on all of the others.

*First*, the SEC claims that ▬ opinion about lock-up provisions is "based on financial and economic theory" (Opp. at 13), but ▬ cites to just one academic paper in this section of his report [Field and Hanka (2001)], and not for any verifiable methodology, but instead, for general principles regarding lock-up provisions.

*Second*, ▬ opinions as to Defendants' incentives are purportedly based on nothing more than his review of record evidence ("Ripple's operational costs, share repurchases, outside funding sources, and executive compensation.") (Opp. at 14). But "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

*Third*, ▬ purportedly applied "fundamental principles of finance, mathematics and accounting" (Opp. at 14) to reach conclusions about Ripple's use of XRP sales to supplement its funding gap. That is nothing short of an attempt to rewrite ▬ deficient report, which cites no such principles at all.

*Fourth*, even the SEC admits (Opp. at 14) that ▬ opinions as to the purported similarities between XRP and stock are based on nothing other than his "25 years of expertise in teaching and his expertise in forming conclusions about financial markets."

*Finally*, the SEC fails to respond to ▬ own admissions that tracing transfers becomes increasingly unreliable with each successive transfer, nor does it offer any explanation as to how the analysis can establish who controls the XRP with certainty, especially after each

9

transfer. Rep. ¶ 38 ("[T]he certainty that the initial owner of funds still controls them decreases as the number of hops increases."). That ▇▇▇ relied on FIFO (First-In, First-Out), see Rep. ¶ 65 (using FIFO without explanation); Dep. Tr. ▇▇▇ (ECF No. 539-2) ("Tr.") 342:23-343:8 (acknowledging FIFO was used without citation); Tr. 346:20-347:7 (acknowledging FIFO critiques), for tracing purposes misses the point that he was applying that methodology to XRP that he cannot reliably assert was sold by Larsen or Garlinghouse.

IV.  ▇▇▇ **Opinions are Not Relevant, Not Useful, and Highly Prejudicial.**

In arguing relevance, the SEC offers nothing more than the conclusory assertion (Opp. at 15) that ▇▇▇ opinions are "relevant" to the *Howey* test because they "show the extent to which an investor may expect profit derived from Defendants' efforts." But ▇▇▇ cannot show (1) that investors knew or could have known about the purported efforts in question, since the communications were all non-public and the vast majority of XRP trading is anonymous; or (2) that Defendants' trading actually caused any change in the price of XRP.[7] ▇▇▇ testimony is therefore not probative at all of any *Howey* factors. And even if it were probative, it remains not useful, because ▇▇▇ testimony could be replaced wholesale by the underlying communications and trading data, allowing jurors to draw their own inferences.

In arguing that ▇▇▇ opinions are not unfairly prejudicial, the SEC attempts (Opp. at 15) to blame *Defendants* for any prejudice, arguing that Defendants elicited ▇▇▇ deposition

---

[7] The SEC admits (Opp. at 13), as it must, that ▇▇▇ does not opine as to causation, and ▇▇▇ himself expressly disclaimed any opinion on causation. *See e.g.*, Tr. 126:4-6. But the SEC nonetheless says it was proper for ▇▇▇ to conclude that Defendants achieved "success" in influencing the price of XRP, despite performing no analysis to determine what (if anything) caused XRP's prices to change. This is truly a *non-sequitur*. The SEC cannot argue that ▇▇▇ opinions are extremely narrow (*e.g.*, Opp. at 5) in order avoid Defendants' argument that they are not based on sufficient data, only to turn around and argue that ▇▇▇ can validly opine on whether Ripple's efforts were successful without a shred of support, or analysis for, that view.

10

testimony subtly alleging that Defendants engaged in fraud.  Putting aside that what matters for Rule 403 purposes is the witness's *testimony*, not the party asking the questions, the SEC offers no defense for the unfairly prejudicial framing of ▇▇▇ own report.  *See* ECF No. 538 at 14.  Particularly given that the SEC has now conceded that ▇▇▇ opinion is extremely narrow and limited, what little that remains of ▇▇▇ opinions should be excluded because they fail the Rule 403 balancing test: they are irrelevant and unhelpful, but risk significant confusion and prejudice.  Despite not opining as to causation, and limiting his opinion on XRP purchases to four specific instances, ▇▇▇ repeatedly implies that Ripple engaged and "succeeded" in such efforts throughout the relevant time period.  The SEC should not be permitted to conduct such a bait and switch, offering an expert with extremely narrow and ultimately useless opinions while trying to parlay that into a much larger, more meaningful, and unsupported opinion.

## CONCLUSION

For the foregoing reasons, ▇▇▇ testimony should be excluded in its entirety.

Dated:   New York, New York
         August 30, 2022

                                    Respectfully submitted,

                                    DEBEVOISE & PLIMPTON LLP

                                    By: */s/ Andrew J. Ceresney*
                                    Andrew J. Ceresney
                                    Erol Gulay

                                    919 Third Avenue
                                    New York, NY  10022
                                    (212) 909-6000
                                    aceresney@debevoise.com
                                    egulay@debevoise.com

                                    KELLOGG, HANSEN, TODD, FIGEL, &
                                    FREDERICK PLLC

                                    By: */s/ Michael K. Kellogg*

11

                Michael K. Kellogg

                Sumner Square
                1615 M Street, N.W., Suite 400
                Washington, D.C. 20036
                (202) 326-7900
                mkellogg@kellogghansen.com

                *Counsel for Defendant Ripple Labs Inc.*

| CLEARY GOTTLIEB STEEN & HAMILTON LLP | PAUL, WEISS, WHARTON, RIFKIND & GARRISON LLP |
|---|---|
| By: */s/ Matthew C. Solomon*<br>Matthew C. Solomon | By: */s/ Martin Flumenbaum*<br>Martin Flumenbaum |
| 2112 Pennsylvania Avenue NW<br>Washington, DC 20037<br>(202) 974-1680<br>msolomon@cgsh.com | 1285 Avenue of the Americas<br>New York, NY 10019<br>(212) 373-3000<br>mflumenbaum@paulweiss.com |
| *Counsel for Defendant Bradley Garlinghouse* | *Counsel for Defendant Christian A. Larsen* |