UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

-against-

RIPPLE LABS, INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/6/2023__

20 Civ. 10832 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, the Securities and Exchange Commission (the "SEC"), brings this action against

Defendants Ripple Labs, Inc. ("Ripple") and two of its senior leaders, Bradley Garlinghouse and

Christian A. Larsen, alleging that Defendants engaged in the unlawful offer and sale of securities

in violation of Section 5 of the Securities Act of 1933, 15 U.S.C. §§ 77e(a) and (c).  Am. Compl.

¶¶ 9, 430–35, ECF No. 46.  The SEC also alleges that Garlinghouse and Larsen aided and

abetted Ripple's Section 5 violations.  *Id.* ¶¶ 9, 436–40.

Before the Court are the parties' motions to preclude expert testimony from consideration

at summary judgment and trial.  ECF Nos. 768, 770, 773, 786, 789, 791; *see also* ECF Nos. 532,

535, 537, 540, 543, 546.[1]  For the reasons stated below, the SEC's motion is GRANTED in part

and DENIED in part, and Defendants' motions are GRANTED in part and DENIED in part.

---

[1] Portions of the briefs, expert reports, and other documents discussed in this order were filed under seal or redacted. *See* ECF No. 737 (granting in part and denying in part the parties' and third parties' motions to seal).  These materials are "judicial documents," as they are "relevant to the performance of the judicial function and useful in the judicial process."  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006); *see also Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).  To the extent that information in those documents is disclosed in this order, the privacy and business interests that justified their sealing or redaction are outweighed by "the public's right of access to [information] necessary to understand the basis for court rulings."  *Spinelli v. Nat'l Football League*, 903 F.3d 185, 193 n.2 (2d Cir. 2018); *see also Dodona I, LLC v. Goldman, Sachs & Co.*, 119 F. Supp. 3d 152, 155 (S.D.N.Y. 2015).

## BACKGROUND[2]

I.   Factual and Legal Background

Ripple is a "privately-held payments technology company that uses blockchain innovation" and holds a large percentage of XRP, a digital asset "transacted on the cryptographic XRP Ledger," a blockchain-enabled network.[3]  Ripple Answer, Prelim. Statement ¶¶ 6–7, 11, ECF No. 51.  After its founding in 2012, Ripple, as well as Garlinghouse and Larsen in their individual capacities, sold XRP on various dates in exchange for fiat or other currencies.  *See, e.g.*, Ripple Answer, Resp. ¶ 1.  The SEC alleges that Defendants' unregistered offers and sales of XRP violated Section 5.  Am. Compl. ¶ 9.

Under Section 5, it is "unlawful for any person, directly or indirectly, . . . to offer to sell, offer to buy or purchase[,] or sell" a "security" unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public.  15 U.S.C. §§ 77e(a), (c), (e).  To prove a violation of Section 5, the SEC must show:  (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce.  *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

Defendants concede that they offered to sell and sold XRP through interstate commerce.  *See* Ripple Answer, Resp. ¶¶ 1, 14; Garlinghouse Answer, Resp. ¶¶ 1, 14, ECF No. 462; Larsen Answer, Resp. ¶¶ 1, 14, ECF No. 463.  They also concede that they never filed a registration statement with the SEC for any offer or sale of XRP.  Ripple Answer, Resp. ¶ 1; Garlinghouse

---

[2] The Court presumes familiarity with the facts, which have been set forth in previous orders in this case, *see* ECF No. 440 at 1–5; ECF No. 441 at 1–13, and only briefly summarizes them here.

[3] A blockchain is an electronically distributed database "shared among the nodes of a computer network."  *See* Adam Hayes, *Blockchain Facts: What Is It, How It Works, and How It Can Be Used*, Investopedia (updated Sept. 27, 2022), https://www.investopedia.com/terms/b/blockchain.asp/.

Answer, Resp. ¶ 1; Larsen Answer, Resp. ¶ 1.  The issue in this case is whether Defendants offered to sell or sold XRP as a security.  Specifically, the SEC alleges that Defendants sold XRP as an "investment contract," which is a security defined under the Securities Act, 15 U.S.C. § 77b(a)(1).  *See, e.g.*, Am. Compl. ¶¶ 3, 9, 60.  Defendants argue that they did not sell XRP as investment contracts, and, therefore, no registration statement was required.  *See, e.g.*, Ripple Answer, Resp. ¶¶ 3, 9, 60.  In *SEC v. W.J. Howey Co.*, the Supreme Court held that the test for an investment contract under the Securities Act is whether the scheme "involves [(1)] an investment of money [(2)] in a common enterprise [(3)] with profits to come solely from the efforts of others."  328 U.S. 293, 301 (1946); *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).

II.    Procedural Background

On December 22, 2020, the SEC commenced this action.  ECF No. 1.  An amended complaint was filed on February 18, 2021.  Am. Compl.  Fact discovery closed on August 31, 2021, *see* ECF No. 313, and expert discovery concluded on February 28, 2022, *see* ECF No. 411.  On March 11, 2022, the Court denied the SEC's motion to strike Ripple's affirmative defense that it "lacked notice that its conduct was in violation of law, in contravention of Ripple's due process rights," ECF No. 128.  ECF No. 440.  That same day, the Court also denied Garlinghouse's and Larsen's separate motions to dismiss, ECF Nos. 105, 110.  ECF No. 441.

On July 12, 2022, the parties filed cross-motions to preclude expert testimony.  ECF Nos. 533, 536, 538, 541, 544, 547.  Defendants seek to exclude, in whole or in part, testimony from all five of the SEC's expert witnesses: Experts Nos. 1–5.[4]  *See* ECF Nos. 768, 773, 786, 789, 791. The SEC seeks to exclude, in whole or in part, testimony from all ten of Defendants' expert

---

[4] The Court previously granted the SEC's request to redact its experts' names.  *See* ECF No. 737 at 5.  Accordingly, the Court refers to the SEC's experts as Experts Nos. 1–5 consistent with the parties' filings.

witnesses:  Alan Schwartz, Peter Adriaens, Bradley Borden, Peter Easton, Yesha Yadav, Allen

Ferrell, Carol Osler, Daniel Fischel, M. Laurentius Marais, and Kristina Shampanier.  *See* ECF

Nos. 770, 772.

## DISCUSSION

I.    <u>Legal Standard</u>

The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  It

provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill,

experience, training, or education may testify in the form of an opinion" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the
> trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702.

District courts are the gatekeepers of expert testimony, responsible for "ensuring that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "[T]he proponent of expert

testimony has the burden of establishing by a preponderance of the evidence that the

admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151,

160 (2d Cir. 2007).

Courts first address "the threshold question of whether a witness is 'qualified as an expert

by knowledge, skill, experience, training, or education' to render his or her opinions."  *Nimely v.

City of New York,* 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702).  After

considering the expert's qualifications, courts determine whether the expert's testimony is

reliable.  In determining reliability, courts consider "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'"  *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593–94).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Id.* (cleaned up).  "The mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).

Even after qualifying a witness as an expert and determining that the opinion is reliable, courts ask "whether the expert's testimony as to a particular matter will assist the trier of fact." *Nimely*, 414 F.3d at 397 (cleaned up).  The testimony must be relevant, and it should not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help."  *Arista Recs. LLC v. Lime Grp. LLC*, No. 06 Civ. 5936, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) (quoting *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001)).

Although the proponent of expert testimony bears the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are met, *Williams*, 506 F.3d at 160, the district court is the ultimate gatekeeper, *see* Fed. R. Evid. 104(a).  Exclusion of expert testimony is "the exception rather than the rule."  *Media Glow Digit., LLC v. Panasonic*

*Corp. of N. Am.*, No. 16 Civ. 7907, 2019 WL 1055527, at *1 (S.D.N.Y. Mar. 6, 2019) (quoting Fed. R. Evid. 707 advisory committee's notes to 2000 amendments).

II.    <u>Application</u>

A.  The SEC's Experts

Defendants move to exclude the testimony of Experts Nos. 1–4.  *See* ECF Nos. 768, 773, 786, 791.  Defendants also move to exclude a portion of the testimony of Expert No. 5.  *See* ECF No. 789.

1.  Expert No. 1

The SEC offers the testimony of Expert No. 1, the founder and managing director of an investment partnership which was "originally primarily focused on making investments in the digital asset space."  Expert No. 1 Report ¶ 4, ECF No. 788-1.  Expert No. 1 holds a master's degree in electrical engineering and has "provided expert consulting in blockchain, digital assets, and forensic data analytics for private companies, federal agencies, and foreign securities regulators."  *Id.* ¶¶ 3–4.

Expert No. 1 offers an opening report, *see* Expert No. 1 Report, and a rebuttal report that responds to the opinions offered by four of Defendants' experts:  Carol Osler, Allen Ferrell, Peter Adriaens, and Yesha Yadav, *see* Expert No. 1 Rebuttal Report, ECF No. 788-6.  In his opening report, Expert No. 1 offers two opinions.  First, Expert No. 1 opines that, based on XRP design features and Ripple's public statements, "a reasonable [XRP] purchaser would have had an expectation of future profit derived from the efforts of Ripple."  *Id.* ¶ 8.  Expert No. 1 comes to this conclusion by offering a list of six promotional factors that a reasonable investment-oriented purchaser of XRP would consider.  *Id.* ¶ 50.  Then, he analyzes Ripple's public statements and concludes that Ripple communicated extensively about each of the six factors,

which had the effect of generating significant investor interest in purchasing XRP for the purpose

of future profit. *Id.* ¶¶ 51–87.  Second, Expert No. 1 opines that certain design features of XRP,

the XRP Ledger (the blockchain on which XRP exists), and Ripple's software products,

including Ripple's On-Demand Liquidity product ("ODL"),[5] appeal more to purchasers of XRP

intent on making a profit than to financial institutions seeking to use XRP to facilitate cross-

border asset transfers. *Id.* ¶ 9.  In his rebuttal opinion, Expert No. 1 offers three categories of

rebuttal opinions:

> (1) certain of Osler, Ferrell, and Adriaens' opinions as to ODL are incorrect;
>
> (2) Adriaens's methodology supporting his opinion as to the "use" of XRP or the XRP Ledger is significantly flawed; and
>
> (3) Yadav's opinions as to where offers for the sale of XRP occurred are incorrect.

Expert No. 1 Rebuttal Report ¶¶ 7–10, 52, 92–97.  Defendants seek to exclude Expert No. 1's

opening and rebuttal reports on the grounds that he is unqualified to offer the opinions, he has no

reliable methodology to support his opinions, and his testimony will not assist the trier of fact.

Def. Expert No. 1 Daubert Mem. at 1–2, ECF No. 787.

> a.   Opening Report

First, the Court rejects Defendants' argument that Expert No. 1 is not qualified to offer

his opinions as to digital assets, the design of XRP, the XRP Ledger, and Ripple's ongoing sales,

distribution, escrow, and buybacks of XRP.  Rule 702 embodies a "liberal standard of

admissibility for expert opinions."  *Nimely*, 414 F.3d at 395.  "Any one of the qualities listed in

Rule 702—knowledge, skill, experience, training, or education—may be sufficient to qualify a

witness as an expert."  *Crown Cork & Seal Co., Inc. Master Ret. Tr. v. Credit Suisse First Bos.*

---

[5] ODL is a software developed by Ripple that facilitates cross-border transactions by allowing Ripple customers to exchange fiat currency (for example, U.S. dollars) for XRP and XRP for another fiat currency (for example, Mexican pesos).  Expert No. 1 Report ¶ 17.

*Corp.*, Nos. 12 Civ. 5803–05, 12 Civ. 7263–64, 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013). Although Expert No. 1 lacks formal training in finance, investment, or cross-border remittances, his practical experience and specialized knowledge qualify him to provide expert testimony under Rule 702. *Alto v. Sun Pharm. Indus. Inc.*, No. 19 Civ. 9758, 2021 WL 4803582, at *2 (S.D.N.Y. Oct. 13, 2021). Expert No. 1 has years of practical experience with digital assets and investing. He has analyzed "hundreds of companies, projects, coins, and tokens in the digital asset space" and developed successful cryptocurrency arbitrage strategies. Expert No. 1 Report ¶ 4.

Further, the Court rejects Defendants' argument that Expert No. 1 is unqualified to testify about ODL and the cross-border payment industry. Def. Expert No. 1 Daubert Mem. at 7. "If [an] expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa*, 489 F. Supp. 2d at 282. An expert need not be disqualified "merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, Nos. 08 Civ. 11315, 09 Civ. 2081, 2011 WL 855876, at *1 (S.D.N.Y. Feb 28, 2011) (citation omitted). Based on his extensive expertise with blockchains and digital assets, Expert No. 1 is qualified to opine on the design features of XRP, the XRP Ledger, and ODL. At trial, Defendants may question Expert No. 1 about his specific experience with the cross-border payment industry, but "[a]ssertions that the witness lacks particular educational or other experiential background, go to the weight, not the admissibility, of the testimony." *In re Zyprexa*, 489 F. Supp. 2d at 282 (cleaned up).

Second, Defendants argue that Expert No. 1's first opinion as to what a reasonable XRP purchaser believed should be excluded because he lacks a reliable methodology to support his opinion.  Def. Expert No. 1 Daubert Mem. at 7–12.  The Court agrees.  Expert witnesses, including those testifying from experience, must use "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Amorgianos*, 303 F.3d at 265–66.  Although Expert No. 1 may rely on his practical experience and specialized knowledge, "[i]f [he] is relying solely or primarily on experience, then [he] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 72 advisory committee's notes to 2000 amendments).

Expert No. 1 lists six factors that would have been important to a reasonable purchaser of XRP and analyzes Ripple's public statements using those factors.  But, he provides no justification for the importance of those six factors besides his "experience as an investor in digital assets as well as [his] close observation of the digital asset space."  Expert No. 1 Report ¶ 50.  Expert No. 1 does not explain how his personal experience as an investor is a sufficient basis for his expert opinion about how others decide whether to purchase XRP.  He does not cite any sources supporting his method of measuring the perceptions of XRP purchasers or their behavior.  And, at his deposition, Expert No. 1 conceded that he did not speak to any purchasers of XRP in preparing his report.  Expert No. 1 Dep. at 196:20-24, ECF No. 788-2.  Without more, "[g]eneric appeals to an expert's experience are no substitute for reliable principles and

methods." *Earley Info. Sci., Inc. v. Omega Eng'g, Inc.*, 575 F. Supp. 3d 242, 248 (D. Mass. 2021); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997).[6]

b.   Rebuttal Report

Defendants primarily challenge Expert No. 1's rebuttal report by arguing that he lacks the credentials to rebut the opinions of Defendants' experts, particularly when compared to the credentials of Defendants' experts.  The Court rejects this argument for substantially the same reasons as stated above.  Expert No. 1 has practical experience with and specialized knowledge of digital assets and investing.  *See Alto*, 2021 WL 4803582, at \*2.  And, the question before the Court is whether the witness is "qualified as an expert by knowledge, skill, experience, training, or education" to render his opinions.  Fed. R. Evid. 702.  Whether the witness is better qualified than the opposing party's witness is a question for the trier of fact, not the Court.  *See In re Zyprexa*, 489 F. Supp. 2d at 282; *see also Crown Cork & Seal*, 2013 WL 978980, at \*2.[7]

Accordingly, Defendants' motion to preclude Expert No. 1 from testifying as to his first opinion about the perceptions of a reasonable XRP purchaser is GRANTED, *see, e.g.*, Expert No. 1 Report ¶¶ 50–87, and Defendants' motion to preclude Expert No. 1 from testifying as to the remainder of his opinions, including those in his rebuttal report, is DENIED.

2.   Expert No. 2

The SEC offers the testimony of Expert No. 2, a securities consultant and former senior vice president of regulation and controls for the NASDAQ stock exchange.  *See* Expert No. 2 Report at 3, ECF No. 771-1.  Expert No. 2 has more than fifty years of experience in the

---

[6] Because the Court finds that Expert No. 1's first opinion should be excluded because it is not supported by a reliable methodology, the Court does not address Defendants' argument that Expert No. 1's first opinion will not help the jury.  *See* Def. Expert No. 1 Daubert Mem. at 12.

[7] For the reasons stated below, the Court excludes Yadav's third opinion as to the locations of twenty-five cryptocurrency exchanges.  Therefore, Defendants' motion to exclude Expert No. 1's rebuttal opinion to Yadav's third opinion is moot, and the Court does not address Defendants' argument that Expert No. 1's rebuttal to Yadav's opinion is not supported by reliable methodology.

securities industry, and his areas of expertise include the "rules, regulations, customs, and best practices that govern" various securities markets. *Id.* at 3–5. He has testified in many securities cases on issues related to industry background and practice, regulatory issues, and unregistered securities offerings. *Id.* at 5–6.

> In his expert report, Expert No. 2 opines on four main topics:
>
> (1) general registration and disclosure requirements for the offers and sales of securities under the Securities Act, *id.* at 6–20;
>
> (2) the general procedure for engaging in an initial public offering ("IPO") of securities, the costs typically incurred, and the resources typically expended, when companies raise money for an IPO, *id.* at 20–21;
>
> (3) how the SEC has historically brought actions against novel or innovative investment products, including digital assets, and how market participants could have sought guidance on how the SEC would apply securities laws to digital assets, *id.* at 22–28; and
>
> (4) specific types of "material" information that Ripple would have customarily disclosed had it registered its XRP offerings, *id.* at 28–29.

Defendants seek to exclude Expert No. 2's testimony as irrelevant, confusing to the jury, not based on relevant expertise or reliable methodology, and usurping the role of the judge and jury. Def. Expert No. 2 Daubert Mem. at 4–5, ECF No. 769.

First, Defendants argue that Expert No. 2's opinion concerning general registration and disclosure requirements under securities laws should be excluded as irrelevant to the core legal question at issue in this case: whether Defendants' offers or sales of XRP were investment contracts under the Securities Act. *Id.* at 5. But, Expert No. 2's opinions need not directly address the central issue in the case to be relevant; the proper question is "whether the expert's testimony as to a particular matter will assist the trier of fact." *Nimely*, 414 F.3d at 397 (cleaned up). Here, Expert No. 2's testimony is relevant because it will assist the trier of fact—who will likely be unfamiliar with customary practices and requirements in the securities industry—to

understand the nature of the SEC's charges and the impact of Defendants not registering their

offers and sales of XRP.  *See Highland Cap. Mgmt. L.P. v. Schneider*, 551 F. Supp. 2d 173, 182

(S.D.N.Y. 2008).  Further, Expert No. 2's testimony about industry norms and practices, and

how Defendants' actions deviated from such norms and practices, may be relevant to the fact

finder's assessment of Garlinghouse's and Larsen's knowledge or reckless disregard for whether

Ripple's scheme violated Section 5.  *See, e.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195,

218 (3d Cir. 2006).  Far from confusing the jury, Expert No. 2's opinions would assist the jury in

understanding a technical and specialized industry.  Any potential risk of confusing the jury is

not substantially outweighed by the probative value of Expert No. 2's testimony.

Second, the Court rejects Defendants' argument that Expert No. 2 lacks sufficient

expertise to opine on IPO costs or how the SEC has approached the regulation of digital assets.

*See* Def. Expert No. 2 Daubert Mem. at 11–12, 15.  This argument "rest[s] on a constricted view

of expert qualifications" because an expert "need not be disqualified merely because he or she

does not possess experience tailored to the precise product or process that is the subject matter of

the dispute."  *Lion Oil Trading*, 2011 WL 855876, at *1 (cleaned up).  Expert No. 2 has a

lengthy regulatory career as a securities generalist reviewing thousands of SEC filings and

making "the final determination as to what information NASDAQ[-]listed companies were

required to disclose."  Expert No. 2 Report at 4.  Therefore, Expert No. 2 is sufficiently qualified

to opine on the customs and practices in the securities industry.  At trial, Defendants may

question Expert No. 2's application of his expertise to digital assets, or to IPO costs, but those

challenges "go to the weight, not the admissibility, of [his] testimony."  *In re Zyprexa*, 489 F.

Supp. 2d at 282 (citation omitted).

Third, the Court similarly rejects Defendants' argument that Expert No. 2 lacked "facts, data, or relevant experience" to support his opinion about how market participants may seek regulatory clarity. *See* Def. Expert No. 2 Daubert Mem. at 13. Expert No. 2 bases his opinion on his regulatory career and familiarity with industry customs, including his "personal experience of interaction between NASD and the SEC and how to regulate . . . new products." Expert No. 2 Dep. at 153:2-4, ECF No. 771-2. In addition to his regulatory experience, Expert No. 2 cites specific judicial opinions, SEC regulations, enforcement actions, and SEC online resources that market participants may consult to gain clarity about whether their conduct comports with securities laws. *See, e.g.*, Expert No. 2 Report at 24–27; *SEC v. U.S. Env't, Inc.*, No. 94 Civ. 6608, 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002). For example, Expert No. 2 outlines how a market participant may request a "no-action letter" from SEC staff, and to support his opinion, he cites online resources and his regulatory experience. Expert No. 2 Report at 26–27.

Lastly, Defendants argue that the Court should exclude Expert No. 2's opinion as to "important disclosures" that would have been "material to investors with respect to Ripple and XRP." Expert No. 2 Report at 28; *see* Def. Expert No. 2 Daubert Mem. at 8–11. Here, the Court agrees. Expert No. 2's opinions as to the materiality of important disclosures is a legal conclusion that would usurp "the role of the jury in applying th[e] law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citations omitted); *see also id.* ("As a general rule an expert's testimony on issues of law is inadmissible."). Nor does Expert No. 2 conduct an assessment based on the "total mix" of information available. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Therefore, the Court precludes Expert No. 2 from testifying as to the materiality of Ripple's potential disclosures.

Accordingly, Defendants' motion to preclude Expert No. 2 from testifying as to his fourth opinion about the materiality of Ripple's potential disclosures is GRANTED, *see, e.g.*, Expert No. 2 Report at 28–29, and Defendants' motion to preclude Expert No. 2 from testifying as to the remainder of his expert report is DENIED.

### 3. Expert No. 3

The SEC offers the testimony of Expert No. 3, a professor of finance and the founder, owner, and president of an expert consulting firm.  Expert No. 3 Report ¶ 3, ECF No. 779-1.  His research focuses on forensic finance, with a particular concentration on market manipulation, structured finance, credit ratings, IPOs, and international finance.  *Id.* at ¶ 4.  His academic research focuses on digital assets and has been extensively featured in a variety of media outlets. *Id.*

In his expert report, Expert No. 3 proffers two opinions on Defendants' trading activities and four opinions on Defendants' sales practices and incentives.  *Id.* at ¶ 9.  Specifically, Expert No. 3 opines that:

> (1) at specific times, Defendants directed GSR, a digital asset trading firm, to buy XRP in a manner consistent with pushing XRP's price upwards or providing a price floor to stabilize XRP's price; and
>
> (2) Defendants sold XRP in a manner designed to minimize downward pressure on XRP's price and employed trading strategies to protect XRP's price.

*Id.*  Expert No. 3 further opines that Defendants:

> (1) restricted sales of XRP to mitigate selling pressure and protect XRP's price from falling;
>
> (2) were incentivized to influence XRP's price;
>
> (3) relied on XRP sales to supplement a funding gap; and
>
> (4) used XRP in a manner similar to how companies use stock.

*Id.*  Defendants do not contest Expert No. 3's qualifications; rather, they seek to exclude his testimony on the grounds that his opinions lack any reliable methodology and are irrelevant and unduly prejudicial.  Def. Expert No. 3 Daubert Mem. at 1–2, ECF No. 774.

a.   Trading Activity Opinions

First, Defendants argue that Expert No. 3's first trading activity opinion—that Defendants directed GSR to purchase XRP in a manner consistent with positively influencing XRP's price—is based on insufficient data and inconsistent methodology.  *Id.* at 5–7. Defendants argue that Expert No. 3 considered a small subset of Defendants' XRP purchases in small trading windows when compared to the thousands of days of trading activity involving offerings of XRP.  *Id.*  Defendants also argue that Expert No. 3 considered different benchmarks to evaluate Ripple's trades compared to Larsen's trades, and that he did not consider any of Garlinghouse's trades.  *Id.* at 7.

In his report, Expert No. 3 describes his methodology and his criteria for identifying the specific trading activity used to produce Figures 1–4 based on existing communications and available trading data.  Expert No. 3 Report ¶¶ 17–25.  His methodology is testable and reproduceable, and similar analyses and figures are routinely included in peer-reviewed academic papers.  *See* SEC Opp. Expert No. 3 Daubert Mem. at 5 n.4 (listing papers), ECF No. 781; *Romano*, 794 F.3d at 330.  The Court finds that Expert No. 3 reliably explains his selection criteria, which also accounts for the different benchmarks used to evaluate Ripple's and Larsen's trades.  Although Expert No. 3's analysis only covers a small set of trades over a few days, he also only opines that "[a]t specific times," Defendants directed GSR to purchase XRP to positively influence XRP's price.  *Id.* ¶ 9.  He does not purport to offer a broader conclusion about Defendants' general trading strategy and does not extrapolate from his limited sample.  At

15

trial, Defendants may question Expert No. 3 about his limited sample and failure to consider other data, but this criticism of Expert No. 3's methodology is an issue of weight, not admissibility.  *See Aventis Env't Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005).

Second, Defendants argue that Expert No. 3's second trading activity opinion—that Defendants sold XRP to minimize downward pressure on XRP's price—is unreliable because his underlying regression analysis skips critical methodological steps.  Def. Expert No. 3 Daubert Mem. at 7–8.  Defendants assume for the sake of argument that the methodology Expert No. 3 purports to follow (his own methodology as outlined in a 2003 paper) is "generally accepted and would have provided a reliable basis for [his] opinion," but contend that he departed from that methodology in two critical ways:  he failed to examine "price return" as a dependent variable and did not examine "contemporaneous imbalance."  *Id.* at 8 & n.6.

In response, the SEC argues that Expert No. 3's analysis excludes "price return" as a dependent variable because his regression analysis does not attempt to predict whether XRP imbalances predict future returns, so price return is an improper dependent variable.  *See* SEC Opp. Expert No. 3 Daubert Mem. at 10; *see also* Expert No. 3 Dep. at 256:8-9, ECF No. 779-2. Further, the SEC contends that Expert No. 3's analysis excludes "contemporaneous imbalance" as an independent variable because its inclusion would not address the question he attempts to answer through his analysis, and it would present reverse causality concerns—and, regardless, his analysis is robust and would not change even if the variable were included.  *See* SEC Opp. Expert No. 3 Daubert Mem. at 11; Expert No. 3 Dep. at 218:23–220:10.  The Court agrees that Expert No. 3's methodology is reliable and properly applied because his regression model does not attempt to predict future returns.  Moreover, even if the analysis improperly excluded

16

relevant variables, "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Amorgianos*, 303 F.3d at 267.  Rather, "[t]he judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Id.* (cleaned up).  The Court does not find any flaws in Expert No. 3's methodology, let alone one large enough to warrant exclusion of his testimony.

The Court also rejects Defendants' argument that Expert No. 3's opinions exceed the limits of his methodology.  Expert No. 3's trading activity opinions speak to actions that Defendants took to influence XRP's price, but he does not opine that Defendants' actions actually caused a change in XRP's price.  *See* Expert No. 3 Dep. at 256:8-9.  Nor does he offer any opinions as to broader causes that may have influenced XRP's pricing.  Expert No. 3 may testify that the price of XRP did in fact increase or stabilize during the Ripple-instructed GSR trading periods without testifying that Ripple's actions caused these changes.  *See, e.g.*, Expert No. 3 Report ¶ 25.  Defendants may question Expert No. 3 at trial about the absence of a causation analysis in his testimony, but Expert No. 3's opinions do not exceed the limits of his methodology because he may testify about correlation without testifying about causation.

b.   Sales Practices and Incentives Opinions

Defendants contend that Expert No. 3's four opinions as to Defendants' sales practices and incentives are not based on reliable methodologies.  Def. Expert No. 3 Daubert Mem. at 11–13.  Expert No. 3 grounds these four opinions in his personal experience researching economics and finance.  Where an expert witness relies "solely or primarily on experience," he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Comm.*

17

*of Univ. of Montreal*, 691 F. Supp. 2d at 473 n.148.  Expert No. 3 sufficiently explains how his

economics and finance experience forms a sufficient basis for each of his four opinions.  First,

Expert No. 3 cites financial theory and academic literature about the functions of lock-up

provisions and applies that theory to Ripple's actions to support his opinion that "Ripple limited

the supply of XRP tokens, thereby minimizing downward pressure on the price of XRP."  Expert

No. 3 Report ¶¶ 41–43.  Second, he applies financial theory to his review of Ripple's operational

costs, share repurchases, outside funding sources, and executive compensation to conclude that

Defendants were incentivized to influence XRP's pricing.  *Id.* ¶¶ 44–46.  Third, Expert No. 3

interprets Ripple's financial statements to conclude that Defendants sold XRP to supplement a

funding gap.  *Id.* ¶¶ 47–50.  And, fourth, Expert No. 3 references his financial experience and

cites academic research, as well as his other opinions, to ultimately point to similarities between

how Defendants used XRP and how companies use stocks.  *Id.* ¶¶ 53–56.  Therefore, the Court

concludes that Expert No. 3 sufficiently and reliably explains how his opinions on Defendants'

sales practices and incentives arise out of his economic and financial experience and research.

*Pension Comm. of Univ. of Montreal*, 691 F. Supp. 2d at 473.

Lastly, the Court rejects Defendants' argument that Expert No. 3's opinions are irrelevant

and unfairly prejudicial.  Expert No. 3's testimony about Defendants' incentives and actions to

influence XRP's price is directly relevant to the fact finder's determination about whether

purchasers of XRP reasonably expected profits derived from Defendants' efforts, the last

element of the *Howey* test for an investment contract.  *See Howey*, 328 U.S. at 301.  The

probative value of this relevant testimony is not "substantially outweighed" by any potential

unfair prejudice to Defendants.  *See* Fed. R. Evid. 403.

Accordingly, Defendants' motion to preclude Expert No. 3 from testifying is DENIED.

4.   Expert No. 4

The SEC offers the testimony of Expert No. 4, who holds a Ph.D. in distributed systems and has eighteen years of experience in computer science.  Expert No. 4 Report at 3, ECF No. 795-1.  Expert No. 4's area of expertise is fault-tolerant distributed systems, which is "at the core of blockchain and decentralized systems."  *Id.*

In his expert report, Expert No. 4 offers three opinions:

(1) the XRP Ledger is not a "decentralized" system and is less decentralized than the Bitcoin and Ethereum[8] blockchains, *id.* at 22–25;

(2) Ripple's efforts are necessary to support the proper functioning of the XRP Ledger, *id.* at 25–26; and

(3) if Ripple "walked away" from its role with respect to the XRP Ledger, serious risk to the XRP Ledger's operation would arise, *id.* at 26–27.

In support of his first opinion, Expert No. 4 identifies four factors for comparing the relative decentralization of various blockchains:  resilience, inclusiveness, in-protocol incentives, and governance.  *Id.* at 9–11.  Defendants seek to exclude Expert No. 4's testimony on the grounds that his methodologies are "fundamentally unreliable," and his testimony is irrelevant, unduly prejudicial, and risks confusing the trier of fact.  *See* Def. Expert No. 4 Daubert Mem. at 1–2, ECF No. 793.

First, Defendants argue that Expert No. 4's first opinion should be excluded because the word "decentralization" lacks a settled meaning under securities law and within the computer-science field.  *Id.* at 2–5.  Here, Expert No. 4 adopts his definition of decentralization from a scientific paper authored by Carmela Troncoso et al.,[9] which defines decentralized systems as "a

---

[8] Like XRP, Bitcoin and Ethereum are digital assets, colloquially referred to as "cryptocurrencies," transacted on a blockchain network.  *See* Nathan Reiff, *Bitcoin vs. Ethereum: What's the Difference?*, Investopedia (updated Oct. 4, 2022), https://www.investopedia.com/articles/investing/031416/bitcoin-vs-ethereum-driven-different-purposes.asp/.
[9] Carmela Troncoso et al., *Systematizing Decentralization and Privacy: Lessons from 15 Years of Research and Deployments*, 4 PROC. PRIV. ENHANCING TECH. 404 (2017).

subset of distributed systems where multiple authorities (parties) control different system components and no authority is fully trusted by all."  Expert No. 4 Report at 5.  Defendants offer an expert who disputes and challenges Expert No. 4 and Troncoso's definition of decentralization.  *See, e.g.*, Adriaens Rebuttal Report ¶¶ 5–9, ECF No. 775-14.  But, a dispute among experts is not a basis to exclude expert testimony.  When assessing the admissibility of expert testimony, "[t]rial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts."  *In re Joint E & S Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (cleaned up).  Challenges to "the existence or number of supporting authorities" for an opinion speak to the weight of an expert's opinion, not its admissibility.  *Guardino v. Alutiiq Diversified Servs., LLC*, 457 F. Supp. 3d 158, 162 (N.D.N.Y. 2020).  Expert No. 4 adopts his definition of decentralization based on his twenty years of experience with distributed systems and his review of the relevant scientific literature.  *See Pension Comm. of Univ. of Montreal*, 691 F. Supp. 2d at 473.  This methodology is not unreliable.

Defendants further argue that Expert No. 4 abandoned his four-factor test for decentralization in his deposition and ignored factors that would undermine his opinion and conclusions.  Def. Expert No. 4 Daubert Mem. at 8–11.  But, Defendants' arguments misrepresent the nature of Expert No. 4's expert report and deposition testimony.  In his deposition, Expert No. 4 concedes that none of the four factors (resilience, inclusiveness, in-protocol incentives, and governance) are individually dispositive of whether a system is decentralized, but he maintains that the four factors are relevant for comparing the decentralization of multiple systems.  *See, e.g.*, Expert No. 4 Dep. at 187:22–188:3; 381:12-18, ECF No. 795-2.  Expert No. 4 did not abandon his four-factor test.  Moreover, the Court finds

that Expert No. 4's test for decentralization is reliable because it is supported by scientific

literature and Expert No. 4's personal experience with distributed systems; indeed, Expert No. 4

published a peer-reviewed article advocating for consideration of the same four factors when

comparing the decentralization of multiple distributed systems.  *See id.* at 178:5–179:9.

Defendants may challenge Expert No. 4's opinion at trial on the ground that he ignored relevant

factors or misapplied the factors he did consider, but disagreement over an expert's conclusions

does not warrant exclusion.  *See Guardino*, 457 F. Supp. 3d at 162; *In re Visa Check/*

*Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 78 (E.D.N.Y. 2000).

Second, the Court also rejects Defendants' contention that Expert No. 4's second opinion

on Ripple's efforts to correct operation of the XRP Ledger is unreliable.  *See* Def. Expert No. 4

Daubert Mem. at 12–14.  Specifically, Defendants argue that Expert No. 4 reviewed the

improper version of the XRP Ledger's software code, a version that was not in place at the time

of any of the SEC's allegations.  *See id.*  The SEC contends that the code that Expert No. 4

reviewed is materially identical to the prior versions in place during the time of the complaint's

allegations.  *See* SEC Opp. Expert No. 4 Daubert Mem. at 13, ECF No. 782.  Defendants do not

challenge Expert No. 4's interpretation of the code, only that he analyzed the improper

underlying code.  The Court shall not address whether the code that Expert No. 4 examined is

materially identical to the code in place at the time of the alleged activity described in the

complaint.  The Court finds that Expert No. 4's methodology for analyzing the code is reliable,

and the differences in the underlying codes, if any, are proper considerations for the trier of fact

in assessing the weight of Expert No. 4's testimony.  *See, e.g.*, *Buchwald v. Renco Grp.*, 539

B.R. 31, 40 (S.D.N.Y. 2015).

Third, Defendants argue that Expert No. 4's third opinion—"if Ripple would disappear, serious risks to the correct operation of the XRP Ledger network may arise"—is unreliable because it is not supported by data, scientific literature, or reliable methodology.  *See* Def. Expert No. 4 Daubert Mem. at 14–15 (emphasis omitted).  The Court agrees.  Expert No. 4's opinion is based on how validator operators might behave based on economic incentives.  *See* Expert No. 4 Report at 27.  But, without citation to any authority, study, or behavioral analysis, Expert No. 4 cannot opine on how businesses, universities, or others would behave if Ripple "walked away" or "disappeared."  "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004).  The SEC argues that "as a long-standing member of the blockchain and academic communities, [Expert No. 4] is qualified to opine on the behavior of blockchain participants in response to incentives, including academic institutions that often rely on funding for projects."  SEC Opp. Expert No. 4 Daubert Mem. at 14.  Expert No. 4 does not explain how his personal experience provides him with a sufficient basis for speculating about how others would behave.  Without more, "[g]eneric appeals to an expert's experience are no substitute for reliable principles and methods."  *Earley Info. Sci.*, 575 F. Supp. 3d at 248.

Lastly, the Court rejects Defendants' argument that the relevance of Expert No. 4's opinions are "substantially outweighed" by the risks of confusion and prejudice to Defendants.  *See* Def. Expert No. 4 Daubert Mem. at 15.  Expert No. 4's testimony is relevant to Defendants' argument that the decentralization of the XRP Ledger means that XRP cannot be a security.  *See, e.g.*, Ripple Answer ¶ 13.  Any potential concerns about Expert No. 4's language causing prejudice or confusion do not "substantially outweigh" the probative value of his testimony, and, in any case, may be remedied via curative instruction if necessary.

22

Accordingly, Defendants' motion to preclude Expert No. 4 from testifying as to his third opinion about the risks to the XRP Ledger that might materialize if Ripple "walked away" or "disappeared" is GRANTED, *see, e.g.*, Expert No. 4 Report at 26–27, and Defendants' motion to preclude Expert No. 4 from testifying as to the remainder of his expert report is DENIED.

### 5.   Expert No. 5

The SEC offers the testimony of Expert No. 5, who holds a Ph.D. in economics and is a principal consultant at a global economic consulting group.  Expert No. 5 Report ¶¶ 1, 3, ECF No. 792-1.  Expert No. 5's Ph.D. studies included statistics, econometrics, finance, monetary economics, and numerical methods.  *Id.* ¶ 3.  Prior to his current role, Expert No. 5 worked for fifteen years as an economist and specialized in credit research and modeling.  *Id.* ¶ 6.  In that role, he "conducted event studies to assess the impact of credit actions and announcements on corporate and sovereign costs of capital."  *Id.* ¶ 7.

Expert No. 5 authors three reports:  an opening report, *see* Expert No. 5 Report, a rebuttal report to certain opinions of Defendants' expert Allen Ferrell, *see* Expert No. 5 Rebuttal Report, ECF No. 775-6,[10] and a supplemental report in support of the opening report and in response to Defendants' rebuttal witnesses, Daniel Fischel and M. Laurentius Marais, *see* Expert No. 5 Suppl. Report, ECF No. 792-5.  In his opening report, Expert No. 5 presents two separate statistical analyses.  First, he conducts an event study of XRP's price movements over time in certain "event windows" after positive news events announced by Ripple.  *See* Expert No. 5 Report ¶¶ 60–64.  Based on this analysis, Expert No. 5 concludes that XRP's price increased after positive Ripple announcements.  *Id.* ¶¶ 12.a, 68–94.  Second, Expert No. 5 conducts an analysis comparing XRP's price to the prices of Bitcoin and Ethereum to conclude that the price

---

[10] Defendants do not seek to exclude Expert No. 5's rebuttal opinions.  As such, the Court does not address those opinions in this Order.

movements of Bitcoin and Ethereum could only explain, on average, 40% of XRP's price movement. *Id.* ¶¶ 12.b, 114–21.  In his supplemental report, Expert No. 5 uses the same economic model from his initial report and calculates what XRP's prices would have been "but-for" Ripple's positive news announcements.  Expert No. 5 Suppl. Report ¶¶ 10–19.  Defendants do not contest Expert No. 5's qualifications or the relevance of his opinions; rather, they argue that Expert No. 5's event study methodology is flawed and unreliable, so any opinions arising from that methodology should be excluded.  *See* Def. Expert No. 5 Daubert Mem. at 1–2, ECF No. 790; Def. Expert No. 5 Daubert Reply Mem. at 1, ECF No. 800.

Courts have recognized that a standard event study is a reliable methodology that is "objective[] and consistent with scientific principles."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 90 (S.D.N.Y. 2015); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15 Civ. 1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017).  In constructing his event study, Expert No. 5 selected relevant events, determined an appropriate event window, calculated the expected and abnormal returns of XRP's price, and evaluated the statistical significance of the abnormal returns.  *See* Expert No. 5 Report ¶¶ 60–64.  Because "[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible," the Court will only exclude Expert No. 5's event study and the opinions arising from that study if any alleged flaws are "large enough that [Expert No. 5] lacks 'good grounds' for his . . . conclusions."  *Amorgianos*, 303 F.3d at 267 (citation omitted).

First, Defendants argue that the market for XRP is inefficient, and in an inefficient market, an event study cannot reliably identify statistically significant correlations between specific events and asset prices.  *See* Def. Expert No. 5 Daubert Mem. at 3–6.  Defendants and

the SEC separately cite authorities that speak to the reliability of an event study in an inefficient market; the parties also dispute whether the market for XRP is a fully inefficient market or merely a less efficient market.  *Compare id.*, *with* SEC Opp. Expert No. 5 Daubert Mem. at 7–9, ECF No. 784.  But, "[t]he mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility."  *In re Zyprexa*, 489 F. Supp. 2d at 285.  Challenges to "the existence or number of supporting authorities" for an opinion speak to the weight of an expert's opinion, not its admissibility.  *Guardino*, 457 F. Supp. 3d at 162.  The Court declines to usurp the role of the trier of fact in determining the efficiency of the XRP market—a question of fact—and the reliability of an event study in assessing correlations in that market.[11]

Second, Defendants argue that Expert No. 5 selectively manipulated the underlying data for his event study by ignoring relevant news announcements and failing to distinguish news announcements about third-party actions.  *See* Def. Expert No. 5 Daubert Mem. at 6–10.  An expert is not required to conduct any specific analysis, as long as he or she has a "methodological explanation" for the method of analysis chosen.  *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at *7 (S.D.N.Y. Mar. 17, 2022).  When constructing any event study, an expert necessarily must make determinations about what is considered news.  *See McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 429 (S.D.N.Y. 2014).  Here, Expert No. 5 provides a methodological explanation for selecting positive news by separating Ripple news announcements into categories and excluding certain news events that he

---

[11] Defendants' reliance on the Second Circuit's decision in *7 West 57th Street Realty Co. v. Citigroup, Inc.*, is misplaced.  771 F. App'x 498 (2d Cir. 2019) (summary order).  There, in a summary order affirming the district court's decision to deny a motion for leave to amend a complaint, the Second Circuit explained in a proximate cause analysis that the "opacity and illiquidity" of a market would prevent a court from using certain economic tools, including event studies.  *Id.* at 504.  *Citigroup* did not involve a *Daubert* challenge, nor did it involve the Rule 702 standard for determining the reliability of an expert's opinion.

determined were repetitious or directionally uncertain.  Expert No. 5 Report ¶¶ 44–49.  For the

same reason, Defendants' argument about Expert No. 5's inclusion of third-party news does not

support excluding his testimony.  Defendants' contentions about Expert No. 5's over- or under-

inclusion of data may be valid criticisms, but they speak to the weight of his testimony, not its

admissibility.  *See Aventis Env't Sci.*, 383 F. Supp. 2d at 514.

Third, Defendants argue that there is "too great an analytical gap" between Expert No.

5's event study and his conclusion—offered during his deposition, *see* Expert No. 5 Dep. at

250:6–251:5, ECF No. 792-2—that Ripple's announcements caused XRP's price to rise.  *In re*

*LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018)

(citation omitted); *see* Def. Expert No. 5 Daubert Mem. at 10–12.  The Court agrees.  Without

additional analysis controlling for confounding factors, or an appeal to academic literature to

support a determination of causation, Expert No. 5's event study demonstrates, at best,

correlation between the news announcements and XRP's price changes.  His statement of

causation is supported only by his *ipse dixit*,[12] which is insufficient under *Daubert*.  *In re LIBOR*,

299 F. Supp. 3d at 500.

Lastly, the Court rejects Defendants' argument that Expert No. 5's but-for price

methodology in his supplemental report should be excluded.  *See* Def. Expert No. 5 Daubert

Mem. at 12–15.  Defendants argue that Expert No. 5's methodology "has no support in the

relevant scientific community," produces implausible results, and is internally contradictory.  *See*

*id.*  In response, the SEC argues that Expert No. 5's but-for price analysis is "a standard method

of constructing counterfactual prices in securities fraud cases" and that Defendants' own expert

employed the same methodology in a different context.  SEC Opp. Expert No. 5 Daubert Mem.

---

[12] *Ipse dixit* translates from Latin to "he himself said it" and is defined as "[s]omething asserted but not proved."
*Ipse Dixit*, BLACK'S LAW DICTIONARY (11th ed. 2019).

at 14–15 & n.10.  Again, Defendants challenge Expert No. 5's application of his methodology, but this does not control the admissibility of his testimony.  The Court finds that Expert No. 5's but-for price methodology is reliable, and any flaws in his application of that methodology are not "large enough that [he] lacks good grounds for his . . . conclusions."  *Amorgianos*, 303 F.3d at 267 (cleaned up).

Accordingly, Defendants' motion to preclude Expert No. 5 from testifying as to causation is GRANTED, and Defendants' motion to preclude Expert No. 5 from testifying as to the opinions in his opening and supplemental reports is DENIED.

### B.  Defendants' Experts

The SEC moves to exclude the testimony of Alan Schwartz, Peter Adriaens, Bradley Borden, Peter Easton, Yesha Yadav, Allen Ferrell, M. Laurentius Marais, and Kristina Shampanier.  *See* SEC Daubert Mem. at ii–v, ECF No. 772.  The SEC also moves to exclude the opening report of Carol Osler and the testimony, in part, of Daniel Fischel.  *See id.* at iv.

#### 1.  Alan Schwartz

Defendants offer the testimony of Alan Schwartz, a professor of law at Yale Law School and professor of management at the Yale School of Management, who opines on 1,700 written contracts related to Ripple's XRP distribution.  Schwartz Report ¶¶ 1, 5–7, ECF No. 796-1.  Schwartz's areas of expertise include contracts, commercial law, corporate finance, mergers and acquisitions, and bankruptcy.  *Id.* ¶ 2.

In discovery, the parties produced over 1,700 contracts, which are specific agreements by which Ripple transferred XRP to contractual counterparties in a variety of commercial transactions.  *Id.* ¶ 5 & n.2.  In his expert report, Schwartz organizes the 1,700 XRP contracts into four primary categories:

(1) contracts by which Ripple transferred XRP directly to a counterparty;

(2) contracts by which Ripple's counterparties agreed to sell XRP on behalf of Ripple over trading platforms;

(3) contracts by which Ripple paid for various counterparty services in XRP provided by Ripple; and

(4) miscellaneous contracts that do not fall into the first three categories.

*Id.* ¶ 18.  Schwartz further distinguishes between the four categories of contracts, explains their commercial purposes, and identifies specific provisions in each type of contract.  *Id.* ¶¶ 19–55. Lastly, Schwartz compares the XRP contracts with the written contracts at issue in *Howey*.  *Id.* ¶¶ 8–11.  He opines that the Ripple contracts, unlike the *Howey* contracts, do not contain provisions which commit Ripple to perform any post-sale actions "that could affect the value of XRP or return profits to any person."  *Id.* ¶ 11; *see also id.* ¶¶ 30, 35, 42, 55.  The SEC does not contest Schwartz's qualifications; rather, the SEC seeks to exclude his testimony on the grounds that his opinions are "impermissible legal conclusions" premised "on an incorrect reading of *Howey*" and that they are irrelevant.  SEC Daubert Mem. at 12, 17–22, ECF No. 772.

The Court rejects the SEC's argument that Schwartz's opinions about Ripple's 1,700 XRP contracts are impermissible legal conclusions.  "As a general rule an expert's testimony on issues of law is inadmissible."  *Bilzerian*, 926 F.2d at 1294.  But, "expert witness testimony may explain how a contract operates in the marketplace."  *Sitts v. Dairy Farmers of Am., Inc.*, No. 16 Civ. 287, 2020 WL 3467993, at *7 (D. Vt. June 24, 2020).  Here, Schwartz does not offer any legal opinions about how to interpret a disputed contract provision or any other opinions about contract law.  Rather, he provides a framework for categorizing the 1,700 contracts and understanding their commercial purposes in the industry.  *See id.*; *see also Hatala v. Port Auth. of N.Y. & N.J.*, No. 15 Civ. 9218, 2017 WL 9832293, at *5 (S.D.N.Y. Oct. 30, 2017).  Because his testimony is limited to describing the commercial purposes of certain contracts and specific

provisions common to those contracts, Schwartz does not opine on any ultimate issues of law that govern this case. *Cf. In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 191 n.16 (S.D.N.Y. 2009).

However, the Court agrees that Schwartz's opinions about *Howey* are impermissible. SEC Daubert Reply Mem. at 16, ECF No. 776. How to interpret the Supreme Court's reasoning in *Howey* is the central question at issue in this case, and Schwartz dedicates several paragraphs of his expert report to discussing *Howey* and analyzing the Supreme Court's conclusion that Howey offered an investment contract in that case. *See* Schwartz Report ¶¶ 8–10. Therefore, Schwartz may testify about Ripple's XRP contracts, and their differences from the *Howey* contracts, but he may not opine on the legal reasoning in *Howey* or why the *Howey* contracts were investment contracts.

The SEC also argues that Schwartz's opinions impermissibly apply *Howey* and are irrelevant. First, the SEC argues that *Howey* and its progeny do not require the existence of a contract and look beyond the four corners of written contracts (if any) in determining the existence of an investment contract. *See* SEC Daubert Mem. at 18–22. Second, the SEC argues that the contract provisions that Schwartz examines, like post-sale obligations, are "not necessary to satisfy *Howey*." *Id.* at 21 (citing *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020)). The Court rejects these arguments because they do not speak to the relevance of Schwartz's opinions. Assuming arguendo that the SEC is correct that *Howey* is not limited to the terms of written contracts or specific contract provisions, the contracts and those provisions are nonetheless relevant to the question of whether an investment contract exists. Schwartz's testimony need not be dispositive to be relevant to the fact finder's analysis. *See Can't Live Without It, LLC v. ETS Express, Inc.*, 373 F. Supp. 3d 434, 440 (S.D.N.Y. 2018) ("[F]ailure to

prove the defendant's whole case does not mean that [evidence is] irrelevant and should be excluded.").

Accordingly, the SEC's motion to preclude Schwartz from testifying about the Supreme Court's legal reasoning in *Howey* is GRANTED, and the SEC's motion to preclude Schwartz from testifying as to the remainder of his opinions is DENIED.

### 2. Peter Adriaens

Defendants offer the testimony of Peter Adriaens, a professor of engineering, finance, and entrepreneurship at the University of Michigan. Adriaens Report ¶ 1, ECF No. 796-29. Adriaens has devoted most of his career to two fields: blockchain technology and entrepreneurship in digital industries. *Id.* ¶ 2. Since 2015, his expertise has focused on financial technology applications, financial modeling, and blockchain tokenization of infrastructure assets. *Id.* ¶ 4.

Adriaens offers two reports: an opening report, *see* Adriaens Report, and a rebuttal report to Expert No. 4's first opinion that the XRP Ledger is not decentralized, and is centralized compared to the Bitcoin and Ethereum blockchains, *see* Adriaens Rebuttal Report, ECF No. 796-33. In his opening report, Adriaens offers three opinions:

> (1) XRP and the XRP Ledger "represent[] an important innovation in blockchain technology";
>
> (2) "Ripple's iterative development of its business model and products is consistent with start-up practice in high-technology industries"; and
>
> (3) XRP and the XRP Ledger have "commercial utility" that "demonstrate[es] the decentralized nature of the XRP Ledger."

Adriaens Report ¶¶ 19–21. In his rebuttal report, Adriaens argues that Expert No. 4's first opinion is unreliable and based on a flawed methodology. Adriaens Rebuttal Report ¶ 4. The SEC argues that Adriaens's opinions should be excluded because his opinions "are not his own,"

his opinions are irrelevant and inconsistent, he is not qualified to offer his opinions, and his opinions are not supported by reliable methodology.  SEC Daubert Mem. at 23–33.

a. Drafting Process

The SEC challenges Adriaens's drafting process for his opening report, arguing that he "did not write large swaths of his [r]eport" and failed to attribute parts of his report that he copied from other sources.  *Id.* at 26.  Where a witness is "substantially involved" in preparing a report and the report reflects the expert's opinions, the exact mechanics of the drafting process, including whether counsel assisted the expert in drafting the report, are not a basis for excluding the opinion.  *Keystone Mfg. Co. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 568 (W.D.N.Y. 2005).  But, courts will exclude expert testimony where deposition testimony or other evidence demonstrates that the expert's "level of involvement in the preparation of his report was . . . deficient."  *Pac. Life Ins. Co. v. Bank of N.Y. Mellon*, 571 F. Supp. 3d 106, 116 (S.D.N.Y. 2021); *see also Arista Recs. LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 424–25 (S.D.N.Y. 2009).

After reviewing Adriaens's deposition testimony, the Court concludes that he was substantially involved in drafting his report through multiple iterations with counsel and with the assistance of one of his students.  *See* Adriaens Dep. at 15:8–19:20, ECF No. 796-32.  And, during the deposition, Adriaens affirmed that the three opinions in his opening report were his own and did not "back[] away from" those opinions.  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008); *see* Adriaens Dep. at 295:20-22.  The Court also rejects the SEC's argument that the fact that Adriaens copies text word-for-word from uncited sources is a reason for excluding his opinions.  *See* SEC Daubert Mem. at 24–26.  The SEC does not contend that Adriaens copies his expert opinions from another source, just that he copies background information from uncited sources throughout his report.  *See id.*  The Court agrees

31

that the lack of citations in Adriaens's report raises serious concerns about his credibility, but this is not a ground for excluding his opinions.  *See, e.g.*, *GWTP Invs., L.P. v. SES Americom, Inc.*, No. 04 Civ. 1383, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007) ("While the alleged plagiarism may be germane to the issue of [the expert's] credibility, however, [the defendant] has not shown that it impacts the reliability of [her] opinions.").

       b.  First and Second Opinions

     The SEC argues that the Court should exclude Adriaens's first two opinions because "these opinions are factual narrative that merely aggregate record facts to tell Ripple's 'story.'" SEC Daubert Mem. at 27.  The Court agrees.  It is "inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'" *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13 Civ. 8645, 2018 WL 1889763, at *4 (S.D.N.Y. Apr. 18, 2018); *see also Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008).  Adriaens's first two opinions—that "[t]he XRP Ledger and its native currency, XRP, represented an important innovation in blockchain technology" and "Ripple's iterative development of its business model and products is consistent with start-up practice in high-technology industries," Adriaens Report ¶¶ 19–20—are not expert opinions that would be helpful to a jury.

     Expert testimony should not be "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Arista Recs.*, 2011 WL 1674796, at *4 (quoting *Mulder*, 273 F.3d at 104).  These two opinions are "narrative[s] of the case which a juror is equally capable of constructing." *In re Rezulin*, 309 F. Supp. 2d at 551 (citation omitted).  Adriaens may properly opine about the commercial utility of XRP and the XRP Ledger, and Ripple's development of products—as he does in his third opinion, *see, e.g.*,

Adriaens Report ¶¶ 21, 119–34—and the jury may properly make its own determination about whether these uses and Ripple's development are "important," "innovative," or "typical" of "high-technology" startups. *See In re LIBOR*, 299 F. Supp. 3d at 469.

c.   Third Opinion

The Court rejects the SEC's arguments that Adriaens's third opinion about the "commercial utility" of XRP should be excluded because it is irrelevant and unsupported by any reliable methodology. SEC Daubert Mem. at 29. The SEC argues that this opinion is irrelevant because "[t]hat something has 'use,' . . . does not preclude offers or sales of that instrument from meeting *Howey's* expectation of profits prong." *Id.* at 30. But, Defendants do not argue that if XRP has use, that alone will preclude offers or sales of XRP from satisfying *Howey*'s third prong. Rather, Defendants merely contend that the uses of XRP are relevant to that inquiry, and the Court agrees. Adriaens's opinions on XRP's and the XRP Ledger's uses need not be dispositive of the core legal issue in this case for the opinions to satisfy the "low bar" for relevance. *United States v. Jones*, No. 16 Cr. 553, 2018 WL 1115778, at *9 (S.D.N.Y. Feb. 27, 2018); *see Can't Live Without It*, 373 F. Supp. 3d at 440.

The Court also rejects the SEC's argument that Adriaens's methodology is flawed because he "did not[] . . . determine whether or to what extent any of the businesses listed . . . actually used XRP or the XRP Ledger." SEC Daubert Mem. at 33. In short, the SEC challenges Adriaens's selection criteria for identifying use cases; Expert No. 1's rebuttal report likewise directly criticizes Adriaens's methodological decision. However, an expert is not required to conduct any specific analysis, and where an "expert must make a judgment call based on methodological considerations," the Court assesses whether the expert provided a "valid, reasonable explanation" for the choice. *Chen-Oster*, 2022 WL 814074, at *7. Here, Adriaens

33

provides a reasonable explanation for identifying his use cases.  *See* Adriaens Dep. at 227:17–228:10.  Expert No. 1 may disagree and prefer to focus on the depth, rather than breadth, of use, but a difference in opinion between experts is not a ground for exclusion.  *See In re Zyprexa*, 489 F. Supp. 2d at 285.

d. Rebuttal Report

Finally, the Court rejects the SEC's arguments that Adriaens's rebuttal report should be excluded because he "offers conflicting opinions" and is not qualified to offer an opinion regarding the decentralization of the XRP Ledger.  SEC Daubert Mem. at 28–29.  Adriaens does not provide conflicting opinions about decentralization; rather, he contends that decentralization has multiple meanings in different contexts.  *See* Adriaens Dep. at 104:4-14.  And, Adriaens's lack of a computer science background does not justify the exclusion of his rebuttal testimony.  In his rebuttal report, Adriaens opines that Expert No. 4's opinion is unreliable because there is no accepted definition of decentralization.  Adriaens Rebuttal ¶ 4.  This opinion is based on Adriaens's background and experience in the blockchain industry.  At trial, the SEC may question Adriaens about his lack of computer science credentials to cast doubt on his testimony compared to that of Expert No. 4, but the Court shall "not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts."  *In re Joint E & S Dist.*, 52 F.3d at 1135 (cleaned up).

Accordingly, the SEC's motion to preclude Adriaens from testifying about his first two opinions is GRANTED, *see, e.g.*, Adriaens Report ¶¶ 26–118, and the SEC's motion to preclude Adriaens from testifying as to his third opinion and his rebuttal opinions is DENIED.

### 3.   Bradley Borden

Defendants offer the testimony of Bradley Borden, a tax practitioner and tax law professor at the Brooklyn Law School.  Borden Report ¶ 1, ECF No. 796-25.  Borden has over twenty years of expertise in federal income tax classification of property and the federal income tax consequences of property transactions.  *Id.*  He has authored several books and over one hundred articles on federal income tax.  *Id.* ¶ 2.

In his expert report, Borden offers three opinions:

(1) Internal Revenue Service ("IRS") guidance treats virtual currency, such as XRP, as property that is not a security;

(2) no legal taxation authority has classified XRP as a security for federal income tax purposes; and

(3) a reasonable buyer or seller of XRP would not expect it to be classified as a security for federal income tax purposes.

*Id.* ¶ 9.  The SEC argues that Borden's opinions should be excluded because his opinions are irrelevant, they are improper *ipse dixit*, and he is unqualified to render his opinions.  SEC Daubert Mem. at 35–37.

First, the SEC contends that Borden's testimony is irrelevant because the question of whether XRP is a security under federal income tax law has nothing to do with whether it is a security under *Howey* and federal securities law.  The Court disagrees.  The bar for relevance is "low," and Borden's testimony is "specialized knowledge that will help the jury determine a fact at issue in the case." *Jones*, 2018 WL 1115778, at *9.  Ordinarily, expert testimony should be excluded when it applies the wrong legal standard.  *See Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996).  But, "the testimony of a party's expert must be evaluated within the context of that party's own theory of the case."  *Olin Corp. v. Lamorak Ins. Co.*, No. 84 Civ. 1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018).

Under Defendants' theory of the case, how XRP is classified under other legal and industry regimes is relevant to the question of whether XRP would "ordinarily and commonly [be] considered . . . [a] securit[y] in the commercial world." *Marine Bank v. Weaver*, 455 U.S. 551, 559 (1982); *see* Def. Opp. SEC Daubert Mem. at 7, ECF No. 794.  Defendants also argue that an asset's "character in commerce" is relevant to whether it is an investment contract.  *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("Novel, uncommon, or irregular devices . . . are also reached [by the Securities Act] if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as investment contracts[.]" (quotation marks omitted)); *see* Def. Opp. SEC Daubert Mem. at 7.  Where, as here, "the legal or factual sustainability of a party's theory has not yet been decided," that Defendants' theory of the case "may be legally or factually deficient is not justification for concluding that, in the context of [their] theory, the expert's testimony is unreliable or unhelpful."  *Olin Corp.*, 2018 WL 1901634 at *21 (cleaned up).  Because Borden's testimony may help the fact finder "understand the evidence or . . . determine a fact in issue," *Daubert*, 509 U.S. at 591, the Court finds that Defendants have satisfied the "low bar" of showing the relevance of his testimony, *Jones*, 2018 WL 1115778, at *9.

Second, the Court also rejects the SEC's arguments that Borden is unqualified and that his opinions are *ipse dixit*.  The Court will not exclude Borden's testimony "merely because he . . . does not possess experience tailored to the precise product or process that is the subject matter of the dispute." *Lion Oil Trading*, 2011 WL 855876, at *1.  "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the [C]ourt will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyprexa*, 489 F. Supp. 2d at 282.  Borden

36

has been a tax law professional for twenty years and is widely published on federal income tax

issues.  Borden Report ¶¶ 1–3.  The SEC's argument that Borden is unqualified because he has

never written specifically on virtual currencies is a criticism as to the weight of his testimony,

but not its admissibility.  Borden is qualified to apply his expertise in federal income tax

classification of property to digital assets like XRP.

Similarly, the Court finds that Borden's opinions are supported by his expertise and

experience from studying and practicing federal income tax law.  *See Clarke v. Dutton Harris &*

*Co.*, No. 20 Civ. 160, 2022 WL 717611, at *2 (D. Nev. Mar. 10, 2022).  Borden applies his

expertise, and cites IRS Guidance and the Internal Revenue Code, in concluding the appropriate

tax classification for XRP under federal tax law.  *See Medisim Ltd. v. BestMed LLC*, 861 F.

Supp. 2d 158, 174 (S.D.N.Y. 2012).  The Court finds that his opinions are reliable and properly

supported.  *See Crown Cork & Seal*, 2013 WL 978980, at *2.

Accordingly, the SEC's motion to preclude Borden from testifying is DENIED.

4.  Peter Easton

Defendants offer the testimony of Peter Easton, an accounting professor at the University

of Notre Dame, who researches "the role of accounting information in securities valuation and

investors' decision making."  Easton Report ¶¶ 1, 4, ECF No. 796-22.  Easton's teaching and

consulting work "involve[] detailed analysis of complex accounting issues, scrutiny of financial

statements, valuing the related entity, forecasting future financial statements, and exploring the

link between the financial statements and the value and viability of the underlying entity."  *Id.*

¶ 5.

Easton authors two reports:  an opening report, *see* Easton Report, and a rebuttal report in response to the opinions of Experts Nos. 1 and 3, *see* Easton Rebuttal Report, ECF No. 796-24. In his opening report, Easton offers three opinions:

> (1) "Ripple, and other companies holding cryptocurrencies (including XRP), account for those holdings as indefinite-lived intangible assets," and "Ripple accounts for monetary and non-monetary sales of XRP as revenues";
>
> (2) available guidance, analogous U.S. Generally Accepted Accounting Principles ("GAAP"), and the practices of other publicly traded companies are consistent with Ripple's accounting for XRP as an intangible asset and inconsistent with treating XRP as a security under GAAP; and
>
> (3) under GAAP, it would be "improper for Ripple to account for sales and transactions involving XRP as the offer and sale of securities."

Easton Report ¶ 10.  In his rebuttal report, Easton opines that certain of the opinions expressed by Experts Nos. 1 and 3 are inconsistent with GAAP.  Easton Rebuttal Report ¶ 3.  The SEC does not challenge Easton's qualifications or his methodology; rather, the SEC argues that his opinions are irrelevant, and his rebuttal opinions do not address the subject matter of the reports of Experts Nos. 1 and 3.  SEC Daubert Mem. at 41–44.

For substantially the same reasons stated above for Bradley Borden, the Court rejects the SEC's argument that Easton's opinions are irrelevant.  *See id.* at 41–42.  Easton's testimony about the proper application of GAAP to XRP transactions is relevant to Defendants' theory of the case that XRP's "character in commerce" weighs against a finding that it is a security.  *C.M. Joiner*, 320 U.S. at 351; *see* Def. Opp. SEC Daubert Mem. at 7.  Easton's testimony, like Borden's testimony, is specialized testimony that may assist a fact finder in resolving an issue in the case:  whether transactions involving XRP displayed the essential characteristics of a security "in the commercial world."  *Marine Bank*, 455 U.S. at 559; *see also Nimely*, 414 F.3d at 397.

However, the Court agrees with the SEC that Easton's rebuttal opinions should be excluded because they do not address the subject matter of the reports of Experts Nos. 1 and 3.

*See* SEC Daubert Mem. at 43–44.  Under Federal Rule of Civil Procedure 26, a rebuttal report is

limited to "the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii);

*see also McBeth v. Porges*, No. 15 Civ. 2742, 2018 WL 5997918, at *7 (S.D.N.Y. Nov. 15,

2018).  Easton's rebuttal addresses XRP transactions under GAAP and other accounting

guidance, but Experts Nos. 1 and 3 do not mention GAAP or proffer any opinions about XRP's

accounting treatment.  Easton's report goes beyond critiquing the SEC's experts; he presents

entirely new arguments under a different legal regime.  Although "rebuttal is not limited to direct

contradiction," *United States v. Barrow*, 400 F.3d 109, 120 (2d Cir. 2005), the connection

between the testimony of Experts Nos. 1 and 3 and Easton's opinions on GAAP and accounting

practices is too attenuated.  His rebuttal report thus exceeds the scope of a proper rebuttal.  *See*

*McBeth*, 2018 WL 5997918, at *7.

Accordingly, the SEC's motion to preclude Easton's rebuttal testimony is GRANTED,

and the SEC's motion to preclude Easton's opening report is DENIED.

### 5.  Yesha Yadav

Defendants offer the testimony of Yesha Yadav, a law professor and associate dean at

Vanderbilt Law School.  Yadav Report ¶ 1, ECF No. 775-21.  Yadav teaches law school courses

on securities regulation, corporate bankruptcy, market structure, financial markets, and financial

innovation, with a focus on digital financial technologies.  *Id.*  Her research focuses on "the

regulation of market structure, credit risk, financial innovation, and financial system stability,"

and "the areas of [financial technologies], cryptocurrencies and distributed ledger technologies."

*Id.* ¶¶ 2–3.

In her expert report, Yadav opines that:

> (1) "offers to buy and sell cryptocurrencies take place on an exchange and become binding trades as soon as they are matched within the books and records of the exchange in accordance with the rules of the exchange";
>
> (2) "a trade becomes final on a cryptocurrency exchange as soon as an order to trade is matched with another order in accordance with the exchange's rules"; and
>
> (3) based on an analysis of twenty-five exchanges, for twenty-one of the exchanges, "there is no indication that the offers are made on the exchanges in the U.S., or that trades on these exchanges become final in the U.S."

*Id.* ¶¶ 22, 71, 84, 99.  For her third opinion, in determining the locations of the exchanges, Yadav applies four criteria:

> (1) the exchange's place of business, registered office, or domicile;
>
> (2) the location referenced in the exchange's terms of use or service;
>
> (3) market participants' and the public's beliefs about the exchange's location; and
>
> (4) regulators' beliefs about the exchange's location.

*Id.* ¶ 103.  In sum, Yadav opines that Defendants' offers and sales of XRP on foreign cryptocurrency exchanges "were not within the territorial scope of . . . U.S. securities laws." Def. Opp. SEC Daubert Mem. at 86.  The SEC does not challenge Yadav's qualifications; instead, the SEC argues that Yadav's opinions should be excluded because she "offers a legal opinion on a legal issue that [the] Court has already addressed," and because her third opinion is based on a flawed methodology that she applies inconsistently.  SEC Daubert Mem. at 44–45, 48 (emphasis omitted).

First, the SEC argues that Yadav's entire report should be excluded because she offers an "improper and incorrect legal opinion."  SEC Daubert Mem. at 45; *see Bilzerian*, 926 F.2d at 1294.  The Court agrees in part and disagrees in part.  On the one hand, the Court agrees with Defendants that Yadav's first two opinions are not legal opinions, and that they are relevant because they "concern[] market-structural concepts central to how trading on cryptocurrency

exchanges takes places—concepts with which the jury may be unfamiliar."  Def. Opp. SEC

Daubert Mem. at 88.  She analyzes facts and renders opinions on how sales and offers on

cryptocurrency exchanges work.  *See* Yadav Report ¶¶ 26–98.  Yadav's opinions on *how* and

*when* a digital asset sale becomes "final and binding" are not impermissible legal opinions.  *Id.*

¶ 22.

On the other hand, the Court agrees with the SEC that Yadav's opinions as to *where* an

offer or sale occurs is an impermissible legal opinion that conflicts with the legal standard

already set forth by the Court in its previous order on the individual Defendants' motions to

dismiss, *see* ECF No. 441 at 20–29.  In that order, the Court held that, as to Defendants' sales of

XRP, "the transactional domesticity test set out in *Morrison* [*v. National Australia Bank Ltd.*,

561 U.S. 247 (2010)], and clarified by *Absolute Activist* [*Value Master Fund Ltd. v. Ficeto*, 677

F.3d 60 (2d Cir. 2012)], governs this analysis."  ECF No. 441 at 24.  Under that test, whether a

sale of XRP occurs in the United States is determined by "specific facts that suggest that

irrevocable liability attached or title was transferred in the United States," *id.* at 23, which

include those facts "concerning the formation of the contracts, the placement of purchase orders,

the passing of title, or the exchange of money," *id.* (quoting *Absolute Activist*, 677 F.3d at 70).

The Court also held that, as to Defendants' offers of XRP, "for an offer to be domestic, a person

or entity must (1) attempt or offer, in the United States, to dispose of securities or security-based

swaps or (2) solicit, in the United States, an offer to buy securities or security-based swaps."  *Id.*

at 26 (cleaned up) (quoting *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147, 165 (S.D.N.Y.

2011)).  Yadav's opinion that the location of an exchange may be determined through the

application of *her* four criteria, *see* Yadav Report ¶ 103, contravenes the Court's earlier ruling.

Therefore, the Court excludes her opinion about the criteria for determining where an offer or

41

sale occurs, and her application of those criteria to the twenty-five exchanges listed in Table A of her expert report.

Accordingly, the SEC's motion to preclude Yadav's testimony as to her third opinion is GRANTED, *see, e.g.*, Yadav Report ¶¶ 99–114, and the SEC's motion to preclude the remainder of Yadav's report is DENIED.

### 6.   Allen Ferrell

Defendants offer the testimony of Allen Ferrell, an economist and professor of securities law at Harvard Law School.  Ferrell Report ¶ 1, ECF No. 796-4.  Ferrell holds a Ph.D. in economics, specializing in econometrics and finance.  *Id.*  He has published nearly thirty articles, including articles which apply event studies and factor models to assess whether firm actions or information affect an asset's price.  *Id.* at A-2–A-5.

Ferrell offers three separate reports:  an opening report, *see* Ferrell Report, a rebuttal report in response to Expert No. 3's opinions, *see* Ferrell Rebuttal Report, ECF No. 796-11, and a supplemental report in response to Expert No. 5's supplemental report, *see* Ferrell Suppl. Report, ECF No. 796-13.  In his opening report, Ferrell opines that:

> (1) from an economic perspective, none of Ripple's contracts for the distribution of XRP entitle XRP holders to a share of Ripple's profits or require Ripple to expend efforts to increase the price of XRP;

> (2) from an economic perspective, "speculative demand is neither unique to nor indicative of an investment contract";

> (3) Ripple's efforts did not impact the long-run XRP price, so purchasers of XRP can have no reasonable expectation of profits from Ripple's efforts;

> (4) Ripple's XRP distributions aided Ripple's global financial settlement solutions, such as ODL, but did not have a statistically significant effect on XRP's price;

> (5) from an economic perspective, "Ripple and purchasers of XRP are not part of a common enterprise"; and

> (6) from an economic perspective, XRP is "properly viewed as a virtual currency."

42

Ferrell Report ¶ 15.  In his rebuttal report, Ferrell challenges Expert No. 3's opinions by arguing

that Expert No. 3's methodology is flawed and that several of Expert No. 3's opinions are

irrelevant to "whether the economic substance of XRP [or Defendants' offers and sales of XRP]

constitutes an investment contract."  Ferrell Rebuttal Report ¶ 11.  In his supplemental report,

Ferrell argues that the methodology in Expert No. 5's supplemental report is flawed, and that his

results are inconsistent with the evidence.  Ferrell Suppl. Report ¶¶ 4–6.  The SEC moves to

exclude Ferrell's opening report opinions because he "offers a series of legal conclusions," and

his opinions are unreliable and irrelevant.  SEC Daubert Mem. at 51.  And, the SEC moves to

exclude Ferrell's rebuttal and supplemental reports because they "constitute improper attempts to

bolster the original opinions" in his opening report, their findings are beyond the scope of the

opinions to which they are responding, and his critiques are scientifically unsound.  SEC Daubert

Mem. Part 2 at 63–65, ECF No. 772-1.

a.   Opening Report

First, the Court agrees with the SEC that several of Ferrell's opinions should be excluded

as improper legal opinions.  "As a general rule an expert's testimony on issues of law is

inadmissible."  *Bilzerian*, 926 F.2d at 1294.  Although Ferrell proclaims that he offers no legal

opinions on whether the XRP contracts were investment contracts, *see, e.g.* Ferrell Report ¶ 11,

throughout his opening report, Ferrell offers opinions on the features of an investment contract;

the "economic substance" of an investment contract, a security, or XRP; and whether Ripple and

XRP purchasers are part of a "common enterprise," *see, e.g.*, ¶¶ 11–13, 15.  Defendants and

Ferrell do not dispute that "investment contract," the "economic substance" of an investment

contract, and "common enterprise" are all legal concepts.  *See, e.g.*, Ferrell Dep. at 14:4-8,

16:24–17:16, 23:15-22, ECF No. 796-5.  These concepts speak to the legal issues at the heart of this case.

Defendants argue that Ferrell "presents a purely economic" argument and "never crosses the line into offering legal opinions."  Def. Opp. SEC Daubert Mem. at 40.  But, "[i]nserting the word 'economically' . . . does not somehow transform what is a legal proposition and a finding of fact into an admissible opinion."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013). Therefore, the Court finds that certain of Ferrell's opinions, including his second and fifth opinions, are impermissible legal opinions as to whether elements of the *Howey* test are satisfied or whether XRP has the economic substance of an investment contract.

However, the Court disagrees with the SEC that Ferrell's first opinion about the Ripple contracts is an impermissible legal opinion.  As the Court stated above in its analysis of Schwartz's expert opinions, Ferrell's opinion about the XRP contracts is limited to describing the commercial purposes of those contracts; he does not opine on any ultimate issues of law that govern this case.  *Cf. In re Fosamax*, 645 F. Supp. 2d at 191 n.16.  Ferrell does not offer any analysis of contract law or interpret a disputed contract provision—indeed, the parties do not have any legal disputes about the contracts.  His opinion about the commercial purposes of the Ripple contracts is proper expert witness testimony that "may explain how a contract operates in the marketplace."  *Sitts*, 2020 WL 3467993, at *7.

For substantially the same reasons as previously discussed, the Court also rejects the SEC's argument that Ferrell's opinions are irrelevant because they are not dispositive under the *Howey* test.  SEC Daubert Mem. at 54.  Ferrell's opinions are relevant to Defendants' theory that XRP does not have the characteristics of a security, so they satisfy the "low bar" for relevance. *Jones*, 2018 WL 1115778, at *9; *see also Can't Live Without It,* 373 F. Supp. 3d at 440.

44

Second, the Court rejects the SEC's argument that Ferrell's third opinion should be excluded because his methodology, a "factor model," is unreliable.  SEC Daubert Mem. at 55. The SEC argues that instead of using a "generally accepted methodology," such as an event study, Ferrell employs a factor model, which is "novel and unsupported."  *Id.* at 55–56.  Under Rule 702, a disagreement with an opposing expert's choice among various valid methodologies cannot justify exclusion.  *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 648 (S.D.N.Y. 2007); *see also In re Vitamin C Antitrust Litig.*, Nos. 06 Civ. 1738, 05 Civ. 453, 2012 WL 6675117, at *9 (E.D.N.Y. Dec. 21, 2012).  Rather, the Court considers the methodology's "testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'"  *Romano*, 794 F.3d at 330 (quoting *Daubert*, 509 U.S. at 593–94).  The Court disagrees that Ferrell's use of a factor model is novel and unsupported; in his report, he cites leading academic publications which support the use of this approach.  *See, e.g.*, Ferrell Report ¶ 91 nn.153–54.  Ferrell also cites papers which apply factor models to explain the price returns of various assets, including cryptocurrencies, *see id.*, and has previously applied factor models as an expert witness, *see* Ferrell Dep. at 79:2–80:17.

Similarly, the Court finds that the SEC's other criticisms of Ferrell's methodology are not grounds for excluding his testimony.  The SEC challenges Ferrell's conclusion that, based on his model, at an alpha level of 0.05, XRP price returns are not statistically significantly different from zero when controlling for cryptocurrency market factors.  *See* SEC Daubert Mem. at 57; Ferrell Report ¶ 102.  Ferrell arrives at this conclusion because he finds that none of the constants that he uses, which are estimates of the average monthly XRP price return after

controlling for market factors, are statistically significant at the 0.05 alpha level, so he cannot reject his null hypotheses that the constants are zero.  Ferrell Report ¶ 102.  The Court finds no flaw in his methodology.  At trial, the SEC is welcome to challenge Ferrell's interpretation of his results, including by asking whether his model allows for other factors to explain the price return of XRP, but those are properly issues for the trier of fact, not the Court, to resolve.  *Buchwald*, 539 B.R. at 40.  Likewise, the SEC's critiques about the R-squared values of Ferrell's models are proper challenges to his opinions that may be raised before the fact finder.  *See* SEC Daubert Mem. Part 2 at 58.  The fact that Ferrell's models only account for a certain percentage of XRP's price fluctuation speaks to the weight of his opinions, but not their admissibility.

Third, for substantially the same reasons, the Court also does not find that the SEC's criticisms of Ferrell's fourth opinion about XRP distributions warrants exclusion of that opinion.  *See* SEC Daubert Mem. Part 2 at 59–60.  The SEC provides a list of criticisms about Ferrell's methodological choices, including that he did not consider relevant data, that his decision to select twenty-eight-day periods is flawed, and that he converted the XRP asset price into dollar value.  *See id.*  But each of these critiques speaks to the weight of Ferrell's opinion, not its admissibility.  The Court "should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions."  *Amorgianos*, 303 F.3d at 267 (cleaned up).  Here, even crediting the SEC's arguments, the Court does not find any flaw in Ferrell's methodology that is "large enough" to suggest that he lacks good grounds for his conclusions.

Fourth, the Court rejects the SEC's arguments that Ferrell's opinions that XRP is a virtual currency and that ODL "uses" XRP are irrelevant.  *See* SEC Daubert Mem. Part 2 at 60–63.  For the reasons discussed above in the Court's analysis of Borden's and Easton's opinions, Ferrell's opinion that XRP functions like a virtual currency is relevant to Defendants' argument that XRP

is not "ordinarily and commonly considered" to be a "securit[y] in the commercial world."

*Marine Bank*, 455 U.S. at 559.  The SEC cites caselaw for its assertion that even if XRP were a

virtual currency, it could still be sold as an investment contract, and thus a security.  *See* SEC

Daubert Mem. Part 2 at 62.  But again, the SEC's argument here conflates whether Ferrell's

opinion is dispositive with whether it is relevant.  *See Can't Live Without It,* 373 F. Supp. 3d at

440.

b.   Rebuttal and Supplemental Reports

The Court agrees with the SEC that certain portions of Ferrell's rebuttal report should be

excluded as improper legal opinions for the same reasons stated above with regard to his opening

report.  In his rebuttal report, Ferrell offers several legal opinions about Expert No. 3's

testimony, including that:

> (1) Expert No. 3's contentions that Defendants executed sales in a manner designed to positively influence XRP's price, "are not relevant to determining whether the economic substance of [D]efendants' offers and sales of XRP constitute an investment contract";

> (2) Expert No. 3's "contention that Ripple sold XRP to fund operations or repurchase Ripple equity is also irrelevant to whether the economic substance of those sales constitutes an investment contract"; and

> (3) "Using XRP as a component of executive compensation is equally irrelevant to whether the economic substance of XRP constitutes an investment contract."

Ferrell Rebuttal Report ¶ 11.  Like in his opening report, here, Ferrell offers opinions on the

economic substance of an investment contract and opines that several of Expert No. 3's opinions

are "irrelevant" to that issue.  The economic substance of an investment contract is an issue of

law, and expert opinions on issues of law are improper.  *Bilzerian*, 926 F.2d at 1294.  In addition,

Ferrell opines on whether Expert No. 3's opinions are "relevant."  This, too, is an issue of law for

the Court to decide, not an expert.  *See* Fed. R. Evid. 403.

47

The Court rejects the remainder of the SEC's arguments about Ferrell's rebuttal and supplemental reports.  Ferrell's opinions properly fall within the scope of rebuttal to the opinions of Experts Nos. 3 and 5 because he criticizes Expert No. 3's methodology and challenges Expert No. 5's use of an event study.  *See* Ferrell Rebuttal Report ¶¶ 12–46.  Nor does the Court agree that Ferrell's rebuttal opinion should be excluded because his analysis is "scientifically unsound" or because he misreads Expert No. 3's report.  These criticisms by the SEC involve disagreements about Ferrell's opinions, but "[t]he mere fact that an expert's testimony conflicts with the testimony of another expert or scientific study does not control admissibility."  *In re Zyprexa*, 489 F. Supp. 2d at 285.  These criticisms go to the weight of Ferrell's testimony, and may be addressed at trial, but are not grounds for excluding his rebuttal testimony.

Lastly, the SEC argues that Ferrell's supplemental report improperly attempts to bolster his original opinions.  The Court disagrees.  After reviewing Ferrell's supplemental report, the Court concludes that his supplemental report directly responds to Expert No. 5's supplemental report and is therefore "archetypal rebuttal testimony:  [I]t identifies a flawed premise in [Expert No. 5's] report that casts doubt on both that report's conclusions and its author's expertise."  *Sci. Components Corp. v. Sirenza Microdevices, Inc.*, No. 03 Civ. 1851, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008).  In the supplemental report, Ferrell directly challenges Expert No. 5's but-for price methodology and relies on his own factor model from his opening report to support his arguments against Expert No. 5's analysis.  Ferrell Suppl. Report ¶¶ 15–21.

Accordingly, the SEC's motion to preclude Ferrell's legal opinions, including the second and fifth opinions in his opening report and portions of his rebuttal report, is GRANTED, *see, e.g.*, Ferrell Report ¶¶ 84–89, 140–45; Ferrell Rebuttal Report ¶¶ 8, 31, 47–66, and the SEC's motion to preclude the remainder of Ferrell's opinions is DENIED.

7.   Carol Osler

Defendants offer the testimony of Carol Osler, a professor at the international business

school of Brandeis University, where she researches currency markets and exchange rates.  *See*

Osler Report ¶¶ 1, 3–4, ECF No. 796-26.  She previously served as a research economist at the

Federal Reserve Bank of New York, and her academic courses cover topics including

"behavioral finance, financial market structure and the trading process, and applied

macroeconomic analysis."  *Id.* at Ex. A.

Osler offers two reports:  an opening report, *see* Osler Report, and a rebuttal report to the

opinions offered by Expert No. 1, *see* ECF No. 796-28.  In her opening report, Osler offers two

opinions:

> (1) XRP fits the economic definition of a "currency" because it has the functions
> and attributes commonly assigned to currencies by experts; and

> (2) ODL, which relies on the XRP Ledger and uses XRP as a bridge currency,
> "presents an economically sound option for making cross-border and cross-
> currency payments."

Osler Report ¶ 7.  The SEC does not seek to exclude Osler's rebuttal report but challenges her

opening opinions on the bases that her opinions are irrelevant and unreliable, and she is not

qualified to offer her opinions.  *See* SEC Daubert Mem. Part 2 at 71–77.

First, for substantially the same reasons discussed above with respect to Ferrell's

testimony, the Court rejects the SEC's argument that Osler's first opinion is irrelevant.  The SEC

argues that the Court should exclude Osler's opinion because "a *virtual* currency is not a

'currency' under the Securities Act," and even if XRP were a currency, "even currencies can be

sold as investment contracts."  SEC Daubert Mem. Part 2 at 71–72.  The Court disagrees because

Osler's testimony needs not be dispositive to be relevant.  *See Can't Live Without It,* 373 F.

Supp. 3d at 440.  And, as this Court has stated, whether XRP functions like a virtual currency is

relevant to Defendants' core argument that XRP is not "ordinarily and commonly considered" to be a "securit[y] in the commercial world." *Marine Bank*, 455 U.S. at 559.

Second, the SEC argues that Osler's opinions are unreliable because she merely restates Defendants' factual arguments, and an expert "cannot serve as a mouthpiece for the defense on facts that are in dispute." SEC Daubert Mem. Part 2 at 73. The Court disagrees with the SEC's contentions. Expert witnesses may rely on their party's facts, even where facts are in dispute. *See* Fed. R. Evid. 72 advisory committee's notes to 2000 amendments. And, Osler does not just restate Defendants' factual arguments; she applies her expertise from studying cross-border payments to opine that ODL is economically sound for cross-border and cross-currency payments. *See* Osler Report ¶¶ 19–74.

The SEC's other arguments against Osler's opinions speak to the weight of her testimony but do not warrant excluding it. For example, the SEC argues that Osler fails to define the term "currency," fails to verify the facts on which she relies, cites limited sources, and does not consider the possibility of error. *See* SEC Daubert Mem. Part 2 at 73–74. However, each of these criticisms speaks to the weight that a fact finder should afford Osler's testimony, not whether her underlying methodology is reliable. *See Aventis Env't Sci.*, 383 F. Supp. 2d at 514. These arguments fall within the purview of the fact finder, not the Court.

Third, the Court rejects the SEC's argument that Osler is unqualified to offer her opinions. Osler has extensive experience researching currency markets and foreign exchange transactions. That she does not have "special training or experience in evaluating cryptocurrencies" or "any academic or professional studies of . . . ODL," SEC Daubert Mem. Part 2 at 74, 76, does not disqualify her testimony because an expert need "not possess experience tailored to the precise product or process that is the subject matter of the dispute."

*Lion Oil Trading*, 2011 WL 855876, at *1 (citation omitted).  The SEC's proposed requirements for experts are far too restrictive, and Osler undisputedly has "qualifications in a general field closely related to the subject matter in question."  *In re Zyprexa*, 489 F. Supp. 2d at 282.

Accordingly, the SEC's motion to preclude Osler from testifying is DENIED.

### 8.  Daniel Fischel

Defendants offer the testimony of Daniel Fischel, the president of a litigation consulting firm and the former Dean of the University of Chicago Law School.  Fischel Rebuttal Report ¶ 1, ECF No. 796-16.  Fischel's research and teaching have covered the economics of corporate law and financial markets, and he has written and testified extensively on the use of event studies. *Id.* ¶ 2.

Fischel is a rebuttal expert that responds directly to the opinions of Expert No. 5.  In his rebuttal report, Fischel concludes that Expert No. 5's analysis is "fundamentally flawed" for four primary reasons:

> (1) Expert No. 5's event study methodology "do[es] not demonstrate that XRP holders profit solely or primarily from the efforts of Ripple";
>
> (2) Expert No. 5 "misrepresents his own findings by failing to recognize that many of the announcements that he finds to be statistically significant are confounded";
>
> (3) Expert No. 5 "fails to appreciate the significance of his own admission that XRP did not trade in an efficient market"; and
>
> (4) Expert No. 5 "fails to provide any explanation as to why his event study would shed any light on whether XRP holders are engaged in a 'common enterprise' with Ripple."

*Id.* ¶ 14.  The SEC moves to exclude Fischel's first and fourth opinions but does not contest the admissibility of his other two opinions.  Specifically, the SEC argues that these opinions should be omitted because they do not rebut Expert No. 5's report, they are improper and incorrect legal conclusions, and his fourth opinion is unreliable.  SEC Daubert Mem. Part 2 at 77.

"Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (citation omitted).  Proper expert rebuttal testimony is intended to "contradict or rebut evidence on the same subject matter" in the opposing party's expert report. Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also McBeth*, 2018 WL 5997918, at *7.  Fischel's testimony goes well beyond the scope of Expert No. 5's report.  Fischel may properly rebut Expert No. 5's testimony by critiquing his methodology and use of event studies, but Fischel may not expand his rebuttal testimony to opine on why Expert No. 5's analysis and testimony do not satisfy *Howey*'s "expectation of profits" and "common enterprise" prongs—particularly where Expert No. 5 does not at any point in his report mention *Howey* or reference either prong.  *See* SEC Daubert Mem. Part 2 at 85; Fischel Dep. at 105:22–106:11, 136:19-23, ECF No. 796-17. Fischel's rebuttal opinion strays far from the original testimony in Expert No. 5's opening report, introducing new arguments and testimony.

Accordingly, the SEC's motion to preclude Fischel from testifying as to his first and fourth opinions is GRANTED.

### 9.  M. Laurentius Marais

Defendants offer the testimony of M. Laurentius Marais, the executive vice president of a litigation consulting firm.  Marais Rebuttal Report ¶ 1, ECF No. 796-19.  Marais holds a Ph.D. and master's degree in business administration, mathematics, and statistics.  *Id.*  He has extensive experience applying mathematical and statistical theory and methods and in reviewing and assessing the validity of mathematical and statistical studies, inferences, and conclusions, including event studies.  *See id.*; Marais Dep. at 25:25–26:5, ECF No. 796-20.

Marais offers two reports:  a rebuttal report, *see* Marais Rebuttal Report, and a supplemental report, *see* Marais Suppl. Report, ECF No. 796-21.  In Marais's rebuttal and supplemental reports, he discusses the methodological flaws in Expert No. 5's event study and but-for price calculation, respectively.  The SEC moves to exclude both of Marais's reports because "his critique is premised on [Expert No. 5's] omission of a step unrecognized in any standard event study methodology" and "his analysis actually supports, rather than undercuts, Expert No. 5's conclusion that Ripple news had a significant impact on XRP prices."  SEC Daubert Mem. Part 2 at 86.

First, the SEC argues that Marais injects a "novel, unrecognized step" into the event study methodology.  *Id.* at 88.  The Court disagrees.  Marais's rebuttal report highlights confounding factors that Expert No. 5 does not consider in his event study and examines several trading days where unusual XRP price returns were not associated with Ripple news.  *See* Marais Rebuttal Report ¶¶ 23–26.  Marais then opines that because Expert No. 5 did not consider these confounding factors, he cannot opine that Ripple's news caused the changes in XRP's price.  *Id.* ¶ 30.  Rebuttal experts routinely testify about factors that opposing experts failed to consider in their analyses.  *See, e.g.*, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09 Civ. 61490, 2011 WL 2295269, at *5–6 (S.D. Fla. June 8, 2011).  As the Court held above in its analysis of Expert No. 5's opinions, Expert No. 5 may not opine that his event study proves a causal relationship between Ripple's actions and XRP price movements.  Therefore, Marais's analysis is proper rebuttal testimony that explains to a fact finder why Expert No. 5 cannot opine about causation.

Second, the Court also rejects the SEC's argument that Marais's opinions should be excluded because they "actually support[]" Expert No. 5's conclusions.  *See* SEC Daubert Mem.

Part 2 at 86, 89–91.  The SEC's argument that Marais's rebuttal and supplemental opinions are contradictory mischaracterizes his opinions.  Both of Marais's reports speak to his opinion that neither Expert No. 5's event study nor his but-for pricing methodology can prove that Ripple's actions caused XRP's price to increase.  Further, alleged inconsistency between an expert's opinions is not a ground for excluding their testimony, *see Amorgianos*, 303 F.3d at 267, and the SEC may argue before the jury that Marais's testimony actually supports its case.

Accordingly, the SEC's motion to preclude Marais from testifying is DENIED.

10. Kristina Shampanier

Defendants offer the testimony of Kristina Shampanier, the senior vice president of an economic consulting firm.  Shampanier Rebuttal Report ¶ 1, ECF No. 796-35.  Shampanier holds a Ph.D. in business and management science, as well as master's degrees in mathematics and economics.  *Id.* ¶ 1.  She has extensive experience in survey development and administration and analysis of data on consumer behavior; she has also lectured on survey design.  *Id.* ¶ 2.

Shampanier offers a rebuttal report in response to Expert No. 1's opinion about how "reasonable purchasers" of XRP would have perceived certain of Ripple's "statements, actions, and product offerings," Expert No. 1 Report ¶¶ 2, 31, 85–90.  *See* Shampanier Rebuttal Report ¶ 9.  Shampanier opines that Expert No. 1's methodology is unreliable because he does not employ any reliable empirical methods for testing the perceptions of XRP purchasers.  *Id.*  The SEC seeks to exclude the entirety of Shampanier's rebuttal report.  SEC Daubert Mem. Part 2 at 92.

For the reasons stated above in the Court's analysis of Expert No. 1's opinions, Expert No. 1 is precluded from testifying as to his first opinion about the perceptions of a reasonable

XRP purchaser.  Accordingly, the SEC's motion to exclude Shampanier's rebuttal testimony is

DENIED as moot, and the Court shall not address the SEC's arguments.

## CONCLUSION

For the foregoing reasons, the parties' motions are GRANTED in part, and DENIED in

part.  Specifically,

1. Defendants' motion to preclude Expert No. 1 from testifying is GRANTED as
   to his first opinion about the perceptions of a reasonable XRP purchaser, and
   DENIED as to the remainder of his testimony.

2. Defendants' motion to preclude Expert No. 2 from testifying is GRANTED as
   to his fourth opinion about the materiality of Ripple's potential disclosures, and
   DENIED as to the remainder of his testimony.

3. Defendants' motion to preclude Expert No. 3 from testifying is DENIED.

4. Defendants' motion to preclude Expert No. 4 from testifying is GRANTED as
   to his third opinion about the risks to the XRP Ledger that might materialize if
   Ripple "walked away" or "disappeared", and DENIED as to the remainder of
   his testimony.

5. Defendants' motion to preclude Expert No. 5 from testifying is GRANTED as
   to his opinion on causation, and DENIED as to the remainder of his testimony.

6. The SEC's motion to preclude Schwartz from testifying is GRANTED as to his
   opinion on the Supreme Court's legal reasoning in *Howey*, and DENIED as to
   the remainder of his testimony.

7. The SEC's motion to preclude Adriaens from testifying is GRANTED as to his first and second narrative opinions, and DENIED as to the remainder of his testimony.

8. The SEC's motion to preclude Borden from testifying is DENIED.

9. The SEC's motion to preclude Easton from testifying is GRANTED as to his rebuttal report, and DENIED as to his opening report.

10. The SEC's motion to preclude Yadav from testifying is GRANTED as to her third opinion about where an offer or sale of XRP occurs, and DENIED as to the remainder of her testimony.

11. The SEC's motion to preclude Ferrell from testifying is GRANTED as to his legal opinions, including his second and fifth opinions in his opening report and portions of his rebuttal report, and DENIED as to the remainder of his testimony.

12. The SEC's motion to preclude Osler from testifying is DENIED.

13. The SEC's motion to preclude Fischel from testifying as to his first and fourth opinions is GRANTED.

14. The SEC's motion to preclude Marais from testifying is DENIED.

15. The SEC's motion to preclude Shampanier from testifying is DENIED as moot.

The Clerk of Court is directed to terminate the motions at ECF Nos. 532, 535, 537, 540, 543, 546, 768, 770, 773, 786, 789, and 791.

SO ORDERED.

Dated: March 6, 2023
       New York, New York

_____
ANALISA TORRES
United States District Judge