# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **VOYAGER DIGITAL HOLDINGS, INC., et al.,** | : | **Case No. 22-10943 (MEW)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |
| | : | |

------------------------------------------------------------------------

**DECISION REGARDING (1) APPROVAL OF THE DEBTORS'**
**DISCLOSURE STATEMENT, (2) CONFIRMATION OF THE DEBTORS'**
**PLAN OF REORGANIZATION, (3) MOTIONS SEEKING THE APPOINTMENT**
**OF A TRUSTEE, (4) MOTIONS REQUESTING FULL CUSTOMER ACCESS TO**
**ACCOUNT HOLDINGS, AND (5) RELATED MATTERS**

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP
New York, New York
*Attorneys for Debtors*
   By: Joshua Sussberg, Esq.
       Christine Okike, Esq.
       Michael Slade, Esq.
       Allyson Smith, Esq.

QUINN EMANUEL URQUHART SULLIVAN LLP
New York, New York
*Attorneys for the Special Committee of the Board of Directors*
   By: Susheel Kirpalani, Esq.
       Katherine Scherling, Esq.

McDERMOTT WILL & EMERY LLP
New York, New York; Dallas, Texas; and Atlanta, Georgia
*Attorneys for the Official Committee of Unsecured Creditors*
   By: Darren T. Azman, Esq.
       Joseph B. Evans, Esq.
       John J. Calandra, Esq.

LATHAM & WATKINS LLP
New York, New York
*Attorneys for BAM Trading Services Inc.*
*d/b/a Binance.US*
   By: Adam J. Goldberg, Esq.
       Robert Malioneck, Esq.
       Nacif Taousse, Esq.

OFFICE OF THE UNITED STATES TRUSTEE
New York, New Yori
  By: Richard C. Morrissey, Esq.
      Mark Bruh, Esq.

U.S. SECURITIES AND EXCHANGE COMMISSION
Atlanta, Georgia and Washington, D.C.
  By: William M. Uptegrove, Esq.
      Therese Scheuer, Esq.

U.S. DEPARTMENT OF JUSTICE
New York, New York
*Attorneys for United States of America*
  By: Jean-David Barnea, Esq.
      Peter Aronoff, Esq.

FEDERAL TRADE COMMISSION
Washington, DC
  By: Katherine Johnson, Esq.

TEXAS STATE SECURITIES BOARD &
TEXAS DEPARTMENT OF BANKING
Austin, Texas
  By: Abigail Ryan, Esq.

NEW JERSEY BUREAU OF SECURITIES
Newark, New Jersey 07102
  By: Virginia Shea, Esq.

NEW YORK STATE DEPARTMENT OF
FINANCIAL SERVICES
New York, New York
  By: Jason David St. John, Esq.

VERMONT DEPARTMENT OF
FINANCIAL REGULATION
Montpelier, VT
  By: Jennifer Rood, Esq.

NATIONAL ASSOCIATION OF
ATTORNEYS GENERAL
Washington, DC
  By: Karen Cordry, Esq.

KILPATRICK TOWNSEND & STOCKTON LLP
New York, New York
    By: David M. Posner, Esq.
        Kelly E. Moynihan

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE
Nashville, TN 37202
    By: Marvin Clements, Esq.

DC DEPARTMENT OF INSURANCE,
SECURITIES AND BANKING
Washington, DC 20002
    By: David P. O'Brien, Esq.

Lisa Dagnoli
*Pro Se* Creditor

Gina DiResta
*Pro Se* Creditor

Michelle DiVita, Esq.
*Pro Se* Creditor

Tracey Hendershott
*Pro Se* Creditor

SJ Jones
*Pro Se* Creditor

Dan Newsom
*Pro Se* Creditor

Lisa Provino
*Pro Se* Creditor

Jon Warren
*Pro Se* Creditor

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

This Decision addresses the Debtors' request for final approval of the Disclosure

Statement that the Debtors distributed in January 2023, the proposed confirmation of the

Debtors' plan of reorganization, and some other motions that were filed by creditors. The proposed plan contemplates a sale transaction that is subject to some strict deadlines, and I dictated my findings and conclusions into the record at the end of the hearing on March 7, 2023 so that a confirmation order could be entered without unintentionally triggering any termination rights on the part of the proposed purchaser. However, I indicated that we would review a transcript of my rulings and would correct spelling, omitted citations, inadvertent errors, and places where I had been less clear than I would have liked during the course of my dictation, and that a corrected and final decision would then be issued. We have received the transcript and we have made corrections, added citations and re-ordered some points for clarity, but have not changed the substance of the decision as it was announced in open Court. This written Decision represents the actual and final Decision of the Court.

We held a lengthy hearing that began on Thursday, March 2 and continued through Tuesday, March 7. There were many participants in the hearing, including a large number of *pro se* parties who are Voyager account holders. I want to thank the *pro se* parties for their participation and for the unusual amount of work and energy that they put into this case. I appreciate that they are not attorneys and that they have labored under some significant disadvantages as a result. I tried wherever possible during the course of the hearing to give the *pro se* parties the chance to ask questions, even if at times we may have strayed somewhat from the issues that are presently before the Court. Unfortunately, I had to exclude one *pro se* party who refused to abide by my instructions and who was disrespectful in his conduct. However, the other *pro se* participants clearly made a significant effort to be helpful and to abide by the rules as I explained them, and I greatly appreciate the fact that they did so.

The primary issue before me in this hearing is the Debtors' request for final approval of their Disclosure Statement and confirmation of their proposed plan of reorganization. The plan, as I said, provides for a sale of customer accounts to BAM Trading Services Inc. (which does business as Binance.US), though account holders can elect not to become customers of Binance.US. The plan also includes a backup option in the event that the proposed deal with Binance.US does not close.

The Debtors have argued that the proposed deal with Binance.US will maximize their ability to make distributions to account holders in the form of cryptocurrencies rather than cash. This may have tax benefits for the account holders, though the tax issues apparently are not completely clear and nobody has presented evidence or made legal submissions to me about the tax issues or the tax benefits. The Debtors have also argued that the proposed deal with Binance.US would permit more cryptocurrencies to be distributed "in kind" than would be permitted by any of the available alternatives. They have further argued that the Binance.US deal would limit the amounts of cryptocurrency sales that the Debtors would have to make, and thereby would reduce the extent to which sales by the Debtors might adversely affect market prices, particularly in the case of cryptocurrencies where normal trading volumes are relatively low.

The objections have focused on many things. Some objections have raised relatively common bankruptcy issues, such as objections to some of the releases that the Debtors have proposed. Other objections are focused more specifically on regulatory issues or on the wisdom of potential dealings with Binance.US.

Let me say at the outset, and as background to my rulings, that I cannot think of another case I have had that comes before me in a setting quite like this one does.

I am aware that there are some people who question the very concept of cryptocurrencies and the whole idea of cryptocurrency investment and trading. I note that no party in this case has taken such a position, and it is not for me to decide whether particular investments are good ideas or not. But it certainly provides an unusual backdrop to this bankruptcy case.

I also am aware that Voyager operated, and Binance.US currently operates, in a regulatory environment that at best can be described as highly uncertain. There are firms that operate as cryptocurrency brokers or exchanges, and have done so for several years, without being subject to clear and well-defined regulatory requirements. Regulators themselves cannot seem to agree as to whether cryptocurrencies are commodities that may be subject to regulation by the CFTC, or whether they are securities that are subject to securities laws, or neither, or even on what criteria should be applied in making the decision. This uncertainty has persisted despite the fact that cryptocurrency exchanges have been around for a number of years.

If the current regulatory environment can be characterized as uncertain, the future regulatory environment can only be characterized, in my mind, as virtually unknowable. There have been differing proposals in Congress to adopt different types of regulatory regimes for cryptocurrency trading. Meanwhile, the SEC has filed some actions against particular firms with regard to particular cryptocurrencies, and those actions suggest that a wider regulatory assault may be forthcoming. The CFTC seems to have taken some positions that are at odds with the SEC's views. Just how this will all sort itself out, how the pending actions relating to cryptocurrencies will be decided, and just what issues might be raised in future regulatory actions, and how they will affect individual firms or the industry as a whole, is unknown.

Complicating things further is the fact that Voyager operated, and Binance.US continues to operate, in an industry that also has been the subject of severe financial shocks over the past

year.  Many firms were adversely affected by the loan defaults of Three Arrows, including Voyager itself.  The Three Arrows defaults led to several bankruptcy filings across the country.  The more recent and sudden collapse of FTX has reverberated even more throughout the industry and has also led to some financial problems at other firms.

Perhaps the most worrisome, for me, are revelations of apparent misbehavior and misuse of customer assets at some firms.  I certainly do not have all of the evidence as to what happened at FTX, and we will all have to wait until judgments can be entered in that case before we are sure exactly what happened.  However, public statements by the persons currently handling the bankruptcy of FTX have indicated that there was an enormous disparity between the way that FTX actually operated, and the way it actually used customer assets, as opposed to what it had represented to its customers.

I am also aware of the examiner's report about the conduct of business at Celsius, and how the custody of customer assets at that firm may have differed from public statements as to how customer assets were being treated.  Once again, I certainly do not have all the evidence as to what actually happened at Celsius, and we will have to see what further developments there are in that case.  But the examiner's report certainly raised the prospect of a disparity between the way that particular firm actually operated and the representations it made to its customers about how assets were handled.

In this particular case, some account holders and some other parties have referred me to newspaper or magazine articles, or to a recent letter sent by a group of US Senators, all raising questions about how Binance.US does business and perhaps more questions about how its affiliated companies do business.  Despite the questions that have been raised, however, I must note that I have been offered absolutely no actual, admissible evidence – I mean literally zero

admissible evidence – that would support an accusation that Binance.US is misusing customer assets or is engaged in misbehavior of any kind at all. Instead, I am in the unenviable position of having to make a ruling about the proposed transaction in the face of hearsay accusations of potential wrongdoing, in an industry where other firms have apparently engaged in real wrongdoing, while having absolutely no evidence indicating that there is any good basis for the questions about Binance.US that have been raised.

 With those observations to put things into context, let me turn to some of the actual objections that have been filed. The first one that I will address is the objection filed by the Securities and Exchange Commission.

 The SEC argued in its written objection that the Debtors cannot prove the feasibility of their proposed plan, for two reasons. First, the SEC argued that in its view the Debtors had the burden to prove that the rebalancing of the Debtors' cryptocurrency portfolios (in preparation for plan distributions) would not involve illegal purchases and sales of securities. The objection did not take the position that any particular cryptocurrencies are securities, or otherwise explain how or why the Debtors' rebalancing activities might be illegal, although it did contain a vague footnote suggesting that the VGX token was one as to which some unspecified issue might exist.

 The SEC also suggested that the Debtors should be required to prove that Binance.US is not operating as a securities broker without registering as such. Once again, the SEC did not actually take the position that Binance.US *is* operating as an unregistered and unlicensed securities broker. Instead, it just suggested that the Debtors had the burden to prove the negative, without offering any evidence or even any reason to think that Binance.US actually is doing anything for which it requires further SEC registrations.

8

I questioned the SEC about these objections at the outset of this hearing, and to some

extent I rebuked the SEC attorneys for the vagueness of their submission, though in fairness to

the SEC attorneys I think they were just the messengers and not the architects of the message

that they were sent to deliver to me. Although the SEC contended that the Debtors somehow had

to prove a negative – *i.e.*, that the Debtors were not violating securities laws and that Binance.US

is not violating registration requirements for brokers – the SEC had not even affirmatively

contended that the Debtors were doing anything wrong, or that Binance.US was doing anything

wrong. Nor had the SEC offered any guidance at all as to just what it was that the Debtors

allegedly were supposed to prove on these issues, or how the Debtors possibly could prove what

the SEC wanted them to prove without receiving any explanation at all from SEC as to just why

the Debtors' operations, or Binance.US's operations, might raise legal issues.

Near the end of the hearing on Friday the SEC asked to provide clarification of the SEC's

legal position. The SEC initially asked if it could state its position only to me on an *in camera*

basis, but I denied that request and ruled that to the extent the SEC wanted to say something

further about its objection, it ought to be stated in the public forum, where all other interested

parties could hear and understand the SEC's position. The SEC representatives then said two

things on the record. First, I was told that the SEC staff believes that the VGX token has aspects

of a security, but that the Commission itself has not taken any position on that subject. Second, I

was told that the SEC staff believes that Binance.US is operating as a securities exchange

without registering as such, though once again the Commission itself has not taken any position

on that subject. Although the SEC offered these clarifications as to what the SEC staff

apparently believes, the SEC emphasized that only the Commission itself could take a formal

position on behalf of the SEC, and that these views of the staff did not constitute the official

views of the SEC. Furthermore, although the SEC had obtained clearance to reveal the staff's beliefs, the SEC confirmed that it was not authorized, and did not intend, to present any evidence on these issues, or even any further explanation as to the bases for whatever beliefs the SEC staff may have.

To the extent that the SEC contends that these issues are bars to the confirmation of the Debtors' plan, I must disagree. In the first place, I reject the contention that the Court, and the Debtors, somehow were supposed to figure out for themselves just what "aspects" of the VGX token might be considered to be aspects of a "security," or just what particular activities of Binance.US allegedly could raise registration issues, and then somehow to offer evidence and legal argument on those points.

This bankruptcy case has been pending since July 2022. Customers and creditors have been denied access to their assets for many months, and they deserve to have a resolution of the case. Bankruptcy cases are very expensive, and each and every delay means that administrative expenses eat away at the recoveries that creditors may receive. I have a proposed plan of reorganization before me, and I have an obligation to make a ruling – now – as to whether it can be confirmed. I cannot simply put the entire case into an indeterminate and expensive deep freeze while regulators figure out whether they do or do not think there is any problem with the transactions that are being proposed.

As I said at the outset of the hearing, if a regulator believes there is a legal issue with respect to something that is proposed before me, I am more than anxious to hear an explanation and to consider the issue. But if there is a problem, I expect a regulator to tell me that it has an actual objection (as opposed to saying that there "might" be an issue), and also to tell me what

10

the issue is and *why* it is an issue, so that other parties may address it and so that I may make a proper and well-considered ruling.

Here, I do not know how any party could possibly be expected to address the SEC's comments with the limited guidance that the SEC has provided. The SEC did not explain why the VGX token should be regarded as a security, for example, leaving me only to guess as to what the arguments might have been. Similarly, the SEC did not explain why it thought Binance.US might be operating as a securities broker. I do not know, for example, if there is one specific cryptocurrency token that may have been traded by Binance.US and that the SEC thinks was a security (for which the relevant remedy might simply be to stop trading in that token), or whether the SEC has different theories. If we were to try to address the issues, we would have to guess what the issues were, and would have no idea if we were even discussing the right points.

I understand and appreciate that the SEC is limited in what it can say about potential enforcement actions. But I cannot conclude from this record that an enforcement action is even likely, let alone whether it would be meritorious or even what arguments would be made. I also cannot determine, even if an enforcement action were brought, whether it would affect the transactions that I am being asked to approve. On this very point, for example, I asked the SEC's counsel at the outset of this hearing to explain what the consequences would be if Binance.US were to be found to have been acting as an unregistered broker dealer. I asked if that would just mean that Binance.US might have to stop certain activities while it pursued a license, or if it would mean that Binance.US would have to shut down all of its activities. The SEC said it could not answer that question. Notwithstanding that statement, the SEC took the position during argument on March 6 that the Debtors' Disclosure Statement allegedly was deficient because it did not more specifically describe what the results of a regulatory action

11

against Binance.US would be.  As I said then, I do not know how the Debtors could have been expected to be more specific about that question when the SEC attorneys themselves told me that they could not answer the question.

In addition, the SEC's argument on these points has all been phrased in terms of whether the Debtors can prove the "feasibility" of their proposed plan.  "Feasibility," in bankruptcy parlance, is a shorthand reference to the provisions of section 1129(a)(11) of the Bankruptcy Code, which states that in order to confirm a plan the court must find that the confirmation "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  Here, the only issues the SEC has raised are (a) whether one specific token (VGX) is a security, and (b) whether Binance.US needs to register as a securities broker.  There is no reason why these issues affect "feasibility" of the kind discussed in section 1129(a)(11).

The SEC has been aware of the VGX token for some time and has not even reached a conclusion as to whether it is a security, let alone taken any action to stop trading in the token. In addition, even if there are problems with the sale or distribution of VGX, there is no reason to my knowledge why that would or should impede or affect the remainder of what the Debtors are proposing.  Similarly, even if Binance.US were to be told to stop its business entirely, the Debtors' plan in this case provides a so-called "toggle" option under which the Binance.US deal would be stopped and the Debtors would instead make distributions, to the extent they could, without using Binance.US.  There would have to be some practical changes as a result, and the recoveries that account holders would receive would likely diminish, but the plan itself includes the toggle option, and so there is no reason to think that the issues the SEC has raised as to

Binance.US would mean that we would need a further "liquidation" or "reorganization" of a kind that is not already provided for in the plan.

For these reasons, the issues raised by the SEC do not really go to the "feasibility" of the Plan as that term is used in section 1129(a)(11) of the Bankruptcy Code.  I appreciate that the SEC made some effort to tell me something about what the staff is thinking, but in the end it did not support the highly conditional objection that the SEC filed.

One of the requirements for confirmation of a Plan is that the plan has been proposed in good faith and not by any means forbidden by law.  *See* 11 U.S.C. § 1129(a)(3).  Voyager's case is a high-profile one, and the facts that Voyager has been attempting to sell itself to another firm, and to make "in kind" distributions of cryptocurrencies to account holders, has been known for many months.  The SEC and all other government agencies have had a full and fair opportunity to object if they believe that the rebalancing transactions that I have previously approved and that are contemplated by the plan are illegal in any way, or if they believe that the distributions of cryptocurrencies and cash that are contemplated by the plan are violative in any way of any applicable statute, rule or regulation.  I have no desire or intention to approve anything that runs afoul of legal limits, just as I have no desire to approve anything that will put customers at risk. The plain fact is, however, that the SEC has not actually made any objection.  It has only vaguely hinted at possible issues that have not even been described in a manner that would permit the Court or the parties to address them.

This is a Court.  In the end I have to make decisions based on actual, admissible evidence and, where legal issues are involved, based on cogent legal arguments.  I have no actual evidence or cogent legal argument, from the SEC or from any other regulator or party, that could support a contention that the plan would require Voyager to purchase or sell any token that should be

considered to be a security, or that Binance.US is engaged in any activity for which it is required to register as a broker or dealer. I therefore am compelled by the evidence and arguments before me to reject and overrule any contention that the transactions contemplated by the Plan would be illegal, and any suggestion that for regulatory reasons the Debtors would be unable to complete their proposed liquidation. The Debtors have offered evidence that Binance.US has the operational and financial capability to perform its obligations, and I have not been given any evidence to suggest that Binance.US could not legally perform those obligations.

For similar reasons, I reject the contentions by the SEC and others to the effect that the Debtors allegedly did not offer sufficient disclosure about potential regulatory risks. The Disclosure Statement that was distributed included specific disclosures about regulatory issues faced in so-called "Unsupported Jurisdictions" where Binance.US does not have certain regulatory licenses. *See* Disclosure Statement (ECF No. 863) at pp. 79-80. It also included detailed statements to the effect that:

- The Debtors could not predict whether regulators would take the position that additional regulatory approvals are required for the completion of the contemplated transactions (*id.* at 21-22), and that therefore there could be no guaranty that there would not be regulatory issues;

- The Debtors' business is subject to "an extensive and highly evolving regulatory landscape" that involves significant uncertainties, and that it is possible that governmental bodies might disagree as to whether particular laws or regulations are applicable to the Debtors or to the contemplated transactions (*id.* at 74-76);

- The Wind-Down Debtors could be adversely affected by potential litigation or regulatory actions (*id.* at 76); and

14

- • Consummation of the proposed restructuring transactions might require approvals of governmental units and the failures to obtain such approvals "could prevent or impose limitations or restrictions on Consummation of the Restructuring Transaction and Confirmation of the Plan." *Id.* at 76.

Voyager also disclosed all of the regulatory inquiries that it had received from federal and state authorities (*id*. at 76-79), and nobody has contended to the contrary, although I note that none of those inquiries appeared to relate to the characteristics of the VGX token or to the activities of Binance.US. The Disclosure Statement stated that Voyager had received a subpoena from the SEC dated January 5, 2022 that explored (a) whether the Rewards Program that Voyager was offering at that time constituted a securities offering, and (b) whether Voyager needed to register as an investment company. *Id*. at 80. It further revealed that on July 15, 2022 the SEC had asked for certain financial statement information and other internal documentation, and that in August and September 2022 Voyager had received inquiries and a subpoena from the CFTC. *Id.* Other state and federal inquiries were also described. The inquiries show that the regulators raised many questions about Voyager's past activities, but frankly I did not see anything in them that would bar the transactions that are currently contemplated, and nobody has argued to the contrary here.

I do not believe that the Disclosure Statement, which was circulated in January 2023, needed to be any more specific than it was, particularly with regard to issues that the SEC itself did not identify until March 2023 and that the SEC itself has not been able to explain during this hearing in anything other than conclusory terms.

A number of questions have also been raised about the extent to which account holders would be protected if they were to become customers of Binance.US. These objections have

been posed by the SEC, the Office of the United States Trustee, the State of Texas and the State

of New York. Nobody has suggested that the Debtors had information that they were hiding

from anyone on these points. Similarly, nobody has contended that the Debtors made any

misrepresentations about the Debtors' own conclusions about Binance.US. Instead, various

parties have suggested that the Debtors should have obtained different or better assurances from

Binance.US as to how it handles customer assets, and that the prior disclosures supposedly were

inadequate to the extent they did not already anticipate or describe the results of the additional

assurances that the objecting parties think the Debtors should obtain.

Although these objections have been framed as complaints about the disclosures that

were included in the Disclosure Statement, I do not believe that is an accurate way to

characterize them. As I said during the hearing, it is more accurate to say that these are

substantive questions masquerading as disclosure issues. They are substantive complaints about

what the Debtors have done or should be doing to assure themselves of a lack of problems before

the transaction closes, rather than proper objections to the disclosures that the Debtors already

made.

The Debtors have made clear that their due diligence as to how Binance.US does

business is a constant, ongoing project and that the Debtors will continue to ask questions and to

seek assurances as issues are raised. We would all be shocked if the Debtors did not do so. It is

simply wrong for various parties to suggest that the January 2023 Disclosure Statement was

somehow inadequate just because it did not describe follow-up conversations that had not yet

taken place and follow-up assurances that had not yet been received. If I were to impose such a

standard it would mean, in effect, that the Debtors would have had to stop their due diligence

inquiries once a Disclosure Statement had been approved, for fear that any further discussion

16

would immediately mean that the prior disclosures were deficient and that the entire expensive process would have to start all over again so that materials could be updated. That would be an absurd result.

I do not find anything deficient in what the Disclosure Statement actually said, and the evidence of the Debtors' further due diligence investigations just supported what the Debtors had already said in the Disclosure Statement, rather than suggesting any need for revised disclosures.

The Disclosure Statement revealed that cryptocurrencies would be transferred to Binance.US only as and when they were to be distributed to customers, and that until such time as the distributions were completed Binance.US would receive and hold the cryptocurrencies "solely in a custodial capacity in trust and solely for the benefit of Account Holders who each open an account on the Binance.US Platform." *Id.* at 7, 35. Pages 34-36 of the Disclosure Statement also revealed that the Debtors had sought and obtained various assurances from Binance.US that:

- Binance.US had the financial resources to complete the proposed transaction;

- Binance.US "maintains 100% reserves for all its customers' digital assets" and would have "substantial capital remaining" even if all customers were to withdraw all of their digital assets;

- Binance.US "does not lend any of its customers' assets or offer margin products on its platform;"

- Customer assets transferred to Binance.US would be held by Binance.US "pursuant to its standard digital asset wallet infrastructure which is stored on Amazon Web Services (AWS) servers located in Northern Virginia and Tokyo;" and

17

- Binance.US "has various security protocols in place to ensure the safe storage of customer assets" and that those security protocols "have achieved various third-party expert certifications" attesting to their compliance with industry standards.

During the hearing, the Debtors also described other requests for information that they had made and other assurances they had sought. The evidence included testimony that Binance.US had been asked to provide, and had provided, a sworn statement as to certain of its business practices. At my request the Debtors obtained the consent of Binance.US to offer that sworn certificate as evidence of the diligence the Debtors had conducted and as evidence of the bases for the conclusions the Debtors had reached. The certificate was admitted into evidence and filed on the docket so that all parties could see it. (ECF No. 1137-2.) It is dated February 28, 2023 and it states:

- Binance.US holds digital assets deposited by its customers "solely in a custodial capacity and on a one-to-one reserve basis;"

- Binance.US "segregates the Customer Assets from the Company's digital assets on its general ledger;"

- Only employees of Binance.US are able to move or withdraw Customer Assets;

- Binance.US does not lend or rehypothecate Customer Assets; and

- Binance.US maintains security protocols and procedures that are reviewed by independent parties and that comply with various applicable standards.

These results of the Debtors' further due diligence just reinforced what the Debtors had already said in the Disclosure Statement. The fact that these inquiries were made did not mean that the original disclosures were deficient in any way.

The evidence does not satisfy everyone.  I am sure there are some people who are worried about news reports and who would prefer to have nothing to do with Binance.US. During cross-examination, more than a few objectors pointed out that FTX had also made representations to the Debtors and that those statements had turned out to be false, though in fairness the witnesses have testified that they have ramped up their investigations and increased the information and assurances they have sought from Binance.US in light of what happened with FTX.

I do not mean to cast aspersions on Binance.US when I say this, but it is of course true that in the end we can never be one hundred percent sure that a representation is true and correct, even when it is made under oath.  At the same time, however, we do not usually presume that people are lying or that buyers are dishonest, particularly in the absence of any evidence suggesting that they actually are.

My role, as the Bankruptcy Judge, is in the first instance to determine whether the proposed plan complies with the provisions of the Bankruptcy Code itself.  As to the business details and the business wisdom of the arrangement, however, and as to the selection of the proposed counterparty, my role here is more limited.  So long as the provisions of a plan comply with Bankruptcy Code requirements and applicable laws, my authority is limited to a determination of whether the Debtors' desire to do this transaction is within the scope of the Debtors' reasonable business judgment.  *See In re Borders Group, Inc.,* 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011), and cases cited therein.  Furthermore, in considering that issue I am required to make decisions based on the evidence that is submitted to me.

I understand the point of view of the skeptics here.  Given what has happened in this industry I cannot help but be worried myself about how any firm in this industry might handle

19

customer assets. But the plain fact of the matter is that I have been given absolutely no admissible evidence – literally none – that would support a conclusion that Binance.US will misuse customer assets or that Binance.US cannot be trusted. Any party in interest who wished to object to a transaction with Binance.US was entitled to take relevant discovery and was entitled to present evidence of any problems that were discovered, but no party did so. The evidence that is actually before me requires me to conclude that the Debtors are exercising reasonable business judgment in electing to proceed with the transaction.

That does not mean that I think that every detail of the proposed transaction was necessary or even appropriate. During the course of the hearing I asked the Debtors and Binance.US to consider certain changes to the terms of their proposed arrangement that I believed would not affect the primary business terms but that would help to address other concerns and questions that had been raised.

First, after our hearing in January the Binance.US deal was clarified to say (and my Order entered in January clearly says) that from the time when assets are transferred to Binance.US, until the time they are distributed to account holders, Binance.US would be acting as a distribution agent for Voyager. Accordingly, during that time Binance.US would be only a nominal owner of the assets. Binance.US would not have any beneficial interest in the assets during that distribution period. Instead, the assets would be held by Binance.US strictly in trust for (and in custody for) either the Debtors or the account holders, respectively.

Binance.US has also previously confirmed that customers may immediately withdraw assets from Binance.US if they choose to do so. During the hearing I suggested that it would make sense if what I have just referred to as the "distribution period" – i.e., the period during which Binance.US is deemed to have no beneficial interest in the assets – were to continue for a

20

sufficient amount of time after a customer's account is credited so that customers who wish to make immediate withdrawals can do so without sacrificing any of the protections that my order might provide to them. Binance.US has not only agreed to that suggested change, it has gone further. It has agreed with the Debtors to the inclusion of language in the Plan documents and in my order to the effect that the assets transferred to Binance.US by Voyager will *always* be held in strict trust and in custody for customers, and that Binance.US will not have beneficial interests in those assets. That language now appears in Article IV, section C of the plan.

Second, I asked that the parties consider a change to the proposed treatment of account holders who live in what the parties have called "Unsupported Jurisdictions," which are four States in which Binance.US does not currently have the licenses necessary to distribute cryptocurrencies to customers. I understand (and will address below) the issues that have been raised regarding the fact that customers in most states will be able to receive distributions in the form of cryptocurrencies, whereas customers in the Unsupported Jurisdictions will have to wait six months to see if Binance.US can obtain the needed approvals, and will receive cash distributions at the end of six months if Binance.US cannot obtain such approvals. The question that I raised with the parties, however, is as to account holders in Unsupported Jurisdictions who do not want to become Binance.US customers and who would prefer to take a cash distribution. Under the proposed plan, customers in most States who do not become customers of Binance.US, or who just would prefer cash distributions for other reasons, will be given cash distributions at the end of a three-month period. Since customers in most states can get such cash distributions after three months, I raised the question as to why customers in Unsupported Jurisdictions should not have that same right. I suggested that this opportunity could be made available by giving customers a simple "opt-out" form by which they would elect to take cash

distributions and would thereby be entitled to them at the completion of the same three-month period. Binance.US has agreed to this proposed change and the change has been incorporated in the plan and related documents.

Third, I noted that the parties' agreement includes provisions requiring the transfer of customer data from Voyager to Binance.US. Voyager has argued that its customer agreements permit the transfer of that data, and no party has offered me any contrary evidence or contention. Under the parties' agreement, as I understand it, the only customer data that has been transferred so far is as to customers who have already made elections to be customers of Binance.US. However, if there is approval of the transaction, there would be a wholesale transfer to Binance.US of all remaining customer data, which would mean that Binance.US would receive all customer data for all Voyager customers, even if those customers elect not to do business with Binance.US. I raised the question of whether these terms could be modified. I recognize that one of the things that Binance.US is "buying" here is the right to market itself to Voyager's customers. I asked, however, whether the transfer of customer data to Binance.US could be limited as much as possible in the first instance (which would enable Binance.US to do such marketing), but with a deferral where possible of the transfer of other, more sensitive customer information (about bank account information, for example) to such time as a particular customer actually elects to be a Binance.US customer. The parties have agreed, in response, to allow customers to "opt out" of the transfer of certain kinds of information, including photo IDs and bank account information, until such time as they actually become customers of Binance.US. The final agreement incorporates this limit, which complies with the terms of Voyager's customer agreements and is a reasonable accommodation of the points the Court raised.

I think that these proposed modifications address some of the objections and issues that came up during the hearing. However, there are other issues that I will now discuss.

The Office of the United States Trustee has asserted additional objections to the Disclosure Statement. One such objection is the U.S. Trustee's contention that the Disclosure Statement was not clear as to who would hold cryptocurrencies and in what capacities: I believe the Disclosure Statement already said, as a I noted above, that cryptocurrencies would only be transferred to Binance.US as and when they were to be distributed to account holders; that until the distributions were completed Binance.US would have only a nominal and not a beneficial interest in the assets to be transferred; and that all such assets would be held in custody and in trust either for the Debtors or for account holders, as applicable. I believe those disclosures were sufficient, and as I have described the parties have agreed to additional language to try to provide further protections to customers.

The SEC has complained that the Debtors did not disclose whether there are meaningful economic benefits to the Binance.US transaction apart from the $20 million that Binance.US would pay in excess of the market valued of cryptocurrencies. I am going to overrule this objection. The Liquidation Analysis that was attached to the Disclosure Statement included projections as to what creditors' recoveries would be under the Binance.US transaction, under the alternative "toggle" proposal, and under a chapter 7 liquidation. It stated that for various reasons (which were explained in footnotes) that the Binance.US proposal would result in approximately $90 million more being available for distribution, resulting in approximately 5% greater recoveries for creditors when compared to the toggle option and about a 14% increase when compared to a possible chapter 7 liquidation. I think those calculations were sufficient to disclose what the Debtors believed as to the value of the Binance.US transaction.

During the hearing there were many questions about these calculations. The Debtors testified that their current estimates are that the Binance.US deal will produce approximately $100 million more in distributable assets than the so-called "toggle" plan would provide. I found the Debtors' explanations and testimony about these points to be reasonable and credible, and I note that no contrary evidence was presented.

The State of Texas has contended that the Disclosure Statement was insufficient because it allegedly did not make sufficient disclosures about certain features of the Binance.US "terms of use" for customers. However, I note that the Disclosure Statement contains many direct links to those terms of use, and all of the arguments about provisions that Texas thinks customers should know are taken directly from the terms of use to which customers were directed. This is not an argument about actual disclosures, and about actual information available to customers, so much as it is a contention (made in hindsight) that the Debtors should have put greater emphasis on specific provisions that Texas thinks are important, instead of just referring customers to the places where the terms could be found. I do not find this to be a proper or reasonable objection. I note that the State of Texas reviewed the Disclosure Statement before this Court's preliminary approval and filed its own objections in January (ECF No. 814), and that in its January objection Texas did not ask for any further disclosures about the Binance.US terms of use. That just supports my conclusion that this is not really a complaint that there was a failure to disclose material information, so much as it is a belated complaint by one party that the Disclosure Statement did not give as much emphasis to particular information as the complaining party would have preferred.

Texas has also complained that the Disclosure Statement allegedly did not disclose the potential effects that a preference lawsuit by Alameda could have on creditor recoveries.

However, the figures quoted in the Texas objection (as to how much recoveries would be affected) were taken from Exhibit C to the Disclosure Statement itself.  *See* Disclosure Statement (ECF No. 863) at page 198 of 420.  Texas contended, during argument at the end of the confirmation hearing, that the information was too hard to find.  However, the information was added to the Disclosure Statement after there was discussion of the point in January 2023.  At that time I approved the addition of the information at the place where it ultimately appears, and to my recollection no party complained that it should have been placed elsewhere.

Texas has also complained that the disclosures as to what creditors' recoveries would be somehow shows that the recoveries under the Plan would be less than they would be in a chapter 7 liquidation.  I do not think Texas is continuing to press this objection but for completeness I will address it.  The problem with the objection is that it was based on an  "apples to oranges" comparison.  More specifically, Texas compared (a) what the recoveries under the Binance.US deal would be if Alameda *does* have a valid and large administrative claim against the Debtors, versus (b) what the chapter 7 recoveries would be if Alameda does *not* have such a claim.  The plain truth, however, is that if Alameda has a large administrative claim it would have that same claim regardless of whether a plan is confirmed or the Debtors are liquidated in chapter 7, and the administrative claim would have the same impact on recoveries in all of the possible scenarios.  An Alameda claim therefore would not affect the Debtors' conclusion that recoveries under the proposed plan will exceed what recoveries would be in a chapter 7 liquidation.

A number of parties have also objected to the releases of creditors' claims that have been proposed in the plan.  Many of these objections seem to be based on misconceptions as to exactly how the releases work.  Just to be clear: the Debtors have proposed to release some claims that the Debtors themselves would otherwise be able to pursue, or that the estate would otherwise be

able to pursue. Some other parties (Binance.US itself, for example, and the Debtors' officers and directors) have agreed to release claims that they might own against the Debtors and a long list of other parties. In addition, creditors were given the opportunity to elect to grant releases – or in bankruptcy terms, to "opt into" releases – if they chose to do so. However, the forms that were sent to creditors made clear that nobody was obligated to opt in and that the choice was strictly voluntary. Many bankruptcy plans provide that an affirmative vote in favor of a plan is itself a consent to the grant of releases, but the plan in this case does not do so. Instead, the plan here provides that no creditor or shareholder has released any claims belonging to that person or entity unless that person has affirmatively done so by executing the "opt in" release form.

I believe that this disposes of the objection filed by the Federal Trade Commission and portions of the objections posed by the United States Trustee and by certain customers, including Mr. Newsom, Mr. Warren, Mr. Hendershott, Mr. Jones and Mr. Brucker. They objected to the approval of nonconsensual third-party releases, but there are no nonconsensual third-party releases here. There is a separate issue regarding the proposed "exculpation" provisions of the Plan and confirmation order, but I will address those provisions in a moment.

There are also challenges to some of the settlements and releases of the Debtors' own claims that are included in the Plan. The United States Trustee filed an objection stating that the "Released Party" and "Releasing Party" definitions should not include the Wind-Down Debtors. That change has been made, and my understanding is that this particular objection is moot.

The Debtors also have proposed a settlement of claims against the Debtors' CEO (Mr. Ehrlich) and former Chief Financial Officer (Mr. Psaropoulos). The Debtors offered evidence that two independent directors were in charge of a Special Committee that investigated possible claims against officers and directors; that the Special Committee hired outside counsel (the

26

Quinn Emmanuel firm) to assist in that investigation; that the Special Committee had concluded that the only claims against insiders that were worth pursuing were claims against Mr. Ehrlich and Mr. Psaropolous relating to the Three Arrows loans; that the Special Committee further concluded that those claims would be subject to various defenses and that the claims were not "slam dunks;" that the Special Committee had investigated the officers' resources and that the proposed settlements would provide for payments that represent a significant percentage of the officers' available assets; that the Debtors would release other claims against the two officers but would not actually release claims relating to the Three Arrows loans, and instead would only agree that any further recoveries on the Debtors' claims as to the Three Arrows loans would come from insurance proceeds and not from the individual assets of the settling parties. The Debtors also reserved their rights to seek to undo a transaction by which Voyager allegedly paid as much as $10 million, just before its bankruptcy filing, for an additional $10 million of director and officer liability coverage.

When considering a settlement such as this, the applicable Second Circuit authorities make clear that my role is to determine whether the Debtors' decision to settle is a reasonable one, after considering a number of factors. In this case, consistent with the applicable case law, I have considered the nature of the claims that would have been asserted; the legal defenses that could have been asserted (including the business judgment defense); the testimony about additional defenses that could have been asserted under the terms of certain exculpatory language in the Debtors' by-laws or other governing documents; the benefits of the proposed settlement; the testimony that the settlement was the result of arm's-length bargaining; the testimony about the size of the settlement payments in relation to the settling parties' resources; the fact that the settlements preserve the Debtors' rights to pursue the Three Arrows claim

27

further, though further recoveries on such claims would be limited to insurance proceeds; the competency and experience of the counsel retained by the Special Committee; and the support for the settlement by the Official Committee of Unsecured Creditors.  *See Iridium Operating LLC v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (citations omitted).  I conclude after considering the relevant factors that the settlement with Mr. Ehrlich and Mr. Psaropolous is a reasonable one and should be approved.

I understand that this settlement is disappointing to some of the *pro se* parties who have appeared, a number of whom expressed a strong resentment towards the two settling parties and who expressed a strong desire to pursue them more vigorously and to demand a higher percentage of their net worth before settling.  I sympathize with these parties' frustrations, but the only actual evidence that I have on the relevant points is the evidence submitted by the Debtors, and I conclude from that evidence that the settlement is a reasonable one.

The releases that the Debtors proposed to give as to their own claims were not limited to the releases to be granted as part of the settlement with Mr. Ehrlich and Mr. Psaropolous.  Instead, the Debtors also proposed to grant broad releases of claims that the Debtors might have against a number of other parties.  The parties who would have been the beneficiaries of such releases included the Official Committee of Unsecured Creditors and its members, a long list of "Released Professionals" (which apparently includes all of the law firms and other advisors in these cases), plus all "Released Voyager Employees."  "Released Voyager Employees" was defined as "all directors, officers, and Persons employed by each of the Debtors and their Affiliates serving in such capacity on or after the Petition Date but before the Effective Date."

The scope of the releases that the Debtors proposed to give to such persons was extremely broad.  The releases proposed to free all Released Parties from all Causes of Action,

whether known or unknown, that the Debtors could have asserted in their own right "or on behalf of the Holder of any Claim . . ." I really did not understand this latter phrase at all. If it was somehow intended to mean that a third party's own claim would be released (on a theory that the Debtors somehow could have asserted it in some kind of representative capacity) it is both too vague and excessive, and I will not approve it.

The plan also proposed to release all of the Released Parties from any claim of any kind that the Debtors might have against those Released Parties "based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), their capital structure, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtor's out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor . . . or upon any other act or omission, transaction, agreement, event, or other occurrence related to the Debtors taking place on or before the Effective Date," but with an exclusion for actual fraud, willful misconduct, or gross negligence. The evidence before me, however, did not suggest that the Debtors had done any investigation, or made any careful consideration, of all of the types of claims that would be covered by this sweeping language. Mr. Kirpalani, the counsel to the Special Committee, acknowledged that much during oral argument.

As I said during oral argument, this is not a release that is tailored to claims that have actually been reviewed and assessed by the Debtors. Instead, it is a release that is deliberately as broad and all-encompassing as possible, untethered to any actual review of many of the claims that would be subject to the release. I therefore do not believe that the evidence before me

justified and warranted the full scope of the Debtors' releases as they were proposed. The Debtors have since modified the terms of these proposed releases so that they will be limited to matters that the Special Committee actually investigated. I have approved those modified releases in the confirmation order that I have entered.

I want to pause to re-emphasize a point that came up several times during the hearing. A number of account holders and/or shareholders complained during the hearing that they felt they had been misled as to Voyager's financial condition. If a customer or shareholder believes he or she was misled by statements about Voyager's financial condition, and that he or she took actions that he or she otherwise would not have taken and suffered damages as a result, any claims based on such injuries would belong to the customers or shareholders, and not to the Debtors or the estate. The Debtors' proposed releases may release claims that the Debtors themselves were injured due to mismanagement or bad decisions by officers and employees. However, claims for injuries directly suffered by customers or shareholders (*i.e.*, injuries that are not just derivative of injuries suffered directly by the Debtors) are not affected.

The Office of the United States Trustee also objected to the scope of the exculpation provisions that the Debtors sought to include in the Plan. Broadly speaking, the proposed exculpation provision stated that certain parties would not have liability for certain transactions and actions that occurred during the courts of the bankruptcy case or that will occur in the implementation of a confirmed bankruptcy plan. It is routine that bankruptcy plans contain provisions that state that fiduciaries and other parties do not incur liabilities by having engaged in transactions that the Court has approved, or by taking actions that the Court has directed them to take.

In this case, the version of the plan that was circulated to creditors and other parties in interest in January (ECF No. 852) included a proposed exculpation provision that was fairly broad. It stated in relevant part as follows:

> Effective as of the Effective Date, to the fullest extent permissible under applicable law . . . no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission on or after the Petition Date and prior to the Effective Date based on the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Plan, the Special Committee Investigation, any Definitive Documents or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement . . . except for Causes of Action related to any act or omission that is determined by a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence . . .

It further stated:

> The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

I have previously issued a decision as to what I regard as the proper scope of an exculpation provision and some of the legal justifications for it. *See In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019). As I noted in *Aegean*, "exculpation" provisions are to some extent based on the theory that court-supervised fiduciaries are entitled to a qualified immunity for discretionary actions that they take in their official capacities. However, a proper exculpation provision is also a protection for court-supervised and court-approved transactions. As I noted there, parties should not be liable for doing things that

the Court authorizes them to do and that in many instances a court may direct them to do. *See, e.g., Airadigm Commc'ns., Inc. v. FCC (In re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of a Plan, except for willful misconduct); *In re GraniteB Broad Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require 'that any claims in connection with the bankruptcy case be raised in the case and not saved for future litigation.").

My reasoning in the *Aegean* case has been approved and adopted by other courts in other cases. *See, e.g., In re LATAM Airlines Grp. S.A.*, 2022 Bankr. LEXIS 1725, at *159 (Bankr. S.D.N.Y. June 18, 2022) ; *In re Murray Metallurgical Coal Holdings, LLC*, 623 B.R. 444, 504 (Bankr. S.D. Ohio 2021). Such provisions are proper to protect those who are authorized – in fact, directed – by the confirmation of a plan to carry out the terms of the plan. *See In re Ditech Holding Corp.*, 2021 Bankr. LEXIS 2274, at *25-26 (Bankr. S.D.N.Y. Aug 20, 2021). My conclusion that parties generally should be protected from liabilities for having done what a Court has specifically authorized (and especially for having done what a Court has directed them to do) is also consistent with a long line of authority, as discussed further below.

In this case, the Debtors and the United States Trustee apparently had discussions, and my understanding is that they had tentatively agreed that the proposed exculpation language in the Plan and confirmation order would be equivalent to what I had ordered in *Aegean* – namely, it would make clear that exculpated parties would not have liability for having done things that I had approved or for making doing what a confirmed Plan would require them to do. This became a much bigger issue, however, at the end of the first week in March, when the Debtors

filed revisions to their proposed confirmation order that included paragraphs that could have been read as barring all federal and state governmental entities and other parties from ever making any assertion of any kind that the Debtors, Binance.US or their representatives were doing anything that violated any federal or state law or regulation. It was not my attention to approve anything so broad, and I said so as soon as the issue came up during argument on March 6. As we discussed the issue during oral argument, however, the SEC, the US Trustee and the US Government circled back to the proposed exculpation provisions, and took the position that no exculpation provision could be granted at all insofar as it would relate to any federal or state statute or regulation. As somebody put it during argument, any officers or directors or entities who would implement the confirmed plan would just have to "take their chances" as to whether the Government might contend that their conduct was illegal, and as to whether the Government might seek to punish them for doing what I had authorized and directed them to do.

Frankly, I think this position by the Government is unreasonable and wrong. It is based on a serious misunderstanding of just what it means when a court confirms a plan of reorganization.

The approval of a plan of reorganization does not just give a debtor an option to proceed with what the plan provides. Instead, section 1142(a) of the Bankruptcy Code states that "the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a). Section 1142 thereby imposes an affirmative, statutory obligation on the debtors, other entities and their personnel to do what the plan contemplates. In effect, the confirmation order acts as a court order that the plan be carried out.

33

In this case, confirmation of the Plan will require the Debtors and their respective personnel and representatives (including Binance.US in its capacity as the Debtors' distribution agent) to complete the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan contemplates. Once I confirm the Plan, the relevant parties will have no choice but to do so.

All of the relevant governmental entities have been on notice of what the plan proposes. They had every opportunity to tell me if they believed that anything contemplated by the Plan would violate any applicable statute, rule or regulation. Four States have taken the position that Binance.US cannot open customer accounts in those States without additional approvals, and the Plan specifically takes account of that fact. No other regulator has contended during the confirmation hearing that there is anything illegal in what the plan contemplates. As noted above, the SEC has hinted vaguely that it thinks there "might" be issues with the Debtors' sales of VGX and/or with some unspecified aspect of Binance.US's business, but it has explicitly stopped short of contending that anything actually is illegal, and has repeatedly declined to offer evidence or to take a firm position on these points.

In short, what the Government is requesting is that I enter a confirmation order that will have the effect, under section 1142 of the Code, of compelling employees, officers, professionals and entities to do the rebalancing transactions that the Plan contemplates and to make the distributions of cryptocurrencies that the Plan requires, while in the view of the Government those same people and entities might then be liable for fines, sanctions, damages or other liabilities just for doing what my confirmation order affirmatively obligates them to do. And the Government contends that this daunting prospect of future liability should hang over the heads of the parties and their personnel even though the Government itself has had every opportunity to

34

identify any legal issues that are posed by the transactions and is not prepared to say today that there is anything wrongful about what we are currently contemplating.

I think the Government's position is absurd. I note that the Government has conceded, in the supplemental papers that it filed, that many courts have considered participants in bankruptcy proceedings to be protected by a species of qualified immunity. However, while "qualified immunity" is a similar doctrine, it is not entirely accurate as a description of the authority that I have in mind for the exculpation provision. "Qualified immunity" is a doctrine that is applied to people who have discretion to perform specific functions in quasi-official roles but without having obtained specific court approval or acting pursuant to an explicit court direction. Many of the same decisions that discuss such a "qualified" immunity, however, also make clear that there is a broader immunity for actions that are specifically approved by a court and/or that have been explicitly required to be taken by court order, particularly where government officials or other parties had the opportunity to object to the court's approval of an action and did not do so. *See, e.g., Bradford Audio Corp. v. Pious*, 392 F.2d 67, 72-73 (2d Cir. 1968) (receiver was immune from liability for having done what a court order approved and directed the receiver to do); *Dana Commercial Credit Corp. v. Center Teleproductions, Inc. (In re Center Teleproductions, Inc.),* 112 B.R. 567, 577-78 (Bankr. S.D.N.Y. 1990) (trustee granted absolute immunity from action brought by an entity with a security interest in property where trustee acted pursuant to court order); *see also Boullion v. McClanahan,* 639 F.2d 213, 214 (5th Cir. 1981) (holding that where a bankruptcy trustee sought and obtained court approval for his actions he was entitled to absolute immunity); *T& W Inv. Co. v. Kurtz*, 588 F.2d 801, 802 (10th Cir. 1978) (finding immunity appropriate when "every action by [the receiver] objected to in this suit was known to and approved by the state court judge supervising the receiver," the plaintiff

35

"had an opportunity to and did object throughout the state court proceedings" and "the receiver was in fact following the orders of the court and complying therewith**")**; *Phoenician Mediterranean Villa, LLC v. Swope (In re J&S Props., LLC)*, 545 B.R. 91, 103 (Bankr. W.D. Pa 2015) (where a bankruptcy trustee acts pursuant to an order of court, a bankruptcy trustee is generally afforded absolute immunity*); In re XRX, Inc.*, 77 B.R. 797, 798 (Bankr. D. Nev. 1987) (a trustee acting pursuant to a court order in making a disbursement is not subject to personal liability).  As the Court held in *Bradford Audio*, the persons who act under my authority and direction should not be placed in the position of being guarantors of the correctness of my decisions.  *Bradford Audio*, 392 F.2d at 73.

Exculpation for doing what a confirmation order requires is entirely proper under these authorities.  In a chapter 11 bankruptcy case, the debtors in possession have the responsibilities and duties that a trustee otherwise would have.  *See* 11 U.S.C. § 1107(a).  Under the plan in this case, the Debtors and entities to be created by the plan (the Wind-down Debtor, under direction of Plan Administrator) must complete rebalancing and make distributions.  The plan further contemplates that Binance.US will act as the "distribution agent" of the Debtors; until cryptocurrency distributions are completed, and in that capacity Binance.US will hold assets in trust for either the Debtors or customers, as applicable.  The persons and entities who will carry out specific activities that are not only approved by my confirmation order, but also are required by that Order by virtue of section 1142 of the Bankruptcy Code, are entitled to know that they will not incur liability just for doing what I have approved and required, particularly when the SEC and all other Government agencies have had a full and fair opportunity to argue to me that the proposed transactions are illegal in any way and have not made any such contentions.

36

I do agree that a modification of the original exculpation provision is appropriate, and I have approved a modified exculpation provision that provides as follows:

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third-party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any liability for damages based on the negotiation, execution and implementation of any transactions or actions approved by the Bankruptcy Court in the Chapter 11 Cases, except for Causes of Action related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; *provided* that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The Exculpated Parties have, and upon Consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes.

In addition, the Plan contemplates certain rebalancing transactions and the completion of distributions of cryptocurrencies to creditors. The Exculpated Parties shall have no liability for, and are exculpated from, any claim for fines, penalties, damages, or other liabilities based on their execution and completion of the rebalancing transactions and the distribution of cryptocurrencies to creditors in the manner provided in the Plan.

For the avoidance of doubt, the foregoing paragraph reflects the fact that Confirmation of the Plan requires the Exculpated Parties to engage in certain rebalancing transactions and distributions of cryptocurrencies and the fact that no regulatory authority has taken the position during the Combined Hearing that such conduct would violate applicable laws or regulations. Nothing in this provision shall limit in any way the powers of any Governmental Unit to contend that any rebalancing transaction should be stopped or prevented, or that any other action contemplated by the Plan should be enjoined or prevented from proceeding further. Nor does anything in this provision limit the enforcement of any future regulatory or court order that requires that such activities either cease or be modified, or limit the penalties that may be applicable if such a future regulatory or court order is issued and is violated. Similarly, nothing herein shall limit the authority of the Committee on Foreign Investment of the United States to bar any of the contemplated transactions. Nor does anything in this provision alter the terms of the Plan regarding the compliance of the Purchaser with applicable laws in the Unsupported

Jurisdictions before distributions of cryptocurrency occur in those
Unsupported Jurisdictions.

My order does not purport to limit any contention regarding things that the Debtors may
have done in the past that I did not specifically authorize or approve. It does not bar the
Government from trying to stop transactions from occurring, and does not bar any regulatory
contention in that regard. If the SEC or any other party believes tomorrow that it has grounds to
go to court to enjoin further steps in the completion of the contemplated transactions, it is
entitled to do so. I am not barring any such thing. I am simply saying that if we get six weeks
down the road and then the SEC decides to take action, the people who have spent six weeks
doing what I have ordered them to do will not be held liable on an *ex post facto* basis for having
followed my order in the interim.

Where the Government has declined to argue that the rebalancing transactions that the
plan contemplates are illegal in any way, and where the Government has declined to argue that
the distributions of cryptocurrencies to creditors that the Plan contemplates (either through
Binance.US or by Voyager if the so-called "Toggle" plan is pursued) are illegal in any way, then
the individuals and entities who will be required by my confirmation order to engage in those
activities are entitled to know that they have not been sentenced by me to incur statutory or
regulatory liabilities just for doing what I have ordered. That is consistent with ordinary practice
in bankruptcy cases, with the authorities that I have cited above, and with basic principles of
equity and estoppel. It is a fair and proper consequence of the Government's own unwillingness
or inability to challenge the legality of the contemplated transactions and of the fact that I am
entering an order that not only approves those transactions but actually requires them to be
carried out.

If the Government really wants to litigate the legality of the proposed transactions, it has been free to do so.  Similarly, if the Government truly wishes for me to make a decision today as to whether the transactions are legal, then I will do so.  Based on the evidence that has actually been offered to me, if I were to make that determination today I would have no choice but to conclude that the transactions are perfectly legal.  No contrary evidence or argument has been offered to me.  However, we have not attempted to foreclose future arguments by the Government, or the Government's assertion of changing or evolving regulatory views.  We are simply protecting those persons who in the interim will be engaging in transactions that the Government has failed to challenge and that must be carried out under the authority of this Court's order.

The Government has argued that even an exculpation provision of this kind somehow amounts to a third-party release that offends the principles set forth in Judge McMahon's decision in *In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), or that it otherwise represents an action that is beyond my jurisdiction.  I do not believe that is accurate at all.  *See Blixseth v. Credit Suisse*, 961 F.3d 1074, 1081-83 (9th Cir. 2020) (distinguishing exculpation provisions from third party releases).  I plainly have jurisdiction over the confirmation of the plan, over the actions that must be taken to confirm the plan, and therefore as to the effects that my Order may have on the liabilities of persons who will be required to do the things that the plan requires.  The arguments in the Government's papers are mostly straw men, taking issue with purported legal justifications for the exculpation provisions that are not the real justifications for those provisions, and failing to discuss any of the authorities that are actually relevant.  The Government's position that exculpation is entirely unauthorized and in excess of my authority also is belied by the Government's failure to object to similar provisions that have

routinely been included in thousands of confirmed bankruptcy plans, and the by failure of most

of the Government entities in this case (with the sole exception of the U.S. Trustee) to object to

the original exculpation provision, which I believe was broader than the one that I have

approved. Even the U.S. Trustee's objection just asked for a more tailored version of the

exculpation provision, and not the wholesale deletion that other Governmental entities belatedly

have requested.

      The Government has also suggested that I should just leave it for future courts to decide

whether or not my confirmation order has immunized any particular conduct. I do not see how

that makes any sense at all. I am the judge who has jurisdiction over the parties and who is

confirming the plan, and therefore I am the one who by doing so will require that particular

actions should be taken. If it is my Order that is to provide the source of any future immunity,

then I should be the one who specifies what it is that the confirmation order has the effect of

requiring the parties to do, so that any future court can properly assess the scope of the

exculpation that has properly been granted. Asking other courts to guess as to the scope of the

intended exculpation, or to second-guess my intentions as to whether particular actions needed to

be taken or should have been taken, would be inappropriate and would be unfair to the parties.

      Once again, I am not by any means preventing the enforcement of any law or regulation.

I am not stopping any regulatory body from stepping in and attempting to enjoin any act or

transaction on any applicable regulatory ground. I am simply saying that until such time as some

regulatory or court order says that the parties should stop what they are doing, the parties who do

what the confirmation order requires them to do should not be held liable for having done so.

      I also have an objection by the State of New York to the effect that the Plan allegedly

provides for an "unfair discrimination" in the treatment of New York customers as opposed to

customers in other states.  The State of Texas has made a similar objection.  It appears, though, that the Debtors and Binance.US have resolved a similar issue as to Vermont and possibly as to Hawaii.  In any event, the State of Hawaii has not pressed any objection before me during this hearing.

The gist of the New York objection is that customers in 48 states where Binance.US has the required licenses may receive cryptocurrency distributions relatively quickly, but that Binance.US and the Debtors cannot legally do the same thing in New York.  Accordingly, customers in New York would have to wait until such time as Binance.US may obtain the necessary approvals in New York.  Under the Plan, if such approvals are not obtained within six months, the New York customers will receive cash distributions instead of distributions that include cryptocurrencies.

Curiously, although the State of New York has filed an objection, no New York account holder filed an objection on this ground.  This perhaps raises a standing issue, but I do not believe I need to address that question, because I believe that in any event the objection does not have merit.

New York has argued that the plan unfairly discriminates between customers in New York and other states.  "Unfair discrimination," though, is not really the right way to describe the objection.  Section 1129(b) provides that a plan may be confirmed even if not all classes have voted to accept it, so long as certain conditions are met.  One of those conditions is that the plan does not "discriminate unfairly" with respect to "each class of claims or interests that is impaired under, and has not accepted, the plan . . ."  Here, the relevant class of creditors is class 3, which is made up of account holders.  That class has overwhelmingly voted to accept the plan, not to reject it.

41

I think that what the state regulators really mean to argue is that the Plan does not provide the same treatment to all members of class 3, as is required by section 1123(a)(4) of the Bankruptcy Code. I think there was a basis for this objection insofar as it related to the treatment of account holders who chose not to receive cryptocurrencies from Binance.US and who instead wished to take cash distributions. The Plan, as proposed, would have allowed most customers to receive cash once three months had passed and they had not affirmatively elected to be customers of Binance.US. Customers in the Unsupported Jurisdictions, however, would have had to wait six months while Binance.US tried to work things out with regulators – even if the relevant customers did not want to be customers of Binance.US, and even if they wanted cash. I could not understand any basis for this different treatment, and as described above Binance.US and the Debtors have agreed to changes that address this issue.

I do not otherwise believe that the objection is correct. It is quite clear that the Debtors and Binance.US would like to make "in kind" distributions to all customers in all states. It is not the terms of the plan that prevent the Debtors and Binance.US from doing so. Instead, it is the different regulatory requirements and licenses in the different states that account for any different treatment that may occur. To put it another way: the plan provides, in essence, that the Debtors will make in kind distributions to customers as soon as they become customers of Binance.US and as soon as the applicable rules and regulations in a given state permit such distributions. However, we are not free to ignore the fact that in certain states that cannot be accomplished as readily as in others. That does not mean that the plan is providing for different treatment of different customers. It just means that the plan itself does not have the power to sweep away the different regulations that apply in different states, and does not have the power to grant licenses to Voyager and/or Binance.US that they do not already have.

Every customer's initial distribution rights will be determined on the same date. The different regulatory regimes in different states may mean that some customers receive distributions on different dates or even in different forms, but the Debtors cannot do anything about that. The only solution to the problem that New York has raised would be to force everyone in the entire country to delay their distributions just because the necessary approvals are not in place to make such distributions to New York customers. That would not make any sense, and New York acknowledged during argument that it is not requesting such a result and that the Bankruptcy Code does not compel such a result.

At one point, papers submitted on behalf of one of the States in the Unsupported Jurisdictions argued that cryptocurrency prices may vary over time, so that the consideration that customers receive may have different values when it is actually received. However, that often happens under bankruptcy plans. In the American Airlines case, for example, creditors were entitled to receive stock as distributions on their allowed claims. There were many disputed claims, however, and the people who held those claims only received stock as and when their claims were allowed. In the meantime the stock price changed, sometimes very significantly. But there was no way for the debtors in that case to control for those price changes, and no practical way for them to ensure that the stock that was reserved and later distributed would have the same value on every single distribution date. The creditors received the same amounts of stock, which is all that the Bankruptcy Code requires and, as a practical matter, the only thing that the Bankruptcy Code could require when property other than cash is being distributed.

Similarly here, the Debtors cannot "solve" for the fact that cryptocurrency prices inevitably will fluctuate. The distributions that are calculated for creditors will be done on the same day and on the same basis. However, some creditors will have disputed claims and will not

43

receive distributions until disputes are resolved.  Other creditors may face delays due to

regulatory issues, or simply due to delays in the submission and processing of the paperwork

needed to open a Binance.US account.  It is inevitable that some customers will actually receive

distributions on different dates and that market values may fluctuate, but that does not amount to

an "unequal treatment" proposed by the plan.

I therefore overrule the objections as to the Plan's treatment of customers in

"Unsupported Jurisdictions."

Some owners of the VGX token have argued that they are being unfairly discriminated

against.  This is based primarily on the fact that there is no guaranty that the VGX token will

continue to be traded in a meaningful way, and therefore no assurance that the VGX token will

continue to have much, if any, value.  I note that under the terms of the Plan the amounts of the

allowed *claims* that customers have, based on their VGX holdings, will be based on the value

that VGX had on the date these cases were commenced.  To the extent that some of a customer's

distributions will be in the form of VGX, however, the values of those distributions will be based

on the updated value that VGX has on a specified date in advance of the actual distributions.

The goal is to try, if possible, to make some "in kind" distributions if they can be made, thereby

possibly reducing tax consequences, though we have no guarantee that will work.

I do not believe the Debtors are in a position to guaranty that VGX will continue to be

traded, any more than the Debtors could guaranty that any of the other coins that will be

distributed will continue to be traded.  Similarly, the Debtors can make no guarantees as to what

will happen to the future values of any of the coins.  Those are all things that will depend on

market forces.  Customers who elect to receive in-kind distributions instead of cash distributions

will receive VGX only because they previously owned VGX. I find that this does not amount to a differential treatment or an improper discrimination in violation of any Code requirements.

Some suggestion was made to the effect that the Plan distributions will treat VGX as having a certain value, whereas that value might actually be illusory. Ordinarily the market price of an asset represents the market's assessment of the potential risk and rewards. Even when a stock or other marketable asset may appear to have little future prospect it may nevertheless carry an "option" value based on the possibility that circumstances will change; that is why "out-of-the-money" warrants often have actual market value. Such values are real values in the absence of proof to the contrary, and I have no such contrary proof here. I appreciate that there is perhaps more uncertainty as to the value of VGX, but that does not mean that VGX has absolutely no actual value, or that the provisions of the plan are improper in their treatment of VGX.

There were also objections that were filed as to the identity of the proposed Plan Administrator, Mr. Paul Hage. Many of the objections suggested that the job should not go to anyone associated with the Official Committee of Unsecured Creditors or their individual members, apparently because a number of account holders are not happy with the Committee's decisions and work. Mr. Hage testified about his qualifications and answered questions about his work in the case and as to whether he has any conflicts of interest that would prevent him from serving as the Plan Administrator. He testified that he was the personal attorney to an individual who was a member of the UCC and that at the outset of the case he also gave some advice to UCC members as to how they could organize the process by which they selected a firm to act as counsel to the Committee.

A number of customers postulated that the individual whom Mr. Hage represented was a close friend of Mr. Ehrlich and that this had improperly influenced the Committee member in considering the settlement with Mr. Ehrlich that is embodied in the plan. However, Mr. Hage testified credibly that the relevant Committee member was a large customer of Voyager whose friendly relationship with Mr. Ehrlich ended when Voyager closed down its platform. He further testified that the relevant Committee member actually spoke out against the proposed settlement when it was presented for the Committee's review, and that he ultimately abstained from voting after the votes of other committee members had already made clear that the Committee approved of the settlement terms.

I do not believe that Mr. Hage's limited connections to this Committee member give rise to conflicts of interest or that in the real world they would affect his work.

Some account holders objected on the ground that Mr. Hage has never been a Plan Administrator before. However, a person who has had as much extensive experience in the bankruptcy world as Mr. Hage has had, and who has represented debtors, creditors and other parties, is well qualified to do the work that a Plan Administrator will be required to do in these cases. There were also expressions of concern by some account holders as to whether Mr. Hage would effectively and aggressively pursue claims that the estate might have, but I believe he will do so.

Some other objections have been resolved that I do not need to discuss in detail here. The amended plan has deleted a provision deeming all claims to be objected to. The amended plan has changed a provision that previously stated that that the Wind-Down Debtor "shall have the sole authority on behalf of the Debtors" to object to claims. The parties have also changed a

provision saying that late-filed claims would be deemed disallowed, and the documents now say that late claims are disallowed subject to my approval.

Alameda/FTX at one point objected to the proposed treatment of claims based on loans that Alameda made to Voyager, but that objection has not been pursued. The treatment of the Alameda loan claim also is the subject of a separate stipulation to be presented at a future date. Essentially the plan now provides that the loan claim will be treated in the manner specified in the stipulation; or, if the stipulation is not approved, it will be subordinated; or, if the stipulation is not approved and the court does not order subordination, it will be treated as a claim in the class in which it properly falls.

An Ad Hoc Group of Equity Security Holders objected to the way the Plan described the treatment of Intercompany Claims, but the parties agreed to language that has been included in the plan documents and in the Confirmation Order to address their concerns. I was under the impression that this had resolved this objection until near the end of the hearing, when counsel to the Ad Hoc Group asked that I direct that a separate Plan Administrator be appointed for the ultimate holding company of the Debtors. I will not address that point in detail because the Debtors agreed that each Debtor will have an independent director who will have the right to appear and to be heard on any issue as to which the Debtors' interests are in conflict with each other. The identities of the independent directors have been disclosed, and the Ad Hoc Group of Equity Holders has agreed that these changes resolve the objections.

The Bank of New York filed a curious objection based on property in which it has a mortgage interest. Apparently the owner of the property recently purported to transfer the property to Voyager. My impression is that this came as a surprise to everyone. In any event,

47

language has been included in the Confirmation Order that resolves the issue and that makes clear that Voyager does not have any interest in that property.

Finally, one party objected to the plan on the ground that it does not provide for a recovery for the holders of equity at the ultimate holding company level. Actually, the plan makes clear that those equity holders will be entitled to distributions if the ultimate holding company has assets once it pays its own creditors in full, though the current predictions are that there will not be any.

There were two other points in the proposed plan and in the proposed Plan Administrator Agreement that I required to be changed and that have been changed. First, the prior versions stated that the Debtors and the Plan Administrator would have no responsibility to try to locate any person for whom a check or other communication is returned as undeliverable. These provisions are often proposed, but I do not believe that I personally have ever approved them. Instead, I require that reasonable efforts be made to locate the relevant person(s) before any distribution may be treated as having been forfeited.

Second, the proposed plan stated that professionals only needed to comply with the relevant Bankruptcy Code provisions regarding their retentions, and only needed approvals of their fees, until the "Confirmation Date," even though it is anticipated that this plan may only take effect on a future "Effective Date." Section 1129(a)(4) requires, I believe, that the application of the relevant Code provisions, and the Court's authority to review the reasonableness of professionals' compensation, continue up to and including the Effective Date. That change has been made.

Some other motions were addressed during the same hearing at which we considered the confirmation of the plan. Several *pro se* parties asked the Court to appoint a trustee, to disband

48

the Official Committee of Unsecured Creditors and to remove the advisors to the Official

Committee of Unsecured Creditors. (ECF Nos. 843, 941, 1059, 1061, 1076, 1077.)  The

Bankruptcy Code provides that I may appoint a Trustee at any time before confirmation of a

plan, and it gives me considerable discretion in deciding whether "cause" exists to do so.  *See In

re Adelphia Comm'ns Corp.*, 336 B.R. 610, 656 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122

(S.D.N.Y.); 7 COLLIER ON BANKRUPTCY ¶ 1104.02[3].  Here, the motion for appointment of a

trustee was argued just prior to the confirmation of a plan.  As I noted during the hearing, there

would have been no way, even if I had felt that circumstances called for the appointment of a

trustee, that a trustee would have been in place before confirmation took effect and rendered the

whole concept moot.  I know that is frustrating for the account holders who filed the motions,

and I also note that the motions make a lot of accusations that have not really been answered by

the Debtors.  However, at this late stage in the cases, the issues that were raised did not provide

"cause" to interrupt the confirmation process and to throw everything into disarray.

Two *pro se* parties also asked that they be allowed to withdraw the assets that were listed

in their accounts, rather than receiving merely *pro rata* distributions.  (ECF Nos. 854, 947.)  I

simply cannot allow that.  If one customer were to withdraw everything that had been listed in

that customer's account, it would just mean that the next customer would get less.  The whole

point of the Bankruptcy Code is to make sure that everybody gets equal distributions.  Since

there is not enough to pay all claims in full, no customer can get a complete recovery of what

was listed in his or her account.  That is simply a basic matter of bankruptcy.

For the foregoing reasons, I will approve the Disclosure Statement and confirm the

Debtors' plan of reorganization, and the confirmation order that I have entered will reflect those

rulings.  I will also issue separate orders denying the motions seeking appointment of a trustee

and the other motions discussed above.

Dated:  New York, New York
        March 11, 2023


                                    /s/ **Michael E. Wiles**
                                    Honorable Michael E. Wiles
                                    United States Bankruptcy Judge