# Exhibit 6

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4  SECURITIES AND EXCHANGE        )
   COMMISSION,                    )
5                                 )
                   Plaintiff,     )
6                                 ) Case No.:
           v.                     ) 20-Civ-10832(AT)(SN)
7                                 )
   RIPPLE LABS, INC., BRADLEY     )
8  GARLINGHOUSE, and CHRISTIAN    )
   LARSEN,                        )
9                                 )
                   Defendants.    )
10 _____  )

11

12

13    **HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

14

15              VIDEOTAPED DEPOSITION OF

16                 PHILLIP RAPOPORT

17              Thursday, July 22, 2021

18

19

20

21

22

23

   Reported by:
24 BRIDGET LOMBARDOZZI,
   CSR, RMR, CRR, CLR
25 Job No. 210722BLO

                                                    1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                        Plaintiff,    )
6                                     ) Case No.:
                v.                    ) 20-Civ-10832(AT)(SN)
7                                     )
     RIPPLE LABS, INC., BRADLEY       )
8    GARLINGHOUSE, and CHRISTIAN      )
     LARSEN,                          )
9                                     )
                        Defendants.   )
10   _____ )

11

12

13

14

15            Videotaped deposition of PHILLIP RAPOPORT taken

16   on behalf of Plaintiff, held at the offices of Debevoise

17   & Plimpton, 919 Third Avenue, New York, New York,

18   commencing at 9:03 a.m. and ending at 5:47 p.m., on

19   Thursday, July 22, 2021, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States of

21   New York and New Jersey, pursuant to notice.

22

23

24

25

                                                              2

```
 1   A P P E A R A N C E S (Via Remote where indicated):

 2

 3

 4   For the Plaintiff:

 5

 6

 7          UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 8          NEW YORK REGIONAL OFFICE

 9          BY:  LADAN STEWART, ESQUIRE

10               JORGE G. TENREIRO, ESQUIRE

11               JON DANIELS, ESQUIRE (Remote)

12          200 Vesey Street

13          Suite 400

14          New York, New York  10281-1022

15          Telephone:  212.336.1060

16          Email:   stewartl@sec.gov

17                   tenreiroj@sec.gov

18                   jdaniels@sec.gov

19

20

21

22

23

24

25
```

                                                                3

```
 1   A P P E A R A N C E S  (Continued):

 2

 3   For Defendant Ripple Labs Inc.:

 4

 5           DEBEVOISE & PLIMPTON LLP

 6           BY:  EROL GULAY, ESQUIRE

 7                LISA ZORNBERG, ESQUIRE

 8                LEYLA SALMAN, ESQUIRE (Remote)

 9           919 Third Avenue

10           New York, New York  10022

11           Telephone:  212.909.6000

12           E-Mail:  egulay@debevoise.com

13                    lzornberg@debevoise.com

14                    lsalman@debevoise.com

15

16                    -and-

17

18           KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19           BY:  BETHAN JONES, ESQUIRE (Remote)

20           Sumner Square

21           1615 M Street, N.W.

22           Suite 400

23           Washington, D.C.  20036

24           Telephone:  202.326.7999

25           E-mail:  bjones@kellogghansen.com
```

                                                            4

```
 1  A P P E A R A N C E S (Continued):

 2

 3  For Defendant Bradley Garlinghouse:

 4

 5          CLEARY GOTTLIEB STEEN & HAMILTON

 6          BY:  TAYLOR BATES, ESQUIRE (Remote)

 7                MICHAEL SCHULMAN, ESQUIRE (Remote)

 8                ANNE BAKER, ESQUIRE  (Remote)

 9          2112 Pennsylvania Avenue, NW

10          Washington, D.C.  20037

11          Telephone:  202.974.1500

12          E-mail:  Tbates@cgsh.com
                     mschulman@cgsh.com
13                   abaker@cgsh.com

14

15  For Defendant Christian A. Larsen:

16

17          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18          By:  KRISTINA A. BUNTING, ESQUIRE

19                MICHAEL GERTZMAN, ESQUIRE (Remote)

20                EMILY GLAVIN, ESQUIRE (Remote)

21          1285 Avenue of the Americas

22          New York, New York  10019-6064

23          Telephone:  212.373.2491

24          E-mail:  kbunting@paulweiss.com
                     mgertzman@paulweiss.com
25                   eglavin@paulweiss.com
```

5

```
 1   A P P E A R A N C E S (Continued):

 2

 3   For the Witness:

 4

 5          KAPLAN HECKER & FINK LLP

 6          BY:  JUSTIN R. HORTON, ESQUIRE

 7               SEAN HECKER, ESQUIRE

 8          350 Fifth Avenue

 9          Suite 7110

10          New York, New York  10018

11          Telephone:  646.889.3906

12          E:mail:  shecker@kaplanhecker.com

13                   jhorton@kaplanhecker.com

14

15   ALSO PRESENT:

16

17          ███████████████, Ripple

18          LYRIC GUPTA, Cleary Gottlieb

19          NICOLE FORBES

20          DAVID SHERECK, Videographer
            Shereck Video Service
21

22

23

24

25
                                                            6
```

```
1                          INDEX

2   WITNESS                              EXAMINATION

3   PHILLIP RAPOPORT

4       BY MS. STEWART                        17

5

6

7

8

9

10

11                        EXHIBITS

12  SEC
    NUMBER                 DESCRIPTION         PAGE
13

14  Exhibit PR-2 10/9/13 E-mail from Rapoport      61

15               to Griffin with attachment

16               RPLI_SEC 0320652-63

17

18  Exhibit PR-4 String of e-mails dated          123

19               October 2013

20               RPLI_SEC 0012819-21

21

22  Exhibit PR-5 10/1713 E-mail from Rapoport       63

23               to Larsen with attachment

24               RPLI_SEC 0328413-32

25
```

7

```
 1                              EXHIBITS
 2   SEC
     NUMBER              DESCRIPTION            PAGE
 3
 4   Exhibit PR-6  String of e-mails dated        65
 5                 October 2013 with attachment
 6                 RPLI_SEC 0337822-42
 7
 8   Exhibit PR-8  String of e-mails dated        136
 9                 October 24, 2013
10                 RPLI_SEC 0038399-400
11
12   Exhibit PR-10 String of e-mails dated        82
13                 11/5/13 with attachment
14                 RPLI_SEC 0843205-13
15
16   Exhibit PR-12 String of e-mails dated        147
17                 November 2013 with attachment
18                 RPLI_SEC 0461857-66
19
20   Exhibit PR-15 String of e-mails dated        208
21                 November 2013
22                 RPLI_SEC 0842922-26
23
24
25
```

8

```
 1                          EXHIBITS
 2   SEC
     NUMBER                  DESCRIPTION              PAGE
 3
 4   Exhibit PR-16 String of e-mails dated          102
 5                 November 2013
 6                 RPLI_SEC 0012356
 7
 8   Exhibit PR-19 String of e-mails dated          214
 9                 January 4, 2014
10                 RPLI_SEC 0088057-58
11
12   Exhibit PR-20 String of e-mails dated          230
13                 January 2014
14                 RPLI_SEC 0088034-35
15
16   Exhibit PR-21 1/16/14 E-mail from Rapoport     234
17                 to ██████, et al
18                 SEC-███████-E-0072551
19
20   Exhibit PR-22 String of e-mails dated          238
21                 February 5, 2021
22                 RPLI_SEC 0012150-51
23
24
25
```

9

```
 1                        EXHIBITS

 2  SEC
    NUMBER                DESCRIPTION              PAGE
 3

 4  Exhibit PR-26 String of e-mails dated          278

 5                May 2014

 6                RPLI_SEC 0842618-20

 7

 8  Exhibit PR-27 String of e-mails dated          156

 9                June 2014

10                RPLI_SEC 0425895-900

11

12  Exhibit PR-32 7/22/21 E-mail from Rapoport     173

13                with attachments

14                ████████Ripple_0002422-28

15

16  Exhibit PR-34 String of e-mails dated          282

17                July 2014

18                RPLI_SEC 0882487-89

19

20  Exhibit PR-35 String of e-mails dated          166

21                July/August 2014

22                RPLI_SEC 0842611-14

23

24

25

                                                    10
```

```
 1                          EXHIBITS
 2  SEC
    NUMBER                DESCRIPTION              PAGE
 3
 4  Exhibit PR-36 8/21/14 E-mail from Rapoport      182
 5                to  █████, et al
 6                RPLI_SEC 0842466-67
 7
 8  Exhibit PR-37 The Ripple Protocol:  A Deep      182
 9                Dive for Finance Professionals
10                RPLI_SEC 0539465-511
11
12  Exhibit PR-39 String of e-mails dated          242
13                September 10, 2014
14                ████_0002320
15
16  Exhibit PR-40 String of e-mails dated          245
17                September 11, 2014
18                ████_0002297
19
20  Exhibit PR-41 String of e-mails dated          248
21                September 2014
22                ████_0001489-90
23
24
25
                                                     11
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
 1                          EXHIBITS

 2  SEC
    NUMBER                  DESCRIPTION              PAGE
 3

 4  Exhibit PR-44 String of e-mails dated          252

 5                September 25, 2014

 6                RPLI_SEC 0199575-76

 7

 8  Exhibit PR-45 String of e-mails dated          272

 9                October 2014

10                GSR00000208-09

11

12  Exhibit PR-51 String of e-mails dated          258

13                October 30, 2014

14                ████_0001955

15

16  Exhibit PR-52 String of e-mails dated          254

17                October 2014

18                RPLI_SEC 0199556-61

19

20  Exhibit PR-57 String of e-mails dated          297

21                November 2014

22                RPLI_SEC 0054769-71

23

24

25

                                                    12
```

```
 1                          EXHIBITS

 2    SEC
      NUMBER              DESCRIPTION                  PAGE

 3

 4    Exhibit PR-65 12/21/14 E-mail from ████        261

 5                  to Rapoport

 6                  ████ 0001848

 7

 8    Exhibit PR-66 String of e-mails dated          269

 9                  January 2015

10                  RPLI_SEC 0096888-89

11

12    Exhibit PR-68 String of e-mails dated          265

13                  January 2015

14                  ████ 0001803-05

15

16    Exhibit PR-74 String of e-mails dated          294

17                  January 2015 with attachment

18                  RPLI_SEC 0481363-75

19

20    Exhibit PR-78 10/23/18 E-mail from Rapoport    292

21                  to Larsen with attachment

22                  RPLI_SEC 0235399-407

23

24

25

                                                      13
```

1  PREVIOUSLY MARKED EXHIBITS

2

3  Exhibit PG-5 description                              107

4  Exhibit PG-6 description                               99

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

14

1                   DEPOSITION SUPPORT INDEX

2

3      DIRECTION TO WITNESS NOT TO ANSWER

4         Page    Line

5          91      13

6         296      19

7

8

9

10     STIPULATIONS

11        Page    Line

12         17      15

13

14

15     PORTION MARKED HIGHLY CONFIDENTIAL

16        Page    Line

17        287       1

18

19

20     REQUEST FOR DOCUMENTS

21        Page    Line

22         - -none- -

23

24

25

                                                    15

```
 1                    -   -   -

 2               9:03 a.m.

 3            July 22, 2021

 4                    -   -   -

 5               THE VIDEOGRAPHER:  Okay.  We're

 6       on the record.  The time is approximately

 7       9:03 a.m.  Today's date is Thursday, July

 8       22nd, 2021.  This is the video deposition

 9       of Phillip Rapoport in the matter of the

09:03:56 10   SEC versus Ripple Labs, et al.  Index No.

11       is 20-civ-10832 in the United States

12       District -- District Court in the Southern

13       District of New York.

14               My name is David Shereck,

09:04:16 15   certified legal videographer with Shereck

16       Video, in association with Gradillas

17       Court Reporting of Glendale, California.

18       We're located today at the offices of

19       Debevoise & Plimpton, located at 919

09:04:28 20   Third Avenue, New York, New York.

21               All counsel that are present

22       will be noted on the stenographic record.

23               The court reporter today is

24       Bridget Lombardozzi, also with Gradillas,

09:04:37 25   and will you please swear in the witness?
```

16

```
09:04:42   1                 P H I L L I P   R A P O P O R T,
           2          having been duly sworn, was examined and
           3          testified as follows:
           4                    THE REPORTER:  Thank you.
09:04:54   5                    You may proceed.
           6                    DIRECT-EXAMINATION
           7    BY MS. STEWART:
           8          Q.   Good morning, Mr. Rapoport.
           9          A.   Good morning.
09:04:59  10          Q.   Can you please state and spell your name
          11    for the record?
          12          A.   Phillip Rapoport.  P-H-I-L-L-I-P
          13    R-A-P-O-P-O-R-T.
          14          Q.   Thank you.
09:05:08  15                    MR. GULAY:  Just before we begin,
          16          just to note two things.  One, an
          17          objection by one counsel is an objection
          18          for all counsel.  And, then, two, we are
          19          designating the transcript and videotape
09:05:18  20          of this deposition as confidential under
          21          the protective order.
          22                    MS. STEWART:  Okay.  Thank you.
          23    BY MS. STEWART:
          24          Q.   Mr. Rapoport, are you represented by
09:05:25  25    counsel today?
```

17

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
09:05:26   1          A.    Yes.
           2                      MR. GERTZMAN:  I apologize, all,
           3             for interrupting from the Zoom audience
           4             here, but is it possible to have the Zoom
09:05:32   5             camera positioned so that we can see the
           6             witness?
           7                      MR. TENREIRO:  Yeah.  Good point.
           8             Can you see him?
           9                      MR. GERTZMAN:  Yes.  Thank you.
09:05:44  10                      MR. TENREIRO:  Okay.
          11     BY MS. STEWART:
          12          Q.    Okay.  I'll try this again.
          13                Are you represented by counsel today?
          14          A.    Yes.
09:05:51  15          Q.    Okay.  Who is your counsel?
          16          A.    Kaplan Hecker.
          17          Q.    Okay.  I'm Ladan Stewart.  I'll be
          18     asking questions here on behalf of the SEC.  With
          19     me is my colleague Jorge Tenreiro.  Some of my
09:06:02  20     other colleagues are participating via Zoom.
          21                Mr. Rapoport, have you ever testified
          22     before?
          23          A.    No.
          24          Q.    Okay.  So let's run through some sort of
09:06:10  25     rules of the road just to make sure that we get a
```

18

09:06:13  1   clean record today.

2            So the first is that we have a court

3   reporter here who's transcribing everything that

4   we say to each other.  And to try to make her life

09:06:21  5   easier, please try not to speak over me and I'll

6   try not to speak over you.  So if you can wait for

7   me to finish my question before you answer, and

8   I'll do my best to, you know, let you finish your

9   answer before I ask my next question.  It's kind

09:06:32 10   of hard to do, but it helps to get us a clean

11   record.

12            Okay?

13      A.   Yes.

14      Q.   And in the same vein, it's important

09:06:39 15   that you give audible verbal answers to my

16   questions.  So shakes of the head or nods of the

17   head, that's not easy to transcribe into the

18   record.  So if you could answer yes or no and

19   things like that.  Okay?

09:06:52 20      A.   Understood.

21      Q.   If I ask you a question that you don't

22   understand, just let me know and I'll try to

23   rephrase it.

24            Any time you want a break, just ask me

09:07:00 25   and I'm happy to accommodate you.  I would only

19

```
09:07:03   1    ask that if there's a question pending, you answer

           2    that question before we -- we break.  Okay?

           3         A.   Yes.

           4         Q.   Okay.  Any -- any questions before we

09:07:13   5    start?

           6         A.   No.

           7         Q.   Okay.  Great.

           8              Is there any reason that you can't

           9    testify truthfully or accurately today?

09:07:18  10         A.   No.

          11         Q.   Okay.  Did you take any steps to prepare

          12    for today's deposition?

          13         A.   Yes.

          14         Q.   What did you do?

09:07:25  15         A.   I spent approximately a half day in --

          16    in this office with ███████ and -- and a couple

          17    hours on the phone.

          18              THE REPORTER:  And?  I can't

          19      hear you, sir.

09:07:33  20              THE WITNESS:  I'm sorry.

          21         A.   I spent a couple -- a couple hours on

          22    the phone and approximately a half day in this

          23    office preparing.

          24         Q.   And who was present during your

09:07:41  25    preparation session?
```

                                                                20

09:07:43  1         A.    Kaplan Hecker and Debevoise's

          2    representatives.

          3         Q.    Okay.  And were there people in this

          4    room or other people?

09:07:50  5         A.    Yes.  Mainly the people in this room

          6    were present.

          7         Q.    Okay.  Was anybody on the phone?

          8         A.    Yes, a number of participants were on

          9    the phone.

09:08:03 10         Q.    Okay.  And you said you had a -- a half

         11    day session and then a separate phone call?

         12         A.    That's correct.

         13         Q.    Okay.  Did you review any documents

         14    during either of those sessions?

09:08:08 15         A.    Yes, we reviewed some documents.

         16         Q.    Did any of the documents refresh your

         17    recollection about any of the events?

         18         A.    To some extent, yes.

         19         Q.    And what were the documents that

09:08:16 20    refreshed your recollection?

         21               MR. GULAY:  Objection.  I just

         22            want to pause to instruct Mr. Rapoport to

         23            answer without disclosing the substance of

         24            any privileged communications with

09:08:27 25            counsel.

                                                              21

09:08:29  1      Q.   Go ahead.

       2      A.   Rereading e-mails, my own e-mails, you

       3  know, refreshed my memory on certain things; but,

       4  you know, generally speaking, it was a number of

09:08:40  5  years ago and -- and it's difficult to remember,

       6  you know, seven -- or eight to -- six -- six to

       7  eight years ago.

       8      Q.   I understand.

       9           Do you recall any of the e-mails that

09:08:51 10  refreshed your recollection?

      11      A.   Some I recall clearly and some I have no

      12  recollection of.

      13      Q.   Okay.  So which e-mails do you recall

      14  clearly?

09:09:00 15           MR. HORTON:  Objection.

      16      A.   I generally --

      17           MR. GULAY:  You can answer.

      18      Q.   Okay.  You can answer.

      19      A.   That's a general comment.  Even from

09:09:09 20  yesterday, it's hard to think about specific

      21  e-mails.

      22      Q.   Okay.  Do you currently reside in the

      23  United States?

      24      A.   I do.

09:09:22 25      Q.   Where do you reside?

                                                           22



```
09:09:23  1        A.    I live in ███████.
          2        Q.    Did you graduate from college?
          3        A.    I did not.
          4        Q.    Okay.  Did you attend college?
09:09:31  5        A.    I did.
          6        Q.    And where did you go?
          7        A.    I went to █████████████.
          8        Q.    Okay.  But -- but you -- you didn't
          9  officially graduate?
09:09:37 10        A.    No.
         11        Q.    Okay.  When did you attend Columbia?
         12        A.    2001 to 2005.
         13        Q.    I take it you don't have any
         14  postgraduate degrees?
09:09:48 15        A.    No.
         16        Q.    Can you take me through your employment
         17  post your time at ████████?
         18        A.    Sure.  I spent approximately two years
         19  at ██████████, approximately two years at
09:10:00 20  ██████████, approximately four years at ██████████
         21  ██████████, which is a broker-dealer, at which
         22  point I went to Ripple in 2013 for approximately
         23  two years.  Then I spent four years, four and a
         24  half years or so, at a firm called ██████████████
09:10:15 25  ██████████ firm, and since then I've been
```

23

```
09:10:19   1    self-employed working on a real estate project.
           2         Q.   Okay.  And what did you do at █████████
           3    ████████?
           4         A.   I was an institutional salesperson in
09:10:34   5    equity derivatives, trading desk.
           6         Q.   So you were a trader?
           7         A.   I was a sales trader.
           8         Q.   And what was your role at ████████?
           9         A.   I was an institutional salesperson on
09:10:51  10    the cross asset sales desk.
          11         Q.   And why did you leave ███████████████
          12    for ████████?
          13         A.   I perceived it to be a stronger firm
          14    with better opportunity.
09:11:10  15         Q.   Okay.  And why did you leave ████████ for
          16    ████████████?
          17         A.   I wanted a more entrepreneurial business
          18    environment in short.
          19         Q.   Okay.  And what was your position at
09:11:24  20    ████████████?
          21         A.   I was a principal and part of the
          22    founding team of a small firm.
          23         Q.   And what is ████████████?
          24         A.   We were a broker-dealer that published
09:11:38  25    market strategy reports and executed trades on
```

24

```
09:11:40  1    behalf of institutional investors like hedge
          2    funds.
          3         Q.   And during your time at ███████████,
          4    █████, or ██████████████ did you have any
09:11:55  5    involvement with digital assets?
          6              MR. GULAY:  Objection to form.
          7         A.   None of those firms at the time formally
          8    did anything with digital assets.  I did write --
          9    publish some of my own commentary while at ██████
09:12:10 10    ████████████ about digital assets.
         11         Q.   Okay.  And what kind of commentary did
         12    you publish?
         13         A.   Very introductory primers to familiarize
         14    institutional investors with what was then a
09:12:24 15    nascent space.
         16         Q.   Okay.  Can you give me any more
         17    information about what was included in your
         18    commentary?
         19         A.   The time period was pre-2013, so it was
09:12:39 20    an explanation of how bitcoin worked, what the
         21    market dynamics were, and, you know, some guesses
         22    about what the future may hold for bitcoin
         23    specifically.
         24         Q.   Okay.  I want to come back to your time
09:12:56 25    at Ripple, but -- but moving forward a little bit,
```

                                                                    25

| | | |
|---|---|---|
| 09:13:00 | 1 | after Ripple, you said you went to ███████, is |
| | 2 | that right? |
| | 3 |     A.   That's correct. |
| | 4 |     Q.   And you were there for four and a half |
| 09:13:04 | 5 | years? |
| | 6 |     A.   Approximately, yes. |
| | 7 |     Q.   Okay.  And then you said that -- that |
| | 8 | after ██████████████, you became |
| | 9 | self-employed? |
| 09:13:11 | 10 |     A.   That's correct. |
| | 11 |     Q.   Okay.  And so what is it that -- that |
| | 12 | you do now as part of your self-employment? |
| | 13 |     A.   I pursued the entitlement and -- and |
| | 14 | pursuing the construction of a real estate |
| 09:13:23 | 15 | project. |
| | 16 |     Q.   What is ██████? |
| | 17 |     A.   ██████ is the -- is -- is the d/b/a |
| | 18 | name for the company that is -- they're doing |
| | 19 | construction on a -- on our real estate project. |
| 09:13:46 | 20 |     Q.   And what kind of real estate is it? |
| | 21 |     A.   It's a hotel project. |
| | 22 |     Q.   Okay.  When did you start work at |
| | 23 | Ripple? |
| | 24 |     A.   In 2013. |
| 09:14:03 | 25 |     Q.   Do you remember what month? |

26

```
09:14:07   1        A.   I was initially a consultant in

           2   approximately the summer of 2013 and I believe my

           3   full-time employment began around fall of 2013

           4   after several months of being a consultant.

09:14:21   5        Q.   How did you come to be a consultant for

           6   Ripple?

           7        A.   I was interested in working in the

           8   digital asset space broadly and a friend

           9   introduced me to Patrick Griffin and we discussed

09:14:34  10   ways that I might be helpful to the company.

          11        Q.   Okay.  Did you know Patrick Griffin

          12   before you were introduced to him?

          13        A.   No.

          14        Q.   And you said you were interested in the

09:14:44  15   digital asset space?

          16        A.   Correct.

          17        Q.   Why were you interested in the digital

          18   asset -- asset space?

          19        A.   I believed the technology was very

09:14:53  20   interesting and I thought that there was a

          21   potential future where the market grew in size and

          22   relevance.

          23        Q.   Okay.  And who was the friend who

          24   introduced you to Mr. Griffin?

09:15:06  25        A.   A person named ███████.
```

                                                                    27

09:15:08   1          Q.   And who is he?

           2          A.   He's a mutual friend.

           3          Q.   Does he have a connection with Ripple?

           4          A.   No.

09:15:19   5          Q.   So you said that -- that you met with

           6     Mr. Griffin sometime in the summer of 2013?

           7          A.   I don't recall exactly when we met, but

           8     it was sometime around then, yes.

           9          Q.   Okay.  And before you started to work as

09:15:32  10     a consultant for Ripple in the summer of 2013, did

          11     you meet with anyone else other than Mr. Griffin

          12     from Ripple?

          13          A.   I don't recall.

          14          Q.   Okay.  And what do you recall about your

09:15:45  15     initial conversation or conversations with

          16     Mr. Griffin before you became a consultant?

          17          A.   They were focused on explanations of how

          18     the technology worked, broadly how the Ripple

          19     technology worked.

09:15:58  20          Q.   Okay.  And what did Mr. Griffin tell

          21     you?

          22          A.   I'm sorry, by "Ripple technology," I

          23     mean the -- the Ripple Ledger.

          24          Q.   Okay.

09:16:06  25          A.   He explained the consensus mechanism

                                                                  28

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:16:10  1  that the Ripple Ledger uses, the decentralized

2  exchange and other -- other aspects, which at the

3  time were -- were not really recorded clearly for

4  a nontechnical person to read.

09:16:21  5       Q.   Okay.  And then at some point you agreed

6  to work as a consultant for Ripple?

7       A.   That's correct.

8       Q.   And what were you doing in your role as

9  a consultant for Ripple?

09:16:36  10      A.   Generally speaking, making introductions

11  to many of the hedge funds with whom I had

12  existing relationships to act as a general

13  evangelist for the Ripple Ledger technology.

14      Q.   And when you say "general evangelist,"

09:16:57  15  what do you mean?

16      A.   At the time there was a budding interest

17  in digital assets broadly, but there wasn't much

18  understanding and there wasn't much awareness of

19  anything beyond bitcoin as a digital asset.  And

09:17:12  20  so there was, I think, value in having feedback

21  and awareness of the fact that the Ripple

22  technology -- Ripple Consensus Ledger technology

23  existed and hearing feedback from experienced

24  people in the financial market.

09:17:29  25      Q.   Okay.  And is this something that you

29

```
09:17:31   1    proposed to Mr. Griffin or that Mr. Griff --
           2    Griffin proposed to you?
           3                    MR. GULAY:  Objection.
           4         A.   I don't remember the genesis of it.
09:17:41   5         Q.   Was it an idea that you had before you
           6    went to meet with Mr. Griffin, that it would be
           7    good to introduce the technology to -- to hedge
           8    funds?
           9                    MR. GULAY:  Objection.
09:17:48  10                    MR. HORTON:  Objection to form.
          11         A.   It would likely have been my idea
          12    because I was actively seeking a -- a job and
          13    try -- in the digital asset space and trying to
          14    find where my skills would be most useful and
09:18:00  15    where I could, you know, find a job that I was
          16    excited about.
          17         Q.   Okay.  And at the time that you were
          18    acting as a consultant for Ripple, were you still
          19    employed by ██████████████████?
09:18:15  20         A.   I beli -- there may have been some
          21    dovetailing, but generally speaking, it was after
          22    I left ██████████████████, when I was on a
          23    noncompete with ████████████████.
          24         Q.   Got it.  Okay.
09:18:29  25                    And so during that summer in 2013 when
```

                                                                    30

09:18:31  1    you were still in your consultant role, what is it

2    that you did on behalf of Ripple?

3         A.   That was a long time ago, so I don't

4    remember everything that I may have done, but

09:18:44  5    generally speaking, I was arranging meetings

6    and -- and bringing Patrick to meetings and the

7    two -- either he or the two of us were explaining

8    the Ripple Ledger technology to people in the

9    market.

09:18:57 10         Q.   And are these hedge funds that you're

11    meeting with or other types of institutions as

12    well?

13         A.   It's --

14              MS. BUNTING:  Objection.

09:19:07 15              MR. GULAY:  Objection.

16         A.   It's difficult to remember exactly who

17    we met with, but certainly there were hedge funds

18    amongst the group.

19         Q.   Okay.  And in those meetings, did the --

09:19:17 20    the institutions that you were meeting with

21    express interest?

22              MR. HECKER:  Objection to form.

23              MS. BUNTING:  Objection.

24         A.   Yes.

09:19:28 25         Q.   Okay.  What did they express interest

31

09:19:30   1    in?

2        A.   There was a broad but nascent interest

3    in digital assets broadly and this was an

4    innovative iteration of that and arguably the

09:19:43   5    first kind of major iteration beyond bitcoin and I

6    think people found that interesting.

7        Q.   So were -- were people expressing

8    interest to you in the digital asset itself or in

9    the technology or both?

09:19:54  10                 MR. HORTON:  Objection.

11                 MS. BUNTING:  Objection.

12                 MR. GULAY:  Objection.

13        A.   We generally were explaining the

14    technology broadly and explicitly not focusing on

09:20:05  15    the digital asset itself, which is ancillary to

16    technology.

17        Q.   Other than the meetings that you just

18    described, do you remember anything else about

19    your work as a consultant in the summer of 2013

09:20:25  20    for Ripple?

21        A.   It's difficult to remember other

22    specifics given how long ago it was.

23        Q.   Okay.  How many meetings did you have in

24    that time, in the summer of 2013?

09:20:39  25                 MR. GULAY:  Objection.

32

09:20:39   1          A.    It's difficult to say for certain.

2          Q.    Can you ballpark it at all?

3          A.    I would be guessing, I think.

4          Q.    Would you say more than a dozen?

09:20:51   5                MR. GULAY:  Objection.

6          A.    Somewhere between 10 and 30 if I had to

7     guess.

8          Q.    Okay.  And then at some point you became

9     a full-time employee of Ripple?

09:21:03  10          A.    That's correct.

11          Q.    And when did that happen?

12          A.    It was around the fall of 2013.

13          Q.    And how -- how did that come to be, that

14     you went from a consultant to a full-time

09:21:11  15     employee?

16          A.    I was fascinated by the technology and

17     found it to be incredibly innovative and decided

18     that I wanted to pursue this as my full-time use

19     of my time.

09:21:26  20          Q.    Before you became a full-time employee,

21     did you meet with others at Ripple to discuss your

22     employment?

23          A.    I believe just Chris Larsen.

24          Q.    And did you have a meeting with

09:21:37  25     Mr. Larsen?

                                                              33

09:21:38  1         A.   I believe we met in person as well as
        2  had phone conversations.
        3         Q.   Okay.  And what was the nature of those
        4  conversations?
09:21:46  5                   MS. BUNTING:  Objection.
        6         A.   It's difficult to remember what was
        7  discussed beyond the fact that they were
        8  introductory, getting-to-know-you conversations
        9  typical of, you know, an interview and new
09:21:58 10  employment.
       11         Q.   Were you expressing to Mr. Larsen your
       12  ideas for how you could contribute to Ripple doing
       13  business?
       14                   MR. HORTON:  Objection to form.
09:22:06 15                   MS. BUNTING:  Objection.
       16         A.   It's difficult to remember.
       17         Q.   What did Mr. Larsen tell you, if
       18  anything, about Ripple?
       19                   MR. GULAY:  Objection.
09:22:18 20         A.   Again, it's very difficult to remember
       21  the specifics of a conversation from 2013 at this
       22  point.
       23         Q.   I understand that.  And I'm not
       24  necessarily looking for specifics, but do you have
09:22:26 25  a general memory of what it is that you and he

                                                                34

09:22:29  1  discussed?

         2              MS. BUNTING:  Objection.

         3              MR. HORTON:  Objection.  Asked

         4    and answered.

09:22:35  5     A.   I think I was selling him on my

         6  abilities and he was selling me on the prospects

         7  of the company as is typical of -- you know, in an

         8  interview situation.

         9     Q.   Okay.  And when you say your

09:22:43 10  "abilities," your abilities to do what?

      11     A.   At the time I felt that I would be the

      12  most -- the person with the most markets

      13  experience to join the company, which was

      14  primarily developers and -- and other start-up

09:23:01 15  entrepreneurs that didn't come from specifically a

      16  trading background and so I thought that would be

      17  valuable to the company.

      18     Q.   Okay.  Why would markets -- markets

      19  experience be valuable to the company?

09:23:15 20     A.   A major component of the Ripple Ledger

      21  technology is a decentralized exchange and

      22  understanding market conventions is valuable in

      23  creating a software that will adhere to those

      24  conventions for the -- for the financial world and

09:23:35 25  not reinvent the wheel in a bizarre way that --

                                                35

09:23:39  1   that is nonstandard for -- for financial

2   professionals.

3        Q.   Okay.  What was your title when you

4   started at Ripple?

09:23:49  5        A.   Director of markets and trading.

6        Q.   And did that title change at any point

7   during your employment with Ripple?

8        A.   At some point I became the head of

9   markets and trading.

09:23:58 10        Q.   Did your responsibilities change along

11   with the title change?

12        A.   My responsibilities were largely the

13   same throughout, though when I received the head

14   of markets and trading title, I also joined the

09:24:17 15   management committee of the firm.

16        Q.   And when was that?

17        A.   I don't recall without researching it.

18        Q.   Do you recall if it was near the

19   beginning or near the end of your tenure?

09:24:27 20        A.   It wasn't near the beginning so it was

21   near the middle or the end, but the specific date

22   I don't recall.

23        Q.   Okay.  When you first started as

24   director of markets and tradings, who did you --

09:24:39 25   trading, who did you report to?

36

```
09:24:41   1        A.   I reported to Patrick Griffin throughout
           2   my tenure at the firm.
           3        Q.   So even when you were the head of
           4   markets and trading, you continued to report to
09:24:52   5   Mr. Griffin?
           6        A.   That's correct.
           7        Q.   Okay.  Did anyone report to you during
           8   your time at Ripple?
           9        A.   I had one report towards the latter half
09:24:58  10   of my time there.
          11        Q.   And who was that?
          12        A.   ███████████.
          13        Q.   And is that when you were head of
          14   market -- markets and trading or it was -- it
09:25:08  15   started before that?
          16             MR. GULAY:  Objection.
          17        A.   I'm not sure exactly how those two dates
          18   relate to one another.
          19        Q.   Okay.  How many people were at Ripple
09:25:23  20   when you started in -- when you started as a
          21   consultant in the summer of 2013?
          22        A.   Less than 20, I believe.  Maybe 15.
          23        Q.   And when you started as the director of
          24   markets and trading, what did you understand that
09:25:42  25   your responsibilities would be in that role?
```

37

09:25:45 1      A.   My primary responsibility was to recruit

2   and onboard market-making firms, which is a type

3   of trading firm, to participate in -- on the

4   Ripple Ledger as market makers.  My secondary

09:26:06 5   responsibility was educational in nature.

6   Generally providing explanations and general

7   evangelism of the technology within the -- the

8   financial market world.

9      Q.   And both of these -- these primary and

09:26:37 10  secondary responsibilities are things that you

11  discussed with Mr. Larsen before you began as

12  director of markets and trading?

13                MS. BUNTING:  Objection.

14                MR. HORTON:  Objection to form.

09:26:47 15     A.   They're things I discussed with Patrick

16  Griffin.  They may or may not have been discussed

17  with Chris Larsen.  I don't recall me discussing

18  directly or not.

19      Q.   Okay.  And did the nature of your

09:27:04 20  responsibility change over time during your tenure

21  at Ripple?

22      A.   No.

23      Q.   Did you have an annual salary while at

24  Ripple?

09:27:17 25     A.   Yes.

38

```
09:27:18   1        Q.    What was your salary?
           2        A.    It was approximately ██████ a year.
           3        Q.    And did you receive a bonus?
           4        A.    I received equity-based compensation and
09:27:33   5   I received incentive-based compensation in XRP for
           6   meeting performance goals.
           7        Q.    What was your equity-based compensation?
           8        A.    I believe it was ████████████ in the
           9   company over a four-year vesting period, but my
09:27:52  10   recollection is fuzzy without looking at the
          11   numbers again.
          12        Q.    Do you still have equity in Ripple?
          13        A.    I do still have my employee equity
          14   compensation, yes.
09:28:12  15        Q.    The full amount of equity?
          16        A.    I believe so, yes.
          17        Q.    And do you know how much you have in
          18   equity currently?
          19        A.    It's difficult to say since it's a
09:28:27  20   private company and there's no visible market for
          21   it.
          22        Q.    Do you have a ballpark?
          23        A.    I would be guessing.
          24        Q.    Do you have a sense if it's in the
09:28:44  25   millions of dollars, in the tens of millions of
```

39

```
09:28:46    1    dollars, or something else?
            2                    MR. HORTON:  Objection.
            3         A.   If I wagered a guess, I would say it's
            4    about  ████████ ; but, again, the -- I think the --
09:28:52    5    the prices even on a given day can vary by a
            6    hundred percent depending on where the transaction
            7    happens and who -- who transacts.
            8         Q.   Okay.  And you're -- and you said you
            9    had incentive-based compensation that was paid out
09:29:05   10    in XRP?
           11         A.   Correct.
           12         Q.   Okay.  And what was your incentive-based
           13    compensation?
           14         A.   I received -- my memory on the exact
09:29:14   15    number is fuzzy, but I believe a total of ██████
           16    ████████  XRP.
           17         Q.   And this is in total during your time at
           18    Ripple?
           19         A.   Correct.
09:29:21   20         Q.   Okay.  And what was this compensation
           21    based on?
           22                    MR. HORTON:  Objection to form.
           23         A.   It was a performance bonus in exchange
           24    for signing up a specific number of market-making
09:29:42   25    firms during my time there.
```

40

```
09:29:47   1           Q.    And what was the specific number?
           2                  MR. GULAY:   Objection.
           3           A.    I believe it was five, but the specifics
           4    are hazy without researching it.
09:30:00   5           Q.    So when did you get this incentive-based
           6    compensation?
           7           A.    It would have been towards the end of my
           8    time at Ripple.
           9           Q.    Do you still own XRP?
09:30:20  10           A.    Not any material amount.  I'm sure
          11    accounts that I control still have a de minimis
          12    amount, like in the tens of dollars, but it's
          13    accidental.  There's no material amount that I
          14    currently hold.
09:30:35  15                  THE REPORTER:   "There's no
          16     material amount that"?
          17           A.    I don't cur -- there's no material
          18    amount that I currently hold.
          19           Q.    So you sold the ███████████ or so
09:30:49  20    XRP?
          21           A.    That's correct.
          22           Q.    Okay.  When did you sell it?
          23           A.    It was over a period of several months.
          24    The exact time I don't recall, but it would have
09:31:02  25    been around 2014, 2015.
```

                                                                    41

```
09:31:09  1          Q.    Was it while you were still at Ripple?
          2          A.    I don't recall whether my transactions
          3   began while I was still at Ripple or immediately
          4   after.
09:31:25  5          Q.    And how did you sell your XRP?
          6          A.    Through -- through exchanges on the
          7   Ripple Ledger.  I don't remember if that was
          8   exclusively the way I did it given how much time
          9   has passed, but that was predominantly how it was
09:31:46 10   done.
         11          Q.    Which exchanges?
         12          A.    I recall that Bitstamp was one of the
         13   exchanges with significant liquidity at the time
         14   that I used, but I don't recall if that was
09:32:02 15   exclusively what I used given how much time has
         16   passed.  I -- I'm sure that I used others, but I
         17   don't recall which.
         18          Q.    And who did you sell it to?
         19          A.    I don't know.
09:32:13 20          Q.    How much did you sell it for?
         21          A.    Approximately a ███████████ in
         22   total, but the exact total I would have to check
         23   to be certain of.
         24          Q.    Other than that ███████████ XRP,
09:32:29 25   have you at any point bought other XRP?
```

42

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:32:36 1      A.   I regularly --

2                MS. BUNTING:  Objection.

3          A.   I regularly bought -- I regularly

4     transacted on the network because I felt it was

09:32:43 5    important to use the product to understand it

6     better.  So I -- I made transactions regularly,

7     not necessarily with a -- with an economic goal of

8     any type.

9          Q.   Well, what kinds of transactions?

09:33:05 10        A.   I thought it was important to make a

11    breadth of transactions given my role as head of

12    markets and trading to understand the system.  So

13    I would try and make all types of transactions to

14    understand things are working correctly and

09:33:17 15   understand if things can be improved.

16         Q.   Can you give me some examples of the

17    types of transactions you -- you made?

18         A.   Generally speaking, transactions on

19    Ripple, on the Ripple Ledger, are exchanging one

09:33:29 20   type of asset for another type of asset.  And so I

21    frequently transacted all types of assets for all

22    other types of assets to test the system, demo the

23    system, et cetera.

24         Q.   And were you doing this with your own

09:33:45 25   funds or with Ripple's funds?

43

```
09:33:48   1                    MR. GULAY:  Objection.
           2                    MS. BUNTING:  Objection.
           3         A.    Both my own funds and Ripple's funds.
           4         Q.    When you held your ███████████ XRP
09:34:03   5   before you sold it, did you want the price of --
           6   of XRP to go up while you held it?
           7                    MR. GULAY:  Objection.
           8                    MS. BUNTING:  Objection.
           9         A.    I certainly preferred it to go up than
09:34:12  10   down.
          11         Q.    Okay.  And when did you leave Ripple?
          12         A.    Mid to late 2015.
          13         Q.    And why did you leave Ripple?
          14         A.    General sense of burnout after working
09:34:32  15   very long hours for two years, as well as from a
          16   risk management perspective, feeling like the
          17   outcome of Ripple, like I viewed all technology
          18   start-ups, early stage start-ups, to have a fairly
          19   binary outcome of success or failure over time.
09:34:54  20   And from a risk management perspective, once you
          21   have the trade on, so to speak, it often makes
          22   sense to diversify and do something else rather
          23   than devoting ten years of your life to a binary
          24   outcome.
09:35:10  25         Q.    Are you still in touch with your former
```

                                                              44

```
09:35:11   1   Rip -- Ripple colleague?
           2       A.    Yes, I am.
           3              MS. BUNTING:  Objection.
           4       Q.   Who --
09:35:14   5              MS. STEWART:  What was the
           6       objection there?
           7              MS. BUNTING:  You said "Are you
           8       still in touch" --
           9              THE REPORTER:  I can't hear you.
09:35:20  10              MS. BUNTING:  She said "Are you
          11       still in touch?"  What does that mean?
          12              MS. STEWART:  Okay.
          13              MS. BUNTING:  Can you -- I think
          14       that's ambiguous.  So you can rephrase it.
09:35:25  15   BY MS. STEWART:
          16       Q.   Okay.  If you understand what that
          17   means, please answer.
          18       A.    Yes, I am.
          19       Q.   Okay.  Who are you in touch with?
09:35:37  20       A.    Primarily Patrick Griffin and ████████
          21   █████, though I have sporadic conversations with
          22   a large number of people from the firm.
          23       Q.   Okay.  How often do you speak with
          24   Patrick Griffin?
09:35:55  25       A.    At least once a month.
```

45

```
09:36:01   1         Q.   Do you consider any of your former
           2    Ripple colleagues to be friends?
           3         A.   Yes.
           4         Q.   Who?
09:36:06   5         A.   Patrick Griffin and ███████, the
           6    two that I mentioned that I'm in touch with
           7    regularly.
           8         Q.   Are you in touch with Chris Larsen?
           9              MS. BUNTING:   Objection.
09:36:14  10         A.   Not regularly.
          11         Q.   Okay.  When was the last time you spoke
          12    with Mr. Larsen?
          13         A.   Over a year ago.  The exact date I'm
          14    not -- I'm not sure of.
09:36:30  15         Q.   What did you speak with him about over a
          16    year ago?
          17         A.   I solicited him for investment in my
          18    real estate project and he did not want to invest
          19    in it.
09:36:48  20         Q.   Do you know Brad Garlinghouse?
          21         A.   I do.
          22         Q.   How do you know him?
          23         A.   Through my time at Ripple as an
          24    employee.
09:36:56  25         Q.   So did you and Mr. Garlinghouse overlap
```

46

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:36:58  1    at Ripple?

          2         A.    We did.

          3         Q.    Okay.  Are you in touch with him?

          4         A.    I have not spoken to him for a very long

09:37:06  5    time.

          6         Q.    Okay.  I want to make sure that we're

          7    using the right terminology here as we talk -- as

          8    we talk here today.

          9               So when -- when you first joined Ripple,

09:37:24 10    was there something called the Ripple network?

         11         A.    There was a technology which people

         12    referred to as "Ripple," which may also -- you

         13    know, I think that's what you're referring to when

         14    you say "the Ripple network."  People today often

09:37:44 15    call it the Ripple Consensus Ledger --

         16         Q.    Okay.

         17         A.    -- so yes.

         18         Q.    So -- so Ripple network in your mind is

         19    what today is called the Consensus Ledger or the

09:37:54 20    XRP Ledger?

         21               MR. GULAY:  Objection.

         22               MR. HORTON:  Objection.

         23         A.    I don't recall Ripple network being a

         24    common term, but people referred Ripple as a

09:38:01 25    technology and I think that's what you mean by

                                                              47

09:38:04 1  "Ripple network."

2       Q.   Okay.  Well, as we go through some of

3  the documents, as we see these terms, then maybe

4  I'll ask you in the context of the documents what

09:38:11 5  they mean.

6       A.   Yes.  Understood.

7       Q.   Okay.  And was there something called

8  the Ripple protocol in 2013?

9       A.   Yes.

09:38:23 10      Q.   Okay.  And what is the Ripple protocol?

11            MR. GULAY:  Objection.  Do you

12       mean in 2013 --

13            MS. STEWART:  Yes.

14            MR. GULAY:  -- or now?

09:38:32 15            MS. STEWART:  Yes, in 2013.

16      A.   I'm not sure if you're using these terms

17  in a very nuanced way, but Ripple protocol I think

18  of as code, software.  And maybe you're referring

19  to Ripple network as the network of computers

09:38:51 20  employing the code?  But in some ways those are

21  synonymous terms, Ripple network and Ripple

22  protocol.

23      Q.   Okay.  I was trying to cause less

24  confusion, but I think I caused more.  So as we go

09:39:02 25  through the documents, I'll ask you -- I'll ask

48

| | | |
|---|---|---|
| 09:39:04 | 1 | you the question. |
| | 2 | Do you understand that one of the issues |
| | 3 | in this case is whether XRP is a security and |
| | 4 | subject to SEC regulation? |
| 09:39:17 | 5 | A.   That is my understanding. |
| | 6 | Q.   Okay.  Did anyone at the SEC ever tell |
| | 7 | you that XRP is not a security? |
| | 8 | A.   No. |
| | 9 | Q.   Are you aware of anyone at the SEC ever |
| 09:39:31 | 10 | telling anyone at Ripple that XRP is not a |
| | 11 | security? |
| | 12 | MR. HORTON:  Objection to form. |
| | 13 | A.   I'm not aware of any conversations that |
| | 14 | Ripple did or did not have with the SEC. |
| 09:39:51 | 15 | Q.   Okay.  So you -- you mentioned that your |
| | 16 | sort of primary responsibility at -- at Ripple was |
| | 17 | to recruit and onboard market-making firms to |
| | 18 | participate on the Ripple Ledger as market makers. |
| | 19 | Do I have that right? |
| 09:40:05 | 20 | A.   Correct. |
| | 21 | MR. GULAY:  Objection. |
| | 22 | Q.   Was one of your responsibilities also to |
| | 23 | sell XRP? |
| | 24 | A.   No. |
| 09:40:12 | 25 | Q.   That was never part of your job |

49

```
09:40:13   1   function?
           2        A.   No.
           3                 MR. HORTON:  Objection to form.
           4        Q.   Did you, in fact, sell XRP on behalf of
09:40:17   5   Ripple?
           6        A.   I don't recall if I effected a
           7   transaction.  I may have, but certainly I did not
           8   frequently effect transactions in XRP.
           9        Q.   When you started at --
09:40:41  10        A.   I'm sorry.  I should say with third
          11   parties over the counter.  I did trade in the
          12   network, as I said, which is effecting
          13   transactions.
          14        Q.   Okay.  Understood.  Thank you for that
09:40:52  15   clarification.
          16             When you started at Ripple, was there a
          17   market for buying and selling XRP?
          18                 MR. HORTON:  Objection to form.
          19        A.   There was a nascent illiquid market.
09:41:10  20        Q.   At that time when you started at Ripple,
          21   how much volume of XRP was -- was traded daily?
          22                 MR. GULAY:  Objection.
          23                 MS. BUNTING:  Objection.
          24        A.   I don't recall without looking it up.  A
09:41:22  25   very small amount.
```

50

09:41:23  1        Q.   Something in the range of, you know, in

        2   the hundreds or thousands of dollars?

        3              MR. HORTON:  Objection to form.

        4              MR. GULAY:  Objection.

09:41:33  5        A.   I don't recall, but a very small amount.

        6   I would say a de minimis amount.

        7        Q.   And what was XRP's price at that time

        8   when you started?

        9              MR. HORTON:  Objection to form.

09:41:41 10              MR. GULAY:  Objection.

       11        A.   I don't recall without checking the

       12   chart exactly.

       13        Q.   Do you recall if it was fractions of a

       14   penny?

09:41:54 15        A.   It was fractions of a penny.

       16        Q.   And how much XRP at that time was in

       17   circulation, meaning not with Ripple or Ripple's

       18   founders?

       19              MR. HORTON:  Objection to form.

09:42:05 20              MR. GULAY:  Objection.

       21              MS. STEWART:  What's the

       22         objection?

       23              MR. HORTON:  I don't know what

       24         you mean by "at that time."

09:42:09 25        Q.   At the time that you started at Ripple.

                                                              51

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:42:14  1        A.    I think that's publicly available, but I

        2   don't recall without looking it up.

        3        Q.    Did Ripple take steps during your tenure

        4   to increase trading in the XRP market?

09:42:35  5                  MS. BUNTING:  Objection.

        6        A.    The firm had an interest in increasing

        7   liquidity and developing a liquid market for all

        8   assets on the Ripple Ledger, including XRP.

        9        Q.    And why did the firm have an interest in

09:43:02 10   increasing liquidity for XRP specifically?

       11                  MR. HORTON:  Objection to form.

       12                  MR. GULAY:  Objection.

       13                  MS. BUNTING:  Objection.

       14        A.    I think the firm would have viewed it as

09:43:15 15   a success if the Ripple network, Ripple Ledger,

       16   developed liquidity for other assets excluding

       17   XRP.  I still think that would have been viewed as

       18   a success state.  But certainly, just like I

       19   preferred the price of XRP to go up rather than

09:43:34 20   down, the firm would have benefited from the price

       21   of XRP growing up rather than down.

       22        Q.    Did the firm take steps to increase the

       23   liquidity of assets other than XRP on the --

       24        A.    Yes.

09:43:46 25        Q.    -- on the Ripple Ledger?

                                                              52

09:43:48  1                    MR. GULAY:  Objection.

          2        A.    Yes.

          3        Q.    Which assets?

          4        A.    A variety of assets.

09:43:55  5        Q.    Can you give me some examples?

          6        A.    Sure.  We had a number of business

          7   development efforts to increase the liquidity of

          8   bitcoin against dollars on the network.  We also

          9   had a number of business development ex -- efforts

09:44:11 10   to develop a market for gold against dollars on

         11   the network.  And there were many other examples.

         12   Those are two that I can recall easily.

         13        Q.    And what steps did the firm take to

         14   increase liquidity of XRP?

09:44:34 15                    MR. GULAY:  Objection;

         16          foundation.

         17        A.    The firm took similar steps to increase

         18   liquidity of those assets that I just mentioned

         19   and XRP.  I don't -- I don't think that we treated

09:45:00 20   them particularly differently.  We were interested

         21   in developing a liquid market broadly speaking.

         22   And as I mentioned, if that liquid market

         23   developed outside of XRP, I think the firm viewed

         24   that equally to be a success.

09:45:16 25        Q.    Okay.  But can you think of any steps

                                                              53

09:45:18  1  that the firm took with respect to XRP in

2  particular to -- to develop a more liquid market?

3           MR. GULAY:  Objection.

4      A.   Sure.  So this is not unique to XRP but

09:45:30  5  it did apply to XRP.  The market-making firms that

6  I onboarded had received compensation in exchange

7  for providing quotes to buy and sell XRP against

8  dollars as well as bitcoin against dollars and --

9  and other assets.

09:45:52  10      Q.   Okay.  Any other steps that you recall?

11      A.   Not that I can easily recall, no.

12      Q.   When you started at Ripple, did Ripple

13  have a strategy for distributing XRP?

14           MR. GULAY:  Objection.

09:46:18  15      A.   When I started at Ripple, generally

16  speaking, there was a -- there was a -- a desire

17  to give away the XRP, to distribute it by giving

18  it away.

19      Q.   Did this desire to -- to distribute XRP

09:46:35  20  by giving it away, did that change over time

21  during your time at Ripple?

22           MR. HORTON:  Objection to form.

23      A.   Over time, yes, the giveaways slowed and

24  increasingly Ripple was distributing XRP by

09:47:02  25  selling it or granting it in business development

54

```
09:47:05   1   deals, which are forms of giveaways, but different
           2   form than -- than when I started at the company.
           3              THE REPORTER:  "When I
           4      started..."?
09:47:12   5      A.   When I started at the company.
           6      Q.   And when did the shift happen to --
           7   strike that.
           8           When did the shift happen from giveaways
           9   to sales of XRP?
09:47:24  10              MR. HORTON:  Objection to form.
          11              MR. GULAY:  Objection.
          12              MS. BUNTING:  Objection.
          13      A.   I don't think there was a discrete
          14   change, but at the beginning of my time with the
09:47:34  15   firm, it clearly seemed different from at the end
          16   of my time with the firm.
          17      Q.   Okay.  And why -- why did Ripple begin
          18   to -- to sell XRP as a means of distributing it?
          19      A.   I don't know.  I -- I didn't make the
09:47:55  20   decision -- I believe Ripple sold XRP prior to my
          21   arriving at the firm and I wasn't the person
          22   deciding how and when or why Ripple sold XRP.
          23      Q.   But fair to say that at some point
          24   during your tenure, there -- there was a movement
09:48:16  25   from sort of focusing on giveaways to focusing
```

55

09:48:18  1    more on sales of XRP?

2                      MR. HORTON:  Objection to form.

3                      MR. GULAY:  Objection.

4         A.   I think give a -- both -- both things

09:48:33  5    were happening throughout my tenure at the firm.

6    I think the nature of the giveaways shifted from

7    broadly giving it away to anyone to strategically

8    striking business development deals.

9         Q.   And when did Ripple start striking

09:48:56 10    business development deals?

11        A.   Prior to my arrival at the firm and

12    throughout my time there.

13        Q.   Were you involved in -- in those

14    business development deals?

09:49:10 15        A.   In some situations, yes.

16        Q.   Was there a team that was in charge of

17    those business development deals?

18                      MS. BUNTING:  Objection.

19        A.   There was a business development team.

09:49:30 20        Q.   Okay.  And who was on that team?

21        A.   Patrick Griffin was the senior vice

22    president of business development and there was a

23    team of -- of people reporting to him.  I was -- I

24    was also on that team as someone reporting to the

09:49:45 25    senior vice president of business development.

56

09:49:48  1        Q.   But was there somebody else at your

          2   level who -- who was tasked with the business

          3   development deals?

          4              MS. BUNTING:   Objection.

09:50:00  5        A.   There was a team of people who had a

          6   title of business development director who

          7   reported to Patrick Griffin, the senior vice

          8   president of business development.

          9        Q.   And who was that person with that title?

09:50:09 10        A.   There were several people at various

         11   times, but ███████████████████████████████████

         12   ██████ are three that I can easily name, easily

         13   recall.

         14        Q.   When Ripple sold XRP, did it place

09:50:53 15   restrictions on the resale of the XRP?

         16              MR. HECKER:   Objection to form.

         17              MR. GULAY:   Objection;

         18    foundation.

         19        A.   I believe --

09:51:11 20              MR. GULAY:   In fact, what time

         21    period are we talking about here?

         22        Q.   Well, I'll ask the question first more

         23   generally during your entire -- the entire time

         24   period that you were at Ripple.

09:51:23 25        A.   I recall at times the company's desire

                                                              57

09:51:29   1   to have, quote/unquote, lock-ups restricting sale.

2   I'm not aware of how those were structured or

3   enforced.

4           Q.   Are you aware of Ripple placing

09:51:45   5   restrictions on who the XRP recipient could sell

6   the XRP to?

7           A.   I don't recall any situation like that.

8           Q.   So broadly speaking, whether it was

9   through giveaways or the business development

09:52:08  10   deals we've talked about or otherwise, why did

11   Ripple take steps to distribute XRP?

12                   MR. GULAY:   Objection to form.

13                   MR. HORTON:   Objection.

14           A.   The technology is -- is not -- the

09:52:32  15   Ripple Consensus Ledger, Ripple protocol

16   technology, is designed in a way that in order for

17   a user to use the network, a small amount of XRP

18   is required.  The user is required to hold a small

19   amount of XRP.  And so given that the firm had an

09:52:51  20   interest in seeing a growth in the number of users

21   using the protocol, it was important for XRP to be

22   broadly distributed in the hands of people

23   globally, people and entities globally.

24           Q.   Any other reasons for Ripple to

09:53:11  25   distribute XRP?

                                                          58

09:53:19    1          A.   I view that as the primary interest

            2    Ripple had in distributing XRP.

            3          Q.   Did Ripple distribute XRP in order to

            4    increase XRP's liquidity?

09:53:33    5                    MR. GULAY:  Objection to form.

            6          A.   One form of distribution was

            7    compensation to market makers.  So in that sense

            8    Ripple sought to engage market makers to improve

            9    liquidity of XRP and other assets and compensated

09:54:00   10    them with XRP.  So in that light, I think the

           11    answer to your question is yes.

           12          Q.   Any other way in which Ripple sought to

           13    increase liquidity through distributions other

           14    than through market makers?

09:54:15   15                    MR. GULAY:  Objection; asked and

           16          answered.

           17          A.   I can't immediately think of other ways,

           18    no.

           19          Q.   When Ripple was selling XRP or giving

09:54:32   20    away XRP, was there a thought that the recipient

           21    of the XRP would then do additional trades, thus

           22    increasing the volume --

           23                    MR. GULAY:  Objection.

           24          Q.   -- in the market?

09:54:41   25                    MR. HORTON:  Objection to form.

                                                              59

09:54:50  1          A.   I wasn't aware of an assumption one way

       2    or another, that the person would do more trades

       3    or not do more trades.

       4          Q.   Okay.  Did Ripple sell XRP to raise

09:55:02  5    money for its business operations?

       6                    MR. GULAY:  Objection to form.

       7          A.   I did not have visibility into the

       8    firm's finances and whether the venture capital

       9    funding was sufficient to meet the firm's needs or

09:55:20 10    not at various points in time.

      11          Q.   So you're not aware one way or -- or the

      12    other as to whether Ripple sold XRP in order to

      13    fund its business operations?

      14          A.   I'm aware --

09:55:30 15                    MR. HECKER:  Objection.

      16          A.    -- that the firm took in dollars in

      17    exchange for selling XRP and I'm aware that that

      18    improved the firm's balance sheet.  I'm not aware

      19    of whether that was required capital to fund the

09:55:43 20    firm's operations or not.

      21          Q.   Okay.  And what is the -- the venture

      22    capital funding that you spoke about a moment ago?

      23          A.   Ripple Labs, Inc., in my understanding,

      24    began with seed funding from venture capitalists

09:55:59 25    and over time received additional rounds of

                                                              60

09:56:02 1  funding from venture capitalists in exchange for

2  equity in the company.

3              MS. STEWART:  Okay.  I'm going to

4          start with our first document.  That's

09:56:28 5          Exhibit 2.

6              (Whereupon, exhibit is presented

7          and marked SEC Rapoport Exhibit PR-2 for

8          identification.)

9              MR. TENREIRO:  I'll give one to

09:56:44 10         Bridget and if that's not enough on this

11         side...

12             I think that's enough, though.

13             MR. GULAY:  And, Jorge, you're

14         e-mailing it to Leyla?

09:56:57 15         MR. TENREIRO:  Yes.  Nicole is

16         usually e-mailing it.

17             MR. GULAY:  Nicole is, okay.

18         Thank you.

19  BY MS. STEWART:

09:57:04 20    Q.   Okay.  So, Mr. Griffin (sic), I've

21  handed you what we've marked PR-2.  That's Bates

22  number RPLI_SEC 0320652 through 663.  Take a

23  moment, please, to look at it and let me know when

24  you're ready.

09:59:38 25         (Pause)

61

10:00:24  1        A.    Okay.  I've reviewed it.

          2        Q.    Okay.  Great.

          3              So what is this document?

          4        A.    This is a primer to explain the very

10:00:36  5     basic concepts of the Ripple technology to a

          6     new -- a new reader.

          7        Q.    Okay.  And did you put this document

          8     together?

          9        A.    I did.

10:00:49 10        Q.    Why did you put it together?

         11        A.    At the time my recollection was that

         12     there was primarily technical documents for a

         13     technical audience and there was not a simplified

         14     document for a -- a nontechnical person to

10:01:05 15     familiarize themselves with the technology.

         16        Q.    And -- and is the audience that you're

         17     referring to the -- the hedge funds and other

         18     institutions that we had talked about earlier?

         19              MR. GULAY:  Objection to form.

10:01:21 20              MR. HORTON:  Objection.

         21        A.    I think this document can be broadly

         22     read by anybody, but, in general, Ripple had an

         23     interest in financial institutions of all type.

         24     That was the -- the market that we were generally

10:01:34 25     speaking to at the time.

                                                              62

10:01:37  1        Q.   Did someone ask you to put this document

       2   together?

       3        A.   I don't recall.

       4        Q.   Did Mr. Griffin send you comments on

10:01:52  5   this document after you sent him this -- this

       6   version that's in PR-2?

       7        A.   I don't recall whether he iterated on

       8   this or not.

       9        Q.   Do you recall if anyone else commented

10:02:06 10   on it?

      11        A.   I really don't.  It -- it was so long

      12   ago.  I don't recall.  I'm sorry.

      13        Q.   And did you ultimately finalize this

      14   document?

10:02:17 15        A.   Yes, we did.

      16             MS. STEWART:  Nicole, we're on

      17         PR-5 now.

      18             (Whereupon, exhibit is presented

      19         and marked SEC Rapoport Exhibit PR-5 for

10:02:25 20         identification.)

      21             MS. STEWART:  So for the record,

      22         PR-5 -- for the record, PR-5 is Bates

      23         numbered RPLI_SEC 0328413 through 8432.

      24   BY MS. STEWART:

10:02:40 25        Q.   And, once again, take however long you

                                                                    63

10:02:45  1    need to look at the document and let me know when

2    you're ready.

3            (Pause)

4        A.   Okay.  I've reviewed it.

10:06:04  5        Q.   Okay.  So what is this document?

6        A.   This is a later version of the document

7    we just looked at, which, as I said, it's a primer

8    for someone looking to familiarize themselves with

9    the basics of Ripple.

10:06:18 10        Q.   Okay.  And you're sending this later

11   version to Mr. Larsen in this e-mail?

12        A.   I see that from the e-mail header, but I

13   don't recall this interaction specifically.

14        Q.   Okay.  Do -- do you recall why you sent

10:06:31 15   the -- the draft to Mr. Larsen?

16        A.   I don't recall this -- sending this

17   e-mail, but I see the -- in the header that I sent

18   it to him.

19        Q.   Okay.  Do you recall if Mr. Larsen had

10:06:40 20   any comments on the primer before it was

21   finalized?

22            MS. BUNTING:  Objection.

23        A.   I don't recall.

24        Q.   Do you recall any discussions with

10:06:53 25   Mr. Larsen about the primer?

64

10:06:58  1              MS. BUNTING:  Objection.

         2      A.   No, I don't.

         3      Q.   And do you recall any discussions with

         4  Mr. Griffin about the primer?

10:07:08  5      A.   I'm sure we discussed it, but I don't

         6  recall the specifics of any discussion.

         7      Q.   Did you send the primer to anyone else

         8  at Ripple before it was finalized?

         9      A.   I may have, but I -- I just don't recall

10:07:21 10  given how long ago it was.

        11      Q.   Okay.

        12              MS. STEWART:  Okay.  Nicole,

        13        we're -- we're looking at PR-6 now.

        14              (Whereupon, exhibit is presented

10:07:31 15        and marked SEC Rapoport Exhibit PR-6 for

        16        identification.)

        17              MS. STEWART:  So for the record,

        18        PR-6 is Bates numbered RPLI_SEC 0337822

        19        through 7842.

10:07:54 20  BY MS. STEWART:

        21      Q.   And, once again, please take whatever

        22  time you need to -- to review the document and let

        23  me know when you're ready.

        24              (Pause)

10:09:03 25      A.   Okay.  I've reviewed this.

                                                          65

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:09:04    1          Q.    Okay.  Great.

            2                So what -- what is this document, the

            3    cover e-mail and then the attachment?

            4          A.    The attachment appears to be the same

10:09:16    5    attachment, at least I didn't spot any differences

            6    from PR-5's attachment.  The cover e-mail appears

            7    to be me sending this primer to ████████, who is

            8    a friend of Chris Larsen's, who I believe had been

            9    a seed investor in the firm, but I'm not sure of

10:09:39   10    that fact.

           11          Q.    So is it fair to say that the -- the

           12    version of the primer that's attached to this

           13    document, PR-5, is the final version of the

           14    primer?

10:09:50   15                MR. GULAY:  Objection.

           16          A.    Since this was sent externally, I think

           17    it's clearly a live version, but I think there may

           18    have been other iterations.  I just don't recall.

           19          Q.    Okay.  But given that it was sent

10:10:06   20    externally, it's -- you know, it was a final

           21    version --

           22          A.    It was --

           23          Q.    -- at the time?

           24          A.    I'm sorry for talking over you.

10:10:11   25                It was in use.

                                                                    66

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 10:10:13 | 1  | Q.   Okay.  Got it.                                   |
|          | 2  | And why were you sending this primer to              |
|          | 3  | Mr. ████?                                             |
|          | 4  | A.   I recall spending a lot of time on the          |
| 10:10:24 | 5  | language used in the primer; and I don't remember    |
|          | 6  | sending this specific e-mail, but I say in the       |
|          | 7  | e-mail that it runs through a narrative in a nice    |
|          | 8  | way that avoids an emphasis on the new currency.     |
|          | 9  | THE REPORTER:  I can't hear you.                     |
| 10:10:40 | 10 | A.   It -- I say in the e-mail I think it            |
|          | 11 | runs through the narrative in a nice way that        |
|          | 12 | avoids an emphasis on the new currency.              |
|          | 13 | Q.   Do you recall if -- if Ripple was              |
|          | 14 | soliciting an investment from Mr. ████ --            |
| 10:11:01 | 15 | MR. GULAY:  Objection.                               |
|          | 16 | Q.   -- at this time?                                |
|          | 17 | A.   I do not believe Ripple was soliciting         |
|          | 18 | investment from Mr. ████ at this time.              |
|          | 19 | Q.   Okay.  And you don't remember one way or       |
| 10:11:15 | 20 | the other why you sent him this document in          |
|          | 21 | October of 2013?                                     |
|          | 22 | A.   I don't remember sending this e-mail.          |
|          | 23 | Even though I'm looking at it, I obviously sent      |
|          | 24 | it, but I don't recall the specifics around why I   |
| 10:11:30 | 25 | sent this e-mail.                                    |

67

10:11:31  1      Q.   Okay.  After you finalized the primer,

       2    did you send it to financial institutions?

       3      A.   In my recollection, this primer was the

       4    main nontechnical explanation that was in use to

10:11:54  5    share a written version of -- of the narrative

       6    of -- explaining Ripple.

       7      Q.   Okay.  So did you send the primer to

       8    financial institutions as part of -- of your work

       9    to -- to market XRP?

10:12:14 10                MR. HORTON:  Objection to form.

      11                MR. GULAY:  Objection.

      12                MS. BUNTING:  Objection.

      13      A.   My recollection is that we sent this

      14    document to explain the Ripple technology to

10:12:23 15    interested parties.

      16      Q.   Okay.  What types of interested parties?

      17      A.   Really all types from nonfinancial

      18    corporates, interested in individuals like ███

      19    ███, hedge funds and financial institutions,

10:12:44 20    and other -- other types.

      21      Q.   And did that include individuals or

      22    institutions who were interested in buying XRP?

      23      A.   I don't -- I wouldn't necessarily know

      24    what someone's interest in buying it was or was

10:13:08 25    not.  In general, our goal and our messaging was

                                                          68

10:13:14  1   focused around explaining the technology and not
        2   on XRP.  And we specifically sought to
        3   de-emphasize XRP in our -- in the narrative we
        4   used as this -- as this e-mail indicates.
10:13:28  5       Q.   Okay.  But my question is, to the extent
        6   that you were trying to get individuals or
        7   institutions to buy XRP, did you send them this
        8   primer?
        9                 MR. HORTON:  Objection.
10:13:43 10                 MR. GULAY:  Objection to form.
       11                 MS. BUNTING:  Objection.
       12       A.   I did not try and get individuals or
       13   institutions to buy XRP.  And in meetings, the
       14   narrative we used very specifically tried to focus
10:13:57 15   only on the technology and de-emphasize any
       16   discussions of XRP and digital assets.
       17       Q.   And why is that?  Why did you want to
       18   de-emphasize discussions of digital assets?
       19       A.   Because our primary objective was to
10:14:16 20   develop a liquid market for any asset.  I think
       21   the company viewed it as a -- as a win
       22   strategically if a liquid market developed for
       23   bitcoin against dollars or gold against dollars or
       24   Euros against dollars.  And we largely felt that
10:14:33 25   the focus on digital assets was a distraction from

69

```
10:14:40    1   what we viewed to be applicable use cases in the
            2   real world.
            3                MR. HECKER:  Counsel, we've been
            4           going for about 75 minutes.  Can we take a
10:14:57    5           short break?
            6                MS. STEWART:  Well, I have more
            7           questions on this document, but -- but we
            8           can come back to it if you'd prefer.
            9                MR. HORTON:  Thanks.
10:15:03   10                MS. STEWART:  That's fine.  We
           11           can go off the record.
           12                THE VIDEOGRAPHER:  Okay.  Going
           13           off the record at 10:15.
           14                (Whereupon, a recess is taken.)
10:30:53   15                THE VIDEOGRAPHER:  Okay.  Back on
           16           the record at 10:30.
           17                Go ahead.
           18   BY MS. STEWART:
           19        Q.   Okay.  Mr. Rapoport, still looking at
10:31:01   20   Exhibit PR-6, I want to now go through the
           21   attachment to this document, the -- the Ripple
           22   primer.  Okay?
           23        A.   Yes.
           24        Q.   So let's first look at page 17 of the
10:31:16   25   document, which is Bates numbered 37841 on the
```

70

```
10:31:26   1   bottom.
           2        A.   Yes.
           3        Q.   Okay.  So looking at the top of this
           4   document, the first sentence says "Ripple Labs is
10:31:34   5   the creator of Ripple."
           6             Do you see that?
           7        A.   Yes.
           8        Q.   Okay.  Did you write that statement?
           9        A.   Yes.
10:31:39  10        Q.   And is it accurate?
          11             MR. GULAY:  Objection.  What time
          12         period are we talking about?
          13        Q.   Was it accurate when you wrote it?
          14        A.   No, it was intentionally inaccurate for
10:31:59  15   the purposes of simplification.
          16        Q.   Okay.  How was it intentionally
          17   inaccurate?
          18        A.   The Ripple network -- the Ripple
          19   protocol predated the creation of the -- of Ripple
10:32:13  20   Labs, Inc. as an entity.  And so Ripple Labs, Inc.
          21   could not have been the creator of Ripple; but for
          22   the purposes of an entry-level primer, we
          23   thought -- we knowingly thought the simp -- we --
          24   we knowingly wrote this inaccurately thinking that
10:32:31  25   the simplification was beneficial and that the
```

                                                        71

10:32:34  1  actual explanation was needlessly confusing for

2  someone looking for an entry-level primer.

3       Q.   Okay.  And -- and is it the case that

4  the predecessor company is OpenCoin?

10:32:46  5       A.   No.  My understanding is that the Ripple

6  protocol predates OpenCoin and Ripple Labs, Inc.

7       Q.   Okay.  The next sentence says "We

8  developed the protocol and its distributed payment

9  network, and we now work to support and promote

10:33:11 10  its growth."

11            Do you see that?

12       A.   Yes.

13       Q.   Okay.  Was that sentence accurate when

14  you wrote it?

10:33:22 15       A.   It suffers from the same inaccuracy as

16  the preceding sentence, which is that Ripple Labs,

17  Inc. did not technically develop the protocol; but

18  the second clause, Ripple Labs did work to support

19  and promote the growth of the network.  That was

10:33:37 20  accurate.

21       Q.   So the "we" in that sentence refers to

22  Ripple Labs, Inc. or to something else?

23       A.   Ripple Labs, Inc.

24            MR. GULAY:  Objection.

10:33:46 25       Q.   Who developed the protocol?

72

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:34:02  1          A.   It's not a straightforward question to

       2   answer.  My understanding is that there was a --

       3   an early predecessor that I believe was called

       4   Ripple Pay developed by someone who I believe was

10:34:15  5   called ██████████  And his work was further

       6   developed by Jeb McCaleb, Arthur Britto, and David

       7   Schwartz, who were the primary architects of the

       8   consensus -- the method by which the network, the

       9   network of computers, reaches consensus about the

10:34:40 10   state of the ledger.  And my understanding is that

      11   those three people -- Jed McCaleb, Arthur Britto,

      12   David Schwartz -- expanded upon the work of ██████

      13   ██████ to improve upon his previous work and

      14   develop what became the Ripple protocol.

10:35:09 15          Q.   So the "we" in the sentence that we're

      16   looking at, does the "we" include Chris -- Chris

      17   Larsen?

      18                  MS. BUNTING:  Objection.

      19          A.   The "we" refers to the Ripple Labs team

10:35:23 20   and Chris Larsen was a member of that team, so,

      21   yes.

      22          Q.   But your testimony is that the first

      23   part of the sentence is -- in inaccurate?

      24                  MR. GULAY:  Objection.

10:35:57 25          A.   I think the phrase "we developed the

                                                              73

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:35:59  1   protocol," meaning Ripple Labs developed the

2   protocol, can be interpreted a number of ways, but

3   it does not -- it is not accurate that Ripple

4   Labs, Inc. or OpenCoin Inc. created the Ripple

10:36:14  5   protocol as I know it.

6        Q.   Okay.  And you said earlier about both

7   the first sentence on this page and then the first

8   part of the second sentence, that I think you said

9   that we knowingly made it inaccurate for

10:36:24 10   simplicity or something to that effect.  Do I have

11   that right?

12             MR. GULAY:  Objection.

13        A.   I remember writing this sentence and

14   acknowledging to myself that Ripple Labs is the

10:36:39 15   creator of Ripple is not technically correct, but

16   I thought at the time that it was needlessly

17   confusing to provide the entire history that I

18   just described for the purpose of this primer.

19        Q.   Okay.  And did you discuss that issue

10:36:51 20   with -- with Mr. Griffin?

21             MR. GULAY:  Objection.

22        A.   I don't recall whether we did or did not

23   discuss it.

24        Q.   Did you discuss it with Mr. Larsen?

10:37:03 25             MS. BUNTING:  Objection.

74

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:37:07  1      A.   I would not have -- I don't recall, but,

 2  in general, I would not have discussed semantics

 3  like that on a document with Chris Larsen.

 4      Q.   Okay.  Looking at the second paragraph,

10:37:16  5  still on page 17, it reads "Ripple Labs hopes to

 6  make money from XRP if the world finds the Ripple

 7  network useful and broadly adopts the protocol."

 8         Do you see that?

 9      A.   Yes.

10:37:28 10      Q.   And did you write that sentence?

11      A.   Yes.

12      Q.   Okay.  Was that sentence accurate when

13  you wrote it?

14      A.   Yes.

10:37:39 15      Q.   Did it continue to be accurate during

16  your time at Ripple?

17      A.   Yes.

18      Q.   And as you use it in this sentence, what

19  is the "Ripple network"?

10:37:59 20      A.   It's synonymous with the Ripple

21  Consensus Ledger or the Ripple transaction

22  protocol that was used in this paper.

23      Q.   And -- and the word "protocol" in this

24  sentence, what -- what does that mean?

10:38:13 25      A.   The software.  This goes back to the

75

10:38:18  1   nuance I was referring to earlier, that I think

2   the protocol is the software and the network is a

3   group of computers choosing to use the software.

4       Q.   Okay.  Then moving on to the -- to the

10:38:32  5   next paragraph, "100 billion XRP was created with

6   the Ripple protocol," was that sentence accurate

7   when you wrote it?

8       A.   Yes.

9       Q.   Okay.  And then "Ripple Labs plans to

10:38:48 10   gift 55 billion XRP to charitable organizations,

11   users, and strategic partners in the ecosystem

12   over time."

13            Was that sentence accurate when you

14   wrote it?

10:38:56 15       A.   Yes.

16       Q.   Okay.  And what does "strategic partners

17   in the ecosystem" refer to?

18       A.   If a prominent financial institution

19   were to decide to adopt the Ripple protocol for

10:39:22 20   payments, for example, we were prepared to provide

21   that org -- that financial institution with XRP to

22   help them achieve that goal of -- of implementing

23   the protocol in their business.

24       Q.   And when you say "implementing the

10:39:48 25   protocol in their business," what do you mean?

76

10:39:53 1      A.   It could mean a variety of things

2    because the protocol is broadly applicable to a

3    number of different types of financial businesses.

4    But as an example, a bank using Ripple for

10:40:04 5    cross-border payments.

6           Q.   The next sentence says "The company will

7    retain a portion with the hope of creating a

8    robust and liquid marketplace in order to monetize

9    its only asset sometime in the future."

10:40:21 10           Do you see that?

11           A.   Yes.

12           Q.   Was this sentence accurate when you

13    wrote it?

14           A.   Yes.

10:40:25 15           Q.   And did it continue to be accurate

16    during your time at Ripple?

17           A.   Yes.

18           Q.   Okay.  And -- and when -- when you say

19    in this sentence "its only asset," what are you

10:40:42 20    referring to?

21           A.   Looking back, I think that's a little

22    inarticulate because from an accounting

23    perspective, the company had other assets, like

24    desks and chairs and whatnot.  But at the

10:41:03 25    inception of the company, I think there was a

77

10:41:05  1  vision that this technology was interesting and

2  had potential to be adopted.  And if the

3  technology was adopted broadly, there may be an

4  increase in the price of XRP, which would benefit

10:41:17  5  the company as a holder of XRP, but there was also

6  an acknowledgment that the technology may be

7  broadly adopted and that thesis may not be

8  correct; that -- that that asset may or may not

9  appreciate in value.  And so this sentence I think

10:41:33  10  was deliberately worded saying -- using the word

11  "hope" in multiple places in this -- in this page.

12      Q.   So when you say in this sentence

13  "monetize its only asset," you're referring to

14  XRP?

10:41:46  15      A.   That's correct.

16      Q.   And moving on to the next page, page 18,

17  Bates numbered 7842 on the bottom, the very last

18  sentence says "The Ripple ecosystem needs

19  gateways," mark -- "market makers, developers, and

10:42:10  20  merchants to fulfill its potential."

21      Do you see that?

22      A.   Yes.

23      Q.   And was that sentence accurate when you

24  wrote it?

10:42:24  25      A.   That was my view at the time.  Whether

78

10:42:25   1   or not it's true I think is debatable.

2          Q.   Okay.   What was your view based on at

3   the time?

4          A.   Knowledge of the technology and a lot of

10:42:39   5   hours of thought about the applicability of the

6   technology in the marketplace.

7          Q.   And why is it debatable whether or not

8   it's true?

9          A.   Well, for example, it references

10:42:51  10   merchants and it is possible for the Ripple net --

11   ecosystem to fulfill its potential without

12   merchants.   It's unclear what its potential was.

13   This was an early stage company and, like many

14   early stage companies, there's a lot of

10:43:07  15   trajectories it could have taken.

16          Q.   Okay.   Were you seeking out merchants at

17   this time for the Ripple ecosystem?

18          A.   Yes.

19          Q.   What kinds of merchants?

10:43:26  20          A.   Merchants involved in the payments flow

21   of transactions.   So, for example, businesses,

22   infrastructure, and providers of services around

23   card terminals when you buy something.   Like if

24   you buy a Starbucks coffee using a card, that's

10:43:45  25   a -- a merchant and infrastructure surrounding the

79

```
10:43:47   1    merchant.
           2        Q.    Okay.  And what's the reference to
           3    "gateways" in this sentence?
           4        A.    Gateways is defined earlier in the
10:43:57   5    document, but the simplified version is on-ramp or
           6    off-ramp for currencies other than XRP to the
           7    Ripple network.
           8        Q.    I think you mentioned that -- that
           9    Mr. ████████ who's on the cover e-mail of this
10:44:25  10    exhibit, was a seed investor in Ripple, is that
          11    right?
          12        A.    That's my recollection.
          13        Q.    Okay.  Do you know if he also owned XRP?
          14            MR. GULAY:  Objection.
10:44:42  15        A.    I don't know whether he did or did not,
          16    but his e-mail implies he does.
          17        Q.    And when you say your -- his e-mail
          18    observed that he does, what do you mean by that?
          19            MR. HORTON:  Objection.  You
10:44:59  20     mis -- you misquoted his testimony, but...
          21        Q.    Okay.  Well -- well, can you see
          22    something in his e-mail that suggests that he
          23    owned XRP?
          24        A.    When I read his e-mail at the bottom of
10:45:20  25    this page, 22 --
```

80

```
10:45:24   1          Q.    Okay.

           2          A.    -- my takeaway is that he likely owned

           3    XRP.

           4          Q.    And is that because he says "when my

10:45:31   5    ripples makes me so rich that I can cover myself

           6    in gold plating"?

           7          A.    Yes.

           8          Q.    Okay.  Did you have an understanding at

           9    this time in 2013 that certain individuals or

10:45:42  10    firms bought XRP for speculative reasons?

          11                MS. BUNTING:   Objection.

          12                MR. HORTON:   Objection to form.

          13          A.    I do believe that people speculated on

          14    the price of XRP.

10:45:59  15          Q.    Did Mr. ██████ speculate on the price of

          16    XRP?

          17                MR. HORTON:   Objection to form.

          18          A.    I don't know anything about Mr. ████████

          19    speculations other than this e-mail.

10:46:10  20          Q.    And who is Mr. ██████?

          21          A.    He was a high-ranking executive at ████

          22    ██████ newspaper.

          23          Q.    And you said he was a friend of

          24    Mr. Larsen?

10:46:24  25          A.    That's my understanding.
```

                                                                      81

10:46:33 1        Q.   Did Ripple seek out investors who were

2    looking to buy XRP for speculative reasons?

3                     MR. GULAY:  Objection to form.

4        A.   I'm not aware of what all employees did

10:46:41 5    at the company.  I did not actively seek out

6    investors.

7        Q.   Do you know of any Ripple employees who

8    did actively seek out investors who were looking

9    to speculate on XRP?

10:46:53 10       A.   I'm not aware of that.

11                    MR. GULAY:  Objection.

12                    MS. STEWART:  Nicole, we're on

13        PR-10 now.

14                    (Whereupon, exhibit is presented

10:47:11 15        and marked SEC Rapoport Exhibit PR-10 for

16        identification.)

17                    MS. STEWART:  Okay.  PR-10 for

18        the record is Bates numbered RPLI_SEC

19        0843205 through 213.

10:47:34 20   BY MS. STEWART:

21        Q.   And, once again, if you can take a

22   moment to look at this document and let me know

23   when you're done.

24                    (Pause)

10:53:25 25       A.   Okay.  I've reviewed this.

82



10:53:27  1       Q.   Okay.  So focusing on the cover e-mail

2   of PR-10, what is this document?

3       A.   What is the cover e-mail?

4       Q.   Yeah.

10:53:39  5       A.   This appears to be my sending this

6   document to ████████████ and ██████████.

7       Q.   Okay.  Who is ████████████?

8       A.   ████████████ is an attorney for ████████

9   ██████.

10:53:56 10       Q.   And who is ████████████?

11       A.   ████████████ is -- was someone who had

12   a -- who I was speaking with about potentially

13   providing market-making services on the Ripple

14   network.

10:54:10 15            THE REPORTER:  "On the..."?

16       A.   On the Ripple network.

17       Q.   And ████████████ is at the firm ████████

18   █████?

19       A.   My discussions at this time were

10:54:23 20   independent of ████████████; but, yes, he's the

21   founder and CEO of ████████████.

22       Q.   And what do you mean they're

23   independent -- they "were independent of ████████

24   █████"?

10:54:32 25       A.   His investigation of potentially

83

```
10:54:33   1   providing market-making services on the Ripple

           2   network was independent of ████████████ as an

           3   entity and was conducted under a separate entity

           4   unrelated to ████████████.

10:54:53   5        Q.   Okay.

           6        A.   Unaffiliated.

           7        Q.   Okay.  And what was the result of those

           8   discussions with Mr. ████████?

           9        A.   He ultimately started a -- a new

10:55:03  10   unaffiliated entity and -- which that entity

          11   became a market maker on the Ripple network.

          12        Q.   And which -- what's the entity?

          13        A.   Its d/b/a name was ████████████.  I

          14   don't recall the LLC name.

10:55:25  15        Q.   And when did ████████████ become a

          16   market maker on the Ripple network?

          17        A.   I don't recall the date without

          18   researching it.

          19        Q.   Was it shortly after this e-mail

10:55:36  20   exchange that we're looking at, PR-10?

          21        A.   I'm sorry, I don't recall how long

          22   after -- after this e-mail.

          23        Q.   Okay.  And for how long did ████████████

          24   ████████ provide market-making services on the Ripple

10:55:48  25   network?
```

                                                              84

10:55:54  1      A.   I'm not sure of the answer to that.

          2      Q.   And on what trades did ██████████ act

          3  as a market maker on the Ripple network?

          4           MR. GULAY:  Objection.

10:56:11  5      A.   Could you clarify what you're asking so

          6  I can answer correctly?

          7      Q.   On what trading pairs?  I'll -- I'll

          8  reask my question.

          9           Did ██████████ act as a market maker

10:56:21 10  on trading pairs that included XRP?

         11           MR. GULAY:  Objection.

         12      A.   I don't recall the specifics of ████████

         13  ████ but, generally speaking, the agreements

         14  were very similar across market makers and

10:56:37 15  required each market maker to quote XRP pair --

         16  pairs against XRP, as well as other pairs, like

         17  bitcoin dollar and gold dollar, and gave Ripple

         18  the right to grow the list of required pairs over

         19  time if I recall correctly.

10:56:56 20      Q.   And were the market makers compensated

         21  for quoting pairs that did not include XRP?

         22           MR. GULAY:  Objection.

         23      A.   Yes.

         24      Q.   Were they compensated the same amount as

10:57:11 25  they were for quoting pairs that did include XRP?

                                                              85

```
10:57:14   1        A.   They were compensated --

           2                MR. GULAY:  Objection.  Sorry.

           3         Objection.  And can you just clarify which

           4         market makers we're talking about?

10:57:19   5                MS. STEWART:  Well, I think his

           6         last answer was generally about mark --

           7         market makers during his time at Ripple so

           8         I'm -- that's what I'm asking about.

           9        A.   I don't recall the specifics of any

10:57:27  10    particular market-making agreement, but, in

          11    general, they were similar.  And, in general,

          12    they -- the compensation was an exchange for

          13    fulfilling the agreement in its totality, not for

          14    specific parts of the agreement.

10:57:44  15        Q.   Is it fair to say that the focus of the

          16    agreement was on trading pairs that included XRP?

          17                MR. HORTON:  Objection to form.

          18                MS. BUNTING:  Objection.

          19        A.   I would disagree with that.

10:57:56  20        Q.   And why would you disagree with that?

          21        A.   Because I don't believe the focus was on

          22    pairs that included XRP.

          23        Q.   Was there a focus?

          24                MR. HORTON:  Objection to form.

10:58:06  25                MR. GULAY:  Objection.
```

86

10:58:07  1            MS. BUNTING:  Objection.

       2       A.    No.

       3       Q.    So going back to PR-10 and looking at

       4  the very bottom e-mail, which starts at the bottom

10:58:21  5  of the first page and runs to the second page,

       6  which appears to be an e-mail from you to

       7  Mr. ███████, do you see that?

       8       A.    Yes.

       9       Q.    And you -- you say to Mr. ███████, "As I

10:58:34 10  mentioned, government guidance has been sparse,

      11  but here are two bitcoin-centric things that were

      12  issued earlier this year."

      13            Do you see that?

      14       A.    Yes.

10:58:44 15       Q.    So this -- this suggests that you had an

      16  earlier conversation with Mr. ███████, is that

      17  right?

      18       A.    I recall having a number of phone calls

      19  with him and this e-mail implies that we had a

10:59:00 20  phone call prior to this e-mail, yes.

      21       Q.    Okay.  And what did you discuss with

      22  Mr. ███████ on the -- on the subject of government

      23  guidance being sparse?

      24       A.    I don't recall the specifics of our

10:59:13 25  conversations from 2013 apart from the fact that I

                                                              87

| | | |
|---|---|---|
| 10:59:16 | 1 | was providing a general overview of Ripple. |
| | 2 | Q.   You say in the next sentence "We |
| | 3 | emphasize that Ripple is different from bitcoin in |
| | 4 | many ways." |
| 10:59:28 | 5 | Do you see that? |
| | 6 | A.   Yes. |
| | 7 | Q.   Okay.  What did you mean by that? |
| | 8 | MR. GULAY:  I just want to pause |
| | 9 | here and ask Mr. Rapoport to answer |
| 10:59:32 | 10 | without revealing the substance of any |
| | 11 | privileged communications he may have had |
| | 12 | with Perkins Coie or other counsel. |
| | 13 | BY MS. STEWART: |
| | 14 | Q.   And I would add to that the extent you |
| 10:59:44 | 15 | had passed on whatever communications you would -- |
| | 16 | you had had to third parties, like Mr. ███████, |
| | 17 | then I think your counsel would agree that you can |
| | 18 | testify about those. |
| | 19 | MR. GULAY:  Well, no, I don't |
| 10:59:52 | 20 | agree with that.  I think to the extent |
| | 21 | your understanding of this language here, |
| | 22 | that Ripple is different from bitcoin in |
| | 23 | many ways, is derived from your |
| | 24 | communications with counsel, then I would |
| 11:00:03 | 25 | instruct you not to testify. |

88

| | | |
|---|---|---|
| 11:00:06 | 1 | BY MS. STEWART: |
| | 2 | Q. Can you testify without revealing |
| | 3 | communications with counsel? |
| | 4 | A. Yes. |
| 11:00:09 | 5 | Q. Okay. |
| | 6 | A. Can you repeat your question again? |
| | 7 | Q. I want to know what you meant when you |
| | 8 | wrote "I'd reemphasize that Ripple is different |
| | 9 | from bitcoin in many ways." |
| 11:00:43 | 10 | A. I don't recall the specifics of this |
| | 11 | conversation, but given the context of the e-mail, |
| | 12 | I believe that this is referring to the fact that |
| | 13 | bitcoin and XRP share similarities in being a |
| | 14 | math-based digital asset; but the Ripple network |
| 11:01:00 | 15 | also includes IOUs or balances of iss -- of |
| | 16 | issuers, which is unique to Ripple and not shared |
| | 17 | by bitcoin, as well as a decentralized exchange |
| | 18 | which bitcoin doesn't -- doesn't contain. |
| | 19 | MR. TENREIRO: Before we move on, |
| 11:01:18 | 20 | I just want to create a record on this |
| | 21 | because we're having this and we continue |
| | 22 | to have this. You're instructing him not |
| | 23 | to answer what counsel told him even if he |
| | 24 | disclosed that to a third party? |
| 11:01:28 | 25 | MR. GULAY: No. We're talking |

89

| | | |
|---|---|---|
| 11:01:29 | 1 | about the language in the e-mail here and |
| | 2 | I think the question was what Mr. Rapoport |
| | 3 | understood when he wrote that language. |
| | 4 | And I'm -- I'm instructing him not to |
| 11:01:39 | 5 | testify to the extent that his |
| | 6 | understanding of this language here |
| | 7 | derives from his communications with |
| | 8 | counsel. |
| | 9 | MR. TENREIRO:  But if he conveyed |
| 11:01:46 | 10 | his understanding of that language to a |
| | 11 | third party, he can then testify to it, |
| | 12 | right?  Because he's disclosed it. |
| | 13 | MR. GULAY:  Well, no, I mean, |
| | 14 | obviously he -- you know, he conveyed this |
| 11:01:54 | 15 | white paper to third parties, and you |
| | 16 | know, the -- the white paper has been |
| | 17 | produced and is not privileged.  But, |
| | 18 | like, to give you an example, to the |
| | 19 | extent he had discussions with counsel |
| 11:02:05 | 20 | about this white paper and the preparation |
| | 21 | of the white paper, we would assert |
| | 22 | privilege over that. |
| | 23 | MR. TENREIRO:  Absolutely.  But |
| | 24 | if he disclosed the conversations with |
| 11:02:13 | 25 | counsel in conversations about the white |

90

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 11:02:14 | 1 | paper with the third party that's copied |
| | 2 | in the e-mail, that's not privileged. |
| | 3 | MR. GULAY:  I just don't under -- |
| | 4 | I don't understand what that means, |
| 11:02:19 | 5 | though.  Like, what's the scope of, you |
| | 6 | know, the extent of, like, disclosing |
| | 7 | conversations with counsel?  I don't |
| | 8 | understand. |
| | 9 | MR. TENREIRO:  The guy might have |
| 11:02:27 | 10 | asked him What did you mean by, you know, |
| | 11 | bitcoin is different from XRP?  And he |
| | 12 | might have answered. |
| | 13 | MR. GULAY:  We're going to |
| | 14 | instruct him not to answer. |
| 11:02:34 | 15 | MR. TENREIRO:  You're going to |
| | 16 | instruct him not to answer.  Okay.  We're |
| | 17 | going to reserve our rights. |
| | 18 | MR. GULAY:  That's fine. |
| | 19 | MR. TENREIRO:  Okay.  Go on.  And |
| 11:02:43 | 20 | also -- I just want to also point out for |
| | 21 | the record that there has been a limited |
| | 22 | waiver on the Perkins Coie memos |
| | 23 | themselves, so, you know, we should also |
| | 24 | keep that in mind.  But we obviously don't |
| 11:02:54 | 25 | agree with you that if he answered a third |

91

11:02:55  1          party's question, What did you mean by
          2          bitcoin is different than XRP? that that
          3          conversation cannot be repeated here
          4          because it's obviously not privileged.
11:03:02  5          But I -- I have your position.  We
          6          disagree.
          7                  MS. ZORNBERG:  I'll just add
          8          that, you know, we can take it on a
          9          case-by-case basis.  If you actually lay a
11:03:12 10          proper foundation for there being some
         11          discussion between a third party, we're
         12          happy to revisit it in the context of a
         13          foundation being laid as to a particular
         14          conversation.  I do think it needs to be
11:03:23 15          done on a case-by-case basis.
         16                  MR. TENREIRO:  That's fair.
         17                  MS. ZORNBERG:  In any event, the
         18          witness said that he could answer the
         19          question without revealing legal advice
11:03:28 20          that Ms. Stewart put to him and he did.
         21          So I don't think there's an issue for this
         22          particular instance.
         23                  MR. TENREIRO:  Okay.
         24     BY MS. STEWART:
11:03:36 25          Q.   Mr. Rapoport, was your statement here

                                                          92

11:03:39  1  that Ripple is different from bitcoin in many ways

 2  related to the -- to the issue of government

 3  guidance that you seem to be referring to in this

 4  paragraph?

11:03:50  5                 MR. GULAY:  Same instruction

 6      about your discussions with counsel.

 7      A.   I don't recall my intent and whether or

 8  not there's a link between those sentences.

 9      Q.   Okay.  I understand your testimony that

11:04:11 10 the technologies of bitcoin and -- and XRP are

11 different; but my question is, did you have an

12 understanding at this time, in 2013, that

13 regulatory guidance was different as to bitcoin

14 and XRP?

11:04:27 15               MS. BUNTING:  Objection.

16               MR. GULAY:  Same instruction

17     about discussions with counsel.

18     A.   That's a very broad question.  Because

19 Ripple as a technology includes balances issued by

11:05:00 20 an issuer, as well as a decentralized exchange, my

21 understanding was and is that there are inherently

22 additional considerations as a result of those

23 things from a regulatory perspective that don't

24 apply to bitcoin.

11:05:19 25     Q.   And what are those additional

93

```
11:05:20   1    considerations?
           2                   MR. GULAY:   Objection; foundation
           3            and same instruction about discussions
           4            with counsel.
11:05:29   5         A.    I'm not a lawyer to really express that,
           6    to answer that in a -- in a coherent way I think.
           7         Q.    Well, but you -- you say that you have
           8    an understanding that there are differences.
           9                   So do you have any general sense of what
11:05:47  10    the differences are?
          11         A.    Well --
          12                   MS. BUNTING:   Objection.
          13         A.    I generally understand that exchanges,
          14    for example, have -- may have regulatory framework
11:05:58  15    applied to them.   And if one technology has a
          16    built-in exchange and one doesn't, there may -- I
          17    understood that there may be other considerations
          18    that would apply.   But the specifics of those
          19    considerations, I -- I don't profess to
11:06:12  20    understand.
          21         Q.    Okay.   At the end of your -- your e-mail
          22    to Mr. █████████, you say "Also, in case it's of
          23    interest to you, this law firm has established
          24    itself as the early expert in these technologies."
11:06:29  25     And you send a link to the Perkins Coie website.
```

94

| | | |
|---|---|---|
| 11:06:33 | 1 | Do you see that? |
| | 2 | A.   Yes. |
| | 3 | Q.   Okay.  And why did you send this link to |
| | 4 | Mr. ████? |
| 11:06:49 | 5 | A.   Back in 2013 there was a limited number |
| | 6 | of law firms with domain expertise in the digital |
| | 7 | asset space.  And I think many people would find |
| | 8 | it pretty daunting to get a friend -- you know, a |
| | 9 | law firm without domain expertise in that area up |
| 11:07:09 | 10 | to speed to provide legal advice. |
| | 11 | And so I found it -- I think people |
| | 12 | found it helpful to be informed about which law |
| | 13 | firms already had clients in the space and |
| | 14 | familiarity with the space. |
| 11:07:21 | 15 | Q.   So are you suggesting to Mr. ██████ |
| | 16 | that -- that his client, Mr. ██████, engage |
| | 17 | Perkins Coie? |
| | 18 | MR. HECKER:  Objection. |
| | 19 | MR. GULAY:  Objection. |
| 11:07:31 | 20 | A.   I wasn't making any kind of |
| | 21 | recommendation or suggestion. |
| | 22 | Q.   Okay.  So, again, I'm not sure I |
| | 23 | understand what the purpose is of -- of sending |
| | 24 | Mr. ██████ the Perkins Coie website link. |
| 11:07:46 | 25 | MS. BUNTING:  Objection. |

95

```
11:07:46   1                    MR. HORTON:  Objection to form.
           2                    MS. BUNTING:  What's the
           3         question?
           4    BY MS. STEWART:
11:07:55   5         Q.   I want to know why you sent to
           6    Mr. █████  this link to the Perkins Coie website.
           7                    MR. HORTON:  Objection; asked and
           8         answered.
           9                    MR. GULAY:  Objection.  He
11:08:04  10         answered that question.
          11         A.   I believe I answered that question,
          12    which is that I believed it helpful for someone
          13    new to the space that would likely be seeking
          14    legal representation about the space to be aware
11:08:23  15    of law firms that already had domain expertise in
          16    the space.
          17         Q.   At the time you sent this e-mail, was
          18    Perkins Coie counsel for Ripple?
          19         A.   I was not aware of which law firms were
11:08:45  20    officially engaged and not engaged by Ripple and
          21    at what times.  I was aware of this memo and other
          22    similar memos, but that was the extent of my
          23    knowledge of Ripple's dealings with Perkins Coie.
          24         Q.   So -- so fair to say at this time in
11:09:00  25    2013, you understood that Perkins Coie at some
```

96

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:09:02   1    point had been counsel to Ripple?
           2                MR. HORTON:  Objection to form.
           3        A.   It's -- let me actually correct that
           4    because I did have phone calls at times with
11:09:14   5    legal -- with Ripple's outside counsel, but the
           6    specifics of which counsel and what time are
           7    difficult for me to remember given how much time
           8    has passed.
           9        Q.   Okay.  But at the time of -- of this
11:09:27  10    e-mail exchange in PR-10, did you have an
          11    understanding that PR Coie -- that -- that Perkins
          12    Coie had acted as counsel to Ripple at some point
          13    in the past?
          14                MR. HORTON:  Objection to form.
11:09:37  15        A.   Based on this memo, my -- it's a
          16    reasonable assumption that -- that that Perkins
          17    Coie was engaged by Ripple, and so that would have
          18    been my assumption today and at the time.
          19        Q.   Okay.  And -- and I take it that's
11:09:48  20    because the -- the -- the memo says "Perkins Coie"
          21    on top?
          22                MR. GULAY:  Objection.
          23        A.   Correct, though this is an unusual
          24    document that says who can I contact for questions
11:10:06  25    and includes both Patrick Griffin of Ripple Labs
```

97

| | | |
|---|---|---|
| 11:10:08 | 1 | and ████████ of Perkins Coie, which isn't |
| | 2 | typical of a legal memo. |
| | 3 | Q.   Okay.  And why were you sending this |
| | 4 | document entitled "White Paper" to Mr. █████? |
| 11:10:28 | 5 | A.   I don't recall what my thought process |
| | 6 | was back in 2013, but I believe that at a minimum, |
| | 7 | this document would help familiarize someone new |
| | 8 | to this space with what some of the key questions |
| | 9 | may be as they begin an investigation into the |
| 11:10:44 | 10 | space. |
| | 11 | Q.   Did Ripple at any point sell XRP to |
| | 12 | ████████? |
| | 13 | A.   I don't believe so, but my recollection |
| | 14 | is too fuzzy to say that definitively. |
| 11:11:18 | 15 | Q.   Did Ripple at any point sell XRP to |
| | 16 | Mr. ██████ or any other company affiliated with |
| | 17 | him? |
| | 18 | MS. BUNTING:  Objection. |
| | 19 | MR. HORTON:  Objection. |
| 11:11:33 | 20 | MR. GULAY:  Objection.  Just to |
| | 21 | clarify, what time period are you talking |
| | 22 | about? |
| | 23 | MS. STEWART:  At any point during |
| | 24 | Mr. Rapoport's tenure. |
| 11:11:40 | 25 | MR. GULAY:  Okay. |

98

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:11:41   1        A.   Same answer, which is I don't believe
           2   so, but my recollection is too hazy to say
           3   definitively no.
           4               MR. TENREIRO:  They're not
11:12:13   5           collated correctly.
           6               MS. STEWART:  Nicole, the -- the
           7           next exhibit is PG-5 -- 6, sorry.  PG-6.
           8           That should be in a separate folder,
           9           Nicole.
10:47:11  10   BY MS. STEWART:
          11        Q.   Okay.  So for the record, I've handed
          12   you a document that was previously marked as PG-6,
          13   and it's Bates numbered RPLI_SEC 0337666 through
          14   673.
11:14:50  15               (Pause)
          16        A.   Okay.  I've reviewed this.
          17        Q.   Okay.  What is this document?
          18        A.    I don't recall this document
          19   independently, but based on the cover e-mail, it
11:15:10  20   appears to be a document that Patrick put together
          21   to share with ██████████.
          22        Q.   Who is ████████████?
          23        A.   She's a ████ professor and ██████
          24   ████████ at ████████ who was an advisor to
11:15:27  25   Ripple at various points in time.
```

                                                                99

```
11:15:29    1         Q.   Was she an advisor to Ripple in 2013?
            2         A.   I'm not sure of her official status, but
            3    she certainly provided informal advice to us on a
            4    number of occasions.
11:15:43    5         Q.   Okay.  And from -- from Mr. Griffin's
            6    cover e-mail to you, it -- it -- it -- it seems
            7    that he intends to send this document to
            8    Ms ███████.
            9              Is that -- is that your understanding?
11:15:58   10         A.   That's my understanding, yes.
           11         Q.   Okay.  And what was the purpose of this
           12    document that's attached to Mr. Griffin's e-mail
           13    to you?
           14              MR. GULAY:   Objection;
11:16:05   15     foundation.
           16         A.   I don't recall the document, but from
           17    reading it, it appears that it's a document aimed
           18    at discussing distribution of XRP with ███████.
           19         Q.   Do you remember discussing that issue
11:16:29   20    with Ms. ███████?
           21         A.   I have a general recollection of
           22    discussing that issue with her, yes.
           23         Q.   What's your recollection?
           24         A.   That we viewed her to be a very
11:16:40   25    intelligent thinker about systems and markets and
```

100

| | | |
|---|---|---|
| 11:16:45 | 1 | that we viewed her advice on those topics as very |
| | 2 | valuable. |
| | 3 | Q.   And was this part of your and |
| | 4 | Mr. Griffin's efforts to develop a distribution |
| 11:17:00 | 5 | strategy -- |
| | 6 | MS. BUNTING:  Objection. |
| | 7 | Q.   -- for XRP? |
| | 8 | A.   We were interested in thinking about the |
| | 9 | most effective ways to get XRP into the world and |
| 11:17:19 | 10 | distribute it. |
| | 11 | Q.   Okay.  Was -- is it fair to say that |
| | 12 | that was a distribution strategy? |
| | 13 | MR. GULAY:  Objection. |
| | 14 | A.   I think an overall strategy was |
| 11:18:01 | 15 | discussed at times that specific tactics were not |
| | 16 | well defined and the company continued to |
| | 17 | experiment for most all of my time there. |
| | 18 | Q.   Okay.  Is it fair to say that you were |
| | 19 | developing a distribution framework for XRP as -- |
| 11:18:23 | 20 | as seems to be the title of this document? |
| | 21 | MR. GULAY:  Objection. |
| | 22 | A.   This was a discussion document from what |
| | 23 | I can tell.  And, yes, it appears to discuss a -- |
| | 24 | a framework around how the company could |
| 11:18:44 | 25 | distribute its XRP. |

101

```
11:18:46   1        Q.   Okay.  Did you provide comments to
           2   Mr. Griffin in this document?
           3        A.   I don't recall whether I provided
           4   comments on this document.  It's certainly a topic
11:18:57   5   we discussed at times.
           6        Q.   Okay.  Do you remember discussing
           7   this -- this deck, a draft of which is attached in
           8   PG-6, with Mr. Griffin?
           9        A.   I don't remember this e-mail or this
11:19:10  10   deck given the amount of time that's passed.
          11        Q.   Okay.
          12             MS. STEWART:  Can we look at
          13        PR-16 next?
          14             (Whereupon, exhibit is presented
11:19:29  15        and marked SEC Rapoport Exhibit PR-16 for
          16        identification.)
          17             MS. STEWART:  PR-16 is Bates
          18        numbered RPLI_SEC 0012358.
          19             (Pause)
11:20:08  20        A.   Okay.  I've reviewed this.
          21        Q.   Okay.  Does this document refresh your
          22   recollection that you provided comments to
          23   Mr. Griffin on the deck that we were just looking
          24   at?
11:20:16  25        A.   I see the responses and they're clearly
```

102

11:20:17  1   from me, but I don't have a specific recollection

       2   of -- of this e-mail.

       3        Q.   Okay.  Looking at the top e-mail from

       4   you to Mr. Griffin dated 11/30/2013 and looking

11:20:30  5   at, I guess the fourth bullet point, you say "We'd

       6   prefer to attract speculators who take a long-term

       7   view and believe XRP demand will overwhelm supply

       8   as commercial use of the network increases."

       9        Do you see that?

11:20:44 10        A.   Yes.

      11        Q.   What did you mean by this sentence?

      12        A.   I was aware of the fact that some people

      13   were speculating on the price of XRP.  And given

      14   the choice, I would have preferred people who took

11:21:20 15   a long-term view on that.

      16        Q.   Okay.  So let's unpack that a little.

      17        How were you aware that some people were

      18   speculating on XRP?

      19        A.   Despite our efforts to focus

11:21:43 20   conversations on the protocol and not the digital

      21   asset, as some of the e-mails you've already shown

      22   indicate, at times people would e-mail us

      23   indicating that they're speculating on the price

      24   of XRP or speak to us or -- you know, along that

11:22:06 25   topic.

                                                          103

11:22:07  1       Q.   And why is it that you preferred

2    speculators who took a long-term view?

3       A.   Parsing this sentence, and I don't

4    recall what my thought process was when I wrote

11:22:39  5    this, but it appears that I'm referring to -- the

6    second sentence here says "If you believe 500

7    million people will eventually use Ripple, then

8    there's far less concern of an XRP supply

9    overhang."  And that refers to a concern that was

11:22:56 10    in the marketplace about -- not specific to

11    Ripple, but that applied to Ripple, a concern

12    about one holder holding a large amount of a

13    digital asset.

14            And so I interpret this comment to be

11:23:11 15    that you would not have that concern if you took a

16    very long-term view of the protocol and what may

17    become of the protocol.  You would not be

18    concerned about the supply overhang from one large

19    holder -- in this case Ripple -- holding a digital

11:23:26 20    asset.

21       Q.   Okay.

22            MS. ZORNBERG:  And Ripple there,

23       you're talking about Ripple Labs?

24            THE WITNESS:  I'm talking about

11:23:32 25       Ripple Labs, excuse me.

104

```
11:23:34   1   BY MS. STEWART:
           2       Q.   Okay.   The next bullet, you say "Good BD
           3   giveaways" will resul -- "will result in more
           4   demand than supply.   The announcement of the
11:23:43   5   giveaway/partnership should generate demand."
           6            Do you see that?
           7       A.   Yes.
           8       Q.   Okay.   What -- what did -- what does "BD
           9   giveaways" mean as you use it in the sentence?
11:23:56  10       A.   "BD" refers to business development and
          11   "giveaway" refers to the business development team
          12   making a grant of XRP to somebody or some company.
          13       Q.   Okay.   And when you say "The
          14   announcement of the giveaway/partnership should
11:24:14  15   generate demand," are you referring to any
          16   particular announcement or to announcements of
          17   giveaways and partnerships in general?
          18       A.   That's a general comment.
          19            MR. GULAY:   Objection.
11:24:25  20       Q.   Okay.   So you -- you mentioned that you
          21   were aware from e-mails, like some of the ones
          22   we've looked at already, that certain people
          23   were -- were speculating on XRP.
          24            Do you remember that?
11:24:49  25       A.   Yes.
```

105

11:24:50  1    Q.   Okay.  Do you recall receiving e-mails

2   or having conversations with -- with particular

3   individuals or firms about them speculating on

4   XRP?

11:24:59  5                MS. BUNTING:  Objection.

6        A.   I was generally aware -- I recall being

7   generally aware of that fact, but I don't recall

8   specific discussions, you know, from seven years

9   ago about it.

11:25:13 10    Q.   Do you recall discussions internally at

11  Ripple about individuals or firms who were

12  speculating on XRP?

13       A.   I recall a specific desire to focus our

14  discussions on the technology itself and away from

11:25:27 15  speculation on an XRP.

16       Q.   And why is that?

17       A.   Because we viewed speculation on XRP to

18  be a distraction from the core technology and the

19  use of the core technology.

11:25:43 20    Q.   But is it fair to say that speculation

21  was also helpful in building liquidity for XRP?

22                MR. HORTON:  Objection to form.

23                MS. BUNTING:  Objection.

24       A.   Building liquidity means getting more

11:25:59 25  volume.  So anything that gets more volume is

106

| | | |
|---|---|---|
| 11:26:01 | 1 | helpful to building liquidity.  And so speculator |
| | 2 | trading creates volume, so, yes. |
| | 3 | Q.   Okay. |
| | 4 |         MS. STEWART:  Let's look at a |
| 11:26:15 | 5 |     document we've previously marked as PG-5. |
| | 6 |         Nicole, that's also in a |
| | 7 |     separate folder. |
| | 8 |         And for the record, PG-5 is |
| | 9 |     Bates numbered RPLI_SEC 0012359 through |
| 11:26:35 | 10 |     12368. |
| | 11 |         (Pause) |
| | 12 | A.   Okay.  I've reviewed it. |
| | 13 | Q.   Okay.  Is it fair to say that the |
| | 14 | attachment to PG-5 reflects some of the comments |
| 11:28:02 | 15 | you gave Mr. Griffin in the last exhibit we looked |
| | 16 | at? |
| | 17 | A.   I see some of the same language |
| | 18 | included, yes. |
| | 19 | Q.   Okay.  So do you recall a conversation |
| 11:28:15 | 20 | with Ms. Athey after Mr. Griffin sent her this |
| | 21 | deck in PG-5? |
| | 22 | A.   I don't -- I -- I generally remember |
| | 23 | speaking with Ms. ███ at various points in time, |
| | 24 | but I don't remember the specific discussion or |
| 11:28:32 | 25 | anything about it. |

107

11:28:32  1      Q.   Okay.  The cover e-mail in PG-5

2      references "Thank you for your time here.  We

3      really value your input.  As promised, here is a

4      summary of the themes we touched on during our

11:28:45  5      call on Wednesday."

6           Just to -- just to make sure, do you

7      remember the call that's referenced here with

8      Ms. ▇▇▇▇?

9      A.   I don't.

11:28:53 10      Q.   Okay.  So looking at the -- at the deck,

11      on page -- on the second page of the -- of the

12      deck, which is Bates numbered on the bottom 12362,

13      where the title is "Goal of Distribution," do you

14      see that?

11:29:10 15      A.   Yes.

16      Q.   Okay.  And there's two bullets under

17      there.  The first is "Network growth."

18           Do you see that?

19      A.   Yes.

11:29:17 20      Q.   And what does that mean?

21      A.   This is such a sparse slide that I would

22      be guessing as to the meaning of -- you know, the

23      meaning that Patrick ascribed to this when he

24      wrote it.

11:29:35 25      Q.   Well, the -- the second bullet says

108

```
11:29:36   1   "Raise funds for Ripple Labs operation."
           2            Do you see that?
           3       A.   Yes.
           4       Q.   Okay.  What does that mean to you?
11:29:41   5            MR. GULAY:  Objection;
           6        foundation.  And just to clarify, what
           7        does it mean to him sitting here today or
           8        what did it mean to him at the time?
           9   BY MS. STEWART:
11:29:55  10       Q.   Well, let's start with at the time that
          11   you reviewed and commented on it.
          12            What -- what did this mean to you?
          13       A.   This was almost eight years ago and, you
          14   know, one month into my tenure at the company.
11:30:16  15   I -- I really don't remember any specifics about
          16   this interaction apart from what I'm looking at
          17   today that you just showed me.
          18       Q.   Okay.  Do you recall at the time, in
          19   2013, having an understanding that one of the
11:30:25  20   goals of distributing XRP was to raise funds for
          21   the operations of Ripple Labs?
          22       A.   I was aware that the company received
          23   revenue from the sale of XRP, yes.
          24       Q.   Okay.  But -- but -- but I guess my
11:30:40  25   question is a little bit different.
```
                                                                     109

11:30:42 1        Did you have an understanding that one

2    of the reasons that the company sold XRP was

3    specifically to raise money to fund its

4    operations?

11:30:51 5              MS. BUNTING:  Objection.

6        A.   I was aware that the company received

7    venture funding and also that the company took in

8    dollars from the sale of XRP.  I did not have

9    visibility or I do not recall having visibility

11:31:14 10   into the financial health of the firm and whether

11   this was required to fund operations or for other

12   reasons.

13        Q.   Okay.  Did you have an understanding in

14   2013 that one of the goals of distributing XRP was

11:31:29 15   to grow the Ripple network?

16        A.   Yes.

17        Q.   Okay.  And is it fair to say that the

18   bullet here "Network growth" refers to growing the

19   Ripple network?

11:31:46 20        A.   I think that seems like a reasonable

21   assumption, yes.

22        Q.   Okay.  Moving on to the next page, which

23   is Bates numbered 363 at the end, and this refers

24   to three phases of Ripple -- of Ripple's long --

11:32:01 25   I'm sorry.  Let me start again.

110

11:32:03  1            The title of this page is "Long-term
         2    Stages of Ripple."
         3            Do you see that?
         4       A.   Yes.
11:32:07  5       Q.   And three phases are referenced here?
         6       A.   Yes.
         7       Q.   Okay.  Did you discuss these phases with
         8    Mr. Griffin?
         9       A.   I don't have any recollection of whether
11:32:20 10    we discussed it, but this e-mail implies that I
        11    read this document and provided some feedback and
        12    that a discussion with Susan was had.
        13       Q.   Okay.  Phase 1, it says here, is titled
        14    "Speculatively valuable."
11:32:36 15            Do you see that?
        16       A.   Yes.
        17       Q.   And it says "In this stage, XRP is new
        18    and few adopters.  XRP is valuable among
        19    speculators."
11:32:44 20            Do you see that?
        21       A.   Yes.
        22       Q.   Okay.  In 2013 what phase of these three
        23    phases was Ripple in?
        24            MR. GULAY:  Objection.
11:33:02 25       A.   I don't know that I'd characterize these

                                                         111

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

11:33:03  1   three phases from a discussion document as a

        2   necessarily accurate depiction of the trajectory

        3   of anything.

        4      Q.   Okay.  Well, let me ask you, looking at

11:33:17  5   these three phases now, are these accurate?  Are

        6   these accurate descriptions of the trajectory of

        7   the Ripple network?

        8              MR. GULAY:  Objection.

        9      A.   I would not describe -- use this

11:33:40 10   framework to describe Ripple.

       11              MR. GULAY:  Just to clarify, are

       12        you referring to Ripple Labs or Ripple

       13        network?

       14      A.   I would not use this framework to

11:33:50 15   describe anything.

       16      Q.   Okay.  In this document, when it says

       17   "Long-term Stages of Ripple," what does "Ripple"

       18   mean?

       19              MR. GULAY:  Objection;

11:34:00 20        foundation.

       21      A.   I believe it refers to the network, but

       22   it's a bit ambiguous.

       23      Q.   Okay.  So your testimony is that you

       24   don't think what's -- the phases that are listed

11:34:08 25   here is an accurate description of the Ripple

                                                          112

```
11:34:11  1   network?
          2        A.   I don't view this as a particularly good
          3   framework of anything.
          4        Q.   Okay.  Do you agree that in 2013 XRP was
11:34:24  5   new and had few adopters?
          6        A.   Yes.
          7             MS. BUNTING:  Objection.
          8        Q.   And do you agree that in 2013, XRP was
          9   valuable among speculators?
11:34:36 10        A.   What does "valuable" mean in this
         11   context?
         12        Q.   Well, I'm -- I'm reading the words in
         13   the document that you and Mr. Griffin prepared.
         14   So in the context --
11:34:46 15             MR. HECKER:  Objection.
         16             MR. GULAY:  Objection.  Just to
         17        clarify his testimony, he said he did not
         18        prepare the presentation.
         19        Q.   Okay.  But you reviewed and commented on
11:34:53 20   the presentation, right?
         21             MR. HORTON:  Okay.  Counsel, I
         22        also want to object.  The document doesn't
         23        say that XRP is valuable among speculators
         24        in 2013.
11:34:59 25             MS. STEWART:  Well, I'm -- the
```

                                                          113

11:35:00  1       question I'm trying to understand is I

2       want to know at the time that -- that this

3       document was prepared, what phase did

4       Mr. Griffin and Mr. Rapoport believe that

11:35:12  5       the company -- or that Ripple -- the

6       Ripple network was in.

7 BY MS. STEWART:

8    Q.  So you're saying that you don't agree

9 with these phases.  So I'm trying to ask the

11:35:20 10 question in a slightly different way and ask you

11 whether in 2013 XRP was valuable among

12 speculators.

13         MR. GULAY:  Objection; asked and

14    answered.

11:35:29 15         MS. BUNTING:  Objection.

16         MR. HORTON:  Objection.

17         You can answer the question.

18    A.  If we take a dictionary definition of

19 valuable as something that -- I don't have a

11:35:40 20 dictionary in front of me, but something that

21 people will exchange money for, I think XRP had

22 some value to some people and those people were

23 primarily speculators or people who were -- sought

24 to use the network for other purposes, that they

11:35:55 25 would be required to purchase some XRP in order to

114

```
11:35:58    1    use the network.  And that would be reasons that
            2    someone would ascribe a monetary value to a
            3    digital ledger entry.
            4         Q.   Okay.  In 2013 were there people who
11:36:08    5    used the Ripple network?
            6         A.   Yes.
            7         Q.   Okay.  For what purposes?
            8              MR. GULAY:  Objection;
            9          foundation.
11:36:23   10         A.   I'm not a -- I can't say definitively
           11    all the purposes, but certainly people used the
           12    Ripple network from a technologist experimenting
           13    perspective as well as for exchanging one asset
           14    for another type of asset.  For example,
11:36:38   15    exchanging bitcoins for dollars.
           16         Q.   Okay.  Looking at the next page of this
           17    presentation, which is Bates numbered 364, where
           18    the header is "Goal of XRP Allocations," do you
           19    see that?
11:36:53   20         A.   Yes.
           21         Q.   Okay.  And do you see the first bullet
           22    that says "Biggest goal is existential"?
           23         A.   Yes.
           24         Q.   Okay.  What does that mean?
11:37:01   25              MR. GULAY:  Objection; vague.
```

115

11:37:09   1        A.   I'm -- I'm not sure what that means to

           2   be honest.

           3        Q.   The second bullet that says "Reason for

           4   doing anything is to grow the network," do you see

11:37:20   5   that?

           6        A.   Yes.

           7        Q.   What does that mean?

           8             MR. GULAY:   Objection.

           9        A.   I'm -- I'm not really sure what that

11:37:42  10   means specifically.  It's a very broad statement

          11   that seems poorly crafted.

          12        Q.   Do you recall when you initially

          13   reviewed this presentation asking Mr. Griffin

          14   what -- what these bullets meant?

11:37:57  15        A.   This appears to be one or two months

          16   into my employment reporting to Mr. Griffin, and

          17   so the nature of my comments was a subordinate

          18   responding to, you know, the person they report

          19   to.  So I wouldn't necessarily critique the -- you

11:38:08  20   know, parse every single sentence in the way that

          21   I think you're suggesting.

          22        Q.   Okay.  The next bullet, it says "Phase

          23   1:  Striking partnerships for inorganic growth,"

          24   and underneath that it says "Distribution is for

11:38:22  25   business development."

                                                              116

11:38:23  1              Do you see that?

        2      A.    Yes.

        3      Q.    Okay.  What does that mean?

        4              MR. GULAY:  Objection.

11:38:35  5      A.    It seems to generally refer to a

        6   strategy of distributing XRP to companies that aid

        7   in the business development of -- in the

        8   development of the Ripple network.

        9      Q.    And -- okay.

11:39:02 10              The -- the next bullet says "Any

       11   currency strategy should be geared to making Phase

       12   2, 3, more successful."

       13              Do you see that?

       14      A.    I do.

11:39:10 15      Q.    And what does that refer to?

       16              MR. GULAY:  Objection.

       17              If you know.

       18      A.    I don't know.  And, again, my -- my

       19   feedback on this was limited to the nature of

11:39:21 20   feedback a subordinate would give to his new boss.

       21   So I didn't pick apart every single bullet even if

       22   I didn't fully understand what it meant after two

       23   months at the company or however many months in

       24   this was.

11:39:37 25      Q.    Okay.  Going on to two pages later,

                                                              117

11:39:41  1    12366 that says "Current Distributions" on top.

2        A.   Yes.

3        Q.   The first bullet says "There are ways to

4    increase supply that create a bigger increase in

11:39:53  5    demand."  And under it it says "Good BD giveaways

6    will result in more demand than supply.  The

7    announcement of the giveaway/partnership should

8    generate demand."

9             Do you see that?

11:40:03 10        A.   Yes.

11        Q.   Is this the idea that you had given

12    Mr. Griffin in the last exhibit that we looked at?

13        A.   Yes, this looks like the same language

14    from my e-mail.

11:40:10 15        Q.   Okay.  And then moving on to the next

16    page, Bates numbered 2367, that's titled

17    "Speculators."

18             Do you see that?

19        A.   Yes.

11:40:23 20        Q.   So do you see the first bullet, it says

21    "We'd prefer to attract speculators" who -- "who

22    take a long-term view and believe XRP demand will

23    overwhelm supply as commercial use of the network

24    increases"?

11:40:34 25        A.   Yes.

118

11:40:36   1        Q.   Is that also an idea that you had given
           2   Mr. Griffin in your comments?
           3        A.   Yes, it looks like the same language.
           4        Q.   Okay.  And then you see the -- the third
11:40:45   5   bullet, it says "If you are holding XRP, you
           6   should not want RL to retain XRP for business
           7   development."
           8             Do you see that?
           9             MR. HECKER:  Objection.
11:40:56  10             MR. HORTON:  Objection.  Counsel,
          11      it doesn't say "you should not want."
          12             MS. STEWART:  Oh, I'm sorry.
          13        Thank you.  I'll -- I'll rephrase that.
          14   BY MS. STEWART:
11:41:02  15        Q.   It says "If you are holding XRP, you
          16   should want RL to retain XRP for business
          17   development."
          18             Do you see that?
          19        A.   Yes.
11:41:08  20        Q.   What does this sentence mean?
          21             MR. GULAY:  Objection.
          22             If you know.
          23        A.   I'm not sure what Patrick meant by this
          24   sentence.
11:41:26  25        Q.   What about the bullet under that says

                                                              119

```
11:41:27   1    "Give ourselves six months"?  Do you know what
           2    that means?
           3         A.   I'm not sure what that refers to.
           4         Q.   What about the bullet under that that
11:41:35   5    says "Speculators are speculating on Ripple Labs."
           6              Do you know what that means?
           7              MR. HORTON:  Objection to form.
           8         A.   I'm not sure what that's referring to.
           9         Q.   Is it fair to say that someone who buys
11:41:49  10    XRP for speculative reasons is speculating that
          11    Ripple Labs will do better and therefore XRP will
          12    do better?
          13              MS. BUNTING:  Objection.
          14              MR. GULAY:  Objection to form.
11:42:06  15         A.   I think somebody buying equity in Ripple
          16    Labs, Inc. would be betting that Ripple Labs will
          17    do better.  I think someone buying XRP may or may
          18    not be betting that Ripple Labs will do better.
          19         Q.   Is it fair to say someone who is buying
11:42:20  20    XRP for speculative reasons is looking to Ripple
          21    Labs to take steps to increase the price of XRP?
          22              MR. HORTON:  Objection to form.
          23              MS. BUNTING:  Objection.
          24         A.   No, I don't believe that's true.
11:42:41  25         Q.   Okay.  In your conversations with the
```

120

11:42:48  1    individuals and firms that you were looking for

2    partnerships with, did you have discussions about

3    what steps Ripple Labs would take in increasing

4    XRP's liquidity?

11:43:01  5              MR. HORTON:  Objection to form.

6              MS. BUNTING:  Objection.

7         A.   In a general sense, yes, we discussed

8    the fact that people were aware of the fact that I

9    was having discussions with other firms, similar

11:43:28 10   discussions with other firms, trying to recruit

11   and onboard them to provide liquidity.

12        Q.   Okay.  And is that something that was --

13   was important to the individuals and firms that

14   you were in discussions with?

11:43:40 15             MR. HORTON:  Objection to form.

16             MS. BUNTING:  Objection.

17        A.   Liquidity overall was important to those

18   firms and at times liquidity was appearing in

19   other places, like Korea, for example, without my

11:43:57 20   efforts or involvement, and -- but certainly they

21   valued my efforts and involvement as well.

22        Q.   Is it fair to say that they were looking

23   to Ripple to make those efforts and have that

24   involvement in increasing liquidity in the XRP

11:44:10 25   market?

121

11:44:10   1                 MR. HORTON:  Objection to form.

          2                 MS. BUNTING:  Objection.

          3     A.   I don't think they believed that Ripple

          4 exclusively was responsible for building liquidity

11:44:17   5 in the network.

          6     Q.   Okay.  But putting aside whether Ripple

          7 was exclusively responsible for that, were they

          8 looking to Ripple to provide -- to take steps to

          9 provide that liquidity?

11:44:28 10                 MR. HORTON:  Objection to form.

        11                 MS. BUNTING:  Objection.

        12     A.   I'm not sure what they were looking for.

        13 They were aware that I was doing that.

        14     Q.   Did they ask you questions about what

11:44:39 15 steps Ripple was taking to provide liquidity?

        16     A.   I don't recall if they asked me

        17 questions about that.

        18     Q.   Did you provide updates on what steps

        19 Ripple was taking to provide liquidity?

11:44:55 20                 MR. HORTON:  Objection to form.

        21     A.   I did provide updates on important

        22 developments in the marketplace.

        23     Q.   Including what Ripple was doing to

        24 provide liquidity?

11:45:07 25                 MR. HORTON:  Objection to form.

                                    122

11:45:11  1        A.    When appropriate, those included things

          2   that Ripple was doing, yes.

          3        Q.    And did you provide those updates

          4   because you believed that that was information

11:45:17  5   that the individuals and firms you were

          6   interacting with would want to know?

          7                MR. GULAY:   Objection.

          8        A.    I believe that those individuals and

          9   firms were interested in staying apprised of

11:45:37 10   market developments broadly, and so my updates to

         11   them would have included relevant things that I

         12   viewed as material, whether or not they included

         13   Ripple Labs and sometimes they did include Ripple

         14   Labs.

11:45:47 15        Q.    Okay.

         16                MS. STEWART:   Nicole, the next

         17         exhibit is PR-4.

         18                (Whereupon, exhibit is presented

         19         and marked SEC Rapoport Exhibit PR-4 for

11:46:17 20         identification.)

         21                MS. STEWART:   And for the record,

         22         PR-4 is Bates numbered RPLI_SEC 0012819

         23         through 821.

         24                (Pause)

11:48:17 25        A.    Okay.  I've reviewed this.

                                                              123

11:48:18  1    BY MS. STEWART:

2          Q.   Okay.  So looking at the -- the bottom

3    e-mail in this chain, which is an e-mail from --

4    from ████████, do you see that?

11:48:29  5    A.   Yes.

6          Q.   And who is ██████████?

7          A.   She was an employee at the company that

8    worked in product.

9          Q.   Okay.  And -- and do you see her e-mail

11:48:41 10   starts "Hey, Patrick, in the giveaway doc you

11   mentioned the 4 V's we need to track for each of

12   the giveaways - volume, velocity, volatility,

13   valuation."  Do you see that?

14         A.   Yes.

11:48:54 15   Q.   Okay.  Do you recall what the "giveaway

16   doc" is?

17         A.   I don't recall what that is.

18         Q.   Okay.  I think we talked about this

19   briefly a little while ago, but did Ripple from

11:49:03 20   time to time give away XRP?

21         A.   Yes.

22         Q.   Okay.  And those were called giveaways?

23         A.   Yes.

24         Q.   Okay.  So what is a giveaway?

11:49:20 25   A.   In the sense it was used at Ripple Labs

124

11:49:22    1    at the time, it was a distribution of XRP from

            2    Ripple Labs to a group of market participants,

            3    sometimes indiscriminately for anyone signed up,

            4    and sometimes as a specific incentive for

11:49:39    5    something, like signing up for a new account or

            6    some other goal.

            7         Q.   Okay.  When it was done

            8    indiscriminately, as you said, what was the

            9    purpose of it?

11:49:57   10         A.   To get XRP into the hands of more people

           11    and off Ripple's balance sheet.

           12         Q.   Okay.  And what was the benefit to

           13    Ripple of getting the XRP into the hands of more

           14    people, if any?

11:50:14   15              MR. GULAY:  Objection;

           16          foundation.

           17         A.    In my understanding, given that a user

           18    needs a small amount of XRP as an anti-spam

           19    mechanism to use the network and given that Ripple

11:50:28   20    Labs had a goal of more people using the network

           21    for utility, it was necessary for XRP to be

           22    distributed into the hands of -- of people other

           23    than Ripple Labs.

           24         Q.   Was one of the goals of the giveaways to

11:50:47   25    increase XRP's liquidity?

                                                                    125

11:50:50   1                    MR. GULAY:  Objection.

           2        A.    The goal of certain types of giveaways

           3   was to increase the liquidity of XR -- the

           4   liquidity on the Ripple network, broadly speaking,

11:51:05   5   including XRP.

           6        Q.    Okay.  What types of giveaways were

           7   intended to do that?

           8        A.    It's debatable if this is called a

           9   giveaway, but we compensated market makers in

11:51:18  10   exchange for providing quotes on the network and

          11   we did that because we wanted to increase the

          12   liquidity of the assets on the network.

          13        Q.    Okay.  And why -- why do you say that

          14   it's debatable if that's a giveaway?

11:51:34  15        A.    I think in colloquial terms at the

          16   company that may have been referred to as a

          17   giveaway even though that's technically

          18   compensation for something, for providing a

          19   service, market making.

11:51:43  20        Q.    Okay.  Other than the compensation to

          21   market makers, were there other giveaways that

          22   were intended to increase the liquidity of XRP?

          23                    MR. GULAY:  Objection.

          24        A.    There were a number of different

11:52:00  25   giveaway strategies employed while I was there and

                                                              126

11:52:03  1    I wasn't always party to the goals of what that
       2    strategy was; so there were some giveaways that
       3    were intended to increase liquidity in the
       4    marketplace and there were others with presumably
11:52:17  5    other goals irrespective of liquidity.
       6         Q.   Okay.  Can you recall any giveaways
       7    where goals were to increase liquidity of XRP?
       8              MR. HORTON:  Objection to form.
       9         A.   Apart from the market maker compensation
11:52:44 10    that I mentioned, I can't recall others.
      11         Q.   Okay.  Going back to the document PR-4,
      12    I want to look at your e-mail, which is on the
      13    second page of the document, that's dated October
      14    13, 2013, where it starts "Hi ███."
11:53:04 15              Do you see that?
      16         A.   Yes.
      17         Q.   Okay.  So you say here, "Generally
      18    speaking, I think a successful giveaway will have
      19    at least one of two factors:  One, the XRP that
11:53:17 20    was given away has high velocity, i.e., it gets
      21    traded around between many accounts, presumably
      22    getting more users involved in Ripple and also
      23    improving network volumetrics."
      24              Do you see that?
11:53:30 25         A.   Yes.

127

11:53:31   1          Q.   Okay.  What did you mean by this?

2          A.   I think the sentence is clear.  Is there

3     something that should be clarified?

4          Q.   Okay.  I'll ask a more specific

11:53:55   5     question.  That's fine.

6               Was -- was -- was the point that you

7     were making here that the -- the giveaway would

8     increase the volume of XRP on the network?

9               MR. GULAY:  Objection.

11:54:19  10          A.   I had a view that a successful giveaway

11    would increase the volume or improve liquidity.

12    So the way you phrased the last question, I don't

13    view many of the giveaways as having achieved

14    that -- that goal.

11:54:41  15          Q.   You don't view many of -- of Ripple's

16    give -- giveaways as having achieved the goal of

17    increasing liquidity?

18          A.   Correct.

19          Q.   Okay.  And -- and why -- why -- why is

11:54:50  20    that?

21          A.   The XRP that was given away did not have

22    high velocity or get traded around between many

23    accounts in my view, my understanding.

24          Q.   What does it mean, it "did not have high

11:55:11  25    velocity"?

                                                          128

11:55:18  1        A.    If you were to track one unit of XRP

2    that was given away, how much it changed hands

3    after that point in time would be the velocity.

4        Q.    So velocity just means how much it gets

11:55:34  5    traded around between accounts?

6        A.    Correct.  How much volume.

7        Q.    And do you have an understanding of why

8    the XRP that was given away did not end up being

9    traded -- traded around between many accounts?

11:55:49 10            MR. GULAY:  Objection.

11        A.    At this point in time, my recollection

12    is that the XRP was generally given away for

13    nothing.  And my assumption was that the people on

14    the receiving end immediately sold it for dollars

11:56:14 15    or bitcoin or something else.

16        Q.    Okay.

17        A.    But I don't have any way to know what

18    the large number of the people on the other end

19    thought.

11:56:25 20        Q.    Was there a limit on the size of the

21    giveaways?

22            MR. GULAY:  Objection;

23      foundation.

24        A.    This was very early in my time at the

11:56:39 25    company, maybe the first month.  And so I wasn't

129

11:56:42  1    privy to the discussion on the size of the

       2    giveaway.  I don't recall being part of that

       3    discussion.

       4         Q.   Do you recall if there was a limit one

11:56:50  5    way or the other?

       6                   MR. HORTON:  Objection.

       7         A.   I remember discrete programs with the

       8    earmarks, numbers, attached to them in a large

       9    amount of experimentation at that time.

11:57:08 10         Q.   Okay.  Going down in -- in your e-mail

      11    to where -- do you see where the -- the word

      12    "volume" is in bold?

      13         A.   Yes.

      14         Q.   And it says "Volume equals:  One, amount

11:57:21 15    given away; and, two, ensuing trading volume in

      16    receiving accounts."

      17                   Do you see that?

      18         A.   Yes.

      19         Q.   Okay.  Am I understanding correctly that

11:57:30 20    what you're saying here is that the XRP that's

      21    given away, if that is then traded in other

      22    accounts, it's -- it's the ensuing trading that

      23    contributes to the volume?

      24                   MR. GULAY:  Objection.

11:57:51 25         A.   My primary interest and focus was on

                                                          130

11:57:54  1    liquidity as the markets person.  And so when a

2    unit of XRP was given away, my focus was on

3    whether that giveaway resulted in increased volume

4    or not, and I viewed it to be more successful of a

11:58:10  5    giveaway if more volume ensued as a result.

6         Q.   Okay.  And is that why you say here that

7    "the ratio of these would be an interesting metric

8    for us to track"?

9         A.   That's correct.

11:58:21 10         Q.   Okay.  Did Ripple, in fact, track that

11   ratio?

12         A.   I don't recall tracking it.

13         Q.   Okay.  We've talked a lot today about

14   liquidity.  What does liquidity mean to you?

11:58:43 15              MR. GULAY:  Objection.

16         A.   I think the first few paragraphs of this

17   e-mail are a pretty good explanation of that.

18   That you can measure how liquid something is based

19   on how wide the market is, either the bid/ask

11:59:06 20   spread, and by how volume you can trade at those

21   levels.

22         Q.   Okay.  Is it fair to say that what

23   goes -- the factors that go into liquidity are

24   volume and price?

11:59:14 25              MR. HORTON:  Objection to form.

131

```
11:59:15   1          A.   I would say volume and size.  I'm sorry,
           2    bid/ask spread and size.
           3          Q.   Bid/ask spread and size.  Is size
           4    different than volume?
11:59:29   5          A.   I think we're saying the same thing,
           6    but -- but how -- how much size is available at a
           7    given price or how much volume you can trade at
           8    that price.
           9          Q.   I understand.
11:59:38  10          So what you say here, how much volume
          11    you can trade at those levels?
          12          A.   Correct.
          13          Q.   Okay.  So the sentence here at the top
          14    of PR-4, your first sentence, that is an accurate
11:59:48  15    description of liquidity in your mind?
          16          A.   Yes.
          17          Q.   And just so it's in the record, it says
          18    here "You typically measure how liquid something
          19    is by talking about how wide the market is, i.e.,
12:00:03  20    bid/ask spread and how much volume you can trade
          21    at those levels," yes?
          22          A.   Correct.
          23          Q.   Okay.  Was Ripple tracking the liquidity
          24    of XRP?
12:00:22  25                    MS. BUNTING:  Objection.
```

132

12:00:31  1        A.    At this point in time, there were

2   relatively crude tools to track market activity,

3   including XRP, but not limited to XRP overall, and

4   those tools improved over time.

12:00:46  5        Q.    Okay.  And did -- did Ripple use those

6   tools to track the liquidity of XRP?

7              MR. GULAY:  Objection.

8        A.    My recollection is those tools were

9   generally open source and publicly available, and

12:01:03 10   I used those tools to monitor activity in the

11   market, including, but not limited to, XRP's

12   liquidity.

13        Q.    What other activity did you monitor

14   while you were at Ripple?

12:01:19 15              THE REPORTER:  Repeat.

16        Q.    What other activity did you monitor

17   while you were at Ripple?

18        A.    I had an interest in all trading

19   activity on the network.  At this time bitcoin

12:01:27 20   against the dollar was a prominent trading pair

21   that didn't involve XRP, as one example.

22        Q.    Okay.

23              MR. HORTON:  Counsel, would now

24       be a good time for a break?

12:01:37 25              MS. STEWART:  Sure.

133

```
12:01:38    1              THE VIDEOGRAPHER:  Going off the
            2       record at 12:01.
            3                  (Whereupon, a luncheon recess is
            4       taken.)
12:01:40    5
            6
            7
            8
            9
           10
           11
           12
           13
           14
           15
           16
           17
           18
           19
           20
           21
           22
           23
           24
           25
```

134

```
12:01:40    1              A F T E R N O O N   S E S S I O N
            2                   THE VIDEOGRAPHER:  Okay.  Back on
            3           the record at 12:50.
            4                   Go ahead.
12:50:50    5    BY MS. STEWART:
            6         Q.   Okay.  Mr. Rapoport, do you recall
            7    before lunch we -- we looked at the -- the primer
            8    that you had drafted and that you had sent to
            9    Mr. ███████ that was PR-6?
12:51:02   10         A.   Yes.
           11         Q.   Okay.  I think I forgot to ask you about
           12    that document, whether there were other
           13    individuals or firms that you sent the primer to.
           14         A.   My recollection of this was broad --
12:51:20   15    this was a broadly used document for nontechnical
           16    people that wanted to familiarize themselves with
           17    Ripple basics.
           18         Q.   Okay.  When was the last time you spoke
           19    with Mr. Griffin?
12:51:37   20         A.   In the past month.
           21         Q.   Okay.  Did you speak with him about this
           22    litigation?
           23         A.   No.
           24         Q.   Did you speak with him about your
12:51:45   25    testimony?
```

135

12:51:45  1        A.    No.

          2        Q.    Are you aware of whether Mr. Griffin has

          3    been deposed in this matter?

          4        A.    I was aware that it did happen, yes.

12:51:52  5        Q.    Okay.  Did Mr. Griffin tell you that he

          6    was deposed in this matter?

          7        A.    I was aware that he was in New York for

          8    this matter and that was the extent of our

          9    discussions about it.

12:52:03 10        Q.    Did you speak with him after his

         11    deposition?

         12        A.    I'm not sure exactly at what time during

         13    his time in New York it happened.  And so I spoke

         14    with him during his time in New York.  Whether

12:52:21 15    that was before or after, I'm not sure.

         16        Q.    Okay.  Did you discuss with him at all

         17    his testimony?

         18        A.    No.

         19             MR. HORTON:  Objection; asked and

12:52:29 20      answered.

         21        Q.    Okay.

         22             MS. STEWART:  We'll do 8.

         23             Nicole, we're on PR-8.

         24             (Whereupon, exhibit is presented

12:52:38 25      and marked SEC Rapoport Exhibit PR-8 for

                                                              136

```
12:52:38    1         identification.)

            2              MS. STEWART:  So for the record,

            3         PR-8 is Bates numbered RPLI_SEC 0038399 to

            4         400.

12:53:08    5              (Pause)

            6    A.    Okay.  I've reviewed this.

            7  BY MS. STEWART:

            8    Q.    Okay.  Have you seen this document

            9  before?

12:54:31   10    A.    No.

           11    Q.    Okay.  Do you have any --

           12    A.    Excuse me.  I saw this -- I clearly saw

           13  this back in 2013 because my name is on the

           14  e-mail, but I haven't -- I don't remember it and

12:54:41   15  haven't seen it since then.

           16    Q.    Okay.  Do you have any reason to doubt

           17  that you had this e-mail exchange with ███████

           18  ██? 

           19    A.    No, and I -- no, I don't.

12:54:49   20    Q.    Okay.  Who is ██████████?

           21    A.    He is a representative of ████████

           22  ██████, which is a venture capital firm.

           23    Q.    Okay.  And did ██████████ have a

           24  relationship with Ripple?

12:55:06   25    A.    My understanding is that ████████
```

                                                      137

12:55:08  1      ███████████ was a seed round investor in Ripple.

2          Q.   Does that mean that their

3      relationship --

4          A.   Sorry, Ripple Labs, I should say.

12:55:18  5      Q.   Okay.  Thank you.

6               Does that mean that their relationship

7      with Ripple Labs preceded your tenure at Ripple?

8          A.   That's correct.

9          Q.   And what is it that you and -- and -- is

12:55:32 10    it Mr. █████?

11         A.   Yes.

12         Q.   Okay.  What is it that you and Mr. ███████

13     are discussing in this e-mail?

14         A.   Mr. ██████ and Chris Larsen, and it looks

12:55:50 15    like ██████████████ who's an associate of

16     Mr. ██████, had a discussion without me about a

17     strategy described here to trade in the market

18     with the intent to lose XRP.

19         Q.   Okay.  And in -- in the top e-mail, your

12:56:09 20    e-mail to Mr. ██████ at the top of the document, you

21     say "Yes, we are all on the same page that this

22     will be a 'distribution' strategy where you are

23     expected to lose XRP to the market, and the loan

24     will be forgiven."

12:56:22 25              Do you see that?

138

```
12:56:23  1        A.   Yes.
          2        Q.   Okay.  So what did you mean when you
          3   wrote "distribution strategy" here?
          4        A.   I remember the scenario and I remember
12:56:37  5   thinking it was a nonsensical idea at the time and
          6   the strategy did not make sense to me to achieve
          7   any goal at all.  But this was October 2013, when
          8   I was relatively new at the company, and so I went
          9   along with it largely because it was the CEO of
12:56:55 10   the company, Chris Larsen, encouraging this
         11   interaction with two investors.  So I didn't think
         12   it was my place to voice my -- my disagreement
         13   with the strategy.
         14        Q.   Okay.  What is your understanding of
12:57:11 15   what the strategy was supposed to achieve?
         16        A.   In reading the e-mail, it sounds like
         17   ██████████ had certain objectives described in
         18   the e-mail, which he describes as "creating flow
         19   to encourage the fundamental building blocks of
12:57:51 20   any market," or the market in this case.  So it
         21   appears that he thought this would increase
         22   liquidity in the market, this strategy.
         23        Q.   And did you disagree with that?
         24        A.   I did disagree with that.
12:58:04 25        Q.   And why?
```

139

```
12:58:10    1          A.   I actually viewed this as a liquidity
            2    destructive action.  He describes "sweeping the
            3    book back and forth," which what he means by that
            4    is removing liquidity from what's posted in the
12:58:31    5    order book by buying and then selling and then
            6    buying and then selling.  To me, that's the
            7    opposite of building liquidity.  That's -- that's
            8    removing liquidity from the market.
            9          Q.   Okay.  Did you discuss your view with
12:58:45   10    Mr. ████?
           11          A.   As a newly hired employee put in this
           12    discussion by the CEO of the company and speaking
           13    to an investor, I didn't think it was my place to
           14    dispute Mr. ████'s views at this time.
12:59:05   15          Q.   Did you discuss your views with
           16    Mr. Larsen?
           17          A.   I don't recall if I did or I didn't.
           18          Q.   Did you discuss your views with
           19    Mr. Griffin?
12:59:14   20          A.   I don't recall.
           21              MR. GULAY:  Sorry.  Just to
           22          clarify, Mr. Rapoport, when you say
           23          "speaking to an investor," did you mean an
           24          investor in Ripple Labs, Inc.?
12:59:23   25              THE WITNESS:  Yes.  Mr. ████ was
```

140

```
12:59:25   1        an investor in Ripple Labs -- ███████████

           2     ███████████ was an investor in Ripple Labs,

           3       Inc.

           4   BY MS. STEWART:

12:59:31   5        Q.   Okay.  And when you say in the sentence

           6   that we just read, "we are all in the same page

           7   that this will be a distribution strategy," who is

           8   the "we" that you're referring to in that

           9   sentence?

12:59:41  10        A.   I do recall having a conversation with

          11   ██████████ on the phone that I reference in this

          12   e-mail.  I'm not certain whether the "we" refers

          13   just to me and ██████████████ or the four people in

          14   this e-mail.  The others are ███████████████ and

13:00:01  15   Chris Larsen.

          16        Q.   Okay.  Do you agree with Mr. ████████ that

          17   the "fundamental building blocks of any market are

          18   speculators"?

          19        A.   No.  I think speculators can play an

13:00:27  20   important role, but natural users of an asset can

          21   be equally important as fundamental building

          22   blocks of a market.

          23        Q.   So is it fair to say that you think that

          24   there's two fundamental building blocks of a

13:00:40  25   market?
```

141

13:00:40  1                    MR. HORTON:  Objection.

          2                    MR. GULAY:  Objection to form.

          3        A.   I think the answer to that depends on

          4   how we define "speculators," but I think, in

13:00:58  5   general, people transacting in an asset are either

          6   speculating in some form, whether short-term or

          7   long-term holders, or they have some natural need

          8   to purchase or sell the asset.  For example, an

          9   airline company has to buy jet fuel and the jet

13:01:17 10   fuel market can be speculators and natural users.

         11        Q.   Okay.  So -- so together, the

         12   speculators and the natural users would, in your

         13   view, be the fundamental building blocks of any

         14   market?

13:01:29 15                    MR. HORTON:  Objection to form.

         16        A.   Yeah, I think those are the primary

         17   market participants of any market, yes.

         18        Q.   And at the time in 2013, were there more

         19   speculators than natural users in the Ripple

13:01:43 20   network?

         21                    MR. HORTON:  Objection to form.

         22        A.   I don't know that I can answer that.  I

         23   don't know that I know the answer to that.

         24        Q.   Well, did you have a sense that more of

13:02:03 25   the -- of the people who were -- who are holding

                                                              142

```
13:02:06   1   XRP -- let me -- strike that.  Let me restart.

           2         Did you have a sense that more of the

           3   people who are buying XRP were buying it to

           4   speculate on XRP as opposed to use XRP?

13:02:20   5              MR. GULAY:  Objection to

           6      foundation.

           7              MS. BUNTING:  Objection.

           8      A.   Any user of the Ripple network needed a

           9   small amount of XRP based on the network design of

13:02:31  10   using XRP as an anti-spam mechanism.  And I don't

          11   think anyone has any way of knowing which users

          12   were purchasing XRP for that purpose, for its

          13   utility in -- in the network, or speculating on

          14   it.

13:02:48  15      Q.   That's not something that Ripple

          16   tracked?

          17      A.   I'm not sure that there is a way to

          18   track that because it's an open-source network

          19   that anyone can participate in and it was --

13:02:59  20   there's, to my knowledge, no way to get that

          21   information.

          22      Q.   Okay.  Do you agree with Mr. ████████

          23   statement at the very end of his e-mail that a

          24   controlled appreciation of XRP is what Ripple

13:03:21  25   wants?
```

13:03:24    1          A.    No.

            2          Q.    And why not?

            3          A.    To my knowledge, Ripple didn't have any

            4    goals with respect to what the price of XRP should

13:03:43    5    or shouldn't do and that's what Mr. ████ seems to

            6    be implying here.

            7          Q.    So Ripple's goal, or at least one of

            8    Ripple's goals, was not to take steps to

            9    appreciate the price of XRP?

13:04:03   10                MR. HORTON:   Objection to form.

           11          A.    I believe that the company sought to

           12    increase usage of the Ripple network and improve

           13    liquidity in the market; and it's my belief that

           14    those actions could lead to an increase in XRP

13:04:23   15    price, but I don't think that that's a given and

           16    that's an ancillary effect that is my belief.  And

           17    so I don't believe the company had a direct goal

           18    to influence the price of XRP.

           19          Q.    Did the company have a goal to decrease

13:04:38   20    the price of XRP?

           21                MR. HORTON:   Objection to form.

           22          A.    No, I don't think the company had any

           23    goals with respect to the price of XRP whatsoever.

           24          Q.    So the company had no goals one way or

13:04:47   25    the other with respect to the price of XRP?

                                                                    144

```
13:04:50   1        A.   No.  Not that I'm aware.
           2        Q.   This distribution strategy,
           3   quote/unquote, that's referred to in your e-mail
           4   with Mr. ██████ did Mr. ██████ firm, in fact,
13:05:16   5   pursue this strategy?
           6        A.   Yes.  A version of this moved forward
           7   shortly after these e-mails.
           8        Q.   Okay.  And when you say "a version of
           9   this," what do you mean?
13:05:28  10        A.   I don't recall the specifics of exactly
          11   how it was conducted, but I do remember that XRP
          12   was sent to a representative of ████████████████
          13   and that representative traded in the market.  And
          14   that's -- that's what I remember about it.
13:05:48  15        Q.   That representative of ████████████████
          16   traded in the market and intentionally lost the
          17   XRP?
          18             MR. HORTON:  Object to form.
          19        A.   What I remember is that that person
13:05:59  20   removed a lot of liquidity from the order books,
          21   meaning that they bought and sold and bought and
          22   sold.  I didn't have visibility or I don't have
          23   recollection as to how much or what they lost
          24   trading.
13:06:15  25        Q.   How much XRP was given to ██████████
```

                                                            145

13:06:17  1   █████████?

       2      A.   I don't have any recollection of this,

       3  but the e-mail says ██████ XRP.

       4      Q.   And do you know how much XRP ███████

13:06:27  5  ██████ lost?

       6           MR. GULAY:  Objection.

       7      A.   I don't have any recollection of whether

       8  they made or lost money and how much.

       9      Q.   And where -- where you say here in the

13:06:41 10  top e-mail that "the loan will be forgiven,"

     11  what -- what is that a reference to?

     12      A.   For reasons I don't think I fully

     13  understood at the time, the company, when

     14  distributing XRP in certain situations, was

13:07:08 15  treating it as a forgivable loan; that the -- XRP

     16  would be transferred to somebody and then -- as a

     17  loan, and that loan would be forgiven.  I'm not

     18  sure of the reasoning behind that structure.

     19      Q.   And did Ripple pursue this kind of

13:07:27 20  strategy with any other individual of the firm?

     21           MR. HORTON:  Objection to form.

     22      A.   I'm not aware of this type of trading

     23  strategy being conducted again after this one

     24  instance.

13:07:42 25      Q.   Did you have a concern in 2013 whether

                                                  146

```
13:07:45   1   this kind of trading strategy could constitute
           2   market manipulation?
           3              MR. HORTON:  Objection to form.
           4              MR. GULAY:  Objection.
13:07:59   5       A.   I found it disruptive to the market.  I
           6   didn't have concerns about market manipulation at
           7   this time.
           8       Q.   Sitting here today, do you have concerns
           9   that this kind of strategy could constitute market
13:08:13  10   manipulation?
          11              MR. HORTON:  Objection.
          12              MR. GULAY:  Objection;
          13         foundation.
          14       A.   I don't have enough knowledge of the
13:08:20  15   legal meaning of that to really have an opinion
          16   without advice.
          17              MS. STEWART:  Nicole, the next
          18         exhibit is PR-12.
          19              And for the record, that's Bates
13:08:45  20         numbered RPLI_SEC 0461857 through 866.
          21              (Whereupon, exhibit is presented
          22         and marked SEC Rapoport Exhibit PR-12 for
          23         identification.)
          24   BY MS. STEWART:
13:09:21  25       Q.   So, Mr. Rapoport, I plan to ask you
```

                                                           147

13:09:22  1    about your e-mail which is on the first page of

2    this document, but of course feel free to -- to

3    review the -- the rest of the e-mail chain.

4           (Pause)

13:15:45  5      A.  Okay.

6      Q.  Okay.  Is it -- is it fair to say that

7    this document is an internal discussion at Ripple

8    about the pros and cons of a bond auction as a way

9    to distribute XRP?

13:16:02 10             MR. GULAY:  Objection.

11            MR. HORTON:  Objection to form.

12      A.  I think this document is a general

13    discussion on how to get XRP off of Ripple's books

14    and into the market in various different ways.

13:16:15 15      Q.  Okay.  And the -- the title -- the "Re"

16    line of the e-mail, which I don't -- I don't think

17    you wrote, but it says "Giveaways versus auction

18    and pump priming."

19          Do you have a sense of what "pump

13:16:32 20    priming" means?

21      A.  I'm not sure what that means.

22      Q.  Okay.  So in the e-mail that you write

23    on the first page of the document, which is

24    November 24th at 9:16 a.m., the -- the second

13:16:46 25    paragraph of your e-mail says "The bond auction

148

```
13:16:49   1    structure does seem to cleanly solve our
           2    self-imposed goal of getting XRP off our books
           3    without immediately flooding the market with XRP
           4    supply/price pressure."
13:17:00   5            Do you see that?
           6        A.   Yes.
           7        Q.   Okay.  And -- and was that -- was that
           8    sentence accurate at the time you wrote it?
           9        A.   I think so, yes.
13:17:11  10        Q.   Okay.  And where you say "our
          11    self-imposed goal," who is -- whose self-imposed
          12    goal are you referring to?
          13        A.    In this e-mail chain, there's a
          14    conversation between several senior members of the
13:17:27  15    company.  And it's -- I interpret this to reflect
          16    a strong desire to distribute XRP into the
          17    marketplace and get a significant amount of it off
          18    of Ripple Labs' books with some disagreement about
          19    what the best strategy is to do that.
13:17:47  20        Q.   So your statement in this e-mail is
          21    based on the e-mails further down in the -- in the
          22    chain of the document we're looking at?
          23        A.   Based on this e-mail and --
          24            MR. HECKER:  Objection to form.
13:17:58  25        A.   Based on this e-mail and my recollection
```

149

13:17:59  1   of the dynamics at the company at the time.

2        Q.   Okay.  Did you have discussions about

3   this self-imposed goal other than what's reflected

4   in this e-mail with -- with your colleagues at

13:18:18  5   Ripple?

6        A.   Yes.

7        Q.   And what were those discussions?

8        A.   I generally recall having discussions.

9   Given seven years have passed, I don't recall

13:18:28 10   specific discussions clearly.

11        Q.   What do you recall generally about the

12   discussions?

13        A.   I think this e-mail thread accurately

14   represents the fact that senior members of the

13:18:45 15   company viewed it as important to get XRP off the

16   books and that that was the goal in and of itself.

17   And there was discussion about whether that could

18   be done through a charitable process without the

19   company receiving economic benefit in exchange for

13:19:06 20   selling or giving away the XRP, but that there was

21   concern about harming the marketplace and

22   impacting liquidity in the marketplace if Ripple

23   Labs were to indiscriminately give away or donate

24   all the XRP versus employing other tactics like

13:19:34 25   the ones discussed in -- in this e-mail, including

150

13:19:41  1  selling XRP.

2      Q.   So the reason that Ripple didn't want to

3  give away all the XRP was that it didn't want to

4  negatively impact the liquidity?

13:19:47  5              MR. GULAY:  Objection.

6              MR. HORTON:  Objection to form.

7      A.   From early giveaways, it was evident

8  that the common result of a broad giveaway of XRP

9  was that the recipients immediately sold that XRP

13:20:09 10  and that that harmed market structure and the

11  price of XRP, neither of which were viewed to be

12  good outcomes.

13      Q.   Okay.  And in the sentence that we just

14  read in your e-mail, you say "XRP supply/price

13:20:28 15  pressure."

16              Do you see that?

17      A.   Yes.

18      Q.   What do you mean by "price pressure"?

19      A.   While Ripple Labs did not, to my

13:20:55 20  knowledge, take actions to impact what the price

21  of XRP was, Ripple Labs certainly had a preference

22  for the price to rise rather than fall given that

23  it was a significant holder.  And so in a similar

24  way to how ExxonMobil doesn't want to have its

13:21:11 25  actions collapse the price of oil since it's a

151

13:21:14  1   significant holder of oil, Ripple Labs was

2   cognizant of the fact that its actions in the

3   marketplace could have adverse consequences for

4   its balance sheet.

13:21:28  5        Q.   So you -- you say in the next sentence

6   in your e-mail, "I want to carefully consider all

7   of the other structured products that we can come

8   up with that could accomplish the same goal."

9             Do you see that?

13:21:40 10        A.   Yes.

11        Q.   Did you and others at Ripple carefully

12   consider other structured products?

13        A.   I know that we discussed a variety of

14   ideas.  I don't know.  We may disagree on what

13:22:06 15   "carefully consider" means.

16        Q.   But you discussed other structured

17   products that could accomplish the goal that we

18   were just talking about?

19        A.   Yes.  We discussed a large number of

13:22:15 20   ideas.

21        Q.   Okay.  Can you tell me about some of

22   those ideas that you discussed?

23        A.   The number of voices and tactics

24   described in this e-mail exchange I think are good

13:22:39 25   examples of the large number of out-of-the-box

152

13:22:41  1  ideas that were discussed, but given the amount of

2  time that's passed, the specifics of ideas are

3  difficult for me to recall.

4      Q.   Did Ripple pursue this bond auction

13:22:51  5  strategy?

6      A.   Not to my knowledge.

7      Q.   Were there any other structured products

8  that -- that Ripple used to distribute XRP?

9              MR. GULAY:  Objection.

13:23:07 10              To the extent you know.

11      A.   I'm not aware of Ripple acting as the

12  issuer of a structured product to distribute XRP.

13      Q.   You mentioned a moment ago that if

14  Ripple were to give away all of its XRP, that

13:23:28 15  would create liquidity issues.

16              Do I have that right?

17              MR. GULAY:  Objection.

18      Q.   I'm not trying to mischaracterize what

19  you said, but put it in your own words.  I just --

13:23:44 20  I have a follow-up question to that.

21      A.   When Ripple conducted straight giveaways

22  of XRP to large numbers of interested people, I

23  observed that to have an adverse impact on market

24  liquidity and price.

13:23:58 25      Q.   Okay.  Was the same true when Ripple

153

13:24:00  1   sold XRP?

2        A.   At times it was true and at times it was

3   not true.

4        Q.   Okay.  When was it true?

13:24:21  5        A.   When Ripple sold XRP at a discount to

6   market price, the purchaser could then go sell at

7   the market price and -- and make a quick profit.

8   And so that, in my view, had a similar neg --

9   adverse impact on liquidity and price.

13:24:44 10        Q.   Okay.  And so what were the instances

11   where it did not have a negative impact on

12   liquidity, the sales of XRP?

13        A.   Those were the two examples where I

14   thought there was an obvious negative impact and I

13:25:00 15   can't -- I think other instances did not have the

16   same negative impact to my current recollection.

17        Q.   So that was when XRP was sold either

18   with -- without a dis -- discount or with a

19   premium?

13:25:15 20        A.   Correct.

21        Q.   Okay.  At the bottom of -- of the first

22   page of this e-mail that we're looking at, you say

23   "We want a sales team that can target -- "that can

24   target funds that specialize in thematic trades

13:25:32 25   with convex payouts."

154

13:25:34  1             Do you see that?

       2        A.   Yes.

       3        Q.   What do you mean by that?

       4        A.   In my view, digital assets generally,

13:25:52  5   and XRP specifically, are largely binary outcomes,

       6   meaning that if we look five or ten years into the

       7   future, I think the price of a given digital asset

       8   will likely be a lot more today or zero -- a lot

       9   more than today or zero.  And that's what I mean

13:26:09 10   by a convex payout:  Something that is likely to

      11   either just go to zero or have an exponential

      12   rise.

      13             And thematic trade I think is referring

      14   to trading on a -- a theme.  I'm not quite sure

13:26:41 15   how to explain that.

      16        Q.   Okay.  At this time in 2013, did you

      17   think that XRP was going to go to zero or that it

      18   would have exponential growth?

      19             MR. HORTON:  Objection to form.

13:26:52 20             MR. GULAY:  Objection.

      21        A.   Like most early stage technologies, I

      22   thought that the higher probability was going to

      23   zero and that a small probability of a high price

      24   was possible and that that tends to be something

13:27:16 25   that characterized this type of convexity.

                                                          155

13:27:22 1      Q.   Okay.  And did that view of yours change
2    during your time at Ripple?
3      A.   No.  I think that was a view I held
4    throughout my time at Ripple.
13:27:35 5      Q.   Okay.
6           MS. STEWART:  Nicole, we're --
7       we're doing PR-27 next.
8           (Whereupon, exhibit is presented
9        and marked SEC Rapoport Exhibit PR-27 for
13:27:42 10       identification.)
11          MS. STEWART:  And PR-27 is Bates
12       numbered RPLI_SEC 425895 through 900.
13   BY MS. STEWART:
14      Q.   And, Mr. Rapoport, I'm going to ask you
13:28:04 15   questions on the first page of this document and
16   your -- your e-mail that continues on to the top
17   of page 2, but of course feel free to review the
18   entire document.
19          (Pause)
13:29:34 20      A.   Okay.  I've read it.
21      Q.   Okay.  So looking at -- at your e-mail
22   which starts sort of midway through the first page
23   of the document, where you say "Two concerns
24   here."
13:29:49 25          Are you there?

156

| 13:29:50 | 1 | A.   Yes. |
|----------|----|-----------|

13:29:50   1          A.   Yes.

            2          Q.   Okay.  So you say "On a 1 million"

            3     dollar -- "1 million XRP transaction, there is

            4     plenty of liquidity to easily purchase that amount

13:29:59   5     in the market.  When we sell directly to someone,

            6     it hurts our goal of achieving critical mass on

            7     the exchange because we're detracting from" --

            8     we're de -- "we're detracting from market volume."

            9          Do you see that?

13:30:10  10          A.   Yes.

           11          Q.   Okay.  What do you mean by that?  Or

           12     what did you mean by that?

           13          A.   As a person focused on markets and

           14     developing liquidity at the company, it was my

13:30:28  15     preference that the company did not sell over the

           16     counter bilaterally to interested parties.  I

           17     thought it benefited the goal of building a liquid

           18     market to force all interested buyers or sellers

           19     to transact in the market where the volume is

13:30:49  20     publicly visible, accessible to others, and will

           21     ultimately encourage the development of a liquid

           22     market.

           23          Q.   So you would rather someone who wanted

           24     to buy XRP do it on the exchange as opposed to

13:31:04  25     buying it from Ripple directly?

                                                                  157

13:31:06  1       A.   Correct.  On the Ripple -- on the Ripple

        2   Ledger itself at this time.

        3       Q.   Okay.  And then you continue to say in

        4   that paragraph, "We are also preventing XRP price

13:31:17  5   from rising, because the demand doesn't go to the

        6   market."

        7            Do you see that?

        8       A.   Yes.

        9       Q.   And what did you mean by that?

13:31:26 10       A.   Markets respond -- the price of the

       11   market responds to the actions of buyers and

       12   sellers.  And for a price to rise, there need to

       13   be more buyers than sellers in the marketplace, in

       14   the public marketplace.  And if any interested

13:31:39 15   buyer came and bought directly from Ripple, from

       16   Ripple Labs, that was preventing that same

       17   buyer -- or -- or substituting that buyer from

       18   going into the market and otherwise lifting offers

       19   to -- which would typically increase the price.

13:32:02 20       Q.   Okay.  Is that what you mean by that

       21   last sentence of the paragraph, where you say "If

       22   everyone can buy from us, the price will never go

       23   up"?

       24       A.   Correct.  Theoretically, if -- if every

13:32:15 25   buyer bought directly from Ripple Labs and only

                                                              158

```
13:32:17   1   the sellers went to the market, the price would
           2   only go in one direction:  Down.
           3       Q.   Okay.  And so am I understanding
           4   correctly that you thought that over-the-counter
13:32:28   5   sales would hurt both volume and price?
           6       A.   That's correct.
           7       Q.   And then you go on to say in this
           8   e-mail, "I'd question whether we should provide a
           9   discount at all, even for large size.  It would
13:32:42  10   make more sense to me to offer a 5 percent
          11   premium."
          12           Do you see that?
          13       A.   Yes.
          14       Q.   Did Ripple, in fact, stop at some point
13:32:52  15   offering discounts on these types of XRP sales?
          16           MR. GULAY:  Objection.  I assume
          17        you mean during the time of his
          18        employment.
          19           MS. STEWART:  Yes.
13:33:04  20       Q.   All of my questions are during the time
          21   of your employment.
          22       A.   I didn't have responsibility for
          23   Ripple's transactions with third parties.  And so
          24   I saw and knew about a limited number of what I
13:33:20  25   believe to be the total number of transactions.
```

159

13:33:24  1   What I saw varied a lot over time.  I don't think

2   that there was a clear stopping point that I can

3   recall.

4        Q.   In -- in the e-mail sort of near the top

13:33:48  5   of the document from Arthur Britto, do you see

6   that, at 12:42 p.m.?

7        A.   Yes.

8        Q.   So Mr. Britto says "I think we're trying

9   to serve two types of purchasers:  One, bulk

13:34:01 10   purchasers for investment; two, bulk purchasers

11   for resale."

12            Do you agree with Mr. Britto's

13   statement?

14        A.   I think logically he describes the two

13:34:14 15   things that a person could do after buying an

16   asset:  They could hold it or they could sell it.

17   So I think, yes, that's logically true.

18        Q.   Okay.  But he doesn't mention here

19   people who are buying it to use it, right?

13:34:36 20        A.   What do you mean by "use it"?

21        Q.   To use it on the -- on the Ledger, on

22   the network.

23        A.   His e-mail doesn't explicitly refer to

24   that.  Parsing it, I think that there's two types

13:35:17 25   of use:  One is the anti-spam functionality and

160

13:35:20  1  the other is using it as a bridge currency to
2  trade for another asset.  Using it as a bridge
3  currency I guess is, in a sense, selling it,
4  but -- I'm a little confused by the question, but
13:35:36  5  this e-mail does not specifically refer to using
6  it, no.
7      Q.   Okay.  Was there wide use of XRP as a
8  brid -- bridge currency at this time in 2014?
9            MR. HORTON:  Objection to form.
13:35:45 10            MS. BUNTING:  Objection.
11      A.   It was a fairly nascent network and
12  technology at the time.  So I think in the global
13  sense, there wasn't broad use of Ripple for
14  anything at the time, but certainly there was some
13:36:03 15  use of XRP as a bridge currency.
16            MR. GULAY:  I'm sorry.  When you
17       said "broad use of Ripple" --
18            THE WITNESS:  Sorry.  XRP as a
19       bridge currency.
13:36:13 20      Q.   Would you say that -- that though there
21  was some use, it was de minimis?
22            MR. GULAY:  Objection to form.
23            MS. BUNTING:  Objection.
24      A.   There were certain technical features
13:36:26 25  that increased the use of XRP as a bridge currency

161

```
13:36:30   1    when implemented.  And I don't recall if this is
           2    before or after that.  So it's difficult for me to
           3    answer that question.
           4         Q.   Well, let's take it back, then, to the
13:36:45   5    beginning of your time at Ripple.
           6              Was there a time when the use of XRP as
           7    a bridge currency was de minimis?
           8         A.   Yes.
           9              MR. GULAY:  Objection.
13:36:55  10         Q.   So in -- in this e-mail chain, the
          11    e-mail right above, we're still on page 1,
          12    Mr. Griffin says "Fully supportive of this view.
          13    Adding ███ and Chris."
          14              Do you see that?
13:37:07  15         A.   Yes.
          16         Q.   Do you recall if Mr. Larsen ever
          17    expressed a view on this issue?
          18              MS. BUNTING:  Objection.
          19         A.   On what issue?
13:37:17  20         Q.   On the issue that's being discussed in
          21    this e-mail chain.
          22              MR. GULAY:  Objection to form.
          23         A.   On the issue of selling at a discount?
          24         Q.   Yes.
13:37:34  25         A.   I don't recall if Mr. Larsen had a
```

162

13:37:36  1    strong view one way or another on this issue.

2         Q.   Do you remember discussing it with him?

3         A.   I do generally remember having

4    discussions about it, yes.

13:37:44  5         Q.   Okay.  And so you don't recall if he had

6    a strong view.

7              Do you recall what his view was?

8         A.   I remember discussing it, but I don't

9    remember the substance of those discussions.

13:38:01 10         Q.   These types of -- well, let me take a

11   step back.

12             The -- the kind of sales that we're

13   talking about here, I think they're referred to in

14   the e-mail -- e-mail as "wholesale selling," is

13:38:17 15   that right?

16        A.   I see Patrick refers to it as "wholesale

17   selling" in this e-mail.

18        Q.   Okay.  How did you refer to it during

19   your time at Ripple?

13:38:28 20        A.   I would refer to these as

21   over-the-counter transactions --

22        Q.   Okay.

23        A.   -- or OTC.

24        Q.   And was -- was there any kind of

13:38:36 25   limitation in terms of -- of the size of -- of

                                                          163

13:38:38  1  these over-the-counter transactions while you were

2  at Ripple?

3           MR. GULAY:  Objection to form.

4      A.   I had visibility to a limited number of

13:38:52  5  the transactions that Ripple ultimately engaged in

6  and so I'm not sure of the answer to that --

7      Q.   Okay.

8      A.   -- companywide.

9      Q.   Were -- were these transactions

13:38:59 10  generally large transactions?

11           MS. BUNTING:  Objection.

12      A.   In this e-mail thread, there's a team of

13  people critical of the fact that a small

14  transaction is being conducted over the counter

13:39:20 15  and preferring them to be large transactions, and

16  that was a view that I held at the time.

17      Q.   Okay.  So is it fair to say that when

18  Ripple did engage in these types of

19  over-the-counter transactions, it generally

13:39:36 20  wouldn't have been for purposes of -- of currency

21  exchange, meaning small amounts that someone would

22  use on the Ledger?

23           MR. HORTON:  Objection to form.

24      A.   Could you repeat the question?  I just

13:39:51 25  didn't understand exactly what you mean.

                                                      164

13:39:53 1      Q.   Sure.

2           Is it fair to say that when Ripple was

3      engaging in these types of over-the-counter

4      transactions, the sales of XRP, there were

13:40:00 5      generally large bulk sales, not the types of

6      small -- small volumes that someone who'd be using

7      XRP as a bridge currency would -- would need?

8                MS. BUNTING:  Objection.

9                MR. HORTON:  Objection to form.

13:40:20 10      A.   Again, I don't feel that I have the

11      information at the time even -- and I certainly

12      don't remember today, but didn't -- at the time

13      did not have enough visibility into the totality

14      of Ripple's transactions to understand that.  The

13:40:31 15      limited number of transactions I saw tended to be

16      larger transactions.

17           I wouldn't agree that use of a bridge

18      currency necessarily needs to be a small size.  I

19      think that could be a large or small size.

13:40:49 20      Q.   What about the -- the transactions for

21      preventing the -- the spam feature that you

22      referred to?  Would those be small or large?

23                MR. HORTON:  Objection to form.

24      A.   Generally speaking, those are very small

13:41:02 25      amounts that are designed to be low value in

165

```
13:41:08   1   dollar terms, but then a user of the network --

           2   those fees scale to combat abuse.  And so an

           3   attacker on the network would face escalating fees

           4   which could turn out to be very large dollar

13:41:22   5   amounts and -- yeah.

           6              MS. STEWART:  And, Nicole, the

           7          next document is PR-35, which is Bates

           8          numbered RPLI_SEC 0842611 through 614.

           9              (Whereupon, exhibit is presented

13:41:44  10          and marked SEC Rapoport Exhibit PR-35 for

          11          identification.)

          12              (Pause)

          13      A.    Okay.  I've reviewed this.

          14   BY MS. STEWART:

13:44:17  15      Q.    Okay.  So I want to look at your e-mail

          16   which is on page 1 of the document at 5:52 a.m.

          17          Do you see that?

          18      A.    Yes.

          19      Q.    And I believe, and -- and please confirm

13:44:30  20   for me that you're responding to -- to some

          21   questions in -- in the previous e-mail from

          22   ███████████?

          23      A.    Yes, it appears that way.

          24      Q.    Okay.  And who is Mr. ███████?

13:44:47  25      A.    I don't recall interacting with this
```

166

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
13:44:49   1    person apart from seeing this e-mail.  But I see

           2    in the e-mail signature that it says he worked for

           3    ███████████████████████.

           4         Q.   And do you know what that is?

13:44:58   5         A.   It's a venture capital firm.

           6         Q.   And you -- you here are responding to a

           7    question about the qualifications for wholesalers.

           8              Do you see that?

           9         A.   Yes.

13:45:11  10         Q.   And as it's used in -- in this e-mail,

          11    the word "wholesaler," are you referencing the

          12    over-the-counter sales that we talked about a

          13    moment ago or something else?

          14         A.   I don't remember what I was -- my

13:45:31  15    thought process when writing this e-mail, but I

          16    see that ██████████ used this terminology

          17    "wholesale recipients" later in the chain.  It's

          18    not terminology that I would typically use

          19    independently, but I -- I suspect that I used his

13:45:44  20    language to not cause confusion in an e-mail

          21    chain.

          22         Q.   Okay.  But the type of transaction

          23    you're talking about is an over-the-counter

          24    transaction?

13:45:52  25         A.   Correct.
```

167

13:45:52  1          Q.   Okay.  So you say in the second
        2  paragraph after the number 1, you say "In
        3  addition, we occasionally receive inquiries from
        4  individual investors looking to purchase large
13:46:02  5  amounts of XRP with no intention to resell to
        6  third parties."
        7          Do you see that?
        8          A.   Yes.
        9          Q.   So how many such inquiries do you recall
13:46:10 10  having received while you were at Ripple?
        11          A.   Given that six, seven, eight years have
        12  passed, it's difficult for me to put a number on
        13  it even as an estimate.  I'd be guessing.  But I
        14  do remember that it did occur.
13:46:26 15          Q.   Did it happen more than once?
        16          A.   Yes.
        17          Q.   Okay.  And -- and did these investors
        18  express to you that they didn't have an intention
        19  to resell to third parties?
13:46:51 20          A.   I believe this would be contrasting to
        21  someone who's explicitly saying they intend to
        22  sent to third -- sell to third parties, but I
        23  don't recall having any kind of guarantee or
        24  written agreement with somebody that they wouldn't
13:47:03 25  do that.

                                                            168

13:47:04  1        Q.   Meaning that there were some investors

2    who specifically told you that they did intend to

3    sell to third parties and there were some who

4    didn't tell you one way or the other?

13:47:12  5        A.   In this e-mail thread, it talks about

6    people who were "resellers."  And so I believe

7    this sentence is contrasting a purchaser who

8    doesn't intend to resell with someone who is

9    explicitly saying they are going to resell to

13:47:32 10  third parties.

11        Q.   Okay.  And -- and would you say that

12   most of the -- the individuals and firms you were

13   interacting with expressed to you that they did

14   intend to -- to resell the XRP?

13:47:43 15             MR. HORTON:  Objection to form.

16        A.   Too difficult for me to remember

17   specifics to really give an accurate answer to

18   that.

19        Q.   Did -- did Ripple place any restrictions

13:47:59 20  on the resale of XRP by these individuals and

21   firms that you were interacting with?

22             MR. GULAY:  Objection;

23        foundation.

24        A.   I recall certain discussions about

13:48:15 25  "lockups," but I was not aware of any mechanism

                                                      169

13:48:20  1    for Ripple Labs to enforce that.

2         Q.    Were you aware of instances where the

3    lockup requirement was disregarded by the XRP

4    recipient?

13:48:34  5              MR. HORTON:   Objection to form.

6         A.    I can't think of any instance like that.

7         Q.    Okay.   You say in the next paragraph in

8    your e-mail "This wholesale revenue has been a

9    reliable stream of funding for RL."

13:48:46  10             Do you see that?

11        A.    Yes, I do see it.

12        Q.    Okay.   And when you say "RL," you're

13   referring to Ripple Labs?

14        A.    Yes.

13:49:06  15       Q.    So was -- was Ripple using the -- the

16   revenues from over-the-counter XRP sales to fund

17   its business?

18        A.    I did not have visibility into the

19   monthly or even six-month or annual financial

13:49:27  20   situation of the company; but based on this e-mail

21   and some of the others that you've shown me, it

22   seems reasonable to assume that was the case.

23        Q.    Well, at the time that you wrote this

24   e-mail, what was your basis for it?

13:49:41  25       A.    I don't recall.

170

13:49:43   1          Q.   Okay.   Then you say "After a Series A
           2   round, we are contemplating to discontinue the
           3   wholesale activities, as there will be less
           4   short-term funding concerns."
13:49:55   5               Do you see that?
           6          A.   I do.
           7          Q.   Okay.   What is a Series A round?
           8          A.   A Series A round is a venture capital
           9   funding round that typically follows a seed round.
13:50:08  10          Q.   Okay.   And was there, at this time in
          11   2014, a Series A round?
          12          A.   A Series A round did occur.   I don't
          13   recall the timing of that without researching it.
          14          Q.   And -- and is it -- is it accurate
13:50:23  15   that -- that Ripple was -- was contemplating
          16   discontinuing over-the-counter sales after this
          17   Series A round as you say here in your e-mail?
          18          A.   I don't have independent recollection of
          19   that, but in PR-27, ███████████ says "Post A round
13:50:39  20   I think is the key," and that implies that that
          21   was the case.
          22               THE REPORTER:   I'm sorry.   Can
          23      you repeat that answer?
          24          A.   I said I don't have a independent
13:50:44  25   recollection of that, but in Exhibit PR-27, ██████

                                                                 171

13:50:48  1     ███████ says "Post A round I think is the key," and
          2     that implies that that's true.
          3          Q.   And did Ripple, in fact, stop doing
          4     over-the-counter sales after the Series A round?
13:50:58  5                    MR. HORTON:  Objection to form.
          6          A.   I don't recall and I don't believe I
          7     would have had the information available when I
          8     was an employee.
          9          Q.   You go on to say "We think this will
13:51:15 10     have two positive effects."  We -- "One, we will
         11     push all XRP demand into the market which will
         12     have a positive impact on the price, and, two,
         13     this will add to market volumes."
         14               Do you see that?
13:51:25 15          A.   Yes.
         16          Q.   And is this similar to what we were
         17     talking about earlier about -- about increasing
         18     both price and volume and therefore increasing
         19     liquidity of XRP?
13:51:37 20          A.   Yes, this is the same concept we
         21     discussed earlier.
         22          Q.   Okay.  And later in this e-mail on this
         23     page, sort of the second-to-last paragraph, the
         24     last sentence, you say "In order to fix this
13:52:11 25     issue, we have now discontinued the discount.  We

                                                                172

13:52:14  1    now sell XRP to wholesalers at the market price."

2         Do you see that?

3         A.   Yes.

4         Q.   Okay.  And was this accurate at this

13:52:21  5    time in August 2014?

6         A.   I don't recall.  I assume that I

7    believed it to be accurate when I wrote the

8    sentence.

9              MS. STEWART:  Okay.  The next

13:52:49 10       exhibit is PR-32.

11              (Whereupon, exhibit is presented

12         and marked SEC Rapoport Exhibit PR-32 for

13         identification.)

14              MS. STEWART:  And this Exhibit 32

13:53:04 15       is Bates numbered ███████ Ripple 0002422

16         through 428.

17              (Pause)

18         A.   Okay.  I've reviewed this.

19    BY MS. STEWART:

13:56:58 20       Q.   Okay.  Who's ███████████?

21         A.   ███████████ is the founder and I

22    believe the CEO of ███████████.

23         Q.   And what is ███████████?

24         A.   ███████████ has a variety of

13:57:17 25    businesses, but I think it's primarily known for

173

13:57:19  1   being a -- the best venture capital firm these

       2   days.

       3       Q.   Well, did ██████████ have a

       4   relationship with Ripple Labs?

13:57:29  5       A.   My understanding is that ████████████

       6   was a seed investor in Ripple Labs.

       7       Q.   So in the very bottom e-mail in this

       8   chain, which is a July 19, 2014 e-mail from

       9   Mr. Larsen to Mr. ████████ and you, Mr. Larsen lays

13:57:51 10   out what he calls "the terms we're using now for

      11   large blocks of XRP."

      12           Do you see that?

      13       A.   Yes.

      14       Q.   And he goes on to say "We are in the

13:58:03 15   process of putting together a block purchase for

      16   some hedge fund investors with these same terms.

      17   Our thinking behind the discount/lockup is to

      18   reward investors who share our long-term view."

      19           Do you see that?

13:58:16 20       A.   Yes.

      21       Q.   Okay.  Do you know what Mr. Larsen is

      22   referring to when he says "a block purchase for

      23   some hedge fund investors with these same terms"?

      24       A.   I have a vague and general recollection

13:58:33 25   of discussing a transaction with a group of hedge

                                                        174

13:58:39  1   fund investors, but I don't believe it ever moved

2   forward.

3       Q.   And was -- was that -- was that

4   discussion around the same time in 2014?

13:58:47  5       A.   It's difficult for me to say the timing

6   with certainty, but I think that makes sense.

7       Q.   And was the -- was the purpose of the

8   transactions that you were discussing at that time

9   with hedge fund investors, was the purpose to

13:59:03 10   reward investors who shared Ripple's long-term

11   view?

12            MR. HORTON:  Objection to form.

13       A.   I think the purpose would have been to

14   provide a vehicle for people to get exposure to

13:59:24 15   the price of XRP.

16       Q.   What was Ripple's long-term view in

17   2014?

18            MR. HORTON:  Objection to form.

19       A.   I don't -- can't speak for the views of

13:59:43 20   all the different individuals at the company; but

21   I shared my personal view, which is that there was

22   a high probability of going to zero and a low

23   probability of an exponentially high outcome.

24       Q.   Do you know what Mr. Larsen's view was

13:59:56 25   about -- what Mr. Larsen's long-term view was for

175

13:59:58 1    Ripple?

2         A.    I don't know his view.

3         Q.    And when you spoke two answers ago about

4    your personal view of the high probability of

14:00:18 5    going to zero and the low probab -- probability of

6    an exponentially high outcome, you were referring

7    to the price of XRP?

8               MR. HORTON:  Object to the form.

9         A.    I would -- that view applies to both the

14:00:33 10    price of XRP, Ripple Labs, Inc., and in general

11    any early stage investment where there's potential

12    for high outcomes.  I think risk and reward are

13    related.  And you don't see 100X potential

14    outcomes without a high probability of going to

14:00:50 15    zero.

16         Q.    Okay.  Now, the -- the terms that

17    Mr. Larsen is laying out in his e-mail here

18    include a two-year lockup.

19               Do you see that?

14:00:58 20    A.    Yes.

21         Q.    Okay.  And what was the purpose of -- of

22    this lockup?

23               MR. GULAY:  Objection;

24         foundation.

14:01:06 25    A.    I can't be certain what Chris meant when

176

14:01:08  1   he wrote this e-mail; but in general, as we

2   discussed earlier, it was problematic to sell XRP

3   at a discount without a lockup because the buyer

4   would be attempted to go and sell at the market

14:01:23  5   price after purchasing at a discount pretty

6   shortly thereafter.

7       Q.   So did the lockup allow Ripple to

8   control the liquidity of XRP?

9               MR. HORTON:  Objection to form.

14:01:35 10               MR. GULAY:  Objection;

11     foundation.

12               MS. BUNTING:  Objection.

13       A.   My understanding of the purpose of this

14   type of lockup is to prevent the discounted buyer

14:01:46 15   from immediately harming both the liquidity and

16   the price in the market.

17       Q.   Okay.  Going to your e-mail on the very

18   first page of this document, PR-32, sort of in the

19   middle of the page, you say "This is partially why

14:02:08 20   we're interested in selling a block of XRP to

21   hedge fund investors for future funding (as

22   opposed to selling equity to VC investors)."

23               Do you see that?

24       A.   Yes.

14:02:19 25       Q.   And then you say "We think the HF

177

14:02:21  1    investor class will pay closer to market price in

2    exchange for a more defined (two-year) lockup

3    term, while also not diluting RL equity holders."

4         Do you see that?

14:02:33  5    A.   Yes.

6    Q.   Okay.  What did you mean by that

7    sentence?

8    A.   If a publicly traded gold company had a

9    market capitalization of a billion dollars but

14:02:48 10   held gold holdings of fifty billion dollars, I

11   think prudent management, if it needed to raise

12   money, would sell the gold assets rather than

13   diluting equity holders.  And I viewed the same to

14   be true for Ripple Labs at this point in time

14:03:07 15   based on this e-mail.

16   Q.   And your reference in the first sentence

17   to "a block of XRP to hedge fund investors," these

18   are over-the-counter transactions that you're

19   referring to?

14:03:26 20   A.   This was a hypothetical transaction

21   which was discussed in various formats, but I

22   don't believe it ever proceeded.

23   Q.   And then you go on to say "Side note:

24   If you're contemplating an XRP investment vehicle

14:03:42 25   for outside investors, this is something we'd love

178

14:03:45 1    to cooperate with you on.  We're already in motion

2    here."

3              Do you see that?

4        A.   Yes.

14:03:49 5        Q.   What did you mean by "We're already in

6    motion here"?

7        A.   We had ongoing thought process and

8    discussion around how that might look, but I would

9    describe it as fairly exploratory in early stages

14:04:07 10   based on my recollection and based on the fact

11   that I don't believe it ever proceeded.

12       Q.   It never proceeded with Mr. ███████

13   firm or -- or more generally?

14       A.   What I was ref -- referencing in this

14:04:19 15   e-mail never proceeded.

16       Q.   Okay.  What were you referencing in this

17   e-mail?

18       A.   Some form of vehicle which would allow a

19   number of hedge fund investors to get exposure to

14:04:33 20   the price of XRP.

21       Q.   And were you in discussions with one or

22   more firms about such vehicle at this time?

23       A.   Over the time -- over my tenure at the

24   company, I had discussions with a number of firms

14:04:55 25   about this topic and similar topics.  I don't

179

```
14:04:58   1    recall at this point in time how many firms or who
           2    I was speaking with.
           3         Q.   Would the purpose of this kind of fund
           4    be to speculate on the price of XRP?
14:05:11   5                   MR. HORTON:  Objection.
           6                   MR. GULAY:  Objection.
           7                   MS. BUNTING:  Objection.
           8         A.   Any time someone owns an asset that
           9    fluctuates in price, I would call that speculating
14:05:30  10    on the price of the asset.  So if the purpose of
          11    this hypothetical structure was to provide
          12    exposure to the price of XRP, then the answer is
          13    yes.
          14         Q.   At the top of this e-mail, in response
14:06:02  15    to a question that I think you had copied over
          16    from Mr. ████████, where it says "What has" ribble
          17    -- "Ripple Labs communicated publicly about the
          18    plans for the 72 billion XRP held by the company?"
          19    Do you see that question?
14:06:17  20         A.   Yes.
          21         Q.   And then you copy in a response, a
          22    paragraph here that starts with "Distributing
          23    value is a powerful way to incentivize certain
          24    behaviors."
14:06:25  25                   Do you see that?
```

180

14:06:25  1          A.   Yes.
        2          Q.   Is it accurate that -- that this
        3    statement that you have in your e-mail was -- was
        4    communicated publicly by Ripple?
14:06:34  5          A.   Yes, I believe this was a copy-paste
        6    from the public-facing website.
        7          Q.   Okay.
        8                    MR. HORTON:   Counsel, can we take
        9          a break?
14:06:48 10                    MS. STEWART:   Sure.
       11                    THE VIDEOGRAPHER:   Going off the
       12          record at 2:06.
       13                    (Whereupon, a recess is taken.)
       14                    THE VIDEOGRAPHER:   We're back on
14:19:00 15          at 2:19.
       16                    MS. STEWART:   Can we go off the
       17          record for a second?
       18                    THE VIDEOGRAPHER:   Going off at
       19          2:19.
14:19:17 20                    (Pause)
       21                    THE VIDEOGRAPHER:   Okay.   Back
       22          on, 2:19.
       23                    MS. STEWART:   Okay.   So we're
       24          going to hand out two exhibits, Exhibits
14:19:41 25          PR-36 and PR-37.

                                                              181

```
14:19:45   1              (Whereupon, exhibit is presented
           2          and marked SEC Rapoport Exhibit PR-36 for
           3          identification.)
           4              (Whereupon, exhibit is presented
14:19:45   5          and marked SEC Rapoport Exhibit PR-37 for
           6          identification.)
           7              MS. STEWART:  And PR-36 is Bates
           8          numbered RPLI_SEC 842466 through 467.  And
           9          PR-37 is Bates numbered RPLI_SEC 539465
14:20:03  10          through 511.
          11              (Pause)
          12      A.   I briefly reviewed it.
          13  BY MS. STEWART:
          14      Q.   I'm sorry?
14:24:45  15      A.   I -- I didn't review the whole thing,
          16  but I reviewed it generally.
          17      Q.   Okay.  Okay.  So looking first at
          18  Exhibit 37, can you tell me what this document is?
          19      A.   This was a more in-depth primer aimed at
14:24:59  20  the finance professionals as the title implies.
          21      Q.   Okay.  And were you an author of this
          22  document?
          23      A.   Yes.
          24      Q.   What was the purpose of this document?
14:25:17  25      A.   In contrast to the prior document, which
```

182

```
14:25:19   1    I think was gener -- the prior primer we looked
           2    at, which was generally geared towards any
           3    nontechnical person that wanted to learn about
           4    Ripple, this was a more in-depth document intended
14:25:32   5    for an audience that is a financial professional,
           6    someone that works in financial markets --
           7         Q.   Okay.
           8         A.   -- or banking.
           9         Q.   And whose idea was it to create this
14:25:42  10    document?
          11         A.   I can't remember whose idea it was
          12    initially.
          13         Q.   Did anyone direct you to create this
          14    document?
14:25:58  15         A.   I can't remember if it was a purely
          16    self-starting idea, but -- I don't remember
          17    whether or not I was directed to create it or not.
          18         Q.   Who actually, you know, wrote the words
          19    in the document?
14:26:21  20         A.   I was the primary author, but a number
          21    of people collaborated on it.
          22         Q.   Okay.  Who is ███████████████?
          23         A.   He was someone I engaged as a consultant
          24    that I knew from his role as a research analyst on
14:26:37  25    Wall Street.
```

183

14:26:41  1                THE REPORTER:  From?

       2                THE WITNESS:  On Wall Street.

       3        Q.   And was Mr. ████ at ███████?

       4        A.   Yes.

14:26:46  5        Q.   Okay.  How did he contribute to this

       6   document?

       7        A.   He wrote pieces of it.

       8        Q.   Okay.  And Patrick Griffin is listed as

       9   an author on the last page of the document, on

14:26:56 10   page 47.

      11             Do you see that?

      12        A.   Yes.

      13        Q.   What was his role in creating this

      14   document?

14:27:01 15        A.   He provided feedback and input on the

      16   document.

      17        Q.   So before this document was finalized,

      18   who at Ripple reviewed the document?

      19        A.   Patrick certainly did.  I don't recall

14:27:23 20   if others did as well.

      21        Q.   Did everyone listed as an author on the

      22   document on page 47 review it?

      23        A.   Yes.

      24        Q.   Okay.  Did Mr. Larsen review the

14:27:43 25   document before it was finalized?

                                                      184

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
14:27:44   1          A.   I don't --

           2               MS. BUNTING:  Objection.

           3          A.   I don't recall whether he did or didn't.

           4          Q.   Do you -- do you recall discussing the

14:27:51   5   document with Mr. Larsen?

           6          A.   I don't recall whether I did or didn't.

           7          Q.   Did you discuss the document with

           8   Mr. Griffin?

           9          A.   Yes.

14:28:01  10          Q.   And what did you discuss with

          11   Mr. Griffin?

          12          A.   I discussed the substance and concepts

          13   of the document extensively with him.  It took

          14   a -- a long time to write as you can imagine.

14:28:15  15          Q.   How long did it take?

          16          A.   I can't say exactly, but it's a 45-page

          17   document.

          18          Q.   So several weeks?

          19          A.   The work continued over the period of

14:28:24  20   several weeks, yes.

          21          Q.   Okay.  And did you distribute this

          22   document to -- to potential investors?

          23               MR. GULAY:  Objection to form.

          24               MR. HORTON:  Objection.

14:28:36  25          A.   The intended audience was people in
```

185

14:28:39  1    finance and banking who wanted to learn about the

2    Ripple technology, so we distributed it to that

3    audience and I believe it was also publicly

4    available for people that wanted to download it

14:28:52  5    online.

6         Q.    Where was it publicly available?

7         A.    If I recall correctly, it was on

8    ripple.com behind the prompts where you have to

9    put your e-mail address in.

14:29:03 10        Q.    Okay.  And this audience that you're

11    referring to who wanted to learn about the Ripple

12    technology, how large an audience was this?

13        A.    Hundreds of people.

14        Q.    Did you distribute this document to

14:29:17 15    those hundreds of people?

16        A.    People could pull it down from the

17    website proactively and we also actively

18    distributed it to a large number of people.

19        Q.    Do you know how large a number you

14:29:32 20    distributed the document to actively?

21        A.    I would say over a hundred, but I --

22    that's an estimate given how much time has passed.

23        Q.    Did you discuss with Mr. Larsen that

24    this document was being broadly distributed?

14:29:47 25              MS. BUNTING:  Objection.

186

14:29:56  1      A.   I don't recall whether I discussed this

       2   document with Mr. Larsen.

       3      Q.   Did you -- did you mention a minute ago

       4   that -- that people had to input their e-mail into

14:30:08  5   the Ripple address --

       6      A.   Yes.

       7      Q.   -- the Ripple website to pull this

       8   document?

       9      A.   Yes.

14:30:12 10      Q.   Did Ripple collect those e-mail

      11   addresses?

      12           MR. GULAY:  Objection.

      13      A.   I'm not sure if they did or didn't.

      14      Q.   So looking now at Exhibit 36, is this an

14:30:28 15   instance of you actively distributing this

      16   document?

      17      A.   Yes.

      18      Q.   Okay.  And -- and what is █████████

      19   ████████?

14:30:37 20      A.   It is a market-making firm.

      21      Q.   And at the time that you sent this

      22   document to ████████, did Ripple have a

      23   relationship with ████████?

      24           MR. GULAY:  Objection.  What do

14:30:50 25       you mean by "a relationship with"?

                                                          187

```
14:30:52   1              MS. STEWART:  I mean a business

           2         relationship.

           3         A.  ███████████ was a market maker on the

           4    Ripple network that received compensation in

14:31:01   5    exchange for market-making services.  I don't

           6    recall as of this date whether that relationship

           7    was formalized or not without looking into it

           8    further.

           9         Q.  Okay.  And why did you send this

14:31:11  10    document to ████████████?

          11         A.  I believed this was a relevant document

          12    for anyone in banking or finance that had an

          13    interest in Ripple to see.

          14         Q.  Okay.  Now I want to go through some of

14:31:35  15    the statements in the document itself.  So back to

          16    PR-37.

          17              MR. GULAY:  I just want to point

          18         out for the record that PR-37 is not

          19         attached to PR-36 and PR-36 only contains

14:31:50  20         a link to the report and PR-37 is a

          21         stand-alone report that may or may not be

          22         the final version.

          23              MR. HECKER:  I'll just add that

          24         PR-37 appears to postdate the e-mail in

14:32:04  25         PR-36.  PR-36 is an August date and PR-37
```

                                                              188

14:32:09  1        is a September date.

       2   BY MS. STEWART:

       3        Q.   Okay.  Mr. Rapoport, having reviewed

       4   PR-37, is there anything in the document that

14:32:17  5   makes you think that this is not the final

       6   version?

       7        A.   The different dates in August of 2014,

       8   the e-mail, and September 2014 on the document,

       9   lead me to believe that this was a living document

14:32:37 10   and that there was a continued iteration after the

      11   first publicly released version.

      12        Q.   Did you continue to edit the document

      13   after the first publicly released version?

      14        A.   I don't recall specifically, but it

14:32:47 15   likely would have been me.

      16        Q.   Do you recall making significant changes

      17   to the document after its first public

      18   distribution?

      19        A.   I don't remember the number of changes

14:32:58 20   and how material they were.

      21        Q.   Okay.  So as we go through this -- this

      22   version that we've marked PR -- PR-37, I'll ask

      23   you if you do recall changes that occurred after

      24   this document, if you can just tell me -- tell me

14:33:11 25   what those changes were.  Okay?

                                                          189

14:33:12  1      A.    Okay.  I'm unlikely to recall specifics

2    of changes.

3          Q.    Understood.

4          Okay.  So if we can first look at page

14:33:29  5    17 of the document, which is Bates numbered 481.

6          Okay.  So here in the -- in the third

7    paragraph -- or I guess the fourth paragraph that

8    starts with "Historically," do you see that?

9          A.    Yes.

14:34:08  10      Q.    So here it says, the second sentence,

11    "The Ripple protocol, however, could in fact be

12    monetized through its native currency, XRP."

13          Do you see that?

14          A.    Yes.

14:34:19  15      Q.    Did you write this sentence?

16          A.    There were multiple authors so I'm not

17    certain who wrote what text, but I was a primary

18    author on the paper.

19          Q.    Okay.  Was this sentence accurate as of

14:34:34  20    2014?

21          A.    It's a little awkwardly worded.  I'm not

22    totally sure what the intention of the word

23    "monetized" was here, so I'm having trouble saying

24    whether it's accurate.

14:35:50  25      Q.    Are you done with your answer or are you

190

14:35:52   1  thinking?

2       A.   I find it difficult to answer that

3  question with a yes/no.

4       Q.   Okay.  What is -- sitting here today

14:36:00   5  reading this, what's your understanding of what

6  this sentence is trying to say?

7       A.   I'll read the preceding sentence.  The

8  preceding sentence says "Historically, information

9  protocols, like http and SMTP, were impossible to

14:36:18  10  monetize directly.  Ripple Labs is not a financial

11  service provider and thus does not charge for

12  using the network.  The Ripple protocol, however,

13  could, in fact, be monetized through its native

14  currency, XRP."

14:36:30  15       I think the intent of this paragraph or

16  those three sentences is to indicate that http and

17  SMTP did not have a native asset that someone

18  could purchase within those -- within those

19  protocols and the Ripple protocol does have an

14:36:44  20  asset that someone can purchase as part of that --

21  as part of the protocol.

22       Q.   Okay.  So an asset that someone could

23  purchase and -- and make money off of?

24       A.   It's an asset that fluctuates in price,

14:37:00  25  so, yes.

191

```
14:37:03   1        Q.   Going back up to the paragraph that
           2   starts with "First" on the same page.
           3        A.   Yes.
           4        Q.   So you say "Ripple Labs" -- or the
14:37:11   5   document says, I should say.  The document says
           6   "Ripple Labs builds new tools to allow developers
           7   to build user friendly applications."
           8             Do you see that?
           9        A.   Yes.
14:37:20  10        Q.   And was this statement accurate at the
          11   time?
          12        A.   Yes.
          13        Q.   And then that paragraph goes on to say
          14   "Ripple Labs pursues partnerships to expand the
14:37:31  15   Ripple network of financial institutions, users
          16   and market makers, providing APIs to access the
          17   protocol."
          18             Do you see that?
          19        A.   Yes.
14:37:37  20        Q.   And was this sentence accurate at the
          21   time?
          22        A.   Yes.
          23        Q.   And the next paragraph says "Ripple Labs
          24   has raised capital from some of the leading
14:37:46  25   venture capital and technology firms."
```

192

```
14:37:48   1              Do you see that?
           2       A.    Yes.
           3       Q.    And was this sentence accurate at the
           4    time?
14:37:51   5       A.    Yes.
           6       Q.    And the next sentence that says "In
           7    addition, Ripple Labs continues to" address --
           8    "attract a diverse set of talented individuals."
           9              Do you see that sentence?
14:38:02  10       A.    Yes, I do.
          11       Q.    Was this sentence accurate at the time?
          12       A.    Yes.
          13       Q.    Okay.  And then going to the last
          14    paragraph on this page, "Ripple Labs plans to
14:38:12  15    retain 25 percent of all XRP issued to fund
          16    operations (and hopefully turn a profit) and
          17    distribute the rest to incent the participation of
          18    market makers, gateways, and consumers to utilize
          19    the protocol."
14:38:26  20              Do you see that?
          21       A.    I do.
          22       Q.    And was this sentence accurate at the
          23    time?
          24       A.    Yes.
14:38:36  25       Q.    And then it goes on to say "Given that
```

193

14:38:38  1   there is a finite number of XRP, as demand for XRP
        2   grows, the value of XRP should appreciate."
        3           Was this sentence accurate at the time?
        4       A.   I think that's a logically true sentence
14:38:48  5   ahead of time, yes.
        6       Q.   Okay.  And then the paragraph closes
        7   with "In this manner, Ripple Labs believes that
        8   its incentives are aligned with those of protocol
        9   users - both want the protocol to reach its full
14:39:00 10   potential and scale."
       11           Do you see that?
       12       A.   Yes.
       13       Q.   Okay.  And was this sentence accurate at
       14   the time?
14:39:06 15       A.   I believe so, yes.
       16       Q.   Okay.  Do you recall discussing what
       17   we're seeing on this page under "An Overview of
       18   Ripple Labs" with anyone else at Ripple?
       19       A.   I don't have specific recollection of
14:39:28 20   discussing this text, but as I mentioned earlier,
       21   Patrick Griffin played an active role in reviewing
       22   and -- and authoring this document as well.
       23       Q.   Do you have any reason to believe that
       24   anyone at Ripple did not agree that Ripple Labs'
14:39:42 25   incentives were aligned with those of the

                                                          194

14:39:46  1    protocol's users?

2         A.   I don't know whether others at the

3    company did or did not believe that at the time.

4         Q.   Did you discuss that issue with anyone

14:39:54  5    at the company?

6         A.   To the extent Patrick reviewed all this

7    text and worked with me to publish this paper, the

8    two of us certainly discussed it.  I don't recall

9    specific discussions about this outside of that.

14:40:09 10        Q.   And when -- when it says in this

11   paragraph "users of the protocol," does that

12   include speculators?

13        A.   I think a speculator could be

14   categorized as a type of user, yes.

14:40:35 15        Q.   Okay.  If you can turn to page 23 next,

16   which is Bates numbered 487, and I want to look at

17   the first paragraph on that page, the middle

18   sentence, that says "Ripple Labs' business model

19   is predicated on a belief that demand for XRP will

14:40:56 20   increase (resulting in price appreciation) if the

21   Ripple protocol becomes widely adopted."

22             Do you see that?

23        A.   I do.

24        Q.   Okay.  Was that sentence accurate at the

14:41:06 25   time?

                                                            195

14:41:19   1          A.   At the inception of the company that
        2   sentence was accurate.  Over time Ripple Labs
        3   developed other business models as well, but I
        4   assume that it was true at the time the paper was
14:41:29   5   written since we published it.
        6          Q.   And what was your understanding, as you
        7   described here, about Ripple's business model
        8   based on?
        9          A.   I'm sorry, could you repeat that?
14:41:40  10          Q.   The -- the understanding that's
       11   reflected in this sentence about Ripple Labs'
       12   business model, what is that based on?
       13          A.   At the inception of the company, there
       14   was no other clear monetization strategy.  I think
14:42:04  15   the earliest investors in the company believed
       16   that Ripple Labs was going to develop a -- further
       17   develop the Ripple protocol and that that may
       18   result in demand for XRP and that the asset on
       19   Ripple Labs' balance sheet may appreciate.
14:42:28  20          Q.   And in 2014 did that continue to be
       21   Ripple's business model?
       22          A.   The specific timing of additional
       23   revenue streams in businesses is difficult for me
       24   to -- to recall with certainty, but over time
14:42:43  25   other consulting and software serve -- and

                                                      196

14:42:45  1  services businesses became viable revenue streams.

2      Q.   And what were those services and

3  businesses?

4      A.   We often looked at Red Hat and Linux as

14:43:11  5  two analogous concepts where Linux is an

6  open-source software that's developed by a

7  community of -- of users throughout the world and

8  Red Hat is a service provider that's engaged by

9  companies that deploy Linux to provide consulting

14:43:28  10  and advisory services.  And we felt that Ripple

11  Labs could play a similar role for financial

12  institutions that wanted to employ the open-source

13  Ripple protocol.

14      Q.   And did -- did Ripple, in fact, play

14:43:49  15  such a role for financial institutions?

16      A.   My role at the company was focused on

17  market makers and liquidity, and so I -- I did not

18  negotiate or have visibility into revenue from

19  consulting from financial institutions, but my

14:44:11  20  understanding is that that was occurring, yes.

21      Q.   Okay.  Turning to page 25, which is

22  Bates numbered 489.  So I want to look at the

23  paragraph under the title "Future Demand

24  Potential."

14:44:36  25          So here it says "The Ripple network is

197

14:44:38  1    still in its infancy and relatively unknown."

2              Do you see that?

3         A.   Yes.

4         Q.   Was this accurate at the time?

14:44:44  5    A.   On a global scale, yes, that's true.

6         Q.   Is it not true on some other scale?

7         A.   In the cryptocurrency or digital asset

8    community, it was very well known; but on the

9    global financial stage, it was in its infancy.

14:44:56 10    Q.   Okay.  Then it goes on to say "Likewise,

11   XRP is still fairly complicated for average users

12   to acquire or even completely inaccessible in many

13   parts of the world."

14             Was that an accurate statement at the

14:45:10 15   time?

16        A.   I believe so, yes.

17        Q.   And then it goes on to say "Increased

18   exposure and a more global network of Ripple

19   gateways could result in increased speculative

14:45:18 20   interest, which may have significant impacts on

21   price."

22             Do you see that?

23        A.   Yes.

24        Q.   And was this accurate at the time?

14:45:26 25   A.   Yes.

                                                    198

14:45:27  1        Q.   And when -- when the document refers to

        2   "significant impacts on price," is that positive

        3   or negative impacts or both?

        4        A.   I think it deliberately omits whether

14:45:36  5   that's positive or negative.

        6                THE REPORTER:  Repeat, please.

        7        A.   I think if deliberately omits whether

        8   it's a positive or a negative impact on price.

        9        Q.   Okay.  So would the impact be positive

14:45:49 10   or negative?

       11        A.   It could be either.

       12        Q.   Then it goes on to say "Speculative

       13   demand and bullish expectations for the future

       14   were enough to send XRP and BTC total market

14:46:06 15   capitalization to over $6 billion and $23 billion

       16   in Q4 2014 respectively."

       17                Do you see that?

       18        A.   Yes.

       19        Q.   Okay.  And was that sentence accurate at

14:46:14 20   the time?

       21        A.   Without checking the numbers, I assume

       22   it's accurate if we published it.

       23        Q.   Okay.  And then it goes on to say "If

       24   the Ripple protocol becomes the backbone for

14:46:22 25   global value transfer, Ripple Labs expects the

                                                        199

14:46:25  1  demand for XRP to be considerable."

2          Do you see that?

3      A.   Yes.

4      Q.   Okay.  So what is the purpose of -- of
14:46:35  5  this section of this report under "Future Demand

6  Potential"?

7      A.   It's difficult for me to recall the

8  intent, you know, or thought process in writing

9  specific paragraphs of a 45-page paper; but, in
14:47:13 10  general, our narrative in speaking about the

11  Ripple protocol focused on a clearing settlement

12  and value transfer and using technology for that

13  purpose.

14          But after hundreds of meetings, we were
14:47:32 15  definitely aware that XRP was a topic that

16  frequently came up in conversations and we were

17  likely responding to common questions and topics

18  that we fielded after hundreds of meetings on the

19  topics.
14:47:50 20      Q.   And did those common questions include

21  questions about the value of XRP?

22      A.   Despite our deliberate intent to focus

23  on the technology and value transfer, frequently

24  people ask about XRP and our views on XRP in
14:48:09 25  meetings.

                                                          200

14:48:11   1        Q.   Okay.  What was the purpose of making

2    this document available to the public on Ripple's

3    website?

4        A.   The purpose of making anything public on

14:48:36   5    the website was to reach an audience that we

6    didn't necessarily have direct contact with.

7        Q.   Okay.  So turning now to page 43 of the

8    document, Bates numbered 5307, and looking at the

9    section "Regulation Remains Unclear."

14:49:17  10        Do you see that?

11        A.   Yes.

12        Q.   Okay.  So here the document says "As

13    with other settlement protocols which involve a

14    digital currency, regulatory uncertainty remains a

14:49:26  15    big hurdle for wide adoption of Ripple.

16    Regulators in the U.S. and abroad are increasingly

17    taking steps to understand, contextualize and

18    regulate digital currencies.  As a result, it is

19    still unclear how regulation will ultimately look

14:49:39  20    and how burdensome it will be on digital currency

21    protocols and users."

22        Do you see that?

23        A.   Yes.

24        Q.   Is this statement accurate as of 2014?

14:49:46  25        A.   Yes.

201

14:49:46  1         Q.   Okay.  Did you discuss this paragraph
          2   with anyone before this document was finalized?
          3               MR. HORTON:  I just want to
          4          clarify for the witness that excludes
14:49:56  5          conversations you've had with lawyers.
          6         A.   The answer is the same as the other
          7   discussions about this document, which is that I
          8   recall discussing it with Patrick Griffin in his
          9   role as a reviewer and -- and author.  I don't
14:50:11 10   recall specific other conversations about this
         11   document with others at the firm.
         12         Q.   Okay.  The next paragraph starts "Though
         13   the Ripple protocol is very different from other
         14   digital currency protocols, it is unclear whether
14:50:24 15   regulation will distinguish between protocols or
         16   regulate all digital currencies under one broad
         17   brush."
         18               Do you see that?
         19         A.   Yes.
14:50:31 20         Q.   What is the statement based on?
         21               MR. GULAY:  Same instruction on
         22          your discussions with counsel.  To the
         23          extent this is based on your discussions
         24          with counsel, you should exclude that from
14:50:47 25          your answer.

                                                              202

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:51:00  1          A.   Can you repeat the question, please?

       2          Q.   What was this sentence that I just read

       3   based on?

       4          A.   The statement that the Ripple protocol

14:51:13  5   is very different from other digital currency

       6   protocols is based on the fact that Ripple -- the

       7   Ripple protocol includes a decentralized exchange

       8   and the ability to have assets created by

       9   third-party issuers on the platform, whereas all

14:51:31 10   other digital currency protocols that I was aware

      11   of at the time had only one native digital asset

      12   and no decentralized exchange or ability for

      13   issuers to create new assets.

      14          Q.   And what about the part -- part of the

14:51:43 15   sentence that says "it is unclear whether

      16   regulation will distinguish between the protocols

      17   or treat them all the same"?  What was that based

      18   on?

      19               MR. HORTON:  Same instruction.

14:52:07 20          A.   I don't recall the specific thought

      21   process when writing this sentence, but I read

      22   that to be a general risk statement that I think

      23   would be prudent to write about any digital asset

      24   at the time or today even.

14:52:24 25          Q.   Moving on to page 45, which is Bates

                                                              203

14:52:26  1  numbered 50 -- 509, and in the section "The Role

       2  of XRP," the middle sentence in that paragraph

       3  says --

       4      A.   I'm sorry, which page?

14:52:38  5      Q.   Sorry.  Page 45.

       6      A.   Forty-five.

       7      Q.   So under "The Role of XRP."

       8      A.   Yes.

       9      Q.   The middle sentence says "Over time, if

14:52:46 10  the Ripple protocol becomes widely adopted, demand

      11  for XRP may increase, leading to an increase in

      12  price."

      13           Do you see that?

      14      A.   Yes.

14:52:53 15      Q.   And was this sentence accurate at the

      16  time?

      17      A.   Yes.

      18      Q.   Okay.  And why did you include this

      19  sentence in this sort of conclusion page of this

14:53:05 20  document?

      21      A.   It's difficult for me to recall the

      22  thought process of how we structured the document.

      23      Q.   Is it fair to say that given that it was

      24  included in the conclusion page, that it's a --

14:53:26 25  it's an important piece of information?

                                                          204

14:53:28   1              MR. HORTON:  Objection to form.

         2       A.   I do think XRP is an important piece of

         3   the Ripple protocol.

         4       Q.   Well, what about the idea that if the

14:53:57   5   protocol becomes widely adopted, demand for XRP

         6   may increase leading to an increase in price?  Is

         7   that idea an important part of what you were

         8   conveying in this document?

         9       A.   I think it accurate -- I think it

14:54:11  10   accurately captures our view that wide adoption of

        11   the Ripple protocol may or may not involve XRP

        12   price appreciation and our view that use of the

        13   Ripple protocol as a settlement layer may or may

        14   not lead to an increase in XRP price.

14:54:35  15       Q.   Well, but you don't say here may or may

        16   not.  You say it may increase, leading to an

        17   increase in price, right?

        18              MR. HORTON:  Objection to form.

        19       A.   That is what the page says.

14:54:50  20       Q.   Okay.  So were you trying to convey here

        21   that if the Ripple protocol is adopted, that could

        22   mean that XRP will become more valuable?

        23              MR. GULAY:  Objection to form.

        24       A.   I think it's accurate in saying that

14:55:10  25   that is a possibility.

                                                          205

14:55:13  1      Q.   Is there a possibility where the Ripple

        2  protocol is widely adopted but XRP decreases in

        3  price?

        4           MR. GULAY:  Objection.

14:55:27  5      A.   Yes.

        6      Q.   Can you explain to me how that would

        7  happen?

        8           MR. HORTON:  Objection to form.

        9      A.   XRP is necessary in very small

14:55:42 10  quantities and low value, low-dollar-value

       11  amounts, for anyone to use the network.  XRP's

       12  adoption as a bridge currency may or may not occur

       13  in a widespread adoption scenario of Ripple as a

       14  technology.

14:56:01 15           So we were acutely aware of the fact

       16  that Ripple technology could be widely adopted as

       17  a global settlement layer; but the amount of XRP,

       18  say if a hundred million users were using the

       19  network and each needed to own a few cents' worth

14:56:20 20  of XRP, that would apply a -- a valuation of 1 or

       21  $5 million for the total sum of XRP, which would

       22  be a significant decrease in value.  And I

       23  believed then and today that that was a plausible

       24  outcome in a success state of Ripple's technology.

14:56:41 25      Q.   So at the time in 2014, you thought that

                                                              206

14:56:44  1    that was a plausible outcome?

2         A.   Yes.

3         Q.   Is that what you just said?

4         A.   Yes.

14:56:48  5    Q.   Did you think it was a more plausible

6    outcome than an increase in XRP's price if the

7    Ripple technology was widely adopted?

8              MR. HECKER:  Objection to form.

9         A.   I viewed it as highly uncertain both

14:57:05 10    ways and I could see it reasonably going in either

11    direction.  I thought it was highly -- a highly

12    risky thesis.

13        Q.   Going back to, I think, a similar

14    thought you expressed earlier about a high

14:57:17 15    probab -- probability of it going to either zero,

16    low probability of -- of a hundred X, do you

17    remember that?

18        A.   Yes.

19        Q.   In your view in 2014, if Ripple had

14:57:30 20    walked away from the Ripple network, what would

21    have -- which outcome would have been more likely,

22    the going to zero or the going to a hundred X?

23             MR. HORTON:  Objection to form.

24             MS. BUNTING:  Objection.

14:57:44 25    A.   If Ripple Labs ceased to exist or

207

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:57:47   1   disbanded, I'm confident that the Ripple

       2   technology would continue to operate, albeit with

       3   likely hiccups in a very short -- in the very

       4   short term.

14:58:01   5          I do think that in that scenario, in the

       6   very short term, the price would be more likely to

       7   fall than rise, but I don't think there's a clear

       8   statement about the long-term future of the

       9   protocol or XRP in the absence of Ripple Labs.

14:58:32  10              MS. STEWART:  PR-15 next, Nicole.

      11              (Whereupon, exhibit is presented

      12          and marked SEC Rapoport Exhibit PR-15 for

      13          identification.)

      14              MS. STEWART:  So PR-15 for the

14:58:43  15          record is 842922 through 842925 Bates

      16          stamp.

      17              (Pause)

      18              MS. FORBES:  Can you repeat the

      19          number?

14:59:18  20              MS. STEWART:  Fifteen, one-five.

      21              MS. FORBES:  PR-15?

      22              MS. STEWART:  Yes, one-five.

      23              MS. FORBES:  Thank you.

      24              (Pause)

14:59:55  25   A.   Okay.  I've reviewed this.

                                                       208

```
15:00:13   1   BY MS. STEWART:
           2       Q.   Okay.  Who is ███████████?
           3       A.   He's a friend of mine.
           4       Q.   And does he work for the law firm
15:00:24   5   ██████████████████████████████?
           6       A.   Yes, he does.
           7       Q.   Okay.  And why were you reaching out to
           8   Mr. ██████ on November 4th, 2013?
           9       A.   In the very early stages of the company,
15:00:40  10   we were eager to explain the technology and share
          11   information about the technology with pretty much
          12   anyone who would listen, whether that person was a
          13   financial market person, a legal professional,
          14   totally unrelated to the company.  We did not yet
15:00:59  15   know exactly where this technology could be
          16   applied functionally.
          17       Q.   Okay.  And did you discuss having
          18   Mr. █████s law firm be a merchant for XRP?
          19       A.   I see he used the phrase "merchant or
15:01:24  20   vendor."  I'm not sure exactly what he meant.  I
          21   think that verbiage is strange and he didn't yet
          22   have an understanding of what Ripple was.
          23       Q.   Okay.  Did you discuss with him the
          24   possibility of his firm accepting payments in XRP?
15:01:51  25       A.   I see that his e-mail refers to payment
```

209

15:01:57  1  by other Ripple network which could be in dollars.

2  I presume it would be in dollars.  I don't recall

3  the specifics of a discussion around that given

4  that this was in 2013.

15:02:06  5      Q.   Okay.  Did the discussions with

6  Mr. ███ on this point go anywhere?

7      A.   Generally speaking, the discussions did

8  not go anywhere.  I think we had one or maybe two

9  meetings to discuss the topic of Ripple.

15:02:25 10      Q.   Okay.  On the second-to-last page of the

11  document, Bates numbered 924, your e-mail that's

12  at 9:37 a.m. to Mr. ███.  So you write "FWIW?"

13  Does that mean for what it's worth?

14      A.   Yes, it does.

15:02:47 15      Q.   Okay.  "This law firm seems to have

16  become the main source of advice in the space.

17  Every bitcoin startup is paying them."  And then

18  you send a link to Perkins Coie's website and then

19  you say "Very interesting space, and ripe for

15:03:01 20  regulation."

21           Do you see that?

22      A.   Yes.

23      Q.   What did you mean when you said "ripe

24  for regulation"?

15:03:06 25      A.   In general, market participants at the

210

15:03:09   1   time in my recollection were seeking regulatory

2   clarity and hungry for regulatory clarity and

3   there was very little guidance available at the

4   time.

15:03:18   5        Q.   And why were you sending Mr. ███ a

6   link to Perkins Coie's website?

7        A.   I observed that there was a lot of

8   demand for legal advice and few law firms that

9   were providing legal advice on the topic of

15:03:35  10   digital assets and I thought he would be

11   interested in knowing that as a lawyer.

12        Q.   Okay.  Did Mr. ███ and his firm at any

13   point provide legal services to Ripple?

14        A.   I don't know one way or another.  I'm

15:03:50  15   not aware of them providing any services to

16   Ripple.

17        Q.   So you said that -- that market

18   participants at the time were seeking regula --

19   regulatory clarity and were hungry for regulatory

15:04:05  20   clarity?  You said that a moment ago.  Do you

21   remember that?

22        A.   Yes.

23        Q.   During your time at Ripple, was Ripple

24   seeking regulatory clarity?

15:04:20  25             MR. GULAY:  Objection;

211

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

15:04:20  1        foundation.

2        A.    Ripple was generally, in my recollection

3    and view, the most proactive firm in the digital

4    asset space, trying to promote a regulated

15:04:43  5    environment and approach, and was doing its best

6    to embrace regulation and seek regulatory clarity.

7        Q.    Okay.  And in what way was Ripple

8    proactive, as you said?

9        A.    Both through private discussions with

15:05:14 10    legal counsel as well as direct -- directly

11    seeking out members of the governance and

12    regulatory community to explain the technology and

13    explain what -- what was going on in the space

14    that Ripple saw happening.

15:05:33 15        Q.    Okay.  So during your time at Ripple,

16    which members of the governance and -- I forget

17    what words you used, but which regulators did --

18    did Ripple reach out to?

19              MR. HORTON:   Objection to form;

15:05:48 20      lack of foundation.

21        A.    I don't know the goings on of every

22    member of the company, but I know at a minimum,

23    Treasury, Federal Reserve, and certainly other

24    domestic and foreign regulators that are difficult

15:06:13 25    for me to recall on the fly.

212

15:06:16   1          Q.    During your time at Ripple, did Ripple

          2    reach out to the SEC for regulatory clarity?

          3                      MR. GULAY:   Objection; lack of

          4          foundation.

15:06:23   5          A.    I'm not aware whether Ripple did or did

          6    not have conversation with the SEC.

          7          Q.    Okay.   And what is ███████████?

          8          A.    A charity organization.

          9          Q.    And was the donation that's referenced

15:06:40  10    in your e-mail here to ████████████ of XRP, was

         11    that part of Ripple's distribution strategy?

         12          A.    Yes.   In general, Ripple had a

         13    preference for charit -- charitably distributing

         14    XRP if it was ignoring market impacts of its

15:06:57  15    actions.

         16                      THE REPORTER:   Repeat.

         17          A.    In general, Ripple had a preference for

         18    charitable distribution of XRP if it was ignoring

         19    market impacts of its actions.

15:07:08  20          Q.    And what do you mean "if it was ignoring

         21    market impacts of its actions"?

         22          A.    As I mentioned earlier, giving away XRP

         23    for zero I view harm -- in my view harmed

         24    liquidity and price; but ignoring those impacts,

15:07:27  25    as some of the prior e-mails showed, Ripple had an

                                                                    213

```
15:07:36   1   interest in charitably distributing XRP.
           2        Q.   And why did it have such an interest?
           3        A.   I don't know.
           4        Q.   Did you discuss that issue with anyone
15:07:47   5   at Ripple?
           6        A.   It's difficult to recall conversations
           7   from 2013 about that now.
           8        Q.   So you don't have a general
           9   understanding of -- of why they -- they preferred
15:08:01  10   charitable giving?
          11             MR. HORTON:   Objection.
          12        A.   My assumption is that the members of the
          13   company looked favorably on altruistic acts.
          14        Q.   Okay.
15:08:28  15             MS. STEWART:   Okay.   Can we look
          16         at PR-19 next?   One-nine.   And that's
          17         Bates numbered RPLI_SEC 88057 to 58.
          18             (Whereupon, exhibit is presented
          19         and marked SEC Rapoport Exhibit PR-19 for
15:08:45  20         identification.)
          21             (Pause)
          22        A.   Okay.   I've read this.
          23   BY MS. STEWART:
          24        Q.   Okay.   Looking at the -- the last e-mail
15:10:19  25   in the chain, which is your 8:54 p.m. e-mail.
```

214

| | | |
|---|---|---|
| 15:10:23 | 1 | A.   Yes. |
| | 2 | Q.   Do you see that? |
| | 3 | Why did you write this e-mail? |
| | 4 | A.   I don't recall the discussions that |
| 15:10:45 | 5 | preceded this leading me to send this e-mail. |
| | 6 | Q.   Did anyone ask you to write this e-mail? |
| | 7 | A.   I don't think the recipients would have |
| | 8 | asked me to provide this information to them. |
| | 9 | Q.   And who do you mean by "the recipients"? |
| 15:11:02 | 10 | A.   I think if ▮▮▮▮▮ and ▮▮▮▮▮ |
| | 11 | ▮▮▮▮ were interested in this information, they |
| | 12 | would ask their legal advisor. |
| | 13 | Q.   Okay.  So then why were you sending them |
| | 14 | this information? |
| 15:11:21 | 15 | A.   It's hard to -- for me to remember what |
| | 16 | my motivation was on January 2014 at 8 p.m. |
| | 17 | Q.   Okay.  Do you recall any conversations |
| | 18 | with -- well, let me step back. |
| | 19 | What is ▮▮▮▮▮? |
| 15:11:38 | 20 | A.   ▮▮▮▮▮ is an asset management firm. |
| | 21 | Q.   Okay.  And why at this time were you |
| | 22 | having conversations with Mr. ▮▮▮▮ and |
| | 23 | Mr. ▮▮▮? |
| | 24 | A.   At some point before or after this |
| 15:11:56 | 25 | e-mail, they were investigating and -- and |

215

```
15:12:00   1   proceeded to start a separate unaffiliated Ripple

           2   market-making firm that did business under the

           3   name of ███████████, as I mentioned earlier.

           4       Q.   Okay.  And in connection with that deal,

15:12:14   5   did you have conversations with -- with

           6   Mr. ████████ or Mr. ██████████ about the issues that

           7   are referenced in your e-mail here in Exhibit

           8   PR-19?

           9               MR. HORTON:  Objection to form.

15:12:36  10       A.   Any -- like any prudent financial market

          11   participant, I believe all of the market-making

          12   firms that ultimately engaged in trading on Ripple

          13   did some form of investigation around these

          14   questions prior to starting to trade on the

15:12:50  15   platform.

          16       Q.   Okay.  Well, did you have discussions

          17   with -- with either Mr. ████████ and Mr. ██████████ or

          18   any other individual of the firms you were talking

          19   to?  Did you have discussions about these issues?

15:13:02  20               MR. HORTON:  Objection to form.

          21               MR. GULAY:  Objection to form.

          22       A.   While it's difficult to recall specifics

          23   of discussions, I do recall that every

          24   market-making firm generally did some form of

15:13:20  25   regulatory investigation prior to commencing to
```

216

15:13:23    1    trade on the Ripple network.  And so I do recall
            2    having -- I do generally recall having discussions
            3    on this topic with many or most of the
            4    market-making firms that ultimately moved forward.
15:13:39    5         Q.   Did any of the market-making firms
            6    express to you that XRP may be a security?
            7         A.   Each of them independently investigated
            8    it, to my understanding, and all of them reached
            9    the same conclusion, that it was not likely to be
15:13:58   10    considered a security.  And so the primary area of
           11    further investigation was around money
           12    transmission regulation, which is what people
           13    generally thought was more potentially applicable.
           14         Q.   Okay.  Did you convey the discussions
15:14:23   15    that you were having with these market-making
           16    firms to others at Ripple?
           17         A.   I'm sorry?
           18         Q.   Did you convey these discussions we've
           19    been talking about that you were having with
15:14:33   20    market-making firms to others at Ripple?
           21              MR. HORTON:  Objection to form.
           22         A.   It's difficult for me to recall whether
           23    I did or I didn't.
           24         Q.   So you start your e-mail, the bottom
15:14:47   25    e-mail, saying "I want to emphasize that I'm not a

                                                              217

15:14:51  1  lawyer, nor do I have expertise on these issues.

       2  But here are some interpretations/excerpts I've

       3  picked up after talking to a bunch of legal

       4  experts (many of whom had" differ -- "differing

15:15:02  5  opinions, I might add)."

       6              Who are the bunch of legal experts that

       7  you talked to?

       8      A.   I had a very large number of

       9  conversations with a large number of people on the

15:15:17 10  topic of Ripple and so it's difficult for me to

      11  recall who I would have talked to apart from

      12  Ripple's internal counsel and Ripple's external

      13  counsel.

      14      Q.   How did it come that you undertook to

15:15:32 15  speak to all of these lawyers about these issues?

      16              MS. BUNTING:   Objection.

      17              MR. GULAY:   I just want to pause

      18         here.  You can -- you can answer the

      19         question, but I would just caution you not

15:15:41 20         to reveal the substance of any privileged

      21         communications with Ripple's lawyers.

      22      A.   As you can see from Exhibit PR-15, in my

      23  conversations with ███████████   I was generally

      24  willing to talk to anyone who would listen about

15:16:08 25  Ripple, and that included people from a variety of

                                                          218

15:16:10  1    different professions, some of whom were legal

        2    professionals.  So that's how I came to speak with

        3    people who are not Ripple's counsel on the topic.

        4         Q.   So I'm just trying to understand sort of

15:16:25  5    the chronology here.

        6              Was it the case that you wanted to put

        7    together this e-mail and then you went and sought

        8    out lawyers to talk to or was it the case that

        9    you'd already talked to lawyers among the various

15:16:35 10    other people you talked to and then you put that

       11    information in this e-mail?

       12              MS. BUNTING:  Objection.

       13              MR. HORTON:  Objection to form.

       14         A.   I independently looked up the legal

15:16:49 15    excerpts and had an interest in reading them on a

       16    personal level that are referenced in this e-mail.

       17    This isn't something somebody sent to me.

       18              THE REPORTER:  Repeat the last

       19       part.

15:17:01 20         A.   I independently looked up legal excerpts

       21    or excerpts from -- from laws, I guess, that --

       22    that I had a personal interest in understanding

       23    and reading.  And this is not information that

       24    someone else sent to me.

15:17:13 25         Q.   But in terms of the legal experts you

                                                              219

15:17:15  1   talked to, the individuals, did you do that in

2   order to put this document together or had you

3   already done that as part of your job

4   responsibilities?

15:17:26  5             MR. GULAY:  Objection; calls

6        for --

7             MR. HECKER:  Objection.

8             MS. BUNTING:  Objection.

9        A.   As a matter of --

15:17:32 10             MR. GULAY:  Well, hold on.

11             MR. HECKER:  Go ahead.

12             THE WITNESS:  You want to --

13             MR. GULAY:  We -- I mean, I think

14        that calls for -- you know, if it's

15:17:36 15        requesting for legal advice, I think that

16        this calls for potentially privileged

17        information.  You know, the reason why he

18        wanted to seek advice from lawyers.

19             MS. STEWART:  Okay.  I'll --

15:17:47 20        I'll -- I'll rephrase the question.

21   BY MS. STEWART:

22        Q.   What I'm trying to understand is whether

23   you wanted to write an e-mail that you would then

24   send to third parties with -- with this

15:18:03 25   information and to do that, you sought out legal

220

15:18:06  1  experts.

2              Is that how it happened?

3                  MS. ZORNBERG:  Might I suggest a

4          short break?  Because maybe we can speak

15:18:19  5  to him and -- you know, or his counsel

6          can, to clarify what you're trying to get

7          at and find a way that he can answer in a

8          way that's comfortable without -- you

9          know, avoiding privilege issues.

15:18:30 10              MS. STEWART:  That's fine.

11                  MR. TENREIRO:  Sure.  Just before

12          we go off the record, again, I mean, this

13          is an example of him saying to someone

14          else, most -- most lawyers I've spoken to.

15:18:39 15  So as we discussed this morning, I'm not

16          sure what the basis of asserting privilege

17          over what he's conveying to other people

18          is.  So let's go off the record and

19          discuss that, but I think that's what

15:18:49 20  she's trying to talk about so --

21                  MR. HORTON:  I think we heard the

22          questions differently.

23                  MR. TENREIRO:  Okay.  That's --

24          that's possible.  Sure.  But let's go off

15:18:56 25  the record and talk about it and see what

221

```
15:18:58   1        we can do.
           2                MS. STEWART:  Yeah.
           3                THE VIDEOGRAPHER:  Going off the
           4        record at 3:19.
15:19:01   5                (Whereupon, a recess is taken.)
           6                THE VIDEOGRAPHER:  Okay.  Back on
           7        the record at 3:30.
           8                MR. GULAY:  Okay.  So, yeah,
           9        we are prepared to make a -- a proffer
15:30:09  10        about this particular document in the
          11        hopes that it will clarify things and for
          12        further questioning.
          13                So prior to the date of the
          14        e-mail, January 4th, 2014, Mr. Rapoport
15:30:20  15        had some discussions with Ripple's
          16        lawyers as well as other attorneys who
          17        were not representing the company at the
          18        time, some of whom were his friends.  He
          19        can't parse which discussions led to
15:30:36  20        which portions of the e-mail.  So, in
          21        other words, he can't parse whether
          22        discussions with Ripple's counsel led to
          23        certain portions of this e-mail or his
          24        understanding informing certain portions
15:30:49  25        of this e-mail as opposed to his
```

222

15:30:50  1          discussions with the non-Ripple

        2          attorneys.

        3                  The document does reflect

        4          Mr. Rapoport's efforts to, you know,

15:31:00  5          share his then-present understanding of

        6          these topics with ███████████.

        7                  He -- he did not -- for purposes

        8          of this e-mail, he did not speak with any

        9          attorneys for the -- for the purpose of

15:31:16 10          writing the e-mail or -- and he did not

       11          ask any attorneys to review the e-mail,

       12          so it doesn't reflect direct input of

       13          attorneys.

       14                  So we think that you can -- you

15:31:28 15          know you can ask -- you can him

       16          questions, but, you know, he just doesn't

       17          have recollection of those privileged

       18          communications with Ripple attorneys.

       19                  And, so, Mr. Rapoport, can you

15:31:41 20          just confirm that that accurately

       21          reflects your understanding and

       22          recollection of this e-mail and its

       23          preparation?

       24                  THE WITNESS:  Yes, that's

15:31:47 25          correct.

                                                      223

15:31:48   1                    MS. STEWART:  Okay.  Thank you.
           2        That's helpful.
           3   BY MS. STEWART:
           4        Q.   So first focusing on the conversations
15:31:55   5   you had before this e-mail with Ripple's lawyers,
           6   I don't want to know about the substance of those
           7   conversations, but who were the lawyers that you
           8   spoke with?
           9        A.   Having seen ███████████ s name on a
15:32:12  10   prior document from Perkins Coie, I remember his
          11   particular name, but I don't otherwise recall the
          12   names of specific attorneys outside of Ripple that
          13   were -- that were engaged by Ripple in an official
          14   capacity.
15:32:24  15        Q.   Do you remember any other law firms?
          16        A.   I remember Paul Hastings was another law
          17   firm that Ripple worked with at times.
          18        Q.   And do you recall conversations with
          19   Paul Hastings prior to this e-mail?
15:32:40  20        A.   I don't recall any specific
          21   conversations with Paul Hastings or the timing of
          22   those conversations.
          23        Q.   Okay.  And were there also conversations
          24   with Ripple's in-house lawyers?
15:32:52  25        A.   I had a number of conversations with

                                                                224

15:32:54   1    ███████████, who was, I believe, general counsel

          2    internally for a period of time.  But, again,

          3    specifics of those are -- are difficult to recall

          4    given how much time has passed.

15:33:04   5         Q.   Okay.  And in terms of the other

          6    attorneys who are not Ripple's attorneys, who did

          7    you speak with?

          8         A.   I can freshly remember ███████████,

          9    which I would not have otherwise recalled had you

15:33:18 10    not just shown me this e-mail.  But I have a

         11    number of friends who are attorneys and this was a

         12    topic that was of personal interest to me even

         13    prior to my time at Ripple Labs.  And so I had a

         14    number of discussions with friends over the course

15:33:29 15    of a number of years.

         16         Q.   Okay.  Do you recall the names of any of

         17    those friends?

         18         A.   Which friends were both attorneys and

         19    that I had discussions with is, again, difficult

15:33:43 20    for me to -- to remember given how much time has

         21    passed.

         22         Q.   Okay.  So you say here in your e-mail,

         23    under number 1, "Most lawyers whom I've spoken" --

         24    I think that should be spoken with -- "seem quick

15:33:56 25    to agree that XRP is not a security."

225

15:33:58  1          Do you see that?

2          A.    I do.

3          Q.    Were there lawyers who were friends of

4     yours who you spoke with who -- who did think XRP

15:34:06  5     was a security?

6          A.    In my recollection, it was

7     unanimously -- everyone unanimously thought that

8     this was not really a critical question and that

9     XRP was clearly not likely to be a security.

15:34:23 10          Q.    Okay.  But you wrote in your e-mail

11     "most lawyers."

12          So what does that refer to?

13          MR. HORTON:  Objection.

14          A.    I don't recall the specific thought

15:34:34 15     process, but some of the lawyers I spoke with may

16     not have had a view or expertise on whether or not

17     something is a security, so they may not have had

18     any opinion at all.

19          Q.    Okay.  Now, you -- you -- you mentioned

15:34:49 20     that this topic was of general interest to you, is

21     that right?

22          A.    The regulation of digital assets was

23     broadly interesting to me, yes.

24          Q.    Okay.  Were there others at Ripple that

15:34:58 25     you're aware of who were also interested in this

226

15:35:01   1   topic?

           2                MR. HORTON:  Objection to form.

           3        A.   I would assume so, but I don't have

           4   specific examples to reference on that.

15:35:08   5        Q.   Did you discuss this topic with others

           6   at Ripple?

           7        A.   I'm sure I did but I can't recall

           8   specific conversations.

           9        Q.   And -- and you said earlier, before our

15:35:20  10   break, that the market-making firms that you were

          11   interacting with were doing their own due

          12   diligence on these regulatory issues, is that

          13   right?

          14        A.   That's what I understood to be true,

15:35:30  15   yes.

          16        Q.   Did -- did Ripple provide facts or other

          17   information to those market-making firms as part

          18   of their due diligence?

          19                MR. GULAY:  Objection to form.

15:35:48  20        A.   I believe I shared certain documents

          21   like the white paper that had Perkins Coie's logo

          22   on the top of it that we -- that we looked at

          23   earlier today.

          24        Q.   Okay.  Any other facts or information

15:36:05  25   that you related in a more informal way, whether

                                                                227

15:36:08  1    over the phone or by e-mail or in person --

2                    MR. HORTON:  Objection.

3                    MR. GULAY:  Objection to form.

4         Q.    -- that would go into such an analysis?

15:36:13  5                    MR. HORTON:  Objection to form.

6         A.    I viewed all of these firms and people

7    to be sophisticated financial market participants

8    who would have relied on their own due diligence

9    and analysis and not anything that I said beyond

15:36:31 10    maybe to help identify what the primary areas of

11    investigation could be.

12         Q.    And you go on in this document to -- to

13    talk about the fact that "XRP doesn't qualify as a

14    currency under the U.S. Treasury's definition," is

15:36:49 15    that right?

16         A.    That's what this -- that's what this

17    e-mail says.

18         Q.    Okay.  And what was this based on, your

19    conclusion?

15:36:57 20         A.    This was my current understanding

21    synthesizing a variety of conversations and things

22    that I had read.

23                    MR. GULAY:  And the same

24         instruction about your discussions with

15:37:10 25         Ripple counsel.

228

```
15:37:10   1                  THE WITNESS:  Understood.
           2  BY MS. STEWART:
           3       Q.   By sending this document to ███████
           4  █████ -- well, strike that.
15:37:18   5            By sending this document to Mr. ████████
           6  and Mr. ████████, were you trying to provide
           7  assurances to them about the regulatory landscape?
           8                  MR. HORTON:  Objection to form.
           9                  MS. BUNTING:  Objection.
15:37:34  10       A.   For context, I'd known both of these
          11  people, you know, in excess of 10 and 20 years.
          12  And so this was a conversation between friends
          13  about a topic of mutual interest and was not meant
          14  to provide assurances about anything.
15:37:56  15       Q.   But it was a topic of mutual interest
          16  concerning a transaction that you were
          17  contemplating, right?
          18                  MR. HORTON:  Objection to form.
          19       A.   It -- it was related to, yes.
15:38:07  20       Q.   Okay.
          21                  MS. STEWART:  Can we look at 20
          22       next?
          23  BY MS. STEWART:
          24       Q.   Sticking with PR-19 for a second, the
15:38:34  25  very last sentence on the first page of the
```

229

```
15:38:38   1    document where the sentence before says they --

           2    "They also all specify that in order to be a

           3    currency, it must be the legal -- "the legal

           4    tender of some sovereign.  Pretty clear-cut."

15:38:48   5           Do you see that?

           6      A.    I do.

           7      Q.    What did you mean by "pretty clear-cut"?

           8      A.    This is an e-mail that begins with "I

           9    want to emphasize that I'm not a lawyer, nor do I

15:39:06  10    have expertise on these issues."  But in my

          11    amateur reading of the excerpts that were attached

          12    to this e-mail, I thought it was clear-cut from

          13    the plain English reading of these that digital

          14    assets are not currencies under the way I read

15:39:17  15    those definitions.

          16      Q.    Okay.

          17           (Whereupon, exhibit is presented and

          18    marked SEC Rapoport Exhibit PR-20 for

          19    identification.)

15:39:20  20           MS. STEWART:  PR-20 is Bates

          21       numbered RPLI_SEC 88024 to 25.

          22           MS. FORBES:  Could you repeat the

          23       exhibit number, please?

          24           MS. STEWART:  Twenty.

15:39:58  25           MS. FORBES:  Twenty?
```

230

| | | |
|---|---|---|
| 15:39:58 | 1 | MS. STEWART:  Yes. |
| | 2 | MS. FORBES:  Thank you. |
| | 3 | (Pause) |
| | 4 | THE WITNESS:  Okay.  I've |
| 15:40:16 | 5 | reviewed this. |
| | 6 | BY MS. STEWART: |
| | 7 | Q.  Okay.  And who is ████████████? |
| | 8 | A.  ████████████ is a representative of |
| | 9 | a market-making firm, trading firm. |
| 15:40:27 | 10 | Q.  And is that ██████████? |
| | 11 | A.  Yes. |
| | 12 | Q.  Okay.  And what was the relationship |
| | 13 | between ████████ and Ripple at this time in |
| | 14 | 2014? |
| 15:40:39 | 15 | MR. HORTON:  Objection to form. |
| | 16 | A.  At some point, I'm not certain if it was |
| | 17 | before or after the time stamp on this e-mail, |
| | 18 | ████████████ and his team became -- had -- had |
| | 19 | a formalized relationship with Ripple as market |
| 15:40:55 | 20 | makers and received compensation for services. |
| | 21 | Q.  Okay.  And am I correct that you send |
| | 22 | the same e-mail that we had just looked at in |
| | 23 | PR-19, you send that e-mail to ████████████ |
| | 24 | and ██████, is that right? |
| 15:41:12 | 25 | A.  Yes, it looks like the same e-mail. |

231

15:41:14   1          Q.   Okay.  And why did you send this e-mail
           2    to Mr. ███████████ and Ms. -- Mr. ██████ -- is it
           3    Mr. ██████?
           4          A.   Yes.
15:41:21   5          Q.   Okay.
           6          A.    I personally found it interesting
           7    looking through the actual texts of -- of these
           8    definitions and how they're written.  And, again,
           9    this was a topic -- I was aware of the fact that
15:41:40  10    all of the firms did their own independent
          11    investigation and I thought that -- I'm assuming.
          12    I don't recall sending this specific e-mail, but
          13    I'm assuming I thought they would find it
          14    interesting to also read the actual language as
15:41:53  15    opposed to just speaking with legal professionals
          16    as people would typically do when they
          17    investigate.
          18                    THE REPORTER:  Repeat the last
          19          part.
15:41:59  20          A.   As opposed to just speaking with legal
          21    professionals as people typically do when they
          22    investigate a matter.
          23          Q.   And who is ██████████████?
          24          A.   ████████████████ worked at a firm called
15:42:13  25    ██████████████ which was at times engaged by Ripple

                                                                   232

15:42:18  1   Labs.

2        Q.   For what services?

3        A.   ███████████ was a -- is a regulatory

4   advisory firm.

15:42:23  5        Q.   And was there a call with Mr. ███████████

6   and Mr. ███████████?

7        A.   It appears from this e-mail that there

8   was a call together with ███████████.

9        Q.   And what was the nature of that call?

15:42:40 10        A.   I don't recall the specific discussion,

11   but my assumption is that we held a call for these

12   individuals to speak with ███████████ about his

13   area of expertise, which is regulatory issues.

14        Q.   What types of regulatory issues?

15:42:58 15        A.   I don't recall what was discussed on the

16   call and I don't frankly recall ███████████

17   specific background without looking it up.

18        Q.   And then you send, also, some FinCEN

19   guidance.  You send a link to FinCEN guidance in

15:43:15 20   this e-mail.

21            Do you see that?

22        A.   Yes.

23        Q.   Why did you send that?

24        A.   In my recollection, this was the primary

15:43:23 25   regulatory guidance that was available at the

233

| | | |
|---|---|---|
| 15:43:25 | 1 | time. |
| | 2 | Q.   And then you say in the third bullet, |
| | 3 | "This is a good summary of the legal landscape |
| | 4 | from Katten." |
| 15:43:33 | 5 | Do you see that? |
| | 6 | A.   I do. |
| | 7 | Q.   Why did you send that link to |
| | 8 | Mr. ██████████? |
| | 9 | A.   I don't recall the content of that link. |
| 15:43:44 | 10 | Q.   Other than the documents we've looked |
| | 11 | at, PR-19 and PR-20, were there others -- other |
| | 12 | third parties that you sent the legal definitions |
| | 13 | to? |
| | 14 | A.   Given that I sent it to two groups of |
| 15:43:57 | 15 | people, it's plausible that I sent it to others, |
| | 16 | but I don't recall whether I did or didn't. |
| | 17 | MS. STEWART:  Nicole, PR-21 next, |
| | 18 | please. |
| | 19 | (Whereupon, exhibit is presented |
| 15:44:15 | 20 | and marked SEC Rapoport Exhibit PR-21 for |
| | 21 | identification.) |
| | 22 | MS. STEWART:  PR-21 is Bates |
| | 23 | numbered SEC-██████-E-72551.  It's a |
| | 24 | one-page document. |
| 15:45:09 | 25 | (Pause) |

234

15:45:09   1                    THE WITNESS:   Okay.   I've

           2        reviewed this document.

           3                    MS. STEWART:   Okay.

           4   BY MS. STEWART:

15:45:14   5        Q.    Who is ███████████?

           6        A.    ████████████ was a representative of a

           7   market-making firm called ███████████.

           8        Q.    And who is ███████████?

           9        A.    He's an associate at the same firm.

15:45:31  10        Q.    Okay.   And did -- did this firm have

          11   a -- a relationship with Ripple in 2014?

          12        A.    Similar to the others.   I don't recall

          13   whether the formalization of a relationship

          14   occurred before or after this timestamp, but

15:45:46  15   eventually they did have a -- a similar formalized

          16   relationship for market-making services with

          17   Ripple --

          18        Q.    And what did you say -- I'm sorry.

          19        A.    With Ripple Labs.

15:45:55  20        Q.    Thank you.

          21              What did you say the name of the firm

          22   was?

          23        A.    ████████████ was the d/b/a.   I

          24   don't remember the entity name.

15:46:01  25        Q.    And were they affiliated with ███████

                                                                235

15:46:03  1  ▮▮▮▮▮ ?

2       A.   No.   Not to my knowledge.

3       Q.   Okay.   So what -- what is -- what are

4  you discussing in this e-mail that's Exhibit

15:46:21  5  PR-21?

6       A.   Without seeing other communications from

7  around that time, I don't remember the specifics

8  of what we were discussing.

9       Q.   When you say in your e-mail "We're

15:46:39 10  making progress in finding the right structure,"

11  what are you referring to?

12      A.   I do have a general recollection from

13  this time period being on the phone discussing tax

14  issues.   I don't remember the nature of the

15:46:52 15  question that we were trying to resolve.   But,

16  generally speaking, the area, the whole space had

17  a lot of questions around tax accounting treatment

18  and all sorts of other questions.   So this was not

19  uncommon.

15:47:07 20            MR. GULAY:   Here I just want to

21         caution you not to reveal the substance of

22         any privileged communications you may have

23         had with lawyers at Perkins Coie.

24            THE WITNESS:   Understood.

15:47:14 25  BY MS. STEWART:

236

```
15:47:16   1          Q.   Did you discuss with Mr. ██████ or

           2    Mr. ██████ the nuances of your discussions with

           3    Perkins and ██████, as you say in your e-mail,

           4    when you say "I'd be happy to explain the nuances

15:47:29   5    over the phone"?

           6                   MR. GULAY:  Same objection.

           7                   MR. HORTON:  I'm also going to

           8          object in that it's not clear that that's

           9          what the e-mail says.

15:47:36  10                   MS. STEWART:  Okay.  I'll --

          11          I'll -- I'll restate the question.

          12    BY MS. STEWART:

          13          Q.   You say in your e-mail "I'd be happy to

          14    explain the nuances over the phone if you're

15:47:42  15    interested."

          16                   Do you see that?

          17          A.   Yes.

          18          Q.   Did you, in fact, have a conversation

          19    where you explained the nuances to Mr. ██████ and

15:47:49  20    Mr. ██████?

          21          A.   I -- I really don't have recollection of

          22    the overarching topic that this e-mail is -- is

          23    fitting into to -- to answer that.

          24          Q.   Okay.

15:48:01  25                   MS. STEWART:  Can we do 22 next?
```

237

```
15:48:03   1              PR-22, please, Nicole.  And
           2          that's Bates numbered RPLI_SEC 12150 to
           3          51.
           4              (Whereupon, exhibit is presented
15:48:16   5          and marked SEC Rapoport Exhibit PR-22 for
           6          identification.)
           7              (Pause)
           8      A.   Okay.  I've reviewed the document.
           9  BY MS. STEWART:
15:49:38  10      Q.   Okay.  Who is ███████████?
          11      A.   Based on the content of this e-mail, it
          12  appears it's a cold e-mail from the website.  I
          13  don't believe I had any further interaction with
          14  this person before or after this e-mail.
15:49:54  15      Q.   Okay.  You say in your e-mail to
          16  Ms. ███████, "There are a lot of
          17  legal/regulatory and licensing requirements
          18  involved in the idea you described.  It's very
          19  important that we remain 100 percent compliant and
15:50:08  20  friendly with regulators.  That is one (of
          21  several) reasons that we generally give away XRP
          22  to individuals and have not experimented with
          23  selling it."
          24              Do you -- do you see that?
15:50:21  25      A.   Yes.
```

238

15:50:24  1          Q.   Was it accurate as of February 2014
          2     that -- that Ripple had not experimented with
          3     selling XRP?
          4          A.   I'd have to look back through some of
15:50:37  5     these documents to confirm that that -- if that is
          6     true or not.
          7          Q.   Okay.  When you joined Ripple in 2013,
          8     was it the case that Ripple had not sold XRP?
          9               MR. GULAY:  Objection.  Also, the
15:50:55 10          e-mail's not clear whether its refers to
         11          selling it full stop or selling to
         12          individuals.
         13          A.   I don't have specific recollection of
         14     writing this e-mail, but I'm assuming that this
15:51:07 15     reflected my understanding at the time based on
         16     the information that was available to me as a
         17     relatively new employee of the company.
         18          Q.   Okay.  You say in your e-mails that
         19     being friendly with regulators and 100 percent
15:51:22 20     compliant is one of several reasons that Ripple
         21     does giveaways, is that right?
         22          A.   That's what the e-mail says.
         23          Q.   Okay.  Is that -- is that accurate?
         24          A.   It was important for us to be compliant
15:51:34 25     and friendly with regulators.  And I assume the

                                                                239

```
15:51:39   1   sentence that says that this is one of several
           2   reasons that we generally give away to
           3   individuals -- that "we generally give away XRP to
           4   individuals and have not experimented with selling
15:51:51   5   it," I assume that reflects my understanding at
           6   the time.
           7       Q.   Okay.  What are the other reasons that
           8   Ripple was doing giveaways as opposed to selling
           9   XRP at this time in 2014?
15:52:05  10       A.   As I mentioned earlier, at the inception
          11   of the company, there was a desire to be
          12   charitable and do good deeds with the -- the
          13   assets that the company held.
          14       Q.   Any other reason?
15:52:23  15       A.   None that I can think of currently.
          16       Q.   One more question on the document that
          17   we had looked at earlier, the e-mails that you had
          18   forwarded to Mr. ████████ and to Mr. ████████,
          19   PR-19 and PR-20.
15:52:39  20       A.   Yes.
          21       Q.   Did you -- so I see that you copied
          22   Mr. Griffin on both those e-mails.
          23           Were others at the -- at the company
          24   aware that you were sending these e-mails to third
15:52:51  25   parties?
```

240

| | | |
|---|---|---|
| 15:52:51 | 1 | MR. HORTON:  Objection to form. |
| | 2 | A.    No, I don't believe others would have |
| | 3 | had any reason to know about these e-mails.  These |
| | 4 | were a synthesis of my personal understanding |
| 15:53:06 | 5 | based on conversations I had. |
| | 6 | Q.    Are you familiar with an entity called |
| | 7 | ███████████████████████? |
| | 8 | A.    Yes. |
| | 9 | Q.    Okay.  And is that entity known as ████? |
| 15:53:18 | 10 | A.    Yes. |
| | 11 | Q.    Okay.  How did you come to know ████? |
| | 12 | A.    I don't remember the specific genesis of |
| | 13 | how we met, but at some point in time I met them |
| | 14 | and -- and had numerous conversations over a |
| 15:53:40 | 15 | period of time about Ripple. |
| | 16 | Q.    Had you met anyone from █████ before your |
| | 17 | time at Ripple? |
| | 18 | A.    No. |
| | 19 | Q.    And what was the nature of █████s |
| 15:53:54 | 20 | relationship with Ripple? |
| | 21 | A.    ████, I believe, ultimately invested in |
| | 22 | the equity of Ripple Labs, Inc. and also purchased |
| | 23 | XRP, if I recall, but the specifics are difficult |
| | 24 | to remember without researching it. |
| 15:54:28 | 25 | Q.    Okay.  Let's look at some documents and |

241

```
15:54:30   1    maybe that will refresh your recollection.

           2                    MS. STEWART:  Can we look at

           3         PR-39?

           4                    And PR-39 is Bates numbered ████

15:54:58   5         2320.  It's a one-page document.

           6                    (Pause)

           7                    THE WITNESS:  Okay.

           8    BY MS. STEWART:

           9         Q.   Okay.  So what is this e-mail exchange

15:55:30  10    between you and ████ about?

          11         A.   I don't recall this independently, but

          12    based on reading the e-mail, it appears that ████

          13    was interested in purchasing $500,000 worth of

          14    Ripple -- of XRP.

15:55:51  15         Q.   Of XRP.

          16         A.   Yes.

          17         Q.   And you say in your e-mail to Mr. ████

          18    ████, at the bottom, you say "Our intention is to

          19    completely stop these OTC transactions after our

15:56:06  20    funding round closes, and we generally view XRP to

          21    be undervalued at these levels."

          22                    Do you see that?

          23         A.   Yes.

          24         Q.   What did you mean by this?

15:56:17  25         A.   The first clause I think agrees with
```

                                                                242

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

15:56:19  1   some of the other e-mails that we've looked at

2   today, which is that various individuals had

3   conveyed this intent to stop selling OTC after a

4   funding round closes.

15:56:33  5          And the second clause, it's difficult

6   for me to say without knowing the price on that

7   day and the events, you know, surrounding that

8   day.  My memory just isn't that good about market

9   activities in 2014.

15:56:48 10      Q.   Okay.  Okay.  The next sentence you say

11  "When we close the 'OTC window' and push everyone

12  into the market soon, we think it will have a

13  bullish effect on price going forward."

14          Do you see that?

15:57:03 15      A.   Yes.

16      Q.   And what did you mean by "bullish effect

17  on price"?

18      A.   We talked about this concept a little

19  bit earlier, which is that in a -- in any market,

15:57:12 20  if all the buyers purchase directly from an

21  entity, in a hypothetical scenario, if a hundred

22  percent of buyers purchase from an entity and only

23  sellers went to the market, there's no mechanism

24  for the price to ever go up.  It could only go

15:57:27 25  down.

243

15:57:28   1            And so it was my view that selling OTC

2   had a negative impact both on the liquidity in the

3   market and the price of XRP.

4       Q.   And why were you telling Mr. ████ this?

15:57:50   5       A.   I was conveying my -- my views on the

6   market at the time.

7       Q.   Were you communicating to Mr. ████ that

8   the XRP that he would be purchasing would go up in

9   price once Ripple stopped doing OTC sales?

15:58:04 10           MR. HORTON:   Objection to form.

11       A.   As I said earlier, I thought the highest

12   probability of the outcome was that it goes to

13   zero, but I thought -- these were my -- my views

14   of the market at this given point in time.

15:58:17 15       Q.   Well, at this point in time you thought

16   that the -- the -- stopping the OTC sales would

17   have a bullish effect on price, right?

18       A.   Yes, I did think that there was a cause

19   and effect there.

15:58:28 20       Q.   Okay.  Did ████ ultimately buy this

21   $500,000 of XRP?

22       A.   From this e-mail, it seems like that

23   likely happened, but I don't recall if the

24   transaction was consummated.

15:58:48 25           MS. STEWART:   Okay.  Let's look

244

```
15:58:49   1          at another document, PR-40.
           2                     (Whereupon, exhibit is presented
           3          and marked SEC Rapoport Exhibit PR-40 for
           4          identification.)
15:59:18   5                     MS. STEWART:  And PR-40 is Bates
           6          numbered ███ 2297.  It's a one-page
           7          document.
           8                     (Pause)
           9                     THE WITNESS:  Okay.  I've read
15:59:48  10          it.
          11   BY MS. STEWART:
          12       Q.   Okay.  So this -- this e-mail, PR-40,
          13   appears to be one day after the e-mail we looked
          14   at in PR-39.
16:00:00  15                     Does this refresh your recollection as
          16   to whether ███ bought $500,000 or whether it
          17   ultimately bought a million dollars, or perhaps
          18   these were separate transactions?  If you
          19   remember.
16:00:09  20                     MR. HORTON:  Objection to form.
          21       A.   Given that this was seven years ago, I
          22   don't have specific recollection of -- of how
          23   these days went down and whether these
          24   transactions occurred.  From this e-mail, it looks
16:00:26  25   like they agreed to purchase $1 million worth of
```

245

| | | |
|---|---|---|
| 16:00:30 | 1 | XRP on September 11th, 2014.  I'm not sure if that |
| | 2 | was in addition to or in -- you know, in lieu of |
| | 3 | the prior day's e-mail. |
| | 4 | Q.   Okay.  So this transaction that's |
| 16:00:46 | 5 | referenced in PR-40 includes a ███████ discount |
| | 6 | and ████████, is that right? |
| | 7 | A.   That's what the e-mail says. |
| | 8 | Q.   Okay.  And why was no lockup included |
| | 9 | for this transaction? |
| 16:01:02 | 10 | A.   I don't recall what the circumstances |
| | 11 | were surrounding the discussions outside of this |
| | 12 | e-mail. |
| | 13 | Q.   Was it your understanding that when |
| | 14 | buying at a ███████ discount with ███████, |
| 16:01:12 | 15 | ████ would immediately sell the XRP? |
| | 16 | MR. HORTON:  Objection to form. |
| | 17 | MS. BUNTING:  Objection. |
| | 18 | A.   Generally speaking, I think there's a |
| | 19 | lesser incentive to act that way if you hold more |
| 16:01:31 | 20 | of an asset because selling ███████ immediately |
| | 21 | could negatively impact the other ███████ that |
| | 22 | someone holds.  That's a general statement.  I |
| | 23 | don't have any specific knowledge or recollection |
| | 24 | about what -- what ███████ did to say. |
| 16:01:43 | 25 | Q.   Did you have any discussions with |

246

16:01:44  1    Mr. ███ about what ██████ intent was with respect

2    to the million dollars in XRP it was buying?

3         A.   I don't recall what discussions we did

4    or didn't have that day.

16:01:54  5         Q.   Do you recall discussions generally

6    with -- with him about what ████ intended to do

7    with the XRP it was purchasing?

8         A.   I do remember having a number of

9    discussions with him over the course of a long

16:02:07 10   period of time.  I don't remember whether or not

11   he expressed to me what his intent was with --

12   with the XRP that he purchased.

13        Q.   Whether or not he expressed it to you,

14   did you have an understanding of what his intent

16:02:20 15   was with respect to the XRP he was purchasing?

16        A.   I understood him to be a speculator.

17        Q.   Okay.  And did you understand him to be

18   a long-term speculator or a short-term speculator?

19                  MR. HORTON:  Objection to form.

16:02:34 20                  MS. BUNTING:  Objection.

21        A.   Based on the information available to me

22   at the time, I -- I viewed him as -- as a likely

23   long-term -- having a long-term interest in the

24   technology and a long-term speculator.

16:02:49 25        Q.   And what information are you referring

247

```
16:02:50   1    to?
           2         A.   A synthesis of information from a number
           3    of conversations over time.
           4         Q.   Did Ripple place any restrictions on the
16:03:04   5    resale of the XRP that it was selling to ███?
           6              MR. GULAY:  Objection;
           7          foundation.
           8         A.   I'm not aware of any restrictions that
           9    Ripple placed on it, no.
16:03:25  10         Q.   Okay.
          11              MS. STEWART:  Can you look at
          12          PR-41 next, please?
          13              (Whereupon, exhibit is presented
          14          and marked SEC Rapoport Exhibit PR-41 for
16:03:30  15          identification.)
          16              MS. STEWART:  And PR-41 is Bates
          17          numbered ███ 1489 to 1490.
          18              (Pause)
          19              THE WITNESS:  Okay.
16:04:32  20    BY MS. STEWART:
          21         Q.   Looking at the bottom e-mail in the
          22    chain from Mr. ███ to you, which is on the second
          23    page of the document, here he says "I believe I
          24    can buy 4 MM by year end, I bought 3 MM USD
16:04:49  25    already."
```

248

16:04:49  1          Do you see that?

2          A.   Yes.

3          Q.   Does this refresh your recollection that

4     ███ bought $3 million of XRP as of September 20,

16:04:56  5     2014?

6          A.   This e-mail implies -- certainly implies

7     that, yes.

8          Q.   Okay.  But you don't have a recollection

9     one way or the other?

16:05:11 10          A.   I don't recall whether he bought it from

11    Ripple, in the market through others or how -- how

12    and when or how much he purchased, no.

13          Q.   Okay.  Then looking at your response to

14    him, which is on the first page of the document,

16:05:22 15    you say "As I mentioned previously, we hope to

16    stop these 'OTC' sales after our funding round

17    officially closes and" we're no longer -- "we are

18    no longer reliant on XRP sales to help fund the

19    company (at least for a period of several" --

16:05:37 20    "several years)."

21          Do you see that?

22          A.   Yes.

23          Q.   Okay.  So -- and I think you said this

24    before, but is it the case that -- that OTC sales

16:05:54 25    at some point were -- were used to help fund

249

16:05:57  1   Ripple?

       2              MR. GULAY:  Objection.

       3        A.   Reading this e-mail, it -- it appears

       4   that that was my belief at the time, yes.

16:06:06  5        Q.   Okay.  And the next sentence, where you

       6   say "I think the OTC sales hurt our efforts

       7   elsewhere - it removes demand from the market and

       8   also makes for lower volume," is that the same

       9   concept that you've discussed already today about

16:06:19 10   your view about OTC sales not being helpful for

      11   liquidity?

      12        A.   Yes.

      13              MS. BUNTING:  Objection.

      14        Q.   And then you say "If we satisfy every

16:06:32 15   large buyer, then XRP will never rally."

      16              What do you mean by that?

      17        A.   This is the same dynamic referenced in

      18   the preceding sentence and it was discussed about

      19   OTC sales dynamics.

16:06:46 20        Q.   And were you explaining this -- this to

      21   Mr. ███ be -- because, as a speculator, he wanted

      22   XRP to rally?

      23              MR. HORTON:  Objection to form.

      24              MR. GULAY:  Objection.

16:07:06 25        A.   Reading the following paragraph, where I

                                                         250

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:07:09   1   asked "Do you have a sense of the size that the

2   Chinese buyers are interested in?  Perhaps we can

3   do a big final block before we close the OTC

4   window," it seems I may have been debating whether

16:07:22   5   we should force that buyer or encourage that buyer

6   to go into the market to purchase the XRP

7   independently of Ripple Labs.

8        Q.   And was that related to the desire to --

9   the desire for the XRP price to rally?

16:07:39  10             MR. HORTON:  Objection to form.

11        A.   As I said earlier, I -- I thought that

12   OTC sales hurt liquidity, market liquidity, as

13   well as price.

14        Q.   Did Ripple, in fact, stop selling XRP

16:08:01  15   after this funding round that's referenced in your

16   e-mail?

17             MR. HORTON:  Objection to form.

18        A.   I don't recall whether I had information

19   one way or another and I certainly didn't have

16:08:18  20   full transparency into Ripple's XRP sales to

21   answer that definitively.

22        Q.   Do you have a general memory as to

23   whether Ripple continued to sell XRP during your

24   tenure at Ripple?

16:08:32  25             MR. GULAY:  Objection.  What do

251

```
16:08:33   1          you mean, "selling XRP"?  OTC or just
           2          generally?
           3                    MS. STEWART:  Yes, I'm talking
           4          about over-the-counter sales right now.
16:08:49   5      A.   I would be guessing because without more
           6   information, I couldn't even tell you what the
           7   date of the Series A round was given how much time
           8   has passed.
           9                    MS. STEWART:  Okay.  Can we look
16:09:03  10          at PR-44 next?
          11                    (Whereupon, exhibit is presented
          12          and marked SEC Rapoport Exhibit PR-44 for
          13          identification.)
          14                    MS. STEWART:  And PR-44 is Bates
16:09:28  15          numbered RPLI_SEC 199575 to 576.
          16                    (Pause)
          17                    THE WITNESS:  Okay.
          18   BY MS. STEWART:
          19      Q.   Okay.  So in this e-mail you are talking
16:10:44  20   with Mr. Larsen, Mr. Griffin, and others about a
          21   deal with ████ that would bring their total XRP
          22   purchase -- purchases to $10 million, is that
          23   right?
          24      A.   Yes.
16:11:01  25      Q.   Okay.  And -- and the deal would include
```

252

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:11:04  1   a ███████████████ and a ███████████ discount?

2        A.   Yes.

3        Q.   Okay.  And do you see in the first --

4   the second e-mail in the chain where Mr. Larsen

16:11:18  5   says "Yes, I'm moving forward here - the lockup is

6   great"?  Do you see that?

7        A.   Yes.

8        Q.   Did Mr. Larsen approve every OTC

9   transaction?

16:11:29  10            MS. BUNTING:   Objection.

11       A.   I only saw the details of what I thought

12   were a subset of the OTC transactions.  And I

13   generally recall Mr. Larsen approving them, but I

14   don't have a good enough memory to say he did or

16:11:59  15   did not approve every transaction that I was

16   involved in.

17       Q.   Okay.  And Mr. Larsen says here "the

18   lockup is great."

19            Do you have an understanding of what he

16:12:08  20   means by that?

21       A.   I think he preferred having a lockup in

22   place to having no lockup in place.

23       Q.   And what's your understanding of why he

24   preferred that?

16:12:27  25       A.   In general, I think we all shared a

253

16:12:29  1    preference for the price of XRP to rise rather

2    than fall and there was a risk that large holders

3    buying at a discount could sell at the market

4    price to arbitrage a smaller large profit or a

16:12:48  5    significant profit.

6                    MS. STEWART:  Can we look at

7            PR-52 next?

8                    And PR-52 is Bates numbered

9            RPLI_SEC 199556 to 561.

16:13:32 10                    (Whereupon, exhibit is presented

11            and marked SEC Rapoport Exhibit PR-52 for

12            identification.)

13                    (Pause)

14                    MR. GULAY:  I just want to note

16:14:57 15            for the record there appears to be a page

16            missing.  It skips from 557 to 559.

17                    MS. STEWART:  Okay.  I think

18            there was another attachment that was not

19            a substantive one that I didn't print, but

16:15:09 20            I can't be sure of that.

21                    MR. GULAY:  Okay.  Noted.

22                    THE WITNESS:  Okay.  I've

23            reviewed it.

24    BY MS. STEWART:

16:15:52 25        Q.   Okay.  So this appears to be an e-mail

254

16:15:54 1    from Mr. ███ to you that you then forward to

2    Mr. Larsen and others attaching the long-term

3    Ripple fund term sheet, is that right?

4         A.   Yes.

16:16:05 5         Q.   Okay.  So what is the long-term Ripple

6    fund?

7         A.   I'm not aware that the long-term Ripple

8    fund was anything.  It says it's yet to be formed,

9    manager and detail legal structures to be

16:16:26 10   determined by lawyers.  I believe as the e-mail

11   from Mr. ███ says, these are just thoughts.

12        Q.   Okay.  Was this fund something that you

13   were discussing with Mr. ███?

14        A.   I'm sure I discussed this after he

16:16:40 15   put -- discussed this with him after he put in the

16   time to draft it, yes.

17        Q.   Okay.  So can you just explain to me

18   what this fund -- well, strike that.

19             Did this fund ever come to be?

16:16:55 20        A.   Not to my knowledge.

21        Q.   Okay.  What -- what was supposed to be

22   the structure of this fund that you were

23   discussing with Mr. ███ both before and after

24   this -- this document?

16:17:07 25             MR. GULAY:  Objection to form.

255

16:17:10   1        A.   I recall that Mr. ███ had a general

           2   desire to form some entity that would allow third

           3   parties to get exposure through his entity to the

           4   price of XRP.  I think he shares a lot of thoughts

16:17:28   5   in this attachment which I viewed in draft form

           6   for discussion purposes.

           7        Q.   And was Ripple interested in pursuing

           8   such a fund with ███?

           9             MR. GULAY:  Objection;

16:17:38  10       foundation.

          11        A.   Based on my recollection, I would -- of

          12   general circumstances at the company at the time,

          13   I think the company would have been happy to have

          14   a third party create an entity that purchases a

16:18:02  15   lot of XRP.

          16        Q.   And why is that?

          17        A.   Because it would have allowed the

          18   company to monetize assets on its balance sheet.

          19        Q.   And would it also -- would it also allow

16:18:22  20   the company to manetize -- monetize assets on its

          21   balance sheet without some of the liquidity issues

          22   that you have discussed surrounding OTC sales?

          23             MR. HORTON:  Objection to form.

          24             MR. GULAY:  Objection.

16:18:35  25        A.   That would depend on the details, which

                                                                  256

```
16:18:39   1   are unknown in this hypothetical discussion.
           2        Q.    Okay.  As -- as you -- did the
           3   discussions with Mr. ███ continue after this
           4   document that we're looking at in PR-52?
16:18:51   5        A.    I believe Mr. ███ had an ongoing
           6   relationship with Ripple that extended beyond
           7   this -- this e-mail.
           8        Q.    So what would the benefit to Ripple be
           9   of having a third party like this fund buy its XRP
16:19:10  10   versus the other distribution strategies that
          11   we've talked about today, like the OTC sales or
          12   the giveaways?
          13                  MR. GULAY:  Objection.
          14                  MS. BUNTING:  Objection.
16:19:21  15                  MR. GULAY:  Calls for
          16          speculation.
          17        A.    Whether it would be beneficial or not
          18   would depend largely on the details, which are
          19   unknown.
16:19:47  20                  MR. TENREIRO:  Just so you know,
          21          Erol, the -- the missing page is called
          22          "Attachment 2" and it's a blank page.
          23                  MR. GULAY:  Okay.
          24                  MS. STEWART:  Thank you.
16:20:05  25                  Okay.  Can we look at 51 next,
```

257

```
16:20:07   1         please?
           2                  (Whereupon, exhibit is presented
           3         and marked SEC Rapoport Exhibit PR-51 for
           4         identification.)
16:20:25   5                  MS. STEWART:  PR-51 is Bates
           6         numbered ███ 1955.  It's a one-page
           7         document.
           8                  (Pause)
           9                  THE WITNESS:  I've -- I've
16:21:22  10         reviewed this.
          11    BY MS. STEWART:
          12         Q.   Okay.  Looking at Mr. ███ s e-mail to
          13    you at the bottom of the page, he says "As I
          14    think" -- "As I think through the utility of XRP,
16:21:36  15    a stable XRP and a more liquid XRP promotes
          16    business."
          17              Do you see that?
          18         A.   Yes.
          19         Q.   Do you agree with that statement?
16:22:04  20         A.   I find that to be an unclear statement,
          21    unclear sentence.  Promotes what business?
          22         Q.   Okay.  So you don't have an opinion
          23    about that sentence?
          24         A.   What do you understand "promotes
16:22:29  25    business" to mean here?  Then maybe I can answer
```

                                                              258

```
16:22:31   1   if I think it's true.
           2        Q.   Well, I can't -- I can't provide
           3   answers, so it's just your understanding of -- do
           4   you have an understanding of what he means in this
16:22:38   5   sentence?
           6        A.   I don't understand what that means.
           7        Q.   Okay.
           8        A.   So it's difficult for me to say if it's
           9   true.
16:22:43  10        Q.   Okay.  Then a couple of paragraphs down,
          11   Mr. ████ says "Lastly, if Ripple Labs is in the
          12   market stabilizing XRP, it looks bad and is an
          13   excuse for others to criticize Ripple.  But if a
          14   third party buys on behalf of institutions, then
16:22:58  15   no one says nothing."
          16            Do you see that?
          17        A.   I do.
          18        Q.   Okay.  Do you agree with Mr. █████████
          19   statement?
16:23:05  20        A.   I think this statement reflects Mr.
          21   ███████ thoughts and not the thoughts of anyone at
          22   the company and certainly not my thoughts.
          23        Q.   Okay.  Do you agree that if -- if Ripple
          24   Labs is in the market stabilizing XRP, it looks
16:23:20  25   bad?
```

259

16:23:21  1            MR. GULAY:  Objection.

        2       A.   I would certainly perceive it negatively

        3  as a third party if I was aware that Ripple Labs

        4  was in the market stabilizing XRP.

16:23:36  5       Q.   Was one of the goals of this fund that

        6  was being discussed with Mr. ████ to stabilize the

        7  price of XRP?

        8            MR. GULAY:  Objection.

        9       A.   Mr. ████ is clearly sending

16:23:54 10  unsolicited -- his unsolicited thoughts about this

       11  topic, but it was not a goal of Ripple Labs to

       12  have him do that.

       13       Q.   And when -- when you respond

       14  "Exactly - the fund can be as big as it wants to

16:24:30 15  be," and then you go on to say "RL will want to

       16  supply the majority of it, but if the fund has

       17  more demand than RL wants to provide, that's not

       18  necessarily a problem," do you see that?

       19       A.   Yes.

16:24:42 20       Q.   What's -- why -- well, first of all, RL

       21  here refers to Ripple Labs?

       22       A.   Yes.

       23       Q.   Okay.  And when you say "Ripple Labs

       24  will want to supply the majority of it," meaning

16:24:53 25  the fund, what is that statement based on?

                                                          260

16:24:56  1        A.   I must have been making an assumption

          2   about a dollar amount that the fund would be

          3   interested in purchasing and making an assumption

          4   that Ripple Labs would be interested in supplying

16:25:08  5   the majority of that dollar amount.

          6        Q.   Did you -- did you discuss that with

          7   anyone at Ripple?

          8        A.   I don't recall the specific

          9   circumstances surrounding this e-mail exchange.

16:26:08 10        Q.   Why did Ripple want to supply the

         11   majority of the XRP for this fund?

         12             MR. GULAY:  Objection.

         13        A.   Again, I don't remember the specific

         14   circumstances surrounding this e-mail exchange,

16:26:20 15   but I can presume that Ripple's interested in

         16   getting XRP off its balance sheet and getting

         17   dollars on to its balance sheet.

         18        Q.   Okay.

         19             MS. STEWART:  Can we look at

16:26:37 20     PR-65 next?

         21             (Whereupon, exhibit is presented

         22        and marked SEC Rapoport Exhibit PR-65 for

         23        identification.)

         24             (Pause)

16:27:28 25             THE WITNESS:  Okay.  I've -- I've

                                                              261

```
16:27:29    1         reviewed this.
            2    BY MS. STEWART:
            3         Q.   Do you remember receiving this e-mail
            4    from Mr. ████ in December 2014?
16:27:35    5         A.   I -- I don't remember this e-mail, but
            6    I'm looking at it and, you know, I was a party to
            7    it.
            8         Q.   Okay.  Do you recall having discussions
            9    about the issues reflected in the e-mail with
16:27:44   10    Mr. ████?
           11         A.   I don't remember specifically discussing
           12    these issues with Mr. ████, but I do remember that
           13    these were issues that were considered at various
           14    times during my time with the company.
16:27:57   15         Q.   Okay.  Is -- is Mr. ████ here asking
           16    that Ripple get a legal opinion that XRP is not a
           17    security?
           18              MR. HORTON:  Objection to form.
           19         A.   In my recollection, Ripple did already
16:28:12   20    have a legal memo that gave us comfort that XRP
           21    was not likely to be considered a security, and I
           22    believe we sought another one after this which
           23    said the same thing ultimately.
           24         Q.   Okay.  And the legal memo that you're
16:28:29   25    referring to that -- that Ripple already had, was
```

262

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
16:28:32   1    that from Perkins Coie?
           2         A.   I believe so, yes.
           3         Q.   Okay.  Had you shared that legal memo
           4    with Mr. ███
16:28:43   5         A.   Reading this e-mail, it would imply he
           6    had not seen it, but I don't recall if I shared it
           7    or not.
           8         Q.   Did you share that legal memo with
           9    Mr. ███ after you received this e-mail that's
16:28:53  10    Exhibit PR-65?
          11              MR. HORTON:  Objection to form.
          12         A.   I apologize.  I just don't remember
          13    seven years ago.
          14         Q.   After you received this e-mail, you
16:29:05  15    sought another legal memo from another firm?
          16              MS. ZORNBERG:  Objection.
          17         A.   My recollection is that there was more
          18    than one law firm that helped us investigate this
          19    issue and came to the same conclusion, yes.
16:29:26  20              MR. GULAY:  I'm sorry, just to --
          21           to pause again and caution you not to
          22           reveal the -- any discussions with outside
          23           counsel or the -- the outcome of any of
          24           your discussions with outside counsel or
16:29:40  25           the conclusions of counsel.
```

263

```
16:29:41   1                    THE WITNESS:  Okay.

           2                    MS. ZORNBERG:  I'd also like to

           3          take a break.

           4                    MS. STEWART:  Okay.

16:29:49   5                    MS. ZORNBERG:  Is now a good time

           6          to take a short break?

           7                    MS. STEWART:  That's fine.

           8                    THE VIDEOGRAPHER:  Okay.  Going

           9          off the record at 4:29.

16:29:55  10                    (Whereupon, a recess is taken.)

          11                    THE VIDEOGRAPHER:  On the rec --

          12          on the record, 4:45.

          13   BY MS. STEWART:

          14        Q.   So, Mr. Rapoport, I think you told me

16:45:08  15   before the break that you weren't sure whether you

          16   sent the Perkins Coo -- the Perkins Coie memo to

          17   Mr. ███ , is that right?

          18        A.   Yes.  I'm not sure one way or another.

          19        Q.   Okay.  Why did you retain Paul Hastings

16:45:26  20   to prepare a memo when you already had a memo from

          21   Perkins Coie?

          22                    MR. GULAY:  Objection.

          23                    MR. HORTON:  Objection.

          24                    MR. GULAY:  Calls for privileged

16:45:33  25          communications.
```

                                                                    264

```
16:45:36    1              You can answer to the extent it
            2         won't reveal the substance of any
            3         communications with outside counsel.
            4    A.   I -- I don't believe I was ever the
16:45:45    5    person at Ripple Labs engaging any lawyer or law
            6    firm.
            7    Q.   Okay.
            8              MS. STEWART:  Can we -- can we
            9         look at Exhibit 68, please?
16:46:29   10              (Whereupon, exhibit is presented
           11         and marked SEC Rapoport Exhibit PR-68 for
           12         identification.)
           13              MS. STEWART:  And Exhibit 68 is
           14         Bates numbered ████ 1803 to 05.
16:47:01   15              (Pause)
           16              THE WITNESS:  I've reviewed this.
           17    BY MS. STEWART:
           18    Q.   And in the second e-mail in this chain,
           19    you're telling Mr. ████ "FYI, Paul Hastings is
16:47:33   20    producing a memorandum for us which explains why
           21    we don't believe XRP is a security.  ETA equals
           22    January 23rd."
           23              Do you see that?
           24    A.   I do.
16:47:42   25    Q.   Okay.  Did Ripple retain Paul Hastings
```

265

| | | |
|---|---|---|
| 16:47:44 | 1 | to produce a memorandum in response to Mr. ████ |
| | 2 | request? |
| | 3 | MR. HORTON:  Objection. |
| | 4 | MR. GULAY:  Objection.  The -- |
| 16:47:52 | 5 | the reason why Ripple retained Paul |
| | 6 | Hastings would be privileged. |
| | 7 | MS. STEWART:  Well, let -- let's |
| | 8 | start chronologically. |
| | 9 | BY MS. STEWART: |
| 16:48:02 | 10 | Q.    Did Mr. -- did -- did Ripple retain Paul |
| | 11 | Hastings to produce a memorandum after Ripple |
| | 12 | received Mr. ████ e-mails in December and |
| | 13 | January that we've looked at? |
| | 14 | MR. HORTON:  Objection to form; |
| 16:48:13 | 15 | foundation. |
| | 16 | A.    I don't know when Ripple retained Paul |
| | 17 | Hastings. |
| | 18 | MS. STEWART:  Okay.  And your -- |
| | 19 | your position, Erol, is that the reason |
| 16:48:29 | 20 | that Ripple retained Paul Hastings is |
| | 21 | privileged? |
| | 22 | MR. GULAY:  Yes, the -- the |
| | 23 | purpose of the legal advice sought from |
| | 24 | Paul Hastings would be privileged. |
| 16:48:38 | 25 | MS. STEWART:  So even -- even |

266

```
16:48:39   1        the -- the purpose that you would put on a

           2        privilege log, like the "re" line of the

           3        engagement, you're saying is privileged?

           4             MR. GULAY:  Well, first, I don't

16:48:46   5        know if Mr. Rapoport would know that.

           6             Second, you know, yes, we

           7        would -- we would assert that, you know,

           8        the -- the legal advice that was sought

           9        from Paul Hastings is obviously

16:48:59  10        privileged.

          11             MS. STEWART:  And -- and your

          12        position doesn't change with -- with the

          13        fact that the legal advice received from

          14        Paul Hastings was ultimately provided to a

16:49:10  15        third party?

          16             MR. GULAY:  Well, I guess -- can

          17        you clarify for us what questions you are

          18        asking about?

          19             MS. ZORNBERG:  Hold on.  Can I --

16:49:19  20        can I interject?

          21             MR. GULAY:  Yes.

          22             MS. ZORNBERG:  We've produced to

          23        you the Paul Hastings memo.

          24             MS. STEWART:  Uh-huh.

16:49:24  25             MS. ZORNBERG:  You have that.
```

267

```
16:49:25   1        You can ask questions about that.  But
           2        beyond the memo itself, if you're asking
           3        this witness -- and I don't know if he has
           4        any information even to give you in
16:49:33   5        response.  If you're asking him about
           6        conversations he had or Ripple or Paul
           7        Hastings, those do go to privilege.  I
           8        think you should just take it question by
           9        question.
16:49:45  10             MS. STEWART:  So you would assert
          11        privilege over conversations even though
          12        the final product was -- was given to a
          13        third party?  I'm just trying to make that
          14        clear.
16:49:53  15             MS. ZORNBERG:  Correct.
          16             MS. STEWART:  Okay.
          17             MR. TENREIRO:  And on the -- on
          18        the reasons, so, you know, I decide -- I
          19        wake up one morning and I say I need a
16:50:05  20        lawyer because I'm in trouble, that's
          21        privileged?  You're asserting privilege
          22        over that?  Or are you saying someone told
          23        him to request a lawyer, that might be
          24        privileged?
16:50:12  25             MS. ZORNBERG:  This is too
```

268

16:50:13  1          hypothetical and it's well beyond what the
         2          witness himself has said, which is he
         3          doesn't know when Paul Hastings was
         4          retained by Ripple.
16:50:20  5                    MR. TENREIRO:  I don't think it's
         6          hypothetical.  She asked him why did you
         7          retain Paul Hastings?  So you're --
         8                    MS. ZORNBERG:  And his answer was
         9          he doesn't know when Ripple Labs retained
16:50:28 10          Paul Hastings.  I think we have to do this
        11          question by question.
        12                    MS. STEWART:  Okay.  Can we look
        13          at Exhibit 66, please?
        14                    (Whereupon, exhibit is presented
16:50:38 15          and marked SEC Rapoport Exhibit PR-66 for
        16          identification.)
        17                    MS. STEWART:  Exhibit 66 is Bates
        18          numbered RPLI_SEC 96888 to 889.
        19                    (Pause)
16:51:49 20                    THE WITNESS:  Okay.
        21     BY MS. STEWART:
        22          Q.   Okay.  Who is ██████████████?
        23          A.   I'm not sure that I've ever spoken to
        24     ████████████████   I can make a guess based on his
16:52:02 25     e-mail signature.

                                                            269

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:52:03  1        Q.   Do you have an understanding that he was
        2   representing ███ ?
        3        A.   I don't know the nature of their
        4   relationship, but he appears to be a lawyer or
16:52:11  5   works at a law firm.
        6        Q.   Okay.  So in this e-mail, Mr. --
        7   Mr. ███ seems to be forwarding an e-mail to you,
        8   Mr. Larsen, and Mr. ███ from Mr. ███ where
        9   Mr. ███ says -- this is the second e-mail in
16:52:26 10   the chain -- "We don't know of the SEC taking any
       11   position on the issue of whether a virtual
       12   currency is itself a security."
       13              Do you see that?
       14        A.   I do.
16:52:34 15        Q.   Okay.  Do you recall discussing this
       16   e-mail from Mr. ███ with anyone at Ripple?
       17        A.   I don't remember discussing
       18   Mr. ███ e-mail with anybody.
       19        Q.   Okay.  Do you recall seeing
16:52:55 20   Mr. ███ e-mail at the time in January 2015?
       21        A.   I don't recall the circumstances around
       22   this e-mail, so, no, I don't recall seeing that
       23   e-mail or not.
       24        Q.   Okay.  Are you familiar with an entity
16:53:33 25   named GSR?

                                                           270

16:53:34  1          A.    I am.

          2          Q.    Okay.  What is GSR?

          3          A.    GSR is a market-making firm.

          4          Q.    Okay.  And did GSR have a relationship
16:53:43  5     with Ripple?

          6          A.    GSR had a similar relationship as the

          7     other market makers that I mentioned that

          8     provide -- provided market-making services and

          9     received compensation for it.

16:53:54 10          Q.    Okay.  Did you have any involvement in

         11     the GSR relationship?

         12          A.    I did.

         13          Q.    Okay.  What was your involvement?

         14          A.    Similar to the other market makers, I

16:54:08 15     was the introducing party bringing -- making them

         16     aware of Ripple and -- and working to formalize a

         17     relationship with the firm.

         18          Q.    Okay.  So -- so you were the introducing

         19     party for GSR?

16:54:21 20          A.    Yes.

         21          Q.    Okay.  And when was that?

         22          A.    I don't recall the date, but it would

         23     have been sometime in 2013 or 2014 based on my

         24     recollection.

16:54:34 25          Q.    And did you have a relationship with GSR

                                                                    271

16:54:36   1    before you came to Ripple?

           2        A.    I knew some of the principals of GSR

           3    prior to my time at Ripple, yes.

           4        Q.    Okay.  Was there any difference between

16:54:49   5    GSR and other market makers in terms of the

           6    services they provided or the nature of their

           7    relationship with Ripple?

           8              MR. GULAY:  Objection to form.

           9              MS. BUNTING:  Objection.

16:54:58  10        A.    Initially there was no material

          11    difference that I can recall, but over time, GSR

          12    provided additional services beyond what some of

          13    the other market makers were providing.

          14        Q.    And what were these additional services?

16:55:19  15        A.    Programmatic selling of XRP.

          16        Q.    And what does that mean?

          17        A.    In this case, it refers to selling XRP

          18    in the public market as a percentage of volume, as

          19    a percentage of the overall markets volume.

16:55:39  20        Q.    Okay.

          21              MS. STEWART:  Can we look at 45,

          22        please?

          23              PR-45, Nicole.

          24              (Whereupon, exhibit is presented

16:55:45  25        and marked SEC Rapoport Exhibit PR-45 for

                                                               272

```
16:55:45   1          identification.)

           2                    MS. STEWART:  And PR-45 is Bates

           3          numbered GSR 208 to 209.

           4                    (Pause)

16:56:57   5                    THE WITNESS:  Okay.

           6    BY MS. STEWART:

           7          Q.   Okay.  So in the bottom e-mail, which is

           8    on page 2 of this document, you -- you say "Per

           9    RL's request, GSR (███████ is cc'd) has

16:57:10  10    developed a bot that will provide" liquid --

          11    "liquidity as a market maker while net selling a

          12    specified percentage of overall XRP volume."

          13                    Do you see that?

          14          A.   I do.

16:57:19  15          Q.   Is that what you were referring to a

          16    moment ago?

          17          A.   Yes.

          18          Q.   Okay.  So what is a bot?

          19          A.   It's short for robot, but in this case

16:57:34  20    refers to a software that places trades.

          21          Q.   Okay.  And then you go on to say ""The

          22    intent is to experiment with this as a more

          23    structured way to monetize XRP holdings rather

          24    than conducting OTC sales.  This way we

16:57:48  25    algorithmically control the market impact, rather
```

273

16:57:50   1   than leaving that role to others who might have

  2   less experience trading."

  3            Do you see that?

  4        A.     I do.

16:57:54   5        Q.     Okay.  Can you explain what you mean by

  6   this?

  7        A.     Sure.  In institutional trading, when

  8   someone is buying or selling an asset, there's

  9   generally a preference to minimize market impact,

16:58:17 10   which is to say minimize the footprint or the --

11   or the effect that one's buying or selling has on

12   the market price.  And someone inexperienced in

13   trading may not be able to do that effectively

14   whereas someone experienced, an experienced

16:58:34 15   institutional trader, is aware of techniques to

16   minimize the impact on the price.  And one such

17   technique would be using a specified percentage of

18   the overall volume.

19        Q.     And is that -- would the intent be to

16:58:49 20   alleviate some of the issues that you were

21   discussing before about the negative impacts on

22   liquidity and price and volume?

23            MS. BUNTING:  Objection.

24            MR. HORTON:  Objection.

16:59:05 25        A.     When you say "would the intent be" --

             274

16:59:08   1   can you rephrase the question?

           2       Q.   Sure.

           3            So would the benefit of having this type

           4   of algorithmic market making be to -- to alleviate

16:59:21   5   some of the issues that you talked to -- talked

           6   about throughout today about -- about the negative

           7   impact that OTC sales have on liquidity?

           8                 MS. BUNTING:   Objection.

           9       A.   I thought this was a more sensible and

16:59:35  10   more typical way to go about these transactions

          11   than -- than OTC sales.

          12       Q.   And why -- why is that?

          13       A.   For a number of reasons.  One reason is

          14   that it's programmatic so selling -- having a

17:00:02  15   third party sell 3 percent of volume consistently

          16   I found to be preferable than having Ripple Labs

          17   itself choosing discrete moments in time to

          18   transact.  I thought doing this on an arm's length

          19   basis was more customary for this sort of

17:00:18  20   transaction in financial markets generally.

          21            And I thought that, as we discussed

          22   earlier, having the volumes occur in the public

          23   market I thought benefited my goal, the company's

          24   goal, of encouraging a more liquid market.

17:00:35  25            And I thought that doing it as a

                                                              275

17:00:36  1  percentage of volume, particularly such a low

2  percentage of volume, was unlikely to have any

3  material impact on the market price and it was a

4  controlled way of effecting these transactions.

17:00:55  5      Q.   Okay.  And did Ripple look to have

6  similar relationships with other market makers?

7              MR. GULAY:  Objection.

8      A.   At points in time I do recall

9  contemplating whether other types of these

17:01:35  10  relationships should be pursued, but I'm not aware

11  of Ripple pursuing any other types of

12  relationship -- any other relationships of this

13  type with other firms.

14      Q.   But you had discussions about pursuing

17:01:45  15  similar relationships with other firms?

16      A.   I remember that was contemplated at

17  points in time, yes.

18      Q.   With which other firms?

19      A.   I think it was -- I recall generally and

17:01:57  20  broadly contemplating it, but I don't recall

21  taking steps to actually do it.

22      Q.   And -- and do you have an understanding

23  of why steps were not taken to actually do it?

24              MR. HORTON:  Objection to form.

17:02:14  25      A.   No, I don't recall.

276

17:02:17  1        Q.   And was the intent of this, the
        2  market-making bot with GSR, as you say in your
        3  e-mail, another way to monetize Ripple's XRP
        4  holdings?
17:02:36  5              MS. ZORNBERG:  I'm sorry, can
        6         you -- can you read that question back?  I
        7         just didn't hear you.
        8              MS. STEWART:  Sure.
        9        Q.   Was -- was the intent of the GSR
17:02:45 10  market-making bot to monetize Ripple's XRP hold --
       11  holdings?
       12              MR. HORTON:  Objection to form.
       13        A.   The intent of the bot was to both buy
       14  and sell making markets; but whereas a typical
17:03:04 15  market-making program would seek to be neutral and
       16  have no position at the end of a period of time,
       17  this bot sought to net sell XRP exchange for
       18  dollars and that was the -- That was the goal of
       19  it.
17:03:15 20        Q.   Okay.  So similar to the goal of the OTC
       21  sales?
       22        A.   Yes.
       23              MS. STEWART:  Can I get 26 next?
       24              Nicole, that's PR-26.
17:03:35 25              (Whereupon, exhibit is presented

                                                        277

17:03:35  1          and marked SEC Rapoport Exhibit PR-26 for

          2          identification.)

          3                  (Pause)

          4                  THE WITNESS:  Okay.

17:05:07  5    BY MS. STEWART:

          6          Q.   Okay.  So -- I can't remember if I read

          7    the Bates numbers for the record.  I don't think I

          8    did.  PR-26 is Bates numbered RPLI_SEC 842618 to

          9    20.

17:05:23 10                  So I want to look at your e-mail to

         11    Ms. Long at the top of page 1.

         12                  Who is Monica Long?

         13          A.   She was -- I believe her title was head

         14    of communications or something to that extent.

17:05:41 15          Q.   Okay.  And -- and here is -- is

         16    Ms. Long -- Ms. Long is -- is forwarding you a

         17    communication she's having with a reporter, is

         18    that right?

         19          A.   That's my understanding, yes.

17:05:53 20          Q.   Okay.  And you say to her in your e-mail

         21    "I'd be careful saying XRP is not an investment

         22    asset.  It certainly is and we're pitching it to

         23    investors.  At the end of the day, our biz model

         24    is predicated on people buying it.  We can still

17:06:09 25    say that we don't encourage investment in XRP or

                                                             278

17:06:12  1   hype it at all."

2               Do you see that?

3       A.   I do.

4       Q.   Okay.  Was that statement from you

17:06:17  5   accurate at the time in 2014?

6       A.   Is it okay if I parse the individual

7   statements in there?  There's a lot of statements.

8       Q.   Sure.

9       A.   So I do think it's accurate that we

17:06:37 10  don't encourage investment in XRP or hype it at

11  all.  And I think that's echoed by her e-mail at

12  the bottom to the reporter saying "I suggest not

13  encouraging readers to buy XRP, given that it is

14  more of an enabler than an investment asset."

17:06:55 15              I do think that it was accurate in the

16  early days of the company that our business model

17  is predicated on people buying it, meaning buying

18  XRP.  As I mentioned earlier, I think the seed

19  investors were investing in a company that was --

17:07:14 20  there was -- it was unclear where the technology

21  could be applied or would be applied in the

22  financial system and that the expectation of early

23  investors was that -- the business model was that

24  XRP may appreciate in value as a re -- as a result

17:07:29 25  of the technology being adopted.

                                                      279

17:07:33   1          The statement that "XRP is not an

2     investment asset," that doesn't seem like language

3     that I would typically use and so I believe that I

4     was likely mirroring her use of that language at

17:07:53   5     the bottom, but I'm not really sure what that

6     means in a -- I mean, you could buy it, but I'm

7     not really sure what -- what "investment asset"

8     means.

9          Does that answer your question?

17:08:08  10     Q.   Yes.   Thank you.

11          So you referenced in your prior answer

12     seed investors.

13          When were the seed investors that you're

14     referring to invest in Ripple?

17:08:18  15     A.   These are seed investors in Ripple Labs,

16     Inc. or OpenCoin Inc. at the time.

17     Q.   Uh-huh.

18     A.   I don't know the date that that

19     occurred.   It was likely in 2012 and predated my

17:08:29  20     time at the firm.

21     Q.   Okay.   So when you say here in 2014 "it

22     certainly is and we're pitching it to investors,"

23     you're not referring to seed investors, right?

24     A.   No.

17:08:39  25     Q.   Okay.   So you're referring to the

280

17:08:41 1  efforts that you are involved in in 2014 that

2  we've talked about throughout today, right?

3                    MR. GULAY:  Objection.

4                    MR. HORTON:  Objection to form.

17:08:50 5                    MS. BUNTING:  Objection.

6      A.   I believe this refers to conversations

7  with people that are interested in purchasing XRP.

8      Q.   Okay.  Did the seed investors in Ripple

9  Labs include Mr. Larsen?

17:09:16 10                    MS. BUNTING:  Objection.

11                    MS. STEWART:  What's the

12           objection?

13                    MS. BUNTING:  What do you mean by

14           "seed investors"?

17:09:20 15                    MS. STEWART:  Well, we've been

16           talking about seed investors.  It's his

17           term.

18                    MS. BUNTING:  You can explain it

19           in the question as well.

17:09:25 20                    MS. STEWART:  Well, I think he

21           understands it since he used it.

22                    MS. BUNTING:  Well, I don't

23           think he can.

24  BY MS. STEWART:

17:09:27 25      Q.   Go ahead, you can answer.

                                                      281

17:09:30  1      A.   I'm not sure if he invested money in the

        2  seed round of OpenCoin.

        3      Q.   I'm sorry, say that again.

        4      A.   I'm not sure whether or not he put

17:09:37  5  his -- his own money into the company.  He

        6  invested his time, certainly.

        7      Q.   Okay.

        8           MS. STEWART:  Thirty-four,

        9        please.

17:09:46 10           PR-34 is the next exhibit,

       11        Nicole, and that's Bates numbered

       12        RPLI_SEC 882487 to 89.

       13           (Whereupon, exhibit is presented

       14        and marked SEC Rapoport Exhibit PR-34 for

17:09:54 15        identification.)

       16           (Pause)

       17           THE WITNESS:  Okay.

       18  BY MS. STEWART:

       19      Q.   Okay.  So is it fair to say that -- that

17:12:48 20  in this e-mail, Ms. -- Ms. Long is forwarding you

       21  a draft statement and then you're commenting on

       22  that statement?

       23      A.   Yes.

       24      Q.   Okay.  And what was the purpose of this

17:12:57 25  statement?

                                                             282

```
17:13:01   1                MR. GULAY:  Objection;
           2        foundation.
           3        A.   This was a statement describing a
           4   settlement or the restrictions that Jed McCaleb,
17:13:11   5   one of the founders of OpenCoin or Ripple Labs,
           6   announcing restrictions that he was agreeing to on
           7   his personal XRP holdings.
           8        Q.   Okay.  And you say in your e-mail, I
           9   guess in the third bullet that starts with "In
17:13:28  10   exchange for," do you see that bullet?
          11        A.   Yes.
          12        Q.   Okay.  You say sort of in the middle of
          13   the paragraph:  "I'd think the main goal is to
          14   restore confidence in the market that founders
17:13:38  15   won't dump, so people feel comfortable owning
          16   XRP."
          17             Do you see that?
          18        A.   Yes.
          19        Q.   Okay.  And what did you mean by that?
17:13:47  20        A.   Jed McCaleb was a significant holder of
          21   XRP and he made an announcement at some point in
          22   time prior to this date that he would sell his
          23   significant holdings at a specific price, which I
          24   think was done in a deliberately destructive way
17:14:13  25   to market confidence.
```

283

17:14:24   1        And this overhang resulting from that

2   was a frequent topic that came up over the period

3   of time that it existed.  And so that's -- my

4   sentence here is -- is in reference to that, that

17:14:42   5   backdrop.

6        Q.   And when you say "market confidence"

7   in -- in your prior answer, what are you referring

8   to?

9        A.   If the market is aware that there's a

17:15:02  10   very, very large seller at a certain price, it

11   stands to reason that the price would not likely

12   rise above that level without very, very

13   significant buying pressure.

14        Q.   Okay.  So a dump, like what you're

17:15:17  15   referring to here, by the founders would

16   negatively impact the price of XRP?

17             MS. BUNTING:  Objection.

18        A.   Selling -- public -- publicly announcing

19   of selling of very large holders negatively

17:15:41  20   impacts market prices.  That's generally true.

21        Q.   And that would negatively im -- impact

22   market confidence?

23        A.   Yes.

24        Q.   I want to shift gears a bit and talk

17:15:56  25   about your time at ██████████.

284

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
17:15:58   1              Can you remind me the -- the dates that
           2   you were employed at ███████████?
           3                   THE WITNESS:  Is that...
           4                   MR. HECKER:  Counsel, can you
17:16:13   5       make a proffer as to the relevance of his
           6             ██████████ time?
           7                   MS. STEWART:  Sure.  Why don't we
           8       go off the record?
           9                   THE VIDEOGRAPHER:  Going off the
17:16:20  10       record.
          11                   MS. ZORNBERG:  Why off the
          12       record?
          13                   MS. STEWART:  Because I don't
          14       understand why I need a proffer to ask
17:16:25  15       questions.  I mean, they will concern XRP.
          16                   MR. HECKER:  Okay.  Why don't you
          17       start answering the question.
          18                   MS. STEWART:  Okay.
          19       A.   I started working there in --
17:16:36  20                   MR. GULAY:  Are we on the record?
          21                   THE VIDEOGRAPHER:  Yeah.
          22                   MR. GULAY:  Okay.
          23       A.   I started working there in 2015.  And
          24   the exact date when I stopped, I'd have to check
17:16:53  25   because there was a period of time when I stopped
```

285

| | | |
|---|---|---|
| 17:16:54 | 1 | going full-time and continued to have a noncompete |
| | 2 | and provide services to the company, but it was |
| | 3 | sometime around 2020. |
| | 4 |     Q.   Okay.  What is ███████████? |
| 17:17:15 | 5 |             MR. HECKER:  Objection to form. |
| | 6 |     A.   █████████ -- are you referring to |
| | 7 | -- |
| | 8 |     Q.   Not -- not the street. |
| | 9 |         What is ████████████████ |
| 17:17:30 | 10 |     A.  ██████████████████ is a |
| | 11 | investment vehicle that ████████ managed. |
| | 12 |     Q.   Okay.  Does █████████ invest in |
| | 13 | XRP? |
| | 14 |             THE WITNESS:  I'm sorry, I'm just |
| 17:17:46 | 15 |   not -- |
| | 16 |             MR. HECKER:  Shall we take a |
| | 17 |   two-minute break?  Why don't we take a |
| | 18 |   two-minute break, yeah. |
| | 19 |             THE VIDEOGRAPHER:  Okay. |
| 17:17:54 | 20 |             MS. STEWART:  Okay. |
| | 21 |             THE VIDEOGRAPHER:  Going off the |
| | 22 |   record at 5:17. |
| | 23 |         (Whereupon, a recess is taken.) |
| | 24 |             THE VIDEOGRAPHER:  Okay.  Back on |
| 17:22:49 | 25 |   the record, 5:22. |

286

17:22:51   1                MR. HORTON:  Counsel, before you

         2         begin resuming your questions, we make a

         3         request that those questions and answers

         4         about ████████ be designated highly

17:23:01   5         confidential under the protective order.

         6                MS. STEWART:  Okay.

         7 BY MS. STEWART:

         8      Q.   So, Mr. Rapoport, did ████████

         9 invest in XRP?

17:23:15 10      A.   Yes.

       11      Q.   Does it currently invest in XRP?

       12             MR. GULAY:  Objection;

       13      foundation.

       14      A.   I'm not aware of what it currently does

17:23:27 15 since I left the firm.

       16      Q.   Okay.  As of the time you left the firm,

       17 did it invest in XRP?

       18      A.   It -- it had XRP holdings until the end

       19 of my time at the firm to the best of my

17:23:40 20 knowledge.

       21      Q.   Okay.  And why did ████████ invest

       22 in XRP?

       23            MS. BUNTING:  Objection.

       24      Actually, withdraw.  Okay.

17:23:52 25      A.   The objective of the fund was to provide

                                                     287

17:23:55   1    diversified exposure to a basket of the -- of the

2    largest most liquid digital assets.

3        Q.   Was ██████████ goal to also at

4    least sell its XRP holdings and make money?

17:24:08   5            MR. HECKER:  Objection to form.

6        A.   ████████████████ was a

7    vehicle that allowed investors to get diversified

8    exposure to a broad basket of digital assets, and

9    it was up to those investors to decide when they

17:24:23  10   wanted to subscribe or redeem from that fund like

11   any other funds that an investment manager

12   manages.

13       Q.   Was ████████████ investing in XRP in

14   order to use XRP?

17:24:36  15            MR. HORTON:  Objection to form.

16       A.   The objective of ██████████████

17   ████████████ fund was to provide investors with a

18   diversified exposure to a basket of digital

19   assets.

17:24:50  20       Q.   Okay.  So it was for investment

21   purposes, right?

22            MR. HORTON:  Objection to form.

23            You can answer.

24       A.   I think I can repeat the objective of

17:25:01  25   the fund again.  The objective was to provide

288

```
17:25:03    1   investors with an exposure to a diversified basket
            2   of the largest most liquid digital --
            3                 THE REPORTER:  Repeat, please.
            4        A.    The objective of the fund was to provide
17:25:08    5   investors with exposure to a diversified basket of
            6   the largest most liquid digital assets.
            7        Q.    Including XRP?
            8        A.    Including XRP.
            9        Q.    Has ██████████ interacted with the
17:25:20   10   SEC regarding its digital asset holdings?
           11                 MR. HORTON:  Objection to form.
           12        A.    I did not personally participate in any
           13   interactions with the SEC during my time at ██████
           14   ██████, but my understanding in speaking with other
17:25:40   15   employees was that the firm did interact with the
           16   SEC about its digital asset holdings.
           17        Q.    Okay.  And what is your understanding of
           18   the nature of those interactions with the SEC?
           19                 MR. HORTON:  Counsel, I assume
17:25:52   20        you're not asking about any understanding
           21        that's derived from communications with
           22        ██████████ counsel.  I just want to
           23        clarify that.
           24                 MS. STEWART:  Correct.
17:26:00   25                 MR. HORTON:  To the extent you
```

289

17:26:02    1          can parse that out, you can answer the

            2          question.

            3          A.    ██████████, in my understanding, had a

            4   large number of innovative investment products and

17:26:09    5   had frequent discussions, in my understanding,

            6   with the SEC on a wide variety of topics

            7   concerning a number of different funds.  And,

            8   again, I wasn't privy to these conversations.  But

            9   based on how others relayed them to me, my

17:26:24   10   understanding is that ██████████ sought guidance

           11   about whether or not the digital assets held in

           12   the fund were securities or not.

           13          Q.    Okay.  And did ██████████ receive such

           14   guidance from the SEC?

17:26:37   15          A.    My understanding is that despite

           16   significant attempts to receive that guidance, I'm

           17   not aware that they received any guidance.  I

           18   don't believe that the SEC provided any guidance

           19   to ██████████.

17:26:52   20          Q.    Did the SEC provide any assurances to

           21   ██████████ that the digital assets in -- in the

           22   ██████████ fund were not securities?

           23               MR. HORTON:  Objection to form.

           24          A.    To the best of my understanding --

17:27:04   25   which, again, I was not there to witness or hear

                                                                    290

17:27:08  1   these conversations, so my understanding is

2   limited to information that was shared with me by

3   others -- I don't believe the SEC provided

4   guidance one way or another of what its views were

17:27:22  5   on -- on whether XRP or any of the other digital

6   assets were or were not securities.

7        Q.   Was Mr. Larsen a client of ███████████

8   ████████████████████ during your time with ████████

9   ██?

17:27:34  10            MR. HORTON:  Objection to form.

11       A.   ██████████████████████████ funds a

12  specific investment vehicle and I don't believe

13  that Mr. Larsen personally invested in that

14  vehicle, but I do believe that he invested in

17:27:51  15  other investment products offered by ███████████.

16       Q.   And what were those investment products?

17       A.   I didn't generally have granular

18  visibility on investor level holdings and

19  Mr. Larsen was no different in that respect, so I

17:28:11  20  don't know the answer.

21       Q.   Okay.

22            MS. STEWART:  Can we look at 78,

23       please?

24            MR. TENREIRO:  Yeah.

17:28:18  25            (Whereupon, exhibit is presented

291

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

17:28:18  1          and marked SEC Rapoport Exhibit PR-78 for

2          identification.)

3                    MS. STEWART:  So PR-78 is Bates

4          numbered RPLI_SEC 235399 through 407.

17:28:38  5                    (Pause)

6    BY MS. STEWART:

7          Q.   And, Mr. Rapoport, feel free to -- to

8    review the document in its entirety, but I'm not

9    going to ask you any details about the attachment.

17:30:37 10          A.   Okay.  Well, I've reviewed the cover

11    page.

12          Q.   Okay.  Why were you sending the █████████

13    ██████████████████████ fund commentary to Mr. Larsen

14    in 2018?

17:30:52 15          A.   This was an automated e-mail that would

16    have gone to all investors in the fund.  So the

17    fact that he received this suggests to me that he

18    may have been an investor in the fund.  But,

19    again, I -- I didn't customarily focus on an

17:31:03 20    investor-level holding detail.  I was focused on

21    bigger-picture things.  But this is a -- an

22    automated e-mail that went to all investors and

23    some selected other parties.

24          Q.   Okay.  How many investors does the

17:31:15 25    ████████████████████████ fund have?

292

```
17:31:16   1              MR. HORTON:  Objection to form.
           2        At what -- at what period?
           3        Q.   During your time with ███████████.
           4        A.   On the order of ██████████, but the exact
17:31:26   5   number I don't recall.
           6        Q.   Okay.  Did you maintain a Ripple e-mail
           7   address after you left Ripple?
           8        A.   My recollection is that I lost access to
           9   Ripple e-mail when I left the firm as is
17:31:52  10   customary.
          11        Q.   Okay.  So going back to the memo we
          12   discussed a little bit ago that Ripple got from
          13   Paul Hastings in 2015 --
          14        A.   Yes.
17:32:08  15        Q.   -- you sent that memo to Mr. ██████,
          16   correct?
          17        A.   I don't recall whether I sent it to him.
          18        Q.   You don't recall one way or the other?
          19        A.   No.  I generally have very little
17:32:27  20   recollection of my e-mails from seven years ago.
          21        Q.   Okay.  Do you recall sending the memo to
          22   anyone else outside of Ripple?
          23        A.   I recall the existence of the memo, but
          24   the content of it and whether or not I sent it and
17:32:40  25   to how many people, as you can imagine, is
```

293

17:32:43   1    difficult to recall from back in 2015 or whenever

          2    it was drafted.

          3        Q.   Okay.

          4             MS. STEWART:   Let's look at

17:32:49   5        PR-74, which is Bates numbered RPLI_SEC

          6        481363 through 75.

          7             (Whereupon, exhibit is presented

          8        and marked SEC Rapoport Exhibit PR-74 for

          9        identification.)

17:33:00  10    BY MS. STEWART:

         11        Q.   And I'm not going to ask you about the

         12    contents of the attachment, just the e-mail.

         13             (Pause)

         14        A.   Okay.

17:33:21  15        Q.   Okay.  Does this e-mail refresh your

         16    recollection that you sent a copy of the Paul

         17    Hastings memo to Mr. ██████?

         18        A.   Yes.

         19        Q.   Okay.  Does it refresh your recollection

17:33:38  20    about whether or not you sent copies of this memo

         21    to anyone else outside of Ripple?

         22        A.   I do generally recall sharing memos on

         23    this topic with others.  I don't recall to what

         24    extent I shared this Paul Hastings memo versus the

17:34:10  25    Perkins Coie memo and, you know, how many people I

                                                            294

17:34:13  1   sent either of them to.

2       Q.   And which Perkins Coie memo are you

3   referring to?

4       A.   There was one document that we reviewed

17:34:27  5   earlier today that was marked white paper and had

6   ███████████ s name on it.  I don't recall whether

7   that memo from 2013 or earlier or another one was

8   the one that I was sending seven years ago.

9       Q.   Do you recall sending a -- a legal

17:34:46 10   opinion from Perkins Coie to anyone outside of

11   Ripple?

12             MR. HORTON:  Objection to form.

13       A.   That's a very specific request that I

14   don't have recollection of.

17:34:57 15       Q.   Okay.  Are you aware of anyone else at

16   Ripple sending the Paul Hastings memo to any third

17   parties other than Mr. ██████?

18       A.   I don't recall one way or another.

19       Q.   Did you have any discussions with anyone

17:35:14 20   at Ripple about sending the Paul Hastings memo to

21   third parties outside of Ripple?

22       A.   I would think I likely discussed it

23   prior to sending it to a third party.

24       Q.   Did you have discussions about sending

17:35:27 25   it to third parties in addition to Mr. ████?

                  295

17:35:32  1          A.   I don't recall.

        2          Q.   I want to look back at Exhibit 65, which

        3   should be in your stack.  That was the one-page

        4   e-mail from Mr. ██████ to you December 21st of 2014.

17:35:51  5          A.   I see it.

        6          Q.   Okay.  Here -- here Mr. ██████ says in the

        7   third paragraph "If we can somehow get a legal

        8   opinion, it will protect Ripple a ton.  And

        9   especially we are in the process of settling with

17:36:14 10   FinCEN and DOJ.  We really do not need the SEC to

       11   join the party."

       12              Do you see that?

       13          A.   I do.

       14          Q.   Did Ripple obtain the Paul Hastings

17:36:26 15   legal memo that we're talking about to address

       16   Mr. ██████ concern that "we really do not need the

       17   SEC to join the party"?

       18              MR. HORTON:  Objection.

       19              MR. GULAY:  Objection.  I'm going

17:36:34 20          to instruct the witness not to answer

       21          because it calls for privileged

       22          information.

       23              MS. STEWART:  Okay.

       24   BY MS. STEWART:

17:36:45 25          Q.   What did you understand Mr. ██████ to mean

                                                              296

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
17:36:47   1   by the statement "We really do not need the SEC to

           2   join the party"?

           3                   MR. GULAY:  Objection; calls for

           4           speculation.

17:37:20   5       A.   Beyond the plain reading of this e-mail,

           6   I'm not sure what Mr. ███████ intention was.

           7       Q.   Did you discuss that statement with him?

           8       A.   I don't recall whether we discussed this

           9   e-mail in person apart from these e-mails.

17:37:45  10       Q.   Okay.

          11                   MS. STEWART:  Can we look at 57

          12           now, PR-57?

          13                   (Whereupon, exhibit is presented

          14           and marked SEC Rapoport Exhibit PR-57 for

17:37:48  15           identification.)

          16                   MS. FORBES:  To confirm, you said

          17           57 or 67?

          18                   MS. STEWART:  Fifty-seven.

          19                   MS. FORBES:  Thank you.

17:38:52  20                   (Pause)

          21                   THE WITNESS:  Okay.

          22   BY MS. STEWART:

          23       Q.   Okay.  The bottom e-mail in this chain

          24   appears to be from a person named ███████.

17:39:15  25                   Do you see that?
```

297

17:39:16  1          A.    I do.

          2          Q.    Do you know who that person is?

          3          A.    I don't know who that person is.

          4          Q.    Okay.  Is this -- I think you referred

17:39:21  5     to it before as like a cold request or something

          6     of that nature that you received?

          7          A.    It's unclear from this e-mail who was on

          8     the initial e-mail thread, but this seems likely

          9     to have been a cold -- cold e-mail.

17:39:38 10          Q.    Okay.  And how frequently did you

         11     receive these types of cold e-mails?

         12          A.    I recall that there was an account set

         13     up to capture those, but I don't recall the volume

         14     that were coming through.

17:39:52 15          Q.    Okay.  Do you have a ballpark for the

         16     kind of volume?  Was it every day? every week?

         17     every once in a while?

         18          A.    I'd really be guessing.  I was getting a

         19     large volume of e-mails in general directly and so

17:40:05 20     these were generally not the most -- the focus of

         21     my day.

         22          Q.    Did you respond to all of them?

         23          A.    No.

         24          Q.    Okay.  Was there some policy for when to

17:40:13 25     respond to these types of e-mails?

                                                                    298

17:40:14   1        A.    No.

           2        Q.    Okay.  Did you have a practice of which

           3   e-mails you responded to and which you didn't?

           4        A.    No.

17:40:20   5        Q.    Do you know why you responded to this

           6   particular e-mail?

           7        A.    I sporadically responded to certain

           8   e-mails when I had the time and interest in doing

           9   so.

17:40:40  10        Q.    Okay.  And you said that there was an

          11   account set up to capture these types of e-mails?

          12        A.    There was a distribution group, yes.

          13        Q.    Okay.  Meaning that when the e-mails

          14   came in, they went to a certain distribution

17:40:52  15   group?

          16        A.    Correct.

          17        Q.    And what was the name of that

          18   distribution group?

          19        A.    Partners@ripple.com.

17:40:59  20        Q.    So would those e-mails go to you and

          21   certain other people at Ripple?

          22        A.    I believe they went to the business

          23   development team broadly.

          24        Q.    Okay.  Looking at -- at the -- the top

17:41:12  25   e-mail in this chain where you -- you say to █████

                                                                    299

17:41:19  1   ████████       -- I'm not sure I'm saying that right.

2          Who is -- who is Mr. ███████ ?

3     A.    I believe his title was head of

4   developer relations.

17:41:28  5     Q.    Okay.  You say to him "It's not rocket

6   science.  This guy previously would have bought

7   from us directly.  We're growing volume and rising

8   price."

9          Do you see that?

17:41:37 10     A.    Yes.

11     Q.    Okay.  And then Mr. ████████ responds

12   "Yep, to the moon."

13          Do you see that?

14     A.    Yes.

17:41:43 15     Q.    Do you have an understanding of what he

16   meant by that statement?

17     A.    That's a colloquial -- colloquialism

18   often used humorously in the digital asset

19   community in meetings and the like.

17:41:57 20     Q.    To express what?

21     A.    To express a rising price.

22     Q.    Okay.  When you got these types of cold

23   requests that we're discussing, did you -- did you

24   do any -- any kind of due diligence or take any

17:42:15 25   steps to -- to ascertain why the person was

300

17:42:19  1    looking to acquire XRP?

2         A.   No.

3         Q.   Was there a policy or practice at Ripple

4    to take any such steps with respect to cold

17:42:39  5    requests?

6              MR. HORTON:  Objection; asked and

7         answered.

8         A.   There was no specific policy that I was

9    aware of to inquire why someone was interested in

17:43:02 10    a particular thing.

11        Q.   Did anyone ever instruct you to inquire

12   as to why anyone was -- was interested in

13   acquiring XRP?  I'm sorry, I don't think I asked

14   that right.

17:43:14 15         Did anyone instruct you to inquire as to

16   the purpose of -- of someone looking to acquire

17   XRP?

18             MR. GULAY:  Objection.

19        A.   I don't recall receiving such

17:43:28 20    instruction.

21        Q.   When we were looking a couple exhibits

22   ago at the statement that Ms. Long had forwarded

23   you that you had commented on and you were talking

24   about Mr. McCaleb's announcement that he was going

17:43:50 25    to sell his XRP at a given price and you said that

301

17:43:53  1    this created overhang, do you remember that?

          2        A.    Yes.

          3        Q.    Okay.  What did you mean by "overhang"?

          4        A.    I think I explained it in the previous

17:44:02  5    answer.  What I meant by that term is that if

          6    there's a publicly announced large seller of a

          7    given asset at a specific price, market

          8    participants can reasonably infer that the price

          9    of that asset will not rise above that level until

17:44:23 10    all the selling -- the amount for sale was fully

         11    consumed.  So that effect -- effectively creates

         12    an overhang, meaning that the price is not likely

         13    to rise above that level unless there's enough

         14    buying demands to consume the amount for sale.

17:44:42 15        Q.    Okay.  And did Ripple take steps to

         16    address this overhang?

         17        A.    Are you asking about Jed McCaleb and his

         18    selling specifically?

         19        Q.    Sure.  Let's start with that.

17:45:02 20        A.    Ripple Labs entered into a settlement

         21    with Jed McCaleb, so, yes.

         22        Q.    And more generally with respect to

         23    overhang, did Ripple take steps to address it?

         24              MR. GULAY:  Objection to form.

17:45:17 25        A.    I believe after I left the company,

                                                                  302

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

17:45:19  1   Ripple Labs put a significant percentage of its
          2   holdings into escrow in part to address the
          3   market's perception of an overhang.
          4        Q.   Okay.  And -- and why was Ripple trying
17:45:36  5   to address the market's perception of an overhang?
          6                  MR. GULAY:  Objection; calls for
          7            speculation.
          8        A.   I was no longer with the company at the
          9   time so it's hard -- not -- not really my place to
17:45:51 10   say.
         11        Q.   Okay.  What about with respect to what
         12   you testified the steps Ripple took with respect
         13   to Mr. McCaleb's overhang?  Why did Ripple take
         14   steps to address that overhang?
17:46:02 15                  MR. GULAY:  Objection.
         16        A.   I viewed Mr. McCaleb's actions to be
         17   deliberately harmful to Ripple Labs and -- and I
         18   thought that Mr. McCaleb sought to hurt the goal
         19   of the company generally and this was one of a
17:46:21 20   number of other actions that he took.
         21        Q.   So was the reasons for -- for Rip -- the
         22   steps that Ripple took to restore market
         23   confidence?
         24                  MR. HORTON:  Object to form.
17:46:47 25        A.   I believe, and I think the company

                                                              303

17:46:49  1  believed, that Jed's actions were harmful, and so

       2  having him stop those actions were helpful to the

       3  company.

       4        Q.   Were harmful to the company?

17:46:59  5        A.   Yes.

       6             MS. STEWART:  Okay.  I have no

       7        further questions at this time.

       8             MR. GULAY:  We have no further

       9        questions.

17:47:10 10             THE VIDEOGRAPHER:  Okay.  All

      11        right.  This concludes the video

      12        deposition of Phillip Rapoport.  The time

      13        is 5:47.  Going off the record.

      14             (Whereupon, the deposition

17:47:18 15        concluded at 5:47 p.m.)

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

                                                          304

```
1   STATE OF NEW YORK        )

2                            ) ss:

3   COUNTY OF NEW YORK       )

4          I hereby certify that the witness in the

5   foregoing deposition, PHILLIP RAPOPORT was by me duly

6   sworn to testify to the truth, the whole truth and

7   nothing but the truth, in the within-entitled cause;

8   that said deposition was taken at the time and place

9   herein named; and that the deposition is a true record

10  of the witness's testimony as reported by me, a duly

11  certified shorthand reporter and a disinterested person,

12  and was thereafter transcribed into typewriting by

13  computer.

14          I further certify that I am not interested in

15  the outcome of the said action, nor connected with nor

16  related to any of the parties in said action, nor to

17  their respective counsel.

18          IN WITNESS WHEREOF, I have hereunto set my

19  hand this 26 day of July, 2021.

20          Reading and Signing was:

21  ___ requested    ___ waived   _X_ not requested.

22

23

24

25       BRIDGET LOMBARDOZZI, CSR, RMR, CRR

                                               305
```

**GRADILLAS COURT REPORTERS**
(424) 239-2800